# EXHIBIT N

0001

```
 1                     UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF MASSACHUSETTS
                                    :
 3   IN RE NEURONTIN MARKETING      : MDL DOCKET NO. 1629
     AND SALES PRACTICES and        :   Master File No.
 4   PRODUCTS LIABILITY             :    04-10981
     LITIGATION                     : Judge Patti B. Saris
 5                                  : Magistrate Leo T.
                                    :     Sorokin
 6                                  :
 7   ------------------------- X
     ------------------------- X
 8   SUPREME COURT OF THE STATE  : Case Management
     OF NEW YORK                 : Index No. 765,000/2006
 9   COUNTY OF NEW YORK          : Hon. Marcy S. Friedman
     ------------------------- :
10   IN RE: NEW YORK NEURONTIN   :
     PRODUCTS LIABILITY          : DEPOSITION UPON ORAL
11   LITIGATION                  :   EXAMINATION OF
                                 :    DALE KRAMER
12                               :
                                 :
13   ------------------------- X ---------------------
14
15        TRANSCRIPT of testimony as taken by and before
16   MARK SCHAFFER, a Certified Shorthand Reporter and
17   Notary Public of the States of New Jersey and New
18   York, at the offices of Kaplan, Fox & Kilsheimer,
19   P.C., 805 Third Avenue, New York, New York 10022 on
20   Wednesday, October 10, 2007, commencing at 9:16 in the
21   forenoon.
22
23          REPORTING SERVICES ARRANGED THROUGH:
               VERITEXT CORPORATE SERVICES, INC.
24              25B Vreeland Road, Suite 301
                 Florham Park, New Jersey 07932
25      Phone:  (800) 567-8658    Fax:  (973) 410-1313
```

2

```
 1   A P P E A R A N C E S
 2
 3   KAPLAN, FOX & KILSHEIMER, P.C.,
     805 Third Avenue
 4   New York, New York 10022
     BY:  LINDA NUSSBAUM, ESQ.
 5   lnussbaum@kaplanfox.com
     Attorneys for Kaiser Foundation Health Plans, the
 6   Coordinated Plaintiffs and the Witness.
 7
 8
     DAVIS, POLK & WARDWELL
 9   BY:  RAJESH JAMES, ESQ.
     450 Lexington Avenue
10   New York, New York 10017
     212-450-4384
11   rajesh.james@dpw.com
     Attorneys for Defendants Pfizer, Inc.
12   and Warner-Lambert Company
13
14   ALSO PRESENT:   ADAM M. RAFSKY, Paralegal
                     CRAIG ATILLA, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                    I N D E X
 2
 3   Witness                               Page
 4
 5     D A L E   L.   K R A M E R            5
 6
     DIRECT EXAMINATION BY MR. JAMES         6
 7
 8   CONTINUED DIRECT EXAMINATION BY MR. JAMES  50
 9
     CONTINUED DIRECT EXAMINATION BY MR. JAMES  64
10
11
12
13
14
15
                       E X H I B I T S
16
17
     Description                           Page
18
19
20   Approved Combined Minutes dated September  50
     12, 2001 marked Kramer-1
21
22   Approved Combined Minutes dated July 11,   51
     2001 marked Kramer-2
23
24   Approved Combined Minutes dated December   53
     3, 2003 marked Kramer-3
25
```

4

```
 1                E X H I B I T S (Continued)
 2
 3   Description                           Page
 4
     E-mail dated 3/07/2000 marked Kramer-4   54
 5
 6   E-mail dated 8/14/2000 marked Kramer-5   54
 7
     E-mail dated 8/23/2000 marked Kramer-6   55
 8
 9   E-mail dated 9/12/2000 marked Kramer-7   57
10
     E-mail dated 4/5/2002 marked Kramer-8    62
11
12   Acceptance Effective Date January 1, 1999  63
     marked Kramer-9
13
14   Letter dated April 7, 1998 marked        63
     Kramer-10
15
16   Letter dated January 26, 1995 marked     64
     Kramer-11
17
18   Notice of Award dated March 3, 2000      64
     marked Kramer-12
19
20   E-mail dated 8/14/2001 marked Kramer-13  64
21
22   E-mail dated 2/5/2003 marked Kramer-14   64
23   E-mail dated 1/17/2003 marked Kramer-15  64
24
25
```

5

```
 1          THE VIDEOGRAPHER: Good morning.  My name is
 2   Craig Attile of Nationwide Video Productions,
 3   located in Roseland, New Jersey.  The date today
 4   is October 10th, 2007 and the time is
 5   approximately 9:16.
 6          This deposition is being held in the office
 7   of Kaplan, Fox located at 850 Third Avenue, New
 8   York, New York.  The caption of this case is
 9   Neurontin Marketing and Sales Practices Liability
10   Litigation.  The name of the witness is Dale
11   Kramer.
12          At this time the attorneys will identify
13   themselves and the parties they represent, after
14   which our court reporter will swear in the witness
15   and we can proceed.
16          MS. NUSSBAUM: Linda Nussbaum for the Kaiser
17   plaintiffs and the coordinated plaintiffs.
18          MR. COHEN: Mitchell Cohen with Kaiser.
19          MR. JAMES: Rajesh James for Pfizer and Warner
20   Lambert.
21
22   D A L E   L.   K R A M E R,
23   3052 Live Oak Court, Danville, California, 94506,
24   having been duly sworn according to law by the
25   Officer, testified as follows:
```

```
 1
 2   DIRECT EXAMINATION BY MR. JAMES:
 3       Q.   Good morning.  My name is Rajesh James, and I
 4   represent Pfizer and Warner Lambert.
 5       A.   Good morning.
 6       Q.   Which I'll refer to as "the defendants."
 7   During this deposition I'll refer to the plaintiffs,
 8   Kaiser Foundation Hospitals and Kaiser Foundation
 9   Health, as "Kaiser."
10          Are you employed by Kaiser?
11       A.   Yes.
12       Q.   Are you employed by Kaiser Foundation
13   Hospitals or Kaiser Foundation Health?
14       A.   Kaiser Foundation Hospitals.
15       Q.   And what is your position with Kaiser?
16       A.   Director of Pharmacy Contracting.
17       Q.   Have you been deposed before?
18       A.   Yes.
19       Q.   You may already know these rules, but I'll
20   repeat them in case it's been awhile.
21          I need verbal answers because the court
22   reporter here can't take nonverbal gestures.  And wait
23   until my question is done before you answer, and I'll
24   do my best to wait until your answer is completed
25   before I ask my next question.
```

```
 1          We can take breaks at any time, so if you
 2   need a break, please let me know.  I may ask you to
 3   complete any question that's still outstanding, but
 4   otherwise we are very flexible on breaks.
 5          Your lawyer may at some point object to the
 6   way that I ask a question.  You can still answer that
 7   question unless she instructs you not to.  You can ask
 8   me to rephrase any question if you don't understand
 9   it, and we can ask the court reporter to read back any
10   question in case you need to hear it again.
11          The relevant period for purposes of this
12   deposition begins in 1994 and extends to the present.
13   Let me know if you need greater specificity; otherwise
14   I'll assume that your answers apply to the entire
15   period.
16          I believe you indicated that you had been
17   deposed before.  Is that correct?
18       A.   Yes.
19       Q.   On what occasions?
20       A.   A few times pharmacy-related issues, and a
21   few times some personnel issues.
22       Q.   Do you specifically remember the
23   pharmacy-related issues?
24       A.   Once was Federal Trade Commission regarding a
25   wholesale antitrust issue on a merger; once related to
```

```
 1   a case with a generic drug company, Mylin, and
 2   lorazepam, also an antitrust issue; once related to
 3   another antitrust issue, witness for the Federal Trade
 4   Commission.  I think the drug was Cardizem.
 5          One time, an issue Kaiser had with Abbott,
 6   related also to antitrust conduct related to Hytrin.
 7       Q.   And aside from those occasions, have you
 8   given prior testimony in any matter, either in court
 9   or in a legislative hearing, by affidavit or through
10   other legal proceedings?
11       A.   Yes.
12       Q.   On what occasions were those?
13       A.   They were -- I don't recall specifically, but
14   I gave three or four affidavits, again, to the Federal
15   Trade Commission on antitrust issues.  I don't
16   remember specific -- specifically.
17       Q.   I'm going to ask a few questions about your
18   educational background.
19          Where did you attend college?
20       A.   Columbia University.
21       Q.   And what was your college major?
22       A.   Pharmacy.
23       Q.   And you emerged from that with what degree?
24       A.   B.S. in pharmacy.
25       Q.   And that's a four-year degree; is that right?
```

1     A.   That is correct.
2     Q.   And did you focus on any particular area of
3   pharmacy during your time at Columbia?
4     A.   No.
5     Q.   And when did you graduate from Columbia?
6     A.   1959.
7     Q.   Do you -- did you pursue further education
8   after that point?
9     A.   Yes.
10    Q.   And what was that?
11    A.   I pursued a master's degree in biochemistry,
12  but never finished.
13    Q.   Do you have any other graduate education?
14    A.   No.
15    Q.   During your studies as an undergraduate, I
16  assume you learned about pharmaceuticals.  Is that
17  correct?
18    A.   Yes.
19    Q.   Did you learn about off-label prescription or
20  off-label promotion?
21    A.   No.
22    Q.   You indicated that you finished your
23  undergraduate degree in 1959.  Did you immediately
24  then begin your master's in -- in biochemistry?
25    A.   Yes.

