# EXHIBIT O

## Page 1

10/11/2007 Cohen, Mitchell (MDL)

0001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE NEURONTIN MARKETING     : MDL DOCKET NO. 1629
AND SALES PRACTICES and       : Master File No.
PRODUCTS LIABILITY            : 04-10981
LITIGATION                    : Judge Patti B. Saris
                              : Magistrate Leo T.
                              :   Sorokin
------------------------------ X

------------------------------ X
SUPREME COURT OF THE STATE    : Case Management
OF NEW YORK                   : Index No. 765,000/2006
COUNTY OF NEW YORK            : Hon. Marcy S. Friedman
                              :
IN RE: NEW YORK NEURONTIN     :
PRODUCTS LIABILITY            : DEPOSITION UPON ORAL
LITIGATION                    :   EXAMINATION OF
                              : MITCHELL COHEN, ESQ.
                              :
------------------------------ X ------------------

TRANSCRIPT of testimony as taken by and before
MARK SCHAFFER, a Certified Shorthand Reporter and
Notary Public of the States of New Jersey and New
York, at the offices of Kaplan, Fox & Kilsheimer,
P.C., 805 Third Avenue, New York, New York 10022 on
Thursday, October 11, 2007, commencing at 3:26 in the
afternoon.

REPORTING SERVICES ARRANGED THROUGH:
VERITEXT CORPORATE SERVICES
25B Vreeland Road, Suite 301
Florham Park, New Jersey 07932
Phone: (800) 567-8658    Fax: (973) 410-1313

## Page 2

10/11/2007 Cohen, Mitchell (MDL)

APPEARANCES

KAPLAN, FOX & KILSHEIMER, P.C.,
805 Third Avenue
New York, New York 10022
BY: LINDA NUSSBAUM, ESQ.
lnussbaum@kaplanfox.com
Attorneys for Kaiser Foundation Health Plans, the
Coordinated Plaintiffs and the Witness


DAVIS, POLK & WARDWELL
BY: RAJESH JAMES, ESQ.
450 Lexington Avenue
New York, New York 10017
212-450-4384
rajesh.james@dpw.com
Attorneys for Defendants Pfizer, Inc.
and Warner-Lambert Company


ALSO PRESENT:    ADAM M. RAFSKY, Paralegal
                 CRAIG ATILLA, Videographer

## Page 3

10/11/2007 Cohen, Mitchell (MDL)

I N D E X

Witness                                    Page

MITCHELL COHEN                              5

DIRECT EXAMINATION BY MR. JAMES             6


E X H I B I T S

Description                                Page

Defendants' Amended Notice of Deposition    8
of Kaiser Foundation Health plan, Inc.
and Kaiser Foundation Hospitals marked
Cohen-1

Article titled Mevacor and Zocor Dosing,   21
Issue 1, dated January 16, 1998 marked
Cohen-2

Article Titled Issue 5 dated May 11, 1999  25
marked Cohen-3

Article titled Issue 3, March 1, 2000,     28
marked Cohen-4

## Page 4

10/11/2007 Cohen, Mitchell (MDL)

E X H I B I T S (Continued)

Description                                Page

Article titled Special Edition January,    29
2001 marked Cohen-5

Exhibit Previously Marked Kubota-13        30
marked Cohen-6

Article titled Issue 4, April 2002 marked  34
Cohen-7

Regional Formulary and Therapeutics        45
Committee Minutes Dated February 10, 2000
marked Cohen-8


QUESTIONS FOR WHICH ANSWERS ARE TO BE SUPPLIED LATER


Description                                Page


Q. What was Neurontin's classification on  15
Kaiser's Mid Atlantic region formulary in
January -- on January 1st, 1984?

## Page 6

1  THE VIDEOGRAPHER: Good afternoon, my name is
2  Craig Atilla, Nationwide Video Productions,
3  located in Roseland, New Jersey. The date today
4  is October 11th, 2007. The time is approximately
5  3:26.
6  This deposition is being held in the office
7  of Kaplan, Fox located at 850 Third Avenue, New
8  York, New York. The caption of this case is
9  Neurontin Marketing and Sales Practices Liability
10  Litigation. The name of witness is Mitchell
11  Cohen.
12  At this time the attorneys will identify
13  themselves and the parties they represent, after
14  which our court reporter, Mark Schaffer of
15  Veritext, will swear in the witness and we can
16  proceed.
17  MS. NUSSBAUM: Linda Nussbaum for the witness,
18  for the Kaiser plaintiffs and for the coordinated
19  plaintiffs.
20  MR. JAMES: Rajesh James for the defendants,
21  Pfizer and Warner Lambert.
22
23
24
25

## Page 8

1  emphasize that they feel that they would be
2  entitled to discover any matters with --
3  which they would be entitled to discover with
4  regard to a non-attorney witness.
5  MS. NUSSBAUM: Let me make a suggestion.
6  Although I'm not exactly sure what you mean, I
7  think that we can -- can proceed here. Our
8  concern clearly is the waiver issue and the
9  attorney-client issue and the attorney work
10  product issue. And we agree that you can examine
11  Mr. Cohen as though he were a witness who were not
12  an attorney.
13  Q.  For the record, are you an employee of
14  Kaiser?
15  A.  I'm an attorney of Kaiser Foundation Health
16  Plan.
17  Q.  And what is your title at Kaiser Foundation
18  Health Plan?
19  A.  Senior counsel.
20  Q.  Are you aware that this deposition is being
21  taken in connection with a lawsuit filed by Kaiser
22  against defendants relating to the prescription drug
23  Neurontin?
24  A.  I am.
25  MR. JAMES: I am going to mark an exhibit.

## Page 7

1  MITCHELL  COHEN,
2  One Kaiser Plaza, Oakland, California 94612,
3  having been duly sworn according to law by the
4  Officer, testified as follows:
5
6  DIRECT EXAMINATION BY MR. JAMES:
7  MS. NUSSBAUM: I may just make a very short
8  statement for the record:
9  Mr. Cohen is here today as a 30(b)(6) witness
10  with respect to certain questions concerning Topic
11  2 of the 30(b)(6) notice that has previously been
12  served by defendants in this action.
13  Although Mr. Cohen by profession is an
14  attorney, his testimony today shall not be
15  construed in any way to be any waiver of the
16  attorney-client privilege or of attorney work
17  product. He is here not in his capacity as an
18  attorney, but simply in his capacity as a 30(b)(6)
19  witness for the Kaiser plaintiffs.
20  MR. JAMES: I will make my statement for the
21  record. I would agree on behalf of defendants
22  that they will not construe this deposition as a
23  waiver of any privilege that might exist between
24  Mr. Cohen and -- and his client, Kaiser.
25  At the same time, defendants do wish to

## Page 9

1  Q.  When you have had an opportunity to review
2  the exhibit, let me know.
3  A.  What do you want me to look at? The entire
4  document?
5  Q.  No, I think if you can glance at it and come
6  to an understanding as to whether you recognize it or
7  not?
8  (Defendants' Amended Notice of
9  Deposition of Kaiser Foundation Health plan,
10  Inc. and Kaiser Foundation Hospitals marked
11  Cohen-1 for identification.)
12  A.  Okay.
13  Q.  Do you recognize this document?
14  A.  It appears to be a notice, it's called an
15  amended notice, defendants' amended notice of
16  deposition of Kaiser Foundation Health plan, Inc. and
17  Kaiser Foundation Hospitals.
18  Q.  I would ask you to turn to Page 8 of this
19  document.
20  A.  Okay.
21  Q.  And I would ask you to review the paragraph
22  following the numeral II beneath the heading "Topics."
23  A.  Okay.
24  Q.  Have you seen this paragraph prior to your
25  deposition?

