UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                :
        SALES PRACTICES AND            :   Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   Judge Patti B. Saris
:
THIS DOCUMENT RELATES TO:            :   Magistrate Judge Leo T.
:   Sorokin
      PRODUCTS LIABILITY ACTIONS      :
:
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' REPLY TO PRODUCTS LIABILITY PLAINTIFFS'
MEMORANDUM IN RESPONSE TO THE COURT'S INVITATION
FOR SUGGESTIONS TO AVOID FUTURE DISMISSALS OR
APPLICATIONS FOR WITHDRAWALS IN THE TRACK ONE
CASES, AND IN OPPOSITION TO DEFENDANTS' REQUEST
FOR ENTRY OF A *LONE PINE* CASE MANAGEMENT ORDER**

Plaintiffs express a number of concerns – all of them unfounded – regarding entry
of a *Lone Pine* case management order, but they have failed to provide any basis for the Court to
reject Defendants' proposed order, which is intended to remedy the problems created by
plaintiffs' counsel's failure to properly screen claims before filing suit. Plaintiffs' alternative
proposal – that plaintiffs' counsel call plaintiffs on the telephone to discuss their case – misses
the mark in that it would not ensure that meritless cases are weeded out now, and, therefore,
provides little assurance to Defendants and this Court that there will not be a recurrence of the
dismissals and motions to withdraw that have thus far disrupted the orderly management of this
MDL. Plaintiffs' proposal should be rejected as inadequate and the Court should enter the order
requested by Defendants.

Plaintiffs' request that Defendants be made to proceed with *Alsberge* – a case Defendants did not designate – is yet another attempt by plaintiffs to manipulate the Track One case-selection process. Defendants advised plaintiffs' counsel days before the deposition of the prescriber in *Alsberge* that Defendants had not yet selected a second case to go along with *Ellis*. Plaintiffs' counsel's representation to this Court that they were relying on the designation of *Alsberge* in agreeing to attend the deposition of the prescriber is disingenuous and simply untenable given Defendants' clear and unambiguous communications regarding where they were in the case-selection process. Accordingly, plaintiffs' request that Defendants be required to proceed with *Alsberge* should be summarily rejected.

## I.    A *LONE PINE*-TYPE ORDER IS NECESSARY TO PREVENT FURTHER DISRUPTIONS TO THE MDL PROCESS

At the October 17 hearing, the Court stated: "[W]hat I'm interested in and what's driving me is the following: I want to be able to put you [Defendants] in the position that you can pick your cases and not have them dismissed or motions to withdraw." Oct. 17, 2007 Tr. at 68:22-25. Rather than offer a solution that would accomplish the Court's objective, plaintiffs' counsel propose only that they confer with each of their clients within 45 days regarding the status of their cases and determine any circumstances under which plaintiffs may not wish to proceed. *See* Pls.' Br. at 7. This proposal falls far short of what is needed to ensure that future Track One selections are not dismissed or subject to motions to withdraw.

As Defendants' counsel pointed out at the October 17 hearing, a telephone call to each plaintiff to determine whether they wish to proceed with the case does not address situations like *Strickland* and *Mendoza* where the plaintiffs wanted to proceed and, in fact, were deposed, and the parties conducted other fact discovery, including physician depositions, only to

have the cases abandoned when it became obvious they had no chance of succeeding.[1] Plaintiffs' proposal fails to address the very heart of this issue:  The inadequate screening of plaintiffs' cases before filing.  Only after this problem is remedied can Defendants and the Court have any assurance that future dismissals or motions to withdraw will not occur with the frequency that they have to date.

In this regard, it is significant that plaintiffs' counsel have not denied that Mr. Finkelstein made false statements to Judge Stearns, the FDA, and the news media when he stated that none of his clients had prior suicide attempts and that he had "weeded out" anyone who attempted suicide before taking Neurontin.  *See* Defs.' Opening Br. at 4-5.  The point of bringing Mr. Finkelstein's statements to the attention of the Court is to demonstrate that such comments reflect an obvious failure by his firm to review plaintiffs' claims before filing the complaints.  Defendants are not arguing that a plaintiff with a prior psychiatric history should not be permitted to bring suit, as plaintiffs would have this Court believe.  Rather the point is that plaintiffs' counsel are not sufficiently informed about their cases.  That fact could not be more clear given the repeated practice of seeking dismissal or moving to withdraw from nearly half of the Track One cases.

