# EXHIBIT A.1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------X

| | |
|---|---|
| In re: NEURONTIN MARKETING | MDL Docket No. 1629 |
| SALES PRACTICES, AND PRODUCTS | Master File No. |
| LIABILITY LITIGATION | 04-10981 |

------------------------------X

VIDEOTAPED DEPOSITION OF

MICHAEL ROBERT TRIMBLE, M.D.

New York, New York

October 19, 2007

VOLUME II

Reported by:
Bonnie Pruszynski, RMR

STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------x
IN RE NEURONTIN PRODUCT
LIABILITY LITIGATION Index Number 765000
-----------------------------x

VIDEOTAPED DEPOSITION OF
MICHAEL ROBERT TRIMBLE, M.D.
New York, New York
October 19, 2007

October 19, 2007
9:10 a.m.

Continued deposition of MICHAEL ROBERT TRIMBLE, M.D., held at Lanier Group, 126 East 56th Street, New York, New York, before Bonnie Pruszynski, a Notary Public of the State of New York.

APPEARANCES:
FINKELSTEIN & PARTNERS
Attorneys for Product Liability Plaintiffs
785 Broadway, Third Floor
Kingston, New York 12401
BY: ANDREW G. FINKELSTEIN, ESQ.
JACK LONDON, ESQ.
Attorneys for Plaintiffs
3701 Bee Cave, Suite 200
Austin, Texas 78746
BY: JACK LONDON, ESQ.
THE LANIER LAW FIRM
Attorneys for Plaintiffs
6810 FM 1960 West
Houston, Texas 77069
BY: KENNETH S. SOH, ESQ.
WHEELER TRIGG & KENNEDY, LLP
Attorneys for Defendant Pfizer, Inc. and the witness
1801 California Street, Suite 3600
Denver, Colorado 80202
BY: JAMES E. HOOPER, ESQ.

ALSO PRESENT: Keith Altman, Finkelstein & Partners
Leigh Raymond, Ph.D., Shook, Hardy and Bacon
Charles Taylor, Ph.D.
Lee Bowrey, Nationwide Video

THE VIDEOGRAPHER: My name is Lee Bowrey of Veritext Corporate Services.

The date today is October 19, 2007, and the time is approximately 9:08 a.m.

This deposition is being held in the office of the Lanier Law Firm located at 126 East 56th Street, New York, New York.

The caption of this case is In Re Neurontin Sales Marketing Practices and Products Liability Litigation in the United States District Court, District of Massachusetts, MDL Docket Number 1629, Master File Number 04-10981, CA number 05-11017.

The name of the witness is Professor Michael Robert Trimble.

This is day two of Professor Trimble's testimony and I would like to remind him that he remains under oath.

The court reporter for today is Bonnie Pruszynski.

At this time, I would like the attorneys to identify themselves and the parties they represent, after which we can

proceed.

MR. FINKELSTEIN: Andrew Finkelstein, Finkelstein and Partners, on behalf of the product liability plaintiffs in the MDL and the Smith family.

MR. LONDON: Jack London on behalf of plaintiff's products liability steering committee.

MR. SOH: Ken Soh, the Lanier Law Firm, for the plaintiffs.

MR. ALTMAN: Keith Altman, non-attorney with Finkelstein & Partners.

MR. TAYLOR: Charles Taylor, Pfizer.

MS. RAYMOND: Leigh Raymond, non-attorney, Shook Hardy and Bacon for Pfizer.

MR. HOOPER: Jim Hooper for Pfizer.

Before we get started, I would like to note an objection on the record to the production of the document marked as Exhibit 8 yesterday and entitled Professor Michael R. Trimble, M.D. Case List. Pursuant to Rule 26, I don't think that meets plaintiff's obligations under Rule 26 and

reserve rights to seek appropriate relief under Rule 37.

EXAMINATION (Continued)
BY MR. HOOPER:

Q Professor Trimble, you have a copy -- let me ask you first.

You have brought with you a stack of materials to your deposition, I see?

A Correct.

Q May we see those?

A You are welcome to see them.

Q And what are those documents, sir?

A These are the largely, mainly, peer-reviewed papers that I have relied upon in my report.

They are also additional peer-reviewed papers that are not in my report, but which helped to confirm my views in my report, and they are here, as an aid memoir, in case you asked me a question that I didn't have a precise answer, that I could refer to them; that's all.

Q Very well.

If you could pass those over, we can look through them. We may have something to ask

on those, maybe not.

A May I keep them with me for the time being? You are welcome to see them in the break. I might want to look at them within the next hour.

Q Sure, that's fine.

Let's look at Exhibit 3.

A Before you start, I have remembered two more people overnight who I have had discussions with.

Q All right. Who are those?

