UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE NEURONTIN MARKETING AND )
SALES PRACTICES LITIGATION )
)
_____)
THIS DOCUMENT RELATES TO: )
_____)
THE GUARDIAN LIFE INSURANCE )
COMPANY OF AMERICA  v. )
 PFIZER, INC., and )
)
AETNA, INC. v. PFIZER, INC. )
_____)

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL KAISER TO PRODUCE AN ADEQUATELY PREPARED RULE 30(B)(6) WITNESS AND FOR ATTORNEYS' FEES AND COSTS PURSUANT TO RULE 37 AND IN SUPPORT OF KAISER'S CROSS-MOTION FOR AN ORDER <u>UNDER RULES 26(b)(2)(C) AND 26(c)</u>**

Linda P. Nussbaum, Esq.
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, New York  10022
Tel. No.: (212) 687-1980

*Counsel for Kaiser Foundation
Hospitals Inc. and Kaiser Foundation
Health Plan, Inc.*

## INTRODUCTION

Kaiser Foundation Hospitals Inc. and Kaiser Foundation Health Plan, Inc.,

(together "Kaiser") submit this brief in opposition to Pfizer Inc. and Warner-Lambert

Company's (together "Defendants" or "Pfizer") motion to compel Kaiser to produce an

additional witness to testify to Topic 2 of the Rule 30(b)(6) notice of deposition of Kaiser

("Topic 2") and for attorneys fees and costs. Kaiser also seeks an order, under Federal

Rules of Procedure 26(b)(2)(C) and 26(c), requiring Pfizer to submit any further inquiries

on Topic 2 through interrogatories or written deposition questions.

On July 5, 2007, Defendants served a Second Amended 30(b)(6) Notice of

Deposition upon Kaiser. In response to that notice, and in compliance with multiple

meet-and-confer discussions, Kaiser prepared and produced three witnesses who

provided four days of detailed testimony. Now, at the close of discovery, Pfizer has

come forward with a complaint with regard to one of the twenty-three noticed 30(b)(6)

topics. Topic 2 reads as follows:

> Your policies and practices concerning Neurontin, including: (a) payment or
> reimbursement of claims for Neurontin for off-label uses; (b) payment or
> reimbursement of claims for Neurontin for particular off-label uses; (c) the
> inclusion, maintenance, and removal of Neurontin on any formulary used,
> including any limits on Neurontin's coverage; (d) disease management and drug
> utilization review relating to Neurontin; (e) prior authorization programs relating
> to Neurontin; and (f) academic detailing relating to Neurontin.

As a result of the broad nature of Topic 2, the parties inevitably developed

differing interpretations of its scope. After producing its first two-day 30(b)(6) deponent,

Kaiser, in an effort to avoid unnecessary judicial intervention, agreed to produce an

additional witness in a good-faith effort meet the Defendants' ever-evolving requests.

For example not until Kaiser had already prepared and produced its second witness in

1

response to Defendants' written concerns, did Defendants object to the geographic scope of the testimony of Kaiser's first witness.  Kaiser suggested, upon hearing Defendants' broadened request that such testimony would be more effectively supplied through sworn responses to interrogatories.  The questions at issue concern the dates that Neurontin appeared on certain formularies in certain geographic regions.  Defendants nonetheless insisted on a third deposition.[1]  To prepare its third witness, Kaiser undertook to (i) predict the information that would be sought; (ii) identify which employees in each region would have the appropriate pieces of personal knowledge to supply that information; (iii) elicit that information from those employees through an interview process; and (iv) compile the information in a manner that was then "downloaded" to its third 30(b)(6) witness.  Even after deposing a third witness, Defendants were still unsatisfied and refused to discuss whether sworn interrogatories could be a more efficient and effective supplement to their ever-changing demands with respect to very specific dates and drug restrictions.  Defendants now ask the Court to grant sanctions reserved under the law for cases of "bad faith or willful obstruction."  *Berwind Prop. Group v. Envtl. Mgmt.* Group, 233 F.R.D. 62, 65 (D. Mass. 2005).

