EXHIBIT A

## AFFIDAVIT OF CYNTHIA McCORMICK

STATE OF MARYLAND   )
            : ss
COUNTY OF MONTGOMERY )

  Cynthia McCormick, being duly sworn, deposes and says:

1.  From 1991 to 2002, I served with the United States Food and Drug Administration ("FDA"), initially as a Medical Review Officer and later as the Director of the Division of Anesthetics, Critical Care, and Addiction Drug Products ("DACCADP"). In both of these capacities, I was involved in FDA's process of reviewing and ultimately approving Neurontin for several indications or uses. This Affidavit accurately reflects my actions and conclusions with respect to my involvement with the review and approval of Neurontin.

### I. PROFESSIONAL BACKGROUND

2.  I received my A.B. in Chemistry from Bryn Mawr College in 1972 and my M.D. from the Medical College of Pennsylvania in 1976. After medical school, I completed a Residency in Pediatrics and Communicable Diseases at the University of Michigan Medical Center, and from 1979 to 1980, I completed a Fellowship in Pediatric Neurology at the University of Michigan Medical Center. From 1980 to 1982, I completed a Neurology Residency at the University of Pennsylvania, Children's Hospital of Philadelphia.

3.  From 1982 to 1987, I practiced pediatric neurology in Duluth, Minnesota, where I also served as Associate Clinical Professor of Neurology, University of Minnesota – Duluth. In 1985 and 1986, I served as Chair of the Department of Neurology at St. Mary's Medical Center in Duluth, Minnesota.

4.  I joined the National Institutes of Health ("NIH") as a Medical Officer in 1987, working in the Epilepsy Branch of the National Institute of Neurological Convulsive and Developmental

1

Disorders and Stroke ("NINCDS"). One of our branch's primary goals was the development of new anticonvulsants. It had been years since an anticonvulsant had been approved, and the anticonvulsants that were then available had many drawbacks. Due to the lack of new anticonvulsants, the NIH led a coordinated effort aimed at developing new anticonvulsants. As a Medical Officer with the NIH, I had responsibility for overseeing the administration of grants for the development of new anticonvulsants as well as other neurological disorders. I also served as medical monitor for a number of clinical trials for new anti-epileptic drugs in development.

5.     In 1991, I joined the FDA as a Medical Officer in the Neurology section of the Division of Neuropharmacological Drug Products ("DNDP"). It was in this capacity that I was involved in the initial review and approval of Neurontin as adjunctive therapy in the treatment of partial seizures in adults. I served in that role until 1997 when I was promoted to Director of the DACCADP. As the Division Director, I was involved in the review and approval of Neurontin for the management of postherpetic neuralgia in adults.

6.     In October 2002, I left the FDA to become the Deputy Director of the National Institute of Neurological Disorders and Stroke ("NINDS") Division of Extramural Research, where my work focused on promotion in research stroke and neurological disorders. I served as the Deputy Director until 2004 when I left the NIH. Since 2004, I have served as a private regulatory consultant.

7.     I have been board-certified by the American Board of Pediatrics and board eligible by the American Board of Neurology and Psychiatry with special competence in child neurology. Since 1976, I have maintained my medical licensure in one or more states.

8.     As a licensed physician, I have treated patients suffering from a multitude of disorders and have experience in prescribing medicines for both approved and unapproved uses.

2

Prescribing medicines for "off-label" purposes is a common and beneficial practice of medicine, and it is important that physicians use their own experience and best medical judgment in treating patients.

## II. DUTIES AT THE FDA

9.     As a Medical Officer in DNDP, my duties included reviewing Investigation New Drug ("IND") Exemptions, New Drug Applications ("NDAs"), and other submissions by sponsors seeking approval to study and/or market a compound for certain uses or indications.

10.     My duties as the Director of the DACCADP included supervision and oversight of the review team throughout the drug development process and the rendering of approval decisions based on safety and efficacy data in NDAs and Supplemental New Drug Applications submitted by sponsors seeking to market compounds for specific uses or indications.

## III. NEURONTIN ADJUNCTIVE EPILEPSY THERAPY REVIEW AND APPROVAL

11.     Beginning in January 1992, I served as the clinical reviewer for an NDA submitted by Parke-Davis Pharmaceuticals for approval of Neurontin as a safe and effective adjunctive therapy in the treatment of partial seizures in adults. My responsibilities as the clinical reviewer included reviewing and analyzing the safety and efficacy data contained in the NDA and all supplemental materials, preparing reports summarizing the safety and efficacy data, presenting data to the Peripheral Central Nervous System Advisory Committee in December 1992, and as a member of the review team, reviewing and revising the proposed Neurontin labeling.

12.     As the clinical reviewer, I wrote several reviews summarizing the safety and efficacy data of Neurontin. My initial clinical review evaluated the data reported in the initial NDA and first two safety update reports. In this review, which contains 119 pages of text and reflected hundreds of hours of analysis by me, I concluded that the benefits of using Neurontin as

3

adjunctive therapy for the treatment of partial and secondary generalized seizures outweigh the potential risks. Acccordingly, I concluded that the medication is safe and effective and should be approved. See Combined Medical Statistical Review ("Review") (Attached Exhibit A).

13.     In preparing my initial clinical review, I thoroughly evaluated all adverse events to identify any potential risks. Among the potential risks I discussed in my clinical review were adverse event reports of depression and suicidality. In evaluating these adverse events, I identified all reports of depression and suicidal behavior and separately listed the number of reports considered serious or that led to withdrawal. See Review at 109, 114. In addition, I also noted in my Review the number of patients reporting depression as an adverse event who had no prior history of depression and also the number of patients who required treatment for their depression. Review at 114.

14.     Whereas I emphasized in my Review the potential risk of depression and suicidality, I never concluded that the clinical trial data affirmatively established or supported the conclusion Neurontin increases the risk of or causes depression or suicidal behavior. Had I reached such a conclusion, I would have emphasized this conclusion in one of the several reports I prepared during the epilepsy NDA review process and would have made a strong appeal that the drug should not be approved. Furthermore, such a concern also would have been prominently noted in a warning in the final approved labeling.

15.     Evaluating adverse events of depression and suicidal behavior reported by patients with epilepsy requires an understanding that such patients are far more likely to experience depression and suicidality than the general population. I noted this in my Review of the Fourth Safety Update. Review of Safety Update #4 (December 28, 1993) (Attached Exhibit B). In this review, which was completed several months after my initial report, I noted "There is a higher incidence

4

of depression among epileptics with partial seizures as compared to the general population."
Review of Safety Update #4 at 8. Given the high background rate of depression and suicidal
behavior in patients with epilepsy, that there were cases of depression with suicidal ideation and
cases of suicide attempt reported for all epilepsy studies did not suggest to me a causal
association between Neurontin and suicidal behavior.

16.    The clinical trials I evaluated in the course of the NDA review did not involve any reports
of completed suicide committed by a patient while on Neurontin. Although there was one report
involving a patient who committed suicide six months after last ingesting Neurontin, there was
no immediate temporal relationship between the suicide and Neurontin. This suicide was
reported by Parke Davis to the FDA in the First Safety Update and considered by me and my
colleagues during the NDA review process. In addition, I discussed this event at the Advisory
Committee meeting held in December 1992. As the patient's suicide occurred several months
after the patient discontinued treatment, the event was appropriately considered unrelated to the
study medication.

17.    Furthermore, a single case of suicide in a database of over 2,000 patients would not in
and of itself have established a causal association with the medication. As explained above, the
rate of suicide in patients with partial epilepsy is significantly higher than the rate in the general
population, and thus, it is not inconsistent with background rates to have a patient with epilepsy
commit suicide.

18.    The absence of any suicides in the clinical trials database is not due to the exclusion of
patients with pre-existing psychiatric disorders from the clinical trials. Indeed, the clinical trials
included such patients. On page 114 of my Review, I wrote that of the 78 patients who reported
depression as an adverse event, 19 had no prior history of depression. See Review at 114.

Implied in this statement is that 58 patients who reported depression as an adverse event did report a prior history of depression. Accordingly, patients with depression were included in the clinical trials and were evaluated by the FDA before Neurontin had been approved.

