# EXHIBIT A



Howard S. Finkelstein, P.C. (NY)
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy (NY)
Kenneth L. Oliver, P.C. (NY)
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark (NY)
Ronald Rosenkranz (NY)
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim (NY)
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni (NY)
Steven H. Cohen (NY)
Francis Navarra (NY)
Andrew J. Genna, LLM (NY & PA)

Thomas C. Yatto (NY)
Elyssa M. Fried-DeRosa (NY)
Mary Ellen Wright (NY)
Kenneth B. Fromson (NY & NJ)
Joel Bossom (NY)
Nancy Y. Morgan (NY, NJ & PA)
Andrew L. Spitz (NY)
James W. Shuttleworth, III (NY)
Lawrence D. Lissauer (NY)
David E. Gross (NY & NJ)

Terry D. Horner (NY)
Robert F. Moson (NY)
Debra J. Reisenman (NY)
Michael T. McGarry (NY)

Steven P. Shultz (NY & MA)
Julio E. Urrutia (NY & NJ)
Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer (NY)
Thomas J. Pronti (NY)
Kristine M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Arieh Mezoff (NY)
Christopher T. Milliman (NY)
Silvia Fermanian (NY)
Edward M. Steves (NY)
Karen M. Queenan (NY & CT)
Marie Dusault (NY)
Andrew I. Falk (NY)

*Of Counsel*
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C. (NY)
Joel A. Reback (NY & Israel)
Sheila Rosenrauch (NY)
Kenneth Cohen (NJ)
Cynthia M. Maurer (NY & NJ)
Raye D. Futerfas (NJ)
Frances M. Bova (NY & NJ)
Kenneth G. Bartlett (CT & NJ)
Ari Kresch (NY & MI)

*Accredited CLE Provider*

(800) 634-1212
Fax: (845) 562-3492
www.lawampm.com

March 21, 2005

Dr. Russell Katz
Director, Neuropharmacological Drug Products
Food and Drug Administration, FDA 120
1451 Rockville Pike, Room 4037
Rockville, MD   20852

Via e-mail and regular mail

Re:   NEURONTIN

Dear Dr. Katz:

Enclosed you will find two hundred fifty eight MedWatch forms, most with redacted death certificates. Each represents a suicide of an American who was on Neurontin when he or she took his or her own life. To this day, *completed suicide* is not found anywhere on the warning label for Neurontin.

As you know, Neurontin was recommended for approval by the Neuropharmacolgical Drug Products Division of the FDA in 1992. At that time you were Group Leader of the Division and oversaw the FDA's analysis of the clinical data supplied by Parke-Davis Pharmaceuticals, the sponsor seeking approval to sell Neurontin.

Recently, we obtained the FDA's analysis of the New Drug Application filed by Parke-Davis and found shocking information. During your evaluation of serious adverse events that occurred during original clinical trials, the risk of Neurontin causing suicide was both known and a major concern. The FDA clinical reviewer from your Division specifically stated in December, 1992:

> Serious adverse events may limit the drug's widespread usefulness. Depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or *lead to suicide*, as it has resulted in some suicidal attempts during clinical trials. (emphasis added)

In fact, during the clinical trials Parke-Davis reported Neurontin was attributable to four people actually attempting suicide, two more having depression with suicidal ideations and twenty two participants reporting depression so severe it required pharmacologic intervention. Additionally, nineteen of the seventy eight participants who reported depression during the clinical trials had no prior history of depression.

However, since the underlying condition Neurontin helps is such a serious condition – intractable refractory seizures in adults that are not controllable with existing antiseizure medications – your Division recommended approval with "appropriate and prominent labeling for use in a specific population." Clearly, the FDA did not approve this drug with any expectation of use beyond the approved indication. Given the limited population for whom the drug was approved, and the importance of controlling intractable partial seizures, I take no issue with the ultimate approval.

