EXHIBIT A

Rough Draft - 1                    0 0 KRUSZEWSKI ROUGH DRAFT DAY 2 a

COMPUTER UNCERTIFIED ROUGH DRAFT ONLY

THIS DRAFT CANNOT BE QUOTED

IN ANY PLEADINGS OR FOR ANY

OTHER PURPOSE AND MAY NOT BE

FILED WITH ANY COURT.

This transcript draft is uncertified and
may contain untranslated stenographic symbols,
an occasional reporter's note, a misspelled
proper name, and/or nonsensical word
combinations.  All such entries will be
corrected in the final certified transcript.

Due to the need to correct entries prior
to certification, you agree to use this
realtime draft only for the purpose of
augmenting counsel's notes and not to use or
cite it in any court proceeding.

Please keep in mind that the final
certified transcript's page and line numbers
will not match the rough draft due to the
addition of title pages, indices, appearances
of counsel, paragraphing and other changes.

- - -

ᕎRough Draft - 2

```
1       IN THE UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
2    ------------------------x
     In Re:               :  MDL Docket No. 1629
3                         :
     NEURONTIN MARKETING, :  Master File No.
```

Page 1

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

```
 4    SALES PRACTICES AND         :   04-10981
      PRODUCTS LIABILITY          :
 5    LITIGATION                  :   Judge Patti B. Saris
      --------------------------x
 6    THIS DOCUMENT RELATES TO:   :
                                  :
 7    PRODUCTS LIABILITIY         :   Magistrate Judge
      ACTIONS                     :   Leo T. Sorokin
 8                                :
      Fenelon v. Pfizer, Inc.,    :
 9    Et al.                      :
      Case No. 06 CV 4136         :
10    --------------------------x

11           SUPREME COURT OF THE STATE OF NEW YORK
                      COUNTY OF NEW YORK
12    --------------------------x
      In Re:                      :   INDEX NO. 765000/06
13    NEURONTIN PRODUCT           :
      LIABILITY LITIGATION        :
14    --------------------------x
      THIS DOCUMENT APPLIES TO:   :   Hon. Marcy S. Friedman
15    ALL CASES                   :
      --------------------------x
16
                 Friday, December 7, 2007
17
                        - - -
18
                Videotaped deposition of
19
              STEFAN P. KRUSZEWSKI, M.D.
20
                        - - -
21
      VERITEXT NATIONAL COURT REPORTING COMPANY
22           1845 Walnut Street, 15th Floor
               Philadelphia, PA  19103
23          (215) 241-1000  (888) 777-6690

24                      - - -
URough Draft - 3
```

```
 1
 2              Videotaped deposition of STEFAN

 3    P. KRUSZEWSKI, M.D., taken at Crowne Plaza

 4    Hotel, 23 South 2nd Street, Harrisburg,

 5    Pennsylvania, commencing at 9:22 a.m., before

 6    Jennifer S. Walker, a Federally Approved

 7    Registered Professional Reporter and Notary

 8    Public.

 9
```

Page 2

0 0 KRUSZEWSKI ROUGH DRAFT DAY 2 a

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Rough Draft - 4

1  APPEARANCES:

2           FINKELSTEIN & PARTNERS
         BY:  ANDREW G. FINKELSTEIN, ESQUIRE
3           436 Robinson Avenue
         Newburgh, New York  12550
4           (800) 634-1212
         afinkelstein@lawampm.com
5           Representing the MDL Product
         Liability Plaintiffs and Smith

6

7           WHEELER TRIGG KENNEDY LLP
         BY:  JAMES E. HOOPER, JR., ESQUIRE
8           1801 California Street, Suite 3600
         Denver, Colorado  80202-2617
9           (303) 292-2525
         hooper@wtklaw.com
10         Representing the Defendant Pfizer

