UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION )))))) | |
| | ) |
| THIS DOCUMENT RELATES TO: ) | MDL Docket No. 1629<br>Master File No. 04-10981 |
| ) | Judge Patti B. Saris |
| ALL MARKETING AND ) | Mag. Judge Leo T. Sorokin |
| SALES PRACTICES ACTIONS ) | |
| ) | |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
RENEWED MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     PLAINTIFFS PROPOSE CERTIFICATION OF A TPP CLASS, A CONSUMER
        CLASS, AND, FOR EACH CLASS, INDICATION-SPECIFIC SUBCLASSES .......... 5

III.    THE ADDITIONAL CONSUMER INDICATION SUBCLASS
        REPRESENTATIVES ........................................................................................... 7

        A.      Bipolar and Other Mood Disorders........................................................... 7

                1.      Jan Frank Wityk .......................................................................... 7

                2.      Gary L. Varnam ........................................................................... 8

        B.      Nociceptive and Non-Neuropathic Pain .................................................. 8

        C.      Dosages In Excess of 1800 mg/day ........................................................ 8

IV.     THE INDICATION SUBCLASSES ARE SUFFICIENTLY NUMEROUS ................... 9

V.      THE PROPOSED TPP SUBCLASS REPRESENTATIVES PAID FOR THE
        OFF-LABEL INDICATIONS AT ISSUE................................................................ 12

VI.     NEURONTIN PRESCRIPTIONS SKYROCKETED AS A RESULT OF
        DEFENDANTS' FRAUDULENT OFF-LABEL MARKETING CAMPAIGNS .......... 13

        A.      Bipolar and Other Mood Disorders......................................................... 16

        B.      Neuropathic & Nociceptive Pain ............................................................ 24

        C.      Migraine and Other Forms of Headache.................................................. 31

        D.      Doses Above 1800 mg/day ..................................................................... 33

VII.    THE COST OF PRESCRIPTIONS PAID FOR BY EACH TPP FOR EACH
        OFF-LABEL INDICATION CAN BE DETERMINED STATISTICALLY WITH
        A SUFFICIENT DEGREE OF PRECISION ............................................................ 39

VIII.   CONCLUSION................................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Holton v. Rothschild,*
118 F.R.D. 280 (D. Mass. 1987) ............................................................. 9

*In re Pharmaceutical Industry Average Wholesale Price Litigation,*
230 F.R.D. 61 (D. Mass. 2005) ............................................................. 17

*In re Telectronics Pacing Sys., Inc.,*
172 F.R.D. 271 (S.D. Ohio 1997) ......................................................... 1

*Long v. Trans World Airlines, Inc.,*
761 F. Supp. 1320 (N.D. Ill. 1991) ....................................................... 39

## RULES

Federal Rules of Civil Procedure
Rule 23 ..................................................................................................... 6

## TREATISES

Federal Judicial Center, <u>Manual for Complex Litigation, Fourth</u> (2005) ..................................... 1

## OTHER AUTHORITIES

U.S. Dept. of Health and Human Services,
<u>Health, United States, 2007 with Chartbook on Trends in the Health of Americans</u> ............................................................................................ 17

Pursuant to the Court's September 4, 2007 Memorandum and Order, Plaintiffs Louisiana Health Service Indemnity Company dba BlueCross/BlueShield of Louisiana ("BCBSLA"), ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA"), Harden Manufacturing Corporation ("Harden," and, collectively, the "TPP Class Representatives"), Gerald Smith, Lorraine Kopa, and proposed additional Consumer Subclass representatives[1] Carolyn Hollaway (for nociceptive and non-neuropathic pain indications), Gary L.Varnam (for bipolar and other mood disorders), Jan Frank Wityk (for bipolar and other mood disorders, and dosages over 1800 mg/day), and Jeanne Ramsey (for dosages over 1800 mg/day) (collectively, the "Consumer Class Representatives," and, together with the TPP Class Representatives, "Plaintiffs") respectfully submit this memorandum of law in support of their renewed motion for class certification.

## I.    <u>INTRODUCTION</u>

On September 4, 2007, the Court entered its Memorandum and Order on Plaintiffs' motion for class certification (the "Order"), finding that Plaintiffs had satisfied the predominance requirement of Rule 23(b)(3) for each of the off-label conditions at issue (Order at 14-30, 43-48), the typicality requirement of Rule 23(a)(3) with respect to the proposed Consumer Subclass representatives for neuropathic pain and migraine indications (Order at 40-42), and the adequacy of representation requirement of Rule 23(a)(4) with respect to the existing Plaintiffs and their counsel (Order at 42-43).   However, the Court denied certification without prejudice, allowing

---

[1] While there is authority that a class action complaint need not be formally amended to add additional proposed class representatives as named plaintiffs (*see, e.g.,* Federal Judicial Center, <u>Manual for Complex Litigation, Fourth</u> § 21.26 (2005) ("[t]he court may permit intervention by a new representative or may simply designate that person as a representative in the order granting class certification," citing *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 283 (S.D. Ohio 1997)), out of an abundance of caution, Plaintiffs have also moved to amend the Third Amended Class Action Complaint to add the proposed additional Consumer Class representatives as named plaintiffs.  *See* Plaintiffs' Renewed Motion for Class Certification, at 3.  This memorandum of law is filed in support of the motion to amend, as well as Plaintiffs' renewed motion for class certification.

Plaintiffs 60 days to renew their motion and correct the following perceived deficiencies:

- **Class Structure/Commonality:** "[T]he proposed consumer and TPP classes must be further divided into subclasses by use.  Plaintiffs will need to satisfy the prerequisites of Rule 23, both for consumers and the TPPs, for (1) bipolar and other mood disorders; (2) neuropathic pain; (3) migraine and headache; (4) nociceptive and non-neuropathic pain; (5) restless leg syndrome ("RLS")/periodic limb movement disorder ("PLMD"); (6) anxiety disorders; (7) monotherapy; and (8) doses of 1800 mg to 3600 mg per day."  (Order at 37, citation omitted.)

- **Numerosity:** "[P]laintiffs must allege numerosity for the consumer and TPP off-label purchasers by indication for each subclass under Fed. R. Civ. Pro. 23(c)(4). . . . [T]o meet their burden, plaintiffs must submit a proffer that the number of consumer and TPP plaintiffs in each subclass is sufficiently large that joinder of all members would be impractical."  (Order at 38, citation omitted.)

- **Typicality – Consumer Subclass:** "Plaintiffs have proposed Gerald Smith and Loraine Kopa as consumer representatives for neuropathic pain and migraine. They have not proposed consumer representatives for the other off-label indications.  Plaintiffs have failed to demonstrate that these proposed consumer plaintiffs' claims are typical of the claims of the members of the subclasses for bipolar and other mood disorders; nociceptive and non-neuropathic pain; RLS/PLMD; anxiety disorders; epilepsy monotherapy; and doses in excess of 1800 mg per day."  (Order at 40, citation omitted.)

- **Typicality – TPP Subclass:** "Plaintiffs must make a proffer that a proposed TPP representative for each subclass likely paid for the off-label indication for that

subclass.  For large TPPs that reimburse for numerous Neurontin prescriptions, standing and typicality could be met by a statistical likelihood of payment for a specific indication."  (Order at 42.)

- **Causation and Injury — Consumer Subclass:**  "If only a de minimis number of doctors prescribed Neurontin for an off-label condition, and then off-label prescriptions skyrocketed after a fraudulent campaign for that indication (i.e., migraines or bipolar), the Court will consider statistical proof as sufficient to demonstrate that most purchasers in that period were injured.  At present, however, the record does not contain such a proffer."  (Order at 62-63.) [2]

- **Causation and Injury — TPP Subclass:**  "If Dr. Rosenthal has an accurate methodology for calculating that, say, 85% of all Neurontin prescriptions for migraines resulted from a fraudulent marketing campaign, it seems reasonable for a TPP to allege that 85% of its reimbursements for that indication were a result of the fraud.  This approach is problematic, however, if TPPs are unable to distinguish between payments for on- and off-label prescriptions, or among the indications.  It is unclear if that problem can be resolved statistically.  Because plaintiffs have not proposed typical TPP class representatives and there are so many open questions, I need not address the viability of plaintiffs' theory on an incomplete record."  (Order at 63.)

Plaintiffs are able to satisfy these requirements, as follows:

---

[2] The text of the Order immediately following the portion quoted above makes it clear that this obstacle to certification affects only the Consumer Class, not the TPP Class.  *See* Order at 62-63 ("At present, however, the record does not contain such a proffer.  As such, Plaintiffs' motion to certify a *consumer class* for neuropathic pain and migraine is DENIED without prejudice.  A *different problem in manageability exists for TPPs* which reimburse for Neurontin for many plan beneficiaries.") (emphasis added).

- **Class Structure/Commonality:**  Plaintiffs have divided the proposed TPP and Consumer Classes into subclasses for five of the eight off-label uses that have heretofore been the subject of this litigation, specifically:  (1) bipolar and other mood disorders; (2) neuropathic pain; (3) migraine and headache; (4) nociceptive and non-neuropathic pain; and (5) doses of 1800 mg to 3600 mg per day.  Now that Plaintiffs are in possession of more complete sales data, Plaintiffs have elected not to pursue claims on behalf of subclasses for restless leg syndrome or anxiety disorders, which constitute a relatively small portion of Neurontin off-label sales, in order to avoid unnecessarily complicating further proceedings. Plaintiffs have also elected not to pursue claims on behalf of an epilepsy monotherapy subclass, which presents unique data analysis problems, owing to the difficulty of determining whether a particular Neurontin prescription was written for monotherapy, an off-label use, or adjunctive therapy, an approved use, in light of the common diagnostic codes associated with either.

