# EXHIBIT A

## AFFIDAVIT OF CYNTHIA McCORMICK

STATE OF MARYLAND       )

                              : ss

COUNTY OF MONTGOMERY     )

      Cynthia McCormick, being duly sworn, deposes and says:

1.      From 1991 to 2002, I served with the United States Food and Drug Administration ("FDA"), initially as a Medical Review Officer and later as the Director of the Division of Anesthetics, Critical Care, and Addiction Drug Products ("DACCADP"). In both of these capacities, I was involved in FDA's process of reviewing and ultimately approving Neurontin for several indications or uses. This Affidavit accurately reflects my actions and conclusions with respect to my involvement with the review and approval of Neurontin.

### I. PROFESSIONAL BACKGROUND

2.      I received my A.B. in Chemistry from Bryn Mawr College in 1972 and my M.D. from the Medical College of Pennsylvania in 1976. After medical school, I completed a Residency in Pediatrics and Communicable Diseases at the University of Michigan Medical Center, and from 1979 to 1980, I completed a Fellowship in Pediatric Neurology at the University of Michigan Medical Center. From 1980 to 1982, I completed a Neurology Residency at the University of Pennsylvania, Children's Hospital of Philadelphia.

3.      From 1982 to 1987, I practiced pediatric neurology in Duluth, Minnesota, where I also served as Associate Clinical Professor of Neurology, University of Minnesota – Duluth. In 1985 and 1986, I served as Chair of the Department of Neurology at St. Mary's Medical Center in Duluth, Minnesota.

4.      I joined the National Institutes of Health ("NIH") as a Medical Officer in 1987, working in the Epilepsy Branch of the National Institute of Neurological Convulsive and Developmental

1

Disorders and Stroke ("NINCDS"). One of our branch's primary goals was the development of new anticonvulsants. It had been years since an anticonvulsant had been approved, and the anticonvulsants that were then available had many drawbacks. Due to the lack of new anticonvulsants, the NIH led a coordinated effort aimed at developing new anticonvulsants. As a Medical Officer with the NIH, I had responsibility for overseeing the administration of grants for the development of new anticonvulsants as well as other neurological disorders. I also served as medical monitor for a number of clinical trials for new anti-epileptic drugs in development.

5.      In 1991, I joined the FDA as a Medical Officer in the Neurology section of the Division of Neuropharmacological Drug Products ("DNDP"). It was in this capacity that I was involved in the initial review and approval of Neurontin as adjunctive therapy in the treatment of partial seizures in adults. I served in that role until 1997 when I was promoted to Director of the DACCADP. As the Division Director, I was involved in the review and approval of Neurontin for the management of postherpetic neuralgia in adults.

6.      In October 2002, I left the FDA to become the Deputy Director of the National Institute of Neurological Disorders and Stroke ("NINDS") Division of Extramural Research, where my work focused on promotion in research stroke and neurological disorders. I served as the Deputy Director until 2004 when I left the NIH. Since 2004, I have served as a private regulatory consultant.

7.      I have been board-certified by the American Board of Pediatrics and board eligible by the American Board of Neurology and Psychiatry with special competence in child neurology. Since 1976, I have maintained my medical licensure in one or more states.

8.      As a licensed physician, I have treated patients suffering from a multitude of disorders and have experience in prescribing medicines for both approved and unapproved uses.

2

Prescribing medicines for "off-label" purposes is a common and beneficial practice of medicine, and it is important that physicians use their own experience and best medical judgment in treating patients.

## II. DUTIES AT THE FDA

9.      As a Medical Officer in DNDP, my duties included reviewing Investigation New Drug ("IND") Exemptions, New Drug Applications ("NDAs"), and other submissions by sponsors seeking approval to study and/or market a compound for certain uses or indications.

10.     My duties as the Director of the DACCADP included supervision and oversight of the review team throughout the drug development process and the rendering of approval decisions based on safety and efficacy data in NDAs and Supplemental New Drug Applications submitted by sponsors seeking to market compounds for specific uses or indications.

## III. NEURONTIN ADJUNCTIVE EPILEPSY THERAPY REVIEW AND APPROVAL

11.     Beginning in January 1992, I served as the clinical reviewer for an NDA submitted by Parke-Davis Pharmaceuticals for approval of Neurontin as a safe and effective adjunctive therapy in the treatment of partial seizures in adults. My responsibilities as the clinical reviewer included reviewing and analyzing the safety and efficacy data contained in the NDA and all supplemental materials, preparing reports summarizing the safety and efficacy data, presenting data to the Peripheral Central Nervous System Advisory Committee in December 1992, and as a member of the review team, reviewing and revising the proposed Neurontin labeling.

12.     As the clinical reviewer, I wrote several reviews summarizing the safety and efficacy data of Neurontin. My initial clinical review evaluated the data reported in the initial NDA and first two safety update reports. In this review, which contains 119 pages of text and reflected hundreds of hours of analysis by me, I concluded that the benefits of using Neurontin as

adjunctive therapy for the treatment of partial and secondary generalized seizures outweigh the potential risks. Acccordingly, I concluded that the medication is safe and effective and should be approved. See Combined Medical Statistical Review ("Review") (Attached Exhibit A).

13.    In preparing my initial clinical review, I thoroughly evaluated all adverse events to identify any potential risks. Among the potential risks I discussed in my clinical review were adverse event reports of depression and suicidality. In evaluating these adverse events, I identified all reports of depression and suicidal behavior and separately listed the number of reports considered serious or that led to withdrawal. See Review at 109, 114. In addition, I also noted in my Review the number of patients reporting depression as an adverse event who had no prior history of depression and also the number of patients who required treatment for their depression. Review at 114.

14.    Whereas I emphasized in my Review the potential risk of depression and suicidality, I never concluded that the clinical trial data affirmatively established or supported the conclusion Neurontin increases the risk of or causes depression or suicidal behavior. Had I reached such a conclusion, I would have emphasized this conclusion in one of the several reports I prepared during the epilepsy NDA review process and would have made a strong appeal that the drug should not be approved. Furthermore, such a concern also would have been prominently noted in a warning in the final approved labeling.

15.    Evaluating adverse events of depression and suicidal behavior reported by patients with epilepsy requires an understanding that such patients are far more likely to experience depression and suicidality than the general population. I noted this in my Review of the Fourth Safety Update. Review of Safety Update #4 (December 28, 1993) (Attached Exhibit B). In this review, which was completed several months after my initial report, I noted "There is a higher incidence

of depression among epileptics with partial seizures as compared to the general population."
Review of Safety Update #4 at 8. Given the high background rate of depression and suicidal
behavior in patients with epilepsy, that there were cases of depression with suicidal ideation and
cases of suicide attempt reported for all epilepsy studies did not suggest to me a causal
association between Neurontin and suicidal behavior.

16.     The clinical trials I evaluated in the course of the NDA review did not involve any reports
of completed suicide committed by a patient while on Neurontin. Although there was one report
involving a patient who committed suicide six months after last ingesting Neurontin, there was
no immediate temporal relationship between the suicide and Neurontin. This suicide was
reported by Parke Davis to the FDA in the First Safety Update and considered by me and my
colleagues during the NDA review process. In addition, I discussed this event at the Advisory
Committee meeting held in December 1992. As the patient's suicide occurred several months
after the patient discontinued treatment, the event was appropriately considered unrelated to the
study medication.

17.     Furthermore, a single case of suicide in a database of over 2,000 patients would not in
and of itself have established a causal association with the medication. As explained above, the
rate of suicide in patients with partial epilepsy is significantly higher than the rate in the general
population, and thus, it is not inconsistent with background rates to have a patient with epilepsy
commit suicide.

18.     The absence of any suicides in the clinical trials database is not due to the exclusion of
patients with pre-existing psychiatric disorders from the clinical trials. Indeed, the clinical trials
included such patients. On page 114 of my Review, I wrote that of the 78 patients who reported
depression as an adverse event, 19 had no prior history of depression. See Review at 114.

Implied in this statement is that 58 patients who reported depression as an adverse event did report a prior history of depression. Accordingly, patients with depression were included in the clinical trials and were evaluated by the FDA before Neurontin had been approved.

19.     On page 109 of my Review, I noted that some patients with mild or no depression on recruitment who required treatment with antidepressant drugs while on treatment with gabapentin "appear to have fallen through the cracks." Review at 109. I made these comments in reference to several reports of depression not being listed as serious adverse events despite the patients having undergone treatment with other medications. I further elaborated on this matter at an advisory committee meeting held on December 15, 1992. Speaking to the Peripheral Central Nervous System Advisory Committee, I explained that "numerous examples were found on a spot check among case report forms where patients developed treatment-emergent depression, pharmacological intervention was required, and a report of a serious adverse event was not made. Indeed, it wasn't required." See Transcript of PCNS Advisory Committee, December 15, 1992, page 59 (Attached Exhibit J). Accordingly, the statements reflected on page 109 of my Clinical Review and those presented to the PCNS Advisory Committee were a commentary on the regulations and were not a reflection of Parke-Davis' reporting practices.

20.     The PCNS Advisory Committee is a group of outside experts that gives independent professional and technical advice to the FDA. The Advisory Committee met in December 1992 to assess the safety and effectiveness of Neurontin for use as adjunctive therapy in patients with epilepsy. At the meeting, I presented an overview of my Clinical Review. Included in this overview was a discussion of various adverse events reported in the clinical trials, including episodes of depression and suicidal behavior. In presenting the data, I never suggested that Neurontin causes or increases the risk of depression or suicidal behavior. Had I believed that

6

Neurontin did cause or increase the risk of depression or suicidal behavior, I would certainly have discussed the matter and advised the committee of this belief.

21.    As part of my ongoing review of the Neurontin adjunctive epilepsy NDA, I reviewed Safety Updates submitted periodically by the sponsor. Safety updates are, as the name implies, updates of safety data from ongoing human exposure from clinical trials or named patient treatment that a sponsor is required to submit between the time of an initial NDA submission and the time of approval. In my review of the Fourth (and final) Safety Update, I made this written observation: "There is a higher incidence of depression among epileptics with partial seizures as compared to the general population. One cannot determine based on the available data, largely uncontrolled, whether the reports here represent an increase in incidence or intensity of depression compared to that which is expected." Review of Safety Update #4 at 8. These statements are consistent with my belief that although there had been adverse event reports of depression in the clinical trials, these reports were not surprising in light of the background rates of depression in patients with epilepsy.

