# EXHIBIT  A

Qualifications Pertinent to Neurontin Litigation

My training and experience provides me with a composite of skills and capabilities that enable me to evaluate the issues and claims across the multiple disciplines and areas of expertise this matter requires for resolution, and enables me to provide an assessment that appropriately integrates and balances inputs from all the expert areas and scientific disciplines relevant to this case.

I am physician who is current in board certification in Internal Medicine and Rheumatology. I graduated from medical school as a member of the Alpha Omega Alpha Medical Honor Society and successfully completed postgraduate training and board certification in Internal Medicine and Rheumatology. Subsequently I accumulated over 16 years of clinical practice where I treated a spectrum of diseases and conditions in patients typical for an internal medicine practice and specialized in rheumatic disorders, most of which are chronic, incurable, progressive, and associated with both psychological and physical distress. Working with patients who had chronic debilitating and dire diseases for which treatments were sometimes very limited led me to appreciate the toll it took on patients and the need to explore any and all available therapeutic approaches especially when conventional treatments failed. The vast majority of my patients experienced significant depression as a result of their condition at least multiple times during the course of their condition. Some of these conditions I managed had epilepsy as part of their clinical spectrum of manifestations.

The majority of the therapeutic agents available to treat rheumatic diseases in the early part of my clinical practice experience were drugs borrowed from off label or "unapproved" uses. The robust sharing of empirical observations in off label uses among colleagues often enabled the "discovery" of a therapeutic "diamond in the rough" that often became a standard of care. Preliminary observations of the benefits of off label unapproved uses of various medications often led to investigational new drug applications and subsequent company sponsored randomized control trials that led to approval. Examples of drugs used in off label or unapproved uses after recognition of a favorable risk benefit ratio that either became formally approved or became part of the standard of care without approval included cortisone, aspirin, hydroxychloroquine, methotrexate, azathioprine, gold salts, and cyclophosphamide. I also frequently employed antidepressant medications, antiepileptic agents, including Neurontin, and sedatives with success in chronic pain management in my patients. These uses would be considered off label but nonetheless of therapeutic value with a favorable.

Similar stories of progression from off label use to formal approval and incorporation into the standard of care can be told of drugs used in other medical disciplines. Examples include aspirin in the management and secondary prevention of stroke and myocardial infarction and use of beta blockers in the management of heart failure.

As a rule I found that information already existing from a drugs approved uses in addition to safety information derived from its approved use was sufficient to understand and manage risk in the unapproved or off label use populations. Many of these new uses for old drugs would not have come to fruition without a scientific dialogue between practitioners and pharmaceutical companies. Off label practices by clinicians, nor interest demonstrated in those uses by therapeutics developers, are not equivalent to a lack of concern for safety, are not inconsistent with responsible safety and pharmacovigilance due diligence and do not automatically mean unsafe use or practice. Recognizing the

1

need and value for off label use in therapeutics innovation the FDA is drafting guidelines to better guide communication among practitioners, scientists and therapeutics development companies about off label uses.

My clinical experience was built over a 16-18 year period and included both private practice and academic medicine. The clinical acumen and experience I built over this period enables me to evaluate and understand the details and complexity of individual case reports of adverse drug events and provide accurate assessment of causality in the context of the clinical background in each cases.
I received Masters of Health Science degree in Public Health from Johns Hopkins University. That academic training included and required the development of analytical skills in epidemiology and biostatistics. That training was further supplemented by additional post graduate training in epidemiology and biostatistics and statistical computing required as part of National Library of Medicine Fellowship Program in Medical Informatics. Subsequent to this training I received an academic appointment in the Department of Biomedical Informatics at Mayo Clinic where I received an NIH R01 (scientific methods) research grant as principle investigator (endorsement of scientific method and rigor relevant to issues presented here).

I designed information systems and directed data management activities for the purpose of creating clinical data warehouses for research and knowledge discovery. I helped develop machineable logic based medical terminologies that enabled concept based search and retrieval of data from electronic records. I acquired skills in data management and data analytics and in doing so practiced and applied epidemiological methods and techniques. I had an appointment as Assistant Professor in the Department of Health Sciences at Mayo Clinic.

Subsequent to this experience I held positions as Medical Director for Global Safety and Director for Information Management and Strategy in the Global Regulatory and Safety Department at Amgen Inc. I directed and was directly involved in the safety surveillance activities for a therapeutic area involving multiple biologic therapeutic agents and my activities extended across pre and post approval periods for all products. I had hands on involvement in the pharmacovigilance activities for several products and interacted with global regulatory agencies and global labeling groups for purposes of safety knowledge discovery and appropriate safety conveyance. This experience enabled me to understand the drug development process and the strengths and limitations of the various data sources for purpose of drawing inferences regarding safety issues. I developed, implemented, and executed signal detection and analysis methodologies, pharmacovigilance plans and risk management plans. I identified safety issues and articulated them to patients, providers, regulators, business partners, and internal company partners and leadership. I have studied and performed drug safety issue analyses and have studied and applied the scientific principles, analytic methods, information and data management techniques that serve as a foundation of those analyses.

I have not testified in the previous 4 years as an expert at trial or by deposition.

My fee for review and preparation is $325 per hour and my fee for testimony at trial or deposition is $500 per hour. My CV and the list of materials considered in forming my opinions are attached.

I have been asked in this matter to address the following issues.

- Attest to the scientific principles and methods for acquiring and evaluating evidence on which scientific assessments and conclusions relating to causation in drug safety matters are based

- Evaluate and opine on whether there is reliable scientific evidence to establish an association between gabapentin and suicide or suicidal attempt
- Evaluate whether the clinical evidence over time supported a warning, precaution or contraindication in the Neurontin package insert on the basis of an increased risk of suicide or suicide attempt.
- Evaluate and opine on standards of safety and pharmacovigilance management practices undertaken by Pfizer
- Evaluate and opine on the relevance, cogency and scientific validity of assertions made by plaintiffs that gabapentin causes suicide or suicide attempt

Conclusions:

The following is a summary of my opinions, all of which are stated in my report to a reasonable degree of scientific and medical certainty. In answering the questions summarized above, I have applied generally accepted pharmacoepidemiologic principles. These are the same principles that I apply in the course of professional activities, including my work in drug safety, publishing peer-reviewed papers, and advising public health agencies such as FDA as to the risks associated with various medicines. I reserve the right to review, consider and rely upon additional materials as they become available, including reports, testimony and materials considered by other designated experts in this litigation.

1. The scientifically reliable and accepted method to determine whether a drug is associated with an adverse event is to analyze controlled clinical and epidemiologic data. The absence of evidence of a statistically significant increased risk of suicide behavior in these studies supports the conclusion that there is no scientifically reliable evidence of causation.

2. Multiple well designed rigorous randomized control clinical trials fail to support the assertion that Neurontin is associated with an increased risk of suicide behavior. Additional rigorous pharmacoepidemiologic studies guided and endorsed by the FDA, and strengthened with additional data from open label clinical studies of Neurontin and post marketing data, continue to fail to support the assertion that Neurontin is associated with, much less causes, suicide behavior.

3. Based on the absence of evidence from multiple analyses of controlled, open label clinical trials and any other existing pharmacoepidemiologic data, there is not now and has never been a risk based reason for an elevated warning, risk communication, or other formal risk conveyance based on data derived from aggregate observations of suicide related adverse events in humans . Aggregate epidemiologic analyses present the highest level of evidence in this matter and none of the multiple analyses performed now or in the past has ever supported the plaintiff's assertions. All considerations and decisions by Pfizer and the FDA who held, and now still holds, full control and authority over risk conveyance decisions in medicinal product information, regarding the need to convey risk information regarding suicidal behavior in the Neurontin package insert were correct, appropriate, and consistent with all scientific based analyses performed according scientific and regulatory standards to this date. The Neurontin package insert remains a correct and accurate portrayal of all risk related observations relative to Neurontin use in the medical community.

4. Pfizer properly analyzed the data – including controlled and open label studies and post market safety data – to look for an association or a signal regarding Neurontin and suicide behavior. These data have consistently failed to support an association or raise a signal regarding suicide.

5. The results of an analysis by Sheila Weiss Smith, Ph.D., a pharmacoepidemiologist, using spontaneous adverse event reporting data from FDA FOI-AERS database and which applies the same methodology acknowledged to have validity in detecting pharmacovigilance "signals" in the Blume report , and purportedly correctly applied in the Blume analysis, provides yet more evidence for the absence of any so called "signal " relative to adverse event reporting of suicidal behavior in patients treated with Neurontin. Dr. Weiss Smith's analysis confirms and validates the findings from analyses based on randomized controlled clinical trial data, and indicates the entire basis for bringing this action is unsupported. The plaintiffs' experts have failed to demonstrate scientific evidence of any validity or merit. I adopt Dr. Weiss' opinion, including her analysis of the information in the FOI-AERS database, concerning the absence of a suicide signal.

6. Evidence provided by the plaintiff's expert, Dr. Blume, is insufficient to support the assertion for a causal role of Neurontin in that it fails to adhere to the scientific methods and principles set forth by regulatory bodies, scientific experts and scientific bodies to perform science based pharmacovigilance. Plaintiffs methods misapply quantitative concepts in the formulation of evidence from existing data, deviate from established practices in pharmacoepidemiology and pharmacovigilance, and thus lack rigor and substance. As such the evidence put forth by the plaintiffs' experts provides evidence that is insufficient and fails to support their causation theory.

In summary, my conclusions are that Neurontin (gabapentin) administration carries no independent or excess risk of suicide, suicidality, suicide gesture, suicide attempt, nor does it adversely affect suicide risk in medical conditions in which it is therapeutically used. I reach this conclusion based on aggregate analyses of data and reports presented and the scientific validity of the methods applied therein, my clinical judgment developed over almost 18 years of clinical training and experience in medicine, and my personal clinical experience using Neurontin (gabapentin) in patients in approved and off label indications. Furthermore I believe that the hypothesis that Neurontin, because of potential therapeutic benefit in any given patient, may be protective against suicide risk is clinically plausible because of the inherent suicide risk inexorably intertwined with the diseases and disorders to which therapeutic use of Neurontin is directed.

## Scientific Methods and Principles Underlying Pharmacovigilance and Pharmacoepidemiology

Epidemiologic evidence is the cornerstone for evaluation of safety and effectiveness of medicinal products. Pharmacoepidemiology is a scientific discipline which consists of consensus methods and principles that extends and applies the science of epidemiology to scientific and regulatory evaluation of the safety and attendant risks that may emerge with use of medicinal products before and after their marketed use. Epidemiologic evidence and pharmacoepidemiologic methods are relevant and necessary for evaluating whether there is any evidence of an association between a medicine and an adverse event. If analysis of these data, using accepted methodology, show a statistically significant increased incidence of the adverse event, it can be concluded that there is an association. This does not establish that the product causes the event. Scientific Reference Manual; U.S. Surgeon General Report 1964. The generally accepted methodology requires further analysis applying factors known as the Bradford Hill

4

criteria to determine whether the association can be considered causal. Scientific Reference Manual. Clinical judgment is also an integral part of this consideration.

