UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| ALL PRODUCT LIABILITY ACTIONS | Magistrate Judge Leo T. Sorokin |

---

**DEFENDANTS' EMERGENCY MOTION TO MODIFY THE
NOVEMBER 9, 2007 CASE MANAGEMENT ORDER**

Defendants Pfizer Inc. and Warner-Lambert Company ("defendants"), by the undersigned counsel, submit this emergency motion to modify the schedule contained in the November 9, 2007 Case Management Order and for leave to exceed the page limitation on the memoranda in support of their *Daubert* and summary judgment motions.

## I. BACKGROUND

After the close of expert discovery,[1] plaintiffs' experts are attempting to revamp their general causation opinions without allowing defendants the opportunity to either obtain the data on which the new opinions are based or to question the experts regarding these new opinions. On February 1, 2008, plaintiffs served defendants with a supplemental expert disclosure. The supplemental disclosure was prompted by a January 31, 2008 FDA Alert on Suicidality and Antiepileptic Drugs ("the Alert"). (*See* Plaintiffs' Supplemental Expert Disclosure on General

---

[1] On November 9, 2007, the Court set forth the schedule for expert discovery and dispositive motions based on *Daubert*, general causation, and federal preemption. (Products Liability Case Management Order, Nov. 9, 2007). Under this schedule, expert discovery is closed and the deadline for *Daubert* and summary judgment motions is February 29, 2008.

Causation (Feb. 1, 2008), attaching FDA, "Information for Healthcare Professionals on Suicidality and Antiepileptic Drugs," (Jan. 31, 2008), attached hereto as **Exhibit A.**) The Alert, which was based on the FDA's review of eleven drugs, including Neurontin, indicated that patients receiving unspecified antiepileptic medications were at a greater risk of suicidal behavior or ideation compared to patients receiving placebo. The Alert did not include any details about the FDA's analysis or any data regarding the eleven drugs that were the subject of the analysis. After learning of the Alert, defendants took immediate steps to obtain the data, but have not yet received it. Although defendants do not have most of the data underlying the FDA's analysis, defendants do have the Neurontin-specific data that the FDA analyzed. These data are devoid of any evidence of an increased risk of suicidal behavior or ideation in Neurontin-treated patients. As shown below, plaintiffs' experts admitted as much during expert discovery.

Plaintiffs' supplemental expert disclosures, however, state that four of their experts will now rely on the Alert to support their general causation opinions. Plaintiffs' supplemental designation does not provide any information regarding how the FDA Alert affects their experts' opinions. Given that plaintiffs' experts previously conceded that the Neurontin-specific data do not show an association between Neurontin and suicide—and in fact testified that the data were "not relevant" to the issue of general causation—it is at best unclear how the Alert purportedly supports plaintiffs' experts' opinions. Plaintiffs' experts' reliance on the Alert can only mean that they now opine that the data are relevant and/or show an association they previously conceded does not exist. Defendants should be allowed to obtain the underlying data and to question plaintiffs' experts about these new opinions and the new basis for them. Defendants are currently in an impossible position because they have neither the data nor a complete disclosure

2

as required by Rule 26 regarding how the FDA Alert affects plaintiffs' experts' opinions. Defendants cannot fairly explore plaintiffs' experts' new opinions and reliance on the Alert until: (1) plaintiffs fully disclose the new opinions; and (2) defendants have the opportunity to obtain and analyze all the data on which the Alert is based and cross examine plaintiffs' expert witnesses on the data; and (3) defendants supplement their expert reports, if necessary, before briefing the *Daubert* and summary judgment motions.

Accordingly, defendants request an extension of the *Daubert* and summary judgment deadlines until thirty days after the relevant data is received from FDA. This schedule will allow the experts to review the data and defendants to conduct additional expert discovery prior to filing the motions.

## II. ARGUMENT

### A. The *Daubert* and Dispositive Motion Deadline Should Be Extended Until After Additional Expert Discovery is Conducted.

Plaintiffs filed a supplemental expert disclosure within hours of the FDA's release of the Alert, which stated that four of their experts "shall rely on the substance of the FDA Alert in providing opinion testimony that is consistent and supportive of Product Liability Plaintiffs' claim that Neurontin contributes to mood and behavioral disturbances, including depression and suicidality."[2] Contrary to Fed. R. Civ. P. 26(a), which requires plaintiffs to set forth a "complete statement of all opinions to be expressed and the reasons and basis therefore," plaintiffs have not identified their revised opinions, let alone the reasons for those opinions.

