UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ------------------------------------------------------------x : | MDL Docket No. 1629 |
| In re:  NEURONTIN MARKETING,       : | |
|           SALES PRACTICES AND        : | Master File No. 04-10981 |
|           PRODUCTS LIABILITY LITIGATION  : | |
| ------------------------------------------------------------x | Judge Patti B. Saris |
| : | Magistrate Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:    : | |
| :         ALL ACTIONS                          : | |
| ------------------------------------------------------------x | |

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO
<u>MODIFY THE NOVEMBER 9, 2007 CASE MANAGEMENT ORDER</u>**

Products Liability Plaintiffs ("PL Plaintiffs") hereby oppose the emergency motion by Defendants Pfizer Inc. and Warner-Lambert Company ("Defendants") to modify the November 9, 2007 Case Management Order, relating to the scheduling of *Daubert* and summary judgment motions, and oppose in part Defendants' request to exceed the page limitations for these motions.

<u>**PRELIMINARY STATEMENT**</u>

Plaintiffs' experts have no new opinions. Defendants' assertion that Plaintiffs' experts' reliance on the recent FDA Alert that Neurontin doubles the risk of suicide somehow constitutes "new" opinions of Plaintiffs' experts borders on absurdity. From Plaintiffs' first complaint, through Plaintiffs' experts' reports entitled "Declaration of Professor Michael Trimble, M.D. in Relation to Neurontin Causing Negative Mood and Behavioural Alterations, Including Suicidal Behavior, in Treated Patients"; and "Gabapentin: Mechanism of Mood-altering Action" by Stefan P. Kruszewski, M.D., Plaintiffs have consistently maintained that Neurontin increases the

risks of suicide. Yet, Defendants now seek relief from this Court on the surreptitious grounds that the FDA finding that Neurontin increases the risk of suicide somehow makes Plaintiffs' previous consistently and vociferously voiced opinions concerning such risks of Neurontin "new".

Let us all call this what it really is – Defendants are requesting an extension for a presently undetermined period of time, "until thirty days after the relevant data is received from FDA," to fix their expert reports, and not to re-depose the PL Plaintiffs' experts concerning the FDA Alert. Defendants' experts are the ones who need to revamp and change their opinions, not Plaintiffs' experts. Defendants chose a litigation strategy of an extreme nature and should bear the consequences of their decision. Defendants' experts Sanacora, Rothschild and Jacobs, as well as their other experts, all stated that absolutely no evidence whatsoever exists relating Neurontin or any other anti epileptic drug to suicide. Defendants are seeking a way to revamp their entire defense, and this Court should not delay this litigation a moment longer. This Court should not provide Defendants the opportunity to redo their entire defense theory at the expense of their client or Plaintiffs. This litigation has proceeded for the past four years and Plaintiffs deserve their day in court.

On January 31, 2008, the FDA issued an Alert "Information for Healthcare Professionals Suicidality and Antiepileptic Drugs" advising that "All patients who are currently taking or staring on an antiepileptic drug should be closely monitored for notable changes in behavior that could indicate the emergence or worsening of suicidal thoughts or behavior or depression." (Hereinafter referred to as "the Alert", attached to Defs.' moving papers as Ex. A.) The Alert was the result of the FDA's analysis of reports of suicidal behavior or ideation from placebo controlled clinical studies of eleven anti-epileptic drugs. *Id.* The analysis demonstrated that

"patients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation (0.43%) compared to patients receiving placebo (0.22%). The increased risk of suicidal behavior and suicidal ideation was observed as early as one week after starting the antiepileptic drug and continued through 24 weeks." *Id.* PL Plaintiffs supplemented their expert disclosure for experts Sander Greenland, M.A., M.S., Dr.P.H., Michael Trimble, M.D., Cheryl Blume, Ph.D., and Stefan Kruszewski, M.D., as follows:

