UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING,
       SALES PRACTICES AND
       PRODUCTS LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

ALL PRODUCTS LIABILITY CASES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: MDL Docket No. 1629
:
:
: Master File No. 04-10981
:
: Judge Patti B. Saris
:
: Magistrate Judge Leo T. Sorokin
:
:
:
:
:

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS PFIZER INC.
AND WARNER-LAMBERT COMPANY LLC'S MOTION TO EXCLUDE THE
TESTIMONY OF DOCTORS TRIMBLE, KRUSZEWSKI AND BLUME
ON THE ISSUE OF GENERAL CAUSATION**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
Tel:  (212) 450-4000

SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel:  (816) 474-6550

-and-

HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
Tel:  (617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company LLC*

Table of Contents

Page

PRELIMINARY STATEMENT ................................................................................................... 4

BACKGROUND .......................................................................................................................... 6

I.      NEURONTIN AND SUICIDE OVERVIEW ................................................................. 6

        A.      Neurontin Has Been Approved As Safe and Effective As Labeled For More Than
                a Decade........................................................................................................... 6

        B.      Neurontin Patients' Pre-Existing Conditions Increase Their Risk For Suicide...... 6

ARGUMENT ............................................................................................................................... 9

II.     WELL-ESTABLISHED    SCIENTIFIC    METHODOLOGY    EXISTS    FOR
        EVALUATING GENERAL CAUSATION...................................................................... 9

        A.      Plaintiffs Bear the Burden of Proving General Causation By Reliable and
                Relevant Scientific Evidence. ................................................................................ 9

        B.      Plaintiffs Must First Come Forward with Epidemiologic Evidence of a
                Statistically Significant Association Between Neurontin and Suicide-Related
                Events........................................................................................................... 10

        C.      Only If a Statistically Significant Association Is Found, Is It Proper to Examine
                Whether Neurontin Causes Suicide-Related Events by Application of the
                Bradford Hill Criteria...................................................................................... 12

III.    THERE IS NO EPIDEMIOLOGIC EVIDENCE ESTABLISHING THAT NEURONTIN
        IS ASSOCIATED WITH, LET ALONE CAUSES, SUICIDE-RELATED EVENTS.... 13

        A.      The Clinical Trial Data Fail To Support an Association Between Neurontin and
                Suicide............................................................................................................ 14

        B.      The McFarland Study Fails To Establish an Association and, If Anything,
                Suggests that Neurontin May Be Protective Against Suicide............................... 17

        C.      Plaintiffs' Experts Admit that the Epidemiologic Data Fail To Show an
                Association Between Neurontin and Suicide-Related Events; Plaintiffs Have Thus
                Failed To Meet Their General Causation Burden.............................................. 20

        D.      Even Assuming *Arguendo* that Plaintiffs Relied On a Statistically Significant
                Association Between Neurontin and Suicide-Related Events (Which They Admit
                Does Not Exist), the Association Is Not Causal. ............................................... 21

IV.   PLAINTIFFS' EXPERTS' OPINIONS FAIL TO SATISFY *DAUBERT'S* REQUIREMENTS...........................................................................................23

    A.   Plaintiffs' Experts Have Done Nothing To Test Their General Causation Theories.....................................................................................................25

    B.   Plaintiffs' Experts' Causation Theories And Methodologies Are Not Generally Accepted Anywhere in the World........................................................27

        1.   Plaintiffs' Theory That Neurontin Causes Suicide Is Not Generally Accepted. ............................................................................27

        2.   Plaintiffs' Methodologies Are Not Generally Accepted.........................28

    C.   Plaintiffs' Experts' Failed to Consider Rate of Error and Proper Controls. .........30

    D.   Neither the Theories Nor Methodology Used By Plaintiffs' Experts In This Litigation Have Been Subjected to Peer Review and Publication........................31

    E.   Plaintiffs' Experts' General Causation Theory Was Developed Solely for Litigation...............................................................................................33

        1.   Dr. Trimble's opinions are directly contrary to his published views on Neurontin prior to his involvement in this litigation. ................................33

        2.   Dr. Kruszewski's opinions were developed entirely within the context of this litigation for the express purpose of overcoming an anticipated *Daubert* challenge....................................................................................34

        3.   Dr. Blume never expressed any opinions regarding Neurontin and suicide prior to her involvement in the drafting of Plaintiffs' counsel's Citizen Petition. ..................................................................................35

V.   PLAINTIFFS' EXPERTS BASE THEIR GENERAL CAUSATION OPINIONS ON UNRELIABLE AND IRRELEVANT "EVIDENCE." ....................................................36

    A.   Anecdotal Reports of Adverse Events In the Postmarketing Safety Databases Are Unreliable...............................................................................................36

    B.   Published Anecdotal Case Reports Are Unreliable and Irrelevant.......................42

    C.   Dechallenge Reports and a Single Rechallenge Report Are Unreliable................42

    D.   Hand-Picked Adverse Events From Neurontin Clinical Trials Are Unreliable.....44

    E.   Non-Suicide, Psychiatric Adverse Events Are Unreliable. ..................................46

    F.   Reliance on the McCormick Review Is Misplaced...............................................50

G.     Analogies to Chemically Distinct Drugs Are Unreliable and Not Scientifically Valid.................................................................................................................... 51

H.     Reliance on Mechanism of Action Theories Is Unscientific. ............................... 53

1.     It is uncontested that animal and *in vitro* laboratory studies do not predict suicide; therefore, reliance on such studies fails *Daubert*. ....................... 53

2.     Plaintiffs' experts' speculative and untested mechanism of action theories are contrary to existing science and thus unreliable. ................................ 54

VI.     DRS. KRUSZEWSKI AND BLUME HAVE IMPROPERLY TESTIFIED OUTSIDE THE SCOPE OF THEIR EXPERTISE. .......................................................................... 57

A.     Dr. Kruszewski Is Not Qualified to Opine On the Issue of Mechanism of Action. ................................................................................................................ 58

B.     Dr. Blume Is Not Qualified to Opine on the Issue of Mechanism of Action. ...... 59

CONCLUSION................................................................................................................................ 60

Defendants, Pfizer Inc. and Warner-Lambert Company LLC ("Pfizer"), respectfully submit this memorandum in support of their motion to exclude the opinion testimony of Drs. Michael Trimble, Stefan Kruszewski, and Cheryl Blume that Neurontin (gabapentin) is capable of causing suicide, suicide attempt, suicide gesture, or suicidal ideation (collectively "suicide-related events").

## PRELIMINARY STATEMENT

It is undisputed—plaintiffs concede and agree—that the Neurontin clinical trial data show no increased risk of suicide.[1]  Nevertheless, three of plaintiffs' experts—Drs. Stefan Kruszewski, a clinical psychiatrist who previously sued Pfizer in a whistleblower lawsuit,[2] Cheryl Blume, a pharmaceutical consultant for plaintiffs in tort litigation, and Michael Trimble, a neuropsychopharmacologist who previously disclaimed any relationship between Neurontin and psychiatric events—opine that Neurontin causes suicide.[3]  At the same time, these experts admit that the clinical and epidemiologic data <u>fail</u> <u>to</u> <u>establish</u> that Neurontin use is associated with

---

[1] Products Liability Plaintiffs' Memorandum in Opposition to Defendants' Emergency Motion to Modify the November 9, 2007 Case Management Order, at 10 (Doc. 1134) ("Plaintiffs do not dispute that Defendants' Neurontin-specific data, based upon improperly designed and underpowered clinical trials, show no increased risk of suicide.").

[2] Before being retained by plaintiffs, Dr. Kruszewski filed a whistleblower lawsuit against several pharmaceutical companies, including Pfizer, claiming that Pfizer was involved in a conspiracy with President Bush (among others), which caused Dr. Kruszewski's employer to fire him.  Declaration of Scott W. Sayler, Esq. ("Sayler Decl."), Ex. 9 at 537:17-539:13.

[3] Plaintiffs' also designated Drs. Robert Roth, Bentson McFarland, and Sander Greenland as experts on general causation.  Notably, <u>none</u> of these experts opine that Neurontin causes suicide.  Drs. McFarland and Greenland, both epidemiologists, and Dr. Robert Roth, a Yale-trained neuropharmacologist, expressly decline to give general causation opinions.  Sayler Decl., Ex. 7 at 205:16-206:1; Sayler Decl., Ex. 10 at 7, 14-15; Sayler Dec., Ex. 11 at 11:21-24, 55:12-56:4.  And they have given opinions that agree with Pfizer's experts.  *See, e.g.*, Sayler Decl., Ex. 11 at 77:15-24 (Dr. Roth opines that there are no good animal models that predict suicide in humans); Sayler Decl., Ex. 7 at 212:12-16 (Dr. McFarland opines that his study is consistent with conclusion that Neurontin does not cause suicide); Sayler Decl., Ex. 10 at 19 (Dr. Greenland admits that the epidemiologic evidence does not establish an association between Neurontin and suicide).  Because neither Drs. Roth, McFarland nor Greenland offer general causation opinions, *i.e.*, that Neurontin causes suicide-related events, Pfizer does not seek to exclude their opinions at this time.

suicide-related events.   They further admit that <u>no</u> regulatory, medical or scientific body has concluded that Neurontin can cause suicide.[4]  They admit that they have <u>not</u> tested their theory that Neurontin causes suicide.  They admit that they <u>cannot</u> identify the rate of error associated with their theories and methodology.   They admit that there is <u>no</u> peer-reviewed literature published worldwide opining or concluding that Neurontin causes suicide.  They admit they have <u>not</u> published their causation theory or the methodology upon which it is based.   Further, they admit that they only concluded that Neurontin causes suicide <u>after</u> being hired as experts by plaintiffs in this litigation.

Because plaintiffs' experts admit that there is no epidemiologic evidence of a statistically significant association between Neurontin and suicide-related events, they <u>cannot</u> complete even the initial step in the generally accepted scientific methodology to meet their burden to demonstrate that Neurontin causes suicide-related events.  Instead, Drs. Kruszewski, Trimble and Blume uniformly base their general causation opinions on unreliable evidence—anecdotal case reports, cherry-picked clinical trial case reports, unscientific extrapolations and speculative theories based on *in vitro* and animal data—and ignore unsupportive epidemiologic evidence.

Allowing these cases to proceed in the absence of any reliable scientific evidence would reward precisely the kind of misuse of the civil justice system that Rules 702 and 703 of the Federal Rules of Evidence and *Daubert* and its progeny are intended to prevent.   As Judge

---

[4] FDA issued an Alert on January 31, 2008 regarding an increased risk of suicidal behavior and thinking in patients receiving antiepileptic drugs versus those receiving placebo.  The Alert was based on analysis of pooled data from clinical trials of 11 chemically and pharmacologically different medications used in the treatment of seizures.  In the Alert, FDA did not determine that Neurontin, or any of the specific antiepileptic drugs included in the pooled data set, causes suicide-related events.   Rather, FDA emphasized that "Posting this information does <u>not</u> mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue."  Sayler Decl., Ex. 1 at 1.  More importantly, as discussed <u>infra</u> III, the Neurontin-specific placebo-controlled data contained in this FDA analysis fail completely to establish any association between Neurontin specifically and suicidal behavior or thinking.

Richard Posner has stated, "the courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it."  *Rosen v. Ciba-Geigy Corp*., 78 F.3d 316, 319 (7th. Cir 1996).  Pfizer thus requests that this Court, exercising its *Daubert* gatekeeping role, exclude plaintiffs' experts' testimony on the basis of plaintiffs' failure to satisfy Rules 702, 703 and *Daubert*.

## BACKGROUND

### I.    NEURONTIN AND SUICIDE OVERVIEW

#### A.    Neurontin Has Been Approved As Safe and Effective As Labeled For More Than a Decade.

FDA approved Neurontin as safe and effective for the adjunctive treatment of refractory epilepsy in December 1993.[5]   More than eight years later, in May 2002, FDA approved Neurontin as safe and effective for the management of postherpetic neuralgia (PHN) in adults. Coronel Decl., Ex. 2 at 1.  FDA specifically reviewed and considered adverse event reports related to suicide during the review and approval processes.  FDA has never concluded that Neurontin can cause suicidal behavior or thinking.  Sayler Decl., Ex. 2 at ¶¶ 13-14, 35-38, 46.

Physicians have prescribed Neurontin not only for epilepsy and PHN, but also for other conditions, such as psychiatric and pain disorders.  Between 1993 and 2004, an estimated 13.7 million patients were prescribed Neurontin.  Coronel Decl., Ex. 3 at 3.

#### B.    Neurontin Patients' Pre-Existing Conditions Increase Their Risk For Suicide.

In the United States, suicide is the 11th leading cause of death in the general population. Sayler Decl, Ex. 3 at 5, Table C.  More than 30,000 individuals commit suicide each year.  For each completed suicide, there are an estimated 10 to 25 non-fatal attempts.  Most suicide victims

---

[5] Declaration of Mary Ann Coronel, R.Ph. ("Coronel Decl."), Ex. 1 at 1

have one or more known risk factors for suicide, which include several psychiatric disorders, chronic pain, substance abuse, and epilepsy.

Virtually all Neurontin patients are at a heightened risk for suicide due to their underlying medical or psychiatric illnesses.[6]  For instance, the annual rates of suicide in bipolar disorder (.4%), anxiety (.193%), epilepsy (.035-.073%) and pain (.02-.05%) patient groups far exceed the annual rate of .014% in the general population.   Coronel Decl., Ex. 4 at 10-12.   Stated differently, patients with bipolar disorder are 40 times more likely to commit suicide than the general population.  Patients with anxiety disorder are nearly 20 times more likely to commit suicide.  Patients with epilepsy are more than three times as likely to commit suicide.  And patients with chronic pain are two to five times more likely to commit suicide.  As FDA has explicitly acknowledged, these background rates must be considered in evaluating suicidality in the context of Neurontin.  Sayler Decl., Ex. 4 at 1 (noting that individuals receiving Neurontin for psychiatric illnesses "are well-known to be associated with an increased risk of suicide compared to the general population").

The risk factors for suicide fully explain the suicide-related events that plaintiffs seek to blame on Neurontin.  Plaintiffs in the initial group of Track One cases had classic risk factors for suicide, increasing their risk of suicidal thinking or behavior far beyond that of the general population.  Each initially-designated Track One case[7] was evaluated by Dr. Douglas Jacobs, a nationally recognized expert on suicide and author of the *Harvard Medical School Guide to*

---

[6] Sayler Decl, Ex. 2 at ¶¶ 15, 38; Sayler Decl., Ex. 4 at 1; Sayler Decl., Ex. 5 at 470:4-20, 472:11-23; Sayler Decl., Ex. 6 at 27:14-25,  60:21-61:8, 62:7-20; Sayler Decl., Ex. 7 at 134:13-23.

[7] Dr. Jacobs' expert report reviewed the ten initially-designated Track One cases.  Subsequently, plaintiffs abandoned three of those cases (*Strickland*, *Mendoza*, and *Fenelon*).  More recently, an additional seven Track One cases were chosen by the parties and the Court.  Initial discovery in these cases must be completed by March 31, 2008.  Pfizer intends to supplement Dr. Jacobs' opinions with an analysis of the newly-designated Track One cases following this discovery.

*Suicide Assessment and Intervention*.  Dr. Jacobs found that each suicide-related event can be fully explained by established risk factors without regard to Neurontin:

- **Bentley:**  Decedent had a long-standing history of alcoholism; suffered from underlying depression; was diagnosed with chronic anxiety, characterized by "high anxiety attacks;" had manifested suicidality at least once before using Neurontin; and was molested as a child. Decedent's suicide was preceded by a series of financial, marital, and work-related stressors, culminating in him hanging himself at work.  Sayler Decl., Ex. 8 at 22.

