# Exhibit 5

Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

 3   In re:  NEURONTIN MARKETING, SALES  MDL DOCKET NO:  1629
             PRACTICES, AND PRODUCTS
 4           LIABILITY LITIGATION      Master File No. 04-10981

 5   _____/

 6   THIS DOCUMENT RELATES TO:

 7         ALL PRODUCTS LIABILITY
           ACTIONS
 8   _____/

 9

     VIDEOTAPED
10   DEPOSITION OF:      CHERYL D. BLUME, Ph.D.

11   DATE:               November 12, 2007

12   TIME:               9:25 a.m. to 6:07 p.m.

13   PLACE:              13902 North Dale Mabry Highway
                         Suite 122
14                       Tampa, Florida

15   PURSUANT TO:        Notice by counsel for
                         Defendants for purposes
16                       of discovery, use at
                         trial or such other
17                       purposes as are permitted
                         under the Federal Rules
18                       of Civil Procedure

19   BEFORE:             VALERIE A. HANCE, RPR
                         Notary Public, State of
20                       Florida at Large

21                       Volume 1
                         Pages 1 to 370
22

23

24

25
```

Page 14

1    thousands of pages. There are probably almost a
2    million documents, not pages.
3        MR. GUNTER: Okay. So the best thing to do
4    then, if we have to extract any documents on that,
5    we could -- you could confirm that this was on
6    the --
7        MR. BARNES: Original.
8        MR. GUNTER: -- hard drive that you gave, the
9    original?
10        MR. ALTMAN: One simple way to do it is that,
11    maybe on a break, we can run a directory of what's
12    on that hard drive, mark that itself as an exhibit
13    which would authenticate what was on the hard
14    drive. Then you can take it with you. Then we
15    have the copy --
16        MR. BARNES: And that will be Exhibit -- we'll
17    make that as Exhibit 2A to the deposition.
18        MR. ALTMAN: And that would probably solve
19    that.
20        MR. BARNES: Okay. That's excellent. Thank
21    you.
22        And then I'd like to mark this as Exhibit 3
23    and 3A, if I might, Madame Court Reporter.
24        Excuse me, Dr. Blume.
25        (Deposition Exhibit Nos. 3 and 3A marked for

Page 15

1    identification.)
2    BY MR. BARNES:
3        Q. Can you identify what's been marked as
4    Exhibit 3 and Exhibit 3A to the deposition?
5        A. Yes. Exhibit 3 is a disk that I asked to be
6    prepared that includes the following information. It
7    includes our complete bibliography relating to Neurontin
8    and gabapentin of scientific literature articles. It
9    also includes information that I have cited in my report
10    that I obtained independently. And it includes the --
11    as I -- yes, it includes the databases that were
12    provided to us relating to the various postmarketing
13    pharmacovigilance data.
14        Q. Who provided information to you on the
15    pharmacovigilance data?
16        A. Mr. Altman.
17        Q. Who is Mr. Altman?
18        A. Keith Altman is an employee of Finkelstein who
19    works with PDG on various projects relating to
20    postmarketing pharmacovigilance.
21        Q. On how many products does Mr. Altman work with
22    your company on pharmacovigilance products?
23        A. Oh, over the last three or four years,
24    probably 20.
25        Q. And can you describe the -- the ref- -- the

Page 16

1    work you've done with Mr. Altman over the -- in the 20
2    projects that you've identified?
3        A. They may be divided into two categories. One
4    relates to the product development work we do for
5    pharmaceutical clients with respect to their preparation
6    of submissions for the U.S. Food and Drug
7    Administration, and the other relates to work that we
8    have done with him on litigation-related matters.
9        Q. Okay. Is Mr. Altman an employee of your firm?
10        A. No, as I noted, he's an employee of
11    Finkelstein.
12        Q. How is he -- when he works on project
13    development work for your clients with regard to FDA
14    submissions, on what basis is he compensated?
15        A. He -- he provides a bill -- he provides an
16    invoice for his hours to us, and that invoice is then
17    included with the expenses that I provide to the client.
18        Q. What clients have you worked with Mr. Altman
19    on product development work?
20        MR. FROMSON: Just note my objection as to
21    form.
22        THE WITNESS: Yes. And I can tell you the
23    types of clients they are, but I'm not permitted to
24    identify our pharmaceutical clients.
25    BY MR. BARNES:

Page 17

1        Q. On what basis do you -- you can't identify
2    your pharmaceutical clients?
3        MR. FROMSON: Just note my objection to the
4    extent that it may be privileged information or
5    subject to confidentiality agreements that she has
6    with both pharmaceutical companies.
7        THE WITNESS: That is correct. And I have
8    questioned them in the past regarding these types
9    of issues and they have forbidden me to identify
10    them.
11    BY MR. BARNES:
12        Q. How many clients has Mr. Altman worked with
13    you on product development matters?
14        A. Probably four or five.
15        Q. And when did that begin?
16        A. In 2004.
17        Q. Describe the nature of the work that
18    Mr. Altman does for you for your pharmaceutical clients.
19        A. He has evaluated U.S. as well as international
20    databases, both publicly available as end company-based
21    databases, relating to adverse events for utilization in
22    either IND or NDA submissions or in the establishment of
23    pharmacovigilance assignments following an NDA approval.
24        Q. Are these U.S.-based companies that you're
25    working with?

5 (Pages 14 to 17)

Page 18

1    A.  Both U.S. and international.
2    Q.  Are the -- involves the products that are --
3  are they generic or are they ethical pharmaceuticals,
4  branded pharmaceuticals?
5    A.  They are both.
6    Q.  Do you direct his activities when he works
7  with you on your -- your pharmacovigilance work for
8  private clients outside of litigation?
9    A.  Yes.
10    Q.  And so he -- you basically ask him to run the
11  queries of the database and you will run the queries?
12    A.  Yes.
13    Q.  Does he ever design the queries himself?
14    A.  I did -- I request the type of information
15  that I need extracted.  He -- he designs the assignments
16  that he conducts in order to assess the database,
17  electronically access the database and check the
18  database.
19    Q.  So I understand, you will say, "Mr. Altman, I
20  would like for you to query the database to extract this
21  information, run these analyses," and he would use his
22  system to pull the information out and return the
23  information to you for your professional evaluation?  Is
24  that fair?
25    A.  Yes.  And his -- his analyses procedures

Page 19

1  are included with the information that is provided to
2  both the client and to the Food and Drug Administration.
3    Q.  Let me know, how does that work?  When he
4  provides you with the analyses and procedures, what
5  are -- what documentation does he provide you with in
6  response to your request for information?
7      MR. FROMSON:  Just note my objection as to
8    form.
9      THE WITNESS:  Well, it takes -- it takes --
10    takes different approaches depending on the type of
11    search and depending on the client.  Generally he
12    is involved with the design, the information that
13    is needed in the goals for -- for the IND or for
14    the NDA.  And so he is aware of what we are -- what
15    we are working on.
16      And I will ask him specific queries, either at
17    a meet -- either at a face-to-face meeting or
18    telephonically or electronically, and he will run
19    that information.  There is generally telephonic
20    contact back and forth as that information is
21    generated.  And the information is provided to us
22    electronically or he brings us to us when we meet.
23  BY MR. BARNES:
24    Q.  Your prior answer talked about that he would
25  provide you with design and documentation back to you in

Page 20

1  terms of the request.
2    Q.  Does he provide you with the protocol for a
3  search or how does he set up the search or does he --
4  you just let him run the search as he sees fit?
5    A.  Well, we've done it several times, and he
6  provides to me an overview of how he has -- how he plans
7  on conducting the search.  That protocol and the -- and
8  his execution of that protocol has been previously found
9  acceptable by the Food and Drug Administration.
10  Generally, that same general type of search is conducted
11  for all of our searches.
12    Q.  And when -- when was it found acceptable by
13  the Food and Drug Administration?
14    A.  I think our first NDA with that was approved
15  in 2004.
16    Q.  And what -- what protocol did he run that was
17  found acceptable by the Food and Drug Administration?
18  Describe it, the protocol and what the output was.
19      MR. FROMSON:  Just note my objection as to
20    form.
21      THE WITNESS:  Within the confines of our
22    confidentiality agreement with that client, the
23    search was designed to compare a variety of
24    adverse-related events over a family of drug
25    products.  And we were interested in specific

Page 21

1  events within a drug product and across the family
2  of drugs.  And we were also interested in the
3  standard pharmacovigilance tools of accessing the
4  top 25 events at each reporting period, any changes
5  in the top 25 events, any events that represent a
6  signal from one reporting period to the next, any
7  new events that have popped up on the database from
8  the previous period.
9  BY MR. BARNES:
10    Q.  And do you have a -- was that information
11  submitted to the Food and Drug Administration?
12    A.  Yes.
13    Q.  And was this NDA approved?
14    A.  Yes.
15    Q.  Is it, work that Mr. Altman did, publicly
16  available from the Food and Drug Administration?
17    A.  I don't know if that is specifically noted in
18  the summary basis of approval.  I don't know.
19    Q.  The infor-- -- you provide information to the
20  government that was prepared by Mr. Altman, correct?
21    A.  Yes.
22    Q.  Is there any -- any -- any known reason -- any
23  basis for confidentiality that you can identify with
24  regard to the information that your company submitted to
25  the Food and Drug Administration that was presented by

6 (Pages 18 to 21)

Page 22

1  Mr. -- prepared by Mr. Altman in connection with that
2  NDA?
3      A.  The only thing that is publicly available from
4  a new drug application is the information that the FDA
5  provides relating to that new drug application. And I
6  don't know if the FDA's release of the clinical data
7  section includes an overview of the postmarketing
8  pharmacovigilance. I don't know.
9      Q.  And what's the name of that drug?
10     A.  I just can't share this with you.
11     Q.  Well, just so I understand, you did work on
12  behalf of a pharmaceutical company in regard to a new
13  drug application, correct?
14     A.  Yes.
15     Q.  And that your -- your client submitted that
16  information to the Food and Drug Administration in
17  connection with seeking FDA approval for a drug?
18     A.  Yes.
19     Q.  And now is it your testimony that the drug was
20  subsequently approved by the Food and Drug
21  Administration?
22     A.  Yes.
23     Q.  And you're claiming that the work that you
24  submitted to the United States Government is somehow
25  confidential in connection with that approval of -- of a

Page 23

1  drug for marketing to the United States?
2      A.  Yes.
3      Q.  I'm asking you -- so you're just refusing to
4  provide me with the name of the drug?
