Page 146

1  that.
2      Q.  Do you know how Mr. Altman treated overdose
3  cases?
4          MR. FROMSON:  Note my objection as to form.
5          THE WITNESS:  I know we discussed earlier in
6      the report that in some cases we included all
7      overdose and in some we ruled out ones that were --
8      we only did intentional overdoses.  And the tables
9      so note that in the earlier part of the report.
10  BY MR. BARNES:
11     Q.  On the PRR Over Time, Suicidal -- I'm sorry.
12  For the PRR Over Time graph on page 194, do
13  you know how Mr. Altman treated overdose cases?
14     A.  I do not know if he included the prescriber --
15  misprescribing of the extra -- of the higher doses.  I
16  don't know that.
17     Q.  Do you know how he treated intentional
18  overdose cases?
19     A.  Well, the intentional would have been included
20  in here.
21     Q.  How do you know that?
22     A.  Because we discussed it and included it in the
23  earlier tables.
24     Q.  Do you know for a fact that intentional
25  overdose cases were included in as -- in either the

Page 147

1  suicidal or self-injurious behavior event?
2      A.  No, I do not have a list of what terms went
3  into this.
4      Q.  Are all intentional overdoses -- constitute
5  suicidal behavior, in your view?
6      A.  No, that's why we have it as two separate
7  categories earlier in the report.
8      Q.  So my question is here, do you know if he
9  differentiated between -- how he -- if he differentiated
10  between intentional overdose cases that did exhibit
11  self-injurious behavior and intentional overdose cases
12  that were not self-injurious behavior?
13         MR. FROMSON:  Just note my objection as to
14     form.
15         THE WITNESS:  No, I don't know how he did it.
16  BY MR. BARNES:
17     Q.  Now -- so if there was some degree of editing
18  discretion that Mr. Altman used in deciding which cases
19  were included in the analysis on page 194 and which
20  cases were not used in the analysis on 194, correct?
21         MR. FROMSON:  Just note my objection as to
22     form.
23         THE WITNESS:  No, that is not my
24     understanding.  We do not edit within it.  We
25     select a category and do it across all drug

Page 148

1  products.
2      I do not know what he did in this table
3  though.  I will have to go back and check.  I do
4  not have the terms memorized that went into this.
5  I can tell you it was the same terms across all
6  products.
7  BY MR. BARNES:
8      Q.  When you -- when you submitted this report,
9  did you know how Mr. Altman treated overdose cases in
10  terms of including and excluding them from this table?
11         MR. FROMSON:  Objection to form to the extent
12     that it has already been asked and answered.  Over
13     my objection, you can answer.
14         THE WITNESS:  My understanding is intentional
15     overdoses are included.
16  BY MR. BARNES:
17     Q.  And you would agree that not all intentional
18  overdoses constitute self-injurious or suicidal
19  behavior, correct?
20         MR. FROMSON:  Objection to the extent that it
21     has not already been asked and answered.
22         THE WITNESS:  I think because Pfizer included
23     intentional overdoses when they did their list, we
24     put intentional overdoses in the same list.  I -- I
25     believe that's the reasoning behind that.  When

Page 149

1  they listed the list, the intentional overdoses
2  were separated out from physician error.
3  BY MR. BARNES:
4      Q.  Do you know that for a fact or are you just
5  supposing that's what Mr. Altman did?
6      A.  I think -- I think -- well, I don't know for a
7  fact what Mr. Altman did, but that was what we did
8  earlier in the report when we isolated out intentional
9  overdoses.
10     Q.  Now, was any preferred terms excluded from the
11  analysis that would normally map to the high-level term
12  suicidal or self-injurious behavior when Mr. Altman did
13  his report -- his work?
14     A.  Well, it's the same answer I've given you.  I
15  don't know the terms that went into this.  I will have
16  to get those to you at the break.
17     Q.  Well, how are you going to find out what
18  Mr. Altman did?
19     A.  I'm going -- I'm going to look at the data
20  that we have -- we have the data sets -- and see what
21  goes into it.
22     Q.  Where is it in your report?
23     A.  I gave you a disk that has the data sets on
24  here.
25     Q.  Exhibit 7?

38 (Pages 146 to 149)

Page 158

1    Q. Well, let me ask you this. Are you aware
2  that -- is suicide -- does suicide map to suicidal or
3  self-injurious behaviors or both?
4    A. Well, I think completed suicide is a separate
5  term. Complete -- yeah, completed suicide is a separate
6  term. And -- and I have the map out there. I will have
7  to refer to that before I can answer that specific
8  question.
9    Q. Make sure I understand. Does -- do -- does
10  the data on page 194 include completed suicides for all
11  of these drugs that are listed on page 194?
12    A. Yeah, I will have to check. I -- I -- I'll
13  have to check and see what -- what is subsumed, folded
14  into HLT as it relates to completed suicide.
15    Q. So as you sit here right now, do you -- you
16  don't -- you cannot confirm that completed suicides are
17  even part of the analysis on page 194?
18    A. I don't know if it mapped into that. I don't.
19  I'll check for you. It says that it's suicidal and
20  self-injurious. Whether completed suicides, I just have
21  to check.
22    MR. BARNES: Why don't we -- Ken, why don't we
23  take a lunch break so she can check out the mapping
24  stuff, because we have to just understand how it's
25  done. So I thought she would have that done, so --

Page 159

1    MR. FROMSON: We can take a break for lunch
2  and -- let's take a break now. That's fine.
3    MS. McGRODER: How -- how long?
4    MR. FROMSON: 30 minutes.
5    MR. BARNES: 30 minutes.
6    THE VIDEOGRAPHER: Off the record at
7  12:53 p.m.
8    (Lunch recess taken.)
9    THE VIDEOGRAPHER: On the record 1:28 p.m.
10  BY MR. BARNES:
11    Q. Thank you. Good afternoon, Dr. Blume.
12    A. Good afternoon.
13    Q. Did you -- were you able to find some of the
14  mapping terms I asked you for?
15    A. I did.
16    Q. Okay. Can you release them to me now.
17    A. (Handing.)
18    Q. Okay. These same copies of the same thing?
19    A. They are.
20    Q. Okay. What I'll do is I'll mark this as the
21  next exhibit and then you can tell me what it is. Okay?
22    A. Okay.
23    MR. BARNES: If you would.
24    (Deposition Exhibit No. 10 marked for
25  identification.)

Page 160

1    MR. BARNES: Thank you.
2  BY MR. BARNES:
3    Q. I'm going to hand the witness what's been
4  marked as Blume Exhibit 10. Can you identify Blume
5  Exhibit 10 for the record. Please?
6    A. Yes, these -- this is the map of the terms
7  that goes into the single HLT category entitled
8  "Suicidal and Self-Injurious Behaviors." And these --
9  this is a spreadsheet that has the preferred term, the
10  noted high-level term, high-level group term, and the
11  SOC class.
12    Q. Okay. I have a -- you keep the exhibit and we
13  keep -- is that an extra copy for me? Thank you.
14    A. Okay.
15    Q. Let me just look at it with counsel here.
16    Okay. Let's -- let's work through Exhibit 10,
17  if we might, okay? And keep page 194 handy and we'll
18  make our -- make our way through the -- the exhibit,
19  okay?
20    Now, can you explain what -- how this works on
21  Exhibit 10, working your way from left to right across
22  the vertical access? And go from the top line across.
23    A. Yes. And these are -- these -- one, two,
24  three, four, five, six, seven, eight.
25    These eight terms, eight preferred terms are

Page 161

1  all subsumed within the high-level term. And it is one
2  high-level term group, suicidal and self-injurious
3  behaviors. I think it might have been mentioned earlier
4  these were two HLT terms. They're not. They're one.
5    Q. Oh, okay. So can I just follow up on that
6  then.
7    The suicidal and self-injurious behavior term
8  is the MedDRA HL -- HLT term?
9    A. Yes.
10    Q. High-level term?
11    A. Yes.
12    Q. And who created this suicidal and
13  self-injurious behavior HLT term; did you or did someone
14  else?
15    A. No, the MedDRA.
16    Q. This MedDRA dictionary?
17    A. Right, MedDRA did this.
18    Q. Okay. And so -- so completed suicide maps to
19  the higher-level term suicidal and self-injurious
20  behavior as one category?
21    A. All of these terms. All of these preferred
22  terms map to the same HLT category. And it just so
23  happens it has the same name as the -- the HL --
24  high-level group term category.
25    Q. So working your way across then, there are

Page 166

1    BY MR. BARNES:
2        Q.   What basis do you say this is not the accepted
3    definition of proportional reporting ratio?
4        A.   I'm not saying it isn't. I'm just saying I
5    don't -- I don't use it for all drugs across all
6    categories.
7        Q.   And what -- and why don't you use the -- the
8    proportional reporting ratio set forth in the textbook
9    by Dr. Strom on page 171, Exhibit --
10       A.   Well, I don't know I'm disagreeing.
11       Q.   -- Exhibit 11?
12       A.   I simply don't know his statement is for all
13   drugs in the database. For all I know, it's all drugs
14   in the database dealing with antiepileptic drugs or
15   database dealing with statins, so we may be saying the
16   same thing.
17           What I'm saying is, generally when I do a
18   comparison, I do it a compare -- comparison is generally
19   with drugs of one of the three categories that I
20   mentioned earlier today.
21       Q.   And as to -- and my earlier question was where
22   was that method published. And you mentioned
23   Dr. Strom's book and you mentioned the FDA guidance
24   document.
25           And my question is, the method you described

Page 167

1    earlier is not described in either Dr. Strom's textbook,
2    the best I can tell, or in the FDA guidance document
3    that you referenced --
4        A.   What -- what method?
5        Q.   -- isn't that correct?
6        A.   I'm sorry.
7        Q.   Well, you just -- you referenced a method that
8    you employed in the -- on page 194 of your report. And
9    I said, "Where is that published?" And you testified it
10   was in Dr. Strom's textbook as well as the FDA guidance
11   document. We pulled those guidance -- those two
12   documents out.
13           So my question is, isn't it that the PRR graph
14   that's on page 194, the report is -- is not, in fact, a
15   proportion of all reactions to the drug that represent a
16   particular medical condition of interest compared to the
17   same proportion for all drugs in the database, is it?
18           MR. FROMSON:  Just note my objection as to
19   form, asked and answered.
20           THE WITNESS:  I have no idea what the term
21   "database" is referring to. My only comment was it
22   would not -- it -- I do not use it for all drugs.
23   BY MR. BARNES:
24       Q.   Okay. And let me make -- make -- I want to
25   just make sure I understand.

