1    attempted to use suicide as an endpoint.
2    BY MR. BARNES:
3    Q.  You agree that suicide has been analyzed in
4    the randomized clinical trials?
5    A.  Yes, but that's a different question.
6        MR. FROMSON:  Objection as to form.
7    BY MR. BARNES:
8    Q.  I know, but you understand that, don't you?
9        You may answer.
10       MR. FROMSON:  The question is: "You
11   understand that, don't you?"  I have an objection
12   as to form.
13       THE WITNESS:  I understand that in trials
14   designed for an -- as the endpoint, adverse events
15   are reviewed.  And among those adverse events were
16   psychological biological events and suicide.
17   BY MR. BARNES:
18   Q.  Yeah, and there were -- and -- and those
19   trials did not demonstrate any statistical association
20   between Neurontin and suicide, right?
21       MR. FROMSON:  Objection as to form, asked and
22   answered.
23       THE WITNESS:  Yeah, I think I've answered that
24   already.  The answer is the same answer, the trials
25   weren't designed to examine statistical

1    significance in suicide, did not see a statistical
2    significance in suicide.
3    BY MR. BARNES:
4    Q.  Okay.  Now, I'm going to come back to the
5    mechanism question in a minute, but let's -- let's go on
6    to Mr. Altman.
7        You stated yesterday that Mr. Altman's methods
8    for analyzing postmarket data had been approved by the
9    Food and Drug Administration, and specifically his
10   analysis on 194.  Do you remember that testimony?
11       MR. FROMSON:  Just note my objection as to the
12   form to the extent it misstates her testimony
13   yesterday.
14   BY MR. BARNES:
15   Q.  If I misstated it, I'm trying to orient you to
16   our discussion.
17   A.  I'm sorry.  On page 194?
18   Q.  194, yes, ma'am.
19   A.  Page?
20   Q.  Page 194.
21   A.  Well, we have paragraphs 194 too.
22   Q.  Page 194.
23       Okay.  Are you aware -- okay.  You stated
24   yesterday that that analysis had been provided to FDA
25   through PDG and that FDA had reviewed it and approved

1    that method for analyzing postmarket data.  Do you
2    remember that testimony yesterday?
3        MR. FROMSON:  Just note my objection as to the
4    form.
5        MR. BARNES:  Just say "Objection, form."
6    Okay?
7        MR. FROMSON:  Well, the problem is that you're
8    saying that this chart was analyzed and had
9.   actually -- this chart itself was provided --
10       MR. BARNES:  The method.  The method.  The
11   method.
12       MR. FROMSON:  That's not what you asked when
13   you said is this chart was analyzed and provided to
14   the FDA.  And that's why --
15       MR. BARNES:  Let me ask it again.
16       MR. FROMSON:  -- I have an objection.
17       MR. BARNES:  Let me ask it again.
18   BY MR. BARNES:
19   Q.  The method --
20       MR. FROMSON:  That's a different question.
21   BY MR. BARNES:
22   Q.  -- that was employed in that chart.  Okay?
23       You testified yesterday that the method
24   employed by Mr. Altman in creating that chart had been
25   submitted to FDA and approved by FDA, yesterday,

1    correct?
2        MR. FROMSON:  Just note my objection to form.
3        THE WITNESS:  Well, let me review what I did
4.   say yesterday.
5    BY MR. BARNES:
6    Q.  Okay.
7    A.  I talked yesterday that -- discussed with you
8    yesterday that Mr. Altman's analyses of postmarketing
9    databases have been included in NDAs, reviewed by FDA,
10   and those analyses have been part of an approved new
11   drug application.
12       When I discussed PRR ratios yesterday, the
13   example that I gave is that PRR ratios are in the FDA's
14   review of the Baycol data in comparing Baycol fatalities
15   with other statin fatalities.
16       MR. BARNES:  Read back that last answer,
17   please.
18       (The reporter read the portion requested.)
19   BY MR. BARNES:
20   Q.  Okay.  Just so I understand.  Did FDA issue to
21   you any communication, written or oral, where they
22   stated they had reviewed and accepted Mr. Altman's work
23   on postmarket data in connection with NDAs that your
24   firm filed with the Food and Drug Administration?
25   A.  Maybe I need to explain the way the new drug

Page 392

1    A.   Right.
2    Q.   All right. Well, my request is of you to
3 produce that information, and it's up to you to deal
4 with Dr. -- Dr. Wolfson, but I will take that up with
5 counsel.
6        Okay. Now, so your -- your belief is FDA is
7 quite firm in getting -- in letting you know what they
8 don't like about an NDA and make sure it's documented on
9 the record? Is that what your testimony is?
10       MR. FROMSON: Just note my objection as to
11 form.
12       THE WITNESS: Yeah, my experience with FDA is
13 it's never been shy or a bit reticent to share with
14 you what they don't like or don't agree with an
15 NDA.
16 BY MR. BARNES:
17   Q.   And what they want to see in the NDA?
18   A.   Oh, of course.
19   Q.   And how -- and -- okay. Then we'll get back
20 to that in a second. One other question on this.
21       You mentioned that in answering some of my
22 questions earlier this morning about -- about suicide
23 was not a endpoint for the analysis of some of the
24 efficacy studies. Do you remember those -- those
25 answers?

Page 393

1    A.   Yes.
2    Q.   Do you believe that the only way you can find
3 statistical significance in a randomized controlled clinical trial is if that adverse
4 event is an a priori or an endpoint established in the
5 design of the study?
6    A.   No.
7    Q.   Okay. So you understand that they can look
8 for other endpoints and draw -- make statistical
9 analysis as to whether or not there's a
10 statistically-increased risk between an endpoint and an
11 adverse -- in a medicine, even though it's not an
12 official endpoint of the study?
13   A.   If the study was powered, population powered,
14 and controlled and designed to -- to look at that, to
15 look at a secondary endpoint, yes.
16   Q.   Okay.
17   A.   But it has to be adequately powered to show
18 that.
19   Q.   Okay. Thank you.
20   A.   Which these were not.
21   Q.   What number would be necessary, in your
22 judgment? How -- how many patients would be in the
23 study? And tell me how you derive that.
24   A.   Well, I would -- I would -- as I said

Page 394

1 yesterday, I would deal with a biostatistician on these
2 issues and I would -- if I were going to attempt to
3 answer that question, I would provide that statistician
4 with all available information that I have, baseline
5 data, and the disease state, data with drugs of similar
6 mechanism of action, and then define -- depending on
7 whether we were looking at completed suicide or suicidal
8 behaviors, either suicidal, whatever behavior, I would
9 provide all that information to him or to her and to ask
10 for an estimate in population size.
11   Q.   Thank you.
12       I take it you can't give me the basis for the
13 formula to determine that number here today; you'd have
14 to -- you'd have to work with a biostatistician?
15   A.   Oh, as I said yesterday, yeah, that requires a
16 biostatistician to do that.
17   Q.   Now, is it your testimony that the only way to
18 determine if there is a statistically-significant
19 increase in suicides is by looking at suicide data?
20       MR. FROMSON: Objection as to form.
21       THE WITNESS: Is the only way to see if there
22       are statistically-significant increases in
23       patients -- people committing suicide is to look at
24       data in people who have committed suicide?
25 BY MR. BARNES:

Page 395

1    Q.   Correct.
2    A.   Well, I guess if your endpoint would be
3 completed suicide, you would need to have data on
4 completed suicide. If your data were parameters that
5 are believed to be contributory or to be precedent
6 events to suicide, then you could look at populations
7 who were differences in populations, extent of those --
8 those symptoms, as well as the various suicide or
9 pro-suicidal behaviors.
10   Q.   Let's look at suicide though.
11       In order to determine there is a statistic
12 significant increased risk in suicides, you would have
13 to look at suicide data in controlled clinical trials,
14 correct?
15   A.   If you're asking me if --
16   Q.   Suicide, not -- not -- not what you believe to
17 be surrogates or midpoints. I'm talking about suicides.
18   A.   If you're asking whether the only way to find
19 out if there is statistically increases in suicide, in
20 actually patients committing suicide, you would need to
21 examine patients who are committing suicide. However --
22   Q.   How about suicide attempts?
23   A.   Then you could -- well -- well, suicide
24 attempts, you could look at patients who were -- I guess
25 you could define the criteria for suicide attempts. And

Page 400

1    Q.  Why is it important to do those calculations
2  to rule out the effect of chance between an exposure and
3  an outcome in a -- in a rigorous scientific way?
4    A.  Well, for -- of course -- of course, these
5  criteria are different for efficacy and for safety.
6    Q.  Let's do safety, please.
7    A.  Trying to think when we -- when we developed
8  the integrated summary of safety, integrated summary of
9  safety prevents -- presents all -- all safety data.
10       And I don't know if I've ever included in an
11  ISS statistical endpoints about relatedness or
12  associatedness, so that -- it's not required for a
13  safety data.  I mean, I guess from a theoretical
14  viewpoint, if you had a true placebo group in a
15  randomized placebo-controlled study and that study were
16  adequately powered to detect statistical significance,
17  you might find some worthwhile information if you
18  conducted statistics around it.
19       The problem is, with controlled clinical
20  trials, that they're designed for efficacy endpoints and
21  most of them are clearly inadequate to detect safety
22  endpoints, because when you're doing the study, you have
23  no idea what the safety endpoints are going to be.
24       So I -- I don't see the significance --
25  generally don't see the statistical significance applied

Page 401

1  to the safety endpoints that are applied to the efficacy
2  endpoints, unless the study is specifically designed in
3  population number to take that into consideration.
4    Q.  Well, how do you determine the strength of an
5  association on the safety endpoints?
6    A.  Well, if you look at the way we -- we create
7  the summary tables, we will list all safety events that
8  are reported and then we will take -- we will reduce the
9  main database down to look at those events that have
10  some degree of associate -- if this is required, some
11  degree of associatedness.  And then we will look at the
12  different degrees, however the protocol find those
13  degrees.
14       But the main step is to present all the safety
15  data.  And then if enough data are available to make it
16  meaningful, you can whittle it down by the individual
17  components.
18    Q.  Do you use any statistical methods in
19  conducting that analysis?
20    A.  Well, as I said earlier, I recall one protocol
21  in which we pulled all the events that had an
22  associatedness rating by the principal investigator and
23  compared those.
24       I don't recall any study -- ever doing any
25  studies where we compared them between or among the

Page 402

1  groups slightly related, maybe related, possibly
2  related, but I do recall one instance where we took them
3  all, some of them together, and compared it.
4    Q.  Now, you're aware that review of data can be
5  economically biased, correct, in -- in where the
6  study -- study is conducted?
7    A.  Yes.
8    Q.  Okay.  Do you agree that before you can assess
9  cause-and-effect relationships, you must show that the
10  association is not explained by bias?
11       MR. FROMSON:  Just objection as to form.
12       THE WITNESS:  Yes, I think you need to address
13  bias.
14  BY MR. BARNES:
15    Q.  How do you define bias?
16    A.  A bias is a -- some sort of -- let's see.  A
17  propensity to look for or assess an event that may be
18  impacted by issues other than the study design.
19    Q.  What is selection bias?
20    A.  That patients are enrolled in a study and this
21  allows an enriched population.  For example, if we're
22  going to do a bipolar study and we rule out anyone who
23  presents with depression at the time we're going to
24  initiate the study, that would be an enrollment bias.
25    Q.  So it refers to the error in an observed

Page 403

1  association that was due to the method of selection of
2  cases and controls for the exposed/unexposed populations
3  in the study?
4    A.  Well, for a selection bias, it would be.
5  There can be execution biases as well.
6    Q.  Well, I asked you about selection bias, right?
7    A.  Selection bias would be an example of where
8  the enrollment could lead to a -- yeah, could lead to a
9  propensity to see an affected one and not the other.
10    Q.  So it would -- it would lead to a inaccurate
11  or a biased result, correct?
12    A.  Well, either way.  It could lead to an
13  exacerbation of an event or diminution of an event.
14    Q.  Right.
15       And then you referred to execution bias.  What
16  is execution bias?
17    A.  Well, if a person would design a study and not
18  have a blinded study and the patients knew they were
19  getting a placebo and the other patients knew they were
20  getting a real one, a hypertensive, the blood pressure
21  measurements you took at the end of the study would be
22  biased because those patients who were receiving placebo
23  would be more anxiety ridden and their blood pressures
24  would be increased by the execution of the study.
25    Q.  What is information bias?

