Exhibit 9

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2   ------------------------------x
     In Re:                  :  MDL Docket No. 1629
 3                           :
     NEURONTIN MARKETING,    :  Master File No.
 4   SALES PRACTICES AND     :  04-10981
     PRODUCTS LIABILITY      :
 5   LITIGATION              :  Judge Patti B. Saris
     ------------------------------x
 6   THIS DOCUMENT RELATES TO: :
                             :
 7   PRODUCTS LIABILITY      :  Magistrate Judge
     ACTIONS                 :  Leo T. Sorokin
 8                           :
     Fenelon v. Pfizer, Inc., :
 9   Et al.                  :
     Case No. 06 CV 4136     :
10   ------------------------------x

11      SUPREME COURT OF THE STATE OF NEW YORK
                COUNTY OF NEW YORK
12   ------------------------------x
     In Re:                  :  INDEX NO. 765000/06
13   NEURONTIN PRODUCT       :
     LIABILITY LITIGATION    :
14   ------------------------------x
     THIS DOCUMENT APPLIES TO: :  Hon. Marcy S. Friedman
15   ALL CASES               :
     ------------------------------x
16        CONTAINS CONFIDENTIAL INFORMATION
             Thursday, December 6, 2007
17
                    -  -  -
18

19         Videotaped deposition of

20         STEFAN P. KRUSZEWSKI, M.D.

21                  -  -  -

22   VERITEXT/NEW JERSEY REPORTING COMPANY, LLC
              25B Vreeland Road, Suite 301
23         Florham Park, New Jersey  07932
           (973) 410-4040  Fax (973) 410-1313
24
```

1    reporter is Jennifer Walker. The
2    court reporter will now swear in the
3    witness.
4            - - -
5            STEFAN P. KRUSZEWSKI, M.D.,
6    having been first duly sworn, was
7    examined and testified as follows:
8            - - -
9            VIDEO SPECIALIST: You may
10   proceed.
11           MR. HOOPER: Just very briefly,
12   before we get started, as stated in
13   the depositions of Drs. Trimble and
14   Roth, we're here to depose
15   Dr. Kruszewski on the subject of
16   general causation in this case.
17           MR. FINKELSTEIN: And, for the
18   record, we're producing Dr. Kruszewski
19   for purposes of general causation as
20   well as in the Smith matter.
21           - - -
22           EXAMINATION
23           - - -
24

1    BY MR. HOOPER:
2        Q.    Dr. Kruszewski, hi. I'm
3    Jim Hooper.
4        A.    Good morning.
5        Q.    Can you confirm that I'm
6    pronouncing your name correctly? Is it
7    "Kruszewski"?
8        A.    "Kruszewski," correct.
9        Q.    Dr. Kruszewski, what does the
10   word "cytosolic" mean? C-Y-T-O-S-O-L-I-C.
11       A.    That's the inner containings of
12   a cell.
13       Q.    If a substance is cytosolic,
14   does that mean it is located inside the cell
15   membrane?
16       A.    Not inside the cell membrane;
17   inside the cell.
18       Q.    In the cytoplasm within the
19   cell?
20       A.    That's correct.
21       Q.    What is the normal level of the
22   neurotransmitter gamma-aminobutyric acid, or
23   GABA, in an adult healthy human brain?
24           MR. FINKELSTEIN: Objection as

1        to form.
2            THE WITNESS: There is levels
3        in the literature that range from 0.5
4        to 5, I believe. And the units are
5        micrograms per ML.
6    BY MR. HOOPER:
7        Q.    And same question for the
8    neurotransmitter serotonin; what is the normal
9    level in an adult healthy human brain?
10       A.    There are no normal levels that
11   I'm aware of in an adult human brain for
12   serotonin.
13       Q.    There is serotonin in every
14   healthy adult human's brain. Correct?
15       A.    That is correct.
16       Q.    Do I understand your answer
17   correctly that you acknowledge the presence of
18   serotonin in a healthy brain, but can't state
19   what the normal level of that neurotransmitter
20   would be?
21       A.    It's -- in the literature that
22   I've examined, there is no normal level of
23   serotonin. It's a ubiquitous monoamine in all
24   humans.

1        Q.    Same question for the
2    neurotransmitter norepinephrine; that is, what
3    is the normal level in an adult healthy human
4    brain?
5        A.    The same response would apply.
6        Q.    Would the same response apply
7    for dopamine as well?
8        A.    Yes, it would.
9        Q.    For any of the four
10   neurotransmitters that we just discussed --
11   GABA, serotonin, norepinephrine and
12   dopamine -- are you able to state any
13   knowledge that you have as to the normal level
14   of extracellular neurotransmitter in an adult
15   healthy human brain?
16       A.    Repeat that again, if you
17   would.
18       Q.    For any of those four
19   neurotransmitters, are you able to state the
20   normal range for extracellular levels of any
21   of those four neurotransmitters?
22       A.    I am not. I do not believe
23   that that information exists.
24           - - -

Page 14

1         (Whereupon, a document was
2     marked for identification purposes
3     as No. 1.)
4             - - -
5    BY MR. HOOPER:
6         Q.    Dr. Kruszewski, let me show you
7    what's been marked as Exhibit 1. I'd like to
8    ask you to please take a look at that and
9    confirm that that is a complete copy of the
10   textual part of your report in this case,
11   Pages 1 through 19. Your signature is on 19
12   and then Pages 21 through 24 contain a list of
13   end notes to your report.
14        A.    (Reviewing.)
15             Yes, that is my report.
16        Q.    For convenience, as we go,
17   we're going to mark various exhibits through
18   the day. I can tell you that that one is one
19   that we'll keep coming back to. So just for
20   stacking purposes, you might want to keep that
21   one handy.
22             Does your report marked as
23   Exhibit 1 contain a complete statement of your
24   opinions and your reasons and bases for them?

Page 15

1        A.    Yes, it does.
2        Q.    Who first asked you to prepare
3    a report in this litigation?
4        A.    Mr. Finkelstein.
5        Q.    When were you first asked to
6    prepare this report?
7        A.    Sometime in the fall of 2004.
8    I'm sorry.
9        Q.    Other than Mr. Finkelstein,
10   with whom, if anyone, have you communicated
11   about your work in this case?
12             MR. FINKELSTEIN: Lawyers,
13        nonlawyers, the whole world?
14             MR. HOOPER: Yeah.
15             THE WITNESS: If I can just ask
16        you to -- my understanding of your
17        question, who else is aware of the
18        existence of the report?
19             MR. HOOPER: No. That's not it
20        at all.
21   BY MR. HOOPER:
22        Q.    Other than Mr. Finkelstein,
23   with whom have you communicated about your
24   work in this case?

Page 16

1        A.    If I understand the question,
2    no one other than my staff is aware of the
3    report or have had any communication about it.
4             MR. FINKELSTEIN: Your work in
5        this case, and you answered your
6        "report."
7             MR. HOOPER: Right.
8             MR. FINKELSTEIN: So --
9             MR. HOOPER: Let me reask it
10       again. We're getting there.
11   BY MR. HOOPER:
12        Q.    Have you communicated with
13   anyone other than Mr. Finkelstein about your
14   work in this case?
15        A.    No.
16        Q.    Have you communicated with
17   anyone other than Mr. Finkelstein about your
18   report in this case?
19        A.    No.
20        Q.    You mentioned your staff.
21   Where do you work, sir?
22        A.    I have an office in Harrisburg,
23   Pennsylvania.
24        Q.    You are a licensed medical

Page 17

1    doctor. Is that correct?
2        A.    That is correct.
3        Q.    You're a psychiatrist. Is that
4    correct?
5        A.    I am a psychiatrist.
6        Q.    Do you have a medical office or
7    clinical practice?
8        A.    I do have a clinical practice.
9        Q.    Is there a name of that
10   particular business or clinical practice?
11        A.    Stefan P. Kruszewski and
12   Associates.
13        Q.    Do you -- are you the principal
14   of that business?
15        A.    Yes.
16        Q.    How many -- do you employ other
17   people in addition to yourself?
18        A.    Yes.
19        Q.    How many people do you employ
20   at Stefan Kruszewski and Associates?
21        A.    Seven.
22        Q.    Do you employ other physicians?
23        A.    Yes.
24        Q.    How many other physicians do

Page 18

1  you employ?
2      A.  One.
3      Q.  Do you employ any nurses?
4      A.  No.
5      Q.  Can you tell me what the
6  occupations are of the other six people that
7  are employed by Stefan Kruszewski and
8  Associates?
9      A.  In terms of what they do in the
10  office?
11      Q.  Yes.
12      A.  I have a full-time
13  secretary/transcriptionist that's -- whose
14  name is Wendy.  I have a -- several
15  investigators in the office who do research
16  for me.  I have an office manager.  I have a
17  physician who works with me to help in the
18  research that I do and to help in the
19  monitoring that I do.
20      Q.  How many investigators who
21  assist you with research do you employ?
22      A.  All of them -- all of the
23  people except one.  So six do investigation at
24  any given time.

Page 19

1      Q.  Can you describe the medical
2  and scientific training of the people that you
3  employ as investigators or research
4  assistants?
