Page 202
1  living human brain?
2      A.    It is quantitatively different.
3  It is qualitatively different only because the
4  drug that is showing similarities of action of
5  depletion of monoamines is not gabapentin in
6  this case, but reserpine.
7      Q.    You would agree with me that
8  there is no published science anywhere that
9  says or purports to say that gabapentin
10  depletes monoamines in the same way or to the
11  same extent that reserpine does?
12      MR. FINKELSTEIN: Objection.
13  BY MR. HOOPER:
14      Q.    Correct?
15      MR. FINKELSTEIN: Objection as
16  to form.
17      THE WITNESS:  Repeat that.
18      MR. HOOPER:  Would you read
19      that back, please?
20      REPORTER: "QUESTION: You
21      would agree with me that there is
22      no published science anywhere that
23      says or purports to say that
24      gabapentin depletes monoamines in

Page 203
1      the same way or to the same extent
2      that reserpine does?"
3      THE WITNESS:  No.  I guess I
4      would disagree with that.
5  BY MR. HOOPER:
6      Q.    What published science says
7  that gabapentin depletes monoamines in the
8  same way and to the same extent that reserpine
9  does?
10      MR. FINKELSTEIN:  My objection
11      is solely because of the compound
12      nature of it because I don't know --
13      his prior answer distinguished between
14      the two, so that's...
15  BY MR. HOOPER:
16      Q.    My question is:  You just told
17  me if I heard you correctly that you would
18  disagree with my proposition that there is no
19  published science that says that gabapentin
20  depletes monoamines in the same way and to the
21  same extent that reserpine does.  You disagree
22  with that.  Correct?
23      A.    I do disagree with that
24  statement, yes.

Page 204
1      Q.    My question is:  What is the
2  published science that states that gabapentin
3  depletes monoamines in the same way and to the
4  same extent that reserpine does?
5      MR. FINKELSTEIN:  Objection as
6  to form.
7      THE WITNESS:  There are --
8      there is science including that which
9      is included in the NDA for gabapentin
10      that gabapentin decreases the release
11      of monoamines in hyperexcitable
12      states.
13      There is also ample evidence
14      placed into my report that gabapentin
15      has shown to decrease monoamines in
16      other animal studies.
17      There is evidence analogously
18      that the depletion of monoamines,
19      since we don't have a quantifiable
20      amount of how much depletion of
21      serotonin or norepinephrine it takes
22      to reduce depression -- I'm just
23      talking about serotonin -- that it's
24      analogous to the reserpine depletion

Page 205
1      of all three of those monoamines.
2  BY MR. HOOPER:
3      Q.    Okay.  My question isn't about
4  whether there is published science that finds
5  some depletion or reduction of monoamines
6  under some set of conditions.  My question has
7  an equals sign in it.
8      What published science says or
9  purports to say that gabapentin depletes
10  monoamine levels to the same extent that
11  reserpine depletes monoamine levels, if you
12  can cite any?
13      A.    There's no published evidence
14  that I'm aware of that shows that.
15      Are we done with this one?
16      Q.    We are, yes.
17          - - -
18      (Whereupon, a document was
19      marked for identification purposes
20      as No. 12.)
21          - - -
22  BY MR. HOOPER:
23      Q.    Dr. Kruszewski, let me show you
24  what's been marked as Exhibit 12 and confirm

52 (Pages 202 to 205)

Page 210

1    Q.    Barbiturates and
2  benzodiazepines are distinct classes of
3  pharmaceutical compounds. Correct?
4    A.    That's correct.
5    Q.    Would you agree with me that
6  the pharmacological actions of barbiturates,
7  benzodiazepines and gabapentin in the brain
8  and central nervous system are different?
9    A.    Yes.
10    Q.    Would you -- oh, one other
11  question on that reference. This is the fifth
12  edition of the Cooper, Bloom and Roth's book
13  "The Biological Basis of Neuropharmacology."
14  Correct?
15    A.    Yes.
16    Q.    Are you aware that an eighth
17  edition was published more recently in 2003?
18    A.    I am, yes.
19    Q.    Was there a reason that you
20  chose not to refer to a more recent edition of
21  that book?
22    A.    I already have that one at
23  home.
24         - - -

Page 211

1         (Whereupon, a document was
2         marked for identification purposes
3         as No. 13.)
4         - - -
5  BY MR. HOOPER:
6    Q.    Dr. Kruszewski, I'd like to
7  show you what's been marked as Exhibit 13 and
8  ask you to look in particular, just so the
9  record is clear, at the final page of the
10  exhibit, which is Page 216 of this excerpt
11  from the book and ask you to confirm that
12  that's the same -- Page 16 is the same --
13  sorry, Page 216 of the exhibit is the same
14  Page 216 that is cited as Exhibit -- as
15  Reference 13 in your report.
16    A.    You'll have to give me that
17  again. It's late, and I apologize.
18    Q.    If you can just take a look at
19  the last page of the exhibit, you'll see that
20  it's Book Page 216.
21    A.    Yes, thank you.
22    Q.    And could you confirm for me
23  that that is the same page cited as
24  Reference 13 on Page 3 of your report?

Page 212

1    A.    Yes.
2    Q.    This is the Brown and Stoud --
3  Brown and Stoudemire book. Correct?
4    A.    That's correct.
5    Q.    Okay. And if you look in the
6  rightmost column, there's a section captioned
7  "Catecholamine Depleters." Is that right?
8    A.    That's correct.
9    Q.    And there is one drug listed
10  there as a catecholamine depleter, namely,
11  reserpine. Is that correct?
12    A.    That's correct.
13    Q.    And the first sentence of that
14  section says, "Reserpine is infamous for
15  causing depression with suicidal ideation."
16  Correct?
17    A.    That's correct.
18    Q.    Is that the portion of this
19  page that you're referring to as support for
20  the sentence that we've been discussing about
21  emergence of violence and self-destructive
22  behavior on Page 3 of your report?
23    A.    It's not the only piece from
24  this page.

Page 213

1    Q.    Okay. What else on that page
2  supports your opinion expressed on Page 3 of
3  your report?
4    A.    Let me just take a moment to
5  read it.
6    Q.    Sure.
7    A.    (Reviewing.)
8         Okay.
9    Q.    Is that the language that you
10  were referring to as support for the sentence
11  on Page 3 of your report about emergence of
12  violent and self-destructive behavior?
13    A.    It includes that sentence.
14    Q.    What else on that page do you
15  believe supports that statement in your
16  report?
17    A.    It also includes the sentences,
18  under "Catecholamine depleters," as follows,
19  "Other dose-dependent encephalopathic effects
20  of reserpine, uncommon under 0.25 milligrams
21  per day, are sedation, anxiety, psychosis,
22  nightmares and Parkinsonism."
23         Secondly, under the section of
24  "Dopamine," when discussing the

54 (Pages 210 to 213)

Page 214

1 pathophysiology, the second paragraph under
2 that section reads as follows: "The
3 catecholamine" -- let me just pinpoint the
4 area that I want to highlight. "Physio" --
5 "However, physiologic stressors that
6 predispose to delirium, as well as some
7 medications, may both reduce the integrity of
8 the blood-brain barrier and increase dopamine
9 release. Theoretically, this may heighten the
10 possibility of neuropsychiatric toxicity due
11 to exogenous dopamine."
12        What we have on here and why I
13 included it is problems both with dopamine and
14 norepinephrine and the -- we know from the
15 information that I've previously looked at
16 elsewhere that two of the monoamines that can
17 be decreased by gabapentin include these two.
18        What I said in this sentence
19 and why it relates specifically to that is
20 that dopaminergic responses in different parts
21 of the brain, as well as neuroadrenergic
22 changes in different parts of the brain, both
23 of them can produce violent and unpredictable
24 behavior.

Page 215

1      Q.    Does gabapentin cross the
2 blood-brain barrier?
3      A.    It does, yes.
4      Q.    You believe it does?
5      A.    I believe it does, yes.
6      Q.    Would you agree with this
7 statement that, "Reserpine inhibits the
8 transport of biogenic amines such as dopamine,
9 noradrenaline and serotonin from the cytoplasm
10 into storage vesicles"?
11      A.    I'm sorry, where are you
12 reading from?
13      Q.    I apologize. I'm reading from
14 Page 4 of the Stoudemire book. It's about the
15 third page in of the exhibit -- I'm sorry,
16 fourth page in of the exhibit, left-hand
17 column third full paragraph right under the
18 word bolded "Pathophysiology"?
19      A.    Yes.
20      Q.    You agree with that? The
21 question is: Do you agree with that?
22            MR. FINKELSTEIN: I'm so sorry.
23 Which sentence?
24            MR. HOOPER: It's the one that

Page 216

1 begins "Reserpine inhibits."
2            MR. FINKELSTEIN: Oh.
3            THE WITNESS: Yes.
4 BY MR. HOOPER:
5      Q.    Can you cite for me any
6 published science that concludes or states
7 that gabapentin inhibits the transport of
8 biogenic amines such as dopamine,
9 noradrenalin, serotonin, from the cytoplasm
10 into storage vesicles?
11      A.    I can't, as I sit here today.
12      Q.    That's all with that one.
13 We'll move on to the next one.
14            Let me just ask you,
15 Dr. Kruszewski, we've been at it for a number
16 of hours. Do you feel like the questions have
17 been fair and understandable? Are we doing
18 okay in terms of communicating?
19            MR. FINKELSTEIN: Objection.
20            THE WITNESS: Yes.
21 BY MR. HOOPER:
22      Q.    Do you feel like you're getting
23 adequate time to look at the materials you're
24 reviewing?

