Page 498

1    Q.    Okay.  And then the next
2    sentence down says, "The addition of
3    gabapentin also appears to have anxiolytic
4    properties as evidenced by a marked reduction
5    in the cluster of anxiety symptoms from the
6    HAM-D."  And the HAM-D, as we know, is a
7    measurement or a scale?
8        A.    Hamilton Depression Scale.
9        Q.    Okay.  Can you tell the jury,
10   Doctor, what is meant by "The addition of
11   gabapentin also appears to have anxiolytic
12   properties"?
13       A.    That it, in this population,
14   reduced anxiety.
15       Q.    And if you look over on the --
16   well, let's read one more sentence.
17   "Furthermore, our data suggests that this
18   effect is sustained for up to six months,
19   thereby extending our previous observations
20   during an acute six-week antidepressant
21   trial."
22           So the others report six months
23   of anxiolytic -- or improvement in anxiety on
24   the drug, correct, in bipolar patients?

Page 499

1        A.    Ask that again.
2        Q.    I need to.  Thank you for
3    asking me to.
4           The authors report here that
5    the anxiolytic effect, or the antianxiety
6    effect, was sustained for up to a period of
7    six months in these patients.  Correct?
8        A.    I'm not sure that that's
9    correct.  If you give me one minute, I will...
10       Q.    Sure, but only one.
11       A.    (Reviewing.)
12           Okay.  I believe I can answer
13   the question if you give it to me one more
14   time.
15       Q.    Sure.  The authors report here
16   in this sentence that we just read into the
17   record starting with "Furthermore" --
18       A.    Yes.
19       Q.    -- that their data suggests
20   that the antianxiety properties of gabapentin
21   in bipolar -- in these bipolar patients lasted
22   for up to six months.  Correct?
23       A.    Yes.
24       Q.    Okay.  If you go to the next

Page 500

1    column, at the very bottom, the last sentence,
2    the authors say, "Notwithstanding these
3    limitations, the antimanic and antidepressant
4    effects observed are impressive considering
5    the treatment refractory nature of the cohort
6    and the inclusion of a large number of rapid
7    cycling patients."
8           Do you see that?
9        A.    I do.
10       Q.    Do you include the information
11   in the conclusion of this report in your
12   report -- withdrawn.  Let me state it better.
13           Do you include in your report
14   the conclusion of these authors in Young 1999
15   in your report that the antimanic and
16   antidepressant effects of gabapentin are
17   impressive?
18       A.    No.
19       Q.    Okay.  We talked a little bit,
20   I think, about your opinion in your report
21   that gabapentin has mood and behavioral
22   effects in a susceptible minority of
23   consumers.  Correct?
24       A.    Yes.

Page 501

1        Q.    What do you mean by the words
2    "susceptible minority of consumers"?
3        A.    I mean that there's a small
4    group of patients who receive Neurontin, as I
5    mentioned yesterday, less than five percent,
6    who are, for whatever reason, genetically or
7    otherwise susceptible to the adverse
8    consequences of Neurontin.
9        Q.    How can you identify who are
10   the susceptible minority of consumers that you
11   believe are genetically or otherwise
12   susceptible to the adverse consequences of
13   Neurontin?
14       A.    One of the -- one of the
15   problems is that it's impossible to
16   specifically identify who is at risk prior to
17   the initiation or continuation of Neurontin;
18   however, through careful questioning and
19   medical history, previous response to
20   medicines, medical history, one can get a
21   possible risk of a small group of people who
22   may be more predisposed to side effects of
23   Neurontin than the majority of patients who
24   receive Neurontin.

Page 502

1    Q.    Well, Doctor, let's say you had
2  50 people in your office over at Chambers
3  substance-abuse center there, and you're
4  trying to figure out which are the ones who
5  are going to be the susceptible minority of
6  consumers who will be adversely affected by
7  Neurontin; how are you going to pick them out?
8    A.    I would begin by doing a
9  complete and comprehensive medical and
10 psychiatric psychosocial history.
11   Q.    And what would you be looking
12 for? What in that history is going to tell
13 you whether these people are going to be
14 susceptible to Neurontin?
15   A.    People who -- there's no
16 specific way, as I've said. People who may be
17 at risk for problems associated with Neurontin
18 include people who have a previous history of
19 mood disturbances, individuals who have a
20 previous history of addiction, individuals who
21 have a previous history of psychosis.
22        Individuals who have a previous
23 history of cognitive dysfunction. Individuals
24 who have a previous history of developmental

Page 503

1  delay. Individuals who have a previous
2  psychiatric history of any kind.
3    Q.    Now, have you ever tested your
4  theory that by using a complete psychiatric
5  history, you can accurately identify the
6  susceptible minority of consumers who have all
7  of these traits you just mentioned?
8    A.    No.
9    Q.    Have you ever -- well, given
10 that you've never tested whether you can
11 accurately identify this susceptible minority
12 of consumers, I take it there's no rate of
13 error calculable to the way that you would go
14 about figuring out who these people are.
15   A.    I don't understand the
16 question.
17   Q.    Withdrawn.
18        Well, given that you haven't
19 tested this theory, there's no way to quantify
20 how much error there is in this theory. True?
21   A.    That would be correct, yes.
22   Q.    Have you ever published your
23 theory that if -- you take a complete
24 psychiatric history and you identify these

Page 504

1  variables that you set forth in your answer to
2  my question in a peer-reviewed scientific
3  journal?
4    A.    No.
5    Q.    You also state in your report
6  that there is a group of people who will
7  experience paradoxical effects from Neurontin.
8  Do you remember that part of your report?
9    A.    Sounds familiar.
10   Q.    Well, given that you haven't
11 closely reviewed your report for a week, would
12 you like to review that part of your report?
13   A.    Yes, if you'll show me where it
14 is.
15   Q.    If you look on Page 15, you
16 say, "Gabapentin's effects" in that big
17 heading there "are paradoxical and yield
18 differing results" --
19        MR. FINKELSTEIN: 15.
20        THE WITNESS: Oh, 15.
21 BY MS. McGRODER:
22   Q.    I'm sorry. Are you now with
23 me?
24   A.    Yes.

Page 505

1    Q.    Your heading says,
2  "Gabapentin's effects are paradoxal and yield
3  differing results from patient to patient."
4        Do you see that?
5    A.    Yes.
6    Q.    And then you say, "There are
7  clinical trials that involve nearly 2,100
8  individuals." Is that accurate now? Given
9  the two days you've spent in this deposition,
10 is it accurate that there are only 2,100
11 individuals in the gabapentin clinical trials?
12   A.    I believe that there may be
13 more.
14   Q.    Yeah. And -- so that's not
15 accurate? 2,100 is not accurate. Right?
16   A.    Right.
17   Q.    Okay. "That the above-noted
18 adverse events demonstrate that gabapentin has
19 the capacity to cause mood and behavioral
20 disturbances in susceptible individuals."
21 Okay. That's just what we were just talking
22 about. Correct?
23   A.    That's correct.
24   Q.    And then you go on to say, "In

Page 506

1  peer-reviewed literature and in corporate
2  documents, gabapentin effects are
3  paradoxical"?
4      A.    Yes.
5      Q.    And there is no citation there,
6  no reference at the end of that sentence.
7  Tell me, Doctor, where is the peer-reviewed
8  literature that states that gabapentin's
9  effects are paradoxical?
10     A.    That sentence would apply to
11 any and all of the documents either that are
12 referenced in my report or any of the
13 documents that I've previously mentioned in my
14 large bibliography or anything else that I've
15 reviewed related to gabapentin.
16     Q.    Well, out of those documents
17 that are cited in your large bibliography and
18 out of all the documents that you've reviewed
19 relating to gabapentin, cite to me one
20 peer-reviewed study that states that
21 gabapentin's effects are paradoxical.
22     A.    As I already said -- and I'll
23 repeat -- gabapentin's effects are paradoxical
24 based upon the summation and review of all of

Page 507

1  the documents that I reviewed. And a specific
2  example of that would include --
3      Q.    Well, I didn't ask you that.
4  That's not what I asked you, Dr. Kruszewski,
5  with all due respect.
6         My question is -- let me ask it
7  this way: Is your testimony that you can't
8  cite any peer-reviewed study that says
9  gabapentin's effects are paradoxical?
10     A.    It is my testimony that I
11 cannot report one specific reference that
12 gabapentin's effects are paradoxical. I would
13 have to respond with reporting multiple,
14 multiple references.
15     Q.    Okay. But you can't tell me
16 one right now, as you sit here today?
17     A.    That is correct.
18     Q.    Okay. And is your opinion --
19     A.    That is not correct. I want to
20 amend that.
21     Q.    Okay. Well, then cite me a
22 study. Cite me a peer-reviewed scientific
23 article that says the effects of gabapentin
24 are paradoxical.

Page 508

1      A.    Not that wording, but I can use
2  some of the ones we've already talked about
3  today.
4      Q.    Well, let me ask it this way.
5  I think I see where you're going here. I want
6  to be on the same page with you about this
7  because it's important because this is our
8  only chance to ask you these questions.
9      A.    I understand.
10     Q.    Is it correct, then, that you
11 cannot cite any peer-reviewed scientific
12 article that states that gabapentin's effects
13 are paradoxical, but it's your opinion, based
14 on everything that you've looked at, that
15 gabapentin's effects are paradoxical. Is that
16 correct?
17     A.    Just one more time if you'd
18 repeat that, please.
19     Q.    Is it correct, then, that you
20 cannot cite any peer-reviewed scientific
21 article that states that gabapentin's effects
22 are paradoxical, but it's your opinion, based
23 on everything that you've looked at, that
24 gabapentin's effects are paradoxical?

