# Exhibit 12

# Reference Manual on Scientific Evidence

*Second Edition*

## Federal Judicial Center 2000

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

An electronic version of the *Reference Manual* can be downloaded from the
Federal Judicial Center's site on the World Wide Web. Go to

**http://air.fjc.gov/public/fjcweb.nsf/pages/16**

For the Center's overall homepage on the Web, go to

**http://www.fjc.gov**

# Reference Guide on Statistics

DAVID H. KAYE AND DAVID A. FREEDMAN

*David H. Kaye, M.A., J.D., is Regents' Professor, Arizona State University College of Law, and Fellow, Center for the Study of Law, Science, and Technology, Tempe, Arizona*

*David A. Freedman, Ph.D., is Professor of Statistics, University of California, Berkeley, California*

CONTENTS

I. Introduction, 85

    A. Admissibility and Weight of Statistical Studies, 86

    B. Varieties and Limits of Statistical Expertise, 86

    C. Procedures that Enhance Statistical Testimony, 88

        1. Maintaining Professional Autonomy, 88

        2. Disclosing Other Analyses, 88

        3. Disclosing Data and Analytical Methods Before Trial, 89

        4. Presenting Expert Statistical Testimony, 89

II. How Have the Data Been Collected? 90

    A. Is the Study Properly Designed to Investigate Causation? 90

        1. Types of Studies, 90

        2. Randomized Controlled Experiments, 93

        3. Observational Studies, 94

        4. Can the Results Be Generalized? 96

    B. Descriptive Surveys and Censuses, 98

        1. What Method Is Used to Select the Units? 98

        2. Of the Units Selected, Which Are Measured? 101

    C. Individual Measurements, 102

        1. Is the Measurement Process Reliable? 102

        2. Is the Measurement Process Valid? 103

        3. Are the Measurements Recorded Correctly? 104

III. How Have the Data Been Presented? 104

    A. Are Rates or Percentages Properly Interpreted? 105

        1. Have Appropriate Benchmarks Been Provided? 105

        2. Have the Data-Collection Procedures Changed? 105

        3. Are the Categories Appropriate? 106

        4. How Big Is the Base of a Percentage? 107

        5. What Comparisons Are Made? 107

    B. Is an Appropriate Measure of Association Used? 108

    C. Does a Graph Portray Data Fairly? 110

        1. How Are Trends Displayed? 110

        2. How Are Distributions Displayed? 112

    D. Is an Appropriate Measure Used for the Center of a Distribution? 113

83

*Reference Manual on Scientific Evidence*

    E. Is an Appropriate Measure of Variability Used? 114
IV. What Inferences Can Be Drawn from the Data? 115
    A. Estimation, 117
        1. What Estimator Should Be Used? 117
        2. What Is the Standard Error? The Confidence Interval? 117
    B. Significance Levels and Hypothesis Tests, 121
        1. What Is the *p*-value? 121
        2. Is a Difference Statistically Significant? 123
    C. Evaluating Hypothesis Tests, 125
        1. What Is the Power of the Test? 125
        2. One- or Two-tailed Tests? 126
        3. How Many Tests Have Been Performed? 127
        4. Tests or Interval Estimates? 128
        5. What Are the Rival Hypotheses? 129
    D. Posterior Probabilities, 131
V. Correlation and Regression, 133
    A. Scatter Diagrams, 134
    B. Correlation Coefficients, 135
        1. Is the Association Linear? 137
        2. Do Outliers Influence the Correlation Coefficient? 137
        3. Does a Confounding Variable Influence the Coefficient? 138
    C. Regression Lines, 139
        1. What Are the Slope and Intercept? 140
        2. What Is the Unit of Analysis? 141
    D. Statistical Models, 143
        1. A Social Science Example, 145
        2. Standard Errors, *t*-statistics, and Statistical Significance, 148
        3. Summary, 148
Appendix, 151
    A. Probability and Statistical Inference, 151
    B. Technical Details on the Standard Error, the Normal Curve, and Significance Levels, 153
Glossary of Terms, 160
References on Statistics, 178

*Reference Guide on Statistics*

# I. Introduction

Statistics, broadly defined, is the art and science of gaining information from data. For statistical purposes, data mean observations or measurements, expressed as numbers. A statistic may refer to a particular numerical value, derived from the data. Baseball statistics, for example, is the study of data about the game; a player's batting average is a statistic. The field of statistics includes methods for (1) collecting data, (2) analyzing data, and (3) drawing inferences from data.

Statistical assessments are prominent in many kinds of cases, ranging from antitrust to voting rights. Statistical reasoning can be crucial to the interpretation of psychological tests, toxicological and epidemiological studies, disparate treatment of employees, and DNA fingerprinting; this list could easily be extended.[1]

This reference guide describes the elements of statistical thinking. We hope that the explanations provided will permit judges and lawyers who deal with statistical evidence to understand the terminology, place the evidence in context, appreciate its strengths and weaknesses, and apply legal doctrine governing the use of such evidence. The reference guide is organized as follows:

- Section I provides an overview of the field, discusses the admissibility of statistical studies, and offers some suggestions about procedures that encourage the best use of statistical expertise in litigation.
- Section II addresses data collection. The design of a study is the most important determinant of its quality. The section reviews controlled experiments, observational studies, and surveys, indicating when these designs are likely to give useful data.
- Section III discusses the art of describing and summarizing data. The section considers the mean, median, and standard deviation. These are basic descriptive statistics, and most statistical analyses seen in court use them as building blocks. Section III also discusses trends and associations in data as summarized by graphs, percentages, and tables.
- Section IV describes the logic of statistical inference, emphasizing its foundations and limitations. In particular, this section explains statistical estimation, standard errors, confidence intervals, *p*-values, and hypothesis tests.
- Section V shows how relationships between two variables can be described by means of scatter diagrams, correlation coefficients, and regression lines. Statisticians often use regression techniques in an attempt to infer causation

---

1. *See generally* Statistics and the Law (Morris H. DeGroot et al. eds., 1986); Panel on Statistical Assessments as Evidence in the Courts, National Research Council, The Evolving Role of Statistical Assessments as Evidence in the Courts (Stephen E. Fienberg ed., 1989) [hereinafter The Evolving Role of Statistical Assessments as Evidence in the Courts]; Michael O. Finkelstein & Bruce Levin, Statistics for Lawyers (1990); 1 & 2 Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy (1988); Hans Zeisel & David Kaye, Prove It with Figures: Empirical Methods in Law and Litigation (1997).

*Reference Manual on Scientific Evidence*

from association; section V briefly explains the techniques and some of their limitations.

- An appendix presents certain technical details, and the glossary defines many statistical terms that might be encountered in litigation.

## A. Admissibility and Weight of Statistical Studies

Statistical studies suitably designed to address a material issue generally will be admissible under the Federal Rules of Evidence. The hearsay rule rarely is a serious barrier to the presentation of statistical studies, since such studies may be offered to explain the basis for an expert's opinion or may be admissible under the learned treatise exception to the hearsay rule.[2] Likewise, since most statistical methods relied on in court are described in textbooks and journal articles and are capable of producing useful results when carefully and appropriately applied, such methods generally satisfy important aspects of the "scientific knowledge" requirement articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[3] Of course, a particular study may use a method that is entirely appropriate, but so poorly executed that it should be inadmissible under Federal Rules of Evidence 403 and 702.[4] Or, the method may be inappropriate for the problem at hand and thus lacks the "fit" spoken of in *Daubert*.[5] Or, the study may rest on data of the type not reasonably relied on by statisticians or substantive experts, and hence run afoul of Federal Rule of Evidence 703. Often, however, the battle over statistical evidence concerns weight or sufficiency rather than admissibility.

## B. Varieties and Limits of Statistical Expertise

For convenience, the field of statistics may be divided into three subfields: probability, theoretical statistics, and applied statistics. Theoretical statistics is the study of the mathematical properties of statistical procedures, such as error rates; probability theory plays a key role in this endeavor. Results may be used by

---

2. *See generally* 2 McCormick on Evidence §§ 321, 324.3 (John W. Strong ed., 5th ed. 1999). Studies published by government agencies also may be admissible as public records. *Id.* § 296. *See also* United States v. Esquivel, 88 F.3d 722, 727 (9th Cir. 1996) (taking judicial notice of 1990 census data showing the number of Hispanics eligible for jury service).

