information about pathological mechanisms and play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiologic studies.

Animal studies have two significant disadvantages, however. First, animal study results must be extrapolated to another species—human beings—and differences in absorption, metabolism, and other factors may result in interspecies variation in responses. For example, one powerful human teratogen, thalidomide, does not cause birth defects in most rodent species.[34] Similarly, some known teratogens in animals are not believed to be human teratogens. In general, it is often difficult to confirm that an agent known to be toxic in animals is safe for human beings.[35] The second difficulty with inferring human causation from animal studies is that the high doses customarily used in animal studies require consideration of the dose–response relationship and whether a threshold no-effect dose exists.[36] Those matters are almost always fraught with considerable, and currently unresolvable, uncertainty.[37]

Toxicologists also use in vitro methods, in which human or animal tissue or cells are grown in laboratories and exposed to certain substances. The problem with this approach is also extrapolation—whether one can generalize the findings from the artificial setting of tissues in laboratories to whole human beings.[38]

Often toxicologic studies are the only or best available evidence of toxicity. Epidemiologic studies are difficult, time-consuming, and expensive, and consequently they do not exist for a large array of environmental agents. Where both animal toxicology and epidemiologic studies are available, no universal rules exist for how to interpret or reconcile them.[39] Careful assessment of the meth-

---

34. Phillip Knightley et al., Suffer the Children: The Story of Thalidomide 271–72 (1979).

35. *See* Ian C.T. Nesbit & Nathan J. Karch, Chemical Hazards to Human Reproduction 98–106 (1983); International Agency for Research on Cancer (IARC), Interpretation of Negative Epidemiological Evidence for Carcinogenicity (N.J. Wald & R. Doll eds., 1985).

36. *See infra* § V.C & note 119.

37. *See* General Elec. Co. v. Joiner, 522 U.S. 136, 143–45 (1997) (holding that the district court did not abuse its discretion in excluding expert testimony on causation based on expert's failure to explain how animal studies supported expert's opinion that agent caused disease in humans).

38. For a further discussion of these issues, see Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology § III.A, in this manual.

39. *See* IARC, *supra* note 35 (identifying a number of substances and comparing animal toxicology evidence with epidemiologic evidence).

A number of courts have grappled with the role of animal studies in proving causation in a toxic substance case. One line of cases takes a very dim view of their probative value. For example, in *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 313 (5th Cir. 1989), *cert. denied,* 494 U.S. 1046 (1990), the court noted the "very limited usefulness of animal studies when confronted with questions of toxicity." A similar view is reflected in *Richardson v. Richardson-Merrell, Inc.,* 857 F.2d 823, 830 (D.C. Cir. 1988), *cert. denied,* 493 U.S. 882 (1989); *Bell v. Swift Adhesives, Inc.,* 804 F. Supp. 1577, 1579–80 (S.D. Ga. 1992); and *Cadarian v. Merrell Dow Pharmaceuticals, Inc.,* 745 F. Supp. 409, 412 (E.D. Mich. 1989). Other courts have been more amenable to the use of animal toxicology in proving causation.

*Reference Guide on Epidemiology*

odological validity and power[40] of the epidemiologic evidence must be under-
taken, and the quality of the toxicologic studies and the questions of interspecies
extrapolation and dose–response relationship must be considered.[41]

Thus, in *Marder v. G.D. Searle & Co.*, 630 F. Supp. 1087, 1094 (D. Md. 1986), *aff'd sub nom.* Wheelahan
v. G.D. Searle & Co., 814 F.2d 655 (4th Cir. 1987), the court observed: "There is a range of scientific
methods for investigating questions of causation—for example, toxicology and animal studies, clinical
research, and epidemiology—which all have distinct advantages and disadvantages." *See also* Villari v.
Terminix Int'l, Inc., 692 F. Supp. 568, 571 (E.D. Pa. 1988); Peterson v. Sealed Air Corp., Nos. 86-
C3498, 88-C9859 Consol., 1991 U.S. Dist. LEXIS 5333, at *27–*29 (N.D. Ill. Apr. 23, 1991); *cf. In re*
Paoli R.R. Yard PCB Litig., 916 F.2d 829, 853–54 (3d Cir. 1990) (questioning the exclusion of animal
studies by the lower court), *cert. denied*, 499 U.S. 961 (1991). The Third Circuit in a subsequent opinion
in *Paoli* observed:

> [I]n order for animal studies to be admissible to prove causation in humans, there must be good
> grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute
> good grounds to reach conclusions about the animals themselves. Thus, the requirement of reliability,
> or "good grounds," extends to each step in an expert's analysis all the way through the step that
> connects the work of the expert to the particular case.

*In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995);
*see also* Cavallo v. Star Enter., 892 F. Supp. 756, 761–63 (E.D. Va. 1995) (courts must examine each of
the steps that lead to an expert's opinion), *aff'd in part and rev'd in part*, 100 F.3d 1150 (4th Cir. 1996),
*cert. denied*, 522 U.S. 1044 (1998).

One explanation for these conflicting lines of cases may be that when there is a substantial body of
epidemiologic evidence that addresses the causal issue, animal toxicology has much less probative value.
That was the case, for example, in the Bendectin cases of *Richardson*, *Brock*, and *Cadarian*. Where
epidemiologic evidence is not available, animal toxicology may be thought to play a more prominent
role in resolving a causal dispute. *See* Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in
Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation*, 86 Nw. U. L. Rev. 643,
680–82 (1992) (arguing that plaintiffs should be required to prove causation by a preponderance of the
available evidence); Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1359 (6th Cir.), *cert. denied*,
506 U.S. 826 (1992); *In re* Paoli R.R. Yard PCB Litig., No. 86-2229, 1992 U.S. Dist. LEXIS 16287,
at *16 (E.D. Pa. Oct. 21, 1992). For another explanation of these cases, see Gerald W. Boston, *A Mass-
Exposure Model of Toxic Causation: The Control of Scientific Proof and the Regulatory Experience*, 18 Colum.
J. Envtl. L. 181 (1993) (arguing that epidemiologic evidence should be required in mass–exposure cases
but not in isolated–exposure cases). *See also* IARC, *supra* note 35; Bernard D. Goldstein & Mary Sue
Henifin, Reference Guide on Toxicology § I.F, in this manual. The Supreme Court, in *General Electric
Co. v. Joiner*, 522 U.S. 136, 144–45 (1997), suggested that there is not a categorical rule for toxicologic
studies, observing, "[W]hether animal studies can ever be a proper foundation for an expert's opinion
[is] not the issue. . . . The [animal] studies were so dissimilar to the facts presented in this litigation that
it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them."

40. *See infra* § IV.A.3.

41. *See* Ellen F. Heineman & Shelia Hoar Zahm, *The Role of Epidemiology in Hazard Evaluation*, 9
Toxic Substances J. 255, 258–62 (1989).

# III. How Should Results of an Epidemiologic Study Be Interpreted?

Epidemiologists are ultimately interested in whether a causal relationship exists between an agent and a disease. However, the first question an epidemiologist addresses is whether an association exists between exposure to the agent and disease. An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance.[42] Although a causal relationship is one possible explanation for an observed association between an exposure and a disease, an association does not necessarily mean that there is a cause–effect relationship. Interpreting the meaning of an observed association is discussed below.

This section begins by describing the ways of expressing the existence and strength of an association between exposure and disease. It reviews ways in which an incorrect result can be produced because of the sampling methods used in all observational epidemiologic studies and then examines statistical methods for evaluating whether an association is real or due to sampling error.

The strength of an association between exposure and disease can be stated as a relative risk, an odds ratio, or an attributable risk (often abbreviated as "RR," "OR," and "AR," respectively). Each of these measurements of association examines the degree to which the risk of disease increases when individuals are exposed to an agent.

## A. Relative Risk

A commonly used approach for expressing the association between an agent and disease is relative risk (RR). It is defined as the ratio of the incidence rate (often referred to as incidence) of disease in exposed individuals to the incidence rate in unexposed individuals:

$$\text{Relative Risk (RR)} = \frac{\text{Incidence rate in the exposed}}{\text{Incidence rate in the unexposed}}$$

The incidence rate of disease reflects the number of cases of disease that develop during a specified period of time divided by the number of persons in the cohort under study.[43] Thus, the incidence rate expresses the risk that a

---

42. A negative association implies that the agent has a protective or curative effect. Because the concern in toxic substances litigation is whether an agent caused disease, this reference guide focuses on positive associations.

43. Epidemiologists also use the concept of prevalence, which measures the existence of disease in a population at a given point in time, regardless of when the disease developed. Prevalence is expressed as the proportion of the population with the disease at the chosen time. *See* Gordis, *supra* note 26, at 32–34.

*Reference Guide on Epidemiology*

member of the population will develop the disease within a specified period of time.

For example, a researcher studies 100 individuals who are exposed to an agent and 200 who are not exposed. After one year, 40 of the exposed individuals are diagnosed as having a disease, and 20 of the unexposed individuals also are diagnosed as having the disease. The relative risk of contracting the disease is calculated as follows:

- The incidence rate of disease in the exposed individuals is 40 cases per year per 100 persons (40/100), or 0.4.

- The incidence rate of disease in the unexposed individuals is 20 cases per year per 200 persons (20/200), or 0.1.

- The relative risk is calculated as the incidence rate in the exposed group (0.4) divided by the incidence rate in the unexposed group (0.1), or 4.0.

A relative risk of 4.0 indicates that the risk of disease in the exposed group is four times as high as the risk of disease in the unexposed group.[44]

In general, the relative risk can be interpreted as follows:

- If the relative risk equals 1.0, the risk in exposed individuals is the same as the risk in unexposed individuals. There is no association between exposure to the agent and disease.

