*Reference Manual on Scientific Evidence*

These guidelines reflect criteria proposed by the U.S. Surgeon General in 1964[112] in assessing the relationship between smoking and lung cancer and expanded upon by A. Bradford Hill in 1965.[113]

## A. Is There a Temporal Relationship?

A temporal, or chronological, relationship must exist for causation. If an exposure causes disease, the exposure must occur before the disease develops.[114] If the exposure occurs after the disease develops, it cannot cause the disease. Although temporal relationship is often listed as one of many factors in assessing whether an inference of causation is justified, it is a necessary factor: Without exposure before disease, causation cannot exist.

## B. How Strong Is the Association Between the Exposure and Disease?[115]

The relative risk is one of the cornerstones for causal inferences.[116] Relative risk measures the strength of the association. The higher the relative risk, the greater the likelihood that the relationship is causal.[117] For cigarette smoking, for example, the estimated relative risk for lung cancer is very high, about 10.[118] That is, the risk of lung cancer in smokers is approximately ten times the risk in nonsmokers.

A relative risk of 10, as seen with smoking and lung cancer, is so high that it is extremely difficult to imagine any bias or confounding factor that might account for it. The higher the relative risk, the stronger the association and the lower the chance that the effect is spurious. Although lower relative risks can

112. U.S. Dep't of Health, Educ., and Welfare, Public Health Serv., Smoking and Health: Report of the Advisory Committee to the Surgeon General (1964).

113. A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965) (Hill acknowledged that his factors could only serve to assist in the inferential process: "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*.").

114. *See* Carroll v. Litton Sys., Inc., No. B–C–88–253, 1990 U.S. Dist. LEXIS 16833, at *29 (W.D.N.C. Oct. 29, 1990) ("[I]t is essential for . . . [the plaintiffs' medical experts opining on causation] to know that exposure preceded plaintiffs' alleged symptoms in order for the exposure to be considered as a possible cause of those symptoms . . . .").

115. Assuming that an association is determined to be causal, the strength of the association plays an important role legally in determining the specific causation question—whether the agent caused an individual plaintiff's injury. *See infra* § VII.

116. *See supra* § III.A.

117. *See* Cook v. United States, 545 F. Supp. 306, 316 n.4 (N.D. Cal. 1982); Landrigan v. Celotex Corp., 605 A.2d 1079, 1085 (N.J. 1992). The use of the strength of the association as a factor does not reflect a belief that weaker effects occur less frequently than stronger effects. *See* Green, *supra* note 39, at 652–53 n.39. Indeed, the apparent strength of a given agent is dependent on the prevalence of the other necessary elements that must occur with the agent to produce the disease, rather than on some inherent characteristic of the agent itself. *See* Rothman & Greenland, *supra* note 49, at 9–11.

118. *See* Doll & Hill, *supra* note 7.

*Reference Guide on Epidemiology*

reflect causality, the epidemiologist will scrutinize such associations more closely because there is a greater chance that they are the result of uncontrolled confounding or biases.

## C. Is There a Dose–Response Relationship?

A dose–response relationship means that the more intense the exposure, the greater the risk of disease. Generally, higher exposures should increase the incidence (or severity) of disease. However, some causal agents do not exhibit a dose–response relationship when, for example, there is a threshold phenomenon (i.e., an exposure may not cause disease until the exposure exceeds a certain dose).[119] Thus, a dose–response relationship is strong, but not essential, evidence that the relationship between an agent and disease is causal.

## D. Have the Results Been Replicated?

Rarely, if ever, does a single study conclusively demonstrate a cause–effect relationship.[120] It is important that a study be replicated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists.

The need to replicate research findings permeates most fields of science. In epidemiology, research findings often are replicated in different populations.[121] Consistency in these findings is an important factor in making a judgment about causation. Different studies that examine the same exposure–disease relationship

119. The question whether there is a no-effect threshold dose is a controversial one in a variety of toxic substances areas. *See, e.g.,* Irving J. Selikoff, Disability Compensation for Asbestos-Associated Disease in the United States: Report to the U.S. Department of Labor 181–220 (1981); Paul Kotin, *Dose–Response Relationships and Threshold Concepts,* 271 Annals N.Y. Acad. Sci. 22 (1976); K. Robock, *Based on Available Data, Can We Project an Acceptable Standard for Industrial Use of Asbestos? Absolutely,* 330 Annals N.Y. Acad. Sci. 205 (1979); Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1536 (D.C. Cir.) (dose–response relationship for low doses is "one of the most sharply contested questions currently being debated in the medical community"), *cert. denied,* 469 U.S. 1062 (1984); *In re* TMI Litig. Consol. Proc., 927 F. Supp. 834, 844–45 (M.D. Pa. 1996) (discussing low-dose extrapolation and no-dose effects for radiation exposure).

Moreover, good evidence to support or refute the threshold-dose hypothesis is exceedingly unlikely because of the inability of epidemiology or animal toxicology to ascertain very small effects. *Cf.* Arnold L. Brown, *The Meaning of Risk Assessment,* 37 Oncology 302, 303 (1980). Even the shape of the dose–response curve—whether linear or curvilinear, and if the latter, the shape of the curve—is a matter of hypothesis and speculation. *See* Allen v. United States, 588 F. Supp. 247, 419–24 (D. Utah 1984), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987), *cert. denied,* 484 U.S. 1004 (1988); Troyen A. Brennan & Robert F. Carter, *Legal and Scientific Probability of Causation for Cancer and Other Environmental Disease in Individuals,* 10 J. Health Pol'y & L. 33, 43–44 (1985).

120. In *Kehm v. Procter & Gamble Co.,* 580 F. Supp. 890, 901 (N.D. Iowa 1982), *aff'd sub nom.* Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613 (8th Cir. 1983), the court remarked on the persuasive power of multiple independent studies, each of which reached the same finding of an association between toxic shock syndrome and tampon use.

121. *See* Cadarian v. Merrell Dow Pharms., Inc., 745 F. Supp. 409, 412 (E.D. Mich. 1989) (hold-

377

*Reference Manual on Scientific Evidence*

generally should yield similar results. While inconsistent results do not rule out a causal nexus, any inconsistencies signal a need to explore whether different results can be reconciled with causality.

### E. Is the Association Biologically Plausible (Consistent with Existing Knowledge)?[122]

Biological plausibility is not an easy criterion to use and depends upon existing knowledge about the mechanisms by which the disease develops. When biological plausibility exists, it lends credence to an inference of causality. For example, the conclusion that high cholesterol is a cause of coronary heart disease is plausible because cholesterol is found in atherosclerotic plaques. However, observations have been made in epidemiologic studies that were not biologically plausible at the time but subsequently were shown to be correct. When an observation is inconsistent with current biological knowledge, it should not be discarded, but the observation should be confirmed before significance is attached to it. The saliency of this factor varies depending on the extent of scientific knowledge about the cellular and subcellular mechanisms through which the disease process works. The mechanisms of some diseases are understood better than the mechanisms of others.

### F. Have Alternative Explanations Been Considered?

The importance of considering the possibility of bias and confounding and ruling out the possibilities was discussed above.[123]

### G. What Is the Effect of Ceasing Exposure?

If an agent is a cause of a disease one would expect that cessation of exposure to that agent ordinarily would reduce the risk of the disease. This has been the case, for example, with cigarette smoking and lung cancer. In many situations, however, relevant data are simply not available regarding the possible effects of ending the exposure. But when such data are available and eliminating exposure reduces the incidence of disease, this factor strongly supports a causal relationship.

---

ing a study on Bendectin insufficient to support an expert's opinion, because "the study's authors themselves concluded that the results could not be interpreted without independent confirmatory evidence").

122. A number of courts have adverted to this criterion in the course of their discussions of causation in toxic substances cases. *E.g.*, Cook v. United States, 545 F. Supp. 306, 314–15 (N.D. Cal. 1982) (discussing biological implausibility of a two-peak increase of disease when plotted against time); Landrigan v. Celotex Corp., 605 A.2d 1079, 1085–86 (N.J. 1992) (discussing the existence vel non of biological plausibility). *See also* Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, § III.E, in this manual.

123. *See supra* § IV.B–C.

## H. Does the Association Exhibit Specificity?

An association exhibits specificity if the exposure is associated only with a single disease or type of disease.[124] The vast majority of agents do not cause a wide variety of effects. For example, asbestos causes mesothelioma and lung cancer and may cause one or two other cancers, but there is no evidence that it causes any other types of cancers. Thus, a study that finds that an agent is associated with many different diseases should be examined skeptically. Nevertheless, there may be causal relationships in which this guideline is not satisfied. Cigarette manufacturers have long claimed that because cigarettes have been linked to lung cancer, emphysema, bladder cancer, heart disease, pancreatic cancer, and other conditions, there is no specificity and the relationships are not causal. There is, however, at least one good reason why inferences about the health consequences of tobacco do not require specificity: because tobacco and cigarette smoke are not in fact single agents but consist of numerous harmful agents, smoking represents exposure to multiple agents, with multiple possible effects. Thus, while evidence of specificity may strengthen the case for causation, lack of specificity does not necessarily undermine it where there is a plausible biological explanation for its absence.

