# Exhibit 20

Page 1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
 2
 3   - - - - - - - - - - - X
     IN RE:  NEW YORK NEURONTIN          :
 4   PRODUCTS LIABILITY LITIGATION       :
                                         :Case Management.
 5   vs.                                 :Index No. 765000/2006
                                         :Hon. Marcy S. Friedman
 6   THIS DOCUMENT APPLIES TO ALL        :
     CASES                               :
 7   - - - - - - - - - - - X
 8
 9
10
11       DEPOSITION OF:       CHERYL D. BLUME, PH.D.
12
         DATE:                February 29, 2008
13
14       TIME:                12:57 p.m. to 2:52 p.m.
15
         PLACE:               13902 N. Dale Mabry Hwy
16                            Tampa, Florida
17
         BEFORE:              CAROLYN R. LOUDEN, RPR
18                            Notary Public, State of
                              Florida at Large
19
                              Pages 1 - 92
20
21
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2      ANDREW G. FINKELSTEIN, ESQUIRE
          Finkelstein & Partners, LLP
 3        436 Robinson Avenue
          Newburgh, New York 12550
 4        (845) 562-3492
            Attorney for Plaintiff
 5
        LORI CONNORS McGRODER, ESQUIRE
 6      VINCE GUNTER, ESQUIRE (Via teleconference)
          Shook, Hardy & Bacon, LLP
 7        2555 Grand Boulevard
          Kansas City, Missouri 64108
 8        (816) 474-6550
          -and-
 9      MICHAEL J. WASICKO, ESQUIRE
          Goodell, DeVries, Leech & Dann, LLP
10        One South Street, 20th Floor
          Baltimore, Maryland 21202
11        (410) 783-4000
            Attorney for Defendants
12          Pfizer and Warner-Lambert Company, LLC
13                      INDEX
14  DIRECT EXAMINATION BY MS. MCGRODER       3
15  WITNESS' SIGNATURE PAGE              90
16  CERTIFICATE OF OATH                  91
17  REPORTER'S CERTIFICATE               92
18              EXHIBITS
19          (No exhibits marked.)
20
21
22
23
24
25
```

Page 3

```
 1         CHERYL D. BLUME, Ph.D.,
 2  the witness herein, being first duly sworn on oath, was
 3  examined and deposed as follows:
 4         THE WITNESS: I do.
 5              DIRECT EXAMINATION
 6  BY MS. McCRODER:
 7      Q. Dr. Blume, you agree the FDA alert expressly
 8  states that posting this information does not mean that
 9  FDA has concluded there is a causal relationship between
10  the drug products and the emerging safety issue? You
11  agree?
12      A. I agree that FDA stated that.
13      Q. And the FDA also states that it is not
14  advising healthcare providers to discontinue prescribing
15  these products. Agree?
16      A. Agree.
17      Q. So doctors today are still prescribing
18  Neurontin?
19      A. I don't know, but I would think so.
20      Q. Do you agree that the Neurontin specific
21  controlled clinical trial data do not show an increased
22  risk of suicide?
23      A. I do not believe I saw any suicides in the
24  placebo-controlled studies.
25      Q. When you read the FDA alert, what did it tell
```

Page 4

```
 1  you about Neurontin that you did not know when you wrote
 2  your report?
 3      And I'm not talking about other antiepileptic
 4  drugs, specifically with respect to Neurontin.
 5      A. The report told me that FDA had spent two or
 6  three years following the receipt of the requested data
 7  and reviewed the various reports from different
 8  perspectives and concluded that across the category of
 9  antiepileptics there was an increased risk of suicide
10  behavior and that the risk was found across all the
11  members studied.
12      Q. Okay. That wasn't my question. My question
13  was specific to Neurontin. What did you learn about
14  Neurontin, when you read that FDA alert, that you did
15  not know when you wrote your Neurontin report?
16      A. I learned that FDA reviewed the data that was
17  provided to them and analyzed the data and included
18  Neurontin in the group of 11 drugs for which they found
19  an increase in suicide behavior and that that applied to
20  Neurontin, as well as to the other ten members in the
21  group.
22      Q. You do not know what the incidence of suicide
23  behaviors or ideation is for any of the specific drugs
24  identified in that report other than Neurontin, correct?
25      A. Correct. I do not have those databases, and I
```

Page 5

```
 1  do not know the methods used by the FDA to calculate
 2  that.
 3      Q. Do you agree that the FDA, in its analysis of
 4  the antiepileptic drugs that are included in this alert,
 5  looked only at placebo-controlled clinical trial data
 6  for these 11 drugs?