1   what did you do next?
2     A.   Went to work in a pharmacy in New York City.
3     Q.   Are we still in 1961?
4     A.   By now it's probably 1962.
5     Q.   And who was your employer at that point?
6     A.   I had a number of different jobs.  One was
7   Neiman Pharmacy, N-e-i-m-a-n.
8     Q.   Is that another retail pharmacy?
9     A.   Yes.
10    Q.   And following Neiman, where did you go next?
11    A.   I work at Atlantic Pharmacy.
12    Q.   And you worked there until what time?
13    A.   I don't recall exactly.
14    Q.   And after Atlantic, where --
15    A.   M&M Drug.
16    Q.   And after M&M?
17    A.   Kaiser.
18    Q.   At M&M, were you still a retail pharmacist?
19    A.   Yes.
20    Q.   When did you join Kaiser?
21    A.   October, 1969.
22    Q.   And what was your role at Kaiser when you
23  first joined?
24    A.   Staff pharmacist.
25    Q.   And during your period at these three retail

1     Q.   And at what point did you conclude those
2   studies?
3     A.   About 1960 -- mid 1961.
4     Q.   And what did you do at that point?
5     A.   Went to work as a pharmacist.
6     Q.   For whom?
7     A.   Watt Drug.
8     Q.   What kind of company is that?
9     A.   It was a retail pharmacy in Sacramento,
10  California.
11    Q.   And were you working as a -- as a retail
12  pharmacist?
13    A.   Excuse me?
14    Q.   Were you working as a retail pharmacist?
15    A.   Yes.
16    Q.   About how long were you in that role?
17    A.   About four months.
18    Q.   And what did you do at that point?
19    A.   Got an invitation from Uncle Sam, so I was in
20  the military, military.
21    Q.   And when did your military service conclude?
22    A.   I spent six months, six months in active
23  duty.  So sometime towards the end of 1961 or early
24  '62.
25    Q.   And once you completed your military service,

1   pharmacists, Neiman, Atlantic or M&M, did you learn
2   either about off-label prescriptions or off-label
3   promotions?
4     A.   No.
5     Q.   Once you joined Kaiser as a staff pharmacist,
6   what were your responsibilities?
7     A.   When I started?
8     Q.   Right.
9     A.   Usual pharmacist, hospital and outpatient
10  duties; filling prescriptions and outpatient orders;
11  counseling patients.
12    Q.   And at what point did you move to a different
13  role?
14    A.   About a year and a half after I joined
15  Kaiser, I joined management.
16    Q.   In what capacity?
17    A.   Assistant Chief Pharmacist.
18    Q.   And how did your role as Assistant Chief
19  Pharmacist differ from your role as Staff Pharmacist?
20    A.   I was directing other pharmacists and clerks,
21  and then had some administrative responsibilities.
22    Q.   And the pharmacists that you were supervising
23  had a role similar to the one that -- that you had had
24  as a staff pharmacist.  Is that correct?
25    A.   Yes.

1    Q.    And how long were you in the role of
2  Assistant Chief Pharmacist?
3    A.    A couple of years.
4    Q.    And what role did you move on to next?
5    A.    Manager of a pharmacy warehouse.
6    Q.    And what were your responsibilities in that
7  role?
8    A.    Managing -- Managing warehouse distributions
9  of pharmaceuticals in Southern California.
10   Q.    Was it a specific like single warehouse that
11 you were in charge of?
12   A.    Yes.
13   Q.    Where was that located?
14   A.    Vernon, California.
15   Q.    And did that serve Kaiser in the entire state
16 of California?
17   A.    No, just Southern California.
18   Q.    Were there other warehouses also serving
19 Southern California?
20   A.    No.
21   Q.    And what sort of responsibilities did you
22 have in managing the warehouse?
23   A.    Ordering goods, delivering them to the local
24 pharmacies.  I was responsibility (sic) for quality,
25 responsibility for initiating a generic program.

14

1  the switch from your warehouse role into the role of
2  an area chief pharmacist?
3    A.    Just some personal reasons.
4    Q.    And what did your responsibilities as an Area
5  Chief Pharmacist involve?
6    A.    Managing a couple of hospital pharmacies and
7  four or five outlying medical center -- clinic
8  pharmacies, rather.
9    Q.    And which area was this in?
10   A.    West Los Angeles.
11   Q.    By the time you joined this position, had you
12 developed an understanding of off-label prescription
13 or off-label promotion?
14   A.    No.
15   Q.    And how long were you in this role as an Area
16 Chief Pharmacist?
17   A.    At West LA, about three years.
18   Q.    And so then in about 1984, what -- what role
19 did you move on to?
20   A.    I had a parallel position, but I moved --
21 they opened a new area in Woodland Hills, Southern
22 California, so I was responsible for the pharmacy
23 start-up services in the Woodland Hills area.
24   Q.    Just to confirm, in this role you are largely
25 supervising staff pharmacists or I guess supervisors

16

1    Q.    When you mentioned quality, what did you
2  mean?  What did that responsibility involve
3  specifically?
4    A.    Particularly focused on generic drugs, making
5  sure the products were approved, they came from pretty
6  reliable suppliers, and they had the correct labeling
7  and packaging.
8    Q.    And when you said you initiated a generic
9  program, what did that mean?
10   A.    At that time they didn't use generic drugs to
11 any extent in Southern California, so I was given the
12 project to initiate the purchase and distribution of
13 generic drugs for Kaiser, Southern California.
14   Q.    I guess aside from simply purchasing the
15 drugs and making them available in pharmacies, what
16 else did initiation of that program involve, if
17 anything?
18   A.    I spent a couple of weeks visiting generic
19 manufacturers and learning that part of the business.
20   Q.    And at what point did you move on from your
21 role as manager of the warehouse?
22   A.    I don't know exactly.  Maybe three or four
23 years later I went back into Operations and became an
24 Area Chief Pharmacist.  It was probably around 1981.
25   Q.    Is there any reason that you chose to make

15

1  and staff pharmacists?
2    A.    Yes.
3    Q.    And when did you move on from your expanded
4  role that you had begun in about 1984?
5    A.    1987, I moved to Northern California to my
6  current position.
7    Q.    Could you state that specific position again?
8    A.    Director of Pharmacy Contracting.
9    Q.    Looking at some documents, I've seen you
10 referred to as a "Material Services Leader" or
11 something of that sort.  Is that another title that
12 you have?
13   A.    I guess analogous.
14   Q.    And what are -- what are your
15 responsibilities as Director of Pharmacy Contracting?
16   A.    I lead a department that makes agreements
17 with pharmaceutical manufacturers for the purchases of
18 pharmaceuticals for use in the Kaiser program.
19   Q.    And in making those agreements, do they cover
20 all drugs dispensed in the Kaiser system?
21   A.    We have some drugs that are not covered in
22 the purchasing agreements.
23   Q.    What kinds of drugs are those?
24   A.    Prescription drugs.
25   Q.    Do you handle purchasing for -- for all

17

1    regions of Kaiser?
2        A.    I don't handle purchasing.  I do the
3    contracting.
4        Q.    Do you handle the contracting for all regions
5    of Kaiser?
6        A.    Yes.
7        Q.    And whether a drug is dispensed through a
8    hospital or through a pharmacy, the contracting is
9    done through your department.  Is that right?
10       A.    That's right.
11       Q.    Have you heard of a company called Medimpact?
12       A.    Yes.
13       Q.    What role does that company play for Kaiser,
14   if any?
15       A.    It's not really my area of responsibility,
16   but I believe --
17             MS. NUSSBAUM: Well, please, not what you
18   believe.
19             THE WITNESS:  Okay.
20             MS. NUSSBAUM: Please don't speculate.
21       A.    It's not in my area of responsibility.
22       Q.    Do you know whether drugs dispensed by
23   Medimpact are covered by the contracts that you deal
24   with?
25       A.    They are not.

1        Q.    I think you mentioned earlier that certain
2    drugs are not covered by the contracts that you are
3    responsible for.  Is that right?
4        A.    That's right.
5        Q.    And are there any particular kinds of
6    prescription drugs that would not be covered by these
7    contracts?
8        A.    I don't understand what you mean.
9             MS. NUSSBAUM: There's a -- not meeting of the
10   minds.  But I think that maybe it would be this
11   question:  Are there contracts for all
12   pharmaceutical drugs that Kaiser uses, I think
13   will have him explain what you are looking for.
14            MR. JAMES: Actually, could you read the
15   question that Counsel suggested?
16            (The question is read.)
17       Q.    So that's the question to answer.
18       A.    No.
19       Q.    How do you decide which drugs are covered by
20   contracts and which are not?
21       A.    Some companies do not want to contract or
22   provide a concession, so those drugs are purchased at
23   list price without a contract.
24       Q.    Do you have any role in deciding the scope of
25   prescription drug coverage?

1        A.    No.
2        Q.    Do you have any role in formulary management?
3        A.    No.
4        Q.    Are you involved in any way in assessing the
5    efficacy of prescription drugs?
6        A.    No.
7        Q.    Are you responsible for containing the cost
8    associated with prescription drugs?
9        A.    Can you repeat that, please?
10       Q.    Yes.  Are you responsible for containing
11   costs associated with prescription drugs?
12       A.    I'm responsible for getting the lowest
13   possible price for the drugs we purchase.
14       Q.    And aside from trying to get the lowest
15   possible price from the manufacturer, are you
16   responsible for containing costs associated with
17   prescription drugs --
18       A.    No.
19       Q.    -- in other ways?
20       A.    No.
21       Q.    Are you familiar with any drug utilization
22   review programs that -- that Kaiser has?
23       A.    Yes.
24       Q.    And in what capacity did you become familiar
25   with those programs?