### Page 10

1  A. Yes.
2  Q. Do you understand that you have been
3  designated on Topic II with regard to Kaiser's
4  non-California regions?
5       MS. NUSSBAUM: Clarification by counsel, he is
6  being designated on Topic II with respect to the
7  non-California Kaiser regions and subject to
8  various meetings, conferences and correspondences.
9  So he is being designated as the Topic II
10  designee, subject to various meetings that counsel
11  have had.
12       MR. JAMES: I wish to clarify that with
13  counsel.
14       Do you believe that the scope of this
15  deposition is narrower than Topic II with regard
16  to Kaiser's non-California regions?
17       MS. NUSSBAUM: I think that we have had some
18  debate between us as to the definition or meaning
19  of certain words or terms within Topic II. So I
20  think we all agree that this witness is here as
21  the designee with respect to the non-California
22  regions for Topic II, whatever the breadth or
23  scope of that is that we'll discuss or the Judge
24  will ultimately decide.
25

### Page 11

1  CONTINUED DIRECT EXAMINATION BY MR. JAMES:
2  Q. How did you prepare to testify regarding the
3  topic noticed?
4  A. I conferred with counsel.
5  Q. "Counsel" being Ms. Nussbaum here?
6  A. And perhaps others on her staff, yes.
7  Q. For how long did you confer with counsel
8  regarding Topic II?
9  A. You know, I don't recall specifically.
10  Q. Can you give me a rough estimate?
11  A. Maybe the challenge is that I've been
12  involved in this litigation as a lawyer as well, so it
13  is difficult for me to really estimate specifically
14  how much time I've spent preparing for this
15  deposition.
16  Q. Had you begun preparing for this deposition
17  prior to this week?
18  A. Specifically, no.
19  Q. How much time have you spent preparing
20  specifically for this deposition?
21  A. Well, I think I answered that question,
22  which is it's really difficult to estimate that
23  because I've been involved in many ways in aspects of
24  this litigation as a lawyer for some time.
25  Q. Did you speak to anyone other than counsel in

### Page 12

1  connection with your preparation for this topic?
2  A. I did speak with one representative of one of
3  our regions.
4  Q. Who was that representative?
5  A. Her name is Barbara Kashiwabara.
6  Q. And what is her role?
7  A. She -- I believe her role is she is the
8  Director For Pharmacy in our Hawaii region.
9  Q. And how long did you speak to her?
10  A. I don't recall how long.
11  Q. Was it more or less than half an hour?
12  A. Again, I -- I'm not sure that I can really
13  give you the right estimate there.
14       MS. NUSSBAUM: And by counsel, just to clarify
15  the record. I think, and clearly against without
16  waiver at all of any attorney work product, Mr.
17  Cohen has been involved in many interviews with
18  many employees which concern items within Topic
19  II, but in those other meetings has been
20  functioning as -- as counsel for Kaiser.
21  Q. What facts were conveyed to you by the
22  Pharmacy Director for Kaiser's Hawaii region?
23  A. She explained to me the general formulary
24  process in Hawaii and more specifically Neurontin and,
25  you know, that it was -- had been or was on the

### Page 13

1  formulary.
2  Q. Did you review any documents to prepare
3  yourself for this deposition?
4  A. Only the documents that were shared with me
5  by counsel.
6  Q. Which documents were those?
7       MS. NUSSBAUM: We would object on the ground of
8  work product.
9  Q. Can you describe the documents generally?
10  A. I think they were documents that were given
11  to the defendants that -- that may have been -- that
12  come from these various regions outside of California.
13  Q. Were there any documents you reviewed other
14  than documents that were produced to defendants?
15  A. Could you clarify? For what purpose? For
16  this deposition?
17  Q. In preparation for this deposition.
18  A. No.
19  Q. Roughly how many documents did you review in
20  total?
21  A. I can't -- I -- I don't know.
22  Q. Can you provide a rough estimate?
23  A. No.
24  Q. Do you know for how long you reviewed those
25  documents?

**Page 14**

1   A.   To be honest, I don't have an answer -- I
2   don't know how much time it was.
3        MS. NUSSBAUM: And, again, to clarify for the
4   record, Mr. Cohen has spent many, many, many
5   hours, in fact, years on this litigation, and in
6   the process of this litigation, but that has been
7   as counsel.
8        So if your question is very specifically with
9   respect to this particular deposition versus the
10  time that he has spent as counsel, I think that
11  that's where the difficulty is coming in here.
12       THE WITNESS: Yes.
13  Q.   Did any of the documents you reviewed refresh
14  your recollection as to any of the issues regarding
15  which you have been designated to testify?
16  A.   No.
17  Q.   Did you do anything else to prepare for this
18  deposition other than the activities that we have just
19  gone over?
20  A.   Not that I can recall.
21  Q.   Did you have any experience or knowledge
22  regarding this topic before your preparation?
23  A.   Well, as I've said before, I've been a lawyer
24  for many years and involved in this litigation, so in
25  that capacity, yes.

**Page 15**

1   Q.   And in that capacity, you gained particular
2   knowledge with regard to policies and practices
3   concerning Neurontin in Kaiser's non-California
4   regions. Is that correct?
5   A.   I think in that capacity I have -- as a
6   lawyer for Kaiser, both perhaps involved related to
7   this litigation and then other circumstances, I have
8   obtained knowledge about practices in our various
9   regions.
10  Q.   Practices concerning Neurontin specifically
11  in Kaiser's non-California regions. Is that right?
12  A.   I think the answer to that would be yes, some
13  of that would be specifically as to Neurontin, yes.
14  Q.   Did any of that knowledge concern formulary
15  practices in Kaiser's non-California regions?
16  A.   Any of the knowledge that I brought -- that I
17  brought before this deposition?
18  Q.   Yes.
19  A.   Yes.
20  Q.   And did any of that knowledge concern drug
21  utilization programs relating to Neurontin in the
22  non-California regions?
23  A.   Again, yes, as a lawyer involved in the --
24       MS. NUSSBAUM: And I'm cautioning you again,
25  let's not go into any details --

**Page 16**

1        THE WITNESS: Right.
2        MS. NUSSBAUM: -- as to how you gained any of
3   this information.
4        THE WITNESS: Okay.
5   Q.   So during this deposition, from now on I will
6   use the phrase "you" if I am referring to Kaiser and
7   all its subsidiaries. If I mean you personally, I
8   will say so. If you mean to refer to yourself
9   personally rather than to Kaiser, you should tell me
10  or I will assume that "you" means Kaiser and that you
11  are speaking on behalf of the company. (Sic).
12       I think I will begin by asking questions
13  regarding Kaiser's Mid Atlantic region. Are you
14  generally familiar that Kaiser has a Mid Atlantic
15  region?
16  A.   I am.
17  Q.   What was Neurontin's classification on
18  Kaiser's Mid Atlantic region formulary in January --
19  on January 1st, 1984?
20  A.   I do not actually right now have the
21  information in regard to the Mid Atlantic region. So
22  I can -- that's probably in terms of the specific date
23  that it was formularied, we can provide that. We can
24  leave a blank in the transcript or we can provide it
25  after.