What Defendants do not want – and the Court has repeatedly made clear it does not want – is for Defendants to select two more cases and proceed with discovery only to have plaintiffs seek to dismiss or withdraw from one or both of the cases, having decided that they cannot win them.  Plaintiffs' counsel suggest that they are not in a position to fully assess each case until the depositions of plaintiffs and their treating physicians are complete.  This ignores, however, the fact that counsel have an obligation pursuant to Rule 11 to conduct a reasonable

---

[1]     Further, in *Mendoza*, *Fenelon*, and, presumably, *Ellis*, plaintiffs still want to proceed with their cases.  It is plaintiffs' counsel that have made the decision to pull the plug on their representation.

inquiry <u>before</u> filing suit. Plaintiffs' counsel maintain that they performed a "thorough review of each case . . . prior to commencing the action." Pls.' Br. at 12. We need look no further than *Strickland* and *Mendoza*, however, to see that a thorough review was not done. Had plaintiffs' counsel conducted thorough initial interviews with Mr. Strickland and Mr. Mendoza and collected and reviewed their medical records, they would have known from the outset that those cases were not viable. To say that this determination could not be made until after discovery was completed belies the facts. As set out in Defendants' initial brief, Mr. Strickland's and Mr. Mendoza's deposition testimony and medical records tell the story – and all this information was available to plaintiffs' counsel <u>before</u> filing suit.

The adequacy of plaintiffs' counsel's review of the claims is further called into question by the fact that they have filed cookie-cutter complaints that provide little information as to each plaintiff and have only produced medical records to Defendants in slightly more than half of their cases. Without medical records, just what was counsel's "thorough review" based on in those other cases?

Until now, plaintiffs' counsel have been able to sit back and let Defendants shoulder the enormous expense of collecting and analyzing medical records, identifying wholly meritless cases in the process. In essence, plaintiffs' counsel have waited for Defendants to do what they should have already done themselves pursuant to Rule 11. Defendants should not have to review one more medical record in these cases until plaintiffs' counsel have done so first.

Plaintiffs criticize Defendants' *Lone Pine* proposal, arguing that it is a "drastic step" that is appropriate only in very limited circumstances that are not applicable here. Specifically, plaintiffs suggest that *Lone Pine* orders should be reserved for toxic tort cases involving "a large number of 'repeat players,'" negative governmental opinions against

plaintiffs' claims, and product identification issues, and that such orders should only be used in "extraordinary situations." Pls.' Br. at 6. Plaintiffs further argue that Defendants' request for a *Lone Pine* order is untimely because the parties have already conducted significant discovery, that the issuance of such an order would severely prejudice plaintiffs by denying them the procedural safeguards under the summary judgment standards, and that obtaining expert affidavits for their pending cases would be too costly and would cause an inordinate delay in the litigation. *Id.* None of these concerns should dissuade the Court from entering the order proposed by Defendants. Defendants address each of plaintiffs' points in turn.

As an initial matter, plaintiffs construe too narrowly the applicability of the type of order sought by Defendants. There are no hard-and-fast rules regarding the types of cases in which such orders are appropriate. While *Lone Pine* orders are most often seen in toxic tort cases, courts enter such orders: (1) to manage or reduce potentially burdensome or extensive discovery; (2) to eliminate meritless claims; (3) to provide notice to the court and the defendants of plaintiffs' claims; (4) to facilitate the management of the court's docket; (5) to help address complex causation issues; and (6) to prevent plaintiffs from seeking to delay having to prove their cases in the hopes that defendants will simply settle to avoid the costs of continuing litigation. *See, e.g.*, *Prove It or Lose It: Defending Against Mass Tort Claims Using Lone Pine Orders*, 26 Am. J. Trial Advoc. 599, 601-11 (2003). All these criteria are present here.