A Professor -- Professor Bettina Schmitz, S-C-H-M-I-T-Z.

Q And the other?

A Professor Peter Stonier. S-T-O-N-I-E-R.

Q Where is Professor Bettina Schmitz located?

A At the Charite, C-H-A-R-I-T-E. Hospital, Berlin.

Q And what did you discuss with Professor Schmitz.

A Professor Schmitz and I have collaborated on a number of articles and I discussed, in a loose way, whether or not she had

experience with gabapentin and whether she would be surprised if side effects were being reported with this compound.

Q What did she say?

A That she had very little experience with the compound. She is an epileptologist, by the way, and also a psychiatrist, and that she would not be surprised.

Q Did she comment on -- well, gabapentin is a prescription drug, is it not?

A Yes.

Q All prescription drugs have some adverse effects associated with them?

A We were specifically talking about affect and depression.

Q Did she say she had any patients on gabapentin commit suicide?

A No.

Q Did she say she had any patients on gabapentin attempt suicide?

A Not that I recall. She very rarely used the compound.

Q And where is Professor Peter Stonier located?

Page 255

A 5194.

Q To the right of it, what is the number patients comprising the placebo group?

A 2682.

Q What is the incidence of completed suicide in the gabapentin group?

A Zero.

Q What is the incidence of completed suicide in the placebo group?

A Zero.

Q What is the incidence of suicide attempt in the gabapentin group?

A Zero.

Q And what is the incidence of suicide attempt in the placebo group?

A Zero.

Q And, Professor, if you would please look down at the fourth row from the bottom, suicidal ideation, what is the number of, excuse me, the number of events of suicidal ideation and the percentage thereof in the gabapentin group?

A Two, in parentheses 0.039.

Q And what is the number of events and percentage in the placebo group?

Page 256

A One, in parentheses 0.037.

Q Is this something that you think a scientist should have looked at in assessing whether there is a relationship between gabapentin and suicide in this case?

A It is not relevant to the issue. The answer is no.

Q Professor Trimble, I just want to give you another chance on that.

Is it your opinion, as a scientist, that the incidence rates of completed suicide, suicide attempt and suicidal ideation from randomized, double blind, placebo-controlled clinical trials are not relevant to a causal assessment of whether the agent of interest, gabapentin, has a causal association with either of those three outcomes? Is that your opinion?

A That is my opinion.

Have we finished with this?

Q Yes.

Do you have any information or knowledge as to the total patient exposure to gabapentin in clinical use since the time of its introduction in 1993?

Page 257

A As of today, no.

Q So, I take it you, therefore, have no expectation as to how many events of suicide or suicide attempt or ideation would have, might have been reported if your theory were true?

A I do not know how many cases of suicidal ideation, suicide attempt or completed suicide have been reported worldwide.

Q Now, do you have any belief as to what those numbers might be?

A I do not.

Q Have you looked at any post-marketing data analyses in connection with this case?

A I have referred already to company documents that I have seen.

Q None other than what is cited in your report; correct?

Let me ask it better.

Have you looked at any post-marketing pharmacovigilance data regarding suicide, suicide attempt or suicidal ideation that are not referenced in your report?

A My report did not reference every single document that I have seen for obvious

Page 258

reasons that it has to be a containable document and readable by people involved in the case, but I have cited the most relevant that I consider to be important in this case, but there are other company documents. There are hundreds of company documents that I could have quoted leading, for example, to the conclusion that depression is a side effect that occurs in five percent or more of the population, but I don't quote them all, but I quote some.

Q Were you provided any company documents constituting an overall analysis of the post-marketing safety database for gabapentin?

A I just don't know the status of some of the documents that I have had -- I don't, I just don't know whether a document that I have here in front of me now is the kind of document you are talking about. I just don't know the status of the documents, that is all I am saying. And, of course, they change from year to year, I expect.

Q Please take a look at page 3806 in your report marked as Exhibit 3.

A Yes.

Page 259

Q Professor, were you provided any of the integrated safety summaries for Neurontin's new drug application submissions to FDA for the epilepsy or neuropathic pain indications?
A I really don't know.
Q You don't recall seeing those?
A I saw so much, I do not know the status of the documents I have seen, that's all I am saying. There are many documents.
Q You are here today for your deposition in the case, and I would like for you to tell me whether the integrated safety summary for the Neurontin gabapentin neuropathic pain submission is a basis or reason for the opinions expressed in your report?
A If it's to do --
MR. LONDON: Excuse me, Doctor. Let me make an objection to form and if you don't mind me saying to you -- and don't listen to what I'm saying, Doctor.
MR. HOOPER: He's going to listen to what you are saying. Just make your objection, Jack.
MR. LONDON: My objection is form, is

Page 260

the difficulty in perceiving the caption of the document versus the body of the document, and whether he has seen the body of the document, it may not have registered as the caption. I don't want to suggest that is the case. He may not have seen the interim safety summary.
I want to see if you can help getting to the substance of what you are trying to get to with the body of the document.
Q Do you recall ever seeing the phrase "integrated safety summary" in connection with your work in this case?
A No.
Q Can you take it -- do you have page 38 of your report now, Professor Trimble?
A I do.
Q In the first full paragraph, beginning with the words document, Pfizer.
A Yes.
Q You list in that paragraph various adverse events and percentages along with them; correct?
A Correct.