As the facts below will detail, Kaiser has done everything practicable to fulfill its good-faith obligations to sufficiently prepare its witnesses to meet Defendants expanding demands for factual minutiae in the guise of a 30(b)(6) deposition.  To the extent Defendants remain unsatisfied with this <u>one</u> out of twenty-three 30(6)(b) topics, it is a function of the amorphous nature of their requests and their failure to communicate their

---

[1]     Defendants have asked several questions that can easily be answered by sworn responses to interrogatories.  These questions included:  (1) when Neurontin was added to the formulary in each of Kaiser's non-California regions; (2) what restrictions or guidelines were in place on these formularies with respect to Neurontin; and (3) and what initiatives were in place in these regions with respect to Neurontin.  *See* Section I below at p. 10.

changing expectations. Kaiser should not be required to undertake the burden of preparing a fourth witness under such circumstances, nor should it be subjected to sanctions for Defendants' unreasonable behavior. As a final attempt to compromise, Kaiser offered to supplement its testimony through sworn interrogatory responses to specific dates and formulary entries that will be compiled by surveying multiple employees throughout the country with the appropriate personal knowledge.

Accordingly, Kaiser requests the Court deny Defendants' motion to produce a fourth witness, and for sanctions and costs, and grant Kaiser's request for an Order requiring that any further inquiries on Topic 2 be submitted through written interrogatories or deposition questions.

## I.    **STATEMENT OF FACTS**

To date, Kaiser has produced three different witnesses to testify concerning Topic 2: Albert L. Carver, Mirta Millares and Mitchell Cohen, Esq. These witnesses were adequately prepared to testify concerning Topic 2.[2]

Albert L. Carver

On July 12 and 13, 2007, Kaiser produced Mr. Carver to testify concerning the 23 noticed 30(b)(6) topics. Mr. Carver testified for two full days and provided substantial information concerning each of the topics set forth in Defendants' notice. Mr. Carver testified that in preparation for his deposition, he reviewed documents provided by counsel and had meetings with counsel. *See* Albert L. Carver Deposition Transcript, taken on July 12 & 13, 2007 (hereinafter "Carver Tr.") at 29:16-31:6 (attached as Exhibit 1 to the Declaration of Rajesh S. James, dated July 27, 2007 [Dkt #808]). Mr. Carver

---

[2]    In addition, Kaiser has produced three additional witnesses to testify as fact witnesses. Several of these witnesses were authors or recipients on the documents used as exhibits at the 30(b)(6) depositions and testified fully as fact witnesses with knowledge.

reviewed many documents in preparation for his deposition, including but not limited to minutes of the pharmacy and therapeutics committee (hereinafter "P&T Committee"), documents from the Regional Drug Utilization Action Team ("DUAT") and Regional Drug Utilization Group, organizational data, Neurontin purchasing data, interoffice memos and internal communications concerning Neurontin, documents from continuing medical education seminars as well as articles concerning Neurontin. *See* Declaration of Linda P. Nussbaum, dated November 2, 2007 (hereinafter "Nussbaum Decl.") at ¶ 7.

Mr. Carver stated during his deposition that he was knowledgeable to testify, and in fact had *personal knowledge*, concerning each of the topics in Defendants' notice, including Topic 2. *See* Carver Tr. at 34:12-35:19. Mr. Carver has been employed at Kaiser for over twenty years and is currently employed as Vice President of Pharmacy and Operations. *Id.* at 104:5-8. Carver is also on the P&T Committee, which is a committee that administers the formulary at Kaiser. *Id.* at 24:15-25:2.

Mr. Carver provided substantial testimony regarding Topic 2 which, in light of meet and confers and discussions with Defendants' counsel we believed at the time fully satisfied the notice. For example, Mr. Carver provided testimony regarding subpart (c) of Topic 2, concerning the formulary status of Neurontin, beginning in 1994, *i.e.,* the particular restrictions or guidelines that were in place (*Id.* at 80:8-81:8; 108:13-17; 186:11-24), including those that were in place in 1999 (*Id.* at 137:24-138:3; 178:18-179:25; 186:25-187:15), the information which the P&T Committee relied on in making recommendations for Neurontin in 1999 (*Id.* at 172:7-18) and how formulary restrictions regarding Neurontin were communicated to physicians (*Id.* at 81:9-82:5). Furthermore, Carver testified generally that if restrictions were in place for Neurontin on Kaiser's

formulary, physicians could still dispense the product and Kaiser would then pay for it. *Id.* at 218:22-219:15. This testimony pertains to "limitations on Neurontin's coverage" as well as subpart (a) and (b) and did not specifically pertain to time frame.