19.    On page 109 of my Review, I noted that some patients with mild or no depression on recruitment who required treatment with antidepressant drugs while on treatment with gabapentin "appear to have fallen through the cracks." Review at 109. I made these comments in reference to several reports of depression not being listed as serious adverse events despite the patients having undergone treatment with other medications. I further elaborated on this matter at an advisory committee meeting held on December 15, 1992. Speaking to the Peripheral Central Nervous System Advisory Committee, I explained that "numerous examples were found on a spot check among case report forms where patients developed treatment-emergent depression, pharmacological intervention was required, and a report of a serious adverse event was not made. Indeed, it wasn't required." See Transcript of PCNS Advisory Committee, December 15, 1992, page 59 (Attached Exhibit J). Accordingly, the statements reflected on page 109 of my Clinical Review and those presented to the PCNS Advisory Committee were a commentary on the regulations and were not a reflection of Parke-Davis' reporting practices.

20.    The PCNS Advisory Committee is a group of outside experts that gives independent professional and technical advice to the FDA. The Advisory Committee met in December 1992 to assess the safety and effectiveness of Neurontin for use as adjunctive therapy in patients with epilepsy. At the meeting, I presented an overview of my Clinical Review. Included in this overview was a discussion of various adverse events reported in the clinical trials, including episodes of depression and suicidal behavior. In presenting the data, I never suggested that Neurontin causes or increases the risk of depression or suicidal behavior. Had I believed that

6

Neurontin did cause or increase the risk of depression or suicidal behavior, I would certainly have discussed the matter and advised the committee of this belief.

21. As part of my ongoing review of the Neurontin adjunctive epilepsy NDA, I reviewed Safety Updates submitted periodically by the sponsor. Safety updates are, as the name implies, updates of safety data from ongoing human exposure from clinical trials or named patient treatment that a sponsor is required to submit between the time of an initial NDA submission and the time of approval. In my review of the Fourth (and final) Safety Update, I made this written observation: "There is a higher incidence of depression among epileptics with partial seizures as compared to the general population. One cannot determine based on the available data, largely uncontrolled, whether the reports here represent an increase in incidence or intensity of depression compared to that which is expected." Review of Safety Update #4 at 8. These statements are consistent with my belief that although there had been adverse event reports of depression in the clinical trials, these reports were not surprising in light of the background rates of depression in patients with epilepsy.

22. In addition to the Clinical Reviews I prepared, Neurontin's safety and efficacy data were also thoroughly evaluated and summarized by other officials in the Division of Neuropharmacological Drug Products, including the Division's Deputy Director, Dr. Russell . Katz. His report, dated October 11, 1993, contains multiple references to the data on depression and suicidal behavior. The report also notes (page 3) that there had been one suicide "after having been off drug for a considerable time." See Dr. Russell Katz, "Supervisory Overview of Safety and Efficacy Data for NDA 20-235" at 13-15 (October 11, 1993) (Attached Exhibit C). Consistent with my findings, Dr. Katz never concluded or stated that there was an increased risk

or causal association with Neurontin and suicidal behavior. He likewise recommended approval of the Neurontin NDA.

23.    Dr. Paul Leber, the Director of the Neuropharmacological Division, also carefully evaluated the Neurontin NDA and prepared a report concerning the medication's safety and effectiveness. His report, titled "Approval Action Memorandum," issued findings consistent with those noted in Dr. Katz's report and my clinical reviews. See Dr. Paul Leber, Approval Action Memorandum (December 13, 1993) (Attached Exhibit D).

24.    Based on my recommendations and those of Drs. Leber and Katz, the FDA approved Neurontin on December 30, 1993, for adjunctive therapy in the treatment of partial seizures in patients over 12 years of age with epilepsy.

## IV. FDA'S REVIEW AND APPROVAL OF THE NEURONTIN LABELING

25.    In connection with the FDA's review of an NDA, the FDA is substantially involved in developing and approving the physician package insert (commonly called the label). Throughout this process the FDA carefully reviews all of the proposed labels submitted by the sponsor, closely edits each draft, and often requests significant revisions. The FDA is the final arbiter regarding the label and is authorized to withhold approval until the FDA's required changes have been made.

26.    The FDA's involvement in developing and approving the Neurontin label was no different. Before approval, the FDA reviewed each and every word of the Neurontin proposed labeling and made many revisions, thereby ensuring that the final approved labeling accurately reflected the preclinical data and clinical-trial data. Throughout the approval process, I recall Parke-Davis being responsive to all of the FDA's requested recommended labeling changes.

8

27.     When the FDA ultimately approved Neurontin on December 30, 1993, it did so on the condition that "[t]he final printed labeling (FPL) must be identical to the draft labeling/PPI" that the FDA had reviewed, edited, and approved. FDA Approval Letter (December 30, 1993) (Attached Exhibit E).

28.     The final approved labeling appropriately identified the data on depression and suicide-related events in the Adverse Reactions section. The data on depression is contained in a table that lists treatment-emergent events that occurred in at least 1% of patients in the placebo-controlled add-on trials and were numerically more common in the Neurontin group. As reflected in the table, 1.8% of Neurontin patients reported treatment-emergent depression compared to 1.1% of placebo patients. The slight difference between the Neurontin group and placebo group is not statistically or clinically meaningful, and thus, does not establish an association with depression.

29.     Given the relatively low frequency of suicidal adverse events reported in the clinical trials and the high background rate of suicidal behavior in patients with epilepsy, the FDA did not believe it would have been appropriate to address suicidal behavior in the warnings, precautions, or contraindications sections. Accordingly, the FDA's scientific judgment in December 1993 was that there was no reasonable evidence of an association with Neurontin and suicidal behavior or any psychiatric adverse event. To include a warning or other prominent listing of suicide-related events would have been inconsistent with the clinical trial data and a mischaracterization of the risks associated with Neurontin. In addition, such a warning would have had significant potential to impact public health adversely; both by diluting scientifically supported information in the labeling and by improperly discouraging the use of Neurontin.

30.     Because the rate of clinical-trial suicide-related events did not exceed the expected rate, the data regarding suicidality events was appropriately listed in the "Other Adverse Events Observed During All Clinical Trials" subsection. This section of the label included all reported events except those already listed in the table comparing drug and placebo data, those too general to be informative, and those not plausibly associated with the use of the drug. Importantly, the events listed in the Other Adverse Events subsection were included without regard to causation, and thus, the mere listing of an event in no way suggests a causal association with the study medication.

31.     Adverse events involving reports of suicidal behavior were listed in the Other Adverse Events' Nervous System subsection. This subsection identified suicidal as an infrequent event (event occurring in 1/100 and 1/1000 patients) and suicide gesture as a rare event (event occurring in fewer than 1/1000 patients). The terms suicidal and suicide gesture were taken from the sponsor's modified COSTART dictionary and were approved by the FDA for use in the Neurontin label. Both terms accurately reflected the adverse events involving suicidal behavior observed during the clinical trials. Any additional discussion relating to suicidal behavior in other sections of the labeling would have conflicted with the FDA's decision on the final printed labeling.

32.     In addition to suicidal and suicide gesture, the Neurontin label's Nervous System subsection lists many other psychobiologic adverse events. These events are listed despite psychobiologic adverse events having been more common in patients on placebo than patients on Neurontin in the controlled trials. That the Neurontin label lists psychobiologic events that were more common in placebo than Neurontin further illustrates how events were included regardless of causation.

## V. APPROVAL FOR TREATMENT OF POSTHERPETIC NEURALGIA

33. As previously noted, in 1997 the FDA appointed me Director of the DACCADP (since renamed the Division of Analgesics, Anti-inflammatory and Rheumatology Products). As the Division head, I was responsible for providing scientific and regulatory oversight for numerous investigational and marketed analgesic products, including medications for the treatment of neuropathic pain.

34. As Director, I had supervisory responsibility of a supplemental NDA submitted by Pfizer Inc. for an indication for the management of postherpetic neuralgia. Pfizer had initially sought an indication for the management of neuropathic pain based on prior discussions with individuals in the Division of Anti-inflammatory, Analgesics, and Ophthalmologic Drug Products, who until July 2000 were responsible for reviewing many applications for pain. This Division had indicated to the sponsor that an indication for the management of neuropathic pain was a viable indication if there were two positive trials in one neuropathic pain model and a single positive trial in a second neuropathic pain model. In May 2001, however, my division, the DACCADP, which at that time was given responsibility for products for neuropathic pain, advised Pfizer that a general neuropathic pain indication was not yet recognized by the FDA. In addition, we advised Pfizer that replicated evidence of efficacy in one neuropathic pain condition would only gain an indication for relief of pain in that particular pain condition. Based on the guidance communicated from my division, Pfizer agreed to amend its application to postherpetic neuralgia specifically. To date, no medication has been approved in the United States for a general neuropathic pain indication.