In July, 1996, it came to the attention of the FDA that Parke-Davis was involved in off-label promotions of Neurontin. At that time, Lesley Frank of the FDA wrote to Parke-Davis voicing the FDA's concern:

> Parke-Davis may be promoting Neurontin for 'off-label' uses, i.e., any use beyond the FDA approved indications, in printed promotional materials, in detail or sales presentations to physicians, and through the use of company-solicited physician participation in a series of teleconferences. **These promotions of Neurontin for off-label uses included, but were not limited to, its use in chronic pain, bipolar disorders, and other psychiatric conditions.** As you are aware, Neurontin's only approved indication was for adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. (emphasis added)

Even though the FDA knew Neurontin caused depression that may lead to suicide and that Neurontin's effects were never fully tested on people who suffered from chronic pain, bipolar disorder or other psychiatric conditions, the FDA acted with no urgency. After eleven months, Parke-Davis responded by denying all allegations and the FDA simply accepted their denial. Noteworthy, a former employee of Parke-Davis "blew the whistle" and exposed a plot to defraud physicians and healthcare providers. Through an elaborate scheme of deception, off label sales of Neurontin increased from $23 million in 1993 to $2.7 ***billion*** in 2004. By so doing, they were exposing a vulnerable population of Americans to a drug known for causing depression that leads to suicide, without proper warnings. Ultimately, the Department of Justice in Boston took notice and prosecuted only the illegal marketing and sales practices of Parke-Davis. The prosecution resulted in the company pleading guilty to multiple felonies and paying fines totaling $430 million.

More disturbing, however, is that from 1996 to today, the FDA has taken no affirmative action to require Parke-Davis to advise physicians or their patients of the risks of suicide associated with Neurontin. The FDA never issued a cease and desist letter preventing the off-label sales of Neurontin. The FDA never warned physicians of the known association between Neurontin and suicide. The FDA never required a stronger warning label be affixed on Neurontin prescriptions. The FDA's complete inaction in protecting the health and safety of United States citizens from a known serious risk of an approved drug is highly suspicious given the recent exposed relationships between pharmaceutical companies and the FDA.

On March 31, 2004, you and I had a conference call wherein we discussed the problems with Neurontin's suicidal effects. At that time you were made aware of over one hundred completed suicides and thousands of attempted suicides of Americans while on Neurontin. During that conversation you stated my firm had "the

world's largest data set addressing the question of Neurontin and suicidal behavior that exists" and were most interested in evaluating our findings. Provided I could maintain my clients' confidentiality, I agreed to provide all our raw data at the earliest possible time so as to enable the FDA to act with the swiftness this crisis required. You agreed immediate attention was necessary and advised someone from your office would contact me to coordinate the delivery of the data. Unbelievably, no one from the FDA has called or written me in the past year.

The next month, in April of 2004, my firm's Director of Adverse Event Analysis, Keith Altman, attended a conference on pharmacovigilance sponsored by the Drug Information Association. At that conference Mr. Altman had extensive conversations with Ms. Carol Krueger, a member of the Post Marketing Surveillance Division of the FDA. They specifically discussed the hundreds of known suicides related to Neurontin of which my firm was aware. Ms. Krueger agreed it was important for the FDA to send someone to my office to review the information. Yet again, no one from the FDA has called or written.

Having not heard from the FDA and receiving nearly daily notices of ongoing suicides, my firm pursued the formal administrative process. We filed a Citizens Petition on May 17, 2004, pursuant to 21 CFR 10.35 of the Federal Food, Drug and Cosmetic Act. Our petition sought one simple objective – warn the public of the potential for suicide when taking Neurontin. In our petition we asked the FDA to do two simple things: (i.) require the strongest warning on the label - a black box warning – warning of an association between Neurontin and suicide; and (ii.) require the manufacturer to disseminate "Dear Doctor" and "Dear Healthcare Professional" letters cautioning them to watch for increased depression in patients who were prescribed Neurontin.

Nearly six months later the FDA finally responded to our Citizens Petition. In a letter dated November 5, 2004, we were advised that the "FDA has been unable to reach a decision on your petition because it raises issues that require additional review and analysis by the agency." Clearly, if your agency has undertaken any analysis at all, it must have been done so without the benefit of "the world's largest data set addressing the question of Neurontin and suicidal behavior that exists" since no one from the agency has contacted my firm. Nonetheless, we do know FDA officials have had several meetings with the manufacturer regarding the issues of suicide caused by Neurontin. One can only wonder, is it the government's agenda to protect the pharmaceutical company's blockbuster drug at the expense of the safety and security of the American people?