11

12          SHOOK, HARDY & BACON LLP
         BY:  LORI CONNORS MCGRODER, ESQUIRE
         BY:  JENNIFER STEVENSON, ESQUIRE
13          2555 Grand Boulevard
         Kansas city, MO  64108-2613
14          (816) 474-6550
         lmcgroder@shb.com
         Page 3

```
              O O KRUSZEWSKI ROUGH DRAFT DAY 2 a
   15            Representing the Defendant Pfizer

   16
      ALSO PRESENT:   LEIGH A.M. RAYMOND, Ph.D., Senior
   17                 Research Analyst

   18                 EARLE STRAIN, CLVS

   19                      - - -

   20

   21

   22

   23

   24
 Rough Draft - 5
```

```
    1                  I N D E X
    2                     - - -

       Testimony of:  STEFAN P. KRUSZEWSKI, M.D.
    3

    4   By Ms. McGroder..........................^^

    5                     - - -

    6              E X H I B I T S

    7                   - - -

    8   EXHIBIT NUMBER     DESCRIPTION      PAGE MARKED

    9   No. 24

   10   No. 25

   11   No. 26

   12   No. 27

   13   No. 28

   14   No. 29

   15   No. 30

   16   No. 31

   17   No. 32

   18   No. 33

   19   No. 34

   20   No. 35
```

0 0 KRUSZEWSKI ROUGH DRAFT DAY 2 a

21            - - -

22

23

24
☐Rough Draft - 6


STEFAN P. KRUSZEWSKI, M.D.

1        MR. FINKELSTEIN:

2        VIDEO SPECIALIST:  We're now on

3    and the video record.  The time is

4    9:22.  Today is December 7th, 2007,

5    and this is the continuing deposition

6    of Dr. Stefan Kruszewski who has been

7    previously sworn in in the case of

8    Neurontin marketing and sales

9    practices versus Pfizer.  You may

10   proceed.

11       MR. FINKELSTEIN:  Before we get

12   going today, I want to place a formal

13   objection on the record that yesterday

14   the questioning was presented by

15   counsel for Pfizer Jim Hooper and

16   today apparently Ms. McGroder is going

17   to do the questioning and I believe it

18   is offensive to the rules of the

19   court, although I do not have a

20   particular citation.  I made effort to

21   reach out to the court this morning.

22   The court was unavailable.  As a

23   result, I'm not going to prevent the

24   deposition from going, but I'm going
☐Rough Draft - 7

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a
STEFAN P. KRUSZEWSKI, M.D.

1    to have a continuing objection to

2    every question that Ms. McGroder sets

3    forth and move to strike all testimony

4    that flows from this.  I won't object

5    to every question.  Just a continuous

6    objection.  I do believe that it

7    violates the court rules to have more

8    than one attorney conduct an

9    examination.  It has not occurred any

10   other deposition throughout this

11   litigation.  Once one party's counsel

12   has commenced questioning that one

13   counsel has concluded questioning.  So

14   with that general objection, you may

15   proceed with the witness.

16          MS. McGRODER:  And I do respond

17   to that statement with the factual

18   record that the basis for having two

19   examinations -- or two lawyers examine

20   this witness on behalf of Pfizer is

21   that in the first instance when this

22   deposition was scheduled, one lawyer

23   was unavailable on one day.

24          MR. FINKELSTEIN:  If we could

Rough Draft - 8


STEFAN P. KRUSZEWSKI, M.D.

1    just add the date.

2          MS. McGRODER:  I don't know it.

3    Do you know it?

4          MR. FINKELSTEIN:  Sure.  It

5    was -- I can get you the exact date,

Page 6

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

6      but it was the first week of November.

7              MS. MCGRODER:  Okay.  It wasn't

8      the first week of November.

9              THE WITNESS:  November 12th and

10     13.

11             MR. FINKELSTEIN:  November 12th

12     and 13th it was scheduled.

13             MS. MCGRODER:  Mr. Hooper was

14     unavailable and so I planned to depose

15     Dr. Kruszewski on that date.

16     Subsequently plaintiffs unilaterally

17     canceled the deposition due to a back

18     injury by the witness -- of the

19     witness and when the deposition was

20     rescheduled of course it made sense

21     for us to continue with the same plan

22     as was originally required by the

23     scheduling issues.