- **Numerosity:**  Plaintiffs' expert calculates that membership in the consumer indication-specific subclasses ranges from over 365,641 for migraine and headache, to over 2,283,907 for neuropathic pain.  As to TPPs, Plaintiffs' expert opines that of the approximately 1,300 commercial health insurance plans in the United States, which had an average of approximately 160,000 covered lives midway into the class period, the vast majority have over a 99% likelihood of membership in all five of the proposed indication subclasses.

- **Typicality — Consumer Subclass:**  Plaintiffs have proposed additional class representatives for bipolar and other mood disorders, nociceptive and non-

neuropathic pain, and doses in excess of 1800 mg/day (*i.e.*, all of the indication-specific subclasses Plaintiffs intend to move forward on presently lacking a subclass representative).

- **Typicality — TPP Subclass:**  Plaintiffs' expert calculates that there is over a 99% probability that BCBSLA and ASEA paid for one or more Neurontin prescriptions for each of the off-label conditions at issue, and a 99% probability that Harden paid for one or more Neurontin prescriptions to treat neuropathic pain.

- **Causation and Injury — Consumer Subclass:**  Based on industry-standard data, Plaintiffs' expert calculates that prior to the onset of Defendants' indication-specific marketing campaigns, there were only a *de minimis* number of Neurontin prescriptions, written by a *de minimis* number of physicians, for each such indication, and that sales for each such condition rose dramatically shortly after the onset of each such marketing campaign.

- **Causation and Injury — TPP Subclass:**  Plaintiffs can estimate the likely amount of each TPP's Neurontin purchases for each indication, by multiplying each TPPs total expenditures for Neurontin over the applicable subclass period by the corresponding NDTI percentages for the same time period (*see* n.7, *infra*).

Each of these matters is discussed separately below.

## II.  PLAINTIFFS PROPOSE CERTIFICATION OF A TPP CLASS, A CONSUMER CLASS, AND, FOR EACH CLASS, INDICATION-SPECIFIC SUBCLASSES

Plaintiffs had originally proposed the creation of a single class, composed of all individuals and entities who paid some or all of the purchase price of Neurontin for any off-label use, comprised of a TPP Subclass and a Consumer Subclass.  *See* Order at 2-3.  The Court's

Order requires separate TPP and Consumer Classes, with each Class divided into indication-specific subclasses.[3]  The Court also noted Defendants' complaint that "the class period for each indication is different."  Order at 36 n.14 (citation omitted).

Accordingly, the TPP Class Representatives propose certification of a TPP Class, composed of separate subclasses for each indication, as follows:

> All private, non-governmental entities in the United States and its territories that paid or reimbursed all or part of the cost of Neurontin prescribed, provided, or administered to natural persons covered by any contract, policy, or plan, for any of the following indications during the following periods of time[4] (the "TPP Class"):

| TPP Subclass | Subclass Period |
|---|---|
| Bipolar/Mood Disorders | 11/95 – 12/04 |
| Neuropathic Pain | 7/95 – 12/04 |
| Migraine/Headache | 9/95 – 12/04 |
| Nociceptive Pain | 9/95 – 12/04 |
| Doses > 1800 mg/day | 3/95 – 12/04 |

> Such entities include, but are not limited to, insurance companies, union health and welfare benefit plans, entities with self-funded plans that contract with a health insurance company or other entity to serve as a third-party claims administrator to administer their prescription drug benefits, private entities paid by any governmental entity (including a state Medicaid program), and other

---

[3] As a practical matter, it would appear to make little difference whether there is an over-arching class including both TPPs and consumers, or whether the TPP and consumer groups are separated entirely.  *See* Fed. R. Civ. P. 23(c)(4)(b) ("a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall them be construed and applied accordingly").

[4] The basis for these respective inception dates is set forth in Part VI, *infra*, which provides, by indication, a chronology of Defendants' more significant marketing efforts.  The common termination date of December 2004 reflects two events, the entry into the marketplace of generic gabapentin in the fourth quarter of 2004, and Pfizer's corresponding cessation of all Neurontin marketing efforts, its sales force having been migrated to Pregabalin, a successor product.

organizations.

Pursuant to the Court's directive, Plaintiffs also seek certification of a Consumer Class, composed of "all individuals in the United States and its territories who, for purposes other than resale, purchased, reimbursed, or paid for some or all of the price of Neurontin" for any of the same indications during the same periods of time.

## III.    THE ADDITIONAL CONSUMER INDICATION SUBCLASS REPRESENTATIVES

While the Court found that the claims of the existing consumer plaintiffs, Gerald Smith and Lorraine Kopa, satisfy the requirement of typicality with respect to the neuropathic pain indication subclass, and that Mr. Smith further satisfies the typicality requirement with respect to the migraine and headache subclass, the Court found that the Consumer Subclass must put forward additional class representatives who paid some amount for Neurontin prescribed for the following off-label conditions:  (1) bipolar and other mood disorders; (2) nociceptive and non-neuropathic pain; and (6) doses in excess of 1800 mg per day.[5]  Order at 40.  The additional Consumer Class representatives and the basic facts concerning their conditions and Neurontin prescriptions are summarized below, supported by declarations filed herewith.[6]

### A.    Bipolar and Other Mood Disorders

#### 1.    Jan Frank Wityk

Jan Frank Wityk is a resident of Butler, Indiana.  Declaration of Jan Frank Wityk. Between August 2000 and September 2001, Ms. Wityk was prescribed and took Neurontin for

---

[5] As set forth above, Plaintiffs have elected not to pursue subclasses for restless leg syndrome or anxiety disorders, due to the relatively small sales for these off-label conditions, or for epilepsy monotherapy, which presents unique obstacles to data analysis.

[6] In order to expedite the deposition of the proposed additional class representatives, contemporaneously with this filing, Plaintiffs are producing their medical and prescription records to Defendants, consistent with prior agreements and orders regarding the scope of the production.

the treatment of bipolar disorder by Dr. Jerrold Gray.  *Id.*  At certain times, she was prescribed

and took Neurontin doses of 2400 mg/day.  *Id.*  Ms. Wityk made copayments ranging from

$20.00 to $49.87 for each of her Neurontin prescriptions, and, in at least one case, paid the entire

prescription cost of $151.98.  *Id.*  Neurontin was completely ineffective in treating Ms. Wityk's

bipolar disorder.  *Id.*

### 2. Gary L. Varnam

Mr. Varnam is a resident of Winthrop, Maine.  Declaration of Gary L. Varnam.  Between

February 2001 and June 2004, Mr. Varnam was prescribed and took Neurontin for the treatment

of bipolar disorder.  *Id.*  Neurontin was prescribed for Mr. Varnam by three physicians – Dr.

Beverly Grimm, Dr. Teresa Hermida, and Dr. John Arness, all of Kennebec Valley MHC

(Mental Health Counseling).  *Id.*  Mr. Varnam made a copayment toward each prescription. *Id.*

Neurontin was completely ineffective in treating Mr. Varnam's bipolar disorder.  *Id.*

### B. Nociceptive and Non-Neuropathic Pain

Carolyn Hollaway is a resident of McAlester, Oklahoma.  Between November 2003 and

March 2004, she was prescribed and took Neurontin for the treatment of back pain resulting from

an automobile accident.  *Id.*  Neurontin was prescribed for Ms. Hollaway by Dr. Gregory Rogers.

Ms. Hollaway made a $25 copayment toward each prescription.  *Id.*  Neurontin was ineffective

in treating Ms. Hollaway's back pain.  *Id.*

### C. Dosages In Excess of 1800 mg/day

Jeanne Ramsey is a resident of Dallas, Texas.  Declaration of Jeanne Ramsey.  Between

March 2000 and December 2003, she was prescribed and took Neurontin for the treatment of

reflex sympathetic dystrophy and musculoskeletal pain.  *Id.*  Ms. Ramsey was prescribed

Neurontin by two physicians, Dr. Robert Haynsworth, Jr. of Baylor Pain Management, and Dr.

Rick Waldo.  *Id.*  At times, Ms. Ramsey was prescribed and took Neurontin in dosages ranging

from 2100 to 3200 mg/day.  *Id.*  Ms. Ramsey made a copayment toward each prescription.  *Id.*

Neurontin was completely ineffective in treating either of Ms. Ramsey's pain conditions.  *Id.*

As set forth above, at times, Ms. Wityk was prescribed Neurontin at dosages of 2400

mg/day.  Accordingly, in addition to standing as a representative of the bipolar/consumer class,

Ms. Wityk is also a proper representative of the dosages over 1800 mg/day consumer subclass.

## IV.    THE INDICATION SUBCLASSES ARE SUFFICIENTLY NUMEROUS

As the Court observed in the Order, while "plaintiffs must allege numerosity for the

consumer and TPP off-label purchasers by indication for each subclass under Fed. R. Civ. Pro.

23(c)(4)," given "the low threshold for numerosity and the high number of off-label

prescriptions, this prong of Rule 23 is unlikely to preclude certification.  *See, e.g., Holton v.

Rothschild*, 118 F.R.D. 280, 282 (D. Mass. 1987) (explaining, with respect to numerosity, that

'[w]hether the number be 50 or 60, it is sufficiently large' (citation omitted))."  Order at 38.  The

Court is correct.