22.    In addition to the Clinical Reviews I prepared, Neurontin's safety and efficacy data were also thoroughly evaluated and summarized by other officials in the Division of Neuropharmacological Drug Products, including the Division's Deputy Director, Dr. Russell Katz. His report, dated October 11, 1993, contains multiple references to the data on depression and suicidal behavior. The report also notes (page 3) that there had been one suicide "after having been off drug for a considerable time." See Dr. Russell Katz, "Supervisory Overview of Safety and Efficacy Data for NDA 20-235" at 13-15 (October 11, 1993) (Attached Exhibit C). Consistent with my findings, Dr. Katz never concluded or stated that there was an increased risk

7

or causal association with Neurontin and suicidal behavior. He likewise recommended approval of the Neurontin NDA.

23.     Dr. Paul Leber, the Director of the Neuropharmacological Division, also carefully evaluated the Neurontin NDA and prepared a report concerning the medication's safety and effectiveness. His report, titled "Approval Action Memorandum," issued findings consistent with those noted in Dr. Katz's report and my clinical reviews. See Dr. Paul Leber, Approval Action Memorandum (December 13, 1993) (Attached Exhibit D).

24.     Based on my recommendations and those of Drs. Leber and Katz, the FDA approved Neurontin on December 30, 1993, for adjunctive therapy in the treatment of partial seizures in patients over 12 years of age with epilepsy.

## IV. FDA'S REVIEW AND APPROVAL OF THE NEURONTIN LABELING

25.     In connection with the FDA's review of an NDA, the FDA is substantially involved in developing and approving the physician package insert (commonly called the label). Throughout this process the FDA carefully reviews all of the proposed labels submitted by the sponsor, closely edits each draft, and often requests significant revisions. The FDA is the final arbiter regarding the label and is authorized to withhold approval until the FDA's required changes have been made.

26.     The FDA's involvement in developing and approving the Neurontin label was no different. Before approval, the FDA reviewed each and every word of the Neurontin proposed labeling and made many revisions, thereby ensuring that the final approved labeling accurately reflected the preclinical data and clinical-trial data. Throughout the approval process, I recall Parke-Davis being responsive to all of the FDA's requested recommended labeling changes.

8

27.     When the FDA ultimately approved Neurontin on December 30, 1993, it did so on the condition that "[t]he final printed labeling (FPL) must be identical to the draft labeling/PPI" that the FDA had reviewed, edited, and approved.  FDA Approval Letter (December 30, 1993) (Attached Exhibit E).

28.     The final approved labeling appropriately identified the data on depression and suicide-related events in the Adverse Reactions section.  The data on depression is contained in a table that lists treatment-emergent events that occurred in at least 1% of patients in the placebo-controlled add-on trials and were numerically more common in the Neurontin group.  As reflected in the table, 1.8% of Neurontin patients reported treatment-emergent depression compared to 1.1% of placebo patients.  The slight difference between the Neurontin group and placebo group is not statistically or clinically meaningful, and thus, does not establish an association with depression.

29.     Given the relatively low frequency of suicidal adverse events reported in the clinical trials and the high background rate of suicidal behavior in patients with epilepsy, the FDA did not believe it would have been appropriate to address suicidal behavior in the warnings, precautions, or contraindications sections.  Accordingly, the FDA's scientific judgment in December 1993 was that there was no reasonable evidence of an association with Neurontin and suicidal behavior or any psychiatric adverse event.  To include a warning or other prominent listing of suicide-related events would have been inconsistent with the clinical trial data and a mischaracterization of the risks associated with Neurontin.  In addition, such a warning would have had significant potential to impact public health adversely; both by diluting scientifically supported information in the labeling and by improperly discouraging the use of Neurontin.

9

30.     Because the rate of clinical-trial suicide-related events did not exceed the expected rate, the data regarding suicidality events was appropriately listed in the "Other Adverse Events Observed During All Clinical Trials" subsection. This section of the label included all reported events except those already listed in the table comparing drug and placebo data, those too general to be informative, and those not plausibly associated with the use of the drug. Importantly, the events listed in the Other Adverse Events subsection were included without regard to causation, and thus, the mere listing of an event in no way suggests a causal association with the study medication.

31.     Adverse events involving reports of suicidal behavior were listed in the Other Adverse Events' Nervous System subsection. This subsection identified suicidal as an infrequent event (event occurring in 1/100 and 1/1000 patients) and suicide gesture as a rare event (event occurring in fewer than 1/1000 patients). The terms suicidal and suicide gesture were taken from the sponsor's modified COSTART dictionary and were approved by the FDA for use in the Neurontin label. Both terms accurately reflected the adverse events involving suicidal behavior observed during the clinical trials. Any additional discussion relating to suicidal behavior in other sections of the labeling would have conflicted with the FDA's decision on the final printed labeling.

32.     In addition to suicidal and suicide gesture, the Neurontin label's Nervous System subsection lists many other psychobiologic adverse events. These events are listed despite psychobiologic adverse events having been more common in patients on placebo than patients on Neurontin in the controlled trials. That the Neurontin label lists psychobiologic events that were more common in placebo than Neurontin further illustrates how events were included regardless of causation.

10

## V. APPROVAL FOR TREATMENT OF POSTHERPETIC NEURALGIA

33.    As previously noted, in 1997 the FDA appointed me Director of the DACCADP (since renamed the Division of Analgesics, Anti-inflammatory and Rheumatology Products). As the Division head, I was responsible for providing scientific and regulatory oversight for numerous investigational and marketed analgesic products, including medications for the treatment of neuropathic pain.

34.    As Director, I had supervisory responsibility of a supplemental NDA submitted by Pfizer Inc. for an indication for the management of postherpetic neuralgia. Pfizer had initially sought an indication for the management of neuropathic pain based on prior discussions with individuals in the Division of Anti-inflammatory, Analgesics, and Ophthalmologic Drug Products, who until July 2000 were responsible for reviewing many applications for pain. This Division had indicated to the sponsor that an indication for the management of neuropathic pain was a viable indication if there were two positive trials in one neuropathic pain model and a single positive trial in a second neuropathic pain model. In May 2001, however, my division, the DACCADP, which at that time was given responsibility for products for neuropathic pain, advised Pfizer that a general neuropathic pain indication was not yet recognized by the FDA. In addition, we advised Pfizer that replicated evidence of efficacy in one neuropathic pain condition would only gain an indication for relief of pain in that particular pain condition. Based on the guidance communicated from my division, Pfizer agreed to amend its application to postherpetic neuralgia specifically. To date, no medication has been approved in the United States for a general neuropathic pain indication.

35.    In reviewing the sNDA submitted for the indication of PHN, my division thoroughly evaluated the safety data reported in the sponsor's Integrated Summary of Safety and

11

supplemental materials.  An in-depth clinical review was completed by Dr. Sharon Hertz, a

Medical Officer in DACCADP, who concluded that Neurontin was safe for use in patients with

postherpetic neuralgia (see Dr. Sharon Hertz, "Review and Evaluation of Clinical Data (May 24,

2002) (Attached Exhibit F)).  Dr. Hertz's findings are consistent with the conclusions reached by

Dr. Bob Rappaport, the Deputy Director and also team leader in the Division.

36.    Among the adverse events evaluated by Dr. Hertz were reports of depression, which she

found were more frequent among patients on placebo than patients on Neurontin.  Dr. Hertz

reflected this in Table 7.20 of her report, which shows that 2.2 percent of placebo patients in the

neuropathy studies reported treatment-emergent depression compared to only 1.3 percent of

patients on Neurontin.  The adjacent columns list the depression data reported in the epilepsy

add-on studies.  A combined analysis of both the epilepsy add-on and neuropathy controlled

studies shows that 1.7 percent of patients on placebo reported treatment-emergent depression

compared to 1.5 percent of Neurontin patients.  Although the 1.7 percent and 1.5 percent figures

are not statistically significant, the fact that depression was more commonly reported in patients

on placebo reinforces the lack of any causal association between Neurontin and depression.

37.    Dr. Hertz's report also evaluated adverse events involving suicidal behavior.  Her review

identified only one intentional overdose, which the sponsor reported as a suicide attempt.  The

narrative indicates that the patient ingested 4500 mg of Neurontin and developed somnolence.  A

dose of 4500 mg of Neurontin may have been higher than the prescribed dose for this patient, but

it would not be expected to result in fatality or even serious consequences in an adult.  In

evaluating this case, Dr. Hertz attributed only the somnolence as being related to Neurontin.

38.    Consistent with Dr. Hertz's and Dr. Rappaport's findings, I concluded in my report that

there was sufficient safety and efficacy data of Neurontin to treat postherpetic neuralgia.  See

Review and Basis for Approval Action (May 22, 2002) (Attached Exhibit G). It is important to note that my report contains no discussion about Neurontin and psychiatric adverse events or suicidality. Considering the high background rates of depression in patients with epilepsy and chronic pain together with the overall controlled-trial data revealing higher numbers of depression in placebo patients, there clearly was no need to discuss depression as a potential risk.

39.     In addition, as of May 2002, I had reviewed a number of NDAs since completing my review of the initial Neurontin NDA in 1993. I also was very familiar with Neurontin's exposure and safety data.  Based on my extensive experience in reviewing NDAs and knowledge of Neurontin, I felt that Neurontin's benefits outweighed its relatively low risks. This is illustrated by the relatively few side effects associated with the medication, absence of metabolites, the lack of any significant drug-to-drug interaction issues, and relatively safe adverse-event profile.   In addition, Neurontin had in 2002 been in use throughout the world for nearly a decade and had not given rise to a safety signal involving any psychiatric adverse event or suicidality. Accordingly, I did not feel it necessary in May 2002 to "set the record straight" as there was no record needing to be set straight.  Therefore, I noted in my report that "Combined with the finding of safety in the epilepsy development program, which included exposure and safety data of several years' duration, there was adequate safety exposure to support the finding of safety in postherpetic neuralgia . . . ." Review and Basis for Approval Action at 3 (May 22, 2002).