The randomized trial, clinical trial, or true experiment, is considered the gold standard and provides the best and strongest approach for examining and providing evidence for a hypothesized relationship of an agent to a disease or heath outcome. The scientific strength of the randomized control trial for ascertaining the risk for an outcome related to drug exposure lies in its ability to provide an unbiased estimate or measure of the effect of drug or exposure independent of other factors by eliminating or minimizing effects from those factors that could be responsible for the observed effect independent of drug exposure status.

Randomized control trials can provide evidence for both the benefit of a drug as well as the risk of adverse events. The efficacy and safety of a therapeutic drug demonstrated in randomized blinded placebo control trials forms the core basis for drug approval and dissemination of drug information by regulatory bodies worldwide. The conduct necessary to maintain the integrity of the randomized control trial in drug testing and development is articulated in a set or practices and guidelines known as "Good Clinical Practices" (ICH Guidelines E6, E2A, E8). "Good Clinical Practices" are incorporated in to federal regulations that govern and regulate drug development and marketing (CFR 21.Part 11). Adherence to these practices insures the ability of the randomized control trial to provide the strongest and best evidence from which to draw inferences about the safety. The absence of statistically verifiable quantitative differences between occurrence of a particular event in patients taking a drug and other patients not taking the drug but equally matched on all other attributes and characteristics speaks strongly for the absence of risk caused by the administered drug.

In this case, in aggregate the controlled as well as open label studies fail to show an association between Neurontin and suicidal thinking and behavior. Because of the inherent scientific strength of controlled clinical trials and the finding , there is no support for the assertion that Neurontin causes suicide. Failure to provide data or findings from epidemiological studies of a similar or stronger scientific caliber makes the assertion that Neurontin causes suicide or suicidal behavior untenable, and under accepted pharmacoepidemiologic principles, creates a high scientific bar to overcome.

## Signals

Spontaneously reported adverse events and anecdotal cases cannot be used to determine whether a drug causes an adverse event. This type of information can only be used to evaluate whether there is a signal; in other words, to raise a hypotheses. It is well known and accepted that all possible adverse events related to use of a medicinal product cannot always be anticipated in the study design of randomized control trials for drug approval because of practical limits to the study design, the existence of small differences in events known to be very common, or in the opposite extreme, events known to be very rare in the population that may not be detected during the course of the clinical trial. Because of this possibility, scientific bodies in cooperation with regulatory authorities (CIOMS, ICH, EMEA) have put forth systems, approaches, and standards for monitoring and detecting potential adverse events occurring in populations that might be related to medication use after product approval as well as methods for scientifically assessing whether such observations are actually related to use of the medication in question.

Monitoring and detection systems supporting pharmacovigilance include the capture and review of individual adverse event reports submitted to company or regulatory spontaneous adverse event reporting databases, and data mining methods applied to collections of data that contain data

5

pertaining to medication use and medical events.  Very sophisticated automated data mining methods are emerging as a means to generate signals or exploratory hypotheses. These techniques are very new, still being evaluated, and not yet considered part of routine pharmacovigilance (Strom 4th Edition, pg 285; FDA Guidance for Industry:  Good Pharmacovigilance Practices and Pharmacoepidmiologic Assessment (March 2005).

Certain monitoring and detection methods can provide "signals" or patterns or presentations of data or information about medication use and medical events that might suggest the possibility of a problematic relationship between use of a medication and a particular adverse medical event (Strom pg 122). There are no universally applicable criteria of when a "signal" exists or emerges. Such criteria and thresholds, although based upon statistical analysis and algorithms, are somewhat arbitrary and depend on the nature of the data or information source, the quality and reliability the data, the amount of data available, the type of medical event of interest, and of course the overlay of clinical judgment.  (Strom BL.  Potential for conflict of interest in the evaluation of suspected adverse drug reactions:  a counterpoint. JAMA, 2004, 292:2643-2626; Hauben et al.  Evaluation of Suspect Adverse Drug Reactions. JAMA, March 16, 2005 - Vol. 293, No. 11, pg. 1324; Strom BL.  Reply to "Evaluation of Suspect Adverse Drug Reactions." JAMA, March 16, 2005 - Vol. 293, No. 11, pg. 1324-1325).

It is widely recognized that the mere identification of a "signal" does not in any way constitute or establish a causal relationship between an adverse event and use of a medication (FDA Guidance for Industry:  Good Pharmacovigilance Practices and Pharmacoepidmiologic Assessment (March 2005) pg 4; Strom pg 122-123, CIOIMS Working Group V pg 30), nor does it supersede or negate the findings of randomized control clinical trials (acknowledged as the strongest form of evidence regarding the effects of drugs because it provides the opportunity to overcome bias in comparisons and estimates), and other epidemiological studies. (Ref Manual Scientific Evidence pg 338, Strom, pg 17 pg. 311). The existence of bias and the multiple potential influences from uncontrolled factors in the occurrence of a given medical event in a patient taking a medication represents a significant challenge for uncovering new information about a medication outside the observations of a randomized control trial (Strom 4th edition Chapter 16). The identification of a "signal" outside of a controlled setting itself provides no evidence for a causal relationship of a medical event and requires further analysis for confirmation (FDA Guidance for Industry:  Good Pharmacovigilance Practices and Pharmacoepidmiologic Assessment (March 2005) pg 4; Strom, Pharmacoepidemiology, 4th Ed. (2006), 122-123, CIOIMS Working Group V pg 30)

A set of scientific approaches, principles, methods practices have been articulated in expert sources (FDA Guidance for Industry:  Good Pharmacovigilance Practices and Pharmacoepidmiologic Assessment (March 2005); Strom, Pharmacoepidemiology, 4th Ed. (2006), and CIOMS V) to support the ongoing evaluations marketed drug use requires after it is approved.  Collectively these references specify the scientific principles and methods that make up the scientific discipline that support pharmacovigilance and safety surveillance and are largely encompassed by pharmacoepidemiology. These scientific methods and practices form the foundation for decisions and actions related to drug safety. (Strom, *Pharmacoepidemiology*, 4th Ed. (2006)).  It is important to understand when reviewing the issues in this matter that Neurontin has been either in development or in wide-spread clinical use for two decades and that the analytical techniques and the standard practices have evolved over time.  In fact, our understanding of various pharmacovigilance practices and techniques have changed significantly since 2000.

The collection and review of single or individual case reports from the spontaneous adverse event reporting system involving a specific event of interest is generally deemed inadequate by itself as a

means to establish a causal relationship between a reported event and use of a medicinal therapeutic product for many reasons, among which include inadequate information, bias in reporting or perception of an adverse event and the existence of confounding factors that could explain the event occurrence.

1. While often heralded as a means to infer causality between a drug and an event occurring in temporal relationship to administration of the drug, the de-challenge/re-challenge phenomenon is hardly absolute and depends on several factors and assumptions that are often overlooked. These factors should have logic-based face validity to clinical experts qualified to assess adverse events in a clinical trial and have been cited in other expert sources (Strom, Chapter 8, Pharmacoepidemiology, 4th Ed. (2006), pg. 131).

2. The "event" should be objectively measurable or ascertainable and verifiable in a way that is scientifically reproducible or, at least by a method whose scientific reproducibility in the hands of the assessor has been established. Also the person measuring the temporal relationships must have all information about changes in the patients drug therapy or medical conditions. Examples include cognitive states, changes in mood, and sometimes very precisely measured variables such as blood sugar levels which can fluctuate in relation to a number of factors.

3. The "event" should not already be extant and ongoing ( i.e. not retrospectively ongoing or already existing in the patient or subject prior to the first exposure to the drug), nor should it be part of the spectrum of manifestations which characterize the underlying condition being treated)

4. The "event" should not be explainable or causally related to other factors that are present and potentially influencing the appearance of the event (i.e. confounding factors)

5. The "event" should be time discrete (i.e. clearly delimited by time for its first appearance, disappearance, and reappearance) and not cyclic in its clinical pattern, or spontaneously remissive in its natural behavior or time course.

6. There should be some plausible relationship between the pharmacokinetic properties of the drug and the time of appearance, disappearance, and reappearance of the "event". Hence, the timing of the events appearing, disappearing, and reappearing should be consistent with the absorption, distribution, and elimination of the drug from the body. Events occurring or disappearing well after a drug had been eliminated from the body (e.g. "washed out") could not be considered dechallenge events.

The validity of dechallenge/rechallenge assertions can be significantly compromised when conditions that conflict with the above premises or assumptions exist. Girard, M., "Oral Provocation Limitations," Br. J. Clin. Pharmac. (1987) 23, 73-79. In addition, the importance of clinical judgment in assessing rechallenge events cannot be overlooked.

Review of isolated or collections of spontaneous adverse event reports can only be used to generate hypotheses. If a signal is raised, it must be further addressed by more definitive epidemiologic or pharmacoepidemiologic methods that provide stronger levels of evidence in order to draw conclusions about whether it is a true signal that warrants further evaluation. (Strom 4th edition pg 280-281, 131: CIOMS V pg 4).

When there is sufficient evidence within a "signal" (i.e. the signal is real) to form a reasonable hypothesis about a relationship of particular adverse medical event with administration of a medicinal product then more definitive methodologies must be employed in order to draw conclusions about the

7

relationship sufficient to take action to redefine the safety profile of the product. Methods and guidance for performing these analyses have been articulated in expert sources (Strom, Pharmacoepidemiology, 4th Ed. (2006) at Chapter 14; FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidmiologic Assessment (March 2005). It should be emphasized that the use of these additional methods is not considered part of routine pharmacovigilance or safety surveillance required by regulatory authorities.

Central to many of these methods, and invaluable for putting a definitive signal into context, is the calculation of the incidence rate or frequency with which a particular medical event suspected of being related to administration of a medicinal product is occurring in the product exposed population, which is described as the "hallmark of pharmacoepidemiologic risk assessment" (FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidmiologic Assessment (March 2005), pg 10).  When rates are calculated such that the frequency of all events occurring in the product exposed population can be determined, examination of these rates in the context of background rates from similar populations not exposed to the product allow for comparisons  that may come near (but never equal) to the strength of a prospective randomized control trial.  Incidence rates are one of the basic tools that enable epidemiology to draw science based conclusions and inferences. Rothman, K. J. and Greenland, S. (1998). Modern Epidemiology, 2nd ed. Philadelphia: Lippincott-Raven, p. 29. ). Even when it is not practical to capture every and all medical events occurring in a population treated with a medicinal product, calculation of the rate of isolated spontaneous adverse event reporting (reporting rates) for a given category or type of medical event may be helpful in further understanding (but not establishing) a possible relationship to use of the product.