Plaintiffs suggest that the Alert provides further support for the opinions that the experts previously provided. Defendants are entitled to explore this new position through depositions of

---

[2] Notably, plaintiffs' supplemental disclosure refers to "*mood and behavioral disturbances including depression and suicidality*," when there is no evidence at all that the FDA analyzed anything other than suicidal behavior and ideation. This adds to the uncertainty regarding how plaintiffs' expert witnesses intend to use the FDA Alert as support for their opinions.

3

plaintiffs' experts after obtaining the data considered by FDA as discussed in the Alert. The FDA's Alert was based on randomized controlled clinical trial data for eleven medications. Plaintiffs' experts have already provided opinions regarding the Neurontin-specific data. Dr. Sander Greenland, one of the experts plaintiffs identify in their supplemental disclosure, previously opined that the controlled clinical trial data "provide no statistical support for . . . the hypothesis that gabapentin does cause suicide or suicide attempt (the causal hypothesis)." (Greenland Report at 14-15, hereto attached as **Exhibit B**.) Another of the experts identified in plaintiffs' supplemental disclosure testified under oath that the randomized controlled trial data were "not relevant" to his general causation opinions. (Trimble Dep. at 254:18-256:19, hereto attached as **Exhibit C**). Plaintiffs' reliance on the FDA Alert, which, as to Neurontin, is based on identical information that plaintiffs' experts previously opined provided no causal support for an increased suicide risk of suicide, thus represents a 180 degree change from their prior position.

At a minimum, defendants are entitled to question plaintiffs' expert witnesses about their new opinions and the new basis for those opinions. As it stands now, however, defendants lack the data and information to do so. And, in any event, plaintiffs have refused to make their experts available for depositions on this topic, either at this juncture or following the release by FDA of the data.

The FDA's January 31, 2008 Alert contains little information. The Alert states that "patients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation (0.43%) compared to patients receiving placebo (0.22%)." The Alert further notes that the results were "generally" consistent among the eleven drugs it reviewed. The FDA did not, however, specifically discuss any of the eleven medications. Nor did it include any drug-specific

4

data. Without these data, defendants are unable to analyze the basis for the FDA's statements in the Alert. Importantly, for example, defendants are unable to discern which medications showed an increased suicide risk that skewed the results for the entire group of medications reviewed. The FDA also provided no details in the Alert regarding its methodology. Defendants do not know, for example, which categories of events[3] the FDA included in reaching the percentages noted in the Alert. For these reasons, defendants are diligently seeking the data and have requested it from the FDA.

Full disclosure of the data is especially important given that the increased risk of suicide noted in the Alert was not seen in the Neurontin clinical trial data. In the forty-nine Neurontin randomized controlled trials, including 8829 patients (5194 treated with Neurontin), there were <u>no</u> completed suicides and <u>no</u> attempted suicides in the Neurontin treatment groups. (Letter from Many Ann Coronel Evertsz to Russell Katz (June 2006) at 3-4, attached hereto as **Exhibit D**.) There were likewise <u>no</u> "preparatory acts toward imminent suicidal behavior" in the Neurontin treatment groups. (*Id*. at 4.) And, suicidal ideation was reported in 0.039% of the Neurontin-treated patients and in 0.037% in placebo, a statistically indistinguishable percentage. (*Id*.) The clinical trial data for Neurontin is thus inconsistent with the limited information contained in the Alert, because the Neurontin data clearly fail to show any increased risk of suicide. And, as mentioned above, plaintiffs' experts agree that the Neurontin clinical trial data fail to support an increased risk of suicide with Neurontin.

---

[3] The FDA asked defendants to analyze the following categories of data: (1) completed suicide; (2) suicide attempt; (3) preparatory acts toward imminent suicidal behavior; (4) self-injurious behavior, intent unknown; (5) suicidal ideation; and (6) not enough information (fatal and nonfatal). The frequency of these six events was lower in the patients who received Neurontin than in those who received placebo. Specifically, the frequency in placebo was 0.149% but only 0.116% in the group treated with Neurontin. *See* Exhibit C at 4.

Plaintiffs' experts now apparently opine—contrary to their prior testimony and expert reports—that the Neurontin clinical data support their general causation opinions. Because plaintiffs seek to revamp their opinions within days of the date on which *Daubert* and summary judgment motions are due and, at the same time, to preclude any further discovery of those experts, defendants respectfully request an extension of the *Daubert* and summary judgment motion deadlines until thirty days after the defendants receive the data underlying the Alert so that defendants may meaningfully test plaintiffs' experts' reliance on the Alert through additional expert discovery.