> On January 31, 2008, the U.S. Food and Drug Administration (FDA), Center for Drug Evaluation and Research (CDER), issued an FDA Alert relating to antiepileptic drugs, including Neurontin. Attached is said FDA Alert and same is incorporated by reference to this supplemental disclosure.
>
> Each of the aforementioned Products Liability Plaintiffs' experts have reviewed and considered the aforementioned FDA Alert. Each of the Products Liability Plaintiffs' experts shall rely on the substance of the FDA Alert in providing opinion testimony that is consistent and supportive of Products Liability Plaintiffs' claim that Neurontin contributes to mood and behavioral disturbances, including depression and suicidality. *Id.*

Contrary to Defendants' assertions, PL Plaintiffs experts are not changing or revamping their opinions but instead intend to rely on the Alert as simply being supportive of their opinions which have previously been expressed in detailed expert reports and examined by counsel in depth through deposition testimony. The parties at this juncture are on an even footing in regard to the Alert and the information contained therein.

This litigation has been ongoing for the past four years. Any delay will prejudice PL Plaintiffs who deserve a resolution to their cases and their day in court. For instance, on June 29, 2006, Plaintiffs requested from the FDA a certified copy of the Clinical Review of the New Drug Application #20-235 for Neurontin. A response to this FOIA request was just received on February 11, 2008, almost a year and eight months after the request. *See* Declaration of Gail Schlanger, submitted herewith. The FDA, like other federal governmental entities, works very

3

slowly, and there is no reason to believe that the parties to this litigation will obtain additional information concerning the Alert at any time in the near future.  The Defendants are essentially requesting that this Court grant a limitless delay in this litigation.  Defendants will never be satisfied with the information provided by the FDA,  Defendants will always claim it is not complete—effectively never bringing this litigation to a conclusion.  Thus, the delay could conceivably prolong this litigation by many months if not a number of years.

Moreover, PL Plaintiffs will be at a distinct disadvantage if Defendants are allowed additional time to further explore the Alert.  Defendants will be privy to discussions with the FDA and documents and information which may never be available to Plaintiffs through the FOIA process.  As noted, it took Plaintiffs more than a year and eight months simply to obtain a certified copy of the clinical review.  The Alert should speak for itself as a document in this case.  New scientific studies, articles and other information is revealed everyday—are Plaintiffs to wait for their day in this Court until a study appears that is favorable to the Pfizer Defendants?  This Court's November 9, 2007 Case Management Order reset the schedule for summary judgment motions on general causation, *Daubert* and preemption as set forth in the Assented to Motion.  (ECF Doc. # 946) that was allowed by the Court (ECF Doc. # 949).  Plaintiffs submit that this Court should adhere to the schedule established.  The parties to this litigation are on equal footing—each has a copy of the Alert.

Furthermore, PL Plaintiffs have made it quite clear, from the inception of this litigation by the first complaint filed, through the discovery process and every targeted discovery request, to the questioning conducted at the depositions of Defendants and Defendants' experts, that all efforts were aimed at supporting the claim that Neurontin causes suicide.  Plaintiffs' expert opinions support the claim that Neurontin causes suicide.  For Defendants to suggest the FDA

4

Alert confirming that Neurontin causes suicide is now a "new" opinion which comes as a surprise requiring that discovery be reopened is a mere ploy to delay the inevitable—exposing the truth. There are hundreds of Americans who were harmed from their ingestion of Neurontin and who deserve justice from this Court. Plaintiffs respectfully request that this Court deny Defendants' motion to modify the schedule contained in the November 9, 2007 Case Management Order.

In regard to Defendants' request to exceed the page limitations, if Defendants intend to combine the preemption and general causation motions for summary judgment, PL Plaintiffs request that the moving and opposition papers on preemption and general causation be limited to 60 pages. Plaintiffs submit that replies and sur-replies retain the normal 7-page limitations.

**ARGUMENT**

**I.    CONTRARY TO DEFENDANTS' ALLEGATIONS, PL PLAINTIFFS' EXPERTS HAVE NOT ALTERED THEIR OPINIONS CONCERNING NEURONTIN, AND INTEND TO RELY ON THE FDA ALERT SIMPLY AS FURTHER SUPPORT OF THEIR OPINIONS**

PL Plaintiffs are not revamping or changing any of their expert opinions as detailed in their expert reports based upon the Alert. Plaintiffs' experts will simply rely on the Alert as further supporting their heretofore expressed opinions in regard to Neurontin.