- **Fenelon:**  Decedent had attempted suicide before ingesting Neurontin for the first time; suffered from alcoholism, chronic depression, fatigue, chronic pain and chronic hepatitis; and had a family history of mental illness.  *Id.*

- **McGee:**  Decedent suffered from joint pain and fibromyalgia, causing persistent pain and discomfort, and a variety of psychosocial stressors, including financial problems.  She left a note explicitly stating that the reason for her suicide was her financial situation.  *Id.*

- **Mendoza:**  Plaintiff attempted suicide on at least two separate occasions before using Neurontin; has been diagnosed with bipolar disorder; suffers from chronic depression; is a poly-substance abuser (marijuana and crack cocaine); and has severe psychosocial stressors, including several domestic violence incidents, homelessness, and incarceration for assault. The "trigger event" for his alleged suicide attempt was his desire to find living arrangements (in-patient care at the hospital) after he was expelled from his group home and found himself homeless.  *Id.* at 22-23.

- **Owens:**  Decedent suffered from chronic depression and chronic pain that limited his ability to work and/or enjoy life activities.  He explicitly told family members the actual cause of his suicide: namely, that if he could not find work, he would kill himself.  *Id.* at 23.

- **Pursey:**  Decedent had a history of profound psychiatric problems, including agoraphobia, panic, acute depressive symptoms, and bipolar disorder.  He also had a long history of suicidal ideation before he ever ingested Neurontin.  His suicide was acutely triggered by marital dysfunction and financial stressors.  *Id.*

- **Roberson:**  Decedent had a long history of treatment-resistant depression, chronic pain, and alcoholism, and had gone through a detoxification program 18 months before his suicide. Several weeks before his suicide, he resumed drinking and his wife threatened to leave him. Decedent left a suicide note in which he apologized for not being able to stop drinking and stated that he was no good to his wife.  *Id.*

- **Smith:**  Decedent had long suffered from chronic pain, which culminated in severe hopelessness after his physicians told him he was not a candidate for any further surgery to relieve his pain.  He left a suicide note identifying the cause of his decision to end his life:

> Pain has taken over my mind and body.  I need back surgery left
> and right rotator cuffs right bicep torn back surgery to correct pain

- 8 -

> in legs.  Forgive me; I cannot go on like this!  I cannot have my body, the temple of the Holy Spirit cut on anymore.  I have talked to God all night and he understands.  *Id.* at 7-8, 24.

- **Strickland:**  Plaintiff has a history of mental illness (paranoid schizophrenia), poly-substance abuse and chronic pain.  He also has a variety of psychosocial stressors that explain his alleged suicide attempt, including an extensive criminal history and unresolved grief regarding the murder of his son.  *Id.* at 24.

- **Vercillo:**  Plaintiff has a long history of poly-substance abuse (LSD, ecstasy and "mushrooms"), anxiety symptoms and depressive symptoms.  He also has a long history of legal difficulties, including assault and domestic violence charges.  Multiple psychosocial stressors preceded the alleged suicide attempt, including the inability to hold steady employment, living at home with his parents, social isolation, and lack of self-esteem.  *Id.*

As shown below, there is no proper basis for plaintiffs to adduce purportedly "scientific" evidence that Neurontin—as opposed to the well-established suicide risk factors evident in each of the cases and, in some cases, the reasons explicitly documented in the decedent's final words—caused the suicide-related events.

## ARGUMENT

## II.    WELL-ESTABLISHED SCIENTIFIC METHODOLOGY EXISTS FOR EVALUATING GENERAL CAUSATION.

### A.    Plaintiffs Bear the Burden of Proving General Causation By Reliable and Relevant Scientific Evidence.

Causation in pharmaceutical personal injury cases is typically analyzed in terms of general and specific causation.[8]  General causation refers to whether the substance at issue can cause the harm alleged; specific causation refers to whether exposure to the substance caused the harm in a particular individual.  Sayler Decl., Ex. 12 at 333; *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 402 (S.D.N.Y. 2005).  Here, Plaintiffs have the burden of proof on both general causation, that is, whether Neurontin is capable of causing suicide-related events, and specific causation, that is, whether Neurontin caused the suicide-related event alleged in each particular

case. *See, e.g., Grimes v. Hoffmann-LaRoche, Inc.*, 907 F. Supp. 33, 38 (D.N.H. 1995) (excluding plaintiff's expert's opinion on general and specific causation before granting defendant's motion for summary judgment). To carry their burden of proving general causation, plaintiffs must come forward with reliable and relevant scientific evidence that Neurontin can cause suicide-related events. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (trial judges must ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (same); *Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir. 1998) (proponent of expert evidence bears the burden of proof).

### B. Plaintiffs Must First Come Forward with Epidemiologic Evidence of a Statistically Significant Association Between Neurontin and Suicide-Related Events.

The Federal Judicial Center's Reference Manual on Scientific Evidence provides guidance to courts on the proper methodology for establishing general causation. *Atkins v. Virginia*, 536 U.S. 304, 327 (2002) (noting that the Reference Manual offers helpful suggestions to judges called upon to assess the weight and admissibility of evidence); *e.g., Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 70 (D. Mass. 2000) (referring to the Reference Manual in concluding that expert's methodology was unreliable); *Grimes*, 907 F. Supp. at 38 (same). In assessing general causation, the first question scientists must ask is whether "the results of an epidemiologic[9] study reveal an association between an agent and disease." Sayler Decl., Ex. 12

---

[8] *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1171-72 (N.D. Cal. 2007) (citing *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002)).

[9] The science of epidemiology provides "the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease." *Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 1025-26 (S.D. Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir. 1994); *see generally In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1224 (D. Colo. 1998) (collecting cases standing for the proposition that epidemiologic studies are the best evidence of causation).

at 337. An association between exposure and disease "exists when they occur together more frequently than one would expect by chance." *Id*. at 348. Once an association is observed, scientists assess what sources of error—chance, bias, or confounding—may have contributed to an inaccurate result. *Id.* at 337; *Magistrini v. One Hour Martinizing Dry Cleaning*, 80 F. Supp. 2d 584, 591 (D.N.J. 2002).

Among epidemiological studies, it is widely accepted that the randomized controlled clinical trial is the "gold standard" for determining whether there is an association between a medication or other agent and a health outcome. Sayler Decl., Ex. 12 at 338; *In re Rezulin*, 369 F. Supp. 2d at 406. As used in epidemiological studies, "association" refers to the relationship between the incidence of the outcome of interest (here, suicide-related events) in an exposed population (here, a group treated with Neurontin) and the incidence of the same outcome in an unexposed population. Sayler Decl., Ex. 12 at 348.[10]

A statistically significant association between a drug and an adverse event may only be demonstrated through epidemiologic studies with appropriate controls. *Id.* at 95 (In deciding whether an association is causal, scientists should ask: "Was there a control group? If not the study has little to say about causation."); Sayler Decl., Ex. 13 at 17. FDA has likewise recognized the importance of a control group in establishing causation, particularly in populations at a heightened risk for the event. Sayler Decl., Ex. 4 at 1. As FDA's Dr. Russell Katz specifically noted when addressing the issue of Neurontin and suicide, "in the absence of an

---

[10] Scientists use "relative risk" to express an association between, for example, the ingestion of a drug and a disease. Sayler Decl., Ex. 12 at 348. A relative risk greater than 1.0 suggests the risk in exposed individuals is greater than the risk in unexposed individuals. This is called a positive association. *Id.* at 349. A relative risk of 1.0 suggests the same numbers of people using the product are diagnosed with the disease as those not using the product. Stated differently, there is no association. *Id.* Finally, a relative risk of less than 1.0 suggests that fewer people using the product contract the disease than those not taking the product. This is called a negative association and may reflect a preventative or curative effect. *Id.*

appropriate control group, it will be difficult, if not impossible, to assess the role of any other factors that might explain these events." *Id.* Anecdotal evidence, such as case reports and adverse event reports (AERs), cannot be used to establish an association because there is no control group. Sayler Decl., Ex. 12 at 83, 90-91 (anecdotal evidence is more useful as a stimulus for further inquiry than as a basis for establishing association); Sayler Decl., Ex. 5 at 135:21-136:11 (analysis of AERs can raise a signal, but is not evidence of a statistically significant association).

**C.    Only If a Statistically Significant Association Is Found, Is It Proper to Examine Whether Neurontin Causes Suicide-Related Events by Application of the Bradford Hill Criteria.**

Demonstrating that an association exists cannot and does not mean that an agent <u>causes</u> a disease or outcome of interest. *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 878 (W.D. Tex. 1997), *appeal dismissed*, 139 F.3d 899 (5th Cir. 1998) (stating that association is not equivalent to causation); Sayler Decl., Ex. 12 at 336 ("it should be emphasized that an association is not equivalent to causation"). Rather, if and only if studies find a statistically significant association (*i.e.*, a positive relative risk or odds ratio that can confidently be ascribed to factors other than random statistical error), scientists must go further, and evaluate that association by other factors to determine whether the association is probably causal.[11] This principle is long-established; as the U.S. Surgeon General stated in 1964, "<u>if</u> it be shown that an association exists, <u>then</u> the question is asked: Does the association have a causal significance." Sayler Decl., Ex. 14 at 20. The Reference Manual is in accord, "Once an association has been

---

[11] Sayler Decl., Ex. 12 at 374; Sayler Decl., Ex. 14 at 20; Sayler Decl., Ex. 15 at 110 ("even after excluding . . . the possibilities of chance, bias and confounding factors, other criteria are needed to turn an association into causation").

found between exposure to an agent and development of a disease, researchers consider whether the association reflects a true cause-effect relationship." Sayler Decl., Ex. 12 at 374.

The generally accepted and widely-applied scientific methodology for determining whether a statistically significant association—if found—can be considered causal involves application of nine principles first introduced in part by the U.S. Surgeon General in his landmark 1964 study of the relationship between smoking and lung disease, and further developed by Sir. Austin Bradford Hill in 1965. These factors are commonly known as the "Bradford Hill" criteria. Sayler Decl., Ex. 12 at 374-75. As addressed in the Reference Manual, these criteria include: (1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of the results; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the exposure; and (9) consistency with other knowledge. All nine Bradford Hill criteria must be considered in determining whether an association is causal.[12] It is important to reiterate, however, that a statistically significant positive association between a drug and an adverse event or disease is necessary before applying the Bradford Hill criteria.[13]

## III.    THERE IS NO EPIDEMIOLOGIC EVIDENCE ESTABLISHING THAT NEURONTIN IS ASSOCIATED WITH, LET ALONE CAUSES, SUICIDE-RELATED EVENTS.

Plaintiffs' experts concede that the epidemiologic evidence fails to establish an association between Neurontin and suicide-related events. In June 2006, at FDA's request, Pfizer submitted data from 49 randomized, controlled clinical trials using FDA-specified

---

[12] *Miller v. Pfizer*, 196 F. Supp. 2d 1062, 1085-86 (D. Kan. 2002) (excluding expert testimony where expert failed to address certain criteria); Sayler Decl., Ex. 16 at 299.

[13] Sayler Decl., Ex. 12 at 374; Sayler Decl., Ex. 14 at 21; Sayler Decl., Ex. 17 at 29 ("absent evidence of a statistical association, or convincing clinical evidence, biological mechanisms cannot be invoked to prove causality").

analytical criteria for evaluating suicide-related events.  Neurontin has also been studied in a published epidemiologic study entitled, "Divalproex, Lithium and Suicide Among Medicaid Patients with Bipolar Disorder," co-authored by Bentson McFarland, one of Plaintiffs' designated experts, and his colleague Dr. Jon Collins (hereinafter "McFarland study").[14]  The results of these epidemiologic studies are consistent—they fail to demonstrate an association between Neurontin and suicide-related events.  Sayler Decl., Ex. 5 at 377:1-381:25; Sayler Decl., Ex. 6 at 31:23-33:25; Sayler Decl., Ex. 10 at 2, 8-9, 14-15, 18-19.

### A.    The Clinical Trial Data Fail To Support an Association Between Neurontin and Suicide.

The Neurontin clinical trial data unequivocally do not establish an association between Neurontin and suicide-related events.  In June 2006, at FDA's request, Pfizer submitted analysis of 49 Neurontin randomized, controlled clinical trials using FDA-specified analytical criteria for evaluating suicidality.  In these randomized controlled trials, which included 8,829 patients (5,194 of whom were treated with Neurontin), there were no completed suicides, no attempted suicides, and no preparatory acts toward imminent suicidal behavior in any patients taking Neurontin.[15]  Coronel Decl., Ex. 5 at 3-4.  Suicidal ideation was reported in two of 5,194 Neurontin-treated patients (0.039%) and one of 2,682 placebo patients (0.037%), statistically indistinguishable rates.  *Id.* at 4.  The randomized controlled clinical data—the gold standard for demonstrating an association between a drug and an adverse event—thus fail to show any association between Neurontin and suicide-related events.  Plaintiffs' expert, Dr. Sander

---

[14] Sayler Decl., Ex. 18.

[15] These trials included three studies in patients with psychiatric disorders (panic disorder, bipolar disorder, and social phobia).  Coronel Decl., Ex. 4 at 27.  There were no reports of suicide, attempted suicide, or preparatory acts toward imminent suicidal behavior in Neurontin-treated patients in any of these psychiatric clinical trials.  *Id.*  In addition, there was no association between the use of Neurontin and treatment-emergent depression or anxiety.

Greenland, opined that the Neurontin controlled clinical trial data "provide no statistical support for . . . the hypothesis that gabapentin does cause suicide or suicide attempt (the causal hypothesis)." Sayler Decl., Ex. 10 at 14-15.[16] Plaintiffs may attempt to argue that the design or size of these clinical trials explains why they do not support plaintiffs' burden of proving general causation, but it is telling that plaintiffs and plaintiffs' experts failed to initiate or conduct any epidemiologic testing of their own to support their burden of proof.[17]

On January 31, 2008, the FDA issued an FDA Alert reporting on its pooled analysis of clinical data involving eleven different antiepileptic drugs (AEDs), including the Neurontin data discussed above. The January 31, 2008 FDA Alert in no way alters the conclusion that the Neurontin randomized, controlled clinical trial data do not demonstrate any association between Neurontin and suicide-related events. Rather, FDA emphasized that "Posting this information does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue," a fact all three of plaintiffs' experts acknowledge. Sayler Decl., Ex. 9 at 579:24-580:5; Sayler Decl., Ex. 19 at 13:1-10; Sayler Decl., Ex. 20 at 3:7-12. In addition, the FDA Alert is based on no specific conclusions about Neurontin specifically, but rather on analysis of pooled or combined placebo-controlled clinical trial data for eleven

---

[16] Dr. Greenland also agrees that the combined controlled and uncontrolled clinical data for Neurontin likewise fail to establish an association between Neurontin and suicide-related events. The Neurontin regulatory file includes 147 studies in over 10,000 patients. As discussed supra, these studies include 49 placebo-controlled trials involving 5,194 Neurontin-treated patients. There were only two suicides in the more than 10,000 patients receiving Neurontin during the nearly 150 clinical trials submitted to FDA for Neurontin's various indications. Coronel Decl., Ex. 4 at 2; Coronel Decl., Ex. 6 at 4, 15. One of the suicides occurred six months after the patient stopped taking Neurontin. Coronel Decl., Ex. 4 at 2. The other, which occurred during an uncontrolled, open-label study, was considered definitely not related to Neurontin by the clinical investigator. Id. Dr. Greenland opined that the combined controlled and uncontrolled data fail to establish an association between Neurontin and suicide and that the data are in fact "compatible with the null hypothesis of no gabapentin [Neurontin] effect." Sayler Decl., Ex. 10 at 2, 8-9.