5      A.  All the work that I provide goes to the client
6  and is embedded within their new drug application.
7      Q.  What's confidential with the name of the drug?
8          MR. FROMSON:  Just note my objection as to
9      form.
10         THE WITNESS:  I am not permitted to talk about
11     the clients nor their drug products.
12  BY MR. BARNES:
13     Q.  By whom?
14     A.  By the client.
15     Q.  Are you relying on any of your experience
16  working with these pharmaceutical clients in forming
17  your opinions in this case?
18         MR. FROMSON:  Note my objection as to form.
19         THE WITNESS:  My opinions in this case are --
20     are predicated upon my 25 years in the
21     pharmaceutical industry as well as the work that I
22     have continued over the last six years.
23  BY MR. BARNES:
24     Q.  Are you relying on any of the work you've done
25  with the Food and Drug Administration in connection with

Page 24

1  pharmaceutical clients in expressing any of your
2  opinions in this case, including the methods that
3  Mr. Altman employed on your behalf in making these
4  submissions?
5      A.  No. Not specifically, no.
6      Q.  Not specifically. How about generally?
7      A.  He does the same general types of searches in
8  both litigation and as well as in the product
9  development assignments.
10     Q.  It's not my question.
11         MR. BARNES:  Would you read back that last
12     question, please.
13         (The reporter read the portion requested.)
14         THE WITNESS:  It is the same methods that he
15     uses for both our litigation work as well as
16     pharmaceutical development work. So I'm relying on
17     the experience I have gained with him in the
18     litigation for my work in this case.
19  BY MR. BARNES:
20     Q.  Please list every drug pharmaceutical client
21  that Mr. Altman has assisted you with --
22         (Brief interruption.)
23         MR. FROMSON:  Did you finish the question?
24         MR. BARNES:  I did not. Thank you.
25         MR. FROMSON:  Okay.

Page 25

1  BY MR. BARNES:
2      Q.  Please list for me each pharmaceutical client
3  with whom you have provided services and have engaged
4  the services of Mr. Altman of Finkelstein &
5  Associates --
6          MR. FROMSON:  Object --
7  BY MR. BARNES:
8      Q.  -- for me.
9          MR. FROMSON:  Okay. Now, just note my
10     objection again to the extent that she's already
11     indicated that confidentiality agreements from
12     those pharmaceutical companies --
13         MR. BARNES:  Make your record.
14         MR. FROMSON:  I thank you.
15     -- prevent her from answering that question.
16         THE WITNESS:  Yes, I can't answer it.
17  BY MR. BARNES:
18     Q.  Would you please -- you're refusing to answer
19  the question?
20     A.  Well, I'm refusing because I am not permitted
21  to answer the question.
22     Q.  Would you please provide me with
23  confidentiality agreements with these companies with the
24  names redacted?
25         MR. FROMSON:  Just note my -- my same

7 (Pages 22 to 25)

Page 26

1  objection. Over my objection, she can answer the
2  question to the best she can.
3       THE WITNESS: I will check with our corporate
4  counsel. And depending on his response, I will
5  address that request.
6  BY MR. BARNES:
7       Q.  What's confidential about the names of the
8  drugs that you have worked on for pharmaceutical
9  clients --
10      MR. FROMSON: Just note my objection.
11 BY MR. BARNES:
12      Q.  -- that have been approved by the Food and
13 Drug Administration. Not in process, but that are now
14 approved. What's confidential about that?
15      MR. FROMSON: Note my objection to the form of
16 the question. She's not an attorney, so she can't
17 define for you what's confidential. She's
18 instructed -- she's indicating to you that her
19 confidentiality agreements prevent her from
20 disclosing it and her counsel is indicating she
21 can't do that.
22      MR. BARNES: I just want to know her
23 understanding.
24      THE WITNESS: Yes.
25      MR. FROMSON: Over my objection, you can

Page 27

1  answer.
2       THE WITNESS: Yes, we -- we sign
3  confidentiality agreements and contracts with these
4  clients. Those are reviewed by my corporate
5  counsel.
6       We've been asked this in earlier time. I've
7  requested permission to give their names. Both our
8  corporate counsel and the clients have refused.
9       MR. BARNES: So to the extent that you are
10 relying upon your work with these clients in
11 expressing any of your opinions here today, I will
12 object to that and ask that if that goes forward, I
13 want that information produced.
14      MR. FROMSON: I'll take your objection under
15 advisement.
16      MR. BARNES: Thank you.
17 BY MR. BARNES:
18      Q.  Can you generally describe the terms of the
19 confidentiality agreement?
20      MR. FROMSON: Just note my objection as to
21 form. Over my objection, go ahead if you know..
22      And -- and, further, you don't even know if
23 the terms of the agreement are also confidential,
24 so you're asking her to deal with that issue.
25      MR. BARNES: Speaking objections now, Counsel.

Page 28

1  BY MR. BARNES:
2       Q.  I'm not try -- if it's -- I want to know the
3  terms of the confidentiality agreements.
4       A.  Really, I don't know if I'm permitted to talk
5  about this. I will check with our corporate counsel and
6  answer it later, depending on his response.
7       Q.  How many times years -- do you know the term
8  of the confidentiality for -- is it -- is it forever or
9  is there a period of years and it's limited to years?
10      MR. FROMSON: Note my same objection.
11      THE WITNESS: Corporate counsel reviews these
12 contracts. From what I can recall, the ones that I
13 can recall, I believe are seven years after the NDA
14 is approved.
15 BY MR. BARNES:
16      Q.  And that applies to all companies?
17      A.  No, just the ones that I recall.
18      Q.  Okay.
19      THE REPORTER: Excuse me. That are --
20      THE WITNESS: Just the ones that I recall.
21 BY MR. BARNES:
22      Q.  Now, are there any clients for whom you do
23 pharmaceutical work in which Mr. Altman has worked with
24 you that do not have confidentiality agreements?
25      A.  I don't think so. Not that I can recall, no.

Page 29

1       Q.  What's Mr. Altman's background? Do you know
2  his educational background?
3       A.  Yes. His undergraduate work, I believe, is
4  with SUNY in some sort of an mathematical engineering
5  degree. And I know that he has almost completed law
6  school.
7       Q.  Oh, he's a lawyer, wants to be a lawyer?
8       A.  I don't think he's completed yet, but I think
9  he's almost completed.
10      Q.  And he's not a -- is he a medical doctor?
11      A.  Not that I know of, no.
12      Q.  Is he a biostatistician?
13      A.  No.
14      Q.  Is he an epidemiologist?
15      A.  Not by training, no.
16      Q.  Is he an epidemiologist professionally?
17      A.  No.
18      Q.  Now, he's worked with you on pharmaceutical
19 litigation, correct?
20      A.  Yes.
21      Q.  And describe how -- what clients he has worked
22 with you on -- identify the clients he's worked with you
23 on pharmaceutical litigation?
24      MR. FROMSON: Same objection as before, in
25 terms of confidentiality.

8 (Pages 26 to 29)

Page 46

1    have 6 -- I have 6 being the -- I pulled this out
2    separately. Put it right on top. Thanks.
3        Now, I'm going to -- I'm just going to -- now,
4    I'm going to just -- just lay a foundation with --
5    with counsel so we understand what this is.
6        This was at our request. Your firm, from
7    Mr. Altman, provided Exhibit No. 7. Mr. Altman,
8    will you describe what -- what is -- Exhibit No. 7
9    contains, for the record, please.
10        MR. FROMSON: Notwithstanding that Mr. Altman
11    has not been sworn under oath, I certainly don't --
12        MR. BARNES: I'll -- I'll --
13        MR. FROMSON: I don't have an objection to him
14    making a representation for our firm and for our --
15    for our discussion purposes.
16        MR. BARNES: And he did -- he made that
17    repre- -- he can make -- he's making this
18    representation under your direction and permission,
19    correct?
20        MR. FROMSON: As part of what we'd consider --
21    we would consider to be a meet-and-confer process,
22    absolutely.
23        MR. BARNES: Thank you very much.
24        MR. FROMSON: Go ahead.
25        MR. BARNES: Okay.

Page 47

1        MR. ALTMAN: I prepared a disk at the request
2    of defense counsel which contained all of the
3    material that I had sent to Dr. Blume and all of
4    the material I had actually created, all of my
5    working copies of all of the material I had worked
6    with, as well as the raw data, I believe, that had
7    been provided to me by either the -- by the
8    defendants, by Pfizer, in this case.
9        MR. BARNES: Okay.
10        MR. ALTMAN: And I just might add, that disk
11    will contain a lot of information that was not
12    actually provided to Dr. Blume, so she does not
13    have everything that is on that disk.
14    BY MR. BARNES:
15        Q. Okay. Dr. -- Dr. Blume, describe for me, if
16    you would --
17        MR. BARNES: I'll accept your representation,
18    and thank you. That was not part of that
19    discussion between counsel and -- for the
20    plaintiffs and the defense counsel.
21    BY MR. BARNES:
22        Q. When Mr. Altman -- describe how in this case
23    you've interacted with Mr. Altman in terms of the
24    performing any analyses and -- on the various databases
25    and data sets that you've referenced in -- in your -- in

Page 48

1    your prior answer.
2        MR. FROMSON: Just -- just note my objection
3    to the form of the question to the extent that
4    you're asking her anything that pertains to the
5    subject matter of draft reports that were
6    ultimately provided.
7        MR. BARNES: I do not want draft report
8    information. I don't know if she'd even know that.
9    But if you do, that -- not the draft report.
10    BY MR. BARNES:
11        Q. What I want to know, when you communicated
12    with Mr. Altman, what analyses -- or how did you
13    interact with him in terms of creating the analyses for
14    your consideration in this case? Broadly.
15        A. Uh-huh. (Indicates affirmatively.)
16        I asked Mr. Altman to conduct the same sort of
17    analyses that we conduct in our standard
18    pharmacovigilance work for -- for pharmaceutical
19    companies. And what that means is accessing the
20    different types of events at different periods of time.
21        In this particular instance, the report is
22    divided into four time periods. And in each time
23    period, we looked at all available databases, which
24    included the U.S. pharmacovigilance database referred to
25    as either "SRS" or "SRS/AERS." We accessed the World

Page 49

1    Health Organization database. We looked at Health
2    Canada at least during one period in which it was
3    available. I believe in this report we also looked at
4    DAWN, the Drug Abuse Network Test, the Test Network, and
5    the internal Pfizer pharmacovigilance database or
6    adverse event database.
7        And during that period of time -- during those
8    periods of time, we conducted the same sort of queries
9    that we conduct as part of our NDA preparation efforts
10    and as part of our post-NDA pharmacovigilance
11    assignments for clients.
12        And that includes -- in this particular case,
13    we were interested in psychobiological, neuropsychiatric
14    terms, and we were also look -- interested in looking at
15    the contribution of those terms relative to the entire
16    database over time.
17        Q. Okay. Now, specifically, can you set forth in
18    specifics what inquiries you had Mr. Altman run in