Page 168

1        My question that led to Dr. Strom's book and
2    the FDA guidance document is I asked you where is the
3    method published on page 194 in your report published in
4    the medical or scientific literature.
5        Do you have a reference you can give me that I
6    can look at to verify the method that you're using has
7    been published in a -- somewhere in the scientific or
8    medical literature?
9        MR. FROMSON:  Same -- just note my objection
10   to the extent it's been asked and answered. Also
11   misstates her testimony.
12       THE WITNESS:  Yeah, I thought what you had
13   asked me, to show me where PRR is ever mentioned by
14   the FDA or by Brian Strom, so I brought in
15   Brian Strom's textbook and I brought in the FDA
16   guidance.
17   BY MR. BARNES:
18       Q.   Let's go back to the first principles.
19       Can you cite me a -- any reference in the
20   medical literature, published medical literature,
21   where -- where the method that you described that led to
22   the creation of a plot on page 194 of the report is
23   published in the medical literature or scientific
24   literature?
25       MR. FROMSON:  Same ob- -- just note my

Page 169

1        objection to the extent it was asked and answered.
2        THE WITNESS:  Well, the same mec- -- the same
3    analysis was used by FDA, as I mentioned earlier
4    with Baycol, where they compared fatalities with
5    Baycol specifically with fatalities with other
6    statins. And that is publicly available in the FDA
7    database.
8    BY MR. BARNES:
9        Q.   Well, let me do it this way, okay. I'm not
10   sure we're connecting.
11       Look at the -- the -- the bottom of page 1 --
12   the second paragraph on page 171, okay?
13       There is -- there is a formula there, correct?
14       A.   Yes.
15       Q.   Okay. Do you see "PRR is a/(a+b) divided by
16   c/(c+d)"?
17       A.   Right.
18       Q.   In the -- in the PRR analysis you contend was
19   performed on page 194, what is the "a" for Neurontin on
20   2000 -- June 30, 2003?
21       A.   Well, I -- I don't have that. I -- my
22   report -- like, as we discussed earlier, it's for the
23   entire year. But the "a" in this --
24       Q.   Your report --
25       A.   The "a" --

Page 170

1    Q.  Your report on -- on -- I'm directing you to
2    the data point on your graph on June 30, 2003.
3        What -- what is the "a" for Neurontin in the
4    PRR formula in Dr. Strom's book?
5        MR. FROMSON:  Note my objection as to form.
6        THE WITNESS:  I -- I can't answer that.
7    BY MR. BARNES:
8    Q.  And -- and why not?
9    A.  Because the -- the raw data aren't here.  The
10   ratio is 10 percent.  But the "a" would be the number of
11   events for Neurontin divided by the total number of
12   events in the Neurontin database.
13   Q.  Do you see --
14   A.  For that point, it's 10 percent.
15   Q.  Do you have the -- okay.  I'm asking you for
16   the -- for the number that -- that represents the "a" in
17   that -- in that formula.  And you say you can give me
18   a -- you give me percentage.  I want to know the raw
19   data by which that proportion can be created.
20   A.  Well --
21       MR. FROMSON:  Just note my objection as to the
22   extent it's been asked and answered.
23       THE WITNESS:  Okay.  I'll --
24       MR. FROMSON:  I think she said it's not there.
25       THE WITNESS:  Yeah, I don't have it.  I can

Page 171

1    give you the number for that entire year using
2    these terms.  But for the specific date you picked,
3    it's in the middle of the year and my -- my report
4    is done by end of -- end of the calendar years.
5    BY MR. BARNES:
6    Q.  Well -- well, I -- I'm going to the last data
7    point on your -- on your -- which is cumulative, so I
8    want to -- I'm going to the last data point on your
9    plot.  So let me go to "b."
10       Wouldn't you also need to know what the "b" is
11   from Dr. Strom's formula, which is the number of all
12   other reactions for the -- in the Neurontin database,
13   correct?
14   A.  Yes, I would need to know that, and we did
15   know that.
16   Q.  Do you know that today?
17   A.  Well, the database is in the -- in the file.
18   But, no, specifically sitting here, I don't know how
19   many thousands and thousands of adverse events you had
20   reported with Neurontin at June 30th, 2003.
21   Q.  Is there anywhere in your report where the
22   calculation a/(a+b) is set forth, which is the numerator
23   of the PRR ratio reported in Dr. Strom's book?
24   A.  Only at the end of the quarter.
25   Q.  Is where?

Page 172

1    A.  At the end of the year.
2        Well, for example, on page 168, the sui- --
3    the percentage of suicide events on page 168, for
4    completed suicide there is a percentage at the end of
5    Quarter -- end of 2002, 2003.
6        MR. BARNES:  Read my last question back.  I'd
7    like an answer to that question.
8        (The reporter read the portion requested.)
9        THE WITNESS:  No, it is not in this report.
10   BY MR. BARNES:
11   Q.  Okay.  Thank you.
12       Now, with regard to the -- the formula in Dr.
13   Strom's book for PRR, you also need to know the "c"
14   value, which is the value for all other drugs in the
15   database, for the reaction of interest, correct?
16   A.  Correct.
17   Q.  What is the "c" element of the PRR formula
18   that's December -- June 30th, 2003, for the Neurontin
19   plot?  Do you know what the "c" value is?
20   A.  For what?  For these other drugs?
21   Q.  For -- for -- for -- first of all, for the --
22   for Neur- -- you're comparing Neurontin against
23   Neurontin, correct?
24       MR. FROMSON:  Objection as to form.  I don't
25   think she's comparing Neurontin to Neurontin.

Page 173

1        THE WITNESS:  No, I'm not comparing Neurontin
2    to Neurontin.
3    BY MR. BARNES:
4    Q.  What's the percentage basis?  You have it --
5    A.  The percentage is --
6    Q.  Okay.  Well, let me know what the "c" then, in
7    terms of --
8    A.  "c" is the other drug you're going to do.
9    Q.  Or other drugs?
10   A.  Or however you want to do it, right, but it's
11   not Neurontin.
12   Q.  Okay.  So what is the -- what is the number
13   for "c" in your report for the other drugs?
14   A.  It would be the number for whatever drug we
15   were going to compare it with on this table.
16   Q.  Drug or drugs, one or all?
17   A.  No, we did these by individual drugs.  We did
18   not lump them together.
19   Q.  Okay.  For each -- so for each -- each
20   medicine on 194, do you know the value for "c"?
21   A.  No, they don't have -- I do not have them
22   listed here.  It's listed only by percent, but the
23   numbers will be in your database.
24   Q.  But it's not in your -- I can't find it in the
25   report, correct?

Page 174

1  A.  No, I only used the percentages.
2  Q.  So, finally, you'd also need to know what the
3  "d" value is for the other drugs in the database for all
4  other reactions, correct?
5  A.  Well, that'd be the total number of events in
6  their database, of course, yes.
7  Q.  And you -- is there anywhere in your report
8  that that is set forth, the value for "d" in the
9  proportional reporting ratio?
10  A.  No, just as evidenced by the percentage.
11  Q.  Percentage of what?
12  A.  All I've done is the percentage of the
13  suicidal events over their -- that's all I have.
14  Q.  So is it true to say that -- that nowhere in
15  your report was a proportional reporting ratio
16  calculated, correct?
17      MR. FROMSON:  Objection as to form.
18      THE WITNESS:  No, the table simply has a
19    diagram of all the individual percent reports.
20  BY MR. BARNES:
21  Q.  So you would agree with my statement that a
22  proportional reporting ratio was not prepared in your
23  report?
24      MR. FROMSON:  Objection.  Asked and answered.
25      THE WITNESS:  Ken --

Page 175

1  BY MR. BARNES:
2  Q.  On page 194 or anywhere in your report,
3  correct?
4      MR. FROMSON:  Objection.  Asked and answered.
5      THE WITNESS:  Exactly.  As I've answered it
6    before, they are not in the report.
7      MR. BARNES:  All right.  Okay.  I'm going to
8    mark as the next exhibit composite exhibit, which
9    we can discuss.  For you guys.  Mark as the next
10    exhibit, please.
11      (Deposition Exhibit No. 12 marked for
12    identification.)
13  BY MR. BARNES:
14  Q.  All right.  Dr. Blume, would you identify
15  Exhibit No. 12 for the record, please.
16      MR. FROMSON:  Just note my objection as to
17    form.  Do you want to know if she can or will she?
18      MR. BARNES:  Can you.
19      MR. FROMSON:  Okay.
20      THE WITNESS:  I have no idea what this is.
21  BY MR. BARNES:
22  Q.  For the record, we printed out on -- from a
23  Blume Exhibit No. 3 the graphs that were generated on
24  May 6th, 2003, as reflected on Blume Exhibit No. 3.
25      Were you involved in the generation of these

Page 176

1  graphs on -- on March 6th, 2006?
2      MR. FROMSON:  Just note my objection as to the
3    form of the question.  March of '06 --
4      MR. BARNES:  Okay.  I'm reading --
5      MR. FROMSON:  -- or March of '03?
6      MR. BARNES:  -- three different documents, so
7    let me try it again.
8      MR. FROMSON:  Thanks.
9      MR. BARNES:  Thanks.
10  BY MR. BARNES:
11  Q.  And this is -- what is this, Exhibit No. 12?
12  Exhibit No. 12 -- well, you've never seen
13  these before, Exhibit No. 12?  Take a moment and look at
14  them.
15  A.  Okay.  These are system -- okay.  This starts
16  with system organ class of all psychiatric through the
17  period 2004.
18  Q.  Right.  And -- and this was generated on
19  March 6th, 2006.  Do you see that the bottom left-hand
20  corner of the page?
21  A.  Yes.
22  Q.  Now, these -- these plots were pulled from
23  Exhibit 3 to your deposition, the Blume exhibit -- I'm
24  sorry.  Wait.  The exhibit -- wait a minute.
25      Pulled from Exhibit 7, I believe.  Correct?

Page 177

1  Okay.  Let me go back to the beginning.  I have too many
2  disks around here.
3      MR. FROMSON:  Rich, do you mean that on the
4    data that was on the disk you pulled the plots and
5    then you -- then you made this graph, or was the
6    graph on there already?
7      MR. BARNES:  The graph -- the graph was
8    already on it.
9      MR. FROMSON:  Okay.
10      THE WITNESS:  This is from Mr. Altman.
11      MR. BARNES:  Yeah, let me go back.  Let me go
12    back.
13  BY MR. BARNES:
14  Q.  On Exhibit -- Exhibit No. 7 is a CD that was
15  provided to Shook, Hardy & Bacon by Mr. Altman on
16  October 28th, 2007, pursuant to a discovery request
17  between firms.  And this was made available to us here
18  today as Exhibit No. 7.
19      MR. FROMSON:  Right.
20      MR. BARNES:  Okay.
21      MR. FROMSON:  So that's the October disk that
22    we provided to Shook, Hardy & Bacon.
23      MR. BARNES:  Correct.
24      MR. FROMSON:  Got you.  And do you have a --
25    do you -- would you happen to have the name of the

Page 190

1    correct?
2        A.    Or other families of drugs.
3        Yeah, I mean, one of the main -- one of the
4    main limitations with an adverse event database is
5    that -- and the reason they're such poor reporting --
6    poor reporting frequencies is that people don't know
7    about the data -- don't know about the database.
8        And generally, when there is some big
9    announcement, if FDA makes the announcement, FDA will
10   hone in again and say we have this reporting system and
11   tells you all the different ways you may access the
12   reporting system, and you will tend to see a spurt in
13   the number of reports.
14       Q.    Mostly, if not exclusively, with the drug that
15   has the publicity and the not- -- and the notoriety,
16   correct?
17       A.    Well, I know when we -- I think it was when we
18   looked at the statins, we saw that there was a case -- I
19   mean, Baycol was the major problem, but because it was
20   in a family of drugs that could -- had the potential,
21   but in a much lesser amount, you saw increases across
22   the statin category.
23       Q.    Equal increases or differential increases?
24       A.    No, no, there were not equal to what we saw
25   with Baycol, but we did see increases over the previous

Page 191

1    period. People are simply more aware --
2        Q.    But the proportion --
3        A.    -- of the event.
4        Q.    But the proportion is biased against the drug
5    that has the publicity? It becomes -- the reports
6    become stimulated and you get more reports due to the
7    bias -- due to the publicity, correct?
8        A.    Well, the publicity is because the drug's
9    causing the adverse events, so I don't know how to
10   answer that.
11       I mean, clearly Baycol was a problematic drug
12   and it was recognized and it was announced. And once it
13   was announced, people recognized and submitted more
14   events.
15       Q.    Well, let's make sure this is not circular.
16       Do you agree that when there is not- --
17   notoriety associated with a particular drug, that there
18   is something called notoriety -- it could be something
19   called notoriety bias which increases the number of
20   reports relative to other drugs in a -- in a database?
21       MR. FROMSON: Just note my objection to the
22   extent it may have been asked and answered.
23       THE WITNESS: Yes, I think it exists for the
24   drug and for other similar drugs, but to a greater
25   extent for the drug.