9 (Pages 400 to 403)

Page 408

1    increased result.
2    BY MR. BARNES:
3    Q. A biased result?
4        MR. FROMSON: Objection, asked and answered.
5        THE WITNESS: Is it a more informed result or
6    is it a biased result, I don't know.
7    BY MR. BARNES:
8    Q. It can be either one, in your view?
9    A. Yeah, I guess. I mean, I don't know if it's
10   necessarily biased if somebody knows something about a
11   drug that hadn't been told to them in the past.
12   Q. What have they published on notoriety bias?
13   Why -- where are there -- what does Dr. Strom mention in
14   his book?
15       MR. FROMSON: Objection, form.
16       THE WITNESS: Because I think you need to be
17   aware of it. I just don't know if it's always a
18   false bias.
19   BY MR. BARNES:
20   Q. It's not always, but it can be?
21   A. Can be. But it could be just a more informed
22   bias from information previously --
23   Q. How would you --
24   A. -- not provided.
25   Q. And -- and -- and how would you measure that

Page 409

1    as a -- as a -- as a scientist? Can -- are there ways
2    you can look to see what the effect is of notoriety bias
3    on a result?
4    A. Gee, that's an interesting question. I mean,
5    I guess a study could be conducted if you were able to
6    access the people, prescribers, who reported an event
7    following a public announcement and asked them, queried
8    them for their reasoning for reporting these events and
9    whether this report was considered to be -- occurred
10   simply because they recognized that the event was now
11   associated with the product.
12   Q. What -- what is a confounding factor?
13   A. With respect to?
14   Q. Just definition of a confounding factor in
15   any -- any -- any study.
16   A. A factor that may impact the -- either a
17   primary or a secondary observational endpoint.
18   Q. What are -- in terms of looking at a question
19   regarding suicide, can you identify some confounding
20   factors that we'd have to consider?
21   A. Are we talking about in a controlled clinical
22   trial?
23   Q. Let's start with controlled clinical trial.
24   A. Well, in a controlled clinical trial, you
25   would attempt to remove that bias by being able to

Page 410

1    randomize and stratify the patient. You would ask your
2    study design experts and psychiatrists, or perhaps the
3    neurobiologists, who were designing the study what
4    confounding factors would impact suicide. And then you
5    would take care to stratify those events between the
6    groups, among the groups.
7        That would include precedent events that are
8    likely associated with suicide, those patients who may
9    have had an event in their life, a lifestyle event that
10   could impact their potential to commit suicide. So we
11   would have other drugs that may be on which would
12   reflect either an increased propensity for suicide, if
13   they've been in a traumatic accident that may have
14   impacted central nervous system function. I guess if --
15   you would stratify them if -- for their use of abused
16   drugs or alcohol.
17   Q. How about in am epidemiologic study that was
18   not a controlled clinical trial; placebo-controlled
19   randomized clinical trial?
20   A. Well, in a -- you can -- you can attempt to
21   control for it in one of two ways.
22       In a cohort study, you can elect that you're
23   only going to study patients who fall or don't fall
24   within certain groups. And cohort, you're going
25   forward, so you can better control for confounding

Page 411

1    events.
2        In a case series, you can filter the database
3    to look at all data and then begin -- when known -- and
4    then begin to filter out those events that you know of
5    between or among the treatment groups.
6    Q. Do you agree that it's important to -- well,
7    why is it important to control for confounding factors,
8    that you identified, in both randomized clinical trials
9    and in other epidemiological studies?
10   A. Well, if you're attempting to look at whether
11   a drug has a certain effect or whether a subgroup has a
12   certain response to a drug product, whether a drug has a
13   certain adverse event, if you know that other events or
14   life events or physiologic events, biochemical
15   pharmacologic events could impact that potential
16   endpoint, then it -- then it is appropriate to try to
17   control for that among your groups.
18   Q. Do you believe that -- that it's -- that in
19   order for an association to be valid, that you have to
20   determine that it cannot be explained by bias?
21   A. That order for an association to be valid.
22   That's -- I don't know how to answer that.
23   Q. Well, you've written it --
24   A. That's so open-ended, I don't know how to
25   answer that.

11 (Pages 408 to 411)

Page 468

1  MR. FROMSON: Hold on. Hold on. Just note my
2  objection as to the form of the question.
3  THE WITNESS: Okay. So what I'm seeing here
4  is that all -- from the moment it was marketed, at
5  all points in time, completed suicides were in the
6  internal Pfizer database. Completed suicides
7  beginning fourth quarter of '94. I don't know
8  where the other data are. But at all points, we
9  never returned to baseline, indicating that every
10 time an event was tagged, there was a completed
11 suicide added.
12 BY MR. BARNES:
13 Q. Okay. And -- and -- and -- okay.
14 A. So it -- so that's -- that's point number one.
15 That's what I would see in it.
16 At the beginning of '94, it tends to go down
17 for a couple of quarters and kind of evens off. Little
18 blip in '97. Kind of evens off again. Maintains itself
19 at around this 0.05 percent baseline and starts to
20 increase in Quarter 2, and continues to increase after
21 that.
22 I'm just surprised, because at every quarter
23 there had been a complete -- according to this,
24 completed suicides in their internal database.
25 Q. Okay. In 2 -- in 1994, fourth quarter of

Page 469

1  1994, the percentage of completed suicides in the Pfizer
2  Neurontin database was one-tenth of one percent of all
3  adverse reaction reports, correct?
4  A. Yes.
5  Q. Okay. And over the next ten years, the
6  maximum percentage was 0.35 percent -- completed
7  suicides constituted 0.35 percent of all adverse
8  reactions for Neurontin in the Pfizer database, correct?
9  A. Based on this, yes.
10 Q. Okay. And this is from Mr. Altman, correct?
11 A. Yes, I --
12 Q. You have no reason to doubt the accuracy of
13 these statistics that are quoted -- that are depicted in
14 Mr. Altman's graph on Exhibit 12, P -- plot captioned
15 "PRR Over Time, Completed Suicide (PT)" in Exhibit 12,
16 correct?
17 A. No, there appears to have been -- at each
18 reporting period, additional completed suicides were
19 entered into the database.
20 Q. And at no point did it exceed 0.35 percent of
21 the internal Pfizer database for Neurontin, correct?
22 A. The last point that I see is at 0.35.
23 Q. I want you to go to Exhibit 18, if you would.
24 Or do it -- let me ask you this.
25 Do you see a signal at any point in time in

Page 470

1  this data?
2  A. Well, yeah, you have completed suicides at
3  every point of the measurement.
4  Q. But you would agree that the population using
5  Neurontin during this period of time was a population
6  that was obviously high risk for suicide or suicide
7  attempt, correct?
8  A. Are you referring -- to what population, the
9  labeled or the multiple unlabeled events, multiple
10 unlabeled populations?
11 Q. We'll do labeled first.
12 Do you agree that people for the labeled
13 indication of for epilepsy, adjunctive therapy for
14 epilepsy, as you've described, are at higher risk for
15 attempted suicide and completed suicide when compared to
16 the general population?
17 A. Well, I think that epilepsy patients are at
18 higher risk for suicidal behavior. I can't parse it
19 between completed and suicidal behavior, but I think
20 they are, yes.
21 Q. Okay. So it would -- it would not be
22 surprising to you that in a population of -- of patients
23 taking Neurontin for epilep- -- for epileptic therapy,
24 that you would have completed suicides reported in the
25 adverse event database for Neurontin, at Pfizer,

Page 471

1  correct?
2  A. Well, I don't know. You know, I'm -- the fact
3  that you have it at every reporting period, it doesn't
4  ever seem to go away. And the fact that it -- what I'm
5  surprised at is that it wasn't shared with the medical
6  community --
7  Q. Well --
8  A. -- that you had completed suicides at every
9  period and that it wasn't in the label --
10 Q. What's your threshold --
11 A. -- as completed suicide.
12 Q. What is your threshold for a signal?
13 A. Anything that makes you look differently.
14 And why -- why I see this as a signal is, the
15 first thing that I noticed when you showed it to me is
16 that you had a completed suicide at every reporting
17 period. To me, that's a signal.
18 Q. Okay. Now, where is that definition of the
19 signal contained in the published medical literature?
20 A. Well, F -- FDA's definition of a signal is
21 very vaguely defined -- defined as anything that catches
22 your attention or makes you look differently at
23 something.
24 Q. So it's -- it's your testimony that the fact
25 that in the population of patients taking Neurontin,

26 (Pages 468 to 471)

Page 472

1  labeled and unlabeled, that the fact that they had
2  reports in every quarter on Mr. Altman's graph
3  constitutes a signal?
4        MR. FROMSON: Just note my objection as to the
5  form.
6        THE WITNESS: Yeah, it's a signal that they
7  needed to something differently.  They had that
8  report in every reporting period.  They never went
9  to baseline.
10 BY MR. BARNES:
11     Q.  You would agree that the population of
12 patients using Neurontin for off-label uses were also --
13 had significantly increased risk for suicide compared to
14 the general population, correct?
15     A.  I would think that some of the populations
16 that they were used for off-label would be at an
17 increased risk.
18     Q.  Which populations?
19     A.  The schizophrenic, the bipolar.  My -- those
20 are the first two that come to mind would be.
21     Q.  What about chronic pain?
22     A.  I think that -- yeah, I think chronic pain can
23 be added to that list.  Yeah.
24     Q.  How about the social phobia?
25     A.  Yeah.  Now, that, I don't know.  I don't know

Page 473

1  whether they're at a specifically higher risk for it or
2  not.  I don't know.
3        Q.  So what did -- so can you define for me -- so
4  quantitatively, can you define for me the threshold for
5  a signal in Mr. Altman's PRR over time analysis depicted
6  in Exhibit No. 12?  Is there a quantitative threshold
7  that you would identify as -- as constituting the signal
8  or is it just eyeballing that data?
9        MR. FROMSON: Objection as to form to the
10 extent already asked and answered.
11       THE WITNESS: Well, as I said, the signal for
12 me was that it was always reported.  It's -- it's
13 fairly steady at 0.05 percent until second quarter
14 of 2002.  Goes from 0.05 to -- looks like 0.11, so
15 there is a twofold jump there.  Then it jumps again
16 twofold at -- I don't know.  Somewhere, I guess, in
17 2003 there is a -- looks like there is a second
18 blip up.
19 BY MR. BARNES:
20     Q.  All right.  Let me ask you this.
21       So this is a -- a cumulative events, number of
22 reports -- the one you're looking at here, "PRR Over
23 Time" is a cumulative chart of reports, correct?
24     A.  I have no idea.
25     Q.  You have no idea?