5      A.  Yes.  From the most
6  credentialed is a neurologist, an adult
7  neurologist, to a person who has a bachelor's
8  degree from the college of William and Mary,
9  to a person who has a bachelor's degree --
10  that's in biology.  A person who has a
11  bachelor's degree in psychology from the
12  University of New Jersey to -- everyone else
13  is at least a high school graduate or has some
14  college.
15      Q.  What is the business of Stefan
16  Kruszewski and Associates?
17      A.  We do a number of things.  We
18  do medical research that investigates and
19  reevaluates science that has been published in
20  order to examine the statistical analyses in
21  order to examine the quality of the work.  We
22  do that increasingly for the purpose of --
23  purposes of publishing.
24      We also clinically do a number

Page 20

1  of things.  I monitor Pennsylvania physicians
2  and attorneys and an occasional member of the
3  judiciary who have mental-health and
4  substance-abuse problems.
5      And the requirements of that
6  monitoring include the staff taking
7  information and processing certain papers
8  associated with that monitoring for regulatory
9  bodies, the Pennsylvania Supreme Court or the
10  medical board of the -- Pennsylvania.
11      Q.  Do you treat patients
12  clinically at Stefan Kruszewski and
13  Associates?
14      A.  Yes, I do.
15      Q.  How many patients do you treat
16  in an average week at Stefan Kruszewski and
17  Associates?
18      A.  Probably two.
19      Q.  Are there -- can you describe
20  the kinds of medical conditions or disorders
21  that you treat at your firm?
22      A.  Yes.  The majority of
23  individuals have, obviously, psychiatric or
24  neuropsychiatric problems or drug and alcohol

Page 21

1  problems.  So the individuals who come to see
2  me for diagnostic purposes, as I've, I guess,
3  begun to say, are physicians and attorneys for
4  whom I make a diagnosis and then triage to
5  other people for their care and treatment.
6      I also, on occasion, because I
7  see most of the clients who I treat outside of
8  my office, I will, on an emergency basis, see
9  individuals in my office for certain
10  circumstances that require immediate
11  attention.
12      Q.  Do you have hospital privileges
13  at any hospital institution?
14      A.  Inpatient institution, yes.
15      Q.  At what hospitals do you have
16  inpatient privileges?
17      A.  Gaudenzia, Incorporated.  The
18  hospital is Chambers Hill Inpatient Facility
19  in Harrisburg.
20      Q.  Do you have admitting
21  privileges?  Are you able to admit patients to
22  that hospital?
23      A.  Yes.  Yes.
24      Q.  How many patients do you treat

Page 26

1    Mr. Finkelstein a question about -- if I can.
2        MR. HOOPER: You need to answer
3    that one first, and then you can.
4        THE WITNESS: Okay. I
5    apologize.
6        MR. FINKELSTEIN: Let me just
7    give a general statement. If you're
8    concerned about some confidentiality
9    or something like that, just tell him
10   there's some confidential information
11   that prevents you from disclosing
12   whatever you're about to -- that you
13   can't disclose, I should say.
14       THE WITNESS: Right. Some of
15   the work that I do has been requested
16   confidentially by either state
17   attorneys general or the federal
18   Department of Justice.
19       MR. FINKELSTEIN: Does that
20   answer the issue that you wanted to
21   talk to me about?
22       THE WITNESS: Yes.
23       MR. FINKELSTEIN: Okay.
24

Page 27

1    BY MR. HOOPER:
2        Q.    Other than Florida
3    International University, state attorneys
4    general or the Department of Justice, does any
5    other person or entity pay you to perform
6    medical research consisting of reevaluation of
7    existing science?
8        A.    Only that which we do in the
9    context of litigation support.
10       Q.    How much of your -- an
11   approximate percentage, how much of your
12   medical research work is done for the purposes
13   of litigation support?
14       A.    Ten percent perhaps.
15       Q.    What's the most recent medical
16   research that you performed at the request of
17   the Florida International University board of
18   trustees?
19       MR. FINKELSTEIN: And I'll just
20   give a general comment, providing it
21   doesn't breach any confidentiality.
22   He's not asking you to divulge
23   confidential information.
24       THE WITNESS: Right.

Page 28

1        I have helped with two other
2    doctors to create a module to explain
3    the effects and side effects of
4    anti-con -- I'm sorry, atypical
5    antipsychotics in children.
6    BY MR. HOOPER:
7        Q.    You mentioned that you do some
8    work at the request of state attorneys general
9    or the U.S. Department of Justice?
10       A.    That's correct.
11       Q.    Are you hired by lawyers who
12   work for state attorneys general offices or
13   the U.S. Department of Justice to perform that
14   research?
15       A.    Both.
16       Q.    Tell me the name of the lawyer
17   at the U.S. Department of Justice or lawyers,
18   plural, who have hired you within the past two
19   years to perform medical research for the
20   federal government?
21       A.    I don't think I'm able to do
22   that.
23       Q.    Why not?
24       A.    Confidential information.

Page 29

1        Q.    The names of the lawyers who
2    hired you are confidential information?
3        A.    Yes.
4        Q.    So are you refusing to answer
5    the question on that basis?
6        A.    Yes.
7        MR. FINKELSTEIN: I'll make a
8    general comment that after review -- I
9    think he's just being conservative.
10   He may have some documents. I have no
11   idea that he may have executed on
12   confidentiality and may not know that
13   that falls within it, but if it turns
14   out the names are not, in fact,
15   confidential, he'll supplement and
16   give you those names.
17       MR. HOOPER: Very good. Would
18   you do the same thing for state
19   attorneys general --
20       MR. FINKELSTEIN: Sure.
21       MR. HOOPER: -- who hired you
22   to perform any research?
23       MR. FINKELSTEIN: Sure. If it
24   turns out it's not confidential,

8 (Pages 26 to 29)

Page 30

1    absolutely.
2  BY MR. HOOPER:
3        Q.    When you were first asked to
4  prepare your report in this case, what
5  specifically were you asked to do?
6        A.    When Mr. Finkelstein first
7  approached me, he asked me to undertake an
8  investigation examination of whether there was
9  any scientific explanation for how Neurontin
10  might or could or did cause psychological
11  harm.
12        Q.    What do you mean by
13  psychological harm?
14        A.    In this context, depression,
15  agitation, psychosis, suicidal ideation or
16  suicide.
17        Q.    Did you ask any questions about
18  that task of Mr. Finkelstein?
19        A.    Yes.
20        Q.    What did you ask?
21        A.    I asked him to explain the
22  scope of that -- of his question and his
23  request.
24        Q.    Anything else? Did you ask

Page 31

1  anything else?
2        A.    I'm sure I did.
3        Q.    Tell me as much as you can
4  remember about what questions you asked of
5  Mr. Finkelstein when you were first asked to
6  prepare a report in this case.
7        A.    Let me, if I can use my sheet,
8  just pause for a moment.
9              Okay. Let me use this as a
10  beginning. I asked him to explain the --
11  again, the scope of the project and the
12  purpose of the request. I asked him about
13  what would be required of me in terms of time
14  requirements, in terms of individual
15  investigation about resources to examine.
16              I asked him about, if a report
17  would be needed at some point in the future,
18  what that report should contain. I asked him
19  about whether the -- if it were going to be a
20  general causality report, whether that had to
21  meet certain Daubert standards. I asked him
22  about his expected time requirements, and I
23  asked him about reimbursement.
24        Q.    Have you conducted any

Page 32

1  statistical analysis in connection with
2  developing your report in this case?
3        A.    No.
4        Q.    Have you made any mathematical
5  calculations in connection with developing
6  your report in this case?
7        A.    Yes.
8        Q.    What calculations have you made
9  in this case?
10        A.    The best way that I can respond
11  to that is that there have been numbers
12  associated with many of the issues involved.
13  If I can give you one example --
14        Q.    Please do.
15        A.    In the New Drug Application, in
16  my review of the New Drug Application for
17  gabapentin or the product approval aspect of
18  the New Drug Application, I would, for
19  example, add up the number of adverse effects
20  associated with gabapentin, be they
21  individuals who had somnolence or suicide or
22  any other side effect, and use that to keep
23  track and compare it to other parts of the
24  literature that I was examining. So if I

Page 33

1  was -- enough said.
2        Q.    In placebo-controlled clinical
3  trials of gabapentin, how many suicides
4  occurred in patients who were administered
5  gabapentin?
6              MR. FINKELSTEIN: In the whole
7        history of every placebo-controlled
8        trial?
9              MR. HOOPER: Just the way I
10        asked it.
11              THE WITNESS: I don't have a
12        response to that.
13  BY MR. HOOPER:
14        Q.    The number is zero, isn't it?
15        A.    I don't know.
16        Q.    You don't know the number of
17  patients who committed suicide on gabapentin
18  in placebo-controlled trials on the drug?
19        A.    I do not know.
20        Q.    Do you know the number on
21  placebo?
22        A.    No.
23        Q.    Do you know the number of
24  patients who attempted suicide in

9 (Pages 30 to 33)

Page 34

1  placebo-controlled trials of gabapentin who
2  were administered the drug?
3      A.    In placebo-controlled trials?
4      Q.    Yes.
5      A.    No.
6      Q.    Do you know the number who
7  attempted suicide on placebo in
8  placebo-controlled trials?