Page 217

1      A.    Yes.
2              - - -
3            (Whereupon, a document was
4            marked for identification purposes
5            as No. 14.)
6              - - -
7 BY MR. HOOPER:
8      Q.    Let me ask you to look at
9 what's marked as Exhibit 14, please, and
10 confirm that that is the same reference that
11 is noted as Reference No. 31 on Page 4 of your
12 report. I believe it appears first in the
13 second to the last paragraph there.
14      A.    (Reviewing).
15            Yes, that's correct. On
16 Page 4?
17      Q.    Um-hum.
18            This is another study by the
19 Petroff group at Yale. Correct?
20      A.    That's correct.
21      Q.    This is another study of, in
22 fact, measuring gaba -- changes in gabapentin
23 levels -- I'm sorry, changes in GABA levels in
24 the brains of patients with epilepsy who were

1  well-tolerated treatment in a large proportion
2  of bipolar patients who are resistant to
3  traditional mood stabilizers. More
4  specifically, this drug appears to have
5  antidepressant and anxiolytic properties."
6          Is that what they said?
7      A.    That's what they said, yes.
8      Q.    That language is not cited or
9  quoted in your report. Correct?
10     A.    It's not. I was using the next
11 page of this article for different purposes.
12     Q.    Okay. Any reason, as you sit
13 here today, that you can offer as to why you
14 would not put in your report in this case the
15 conclusions of the Perugi group about the
16 apparent antidepressant and anxiolytic
17 properties of gabapentin?
18     A.    Because there's ample evidence
19 in the psychiatric literature at this time
20 that gabapentin is contraindicated in both
21 bipolar disorder and depressive illnesses.
22          - - -
23          (Whereupon, a document was
24      marked for identification purposes

1      as No. 23.)
2          - - -
3  BY MR. HOOPER:
4      Q.    Dr. Kruszewski, let me show you
5  what's been marked as Exhibit 23 and ask you
6  to confirm that that document is a
7  comprehensive bibliography that lists all the
8  materials that you reviewed or consulted in
9  connection with your work in this case.
10     A.    Yes, that appears to be so.
11     Q.    Is the Ben-Menachem 1992 paper
12 listed in that comprehensive bibliography?
13     A.    Yes.
14     Q.    Who prepared this document?
15     A.    I did.
16     Q.    And -- last question. A
17 section of your report discusses the
18 glutaminergic effects of gabapentin that you
19 believe exist. Correct?
20     A.    That's correct.
21     Q.    As we sit here today, can you
22 cite for me any study that states any
23 conclusion about a relationship between
24 glutaminergic effects of gabapentin and

1  suicide?
2      A.    Not as I sit here today, no.
3          MR. HOOPER: That's all for
4  today. We'll come back tomorrow.
5          VIDEO SPECIALIST: Thank you.
6  That concludes the video. The time is
7  6 o'clock.
8          - - -
9          (Witness excused.)
10          - - -
11          (Deposition concluded at 6:00
12 p.m.)
13          - - -

1          C E R T I F I C A T E
2          I hereby certify that the
3  witness was duly sworn by me and that the
4  deposition is a true record of the testimony
5  given by the witness.
6
7
8
          _____
          Jennifer S. Walker, RPR
9          Dated: December 12
10
11 (The foregoing certification of this
12 transcript does not apply to any reproduction
13 of the same by any means, unless under the
14 direct control and/or supervision of the
15 certifying shorthand reporter.)
16
17
18
19
20
21
22
23
24

VERITEXT CORPORATE SERVICES (800) 567-8658

```
 1            IN THE UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 2       --------------------------x
         In Re:                    :  MDL Docket No. 1629
 3                                  :
         NEURONTIN MARKETING,       :  Master File No.
 4       SALES PRACTICES AND        :  04-10981
         PRODUCTS LIABILITY         :
 5       LITIGATION                 :  Judge Patti B. Saris
         --------------------------x
 6       THIS DOCUMENT RELATES TO:  :
                                     :
 7       PRODUCTS LIABILITY         :  Magistrate Judge
         ACTIONS                    :  Leo T. Sorokin
 8                                   :
         Fenelon v. Pfizer, Inc.,   :
 9       Et al.                     :
         Case No. 06 CV 4136        :
10       --------------------------x

11          SUPREME COURT OF THE STATE OF NEW YORK
                   COUNTY OF NEW YORK
12       --------------------------x
         In Re:                    :  INDEX NO. 765000/06
13       NEURONTIN PRODUCT          :
         LIABILITY LITIGATION       :
14       --------------------------x
         THIS DOCUMENT APPLIES TO: :  Hon. Marcy S. Friedman
15       ALL CASES                  :
         --------------------------x
16
                  Friday, December 7, 2007
17
                       - - -
18
                Videotaped deposition of
19
           STEFAN P. KRUSZEWSKI, M.D.
20
                       - - -
21
         VERITEXT/NEW JERSEY REPORTING COMPANY, LLC
22            25B Vreeland Road, Suite 301
              Florham Park, New Jersey  07932
23          (973) 410-4040  Fax (973) 410-1313

24                     - - -
```

Page 302

1  them?
2      THE WITNESS: I'm not sure I
3  understand the question.
4  BY MS. McGRODER:
5      Q.    Well, you cite the third safety
6  update and the fourth safety update on the top
7  of Page 13 of your report.
8      A.    That's correct.
9      Q.    And you cite them for the
10 proposition or for the statement that there
11 are no new data in Safety Update 3 and Safety
12 Update 4 which alter the safety profile of
13 this drug as presented in the initial NDA.
14 Correct?
15     A.    That's correct.
16     Q.    That's what you cite from the
17 safety updates?
18     A.    Yes.
19     Q.    What is your point in including
20 that language in your report in this case?
21     A.    I thought it was important to
22 be as comprehensive as I could about this very
23 important piece of information from the safety
24 update.

Page 303

1      Q.    Could you turn to Paragraph 15
2  of the McCormick affidavit, please?
3      A.    Yes.
4      Q.    Dr. McCormick states in
5  Paragraph 15 of her September 2007
6  affidavit --
7      A.    I'm sorry. Paragraph 15?
8      Q.    Yes.
9          MR. FINKELSTEIN: We're just
10     coming up on an hour.
11 BY MS. McGRODER:
12     Q.    -- "Evaluating adverse events
13 of depression and suicidal behavior reported
14 by patients with epilepsy requires an
15 understanding that such patients are far more
16 likely to experience depression and
17 suicidality than the general population."
18         Do you see that language?
19     A.    I do.
20     Q.    Do you agree with it?
21     A.    Yes.
22     Q.    "I noted this in my review of
23 the fourth safety update. In this review,
24 which was completed several months after my

Page 304

1  initial report, I noted there is a higher
2  incidence of depression among epileptics with
3  partial seizures as compared to the general
4  population," and she cites the reference at
5  Safety Update 4.
6      Q.    Do you see that?
7      A.    I do.
8      Q.    Did you include Dr. McCormick's
9  quote from Safety Update 4 where she says,
10 "There is a higher incidence of depression
11 among epileptics with partial seizures as
12 compared to the general population"? Did you
13 include that language in your report?
14     A.    No.
15     Q.    Why -- why not?
16     A.    The whole point of my report
17 was to examine all of the records that I could
18 find, all of the Pfizer proprietary documents,
19 and to examine whether there was evidence that
20 could withstand a Daubert challenge in regard
21 to whether Neurontin causes suicide and
22 suicidal ideation.
23         It was not under my task to
24 examine how often, per se, there's an

Page 305

1  increased risk of depression in epilepsy.
2  That's a totally separate issue.
3      Q.    Is a Medical Officer Review
4  Report from the FDA a Pfizer proprietary
5  document?
6      A.    It came with the Pfizer
7  proprietary documents.
8      Q.    Well, by characterizing it as a
9  Pfizer proprietary document, you're not
10 meaning to suggest that it's a document from
11 Pfizer. It's a document from the FDA. Right?
12     A.    I'm sorry. I do stand
13 corrected. I'm making a statement that it was
14 provided to me with all of the Pfizer
15 documents from the disk provided by
16 Mr. Finkelstein.
17     Q.    Okay. But a Medical Officer
18 Review Report from the FDA is a document
19 authored by someone at the FDA. Correct?
20     A.    That is correct.
21         MR. FINKELSTEIN: Okay. Take a
22     break.
23         MS. McGRODER: Let me just
24     finish this.