Page 509

1      A.    Yes, that is accurate.
2      Q.    So there's no study that backs
3  you up on that that you can cite right now?
4      A.    There are multiple studies that
5  back me up on that.
6      Q.    Well, do they have the words in
7  them -- do they have specific wording in them
8  that states gabapentin has paradoxical
9  effects?
10     A.    The multiple studies
11 demonstrate paradoxical effects. I do not
12 believe that that word is used elsewhere.
13 That is my word.
14     Q.    Okay. So in terms of
15 gabapentin and gabapentin litigation, you
16 coined the term "paradoxical" in connection
17 with gabapentin?
18         MR. FINKELSTEIN: Objection as
19     to form.
20         THE WITNESS: Yes.
21 BY MS. McGRODER:
22     Q.    Does paradoxical -- well, what
23 is the medical definition of "paradoxical"?
24     A.    I don't know that there's a

Page 526

1  without saying that you didn't reference these
2  data in your report for the court to review.
3  Correct?
4       A.    These data are not referenced
5  in my report, that's correct.
6       Q.    Doctor, I turn your attention
7  to Page 17 of your report. You make some
8  analogies here between gabapentin and some
9  other drugs, don't you?
10      A.    Yes, I do.
11      Q.    And what I want to ask you is,
12 can you cite one peer-reviewed published study
13 that finds that gabapentin is like Valium and,
14 therefore, causes suicide?
15      A.    No.
16      Q.    Can you cite to me one
17 peer-reviewed published study that finds that
18 gabapentin is like Valium and, therefore,
19 causes suicide adverse events, including
20 suicide attempt and suicide ideation?
21      A.    No.
22      Q.    Same question for alcohol; can
23 you cite to me, Doctor, one peer-reviewed
24 publication stating that gabapentin is like

Page 527

1  alcohol and, therefore, causes suicide,
2  suicide attempt or suicide ideation?
3       A.    No.
4       Q.    And starting with the second
5  paragraph on Page 17, you say, "There's an
6  abundance of evidence exists" (sic) "that
7  states artificially enhanced GABAergic
8  activity can induce major depression and
9  suicidality," and you go on to talk about
10 vigabatrin, yet you don't cite anything after
11 the sentence where you say, "There's an
12 abundance of evidence."
13      Do you have peer-reviewed
14 scientific published studies to support your
15 first sentence in this paragraph?
16      A.    Repeat that question.
17      Q.    Do you have and can you cite to
18 me any peer-reviewed published studies that
19 support your statement in this first sentence?
20      A.    Yes.
21      Q.    And is that anything other than
22 what was discussed yesterday at your
23 deposition?
24      A.    Yes.

Page 528

1       Q.    Cite to me a peer-reviewed
2  published study that supports your first
3  statement in this sentence.
4       A.    I don't think, as I sit here
5  today, I can cite a specific report. I can
6  site the information that GABAergic drugs,
7  including adjunct --
8       Q.    I'm not asking you that. I'm
9  asking for your opinion about GABAergic drugs.
10 I'm asking you to cite me a study.
11      Can you, right now, cite me a
12 study that supports your sentence that there's
13 an abundance of evidence that states
14 artificially enhanced GABAergic activity can
15 induce major depression and suicidality?
16 Where is the study? Name it.
17      A.    I cannot cite one, as I sit
18 here today.
19      Q.    Okay. In the next paragraph
20 down -- well, withdrawn.
21      You cite Brown and Stoudemire
22 several times in this report. Correct?
23      A.    That's correct.
24      Q.    Have you used that text in

Page 529

1  practice?
2       A.    What do you mean?
3       Q.    In your clinical practice.
4       A.    What do you mean have I used
5  it?
6       Q.    Do you rely on it? Have you
7  used it? Have you looked drugs up in Brown
8  and Stoudemire in your clinical practice?
9       A.    Yes.
10      Q.    And you cite Brown and
11 Stoudemire on Page 17 of your report for your
12 discussion about vigabatrin. Do you remember
13 that?
14      A.    Yes, I do.
15      Q.    Which reference is it in your
16 report? Which is the Brown and Stoudemire
17 reference in that paragraph, Dr. Kruszewski?
18      A.    Which paragraph and what am I
19 looking for?
20      Q.    Where on Page 17 -- I know it's
21 in your discussion of vigabatrin. You cite to
22 the reference Brown and Stoudemire. I believe
23 it's 123. I could be off by one. I'm just
24 trying to find the sentence. Yeah, 123.

Page 530

1    Okay. Don't worry. I found it.
2            Look at your report on Page 17.
3        A.    Yes.
4        Q.    And you cite Brown and
5    Stoudemire for the sentence "Vigabatrin side
6    effects are similar to those of gabapentin,
7    including the prominent ones that include
8    sedation, psychosis, dizziness, irritability,
9    major depression and suicidality." Right?
10       A.    Yes.
11       Q.    And I looked in the Brown and
12   Stoudemire text, and there is a page on
13   vigabatrin, which is the page you cite.
14   Right?
15       A.    Yes.
16       Q.    If you look one page back,
17   there's Brown and Stoudemire's summary of
18   gabapentin. Why don't you cite to Brown and
19   Stoudemire's summary of gabapentin in your
20   report?
21       A.    I'm not sure. I'd have to
22   reexamine the...
23       Q.    Do you know what Brown and
24   Stoudemire says about gabapentin?

Page 531

1        A.    I don't recall that, as I sit
2    here.
3        Q.    Did you know that Brown and
4    Stoudemire does not -- does not state that --
5    it doesn't identify any of the side effects
6    associated with vigabatrin that you put in
7    your report? Did you know that?
8        A.    I'd have to see it, but it
9    would not surprise me.
10       Q.    It doesn't surprise you that
11   the side effects reported with respect to
12   gabapentin are completely different from the
13   ones cited with respect to vigabatrin?
14       A.    That citation is not a
15   word-for-word citation. That citation is to
16   make the example that vigabatrin, which is a
17   strongly GABAergic drug, has side effects that
18   includes sedation, psychosis, dizziness,
19   irritability, major depression and
20   suicidality --
21       Q.    Well, Doctor --
22       A.    -- all those side effects --
23   let me finish -- have been associated as well
24   with gabapentin and, therefore, I made that

Page 532

1    statement.
2        Q.    Well, the statement that you
3    make is "Vigabatrin side effects are similar
4    to those of gabapentin," then you list them
5    all and then you cite Brown and Stoudemire as
6    I'm going to go to Brown and Stoudemire and
7    learn that all of these sides effects you
8    listed here are listed likewise with
9    gabapentin. Isn't that the implication of
10   that sentence in your report?
11           MR. FINKELSTEIN: Objection.
12           THE WITNESS: No.
13   BY MS. McGRODER:
14       Q.    That's not what you meant to
15   imply when you wrote that sentence?
16       A.    No.
17       Q.    You didn't mean to imply at all
18   that Brown and Stoudemire says that you might
19   experience sedation, psychosis, dizziness,
20   irritability, major depression and suicidality
21   with gabapentin?
22       A.    Say that again, I'm sorry.
23       Q.    You didn't mean to imply when
24   you wrote that sentence that gabapentin causes

Page 533

1    sedation, psychosis, dizziness, irritability,
2    major depression and suicidality. Right?
3        A.    I meant to say exactly what I
4    said, that vigabatrin side effects which are
5    in Brown and Stoudemire are in my conclusion,
6    which is where we're at in this report --
7        Q.    We're not here to talk about
8    vigabatrin. This litigation is not about
9    vigabatrin.
10           Don't you think it would have
11   been less misleading if you had identified the
12   Brown and Stoudemire side effects that are
13   associated with gabapentin in this paragraph
14   rather than this list of psychiatric events
15   that are associated with vigabatrin?
16           MR. FINKELSTEIN: Objection.
17           THE WITNESS: Excuse me. Read
18       that question back to me, please.
19   BY MS. McGRODER:
20       Q.    I said we're not here to talk
21   about vigabatrin. This litigation is about
22   Neurontin.
23           Don't you think it's misleading
24   to include a sentence in your report for the

Page 534

1  court and jury to see that says that
2  vigabatrin side effects are similar to
3  gabapentin, and then you list out all the
4  psychiatric side effects, but, in fact -- and
5  then you cite Brown and Stoudemire, but, in
6  fact, those side effects are not reported with
7  gabapentin in Brown and Stoudemire? Don't you
8  think that's misleading?
9          MR. FINKELSTEIN: Objection.
10         THE WITNESS: No.
11 BY MS. McGRODER:
12     Q.    And you surely didn't mean to
13 mislead anybody when you cited Brown and
14 Stoudemire for that proposition?
15     A.    I do not believe I misled
16 anybody, and I do not want to mislead anybody.
17     Q.    Well, wouldn't it have been
18 just as easy, Dr. Kruszewski, for you to turn
19 back one page in Brown and Stoudemire and look
20 at Page 105 where the side effects reported
21 associated with gabapentin are listed and put
22 those in your report rather than side effects
23 associated with vigabatrin?
24         MR. FINKELSTEIN: Objection.

Page 535

1  BY MS. McGRODER:
2      Q.    Wouldn't that be easy?
3      A.    Maybe it's easy.
4      Q.    Let's talk about the side
5  effects that Brown and Stoudemire reports for
6  gabapentin. Here's what it says. "Gabapentin
7  is associated with somnolence" -- what is
8  somnolence?
9      A.    Sleepiness.
10     Q.    Right. "Dizziness." Dizziness
11 is not a psychiatric side effect, is it?
12     A.    It can be a psychiatric side
13 effect.
14     Q.    Well, dizziness is a CNS side
15 effect, but not a psychiatric side effect.
16 You'd agree with that, wouldn't you?
17     A.    It's a neuropsychiatric side
18 effect.
19     Q.    And fatigue, is fatigue a
20 psychiatric side effect?
21     A.    Yes, it can be.
22     Q.    Fatigue is a psychiatric side
23 effect, in your opinion?
24     A.    Yes, it can be.