3. 509 U.S. 579, 589–90 (1993). For a discussion of the implications and scope of *Daubert* generally, see 1 Modern Scientific Evidence: The Law and Science of Expert Testimony § 1–3.0 (David L. Faigman et al. eds., 1997).

4. *See, e.g.,* Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997) ("failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation" renders analysis inadmissible under *Daubert*).

5. 509 U.S. at 591; *cf.* People Who Care v. Rockford Bd. of Educ., 111 F.3d 528, 537–38 (7th Cir. 1997) ("a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court"); *Sheehan*, 104 F.3d at 942 (holding that expert's "failure to correct for any potential explanatory variables other than age" made the analyst's finding that "there was a significant correlation between age and retention" inadmissible).

*Reference Guide on Statistics*

applied statisticians who specialize in particular types of data collection, such as survey research, or in particular types of analysis, such as multivariate methods.

Statistical expertise is not confined to those with degrees in statistics. Because statistical reasoning underlies all empirical research, researchers in many fields are exposed to statistical ideas. Experts with advanced degrees in the physical, medical, and social sciences—and some of the humanities—may receive formal training in statistics. Such specializations as biostatistics, epidemiology, econometrics, and psychometrics are primarily statistical, with an emphasis on methods and problems most important to the related substantive discipline.

Individuals who specialize in using statistical methods—and whose professional careers demonstrate this orientation—are most likely to apply appropriate procedures and correctly interpret the results. On the other hand, forensic scientists and technicians often testify to probabilities or statistics derived from studies or databases compiled by others, even though some of these testifying experts lack the training or knowledge required to understand and apply the information. *State v. Garrison*[6] illustrates the problem. In a murder prosecution involving bite-mark evidence, a dentist was allowed to testify that "the probability factor of two sets of teeth being identical in a case similar to this is, approximately, eight in one million," even though "he was unaware of the formula utilized to arrive at that figure other than that it was 'computerized.'"[7]

At the same time, the choice of which data to examine, or how best to model a particular process, could require subject matter expertise that a statistician might lack. Statisticians often advise experts in substantive fields on the procedures for collecting data and often analyze data collected by others. As a result, cases involving statistical evidence often are (or should be) "two-expert" cases of interlocking testimony.[8] A labor economist, for example, may supply a definition of the relevant labor market from which an employer draws its employees, and the statistical expert may contrast the racial makeup of those hired to the racial composition of the labor market. Naturally, the value of the statistical analysis depends on the substantive economic knowledge that informs it.[9]

---

6. 585 P.2d 563 (Ariz. 1978).

7. *Id.* at 566, 568.

8. Sometimes a single witness presents both the substantive underpinnings and the statistical analysis. Ideally, such a witness has extensive expertise in both fields, although less may suffice to qualify the witness under Fed. R. Evid. 702. In deciding whether a witness who clearly is qualified in one field may testify in a related area, courts should recognize that qualifications in one field do not necessarily imply qualifications in the other.

9. In *Vuyanich v. Republic National Bank*, 505 F. Supp. 224, 319 (N.D. Tex. 1980), *vacated*, 723 F.2d 1195 (5th Cir. 1984), defendant's statistical expert criticized the plaintiffs' statistical model for an implicit, but restrictive, assumption about male and female salaries. The district court trying the case accepted the model because the plaintiffs' expert had a "very strong guess" about the assumption, and her expertise included labor economics as well as statistics. *Id.* It is doubtful, however, that economic knowledge sheds much light on the assumption, and it would have been simple to perform a less restrictive analysis. In this case, the court may have been overly impressed with a single expert who

## C. Procedures that Enhance Statistical Testimony

### 1. Maintaining Professional Autonomy

Ideally, experts who conduct research in the context of litigation should proceed with the same objectivity that they would apply in other contexts. Thus, experts who testify (or who supply results that are used in testimony by others) should be free to do whatever analysis is required to address in a professionally responsible fashion the issues posed by the litigation.[10] Questions about the freedom of inquiry accorded to testifying experts, as well as the scope and depth of their investigations, may reveal some of the limitations to the analysis being presented.

### 2. Disclosing Other Analyses

Statisticians analyze data using a variety of statistical models and methods. There is much to be said for looking at the data in a variety of ways. To permit a fair evaluation of the analysis that the statistician does settle on, however, the testifying expert may explain the history behind the development of the final statistical approach.[11] Indeed, some commentators have urged that counsel who know of other data sets or analyses that do not support the client's position should reveal this fact to the court, rather than attempt to mislead the court by presenting only favorable results.[12]

combined substantive and statistical expertise. Once the issue is defined by legal and substantive knowledge, some aspects of the statistical analysis will turn on statistical considerations alone, and expertise in another subject will not be pertinent.

10. *See* The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, at 164 (recommending that the expert be free to consult with colleagues who have not been retained by any party to the litigation and that the expert receive a letter of engagement providing for these and other safeguards).

11. *See, e.g.,* Mikel Aickin, *Issues and Methods in Discrimination Statistics, in* Statistical Methods in Discrimination Litigation 159 (David H. Kaye & Mikel Aickin eds., 1986).

12. The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, at 167; *cf.* William W Schwarzer, *In Defense of "Automatic Disclosure in Discovery,"* 27 Ga. L. Rev. 655, 658–59 (1993) ("[T]he lawyer owes a duty to the court to make disclosure of core information."). The Panel on Statistical Assessments as Evidence in the Courts also recommends that "if a party gives statistical data to different experts for competing analyses, that fact be disclosed to the testifying expert, if any." The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, at 167. Whether and under what circumstances a particular statistical analysis might be so imbued with counsel's thoughts and theories of the case that it should receive protection as the attorney's work product is an issue beyond the scope of this reference guide.

*Reference Guide on Statistics*

### 3. Disclosing Data and Analytical Methods Before Trial

The collection of data often is expensive, and data sets typically contain at least some minor errors or omissions. Careful exploration of alternative modes of analysis also can be expensive and time consuming. To minimize the occurrence of distracting debates at trial over the accuracy of data and the choice of analytical techniques, and to permit informed expert discussions of method, pretrial procedures should be used, particularly with respect to the accuracy and scope of the data, and to discover the methods of analysis. Suggested procedures along these lines are available elsewhere.[13]

### 4. Presenting Expert Statistical Testimony

The most common format for the presentation of evidence at trial is sequential. The plaintiff's witnesses are called first, one by one, without interruption except for cross-examination, and testimony is in response to specific questions rather than by an extended narration. Although traditional, this structure is not compelled by the Federal Rules of Evidence.[14] Some alternatives have been proposed that might be more effective in cases involving substantial statistical testimony. For example, when the reports of witnesses go together, the judge might allow their presentations to be combined and the witnesses to be questioned as a panel rather than sequentially. More narrative testimony might be allowed, and the expert might be permitted to give a brief tutorial on statistics as a preliminary to some testimony. Instead of allowing the parties to present their experts in the midst of all the other evidence, the judge might call for the experts for opposing sides to testify at about the same time. Some courts, particularly in bench trials, may have both experts placed under oath and, in effect, permit them to engage in a dialogue. In such a format, experts are able to say whether they agree or disagree on specific issues. The judge and counsel can interject questions. Such practices may improve the judge's understanding and reduce the tensions associated with the experts' adversarial role.[15]

---

13. *See* The Special Comm. on Empirical Data in Legal Decision Making, Recommendations on Pretrial Proceedings in Cases with Voluminous Data, *reprinted in* The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, app. F. *See also* David H. Kaye, *Improving Legal Statistics*, 24 L. & Soc'y Rev. 1255 (1990).

14. *See* Fed. R. Evid. 611.

15. The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, at 174.

# II. How Have the Data Been Collected?

An analysis is only as good as the data on which it rests.[16] To a large extent, the design of a study determines the quality of the data. Therefore, the proper inter-pretation of data and their implications begins with an understanding of study design, and different designs help answer different questions. In many cases, statistics are introduced to show causation. Would additional information in a securities prospectus disclosure have caused potential investors to behave in some other way? Does capital punishment deter crime? Do food additives cause can-cer? The design of studies intended to prove causation is the first and perhaps the most important topic of this section.

Another issue is the use of sample data to characterize a population: the popu-lation is the whole class of units that are of interest; the sample is a set of units chosen for detailed study. Inferences from the part to the whole are justified only when the sample is representative, and that is the second topic of this section.

Finally, it is important to verify the accuracy of the data collection. Errors can arise in the process of making and recording measurements on individual units. This aspect of data quality is the third topic in this section.