- If the relative risk is greater than 1.0, the risk in exposed individuals is greater than the risk in unexposed individuals. There is a positive association between exposure to the agent and the disease, which could be causal.

- If the relative risk is less than 1.0, the risk in exposed individuals is less than the risk in unexposed individuals. There is a negative association, which could reflect a protective or curative effect of the agent on risk of disease. For example, immunizations lower the risk of disease. The results suggest that immunization is associated with a decrease in disease and may have a protective effect on the risk of disease.

Although relative risk is a straightforward concept, care must be taken in interpreting it. Researchers should scrutinize their results for error. Error in the design of a study could yield an incorrect relative risk. Sources of bias and confounding should be examined.[45] Whenever an association is uncovered, further analysis should be conducted to determine if the association is real or due to an error or bias. Similarly, a study that does not find an association between an agent and disease may be erroneous because of bias or random error.

---

44. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 947 (3d Cir. 1990); Gaul v. United States, 582 F. Supp. 1122, 1125 n.9 (D. Del. 1984).

45. *See infra* § IV.B–C.

## B. Odds Ratio

The odds ratio (OR) is similar to a relative risk in that it expresses in quantitative terms the association between exposure to an agent and a disease.[46] In a case-control study, the odds ratio is the ratio of the odds that a case (one with the disease) was exposed to the odds that a control (one without the disease) was exposed. In a cohort study, the odds ratio is the ratio of the odds of developing a disease when exposed to a suspected agent to the odds of developing the disease when not exposed. The odds ratio approximates the relative risk when the disease is rare.[47]

Consider a case-control study, with results as shown schematically in a 2 x 2 table (Table 2):

Table 2. Cross-Tabulation of Cases and Controls by Exposure Status

|  | Cases | Controls |
|---|---|---|
| Exposed | a | b |
| Not Exposed | c | d |

In a case-control study

$$\text{Odds Ratio (OR)} = \frac{\text{the odds that a case was exposed}}{\text{the odds that a control was exposed}}$$

Looking at the above 2 x 2 table, this ratio can be calculated as

$$\frac{a/c}{b/d}$$

This works out to ad/bc. Since we are multiplying two diagonal cells in the table and dividing by the product of the other two diagonal cells, the odds ratio is also called the cross-products ratio.

Consider the following hypothetical study: A researcher identifies 100 individuals with a disease who serve as "cases" and 100 people without the disease who serve as "controls" for her case-control study. Forty of the 100 cases were exposed to the agent and 60 were not. Among the control group, 20 people were exposed and 80 were not. The data can be presented in a 2 x 2 table (Table 3):

---

46. A relative risk cannot be calculated for a case-control study, because a case-control study begins by examining a group of persons who already have the disease. That aspect of the study design prevents a researcher from determining the rate at which individuals develop the disease. Without a rate or incidence of disease, a researcher cannot calculate a relative risk.

47. *See* Marcello Pagano & Kimberlee Gauvreau, Principles of Biostatistics 320–22 (1993). For further detail about the odds ratio and its calculation, see Kahn & Sempos, *supra* note 25, at 47–56.

Table 3. Case–Control Study Outcome

|  | Cases (with disease) | Controls (no disease) |
|---|---|---|
| Exposed | 40 | 20 |
| Not Exposed | 60 | 80 |
| Total | 100 | 100 |

The calculation of the odds ratio would be

$$OR = \frac{40/60}{20/80} = 2.67$$

If the disease is relatively rare in the general population (about 5% or less), the odds ratio is a good approximation of the relative risk, which means that there is almost a tripling of the disease in those exposed to the agent.[48]

## C. Attributable Risk

A frequently used measurement of risk is the attributable risk (AR). The attributable risk represents the amount of disease among exposed individuals that can be attributed to the exposure. It can also be expressed as the proportion of the disease among exposed individuals that is associated with the exposure (also called the "attributable proportion of risk," the "etiologic fraction" or "attributable risk percent"). The attributable risk reflects the maximum proportion of the disease that can be attributed to exposure to an agent and consequently the maximum proportion of disease that could be potentially prevented by blocking the effect of the exposure or by eliminating the exposure.[49] In other words, if the association is causal, the attributable risk is the proportion of disease in an exposed population that might be caused by the agent and that might be prevented by eliminating exposure to that agent (see Figure 3).[50]

---

48. The odds ratio is usually marginally greater than the relative risk. As the disease in question becomes more common, the difference between the odds ratio and the relative risk grows.

49. Kenneth J. Rothman & Sander Greenland, Modern Epidemiology 53–55 (2d ed. 1998). *See also* Landrigan v. Celotex Corp., 605 A.2d 1079, 1086 (N.J. 1992) (illustrating that a relative risk of 1.55 conforms to an attributable risk of 35%, i.e., (1.55 − 1.0)/1.55 = .35 or 35%).

50. Risk is not zero for the control group (those not exposed) when there are other causal chains that cause the disease which do not require exposure to the agent. For example, some birth defects are the result of genetic sources, which do not require the presence of any environmental agent. Also, some degree of risk in the control group may be the result of background exposure to the agent being studied. For example, nonsmokers in a control group may have been exposed to passive cigarette smoke, which is responsible for some cases of lung cancer and other diseases. *See also* Ethyl Corp. v. United States Envtl. Protection Agency, 541 F.2d 1, 25 (D.C. Cir.), *cert. denied*, 426 U.S. 941 (1976). There are some diseases that do not occur without exposure to an agent; these are known as signature diseases. *See infra* note 128.

*Reference Manual on Scientific Evidence*

Figure 3. Risks in Exposed and Unexposed Groups



To determine the proportion of a disease that is attributable to an exposure, a researcher would need to know the incidence of the disease in the exposed group and the incidence of disease in the unexposed group. The attributable risk is

$$AR = \frac{(\text{incidence in the exposed}) - (\text{incidence in the unexposed})}{\text{incidence in the exposed}}$$

The attributable risk can be calculated using the example described in section III.A. Suppose a researcher studies 100 individuals who are exposed to a substance and 200 who are not exposed. After one year, 40 of the exposed individuals are diagnosed as having a disease, and 20 of the unexposed individuals are also diagnosed as having the disease.

- The incidence of disease in the exposed group is 40 persons out of 100 who contract the disease in a year.
- The incidence of disease in the unexposed group is 20 persons out of 200 (or 10 out of 100) who contract the disease in a year.
- The proportion of disease that is attributable to the exposure is 30 persons out of 40, or 75%.

This means that 75% of the disease in the exposed group is attributable to the exposure. We should emphasize here that "attributable" does not necessarily mean "caused by." Up to this point we have only addressed associations. Inferring causation from an association is addressed in section V.

## D. Adjustment for Study Groups That Are Not Comparable

Populations often differ in characteristics that relate to disease risk, such as age, sex, and race. Florida has a much higher death rate than Alaska.[51] Is sunshine dangerous? Perhaps, but the Florida population is much older than the Alaska population, and some adjustment must be made for the different age demo-

---

51. *See* Lilienfeld & Stolley, *supra* note 29, at 68–70 (mortality rate in Florida approximately three times what it is in Alaska).

graphics. The technique used to accomplish this is called adjustment, and two types of adjustment are used—direct and indirect.

In direct age adjustment, a standard population is used in order to eliminate the effects of any age differences between two study populations. Thus, in comparing two populations, A and B, the age-specific mortality rates for Population A are applied to each age group of the standard reference population, and the numbers of deaths expected in each age group of the standard population are calculated. These expected numbers of deaths are then totaled to yield the number of deaths expected in the standard population if it experienced the mortality risk of Population A. The same procedure is then carried out for Population B. Using these expected numbers of deaths, mortality rates are calculated for the standard population on the basis of the number of deaths expected if it had the mortality experience of Population A and the number of deaths expected if it had the mortality experience of Population B. We can then compare these rates, called age-adjusted rates, knowing that any difference between these rates cannot be attributed to differences in age, since both age-adjusted rates were generated using the same standard population.

A second approach, indirect age adjustment, is often used, for example, in studying mortality in an occupationally exposed population, such as miners or construction workers. To answer the question whether a population of miners has a higher mortality rate than we would expect in a similar population not engaged in mining, we must apply the age-specific rates for a known population, such as all men of the same age, to each age group in the population of interest. This will yield the number of deaths expected in each age group in the population of interest if this population had had the mortality experience of the known population. The number of deaths expected is thus calculated for each age group and totaled; the numbers of deaths that were actually observed in that population are counted. The ratio of the total number of deaths actually observed to the total number of deaths that would be expected if the population of interest actually had the mortality experience of the known population is then calculated. This ratio is called the standardized mortality ratio (SMR). When the outcome of interest is disease rather than death, it is called the standardized morbidity ratio.[52] If the ratio equals 1.0, the observed number of deaths equals the expected number of deaths, and the mortality experience of the population of interest is no different from that of the known population. If the SMR is greater than 1.0, the population of interest has a higher mortality risk than that of the known population, and if the SMR is less than 1.0, the population of interest has a lower mortality risk than that of the known population.

52. *See In re* Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124, 1128 (2d Cir. 1995) (using SMR to describe relative risk of an agent in causing disease). For an example of adjustment used to calculate an SMR for workers exposed to benzene, see Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment*, 316 New Eng. J. Med. 1044 (1987).