## I. Are the Findings Consistent with Other Relevant Knowledge?

In addressing the causal relationship of lung cancer to cigarette smoking, researchers examined trends over time for lung cancer and for cigarette sales in the United States. A marked increase in lung cancer death rates in men was observed, which appeared to follow the increase in sales of cigarettes. Had the increase in lung cancer deaths followed a decrease in cigarette sales, it might have given researchers pause. It would not have precluded a causal inference, but the inconsistency of the trends in cigarette sales and lung cancer mortality would have had to be explained.

---

124. This criterion reflects the fact that although an agent causes one disease, it does not necessarily cause other diseases. *See, e.g.,* Nelson v. American Sterilizer Co., 566 N.W.2d 671, 676–77 (Mich. Ct. App. 1997) (affirming dismissal of plaintiff's claims that chemical exposure caused her liver disorder, but recognizing that evidence supported claims for neuropathy and other illnesses); Sanderson v. International Flavors & Fragrances, Inc., 950 F. Supp. 981, 996–98 (C.D. Cal. 1996).

# VI. What Methods Exist for Combining the Results of Multiple Studies?

Not infrequently, the court may be faced with a number of epidemiologic studies whose findings differ. These may be studies in which one shows an association and the other does not, or studies which report associations, but of different magnitude. In view of the fact that epidemiologic studies may disagree and that often many of the studies are small and lack the statistical power needed for definitive conclusions, the technique of meta-analysis was developed.[125] Meta-analysis is a method of pooling study results to arrive at a single figure to represent the totality of the studies reviewed. It is a way of systematizing the time-honored approach of reviewing the literature, which is characteristic of science, and placing it in a standardized framework with quantitative methods for estimating risk. In a meta-analysis, studies are given different weights in proportion to the sizes of their study populations and other characteristics.[126]

Meta-analysis is most appropriate when used in pooling randomized experimental trials, because the studies included in the meta-analysis share the most significant methodological characteristics, in particular, use of randomized assignment of subjects to different exposure groups. However, often one is confronted with non-randomized observational studies of the effects of possible toxic substances or agents. A method for summarizing such studies is greatly needed, but when meta-analysis is applied to observational studies—either case-control or cohort—it becomes more problematic. The reason for this is that often methodological differences among studies are much more pronounced than they are in randomized trials. Hence, the justification for pooling the results and deriving a single estimate of risk, for example, is not always apparent.

A number of problems and issues arise in meta-analysis. Should only published papers be included in the meta-analysis, or should any available studies be used, even if they have not been peer reviewed? How can the problem of differences in the quality of the studies reviewed be taken into account? Can the results of the meta-analysis itself be reproduced by other analysts? When there

---

125. *See In re* Paoli R.R. Yard PCB Litig., 916 F.2d 829, 856 (3d Cir. 1990), *cert. denied*, 499 U.S. 961 (1991); Hines v. Consolidated Rail Corp., 926 F.2d 262, 273 (3d Cir. 1991); Allen v. International Bus. Mach. Corp., No. 94-264-LON, 1997 U.S. Dist. LEXIS 8016, at *71–*74 (meta-analysis of observational studies is a controversial subject among epidemiologists). Thus, contrary to the suggestion by at least one court, multiple studies with small numbers of subjects may be pooled to reduce the possibility that sampling error is biasing the outcome. *See In re* Joint E. & S. Dist. Asbestos Litig., 827 F. Supp. 1014, 1042 (S.D.N.Y. 1993) ("[N]o matter how many studies yield a positive but statistically insignificant SMR for colorectal cancer, the results remain statistically insignificant. Just as adding a series of zeros together yields yet another zero as the product, adding a series of positive but statistically insignificant SMRs together does not produce a statistically significant pattern."), *rev'd*, 52 F.3d 1124 (2d Cir. 1995); *see also supra* note 76.

126. Petitti, *supra* note 76.

are several meta-analyses of a given relationship, why do the results of different meta-analyses often disagree? Another consideration is that often the differences among the individual studies included in a meta-analysis and the reasons for the differences are important in themselves and need to be understood; however, they may be masked in a meta-analysis. A final problem with meta-analyses is that they generate a single estimate of risk and may lead to a false sense of security regarding the certainty of the estimate. People often tend to have an inordinate belief in the validity of the findings when a single number is attached to them, and many of the difficulties that may arise in conducting a meta-analysis, especially of observational studies like epidemiologic ones, may consequently be overlooked.[127]

# VII. What Role Does Epidemiology Play in Proving Specific Causation?

Epidemiology is concerned with the incidence of disease in populations and does not address the question of the cause of an individual's disease.[128] This question, sometimes referred to as specific causation, is beyond the domain of the science of epidemiology. Epidemiology has its limits at the point where an

---

127. Much has been written about meta-analysis recently, and some experts consider the problems of meta-analysis to outweigh the benefits at the present time. For example, Bailar has written the following:

> [P]roblems have been so frequent and so deep, and overstatements of the strength of conclusions so extreme, that one might well conclude there is something seriously and fundamentally wrong with the method. For the present . . . I still prefer the thoughtful, old-fashioned review of the literature by a knowledgeable expert who explains and defends the judgments that are presented. We have not yet reached a stage where these judgments can be passed on, even in part, to a formalized process such as meta-analysis.

John C. Bailar III, *Assessing Assessments*, 277 Science 528, 529 (1997) (reviewing Morton Hunt, How Science Takes Stock (1997)); *see also Point/Counterpoint: Meta-analysis of Observational Studies,* 140 Am. J. Epidemiology 770 (1994).

128. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945 & n.6 (3d Cir. 1990) ("Epidemiological studies do not provide direct evidence that a particular plaintiff was injured by exposure to a substance."); Smith v. Ortho Pharm. Corp., 770 F. Supp. 1561, 1577 (N.D. Ga. 1991); Grassis v. Johns-Manville Corp., 591 A.2d 671, 675 (N.J. Super. Ct. App. Div. 1991); Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact,* 7 Harv. Envtl. L. Rev. 429, 436 (1983).

There are some diseases that do not occur without exposure to a given toxic agent. This is the same as saying that the toxic agent is a necessary cause for the disease, and the disease is sometimes referred to as a signature disease (also, the agent is pathognomonic), because the existence of the disease necessarily implies the causal role of the agent. *See* Kenneth S. Abraham & Richard A. Merrill, *Scientific Uncertainty in the Courts,* Issues Sci. & Tech., Winter 1986, at 93, 101. Asbestosis is a signature disease for asbestos, and adenocarcinoma (in young adult women) is a signature disease for in utero DES exposure. *See In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 834 (E.D.N.Y. 1984) (Agent Orange allegedly caused a wide variety of diseases in Vietnam veterans and their offspring), *aff'd*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988).

*Reference Manual on Scientific Evidence*

inference is made that the relationship between an agent and a disease is causal (general causation) and where the magnitude of excess risk attributed to the agent has been determined; that is, epidemiology addresses whether an agent can cause a disease, not whether an agent did cause a specific plaintiff's disease.[129]

Nevertheless, the specific causation issue is a necessary legal element in a toxic substance case. The plaintiff must establish not only that the defendant's agent is capable of causing disease but also that it did cause the plaintiff's disease. Thus, a number of courts have confronted the legal question of what is acceptable proof of specific causation and the role that epidemiologic evidence plays in answering that question.[130] This question is not a question that is addressed by epidemiology.[131] Rather, it is a legal question a number of courts have grappled with. An explanation of how these courts have resolved this question follows. The remainder of this section should be understood as an explanation of judicial opinions, not as epidemiology.

Before proceeding, one last caveat is in order. This section assumes that epidemiologic evidence has been used as proof of causation for a given plaintiff. The discussion does not address whether a plaintiff must use epidemiologic evidence to prove causation.[132]

Two legal issues arise with regard to the role of epidemiology in proving individual causation: admissibility and sufficiency of evidence to meet the burden of production. The first issue tends to receive less attention by the courts but nevertheless deserves mention. An epidemiologic study that is sufficiently rigorous to justify a conclusion that it is scientifically valid should be admissible,[133] as it tends to make an issue in dispute more or less likely.[134]

---

129. *Cf. "Agent Orange,"* 597 F. Supp. at 780.

130. In many instances causation can be established without epidemiologic evidence. When the mechanism of causation is well understood, the causal relationship is well established, or the timing between cause and effect is close, scientific evidence of causation may not be required. This is frequently the situation when the plaintiff suffers traumatic injury rather than disease. This section addresses only those situations in which causation is not evident and scientific evidence is required.

131. Nevertheless, an epidemiologist may be helpful to the fact finder in answering this question. Some courts have permitted epidemiologists (or those who use epidemiologic methods) to testify about specific causation. *See* Ambrosini v. Labarraque, 101 F.3d 129, 137–41 (D.C. Cir. 1996), *cert. dismissed*, 520 U.S. 1205 (1997); Zuchowicz v. United States, 870 F. Supp. 15 (D. Conn. 1994); Landrigan v. Celotex Corp., 605 A.2d 1079, 1088–89 (N.J. 1992). In general, courts seem more concerned with the basis of an expert's opinion than whether the expert is an epidemiologist or clinical physician. *See* Porter v. Whitehall, 9 F.3d 607, 614 (7th Cir. 1992) ("curb side" opinion from clinician not admissible); Wade-Greaux v. Whitehall Labs., 874 F. Supp. 1441, 1469–72 (D.V.I.) (clinician's multiple bases for opinion inadequate to support causation opinion), *aff'd*, 46 F.3d 1120 (3d Cir. 1994); *Landrigan*, 605 A.2d at 1083–89 (permitting both clinicians and epidemiologists to testify to specific causation provided the methodology used is sound).