 7      A. Well, I don't have any idea what FDA has done
 8  in total. I know that they requested data from
 9  placebo-controlled studies, as well as active-controlled
10  and post-marketing data, but I believe that their
11  initial analyses, for the purposes of this alert,
12  relates to the placebo-controlled trials. But I have no
13  idea of the totality of what FDA has reviewed to date.
14      Q. You haven't discussed the FDA's analysis of
15  these data with anyone from FDA; is that correct?
16      A. I have not.
17      Q. And you know from looking at the FDA alert
18  that the FDA analyzed reports of suicidality, suicidal
19  behavior, or ideation from placebo-controlled clinical
20  studies of 11 drugs to treat epilepsy, as well as
21  psychiatric disorders and other conditions, correct?
22      A. Yes. The background data indicates that they
23  reviewed the placebo-controlled trials for the purposes
24  of this alert.
25      Q. The FDA did not look at post-marketing
```

2 (Pages 2 to 5)

Page 6

1  adverse-event data for its analysis, which is reflected
2  in this alert, correct?
3      A.  I have no idea of the totality of what they
4  looked at, but they reflect data that they generated
5  from the placebo-controlled trials in this alert.
6      Q.  And so my question is, on the face of this
7  alert, there's no evidence, as you sit here today, that
8  the FDA analyzed adverse-event data in order to conduct
9  or perform the analysis that's reflected in this alert,
10 correct?
11     A.  I don't know what FDA did. I know that
12 they --
13     Q.  Well, I didn't ask you if you knew what FDA
14 did.
15     A.  Well, I'm answering your question.
16     Q.  I asked you if on the face --
17     A.  I don't know.
18         MR. FINKELSTEIN:  Just a second.
19         MS. McCRODER:  No, no, no.  I was asking my
20 question.
21         MR. FINKELSTEIN:  No, no.  Let's -- so that we
22 get a clean record, just let her finish.  She'll
23 let you finish.  That's all.
24         THE WITNESS:  I don't know how else to answer
25 it.  I know that FDA requested many, many different

Page 7

1  types of categories of data from these
2  manufacturers.  So I don't know what they've
3  reviewed so far, but this alert is reflecting their
4  analysis of the placebo-controlled studies.
5         MS. McCRODER:  Well, object and move to
6  strike.
7  BY MS. McCRODER:
8      Q.  My question wasn't:  Dr. Blume, do you know
9  what the FDA reviewed?  My question was, on the face of
10 this alert, it's clear that the FDA analyzed
11 placebo-controlled studies and not adverse-event data in
12 order to conduct the meta-analysis that is reflected in
13 this alert, correct?
14     A.  The meta-analysis appears to be taken from 199
15 placebo-controlled studies.
16     Q.  There's no mention in this FDA alert of any
17 analysis of post-marketing data from the AERS database,
18 is there?
19     A.  I don't believe so.
20     Q.  There's no mention in this alert of FDA
21 analysis of any dechallange or rechallange adverse-event
22 reports, correct?
23     A.  Dechallange and rechallange data occurred in
24 the placebo-controlled trials.
25     Q.  No.  That wasn't my question.  My question

Page 8

1  was, there's no evidence on the face of this alert that
2  the FDA analyzed dechallange/rechallange adverse events
3  for purposes of this analysis?
4      A.  I don't know what they analyzed.  They don't
5  mention the words "dechallange" and "rechallange" in
6  this report.
7      Q.  Correct.
8      A.  Whether there were dechallange data as part of
9  the events reported, I don't know.
10     Q.  Right.
11     A.  But they may well have been.
12     Q.  Right.  You don't know, do you?
13     A.  No.  I don't know what FDA did as they
14 conducted their various analyses.  No.
15     Q.  So as you sit here today, you have no evidence
16 that the FDA analyzed dechallange/rechallange adverse
17 events for purposes of this analysis as reflected in
18 this alert, correct?
19     A.  I have no evidence either way, that they did
20 or they didn't, if there were dechallange/rechallange
21 events as part of these reports.
22     Q.  Would you agree, Dr. Blume, that the -- to the
23 extent a high number of suicide events were reported
24 for, say, one of the drugs included in this FDA alert,
25 it could drive the overall results for the

Page 9

1  meta-analysis?
2         MR. FINKELSTEIN:  Objection.  You can answer
3  it.