1        A.    From hearing about them at meetings.
2        Q.    And what sorts of meetings were those?
3        A.    Pharmacy and therapeutics meeting, some
4    pharmacy management meetings.
5        Q.    What are pharmacy management meetings?
6        A.    Essentially staff meetings.
7        Q.    For the staff of which organization?
8        A.    Kaiser Pharmacy Operations.
9        Q.    I'm trying to get a sense of where you fit
10   within Kaiser organizationally.
11            You said that you are the Director of
12   Pharmacy Contracting.  Who reports to you?
13       A.    Currently?
14       Q.    Actually why don't we start from the time
15   that you first took on the role and then move to the
16   present.
17            MS. NUSSBAUM: That was 20 years ago.  Maybe we
18   can just stick with the relevant time period here?
19            MR. JAMES: Yes, actually I will take that
20   suggestion.
21       Q.    So we can start from 1994 and move to the
22   present.
23       A.    Let's see.  1994.  At that time I had a
24   purchasing agent reporting to me.
25       Q.    A single purchasing agent?

1    A.    Yes.  And at that time I was responsible for

2    pharmacy warehouses, so I had two warehouse managers

3    reporting to me.  I had a -- I was also responsible at

4    that time for repackaging.  I had a repack -- had a

5    repackaging manager reporting to me.

6        Q.    What did the repackaging involve?

7        A.    Essentially buying product in bulk and

8    repackaging it into smaller dispensing units.

9        Q.    And at what point did the individuals

10   reporting to you change?

11       A.    About four years ago, they divided the

12   department.  And all of the -- I retained pharmacy

13   contracting and all of the supply chain functions were

14   split off.

15            So currently I have two assistants reporting

16   to me.  And an administrative assistant.  And a

17   purchasing agent.  So I have four direct reports

18   currently.

19       Q.    Who are the two assistants who report to you

20   now?

21       A.    Their names?

22       Q.    Yes.

23       A.    Ambrose Carejo, C-a-r-e-j-o [sic].  And

24   Samuel Lum, L-u-m.

25       Q.    And what are their responsibilities

1    specifically?

2        A.    They do all the stuff I don't want to do.

3    Essentially same responsibilities as I have,

4    negotiating agreements with suppliers.

5        Q.    And about --

6            MR. JAMES:  Scratch that.

7        Q.    Who is the purchasing agent who now reports

8    to you?

9        A.    Elizabeth Guerrero.

10       Q.    And do you know of someone named Rich

11   Lieblich?

12       A.    Yes, I know Rich Lieblich.

13       Q.    Was he formally a purchasing agent?

14       A.    No, he was an assistant to me.

15       Q.    Is he still employed by Kaiser?

16       A.    No.

17       Q.    Do you know at what point he left?

18       A.    About three or four years ago.

19       Q.    And do you know roughly when he began as a --

20   as an assistant to you?

21       A.    He worked for me for about eight years, so

22   around 1996 or 'seven, I would guess.

23       Q.    Are particular assistants tasked with

24   handling contracts for particular prescription drugs?

25       A.    Yes.

1        Q.    And do they follow those drugs over, you

2    know, two or more years?

3        A.    What do you mean?

4        Q.    I guess once an assistant handles a contract

5    for a particular drug in one year, do they typically

6    follow that drug over the course of, you know, a few

7    or several years?

8        A.    No.

9        Q.    Do you know whether Rich Lieblich had

10   particular responsibilities with regard to Neurontin

11   or gabapentin?

12       A.    He didn't have any specific responsibilities

13   relating to that drug.

14       Q.    About how often do you confer with your

15   assistants about, you know, about their

16   responsibilities?

17            MS. NUSSBAUM:  Is this generally now, his

18       general practice?

19            MR. JAMES:  I guess his general practice.

20       Q.    And if you feel it's changed substantially

21   between 1994 and today, let me know.

22       A.    It hasn't, hasn't changed.

23       Q.    And how about often do you meet with them?

24       A.    About 20 times a day.

25       Q.    And you told me earlier that, you know, in

1    1994 you had some supply chain functions in addition

2    to your role in pharmacy contracting, and that supply

3    chain functions were split off around 2003.  Is that

4    right?

5        A.    That's right.

6        Q.    Have your other responsibilities changed in

7    other ways aside from that since 1994?

8        A.    No.

9        Q.    Do you report to anyone?

10       A.    Yes.

11       Q.    Who?

12       A.    Al Carver.

13       Q.    Do you serve on any Kaiser committees?

14       A.    P&T Committee.

15       Q.    Is that for a particular region?

16       A.    Northern California.

17       Q.    Do you serve on the Southern California P&T

18   Committee?

19       A.    No.

20       Q.    Have you appeared as a guest at Southern

21   California P&T Committee meetings?

22       A.    On a couple of occasions.

23       Q.    Have you appeared as a guest at meetings of

24   P&T Committees for other Kaiser regions?

25       A.    Not that I can recall.

```
 1    Q.  Do you serve on any other Kaiser committees
 2  beyond the P&T -- sorry -- the P&T Committee for
 3  Northern California?
 4    A.  Yes.
 5    Q.  What committees are those?
 6    A.  We have a drug -- DUM Committee.
 7    Q.  What does that stand for?
 8    A.  I'm not too sure what the acronym stands for,
 9  but it's a drug management meeting, and it's
10  coordinating clinical people and supply chain people.
11    Q.  How often are those meetings held?
12    A.  Monthly.
13    Q.  And who attends those meetings?
14    A.  Supply chain people and some clinical folks
15  and a couple of physicians.
16    Q.  Does that committee have any particular name,
17  or is it like the DUM Committee?
18    A.  Yes, DUM Group is what it's called.
19    Q.  About how many people are there in the group
20  who come to those meetings?
21    A.  About 14.
22    Q.  And you, you continue to attend these
23  meetings, although I guess technically you are no
24  longer on the supply chain side?
25    A.  Yes.
```

26

```
 1    Q.  Who else attends from -- from the supply
 2  chain side as opposed to the clinical side?
 3    A.  My two assistants.  Elizabeth Guerrero, the
 4  purchasing agent.
 5    Q.  Anyone else?
 6    A.  That's from my group.
 7    Q.  Okay.  As far as the group that kind of split
 8  off from yours?
 9    A.  The supply chain folks?  The warehouse
10  manager; the individual that's responsible for data
11  systems.  Usually a representative from the automatic
12  dispensing pharmacy, the automated dispensing
13  pharmacy.
14        I think that's the supply chain folks that
15  attend.
16    Q.  What is the automated dispensing pharmacy?
17    A.  It's a -- automated dispensing pharmacy.
18  It's an outpatient pharmacy that uses robotics to
19  dispense prescriptions.
20    Q.  And from the clinical side who attends these,
21  these DUM meetings?
22    A.  The Drug Use Manager from the North and from
23  the South.  One additional person from each of their
24  staffs.  So those are the clinical folks, clinical
25  pharmacy folks.
```

27

```
 1    Q.  And have we about covered everyone who
 2  attends these DUM meetings?
 3    A.  No, there's two -- two physicians,
 4  representatives of -- from the Northern California P&T
 5  Committee.
 6    Q.  They are both representatives from the
 7  Northern California --
 8    A.  Yes.
 9    Q.  Is it a DUM committee specifically addressing
10  Northern California as opposed to Southern California?
11    A.  No, it's both, north and south.
12    Q.  But there are no physician representatives
13  from Southern California?
14    A.  Correct.
15    Q.  Do you recall any DUM meetings at which
16  Neurontin or gabapentin were discussed?
17    A.  No.
18    Q.  Do you recall any DUM meetings at which
19  off-label prescription or off-label promotion were
20  discussed?
21    A.  No.
22    Q.  Are there any other committees to which you
23  belong, aside from the Northern California P&T
24  Committee and the DUM Committee?
25    A.  Not that I can think of.
```

28

```
 1    Q.  Do you belong to any sub committees of either
 2  the Northern California P&T Committee -- actually,
 3  let's start there.
 4    .     Do you belong to any sub committees of the
 5  Northern California P&T Committee?
 6    A.  I used to belong to the Educational
 7  Subcommittee of Northern California.  I no longer
 8  attend those meetings.
 9    Q.  When did you stop attending those meetings?
10    A.  About four years ago.
11    Q.  And were you a member of the Educational
12  Subcommittee in 1994?
13    A.  Yes.
14    Q.  What was your role on the Educational
15  Subcommittee?
16    A.  Mainly provide information about contracting
17  or pricing, if it was necessary.
18    Q.  I should ask:  What was the purpose of the
19  Educational Subcommittee?
20        MS. NUSSBAUM:  If you know.
21    A.  I'm not 100 percent sure.
22    Q.  What sort of matters were discussed at
23  Educational Subcommittee meetings?
24    A.  They did a newsletter relating to
25  pharmaceutical issues and patient care issues.  That
```

29

```
1     was the main focus of the meetings.
2         Q.   The main focus of the meeting was a
3     newsletter?
4         A.   Yes.
5         Q.   How often was the newsletter issued?
6         A.   I think three or four times a year.
7         Q.   And to whom was it distributed?
8         A.   Kaiser physicians, nurse practitioners.
9         Q.   And in what sort of context would you provide
10    information on -- on contracting, you know, for
11    purposes of this newsletter?
12        A.   If they were doing an article where they were
13    going to do some references to prices or cost, I
14    validated the cost information.
15        Q.   Do you generally provide costs relating to
16    the current contracts in place or with regard to your
17    forecast of contracts for the coming year?
18        A.   I don't understand the question.
19        Q.   Were you asked to provide information
20    regarding the costs of particular drugs under the
21    contracts that were currently in place, or were you
22    also asked to provide forecasts of contract prices for
23    the next year?
24        A.   Sometimes both.
25        Q.   And in providing forecasts, did you take into
```