**Page 17**

1        (Space left intentionally blank.)
2
3
4
5   Q.   Should we move onto a different region? Is
6   that information --
7   A.   Yes, I think you might want to move on to a
8   different region, yeah.
9   Q.   What was Neurontin's classification on
10  Kaiser's Ohio region formulary on January 1st, 1994?
11  A.   I don't know the answer to January 1st, 1994,
12  as to what its status was.
13  Q.   What is the first date on which you would
14  know Neurontin's classification on Kaiser's Ohio
15  region formulary?
16  A.   In June, 1994 it was added to the formulary,
17  is my understanding in Ohio.
18  Q.   What was its status at that point, once it
19  had been added to the formulary?
20  A.   It was added to the formulary with
21  restrictions.
22  Q.   And what restrictions were those?
23  A.   It was restricted again in the context -- and
24  the context is more of a guideline, to neurology or
25  neurologists.

```
 1     Q.  I'm sorry.  Is that a restriction or a
 2   guideline?
 3     A.  I believe the term they used was
 4   "restriction," but effectively it's a guideline.  In
 5   other words, a physician other than a neurologist
 6   could prescribe the drug if it were medically
 7   necessary.
 8     Q.  Do you know whether the restriction to
 9   neurologists had any impact on the detailing of
10   Neurontin with regard to Kaiser's Ohio region?
11     A.  It's a pretty broad question.  Whether the --
12   could you repeat it.  I'm sorry.
13          MR. JAMES:  Could you read back the question.
14          (The question is read.)
15     A.  No.
16     Q.  Do you know whether within Kaiser's Ohio
17   region, it would be consistent with Kaiser policy for
18   a prescription drug manufacturer to detail regarding a
19   restricted drug to physicians who were outside the
20   restriction?
21     A.  I think you need to clarify for me what you
22   are referring to as -- when you are talking about
23   detailing, the circumstances that you are trying to
24   suggest.  I don't quite understand your question.
25     Q.  Do you know whether any drugs are designated
```

18

```
 1   as non-detailable within Kaiser's Ohio region?
 2     A.  I don't know that.
 3     Q.  Do you know whether any drugs are designated
 4   as non-detailable in Kaiser's California region?
 5          MS. NUSSBAUM:  I'm -- I would object.  This
 6   witness is not here with respect to the California
 7   regions, and my understanding is that there has
 8   already been testimony with respect to the
 9   California regions, and that is that this is
10   guidelines to the extent that they exist, but that
11   it was no control over what the manufacturers do.
12     Q.  Do you know whether prescription drug
13   manufacturers might be barred from visiting Kaiser
14   premises within its Ohio region if they detailed
15   physicians with regard to certain prescription drugs?
16          MS. NUSSBAUM:  It assumes facts not in
17   evidence.
18     A.  Your question is so lengthy, it's a little
19   confusing.  Could you try that again.  I'll try to
20   answer it if I can.
21     Q.  I shall withdraw that question.
22     A.  Okay.
23     Q.  Would you know if -- if the defendants --
24          Sorry.  Scratch that as well.
25          Would it have been consistent with Kaiser's
```

19

```
 1   policy within its Ohio region in 1994 if the
 2   defendants were to detail physicians other than
 3   neurologists with regard to Neurontin?
 4     A.  I think what you are asking about are -- is
 5   different than a formulary policy.  You are talking
 6   about policies around visitation rights and whether
 7   a -- a pharmaceutical company could -- could come and
 8   visit and detail for non-formulary drugs.
 9          And I'm not prepared to talk about what
10   Ohio's policy was on visitation rights during -- in
11   1994.
12     Q.  Do you understand that whether a drug may be
13   detailed to particular physicians is not part of that
14   drug's formulary status within Kaiser's Ohio region?
15          THE WITNESS:  Could you read that back.  Sorry.
16          (The question is read.)
17     A.  I'm sorry.  I don't understand the question.
18   Too many negatives.  I'm sorry.  You lost me on it.
19     Q.  Are the Ohio region's policies with regard to
20   how a particular drug may be detailed part of that
21   drug's formulary status within the Ohio region?
22     A.  So does it have a -- for example, does it
23   have a status that is formulary non-detailable?  Is
24   that what you are asking me?
25     Q.  Yes.
```

20

```
 1     A.  I don't know the answer to that.
 2     Q.  Do you know who proposed that the drug
 3   Neurontin be added to Kaiser's Ohio region formulary
 4   in June of 1994?
 5     A.  I don't know.
 6          MS. NUSSBAUM:  I would also say that my view is
 7   that these questions are really outside the scope
 8   of this 30(b)(6) notice.  Now, we have given you
 9   some latitude here, but this is really policies
10   and practices concerning Neurontin, and not
11   particular dates and who proposed what.  That's
12   really not within policies and practices as we
13   understand the 30(b)(6) notice.
14     Q.  Do you understand that the Ohio region P&T
15   Committee voted to accept Neurontin to the Ohio region
16   formulary in June of 1994?
17     A.  Yes, I do.
18     Q.  Do you know what individuals or groups of
19   individuals were consulted prior to the Regional P&T
20   Committee's vote?
21     A.  I do not.
22          MS. NUSSBAUM:  And, again, I would say that
23   that is clearly outside the scope of this 30(b)(6)
24   deposition notice.
25     Q.  Do you know the considerations on which the
```

21

10/11/2007 Cohen, Mitchell (MDL)

**Page 22**

1  P&T Committee based its decision?
2      MS. NUSSBAUM: Again, objection. Outside of
3  the scope of the notice.
4      A. Specifically as to Ohio in 1994? No.
5      Q. Did Neurontin's classification on Kaiser's
6  Ohio region formulary change after June of 1994?
7      A. Yes.
8      Q. When was the first change that occurred after
9  June of 1994?
10     A. January, 1998.
11     Q. And what change occurred at that time?
12     A. The restrictions were expanded to include
13  pain management.
14     MR. JAMES: I'm going to mark an exhibit.
15     (Article titled Mevacor and Zocor
16  Dosing, Issue 1, dated January 16, 1998
17  marked Cohen-2 for identification.)
18     Q. And when you have had a chance to glance at
19  the exhibit generally, let me know.
20     A. Okay.
21     Q. Have you seen this document before?
22     A. I don't recall seeing this before.
23     Q. Do you know what it is?
24     A. I do not.
25     Q. Do you know if this is a document produced by

10/11/2007 Cohen, Mitchell (MDL)