Further, a multi-district litigation of this nature, where the personal injury claims of more than 750 plaintiffs are pending, presents many of the same burdens on defendants and other challenges seen in toxic tort cases. Plaintiffs ignore completely that one of the primary purposes of a *Lone Pine* order is to screen invalid or unsubstantiated claims and discourage the

bringing of weak or questionable claims – which is precisely the reason Defendants have recommended this approach here.

It is clear, though, that *Lone Pine* orders are not limited to traditional toxic tort cases. As the Fifth Circuit has stated, "*Lone Pine* orders are designed to handle the complex issues and potential burdens on defendants and the court in *mass tort* litigation . . . and such orders are issued under the wide discretion afforded district judges over the management of discovery under Fed. R. Civ. P. 16." *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340 (5th Cir. 2000) (emphasis added). Judge Lewis Kaplan of the Southern District of New York issued a *Lone Pine* order in a pharmaceutical products liability multi-district litigation after deeming it "essential to the fair and efficient administration of [the] litigation." *In re Rezulin Prods. Liab. Litig.*, No. 00 Civ. 2843 (LAK), 2005 WL 1105067 (S.D.N.Y. May 9, 2005).

Plaintiffs' argument that Defendants' request for a *Lone Pine* order is untimely is also without merit. First, the Court invited suggestions for dealing with this problem in Discovery Order No. 14. Second, pursuant to Fed. R. Civ. P. 16, district courts have wide discretion to issue pretrial orders at any stage of the litigation, including orders necessary for "simplification of the issues, including the elimination of frivolous claims," and "adopting special procedures for managing potentially difficult or protracted actions." Fed. R. Civ. P. 16(c)(1) and (12). Indeed, Judge Kaplan issued his *Lone Pine* order in *In re Rezulin* at an advanced stage in the MDL proceedings. *See In re Rezulin,* 2005 WL 1105067.

Plaintiffs' argument that having to comply with a *Lone Pine* order would deny them their procedural rights under summary judgment standards is equally unavailing. In *Acuna*, plaintiffs argued that a pre-discovery order requiring expert support for the details of each plaintiff's claim "imposed too high a burden for that stage of the litigation." *Acuna*, 200 F.3d at

340.  In upholding the *Lone Pine* orders issued by the district court, the Fifth Circuit held that the

district court's orders

> essentially required that information which plaintiffs should have
> had before filing their claims pursuant to Fed. R. Civ. 11(b)(3).
> Each plaintiff should have had at least some information regarding
> the nature of his injuries, the circumstances under which he could
> have been exposed to harmful substances, and the basis for
> believing that the named defendants were responsible for his
> injuries.

*Acuna*, 200 F.3d at 340.  Further, as one commentator has observed:

> [I]f the plaintiffs have a valid claim, organizing and presenting the
> evidence the court demands should not present too difficult a task.
> This is especially true considering the requirement that plaintiffs
> have evidence to support their claims before filing suit in the first
> place.  When one considers the immense task and risk facing
> defendants in such suits, establishing a minimum threshold for
> plaintiffs in the form of the Lone Pine Order seems only fair.
>
> * * *
>
> The filter that Lone Pine Orders represent is specially designed to
> screen from the court system those claims that have no right to be
> there.  Legitimate plaintiffs have little to fear when a court imposes
> a CMO in the form of a Lone Pine Order.  Neither should plaintiffs
> be surprised by the fact that not only are defendants widely
> expected to request Lone Pine Orders, courts are predisposed to
> grant such requests.  Establishing a prima facie case is a simple
> procedure, hardly one to which a plaintiff about to expose a
> defendant to costly and time-consuming litigation should object.

Scott A. Steiner, *The Case Management Order: Use and Efficacy in Complex Litigation and the

Toxic Tort*, HASTINGS W.-NW. J. ENVTL. L. & POL'Y, Fall 1999, at 88.

When compared to the costs facing the defendants in a litigation of this size, the

cost to plaintiffs in complying with a *Lone Pine* order is not an undue burden.  As discussed

above, the information requested is information that plaintiffs should have had before filing suit.