Page 261

Q And those are percentages that you saw in that document that were reported in patients who were administered gabapentin; correct?
A Correct.
Q What was the comparable placebo rate in the information that you reviewed there?
A I am not sure. I don't recall now exactly whether this gave rates for placebo. These were adverse events and I don't recall offhand whether this also included placebo.
Q So, these are incidence rates on gabapentin, but they are not compared to -- there is no comparable rate in an unexposed or placebo controlled group?
MR. FINKELSTEIN: Objection.
Q Is that right?
MR. FINKELSTEIN: That's not what he said. You are mischaracterizing what he said. He said he doesn't recall.
A I don't recall now whether these documents also gave placebo rates.
Q Your report certainly doesn't?
A Correct.

Page 262

Q Depression is an adverse event that you consider very significant to your opinions in this case; isn't that true?
A It is one of them.
Q Have you looked at the U.S. package insert or labeling for Neurontin?
A I have.
Q What are the rates on drug versus placebo for depression listed in the U.S. labeling for Neurontin?
A I don't recall.
Q Are those rates cited anywhere in your report?
A No.
Q That is to say the rates of the U.S. labeling.
A No.
MR. HOOPER: We are getting close to a break.
Why don't we take a break and change the tape?
THE VIDEOGRAPHER: Going off the record. The time is 10:05 a.m.
This is the end of tape one in

In the stack of materials that you brought with you that we reviewed over the break, we have put a tape flag of this color on one.

A Okay. I have that.

Q It refers to this next document, et cetera, the folder in which this is contained.

MR. FINKELSTEIN: So, he will mark his --

MR. HOOPER: We did make extra copies, so we didn't remove anything from his folder.

MR. FINKELSTEIN: No, I understand. My question is: What do you want him to look at?

MR. HOOPER: The marked copy, and he can look at the original in the folder as well.

(Trimble Exhibit Number 25 marked for identification as of this date.)

Q Professor Trimble, would you confirm that the document have you been shown marked as Exhibit 25 is also located in the files that you brought with you to the deposition today.

And, again, we tape flagged that with

a purple --

A I accept that's a copy of the --

Q Very good.

A -- paper.

Q Thank you.

And would you confirm that Exhibit 25 is a is a copy of a paper entitled "Reduction of 3,4 D I-A-M-I-N-O-P-Y-R-I-D-I-N-E Induced Biogenic Amine Synthesis and Release in Rat Brain by Gabapentin," dated, as published, in 1998, in the journal entitled Psychopharmacology.

Is that what you have got as Exhibit 25?

A That is correct.

Q All right. And amine synthesis and release refers to what we were discussing earlier in the deposition as turnover of the amine; correct? The release and synthesis of the amine?

A That is correct.

Q Okay. Very good.

Could you tell me whether this paper is cited in your report in this case?

A I think if it's not in the references, it will not have been.

Q All right. I will check with you.

A No, this particular report is not cited in my basic report.

Q Do you know how this report came to be placed in the files that you brought with you?

A Yes.

Q How so?

A Because in preparation for this deposition, I have reread, not only all of these papers, but many more papers, and this is merely another paper which I have read which improves my view or supports my view of the relationship between the prescription of the gabapentin and the release of serotonin.

Q Okay. Could you explain how you believe this paper supports your opinions in this case?

A This is another paper which reveals that gabapentin has an effect on the release of serotonin in this particular model.

Q Okay. And could you point to the language in the paper where you believe it says that --

A Yes.

Q -- gabapentin affects the release of serotonin?

A Well, I, again, need to just look at this for a moment.

Q Oh, sure, sure, please do.

MR. FINKELSTEIN: We will simply ask, is your question to Dr. Trimble, or Professor Trimble, simply you would like him to highlight for you those areas where it indicates and supports his opinion that it reduces serotonin?

MR. HOOPER: Yes, yes. I've asked him that.

MR. FINKELSTEIN: So, Professor Trimble as you read through it, if you come across sections that describe the reduction of serotonin, why don't you point it out to Mr. Hooper?

A Should we just stick with the abstract?

Q That's fine.

A May I just read to you the final sentence of the abstract in the left-hand column of page 137, that is the first page. I do beg