Mr. Carver also testified adequately concerning "drug utilization review relating to Neurontin." Mr. Carver testified that the purpose of DUAT, in Southern California, and DRUG, in Northern California, were to promote the appropriate use of drugs. *Id.* at 224:24-225:9. Carver explained that the DUAT and DRUG committees determined which categories of drugs to focus on. *Id.* at 226:17-19. He also identified the titles of individuals who are members on these committees (*Id.* at 226:20-227:21), the names of these individuals (*Id.* at 228:13-22), and described how the decisions were made with respect to the particular drugs or drug categories on which to focus. *Id.* at 228:2-7 (stating "based on their estimation of opportunities for improving prescribing or managing costs, reducing utilization, whatever the topic may be"). Mr. Carver further testified that the after the committee identified which drug(s) to focus on, a review of the utilization of the drug is generally performed, a target is set to reduce or increase utilization, metrics to monitor progress are determined, and then these goals are discussed with physician groups. *Id.* at 229:19-230:16. In addition, Mr. Carver stated that the utilization data relied on by Kaiser was based on its prescription data. *Id.* at 231:8-18.

Following the two full days of Mr. Carver's deposition, in their August 13, 2007 letter, Defendants claimed that Mr. Carver, in their view, did not provide sufficient testimony with respect to one of the 23 topics in their 30(b)(6) deposition notice.[3] At no

---

[3]    In addition, Defendants requested Kaiser produce documents related to the consideration or adoption of guidelines pertaining to Neurontin in Kaiser's non-California regions. Kaiser has complied with Defendants' request for production of documents from each of its non-California

time prior to Mr. Carver's deposition did Defendants state that they expected Mr. Carver would be knowledgeable to testify regarding Kaiser's non-California regions.[4] *See* Nussbaum Decl. at ¶ 5. Defendants also did not raise this alleged deficiency at Mr. Carver's deposition. Furthermore, in their letter dated August 13, 2007, wherein Defendants requested Kaiser to produce documents from its non-California regions, Defendants did not claim that Mr. Carver did not testify adequately concerning this portion of Topic 2 for Kaiser's non-California regions.

### Mirta Millares

On October 2, 2007, Kaiser produced a second witness, Mirta Millares to testify concerning the complained about Topic 2.[5] Counsel for Kaiser produced Dr. Millares despite its view that such discovery had never been properly requested or agreed to simply to attempt to be reasonable and avoid unnecessary motion practice. Dr. Millares was also produced as a fact witness. Her position is currently Manager, Drug Information Services and Pharmacy Outcomes Research at Kaiser Foundation Hospitals. *See* Deposition Transcript of Mirta Millares taken on October 2, 2007 (hereinafter "Millares Tr."), at 9:25-10:2 (attached as Exhibit J to the Declaration of Rajesh S. James [Dkt #919]). She has been employed by Kaiser continuously since 1988. *See* Millares Tr. at 14:22-23. Dr. Millares is also a nonvoting member of the Northern and Southern California P&T Committees. *Id.* at 32:3-14. Accordingly, she has personal knowledge

---

regions and accordingly, fulfilled its discovery obligations with respect to the document production. *See* Nussbaum Decl. at ¶ 4.

[4]     Kaiser's non-California regions which are dwarfed by the California Region include: Hawaii, Colorado, Ohio, Georgia, Mid-Atlantic and Northwest.

[5]     Dr. Millares was scheduled to be deposed for two full days. However, Defendants chose to cut short her deposition after less than one full day.

of the policies and practices concerning Neurontin in California, particularly with regard to Neurontin's formulary status and changes to that status.

Dr. Millares testified that in preparation for her deposition, she met with counsel for "several hours." *Id.* at 65:19. She also stated that she reviewed documents in preparation for her deposition. *Id.* at 65:23-66:1. She has previously testified on behalf of Kaiser in other litigation. *See* Nussbaum Decl. at ¶ 9.

With regard to Topic 2, Dr. Millares adequately testified concerning the policies and practices of the formulary process in Kaiser's California regions. She testified concerning changes to the formulary for Neurontin, including those in and after 1999, as well as the type of information considered in making formulary decisions. *See e.g.,* Millares Tr. at 68:22-70:7, 70:20-71:24, 78:21-79:9, 81:19-82:3. She also stated that guidelines for Neurontin were in place in 2004 before brand name Neurontin was removed from the formulary. *Id.* at 79:15-19. Dr. Millares also recognized and authenticated documents that pertained to the formulary changes related to Neurontin. *Id.* at 85:13-23. Counsel for Kaiser objected only to questions clearly beyond the scope of the deposition notice, which called for "policies and practices" concerning Neurontin. *Id.* at 82:4-13 (stating "[t]his witness is not here to testify about Xenical capsules and I would object to any discussion of Xenical capsules.").