35. In reviewing the sNDA submitted for the indication of PHN, my division thoroughly evaluated the safety data reported in the sponsor's Integrated Summary of Safety and

11

supplemental materials. An in-depth clinical review was completed by Dr. Sharon Hertz, a Medical Officer in DACCADP, who concluded that Neurontin was safe for use in patients with postherpetic neuralgia (see Dr. Sharon Hertz, "Review and Evaluation of Clinical Data (May 24, 2002) (Attached Exhibit F)). Dr. Hertz's findings are consistent with the conclusions reached by Dr. Bob Rappaport, the Deputy Director and also team leader in the Division.

36.    Among the adverse events evaluated by Dr. Hertz were reports of depression, which she found were more frequent among patients on placebo than patients on Neurontin. Dr. Hertz reflected this in Table 7.20 of her report, which shows that 2.2 percent of placebo patients in the neuropathy studies reported treatment-emergent depression compared to only 1.3 percent of patients on Neurontin. The adjacent columns list the depression data reported in the epilepsy add-on studies. A combined analysis of both the epilepsy add-on and neuropathy controlled studies shows that 1.7 percent of patients on placebo reported treatment-emergent depression compared to 1.5 percent of Neurontin patients. Although the 1.7 percent and 1.5 percent figures are not statistically significant, the fact that depression was more commonly reported in patients on placebo reinforces the lack of any causal association between Neurontin and depression.

37.    Dr. Hertz's report also evaluated adverse events involving suicidal behavior. Her review identified only one intentional overdose, which the sponsor reported as a suicide attempt. The narrative indicates that the patient ingested 4500 mg of Neurontin and developed somnolence. A dose of 4500 mg of Neurontin may have been higher than the prescribed dose for this patient, but it would not be expected to result in fatality or even serious consequences in an adult. In evaluating this case, Dr. Hertz attributed only the somnolence as being related to Neurontin.

38.    Consistent with Dr. Hertz's and Dr. Rappaport's findings, I concluded in my report that there was sufficient safety and efficacy data of Neurontin to treat postherpetic neuralgia. See

Review and Basis for Approval Action (May 22, 2002) (Attached Exhibit G). It is important to note that my report contains no discussion about Neurontin and psychiatric adverse events or suicidality. Considering the high background rates of depression in patients with epilepsy and chronic pain together with the overall controlled-trial data revealing higher numbers of depression in placebo patients, there clearly was no need to discuss depression as a potential risk.

39.    In addition, as of May 2002, I had reviewed a number of NDAs since completing my review of the initial Neurontin NDA in 1993. I also was very familiar with Neurontin's exposure and safety data.  Based on my extensive experience in reviewing NDAs and knowledge of Neurontin, I felt that Neurontin's benefits outweighed its relatively low risks. This is illustrated by the relatively few side effects associated with the medication, absence of metabolites, the lack of any significant drug-to-drug interaction issues, and relatively safe adverse-event profile.  In addition, Neurontin had in 2002 been in use throughout the world for nearly a decade and had not given rise to a safety signal involving any psychiatric adverse event or suicidality. Accordingly, I did not feel it necessary in May 2002 to "set the record straight" as there was no record needing to be set straight.  Therefore, I noted in my report that "Combined with the finding of safety in the epilepsy development program, which included exposure and safety data of several years' duration, there was adequate safety exposure to support the finding of safety in postherpetic neuralgia . . . ." Review and Basis for Approval Action at 3 (May 22, 2002).

40.    In addition to the Division's clinical reviews, a pharmacology review was conducted by Dr. Timothy McGovern, the Division's Pharmacologist.    Timothy McGovern, FDA Pharmacology Review of NDA 21-397 (May 21, 2002). Included in Dr. McGovern's and the FDA's pharmacology evaluation was a review of the "Clinical Pharmacology: Mechanism of Action" section of the proposed labeling. Pfizer's proposed label contained new language in the

13

Mechanism of Action section regarding monoamines and GABA. Specifically, Pfizer sought approval of language stating that "Gabapentin reduces the stimulated release of noradrenaline, dopamine, and glutamate under certain laboratory conditions. Gabapentin administration to humans increases the total brain content of GABA after a single dose. However, the relevance of these findings to clinical use is not yet clear."

41.    The FDA deleted this language by lining through both sentences in a series of edits made on May 16, 2002. See HFD-120 Labeling Version #2, dated May 16, 2002 (Attached Exhibit H). The deletion of the language regarding monoamines and GABA is supported by the conclusion that this information had little importance to a clinician and his prescribing decisions. Had the FDA believed these sentences were important to prescribers or to safety and efficacy, the Agency would not have removed them.

42.    The FDA approved Neurontin for the treatment of postherpetic neuralgia on May 24, 2002. See FDA Approval letter (May 24, 2002) (Attached Exhibit I).

43.    As before, when the FDA approved Neurontin for the treatment of postherpetic neuralgia, it did so on the condition that "The final printed labeling (FPL) must be identical to the draft labeling/PPI" that the Agency had reviewed, edited, and approved. Except in limited circumstances set forth in FDA regulations, any deviation from the final printed labeling by Pfizer would have constituted unlawful misbranding.

44.    The final printed labeling contained data on psychiatric-related events seen in the neuropathic pain clinical trials. For example, in the Adverse Reactions' "Other Adverse Events" subsection relating to the neuropathic pain trials, depression was listed as a frequent adverse event. Other events such as anxiety, depersonalization, and emotional lability were identified as infrequent events. Because depression occurred more often in patients on placebo than in

14

patients on Neurontin, the data on depression was appropriately not listed in Table 2, "Treatment-Emergent Adverse Event Incidence in Controlled Trials in Postherpetic Neuralgia (Events in at least 1% of Neurontin-Treated Patients and Numerically More Frequent Than in the Placebo Group)." As with the adverse events listed in the epilepsy section, the inclusion of adverse events observed in the neuropathic pain trials in no way suggests that Neurontin caused any of these events.

45.    I believed then and continue to believe now that the final printed labeling approved by the FDA in May 2002 appropriately and accurately identified the data on psychiatric-related events reported in the neuropathic pain clinical trials.

46.    Throughout my career at the FDA, I never concluded that Neurontin increases the risk of or causes depression or suicidal behavior. This remains my belief today.


*Cynthia McCormick MD*
Cynthia McCormick


Subscribed and sworn to before me, a notary public, this _13th_ day of _September_ 2007.


Notary Public

My Commission expires

VIVIENNE E. COOPER
NOTARY PUBLIC
MONTGOMERY COUNTY, MARYLAND
My Commission Expires July 15, 2008

EXHIBIT B

371

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:  NEURONTIN MARKETING, SALES  MDL DOCKET NO:  1629
        PRACTICES, AND PRODUCTS
        LIABILITY LITIGATION       Master File No. 04-10981

_____/

THIS DOCUMENT RELATES TO:

      ALL PRODUCTS LIABILITY
      ACTIONS

_____/


      VIDEOTAPED
      DEPOSITION OF:        CHERYL D. BLUME, Ph.D.

      DATE:                 November 13, 2007

      TIME:                 9:06 a.m. to 6:08 p.m.