The complete inaction by the FDA to warn an unknowing population that was relying upon the FDA to require warnings for potential adverse events from off-label usage is deplorable. The complicity by the FDA in Parke-Davis's scheme to defraud physicians and consumers is more egregious than the underlying fraud itself. The governmental body charged with the responsibility of protecting the health and safety of Americans has done absolutely nothing to prevent entirely preventable deaths. Such complicity borders on criminality.

Since our conversation of March 31, 2004, my firm has learned of seventy four additional suicides that occurred after that date. Many of these suicides likely could have been prevented had both the treating physician and unsuspecting families been armed with full knowledge of the risks of suicide that was known to both the FDA and the manufacturer.

How many more people have to die before the FDA mandates a black box warning for suicide? How many more people have to die before the FDA mandates a simple "Dear Doctor" letter advising health care providers about a known risk of Neurontin? The administrative process has failed to date. If this failure is in anyway due

to my error kindly advise so I can cure it immediately. If I do not hear from you by April 8, 2005, I will presume your inaction is not based in anyway through a deficiency on my part and I will act accordingly.

I sincerely hope to hear from you.

                                      Very truly yours,

                                      FINKELSTEIN & PARTNERS, LLP

                                      BY: ANDREW G. FINKELSTEIN

AGF/jam
Enclosure

Cc: Dr. Lester Crawford, Acting Commissioner FDA
Dr. Robert Temple, Office of New Product Evaluation, FDA
Hon. Charles Schumer
Hon. Hillary Rodham Clinton
Hon. Maurice D. Hinchey
Hon. Charles Grassley
Hon. John Dingell
Hon. Henry Waxman
Hon. Richard Stearns, USDJ

# EXHIBIT B

| x | SF Gate | Return to regular view

Print This Article

---

### FDA tells companies to review safety data on epilepsy drugs
### Agency responds to charge that Neurontin raises suicide risk among all patients who take it
- Bernadette Tansey, Chronicle Staff Writer
Thursday, April 21, 2005

| x | Click to View    | x | Click to View

The Food and Drug Administration has asked the makers of all epilepsy drugs to re-examine their clinical trial data in response to claims that one of the medicines, Pfizer's Neurontin, boosts the risk of suicide.

Word of the FDA action came in response to a petition filed last May by personal injury attorney Andrew Finkelstein, who has been urging the agency to warn doctors that the commonly prescribed drug Neurontin can lead to severe depression and suicide.

Neurontin, with $2.7 billion in sales last year, has been prescribed to more than 10 million people since it was put on the market in 1994. Although it was formally approved for patients suffering from epilepsy and later for pain related to a skin disorder, it has since been prescribed for illnesses ranging from psychiatric disorders to back pain.

Finkelstein bases his claims on the FDA's own records as well as 318 suicides and about 2,000 suicide attempts among families he represents.

The FDA's inquiry comes as it tries to repair its image as the guardian of drug safety after a series of controversies over its response to warnings about serious side effects linked to several other blockbuster medicines.

The probe of epilepsy drugs is similar to the FDA's examination last year of a class of widely prescribed antidepressants, including Paxil. That inquiry eventually resulted in strong warnings that antidepressants could increase suicide risks. But the case damaged the FDA's credibility when families and their lawyers accused the agency of suppressing a report by one of its own experts.

The agency came under fire again for its handling of drug safety concerns when Merck & Co. suddenly withdrew its widely sold painkiller Vioxx in September due to cardiovascular risks that experts had been urging the FDA to act on for years.

The FDA, in a letter Finkelstein shared with The Chronicle, said it is now requesting that Pfizer and 13 other manufacturers reanalyze the results of their controlled clinical trials for signs of suicidal thoughts and actions. According to the National Society for Epilepsy, there are at least 23 prescription drugs that are approved for the treatment of epilepsy. But an FDA spokeswoman said she could not supply the names of the other drugs subject to the inquiry.

Case 1:04-cv-10981-PBS Document 987 Filed 12/14/2007 Page 8 of 13

Pfizer received the letter last month and said it will comply with the FDA request but denied that Neurontin increases the risk of suicide.