24             Also, I am not aware of any

☐Rough Draft - 9


STEFAN P. KRUSZEWSKI, M.D.

1      rule of civil procedure that precludes

2      approaching this deposition in this

3      way nor am I aware of any statement in

4      any ^^case order or discovery order

5      after our review of those that would

6      preclude our proceeding in this way.

7              MR. FINKELSTEIN:  Just one last

8      thing.  Let the record reflect that

9      Mr. Hooper is sitting at the end of

10     the table.

Page 7

0 0 KRUSZEWSKI ROUGH DRAFT DAY 2 a

11          MS. McGRODER:  And Mr. Hooper

12      has a conference with the court at

13      noon which would also preclude him

14      from conducting an examination today.

15          MR. FINKELSTEIN:  Of course, we

16      would accommodate at a lunch break,

17      but that's all right.  I just want the

18      record to be clear as to who is here.

19          MS. McGRODER:  Are you ready to

20      proceed?

21          MR. FINKELSTEIN:  I am.

22   BY MS. McGRODER:

23      Q.    Are you, Dr. Kruszewski?

24      A.    I am, yes.

□Rough Draft - 10


STEFAN P. KRUSZEWSKI, M.D.

1       Q.    I'm Lori McGroder, and I

2    represent Pfizer.  Today I have the

3    opportunity to ask you some questions.  You

4    understand that you're still under oath?

5       A.    I do.

6       Q.    Did you do anything last night

7    to prepare for your deposition today?

8       A.    I got a good night's sleep.

9       Q.    Did you have a meeting with

10   Mr. Finkelstein last evening?

11      A.    No.

12      Q.    Did you discuss the deposition

13   and your testimony yesterday with

14   Mr. Finkelstein at the end of the day

15   yesterday?

16      A.    Yes.

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

17      Q.     And what did you talk about?

18      A.     I said I'm glad the first day

19   is over and he said, me too.

20      Q.     Did you talk about your

21   testimony?

22      A.     No.

23      Q.     Did you have a conversation

24   about anything substantive with respect to

Rough Draft - 11

STEFAN P. KRUSZEWSKI, M.D.

1   your testimony?

2      A.     No.

3      Q.     Did you speak with anyone last

4   night about your testimony?

5      A.     No.

6      Q.     Have you spoken with any of the

7   other expert witnesses identified by the

8   plaintiffs in the Neurontin litigation?

9          MR. FINKELSTEIN:  Objection

10         asked and answered yesterday.

11         THE WITNESS:  I've spoken to

12         Dr. Trimble.

13   BY MS. MCGRODER:

14      Q.     Correct.  Apart from or other

15   than Dr. Trimble, have you spoken with any

16   other expert witness on behalf of plaintiffs

17   in the Neurontin litigation?

18         MR. FINKELSTEIN:  Objection.

19         Asked and answered.

20         THE WITNESS:  I don't believe

21         so.  I'm not even sure who they are.

Page 9

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

22   BY MS. McGRODER:

23        Q.     Have you read any transcripts

24   of any of the plaintiffs's depositions in the

□Rough Draft - 12

STEFAN P. KRUSZEWSKI, M.D.

1   Neurontin litigation?

2        A.     Yes.

3        Q.     And which transcripts have you

4   read?

5        A.     Dr. Trimble's, Dr. Roth's and

6   Dr. Taylor.

7        Q.     Dr. Taylor has not yet been

8   deposed in this litigation.  Oh, you're

9   thinking of his.  You remember at his

10  deposition in the context of his 30(b)(6) as a

11  company witness.  Is that right?

12             MR. FINKELSTEIN:  He wasn't a

13             30(b)(6).  He was -- he was a witness

14             that was produced --

15  BY MS. McGRODER:

16        Q.     And so you read his testimony

17  given prior to any time that defendants have

18  identified expert witnesses?