Based on data produced by Defendants providing unique patient counts for Neurontin

overall for the period June 1997 to December 2002, combined with NDTI data on the prevalence

of Neurontin use by specific indication,[7] Plaintiffs' expert, Dr. Rena Conti,[8] calculates the

following approximate number of unique consumers during this time period, as to each

---

[7] As Dr. Conti explains, the National Disease and Therapeutic Index ("NDTI") data, obtained from IMS, is based on a quarterly survey of a representative sample of physicians who provide anonymous patient-level information for the previous two weeks, including any mention of Neurontin use in relation to the patient, and the associated ICD-9 diagnostic codes.  This survey data is used to determine relative frequency of use (*e.g.*, the percentage of Neurontin prescriptions written for bipolar disorder during the corresponding time period).  *See* Conti Decl. ¶ 7(1).

[8] Dr. Conti is well-qualified to opine on the matters addressed in this submission.  She holds a PhD. in Health Policy (Economics Track) from Harvard University, and is presently an instructor of Health Economics at the University of Chicago.  *See* Conti Decl. ¶¶ 1-4 and Attachment A.1 (curriculum vitae).

indication, as follows:

| Off-Label Condition | Approx. No. Consumer Subclass Members |
|---|---|
| Bipolar/Mood Disorders | 1,189,189 |
| Neuropathic Pain | 2,283,907 |
| Migraine/Headache | 365,641 |
| Nociceptive Pain | 750,219 |
| Doses 1800-3600 mg/day | 786,236 |
| Total | 5,375,192 |

*See* Declaration of Rena Conti in Support of Plaintiffs' Renewed Motion for Class Certification

("Conti Decl.") ¶¶ 51-53, Table 1.  As Professor Conti explains, these numbers vastly

underestimate the number of Consumer Subclass members for each indication subclass, as it is

based on patient counts for only 66% of the overall class period (66 mos./113 mos.),[9] but

extrapolation to cover the missing data points is unnecessary, in light of the low threshold of

numerosity required for certification.

As to TPPs, the number of members in each indication subclass over the same time

period may be estimated by:  (1) taking the total unique number of consumers prescribed

Neurontin for each indication; (2) dividing that number by the total population, to derive a

measure of incidence (*i.e.,* the rate of new cases) for each indication; and (3) based on this

information, and the reasonable assumption that each TPP covers a representative sample of the

population, calculating the statistical probability that a plan of a given size (*i.e.*, the number of

members) had at least one patient who received Neurontin for each indication.  *See* Conti Decl.

---

[9] *See* Conti Decl. ¶ 49.

¶¶ 54-58 and Attachment E.  The resulting figures, at 90%, 95%, and 99% confidence intervals,

are as follows:

**Table 2. Number of Total Members a TPP would Need to Cover During the Class Period to Be Represented with 99%, 95% and 90% Probability**

|  | Bipolar (population incidence during period=0.5%) | Neuropathic pain (population incidence during period=0.9%) | Nociceptive pain (population incidence during period=0.3%) | Migraine (population incidence during period=0.1%) | Doses > 1800 mg (population incidence during period=0.3%) |
|---|---|---|---|---|---|
| 99% probability | 997 | 518 | 1,582 | 3,248 | 1,509 |
| 95% probability | 649 | 337 | 1,029 | 2,113 | 982 |
| 90% probability | 499 | 259 | 791 | 1,624 | 755 |

*Id.* ¶ 54, Table 2.  In other words, if a health plan had at least 518 members, there is a 99%

probability that health plan had at least one member who was prescribed Neurontin for

neuropathic pain during the time period June 1997 – December 2002, which is well inside

Plaintiffs' proposed subclass periods, and is therefore a member of the TPP Subclass for that

indication.[10]  The largest such number is 3,248, to achieve a 99% confidence level as to

membership in the Migraine and Headache Subclass.  *Id.*

In 2001 (a date well within the available dataset), the approximately 1,300 commercial

health insurance plans in the United States had an average of approximately 160,000 covered

lives, with plans under 130,000 members classified as "small."  *Id.* ¶ 55.  Accordingly, it is

reasonable to conclude that the vast majority of these 1,300 plans had more than 4,017 members

during the relevant time period, and are therefore members of each condition-specific TPP

---

[10] As noted above, by definition, this grossly undercounts membership in the TPP Subclasses, but as the requirement of numerosity is easily satisfied, additional calculations are unnecessary.

Subclass.[11]  As this is well in excess of the 50-60 deemed "sufficiently large" in *Holton*, each of

the TPP indication subclasses, if any,[12] are sufficiently numerous to warrant certification.

## V.     THE PROPOSED TPP SUBCLASS REPRESENTATIVES PAID FOR THE OFF-LABEL INDICATIONS AT ISSUE

The Court's Order requires Plaintiffs to "make a proffer that a proposed TPP

representative for each subclass likely paid for the off-label indication for that subclass," and

states that "[f]or large TPPs that reimburse for numerous Neurontin prescriptions, standing and

typicality could be met by a statistical likelihood of payment for a specific indication."  As set

forth in Part III, *supra*, statistically speaking, the likelihood that any particular TPP paid for a

particular off-label indication depends on the number of its members and the percentage of total

Neurontin prescriptions written for that indication over the relevant time period.

Performing these calculations for the proposed TPP class representatives, the probability

that each of them paid for one or more Neurontin prescriptions for each of the off-label

conditions at issue, during the applicable subclass period, is as follows:

| Off-Label Condition | BCBSLA | ASEA | Harden |
|---|---|---|---|
| Bipolar/Mood Disorders | > 99% | > 99% | 88% |
| Neuropathic Pain | > 99% | > 99% | > 99% |
| Migraine/Headache | > 99% | > 99% | 45% |
| Nociceptive Pain | > 99% | > 99% | 78% |
| Dose > 1800 mg/day | > 99% | > 99% | 78% |

Conti Decl. ¶¶ 59-61 and Table 3.  Accordingly, should the Court find the creation of TPP

---

[11] In addition, the approximately 2,500 Taft-Hartley Funds average approximately 3,600 members per year, and Dr. Conti estimates that an additional 12,369 self-insured employers had one or more of their members prescribed Neurontin for one or more of the off-label conditions at issue.  *Id*. ¶¶ 56-57.

[12] Plaintiffs note that while the creation of indication-specific Consumer subclasses appears inevitable, this is not necessarily required as to the TPPs, the vast majority of which have paid for at least one Neurontin prescription for *each* of the off-label conditions at issue.

Subclasses necessary or expedient (*see* n.12, *supra*), Plaintiffs propose the appointment of

BCBSLA, ASEA, and Harden as representatives of the Neuropathic Pain TPP Subclass, and

BCBSLA and ASEA as representatives of the other TPP Subclasses, as there is over a 99%

probability that each of them paid for Neurontin to treat the corresponding off-label indication.[13]

## VI.    NEURONTIN PRESCRIPTIONS SKYROCKETED AS A RESULT OF DEFENDANTS' FRAUDULENT OFF-LABEL MARKETING CAMPAIGNS

The Court observed that Plaintiffs:

> proffered dramatic statistics that even a lay judge can understand without an
> econometric model.  One calendar quarter after the campaign to publicize
> Neurontin for pain started, Neurontin prescriptions for pain increased 2500%.
> Within three months after the migraine promotion commenced in the second
> quarter of 1996, usage increased 800%.  After the psychiatric off-label campaign
> began, psychiatric use increased 1000% in only six months. (Rosenthal Report ¶
> 35.)  Evidence demonstrates that off-label prescriptions of Neurontin amounted to
> approximately 13% of total scripts prior to the off-label promotional campaign.
> (*Id*. at ¶ 37.)  Off-label prescriptions constituted 90% of total scripts at the end of
> the class period.

Order at 52.  Accordingly, the Court held that:

> If only a de minimis number of doctors prescribed Neurontin for an off-label
> condition, and then off-label prescriptions skyrocketed after a fraudulent
> campaign for that indication (*i.e.*, migraines or bipolar), the Court will consider
> statistical proof as sufficient to demonstrate that most purchasers in that period
> were injured.  At present, however, the record does not contain such a proffer.

---

[13] The estimated amounts spent by each proposed TPP Subclass representative on these
indications during the applicable subclass period, calculated by multiplying their total Neurontin
expenditures by the NDTI percentages for each condition, are as follows:

| Off-Label Indication | BCBSLA | ASEA | Harden |
|---|---|---|---|
| Bipolar | $1,165,457 | $42,435 | $1,054 |
| Neuropathic Pain | $2,583,694 | $94,034 | $2,335 |
| Nociceptive Pain | $862,873 | $31,409 | $780 |
| Migraine | $346,703 | $12,620 | $313 |
| Doses > 1800 mg/day | $871,752 | $31,715 | $788 |

*Id*. ¶ 61, Table 4.