40.     In addition to the Division's clinical reviews, a pharmacology review was conducted by Dr. Timothy McGovern, the Division's Pharmacologist.    Timothy McGovern, FDA Pharmacology Review of NDA 21-397 (May 21, 2002). Included in Dr. McGovern's and the FDA's pharmacology evaluation was a review of the "Clinical Pharmacology: Mechanism of Action" section of the proposed labeling. Pfizer's proposed label contained new language in the

13

Mechanism of Action section regarding monoamines and GABA. Specifically, Pfizer sought approval of language stating that "Gabapentin reduces the stimulated release of noradrenaline, dopamine, and glutamate under certain laboratory conditions. Gabapentin administration to humans increases the total brain content of GABA after a single dose. However, the relevance of these findings to clinical use is not yet clear."

41.    The FDA deleted this language by lining through both sentences in a series of edits made on May 16, 2002. See HFD-120 Labeling Version #2, dated May 16, 2002 (Attached Exhibit H). The deletion of the language regarding monoamines and GABA is supported by the conclusion that this information had little importance to a clinician and his prescribing decisions. Had the FDA believed these sentences were important to prescribers or to safety and efficacy, the Agency would not have removed them.

42.    The FDA approved Neurontin for the treatment of postherpetic neuralgia on May 24, 2002. See FDA Approval letter (May 24, 2002) (Attached Exhibit I).

43.    As before, when the FDA approved Neurontin for the treatment of postherpetic neuralgia, it did so on the condition that "The final printed labeling (FPL) must be identical to the draft labeling/PPI" that the Agency had reviewed, edited, and approved. Except in limited circumstances set forth in FDA regulations, any deviation from the final printed labeling by Pfizer would have constituted unlawful misbranding.

44.    The final printed labeling contained data on psychiatric-related events seen in the neuropathic pain clinical trials. For example, in the Adverse Reactions' "Other Adverse Events" subsection relating to the neuropathic pain trials, depression was listed as a frequent adverse event. Other events such as anxiety, depersonalization, and emotional lability were identified as infrequent events. Because depression occurred more often in patients on placebo than in

14

patients on Neurontin, the data on depression was appropriately not listed in Table 2, "Treatment-Emergent Adverse Event Incidence in Controlled Trials in Postherpetic Neuralgia (Events in at least 1% of Neurontin-Treated Patients and Numerically More Frequent Than in the Placebo Group)." As with the adverse events listed in the epilepsy section, the inclusion of adverse events observed in the neuropathic pain trials in no way suggests that Neurontin caused any of these events.

45.    I believed then and continue to believe now that the final printed labeling approved by the FDA in May 2002 appropriately and accurately identified the data on psychiatric-related events reported in the neuropathic pain clinical trials.

46.    Throughout my career at the FDA, I never concluded that Neurontin increases the risk of or causes depression or suicidal behavior. This remains my belief today.

_Cynthia McCormick MD_
Cynthia McCormick


Subscribed and sworn to before me, a notary public, this 13th day of _September_, 2007.

_Vivienne E. Cooper_
Notary Public

My Commission expires

VIVIENNE E. COOPER
NOTARY PUBLIC
MONTGOMERY COUNTY, MARYLAND
My Commission Expires July 15, 2008

15

# EXHIBIT B

~~Department of Health and Human Services~~
**Public Health Service**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

---

DATE:    December 13, 1993

FROM:    Paul Leber, M.D.
         Director,
         Division of Neuropharmacological Drug Products
         HFD-120

SUBJECT: Approvable Action Memorandum
         NDA 20-235:  Neurontin™, Warner Lambert brand of gabapentin

TO:      File NDA 20-235
                     &
         Robert Temple, M. D.
         Director,
         Office of Drug Evaluation I
         HFD-100

---

The Division's review of NDA 20-235 has been completed.  The review team, headed by Dr. Russell Katz, has concluded that the evidence submitted to the NDA supports the conclusion that gabapentin is safe for use and effective in use as an adjunct for the management of partial and secondary generalized tonic clonic seizures.  Accordingly, the Division recommends that NDA 20-235 for Neurontin®, Warner Lambert's brand of gabapentin, be declared approvable provided that Neurontin is marketed under the conditions of use described in the draft labeling attached to the approvable action letter being forwarded to the Office for signature.

I have some comments to offer about the basis for the Division's recommendations.

**Effectiveness:**

Results of 3 randomized, placebo controlled, 'add-on,' clinical investigations' (877-210, 945-5 and 945-6) provide 'substantial' evidence of gabapentin's effectiveness as an antiepileptic agent when it is administered, in combination with other antiepileptic drug products (AEDs), to patients with partial seizures at daily doses of between 600 and 1800 mg. The results also provide support for the claim that

Confidential

Pfizer_LAlphs_0075301

gabapentin suppresses the incidence of secondary generalized tonic clonic convulsions.

The relationship between gabapentin dose and treatment response has not been evaluated in depth. To begin, the sponsor conducted only one study, 945-5, that examines a sufficient number of doses, (i.e., subjects randomized to fixed daily doses of 800 mg, 1200 mg and 1800 mg) to allow a within study estimate of the shape of the dose response relationship. Unfortunately, as the diagram[1] which follows illustrates, that study reveals a seemingly inconsistent dose response relationship. On the other hand, if dose and the magnitude of treatment effect are compared across all 3 studies, there is a suggestion of a monotonic relationship.



Responders-Risk Difference by dose & Study

---

[1] In the figure, treatment effect magnitude, measured on the Y axis in terms of the difference in the proportion of gabapentin and placebo assigned patients attaining a 50% or greater reduction in seizure frequency from baseline, is plotted against the daily dose of gabapentin administered (X axis).

Pfizer_LAlphs_0075302

Furthermore, the seemingly anomalous dose response profile observed in study 945-5 must be considered in light of the experimental conditions and the nature of the population studied. Epileptic patients are heterogeneous and vary among each other and within themselves (i.e., from occasion to occasion) in the degree to which they manifest the epiphenomena (i.e., seizures) of their illness. Furthermore, quantitative estimates of seizure counts, especially counts of partial seizures, tend to be imprecise[2]. Another factor potentially confounding attempts to estimate the shape of the dose response 'surface' is the non-proportional relationship between the dose of gabapentin administered orally and the fraction of that dose absorbed (i.e., the fraction not absorbed increases with increasing dose). Given these sources of uncontrolled variation, it is neither surprising nor disconcerting that the treatment response in Study 945-5 fails to exhibit a positive monotonic association with dose.

In any case, although the best regimen for administering gabapentin has yet to be identified with certainty, the clinical trial experience provides more than a sufficient basis to justify recommending gabapentin's administration at doses in the range of 900 mg to 1800 mg per day.

**Safety in Use: the risks and benefits of gabapentin.**

Based on its evaluation of reports of preclinical tests and reports on clinical experience amassed in some 2000 or so human subjects, the review team has concluded that gabapentin, provided it is administered under the conditions of use described in the Division's proposed draft labeling, is 'safe for use'

Given the often unrealistic expectations that many of the laity have about the capacity of drug regulatory authorities to guarantee the safety of new

---

[2] Both Dr. McCormick, the primary clinical reviewer, and Dr. Katz, the group leader for Neurological Drug Products, make note of the difficulties experienced in providing numerical counts of seizure activity in studies 945-5 and 945-6, in particular when seizures occurred in so-called flurries (i.e., clusters of seizures that occurred at such closely spaced intervals that their discrete number could not be reliably counted).

Confidential

Pfizer_LAlphs_0075303

drugs, it seems prudent to state explicitly in the record that the Division's conclusion that Neurontin™ is 'safe for use' is not a warrant that the use of Neurontin is without risk. Rather the conclusion reflects a judgment by the review team that the risks attributed [3] to the use of Neurontin™ are reasonably acceptable in light of the benefits that the use of Neurontin™ is expected to provide when it is administered under the conditions of use recommended in its approved product labeling.

Moreover, the validity of the review team's conclusion turns, in part, on assumptions about evidence that cannot be evaluated by objective means. In particular, while the probable cause of common adverse events reported in the controlled trial clinical experience can ordinarily be evaluated using quantitative methods, events that occur during open, uncontrolled use cannot. In the absence of a suitable control to serve as a basis for comparison, there is simply no objective means to discover whether observed events are spontaneous, manifestations of the illness being treated, or an untoward effect of the drug.

An important example of the problem is the interpretation given to the 28 deaths reported among approximately 2100 patients treated with gabapentin through March 1993, the cutoff date for the count of fatalities used in the sponsor's 3rd safety update. There is no way to know with any degree of certainty, absent a reliable estimate of the incidence of death expected in a population of epileptic patients like those admitted to study with gabapentin, whether or not these deaths are in some manner caused and/or contributed to by gabapentin.

The review team took the following approach. Deaths were classified as to whether they could reasonably be attributed to a cause other than drug treatment. The review team concluded [4] that 21 deaths could be so

---

[3] at the time the judgment is offered

[4] Dr. McCormick reviewed reports of each death individually, classifying each death as to whether it could be explained. By her reckoning, a patient dying following a seizure is not considered to have suffered a drug related death. A note of caution is in order, however, There is no absolute means to exclude the possibility that drug contributed to a death classified as being explained by other factors. A patient might have suffered a seizure because of drug treatment or might

Confidential

explained; 7, however, were classified as sudden unexplained deaths (SUDs). It was recognized that these SUDs, occurring at an estimated incidence [5] of approximately 0.0025 deaths per patient year of exposure, might or might not be caused by gabapentin. Without knowledge of the incidence of SUD in a population similar to the one studied, however, there was, once again, no certain means to resolve the question.

The review team, despite this uncertainty, concluded that these unexplained deaths are most reasonably explained by factors other than treatment with gabapentin. This judgment is defensible, but, obviously, is far from infallible. The review team based its conclusion on several considerations. First, experts in epilepsy with whom the matter was discussed accepted the incidence (0.0025 deaths/patient year) as within the range expected in a population of chronic, treatment resistant, epileptic patients. The literature provides some support for this view, recording rates as high as 0.005 per patient year among patients (treatment status unknown) with refractory epilepsy. The review team gave greatest weight, however, to the fact that the incidence of SUD among patients who participated in the antiepileptic drug development program for Lamictal, a program carried out more or less contemporaneously with the one for Neurontin, was nearly identical (i.e., ____ patient year vs. ____ patient year for Neurontin). The degree of reassurance provided by this comparison, however, depends upon the validity of the assumption that Lamictal does not itself increase the risk of SUD.