## The IND/NDA for Neurontin Meets FDA and Good Clinical Practice Standards and Demonstrates the Safety and Efficacy of Neurontin.

The studies performed  during clinical development of gabapentin were designed and conducted consistent with Good Clinical Practices.   The Investigational New Drug Applications were approved without evidence of hesitation or concern by the FDA or other regulatory agencies on the ability of the company  to provide the infrastructure and resources, to conduct the preclinical and clinical development programs according to Good Clinical Practices and ensure the safety of study subjects.

The compilation of reports representing data collected during the clinical trials pertinent to safety indicates that data management and data analyses were performed in a way consistent with good practices for premarket risk assessment. These practices at the time of the Neurontin development program were embodied in several guidance documents established by the International Council of Harmonization and contained in Good Clinical Practices that inform regulatory oversight. (CFR 21 Part 11, ICH E6, E2A, E8)

There were no concerns during preclinical studies identified in the IND applications for clinical testing of Neurontin, nor were there any chemical or drug class characteristics that would point to such.

The size of the safety database was adequate for the indication being studied (i.e. life threatening chronic conditions) and exceeded defined standards in terms of patients exposed and duration of exposure.(The Extent of Population Exposure to Assess Clinical Safety: For Drugs Intended for Long-Term Treatment of Non-Life-Threatening Conditions, International Conference on Harmonisation (ICH)). There were no predevelopment risk related circumstances such as sharing established drug class effects, unusual pharmacokinetic properties, or data indicating risks from animal

8

studies that predicted low frequency, rare or unusual adverse events that were unexpected in the populations studied, or which were not balanced with potential benefit offered to patients with a life threatening disorder which often was intractable and exhausted available therapies. There were no evident reasons for the advisability of controlled long term trials focusing specifically on safety and in fact the FDA in giving preliminary approval to these programs demanded none.

The company used a coding dictionary (COSTART), which was a standard at the time, and showed prescience in quickly recognizing concept granularity issues using the COSTART and modifying it specifically for the purpose of capturing more detailed adverse event data and the meaning of verbatim investigator descriptors. More importantly than the institution of modifications to COSTART was the consistent use of those modifications to insure fidelity in the data across clinical trials.

The company provided complete and exhaustive Integrated Safety Summaries for its new and supplemental drug applications, which included presentations and discussions of individual adverse events and complete and thorough integration and analyses of data across multiple studies.  RR-Reg 720-02957, Integrated Summary of Safety, NDA 20-235 at p. 135 (November 19, 1991); RR-Reg 720-30135, PHN Integrated Summary of Safety, (December 13, 2001).  In addition to the Integrated Summary / Analysis of Safety with relevant adverse event tables, laboratory abnormality tables, and subject baseline data, individual case reports of serious and non serious adverse event reports including narratives and source documents were received and acknowledged by the FDA.

Aggregate, tabular and individual case reports of death, serious adverse events, drop-outs due to adverse events, and discontinued subjects lost to follow up were presented in the Integrated Summaries of Safety and related safety updates.  (Epilepsy ISS; RR-Reg 720-03132, NDA 20-235 (October 29, 1992); RR-Reg 720-03236, NDA 20-235 (May 12, 1993); RR-Reg 720-03315, NDA 20-235 (December 15, 1992)) Event rates in both placebo and treatment groups were provided in order to enable comparison of subject incidence rates of all the above mentioned safety parameters.  These calculations, so critical to causation assessment in a randomized controlled trial, were validated by the FDA review.  Calculations were performed both for all adverse events and for adverse events noted by investigators to be related with any degree of certainty to Neurontin.
Appropriate presentations and considerations of death tabulations were included that incorporated death occurrences during participation in the study after discontinuation and during a period after the termination of the study, which was consistent with the half life of elimination of the test medicine.

Subset analyses were appropriately performed for Migraine and Spasticity Clinical trials and data from these studies was also lumped into the larger safety assessment.  Epilepsy ISS; Cynthia G. McCormick, M.D., FDA Division of Neuropharmacological Drug Products, Combined Medical-Statistical Review at p 77 (May 1993).  This approach ensured the ability to detect important safety issues that may be seen in those subjects studied under a different indication and also incorporates experiences from those studies into the larger safety database generated for the larger epilepsy indication.

All adverse events from all studies considered worthy of medical consideration, regardless of attribution to Neurontin administration by the independent investigator, and with any relationship to the central nervous system, mood or cognitive function occurred at subject incidence frequencies or rates less than one tenth of 1% and constituted the lowest and most infrequent of any type of adverse event observed with the exception of seizures (10%) which could be considered more a manifestation of lack of efficacy in some patients rather than an adverse event that would not have otherwise occurred if Neurontin was not administered.

9

Data tabulations, and summaries derived from all safety data captured during neuropathic pain studies and presented in the PHN Integrated Summary Safety were consistent with or exceeded all standard data tables, data presentations and data considerations promulgated in internationally recognized guidance documents for premarket risk assessment and safety reviews that comprise "Good Clinical Practices". Adverse event rates were low and in most instances were the same or lower than adverse event rates in placebos. When subject incidence rates of certain adverse event types in treatment groups were detected that were higher than those in placebo, those differences were not consistent across the various dosing groups of Neurontin.

Of relevance to matters raised in this litigation is the dissociation of event rate differences for "Depression" between patients receiving placebo and patients receiving Neurontin and event rate differences that exist between patients receiving placebo and patients receiving Neurontin and "Somnolence" and "Dizziness". A consistent practice by Plaintiffs' experts, in their reports and testimony,  was to conflate and aggregate disparate adverse event categories into a bundled category called "Psychobiological Function" (into which adverse events representing depression, dizziness, and somnolence are concatenated). The implied assumption for this bundling of disparate types of events is that there exists a relationship between so called "psychobiological function events" and the occurrence of depression which carries a high risk of suicide. The logic of this bundling is that when one is dizzy or feeling sleepy then they might kill themselves.  Medically qualified clinical judgment and expertise would dismiss this notion on face validity alone.

The safety data findings in the PHN Integrated Safety Summary would support and make plausible the hypothesis that adverse events of cognitive disturbances such as "Somnolence" and "Dizziness" (event rates higher in Neurontin treated groups with chronic PHN neuropathic pain) are not part of a common pathological spectrum with "Depression" (event rates higher in placebo patients with chronic PHN neuropathic pain. These findings also support and make clinically plausible the hypothesis that Neurontin,  by virtue of its therapeutic effect on neuropathic PHN pain and the attendant risk for depression and suicide inexorably intertwined with PHN and other chronic pain conditions, protects against depression (mood disturbance) and any suicidality (self injurious behavior) associated with PHN.

Plaintiffs' experts have included types of adverse events other than suicide and suicide attempt, referred to as "psychobiologic function", to support the theory that Neurontin causes suicide.  There exists no body of scientific evidence, medical observations, or consensus opinion that the types of events characterized as "psychobiologic function" are informative with respect to suicide risk with or without Neurontin administration.  Inclusion of these events obfuscates the precision and accuracy of the analysis and has no medical or scientific basis.  The FDA in requesting a confirmatory analysis did not ask Pfizer to include and lump adverse event data in their attempt to examine questions related to suicide.  These types of adverse neuropsychiatric medical events are known to be part of the clinical spectrum of the conditions for which Neurontin is being used.  Use of these purported surrogate markers is also misplaced.  Not only do these purported surrogates lack the sensitivity and specificity required to predict suicide, and so cannot "substitute" for suicide in the analysis, but these events are consistently reported as higher in placebo than on Neurontin throughout the controlled study safety analyses.  For example, in combined epilepsy and neuropathic pain trials, depression was reported as higher in placebo (1.7%) than Neurontin (1.5%). Hertz, FDA Clinical Review at 77 (May 24, 2002).  The controlled data from the epilepsy trials showed a higher percentage of all "psychobiologic" events on placebo (9.0%) than Neurontin (8.3%).  First Safety Update, 20-235, Table 8 (May 29, 1992).  This is also true for hostility – placebo (0.7%) compared to Neurontin (0.0%) –  and anxiety – placebo (1.3%) compared to

10

Neurontin (0.7%). First Safety Update, Table 9. Others are no different, including psychosis, paranoia, personality disorder, all of which were reported as higher in placebo than on Neurontin.    Appendix B.33, Epilepsy ISS, NDA 20-235 (November 18, 1991).

Dr. Cynthia McCormick, a qualified and experienced medical safety physician, stated in a sworn affidavit that the safety data were sufficient to support approval of Neurontin for epilepsy and post herpetic neuralgia, and that she and other colleagues at the FDA, as the final arbiter of safety advisements in the product labels or package insert, directed to their satisfaction the appropriate language for those advisements with cooperation from Pfizer the company described as "responsive". Affidavit of Cynthia McCormick, M.D. at pp. 8-9 (September 13, 2007).  Her assessments, as well as those of Dr Hertz who evaluated the PHN NDA, reached scientific and medically appropriate conclusions based on thorough and complete safety analyses of Neurontin clinical trials.  Id.; Sharon Hertz, M.D., FDA Division of Anesthetic, Critical Care, and Addiction Drug Products at Table 7.20 (May 24, 2002); Cynthia McCormick, M.D., Director, FDA Division of Anesthetic, Critical Care, and Addiction Drug Products, Division Director Review and Basis for Approval Action (May 22, 2002).  Findings reached by Dr. McCormick were vetted before the Peripheral and Central Nervous System Advisory Committee consisting of independent medical scientists and physicians who evaluated all safety and efficacy issues.  (Transcript of Peripheral and Central Nervous System Drugs Advisory Committee, December 15, 1992)  Their findings paralleled the conclusions of Dr. McCormick on the safety or Neurontin.  (Transcript of Peripheral and Central Nervous System Drugs Advisory Committee, December 15, 1992)

Annual Study Reports and Product Safety Update Reports were submitted on schedule and with required structure and content of safety information.

Post approval Neurontin Experience

In the post approval period up to the filing of the Citizen's Petition there was no published literature that provided scientific evidence or concern for any emerging safety issues regarding Neurontin use in any patient population or that suggested than Neurontin was not accepted by the medical practice community as safe and effective. The company had sought outside independent experts to assist with the evaluation and interpretation of safety data (Trimble, Brown Reports). Those independent expert evaluations concluded that these neuropsychiatric adverse event reports did not reflect the safety profile of gabapentin. Those reports also acknowledged correctly the existence of assorted neuropsychiatric manifestations that occurred as part of the natural history and disease spectrum of disorders for which Neurontin was used as treatment. Support by those experts to this fact validates and establishes the fact that strong biases and confounding (bias or confounding by disease indication, Strom 4th edition pg 267) exists which can influence post-market safety data validity and interpretation.