### B. An Extension of the Twenty Page Limitation Is Warranted

Defendants also seek leave to exceed the twenty-page limitation on briefs. In particular, defendants respectfully request that they be permitted to file (a) one brief of no more than 60 pages in length in support of an omnibus *Daubert* motion, and (b) a 45-page brief in support of their combined motion for summary judgment.

The *Daubert* motion will address the unreliability of the opinions provided by three of plaintiffs' experts on general causation. Defendants considered filing a separate motion as to each expert, with each supported by a 20-page brief. This approach, however, would increase the burden for everyone concerned, including the Court. Defendants would prefer to proceed via an omnibus motion supported by an oversized brief. Allowing defendants to place all of their arguments in one brief will avoid repetition of common issues and provide a comprehensive point of focus for the Court's review. Each of the three experts provided a lengthy, detailed, and technical report and was deposed at length. The brief in support of the *Daubert* motion will, and must, describe each of the three experts' opinions, discuss additional facts and data relevant to their purported opinions, discuss the extensive body of law that is applicable to the motion, and apply that law to each expert's opinion. All of this cannot be accomplished in fewer than 60

pages.  Without the full 60 pages, defendants would have to resort to extensive incorporation-by-reference and cryptic summaries, which would make the brief nearly unreadable.  With the 60 pages, defendants will be able to lay out in clear and coherent fashion the facts, law, and analysis that must be considered in determining whether plaintiffs' general causation experts meet the multiple criteria for admissibility under *Daubert* and its progeny.

For similar reasons, defendants propose also to file a single summary judgment motion that combines two distinct issues, pre-emption and general causation, rather than two separate motions, and they respectfully request leave to file a single 45-page brief in support of this motion.  By combining these two issues, some economies will result, for the issues share a limited nucleus of common fact.  At the same time, many other facts that bear on these issues are not common, and, more important, each is legally complex.  The case law on these issues is extensive, and the analysis that each issue requires is substantial.  Defendants cannot properly cover the relevant facts, law, and analysis in anything fewer than 45 pages.  Indeed, any shorter brief would have to be either so dense as to be unreadable or so incomplete as to be of little value.  Defendants thus believe that the 45-page brief will assist the Court in its consideration of their combined motion for summary judgment, and they respectfully request leave to file such a brief in support of it.

### III.    CONCLUSION

For the reasons set forth above, defendants respectfully request that the Court (i) extend the deadline for filing of *Daubert* and summary judgment motions until thirty days after the receipt of the data on which the FDA's Alert is based and (ii) order plaintiffs to make their experts available for deposition within two weeks after the receipt of the data.  Defendants additionally request permission to file memoranda in support of their summary judgment and *Daubert* motions in excess of the Court's twenty page limitation.

This motion is brought on an emergency basis because the deadline for the filing of summary judgment and *Daubert* motions is February 29, and the next discovery conference is not until February 26, 2008, three days before the deadline.  An expedited determination of this motion will avoid a waste of effort during the coming weeks on motion papers that would have to be modified based on the data and additional discovery this motion seeks.

Dated:  February 11, 2008                             Respectfully submitted,

                                             DAVIS POLK & WARDWELL

                                             By:  /s/James P. Rouhandeh
                                                  James P. Rouhandeh

                                             450 Lexington Avenue
                                             New York, NY 10017
                                             Tel:  (212) 450-4000

                                             SHOOK, HARDY & BACON L.L.P.

                                             By:     /s/Scott W. Sayler
                                                    Scott W. Sayler

                                             2555 Grand Blvd.
                                             Kansas City, MO 64108-2613
                                             Tel:  (816) 474-6550

                                                  -and-

                                             HARE & CHAFFIN

                                             By:     /s/David B. Chaffin
                                                  David B. Chaffin

                                             160 Federal Street
                                             Boston, MA 02110
                                             Tel:  (617) 330-5000


                                             *Attorneys for Defendants Pfizer Inc. and*
                                             *Warner-Lambert Company LLC*

## CERTIFICATE OF CONSULTATION

I certify that counsel have conferred and have attempted in good faith to resolve or narrow the issue presented by this motion.

/s/David B. Chaffin

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 11, 2008.

/s/David B. Chaffin
David B. Chaffin