**A.    PL Plaintiffs' Supplemental Expert Disclosure Does Not Set Forth Any New Opinions and Is Consistent With Fed. R. Civ. P. 26(e).**

The Court should deny Defendants' motion to modify the schedule contained in the November 9, 2007 case management order. The crux of Defendants' argument is that PL Plaintiffs' expert disclosure sets forth "new" opinions based upon a January 31, 2008 FDA Alert on Suicidality and Antiepileptic Drugs. *See* Defs.'Ex. A. Defendants are plainly wrong. Plaintiffs' experts are not putting forth any "new" opinions. Rather, the FDA Alert is simply

5

another source of information that is consistent with Plaintiffs' previously exchanged Rule 26 expert disclosures.

Consistent with Fed. R. Civ. P. 26(e), PL Plaintiffs supplemented their experts' disclosures with additional information that facilitated the completeness of their reports. Rule 26(e) states in pertinent part: "(e) Supplementation of Disclosure and Responses. (1) In General. A party who has made a disclosure under Rule 26(a) . . . must <u>supplement</u> or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is <u>incomplete</u> or incorrect, and if the additional or corrective information has not otherwise been <u>made known</u> to the other parties during the discovery process or in writing . . . . " (Emphasis added.)

Applying the rule to the present case, PL Plaintiffs timely <u>supplemented</u> their expert disclosures because the Alert provided information supplemental to previously disclosed opinions. The reference to the Alert goes towards the <u>completeness</u> of the disclosures, and the failure to <u>make known</u> to Defendants this <u>additional</u> material would have been contrary to Rule 26(e).[1]

As previously stated, PL Plaintiffs' supplemental disclosure does not serve to offer any "new" opinions. The Alert is consistent with and supportive of Plaintiffs' previous expert

---

[1] Noteworthy, after the discovery deadline for Defendants' own expert disclosures, Defendants also supplemented their own expert disclosures. For example, on January 17, 2008, defense counsel supplemented the disclosure pertaining to their expert, Douglas Jacobs, M.D. Specifically, defense counsel, via email, disclosed <u>additional</u> materials reviewed by their expert. (*See* Exhibit A.) On January 2, 2008, defense counsel, via email, supplemented the disclosure pertaining to their expert, Janet Arrowsmith-Lowe. Specifically, defense counsel disclosed "an <u>additional</u> and more <u>complete</u> list of prior testimony" relating to the expert (*See* Exhibit B (emphasis added).)

Similar to the information included in Defendants' supplemental disclosures, and which did not serve to change or provide any new opinions to be offered by their experts, PL Plaintiffs also have supplemented their own disclosures with <u>additional</u> material that does not offer any new opinion. Rhetorically, would Defendants' concern be appeased if Plaintiffs' counsel had emailed an informal communication, as did Defendants, that Plaintiffs' experts had reviewed additional material and sought to add to their list of materials? While Plaintiffs' counsel chose a more formal route of correspondence, the intended purpose was the same: no new opinion disclosed, just new material that supports the opinion and makes the disclosure more complete.

disclosure and Plaintiffs' claim that Neurontin contributes to mood and behavioral disturbances, including suicidality. One need only look to the Alert to recognize that the language of the Alert is consistent with the opinions of Plaintiffs' experts: it is merely <u>additional</u> material that serves to further <u>complete</u> Plaintiffs' disclosures and in accordance with the Rule 26(e), Plaintiffs properly disclosed the material to Defendants.