[17] See IV.A., infra, discussing plaintiffs' experts' failure to test their theories in detail.

different AEDs.  The FDA Alert concludes that its pooled analysis demonstrates that "patients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation (0.43%) compared to patients receiving placebo (0.22%)."  The "pooled" data set that produced those figures is comprised of the aggregated data for eleven different drugs with different pharmacologic properties, chemical structures, mechanisms of action and safety profiles.[18]

More significantly, the pooled incidences and relative risk calculations reported in the FDA Alert are dramatically different from those in the Neurontin-specific controlled clinical data.  The reported incidence of suicidal behavior or ideation in the pooled population was 0.43%, whereas the incidence in the Neurontin population was 0.039%, an incidence over ten times less than the pooled incidence.  Sayler Decl., Ex. 9 at 680:21-681:24; Sayler Decl., Ex. 19 at 72:7-73:13; Sayler Decl., Ex. 20 at 45:2-46:2.  Moreover, while the pooled data suggested a statistically significant overall relative risk of 2.0 (0.43% AEDs vs. 0.22% placebo), the Neurontin-specific data show no statistically significant different incidence of suicidal behavior and thinking between Neurontin (0.039%) and placebo (0.037%).  Unless and until FDA shares the underlying data supporting its analysis, it is not possible to state which drug's or drugs' data is responsible for the pooled FDA findings, but clearly it was not the Neurontin data.  See Sayler Decl., Ex. 9 at 601:22-602:9 (admitting that high incidence of suicide in one or more drugs could drive the overall increased risk identified in the Alert); Sayler Decl., Ex. 19 at 45:25-46:10 (same); Sayler Decl., Ex. 20 at 8:22-9:10 (same).  This pooled analysis does not alter the

---

[18] Sayler Decl., Ex. 9 at 615:22-616:5; 644:5-645:5, 647:3-15, 649:17-23, 652:25-653:5 (no published literature supports aggregating data for drugs with different mechanisms of action and different pharmacologic properties to determine scientific causation for one drug in the pool); Sayler Decl., Ex. 19 at 37:20-38:19 61:3-25, 105:17-22; Sayler Decl., Ex. 20 at 17:8-18:9; Sayler Decl., Ex. 21 at 89-90 ("Because the new AEDs [gabapentin, felbamate, and lamotrigine] have different structures and mechanisms of action, as compared with each other and with conventional AEDs, they should be evaluated as separate entities and not as one class.").

conclusion that the Neurontin data do not support plaintiffs' theory that Neurontin increases the risk of suicidal behavior or thinking.[19]

In addition, FDA statements and findings are not evidence of causation here. As other courts have recognized, FDA utilizes a risk-benefit approach and may thus choose to err on the side of causation and act in the absence of causation. *See, e.g., Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002). Thus, even where FDA has taken the extreme step of withdrawing approval for a drug's indication (which it expressly declined to do here),[20] such action does not provide reliable scientific proof of general causation where FDA expressly states that no causal determination has been made. *See Rider*, 295 F.3d at 1201 (holding that FDA's withdraw of Parlodel's indication for the prevention of lactation was not proof of causation, particularly where FDA noted in statement that it did not purport to draw a conclusion about causation).

**B.    The McFarland Study Fails To Establish an Association and, If Anything, Suggests that Neurontin May Be Protective Against Suicide.**

Plaintiffs' general causation experts all cite the McFarland study,[21] as the sole retrospective epidemiologic study relating to Neurontin and attempted or completed suicide.

---

[19] The Court reached a similar conclusion in *In re Bextra and Celebrex*, 524 F. Supp. 2d 1166 (N.D. Cal. 2007). There, the Court noted that a meta-analysis of all available published and unpublished randomized clinical trials of all COX-2 inhibitors (including Celebrex) found that while COX-2 inhibitors as a whole are associated with a moderate increase in the risk of adverse cardiovascular events, no such association is found with the available data for Celebrex at 200 mg/d or less. *Id.* at 1175. The Court ultimately held that plaintiffs had failed their burden of proving general causation because their experts had come forward with no reliable epidemiologic evidence supporting their opinions that Celebrex caused the cardiovascular events at the particular dosage at issue. *Id.* at 1181. *See also In re Bextra & Celebrex Prod. Liab. Litig.*, No. 762000/2006 at 19-31 (N.Y. Sup. Ct. Jan. 7, 2008) (slip opinion) (same) (attached as Sayler Decl., Ex. 22.)

[20] *See* Sayler Decl., Ex. 1 at 1 (posting this information does not mean "that FDA is advising health care professionals to discontinue prescribing these products").

[21] Sayler Decl., Ex. 18.

Sayler Decl., Ex. 6 at 8:2-16; Sayler Decl., Ex. 23 at 18, Sayler Decl., Ex. 24 at 182-183. The objective of the McFarland study was "to compare rates of completed suicide and suicide attempts among those Medicaid patients using lithium, divalproex, and/or other anticonvulsant medications." Sayler Decl., Ex. 18 at 2. The authors compared the rates of suicides and suicide attempts in patients taking lithium, divalproex, carbamazepine, gabapentin (Neurontin), lamotrigine, oxcarbazepine, and combination treatment, without any placebo control group. *Id.* at 2-3. According to the study authors, this design introduced numerous study weaknesses, including that: (1) subjects were not randomly assigned; (2) important clinical data such as history of suicide attempt, medication adherence, and age of first diagnosis of bipolar disorder were not available; (3) diagnoses were obtained from electronic data systems and not from structured psychiatric interviews; and (4) the low number of suicide deaths may have limited the statistical power. *Id.* at 4.

The authors concluded that Neurontin treatment, compared to lithium treatment, was associated with a greater risk of suicide, but not suicide attempts. *Id.* at 5. Those results are not surprising given that lithium has been shown to be protective against suicide, a fact Dr. McFarland admits. Sayler Decl., Ex. 7 at 60:24-61:3; 116:10-19. Plaintiffs' expert Dr. Greenland also noted this fact when analyzing the limitations of Dr. McFarland's study and opined that "any estimates from the analysis in [the McFarland study] may reflect preventive effects of lithium." Sayler Decl., Ex. 10 at 18. Dr. McFarland agreed that his study is consistent with the conclusion that all of the drugs studied were protective against suicide, but that lithium was more protective. Sayler Decl., Ex. 7 at 151:22-152:5; 157:5-10.

In addition, plaintiffs' expert Dr. McFarland testified that he never concluded that Neurontin causes suicide generally or that it caused the suicides in the population he studied. *Id.*

at 205:16-206:1.[22]   Rather, he agreed that his study is consistent with the conclusion that Neurontin does <u>not</u> cause suicide or suicide attempt.  *Id.* at 212:12-16.  And the study itself notes "the elevated rate of completed suicide among gabapentin [Neurontin] users may well be related to the prescription of this medication for people with chronic pain (in addition to bipolar disorder) who could be at very high risk for suicide."  Sayler Decl., Ex. 18 at 4.  Dr. Greenland opined that the McFarland study does not address the hypothesis that Neurontin use elevates suicide risk in the general patient population.  Sayler Decl., Ex. 10 at 19.

Dr. McFarland's conclusion that his study does not show that Neurontin causes suicide should preclude any expert from suggesting otherwise.  *See Gen. Elec. v. Joiner*, 522 U.S. 136, 145 (1997) (noting that given that study authors were unwilling to conclude that PCB exposure caused cancer in workers studied, their study did not support the experts' conclusion that plaintiff's exposure to PCB's caused his cancer); *see also See In re Accutane Prod. Liab.*, 511 F. Supp. 2d 1288, 1291 (M.D. Fla. 2007) ("When an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study.  That is, he must not draw overreaching conclusions.").

Moreover, a comparison of the suicide background rates in the bipolar population cited in the McFarland study with rates in Neurontin users suggests that Neurontin is protective against suicide.  The incidence of suicides (3.5 per 1000 patient years) and suicide attempts (9.5 per 1000 patient years) in patients taking Neurontin was less than the incidence of suicides (10 per 1000 patient years) and suicide attempts (40 per 1000 patient years) expected in untreated bipolar patients.  Sayler Decl., Ex. 9 at 138:17-142:14.  This comparison not only fails to support an

---

[22] Sayler Decl., Ex. 7 at 205:16-206:1 ("Q. That statement was in no way to imply that Gabapentin in your Medicaid population actually caused suicide or suicide attempt? A.  Correct.  Q.  And your report does not contain the statement that Neurontin use generally can cause suicide or suicide attempt versus . . . patients who are not taking the drug, correct? A.  Correct.").

association between Neurontin and suicide, but instead suggests that Neurontin is protective against suicide in bipolar patients.

### C.    Plaintiffs' Experts Admit that the Epidemiologic Data Fail To Show an Association Between Neurontin and Suicide-Related Events; Plaintiffs Have Thus Failed To Meet Their General Causation Burden.

Plaintiffs' experts admit that none of the epidemiological testing shows a statistically significant association between Neurontin and suicide-related events.  Sayler Decl., Ex. 5 at 384:18-385:2; Sayler Decl., Ex. 6 at 31:23-32:8; Sayler Decl., Ex. 10 at 19.  Based on the reliable methodology for establishing causation, the inquiry is over; plaintiffs cannot carry their burden of adducing scientifically valid evidence of general causation.  Sayler Decl., Ex. 12 at 374 (noting that a statistically significant association is necessary for causation).

In *Lynch v. Merrell-National Laboratories*, 830 F.2d 1190 (1st Cir. 1987), the First Circuit made clear that "confirmatory epidemiological data" is necessary to prove general causation.  There, the plaintiff's expert relied on *in vivo* animal studies, *in vitro* animal studies and the study of "analogous" chemicals to support general causation opinions.  *Id*. at 1194.  The First Circuit held that the district court rightly found that such studies did not furnish a reliable foundation for the expert's opinions.  In particular, the Court noted, "Studies of this sort, singly or in combination, do not have the capability of proving causation in human beings in the absence of any confirmatory epidemiological data." *Id.*[23]  As in *Lynch*, plaintiffs' experts here

---

[23] *See also Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 197 (5th Cir. 1996) (where no epidemiologic study has found a statistically-significant link between the product and the alleged injury, expert testimony of an association does not meet the standard of reliability required under *Daubert* ); *Turpin v. Merrell Dow Pharms., Inc.,* 959 F.2d 1349, 1351-56, 1360 (6th Cir. 1992) (affirming grant of summary judgment for defendants because the evidence relied upon by plaintiffs, which did not include epidemiologic studies, was insufficient basis for opinion on causation), *cert. denied,* 506 U.S. 826 (1992); *Wade-Greaux v. Whitehall Labs., Inc.,* 874 F. Supp. 1441, 1485 (D.V.I. 1994) (opinions excluded because none of the studies showed a statistically-significant increased risk of the relevant injury due to exposure to the drug at issue), *aff'd without op.,* 46 F.3d 1120 (3d Cir. 1994); *see also, e.g., Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1316 (9th Cir. 1995) (rejecting plaintiffs' expert testimony as inadmissible under *Daubert,* noting that none of plaintiffs' experts could testify that the epidemiologic data showed a

do not dispute that they have no confirmatory epidemiological data.  Exclusion of their opinions

on this basis alone is proper.  *See id.* at 1194, 1197 (excluding expert testimony as

"foundationless" where there was no confirmatory epidemiologic evidence).

> **D.    Even Assuming *Arguendo* that Plaintiffs Relied On a Statistically Significant Association Between Neurontin and Suicide-Related Events (Which They Admit Does Not Exist), the Association Is Not Causal.**

As noted above, plaintiffs admit that the epidemiologic evidence fails to establish a

statistically significant association between Neurontin and suicide-related events.  Even if

plaintiffs had come forward with evidence of such an association, however, application of the

Bradford Hill criteria refutes any suggestion of causation.

1. **Temporal Relationship**: No temporal relationship between the prescription of Neurontin and the onset of suicide-related events has been demonstrated.  In fact, among the initial Track One cases, there is no consistent relationship between the prescription of Neurontin and the onset of suicide-related events.  Instead, the temporal relationship in many of their cases is indisputably the opposite: many of the subject patients are known to have manifested suicidal thoughts or behavior <u>before</u> they ever ingested Neurontin for the first time.  Sayler Decl., Ex. 8 (expert report of suicidologist Dr. Douglas Jacobs) at 17-19.

2. **Strength of the Association:**  Where epidemiological evidence shows a positive association between exposure and the outcome of interest, stronger associations—reflected by relative risks or odds ratios much larger than 1.0—are more likely to reflect causal relationships than weaker associations.  Sayler Decl., Ex. 12 at 376-77.  There is no association between Neurontin and suicide-related events; therefore the strength of the association cannot be assessed.  Sayler Decl., Ex. 8 at 19-20.

3. **Dose-Response Relationship:** None of plaintiffs' experts have suggested that a dose-response relationship exists between Neurontin and suicide-related events.  Dr. Trimble pointed to an Investigator Brochure as evidence of a dose-response relationship between

---

relative risk of greater than two, and that relative risk of less than two actually tended to disprove legal causation); *Brock v. Merrell Dow Pharms., Inc.,* 884 F.2d 166, 167 (5th Cir. 1989) (plaintiffs' failure to present statistically-significant epidemiologic proof of causation required dismissal); *Haggerty v. Upjohn Co.,* 950 F. Supp. 1160, 1165 (S.D. Fla.1996) ("Epidemiological studies [or the lack thereof] ... are an important factor in determining the admissibility of an expert's opinion on causation."), *aff'd without op.,* 158 F.3d 588 (11th Cir. 1998).

Neurontin and depression, but the reports of depression do not increase with each dose, suggesting the absence of a dose-response relationship. *See* Coronel Decl., Ex. 7 at 56.[24]

4. **Replication of the Results:**    Associations that are real and the product of a causal relationship should be detectable and reproducible in multiple studies.  Sayler Decl., Ex. 12 at 377-78.  No epidemiologic study has ever demonstrated an association between Neurontin and suicide-related events.  The only result that has been replicated in different populations and by different investigators is the failure to establish an association between Neurontin and suicide-related events.   Sayler Decl., Ex. 8 at 20.

5. **Biological Plausibility:** Plaintiffs' experts' proposed mechanisms of action are based on an outdated understanding of key scientific principles and literature and are not accepted in the scientific community.[25]   Plaintiffs have not and cannot cite a single peer-reviewed publication stating that Neurontin has a mechanism of action that leads to suicide-related adverse events.  *E.g.,* Sayler Decl., Ex. 9 at 570:1-5.  Moreover, Dr. Strom's book, Pharmacoepidemiology, which Dr. Blume considers instructive, states, "As important as we consider biologic plausibility to be, it is equally important to realize that it can mislead in either direction."  Sayler Decl., Ex. 25 at 395.

6. **Consideration of Alternative Explanations:**   Plaintiffs' experts consistently ignore this fundamental tenet of scientific reasoning.  Indeed in direct conflict with FDA's position, Dr. Blume even suggests that background rates—*i.e.,* the rates of suicide in the patients taking Neurontin due to their underlying psychiatric illnesses or chronic pain—are irrelevant. Sayler Decl., Ex. 24 at ¶ 276; Sayler Decl., Ex. 5 at 620:6-24.  This approach is contrary to good science.  *See, e.g., McClain v. Metabolife Int'l., Inc*., 401 F.3d 1233, 1243 (11th Cir. 2005) ("A reliable methodology should take into action the background risk.")  Moreover, each of the decedents/plaintiffs in the initial Track One cases had known risk factors, and alternative explanations for the suicide events.  Sayler Decl., Ex. 8 at 21-22.

7. **Cessation of Exposure:**  Because there is no association between Neurontin and suicide-related events, it is impossible to assess whether stopping Neurontin would decrease the risk of these events.  Plaintiffs have offered no evidence that the incidence or risk of suicide-related events decreases upon cessation of exposure to Neurontin.  *Id*. at 24-25.