19    connection with your review of the various databases?
20    And I'm not so much interested in report, but the -- you
21    know, the -- but the types of inquiries you asked him to
22    run. And are all of them included in your report?
23        A. Yes, I can address that.
24        Q. Thank you.
25        A. And the assignments varied, of course, by

1  necessity during different time periods.
2      I believe the first time period that we will
3  be interested in is in the period 1994 to 1996. And
4  I'll get to that in just a second.
5      Now, the adverse events that are noted in this
6  report that appear in either quarterly or annual reports
7  or in PSURs, we are able to access those and address
8  those in our office.
9      Where I turn to Mr. Altman's expertise are in
10  the -- are in the large databases that are relied upon
11  in doing -- conducting pharmacovigilance work. So that
12  would include the Pfizer's -- Pfizer's internal
13  database. And, for example, he would have been involved
14  in the work that we did in -- the first time period of
15  relevance is '94 to '96.
16      Q. Would you please tell me the charts which he
17  pulled for you, please.
18      A. He filtered the data that would have been
19  involved in -- on page 69 of my report, page 70, 71, 72,
20  which are the filter of the top 25 adverse events during
21  that relevant time period in the database across all
22  body systems. And that would proceed to 72, 73, 74.
23      Beginning on page 75, which is paragraph 117,
24  we turn then to the various available databases,
25  independent available databases. During this timeframe

1  with the U.S. Government, it would have been the SRS --
2      Q. Who did --
3      A. -- system.
4      Q. Who -- who pulled the data on -- and did the
5  analysis for paragraph 117 on page 75?
6      A. Mr. Altman.
7      Q. Mr. Altman did?
8      A. Yes. This is from the FDA's database. It's
9  maintained by -- I think it's maintained by NTIS.
10      Q. So just so I understand, the tables on 69, 70,
11  71, 72, 73, 74, and page 75 were prepared by Mr. Altman,
12  correct?
13      A. He provided me with the numbers of events.
14  The tables were actually prepared here.
15      Q. What did you do -- let's just take page 75.
16  What -- describe what you personally did to prepare
17  Table -- the table on page 75.
18      A. Okay. This is in 1994, which would have been
19  the first marketed year of Neurontin in the
20  United States, so Pfizer would be submitting quarterly
21  reports during that timeframe. So we pulled the terms
22  that we were interested in having filtered by Mr. --
23  Mr. Altman from the FDA's database. We gave him the
24  terms that we were interested in. He gave me the number
25  of reports.

1      I also asked him to give me the total number
2  of events in the database so we could do the standard
3  calculation of the percent of total.
4      Q. So on page 75, you look at abnormal dreams,
5  that -- that percentage, the numerator is -- let's say
6  on 1996 Q2, the numerator would be one, and then the
7  denominator would be all events in the database
8  pertaining to having been reported to Neurontin?
9      A. That would be yes.
10      Q. Okay.
11      A. Oh, yeah. And it would only be the Pfizer
12  database, of course, because it was a sole source
13  product at that time.
14      Q. Okay. Continue after '75 as to what -- what
15  Mr. Altman prepared versus to what -- as to what you
16  prepared.
17      A. Okay. So the --
18      Q. Who accessed Health Canada on page 76?
19      A. Well, that's World Health Organization.
20      Q. I'm sorry.
21      A. That's not Health Canada.
22      Q. I made a mistake. I apologize.
23      A. We generally access the WHO database. Now,
24  whether we did it in this case or Mr. Altman accessed
25  it, I don't specifically recall.

1      Q. You don't know who prepared this. Who
2  provided the terms?
3      A. We provided the terms.
4      Q. You directed the terms and he went -- he or
5  you -- on this, on page 76 -- went into the database to
6  extract it?
7      A. Yes, it's a little different with the World
8  Health Organization. When you receive the database from
9  them, they send you the entire database, so it's a
10  matter of going through and extracting from a whole --
11  you don't -- you don't have the opportunity to do it by
12  body systems. They send you everything.
13      Q. Do you have -- okay.
14      Do you have the database that was provided to
15  you from World Health Organization in your possession;
16  that was used to create this table on page 76?
17      A. Yes, and I have put that on this disk as well.
18      Q. And that would be referring to Exhibit No. 3?
19      A. Yes.
20      Q. Thank you very much.
21      All right. Why don't you continue to review
22  the report just as to what you -- so -- what you
23  prepared.
24      Right now, we have Mr. Altman preparing 69,
25  70, 71, 72, 73, 74, 75, and 76, correct?

14 (Pages 50 to 53)

Page 54

1      MR. FROMSON: Just note my objection as to the
2  form in terms of the use of the word "prepare."
3      MR. BARNES: "Filtered" was her room -- word.
4  "Filtered." I'll --
5      THE WITNESS: Yes. And just to clarify, I
6  would have to check if we -- if we did the World
7  Health Organization or if he did it.
8  BY MR. BARNES:
9    Q.  You'll check on that for me?
10    A.  Yes, I will.
11    Q.  Okay. Now, when you -- Mr. Fromson noted an
12  objection. What do you mean by Mr. -- by using the
13  phrase Mr. Altman filtered the information for you, what
14  does that mean?
15    A.  Well, my understanding of the FDA and some of
16  these other databases is they are huge databases. The
17  word "filter" is simply my way of asking him to apply
18  the rules and the conditions that he has established in
19  evaluating the database and calculating the number of
20  specific events at -- at this designated time periods.
21    Q.  What are the rules that Mr. Altman established
22  in querying the databases to get the number of events?
23    A.  Well, we out -- we outline these. When we
24  submit, for example, to the Food and Drug
25  Administration, we give a complete list of what he does.

Page 55

1      But my understanding is that care is taken to
2  take into consideration when there is an initial report
3  versus a follow-up report so it is not counted twice.
4  We filter -- I believe he filters the database so that
5  we are getting all of the information. We take the last
6  reports so that it includes all the cumulative
7  information. He checks for duplicates. He is able to
8  filter them for us by suspect status, nonsuspect status.
9  If we ask, he can filter it by various demographics.
10  For example, if the patient were on other meds, were not
11  on other meds.
12      If we're given information generally, whatever
13  fields -- it is my understanding, whatever fields are in
14  the intake form, he would be able to filter by those
15  forms -- fields. Excuse me.
16    Q.  Are you -- is it your testimony that that's
17  what he did in this case?
18    A.  Well, what I asked for -- and there are
19  certain -- there are certain precautions that he
20  undertakes for all tables. For example, he is very
21  careful that we don't double count. He is very careful
22  that we put the event when the event was -- when the
23  event occurred, not necessarily when reported.
24    Q.  How do you know he was careful? What did you
25  do to -- did you do anything to audit his work in this

Page 56

1  case to verify that he was exercising care?
2    A.  We have used his -- the method that he has
3  developed has been provided to the FDA. FDA has queried
4  him independently on the way in which he analyzes these
5  data. FDA has -- has approved our applications using
6  these data. I understand that Mr. Altman communicates
7  with the FDA on projects other than mine, as well, on
8  these database assignments, so --
9    Q.  My question is, what did you do in this
10  particular case to verify that Mr. Altman exercised care
11  in preparing these tables and filtered it in an accurate
12  and reliable way --
13    A.  Well, I under --
14    Q.  -- in this case?
15    A.  Yes. I understood he used the same system
16  that has been previously found to be acceptable. I
17  cannot tell you over the last four years of whether I
18  did any independent checking or not. I just don't
19  recall.
20    Q.  In this case, did you do any independent
21  checking of Mr. Altman?
22    A.  That's what I'm saying. In the last four
23  years, I just don't recall if I did or not.
24    Q.  Well, when were you retained in this matter?
25    A.  2003. 2003, I think.

Page 57

1    Q.  2003.
2      And who called you?
3    A.  Wow. I think I was contacted by
4  Andrew Finkelstein.
5    Q.  Okay. So is there any documentation that you
6  have reviewed to verify that the material provided to
7  you and the analysis provided to you by Mr. Altman was
8  done in -- in a scientifically-rigorous and reliable
9  manner?
10      MR. FROMSON: Just note my objection as to
11  form.
12      THE WITNESS: I -- over the years, I don't
13  recall if I did any of that on this case. I accept
14  his work because it has been accepted and -- and
15  validated to FDA satisfaction.
16  BY MR. BARNES:
17    Q.  Would you de- -- would you please describe to
18  me the -- the cases that Mr. Altman worked --
19  Mr. Altman's work has been validated by the Food and
20  Drug Administration.
21    A.  Well, I -- I can tell you that NDAs have been
22  approved using his database work, but I -- it's the same
23  answer I gave you earlier. I can't identify those
24  clients.
25    Q.  Has any of Mr. Altman's work been published in

15 (Pages 54 to 57)

Page 62

1     MR. FROMSON: Objection as to form.
2     THE WITNESS: Well, as I've testified before,
3   it ranges anywhere from 17 to 28 or -- 20 percent
4   of our income.
5   BY MR. BARNES:
6     Q.   Well, in the past year, you are -- you've
7   engaged in testimony in several separate pharmaceutical
8   litigations; have you not?
9     A.   I have.
10    Q.   Can you list those for me? Just the -- if you
11  recall, in the past year, how many separate drugs have
12  you testified in connection with a trial?
13    A.   Well, I've done Accutane trials and I've done
14  a few of the hormone replacement trials. And I think
15  those are the only trials that I've been in this year.
16    Q.   And you're retained in the Mirapex litigation?
17    A.   Oh, I haven't done a deposition or --
18    Q.   Have you been retained in that litigation?
19    A.   Yes.
20    Q.   By plaintiff's firms?
21    A.   Yes.
22    Q.   And you are -- have you been -- have you been
23  retained in connection with the Vioxx litigation?
24    A.   I think so. I'm not sure if that's still
25  ongoing, but I think so.

Page 63

1     Q.   Yeah.
2          And you've been retained in the diet drug
3   litigation?
4     A.   I've already testified to that.
5     Q.   That, you agree?
6     A.   Yes.
7     Q.   Okay. And you've testified in the Baycol
8   litigation?
9     A.   Yes.
10    Q.   And all these are against pharmaceutical
11  companies, correct?
12    A.   Well, they're on behalf of the plaintiffs,
13  yes.
14    Q.   And you under- -- so you do understand that
15  plaintiff's firms such as Mr. Finkelstein's firm,
16  Mr. Fromson's firm have a financial stake in the outcome
17  of their claims against the defendants in the Neurontin
18  litigation, correct? You know that, right?
19    A.   Well, I understand that they are -- my
20  understanding is that they are only able to recover
21  money if -- if they are successful. I think it's a
22  little different with the defense attorneys. They
23  recover it by the hour --
24    Q.   So you --
25    A.   -- yes.

Page 64

1     Q.   -- understand that they have a big motivation