Page 192

1    BY MR. BARNES:
2        Q.    And it can be a lot greater extent for the
3    drug that -- that has the publicity, correct?
4        A.    I don't know.
5        MR. FROMSON: Objection as to form.
6    BY MR. BARNES:
7        Q.    Have you ever measured the effect of a
8    publicity bias or notoriety bias on spontaneous
9    reportings?
10       A.    No. I mean, we quantify it, no.
11       Q.    Is there literature out there that quantifies
12   the effect of publicity on spontaneous reporting?
13       A.    I don't know.
14       Q.    Do you know how it can be measured?
15       A.    No.
16       Q.    Do you know if -- do you know that there
17   are -- if there are techniques to measure the effect of
18   publicity on postmarket surveillance systems?
19       MR. FROMSON: Objection as to form.
20   BY MR. BARNES:
21       Q.    Databases?
22       A.    I recall one article that talked about the
23   influence of publicity, but I don't specifically
24   remember it.
25       Q.    Do you -- you've been involved with working

Page 193

1    with Mr. Finkelstein's firm since 2003, correct?
2        A.    Yes.
3        Q.    And do you know what publicity was being
4    generated in 2003 with regard to Neurontin?
5        MR. FROMSON: Just note my objection as to
6    form. Lack of foundation for that time period.
7        THE WITNESS: Let me see. I will -- I think I
8    note -- I think I note it in here.
9        MR. FROMSON: The year -- the year in -- the
10   year for the question is 2003?
11       MR. BARNES: 2003.
12   BY MR. BARNES:
13       Q.    Was there any publicity that you are aware of
14   in 2003 that could have affected reporting of adverse
15   events with Neurontin?
16       MR. FROMSON: Now, that's in general, not with
17   respect to -- you've changed the question, Richard.
18       MR. BARNES: Let me ask another question.
19   BY MR. BARNES:
20       Q.    Have you evaluated what was a -- what
21   publicity concerning Neurontin was in public domain in
22   2003?
23       MR. FROMSON: Okay. Now note my objection as
24   to form to the extent that she -- her previous
25   testimony referenced the guilty plea.

49 (Pages 190 to 193)

Page 194

1      MR. BARNES: That's not the question.
2      MR. FROMSON: Okay.
3      MR. BARNES: That's not the question. You're
4   now giving her hints and speaking objections and
5   coaching, and I'd appreciate if you'd now stop.
6      THE WITNESS: Well, I did note in my report on
7   page 153. If you're referring to an advertisement
8   that was placed, I do note that on paragraph 215.
9   BY MR. BARNES:
10     Q. Okay. And what -- what is that -- what page
11  is that on?
12     A. 153.
13     Q. And what is -- what paragraph?
14     A. 215.
15     Q. Thank you.
16        All right. Now, do you have that in front of
17  you?
18     A. I just gave it to you.
19     Q. Now, do you have -- do you have that paragraph
20  in front of you?
21     A. I just -- yes.
22     Q. Do you have the advertisement in question in
23  your file?
24     A. I have a Pfizer document referencing that
25  advertisement. I don't know if that -- the Pfizer

Page 195

1   document may well have an attachment to it that has
2   that. I don't know.
3      Q. Okay. Is it your opinion that advertisements
4   placed by law firms concerning suicides in patients
5   taking Neurontin can stimulate adverse event reports in
6   the AERS database?
7      A. It could.
8      Q. Did you make any effort to survey the -- the
9   publicly-available information regarding the nature and
10  extent of the attorney advertising concerning suicide
11  and its alleged association with Neurontin?
12     A. No, and I also didn't with the guilty plea
13  either. And I think that's why I was referring to 2003
14  and 2004. One occurred in '03 and one occurred in '04.
15     Q. Let me ask you. Move to strike the answer as
16  unresponsive. I'll ask the question again. Didn't ask
17  you about the guilty plea.
18     A. Well, it's both bias. It's notoriety bias
19  when it's a 500 hundred million dollar guilty plea.
20     Q. Can you answer -- answer the following
21  question. Did you do anything to assess the publicity
22  bias that was associated with attorney advertising for
23  lawsuit cases alleging that the Neurontin is associated
24  or causing suicide?
25     MR. FROMSON: Just note my objection, asked

Page 196

1   and answered.
2      THE WITNESS: No.
3      MR. BARNES: We'll mark as the next exhibit --
4   have that marked as an exhibit.
5      MR. FROMSON: I thought it was for me.
6      MR. BARNES: No.
7      MR. FROMSON: All right.
8      MR. BARNES: Hand it to her, please.
9      MR. FROMSON: All right. Sorry.
10     (Deposition Exhibit No. 13 marked for
11  identification.)
12  BY MR. BARNES:
13     Q. Can you identify Exhibit 13 for the record,
14  please.
15     A. I have no idea what it is. You want me to
16  describe it?
17     Q. Please.
18     A. It is -- appears to be a copy of something.
19  It has "Neurontin" -- "Neurontin."
20     Q. Yeah.
21     A. Has "Neurontin" on the horizontal pad --
22  horizontal line above in red, and then "1-800-LAW-FIRM."
23     Q. Who -- and --
24     A. And a woman -- appears to be a woman who is
25  holding a loop, loop at the top.

Page 197

1      Q. Is that a loop or a noose?
2      A. Oh, I don't know, have any idea what this is.
3      Q. Okay.
4      A. Looks like a loop. Noose.
5      Q. Can you show that --
6      A. I don't know.
7      Q. Okay. Show it to the -- show it to the
8   camera, please. Is that -- publish it to the jury,
9   please.
10     MR. FROMSON: Just note my objection, lack of
11  foundation.
12     MR. BARNES: Okay. And I'll mark the next
13  exhibit.
14     THE WITNESS: Neurontin is misspelled.
15     MR. BARNES: This is 13A. I should make it
16  14.
17     (Deposition Exhibit No. 14 marked for
18  identification.)
19  BY MR. BARNES:
20     Q. Can you identify what's been marked as
21  Exhibit 14 for the record, please.
22     A. It appears to be the same picture except
23  "Neurontin" is replaced by the word "Suicide."
24     Q. What's underneath the -- the word "Suicide"?
25  Is there something written?

Page 198

1    A.   "1-800-LAW-FIRM."
2    Q.   And would you describe the picture for the
3 record, please, that is between the word "Suicide" and
4 "1-800-LAW-FIRM."
5    A.   I think it's a close-up of the picture that
6 was in the earlier one.
7    Q.   And what -- what -- can you describe it for
8 the record, please.
9    A.   It appears to be a lady's silhouette with her
10 hand on a loop of some sort.
11    Q.   Is it -- and is it a loop or does it look like
12 a noose?
13    A.   Well, I don't know.  I don't know.  I guess it
14 could be either.  I don't know.  I don't think I've ever
15 seen a real noose.
16    Q.   Okay.  Can you publish that to the jury,
17 please.
18        MR. FROMSON:  Just note my objection to the
19 document.  Lack of foundation.
20 BY MR. BARNES:
21    Q.   Can you hold it up, please.
22        Do you understand this to be attorney
23 advertising that was referred to in your report at
24 page -- at paragraph 215?
25    A.   I just --

Page 199

1        MR. FROMSON:  Just note my objection to form.
2        Do you mean does she refer to this as this is
3 the advertising that's referenced or is it
4 advertising in general?
5 BY MR. BARNES:
6    Q.   Is this attorney advertising for Neurontin
7 lawsuits and suicide?
8    A.   This --
9        MR. FROMSON:  Objection as to the form of the
10 question.  Lack of foundation.
11        THE WITNESS:  I refer here to a series of
12 documents that I think one of your in-house
13 counsel, last name Su, it's her records that I'm
14 referring to.  And she discusses in one of these
15 that there has been an attorney placement --
16 placement by an attorney's firm for suicide.  And
17 I'm pretty confident that that's to what I'm
18 referring.
19 BY MR. BARNES:
20    Q.   So did you -- when did you -- when did you --
21 well, how did you -- so you know there was a document
22 that talks about attorney advertising in 2003 that
23 you've reviewed and put into your report, correct?
24    A.   I reviewed this from your database, yes.
25    Q.   Now, did you ask -- did you ask for more

Page 200

1 information concerning the nature and extent of the
2 attorney advertising in 2003 when forming your opinions
3 in this case?
4    A.   I knew that there was attorney information in
5 2003.
6    Q.   Advertising?
7    A.   Advertising for cases, yes.
8    Q.   And do you know if it ran nationwide?  Did you
9 make any inquiry as to the extent of the advertising in
10 2003?
11    A.   No.
12    Q.   Did you make any inquiry as to the extent of
13 the attorney advertisement for Neurontin cases in 2004?
14    A.   I don't even know if it was still going on.  I
15 don't know.
16    Q.   Did you make any inquiry as to the extent of
17 the plaintiff's attorney advertising for Neurontin cases
18 in 2005?
19    A.   No.
20    Q.   Did you make any inquiry as to the extent of
21 attorney advertising for Neurontin cases in 2006?
22    A.   No.
23    Q.   Did you make any inquiry as to the extent of
24 attorney advertising for Neurontin cases in 2007?
25    A.   No.

Page 201

1    Q.   Do you think that -- that attorney advertising
2 for Neurontin cases, as it pertains to suicide between
3 2003 and 2006, could artificially stimulate reports of
4 adverse events pertaining to Neurontin?
5        MR. FROMSON:  Just note my objection as to the
6 form of the question.
7        THE WITNESS:  Well, there is suicide events
8 with Neurontin from the beginning of time with
9 Neurontin.  I mean, they were in the clinical
10 trials.  But it's conceivably that the events, if
11 these indeed are true and were published, could
12 have stimulated reports.  I mean, the events with
13 Dr. Franklin could have stimulated reports.  I
14 don't know.
15        MR. BARNES:  Move to strike.  Would you read
16 back my last question.  I want her -- I would like
17 for her to answer my question, please.
18        (The reporter read the portion requested.)
19 BY MR. BARNES:
20    Q.   Please answer that question.
21        MR. FROMSON:  Note my objection to the form of
22 the question.  And I'll also object that it's been
23 asked and answered.
24        You can answer.
25        THE WITNESS:  It is possible that advertising

51 (Pages 198 to 201)

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 206

an answer to that question.
(The reporter read the portion requested.)
MR. FROMSON: I just note my objection as it misstates her testimony.
MR. BARNES: That doesn't relate to her testimony.
BY MR. BARNES:
Q. Can you answer that question, please?
A. There were multiple reasons why we picked the cuts that we did.
Q. What was -- was one of them the notoriety bias from publicity surrounding Neurontin that occurred after 2002?
A. I recall that we specifically discussed that in a -- in a variety of ways. Whether I was specifically thinking about that when we made the cut in 2002, I think I was. But at the end of the day, the 2002 data support that there was an increase in suicide, it has nothing to do with these ads or with Dr. Franklin's findings.
So I have covered the period of time that precedes any of these notoriety biases you are concerned with.
Q. What other reasons other than notoriety bias caused you -- that was one reason, correct? Just make