Page 474

1        A.  I don't know.
2        Q.  You still wouldn't -- and you still wouldn't
3  say it constitutes a signal just from looking at the --
4  at the plot?
5        A.  Well, I asked.  I said, "Is this saying that
6  there has been reports every quarter?"
7        Q.  Well, assuming this is a cumulative report?
8  And I -- and I believe that's the representation of --
9  of counsel, that this represents a cumulative list of
10 reports of completed suicides.
11     A.  I don't know.  You know, I --
12     Q.  This is a cumulative report, correct?
13       MR. ALTMAN: Which exactly one are we talking
14 right now?
15       MR. BARNES: This one right here, Exhibit 12.
16       MR. ALTMAN: Well, that's percentages, so
17 you're not talking numbers of reports in that at
18 all.  You're not talking --
19       MR. BARNES: This is a cumulative -- this is a
20 cumulative plot though, correct?
21       MR. ALTMAN: But it's just percentages.
22       MR. BARNES: I understand that.
23       MR. ALTMAN: You're not talking numbers of
24 reports.
25       MR. BARNES: It's percentages.  It's the

Page 475

1  percentages.  But this reflects -- this is a
2  percentage of cumulative reports as a -- as a
3  percentage of events in the -- for Neurontin in the
4  Pfizer database, correct?
5        MR. ALTMAN: Correct.
6        MR. BARNES: Okay.  So it -- so if you have --
7  if you have -- just so I understand, if you have
8  one report in the first quarter of 1994, it would
9  remain as an event in the numerator the entire --
10 the entire time of your analysis, correct?  It
11 doesn't drop out?
12       MR. ALTMAN: That's correct.
13       MR. BARNES: Okay.  That's what I wanted --
14       THE WITNESS: Okay.  So what that means is --
15 BY MR. BARNES:
16     Q.  Well, let -- let me just ask my question.
17       So if you're looking at a cumulative number
18 of -- of reports, the plot will never go to zero if you
19 simply have one completed suicide, correct?
20     A.  If it's cumulative, it will not go to zero.
21 But what we're seeing is it's keeping pace.  In here,
22 this is all kind of a steady line, a steady line, which
23 means I'm assuming your overall adverse reactions are
24 increasing at each reporting period.  And if the number
25 is maintaining the same, then that means there has to be

27 (Pages 472 to 475)

1 a number -- an increase in the number of completed
2 suicides.
3     Q. You -- you -- you would that from this chart,
4 you have 0.10 percent in the first quarter of 19 --
5 199- -- fourth quarter of 1994, correct?
6     A. Correct.
7     Q. And that is one-tenth of one percent of all
8 reports in the Neurontin database for completed
9 suicides, correct?
10     A. Right.
11     Q. And then eight years later, the fourth quarter
12 of 2002, the percentage of completed suicides in the
13 Pfizer database has dropped by over half. It's now
14 0.5 -- 0.05 percent, correct. It's one -- it's less
15 than -- it's more than one-half -- it's -- well, it's
16 almost a -- it's more than a 50 percent drop from 1994,
17 correct? It's decreased over time, right?
18     A. The percentage has decreased over time, but
19 it -- there is a plateau, meaning the number of reports,
20 not percent -- you count number of reports -- has kept
21 pace or is proportional to the increase in the number of
22 overall adverse events.
23     Q. Here is my question. In 2000 and -- in 1994,
24 fourth quarter, the percentage of completed suicides in
25 the Pfizer database is 0.12 percent, correct?

1     A. Okay.
2     Q. And in the fourth quarter of 2002, the
3 completed -- the percentage of completed suicides in the
4 Pfizer database is less than 0.05 percent, correct?
5     A. Okay.
6     Q. Is that correct?
7     A. Well, at some points it's 0.05.
8     Q. I'm saying in the fourth quarter of 2002, it's
9 less than 0.05 percent, correct?
10     A. Okay. It is -- yes, it's a little bit under
11 0.05.
12     Q. It is less than 0.05 percent, correct?
13     A. Okay.
14     Q. Is that correct?
15     A. It is below the line. Slightly below the line
16 of 0.05.
17     Q. Okay. That's all I'm asking. Is it below
18 0.05 percent?
19     A. Yes.
20     Q. Okay. So you would agree with me that as
21 of -- in terms of a percentage, the report -- the
22 percentage of completed suicides between fourth quarter
23 of 1994 dropped by over half between 1994 and the end --
24 the end of 2002, correct?
25     A. I would agree that that percentage has

1 dropped.
2     Q. And then after 2002, you have the effective
3 notoriety bias that we discussed yesterday, correct?
4         MR. FROMSON: Objection as to form.
5         THE WITNESS: In 2002?
6 BY MR. BARNES:
7     Q. After 2002.
8         MR. FROMSON: Objection as to the form using
9     the -- it's vague as to timeframe.
10 BY MR. BARNES:
11     Q. After the fourth quarter of 2002, you became
12 concerned, in part, about the effective notoriety bias
13 in the -- in the adverse event databases that you were
14 reviewing, correct?
15         MR. FROMSON: Objection as to form, misstates
16     her testimony and just --
17         MR. BARNES: The testimony is what the
18     testimony is and we'll go back to it if you want
19     us to, but you want to go off the record and we'll
20     find it.
21         MR. FROMSON: I think we can go off the record
22     and clear up the clari- -- the clarification.
23         MR. BARNES: Don't need to. Your speaking
24     objections --
25         MR. FROMSON: I haven't made a speaking

1     objection.
2         MR. BARNES: You just did.
3         MR. FROMSON: You're speaking and I'm simply
4     responding. Objection is to counsel's testimony.
5         MR. BARNES: "Objection" is fine.
6 BY MR. BARNES:
7     Q. You may answer the question.
8     A. Here is what I see.
9     Q. I didn't ask what you see. I'm asking my
10 question. You can give the answer.
11         Isn't it true that after the fourth quarter of
12 2002, you -- you have identified a introduction of
13 notoriety bias into the postmarket surveillance
14 databases, correct?
15         MR. FROMSON: Objection.
16         THE WITNESS: Yeah, I'm -- I'm not certain
17     that I used 2002 for the notoriety.
18 BY MR. BARNES:
19     Q. I said after 2002.
20         MR. FROMSON: Same objection.
21 BY MR. BARNES:
22     Q. Correct?
23     A. After -- well, I think I said "2004," but that
24 would be after 2002 I noted notoriety bias.
25     Q. Thank you.

Page 480

1　　　MR. BARNES: Okay. You have to change the
2　tape? We -- it's a good time to stop. Thank you.
3　　　THE VIDEOGRAPHER: Off the record 11:27.
4　　　(Recess taken.)
5　　　THE VIDEOGRAPHER: On the record 11:37.
6　BY MR. BARNES:
7　　　Q. Looking at your report, going back to
8　page 194, are you aware of any methods that were used by
9　Mr. Altman to control for bias in the calculations and
10　analysis that he did that's -- that is reflected in the
11　plot on page 194 of your report?
12　　　MR. FROMSON: Just objection as to form.
13　　　THE WITNESS: I can't specifically address
14　　what he does. I know that we reviewed various
15　　bias-related issues when we -- when we first
16　　started generating these for the FDA, but -- and
17　　I'm assuming he used the same approach in this one,
18　　but I am not specifically familiar with what he did
19　　for this. You'd have to ask him.
20　BY MR. BARNES:
21　　　Q. Same question as to confounding factors.
22　　　A. Again, you'd have to check with him.
23　　　Q. Okay. Do you -- as a general matter, do you
24　accept that Neurontin is generally well tolerated by
25　patients overall as an anti- -- as an antiepileptic

Page 481

1　medication?
2　　　A. I can't answer it. I was only asked to look
3　at psychobiological and suicide-related events. I have
4　not looked at overall system -- any system organ classes
5　other than that.
6　　　Q. Okay. So no opinion?
7　　　A. No opinion.
8　　　Q. Okay. Why don't we look at your opinions with
9　regard to psychobiologic adverse events then and clean
10　up the exhibits. I think we're done with Exhibit 12 and
11　Exhibit 18. Exhibit 18 is multiple -- I believe it's
12　multiple pages.
13　　　MR. FROMSON: I thought 18 was one single
14　　page.
15　　　THE WITNESS: Yeah, there is no staple.
16　　　MR. FROMSON: Exhibit 12 is one with multiple
17　　charts.
18　　　MR. BARNES: That's fine. You're correct.
19　　Thank you.
20　　　THE WITNESS: Put all these back?
21　　　MR. BARNES: Put it back in order, yes.
22　BY MR. BARNES:
23　　　Q. Now, your -- your report refers to
24　psychobiological adverse events at several places,
25　correct?

Page 482

1　　　A. Yes.
2　　　Q. Would you please define for me the case
3　definition of a psychobiologic adverse event?
4　　　A. I'm -- I'm -- I don't understand what is a
5　case definition.
6　　　Q. Do you know what a case definition is in
7　epidemiologic studies?
8　　　A. Yes. And I know what a trial definition is
9　for the psychobiological, but I know that it also varies
10　across studies.
11　　　Q. Well, what is the -- what do you mean when you
12　say "psychobiologic adverse event"? Is that -- I'm
13　asking you, is that a case definition or where is it
14　derived from?
15　　　A. I derived the psychobiological events -- it's
16　quoted in the various sections to what I'm referring,
17　but I use the line listings that were either in system
18　organ class or the ones in the research report -- annual
19　report -- or PSUR reports from the Pfizer database.
20　　　Q. Is there a DSM criteria for psychobiologic
21　adverse events?
22　　　A. Well, there are several DSM criterias for
23　psychobiological events.
24　　　Q. Is there one specifically for that term?
25　　　A. I don't know. I don't know.

Page 483

1　　　Q. Is "psychobiological adverse events" a term
2　used -- is that in any recognized dictionary or adverse
3　event coding?
4　　　A. I don't know. I used the term in my adverse
5　events for our depression NDA, and I pulled the events
6　from the Pfizer research reports in their annual
7　reports.
8　　　Q. So you're using "psychobiological adverse
9　events" because it -- it's a term that is used in some
10　of the Pfizer reports? Basically, is that what you're
11　doing?
12　　　A. Yes. And I've used the term before in dealing
13　with the Food and Drug Administration. And I defined
14　them. I don't -- I don't just use a category. In each
15　case -- at each place where we use it, I give the line
16　listing of it --
17　　　Q. Now --
18　　　A. -- of the individual events.
19　　　Q. Okay. And in the individual -- in the line
20　listings you've described yesterday in the reports, is
21　it fair to say that your discussions of psychobiological
22　adverse events are essentially just crude case -- serial
23　case reports or a crude -- crude count of the events
24　that are -- you classify as psychobiological adverse
25　events?

Page 484

1    MR. FROMSON: Objection to form.
2  BY MR. BARNES:
3    Q.  Just --
4    A.  Yes, they are -- if you said "accrued," they
5  are accrued from the listings that were either --
6    Q.  Not accrued.  Crude, c-r-u-d-e.
7    I don't see any comparisons or any statistical
8  analyses.  What I see in all of your tables in your
9  report, save the report on page 194 where there is a
10 graph from Mr. Altman, I don't -- I'm only seeing case
11 counts and not statistical analyses in all these tables,
12 correct?
13    MR. FROMSON: Objection to form.
14 BY MR. BARNES:
15    Q.  I use --
16    A.  Can you give me an example of what you're
17 referring too?
18    Q.  Okay.  Well, let's just look at page 34.
19 That -- that is -- that is simply a -- the table there
20 is simply a crude count of adverse events, but that you
21 call psychobiological adverse events, correct?
22    A.  Well, I took these from your publication, from
23 the STEPS trial, and they're -- this trial was designed
24 to look at different doses of Neurontin, so it's broken
25 out exactly as it is in the paper.