9      A.    No.
10     Q.    Do you know the number of
11 patients who experienced suicidal ideation on
12 gabapentin in placebo-controlled trials of the
13 drug?
14     A.    No.
15     Q.    Do you know the number for
16 placebo?
17     A.    No.
18     Q.    Do you know the number of
19 patients who reported -- who were reported as
20 manifesting depression on gabapentin in
21 placebo-controlled clinical trials of the
22 drug?
23     A.    As in suicidal ideation,
24 suicides, I don't know the exact number, no.

Page 35

1      Q.    And is the same true for
2  depression on placebo in placebo-controlled
3  clinical trials?
4      A.    It's the same answer, yes.
5      Q.    Have you conducted -- I'm
6  sorry. Other than what you just told me
7  about, have you made any other calculations in
8  this case?
9      A.    Many calculations. Too
10 numerous to, you know, review here.
11     Q.    Have you conducted any
12 experiment in connection with your work in
13 this case?
14     A.    No.
15     Q.    Have you conducted any
16 scientific tests of any other kind in
17 connection with your work on this case?
18     A.    No.
19     Q.    In those calculations that you
20 have made in this case, have you attempted to
21 calculate a relative risk for the risk of
22 suicide in patients who take Neurontin as
23 compared with any control group unexposed to
24 Neurontin?

Page 36

1      A.    I have not.
2      Q.    Have you -- same question for
3  an odds ratio.
4            Have you calculated any odds
5  ratio for a risk of suicide in patients
6  exposed to Neurontin versus a control group
7  unexposed to Neurontin?
8      A.    No.
9      Q.    From the time you first spoke
10 with Mr. Finkelstein about preparing a report
11 in this case --
12     A.    Yes.
13     Q.    -- I'd like to walk through the
14 steps you took to get from that point to
15 finalizing and signing that report.
16            After your discussion with
17 Mr. Finkelstein, I take it you agreed to
18 prepare a report?
19     A.    At some point afterwards, yes.
20     Q.    After your first -- after you
21 first received a request to prepare a report,
22 what was the next thing you did towards
23 preparing that report?
24     A.    Repeat that for me, if you

Page 37

1  would.
2      Q.    After you first received the
3  request to prepare a report, what was the next
4  thing that you did toward preparing the report
5  marked as Exhibit 1?
6      A.    I began a comprehensive
7  literature review.
8      Q.    How did you go about performing
9  that literature review?
10     A.    A number of ways.
11     Q.    Did you use any of your
12 research staff at Stefan Kruszewski and
13 Associates to help you perform that literature
14 review?
15     A.    Yes.
16     Q.    What are the names of those who
17 helped you prepare this report?
18            MR. FINKELSTEIN: Sorry.
19 Prepare the report or prepare the
20 review?
21            MR. HOOPER: Let me reask it.
22 BY MR. HOOPER:
23     Q.    What are the names of your
24 staff members who helped you in any way in

Page 38

1  connection with your work in this case?
2      A.    Well, no one helped me prepare
3  or write the report. Obviously, there are
4  members of my staff who will go to the library
5  for me, look on PubMed or any of the other
6  search engines in order to find appropriate
7  literature.
8          MR. FINKELSTEIN: The question
9      was, what are the names of the people
10     who did that.
11         THE WITNESS: Oh. John
12     Renayne.
13         MR. HOOPER: Could you -- I'm
14     sorry.
15         THE WITNESS: John Renayne.
16 BY MR. HOOPER:
17     Q.    Anyone else?
18     A.    Jason Crist, Richard Paczynski,
19 David Tobias. That's all I can think of at
20 the moment.
21     Q.    What did John Renayne do for
22 you in terms of assisting you with your work
23 in this case?
24     A.    His major contribution, other

Page 39

1  than what we just talked about, was helping me
2  to format the bibliography.
3      Q.    Is John Renayne a scientist?
4      A.    He has a bachelor's degree in
5  biology from William and Mary.
6      Q.    What's his approximate age?
7      A.    Thirty-two.
8      Q.    What did Jason Crist do to
9  assist you in connection with your work in
10 this case?
11     A.    I believe that he also looked
12 on -- looked to find references that I had
13 identified and that would be either at Hershey
14 Medical Center or going online or purchasing
15 them from a journal if they weren't otherwise
16 available.
17     Q.    Is Jason Crist a scientist?
18     A.    No.
19     Q.    What is his educational
20 background?
21     A.    He has a high school diploma
22 and some college, I believe.
23     Q.    What did Richard Paczynski do
24 in terms of assisting you with your work in

Page 40

1  this case?
2      A.    The most helpful thing that he
3  did was to talk with me about some of the
4  issues that I addressed in my report.
5      Q.    Is Richard Paszynski a
6  physician or scientist?
7      A.    He's a Boarded neurologist.
8      Q.    Neurologist?
9      A.    Neurologist, yes.
10     Q.    How many different
11 conversations did you have with
12 Richard Paczynski about your report in this
13 case or any of the opinions expressed in it?
14     A.    I don't recall the number.
15     Q.    More than one?
16     A.    Yes.
17     Q.    And what did David Tobias do in
18 terms of assisting you with your work in this
19 case?
20     A.    He would primarily find
21 articles for me online that I requested from
22 reading previous articles.
23     Q.    And is David Tobias a
24 scientist?

Page 41

1      A.    He has a bachelor's degree in
2  psychology.
3      Q.    What's his approximate age?
4      A.    Fifty-five.
5      Q.    What's Richard Paszynski's
6  approximate age? I'm sorry, Dr. Richard
7  Paszynski's approximate age?
8      A.    Approximately 45.
9      Q.    What's Jason Crist's
10 approximate age?
11     A.    Approximately 35.
12     Q.    Did you do the word processing
13 to prepare your report in this case?
14     A.    Yes.
15     Q.    Did you, yourself, personally
16 use libraries or electronic search engines to
17 locate the literature that you reviewed in
18 connection with your work in this case?
19     A.    At times, yes.
20     Q.    Did any of your assistants who
21 helped you physically perform searches of
22 medical or scientific databases for literature
23 for incorporation or summary in your report in
24 this case?

Page 42

1      A.   At my request, yes.
2      Q.   Did you provide them the search
3  terms that they should use?
4      A.   I'm not sure that they did it
5  with search terms as much as they -- I would
6  read an article and identify references from
7  that article that I wanted to read in their
8  entirety, and they would then find those
9  articles for me either online or from the
10  publisher or in the library.
11      Q.   After you received the request
12  to prepare a report for Mr. Finkelstein, you
13  told me that you, assisted by your staff,
14  performed a search and review of medical
15  literature.  Correct?
16      A.   Yes.
17      Q.   What was the next step that you
18  took towards preparing your report marked as
19  Exhibit 1?
20      MR. FINKELSTEIN:  It can be
21      contemporaneous.  He's just looking
22      for some protocol, so it's not
23      presumed that you did this in a
24      sterile fashion and then nothing else.

Page 43

1      THE WITNESS:  I began to read
2      literature that both Mr. Finkelstein
3      provided and, as well, the literature
4      that I was able to find.
5  BY MR. HOOPER:
6      Q.   Dr. Kruszewski, did you,
7  yourself, personally read all of the
8  publications that are cited in your report?
9      A.   At one time, I read most of
10  them at least their abstracts and their
11  conclusions and, to the best of my ability,
12  the contents as well.
13      Q.   So, Dr. Kruszewski, are you
14  saying that there are scientific -- medical
15  and scientific publications cited in your
16  report that you did not read in their
17  entirety?
18      A.   I believe I read them all.
19      Q.   What was your -- strike that.
20      How did you decide which
21  publications, of all of the publications that
22  you reviewed, to cite as references in your
23  report in this case?
24      A.   There's a voluminous amount of

Page 44

1  literature, obviously, involving gabapentin
2  and all of the problems that we're here to
3  talk about today.  So I -- I read and reviewed
4  probably several thousand reports and/or
5  pieces of books, for example, to do that.
6      Over the course of many months,
7  I had to go through a process of refining all
8  of that information in a way that I could make
9  it understandable for myself and the reader.
10      So when I felt comfortable that
11  I understood the -- gabapentin's GABAergic
12  effects that decrease serotonin and how that
13  relates to suicidal ideation and suicide, I
14  then put together a comprehensive bibliography
15  obviously choosing those articles which I
16  thought led credibility to my arguments
17  that -- and supported them.
18      Those, because at
19  Mr. Finkelstein's insistence and my
20  understanding of Daubert challenge, had to be
21  peer-reviewed articles in -- and appropriately
22  referenced in literature.
23      So I did the best I could to
24  draw from peer-reviewed literature, from

Page 45

1  regulatory documents like the NDA, and any
2  other documents that I might have had
3  available to me during the course of my many,
4  many months and hundreds of hours of review.
5      Q.   Before you wrote and signed the
6  report marked as Exhibit 1, have you ever
7  published any document of any kind that
8  discusses any relationship between gabapentin
9  and suicide?
10      A.   No, I don't believe so.
11      Q.   Have you submitted any portion
12  of the opinions or reasoning that are set out
13  in your report marked as Exhibit 1 for
14  publication in any journal?