Page 306

1  BY MS. McGRODER:
2      Q.    And so your goal in creating
3  your report in this case was to look for
4  evidence so that -- look for evidence of
5  whether the plaintiff's case regarding
6  Neurontin could withstand a Daubert challenge?
7      A.    That was part of my task, yes.
8      Q.    Have you read the Daubert
9  opinion?
10     A.    I'm not sure I've read it in
11  its entirety.
12     Q.    Have you read any of the law
13  related to Daubert?
14     A.    I'm sure that I have.
15     Q.    And when did you read the law
16  related to Daubert?
17     A.    Well, the first time would have
18  been in approximately 1999.
19     Q.    And did Mr. Finkelstein's law
20  firm provide you with any Daubert opinions
21  produced by courts around the country?
22     A.    No.
23          MR. FINKELSTEIN:  Okay.
24

Page 307

1  BY MS. McGRODER:
2      Q.    That's just law that you keep
3  up with?
4      A.    I try to keep up with the
5  requirements and standards of Daubert and Frye
6  principles.
7      Q.    And why do you do that?
8      A.    I think that it's important for
9  me to understand what evidence is required and
10  where it comes from in order to support
11  opinions in federal and other courts.
12     Q.    When you're testifying in
13  court.  Correct?
14     A.    Yes.
15          MS. McGRODER:  Let's take a
16  break.
17          VIDEO SPECIALIST:  We're going
18  off the video.  The time is 10:25.
19              - - -
20          (Recess 10:25-10:45 a.m.)
21              - - -
22          VIDEO SPECIALIST:  We're back
23  on the video.  The time is 10:45.
24

Page 308

1  BY MS. McGRODER:
2      Q.    Dr. Kruszewski, you've never
3  worked at the FDA.  Is that right?
4      A.    That's correct.
5      Q.    And you've never determined,
6  from a safety or efficacy standpoint, whether
7  a prescription drug should be available in the
8  United States, have you?
9      A.    No.
10     Q.    You've never approved the
11  labeling for any prescription drug as a member
12  of the FDA.  Is that correct?
13     A.    That is correct.
14     Q.    You're not an expert in
15  regulations governing the approval by the FDA
16  of a prescription drug.  Is that fair to say?
17     A.    That is fair.
18     Q.    You've never reviewed an NDA as
19  a medical review officer, have you?
20     A.    No.
21     Q.    You've never analyzed data
22  contained in an NDA on the safety of a
23  prescription drug as a medical review officer
24  to make a recommendation regarding the safety

Page 309

1  or efficacy of that drug, have you?
2      A.    I have not.
3      Q.    Was Dr. McCormick's job at the
4  FDA, if you know, to review all the safety and
5  efficacy data for Neurontin?
6      A.    I believe that was part of her
7  task, yes.
8      Q.    And it was part of her task to
9  make a recommendation about her review of that
10  safety and efficacy in the form of her Medical
11  Officer Review Report?
12     A.    Yes.
13     Q.    Is it your testimony, Dr.
14  Kruszewski -- I just want to make sure I
15  understand this right.
16          Is it your testimony that it is
17  not the task of the reviewers at the FDA to
18  generate statements about causality?  Is that
19  your testimony?
20     A.    My testimony is as I previously
21  stated; the task, as Dr. McCormick stated in
22  the affidavit that I just read, was to review
23  the safety and efficacy data for possible
24  approval of the NDA and not to establish

12 (Pages 306 to 309)

Page 326

1    THE WITNESS: Just what I
2    answered.
3    BY MS. McGRODER:
4        Q.    Well, you said it was a -- you
5    usually put a note to yourself about deep
6    breathing. I want to know precisely what the
7    words said on the note that you threw away
8    this morning.
9        A.    I don't think I can repeat it
10   precisely. It said -- but I'll do the best
11   that I can.
12       Q.    Okay. Thank you.
13       A.    It said, "Quiet. Relax.
14   Answer the question. Remember your
15   principles, values and ethics." That's what
16   it said on the top of it. Doodles beyond
17   that.
18       Q.    Why did it say the word
19   "quiet"?
20       A.    I like to -- for me to be able
21   to answer the question -- to be most effective
22   and responsive to your questions, I like to be
23   internally quiet. It's something that I just
24   practice.

Page 327

1        Q.    Something that you practice
2    when you're giving a deposition?
3        A.    I practice all of the time.
4        Q.    So, as you sit here today, can
5    you tell me how many patients were studied in
6    the gabapentin randomized controlled trials?
7        A.    The number that comes to mind
8    is over 2,000.
9        Q.    Does the number 8,000 come to
10   mind?
11       A.    That does not.
12       Q.    So it could be 2,000 patients
13   were studied in randomized controlled trials
14   for gabapentin or 8,000; you don't know one
15   way or the other?
16       A.    That's correct.
17       Q.    Do you know what patient
18   populations were studied in the controlled
19   studies for gabapentin?
20       MR. FINKELSTEIN: At any time?
21   At any time?
22       MS. McGRODER: Sure. At any
23   time.
24       THE WITNESS: Please define

Page 328

1    "patient populations" for me.
2    BY MS. McGRODER:
3        Q.    Well, do you know what types of
4    patients were studied in the randomized
5    controlled trials for gabapentin?
6        MR. FINKELSTEIN: Just so he
7    provides an accurate answer, sponsored
8    by Pfizer, sponsored by some other --
9    just anything that he's ever reviewed?
10       MS. McGRODER: If they're
11   randomized controlled clinical
12   studies, yes.
13       MR. FINKELSTEIN: Okay.
14       THE WITNESS: The question is
15   so broad as to make it very difficult
16   for me to respond, however --
17       MS. McGRODER: Let me change
18   it, then.
19       THE WITNESS: -- that being
20   said, the study included epilepsy and
21   nonepilepsy patients, adults,
22   individuals with psychiatric
23   conditions and individuals without
24   psychiatric conditions.

Page 329

1    BY MS. McGRODER:
2        Q.    Have patients with diabetic
3    peripheral neuropathy been studied in
4    randomized controlled trials with gabapentin?
5        A.    Yes, I believe so.
6        Q.    Have patients with postherpetic
7    neuralgia been studied in randomized
8    controlled trials with gabapentin?
9        A.    Yes, I believe so.
10       Q.    Have patients with bipolar
11   disorder been studied?
12       A.    Yes, I would believe so.
13       Q.    You would believe so or you
14   know?
15       A.    Multiple psychiatric conditions
16   were included in the patient population group.
17       Q.    But you're not sure which ones?
18       A.    As I sit here today, I don't
19   recall the breakdown of psychiatric
20   conditions, that's correct.
21       Q.    Were any suicide events
22   reported in the randomized controlled trials
23   for gabapentin in psychiatric patients?
24       A.    I'm sorry. Repeat the

Page 338

1  question, please.
2       Q.    Well, I think you gave
3  testimony yesterday, Dr. Kruszewski, that at
4  Kruszewski and Associates, you actually have
5  people assigned to conduct literature searches
6  for you. Wasn't that your testimony? Don't
7  you do medical research that includes
8  literature searches?
9       A.    That was not my testimony, to
10 the best of my knowledge. I do literature
11 search -- I did literature searches for
12 this -- the preparation of this report. When
13 I read specific references and specific papers
14 and then find that I have not been able to
15 access a specific paper, I will ask members of
16 my staff to do further searches on PubMed or
17 to go to Hershey Medical library or go to
18 the -- go to Washington, D.C., and access the
19 Library of Congress.
20      Q.    Okay. So you're the person who
21 does the literature searching?
22      A.    That is correct.
23      Q.    So when is the last time you
24 did a literature search on Neurontin prior to

Page 339

1  the date of this deposition?
2       A.    About a year ago.
3       Q.    Okay. And so that would be
4  about December of 2006?
5       A.    That would be a year ago, yes.
6       Q.    Okay. And so is it your
7  testimony that the information you have
8  learned about Neurontin from about December of
9  2006 until the time of this deposition has
10 been in the form of what you learned yesterday
11 at your deposition through the articles that
12 Mr. Hooper showed you and asked you questions
13 about? Is that the extent of the new
14 literature that you've reviewed?
15      A.    That's a -- no.
16      Q.    Okay. So you haven't done a
17 literature search since December of 2006. In
18 what way have you updated your understanding
19 of the literature about Neurontin over the
20 past year?
21      A.    In order for me to properly
22 answer that question, it's, I believe, very
23 important for you to define what a literature
24 search is.

Page 340

1       Q.    Well, how do you define it?
2       A.    I define a literature search as
3  a comprehensive effort to examine any and all
4  documents related to a specific topic.
5       Q.    So the last time you conducted
6  a comprehensive effort to examine any and all
7  documents related to Neurontin was December of
8  2006 or before. Correct?
9       A.    That's correct.
10      Q.    Okay. Is the EMEA report --
11           UNIDENTIFIED SPEAKER:
12           Alexander Carmichael has joined the
13           conference.
14 BY MS. McGRODER:
15      Q.    -- regarding that regulatory
16 authority's review of whether Neurontin causes
17 suicide, is that something that appears on
18 your bibliography?
19      A.    I do not believe that that
20 appears on my bibliography.
21      Q.    I apologize. It's my fault
22 because I just don't remember your answer.
23           Did you say you've ever looked
24 at the EMEA report, or you have not looked at

Page 341

1  it?
2       A.    I said I believe that I'm aware
3  of it. I don't remember reviewing it. I
4  don't believe I have ever read it, to the best
5  of my knowledge, as I sit here today.
6
7           (Whereupon, a document was
8           marked for identification purposes
9           as No. 25.)
10          - - -
11 BY MS. McGRODER:
12      Q.    I'm going to hand you,
13 Dr. Kruszewski, what is now marked as
14 Exhibit 25 to your deposition. It is called
15 the "Joint Response Assessment Report on List
16 of Outstanding Issues, Neurontine" (sic)
17 "(gabapentin)." It is dated January 19 -- no,
18 I'm sorry. It is dated January 12th, 2006.
19          You've never seen that document
20 before?
21      A.    (Reviewing.)
22          I'll just take one minute.
23      Q.    I'm not going to ask you
24 questions about the whole document. It's