Page 536

1      Q.    And are you saying that because
2  some patients with psychosis are tired?
3      A.    I'm saying that fatigue is one
4  of the common signs and symptoms associated
5  with depression, for example.
6      Q.    Let me ask you one more time.
7  Did you look at the gabapentin entry in Brown
8  and Stoudemire to identify side effects when
9  you wrote your report?
10     A.    Yes.
11     Q.    And you just chose not to
12 include the side effects in Brown and
13 Stoudemire for gabapentin in your report, but
14 instead to include those for vigabatrin. Is
15 that fair?
16     A.    The analogy that I'm making is
17 that the GABAergic effects of vigabatrin are
18 similar to the GABAergic effects of gabapentin
19 and that, on the basis of all of my
20 conclusions drawn by the previously
21 peer-reviewed information and the Pfizer
22 proprietary documents, that all of those are
23 similar to vigabatrin.
24     Q.    Move to strike as

Page 537

1  nonresponsive.
2          My question was: Did you look
3  at the gabapentin entry in Brown and
4  Stoudemire -- oh, that's not the question.
5          My question was: As you -- and
6  you chose not to include the side effects
7  listed in Brown and Stoudemire for gabapentin
8  in your report, but instead to include those
9  for vigabatrin. That's what you did, isn't
10 it?
11         MR. FINKELSTEIN: Objection.
12         THE WITNESS: That statement is
13 correct.
14         MS. McGRODER: Okay. Let's
15 move on.
16 BY MS. McGRODER:
17     Q.    You were fired from the
18 Department of Public Welfare in 2003 -- the
19 Pennsylvania Department of Public Welfare in
20 2003. Is that correct?
21     A.    That's correct.
22     Q.    And subsequent to that, you
23 filed a whistleblower lawsuit. Is that right?
24     A.    Yes, I did. A First Amendment

Page 538

1  litigation in the Middle District of
2  Pennsylvania.
3      Q.     And in that lawsuit, you sued,
4  among other people or companies, Pfizer.
5  Correct?
6      A.     Yes.
7      Q.     And that lawsuit was filed in
8  2004?
9      A.     That's correct.
10     Q.     Okay. And -- and you sued
11 Pfizer claiming -- among other drug companies
12 and some individuals at the Pennsylvania
13 Department of Welfare, you sued Pfizer
14 claiming that there was a conspiracy.
15 Correct?
16     A.     That's what the initial
17 Complaint says, yes.
18     Q.     Was that lawsuit filed before
19 or after you started working with
20 Mr. Finkelstein?
21     A.     Before.
22     Q.     And in that lawsuit, you
23 claimed in a Complaint that you filed in the
24 Middle District of Pennsylvania federal court

Page 539

1  that drug companies, including Pfizer, are
2  incestuously involved politically through
3  massive campaign contributions to politicians,
4  including the current administration of
5  George W. Bush, are pursuing policies to
6  extend their unlawful influence and control
7  over the medical treatment of other innocent
8  persons throughout the nation so that they can
9  continue profiteering on the vulnerable
10 situation of these populations."
11         Is that what you alleged?
12     A.     That sounds like an accurate
13 representation of what's in the Complaint.
14     Q.     Did you believe there was a --
15 withdrawn.
16         Do you believe today that
17 there's a conspiracy between Pfizer and other
18 drug companies and President Bush?
19     A.     No.
20     Q.     You claimed in that
21 whistleblower lawsuit that you were personally
22 harmed when you were fired from the welfare
23 department of Pennsylvania. Correct?
24     A.     That's correct.

Page 540

1      Q.     And that you suffered
2  posttraumatic stress disorder. Is that
3  correct?
4      A.     That's correct.
5      Q.     And, at the time, I think up
6  through 2006, based on testimony you've given
7  under oath in other cases, you were taking
8  Zoloft for a posttraumatic stress disorder.
9  Is that right?
10     A.     That's correct.
11     Q.     Are you taking Zoloft today?
12     A.     No.
13     Q.     Are you taking any psychotropic
14 medications today?
15     A.     No.
16     Q.     Did Zoloft help you?
17     A.     Yes.
18     Q.     You've written and published an
19 article that states that you are passionate
20 about whistleblowing, have you not?
21     A.     Yes, I have.
22     Q.     And -- well, let me back up.
23         What was the disposition of
24 your whistleblower lawsuit ultimately?

Page 541

1      A.     It was successfully settled in
2  my favor in June or July of this year.
3      Q.     Oh, it settled this year?
4      A.     Yes.
5      Q.     And so when you began working
6  with -- well, strike that.
7         Did you recover any monetary
8  sum as a result of that settlement?
9      A.     Yes.
10     Q.     How much did you recover?
11     A.     I was paid $374,000 and some
12 amount of cents.
13     Q.     And in the article you wrote
14 where you stated that you were passionate
15 about being a whistleblower, you quoted Ralph
16 Waldo Emerson. Do you remember that?
17     A.     Yes.
18     Q.     And you said, in so many words,
19 that you believe the world's a better place
20 because you are a whistleblower. Do you
21 believe that?
22     A.     I guess I hope that that might
23 be the case.
24     Q.     So did you take the money that

Page 562

1        MR. FINKELSTEIN: Objection.
2    Presumes facts not in evidence.
3        MS. McGRODER: If he did.
4        THE WITNESS: He must have
5    asked me.
6    BY MS. McGRODER:
7        Q.    And was the first contact with
8    the Finkelstein law firm a contact they made
9    to you? In other words, did they call you or
10   did you call them?
11       A.    The first personal contact that
12   I had?
13       Q.    Yes.
14       A.    I remember receiving a phone
15   call from my former attorney, Don Bailey, who
16   said that Mr. Finkelstein would be interested
17   in speaking with me. And I believe that
18   Mr. Finkelstein then, at some point later,
19   called me.
20       Q.    Do you disagree with the Church
21   of Scientology's views regarding prescription
22   medication?
23       MR. FINKELSTEIN: Objection.
24   Lacks foundation.

Page 563

1        THE WITNESS: Yes. I generally
2    disagree with the -- what I understand
3    their views to be.
4    BY MS. McGRODER:
5        Q.    Do you know whether the Church
6    of Scientology has quoted you in its Citizens
7    Commission on Human Rights?
8        A.    I believe they have used a
9    quote from me, yes.
10       Q.    Did they do that with your
11   authorization?
12       A.    I did not authorize that.
13       Q.    How did you know they were
14   quoting you?
15       A.    It was pointed out to me that
16   someone Googled my name and said that "You've
17   been referenced by the Church of Scientology."
18       Q.    And did you call the Church of
19   Scientology and say, "Please don't reference
20   me in your Citizens Commission on Human Rights
21   papers"?
22       A.    I did not.
23       Q.    Is it your belief that, in
24   psychiatry, you can get anything published,

Page 564

1    absolutely anything; it's just a matter of
2    where and when. Have you said that before?
3        A.    Yes.
4        Q.    Do you remember when you said
5    that in sworn testimony?
6        A.    I do not.
7        Q.    Do you remember giving that
8    testimony under oath?
9        A.    It sounds like something I've
10   said.
11       Q.    Okay. And you said it, so you
12   believe it. Correct?
13       A.    If you have documentation that
14   I said it, and I believe that I said it, then
15   it's probably accurate that I said it.
16       Q.    And do you believe it?
17       A.    That almost anything from a
18   psychiatrist or in psychiatry can be published
19   somewhere at some time?
20       Q.    Yes.
21       A.    Yes.
22       MS. McGRODER: I have no
23   further questions at this moment.
24       MR. FINKELSTEIN: Why don't we

Page 565

1    take five minutes.
2        MS. McGRODER: Okay.
3        VIDEO SPECIALIST: We're going
4    off the video. The time is 5:19.
5            - - -
6        (Recess 5:19-5:25 p.m.)
7            - - -
8        VIDEO SPECIALIST: We're back
9    on the video. The time is 5:25.
10   BY MR. FINKELSTEIN:
11       Q.    Dr. Kruszewski, what does
12   "GABAergic" mean?
13       A.    "GABAergic" means that the
14   amount of GABA is increased.
15       Q.    And what is GABA?
16       A.    GABA is an inhibitory
17   neurotransmitter ubiquitously found in a
18   human.
19       Q.    Is Neurontin GABAergic?
20       A.    Neurontin is GABAergic, yes.
21       Q.    And do you have an opinion,
22   with a reasonable degree of scientific
23   certainty, why Neurontin is GABAergic?
24       A.    Yes.

Page 570

1    Cite to me one peer-reviewed
2    scientific study that states -- using any
3    mechanism theory that you propose -- that
4    gabapentin causes suicide.
5        A.    I cannot.
6            MS. McGRODER:  No further
7    questions.
8            VIDEO SPECIALIST:  Does that
9    conclude the video?
10           MR. FINKELSTEIN:  That
11   concludes the video.
12           VIDEO SPECIALIST:  Thank you.
13   We're going off the video.  The time
14   is 5:30.
15           - - -
16       (Witness excused.)
17           - - -
18       (Deposition concluded at 5:30
19   p.m.)
20           - - -
21
22
23
24

Page 571

1        C E R T I F I C A T E
2        I hereby certify that the
3    witness was duly sworn by me and that the
4    deposition is a true record of the testimony
5    given by the witness.
6
7
8        _____
             Jennifer S. Walker, RPR
9            Dated:  December 14, 2007
10
11   (The foregoing certification of this
12   transcript does not apply to any reproduction
13   of the same by any means, unless under the
14   direct control and/or supervision of the
15   certifying shorthand reporter.)
16
17
18
19
20
21
22
23
24

Page 572

1        INSTRUCTIONS TO WITNESS
2        Please read your deposition
3    over carefully and make any necessary
4    corrections.  You should state the reason in
5    the appropriate space on the errata sheet for
6    any corrections that are made.
7        After doing so, please sign the
8    errata sheet and date it.
9        You are signing same subject to
10   the changes you have noted on the errata
11   sheet, which will be attached to your
12   deposition.
13       It is imperative that you
14   return the original errata sheet to the
15   deposing attorney within thirty (30) days of
16   receipt of the deposition transcript by you.
17   If you fail to do so, the deposition
18   transcript may be deemed to be accurate and
19   may be used in court.
20
21
22
23
24