## A. Is the Study Properly Designed to Investigate Causation?

### 1. Types of Studies

When causation is at issue, advocates have relied on three major types of infor-mation: anecdotal evidence, observational studies, and controlled experiments.[17] As we shall see, anecdotal reports can provide some information, but they are

---

16. For introductory treatments of data collection, see, e.g., David Freedman et al., Statistics (3d ed. 1998); Darrell Huff, How to Lie with Statistics (1954); David S. Moore, Statistics: Concepts and Controversies (3d ed. 1991); Hans Zeisel, Say It with Figures (6th ed. 1985); and Zeisel & Kaye, *supra* note 1.

17. When relevant studies exist before the commencement of the litigation, it becomes the task of the lawyer and appropriate experts to explain this research to the court. Examples of such "off-the-shelf" research are experiments pinpointing conditions under which eyewitnesses tend to err in identi-fying criminals and studies of how sex stereotyping affects perceptions of women in the workplace. *See, e.g.,* State v. Chapple, 660 P.2d 1208, 1223–24 (Ariz. 1983) (reversing a conviction for excluding expert testimony about scientific research on eyewitness accuracy); Price Waterhouse v. Hopkins, 490 U.S. 228, 235 (1989). Some psychologists have questioned the applicability of these experiments to litigation. *See, e.g.,* Gerald V. Barrett & Scott B. Morris, *The American Psychological Association's Amicus Curiae Brief in* Price Waterhouse v. Hopkins: *The Values of Science Versus the Values of the Law,* 17 Law & Hum. Behav. 201 (1993). For a rejoinder, see Susan T. Fiske et al., *What Constitutes a Scientific Review?: A Majority Retort to Barrett and Morris,* 17 Law & Hum. Behav. 217 (1993).

If no preexisting studies are available, a case-specific one may be devised. *E.g.,* United States v. Youritan Constr. Co., 370 F. Supp. 643, 647 (N.D. Cal. 1973) (investigating racial discrimination in the rental-housing market by using "testers"—who should differ only in their race—to rent a property),

more useful as a stimulus for further inquiry than as a basis for establishing association. Observational studies can establish that one factor is associated with another, but considerable analysis may be necessary to bridge the gap from association to causation.[18] Controlled experiments are ideal for ascertaining causation, but they can be difficult to undertake.

"Anecdotal evidence" means reports of one kind of event following another. Typically, the reports are obtained haphazardly or selectively, and the logic of "post hoc, ergo propter hoc" does not suffice to demonstrate that the first event causes the second. Consequently, while anecdotal evidence can be suggestive,[19] it can also be quite misleading.[20] For instance, some children who live near power lines develop leukemia; but does exposure to electrical and magnetic fields cause this disease? The anecdotal evidence is not compelling because leukemia also occurs among children who have minimal exposure to such fields.[21] It is necessary to compare disease rates among those who are exposed and those who are not. If exposure causes the disease, the rate should be higher among the exposed, lower among the unexposed. Of course, the two groups may differ in crucial ways other than the exposure. For example, children who live near power

---

*aff'd in part*, 509 F.2d 623 (9th Cir. 1975). For a critical review of studies using testers, see James J. Heckman & Peter Siegelman, *The Urban Institute Audit Studies: Their Methods and Findings, in* Clear and Convincing Evidence: Measurement of Discrimination in America 187 (Michael Fix & Raymond J. Struyk eds., 1993) (including commentary).

18. For example, smokers have higher rates of lung cancer than nonsmokers; thus smoking and lung cancer are associated.

19. In medicine, evidence from clinical practice is often the starting point for the demonstration of a causal effect. One famous example involves exposure of mothers to German measles during pregnancy, followed by blindness in their babies. N. McAlister Gregg, *Congenital Cataract Following German Measles in the Mother*, 3 Transactions Ophthalmological Soc'y Austl. 35 (1941), *reprinted in* The Challenge of Epidemiology 426 (Carol Buck et al. eds., 1988).

20. Indeed, some courts have suggested that attempts to infer causation from anecdotal reports are inadmissible as unsound methodology under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See, e.g.*, Haggerty v. Upjohn Co., 950 F. Supp. 1160, 1163–64 (S.D. Fla. 1996) (holding that reports to the Food and Drug Administration of "adverse medical events" involving the drug Halcion and "anecdotal case reports appearing in medical literature . . . can be used to generate hypotheses about causation, but not causation conclusions" because "scientifically valid cause and effect determinations depend on controlled clinical trials and epidemiological studies"); Cartwright v. Home Depot U.S.A., Inc., 936 F. Supp. 900, 905 (M.D. Fla. 1996) (excluding an expert's opinion that latex paint caused plaintiff's asthma, in part because "case reports . . . are no substitute for a scientifically designed and conducted inquiry").

21. *See* Committee on the Possible Effects of Electromagnetic Fields on Biologic Sys., National Research Council, Possible Health Effects of Exposure to Residential Electric and Magnetic Fields (1997); Zeisel & Kaye, *supra* note 1, at 66–67. There are serious problems in measuring exposure to electromagnetic fields, and results are somewhat inconsistent from one study to another. For such reasons, the epidemiologic evidence for an effect on health is quite inconclusive. *Id.*; Martha S. Linet et al., *Residential Exposure to Magnetic Fields and Acute Lymphoblastic Leukemia in Children*, 337 New Eng. J. Med. 1 (1997); Edward W. Campion, *Power Lines, Cancer, and Fear*, 337 New Eng. J. Med. 44 (1997) (editorial); Gary Taubes, *Magnetic Field-Cancer Link: Will It Rest in Peace?*, 277 Science 29 (1997) (quoting various epidemiologists).

*Reference Manual on Scientific Evidence*

lines could come from poorer families and be exposed to other environmental hazards. These differences could create the appearance of a cause-and-effect relationship, or they can mask a real relationship. Cause-and-effect relationships often are quite subtle, and carefully designed studies are needed to draw valid conclusions.[22]

Typically, a well-designed study will compare outcomes for subjects who are exposed to some factor—the treatment group—and other subjects who are not so exposed—the control group. A distinction must then be made between controlled experiments and observational studies. In a controlled experiment, the investigators decide which subjects are exposed to the factor of interest and which subjects go into the control group. In most observational studies, the subjects themselves choose their exposures. Because of this self-selection, the treatment and control groups are likely to differ with respect to important factors other than the one of primary interest.[23] (These other factors are called confounding variables or lurking variables.[24]) With studies on the health effects of power lines, family background is a possible confounder; so is exposure to other hazards.[25]

---

22. Here is a classic example from epidemiology. At one time, it was thought that lung cancer was caused by fumes from tarring the roads, because many lung cancer patients lived near roads that had recently been paved. This is anecdotal evidence. But the logic is quite incomplete, because many people without lung cancer were exposed to asphalt fumes. A comparison of rates is needed. Careful study showed that lung cancer patients had similar rates of exposure to tar fumes as other people; the real difference was in exposure to cigarette smoke. Richard Doll & A. Bradford Hill, *A Study of the Aetiology of Carcinoma of the Lung*, 2 Brit. Med. J. 1271 (1952).

23. For present purposes, a variable is a numerical characteristic of units in a study. For instance, in a survey of people, the unit of analysis is the person, and variables might include income (in dollars per year) and educational level (years of schooling completed). In a study of school districts, the unit of analysis is the district, and variables might include average family income of residents and average test scores of students. When investigating a possible cause-and-effect relationship, the variable that characterizes the effect is called the dependent variable, since it may depend on the causes; dependent variables also are called response variables. In contrast, the variables that represent the causes are called independent variables; independent variables also are called factors or explanatory variables.

24. A confounding variable is correlated with the independent variables and with the dependent variable. If the units being studied differ on the independent variables, they are also likely to differ on the confounder. Therefore, the confounder—not the independent variables—could be responsible for differences seen on the dependent variable.

25. Confounding is a problem even in careful epidemiologic studies. For example, women with herpes are more likely to develop cervical cancer than women who have not been exposed to the virus. It was concluded that herpes caused cancer; in other words, the association was thought to be causal. Later research suggests that herpes is only a marker of sexual activity. Women who have had multiple sexual partners are more likely to be exposed not only to herpes but also to human papilloma virus. Certain strains of papilloma virus seem to cause cervical cancer, while herpes does not. Apparently, the association between herpes and cervical cancer is not causal but is due to the effect of other variables. *See* Viral Etiology of Cervical Cancer (Richard Peto & Harald zur Hausen eds., 1986); The Epidemiology of Cervical Cancer and Human Papillomavirus (N. Muñoz et al. eds. 1992). For additional examples and discussion, see Freedman et al., *supra* note 16, at 12–27, 150–52; David Freedman, *From Association to Causation: Some Remarks on the History of Statistics*, 14 Stat. Sci. 243 (1999).