Thus, age adjustment provides a way to compare populations while in effect holding age constant. Adjustment is used not only for comparing mortality rates in different populations but also for comparing rates in different groups of subjects selected for study in epidemiologic investigations. Although this discussion has focused on adjusting for age, it is also possible to adjust for any number of other variables, such as gender, race, occupation, and socioeconomic status. It is also possible to adjust for several factors simultaneously.[53]

# IV. What Sources of Error Might Have Produced a False Result?

Incorrect study results occur in a variety of ways. A study may find a positive association (relative risk greater than 1.0) when there is no association. Or a study may erroneously conclude that there is no association when in reality there is. A study may also find an association when one truly exists, but the association found may be greater or less than the real association.

There are three explanations why an association found in a study may be erroneous: chance, bias, and confounding. Before any inferences about causation are drawn from a study, the possibility of these phenomena must be examined.[54]

The findings of a study may be the result of chance (or sampling error) because virtually all epidemiologic studies are based on sampling a small proportion of the relevant population. During the design of a study, the size of the sample can be increased to reduce (but not eliminate) the likelihood of sampling error. Once a study has been completed, statistical methods (discussed in the next subsection) permit an assessment of whether the results of a study are likely to represent a true association or random error.

The two main techniques for assessing random error are statistical significance and confidence intervals. A study that is statistically significant has results that are unlikely to be the result of random error, although the level of significance used entails a somewhat arbitrary determination.[55] A confidence interval

---

53. For further elaboration on adjustment, see Rothman & Greenland, *supra* note 49, at 234–35; Gordis, *supra* note 26, at 49–52; Philip Cole, *Causality in Epidemiology, Health Policy, and Law,* [1997] 27 Envtl. L. Rep. (Envtl. L. Inst.) 10279, 10281 (June 1997).

54. *See* Cole, *supra* note 53, at 10285. In *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 955 (3d Cir. 1990), the court recognized and discussed random sampling error. It then went on to refer to other errors (i.e., systematic bias) that create as much or more error in the outcome of a study. For a similar description of error in study procedure and random sampling, see David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV, in this manual.

55. Describing a study result as "statistically significant" does not mean that the result—the relative risk—is of a significant or substantial magnitude. *Statistical significance does not address the magnitude of the*

provides both the relative risk found in the study and a range (interval) within which the true relative risk resides with some (arbitrarily chosen) level of confidence. Both of these techniques are explained in subsection IV.A.

Bias (or systematic error) also can produce error in the outcome of a study. Epidemiologists attempt to minimize the existence of bias through their study design, which is developed before they begin gathering data. However, even the best designed and conducted studies can have biases, which may be subtle. Consequently, after a study is completed it should be evaluated for potential sources of bias. Sometimes, after bias is identified, the epidemiologist can determine whether the bias would tend to inflate or dilute any association that may exist. Identification of the bias may permit the epidemiologist to make an assessment of whether the study's conclusions are valid. Epidemiologists may reanalyze a study's data to correct for a bias identified in a completed study or to validate the analytic methods used.[56] Common biases and how they may produce invalid results are described in subsection IV.B.

Finally, a study may reach incorrect conclusions about causation because, although the agent and disease are associated, the agent is not a true causal factor. Rather, the agent may be associated with another agent that is the true causal factor, and this factor confounds the relationship being examined in the study. Confounding is explained in subsection IV.C.

## A. What Statistical Methods Exist to Evaluate the Possibility of Sampling Error?[57]

Before detailing the statistical methods used to assess random error (which we use as synonymous with sampling error), we explain two concepts that are central to epidemiology and statistical analysis. Understanding these concepts should facilitate comprehension of the statistical methods.

Epidemiologists often refer to the true association (also called "real association"), which is the association that really exists between an agent and a disease and that might be found by a perfect (but nonexistent) study. The true association is a concept that is used in evaluating the results of a given study even though its value is unknown. By contrast, a study's outcome will produce an observed association, which is known.

---

*relative risk* found in a study, only the likelihood that it would have resulted from random error if there is no real association between the agent and disease.

56. *E.g.*, Richard A. Kronmal et al., *The Intrauterine Device and Pelvic Inflammatory Disease: The Women's Health Study Reanalyzed*, 44 J. Clinical Epidemiology 109 (1991) (reanalysis of a study that found an association between use of IUDs and pelvic inflammatory disease concluded that IUDs do not increase the risk of pelvic inflammatory disease).

57. For a bibliography on the role of statistical significance in legal proceedings, see Sanders, *supra* note 13, at 329 n.138.

Scientists, including epidemiologists, generally begin an empirical study with a hypothesis that they seek to disprove,[58] called the null hypothesis. The null hypothesis states that there is no true association between an agent and a disease. Thus, the epidemiologist begins by technically assuming that the relative risk is 1.0 and seeks to develop data that may disprove the hypothesis.[59]

### 1. False positive error and statistical significance

When a study results in a positive association (i.e., a relative risk greater than 1.0), epidemiologists try to determine whether that outcome represents a true association or is the result of random error.[60] Random error is illustrated by a fair coin yielding five heads out of five tosses,[61] an occurrence that would result, purely by chance, in about 3% of a series of five tosses. Thus, even though the true relative risk is 1.0, an epidemiologic study may find a relative risk greater than 1.0 because of random error. An erroneous conclusion that the null hypothesis is false (i.e., a conclusion that there is a difference in risk when no difference actually exists) owing to random error is called a false positive error or type I error or alpha error.

Common sense leads one to believe that a large enough sample of individuals must be studied if the study is to identify a relationship between exposure to an agent and disease that truly exists. Common sense also suggests that by enlarging the sample size (the size of the study group), researchers can form a more accurate conclusion and reduce the chance of random error in their results. Both statements are correct and can be illustrated by a test to determine if a coin is fair. A test in which a coin is tossed 1,000 times is more helpful than a test in which the coin is tossed only 10 times. Common sense dictates that it is far more likely that a test of a fair coin with 10 tosses will come up, for example, with

---

58. *See, e.g.,* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (1993) (scientific methodology involves generating and testing hypotheses). We should explain that this null-hypothesis testing model may be misleading. The reality is that the vast majority of epidemiologic studies are conducted because the researcher suspects that there is a causal effect and seeks to demonstrate that causal relationship. Nevertheless, epidemiologists prepare their study designs and test the plausibility that any association found in a study was the result of sampling error by using the null hypothesis.

59. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945 (3d Cir. 1990); Stephen E. Fienberg et al., *Understanding and Evaluating Statistical Evidence in Litigation*, 36 Jurimetrics J. 1, 21–24 (1995).

60. Hypothesis testing is one of the most counterintuitive techniques in statistics. Given a set of epidemiologic data, one wants to ask the straightforward, obvious question, What is the probability that the difference between two samples reflects a real difference between the populations from which they were taken? Unfortunately, there is no way to answer this question directly or to calculate the probability. Instead, statisticians—and epidemiologists—address a related but very different question: If there really is no difference between the populations, how probable is it that one would find a difference at least as large as the observed difference between the samples? *See* Expert Evidence: A Practitioner's Guide to Law, Science, and the FJC Manual 91 (Bert Black & Patrick W. Lee eds., 1997).

61. *DeLuca,* 911 F.2d at 946–47.

*Reference Guide on Epidemiology*

80% heads than will a test with 1,000 tosses. For if the test is conducted with larger numbers (1,000 tosses), the stability of the outcome of the test is less likely to be influenced by random error, and the researcher would have greater confidence in the inferences drawn from the data.[62]

One means for evaluating the possibility that an observed association could have occurred as a result of random error is by calculating a *p*-value.[63] A *p*-value represents the probability that a positive association would result from random error if no association were in fact present.[64] Thus, a *p*-value of .1 means that there is a 10% chance that if the true relative risk is 1.0, the observed relative risk (greater than 1.0) in the study was due to random error.[65]

To minimize false positive error, epidemiologists use a convention that the *p*-value must fall below some selected level known as alpha or significance level for the results of the study to be statistically significant.[66] Thus, an outcome is statistically significant when the observed *p*-value for the study falls below the preselected significance level. The most common significance level, or alpha,

---

62. This explanation of numerical stability was drawn from Brief Amicus Curiae of Professor Alvan R. Feinstein in Support of Respondent at 12–13, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) (No. 92-102). *See also* Allen v. United States, 588 F. Supp. 247, 417–18 (D. Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988). The *Allen* court observed that although "[s]mall communities or groups of people are deemed 'statistically unstable'" and "data from small populations must be handled with care [, it] does not mean that [the data] cannot provide substantial evidence in aid of our effort to describe and understand events."

63. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.B, in this manual (*p*-value reflects the implausibility of the null hypothesis).

64. Technically, a *p*-value represents the probability that the study's association or a larger one would occur as a result of sampling error where no association (or, equivalently, the null hypothesis) is the true situation. This means that if one conducted an examination of 20 associations in which the true RR = 1, on average one of those examinations would result in a statistically significant, yet spurious, association.

Unfortunately, some have failed to appreciate the difference between a statement of the probability that the study's outcome would occur as a result of random error (the correct understanding of a *p*-value) if the true association were RR equal to 1 and a statement of the probability that the study's outcome was due to random error (an incorrect understanding of a *p*-value). *See, e.g., In re* TMI Cases Consol. II, 922 F. Supp. 997, 1017 (M.D. Pa. 1996); Barnes v. Secretary of Dep't of Health & Human Servs., No. 92-0032V, 1997 U.S. Claims LEXIS 212, at *22 (Fed. Cl. Sept. 15, 1997) ("The *P* value . . . [measures] the probability that the results could have happened by chance alone."). Conventional statistical methodology does not permit calculation of the latter probability. However, the *p*-value is used to assess the plausibility that a positive association should be taken to disprove the null hypothesis and permit an inference, after assessing the factors discussed in section V *infra*, that the agent causes disease.