132. *See* Green, *supra* note 39, at 672–73; 2 Modern Scientific Evidence, *supra* note 2, § 28-1.3.2 to –1.3.3, at 306–11.

133. *See DeLuca*, 911 F.2d at 958; *cf.* Kehm v. Procter & Gamble Co., 580 F. Supp. 890, 902 (N.D. Iowa 1982) ("These [epidemiologic] studies were highly probative on the issue of causation—they all

382

*Reference Guide on Epidemiology*

Far more courts have confronted the role that epidemiology plays with regard to the sufficiency of the evidence and the burden of production. The civil burden of proof is described most often as requiring the fact finder to "believe that what is sought to be proved . . . is more likely true than not true."[135] The relative risk from epidemiologic studies can be adapted to this 50% plus standard to yield a probability or likelihood that an agent caused an individual's disease.[136] An important caveat is necessary, however. The discussion below speaks in terms of the magnitude of the relative risk or association found in a study. However, before an association or relative risk is used to make a statement about the probability of individual causation, the inferential judgment, described in section V, that the association is truly causal rather than spurious is required: "[A]n agent cannot be considered to cause the illness of a specific person unless

concluded that an association between tampon use and menstrually related TSS [toxic shock syndrome] cases exists."), *aff'd sub nom.* Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613 (8th Cir. 1984).

Hearsay concerns may limit the independent admissibility of the study (*see supra* note 3), but the study could be relied on by an expert in forming an opinion and may be admissible pursuant to Fed. R. Evid. 703 as part of the underlying facts or data relied on by the expert.

In *Ellis v. International Playtex, Inc.*, 745 F.2d 292, 303 (4th Cir. 1984), the court concluded that certain epidemiologic studies were admissible despite criticism of the methodology used in the studies. The court held that the claims of bias went to the studies' weight rather than their admissibility. *Cf.* Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1109 (5th Cir. 1991) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility . . . ."), *cert. denied*, 503 U.S. 912 (1992).

134. Even if evidence is relevant, it may be excluded if its probative value is substantially outweighed by prejudice, confusion, or inefficiency. Fed. R. Evid. 403. However, exclusion of an otherwise relevant epidemiologic study on Rule 403 grounds is unlikely.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), the Court invoked the concept of "fit," which addresses the relationship of an expert's scientific opinion to the facts of the case and the issues in dispute. In a toxic substance case in which cause in fact is disputed, an epidemiologic study of the same agent to which the plaintiff was exposed that examined the association with the same disease from which the plaintiff suffers would undoubtedly have sufficient "fit" to be a part of the basis of an expert's opinion. The Court's concept of "fit," borrowed from *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985), appears equivalent to the more familiar evidentiary concept of probative value, albeit one requiring assessment of the scientific reasoning the expert used in drawing inferences from methodology or data to opinion.

135. 2 Edward J. Devitt & Charles B. Blackmar, Federal Jury Practice and Instruction § 71.13 (3d ed. 1977); *see also* United States v. Fatico, 458 F. Supp. 388, 403 (E.D.N.Y. 1978) ("Quantified, the preponderance standard would be 50%+ probable."), *aff'd*, 603 F.2d 1053 (2d Cir. 1979), *cert. denied*, 444 U.S. 1073 (1980).

136. An adherent of the frequentist school of statistics would resist this adaptation, which may explain why so many epidemiologists and toxicologists also resist it. To take the step identified in the text of using an epidemiologic study outcome to determine the probability of specific causation requires a shift from a frequentist approach, which involves sampling or frequency data from an empirical test, to a subjective probability about a discrete event. Thus, a frequentist might assert, after conducting a sampling test, that 60% of the balls in an opaque container are blue. The same frequentist would resist the statement, "The probability that a single ball removed from the box and hidden behind a screen is blue is 60%." The ball is either blue or not, and no frequentist data would permit the latter statement. "[T]here is no logically rigorous definition of what a statement of probability means with reference to an individual instance . . . ." Lee Loevinger, *On Logic and Sociology*, 32 Jurimetrics J. 527, 530 (1992); *see*

*Reference Manual on Scientific Evidence*

it is recognized as a cause of that disease in general."[137] The following discussion should be read with this caveat in mind.[138]

The threshold for concluding that an agent was more likely than not the cause of an individual's disease is a relative risk greater than 2.0. Recall that a relative risk of 1.0 means that the agent has no effect on the incidence of disease. When the relative risk reaches 2.0, the agent is responsible for an equal number of cases of disease as all other background causes. Thus, a relative risk of 2.0 (with certain qualifications noted below) implies a 50% likelihood that an exposed individual's disease was caused by the agent. A relative risk greater than 2.0 would permit an inference that an individual plaintiff's disease was more likely than not caused by the implicated agent.[139] A substantial number of courts in a variety of toxic substances cases have accepted this reasoning.[140]

---

*also* Steve Gold, Note, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion and Statistical Evidence*, 96 Yale L.J. 376, 382–92 (1986). Subjective probabilities about discrete events are the product of adherents to Bayes Theorem. *See* Kaye, *supra* note 67, at 54–62; David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.D, in this manual.

137. Cole, *supra* note 53, at 10284.

138. We emphasize this caveat, both because it is not intuitive and because some courts have failed to appreciate the difference between an association and a causal relationship. *See, e.g.,* Forsyth v. Eli Lilly & Co., Civ. No. 95-00185 ACK, 1998 U.S. Dist. LEXIS 541, at *26–*31 (D. Haw. Jan. 5, 1998). *But see* Berry v. CSX Transp., Inc., 709 So. 2d 552, 568 (Fla. Dist. Ct. App. 1998) ("From epidemiological studies demonstrating an association, an epidemiologist may or may not infer that a causal relationship exists.").

139. *See* Davies v. Datapoint Corp., No. 94-56-P-DMC, 1995 U.S. Dist. LEXIS 21739, at *32–*35 (D. Me. Oct. 31, 1995) (holding that epidemiologist could testify about specific causation, basing such testimony on the probabilities derived from epidemiologic evidence).

140. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 958–59 (3d Cir. 1990) (Bendectin allegedly caused limb reduction birth defects); *In re* Joint E. & S. Dist. Asbestos Litig., 964 F.2d 92 (2d Cir. 1992) (relative risk less than 2.0 may still be sufficient to prove causation); Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1320 (9th Cir.) (requiring that plaintiff demonstrate a relative risk of 2), *cert. denied*, 516 U.S. 869 (1995); Pick v. American Med. Sys., Inc., 958 F. Supp. 1151, 1160 (E.D. La. 1997) (recognizing that a relative risk of 2 implies a 50% probability of specific causation, but recognizing that a study with a lower relative risk is admissible, although ultimately it may be insufficient to support a verdict on causation); Sanderson v. International Flavors & Fragrances, Inc., 950 F. Supp. 981, 1000 (C.D. Cal. 1996) (acknowledging a relative risk of 2 as a threshold for plaintiff to prove specific causation); Manko v. United States, 636 F. Supp. 1419, 1434 (W.D. Mo. 1986) (swine flu vaccine allegedly caused Guillain-Barré syndrome), *aff'd in part*, 830 F.2d 831 (8th Cir. 1987); Marder v. G.D. Searle & Co., 630 F. Supp. 1087, 1092 (D. Md. 1986) (pelvic inflammatory disease allegedly caused by Copper 7 IUD), *aff'd without op. sub nom.* Wheelahan v. G.D. Searle & Co., 814 F.2d 655 (4th Cir. 1987); *In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 835–37 (E.D.N.Y. 1984) (Agent Orange allegedly caused a wide variety of diseases in Vietnam veterans and their offspring), *aff'd*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988); Cook v. United States, 545 F. Supp. 306, 308 (N.D. Cal. 1982) (swine flu vaccine allegedly caused Guillain-Barré syndrome); Landrigan v. Celotex Corp., 605 A.2d 1079, 1087 (N.J. 1992) (relative risk greater than 2.0 "support[s] an inference that the exposure was the probable cause of the disease in a specific member of the exposed population"); Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 718 (Tex. 1997) ("The use of scientifically reliable epidemiological studies and the requirement of more than a doubling of the risk strikes a balance between the needs of our legal system and the limits of science."). *But cf. In re* Fibreboard Corp., 893 F.2d 706, 711–12 (5th Cir. 1990) (The court disapproved a trial in which several representative

384

An alternative, yet similar, means to address probabilities in individual cases is use of the attributable risk parameter.[141] The attributable risk is a measurement of the excess risk that can be attributed to an agent, above and beyond the background risk that is due to other causes.[142] When the attributable risk exceeds 50% (equivalent to a relative risk greater than 2.0), this logically might lead one to believe that the agent was more likely than not the cause of the plaintiff's disease.