4         THE WITNESS:  Would I -- is your question
5  would I agree if one product had a high number of
6  events that that could impact the analysis?
7  BY MS. McCRODER:
8      Q.  Yes.  That's my question.
9      A.  I guess it could.  I don't know how FDA
10 corrected for that.  I don't know.
11     Q.  You can't rule that out?  That's a
12 possibility?
13     A.  Or in.  I don't know what FDA did.
14     Q.  Have you read the FDA-approved labeling for
15 all of the 11 antiepileptic drugs referenced in the
16 alert?
17     A.  No.  I don't know if I did sometime over the
18 years.  I believe I have reviewed some of them, but I
19 don't recall.
20     Q.  Well, you don't prescribe antiepileptic drugs,
21 correct?
22     A.  No.  As I told the reporter, I'm a Ph.D.
23     Q.  So you don't prescribe drugs at all?
24     A.  No.  I'm not an M.D.
25     Q.  Do you think that you've looked at the

Page 14

1    A.  Okay.
2    Q.  How many of those four events are reported in
3 the Neurontin placebo-controlled clinical studies?
4    A.  I have just a vague recollection of the
5 October letter, October 2006 letter, which just was
6 discussed by Pfizer.  If you want to show me a copy of
7 that, I can give you a breakdown of it.
8    Q.  When's the last time you looked at the
9 October 2006 letter?
10   A.  I don't specifically recall.
11   Q.  And you also referenced another letter that
12 you believe you looked at that supports your -- that you
13 believe supports your testimony about the number of
14 suicide adverse events reported for Neurontin in the
15 placebo-controlled trials.  What letter is that?
16       MR. FINKELSTEIN:  I'm not sure what you're
17    referring to.  You mean in her testimony right now?
18       MS. McCRODER:  Yeah, in her testimony right
19    now.
20       THE WITNESS:  If I said that, I don't recall
21    which one it was.
22 BY MS. McCRODER:
23   Q.  Well, are you thinking of more than one letter
24 as relates to the number of suicide adverse events
25 reported in the placebo-controlled studies for

Page 15

1 Neurontin?
2    A.  There have been multiple correspondences sent
3 by Pfizer to the FDA in response to this issue.
4    Q.  When's the last time you looked at any one of
5 those letters?
6    A.  Well, certainly prior to my deposition.
7    Q.  Your deposition today?
8    A.  My deposition, I believe, in November.  And I
9 may have looked at them again sometime prior, after
10 that.  I just don't recall.
11   Q.  Well, did you look at any of them today?
12   A.  I don't -- I don't think so.
13   Q.  You don't know?
14   A.  I may have looked early this morning at the
15 October 2006 one.
16   Q.  You don't know if you looked this morning at a
17 letter?
18   A.  I may have looked at the one this morning, or
19 it may have been prior to today.
20   Q.  Well, did you or didn't you?
21   A.  I don't recall, but I may have.
22   Q.  You don't recall what you looked at this
23 morning?
24   A.  No.
25   Q.  But you looked at something?

Page 16

1    A.  I looked at this.  I reviewed this, and I
2 looked at my declaration.
3    Q.  When you say "this," you're pointing to the
4 FDA alert?
5    A.  Yes.
6    Q.  And your declaration.  What are you referring
7 to?
8    A.  The declaration that the attorneys submitted
9 responding to this.
10   Q.  I'm sorry.  I don't know what you mean.
11   A.  The FDA -- my understanding is that the
12 attorneys submitted a report saying that the -- some of
13 the experts had reviewed this and believed that this
14 supported their opinion.
15   Q.  Okay.  So the supplemental designation that
16 says you plan to rely on the FDA on your --
17   A.  Yes, yes.
18   Q.  And you also looked at correspondence related
19 to the suicide adverse events reported for Neurontin in
20 the placebo-controlled studies?
21   A.  There are several correspondences prepared and
22 reported by Pfizer relating to this topic beginning in
23 2004, and I certainly reviewed those prior to my
24 deposition a couple months ago.  Whether since then and
25 before today I looked at those, again, I don't

Page 17

1 specifically recall, but I do recall that one of them
2 was October 2006.
3    Q.  Well, I didn't ask you about before today.  I
4 asked you about today.  Today did you look at any
5 correspondence --
6    A.  I may have looked at that letter this morning.
7 I don't specifically recall.
8    Q.  Do you agree the 11 drugs identified by the
9 FDA in the alert do not all have the same pharmacologic
10 properties?
11   A.  In what respect?
12   Q.  In the respect of their pharmacologic
13 properties.