30

```
1     account the likelihood that a generic substitute would
2     be available for a drug in the coming year?
3              MS. NUSSBAUM: I would object at this point.
4         This is highly speculative. "If you did it" and
5         "if" and "maybe." So, you know, if you want to
6         ask specifically if he specifically recalls,
7         please. But otherwise this is just very
8         hypothetical at this point.
9              MR. JAMES: I'll withdraw my last question.
10        Q.   Do you recall considering the likelihood that
11    a generic substitute would be available for a drug in
12    providing forecasts to the Educational Subcommittee?
13        A.   Ever?
14        Q.   From 1994 forward.
15             MS. NUSSBAUM: If you have a specific
16        recollection.
17        A.   I don't have a specific recollection.
18        Q.   Do you know whether the cost information that
19    you verified would be used to direct physicians or
20    nurse practitioners to more cost-effective drugs?
21        A.   I don't think that type of influence was
22    primarily directed at cost.
23        Q.   I'm sorry. Could you elaborate on that last
24    answer?
25             MS. NUSSBAUM: Well, do you understand the
```

31

```
1     question?
2              THE WITNESS: I thought so.
3         Q.   Was your answer that the cost information you
4     provided was not directed primarily toward sort of
5     guiding physicians and nurse practitioners to more
6     cost-effective drugs?
7         A.   No. I -- I think considerations were not
8     focused when articles were meant to influence
9     prescribing. I don't think cost was the primary
10    factor.
11        Q.   Do you recall whether it was a factor?
12        A.   Yes.
13        Q.   Do you recall any meetings of the Northern
14    California P&T Committee meeting -- sorry.
15             MR. JAMES: Scratch that.
16        Q.   Do you recall any meetings of the Northern
17    California P&T Committee at which Neurontin or
18    gabapentin were discussed?
19        A.   I recall meetings where gabapentin was
20    discussed, but I don't recall the specifics.
21        Q.   You mentioned earlier that you had attended a
22    few Southern California P&T Committee meetings as a
23    guest. Do you recall why you were asked to
24    participate at those meetings?
25        A.   No.
```

32

```
1         Q.   Do you recall whether Neurontin or gabapentin
2     were discussed at any of those meetings?
3         A.   No.
4         Q.   When you joined your current position, did
5     you have any understanding of off-label promotion or
6     off-label prescription?
7         A.   No.
8         Q.   In the -- In the past 20 years as you have
9     been in this role, have you developed any
10    understanding of off-label prescription or off-label
11    promotion?
12        A.   A vague understanding.
13        Q.   What does the term "off-label" mean to you?
14        A.   When a drug is approved by the Federal Drug
15    Administration -- Agency, it has specific indications
16    for specific disease states; and if it's used or
17    promoted for a different indication, then that's
18    considered off-label. That's at least my
19    understanding.
20        Q.   Do you have any recollection of the first
21    time when you sort of began to form this
22    understanding?
23        A.   No.
24        Q.   Are you aware that physicians are permitted
25    to prescribe drugs for off-label uses?
```

33

1    A.   Yeah.

2         MS. NUSSBAUM: Objection.  I'm sorry.

3         But you are asking him now having nothing to

4    do with his job at Kaiser if he is personally

5    aware?  Because I think he testified his job has

6    nothing to do with this.  So if you just want to

7    know as a human being is he aware, that's fine.

8         MR. JAMES: Yes.

9         MS. NUSSBAUM: But this has nothing to do with

10   his position at Kaiser.

11   Q.   You can answer my question if you understand

12   it.

13   A.   Could you repeat it, please?

14   Q.   Sure.

15        MR. JAMES: Could you read back the question.

16        (The question and answer are read.)

17        MS. NUSSBAUM: No answered.  The record

18   reflected the answer already.

19   Q.   Do you recall when you became aware of this?

20   A.   No.

21   Q.   Are you aware that physicians frequently

22   prescribe drugs for off-label uses?

23        MS. NUSSBAUM: Again, this is hypothetical.  He

24   is not an expert witness.

25   A.   I -- I have no idea of the frequency.

34

1    Q.   And are you -- or do you know whether certain

2    drugs or types of drugs are prescribed for off-label

3    uses more frequently than others?

4    A.   That's not --

5         MS. NUSSBAUM: Objection, again.

6    A.   That's not my area of responsibility, so I

7    really don't know.

8    Q.   Are you familiar with the term, "off-label

9    promotion"?

10   A.   Yes.

11   Q.   And what does it mean?

12   A.   It means somebody is suggesting using a drug

13   for a non-approved indication.

14   Q.   Do you recall when you first became aware of

15   this concept?

16   A.   No.

17   Q.   And I take it from your prior answers that

18   your employment at Kaiser has never required you to

19   deal with these issues.  Is that right?

20   A.   Yes.

21   Q.   Are you aware of any ways that a health

22   insurer can prevent the coverage of drugs prescribed

23   for off-label uses?

24        MS. NUSSBAUM: Objection.  This is hypothetical

25   and I think outside the scope, again, of his

35

1    employment at Kaiser.

2    Q.   You can answer.

3    A.   No.

4    Q.   Are you familiar with the drug Neurontin?

5    A.   Yes.

6    Q.   What do you know about it?

7    A.   It is manufactured by Pfizer.  The generic

8    name is gabapentin.  It went off patent a few years

9    ago.

10   Q.   Do you know Neurontin's uses?

11   A.   It was approved for adjunct therapy in

12   epilepsy, and got an additional indication some years

13   later.  And it was used I think for a variety of other

14   indications.

15   Q.   When did you first learn about Neurontin or

16   gabapentin?

17        MS. NUSSBAUM: Objection.  You want to know

18   when he first learned that such a drug existed?

19        MR. JAMES: Yes.

20        MS. NUSSBAUM: If you recall either that date

21   or time period.

22   A.   I couldn't tell you the exact date, but I

23   became aware of drugs usually shortly after they come

24   to market.

25   Q.   And how have you learned about Neurontin's

36

1    off-label uses?

2         MS. NUSSBAUM: Objection.

3    A.   From reading the media and trade journals and

4    from some discussions at the P&T meetings.

5    Q.   What discussions are those at the -- at the

6    P&T Committee meetings?

7    A.   I don't recall specifically.

8    Q.   Do you recall the general time frame in which

9    those discussions took place?

10   A.   No.

11   Q.   And do you recall any of the individual P&T

12   Committee members involved in those discussions?

13   A.   No.

14   Q.   Since Neurontin has been approved, have you

15   learned anything about how often Neurontin is

16   prescribed for off-label uses?

17   A.   No.

18   Q.   In some documents, I've seen some references

19   to Livermore Pharmaceutical Contracting and

20   Purchasing.

21        Is Livermore sort of where the Pharmaceutical

22   Contracting Group is headquartered?

23   A.   Yes.

24   Q.   But there are not other certain locations of

25   the Pharmaceutical Contracting Group, there is just a

37

1 single location that serves Kaiser nationally.  Is
2 that right?
3     A.   That is right.
4     Q.   You described some of the basic functions of
5 Pharmaceutical Contracting and Purchasing insofar as
6 you negotiate contracts for prescription drugs.  Are
7 there other functions that Pharmaceutical Contracting
8 and Purchasing performs?
9     A.   Not really.  It's just the getting of those
10 agreements and maintaining and administering them.
11     Q.   I think you mentioned earlier that you
12 sometimes provide cost information -- or formerly
13 provided cost information for the newsletter that was
14 put out by the P&T Committee, subcommittee on
15 education.
16          Does the Pharmaceutical Contracting and
17 Purchasing Group regularly provide cost information or
18 forecasts of cost information to other sort of
19 employees of Pfizer -- of Kaiser?
20     A.   To appropriate individuals that need that
21 information, yes.
22     Q.   Are there any individuals that
23 information is supplied on a -- sort of on a recurring
24 basis?
25     A.   There's regional Purchasing offices, and they

1     A.   They use it to do the budget forecasting for
2 the cost of the drugs for the coming years.  They also
3 use it in their cost-effective prescribing analysis.
4     Q.   What is the cost-effective prescribing
5 analysis that you refer to?
6     A.   When they compare competing therapies.
7     Q.   I guess once they have done a comparison, do
8 you know what they do with it?
9          MS. NUSSBAUM: If you know.
10     A.   Not necessarily.
11     Q.   Do you know some of the purposes for which
12 that comparison is applied?
13          MS. NUSSBAUM: Again, don't speculate.  This is
14 only if you know.
15     A.   Can you repeat the question, please?
16          MR. JAMES: Could you read back the question.
17     A.   Yes, when they provide information to
18 providers, generally they include costs and
19 comparative cost.
20     Q.   Do you know whether they provide this
21 information to the -- to the P&T Committee?
22     A.   Yes, they do.
23     Q.   All right.  And do you know whether the P&T
24 Committee bases its decisions regarding the formulary
25 classification of drugs on -- on that information?

38

40

1 have access to that information.  And there's some key
2 individuals in Drug Information and Clinical Services
3 that also have access to that information.
4     Q.   What do the regional Purchasing offices do?
5     A.   They procure the pharmaceuticals, buying them
6 against the contracts we negotiate.
7     Q.   And what information do you provide to those
8 Purchasing offices, I guess other than the terms of
9 the contract?
10     A.   That's it.
11     Q.   And you referred to certain key individuals
12 within Drug Information Services.  Do you have any
13 particular individuals in mind?
14     A.   The Drug Use Managers and some of their
15 staff.
16     Q.   And what information does Pharmaceutical
17 Contracting and Purchasing provide to those
18 individuals?
19     A.   Prices of the products we have on contract.
20     Q.   Do you provide forecasts of prices for, you
21 know, the coming year or the next year or some other
22 future periods?
23     A.   On some drugs, yes.
24     Q.   Do you know for what purposes Drug
25 Information Services uses that information?