**Page 23**

1  Kaiser's Ohio region?
2      A. I do not know whether it was produced by
3  Kaiser's Ohio region.
4      Q. I would ask you to turn to the second page of
5  this document, which bears the Bates stamp KAIS
6  044086; and in particular I guess look at the column
7  that is most to the right. And I guess there is a
8  heading on Neurontin. Do you see that?
9      A. I see it.
10     Q. Do you see the statement "restricted to use
11  by or in consultation with Neurology or Susan
12  Arceneaux M.D. and Christopher Spivack M.D."?
13     A. I see that.
14     Q. Do you know if that accurately reflects a
15  change made with regard to Neurontin's formulary
16  classification in its Ohio region in January of 1998?
17     A. I do not know. As I think I indicated, I
18  don't know whether this is an Ohio document or not.
19     Q. Do you have any knowledge of who Susan
20  Arceneaux, M.D. is?
21     A. I do not.
22     Q. Do you know who Christopher Spivack M.D. is?
23     A. I do not.
24     Q. Do you know what the phrase "restricted to
25  use by or in consultation with" means in -- in the

10/11/2007 Cohen, Mitchell (MDL)

**Page 24**

1  context of Kaiser's Ohio region formulary?
2      A. Well, I don't know that that language is
3  specifically in the formulary; but as I understand,
4  the Ohio -- this is 1998, January 1998 -- did say that
5  Neurontin was available, that it was restricted to
6  neurology and to pain management.
7      And by that, again, what it meant was those
8  were the formulary restrictions or effectively
9  guidelines. In other words, a physician who wrote a
10  prescription for that drug as medically necessary
11  would have that prescription filled by the Kaiser
12  pharmacy.
13     Q. To the best of your knowledge, is the
14  statement "restricted to use by or in consultation
15  with Neurology or Susan Arceneaux, M.D. and
16  Christopher Spivack M.D." an accurate statement
17  regarding the formulary status of Neurontin on
18  Kaiser's Ohio region formulary in January of 1998?
19     MS. NUSSBAUM: Asked and answered. I think the
20  witness has testified that he does not know that
21  this document, Exhibit 2, is from the Ohio
22  formulary. I think he also testified that he
23  doesn't know who these particular individuals are,
24  and he's testified to his understanding of the
25  formulary status in Ohio at that particular time.

10/11/2007 Cohen, Mitchell (MDL)

**Page 25**

1      Q. You can answer the question.
2      A. I think I've testified as to what the
3  formulary status was in Ohio in that time frame. I
4  don't know this document, so I can't really answer
5  whether or not that's accurate language or not because
6  I don't -- I don't know this document.
7      Q. Do you know whether any documents were
8  created memorializing the addition of Neurontin to
9  Kaiser's Ohio region formulary in June of 1994?
10     A. Do I know that? I do not know that.
11     Q. Do you know whether any documents were
12  created with regard to the January, 1998 modification
13  of Neurontin's classification on Kaiser's Ohio region
14  formulary?
15     A. I do not know that.
16     Q. Do you know whether Kaiser has produced all
17  minutes of its Ohio region P&T committee that relate
18  to changes with regard to Neurontin's formulary
19  status?
20     MS. NUSSBAUM: Objection. Outside the scope of
21  the 30(b)(6) topics here. We have had numerous
22  meeting conferrals about document production, we
23  have in good faith produced documents and you have
24  already had a 30(b)(6) witness with respect to the
25  document production issued, which are another

10/11/2007 Cohen, Mitchell (MDL)

**Page 26**

1  topic in your notice, so I suggest that we move
2  on.
3      MR. JAMES: I'm going to mark another exhibit.
4      (Article Titled Issue 5 dated May 11,
5  1999 marked Cohen-3 for identification.)
6   Q.  Let me know when you have had an opportunity
7  to read this document?
8   A.  I've glanced at it.
9   Q.  Have you seen this document before?
10  A.  I don't recall.
11  Q.  Do you know what it is?
12  A.  I do not.
13  Q.  I direct you to the second page of this
14 document. It bears a Bates stamp KAIS 044093.
15  A.  Okay.
16  Q.  In the far right column of that page, do you
17 see a heading "Neurontin"?
18  A.  I do, yes.
19  Q.  And following that heading, do you see the
20 words "restricted to use by or in consult with
21 neurology or pain management specialists"?
22  A.  Yes, I do see that. There is some additional
23 language, but, yes, I see that.
24  Q.  Does this document refresh your recollection
25 that the change to a formulary classification whereby

**Page 27**

1  Neurontin was restricted to use by or in consult with
2  neurology or pain management specialists actually took
3  place in May of 1999, rather than January of 1998?
4   A.  It does not change my testimony, no.
5   Q.  Was your testimony that in January, 1998, the
6  classification was changed to "restricted to neurology
7  and pain management specialists," or did you use
8  different language?
9   A.  Expanded. So, in other words, earlier,
10 again, it was -- it was restricted to neurology,
11 neurologists, and then it was expanded to include pain
12 management.
13  Q.  Are you aware whether the terms used "by or
14 in consult with" have a particular meaning with regard
15 to Kaiser's Ohio region formulary?
16      MS. NUSSBAUM: Outside the scope.
17      If you can answer it.
18  A.  I am not aware.
19  Q.  With regard to the expansion to pain
20 management specialists with regard to what you
21 testified, do you know who proposed that the change be
22 made?
23  A.  I do not.
24      MS. NUSSBAUM: Again, outside the scope.
25  Q.  Do you know whether any individuals or groups

**Page 28**

1  of individuals were consulted with prior to the
2  Regional P&T Committee's vote?
3   A.  I do not know.
4      MS. NUSSBAUM: Again, all of this is outside
5  the scope.
6   Q.  Do you know on the basis of what
7  considerations the P&T Committee voted to make this
8  change?
9      MS. NUSSBAUM: Again, objection. Outside the
10 scope of the notice.
11  Q.  Do you know what the next change regarding to
12 Neurontin's formulary classification in its Ohio
13 region was?
14  A.  It's my understanding that in September,
15 2004, when generic gabapentin -- gabapentin became
16 available, that it replaced the brand name Neurontin
17 on the formulary.
18  Q.  When Neurontin was accepted to the Ohio
19 region formulary in June of 1994, do you know whether
20 that acceptance was limited to particular dosages of
21 Neurontin?
22      MS. NUSSBAUM: Objection. Outside the scope.
23  A.  I do not know.
24      MR. JAMES: If we can just go off the record
25 for a few minutes.

**Page 29**

1      THE VIDEOGRAPHER: The time is approximately
2  4:00 p.m. We are now going off the record.
3      (A discussion is held off the record.)
4      (A recess is taken.)
5
6  CONTINUED DIRECT EXAMINATION BY MR. JAMES:
7      MR. JAMES: I am going to designate another
8  document -- another exhibit, rather.
9      THE VIDEOGRAPHER: The time is approximately
10 4:07. We are now back on the record.
11     (Article titled Issue 3, March 1, 2000,
12 marked Cohen-4 for identification.)
13  Q.  Have you had a chance to review this
14 document?
15  A.  I glanced at it now, yes.
16  Q.  Do you know what this document is?
17  A.  I don't.
18  Q.  And on the second page in the -- in the
19 middle column near the bottom, do you see the heading
20 "Neurontin" beneath "Formulary Restrictions"?
21  A.  Yes, I see that.
22  Q.  And do you see the words, "600 and 800
23 milligram capsules" followed by, you know, the phrase
24 "restricted to use by or in consult with a neurology
25 or pain management specialist"?