Moreover, given that plaintiffs are required to provide expert testimony to establish causation in

each of their cases, how can they argue that they are prejudiced by having to provide expert

affidavits?[2]  Further, weeding out invalid claims in this litigation has implications that go beyond the immediate concerns regarding the Track One process to encompass all remaining proceedings in this MDL.  If these claims survive summary judgment, at some point this litigation will move beyond the trials of the initial Track One cases to include discovery in the remaining cases in Finkelstein's inventory.  Eliminating the unsubstantiated claims now prevents the parties – and the Court – from spending money and resources on those cases as well.

Nor would the time needed to comply with the *Lone Pine* order cause any undue delay to the MDL proceedings.  Plaintiffs' counsel should be able to conduct the requisite review of their cases within 45 days.  Defendants would select their replacement cases shortly thereafter and the parties would proceed with discovery.  The long-term benefit of saving time, money, and other resources through the winnowing out of invalid claims far outweighs any concerns over a brief delay in the proceedings.  The wheat should be separated from the chaff before this litigation proceeds any further.

Finally, at the October 17 hearing the Court expressed concerns about the potential ramifications of requiring plaintiffs' counsel to submit affidavits.  Defendants suggested that the form in which the information is provided is less important than the substance.  Plaintiffs should be required to: identify the specific injury alleged and circumstances of the injury; confirm that each plaintiff used Neurontin prior to that alleged injury; collect, review, and produce each plaintiff's medical records; and have an expert prepare a declaration in each case

---

[2]    Plaintiffs suggest that submission of their expert reports on general causation should somehow satisfy Defendants and the Court.  But this does nothing to establish the viability of the individual claims.  First, as will be shown in Defendants' motion(s) for summary judgment, there is no reliable scientific evidence linking Neurontin to suicide – period.  But beyond that, the point of the proposed order is for plaintiffs to show that they have physician support for their claim that Neurontin caused the specific alleged injury of each plaintiff.

stating that the alleged injury resulted from the ingestion of Neurontin. This is basic information that plaintiffs' counsel should readily be able to provide if they stand behind their cases.

The power to enter the type of order proposed by Defendants derives from both the inherent powers of the Court to manage the discovery process and Rule 16 of the Federal Rules of Civil Procedure. Accordingly, the Court need not style the order as a *Lone Pine* order. Whether the order is styled as a *Lone Pine* order or not, at the end of the day, Defendants are asking the Court to enter an order that requires plaintiffs to undertake a meaningful review of their cases and the factual basis for their claims before Defendants select their two Track One replacement cases.

## II.    PLAINTIFFS' COUNSEL'S REQUEST THAT DEFENDANTS BE REQUIRED TO PROCEED WITH *ALSBERGE* HAS NO BASIS AND PLAINTIFFS' COUNSEL HAVE MISSTATED THE COMMUNICATIONS BETWEEN COUNSEL REGARDING SELECTION OF THE REPLACEMENT CASES

Plaintiffs appear to want the ability to select their best case while reserving veto power over the cases selected by Defendants – not quite the level playing field envisioned by the Court when it instituted the Track One process. Now, plaintiffs have taken it one step further and apparently would like to select one of Defendants' replacement cases for them. Remarkably, plaintiffs' counsel ask this Court to order Defendants to proceed with *Alsberge* as one of their two replacement cases, a case Defendants have not designated. Plaintiffs' counsel assert that Defendants should have to proceed with *Alsberge* because plaintiffs' counsel "participated in the deposition of the prescriber in reliance on Defendants' counsel's statement that they intended to designate the *Alsberge* case as a Track One replacement case." Pls.' Br. at 3. This assertion has no merit. Defendants' counsel advised plaintiffs' counsel several days before the prescriber's deposition that Defendants had not yet selected a second replacement case (to go along with

*Ellis*).  As such, plaintiffs' counsel's claim of reliance on the selection of *Alsberge* as the reason they agreed to attend the prescriber's deposition on short notice is baseless.