Dr. Millares also provided testimony regarding drug utilization initiatives pertaining to Neurontin. For example, Dr. Millares stated that DUAT and DRUG had initiatives which pertained to Neurontin and began in or around 2002. *Id.* at 87:17-25. She also stated the goals and objectives of these initiatives were reflected in the

7

documents presented to her at the deposition and marked as exhibits. *Id.* at 90:19-92:25, 93:7-16, 93:13-16, 93:24-94:2.

It was at Dr. Millares' deposition that Defendants for the first time raised the issue that the continued deposition on Topic 2 should include testimony concerning Kaiser's non-California regions, which Defendants had previously not sought.[6] *See* Nussbaum Decl. at ¶ 8. At this point, Kaiser proposed that it would attempt to produce a witness the following week to testify concerning: (1) changes to the formulary status of Neurontin in Kaiser's non-California regions; and (2) initiatives at the non-California regions pertaining to Neurontin. *Id.* This was Kaiser's first attempt to provide the newly requested information for Kaiser's non-California regions. Furthermore, counsel for Kaiser stated that to the extent the *additional* witness could not provide sufficient answers to certain questions, Kaiser would supplement those responses by way of sworn responses to such questions. *Id.* Given that Kaiser's non-California regions consist of six different regions scattered throughout the country, counsel for Kaiser believed that supplementing the deposition questions as to specific dates and entries on a drug formulary through sworn responses was an efficient and practical approach.

As Kaiser has consistently stated to Defendants and the Court since the beginning of discovery, it has focused its discovery efforts in California. Kaiser is headquartered in California, and the vast majority of its members and drug utilization are in California.[7] When Defendants filed their motion to compel for documents from Kaiser's non-

---

[6] Approximately 75% of Kaiser's members are located in California and the non-California regions are quite small in comparison to the California regions.

[7] As of May 2007, Kaiser had approximately 8.6 million members in nine states and the District of Columbia, with over 6 million of those members in California.

California regions in July 2006, Kaiser represented that, as Defendants had agreed, it had performed a *non-exhaustive* search for responsive documents from its non-California regions. *See* Nussbaum Decl. at ¶ 4. As of today, Kaiser has produced responsive documents to Defendants' requests from its non-California regions. *Id.*

   Mitchell Cohen, Esq.

   On October 11, 2007, in a further attempt to satisfy Defendants' new and increased demands, Kaiser produced a third witness to testify concerning Topic 2. Mr. Cohen is currently senior counsel at Kaiser Foundation Health Plan. *See* Deposition Transcript of Mitchell Cohen, Esq. taken on October 11, 2007 (hereinafter "Cohen Tr.") at 7:17-19 (attached as Exhibit O to the Declaration of Rajesh S. James [Dkt #919]). In the days leading up to Mr. Cohen's deposition, counsel for Kaiser interviewed six Kaiser employees, each of whom possessed personal knowledge regarding Topic 2 at each of their respective non-California regions. *See* Nussbaum Decl. at ¶ 10. The information Mr. Cohen provided at his deposition (regarding the formulary changes of Neurontin at each of Kaiser's non-California regions and the formal initiatives implemented at these Kaiser regions regarding Neurontin) was based on these interviews. Counsel for Kaiser interviewed these individuals because they believed the interviews would provide accurate testimony and be an efficient means of preparation for the 30(b)(6) deposition. In addition to these interviews, Mr. Cohen also spoke directly to an employee of Kaiser's Hawaii region. *See* Cohen Tr. at 10:25-11:8.

   At Mr. Cohen's deposition, Defendants asked several questions, which are the subject of their motion, that can easily be answered by sworn written responses. These questions included: (1) when was Neurontin added to the formulary in each of Kaiser's

non-California regions; (2) what restrictions or guidelines were in place on these

formularies with respect to Neurontin; and (3) and what initiatives were in place in these

regions with respect to Neurontin. *See* Cohen Tr. at 16:13-25, 27:11-13, 32:6-7, 36:25-

37:2, 37:12-18, 43:10-11. Before Mr. Cohen's deposition was concluded by Defendants,

after only several hours, because it was 5:00 pm. and defense counsel wanted to leave,

counsel for Kaiser stated on the record:

> We have made great efforts to prepare witnesses here. We have a witness who, in
> fact, is prepared. We are ready to go forward here. For judicial economy and for
> the convenience of all parties, we would ask that the defendants ask whatever
> questions they have. . . to the extent that there are some questions that the witness
> cannot answer because those questions were not anticipated, we would leave
> blanks in the transcript and we would promptly get a verified answer back. . . we
> can take as a template the questions that you have asked with respect to Georgia
> and/or the Northwest region and we can provide information to you for all of the
> other regions that would be responsive in those questions. And we are willing to
> do that within a reasonable period of time, ten days, under oath.