      PLACE:                1390 North Dale Mabry Highway
                            Suite 122
                            Tampa, Florida

      PURSUANT TO:          Notice by counsel for
                            Defendants for purposes
                            of discovery, use at
                            trial or such other
                            purposes as are permitted
                            under the Federal Rules
                            of Civil Procedure

      BEFORE:               VALERIE A. HANCE, RPR
                            Notary Public, State of
                            Florida at Large

                            Volume 2
                            Pages 371 to 722

*Condensed Copy*

**372**

1 APPEARANCES:
2    KENNETH B. FROMSON, ESQUIRE
     Finkelstein & Partners
3    785 Broadway
     3rd Floor
4    Kingston, New York 12401
     (800) 634-1212 Ext. 2755
5       Attorney for Plaintiffs
6    RICHARD M. BARNES, ESQUIRE
     MICHAEL J. WASICKO, ESQUIRE
7    Goodell, DeVries, Leech & Dann, LLP
     One South Street
8    20th Floor
     Baltimore, Maryland 21202
9    (410) 783-4000
10      -and-
11   VINCENT E. GUNTER, ESQUIRE
     LORI C. McGRODER, ESQUIRE (via telephone)
12   Shook, Hardy & Bacon, LLP
     2555 Grand Boulevard
13   Kansas City, Missouri 64108-2613
     (816) 474-6550
14      Attorneys for Defendant, Pfizer, Inc.
15   ANNAMARIE A. DALEY, ESQUIRE (via telephone)
     Robins, Kaplan, Miller & Ciresi L.L.P.
16   2800 LaSalle Plaza
     800 LaSalle Avenue
17   Minneapolis, Minnesota 55402
     (612) 349-8500
18      Attorney for Plaintiff, Assurant
19   ELANA GOLD, ESQUIRE (via telephone)
     Law Office of Steven Hillyard
20   345 California Street
     Suite 1770
21   San Francisco, California 94104
     (415) 334-6880
22      Attorney for Raymond Jennings, M.D.
23 ALSO PRESENT:
     KEITH ALTMAN, Finkelstein & Partners
24   DAVID LEGGETT, Videographer
25

**373**

1                  INDEX
                                        PAGE
2 DIRECT EXAMINATION BY MR. BARNES (CONTINUED) ......... 375
3 WITNESS' SIGNATURE PAGE.............................. 720
4 CERTIFICATE OF OATH................................. 721
5 REPORTER'S CERTIFICATE.............................. 722
6
7                EXHIBITS
                           ID    MARK
8 17   "Conclusiveness of rechallenge in ...... 441    440
9     the interpretation of adverse drug
      reactions"
10 18  Chart "PRR Over Time Completed ......... 462    461
      Suicide (PT) Serious Reports
11
   19  Integrated Summary of Safety ........... 513    512
12     Information
13 20  First Safety Update Following the ...... 517    516
      Submission of the ISS (5/29/92)
14
   21  Medical Review - Application Number .... 533    533
15     21-397/21-423/21-424
16 22  Affidavit of Cynthia McCormick.......... 552    550
17 23  Citizen Petition....................... 602    602
18 24  Letter from Russell Katz, M.D., to ..... 615    615
      Andrew G. Finkelstein (April 12, 2005)
19
20 25  Neurology Today Article (June 2005)..... 653    653
21
   26  Record of FDA Contact.................. 659    659
   27  Approvable Letter Package (12/21/93).... 664    664
22
   28  Package Insert for Neurontin ........... 670    669
23     (Gabapentin Capsules)
24 29  Record of FDA Contact (12/29/93)........ 671    671
25

**374**

1                EXHIBITS
                           ID    MARK
2 30   Record of FDA Contact (12/22/93)........ 672    672
3 31   Letter from Robert Temple, M.D., to .... 692    692
      Janeth Turner with Approval Letter
4     (12/30/93)
5 32   e-mail from Courtney Calder to Manini .. 705    704
      Patel (11/22/05)
6
   33   Joint Response Assessment Report on .... 710    708
7     List of Outstanding Issues, Neurontin
      and Associated Tradenames (Gabapentin)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**375**

1       (Proceedings continued from Volume 1.)
2       THE VIDEOGRAPHER:  It's November 13th, 2007.
3   We're on the record at 9:06 a.m.
4       CHERYL D. BLUME, Ph.D.,
5 the witness herein, being previously duly sworn on oath,
6 was examined and deposed as follows:
7       DIRECT EXAMINATION (CONTINUED)
8 BY MR. BARNES:
9   Q.  Good morning, Dr. Blume.
10  A.  Good morning.
11  Q.  We're going to resume your deposition today.
12 Okay?  Again, this is -- my name is Rick Barnes, and I'm
13 going to ask you some questions today about your report.
14      Yesterday I asked you several questions and
15 you stated you would have to look and check and see if
16 you could find certain information.  Did you have a
17 chance to review your file for the information regarding
18 the medical literature that we discussed yesterday as
19 well as the FDA reference that you mentioned?
20      MR. FROMSON:  Objection as to form.
21      THE WITNESS:  I'm sorry.  You're going to have
22   to remind me.
23 BY MR. BARNES:
24  Q.  Well, let me -- let be very direct then.
25      Well, do you remember when I was asking you

2 (Pages 372 to 375)

548

1 That's what you're pointing out in their medical officer
2 review report, correct?
3         To make sure I under- -- I just want to
4 understand what inferences, if any, you draw from this
5 is what I'm trying to draw out of you. And if there is
6 no inferences other than this was sent by FDA and the
7 company was on notice, that's one thing. If you're
8 saying and FDA had formed a certain belief as to
9 Neurontin either increasing the risk for suicide or
10 depression, then I want to know that. That's not a
11 trick question.
12    A.   Well, I don't know --
13         MR. FROMSON: Objection as to form.
14         THE WITNESS: I don't know where --
15 BY MR. BARNES:
16    Q.   All --
17    A.   I haven't said that.
18    Q.   All -- I'm not making -- I'm making sure you
19 won't say that if you -- if you have that -- if you have
20 that opinion, I want to know about it. If you're saying
21 it's simply putting the company on notice that somebody
22 at FDA had said that, that's something else. I'm just
23 trying to understand what significance you placed upon
24 this -- this statement in an MOR.
25    A.   Well, I --

549

1         MR. FROMSON: Objection, form.
2         THE WITNESS: Okay. A random person at FDA
3    didn't say this. This is in an officer's review.
4    And the --
5 BY MR. BARNES:
6    Q.   Correct.
7    A.   -- significance that I put on this is that FDA
8    had noted that there was clinically-significant
9 depression and suicide attempts and that -- and they
10 took that information and suggested that could be a
11 concern if it were used in any other populations.
12    Q.   In -- in your work over the past four years on
13 Neurontin, did you talk to Dr. Katz about this medical
14 officer review report?
15    A.   No.
16    Q.   Have you talked to Dr. McCormick about it?
17    A.   No, I worked with her on a different project.
18    Q.   She's -- she's no longer with the FDA,
19 correct?
20    A.   No.
21    Q.   You agree with me, she's no longer with the
22 FDA?
23    A.   I agree, she's not with the FDA.
24    Q.   And -- and have you taken the opportunity to
25 review your -- your -- your notes and your findings on

550

1 Neurontin with regard to the premarket evaluation FDA
2 conducted on Neurontin under Dr. McCormick's tenure?
3         MR. FROMSON: Objection.
4         THE WITNESS: No, I -- I received these
5    documents, protected documents. I didn't discuss
6    these with anybody.
7 BY MR. BARNES:
8    Q.   Did you ask Mr. Fromson or anyone at the
9 Finkelstein firm to discuss Dr. McCormick's views
10 concerning Neurontin and -- and suicide or depression?
11         MR. FROMSON: Objection as to form.
12         THE WITNESS: No, I -- I've never done that.
13    I hadn't thought to do it and I didn't do it.
14 BY MR. BARNES:
15    Q.   Okay. Can you advise me what project you're
16 working on with Dr. McCormick?
17         MR. FROMSON: Objection only to the tense of
18    your question. I think it's past tense.
19         THE WITNESS: Yes, it is. It was a project.
20    I can't identify it. It's not yet approved yet,
21    and it has nothing to do with neurobiologic or
22    psychobiologic.
23         MR. BARNES: Let's mark the next exhibit,
24    please.
25         (Deposition Exhibit No. 22 marked for

551

1 identification.)
2         MR. FROMSON: Just let me know when -- has the
3    document been marked?
4         MR. BARNES: Yes.
5         MR. FROMSON: What's the exhibit number on the
6    document?
7         THE WITNESS: 22.
8         MR. FROMSON: Is that -- is that correct,
9    Rick? Is it 22?
10         MR. BARNES: I'm looking. Hand it to me,
11    please.
12         It's Exhibit 22.
13         MR. FROMSON: All right. Just note I -- so I
14    don't have to -- unless you want me to make a
15    continuing objection after each question, I'll
16    object to the use of the document during the
17    deposition, not been previously disclosed. I don't
18    believe Cynthia McCormick has been disclosed as a
19    presuit 26(a) disclosure.
20         MR. GUNTER: She has.
21         MR. FROMSON: To the extent -- I'm just making
22    my record. So to the extent that it has not, if at
23    all, that would be my basis for the objection.
24    That's all.
25         MR. BARNES: Thank you.