"Pfizer maintains an extensive program for tracking and reporting medical events associated with the use of Neurontin, as we do for all our medicines," said company spokesman Bryant Haskins. "The comprehensive data -- including clinical trial results -- that we've submitted to the FDA over the past decade refute any suggestion that Neurontin causes depression, suicidal thoughts or suicidal behavior."

Finkelstein sees the FDA's response to his petition as part of a pattern of agency delays when serious potential drug risks arise. The attorney wants the FDA to include a prominent suicide warning on Neurontin's label. He also thinks it should ask an independent expert to analyze the drugmakers' data and demand disclosure of any trials the manufacturers haven't published.

In addition, he wants the agency to alert doctors that it is now investigating the possible suicide risk, to encourage heightened monitoring of Neurontin patients.

"I think they're taking modest steps when they're confronted with what could be a very significant issue," Finkelstein said.

A top FDA official said the agency had been looking into possible suicide links with "mood stabilizers" like Neurontin for some time before Finkelstein's petition was filed, based on lessons the agency learned from the antidepressants case.

"We'd like to get an answer to the question: Can it make your mood worse?" said Dr. Robert Temple, associate director for medical policy at the FDA's Center for Drug Evaluation and Research.

But Temple said the FDA will not issue advisories to doctors during the six months that the manufacturers have to review their data, unless the agency finds significant signs of a suicide danger. "So far, we have not," he said.

Neurontin has already been the focus of one of the recent drug company scrapes that have trained a harsh light on the industry. Neurontin is FDA- approved only for epilepsy and pain associated with a skin disorder, but it is widely prescribed for back pain, psychiatric illnesses and other conditions --

that is, so-called off-label uses not approved (but not forbidden) by the

## FDA.

That huge off-label market resulted from illegal promotional tactics such as treating doctors to luxury trips, government prosecutors charged last year. They won a $430 million settlement and guilty pleas from the drug's former manufacturer, now a unit of Pfizer, which is the world's largest drug firm.

In spite of that, as well as findings by expert pharmacologists that Neurontin has little value in most off-label uses, the drug's revenues rose in 2004. So the FDA's finding on Finkelstein's safety claims could affect millions of Americans.

Finkelstein is the managing partner of a multibranch law firm based in Newburgh, a small city beside the Hudson River north of New York City. He filed his petition to the FDA after he found that 25 people taking Neurontin had committed suicide between 1998 and mid-2003, according to MedWatch, an FDA program that receives voluntary alerts from doctors and others. This "passive surveillance" system is estimated to capture about a tenth of actual side-effect cases.

Finkelstein said his law firm then did what he thinks the FDA should be doing: It actively searched for other cases. When the firm placed ads asking if patients displayed suicidal behavior on Neurontin, it received thousands of calls. Finkelstein said he weeded out people who had ever attempted suicide before taking the drug.

Among the more than 2,300 families he represents are the Richardsons of San Jose. Lori Richardson's husband, Timothy, committed suicide in 2003 at the age of 34, leaving behind a young son and daughter. Richardson said her husband's personality changed after he started taking Neurontin in 2000 for pain from spinal fusion surgery that repaired a work injury. The tall commercial plumbing division manager -- introverted and a meticulous planner -- became agitated, aggressive and impulsive, she said.

"He knew it," Richardson said. "He would tell the doctors, 'I'm not like I always have been.'"

Doctors prescribed antidepressants. Timothy Richardson also received the narcotic-based painkiller Vicodin and developed an addiction, his wife said. Financial pressures and caring for the couple's two children were other stresses, she acknowledges. But she suspects Neurontin was a crucial factor in his intentional overdose.

Finkelstein said all the suicide cases he found involved people taking Neurontin for off-label uses, with about 50 percent given it for pain-related problems like migraines or back aches. He said the FDA has not done enough to curb off-label prescribing of Neurontin, particularly for psychiatric illnesses like bipolar disorder, where depression is already a factor. The lack of a suicide warning on the drug's label is an indictment of the drug regulatory system, he said.

"It's structured to benefit sales to pharmaceutical companies rather than to provide necessary information to prescribing physicians and their patients, " said Finkelstein.