19        A.     I'm sorry.  Repeat that again.

20        Q.     You know what let's just strike

21  it.  You've read the deposition transcript of

22  Charlie Taylor?

23        A.     Charlie Taylor.

24        Q.     And why did you read that

□Rough Draft - 13

STEFAN P. KRUSZEWSKI, M.D.

1   deposition?

Page 10

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

2          A.      It was provided to me by

3    Mr. Finkelstein.

4          Q.      And were the others provided to

5    you by Mr. Finkelstein as well, the deposition

6    of doctors Trimble and Roth?

7          A.      Yes.

8          Q.      Have you read any other

9    transcripts of testimony of Pfizer witness

10   other than Dr. Charlie Taylor?

11         A.      No.  I don't believe so.

12         Q.      Did you receive those

13   transcripts and not read them or you don't

14   have them?

15         A.      I don't believe I have them.

16         Q.      Was there anything in

17   particular that you read in the deposition of

18   Dr. Charlie Taylor that was important to the

19   opinions you formed in this case?

20         A.      Nothing that I read in his

21   deposition transcript changed my opinions.

22         Q.      And did you read that

23   transcript front to back?

24         A.      Yes.
DRough Draft - 14


STEFAN P. KRUSZEWSKI, M.D.

1          Q.      Have you billed the Finkelstein

2    law firm this year Dr. Kruszewski for your

3    work on the Neurontin litigation?

4          A.      Yes.

5          Q.      And how much have you billed

6    them to date in 2007?

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

7      A.      I don't know the number.

8      Q.      Do you have billing records

9  that establish the number?

10     A.      Yes.

11     Q.      When is the last time that you

12  submitted a bill to the Finkelstein law firm?

13     A.      Probably the bill for

14  September/October.

15     Q.      And what was the amount of that

16  bill?

17     A.      I believe it was for

18  approximately $5,000.

19     Q.      And was that for a one month

20  time period?

21     A.      The that was a two month time

22  period.

23     Q.      And is it your testimony today

24  that you don't know the amount you billed the

Rough Draft - 15

STEFAN P. KRUSZEWSKI, M.D.

1  Finkelstein law firm in the year 2007 to date?

2      A.      Yes as I statistic here today I

3  don't know the amount, correct.

4      Q.      Due do your own billing?

5      A.      My office does, yes.

6      Q.      Who does that billing?

7      A.      Mr. To bias.

8      Q.      And I take it you didn't bring

9  any of those billing records with you here

10  today?

11     A.      I did not.

12              MS. MCGRODER:  Mr. Finkelstein,

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

13      those were I believe part of the

14      stipulated schedule to the deposition

15      notice and so I'll just make a request

16      on the record that we get the billing

17      records for Dr. Kruszewski's bill for

18      the Finkelstein law firm from 2004

19      when he first began working with you

20      forward.

21          MR. FINKELSTEIN:  Sure.

22  BY MS. MCGRODER:

23          Q.    Do you know what you build the

24      Finkelstein law firm in the year 2006?

CRough Draft - 16


STEFAN P. KRUSZEWSKI, M.D.

1          A.    I do not.

2          Q.    Do you know what income you

3      derived from the Finkelstein law firm in the

4      year 2006?

5          A.    No.

6          Q.    What about 2005.  Do you know

7      what you billed them in 2005?

8          A.    No.

9          Q.    Do you do any work with the

10      Finkelstein law firm other than as related to

11      Neurontin?

12          A.    Yes.

13          Q.    What do you do?

14          A.    Sometime in the past year an

15      attorney for Mr. Finkelstein's group asked me

16      to examine some preliminary documents about --

17      I don't remember the case -- and asked my

Page 13

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

18  opinion about whether there was sufficient

19  evidence that could move forward to

20  litigation.

21      Q.    Did that case involve a

22  prescription drug product?

23      A.    Yes, I believe so.

24      Q.    And what was the prescription

Rough Draft - 17


STEFAN P. KRUSZEWSKI, M.D.

1   are drug product?

2       A.    I don't recall as I sit here

3   today.

4       Q.    When did you evaluate that

5   case?