Order at 62-63.[14]

For each of the five off-label indications at issue — bipolar disorder, neuropathic pain, nociceptive pain, migraine and headache, and doses over 1800 mg/day — Plaintiffs can demonstrate that there were a *de minimis* number of prescribers prior to the fraud, followed by exponential growth in the number of prescribers and prescriptions, in proportion to the scope and intensity of the fraudulent marketing effort.  As shown in Figure 5,[15] while sales of Neurontin for its two approved uses (adjunctive epilepsy and post-herpetic neuralgia) remained relatively stable over the class period (green band), sales for off-label uses skyrocketed beginning in 1996, with pain, psychiatric indications, and migraine comprising the vast majority of all Neurontin uses (Area A):

---

[14] As set forth above, this former obstacle to certification affects only the Consumer Subclass, not the TPP Subclass (*see* n.12, *supra*), as the Court made clear at the conclusion of the Order:

> A *different* problem in manageability exists for TPPs which reimburse for
> Neurontin for many plan beneficiaries.  If Dr. Rosenthal has an accurate
> methodology for calculating that, say, 85% of all Neurontin prescriptions for
> migraines resulted from a fraudulent marketing campaign, it seems reasonable for
> a TPP to allege that 85% of its reimbursements for that indication were a result of
> the fraud.

Order at 63 (emphasis added).

[15] Unless otherwise indicated, references to Figures are to the corresponding Exhibit to the Conti Decl.



**Figure 5**
**Neurontin's On-Label Use vs Off-Label Use for All Physicians**

Source: IMS NDTI data.

*See also* Conti Decl. ¶¶ 23, 24.

Figure 6, which further divides Area A into the specific indications at issue in this motion, shows the growth in Neurontin sales to treat these conditions as follows:



Figure 6
Area A from Figure 5 Broken Down by Specific Indication Category

Source: IMS NDTI data.

*See also* Conti Decl. ¶ 25.

The parallel between these dramatic increases in sales and the onset, intensity (and, in one case, sunset) of Defendants' multifaceted off-label marketing campaign for each condition is explored in more detail below.

### A.    Bipolar and Other Mood Disorders

From its launch in February 1994 until November 1995, there was no marketing of Neurontin for bipolar. In November 1995, Parke-Davis began fraudulently marketing the drug as an effective treatment for bipolar and other mood disorders, notwithstanding its knowledge of the lack of a scientific rationale to support such statements.[16]  *See*

---

[16] In addition to the absence of any scientific rationale to support Neurontin's use to treat bipolar, Plaintiffs have previously summarized, in numerous filings, the scientific evidence known to Defendants that Neurontin was *in*effective in treating bipolar disorder and the other conditions at issue (although this bibliography remains a moving target, as Plaintiffs continue to review and digest Defendants' voluminous document production), and Plaintiffs incorporate these prior filings by reference as if fully set forth herein.  *See, e.g.*, Reply Memorandum of Law in Support of Plaintiffs' Motion For Class Certification (Dkt. No. 678), at 10-12; Third Amended Class Action Complaint (Dkt. No. 580), ¶¶ 133, 148, 152, 172-74, 195, 207-09; Plaintiffs' Joint

WLC_FRANKLIN_0000170736.[17]

Internal company documents show that as of March 1995, there were only 141 psychiatrists prescribing Neurontin nationwide, only 0.6% of all psychiatrists in the U.S.[18] WLC_FRANKLIN_0000041780.  Parke-Davis's own Bipolar Marketing Assessment, prepared in May 1995, showed that Neurontin had, and would continue to have, 0% of the bipolar market, absent a concerted marketing effort. WLC_FRANKLIN_0000170736.[19]

---

Memorandum of Law In Opposition to Defendants Pfizer Inc. and Warner-Lambert Company's Motion to Dismiss the Second Amended Class Action Complaint and the Second Coordinated Amended Complaint (Dkt. No. 448), at 12-15; Exhibit A to Plaintiffs' Post-Hearing Submission of Chart Identifying False Statements and Material Omissions Alleged in Complaints (Dkt. No. 316).  An Appendix of Suppressed Negative Studies for the indications at issue, taken from Plaintiffs' responses to Defendants' second set of interrogatories (No. 9), supplemented to add more recently discovered information, is attached hereto.  The absence of any scientific rationale or clinical evidence to support Neurontin's use for bipolar provides an alternative route to the causation inference drawn by the Court based on the comparative level of pre- and post-marketing sales, *i.e.*, because no reasonable physician would have prescribed Neurontin for bipolar absent Defendants' fraud, *all* of the prescriptions for bipolar can fairly be attributed to Defendants' fraudulent marketing activity.

[17] Bates numbers refer to documents produced in the *Franklin* case or in this litigation, as the prefix indicates.  Plaintiffs understand that the Court does not wish to delve into or resolve the complex factual disputes regarding the misleading character of Defendants' off-label marketing efforts, and Plaintiffs present this information only to demonstrate the close relationship between the dramatic rise in sales of Neurontin for a particular off-label indication and the intensity and cumulative nature of the corresponding marketing effort.  Accordingly, Plaintiffs present herein chronologies of Defendants' persistent and multifaceted marketing efforts, by indication, type of event or publication, sponsorship, geographic dispersion, frequency, and quantifiable reach, gleaned from hundreds of thousands of documents produced in the *Franklin* case, as well as in this litigation.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 77 (D. Mass. 2005) ("*AWP*") (in determining propriety of certification, question is not whether plaintiffs will prevail on the merits) (citations omitted).

[18] In 1995, there were approximately 23,334 psychiatrists in the U.S.  *See* U.S. Dept. of Health and Human Services, Health, United States, 2007 with Chartbook on Trends in the Health of Americans, at Table 107.

[19] Also in May 1995, Parke-Davis filed a patent application covering Neurontin's use in treating bipolar disorder in which it represented to the United States Patent and Trademark Office under oath that such use was "a novel use for gabapentin which would not be obvious to a medical practitioner of ordinary skill."  *See* U.S. Patent No. 5,510,381 (issued Apr. 23, 1996).  Had Parke-Davis learned of a significant use of Neurontin to treat bipolar prior to this time, it could

The initial marketing "push" began in November 1995, with a series of scripted teleconferences presenting misleading information concerning Neurontin's efficacy in treating bipolar disorder. *See* WLC_FRANKLIN_0000199997; WLC_FRANKLIN_0000098315. These calls continued until the spring of 1996, when concerns about FDA scrutiny of such tactics (*see* WLC_FRANKLIN_0000092698) prompted Parke-Davis to instead use a series of sham regional "consultant" meetings as a venue to present "hot off the press" data suggesting that Neurontin was effective for bipolar. *See* WLC_FRANKLIN_0000199743; WLC_FRANKLIN_0000073645.

In May 1997, Parke-Davis redoubled its marketing efforts, and embarked on an ambitious campaign of hundreds of sham continuing medical education events ("CMEs") and dinner meetings, as well as the mailing of hundreds of thousands of journal supplements[20] targeted at psychiatrists. Such events included:

- In 1997, the distribution of journal supplements from the Psychiatric Times to 40,000 psychiatrists and the posting of the supplement on the Mental Health InfoSource website, which received 750,000 hits per month. *See* CME0101-CME0108.

- In March 1998 and April 1998, the conducting of 50 dinner programs and 16 teleconferences entitled "Closing the Psychiatry-Neurology Divide: Emerging Uses of Anticonvulsants" in 41 cities. *See* WLC_CBU_074388.

- In May 1998, the distribution of a teaching monograph in CNS Spectrums, a psychiatric journal with 50,000 monthly subscribers. *See* WLC_CBU_074388.

---

not have claimed inventorship of a novel and non-obvious use.

[20] These journal supplements were non-peer-reviewed articles placed in unscheduled "supplemental" issues of various medical journals. Parke-Davis paid to have these journal supplements circulated to all subscribers of the regular issues (including libraries and indexing services). Parke-Davis also received tens of thousands of bulk copies, which it mailed to its target audiences. According to Elsevier, one of the world's largest journal publishers, "pharmaceutical companies regard [journal supplements] as an ideal method for rapid and powerful dissemination of their conference material or scientific findings to as wide or narrow an audience as required." See http://intl.elsevierhealth.com/contacts/jsupps.cfm.

- In July through October 1998, the conducting of 30 seminars entitled, "New Treatment Frontiers in Social Phobia and Bipolar Disorder" in 30 cities attended by 5,645 psychiatrists. *See* WLC_CBU_074388.

- In late 1998, the circulation of a psychiatry supplement to the Cleveland Clinic Journal of Medicine, with a circulation of 45,000. *See* PFIZER_TMARTIN_0001736.

- In 1999, the conducting of 53 meetings for psychiatrists entitled "New Frontiers in Social Phobia and Bipolar Disorders-1999," which were held in 30 cities and attended by approximately 6,225 physicians. *See* CME0027-CME0034 and CME0038-CME0057.

- In May through December 1999, the conducting of 45 meetings entitled, "New Frontiers in Anxiety, Substance Abuse and Bipolar Disorders," attended by an estimated 8,500 psychiatrists. *See* PFIZER_NMANCINI_0011631.

- In late 1999, having an employee author a supplement to *Epilepsia*, a monthly journal with 15,000 subscribers. *See* PFIZER_JSU_0012780.

- In 2000, the conducting of a series of CME programs for psychiatrists entitled "Anxiety & Bipolar Disorders: Challenges in Current Management," held in numerous cities and attended by hundreds of physicians. *See WLC_CBU_028929; PFIZER_MDANA_0001157.*

- In May 2001, the conducting of marketing activities in connection with the American Psychiatric Association's Annual Meeting in New Orleans, attended by an estimated 800 physicians. *See* MDL_VENDORS_111010; MDL_VENDORS_111131; MDL_VENDORS_054931.

- Between April and June 2001, the conducting of 12 programs in major cities for psychiatrists entitled "Anxiety & Bipolar Disorders: Challenges in Current Management." *See* PFIZER_RGLANZMAN_0094149.