Another question about Neurontin's safety in use, one raised by an in-vivo lifetime carcinogenicity study in rats, involves gabapentin's potential to cause tumors. This issue was at one point considered serious enough to justify suspension of clinical testing. However, upon further

---

have aspirated because of some adverse effect of the drug on some ordinarily operative protective mechanism (e.g., gag reflex) that acts to prevent aspiration.

[5] The clinical experience, measured in terms of patient years of exposure, from which these 7 cases arose is not yet available. Accordingly, for comparative purposes, the estimate of SUD associated with gabapentin is based on 5 deaths arising from a 'sea' of experience for which patient time is known (i.e., from the 9/15/92 cutoff in the 2nd Safety update).

Confidential

Pfizer_LAlphs_0075305

consideration of the findings and at the advice of the PCNS AC, the signal has now been largely discounted, the findings in rats being accepted as having no reliable predictive value vis a vis human tumorigenic risk.

Although the review team has concluded that the incidence of SUDs and the findings of the rat carcinogenicity study are not a barrier to the approval of Neurontin™, they also believe that it would be improper to fail to disclose these findings in product labeling. Accordingly, the Warnings section of the draft labeling crafted by the Division includes statements about both gabapentin's rate of SUD and its 'tumorigenic potential.'

The firm may well have concerns about these proposed statements, i n particular, their placement in the Warnings section, but there is really no other location in labeling that will serve as well. In any case, I believe the text we have developed is fair and militates against causing undue alarm among either patients or prescribers.

The remaining adverse clinical phenomena associated with the use of gabapentin seem relatively unremarkable for an antiepileptic drug product.

**Conclusions and Recommendations:**

NDA 20-235 is approvable under the conditions of use recommended in the draft labeling attached to the approvable action letter. The approvable action letter should be issued.

Paul Leber, M.D.
12/13/93

Pfizer_LAlphs_0075306

cc NDA 20-235
    HFD-100: Temple
    HFD-120:
        Katz
        McCormick
        Fitizgerald
        Blum
        Chamberlin
    HFD-713
        Nevius
        Taneja

Confidential

Pfizer_LAlphs_0075307

FROM:     Deputy Director
          Division of Neuropharmacological Drug Products/HFD-120

TO:       Director
          Office of Drug Evaluation I/HFD-100

SUBJECT:  Revised Package for Neurontin

We are sending back the Neurontin package with several revisions that you have not yet seen.

In the Approvable Letter, we have included a request for the sponsor to perform additional pre-clinical studies to further elucidate the mechanism of tumor formation in the pancreas of male rats. This was a recommendation made by our Advisory Committee at the 10/24/91 meeting at which the NDA was discussed.

In the labeling, we have made the changes you have asked for, and requested the firm to propose and support several others that you requested. You should be aware of a few other changes, however.

1) In the section on SUDs, we are aware that additional data are available, and we have asked them to supply the new exposure data. This will necessitate changes in the number of patients exposed (we discovered that the original numbers included patients with diseases other than epilepsy), and the calculations of the total exposure in patient-years and incidence density of SUD.

2) In several places in which animal data are described, you had asked us to revise the multiples of the human dose at which various findings occurred in animals based on the "recommended" (your word) maximum human dose of 2400 mg/day (we had used 3600 mg/day as the basis for these calculations). In reality, although our original draft had included a statement in the D and A Section about the experience at 2400 mg/day, it was not a recommended dose. What we have done is add a statement in the

Pfizer_LAlphs_0075308

# EXHIBIT C

Parke-Davis

# RECORD OF FDA CONTACT

| Date: | December 22, 1993 | Signature Name: | Janeth L. Turner |
|---|---|---|---|

| Product Identification: (Add CI No. if known) | Gabapentin CI-945 |
|---|---|

| NDA No: | 20-235 | IND No: | |
|---|---|---|---|

| Initiated by: | x P-D    _ FDA | Made: | _ In Person    x Phone |
|---|---|---|---|

**FDA Contact Person:**

| Name: | Paul Leber Russel Katz Nancy Chamberlain | Title: | Division Director Supervisory Medical Officer CSO |
|---|---|---|---|

| Division: | Neuropharmacology | Phone No. | 1-301-443-3830 |
|---|---|---|---|

**Purpose of Contact (Subject):**

Discuss proposed changes in the package insert provided with the December 21 approvable letter

**Summary:**

WLC_JTurner_000813

This conference call was requested by Parke Davis to discuss our response to FDA revisions to the package insert as included with their December 21 Approvable letter; specifically the inclusion of status epilepticus and sudden unexpected death and the deletion of statements about dose response.

FDA Attendees: Dr. Paul Leber, Dr. Russel Katz, Ms. Nancy Chamberlain
PD Attendees: Dr. Mark Pierce, Ms. Maira Rieger, Ms. Linda LaMoreaux, Dr. Bill Merino, Dr. Irwin Martin, Ms. Jan Turner.

WARNINGS section: Status epilepticus
PD agreed that the statement about the possibility of status epilepticus with abrupt withdrawal of gabapentin should be included, but were concerned with statements about the incidence of status epilepticus with gabapentin treatment. Drs. Leber and Katz agreed that while there were no differences in the incidence of status in the controlled studies, these studies were of short duration. FDA felt that their statements about status epilepticus must be included. They must warn of the possibility of occurrence. We may not claim that a lack of information on status means that status does not occur.

However, as part of full disclosure they have also included statements suggesting that they do not know what the numbers as cited in the PI really mean. In response to our concern that our competition might use this against us, Dr. Leber reminded us that Dr. Temple was now head of advertising, and if our competition were to suggest that gabapentin were any different than competitive products, FDA would pursue this violation immediately. PD suggested also including the results of the controlled studies. While Dr. Leber suggested that this was acceptable, we should submit it as part of our comments on the labeling and they will review it in more detail.

WARNINGS section: Sudden unexpected death
PD expressed concern about the inclusion of sudden unexpected death in the WARNINGS section. We felt that the statements were not very helpful to prescribing physicians and suggested that they be deleted from the package insert. While FDA agreed that the statements didn't really say anything, they again felt that it was their duty to warn of the possibility of occurrence. FDA's long term goal is to make the package insert for all new antiepileptics cover the same areas. While it is true that this was not covered in the previously approved new antiepileptic, they are thinking of exploring putting this in as more data becomes available. PD felt that referring to this as "SUD" gave it more of an emphasis as a specific adverse event than it deserved. FDA agreed with deleting "SUD" and only referring to "sudden unexpected death".

Clinical Pharmacology: Clinical Studies
We suggested changing the figure on responder rate to include all results for 1200 mg in one column. FDA thought that this was acceptable. Dr. Leber did not agree, however, with specific statements that gabapentin showed dose response. PD reminded them of our May 19, 1987 meeting with Drs. Leber and Katz where FDA minutes indicated that we had specifically discussed that these studies were designed to be combined to evaluate dose response. Dr. Leber said that FDA had learned a lot about dose response since 1987, and that he did not feel we could state that we had demonstrated dose response. While Dr. Leber conceded that the results certainly suggested dose response, the results were not robust enough to support definitive statements. He agreed that a statement concerning a dose response trend could be made in the labeling. He also stated that dose response might be best demonstrated in monotherapy studies, where the results were not confounded by other antiepileptics.

Confidential

Dr. Leber asked if we felt that we were close to an agreement on the labeling and PD said that they thought we were. We were preparing our response to FDA's package insert. The results of the above discussions would be incorporated into our response. We were also including other FDA requested information and making a few revisions which we felt added to the clarity of the package insert. We would have this completed on December 23 and would send it to FDA so that it would be there when they returned to work on December 27.

**Abstract:**

FDA has indicated that the statements about status epilepticus and sudden death must be included in the package insert. If we wish, we could submit suggested revisions to FDA's wording. FDA did not feel that we had demonstrated adequate dose response to include such statements in our package insert, but said that we could add a statement concerning a dose response trend.

| Action: | PC: | |
|---|---|---|
| J. Turner: submit suggested revisions to the package insert (done 12/23/93) | W. Merino | I. Martin |
| | A. Blumberg | S. Dombey |
| | R. Martin | M. Pierce |
| | M. Rieger | L. LaMoreaux |
| | J. Howard | B. Boselli |
| | A. Rubenstein | |
| | CBI, AA | B. McManus (distribution) |
| | RA, AA: CI-945 File, NDA 20-235 | |

Confidential

# EXHIBIT D

Parke-Davis

# RECORD OF FDA CONTACT

| Date: | December 13, 1993 | Signature Name: | Janeth L. Turner |
|---|---|---|---|

| Product Identification: (Add CI No. if known) | Gabapentin CI-945 | | |
|---|---|---|---|

| NDA No: | 20-235 | IND No: | |
|---|---|---|---|

| Initiated by: | _ P-D    x FDA | Made: | _ In Person    x Phone |
|---|---|---|---|

**FDA Contact Person:**

| Name: | Nancy Chamberlain | Title: | CSO |
|---|---|---|---|
| Division: | Neuropharmacology | Phone No. | 1-301-443-3830 |

**Purpose of Contact (Subject):**

Approvable package has been sent to Dr. Temple

**Summary:**

The approvable package was taken to Dr. Temple's office late Monday, December 13. Nancy does not know where this package is in the que for Dr. Temple's review.

To help speed up the approval process, FDA has requested that we send them the safety update now. We must also include the listing of deaths and serious adverse events beyond the cut off date for this safety update. I explained that the serious adverse events included all hospitalizations, therefore the listing would include some adverse events that might not customarily be viewed as serious for this patient population.

While FDA has been notified by FAX that we have passed the inspection in Puerto Rico, they must receive the paper copy of this notification before we can receive the approval letter. However, at this time there are no anticipated delays based on this.

The Environmental Assessment has been approved and signed off.

Confidential

The package insert was revised by Neuropharmacology before it went to Dr. Temple. The changes which Nancy discussed are:

Table 1 Responder Rate reflects the 3 rather than 5 placebo controlled studies.