PSURs in the post approval period were submitted with both structure and content that are required in these documents. These safety update documents were reviewed and accepted with no variations imposed by the regulatory authorities that required them and/or reviewed them. At no time up to the Citizen's Petition did any regulatory body indicate concern regarding suicide or suicide related events such that escalation to labeling change was discussed. Pfizer sought input on the evaluation of neuropsychiatric events from qualified experts who acknowledged that many neuropsychiatric events occur as part of the disease spectrum of disorders for which gabapentin was being used and that there was nothing in case reports reviewed to suggest a pattern related to gabapentin use. (Memo from Tim Paget to Stuart Dombey (May 22, 1995) WLC_CBU_102997 – 98; Report by Dr. Michael Trimble,

"Psychosis with Gabapentin" (May 20, 1995) WLC_CBU_102999 – 3012; Report by Dr. Michael Trimble, "Behavioural Disturbance With Gabapentin" Pfizer_CPacella_0009422 to 39).

Pfizer routinely evaluated the postmarketing adverse event data. For example, in 2002, Pfizer evaluated events from the ARISg/WAERS databases for possible addition to the gabapentin core data sheet. Memo from Christopher Pacella, dated July 30, 2002, Pfizer_CPacella_0029393; Pacella Deposition at 175-208. The review and analysis was performed by medical experts who were members of Pfizer's Gabapentin Product Maintenance and Pharmacovigilance (PMP) Labeling Core Working Group. Chris Pacella Deposition at 177. Any adverse events meeting a reporting threshold greater than or equal to one percent were evaluated. Memo from Christopher Pacella, dated July 30, 2002, Pfizer_CPacella_0029393. The medical experts identified 65 adverse events for review and evaluation to the core data sheet. Memo from Christopher Pacella, dated July 30, 2002, Pfizer_CPacella_0029393. Events involving suicidal behavior and thinking did not meet the one-percent reporting threshold nor did the medical experts believe, based on their clinical judgment, that such events met the other criteria for evaluation. Memo from Christopher Pacella, dated July 30, 2002, Pfizer_CPacella_0029393; Pacella Deposition at 208, exhibits 16 and 17. In other words, the PMP team reached the conclusion that there was no signal regarding events involving suicidal behavior or thinking. My review and analysis of the data presented by Dr. Weiss in her expert report regarding the FDA's AERs database confirms the PMP team's conclusions that in 2002 there was no signal regarding suicide, suicide attempt, or suicidal ideation.

## Responsive Reports and Documents to FDA Inquiries after the Citizens Petition

Subsequent to discussions with attorneys from Finkelstein & Partners in March and April 2004 and the running of nationwide advertisements beginning in 2003, the FDA contacted and requested from Pfizer data and specific analyses to address concerns raised by members from Finkelstein & Partners. Letter from Andrew Finkelstein, Finkelstein & Partners, to FDA (March 21, 2005); Letter from Dr. Russell Katz, Director, FDA Division of Neuropharmacology, to Andrew Finkelstein (April 12, 2005); FDA Contact Report (April 26, 2004) Pfizer_BParsons_0141815. The FDA, consistent with their mission employing scientific based methods to insure the evaluation of safety and effectiveness of medicinal products, assumed the authority and the duty consistent with that mission to define and control the types of data to be employed in confirmatory analyses and methodologies to be employed. Their methodological and data analytic imperatives given to Pfizer are consistent with basic scientific principles of depending on the most reliable data available and the analytic methods providing the most compelling strength for drawing scientific inference.

The conclusions reached by Pfizer's internal pharmacovigilance activities and its submissions to FDA starting in 2004 are further supported by analyses of the FOI-AERS database by Sheila Weiss Smith, Ph.D., an Associate Professor in the Department of Pharmaceutical Health Services Research, School of Pharmacy, with a secondary appointment in the Department of Epidemiology and Preventive Medicine, School of Medicine, University of Maryland, Baltimore, MD. That analysis revealed that there was never any signal relative to an adverse event occurrences of suicidal behavior with Neurontin when based on analyses of data in the FDA AERs Database. The analysis clearly demonstrates a large increase in direct-to-FDA reports in the first quarter of 2005, a notoriety bias induced as evidenced by a sharp temporal alignment with litigation activities. The PRR analysis performed by Dr. Weiss correctly provides an important validation for the sufficient sensitivity of the Pfizer pharmacovigilance activities.

It is important to note that in making these requests for analyses from Pfizer , the FDA never suggested that these requests were being made because of acknowledgement of a previously missed or unknown "signal" or because of failure of Pfizer to perform its duties in post market pharmacovigilance or from any previous misrepresentation of data within regulatory submissions or adverse event case reporting.

Because of duties to the public health, neither the FDA nor Pfizer had the luxury afforded academicians of "sitting on the fence", nor the choice of hiding behind impractical abstract epidemiological theories about what conclusions the data might or might not allow. The FDA as well as Pfizer must make decisions on the public's behalf and must use the best available resources to do so and cannot equivocate when a question about safety is put forth. Being "non informative" on any issues because of theoretical abstractions about the data would make the FDA and the manufacturer derelict in their duties. As such it is presumed the FDA selected the data management and analytic approaches consistent with the need to make a decision using the best available data.  These data have unparalleled scientific evidentiary strength, and relevance in the assessment of whether Neurontin causes suicide, and sets the standard for evidence with which to refute or overcome the conclusions reached by the FDA.

The FDA defined the adverse event codes to be used in the compilation of the data sets for further examination of the questions regarding suicidality and Neurontin use.  FDA Contact Report (April 26, 2004) Pfizer_BParsons_0141815.  Choice of these code sets defined the data set with the most precision for evaluation suicidality and Neurontin use. The FDA did not include coded terms which lacked specificity for suicide risk or whose pathophysiological relationship to suicidality was ambiguous. Data from clinical trials (both randomized and open label) was selected, providing the most strength for drawing scientific inferences and conclusions. Data from post market adverse event databases was also requested as were individual adverse event report listings and reports.

Pfizer submitted reports to FDA following the Finkelstein Law Firm's submission of the Citizen's Petition, on September 9, 2004, November 19, 2004, and June 22, 2006.  Response to FDA: Neurontin (September 9, 2004) Pfizer_MPatel_0039110; Response to FDA Regarding Suicide and Suicide Attempt in Neurontin Clinical Trials – Phase 1 Studies (November 19, 2004) Pfizer_MPatel_0045143; Response to FDA Suicidality Request (June 22, 2006) Pfizer_MEvertsz_0079431. The Pfizer reports were fully compliant with the FDA's request and specifications.

Dr. Parsons' September 2004 analysis employed the calculation of incidence rates (even occurrence rates) and Kaplan Meir as these statistical parameters provide the strongest level of evidence with respect to risk.  The Kaplan Meir approach was consistent with recommendations for analyzing risk with changing denominators (populations exposed) as well as risk that may change over time with increased cumulative exposure as would occur in patients who stayed on Neurontin into open labeled clinical study extensions (Medical Uses of Statistics, 2nd Edition pg 282). This statistical approach was one with which the FDA concurred.

The Parsons November 2004 report employed clinical trials from phase 1 study. Similar statistical measures of risk were calculated (rate of event occurrence as well as description of individual case reports from those studies. Those reports and their conclusion of absence of a detectable risk in phase 1 studies of Neurontin for suicide, suicide attempt and intentional self harm were accepted by the FDA.

Subsequent to these reports, the FDA requested additional data that cast an even wider net than originally requested by the FDA with respect to cases that might be included in the analysis. Response to

this request was presented in a report dated June 22, 2006 ("June 2006 submission"). Response to FDA Suicidality Request (June 22, 2006) Pfizer_MEvertsz_0079431. Using the less stringent data inclusion criteria, risk estimates continued to indicate the absence of excess risk for suicide related to Neurontin use in this study population.

All of these three consecutive reports had their analytic approach and data selection criteria chosen and guided by the FDA. Pfizer was responsive to all additional requests and modifications for the analysis. The conclusions of all the reports received and accepted by the FDA were that there was no evidence to support excess risk related to Neurontin use for suicide related events.

In summary, well-designed rigorous randomized control clinical-trial data fail to support the assertion that Neurontin is causally associated with a risk of suicidality. In addition, additional pharmacoepidemiologic studies guided and endorsed by the FDA and other regulatory agencies fail to support the assertion of a causal relationship of Neurontin administration to suicide risk. To date, there has not been a risk-based reason for a new warning regarding suicide in the Neurontin package insert. The FDA has not requested that the package insert for Neurontin be modified to include a warning, precaution or contraindication related to suicide.

Plaintiff Assertions

I have reviewed reports and affidavits making assertions on behalf of the plaintiffs claim. Specifically the Blume report, and the assertion by plaintiffs that a literature study (Collins JC, McFarland BH. Divalproex, lithium and suicide among Medicaid patients with bipolar disorder. J Affect Disord. 2007 Aug 15) provide evidence from which to conclude that there is a causative relationship between suicide risk or suicide related experiences and gabapentin sufficient to escalate warnings or advisements in product information material (product labels, package inserts)

I reject the basis for plaintiff's expert assertions on scientific grounds and scientific rules of evidence. The rationale for my rejection is summarized below.

The Collins & McFarland Report

The Collins & McFarland report has been cited by several of plaintiffs' experts as a scientific epidemiological study supporting the assertion of a causative relationship of suicide to the therapeutic use of Neurontin in Bipolar Depression Disorders. Assertions that it was the intent of this study to evaluate the excess risk of suicide occurrence related to therapeutic Neurontin administration, or that evidence presented in this literature report supports this assertion are flawed. Testimony by the scientific author of the paper refutes the assertion that evidence for a relationship of Neurontin administration to suicide is presented or evident from data in the paper. Deposition of Bentson McFarland, M.D. at 106, 107-99, 199, 211-212.

The stated purpose of the paper was to evaluate the relative efficacy of three therapies used in the treatment of bipolar using a disease outcome measure of suicide. Suicide is an outcome for bipolar depression much the same way that cardiac arrest is an outcome measure for coronary artery disease. Much a study in cardiology may measure the relative effectiveness of therapies for coronary heart disease based on their ability to prevent cardiac arrest this study evaluates three acknowledged therapies for bipolar depression based on their ability to prevent suicide, a known and feared outcome

14

in bipolar patients. This was a study of relative efficacy of three different therapies for bipolar depression with respect to their ability to prevent suicide outcomes from bipolar depression.

The Collins & McFarland paper cites epidemiological studies that have scientifically established incidence rates of suicide in the bipolar depression population that appear higher than the suicide rates that were calculated from the Collins & McFarland data. Based on the findings in this paper the hypothesis that Neurontin, by virtue of any therapeutic effect it exerts in the treatment of bipolar depression, reduces the risk of suicide in bipolar patients is a clinically and epidemiologically plausible hypothesis. Nothing in the McFarland Collins study supports the theory that Neurontin is associated with or in any way causes suicide or suicide attempt.

The Blume Report

In my opinion the Blume report is scientifically insufficient to support plaintiffs' assertion that Neurontin causes suicide.