The Alert explains that there was observed by the FDA an increased risk of suicidal behavior and suicidal ideation with the use of antiepileptic drugs. Eleven drugs, including Neurontin, were evaluated by the FDA. The Alert explains that patients treated for psychiatric disorders and other conditions (e.g., pain syndromes) were all at increased risk for suicidality when compared to placebo. The Alert recommends that patients taking "any antiepileptic drug should be closely monitored for notable <u>changes in behavior</u> that could indicate the emergence or worsening of suicidal thoughts or behavior or depression." (Emphasis added.) The Alert explains that patients should be monitored for "<u>unusual changes in behavior</u>" including "[s]ymptoms such as anxiety, agitation, hostility, mania and hypomania . . . ." (Emphasis added.) The alert instructs doctors to "inform patients, their families, and caregivers . . . [to] pay close attention to any day-to-day changes in mood, behavior and actions." Lastly, the Alert indicates that "FDA expects that the increased risk of suicidality is shared by all AEDs [anti-epileptic drugs] and anticipates that the class labeling changes will be applied broadly." *See* Def.s' Ex. A.

To demonstrate the supportive nature of the Alert, the Court's attention is respectfully referred to excerpts of PL Plaintiffs' experts reports. These excepts should amply demonstrate to this Court that the Alert is supportive of the already set forth opinions of Plaintiffs' experts. The references below are not meant to be exhaustive, but merely illustrate how Plaintiffs' experts' use

of the Alert is not for purposes of offering a "new" opinion, but merely for purposes of referring to additional supportive material which makes the expert disclosures more complete.

For example, PL Plaintiffs' expert, Stefan Kruszewski, M.D., in his previously disclosed expert report (attached as Exhibit C), stated the following:

> This report is limited to gabapentin's capacity to cause negative mood alteration in susceptible people . . . . It is further my opinion that gabapentin's net effect on these neurotransmitter systems results in self-injurious behavior, including attempted and completed suicide in a susceptible minority of consumers. [Kruszewski Report, p.1.]
>
> This net effect has been repeatedly shown in peer reviewed literature to affect mood and mood-related behaviors. Gabapentin's adverse effects upon mood and mood related behaviors have the capacity to cause, *inter alia*, dysphoria, sadness, depression, abnormal thinking, depersonalization, irritability, agitation, aggression, suicidal behavior and completed suicides. [Kruszewski Report, p.19.]

Likewise, PL Plaintiffs' expert, Michael Trimble, M.D., opined in his previously disclosed expert report, concerning not only the association of Neurontin with psychiatric adverse events, but also the association specifically with Neurontin and mood disorders and suicidality. Importantly, Dr. Trimble was hired by Defendants as long ago as 1995 and at that time he informed Defendants that "the main adverse effect of anticonvulsants is the link between anticonvulsant drugs and depression." (Trimble Report, p.2, attached as Exhibit D.) In his expert disclosure for this litigation, Dr. Trimble further states the following:

> This report is prepared as an expert opinion in relationship to the capacity of the drug gabapentin (Neurontin) to contribute to acts of completed suicide or suicidal attempts in patients prescribed the medication. [Trimble Report, p.2.]
>
> Accordingly, patients taking gabapentin are at risk to develop mood instability and affective disorders that may predictably result in suicidal behavior, in particular, patients who have a prior personal history of mood disorders are at greater risk with gabapentin. [Trimble Report, p.7.]
>
> Prescribing of drugs with the profile of gabapentin in vulnerable patients with a past history of mood disorder or impulsive aggressivity or with a current mood disorder should be undertaken only after a complete psychiatric anamnesis, and

with a risk assessment with regards to the potential for suicide. [Trimble Report, p.7.]

PL Plaintiffs' expert, Cheryl Blume, Ph.D., in her previously disclosed expert report (attached as Exhibit E), states the following:

> I have been asked by counsel to provide an opinion on whether Neurontin contributes to mood and behavior disturbances including self-injurious actions and suicide. . . . The documentary evidence in this case demonstrates that the Pfizer Defendants were aware of multiple pre-marketing clinical trial reports and post-marketing patient events of self-injurious behavior, including suicide, in association with Neurontin. [Blume Report, p.1.]

Dr. Blume further opined how Defendants failed to warn consumers, and she proposed labeling language that should have been included by Defendants, including the following: "Patients of all ages who are started on Neurontin should be monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior. Families and caregivers should be advised of the need for close observation and communication with the prescriber." *Id.* at 196.