8. **Specificity of the Association:**  There is no association between Neurontin and suicide-related events.  Plaintiffs have identified no specific form or pattern of suicidality to be associated with Neurontin exposure.  Moreover, suicide is caused by many factors including psychiatric disorders and pain disorders; the known facts of the Track One cases indicate that the subject suicide-related events fall squarely within the well-established medical and psychosocial profiles of suicidal persons.  *Id.* at 19-20.

---

[24] Dr. Trimble refers to this document as a 2002 Investigator Brochure in his report, but it is actually dated July 2004.

[25] See V.H., infra, discussing the unreliability of plaintiffs' mechanism of action theories in detail.

9. **Consistency with Other Knowledge:** No published, peer-reviewed scientific literature concludes that Neurontin causes suicide-related events. And since Neurontin's introduction to the market, suicide rates have decreased. *Id.* at 25.

## IV. PLAINTIFFS' EXPERTS' OPINIONS FAIL TO SATISFY *DAUBERT'S* REQUIREMENTS.

Federal Rule of Evidence 702 allows a qualified witness to testify "in the form of an opinion, or otherwise, if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Trial judges must ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co.*, 526 U.S. at 147-49. The purpose of this gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Under Rule 702, untested theories, speculation, or personal beliefs asserted by qualified experts are not admissible: as the Supreme Court emphasized in *Daubert*, the expert's opinions must constitute "scientific *knowledge.*" *Daubert*, 509 U.S. at 589-90. Rule 702's reliability requirement demands that the expert's opinion be based on the methods and procedures of science, rather than on subjective belief or unsupported speculation; as explained in *Daubert*, scientific validity ensures evidentiary reliability. *Id.* at 590; *Sutera v. Perrier Group of Am.,* 986 F. Supp. 655, 661 (D. Mass. 1997) (further citation omitted). In *Daubert*, the Supreme Court identified four factors that may assist a trial court in determining the reliability of an expert's testimony: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential

rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline. 509 U.S. at 593-94. These factors are not exhaustive, and the trial court enjoys broad latitude to use other factors to evaluate reliability. *Kumho Tire*, 526 U.S. at 153; *United States v. Monteiro*, 407 F. Supp. 2d 351, 357 (D. Mass. 2006).

Other factors courts have considered in assessing reliability include: (1) whether the expert is proposing to testify about matters growing directly out of independent research he or she has conducted, or whether the opinion was developed expressly for purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered. *In re Silicone Gel Breast Implant Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (citing FED. R. EVID. 702 Advisory Committee's Notes).[26]

Plaintiffs' experts' general causation opinions do not remotely satisfy *Daubert's* express requirements. They have not been tested, have no known error rate, are not generally accepted, have not been subject to peer review, and were developed entirely for the purpose of testifying. As such, plaintiffs' experts' general causation opinions should be excluded.[27]

---

[26] Along with the reliability requirement, expert testimony must also satisfy Rule 702's relevancy or "fit" requirement. *Sutera*, 986 F. Supp. at 661 (quoting *Grimes*, 907 F. Supp. at 35). To be admissible, expert testimony must help the trier of fact understand or determine a fact in issue in the lawsuit. *Ruize-Troche v. Pepsi Cola*, 161 F.3d 77, 81 (1st Cir. 1998). In other words, Rule 702, as visualized through the *Daubert* prism, "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility;" the expert testimony must "fit" the facts of the case. *Daubert*, 509 U.S. at 592.

[27] This court is the third federal court to address *Daubert* issues in a Neurontin case. On the other two occasions, both courts granted summary judgment in defendants' favor. *See Manning v. Pfizer, Inc.*, No. 5:02CV71 at 15-21 (N.D.W.V. Dec. 30, 2004) (granting summary judgment because plaintiffs' reliance on case reports as evidence that Neurontin can cause seizures, cognitive deficits, and abnormalities of the nervous system failed *Daubert*) (attached at Sayler Decl., Ex. 26); *Dellinger v. Pfizer Inc.*, No. 5:03CV95 at 14-20 (W.D.N.C. July 19, 2006) (granting summary judgment because unqualified expert's reliance on

### A.    Plaintiffs' Experts Have Done Nothing To Test Their General Causation Theories.

Plaintiffs' experts admit that they have not independently sought to test their causation theories.  Sayler Decl., Ex. 9 at 35:11-18; Sayler Decl., Ex. 6 at 121:14-24; Sayler Decl., Ex. 5 at 97:18-98:2; 67:20-25; 87:10-15; 92:1-12.  Realizing that the epidemiologic testing that has been done fails to support their general causation opinions, Plaintiffs' experts round out their theories with criticisms of Pfizer for not performing additional, different, or larger studies—an expedient criticism that fails to acknowledge that plaintiffs carry the burden of proof.[28]  The Court should exclude plaintiffs' experts' opinions as unreliable because they not only ignore unsupportive epidemiologic testing in favor of unscientific "evidence" in reaching their general causation opinions, but rest their case on nothing more than criticisms of the epidemiologic data that does exist and which fails to support their opinions.

Plaintiffs cannot carry their burden of proving general causation by claiming that Pfizer's studies—which they agree do not show an association between Neurontin and suicide—were not good enough.  This is particularly true when plaintiffs' experts did not, themselves, ever endeavor to perform any studies designed to test an association between Neurontin and suicide-related events.  See Sayler Decl., Ex. 9 at 35:11-18; Sayler Decl., Ex. 6 at 121:14-24; Sayler Decl., Ex. 5 at 97:18-98:2; 67:20-25; 87:10-15; 92:1-12.

---

case reports and package inserts as evidence that Neurontin can cause pancreatitis or pneumonia failed *Daubert*) (attached at Sayler Decl., Ex. 27).

[28]  Dr. Greenland criticizes the available clinical trial data—consisting of approximately 10,000 Neurontin-treated patients and more than 4,500 patient-years of exposure to Neurontin—as "far too small to draw any statistically reliable conclusion" and then states that these data prove nothing.  Sayler Decl., Ex. 10 at 6-7 ("the data presented . . . provide no statistical basis [for] evaluating any hypothesis about gabapentin effects on suicide").[28]  Dr. Blume, who is neither an epidemiologist nor a statistician, and thus is unqualified to opine on the issue, mounted a similar attack on the clinical trial data, although she was unable to describe how many patients would be needed for an adequate study.  Sayler Decl., Ex. 5 at 393:8-394:16.  Dr. Trimble testified under oath that the controlled trial data were "not relevant" to his

The bottom line is that, give the conceded absence of evidence establishing an association between Neurontin and suicide-related events, plaintiffs' experts simply failed to conduct the epidemiologic testing they could and must have done to survive a *Daubert* challenge. The court faced a nearly identical issue in *In re Bextra and Celebrex*, 524 F. Supp. 2d 1166. There, the plaintiffs' experts had no epidemiologic evidence of an association between Celebrex at a dose of 200/mg day and heart attacks or strokes, the claimed events at issue in the litigation. *Id*. at 1175-76. Plaintiffs' expert attempted to extrapolate from studies involving other doses to prove general causation. *Id*. at 1180. In concluding that the extrapolation was unreliable, the court noted:

> Instead of citing evidence that supports such extrapolation, plaintiffs complain that evidence of harm at 200 mg/d does not exist because Pfizer did not initiate long term randomized trials at such dose . . . . <u>Plaintiffs cite no case, however, that suggests that they can satisfy their burden of proof based on a lack of evidence; plaintiffs filed these lawsuits and carry the burden of proving</u> today based on currently available scientifically valid evidence that Celebrex can cause heart attacks or strokes at 200 mg/d. *Id.* at 1181 (emphasis added)

As in *In re Bextra and Celebrex*, plaintiffs here admit that the available epidemiologic evidence, including studies conducted by Pfizer and those reported in the published literature, does not support an association between Neurontin and suicide, <u>and</u> that they have not done any independent epidemiologic testing of their general causation theories. Plaintiffs' attacks on Pfizer's studies as insufficient do nothing to satisfy <u>their</u> burden of proving through reliable scientific evidence that Neurontin causes suicide-related events. *See In re Bextra & Celebrex*, 524 F. Supp. 2d at 1181; *Siharath v. Sandoz Pharms. Corp.,* 131 F. Supp. 2d 1347, 1358 (N.D. Ga. 2001) (criticizing the available epidemiological studies "does not satisfy [plaintiff's] burden

opinion. Sayler Decl., Ex. 6 at 254:18-256:19. And Dr. Kruszewski admitted that he never reviewed the clinical trial data. Sayler Decl., Ex. 9 at 590:10-591:7.

of proof"); *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. at 593 n.10 (citing *Bourjaily v. United States,* 483 U.S. 171, 175-176 (1987) (noting that plaintiffs bear the burden of admissibility of expert testimony based on a preponderance of proof).

      **B.**      **Plaintiffs' Experts' Causation Theories And Methodologies Are Not Generally Accepted Anywhere in the World.**

As the Supreme Court has noted, "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and a 'known technique that has been able to attract only minimal support within the community' may properly be viewed with skepticism." *Daubert,* 509 U.S. at 594 (internal citations omitted). Many courts have recognized that an unexplained conflict with the generally accepted methodology or theories in a given scientific field can be a basis for excluding proffered expert testimony. *See* Turpin, 959 F.2d at 1360 (finding no scientific basis for testimony of a causation expert who did "not testify on the basis of the collective view of his scientific discipline, nor [did] he take issue with his peers and explain the grounds for his differences").[29]

      **1.**      **Plaintiffs' Theory That Neurontin Causes Suicide Is Not Generally Accepted.**

Plaintiffs' theory that Neurontin causes suicide-related events is not generally accepted. It is not even a conclusion voiced by any discernable <u>minority</u> in science. In fact, outside of plaintiffs' hired experts in this litigation, it has never been stated, much less accepted, by any scientist, scientific or medical organization, or regulatory authority. Sayler Decl., Ex. 9 at 691:7-

---

[29] *See also O'Conner v. Commonwealth Edison Co.,* 807 F. Supp. 1376, 1398 (D. Ill. 1992), *aff'd,* 13 F.3d 1090 (7th Cir. 1994), *cert. denied,* 512 U.S. 1222 (1994) (holding that "an expert opinion that actually contradicts directly the scientific consensus is inadmissible"); *Conde,* 804 F. Supp. at 1024 (holding that "when an expert expresses an opinion which is not generally accepted within the medical and scientific communities, he has an obligation to provide a reasoned explanation of why his methodology and opinions differ").

21.[30]    Tellingly, plaintiffs' experts were unable to identify a single study establishing a statistically significant increased risk of suicide-related events associated with Neurontin. Sayler Decl., Ex. 5 at 318:11-319:9, 333:9-21; Sayler Decl., Ex. 9 at 380:2-381:6, 690:14-691:5; Sayler Decl., Ex. 6 at 31:16-32:8.    Nor have plaintiffs' experts identified any literature published anywhere stating that Neurontin causes suicide, in any patients, including the so-called "vulnerable" group of patients they claim are at a heightened risk of suicide. Sayler Decl., Ex. 5 at 318:11-319:9; Sayler Decl., Ex. 9 at 379:13-18.[31]    Plaintiffs' experts' mechanism of action theories are without any support in the scientific literature; plaintiffs' experts could not identify a single peer-reviewed, published medical or scientific article concluding that Neurontin, acting through any of the various mechanisms they propose, causes suicide. Sayler Decl., Ex. 9 at 570:1-5; Sayler Decl., Ex. 11 at 73:11-18.

### 2.    Plaintiffs' Methodologies Are Not Generally Accepted.

Plaintiffs' experts' methodologies are not generally accepted in the relevant scientific/medical fields. Reliance on case reports, surrogate endpoints, analogies to other pharmacologic drugs with distinct properties, and speculative mechanism of action theories are

---

[30] As discussed above, the FDA's January 31, 2008 Alert is not evidence of causation. *See* FDA Alert, Suicidality and Antiepileptic Drugs (Jan. 31, 2008) ("Posting this information does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue."). And Dr. Kruszewski testified that even after the Alert, he still could not "identify any scientific body, medical authority, or regulatory authority which has concluded that Neurontin causes suicidal events." Sayler Decl., Ex. 9 at 691:7-22.

[31] In his report and at his initial deposition, Dr. Kruszewski opined that Neurontin cases suicide-related events in a "susceptible minority of consumers," which he defined as "individuals who have a previous psychiatric history of any kind." Sayler Decl., Ex. 23 at 1, Sayler Decl., Ex. 9 at 501:1-503:2. Following the issuance of the FDA Alert, in which the FDA found that the relative risk of suicidal behavior and thinking was the lowest in the patients taking antiepileptic medications for a psychiatric indication, Dr. Kruszewski abandoned this theory. Sayler Decl., Ex. 9 at 657:1-14. He testified that he did not hold the opinion that patients with a psychiatric history—i.e., the susceptible minority of consumers he previously identified—are a greater risk of suicidality than all other patients taking Neurontin. *Id.* at 666:11-18. He incredibly disavowed ever opining that patients with a psychiatric history are at an increased risk. *Id.* at 663:12-18.

not generally accepted methodologies for proving causation, particularly when epidemiologic evidence provides no support for those theories. *Lynch,* 830 F.2d at 1194 (reliance on anecdotal, animal, and analogous chemical structure evidence to prove causation is inappropriate when no epidemiologic evidence suggests a link between the drug and the alleged harm); *In re Accutane Prods. Liab.*, 511 F. Supp. at 1291-1303 (expert's reliance on analogies to animal and cell culture studies, biological plausibility of possible mechanisms of action, and case reports, was not consistent with the methods and procedures of science where no studies showed that the drug caused the outcome of interest).[32]

Nor is it generally acceptable to ignore contrary epidemiologic or other data. *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (excluding experts' opinions as unreliable where experts ignored contrary information); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (methodology properly excluded as unreliable when experts ignored or discounted epidemiological studies that found no medically reliable link between silicone breast implants and systemic disease). Yet, plaintiffs' experts have done just that. They consistently highlight individual AERs in clinical studies, postmarketing reports, and unproven hypotheses "cherry-picked" from the scientific literature in order to weave together their general causation theories while glossing over or wholly ignoring contrary data from the very trials from which they cherry-picked. This "selective reliance" methodology is not an accepted scientific methodology. *Lust v. Merrill Dow*, 89 F.3d 594, 596 (9th Cir. 1996) (noting

---

[32] *See also, e.g., Raynor v. Merrell Pharm., Inc.,* 104 F.3d 1371, 1375-76 (D.C. Cir. 1997) (affirming j.n.o.v. and exclusion of plaintiff's experts' testimony because, among other reasons, experts' conclusions regarding causation were directly contradicted by epidemiologic data); *Richardson v. Richardson-Merrell, Inc.,* 857 F.2d 823, 831 n.59 & 832 (D.C. Cir. 1988) (affirming j.n.o.v. for defendant drug manufacturer because none of the epidemiologic data found a statistically-significant relationship; and "[i]n mass tort cases . . . epidemiological studies are of critical significance"); *Grimes,* 907 F. Supp. at 36 (expert could not rely on anecdotal evidence when no epidemiological studies established a relationship between the drug and outcome of interest).

that it is "hardly scientific" for an expert "to 'pick and choose' from the scientific landscape and present the Court with what he believes the final picture looks like.")

Moreover, because none of the epidemiologic evidence supports an association between Neurontin and suicide-related events, plaintiffs do not have the evidence necessary to advance to the next step of analysis using the Bradford Hill criteria. Under the generally accepted methodology for proving general causation, there must first be a statistically significant association through epidemiologic studies before assessing whether the association is "causal" by applying the Bradford Hill criteria. *See In re Breast Implant Litig.*, 11 F. Supp. 2d at 1243 "[T]he accepted method for determining the cause of disease is epidemiology and, if necessary, the Bradford Hill criteria."). Here, all of the epidemiologic evidence fails to establish an association between Neurontin and suicide. Plaintiffs have no data to the contrary and therefore have failed to meet their burden of establishing a statically significant association. Nevertheless, plaintiffs' experts improperly proceed to some (but not all) of the Bradford Hill criteria and ignore scientific evidence that refutes the criteria they selectively chose to address.