2   in -- in actually securing a -- your testimony to obtain
3   financial compensation in connection with the personal
4   injury cases that -- that they're bringing, correct?
5     MR. FROMSON: Objection as to form.
6     THE WITNESS: Well, I never know how to -- I
7   would never know how to answer that question. I
8   don't know what "big" means. And I don't -- you
9   know --
10  BY MR. BARNES:
11    Q.   You don't think it's important if they --
12  if -- to them --
13    MR. FROMSON: Can you let her finish her
14  answer, please.
15    MR. BARNES: Yeah, I will. I apologize.
16    THE WITNESS: Yeah, I guess I just don't
17  under- -- you know, I -- having worked with both
18  defense attorneys and plaintiff's attorneys, I
19  behave the same way with both of them. And I think
20  both of your groups have a large incentive to do
21  well and to succeed. I mean, certainly, defense
22  attorneys are rehired and maintained based on their
23  merits and their successes in the case.
24  BY MR. BARNES:
25    Q.   But my question pertains -- I've not -- the

Page 65

1   defense has not -- has not retained you in this case,
2   correct?
3     A.   What defense?
4     Q.   The defendants have not retained you in this
5   case, correct?
6     A.   No, I am not working for Pfizer in this case.
7     Q.   Your work -- have you ever worked for Pfizer
8   in litigation?
9     A.   I don't think so.
10    Q.   I don't think so. Okay.
11         How about Mr. Fromson? You -- he has retained
12  you, correct; his firm? The Finkelstein firm, right?
13    A.   Yes.
14    Q.   And so I just want to ask you, knowing that
15  they -- we -- you've testified that they have a
16  financial interest in the outcome of this litigation.
17  And, specifically, the evidence that you are putting
18  forth that it's matter of opinions, don't you think it's
19  appropriate for you to actually validate the analyses
20  that Mr. Altman is giving to you to make sure they're
21  accurate and -- as a matter of scientific discipline and
22  rigor?
23    MR. FROMSON: Objection as to form to the
24  extent it has already been asked and answered.
25  BY MR. BARNES:

17 (Pages 62 to 65)

Page 66

1    Q.  You may answer.
2       THE WITNESS:  Do I answer?
3    BY MR. BARNES:
4    Q.  Yes.
5    A.  Mr. Altman is hired to do this because he has
6 a specialty in filtering, or whatever more sophisticated
7 term that should be applied to it, these databases.  He
8 is used for this in our -- in our work and in other
9 people's work.
10      He was asked by the FDA years ago to validate
11 his efforts, and FDA confirmed his method.  I would not
12 be able to completely validate what he does.  But once
13 the FDA statisticians and epidemiologists approved NDA's
14 using his method, I have accepted his method.
15   Q.  How do you know that --
16   A.  And --
17   Q.  I'm sorry.
18   A.  And as you will know through my discussions of
19 the data, my opinions are certainly not predicated upon
20 these individual databases any more than they are on
21 other events in this database.  So while the information
22 is important and while it agrees with other opinions, it
23 is not the ultimate opinion, but I accept his work based
24 on persons far more knowledgeable and skilled in this
25 area than I.

Page 67

1    Q.  Did FDA review his work in this case?
2    A.  No.
3    Q.  In the Neurontin case?
4    A.  No.
5       MR. FROMSON:  Just note my objection as to
6    form.
7       THE WITNESS:  He -- they -- they reviewed and
8    validated his approach of the FDA databases and
9    other databases.
10   BY MR. BARNES:
11   Q.  Which you won't produce to me yet at this
12 point for me to examine you on?
13   A.  Well, I'm certainly willing to ask if I may do
14 that, but you would certainly not ask me to violate my
15 confidentiality or contracts.
16   Q.  Not today.  I'm not going to ask you to do
17 that today.  I've asked -- we'll take it up with the
18 court if we have to.
19      But have you --
20   A.  No, I have not validated his work.
21   Q.  Okay.  And so you don't know the rate of error
22 in his work in the report, do you?
23      MR. FROMSON:  Objection as to form.
24      THE WITNESS:  If -- if there is any errors.  I
25    don't know if there is any errors.

Page 68

1    BY MR. BARNES:
2    Q.  One way --
3    A.  The error -- the error rate was acceptable
4 when he did a far more difficult assignment.
5       He -- the -- the NDA work that he does for us
6 is far more difficult than this work.  And the rate of
7 errors were -- if any, were certainly acceptable.
8    Q.  That's not my question.
9    A.  I know, but I'm trying to answer your
10 question.
11   Q.  I understand you are, but listen to my
12 question, okay, and we'll just keep moving on.
13      My question is in connection with the work he
14 has done on pages -- in your report -- 60 -- you've
15 identified Pages 69, 70, 71, 72, 73, 74, 75.  We don't
16 know about 76.
17      For example, you have not gone back and -- and
18 established the error -- any -- the rate of error in the
19 filtering he did for you prior to this deposition,
20 correct?
21      MR. FROMSON:  Objection to the extent that it
22    hasn't already been asked and answered.
23      THE WITNESS:  Correct, I have not done that.
24    He may well have underestimated the reports.  No,
25    I'm kidding.  He -- I have not checked anything.

Page 69

1    I'm not capable of validating his work.
2    BY MR. BARNES:
3    Q.  So it is your testimony that you have never
4 specifically done anything to validate his data in 2007
5 on his work in Neurontin?
6       MR. FROMSON:  Same objection, to the extent
7    that it hasn't already been asked and answered.
8       THE WITNESS:  Yes, I have not -- I am not
9    capable of independently validating his extraction
10   of data from -- from these databases.
11   BY MR. BARNES:
12   Q.  At any time in this litigation, correct?
13      MR. FROMSON:  Same objection to the extent
14    that it has not already been asked and answered.
15      THE WITNESS:  Yes.
16   BY MR. BARNES:
17   Q.  Okay.  Now, let's -- let's finish going
18 through your report and identify other tables that
19 Mr. Altman --
20   A.  Okay.
21   Q.  -- filtered for you.
22   A.  Okay.  And, again, I don't -- I don't mean
23 to -- to limit what he does as filtering.  That's simply
24 my shorthand way of referring to it.
25      The Pfizer database --

18 (Pages 66 to 69)

Page 70

1  Q. Well, they --
2      MR. BARNES: Would you read that back, that
3  last answer. I apologize. Read back her last
4  answer. And identify the pages, but read back that
5  last answer.
6      (The requested portion was read by the
7  reporter.)
8  BY MR. BARNES:
9  Q. Well, would you give me the long-handed way of
10 referring to filtering as to describing in detail what
11 Mr. Altman's work entails for you when he runs these
12 tables and analysis for you, because I don't want to --
13 you've said "shorthand." I don't want the short. I
14 want the complete answer.
15     MR. FROMSON: Just note -- are you finished?
16     MR. BARNES: Yeah.
17     MR. FROMSON: Just note my objection as to
18 form to the extent that it has not already been
19 asked and answered. On the record, you will see
20 that she -- you asked about rules, conditions, and
21 evaluating queries, so that my objection is to the
22 extent it's already been asked and answered. Go
23 ahead.
24     THE WITNESS: Okay. My understanding, when --
25 again, you certainly have to ask him these

Page 71

1  questions.
2      My understanding, when Mr. Altman approaches a
3  database, is that he establishes the database so
4  that we are fulfilling requirements for ensuring
5  that we have access -- that we have secured all the
6  numbers that are available, that there has not been
7  double counting, and that we have structured the
8  database in such a way that allows us to get an
9  accurate number of the events at each time period.
10     I know that several procedures and controls
11 are put into place to allow him to do that. What
12 the specific natures are, specific natures of those
13 controls, I just don't know.
14 BY MR. BARNES:
15 Q. That's fair. Thank you.
16     MR. BARNES: All right. Let's take a very
17 short break, about five minutes pushing.
18     MR. FROMSON: Okay.
19     THE VIDEOGRAPHER: Off the record at 10:42.
20     (Recess taken.)
21     THE VIDEOGRAPHER: On the record 10:51.
22 BY MR. BARNES:
23 Q. Okay. I think, Dr. Blume, we were at page 76
24 and you were talking about -- we were addressing the
25 work that Mr. Altman had done on your -- with you on

Page 72

1  your report. And let's continue after page 75 and 76.
2  You're not sure about 76. You'll tell me. Let's
3  continue.
4      When -- what's -- what other pages did he
5  provide you the work product for?
6  A. Well, if I didn't already say it, when I was
7  talking about the internal database, these are captioned
8  as serious events. So another thing that we do when
9  we're looking at databases is, in addition to canvassing
10 the entire database, we also look at variety of subsets.
11 And one of those subsets are those events that have been
12 declared serious. And FDA defines a serious, a
13 criteria for an event to be serious.
14 Q. And who did that canvassing of the database to
15 identify serious adverse events? Is that something you
16 did personally?
17 A. If you -- if you look at an FDA MedWatch form,
18 it defines the criteria which makes it serious, so it's
19 a computer filtering of it. If a patient is
20 hospitalized, there is certain things that you check to
21 make it serious or nonserious.
22 Q. I asked a poor question and I apologize. But
23 my question is in terms of your analysis when you
24 generated reports on serious adverse events.
25     Did -- who did the query to generate the

Page 73

1  listings of the serious adverse events; something you
2  did or someone did at your request?
3  A. Okay. Serious is -- there is -- there is no
4  degree of choice in that.
5  Q. It's a designation. I understand that.
6  A. Yes. And we use the same designation for the
7  term "serious" that FDA does.
8  Q. Who extracted the serious cases for your
9  report?
10 A. Mr. Altman.
11 Q. Okay. He did that for you?
12 A. Yes.
13 Q. And, again, you -- you've not validated
14 that -- that query?
15 A. No.
16 Q. You agree? I asked you a double negative.
17 A. Well, I agree that Mr. Altman uses the
18 specific terms that we require for serious, which are
19 the FDA terms for serious, but I did not hire a separate
20 computer base -- computer database expert to validate
21 his work for Neurontin.
22 Q. And you didn't do it personally?
23 A. Well, if I could have done it personally, I
24 wouldn't have hired Mr. Altman. I hire him for his
25 expertise.

19 (Pages 70 to 73)

Page 82

1   out of Exhibit 5. Thank you. Okay.
2         I hand that back to you. Okay.
3      A.   All right.
4      Q.   Now -- okay. Then -- and then you then
5   organized from 2002 to 2006, correct?
6      A.   Yes.
7      Q.   Okay. And what was the basis for that time
8   period?
9      A.   To take it to current. My reference list --
10  actually, I think I have it coded 2002 to 2000- -- I
11  mean, to present.
12     Q.   To present?
13     A.   Yeah.
14     Q.   Okay. 2007?
15     A.   Yeah. And all of the publications that we
16  have accessed or other data are included --
17     Q.   All right.
18     A.   -- on the disks that we have prepared for you.
19     Q.   All right. Thank you.
20        Can we then go back to page 70 -- I'm sorry.
21  I think you were on 80s looking at which -- we were
22  looking at some line listings there, correct?
23        The last one I have is 89, page 89. And this
24  was dechallenge events that you organized, correct, and
25  did the analysis for?

Page 83

1      A.   Yes. Okay.
2         Okay. So the conclusions for '94 and '96 and
3   beginning on page 94, we go into the '96 to 2002