Page 207

sure I have that understood, that one of the reasons you chose the end of 2002 was because of the effect of notoriety bias on adverse event reporting, correct?
A. No.
MR. FROMSON: Objection as to form.
THE WITNESS: What I said was, I had to find some ways to cut this huge amount of time. 2002 reflects a postherpetic neuralgia approval and the -- and the ANDA -- or the NDAs include the postherpetic neuralgia.
When we were deciding on the times, I recall the discussion about the advertisements. There was a big influx in the number of events and the Franklin revelation became public. So by cutting it in 2002, we were able to resolve all of those concerns with the 2002 date.
BY MR. BARNES:
Q. So let me -- that's fine. Let me make sure I understand the two points.
One was, in 2002, there was a new indication that was approved for postherpetic neuralgia, correct?
A. Yes.
Q. The other thing that caused you concern was the notoriety bias due to publicity between Neurontin and a -- a guilty plea concerning off-label promotion as

Page 208

well as attorney advertising, correct?
MR. FROMSON: Objection, form.
THE WITNESS: Well, I'll repeat it again.
I recall that we had a discussion regarding the advertisements, regarding the guilty plea, and how we were going to divide up the database.
BY MR. BARNES:
Q. Were there advertisements regarding the guilty plea?
A. No, regarding advertising in 2003, The ramifications in early -- in 2004 with the guilty plea -- I think it was in May -- and the postherpetic neuralgia was approved in 2002.
There was some comment that postherpetic neuralgia does not have a very big database, so it really wouldn't make that big of a contribution to a database that was already 90 percent driven by off-label uses. But by cutting it at 2002, we will be able to avoid any of these influences or notoriety bias. So, luckily, in 2002, we've avoided this problem.
Q. Okay. And -- and -- and after 2002, did you make any effort to quantify the effect of notoriety bias on adverse event reporting that occurred after January 1, 2003?
MR. FROMSON: Objection to the -- it's been

Page 209

asked and answered.
THE WITNESS: Yeah, I -- I -- no. I made no attempt either -- for either of the instances that could have impacted notoriety bias.
MR. BARNES: Okay. Let's take a short break. I'm going to clean up from my exhibits and go on to the next area. Thanks.
THE VIDEOGRAPHER: Off the record 2:25.
(Recess taken.)
THE VIDEOGRAPHER: On the record at 2:38 p.m.
BY MR. BARNES:
Q. Dr. Blume, I want to go back to some of your qualifications in this case, if we might. Okay?
Dr. Blume, are you a medical doctor?
A. No.
Q. Are you permitted to prescribe medicines in the United States to patients?
A. No. I have a Ph.D.
Q. Okay. And your Ph.D. is in what?
A. Pharmacology and toxicology.
Q. And in the course of your career as a toxicologist and pharmacologist, have you ever had to read a prescription drug label for the purposes of balancing potential risks and benefits of the medication for an actual patient?

1    A.  Yes.
2    Q.  And did you prescribe the drug for that
3  patient?
4        MR. FROMSON:  Objection as to form.
5        THE WITNESS:  No, I'm a Ph.D.  I'm not a
6    prescriber.
7  BY MR. BARNES:
8    Q.  But in your -- in the course of your career,
9  you actually look at a specific patient and -- and make
10  determination as to whether a particular drug is
11  appropriate for that particular patient?
12        MR. FROMSON:  Objection as to form.
13        THE WITNESS:  No.
14  BY MR. BARNES:
15    Q.  That's not what you do?
16    A.  No.
17    Q.  Okay.  I thought you said you did do that.
18        MR. FROMSON:  No.  That's objection.
19    Misstates her testimony.
20        THE WITNESS:  No, I read labels for safety
21    benefit, but I don't do it with respect to a
22    specific patient.
23  BY MR. BARNES:
24    Q.  That's what I thought.  Okay.  That was my
25  question.

1        So you don't actually, yourself, look at
2  medicines and decide what medicine is right for a
3  specific patient, correct?
4    A.  That is correct.
5    Q.  Okay.  And you've never had the opportunity to
6  consider medicines for off-label use for a specific
7  patient, have you?
8    A.  If you are asking me have I ever considered a
9  medication appropriate as an off-label use for a
10  specific patient, the answer would be no.
11    Q.  Medical doctors have the authority to
12  prescribe medicines off label for their patients,
13  correct?
14    A.  Well, prescribers and there are some others
15  besides medical doctors who can do that.
16    Q.  There are health care professionals who --
17    A.  Correct.
18    Q.  -- who are licensed?
19    A.  Correct.
20    Q.  And you would agree that in the hands of a
21  health care professional such as a physician, that
22  off-label prescribing for their patients is entirely
23  lawful?
24    A.  Well, I think it is legal in -- in most
25  states, if not all, for a physician or other health care

1  prescriber to prescribe a product off label, yes.
2    Q.  Okay.  And you are not sitting here qualified
3  to address the propriety of a physician's decision to
4  prescribe a medicine off label, correct?
5        MR. FROMSON:  Just note my --
6  BY MR. BARNES:
7    Q.  To a particular patient, correct?
8        MR. FROMSON:  Note my objection as to form.
9        THE WITNESS:  I am not opining on any specific
10    patients.
11  BY MR. BARNES:
12    Q.  But with regard to -- you said something
13  earlier in your testimony that -- that there was
14  inappropriate off-label use of Neurontin by physicians.
15    Do you recall you saying that in your -- one
16  of your answers earlier today?
17        MR. FROMSON:  Just note my objection to the
18    extent it misstates her testimony.
19        THE WITNESS:  I'm not sure if I said that.  I
20    think I said there was inappropriate off-label
21    advertising of unlabeled uses and marketing
22    practices relating to unlabeled uses.
23  BY MR. BARNES:
24    Q.  Okay.  So just so I'm clear, you would agree
25  that -- that it is entirely lawful and within the

1  discretion of a health care professional to prescribe
2  Neurontin for off-label use for his or her patient,
3  correct?
4        MR. FROMSON:  Just note my objection, asked
5    and answered.
6        THE WITNESS:  I think it is legal, yes.
7  BY MR. BARNES:
8    Q.  Do you -- and do you have any criticism of
9  physicians who choose to prescribe Neurontin for
10  off-label uses for their patients?
11        MR. FROMSON:  Objection as to form.
12        THE WITNESS:  I'm -- I'm -- I'm not opining on
13    any specific patient or their physicians.
14  BY MR. BARNES:
15    Q.  So with regard to a -- a physician's decision
16  to prescribe Neurontin for off-label use, you offer no
17  opinions as to their decisions in that regard, in this
18  litigation, correct?
19        MR. FROMSON:  Objection as to form.
20        THE WITNESS:  I don't know how to answer that.
21    I mean, obviously, my report talks about the
22    necessity for labeling to be adequate and current.
23    And certainly if a firm is aware of off-label
24    advertising and those off-label indications alter
25    the benefit/risk information that's in the label,

54 (Pages 210 to 213)

Page 222

1    additional drugs. I think it could happen, yes.
2  BY MR. BARNES:
3    Q.  And it could also -- it could -- it's also
4  possible that a physician could find that a particular
5  off-label use for a drug was actually effective in
6  treating their patients, even though it was not labeled
7  for that indication, correct?
8        MR. FROMSON: Objection as to form, lack of
9  foundation, improperly-stated hypothetical.
10       THE WITNESS: Are you asking me if it's
11  conceivable that a product could be successfully
12  used off-label?
13 BY MR. BARNES:
14    Q.  Sure.
15    A.  For a patient? Yeah, I think a product -- a
16  hypothetical product could be used in a hypothetical
17  patient successfully for hypothetical off-label use,
18  yes.
19    Q.  Do you understand that -- did you inquiry as
20  to whether or not Neurontin was found to be effective
21  for off-label indications by clinicians in the
22  United States? Did you do any research into that?
23    A.  Well, I reviewed quite a few of the off-label
24  indications in my report.
25    Q.  Did -- did you do any inquiry as to whether or

Page 223

1  not there was that clinicians found certain off-label
2  indications to be effective?
3    A.  Are you asking if I interviewed --
4    Q.  Any --
5    A.  -- independent physicians?
6    Q.  Any -- any effort to understand the effica- --
7  the off-label use issue with regard to physicians
8  finding applications for those uses?
9    A.  No, I --
10       MR. FROMSON: Let me object. Let me object to
11  the form of that last question.
12       MR. BARNES: Thank you.
13       MR. FROMSON: Go ahead.
14       THE WITNESS: No, I did not interview any
15  independent physicians regarding their off-label
16  use of Neurontin.
17 BY MR. BARNES:
18    Q.  Do you understand how many patients have used
19  Neurontin since it came on the market in early 1994?
20    A.  No, I -- I -- it's in the annual reports. I
21  know it was around two billion dollars before it was
22  multi-sourced, but I -- I haven't done the calculations
23  backwards for the number of patients.
24    Q.  Can you give me a rough estimate of your
25  understanding of the number of patients who have used

Page 224

1  Neurontin --
2    A.  No, I would have to --
3    Q.  -- since 1984?
4    A.  It's in the annual reports. I would have to
5  stop at a break and look it up or calculate it back
6  based on your price.
7    Q.  Did you -- is it more than a million patients?
8    A.  Well, let's see. If it's two billion dollars
9  a year --
10    Q.  Let's do it that way. Strike that last
11  question.
12        Did you read the -- the September '04 report
13  submitted?
14    A.  Yeah, that's in my report. Yes. And I have a
15  copy of that here, so I guess we could backtrack into
16  that.
17    Q.  Are you aware that it stated in there that
18  there was an excess of 12 million patients who had taken
19  Neurontin since 1994?
20    A.  I didn't specifically remember that number,
21  no, but I have the report.
22        So 12 million, 90 percent of it's off-label,
23  so that would be 1.2 million people have received it for
24  either an epilepsy or a postherpetic neuralgia.
25    Q.  Strike that.

Page 225

1        Do you -- do you have any reason to disagree
2  with the number in the Parson's report of 12 million
3  patients who have taken Neurontin since 1994?
4        MR. FROMSON: Objection, lack of foundation.
5        THE WITNESS: I haven't specifically
6  researched it, but at this -- at this point, I have
7  no reason to dispute her number, no.
8  BY MR. BARNES:
9    Q.  Okay. Do you know how many physicians have
10  prescribed Neurontin since 1994?
11    A.  No.
12    Q.  Have you ever served on FDA advisory committee
13  that was meeting about a particular drug's approval?
14    A.  No, I've always been with industry. I've
15  never been on an FDA advisory committee. I've always
16  been with industry.
17    Q.  Do you agree that you're not an expert
18  qualified in the field of neurology?
19    A.  I'm not a physician, no.
20    Q.  You would agree with that?
21    A.  I would agree I'm not a physician, so I can't
22  be an expert in neurology.
23    Q.  Okay. How about psychiatry?
24    A.  Same answer.
25    Q.  Are you an expert in psychiatry?