Page 485

1    Q.  I'm not saying what -- I understand you got it
2  from the paper.  What I'm saying is, it's a -- it's just
3  a count of adverse events.  It's not a statistical
4  analysis, correct?  What you've depicted on page 34.
5    A.  No, it's a count taken directly from the
6  report.
7    Q.  Yeah.  And isn't it true that all of your
8  reports -- all of your tables in your report are counts
9  taken from various reports submitted by Pfizer to the
10 Food and Drug Administration, or regulatory authorities,
11 or from databases?
12    A.  Yes, these are set up exactly as you would set
13 them up if you were doing an ISS report or an annual
14 report summary, yes.
15    Q.  Crude counts of cases, correct?  Just so I
16 know what you're --
17    A.  It's just a tabular listing of what we're
18 provided in the Pfizer reports or whatever I'm listing.
19    Q.  Without any statistical analyses applied by
20 you or Mr. Altman, correct?
21    A.  Yes, or just --
22    MR. FROMSON: Objection to form.
23    THE WITNESS: Yeah, are you saying a reference
24 to statistical analysis?
25 BY MR. BARNES:

Page 486

1    Q.  No, I'm making sure I didn't.  I don't see any
2  statistical analysis that you've done in this case.
3    A.  Oh, no, I never --
4    MR. FROMSON: Objection to form.
5    THE WITNESS: Yeah, and I didn't intend for
6  you to and I --
7  BY MR. BARNES:
8    Q.  That's fine.
9    A.  -- I didn't conduct statistical analysis.
10   Q.  And that's fine.
11   Now, is there any definition of
12 psychobiological events in peer-reviewed literature?
13   A.  Are you asking if there is a line listing of
14 them in the --
15   Q.  No, a definition that you -- that I can refer
16 to in the -- in the peer-reviewed medical literature.
17   A.  Oh, I don't know.
18   Q.  Okay.  Can you cite me any medical or
19 scientific literature that uses the term
20 "psychobiological event" in the context of analyzing the
21 risk of suicide?
22   A.  I have -- I haven't addressed the articles
23 that I provided to you -- that we discussed yesterday --
24 that relate to the suicidal events to see if they use
25 that term, but --

Page 487

1    Q.  You can --
2    A.  -- that wasn't my use of the term.  It was a
3  table heading and in order to collapse the various
4  events reported by Pfizer or by a particular author.
5    Q.  Just so -- the answer my question is, you
6  cannot cite me a medical or scientific literature
7  article that actually uses the term "psychobiological
8  event" in the context of analyzing risk for suicide,
9  correct?
10   A.  Either way.  I didn't search it for that way.
11   Q.  That's fine.  You don't know.  That's
12 perfectly fine if you don't know.
13   What criteria do you use to establish whether
14 an event is considered psychobiological adverse event in
15 your report?
16   A.  If they were listed -- if -- if they were
17 listed psychiatric or neuropharmacologic events or if I
18 had previously used it in line listings as
19 psychobiologic.
20   But in each case, depending on the source of
21 the data, they may differ, which is why I listed in each
22 case what the terms were.
23   Q.  And that's -- and since you're not a
24 psychiatrist, you would not be qualified to actually
25 make a determination yourself as to which events fall

Page 492

1  suicide? You've used that word. It was used. Today
2  you've used, I think, "precursor" or "midpoint."
3        MR. FROMSON: Objection as to form.
4  BY MR. BARNES:
5    Q. If that -- if that misstates your belief, then
6  let me know.
7    A. I think that I was responding to a question
8  when you asked me if depression would be a precursor
9  event to suicide.
10    Q. Let me just ask you the question.
11        Is it your opinion that psychobiological --
12  psychobiological events, as used in your report,
13  represents a surrogate endpoint for suicide or suicide
14  attempt?
15    A. Not all of them, no.
16    Q. So it would not be all of the -- would -- so
17  are there -- are there psychobiological adverse events
18  which you believe are documented in the medical
19  literature as representing a surrogate endpoint for
20  suicide?
21    A. As a surrogate end -- I don't know if I know
22  that that term has ever been used, "surrogate endpoint,"
23  for any one event. I know that there are certain events
24  that you watch in depression trials as concerning for a
25  patient self-injury.

Page 493

1    Q. Do you know the definition of surrogate
2  endpoint?
3    A. One that can be used in place of.
4    Q. So is there -- you've used the word
5  "precursor" in your report. Is that -- by the --
6  using -- well, define the word "precursor" as it is used
7  in your report.
8    A. An event that may precede.
9    Q. The fact that you call something a precursor
10  means that you believe that the precursor is -- predicts
11  that suicide or suicide attempt will follow the event?
12        In other words, you've used depersonalization
13  as a precursor to suicide. What -- what does that mean?
14    A. I quote the Kelly article, Kelly and Knudson's
15  article there.
16    Q. Does the Kelly and Knudson article say --
17  use -- say or conclude in any place in the article that
18  depersonalization is a precursor to suicide?
19    A. Oh, we'd have to pick it up. I don't know if
20  I --
21    Q. As you sit -- as you sit here now, is it your
22  opinion that the Kelly and Knudson article states that
23  depersonalization is a precursor to suicide?
24    A. I think the article points out the need to
25  watch for depersonalization as it relates the patient

Page 494

1  to -- depressed patients and patients who may attempt to
2  injure themselves. Whether they specifically said
3  precursor, I don't know.
4    Q. Okay. Well, then it's -- is it your
5  interpretation, based upon the Kelly -- of the Kelly and
6  Knudson article, that they conclude that
7  depersonalization is a precursor to suicide?
8    A. It isn't in quotes, so I don't know if they
9  specifically said that or not. I don't know.
10    Q. You don't know?
11    A. I don't know.
12    Q. Okay. Is there any literature in the -- in
13  the world that says that depersonalization is a
14  precursor to suicide? Anywhere in the published medical
15  literature?
16    A. I don't know.
17    Q. And what do you base your opinion on that
18  depersonalization is a precursor to suicide?
19    A. I don't know. I'll have to get out the
20  Kelly-Knudson article and see what other articles they
21  reference.
22    Q. Okay. If the Kelly and Knudson article does
23  not cite any reference for the statement concerning
24  depersonalization, is there any other basis for your
25  opinion that -- that depersonalization is a precursor to

Page 495

1  suicide?
2    A. Well, I have to check all the articles that
3  they reference, including the textbook.
4    Q. What textbook?
5    A. If she includes any textbooks.
6    Q. Okay. What -- what psychobiological adverse
7  events do you conclude are precursors to suicide?
8    A. Can you point me to where I said that?
9    Q. I'm just saying, are there any other than --
10  you've mentioned personalization. Are there any other
11  psychobiological adverse events that you believe are
12  precursors to suicide?
13    A. Well, I think that profound depression,
14  self-injurious behavior may be precursors. Suicidal
15  threats may be precursors.
16    Q. Self-injurious --
17    A. Certainly suicide attempts may be precursors
18  to suicide.
19    Q. Looking at the -- looking at the table on
20  page 118 of your -- just look at the Costart terms,
21  pages 117 and 118.
22        Do you have an opinion to a reasonable degree
23  of scientific certainty as to whether any of the Costart
24  terms listed on pages 117 or 118 -- I think they're the
25  same list, so we'll just work off 117 -- are precursors

32 (Pages 492 to 495)

Page 496

1  to suicide?
2      A.  And did I say that?
3      Q.  Well, I'm just saying -- I'm asking you,
4  you've listed --
5      A.  I don't think I've said that.
6      Q.  I don't think --
7      A.  I think I recall these, the terms in the
8  AERS/SRS database, but I don't think I've said that
9  these terms alone are necessarily precursors or part of
10 the constellation of psychobiological events that we
11 commonly measure with psychiatric drugs.
12     Q.  So you would -- so -- I'm asking the question.
13 That's fine.  That -- so can you cite -- so --
14     A.  In fact, I highlight for you the -- the actual
15 suicide terms in these tables.
16     Q.  Okay.  Well, then let me make sure.
17         It -- it's your opinion that -- that none of
18 the terms listed on page 117 or 118 are valid precursors
19 or surrogate endpoints to -- and I asked a compound.
20 You want me to break it down, I will -- to suicide?
21         MR. FROMSON:  Objection as to form.
22         THE WITNESS:  No, I absolutely didn't say
23     that.
24 BY MR. BARNES:
25     Q.  Okay.  That's fine.

Page 497

1      A.  What I said was I don't know if they're
2  considered surrogate terms.  Never would I say that
3  depression is not a precursor to suicide.  I wouldn't
4  think that suicide ideation or suicide attempt would not
5  be considered a precursor to suicide.
6      Q.  Okay.  Well --
7      A.  But what I didn't say is that they are
8  necessarily surrogate terms for it.
9      Q.  Okay.  Looking at the -- let me just ask this
10 in page 117.
11         Are there any terms on page 117 that you
12 believe to be a precursor to suicide?  Just identify the
13 ones you believe to be precursors to suicide, if any.
14     A.  That are considered precursors to suicide?
15 You know, I don't know.  I haven't studied the
16 literature for that.  It wasn't part of my opinion.
17         Just looking at it, I would -- from our
18 earlier studies, we were concerned with depression and
19 certainly intentional self-injury we were concerned
20 with.  Psychotic splits were one of our concern points.
21 And anything related to self-injurious or suicidal
22 anything.
23     Q.  What -- what -- so do you have an opinion to a
24 reasonable degree of certainty that those terms are
25 surrogate endpoints or precursors to suicide?

Page 498

1      A.  No.
2          MR. FROMSON:  Objection as to form.
3          THE WITNESS:  No.  And I did not say that in
4      my report.
5  BY MR. BARNES:
6      Q.  Okay.  So --
7      A.  Those aren't fundamental to my opinion at all.
8      Q.  Well, how -- what inferences do you draw from
9  the various postmarketing -- strike that.  Let me do it
10 another way.
11         How many of the psychobiological events in
12 your report must be present in a data source or article
13 before you conclude that there is a risk -- increased
14 risk for suicide?
15     A.  I also didn't opine on that.  These terms are
16 in here because these terms are important not only for
17 suicide, but remember your client was advertising he was
18 marketing this product for a variety of off-label uses.
19         And the issue of delirium or psychoses would
20 certainly be of concern, even if the patient didn't kill
21 themselves, in patients who are bipolar.
22         MR. BARNES:  Move to strike that as
23     unresponsive, okay.  Let me ask it this way.
24 BY MR. BARNES:
25     Q.  Are you of the opinion that -- that any of the

Page 499

1  adverse -- any of your analyses of the adverse event
2  tables that you've put in your report demonstrate
3  collectively or separately that Neurontin is a cause of
4  suicide?
5      A.  We have -- your database has cases of
6  completed suicide in the database.
7      Q.  Okay.
8      A.  I believe that completed suicide is in the
9  clinical trials database as well as certainly in the
10 postmarketing database.  It's in database -- across the
11 databases, not limited to just one database.  Those
12 events coupled with the mechanism of action in this drug
13 and, indeed, the pharmacologic data generated with
14 this -- this drug support my conclusion that --
15     Q.  Okay.
16     A.  -- Neurontin can cause suicide behaviors in
17 certain individuals.
18     Q.  Okay.  Let me -- let me keep -- make sure -- I
19 want to get to the psychobiological alone.
20         Psychobiological events in -- in -- in your
21 report, do you have an opinion that they are -- that
22 they are, in and of themselves, establish that Neurontin
23 is a cause of suicide?
24         MR. FROMSON:  Note my objection to form.
25     Objection to form.