15      A.   No.
16      Q.   Have you submitted your --
17  strike that, please.
18      Apart from discussions that you
19  had with your employee, Dr. Paszynski, about
20  your work in this case, has any part of the
21  opinions or reasoning expressed in your report
22  marked as Exhibit 1 been submitted to a
23  peer-review committee?
24      A.   No.

12 (Pages 42 to 45)

Page 46

1    Q.    Okay. We've gone from the
2    request to prepare the report to literature
3    search and a compilation of that literature
4    and your review and distillation of that
5    literature to materials that you, in your own
6    words, lent credibility and support of your
7    opinions in this case. We're up to that point
8    so far?
9    A.    Yes.
10    Q.    What's the next step you took
11    towards preparing your written report in this
12    case?
13    A.    Just repeat the last part
14    again, if you would.
15    Q.    What's the next step you took
16    towards preparing your report in this case?
17    A.    After the distillation of the
18    literature that I've described, I began to
19    create a single document. I say that because
20    when I write and I do word processing, I start
21    by putting my name and address on the
22    document, and I fill in the blanks, if you
23    will, with information that I want to include
24    and reference it so that, over a period of

Page 47

1    months, the -- that document creates one final
2    document.
3    Q.    So you begin to write the
4    report?
5    A.    Yes.
6    Q.    And, obviously, at some point,
7    you finished writing the report and signed it.
8    Is that right?
9    A.    I did.
10    Q.    Have we now covered everything
11    that you did from the time you were first
12    asked to prepare a report in this case and the
13    time you signed and provided Mr. Finkelstein
14    your report marked as Exhibit 1?
15    A.    I believe we have.
16    MR. FINKELSTEIN: Did you take
17    any classes or seek any information?
18    THE WITNESS: Yes.
19    BY MR. HOOPER:
20    Q.    What else did you do other than
21    the things that we've talked about this
22    morning to prepare your report in this case?
23    A.    I also took a course at
24    St. Louis University, and I got a -- in the

Page 48

1    mail a free mailing, an advertisement that had
2    a neuroanatomy course that was designed to
3    train or teach psychiatrists, psychologists,
4    neuroanatomists, neurologists in the
5    behavioral aspects of neuroanatomy, and I
6    attended that course.
7    Q.    Where was the course conducted,
8    again?
9    A.    St. Louis, Missouri.
10    Q.    When did you attend it?
11    A.    I believe that was sometime in
12    2005.
13    Q.    How many -- for what period of
14    time were you at that course?
15    A.    I believe that it was five
16    days, approximately.
17    Q.    What subjects were taught in
18    the course?
19    A.    Basic neuroanatomy,
20    neuroanatomical dissection and the
21    emotional/behavioral counterparts of
22    neuroanatomical pathology.
23    Q.    What -- why did you take that
24    course?

Page 49

1    A.    I thought that it was -- that
2    it spoke to the issue that was being addressed
3    in the project that I had undertaken for
4    Mr. Finkelstein.
5    Q.    What did you learn in that
6    course that contributed to your report in this
7    case?
8    A.    Well, I learned a lot about
9    neuroanatomy, about neurophysiology, about
10    adjunct anticonvulsants, anticonvulsants and
11    how other agents contributed to -- or were --
12    or how other agents -- pharmacological agents,
13    affected and were explained by neuroanatomical
14    underpinnings.
15    Q.    Why did you feel it was
16    necessary to take a course to gain
17    understanding or information about those
18    subjects in order to prepare a report in this
19    case?
20    A.    It was helpful for a review.
21    My major work has been and continues to be
22    clinical medicine, meaning clinical psychiatry
23    and treatment of substance-abuse issues. So
24    this was a time in taking this course that I

13 (Pages 46 to 49)

Page 50

1  could review things that I had learned and
2  probably -- and not always remembered as well
3  as I would like, and to help me understand
4  some of the issues that I articulated or tried
5  to articulate in my paper.
6       Q.    Who taught the courses or
7  classes that you attended at St. Louis
8  University?
9       A.    I don't remember the names of
10 the faculty other than Dr. Trimble.
11           MR. HOOPER:  Let me show you
12      what I'm just going to mark as
13      Exhibit 2.
14              - - -
15          (Whereupon, a document was
16      marked for identification purposes
17      as No. 2.)
18              - - -
19 BY MR. HOOPER:
20      Q.    And this is just a rough
21 sketch, just to be fair, of a side view of the
22 brain and a view of the brain looking from the
23 top down.  Because there are many of these
24 terms that we're going to -- anatomical terms

Page 51

1  we're going to talk about in the next few
2  days, I'd like for you to help me out.
3           Could you just, on each
4  diagram, so we can sort of see where it would
5  be from the top view and where it would be
6  from the side, can you just put an "A" on
7  that -- using your pen, just indicate with a
8  small -- the letter "A" where the amygdala
9  would be located within the brain.
10      A.    The amygdala?
11      Q.    Yes.
12      A.    (Indicating.)
13      Q.    And from the top view as well?
14           MR. FINKELSTEIN:  Just so it's
15      clear, from the top view -- and I'm
16      saying this from pure naivete -- is
17      there a difference whether this is the
18      front of the brain or back of the
19      brain?
20           MR. HOOPER:  Make the left side
21      the front and that would be consistent
22      for both.
23 BY MR. HOOPER:
24      Q.    So you'd be, in essence,

Page 52

1  looking at a person from the top down there.
2  This would be the front of their head, and
3  this would be the front of their head in that
4  picture.  Make sense?
5       A.    I think so.
6       Q.    Okay.  Where would the amygdala
7  be on the top view?
8       A.    I'm not able to locate it on
9  the top view because it would depend on the
10 section that you were looking at.  So if you
11 were looking at a deep-brain section right
12 above the mid brain or forebrain, and you did
13 a cross-section as you have it in the top
14 view, I might be able to define the amygdala.
15          If I had a more superior view,
16 you could not because the amygdala would end
17 at a certain point and would no longer be in
18 the top view.
19      Q.    I follow.  Could you do this
20 for me?  Could you indicate with -- maybe
21 perhaps draw your own figure and label it "A"
22 as to where the amygdala would be located if
23 we looked down from the top of the brain?
24 Does that make sense?

Page 53

1           MR. FINKELSTEIN:  He just said
2      he couldn't.
3           MR. HOOPER:  He said if he does
4      cross-sections he can't because it
5      would change levels like in a CT scan.
6      Right?
7           THE WITNESS:  That's correct.
8  BY MR. HOOPER:
9       Q.    If you had the ability to look
10 down at the top of the brain, show me where
11 the outline of the amygdala would be.
12      A.    You mean if it were there?
13      Q.    Yes.
14      A.    I'd place it somewhere in the
15 central portion.  (Indicating.)
16      Q.    Can you locate with an "R"
17 where the raphe would be located?
18      A.    Yes.  It would not be on your
19 picture, of course, of the top view.  It's
20 located in the pons, which is the middle
21 portion of the brain stem, and that is -- it
22 would be approximately here if this were the
23 pons and this were the mid brain.  This would
24 be the raphe nucleus -- would be there.

14 (Pages 50 to 53)

Page 54

1    Q.    Could you locate with an "O"
2  where the occipital -- O-C-C-I-P-I-T-A-L --
3  the occipital lobe would be?
4    A.    Yes. It would be here,
5  although the occipital lobe and the side
6  merges with the posterior part of the temporal
7  lobe which includes the amygdala. So they're
8  going to join, but this is certainly where
9  it's located. If this is the -- if we can put
10  the nose of the person here --
11        MR. FINKELSTEIN: I think this
12    is -- the front was --
13        MR. HOOPER: The front is on
14    the left.
15        THE WITNESS: Oh, sorry.
16        MR. FINKELSTEIN: That's why I
17    was concerned about the confusion.
18        Does that change your prior
19    answers?
20        THE WITNESS: Let me answer
21    that the occipital lobe in this case
22    would be here.
23        MR. HOOPER: Just leave that
24    handy, and we'll add to it as we go.

Page 55

1        THE WITNESS: That would be
2    great.
3        MR. FINKELSTEIN: If you
4    think --
5        THE WITNESS: If the nose is
6    here, this is going to be a little bit
7    more this way. So that's all.
8  BY MR. HOOPER:
9    Q.    And what you just drew, is that
10  an "O" or is that a shape? Were you adding a
11  shape?
12    A.    No, I'm not. That's -- I'm
13  just saying that it's a little bit more
14  anterior rather than posterior if the nose is
15  where we've now placed it.
16        MR. FINKELSTEIN: The problem
17    lies in that the first time he drew it
18    he thought the front was where you
19    said top view, and you had said it's
20    on the left side. So that's why there
21    are problems with the drawing.
22  BY MR. HOOPER:
23    Q.    You've spoken with
24  Professor Trimble?

Page 56

1    A.    Yes.
2    Q.    Have you spoken with
3  Professor Trimble about the subjects that are
4  discussed in your report in this case
5  specifically?
6    A.    No.
7    Q.    I'm sorry?
8    A.    No.
9    Q.    Did you ask Professor Trimble
10  to work in this case?
11    A.    I asked him if he were
12  interested in speaking to Mr. Finkelstein.