Page 346

1  protocols for the four studies that I just
2  identified. You know what? Let's switch.
3  This has now been marked as Exhibit 26 to your
4  deposition. You can give your copy to
5  Mr. Finkelstein. Same thing.
6              - - -
7              (Whereupon, a document was
8         marked for identification purposes
9         as No. 26.)
10             - - -
11  BY MS. McGRODER:
12     Q.    Now, let's just look at these.
13  This is Protocol 945-13, right, on the first
14  page of this exhibit?
15     A.    That's correct.
16     Q.    And it's called "An Open-Label
17  Multicenter Study of the Safety and Efficacy
18  of Gabapentin as Add-on Therapy in the
19  Extended Treatment of Epileptic Seizures."
20          Is a study in which there is an
21  extended treatment phase, is that part of the
22  study considered a controlled trial?
23     A.    Not necessarily.
24     Q.    Do you know one way or the

Page 347

1  other whether Study 945-13 is a controlled
2  study?
3     A.    945-13 is a controlled study,
4  yes.
5     Q.    Turn the page, then, to 945-14.
6          MR. FINKELSTEIN: I just want
7     to add simply an objection that I
8     don't see any Bates numbers and --
9          MS. McGRODER: The document is
10    from the --
11         MR. FINKELSTEIN: Can I just
12    finish my objection?
13         MS. McGRODER: Sure.
14         MR. FINKELSTEIN: I see no
15    Bates numbers on these documents, and
16    I have no confirmation that these
17    documents were ever exchanged. I'm
18    sure counsel will provide some type of
19    confirmation they were, in fact,
20    exchanged and, upon that, I'll
21    withdraw my objection.
22         Until then, I'll have a
23    continued objection with respect to
24    any testimony associated with these

Page 348

1  documents.
2          You can go ahead.
3          MS. McGRODER: These are
4     documents that are contained in the
5     NDA for Neurontin to which your firm
6     had access.
7  BY MS. McGRODER:
8     Q.    Second page of Exhibit 26, it
9  says, "An Open-Label Multicenter Study of the
10 Safety and Efficacy as Gabapentin as Add-on
11 Therapy in Extended Treatment of Epileptic
12 Seizures."
13          Do you see that?
14    A.    I do.
15    Q.    Is an open-label multicenter
16 study considered a controlled study?
17    A.    You would have to define the
18 word "controlled" for me to answer that
19 properly.
20    Q.    Does it have a placebo control?
21    A.    Then the answer is no.
22    Q.    Okay. What about the third
23 page of Exhibit 26, 945-15; it's also an
24 open-label multicenter study of the safety and

Page 349

1  efficacy of gabapentin as monotherapy.
2          Does this study have a placebo
3  control?
4     A.    It may have a placebo arm to
5  it; however, because it is an open-label
6  study, in my opinion, it is not controlled.
7     Q.    Okay. And the last one is
8  945-411. It's a randomized open-label trial
9  on the relative efficacy and safety of a fixed
10 dose of gabapentin.
11          As an open-label study, then,
12 is it your testimony that this, likewise, is
13 not a placebo-controlled study?
14    A.    It may be -- have a placebo
15 arm, but an open-label study, by definition,
16 in my opinion, is not controlled.
17    Q.    Okay. So if, by your
18 definition, an open-label study is not
19 controlled, then none of these four studies
20 that we just discussed are controlled.
21 Correct?
22    A.    As I've just defined the word
23 "controlled study," and since it's not been
24 otherwise defined, that is correct.

22 (Pages 346 to 349)

Page 350

1    Q.    Let's look at some of the
2    patients from the list that you have included
3    on Page 13 of your report.
4         We need to go off the record
5    for a second.
6         VIDEO SPECIALIST: Going off
7    the video. The time is 11:30. This
8    concludes Tape No. 1.
9         - - -
10        (Recess 11:30-11:45 a.m.)
11        - - -
12        VIDEO SPECIALIST: We're back
13   on the video. The time is 11:45.
14   Beginning of Tape 2.
15   BY MS. McGRODER:
16        Q.    Doctor, starting with Paragraph
17   No. 1 on Page 13, Patient 221, are you aware
18   whether the protocol for Study 945-13 included
19   or excluded psychiatric patients?
20        A.    I believe that it included
21   psychiatric patients.
22        Q.    And with respect to this
23   patient, you say, "A 17-year-old male reported
24   severe depression after 13 days of treatment

Page 351

1    and attempted suicide while being treated with
2    gabapentin on Day 166. Investigators thought
3    that the depression was possibly related to
4    gabapentin." Correct?
5         A.    That's correct.
6         Q.    And were those the facts that
7    you thought were important to put in your
8    report to demonstrate mood and behavioral
9    disturbances reported by patients during
10   well-controlled clinical trials?
11        A.    Yes.
12        Q.    But we've already looked at the
13   protocol for Study 945-13, right, and it's not
14   a controlled trial. Correct?
15        A.    Not controlled in the way I've
16   defined it, yes.
17        Q.    Okay. And will you just take a
18   look here -- I'm not marking this as an
19   exhibit, Dr. Kruszewski --
20        MR. FINKELSTEIN: I don't know
21   what you're showing him. Why not?
22        MS. McGRODER: I'm just showing
23   him the actual summary that he used
24   and he references in his report.

Page 352

1         MR. FINKELSTEIN: Let's
2    mark it --
3         MS. McGRODER: I don't think it
4    needs to be marked. Do you really
5    want it marked?
6         MR. FINKELSTEIN: Anything
7    you're putting in front of the witness
8    has to be marked.
9         MS. McGRODER: Let's mark it as
10   Exhibit 27.
11        - - -
12        (Whereupon, a document was
13        marked for identification purposes
14        as No. 27.)
15        - - -
16   BY MS. McGRODER:
17        Q.    If you look at the first couple
18   of lines of Exhibit 27 -- well, first can you
19   identify what Exhibit 27 is?
20        A.    It is a Pfizer document, MPatel
21   0039149. "Gabapentin: Response to FDA
22   Regarding Suicide and Suicide Attempt.
23   Confidential."
24        Q.    And this document summarizes

Page 353

1    some of the adverse event reports regarding
2    suicide and suicide attempt. Correct?
3         A.    Yes.
4         Q.    Okay. And you've looked at
5    this document before?
6         A.    Yes.
7         Q.    Okay. If you look under
8    Patient 221, it says, "A 17-year-old white man
9    was suicidal (attempted suicide) on Day 166
10   while receiving gabapentin."
11        MR. FINKELSTEIN: "While
12   receiving 2,400 milligrams a day of
13   gabapentin."
14        MS. McGRODER: I'm paraphrasing
15   because I started at the wrong place.
16   We'll just read the whole thing.
17   BY MS. McGRODER:
18        Q.    "The investigator considered
19   this event severe and definitely not related
20   to the study medication."
21        Do you see that?
22        A.    Yes.
23        Q.    "And the medical monitor
24   considered it serious."

Page 354

1      Does this language tell us that
2  the investigator considered the attempted
3  suicide definitely not related to gabapentin?
4      A.    That's what that sentence says,
5  yes.
6      Q.    Okay. Did you include that
7  information in your summary of this patient on
8  Page 13 of your report?
9      A.    Not that sentence, no.
10     Q.    No, you didn't.
11         Why did you not include the
12  sentence that tells us that the attempted
13  suicide is considered by the investigator
14  definitely not related to the drug, to
15  gabapentin?
16     A.    Let me answer that by just
17  finishing reading the -- refreshing my memory
18  about the entire report.
19     Q.    Okay.
20     A.    (Reviewing.)
21     Q.    Have you finished reviewing it?
22     A.    I haven't actually finished
23  reviewing it, but I found what I was looking
24  for.

Page 355

1      Q.    Okay. What were you looking
2  for?
3      A.    The wording that I used, which
4  I believe is fair, accurate and honest occurs
5  in -- I believe it's the fourth or fifth
6  sentence, which says, "In the preceding
7  protocol, the investigator had recorded mild
8  depression as an adverse event possibly
9  related to gabapentin beginning on Day 13 of
10  gabapentin therapy."
11     Q.    So the reference that you make
12  to a possibly related event in your summary of
13  this patient in Paragraph 1 is the depression,
14  the mild -- let's see, the mild depression
15  beginning on Day 13. Is that right?
16     A.    Yes. My report says,
17  "Investigators thought that the depression was
18  possibly related to gabapentin."
19     Q.    And by that sentence, you're
20  referring to the mild depression beginning on
21  Day 13. Correct?
22     A.    Yes.
23     Q.    In Exhibit 27?
24     A.    Yes.