Page 573

1        - - -
2        E R R A T A
3        - - -
4    PAGE    LINE        CHANGE
5    _____   _____   _____
6    _____   _____   _____
7    _____   _____   _____
8    _____   _____   _____
9    _____   _____   _____
10   _____   _____   _____
11   _____   _____   _____
12   _____   _____   _____
13   _____   _____   _____
14   _____   _____   _____
15   _____   _____   _____
16   _____   _____   _____
17   _____   _____   _____
18   _____   _____   _____
19   _____   _____   _____
20   _____   _____   _____
21   _____   _____   _____
22   _____   _____   _____
23   _____   _____   _____
24   _____   _____   _____

```
 1          IN THE UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2   IN RE:                    : MASTER FILE NO.
     NEURONTIN MARKETING,      : 04-10981
 3   SALES PRACTICES and       :
     PRODUCTS LIABILITY        :
 4   LITIGATION                :
     ------------------------  :
 5   THIS DOCUMENT RELATES     :
     TO:                       : CASE NO.
 6   PRODUCTS LIABILITY        : 06-CV-4136
     ACTIONS                   :
 7                             :
     FENELON V PFIZER,         :
 8   INC., et al.              :

 9     SUPREME COURT OF THE STATE OF NEW YORK
                COUNTY OF NEW YORK
10   ------------------------  :
     IN RE:                    :
11   NEURONTIN PRODUCT         :
     LIABILITY LITIGATION      :
12   ------------------------  :
     THIS DOCUMENT APPLIES TO  :
13   ALL CASES                 :
     ------------------------  :
14
          CONTAINS CONFIDENTIAL INFORMATION
15
             CONTINUED EXAMINATION OF
16          STEFAN P. KRUSZEWSKI, M.D.
                    VOLUME II
17

18          Taken at the Harrisburg

19   International Airport, Susquehanna Club

20   Room, One Terminal Drive, Middleton,

21   Pennsylvania, on Tuesday, February 26,

22

23   2008, commencing at 1:44 p.m., before

24

25   Linda Beyerle, Court Reporter.
```

CONFIDENTIAL

Condensed Copy

Confidential

576

1  APPEARANCES:
2
3
   FINKELSTEIN & PARTNERS
4  BY: ANDREW G. FINKELSTEIN, ESQ.
       KENNETH FROMSOM, ESQ. (by phone)
5  436 Robinson Avenue
   Newburgh, New York 12550
6  -- For Plaintiffs
7
8
   SHOOK, HARDY & BACON
9  BY: LORI CONNORS McGRODER, ESQ.
   2555 Grand Boulevard
10 Kansas City, Missouri 64108
   -- For Pfizer
11
12
13
14 PRESENT VIA PHONE:
15
   LAW OFFICES OF STEVEN D. HILLYARD
16 BY: ELANA GOLD, ESQ.
   237 Sadowa Street
17 San Francisco, CA 94112
   -- For Raymond Jennings, M.D.
18
19
   STEVEN EASIERE
20
21
22
23
24
25

577

1              INDEX
2
   WITNESS              PAGE
3
   STEFAN P. KRUSZEWSKI, M.D.
4
     By Ms. McGroder     578
5
6
7
8
9          NO EXHIBITS
10
               * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

578

1              (It is stipulated by and among
2  counsel for the respective parties that the
3  reading, signing and sealing of the
4  deposition is waived, and that all
5  objections except as to the form of the
6  question are reserved until the time of
7  trial.)
8              * * *
9          STEFAN P. KRUSZEWSKI, M.D.,
10 having been duly sworn, was examined and
11 testified as follows:
12             * * *
13 BY MS. McGRODER:
14 Q.   Dr. Kruszewski, good to see you.
15 A.   Hi.
16 Q.   It has not been that long since I last
17 deposed you, right?
18 A.   That's correct.
19 Q.   Did you speak to anyone from the FDA
20 about the FDA alert prior to the time that
21 it was issued on January 28th, 2008?
22 A.   No.
23 Q.   Did you have any advanced notice of
24 the FDA alert in the, say, month before it
25 came out?

579

1  A.   No.
2  Q.   Did you have any conversations with
3  members of the Finkelstein Law Firm about
4  the potential for an FDA alert prior to the
5  time it was issued on January 31, 2008?
6  A.   No.
7  Q.   Have you had conversations with
8  Mr. Finkelstein or anyone else from his law
9  firm about the alert after the time it was
10 issued?
11 A.   Yes.
12 Q.   And how many times?
13 A.   Once.
14 Q.   And when was that?
15 A.   Today.
16 Q.   So you had no conversations with
17 anyone from the Finkelstein Law Firm between
18 January 31 and today regarding the alert?
19 A.   That's correct.
20 Q.   Did you have conversations with
21 members of the Finkelstein Law Firm between
22 your last deposition and today?
23 A.   Not that I recall at this moment.
24 Q.   Now, the FDA alert expressly states
25 that, quote, Posting this information does

2 (Pages 576 to 579)

Confidential

580

1  not mean that FDA has concluded there is a
2  causal relationship between the drug product
3  and the emerging safety issue.
4       Do you agree that?
5  A.  Yes, I do.
6  Q.  The FDA also states in the alert that
7  is not, quote, Advising healthcare
8  professionals to discontinue prescribing
9  these products.
10      And so, doctors today are still
11  prescribing Neurontin; is that correct?
12  A.  Yes.
13  Q.  The FDA alert states that preliminary
14  analyses of data from several drugs in this
15  class suggest an increased risk of
16  suicidality; is that correct?
17  A.  That's correct.
18  Q.  You don't know as you sit here today
19  which drugs the FDA is referring to in that
20  statement, correct?
21      MR. FINKELSTEIN:  Objection
22  as to form.
23      THE WITNESS:  Probably not
24  correct.  They cite all eleven drugs that
25  they report have an equal risk in

581

1  suicidal behavior.
2  BY MS. McGRODER:
3  Q.  Your testimony is that the FDA reports
4  that all eleven drugs have an equal risk of
5  suicide behavioral?
6  A.  Comparable risk.
7  Q.  And where is that statement made in
8  the FDA alert?
9  A.  You'll have to show me the alert.
10  Q.  I'm handing you now a copy of the FDA
11  alert.
12      MR. FINKELSTEIN:  We'll mark
13  it as 1.
14      MS. McGRODER:  I'm not
15  marking it.  You can mark it if you want
16  later.
17      MR. FINKELSTEIN:  We won't
18  mark it as 1.  We'll leave it as 0.
19      THE WITNESS:  The FDA alert
20  from January 31st, 2008 begins with the
21  premise that the FDA has analyzed -- this
22  is a direct quote -- reports of
23  suicidality, parenthesis, suicidal
24  behavior or ideation, end parenthesis,
25  from placebo-controlled clinical studies

582

1  of eleven drugs used to treat epilepsy as
2  well as psychiatric disorders, and other
3  conditions, period.
4       Then several sentences down
5  when they're reporting this risk, they
6  state, quote, The results were generally
7  consistent among the eleven drugs,
8  period, end quote.
9  BY MS. McGRODER:
10  Q.  And so the language in the FDA alert
11  that the results were generally consistent
12  among the eleven drugs is the basis for your
13  statement that the FDA has completed there
14  is a, quote, comparable risk, end quote, for
15  all eleven drugs; is that correct?
16  A.  That there's a risk.
17  Q.  Well, I'm asking you based on your
18  testimony, Dr. Kruszewski, which was you
19  believe the FDA had a comparable risk
20  for each of the eleven drugs.  Do you
21  remember that testimony?
22  A.  Yes.
23  Q.  Do you have any basis for the
24  statement that there's a comparable risk for
25  each of the eleven drugs other than the

583

1  statement you just read to me which says the
2  results were generally consistent among the
3  eleven drugs?
4  A.  Comparably consistent.  I view it as
5  relative semantics here.  All I can say is
6  what's in the FDA alert.  And the FDA alert
7  says that examining all of the eleven drugs
8  that they examined, the increased risk of
9  suicidal behaviors was across all eleven
10  drugs.
11  Q.  Does the FDA alert say anywhere that
12  the risk -- that the results were comparable
13  among the eleven drugs?
14  A.  I have to read the whole FDA alert to
15  know whether they use the word "comparable"
16  or not.
17  Q.  Go ahead.
18  A.  Can I mark on this?
19  Q.  Sure.  For purposes of time,
20  Dr. Kruszewski, since I'm limited to two
21  hours today, I'd appreciate it -- and I'll
22  limit my question this way if it makes it
23  easier for you.  I'd appreciate if you could
24  identify language on which you base your
25  testimony that the FDA found a comparable

3 (Pages 580 to 583)

Confidential

588

1  go off the record and debate it?
2          MR. FINKELSTEIN: No.
3          MS. McGRODER: Should I
4  continue, because you're not going to use
5  my time for that discussion.
6          MR. FINKELSTEIN: We get at
7  least ten minutes.
8  BY MS. McGRODER:
9  Q.   My original question to you,
10  Dr. Kruszewski, was the FDA alert states
11  that there were preliminary analyses of data
12  from several drugs in this class which
13  suggested an increased risk of suicidality.
14  Do you know which of the several drugs
15  suggested an increased risk of suicidality
16  in the preliminary analysis by the FDA?
17  A.   I know only what the FDA alert says,
18  which is there was an increased risk in all
19  eleven drugs.
20  Q.   Well, that's your interpretation of
21  the FDA alert, is it not?
22  A.   It's paraphrasing the FDA alert, yes.
23  Q.   And you don't know which drugs were
24  considered by the FDA in its preliminary
25  analysis of suicide risk; is that correct?

589

1  A.   If there was an analysis prior to what
2  is related in this FDA alert, obviously, I
3  did not review it.
4  Q.   Right. And are you aware of whether
5  there was a preliminary analysis by FDA
6  related to several but not all of the drugs
7  that are included in the FDA's
8  meta-analysis?
9  A.   I'm only aware of what you're telling
10  me today.
11  Q.   And so you were not aware of that
12  before right now when I raised that with you
13  in this deposition; is that correct?
14  A.   That's correct.
15  Q.   Are you aware, Dr. Kruszewski, that
16  your lawyers have said in pleadings to the
17  Court that plaintiffs do not dispute that
18  Neurontin's specific data based on
19  improperly designed and underpowered
20  clinical trials show no increased risk of
21  suicide? Were you aware of that?
22  A.   Would you repeat that?
23  Q.   Sure. Are you aware that the lawyers
24  representing plaintiffs in this case and
25  here with you today have said to the Court

590

1  that they do not dispute that the Neurontin
2  specific data based on improperly designed
3  and underpowered clinical trials show no
4  increased risk of suicide?
5          MR. FINKELSTEIN: Objection
6  as to form.
7  BY MS. McGRODER:
8  Q.   Are you aware of that?
9  A.   I'm not aware of that.
10  Q.   Okay. Assume it to be true, assume
11  that the plaintiffs' lawyers in this
12  litigation have said that, including
13  Mr. Finkelstein. Setting aside the
14  plaintiffs' lawyers' criticism about the
15  design or the size of the epidemiologic data
16  for Neurontin, would you agree that the
17  Neurontin specific data, the controlled
18  trial data, do not show an increased risk of
19  suicidality?
20          MR. FINKELSTEIN: Objection
21  as to form.
22          THE WITNESS: I can't comment
23  on it. I'm not sure I understand the
24  question. But as I understand it, I
25  can't comment on it.