*Reference Guide on Statistics*

### 2. *Randomized Controlled Experiments*

In randomized controlled experiments, investigators assign subjects to treatment or control groups at random. The groups are therefore likely to be quite comparable—except for the treatment. Choosing at random tends to balance the groups with respect to possible confounders, and the effect of remaining imbalances can be assessed by statistical techniques.[26] Consequently, inferences based on well-executed randomized experiments are more secure than inferences based on observational studies.[27]

The following illustration brings together the points made thus far. Many doctors think that taking aspirin helps prevent heart attacks, but there is some controversy. Most people who take aspirin do not have heart attacks; this is anecdotal evidence for the protective effect, but proves very little. After all, most people do not suffer heart attacks—whether or not they take aspirin regularly. A careful study must compare heart attack rates for two groups: persons who take aspirin (the treatment group) and persons who do not (the controls). An observational study would be easy to do, but then the aspirin-takers are likely to be different from the controls. If, for instance, the controls are healthier to begin with, the study would be biased against the drug. Randomized experiments with aspirin are harder to do, but they provide much better evidence. It is the experiments that demonstrate a protective effect.

To summarize: First, outcome figures from a treatment group without a control group generally reveal very little and can be misleading. Comparisons are essential. Second, if the control group was obtained through random assignment before treatment, a difference in the outcomes between treatment and control groups may be accepted, within the limits of statistical error, as the true measure of the treatment effect.[28] However, if the control group was created in any

---

26. *See infra* § IV.

27. Experiments, however, are often impractical, as in the power-line example. Even when randomized controlled experiments are feasible, true randomization can be difficult to achieve. *See, e.g.,* Kenneth F. Schulz, *Subverting Randomization in Controlled Trials,* 274 JAMA 1456 (1995); Rachel Nowak, *Problems in Clinical Trials Go Far Beyond Misconduct,* 264 Science 1538 (1994). For statistical purposes, randomization should be accomplished using some definite, objective method (like a random number generator on a computer); haphazard assignment may not be sufficient.

28. Of course, the possibility that the two groups will not be comparable in some unrecognized way can never be eliminated. Random assignment, however, allows the researcher to compute the probability of seeing a large difference in the outcomes when the treatment actually has no effect. When this probability is small, the difference in the response is said to be "statistically significant." *See infra* § IV.B.2. Randomization of subjects to treatment or control groups puts statistical tests of significance on a secure footing. Freedman et al., *supra* note 16, at 503–24, 547–78.

Even more important, randomization also ensures that the assignment of subjects to treatment and control groups is free from conscious or unconscious manipulation by investigators or subjects. Randomization may not be the only way to ensure such protection, but "it is the simplest and best understood way to certify that one has done so." Philip W. Lavori et al., *Designs for Experiments—Parallel Comparisons of Treatment, in* Medical Uses of Statistics 61, 66 (John C. Bailar III & Frederick Mosteller

other way, differences in the groups that existed before treatment may contribute to differences in the outcomes, or mask differences that otherwise would be observed. Thus, observational studies succeed to the extent that their treatment and control groups are comparable—apart from the treatment.

### 3. Observational Studies

The bulk of the statistical studies seen in court are observational, not experimental. Take the question of whether capital punishment deters murder. To do a randomized controlled experiment, people would have to be assigned randomly to a control group and a treatment group. The controls would know that they could not receive the death penalty for murder, while those in the treatment group would know they could be executed. The rate of subsequent murders by the subjects in these groups would be observed. Such an experiment is unacceptable—politically, ethically, and legally.[29]

Nevertheless, many studies of the deterrent effect of the death penalty have been conducted, all observational, and some have attracted judicial attention.[30] Researchers have catalogued differences in the incidence of murder in states with and without the death penalty, and they have analyzed changes in homicide rates and execution rates over the years. In such observational studies, investigators may speak of control groups (such as the states without capital punishment) and of controlling for potentially confounding variables (e.g., worsening economic conditions).[31] However, association is not causation, and the causal inferences that can be drawn from such analyses rest on a less secure foundation than that provided by a randomized controlled experiment.[32]

eds., 2d ed. 1992). To avoid ambiguity, the researcher should be explicit "about how the randomization was done (e.g., table of random numbers) and executed (e.g., by sealed envelopes prepared in advance)." *Id. See also* Colin Begg et al., *Improving the Quality of Reporting of Randomized Controlled Trials: The CONSORT Statement*, 276 JAMA 637 (1996).

29. *Cf.* Experimentation in the Law: Report of the Federal Judicial Center Advisory Committee on Experimentation in the Law (Federal Judicial Center 1981) [hereinafter Experimentation in the Law] (study of ethical issues raised by controlled experimentation in the evaluation of innovations in the justice system).

30. *See generally* Hans Zeisel, *The Deterrent Effect of the Death Penalty: Facts v. Faith*, 1976 Sup. Ct. Rev. 317.

31. A procedure often used to control for confounding in observational studies is regression analysis. The underlying logic is described *infra* § V.D and in Daniel L. Rubinfeld, Reference Guide on Multiple Regression, § II, in this manual. The early enthusiasm for using multiple regression analysis to study the death penalty was not shared by reviewers. *Compare* Isaac Ehrlich, *The Deterrent Effect of Capital Punishment: A Question of Life and Death*, 65 Am. Econ. Rev. 397 (1975), *with, e.g.,* Lawrence R. Klein et al., *The Deterrent Effect of Capital Punishment: An Assessment of the Estimates, in* Panel on Research on Deterrent and Incapacitative Effects, National Research Council, Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates 336 (Alfred Blumstein et al. eds., 1978); Edward Leamer, *Let's Take the Con Out of Econometrics*, 73 Am. Econ. Rev. 31 (1983).

32. *See, e.g.,* Experimentation in the Law, *supra* note 29, at 18:

[G]roups selected without randomization will [almost] always differ in some systematic way other than exposure to the experimental program. Statistical techniques can eliminate chance as a feasible explanation for the

94

Of course, observational studies can be very useful. The evidence that smoking causes lung cancer in humans, although largely observational, is compelling. In general, observational studies provide powerful evidence in the following circumstances:

- The association is seen in studies of different types among different groups. This reduces the chance that the observed association is due to a defect in one type of study or a peculiarity in one group of subjects.
- The association holds when the effects of plausible confounding variables are taken into account by appropriate statistical techniques, such as comparing smaller groups that are relatively homogeneous with respect to the factor.[33]
- There is a plausible explanation for the effect of the independent variables; thus, the causal link does not depend on the observed association alone. Other explanations linking the response to confounding variables should be less plausible.[34]

When these criteria are not fulfilled, observational studies may produce legitimate disagreement among experts, and there is no mechanical procedure for ascertaining who is correct. In the end, deciding whether associations are causal is not a matter of statistics, but a matter of good scientific judgment, and the questions that should be asked with respect to data offered on the question of causation can be summarized as follows:

- Was there a control group? If not, the study has little to say about causation.
- If there was a control group, how were subjects assigned to treatment or control: through a process under the control of the investigator (a controlled experiment) or a process outside the control of the investigator (an observational study)?

---

differences, . . . [b]ut without randomization there are no certain methods for determining that observed differences between groups are not related to the preexisting, systematic difference. . . . [C]omparison between systematically different groups will yield ambiguous implications whenever the systematic difference affords a plausible explanation for apparent effects of the experimental program.

33. The idea is to control for the influence of a confounder by making comparisons separately within groups for which the confounding variable is nearly constant and therefore has little influence over the variables of primary interest. For example, smokers are more likely to get lung cancer than nonsmokers. Age, gender, social class, and region of residence are all confounders, but controlling for such variables does not really change the relationship between smoking and cancer rates. Furthermore, many different studies—of different types and on different populations—confirm the causal link. That is why most experts believe that smoking causes lung cancer and many other diseases. For a review of the literature, see 38 International Agency for Research on Cancer (IARC), World Health Org., IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans: Tobacco Smoking (1986).