65. Technically, a *p*-value of .1 means that if in fact there is no association, 10% of all similar studies would be expected to yield an association the same as, or greater than, the one found in the study due to random error.

66. *Allen*, 588 F. Supp. at 416–17 (discussing statistical significance and selection of a level of alpha); *see also* Sanders, *supra* note 13, at 343–44 (explaining alpha, beta, and their relationship to sample size); *Developments in the Law—Confronting the New Challenges of Scientific Evidence*, 108 Harv. L. Rev. 1481, 1535–36, 1540–46 (1995) [hereinafter *Developments in the Law*].

*Reference Manual on Scientific Evidence*

used in science is .05.[67] A .05 value means that the probability is 5% of observing an association at least as large as that found in the study when in truth there is no association.[68] Although .05 is often the significance level selected, other levels can and have been used.[69] Thus, in its study of the effects of secondhand smoke, the Environmental Protection Agency (EPA) used a .10 standard for significance testing.[70]

67. A common error made by lawyers, judges, and academics is to equate the level of alpha with the legal burden of proof. Thus, one will often see a statement that using an alpha of .05 for statistical significance imposes a burden of proof on the plaintiff far higher than the civil burden of a preponderance of the evidence (i.e., greater than 50%). *See, e.g.,* Ethyl Corp. v. United States Envtl. Protection Agency, 541 F.2d 1, 28 n.58 (D.C. Cir.), *cert. denied,* 426 U.S. 941 (1976); Hodges v. Secretary of Dep't of Health & Human Servs., 9 F.3d 958, 967, 970 (Fed. Cir. 1993) (Newman, J., dissenting); Edward J. Imwinkelried, *The Admissibility of Expert Testimony in* Christophersen v. Allied-Signal Corp.: *The Neglected Issue of the Validity of Nonscientific Reasoning by Scientific Witnesses,* 70 Denv. U. L. Rev. 473, 478 (1993).

This claim is incorrect, although the reasons are a bit complex and a full explanation would require more space and detail than is feasible here. Nevertheless, we sketch out a brief explanation: First, alpha does not address the likelihood that a plaintiff's disease was caused by exposure to the agent; the magnitude of the association bears on that question. *See infra* § VII. Second, significance testing only bears on whether the observed magnitude of association arose as a result of random chance, not on whether the null hypothesis is true. Third, using stringent significance testing to avoid false positive error comes at a complementary cost of inducing false negative error. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 947 (3d Cir. 1990). Fourth, using an alpha of .5 would not be equivalent to saying that the probability the association found is real is 50%, and the probability that it is a result of random error is 50%. Statistical methodology does not permit assessments of those probabilities. *See* Green, *supra* note 39, at 686; Michael D. Green, *Science Is to Law as the Burden of Proof Is to Significance Testing,* 37 Jurimetrics J. 205 (1997) (book review); *see also* David H. Kaye, *Apples and Oranges: Confidence Coefficients and the Burden of Persuasion,* 73 Cornell L. Rev. 54, 66 (1987); David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.B.2, in this manual; *Developments in the Law, supra* note 66, at 1551–56; Allen v. United States, 588 F. Supp. 247, 417 (D. Utah 1984) ("Whether a correlation between a cause and a group of effects is more likely than not—particularly in a legal sense—is a different question from that answered by tests of statistical significance . . . ."), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987), *cert. denied,* 484 U.S. 1004 (1988); Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1357 n.2 (6th Cir.), *cert. denied,* 506 U.S. 826 (1992); *cf.* DeLuca, 911 F.2d at 959 n.24 ("The relationship between confidence levels and the more likely than not standard of proof is a very complex one . . . and in the absence of more education than can be found in this record, we decline to comment further on it.").

68. This means that if one conducted an examination of a large number of associations in which the true RR equals 1, on average 1 in 20 associations found to be statistically significant at a .05 level would be spurious. When researchers examine many possible associations that might exist in their data—known as data dredging—we should expect that even if there are no associations, those researchers will find statistically significant associations in 1 of every 20 associations examined. *See* Rachel Nowak, *Problems in Clinical Trials Go Far Beyond Misconduct,* 264 Science 1538, 1539 (1994).

69. A significance test can be either one-tailed or two-tailed, depending on the null hypothesis selected by the researcher. Since most investigators of toxic substances are only interested in whether the agent increases the incidence of disease (as distinguished from providing protection from the disease), a one-tailed test is often viewed as appropriate. For an explanation of the difference between one-tailed and two-tailed tests, see David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.C.2, in this manual.

70. U.S. Envtl. Protection Agency, Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders (1992); *see also* Turpin, 959 F.2d at 1353–54 n.1 (confidence level frequently set at

Statistical significance is a term that speaks only to the question of sampling error—it does not address the magnitude of any association found in a study.[71] A study may be statistically significant but may find only a very weak association; conversely, a study with small sample sizes may find a high relative risk but still not be statistically significant.[72]

There is some controversy among epidemiologists and biostatisticians about the appropriate role of significance testing.[73] To the strictest significance testers, any study whose *p*-value is not less than the level chosen for statistical significance should be rejected as inadequate to disprove the null hypothesis. Others are

95%, though 90% (which corresponds to an alpha of .10) is also used; selection of the value is "somewhat arbitrary").

71. Unfortunately, some courts have been confused about the relationship between statistical significance and the magnitude of the association. *See In re* Joint E. & S. Dist. Asbestos Litig., 827 F. Supp. 1014, 1041 (S.D.N.Y. 1993), *rev'd on other grounds,* 52 F.3d 1124 (2d Cir. 1995) (concluding that any relative risk less than 1.50 is statistically insignificant).

72. *See* Cole, *supra* note 53, at 10282. While statistical significance and association are two distinct concepts, whether a study's results are statistically significant does depend, in part, on the incidence of disease and the magnitude of any association found in the study. In other words, the more common the disease and the greater the association between an agent and the disease, the more likely that a study's outcome will be statistically significant, all other things being equal. Also critical to alpha is the number of persons participating in the study. As the disease becomes more infrequent, the sample sizes decrease, and the associations found are weaker, it is less likely that the results will be statistically significant.

73. Similar controversy exists among the courts that have confronted the issue of whether statistically significant studies are required to satisfy the burden of production. The leading case advocating statistically significant studies is *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 312 (5th Cir.), *amended,* 884 F.2d 167 (5th Cir. 1989), *cert. denied,* 494 U.S. 1046 (1990). Overturning a jury verdict for the plaintiff in a Bendectin case, the court observed that no statistically significant study had been published that found an increased relative risk for birth defects in children whose mothers had taken Bendectin. The court concluded: "[W]e do not wish this case to stand as a bar to future Bendectin cases in the event that new and statistically significant studies emerge which would give a jury a firmer basis on which to determine the issue of causation." Brock v. Merrell Dow Pharms., Inc., 884 F.2d 167, 167 (5th Cir. 1989).

A number of courts have followed the *Brock* decision or have indicated strong support for significance testing as a screening device. *See* Kelley v. American Heyer-Schulte Corp., 957 F. Supp. 873, 878 (W.D. Tex. 1997) (lower end of confidence interval must be above 1.0—equivalent to requiring that a study be statistically significant—before a study may be relied upon by an expert), *appeal dismissed,* 139 F.3d 899 (5th Cir. 1998); Renaud v. Martin Marietta Corp., 749 F. Supp. 1545, 1555 (D. Colo. 1990) (quoting *Brock* approvingly), *aff'd,* 972 F.2d 304 (10th Cir. 1992); Thomas v. Hoffman-LaRoche, Inc., 731 F. Supp. 224, 228 (N.D. Miss. 1989) (granting judgment n.o.v. and observing that "there is a total absence of any statistically significant study to assist the jury in its determination of the issue of causation"), *aff'd on other grounds,* 949 F.2d 806 (5th Cir.), *cert. denied,* 504 U.S. 956 (1992); Daubert v. Merrell Dow Pharms., Inc., 727 F. Supp. 570, 575 (S.D. Cal. 1989), *aff'd on other grounds,* 951 F.2d 1128 (9th Cir. 1991), *vacated,* 509 U.S. 579 (1993); Wade-Greaux v. Whitehall Labs., Inc., 874 F. Supp. 1441 (D.V.I. 1994); Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 724 (Tex. 1997).

By contrast, a number of courts appear more cautious about using significance testing as a necessary condition, instead recognizing that assessing the likelihood of random error is important in determining the probative value of a study. In *Allen v. United States,* 588 F. Supp. 247, 417 (D. Utah 1984), the court stated, "The cold statement that a given relationship is not 'statistically significant' cannot be read to mean there is no probability of a relationship." The Third Circuit described confidence intervals (i.e., the range of values within which the true value is thought to lie, with a specified level of confidence)

critical of using strict significance testing, which rejects all studies with an observed *p*-value below that specified level. Epidemiologic studies have become increasingly sophisticated in addressing the issue of random error and examining the data from studies to ascertain what information they may provide about the relationship between an agent and a disease, without the rejection of all studies that are not statistically significant.[74]

Calculation of a confidence interval permits a more refined assessment of appropriate inferences about the association found in an epidemiologic study.[75] A confidence interval is a range of values calculated from the results of a study, within which the true value is likely to fall; the width of the interval reflects random error. The advantage of a confidence interval is that it displays more information than significance testing. What a statement about whether a result is statistically significant does not provide is the magnitude of the association found in the study or an indication of how statistically stable that association is. A confidence interval for any study shows the relative risk determined in the study as a point on a numerical axis. It also displays the boundaries of relative risk

and their use as an alternative to statistical significance in *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 948–49 (3d Cir. 1990). *See also* Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1357 (6th Cir.) ("The defendant's claim overstates the persuasive power of these statistical studies. An analysis of this evidence demonstrates that it is possible that Bendectin causes birth defects even though these studies do not detect a significant association."), *cert. denied*, 506 U.S. 826 (1992); *In re* Bendectin Prod. Liab. Litig., 732 F. Supp. 744, 748–49 (E.D. Mich. 1990) (rejecting defendant's claim that plaintiff could not prevail without statistically significant epidemiologic evidence); Berry v. CSX Transp., Inc., 709 So. 2d 552, 570 (Fla. Dist. Ct. App. 1998) (refusing to hold studies that were not statistically significant inadmissible).