The discussion above contains a number of assumptions: that the study was unbiased, sampling error and confounding were judged unlikely or minimal, the causal factors discussed in section V point toward causation, and the relative risk found in the study is a reasonably accurate measure of the extent of disease caused by the agent. It also assumes that the plaintiff in a given case is comparable to the subjects who made up the exposed cohort in the epidemiologic study and that there are no interactions with other causal agents.[143]

Evidence in a given case may challenge one or more of those assumptions. Bias in a study may suggest that the outcome found is inaccurate and should be estimated to be higher or lower than the actual result. A plaintiff may have been exposed to a dose of the agent in question that is greater or lower than that to which those in the study were exposed.[144] A plaintiff may have individual factors, such as higher age than those in the study, that make it less likely that

---

cases would be tried and the results extrapolated to a class of some 3,000 asbestos victims, without consideration of any evidence about the individual victims. The court remarked that under Texas law, general causation, which ignores any proof particularistic to the individual plaintiff, could not be substituted for cause in fact.).

141. *See supra* § III.C.

142. Because cohort epidemiologic studies compare the incidences (rates) of disease, measures like the relative risk and attributable risk are dependent on the time period during which disease is measured in the study groups. Exposure to the agent may either accelerate the onset of the disease in a subject who would have contracted the disease at some later time—all wrongful death cases entail acceleration of death—or be the cause of disease that otherwise would never have occurred in the subject. This creates some uncertainty (when pathological information does not permit determining which of the foregoing alternatives is the case) and ambiguity about the proper calculation of the attributable risk, that is, whether both alternatives should be included in the excess risk or just the latter. *See* Sander Greenland & James M. Robins, *Conceptual Problems in the Definition and Interpretation of Attributable Fractions*, 128 Am. J. Epidemiology 1185 (1988). If information were available, the legal issue with regard to acceleration would be the characterization of the harm and the appropriate amount of damages when a defendant's tortious conduct accelerates development of the disease. *See* Restatement (Second) of Torts § 924 cmt. e (1977); Keeton et al., *supra* note 107, § 52, at 353–54; Robert J. Peaslee, *Multiple Causation and Damages*, 47 Harv. L. Rev. 1127 (1934).

143. *See* Greenland & Robins, *supra* note 142, at 1193.

144. *See supra* § V.C; *see also* Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1536 (D.C. Cir.) ("The dose–response relationship at low levels of exposure for admittedly toxic chemicals like paraquat is one of the most sharply contested questions currently being debated in the medical community."), *cert. denied*, 469 U.S. 1062 (1984); *In re* Joint E. & S. Dist. Asbestos Litig., 774 F. Supp. 113, 115 (S.D.N.Y. 1991) (discussing different relative risks associated with different doses), *rev'd on other grounds*, 964 F.2d 92 (2d Cir. 1992).

*Reference Manual on Scientific Evidence*

exposure to the agent caused the plaintiff's disease. Similarly, an individual plaintiff may be able to rule out other known (background) causes of the disease, such as genetics, that increase the likelihood that the agent was responsible for that plaintiff's disease. Pathological-mechanism evidence may be available for the plaintiff that is relevant to the cause of the plaintiff's disease.[145] Before any causal relative risk from an epidemiologic study can be used to estimate the probability that the agent in question caused an individual plaintiff's disease, consideration of these (and similar) factors is required.[146]

Having additional evidence that bears on individual causation has led a few courts to conclude that a plaintiff may satisfy his or her burden of production even if a relative risk less than 2.0 emerges from the epidemiologic evidence.[147] For example, genetics might be known to be responsible for 50% of the incidence of a disease independent of exposure to the agent.[148] If genetics can be ruled out in an individual's case, then a relative risk greater than 1.5 might be sufficient to support an inference that the agent was more likely than not responsible for the plaintiff's disease.[149]

---

145. *See* Tobin v. Astra Pharm. Prods., Inc., 993 F.2d 528 (6th Cir.) (plaintiff's expert relied predominantly on pathogenic evidence), *cert. denied*, 510 U.S. 914 (1993).

146. *See* Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997); Mary Carter Andrues, Note, *Proof of Cancer Causation in Toxic Waste Litigation*, 61 S. Cal. L. Rev. 2075, 2100–04 (1988). An example of a judge sitting as fact finder and considering individual factors for a number of plaintiffs in deciding cause in fact is contained in *Allen v. United States*, 588 F. Supp. 247, 429–43 (D. Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988); *see also* Manko v. United States, 636 F. Supp. 1419, 1437 (W.D. Mo. 1986), *aff'd*, 830 F.2d 831 (8th Cir. 1987).

147. *See, e.g.*, Grassis v. Johns-Manville Corp., 591 A.2d 671, 675 (N.J. Super. Ct. App. Div. 1991): "The physician or other qualified expert may view the epidemiological studies and factor out other known risk factors such as family history, diet, alcohol consumption, smoking . . . or other factors which might enhance the remaining risks, even though the risk in the study fell short of the 2.0 correlation." *See also In re* Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124 (2d Cir. 1995) (holding that plaintiff could provide sufficient evidence of causation without proving a relative risk greater than 2); *In re* Joint E. & S. Dist. Asbestos Litig., 964 F.2d 92, 97 (2d Cir. 1992), *rev'g* 758 F. Supp. 199, 202–03 (S.D.N.Y. 1991) (requiring relative risk in excess of 2.0 for plaintiff to meet burden of production); Jones v. Owens-Corning Fiberglas Corp., 672 A.2d 230 (N.J. Super. Ct. App. Div. 1996).

148. *See In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 758–59 (3d Cir. 1994) (discussing the technique of differential diagnosis to rule out other known causes of a disease for a specific individual).

149. The use of probabilities in excess of .50 to support a verdict results in an all-or-nothing approach to damages that some commentators have criticized. The criticism reflects the fact that defendants responsible for toxic agents with a relative risk just above 2.0 may be required to pay damages not only for the disease that their agents caused, but also for all instances of the disease. Similarly, those defendants whose agents increase the risk of disease by less than a doubling may not be required to pay damages for any of the disease that their agents caused. *See, e.g.*, 2 American Law Inst., Reporter's Study on Enterprise Responsibility for Personal Injury: Approaches to Legal and Institutional Change 369–75 (1991). To date, courts have not adopted a rule that would apportion damages based on the probability of cause in fact in toxic substances cases.

*Reference Guide on Epidemiology*

# Glossary of Terms

The following terms and definitions were adapted from a variety of sources, including A Dictionary of Epidemiology (John M. Last et al. eds. 3d ed. 1995); 1 Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy (1988); James K. Brewer, Everything You Always Wanted To Know About Statistics, But Didn't Know How To Ask (1978); and R.A. Fisher, Statistical Methods for Research Workers (1973).

**adjustment.** Methods of modifying an observed association to take into account the effect of risk factors that are not the focus of the study and that distort the observed association between the exposure being studied and the disease outcome. See also direct age adjustment, indirect age adjustment.

**agent.** Also, risk factor. A factor, such as a drug, microorganism, chemical substance, or form of radiation, whose presence or absence can result in the occurrence of a disease. A disease may be caused by a single agent or a number of independent alternative agents, or the combined presence of a complex of two or more factors may be necessary for the development of the disease.

**alpha.** The level of statistical significance chosen by a researcher to determine if any association found in a study is sufficiently unlikely to have occurred by chance (as a result of random sampling error) if the null hypothesis (no association) is true. Researchers commonly adopt an alpha of .05, but the choice is arbitrary and other values can be justified.

**alpha error.** Also called type I error and false positive error, alpha error occurs when a researcher rejects a null hypothesis when it is actually true (i.e., when there is no association). This can occur when an apparent difference is observed between the control group and the exposed group, but the difference is not real (i.e., it occurred by chance). A common error made by lawyers, judges, and academics is to equate the level of alpha with the legal burden of proof.

**association.** The degree of statistical relationship between two or more events or variables. Events are said to be associated when they occur more or less frequently together than one would expect by chance. Association does not necessarily imply a causal relationship. Events are said not to have an association when the agent (or independent variable) has no apparent effect on the incidence of a disease (the dependent variable). This corresponds to a relative risk of 1.0. A negative association means that the events occur less frequently together than one would expect by chance, thereby implying a preventive or protective role for the agent (e.g., a vaccine).

**attributable proportion of risk (PAR).** This term has been used to denote the fraction of risk that is attributable to exposure to a substance (e.g., $X\%$ of

lung cancer is attributable to cigarettes). Synonymous terms include attributable fraction, attributable risk, and etiologic fraction. See attributable risk.

**attributable risk.** The proportion of disease in exposed individuals that can be attributed to exposure to an agent, as distinguished from the proportion of disease attributed to all other causes.

**background risk of disease.** Background risk of disease (or background rate of disease) is the rate of disease in a population that has no known exposures to an alleged risk factor for the disease. For example, the background risk for all birth defects is 3%–5% of live births.

**beta error.** Also called type II error and false negative error, beta error occurs when a researcher fails to reject a null hypothesis when it is incorrect (i.e., when there is an association). This can occur when no statistically significant difference is detected between the control group and the exposed group, but a difference does exist.

**bias.** Any effect at any stage of investigation or inference tending to produce results that depart systematically from the true values. In epidemiology, the term bias does not necessarily carry an imputation of prejudice or other subjective factor, such as the experimenter's desire for a particular outcome. This differs from conventional usage, in which bias refers to a partisan point of view.

**biological marker.** A physiological change in tissue or body fluids that occurs as a result of an exposure to an agent and that can be detected in the laboratory. Biological markers are only available for a small number of chemicals.

**biological plausibility.** Consideration of existing knowledge about human biology and disease pathology to provide a judgment about the plausibility that an agent causes a disease.