14   A.  Are you talking about their non-clinical
15 pharmacologic properties, their clinical pharmacologic
16 properties?  In what respect?
17   Q.  Well, I actually was talking about their
18 clinical pharmacologic properties, the way they are
19 distributed in the body, excreted, metabolized.
20   A.  Well, of course, different chemicals are
21 metabolized in different ways.  It's dependent on the
22 individual ingredient.  Yes.  I would agree that they
23 are metabolized differently.
24   Q.  And so do you agree that they have different
25 pharmacologic properties?

Page 18

1  A. Yes. They have different -- well, it's a
2  pharmacokinetic property, but I will agree that
3  individual ingredients have different pharmacokinetic
4  properties.
5  Q. For these 11 antiepileptic drugs?
6  A. For any drugs.
7  Q. Do you agree that these 11 antiepileptic drugs
8  have differing -- or differences in their mechanisms of
9  action?
10 A. They may have differences among -- in the --
11 they may in the extent of different pharmacologic
12 properties.
13 Q. Can you identify for me any peer-reviewed
14 literature in a medical or scientific journal stating
15 that you can combine data for drugs with different
16 pharmacologic properties and different mechanisms of
17 action to determine whether a single one of those drugs
18 can cause an adverse event?
19 A. No.
20 Q. Are you aware of the limitations of conducting
21 a meta-analysis of studies involving drugs that do not
22 have the identical or same mechanisms of action?
23 A. I don't -- no. I have no idea what -- upon
24 what limitations FDA based their meta-analysis. I don't
25 know what they did to adjust for that, if anything. I

Page 19

1  don't know. I mean, the FDA spent years reviewing this
2  data, but I do not know the specifics upon which they
3  developed their analyses. I defer to the FDA.
4  Q. You agree there are limitations in conducting
5  meta-analyses?
6  A. I don't know if there were in this dataset. I
7  don't know.
8  Q. In general. I'm not asking you on this
9  dataset. I'm asking you generally.
10    Do you agree there are limitations in
11 conducting meta-analyses?
12 A. Certainly there are different approaches using
13 meta-analysis than there are placebo-controlled trials.
14 I will agree to that, but I know that the information
15 that are obtained -- data and information obtained from
16 that analysis are extremely valuable, because it allows
17 one to access large amounts of data.
18 Q. That wasn't my question. My question was --
19 A. But that's the best way I can answer it.
20 Q. Well, you need to let me ask my question. You
21 need to answer the question I ask.
22    My question is, are you aware that there are
23 limitations in conducting meta-analyses?
24 A. And I will answer you that I'm aware there are
25 limitations and advantages to all types of analyses --

Page 20

1  Q. Okay.
2  A. -- including meta-analyses. But I don't know,
3  again, the way in which FDA handled any perceived
4  strengths or limitations associated with these analyses.
5  Q. And you don't know that because the FDA hasn't
6  told us that, correct?
7  A. That is correct. I do not know what FDA has
8  done yet.
9  Q. So possibly there are limitations in the way
10 the FDA conducted this meta-analyses, and you just don't
11 know them?
12 A. I don't know. I mean, the FDA employs
13 phenomenal biostatisticians and epidemiologists. I
14 would assume that they would have taken those into
15 consideration before they published an alert.
16 Q. Well, regardless of how phenomenal your
17 biostatisticians are, meta-analyses, just as a matter of
18 science, have limitations like any other study, as you
19 just said. Agree?
20 A. All types of studies have limitations and
21 strengths.
22 Q. Right. And so even if the FDA employs the
23 world's foremost biostatisticians, that won't change the
24 fact that its meta-analyses may indeed have limitations
25 of which you are unaware, correct?

Page 21

1  A. Or strengths. I don't know. I don't know the
2  data they used or the methods for analyzing it.
3  Q. Okay. But you need to answer my question.
4  You can talk about strengths, if you want to, after you
5  answer my question about limitations.
6     MS. McCRODER: Can you read back my question?
7     (The court reporter read back.)
8  BY MS. McCRODER:
9  Q. Is that correct?
10 A. Correct. All analyses have strengths and
11 limitations.
12 Q. Should a meta-analysis be carefully planned
13 with a detailed protocol prepared in advance?
14 A. I believe that's the way they're generally
15 done.
16 Q. And you haven't seen, nor do you know, of
17 whether the FDA had a detailed protocol for its analysis
18 as reflected in this alert, correct?