1          MS. NUSSBAUM: Objection.
2     A.   The P&T Committee makes their decisions based
3 on balancing efficacy, safety and cost; and it's a
4 balance of these three factors, major factors, and
5 some other less -- lesser factors.
6     Q.   In any of the Northern California P&T
7 Committee meetings that you have attended, have you
8 seen the costs or cost forecasts that you provided
9 sort of presented to the committee in terms of a drug
10 monograph?
11          MS. NUSSBAUM: Objection. This is again
12 hypothetical.  So if you have a specific situation
13 or specific document, but other than that, unless
14 you have an absolute recollection, please don't
15 speculate.
16     Q.   You can answer the question.
17     A.   The drug monographs do not contain usually
18 specific cost information.
19     Q.   And do you know whether Drug Information
20 Services typically request just the current contract
21 price, or if it asks for a forecast of the cost of a
22 drug in the future?
23     A.   They usually ask for present and future
24 costs -- estimate of future costs.
25     Q.   Beyond the regional Purchasing offices and

39

41

1  Drug Information Services, are there other groups to
2  which your group provides cost information?
3      A.   Not that I'm aware of.
4      Q.   Which documents would set forth the cost that
5  Kaiser pays or has paid for Neurontin?
6      A.   I guess the best source would be invoices
7  from the wholesaler.
8      Q.   Do you know whether Neurontin has been a drug
9  that's been subject to a contract since 1994?
10     A.   We have had, I believe, modest agreements for
11 very short periods of time.
12     Q.   And then some years in which Neurontin was
13 purchased at list price and --
14     A.   Yeah, most -- most of the purchases in most
15 of the years, we had no contract.
16     Q.   Is there a particular contract negotiation
17 process that's applied across drugs?
18     A.   No.
19     Q.   With regard to Neurontin, do you have any
20 recollection of how the contracts that were negotiated
21 were -- you know, came into being?
22     A.   No, I actually did not participate in any of
23 those.
24     Q.   Do you know who the individuals who did were?
25     A.   Yes.

1      Q.   Who were they?
2      A.   Clyde Frith and Rich Lieblich.
3      Q.   Did Kaiser ever receive any rebates in
4  connection with Neurontin?
5      A.   Not that I'm aware of.
6      Q.   As a general matter, are there any kinds of
7  reports that you regularly review in the course of
8  your work?
9      A.   Yes, lots of reports.
10     Q.   Do you recall ever receiving any reports
11 related to Neurontin or gabapentin?
12     A.   Yes.
13     Q.   What are those?
14     A.   I was asked to provide purchasing information
15 to our attorneys on gabapentin --
16          MS. NUSSBAUM: Yeah --
17     Q.   I'm sorry.  I'll interrupt.
18          I guess I should specify excluding any work
19 that you have been asked to do in connection with this
20 litigation.
21     A.   No.
22     Q.   Okay.  So you have no recollection of
23 reviewing or preparing any reports related to
24 Neurontin, aside from in connection with this
25 litigation?

1      A.   I don't recall doing any.
2      Q.   Do you recall reviewing or preparing any
3  reports related to anticonvulsants as a class?
4      A.   Don't recall ever generating a report for
5  that class.
6      Q.   And do you recall preparing or receiving any
7  reports related to off-label use?
8      A.   No.
9      Q.   Do you know whether Kaiser performs any
10 periodic annual or other audits of Neurontin's use?
11     A.   That's out of my area of responsibility, so I
12 wouldn't know if they do or don't.
13     Q.   Have you been party to any discussions about
14 controlling the cost of Neurontin?
15     A.   No.
16     Q.   You indicated earlier that you had some
17 familiarity with Kaiser's drug utilization programs.
18 Is that right?
19     A.   Yes.
20     Q.   And what do you know about those programs?
21          MS. NUSSBAUM: You know, I would object.  I
22 think that's a very general question and I think
23 he indicated that he was not part of that process,
24 but learned about them because he attends many
25 meetings.

1          So if you have a specific question.
2  Otherwise I think that is just very general.
3      Q.   You can answer the question.
4      A.   I have general knowledge about the drug
5  utilization programs.  Any one in specific you are
6  interested in?
7      Q.   Do you know whether Kaiser has implemented a
8  drug utilization initiative related to Neurontin or
9  gabapentin?
10     A.   Yes, they have, or did.
11     Q.   And when did you learn that?
12     A.   I don't recall.
13     Q.   Do you know when that initiative began?
14     A.   Not specifically, but some years ago.
15     Q.   And do you know whether it's -- it's ended or
16 whether it's still in place?
17     A.   I don't know.
18     Q.   Was Pharmacy Contracting and Purchasing asked
19 to provide any information to individuals involved
20 with that drug utilization effort?
21     A.   No.
22     Q.   Do you know whether your assistants have any
23 role with regard to the drug utilization programs that
24 Kaiser has in place in California?
25     A.   They have no role.

1    Q.   Are you aware of what the objectives of
2    Kaiser's drug utilization program with regard to
3    Neurontin were?
4        A.   Not specifically.
5        Q.   Do you know whether the advent of generic
6    gabapentin has led to any reduction in Kaiser's drug
7    utilization efforts with regard to Neurontin?
8        A.   I don't know.
9        Q.   Are you a voting member of the Northern
10   California P&T Committee?
11       A.   No.
12       Q.   And what role do you typically play at a
13   Northern California P&T Committee meeting?
14       A.   They are mainly in an advisory or
15   informational capacity to provide information on
16   pricing if something arises relating to that, or for
17   general supply chain issues.
18       Q.   In what sorts of contexts do questions about
19   pricing arise at P&T Committee meetings?
20       MS. NUSSBAUM: And I would object, and it's
21   just too hypothetical and it's speculative.
22       Q.   You can answer the question.
23       A.   They might be discussing a new drug and they
24   want to know what the cost is.
25       Q.   The considerations about pricing -- or I

46

1    best of your knowledge.
2        THE WITNESS: Okay.
3        A.   We have to get the approval and biostudy
4    information looked at by Drug Information, and their
5    approval. And then we have to negotiate price and
6    delivery.
7        Q.   Negotiating price and delivery with the
8    generic manufacturers. Is that right?
9        A.   Yes.
10       Q.   Are there any programs in place that would
11   sort of automatically either substitute or propose the
12   substitution of a generic for a brand name, you know,
13   at the pharmacy?
14       MS. NUSSBAUM: If you know.
15       A.   Yeah. When a -- a generic enters the
16   program, it's used as the standard product in place of
17   the brand.
18       Q.   So if a Kaiser insured goes to a Kaiser
19   pharmacy with a prescription for a brand name
20   prescription drug, but there is a generic available,
21   what happens, if anything?
22       MS. NUSSBAUM: If you know.
23       A.   The patient would get the generic, unless the
24   physician indicated that he or she wanted the brand.
25       Q.   Well, without a specific indication that the

48

1    guess do you recall pricing also being discussed when
2    the P&T Committee meeting is either discussing
3    restrictions on drugs or clinical practice guidelines?
4        A.   Specifically, no.
5        Q.   Do you know as a general matter whether
6    pricing questions have been posed in those contexts?
7        MS. NUSSBAUM: Objection as to highly
8    speculative.
9        A.   I don't recall specifically.
10       Q.   What sorts of supply chain issues does the
11   P&T Committee meeting -- I'm sorry -- does the P&T
12   Committee discuss?
13       MS. NUSSBAUM: Objection.
14       A.   It might be the availability of a drug, a
15   shortage of a drug.
16       Q.   Does Kaiser have a process in place for
17   replacing a brand name prescription drug with a
18   generic equivalent?
19       A.   Yes.
20       Q.   Has that process been in place since 1994?
21       A.   With some modifications.
22       Q.   What are the steps of that process?
23       MS. NUSSBAUM: To the best of your knowledge,
24   if this is not a process that your department
25   doesn't handle or does handle. So just to the

47

1    brand was preferred, would a substitution be
2    automatic?
3        A.   Yeah. That's the law in California.
4        Q.   Are there -- are you aware of any occasions
5    in which a particular drug is substituted not with a
6    generic equivalent, but with a sort of, quote-unquote,
7    therapeutic equivalent?
8        MS. NUSSBAUM: Objection. Unless you are
9    specifically aware and this is your area of
10   expertise. I caution you not to speculate.
11       Q.   Well, I don't think this needs to be in your
12   specific area of expertise. You know, I do agree that
13   if you don't know, if you don't know, that's -- then
14   that's a fair answer.
15       A.   Therapeutic substitution can't occur without
16   specific -- patient-specific physician authorization.
17       Q.   Do you know whether there are any means by
18   which Kaiser suggests to physicians that they ought to
19   prescribe a therapeutic equivalent rather than
20   prescribing a, you know, particular prescription drug?
21       MS. NUSSBAUM: Objection.
22       A.   There is an educational process and it's a
23   guideline, but it's not mandatory.
24       Q.   Do you know if there is any sort of automated
25   process that occurs, you know, after the prescription

49

10/10/2007 Kramer, Dale (MDL)

10/10/2007 Kramer, Dale (MDL)