1  A. I see that language.
2  Q. Do you have any understanding of what this
3  language means?
4  A. I do not.
5  MR. JAMES: I'll mark the next exhibit.
6  (Article titled Special Edition January,
7  2001 marked Cohen-5 for identification.)
8  Q. Have you seen this document before?
9  A. I do not -- or I don't recall.
10 Q. Do you know what it is?
11 A. I don't.
12 Q. Do you know whether Kaiser's Ohio region ever
13 adopted any guidelines on its formulary with regard to
14 the instances in which tricyclic antidepressants ought
15 to be used in favor of Neurontin.
16 MS. NUSSBAUM: Okay. That's outside the scope
17 of this deposition and outside the scope of the
18 30(b)(6) notice.
19 MR. JAMES: For the record, I feel that whether
20 the Ohio region adopted any such guidelines would
21 be plainly within the scope of a topic concerning
22 policies and practices with regard to Neurontin.
23 Q. Do you have any knowledge in that regard?
24 THE WITNESS: Could you repeat the question?
25 MR. JAMES: Read back the question.

30

1  (The question is read.)
2  A. No.
3  MR. JAMES: Lisa, there was a document that was
4  marked in connection with the Kubota deposition
5  that was recently taken. I don't know if you have
6  any additional copies of the document that was
7  marked Kubota-13.
8  MS. NUSSBAUM: How convenient. We have them
9  right here.
10 MR. JAMES: I believe this will be designated
11 Cohen-6, is that right, for purposes of this
12 deposition?
13 MS. NUSSBAUM: Sure. We'll put two stickers on
14 it.
15 (Exhibit Previously Marked Kubota-13
16 marked Cohen-6 for identification.)
17 Q. Do you know what this document is?
18 A. It appears to be a drug monograph. It says
19 so at the top.
20 Q. Have you seen this document before?
21 A. I believe so.
22 Q. In what context?
23 MS. NUSSBAUM: I would object to anything that
24 might possibly impinge on either work product or
25 the attorney-client privilege.

31

1  MR. JAMES: Are you instructing the witness not
2  to answer that question?
3  MS. NUSSBAUM: Well, I am instructing the
4  witness not to answer the question to the extent
5  his answer might either reveal work product or
6  attorney-client communications.
7  MR. JAMES: You can --
8  MS. NUSSBAUM: So if there is some other
9  context, then he can answer.
10 A. I have seen this document in the context of
11 litigation. I think to do that would certainly go
12 beyond the restrictions that counsel just identified.
13 Q. Do you know whether this was a drug monograph
14 that was presented to the -- Kaiser's Ohio Region P&T
15 Committee?
16 A. Do I know that? I do not know that.
17 Q. I would ask you to turn to the third page of
18 this document. There is a Bates stamp KAIS 044045.
19 A. Okay.
20 Q. Beneath the heading "Formulary
21 Recommendations," do you see a -- a box that has the
22 heading "OPMG Psychiatry"?
23 A. I do.
24 Q. And do you see the text following that, among
25 other things, refers to a recommendation to extend

32

1  prescribing restrictions of newer anti epileptic drugs
2  including gabapentin to psychiatry specialists as a
3  third-line agent for the management of bipolar
4  disease?
5  A. I see that.
6  Q. Do you know whether any such recommendation
7  was made to the Ohio region P&T committee?
8  A. I don't know any more than what's in this
9  document.
10 Q. Do you have any reason to -- to doubt the
11 statement made in this document?
12 MS. NUSSBAUM: Objection. Nobody is calling
13 into question the authenticity of the document.
14 The document was produced by the plaintiff Kaiser
15 in this action, and the witness has testified that
16 he has no personal knowledge with respect to this
17 document, and this document is clearly outside the
18 scope of his 30(b)(6) deposition.
19 Q. Do you know whether --
20 MR. JAMES: Scratch that.
21 Q. I guess to reiterate, you don't know one way
22 or the other whether the Ohio region Chiefs of
23 Psychiatry made a recommendation in 2002 to extend
24 prescribing restrictions of gabapentin to psychiatry
25 specialists. Is that correct?

33

1  A.  I don't doubt this particular document.  I
2  think the document sort of speaks for itself, so I
3  don't have anything to add to the document.
4  Q.  So to the best of your knowledge, was such a
5  recommendation made in 2002?
6      MS. NUSSBAUM:  Objection.  You know, I think
7      that, first of all, this is outside the scope of
8      the 30(b)(6) notice.  Okay?  So the witness is not
9      now speaking as a representative of Kaiser.
10         He has testified that he has no knowledge of
11     this document.  Nowhere on the face of the
12     document does it indicate that he either wrote,
13     commented on or received the document.
14         And by counsel, we have indicated that this
15     document was produced in the course of litigation
16     and that we have no question as to the
17     authenticity of the document.
18     MR. JAMES:  I'll mark another exhibit.
19     THE WITNESS:  Could we take a five-minute
20     break?
21 Q.  Actually I'll ask you one question regarding
22 this document, and then we'll take a break.
23 A.  That will be fine.  If you don't mind taking
24 a little break.  I've been thinking.
25     MR. JAMES:  We were up to seven.

1      (Article titled Issue 4, April 2002
2      marked Cohen-7 for identification.)
3  Q.  When you have had a chance to glance over the
4  document, let me know.
5  A.  I have.
6  Q.  Do you recognize this document?
7  A.  Excuse me.  I do not.
8  Q.  Do you know what it is?
9  A.  I do not.
10 Q.  I ask you to turn to the second page.
11 A.  Okay.
12 Q.  At the bottom of the middle column, do you
13 see a heading "Neurontin"?
14 A.  I do.
15 Q.  And following the heading, do you see the
16 text, "Restricted to use by or in consultation with
17 Neurology, Psychiatry, Pain Management,
18 Orthorheumatology or with chief lead approval"?
19 A.  I do see that.
20 Q.  Do you know whether that text reflects the
21 decision of the Ohio Region P&T Committee following
22 its consideration of the drug monograph that was
23 designated Cohen-6?
24 A.  I do not know.
25 Q.  I guess going to the third heading sort of --

1  at the top of that middle column?
2  A.  Second page still?
3  Q.  Yes.  I think there is a heading that says
4  "Ocuvite PreserVision."
5  A.  Okay.
6  Q.  Do you see that heading?
7  A.  I see it.
8  Q.  Do you see the text "OPMG Ophthalmology"
9  following that heading?
10 A.  I see that at the beginning of that sentence,
11 yes.
12 Q.  Do you have any reason one way or the other
13 to believe whether -- to know whether this document
14 originates from Kaiser's Ohio region?
15     MS. NUSSBAUM:  I have an objection.  This is
16     outside the scope of this 30(b)(6) deposition.
17     This witness is not here to authenticate
18     documents, and he has already testified that he
19     has not seen this document before.  So the
20     document speaks for itself.
21     MR. JAMES:  Well, we can take a break as you
22     suggested.
23     THE WITNESS:  Okay.
24     THE VIDEOGRAPHER:  The time is approximately
25     4:20.  We are now going off the record.