Pursuant to Discovery Order No. 14, Defendants' deadline for selecting their two Track One replacement cases was Wednesday, October 10, 2007.  After initially advising plaintiffs' counsel on Thursday, October 4, as a courtesy, of Defendants' present intention to select *Ellis* and *Alsberge* as the two replacement cases, defense counsel made clear in correspondence on Friday, October 5, that Defendants intended to select *Ellis* but had not yet made a final decision regarding the second case.  Specifically, defense counsel stated:  "As we previously advised, we intend to select *Ellis* as one of our new Track One cases and are attaching deposition notices for plaintiff and his wife.  *We are still considering a handful of cases for our second selection*.  Accordingly, we request that you provide us with the authorizations, which will be sent under separate cover, as soon as possible."  *See* October 5, 2007 email (3:26 pm) (attached as Exhibit A) (emphasis added).  That same email confirmed that the deposition of the prescriber in *Alsberge* was scheduled for October 9.[3]  *See id.*  A subsequent email from defense counsel on October 5 reiterated that a decision had not been made regarding selection of the second replacement case:  "*To the extent that we end up selecting Alsberge as our second Track One case*, we will produce [the sales representative] either in connection with plaintiff's deposition (in Seattle) or in, as per our agreement, in NY at the offices of Davis Polk.  As for the custodial file, *I assume we can discuss these logistics if/when we formally designate Alsberge*."  *See* October 5, 2007 email (4:39 pm) (attached as Exhibit B) (emphasis added).

---

[3]   The prescriber in *Alsberge* was scheduled for deposition on October 9 because *Alsberge* was among the cases being considered by Defendants and that was the only date the doctor was available prior to Defendants' November 9 deadline for selecting its trial workup case.

As this correspondence indicates, plaintiffs' counsel were fully aware four days before the prescriber's deposition that no decision had been made regarding the selection of the second Track One case. Consequently, plaintiffs' counsel's statement that Defendants chose to "withdraw" their selection of *Alsberge* after plaintiffs' counsel had already traveled to Seattle and appeared at the deposition of the prescriber (see Pls.' Br. at 4), is incorrect. They knew that the selection of the second case was still under consideration and never raised concerns about attending the deposition in their communications with defense counsel. Asking this Court to require Defendants to proceed with *Alsberge* is yet another attempt by plaintiffs' counsel to manipulate the case-selection process and deprive Defendants of their right to choose their best case.

Plaintiffs' counsel also express surprise that Defendants designated *Ellis* and *Wendorf* on October 10 as their two replacement cases after being advised by plaintiffs' counsel on October 5 that plaintiffs' counsel intend to withdraw from *Ellis*, and being advised on October 8 that Ms. Wendorf wished to "discontinue her case." Pls.' Br. at 4-5. Given the impending case-selection deadline, what did plaintiffs' counsel expect Defendants to do? Defense counsel spent significant time and resources investigating *Ellis*, *Wendorf* and others as potential replacement cases only to be advised by plaintiffs' counsel <u>two</u> <u>days</u> before Defendants' designations were due (three business days in the case of *Ellis*) that, as was done with *Strickland*, *Mendoza*, and *Fenelon* – these cases too were being abandoned. Defendants had no practical choice but to designate the two preferred cases of those being considered and seek to resolve the situation caused by the announced dismissals/withdrawals at the October 17 hearing. That the parties have had to appear before the Court again regarding this issue after the Court's admonition in Discovery Order No. 14 demonstrates why a *Lone Pine*-type case management

order is necessary. There must be a reliable procedural mechanism in place to prevent these repeated dismissals and withdrawals, which continue to disrupt the Track One process.

## III.     CONCLUSION

For the reasons set forth herein and in Defendants' initial brief, the Court should enter the *Lone Pine* order proposed by Defendants and provide Defendants such other relief as the Court deems appropriate under the circumstances. Further, the Court should deny plaintiffs' request that Defendants be required to proceed with *Alsberge* as a Track One replacement case.

Respectfully submitted,

DAVIS POLK & WARDWELL


By:   /s/ James P. Rouhandeh
        James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000


SHOOK, HARDY & BACON L.L.P.


By:   /s/ Scott W. Sayler
        Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

- and -

HARE & CHAFFIN

By:   /s/ David B. Chaffin
      David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company*

### CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on October 29, 2007.

                              /s/ David B. Chaffin