*Id.* at 52:24-54:7.

During a meet-and-confer with Defendants following Mr. Cohen's deposition, as

well as in subsequent correspondence, counsel for Kaiser again offered to supplement

Mr. Cohen's deposition (which Defendants prematurely and abruptly concluded) through

written interrogatory-style responses. *See* Nussbaum Decl. at ¶ 11. Defendants rejected

Kaiser's offer and instead filed the instant motion.

## II.    ARGUMENT

Federal Rule of Civil Procedure 30(b)(6) "imposes a duty upon the business entity

to perform a reasonable inquiry for information and prepare the selected deponent to

adequately testify not only on matters known by the deponent, but also on subjects that

the entity should reasonably know." *Beloit Liquidating Trust v. Century Indem. Co.*, No.

02 C. 50037, 2003 WL 355743, at *2 (N.D. Ill. Feb. 13, 2003). The rule is designed "to

prevent the 'sandbagging' of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial." *Calzaturficio S.C.A.R.P.A., S.P.A. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36 (D. Mass. 2001).

However, "the rule may not require absolute perfection in preparation – it speaks after all of matters known or reasonably available to the organization." *Guy Chem. Co. v. Romaco, N.V.*, No. Civ.A. 3:06-96, 2007 WL 184782, at *10 (W.D. Pa. Jan. 22, 2007). Nor is Rule 30(b)(6) "designed to be a memory contest." *Equal Employment Opportunity Comm'n v. Am. Int'l Group*, No. 93 Civ. 6390, 1994 WL 376052, at *3 (S.D.N.Y. July 18, 1994) (denying motion to compel a further 30(b)(6) deposition on facts otherwise available within a produced investigative file). Instead, a "rule of reason" is applied to determine when a noticed party has met its good-faith obligations under Rule 30(b)(6). *Banks v. Office of the Senate Sergeant-at-Arms*, 241 F.R.D. 370, 373 (D.D.C. 2007) (rejecting proposition that deponent must be prepared to testify about "*any* fact potentially relevant to the described topic known by any employee of the corporation").

Kaiser properly prepared and produced three witnesses in an effort to satisfy Defendants continually enlarged the interpretation of Topic 2. *See* Section I above. Unfortunately, Defendants' broad and changing interpretation has made it impracticable, indeed impossible, to prepare a witness to Defendants' satisfaction. Under these circumstances, a fourth deposition is an inefficient and unduly burdensome solution. There is no questions that Kaiser has satisfied Defendants' with respect to the <u>22</u> other noticed 30(b)(b) topics. Any further inquiry should now be conducted via written discovery, which will allow Kaiser to properly and cost-effectively canvas its employees for the precise information sought. As discussed in Section II.D. below, the risk of

"sandbagging" can be dealt with as effectively through written testimony as through oral responses, Defendants will receive more precise information (particularly as much of the information they seek are dates and formulary facts), and all parties will benefit by the savings of both time and money. Therefore, Kaiser requests the Court deny Kaiser's motion and order that further requests on Topic 2 be made through written deposition questions or interrogatories.

## A. Defendants Misstate the Potential Import of Topic 2 Testimony

Defendants argue that this testimony is of "critical importance". *See* Def. Opening Brief at 1. Defendants are wrong. Defendants attempt to take a piece-meal approach to the allegations made by Kaiser and other coordinated plaintiffs in this action. Defendants state that if Kaiser physicians knew of the studies that plaintiffs allege were false, they would still have prescribed Neurontin for off-label uses. *Id.* There is noting in the record to support this. Assuming certain physicians in Kaiser's Ohio region knew of one negative study pertaining to Neurontin for the treatment of bipolar and still recommended that it be on the formulary, even if true, does not undermine the premise of this RICO action.

Defendants also argue that the information from a 30(b)(6) witness is important because it demonstrates that Kaiser cannot rely on the industry wide data to determine Kaiser's Neurontin utilization. However, Judge Saris has already ruled that Kaiser be permitted to use the industry-wide data.[8]

_____

[8]    Judge Saris has ruled that Kaiser and other coordinated plaintiffs do not have to produce individual patient files and instead may rely on this industry-wide data. At the hearing held on September 27, 2006, the Court stated: "I am not going to allow . . . a foraging through the third-party payors' patent base." Tr. of Sept. 27, 2006 hearing before Judge Saris at p. 39 (Dkt #503).