46 (Pages 548 to 551)

552

1    MR. FROMSON: If it has, it has.
2    MR. BARNES: That's fine. And to the extent
3    I'm talking to this document, she hasn't
4    communicated --
5    MR. GUNTER: And just our response,
6    Dr. McCormick is not a party affiliated with
7    Pfizer. She's not an employee of Pfizer. She is a
8    neutral party and plaintiffs had every opportunity
9    to talk to her as defendants have.
10 BY MR. BARNES:
11    Q. Okay. Can you identify this document for the
12 record, please?
13    A. I can read the title.
14    Q. That's fine.
15    A. Affidavit of Cynthia McCormick.
16    Q. Okay. And this is -- looking at her
17 professional background, is this consistent with your --
18 with your understanding of her resume?
19    MR. FROMSON: Just note my objection. Did she
20    get an opportunity to read it? Did you read the
21    affidavit?
22    THE WITNESS: No, I haven't seen it.
23    MR. BARNES: Look at -- look at --
24    MR. FROMSON: Why don't you read the entire
25    document.

553

1    MR. BARNES: Now, why don't you just look at
2    it. I'll ask a question and direct her to the
3    document.
4    MR. FROMSON: I'll object to that for that
5    basis. If you're going to ask her to review it to
6    look at the document, but she can't review the
7    whole document.
8    MR. GUNTER: Okay.
9    MR. BARNES: Okay. On your -- on your time.
10    MR. FROMSON: No, on your time. You're asking
11    her about the document just as though you have done
12    to us in every deposition where a document has been
13    given, you're asking her a question, let her review
14    the document.
15    MR. BARNES: All right. Take a minute and
16    review the document. Let us know when she's done.
17    MR. FROMSON: She's going to let you know when
18    she's -- Dr. -- Dr. Blume can let you know when
19    she's done.
20    THE WITNESS: Yeah.
21    MR. GUNTER: What we could do though, have the
22    time going on, but just so she's not on video or
23    the -- not having to take video, shall we go off
24    the record for a few moments?
25    MR. FROMSON: I don't know if that would be

554

1    appropriate.
2    MR. GUNTER: Okay.
3    MR. FROMSON: Only because for authenticity
4    purposes, I think you want to have both.
5    MR. GUNTER: Sure.
6    THE WITNESS: Am I reading?
7    MR. FROMSON: Go ahead.
8    MR. ALTMAN: Do you have an extra copy of this
9    one?
10    MR. FROMSON: She can make a copy.
11    MR. GUNTER: For you, Keith, after all the CDs
12    you've given me.
13    MR. ALTMAN: Thank you, sir.
14    (Witness perusing document.)
15 BY MR. BARNES:
16    Q. You ready?
17    A. Quickly.
18    Q. Okay. Exhibit No. 22 is an affidavit from
19 Dr. Cynthia McCormick, correct?
20    A. Yes. I thought I said that, yes.
21    Q. Yeah. And it's signed by her and -- it's
22 sworn before a notary public, correct?
23    A. I think so, yes.
24    Q. Okay. Is there anything in her affidavit that
25 you believe is factually inaccurate?

555

1    MR. FROMSON: Just note my objection to form.
2    THE WITNESS: I -- with respect to the
3    epilepsy trials and postherpetic neuralgia, I don't
4    think so. Of course, I think she wrote this before
5    the labeling was changed. Let's see. The labeling
6    was changed in 2000.
7    No, she wrote this in 2007. It was after you
8    added -- corrected the suicide issue.
9 BY MR. BARNES:
10    Q. So you -- so again, just so I understand your
11 testimony, there is -- there is nothing in this
12 affidavit that you believe to be factually inaccurate,
13 correct?
14    A. Well --
15    MR. FROMSON: Objection, form, asked and
16    answered.
17    THE WITNESS: Yeah, based -- of course, she
18    provides information from -- from the FDA and
19    people in here that I can't -- I don't know if the
20    information's true or not. She talks about other
21    reviewers and their opinions, so -- but based on
22    what I can -- what I can relate to, no.
23 BY MR. BARNES:
24    Q. You would agree with me?
25    MR. FROMSON: Objection, form, asked and

47 (Pages 552 to 555)

EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| IN RE NEURONTIN | Index No. 04 CV 6704 |
|  | Assigned to: |
|  | Hon. Jed S. Rakoff |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' INITIAL DISCLOSURE STATEMENT

PLEASE TAKE NOTICE that, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendants Pfizer Inc, Parke-Davis, a division of Warner-Lambert Company and Warner-Lambert Company LLC, Warner-Lambert Company, and Warner Lambert Company LLC ("Defendants") make their initial disclosures as follows.

These responses are made subject to all objections as to competence, materiality, relevance, or other objection as to admissibility that may apply in the event that any such response, or the information contained in it, is sought to be used in court.  Defendants expressly reserve all such objections.

### Responses to Initial Disclosure

A.   **Rule 26(a)(1)(A): The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

Discovery and investigation in this case have just begun.  Therefore, based on the information reasonably available to it, Defendants are unable at the present time to identify all individuals, if any, who would have discoverable information that the Defendants may use to support their claims or defenses in the case, and the subjects of such information.

1

Subject to the foregoing and without waiver of any of Defendants' rights, the following individuals may have information that they may be able to use to support their claims and defenses in this case:

1.  Plaintiff.

2.  Members of Plaintiff's and decedent's families.

3.  Health care providers and treating physicians and psychiatrists, including those who prescribed the drug at issue in this case.

4.  Hospital and police personnel who investigated the incident.

5.  Pfizer employees and representatives who had any communications relating to Neurontin with, or were otherwise in contact relating to Neurontin with, the physician(s) who prescribed Neurontin to Plaintiff's decedent.

6.  Pfizer employees and representatives with knowledge of the safety of Neurontin.

7.  Any witness necessary to authenticate documents.

8.  Any witness identified or disclosed by Plaintiff.

To the extent any additional discovery and investigation may provide additional facts and legal contentions that may substantially alter these disclosures, Defendants reserve the right to amend without prejudice any and all disclosures herein consistent with these developments, including product identification, identifying other relevant witnesses and additional areas of information which support Defendants' defenses in this case and identifying additional individuals with discoverable information that may be used to support their claims or defenses in this case.

**B.    Rule 26(a)(1)(B): A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

As discovery and investigation in this matter is just beginning, and in particular as Plaintiff has not identified the physician(s) who prescribed Neurontin to Plaintiff's decedent, Defendants are unable at the present time, based on the information reasonably available, to identify all documents, compilations, and tangible things, if any, that Defendants may use to support claims or defenses in this case and the subject of such information.

Subject to the foregoing and without waiving any of Defendants' rights, Defendants submit the following list:

1.    Medical records in the possession or control of Plaintiff, her attorneys or health care providers.

2.    The applicable package insert for the drug manufactured by Defendants at issue in this case.

3.    Relevant documents contained in regulatory files, including the New Drug Application and Investigational New Drug Application.

4.    Relevant documents contained in safety surveillance and analysis files.

To the extent any additional discovery and investigation may provide additional facts and legal contentions that may substantially alter these disclosures, Defendants reserve the right to amend without prejudice any and all disclosures herein consistent with these developments, including identifying additional areas of information, relevant documents, and tangible things which support its claims or defenses in this case.

Pursuant to Fed.R.Civ.P. 26(b)(5), Defendants object to disclosure or production of documents and materials generated during the course of this litigation that constitute

attorney work product or that contain privileged attorney-client communications. These documents and materials may consist, among others, of communications or correspondence between counsel and Defendants, correspondence between counsel and consulting experts, and between Defendants and employees to facilitate the rendition of legal advice. These documents may be exempt from discovery pursuant to Fed. R. Civ. P. 26(b)(3), 26(b)(4)(B), and/or the applicable attorney-client and/or joint defense privilege.

Moreover, if Defendants identify certain documents that they believe contain trade secrets and other confidential research, development, or commercial information, such documents will be produced subject to an appropriate protective order.