Pfizer says Finkelstein's petition is a ploy to bolster his clients' lawsuits against the company. Haskins, the company spokesman, said the data don't support Finkelstein's demand for a prominent "black box" warning on Neurontin's label -- the FDA's most stringent enforcement action short of banning a drug.

"It's simply irresponsible to promote the false impression that a causal link exists between the use of Neurontin and suicide," said Haskins.

Although suicide is not listed in the warnings section of Neurontin's FDA label, other parts of the 29-page document note that symptoms like depression, anxiety, psychosis, and a category dubbed "suicidal" have cropped up among adults and adolescents in various clinical trials, and may be related to Neurontin.

The "suicidal" symptom was listed as infrequent, occurring in 1 out of 100 to 1 out of 1,000 patients. At that rate, for every million patients on the drug, 1,000 to 10,000 people might experience the side effect. However, some of the studies were not placebo-controlled, so any causal effect of the drug would be hard to quantify.

Finkelstein wants the label information updated to include completed suicides. He sees further proof that Neurontin boosts suicide risks in an FDA document turned over to him in litigation against Pfizer.

In 1992, an FDA official who reviewed the marketing application submitted for Neurontin by Parke-Davis, its original manufacturer, noted that a small fraction of clinical trial participants with epilepsy became seriously depressed while on the drug, and two attempted suicide.

"Depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts," wrote the FDA reviewer, Dr. Cynthia McCormick. That might limit the drug's usefulness, she concluded.

But McCormick, now a private consultant, said she had deferred to the judgment of much more experienced FDA reviewers who also evaluated Neurontin in 1992. The data did not prove that the drug was responsible for the suicide attempts, she now says.

"This is not an unexpected event in the population it was approved for," said McCormick, who did a brief consulting assignment for Pfizer about a year ago.

Finkelstein said he had offered the FDA information from his clients' case reports early last year and was flabbergasted when he was told to hire a pharmacology expert to provide the FDA with a risk analysis. That's the FDA's job, Finkelstein said, not a lawyer's.

The FDA official who responded to Finkelstein's petition in an April 12 letter said he had asked the attorney to hire an expert because the agency would have had difficulty evaluating whether Neurontin played a role in the suicides.

Other factors, like the various different medications taken by the patients, and the fact that many suffered from psychiatric illnesses that carry inherent suicide risks, would complicate the analysis, wrote Dr. Russell Katz, director of the FDA's Division of Neuropharmacological Drug Products.

Assessing drugs for suicide risks is not easy even in controlled clinical trials, Temple said. Suicides are rare enough that even a large trial might not show a significant difference between those on the drug and on a placebo.

Many of the trials the manufacturers will be reviewing were not designed to assess suicide risk, Temple said. But the FDA might find hints of a risk. In a trial of one epilepsy drug, he said, 1.1 percent of participants committed suicide versus 0.4 percent on placebo. If those hints add up, the FDA might take action, Temple said.

If Neurontin appears to boost suicide risks, the agency might advise doctors to restrict its off-label use, Temple said. But he said it's too early to predict the outcome of the epilepsy

drug probe.

"I don't think we have evidence there really is an increase in suicidality in any of these drugs," he said, "but it's the right question to ask."

News on Neurontin

FDA action: The request follows a petition by an attorney who says the drug Neurontin played a role in 318 suicides and about 2,000 suicide attempts among his clients' families.

Impact: Although Neurontin was approved to treat epilepsy and pain related to a skin disorder, it is also prescribed for ailments not approved by the FDA. More than 10 million people have been prescribed Neurontin.

What's next: The 14 manufacturers have six months to reanalyze the results of their clinical trials. The FDA will then review the data and decide what action to take.