6       A.    Sometime in the past year.

7       Q.    In the past two months?

8       A.    No.  It was more like a year

9   ago.

10      Q.    And what was your evaluation of

11  that case in terms of when P whether you

12  thought it had litigation potential?

13      A.    I don't recall my opinion.

14      Q.    What did you do to analyze

15  whether that case had litigation potential?

16      A.    Well, whatever was sent to me

17  to review, I must have looked at.

18      Q.    What was sent to you to review?

19      A.    That, I can't recall.

20      Q.    Who was the lawyer at

21  Mr. Finkelstein's firm who asked you to

22  analyze that case?

23      A.    That, I can't recall either.  I

Page 14

0  0  KRUSZEWSKI ROUGH DRAFT DAY 2 a

24   apologize.
Rough Draft - 18

STEFAN P. KRUSZEWSKI, M.D.

1         Q.      Okay.  Doctor, if you'll turn

2    to Exhibit 1 which I believe is your report,

3    Page 12.  Are you there?

4         A.      Yes.

5         Q.      You opine on Page 12 at least

6    this is what the bold heading says,

7    gabapentin's ability to negatively alter mood

8    confirmed by FDA?

9         A.      I'm sorry.  Where are you?

10        Q.      The bold heading in the middle

11   of the page there?

12        A.      Yes.

13        Q.      Do you see H do you see where

14   we are?

15        A.      Yes.

16        Q.      And that heading reads as I

17   just said, gabapentin's ability to negatively

18   alter mood confirmed by FDA.  Do you see that?

19        A.      Yes, I do.

20        Q.      And you wrote that heading?

21        A.      Yes.

22        Q.      And what do you rely on for

23   your opinion that gabapentin's ability to

24   negatively alter mood was confirmed by the
Rough Draft - 19

STEFAN P. KRUSZEWSKI, M.D.

1    FDA?

2         A.      I'd like to read this threw,

Page 15

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

3  but the primary piece of evidence was Cynthia

4  McCormick's review -- Dr. McCormick's review

5  of the part of the NDA submission that in her

6  conclusion she offered the conclusion that

7  Neurontin is likely to produce altered mood

8  and including suicide.

9       Q.     And you say she concludes that

10  Neurontin is likely to produce altered mood

11  including suicide.  Where in Dr. McCormick's

12  medical officer review report does she say

13  that she believes that Neurontin is likely to

14  produce altered mood, excuse me, including

15  suicide?

16       A.     Let me look at my -- this

17  section before I answer that question.

18       Q.     Sure.  Has it been a while

19  since you looked at that section?

20       A.     About a week, yes.

21       Q.     Okay.

22       A.     (Reviewing.)

23       Q.     Now, having reviewed your

24  report those paragraphs at the bottom of

DRough Draft - 20

STEFAN P. KRUSZEWSKI, M.D.

1  Page 12 and the top of Page 13, please

2  identify for me where in Dr. McCormick's

3  medical officer review report she states that

4  she believes that Neurontin is likely to

5  produce altered mood including suicide?

6       A.     I'd like to read the quote that

7  I use on Page 12.

8       Q.     Okay.  So is your testimony,

Page 16

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

9    Dr. Kruszewski, that the?

10                MR. FINKELSTEIN:  Allow him to

11            answer the question.  He started

12            answering your question.  Let him

13            answer.  Don't cut him off.

14                MS. McGRODER:  I just want to

15            expedite it.

16    BY MS. McGRODER:

17        Q.    My question is:  Is this quote,

18    on the bottom of Page 12, what you rely on to

19    support your opinion that Dr. McCormick stated

20    that she believes Neurontin is likely to

21    produce altered mood including suicide?

22                MR. FINKELSTEIN:  That was not

23            the original question he was

24            answering.  So allow him to answer the

Rough Draft - 21


STEFAN P. KRUSZEWSKI, M.D.

1        original question.

2                MS. McGRODER:  He said -- I

3            don't want him to read the quote.