During this period of intense marketing activity, Parke-Davis and Pfizer also bombarded psychiatrists with hundreds of thousands of sales calls, making a total of 166,198 Neurontin details (*i.e.*, physician office visits) on 21,315 psychiatrists in the period 1999 through 2001 alone. This aggressive marketing/detailing campaign caused exponential growth in both Neurontin prescriptions and the number of prescribers up until August 2001, when the Neurontin marketing team leader made the decision, in the face of the *Franklin* lawsuit and a federal criminal investigation, to abandon the fraudulent marketing of Neurontin for the treatment of

bipolar disorder.  *See* PFIZER_LKNAPP_0016120.

Figure 7 confirms the accuracy of Defendants' internal marketing assessments.  For the four quarters prior to the commencement of the fraud, total Neurontin uses for bipolar disorder were 3,141.  In the four quarters following commencement of the fraud, the use of Neurontin to treat bipolar disorder skyrocketed *over 2000%*, to 62,295.  *See* Conti Decl. ¶ 27.



**Figure 7**
**Total Neurontin Use for Bipolar Indications**

Source: IMS NDTI data. Includes all physician specialties.

Figure 19 similarly shows that among psychiatrists, at whom Defendants directed much of their bipolar marketing efforts, prior to the fourth quarter of 1995, the number of Neurontin prescriptions for bipolar were so small as to be barely visible on the chart:





**Figure 19**
**Neurontin Indications for Psychiatrists**

Source: IMS NDTI Data.

Figure 11 shows the number of Neurontin *prescriptions* by month written by psychiatrists, without regard to indication, and Figure 15 shows the number of *psychiatrists* writing these prescriptions. In both cases, the numbers prior to the onset of Defendants' bipolar marketing effort are negligible:



Figure 11
Number of Neurontin New Prescriptions Per Month
Psychiatrists

Note: For data definitions see Conti Declaration, para 7.
Source: IMS Xponent, Wolters Kluwer

*Privileged and Confidential*

Figure 15
Number of Physicians Writing New Prescriptions for Neurontin Each Month
Psychiatrists

Note: For data definitions see Conti Declaration, para 7.
Source: IMS Xponent, Wolters Kluwer, WLC FRANKLIN 41786 (not included in backcast)

*Privileged and Confidential*

As set forth above, as of March 1995, only 0.6% of psychiatrists were prescribing Neurontin for *any* condition. *Id.* Following the onset of Defendants' misleading bipolar marketing campaign, this number grew steadily, to a peak of approximately 16,000 psychiatrists per month in 2002 (Conte Decl. ¶ 38), before gradually declining, following Pfizer's August 2001 directive to cease its bipolar marketing efforts.[21]

The following timeline (based on Figure 7) shows the incremental and cumulative impact of Defendants' various bipolar marketing efforts:



Source: IMS NDTI data. Includes all physician specialties.

As the timeline graphically illustrates, immediately following commencement of the bipolar marketing effort, there was significant growth in the number of Neurontin prescriptions

---

[21] This was very much a "rolling stop," as Pfizer's sales force continued to detail psychiatrists over 9,487 times following this directive, as reflected in Defendants' Sherlock and CMMS databases.

for bipolar.  This growth skyrocketed during the period of the most intense and aggressive

marketing.  The causal relationship between Defendants' marketing efforts and sales is further

confirmed by a classic "challenge," *i.e.*, after Pfizer abandoned its fraudulent bipolar marketing

campaign, the number of prescriptions and prescribers leveled off, and eventually began to

decline.  *See* Figures 11, 15, 19.  Bipolar and other mood disorders accounted for a clear majority

of the massive growth in psychiatrists' use of Neurontin after November 1995.  *See* Figure 19.

       **B.**      **Neuropathic & Nociceptive Pain**

There was no marketing of Neurontin for either neuropathic or nociceptive pain prior to

July 1995.  Starting in July 1995, Parke-Davis launched a fraudulent marketing scheme touting

Neurontin's use for chronic pain by creating the misleading appearance of scientific evidence

supporting a claim of efficacy, while suppressing clinical trials which demonstrated *in*efficacy.

This campaign involved the use of CMEs, dinner meetings, sham consultant meetings,

teleconferences, and PR campaigns.

Early marketing efforts targeted pain specialists and neurologists.  Although initially

focused on neuropathic pain, by September 1995, the effort was expanded to include nociceptive

pain.  Beginning in 1999, Parke-Davis and subsequently Pfizer expanded the campaign to target

primary care physicians (PCPs), general practitioners, family practitioners and even consumers.

These marketing efforts included:

- In November 1995, the presentation at the American Pain Society (APS) meeting of an abstract entitled "Gabapentin: a New Therapy for the Treatment of Chronic Pain."  *See* WLC_FRANKLIN_0000035723.

- In 1996, the holding of hundreds of marketing events, including in such resort destinations as Vail, CO and Jupiter Beach, FL, which were attended by thousands of physicians and focused in large part on Neurontin's "chronic pain syndromes."  *See* WLC_FRANKLIN_0000037968.

- A multimedia campaign in Spring 1996, which included: (a) distribution to roughly 10,000 physicians of a CME "home study" course book suggesting Neurontin as a treatment option for chronic pain, including neuropathic pain; (b) in May and June 1996, 25 dinner meetings held in 16 large metropolitan areas attended by 4,000 physicians, at which the "home study" course book was discussed; and (c) 50 audio conferences containing the "highlights" of these meetings, in which hundreds of physicians in less urban areas participated. *See* WLC_FRANKLIN_0000015522.

- Between April and September 1997, numerous "Pain Weekend" meetings in locations such as Ponte Vedra, FL, New York City, Rye Brook, NY, Saratoga, NY, Rochester, NY, Newport, RI, Absecon, NJ, Philadelphia, PA, Hershey, PA, and Boston, MA, attended by hundreds of physicians, where Neurontin was presented as a viable treatment option for neuropathic pain, and no mention was made of negative clinical data. *See* WLC_CBU_180735; WLC_FRANKLIN_0000066770; WLC_FRANKLIN_0000066773; WLC_FRANKLIN_0000066779; WLC_FRANKLIN_0000066782; WLC_FRANKLIN_0000066789; WLC_CBU_179585.

- In November 1997, the distribution of a 24-page CME "supplement" to the Journal of Internal Medicine to 56,000 physicians, suggesting Neurontin's efficacy to treat diabetic peripheral neuropathy, but omitting any reference to the negative Gorson study. *See* WLC_FRANKLIN_0000080451.

- Beginning in June 1997, the posting of misleading content on www.pain.com. *See* WLC_FRANKLIN_0000082494.

- In November and December 1998, a Neuropathic Pain CME Teleconference Series held targeting neurologists, PCPs, pain specialists, anesthesiologists, orthopedic surgeons, and diabetes specialists "to increase use of Neurontin for pain" and "increase use of Neurontin in diabetic pain patients." *See* WLC_CBU_000221.

- In December 1998, publication of misleading articles circulated to 325,000 physicians which concluded that Neurontin was effective for neuropathic pain while omitting reference to the negative Gorson study. *See* PFIZER_TMARTIN_0002022; PFIZER_TMARTIN_0002036.

- In December 1998 and January 1999, the launch of an unprecedented media blitz reaching 85,000,000 people to "Establish Neurontin as the treatment of choice for post-herpetic neuralgia and diabetic neuropathy," "generate interest in and coverage of gabapentin's efficacy in chronic pain management," and "Saturate trade and consumer media with a variety of telecommunications vehicles." The target of this media blitz was the entire medical community, including PCPs, neurologists, anesthesiologists, nurse practitioners, pharmacists, patients, caregivers, family, and the "Consumer and Trade Media." *See* WLC_CBU_000221. This media blitz included the following activities:

- o National Media Launch— Parke-Davis developed press releases and collateral materials that supported the Neurontin publicity campaign and targeted consumers and trade publications catering to medical professionals in the fields of diabetes and pain management. *See* WLC_CBU_092879.

- o Video News Release—In order to blanket the TV airwaves, Parke-Davis developed a canned video news release designed to appear as a genuine news report that was distributed to television stations in 79 different TV markets, including 8 of the top 10 US markets, and 22 of the top 25. The ads ran on more than 100 TV stations, including: WCBS and WNBC in New York, WBZ in Boston, KNBC in Los Angeles, WGN and WMAQ in Chicago, KPIX and KGO in San Francisco, and WRC in Washington DC. *Id.*

- o Radio News Release—In order to reach the millions of Americans that listen to radio, Parke-Davis developed a 45-second canned radio news release (RNR) designed to sound like a genuine news report that was distributed to key radio stations across the country. Over a single three day period, the ads were run nearly 1,200 times on 595 radio stations, as well as four national networks with another 600 radio stations. *Id.*

- o Radio Health Journal—Parke-Davis also developed a 60-second Radio Health Journal (RHJ) spot to air unedited on stations around the country. The Radio Health Journal spot aired 1,700 times over a six-week period in all of the top 25 markets and 45 of the top 50. *Id.*

- o Airline Video News Release—Parke-Davis also took advantage of captive audiences in commercial aircraft by showing short video segments to 2.9 million passengers of United Airlines and 200,000 passengers of TWA throughout the month of January 1999, and United Airlines and Northwest Airlines during the month of February 1999, as part of their in-flight entertainment. *Id.*

- o Mat Release—Parke-Davis also developed a canned news article that was designed to appear as a genuine news story and was run unedited in daily and weekly newspapers and magazines around the country, including Business Week, the Washington Post, Los Angeles Times, Chicago Tribune, San Francisco Chronicle, MSNBC.com, and the AP and Reuters newswires. *Id.*

- In all, Parke-Davis's media blitz created 85 million "impressions" across all major markets. In other words, the Parke-Davis sales message reached 85 million people. *See* WLC_CBU_092879. The media blitz misleadingly suggested that Neurontin's efficacy in neuropathic pain had been scientifically demonstrated, but omitted any reference to contrary scientific evidence.