Table 2 includes convulsions. The Psychobiologic Function body system has been included with the Nervous System. The Hemic and Lymphatic body system has been changed to Hematologic and Lymphatic body system.

The listing of Other Adverse Events includes the Rare events, combines Psychobiologic Function with Nervous System, and changes Hemic to Hematologic.

Table 3 (Dosing Chart) has been changed to text. Table 4 is now Table 3.

We may wish to make these changes now, so that if Dr. Temple approves them, we can provide FDA with a typed version immediately.

The launch material was received by their Document Control room yesterday and is being processed now. They received 3 volumes, and ask if we plan to submit additional material. After checking with J. Parker and L. Ulrich, I informed Nancy that we did not plan to submit any additional advertising material prior to the end of the year.

If after we receive the approvable letter with the FDA revised labeling, we wish to make additional changes, they must be approved by Drs. McCormick, Katz, and Leber. Our request for these changes should include justification for why we wish to make the changes. If we are unable to reach an agreement with them, then they may send our recommended changes to Dr. Temple for resolution.

It is not necessary to provide an actual copy of the final printed package insert prior to receipt of the approval letter. FDA's approval letter will request that we submit the final printed package insert exactly as per the labeling which they have attached to their approval letter.

**Abstract:**

The approvable package has gone to Dr. Temple. FDA requests that we send them the 4th Safety Update at this time. The Environmental Assessment has been approved. Minor changes have been made in the Tables in the package insert.

| Action: | PC: | |
|---|---|---|
| J. Turner:  Send FDA the 4th Safety Update with an updated listing of serious adverse events. | W. Merino | I. Martin |
| | A. Blumberg | S. Dombey |
| | S. Brennan | A. Brankiewicz |
| | R. Martin | M. Dong |
| | M. Pierce | D. Leiderman |
| | V. Trudeau | E. Koto |
| | J. Parker | L. Ulrich |
| | CBI, AA | B. McManus (distribution) |
| | RA, AA: CI-945 File, NDA 20-235 | |

Confidential

# EXHIBIT E

Parke-Davis

# RECORD OF FDA CONTACT

| | | | |
|---|---|---|---|
| **Date:** | December 30, 1993 | **Signature Name:** | Janeth L. Turner |

| **Product Identification:** (Add CI No. if known) | Gabapentin CI-945 | | |
|---|---|---|---|

| **NDA No:** | 20-235 | **IND No:** | |
|---|---|---|---|

| **Initiated by:** | _ P-D    x FDA | **Made:** | _ In Person    x Phone |
|---|---|---|---|

**FDA Contact Person:**

| **Name:** | Robbin Nighswander Lois Freed Russel Katz Paul Leber | **Title:** | CSO Reviewing Pharmacologist Supervisory Medical Officer Division Director |
|---|---|---|---|
| **Division:** | Neuropharmacology | **Phone No.** | 1-301-443-3830 |

**Purpose of Contact (Subject):**

Final clarifications on the preclinical pharmacology and toxicology portions of the package insert

**Summary:**

FDA Attendees:  Paul Leber, Russel Katz, Lois Freed, Robbin Nighswander
PD Attendees:  Charlie Taylor, Jan Turner, Mark Pierce (in part)

After FAXing us the attached package insert pages with FDA proposed wording, a conference call was held to discuss the changes.  The agreed upon changes are noted on the attached and discussed below.

page 11:  Clinical Pharmacology; Clinical Trials
    The revised statement about gender analysis is acceptable.  FDA has used the numbers from the histogram in the ISE (pg 66).

page 18 - 19:  Precautions; Pregnancy
    On page 19, the statement about two rabbit teratology studies is incorrect, only one was performed.  The second report on this study is a critical assessment of the teratology results in rats and rabbits.  Any differences in the results between the two reports originate from differences in evaluation criteria.  FDA definitely wants this section to remain, thus the beginning of this paragraph will be changed to read "In one teratology study in rabbits......"

Confidential

page 2-3: Clinical Pharmacology; Mechanism of Action

On page 3, the first paragraph contained FDA proposed wording which left the impression that gabapentin might be an NMDA antagonist. Several different contradictory reports of the in vitro action of gabapentin on NMDA responses from various test systems were briefly discussed (RR 770-0252 from Cambridge Neuroscience Research Unit on electrophysiological responses to NMDA in cultured rat striatal neurons, RR 740-02862 from Ann Arbor on electrophysiological responses to NMDA in rat neocortical wedges, RR 740-02852 from Ann Arbor on cell death in cultured neocortical neurons mediated by NMDA receptor activation, RR 740-02866 from Ann Arbor on receptor binding profile, and the recently-published paper by D. Rock et al., 1993, *Epilepsy Research* 16:89-98). It was decided that no firm conclusion can be made about effects of gabapentin on NMDA responses, particularly since gabapentin did not alter NMDA responses in RR 740-02862 while 7-chlorokynurenic acid (a known glycine-site NMDA antagonist) did.

Accordingly, Dr. Leber and Dr. Katz proposed and P-D agreed that the wording of the package insert be altered from the previous text proposed by FDA (which detailed results from several pharmacological systems) to the following: "Several test systems ordinarily used to assess activity at NMDA receptors have been examined. Results are contradictory. Accordingly, no general statement about the effect, if any, of gabapentin at the NMDA receptor can be made."

Dr. Leber and Dr. Katz said that they were pleased with the package insert as it now existed and were obtaining the final sign-off within their division prior to sending the approval package to Dr. Temple this afternoon. They are not certain of the status of the statements from compliance confirming successful completion of the manufacturing inspections. They have turned this problem over to Dr. Temple. At this time there continues to be nothing which we can do to help expedite this.

**Abstract:**

WLC_JTurner_000827

Proposed changes in the preclinical pharmacology and toxicology portions of the package insert were discussed. The FDA wording on teratology was revised to indicate that one rabbit teratology study was conducted. The FDA wording on NMDA receptors was revised to indicate that the results are contradictory and no general statements about gabapentin's effect can be made. The FDA statement on efficacy and gender is acceptable. An agreement has now been reached on all portions of the package insert. The approval package will be sent to Dr. Temple this afternoon. They are uncertain of the status of the written verification that we have passed manufacturing inspections. This is being handled by Dr. Temple's office.

| Action: | PC: | |
|---|---|---|
| None | W. Merino | I. Martin |
| | W. Wierenga | F. de la Iglesia |
| | J. Herman | R. Walker |
| | M. Pierce | C. Taylor |
| | CBI, AA | B. McManus (distribution) |
| | RA, AA: CI-945 File, NDA 20-235 | |

Confidential

# EXHIBIT F

Parke-Davis

# RECORD OF FDA CONTACT

| | | |
|---|---|---|
| **Date:** October 6, 1993 | **Signature Name:** | Janeth L. Turner |

| | |
|---|---|
| **Product Identification:** (Add CI No. if known) | Gabapentin CI-945 |

| | | |
|---|---|---|
| **NDA No:** 20-235 | **IND No:** | 28,454 |

| | | |
|---|---|---|
| **Initiated by:** x P-D ___ FDA | **Made:** | ___ In Person    x Phone |

**FDA Contact Person:**

| | | |
|---|---|---|
| **Name:** | Nancy Chamberlain | **Title:** CSO |
| **Division:** | Neuropharmacology | **Phone No.** 1-301-443-3830 |

**Purpose of Contact (Subject):**

Status of FDA review

**Summary:**

Dr. Katz and Dr. Leber have decided to send the approvable package to Dr. Temple prior to negotiating labeling with us. The original version of the felbamate labeling had needed extensive revision, and attempting to work with the company to revise it prior to sending it to Dr. Temple had resulted in much confusion. They felt that the most recent revisions which we had submitted on September 3 were very good and developing an FDA version based on this, sending it to Dr. Temple as part of the approvable package, and then sending it to us to begin negotitaions would be the most expeditious method.

They have not yet sent the approvable package to Dr. Temple. There is nothing which FDA needs from us prior to sending the letter. The delay appears to be fine-tuning the labeling. They are reviewing every word, and since it has been so long since the Advisory Committee Meeting, sometimes they need to go back and refresh their memory as to what occurred.

Nancy must have Dr. Katz' permission to tell me when it is sent to Dr. Temple. Nancy will follow up with Dr. Katz to determine if she can so inform me. Unless we instruct FDA otherwise, the approvable letter will be addressed to me. Nancy will call me when it is signed and send me a FAX of the letter once it is date stamped.

While there is nothing which FDA needs from us prior to sending the approvable letter, Nancy stated that the request for additional information in the Environmental Assessment, which had been relayed to Al Brankiewicz earlier today, should be responded to as soon as possible. While this should not delay the approvable letter, sometimes it helps to move things along at FDA to know that none of this sort of thing is outstanding.

**Abstract:**

Package Insert negotiations will begin when we receive the approvable letter. The approvable package has not yet been sent to Dr. Temple.

| Action: | PC: |
|---|---|
| None | W. Merino      I. Martin<br>S. Brennan      A. Brankiewicz<br>CBI, AA      B. McManus (distribution)<br>RA, AA: CI-945 File, NDA 20-235 |

WLC_JTurner_000718

# EXHIBIT G

234

1       Janeth Turner
2    A    -- just read the whole paragraph --
3    Q    Sure.
4    A    -- just to be sure.
5    Q    Sure.
6    A    Let me just see.
7         Clarification for safety update,
8 okay. So that would have gone -- and define
9 information. Okay.
10        Okay. Just keep in mind that where
11 this breaks apart here, that should have been
12 another paragraph. So that is not part of -- it
13 should have been the next paragraph down.
14    Q    My question is just restricted to --
15    A    Yes.
16    Q    -- the comment about Dr. McCormick
17 adding it up.
18    A    She is adding it all up by hand. She
19 was taking every adverse event, and looking at it
20 very closely and carefully, and adding them all up
21 by hand.
22         And I wasn't sure whether she was
23 doing this for deaths, tumors, serious adverse
24 events or what. And Nancy Chamberlain was going
25 to get back to me on that.