Cheryl Blume provides no evidence in her background, training or, work experience that she possesses expertise in matters of pharmacovigilance, pharmacoepidemiology, or medicine that are required to provide the scientific and clinical assessments and evaluations pertinent to this matter.

Lack of sufficient expertise in matters of biostatistics, epidemiology and medicine has been admitted by Cheryl Blume in sworn testimony.

The Blume report  inappropriately attempts to inflate and concatenate  data supposedly representing suicide related adverse events by incorporating data that has no pathogenic or disease specificity for suicide or depression into an arbitrarily lumped category called "Psychobiologic Function".  The term "Psychobiologic Function" does not represent any classification of medical events in any standardized medical vocabulary, or terminology or medical dictionary relative to suicide (National Library of Medicine Online Medical Dictionary, accessed 12/18/2007, Unified Medical Language System Accessed 12/18/2007).  The collection of adverse event types chosen by the Blume report are not precise for analyses exploring suicide risk and confound and obfuscate attempts at scientific assessments of whether a drug is capable of causing suicide.

The Blume report repeatedly uses raw numbers of medical adverse events reported in gabapentin users to identify "trends" and justify "signals" that are false and misleading. Such a practice is directly counter to recommended practices in pharmacovigilance practices and methods contained in the FDA Guidance on Good Pharmacovigilance Practices and Pharmacoepidemiology Strom, 4th edition which the Blume report and the Blume testimony cite.

The Blume report contains tabulations of data that are ambiguously labeled, contain blank cells, and values that are not verifiable. Hence it is presumed that the data on which Blume makes assertions is corrupt and invalid.

The Blume report asserts the existence of well defined "Dechallenge and Rechallenge" adverse events that establish a causal relationship of Neurontin administration to suicide.  Cheryl Blume admits in testimony that she does not possess medical or psychiatric expertise to evaluate the content of individual case reports.  Deposition of Cheryl Blume at pp. 225-229 (November 12, 2007).  The alleged

positive "Dechallenge and Rechallenge" adverse events the Blume report identifies do not meet criteria that establish them as recognized "Dechallenge and Rechallenge" reliable evidence from which to infer causation. (Strom 4th edition pages 18, 131, 278-279; Girard M. Oral Provocation: Limitations. *Seminars in Dermatology*, Vol. 8, No. 3 (September), 1989; Kramer MS, Algorithm for the operational assessment of adverse drug reactions. JAMA, Vol. 242 No. 7, 623-632 (1979)).

The Blume report claims understanding and knowledge of the application of Proportional Reporting Ratio in pharmacoepidemiology and pharmacovigilance "signal" detection. Graphical representations as well as data tabulations asserted to be based on Proportional Reporting Ratio based methods when in fact they are not, suggest the author of the Blume report did not perform quality audit of data tabulations and calculations and/or does not understand the application of this method in pharmacoepidemiology. Dr. Blume admits that she did not verify or validate the analyses that were conducted for her report, nor can she determine the error rate. Deposition of Blume at pp. 68, 87-88, 102-103.

The use of Proportional Reporting Ratios for pharmacoepidemiologic analyses in spontaneous adverse event reporting databases for the purpose of drawing scientific conclusions or inferences conflicts with a report by plaintiffs' expert Dr. Sander Greenland and prior testimony of Dr. Blume herself. Dr Greenland in his report disputes the reliability of analyses using spontaneous adverse event reports and the Proportional Reporting Ratio methodology. Report of Dr. Sander Greenland at pp. 12-13; Blume Deposition at pp. 101-121.

The Blume report attempts to use Proportional Reporting Ratio methodology to validate a "signal" in a way which conflicts with expert references, that the Blume report cites, and which state that Proportional Reporting Ratios are used to identify signals and do not provide a valid method for evaluating or confirming the meaning of "signal".

The Blume report asserts to have identified a "signal" which by definition suggests a hypothesis of a relationship of suicide related events to Neurontin administration. The Blume report never describes quantitatively what that "signal" is. The Blume report never undertakes the pharmacoepidemiologic analyses that are required by the expert references cited in the Blume report. These references state further pharmacoepidemiologic study is required to further evaluate whether a "signal" represents a true risk.

Detailed Review of the Blume Report

Qualifications

The qualifications cited in Cheryl Blume's report dated October 22, 2007 (the Blume report) support neither the reliability nor relevance of her expertise to matters germane to the issues in this case. The core questions, issues, and examinations minimally require expertise and qualifications in data management, epidemiology, the methods and practice of pharmacovigilance, and medical knowledge, in addition to knowledge about drug development.

Qualifying experiences cited in the Blume report include numerous executive positions exemplified by:

16

- An executive position as Vice President of Scientific Affairs for Mylan Laboratories, Inc
- An executive position as Chief Operations Officer for Somerset Pharmaceuticals, Inc

As stated in the Blume report these experiences involved supervision and direction, with no mention of actual intellectual immersion or demonstration of the actual application of knowledge relevant to this matter.

Positions in pharmaceutical industry bearing the title of Vice President for Scientific Affairs typically involve direction and supervision of scientists performing basic laboratory ("bench") based science and or directing and supervising the interactions with scientists or laboratory "bench" research activities external to the company. The title of this position as stated would not suggest any relevant or reliable experience or knowledge relevant to the methods or practice of pharmacovigilance, epidemiology, aggregate data analysis for purpose of drawing inferences and conclusions of medical significance, or medical knowledge with which to evaluate the content, accuracy, completeness or significance of individual adverse event case reports.

Similarly positions in pharmaceutical industry bearing the title of Chief Operations Officer typically involve direction and supervision of operating infrastructure, resources, and operating procedures presumably across all drug development programs with no actual participation in or interface with actual program specific issues specific to a drug program or the application of specific knowledge relevant to drug safety issues. The title of this position as stated would not suggest any relevant or reliable experience or knowledge relevant to the scientific methods or practice of pharmacovigilance, epidemiology, aggregate data analysis for purpose of drawing inferences and conclusions of medical significance, or medical knowledge with which to evaluate the content, accuracy, completeness or significance of individual adverse event case reports.

As such the Blume report provides no information or explanation of how these two positions held provided her sufficient experience to understand and perform the specific scientific intellectual tasks with the same rigor employed by individuals who have experience and/ or expertise in pharmacovigilance, epidemiology, or aggregate data analysis for the purpose of drawing inferences and conclusions carrying medical significance, or the medical knowledge sufficient to evaluate adverse event case reports. Positions in pharmaceutical industry bearing the title of Vice President for Scientific Affairs typically involve direction and supervision of scientists performing basic laboratory ("bench") based science and or directing and supervising the interactions with scientists or laboratory "bench" research activities external to the company. The title of this position as stated would not suggest any relevant or reliable experience or knowledge of relevant to the methods or practice of pharmacovigilance, epidemiology, aggregate data analysis for purpose of drawing inferences and conclusions of medical significance, or medical knowledge with which to evaluate the content, accuracy, completeness or significance of individual adverse event case reports.

The Blume Curriculum Vitae lists keywords presumably making reference to topics of expertise. Among these are "Good Manufacturing Practices" and "Good Laboratory Practices". Excluded is the phrase "Good Clinical Practices". The awareness and understanding of medical scientific principles and knowledge that provides both the rationale and intellectual underpinnings to the collective body of methods, principles, and practices that compose "Good Clinical Practices" are core to the evaluation and validation of the assertions being made in this litigation. Nowhere in the Blume curriculum vitae is mention made of expertise pertinent to "Good Clinical Practices". Frequently in the Blume report there

were assertions and interpretations that suggested a lack of familiarity with this set of scientific standards and methods critical for efficacy and safety assessments in clinical trials.

Blume Report: Psychobiological Adverse Events Presentations and Implications

The Blume report asserts that Pfizer knew of the capacity of Neurontin to contribute to mood and behavior prior to the approval of the NDA for epilepsy. No data or documentation reviewed for this report supported such a "capacity to contribute" for Neurontin in relation to mood or behavior problems, or revealed the mechanism establishing how Neurontin allegedly contributed to mood or behavior problems, or that established knowledge of a demonstrated capacity of Neurontin "to contribute" to mood and behavior problems by Pfizer.

Blume Report of Paragraph 47 (p. 11):

By quoting pieces and concatenated sentences and phrases from parts of Dr. Cynthia McCormick's Medical and Statistical Review (NDA#20-235 Medical Statistical Review) and the proceedings of the Peripheral and Central Nervous System Advisory Committee (PCNSD Advisory Committee Hearings Volume II) out of context, The Blume report distorts the content and conclusion in the Neurontin NDA document filings compiled by well qualified FDA reviewer experts (Blume conceded Drs. Katz, Leber McCormick qualifications at her deposition. Blume Depo at pp. 534-35). The Medical and Statistical Review in its entirety indicates that the FDA reviewers appropriately acknowledged the influences of the confounding effect of depression and suicidality known to be inherently present in populations with epilepsy and the limited statistical power to fully characterize five groups of adverse events. Cynthia G. McCormick, M.D., FDA Division of Neuropharmacological Drug Products, Combined Medical-Statistical Review at p. 117 (May 1993); Transcript of Peripheral and Central Nervous System Drugs Advisory Committee, December 15, 1992, at pp. 43-61. page 59 PCNSD Advisory Committee Hearings Volume II). Nowhere in the Medical and Statistical Review (NDA#20-235 Medical Statistical Review) was there evidence of a conclusion by the FDA that there existed a clear defined safety risk among these 5 issues.

The conclusions of the FDA clinical reviewers and the Peripheral and Central Nervous System Advisory Committee indicate that no evidence for a specific risk of suicidality or depression existed based on data from the Neurontin clinical trials in epilepsy. The FDA was in full steerage and control of the content in product labeling. Based on its findings and after having the opportunity to address any lingering concerns, the agency acted accordingly. In her sworn affidavit of September 13, 2007, Cynthia McCormick MD, the FDA reviewer who compiled the Medical and Statistical Review on Neurontin, led discussions on Neurontin's safety findings during the PCNSD Advisory Committee Hearing, and reiterated and confirmed these facts. Affidavit of Cynthia McCormick, M.D. (September 13, 2007).

Dechallenge and Rechallenge Events (pg 12-13):

The Blume report invokes the existence of adverse "events involving dechallenge and rechallenge data" in the clinical development program of Neurontin as evidence relative to causation sufficient to conclude that Neurontin was not safe with respect to "psychobiologic" adverse reaction risks.

The assertions pertaining to dechallenge or rechallenge events in the Blume report involve types of events that are ill-defined, are known to be endemic to the epilepsy population, were subjectively assessed, had inconsistent relationships to discontinuation of gabapentin, in some cases clearly pre-existed before gabapentin administration occurred, did not fully involve a true dechallenge, or occurred

in the presence of other confounding factors that could explain or account for the depression that was thought to be observed.