Clearly, the statements within the experts' previous disclosures, illustrated above, were an accurate foreshadowing of what has now come into the public view as a recognized concern by the FDA about the association of suicidality and Neurontin (as well as other anticonvulsants). The statements in the Alert are consistent and supportive of the opinions previously disclosed by PL Plaintiffs' expert disclosures. There is no "new" Plaintiffs' expert opinion—there is only additional material disclosed by Plaintiffs' experts, much the same way as Defendants supplemented their expert disclosures regarding additional materials related to their experts.

**B.    Defendants Misapply Plaintiffs Experts' Criticism of Defendants' Neurontin-specific Data Regarding Suicide That Was Provided to the FDA.**

Whether PL Plaintiffs or Plaintiffs' experts attack or otherwise criticize Defendants' Neurontin-specific data provided to the FDA regarding suicide is not probative as to whether

9

Defendants are entitled to an extension of the current discovery schedule: the two issues cannot be juxtaposed as Defendants seek. Defendants allege that Defendants' Neurontin-specific data did not show an increased risk of suicide. Plaintiffs' experts have criticized Defendants' conclusions on the grounds that the data upon which Defendants base their position is flawed due to the fact that Defendants' clinical trials, protocols and methods of analyzing data were improperly designed and underpowered.

     PL Plaintiffs do not dispute that Defendants' Neurontin-specific data, based upon improperly designed and underpowered clinical trials, show no increased risk of suicide. This is not a new issue in the case, and there are no "new" opinions regarding the issue in Plaintiffs' supplemental Rule 26 expert disclosure. The sole material that formed the basis of the supplemental disclosure is the FDA Alert, and the Alert speaks for itself. The supplemental disclosure does not reflect any new opinion or any opinion contrary to previous disclosure. The two issues simply cannot be connected for purposes of deliberating over the substance of Plaintiffs' supplemental disclosure or whether there is a need for an extension of the discovery schedule. Nevertheless, because Defendants have claimed certain admissions and concessions by Plaintiffs in an attempt to obscure the facts at issue, Plaintiffs shall respond accordingly.

     Let there be no confusion by this Court or the parties as to the criticism of Defendants' Neurontin-specific data they claim shows no increased risk of suicide with Neurontin. Plaintiffs' experts are not "revamping" their opinions as Defendants claim. As stated by Plaintiffs' expert, Dr. Sander Greenland, in his previous expert disclosure, Defendants' Neurontin-specific data as provided to the FDA "provide no evidence regarding the <u>presence or absence</u> of a relation of gabapentin to suicide." (*See* Greenland Report, p. 2, attached as Exhibit F.) Dr. Greenland tactfully informs the reader that Defendants' Neurontin-specific data is useless to determine the

10

risk of suicide associated with Neurontin: "These expected and observed numbers of completed suicides are far too small to draw any statistically reliable conclusion." *Id.* at p. 7. Dr. Greenland continues his opinion of Defendants' Neurontin-specific data: "[T]he data are statistically compatible with any and every hypothesis about the gabapentin effect [including] the hypothesis that <u>gabapentin triples the risk of completed suicide</u>." *Id.* (emphasis added.) Noteworthy, Defendants chose not to depose Dr. Greenland subsequent to receiving his expert disclosure.

In conclusion, Defendants' characterization of admissions or concessions regarding their Neurontin-specific data is not only misleading, its not probative of whether Defendants are entitled to an extension of the discovery schedule. Defendants' request should be denied.

    C.    **Defendants Have Failed to Demonstrate Just Cause for an Extension of Discovery.**

A court may make "a scheduling order that limits the time . . . to file motions," Fed. R. Civ. P. 16(b)(2), and "to complete discovery." Rule 16(b)(3). Further, "A schedule shall not be modified except upon a showing of good cause". *Id.* "Summary judgment motions are often the most significant pretrial matters and are typically the most time-consuming motions considered by the district courts. Imposing reasonable limits on when they may be filed, therefore, is critical for the scheduling of trial in individuals cases and for the management of the entire docket, which were the goals behind the amendment of Federal Rule 16." *Julian v. Equifax Check Servs.,* 178 F.R.D. 10, 14 (D. Conn. 1998); *see also Martinez v. Cornell Corrections of Texas*, 377 F. Supp. 2d. 1138 (D.N.M. 2005) (denying motion to extend deadlines for summary judgment motion where defendant failed to demonstrate good cause for extension).