### C.    Plaintiffs' Experts' Failed to Consider Rate of Error and Proper Controls.

Because plaintiffs' experts' general causation opinions are based on speculation and conjecture rather than epidemiologic studies, it is impossible to determine reliably the "known or potential rate of error" applicable to their opinions. *See Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 569 (W.D. Pa. 2003) (citing *Daubert*, 509 U.S. at 594). Indeed, plaintiffs' experts admit that no epidemiologic study supports their causation opinions. Sayler Decl., Ex. 6 at 31:16-32:17; Sayler Decl., Ex. 9 at 690:14-691:5. Drs. Trimble and Kruszewski admit that they performed no statistical analysis whatsoever in forming their opinions. Sayler Decl., Ex. 6 at 121:14-24; Sayler Decl., Ex. 9 at 30:24-31:3. And despite having testified under oath in a

previous case that "[c]ausation can only be proved with controlled clinical trials,"[33] Dr. Blume rejects reliance on controlled data here in favor of calculations related to uncontrolled, anecdotal adverse event reports (AERs) that she herself did not perform and as to which she could neither validate nor identify a rate of error.  Specifically, Dr. Blume testified that she relied on calculations by a non-scientist employee of Finkelstein & Partners, Mr. Keith Altman,[34] but conceded that she did not calculate and does not know the rate of error associated with his work. Sayler Decl., Ex. 5 at 67:20-25; 68:11-69:1; 87:10-15; 92:1-12.

### D.   Neither the Theories Nor Methodology Used By Plaintiffs' Experts In This Litigation Have Been Subjected to Peer Review and Publication.

*Daubert* counsels that "publication in a peer reviewed journal [is] a relevant, though not dispositive, consideration in assessing the validity of a particular technique or methodology on which an opinion is premised." *Daubert,* 509 U.S. at 594.  The First Circuit has elaborated, noting that publication and peer review "serve as independent indicia of the reliability of the . . . technique" and "demonstrate a measure of acceptance of the methodology within the scientific community." *Ruiz-Troche,* 161 F.3d at 84.  That a scientific theory or opinion has withstood such scrutiny is a "significant indication that it is taken seriously by other scientists." *Daubert II,* 43 F.3d at 1318 (citing *Daubert,* 509 U.S. at 593 (declaring scrutiny of the proposed evidence by the scientific community to be a component of good science)).[35]

---

[33] Sayler Decl., Ex. 5 at 297:5-300:7; *see also id.* at 306:20-307:15 ("I have never said that causation can be generated in any way other than in controlled clinical trials."); *id.* at 309:11-20 ("Strict causation would need a randomized, perfectly-controlled group.").

[34] Mr. Altman's degree is in astronomy.  He holds himself out as a specialist in electronic document discovery.

[35] *See also* Sayler Decl., Ex. 6 at 131:3-10 (agreeing that peer review is an "important tool" because it ensures vetting of a potential publication for scientific validity).

Dr. Kruszewski candidly opined that "almost anything from a psychiatrist or in psychiatry can be published somewhere at some time." Sayler Decl., Ex. 9 at 564:16-21. Yet, neither he nor Drs. Trimble or Blume have published their opinions that Neurontin causes suicide. Drs. Kruszewski and Blume have likewise never published in any peer-reviewed medical or scientific journal the methodology they use to derive their opinions in this case.[36] Dr. Kruszewski freely admits that not only can he not list any peer reviewed article that supports his opinion that Neurontin causes suicide, but that in the three years that he has worked on this litigation for the Finkelstein law firm, he has never submitted any portion of his opinions or reasoning for publication in any journal—let alone a peer reviewed journal—for scrutiny by the community of psychiatrists.[37] *Id.* at 379:13-18, 15:2-8, 45:11-24.

Dr. Blume testified that, more than four years and $600,000 after starting her work on Neurontin, she has <u>never</u> submitted her theories and methodology for peer review. Sayler Decl., Ex. 5 at 599:16-18, 254:20-25, 231:18-232:15. And contrary to Dr. Trimble's opinion in this litigation (which he has never published, Sayler Decl., Ex. 6 at 198:18-24, 200-201:21-6), Dr. Trimble published an article as recently as 2006 in which he expressly <u>rejected</u> the theory that he now asserts here regarding Neurontin's mechanism of action.[38] That plaintiffs' experts have

---

[36] Dr. Blume claims that her methodology is approved by FDA. Sayler Decl., Ex. 5 at 19:24-20:15. At her deposition, however, she was unable to provide any support for this claim, testifying instead that her work with FDA was subject to numerous confidentiality agreements, which plaintiffs' counsel have repeatedly refused to produce. *Id.* at 19:21-27:16. Dr. Kruszewski was also unable to provide support for his general causation methodology. *See* Sayler Decl., Ex. 9 at 415:10-416:5 (unable to provide support for use of rechallenge involving subjective adverse events); *Id.* at 469:12-17 (unable to provide support for use of case reports).

[37] Dr. Kruszewski testified multiple times in multiple ways that neither his mechanism of action theory nor his general causation theory or methodology is supported by peer-reviewed scientific literature. *See* Sayler Decl., Ex. 9 at 205:3-14, 259:21-260:2, 570:1-5 (regarding lack of support for his mechanism of action theory); *Id.* at 379:13-18, 469:12-17, 508:19-509:1(regarding lack of support his general causation theory and methodology).

[38] Sayler Decl., Ex. 28 at 368 ("Gabapentin [Neurontin] has a novel mechanism of action, <u>not</u> influencing directly the GABA system, and having its own CNS binding site.").

failed to subject their novel and untested litigation opinions and methodology to the scrutiny of the scientific community weighs heavily in favor of exclusion.

### E. Plaintiffs' Experts' General Causation Theory Was Developed Solely for Litigation.

Another significant factor is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions for purposes of testifying. *Daubert II*, 43 F.3d at 1317 ("That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science."). All three of plaintiffs' general causation experts give litigation-driven opinions.

#### 1. Dr. Trimble's opinions are directly contrary to his published views on Neurontin prior to his involvement in this litigation.

Dr. Trimble's general causation opinions were developed entirely for purposes of this litigation. He was recruited by another of plaintiffs' paid experts (Dr. Kruszewski), before which there is no evidence he held the opinion that Neurontin causes suicide.[39] Sayler Decl., Ex. 6 at 112:2-17. Moreover, Dr. Trimble admitted to only reviewing documents supplied by plaintiffs' counsel. *Id.* at 135:12-18, 137:13-25. It is thus undisputed that Dr. Trimble's causation opinions in this case were developed only after his retention by plaintiffs and within the context of this litigation.

Notably, years <u>before</u> he was recruited by Dr. Kruszewski to serve as an expert for plaintiffs in this litigation, Dr. Trimble opined about the relationship between Neurontin and

---

[39] In particular, Dr. Trimble testified that after being approached by Dr. Kruszewski, he reviewed a document authored by Dr. Kruszewski. The identity of this draft document is unclear from Dr. Trimble's testimony. Given Dr. Trimble's description and the fact that Dr. Kruszewski admitted that he had never published anything about Neurontin prior to his involvement in this litigation, the document may well have been Dr. Kruszewski's expert report in this case. <u>After</u> reviewing this document, Dr. Trimble went to the library to "look[] up certain aspects of the problem that [he] was either unfamiliar with or was not

certain adverse events, including psychosis and behavioral disturbance, in two reports submitted

to the UK regulatory authority.  Coronel Decl., Ex. 8; Coronel Decl., Ex. 9.  In that context, Dr.

Trimble noted in the first report that "psychosis and other behaviour problems are common in

epilepsy," and after reviewing case reports involving Neurontin and psychosis, concluded that he

found "no convincing evidence that any case can be directly attributable to gabapentin

[Neurontin]."  Coronel Decl., Ex. 8 at 8, 10 (emphasis added).  In the second report submitted to

the regulatory agency, Dr. Trimble summarized his review of 76 case reports involving

Neurontin and behavior problems before concluding that "links between gabapentin [Neurontin]

and psychosis cannot be made."  Coronel Decl., Ex. 9 at 15 (emphasis added).  Thus, while Dr.

Trimble opined when communicating to a regulatory agency that psychiatric adverse events were

expected in the population using Neurontin, and that there was no evidence linking these adverse

events with Neurontin, he now claims in the context of litigation—based in part on anecdotal

case reports similar to those he previously disavowed—that Neurontin causes suicide.  These

diametrically opposite opinions evince no "scientific knowledge," but precisely the kind of

unscientific, litigation-driven advocacy barred from evidence in federal courts.

> **2.**    **Dr. Kruszewski's opinions were developed entirely within the context of this litigation for the express purpose of overcoming an anticipated *Daubert* challenge.**

Like Dr. Trimble, Dr. Kruszewski's general causation opinions were developed entirely

within the context of this litigation.  Dr. Kruszewski admitted that, prior to his involvement in

this case, he had never formed any opinions about or conducted any research on or published any

document of any kind discussing a relationship between Neurontin and suicide.  Sayler Decl.,

Ex. 9 at 45:5-10.  After being retained, Dr. Kruszewski conducted a literature review looking for

---

familiar enough with."  Sayler Decl., Ex. 6 at 120:13-20.  He then did a lot of reading, "firming up on the peer reviewed scientific papers" regarding plaintiffs' litigation theory about GABA.  *Id.* at 122:19-123:4.

articles supporting plaintiffs' theory, attended a five-day neuroanatomy course taught by Dr. Trimble—paid for by Mr. Finkelstein and where he was sent to recruit Dr. Trimble—because he thought it "spoke to the issues in his report" and helped him understand some of the issues "he articulated or tried to articulate" in his report. He next reviewed documents provided by plaintiffs' counsel's firm and began writing his report, "obviously choosing those articles which [he] thought led [sic] credibility to [his] arguments." *Id.* at 37:2-50:5, 57:12-58:3, 489:1-16.

Even a cursory review of Dr. Kruszewski's methodology shows that his opinions did not "grow naturally and directly out of research" he conducted independent of this litigation. Rather, as Dr. Kruszewski readily concedes, his methods and opinions were developed entirely to attempt to survive a *Daubert* challenge. According to Dr. Kruszewski, "the whole point of [his] report was to . . . examine whether there was evidence that could withstand a *Daubert* challenge in regard to whether Neurontin causes suicide and suicide ideation." *Id.* at 304:8-305:2. He tries "to keep up with the requirements and standards of *Daubert* and *Frye* principles" so that he understands what evidence is required to support his opinions in federal and state courts. *Id.* at 306:12-307:14.

> ### 3. Dr. Blume never expressed any opinions regarding Neurontin and suicide prior to her involvement in the drafting of Plaintiffs' counsel's Citizen Petition.

Dr. Blume's opinions were also developed for litigation. Although she is a perennial plaintiffs' expert in pharmaceutical cases, Dr. Blume had never researched, formed or publicly expressed any opinions regarding Neurontin and suicide prior to participation in this case. After being retained in 2003, she worked steadily with Mr. Altman, a non-scientist employee of the Finkelstein & Partners, to prepare the Citizen Petition. Sayler Decl., Ex. 5 at 599:16-22, 601:14-15, 602:20-603:23, 15:5-20. She also relied heavily on Mr. Altman to prepare much of her report, conceding she was not capable of verifying his work. *Id.* at 50:16:51:6, 53:24-54:9,

86:22-24, 91:21-92:12, 102:17-21, 65:14-66:24 ("I would not be able to completely validate what he does."); 67:1-25 ("I have not validated his work . . . I don't know if there is [sic] any errors."). She unabashedly testified that her general causation opinion would be the same even if the 21 tables Mr. Altman prepared were inaccurate. *Id.* at 88:22-89:7. And despite her repeated prior testimony that causation can <u>only</u> be established on the basis of randomized controlled trial data[40]—data she ignored here—Dr. Blume opined for the first time in her litigation report that Neurontin causes suicide, on the almost exclusive basis of anecdotal AERs analyzed by an employee of the plaintiffs' lawyers. *Id.* at 18:10-19:2, 47:22-49:16, 50:16:51:6, 53:24-54:9, 86:22-24, 91:21-92:12, 102:17-21. Dr. Blume's wholly litigation-driven opinions should be excluded.

## V.   PLAINTIFFS' EXPERTS BASE THEIR GENERAL CAUSATION OPINIONS ON UNRELIABLE AND IRRELEVANT "EVIDENCE."

Not only do plaintiffs' experts' methodologies fail to pass *Daubert*, but they are based on unreliable and irrelevant evidence. Except for the McFarland study—which Drs. McFarland and Greenland have admitted is <u>not</u> evidence that Neurontin causes suicide—plaintiffs' experts purport to derive their general-causation conclusions from anecdotal case reports; selected (suicide-related and non-suicide-related) adverse events from Neurontin clinical trials; bogus analogies to other, different medications; and speculative theories regarding Neurontin's mechanism of action. None of this evidence satisfies Rule 702's reliability and relevance requirements.

### A.   Anecdotal Reports of Adverse Events In the Postmarketing Safety Databases Are Unreliable.

---

[40] Sayler Decl., Ex. 5 at 297:5-300:7, 306:20-307:15, 309:11-20.

Anecdotal consumer complaints (AERs or case reports) describing events observed after initiation of therapy are regularly reported to pharmaceutical manufacturers or FDA, or sometimes published in a journal to the medical community. These reports describe events that occurred <u>without</u> any medical controls or scientific assessment. *In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1298. They are simply the reporter's account of a particular patient's reaction to a drug or other stimulus, sometimes accompanied by a description of the relevant surrounding circumstances. Sayler Decl., Ex. 12 at 475. In other words, anecdotal reports are "merely compilations of occurrences." *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1133-34 (D. Ariz. 2001). They make little attempt to screen out alternative causes for a patient's condition, frequently lack analysis, and often omit relevant facts about the patient's condition, co-morbid illnesses or diseases, and concomitant medications. Sayler Decl., Ex. 12 at 475. "Simply stated, case reports raise questions; they do not answer them." *McClain,* 401 F.3d at 1254. As such, "[u]ncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation." *Id.* at 1250. It is thus unreliable methodology to base general causation opinions on case reports. *In re Baycol Prods. Litig.*, MDL No. 1431, __ F. Supp. 2d __, 2007 WL 4794163 at *6-7 (D. Minn. July 16, 2007) (collecting cases discussing unreliability of case reports).[41]

Plaintiffs' experts agree that such anecdotal evidence has limitations, including that it is not blinded or randomized and rarely contains statistical analyses. Sayler Decl., Ex. 9 at 468:22-469:8, Sayler Decl., Ex. 10 at 9. On this basis, Dr. Greenland opined that the value of case

---

[41] *See also Soldo,* 244 F. Supp. 2d at 542 ("experts' reliance on anecdotal case reports to support their causation opinions is contrary to both good scientific practice and the *Daubert* case law"); *Norris,* 397 F.3d at 885 ("Case reports that state that some women with breast implants developed disease do not provide an adequate scientific basis from which to conclude that breast implants in fact cause disease. A correlation does not equal causation.").

reports "is very limited."  Sayler Decl., Ex. 10 at 9.  And Dr. Trimble testified that case reports may represent a signal between an exposure and an event but <u>do</u> <u>not</u> prove causation.  Sayler Decl., Ex. 6 at 235:3-8.  Dr. Kruszewski conceded that case reports are only "signals" that require further testing.  Sayler Decl., Ex. 9 at 469:18-470:18.  No peer-reviewed scientific literature states that making causal determinations on the basis of case reports is an accepted or reliable methodology.  Sayler Decl., Ex. 9 at 469:12-17.

Despite the recognized limitations of all such anecdotal evidence, Dr. Blume relies heavily on AERs contained in postmarketing safety databases.  Mr. Altman (of Finkelstein & Partners) gave Dr. Blume the pharmacovigilance data discussed in her report.  Mr. Altman designed and ran the queries in the postmarketing databases, which Dr. Blume referred to as "filtering."  And Mr. Altman, not Dr. Blume, prepared 21 charts that appear on pages 69-75, 116-118, 120-128, 194-195 of her report.  Sayler Decl., Ex. 5 at 50:16:51:6, 53:24-54:10, 86:22-24, 91:21-92:12, 102:17-21.  Among these charts is one entitled "PRR Over Time Suicidal and Self-Injurious Behaviour (HLT)" that purports to calculate a proportional reporting ratio (PRR) between Neurontin and six other drugs according to the methodology in a textbook (Strom's <u>Pharmacoepidemiology</u>).  Sayler Decl., Ex. 24 at 194.[42]  The chart depicts the percentages of "suicidal" and "self-injurious behavior" associated with Neurontin and six other antiepileptic medications.  *Id.*  Based on this chart, Dr. Blume opined that:

> No later than mid 2001, Pfizer Defendants had a safety signal of a possible association between Neurontin and suicidal events. Specifically, the percentage of reports reflecting serious events with Neurontin, Gabatril and Baclofen are approximately twice as

---

[42] Dr. Blume admitted that Mr. Altman did not follow true PRR methodology as set out in Dr. Strom's textbook <u>Pharmacoepidemiology</u>, which she recognizes as instructive, Sayler Decl., Ex. 5 at 122:6-123:5, but rather a "visual overview," or "an ability to compare to do an eyeball between one line and another line on the graph . . . and then make an estimation of the difference in terms of proportional difference." *Id.* at 129:6-18; 138:21:139:2; 174:21-175:6.

much as the percentage of reports from other anti-epileptic drugs used to treat similar conditions. *Id.*

Dr. Blume, however, was unable at her deposition to identify which AERs were encompassed by the search terms Mr. Altman used, Sayler Decl., Ex. 5 at 140:19-143:3, 148:8-149:16, 158:9-21, or provide the raw numbers of the suicide events purportedly represented in the chart. *Id.* at 169:15-170:6. Dr. Blume admitted that she never independently verified or attempted to validate Mr. Altman's work, including this chart on page 194 supporting her "key" opinion that there was a suicide signal with Neurontin. *Id.* at 97:18-98:2. In fact, she testified that she was "not capable of" validating Mr. Altman's work and "ha[d] no idea" of the rate of error associated with it. *Id.* at 67:16-25; 68:11-69:1; 87:10-15; 92:1-12. She thought that Mr. Altman employed "several procedures and controls" to allow him to get an accurate number of events and to avoid double counting of events, but as for the specific nature of those controls, she testified "I just don't know." *Id.* at 70:2-71:13. She merely accepted Mr. Altman's methodology based on her prior experience with him. *Id.* at 19:24-20:11, 57:5-15.

Under nearly identical circumstances, the court in *In re Meridia Products Liability Litigation* disagreed. 328 F. Supp. 2d 791 (N.D. Ohio 2004). There, plaintiffs offered Mr. Altman as an expert witness. As in this litigation, he examined AERs and purportedly prepared a PRR comparing Meridia to Xenical, before concluding that "incidences of [various] cardiovascular injuries dramatically exceed and are more than twice as likely to [be] reported in connection with Meridia usage than in connection with Xenical usage." *Id.* at 807. The court excluded Mr. Altman's opinions, aptly noting as to his methodology:

> Even readers with only a casual understanding of statistics can recognize that this evidence does not speak to the issue of causation, and therefore cannot create a genuine issue of material fact. Indeed, proportional reporting rate analyses are incomplete and often misleading because they do not show the total distribution of reports. The following example illustrates this flaw:

> Suppose that 10,000 people received Meridia and an additional 10,000 received Xenical.  Suppose further that 100 people from each group developed hypertension and that an additional 100 from the Xenical group experienced severe stomach pains.  Under a proportional reporting rate analysis, Meridia would have a hypertension rate of 100%, whereas Xenical's hypertension rate would be only 50%.  This analysis conveys the impression that people taking Meridia are twice as likely to develop hypertension than are people taking Xenical, even though the condition occurred with the same frequency in both groups in the above hypothetical. Clearly, such evidence conceals too much to speak directly to the issue of causation.

*Id.* at 807-08.  For the same reasons that Mr. Altman's opinions were excluded as unreliable in *In re: Meridia*, Dr. Blume's opinions, blindly based on Mr. Altman's unreliable PRR, should be excluded here.

Dr. Blume also failed to account for bias and confounding factors when performing her signal analysis, even though she agreed that no causal relationship can be ascertained without first accounting for those considerations.  Sayler Decl., Ex. 5 at 402:8-13, 409:12-411:17.  For example, Dr Blume did not make any effort to survey the effect of biasing influences such as an advertising campaign by Finkelstein & Partners regarding Neurontin and suicide, which Dr. Blume admits began in 2003.[43]  *Id.* at 193:20-194:8; 195:20-196:2; 195:21-196:2.  Nor did she survey the extent of the advertisements in 2004, 2005, 2006 or 2007, even after admitting that these advertisements could have resulted in notoriety bias.  *Id.* at 200:8-25, 201:7-14.  Hence, her conclusion that the postmarketing AERs suggest a signal between Neurontin and suicide (even if it were a reliable basis to assess causation) is fatally flawed by bias and confounding factors—most obviously, stimulated reporting of AERs created by an expansive advertising campaign by

---

[43] Plaintiffs' counsel's television advertisements show Neurontin alongside the image of a noose and the word "suicide."  See Sayler Decl., Ex. 31.  During her deposition, Dr. Blume tried to downplay the advertisements' inflammatory message by pretending she did not understand them, even referring to the noose as just "a loop."  Sayler Decl., Ex. 5 at 196:13-198:16.

personal-injury lawyers—that she concedes may have produced or skewed the number of AERs received over time.  *See In re Baycol Prod. Litig.*, __ F. Supp. 2d __, 2007 WL 4794163 at *10 (excluding a proffered "meta-analysis" of adverse event data for failure to account for bias).

Not only is it unreliable to base general causation opinions on postmarketing AERs, but an analysis of those reports fails to demonstrate a signal between Neurontin and suicide.  As of 2004, it is estimated that more than 13.7 million patients—many of whom are at an increased risk of suicide due to their conditions, such as epilepsy, chronic pain and psychiatric disorders— have been prescribed Neurontin worldwide.  Coronel Decl., Ex. at 3 (hereinafter "Mohan report").  Yet, as of July 31, 2005, (when notoriety bias would have already impacted the number of AERs, according to Dr. Blume) only 111 cases of completed suicide had been reported.  Even assuming all 111 reports were temporally associated with Neurontin, 111 reports out of a universe of more than 13 million Neurontin users is far below the expected number of suicides (between 2,757 and 9,652) for this population, and does not raise a signal.  Sayler Decl., Ex. 8 at 8-9.  Moreover, Mr. Altman's own analysis—which Dr. Blume did not include in her report— confirms that the percentage of Neurontin AERs involving completed suicide went down over time, not up as Dr. Blume claimed.[44]   Sayler Decl., Ex. 32; Sayler Decl., Ex. 5 at 476:23-478:1. According to Mr. Altman's analysis, in the fourth quarter of 1994, the percentage of completed suicides in the Pfizer database was 0.12%.  Sayler Decl., Ex. 32; Sayler Decl., Ex. 5 at 476:23-478:1.  But in the fourth quarter of 2002, the percentage had dropped to 0.05%, further belying plaintiffs' general causation theory.  Sayler Decl., Ex. 32; Sayler Decl., Ex. 5 at 476:23-478:1.

---

[44] Attorneys for Pfizer found this chart among the data plaintiffs produced—analysis plaintiffs did but selectively omitted because it refutes the suggestion that Pfizer was "on notice" of a signal between Neurontin and suicide.  Only on cross-examination did Dr. Blume admit that this data actually showed suicide decreasing over time.

In addition, the European Medicines Agency (EMEA)—when specifically considering the Neurontin data, including the Mohan report—concluded that "[t]he available data show no clear evidence for a causal association between gabapentin [Neurontin] and suicide or suicide attempt and show no causal association for a risk of psychotic or mood disorders in patients with a positive history of psychotic illness."  Sayler Decl., Ex. 33 at 0252386.

B.      **Published Anecdotal Case Reports Are Unreliable and Irrelevant.**

As discussed above, reliance on anecdotal evidence to prove general causation is unscientific and unreliable.  This is true even when the anecdotal reports are published in the medical literature, called "case reports" or "case series."  *See McClain*, 401 F.3d at 1253-54 (holding that an expert's reliance on case reports found in medical literature was unreliable). Reliance by Drs. Kruszewski and Trimble on case reports is no more reliable than Dr. Blume's use of spontaneously reported AERs as a basis for her opinions—neither is an acceptable methodology to derive conclusions regarding whether a drug is capable of causing an event.  *See In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1298 (concluding that reliance on anecdotal evidence, including AERs and published case reports, was unreliable).

 Further, plaintiffs' experts' reliance on published case reports in this particular case violates *Daubert's* twin requirement of relevance ("fit" and "helpfulness").  Drs. Kruszewski and Trimble both rely on case reports involving adverse events <u>other</u> <u>than</u> suicide—the claimed event in this litigation.  Sayler Decl., Ex. 34 at 19-20; Sayler Decl., Ex. 23 at 10-11.  None of plaintiffs' experts cite to a single published case report involving a suicide, let alone one where the authors conclude or even suggest that Neurontin causes suicide.  Case reports involving injuries <u>other</u> <u>than</u> suicide-related events are irrelevant and should be excluded.  *Miller*, 196 F. Supp. at 1080; *Soldo*, 244 F. Supp. 2d at  550.

C.      **Dechallenge Reports and a Single Rechallenge Report Are Unreliable.**

Drs. Blume and Kruszewski also cite dechallenge and rechallenge reports as support for their general causation opinions. Sayler Decl., Ex. 24 at 12-17, Sayler Decl., Ex. 23 at 13-14. Dechallenge and rechallenge reports are simply another kind of case report. *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 682 (M.D.N.C. 2003). Dechallenge occurs "when a drug that is suspected of causing a certain reaction is withheld to see if the reaction dissipates." *Rider,* 295 F.3d at 1199. The drug may then be reintroduced in a "rechallenge" to see if the reaction reoccurs. *Id.* While dechallenge and rechallenge reports are generally more valuable to demonstrate causation because they may measure the patient's reaction to a drug, "the value of the information gained from rechallenge and dechallenge tests for purposes of establishing general causation is limited because they involve only individual patients rather than groups." *Dunn,* 275 F. Supp. 2d at 683. Moreover, such reports cannot eliminate chance as a cause of the onset or remission of symptoms—particularly symptoms endemic in the population at issue, such as the waxing and waning of depressive symptoms or suicidal ideation—and must therefore be viewed with "great caution." *In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1300.[45] Reliance on a small number of challenge-dechallenge-rechallenge reports to test a hypothesis is thus an unreliable methodology for proving general causation. *Miller*, 196 F. Supp. 2d at 1077; *Dunn*, 275 F. Supp. 2d at 683.

Both Drs. Kruszewski and Blume place great emphasis on one "rechallenge" report. Sayler Decl., Ex. 23at 14-15; Sayler Decl., Ex. 24 at 13, 15. Their reliance on this rechallenge report is not only methodologically flawed but is entirely misplaced because it is factually inaccurate. Not only was "suicidality" not reported on rechallenge, as Dr. Kruszewski claims in his report, but the patient manifested suicidality after being taken <u>off</u> Neurontin therapy

---

[45] Sayler Decl., Ex. 35 at 306 (noting limitations of rechallenge for events such as depression that have a high background rate and a chronic remitting natural history).

(precisely the opposite of the sequence of events that would constitute a positive dechallenge), Sayler Decl., Ex. 9 at 388:22-389:3, 395:10-396:12, making it neither a positive "dechallenge" nor "rechallenge" for suicidality, and therefore, an event utterly inconsistent with his general causation opinion. *See In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1300-01 (when event of interest occurred during dechallenge phase, reliance on dechallenge-rechallenge report lacked "necessary indicia of reliability" to support expert's opinions).

Even assuming that plaintiffs could identify one rechallenge involving suicidality, reliance on a rechallenge involving a subjective event is not a scientifically acceptable methodology. The limitations of dechallenge-rechallenge reports in cases dealing with subjective events with a chronic remitting history are well documented in the scientific literature.[46] It is undisputed that the one positive rechallenge plaintiffs' experts rely on involves depression, which is both subjective and naturally remitting. Sayler Decl., Ex. 9 at 399:1-5. Moreover, the controlled trial data on depression showed no difference between patients taking Neurontin and placebo. Sayler Decl., Ex. 5 at 528:9-25; 539:7-541:7. Drs. Kruszewski's and Blume's reliance on rechallenge and dechallenge reports is thus unreliable.

### D. Hand-Picked Adverse Events From Neurontin Clinical Trials Are Unreliable.

Both Drs. Kruszewski and Blume rely on adverse events from clinical trial participants that they cherry-picked from the universe of epidemiologic data. Sayler Decl., Ex. 23 at 13-15; Sayler Decl., Ex. 24 at 18-53. As an initial matter, plaintiffs' experts' selective reliance on these adverse events in the face of nearly 150 clinical trials finding no association between Neurontin

---

[46] For instance, scientists have noted that, "Reports that document a positive rechallenge do not prove a causal relationship for events such as depression that have a high background rate and a chronic remitting natural history." Sayler Decl., Ex. 35 at 306. In addition, "[w]hen a complaint is purely subjective, rechallenge is quite useless or even misleading" because there is no way to know whether the complaint would have occurred under blinded circumstances. Sayler Decl., Ex. 36 at 76.

and suicide is unreliable and unscientific. *Caraker v. Sandoz Pharms. Corp.*, 172 F. Supp. 2d 1046, 1049 (S.D. Ill. 2001) (excluding experts' opinions where experts "generally attack the epidemiological studies as fundamentally flawed, while, at the same time, selectively pluck favorable numbers (that are not statistically significant) and herald them as crucial pieces of their . . . puzzle" and come forward with no supporting epidemiological evidence).[47]

Compounding the unreliability of this selective reliance methodology are the many errors, misrepresentations, and omissions regarding the adverse events on which Dr. Kruszewski relies. For example, Dr. Kruszewski stated that all 16 of the adverse events he singled out in his report occurred in well-controlled trials. Sayler Decl., Ex. 23 at 13-15. After reviewing the clinical trial protocols at his deposition, however, he admitted that four of the trials, involving 12 of the 16 AERs he cited, were from open-label uncontrolled studies. Sayler Decl., Ex. 9 at 346:12-349:24; Sayler Decl., Ex. 23 at 13-15. In addition, Dr. Kruszewski repeatedly omitted facts regarding the adverse events that do not support his general causation opinion. For instance, he relied on a report of an attempted suicide, but omitted the clinical investigator's determination that the attempt was "<u>definitely</u> <u>not</u> <u>related</u> to study medication [Neurontin]." Sayler Decl., Ex. 9 at 352:17-354:9, 356:21-357:3. In another instance, he referred to an overdose, but omitted that the overdose occurred when the patient <u>accidentally</u> <u>received</u> too much medication over a three-day period. *Id.* at 384:5-385:23, 386:10-388:13. In yet another instance, he neglected to mention that a patient committed suicide six months <u>after</u> discontinuing Neurontin. *Id.* at 372:22-373:18, 381:7-12. His gross mischaracterization of these cherry-picked adverse events plainly constitutes litigation-driven scientific sloppiness, not admissible scientific knowledge.

---

[47] *See also In re Rezulin,* 369 F. Supp. 2d at 437 (excluding expert opinions as unreliable where experts ignored information that appears to call crucial aspects of their theory into question.) *See Miller*, 196 F.

But there is more.    Dr. Kruszewski also refers to seven examples of "mood and behavioral disturbances" that he claims were reported to FDA as "possibly unrelated" to Neurontin.  Sayler Decl., Ex. 23 at 14.  In Dr. Kruszewski's opinion, "clinical correlation" [of these unrelated adverse events] with gabapentin may be significant," notwithstanding their classification as <u>not</u> related to Neurontin.  *Id.*  Not surprisingly, Dr. Kruszewski cites no support for the proposition that adverse events deemed unrelated to a study drug somehow have significance in assessing general causation.  *Id.*  In point of fact, all seven of his examples were <u>actually</u> judged "unlikely" or "definitely not related" to Neurontin, rather than "possibly unrelated" as he claimed.  Sayler Decl., Ex. 9 at 422:12-423:9.  Dr. Kruszewski simply made it up.

In short, Dr. Kruszewski has attempted to manufacture a link between Neurontin and suicide by misrepresenting and omitting information from a handful of AERs, while simultaneously ignoring epidemiologic evidence failing to show any association.    This methodology is the antithesis of accepted scientific method.

### E.    Non-Suicide, Psychiatric Adverse Events Are Unreliable.

In a futile effort to support their general causation opinions, plaintiffs' experts improperly rely on non-suicidal adverse events—both events in clinical trials and postmarketing reports—to suggest that Neurontin causes suicide.  Dr. Blume points to a laundry list of "psychobiologic events" including depression, hostility, depersonalization, abnormal thinking, nervousness, confusion, and emotional lability that she calls "precursors" to suicide.  Sayler Decl., Ex. 24 at 13, 18, 22, 27; Sayler Decl., Ex. 5 at 493:4-494:8.  Drs. Kruszewski and Trimble likewise rely on reports of depression in clinical trials to support their causation opinions.  Sayler Decl., Ex. 23 at

---

Supp. 2d at 1086-87 (discussing an expert's "selective reliance.").

13-15; Sayler Decl., Ex. 34 at 37.  All three experts rely heavily on these non-suicide-related adverse events to support their opinions that Neurontin causes suicide.

Plaintiffs' experts have failed to provide any support for the use of non-suicide-related adverse events as surrogate endpoints in a general causation determination.  Dr. Blume even stated that she had no opinion to a reasonable degree of certainty that the non-suicide psychobiologic terms she set forth were surrogate endpoints or precursors to suicide.  Sayler Decl., Ex. 5 at 497:23-498:7.  Moreover, she admits she is not a medical doctor, psychiatrist or suicidologist and is thus not qualified to offer a medical opinion regarding whether there are, in fact, "precursors" to suicide, and which events, if any, could be so defined.  While risk factors for suicide, including depression, are often present in people who commit suicide, reliance on such risk factors to predict suicide leads to many "false positive predictions."[48]  Accordingly, use of surrogate endpoints has been excluded as unreliable in cases involving suicide and prescription drugs.  *Miller*, 196 F. Supp. 2d at 1080 (D. Kan. 2002) (excluding general causation testimony where expert's opinion failed to discuss association between "SSRI drugs and suicide (the outcome of interest)—rather than the association between SSRI drugs and akathisia (which is purported to be part of the chain of events that lead to suicide, rather than an independent outcome)").

FDA does not base safety analyses related to suicide on non-suicide-related adverse events.  Indeed, after FDA was contacted by the manufacturer of an AED other than Neurontin, FDA asked the manufacturers of eleven AEDs (including Neurontin) to analyze "possibly suicide-related adverse events" occurring in randomized double-blind, placebo-controlled trials.  Coronel Decl., Ex. 5 at 1, which was the same approach used by FDA in analyzing

---

[48] Sayler Decl., Ex. 37 at 320.

antidepressants for suicide risk.  Per FDA's direction, these adverse events included: completed suicides, suicide attempts, preparatory acts toward imminent suicidal behavior, self-injurious behavior, intent unknown and suicidal ideation.  *Id.* at 4.[49]  FDA has never asked Pfizer, or any antiepileptic manufacturer, to evaluate <u>non</u>-suicidal endpoints such as depression, aggression and anxiety for purposes of analyzing suicidality.

Moreover, plaintiffs' experts' "method" has been to pick and choose among the non-suicide adverse events in order to validate their pre-determined conclusions.  Dr. Trimble, for example, relies on an Investigator Brochure for the proposition that "depression [occurred] in 1% of placebo subjects but 5.6% of patients taking 1800 milligrams a day of gabapentin."  Sayler Decl., Ex. 34 at 37.  This brochure also includes comparisons of Neurontin to placebo at other doses, which Dr. Trimble ignores and which do <u>not</u> show a difference.[50]  Dr. Trimble fails to list the total percentage of depression in Neurontin users versus those taking placebo set forth in the same chart: depression occurred in 1% of patients on placebo and 1.6% percent of patients taking Neurontin, a difference that is not statistically significant.  Coronel Decl., Ex. 7 at 56.  By selectively reporting only the difference between Neurontin and placebo at the 1800 mg dose, Dr. Trimble mischaracterizes the complete data regarding depression in an obvious attempt to bolster his general causation opinion.  Moreover, the same chart shows that more patients on placebo than Neurontin experienced anxiety, another fact that belies plaintiffs' reliance on surrogate endpoints and one that is conveniently absent from Dr. Trimble's report.  *Id.*[51]

---

[49] The FDA Alert indicates that four of these categories were included in the analysis (completed suicides, suicide attempts, preparatory acts toward imminent suicidal behavior, and suicidal ideation).

[50] *See* Coronel Decl., Ex. 7 at 56 (600 mg – Neurontin 0%, placebo 1%; 800 mg – Neurontin 1.4%, placebo 1%, 1200 mg – Neurontin 1.3%, placebo 1%).

[51] Dr. Trimble cites the same Investigator Brochure for the proposition that, among 5000 patients, reports of "aggression, confusion, disorientation, dysphoria, hypomania and mania, some cases of psychosis and

Dr. Blume likewise attempted to manipulate the adverse event data to make something out of nothing. For instance, she "extracted" certain psychobiologic adverse event data from clinical trial reports and placed these events in tabular summaries in her report. Sayler Decl., Ex. 5 at 85:24-86:16; Sayler Decl., Ex. 24 at 19-45. At first glance, the numerous tables of adverse events, which account for countless pages in Dr. Blume's report, appear impressive. But when subjected to statistical analysis—which Dr. Blume admits she did not do—the tabulated psychobiologic event counts in her report offer no support for plaintiffs' causation theory. Even Dr. Blume concedes the tables are merely "crude listings" of AERs. Sayler Decl., Ex. 5 at 483:19-486:9. Indeed, in the Neurontin controlled clinical studies for epilepsy, a higher percentage of psychobiologic adverse events occurred in patients taking placebo (9%) than patients taking Neurontin (8.3%). Sayler Decl., Ex. 8 at 16.[52] This is also true for hostility: 0.7% placebo compared to 0.0% Neurontin; and anxiety: 1.3% placebo compared to .07% Neurontin. *Id.* And in the epilepsy and neuropathic pain studies, more patients on placebo experienced depression than on Neurontin. *Id.* Thus, even assuming *arguendo* that it is appropriate to rely on surrogate endpoints to prove causation, the non-suicidal adverse events from the Neurontin clinical trials fail to demonstrate an association between these events and Neurontin and, therefore, suggest the absence of causation.

a suicide attempt" occurred. Sayler Decl., Ex. 34 at 37. Other than the suicide attempt, Dr. Trimble neglected to include the number of adverse events that were reported. *Id.* Out of 5000 patients, there were only: three reports of aggression; three reports of "confusional state"; two reports of disorientation; one report of dysphoria; one report of hypomania; two reports of mania; and three reports of "psychotic disorder." Coronel Decl., Ex. 7 at 84. A handful of non-suicide adverse events is hardly reliable evidence that Neurontin causes suicide. Moreover, the listing of "treatment-emergent, treatment-related serious adverse events" does <u>not</u> include depression, one of the non-suicide adverse events on which plaintiffs' experts heavily rely. *Id.* at 83-84.

[52] Dr. Blume admitted this fact during her deposition, but could not explain why this data was not mentioned in her report, despite agreeing that it would have been important to include. Sayler Decl., Ex. 5 at 519:4- 521:6.

F.      Reliance on the McCormick Review Is Misplaced.

Drs. Kruszewski and Blume also rely on the following passage from the 1993 Review by

Dr. Cynthia McCormick, FDA Medical Review Officer, as evidence supporting their opinion

that Neurontin causes suicide:

> Less common but more serious events <u>may</u> limit the drug's
> [gabapentin's] widespread usefulness . . . depression, while it <u>may</u>
> be not an infrequent occurrence in the epileptic population, <u>may</u>
> become worse and require intervention or lead to suicide, as it has
> resulted in some suicidal attempts.

Sayler Decl., Ex. 23 at 12;  Sayler Decl., Ex. 24 at 10 (emphasis added).  As Dr. McCormick

herself has confirmed, this language refers to a "potential risk" of depression and suicidality,

which she believes has not materialized with Neurontin.  Sayler Decl., Ex. 2 at ¶ 14.  ("Whereas

I emphasized in my Review the potential risk of depression and suicidality, I never concluded

that the clinical trial data affirmatively established or supported the conclusion that Neurontin

increases the risk of or causes depression or suicidal behavior."); *Id.* ¶ 46 ("Throughout my

career at FDA, I never concluded that Neurontin increases the risk of or causes depression or

suicidal behavior.  This remains my belief today.").  A potential risk identified in a now-15-year-

old review is not reliable evidence supporting a causal relationship between Neurontin and

suicide, especially in light of Dr. McCormick's current testimony that the data do not confirm the

potential risk identified fifteen years ago.  Sayler Decl., Ex. 38 at 106:21-108:22.[53]  *See Cloud*,

198 F. Supp. 2d at 1132 (an expert cannot jump from articles that are only suggestive of a link

between Zoloft and suicide, to a reliable conclusion that Zoloft causes suicide); *see also Daubert*,

---

[53] Sayler Decl., Ex. 38 at 107:20-108:3 ("Q. To this day, as you sit here today taking into account
everything you know, have you ever reached a conclusion that Neurontin increases the risk of or is
causally associated with depression, any other psychiatric adverse event, or any type of suicidal thinking
or behavior?  A. I have not.")

43 F.3d at 1322 (an expert may not speak in terms of possibilities without attempting to quantify those possibilities).

> **G.    Analogies to Chemically Distinct Drugs Are Unreliable and Not Scientifically Valid.**

Highlighting the absence of any valid support for their theories in scientific studies conducted on Neurontin during the past 30 years, Drs. Trimble and Kruszewski turn to "analogies" to other drugs and substances.  Specifically, they cite a series of other GABAergic or antiepileptic drugs (including vigabatrin, topiramate, reserpine, baclofen, Valium (diazepam), alcohol, benzodiazepines, and barbiturates) and those medications' purported effects, without recognizing the many differences in chemical and pharmacologic properties of these "analogous" drugs.  Sayler Decl., Ex. 34 at 16-18; Sayler Decl., Ex. 23 at 16-18.

It is well established that "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced."  *McClain*, 401 F.3d at 1246; *Hollander*, 289 F.3d at 1207.  Thus, attempts to extrapolate from other chemically distinct drugs to support a general causation theory regarding Neurontin fail *Daubert's* reliability requirement.  *See Gen. Elec.,* 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Soldo*, 244 F. Supp. 2d at 549-50 ("Testimony extending general conclusions about [similar] drugs does not meet *Daubert's* requirement of reliability."); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1157 (D. Mont. 1999) (same) *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1125 (E.D. Tenn. 1999) (extrapolation based on similar chemical structure is inconsistent with the scientific method because even minor

changes in molecular structure can alter a substance's effect); *Grimes*, 907 F. Supp. at 38 (testimony inadmissible when expert failed to identify any scientifically reliable basis for concluding that Accutane causes cataracts simply because other photosensitive drugs cause cataracts).

Here, plaintiffs' experts have made no attempt to account for the myriad chemical and pharmacological differences between Neurontin and these other drugs. Nowhere do Drs. Trimble or Kruszewski dispute that Neurontin is a unique molecule with no chemical relationship to <u>any</u> of the other antiepileptic or GABAergic drugs generally. Their attempt to claim that because some other drug has a particular property, Neurontin also has that property, is both speculative and illogical—it is supported by nothing more than the experts' *ipse dixit*. For example, although Dr. Kruszewski analogizes Neurontin to substances such as Valium, alcohol, and reserpine, he concedes that he can identify <u>no scientific support</u> equating the pharmacological actions or effects of any of those substances to Neurontin. Sayler Decl., Ex. 9 at 526:11-527:3; 215:6-216:11. He similarly admits that the pharmacologic actions of barbiturates, benzodiazepines and Neurontin in the brain and central nervous system are different. *Id.* at 210:5-9. Dr. Kruszewski's report goes beyond the illogic of imputing like effects across chemically and pharmacologically distinct compounds; he blatantly mischaracterizes scientific publications to suggest they support his "analogies" when in fact they do not. For example, his report cites a textbook for the proposition that "Vigabatrin's side effects are similar to those of Neurontin, including the prominent ones that include sedation, psychosis, dizziness, irritability, major depression and suicidality." Sayler Decl., Ex. 23 at 17. In reality, the textbook lists each of these adverse events in its section on vigabatrin, but <u>none</u> of them in its section on Neurontin. Sayler Decl., Ex. 9 at 530:4-537:13.

Dr. Trimble's report is similarly devoid of any scientific basis for imputing properties or effects of other purportedly "analogous" drugs to Neurontin.  Indeed, Dr. Trimble expressly acknowledges that Neurontin alters the expression of GABA "in ways that are different to the other drugs discussed such as vigabatrin (a pure GABA transaminase inhibitor), or topiramate (a GABAergic receptor at GABA receptors)." Sayler Decl., Ex. 34 at 23.   Dr. Trimble nevertheless attempts  to rely on comparisons to these drugs to support his theories about Neurontin.  Such extrapolation is unreliable and should be excluded.

**H.     Reliance on Mechanism of Action Theories Is Unscientific.**

Because no epidemiologic evidence supports plaintiffs' experts' opinions, they improperly turn to mechanism of action theories, based primarily on animal and *in vitro* laboratory studies.  Sayler Decl., Ex. 34 at 21-28; Sayler Decl., Ex. 23 at 1-9. These theories are even less reliable than the other "evidence" on which plaintiffs' experts purport to rely.

**1.     It is uncontested that animal and *in vitro* laboratory studies do not predict suicide; therefore, reliance on such studies fails *Daubert*.**

As an initial matter, plaintiffs' experts' reliance on animal and *in vitro* laboratory studies is unreliable to prove general causation here.  Extrapolation from animal studies to humans generally is not considered reliable in the absence of a credible scientific explanation of why such extrapolation is warranted. *Hall v. Baxter Healthcare Corp.,* 947 F. Supp. 1387, 1410 (D. Or. 1996).  Stated differently, "[i]n order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans." *In re: Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994).  *In vitro* laboratory studies likewise suffer from the problem of extrapolation.  *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d at 407.

In this case, plaintiffs' own expert, Dr. Robert Roth, admits there are no animal models that are predictive of suicide in humans.  Dr. Roth testified that he was asked by plaintiffs'

counsel to find an animal model that would predict suicide in humans, but that he "couldn't find any." Sayler Decl., Ex. 11 at 77:15-24. As a result, Dr. Roth opined that "studies have to be carried out in human subjects" in order to prove causation for suicide events. Sayler Decl., Ex. 39 at V.4. He likewise admitted that it is not scientifically proper to extrapolate findings from a laboratory study to humans. Sayler Decl., Ex. 11 at 166:25-167:7. As a result, Drs. Trimble's and Kruszewski's attempt to rely on animal and *in vitro* laboratory studies as evidence of general causation should be excluded as unreliable and irrelevant. *See, e.g.*, *United States v. Shay*, 57 F.3d 126, 133 n.5 (1st Cir. 1995) (explaining that expert testimony that a certain chemical causes cancer in animals will not fit the facts of the case and should be excluded unless the plaintiff offers reliable expert testimony that the results observed in the animal studies are transferable to humans); *Gen. Elec.*, 522 U.S. at 144-45 (stating that the experts reliance on animal studies "so dissimilar to the facts presented in the litigation" was unreliable and inadmissible).

### 2. Plaintiffs' experts' speculative and untested mechanism of action theories are contrary to existing science and thus unreliable.

Moreover, plaintiffs' experts' mechanism of action theories are inadmissible as speculative, untested, not replicated, and contrary to existing scientific evidence. Drs. Trimble and Kruszewski propose that Neurontin affects a chemical known as GABA in the human brain. They theorize that Neurontin may raise GABA levels, which they contend lowers monoamine levels (i.e. serotonin, norepinephrine or dopamine) in the brain, which they claim in turn causes depression and aggression, which they further speculate leads to suicide in certain patients. Sayler Decl., Ex. 6 at 52:12-22; Sayler Decl., Ex. 23 at 2-4, 11-12. At the same time:

- Dr. Trimble admits that his GABA theory is <u>not</u> the consensus in the scientific community and has <u>not</u> been replicated. Sayler Decl., Ex. 6 at 177:14-178:4 (no consensus regarding mechanism of action); *Id.* at 271:14-272:10 (no replication of results).

- Dr. Trimble has previously written (outside the context of this litigation) that "Gabapentin [Neurontin] has a novel mechanism of action, <u>not</u> influencing directly the GABA system, and having its own CNS binding site."[54]

- Numerous studies—which Drs. Kruszewski and Trimble do not cite—have consistently found that Neurontin does not act through GABA receptors in the human brain.[55]

- Dr. Trimble cites no study stating Neurontin, at the doses he theorizes raise GABA levels (doses of 200 to 300 milligrams), or at any other dosages, causes suicide. Sayler Decl., Ex. 6 at 54:7-19.

- Dr. Kruszewski admits that GABA levels change in individuals over the course of the day and that he is unable to quantify these fluctuations. Sayler Decl., Ex. 9 at 125:1-126:6. He further admits that GABA levels could change without producing any serious clinical effects. *Id.* at 177:3-12.

- Dr. Kruszewski could cite <u>no</u> support for his claim that "artificially enhanced GABAergic activity can induce major depression and suicidality." *Id.* at 528:11-18.

- Studies indicate that Neurontin may raise <u>total tissue</u> GABA levels by increasing GABA levels within nerve cells,[56] but there is no scientific evidence that the medication raises GABA levels outside of nerve cells (where it may theoretically have clinical effect) or that it affects GABA neurotransmitter activity.[57]

- Studies have also found significant increases in total tissue GABA—the action that Drs. Trimble and Kruszewski claim ultimately leads to suicide—associated with (1) innocuous activities such as yoga,[58] (2) electroconvulsive therapy (ECT), used to <u>treat</u> resistant depression and suicidality[59], and (3) selective serotonin reuptake inhibitors (SSRIs),[60] which are proven effective for the treatment of major depression, a risk factor for suicide.

---

[54] Sayler Decl., Ex. 28 at 368.

[55] *See, e.g.*, Sayler Decl., Ex. 40 at 235-36; Sayler Decl., Ex. 41 at 965; Sayler Decl., Ex. 42 at 1377.

[56] *See* Sayler Decl., Ex. 43 at 475; *See* Sayler Decl., Ex. 44 at 368 (abstract) (observing a 25% increase in total tissue GABA levels over baseline in the human occipital cortex after four weeks of treatment with Neurontin); Sayler Decl., Ex. 45 at 203 (abstract) (observing a 13% increase in total tissue GABA for Neurontin-treated tissue compared to a 62% increase for vigabatrin).

[57] *See* Sayler Decl., Ex. 46 at 53 (abstract) (finding that Neurontin did not affect extracellular GABA levels).

[58] Sayler Decl., Ex. 47 at 419.

[59] Sayler Decl., Ex. 48 at 577.

[60] Sayler Decl., Ex. 49 at 663.

- In direct conflict with Drs. Trimble and Kruszewski's new theory that Neurontin's <u>elevation</u> of GABA levels produces suicide, numerous studies have found that it is low GABA levels—not high GABA levels—that are associated with depression.[61] Although Drs. Kruszewski and Trimble ignore these findings in forming their expert opinions for purposes of this litigation, Dr. Trimble agreed at deposition that low GABA levels have been associated with depression. Sayler Decl., Ex. 6 at 109:4-15.

- Neither Dr. Trimble nor Dr. Kruszewski could identify the normal levels of serotonin, norepinephrine and dopamine in healthy adult human brain; they thus cannot explain what levels demonstrate a "decrease" caused by Neurontin, as they opine. *Id.* at 42:11-23; Sayler Decl., Ex. 9 at 11:21-13:8. Drs. Trimble and Kruszewski cite no scientific studies finding that gabapentin decreases serotonin levels in humans and ignore studies that reach the contrary result.[62] Further, Dr. Roth—plaintiffs' pharmacology expert from Yale University, who adamantly disclaimed opining that Neurontin causes suicide—testified that the literature does not contain "a lot of information that shows that Neurontin has much [of] an effect on serotonin [in the human brain]." Sayler Decl., Ex. 11 at 69:10-16.

Apparently concerned that his GABA theory would not hold water, Dr. Kruszewski posited an alternative mechanism theory. He suggests that Neurontin also inhibits monoamine release by impairing the function of yet a different neurotransmitter—glutamate— and that this inhibition causes depression and suicide. Sayler Decl., Ex. 23 at 7-9, 11. Yet, he admits that:

- He could not cite a single peer-reviewed scientific study that states—using any mechanism theory he proposes in this litigation—that Neurontin causes suicide. Sayler Decl., Ex. 9 at 570:1-5.

- He could not cite any study that states any conclusion about a relationship between the supposed glutaminergic effects of Neurontin and suicide. *Id.* at 259:21-260:2.

---

[61] *See* Sayler Decl., Ex. 50 at 277 (citing in Trimble Rep. at 11) ("GABA agonists are effective antidepressant and antimanic agents. This supports a GABA deficit in mood disorders. A meta-analysis of all published studies shows low CSF [cerebrospinal fluid] GABA in depression to be [a] highly significant finding."); Sayler Decl., Ex. 51 at 185 (cited in Trimble Rep. at 11) (finding that plasma and CSF GABA levels were lower in patients with manic depression than controls and that GABA levels increased following lithium treatment); *See also* Sayler Decl., Ex. 52 at 13-14 (summarizing more than a dozen such studies finding an association between low GABA levels and depression).

[62] *See* Sayler Decl., Ex. 53 at 231 (abstract) (study of human cerebral spinal fluid (CSF) finding that gabapentin administration had no effect on serotonin turnover after several months of treatment); Sayler Decl., Ex. 54, at 45 (CSF study finding that an acute dose of gabapentin causes a slight increase in serotonin turnover).

- Scientific literature suggests that <u>excessive</u> release of glutamate and <u>over-stimulation</u> of glutaminergic NMDA receptors—not the decreased glutaminergic activity that Dr. Kruszewski claims—are likely contributors to major depressive disorder.[63]

Untested and speculative theories regarding a drug's potential mechanism of action which are contrary to existing scientific evidence—such as the theories proposed by Drs. Kruszewski and Trimble—are not reliable bases for general causation opinions. *See In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1296 ("While [expert's] biological theory may be exactly right, at this point it is merely plausible, not proven, and biological possibility is not proof of causation. . . . When a theory has not been verified by testing, it obviously has not been peer-reviewed. Without verification, [the] theory remains an educated guess.").[64]

## VI.    DRS. KRUSZEWSKI AND BLUME HAVE IMPROPERLY TESTIFIED OUTSIDE THE SCOPE OF THEIR EXPERTISE.

In addition to its reliability and helpfulness requirements, Rule 702 also requires experts to be sufficiently qualified. "To be sufficiently qualified to testify as an expert, a witness needs to have knowledge, skill, experience, training, or education in the <u>specific</u> subject for which his testimony is offered." *Sutera,* 986 F. Supp. at 661 (citing *Whiting v. Boston Edison Co*., 891 F. Supp. 12, 24 (D. Mass. 1995) (emphasis added)). Experts are thus prohibited from testifying outside the scope of their expertise. *E.g., Wade-Greaux*, 874 F. Supp. at 1476, 1479-80 (experts

---

[63] *See, e.g.*, Sayler Decl., Ex. 55 at 705 (reporting <u>higher</u> cortical levels of glutamate in patients with major depressive disorder); Sayler Decl., Ex. 56 at 856 (finding that ketamine, an NMDA receptor antagonist, has potent and rapid <u>antidepressant</u>-like effect); Sayler Decl., Ex. 57 (same).

[64] *See also In re Breast Implant Litig.*, 11 F. Supp. 2d at 1235 ("[Plaintiffs' expert's] non-epidemiological methodology, including reliance on anecdotal case reports and theories about the mechanism by which breast implants might cause disease, is not sufficient to support his conclusions that are directly contrary to the epidemiology . . . . [It] has not been objectively tested, has no known rate of error, and is not generally accepted by the medical community as validation that silicone gel breast implants caused the Plaintiffs' various conditions and symptoms."); *Nelson v. Am. Home Prods. Corp.*, 92 F. Supp. 2d 954, 972 (W.D. Mo. 2000) (Plaintiffs' experts' mechanism of action theories depended on "numerous logical shortcuts and inferential leaps. Without testing, epidemiological study, or controlled experimentation, these theories constitute no more than scientific speculation and cannot be admitted as reliable scientific knowledge").

in pediatrics, pharmacology, toxicology, internal medicine, pediatric pathology, cell biology, and physical chemistry unqualified to opine whether asthma medicine causes birth defects in humans); *Christerophersen v. Allied-Signal Corp.*, 939 F. 2d 1106, 1112-13 (5th Cir. 1991) (fact that expert "has an M.D. degree . . . is not enough to qualify him to give an opinion on every conceivable medical issue.").

**A.    Dr. Kruszewski Is Not Qualified to Opine On the Issue of Mechanism of Action.**

Dr. Kruszewski is a clinical psychiatrist who sees two patients a week. Sayler Decl., Ex. 9 at 17:6-12; 20:15-18. He has no advanced training in neurology, psychopharmacology or neuropharmacology. Although he testified that he would "probably qualify" as an expert psychopharmacologist, he is not a member of either the American College of Neuropsychopharmacology or the Collegium Internationale Psychopharmicologicum, the two leading professional organizations in the field. *Id.* at 156:2-22.[65] Nor does he attend any of the annual meetings devoted to the field of psychopharmacology. *Id.* at 158:9-12. His lack of education, training, or experience with either neuropharmacology (the study of drugs used to treat neurological disorders) or psychopharmacology (the study of drugs used to treat psychiatric disorders) disqualifies him from offering admissible opinions purporting to show that neurobiological effects of Neurontin produce specific psychiatric and behavioral events (suicidal thoughts and behavior). There <u>is</u> a field of medical and pharmacological science that examines precisely these questions—namely, neuropsychopharmacology—and he is a stranger to it.

Moreover, Dr. Trimble gave testimony that essentially disqualifies Dr. Kruszewski on his mechanism of action opinions. Dr. Trimble testified that neurology, psychopharmacology, and

---

[65] Pfizer's expert, Dr. Tony Rothschild, is a member of both organizations.

psychiatry are three disciplines that "together are very important" in understanding mechanism

of action of pharmacologic agents.   Sayler Decl., Ex. 6 at 326:21-327:24.  He explained:

> If you only have a neurological perspective, then you will not be
> able to understand the psychiatry and the behavioral disorders.  If
> you have a psychiatric perspective, you will not understand the
> basic underlying neurology.  If you have not had acquaintance with
> neuroanatomy and neurochemistry and experimental methods, you
> will not understand the translation of those into clinical practice.

*Id.*  Thus, according to plaintiffs' own expert witness (Dr. Trimble), Dr. Kruszewski, who is

neither a neurologist nor psychopharmacologist, is not qualified to opine on Neurontin's

purported mechanism of action.

**B.      Dr. Blume Is Not Qualified to Opine on the Issue of Mechanism of Action.**

If it is possible, Dr. Blume is even less qualified than Dr. Kruszewski to opine on

Neurontin's mechanism of action or any medical theory of causation.  She is not a neurologist,

psychopharmacologist, neuropharmacologist or even a medical doctor.   Sayler Decl., Ex. 5 at

209:14-15,  225:17-226:6,  227:3-7,  230:19-231:5.   Nor has she conducted studies in

neuropharmacology or any discipline that would qualify her by experience to offer opinions on

mechanistic theories.  *Id.* at 209: 14-15; 225:25-226:2; 230:19-231:5; 235:21-236:16.  By her

own admission, she lacks expertise in psychiatry, neurology and neuropharmacology.  *Id.* at

225:17-226:2, 230:19-231:5.   She has never published any peer-reviewed articles on the

mechanism of action of any antiepileptic drug.  *Id.* at 235:17-20.  Nor has she ever personally

conducted any toxicological or pharmacological research into the mechanism of action of

antiepileptic drugs.  *Id.* at 235:21-236:16.  Like Dr. Kruszewski, she is not a member of the

American College of Neuropsychopharmacology.  *Id.* at 599:10-12.  She was unaware that there

are certain medications that are known to elevate GABA, but which are not associated with

depression or suicide. *Id.* at 577:5-17.  She has never prescribed Neurontin or any medication, as

she is not qualified to do so.  *Id*. at 209: 16-18.  She has never treated a patient or conducted a risk/benefit analysis in a clinical setting.  *Id.* at 210:8-13.  Dr. Blume's lack of familiarity with concepts at the heart of plaintiffs' causation and mechanism of action theories, along with her lack of qualifications and expertise in psychiatry, neurology, neuropharmacology, and the practice of medicine render her unqualified to opine on general causation or Neurontin's mechanism of action.

## <u>CONCLUSION</u>

As set forth above, the general causation expert opinions of Drs. Trimble, Kruszewski and Blume are unreliable and irrelevant and should be excluded pursuant to Rule 702 and *Daubert*.  In addition, neither Dr. Kruszewski nor Dr. Blume is qualified to opine on the issue of mechanism of action.  Pfizer thus respectfully requests that this Court grant its motion to exclude the testimony of Drs. Trimble, Kruszewski and Blume.

Dated:  March 7, 2008      Respectfully submitted,

             DAVIS POLK & WARDWELL

             By:  /s/James P. Rouhandeh
                 James P. Rouhandeh

             450 Lexington Avenue
             New York, NY 10017
             Tel:  (212) 450-4000

                -and-

             SHOOK, HARDY & BACON L.L.P.

             By:  /s/Scott W. Sayler
                 Scott W. Sayler

             2555 Grand Blvd.
             Kansas City, MO 64108-2613
             Tel:  (816) 474-6550

                -and-

             HARE & CHAFFIN

             By:  /s/David B. Chaffin
                 David B. Chaffin

             (BBO # 549245)
             160 Federal Street
             Boston, MA 02110
             Tel:  (617) 330-5000

             *Attorneys for Defendants Pfizer Inc. and*
             *Warner-Lambert Company LLC*

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 7, 2008.

             /s/David B. Chaffin