4   timeframe.
5      Q.   Yes. Now, what analysis did you run versus
6   Mr. Altman?
7         MR. FROMSON: Just note my objection to the
8      form of the question.
9         THE WITNESS: The sections parallel the one we
10     just discussed.
11  BY MR. BARNES:
12     Q.   What was that?
13     A.   Page 97, our information taken from the PSURs,
14  which --
15     Q.   Who did that?
16     A.   PDG did that.
17        And the same for the tabular listings that you
18  see on pages 101 through 114.
19     Q.   These were PGD?
20     A.   PDG.
21     Q.   PDG.
22     A.   Uh-huh. (Indicates affirmatively.)
23     Q.   All right. Now, let me ask you just a
24  question. And I want to use the right language.
25        Going back to pages 97 to 98, the -- these are

Page 84

1   simply line listings of adverse events included in a
2   PSUR, correct?
3      A.   On this particular page, yes.
4      Q.   So there -- there are no statistical
5   calculations that you performed on the tables on 97 or
6   98, but just a crude listing of events, correct?
7      A.   Yes.
8      Q.   Okay. Continue. And then you're up to 101 to
9   114. And they were -- these were all tables that
10  prepared at PDG?
11     A.   The tables were prepared at PDG from the
12  annual reports either for the Pfizer NDAs or the Pfizer
13  INDs.
14     Q.   Again, these are simply crude reports as
15  opposed to statistical analyses, correct?
16        MR. FROMSON: Just note my objection as to
17     form.
18        THE WITNESS: Yes, these are very similar to
19     the tables that are prepared as part of the normal
20     business of a pharmaceutical company for a given
21     NDA over time.
22  BY MR. BARNES:
23     Q.   But my question is, these are -- these are
24  just reports and not calculations? These are just event
25  reports, correct?

Page 85

1      A.   That is correct.
2      Q.   Okay. Who at PGD prepared these tables?
3      A.   I have -- I would have to check the records of
4   who -- who typed them. I don't know. We -- I don't
5   know.
6      Q.   How many people work at PGD?
7      A.   I think there is, today, 12 or 13.
8      Q.   When -- at the time this report was prepared,
9   how many people worked at PGD?
10     A.   I think it's about the same number.
11     Q.   Okay. And can you describe what you -- what
12  you asked them to do in preparing these reports?
13     A.   Well --
14        MR. FROMSON: Just note my objection as to
15     form to the extent that the inquiry deals with the
16     subject matter of draft expert reports.
17        MR. BARNES: I under- -- thank you.
18        MR. FROMSON: To the extent that you can
19     answer.
20        THE WITNESS: Do I answer? Do I answer?
21        MR. FROMSON: To the extent you can answer
22     without that issue.
23  BY MR. BARNES:
24     Q.   I'm asking you as to what -- what -- how they
25  accomplished putting these on the -- on the report.

22 (Pages 82 to 85)

Page 86

1  What was -- what was the assignment?
2       A.  Okay.  We were interested in all -- at all the
3  relevant time periods of examining the IND or NDA
4  quarterly or annual reports that were given to us or the
5  PSURs that were available in the database.  So those
6  were accessed and we were interested in psychobiological
7  and suicide-related terms.
8       And there are line listings in each of those
9  reports, or on most of those reports.  Those line
10  listings are in there and they were simply extracted
11  from those tables and made into a neat, tidy table that
12  covered the NDA for whatever the -- individual NDAs or
13  INDs for whatever this section covered, whatever
14  relevant time period.
15       Q.  Who actually made the determination that a
16  event was a psychobiological adverse event?
17       A.  We used the same terms throughout the report
18  and we took the terms from the terms that were in the
19  NDA reviews or in Pfizer's reviews.
20       Q.  Okay.  We'll come back to that.  Continue.
21  Page -- you were up to page 114.
22       Then how about the AERS database discussion on
23  page 116, 117, 118, who prepared those?
24       A.  Beginning on 116, Mr. Altman.
25       Q.  And did -- not to short-circuit the questions,

Page 87

1  is it true that you did not -- that he prepared it based
2  upon his customary methods of which you are familiar
3  from your nonpharmaceuti- -- from your nonlitigation
4  work and that you did not validate independently his
5  work on pages 116, 117, and 118?
6       MR. FROMSON:  Just note my objection as to
7  form.
8       THE WITNESS:  That is correct.
9  BY MR. BARNES:
10       Q.  And you do not know the rate of error that
11  exists as to the work product on pages 116, 117, 118,
12  correct?
13       MR. FROMSON:  Objection as to form.
14       THE WITNESS:  If indeed there is a rate of
15  error, I -- I have no idea.
16       My interest is always looking at his work over
17  time.  I really am not interested in a specific
18  number.  I'm looking at signals for changes
19  over time, so I'm looking at his work and changes
20  over time, not so much a specific number.
21  BY MR. BARNES:
22       Q.  If Mr. Altman's work is wrong and inaccurate,
23  would that affect your opinions in this case?
24       MR. FROMSON:  Objection as to form.
25       THE WITNESS:  Well, as I said earlier, I have

Page 88

1  tried very hard to give an overview of all
2  available databases.  And while we're always
3  interested in the FDA's database and Pfizer's
4  internal database, it is not critical to -- I would
5  have the same opinion whether those databases were
6  in my report or not.
7       I also have no idea of the error in the Pfizer
8  database, so I simply assumed that the data they
9  gave me simply used the data that Pfizer gave me,
10  because I'm interested in their data changes over
11  time.  But I -- I have no idea what the internal
12  error rate in the Pfizer database over time.
13  BY MR. BARNES:
14       Q.  That's not my question.
15       A.  But I use the Pfizer database as well as I use
16  the FDA database.
17       Q.  Well, we're -- we're not to the Pfizer
18  database yet.
19       A.  Well, we discussed it in the past and --
20       Q.  Well, but my question is as to Mr. Altman's
21  work product.
22       If Mr. Altman's analyses and work product were
23  some way inaccurate as to the tables based on the Pfizer
24  database or the SRS database and report, would that
25  be -- you would -- your report be the same with or

Page 89

1  without the database analysis for FDA and the Pfizer
2  internal database?  Is that your testimony?
3       MR. FROMSON:  Objection as to form.
4       THE WITNESS:  Well, I relied not only on the
5  Pfizer database, but when Pfizer redid the database
6  in 2004.
7       Yes, my -- I would have the same opinion.
8  BY MR. BARNES:
9       Q.  So just so I understand, so if Mr. Altman's
10  work with regard to the FDA database and the Pfizer
11  database is inaccurate, wrong, that would not change
12  your opinions?
13       MR. FROMSON:  Objection as to form.
14       THE WITNESS:  Well, you know, I --
15       MR. FROMSON:  And to the extent it's already
16  been asked and answered.
17       I'm sorry.  Go ahead.
18       THE WITNESS:  I mean, if Mr. Altman had missed
19  that there were 50 additional suicides in the
20  Pfizer database or 50 or a hundred additional
21  suicides in the FDA's database, I may modify my
22  opinion somewhat as far as wherever I gave a
23  specific number, but the general nature of my
24  opinion would not change.
25  BY MR. BARNES:

23 (Pages 86 to 89)

Page 90

1    Q.   Is -- are -- is -- is -- are the analyses that
2  Mr. Altman prepared for you, as you've defined it in
3  this litigation, important to your opinion in this case?
4         MR. FROMSON:  Just note my objection as to the
5    form.  That's an ambiguous question.
6         THE WITNESS:  Well, I think that everything I
7    have in here is important.  I mean, the World
8    Health Organization database is important to me.
9    Yes, they're all important to me.
10 BY MR. BARNES:
11   Q.   So if -- if Mr. -- is it your testimony that
12 if you extracted the SRS database analysis and the
13 analysis based on the internal Pfizer databases that
14 your opinion would be the same with regard to the signal
15 analysis?
16   A.   Well, the Pfizer database was also repeated in
17 the 2004 NDA records.  So, I mean, even if I lost the
18 Pfizer databases, I would still have their analyses of
19 those databases in the NDA submission.
20        Yeah, my opinion would still be the same,
21 because there -- there was an amazing similarity in
22 signals and conclusions across SRS and WHO and even the
23 Health Canada database.
24   Q.   Just so I understand though, you -- so your --
25 the absence -- you do not need the SRS database analysis

Page 91

1  to form your opinions with regard to signals?
2    A.   Well, it's almost an impossible question to
3  answer.  We are required to assess the SRS database for
4  signals.  I mean, FDA has criteria on how one data mines
5  the database.  So, yes, it's important to me, but we
6  additionally mined the WHO database and we looked at the
7  mining efforts of your client in their internal database
8  and in the materials they redid in 2004.  So my opinion
9  is not dependent on any one issue.
10        And if, as you read the conclusions, I go
11 across -- I conduct pharmacovigilance across databases,
12 not dependent on one database.  Now, if one database
13 were remarkably different than the other one, we might
14 go back and check that again.
15   Q.   Okay.  Let's move on.  One --
16   A.   What page are you on?
17   Q.   120, I think, is my next table.  Who prepared
18 that?
19   A.   This is the internal database, and I believe
20 this was Mr. Altman on through 120 -- let's see -- 127.
21   Q.   So from 120 to 127 are various tables of
22 reports of adverse events that Mr. Altman extracted from
23 the Pfizer internal database between 1996 and 2002,
24 correct?
25   A.   Yes.

Page 92

1    Q.   And, again, did you audit or in any way
2  validate the work product you received from Mr. Altman
3  on pages 120 to 127?
4    A.   No.
5    Q.   Okay.  What's on 128?  This is PSURs, annual
6  reports?  Or is this the internal Pfizer adverse event
7  database?
8    A.   No, this is not -- this isn't PSUR.  These
9  are -- this is the internal database.
10   Q.   So then, again, this is Mr. Altman's work,
11 correct, on 128?
12   A.   Yes.  And these are for -- well, in part.
13        Your client did a partial amplification of
14 their label in '96 to include some additional
15 postmarketing events.  And the ones listed on the page
16 are the ones that Pfizer chose to put into the package
17 insert at that timeframe.
18   Q.   You say the word "Pfizer" in 1997.  Is it your
19 testimony that Pfizer, Inc., modified the label in 1997?
20   A.   Well, I think they -- I'm using "Pfizer" to
21 refer to them all.  I think Pfizer came in around 2000,
22 but when I say "Pfizer," I'm referring to Parke-Davis
23 and Warner-Lambert.
24   Q.   Is it important to you to be accurate in the
25 way you -- you testify in terms of what corporation,

Page 93

1  what party conducted certain analyses?
2    A.   I think in the report I talk about the
3  different -- who submitted the different reports, when
4  they were submitted, at different time points.  But for
5  the purposes of discussion, I have been just using the
6  term "Pfizer."
7    Q.   Well, for purposes of this deposition, when I
8  use the term "Pfizer" and I use the term
9  "Parke-Davis/Warner-Lambert," they're two different
10 corporations.  Do you understand that?
11   A.   I do, but I also looked in the database and
12 couldn't find anywhere when Pfizer did -- did assume
13 control that they corrected anything that Parke-Davis
14 did.
15   Q.   That's not -- that's not the question.
16   A.   So since that time, I have just referred to
17 everything as "Pfizer."
18   Q.   Well, what -- so is it your view that you just
19 lump everybody together no matter who's actually
20 involved as a matter of fact?
21        MR. FROMSON:  Just note my objection as to
22    form.
23        THE WITNESS:  I don't -- I don't understand.
24 BY MR. BARNES:
25   Q.   Well, when you say the word -- when you say

24 (Pages 90 to 93)

Page 94

1  "Pfizer," Pfizer -- you understand that to be Pfizer,
2  Inc., a corporation, right?
3      A.  I guess, yes.
4      Q.  And if Pfizer -- so -- so you're willing to
5  say "Pfizer," just lump the defendants together under
6  the rubric Pfizer even if it's inaccurate or misleading
7  or unfair?
8          MR. FROMSON:  Just note my objection as to
9      form.
10         THE WITNESS:  That's just simply the way it's
11     been referred.  I've just referred it as to the
12     last one.  If you want, I can go back and at
13     various time points specifically note which one it
14     is, but my understanding of the -- of the concern
15     has gone from the beginning until now.
16 BY MR. BARNES:
17     Q.  Well, where you understand it's Pfizer, Inc.,
18 that has prepared the table or have -- has provided
19 analysis or not used the -- I'd appreciate if you'd use
20 the word "Pfizer, Inc.," so I can ask you questions that
21 way.  And if it's a prior -- if it's Parke-Davis or
22 Warner-Lambert that is responsible for the preparation
23 of the event, to the extent you -- you can say that, I
24 would appreciate it.  It would make our -- it would make
25 the deposition go quicker, because I'm going to ask you

Page 95

1  these questions: "What is the basis on Pfizer, Inc.,
2  dated?"
3          "Oh, I just lumped them all together."
4          So to the extent you're capable of actually
5  differentiating between corporations and parties in this
6  litigation as to who did what, that would be
7  appreciated.
8          MR. FROMSON:  Just note my objection as to the
9      form of the last question.
10         THE WITNESS:  Right.  Well, I can make it even
11     easier than that.  I have all of the annual reports
12     and the PSURs and IND annual reports in the room,
13     so when you ask the question, I will get up and
14     actually get the annual report --
15 BY MR. BARNES:
16     Q.  Well --
17     A.  -- so I answer it specifically.
18     Q.  When -- when did Pfizer -- do you understand
19 when Pfizer, Inc., acquired an interest and
20 Warner-Lambert acquired the company?
21         MR. FROMSON:  Just note my objection as to the
22     form of the question, in terms of it having a legal
23     conclusion when you use the term "acquire
24     interest."
25         THE WITNESS:  I think it's 2000.

Page 96

1  BY MR. BARNES:
2      Q.  Okay.  So -- okay.
3          In 1996, who had the -- the approval by the
4  Food and Drug Administration to market Neurontin in the
5  United States?
6      A.  Oh, I don't -- I don't know if one was
7  marketing.  I don't know the difference between the
8  Parke-Davis and Warner-Lambert issue.  I don't know.
9      Q.  Just say Warner-Lambert, who --
10     A.  Okay.  Warner-Lambert.  I don't know.  I have
11 no idea.  But I have the report, so if you want a --
12     Q.  No, I -- do you --
13     A.  If you want a correct answer, I will get up
14 and get the reports.
15     Q.  Why don't we do this.
16         You don't know who filed the data in fourth
17 quarter of 1996, do you?  You don't know what company
18 filed it, do you?
19     A.  I -- I think it's Parke-Davis, but I'm not
20 sure.  But I have the reports, so why don't I get up --
21     Q.  You know it's not Pfizer, correct?
22     A.  Well, I think -- I think Pfizer is 2000.  But
23 I have the reports, so I don't know why you're
24 questioning me this way when I can get up and get them.
25     Q.  Just when you say "Pfizer," you should be

Page 97

1  intentional as to what you're saying about Pfizer.  And
2  if another company filed it, then I'd appreciate if
3  you'd -- you direct your --
4      A.  Well --
5      Q.  -- your -- your -- your answers to that.
6      A.  I will --
7      Q.  We'll proceed.  I'll correct you every time if
8  I have to.  Okay?
9      A.  Okay.
10     Q.  So this is an Altman analysis on 1996, 1997,
11 correct?
12     A.  Page?
13     Q.  Page 128.
14         MR. FROMSON:  Hold on.  Just note my objection
15     to the form of the question as "Altman analysis."
16         THE WITNESS:  Yes.
17 BY MR. BARNES:
18     Q.  Okay.  And did you -- again, you didn't
19 validate this work, did you?
20     A.  No.
21     Q.  Is it fair to say -- just so we don't have to
22 ask this every time you identify Mr. Altman as the
23 source of the -- of the tables, is it fair to say
24 that -- that you've not independently validated or
25 tested any of the tables that Mr. Altman provided to

25 (Pages 94 to 97)

Page 98

1  you, correct?
2      A.  That is correct.
3      Q.  Okay.  When's the next one?  What's the next
4  table?  I have one on 130.  And this is the World Health
5  Organization.
6      A.  Yes, I see on it -- just getting back to your
7  previous criticism, I see on the front page that I have
8  specifically noted that "Pfizer defendants" will refer
9  to Warner-Lambert, Parke-Davis, and Pfizer.  And I think
10  the tables do -- are coded as "Pfizer defendants."
11      So if it makes it easier, I will say "Pfizer
12  defendants" instead of "Pfizer."
13      Q.  Well, now -- but I -- but I think -- do -- do
14  you think it's misleading to have -- to say the word
15  "Pfizer defendants" to -- which includes Pfizer in -- in
16  a report or a regulatory activity or a marketing
17  practice that predated their -- their ownership of the
18  company?  That's -- that's --
19      MR. FROMSON:  Just note my objection as to
20  form.
21      THE WITNESS:  I think that I referred to all
22  three clients and I -- no, I don't think it makes a
23  bit of difference as to what my conclusions are.
24  No.
25  BY MR. BARNES:

Page 99

1      Q.  So accuracy as to -- as to which entity
2  actually submitted the report is not important to you as
3  a scientist or regulatory affairs professional?
4      A.  Well, of course -- of course.
5      MR. FROMSON:  Just note my objection as to the
6  form of the question.  Misstates her testimony.
7      THE WITNESS:  Yes, of course that's important,
8  but I specifically said here I was accessing and
9  reviewing data from all three.  And I was very
10  careful to say "Pfizer defendants."
11      But I don't see "Pfizer" in here.  I say
12  "Pfizer defendants."
13  BY MR. BARNES:
14      Q.  Well, what if you would -- are definitions
15  important to you as a scientist and regulatory affairs
16  professional?
17      A.  Of course they are.
18      Q.  And if your definition is somehow misleading
19  or biased or inaccurate, wouldn't you think it would be
20  important to correct it on the record here today if you
21  have a chance?
22      A.  If I'm referred --
23      MR. FROMSON:  Note my objection as to form.
24      THE WITNESS:  I'm referring to it as "Pfizer
25  defendants."  "Pfizer defendants" include all

Page 100

1      three.
2  BY MR. BARNES:
3      Q.  Okay.  All right.  Then let's go to page 132.
4      Who prepared that?
5      A.  PDG.
6      Q.  And next one, please.  Next table.
7      A.  PDG for pages 132, 133, and 134.
8      Q.  Okay.
9      A.  And 135.
10      Q.  How about 137?  These are the Poison Control
11  Center reports.
12      A.  Yes.  And there was a journal article that
13  accessed all of this information.  And I believe this
14  table derives directly from the AGEM (sic), American
15  Journal of Emergency Medicine Report.
16      Q.  And who prepared this table?
17      A.  PDG.
18      Q.  Okay.  How about the DAWN table on page 143?
19      A.  I believe PDG did that.
20      Q.  How about the tables on 145 and 147 -- 6?
21      A.  Okay.  The -- this was done by PDG and these
22  refer back -- this is similar to what we have already
23  discussed.  These refer back to research reports that
24  were generated during this time period.
25      Q.  How about 165?

Page 101

1      A.  Okay.  We've now moved into the fourth
2  category, June 2002 to present.
3      Q.  This is PSUR, so I assume PDG did it, on 166?
4      A.  163, I think was skipped.  That was PDG.
5      Q.  Uh-huh.  (Indicates affirmatively.)
6      Thank you.
7      A.  165 would be PDG.  166.  And then we're back
8  to the AERS database on page 167.
9      Q.  And -- okay.  167, 168 would be work that
10  Mr. Altman provided to you, correct?
11      A.  Correct.
12      Q.  These are SR -- these are AERS database --
13      A.  Yes.
14      Q.  -- tables, correct?
15      A.  Correct.
16      Q.  And then World Health Organization would be
17  PGD?
18      A.  Would be PDG.
19      Q.  PDG.
20      Okay.  And then the next table I have is
21  two -- really, maybe you can explain to me what they
22  are.  Going to page 193, 194, and 195.
23      A.  One, these tables relate to a dany (sic) -- a
24  data mining effort recognized by the agency, recommended
25  by the agency, called PRRs or percent comparison across

26 (Pages 98 to 101)

Page 102

1  products as percent reports. Both of these tables were
2  done by Mr. Altman.
3      Q.  Who directed that these tables be prepared?
4      A.  The table in 194 is a table across comparisons
5  of different antiepileptic drugs. It's a standard way
6  that we have tried to pictorially present the data that
7  we looked at earlier in comparison to other sister
8  drugs. I asked that that be done.
9      Q.  And so you directed this analysis?
10     A.  Yeah, this is a routine analysis for us in our
11 work when we're -- when we have drugs that are part of a
12 class.
13         And I had -- page 195 is a comparison from
14 another trial -- another project that I guess Mr. Altman
15 is working on. But it illustrated the same sort of
16 separation within a class.
17     Q.  So Mr. Altman prepared this chart on page 195,
18 correct?
19     A.  Yeah, well, he did 194 and 195.
20     Q.  Did both of them?
21     A.  Right.
22     Q.  Okay. Did you do any independent work to
23 validate the graph on page 194 or on page 195?
24     A.  No.
25     Q.  And so you don't know if there is a rate of

Page 103

1  error for the data depicted on page 194 which is
2  entitled "PRR Over Time, Suicidal and Self-Injurious
3  Behavior HLT," correct?
4      A.  I don't know if there is any rate of error and
5  I --
6      Q.  One way or the other?
7      A.  I don't have a -- no, I did not validate it.
8      Q.  Did you -- did you -- you said something about
9  this is how -- at page 194, 195 -- this is how you
10 routinely do these analyses for other -- other clients?
11     A.  No, for pharmacovigilance work.
12         What this does is, we're interested in this
13 case in Neurontin, so Neurontin will be on the chart,
14 but as pharmacovigilance assignments, you're always
15 interested if a particular adverse event is simply
16 part of the -- is part of what is observed with that
17 class of drugs or whether there is something unique
18 with --
19         (Phone ringing.)
20         THE WITNESS:  Somebody is calling in.
21         -- whether there is something unique with your
22 drug.
23         So what one does, what we are -- what is
24 suggested, what we are taught to do is to do these
25 PRR ratios. Because if there is something unique

Page 104

1  about a drug, it will look different in a PRR time,
2  time-derived data, than will the other drugs in the
3  class.
4  BY MR. BARNES:
5      Q.  Who chose the drugs on page 194 for
6  comparison?
7      A.  Oh, I -- I don't know if we did these. I -- I
8  think I mentioned in my report Gabitril. I know we talk
9  about carbamazepine. I don't -- I don't know if we did
10 that collectively or if I sent the list one. I don't
11 know.
12     Q.  So it's possible that Mr. Altman chose the
13 comparator drugs --
14     A.  Well --
15         MR. FROMSON:  Just note my objection.
16 BY MR. BARNES:
17     Q.  -- on this graph?
18     A.  I --
19         MR. FROMSON:  I'm sorry. Just note my
20 objection as to form.
21         THE WITNESS:  I don't recall how we did this.
22 We had to do it in a -- we had to pick drugs that
23 would have data across the relevant time period, so
24 we couldn't use an -- an AED that were approved in
25 2003 or 2004, because it wouldn't have the data.

Page 105

1  So I -- I don't -- whether we collectively did
2  this or not, I just don't recall.
3  BY MR. BARNES:
4      Q.  So it's possible that Mr. Altman chose the
5  comparator drugs, correct, without your supervision?
6         MR. FROMSON:  Note my objection as to form.
7         THE WITNESS:  I recall the discussion of
8  including Gabitril in there. I know that I
9  remember that. Now, I just don't recall.
10 BY MR. BARNES:
11     Q.  You say "class of drugs." What do you mean by
12 a class of drugs?
13     A.  Well, when you look at pharmacovigilance data,
14 you're interested, of course, in the -- in the drug in
15 question for that particular NDA, but you're also
16 interested in other drugs that are chemically similar to
17 that drug, whether it's used for the same indication or
18 not, so you do that comparison. You compare the adverse
19 event of interest with other drugs that are approved for
20 the same indication, and you also approve drugs that
21 have the same mechanism of action. So there is
22 different ways that you canvas pharmacovigilance data.
23         In this particular table or this particular
24 graph, what we have here are the PRRs for the
25 suicide-related events, the high-level term

Page 122

1 ratio, correct?
2     A.   Well, you have to have more than one drug to
3 do a proportional reporting ratio. You have to have an
4 event in one drug, event in another drug, and compare
5 the two of them.
6     Q.   You pulled Dr. Brian Strom's textbook on
7 pharmacoepidemiology, fourth edition, at my request, and
8 I thank you for that.
9         Do you find Dr. Strom's textbook on
10 pharmacoepidemiology to be authoritative?
11     A.   Yeah, well, I -- I pulled the -- this would
12 have been during the relevant time period and then
13 this -- I have the newest one as well.
14         But, yes, I consider Brian Strom's textbook to
15 be it.
16     Q.   Authoritative?
17     A.   Well, I never quite understand what that word
18 "authoritative" means. I certainly would use it as a
19 reference book.
20     Q.   It's important to you?
21     A.   Based on who wrote what chapters, yes.
22     Q.   So you would find it reliable and
23 authoritative?
24     A.   Well, I -- you know, I never understand how to
25 answer authoritative, because they say if there is one

Page 123

1 sentence wrong in a text, then you can no longer
2 consider it authoritative. So I use it as a reference.
3     Q.   And it's a good reference?
4     A.   Well, it's one that I use and I quote it, and
5 there are some chapters that FDA has -- have authored.
6     Q.   Okay. I want you to look at the page 171 on
7 global drug surveillance, chapter of global drug
8 surveillance on proportional reporting ratios.
9         And, specifically, I want you to look at the
10 last sentence in the second paragraph. Read it into the
11 record and let me know -- and tell me if you agree with
12 what Dr. Strom says with regard to the proportional
13 reporting ratio. Read it -- well, read it to yourself
14 and read it into the record.
15     MR. FROMSON:  Just note my objection. Over my
16 objection, she can do it.
17     THE WITNESS:  Yeah, I lost the instruction ten
18 sentences ago.
19 BY MR. BARNES:
20     Q.   Just read the last -- why don't you just read
21 the last sentence in the second paragraph to yourself,
22 please, on page 1 -- what's the page number, 171?
23     A.   Are you saying this is an approach start in
24 the U.K. and now widely used because of simplicity?
25     Q.   You're right. Well, I -- that's not my

Page 124

1 question.
2     MR. FROMSON:  Maybe you want to read it, Rick.
3 BY MR. BARNES:
4     Q.   Go ahead and read it right here.
5     A.   Right here?
6     Q.   I would --
7     A.   I mean, I'll be glad to read the whole
8 paragraph --
9     Q.   I'll put a tab next to it so it's clear.
10 Let's start all over. Okay?
11         From where to where?
12         I want to read to you a sentence from
13 Dr. Strom's book on global drug sur- -- chapter on
14 global drug surveillance proportional reporting ratios.
15 Okay?
16     MR. FROMSON:  Will you give us the page.
17     MR. BARNES:  Yeah, it's 171.
18     MR. FROMSON:  Thank you.
19     MR. ALTMAN:  Can we see that for a second.
20     MR. BARNES:  All right.
21 BY MR. BARNES:
22     Q.   I'll read you the paragraph.
23         "As with other methods, this approach uses the
24 total number of reports for the drug as a denominator to
25 calculate the proportion of all reactions that are the

Page 125

1 type of interest; e.g., hepatitis. The proportion may
2 be compared with the value for other drugs. It is also
3 possible to compare complete profiles of ADR reporting
4 for drugs of different types of reactions where
5 differences in the profile may represent potential
6 signals. The result of such a calculation is also
7 called a PRR, where the PRR is $a/(a+b)$ divided by
8 $c/(c+d)$ as in the following two-by-two table." "a"
9 being the drug of interest, "b" being all other
10 reactions, "c" all other drugs in the database, and "d"
11 all other reactions in the section all other drugs in
12 the database.
13         Do you -- do I -- do you agree with that's the
14 definition of a proportional reporting ratio?
15     MR. FROMSON:  Just note my objection to the
16 question.
17 BY MR. BARNES:
18     Q.   I'll read it to you one more time. Did I read
19 that correctly?
20     A.   Yes. I thought I had said that.
21     Q.   I just want to make sure we have the right --
22 the right formula.
23     A.   Okay. It's -- it's really not very difficult.
24 It's the event of interest divided by the total for each
25 drug and then you can compare the two drugs. That's it.

32 (Pages 122 to 125)

Page 126

1    Q.  Do you agree with the definition set forth in
2  Dr. Strom's textbook, fourth edition of
3  Pharmacoepidemiology, at 171?
4    A.  If -- if you want to compare across drugs. He
5  also mentions -- or whoever wrote this -- you can
6  compare across disease events.  You can use it in a
7  variety of ways.  I didn't use it that way, all the
8  ways.  I just used it to compare two drugs.  You can use
9  a PRR to compare hepatitis versus suicide.  You can
10 compare hepatitis with one drug and hepatitis with
11 another.
12   Q.  My question is, do you agree with that -- with
13 Dr. Strom's definition of PRR that is in his group in
14 his textbook at page 171, fourth edition of
15 Pharmacoepidemiology?
16       MR. FROMSON:  Just note my objection as to
17   form of the question and to the extent that
18   she's asked -- it's been asked and answered.
19       THE WITNESS:  Yes, actually, this is the WHO's
20   definition.  They wrote this chapter.  But, yes, I
21   agree that -- I agree with how you calculate it and
22   that you can use those ratios in a variety of ways
23   to compare across drugs or within a database to
24   compare across events.
25 BY MR. BARNES:

Page 127

1    Q.  Okay.  May I have the book back, please.  Give
2  you some space.
3       Now, is -- did -- did what Mr. Altman did
4  conform with the method set forth by Dr. Strom in
5  Dr. Strom's textbook at page 171?
6       MR. FROMSON:  Just note my objection as to
7   form, foundation.
8  BY MR. BARNES:
9    Q.  Is that what Mr. Altman did at page 194?
10   A.  Well, I think we also referenced --
11      MR. FROMSON:  Same objection.
12      THE WITNESS:  -- this textbook of it, yes.
13 BY MR. BARNES:
14   Q.  I'm ask -- but if that was -- if that was --
15 fourth edition of Strom on Pharmacoepidemiology, is that
16 what Mr. Altman did?
17   A.  I think we referenced this edition.
18   Q.  I'll come to this --
19   A.  Yes.
20   Q.  -- in a minute.
21   A.  Well, I'm just trying to be specific --
22   Q.  Well, I -- I will --
23   A.  -- when there is issues.
24   Q.  I'll do -- I'm going to come to the third
25 edition in a second.

Page 128

1    A.  Okay.
2    Q.  So let's do the fourth edition.  And then if
3  it's important to do the third edition, I'm not -- I'll
4  be happy to do that.
5    A.  Well, I just want to be specific when there is
6  issues.
7    Q.  Okay.  Well, my question -- my question is,
8  did -- is what Mr. Altman did what Dr. Strom describes
9  in the fourth edition of Pharmacoepidemiology by
10 Brian Strom at page 171?
11      MR. FROMSON:  Just note my objection.
12      THE WITNESS:  Yes, one of the permutations
13   that is suggested in there is what we did.
14 BY MR. BARNES:
15   Q.  Is -- is -- is what Dr. Strom says is the
16 correct way to do proportional reporting ratio reflected
17 on page 194?
18      MR. FROMSON:  Objection as to form of the
19   question.
20      THE WITNESS:  I don't know how else to say
21   this.  In 194, we did the ratios for each drug.  By
22   visually looking at the lines in the table, one can
23   do a PRR of one drug for this event versus another
24   drug.  I gave you an example of the 12 percent
25   versus the four percent.

Page 129

1  BY MR. BARNES:
2    Q.  PRR was not actually calculated, correct?
3    A.  Well, you can calculate a million PRRs.  It's
4  every point against every other point.  This is a visual
5  overview of all of the individual percent reports.
6    Q.  Did your report show the individual PRR values
7  over time on page 9 -- 194?
8    A.  Well, it certainly does for Neurontin earlier
9  in the report.  I --
10   Q.  On page 194, ma'am?
11   A.  No, this is just a visual overview.
12   Q.  So it's an eyeball, right?  You're eyeball --
13 eyeballing it?
14   A.  Well, because, remember, all pharmacovigilance
15 is a signal detection and we're just trying to show the
16 difference.  I mean, clearly, Neurontin distinguishes
17 itself in suicide and self-injurious behaviors from the
18 other drugs in -- in this category.
19   Q.  This is your report?
20   A.  So that is meant to be -- that is the purpose
21 of signal detection.  If you read FDA's review of the --
22 of the use of PRRs, it is to detect a signal.
23   Q.  Well, we'll get to the FDA's review in a
24 second.  Let's -- let's -- I'm asking you a question.
25      Does your report demonstrate the different

Page 134

1   it is. And if it's not there, then I'll ask you if it
2   was cited in your report. Let's just do it that way.
3       MR. FROMSON: Note my objection as to form of
4   the question.
5       THE WITNESS: Oh, I'll have to read it. I
6   mean, I can go and have this filtered, but --
7       FDA has got -- it says in here "any apparent
8   increase." I don't see the number "2" in here.
9   But on the break, I will filter it, electronically
10  filter word search it. What they say here is "any
11  apparent change."
12  BY MR. BARNES:
13      Q. What's the page of that?
14      A. Page 10.
15      Q. Okay. We'll come back to that after we take a
16  lunch break.
17      A. Yeah, it says, "Safety signals that warrant
18  further investigation is any apparent increase."
19      And I guess apparent could be one more, but
20  I've generally heard that you need at least a twofold
21  change for it to be a -- to be a signal. But maybe
22  they've downgraded it to less than that. I don't know.
23  But we use twofold.
24      Q. You being Cheryl Blume at PDG or Mr. Altman at
25  Finkelstein & Associates?

Page 135

1       A. No, it -- it's -- it's what we use -- PDG uses
2   in our work with our pharmaceutical clients. And when
3   we do FDA reporting of signals, we always set the number
4   at twofold or higher.
5       Q. And what -- what do you base the twofold on?
6   You'll find that for me, right?
7       A. Yeah, I'll find where--
8       MR. FROMSON: Note my objection as to form of
9   the question to the extent it hasn't already been
10  asked and answered.
11      THE WITNESS: Yeah, I will find where the FDA
12  has said it. It appears that they're no longer
13  making you reach the twofold threshold when they
14  use the word "an apparent increase."
15  BY MR. BARNES:
16      Q. You would agree that all signal analysis is --
17  is -- it's -- according to FDA, it's -- this is your --
18  you're talking about data mining, correct?
19      A. Uh-huh. (Indicates affirmatively.)
20      Of course.
21      Q. Okay. And you would agree that all data
22  mining is -- is -- has -- according to update, it's,
23  quote, inherently exploratory and hypothesis generating,
24  correct?
25      A. Oh, absolutely.

Page 136

1       Q. And so it doesn't -- it doesn't prove that
2   there is a statistically-significant association between
3   Neurontin and suicidal behavior, correct, the signal
4   analysis itself?
5       MR. FROMSON: Just note my objection as to
6   form of the question.
7       THE WITNESS: A signal analysis is meant to
8   show a signal. It's meant to show what you should
9   evaluate further. And if that evaluation shows
10  that that signal is important, then that is your
11  trigger to amplify your labeling.
12  BY MR. BARNES:
13      Q. So it's a -- it's a -- it's a preparatory step
14  of identifying something that needs to be evaluated by
15  further analytic methods, correct?
16      A. Well, I guess that you could say that. Of
17  course, you know, the FDA used PRR ratios and the signal
18  to justify the removal of Baycol from the marketplace.
19  If you look at FDA's review of Baycol, it was removed
20  from the marketplace because the PRRs for the fatalities
21  with Baycol exceeded that of the other drugs in the
22  statin category, so FDA used -- was very vigorous with
23  their use of PRRs in the case of Baycol.
24      But, generally, the way I have used it is it
25  gives you information, and it gives you information that

Page 137

1   you need to study further.
2       Q. But my question is, the information on
3   page 90 -- 194 of your report does not demonstrate a
4   statistically-significant difference between Neurontin
5   and any other value on that chart, as far as you know
6   today, correct?
7       MR. FROMSON: Note my objection as to form,
8   use of the term "statistically-significant
9   difference."
10      THE WITNESS: Well, I did not conduct
11  statistically-signi- -- statistical studies, nor
12  can I anticipate doing such, with PRR ratios on an
13  FDA database, because we know the FDA database is
14  only one to 10 percent of all the events that are
15  ever reported to the agency. So I'm not sure I
16  would do statistics on such a --
17  BY MR. BARNES:
18      Q. I didn't --
19      A. -- minimal database.
20      Q. I didn't ask you if you would -- oh, FDA is a
21  minimal database?
22      A. Well, minimum frequency. Remember, only one
23  to 10 percent of the events are ever reported.
24      Q. But it -- don't you do -- routinely do signal
25  analysis from the FDA database?

1    A.  Sure, it's all -- it's one of the tools we
2  have, but you can't say that that reflects what's going
3  on with the product, because FDA cautions that the new
4  number now is -- that they believe it used to be
5  10 percent.  They now say one to 10 percent.
6    Q.  So the answer to my question is that you did
7  not do statistical analyses to demonstrate that the
8  values for Neurontin on the chart on page 190 -- 194 of
9  your report are statistically different from the other
10  values for the other medicines, correct?
11    MR. FROMSON:  Just note my objection to the
12  form of the question to the extent that it has
13  already been asked and answered.
14    THE WITNESS:  Yeah, I think I've answered it
15  four times.  But, no, I did not do statistical
16  analyses.
17  BY MR. BARNES:
18    Q.  Okay.  Now, looking at the chart on page 194,
19  the graph, I'd like you to explain to me some things.
20  Okay.
21    So the PRR at the very top of the page, the
22  PRR that's listed -- that is listed here is really an
23  ability to compare to do an eyeball between one line and
24  another line on the graph, correct; and then make an
25  estimation of the difference in terms of a proportional

1  difference?
2    A.  Yes, you could do that.
3    Q.  I mean, what -- I'm trying to understand what
4  you said before, just to orient myself to where you
5  were.
6    So in what sense is this graph a PRR again,
7  just to make sure I understand it?
8    MR. FROMSON:  Same --
9  BY MR. BARNES:
10    Q.  On page 194.
11    MR. FROMSON:  Note my objection to the form of
12  the question to the extent it has already been
13  asked and answered.  Go ahead and answer it again
14  over my objection.
15    THE WITNESS:  Yeah, I don't -- okay.
16    The Y axis is the percent within a product.
17  So we have a 10 points or 15 points, whatever we
18  have for each product at different time points.  If
19  I wanted to compare across time one product with
20  another, I could compare the same point in time
21  with one product and another group of products.
22  PRRs can be conducted a variety of ways including
23  across product comparisons.
24  BY MR. BARNES:
25    Q.  So you're saying the information -- okay --

1  the information.  And I -- this doesn't look like a PRR
2  to me based upon what I read in Dr. Strom's test --
3  textbook.
4    You're saying a comparison, a proportional
5  comparison could be derived from -- by comparing the
6  various data points on the chart and doing a
7  proportional analysis between drugs, correct?
8    A.  Incorrect.
9    MR. FROMSON:  Just note my objection to the
10  form.
11  BY MR. BARNES:
12    Q.  Is that -- is that what you could do with it?
13  Is that what -- is that how you do it?
14    MR. FROMSON:  Note my objection to the form of
15  the question.
16  BY MR. BARNES:
17    Q.  Is that how you use this chart?
18    A.  I could, yes.
19    Q.  Well, tell me what inferences you -- well,
20  strike that.  Let me ask you this way.
21    What is the word -- well, explain to me what
22  the -- what preferred terms map to the system organ
23  class psychiatric disorders that was used in this
24  analysis?
25    MR. FROMSON:  Note my objection as to the form

1  of the question.
2    THE WITNESS:  Can you repeat that?
3  BY MR. BARNES:
4    Q.  Yeah.  Explain to me how -- you have a
5  higher-level term for a classification, correct?
6    A.  Well, I don't.  FDA does.
7    Q.  Well, in this report, the table Mr. Altman
8  provided to you says "PRR Over Time, Suicidal and
9  Self-Injurious Behavior HLT," correct?
10    A.  Right, this is the high-level -- this is the
11  grouping of high-level terms coded suicidal and
12  self-injurious behavior.  He took that number and
13  divided it by the total number of reports at that
14  timeframe.
15    Q.  Okay.  This is a -- this is their -- as I
16  understand MedDRA, there is something called a -- a
17  system organ class, correct?
18    A.  Well, that's one category.  This is one down
19  from that.
20    Q.  Okay.  Well, then the -- so what is the --
21  what is the system organ class for the higher-level
22  terms used on page 194?
23    A.  What is the system organ class?
24    Q.  Uh-huh.  (Indicates affirmatively.)
25    A.  I don't -- I mean, I'd have to look at the

36 (Pages 138 to 141)

Page 142

1 map. I don't know what high-level term it fits into.
2 Probably psycho -- psychiatric or psychobiological or
3 CNS. I don't know.
4    Q. You just don't know?
5    A. No. We have a whole map system here I can
6 pull out for you and show it to you.
7    Q. Okay. Do you know the terms that were --
8 that -- for suicide -- the preferred terms that map to
9 the term "suicidal and self-injurious behavior" for the
10 NEC classification not elsewhere identified or
11 classified?
12        MR. FROMSON: Can you just -- objection as to
13    the form, use of the term "NEC."
14 BY MR. BARNES:
15    Q. NEC. Do you know what NEC, not other --
16 elsewhere classified, means?
17    A. No.
18    Q. What does that mean?
19    A. Wait a minute. Are you asking what preferred
20 terms get funneled into high-level terms?
21    Q. Eventually.
22    A. No, I don't -- I don't know specifically. We
23 have a chart here that we refer to. I do not know
24 specifically.
25    Q. Do you -- do you know how Mr. Altman performed

Page 143

1 the analysis in terms of identifying the preferred terms
2 that map to the high-level term "suicidal" that is
3 depicted on page 194? What are the preferred terms for
4 the analysis?
5    A. Well, my understanding, he used the high-level
6 term grouping that includes all of the suicidal and
7 self-injurious behaviors that are collated into -- or
8 reduced into the high-level term.
9    Q. My -- okay. My question is, what preferred
10 terms map to suicidal as appears on -- now, we're using
11 the analysis on page 194?
12    A. I don't -- I -- I -- let me see if we --
13        MR. FROMSON: Was there a question posed?
14        MR. BARNES: Uh-huh. (Indicates
15    affirmatively.)
16        Question mark.
17        MR. FROMSON: All right. Now I -- now I
18    recognize it as a question. Thank you.
19        THE WITNESS: No, I don't -- I did not list in
20    here the specific terms that are included in the
21    HLT grouping, but it was the same grouping across
22    all the -- all of the drugs. And at the break, I
23    can give you the list of --
24 BY MR. BARNES:
25    Q. Well, what --

Page 144

1    A. -- specific terms that went into this.
2    Q. I want to know if you know which ones
3 Mr. Altman included in -- what preferred terms he
4 included in the --
5    A. He --
6    Q. -- in the analysis for suicidal?
7    A. He would have -- it wasn't a choice. It would
8 have been the preferred terms that are collected into
9 the high-level term group.
10    Q. And do you know how he performed that
11 function?
12    A. No. You will have to ask him. Specifically,
13 I do not know how he did that, but I will tell you the
14 terms at the break that fall -- that are collected into
15 the high-level term.
16    Q. As to how he did it, you wouldn't know?
17    A. Well, he would have -- he would -- he would
18 not have exercised any editing of that. He would have
19 taken whatever terms were in the high-level term.
20    Q. How do you know that?
21    A. Because that's what we do. We don't edit
22 terms.
23    Q. That's what you do. Do you know what
24 Mr. Altman did in this case?
25    A. Well, when I say that's what we do, he does

Page 145

1 this work for us and we did -- we developed a program
2 that FDA has approved so that we don't have double
3 booking of terms -- or double counting of terms.
4    Q. Okay. Well, let me ask you this.
5        Do you know how he avoids double counting of
6 terms?
7    A. I -- I don't understand. Electronically, I
8 don't understand what he does. No, I don't understand
9 it.
10    Q. Okay. That's fine. Let's talk about
11 self-injurious behaviors.
12        What preferred terms map to self-injurious
13 behaviors for purposes of the graph on page 194 of
14 the --
15    A. Oh, it's going to be the same answer, I will
16 have to give you the specific list. I can't tell you
17 now what terms are in there.
18    Q. And do you know how Mr. Altman performed the
19 analysis to actually group the appropriate preferred
20 terms into self-injurious behaviors? Do you -- do you
21 know how that happened, if that happened?
22    A. Well --
23    Q. Or how it happened?
24    A. I don't know specifically -- I don't know
25 which terms are collected within HLT. No, I do not know

37 (Pages 142 to 145)