57 (Pages 222 to 225)

Page 226

1    A.  Same answer. I'm not a prescriber, so I
2  cannot be an expert in psychiatry.
3    Q.  Are you an expert in suicide?
4    A.  Same answer. Not a pre- -- not a physician,
5  not a prescriber, not a psychiatrist, not a
6  suicidologist.
7    Q.  Are you an expert in pain management?
8    A.  Same, not a prescriber.
9    Q.  Well, will you answer --
10    A.  Not a pain management expert.
11    Q.  Are you an expert in the field of
12  epidemiology?
13    A.  Well, I'm not an epidemiologist, but, of
14  course, as you can tell from all the work we've done
15  today, I use epidemiologic assignments and principles in
16  our work with our pharmaceutical clients.
17    Q.  Are you a qualified epidemiologist?
18    A.  No, I'm not an epidemiologist by training.
19    Q.  Okay. And when you do epidemiological
20  research, you often employ Mr. Altman to assist you in
21  running certain inquiries to FDA databases and other
22  databases, correct?
23    A.  Well --
24      MR. FROMSON: Objection as to form.
25      THE WITNESS: -- Mr. Altman does run databases

Page 227

1  for us in our epidemiology work; that is correct.
2  BY MR. BARNES:
3    Q.  Okay. Now, are you an expert in the field of
4  epilepsy?
5    A.  No, not a -- not a physician, not a
6  prescriber, not a neurologist, so I'm not an
7  epileptologist.
8    Q.  Same question as to neuropathic pain.
9    A.  Same answer.
10    Q.  You're not an expert, correct?
11    A.  Not a physician, not a prescriber, not a
12  neurologist, so I'm not in neuropathic pain.
13    Q.  What is neuropathic pain?
14    A.  My understanding of neuropathic pain is pain
15  secondary to a nerve-induced neuropathy. It can come
16  from a variety of -- can come from diabetic
17  neuropathies, injury neuropathy, chemotherapy
18  neuropathy, viral neuropathy, postherpetic neuropathies.
19  Oftentimes intermixed with neuralgic pain.
20    Q.  How many drugs in the United States are
21  approved for the treatment of neuropathic pain?
22    A.  I don't know. I don't know.
23    Q.  Are there any?
24    A.  I don't know.
25    Q.  Are there any drugs approved in the

Page 228

1  United States for diabetic neuropathy, for the treatment
2  of diabetic neuropathy?
3    A.  I don't know.
4    Q.  Are there any drugs approved in the
5  United States for the treatment of postherpetic
6  neuralgia?
7    A.  Neurontin is the only one that I know of.
8    Q.  Okay. Are you an expert in the field of
9  biostatistics?
10    A.  We use biostatistics, of course, in -- in all
11  of our assignments, but we hire a biostatistician to
12  design the statistical components of our studies and to
13  represent us, come with us to FDA for biostatistical
14  issues.
15    Q.  My question is as to you, Dr. Blume. Are
16  you -- do you hold yourself out as a biostatistician?
17    A.  Well, I thought I answered it. No, by
18  training, I'm not a biostatistician. We do
19  biostatistical work, but we ally ourselves with a
20  biostatistician for that.
21    Q.  So "we," being the PDG --
22    A.  Yes.
23    Q.  -- hires biostatisticians to help in the
24  biostatistical analyses that you do for your clients,
25  correct?

Page 229

1    A.  In the -- I mean, we don't hire
2  biostatistician to interpret literature article, but we
3  do hire a biostatistician to help us design the power of
4  a clinical study or to help us evaluate animal data with
5  regard to statistical issues, yes.
6    Q.  And how about human data, do you -- do you
7  personally run the biostatistical analyses of human data
8  or do others do that in your practice?
9    A.  Well, I thought I said clinical studies before
10  I said animal. No, we use an outside biostatistician
11  for clinical issues.
12    Q.  In your report that was provided in this case,
13  which is contained within Exhibit 5, were there any
14  biostatistical analyses conducted to -- with regard to
15  the relationship between Neurontin and suicidal
16  behavior?
17    A.  No, I did not. We do not do any statist- --
18  no. We do not do statistics on the pharmacovigilance
19  data, no.
20      There were statistics done in your client's
21  research reports in the studies that reported
22  psychobiological events or suicide-related events, but
23  we did not run any additional statistics on pharm --
24  pharmacovigilance work, no.
25    Q.  Did you run any biostatistics on randomized

58 (Pages 226 to 229)

Page 230

1  clinical trials; any analyses on that data?
2      A.  No, but we report -- we reported the
3  differences.  We reported the -- the data that your
4  client reported for those trials.
5      Q.  But you, Dr. Blume, and Dr. -- or the PDG
6  Group did not do biostatistical analyses of the clinical
7  trial data as referenced in your report of --
8      A.  Oh, no, I assumed the -- no, I just accepted
9  the Pfizer numbers.
10     Q.  Fine.
11         And do you know if Mr. Altman did any
12  biostatistical analyses in connection with addressing
13  the question of Neurontin and its association with
14  suicide or suicidal behavior?
15         MR. FROMSON:  Just note my objection as to
16  form.
17         THE WITNESS:  Well, yeah, I'm not aware of it.
18  BY MR. BARNES:
19     Q.  Okay.  Going on to neurobiology, do you hold
20  yourself out as a neurobiologist?
21     A.  No, I'm a pharmacologist.  My -- my -- my
22  specialty was -- our department in training was -- was
23  neurobiology and endocrine biology.  No, I don't hold
24  myself out to be a neurobiologist.
25         I have several patents in neurobiology and

Page 231

1  much of my work has been done with neurobiological end
2  points, especially with the selegiline and
3  desmethylselegiline.  But notwithstanding those patents
4  and that background, I would not consider myself a basic
5  neuropharmacologist.
6      Q.  Okay.  And as to treatment of depression -- I
7  know we've talked about -- about psychiatry.  Do you
8  hold yourself as an expert in the treatment of
9  depression?
10     A.  Well, not to be repetitive, but I'm not a
11  physician, not a prescriber, not a psychiatrist, so, no,
12  I don't hold myself out to be a depression expert.  I
13  mean, I've worked on NDAs with depression and -- and --
14  and --
15     Q.  But you're not -- you don't treat it nor do
16  you diagnose it, correct?
17     A.  No, I'm not a physician.
18     Q.  Okay.  Now, when is the last time you
19  published article in the peer-reviewed medical
20  literature?
21     A.  Not since I left -- not since Mylan, not since
22  we finished the Mylan work.
23     Q.  Can you tell me the date of your last
24  peer-reviewed publication?
25     A.  Literature publication, not the patent

Page 232

1  literature?
2      Q.  Peer-reviewed medical.
3      A.  I think it was 10, 15 years ago.  I don't have
4  my CV in here.
5      Q.  Let me find your CV.  The CV you gave us
6  had -- your report had more than that.
7         Now, let me hand you the same one.  I'm going
8  to hand you this.  We won't mark it because I believe
9  it's already in Exhibit 5, but that may help you answer
10  the question.
11     A.  1990.
12     Q.  So just so I understand, the last article
13  published in the peer-reviewed medical literature by
14  Cheryl Blume was in April of 1990; is that correct?
15     A.  Yes.
16     Q.  And you are listed as the fifth author on a
17  medical article entitled "Absorption and Disposition of
18  Low-Dose Combination Formulation of Hydrochlorothiazide
19  and Triamterene;" is that correct?
20     A.  No, it's Triamterene.
21     Q.  Triamterene.  Thank you.
22         That was published in "Biopharmacology Drug
23  Dispositions"?
24     A.  "Biopharmaceutics and Drug Disposition."
25     Q.  Okay.  Why haven't you published since 1990?

Page 233

1      A.  Working in industry, it's not very easy to
2  publish, especially working in a small company.  And
3  just -- just haven't.
4      Q.  Okay.  Did any of your -- your published
5  articles deal with postmarket surveillance techniques?
6      A.  I doubt it.  Well, there might be
7  postmarketing information comparing the two products,
8  but I doubt if there were surveillance techniques in
9  those articles.
10     Q.  The answer to my question is no --
11     A.  I doubt it.
12     Q.  You doubt it.
13         The best you can tell, you've never published
14  on postmarket surveillance techniques, correct?
15     A.  I -- I do -- I do not think so.
16     Q.  Okay.  Now, do any of these articles deal with
17  the treatment of -- or diagnosis of epilepsy, that
18  you've published?
19     A.  No.
20     Q.  Do any of them deal with the treatment and
21  diagnosis of depression?
22     A.  I think it's woven in our patents, depression,
23  but it's not --
24     Q.  Peer --
25     A.  -- in publications.

Page 234

1   Q.  Peer-reviewed medical literature?
2   A.  No.
3   Q.  Are any of the peer-reviewed medical
4   literature you've published deal with neuropathic pain?
5   A.  No.
6   Q.  The treatment of pain?
7   A.  No.
8   Q.  Do any of your publications concern
9   proportional reporting ratios?
10   A.  There was a comparison of adverse events in
11   one of these articles, but I -- I have no idea if we
12   defined it as a PRR or just did an incidence ratio.  I
13   can't recall.
14   Q.  Which article are you referring to?
15   A.  Where we were comparing two
16   different clinical -- there is two clinical experience
17   articles in here with Maxzide and SmithKline's Dyazide.
18   I have no idea how we compared electrolyte levels.
19   Q.  Oh, these are electrolyte levels, so -- okay.
20   So these -- it's unlikely you were comparing events with
21   regard to a drug adverse event, correct?
22   A.  Well, one of the -- one of the adverse events
23   was hypocholemia.
24   Q.  Okay.  But you have no information that that
25   pertains to the calculation of --

Page 235

1   A.  Oh, I just don't recall how we did it.
2   Q.  That's fine.
3   A.  I didn't --
4   Q.  Have you ever published any peer-reviewed
5   literature on the mechanism of action of antiepileptic
6   drugs?
7   A.  No.
8   Q.  Have you ever done any research into the
9   mechanism of action of antiepileptic drugs?
10   A.  We are working on a project now with an
11   antiepileptic product, a product development project of
12   an antiepileptic marketed in Europe.  Not marketed
13   yet -- not marketed in the United States, but it's being
14   developed in the United States for a different
15   indication.  But mechanism of action work has been
16   included in that NDA.
17   Q.  Okay.  My question is, have you, Cheryl Blume,
18   ever published any peer-reviewed articles on the
19   mechanism of action of antiepileptic drugs?
20   A.  No, that has not been published as an NDA.
21   Q.  Have you ever personally conducted any
22   toxicological or pharmacological research into the
23   mechanism of action of antiepileptic drugs?
24   A.  I'm working on an NDA project, but I don't
25   personally do animal studies, no.

Page 236

1   Q.  So that's -- I understand -- make sure I
2   understand this.  You won't tell me the name of the drug
3   or the manufacturer, right?
4   A.  Right, I won't.
5   Q.  That's -- that is confidential until you
6   consult with your lawyer, correct?
7   A.  That's right.
8   Q.  I have a pending request for that, so I can't
9   inquire.
10   So is it fair to say that your work does not
11   involve pharmacological studies of the mechanism of
12   action of epileptic drugs where you were personally
13   responsible or participating in the actual research on
14   the mechanism of action?
15   A.  Right, I do not do animal.  I haven't done
16   animal trials since I left graduate school.
17   Q.  Okay.  Have you ever participated as an
18   investigator in a randomized placebo-controlled clinical
19   trial?
20   A.  No, I've always worked for industry.  I
21   haven't -- and I'm not a -- not a physician, so, no,
22   I've never been in one.
23   Q.  Have you ever designed a randomized
24   placebo-controlled clinical trial for a pharmaceutical
25   product?

Page 237

1   A.  Oh, of course.
2   Q.  The answer to that is yes?
3   A.  Yes.
4   Q.  Which ones?
5   A.  Well, I worked -- I worked for Mylan and
6   Somerset, and you see the list of approvals that they
7   received.
8   Q.  How many?
9   A.  So I worked on their -- their products.  Those
10   are wide variety of drug products; gastrointestinal,
11   antihypertensive, diuretic products.  Let's see.
12   Anti-Parkinson drugs, antidepressant drugs.
13   Q.  How many NDAs did you prepare or participate
14   in the preparation of while you were at Mylan
15   Laboratories?  NDAs.
16   A.  New drug applications, let's see, there was
17   Maxzide, the second Maxzide NDA.  We did an ulcer
18   product that was a foreign NDA.  And I participated in
19   the orphan drug NDA.  So four.
20   Q.  What's an orphan drug NDA?
21   A.  Orphan drug, it's for a metabolic -- and I'm
22   blanking.  It's a metabolic disorder in children who
23   cannot process uric acid, but I'll -- I'll have to get
24   you the name of the NDA.
25   Q.  So that there was an ulcer drug you

60 (Pages 234 to 237)

Page 254

1    Q.  What is that?  What's the total?  Okay.  Your
2  total revenues so far for the year are what?
3    A.  Oh, I don't know.  For him, it's -- for
4  Finkelstein, it's thirty-six five --
5    Q.  Okay.
6    A.  -- through the end -- through third quarter.
7    Q.  Okay.  Well, how much -- and you've received
8  $36,500.  How much have you billed in 19 -- in 2007?
9    A.  He's current.  It's current.
10    Q.  It's current?
11    A.  Uh-huh.  (Indicates affirmatively.)
12    Q.  Can you add up the total amount of money that
13  you've been paid by Mr. Finkelstein's firm since 2003 in
14  connection with your work on the Neurontin litigation?
15    A.  Well, I can only -- I gave it to you here at
16  the end of the page, but I --
17    Q.  Oh, you do?
18    A.  Yeah, I can only give it to you through the
19  end of the third quarter.
20    Q.  Okay.  Thank you.
21        So to the end of the third quarter of 2007,
22  you've charged Finkelstein & Associates $617,518.18 for
23  your work in connection with -- with the Neurontin
24  litigation, correct?
25    A.  Yes.

Page 255

1    Q.  And are -- do you bill by the hour?
2    A.  Yes.
3    Q.  And are all -- does -- does this include your
4  time alone or other people's time as well?
5    A.  No, it's all PDG billing.
6    Q.  How many timekeepers have worked on the
7  Neurontin matter for the Finkelstein law firm?
8        MR. FROMSON:  Just note my objection as to
9    form, the use of the word "timekeeper."
10  BY MR. BARNES:
11    Q.  Do you know what a timekeeper is?
12    A.  Yes.
13    Q.  Do you have timekeepers?
14    A.  No.
15    Q.  Do you have people that -- do you bill on the
16  basis of an hourly rate?
17    A.  Yes.
18    Q.  Your timekeepers keep time records?
19    A.  Are we talking about employers -- employees?
20    Q.  Employees, yes.
21    A.  Yes, they keep records.
22    Q.  And -- and so they -- so each person working
23  on the Neurontin litigation would have to bill for their
24  time spent on the litigation, correct?  They would have
25  to tell you how much time they spent?

Page 256

1    A.  Right, they -- we bill everything on an hourly
2  basis.
3    Q.  Sure.
4    A.  Product development clients as well as
5  litigation, everything's billed the same rate.
6    Q.  So how many employees worked on the Neurontin
7  litigation at PDG, besides you?
8    A.  I'd have to check the records.
9    Q.  How much time did you personally spend on the
10  Neurontin litigation for the Finkelstein law firm?
11    A.  I -- I --
12    Q.  Are those records here?
13    A.  Our accountant is not here, but I would have
14  to access the accountant to tell me what percentage were
15  my hours.
16    Q.  Are there documents here at your firm which
17  breaks down the amount of time Cheryl Blume spent
18  working on the Neurontin litigation since 2003?
19        MR. FROMSON:  Just note my objection as to the
20    form of the question.
21        THE WITNESS:  I have no idea.  I have an
22    accountant who does all this.
23  BY MR. BARNES:
24    Q.  Well, you -- do you fill out a time sheet to
25  record the hours you spend working on Neurontin during

Page 257

1  the course of a -- of a month?
2    A.  Well, I do it by day, but what happens after
3  that, I have no idea.
4    Q.  Well, how do you record your time?
5    A.  I record it by the hour, and it's given to one
6  of the administrative assistants, and that somehow
7  translates into the accountant.
8    Q.  How many -- so if I asked you could you find
9  out how many hours Cheryl Blume has spent working on the
10  Neurontin litigation with Mr. Finkelstein and
11  Mr. Fromson's law firm, could you tell me?
12        MR. FROMSON:  Just note my objection to the
13    form of the question.  And to the extent that the
14    discovery of that information would impinge on the
15    agreement between counsel about expert reports, I
16    would object to it.
17        MR. BARNES:  Well, just the hour -- the hours
18    wouldn't be subject to it.
19  BY MR. BARNES:
20    Q.  But go ahead.
21    A.  I -- I don't know how it's done.  We have a --
22  a CPA that does our billing.
23    Q.  Can you -- can you estimate how many hours you
24  have worked since 2003 on the Neurontin litigation?
25    A.  No.

65 (Pages 254 to 257)

Page 294

1  are sufficient to have an event included in the
2  postmarketing section of the insert.
3      Q.  Isn't it --
4      A.  And that is my opinion with relating to
5  suicide events.
6      Q.  Isn't it true that you are of the opinion that
7  only a randomized controlled clinical trial can
8  establish that a drug causes an adverse event?
9      A.  Well, what I've testified in the past is there
10  is three ways it is recognized for causation:
11  Randomized clinical trial, if possible, which in this
12  case, of course, it isn't; secondly, epidemiologic data,
13  which unfortunately I couldn't find any significant
14  epidemiologic data with your client; and, thirdly, the
15  presence of rechallenge information.
16      Q.  Isn't it true that you've repeatedly stated
17  under oath in product liability litigation that the only
18  way to establish that a drug causes adverse event is
19  through a randomized controlled clinical trial?
20      A.  No, I've -- I've -- yeah, perhaps in one trial
21  I said that, but in most of the trials and the rest of
22  them, I've always included the epidemiologic data.
23          And if you want to cite one there that has
24  that, then I will get the rest of them that cite the
25  epidemiologic data and the presence of one.  Even one

Page 295

1  rechallenge event is sufficient to establish causation.
2      Q.  Okay.  I'm going to hand you -- mark this as
3  an exhibit to your deposition.
4          MR. FROMSON:  Just be -- be -- as a
5      precautionary measure, before you mark any
6      deposition exhibit that was referenced in any other
7      products liability litigation, do you have the
8      personal concern about any confidentiality or
9      protective orders about what you --
10          MR. BARNES:  It's trial testimony.
11          MR. FROMSON:  -- about what you have entered?
12      I'm not disagreeing with your -- your strategy
13      to use for cross, but you're saying this is trial
14      from those prior cases which is of public record?
15          MR. BARNES:  Yeah.
16          MR. FROMSON:  Okay.
17          MR. BARNES:  Yeah, yeah, here.
18          MR. FROMSON:  That's my concern.
19          MR. BARNES:  Show it to you.
20          MR. FROMSON:  Before you even show it to me, I
21      don't want to be involved with violation of a
22      protective order.
23          MR. BARNES:  Please mark this for the -- which
24      one did I hand you, Ken?  I want to make sure I
25      gave you the right one.

Page 296

1          MR. FROMSON:  Handed me -- I won't read the
2      title until you tell me it's the right one you want
3      to show me.
4  BY MR. BARNES:
5      Q.  Do you recall giving some testimony in court
6  in Philadelphia?
7          MR. FROMSON:  Do you have a copy for me or no?
8  BY MR. BARNES:
9      Q.  Do you recall testifying in connection with a
10  diet drug case in Philadelphia as to whether or not an
11  adverse event form could be relied upon to prove
12  causation?  Do you remember test- -- giving testimony to
13  that effect?
14          MR. FROMSON:  Just note my objection as to the
15      form, lack of foundation.
16          THE WITNESS:  You'll have to let me read it.
17      I did three or four diet drug litigations.
18  BY MR. BARNES:
19      Q.  Is it true -- isn't it true that you've
20  testified that causation can only be proved with
21  controlled clinical trials?
22      A.  They can be.  And I've also said that it can
23  be proved with epidemiologic and, in fact, one
24  rechallenge.  And I can give you the trial testimonies
25  where those were discussed.

Page 297

1      Q.  Turn to page 78.
2          MR. BARNES:  Counsel.  (Handing.)
3          MR. FROMSON:  Thanks.
4  BY MR. BARNES:
5      Q.  Hand you a transcript.  Try page 77.  Read
6  your testimony.  Tell me if that was your testimony in
7  the Seward (sic) trial.
8      A.  In the what trial?
9      Q.  In the Seward trial in 2002 in the Court of
10  Common Pleas in -- I'm sorry -- in the First Judicial
11  District of Pennsylvania Civil Trial Division, Court of
12  Common Pleas.
13          MR. FROMSON:  Just note my objection to the
14      form of the question and the usage of the
15      deposition exhibit.
16  BY MR. BARNES:
17      Q.  Turn to page 77, please.
18      "Question" -- actually, let's go to page 76,
19  line 25.
20      A.  I'm sorry?
21      Q.  Page 76, line 25 of the transcript.
22      A.  Okay.
23      Q.  This is a -- do you have it in front of you?
24      A.  76, 25.
25      Q.  Yeah.  Were you in -- were you testifying in

Page 298

1  Philadelphia in the Seward matter? And the date is
2  August 3, 2004.
3      A.  I think so. Let me -- let me see. This is a
4  deposition.
5      Q.  This is trial.
6      A.  Yes, I think.
7      Q.  You were retained by a Mr. Michael Miller &
8  Associates?
9      A.  Yes.
10     Q.  And you were testifying against Neurontin in
11  the -- against -- against Wyeth in the diet drug
12  litigation, correct? Do you remember being there on
13  that date?
14     A.  Yes.
15     Q.  Okay. Were the following questions and
16  answers given to you, given by you in this -- in this
17  trial? The question was put to you on page -- page 76,
18  line 25.
19     "You said AD -- ADEs do not prove causation.
20  All they prove is that you were on a drug at the time
21  the event occurred, correct?"
22     And "Answer: Causation is not necessary for
23  dissemination of information.
24     "Question: And, in fact, it's not what the
25  dissemination is about. The information is just

Page 299

1  disseminated to let people know what's going on. It
2  does not imply that one causes the other. That's what
3  I'm trying to say."
4      And your answer was: "The only way one is
5  able to say a drug causes an adverse event is to do the
6  controlled -- placebo-controlled trials. If you believe
7  that your drug product is causing a fatal or potentially
8  fatal event, it is very difficult to do a trial where
9  you ask the patients to go on that drug and see if the
10  event occurs relative to the patient taking the placebo.
11  That's why causality is not required.
12     "Question: Doctor, you certainly wouldn't
13  rely on adverse event forms to prove a -- prove a
14  connection between Pondimin and valve disease, right?
15     "Answer: I would repeat again that I would
16  not use these data to search as all companies do."
17     A.  "I would use these."
18     Q.  I'm sorry. I'm sorry.
19     "Answer: I would repeat again that I would
20  use these data to search, as all companies do, to search
21  for signals, to search for trends. And from there, you
22  can open up your investigation to include adverse event
23  forms, literature, other studies, et cetera.
24     "Question: I appreciate that you stand on
25  that, but I really want a yes or no.

Page 300

1      "Answer: I would use the adverse event forms
2  are generated and used by firms to track a signal.
3      "Question: There are -- yes or no, you would
4  not use an adverse event form to rely on to prove
5  causation, correct?
6      "Answer: Causation can only be proved with
7  controlled clinical trials."
8      Did I read that correctly?
9      A.  And I think you should continue.
10     MR. FROMSON: Well, let me just note my
11  objection to the use of the document.
12     THE WITNESS: It is -- it does say that. I
13  don't know if I said that, but I do go on and say I
14  can't answer it this way. And there is -- and you
15  know this is the case, because you mentioned
16  earlier Accutane depositions. I was very clear in
17  the Accutane depositions.
18     No, you cannot -- when I've given 20 depo --
19  20 trial testimonies and all but these say that you
20  need epidemiologic data to look at causation. FDA
21  says epidemiologic data can be used as causation
22  and FDA says that rechallenge data can be evidence
23  of causation. I would never disagree with the FDA.
24  All three of them can be used as evidence of
25  causation. Of course they can. FDA has said that.

Page 301

1      MR. BARNES: I'd move to strike that last
2  answer.
3  BY MR. BARNES:
4      Q.  My question was, did you give that testimony
5  and those answers, that I read to you, in August of 2004
6  in Philadelphia in the Seward case; yes or no?
7      A.  Well --
8      MR. FROMSON: No, hold on. Just note my
9  objection to the extent it's been asked and
10  answered and you moved to strike already that
11  portion that you believe is not responsive and
12  then -- just note my objection.
13     THE WITNESS: Answer?
14     MR. FROMSON: You can answer over my
15  objection.
16  BY MR. BARNES:
17     Q.  Did you give that testimony?
18     A.  I gave the --
19     MR. FROMSON: Hold on. What -- is there a --
20  hold on -- now you're asking another question.
21     MR. BARNES: Let's do this again.
22     MR. FROMSON: Okay.
23  BY MR. BARNES:
24     Q.  I said, have -- did you give that testimony,
25  that I just read to you, in Philadelphia in 2005 in the

76 (Pages 298 to 301)

Page 306

1  clinical trials. You can obtain evidence of
2  causation, but not generate causation in
3  epidemiologic trials and with rechallenge data.
4  BY MR. BARNES:
5  Q. Okay. Directing your attention -- your
6  attention to page 85 in the Seward trial. Do you have
7  that in front of you?
8  A. Yeah, it's the page we're on.
9  Q. Okay. Do you have that?
10  A. Yes.
11  Q. Okay. And you were -- this was the Seward --
12  Steward trial in the Court of Common Pleas,
13  Philadelphia, Pennsylvania, correct?
14  A. This is the same one we've been on, right?
15  Q. Yes, I'm laying -- yes.
16  A. Yes, it -- it's still in Pennsylvania.
17  Q. Yeah. And you -- and this was -- you appeared
18  at trial and testified under oath, correct?
19  A. Yes.
20  Q. At page 85, you were asked the following
21  question.
22  "Question: Are you trying to infer now that
23  title suspect medication and first causation between the
24  drug and the event?
25  "Answer: I have never said that causation can

Page 307

1  be generated in any way other than in controlled
2  clinical trials."
3  Is that what --
4  A. The only -- yes. And --
5  Q. Was that your test- -- was that your testimony
6  on that date?
7  MR. FROMSON: Objection as to the use of the
8  transcript. Improper use for impeachment purposes.
9  THE WITNESS: Yes, because you can only
10  generate causation data in animal models or in
11  controlled clinical trials with humans. You can
12  obtain causation data from epidemiologic data and
13  from rechallenge data either in case report forms
14  or postmarketing data. You can only generate it in
15  a controlled clinical trial.
16  BY MR. BARNES:
17  Q. So your -- your -- your -- your -- your
18  opinion now is that the word "generated" is -- does not
19  mean it's the only way that it can be made as to
20  controlled clinical trials? It's -- it's something
21  other than -- it's now something that is related to
22  something else?
23  MR. FROMSON: Objection. Misstates her
24  testimony.
25  THE WITNESS: FDA has three ways for

Page 308

1  causation.
2  BY MR. BARNES:
3  Q. I'm not talking about FDA.
4  A. I know, but I am a regulatory person. I
5  subscribe to what the FDA says.
6  You can obtain it from epidemiologic data, you
7  can obtain it from successful or positive rechallenge
8  data, and you can generate it at controlled clinical
9  trials.
10  I don't know how else to answer that. There
11  is three ways to get it and one rechallenge information
12  is evidence of causation when there is biologic
13  plausibility.
14  Q. Okay. Thank you.
15  Isn't it true that you've given testimony on
16  many occasions that the only way you can evaluate
17  causation between a drug and an outcome is through
18  controlled clinical trials?
19  A. You can evaluate the controlled clinical data
20  and look for causation if you have a difference relative
21  to placebo; that is true.
22  But you can obtain causation data from
23  well-controlled epidemiologic trials and from
24  rechallenge data. And I would point you to the FDA's
25  discussion of all three of those efforts.

Page 309

1  Q. Do you recall testifying in the case of
2  Diane Bice, Pamela Davis, and Stella Brooks vs. Wyeth
3  AERS Laboratory on videotape on August 23rd, 2004?
4  A. Can I -- I don't know the names of the
5  plaintiffs.
6  Q. Okay. Do you -- look at this, please, and
7  turn to page 2004.
8  And did you give -- at line 10 on page 104,
9  was the following question given to you and the
10  following answer was given back by you?
11  "Question: And you have said on many
12  occasions that the only way you can evaluate causation
13  between a drug and an outcome is through controlled
14  clinical trials?
15  "Answer: For efficacy, correct, and for --
16  well, for safety. Causation is safety as well as
17  efficacy. Strict causation would need a randomized,
18  perfectly-controlled group."
19  Did you give that answer?
20  A. Yes.
21  MR. FROMSON: Just -- hold on. Just note my
22  objection to the form of the question and the use
23  of the document. You can go ahead and answer over
24  my objection.
25  THE WITNESS: Is it okay to answer?

78 (Pages 306 to 309)

Page 318

1   A.  Well, I --
2      MR. FROMSON: Note my objection as to form.
3      THE WITNESS: Actually, I think it's a little
4   differently worded in the -- in the map. I think
5   it's just "psychiatric events."
6   BY MR. BARNES:
7   Q.  Okay.  Wait.  Right now, we've established
8   that suicide maps to suicidal and self-injurious
9   behavior, correct?
10  A.  Completed suicide as well as suicide attempt.
11  Q.  Okay. I want to focus on those two preferred
12  terms.
13     Okay. Completed suicide. My question is not
14  about psychobiologic adverse events. It's about
15  suicide, so I would like for you to answer the question
16  I asked -- I just asked you concerning did you find any
17  medical article published in the worldwide medical
18  literature that demonstrates that Neurontin causes
19  suicide?
20     MR. FROMSON: Just note my objection to form.
21     THE WITNESS: Well, we'll have to look through
22  each section. I recall the steps are in it for
23  reported suicide in a patient taking Neurontin.
24  BY MR. BARNES:
25  Q.  Causes suicide?

Page 319

1   A.  Well, we'll have to look through all the
2   articles. I don't know.
3   Q.  As you sit here today, can you identify a
4   single article in the worldwide medical literature that
5   demonstrate that Neurontin causes suicide?
6   A.  I would have to look through all the
7   literature. But sitting here, I don't -- I recall event
8   suicide -- events reported with Neurontin. I don't know
9   if anyone used the word "caused."
10  Q.  Well, you -- you --
11  A.  And it really isn't important for my opinion
12  relating to what should be in the labeling, in any
13  event, but I -- sitting here right now, I don't recall
14  anyone using the word "caused."
15  Q.  You would agree that the fact that someone has
16  a suicide while taking Neurontin doesn't mean that
17  Neurontin caused the suicide?
18  A.  All depends.
19  Q.  Well, I'm saying, as a general rule, is it
20  your testimony that simply because a patient commits a
21  suicide while taking Neurontin, that Neurontin caused
22  the event?
23     MR. FROMSON: Just note my objection as to
24  form.
25  BY MR. BARNES:

Page 320

1   Q.  Specifically?
2   A.  Again, I would have to see the information
3   regarding the patient. It would be -- I believe that
4   suicide -- that Neurontin causes suicide in some
5   patients, but I would need to see the events relating to
6   that patient.
7   Q.  So you would agree with my statement that
8   simply because a patient experiences a suicide, commits
9   suicide while on Neurontin, doesn't necessarily mean, in
10  your view, that Neurontin caused the suicide, correct?
11     MR. FROMSON: Note objection to the extent it
12  may have been asked and answered.
13     THE WITNESS: It would depend on the specifics
14  of the patients. Yes, I would agree with that.
15  BY MR. BARNES:
16  Q.  Okay.
17  A.  Yes.
18  Q.  So the fact that a report is made to the
19  company that a patient on Neurontin had a completed
20  suicide does not mean that the suicide was caused by
21  Neurontin, correct?
22  A.  Or that it was caused -- was or was not.
23  Q.  Correct.
24  A.  I can't tell without knowing the individual
25  data. But in neither case does it take away the need

Page 321

1   for having it in the label.
2   Q.  Well, we're not talking about the label.
3   We're talking about your --
4   A.  That's what I talk about.
5   Q.  No. Well, you -- there is two --
6   A.  That's why I'm here.
7   Q.  Well, then let's make -- are you expressing --
8   have you been asked to express an opinion that Neurontin
9   causes suicide?
10  A.  I have -- if you referred to No. 4 --
11  Q.  Okay. It's not the label, but this is -- this
12  is a question of cause and effect. Okay?
13  A.  Well, it's both. And for my purposes, they
14  connect together.
15  Q.  I'm breaking it down to two separate
16  questions. One is, the label is separate and apart from
17  the question of cause and effect. Scientific causation,
18  general causation, do you understand what that means?
19  A.  Yes.
20  Q.  I want you to address your -- your -- your --
21  your answers to -- to my question of causation with
22  respect to biological causation, which you have been --
23  which you have been proffered as an expert on, okay. It
24  has nothing to do with the label. We'll get to the
25  label tomorrow.

Page 330

1  Patient 23812, correct?
2      A.  23812.
3      Q.  Yeah.
4      A.  Uh-huh.  (Indicates affirmatively.)
5      Q.  And it was a patient who had psychosis,
6  correct?
7      A.  Yes.
8      Q.  Was -- and was -- and you believe the
9  narrative says "suicidal," correct?
10      A.  Yes.
11      Q.  And it was determined that the adverse event
12  was un -- was not -- was unlikely related to the -- to
13  Neurontin, correct?
14      A.  That's -- that's what the participating PI, I
15  believe, said.
16      Q.  And the patient had a history of depression,
17  correct; prior history of depression?
18      A.  Yes.
19      Q.  And the other two reports, 13775 and 33624,
20  those adverse events were determined to be definitely
21  not related to Neurontin, correct?
22      A.  70 -- well, the subjective opinion was 70163
23  is definitely not.  1702 (sic) is definitely -- oh, that
24  one's definitely.  Wait a minute.  17012 is definitely,
25  not definitely not.

Page 331

1      Q.  We've already established the other ones, and
2  I directed your attention to 13 -- Patient 13775 and
3  Patient 33624.
4         Those adverse events were definitely --
5  according to the investigator, were definitely not
6  related to the study of the drug Neurontin, correct?
7      A.  No, they say unlikely.
8      Q.  Unlikely.  I'm sorry.
9      A.  Well, that's not the same as definitely.
10      Q.  Well, definitely -- no, it says "definitely
11  not" on your own chart.
12         Did you prepare -- who -- is this one of your
13  charts or one of Mr. --
14      A.  Yeah, this says "unlikely" here.  What are --
15  what are you doing?
16      Q.  Patient No. 13775, my version, says
17  definitely -- "def not."
18      A.  Okay.  That was a fatal insulin overdose.
19  I -- I'm not even referring to that one.
20      Q.  Well, I am referring to that one.  I said
21  "13775."
22      A.  Okay.  13775 was a fatal overdose.
23      Q.  And that was definitely not related to the
24  study drug, correct?
25      A.  Probably not.  It was insulin.

Page 332

1      Q.  Okay.  And then 33624 is definitely not
2  related to the study drug as well, correct?  That was an
3  overdose, correct?
4      A.  Phenobarbital.
5      Q.  Right.  So in the STEPS report, five of the
6  six reports were either unlikely or definitely not
7  related to the study drug, correct?
8      A.  You're -- if you're combining those other two
9  in there, yes.
10      Q.  Any other reports that you rely on that you --
11  you say stand for the proposition that Neurontin causes
12  suicide in STEPS trials?
13      A.  Well, no, the next page is -- is different.  I
14  didn't include those.  Those are serious as defined by a
15  psychobiological event.
16      Q.  Okay.
17      A.  So those are -- are different than the ones on
18  the previous chart.
19      Q.  Let's go to the literature you cited,
20  page 181.  Do any of the articles on page 181 that
21  you've referenced state that Neurontin causes suicide?
22      A.  I don't know.  I was still working on your
23  last question, the proposition of suicide.
24      Q.  I've changed the question to -- I've changed
25  it to causes suicide.

Page 333

1      A.  Yeah, I would have to pull these articles out
2  and look.
3      Q.  Do you -- do you know, as you sit here today,
4  whether any of these articles state that Neurontin
5  causes suicide?
6      A.  I do not know sitting here and neither do I
7  say that in the paragraph.  I say it's describing
8  suicide behavior.
9      Q.  Okay.  And are the articles listed on 181, in
10  paragraph 281, do any of these -- does any of this
11  literature demonstrate that there is a
12  statistically-significant risk of suicide associated
13  with Neurontin?
14      A.  Yeah, I would have to review the literature.
15  I don't know how many patients are in here.
16      Q.  So as you sit here this afternoon, you cannot
17  tell me any of these articles you've reference show a
18  statistically-significant increased risk of suicide with
19  Neurontin, correct?
20      A.  No, these simply report those articles which
21  address suicide behavior associated with Neurontin.
22      Q.  So you have no idea specifically as to whether
23  any one of the events reported in these articles are --
24  were actually caused by Neurontin, correct?
25         MR. FROMSON:  Objection as to form.

84 (Pages 330 to 333)

Page 371

1                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2

3   In re:  NEURONTIN MARKETING, SALES MDL DOCKET NO:  1629
            PRACTICES, AND PRODUCTS
4           LIABILITY LITIGATION      Master File No. 04-10981

5   _____/

6   THIS DOCUMENT RELATES TO:

7        ALL PRODUCTS LIABILITY
         ACTIONS
8   _____/

9
         VIDEOTAPED
10  DEPOSITION OF:        CHERYL D. BLUME, Ph.D.

11  DATE:                November 13, 2007

12  TIME:                9:06 a.m. to 6:08 p.m.

13  PLACE:               13902 North Dale Mabry Highway
                         Suite 122
14                       Tampa, Florida

15  PURSUANT TO:         Notice by counsel for
                         Defendants for purposes
16                       of discovery, use at
                         trial or such other
17                       purposes as are permitted
                         under the Federal Rules
18                       of Civil Procedure

19  BEFORE:              VALERIE A. HANCE, RPR
                         Notary Public, State of
20                       Florida at Large

21                       Volume 2
                         Pages 371 to 722
22

23

24

25

Page 376

1  questions yesterday concerning your literature review?
2      A.  Yes.
3      Q.  And you did -- you testified that you did a
4  literature search with worldwide literature, correct?
5      A.  Yes. Yes.
6      Q.  And you had someone do that under your
7  direction, correct?
8      A.  Yes.
9      Q.  I asked you the question yesterday: "As a
10  result of your search, did you find any medical article
11  in the worldwide medical literature which found a
12  statistically-increased risk between Neurontin and
13  suicide or suicide attempt in the study?"
14      You said you would have to check.
15      Are you prepared to answer that question now?
16      MR. FROMSON:  Just note my objection as to the
17  form to the extent it may have misstated her
18  testimony yesterday.
19      THE WITNESS:  No, I did -- I did not check
20  them.
21  BY MR. BARNES:
22      Q.  Let me ask you the question today, because --
23  because I -- this is the only time Mr. Fromson is going
24  let me talk to you perhaps.  We'll talk later, but I
25  need an answer.

Page 377

1      Do you have -- do you -- can you identify any
2  published medical literature from your literature search
3  in the worldwide literature which found a
4  statistically-significant association between Neurontin
5  and suicide or suicide attempt?
6      MR. FROMSON:  Just note my objection as to
7  form of the question and to the extent it may have
8  been asked and answered yesterday.
9      THE WITNESS:  Sitting here now, I don't know
10  of any other than the ones that we discussed
11  yesterday.
12  BY MR. BARNES:
13      Q.  Well, no, the ones we -- we went through the
14  ones yesterday and you were not able to say yes that
15  they found a statistically-increased --
16  statistically-significant association between Neurontin
17  and suicide or suicide attempt, correct?
18      MR. FROMSON:  Objection as to form, misstates
19  testimony.
20      THE WITNESS:  ·Right.  The only one that I have
21  listed in the report that had any statistics was
22  the statistical significant difference with
23  completed suicides between gabapentin and lithium
24  in the McFarland article, and that does attain
25  statistical significance.

Page 378

1  BY MR. BARNES:
2      Q.  That's the only reference you can cite?
3      A.  Sitting here now, yes.
4      Q.  Is it your opinion that the McFarland-Collins
5  literature found that Neurontin was associated with a
6  statistically-significant association between -- strike
7  that.
8      Is it your testimony that the Collins and
9  McFarland article found a statistically-significant
10  association between Neurontin and suicide --
11      MR. FROMSON:  Objection.
12  BY MR. BARNES:
13      Q.  -- or suicide attempt?
14      MR. FROMSON:  Objection as to form and it's
15  compound and it was asked and answered yesterday.
16      THE WITNESS:  Well, I thought I described
17  yesterday that, the nature of the data.  But what
18  the data shows, it is not relative to baseline
19  data.  It is relative to patients who -- who are --
20  who are bipolar.  And compared with lithium, a drug
21  approved for that indication, there was a
22  significant difference between the two drugs and
23  completed suicide.
24  BY MR. BARNES:
25      Q.  But that is the -- that is the only data that

Page 379

1  you are aware of that showed any statistical analysis
2  between Neurontin and that was -- involving Neurontin --
3  and that involved Neurontin and another drug used for
4  the treatment of bipolar disease, correct?
5      A.  Yeah, it was --
6      MR. FROMSON:  Hold on.  Just note my objection
7  as to form.  Now he's asking any significant --
8  any bad actions.
9  BY MR. BARNES:
10      Q.  Statistically-significant difference
11  between -- well, strike that.
12      MR. FROMSON:  Thank you.
13  BY MR. BARNES:
14      Q.  The McFarland-Collins paper is the only
15  published medical literature that has any
16  statistically-significant assoc- -- study, and that was
17  between Neurontin and another drug lithium, correct?
18      A.  Correct.
19      Q.  It did not involve a study of Neurontin as
20  against placebo in a randomized controlled clinical
21  trial, correct?
22      A.  I know of no randomized placebo-controlled
23  trial that looks at suicide as an endpoint or that
24  showed any data with Neurontin.
25      Q.  So just let me follow up on that.  You -- in

3 (Pages 376 to 379)

Page 380

1  your review of the worldwide medical literature, you
2  concluded that there was no randomized trial that showed
3  a statistically -- randomized placebo-controlled trial
4  that demonstrated a statistically-significant
5  association between Neurontin and suicide, correct?
6      MR. FROMSON:  Just objection as to form to the
7  extent it may have been asked and answered
8  yesterday.
9      THE WITNESS:  Well, in my review of the
10  worldwide literature, I have never seen a
11  placebo-controlled trial in which suicide was an
12  endpoint.  And, specifically, I have never seen a
13  placebo-controlled trial that looked at suicide
14  related to Neurontin as its statistical endpoint.
15  BY MR. BARNES:
16     Q.  You would agree that in the randomized
17  controlled clinical trials involving Neurontin, there
18  was no -- they did not find a statistically-significant
19  association between Neurontin and suicide or suicide
20  attempt, because there are randomized controlled
21  clinical trials, correct?
22     A.  Designed to look at specific endpoints.  And
23  while I'm -- while those trials were not designed and
24  could not be designed to use suicide as an endpoint,
25  those trials did not find a significant increase in

Page 381

1  suicide between Neurontin and baseline, but they weren't
2  designed to do that either.
3      Q.  Be that as it may, there are randomized
4  controlled clinical trials that have looked at
5  Neurontin, correct?
6      A.  Yes, there were randomized trials we discussed
7  yesterday in association with its two indications, yes.
8      Q.  And those trials did not provide any evidence
9  of statistically-significant increased risk of Neurontin
10  and suicide or suicide attempt, correct?
11     MR. FROMSON:  Objection as to form.
12     THE WITNESS:  No, they weren't -- weren't able
13  to do that and did not do that.
14  BY MR. BARNES:
15     Q.  So you would agree with my statement that
16  there was no finding of a statistically-significant
17  increased risk of Neurontin in suicide in the randomized
18  controlled clinical trials involving Neurontin, right?
19     MR. FROMSON:  Objection, asked and answered.
20     THE WITNESS:  Yes, the studies weren't
21  designed to do that, could not see it, and did not
22  see it.
23  BY MR. BARNES:
24     Q.  Did not see it?
25     A.  Yes.

Page 382

1      Q.  Okay.
2      THE REPORTER:  Could you all speak a little
3  slower, please.
4      MR. BARNES:  Did you catch that?
5      THE REPORTER:  Yes.
6      MR. BARNES:  Okay.
7  BY MR. BARNES:
8      Q.  Now, I asked you yesterday -- you described
9  your method for that's how you looked at causation in
10  this case.  Do you remember that testimony yesterday?
11     A.  Yes.
12     Q.  And -- and you identified that FDA had
13  found -- that FDA -- that there was an FDA reference
14  which basically approved your method of determining
15  that -- that Neurontin causes suicide.  Do you remember
16  that testimony?
17     MR. FROMSON:  Note my objection as to form.
18     THE WITNESS:  Well, I'm fairly confident I
19  didn't say that FDA approved of my specific
20  Neurontin -- specific method for looking at
21  Neurontin, because I've never shared my Neurontin
22  method with FDA.
23  BY MR. BARNES:
24     Q.  Well, then I may have misunderstood your
25  answer.

Page 383

1      You -- you described yesterday how you
2  inferred that Neurontin causes suicide.  Do you remember
3  us discussing that yesterday?
4      MR. FROMSON:  Objection as to the form.
5      THE WITNESS:  I recall that discussion.
6  BY MR. BARNES:
7      Q.  Okay.  Let me go back just to make sure I
8  understand your testimony.
9      We've agreed that there is no randomized
10  clinical trial data that you rely on in forming your
11  opinion, correct?
12     A.  Well --
13     MR. FROMSON:  Hold on.  Objection as to form,
14  asked and answered.
15     THE WITNESS:  Yes, I -- I agree there is no
16  randomized trials with an endpoint of patients
17  committing suicide.
18  BY MR. BARNES:
19     Q.  So that has been -- that demonstrates that
20  Neurontin is associated with suicide, correct?
21     A.  Yeah, I --
22     MR. FROMSON:  Objection as to form, asked and
23  answered.
24     THE WITNESS:  I can be even broader.  I know
25  of no randomized trial where ever -- ever anyone

4 (Pages 380 to 383)