33 (Pages 496 to 499)

Page 516

1  report, have you?
2          MR. FROMSON: Objection as to form.
3          THE WITNESS: I've included the entire ISS in
4  my report.
5  BY MR. BARNES:
6      Q.  Well, you -- you included many tables, cut and
7  pasted from various regulatory submissions, into your
8  report. Is Table 14 included in your report?
9      A.  I don't know. I don't even know if this one
10  dated 2 -- '91 is the final one. This is the 11/91
11  dated.
12     Q.  Let's go to the first Safety Update then.
13         I'll represent to you this is the ISS
14  integrated --
15     A.  The original.
16     Q.  The original --
17     A.  So we have to go to ISS 1, 2, 3, and 4.
18     Q.  Okay. Let's go.
19         MR. BARNES: Mark the next one as an exhibit,
20  please.
21         THE REPORTER: Excuse me.
22         THE WITNESS: No. He tossed it at me. I
23  thought he had already given it to you.
24         MR. BARNES: No, I apologize.
25         (Deposition Exhibit No. 20 marked for

Page 517

1  identification.)
2  BY MR. BARNES:
3      Q.  What exhibit is that, ma'am?
4      A.  20.
5      Q.  I'll represent to you that this is the first
6  Safety Update following the submission of the ISS that
7  you've just reviewed.
8      A.  Okay.
9      Q.  Now, can you tell me -- I'll ask the question
10  again. I'll represent to you that this is the --
11  this is -- there is a very similar table on page 30 in
12  the ISS. Okay?
13         And would you please look at Table 8, please.
14     A.  I'm there.
15     Q.  Do you have Table 8?
16     A.  Yes.
17     Q.  Okay. And Table 8 is a "Summary of Body
18  System Frequency for All Adverse Events and
19  Placebo-Controlled Add-on Therapy Studies by Treatment
20  Group," correct?
21     A.  Correct.
22         MR. FROMSON: Objection.
23  BY MR. BARNES:
24     Q.  And the left side, there is "Body System,"
25  correct?

Page 518

1      A.  Right.
2      Q.  And there is a body system adverse event
3  listing for "psychobiologic function," correct?
4      A.  Yes.
5      Q.  And what is -- what is the -- in the first
6  Safety Update, how many placebo patients had -- what
7  percentage had reported psychobiologic adverse events?
8      A.  8.8 in the NDA and 9.0 in the first Safety
9  Update.
10     Q.  How many in the gabapentin-treated group
11  reported biologic events both in the NDA and in the
12  first Safety Update?
13     A.  7.4 and 8.3.
14     Q.  8.3 is the number in the first Safety Update,
15  correct?
16     A.  Correct.
17     Q.  So with regard to the NDA, placebo-treated
18  patients had a higher percentage of psychobiologic
19  adverse events than patients that treated with
20  Neurontin, correct?
21     A.  Yes, the percentage is higher.
22         Now, again, I don't know if there is any
23  statistical significance to this. Oh, yes, I do. There
24  are no statistical differences in these groups.
25     Q.  How do you know that?

Page 519

1      A.  Because there is no asterisk on here.
2      Q.  Did you do any calculations?
3      A.  No, I -- FDA did these calculations.
4      Q.  Okay. Now, how about -- how about in the
5  first Safety Update, would you agree that the
6  placebo-treated group had a higher percentage of
7  psychobiologic adverse events than the gaba-treated --
8  gabapentin-treated patients?
9      A.  Let's see.
10     Q.  It's 9.0 to 8.3. Do you see that?
11     A.  Well, yes, 9 -- 9.0. It's with an average of
12  8 -- yeah, 8.3 in the active.
13     Q.  So -- so gabapentin has a lower percentage of
14  psychobiologic adverse events in the first Safety Update
15  than placebo-treated patients, correct?
16     A.  Yes, 9 is bigger than 8.3.
17     Q.  Okay. Is there a rea- -- do you have a basis
18  for rejecting -- let me ask you this.
19         Nowhere in your report do you reference the
20  table in -- the Safety Update Table No. 8 which
21  demonstrates that a placebo has a -- have a higher
22  percentage of adverse events pertaining to
23  psychobiologic function than gaba-treated patients, do
24  you?
25     A.  Well, I don't know if it -- I don't recall

38 (Pages 516 to 519)

Page 520

1  doing any specific tables from the first Safety Update,
2  but --
3    Q.  You --
4    A.  But I can look through this and answer.
5    Q.  I'll represent to you that I -- and I don't
6  want you to spend the time. I'll -- you can do it on
7  break.
8      I'll represent to you that the data from the
9  NDA we just cited and the data from the gaba- -- from
10  the first Safety Update is not cited in your report.
11   A.  And are you saying that I suggested that the
12  data were different than this?
13   Q.  Well, you don't -- you don't cite -- you --
14  nowhere -- nowhere do you cite that the psychobiologic
15  adverse events with placebo are higher than treated
16  patients in your report, do you?
17   A.  I don't know. I would have to check, but I
18  don't recall saying that they were to the contrary of
19  that either. I was focused on those safety updates on
20  the suicide events. But -- but I will look at break.
21   Q.  Wouldn't you agree that it's important
22  information that to include in your report that when
23  you -- in a randomized controlled clinical trial that
24  placebo patients had a higher percentage of
25  psychobiologic adverse events reported than patients

Page 521

1  treated with Neurontin in both the ISS and the NDA in
2  the first Safety Update?
3    A.  I -- I think it would be important. I think
4  it would have also been important for you to have
5  reported that you had suicides in your controlled
6  clinical trials, and you didn't report that either.
7      MR. BARNES:  Move to strike the last question
8  as entirely argumentative and nonresponsive.
9      Would you please -- last answer. Would you
10  please read back the question, and I want an answer
11  to that question without the extraneous comment.
12     MR. FROMSON:  Note my objection to defense
13  counsel's comment there.
14     MR. BARNES:  Read the question back and I'll
15  see if the doctor can answer that question without
16  a speech.
17     MR. FROMSON:  Objection.
18     MR. BARNES:  Answer that question, Doctor.
19  That question.
20     MR. FROMSON:  Rick --
21     THE WITNESS:  I'm sitting right here.
22     MR. BARNES:  I know.
23     THE WITNESS:  I'm sitting right here.
24     MR. BARNES:  You're wasting my time.
25     THE WITNESS:  You're shouting at me, and I'm

Page 522

1  sitting right here.
2      MR. BARNES:  Ken --
3      MR. FROMSON:  What you pointing your finger at
4  me for? Just calm down.
5      MR. BARNES:  Move to strike the last answer.
6      MR. FROMSON:  You made --
7      MR. BARNES:  Read the question back.
8      MR. FROMSON:  You made your record. Let the
9  reporter do her job.
10     MR. BARNES:  Let -- let -- let the witness
11  answer the question. Read it back. Please answer
12  that question.
13     (The requested portion was read by the
14  reporter.)
15     MR. BARNES:  I'll ask it again.
16  BY MR. BARNES:
17   Q.  Doctor, don't you believe it's important to
18  include information in your report that demonstrates
19  the randomized controlled clinical trials that patients
20  who are treated with a placebo had a higher percentage
21  of psychobiologic adverse events than patients treated
22  with Neurontin; yes or no?
23     MR. FROMSON:  Objection, asked and answered.
24     THE WITNESS:  I could have indicated that one
25  was 9 and one was 8.4 percent, and one was -- and

Page 523

1  the placebo at that point was higher. Although, I
2  will point out that it would have made no
3  difference to my opinion and the FDA still required
4  these adverse events in the Neurontin insert under
5  the active treatment.
6  BY MR. BARNES:
7    Q.  You show us after a break if you cite that
8  information for our --
9    A.  I didn't say I did. I said I would check if
10  I --
11   Q.  Show us after the break.
12   A.  -- noted the safety update one.
13   Q.  This table -- the tables we've just discussed,
14  do you think it's important for you to be fair and
15  objective and impartial in the way you analyze the
16  premarket data?
17   A.  Yes.
18   Q.  Do you?
19   A.  And I do.
20     MR. FROMSON:  Objection to form.
21     THE WITNESS:  You know why? Because I only
22  called the rechallenge a depression when all the
23  psychiatrists called it a suicide -- suicide
24  rechallenge.
25  BY MR. BARNES:

39 (Pages 520 to 523)

1 significance, does it?

2    A. And, gee, I'd have to look for the exact P

3 value. I know it was close, but it did not. That's why

4 I did not say that it did.

5    Q. So in the controlled clinical trials for

6 epilepsy, it's true that the -- the gaba-treated --

7 gabapentin-treated patients who had a -- who had a

8 history of -- strike that.

9      So it's true in the epilepsy clinical trials

10 that, as between treated patients with gabapentin and

11 placebo, that there was not statistically-significant

12 difference in the rate of depression reported in the

13 clinical trials?

14      MR. FROMSON: Objection, asked and answered.

15      THE WITNESS: Yeah, I thought I answered it,

16    but it -- there was -- there were -- it was 40 or,

17    I don't know, 50 percent or 60 percent higher in

18    the Neurontin trial, but it did not -- in the

19    Neurontin-treated patients, but it did not -- did

20    not meet the P equals 0.05 value.

21 BY MR. BARNES:

22    Q. They were not different, they were not --

23    A. They -- they did not meet statistical

24 significance. That difference did not attain

25 statistical significance, the 1.8 versus a 1.1.

1    Q. Thank you.

2      And what tests would you use to -- to -- to

3 examine that or did you use to examine that?

4    A. Oh, I just took it from the NDA.

5    Q. So -- okay.

6      Now, the report does reference the depression

7 data in the epilepsy studies, but do -- does your report

8 reference the data on depression in the neuropathic pain

9 studies?

10    A. Oh, I don't know. I'll have to go back to

11 that section.

12    Q. I'll represent to you that I did not see any

13 discussion in your report concerning depression that was

14 observed in the neuropathic pain studies.

15      MR. FROMSON: Just note my objection to the

16    comment and the form of the question.

17 BY MR. BARNES:

18    Q. How much more time do you need to review the

19 report to answer my question?

20    A. Well, I mean, this is a fairly long section.

21 This is the '96 to 2002, and there is multiple IND

22 reports in here where the adverse events would be

23 listed, so I have to go through all of these. I mean, I

24 see depression on -- on some of these IND annual

25 reports.

1    Q. And I don't -- I don't -- you can confirm on

2 the next break, but I'll represent to you that your

3 report does not include any references to the depression

4 data in the neuropathic pain studies.

5    A. Okay. These are gabapentin add-on reports

6 during the period of time when postherpetic neuralgia

7 was being studied as an investigational drug for an

8 investigational indication.

9      Depression is listed in these line listings.

10 And I have it listed with both placebo and gabapentin,

11 so I would assume that these are coming from studies

12 that placebos are involved.

13    Q. Did you do any statistical analyses to compare

14 the rate of depression between treated patients and

15 placebo patients, in your report?

16    A. No. As I mentioned to you several times, I

17 did no statistics, but I'm -- I'm looking in here and --

18    Q. Did you specifically review the report from

19 the medical officer at FDA who analyzed the depression

20 data from the postherpetic neuralgia NDA?

21    A. I believe I did. I know they're sitting in

22 the back of the room.

23      But just to finish up on the depression

24 question. If you go to the INDs, there are four the

25 period preceding the approval. I see "depression" in

1 the line listings, so I think we need to look at that.

2    Q. What pages?

3    A. Well, for example, "depression" is in placebo

4 group, so I would imagine that that's in a controlled

5 clinical trial. There's a placebo group.

6    Q. What page are you on?

7    A. 110.

8    Q. Let me catch up to you.

9      Other than --

10    A. And I notice "depression" in the next one,

11 '97, '98, in gabapentin groups.

12    Q. How do you know these are pain trials?

13    A. They're -- they're the INDs during that time

14 period.

15    Q. Do you know if they're pain trials?

16    A. No, we can -- we can backtrack them back

17 again, but I listed -- in this -- in this case, I listed

18 everything, but we can backtrack it. We can do that.

19    Q. Let me -- on the next break, if you want to

20 do. But as you sit here today, you cannot tell me if

21 any of these tables that were cut out of IND reports

22 involved pain studies, correct?

23      MR. FROMSON: Objection as to form.

24      THE WITNESS: Well, they're also in the NDA

25    periodic reports as well during that time period,

Page 536

1    A.  Yes, for these -- for the two approved
2  indications, I understand that.
3    Q.  Okay.  Would you please turn to page 77 of 77,
4  Table 7.20, please.
5    A.  77 of 77.
6    Q.  Yeah, it's a table, Table 7.20.  Do you have
7  it in front of you?
8    A.  Yes.
9    Q.  Okay.  The table -- Table 7.20 says "Percent
10  of Treatment Emergent AEs in greater than or equal to 3
11  percent of Patients, Neuropathy and Epilepsy Add-On
12  Studies," correct?
13    A.  Yes.
14    Q.  And on the left-hand side, there is a -- there
15  are a list of preferred terms, correct?
16    A.  Yes.
17    Q.  And depression is a listed preferred term in
18  the -- in the neuropathy studies, correct?
19    A.  Let me see.  Well, these are all neuropathy,
20  yes.
21    Q.  Okay.  And can you tell me what percentage of
22  patients treated with Neurontin experience depression in
23  the neuropathic pain trials?
24    MR. FROMSON:  Objection.
25  BY MR. BARNES:

Page 537

1    Q.  In all neuropathy.
2    A.  All neuropathy with Neurontin was 1.3.
3    Q.  And what about all neuropathy with placebo?
4    A.  0.6.
5    Q.  Now, that -- that next line there is
6  gabapentin.
7    A.  Oh, placebo, 2.2.
8    Q.  So, again, you would agree that the data in
9  the neuropathic pain study shows that only 1.3 percent
10  of gabapentin patients reported depression, correct?
11    A.  Yeah, this table is percent of treatment
12  emergent in over three percent of patients, so I guess
13  it's 1.3 percent in that subset of populations that had
14  events in three percent or more.
15    Q.  Let me ask you this.  Isn't it true that the
16  gabapentin-treated patients had a lower percentage of
17  depression than placebo-treated patients in the
18  neuropathic pain trials?
19    A.  Yes.
20    Q.  Did you consider this in forming your opinions
21  in this case?
22    A.  Yeah, I would have expected this.
23    Q.  And did -- did you report this data in your
24  report concerning that depression occurred less
25  frequently in neuropathic -- in patients with

Page 538

1  neuropathic pain treated with Neurontin than that --
2  than the placebo-treated patients?
3    A.  That depression -- oh, I don't know.  I
4  specifically -- I would have expected this though,
5  because depression is a -- is a hallmark with neuralgia.
6  And as you said, those patients have a greater baseline
7  for depression.  So if you have successfully treated at
8  least some of their neurology, you would have expected
9  an attendant decrease in the depression.
10    Q.  So you would agree that the randomized
11  controlled clinical trial data for neuropathic pain,
12  that Neurontin did not show statistically-increased risk
13  of depression in the gabapentin-treated patients?
14    A.  Well, I think what I would say is that in
15  those patients -- and as you indicated earlier,
16  depression is a component of their disease.  And
17  postherpetic neuralgia was improved with Neurontin, so I
18  would have expected some diminution in the attendant
19  symptoms.
20    Q.  Isn't the same thing true for the
21  epilepsy-treated populations?
22    A.  Yeah, I should have pointed that out earlier.
23  I mean, you correctly indicated that epilepsy may be.
24  Depression is a component of epilepsy.  So assuming that
25  the data are correct and that epilepsy and postherpetic

Page 539

1  neuralgia are successfully treated, or at least
2  statistically different from placebo for those events,
3  you would have expected -- hopefully, you would have
4  expected some diminution in those -- in those endpoints,
5  if patients were being relieved of epileptic outbreaks
6  or of the neuralgia, postherpetic neuralgia.
7    Q.  So in the randomized controlled clinical
8  trials, patients with -- treated with gabapentin are
9  less depressed than patients who are not treated with
10  gabapentin who are on placebo, correct?
11    MR. FROMSON:  Objection as to form.
12    THE WITNESS:  Okay.  Which group are you in
13  now?
14  BY MR. BARNES:
15    Q.  Either one.  They're both right in front you.
16    A.  Okay.  Well, they -- wait a minute.
17    MR. FROMSON:  So you're limiting it to the
18  document that's in front of her now?
19    MR. BARNES:  Sure.  She has -- she has the
20  epilepsy trials and she has the neuropathic pain
21  trials on Exhibit No. -- I guess it's 22?
22    MR. FROMSON:  Right, but you're asking her to
23  look at a particular page.
24    MR. BARNES:  Yeah.  She's on it.
25    MR. FROMSON:  Okay.

43 (Pages 536 to 539)

Page 540

1    MR. BARNES: Page 77.
2    THE WITNESS: Okay. Now, wait a minute.
3    Depression for the Neurontin is 1.8.
4  BY MR. BARNES:
5    Q.  In epilepsy?
6    A.  In epilepsy. And 1.1 in placebo.
7    Q.  Right.
8    A.  So no -- it's higher in epilepsy, but there's
9  no significant difference.
10   Q.  Right.
11   A.  And 1.3 in the all neuropathy, 0.6 in
12 postherpetic, 2.2 in placebo for neuropathy. So
13 the post- -- yeah, the -- yeah.
14   Q.  So you would agree with my statement?
15   A.  I would agree that -- that the depression,
16 I'm -- I'm not -- yeah, I would agree the depression
17 numbers are lower, presumably because you were
18 addressing either epilepsy or postherpetic neuralgia for
19 which these are a component.
20   Q.  Irrespective of -- of the reason, you would
21 agree that the gabapentin-treated patients not show
22 statistically-significant -- statistically-significant
23 difference from placebo-controlled patients as it
24 relates to depression, correct?
25   MR. FROMSON: Objection, asked and answered.

Page 541

1  BY MR. BARNES:
2    Q.  Placebo-treated patients?
3    MR. FROMSON: Same objection.
4    THE WITNESS: Again, I thought I answered
5    that, but, yes, I agree that while 1.8 is bigger
6    than 1.1, it did not attain statistical
7    significance.
8  BY MR. BARNES:
9    Q.  And do you know if the 1.3 versus 2.2
10 percentages for the neuropathic pain trials, 1.3 being
11 for treated and 2.2 being for placebo, are statistically
12 significantly different? Have you done that
13 calculation?
14   A.  No, I didn't. And I didn't see that it was
15 noted as significant in the -- in the report either.
16   Q.  Is this information included in -- in your
17 report?
18   MR. FROMSON: Objection, form.
19   THE WITNESS: That what?
20 BY MR. BARNES:
21   Q.  That the --
22   A.  Well, the 1.8 and 1., 1 we just rehearsed --
23 or just reviewed that one.
24   Q.  How about the -- how about the neuropathic
25 pain?

Page 542

1    A.  Well, the neuropathic pain, I have to go back
2  and check which depression event I'm adding up here,
3  but, I mean, it wouldn't -- you wouldn't expect a
4  depression increase if they're affecting those endpoints
5  in which depression is a component.
6    Q.  Does Dr. Hertz's clinical review in 2002 raise
7  any concerns concerning suicidal depression -- suicidal
8  behavior? Excuse me.
9    MR. FROMSON: Objection, form.
10   THE WITNESS: Can I have it back again?
11 BY MR. BARNES:
12   Q.  It's right there.
13   A.  I mean, certainly Dr. McCormick raises that
14 concern for the epilepsy population, but I don't know
15 for the subpopulation if it was addressed.
16   Q.  I will represent to you that -- and you can
17 check on a break -- that I did not find any reference to
18 a concern regarding suicide in Dr. Hertz's report.
19   If it -- if you had seen it, would you have
20 documented that in your report?
21   MR. FROMSON: Objection, form.
22   THE WITNESS: I don't know. I would assume
23   so. I mean, certainly, we saw in any epilepsy --
24   concern by the FDA for the epilepsy population.
25 BY MR. BARNES:

Page 543

1    Q.  Let's move off that, because I -- it's a
2  document. We'll come back to that.
3    -- You understand that Dr. McCormick was
4  Dr. Hertz's supervisor, correct, at the time the
5  postherpetic neuralgia NDA was approved?
6    MR. FROMSON: Objection as to form, lack of
7  foundation.
8    THE WITNESS: Dr. McCormick was the
9    supervisor, you said?
10 BY MR. BARNES:
11   Q.  Yeah.
12   A.  I think that's the case, yes.
13   Q.  Now, you stated that Dr. McCormick expressed
14 some concern concerning depression in her review of
15 epilepsy?
16   A.  Let me go back. I thought she -- I thought I
17 quoted her review.
18   MR. BARNES: I'm sorry. I had to get
19   reorganized because it's such confined quarters
20   here.
21   MR. FROMSON: Objection to the commentary.
22   MR. BARNES: I can apologize to the witness,
23   right.
24   Would you please read back the last question,
25   please.

44 (Pages 540 to 543)

Page 572

1    A.  I don't think that's the definition of
2  biologic plausibility, but I don't think I'll be
3  offering that specific opinion because there are
4  other -- there are people who are going to be doing
5  that.
6    Q.  Okay.  So define biological plausibility for
7  me, as you use it in your testimony.
8    A.  Biologic plausibility are those situations for
9  which there are experimental, research, or other data
10  which establish a relationship between an action and a
11  either mediated event or a endpoint.
12    So there is a biologic plausibility for
13  penicillin to cure certain infections because we
14  understand that penicillin will destroy certain
15  bacterial cell walls.
16    Q.  Has any article in the published medical or
17  scientific literature stated that it is biologically
18  plausible that Neurontin causes suicide or suicide
19  attempt?
20    MR. FROMSON:  Just note my objection to the
21  extent it may have been asked and answered.
22    THE WITNESS:  Well, I think I have answered
23  that article about -- articles relating to causing
24  suicide, but I will share with you the information
25  I provided relating to Neurontin's actions on

Page 573

1  transmitters that have been established to address
2  mood and its -- the impact of those transmitters,
3  the correction of those problems on the changes in
4  mood.
5  BY MR. BARNES:
6    Q.  So you've cited those in your report, correct?
7    A.  There is quite a lengthy section on that.
8    Q.  Okay.  What are the average concentrations of
9  GABA in the normal human brain?
10    A.  If I've cited it, I don't recall right now.
11  But we know from other data that the average
12  concentration in a brain is not a reflection for
13  neurotransmitter activity in -- in targeted tissue.
14    Certainly, the work with serotonin is -- is
15  quite exhaustive.  But serotonin levels, either the
16  drugs that perturbate or serotonin systemic levels, are
17  no -- are no prediction for events in relating to mood
18  disturbances.
19    Q.  Move to strike as unresponsive.  That's not
20  what I asked you.  I asked you if you knew the average
21  concentrations of GABA in the normal human brain.
22    A.  No.  And my answer is I do not.
23    Q.  Okay.  And how about the average
24  concentrations of dopamine in the normal human brain?
25    A.  Actually, I think I did quote the GABA levels.

Page 574

1    Q.  What is your opinion?
2    A.  I think I did quote the GABA 10 to a hundred
3  microliters in here.
4    Q.  What paragraph?
5    A.  299.  I start quoting.  I need to review
6  these.  I think I do quote levels.
7    Okay.  "Pfizer defendants acknowledge that the
8  effects" -- this is quoting -- "effects of gabapentin on
9  neurotransmitter release occur at drug concentrations
10  that are relevant for pharmacologic actions of
11  gabapentin in the employed animal models, 10 micromolar
12  or translating that to 1.5 micrograms per mL."
13    THE REPORTER:  A little slower, please.
14    THE WITNESS:  Okay.  I'll read it to you
15  again.  This is a quote.
16    "Pfizer defendants acknowledge that the
17  effects of gabapentin on neurotransmitter" -- all
18  one word -- "release occur at drug concentrations
19  that are relevant for pharmacologic actions of
20  gabapentin in animal models."  Then in parentheses,
21  "Approximately ten micromolar or 1.5 micrograms per
22  mL."
23    Q.  My question was in relationship to GABA.  That
24  document does not pertain to GABA, does it?
25    A.  Oh, I thought you said "gabapentin."  Let me

Page 575

1  keep work -- let me keep working through this.
2    Q.  My question was as to GABA.
3    A.  Okay.  Well, then we'll keep going.
4    MR. GUNTER:  I tell you what.  He needs to
5  change the tape, so while she's looking, let's take
6  a break.
7    MR. FROMSON:  We can change the tape.
8    MR. BARNES:  Look at GABA and look at dopamine
9  and Norepinephrine -- Norepinephrine and --
10    MR. FROMSON:  What's -- what's the specific
11  question, Rick?
12    MR. BARNES:  I just wanted to know -- I mean,
13  she's going to talk about this mechanism of action,
14  so I want to know what she knows about these
15  neurotransmitters in the brain.
16    Norepinephrine, dopamine, GABA as an enzyme,
17  as well as serotonin.
18    MR. FROMSON:  Well, I appreciate your candor.
19  Let's go off.
20    MR. BARNES:  Yeah.
21    THE VIDEOGRAPHER:  Off the record 2:13 p.m.
22    (Recess taken.)
23    THE VIDEOGRAPHER:  On record 2:27.
24  BY MR. BARNES:
25    Q.  You mentioned penicillin as being

52 (Pages 572 to 575)

Page 576

1  biologically-plausible agent to treat infections.  Do
2  you remember the -- that -- that reference?
3      A.  It was an example.  It would be plausible that
4  it might treat certain infections because penicillin on
5  some bacterial cell walls has a destabilizing influence
6  in the cell wall.
7      Q.  Breaks it down?
8      A.  I don't know if it completely breaks it down,
9  but it destabilizes it.
10     Q.  And how is it that -- that in that sense that
11 Neurontin, in your view, is -- it's biologically
12 plausible that its mechanism causes a suicide mechanism
13 of action?
14     A.  Oh, well, I didn't mean to infer that the
15 penicillin had any correlation of the Neurontin.  I was
16 using it as an example.
17     Q.  Yeah, in much the same way though, can you
18 explain to me the biologically-plausible mechanism by
19 which Neurontin causes suicide?
20     A.  Yes.  And I brought with me, at your request,
21 for information regarding the actual cellular levels of
22 GABA at baseline and changes with gabapentin.
23         In the -- and we've quoted Petroff.  And it's
24 on your disk as well, the various Petroff articles.
25 This particular one is Petroff 2005.

Page 577

1          And as you can see from this graph that is --
2  that is in -- we also produced Trimble report.  With
3  gabapentin, the level of cellular GABA increases from
4  0.5 micromolar to 1.7.
5      Q.  You would agree that there are certain
6  mechani- -- medications that are known to elevate GABA
7  but do not cause depression or increase the risk of
8  suicide, true?
9      MR. FROMSON:  Objection, lack of foundation.
10     THE WITNESS:  Would you give me an example of
11     that.
12 BY MR. BARNES:
13     Q.  I'm asking you if you are aware of certain
14 medications that are known to elevate GABA but do not
15 cause depression or increase the risk of suicide?
16     MR. FROMSON:  Objection, compound.
17     THE WITNESS:  As I sit here now, I don't.
18 BY MR. BARNES:
19     Q.  Okay.  Are you aware that depression and
20 suicidality are not so much associated with the
21 elevation of total GABA levels but rather what exact
22 component of the GABA system is being influenced by the
23 drug?
24     A.  Well, my understanding from these reports and
25 from the literature that I've referenced is that

Page 578

1  increases in -- GABA is an overall considered inhibitory
2  type of neurotransmitter.  And a component of that
3  inhibitory action is to modulate, decrease excitatory
4  neurotransmitter availability and, in some cases,
5  release an availability.  And those include glutamate,
6  serotonin, and the dopamine or Epinephrine family.  And
7  those neurotransmitters are excitatory and are generally
8  considered with the mood evaluation.  So that is my
9  understanding of the mechanism of the problem when GABA
10 levels are increased.
11     Q.  Are you aware of any studies in which the GABA
12 levels in the raphe nuclei were measured prior --
13 following that Neurontin exposure?
14     A.  I have several for you here.  Do you have an
15 author's name to --
16     Q.  No, I'm asking you.
17     A.  -- to facilitate this?
18     Q.  I'm not --
19     A.  Then I'm going to have to read through them
20 all there.
21     Q.  Just responding to your last answer.
22     A.  For GABA levels, right?  Well, yeah, I
23 provided you with Petroff's 2005 article where they
24 showed the GABA was increased.
25         Let's see if he quotes any others.  But you're

Page 579

1  specifically looking at the raphe nuclei?
2      Q.  Uh-huh.  (Indicates affirmatively.)
3      A.  I'll have to read through them now.
4      Q.  Well, let me see if I can cut through this.
5          What -- are you aware that Drs. --
6  Dr. Trimble's opinion on mechanism of action is that it
7  is the raphe nuclei and the link to serotonin that
8  causes the risk of suicidality?
9      A.  No.
10     MR. FROMSON:  Objection.
11     THE WITNESS:  I did not know it with that
12     degree of specificity, no.
13 BY MR. BARNES:
14     Q.  Have you done any research into -- into
15 Dr. Trimble's opinion regarding that aspect of the
16 mechanism of action of Neurontin?
17     MR. FROMSON:  Objection, form.
18     THE WITNESS:  No, I did not research that
19     opinion.
20 BY MR. BARNES:
21     Q.  Isn't it --
22     A.  If indeed it's in here.
23     Q.  Isn't it basically your -- in terms of
24 researching this, isn't it what you have done is
25 basically look at various reports and -- from Pfizer's

53 (Pages 576 to 579)

Page 596

1  patent is not something that's published in a
2  peer-reviewed medical or scientific literature, correct?
3      A.  No, I list them separately in my -- the CV I
4  gave you, publications and the patents.  The patents
5  that we've done over the last four or five years relate
6  directly to changes in -- changes for neurologic --
7  neuro psychobiologic endpoints.
8          MR. BARNES:  I just had a call from my family.
9  Take it one second.
10         MR. FROMSON:  Absolutely.
11         THE VIDEOGRAPHER:  Off the record 3:00.
12         (Off the record.)
13         THE VIDEOGRAPHER:  On the record 3:02.
14 BY MR. BARNES:
15     Q.  You would agree with me that the patents that
16 are in your resume are not part of the medical and
17 scientific peer-reviewed medical and scientific
18 literature, correct?
19     A.  No, they are not peer-reviewed literature.
20 I've only listed patents that have been issued, but I
21 haven't -- they are -- I wouldn't consider them part of
22 the literature.
23     Q.  Okay.  Now, are you board certified in
24 clinical pharmacology?
25     A.  No, I'm not a physician.

Page 597

1      Q.  Are you -- so your -- are only clinical -- are
2  only physicians clinical pharmacologists?
3      A.  That was my understanding, to be able to be
4  certified.
5      Q.  All right.  And are you on the editorial
6  boards of any of the following journals?  Are you on the
7  editorial board of the "Journal of Clinical
8  Psychopharmacology"?
9      A.  No.
10     Q.  Are you on the editorial board of the "Journal
11 of Clinical Pharmacology"?
12     A.  No.
13     Q.  Have you ever been published in the "Journal
14 of Clinical Pharmacology"?
15     A.  I believe so.
16         "Journal of Clinical Pharmacology and
17 Therapeutics."
18     Q.  Okay.  So as to the "Journal of Clinical
19 Pharmacology," you haven't published in that journal?
20     A.  No.  I don't know if that's a separate journal
21 today from "Clinical Pharmacology and Therapeutics," but
22 I've published in "Clinical Pharmacology and
23 Therapeutics."
24     Q.  On how many occasions?
25     A.  One.

Page 598

1      Q.  What about the "Journal of
2  Neuropsychopharmacology"?
3      A.  No, I'm not on the editorial board.
4      Q.  Have you ever published in the "Journal of
5  Neuropsychopharmacology"?
6      A.  No.
7      Q.  Have you published in the "Journal of
8  Pharmacology and Toxicology"?
9      A.  "Pharmacology and Toxicology"?
10     Q.  Yes.
11     A.  No.
12     Q.  And are you -- have you ever served on the
13 editorial board of the "Journal of Pharmacology and
14 Toxicology"?
15     A.  No.
16     Q.  Have you ever served on any editorial board of
17 any peer-reviewed medical journal?
18     A.  No.
19     Q.  Are you a member of the American Society for
20 Clinical Investigation?
21     A.  I don't see that one on either my list or on
22 PDG's list.
23     Q.  And I'm concerned with your list.  Okay?
24         Are you a member of the American Society for
25 Pharmacology and Experimental Therapeutics?

Page 599

1      A.  Experimental -- I don't have that on my
2  current list.  I was a member while I was in graduate
3  school, but I don't have it on my current list.
4      Q.  You're a member of the American College of
5  Clinical Pharmacology?
6      A.  No, that's not on my current list either.
7      Q.  Have you ever been a member of the American
8  College of Clinical Pharmacology?
9      A.  I -- I -- I don't recall.
10     Q.  Have you ever -- are you a member of the
11 American College of Neuropsychopharmacology?
12     A.  Oh, no, I'm not that.
13     Q.  Okay.
14     A.  You're not asking about the rest of these?
15     Q.  No, I'm done.  Thanks.
16         Now, you've been working with the Finkelstein
17 firm since 2003, correct?
18     A.  Yes.
19     Q.  Were you involved in -- or have you -- were
20 you involved in the preparation of the citizen's
21 petition?
22     A.  Yes.
23     Q.  What is the citizen's petition?  What is a
24 citizen's petition?
25     A.  A citizen's petition is a mechanism by which a

58 (Pages 596 to 599)

Page 600

1  non-NDA holder or a non-device holder or non-application
2  holder for a particular product may submit -- and this
3  may be an individual or a group or an association,
4  whatever -- may -- using a format that is dictated by
5  SEDAR may submit a petition for the FDA or the agency to
6  consider a change or a modification in either a marketed
7  product, requirements for a marketed product, to request
8  a presence, information on a pending application on a
9  wide variety of issues. It's pretty much what it sounds
10  like, a petition submitted by a citizen for the agency
11  to consider something.
12      Q.  Describe your involvement in the preparation
13  of the citizen's petition filed by the Finkelstein law
14  firm.
15      MR. FROMSON:  Just note my objection to form.
16      THE WITNESS:  I don't think I have a copy of
17  it here, but it is in the shelf.
18      As I recall -- this is going back some time --
19  I talked with them about what a citizen's petition
20  is, how it is put together, FDA's requirements for
21  routing it, the necessary period for review,
22  methods of amending it.  I recall reading the
23  petition before it was submitted, reading over it,
24  discussing data that are normally included in a
25  petition.  Those types of general assignments.

Page 601

1  BY MR. BARNES:
2      Q.  Did you draft any portion of the citizen's
3  petition?
4      A.  Boy, this far, I don't -- I don't recall
5  drafting any specific section. I do recall reading it
6  over. I may have edited. I just don't have specific
7  recollection of it.
8      Q.  Were you compensated for your work in
9  assisting in the preparation of the citizen's petition
10  filed by Mr. Finkelstein's law firm?
11      A.  That was not a -- it would not have been a
12  specific bill for that.  It would have been part of the
13  hours during relevant timeframe.
14      Q.  Did you work with Mr. Altman on the petition?
15      A.  Yes.
16      Q.  Now, are you aware of the -- of the specific
17  relief that was requested by the Finkelstein law firm
18  with your assistance in the citizen's petition?
19      A.  No, I do not recall the specific relief we
20  requested.
21      Q.  Okay.
22      A.  That I requested.
23      Q.  You don't have a copy handy by chance?
24      A.  I believe it is in the data files on the
25  shelf.

Page 602

1      (Counsel conferring off the record.)
2      MR. BARNES:  Please hand that to the court
3  reporter for marking.
4      (Deposition Exhibit No. 23 marked for
5  identification.)
6  BY MR. BARNES:
7      Q.  Do you have that in front of you?
8      A.  I do.
9      Q.  Can you tell me what the exhibit number is?
10      A.  Yes.
11      Q.  What's --
12      A.  Exhibit 23.
13      Q.  Okay.  Exhibit 23.
14      And this was submitted by Keith Altman,
15  Director of Adverse Event Analyses, Finkelstein and
16  Partners in Newburgh, New York, correct?
17      A.  Yes.
18      Q.  And do you recognize this document?
19      A.  Yes.
20      Q.  Directing your attention to page 2, the
21  petition requests FDA to make certain changes in the
22  labeling, correct?
23      A.  Just a second.
24      Yes.
25      Q.  Okay.  And this citizen's petition was filed

Page 603

1  on May 17th, 2004, about three and a half years ago,
2  correct?
3      A.  Yes.
4      Q.  Okay.  And, specifically, it asks for a bolded
5  black box warning. Do you see that?
6      A.  You're on page?
7      Q.  Three.
8      A.  Yes.
9      Q.  So reading on page 3, "The petitioners" --
10  which is Finkelstein & Associates -- "request that the
11  FDA commissioner act immediately to require the labeling
12  additions noted below.  This action is especially
13  critical because of Neurontin's -- Neurontin's wide use
14  for nonlabeled indications and for which proper medical
15  monitoring instructions have not yet been established by
16  FDA."
17      Then have a "Bolded Black Block Warning." Do
18  you see that?
19      A.  Yes.
20      Q.  Did I read that correctly?
21      A.  I don't recall the word "yet." I don't see
22  the word "yet" in the last sent- -- last line. But
23  other than that, yes.
24      Q.  Okay.  And then there is a requested black
25  box.  What's a black box warning?

Page 604

1    A.  A black box warning or a bolded warning are
2  different ways you can use to highlight information in
3  an insert.
4    Q.  So, specifically, Mr. Finkelstein asked that
5  the label include the following language -- language
6  regarding psychiatric disorders.  The petition asked --
7  asked for the following label.
8        "Neurontin has been associated with completed
9  suicides, suicide attempts, suicidal ideations, and
10  postmarketing reports.  Prescribers should carefully
11  monitor patients prior to initiation of Neurontin
12  therapy and throughout its period of use.  (See
13  precautions and adverse reactions.)"
14        Do you see that?
15        MR. FROMSON:  Question is -- note my objection
16  to the form of the question.
17  BY MR. BARNES:
18    Q.  Did I read that correctly?
19        MR. FROMSON:  Same objection.
20        THE WITNESS:  Yes.
21  BY MR. BARNES:
22    Q.  Okay.
23    A.  Yes.
24    Q.  To your knowledge, has FDA ever accepted this
25  language petition by the Finkelstein law firm to be

Page 605

1  included on the Neurontin labeling in a black box
2  warning?
3    A.  Completed suicides is now in the labeling, but
4  I don't think the black box has been adopted in the --
5  at least yet -- in the requested fashion.
6    Q.  So in the past three and a half years, there
7  has been no black box warning added to the Neurontin
8  label regarding psychiatric disorders and suicides,
9  correct?
10    A.  I think to date completed suicides has been
11  added to the controlled clinical trial section only.
12    Q.  That was the only action FDA took, correct?
13    A.  To date.
14    Q.  To date.  Well, we only can deal up to today,
15  correct?
16    A.  Uh-huh.  (Indicates affirmatively.)
17        Yes.
18    Q.  We don't know what's going to happen a year
19  from now, so let's -- right?
20    A.  Or sooner.
21    Q.  Or sooner.  Okay.  So let's deal with what we
22  know about today.
23        How about pre- -- there was suggested language
24  about precautions.  All right?  The petition requests
25  precautions regarding suicide-related events.

Page 606

1        In the label, what is -- what is a precaution?
2    A.  The precaution section is designed to give
3  information to the prescribers and to the patients about
4  ways -- of things to be on the lookout for and ways to
5  avoid or ameliorate or in other way compensate for an
6  adverse event.
7    Q.  Okay.  The petition by Mr. Finkelstein asked
8  the FDA to compel the following language in the
9  Neurontin label.  And I'll read it to you.
10        "Suicide-related events:  Neurontin use has
11  been associated with completed suicides, suicide
12  attempts, and suicidal ideations in postmarketing
13  reports.  Patient should be prospectively cautioned
14  against the possibility of these events and advised to
15  report any symptomatology immediately.  Patient should
16  also be carefully observed throughout therapy for signs
17  of suicide-related problems."
18        Did I read that part of the petition --
19        MR. FROMSON:  Objection, form.
20  BY MR. BARNES:
21    Q.  -- that part of the suggested precaution
22  accurately?
23    A.  I think so, yes.
24    Q.  Has FDA ever decided to place the precaution
25  language in the Neurontin label as reflected in the

Page 607

1  citizen's petition following May 17th, 2004?
2    A.  Well, this is a tag line to the black box
3  warning, and they haven't addressed the black box
4  warning yet, so you wouldn't see a tag line to the
5  precautions, yeah.
6    Q.  So the precautions are not included, correct,
7  as -- that are on this page?
8    A.  Well, as they're requested, they're a tag line
9  to the black box.
10    Q.  Right.
11    A.  And they have not yet addressed -- addressed
12  the black box warning.  So they wouldn't have addressed
13  this precautions which is a modification.
14    Q.  Well, they haven't -- how do you know they
15  haven't addressed it?  They haven't -- they haven't
16  accepted the petition in this regard as of today,
17  correct?
18    A.  To date -- to my understanding, to date, the
19  only change that's been made is that completed suicides
20  have now been included in the controlled clinical trial
21  section.
22    Q.  Okay.  Now, you would agree that, by your own
23  report, that that change has been described by the Food
24  and Drug Administration as a minor change to the
25  labeling, correct?

60 (Pages 604 to 607)

Page 620

1 associated with an increased risk of suicide compared to
2 the general population?
3         MR. FROMSON: Objection.
4         THE WITNESS: Yes.
5 BY MR. BARNES:
6    Q.   Now, isn't it true, in -- in evaluating the
7 information that Mr. Finkelstein's law firm submitted to
8 the FDA, that the F- -- that Dr. Katz reminded them in
9 the letter that these illnesses were -- had increased
10 risk when -- when compared to the general population?
11        MR. FROMSON: Objection.
12 BY MR. BARNES:
13    Q.   Right?
14    A.   Yes.
15    Q.   When you report, you state that FDA does not
16 consider comparisons of -- to the background rate in the
17 general population?
18    A.   No, what I said was is the FDA has said you
19 cannot compare numbers. And that's been noted several
20 times. You cannot compare a general baseline number
21 with the reports that are submitted to a MedWatch report
22 and expect to draw quantitative comparisons, because the
23 MedWatch report only pulls in one to 10 percent of all
24 events.
25    Q.   What's that based on?

Page 621

1    A.   Well, the 10 percent has been long reported by
2 FDA. And it was recently updated in 2007 by Dr. -- it's
3 either Drinker or Brinker, from the Office of
4 Epidemiology and Drug Surveillance, in testimony that he
5 provided to Congress in FDA's urging Congress to pass
6 the new PDUFA bill that gave FDA authority to require
7 postmarketing changes and postmarketing studies for
8 safety purposes.
9    Q.   What is the published data upon which that --
10 that information, that statement is based upon; do you
11 know?
12    A.   Well, it was an FDA official who made the
13 statement. I don't know upon what he or she made that
14 statement. I don't know. But it was specifically one
15 to 10 percent.
16    Q.   Okay. Now, when Dr. Katz looks at these --
17 these -- well, strike that.
18         You would agree that Dr. Katz when assessing
19 the information provided by the Finkelstein firm does,
20 in fact, compare the risk of suicide in these
21 populations to that of the general population?
22        MR. FROMSON: Objection.
23 BY MR. BARNES:
24    Q.   Isn't that true?
25        MR. FROMSON: Objection.

Page 622

1         THE WITNESS: No, I think he's saying that
2 he's going to be studying this.
3 BY MR. BARNES:
4    Q.   Look at the sentence. He said -- I'll read it
5 to you.
6         "We note at the time that these illnesses,
7 these psychiatric illnesses, are well known to be
8 associated with an increased risk of suicide compared to
9 the general population."
10        Do you see that?
11        MR. FROMSON: Objection.
12        THE WITNESS: Yes.
13 BY MR. BARNES:
14    Q.   So he -- so in evaluating the -- the -- the
15 citizen's petition, isn't it true that Dr. Katz is
16 reminding them that the -- that the illnesses for which
17 they are citing as evidence of an association for
18 Neurontin are, in fact, associated with increased risk
19 of suicide when compared to the general population?
20        MR. FROMSON: Objection.
21        THE WITNESS: Yeah, I don't know what -- I
22 don't know what of the off-label uses are being
23 referenced here.
24 BY MR. BARNES:
25    Q.   Well, psychiatric illnesses. He -- correct?

Page 623

1    A.   Wait a minute.
2         MR. FROMSON: Just note my objection to the
3 form of the last question. I think the question
4 is: "Correct?" Question mark. So I'm objecting
5 to that.
6         THE WITNESS: I'm a little confused.
7 BY MR. BARNES:
8    Q.   Now, it -- what do you find confusing about
9 the question? All I'm asking you is whether or not in
10 evaluating the information given to FDA by the
11 Finkelstein law firm prior to April 12th, 2005, Dr. Katz
12 noted during the conversation with Mr. Finkelstein's law
13 firm that the illnesses in their database for the
14 patients who were being treated with Neurontin are well
15 known to be associated with an increased risk of suicide
16 compared to the general population.
17        MR. FROMSON: Objection as to form, lack of
18 foundation.
19        THE WITNESS: Okay. I see where you're at. I
20 understand. Yes.
21 BY MR. BARNES:
22    Q.   All right. Is that true?
23    A.   It's true he said it's for committed suicide
24 while receiving Neurontin for psychiatric illnesses.
25    Q.   Okay. So in evaluating that information, he

64 (Pages 620 to 623)