13    Q.    Is that all you asked him about
14  this case?
15    A.    Yes.
16        Should I speak up?
17        MR. HOOPER: Why don't we take
18    a break, Andrew.
19        MR. FINKELSTEIN: Sure.
20        VIDEO SPECIALIST: Going off
21    the video. The time is 10:14.
22        - - -
23        (Recess 10:14-10:29 a.m.)
24        - - -

Page 57

1        VIDEO SPECIALIST: We're back
2    on the video. The time is 10:29.
3  BY MR. HOOPER:
4    Q.    Dr. Kruszewski, earlier, we
5  were discussing a neuroanatomy course that you
6  took in St. Louis, Missouri. Is that correct?
7    A.    Yes.
8    Q.    How did you first hear about
9  the existence of that course?
10    A.    I received a mailing, what I
11  called previously a free mailing, at home.
12    Q.    Who paid for your tuition in
13  that course?
14    A.    Mr. Finkelstein.
15    Q.    Who paid for your airfare to
16  and from that course here from Harrisburg to
17  St. Louis?
18    A.    I don't know the answer to
19  that, but...
20    Q.    You don't know who paid for
21  your plane ticket?
22    A.    I may have or Mr. Finkelstein
23  paid for it. I'm not sure who.
24    Q.    How about your lodging at that

Page 58

1  course? Who paid for that?
2      A.    I believe Mr. Finkelstein paid
3  for that --
4      Q.    By the way, I understand you've
5  had some back trouble. Is that correct?
6      A.    That's correct.
7      Q.    Speaking from experience, let
8  me ask you, please --
9          VIDEO SPECIALIST: One moment,
10     please. We've got to go off the
11     video. The time is 10:30.
12          - - -
13          (Off the record.)
14          - - -
15         VIDEO SPECIALIST: We're back
16     on the video. The time is 10:33.
17 BY MR. HOOPER:
18     Q.    Dr. Kruszewski, I understand
19 you recently had some back trouble. Is that
20 correct?
21     A.    I did, yes.
22     Q.    Let me ask you: Are you taking
23 any medications for pain or for that condition
24 as we sit here today?

Page 59

1      A.    Yes.
2      Q.    Are you taking any medications
3  that would impair your ability to understand
4  or respond truthfully and accurately to the
5  questions I'm asking?
6      A.    No.
7          MR. HOOPER: Let me show you
8      what's going to be marked as
9      Exhibit 3.
10          - - -
11         (Whereupon, a document was
12     marked for identification purposes
13     as No. 3.)
14          - - -
15 BY MR. HOOPER:
16     Q.    Have you seen this document
17 before?
18     A.    Yes. I prepared it.
19     Q.    You did prepare this document?
20     A.    (Nodding.)
21     Q.    This is a list of your expert
22 appearances and/or testimony in courts or in
23 depositions for administrative hearings since
24 2002. Is that correct?

Page 60

1      A.    That's correct.
2      Q.    Let me ask about the first item
3  listed there, the Rompilla, R-O-M-P-I-L-L-A,
4  case. Can you tell me what that case was
5  about?
6      A.    Yes.
7      Q.    Civil or criminal case?
8      A.    Yes, that's a criminal case.
9      Q.    And what was your role in that
10 case?
11     A.    I was hired by the Federal
12 Defenders of Eastern District of Pennsylvania
13 to examine mitigating factors in this woman's
14 history of methamphetamine addiction and her
15 ultimate sentencing.
16     Q.    Did you testify at trial in
17 that case?
18     A.    That is coming up next week.
19     Q.    Have you given a deposition in
20 that case?
21     A.    No.
22     Q.    Have you given any actual
23 testimony in any format in that case at this
24 point?

Page 61

1      A.    I prepared a report.
2      Q.    The next item listed is a
3  "John Doe vs. Pfizer" and that looks to me
4  like that might be this case in this
5  deposition we're here about today. Is that
6  right?
7      A.    It is.
8      Q.    The third one down is captioned
9  in bold "John Doe vs. Eli Lilly and Company."
10 Is that correct?
11     A.    That's correct.
12     Q.    What is your role in that case?
13     A.    I was hired as a consultant for
14 several individual causality actions that were
15 brought by Michael Miller & Associates from
16 Orange, Virginia, in relationship to Zyprexa.
17     Q.    What are the claims made about
18 Zyprexa in that litigation?
19     A.    The primary claim is that
20 Zyprexa can or does cause metabolic
21 dysfunction, hyperlipidemia,
22 hypercholesterolemia, metabolic syndrome,
23 diabetes type 2, aggravation of diabetes type
24 1, excessive weight gain, pancreatitis and

Page 106

1  that's fine.
2      A.    Is it okay if I scribble on
3  this?
4      Q.    Sure. It's fine by me if it's
5  fine with Mr. Finkelstein.
6      MR. FINKELSTEIN: It's fine by
7  me. Do you want him to -- as he goes,
8  do you want him to say, "1, from the
9  Finkelstein firm" or "my own" to --
10     MR. HOOPER: Would this work;
11  to go through the list and maybe just
12  note the ones silently to yourself
13  that were provided by the Finkelstein
14  firm and, at the end, we'll just get
15  the number. Okay?
16     THE WITNESS: Okay.
17     MR. FINKELSTEIN: You can use
18  your pen.
19     THE WITNESS: Yeah.
20     (Reviewing).
21     VIDEO SPECIALIST: Off the
22  video?
23     MR. FINKELSTEIN: No, we can
24  stay on the record.

Page 107

1      THE WITNESS: (Reviewing.)
2      Do you want me to do this
3  without the use of the bibliography?
4      MR. HOOPER: It's -- it's
5  really of no moment to me. I simply
6  want to know which of those items, 1
7  through 126, did you and your staff
8  gather and which ones did the
9  Finkelstein firm provide you to the
10  extent you can tell me that. That's
11  all I want.
12     MR. FINKELSTEIN: If you don't
13  mind just as a follow-up question for
14  me, is there something in the
15  bibliography that would indicate to
16  you that information?
17     THE WITNESS: Actually, it
18  wouldn't.
19     MR. FINKELSTEIN: It would or
20  would not?
21     THE WITNESS: It would not.
22     MR. FINKELSTEIN: Oh, okay.
23     THE WITNESS: (Reviewing.)
24     MR. HOOPER: He's got to change

Page 108

1  the tape. Why don't we go off now.
2      VIDEO SPECIALIST: We're going
3  off the video. This concludes Tape
4  No. 1. The time is 11:44.
5          - - -
6      (Recess 11:44-11:45 a.m.)
7          - - -
8      VIDEO SPECIALIST: We're back
9  on the video. The time is 11:45.
10  Beginning of Tape 2.
11     THE WITNESS: (Reviewing.)
12     Ones that I'm not sure of, do
13  we have the ability to pull the
14  article?
15     MR. FINKELSTEIN: No. Just
16  tell him what you know and what you're
17  not sure of.
18     THE WITNESS: Okay.
19     (Reviewing.)
20     MR. FINKELSTEIN: We're coming
21  up on an hour.
22     THE WITNESS: (Reviewing.)
23     Okay.
24

Page 109

1  BY MR. HOOPER:
2      Q.    Dr. Kruszewski, would you
3  please identify, if you would, by the footnote
4  number ascribed to them in your expert report
5  and the first name of the author, which of the
6  materials listed in your report were provided
7  to you by the Finkelstein firm?
8      A.    Okay. I'll be happy to. Let
9  me say at the outset, though, I have a number
10  of question marks in places where I'm not
11  sure.
12     Q.    I want to understand -- and my
13  question stands -- just list the ones where
14  you know that were sent to you by the
15  Finkelstein firm.
16     A.    Okay. And you'd like me to do
17  what, just identify --
18     Q.    Number, for example, 2, Ng. 4
19  L÷scher, et cetera. So items provided by the
20  Finkelstein firm are which ones of your
21  references?
22     A.    Okay. Number 1, Parke-Davis.
23  Number 3, Ng. Number 4, L÷scher. Number 5,
24  Pfizer. Number 7, Bertrand. Number 8,

Page 110

1  Bertrand. Number 9, Pritts. Number 10,
2  Taylor. Number 15, Bowery. Number 18, Rao.
3  Number 19, Reimann, R-E-I-M-A-N-N. Number 20,
4  I'm not sure about.
5         Number 21, Pfizer. Number 22
6  is a question mark, but Bloms-Funke. Number
7  24, Moore. Number 25, which is a question
8  about -- Fichter, F-I-C-H-T-E-R. Number 26,
9  Blumberg. Number 27, G÷tz. Number 28 is the
10  same reference. I'm not sure about Numbers 30
11  and 31. 32, Tremont-Lukats. Number 33,
12  Pfizer. Number 36, Taylor. Number 38,
13  Taylor. It's the same reference.
14         Number 39, it's possible,
15  Maneuf, M-A-N-E-U-F. Number 41, Reimann.
16  Number 42, Pfizer. Number 43, Gee. Number
17  44, Pfizer. Number 46, Dimond. Possibly
18  Number 50, Ferrier. Number 51, Pfizer.
19  Number 52, Pfizer. Number 53, Pollack.
20  Number 54, Pfizer. Number 55, Reimann.
21  Number 58, Taylor.
22         Number 59, Dooley. Number 61,
23  Blumberg. Number 62, Pfizer. Number 63,
24  Pfizer. Number 64, Shimoyama. Number 65, Gu,

Page 111

1  G-U. Possibly Number 69, Srivastava, which
2  includes 70, which is the same article.
3         (Reviewing.)
4         Possibly Martin. Sorry, Number
5  84. Possibly Stanley, Number 86. Possibly --
6  oh, that's the same one. 88, same reference.
7  Number 91, Pfizer. Number 92, Pfizer. Number
8  93, Pfizer. Number 94, Pfizer, Number 95,
9  Pfizer. Number 96, Pfizer. Number 97,
10  Pfizer. Number 98, Pfizer. Number 99,
11  Pfizer. Number 100, Pfizer. Yeah, Number 100
12  is Pfizer.
13         Number 101, Pfizer.
14  Number 102, Pfizer. Number 103, Pfizer.
15  Number -- and when I'm saying, "Pfizer," I'm
16  including Warner-Lambert, Parke-Davis. What
17  was I up to?
18     Q.    Dr. Kruszewski, if you want to
19  say, "100 through 111," or what have you, "all
20  Pfizer" or "the Finkelstein firm," that's
21  fine. Just want to be clear.
22     A.    That would be good.
23         Actually, we can do that. 100
24  to 111, with the exception of 106, from

Page 112

1  Pfizer. If we didn't say 111 already, that's
2  Pfizer. 112, Trimble. Number 1 -- no, that's
3  Pfizer, sorry. Oh, that's right. Number 113,
4  Pfizer. Number --
5     Q.    Can I interrupt? 112, Trimble,
6  was provided by the Finkelstein firm. Is that
7  correct?
8     A.    Yes, because that was Pfizer
9  proprietary.
10     Q.    113 is Pfizer provided by the
11  Finkelstein firm. Correct?
12     A.    113 is Pfizer, yes.
13     Q.    And 114, tell us about that
14  one.
15     A.    114 to 120 are all ones that I
16  believe my staff and I have located.
17     Q.    Okay.
18     A.    And, actually, that includes
19  all of the rest.
20         MR. HOOPER: Time to take a
21  break. Break for lunch. Back at
22  1:00.
23         MR. FINKELSTEIN: Sure.
24         VIDEO SPECIALIST: We're going

Page 113

1  off the video. The time is 12:17.
2         - - -
3         (Luncheon recess 12:17-1:13
4  p.m.)
5         - - -
6         VIDEO SPECIALIST: We're back
7  on the video. The time is 1:13.
8  BY MR. HOOPER:
9     Q.    Dr. Kruszewski, in your
10  clinical practice, do you prescribe any of the
11  class of drugs known as antiepileptic drugs or
12  AEDs?
13     A.    I don't have anybody currently
14  on AEDs, but I have in the past.
15     Q.    Which of the antiepileptic
16  drugs have you prescribed in the past?
17     A.    Neurontin, Topamax,
18  lamotrigine -- I stand corrected; I do have a
19  patient on lamotrigine right now. Depakote,
20  and that's probably it.
21     Q.    Is lamotrigine a GABA-elevating
22  drug?
23     A.    It is primarily, in my opinion,
24  a glutaminergic drug.

29 (Pages 110 to 113)

Page 122

1  by substance use.
2      Q.    Psychomotor agitation or
3  retardation is one of the nine diagnostic
4  criteria for a depressive episode in the
5  DSM-IV?
6      A.    I believe that's correct.
7      Q.    And suicidal ideation with or
8  without a plan or an active suicidal --
9  suicide plan or a suicide attempt are the
10  ninth of the nine diagnostic criteria in the
11  DSM for a depressive episode.  Correct?
12      A.    I don't remember it as being
13  what number, but it's certainly there.
14      Q.    And weight loss or weight gain
15  can play into that picture, into the
16  vegetative-symptoms category you described.
17  Correct?
18      A.    Yes.
19      Q.    I apologize, but you did tell
20  me you had treated some bipolar patients.  Is
21  that correct?
22      A.    That's correct.
23      Q.    Have you prescribed any
24  medications to treat bipolar patients?

Page 123

1      A.    Yes.
2      Q.    Have you prescribed lithium to
3  treat bipolar patients?
4      A.    Yes.
5      Q.    Have you prescribed valproic
6  acid, or valproate, to treat bipolar disorder
7  in bipolar patients?
8      A.    Yes.
9      Q.    Are there other pharmaceutical
10  or medicinal treatments for bipolar disorder
11  that you've prescribed for your patients with
12  that condition?
13      A.    Yes.
14      Q.    Could you tell me what those
15  are, to the best of your recollection, please.
16      A.    Yes.  There are instances where
17  I've augmented treatment with lithium or
18  Depakote with antipsychotic agents and/or
19  antidepressants and/or electroconvulsive
20  therapy.
21      Q.    For how many patients have you
22  prescribed electroconvulsive therapy or ECT?
23      A.    In what duration?
24      Q.    Any duration, any ECT at all.

Page 124

1      A.    Probably 25 patients in my
2  lifetime.
3          MS. McGRODER:  Can you just
4      keep your voice up a little bit?
5          THE WITNESS:  Yes.
6          MS. McGRODER:  It's hard to
7      hear you guys.
8          THE WITNESS:  Yeah.
9  BY MR. HOOPER:
10      Q.    Dr. Kruszewski, would you agree
11  with me that there is considerable evidence in
12  the medical and scientific literature that ECT
13  is an effective treatment in particular for
14  patients who are suicidal?
15      A.    In certain circumstances, it
16  can be effective for individuals who are
17  suicidal.
18      Q.    Does ECT treatment elevate GABA
19  levels in the brain, lower them or have no
20  effect, to your knowledge?
21      A.    I don't recall.
22      Q.    You don't know the answer to
23  that question?
24      A.    I don't.

Page 125

1      Q.    Okay.  Would you agree that
2  levels of the monoamines, serotonin,
3  norepinephrine and dopamine fluctuate in the
4  healthy adult brain over the course of a
5  24-hour period?
6      A.    Yes, I believe that they do.
7      Q.    Is the same true of GABA levels
8  in a healthy adult human brain, that they
9  fluctuate over the course of a 24-hour period?
10      A.    I believe that they probably
11  do, yes.
12      Q.    Are you able to quantify in any
13  way the range within which monoamine levels
14  fluctuate in the normal adult healthy human
15  brain?
16      A.    No.
17      Q.    Would you be able to quantify
18  the range within which GABA levels fluctuate
19  in a normal, healthy adult human brain over
20  the course of a 24-hour period?
21      A.    Let me ask you to clarify the
22  question.  Would I be able to clarify it
23  through experimentation or --
24      Q.    As you sit here today, we --

32 (Pages 122 to 125)

Page 126

1  it's show time, if you will. So, as you sit
2  here today, are you able to quantify the range
3  within which GABA levels fluctuate over the
4  course of a 24-hour period in an adult healthy
5  human brain?
6      A.    I am not.
7      Q.    Dr. Kruszewski, can you tell me
8  the date that you completed and signed your
9  report in this case?
10     A.    Boy, I... (Reviewing.)
11           No. It was several months ago.
12     Q.    Can you put it within a month?
13     A.    I cannot.
14     Q.    Was it within the past three
15 months that you completed and signed your
16 report in this case?
17     A.    I can't recall.
18     Q.    Do you recall whether it was
19 during the summer or since the summer that you
20 completed and signed your report in this case?
21 Summer being -- starting on June 22nd of this
22 year.
23     A.    The best estimate I can give
24 you is, the bulk of the work was done in 2005

Page 127

1  and early 2006.
2      Q.    Are there any specific changes
3  that you can identify or specific sections
4  that you can identify as ones that you added
5  during calendar year 2007?
6      A.    I have to look over the report
7  to do that. The -- there were multiple
8  changes that I made in the bibliography in
9  terms of formatting and going over that with
10 Mr. Renayne to make sure that that was
11 accurate. So that took a long period of time.
12     Q.    I take it most of the
13 substantive part of your report, that is to
14 say, the part that begins with the
15 word "Introduction" and ends right before your
16 signature, most of the substantive work was
17 completed no later than 2006. Is that what
18 you're saying?
19     A.    Actually -- no, I need to amend
20 that. The bulk of it was done in 2005 and
21 2006 -- my apologies -- and was finished in
22 2007.
23     Q.    Okay. You have a copy of your
24 report there in front of you. With reference

Page 128

1  to Exhibit 1, your report in this case, would
2  you take a look at the last full sentence in
3  the first paragraph that begins with the words
4  "It is further my opinion"?
5      A.    I'm sorry. What page are you
6  on?
7      Q.    On Page 1 of your report.
8           By the way, let me ask you
9  first: Did you read your report before you
10 came to your deposition today in -- within the
11 past few days in preparation for this
12 deposition?
13     A.    I read it about one week ago.
14     Q.    Would you please take a look at
15 the sentence at the end of the first full
16 paragraph on Page 1 of your report that begins
17 with the words "It is further my opinion" and
18 read that sentence to yourself and just let me
19 know when you're finished.
20     A.    (Reviewing.)
21           I'm sorry, I can't find that --
22 oh, the first paragraph.
23     Q.    Last full sentence in the first
24 full paragraph.

Page 129

1      A.    "It is further my opinion that
2  gabapentin's net effect on these
3  neurotransmitter systems results in
4  self-injurious behavior including attempted
5  and completed suicide in a susceptible
6  minority of consumers."
7      Q.    Define for me what you mean by
8  "susceptible minority of consumers."
9      A.    I believe that there are
10 individuals who -- and it's a relatively small
11 number of people who are prescribed Neurontin
12 who suffer the ill effects from Neurontin.
13 And that would be what I consider the
14 susceptible minority.
15     Q.    Quantify what you mean by the
16 words "relatively small number" as a
17 percentage of Neurontin patients. What do you
18 think it is?
19     A.    I believe that it's less than
20 five percent.
21     Q.    You believe that -- are you
22 talking here about -- well, let me ask you
23 this: You've said, "self-injurious behavior,
24 including attempted and completed suicide."

1    Q.    Do you see that Table 2 says,
2    "Exposures and events" right under the words
3    "Table 2" at the top?
4    A.    "Total person years of
5    exposure" --
6    Q.    It's captioned "Table 2
7    Exposures and Events."
8    A.    Yes.
9    Q.    See that part?
10    A.    Yes.
11    Q.    You see across the top bar,
12    there are the words "Lithium," "Divalproex,"
13    "Gabapentin," "Carbamazepine" and "Total."
14    Those are the titles, the labels for the
15    columns. Correct?
16    A.    That's correct.
17    Q.    And in the leftmost column,
18    there's a list of events. And among those,
19    the fourth and fifth listed are "Completed
20    suicides per thousand person years of
21    exposure" and "Suicide attempts per thousand
22    person years of exposure." Correct?
23    A.    That's correct.
24    Q.    And, Dr. Kruszewski, if you

1    look over in the gabapentin column, what is
2    the number of completed suicides per thousand
3    person years of exposure on the
4    gabapentin-treated subjects in this study,
5    observed in study?
6    A.    3.50.
7    Q.    And what is the number of
8    suicide attempts per thousand person years of
9    exposure observed in the Medicaid patients
10    observed in this study?
11    A.    9.49.
12    Q.    Would you agree with me that
13    3.5 is precisely 65 percent less than 10?
14    A.    That sounds accurate to me.
15    Q.    Would you agree with me that
16    9.49 is about 25 percent of 40?
17    A.    Yes.
18    Q.    Do you know where the 2.6
19    figure that you quoted from the Collins and
20    McFarland study comes from or how that was
21    derived?
22    A.    I don't recall. I'd have to
23    reread the paper, but it is in the last
24    sentence under "Results" that -- should I be

1    reading this or...
2    Q.    No. Just sit and breathe.
3    We're on the clock. It's okay.
4    Would you look at Page 5 of the
5    Collins article?
6    A.    Yes.
7    Q.    The last paragraph in the
8    rightmost column beginning at the bottom that
9    begins with the words "The present project" --
10    A.    Yes.
11    Q.    -- would you mind reading aloud
12    the first three sentences? You don't have to
13    include the citations, but would you just read
14    the first three substantive sentences of that
15    paragraph?
16    A.    "The present project found that
17    gabapentin use was associated with a greater
18    risk of suicide compared to lithium. However,
19    this greater risk during gabapentin use did
20    not pertain to suicide attempts. Gabapentin
21    is often prescribed for chronic pain which may
22    well be related to suicide and suicide
23    attempts."
24    Q.    Does that refresh your

1    recollection as to what -- where the figure
2    2.6 that was on the abstract derives from? In
3    other words, what is it comparing gabapentin
4    to?
5    MR. FINKELSTEIN: Objection as
6    to form.
7    THE WITNESS: According to
8    this, it compares it to lithium.
9    BY MR. HOOPER:
10    Q.    Would you agree with me that
11    there is substantial scientific evidence that
12    lithium is protective against suicidal
13    behavior?
14    A.    Yes.
15    Q.    And, in fact, the completed
16    suicide rates and suicide attempt rates for
17    each of the three drug-treated groups in this
18    study are lower than the comparable rates
19    cited in this very study's opening paragraph
20    for completed suicide and suicide attempts in
21    untreated bipolar disorder?
22    A.    I'm not sure that I would agree
23    with that. I'd have to review the article.
24    Q.    We just looked at the numbers.

Page 142

1    A.    I didn't get to review the
2  article. You're showing me certain numbers,
3  and I'd certainly like to read the article.
4    Q.    You just read the numbers that
5  I'm asking you to compare, didn't you?  Do you
6  recall reading the opening paragraph?
7    A.    Yes.
8    Q.    Do you recall reading the
9  numbers from Table 2?
10   A.    Yes.
11   Q.    Okay.  Is 3.5 less than 10?
12   A.    Yes.
13   Q.    And is 9.49 less than 40?
14   A.    Yes.
15   Q.    Let's look at -- back to your
16  report, if you don't mind.
17   A.    Um-hum.
18   Q.    And, Dr. Kruszewski, I'd like
19  to draw your attention in particular to the
20  last sentence right above the heading
21  "Discussion" on the first page?
22   A.    Yes.
23   Q.    And you have a sentence there
24  that reads, "I have used the same type of

Page 143

1  scientific analysis and reasoning herein that
2  I use in my professional work."
3         Did I read that correctly?
4    A.    Yes, you did.
5    Q.    Okay.  You mentioned to me
6  earlier today that one project that you did
7  for Florida International University involved
8  looking at the safety of a drug.
9         Do I recall that correctly?
10   A.    No.
11   Q.    Okay.  What was the project for
12  Florida International University again?
13   A.    The project is providing an
14  educational tool for use for health
15  professionals around the country so that
16  healthcare professionals can understand the
17  risks and benefits associated with the use of
18  antipsychotics.
19   Q.    So it pertains to a class of
20  medications.  Is that right?
21   A.    Yes.
22   Q.    Okay.  Apart from your work in
23  this case, have you ever been retained by any
24  government agency to investigate and opine on

Page 144

1  the safety of any particular pharmaceutical
2  compound?
3    A.    You have to define for me the
4  word "retained."
5    Q.    How about if I replace it.
6  I'll replace it with a different word.  Apart
7  from your work in this case, have you ever
8  been asked by a government agency to
9  investigate and opine on the safety of a
10  pharmaceutical compound?
11   A.    Yes.
12   Q.    Could you tell me, how many
13  times has that happened?
14         VIDEO SPECIALIST:  We're going
15     off the video.  The time is 1:51.
16         - - -
17         (Off the record.)
18         - - -
19         VIDEO SPECIALIST:  We're back
20      on the video.  The time is 1:53.
21  BY MR. HOOPER:
22   Q.    Dr. Kruszewski, the question
23  is: Have you ever been asked by a
24  governmental agency, whether paid or not, to

Page 145

1  investigate and opine on the safety of any
2  pharmaceutical compound?
3    A.    Yes.
4         VIDEO SPECIALIST:  Excuse me.
5     We're going to go off the video.  The
6     time is 1:54.
7         - - -
8         (Off the record.)
9         - - -
10        VIDEO SPECIALIST:  We're back
11     on the video.  The time is 1:54.
12  BY MR. HOOPER:
13   Q.    Your answer was, "Yes," I
14  believe.  Correct?
15   A.    Yes.
16   Q.    How many times have you been
17  asked by a government agency to investigate
18  and opine on the safety of a pharmaceutical
19  compound?
20   A.    That question is difficult for
21  me to answer because I continue to provide
22  certain information in certain ongoing cases.
23   Q.    What government agency -- for
24  which government agencies are you currently

37 (Pages 142 to 145)

Page 154

1    A.    Whether I believed this was an
2    effective agent for the treatment of alcohol
3    dependence.
4        Q.    Did your analysis involve any
5    specific analysis of safety data for Vivitrol?
6        A.    Yes.
7        Q.    What data did you examine?
8        A.    The data associated with the
9    side effects of naltrexone which primarily
10   included nausea and certain laboratory
11   abnormalities.
12       Q.    What was the source of the data
13   that you considered in rendering your opinion
14   to Penn State and Eastern on Vivitrol?
15       A.    I looked at the New Drug
16   Application -- actually, it was the approval
17   package of the New Drug Application as made
18   available to me by the U.S. FDA. And I looked
19   at the research primarily by the group in
20   Philadelphia from Charles O'Brien and the
21   office of -- Veterans Hospital in
22   Philadelphia.
23       Q.    In addition to your analysis of
24   Wellbutrin in 1991 and your more recent 2000

Page 155

1    analysis of Vivitrol for Penn State, are there
2    other specific instances that you can recall
3    where an academic institution asked you to
4    investigate and opine on the safety of a
5    pharmaceutical compound?
6        A.    That's all I can recall at the
7    moment.
8        Q.    You certainly consider yourself
9    a psychiatrist. Correct? And hold -- you are
10   a licensed -- I'm sorry, a board-certified
11   psychiatrist. Is that correct?
12       A.    That's correct.
13       Q.    And you have experience and
14   expertise in clinical psychiatry. Is that
15   correct?
16       A.    Yes.
17       Q.    And, in particular, in the
18   treatment of substance-dependence disorders?
19       A.    Yes.
20       Q.    Substance-abuse disorders, I
21   should say.
22       A.    Both.
23       Q.    Do you hold yourself out as an
24   expert in epidemiology?

Page 156

1        A.    No.
2        Q.    Do you hold yourself out as an
3    expert in psychopharmacology?
4        A.    I guess you'll have to define
5    "expert."
6        Q.    Psychopharmacology is the study
7    of medicines used in psychiatry.
8            MR. FINKELSTEIN: He said,
9        "define expert."
10           THE WITNESS: Define "expert."
11           MR. HOOPER: As a person who
12       has particular education, training or
13       expertise in that subject.
14           MR. SOH: An expert that has
15       expertise?
16           MR. HOOPER: That was a little
17       circular.
18           As a person who has particular
19       training, skill or education, I should
20       have said, in that subject.
21           THE WITNESS: Yes, I believe I
22       would probably qualify.
23   BY MR. HOOPER:
24       Q.    Do you -- do you try to stay

Page 157

1    current on developments in the field of
2    psychopharmacology?
3        A.    Yes.
4        Q.    Do you -- are you a member of
5    the American College of
6    Neuropsychopharmacology?
7        A.    No.
8        Q.    Are you a member of the
9    Collegium Internationale
10   Psychopharmicologicum, or CINP?
11       A.    No.
12       Q.    Do you know what that is?
13       A.    An organization that -- of
14   people who are interested in
15   psychopharmacology.
16       Q.    Do you regularly subscribe to
17   any journals that are specifically directed to
18   the subject of pharmacology such as the --
19   the -- the "Journal of Psychopharmacology,"
20   any journal that is specifically directed at
21   psychopharmacology in particular?
22       A.    Yes.
23       Q.    Which journals do you subscribe
24   to regularly?

VERITEXT CORPORATE SERVICES (800) 567-8658

1    A.    "The Medical Letter." And all
2 of the journals that I subscribe to, I think I
3 need to take time to list them, but the --
4 like the "New England Journal of Medicine" and
5 the "American Journal of Psychiatry" obviously
6 devote a major part of their enterprise to
7 psychopharmacology. And for -- I think I
8 answered your question.
9    Q.    Do you attend any annual
10 meetings that are devoted to the subject and
11 field of psychopharmacology?
12    A.    Not generally.
13    Q.    Okay. Are you familiar with a
14 psychopharmacologist named Dr. Guy Goodwin
15 from Oxford University in England?
16    A.    I know the name, yes.
17    Q.    You'd agree with me, he is one
18 of the leading psychopharmacologists in the
19 world?
20    A.    I believe so.
21    Q.    Do you believe that Dr. Goodwin
22 might have more expertise in
23 psychopharmacology than you, yourself, have?
24    A.    Yes.

1    Q.    Are you familiar with
2 Dr. Charles Nemeroff of Emory University?
3    A.    I am.
4    Q.    You would agree with me that
5 he's one of the leading psychopharmacologists
6 in the world?
7    A.    Yes.
8    Q.    Do you think that he probably
9 has more knowledge of psychopharmacology
10 that -- than you personally have?
11    A.    Perhaps.
12    Q.    Do you think there's a chance
13 that you know as much about the general
14 subject of psychopharmacology as Charles
15 Nemeroff does?
16    A.    I just don't know the answer to
17 that.
18    Q.    Are you familiar with a
19 psychiatrist and psychopharmacologist named
20 Sheldon Preskorn?
21    A.    I am not.
22    Q.    Are you familiar with a
23 neuropsychopharmacologist and psychiatrist
24 named J. John Mann of Columbia University?

1    A.    Yes.
2    Q.    Would you agree with me that he
3 is one of the world's foremost experts on both
4 neuropsychopharmacology and suicide?
5    A.    I know of some of his work in
6 suicidology. I'm not familiar with the bulk
7 of his work.
8    Q.    Do you know he's a past founder
9 and president of the American Foundation for
10 Suicide Prevention? Were you aware of that?
11    A.    I'm not, no.
12    Q.    Are you aware of a
13 psychopharmacologist named Dr. Carl Salzman,
14 S-A-L-Z-M-A-N?
15    A.    I'm aware of the name, yes.
16    Q.    Are you aware of an
17 epidemiologist with particular expertise in
18 the epidemiology of suicide named Eve Mosicki,
19 M-O-S-I-C-K-I?
20    A.    Spell that again.
21    Q.    M-O-S-I-C-K-I. Eve Mosicki.
22    A.    No, I'm not.
23    Q.    Are you familiar with a
24 psychopharmacologist named Dr. Paul Leber,

1 L-E-B-E-R?
2    A.    Yes.
3    Q.    Would you agree with me that he
4 is one of the leading experts in the country
5 on the safety and effectiveness of
6 psychopharmacological compounds?
7    A.    Yes.
8    Q.    Are you aware that he's a
9 former director of the division of
10 psychopharmacological drugs at the Food and
11 Drug Administration?
12    A.    I am.
13    Q.    Are you familiar with a
14 psychopharmacologist named Dr. Jerry
15 Rosenbaum, R-O-S-E-N-B-A-U-M?
16    A.    Yes.
17    Q.    Would you agree with me he's
18 one of the leading psychopharmacologists in
19 the United States?
20    A.    Yes.
21    Q.    And are you familiar with a
22 psychopharmacologist and psychiatrist named
23 Dr. Ross Baldessarini,
24 B-A-L-D-E-S-S-A-R-I-N-I?

Page 174

1    Q.    Let's say it's a 5-HT1 receptor
2    or 5-HT1A receptor.  When serotonin binds to
3    that receptor, what happens at that point that
4    causes a signal to be transmitted from the
5    sending neuron to the receiving neuron?
6    A.    It causes an effect in the
7    post -- the accepting neuron, if you will.
8    Q.    Exactly.  And what is that
9    effect?
10    A.    And that effect depends on
11    which serotonin receptor it stimulates.
12    5-HT1, 5-HT2, 5-HT1, 5-HT2C.
13    Q.    I understand there are a number
14    of them.  Let's start with the first one.
15          5-HT1A receptor, what is that
16    effect that the serotonin molecule brings
17    about on the postsynaptic neuron?
18    A.    It can generate an electrical
19    stimulus.  It can generate chemical changes in
20    the neuron that's -- whose receptor it's
21    binding to.  Can we -- there's no -- I'm kind
22    of blinded by the light.
23    Q.    Is that okay now?
24    A.    Yeah, that's much better.

Page 175

1    Q.    Can we look right underneath
2    the bolded heading on Page 2 at the first
3    sentence that begins with the words "A
4    chemical is"?
5    A.    Yes.
6    Q.    Do you see that?
7          You write there, "A chemical is
8    considered GABAergic when it effects changes
9    in GABA levels."
10          Did I read that correctly?
11    A.    Yes, you did.
12    Q.    Okay.  Can a change in diet
13    affect GABA levels in the human brain?
14    A.    Yes, I believe so.
15    Q.    So certain changes in diet
16    could be GABAergic?
17    A.    Yes.
18    Q.    Can you identify what some of
19    those dietary changes could be that would
20    affect GABA levels?
21    A.    I'm sorry, I was addressing
22    that with -- for serotonin.  I take that back.
23          The question -- can you repeat
24    the question?

Page 176

1    Q.    Sure.  We'll get there, too.
2          Would you agree with me that a
3    change in diet could alter a person's GABA
4    levels?
5    A.    I'm -- actually, for GABA, I'm
6    not aware that any changes in diet would
7    change GABA levels.  I don't believe that
8    research has ever been done.
9    Q.    Okay.  Can changes in diet
10    alter a person's serotonin level?
11    A.    Yes.
12    Q.    And, by the way, I take it
13    that, when you say, "A chemical is considered
14    GABAergic when it affects changes in GABA
15    levels," we can substitute another
16    neurotransmitter such as serotonin for GABA,
17    and the same would be true.  Correct?
18          In other words, a chemical
19    considered -- is considered serotonergic when
20    it affects changes in serotonin levels.
21    Wouldn't that be true?
22    A.    Yes.
23    Q.    Okay.  Would you agree with me
24    that changes in diet can affect serotonin

Page 177

1    levels in the human brain?
2    A.    Yes, I believe that they can.
3    Q.    Would you agree with me that
4    there is a range within which GABA levels can
5    vary in an adult human brain without any
6    serious clinical effects?
7    A.    I believe that's true.
8    Q.    And would you agree with me
9    that the levels of serotonin in a human brain
10    can vary within some range, and within that
11    range, there are no serious clinical effects?
12    A.    Yes.
13    Q.    You write in the opening
14    sentence of the last paragraph beginning on
15    Page 2 that, "Gabapentin has structural
16    similarity to gamma-aminobutyric acid (GABA)."
17    Correct?
18    A.    Yes.
19    Q.    You would agree with me that
20    gabapentin is not structurally identical to
21    GABA.  Correct?
22    A.    Yes.
23    Q.    And would you agree with me
24    that even slight changes in molecular

45 (Pages 174 to 177)