Page 356

1      Q.    But -- but you cite Patient 221
2  for the proposition that this patient
3  attempted suicide while being treated with
4  gabapentin on Day 166. Do you see that?
5      A.    I do.
6          MR. FINKELSTEIN: Objection as
7      to form.
8  BY MS. McGRODER:
9      Q.    And you did not tell the court
10  or the jury in this case that the attempted
11  suicide you talk about in Paragraph 1 on Page
12  13 was considered definitely not related by
13  the clinical investigator. Is that right?
14          MR. FINKELSTEIN: Objection as
15      to form.
16          THE WITNESS: My testimony is,
17      I reported what I reported. And what
18      I reported is accurate from the
19      document that we were reviewing.
20  BY MS. McGRODER:
21     Q.    You just selectively chose to
22  omit the part of this summary where the
23  investigator determines that the suicide
24  attempt is definitely not related to

Page 357

1  gabapentin. Correct?
2      A.    Yes. I believe I've already
3  testified that I did not include that.
4      Q.    You also state in your report
5  that -- in Paragraph 1 on Page 13 that the
6  17-year-old male reported severe depression.
7  Is that right? That's the language that you
8  used?
9      A.    Yes.
10     Q.    In fact, the depression that's
11  reported as possibly related is mild
12  depression. Is that correct?
13     A.    They represent a summation of
14  that information because the first sentence
15  that I put in my report in Paragraph 1 of
16  Page 13 says that the investigator considered
17  this event sincere -- sorry, wrong sentence.
18  The medical monitor considered it serious.
19     Q.    Well, "serious" is a different
20  word from "severe." You recognize that, don't
21  you?
22     A.    Yes.
23     Q.    And severe depression is a
24  different disorder from mild depression. You

Page 370

1    Exhibit 28.
2        MR. FINKELSTEIN: Oh, I see.
3    Yup.
4        THE WITNESS: (Reviewing.)
5        Okay.
6    BY MS. McGRODER:
7        Q.    Okay. Is the event that is
8    considered possibly related to gabapentin
9    therapy in this report depression and
10   attempted suicide?
11       A.    The -- it's -- what I report is
12   what it says in the first two sentences, that
13   "Patient 5, Study 945-15, 17-year-old white
14   woman receiving 2,000 milligrams per day of
15   gabapentin developed depression and became
16   suicidal (attempted suicide), slashing her
17   wrists superficially on Day 384. The
18   investigator considered these events to be of
19   severe intensity and possibly related to
20   gabapentin therapy."
21       Q.    Okay. Did this patient have an
22   underlying psychiatric illness?
23       A.    Yes, she does.
24       Q.    And what is that?

Page 371

1        A.    She has been diagnosed with an
2    adjustment disorder.
3        Q.    Is adjustment disorder a risk
4    factor for suicide?
5        A.    It is generally not considered
6    a risk factor for suicide.
7        Q.    And what do you rely on for
8    your opinion that adjustment disorder is not a
9    risk factor for suicide?
10       A.    I did not say that.
11       Q.    So adjustment disorder is a
12   risk factor for suicide?
13       A.    I said that adjustment disorder
14   is not generally considered a risk factor for
15   suicide and, for that, I rely on the
16   Diagnostic and Statistical Manual of Mental
17   Disorders, Fourth Edition, TR.
18       Q.    So, in your view, the DSM-IV
19   does not associate or does not identify
20   adjustment disorder as a risk factor for
21   suicide?
22       MR. FINKELSTEIN: Objection.
23       THE WITNESS: I do not believe
24   that there is an association -- let me

Page 372

1    repeat that. Adjustment disorder is
2    generally not considered a significant
3    risk factor for suicide.
4    BY MS. McGRODER:
5        Q.    Generally by whom?
6        A.    The American Psychiatric
7    Association.
8        Q.    In the DSM-IV, is adjustment
9    disorder identified as a risk factor for
10   suicide?
11       A.    I don't recall that answer.
12       Q.    So you don't know one way or
13   the other?
14       A.    I do not.
15       Q.    You're not a suicidologist, are
16   you, Dr. Kruszewski?
17       A.    Define "suicidologist."
18       Q.    Well, have you authored any
19   major texts, or have you been published on the
20   subject of suicide?
21       A.    No.
22       Q.    Okay. Doctor, if you look down
23   to the last sentence of this summary in
24   Exhibit 28 --

Page 373

1        A.    Yes.
2        Q.    Do I have that right? Exhibit
3    28, yes.
4        Okay. It says, "The sponsor
5    was informed by the investigator that
6    approximately six months after discontinuing
7    gabapentin, the patient committed suicide.
8    The investigator had no contact with the
9    parents and therefore could not provide any
10   details surrounding this event."
11       Does the fact that this patient
12   committed suicide six months after her last
13   ingestion of Neurontin, is that important to
14   your opinion in this case?
15       A.    I have no opinion about that.
16   I did not include it in my report. I did not
17   include it in my -- for the basis of my
18   opinion and conclusions.
19       Q.    How long after a patient stops
20   taking gabapentin are they at risk for
21   suicide, in your view?
22       A.    I don't have an answer for
23   that, as I sit here today.
24       Q.    You haven't thought about that?

Page 378

1  BY MS. McGRODER:
2      Q.   How long after a vulnerable
3  person's first ingestion of gabapentin will it
4  take for them to commit suicide?
5          MR. FINKELSTEIN:  And I, again,
6      will tell you to answer the question
7      prior to that so you have a complete
8      answer.
9          MS. McGRODER:  Go ahead.
10         THE WITNESS:  Which question am
11     I answering?
12         MS. McGRODER:  The question I
13     just posed.
14         THE WITNESS:  That -- there is
15     no answer for that because it entirely
16     depends on the individual
17     characteristics of the vulnerable
18     person.
19 BY MS. McGRODER:
20     Q.   Is there a dosage that -- some
21 minimum level of dosage that you believe is
22 required?
23         MR. FINKELSTEIN:  Asked and
24     answered.

Page 379

1          THE WITNESS:  I'm sorry, what
2      was...
3          MS. McGRODER:  Go ahead.  You
4      can answer.
5          MR. FINKELSTEIN:  I said she
6      already asked the question, and you
7      already answered.
8          THE WITNESS:  I believe a
9      single therapeutic dose in a
10     vulnerable person can start the series
11     of events that can lead to suicide.
12 BY MS. McGRODER:
13     Q.   Is there any published
14 scientific data in a peer-reviewed journal
15 that suggests that a single dose of gabapentin
16 can cause suicide in a vulnerable group of
17 patients?
18     A.   No.
19     Q.   Is there any scientific
20 publication in a peer-reviewed journal that
21 you can cite to me now that states that a
22 vulnerable population of consumers is at risk
23 for suicide with Neurontin?
24     A.   Repeat that one more time,

Page 380

1  please.
2      Q.   Is there any scientific study
3  published in a peer-reviewed journal that you
4  can cite to me now that states that there is a
5  vulnerable population of consumers at a
6  statistically significant increased risk of
7  suicide from Neurontin?
8      A.   I believe that the best study
9  that I can report to that is the Oregon
10 Medicaid data that shows an increased risk of
11 gabapentin as statistically significant in
12 relationship to suicide over comparable
13 populations that have taken divalproex or
14 lithium treatment.
15     Q.   And that's the Collins and
16 McFarland paper that we talked about
17 yesterday.  Correct?
18     A.   That is correct.
19     Q.   Okay.  And that paper, as you
20 recall from yesterday, compares gabapentin,
21 divalproex, carbamazepine, to lithium; lithium
22 is the comparator in that study.  Correct?
23         MR. FINKELSTEIN:  Objection.
24     Asked and answered.

Page 381

1          THE WITNESS:  Lithium is the
2      comparator, yes.
3  BY MS. McGRODER:
4      Q.   And lithium is protected
5  against suicide, generally accepted?
6      A.   Yes.
7      Q.   Okay.  Back to Patient No. 5,
8  Paragraph No. 2.  Did you include the
9  information in your report that six months
10 after discontinuing gabapentin this patient
11 committed suicide?
12     A.   I did not.
13     Q.   Did you include in your report
14 the information about this patient's
15 underlying psychiatric illness as a diagnosed
16 adjustment disorder?
17     A.   I stated it as -- that she had
18 a history of depression.
19     Q.   Are we looking at the right --
20 are we looking at the same paragraph,
21 Paragraph No. 2, on Page 13 of your report?
22 Where does it say this patient has a history
23 of depression?
24     A.   I said in my first sentence

30 (Pages 378 to 381)

Page 382

1  that "Patient 5 (Study 945-15), a 17-year-old
2  female, was reported to have depression."
3      Q.    You don't say that's a history
4  of depression, do you?
5      A.    Experiencing depression, having
6  depression and a history of depression I
7  believe are comparable nomenclature for the
8  same term.
9      Q.    Well, you say, in Paragraph
10  No. 2, on Page 13 of your report, "This
11  17-year-old female was reported to have
12  depression. The patient attempted suicide.
13  Both the depression and suicide were
14  considered adverse events," are you saying
15  that you didn't mean to imply there that the
16  depression was caused by gabapentin? Because,
17  in fact, the patient has an underlying history
18  of psychiatric illness. Correct?
19          MR. FINKELSTEIN: Objection to
20      the form.
21          THE WITNESS: I said what I
22      said in Patient 5, Paragraph 2, that
23      the patient has a history or has
24      suffered from depression, period.

Page 383

1      It's a different statement and a
2  different sentence.
3  BY MS. McGRODER:
4      Q.    Show me, Dr. Kruszewski, where
5  in Paragraph No. 2 on Page 13 of your report
6  the word "history" appears.
7      A.    It does not appear.
8      Q.    Okay. Let's take a look at
9  Patient No. 4. Study 945-14 is not a
10  controlled study. Is that correct?
11      A.    As we've defined it, that is
12  correct.
13      Q.    Okay. And do you know --
14  well -- strike that.
15          - - -
16          (Whereupon, a document was
17      marked for identification purposes
18      as No. 29.)
19          - - -
20  BY MS. McGRODER:
21      Q.    Let me hand you what we are
22  marking as Exhibit No. 29. And this is the
23  summary for Patient 10022 in Study 945-14.
24  Same patient as in your Paragraph No. 4,

Page 384

1  Page 13, of your report?
2      A.    Yes, that's correct.
3      Q.    Is that tracking?
4      A.    Yes.
5      Q.    You say that "Patient 10022, a
6  31-year-old female, overdosed on medication.
7  The investigator for this study thought that
8  this overdose was a serious adverse event
9  possibly related to gabapentin." Correct?
10      A.    That is correct.
11      Q.    Now, if you turn to Exhibit
12  No. 29, the summary in the Appendix C.4. says,
13  this is "a 31-year-old white female who
14  received an overdose of gabapentin of
15  3,600 milligrams per day, which was double her
16  prescribed dosage."
17          Do you see that?
18      A.    I do.
19      Q.    "From day 254 to 256." That's
20  a three-day period. Right?
21      A.    That's correct.
22      Q.    Okay. So is it your
23  understanding, having now looked at Exhibit
24  No. 29, that this patient did not take an

Page 385

1  overdose; this patient received an overdose of
2  gabapentin?
3      A.    The patient overdosed or was
4  overdosed or received an overdose. The
5  important point is that she overdosed.
6      Q.    Oh, so it's not important to
7  you in your opinions in this litigation about
8  whether Neurontin can cause suicide in
9  individuals -- it's not important to you
10  whether the overdose is received or taken or
11  just somehow overdosed. Is that your
12  testimony?
13          MR. FINKELSTEIN: Objection as
14      to form.
15          THE WITNESS: That was not my
16      testimony, no.
17  BY MS. McGRODER:
18      Q.    So it is important to you that
19  this patient, in fact, received an overdose;
20  she didn't take an overdose?
21          MR. FINKELSTEIN: Objection.
22          THE WITNESS: That is part of
23      her clinical picture, yes.
24

Page 386

1  BY MS. McGRODER:
2      Q.    And that would be important in
3  ascertaining whether this patient was actually
4  attempting suicide or had any sort of
5  intentional -- or intent to overdose.
6  Correct?
7      A.    Repeat that.
8      Q.    It was so poorly worded, I
9  don't believe I can.
10          And it would be important in
11  ascertaining whether this patient was
12  attempting suicide or taking an intentional
13  overdose to know whether the overdose was
14  received versus taken?
15          MR. FINKELSTEIN: Objection.
16          THE WITNESS: It's important
17      for me to understand all of the facts
18      available clinically about any
19      patient, including all the patients
20      that we're talking about. So it is
21      important, yes.
22  BY MS. McGRODER:
23      Q.    And what does the word
24  "received" mean to you in this context?

Page 387

1      A.    That in part of her clinical
2  picture that she was given, for three days,
3  double the dose of gabapentin than she would
4  have otherwise received.
5      Q.    By the person administering the
6  drug. Correct?
7      A.    That's correct.
8      Q.    There's nothing in this summary
9  that indicates that this patient intended to
10  take an overdose. Correct?
11      A.    That is correct.
12      Q.    Okay. And you don't say one
13  way or the other in your summary on
14  Paragraph 4, Page 13 of your report, whether
15  this patient intentionally overdosed or
16  attempted suicide, do you?
17      A.    My testimony is -- no. My
18  testimony is that she overdosed.
19      Q.    Right. Omitting the words that
20  she "received an overdose" from the summary.
21  Correct?
22      A.    Yes. Part of her clinical
23  picture is that she, for three days, received
24  double the amount of gabapentin than she would

Page 388

1  have otherwise received.
2      Q.    And you did not include that in
3  your report. Correct?
4      A.    That is correct.
5      Q.    Would you call that an
6  accidental overdose?
7      A.    Maybe you can rephrase that,
8  what I call what an accidental overdose.
9      Q.    Well, the fact that this
10  patient received for three days, as
11  administered by someone else, too much
12  medication. Is that an accidental overdose?
13      A.    It could be.
14      Q.    Okay. Let's turn to Patient
15  No. 5. You cite Patient No. 5 in your
16  report --
17      A.    Patient No. 5, Paragraph No. 2?
18      Q.    I'm so sorry. I'm so sorry. I
19  got it wrong. It's Paragraph No. 5, Patient
20  No. 1.
21      A.    Yes.
22      Q.    And that's Paragraph 5 on
23  Page 13 of your report. You cite patient
24  No. 1 in Study 945-15 a couple of times in

Page 389

1  your report for the proposition that this is a
2  rechallenge event. Correct?
3      A.    Yes.
4      Q.    Is 945-15 a controlled study?
5      A.    Is uncontrolled the way we have
6  previously defined it.
7      Q.    Okay. And does 945-15 -- did
8  that protocol include or exclude patients with
9  a psychiatric history?
10      A.    To the best of my memory, I
11  believe that includes patients with
12  psychiatric history.
13          - - -
14          (Whereupon, a document was
15          marked for identification purposes
16          as No. 30.)
17          - - -
18  BY MS. McGRODER:
19      Q.    Let's look at the summary for
20  Patient No. 1 now marked as Exhibit 30. It
21  would be Page 2 of the exhibit. I think it
22  begins on Page 2 of the exhibit. There you
23  go. See where it says, "Patient 1 (Center
24  1)"?

Page 394

1  ideation?
2      A.    I don't recall that.
3              - - -
4              (Whereupon, a document was
5          marked for identification purposes
6          as No. 31.)
7              - - -
8  BY MS. McGRODER:
9      Q.    Let me hand you Exhibit No. 31.
10 This is a case report form, obviously not a
11 complete set, for this patient.
12             And if you will look at the
13 second page of Exhibit 31, it shows the
14 tapering of gabapentin --
15     A.    That's correct.
16     Q.    -- in the chart.  Is that
17 right?
18     A.    That's correct.
19     Q.    And at the bottom, it says,
20 "Gabapentin zero" under "Total daily dose"?
21     A.    That's correct.
22     Q.    On 11/5/89.  Correct?  So on
23 November 5 of 1989 --
24     A.    Yes, that's correct.

Page 395

1      Q.    -- the patient did not receive
2  a gabapentin dose and was successfully tapered
3  from the drug, would you say?
4      A.    Yes.
5      Q.    And if you look on Page 1 of
6  Exhibit 31, on 11/27/89, this patient was
7  admitted to the hospital with suicidal
8  ideation.  Correct?
9      A.    Yes, that's correct.
10     Q.    So Patient No. 1 in
11 Study 945-15 had suicidal ideation three weeks
12 after ingesting Neurontin.  Correct?
13     A.    It was noted 22 days after the
14 last ingestion of gabapentin, yes.
15     Q.    Okay.  So 22 days after the
16 last dose of gabapentin was taken, this
17 patient was hospitalized with suicide
18 ideation.  Correct?
19     A.    I do not know if he was
20 hospitalized.  It was recommended that he be
21 hospitalized.
22     Q.    Okay.  And the reason why you
23 say that is because Page 1 of Exhibit 31 says,
24 "to be admitted to hospital today"?

Page 396

1      A.    That's correct.
2      Q.    Okay.  What's the half-life of
3  Neurontin?
4      A.    I believe it's approximately
5  somewhere between three and five and a half
6  hours.
7      Q.    Would you agree, Doctor, that
8  Patient 1, as reflected in Exhibit 31, would
9  not have had Neurontin in his bloodstream 22
10 days after his last ingestion?
11     A.    I would agree that it would be
12 exceedingly unlikely.
13     Q.    Can you cite to me any data,
14 any data in the world, that would suggest that
15 22 days after ingestion of a drug with a
16 half-life of three to five hours there would
17 be even a trace amount of that drug in a
18 patient's blood?
19     A.    Just repeat it one more time,
20 if you would.
21     Q.    Can you cite to me any study,
22 any data or study in the world that would
23 suggest that 22 days after ingestion of a drug
24 with a half-life of three to five hours there

Page 397

1  would be even a trace amount of that drug in a
2  patient's blood system?
3      A.    I cannot, as I sit here today,
4  provide the studies, but I...
5      Q.    Okay.  Did you have more?
6      A.    No.
7      Q.    So today, as you sit here,
8  you're not aware of any study that would
9  suggest that some two to three weeks after a
10 patient -- let's be accurate, some 22 days
11 after a patient last ingests gabapentin that
12 they would have gabapentin in their
13 bloodstream.  Correct?
14     A.    As I sit here today, I believe
15 it's exceedingly unlikely that anyone would
16 have a blood level of gabapentin; however, the
17 question that you posed to me previously was
18 are there any -- to the best of my
19 recollection, are there any studies that
20 support whether any drug with a short
21 half-life can be obtainable in any kind of
22 level in a person after 22 days.
23     Q.    Fair point.
24     A.    And what I would need to do is

34 (Pages 394 to 397)

Page 398

1  look at the literature --
2      Q.   I don't need to know what you
3  would need to do, Doctor. Let me just ask
4  you.
5          Is there any study that you can
6  cite to me today that suggests that
7  gabapentin, with a half-life of three to five
8  hours, would remain in a patient's bloodstream
9  22 days after last ingestion?
10     A.   No.
11     Q.   Thank you.
12         Does the fact that this patient
13 had suicide ideation several weeks after his
14 last ingestion of gabapentin suggest to you
15 that his suicidal thinking might have been
16 caused by his underlying psychiatric history?
17         MR. FINKELSTEIN: Objection.
18         THE WITNESS: It could have
19     been.
20 BY MS. McGRODER:
21     Q.   Possibly?
22     A.   Possibly.
23     Q.   Probably?
24     A.   Don't know that.

Page 399

1      Q.   You agree, don't you, that
2  depression is a subjective adverse event in
3  contrast to an objective adverse event like a
4  skin rash?
5      A.   Yes, I do.
6      Q.   And this was an open-label
7  study, was it not?
8      A.   It was.
9      Q.   Do you know, Doctor, whether,
10 in light of the fact that it was an open-label
11 study, that Patient 1 knew that he was going
12 to be rechallenged with gabapentin?
13     A.   I personally do not know the
14 answer to that.
15     Q.   Would you assume that he would
16 have to know and consent?
17     A.   All we know from an open-label
18 study is that it's possible that the person
19 receiving the drug or the person providing the
20 drug would or would not know what the drug
21 was.
22         I may have to rephrase that
23 one.
24     Q.   Okay. Could you? Because I

Page 400

1  didn't understand it.
2      A.   Ask the question again, and I
3  will do my best to...
4      Q.   Sure.
5          Is it fair to say that if you
6  rechallenge a patient who has experienced
7  suicidal ideation at the same time or
8  temporally associated with a drug, that you
9  would assume, or it would be more likely than
10 not, that the patient would be told they're
11 going to be rechallenged on the drug on which
12 they previously experienced suicidal ideation?
13         MR. FINKELSTEIN: Objection as
14     to form.
15         THE WITNESS: I believe that's
16     a reasonable assumption.
17 BY MS. McGRODER:
18     Q.   Would that have any impact, in
19 your opinion, on whether on rechallenge a
20 patient would be more likely to experience the
21 adverse event previously recorded?
22     A.   I don't have an opinion on
23 that.
24     Q.   You don't have an opinion on

Page 401

1  that today?
2      A.   That's correct.
3      Q.   You haven't thought about it?
4      A.   Repeat the question one more
5  time, and I'll hear it again, if you would.
6      Q.   Is it fair to say that if you
7  rechallenge a patient who has experienced
8  suicidal ideation at the same time or
9  temporally associated with a drug, it would be
10 more likely than not that the patient would be
11 told they're going to be rechallenged on the
12 drug on which they previously experienced
13 suicidal ideation?
14         MR. FINKELSTEIN: I think you
15     read back the wrong question.
16         MS. McGRODER: Oh, you're so
17     right. I'm so sorry.
18 BY MS. McGRODER:
19     Q.   Would that have any impact on
20 your opinion whether, on rechallenge, the
21 patient would be more likely to experience the
22 adverse event previously reported?
23         MR. FINKELSTEIN: Objection.
24         THE WITNESS: I do not have an

Page 414

1  the "British Medical Journal" has published at
2  least two articles that, at least in part,
3  address that issue.
4      Q.   Well, first, can you cite to me
5  those articles, what volume, what journal,
6  authors, that you're referring to?
7      A.   Not as I sit here today.
8      Q.   Second, are those a -- are
9  those letters to the editor, or are they
10  opinion articles?  What are you thinking of?
11     A.   I don't recall.
12     Q.   So you don't know anything
13  about them, as you sit here today?
14     A.   Well, I have one sitting on a
15  bulletin board at home -- in my office, not at
16  home.
17     Q.   And who is it authored by?
18     A.   I don't recall.
19     Q.   Do you recall what year it was
20  published?
21     A.   I don't recall that either.
22     Q.   Do you recall whether it talks
23  about subjectivity in adverse events on
24  rechallenge?

Page 415

1      A.   I do not recall that either.
2      Q.   Okay.  And so that's one
3  article you're thinking of.  You mentioned
4  another?
5      A.   What I've said was I believe
6  that there are at least two articles I've
7  examined and read previously in the "British
8  Medical Journal," or BMJ, that addresses at
9  least the substance of your question.
10     Q.   But you can't, as you sit here
11  today, tell me whether those articles state
12  that you can use rechallenge to produce a
13  subjective adverse event and that that process
14  would be a scientifically reliable methodology
15  for making a causal inference about whether a
16  drug causes an adverse event?
17     A.   You'll have to, if you would,
18  reask that question.
19     Q.   Doctor, listen to my question.
20          You cannot state, as you sit
21  here today, whether there is any peer-reviewed
22  scientific literature stating that rechallenge
23  can be used to produce a subjective adverse
24  event and that that is a reliable methodology

Page 416

1  for making a causal determination about
2  whether a drug can cause an adverse event?
3          MR. FINKELSTEIN:  Objection.
4  Compound.
5          THE WITNESS:  That is correct.
6  BY MS. McGRODER:
7      Q.   Okay.  You also refer, on
8  Page 14 of your report, to patients toward the
9  bottom there on Page 14.  Do you have your
10  report in front of you?
11     A.   Yes.
12     Q.   Okay.
13     A.   Are we finished with this one?
14     Q.   Yes.
15          You say that you are listing
16  examples of mood and behavioral disturbances
17  reported by patients receiving gabapentin
18  during well-controlled trials performed by the
19  company -- I'm paraphrasing -- and these were
20  events that are possibly unrelated, is the
21  term that you used, to gabapentin.  Correct?
22     A.   That's correct.
23     Q.   And so are all of these seven
24  events that you list here identified as

Page 417

1  possibly unrelated to gabapentin?
2      A.   That is correct.
3      Q.   And when you say they were
4  reported to the FDA as possibly unrelated, are
5  you saying they were reported by Parke-Davis,
6  or are you saying that is the clinical
7  investigator's determination of the
8  relationship between the event and the drug?
9      A.   I don't understand your
10  question.
11     Q.   What do you mean when you say,
12  "They were reported to the FDA as possibly
13  unrelated"?  Are you saying the "possibly
14  unrelated" identification or determination was
15  made by the company, or was it made by the
16  clinical investigators?
17     A.   To my recollection, it was made
18  by the clinical investigator.
19     Q.   Okay.  Are you aware, Doctor,
20  that all of the adverse events, these seven
21  adverse events that you've identified here on
22  Page 14 and 15 of your report, are contained
23  in a tabular summary prepared by
24  Dr. Cynthia McCormick?

Page 422

1  need to look at the table for a minute.
2      Q.    Well --
3          MR. FINKELSTEIN:  Just the top
4      of the table.  Is that what you want
5      him to look at?
6          MS. McGRODER:  Yes, just the
7      top of the table.  The title.
8          THE WITNESS:  That it's
9      considered unlikely that these are
10     part of that category.
11  BY MS. McGRODER:
12     Q.    This table is a summary of
13  serious adverse events that are considered
14  unlikely to be drug-related.  Right?
15     A.    Yes.
16     Q.    And the seven events that you
17  identify in your report on Page 14 and 15 are
18  included in this table.  Correct?
19     A.    Yes.
20     Q.    Okay.  So those seven events
21  are, according to Dr. McCormick, unlikely to
22  be drug-related.  Correct?
23     A.    That's correct.
24     Q.    Okay.  Does that say, "possibly

Page 423

1  unrelated"?
2      A.    Says, "considered unlikely."
3      Q.    Right.  It doesn't say,
4  "possibly unrelated."  It says they are
5  "considered unlikely."  Correct?
6      A.    Yes.
7      Q.    Are those two distinct terms in
8  your mind?
9      A.    Yes.
10     Q.    So your report's just not
11  correct where you -- on Page 14 of your report
12  where you say these events are possibly
13  unrelated; in fact, they were unlikely
14  drug-related?
15     A.    I'm using the same wording to
16  suggest that "considered unlikely" and my
17  comment of "possibly unrelated" as synonymous.
18     Q.    Okay.  Well, those are two --
19  those are four different words.  Right?
20  "Possibly unrelated" and "unlikely related."
21  Correct?
22     A.    Yes.
23     Q.    Okay.  And you chose to put
24  "possibly unrelated" instead of "considered

Page 424

1  unlikely" to be related.  Correct?
2      A.    Correct.
3      Q.    Okay.  If you could look at
4  your report on Page 15, Paragraph No. 6 -- are
5  you there?
6      A.    Yes.  Patient No. 2 or the
7  Paragraph No. 6?
8      Q.    Patient No. 2, Study 945-16.
9          Do you know, Doctor, that Study
10  945-16 is an open-label study?
11     A.    Yes.
12     Q.    Okay.  So it's not a controlled
13  study, is it?
14     A.    That's correct.
15     Q.    So in your report on Page 14
16  where you say you're identifying
17  well-controlled studies, that's not accurate.
18  Right?
19     A.    We're using the word
20  "controlled" in different ways.
21     Q.    Okay.  Well --
22     A.    It is controlled, but not in
23  the way I've been defining "controlled."
24     Q.    Well, it's not

Page 425

1  placebo-controlled.  Right?
2      A.    That's correct.
3          - - -
4          (Whereupon, a document was
5          marked for identification purposes
6          as No. 34.)
7          - - -
8  BY MS. McGRODER:
9      Q.    Okay.  I'm handing you what's
10  been marked as Exhibit 34.  And that is the
11  summary for Patient No. 2 in Paragraph No. 6,
12  Page 15 of your report.
13          And you say in your report,
14  "This is a 17-year-old female who overdosed on
15  gabapentin and phenytoin," P-H-E-N-Y-T-O-I-N,
16  "on Day 217."  Correct?
17     A.    Yes.
18     Q.    Now, look at the Exhibit No. 34
19  and the summary says, "The patient was
20  hospitalized because of a phenytoin overdose."
21  Correct?
22     A.    That's correct.
23     Q.    Did this patient overdose on
24  gabapentin?

Page 466

1  the number of patients of 537 is 2.2 percent.
2  Correct?
3      A.    Yes.
4      Q.    So is your understanding of
5  this table, Dr. Kruszewski, that there were --
6  there was a higher percentage of depression
7  reported on placebo than there was on
8  gabapentin in the neuropathy studies?
9      A.    Yes.
10     Q.    Okay. Is that something you
11 would have wanted to know before you prepared
12 your report in this case?
13     A.    Yes.
14     Q.    All right. Let's turn to
15 Page -- darn it -- 10. And here, Doctor, you
16 discuss --
17     A.    Page 10?
18     Q.    Yes, Page 10 of your report.
19         The heading that you put on
20 your report here is "Gabapentin's Effects Have
21 Been Linked to Serious Mood, Cognitive and
22 Behavioral Disturbances in Humans." Right?
23     A.    Yes.
24     Q.    And these studies you cite

Page 467

1  here, the majority of them are case reports.
2  Correct?
3      A.    I'll have to look at this again
4  briefly.
5      Q.    Okay.
6      A.    (Reviewing.)
7      Q.    I'm not going to ask you about
8  all of them, Doctor.
9      A.    Okay. Well, give me one
10 minute.
11     Q.    Okay.
12     A.    (Reviewing.)
13         Just 30 seconds.
14         (Reviewing.)
15         MS. McGRODER: Let's go off the
16 record.
17         VIDEO SPECIALIST: We're going
18 off the video. The time is 2:59.
19         - - -
20         (Recess 2:59-3:16 p.m.)
21         - - -
22         VIDEO SPECIALIST: We're back
23 on the video. The time is 3:16.
24

Page 468

1  BY MS. McGRODER:
2      Q.    Okay. Doctor, we were at
3  Page 10 of your report, and I think the
4  question pending was: Are the majority of
5  these case reports -- were you able to draw
6  any conclusion about that based on the time
7  you had to review this section of your report?
8      A.    Conclusions in what respect?
9      Q.    Whether the majority of the
10 references you've cited here are case reports
11 in the published literature?
12     A.    Yes, the majority are case
13 reports.
14     Q.    And what are -- what is a case
15 report?
16     A.    A case report is a write-up of
17 one or more clinical profiles of problems
18 associated with a particular patient.
19     Q.    And if there are multiple, it's
20 called a case series?
21     A.    Yes.
22     Q.    And if -- case reports in the
23 published literature do have some limitations.
24 Correct?

Page 469

1      A.    They do.
2      Q.    They are -- they have no
3  control group?
4      A.    That's correct.
5      Q.    They are not blinded?
6      A.    That's correct.
7      Q.    There's no randomization?
8      A.    That's correct.
9      Q.    There are no statistical
10 analyses conducted based on data collected?
11     A.    Rarely.
12     Q.    Okay. Can you cite anywhere in
13 the peer-reviewed literature a scientific
14 article stating that it is appropriate
15 methodology to make causal determinations on
16 the basis of case reports?
17     A.    No.
18     Q.    And you agree that you cannot
19 make causal determinations on the basis of
20 published case reports?
21     A.    I agree that's only one signal
22 that can be used in the overall determination
23 of causality.
24     Q.    And so by "signal," do you mean

Page 470

1  that it's a hypothesis-generating event,
2  trigger? Is it something that -- is it
3  something that creates a hypothesis that you
4  would then have to go do further study on in
5  order to make a conclusion about causation?
6        Man, that was a really long and
7  bad question. Let's strike it and start over.
8     A.   Yeah, please.
9        MR. FINKELSTEIN: Why don't you
10       just ask him what a signal is.
11 BY MS. McGRODER:
12    Q.   Is a signal, in your view,
13 something that is hypothesis-generating?  In
14 other words, if a case report creates a
15 signal, you would have to go do something
16 further to test whether the signal was valid?
17       MR. FINKELSTEIN: Objection.
18       THE WITNESS: You could.
19 BY MS. McGRODER:
20    Q.   Okay. Let's turn to -- not
21 just yet. You don't hold yourself out as a
22 pediatric neurologist, do you?
23    A.   I do not.
24    Q.   You're not certified in

Page 471

1  pediatrics. Correct?
2     A.   That's correct.
3     Q.   Routinely, in your practice,
4  you do not treat epileptic patients?
5     A.   Routinely, I do.
6     Q.   You do?
7     A.   Yes.
8     Q.   What about pediatric epileptic
9  patients?
10    A.   If -- yes, I do.
11    Q.   Well, at any given time, say,
12 for example, in the last month, how many
13 pediatric epilepsy patients have you treated?
14    A.   Approximately, two.
15    Q.   And are you including
16 adolescents in your category of "pediatric"?
17    A.   Yes. Both of them would be
18 either 16 or 17.
19    Q.   Do you treat any patients
20 younger than 16?
21    A.   The youngest age of a person
22 admitted to Chambers Hill is 13.
23    Q.   Okay.
24    A.   On only rare occasions do I

Page 472

1  treat anyone under that age.
2     Q.   And Chambers Hill is the
3  hospital or center, rehab center, for
4  adolescents with substance abuse?
5     A.   Yes.
6     Q.   Okay. And so in the context of
7  treating epileptic patients there, you
8  wouldn't really be treating their epilepsy,
9  you would be treating their substance-abuse
10 problems?
11    A.   Actually, it's my
12 responsibility to treat their epilepsy as
13 well.
14    Q.   Do they also have a consulting
15 neurologist or someone who routinely treats
16 their epilepsy at the same time that you're
17 seeing them for substance abuse?
18    A.   I believe, without exception,
19 all of them have had neurological evaluations
20 in the past or I send them for neurological
21 consultation prior to initiating or continuing
22 anticonvulsants.
23    Q.   Okay. So if a patient came to
24 the Chambers Center with -- presenting with

Page 473

1  substance abuse and epilepsy, to the extent
2  they were not already on an antiepileptic
3  agent, you would consult with somebody or
4  refer them out for that?
5     A.   That is correct.
6     Q.   You wouldn't be the original
7  physician who's diagnosing and creating a
8  treatment plan for their epilepsy. Correct?
9     A.   I would not.
10    Q.   Okay. Do you have an
11 understanding, Doctor, of the incidence of
12 adverse behavioral effects in pediatric
13 epileptics, generally?
14    A.   I have --
15    Q.   Was that a bad question? No.
16    A.   Repeat the question, if you
17 would.
18    Q.   Do you have an understanding of
19 the incidence of adverse behavioral effects
20 generally that occur in pediatric epileptics?
21    A.   Yes.
22    Q.   What are some of the adverse
23 behavioral consequences of epilepsy in
24 pediatrics?

Page 486

1    rather than read it, for just a moment.
2            (Reviewing.)
3            Ask your question again.  I
4    don't know if I can answer it yet.
5        Q.    You know what?  I'll withdraw
6    it.  It's going to take us too long, I'm
7    afraid.
8        A.    Okay.
9        Q.    Are you still on Page 832,
10   Doctor?
11       A.    Now I am.
12       Q.    Okay.  Under the first
13   paragraph of "Discussion," the authors offer
14   what I consider a conclusion.  Tell me if you
15   agree.  They say, "Our experience indicates
16   that gabapentin can be an effective adjunctive
17   antiepileptic drug" --
18       A.    I'm sorry.  You're under
19   "Discussion."
20       Q.    I'm sorry.  Right.  Let me
21   start again.
22       A.    Yes, please.
23       Q.    "Our experience indicates that
24   gabapentin can be an effective adjunctive

Page 487

1    antiepileptic drug in children with refractory
2    partial seizures."  Correct?
3        A.    Correct.
4        Q.    So the authors in this study
5    suggest that gabapentin is a good drug to use
6    in pediatric epilepsy.  Correct?
7        A.    I don't think they used the
8    word "good."  They say that it can be
9    effective.
10       Q.    Okay.  They don't say, "Don't
11   use gabapentin in pediatric epilepsy."
12   Correct?
13       A.    That's correct.
14       Q.    And if you look on the front
15   page under the abstract, these authors
16   conclude -- the very last sentence -- "We
17   conclude that gabapentin can be a useful
18   adjunctive medication in the treatment of
19   refractory partial epilepsy in children."
20            Do you agree that's what they
21   say?
22       A.    Yes, I do.
23       Q.    Okay.  Do you agree with that
24   conclusion?

Page 488

1        A.    Yes.
2        Q.    Okay.  In the next paragraph of
3    your report, you refer to the Young paper in
4    1997.
5            - - -
6            (Whereupon, a document was
7            marked for identification purposes
8            as No. 40.)
9            - - -
10   BY MS. McGRODER:
11       Q.    This is Exhibit 40.  "Acute
12   Treatment of Bipolar Depression with
13   Gabapentin."
14       A.    I'm sorry.  Hold on one second.
15   I just want to check it out in terms of my
16   bibliography.
17            (Reviewing.)
18            Yes.
19       Q.    Did you read all these studies
20   before you did this summary in your report?
21       A.    Yes.
22       Q.    This is work that you did
23   yourself?
24       A.    Yes.

Page 489

1        Q.    Okay.  And did you have a
2    certain selection process for the case reports
3    that you included in this section of your
4    report?
5        A.    I wanted to demonstrate what is
6    in the -- yes.
7        Q.    And what was it?
8        A.    I wanted to demonstrate pieces
9    of information from the literature that
10   supported that there is an association between
11   behavioral events and gabapentin.
12       Q.    Okay.  And so you did a review
13   of the literature and then hand-picked some
14   examples that you wanted to include in your
15   report?
16       A.    Yes.
17       Q.    Was there any other method
18   involved in identifying these reports as
19   opposed to any other studies in the published
20   literature?
21       A.    There was no systematic method.
22       Q.    Okay.  If you look at the Young
23   case, you've cited it in your report stating,
24   "Young, et al., reported on a case series of