591

1  BY MS. McGRODER:
2  Q.   Why can't you comment on it?
3  A.   Because I have not seen the data.
4  Q.   You've not looked at the controlled
5  clinical trial data for Neurontin that was
6  submitted by Pfizer to the FDA in 2006?
7  A.   I don't recall that data, no.
8  Q.   Have you ever looked at that
9  submission itself that relates to the
10  placebo-controlled trial data submitted to
11  the FDA in 2006?
12  A.   I don't recall that as I sit here.
13  Q.   So you are giving a causality opinion
14  in the Neurontin litigation without looking
15  at the placebo-controlled clinical trial
16  data for Neurontin; is that fair?
17  A.   Repeat that.
18          MR. FINKELSTEIN: Objection
19  as to form.
20  BY MS. McGRODER:
21  Q.   You're giving a causation opinion in
22  the Neurontin litigation without looking at
23  the placebo-controlled clinical trial data
24  for Neurontin; is that correct?
25  A.   That's not correct. The basis for my

5 (Pages 588 to 591)

Confidential

600

1  alert. He's not answering it.
2         MS. McGRODER:
3  Mr. Finkelstein, my question relates to
4  the data submitted to the FDA as part of
5  this alert. You are being ridiculous.
6         You can answer the question.
7         MR. FINKELSTEIN: No. Don't
8  answer it.
9         MS. McGRODER: Can you read
10 back the question.
11        (The record was read as
12 requested.)
13        THE WITNESS: My answer to
14 that is that I can't answer that question
15 because I don't know what data was
16 submitted by Pfizer to the FDA.
17 BY MS. McGRODER:
18 Q.   That's because you didn't look at that
19 data, correct?
20 A.   I don't recall looking at that data
21 which is the same as I keep saying to you.
22 Q.   You have no memory of looking at the
23 placebo-controlled clinical trial data for
24 Neurontin, correct?
25 A.   That's correct.

602

1         MR. FINKELSTEIN: Objection
2  as to form.
3         THE WITNESS: Yes, it would
4  be possible.
5  BY MS. McGRODER:
6  Q.   Is it possible that a grouping of two
7  drugs other than Neurontin could drive the
8  incidence reported in this FDA alert?
9  A.   It is possible.
10 Q.   Did you review any publications or
11 information about reports of suicide with
12 respect to any of the drugs identified in
13 this alert other than Neurontin?
14 A.   At what time frame?
15 Q.   Ever.
16 A.   Repeat the question.
17        MS. McGRODER: Can you read
18 the question back.
19        (The record was read as
20 requested.)
21        THE WITNESS: I don't recall
22 any specific publications as I sit here.
23 BY MS. McGRODER:
24 Q.   And so as you sit here today, you
25 can't tell me that you've reviewed

601

1  Q.   How does the FDA alert affect your
2  opinions in this case?
3  A.   It supports them.
4  Q.   You've not reviewed the data for all
5  eleven of the drugs addressed in this FDA
6  alert; is that correct?
7  A.   That's correct.
8  Q.   Can you identify the incidence of
9  suicide behavior with respect to
10 any one of the drugs identified in this
11 alert?
12 A.   The alert is about eleven drugs --
13 Q.   I didn't ask if the alert was about
14 eleven drugs.
15        MS. McGRODER: Can you read
16 back my question.
17        (The record was read as
18 requested.)
19 BY MS. McGRODER:
20 Q.   Yes or no?
21 A.   No.
22 Q.   Is it possible, Dr. Kruszewski, that
23 the incidence reported for a drug other than
24 Neurontin could drive the overall increased
25 risk identified by the FDA in this alert?

603

1  information about reports of suicide with
2  respect to any of the other AEDs identified
3  in this FDA alert? True or not true?
4  A.   Not true.
5  Q.   Okay. Why is that not true?
6  A.   Because I chronologically review
7  evidence in the literature about all
8  psychotropic medications, and those include
9  anticonvulsants.
10 Q.   As you sit here today, can you tell me
11 any publication or information about reports
12 of suicide with respect to any of the
13 antiepileptic drugs identified in this
14 report?
15 A.   I cannot as I sit here today.
16 Q.   Are you aware of whether the
17 manufacturers of any of the other
18 antiepileptic drugs identified in the alert
19 expressed concerns about reports of suicide
20 with respect to their drugs?
21 A.   I'm not aware of them expressing
22 concerns.
23 Q.   Were you aware that the anticonvulsant
24 drug Zonisamide reports a suicide rate in
25 its labeling that is greater than -- well,

8 (Pages 600 to 603)

Confidential

612

1   A.   That's correct.
2   Q.   And you have no basis to suggest that
3   Pfizer has that information, correct?
4   A.   Pfizer might have it related to
5   Neurontin.
6   Q.   Correct.
7   A.   But the other drugs that are not
8   Pfizer drugs, no.
9   Q.   That's fair.
10          Were there differences between
11  the studies, the 199 placebo-controlled
12  studies that the FDA evaluated?
13  A.   As a generic answer, I'm sure there
14  were differences.
15  Q.   Do you know how the low dose placebo
16  and active placebo treated subjects were
17  classified for the purposes of this
18  analysis?
19  A.   I wouldn't have that information.
20  Q.   You don't know that today, correct?
21  A.   I do not.
22  Q.   Do you know how many of the
23  antiepileptic drugs are approved -- how many
24  of the eleven antiepileptic drugs discussed
25  are approved to treat migraine?

614

1   indications we just discussed, the patient
2   populations included in the FDA analysis
3   would differ?
4   A.   I would agree that it would differ.
5   Q.   Do you know how many of the eleven
6   antiepileptics discussed in the alert have
7   black box warnings associated with their
8   use?
9   A.   I do not.
10  Q.   Do you know how many of the eleven
11  antiepileptic drugs addressed in the alert
12  require a signed consent form for use?
13  A.   Repeat that again.
14  Q.   How many of the eleven antiepileptics
15  discussed by the FDA in this alert require a
16  consent form for use?
17  A.   Consent form by whom and for what
18  purpose?
19  Q.   A consent form signed by the patient
20  to take the drug.
21  A.   I'm not aware of any of them requiring
22  that.
23  Q.   Do you know one way or the other
24  whether any of them do?
25  A.   I'm not aware of any that do.

613

1   A.   I probably don't know the answer to
2   that.
3   Q.   You do or you don't?
4   A.   Do not.
5   Q.   Do you know how many of the
6   antiepileptics addressed in the alert are
7   approved for the treatment of diabetic
8   neuropathy?
9   A.   I don't think I can answer that
10  either.
11  Q.   You don't know?
12  A.   I didn't look at that information
13  before I came here today.
14  Q.   So you don't know?
15  A.   I don't know.
16  Q.   Do you know how many of the
17  antiepileptics addressed in the alert are
18  approved for the treatment of trigeminal
19  neuralgia?
20  A.   My answer would be the same for
21  trigeminal neuralgia.
22  Q.   You don't know?
23  A.   I don't know.
24  Q.   Would you agree with me that given the
25  different approvals for the different

615

1   Q.   Do you think some do?
2   A.   I'm not aware of any.
3   Q.   How many of these eleven antiepileptic
4   drugs addressed in the alert have a
5   contraindication use for liver disease?
6   A.   I'm not aware.
7   Q.   You don't know?
8   A.   I do not know as I sit here today.
9   Q.   Which of the eleven antiepileptic
10  drugs addressed in the alert carry a
11  pregnancy Class D rating?  Do you know?
12  A.   I do not.
13  Q.   Which of the eleven antiepileptic
14  drugs addressed in the alert are considered
15  first-line treatment for epilepsy?  Do you?
16  A.   I do not.
17  Q.   Which of the eleven antiepileptic
18  drugs addressed in the alert are considered
19  appropriate for monotherapy for epilepsy?
20  Do you know?
21  A.   No.
22  Q.   Do you agree that all eleven
23  antiepileptic drugs addressed in this alert
24  do not have the same risk benefit profiles?
25  A.   Do I agree that they all do not have

11 (Pages 612 to 615)

Confidential

616

1  the same risk benefit profile?
2  Q.  That's the question.
3  A.  I agree that they all have different
4  risk benefit profiles. I'm stating it in
5  the affirmative.
6  Q.  Do you know whether any heterogeneity
7  testing was done for purposes of this
8  meta-analysis?
9  A.  Genetic heterogeneity or other?
10  Q.  Not genetic heterogeneity.
11  Heterogeneity to analyze differences among
12  the studies included in the meta-analysis.
13  Do you know whether any of that kind of
14  heterogeneity testing was done by FDA?
15  A.  I'm sorry. I don't understand the
16  question.
17  Q.  Have you ever heard of heterogeneity
18  testing in the context of meta-analysis?
19  A.  Yes.
20  Q.  What is it?
21  A.  It means different things at different
22  times. That's why I'm asking you to clarify
23  for me what you mean.
24  Q.  Well, what do you think it means?
25  A.  Well, you're asking --

617

1  Q.  I'm asking you in the context of a
2  meta-analysis, ever in meta-analysis, what
3  is heterogeneity testing?
4  A.  Heterogeneity is just the difference
5  in the population examined.
6  Q.  Do you know whether the FDA analyzed
7  the data in this meta-analysis for
8  heterogeneity?
9       MR. FINKELSTEIN: Objection
10  as to form.
11       THE WITNESS: Yes, I guess I
12  have trouble with the way you're asking
13  the question. I'm not familiar with how
14  someone exams data for heterogeneity.
15       MS. McGRODER: That answers
16  my question.
17  BY MS. McGRODER:
18  Q.  You do consider the analysis conducted
19  by the FDA of these eleven drugs a
20  meta-analysis, correct?
21  A.  I do, yes.
22  Q.  And do you agree that a meta-analysis
23  is a form of systematic review in which
24  results of individual studies are pulled
25  together to look for common treatment

618

1  effects?
2  A.  Yes.
3  Q.  Do you agree that meta-analysis should
4  be carefully planned with a detailed
5  protocol in advance?
6  A.  I do.
7  Q.  To your knowledge, did the FDA have
8  such a protocol?
9  A.  I assume that they do.
10  Q.  But you haven't seen one?
11  A.  I have not.
12  Q.  So your testimony is based on an
13  assumption, correct?
14  A.  That's correct.
15  Q.  Do you know how the FDA decided which
16  drugs to analyze for this meta-analysis?
17  A.  I do not.
18  Q.  Did the FDA leave out any
19  antiepileptic or antiseizure medicines?
20  A.  The one that I would have included is
21  vigabatrin. They left out a lot of others
22  as well.
23  Q.  Do you know why they left them out?
24  A.  I do not.
25  Q.  How would we know why they left them

619

1  out? How would we know why the FDA would
2  exclude certain antiepileptic medicines from
3  its review?
4  A.  I don't.
5  Q.  How would we learn that? If you
6  wanted to know that, how would you learn
7  that?
8  A.  Well, we have a list here of the drugs
9  that they included. And any other
10  anticonvulsants that were not included there
11  could have been included. Why they chose
12  those, I don't know.
13  Q.  And if you wanted to know why the FDA
14  selected only the antiseizure medications
15  they did, what would you do to find out?
16  A.  Would you repeat that one more time?
17  Q.  If you wanted to know why the FDA
18  excluded certain antiseizure medications
19  from this review, how would you find out?
20  A.  I would ask them.
21  Q.  Could you look at a protocol to learn
22  that?
23  A.  I'm not aware of any protocol that
24  would elaborate that.
25  Q.  Let's assume for a minute that the FDA

12 (Pages 616 to 619)

Confidential

644

1        MR. FINKELSTEIN: Objection
2   as to the accuracy of those numbers.
3        THE WITNESS: Yes.
4   BY MS. McGRODER:
5   Q.   Agree that it would not be accurate to
6   say that these eleven drugs are from the
7   same class if the definition of class
8   requires the same mechanisms of action?
9        MR. FINKELSTEIN: Objection
10  as to form.
11       THE WITNESS: I would agree
12  that that would be inaccurate.
13  BY MS. McGRODER:
14  Q.   And the same would be true if the
15  definition of class requires the same
16  pharmacologic properties, correct?
17  A.   Correct.
18  Q.   It's true that not all of these eleven
19  drugs included in the alert have the same
20  pharmacologic properties, right?
21  A.   That's correct.
22  Q.   Not all of these eleven antiepileptics
23  are distributed in the same way, correct?
24  A.   That's correct.
25  Q.   Not all are metabolized the same way,

645

1   correct?
2   A.   That's correct.
3   Q.   Not all are excreted the same way,
4   correct?
5   A.   Correct.
6   Q.   The FDA is using class here to
7   describe treatment, correct?
8        MR. FINKELSTEIN: Objection.
9        THE WITNESS: Well, without
10  seeing the FDA data, I'm not sure how
11  they're using the word.
12  BY MS. McGRODER:
13  Q.   Well, would it be fair to assume that
14  because the FDA refers to these eleven drugs
15  as antiepileptics, that the FDA was using
16  class to describe treatment?
17       MR. FINKELSTEIN: Objection
18  as to what was in the FDA's mind.
19       THE WITNESS: That's my
20  answer. I can't answer that because I
21  don't know what the FDA was thinking.
22  BY MS. McGRODER:
23  Q.   And it's your testimony that it
24  wouldn't be fair to assume that?
25  A.   That's correct.

646

1   Q.   Can you think of any other basis on
2   which the FDA has lumped these eleven drugs
3   together?
4   A.   Only to what they stated in their
5   alert, that they're all anticonvulsants.
6   Q.   And referred to as all anticonvulsants
7   means they all treat seizures, correct?
8   A.   That's correct.
9   Q.   It's true that some of the drugs
10  included in this alert are approved for the
11  treatment of bipolar disorder, correct?
12  A.   Yes.
13  Q.   It's true that some of the drugs in
14  this alert are approved for the treatment of
15  generalized anxiety disorder, correct?
16  A.   I don't know the answer to that.
17  Q.   Is Neurontin approved for generalized
18  anxiety disorders?
19  A.   I do not believe so.
20  Q.   Do you know whether any of these
21  eleven antiepileptic drugs are approved for
22  fibromyalgia?
23  A.   I believe Pregabalin is approved for
24  fibromyalgia.
25  Q.   Neurontin is not approved for

647

1   fibromyalgia, correct?
2   A.   Correct.
3   Q.   Not all of the eleven antiepileptic
4   drugs as referred to by the FDA in this
5   alert have the same chemical structures, do
6   they?
7   A.   They do not.
8   Q.   Do they all have different chemical
9   structures?
10  A.   They do.
11  Q.   Does chemical structure of a drug
12  determine the mechanism of action of the
13  drugs?
14  A.   It's one of the things that determine
15  mechanism of action, yes.
16  Q.   Would you agree that the different
17  mechanisms of actions for these drugs would
18  mean that the drugs would likely have
19  differences in efficacy for different
20  indications?
21       MR. FINKELSTEIN: Objection.
22       THE WITNESS: Repeat that one
23  more time.
24  BY MS. McGRODER:
25  Q.   Sure. Would you agree that different

19 (Pages 644 to 647)

Confidential

648

1  mechanisms of action for these eleven drugs
2  would mean the drugs would likely have
3  differences in efficacy for different
4  indications?
5        MR. FINKELSTEIN: Objection.
6        THE WITNESS: The mechanism
7  of action is not necessarily correlated
8  with the efficacy. And the efficacy
9  determines what you are trying to
10 evaluate in a clinical trial. So I can't
11 answer the question.
12       MS. McGRODER: Let me
13 restate.
14       THE WITNESS: I think I
15 understand your answer.
16 BY MS. McGRODER:
17 Q.   Would you agree that the different
18 mechanisms of action for each of these drugs
19 would mean that the drugs would likely have
20 different indications?
21       MR. FINKELSTEIN: Objection.
22       THE WITNESS: Not
23 necessarily. Different drugs with
24 different mechanisms of action can have
25 the same indication.

649

1  BY MS. McGRODER:
2  Q.   Do these all have the same indication?
3  A.   No.
4  Q.   If all of these eleven drugs have the
5  same indications, would they be considered
6  more homogeneous?
7  A.   In terms of their -- if they did, and
8  they do not, they would be homogeneous in
9  terms of their approved indications.
10 Q.   Have you studied the different
11 mechanisms of action for each of these
12 eleven drugs?
13       MR. FINKELSTEIN: Objection.
14 Asked and answered.
15       THE WITNESS: No.
16 BY MS. McGRODER:
17 Q.   And you do not dispute that these
18 eleven drugs have diverse mechanism of
19 actions, correct?
20       MR. FINKELSTEIN: Objection.
21 Asked and answered.
22       THE WITNESS: I do not
23 dispute that.
24 BY MS. McGRODER:
25 Q.   Are you aware of the limitations of

650

1  conducting a meta-analysis across drugs with
2  differences in mechanism of action?
3        MR. FINKELSTEIN: Objection.
4  Asked and answered.
5        THE WITNESS: Could you
6  repeat that?
7  BY MS. McGRODER:
8  Q.   Are you aware of the limitations of
9  conducting a meta-analysis across drugs with
10 differences in mechanisms of actions?
11 A.   I don't believe that I am.
12 Q.   You didn't think it was important to
13 find that out before relying on this
14 meta-analysis?
15 A.   To find out what?
16 Q.   Whether the differences in mechanism
17 of action can affect the results of a
18 meta-analysis?
19 A.   The best way to answer that is that
20 the mechanisms of action do not necessarily
21 change what happens in a meta-analysis.
22 Meta-analysis depends upon results, safety
23 features, efficacy. And you're asking a
24 question -- you're sort of asking me to say
25 how are these apples and oranges similar,

651

1  and I can't answer that.
2  Q.   If a meta-analysis doesn't have
3  homogeneity, are you essentially comparing
4  apples and oranges?
5  A.   The more -- I'm not sure I can answer
6  that one either. I mean, the more
7  homogeneous the populations that you
8  analyze, as I've already stated before, the
9  more reliable the results are in the
10 meta-analysis.
11 Q.   And if there is a high degree of
12 heterogeneity in a meta-analysis, then
13 you're essentially comparing apples and
14 oranges, correct?
15 A.   You could be.
16 Q.   The differences among these drugs in
17 terms of their mechanism of action can
18 affect the reliability of the results of
19 this meta-analysis, correct?
20       MR. FINKELSTEIN: Objection.
21 Asked and answered three times.
22       MS. McGRODER: He didn't
23 answer it.
24       THE WITNESS: My answer -- I
25 believe I have -- is that I can't answer

20 (Pages 648 to 651)

Confidential

652

1 that because the mechanism of an action
2 of a drug should not specifically
3 influence the results of the
4 meta-analysis. You can compare different
5 drugs with different mechanisms of action
6 and still arrive at a result that is
7 reliable from a meta-analysis.
8 BY MS. McGRODER:
9 Q. But you don't disagree that comparing
10 drugs with different mechanisms of action
11 introduces heterogeneity into a
12 meta-analysis, correct?
13        MR. FINKELSTEIN: Objection.
14        THE WITNESS: I don't
15 disagree with that. It does introduce
16 heterogeneity.
17 BY MS. McGRODER:
18 Q. And if you have a high degree of
19 heterogeneity as we discussed, you can't
20 affect the reliability of the results of the
21 study, correct?
22 A. Potential exists that it could. It
23 depends in what aspect of heterogeneity
24 you're looking at.
25 Q. Cite to me any published literature

653

1 that states that you can aggregate data for
2 drugs with different mechanisms of action
3 and different pharmacologic properties to
4 determine scientific causation for one drug
5 in a pool?
6 A. I cannot.
7 Q. If you'll turn to, I think it's about
8 the third page in the FDA alert, there's a
9 chart at the bottom. Do you see that?
10 A. Yes.
11 Q. Under relative risk for the
12 subpopulation called -- or the indication
13 called psychiatric, there's a relative risk
14 reported of 1.6. Do you see that?
15 A. I do.
16 Q. When compared to the relative risk
17 reported for the other indications in the
18 chart which include epilepsy, other -- do
19 you see that?
20 A. Yes.
21 Q. The indication for psychiatric
22 patients has the lowest relative risk
23 reported by the FDA; is that correct?
24 A. That's correct.
25 Q. The FDA doesn't agree with your

654

1 opinion, Dr. Kruszewski, that patients with
2 psychiatric histories are at a greater risk
3 of suicidal thoughts or behaviors than other
4 individuals taking Neurontin, correct?
5        MR. FINKELSTEIN: Objection.
6        THE WITNESS: Not correct.
7 BY MS. McGRODER:
8 Q. And why is that not correct?
9 A. The relative risk here is 1.6 which
10 indicates a 60 percent increase in the risk
11 of suicidal behaviors in a psychiatric
12 population.
13 Q. Compared to what?
14 A. Compared to people who were not
15 psychiatric patients.
16 Q. You don't think that's compared to
17 placebo?
18 A. It could be compared to placebo as
19 well.
20 Q. But you don't know?
21 A. No.
22 Q. And my question -- I don't think you
23 answered my question. My question was, the
24 FDA does not agree with your opinion that
25 patients with psychiatric histories are at a

655

1 greater risk of suicidal behavior and
2 thinking than other individuals taking
3 Neurontin?
4        MR. FINKELSTEIN: Objection.
5        MS. McGRODER: Correct?
6        THE WITNESS: You're going to
7 have to repeat it one more time.
8 BY MS. McGRODER:
9 Q. The FDA does not agree with your
10 opinion that patients with psychiatric
11 histories are at a greater risk of suicidal
12 thinking and behavior than other individuals
13 taking Neurontin?
14        MR. FINKELSTEIN: Objection.
15        THE WITNESS: They agree that
16 there's an increased risk of individuals
17 with psychiatric disorders on the
18 relative risk of 1.6. So a 60 percent
19 increase in risk.
20 BY MS. McGRODER:
21 Q. But you're not answering my question,
22 Doctor.
23 A. I don't understand it.
24 Q. When you compare the 1.6 relative risk
25 as reported in this chart, it's lower than

21 (Pages 652 to 655)

Confidential

656

1    the relative risk reported for every other
2    indication listed here; is that correct?
3    A.    That is correct.
4    Q.    So the FDA doesn't agree with you that
5    patients with a psychiatric history are at a
6    greater risk for suicidality than other
7    patients taking Neurontin, correct?
8            MR. FINKELSTEIN: Objection.
9            THE WITNESS: If I understand
10   it, all of the patients are at greater
11   risk than those who do not take
12   Neurontin.
13   BY MS. McGRODER:
14   Q.    That wasn't my question. Listen to my
15   question. The FDA doesn't agree with your
16   opinion that patients with a psychiatric
17   history are at a greater risk of suicidality
18   than other individuals taking Neurontin?
19   A.    Well, I guess --
20           MR. FINKELSTEIN: Objection
21   again.
22           THE WITNESS: The best answer
23   is I don't know whether the FDA would
24   agree or not.
25   BY MS. McGRODER:

657

1    Q.    Well, the fact is, as reported in this
2    FDA report, patients with a psychiatric
3    history have the lowest relative risk
4    identified, correct?
5    A.    Lower than the patients who are
6    epileptic.
7    Q.    And lower than the patients listed as
8    other?
9    A.    Yes.
10   Q.    So for every indication listed in this
11   chart on Page 3 of this FDA alert, the
12   FDA -- I mean the psychiatric indication has
13   the lowest relative risk, correct?
14   A.    That's true.
15   Q.    And your opinion in this litigation is
16   that psychiatric patients have the highest
17   relative risk of suicide compared to all
18   other patients taking Neurontin; that's the
19   opinion you gave me last time I deposed you.
20   Do you remember that?
21           MR. FINKELSTEIN: Objection.
22           THE WITNESS: My opinion is
23   that Neurontin increases the risk of
24   suicide.
25   BY MS. McGRODER:

658

1    Q.    But your opinion was also,
2    Dr. Kruszewski, that patients with a
3    psychiatric history have the highest risk of
4    suicide above all other patients taking
5    Neurontin, correct?
6            MR. FINKELSTEIN: Objection.
7    His testimony is what it is.
8    BY MS. McGRODER:
9    Q.    Do you remember that testimony?
10   A.    I don't remember that specific
11   testimony.
12   Q.    So that's not your opinion?
13   A.    No. I just don't remember it.
14   Q.    Is your opinion, Dr. Kruszewski, that
15   patients with a psychiatric history have a
16   risk, a higher risk, of suicidality than
17   other patients taking Neurontin? Yes or no?
18           MR. FINKELSTEIN: Objection.
19           Don't answer it.
20           It's beyond the FDA alert.
21   You're now going back to the testimony
22   you took six months ago.
23           MS. McGRODER: I'm entitled
24   to go back to the testimony he gave when
25   he gives an inconsistent answer here.

659

1            MR. FINKELSTEIN: There's
2    nothing inconsistent. Show him his prior
3    testimony. You're just saying it is.
4    BY MS. McGRODER:
5    Q.    Now that you've had a chance to look
6    at this FDA alert and this report, patients
7    with a psychiatric history have, among all
8    the patients looked at, the lowest relative
9    risk of suicidality, correct?
10   A.    Yes. That's correct.
11   Q.    And so does that opinion influence the
12   testimony that you gave that patients with a
13   psychiatric history have the highest risk of
14   suicidality when taking Neurontin?
15           MR. FINKELSTEIN: Objection
16   as to form and the word influence.
17           MS. McGRODER: You can object
18   as to form and then be quiet.
19           Go ahead and answer the
20   question.
21           MR. FINKELSTEIN: I'm just
22   outlining for you what the basis my form
23   is --
24           MS. McGRODER: Answer the
25   question.

22 (Pages 656 to 659)

Confidential

660

1       THE WITNESS: My problem with
2   that is that it's a convoluted question.
3   The issue here for me is that this FDA
4   alert affirms my conclusions based in my
5   expert report that there's a 60
6   percent -- no. That this report says
7   that there's a 60 percent increase of
8   suicide in the psychiatric population,
9   and a greater risk in whatever the
10  epilepsy and other populations are.
11      All of that supports my
12  conclusion that Neurontin produces an
13  increased risk along with the ten other
14  anticonvulsants of suicidal behaviors.
15      MS. McGRODER: Object and
16  move to strike.
17  BY MS. McGRODER:
18  Q.  My question was simply this: Is your
19  opinion after reviewing this alert that
20  patients with a psychiatric history have a
21  greater risk of suicide than all other
22  patients taking Neurontin.
23  A.  I don't think I gave you an opinion on
24  that.
25  Q.  I'm asking you right now. Is your

661

1   opinion after reviewing this FDA alert that
2   patients with a psychiatric history have a
3   greater risk of suicide than all other
4   patients taking Neurontin? Yes or no?
5   A.  I don't think I can answer it yes or
6   no.
7   Q.  Well, answer it.
8   A.  According to this FDA alert, there's a
9   60 percent increased risk --
10  Q.  That's not what I asked you. I didn't
11  ask you to tell me what the FDA alert says
12  and how you're characterizing it as a 60
13  percent. I'm asking you, Dr. Kruszewski, is
14  your opinion after having reviewed this FDA
15  alert that patients with a psychiatric
16  history have an increased risk of
17  suicidality above all other patients taking
18  Neurontin?
19      MR. FINKELSTEIN: And I'd
20  appreciate you not cutting the witness
21  off. If he can't answer it yes or no --
22      MS. McGRODER: You can
23  object.
24      Answer the question.
25      MR. FINKELSTEIN: No. If you

662

1   can't answer it yes or no, tell her, and
2   then give her the answer you want to
3   give.
4       MS. McGRODER: Answer the
5   question, please.
6       THE WITNESS: I can't answer
7   that question yes or no.
8   BY MS. McGRODER:
9   Q.  Then answer it however you would like
10  to answer it without reiterating --
11      MR. FINKELSTEIN: He can do
12  it whatever way he wants.
13      MS. McGRODER: You are being
14  disruptive. You are be obstreperous and
15  disruptive.
16      MR. FINKELSTEIN: You can
17  continue to cut me off.
18      MS. McGRODER: This is not
19  counted as my time. You've made your
20  objection to form, and we'll move on.
21      MR. FINKELSTEIN: I am
22  telling you that you can't instruct this
23  witness how to answer the question.
24      MS. McGRODER: I told him to
25  answer.

663

1       MR. FINKELSTEIN: Without
2   doing something. He can do it however he
3   wants. We'll read it back.
4       MS. McGRODER: We're not
5   reading it back.
6       MR. FINKELSTEIN: I want it
7   read back.
8       MS. McGRODER: This doesn't
9   count against my time.
10      (The record was read as
11  requested.)
12      THE WITNESS: As I've said
13  before, I don't believe that I've ever
14  stated that psychiatric patients have a
15  specific increased risk. I've said that
16  Neurontin increases the risk of suicidal
17  behaviors and completed suicides in
18  individuals who take Neurontin.
19      So the characterization that
20  you made of whether there's an increased
21  risk of suicidality in patients versus
22  nonpsychiatric patients, I don't believe
23  I've ever opined on that one way or the
24  other.
25  BY MS. McGRODER:

23 (Pages 660 to 663)

Confidential

664

1  Q.   Just so I understand, as we move
2  forward in this litigation, do you have an
3  opinion that patients with a psychiatric
4  history are at a greater risk of suicide
5  behavior or thinking above all other
6  patients taking Neurontin?
7  A.   I believe that both populations,
8  psychiatric and nonpsychiatric are at a
9  greater risk for suicidal ideation and
10 completed suicides.
11         MS. McGRODER:  Object and
12 move to strike.  I need you to answer the
13 question that I ask.
14         MR. FINKELSTEIN:  Are you
15 asking him --
16         MS. McGRODER:  I don't want
17 your recharacterization.  I don't want
18 your colloquy.
19         MR. FINKELSTEIN:  It's not a
20 recharacterization.  Someone with a
21 psychiatric history --
22         MS. McGRODER:  Andrew, you're
23 not going to sit here and give him a
24 speech and teach him how to answer my
25 questions.

665

1         MR. FINKELSTEIN:  I'm not
2  teaching him.
3         MS. McGRODER:  You can object
4  to form or you can be quiet.  Do you have
5  an objection to form?
6         MR. FINKELSTEIN:  People with
7  a psychiatric -- I'm trying to help you.
8         MS. McGRODER:  I don't need
9  your help.
10        MR. FINKELSTEIN:  You have
11 twenty-five minutes to go.
12        MS. McGRODER:  I've got
13 plenty of time.
14 BY MS. McGRODER:
15 Q.   Dr. Kruszewski, can you answer my
16 question?  My question is, do you have an
17 opinion in this litigation that patients
18 with a psychiatric history are at a greater
19 risk of suicidality than all other patients
20 taking Neurontin?
21 A.   I do not believe I expressed that
22 opinion previously.
23 Q.   I didn't ask you if you expressed it
24 previously.  I'm asking you now, today.  Do
25 you have an opinion in this litigation that

666

1  patients with a psychiatric history are at a
2  greater risk of suicidality than all other
3  patients taking Neurontin?
4  A.   I do not.
5  Q.   That's not your opinion in this
6  litigation?
7  A.   You're asking me a different question.
8         MS. McGRODER:  I object and
9  move to strike.
10 BY MS. McGRODER:
11 Q.   Listen to my question.  Do you have an
12 opinion in this litigation today that
13 patients with a psychiatric history are at a
14 greater risk of suicidality than all other
15 patients taking Neurontin?
16        MR. FINKELSTEIN:  Objection.
17        THE WITNESS:  As I said, I do
18 not have that opinion.
19        MS. McGRODER:  Okay.  We can
20 move on.
21 BY MS. McGRODER:
22 Q.   Do you know how many patients in the
23 FDA analysis took an antiepileptic for a
24 psychiatric indication?
25 A.   I do not.

667

1  Q.   Do you know how many patients took
2  placebo in a trial looking at drug treatment
3  for a psychiatric indication?
4  A.   I know that the placebo group included
5  approximately 16,000 patients.
6  Q.   And my question is of those 16,000
7  patients, do you know how many were enrolled
8  in a study to look at drug effects in a
9  psychiatric population?
10 A.   I do not.
11 Q.   You don't know the confidence interval
12 for the point estimate of relative risk
13 included in this chart with respect to the
14 psychiatric indication, correct?
15 A.   The only confidence interval that I
16 remember from this is that the twofold
17 increased risk in suicidal behaviors had a
18 confidence interval, I believe, of .7 to
19 4.2.
20        MS. McGRODER:  Object and
21 move to strike.  That wasn't my question.
22 BY MS. McGRODER:
23 Q.   My question is, do you know the
24 confidence interval for the point estimate
25 of relative risk identified with respect to

24 (Pages 664 to 667)

Confidential

680

1  A.  I don't have the question. I have the
2  statement.
3  Q.  That's the premise for my question.
4  Do you have that in mind?
5  A.  That there are two suicidal ideations
6  in the 5,000 some odd patients who took
7  Neurontin?
8  Q.  Correct. Okay. Are we on the same
9  page?
10 A.  Yes.
11 Q.  For an incidence of .039 percent,
12 okay?
13 A.  Yes.
14     MR. FINKELSTEIN: Objection.
15 BY MS. McGRODER:
16 Q.  .039 percent is the same as .39
17 patients in 1,000. Do you agree?
18 A.  Yes.
19 Q.  If you compare -- well, let me back
20 up.
21     If you combine the events for
22 suicide, zero suicides, zero suicide
23 attempts, and two suicide ideations for the
24 Neurontin, the overall incidence is .39 per
25 1,000 patients. Agreed?

681

1  A.  Yes.
2  Q.  Is .39 per 1,000 patients less than
3  4.3 per 1,000 patients reported in the FDA
4  alert?
5  A.  Yes, it would be.
6  Q.  Is it substantially less than the 4.3
7  per 1,000 patients identified in the FDA
8  alert?
9  A.  It depends on what your definition of
10 substantial is.
11 Q.  Is it ten times less than the
12 incidence reported of 4.3 per 1,000 patients
13 in the FDA alert?
14 A.  It's less.
15 Q.  It's more than ten times less,
16 correct?
17 A.  Give me the numbers again.
18 Q.  .39 per 1,000 patients compared to 4.3
19 per 1,000 patients.
20 A.  Yes. I'm sorry. That's correct.
21 Q.  It's correct that it's more than ten
22 times lower that the incidence reported in
23 the FDA alert, correct?
24 A.  Yes.
25 Q.  Does that matter to your opinion in

682

1  this litigation?
2  A.  No.
3  Q.  Have you ever calculated a relative
4  risk for suicidality with respect to the
5  controlled clinical data for Neurontin?
6  A.  I have not.
7  Q.  You didn't think that was important to
8  do?
9      MR. FINKELSTEIN: Objection.
10     THE WITNESS: Was it
11 important for me to do that?
12     MS. McGRODER: Right.
13     THE WITNESS: No.
14 BY MS. McGRODER:
15 Q.  Dr. Kruszewski, if the FDA said that a
16 particular medication was generally
17 effective for the treatment of anxiety
18 disorder, would you understand that to mean
19 that the drug is always effective for
20 treating anxiety disorder?
21     MR. FINKELSTEIN: Objection.
22     Don't answer.
23     It has nothing to do with the
24 FDA alert.
25     MS. McGRODER: I'll get

683

1  there. It does.
2      MR. FINKELSTEIN: It has
3  nothing to do --
4      MS. McGRODER: You can answer
5  the question.
6      MR. FINKELSTEIN: Don't
7  answer it.
8      MS. McGRODER: We're going
9  back to the Court, Andrew.
10     MR. FINKELSTEIN: Okay.
11     MS. McGRODER: These are
12 questions that relate directly to this
13 FDA alert and the language in it, and I'm
14 entitled to ask them. Are you going to
15 let him answer it or am I going to have
16 to go back to Judge Saris?
17     MR. FINKELSTEIN: Read back
18 the question. If it has anything to do
19 with the FDA alert, I'll allow it. But
20 if it has absolutely nothing to do with
21 the FDA alert, he's --
22     MS. McGRODER: You might not
23 know on the face of the question.
24     MR. FINKELSTEIN: If it has
25 nothing to do with the FDA alert, he

28 (Pages 680 to 683)

VERITEXT CORPORATE SERVICES (800) 567-8658

Confidential

688

1   my question.
2       MR. FINKELSTEIN: You said
3   notwithstanding the alert.
4       Don't answer it.
5       MS. McGRODER: I'm going to
6   sit here until I get an answer.
7       MR. FINKELSTEIN: You'll be
8   sitting here alone. We're leaving in
9   fifteen minutes.
10      MS. McGRODER: Well, I'll sit
11  and wait for fifteen minutes. I'm
12  entitled to an answer to that question.
13  Do you want to read it back? It relates
14  directly to his reliance on the FDA
15  alert.
16      MR. FINKELSTEIN: Sure. I'll
17  listen to it again.
18  BY MS. McGRODER:
19  Q.  Dr. Kruszewski, notwithstanding your
20  reliance on the FDA alert, it's true, isn't
21  it, that you can't identify a single
22  published peer review article in which a
23  scientist, doctor, or other qualified expert
24  has concluded that Neurontin causes suicide
25  related events?

689

1       MR. FINKELSTEIN: Don't
2   answer.
3       It's outside the scope of the
4   FDA alert.
5       MS. McGRODER: It directly
6   relates to his new reliance on the FDA
7   alert.
8       MR. FINKELSTEIN: I don't
9   agree.
10      MS. McGRODER: We'll take it
11  to Judge Saris and see what she says.
12  Because I'm going to ask for more time
13  with him.
14      MR. FINKELSTEIN: Okay.
15  BY MS. McGRODER:
16  Q.  Dr. Kruszewski, after having reviewed
17  this FDA alert, did you go and do a review
18  of literature to determine whether there is
19  any published literature in a peer review
20  journal in which a scientist, doctor, or
21  expert of any kind has said that Neurontin
22  causes suicide?
23  A.  I did not.
24  Q.  And, therefore, you have found, even
25  after the FDA alert, no peer review

690

1   published journal that states Neurontin
2   causes suicide?
3       MR. FINKELSTEIN: Objection.
4       MS. McGRODER: I'm sorry. I
5   need to rephrase that. Strike it.
6       Can you read that back for
7   me.
8       (The record was read as
9   requested.)
10      MR. FINKELSTEIN: Objection.
11      MS. McGRODER: I'll restate
12  the question.
13  BY MS. McGRODER:
14  Q.  And, therefore, you have found after
15  your review of this FDA alert, no peer
16  review published article that states
17  Neurontin causes suicide?
18      MR. FINKELSTEIN: Objection.
19  I don't know if that's a question or a
20  statement.
21      THE WITNESS: I did not do
22  any subsequent review.
23  BY MS. McGRODER:
24  Q.  And, therefore, you have not found any
25  peer review published medical literature

691

1   that states Neurontin causes suicide,
2   correct?
3       MR. FINKELSTEIN: Objection.
4       THE WITNESS: That is
5   correct.
6   BY MS. McGRODER:
7   Q.  As you sit here today, after your
8   review of the FDA alert, is it correct that
9   you still cannot identify any scientific
10  body, medical authority, or regulatory
11  authority which has concluded that Neurontin
12  causes suicidal events?
13      MR. FINKELSTEIN: Objection.
14  Asked and answered.
15      MS. McGRODER: You can answer
16  the question.
17      THE WITNESS: Repeat the
18  question or would you read that back?
19      (The record was read as
20  requested.)
21      THE WITNESS: Yes.
22      MS. McGRODER: I think I'm
23  finished. But I need two minutes.
24      (A brief recess was taken at
25  this time.)

30 (Pages 688 to 691)