34. A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965); Alfred S. Evans, Causation and Disease: A Chronological Journey 187 (1993).

- If the study was a controlled experiment, was the assignment made using a chance mechanism (randomization), or did it depend on the judgment of the investigator?
- If the data came from an observational study or a nonrandomized controlled experiment, how did the subjects come to be in treatment or in control groups? Are the groups comparable? What factors are confounded with treatment? What adjustments were made to take care of confounding? Were they sensible?[35]

### 4. Can the Results Be Generalized?

Any study must be conducted on a certain group of subjects, at certain times and places, using certain treatments. With respect to these subjects, the study may be persuasive. There may be adequate control over confounding variables, and there may be an unequivocally large difference between the treatment and control groups. If so, the study's internal validity will not be disputed: for the subjects in the study, the treatment had an effect. But an issue of external validity remains. To extrapolate from the conditions of a study to more general circumstances always raises questions. For example, studies suggest that definitions of insanity given to jurors influence decisions in cases of incest;[36] would the definitions have a similar effect in cases of murder? Other studies indicate that recidivism rates for ex-convicts are not affected by temporary financial support after release.[37] Would the same results be obtained with different conditions in the labor market?

Confidence in the appropriateness of an extrapolation cannot come from the experiment itself.[38] It must come from knowledge about which outside factors

35. These questions are adapted from Freedman et al., *supra* note 16, at 28. For discussions of the admissibility or weight of studies that overlook obvious possible confounders, see *People Who Care v. Rockford Board of Education*, 111 F.3d 528, 537–38 (7th Cir. 1997) ("The social scientific literature on educational achievement identifies a number of other variables besides poverty and discrimination that explain differences in scholastic achievement, such as the educational attainments of the student's parents and the extent of their involvement in their children's schooling. . . . These variables cannot be assumed to be either randomly distributed across the different racial and ethnic groups in Rockford or perfectly correlated with poverty. . . ."); cases cited *supra* note 5 and *infra* note 230.

36. *See* Rita James Simon, The Jury and the Defense of Insanity 58–59 (1967).

37. For an experiment on income support and recidivism, see Peter H. Rossi et al., Money, Work, and Crime: Experimental Evidence (1980). The interpretation of the data has proved controversial. *See* Hans Zeisel, *Disagreement over the Evaluation of a Controlled Experiment*, 88 Am. J. Soc. 378 (1982) (with commentary).

38. Suppose an epidemiologic study is conducted on the relationship between a toxic substance and a disease. The rate of occurrence of the disease in a group of persons exposed to the substance is compared to the rate in a control group, and the rate in the exposed group turns out to be more than double the rate in the control group. (More technically, the relative risk exceeds two.) Do these data imply that a plaintiff who was exposed to the toxic substance and contracted the disease probably would not have contracted the disease but for the exposure? If we assume that the substance causes the disease and all confounding has been properly accounted for (a judgment that might not be easy to defend),

# Reference Guide on Epidemiology

MICHAEL D. GREEN, D. MICHAL FREEDMAN, AND LEON GORDIS

*Michael D. Green, B.S., J.D., is Bess & Walter Williams Chair in Law, Wake Forest University School of Law, Winston-Salem, North Carolina.*

*D. Michal Freedman, J.D., Ph.D., M.P.H., is Epidemiologist, Division of Cancer Epidemiology and Genetics, National Cancer Institute, Bethesda, Maryland.*

*Leon Gordis, M.D., Dr.P.H., is Professor of Epidemiology, Johns Hopkins School of Public Health, and Professor of Pediatrics, Johns Hopkins School of Medicine, Baltimore, Maryland.*

CONTENTS

I. Introduction, 335

II. What Different Kinds of Epidemiologic Studies Exist? 338
    A. Experimental and Observational Studies of Suspected Toxic Agents, 338
    B. The Types of Observational Study Design, 339
        1. Cohort studies, 340
        2. Case–control studies, 342
        3. Cross-sectional studies, 343
        4. Ecological studies, 344
    C. Epidemiologic and Toxicologic Studies, 345

III. How Should Results of an Epidemiologic Study Be Interpreted? 348
    A. Relative Risk, 348
    B. Odds Ratio, 350
    C. Attributable Risk, 351
    D. Adjustment for Study Groups That Are Not Comparable, 352

IV. What Sources of Error Might Have Produced a False Result? 354
    A. What Statistical Methods Exist to Evaluate the Possibility of Sampling Error? 355
        1. False positive error and statistical significance, 356
        2. False negative error, 362
        3. Power, 362
    B. What Biases May Have Contributed to an Erroneous Association? 363
        1. Selection bias, 363
        2. Information bias, 365
        3. Other conceptual problems, 369
    C. Could a Confounding Factor Be Responsible for the Study Result? 369
        1. What techniques can be used to prevent or limit confounding? 372
        2. What techniques can be used to identify confounding factors? 373
        3. What techniques can be used to control for confounding factors? 373

*Reference Manual on Scientific Evidence*

V. General Causation: Is an Exposure a Cause of the Disease? 374
    A. Is There a Temporal Relationship? 376
    B. How Strong Is the Association Between the Exposure and Disease? 376
    C. Is There a Dose–Response Relationship? 377
    D. Have the Results Been Replicated? 377
    E. Is the Association Biologically Plausible (Consistent
       with Existing Knowledge)? 378
    F. Have Alternative Explanations Been Considered? 378
    G. What Is the Effect of Ceasing Exposure? 378
    H. Does the Association Exhibit Specificity? 379
    I. Are the Findings Consistent with Other Relevant Knowledge? 379
VI. What Methods Exist for Combining the Results of Multiple Studies? 380
VII. What Role Does Epidemiology Play in Proving Specific Causation? 381
Glossary of Terms, 387
References on Epidemiology, 398
References on Law and Epidemiology, 398

*Reference Guide on Epidemiology*

# I. Introduction

Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations. The purpose of epidemiology is to better understand disease causation and to prevent disease in groups of individuals. Epidemiology assumes that disease is not distributed randomly in a group of individuals and that identifiable subgroups, including those exposed to certain agents, are at increased risk of contracting particular diseases.[1]

Judges and juries increasingly are presented with epidemiologic evidence as the basis of an expert's opinion on causation.[2] In the courtroom, epidemiologic research findings[3] are offered to establish or dispute whether exposure to an agent[4] caused a harmful effect or disease.[5] Epidemiologic evidence identifies

1. Although epidemiologists may conduct studies of beneficial agents that prevent or cure disease or other medical conditions, this reference guide refers exclusively to outcomes as diseases, because they are the relevant outcomes in most judicial proceedings in which epidemiology is involved.

2. Epidemiologic studies have been well received by courts trying mass tort suits. Well-conducted studies are uniformly admitted. 2 Modern Scientific Evidence: The Law and Science of Expert Testimony § 28-1.1, at 302–03 (David L. Faigman et al. eds., 1997) [hereinafter Modern Scientific Evidence]. It is important to note that often the expert testifying before the court is not the scientist who conducted the study or series of studies. *See, e.g.,* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 953 (3d Cir. 1990) (pediatric pharmacologist expert's credentials sufficient pursuant to Fed. R. Evid. 702 to interpret epidemiologic studies and render an opinion based thereon); *cf.* Landrigan v. Celotex Corp., 605 A.2d 1079, 1088 (N.J. 1992) (epidemiologist permitted to testify to both general causation and specific causation); Loudermill v. Dow Chem. Co., 863 F.2d 566, 569 (8th Cir. 1988) (toxicologist permitted to testify that chemical caused decedent's death).

3. An epidemiologic study, which often is published in a medical journal or other scientific journal, is hearsay. An epidemiologic study that is performed by the government, such as one performed by the Centers for Disease Control (CDC), may be admissible based on the hearsay exception for government records contained in Fed. R. Evid. 803(8)(C). *See* Ellis v. International Playtex, Inc., 745 F.2d 292, 300–01 (4th Cir. 1984); Kehm v. Procter & Gamble Co., 580 F. Supp. 890, 899 (N.D. Iowa 1982), *aff'd sub nom.* Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613 (8th Cir. 1983). A study that is not conducted by the government might qualify for the learned treatise exception to the hearsay rule, Fed. R. Evid. 803(18), or possibly the catchall exceptions, Fed. R. Evid. 803(24) & 804(5). *See Ellis,* 745 F.2d at 305, 306 & n.18.

In any case, an epidemiologic study might be part of the basis of an expert's opinion and need not be independently admissible pursuant to Fed. R. Evid. 703. *See In re* "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1223, 1240 (E.D.N.Y. 1985), *aff'd,* 818 F.2d 187 (2d Cir. 1987), *cert. denied,* 487 U.S. 1234 (1988); *cf.* Grassis v. Johns-Manville Corp., 591 A.2d 671, 676 (N.J. Super. Ct. App. Div. 1991) (epidemiologic study offered in evidence to support expert's opinion under New Jersey evidentiary rule equivalent to Fed. R. Evid. 703).

4. We use *agent* to refer to any substance external to the human body that potentially causes disease or other health effects. Thus, drugs, devices, chemicals, radiation, and minerals (e.g., asbestos) are all agents whose toxicity an epidemiologist might explore. A single agent or a number of independent agents may cause disease, or the combined presence of two or more agents may be necessary for the development of the disease. Epidemiologists also conduct studies of individual characteristics, such as blood pressure and diet, which might pose risks, but those studies are rarely of interest in judicial proceedings. Epidemiologists may also conduct studies of drugs and other pharmaceutical products to assess their efficacy and safety.

5. DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945–48, 953–59 (3d Cir. 1990) (litigation

335

agents that are associated with an increased risk of disease in groups of individuals, quantifies the amount of excess disease that is associated with an agent, and provides a profile of the type of individual who is likely to contract a disease after being exposed to an agent. Epidemiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause disease in a particular individual?).[6] For example, in the 1950s Doll and Hill and others published articles about the increased risk of lung cancer in cigarette smokers. Doll and Hill's studies showed that smokers who smoked ten to twenty cigarettes a day had a lung cancer mortality rate that was about ten times higher than that for nonsmokers.[7] These studies identified an association between smoking cigarettes and death from lung cancer, which contributed to the determination that smoking causes lung cancer.

However, it should be emphasized that *an association is not equivalent to causation*.[8] An association identified in an epidemiologic study may or may not be causal.[9] Assessing whether an association is causal requires an understanding of

---

over morning sickness drug, Bendectin); Cook v. United States, 545 F. Supp. 306, 307–16 (N.D. Cal. 1982) (swine flu vaccine alleged to have caused plaintiff's Guillain-Barré disease); Allen v. United States, 588 F. Supp. 247, 416–25 (D. Utah 1984) (residents near atomic test site claimed exposure to radiation caused leukemia and other cancers), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988); *In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 780–90 (E.D.N.Y. 1984) (Vietnam veterans exposed to Agent Orange and dioxin contaminant brought suit for various diseases and birth defects in their offspring), *aff'd*, 818 F.2d 145 (2d Cir. 1987); Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1115 (5th Cir. 1991) (cancer alleged to have resulted from exposure to nickel-cadmium fumes), *cert. denied*, 503 U.S. 912 (1992); Kehm v. Procter & Gamble Co., 580 F. Supp. 890, 898–902 (N.D. Iowa 1982) (toxic shock syndrome alleged to result from use of Rely tampons), *aff'd sub nom.* Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613 (8th Cir. 1983).

6. This terminology and the distinction between general causation and specific causation is widely recognized in court opinions. *See, e.g.*, Kelley v. American Heyer-Schulte Corp., 957 F. Supp. 873, 875–76 (W.D. Tex. 1997) (recognizing the different concepts of general causation and specific causation), *appeal dismissed*, 139 F.3d 899 (5th Cir. 1998); Cavallo v. Star Enter., 892 F. Supp. 756, 771 n.34 (E.D. Va. 1995), *aff'd in part and rev'd in part*, 100 F.3d 1150 (4th Cir. 1996), *cert. denied*, 522 U.S. 1044 (1998); Casey v. Ohio Med. Prods., 877 F. Supp. 1380, 1382 (N.D. Cal. 1995). For a discussion of specific causation, see *infra* § VII.

7. Richard Doll & A. Bradford Hill, *Lung Cancer and Other Causes of Death in Relation to Smoking*, 2 Brit. Med. J. 1071 (1956).

8. *See* Kelley v. American Heyer-Schulte Corp., 957 F. Supp 873, 878 (W.D. Tex. 1997), *appeal dismissed*, 139 F.3d 899 (5th Cir. 1998). Association is more fully discussed *infra* § III. The term is used to describe the relationship between two events (e.g., exposure to a chemical agent and development of disease) that occur more frequently together than one would expect by chance. Association does not necessarily imply a causal effect. Causation is used to describe the association between two events when one event is a necessary link in a chain of events that results in the effect. Of course, alternative causal chains may exist that do not include the agent that result in the same effect. Epidemiologic methods cannot deductively prove causation; indeed, all empirically based science cannot affirmatively prove a causal relation. *See, e.g.*, Stephan J. Lanes, *The Logic of Causal Inference in Medicine, in* Causal Inference 59 (Kenneth J. Rothman ed., 1988). However, epidemiologic evidence can justify an inference that an agent causes a disease. *See infra* § V.

9. *See infra* § IV.

the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge. It is important to emphasize that most studies have flaws.[10] Some flaws are inevitable given the limits of technology and resources. In evaluating epidemiologic evidence, the key questions, then, are the extent to which a study's flaws compromise its findings and whether the effect of the flaws can be assessed and taken into account in making inferences.

A final caveat is that employing the results of group-based studies of risk to make a causal determination for an individual plaintiff is beyond the limits of epidemiology. Nevertheless, a substantial body of legal precedent has developed that addresses the use of epidemiologic evidence to prove causation for an individual litigant through probabilistic means, and these cases are discussed later in this reference guide.[11]

The following sections of this reference guide address a number of critical issues that arise in considering the admissibility of, and weight to be accorded to, epidemiologic research findings. Over the past couple of decades, courts frequently have confronted the use of epidemiologic studies as evidence and recognized their utility in proving causation. As the Third Circuit observed in *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*: "The reliability of expert testimony founded on reasoning from epidemiological data is generally a fit subject for judicial notice; epidemiology is a well-established branch of science and medicine, and epidemiological evidence has been accepted in numerous cases."[12]

Three basic issues arise when epidemiology is used in legal disputes and the methodological soundness of a study and its implications for resolution of the question of causation must be assessed:

1. Do the results of an epidemiologic study reveal an association between an agent and disease?
2. What sources of error in the study may have contributed to an inaccurate result?
3. If the agent is associated with disease, is the relationship causal?

Section II explains the different kinds of epidemiologic studies, and section III addresses the meaning of their outcomes. Section IV examines concerns about the methodological validity of a study, including the problem of sampling er-

---

10. *See In re* Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, 1997 U.S. Dist. LEXIS 6441, at *26–*27 (E.D. Pa. May 5, 1997) (holding that despite potential for several biases in a study that "may . . . render its conclusions inaccurate," the study was sufficiently reliable to be admissible); Joseph L. Gastwirth, *Reference Guide on Survey Research*, 36 Jurimetrics J. 181, 185 (1996) (review essay) ("One can always point to a potential flaw in a statistical analysis.").

11. *See infra* § VII.

12. 911 F.2d 941, 954 (3d Cir. 1990); *see also* Smith v. Ortho Pharm. Corp., 770 F. Supp. 1561, 1571 (N.D. Ga. 1991) (explaining increased reliance of courts on epidemiologic evidence in toxic substances litigation).

ror.[13] Section V discusses general causation, considering whether an agent is capable of causing disease. Section VI deals with methods for combining the results of multiple epidemiologic studies, and the difficulties entailed in extracting a single global measure of risk from multiple studies. Additional legal questions that arise in most toxic substances cases are whether population-based epidemiologic evidence can be used to infer specific causation, and if so, how. Section VII examines issues of specific causation, considering whether an agent caused an individual's disease.

## II. What Different Kinds of Epidemiologic Studies Exist?

### A. Experimental and Observational Studies of Suspected Toxic Agents

To determine whether an agent is related to the risk of developing a certain disease or an adverse health outcome, we might ideally want to conduct an experimental study in which the subjects would be randomly assigned to one of two groups: one group exposed to the agent of interest and the other not exposed. After a period of time, the study participants in both groups would be evaluated for development of the disease. This type of study, called a randomized trial, clinical trial, or true experiment, is considered the gold standard for determining the relationship of an agent to a disease or health outcome. Such a study design is often used to evaluate new drugs or medical treatments and is the best way to ensure that any observed difference between the two groups in outcome is likely to be the result of exposure to the drug or medical treatment.

Randomization minimizes the likelihood that there are differences in relevant characteristics between those exposed to the agent and those not exposed. Researchers conducting clinical trials attempt to use study designs that are placebo controlled, which means that the group not receiving the agent or treatment is given a placebo, and that use double blinding, which means that neither the participants nor those conducting the study know which group is receiving the agent or treatment and which group is given the placebo. However, ethical and practical constraints limit the use of such experimental methodologies to assessing the value of agents that are thought to be beneficial to human beings.

---

13. For a more in-depth discussion of the statistical basis of epidemiology, see David H. Kaye & David A. Freedman, Reference Guide on Statistics § II.A, in this manual, and two case studies: Joseph Sanders, *The Bendectin Litigation: A Case Study in the Life Cycle of Mass Torts*, 43 Hastings L.J. 301 (1992); Devra L. Davis et al., *Assessing the Power and Quality of Epidemiologic Studies of Asbestos-Exposed Populations*, 1 Toxicological & Indus. Health 93 (1985). *See also* References on Epidemiology and References on Law and Epidemiology at the end of this reference guide.

*Reference Guide on Epidemiology*

When an agent's effects are suspected to be harmful, we cannot knowingly expose people to the agent.[14] Instead of the investigator controlling who is exposed to the agent and who is not, most epidemiologic studies are observational—that is, they "observe" a group of individuals who have been exposed to an agent of interest, such as cigarette smoking or an industrial chemical, and compare them with another group of individuals who have not been so exposed. Thus, the investigator identifies a group of subjects who have been knowingly or unknowingly exposed and compares their rate of disease or death with that of an unexposed group. In contrast to clinical studies, in which potential risk factors can be controlled, epidemiologic investigations generally focus on individuals living in the community, for whom characteristics other than the one of interest, such as diet, exercise, exposure to other environmental agents, and genetic background, may contribute to the risk of developing the disease in question. Since these characteristics cannot be controlled directly by the investigator, the investigator addresses their possible role in the relationship being studied by considering them in the design of the study and in the analysis and interpretation of the study results (see *infra* section IV).

## B. The Types of Observational Study Design

Several different types of observational epidemiologic studies can be conducted.[15] Study designs may be chosen because of suitability for investigating the question of interest, timing constraints, resource limitations, or other considerations. An important question that might be asked initially about a given epidemiologic study is whether the study design used was appropriate to the research question.

Most observational studies collect data about both exposure and health outcome in every individual in the study. The two main types of observational studies are cohort studies and case–control studies. A third type of observational study is a cross-sectional study, although cross-sectional studies are rarely useful in identifying toxic agents.[16] A final type of observational study, one in which data about individuals is not gathered, but rather population data about expo-

---

14. Experimental studies in which human beings are exposed to agents known or thought to be toxic are ethically proscribed. *See* Ethyl Corp. v. United States Envtl. Protection Agency, 541 F.2d 1, 26 (D.C. Cir.), *cert. denied*, 426 U.S. 941 (1976). Experimental studies can be used where the agent under investigation is believed to be beneficial, as is the case in the development and testing of new pharmaceutical drugs. *See, e.g.*, E.R. Squibb & Sons, Inc. v. Stuart Pharms., No. 90-1178, 1990 U.S. Dist. LEXIS 15788 (D.N.J. Oct. 16, 1990); Gordon H. Guyatt, *Using Randomized Trials in Pharmacoepidemiology*, *in* Drug Epidemiology and Post-Marketing Surveillance 59 (Brian L. Strom & Giampaolo Velo eds., 1992). Experimental studies may also be conducted that entail discontinuation of exposure to a harmful agent, such as studies in which smokers are randomly assigned to a variety of smoking-cessation programs or no cessation.

15. Other epidemiologic studies collect data about the group as a whole, rather than about each individual in the group. These group studies are discussed *infra* § II.B.4.

16. *See infra* § II.B.3.

339

sure and disease are used, is an ecological study.

The difference between cohort studies and case-control studies is that cohort studies measure and compare the incidence of disease in the exposed and unexposed ("control") groups, while case-control studies measure and compare the frequency of exposure in the group with the disease (the "cases") and the group without the disease (the "controls"). Thus, a cohort study takes the exposed status of participants (the independent variable) and examines its effect on incidence of disease (the dependent variable). A case-control study takes the disease status as the independent variable and examines its relationship with exposure, which is the dependent variable. In a case-control study, the rates of exposure in the cases and the rates in the controls are compared, and the odds of having the disease when exposed to a suspected agent can be compared with the odds when not exposed. The critical difference between cohort studies and case-control studies is that cohort studies begin with exposed people and unexposed people, while case-control studies begin with individuals who are selected based on whether they have the disease or do not have the disease and their exposure to the agent in question is measured. The goal of both types of studies is to determine if there is an association between exposure to an agent and a disease, and the strength (magnitude) of that association.

### 1. Cohort studies

In cohort studies[17] the researcher identifies two groups of individuals: (1) individuals who have been exposed to a substance that is considered a possible cause of a disease and (2) individuals who have not been exposed (see Figure 1).[18] Both groups are followed for a specified length of time, and the proportions of individuals in each group who develop the disease are compared.[19] Thus, as illustrated in Table 1, a researcher would compare the proportion of unexposed individuals (controls) with the disease ($b/(a + b)$) with the proportion of exposed individuals (cohort) with the disease ($d/(c + d)$). If the exposure causes

---

17. Cohort studies also are referred to as prospective studies and follow-up studies.

18. In some studies, there may be several groups, each with a different magnitude of exposure to the agent being studied. Thus, a study of cigarette smokers might include heavy smokers (> 3 packs a day), moderate smokers (1–2 packs a day), and light smokers (< 1 pack a day). *See, e.g.,* Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment,* 316 New Eng. J. Med. 1044 (1987).

19. Sometimes retrospective cohort studies are conducted, in which the researcher gathers historical data about exposure and disease outcome of the exposed cohort. Harold A. Kahn, An Introduction to Epidemiologic Methods 39–41 (1983). Irving Selikoff, in his seminal study of asbestotic disease in insulation workers, included several hundred workers who had died before he began the study. Selikoff was able to obtain information about exposure from union records and information about disease from hospital and autopsy records. Irving J. Selikoff et al., *The Occurrence of Asbestosis Among Insulation Workers in the United States,* 132 Annals N.Y. Acad. Sci. 139, 143 (1965).

*Reference Guide on Epidemiology*

the disease, the researcher would expect a greater proportion of the exposed individuals than of the unexposed individuals to develop the disease.[20]

Figure 1. Design of a Cohort Study



Table 1. Cross-Tabulation of Exposure by Disease Status

|             | No Disease | Disease |
|-------------|:----------:|:-------:|
| Not Exposed | a          | b       |
| Exposed     | c          | d       |

One advantage of the cohort study design is that the temporal relationship between exposure and disease can often be established more readily. By tracking the exposed and unexposed groups over time, the researcher can determine the time of disease onset. This temporal relationship is critical to the question of causation, since exposure must precede disease onset if exposure caused the disease.

As an example, in 1950 a cohort study was begun to determine whether uranium miners exposed to radon were at increased risk for lung cancer as compared with nonminers. The study group (also referred to as the exposed cohort) consisted of 3,400 white, underground miners. The control group (which need not be the same size as the exposed cohort) comprised white nonminers from the same geographic area. Members of the exposed cohort were examined ev-

---

20. Researchers often examine the rate of disease or death in the exposed and control groups. The rate of disease or death entails consideration of the number within a time period. All smokers and nonsmokers will, if followed for 100 years, die. Smokers will die at a greater rate than nonsmokers.

ery three years, and the degree of this cohort's exposure to radon was measured from samples taken in the mines. Ongoing testing for radioactivity and periodic medical monitoring of lungs permitted the researchers to examine whether disease was linked to prior work exposure to radiation and allowed them to discern the relationship between exposure to radiation and disease. Exposure to radiation was associated with the development of lung cancer in uranium miners.[21]

The cohort design is often used in occupational studies such as the one just cited. Since the design is not experimental, and the investigator has no control over what other exposures a subject in the study may have had, an increased risk of disease among the exposed group may be caused by agents other than the exposure of interest. A cohort study of workers in a certain industry that pays below-average wages might find a higher risk of cancer in those workers. This may be because they work in that industry, or, among other reasons, it may be because low-wage groups are exposed to other harmful agents, such as environmental toxins present in higher concentrations in their neighborhoods. In the study design, the researcher must attempt to identify factors other than the exposure that may be responsible for the increased risk of disease. If data are gathered on other possible etiologic factors, the researcher generally uses statistical methods[22] to assess whether a true association exists between working in the industry and cancer. Evaluating whether the association is causal involves additional analysis, as discussed in section V.

### 2. Case-control studies

In case-control studies,[23] the researcher begins with a group of individuals who have a disease (cases) and then selects a group of individuals who do not have the disease (controls). The researcher then compares the groups in terms of past exposures. If a certain exposure is associated with or caused the disease, a higher proportion of past exposure among the cases than among the controls would be expected (see Figure 2).

Thus, for example, in the late 1960s, doctors in Boston were confronted with an unusual incidence of vaginal adenocarcinoma in young female patients. Those patients became the "cases" in a case-control study (because they had the disease in question) and were matched with "controls," who did not have the disease. Controls were selected based on their being born in the same hospitals and at the same time as the cases. The cases and controls were compared for exposure

---

21. This example is based on a study description in Abraham M. Lilienfeld & David E. Lilienfeld, Foundations of Epidemiology 237–39 (2d ed. 1980). The original study is Joseph K. Wagoner et al., *Radiation as the Cause of Lung Cancer Among Uranium Miners*, 273 New Eng. J. Med. 181 (1965).

22. *See* Daniel L. Rubinfeld, Reference Guide on Multiple Regression § II.B, in this manual.

23. Case-control studies are also referred to as retrospective studies, because researchers gather historical information about rates of exposure to an agent in the case and control groups.

*Reference Guide on Epidemiology*

to agents that might be responsible, and researchers found maternal ingestion of DES (diethylstilbestrol) in all but one of the cases but none of the controls.[24]

Figure 2. Design of a Case–Control Study



An advantage of the case-control study is that it usually can be completed in less time and with less expense than a cohort study. Case-control studies are also particularly useful in the study of rare diseases, because if a cohort study were conducted, an extremely large group would have to be studied in order to observe the development of a sufficient number of cases for analysis.[25] A number of potential problems with case–control studies are discussed in section IV.B.

*3. Cross-sectional studies*

A third type of observational study is a cross-sectional study. In this type of study, individuals are interviewed or examined, and the presence of both the exposure of interest and the disease of interest is determined in each individual at a single point in time. Cross-sectional studies determine the presence (prevalence) of both exposure and disease in the subjects and do not determine the development of disease or risk of disease (incidence). Moreover, since both exposure and disease are determined in an individual at the same point in time, it is not possible to establish the temporal relation between exposure and disease—that is, that the exposure preceded the disease, which would be necessary for drawing any causal inference. Thus, a researcher may use a cross-sectional study to determine the connection between a personal characteristic that does not change over time, such as blood type, and existence of a disease, such as aplastic anemia, by examining individuals and determining their blood types and whether they suffer from aplastic anemia. Cross-sectional studies are infrequently used when the exposure of interest is an environmental toxic agent (current smoking status is a poor measure of an individual's history of smoking),

24. *See* Arthur L. Herbst et al., *Adenocarcinoma of the Vagina: Association of Maternal Stilbestrol Therapy with Tumor Appearance*, 284 New Eng. J. Med. 878 (1971).

25. Thus, for example, to detect a doubling of disease caused by exposure to an agent where the incidence of disease is 1 in 100 in the unexposed population would require sample sizes of 3,100 each for a cohort study, but only 177 each for a case-control study. Harold A. Kahn & Christopher T. Sempos, Statistical Methods in Epidemiology 66 (1989).

but these studies can provide valuable leads to further directions for research.[26]

### 4. Ecological studies

Up to now, we have discussed studies in which data on both exposure and health outcome are obtained for each individual included in the study.[27] In contrast, studies that collect data only about the group as a whole are called ecological studies.[28] In ecological studies, information about individuals is generally not gathered; instead, overall rates of disease or death for different groups are obtained and compared. The objective is to identify some difference between the two groups, such as diet, genetic makeup, or alcohol consumption, that might explain differences in the risk of disease observed in the two groups.[29] Such studies may be useful for identifying associations, but they rarely provide definitive causal answers. The difficulty is illustrated below with an ecological study of the relationship between dietary fat and cancer.

If a researcher were interested in determining whether a high dietary fat intake is associated with breast cancer, he or she could compare different countries in terms of their average fat intakes and their average rates of breast cancer. If a country with a high average fat intake also tends to have a high rate of breast cancer, the finding would suggest an association between dietary fat and breast cancer. However, such a finding would be far from conclusive, because it lacks particularized information about an individual's exposure and disease status (i.e., whether an individual with high fat intake is more likely to have breast cancer).[30] In addition to the lack of information about an individual's intake of fat, the researcher does not know about the individual's exposures to other agents (or other factors, such as a mother's age at first birth) that may also be responsible for the increased risk of breast cancer. This lack of information about each individual's exposure to an agent and disease status detracts from the usefulness of the study and can lead to an erroneous inference about the relationship between fat intake and breast cancer, a problem known as an ecological fallacy. The fallacy is assuming that, on average, the individuals in the study who have

26. For more information (and references) about cross-sectional studies, see Leon Gordis, Epidemiology 137–39 (1996).

27. Some individual studies may be conducted in which all members of a group or community are treated as exposed to an agent of interest (e.g., a contaminated water system) and disease status is determined individually. These studies should be distinguished from ecological studies.

28. In *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1551 (D. Colo. 1990), *aff'd*, 972 F.2d 304 (10th Cir. 1992), the plaintiffs attempted to rely on an excess incidence of cancers in their neighborhood to prove causation. Unfortunately, the court confused the role of epidemiology in proving causation with the issue of the plaintiffs' exposure to the alleged carcinogen and never addressed the evidentiary value of the plaintiffs' evidence of a disease cluster (i.e., an unusually high incidence of a particular disease in a neighborhood or community). *Id.* at 1554.

29. David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology 12 (3d ed. 1994).

30. For a discussion of the data on this question and what they might mean, see David Freedman et al., Statistics (3d ed. 1998).

*Reference Guide on Epidemiology*

suffered from breast cancer consumed more dietary fat than those who have not suffered from the disease. This assumption may not be true. Nevertheless, the study is useful in that it identifies an area for further research: the fat intake of individuals who have breast cancer as compared with the fat intake of those who do not. Researchers who identify a difference in disease or death in a demographic study may follow up with a study based on gathering data about individuals.

Another epidemiologic approach is to compare disease rates over time and focus on disease rates before and after a point in time when some event of interest took place.[31] For example, thalidomide's teratogenicity (capacity to cause birth defects) was discovered after Dr. Widukind Lenz found a dramatic increase in the incidence of limb reduction birth defects in Germany beginning in 1960. Yet other than with such powerful agents as thalidomide, which increased the incidence of limb reduction defects by several orders of magnitude, these secular-trend studies (also known as time-line studies) are less reliable and less able to detect modest causal effects than the observational studies described above. Other factors that affect the measurement or existence of the disease, such as improved diagnostic techniques and changes in lifestyle or age demographics, may change over time. If those factors can be identified and measured, it may be possible to control for them with statistical methods. Of course, unknown factors cannot be controlled for in these or any other kind of epidemiologic studies.

## C. Epidemiologic and Toxicologic Studies

In addition to observational epidemiology, toxicology models based on animal studies (in vivo) may be used to determine toxicity in humans.[32] Animal studies have a number of advantages. They can be conducted as true experiments, and researchers control all aspects of the animals' lives. Thus, they can avoid the problem of confounding,[33] which epidemiology often confronts. Exposure can be carefully controlled and measured. Refusals to participate in a study are not an issue, and loss to follow-up very often is minimal. Ethical limitations are diminished, and animals can be sacrificed and their tissues examined, which may improve the accuracy of disease assessment. Animal studies often provide useful

---

31. In *Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1152–53 (10th Cir. 1990), the defendant introduced evidence showing total sales of Bendectin and the incidence of birth defects during the 1970–1984 period. In 1983, Bendectin was removed from the market, but the rate of birth defects did not change. The Tenth Circuit affirmed the lower court's ruling that the time-line data were admissible and that the defendant's expert witnesses could rely on them in rendering their opinions.

32. For an in-depth discussion of toxicology, see Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, in this manual.

33. *See infra* § IV.C.