Although the trial court had relied in part on the absence of statistically significant epidemiologic studies, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), did not explicitly address the matter. The Court did, however, refer to "the known or potential rate of error" in identifying factors relevant to the scientific validity of an expert's methodology. *Id.* at 594. The Court did not address any specific rate of error, although two cases that it cited affirmed the admissibility of voice spectrograph results that the courts reported were subject to a 2%–6% chance of error owing to either false matches or false eliminations. One commentator has concluded, "*Daubert* did not set a threshold level of statistical significance either for admissibility or for sufficiency of scientific evidence." *Developments in the Law, supra* note 66, at 1535–36, 1540–46. The Supreme Court in *General Electric Co. v. Joiner*, 522 U.S. 136, 145–47 (1997), adverted to the lack of statistical significance in one study relied on by an expert as a ground for ruling that the district court had not abused its discretion in excluding the expert's testimony.

74. *See* Sanders, *supra* note 13, at 342 (describing the improved handling and reporting of statistical analysis in studies of Bendectin after 1980).

75. Kenneth Rothman, Professor of Public Health at Boston University and Adjunct Professor of Epidemiology at the Harvard School of Public Health, is one of the leaders in advocating the use of confidence intervals and rejecting strict significance testing. In *DeLuca*, 911 F.2d at 947, the Third Circuit discussed Rothman's views on the appropriate level of alpha and the use of confidence intervals. In *Turpin*, 959 F.2d at 1353–54 n.1, the court discussed the relationship among confidence intervals, alpha, and power. The use of confidence intervals in evaluating sampling error more generally than in the epidemiologic context is discussed in David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.A, in this manual.

consistent with the data found in the study based on one or several selected
levels of alpha or statistical significance. An example of two confidence intervals
that might be calculated for a study is displayed in Figure 4.

Figure 4. Confidence Intervals



The confidence interval shown in Figure 4 represents a study that found a
relative risk of 1.5, with boundaries of 0.8 to 3.4 for alpha equal to .05 (equiva-
lently, a confidence level of .95) and boundaries of 1.1 to 2.2 for alpha equal to
.10 (equivalently, a confidence level of .90). Because the boundaries of the
confidence interval with alpha set at .05 encompass a relative risk of 1.0, the
study is not statistically significant at that level. By contrast, since the confidence
boundaries for alpha equal to .10 do not include a relative risk of 1.0, the study
does have a positive finding that is statistically significant at that level of alpha.
The larger the sample size in a study (all other things being equal), the narrower
the confidence boundaries will be (indicating greater statistical stability), thereby
reflecting the decreased likelihood that the association found in the study would
occur if the true association is 1.0.[76]

---

76. Where multiple epidemiologic studies are available, a technique known as meta-analysis (*see
infra* § VI) may be used to combine the results of the studies to reduce the numerical instability of all the
studies. *See generally* Diana B. Petitti, Meta-analysis, Decision Analysis, and Cost-Effectiveness Analysis:
Methods for Quantitative Synthesis in Medicine (2d ed. 2000). Meta-analysis is better suited to pooling
results from randomly controlled experimental studies, but if carefully performed it may also be helpful
for observational studies, such as those in the epidemiologic field. *See* Zachary B. Gerbarg & Ralph I.
Horwitz, *Resolving Conflicting Clinical Trials: Guidelines for Meta-Analysis*, 41 J. Clinical Epidemiology
503 (1988).

In *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 856–57 (3d Cir. 1990), *cert. denied*, 499
U.S. 461 (1991), the court discussed the use and admissibility of meta-analysis as a scientific technique.
Overturning the district court's exclusion of a report using meta-analysis, the Third Circuit observed
that meta-analysis is a regularly used scientific technique. The court recognized that the technique
might be poorly performed, and it required the district court to reconsider the validity of the expert's
work in performing the meta-analysis. *See also* E.R. Squibb & Sons, Inc. v. Stuart Pharms., No. 90-
1178, 1990 U.S. Dist. LEXIS 15788, at *41 (D.N.J. Oct. 16, 1990) (acknowledging the utility of meta-
analysis but rejecting its use in that case because one of the two studies included was poorly performed);
Tobin v. Astra Pharm. Prods., Inc., 993 F.2d 528, 538–39 (6th Cir. 1992) (identifying an error in the
performance of a meta-analysis, in which the Food and Drug Administration (FDA) pooled data from

### 2. False negative error

False positives can be reduced by adopting more stringent values for alpha. Using a level of .01 or .001 will result in fewer false positives than using an alpha of .05. The trade-off for reducing false positives is an increase in false negative errors (also called beta errors or type II errors). This concept reflects the possibility that a study will be interpreted not to disprove the null hypothesis when in fact there is a true association of a specified magnitude.[77] The beta for any study can be calculated only based on a specific alternative hypothesis about a given positive relative risk and a specific level of alpha selected;[78] that is, beta, or the likelihood of erroneously failing to reject the null hypothesis, depends on the selection of an alternative hypothesis about the magnitude of association and the level of alpha chosen.

### 3. Power

When a study fails to find a statistically significant association, an important question is whether the result tends to exonerate the agent's toxicity or is essentially inconclusive with regard to toxicity. The concept of power can be helpful in evaluating whether a study's outcome is exonerative or inconclusive.[79]

The power of a study expresses the probability of finding a statistically significant association of a given magnitude (if it exists) in light of the sample sizes used in the study. The power of a study depends on several factors: the sample size; the level of alpha, or statistical significance, specified; the background incidence of disease; and the specified relative risk that the researcher would like to detect.[80] Power curves can be constructed that show the likelihood of finding any given relative risk in light of these factors. Often power curves are used in the design of a study to determine what size the study populations should be.[81]

The power of a study is the complement of beta $(1 - \beta)$. Thus, a study with a likelihood of .25 of failing to detect a true relative risk of $2.0$[82] or greater has a power of .75. This means the study has a 75% chance of detecting a true relative risk of 2.0. If the power of a negative study to find a relative risk of 2.0 or greater

---

control groups in different studies in which some gave the controls a placebo and others gave the controls an alternative treatment), *cert. denied*, 510 U.S. 914 (1993).

77. *See also* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 947 (3d Cir. 1990).

78. *See* Green, *supra* note 39, at 684–89.

79. *See* Fienberg et al., *supra* note 59, at 22–23.

80. *See* Malcolm Gladwell, *How Safe Are Your Breasts?*, New Republic, Oct. 24, 1994, at 22, 26.

81. For examples of power curves, see Kenneth J. Rothman, Modern Epidemiology 80 (1986); Pagano & Gauvreau, *supra* note 47, at 223.

82. We use a relative risk of 2.0 for illustrative purposes because of the legal significance some courts have attributed to this magnitude of association. *See infra* § VII.

is low, it has significantly less probative value than a study with similar results but a higher power.[83]

## B. What Biases May Have Contributed to an Erroneous Association?

Systematic error or bias can produce an erroneous association in an epidemiologic study. Bias may arise in the design or conduct of a study, data collection, or data analysis. When scientists use the term *bias,* it does not necessarily carry an imputation of prejudice or other subjective factors, such as the researcher's desire for a particular outcome. The meaning of scientific bias differs from conventional (and legal) usage, in which bias refers to a partisan point of view.[84] Bias refers to anything (other than random sampling error) that results in error in a study and thereby compromises its validity. The two main classes of bias are selection bias (inappropriate selection of study subjects) and information bias (a flaw in measuring exposure or disease in the study groups).

Most epidemiologic studies have some degree of bias that may affect the outcome. If major bias is present it may invalidate the study results. Finding the bias, however, can be difficult if not impossible. In reviewing the validity of an epidemiologic study, the epidemiologist must identify potential biases and analyze the amount or kind of error that might have been induced by the bias. Often the direction of error can be determined; depending on the specific type of bias, it may exaggerate the real association, dilute it, or even completely mask it.

### 1. Selection bias

Selection bias refers to the error in an observed association that is due to the method of selection of cases and controls (in a case–control study) or exposed and unexposed individuals (in a cohort study).[85] The selection of an appropriate

---

83. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.C.1, in this manual.

84. A Dictionary of Epidemiology 15 (John M. Last ed., 3d ed. 1995); Edmond A. Murphy, The Logic of Medicine 239–62 (1976).

85. Selection bias is defined as "[e]rror due to systematic differences in characteristics between those who are selected for study and those who are not." A Dictionary of Epidemiology, *supra* note 84, at 153.

In *In re "Agent Orange" Product Liability Litigation,* 597 F. Supp. 740, 783 (E.D.N.Y. 1985), *aff'd,* 818 F.2d 145 (2d Cir. 1987), *cert. denied,* 484 U.S. 1004 (1988), the court expressed concern about selection bias. The exposed cohort consisted of young, healthy men who served in Vietnam. Comparing the mortality rate of the exposed cohort and that of a control group made up of civilians might have resulted in error that was due to selection bias. Failing to account for health status as an independent variable tends to understate any association between exposure and disease in studies in which the exposed cohort is healthier.

control group has been described as the Achilles' heel of a case–control study.[86] Selecting members of the control group (those without disease) is problematic in case–control studies if the control participants were selected for reasons that are related to their having the exposure or potential risk factor being studied.

Hospital-based studies, which are relatively common among researchers located in medical centers, illustrate the problem. Suppose an association is found between coffee drinking and coronary heart disease in a study using hospital patients as controls. The problem is that the hospitalized control group may include individuals who had been advised against drinking coffee for medical reasons, such as to prevent aggravation of a peptic ulcer. In other words, the controls may become eligible for the study because of their medical condition, which is in turn related to their exposure status—their likelihood of avoiding coffee. If this is true, the amount of coffee drinking in the control group would understate the extent of coffee drinking expected in people who do not have the disease, and thus bias upwardly (i.e., exaggerate) any odds ratio observed.[87] Bias in hospital studies may also understate the true odds ratio when the exposures at issue led to the cases' hospitalizations and also contributed to the controls' chances of hospitalization.

Just as case–control study controls should be selected independently of their exposure status, in cohort studies, unexposed controls should be selected independently of their disease risk. For example, in a cohort study of cervical cancer, those who are not at risk for the disease—women who have had their cervices removed and men—should be excluded from the study population. Inclusion of such individuals as controls in a cohort study could result in erroneous findings by overstating the association between the agent and the disease.

A further source of selection bias occurs when those selected to participate refuse to participate or drop out before the study is completed. Many studies have shown that individuals who participate in studies differ significantly from those who do not. If a significant portion of either study group refuses to participate in the study, the researcher should investigate reasons for refusal and whether those who refused are different from those who agreed. The researcher can show that those in the study are not a biased sample by comparing relevant characteristics of individuals who refused to participate with those of individuals who participated to show the similarity of the groups or the degree of differences. Similarly, if a significant number of subjects drop out of a study before completion, there may be a problem in determining whether the remaining subjects are representative of the original study populations. The researcher should

---

86. William B. Kannel & Thomas R. Dawber, *Coffee and Coronary Disease*, 289 New Eng. J. Med. 100 (1973) (editorial).

87. Hershel Jick et al., *Coffee and Myocardial Infarction*, 289 New Eng. J. Med. 63 (1973).

examine whether the study groups are still representative of the original study populations.

The fact that a study may suffer from selection bias does not in itself invalidate its results. A number of factors may suggest that a bias, if present, had only limited effect. If the association is particularly strong, for example, bias is less likely to account for all of it. In addition, in studies with multiple control groups, the consistent finding of an association when cases are compared with different control groups suggests that possible biases applicable to a particular control group are not invalidating.

## 2. Information bias

Information bias refers to the bias resulting from inaccurate information about the study participants regarding either their disease or exposure status. In a case-control study, potential information bias is an important consideration because the researcher depends on information from the past to determine exposure and disease and their temporal relationship. In some situations the researcher is required to interview the subjects about past exposures, thus relying on the subjects' memories. Research has shown that individuals with disease (cases) may more readily recall past exposures than individuals with no disease (controls);[88] this creates a potential for bias called recall bias.

For example, consider a case-control study conducted to examine the cause of congenital malformations. The epidemiologist is interested in whether the malformations were caused by an infection during the mother's pregnancy.[89] A group of mothers of malformed infants (cases) and a group of mothers of infants with no malformation (controls) are interviewed regarding infections during pregnancy. Mothers of children with malformations may recall an inconsequential fever or runny nose during pregnancy that readily would be forgotten by a mother who had a normal infant. Even if in reality the infection rate in mothers of malformed children is no different from the rate in mothers of normal children, the result in this study would be an apparently higher rate of infection in the mothers of the children with the malformations solely on the basis of recall differences between the two groups. The issue of recall bias can sometimes be evaluated by finding a second source of data to validate the subject's response

---

88. Steven S. Coughlin, *Recall Bias in Epidemiologic Studies*, 43 J. Clinical Epidemiology 87 (1990).
89. *See* Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 311–12 (5th Cir. 1989) (discussion of recall bias among women who bear children with birth defects), *cert. denied*, 494 U.S. 1046 (1990). We note that the court was mistaken in its assertion that a confidence interval could correct for recall bias, or for any bias for that matter. Confidence intervals are a statistical device for analyzing error that may result from random sampling. Systematic errors (bias) in the design or data collection are not addressed by statistical methods, such as confidence intervals or statistical significance. *See* Green, *supra* note 39, at 667–68; Vincent M. Brannigan et al., *Risk, Statistical Inference, and the Law of Evidence: The Use of Epidemiological Data in Toxic Tort Cases*, 12 Risk Analysis 343, 344–45 (1992).

(e.g., blood test results from prenatal visits or medical records that document symptoms of infection).[90] Alternatively, the mothers' responses to questions about other exposures may shed light on the presence of a bias affecting the recall of the relevant exposures. Thus, if mothers of cases do not recall greater exposure than controls' mothers to pesticides, children with German measles, and so forth, then one can have greater confidence in their recall of illnesses.

Bias may also result from reliance on interviews with surrogates, individuals other than the study subjects. This is often necessary when, for example, a subject (in a case-control study) has died of the disease under investigation.

There are many sources of information bias that affect the measure of exposure, including its intensity and duration. Exposure to the agent can be measured directly or indirectly.[91] Sometimes researchers use a biological marker as a direct measure of exposure to an agent—an alteration in tissue or body fluids that occurs as a result of an exposure and that can be detected in the laboratory. Biological markers are only available for a small number of toxins and only reveal whether a person was exposed. Biological markers rarely help determine the intensity or duration of exposure.[92]

Monitoring devices also can be used to measure exposure directly but often are not available for exposures that occurred in the past. For past exposures, epidemiologists often use indirect means of measuring exposure, such as interviewing workers and reviewing employment records. Thus, all those employed to install asbestos insulation may be treated as having been exposed to asbestos during the period that they were employed. However, there may be a wide variation of exposure within any job, and these measures may have limited applicability to a given individual. If the agent of interest is a drug, medical or hospital records can be used to determine past exposure. Thus, retrospective

---

90. Two researchers who used a case-control study to examine the association between congenital heart disease and the mother's use of drugs during pregnancy corroborated interview data with the mother's medical records. *See* Sally Zierler & Kenneth J. Rothman, *Congenital Heart Disease in Relation to Maternal Use of Bendectin and Other Drugs in Early Pregnancy*, 313 New Eng. J. Med. 347, 347–48 (1985).

91. *See* Paoli R.R. Yard PCB Litig., No. 86-2229, 1992 U.S. Dist LEXIS 18430, at *9–*11 (E.D. Pa. Oct. 21, 1992) (discussing valid methods of determining exposure to chemicals).

92. Dose generally refers to the intensity or magnitude of exposure multiplied by the time exposed. *See* Sparks v. Owens-Illinois, Inc., 38 Cal. Rptr. 2d 739, 742 (Ct. App. 1995). For a discussion of the difficulties of determining dose from atomic fallout, see *Allen v. United States*, 588 F. Supp. 247, 425–26 (D. Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988). The timing of exposure may also be critical, especially if the disease of interest is a birth defect. In *Smith v. Ortho Pharmaceutical Corp.*, 770 F. Supp. 1561, 1577 (N.D. Ga. 1991), the court criticized a study for its inadequate measure of exposure to spermicides. The researchers had defined exposure as receipt of a prescription for spermicide within 600 days of delivery, but this definition of exposure is too broad because environmental agents are only likely to cause birth defects during a narrow band of time.

A different, but related, problem often arises in court. Determining the plaintiff's exposure to the alleged toxic substance always involves a retrospective determination and may involve difficulties simi-

occupational or environmental measurements of exposure are usually less accurate than prospective studies or follow-up studies, especially ones in which a drug or medical intervention is the independent variable being measured.

The route (e.g., inhalation or absorption), duration, and intensity of exposure are important factors in assessing disease causation. Even with environmental monitoring, the dose measured in the environment generally is not the same as the dose that reaches internal target organs. If the researcher has calculated the internal dose of exposure, the scientific basis for this calculation should be examined for soundness.[93]

In assessing whether the data may reflect inaccurate information, one must assess whether the data were collected from objective and reliable sources. Medical records, government documents, employment records, death certificates, and interviews are examples of data sources that are used by epidemiologists to measure both exposure and disease status.[94] The accuracy of a particular source may affect the validity of a research finding. If different data sources are used to collect information about a study group, differences in the accuracy of those sources may affect the validity of the findings. For example, using employment records to gather information about exposure to narcotics probably would lead to inaccurate results, since employees tend to keep such information private. If the researcher uses an unreliable source of data, the study may not be useful to the court.

The kinds of quality-control procedures used may affect the accuracy of the data. For data collected by interview, quality-control procedures should probe the reliability of the individual and whether the information is verified by other sources. For data collected and analyzed in the laboratory, quality-control procedures should probe the validity and reliability of the laboratory test.

Information bias may also result from inaccurate measurement of disease status. The quality and sophistication of the diagnostic methods used to detect a

---

lar to those faced by an epidemiologist planning a study. Thus, in *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1113 (5th Cir. 1991), *cert. denied,* 503 U.S. 912 (1992), the court criticized the plaintiff's expert, who relied on an affidavit of a co-worker to determine the dose of nickel and cadmium to which the decedent had been exposed.

In asbestos litigation, a number of courts have adopted a requirement that the plaintiff demonstrate (1) regular use by an employer of the defendant's asbestos-containing product; (2) the plaintiff's proximity to that product; and (3) exposure over an extended period of time. *See, e.g.,* Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162–64 (4th Cir. 1986).

93. *See also* Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology § I.D, in this manual.

94. Even these sources may produce unanticipated error. Identifying the causal connection between asbestos and mesothelioma, a rare form of cancer, was complicated and delayed because doctors who were unfamiliar with mesothelioma erroneously identified other causes of death in death certificates. *See* David E. Lilienfeld & Paul D. Gunderson, *The "Missing Cases" of Pleural Malignant Mesothelioma in Minnesota, 1979–81: Preliminary Report,* 101 Pub. Health Rep. 395, 397–98 (1986).

disease should be assessed. The proportion of subjects who were examined also should be questioned. If, for example, many of the subjects refused to be tested, the fact that the test used was of high quality would be of relatively little value.

The scientific validity of the research findings is influenced by the reliability of the diagnosis of disease or health status.[95] For example, a researcher interested in studying spontaneous abortion in the first trimester needs to test women for pregnancy. Diagnostic criteria that are accepted by the medical community should be used to make the diagnosis. If a diagnosis is made using an unreliable home pregnancy kit known to have a high rate of false positive results (indicating pregnancy when the woman is not pregnant), the study will overestimate the number of spontaneous abortions.

Misclassification bias is a form of information bias in which, because of problems with the information available, individuals in the study may be misclassified with regard to exposure status or disease status. Misclassification bias has been subdivided into differential misclassification and nondifferential misclassification. Nondifferential misclassification occurs when inaccuracies in determining exposure are independent of disease status or when inaccuracies in diagnoses are independent of exposure status. This is a common problem resulting from the limitations of data collection. Generally, nondifferential misclassification bias leads to a shift in the odds ratio toward one, or, in other words, toward a finding of no effect. Thus, if the errors are nondifferential, it is generally misguided to criticize an apparent association between an exposure and disease on the grounds that data were inaccurately classified. Instead, nondifferential misclassification generally serves to reduce the observed association below its true magnitude.

Differential misclassification refers to the differential error in determining exposure in cases as compared with controls, or disease status in unexposed cohorts relative to exposed cohorts. In a case-control study this would occur, for example, if, in the process of anguishing over the possible causes of the disease, parents of ill children recalled more exposures to a particular agent than actually occurred, or if parents of the controls, for whom the issue was less emotionally charged, recalled fewer. This can also occur in a cohort study in which, for example, birth control users, the exposed cohort, are monitored more closely for potential side effects, leading to a higher rate of disease identification in that cohort than in the unexposed cohort. Depending on how the misclassification occurs, a differential bias can produce an error in either direction—the exaggeration or understatement of an association.

95. In *In re Swine Flu Immunization Products Liability Litigation*, 508 F. Supp. 897, 903 (D. Colo. 1981), *aff'd sub nom.* Lima v. United States, 708 F.2d 502 (10th Cir. 1983), the court critically evaluated a study relied on by an expert whose testimony was stricken. In that study, determination of whether a patient had Guillain-Barré syndrome was made by medical clerks, not physicians who were familiar with diagnostic criteria.

### 3. Other conceptual problems

Sometimes studies are flawed because of flawed definitions or premises that do not fall under the rubric of selection bias or information bias. For example, if the researcher defines the disease of interest as all birth defects, rather than a specific birth defect, he or she must have a scientific basis to hypothesize that the effects of the agent being investigated could be so varied. If the effect is in fact more limited, the result of this conceptualization error could be to dilute or mask any real effect that the agent might have on a specific type of birth defect.[96]

Examining a study for potential sources of bias is an important task that helps determine the accuracy of a study's conclusions. In addition, when a source of bias is identified, it may be possible to determine whether the error tended to exaggerate or understate the true association. Thus, bias may exist in a study that nevertheless has probative value.

Even if one concludes that the findings of a study are statistically stable and that biases have not created significant error, additional considerations remain. As repeatedly noted, an association does not necessarily mean a causal relationship exists. To make a judgment about causation, a knowledgeable expert must consider the possibility of confounding factors. The expert must also evaluate several criteria to determine whether an inference of causation is appropriate. These matters are discussed below.

## C. Could a Confounding Factor Be Responsible for the Study Result?[97]

Even when an association exists, researchers must determine whether the exposure causes the disease or whether the exposure and disease are caused by some other confounding factor. A confounding factor is both a risk factor for the disease and a factor associated with the exposure of interest. For example, researchers may conduct a study that finds individuals with gray hair have a higher rate of death than those with hair of another color. Instead of hair color having an impact on death, the results might be explained by the confounding factor of age. If old age is associated differentially with the gray-haired group (those with gray hair tend to be older), old age may be responsible for the association found between hair color and death.[98] Researchers must separate the relationship be-

---

96. In *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 312 (5th Cir. 1989), *cert. denied*, 494 U.S. 1046 (1990), the court discussed a reanalysis of a study in which the effect was narrowed from all congenital malformations to limb reduction defects. The magnitude of the association changed by 50% when the effect was defined in this narrower fashion. *See* Rothman & Greenland, *supra* note 49, at 132 ("Unwarranted assurances of a lack of any effect can easily emerge from studies in which a wide range of etiologically unrelated outcomes are grouped.").

97. *See* Grassis v. Johns-Manville Corp., 591 A.2d 671, 675 (N.J. Super. Ct. App. Div. 1991) (discussing the possibility that confounders may lead to an erroneous inference of a causal relationship).

98. This example is drawn from Kahn & Sempos, *supra* note 25, at 63.

tween gray hair and risk of death from that of old age and risk of death. When researchers find an association between an agent and a disease, it is critical to determine whether the association is causal or the result of confounding.[99] Some epidemiologists classify confounding as a form of bias. However, confounding is a reality—that is, the observed association of a factor and a disease is actually the result of an association with a third, confounding factor. Failure to recognize confounding can introduce a bias—error—into the findings of the study.

In 1981, Dr. Brian MacMahon, Professor and Chairman of the Department of Epidemiology at the Harvard School of Public Health, reported an association between coffee drinking and cancer of the pancreas in the *New England Journal of Medicine*.[100] This observation caused a great stir, and in fact, one coffee distributor ran a large advertisement in the *New York Times* refuting the findings of the study. What could MacMahon's findings mean? One possibility is that the association is causal and that drinking coffee causes an increased risk of cancer of the pancreas. However, there is also another possibility. We know that smoking is an important risk factor for cancer of the pancreas. We also know that it is difficult to find a smoker who does not drink coffee. Thus, drinking coffee and smoking are associated. An observed association between coffee consumption and an increased risk of cancer of the pancreas could reflect the fact that smoking causes cancer of the pancreas and that smoking also is associated closely with coffee consumption. The association MacMahon found between drinking coffee and pancreatic cancer could be due to the confounding factor of smoking. To be fair to MacMahon, we must note that he was aware of the possibility of confounding and took it into account in his study design by gathering and analyzing data separately for smokers and nonsmokers. The association between coffee and pancreatic cancer remained even when smoking was taken into account.

The main problem in many observational studies such as MacMahon's is that the individuals are not assigned randomly to the groups being compared.[101] As discussed above, randomization maximizes the possibility that exposures other

---

99. Confounding can bias a study result by either exaggerating or diluting any true association. One example of a confounding factor that may result in a study's outcome understating an association is vaccination. Thus, if a group exposed to an agent has a higher rate of vaccination for the disease under study than the unexposed group, the vaccination may reduce the rate of disease in the exposed group, thereby producing an association that is less than the true association without the confounding of vaccination.

100. Brian MacMahon et al., *Coffee and Cancer of the Pancreas*, 304 New Eng. J. Med. 630 (1981).

101. Randomization attempts to ensure that the presence of a characteristic, such as coffee drinking, is governed by chance, as opposed to being determined by the presence of an underlying medical condition. For additional comments on randomization and confounding, see the Glossary of Terms.

*Reference Guide on Epidemiology*

than the one under study are evenly distributed between the exposed and the control cohorts.[102] In observational studies, by contrast, other forces, including self-selection, determine who is exposed to other (possibly causal) factors. The lack of randomization leads to the potential problem of confounding. Thus, for example, the exposed cohort might consist of those who are exposed at work to an agent suspected of being an industrial toxin. The members of this cohort may, however, differ from controls by residence, socioeconomic status, age, or other extraneous factors.[103] These other factors may be causing the disease, but because of potential confounding, an apparent (yet false) association of the disease with exposure to the agent may appear. Confounders, like smoking in the MacMahon study, do not reflect an error made by the investigators; rather, they reflect the inherently "uncontrolled" nature of observational studies. When they can be identified, confounders should be taken into account. Confounding factors that are suspected or known in advance can be controlled during the study design through study-group selection. Unanticipated confounding factors that are suspected after data collection can sometimes be controlled during data analysis, if data have been gathered about them.

MacMahon's study found that coffee drinkers had a higher rate of pancreatic cancer than those who did not drink coffee. To evaluate whether smoking is a confounding factor, the researcher would divide each of the exposed and control groups into smoking and nonsmoking subgroups to examine whether subjects' smoking status affects the study results. If the outcome in the smoking subgroups is the same as that in the nonsmoking subgroups, smoking is not a confounding factor. If the subjects' smoking status affects the outcome, then smoking is a confounder, for which adjustment is required. If the association between coffee drinking and pancreatic cancer completely disappears when the subjects' smoking status is considered, then smoking is a confounder that fully accounts for the association with coffee observed. Table 4 reveals a hypothetical study's results, with smoking being a weak confounding factor, which, when accounted for, does not eliminate the association between coffee drinking and cancer.

---

102. *See* Rothman & Greenland, *supra* note 49, at 124; *see also supra* § II.A.

103. *See, e.g., In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 783 (E.D.N.Y. 1984) (discussing the problem of confounding that might result in a study of the effect of exposure to Agent Orange on Vietnam servicemen), *aff'd*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988).

Table 4. Pancreatic Cancer Study Data

| Pancreatic Cancer Status | All Subjects | | Smokers >1 Pack per Day | | Nonsmokers | |
|---|---|---|---|---|---|---|
| | Controls | Coffee Drinkers | Controls | Coffee Drinkers | Controls | Coffee Drinkers |
| Cancer | 14 | 17 | 8 | 11 | 6 | 6 |
| No Cancer | 1,393 | 476 | 733 | 263 | 660 | 213 |
| RR | 1.1 | 3.9 | 1.2 | 4.6 | 1.0 | 3.1 |

*Note:* RR = relative risk.

There is always a real risk that an undiscovered or unrecognized confounding factor may contribute to a study's findings, by either magnifying or reducing the observed association.[104] It is, however, necessary to keep that risk in perspective. Often the mere possibility of uncontrolled confounding is used to call into question the results of a study. This was certainly the strategy of those seeking, or unwittingly helping, to undermine the implications of the studies persuasively linking cigarette smoking to lung cancer. The critical question is whether it is plausible that the findings of a given study could indeed be due to unrecognized confounders.

### 1. What techniques can be used to prevent or limit confounding?

Choices in the design of a research project (e.g., methods for selecting the subjects) can prevent or limit confounding. When a factor or factors, such as age, sex, or even smoking status, are considered potential confounders in a study, investigators can limit the differential distribution of these factors in the study groups by selecting controls to "match" cases (or the exposed group) in terms of these variables. If the two groups are matched, for example, by age, then any association observed in the study cannot be due to age, the matched variable.[105]

Restricting the persons who are permitted as subjects in a study is another method to control for confounders. If age or sex is suspected as a confounder, then the subjects enrolled in a study can be limited to those of one sex and those who are within a specified age range. When there is no variance among subjects in a study with regard to a potential confounder, confounding as a result of that variable is eliminated.

---

104. Rothman & Greenland, *supra* note 49, at 120; *see also supra* § II.A.

105. Selecting a control population based on matched variables necessarily affects the representativeness of the selected controls and may affect how generalizable the study results are to the population at large. However, for a study to have merit, it must first be internally valid, that is, it must not be subject to unreasonable sources of bias or confounding. Only after a study has been shown to meet this standard does its universal applicability or generalizability to the population at large become an issue. When a study population is not representative of the general or target population, existing scientific knowledge may permit reasonable inferences about the study's broader applicability, or additional confirmatory studies of other populations may be necessary.

*Reference Guide on Epidemiology*

### 2. What techniques can be used to identify confounding factors?

Once the study data are ready to be analyzed, the researcher must assess a range of factors that could influence risk. In the case of MacMahon's study, the researcher would evaluate whether smoking is a confounding factor by comparing the risk of pancreatic cancer in all coffee drinkers (including smokers) with the risk in nonsmoking coffee drinkers. If the risk is substantially the same, smoking is not a confounding factor (e.g., smoking does not distort the relationship between coffee drinking and the development of pancreatic cancer), which is what MacMahon found. If the risk is substantially different, but still exists in the nonsmoking group, then smoking is a confounder, but doesn't wholly account for the association with coffee. If the association disappears, then smoking is a confounder that fully accounts for the association with coffee observed.

### 3. What techniques can be used to control for confounding factors?

To control for confounding factors during data analysis, researchers can use one of two techniques: stratification or multivariate analysis.

Stratification reduces or eliminates confounding by evaluating the effect of an exposure at different levels (strata) of exposure to the confounding variable. Statistical methods then can be applied to combine the results of exposure at each stratum into an overall single estimate of risk. For example, in MacMahon's study of smoking and pancreatic cancer, if smoking had been a confounding factor, the researchers could have stratified the data by creating subgroups based on how many cigarettes each subject smoked a day (e.g., a nonsmoking group, a light smoking group, a medium smoking group, and a heavy smoking group). When different rates of pancreatic cancer for people in each group who drink the same amount of coffee are compared, the effect of smoking on pancreatic cancer is revealed. The effect of the confounding factor can then be removed from the study results.

Multivariate analysis controls for the confounding factor through mathematical modeling. Models are developed to describe the simultaneous effect of exposure and confounding factors on the increase in risk.[106]

Both of these methods allow for "adjustment" of the effect of confounders. They both modify an observed association to take into account the effect of risk factors that are not the subject of the study and that may distort the association between the exposure being studied and the disease outcomes.

If the association between exposure and disease remains after the researcher completes the assessment and adjustment for confounding factors, the researcher then applies the guidelines described in section V to determine whether an inference of causation is warranted.

106. For a more complete discussion, of multivariate analysis, see Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in this manual.

# V. General Causation: Is an Exposure a Cause of the Disease?

Once an association has been found between exposure to an agent and development of a disease, researchers consider whether the association reflects a true cause–effect relationship. When epidemiologists evaluate whether a cause–effect relationship exists between an agent and disease, they are using the term causation in a way similar to, but not identical with, the way the familiar "but for," or sine qua non, test is used in law for cause in fact. "An act or an omission is not regarded as a cause of an event if the particular event would have occurred without it."[107] This is equivalent to describing the act or occurrence as a necessary link in a chain of events that results in the particular event.[108] Epidemiologists use causation to mean that an increase in the incidence of disease among the exposed subjects would not have occurred had they not been exposed to the agent. Thus, exposure is a necessary condition for the increase in the incidence of disease among those exposed.[109] The relationship between the epidemiologic concept of cause and the legal question of whether exposure to an agent caused an individual's disease is addressed in section VII.

As mentioned in section I, epidemiology cannot objectively prove causation; rather, causation is a judgment for epidemiologists and others interpreting the epidemiologic data. Moreover, scientific determinations of causation are inherently tentative. The scientific enterprise must always remain open to reassessing the validity of past judgments as new evidence develops.

In assessing causation, researchers first look for alternative explanations for the association, such as bias or confounding factors, which were discussed in section IV. Once this process is completed, researchers consider how guidelines

---

107. W. Page Keeton et al., Prosser and Keeton on the Law of Torts 265 (5th ed. 1984); *see also* Restatement (Second) of Torts § 432(1) (1965).

When multiple causes are each operating and capable of causing an event, the but-for, or necessary-condition, concept for causation is problematic. This is the familiar "two-fires" scenario in which two independent fires simultaneously burn down a house and is sometimes referred to as overdetermined cause. Neither fire is a but-for, or necessary condition, for the destruction of the house, because either fire would have destroyed the house. *See id.* § 432(2). This two-fires situation is analogous to an individual being exposed to two agents, each of which is capable of causing the disease contracted by the individual. A difference between the disease scenario and the fire scenario is that, in the former, one will have no more than a probabilistic assessment of whether each of the exposures would have caused the disease in the individual.

108. *See supra* note 8.

109. *See* Rothman & Greenland, *supra* note 49, at 8 ("We can define a cause of a specific disease event as an antecedent event, condition, or characteristic that was necessary for the occurrence of the disease at the moment it occurred, given that other conditions are fixed."); Allen v. United States, 588 F. Supp. 247, 405 (D. Utah 1984) (quoting a physician on the meaning of the statement that radiation causes cancer), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988).

for inferring causation from an association apply to the available evidence. These guidelines consist of several key inquiries that assist researchers in making a judgment about causation.[110] Most researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn.[111]

The factors that guide epidemiologists in making judgments about causation are

1. temporal relationship;
2. strength of the association;
3. dose–response relationship;
4. replication of the findings;
5. biological plausibility (coherence with existing knowledge);
6. consideration of alternative explanations;
7. cessation of exposure;
8. specificity of the association; and
9. consistency with other knowledge.

There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines. One or more factors may be absent even when a true causal relationship exists. Similarly, the existence of some factors does not ensure that a causal relationship exists. Drawing causal inferences after finding an association and considering these factors requires judgment and searching analysis, based on biology, of why a factor or factors may be absent despite a causal relationship, and vice-versa. While the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using scientific methodology.

---

110. *See* Mervyn Susser, Causal Thinking in the Health Sciences: Concepts and Strategies in Epidemiology (1973); *In re* Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124, 1128–30 (2d Cir. 1995) (discussing lower courts' use of factors to decide whether an inference of causation is justified when an association exists).

111. Berry v. CSX Transp., Inc., 709 So. 2d 552, 568 n.12 (Fla. Dist. Ct. App. 1998) ("Almost all genres of research articles in the medical and behavioral sciences conclude their discussion with qualifying statements such as 'there is still much to be learned.' This is not, as might be assumed, an expression of ignorance, but rather an expression that all scientific fields are open-ended and can progress from their present state . . . ."); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387 App. B. at 1446–51 (D. Or. 1996) (report of Merwyn R. Greenlick, court-appointed epidemiologist). In *Cadarian v. Merrell Dow Pharmaceuticals, Inc.*, 745 F. Supp. 409 (E.D. Mich. 1989), the court refused to permit an expert to rely on a study that the authors had concluded should not be used to support an inference of causation in the absence of independent confirmatory studies. The court did not address the question whether the degree of certainty used by epidemiologists before making a conclusion of cause was consistent with the legal standard. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 957 (3d Cir. 1990) (standard of proof for scientific community is not necessarily appropriate standard for expert opinion in civil litigation); Wells v. Ortho Pharm. Corp., 788 F.2d 741, 745 (11th Cir.), *cert. denied*, 479 U.S. 950 (1986).