**case-comparison study.** See case-control study.

**case–control study.** Also, case-comparison study, case history study, case referent study, retrospective study. A study that starts with the identification of persons with a disease (or other outcome variable) and a suitable control (comparison, reference) group of persons without the disease. Such a study is often referred to as retrospective because it starts after the onset of disease and looks back to the postulated causal factors.

**case group.** A group of individuals who have been exposed to the disease, intervention, procedure, or other variable whose influence is being studied.

**causation.** Causation, as we use the term, denotes an event, condition, characteristic, or agent's being a necessary element of a set of other events that can produce an outcome, such as a disease. Other sets of events may also cause the disease. For example, smoking is a necessary element of a set of events

388

*Reference Guide on Epidemiology*

that result in lung cancer, yet there are other sets of events (without smoking) that cause lung cancer. Thus, a cause may be thought of as a necessary link in at least one causal chain that results in an outcome of interest. Epidemiologists generally speak of causation in a group context; hence, they will inquire whether an increased incidence of a disease in a cohort was "caused" by exposure to an agent.

**clinical trial.** An experimental study that is performed to assess the efficacy and safety of a drug or other beneficial treatment. Unlike observational studies, clinical trials can be conducted as experiments and use randomization, because the agent being studied is thought to be beneficial.

**cohort.** Any designated group of persons followed or traced over a period of time to examine health or mortality experience.

**cohort study.** The method of epidemiologic study in which groups of individuals can be identified who are, have been, or in the future may be differentially exposed to an agent or agents hypothesized to influence the probability of occurrence of a disease or other outcome. The groups are observed to find out if the exposed group is more likely to develop disease. The alternative terms for a cohort study (concurrent study, follow-up study, incidence study, longitudinal study, prospective study) describe an essential feature of the method, which is observation of the population for a sufficient number of person-years to generate reliable incidence or mortality rates in the population subsets. This generally implies study of a large population, study for a prolonged period (years), or both.

**confidence interval.** A range of values calculated from the results of a study within which the true value is likely to fall; the width of the interval reflects random error. Thus, if a confidence level of .95 is selected for a study, 95% of similar studies would result in the true relative risk falling within the confidence interval. The width of the confidence interval provides an indication of the precision of the point estimate or relative risk found in the study; the narrower the confidence interval, the greater the confidence in the relative risk estimate found in the study. Where the confidence interval contains a relative risk of 1.0, the results of the study are not statistically significant.

**confounding factor.** Also, confounder. A factor that is both a risk factor for the disease and a factor associated with the exposure of interest. Confounding refers to a situation in which the effects of two processes are not separated. The distortion can lead to an erroneous result.

**control group.** A comparison group comprising individuals who have not been exposed to the disease, intervention, procedure, or other variable whose influence is being studied.

389

**cross–sectional study.** A study that examines the relationship between disease and variables of interest as they exist in a population at a given time. A cross-sectional study measures the presence or absence of disease and other variables in each member of the study population. The data are analyzed to determine if there is a relationship between the existence of the variables and disease. Because cross-sectional studies examine only a particular moment in time, they reflect the prevalence (existence) rather than the incidence (rate) of disease and can offer only a limited view of the causal association between the variables and disease. Because exposures to toxic agents often change over time, cross-sectional studies are rarely used to assess the toxicity of exogenous agents.

**data dredging.** Jargon that refers to results identified by researchers who, after completing a study, pore through their data seeking to find any associations that may exist. In general, good research practice is to identify the hypotheses to be investigated in advance of the study; hence, data dredging is generally frowned on. In some cases, however, researchers conduct exploratory studies designed to generate hypotheses for further study.

**demographic study.** See ecological study.

**dependent variable.** The outcome that is being assessed in a study based on the effect of another characteristic—the independent variable. Epidemiologic studies attempt to determine whether there is an association between the independent variable (exposure) and the dependent variable (incidence of disease).

**differential misclassification.** A form of bias that is due to the misclassification of individuals or a variable of interest when the misclassification varies among study groups. This type of bias occurs when, for example, individuals in a study are incorrectly determined to be unexposed to the agent being studied when in fact they are exposed. See nondifferential misclassification.

**direct adjustment.** A technique used to eliminate any difference between two study populations based on age, sex, or some other parameter that might result in confounding. Direct adjustment entails comparison of the study group with a large reference population to determine the expected rates based on the characteristic, such as age, for which adjustment is being performed.

**dose.** Dose generally refers to the intensity or magnitude of exposure to an agent multiplied by the duration of exposure. Dose may be used to refer only to the intensity of exposure.

**dose–response relationship.** A relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or a decrease—in risk of disease.

**double-blinding.** A characteristic used in experimental studies in which neither the individuals being studied nor the researchers know during the study whether any individual has been assigned to the exposed or control group. Double-blinding is designed to prevent knowledge of the group to which the individual was assigned from biasing the outcome of the study.

**ecological fallacy.** An error that occurs when a correlation between an agent and disease in a group (ecological) is not reproduced when individuals are studied. For example, at the ecological (group) level, a correlation has been found in several studies between the quality of drinking water and mortality rates from heart disease; it would be an ecological fallacy to infer from this alone that exposure to water of a particular level of hardness necessarily influences the individual's chances of contracting or dying of heart disease.

**ecological study.** Also, demographic study. A study of the occurrence of disease based on data from populations, rather than from individuals. An ecological study searches for associations between the incidence of disease and suspected disease-causing agents in the studied populations. Researchers often conduct ecological studies by examining easily available health statistics, making these studies relatively inexpensive in comparison with studies that measure disease and exposure to agents on an individual basis.

**epidemiology.** The study of the distribution and determinants of disease or other health-related states and events in populations and the application of this study to control of health problems.

**error.** Random error (sampling error) is the error that is due to chance when the result obtained for a sample differs from the result that would be obtained if the entire population (universe) were studied.

**etiologic factor.** An agent that plays a role in causing a disease.

**etiology.** The cause of disease or other outcome of interest.

**experimental study.** A study in which the researcher directly controls the conditions. Experimental epidemiology studies (also clinical studies) entail random assignment of participants to the exposed and control groups (or some other method of assignment designed to minimize differences between the groups).

**exposed, exposure.** In epidemiology, the exposed group (or the exposed) is used to describe a group whose members have been exposed to an agent that may be a cause of a disease or health effect of interest, or possess a characteristic that is a determinant of a health outcome.

**false negative error.** See beta error.

**false positive error.** See alpha error.

**follow-up study.** See cohort study.

**general causation.** General causation is concerned with whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease. Because of individual variation, a toxic agent generally will not cause disease in every exposed individual.

**generalizable.** A study is generalizable when the results are applicable to populations other than the study population, such as the general population.

**in vitro.** Within an artificial environment, such as a test tube (e.g., the cultivation of tissue in vitro).

**in vivo.** Within a living organism (e.g., the cultivation of tissue in vivo).

**incidence rate.** The number of people in a specified population falling ill from a particular disease during a given period. More generally, the number of new events (e.g., new cases of a disease in a defined population) within a specified period of time.

**incidence study.** See cohort study.

**independent variable.** A characteristic that is measured in a study and that is suspected to have an effect on the outcome of interest (the dependent variable). Thus, exposure to an agent is measured in a cohort study to determine whether that independent variable has an effect on the incidence of disease, which is the dependent variable.

**indirect adjustment.** A technique employed to minimize error that might result when comparing two populations because of differences in age, sex, or another parameter that may affect the rate of disease in the populations. The rate of disease in a large reference population, such as all residents of a country, is calculated and adjusted for any differences in age between the reference population and the study population. This adjusted rate is compared with the rate of disease in the study population and provides a standardized mortality (or morbidity) ratio, which is often referred to as SMR.

**inference.** The intellectual process of making generalizations from observations. In statistics, the development of generalizations from sample data, usually with calculated degrees of uncertainty.

**information bias.** Also, observational bias. Systematic error in measuring data that results in differential accuracy of information (such as exposure status) for comparison groups.

**interaction.** Risk factors interact, or there is interaction among risk factors, when the magnitude or direction (positive or negative) of the effect of one risk factor differs depending on the presence or level of the other. In interaction, the effect of two risk factors together is different (greater or less) than their individual effects.

392

**meta-analysis.** A technique used to combine the results of several studies to enhance the precision of the estimate of the effect size and reduce the plausibility that the association found is due to random sampling error. Meta-analysis is best suited to pooling results from randomly controlled experimental studies, but if carefully performed, it also may be useful for observational studies.

**misclassification bias.** The erroneous classification of an individual in a study as exposed to the agent when the individual was not, or incorrectly classifying a study individual with regard to disease. Misclassification bias may exist in all study groups (nondifferential misclassification) or may vary among groups (differential misclassification).

**morbidity rate.** Morbidity is the state of illness or disease. Morbidity rate may refer to the incidence rate or prevalence rate of disease.

**mortality rate.** Mortality refers to death. The mortality rate expresses the proportion of a population that dies of a disease or of all causes. The numerator is the number of individuals dying; the denominator is the total population in which the deaths occurred. The unit of time is usually a calendar year.

**model.** A representation or simulation of an actual situation. This may be either (1) a mathematical representation of characteristics of a situation that can be manipulated to examine consequences of various actions; (2) a representation of a country's situation through an "average region" with characteristics resembling those of the whole country; or (3) the use of animals as a substitute for humans in an experimental system to ascertain an outcome of interest.

**multivariate analysis.** A set of techniques used when the variation in several variables has to be studied simultaneously. In statistics, any analytic method that allows the simultaneous study of two or more independent factors or variables.

**nondifferential misclassification.** A form of bias that is due to misclassification of individuals or a variable of interest into the wrong category when the misclassification varies among study groups. This bias may result from limitations in data collection and will often produce an underestimate of the true association. See differential misclassification.

**null hypothesis.** A hypothesis that states that there is no true association between a variable and an outcome. At the outset of any observational or experimental study, the researcher must state a proposition that will be tested in the study. In epidemiology, this proposition typically addresses the existence of an association between an agent and a disease. Most often, the null hypothesis is a statement that exposure to Agent A does not increase the occurrence of Disease D. The results of the study may justify a conclusion that the null hypothesis (no association) has been disproved (e.g., a study that finds a

strong association between smoking and lung cancer). A study may fail to disprove the null hypothesis, but that alone does not justify a conclusion that the null hypothesis has been proved.

**observational study.** An epidemiologic study in situations in which nature is allowed to take its course, without intervention from the investigator. For example, in an observational study the subjects of the study are permitted to determine their level of exposure to an agent.

**odds ratio (OR).** Also, cross-product ratio, relative odds. The ratio of the odds that a case (one with the disease) was exposed to the odds that a control (one without the disease) was exposed. For most purposes the odds ratio from a case-control study is quite similar to a risk ratio from a cohort study.

**pathognomonic.** An agent is pathognomonic when it must be present for a disease to occur. Thus, asbestos is a pathognomonic agent for asbestosis. See signature disease.

**placebo controlled.** In an experimental study, providing an inert substance to the control group, so as to keep the control and exposed groups ignorant of their status.

**$p$(probability), $p$-value.** The $p$-value is the probability of getting a value of the test outcome equal to or more extreme than the result observed, given that the null hypothesis is true. The letter $p$, followed by the abbreviation "n.s." (not significant) means that $p > .05$ and that the association was not statistically significant at the .05 level of significance. The statement "$p < .05$" means that $p$ is less than 5%, and, by convention, the result is deemed statistically significant. Other significance levels can be adopted, such as .01 or .1. The lower the $p$-value, the less likely that random error would have produced the observed relative risk if the true relative risk is 1.

**power.** The probability that a difference of a specified amount will be detected by the statistical hypothesis test, given that a difference exists. In less formal terms, power is like the strength of a magnifying lens in its capability to identify an association that truly exists. Power is equivalent to one minus type II error. This is sometimes stated as Power $= 1 - \beta$.

**prevalence.** The percentage of persons with a disease in a population at a specific point in time.

**prospective study.** In a prospective study, two groups of individuals are identified: (1) individuals who have been exposed to a risk factor and (2) individuals who have not been exposed. Both groups are followed for a specified length of time, and the proportion that develops disease in the first group is compared with the proportion that develops disease in the second group. See cohort study.

*Reference Guide on Epidemiology*

**random.** The term implies that an event is governed by chance. See randomization.

**randomization.** Assignment of individuals to groups (e.g., for experimental and control regimens) by chance. Within the limits of chance variation, randomization should make the control group and experimental group similar at the start of an investigation and ensure that personal judgment and prejudices of the investigator do not influence assignment. Randomization should not be confused with haphazard assignment. Random assignment follows a predetermined plan that usually is devised with the aid of a table of random numbers. Randomization cannot ethically be used where the exposure is known to cause harm (e.g., cigarette smoking).

**randomized trial.** See clinical trial.

**recall bias.** Systematic error resulting from differences between two groups in a study in accuracy of memory. For example, subjects who have a disease may recall exposure to an agent more frequently than subjects who do not have the disease.

**relative risk (RR).** The ratio of the risk of disease or death among people exposed to an agent to the risk among the unexposed. For instance, if 10% of all people exposed to a chemical develop a disease, compared with 5% of people who are not exposed, the disease occurs twice as frequently among the exposed people. The relative risk is 10%/5% = 2. A relative risk of 1 indicates no association between exposure and disease.

**research design.** The procedures and methods, predetermined by an investigator, to be adhered to in conducting a research project.

**risk.** A probability that an event will occur (e.g., that an individual will become ill or die within a stated period of time or by a certain age).

**sample.** A selected subset of a population. A sample may be random or nonrandom.

**sample size.** The number of subjects who participate in a study.

**secular-trend study.** Also, time-line study. A study that examines changes over a period of time, generally years or decades. Examples include the decline of tuberculosis mortality and the rise, followed by a decline, in coronary heart disease mortality in the United States in the past fifty years.

**selection bias.** Systematic error that results from individuals being selected for the different groups in an observational study who have differences other than the ones that are being examined in the study.

**sensitivity, specificity.** Sensitivity measures the accuracy of a diagnostic or screening test or device in identifying disease (or some other outcome) when

395

it truly exists. For example, assume that we know that 20 women in a group of 1,000 women have cervical cancer. If the entire group of 1,000 women is tested for cervical cancer and the screening test only identifies 15 (of the known 20) cases of cervical cancer, the screening test has a sensitivity of 15/20, or 75%. Specificity measures the accuracy of a diagnostic or screening test in identifying those who are disease free. Once again, assume that 980 women out of a group of 1,000 women do not have cervical cancer. If the entire group of 1,000 women is screened for cervical cancer and the screening test only identifies 900 women as without cervical cancer, the screening test has a specificity of 900/980, or 92%.

**signature disease.** A disease that is associated uniquely with exposure to an agent (e.g., asbestosis and exposure to asbestos). See also pathognomonic.

**significance level.** A somewhat arbitrary level selected to minimize the risk that an erroneous positive study outcome that is due to random error will be accepted as a true association. The lower the significance level selected, the less likely that false positive error will occur.

**specific causation.** Whether exposure to an agent was responsible for a given individual's disease.

**standardized morbidity ratio (SMR).** The ratio of the incidence of disease observed in the study population to the incidence of disease that would be expected if the study population had the same incidence of disease as some selected standard or known population.

**standardized mortality ratio (SMR).** The ratio of the incidence of death observed in the study population to the incidence of death that would be expected if the study population had the same incidence of death as some selected standard or known population.

**statistical significance.** A term used to describe a study result or difference that exceeds the type I error rate (or *p*-value) that was selected by the researcher at the outset of the study. In formal significance testing, a statistically significant result is unlikely to be the result of random sampling error and justifies rejection of the null hypothesis. Some epidemiologists believe that formal significance testing is inferior to using a confidence interval to express the results of a study. Statistical significance, which addresses the role of random sampling error in producing the results found in the study, should not be confused with the importance (for public health or public policy) of a research finding.

**stratification.** The process of or result of separating a sample into several subsamples according to specified criteria, such as age or socioeconomic status. Researchers may control the effect of confounding variables by stratify-

*Reference Guide on Epidemiology*

ing the analysis of results. For example, lung cancer is known to be associated with smoking. To examine the possible association between urban atmospheric pollution and lung cancer, the researcher may divide the population into strata according to smoking status, thus controlling for smoking. The association between air pollution and cancer then can be appraised separately within each stratum.

**study design.** See research design.

**systematic error.** See bias.

**teratogen.** An agent that produces abnormalities in the embryo or fetus by disturbing maternal health or by acting directly on the fetus in utero.

**teratogenicity.** The capacity for an agent to produce abnormalities in the embryo or fetus.

**threshold phenomenon.** A certain level of exposure to an agent below which disease does not occur and above which disease does occur.

**time-line study.** See secular-trend study.

**toxicology.** The science of the nature and effects of poisons. Toxicologists study adverse health effects of agents on biological organisms.

**toxic substance.** A substance that is poisonous.

**true association.** Also, real association. The association that really exists between exposure to an agent and a disease and that might be found by a perfect (but nonetheless nonexistent) study.

**Type I error.** Rejecting the null hypothesis when it is true. See alpha error.

**Type II error.** Failing to reject the null hypothesis when it is false. See beta error.

**validity.** The degree to which a measurement measures what it purports to measure; the accuracy of a measurement.

**variable.** Any attribute, condition, or other item in a study that can have different numerical characteristics. In a study of the causes of heart disease, blood pressure and dietary fat intake are variables that might be measured.

*Reference Manual on Scientific Evidence*

# References on Epidemiology

Causal Inferences (Kenneth J. Rothman ed., 1988).

William G. Cochran, Sampling Techniques (1977).

A Dictionary of Epidemiology (John M. Last et al. eds., 3d ed. 1995).

Anders Ahlbom & Steffan Norell, Introduction to Modern Epidemiology (2d ed. 1990).

Joseph L. Fleiss, Statistical Methods for Rates and Proportions (1981).

Leon Gordis, Epidemiology (2d ed. 2000).

Morton Hunt, How Science Takes Stock: The Story of Meta-Analysis (1997).

Harold A. Kahn, An Introduction to Epidemiologic Methods (1983).

Harold A. Kahn & Christopher T. Sempos, Statistical Methods in Epidemiology (1989).

David E. Lilienfeld, *Overview of Epidemiology,* 3 Shepard's Expert & Sci. Evid. Q. 25 (1995).

David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology (3d ed. 1994).

Judith S. Mausner & Anita K. Bahn, Epidemiology: An Introductory Text (1974).

Marcello Pagano & Kimberlee Gauvreau, Principles of Biostatistics (1993).

Richard K. Riegelman & Robert A. Hirsch, Studying a Study and Testing a Test: How to Read the Health Science Literature (3d ed. 1996).

Bernard Rosner, Fundamentals of Biostatistics (4th ed. 1995).

Kenneth J. Rothman & Sander Greenland, Modern Epidemiology (2d ed. 1998).

James J. Schlesselman, Case–Control Studies: Design, Conduct, Analysis (1982).

Mervyn Susser, Epidemiology, Health and Society: Selected Papers (1987).

# References on Law and Epidemiology

2 American Law Institute, Reporters' Study on Enterprise Responsibility for Personal Injury (1991).

Bert Black & David H. Hollander, Jr., *Unraveling Causation: Back to the Basics,* 3 U. Balt. J. Envtl. L. 1 (1993).

Bert Black & David Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation,* 52 Fordham L. Rev. 732 (1984).

Gerald Boston, *A Mass-Exposure Model of Toxic Causation: The Content of Scientific Proof and the Regulatory Experience,* 18 Colum. J. Envtl. L. 181 (1993).

Vincent M. Brannigan et al., *Risk, Statistical Inference, and the Law of Evidence: The Use of Epidemiological Data in Toxic Tort Cases*, 12 Risk Analysis 343 (1992).

Troyen Brennan, *Causal Chains and Statistical Links: The Role of Scientific Uncertainty in Hazardous-Substance Litigation*, 73 Cornell L. Rev. 469 (1988).

Troyen Brennan, *Helping Courts with Toxic Torts: Some Proposals Regarding Alternative Methods for Presenting and Assessing Scientific Evidence in Common Law Courts*, 51 U. Pitt. L. Rev. 1 (1989).

Philip Cole, *Causality in Epidemiology, Health Policy, and Law*, [1997] 27 Envtl. L. Rep. (Envtl. L. Inst.) 10279 (June1997).

Comment, *Epidemiologic Proof of Probability: Implementing the Proportional Recovery Approach in Toxic Exposure Torts*, 89 Dick. L. Rev. 233 (1984).

George W. Conk, *Against the Odds: Proving Causation of Disease with Epidemiological Evidence*, 3 Shepard's Expert & Sci. Evid. Q. 85 (1995).

Carl F. Cranor et al., *Judicial Boundary Drawing and the Need for Context-Sensitive Science in Toxic Torts After* Daubert v. Merrell Dow Pharmaceuticals, Inc., 16 Va. Envtl. L.J. 1 (1996).

Richard Delgado, *Beyond Sindell: Relaxation of Cause-in-Fact Rules for Indeterminate Plaintiffs*, 70 Cal. L. Rev. 881 (1982).

Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact*, 7 Harv. Envtl. L. Rev. 429 (1983).

Jean Macchiaroli Eggen, *Toxic Torts, Causation, and Scientific Evidence After* Daubert, 55 U. Pitt. L. Rev. 889 (1994).

Daniel A. Farber, *Toxic Causation*, 71 Minn. L. Rev. 1219 (1987).

Heidi Li Feldman, *Science and Uncertainty in Mass Exposure Litigation*, 74 Tex. L. Rev. 1 (1995).

Stephen E. Fienberg et al., *Understanding and Evaluating Statistical Evidence in Litigation*, 36 Jurimetrics J. 1 (1995).

Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy (1988).

Herman J. Gibb, *Epidemiology and Cancer Risk Assessment, in* Fundamentals of Risk Analysis and Risk Management 23 (Vlasta Molak ed., 1997).

Steve Gold, Note, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion and Statistical Evidence*, 96 Yale L.J. 376 (1986).

Leon Gordis, *Epidemiologic Approaches for Studying Human Disease in Relation to Hazardous Waste Disposal Sites*, 25 Hous. L. Rev. 837 (1988).

Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation*, 86 Nw. U. L. Rev. 643 (1992).

Khristine L. Hall & Ellen Silbergeld, *Reappraising Epidemiology: A Response to Mr. Dore*, 7 Harv. Envtl. L. Rev. 441 (1983).

Jay P. Kesan, *Drug Development: Who Knows Where the Time Goes?: A Critical Examination of the Post-*Daubert *Scientific Evidence Landscape*, 52 Food Drug Cosm. L.J. 225 (1997).

Constantine Kokkoris, Comment, DeLuca v. Merrell Dow Pharmaceuticals, Inc.: *Statistical Significance and the Novel Scientific Technique,* 58 Brook. L. Rev. 219 (1992).

James P. Leape, *Quantitative Risk Assessment in Regulation of Environmental Carcinogens*, 4 Harv. Envtl. L. Rev. 86 (1980).

David E. Lilienfeld, *Overview of Epidemiology*, 3 Shepard's Expert & Sci. Evid. Q. 23 (1995).

Junius McElveen, Jr., & Pamela Eddy, *Cancer and Toxic Substances: The Problem of Causation and the Use of Epidemiology*, 33 Clev. St. L. Rev. 29 (1984).

2 Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman et al. eds.,1997).

Note, *The Inapplicability of Traditional Tort Analysis to Environmental Risks: The Example of Toxic Waste Pollution Victim Compensation*, 35 Stan. L. Rev. 575 (1983).

Susan R. Poulter, *Science and Toxic Torts: Is There a Rational Solution to the Problem of Causation?*, 7 High Tech. L.J. 189 (1992).

Jon Todd Powell, Comment, *How to Tell the Truth with Statistics: A New Statistical Approach to Analyzing the Data in the Aftermath of* Daubert v. Merrell Dow Pharmaceuticals, 31 Hous. L. Rev. 1241 (1994).

David Rosenberg, *The Causal Connection in Mass Exposure Cases: A Public Law Vision of the Tort System*, 97 Harv. L. Rev. 849 (1984).

Joseph Sanders, *The Bendectin Litigation: A Case Study in the Life-Cycle of Mass Torts*, 43 Hastings L.J. 301 (1992).

Joseph Sanders, *Scientific Validity, Admissibility, and Mass Torts After* Daubert, 78 Minn. L. Rev. 1387 (1994).

Richard W. Wright, *Causation in Tort Law*, 73 Cal. L. Rev. 1735 (1985).

*Development in the Law—Confronting the New Challenges of Scientific Evidence,* 108 Harv. L. Rev. 1481 (1995).

*Reference Manual on Scientific Evidence*

cludes epidemiological studies and toxicology studies. The physician should be guided by the methods set forth in the Reference Guides on Epidemiology and Toxicology in evaluating this literature and its relevance to the patient's exposure and condition.[127]

Physicians also have access to case reports or case series in the medical literature. These are reports in medical journals describing clinical events involving one individual or a few individuals. They report unusual or new disease presentations, treatments, or manifestations, or suspected associations between two diseases, effects of medication, or external causes of diseases. For example, the association between asbestos and lung cancer was first reported in a 1933 case report, although the first controlled epidemiological study on the association was not published until the 1950s.[128] There are a number of other instances in which epidemiological studies have confirmed associations between a specific exposure and a disease first reported in case studies (e.g., benzene and leukemia; vinyl chloride and hepatic angiosarcoma),[129] but there are also instances in which controlled studies have failed to substantially confirm the initial case reports (e.g., the alleged connection between coffee and pancreatic and bladder cancer or the infectious etiology of Hodgkins disease).[130]

(witness cited no scientific or medical literature, or other explanation of asserted causal relationship between nicotine patch and heart attack), *cert. denied*, 519 U.S. 819 (1996); Porter v. Whitehall Labs., Inc., 9 F.3d 607, 615 (7th Cir. 1993) (medical literature did not establish link between ibuprofen and plaintiff's kidney ailment; medical theories had not been tested). Other courts have upheld the admission of medical opinion based solely on clinical observations and reasoning, sometimes with reference to the physician's experience with similar kinds of patients or cases. *See, e.g.*, Heller v. Shaw Indus., Inc., 167 F.3d 146, 153–57 (3d Cir. 1999); Westberry v. Gummi, 178 F.3d 257, 262–66 (4th Cir. 1999) (affirmed trial court's admission of expert testimony on talc as cause of plaintiff's sinus problems despite absence of supporting medical literature); Fadelalla v. Secretary of the Dep't of Health & Human Servs., No. 97–05730, 1999 WL 270423, at *6 (Fed. Cl. Apr. 15, 1999) (while clinical experience may be sufficient to establish causal relationship, in this case expert had insufficient clinical experience on which to base an opinion on causation); Becker v. National Health Prods., Inc., 896 F. Supp. 100, 103 (N.D.N.Y. 1995) (absence of published literature on relationship between diet supplement and diverticulosis not fatal to plaintiff's case where expert relied on "differential etiology").

127. *See* Michael D. Green et al., Reference Guide on Epidemiology, §§ V–VII, and Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, §§ III–V, in this manual.

128. *See* Michael Gochfeld, *Asbestos Exposure in Buildings, in* Environmental Medicine, *supra* note 19, at 438, 440.

129. *See* Michael Gochfeld, *Chemical Agents, in* Environmental Medicine, *supra* note 19, at 592, 600 (vinyl chloride); Howard M. Kipen & Daniel Wartenberg, *Lymphohematopoietic Malignancies, in* Textbook of Clinical Occupational and Environmental Medicine 555, 560 (Linda Rosenstock & Mark R. Cullen eds., 1994) (benzene).

130. Kristin E. Anderson et al., *Pancreatic Cancer, in* Cancer Epidemiology and Prevention 725, 740–41 (David Schottenfeld & Joseph F. Fraumeni, Jr., eds., 2d ed. 1996); Debra T. Silverman et al., *Bladder Cancer, in* Cancer Epidemiology and Prevention, *supra*, at 1156, 1165–66.

Case reports lack controls and thus do not provide as much information as controlled epidemiological studies do.[131] However, case reports are often all that is available on a particular subject because they usually do not require substantial, if any, funding to accomplish, and human exposure may be rare and difficult to study. Causal attribution based on case studies must be regarded with caution. However, such studies may be carefully considered in light of other information available, including toxicological data.[132]

### 3. Clinical Evaluation of Information Affecting Dose–Response Relationships

Assessing the role of external causes in the patient's condition requires the integration of the information described in the preceding sections, with particular attention to dose–response relationships. The toxicological law of dose–response, that is, that "the dose makes the poison," refers to the general tendency for greater doses of a toxin to cause greater severity of responses in individuals, as well as greater frequency of response in populations.[133] Clinically, there are some instances in which the general rule does not hold. For agents that cause an allergic response through an immunologic mechanism, the dose–response relationship is often less straightforward. Many people who are not prone or able to develop an allergic reaction, for genetic or other reasons, will not respond adversely to the substance at any dose. However, those who are susceptible are more likely to become specifically reactive (sensitized) to the specific agent as the dose increases. After sensitization has occurred, severe reactions may occur with exposures that are much lower than the previous level required for sensitization.[134]

Although some diseases (e.g., pneumonia that is due to influenza) are frequently considered to be unifactorial, the possibility of multiple causes of a clini-

131. *See generally* Michael D. Green et al., Reference Guide on Epidemiology § II.A, in this manual.
132. *See* Cullen et al., *supra* note 19, at 226. Courts have given varying treatment to case reports. *Compare* Haggerty v. Upjohn Co., 950 F. Supp. 1160, 1165 (S.D. Fla. 1996) (case reports are "no substitute for a scientifically designed and conducted inquiry" (citing Casey v. Ohio Med. Prods., 877 F. Supp. 1380, 1385 (N.D. Cal. 1995))), *aff'd*, 158 F.3d 588 (11th Cir. 1998) (unpublished table decision), *and* Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1411 (D. Or. 1996) (case reports "cannot be the basis of an opinion based on scientific knowledge"), *with* Pick v. American Med. Sys., Inc., 958 F. Supp. 1151, 1160–62, 1178 (E.D. La. 1997) (case studies on gel implants admissible in case on penile implant; theory developed by single physician not admissible), Glaser v. Thompson Med. Co., 32 F.3d 969, 975 (6th Cir. 1994) (ordering trial based on witness who relied on case reports and his own research in rendering opinion on diet pills as cause of intracranial bleeding and fall), *and* Cella v. United States, 998 F.2d 418, 426 (7th Cir. 1993) (in claim under Jones Act, medical opinion on cause of polymyositis based in part on case reports).
133. *See* Michael Gochfeld, *Principles of Toxicology, in* Environmental Medicine, *supra* note 19, at 65, 71–72.
134. *See* Cullen et al., *supra* note 19, at 228–29.

cal condition is a critical concern. At some level most diseases have multiple host and environmental factors that contribute to their presence. A commonly held misconception is that the presence of a nontoxic or other toxic cause for a condition automatically excludes a role for the toxin being considered as an external cause.[135] While this is sometimes true, in reality the converse can also be true. For example, epidemiology studies dealing with occupational asbestos exposure and cigarette smoking indicate that together they result in much higher rates of lung cancer than either one causes on its own.[136] Thus, two toxic agents have been found to interact in a synergistic manner so that their combined effects are much greater than even the sum of their individual effects.[137]

Even if causal factors do not interact synergistically, several may contribute in an incremental fashion to a disease and should not be assumed to be mutually exclusive.[138] Accordingly, the common statement that "alternative causes of disease must be ruled out" before causation is attributed can be more accurately refined to say that "the role of other causes must be adequately considered." If there is a significant rate of disease of unknown etiology (i.e., other causes or risk factors have not been identified), the determination of external causation

135. Some courts have stated that the plaintiff must offer a "differential diagnosis" to rule out other causes, whereas other courts have rejected such a requirement. *Compare* Wheat v. Pfizer, Inc., 31 F.3d 340, 342 (5th Cir. 1994) (witness failed to rule out hepatitis C and another drug as causes of plaintiff's liver disease), Mancuso v. Consolidated Edison Co., 967 F. Supp. 1437, 1446 (S.D.N.Y. 1997) ("differential diagnosis" required to rule out other possible causes; plaintiff's complaints were commonplace ailments), *and* National Bank of Commerce v. Dow Chem. Co., 965 F. Supp. 1490 (E.D. Ark. 1996) (case dismissed because, inter alia, plaintiffs failed to exclude other causes), *aff'd*, 133 F.3d 1132 (8th Cir. 1998), *with* Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 670–72 (5th Cir. 1999) (rejecting requirement of "differential diagnosis" to rule out other causes), *and* Heller v. Shaw Indus., Inc., 167 F.3d 146, 153–57 (3d Cir. 1999) (existence of possible alternative causes goes to weight, not admissibility).

136. Occupational asbestos exposure in nonsmokers increases the risk of lung cancer by a factor of about five, from about 11 per 100,000, for nonsmoking industrial workers not exposed to asbestos to about 58 per 100,000 for nonsmoking asbestos workers; a significant smoking history increases the rate of lung cancer by a factor of at least ten. *See* U.S. Surgeon Gen., U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking: Cancer and Chronic Lung Disease in the Workplace 216 (1985); *see also* Rodolfo Saracci, *The Interactions of Tobacco Smoking and Other Agents in Cancer Etiology*, 9 Epidemiologic Revs. 175, 176–80 (1987). Because the effects of smoking and asbestos are multiplicative for lung cancer, the population of smoking asbestos workers has a lung cancer incidence of 5 times 10, or 50 times the background rates, rather than the 15-fold increase predicted by adding the separate risks. *See* U.S. Surgeon Gen., U.S. Dep't of Health & Human Servs., *supra*, at 216–17.

137. *See* Gochfeld, *supra* note 133, at 73.

138. For example, both occupational asthma and smoking can lead to impairment of pulmonary function, and the presence of one does not rule out a causal role for the other. *See* John H. Holbrook, *Nicotine Addiction, in* 2 Principles of Internal Medicine, *supra* note 42, at 2516, 2518; E.R. McFadden, Jr., *Asthma, in* 2 Principles of Internal Medicine, *supra* note 42, at 1419, 1419–21. *Cf.* Wheat v. Pfizer, Inc., 31 F.3d 340 (5th Cir. 1994), which involved a victim who died of hepatitis after taking two drugs known to cause liver damage. As to her claim against Pfizer, the manufacturer of one of the drugs, the court found the evidence inadequate, in part, for failing to exclude the possibility that her disease was caused by the other drug. *Id.* at 343. The plaintiff's witness offered the possibility that the hepatitis

**differential diagnosis.** The term used by physicians to refer to the process of determining which of two or more diseases with similar symptoms and signs the patient is suffering from, by means of comparing the various competing diagnostic hypotheses with the clinical findings.

**differential etiology.** A term used on occasion by expert witnesses or courts to describe the investigation and reasoning that leads to a determination of external causation, sometimes more specifically described by the witness or court as a process of identifying external causes by a process of elimination.

**disease.** Coherent deviation from normal in structure or function that affects a certain part or parts of the body or type of tissue.

**dose–response relationship.** The general tendency to observe greater responses in individuals when they are given greater doses of a drug or toxic substance. The presence of such a relationship supports an inference of a causal relationship between exposure and response (disease).

**external causation.** As used herein, an underlying cause of a given disease in a given individual that stems from a source outside the individual's body. A hereditary disease such as Tay-Sachs disease or hemophilia would not be due to external causation; cirrhosis of the liver resulting from excessive alcohol intake or ataxia resulting from lead poisoning would be due to external causation.

**general causation.** General causation is established by demonstrating (usually by reference to a scientific publication) that exposure to the substance in question causes (or is capable of causing) disease; for example, smoking cigarettes causes lung cancer.

**inductive reasoning.** See inferential reasoning.

**inferential reasoning.** The reasoning process by which a physician assimilates the various findings on a given patient and forms hypotheses that lead to testing and further hypotheses until a coherent diagnosis is reached.

**invasive procedure.** A procedure (surgery, test, etc.) in which the body of the patient is invaded by an instrument of some sort. Invasive procedures may be as minimal as the biopsy of a lesion on the skin or as traumatic as open-heart surgery.

**laboratory tests.** Analyses of fluids or other substances collected from the body of the patient, including blood samples, urine samples, and fecal samples.

**multiplicative interaction.** A process that occurs when two toxic agents (or two disease states) interact in the patient in such a manner that the magnitude of their combined effects is equal to the product of the effect of each agent (or disease) working in isolation. This is a special instance of synergism.

481