19 A. I do not know what FDA has done.
20 Q. You also don't know really anything about the
21 study design that would be described in that protocol,
22 because you don't have the protocol, correct?
23 A. Correct. I do not have the protocol.
24 Q. You don't know the characteristics of the
25 patients from each of the 199 placebo-controlled studies

Page 42

1    MR. FINKELSTEIN: Off the record.
2    (Brief recess taken.)
3    BY MS. McCRODER:
4    Q. Okay. I was preparing to ask you about the
5    chart, and you were preparing to review the letter.
6    A. I'm sorry?
7    Q. I was preparing to ask you about the chart
8    that's contained in the June 2006 letter from Pfizer to
9    FDA that addresses the suicide events for the
10   placebo-controlled study data for Neurontin.
11   A. Well, my point was -- is that the methodology
12   required by the FDA --
13   Q. Well, no. Wait. I don't have a question
14   pending yet. You're giving me an answer, but I haven't
15   asked you a question.
16   A. Okay.
17   Q. My question is going to relate to the chart,
18   but, if you recall, you said you wanted to look at the
19   letter first.
20   A. I'm done.
21   Q. Okay. Are you ready?
22       If you could turn the page to the chart.
23   A. (Witness complied).
24   Q. How many suicide attempts are reported in the
25   placebo-controlled study data for Neurontin?

Page 43

1    A. The subset of the data compiled by the
2    psychiatrists has zero for suicide attempts.
3    Q. Well, that wasn't my question. My question
4    wasn't about a subset. My question was, what are the
5    number of suicide attempts reported in the
6    placebo-controlled study data for Neurontin subject to
7    the FDA's methodology provided to Pfizer to follow to
8    submit those data? What are the number of suicide
9    attempts reported in that chart?
10   A. Well, I can read to you what the chart says,
11   but the chart does not reflect the preamble to what you
12   said. The chart is a subset of what Pfizer did in
13   response to the FDA's methodology.
14   Q. Okay. And so I'm not asking you about the
15   FDA's methodology. I'm not asking you about Pfizer's
16   methodology pursuant to the FDA's request. I'm just
17   asking you, in that chart what are the number of suicide
18   attempts reported?
19   A. In this particular chart, the number of
20   suicide attempts is zero.
21   Q. What are the number of preparatory acts toward
22   imminent suicidal behavior for Neurontin reported in
23   that chart?
24   A. Well, again, the entire set of columns are
25   zero for that in this chart.

Page 44

1    Q. And for suicidal ideation, what are the number
2    of events reported, on Gabapentin?
3    A. Two.
4    Q. Okay. What is the incidence for those four
5    events reported from that chart, total incidence?
6        MR. FINKELSTEIN: On Gabapentin?
7        MS. McCRODER: Yes, on drug.
8        THE WITNESS: Well, the percent that is in
9    this particular chart reflects two divided by
10   5,194, I think.
11   BY MS. McCRODER:
12   Q. That's correct.
13   A. Because there's no explanation here. And that
14   is coded as .039.
15   Q. And .039 is the same as .39 per 1,000
16   patients, correct?
17   A. .039 percent is the same as .039 per hundred.
18   So that would be .39 per thousand.
19   Q. Okay. Now, let's look at the incidence for
20   the -- reported in the alert for these four suicide
21   events on drug. Is it .43?
22       MR. FINKELSTEIN: Objection. Ask that again,
23   because I don't think you --
24       MS. McCRODER: I'm sorry. Did I ask it wrong?
25       MR. FINKELSTEIN: Yeah. Just ask it again.

Page 45

1    BY MS. McCRODER:
2    Q. Let's look at the FDA alert. Tell me what the
3    incidence is in that alert reported for the 11 drugs for
4    those four suicide events.
5    A. In the FDA's analysis for the active drug --
6    all active drugs, the number is .43.
7    Q. Okay. And that's the same as 4.3 per a
8    thousand patients, correct?
9    A. .43 is the same as 4.3 patients per thousand.
10   Correct.
11   Q. .39 patients per -- strike that.
12       .39 per 1,000 patients is lower than 4.3 per
13   1,000 patients, correct?
14   A. Okay. I will agree that the number .39 is
15   less than the number 4.3.
16   Q. Okay.
17   A. I will not agree that you can correlate these
18   two charts.
19   Q. Did I ask you if you could correlate them? I
20   didn't ask you that, Dr. Blume.
21   A. I just --
22   Q. Just answer the question I ask. Is .39 per
23   1,000 patients lower than 4.3 per 1,000 patients?
24   A. Yes. The number .39 is lower than the number
25   4.3.

Page 46

1   Q. It's ten times lower, isn't it?
2   A. Yes. I think your arithmetic is correct.
3   Q. Now, you would agree -- assuming you could
4   correlate those two things, you would agree that the
5   incidence for those four suicide-related events on
6   Neurontin is lower than -- and actually ten times
7   lower -- than the incidence as reported in the FDA alert
8   for all 11 drugs, correct?
9       MR. FINKELSTEIN: Objection.
10      THE WITNESS: I'm never going to be able to
11      compare these data, the subset of data compiled by
12      the psychiatrists, with what FDA has chosen to
13      provide to us so far across 11 drugs based on the
14      intake data. I can't do it.
15  BY MS. McCRODER:
16  Q. Well, I want you to assume it. Okay? Just
17  for purposes of this question, I want you to assume that
18  you can compare the incidence for Neurontin reported in
19  that letter to the overall incidence reported by the
20  FDA.
21  A. I can't --
22  Q. Is the incidence for Neurontin lower than the
23  overall incidence reported in the FDA alert for all 11
24  antiepileptic drugs?
25      MR. FINKELSTEIN: Objection.

Page 47

1       THE WITNESS: I can discuss this document, and
2       I can discuss this document. I cannot compare
3       those. I cannot do what you're asking me to do.
4       It's scientifically unfounded.
5   BY MS. McCRODER:
6   Q. And what's your basis for saying that it's
7   scientifically unfounded?
8   A. Well, because this is a subset of events -- to
9   begin with, this is a subset of events. In here I'm
10  trying to count up --
11      MR. FINKELSTEIN: I just want the record to be
12      clear what she's referencing is the October 2006 --
13      MS. McCRODER: It's June.
14      MR. FINKELSTEIN: I'm sorry. June.
15      THE WITNESS: Right. June.
16      MR. FINKELSTEIN: June 2006.
17      THE WITNESS: June 2006. And which there is a
18      total of 16 --
19  BY MS. McCRODER:
20  Q. Oh, I understand.
21  A. There's a total of 16 even in here of 336
22  cases in which the Pfizer methodology identified. So if
23  we want to talk about percentages, I have a very minute
24  percentage that was subcalculated -- calculated using
25  the Columbia criteria by psychiatrists, who were not

Page 48

1   involved in the data collection according to the FDA
2   protocol. That's all this is.
3       What this is is a --
4       MR. FINKELSTEIN: Now referencing the FDA
5       alert.
6       THE WITNESS: I'm referencing now the FDA
7       dataset, which is compiled of 26,000 patients'
8       data -- 27,863 data in the active group and 16,029
9       in the placebo group. All of that data across 11
10      drugs and subdivided into three major categories --
11      and including a total statistical analyses -- and
12      it's based not upon a subset of analysis, but upon
13      all of the terms that the FDA requested that they
14      use. I cannot scientifically in any way compare
15      this presentation with this presentation.
16  BY MS. McCRODER:
17  Q. I think I understand your answer, and I want
18  you to look on the first page of this FDA alert. Let's
19  be clear here. The FDA alert says that the four events
20  that it evaluated -- they're right here. Do you see it:
21  Completed suicide, suicide attempt, preparatory acts
22  towards suicide, and suicide ideation?
23      Do you see that subset of events that the FDA
24  analyzed for this meta-analysis?
25  A. Yes.

Page 49

1   Q. Okay. Now, those are the same --
2   A. I don't know what goes into preparatory
3   events. We don't have the full definition.
4   Q. All right. Well, I didn't ask you that. Did
5   I ask you that, Dr. Blume?
6   A. Well, you asked me of the four, and it's one
7   of the four, ma'am.
8   Q. I asked you if those are the four events that
9   the FDA analyzed for purposes of this FDA alert.
10  A. It is the four categories of events.
11  Q. Okay. All right then. And the events that I
12  asked you about in this chart, those are the same four
13  categories of events, are they not?
14      MR. FINKELSTEIN: Now referencing the letter
15      of June 2006.
16      MS. McCRODER: Yes. Thank you.
17      THE WITNESS: Well, not exactly, since of the
18      16 numbers, five -- six of them fall into a
19      different category that FDA doesn't include, which
20      is Code 6 --
21  BY MS. McCRODER:
22  Q. Right. So --
23  A. -- not enough information.
24  Q. So I'm not asking you about Code 6, because
25  the FDA didn't look at Code 6. Look at this.