1    is written that would sort of send it back to the
2    physician or something with a proposal to substitute
3    the therapeutic alternative?
4        A.   I don't know.
5        MS. NUSSBAUM: Objection.
6        Q.   Are you aware that there might be educational
7    efforts that would suggest to physicians that they
8    substitute a therapeutic alternative in place of a
9    particular prescription drug, aside from the
10   newsletter that we discussed earlier, are you aware of
11   any other sorts of educational efforts that Kaiser has
12   implemented?
13       A.   They have drug education coordinators that
14   have regular discussions with physicians and physician
15   groups.
16       Q.   Do you or the individuals who work with you
17   have any interaction with those drug education
18   coordinators?
19       A.   No direct interaction, but if they have a
20   question relating to a contract, we would answer it.
21       Q.   And do you know if any of those drug
22   education coordinators have sought to information
23   physicians about Neurontin?
24       A.   I don't -- I don't know.
25       MS. NUSSBAUM: We have been going for about an

50

1       A.   Yes.
2       Q.   Can you tell me what it is?
3       A.   It's minutes from a P&T Committee meeting.
4       Q.   Is this the kind of document that Kaiser
5    produces in the regular course of its business?
6       A.   Yes.
7       Q.   Do you have any recollection of attending
8    this particular P&T Committee meeting?
9       A.   Six years ago. My name is on the attendees,
10   but I don't specifically remember the meeting.
11      Q.   And do you have any recollection of
12   restrictions on Neurontin being expanded to pain
13   specialists at this meeting?
14      A.   I don't recall the meeting.
15      Q.   Can you set that document aside. I'm marking
16   the second exhibit.
17      (Approved Combined Minutes dated July
18    11, 2001 marked Kramer-2 for
19    identification.)
20      Q.   Do you recognize this document?
21      MS. NUSSBAUM: Do you have another copy?
22      A.   Yes, it's minutes from a similar P&T
23   Committee meeting the same year.
24      Q.   Is this also the kind of document that Kaiser
25   produces in the regular course of its business?

52

---

10/10/2007 Kramer, Dale (MDL)

10/10/2007 Kramer, Dale (MDL)

1    hour now. Is this a good time for a break? Is
2    that okay with you?
3       MR. JAMES: It's a fine time.
4       MS. NUSSBAUM: Okay.
5       THE VIDEOGRAPHER: The time is approximately
6    10:26. This ends Tape Number 1. We are now going
7    off the record.
8       (A recess is taken.)
9
10   CONTINUED DIRECT EXAMINATION BY MR. JAMES:
11      THE VIDEOGRAPHER: The time is approximately
12    10:39. This begins Tape Number 2. We are on the
13    record.
14      MR. JAMES: I want to begin by marking an
15    exhibit.
16      (Approved Combined Minutes dated
17    September 12, 2001 marked Kramer-1 for
18    identification.)
19      Q.   There is no need to read the document in its
20   entirety.
21      A.   Okay.
22      Q.   But, you know, once you have had a chance to
23   glance it over, let me know.
24      A.   Okay.
25      Q.   Do you recognize this document?

51

1       A.   Yes.
2       Q.   Do you have any recollection of attending
3    this meeting, which -- which was also -- took place in
4    2001?
5       A.   Yeah. I was there, but I don't specifically
6    recall the meeting.
7       Q.   I'm sorry. You answered the question before.
8      But what were the last names of your two
9    assistants?
10      A.   Ambrose Carejo and Samuel Lum.
11      Q.   On the second page of this document,
12   underneath the heading "Drug Update" there is a
13   reference to a Dr. Carejo, but that's a different
14   individual; isn't it?
15      A.   No, same individual; but he was not working
16   for me at that time.
17      Q.   When did he begin working for you?
18      A.   Roughly one year ago.
19      Q.   Do you know what his prior roles at Kaiser
20   were?
21      A.   He was involved in drug utilization
22   management for Northern California.
23      Q.   Do you know what his specific role with
24   regard to drug utilization management was?
25      A.   No.

53

1    Q.    And do you have any recollection of the
2    matters discussed in this box titled "Drug Update"?
3    A.    No.
4    Q.    Does Dr. Carejo still have any role with
5    regard to drug utilization management?
6    A.    No.
7    Q.    Set that document aside as well.
8    MR. JAMES: Marking another exhibit.
9    (Approved Combined Minutes dated
10    December 3, 2003 marked Kramer-3 for
11    identification.)
12    Q.    Do you recognize this document?
13    A.    Yes, and it's from another P&T Committee
14    meeting.
15    Q.    And I take it that this also is the type of
16    document that Kaiser produces in the regular course of
17    its business?
18    A.    Yes.
19    Q.    And do you have any recollection of attending
20    this meeting, which is somewhat more recent than the
21    last two?
22    A.    No specific recollection.
23    Q.    And turning to the second page of this
24    document, I guess if you look at Number 3 under the --
25    I guess under the heading "Pharmacy Operations Update,

54

1    for identification.)
2    MR. JAMES: Actually, I'll mark this exhibit at
3    the same time since they concern similar issues.
4    MS. NUSSBAUM: Do you want him to read the
5    whole thing, or just see if he recognizes it?
6    MR. JAMES: No, just to kind of glance over the
7    documents.
8    MS. NUSSBAUM: Okay.
9    So it is not necessary to read the whole
10    thing. He just wants you to glance at it.
11    (E-mail dated 8/23/2000 marked Kramer-6
12    for identification.)
13    A.    Yes, I've looked at it.
14    Q.    Do you recognize either, either of these
15    documents?
16    A.    This is the first time I've seen them.
17    Q.    And do you regard -- do you recall any
18    proposal to add 600 milligram and 800 milligram
19    Neurontin tablets to the formulary and then split them
20    in -- into the lower doses?
21    A.    No, I don't recall that.
22    Q.    Are you aware of other instances in which
23    Kaiser has purchased higher doses of a medication and
24    split them and made them available in lower doses to
25    its physicians?

56

1    Drug Use Management."
2    Beyond the specific statement made here, do
3    you have any recollection of that discussion item?
4    A.    No.
5    Q.    Do you have any recollection of Neurontin's
6    600 and 800 milligram tablets being approved as a --
7    as a line extension in 2005?
8    A.    I don't recall specifically, but I know that
9    occurred.
10    Q.    Do you recall any consideration of whether
11    the extension of -- of the line to those dosages would
12    have an adverse cost impact on Kaiser?
13    A.    I don't recall.
14    MR. JAMES: I'll mark another exhibit.
15    (E-mail dated 3/07/2000 marked Kramer-4
16    for identification.)
17    Q.    Do you recognize this document?
18    A.    No.
19    Q.    Do you have any knowledge of Rich Lieblich
20    being asked by Drug Information Services for
21    information regarding the pricing and availability of
22    generic Neurontin?
23    A.    No.
24    MR. JAMES: Another exhibit.
25    (E-mail dated 8/14/2000 marked Kramer-5

55

1    A.    Yes.
2    Q.    And do you know whether consideration in any
3    of those instances was whether patent protection on
4    the -- on the higher dose might expire, you know,
5    later than the patent on the lower dose?
6    MS. NUSSBAUM: Objection. It's -- it's
7    hypothetical and -- and, you know, irrelevant,
8    because he testified he is not aware of that with
9    respect to the drug edition here.
10    Q.    You can answer the question.
11    A.    I don't recall such an issue with another
12    drug I know.
13    Q.    Do you know of any views that your department
14    formed with regard to the availability of generic
15    gabapentin in the relevant period, that is from 1994 I
16    guess up till 2004, when the generic became available?
17    A.    What do you mean?
18    Q.    I guess in -- in 1994, do you recall any view
19    that your department had formed about when generic
20    Neurontin would become available?
21    A.    In 1994?
22    Q.    Right.
23    A.    No.
24    Q.    Do you recall when your -- well, I guess
25    how -- I'm sorry.

57

1    MR. JAMES: Scratch that.
2    Q.   In 1998, do you recall your department
3  forming a view as to when generic Neurontin would
4  become available?
5    A.   Don't recall.
6    Q.   Until 2003, do you have any recollection of
7  you or anyone in your department forming a view as to
8  when generic Neurontin would become available?
9    A.   What time frame are you talking about now?
10    Q.   I guess anywhere within the, say, 1998 to --
11  to 2002 time frame?
12    A.   I don't recall.
13    MR. JAMES: I'll mark another exhibit.
14    (E-mail dated 9/12/2000 marked Kramer-7
15  for identification.)
16    Q.   Do you recognize this document?
17    A.   Yes.
18    Q.   What is it?
19    A.   It's a memo from Debbie Kubota about some
20  pending formulary issues.
21    Q.   And are e-mails of this sort the kind that
22  Kaiser produces in the regular course of its business?
23    A.   Yes.
24    Q.   Do you -- Do you have any recollection of the
25  role that you played in the reevaluation of Celexa for

58

1  formulary status that's referred to in the first
2  bullet point?
3    MS. NUSSBAUM: Objection.  Totally irrelevant.
4    A.   This goes back seven years.  I don't --
5  really don't recall.
6    Q.   On occasions, if any, in which you have been
7  asked to make a presentation to a P&T Committee
8  meeting -- P&T Committee in connection with their
9  evaluation of a drug for formulary status, you would
10  be providing either current cost information or cost
11  projections.  Is that right?
12    A.   Yes.
13    Q.   Do you provide estimates of only sort of cost
14  per a particular dosage of a drug, or do you also
15  provide forecasts of the -- of the quantity of drug
16  that would be utilized by Kaiser?
17    MS. NUSSBAUM: Objection.   Hypothetical.
18    A.   I'm not in a position to forecast
19  utilization.  Just cost.
20    Q.   I guess the last paragraph of this document
21  that sort of spills over onto the second page
22  discusses the addition of the new dosage forms of
23  Neurontin to the Kaiser formulary.   I guess reviewing
24  this paragraph and in particular a sentence which
25  states that, "previously thought to be imminent, the

59

1  availability of generic gabapentin is now uncertain
2  for the near future."
3    Does it refresh any recollection regarding
4  views that your department or Kaiser had formed about
5  the availability of generic gabapentin?
6    A.   You know, it's -- it's quite a while ago, and
7  I -- I just don't know what the thinking was at that
8  time.  I don't recall.
9    Q.   Because the same paragraph refers to a
10  regionally based conversion program or a conversion
11  program that might be based at local pharmacy
12  operations.  Do you have any understanding of what
13  those terms mean?
14    MS. NUSSBAUM: Well, he didn't write this
15  e-mail, so you want to know his understanding in
16  general?  Because I don't think he can tell you
17  what the author meant.
18    Q.   Your understanding in general.
19    MS. NUSSBAUM: If you have one.
20    A.   What are we looking at?  Which sentence?
21    Q.   On the second page, and I guess it's actually
22  the last line of the paragraph before, you know,
23  "Please contact me."
24    MS. NUSSBAUM: Could you repeat your question?
25    MR. JAMES: Sure.

60

1    Q.   I guess just as a general matter, you needn't
2  really look at the document, do you have an
3  understanding of what a regionally-based generic
4  conversion program would be, as opposed to a generic
5  conversion program that's implemented by local
6  pharmacy operations?
7    MS. NUSSBAUM: The document says for a
8  regionally based conversion program.  That's the
9  phrase in the document?  It doesn't say generic
10  conversion.  It just says "regionally based
11  conversion program."
12    Q.   Do you have an understanding of what any of
13  those terms would mean?
14    A.   A regionally based conversion program?
15    MS. NUSSBAUM: Without speculating, if you know
16  what those words mean in an e-mail written by
17  somebody who is going to be a witness here
18  tomorrow.
19    A.   You know, it's a drug utilization initiative,
20  so I don't know what specific definition, their
21  definition of that is.
22    Q.   Have you been asked to participate in
23  meetings of Chiefs of Psychiatry or chiefs of other
24  specialty areas?
25    A.   Yes.

61

1    Q.   And in what connection do you participate in
2    those meetings?
3         MS. NUSSBAUM: If you know without speculating.
4    A.   Usually to give information about the
5    marketplace or negotiating strategies for a particular
6    class of drug.
7    Q.   What sort of marketplace information would
8    you provide?
9         MS. NUSSBAUM: Again, hypothetical,
10        speculative.
11   A.   What the costs would be, what the
12   ramifications would be of accepting or not accepting a
13   current agreement or proposal from a supplier.
14   Q.   Do the chiefs of service then provide you
15   with input as to whether or not you should accept a
16   proposal?
17   A.   Sometimes, yes.
18   Q.   And are you also providing them with
19   information with which to make certain decisions?
20   A.   Well, the way it works in our program is the
21   decision makers on which drug we use comes from the
22   physicians; and their first consideration is what's
23   best for the patient; secondary consideration may be
24   cost.  But the patient and efficacy and safety always
25   come first.

1    it's hard to remember every one specifically.
2    Q.   Are you generally copied on P&T Committee
3    packets sent to the Southern California P&T Committee?
4    A.   Yes.
5    Q.   Do you have an understanding on why you are
6    copied on those, on those e-mails?
7    A.   I think people have an exaggerated impression
8    of my importance in the program.
9    Q.   On the second page of this document, there is
10   a -- at the bottom there is a discussion of a -- of a
11   class review for -- of anti epileptic agents for
12   bipolar disorder.  But I would assume you have no
13   recollection of this class review?
14   A.   Yes.
15        MR. JAMES: I would like to take a break now
16        for about ten minutes, and I might be able to wrap
17        up soon.
18        MS. NUSSBAUM: Good.
19        THE VIDEOGRAPHER: The time is approximately
20        11:10.  We are now going off the record.
21        (A recess is taken.)
22        (Acceptance Effective Date January 1,
23        1999 marked Kramer-9 for identification.)
24        (Letter dated April 7, 1998 marked
25        Kramer-10 for identification.)

1    Q.   And when you talk about "which drug we use,"
2    you are referring to which drugs are accepted to the
3    formulary.  Is that right?
4    A.   Yeah.  Well, yes.  Or if they are considering
5    a preferred drug.
6    Q.   What is your understanding of the term
7    "preferred drug"?
8    A.   That if there are competing drugs in the same
9    therapeutic class, the preferred drug would be the
10   drug that would be tried first, providing it
11   maintains, you know, quality and doesn't compromise
12   the outcome.
13   Q.   And is that implemented through clinical
14   practice guidelines?
15   A.   Yes.
16        MR. JAMES: Mark another exhibit.
17        (E-mail dated 4/5/2002 marked Kramer-8
18        for identification.)
19        MS. NUSSBAUM: And do you want him to read this
20        whole thing or --
21        MR. JAMES: No.
22   Q.   Actually, again you can glance over it.
23        Do you recognize this document?
24   A.   I don't recall it specifically.  It's 2002.
25   I get copied in on approximately 40 e-mails a day, so

1    (Letter dated January 26, 1995 marked
2    Kramer-11 for identification.)
3    (Notice of Award dated March 3, 2000
4    marked Kramer-12 for identification.)
5    (E-mail dated 8/14/2003 marked Kramer-13
6    for identification.)
7    (E-mail dated 2/5/2003 marked Kramer-14
8    for identification.)
9    (E-mail dated 1/17/2003 marked Kramer-15
10   for identification.)
11
12   CONTINUED DIRECT EXAMINATION BY MR. JAMES:
13        THE VIDEOGRAPHER: The time is approximate the
14   11:28.  We are now back on the record.
15   Q.   We have marked seven additional exhibits,
16   Kramer-9 through -- through 15.
17        I guess looking at Kramer-9, is this a
18   document that you recognize?
19   A.   Yes.
20   Q.   What is it?
21   A.   It's a contract for some Parke-Davis items.
22   Q.   And is Neurontin one of those items?
23   A.   Yes.
24   Q.   And what was the effective date of this
25   contract?

1    A.    January 1, 1999.

2    Q.    And it expired at the end of that year?

3    A.    Yes.

4    Q.    Do you have any recollection regarding the

5    negotiation process that preceded this contract?

6    A.    No.

7    Q.    Do you know who would at Kaiser?

8    A.    No.

9    Q.    I guess turning to the following document,

10   Exhibit Number 10.

11   A.    Yes.

12   Q.    Do you recognize this document?

13   A.    Yes.

14   Q.    What is it?

15   A.    It's an agreement from 1998 for Neurontin.

16   Q.    Do you know what the effective dates of this

17   agreement were?

18   A.    It looks like it's April 21st, 1998.

19   Q.    Through the end of that year?

20   A.    Through -- Yes, December 31st, 1998.

21   Q.    Turning to the next document, Exhibit Number

22   11.   Do you recognize this document?

23   A.    Yes.

24   Q.    What is it?

25   A.    It's an agreement for Neurontin.

1    documents.

2    Q.    And aside from documents, do you have any

3    other recollection of any other agreements having

4    existed?

5    A.    No.

6    Q.    Can you turn to Exhibit Number 13.  Do you

7    recognize this document?

8    A.    No.

9    Q.    Do you recall any occasions on which Drug

10   Information Services has contacted your group in

11   advance of deciding whether to conduct a class review

12   of particular prescription drugs?

13   A.    I don't recall.

14   Q.    Do you have any knowledge of what information

15   Rich Lieblich might have provided to Drug Information

16   Services?

17   A.    No.

18   Q.    Turning to Exhibit 14.  Do you recognize this

19   document?

20   A.    No.

21   Q.    Do you have any recollection of advising Drug

22   Information Services in early 2003 about the likely

23   availability of generic Neurontin -- generic

24   gabapentin?

25   A.    Yes.

1    Q.    And what are the dates of this particular

2    agreement?

3    A.    March 1st, 1995, effective date; expiration,

4    December 31st, 1995.

5    Q.    Do you have any recollection regarding the

6    negotiation of either this agreement --

7    A.    No.

8    Q.    -- or the agreement in Exhibit 10?

9    A.    No.

10   Q.    And finally turning to Exhibit Number 12, do

11   you recognize this document?

12   A.    Yes.

13   Q.    What is it?

14   A.    It's a group Parke Davis agreement.

15   Q.    And is one of the drugs covered by this

16   agreement Neurontin?

17   A.    Yes.

18   Q.    And is the term of the agreement March 1st,

19   2000 to December 31st, 2001?

20   A.    Yes.

21   Q.    Aside from the documents we have just

22   reviewed, that is Exhibits 9 through 12, are you aware

23   of any other agreements that Kaiser has entered into

24   regarding the provision of Neurontin?

25   A.    I did a search and couldn't find any other

1    Q.    Do you recall what advice you provided at

2    that time?

3    A.    I don't know the exact date, somewheres

4    around then.  I had been talking to IvaX, and they

5    indicated the possibility of having gabapentin generic

6    tablets available shortly, and I shared that

7    information.

8    Q.    Was this in early 2003?

9    A.    You know, I don't remember exactly when.

10   Q.    Do you recall having discussions with

11   potential manufacturers of generic gabapentin prior to

12   2003?

13   A.    I may have had discussions, but I don't

14   recall specifically.

15   Q.    Do you recall in what context Drug

16   Information Services had asked you about the likely

17   availability of generic gabapentin in 2003?

18   A.    I don't recall specifically.  I do know that

19   I did talk to them about it, though.

20   Q.    Let's turn to the final exhibit.  Do you

21   recognize this document?

22   A.    I -- I don't recall it.  I'm sure I have seen

23   it before, though.

24   Q.    In the third paragraph of this document, it's

25   the third line from the bottom of that paragraph,

1  there is a statement that "this will yield a 30
2  percent price decrease," and I think "this" appears to
3  refer to information communicated to Kaiser by generic
4  manufacturers.
5       Do you have any knowledge of how Rich
6  Lieblich would come up with that estimate?
7       MS. NUSSBAUM: I would object. This is an
8       e-mail not written by this witness, and your
9       question assumes information in the e-mail that
10      may not be accurate, and then asks him to
11      speculate how could one have come up with that
12      information.
13      So I think the witness indicated he had no
14      specific recollection of the document. He is at
15      best copied on it and I would ask him not to
16      speculate.
17      MR. JAMES: I'll withdraw the last question.
18  Q.  Do you recall you or anyone within your group
19  making an estimate as to the anticipated price
20  decrease in the cost of gabapentin in 2003?
21  A.  I don't recall specifically, but generally we
22  were asked to do that.
23  Q.  And how do you come up with those kinds of --
24  of cost reduction estimates?
25      MS. NUSSBAUM: I would object. Hypothetical.

1  Q.  You can answer.
2  A.  Information based on experience and
3  information we get from the generic suppliers.
4  Q.  And what steps does Kaiser take to apprise
5  itself of the likely future availability of a generic
6  prescription drug?
7  A.  Information in the trade journals and the
8  media and talking specifically to manufacturers that
9  have applications for an approval.
10  Q.  Do you know who Richard Wagner is?
11  A.  Yes.
12  Q.  Who is he?
13  A.  Drug Use Manager for Southern California.
14  Q.  And do you or any others within your group
15  have interactions with him?
16  A.  Yes.
17  Q.  What sorts of interactions are those?
18  A.  Contractual, and we talk. Those folks, those
19  type of people are interested in availability of
20  generics and potential changes in pricing on important
21  drugs.
22  Q.  Do you have an understanding of why they are
23  interested in that?
24      MS. NUSSBAUM: Objection. It's a hypothetical
25      and -- and I would ask the witness not to

1  speculate.
2  Q.  All right. You can answer.
3  A.  They are responsible for forecasting for
4  budgetary purposes the entire cost of drugs, so that's
5  an important factor.
6  Q.  Do you know whether Kaiser Permanente
7  neurologists have in the past insisted that following
8  a generic conversion of an anti epileptic drug, their
9  existing patients who use the branded drug would
10  continue to use the branded drug?
11      MS. NUSSBAUM: Objection. Calls for
12      speculation.
13  A.  Do you have a specific drug in mind?
14  Q.  I asked about anti epileptic drugs generally.
15  A.  On at least one occasion I'm aware of.
16  Q.  What occasion is that?
17  A.  Dilantin.
18  Q.  Do you have an understanding of why they
19  would want their existing patients to remain on
20  Dilantin?
21      MS. NUSSBAUM: Objection.
22      Please don't speculate.
23  A.  There's a concern or a perceived concern
24  about bio equivalents of the brand and the generic.
25  Q.  And if a decision is made to keep existing

1  patients on the branded drug, how is that implemented
2  from a supply chain perspective?
3      MS. NUSSBAUM: Objection. Again, it's
4      irrelevant, concerning another drug and
5      hypothetical.
6  A.  It's not a supply chain issue. We just
7  arrange for the procurement of whatever drugs the
8  physician prescribes. So if they're prescribing the
9  brand, we arrange to obtain the brand with or without
10  a contract.
11  Q.  Do you know if under those circumstances a
12  neurologist needs to make up a specific notation that
13  the patient who has already been on the branded drug
14  continue on the branded drug, or is that somehow
15  automatically implemented at the pharmacy level?
16      MS. NUSSBAUM: Objection.
17      Only if you know.
18  A.  Yes, it's implemented at the pharmacy level
19  and it's understood.
20      MR. JAMES: All right. That concludes my
21      direct examination.
22      MS. NUSSBAUM: I have no questions for this
23      witness. We do, as I've indicated earlier to Mr.
24      James, want to make a statement for the record.
25      And that is:

```
 1        We have scheduled over the next two days the
 2   deposition of Debbie Kubota, and she will be our
 3   30(b)(6) representative with respect to the Topic
 4   2 items in the 30(b)(6) notice for regions other
 5   than Southern and Northern California.
 6        There have been a series of letters back and
 7   forth between Mr. James and his firm and -- and
 8   our firm concerning what each thinks the scope
 9   of -- of that 30(b)(6) notice is and what the
10   meaning of certain words are.  I have expressed to
11   Mr. James that rather than wasting anybody's time,
12   and potentially having to cause yet another
13   witness to come to New York from California, that
14   this witness will be ready, she will be prepared
15   to answer as the 30(b)(6) witness; and in the
16   unlikely event that there are a number of
17   questions that are asked that this witness cannot
18   answer, we will have an answer to Mr. James within
19   seven days by somebody who can answer on behalf of
20   the company, and that that answer will be under
21   oath.
22        MR. JAMES: And I will state for the record
23   that the witness to be deposed tomorrow has been
24   noticed as a fact witness, and has not been
25   noticed as a Rule 30(b)(6) witness.  As Ms.
```

```
 1        alternatively really just to move along this
 2   30(b)(6) process and to finish the discovery in
 3   this case, we have agreed that we would provide
 4   answers under oath.
 5        So what we are suggesting is let's make the
 6   record, let's have this witness answer the
 7   questions on behalf of the company; and in the
 8   event there appears to be a disagreement as to
 9   one, two or three questions, we can either at your
10   option, you can ask the Judge for guidance, or we
11   will make ever effort to answer those under oath.
12        THE VIDEOGRAPHER: The time is approximately
13   11:44.  This concludes today's deposition.  We are
14   now going off the record.
15        (The deposition is adjourned.)
16        (The witness is excused.)
17        (The reporter retains the exhibits.)
18
19          *        *        *
20
21
22
23
24
25
```

```
 1   Nussbaum alluded, there has been disagreement
 2   between the defendants and the plaintiffs
 3   regarding the scope of Topic 2 of the Rule
 4   30(b)(6) notice.
 5        Defendant's view has been that Kaiser has
 6   taken an unreasonable and unduly restrictive
 7   interpretation of that scope, and unless some
 8   agreement can be reached, defendants would regard
 9   it as a further waste of their time to be deposing
10   a witness who has been inadequately prepared.
11        MS. NUSSBAUM: And our position is we had
12   another witness, Dr. Millares, who was here, who
13   could have been here for two days, who could have
14   answered those questions.
15        We are now designating and it is our right to
16   designate who the witness will be, and so we are
17   now designating Ms. Kubota as the witness.  As I
18   told you during the break, please feel free to ask
19   whatever questions you think are relevant
20   questions, and whatever questions you think are
21   appropriate that, although we may object as to
22   relevancy, we will not order the witness or
23   instruct the witness not to answer any question.
24        In the event we then have a record where
25   there is some disagreement, we can go to court or
```

```
 1   IN RE NEURONTIN MARKETING       )
     AND SALES PRACTICES LITIGATION  )
 2                                   )
                                     )
 3   IN RE: NEW YORK NEURONTIN       )
     PRODUCTS LIABILITY LITIGATION   )
 4                                   )
                 Defendants.         )
 5   -------------------------------X
 6
 7
 8
 9
10        I have read the foregoing transcript and found
11   it to be a truthful and accurate representation of the
12   testimony I gave in connection with the captioned
13   matter on_____.
14
15
16
17        _____
                    DALE KRAMER
18
19
20   The State of:
     County of:
21
22
23   Sworn and subscribed before me
         this      day of        , 2007
24   My commission expires:
25
```

10/10/2007 Kramer, Dale (MDL)

```
1            E R R A T A   S H E E T

2

3          Please list any correction with the
    corresponding page and line numbers.

4

5          PAGE   LINE              CORRECTIONS

6     1.                   :

7     2.                   :

8     3.                   :

9     4.                   :

10    5.                   :

11    6.                   :   ;

12    7.                   :

13    8.                   :

14    9.                   :

15    10.                  :

16    11.                  :

17    12.                  :

18    13.                  :

19    14.                  :

20    15.                  :

21    16.                  :

22    17.                  :

23    18.                  :

24    19.                  :

25    20.                  :
```

78

10/10/2007 Kramer, Dale (MDL)

```
1            C E R T I F I C A T E

2

3

4          I, MARK SCHAFFER, a Shorthand Reporter and

5    Notary Public of the States of New York and New

6    Jersey, do hereby certify that prior to the

7    commencement of the examination the witness was sworn

8    by me to testify to the truth, the whole truth and

9    nothing but the truth.

10         I do further certify that the foregoing is a

11   true and accurate transcript of the testimony as taken

12   stenographically by and before me at the time, place

13   and on the date hereinbefore set forth.

14         I do further certify that I am neither of

15   counsel nor attorney for any party in this action and

16   that I am not interested in the event nor outcome of

17   this litigation.

18

19

20

21

              MARK SCHAFFER, C.S.R.

22

23   New Jersey C.S.R. License Number XI00794
     Notary Public of the State of New Jersey

24   Commission No. 55985 Expiring September 13, 2011
     Notary Public of the State of New York

25   Registration No. 01SC4953912 Expiring July 31, 2009
```