1      (A recess is taken.)
2
3  CONTINUED DIRECT EXAMINATION BY MR. JAMES:
4      THE VIDEOGRAPHER:  The time is approximately
5      4:34.  This begins Tape Number 2.  We are now on
6      the record.
7  Q.  Before we left off, you were discussing the
8  substitution of branded Neurontin with generic
9  gabapentin in 2004 on the Ohio region formularies.  Is
10 that correct?
11 A.  Technically I think I did discuss it.  I
12 don't think that was right before we went on a break,
13 but that's -- I believe that's true, that that's the
14 time frame for that formulary decision in Ohio.
15 Q.  Do you know any reasons why that formulary
16 reason was made?
17 A.  Generic gabapentin became available.
18 Q.  Do you know whether any further changes have
19 occurred with regard to the formulary classification
20 of either brand name Neurontin or generic gabapentin
21 on Kaiser's Ohio region formulary?
22 A.  Since September, 2004?
23 Q.  Yes.
24 A.  I don't know of any changes since 2004.
25 Q.  Do you know whether Kaiser's Ohio region has

10/11/2007 Cohen, Mitchell (MDL)

### Page 38

1 implemented any drug utilization initiatives that
2 relate to Neurontin?
3    A.  It's my understanding there have been no
4 formal initiatives related to Neurontin.
5    Q.  I guess turning to Kaiser's Georgia region or
6 Southern region, I mean is it correct that the
7 Southern region encompasses the state of Georgia?
8    A.  Yes, we refer to it as the Georgia region,
9 because it's really only in Georgia. At least that's
10 my understanding. There might be a little bit of
11 spillover, but it is basically the Atlanta area.
12    Q.  When was the brand name Neurontin first added
13 to Kaiser's Georgia region formulary?
14    A.  It's my understanding in December of 1996.
15    Q.  Was it added with restrictions?
16    A.  No.
17    Q.  Was it added with any guidelines?
18    A.  No.
19    Q.  Do you know if there is any reason that the
20 Georgia region decided to add brand name Neurontin to
21 the formulary without either guidelines or
22 restrictions?
23    A.  I don't know of any reason.
24    Q.  Following the addition of Neurontin to
25 Kaiser's Georgia region formulary in December of 1996,

### Page 39

10/11/2007 Cohen, Mitchell (MDL)

1 are you aware of any further changes that were made
2 with regard to the formulary classification of
3 Neurontin in Georgia?
4    A.  It's my understanding that when the generic
5 gabapentin became available, that it replaced brand
6 Neurontin on the formulary in Georgia.
7    Q.  Do you know whether Kaiser's Georgia region
8 had conducted any drug utilization review regarding
9 either Neurontin or generic gabapentin?
10    A.  Can you tell me what you mean by "drug
11 utilization review"?
12    Q.  Actually I guess I'll break it up into two.
13       Has there been any formal initiative to
14 contain the costs of Neurontin within Kaiser's Georgia
15 region?
16    A.  I don't think that -- that narrow of a
17 question, I don't think that the answer --
18       THE WITNESS: Could you read it back. I'm
19 sorry.
20       (The question is read.)
21    A.  I think the answer to that is specifically as
22 limited to cost, no.
23    Q.  Has there been any initiative to alter
24 prescribing physicians conduct with regard to
25 Neurontin in Kaiser's Georgia region?

### Page 40

10/11/2007 Cohen, Mitchell (MDL)

1       MS. NUSSBAUM: Well, to alter? What does that
2 mean?
3    Q.  Do you have an understanding of what the term
4 "alter" means?
5    A.  Maybe you can restate your question, because
6 I didn't quite hear the whole thing. Go ahead. I'm
7 sorry.
8    Q.  I'll withdraw my last question.
9    A.  Okay.
10    Q.  And ask another one.
11       Let's just bring back Exhibit 1.
12       THE WITNESS: Is this it?
13       MS. NUSSBAUM: Yeah.
14    A.  Yes, I have it.
15    Q.  Turn to Topic 8 -- sorry -- Topic 2 on Page
16 8.
17    A.  Okay. I'm there.
18    Q.  On the second-to-the-last line of Topic II,
19 the term "drug utilization review" is used. Do you
20 see that?
21    A.  I see it.
22    Q.  And what's your understanding of the phrase
23 "drug utilization review" in that context?
24    A.  It's not my document. I don't know what's
25 meant by this.

### Page 41

10/11/2007 Cohen, Mitchell (MDL)

1    Q.  In preparing for this deposition, did you
2 have any understanding of the -- of this term as it
3 related to the topic?
4       MS. NUSSBAUM: That would go into
5 attorney-client discussions, and I ask the witness
6 not to divulge any discussions that he's had with
7 counsel.
8    Q.  Apart from your discussion with counsel, did
9 you have any understanding of the term "drug
10 utilization review" as it appeared in this context?
11    A.  Well, again, this is your document; and other
12 than the dialogue perhaps I've had with counsel, I
13 don't have anything to add.
14    Q.  Has there ever been any effort to alter
15 physicians' prescribing behavior with regard to
16 Neurontin in Kaiser's Georgia region?
17    A.  I guess I would ask you the question, when
18 you say "alter," what do you -- what do you mean?
19    Q.  To modify or to change.
20    A.  I think it is my understanding there has been
21 some effort to educate physicians about the -- what
22 the clinical -- what the indications are for the drug
23 Neurontin. I don't know whether that is to alter or
24 not, in your definition.
25    Q.  When did those education efforts first begin?

**Page 42**

1  A. It is my understanding about 2005, there were
2  some efforts to try to educate physicians about, you
3  know, the use of nortriptyline as an alternative to --
4  to Neurontin. And that followed up at that point
5  information and awareness that there had been a
6  substantial fraud on the market from Pfizer and its
7  predecessor in Neurontin marketing to physicians.
8      And so a real concern about the need to get
9  information out.
10 Q. Prior to 2005, was there any similar
11 educational effort with regard to Neurontin?
12 A. I don't know.
13 Q. Do you know of any educational efforts with
14 regard to Neurontin in Kaiser's Georgia region prior
15 to 2005?
16 A. I think I answered that question.
17 Q. Okay.
18 A. I do not --
19 Q. Okay. I think earlier I had a qualification
20 similar, but that was just a somewhat more expansive
21 version of the same question.
22 A. Well, maybe you can ask it again, because
23 maybe I misunderstood the question.
24 Q. I think we'll just move on. I inserted the
25 words somewhere into an earlier question. Provided

**Page 43**

1  that you understood the last question --
2  A. Well, I said now you got me a little confused
3  as to what your question really was and whether I
4  understood the prior question.
5      MR. JAMES: Can you -- can you read back my
6  last question.
7      (The question is read.)
8      (A discussion is held off the record.)
9  Q. Has Kaiser undertaken any efforts to
10 monitor -- monitor the effect that its educational
11 efforts have had on prescriptions of Neurontin in
12 Kaiser's Georgia region following 2005?
13     MS. NUSSBAUM: Yeah, I would object to that as
14 outside the scope of the 30(b)(6) notice on Topic
15 II.
16 Q. By the time the Georgia region began its
17 educational efforts, had brand name Neurontin already
18 been deleted from the formulary of Kaiser's Georgia
19 region?
20 A. I do not know. Because I do not have the
21 exact time frame. I know it was about the time that
22 the generic became available that it replaced the
23 brand. But I don't know the exact time frame.
24 Q. Do you know whether that substitution of
25 generic for brand occurred in either 2004 or 2005 in

**Page 44**

1  Georgia?
2  A. I do not know the exact date.
3  Q. Do you know whether it was in one of those
4  two years?
5  A. I do not know. But again, it's one that we
6  could perhaps give you that information later. I'm
7  sorry. I don't have it right now.
8  Q. So I will move to Kaiser's Northwest region.
9  A. Okay.
10 Q. What was Neurontin's classification on
11 Kaiser's Northwest region formulary in 1994?
12 A. It's my understanding in 1994 it first went
13 on the formulary with no restrictions or guidelines.
14 Q. Do you know whether the acceptance to
15 Kaiser's Northwest region formulary was only with
16 regard to certain dosages of Neurontin?
17 A. I don't think I testified that there were any
18 exceptions. I'm sorry.
19 Q. You believe that all dosages of Neurontin
20 were accepted for formulary in 1994 with regard to
21 Kaiser's Northwest region?
22 A. It's my understanding that the product -- the
23 drug Neurontin was put on the formulary.
24 Q. Regardless of dosage level?
25     MS. NUSSBAUM: Well, are you talking about if a

**Page 45**

1  particular physician writes a prescription for a
2  particular dosage, whether or not that dose of the
3  drug would be covered?
4  Q. Would it be on the formulary?
5  A. Well --
6      MS. NUSSBAUM: Well, it's -- I think we are
7  talking about apples and oranges --
8      THE WITNESS: Right.
9      MS. NUSSBAUM: -- here, so if you want to know
10 whether or not a physician wrote a prescription
11 for a dose of Neurontin, whether or not the
12 pharmacy would fill that and the patient would get
13 the prescription, I think that's one question.
14     If you want to know something else with
15 respect to the formulary, I think the witness has
16 testified it went on the formulary, it's his
17 understanding, without restriction.
18 Q. And "restriction" in that regard meaning
19 without restriction as to dose among other things?
20     MS. NUSSBAUM: What do you mean by dose? 2400
21 milligrams?
22     MR. JAMES: Yes.
23     MS. NUSSBAUM: So it's on the formulary, is
24 that what you are saying? Up to --
25     If you have a specific document or something,

## Page 46

1  because I think we are really like ships passing
2  in the night here. So if there is something that
3  you want to show the witness with respect to that,
4  we'll look at it.
5      Q. What is the next change, if any, with regard
6  to Neurontin's classification on Kaiser's northwest
7  region formulary?
8      A. Again, it's my understanding in December of
9  2003 that Neurontin was deleted from the formulary,
10 well, that it was deleted from the formulary.
11     MR. JAMES: I'm going to mark an exhibit.
12     (Regional Formulary and Therapeutics
13     Committee Minutes Dated February 10, 2000
14     marked Cohen-8 for identification.)
15     Q. When you have had a chance to glance over the
16 document, let me know.
17     A. Okay. I have.
18     Q. Do you know whether Kaiser's Northwest region
19 P&T Committee is known as the Regional Formulary and
20 Therapeutics Committee?
21     A. I think within -- I don't know whether this
22 document is a Northwest document, I guess if that's
23 partly what you are asking. It makes sense that they
24 might be known within their region as the Regional
25 Formulary and Therapeutics Committee.

## Page 47

1      Q. Do you know whether this particular document
2  was created by Kaiser's Northwest region?
3      A. I don't know.
4      Q. I'm going to ask you to turn to the page
5  bearing the Bates stamp KAIS 044377.
6      A. Okay.
7      Q. And turn to the Heading D, which is followed
8  by the words "gabapentin and Neurontin." Do you see
9  that?
10     A. I do.
11     Q. Does this document reflect your -- I'm
12 sorry -- refresh your recollection that 600 milligram
13 and 800 milligram Neurontin tablets were first added
14 to the Northwest region formulary in 2000?
15     MS. NUSSBAUM: Are you representing that those
16     tablets were available earlier or just became
17     available at that time? Are you making any
18     representation as to that?
19     MR. JAMES: No, I am not.
20     MS. NUSSBAUM: So I think that the witness has
21     already testified that when it was added to the
22     formulary, it was added to the formulary without
23     restriction. So it is likely that if a new
24     formulation of the same product became available,
25     that those too would be added to the formulary.

## Page 48

1      Q. Is your counsel's statement consistent with
2  your understanding?
3      A. Yes. I think to the extent -- it's not clear
4  why this refers to the 600, 800 milligrams
5  specifically, what the context was; but I think that's
6  consistent with my earlier testimony.
7      Q. Do you believe that once a drug is on the
8  formulary in any particular dose, a later available
9  dose will be added to the -- to the formulary on an
10 almost automatic basis?
11     MS. NUSSBAUM: I think, again, I'm really just
12     trying to clarify the record. I think, again, the
13     word "dose" here is misleading. We saw documents
14     yesterday with Mr. Kramer talking about the fact
15     that at some point, the manufacturer of Neurontin
16     came to market with line extensions and other
17     presentations of Neurontin. And I think that that
18     is what the concern is here in this document.
19     We haven't identified the document. This
20     again, if you want us to put a line in the
21     transcript and one could look at the -- you know,
22     the Physicians Desk Reference and see the precise
23     dates or Pfizer documents to see the precise dates
24     that the new presentations came to market, but I
25     don't think that when you say "dose," I don't

## Page 49

1  think that that's a clear understandable term.
2  And that's been the problem with the witness.
3      Q. Turning to the following paragraph, do you
4  see the heading: "Recommended criteria adopted by
5  RFTC and NWPerm"?
6      A. I do.
7      Q. Do you have an understanding of what "NWPerm"
8  refers to?
9      A. I would assume it's Northwest Permanente.
10     Q. Do you know when these recommended criteria
11 that follow that heading were first adopted?
12     A. Well, other than perhaps with what you can
13 understand the document to say, I don't have any
14 independent -- I don't have anything independent to
15 add.
16     MS. NUSSBAUM: I would also just state for the
17     record that this is outside the scope of the
18     30(b)(6) deposition; that the document speaks for
19     itself and we are not questioning the authenticity
20     of the document.
21     MR. JAMES: It is just to clarify: If a
22     particular non-California regional P&T committee
23     were to adopt recommended criteria with regard to
24     TCAs and gabapentin, that in your view would be
25     beyond the scope of this deposition? Is that

10/11/2007 Cohen, Mitchell (MDL)

correct?

MS. NUSSBAUM: I'm not certain I understand your question.

MR. JAMES: Could you read back my question to plaintiff's counsel.

(The testimony is read.)

MS. NUSSBAUM: That's a hypothetical question. I'm really not sure what the question is. From my perspective, the scope of the deposition is the notice that you served, the numerous meetings and conferrals that we had with respect to that notice and the many letter that we had back and forth.

If you have a question, ask the question of the witness. He'll answer, you know, whether or not I object, unless it's privileged and that's the only time that I ask him not to answer. And if you feel that you are not getting the satisfactory answer that you are entitled to, we'll ask the Judge.

MR. JAMES: We're at five p.m. now, so I would like to conclude the deposition for today, but before I conclude I would like to make a statement for the record: That this is somewhere between our third and fourth effort to obtain Rule 30(b)(6) testimony with regard to Kaiser's

50

10/11/2007 Cohen, Mitchell (MDL)

policies and practices regarding Neurontin. We initially took a deposition on July 12th and 13th, at which the witness professed not to know of any changes in Neurontin's formulary status, even as to its California regions, following 1999.

We then took a second 30(b)(6) deposition last week, which Kaiser agreed to after we had threatened to -- to move to compel a continued deposition. That deponent was likewise unprepared to answer questions with regard to any guidelines or policies or practices adopted in either of the non-California regions.

I now understood from counsel as of a couple of days ago that a witness who had initially been deposed -- or designated as a fact witness today, Dr. Debbie Kubota, would also serve as Kaiser's Rule 30(b)(6) witness with regard to Topic II of defendant's amended notice of deposition, but that witness apparently became too nervous at having to memorize information that was presented to her by counsel.

And so midday today we switched to yet another deponent. This deponent is, understandably perhaps, unable to answer basic questions regarding Kaiser's policies and

51

10/11/2007 Cohen, Mitchell (MDL)

practices related to Neurontin, and has also supplied a great deal of testimony that is flatly inconsistent with the documentary evidence that's been produced by Kaiser to the defendants.

I think continuing with this deposition is largely a waste of everyone's time, and defendants will move to compel the production of an appropriately prepared Rule 30(b)(6) witness on this topic.

MS. NUSSBAUM: Let me respond. When we first got the 30(b)(6) notice, there were many conferrals with respect to the scope of the notice, and our understanding at that time was that these depositions were going to be limited to the California regions. And that understanding stayed in effect for a very long period of time.

The defendants had their first 30(b)(6) witness, Mr. Carver, who testified very substantially with respect to all of these areas. They then had a witness, Dr. Mirta Millares, who was here, prepared to stay here for two days. The defendant started the deposition about a half hour late, arriving at the building even after the deposition was noticed. The defendants then took perhaps an hour of testimony, asked for a lunch

52

10/11/2007 Cohen, Mitchell (MDL)

break, asked for another break, asked for a third break. And then they ended her deposition in the early afternoon. This witness had planned to be here for two days.

We have had numerous correspondence back and forth with respect to the scope of this continued 30(b)(6) deposition. In addition we have offered the defendant not once, but perhaps a dozen times, that we would offer them a witness that with respect to any particular factual information such as a particular date that a particular, you know, product was or was not added to a formulary, if the witness could not answer that kind of question, although we would endeavor to do so, that we would leave a blank in the transcript and get them a verified under-oath answer within a week.

We also agreed that we would authenticate certain documents, which we are not obliged to do and have not even been asked to do. And we asked the defendants to give us their understanding of the scope of this deposition so that a witness could be appropriately prepared.

We have made great efforts to prepare witnesses here. We have a witness who, in fact,

53

```
 1   is prepared. We are ready to go forward here.
 2   For judicial economy and for the convenience of
 3   all parties, we would ask that the defendants ask
 4   whatever questions they have.
 5        We have a witness sitting here. We have had
 6   other witnesses sitting here waiting for these
 7   questions to be asked. And to the extent that
 8   there are some questions that the witness cannot
 9   answer because those questions were not
10   anticipated, we would leave blanks in the
11   transcript and we would promptly get a verified
12   answer back.
13        That is the way we think it would make sense
14   to proceed here, and that is also the way it would
15   make sense even if the defendants are going to
16   choose to make a motion, for the Judge to be able
17   to see the particular questions that the
18   defendants have, and for the Judge to be able to
19   determine whether or not those are questions
20   within the scope of the 30(b)(6) notice and
21   whether or not a witness has been produced who has
22   been properly prepared.
23        So again we are sitting here, we are prepared
24   to sit here. We would like the questions.
25   Alternatively if you would like, we can take as a
```

54

```
 1   template the questions that you have asked with
 2   respect to Georgia and/or the Northwest region and
 3   we can provide information to you for all of the
 4   other regions that would be responsive to those
 5   questions.
 6        And we are willing to do that within a
 7   reasonable period of time, ten days, under oath.
 8        MR. JAMES: I think our statements are on the
 9   record and together with our prior correspondence
10   and motion practice, fully set forth our
11   respective views and I have no further questions.
12        MS. NUSSBAUM: You are ending this 30(b)(6)
13   deposition?
14        MR. JAMES: Yes.
15        MS. NUSSBAUM: Okay.
16        THE VIDEOGRAPHER: The time is approximately
17   5:04. This concludes today's deposition. We are
18   now going off the record.
19        (The witness is excused.)
20        (The deposition is adjourned.)
21        (The court reporter retains the exhibits.)
22
23
24
25             *    *    *
```

55

```
 1   IN RE NEURONTIN MARKETING       }
     AND SALES PRACTICES LITIGATION  }
 2                                   }
                                     }
 3   IN RE: NEW YORK NEURONTIN       }
     PRODUCTS LIABILITY LITIGATION   }
 4                                   }
             Defendants.             }
 5   ----------------------------------X
 6
 7
 8
 9
10        I have read the foregoing transcript and found
11   it to be a truthful and accurate representation of the
12   testimony I gave in connection with the captioned
13   matter on_____.
14
15
16
17             _____
                 MITCHELL COHEN, ESQ.
18
19
20   The State of:
     County of:
21
22
23   Sworn and subscribed before me
     this      day of       , 2007
24   My commission expires:
25
```

56

```
 1             E R R A T A   S H E E T
 2
         Please list any correction with the
 3   corresponding page and line numbers.
 4
 5        PAGE   LINE           CORRECTIONS
 6   1.                :
 7   2.                :
 8   3.                :
 9   4.                :
10   5.                :
11   6.                :
12   7.                :
13   8.                :
14   9.                :
15   10.               :
16   11.               :
17   12.               :
18   13.               :
19   14.               :
20   15.               :
21   16.               :
22   17.               :
23   18.               :
24   19.               :
25   20.               :
```

57

```
 1                    C E R T I F I C A T E
 2
 3
 4           I, MARK SCHAFFER, a Shorthand Reporter and
 5   Notary Public of the States of New York and New
 6   Jersey, do hereby certify that prior to the
 7   commencement of the examination the witness was sworn
 8   by me to testify to the truth, the whole truth and
 9   nothing but the truth.
10           I do further certify that the foregoing is a
11   true and accurate transcript of the testimony as taken
12   stenographically by and before me at the time, place
13   and on the date hereinbefore set forth.
14           I do further certify that I am neither of
15   counsel nor attorney for any party in this action and
16   that I am not interested in the event nor outcome of
17   this litigation.
18
19
20
21
                       MARK SCHAFFER, C.S.R.
22
23   New Jersey C.S.R. License Number XI00794
     Notary Public of the State of New Jersey
24   Commission No. 55985 Expiring September 13, 2011
     Notary Public of the State of New York
25   Registration No. 01SC4953912 Expiring July 31, 2009
```