## B. Kaiser Fulfilled its Obligations to Prepare its Witnesses in Good Faith

Kaiser has prepared and produced three 30(b)(6) witnesses. The first witness, Albert Carver, testified for two days on the basis of both pre-deposition preparation and personal knowledge obtained through his role as Vice President of Pharmacy and Operations, and through his membership of the P&T Committee. Defendants cannot credibly argue that Mr. Carver was anything less than forthcoming and helpful in his testimony.[9]  Defendants' claim that there was bad faith in the preparation of this witness is belied by the fact that this dispute concerns a subset of one of 23 noticed topics.

Mr. Carver's Topic 2 testimony was adequate, as the scope had then been understood. Kaiser nonetheless agreed to designate a scheduled fact witness as an additional 30(b)(6) witness on Topic 2 to address Defendants written concerns. Dr. Mirta Millares adequately testified based on her pre-deposition preparation and her personal knowledge of Kaiser's policies and practices concerning Neurontin. However, during Dr. Millares' deposition after the issue of non-California regions was raised, counsel indicated *for the first time* to provide Topic 2 testimony regarding Kaiser's non-California regions – testimony which Dr. Millares could not provided because she has not been expected to provide Topic 1. Kaiser's counsel advised Defendants stated that this information could be effectively provided via sworn interrogatories. As Defendants insisted on this format, Kaiser's counsel prepared its third Topic 2 witness.

To prepare for questions on the non-California regions, Kaiser's counsel undertook to: (i) predict the information needed; (ii) identify the employees in each

---

[9]      In particular, he provided substantial testimony on Topic 2, and to the extent his testimony displayed anything less than perfect recollection of the subject matter, Mr. Carver expressed his willingness to have his recall refreshed with documents – an offer that Defendants' counsel declined.  *See* Section I above at p. 4.

region with the appropriate pieces of personal knowledge; (iii) elicit the information from those employees through an interview process; and (iv) compile the information in a manner that could be "downloaded" to a 30(b)(6) witness. This preparation was done in good faith, and if it yielded less-than-ideal results from the perspective of Defendants' counsel, it was not for lack of preparation or for the lack of a forthcoming witness. Kaiser's good faith has been proven in its consistent willingness to compromise and to continually supplement testimony, at considerable expense in time and money, and it has met its obligations under the Rules.

The cases cited by Defendants are not to the contrary. They stand only for the undisputed proposition that a party has a good-faith obligation under Rule 30(b)(6) to prepare its witness with "information obtained from individuals with personal knowledge within the organization." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416 (5th Cir. 2006). Where bad-faith is found, the facts indicate an egregious and willful failure to prepare. For example, in *Fabiano Shoe*, the witnesses and their counsel baldly asserted that they had no duty to educate themselves about the 30(b)(6) topics and insisted that they would only testify on the basis of "firsthand knowledge." *Fabiano Shoe*, 201 F.R.D. at 36.[10] Here, Kaiser has done everything practicable to prepare its witnesses for its 30(b)(6) depositions and cannot be accused of bad faith.

---

[10] Similarly, in *Black Horse Lane Ass'n v. Dow Chemical Corp.*, 228 F.3d 275, 300 (3d Cir. 2000), the designee was an attorney who failed to prepare "in the slightest" for multiple deposition dates and repeatedly denied knowledge of his status as a 30(b)(6) witness. The district court found that the witness had "thumbed his nose at the defendants and, frankly, the court." *Black Horse*, 288 F.3d at 300. In *Big Top USA, Inc. v. The Wittern Group*, 183 F.R.D. 331, 335 (D. Mass. 1998), Judge Saris found bad faith where, among other things, a 30(b)(6) witness and his counsel flatly refused to answer questions during a deposition even after the Magistrate had intervened by phone and ordered the questions answered. After a renewed deposition was ordered, Judge Saris concluded that the designee had "willfully and in bad faith disobeyed [prior court orders] to provide meaningful 30(b)(6) testimony either by claiming not to know the

**C. Sanctions are Inappropriate in the Absence of a Finding of Bad Faith or Willful Obstruction of the Discovery Process**

Sanctions are inappropriate in the absence of bad-faith. *See Guy Chem.*, 2007 WL 184782, at *10 (declining to strike errata sheet or order reimbursement of deposition expenses in absence of bad faith); *Belmont Holdings Corp. v. Unicare Life & Health Ins. Co.*, No. Civ. A. 98-2365, 2000 WL 1920039, at *2 (E.D. Pa. Dec. 1, 2000) (sanctions for failure to comply with Rule 30(b)(6) may only be brought when party "acted willfully or in bad faith to obstruct justice"); *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 151-52 (S.D.N.Y. 1997) (sanctions reserved for "only flagrant discovery abuses" and unwarranted even where witness was "wholly unable to render testimony regarding one of the three subject areas for which he was designated"). Where a deponent prepared in good faith cannot testify fully about a topic, the appropriate solution is to order the noticed party to supplement the information provided at the deposition. *See Guy Chem. Co.*, 2007 WL 184782, at *10.[11]

This is the approach authorized by courts in this circuit. *Berwind* is illustrative. In *Berwind*, plaintiff's counsel attempted to suspend the defendant's 30(b)(6) deposition upon learning that the witness's preparation on the noticed topics had been "limited." *Berwind*, 233 F.R.D. at 64. However, defendant's counsel refused claiming "[w]e're not required to create information nor are we required to go and do an overly diligent search

---

answers to basic questions or by claiming an inability to produce someone who did know the answers." *Big Top*, 183 F.R.D. at 340. Finally, in *Resolution Trust Corp. v. S. Union Co., Inc.*, 985 F.2d 196, 197 (5th Cir. 1993), the witnesses actually testified that they had no knowledge of *any* of the noticed topics.

[11]    Defendants seek, among other things, reimbursement for the Millares deposition. Ms. Millares was deposed as a fact witness, in addition to being designated as a 30(b)(6) witness on Topic No. 2. Defendants have made no complaint as to the vast majority of her testimony. Even if defendants could prove bad faith – which they cannot – reimbursement is not an available remedy under such circumstances. *Bank of N.Y.*, 171 F.R.D. at 152 n.10.

to respond to things that we don't think are relevant." *Id.* at 64-65. Defendant's counsel

claimed that their obligations were met by providing a witness who was "able to speak as

best as anyone can without doing specific research." *Id.* at 65. The witness claimed to

have no knowledge about the noticed topics and admitted that there were relevant

documents he had not reviewed and that had not been produced. *Id.* In response to

plaintiff's subsequent motion to compel further testimony, the court held that the

witness's preparation was inadequate but that there was no evidence of bad faith. *Id.*

The court therefore declined to order a second 30(b)(6) deposition:

> The facts of this case make it clear that Jarosinski was less
> than appropriately knowledgeable and forthcoming. EMG
> should have done a better job preparing him for his
> deposition. Nevertheless, his failure or inability to testify
> fully is not, as this Court has noted in the past, 'tantamount
> to a complete failure' of the corporation to appear.
> Jarosinski had not worked on the project at issue but had
> reviewed EMG files related to the transaction, consulted
> with inside and outside counsel for EMG and answered
> most questions based on the best corporate information
> available to him. The Court finds no bad faith on EMG's
> part nor a willful obstruction of the discovery process. As a
> result, this Court will not order EMG to produce another
> Rule 30(b)(6) deposition witness.

*Id.* Defendant was ordered to supplement the incomplete testimony with additional

information, documentary evidence or depositions. *Id.*

Similarly, in *United States v. Massachusetts Industrial Finance Agency*, 162

F.R.D. 410, 411 (D. Mass. 1995), the plaintiff claimed that MIFA's 30(b)(6) witness was

unable to provide information as to five of eight noticed topics. The plaintiff claimed that

MIFA "failed to make a good faith effort to provide a witness who can provide complete

and knowledgeable answers binding on the agency." *MIFA*, 162 F.R.D. at 411. MIFA

asserted that it was only obligated to make a good-faith effort to designate a witness with personal knowledge and was not obliged to prepare a witness "concerning actions taken five years ago by persons no longer there." The court disagreed and held that 30(b)(6) required defendant to have done "a better job" preparing its witness. *Id.* at 412. Although former MIFA employees, produced as fact witnesses, had further muddied the waters by giving contradictory testimony, the Court declined to order an additional 30(b)(6) witness be produced. *Id.* Such a remedy was limited to instances in which a party "acted wilfully or in bad faith to obstruct discovery." *Id.* Because the facts did not allow it to make such a finding the court denied the plaintiff's motion to compel holding that:

> the most the Court will do . . . is to require MIFA to produce more documents and clarify its position in response to a number of interrogatories. . . . However, the Court will not order MIFA to produce another Rule 30(b)(6) deposition witness. Nor will the Court bar MIFA from presenting its position through witnesses who have already been deposed by the [plaintiff].

*Id.* at 412.

Here, there has been no bad-faith on the part of Kaiser or its counsel. Defendants' case has not been prejudiced by the delay in receiving supplementary material on Topic 2 (*see* Section II.A.), and the additional information sought can easily be provided through written discovery (*see* Section II.D.). Kaiser has voluntarily begun the process of preparing such a supplement and intends to produce it to the Defendants in a timely fashion. *See* Nussbaum Decl. at ¶12. Under such circumstances, sanctions of any nature would be unfair and inappropriate.

17

### D. Kaiser Should be Permitted to Supplement Witnesses' Testimony by Answering Written Interrogatories

Under Rule 26(b)(2)(C) and Rule 26(c), the Court may limit the "frequency or extent of use of the discovery methods otherwise permitted" if the Court finds that "the discovery sought is . . . obtainable from some other source that is more convenient, less burdensome, or less expensive." Fed R. Civ. P. 26(b)(2)(C). The court may order any such limitation "upon its own initiative after reasonable notice or pursuant to a motion under Rule 26(c)." *Id.* In addition, upon a showing of good cause, the court may make "any order which justice requires to protect a party . . . from . . . undue burden or expense" including an order "that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery." Fed. R. Civ. P. 26(c).

Kaiser does not dispute the general proposition that each party has the right to seek 30(b)(6) testimony from the other.[12] However, considerations of fairness and efficiency dictate that a 30(b)(6) deposition is not the most appropriate vehicle to be used in all circumstances. *See, e.g., Beloit*, 2003 WL 355743, at *3-4 (certain noticed topics were better answered via written responses rather than the requested 30(b)(6) deposition). When the method for discovery is disputed, the question for the court becomes: "which of the available devices is most appropriate, *i.e.*, which device would yield most reliably and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties and the court in a case like this?" *McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*, 134 F.R.D. 275, 286 (N.D. Cal. 1991) (contention interrogatories more appropriate than a 30(b)(6) deposition) *rev'd in part on other grounds*, 765 F. Supp. 611 (N.D. Cal. 1991).

---

[12]    Although we note that Defendants still have not produced their own 30(b)(6) witnesses on a number of topics.

Under these circumstances, written interrogatories or a deposition upon written questions pursuant to Rule 31(a)(3) can more efficiently provide the supplemental information defendants seek. Not only will this allow Kaiser to provide the information in a more precise and cost-effective manner, but both devices have mechanisms that will just as effectively avoid "sandbagging" at trial. A deposition under Rule 31(a)(3) may be taken "in accordance with the provisions of Rule 30(b)(6)." And in the case of interrogatories, Rule 26(e)(2) provides that "[a] party is under a duty seasonably to amend a prior response to an interrogatory . . . if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

Defendants argue that depositions upon written questions do not allow for follow-up questions or observations of the witness's demeanor; and allow counsel to "provide answers so carefully tailored that they are uninformative." Def. Opening Brief at 17 (citing 7 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE, § 31.02[3], at 31-10 (3d ed. 2007). Here, however, where what Defendants seek is simply dates and factual formulary entry, and where they have had four days of 30(b0(6) testimony on 22 other topics, this cannot be a real concern. However, MOORE'S also notes that the device may be useful where "the effort or cost of taking an oral deposition might not be necessary to elicit the information sought." MOORE'S FEDERAL PRACTICE, §31.02[3] at 31-10. Kaiser argues only that written responses are a fair and economical means of *supplementing* the testimony of the oral witnesses it has produced in good-faith. That is the position that has

been taken by other courts in this jurisdiction. *See Berwind*, 233 F.R.D. at 65; *MIFA*, 162 F.R.D. at 412.[13]

## CONCLUSION

Kaiser respectfully requests the Court deny Defendants' motion to produce a fourth witness, and for sanctions and costs, and grant Kaiser's request for an Order requiring that any further inquiries on Topic 2 be submitted through written interrogatories or deposition questions.

Respectfully submitted,

Dated: November 2, 2007

By:   /s/ Linda P. Nussbaum
      Linda P. Nussbaum, Esq.

Linda P. Nussbaum, Esq.
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, New York 10022
Tel. No.: (212) 687-1980

*Counsel for Kaiser Foundation Hospitals Inc. and Kaiser Foundation Health Plan, Inc.*

---

[13]    "[T]he traditional remedy for evasive or incomplete answers [remains] available: an application to the trial court to impose sanctions pursuant to [Rule 37]." *Winbourne v. E. Air Lines, Inc.*, 632 F.2d 944, 951 (2d Cir. 1980).

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3.

ATTORNEY FOR KAISER

/s/ Linda P. Nussbaum
LINDA P. NUSSBAUM