**C.  Rule 26(a)(1)(C) A computation of any category of damages claimed by the disclosing party.**

Not applicable.

**D.  Rule 26(a)(1)(D) For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

Defendant is self-insured and has assets sufficient to satisfy any judgment that may be rendered in this matter.

Dated:   New York, New York
          October 29, 2004

DAVIS POLK & WARDWELL

By:                   
        James P. Rouhandeh (JR-2251)
        James E. Murray (JM-4006)

450 Lexington Avenue
New York, New York  10017
(212) 450-4000


Attorneys For Defendants Pfizer Inc,
Parke-Davis, a division of Warner-
Lambert Company and Warner-Lambert
LLC, Warner-Lambert Company, and
Warner-Lambert Company LLC.

# EXHIBIT D

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE NEURONTIN

      :   Index No. 04 CV 6704

      :   Assigned to:

      :   Hon. Jed S. Rakoff

      :   DEFENDANTS'
      :   SUPPLEMENTAL INITIAL
      :   DISCLOSURE STATEMENT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' SUPPLEMENTAL DISCLOSURE STATEMENT

PLEASE TAKE NOTICE that, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendants Pfizer Inc., Parke-Davis, a division of Warner-Lambert Company and Warner-Lambert Company LLC, Warner-Lambert Company, and Warner Lambert Company LLC ("Defendants") amends their disclosures under Rule 26(a)(1)(A) as follows.

These responses are made subject to all objections as to competence, materiality, relevance, or other objection as to admissibility that may apply in the event that any such response, or the information contained in it, is sought to be used in court. Defendants expressly reserve all such objections.

**Rule 26(a)(1)(A): The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

Discovery and investigation in this case are on-going. Therefore, based on the information reasonably available, Defendants are unable at the present time to identify each and every individual who would have discoverable information that the Defendants may use to support their claims or defenses in the case, and the subjects of such information. Defendants reserve the right to supplement these disclosures as they become aware of additional individuals who would have such information.

Subject to the foregoing and without waiver of any of Defendants' rights, the following additional individuals may have information that they may use to support their claims and defenses in this case:

**Warner-Lambert**

| | |
|---|---|
| Mi Dong | Clinical Research and Development |
| Elizabeth Garofalo | Clinical Research and Development |
| Ron Martin | Clinical Research and Development |
| Atul Pande | Clinical Research and Development |
| Mark Pierce | Clinical Research and Development |
| Charles Taylor | Clinical Research and Development |
| Myra Ballina | Drug Safety Surveillance |
| Diane Cairns | Drug Safety Surveillance |
| Rose Rogan | Drug Safety Surveillance |
| Sylvia Tomcyzk | Drug Safety Surveillance |
| Rubin Bedell | Medical Information |
| Barbara Bonetti | Medical Information |
| Charles Fraser | Medical Information |
| Matt DiGiorgi | Medical Information |
| Helen Duda-Racki | Medical Information |
| Leslie Fierro | Medical Information |
| Robert Lewis | Medical Information |
| Robert Menella | Medical Information |
| Frank Pignataro | Medical Information |

2

| | |
|---|---|
| Mike Davies | Medical Liaisons |
| Joe Dymkowski | Medical Liaisons |
| LeeAnne Fogleman | Medical Liaisons |
| Richard Grady | Medical Liaisons |
| Lisa Kellett | Medical Liaisons |
| Ken Lawlor | Medical Liaisons |
| Joe McFarland | Medical Liaisons |
| Darryl Moy | Medical Liaisons |
| | |
| Elizabeth Attias | Medical and Scientific Affairs – Medical Liaisons |
| Adrian Bal | Medical and Scientific Affairs – Medical Liaisons |
| James Black | Medical and Scientific Affairs – Medical Liaisons |
| Denise Bluhm-Heise | Medical and Scientific Affairs – Medical Liaisons |
| Jyoti Jankowski | Medical and Scientific Affairs – Medical Liaisons |
| Ken Massey | Medical and Scientific Affairs – Medical Liaisons |
| Philip Magistro | Medical and Scientific Affairs – Medical Liaisons |
| Lonia Merte | Medical and Scientific Affairs – Medical Liaisons |
| William Sigmund | Medical and Scientific Affairs – Medical Liaisons |
| | |
| Leslie Magnus-Miller | Medical and Scientific Affairs |
| | |
| Irwin Martin | Regulatory |
| James Parker | Regulatory |
| Alan Rubenstein | Regulatory |
| Janeth Turner | Regulatory |
| | |
| Tom Albright | Sales and Marketing |
| Mary Lou Aquino | Sales and Marketing |
| Diane Beskenis | Sales and Marketing |
| John Boris | Sales and Marketing |
| J. Allen Crook | Sales and Marketing |
| Victor Delimata | Sales and Marketing |
| Robert Doyle | Sales and Marketing |
| John Ford | Sales and Marketing |
| Laura Johnson | Sales and Marketing |
| Tim George | Sales and Marketing |
| Edda Guerrero | Sales and Marketing |
| John Howard | Sales and Marketing |
| John Knoop | Sales and Marketing |
| Nancy Kohler | Sales and Marketing |
| John Krukar | Sales and Marketing |
| Les Lang | Sales and Marketing |
| David Murphy | Sales and Marketing |
| Lawrence Perlow | Sales and Marketing |

| Jacqueline Rizzo | Sales and Marketing |
| Doug Saltel | Sales and Marketing |
| Les Slater | Sales and Marketing |
| Michael Valentino | Sales and Marketing |
| John Woychick | Sales and Marketing |
| Brian Zorn | Sales and Marketing |

**Pfizer**

| Gretchen Dieck | Drug Safety and Risk Management |
| Tina Ho | Drug Safety and Risk Management |

| Carol Ceuba-Jones | Drug Safety Surveillance |
| Vivian Conde | Drug Safety Surveillance |
| Yvonne Crichton | Drug Safety Surveillance |
| Terry Donovan | Drug Safety Surveillance |
| Janice Groth | Drug Safety Surveillance |
| Esperanza Molina | Drug Safety Surveillance |
| Kashia Petchel | Drug Safety Surveillance |
| Angela Vales | Drug Safety Surveillance |
| Grazia Zurlo | Drug Safety Surveillance |

| Bruce Parsons | Medical |
| Leslie Tive | Medical |
| Claire Wohlhuter | Medical |

| Barbara Bonetti | Medical Information |
| Catherine Clary | Medical Information |
| Michelle Claussen | Medical Information |
| Helen Duda-Racki | Medical Information |
| John Rocchi | Medical Information |
| Julie Su | Medical Information |
| Adrian Vega | Medical Information |

| Rudi Altevogt | Regulatory |
| Lucy Castro | Regulatory |
| Art Ciociola | Regulatory |
| Andrea Garrity | Regulatory |
| Stephen Cristo | Regulatory |
| Manini Patel | Regulatory |

| Lisa Lardieri | RMRs |

| | |
|---|---|
| Suzanne Doft | Sales and Marketing |
| John Krayacich | Sales and Marketing |
| Andrea Zeucher Malone | Sales and Marketing |
| Avanish Mishra | Sales and Marketing |
| David Probert | Sales and Marketing |
| Meg Yoder | Sales and Marketing |

To the extent any additional discovery and investigation may provide additional facts and legal contentions that may substantially alter these disclosures, Defendants reserve the right to amend without prejudice any and all disclosures herein consistent with these developments, including product identification, identifying other relevant witnesses and additional areas of information which support Defendants' defenses in this case and identifying additional individuals with discoverable information that may be used to support their claims or defenses in this case.

Dated:   New York, New York
         May 16, 2005

DAVIS POLK & WARDWELL

By:   _____

James P. Rouhandeh (JR-2251)
James E. Murray (JM-4006)

450 Lexington Avenue
New York, New York  10017
(212) 450-4000

5

Attorneys For Defendants Pfizer Inc.,
Parke-Davis, a division of Warner-
Lambert Company and Warner-
Lambert LLC, Warner-Lambert
Company, and Warner-Lambert
Company LLC.

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALL ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

## DEFENDANTS' SUPPLEMENTAL DISCLOSURE STATEMENT

PLEASE TAKE NOTICE that, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendants Pfizer Inc., Parke-Davis, a division of Warner-Lambert Company and Warner-Lambert Company LLC, Warner-Lambert Company, and Warner Lambert Company LLC ("Defendants") make and amend their disclosures as follows.

These responses are made subject to all objections as to competence, materiality, relevance, or other objections as to admissibility that may apply in the event that any such response, or the information contained in it, is sought to be used in court. Defendants expressly reserve all such objections.

A.     **Rule 26(a)(1)(A): The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

Discovery and investigation in these actions are on-going. Based on the information reasonably available, Defendants are unable at the present time to identify each and every individual who would have discoverable information that the Defendants may use to support

their claims or defenses in the case, and the subjects of such information. Defendants reserve the right to supplement these disclosures as they become aware of additional individuals who have such information.

Subject to the foregoing and without waiver of any of Defendants' rights, the following individuals may have information that Defendants may use to support their claims and defenses in this action:

1.    Plaintiff(s);

2.    Members of Plaintiffs' and/or Plaintiffs' decedents' families;

3.    Health care providers and treating physicians and psychiatrists, including those who prescribed Neurontin to Plaintiffs' and/or Plaintiffs' decedent;

4.    Hospital, police and emergency personnel who investigated the incidents;

5.    Pfizer employees and representatives who had any communications relating to Neurontin with, or were otherwise in contact relating to Neurontin with, the physician(s) who prescribed Neurontin to Plaintiffs' and/or Plaintiffs' decedents;

6.    Defendants' employees and representatives with knowledge of the safety of Neurontin, including those listed below;

7.    Any witnesses necessary to authenticate documents;

8.    Any witnesses identified or disclosed by Plaintiffs or any other party.

Subject to the foregoing and without waiver of any of Defendants' rights, the following additional individuals may have information that Defendants' may use to support their claims and defenses in this action:

**Warner-Lambert**

| | |
|---|---|
| Mi Dong | Clinical Research and Development |
| Elizabeth Garofalo | Clinical Research and Development |
| Lloyd Knapp | Clinical Research and Development |
| Linda LaMoreaux | Clinical Research and Development |

2

| | |
|---|---|
| Atul Pande | Clinical Research and Development |
| Mark Pierce | Clinical Research and Development |
| Charles Taylor | Clinical Research and Development |
| | |
| Helen Duda-Racki | Medical Information |
| | |
| Mike Davies | Medical Liaisons |
| LeeAnne Fogleman | Medical Liaisons |
| Richard Grady | Medical Liaisons |
| Lisa Kellett | Medical Liaisons |
| Ken Lawlor | Medical Liaisons |
| Joe McFarland | Medical Liaisons |
| Darryl Moy | Medical Liaisons |
| | |
| Elizabeth Attias | Medical and Scientific Affairs – Medical Liaisons |
| Adrian Bal | Medical and Scientific Affairs – Medical Liaisons |
| James Black | Medical and Scientific Affairs – Medical Liaisons |
| Jyoti Jankowski | Medical and Scientific Affairs – Medical Liaisons |
| Philip Magistro | Medical and Scientific Affairs – Medical Liaisons |
| | |
| William Sigmund | Medical and Scientific Affairs |
| Leslie Magnus-Miller | Medical and Scientific Affairs |
| | |
| James Parker | Regulatory |
| Alan Rubenstein | Regulatory |
| Janeth Turner | Regulatory |
| | |
| John Boris | Sales/Marketing |
| George Cavic | Sales/Marketing |
| J. Allen Crook | Sales/Marketing |
| Victor Delimata | Sales/Marketing |
| Chris DeSimone | Sales/Marketing |
| Robert Doyle | Sales/Marketing |
| John Ford | Sales/Marketing |
| Tim George | Sales/Marketing |
| Edda Guerrero | Sales/Marketing |
| John Howard | Sales/Marketing |
| Laura Johnson | Sales/Marketing |
| John Knoop | Sales/Marketing |
| Nancy Kohler | Sales/Marketing |
| John Krukar | Sales/Marketing |
| David Murphy | Sales/Marketing |
| John Richter | Sales/Marketing |
| Tim Windom | Sales/Marketing |
| John Woychick | Sales/Marketing |

**Pfizer**

| | |
|---|---|
| Larry Alphs | Clinical Development |
| | |
| Lalitha Aiyer | Drug Safety and Risk Management |
| Gretchen Dieck | Drug Safety and Risk Management |
| Greg Gribko | Drug Safety and Risk Management |
| Manfred Hauben | Drug Safety and Risk Management |
| Tina Ho | Drug Safety and Risk Management |
| Douglas Kargman | Drug Safety and Risk Management |
| Emily Lanigan | Drug Safety and Risk Management |
| Elizabeth Luczak | Drug Safety and Risk Management |
| Jeffrey Mohan | Drug Safety and Risk Management |
| Esperanza Molina | Drug Safety and Risk Management |
| Kathy Sigler | Drug Safety and Risk Management |
| Deepak Taneja | Drug Safety and Risk Management |
| | |
| Melissa Dana | Marketing |
| Suzanne Doft | Marketing |
| Allison Fannon | Marketing |
| Marino Garcia | Marketing |
| Craig Glover | Marketing |
| Christine Grogan | Marketing |
| Leigh Ann Hemenway | Marketing |
| John Krayacich | Marketing |
| John Marino | Marketing |
| Avanish Mishra | Marketing |
| Steve Piron | Marketing |
| David Probert | Marketing |
| Jason Totolis | Marketing |
| Meg Yoder | Marketing |
| Andrea Zeuchner Malone | Marketing |
| | |
| Nancy Mancini | Marketing Analytics |
| | |
| Robert Glanzman | Medical |
| Bruce Parsons | Medical |
| Leslie Tive | Medical |
| Christopher Wohlberg | Medical |
| Claire Wohlhuter | Medical |
| | |
| Suzan Carrington | Medical Grants |
| Maria McCauley | Medical Grants |
| | |
| Steve Brigandi | Medical/Program Planning & Management |

4

| | |
|---|---|
| Catherine Clary | Medical Information |
| Michelle Claussen | Medical Information |
| Helen Duda-Racki | Medical Information |
| John Rocchi | Medical Information |
| Julie Su | Medical Information |
| Adrian Vega | Medical Information |
| | |
| Ellen Dukes | Outcomes Research & Development |
| | |
| Kay Sumulak | Postmarket Safety |
| | |
| Rudi Altevogt | Regulatory |
| Mary Ann Carnel | Regulatory |
| Lucy Castro | Regulatory |
| Art Ciociola | Regulatory |
| Stephen Cristo | Regulatory |
| Andrea Garrity | Regulatory |
| Chris Pacella | Regulatory |
| Manini Patel | Regulatory |
| Drusilla Scott | Regulatory |
| | |
| Valerie Flapan | Review Committee |
| | |
| Carolyn Blankmeister | RMRS |
| Tim Hylan | RMRS |
| Jill Kerrick Walker | RMRS |
| | |
| Dale Amon | Sales |
| Kim Brett | Sales |
| Mark Brown | Sales |
| Chris Dowd | Sales |
| Mike Fox | Sales |
| Bruce Fleischman | Sales |
| Chris Gish | Sales |
| David Gruber | Sales |
| Dan Linden | Sales |
| Tamela Martin | Sales |
| Kathy Rivas | Sales |
| Michael Romano | Sales |
| James Schultz | Sales |
| | |
| Guy Cohen | Statistical Analysis |

Subject to the foregoing and without waiver of any of Defendants' rights, the following additional individuals may have information relating to FDA issues pertaining to Neurontin that Defendants may use to support their claims and defenses in this action:

Paul Leber
Neuro-Pharm Group, LLC
11909 Smoketree Road
Potomac, MD 20854

Russell Katz
Director, Division of Neurology
FDA, FDA 120
1451 Rockville Pike, Room 4037
Rockville, MD 20852

Cynthia McCormick
McCormick Consulting LLC
9127 Friars Road
Bethesda, MD 20817

Sharon Hertz
Deputy Director
FDA, Division of Anesthesia, Analgesia, and Rheumatology Products
10903 New Hampshire Avenue
Silver Spring, MD 20993

Timothy McGovern
Supervisory Pharmacologist
Office of New Drugs
Center for Drug Evaluation and Research
FDA
10903 New Hampshire Avenue
Silver Spring, MD 20993

Laura A. Governale
Team Leader, Drug Use Data Specialist
Office of Surveillance and Epidemiology
Center for Drug Evaluation and Research
FDA
Bldg. 22, Room #4484
10903 New Hampshire Avenue
Silver Spring, MD 20993

To the extent any additional discovery and investigation provides additional facts and legal contentions that may substantially alter these disclosures, Defendants reserve the right to amend without prejudice any and all disclosures herein consistent with those developments, including product identification, identifying other relevant witnesses and additional areas of information which support Defendants' defenses in this case and identifying additional individuals with discoverable information that may be used to support their claims or defenses in this case.

**B.      Rule 26(a)(1)(B): A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

Because discovery and investigation in these actions are ongoing, and because in many instances, Plaintiffs' counsel has not yet identified the physician(s) who prescribed Neurontin to Plaintiffs and Plaintiffs' decedents, Defendants are unable at the present time, based on the information reasonably available, to identify all documents, compilations, and tangible things, if any, that Defendants may use to support claims or defenses in these cases and the subject of such information.

Subject to the foregoing and without waiving any of Defendants' rights, Defendants submit the following list:

1.      Documents produced by any party or any third party in this case or in the civil action captioned *United States of America ex rel. David Franklin v. Parke-Davis, et al.*, C.A. No. 96-11651-PBS (D. Mass.).

2.      Documents introduced as exhibits during any fact or expert deposition in this case or in the civil action captioned *United States of America ex rel. David Franklin v. Parke Davis, et al.*, C.A. No. 96-11651-PBS (D. Mass.).

3.      Medical records in the possession or control of Plaintiff, Plaintiff's attorneys or health care providers.

4.      The applicable package insert for the drug manufactured by Defendants at issue in this case.

To the extent any additional discovery and investigation provides additional facts and legal contentions that may substantially alter these disclosures, Defendants reserve the right to amend without prejudice any and all disclosures herein consistent with these developments, including identifying additional areas of information, relevant documents, and tangible things that support their claims or defenses in this case.

Pursuant to Fed. R. Civ. P. 26(b)(5), Defendants object to disclosure or production of documents and materials generated during the course of this litigation that constitute attorney work product or that contain privileged attorney-client communications. These documents and materials may consist, among others, of communications or correspondence between counsel and Defendants, correspondence between counsel and consulting experts, and between Defendants and employees to facilitate the rendering of legal advice. These documents may be exempt from discovery pursuant to Fed. R. Civ. P. 26(b)(3), 26(b)(4)(B), and/or the applicable attorney-client and/or joint defense privilege.

Moreover, if Defendants identify certain documents that they believe contain trade secrets and other confidential research, development, or commercial information, such documents will be produced subject to an appropriate protective order.

8

**C.**    **Rule 26(a)(1)(C):  A computation of any category of damages claimed by the disclosing party.**

Not applicable.

**D.**    **Rule 26(a)(1)(D):  For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

Defendant is self-insured and has assets sufficient to satisfy any judgment that may be rendered in this matter.

Dated: November 15, 2007

/s/James P. Rouhandeh
James P. Rouhandeh

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

- and -

/s/David B. Chaffin
David B. Chaffin

HARE & CHAFFIN
BBO # 549245
160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc.,
Parke-Davis, a division of Warner-
Lambert Company and Warner-Lambert
LLC, Warner-Lambert Company, and
Warner-Lambert Company LLC.*

10

EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE NEURONTIN MARKETING,<br>SALES PRACTICES AND PRODUCTS<br>LIABILITY LITIGATION | )<br>)MDL Docket No. 1629<br>)<br>)Judge Patti B. Saris<br>)Magistrate Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:<br><br>PRODUCT LIABILITY LITIGATION | )<br>)<br>)Civil Action No. 04-10981<br>)<br>) |

**PRODUCT LIABILITY PLAINTIFFS' REQUESTS FOR PRODUCTION OF
DOCUMENTS AND THINGS TO DEFENDANTS PFIZER, INC., WARNER
LAMBERT COMPANY LLC, PARKE-DAVIS, A Division of Warner Lambert
Company, and WARNER LAMBERT COMPANY**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, the Plaintiffs hereby request

Defendants Pfizer, Inc and Warner-Lambert Company produce for inspection and

copying the documents and materials described below at the offices of Finkelstein &

Partners, 436 Robinson Avenue, Newburgh, NY 12550 within thirty days of the date of

the service of this request.  Plaintiffs further request that such production be made in

accordance with CMO #3, and the Definitions and Instructions set forth below.

<u>Definitions and Instructions</u>

<u>Definitions</u>

The definitions contained in Rule 26.5 of the Local Rules of the United States District

Court for the District of Massachusetts are incorporated herein by reference.

Additionally, the following definitions apply to this Document Request:

"And" includes the word "or" and vice-versa.

10.    The geographic scope of this Document Request is the United States;
however, all requests for documents and other materials which relate to the safety or
efficacy of Neurontin, or medical research and study relating to Neurontin are not limited
to the United States.

11.    When a request calls for the production of an electronic database file or Data
File, this file must be produced in a form compatible with Microsoft Access, or in any
other format agreed to by the parties.

12.    If a request calls for the production of database records or database files that
no longer exist in electronic form, all hard copies of the requested records and files, even
if not entirely complete, should be provided.

### Documents Requested

1. NDA 20-235

2. All supplemental NDAs filed concerning Neurontin.

3. All documents relating to any clinical trial conducted for the purpose of establishing
the safety or efficacy of Neurontin for the treatment of any pain syndrome.

4. All documents relating to any clinical trial conducted for the purpose of establishing
the safety or efficacy of Neurontin for the treatment of any psychiatric syndrome.

5. All documents relating to any clinical trial conducted for the purpose of establishing
the safety of Neurontin for use by patients suffering from mental illnesses, including,
but not limited to, bipolar disorder, depression, social phobia, anxiety disorder, panic
disorder, obsessive compulsion disorder, mania, attention deficit disorder or attention
deficit hyperactivity disorder.

124. All documents relating to any plans, programs, or efforts to encourage or assist physicians to write articles, published letters, posters or abstracts regarding Neurontin use.

125. All documents relating to any plans or programs to encourage or assist physicians to instruct, make presentations to, advise, champion, or otherwise speak to other physicians about Neurontin use.

126. All documents relating to any studies of Neurontin conducted or proposed by Dr. Kenneth Gorson.

127. All documents relating to any article or abstract written by Dr. Kenneth Gorson concerning his research on Neurontin, including any drafts of any such articles or abstracts.

128. All documents relating to any payments Dr. Kenneth Gorson received directly or indirectly from the Defendants.

129. All documents relating to any studies of Neurontin conducted or proposed by Dr. Bruce Ehrenberg.

130. All documents relating to any article or abstract written by Dr. Bruce Ehrenberg concerning his research on Neurontin, including any drafts of any such articles or abstracts.

131. All documents relating to any payments Dr. Bruce Ehrenberg received directly or indirectly from the Defendants.

132. All documents relating to the efficacy or inefficacy of Neurontin for the treatment of any pain syndrome.

      f.   medical education Events.

186.     All documents relating to Defendants' standard operating procedures regarding provision of Goods or Service of Value to physicians speaking at:

      a.   consultants' meetings;

      b.   advisory committees;

      c.   dinner meetings;

      d.   continuing medical education seminars;

      e.   teleconferences;

      f.   medical education Events.

187. All documents relating to Defendants' standard operating procedures regarding payment or provision of Goods or Services of Value to physicians writing articles on Defendants' products.

188. All documents relating to the mechanism of action of Neurontin on the human brain.

189. All documents relating to Defendants' theories of the mechanism of action of Neurontin.

190. All documents relating to whether the mechanism of action of Neurontin has been established.

191. All documents relating to communications regarding the marketing of Neurontin that occurred between Pfizer and any representative of any consumer protection division of any State.

192. All documents relating to any allegation by any state official that Defendants had violated any consumer protection statute.

Dated: September 22, 2006

FINKELSTEIN & PARTNERS

By:     /s/Kenneth B. Fromson
        /s/Andrew G. Finkelstein
       Kenneth B. Fromson
       Andrew G. Finkelstein

       436 Robinson Avenue
       Newburgh, NY 12550
       (845) 562-0203

       Attorneys for Product Liability Plaintiffs