**The headline on this story has been corrected since it appeared in print editions.**

*E-mail Bernadette Tansey at btansey@sfchronicle.com.*

Page A - 1
URL: http://sfgate.com/cgi-bin/article.cgi?file=/c/a/2005/04/21/MNGDTCCJ3N1.DTL

©2006 San Francisco Chronicle

# EXHIBIT C

Page 130

```
 1              THOMAS MALTESE, M.D.             130
 2      A.  Correct.
 3      Q.  Okay. I'm going to ask you to take a look at
 4  page 117. Now, by the way, this was written, if you
 5  look back on page 19, by Cynthia McCormick, MD,
 6  clinical reviewer --
 7      A.  Um-hmm.
 8      Q.  -- for the FDA.
 9      A.  Okay.
10      Q.  Okay? Would you agree that she would know
11  more about this drug than you would?
12      A.  I would hope so, yes.
13      Q.  Okay. On page 117, the third paragraph down,
14  "Less common but more serious events," do you see where
15  I'm reading --
16      A.  Yes.
17      Q.  -- "may limit the drug's widespread
18  usefulness. One of these is that seizures may become
19  significantly worse or lead to status epilepticus in a
20  small subset of the treated population."
21          A second refers to malignancies.
22          Go down to the third one, Doctor.
23      A.  The third is that depression, um-hmm.
24      Q.  A third and, correct me if I'm reading it
25  wrong, "A third is that depression, while it may not be
```

Page 131

```
 1              THOMAS MALTESE, M.D.             131
 2  an infrequent occurrence in the epileptic population,
 3  may become worse and require intervention or lead to
 4  suicide, as it has resulted in some suicidal attempts."
 5          Did I read that correctly?
 6      A.  You read it correctly.
 7      Q.  Did you ever see that in a labeling for
 8  Neurontin?
 9      A.  No, not that I recall.
10      Q.  Is that information you would have wanted to
11  know before you were prescribing it to depressed
12  patients?
13      A.  Sure.
14      Q.  Okay. Going down to the bottom of that page,
15  you see where it says "In its clinical database" --
16      A.  Yes.
17      Q.  -- "of 2048 patients, gabapentin" -- can we
18  agree gabapentin and Neurontin is the same thing?
19      A.  Yes.
20      Q.  -- "has a risk profile that is uncertain,
21  with five groups of important adverse events that have
22  not yet been fully characterized," and going down into
23  the third line, do you see where it says: "Clinically
24  important depression"?
25      A.  Yes.
```

Page 132

```
 1              THOMAS MALTESE, M.D.             132
 2      Q.  All right. "Accumulated long-range safety
 3  data are limited by the excessive attrition due to
 4  appear present lack of sustained efficacy."
 5      A.  Um-hmm.
 6      Q.  Did you ever see any of that in a label?
 7      A.  No.
 8      Q.  Is that something you would have wanted to
 9  know when you were prescribing this to your patients?
10      A.  It's something you know anyway because most
11  studies aren't done for longer than four to six months.
12      Q.  Okay. Going to page 114, first two
13  paragraphs.
14      A.  Okay.
15      Q.  Depression/suicidal ideation/suicide attempt.
16          By the way, did you differentiate earlier
17  suicidal ideation from suicidal gesture and suicide
18  attempt and suicide?
19      A.  Yes.
20      Q.  A lot of depressed people have suicidal
21  ideation?
22      A.  Yes.
23      Q.  It's a passing thought, I wish I was dead, I
24  would like to shoot myself?
25      A.  Right.
```

Page 133

```
 1              THOMAS MALTESE, M.D.             133
 2      Q.  Suicidal gesture might be some act or
 3  something that could be --
 4      A.  Crying for help.
 5      Q.  Right. Okay. Suicidal attempt is an actual
 6  carrying out of that thought?
 7      A.  Um-hmm.
 8      Q.  And the suicide is succeeding in that
 9  carrying it out?
10      A.  Yes.
11      Q.  Okay. More serious, obviously?
12      A.  Yes.
13      Q.  Okay. Now, because I'm going to come back to
14  that later. With respect to suicide -- depression,
15  suicidal ideation, suicide attempt, "In the total
16  exposed population of the NDA 78, 5.3 percent patients
17  reported depression as an adverse event. This included
18  one subject in a phase I study. There were seven
19  reports of depression as serious adverse events and
20  nine patients who withdrew from studies because of
21  depression.
22          "There may be some underrepresentation of
23  certain categories. For example, in some cases,
24  depression was reported as a serious adverse event,
25  particularly if it resulted in hospitalization or was
```