4    BY MS. McGRODER:

5        Q.    I want to ask him, does this

6    quote everything that you rely on to support

7    your opinion that Dr. McCormick believes that

8    Neurontin will produce altered mood including

9    suicide.

10        A.    This is a quote that I think is

11    applicable to your question.  I'd like to read

12    it.

13        Q.    Well, you have read it.

Page 17

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

14    A.    I haven't read it.

15    Q.    Mr. Finkelstein can ask you to

16    read into the record if he wants you to.  I'm

17    not asking you to do that now.

18    Q.    Anything else in

19    Dr. McCormick's report that you rely on for

20    the statement that gabapentin -- that

21    Dr. McCormick believes that gabapentin will

22    produce altered mood including suicide?

23    A.    As I sit here, that is it at

24    the moment.

Rough Draft - 22

STEFAN P. KRUSZEWSKI, M.D.

1    Q.    Okay.  At the time that

2    Dr. McCormick reviewed the NDA for Neurontin,

3    did she conclude at any point that Neurontin

4    does cause suicide?

5    A.    I do not believe so.

6    Q.    Have you had the opportunity,

7    Dr. Kruszewski, to look at the affidavit of

8    Cynthia McCormick produced to the plaintiffs

9    in this litigation?

10    A.    No.

11    Q.    Were you aware there was an

12    affidavit?

13    A.    I was not aware.

14    Q.    And so at no time before today

15    have you had any discussions with any of the

16    members of the Finkelstein law firm about the

17    affidavit that sin of Cynthia McCormick in

18    this litigation?

19    A.    The that is correct.

Page 18

0 0 KRUSZEWSKI ROUGH DRAFT DAY 2 a

20      Q.      So your first knowledge of the

21  existence of that affidavit is right now?

22      A.      Yes.

23                  - - -

24                  (Whereupon, a document was
 □Rough Draft - 23


STEFAN P. KRUSZEWSKI, M.D.

1                  marked for identification purposes

2                  as No. 24.)

3                  - - -

4  BY MS. MCGRODER:

5      Q.      I'd like to show you what we've

6  marked as Exhibit 24 to your deposition.  This

7  is the affidavit of Dr. McCormick?

8                  MR. FINKELSTEIN:  I'm going to

9                  voice an objection related to this

10                  document being produced at this time.

11                  There's a current motion pending to

12                  strike this affidavit as well as

13                  sanctions of defense counsel for

14                  producing it late.  They've held it

15                  for -- the document is dated

16                  September 13th.

17                  The first time this was

18                  produced was at an expert witness

19                  deposition a few weeks ago.  It could

20                  have been provided prior to the

21                  ex-exchange of when Dr. Kruszewski's

22                  report was due.

23                  He has never been provided a

24                  full opportunity to review this and
 □Rough Draft - 24

Page 19

O O KRUSZEWSKI ROUGH DRAFT DAY 2 a

STEFAN P. KRUSZEWSKI, M.D.

1          every question flowing from this

2          document we'll object to.

3    BY MS. McGRODER:

4          Q.    Are you aware, Dr. Kruszewski,

5    that Dr. McCormick has expressly rejected any

6    attempt to characterize her medical review as

7    evidence that Neurontin causes depression or

8    suicide?  Are you aware of that?

9          A.    I could not be aware because

10   I've never seen this document before.

11         Q.    Why don't you take a minute to

12   look at it.

13         A.    Thank you.

14              MR. FINKELSTEIN:  Read the

15         whole thing.

16              THE WITNESS:  (Reviewing.)

17              MR. FINKELSTEIN:  While he's

18         reading that, is there anybody on the

19         phone?

20              MS. GOLD:  Yes.  Elana Gold.

21              MR. FINKELSTEIN:  Okay.

22   Anybody else?

23              (No audible response.)

24              Thank you.
Rough Draft - 25

STEFAN P. KRUSZEWSKI, M.D.

1              THE WITNESS:  (Reviewing.)

2         Can I mark on this?

3         MS. McGRODER:  Sure.

4              THE WITNESS:  Thank you.
                    Page 20

EXHIBIT B



Ann Arbor MI

*Please return to : L. LaMoreaux 23*
*Ex 23*
*Turner 10/10/07*

**PARKE-DAVIS** PHARMACEUTICAL RESEARCH                    **Memorandum**

People Who Care

To:  Distribution                                                                July 28, 1994

From:  J. L. Turner

Subj:  FDA FOI Documents for Neurontin NDA Approval

Attached for your area of responsibility are the FDA documents available under FOI after
approval of the Neurontin NDA.  Please review this not only for FDA's opinion on this NDA
approval, but also for what documents and information ultimately may become available under
FOI once an NDA is approved.  Note that the Biopharmaceutics review of the human PDM data
is not yet available under FOI.

Distribution:
M. Pierce:  Clinical Research
M. Rieger:  Clinical Communications
L. LaMoreaux:  Biometrics
C. Taylor:  Pharmacology
J. Herman:  Toxicology
L. Radulovic:  PDM
H. Bockbrader:  PDM
A. Brankiewicz:  Chemistry, Manufacturing, and Controls

cc:  without attachments
I. Martin



Confidential                                                    Pfizer_LLaMoreaux_0031285

## MEMORANDUM

DATE:     October 11, 1993

FROM:     Russell Katz, M.D.
          Division of Neuropharmacological Drug Products

TO:       File, NDA 20-235

SUBJECT:  Supervisory Overview of Safety and Efficacy Data for NDA 20-235, Neurontin as Adjunctive Therapy for Patients with Partial and Secondarily Generalized Tonic-Clonic Seizures

## BACKGROUND

NDA 20-235, Neurontin (gabapentin) for the treatment of partial seizures, was submitted by Parke-Davis on January 31, 1992. Of interest is the fact that this drug was discussed in a closed Advisory Committee meeting on October 24, 1991. At that meeting, the Division asked for the Committee's views on a finding of pancreatic acinar cell carcinoma in male rats exposed to gabapentin (the Division had suspended clinical testing of gabapentin as a result of this finding). At that meeting, in which experts in the interpretation of these lesions were invited to participate, the Committee decided that continued clinical testing was warranted, although they recommended that the sponsor perform several additional tests to help further characterize the lesion, some of which are on-going at this time.

Following is a relatively brief overview of the safety and effectiveness data contained in the NDA.

## EFFICACY

The sponsor has submitted the results of 4 randomized, placebo controlled, double blind parallel group add-on studies in patients with refractory partial seizures. One of the studies, 945-9/10, represents an unplanned pooling of 2 individual studies, 945-9 and 945-10. These studies were designed as separate, small studies, (each following protocols essentially identical to 945-6) in which the objective was to measure CSF levels of gabapentin. After the trials were complete, the

Pfizer_LLaMoreaux_0031287

The greatest advantage of this drug could be the apparent lack of clinically significant pharmacokinetic interactions with concomitant AEDs. However, gabapentin administered adjunctly with other antiepileptic drugs resulted in an increased incidence of adverse events, such as a diplopia and depressed WBC seen with carbamazepine and gabapentin. These were generally mild in severity and most improved over time.

Gabapentin appears to lack significant hepatic and bone marrow toxicity.

Less common but more serious events may limit the drug's widespread usefulness. One of these is that seizures may become significantly worse, or lead to *status epilepticus* in a small subset of the treated population. A second is that the incidence of malignancies reported with only limited extended use of the drug coupled with the preclinical evidence that the drug may be carcinogenic. While causation has not been demonstrated in either the genesis or the expansion and recurrence of tumors, the firm has not provided convincing evidence that the drug does not cause or accelerate tumor growth in man. A third is that depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts. A fourth concern that a drug that is 100% cleared by the kidneys may in a small segment of the population be nephrotoxic. Adjustments in dose are recommended with increasing age and with renal failure. Fifth, the limited experience with gabapentin in pregnancy cannot rule out some risk of teratogenicity.

The attrition rate from treatment with gabapentin is high, approximately 63% (all epilepsy studies), however, this is not due primarily to adverse events, which account for only about 7% of all patients in clinical trials. The high dropout rate is due in part to lack of sustained efficacy, seizure exacerbation and an "other", a category which includes largely unclassified dropouts but also dropouts due to lack of efficacy, loss to follow-up, patient preference, and some. Discontinuations due to adverse events were reviewed. There were 3 cases of renal failure, some arrhythmias, 18 tumors reported, convulsions, 3 cataracts, and one case of atrial flutter, weight gain, low white count. There were no significant laboratory abnormalities identified that were seen consistently or frequently.

As of September 30, 1992 nineteen patients with epilepsy have died while receiving Gabapentin and an additional three patients died after discontinuing gabapentin but of a process that began during treatment, specifically cancer. The deaths were of diverse etiology, although twelve may be categorized as complications of inadequate seizure control and sudden unexplained death in epilepsy and six deaths were related to tumors that emerged or enlarged during gabapentin therapy. Whether these deaths due to tumors are related to therapy will be a matter for future studies or postmarketing surveillance.

In its clinical database of 2048 patients, gabapentin has a risk profile that is uncertain, with five groups of important adverse events that have not yet been fully characterized, specifically, seizure exacerbation, carcinogenicity, clinically important depression, renal failure and teratogenicity. Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy.

Confidential



NDA #20-235 Medical-Statistical Review                                                    118.

## ⌄.0    Conclusions based on Statistical Analyses

### Study   877-210P[25]:

The analyses of response ratio, responder rate and global improvement have statistically demonstrated the efficacy of gabapentin as add-on therapy in the treatment of partial seizures in patients with medically uncontrolled epilepsy.

### Study   945-6[26]:

The analyses of response ratio, responder rate and global evaluation have statistically demonstrated the efficacy of gabapentin (for 900 mg/day as well as 1200 mg/day) as add-on therapy in the treatment of partial seizures in patients with medically uncontrolled epilepsy.

### Study   945-5[27]:

This study failed to provide statistical evidence to support the sponsor's claim of efficacy of gabapentin 1200 mg/day over placebo. However 1800 mg/ day did appear superior to placebo in two of the major efficacy variables, Responder rate and Response ratio with seizure flurries included in the intent-to-treat analysis.

### Study   945-9/10[28]:

The sponsor concedes that definite conclusions cannot be drawn from these results regarding the efficacy of gabapentin, 900 mg/day and 1200 mg/day, as as add-on therapy in the treatment of partial seizures in patients with medically uncontrolled epilepsy because of the small size of these studies. No statistical analysis was performed on the 1200 mg group.

---

25 Refer to pp. 27-34 of this review.

26 Refer to pp. 48-53 of this review.

27 Refer to pp. 64-69 of this review.

28 Refer to pp. 72-73 of this review.

Confidential                                                                    Pfizer_LLaMoreaux_0031424



## 0. Recommendations

In conclusion NDA 20-235 is approvable with appropriate and prominent labelling for use in a specific population. Specifically labelling should reflect that while short term efficacy has been demonstrated as add-on treatment in the refractory partial epilepsy population, the firm has not demonstrated that this effect is sustained. Additionally, in a subset of the epilepsy population, seizure exacerbation may occur, such as *status epilepticus* in patients who have not previously experienced status. The as yet unknown risk of carcinogenicity should be considered against possible limited benefit.

Baldeo K. Taneja, Ph.D.
Mathematical Statistician (Biomedical)

Cynthia G. McCormick, M.D.
Clinical Reviewer

S. Edward Nevius, Ph.D. (concur)       5-19-93

Russell Katz, M.D. (concur)



..ya D. Dubey, Ph.D. (concur)       6-7-93

CC:NDA 20-235
HFD-120
HFD-120/Leber/Katz/McCormick/Chamberlin
HFD-713/Dubey/Group 2 File/Taneja
HFD-344/Lisook

This review contains 119 pages of text

Confidential