- In the first quarter of 1999, 100 CME Dinner Meeting Series, entitled "New advances in pain management," where neurologists, PCPs, pain specialists, anesthesiologists, orthopedic surgeons, and diabetes specialists received misleading presentations "to

increase use of Neurontin for pain" and "increase use of Neurontin in diabetic pain patients".  *See* WLC_CBU_000221.

- In the first half of 2000, "an extraordinary schedule of pain programs," with 34 CME meetings held in 35 cities.  *See* RELATOR02977.

- In early 2000, 75 half-day CME pain meetings entitled "New Treatment Options in Management of Pain: The Role of Anticonvulsants," attended by 7,500 physicians from dozens of cities around the country.  *See* RELATOR02977.

- In 2000, 125 CME dinner series entitled "Re-evaluating Neuropathic Pain Treatment Algorithms," attended by 3,750 physicians.  *See* PFIZER_NMANCINI_0011819.

- 16 half-day CME meetings, held in 12 cities, entitled "Practical Approaches to the Treatment of Chronic Neuropathic Pain."  *See* WLC_CBU_072791.

- In March 2000, the distribution of a "Neurology Reviews" supplement entitled "Management of Neuropathic Pain Syndromes," to all neurologists in the United States.  *See* PFIZER_TMARTIN_0001974; PFIZER_CGROGAN_0012356.

- In March 2000 and June 2000, the distribution of "Progress in Neurology" supplements relating to "Entrapment Neuropathies of Upper Extremities," and "Entrapment Neuropathies of Lower Extremities," to all neurologists in the United States.  *See* WLC_CBU_040534; PFIZER_CGROGAN_0012356.

- In June 2000, October 2000, and December 2000, the distribution of "Progress in Pain Management" supplements relating to "Diagnosis and Treatment of Peripheral Neuropathies," "Chronic Neck and Back Pain," and "Diabetic Neuropathy," to 50,000 primary care physicians.  *See* PFIZER_CGROGAN_0012356; WLC_CBU_040534.

- In Fall 2000, 22 half-day CME meetings, held in 22 different cities, attended by over 1,000 physicians, featuring various lectures, including "Practical approaches to treating chronic lower back pain," which stated that Neurontin had analgesic properties that would make it effective in treating non-neuropathic lower back pain but failed to disclose the negative study results for Neurontin and nociceptive pain.  *See* MDL_VENDORS_068588; SH_0029837.

- In 2001, a series of meetings entitled "New Directions in the Understanding & Treatment of Chronic Pain,"  attended by more than 1,500 physicians, where presentations stated that Neurontin was effective for neuropathic pain and chronic low back pain, and references to the negative Gorson, Reckless, POPP and the myriad of negative nociceptive studies were omitted.  *See* MDL_VENDORS_068532; SH_0029960; SH_0064559.0092900.

- In March 2003, the presentation of several posters at the APS annual meeting stating that Neurontin had "demonstrated efficacy in neuropathic pain syndromes" and that the

efficacy was "irrespective of etiology." *See* PFIZER_LALPHS_0013925; PFIZER_LKNAPP_0056201; PFIZER_LKNAPP_0172784.

- Between December 1998 and the present, the distribution of a "Dear Doctor" letter on "various pain conditions" to 7,891 physicians that falsely stated that "available data from other studies… suggests that gabapentin should be considered in the treatment of neuropathic pain as first-line agents [sic]," while omitting any reference to the failed POPP, Gorson, and Reckless studies. *See Merlin database.*

Figures 8A and 9A[22] depict how all of the growth in Neurontin's use for neuropathic and nociceptive pain occurred after the implementation, and in close correlation with, the fraudulent marketing campaign:



**Figure 8A**
**Total Neurontin Use for Neuropathic Pain Indications (Excluding PHN)**

Source: IMS NDTI data. Includes all physician specialties.

---

[22] Like Figure 7A above, Figures 8A and 9A are based on Dr. Conti's Figures 8 and 9, with an overlay of significant marketing activities, to graphically illustrate the successful implementation of Defendants' carefully developed marketing strategy.



**Figure 9A**
**Total Neurontin Use for Nociceptive Pain Indications**

The figures above show a virtual absence of Neurontin use for either neuropathic or nociceptive pain prior to the onset of the fraud, indicating a *de minimis*—likely non-existent—number of prescribers for those indications. Conti Decl. ¶ 28. In the four quarters prior to the commencement of the fraud, total Neurontin uses for neuropathic pain were 5,658. In the four quarters after the fraud began, Neurontin uses for neuropathic pain skyrocketed to 90,302, an increase of *1600%. Id*. The impact of the conjoined marketing campaign for nociceptive pain was no less dramatic, as there were *no* recorded prescriptions for nociceptive pain in the four quarters prior to the onset of the fraud, but 21,110 prescriptions in the four quarters after Defendants' off-label marketing efforts were expanded to include these non-neuropathic pain indications. *Id*.

The *de minimis* level of use independent of Defendants' fraudulent marketing efforts is

illustrated most dramatically by Figure 20, which shows that pain specialists, the "target audience," had no discernable level of Neurontin prescribing activity for either neuropathic or nociceptive pain prior to the onset of Defendants' fraudulent marketing campaign:



**Figure 20**
**Neurontin Indications for Pain Specialists**

Source: IMS NDTI Data.

*See also* Figure 16 (monthly number of pain specialists writing new prescriptions for Neurontin).[23]  This is confirmed *by internal Parke-Davis documents, which as of May 24, 1995, showed that Neurontin was capturing 0% of the pain market*.   WLC_FRANKLIN_0000166608.

As a result of Defendants' aggressive and persistent marketing efforts, by August 2001, market research commissioned by Pfizer showed that 43% of physicians believed that Neurontin

---

[23] While neurologists had already incorporated Neurontin into their epilepsy practices and thus were heavy prescribers of Neurontin at the time (*see* Figure 17), their usage data indicates that only a tiny fraction of their prescriptions, prior to July 1995, were for neuropathic or nociceptive pain.  *See* Figure 21.  Looking at the rest of physician specialties combined reveals that while there were 8,000 physicians out of an estimated 720,325 total physicians (1.1%) (*see* n. 18, *supra*) who prescribed Neurontin for any purpose in July 1995, virtually *none* of their use of Neurontin was for neuropathic or nociceptive pain.  *See* Figures 18 and 22.

had actually been approved by the FDA for a "broad indication" to treat neuropathic pain

(PFIZER_LESLIETIVE_0007258 at 0007281-86), even though the FDA had *declined*

Defendants' application for such an indication.

### C.    Migraine and Other Forms of Headache

Prior to September 1995, Defendants did not market Neurontin for migraine.  Beginning

in September 1995, Parke-Davis implemented a fraudulent marketing scheme directed primarily

at neurologists, and later PCPs, to convince them of Neurontin's efficacy for migraine

prophylaxis, while suppressing negative clinical evidence.  This fraudulent marketing included:

- In March 1996, a presentation at the American Academy of Neurology Meeting suggesting Neurontin's efficacy to treat migraine, but suppressing any mention of negative clinical data, followed by the distribution of a "Medi-Fax" news bulletin to more than 10,000 physicians that falsely claimed that Neurontin "appears to be an effective, well tolerated agent for migraine."  *See* WLC_FRANKLIN_0000096359; WLC_FRANKLIN_0000036427; WLC_FRANKLIN_0000041545; WLC_FRANKLIN_0000067667.

- A multimedia campaign in spring 1996, which included:  (a) in April 1996, the distribution of a CME home study course book to roughly 10,000 physicians which identified Neurontin as a treatment option for migraine, but made no mention of the negative clinical data; (b) in May and June 1996, 25 dinner meetings, held in 16 large metropolitan areas, attended by 4,000 physicians; and (c) 50 audio conferences containing the "highlights" of these meetings.  *See WLC_FRANKLIN_0000015522; WLC_FRANKLIN_0000032920.*

- In 1996, numerous "consultant meetings," including in Vail, CO and Jupiter Beach,  FL, where hundreds of attendees were exposed to misleading presentations suggesting Neurontin's efficacy in preventing migraines and denying the existence of negative data.  *See* WLC_FRANKLIN_0000015627.

- On May 25, 1996, an advisory board meeting to discuss "Gabapentin in the Management of Migraine," attended by top experts in the field of migraine, where employees of Parke-Davis falsely denied the existence of negative clinical data.  *See* WLC_FRANKLIN_0000116885.

- Between April and September 1997, numerous "Pain Weekend" meetings where Neurontin was presented as a treatment option for migraine but no mention was made of negative clinical data.  *See* WLC_CBU_180735; WLC_FRANKLIN_0000066770; WLC_FRANKLIN_0000066773; WLC_FRANKLIN_0000066779;

WLC_FRANKLIN_0000066782; WLC_FRANKLIN_0000066789;
WLC_CBU_179585.

- Beginning in June 1999, the launch of a multimedia educational program on Neurontin and migraine entitled "Advances in the Preventative Treatment of Migraine," which included: (a) the mailing of misleading program materials to 20,000 neurologists and the top 5,000 primary care physicians involved in the treatment of migraines; (b) the distribution of 3,000 copies of a misleading summary monograph that "very favorably mentions Neurontin"; (c) the distribution of misleading audiocassettes; and (d) the creation of an (800) number where callers who could not participate in the above heard a condensed version of the audiotape, edited by the medical marketing firm Cline Davis & Mann. *See* WLC_CBU_030392.

- Between late 1999 and early 2001, dozens of meetings entitled "New Directions in the Understanding & Treatment of Chronic Pain," where physicians were exposed to lectures called "Effective treatment of hard to treat migraine," which contained statements that Neurontin was "preventative" for migraine. *See* RELATOR02281.

- Between December 1998 and July 2000, the distribution of a misleading "Dear Doctor" letter to 1,140 physicians, which omitted reference to the failed migraine trials. *See Merlin database*.

After 2001, Pfizer largely abandoned the fraudulent migraine marketing campaign in the face of mounting scrutiny by criminal investigators, civil attorneys, and the media. Figure 10A depicts how Neurontin's use for migraine grew along with Defendants' misleading marketing campaign:



Figure 10A
Total Neurontin Use for Migraine Indications

Source: IMS NDTI data. Includes all physician specialties.

The figure above shows a virtual absence of use of Neurontin for migraine prior to the onset of the misleading marketing effort, indicating a *de minimis* number of prescribers for migraine. While an appreciable number of neurologists were prescribing Neurontin at the onset of the fraud (*see* Figure 17), their use data indicates that, prior to September 1995, nearly all of their prescriptions were for epilepsy and only a tiny fraction were for migraine. *See* Figure 21. As with pain, while 1.1% % of all other relevant specialties combined were prescribing Neurontin at the onset of the fraud, their use data indicates that *none of their prescriptions*, prior to September 1995, were for migraine. These other specialty groups, combined with neurologists, account for 95% of Neurontin's use for migraine over a 13-year period.

### D.    Doses Above 1800 mg/day

Prior to March 1995, Defendants did not fraudulently market Neurontin for dosages in

excess of 1800 mg/day. Beginning in March 1995, Parke-Davis implemented a fraudulent

marketing scheme directed initially at physicians treating epilepsy, and later all physicians

treating all conditions, to falsely convince them that Neurontin's efficacy did not plateau at 1800

mg/day, and that even greater efficacy could be achieved at much higher doses. In nearly every

case, Parke-Davis and Pfizer recommended titration up to 3600 mg per day—a doubling of the

dose, and the corresponding sale — which was unjustified based on the clinical evidence. This

fraudulent marketing included:

- Enrollment of more than 1,500 physicians in an unscientific clinical study (the STEPS study) in order to induce them to raise the dose of their Neurontin prescriptions. Parke-Davis offered $300 per patient enrolled, as well as a $50 kickback for each patient that continued on Neurontin after the study was concluded. *See* WLC_FRANKLIN_0000093580. Physicians were recruited by members of the sales force, and selected because their "influence is vast." *See* WLC_FRANKLIN_0000069350.

- On March 4, 1995, Parke-Davis conducted a STEPS "telebroadcast," a videoconference directed to 1,542 physicians who were either STEPS investigators or potential STEPS investigators. This videoconference, shown to physicians in Boston, New York, Washington DC, Chicago, Atlanta, St. Louis, Dallas, San Francisco, and Los Angeles, was promotional in nature, as the company tracked the DACON [average daily dosing] of both the investigators as well as "attendees who will not become investigators." *See* WLC_CBU_115481, WLC_FRANKLIN_0000036620. This broadcast was deemed to be "successful," in large part because "the titrate to effect message was clearly communicated by the advisory panel to the investigators." *See* WLC_FRANKLIN_0000052175. Parke-Davis thereafter monitored the effect of the event by tracking the investigators' average daily dose. *See* WLC_FRANKLIN_0000069499. This tracking showed that only two months after the STEPS telebroadcast, the number of participants prescribing Neurontin at doses over 2000 mg/day had increased by 34%, and the number prescribing over 3600 mg/day had increased by 525%. Based on this tracking analysis, Parke-Davis concluded that "[e]ducation about titration…appears to have had a positive impact on the physicians exposed to it." *See* WLC_FRANKLIN_0000039745.

- In May 1995, Parke-Davis hired the Medical Education Network to send a "Medi-Fax" bulletin to thousands of physicians which falsely represented that "many physicians are using much higher doses [than 1800 mg/day]." *See* WLC_FRANKLIN_0000041586.

- In May 1995, Parke-Davis held various promotional dinner meetings where discussion scripts called for the moderator to tell attendees that Neurontin "doses should be pushed

[above 1800 mg per day] to get more efficacy," and that Neurontin should be "titrated as needed."  *See* WLC_FRANKLIN_0000060466.

- Another "Medi-Fax" was distributed to more than 10,000 physicians in March 1996, this one advocating the "Aggressive Dosing" of Neurontin and making the false claim that dosages above 1800 mg per day were "shown to be effective."  *See* WLC_FRANKLIN_0000041545, WLC_FRANKLIN_0000067667.

- In the summer of 1995, Parke-Davis held five seminars (one per regional Customer Business Unit) on Mastering Epilepsy, including one on July 7, 1995 in South Carolina, where attendees were told about the need to titrate to effect but were not informed of the negative clinical study results.  *See* WLC_FRANKLIN_0000033115.

- On December 15-17, 1995, Parke-Davis held an advisory board meeting in New York where more than 25 high prescribing physicians at some of the most influential teaching hospitals were told that many Neurontin patients "require doses higher than 2400 mg/day."  *See* WLC_FRANKLIN_0000164694.

- In 1996, Parke-Davis—in one CBU alone—held 14 CMEs and other events attended by more than 450 neurologists, which were "Designed to emphasize the need to titrate to 3600 mg or higher if necessary."  *See* WLC_CBU_165674.

- In 1997, as part of the monotherapy pre-launch activities, Parke-Davis held several "High Dose" meetings to "encourage titration to higher doses through peer-to-peer influence."  *See* WLC_FRANKLIN_0000112204.  Parke-Davis also developed case reports to disseminate to physicians to "[u]se peer-to-peer influence to give non-users reassurance that Neurontin can be safely titrated to higher doses…"  Parke-Davis authorized the case reports to be based on "[r]eal cases…[or] [a]lternatively on fictionalized case histories could be written based on real situations."  *See* WLC_FRANKLIN_0000112204.  Parke-Davis also gave misleading presentations about the results of the STEPS study.  While STEPS was not designed to allow scientific conclusions about Neurontin's efficacy at doses above 1800 mg per day, Parke-Davis used the results to make precisely that claim. For example, a newsletter distributed to the more than 1,800 STEPS investigators made the misleading claim that STEPS had demonstrated that 3600 mg per day was far more effective than 1800 mg per day.  *See* WLC_FRANKLIN_0000130292.

- In June 1997, Parke-Davis distributed a Pain Medicine Supplement for the American Academy of Pain Medicine, which stated that there was "no plateau" of efficacy at 1800 mg per day, and that "incremental anticonvulsant efficacy has been suggested at higher doses."  *See* WLC_CBU_004837.

- On November 20, 1997, attendees of the American Society of Regional Anesthesia were instructed to "increase dose to 3600 – 4800 mg per day" for maximum efficacy as part of the "dosing guidelines."  *See* WLC_CBU_086362.

- In November 1997, Parke-Davis mailed a 24-page CME "supplement" to the Journal of Internal Medicine to 56,000 physicians. This supplement suggested Neurontin's greater efficacy at doses above 1800 mg per day. *See* WLC_FRANKLIN_0000080451.

- Between January and March 1999, Parke-Davis held 5 advisory board meetings where attendees were informed about the "optimal dose" of Neurontin and the "efficacy results from the STEPS [trial]" were discussed. *See* WLC_FRANKLIN_0000177446.

- As part of the JAMA media blitz described above, Parke-Davis made misleading statements about Neurontin's efficacy at dosages between 1800 – 3600 mg per day. This media blitz created more than 85 million impressions. *See* WLC_CBU_092879.

- On September 16, 2000, at a speaker training meeting entitled "Neurology Breakthroughs in the Millennium" held at the Watergate Hotel in Washington D.C., Pfizer falsely told 49 of its speakers:

  > the PI [FDA-approved package insert] dosing was not high enough. The STEPS study proved that dosing had to go higher than 1st expected to get the effect needed. In 1995, pain data came out saying that 2400-3600 was an effective dose and then they came out with 600 and 800 mg tablets. *See* MDL_VENDORS_064551.

- On April 4, 2001, at a sales training meeting in Puerto Rico entitled "Start Fast, Go High," Pfizer instructed its sales representatives that Neurontin had its "Best efficacy at 3600 mg." While the sales representatives were briefed on the results of numerous clinical trials, no mention was made of any of the negative dose response studies which showed that 3600 mg had no demonstrated superiority over 1800 mg. *See* PFIZER_LKNAPP_0023336. This false information was also contained in a Pfizer sales piece for sales representatives' use in detailing physicians. *See* MDL_VENDORS_079295.

- In June 2001, Pfizer receiver a letter from the FDA's Division of Drug Marketing, Advertising and Communications (DDMAC) advising the company that the FDA deemed promotional statements, based on a trial that (like STEPS) was open-label, were misleading because the trial did not constitute "substantial evidence." *See* PFIZER_LCASTRO_0039757. Pfizer recognized "that DDMACs comments also applied to the use of STEPS efficacy and tolerability data." However, there was "[n]o agreement at [the Review Committee] level regarding discontinuing use of STEPS data in promotion." *See* PFIZER_LCASTRO_0006580. Thus, Pfizer continued to promote STEPS as an efficacy trial even after becoming aware that the FDA would consider such promotion to be misleading.

- Beginning in August 2001, Pfizer began planting its marketing messages in "articles that Pfizer will be submitting for prints in journals." Pfizer referred to these marketing messages as "key messages that Pfizer/Neurontin Team will be targeting to display to the audience directly or indirectly in the article that is produced." *See* PFIZER_JSU_0032011. Two of the "key messages" involved titrating Neurontin above 1800 mg/day. In pain, the "key message" was to use a "dose above 1800 mg/day as tolerated to achieve maximum efficacy." In epilepsy, the "key message" was that "doses up to 3600 mg/day" provided "incremental improvements in efficacy." *See* PFIZER_LESLIETIVE_0014606. These key messages were included in various vendor-written publications. For example, in January 2003, Pfizer published an article written by one of its vendors which falsely stated that the five neuropathic pain clinical trials submitted to the FDA supported the conclusion that 3600 mg/day offered additional benefits over 1800 mg/day in the treatment of pain. *See* PFIZER_LLAMOREAUX_0000682. This article was followed up by another article, published in May 2003, which similarly misrepresented the results of the epilepsy studies and concluded that 3600 mg/day offered additional benefits over 1800 mg/day in the treatment of epilepsy. *See* PFIZER_LALPHS_0014014.

Figure 24A shows the negligible use of Neurontin at doses over 1800 mg/day for unapproved uses prior to the onset of the fraud, and illustrates how essentially all of the growth in Neurontin's use at doses above 1800 mg per day for indications outside of epilepsy[24] occurred

---

[24] As shown in Figure 23A below, even within epilepsy, in the 15 months prior to the onset of the fraud, only 10% of Neurontin's use for epilepsy was above 1800 mg/day, while in the 15 months after commencement of the fraud, use above 1800 mg per day accounted for 27% of all epilepsy use. During this same period, the number of uses above 1800 mg/day grew 239%, while the number of uses at or below 1800 mg/day grew less than 5%. By April 1996, doses above 1800 mg/day accounted for 40% of total epilepsy use.

after the implementation, and in close correlation with, the fraudulent marketing campaign:



**Figure 23A**
**Neurontin Uses for Daily Doses Greater than 1800 mg Per Day: Epilepsy**

and Figure A-2.



**Figure 24A**
**Neurontin Uses for Daily Doses Greater than 1800 mg Per Day: All Indications Except Epilepsy**

## VII. THE COST OF PRESCRIPTIONS PAID FOR BY EACH TPP FOR EACH OFF-LABEL INDICATION CAN BE DETERMINED STATISTICALLY WITH A SUFFICIENT DEGREE OF PRECISION

Damages awards in class actions "need not be 100 percent accurate." *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1327 (N.D. Ill. 1991). The Court must conclude only that the proffered expert methodology for calculating damages on an aggregate class-wide basis is "not so insubstantial as to preclude class certification." *AWP*, 230 F.R.D. at 90. As to the TPP Subclass, the Court concluded that in order to successfully employ Dr. Rosenthal's methodology to determine the amount paid by each TPP to fill the prescriptions for each off-label indication generated by Defendants' fraudulent marketing campaign for that indication, Plaintiffs must be able to demonstrate, statistically, the likely amount of each TPP's Neurontin purchases for each indication. Order at 63.

As set forth in Dr. Conti's declaration, these amounts may be estimated by multiplying each TPPs total expenditures for Neurontin over the applicable subclass period by the corresponding NDTI percentages for the same time period.  *See* Conti Decl. ¶ 61 and Table 4; n.13, *supra* (estimated amounts paid by BCBSLA, ASEA, and Harden for Neurontin prescribed for specific off-label indications).

## VIII.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed TPP Class, the proposed Consumer Class, and the proposed bipolar, neuropathic pain, nociceptive pain, migraine and headache, and dosage over 1800 mg. subclasses, and appoint Plaintiffs, the proposed additional class representatives, and their counsel to represent their interests, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

Dated: December 19, 2007                    Respectfully Submitted,


By:     */s/ Barry Himmelstein*
        Barry Himmelstein, Esquire
        Lieff Cabraser Heimann &
        Bernstein, LLP
        Embarcadero Center West
        275 Battery Street, 30th Floor
        San Francisco, CA 94111-3339


By:     */s/ Thomas Greene*
        Thomas Greene, Esquire
        Greene & Hoffman
        125 Summer Street
        Boston, MA 02110


By:     */s/ Thomas M. Sobol*
        Hagens Berman Sobol Shapiro LLP
        One Main Street, 4th Floor
        Cambridge, MA  02142
        Boston, MA 02110

By:    */s/ Don Barrett*
Don Barrett, Esquire
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095

By:    */s/ Daniel Becnel*
Daniel Becnel, Jr., Esquire
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

By:    */s/ James Dugan*
James Dugan, Esquire
Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130

***Members of the Class Plaintiffs'
Steering Committee***

## Appendix of Suppressed Negative Studies

| Indication | Study No. | Key Finding | Suppression |
|---|---|---|---|
| **Bipolar & Mood** | 945-209 (Pande Study) | Neurontin less effective than placebo | Publication delayed; not submitted to Drugdex; results omitted or misrepresented (TACAC, ¶ 173) |
| | (Frye Study) | Neurontin not significantly more effective than placebo | Not submitted to Drugdex; results omitted or misrepresented (TACAC, ¶ 172) |
| **Doses Above 1800 mg/day** | (Stewart Study) | Lack of proportionality between the dose of gabapentin administered to subjects and the level absorbed | Results omitted or misrepresented (TACAC, ¶ 206) |
| | 945-82 | Failed to establish dose response | Results misrepresented (TACAC, ¶¶ 189, 207, 218) |
| | 945-77, 945-177 | Failed to establish dose response | Not published; not submitted to Drugdex; results omitted (TACAC, ¶¶ 190, 209, 218) |
| | 945-224 | "There was no statistically significant difference between any of the gabapentin groups [600, 1200 or 2400 mg gabapentin per day] and the placebo group for endpoint mean pain score or at any time throughout the trial." | Not published; not submitted to Drugdex; results omitted (TACAC, ¶¶ 148, 261) |

| Indication | Study No. | Key Finding | Suppression |
|---|---|---|---|
| | 945-295 | Although a statistical comparison has not been made between the two doses of Gabapentin [1800 mg; 2400 mg], it is evident from the data that the effects of the two doses on both pain and sleep are very similar. | Results omitted or misrepresented |
| **Migraine & Headache** | 879-201, 879-205, 879-206, 879-207, 879-209 (European Study) | No statistically significant difference in migraine attack frequency between placebo and 900 mg of Neurontin therapy | Not published; not submitted to Drugdex; results omitted (TACAC, ¶ 195) |
| | 945-217 | No statistical difference between gabapentin and placebo | Not published; not submitted to Drugdex; results omitted |
| **Pain—Neuropathic** | (Gorson Study) | Ineffective or minimally effective | Publication delayed; inaccurate abstract submitted to Drugdex; results omitted or misrepresented (TACAC, ¶¶ 146 – 47, 156) |
| | 945-224 (Reckless) | Ineffective | Not published; not submitted to Drugdex; results omitted or misrepresented (TACAC, ¶¶ 148 – 49, 156) |

| Indication | Study No. | Key Finding | Suppression |
|---|---|---|---|
| **Pain—Non-Neuropathic (Nociceptive) Pain** | 1032-001 (Postoperative Dental Pain) | "Overall, the analgesic effect of [gabapentin and hydrocodone] treatment was similar to [hydrocodone] treatment alone." | Not published; not submitted to Drugdex; results omitted (TACAC, ¶ 152) |
| | 1035-001 (Postoperative Dental Pain) | No significant difference between treatment with gabapentin versus placebo; no statistically significant difference between treatment with both gabapentin and hydrocodone versus treatment with hydrocodone alone. Treatment with acetaminophen and hydrocodone far superior to treatment with both gabapentin and hydrocodone | Not published; not submitted to Drugdex; results omitted (TACAC, ¶ 153) |
| | 1032-002 (Acute Osteoarthritis Pain of the Knee) | "…no treatment group (GBP125/NPN250, GBP125, NPN250, or NPN550) was significantly different from placebo on the primary efficacy endpoint, the SPID6... No differences between BP125/NPN250 and NPN550 were detected." | Not published; not submitted to Drugdex; results omitted |

| Indication | Study No. | Key Finding | Suppression |
|---|---|---|---|
| | 1032-004 (Protective Effects of Gabapentin on Naproxen Sodium-Induced Upper Gastrointestinal Mucosal Injury) | "The specific combination doses under investigation in Study 1032-04 (GBP125/NPN250 BID and GBP250/NPN500 BID) do not provide cytoprotection against NPN-induced gastric injury." | Not published; not submitted to Drugdex; results omitted |
| | 945-271 (Post-operative and Posttraumatic Pain) | "Gabapentin did not statistically significantly reduce Mean Pain Intensity Score compared with placebo" | Not published; not submitted to Drugdex; results omitted |