235

1       Janeth Turner
2       MR. BARNES: Are we done with this
3 one?
4       MR. FINKELSTEIN: Yes.
5       (Turner Exhibit Number 28 marked for
6    identification as of this date.)
7    Q    I am handing over to you what's
8 marked as Turner 28, October 11, 2007,
9 WLC_JTurner_000685.
10        Is this also another record of
11 contact that you created?
12    A    Yes, it is.
13    Q    Dated October 15th, 1992?
14    A    Yes, it is.
15    Q    And I would just ask you to turn to
16 the second page.
17        It says Dr. McCormick is extremely
18 anxious to have these responses as soon as
19 possible. She is under a very tight time frame to
20 meet with the December 15 advisory committee date
21 and needs to have information to complete her
22 safety review.
23        Do you recall it being an anxious
24 time for Dr. McCormick in --
25    A    No.

236

1       Janeth Turner
2    Q    Okay.
3    A    She -- basically, this was October.
4 She had two months. She just wanted to be certain
5 that we realized her deadline, that she needed to
6 have it to put together for her review.
7    Q    The next paragraph goes on to state
8 that I asked about the status of the other
9 reviews. Nancy was uncertain and indicated that
10 they would probably need to "take the heat" if
11 they had the advisory committee meeting without
12 completing all of their reviews and this resulted
13 in a delayed approval awaiting the completion of
14 the unfinished reviews.
15        Do you recall that conversation with
16 Ms. Chamberlain?
17    A    No.
18    Q    Okay. During this time, do you have
19 any independent memory of feeling any additional
20 pressure to get information to the FDA quickly?
21    A    No. We, I put pressure on my
22 colleagues at Parke Davis to get answers back to
23 the FDA quickly all the time, because the quicker
24 we got the answers back, the easier it would be
25 for her to do her review.

237

1       Janeth Turner
2       As you now, if you ask a question and
3 you get the answer back two months later, it takes
4 you a while to go back and even try to figure out
5 what, indeed, it was you were asking. Your review
6 goes much better, you can review it in much more
7 thorough context if you do it in a timely manner.
8    Q    Earlier you testified that you went
9 to the Advisory Committee meeting in Washington?
10    A    The one for Neurontin?
11    Q    The one for Neurontin.
12    A    Yes.
13    Q    Was there one meeting or more than
14 one meeting?
15       MR. BARNES: That she attended.
16    Q    That you are aware of having been
17 held.
18    A    On Neurontin?
19    Q    On Neurontin.
20    A    On Neurontin, we had a closed
21 Advisory Committee Meeting before we submitted the
22 NDA, I do believe. And at the time of this
23 Advisory Committee Meeting that was open, another
24 antiepileptic drug was also reviewed, either the
25 day before, I think it was, but I don't really

238

Janeth Turner

1 recall the drug now.

3    Q    I am asking about Neurontin only, not
4 other drugs.

5       I just want to know, as far as open
6 Advisory Committee meetings, are you aware of one
7 or more than one?

8    A    I am aware of only one.

9    Q    And do you recall that having
10 occurred on December 15th, 1992?

11    A    I recall it occurring in 1992. If
12 you say December 15th, you must have it in writing
13 in front of you to quote the date.

14    Q    Prior to that meeting -- well, strike
15 that.

16       Is this Advisory Committee meeting a
17 significant event for a pharmaceutical company?

18    A    Yes.

19    Q    Why?

20    A    Because it's when FDA presents the
21 information they will have on the drug, and to get
22 the Advisory Committee to indicate whether they
23 should approve the drug. As you have read many
24 times, if you read the pink sheet or anything
25 else, the agency doesn't have to abide by the

239

Janeth Turner

2 recommendation of an Advisory Committee meeting,
3 but they generally try to.

4    Q    An Advisory Committee meeting
5 consists of -- who is on the committee.

6    A    There are representatives from,
7 usually, academia. They are not people that have
8 anything to go with the pharmaceutical industry,
9 and they are not people that have anything to do
10 with FDA. They are experts in the area of
11 neuropharmacology, and they put their advisory
12 committee together as their experts to review data
13 that they are presenting to them.

14    Q    Do you know if the members of the
15 Neuropharmacology Advisory Committee meeting that
16 sat and reviewed the Neurontin New Drug
17 Application filed or signed conflict of interest
18 statements?

19    A    I don't recall if they did it back
20 then or not, no.

21    Q    Do you know what a conflict of
22 interest statement is?

23    A    In general, it's something that says
24 I don't have any -- specifically, no. I mean, I
25 can say in general. It just says that -- I'm

240

Janeth Turner

2 trying to think of how to define it -- that you
3 are, you don't have anything going on with you,
4 personally, that would interfere with what you are
5 doing sitting on the Advisory Committee.

6    Q    Do you know who was on the Advisory
7 Committee that sat on December 15th, 1992, related
8 to Neurontin?

9    A    I certainly did at the time, but I
10 don't recall it now.

11    Q    Prior to attending that meeting on
12 December 15th, 1992, did you have any direct
13 communication with any of the members of the
14 committee?

15    A    No.

16    Q    Did you know who the members of the
17 committee were prior to attending the meeting?

18    A    It's publicly available information,
19 so, yes. Yes.

20    Q    That's information you would have
21 obtained prior to going?

22    A    Yes. I know who the members of the
23 Advisory Committee were from years back. I had a
24 listing of the members of every Advisory Committee
25 that the FDA had.

241

Janeth Turner

2    Q    Do you know if any of the members on
3 the Advisory Committee had any relationships with
4 Warner Lambert or Parke Davis at the time?

5    A    No.

6    Q    Do you know what the members of the
7 Advisory Committee reviewed prior to the actual
8 meeting?

9    A    They reviewed a reviewing document
10 prepared by FDA.

11    Q    And did they review anything else, if
12 you know?

13    A    That's the only thing I know of.

14    Q    And did you review that reviewing
15 document prior to attending that meeting?

16    A    Did I review it? No.

17    Q    Did you have a copy of it prior to
18 attending the meeting?

19    A    Yes.

20    Q    And how did you obtain a copy of it?

21    A    Mr. David Banks, who was the -- I
22 don't know what they called him, the FDA secretary
23 or something of the Advisory Committee meeting,
24 asked me if I would like a copy, and it was the
25 day before the Advisory Committee meeting. I

61 (Pages 238 to 241)

242

Janeth Turner

1
2 think it was the day, maybe two days. I don't
3 recall now. And he gave it to me and I made
4 copies for our people. And I do recall I made the
5 copies while we were in Washington, D.C., maybe
6 took them to Kinko's or something to get copies
7 made, and gave them to everyone to look at.
8        But we didn't have time to really
9 review it, because we were too busy preparing our
10 own presentations. And back then we didn't have
11 PowerPoints, so we had people there that were
12 redoing slides up until the last minute, et
13 cetera.
14        And Mr. David Banks called me later
15 in the day and told me that Dr. Leber was not --
16 that we were not supposed to have that, that we
17 were not supposed to get that. We agreed that it
18 was too late, because I had made copies and given
19 them to other people. I guess because Dr. Leber
20 likes to feel that that is information that would
21 only go to the Advisory Committee members.
22   Q    Do you remember the document?
23   A    No.
24   Q    How big it was?
25   A    It was big enough that I didn't have

243

Janeth Turner

1
2 it done at the hotel and took it to Kinko's, so
3 maybe like that big.
4   Q    Inch, inch, half inch?
5   A    Too big to do at the hotel. So --
6   Q    Do you know what --
7   A    It was big --
8        MR. BARNES: You responded.
9   Q    Do you know what was contained? When
10 I say contained, let me define that. Not the
11 words that were on there, if there were different
12 sections to it or what it was?
13   A    I don't recall.
14   Q    Do you know who the author of it was?
15   A    Probably Dr. Cynthia McCormick, and
16 Dr. Glena Fitzgerald, because those are the two
17 people that I recall presenting at the Advisory
18 Committee meeting.
19   Q    Did you work, or your team at Warner
20 Lambert Parke Davis, work with the FDA on what the
21 presentation should be to the Advisory Committee?
22        MR. BARNES: By whom?
23   Q    I don't -- did you work with any
24 member of the FDA? I want to know if --
25   A    Who is "the team"? Do you mean the

244

Janeth Turner

1
2 drug development team? You said "members of my
3 team."
4        MR. BARNES: I think the question is
5 unclear.
6        Why don't you reask the question?
7   Q    Sure. I'm just trying to get a feel
8 for, having never attended an Advisory Committee
9 meeting --
10   A    You should. They are very
11 interesting.
12   Q    What I am asking is in preparation
13 for it, did you work with the FDA? And when I say
14 you, you or anybody from Warner Lambert Parke
15 Davis, in what the presentation to the committee
16 would be, or is that done in isolation where FDA
17 does their work and you do your work, or is it
18 collaborative?
19   A    If it was done with FDA, it would
20 have been done through me.
21        And, no, we did not work with the
22 agency to their presentation. We did not. Other
23 than the information that I got from David Banks
24 the day before the Advisory Committee meeting, we
25 did not know what FDA was planning to do, that I

245

Janeth Turner

1
2 can recall.
3        I mean, I don't recall them
4 discussing what issues they were going to raise or
5 anything else.
6        It was -- we spent a lot of time
7 trying to guess, that's why we put together those
8 NDA request response things, book one and two, so
9 that we would have all the information that we
10 sent back.
11   Q    So, what's marked as exhibit -- I
12 think it was seven and eight, these big books?
13   A    Un-huh.
14   Q    Are those, did you bring that with
15 you to the Advisory Committee?
16   A    Not to the actual meeting. We
17 brought it with us for our pre-meetings that we
18 had in Washington to prepare for it.
19   Q    Did Parke Davis --
20   A    That's why it was prepared.
21   Q    Did Parke Davis or Warner Lambert
22 make a presentation to the committee?
23   A    No.
24   Q    Was that pre-arranged that Warner
25 Lambert or Parke Davis would not make a

62 (Pages 242 to 245)

246

Janeth Turner

2 presentation to the committee?

3    A    Yes. The -- if I recall, and this is

4 a, in just a very general recollection, that we

5 were told that we could respond to questions but

6 that we could not make a presentation.

7    Q    You were instructed not to make a

8 presentation, is that what you are saying?

9    A    I think so. We could not make a

10 presentation without Dr. Leber's permission

11 because it's Dr. Leber's meeting.

12    Q    Do you know if Dr. Katz was there?

13    A    I'm sure he would have been, but I

14 don't recall him there. I don't recall it.

15    Q    Do you know approximately how many

16 members from Warner Lambert Parke Davis attended

17 the meeting?

18    A    Yeah. I can almost picture us

19 sitting, maybe 15, that is really an

20 approximation. I am just trying to picture.

21        As you are looking at the room, we

22 were all over on this side and I think we were in

23 three rows.

24    Q    Was there anything specific about the

25 meeting, itself, that occurred that you recall?

247

Janeth Turner

2    A    Anything specific? I recall that it

3 went very smoothly, and that the Advisory

4 Committee did not raise any specific concerns, and

5 that it was a unanimous recommendation for the

6 approval. And sometimes Advisory Committee

7 meetings can go way into the evening and this one

8 finished in a reasonable time frame. I am

9 thinking it finished in four or five hours.

10    Q    Do you know if any record was made of

11 that committee meeting?

12    A    Probably, because I think FDA makes

13 records of all Advisory Committee meetings.

14 That's another thing that you can get, obtain

15 under FOI.

16    Q    Did you obtain the committee meeting

17 record through FOI?

18    A    Probably, but I don't recall.

19    Q    The document that you described that

20 was provided to you, and I appreciate you are not

21 sure whether it was the day of, the day before,

22 the one that was too thick to photocopy at your

23 office --

24    A    Yes. At the hotel.

25    Q    Correct, I'm sorry.

248

Janeth Turner

2    A    I got it in Washington. I did not

3 get it while I was back at the office.

4    Q    Just so we are talking about the same

5 document.

6    A    Sure.

7    Q    Did you discuss that with any members

8 of Warner Lambert Parke Davis prior to the

9 committee meeting?

10    A    Not that I recall. As I mentioned

11 before, we got it basically the day before or two

12 days before the Advisory Committee meeting. We

13 were, we had already prepared lists of questions

14 that we thought FDA might ask us and had slides

15 put up, put together in groups so that if we had a

16 specific question, we had identified who at the

17 company would respond to it, and what slides they

18 would use to respond to it.

19        So, we went through all of that. We

20 didn't have time to spend a lot of time on the FDA

21 document. We were basically already moving down

22 our own course.

23    Q    Did you ever subsequently read that

24 FDA document?

25    A    I'm sure I did, but remember I was

249

Janeth Turner

2 there, I -- probably.

3    Q    When did your discussions with FDA

4 regarding the committee meeting start, if you

5 know? When I say when, you can say like a day

6 before or a month before, just a general time

7 frame.

8    A    I recall that I --

9    Q    If you recall.

10    A    I told you already that I don't

11 recall specifically any real discussions about the

12 Advisory Committee meeting, the logistics of it.

13        They must have told me something,

14 because I had an idea, you know, I knew where it

15 was going to be and et cetera, but I do not recall

16 those meetings.

17        I can tell by what you are picking up

18 there that you must have a Record of FDA Contact

19 where I outlined it. And that will help me a lot.

20    Q    Yeah. And I will provide it to you.

21    A    Remember, again, you are asking me to

22 go back more than 15 years.

23        MR. BARNES: You have responded.

24    Q    Part of this process is to know what

25 you recall independently. I'm happy to provide it

63 (Pages 246 to 249)

250

Janeth Turner

1
2 to you. It certainly isn't a quiz.
3    A    Good, thank you.
4    Q    You know, if is something memorial
5 that stands out, I just want to hear about it. If
6 it isn't, it isn't.
7         (Turner Exhibit Number 29 marked for
8    identification as of this date.)
9    Q    So, this is marked, I'm sorry, what
10 number is on the top there?
11   A    Number 29.
12        MR. BARNES: Is that correct? Yes.
13   Q    And is this a FDA Record of Contact
14 dated October 20th, 1992?
15   A    Yes, it is.
16   Q    And was it initiated by FDA?
17   A    Yes, it was.
18   Q    In a phone call to you?
19   A    Yes.
20   Q    If I am reading this correctly, on
21 the phone was a Russell Katz?
22   A    Yes.
23   Q    And a Merril Mille?
24   A    Merril Mille.  It's a he.
25   Q    Oh, Merril Mille?

251

Janeth Turner

1
2    A    Nancy Chamberlain must have been
3 gone.  So, he was functioning as the CSO.
4         you Recall, I told you that FDA, as
5 matter of practice, would not call the sponsor
6 without a CSO there.
7    Q    And the purpose of the contact was
8 what?
9    A    To discuss the December 15th, 1992
10 Advisory Committee meeting to review the
11 gabapentin NDA.
12   Q    And did Dr. Katz begin the discussion
13 by indicating that the FDA planned a standard
14 meeting?
15   A    That's what it says in this Record of
16 FDA Contact.
17   Q    The FDA will present first and their
18 presentation should last an hour.  Is that what he
19 said?
20   A    Yes.  That's what it says in this
21 Record of FDA Contact.
22   Q    If you take a look at the second
23 page, please.
24   A    Just a minute.
25        MR. BARNES: Take your time and

252

Janeth Turner

1
2    review the document.
3    A    Where specifically do you have your
4 question and then I will know where to focus my
5 reading?  Do you want me to just read it?
6    Q    No.  I want to focus you on the
7 second page, the last paragraph.
8    A    Oh, then you have to wait a minute.
9    Q    You can read the entire page if that
10 helps.
11   A    Okay.  I'm ready.
12   Q    I do see on the bottom of page two
13 where it states, the second to the last sentence,
14 when asked what these would be, he indicated they
15 would probably be very standard questions, i.e.
16 did the data support efficacy?  Did the data
17 support safety?  And was there an acceptable
18 benefit risk ratio.
19        Dr. Katz indicates that our document
20 for the advisory committee will be necessity --
21   A    Will of necessity?
22   Q    -- will, of necessity, probably be
23 redundant since we will not know ahead of time
24 what FDA is sending out.
25        Do you see that?

253

Janeth Turner

1
2    A    Yes.
3    Q    Where he talks about, there is an
4 acceptable benefit risk ratio, was Dr. Katz
5 referencing the acceptable benefit risk ratio in
6 patients with epilepsy?
7    A    That would be my assumption.
8    Q    And is the acceptable benefit risk
9 ratio in patients with epilepsy different than an
10 acceptable benefit risk ratio with people with
11 pain.
12        MR. BARNES: Objection.  If you know.
13   A    Not that I know of.
14   Q    It's the same?
15   A    No, I don't know that.  I don't know
16 that.
17   Q    Okay.  I just want to know if you
18 know.
19   A    Let me point out that in this same
20 document that you just gave me --
21   Q    You will have an opportunity, your
22 attorney will have an opportunity to ask you
23 questions.
24   A    Oh, okay.
25        MR. BARNES: Let me know later and I

64 (Pages 250 to 253)

254

Janeth Turner

1
2 can ask you about it later if it's
3 important.
4    A    All right. So that's all on that
5 one?
6    Q    That's all.
7    A    Okay.
8    Q    I'm sorry. On next paragraph, or at
9 the third page, it says, "since FDA's document
10 will be very detailed, we do not need to put a
11 great deal of detail into our document. Our
12 document should be a presentation of our case by
13 briefly summarizing the main points.
14    "FDA would like to receive our
15 document by the middle of November, so that they
16 can get the entire package to the Advisory
17 Committee at least two to three weeks prior to the
18 meeting. Since FDA's document will not be
19 available until it is ready to be sent to the
20 Advisory Committee, they will send it to us at the
21 same time as it is sent to the committee. Thus,
22 we should have a copy of the document by the end
23 of November or the 1st of December."
24    Do you see that?
25    A    Um-hum.

255

Janeth Turner

1
2    Q    Yes?
3    A    Yes.
4    Q    Does that refresh your recollection
5 as to when you may have received the document from
6 the FDA?
7    A    We received it in Washington D.C., a
8 day or two before the Advisory Committee meeting.
9 I don't recall receiving anything while I was in
10 Ann Arbor, and I was in Ann Arbor, the end of
11 November, 1st of December.
12    (Interruption in proceedings.)
13    MR. BARNES: Keep your voice up.
14    It's getting late and you are getting tire.
15    Q    The Advisory Committee meeting was on
16 December 15th, 1992?
17    A    Yes.
18    Q    And your main office was in Ann Arbor
19 at that time; right?
20    A    Yes.
21    Q    So, it required you, I take it, to
22 fly to Washington?
23    A    Yes.
24    Q    Do you know when you flew to
25 Washington prior to meeting?

256

Janeth Turner

1
2    A    I don't recall.
3    Q    Do you know how much time you spent
4 in Washington prior to the meeting?
5    A    If I knew when I flew there, I would
6 know how long I spent in Washington prior to the
7 meeting.
8    Q    Did you spend more a week in
9 Washington?
10    A    No. No.
11    Q    Did you spend more than three days in
12 Washington?
13    A    I don't recall. I didn't spent a
14 weekend there.
15    Q    You did spend a weekend?
16    A    I didn't. What date is December
17 15th? Is it a Monday, Tuesday, Wednesday,
18 Thursday, Friday? I don't recall, but it was not
19 a week.
20    MR. BARNES: You don't recall, that's
21    fine.
22    (Turner Exhibit Number 30 marked for
23    identification as of this date.)
24 BY MR. FINKELSTEIN:
25    Q    I would like to hand to you what's

257

Janeth Turner

1
2 marked as Turner 30.
3    MR. BARNES: Thank you.
4    A    Okay. At least we are going
5 chronologically.
6    Q    Do you recognize Turner 30 to be a
7 Record of Contact?
8    A    Yes.
9    Q    And do you see in the upper right
10 hand portion your name?
11    A    Yes.
12    Q    Do you see your -- a signature above
13 it?
14    A    Yes.
15    Q    Do you recognize that to be your
16 signature?
17    A    Yes.
18    Q    And we have looked at several record
19 of contacts without a signature?
20    A    Right.
21    Q    Is there any reason why this one is
22 signed and other ones may not have been signed?
23    A    Well, the one thing we hadn't
24 perfected with our computer process was you could
25 generate this on a word processor, but I had to

65 (Pages 254 to 257)

# EXHIBIT H

SF Gate    Return to regular view

Print This Article

# FDA tells companies to review safety data on epilepsy drugs
## Agency responds to charge that Neurontin raises suicide risk among all patients who take it

- Bernadette Tansey, Chronicle Staff Writer
Thursday, April 21, 2005

Click to View    Click to View

The Food and Drug Administration has asked the makers of all epilepsy drugs to re-examine their clinical trial data in response to claims that one of the medicines, Pfizer's Neurontin, boosts the risk of suicide.

Word of the FDA action came in response to a petition filed last May by personal injury attorney Andrew Finkelstein, who has been urging the agency to warn doctors that the commonly prescribed drug Neurontin can lead to severe depression and suicide.

Neurontin, with $2.7 billion in sales last year, has been prescribed to more than 10 million people since it was put on the market in 1994. Although it was formally approved for patients suffering from epilepsy and later for pain related to a skin disorder, it has since been prescribed for illnesses ranging from psychiatric disorders to back pain.

Finkelstein bases his claims on the FDA's own records as well as 318 suicides and about 2,000 suicide attempts among families he represents.

The FDA's inquiry comes as it tries to repair its image as the guardian of drug safety after a series of controversies over its response to warnings about serious side effects linked to several other blockbuster medicines.

The probe of epilepsy drugs is similar to the FDA's examination last year of a class of widely prescribed antidepressants, including Paxil. That inquiry eventually resulted in strong warnings that antidepressants could increase suicide risks. But the case damaged the FDA's credibility when families and their lawyers accused the agency of suppressing a report by one of its own experts.

The agency came under fire again for its handling of drug safety concerns when Merck & Co. suddenly withdrew its widely sold painkiller Vioxx in September due to cardiovascular risks that experts had been urging the FDA to act on for years.

The FDA, in a letter Finkelstein shared with The Chronicle, said it is now requesting that Pfizer and 13 other manufacturers reanalyze the results of their controlled clinical trials for signs of suicidal thoughts and actions. According to the National Society for Epilepsy, there are at least 23 prescription drugs that are approved for the treatment of epilepsy. But an FDA spokeswoman said she could not supply the names of the other drugs subject to the inquiry.

Pfizer received the letter last month and said it will comply with the FDA request but denied that Neurontin increases the risk of suicide.

"Pfizer maintains an extensive program for tracking and reporting medical events associated with the use of Neurontin, as we do for all our medicines," said company spokesman Bryant Haskins. "The comprehensive data -- including clinical trial results -- that we've submitted to the FDA over the past decade refute any suggestion that Neurontin causes depression, suicidal thoughts or suicidal behavior."

Finkelstein sees the FDA's response to his petition as part of a pattern of agency delays when serious potential drug risks arise. The attorney wants the FDA to include a prominent suicide warning on Neurontin's label. He also thinks it should ask an independent expert to analyze the drugmakers' data and demand disclosure of any trials the manufacturers haven't published.

In addition, he wants the agency to alert doctors that it is now investigating the possible suicide risk, to encourage heightened monitoring of Neurontin patients.

"I think they're taking modest steps when they're confronted with what could be a very significant issue," Finkelstein said.

A top FDA official said the agency had been looking into possible suicide links with "mood stabilizers" like Neurontin for some time before Finkelstein's petition was filed, based on lessons the agency learned from the antidepressants case.

"We'd like to get an answer to the question: Can it make your mood worse?" said Dr. Robert Temple, associate director for medical policy at the FDA's Center for Drug Evaluation and Research.

But Temple said the FDA will not issue advisories to doctors during the six months that the manufacturers have to review their data, unless the agency finds significant signs of a suicide danger. "So far, we have not," he said.

Neurontin has already been the focus of one of the recent drug company scrapes that have trained a harsh light on the industry. Neurontin is FDA- approved only for epilepsy and pain associated with a skin disorder, but it is widely prescribed for back pain, psychiatric illnesses and other conditions --

that is, so-called off-label uses not approved (but not forbidden) by the

## FDA.

That huge off-label market resulted from illegal promotional tactics such as treating doctors to luxury trips, government prosecutors charged last year. They won a $430 million settlement and guilty pleas from the drug's former manufacturer, now a unit of Pfizer, which is the world's largest drug firm.

In spite of that, as well as findings by expert pharmacologists that Neurontin has little value in most off-label uses, the drug's revenues rose in 2004. So the FDA's finding on Finkelstein's safety claims could affect millions of Americans.

Finkelstein is the managing partner of a multibranch law firm based in Newburgh, a small city beside the Hudson River north of New York City. He filed his petition to the FDA after he found that 25 people taking Neurontin had committed suicide between 1998 and mid-2003, according to MedWatch, an FDA program that receives voluntary alerts from doctors and others. This "passive surveillance" system is estimated to capture about a tenth of actual side- effect cases.

Finkelstein said his law firm then did what he thinks the FDA should be doing: It actively searched for other cases. When the firm placed ads asking if patients displayed suicidal behavior on Neurontin, it received thousands of calls. Finkelstein said he weeded out people who had ever attempted suicide before taking the drug.

Among the more than 2,300 families he represents are the Richardsons of San Jose. Lori Richardson's husband, Timothy, committed suicide in 2003 at the age of 34, leaving behind a young son and daughter. Richardson said her husband's personality changed after he started taking Neurontin in 2000 for pain from spinal fusion surgery that repaired a work injury. The tall commercial plumbing division manager -- introverted and a meticulous planner -- became agitated, aggressive and impulsive, she said.

"He knew it," Richardson said. "He would tell the doctors, 'I'm not like I always have been.' "

Doctors prescribed antidepressants. Timothy Richardson also received the narcotic-based painkiller Vicodin and developed an addiction, his wife said. Financial pressures and caring for the couple's two children were other stresses, she acknowledges. But she suspects Neurontin was a crucial factor in his intentional overdose.

Finkelstein said all the suicide cases he found involved people taking Neurontin for off-label uses, with about 50 percent given it for pain-related problems like migraines or back aches. He said the FDA has not done enough to curb off-label prescribing of Neurontin, particularly for psychiatric illnesses like bipolar disorder, where depression is already a factor. The lack of a suicide warning on the drug's label is an indictment of the drug regulatory system, he said.

"It's structured to benefit sales to pharmaceutical companies rather than to provide necessary information to prescribing physicians and their patients, " said Finkelstein.

Pfizer says Finkelstein's petition is a ploy to bolster his clients' lawsuits against the company. Haskins, the company spokesman, said the data don't support Finkelstein's demand for a prominent "black box" warning on Neurontin's label -- the FDA's most stringent enforcement action short of banning a drug.

"It's simply irresponsible to promote the false impression that a causal link exists between the use of Neurontin and suicide," said Haskins.

Although suicide is not listed in the warnings section of Neurontin's FDA label, other parts of the 29-page document note that symptoms like depression, anxiety, psychosis, and a category dubbed "suicidal" have cropped up among adults and adolescents in various clinical trials, and may be related to Neurontin.

The "suicidal" symptom was listed as infrequent, occurring in 1 out of 100 to 1 out of 1,000 patients. At that rate, for every million patients on the drug, 1,000 to 10,000 people might experience the side effect. However, some of the studies were not placebo-controlled, so any causal effect of the drug would be hard to quantify.

Finkelstein wants the label information updated to include completed suicides. He sees further proof that Neurontin boosts suicide risks in an FDA document turned over to him in litigation against Pfizer.

In 1992, an FDA official who reviewed the marketing application submitted for Neurontin by Parke-Davis, its original manufacturer, noted that a small fraction of clinical trial participants with epilepsy became seriously depressed while on the drug, and two attempted suicide.

"Depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts," wrote the FDA reviewer, Dr. Cynthia McCormick. That might limit the drug's usefulness, she concluded.

But McCormick, now a private consultant, said she had deferred to the judgment of much more experienced FDA reviewers who also evaluated Neurontin in 1992. The data did not prove that the drug was responsible for the suicide attempts, she now says.

"This is not an unexpected event in the population it was approved for," said McCormick, who did a brief consulting assignment for Pfizer about a year ago.

Finkelstein said he had offered the FDA information from his clients' case reports early last year and was flabbergasted when he was told to hire a pharmacology expert to provide the FDA with a risk analysis. That's the FDA's job, Finkelstein said, not a lawyer's.

The FDA official who responded to Finkelstein's petition in an April 12 letter said he had asked the attorney to hire an expert because the agency would have had difficulty evaluating whether Neurontin played a role in the suicides.

Other factors, like the various different medications taken by the patients, and the fact that many suffered from psychiatric illnesses that carry inherent suicide risks, would complicate the analysis, wrote Dr. Russell Katz, director of the FDA's Division of Neuropharmacological Drug Products.

Assessing drugs for suicide risks is not easy even in controlled clinical trials, Temple said. Suicides are rare enough that even a large trial might not show a significant difference between those on the drug and on a placebo.

Many of the trials the manufacturers will be reviewing were not designed to assess suicide risk, Temple said. But the FDA might find hints of a risk. In a trial of one epilepsy drug, he said, 1.1 percent of participants committed suicide versus 0.4 percent on placebo. If those hints add up, the FDA might take action, Temple said.

If Neurontin appears to boost suicide risks, the agency might advise doctors to restrict its off-label use, Temple said. But he said it's too early to predict the outcome of the epilepsy

drug probe.

"I don't think we have evidence there really is an increase in suicidality in any of these drugs," he said, "but it's the right question to ask."

News on Neurontin

FDA action: The request follows a petition by an attorney who says the drug Neurontin played a role in 318 suicides and about 2,000 suicide attempts among his clients' families.

Impact: Although Neurontin was approved to treat epilepsy and pain related to a skin disorder, it is also prescribed for ailments not approved by the FDA. More than 10 million people have been prescribed Neurontin.

What's next: The 14 manufacturers have six months to reanalyze the results of their clinical trials. The FDA will then review the data and decide what action to take.

**The headline on this story has been corrected since it appeared in print editions.**

*E-mail Bernadette Tansey at btansey@sfchronicle.com.*

Page A - 1
URL: http://sfgate.com/cgi-bin/article.cgi?file=/c/a/2005/04/21/MNGDTCCJ3N1.DTL

©2006 San Francisco Chronicle