Depression is a mood disorder known to be present in the epilepsy population and typically is a condition that is chronic but episodic, and undulating in its severity and degree's in which it can be manifest or clinically apparent. The accurate ascertainment of the presence of depression and quantification of its severity is challenging and requires confirmation with validated assessment instruments in place of mere subjective assessments in order to achieve consistent case definitions, scientific objectivity and scientific validity. Depression because of its prevalence in the epilepsy population and its natural history and time variable pattern is not a time discrete clinical event that can be assessed with the objectivity that challenge dechallenge assessments require. There exists no definitive biomarker for depression.

Similarly "hostility" reflects a labile mental state that is subjectively and indirectly assessed with no standard assessment or ascertainment tools, is prevalent in patients with certain types of epilepsy, can fluctuate over time, and is not a time discrete clinical event that can be objectively or accurately assessed with precision in single isolated challenge-dechallenge observations.

As such these types of adverse events would not be ones in which the challenge-dechallenge-rechallenge phenomenon can be reliably assessed with any precision and significantly weakens the strength of the challenge-rechallenge phenomenon to infer a causal or a relationship of these types of adverse events to Neurontin administration or withdrawal.

Challenge rechallenge phenomenon identified in the Blume report occurred in the context of randomized clinical trials. Because these involved types of events (hostility, depression) that are otherwise not uncommon (i.e. not rare) in the populations studied, and there were similar types of events in placebo arms of the clinical trials, thus Dechallenge-Rechallenge type phenomenon would not supersede or supplant an association or lack of association of demonstrated through statistical comparison between the rates of those events in treatment and placebo groups. Sharon Hertz, M.D., FDA Division of Anesthetic, Critical Care, and Addiction Drug Products at Table 7.20 (May 24, 2002).

FDA didn't use dechallenge data but relied on the statistical comparison of adverse events. In conducting this comparison, FDA did not find any individual dechallenge-rechallenge observations sufficient to override the statistically comparison of adverse events reported by patients in the treatment and placebo groups. Simply put, individual case reports such as observation dechallenge-rechallenge events do not override the strength of statistical comparisons and the conclusion reached therein of occurrences of adverse events with placebo and treatment groups.


Neurontin Clinical Pharmacology Studies:

Adverse Event Category "Lumping" Into Ambiguous Concept Categories

The Blume report repeatedly aggregates or "lumps" multiple adverse events into a category called "Psychobiologic Adverse Events". While this category label term was once used in safety summarizations by the FDA and Pfizer, there is no explicit consensus definition of this term More importantly there is no explanation or logic provided in the Blume report of any medical or physiological semantic relationship of this aggregate concept to the concept of suicidality. No basis for the relevance of this approach is

19

apparent or provided. There is no apparent intuitive validity for this approach as a means to draw inferences of suicidality or suicidal behaviors.

Because of the basic pharmacology of gabapentin patient experiences relative to their cognition, state of alertness, and changes in conscious feeling are expected, much as occur with other antiepileptic agents or might occur with consumer over the counter medications such as diphenhydramine (Benadryl®).

Blume Report's Summary of Data from Clinical Pharmacology Studies:

Single dose and multiple dose studies of gabapentin were summarized in the Blume report on pages 20 and 21. The Blume report highlights cognitive changes as "psychobiologic adverse events" seen in subjects without stating the purpose of this data representation, conclusions on what it infers, or methodological basis for such conclusions. The Blume report is remiss and imbalanced in failing to point out the fact that there was no comparison group in many of these studies which would be required to draw any conclusions about any event occurring in these subjects. In fact, the FDA expressly advised the attorneys who retained Dr. Blume that there must be a placebo comparator to evaluate whether Neurontin is associated with suicidality. Letter from Dr. Russell Katz, Director, FDA Division of Neuropharmacology, to Andrew Finkelstein (April 12, 2005). When comparison groups were included in the Neurontin clinical studies, the Blume report fails to address those comparisons or consider the data in aggregate. Limitations in drawing any inference from the observations due to the absence of comparator data should have been mentioned in the Blume report. Absence of discussion of multiple confounding factors (factors that could have been responsible for the event independent of gabapentin administration) makes the Blume report an incomplete safety analysis. Such an approach – addressing comparisons or considering the data in aggregate -- would be standard in GCP for any attempt to draw scientific inferences from the observations listed.

Blume Report's Summary of Data from Monotherapy Studies:

The Blume report maintains a pattern of data presentation that is imbalanced, presumably for the purpose of attempting to draw a specific inference and conclusion. This data management approach is inconsistent with scientific standards (GCP) because it ignores the study design and fails to present data from comparison groups. Recognition of both study design and data within comparison groups is necessary in order to draw a scientifically valid conclusion.

Blume Report's Summary of Data from STEPS Psychobiological Adverse Events:

The Blume report presents a table of "line listings" with each row corresponding to a specific patient with adverse events in the above mentioned category. Columns provide some sparse information that describes observations and characteristics pertinent to that adverse event occurrence. The Blume report continues with a pattern of data presentation that ignores study design and limitations for drawing inference. Raw numbers of adverse events, or line listing representations of such are presented without calling out or emphasizing the multiple confounding factors that prevent the ability to attribute the adverse event to gabapentin that exist in each patient and the population studied. Limitations in drawing any inference from the observations due to the absence of comparator data should have been mentioned in the Blume report. Absence of discussion of multiple confounding factors (factors that could have been responsible for the event independent of gabapentin administration) makes the Blume report an incomplete safety analysis.

20

The Blume report on page 36 (paragraph 78, 79) concludes that the data as presented in the Blume report identifies a "trend" that constitutes a safety signal that should have prompted action. The only "trend" that the Blume report sets forth is an artifactual trend that results from her choice of data presentation. The predominance of the studies from which the Blume report extracts raw numbers of events where existence of comparator data provided an opportunity for statistical comparison and a science and evidence based approach. The Blume report did not take advantage of this opportunity where scientific standards and GCP would demand it.

In a footnote on page 36 the Blume report makes assertions regarding medical terminology that the terms "suicidal" and "suicide gesture" are less specific and convey diluted meaning relative to the term "suicide attempt" and this diluted meaning exists along an axis or attribute of severity. If this assertion was based on a formal standardized logic based terminology the Blume report fails to identify it. If this assertion is based on some consensus among domain experts the Blume report fails to describe that consensus granting body or the exact differentiation among those terms recognized by that consensus body. As a practicing physician of some 18 years, a medical scientist, and medical terminology specialist I find the concept based semantic distinctions the Blume report attempts to make among these terms ambiguous, trivial, and invalid.

Blume Report's Summary of Data from Neurontin Pediatric Epilepsy Studies (pp 37-38; Non-Epilepsy Trials (pp 40-45); Deaths Serious Adverse Events and Withdrawals (pp. 46-53):

The Blume report continues a pattern of data presentation that is imbalanced, presumably for the purpose of attempting to draw a specific inference and conclusion. Dr. Blume exclusively extracts adverse events from treatment groups within placebo-controlled trials without making use of comparison data provided by the original randomized-controlled trial study design. This data management approach is inconsistent with scientific standards because it deviates from the study design and fails to present data from comparison groups. FDA Good Pharmacovigilance Practices, Pharmacoepidemiology Strom 4th edition, Chapters 2 and 20. Recognition of both study design and data within comparison groups is necessary in order to draw scientifically valid conclusions. These studies were blinded randomized placebo controlled clinical trials and inferences cannot be drawn based only on raw observations in the treatment group without statistically comparing rates of occurrences between treatment and placebo group matched on all other factors that can contribute to the occurrence of adverse events.

Blume Report: "Suicidal / Homicidal / Overdose Events from Research Reports" (pp. 56-58):

The Blume report presents a table of "line listings" with each row corresponding to a specific patient with adverse events in the above mentioned categories. Columns provide some sparse information that describes observations and characteristics pertinent to that adverse event occurrence. In doing so The Blume report continues with a pattern of data presentation that ignores study design and limitations for drawing inference. Raw numbers of adverse events, or line listing representations of such are presented without calling out or emphasizing the multiple confounding factors that affect the ability to attribute the adverse event to gabapentin that exist in each patient and the population studied. Limitations in drawing any inference from the observations due to the absence of comparator data should have been mentioned in the Blume report. As noted above, a large body of scientific literature has established the presence of psychiatric manifestations and disorders in which gabapentin has been studied. Absence of discussion of multiple confounding factors (factors that could have been responsible for the event

21

independent of gabapentin administration) makes the Blume report an incomplete and unreliable safety analysis.

Neurontin Annual Reports (pp 59 to 61):

The FDA requires the submission of progress updates called Annual Reports which contain information about all ongoing clinical trials within a development program each year from the IND anniversary date. These reports are expected by the FDA to contain only summary tabulations of data pertinent to the clinical trials within a development program as they progressed and are not intended to provide risk benefit assessments or information or justification for continuing with a clinical trial or trials.

The Blume report also continues to employ a seemingly arbitrary aggregate of event terms ambiguously labeled as "neurobiological events" without justifying the scientific or medical rationale for doing so in the context of suicidality. The majority of individual types of adverse events comprising the arbitrary concatenated category termed "neurobiological adverse events" have not been defined as a logical grouping with any shared medical or pathological significance or interdependence making them cohesive with respect to assertions of self harm, behavioral disorders.  The Blume report fails to justify how this aggregation is relevant with respect to any shared pathological or disease attributes among the various rubrics comprise this ambiguous category and thus deviates from Good Clinical Practices promulgated by the FDA and other Regulator Authorities  for evaluating safety information as well as the principles, guidance, and methodologies for conducting pharmacovigilance and safety surveillance.

The Blume report arbitrarily strips and highlights raw numbers of adverse events from listings in the Annual Reports 1994, 1995, and 1996 and combines them into the neurobiological grouping and attempts to infer "trends" that are non scientific and artifactual. Annual Reports include only raw numbers of adverse events of clinical trials as they are initiated and accrue study subjects and as the number of participants in the study increase an increase in adverse event reporting activity is normal and expected. Such a trend is an artifactual trend of the time dependent nature of the enrollment process and does not reflect a trend of safety significance. Also Annual Reports may contain adverse events that actually occurred in placebo patients since many studies may not be unblinded as yet with respect to all adverse events reported.  Warner-Lambert had begun a clinical development program in epilepsy in Q1 1994, which was nearing completion by Q3, 1996.  Enrollment in epilepsy studies reached a peak with most programs near or fully enrolled by end of Q4 1994 or Q1, Q2 1995.  Raw numbers of adverse event report numbers would be expected to parallel these enrollment trends.  Differences in the initiation, starting, and completing enrollment and subsequent study subject accrual explain the trends noted in the Blume report.  Drawing inferences from this trend "artifact" is unscientific and naïve.

By highlighting raw numbers of adverse events reported in Annual Reports the Blume report continues a trend of failing to acknowledge the scientific limitations and inadequacy of drawing inferences from raw numbers. A scientific approach would require the comparison rates of events in treatment and placebo groups when such groups are available, and the existence of expanding numbers of patients exposed to gabapentin as study subjects were being accumulated in newly initiated and ongoing clinical trials. This data management approach is inconsistent with scientific standards because it ignores the study designs and fails to present data from comparison groups. Recognition of both study design and data within comparison groups is necessary in order to draw scientifically valid conclusions. Limitations in drawing any inference from the observations without comparator data should have been mentioned in the Blume report especially since comparator data was or would be available. Also consideration of the obvious relationship of raw number trends in the Annual Study Reports to increasing numbers of study

22

subjects receiving gabapentin as clinical trials reached full enrollment should have been made. Absence of discussion of multiple confounding factors (factors that could have been responsible for the event independent of gabapentin administration) existing in this study population should temper any interpretation of adverse events. Failures to show evidence of these considerations makes the Blume report an incomplete and biased safety analysis. (Expand on factors)

PSURs

The format and content of Periodic Safety Update Reports (PSUR's) was defined by the Council for International Organizations of Medical Sciences in 1992 (International Reporting of Periodic Safety Update Summaries (CIOMS II) Council of International Organizations of Medical Sciences, Geneva, 1992). Pfizer has complied with the frequency and content requirements for PSURs.

The Blume report comments on content PSURs #1, #2, #3, and attempts to draw inferences from that content that are unscientific and sometimes illogical.

Paragraph 108, pg 63 of the Blume report states that Pfizer "chose to ignore" psychobiological adverse events in its PSUR, yet uses the actual listings of those events in the PSUR as the source for the existence of those reports. Pfizer cannot be accused of ignoring those adverse events if in fact they were reporting them in the PSUR according to the structure and content format demanded by existing standards for PSUR reporting.

The Blume report asserts the "rate" and "severity" of those events should have prompted labeling changes, yet fails to identify any rate (none was expressed in the PSURs) nor identifies parameters of severity. The definition of a "rate" with respect to any medical event is the number of events occurring in a population over a period or unit of time. Interpretation of any information within the PSUR as "rate" suggests a fundamental lack of understanding basic pharmacoepidemiology.

The Blume report fails to acknowledge that this PSUR was accepted by regulators without any requirement for additional safety information or expression of concern about the adequacy of safety information representation by regulators who reviewed the PSURs.

The Blume report fails to justify the medical or scientific basis for the aggregation or lumping of variant assorted collection of adverse events under the rubric "psychobiological" or how such an arbitrary conflation is relevant from a pathophysiological perspective to a specific safety issue.

The Blume report states that in PSUR 1, "Despite reports of myriad adverse events the Pfizer defendants chose to ignore these events". Such an assertion is unsupported and contradicted in the record. All psychobiological adverse events were reviewed and included in the PSUR. The number of events alone included in the PSUR, described as "myriad" was sufficient to warrant a change in product labeling. PSUR's are reviewed by multiple regulatory agencies. The Blume reports provides no scientific rationale or analysis of why the adverse event reports included in the PSUR should have led to a conclusion by client Pfizer or regulatory bodies that reviewed these PSUR' that labeling had to be changed or updated.

The definition of the term "myriad" implies countless and innumerable numbers. The Blume report provides no scientific or logical basis for use of such an exaggerated qualitative descriptor in a science based context that requires quantitative precision.

23

The Blume report states "more careful examination should have been undertaken" but fails to identify what "examination" deficiencies existed or what would have constituted a sufficient examination In paragraph 109 Dr Blume mentions a report by Dr. Trimble entitled Psychosis with Gabapentin and his discussion of a literature case report of hypomania but does not take the opportunity to highlight that those conclusions and assessments in Dr Trimble's reports supported conclusions of the PSUR #1 and PSUR #2.

In paragraph 111 regarding PSUR #3 the Blume reports concludes that an adverse event of a man with epilepsy suffering psychosis who self injured himself should have been more accurately represented as a suicide attempt. Cheryl Blume PhD, the author and certifier of the Blume report in sworn testimony has admitted that she has no medical skills or training and is not capable of performing medical assessments that require such training or that depend on skills in performing a differential diagnosis and her conclusion regarding this adverse event is consistent with that assertion. A physician with basic clinical knowledge and training would understand that patients in a psychotic state can and often do injure themselves as a result of their psychotic behavior,  and because of the nature of psychosis do not act by reason to purposefully attempt or commit suicide. The representation of this adverse event as "self injury" is an accurate one and is based on the most clinical plausibility.

The Blume report fails to indicate the truth that all Pfizer defendant PSURs submitted were consistent with regulatory and scientific standards both in information presentation and conclusions and were accepted as such by all regulatory bodies requiring these reports without any actions pertinent to outstanding safety issues.  (verify no variations or actions prompted by PSUR 1,2,3)

Spontaneous Adverse Event Report Analyses (SRS), WHO 1994-1996:

(117) The Blume report trends of twofold increases in spontaneous adverse event reports in suicide, suicide attempts, and in other reports purported to be related to suicide. The data in the table on page 75 speaks exactly to the contrary. Either the author of those assertions did not actually examine the table of data or cannot competently interpret it. The data on page 75 actually shows decline in reports as a fraction of all reports as more patients are exposed. Drawing inferences on raw spontaneous report data is counter to the scientific methods and analytical principles articulated in "Good Pharmacovigilance Practices cited as reference in the Blume report.

118. The Blume report asserts that the WHO Database demonstrated a trend of increasing "incidences" of a conflation of adverse event types which the Blume reports asserts are psychiatric disorders should have been sufficient to trigger safety conveyances in documents. The table of data from which the Blume report draws those conclusions provides raw numbers. Use of raw numbers for safety inferences counters recommendations, methodologies and scientific principles promulgated in the FDA Guidance on Good PV Practices that the Blume report cites. The author of the Blume report is seriously misguided in representing raw numbers as "incidences" as the concept of an incidence with respect to frequency of occurrence of an adverse event requires denominator that includes the number of total patients exposed coupled with a factor of time.

Conclusions 1994-1996

Blume Report at pp. 145-156:

24

The Blume report makes a sweeping conclusion that the use of gabapentin is irresponsible in psychiatric populations based on clinical study and postmarket period reports of depression and suicide, aggression, hostility, and other psychiatric events and asserts use is in a population at risk is irresponsible. In making this assertion Blume

Provides no scientific premise, evidence based reasoning, or rational data driven basis for such a broad and sweeping assertion that is indirect conflict with scientifically drawn conclusions by regulators, scientists and physician scientists using science based analyses and reports based on established scientific principles and methods of pharmacovigilance and epidemiology that showed no basis for the Blume conclusions, and which were in full compliance with regulatory and scientific standards.

In stating clinical use of gabapentin has occurred in populations "at risk" Blume acknowledges the presence of the inherent and inexorably intertwined background risks that exist in patients whether receive gabapentin or not, and thus acknowledges there exists an epidemiologically verified background risk for so called psychiatric "psychobiological" adverse events in this population. In acknowledging the existence of the inherent risks for so called psychiatric "psychobiological" adverse medical events in these patient groups independent of gabapentin use the Blume report must therefore implicitly acknowledge the medically and statistical plausible hypothesis that patients with these "psychobiological" disorders experience can and do suffer adverse psychiatric "psychobiological" medical events independent of gabapentin exposure. The Blume analyses repeatedly and systematically ignores consideration and incorporation of confounding by this agreed pre-existing background risk in analyses that examine any association with gabapentin.  This error and bias in the Blume approach is systematic throughout all analyses and conclusions presented in the Blume report and contradict the very scientific principles, science based methods, and expert guidance that the Blume report repeatedly cites  (FDA Good Pharmacovigilance Practices, Pharmacoepidemiology Strom 4th edition).

The Blume report employs in multiple instances amplifying and exaggerating descriptors such as "myriad" and "startling" to numbers of certain kinds of adverse events but never provides quantitative or comparative evidence to justify these descriptions of the evidence.

Review of Psychobiological Adverse Events October 1996- May 2002

The Blume report states that in order to address post-marketing safety data "an overview of all available databases is provided" and this "overview" is used to draw firm conclusions and impugn the safety profile of a therapeutic agent that has found use in various debilitating chronic disorders. However the conclusions that the Blume report require specific quantitative and comparative methodologies that are described in many scholarly resources, articulated by many experts in the domain of pharmacoepidemiology and pharmacovigilance. The "overview" that the Blume report provides is insufficient to reach the conclusions stated. Application of the well described and available scientific methodologies and practices to examine data was not evident in the Blume approach.

References cited in this report and the Blume report repeatedly emphasize the importance and value of calculation of event rates in performing scientific comparisons intended or seeking to infer causality. Blume conceded in her deposition that she conducted no statistical analyses of the data referenced in her report.  Blume Depo at 68, 84, 87-88, 131-32, 229-230.  The concept of an event rate and its value in making scientific comparisons of the relative frequency or excess risk for an event under a certain exposure is never articulated or represented in the Blume report despite emphasis of the scientific value and merit of this quantitative measure.

25

In the above mentioned section of the Blume report raw numbers of events are extracted from regulatory documents without consideration of increases in exposure from ongoing clinical trial enrollment and completion for Neurontin and increasing use of the approved product by physicians and their patients. This phenomenon is demonstrated in Dr. Sheila Weiss-Smith's analysis of the Neurontin prescription data. Report of Dr. Sheila Weiss-Smith. Because of increasing use of Neurontin raw numbers of events cannot be used to establish a safety risk. Risk is a measure of the probability a given event will occur while exposed to a therapeutic agent or other exposure, and can be measured by the what fraction of patients exposed actually experience the event. As exposure (the number of patients taking a drug) increases as a result of ongoing clinical study or use rising absolute numbers of a suspected adverse event may actually indicate diminishing risk if the "rate" (the fraction of patients with events recorded over a time period of the total population exposed) is declining. As an analogy, a street on which an increase in the number of moving violation tickets is recorded might suggest that it is a dangerous street on which to drive. However if the traffic volume or number of vehicles driving on the street are dramatically increasing then the "rate" of moving violations may actually be declining along reflecting the reduced risk of encountering a reckless driver.

The refusal to consider or calculate rates of events in making comparisons or interpreting adverse event data are systematically ignored throughout the Blume report. Use of event rates is an integral part of scientific assessment in pharmacovigilance.

Spontaneous Reporting System (SRS) / Adverse Event Reporting System (AERs):

The Blume report states that "a number of signals" were apparent of suicide related events during the time period defined above evidenced by a "significant number of cumulative suicide attempts" without defining what criteria or threshold constitutes a "signal" against the naturally occurring and preexisting background risk for suicide that the Blume report acknowledges exists and which have been scientifically validated in several peer reviewed and published scientific epidemiology studies.

The Blume report cites "notable increases" or trends upwards of "cumulative" events heralding a purported "signal". However no valid quantitative trend of an increase in the risk of suicide or suicide attempt is evident in any of data presentations in the Blume report. Evidence of a trend demonstrating an increase in safety risk would require the demonstration of a consistently emerging excess rate of a particular adverse event.

The Blume report depends on use of "cumulative" numbers of events over several year periods to indicate a trend. This is a seriously flawed and deceiving way to examine for the presence of a trend. Returning to the analogy of traffic safety risks on a particular street, consider that the "cumulative" number of traffic mishaps from year to year increases. Using concrete numbers as an example, consider over a 4 year period the traffic volume (the number of cars driving on the street each day) on a given street remains constant and that in year 1 there were 20 accidents, year 2 there were 10 accidents, and year 3 there were 2 accidents and year 4 there was 1 accidents, the cumulative number of accidents from year to year over the four year period would be 20, 30, 32, 33. The "cumulative number" of accidents increases from year to year over the four year period. But the number of number of accidents and the rate of accidents each year is declining. Cumulative numbers cannot reflect a trend. As the number of patients exposed to a drug over time increase it is natural for the cumulative absolute number of events to increase. However only the change in the rate or change in the fraction of total patients experiencing a particular medical event would reflect a trend and if that rate or change in rate

26

did not exceed the preexisting background rate that naturally occurs in that population no trend indicating a safety risk could be concluded.  In sum, use of cumulative numbers to reflect trends is flawed and leads to unreliable inferences.

Tables containing data in the Blume report in the above mentioned section appear corrupt.  Evidence for corruption of data is failure of cumulative numbers to reflect incremental changes in events reported from time period to time period.  As an example in the unlabeled table on page 120 of the Blume report the cumulative number of reports from year to year for intentional overdose events are inflated and do not arithmetically reflect the increment in new reports recorded each year in the table.  Thus for 1996Q4 the baseline is 14 reports and during 1997Q4 there were 2 additional reports recorded which should result in a new cumulative number of 16, however 17 is recorded in the table. Similarly from 1997Q4 to 1998Q4 2 new reports were recorded which when added to 17 should reflect a new cumulative grand total of 19. However, the table indicates the number to be 32.  The number has been inflated by 5 reports without accurate accounting for such.  This error is not random and from year to year artificially and falsely inflates the number upward. Crosschecks by the author of the Blume report apparently were not done and/or quality control of content may have not been in the author's control. Evidence of corrupted data would cause this report and its conclusions to be rejected by scientific peer review bodies.

In tables on pages 116 and 117 many cells contain blank data, and it is unclear why these cells are left blank. If the numbers of events occurring in that time period was "0" or zero, this would be significant and relevant information. A blank data field is not the same as a value of "zero" or "no occurring events" The omission of this data biases calculations and conclusions. Omissions of data from tabulations will impact quantitative assessments and can lead to false or flawed conclusions. Crosschecks by the author of the Blume report apparently were not done and/or quality control of content may have not been in the author's control. Evidence of corrupted data would cause this report and its conclusions to be rejected by scientific peer review bodies.

The Blume report uses raw numbers of reported events without considering the expanding populations being treated with Neurontin. Raw numbers of adverse events without consideration of the fraction of the total number of patients receiving Neurontin purportedly experiencing medical events. The importance of this principle is stated in references cited by the Blume report yet is systematically ignored in the Blume report analyses. The raw numbers of the events reported in the Blume report may actually reflect a protective effect of Neurontin since the conditions of the patient population are associated in themselves associated with a risk of suicide and this risk is related to the success or lack of success in controlling the underlying condition. That Neurontin actually protects against suicide or suicide attempt is a hypothesis that is clinically and medically plausible.

Blume Report SRS Adverse Reporting System

Table page 118 (Gabapentin AERS Psychobiologic Adverse Events):

The table and the data contained therein on page 118 of the Blume Report is cited as representative of a trend of "significant numbers" containing "notable increases" in suicide, suicide ideation, and suicide attempt adverse event reports. However the use of "cumulative numbers" cannot be used to estimate or provide evidence of a change in risk such to warrant a conveyance of new information to providers. Dr. Blume's Report is unscientific and is plagued by the same lack of logical credibility that would state that as long as money cumulatively increases (the cumulative combined interest earnings all over

preceding years combined) then the rate of return of the investment vehicle must each year over a period of years that one is getting better each year. The table below modifies the calculations and statistics to eliminate the use of "cumulative numbers". This table is based on the premise that if Neurontin increases the risk of the events of interest (suicide, suicide ideation, and suicide gesture) then the number of reports of those events in each year as well as the fraction of the total reports represented by reports of events of interest should either increase or at least remain steady. The data derived from the Blume report tables show the opposite. The number of events for each event of interest as well as fraction of total events represented by those events actually declines over the periods described. This should lead one to conclude the exact of opposite of the Blume report conclusion, that is that there are no trends by the statistics chosen by Dr. Blume in her report's table on page 119, which point to an emerging problem or abnormal pattern.

| Numbers and Prevalence of Reports of Interest (RoI) as Percent of Total Reports (PrV%) Received for Each Time Period | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Adverse Event Type** | **(as of') 2000 Q4** | | | **2001 Q4** | | | **2002 Q4** | | |
| | #RoI | #TR | PrV (%) | #RoI | #TR | PrV(%) | #RoI | #TR | PrV (%) |
| **Suicide** | 8 | 3804 | 0.21% | 14 | 5700 | 0.24% | 13 | 6460 | 0.07% |
| **Suicide Ideation** | 29 | 3804 | 0.77% | 15 | 5700 | 0.26% | 11 | 6460 | 0.17% |
| **Suicide Attempt** | 43 | 3804 | 0.114% | 20 | 5700 | 0.35% | 10 | 6460 | 0.15% |

#RoI = the number of event reports of interest over the specified time period
#TR = the total number of reports (all types) that year
#Prv(%) = the prevalence or fraction of the total reports represented by of events of interest (expressed as percent)
*2000 includes all reports collected since the Neurontin began being used in clinical trials and up to that point in time.

The Blume report makes similar systematic errors in table on page 168 as found on page 118. The Blume report errantly employs cumulative numbers to show a trend and uses the prevalence of reports of events of interest to them to show trends. Such quantitative parameters cannot be used to demonstrate change in risk which can only be ascertained by examining the number of patients with reported events over the number of patients exposed over a unit of time. These features define a true "incidence" or a rate and it is change in rate of events that defines risk and would constitute a signal.

In Chapter 3 of Epidemiology by Sander Greenland, Ph.D., an expert reference cited in testimony, the authors "begin to address the basic elements, concepts, and tools of epidemiology".   Rothman, K. J. and Greenland, S. (1998). *Modern Epidemiology*, 2nd ed. Philadelphia: Lippincott-Raven.  The authors state "in an attempt to measure the frequency of disease occurrence in a population, it is insufficient merely to record the number of people or even the proportion of the population that is affected." Rothman, K. J. and Greenland, S. (1998). *Modern Epidemiology*, 2nd ed. Philadelphia:Lippincott-Raven.  The Blume report approach is completely contrary to this approach. Seeking to prove a hypothesis of increased risk or frequency of adverse events presumably related to Neurontin administration the Blume report

28

emphasizes raw numbers and prevalence proportions and never includes rate calculations.   FDA Guidance and B Strom emphasize that calculations of rates are critical to pharmacoepidemiologic analyses. "Rate" calculations are core to assessing the presence of increased or disproportionate risk. Rates were never calculated or presented in the Blume report.

Pages 192 to 196 of Blume Report:

The Blume report claims to have performed a proportional reporting ratio (PRR) analysis and suggests endorsements of the approach in cited expert reference by Strom Pharmacoepidemiology 4th edition.

The Blume report incorrectly defines the concept of a proportional reporting ratio and subsequently misapplies it graphical representations. The Blume report also fails to call out the widespread recognition of the limitations of this approach articulated in Strom as well as by Greenland both in his report and in the textbook in Epidemiology cited above.  Greenland Report at pp. 8-13; Strom at pp. 230 232.

Graphs on pages 194 and 195 track the proportion or the prevalence of adverse events of interest as a percentage of the total reports for several drugs including gabapentin. The Blume reports claims this is a representation of proportional reporting ratio trends. Either the author of the Blume report does not understand the concept of a PRR and its application, and/ or failed to perform validation and quality checks of the data presentation, and/ or was not in control of the content of the Blume report.

In Strom pg 70 4th edition, it states three automated signal detection methods exist, one of which includes PRR methods. Subsequently it states "All three methods are limited by the fact that most of the signals identified by these methods are known associations or represent one or more forms of confounding that bias voluntary reporting systems." Strom BL. Potential for conflict of interest in the evaluation of suspected adverse drug reactions: a counterpoint. JAMA, 2004, 292:2643-2626; Hauben et al. Evaluation of Suspect Adverse Drug Reactions. JAMA, March 16, 2005 - Vol. 293, No. 11, pg. 1324; Strom BL. Reply to "Evaluation of Suspect Adverse Drug Reactions." JAMA, March 16, 2005 - Vol. 293, No. 11, pg. 1324-1325).  Strom himself on, pages 230 to232, repeatedly notes that spontaneous reporting data, on which PRR methods depend, provides  the weakest support among all pharmacoepidemiologic approaches.   Strom at pp. 230-232. Further, on page 127, Strom states, "PRRs…are a measure of association and not causality. The result of a PRR provides a signal: it does not prove causation" Testing the resulting hypothesis usually requires formal study in more structured data".  Strom at p. 127. The Blume Report never performs a PRR analysis, and thus, never identifies a "signal" through that approach.

In citing the FDA Guidance the Blume reports ignores critical information that indicates limitations in the use of PRR approaches. The FDA Guidance states that FDA exercises caution when making such comparisons, because voluntary adverse event reporting systems such as AERS or VAERS are subject to a variety of reporting biases (e.g., some observations could reflect concomitant treatment, not the product itself, and other factors, including the disease being treated, other comorbidities or unrecorded confounders, may cause the events to be reported). In addition, AERS or VAERS data may be affected by the submission of incomplete or duplicate reports, underreporting, or reporting stimulated by publicity or litigation. As reporting biases may differ by product and change over time, and could change differently for different events, it is not possible to predict their impact on data mining scores. Use of data mining techniques is not a required part of signal identification or evaluation. If data mining results

29

are submitted to FDA, they should be presented in the larger appropriate clinical epidemiological context".

The Blume report never actually performed a PRR analysis and even if they had been able to do so this would not provide sufficient perspective or information to constitute the action they assert Pfizer should have undertaken.

The Blume report never performs the required final analysis that provides "the larger appropriate clinical epidemiological context". However this larger epidemiological context was provided by Pfizer in the reports submitted to the FDA in September 2004 and June 2006.

_____

Alexander P. Ruggieri, M.D. M.H.S

12/20/2007
_____
Dated

30