As discussed in detail above, Defendants have not provided sufficient good cause for the extension. The FDA Alert in no way altered PL Plaintiffs' experts' opinions. The FDA Alert

merely serves as further support for the opinions heretofore expressed by Plaintiffs experts. At this juncture in the litigation, the parties are on an equal footing as Plaintiffs and Defendants have the same information available concerning the FDA Alert. There is no way to assure that the information or the data and analysis underlying the Alert will be fully available to both Defendants and Plaintiffs within the near future. It would be unconscionable to subject Plaintiffs, many of whom have waited up to four years already, to any additional delay so that Defendants may, in essence, redo their theory of this case. That this litigation may be prolonged for many months, if not for a number of years, is evidenced by the time that Plaintiffs have waited to receive a certified copy of the NDA Clinical Review for Neurontin.

Moreover, Defendants' request to modify the November 9, 2007 Case Management Order for a presently undetermined period of time, "until thirty days after the relevant data is received from FDA," would be severely prejudicial to PL Plaintiffs in terms of additional expenditure in time and money. Moreover, are injured plaintiffs just to wait idly as this litigation comes to a screeching halt every time a new article or piece of information arises in the public domain? Plaintiffs deserve some measure of assurance that there will be a finality to their litigation and that they will receive justice and their day in court.

The fact that Defendants' experts opinions and theories run starkly contrary to the FDA Alert is not sufficient grounds to grant any delay in the scheduling of this litigation, never mind an inordinate open ended delay as proposed by Defendants. Plaintiffs respectfully request that this Court deny Defendants' motion to modify the November 9, 2007 Case Management Order and that *Daubert*, preemption and summary judgment motions on general causation proceed as presently scheduled.

II. **A REQUEST TO EXCEED THE TWENTY-PAGE LIMITATION OR THE PREEMPTION AND GENERAL CAUSATION SUMMARY JUDGMENT MOTIONS IS WARRANTED**

In regard to Defendants' request to exceed the page limitations, if Defendants intend to combine the preemption and general causation motions for summary judgment, PL Plaintiffs request that the moving and opposition papers on preemption and general causation be allowed a 60-page limit. Plaintiffs submit that replies and sur-replies should retain the normal 7-page limitation.

Increasing the page limitation on the moving and opposition briefs on preemption is necessary due to the fact that the issue of preemption concerns a complex theory which must be addressed on several different levels, including the type of preemption alleged by Defendants, the relevant case law regarding the FDA and its approval of pharmaceutical drugs, and the specific factual situation concerning the FDA approval of Neurontin. PL Plaintiffs will not be able to adequately address the issue of preemption in less than 45 pages. Plaintiffs submit that if Defendants' motion on preemption is combined with their motion on general causation, a 60-page limit for Plaintiffs would be sufficient for a response. As noted above, since the page limitations for the moving and opposition papers will be increased, the normal 7-page limits for replies and sur-replies should be sufficient for all parties.

**CONCLUSION**

PL Plaintiffs therefore respectfully request that this Court deny Defendants' Emergency Motion to modify the schedule contained in the November 9, 2007 Case Management Order, and allow the parties to exceed the page limitations for the moving and opposition papers on general causation and preemption to 60 pages if the two motions are to be combined.

Dated: February 15, 2007

Respectfully submitted,

*Members of Products Liability Plaintiffs' Steering Committee*

By: **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, NY 12550

By: **/s/ Jack W. London**
Jack W. London, Esquire
Law Offices of Jack W. London
  & Associates
106 E. 6th Street, Suite 700
Austin, TX 78701

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on February 15, 2008.

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire