# Exhibit 22

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 54
-----------------------------------------------------------X
                                :

IN RE: BEXTRA AND CELEBREX         :        INDEX NO. 762000/2006
PRODUCT LIABILITY LITIGATION    :
                                  :
-----------------------------------------------------------X
                                :

THIS DOCUMENT APPLIES ONLY TO CASES  :       **DECISION AND ORDER**
INCLUDING CAUSES OF ACTION RELATING  :
TO CELEBREX                            :
                                :
-----------------------------------------------------------X

**KORNREICH, SHIRLEY WERNER, J.:**

Defendants in these joined products liability personal injury actions, Pfizer, Inc.,

Pharmacia Corporation, Pharmacia & Upjohn Company, G.D., Searle & Co. (formerly known as

G.D. Searle LLC), and Monsanto Company (collectively "Pfizer defendants" or "defendants"),

move to exclude expert testimony and opinions proposed by plaintiffs asserting claims arising

from ingestion of Celebrex. Specifically, defendants ask the court to exclude the following

opinions by plaintiffs' proposed experts that: (1) 200 mg of Celebrex daily causes heart attacks

and strokes; (2) 400 mg of Celebrex daily causes heart attacks and strokes; (3) Celebrex causes

strokes; (4) Celebrex caused any individual plaintiff's heart attack or stroke absent reliable proof

of a relative risk that exceeds 2.0; (5) Celebrex causes heart attacks or strokes more than three

days after a patient stops taking it; and (6) Celebrex causes heart attacks or strokes at durations of

less than 33 months of continuous daily use.

Correspondingly, plaintiffs seek to exclude the opinions of and meta-analyses performed

by Pfizer's experts Dr. Muhammad Mamdani, Dr. Milton Packer and Dr. Lee-Jen Wei. Plaintiffs

also seek to exclude Dr. Packer from testifying as to an alternative theory for the "imbalance

1

hypothesis" that plaintiffs have proposed as mechanistic evidence of general causation. For the reasons stated below, the court grants defendants' motion to preclude expert testimony that Celebrex at 200 mg daily causes heart attacks and strokes.  The remaining motions are denied.

I.    *Background*

Celebrex (known generically as Celecoxib) belongs to a general class of pain relievers known as non-steroidal, anti-inflammatory drugs ("NSAIDs"). This class of drugs contains traditional medications sold either over the counter--such as Motrin/Advil (ibuprofen), Aspirin and Aleve (naproxen)—or by prescription--such as Daypro (oxaprozin) and Voltaren (diclofenac). NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that stimulates synthesis of prostaglandins, which are chemicals produced in the body affecting, *inter alia*, blood clotting. Traditional NSAIDs have been a longstanding treatment option for relief of chronic or acute inflammation and pain associated with osteoarthritis, rheumatoid arthritis and other musculo-skeletal conditions. Traditional NSAIDs, however, have significant adverse side effects. Specifically, they greatly add to the risk of gastrointestinal perforations, ulcers and bleeds ("PUBs"). This risk is increased when high doses are ingested, which is often necessary to remedy chronic or acute inflammation and pain.

In the early 1990s, scientists discovered that the COX enzyme had two forms--COX-1 and COX-2--each of which appeared to have several distinct functions. Scientists believed that COX-1 affected the synthesis or production of prostaglandins responsible for protection of the stomach lining. Consequently, scientists hypothesized that "selective" NSAIDs designed to inhibit COX-2, but not COX-1, could offer the same pain relief as traditional NSAIDs with the reduced risk of fatal or debilitating PUBs. In addition, scientists believed that COX-2 inhibitors

2

might prove beneficial for the prevention or treatment of other conditions where evidence suggested that inflammation may play a causative role, such as Alzheimer's disease and certain cancers.

In light of these scientific advances, Pfizer and several other pharmaceutical companies began the development of "COX-2 inhibitors" or "coxibs." Thereafter, Pfizer produced Celebrex and Bextra, and Merck produced Vioxx, all COX-2 inhibitors. The Food and Drug Administration("FDA") approved Celebrex for adult arthritis in 1998, Vioxx in 1999 and Bextra in 2001. The recommended dose of Celebrex was and remains 200 milligrams a day ("mg/d") for arthritis and was 400 mg/d for rheumatoid arthritis.

Before and after its initial approval, Celebrex was subjected to a number of clinical trials and observational studies, the main sources of data analyzed by statisticians to determine the risks associated with the use of a particular compound. In clinical trials, the investigator controls organization of the comparison groups (by random selection) and administration of the exposure (here Celebrex). In an observational study, the investigator studies subjects in the community who have received an exposure through their own choice (over-the-counter medication), the actions of a healthcare provider (by prescription) or other circumstances. This method of scientific research is known as "epidemiology." Meta-analyses also were conducted. A meta-analysis is a systematic technique used to quantitatively summarize and assess data from clinical trials and observational studies.[1]  In addition to the epidemiology, a large amount of scientific

---

[1] Celebrex clinical trials referred to by the parties are: TARGET, APC, PreSAP, ADAPT, and CLASS. Celebrex observational studies referred to by the parties are: Huang, Schneeweiss, Jick, Helin-Salmivaara, Brophy, Gislason, Johnsen, Andersohn, N.S. Abraham, et al., Motsko, et al., and WellPoint, Inc. Celebrex meta-analyses referred to by the parties are: Caldwell, Chen, Kearney, McGettigan and Wei.

3

literature was written on the effects of Celebrex and other COX-2 inhibitors.

The results of a long-term randomized study of Celebrex known as CLASS ("Celecoxib Long-Term Arthritis Safety Study") were published in 2000. The study was designed to evaluate the gastrointestinal side effects of taking Celebrex at 800 mg/d. Based upon investigator reported cardiovascular ("cv") events, the study showed no increased risk of heart attack or stroke when Celebrex was compared to Diclofenac or Ibuprofen. Pfizer distributed this study widely to physicians and the medical community. After the CLASS trial was published, however, unpublished data from the trial were released. A number of medical articles analyzing CLASS in light of the unpublished data, found that the cv rate for Celebrex at 800 mg/d was in fact increased when compared with a placebo. *See* Mukherjee, et al., *Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors*, JAMA, 2001, 286:954-959 (MDL 1699 Exh. N); Hrachovec, et al., JAMA, 2001, 286:2398-9 (MDL 1699 Exh. O); Juni, *Are Selective COX-2 Inhibitors Superior to Traditional Non-Steroidal Anti-Inflammatory Drugs?*, BMJ, 2002, 324:1287-8 (MDL 1699 Exh. P); Fitzgerald, *Coxibs and Cardiovascular Disease*, NEJM, 2004, 351:1709-1711 (MDL 1699 Exh. Q).

Around the same time, a similar study of Vioxx, known as VIGOR, showed a four-fold increase in cv risk for patients taking Vioxx versus Aleve (naproxen), the most benign of the NSAIDs. The FDA subsequently revised the labels of Celebrex and Vioxx to reflect the cv risk results of these studies. Another Vioxx randomized clinical study, known as APPROVe, was published in 2004. This study demonstrated a two-fold increased risk of cv adverse events for patients taking Vioxx versus a placebo. The APPROVe study contributed to Merck's voluntary removal of Vioxx from the market on September 30, 2004. Meantime, the Adenoma Prevention

4

With Celecoxib Trial ("APC"), a randomized, placebo-controlled study of Celebrex at 200 mg twice daily (400 mg/d) and 400 mg twice daily (800 mg/d) to evaluate whether Celebrex prevents the development of colon polyps, showed dose-related increased cv risk for patients taking Celebrex compared to placebo. The cv risk for 200 mg twice daily was doubled, and the risk for 400 mg twice daily was tripled. The APC steering committee discontinued the trial in December 2004 because of these preliminary results.

In February 2005, the FDA convened two Advisory Committees and a 12-member *ad hoc* panel to review the data on cv risk and NSAIDs, including COX-2 inhibitors. The 32-person panel, relying on much of the same scientific and medical methodologies and data considered by the parties' experts in this litigation, was unanimous in its conclusion that Celecoxib significantly increases the risk of cardiovascular events *in a dose-dependent manner*. The panel concluded that COX-2 inhibitors, *as a class*, increase cv risk versus placebo, but that the data was insufficient to determine if traditional NSAIDs also increase cv risk. The panel gave greater weight to clinical trials than observational studies, commenting that the latter are considered supplemental to randomized, controlled clinical trials due to selection bias and residual confounding. The panel considered observational studies "hypothesis generating" in that they provide clues as to whether a manufacturer should conduct randomized, controlled trials. Minutes and transcript of 2/05 FDA advisory committee meeting, plaintiffs' opposition brief, Exhs 30 and 31. With respect to Celebrex, the panel noted that an excessive cv risk was likely with the 800 mg dose and probable at the 400 mg dose. *Id.* The panel made no finding with respect to the 200 mg dose and found that APC was the "strongest data" in support of an increased risk of serious, adverse cv events. FDA Decision Memorandum, April 6, 2005, at 4,

5

Declaration of Loren Brown ("Brown Decl."), Exh. 16.

The committee recommended that Celecoxib be allowed to remain on the U.S. market under several conditions, such as the addition of a "black box" warning to the labeling, restrictions on direct-to-consumer advertising and the development of a patient medication guide. Assumptions included that if Celecoxib was to be used, it should be: in patients who have not achieved pain control with nonselective NSAIDs; used in the lowest possible dose for the shortest time necessary and with information to high-risk cardiac patients about the excess cardiovascular risks. The FDA asked Pfizer to remove Bextra from the market, but determined that the benefits of Celebrex outweigh its risks. Celebrex is the only COX-2 inhibitor currently being sold.

The FDA also directed all NSAIDs, including Celebrex, to include a black box warnings on their labels (not dose related): "CELEBREX may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal. All NSAIDs may have similar risk. This risk may increase with duration of use. Patients with cardiovascular disease may be at greater risk." *Bennett, et al., Use of Nonsteroidal Antiinflammatory Drugs, An Update for Clinicians: A Scientific Statement From the American Heart Association*; circulation 1-9, 2007: 115 (MDL 1699 Exh. EE). The black box warning does not comment on the magnitude of the increase in risk, relative or absolute, and there is no mention of the recommendation for low doses or short duration of treatment. It contains the general statement that "[a]ll NSAIDs may have a similar risk," but includes no recognition of

6

known differences among the nonselective NSAIDs. *Id.*.[2]

Thereafter, thousands of patients and patient representatives filed lawsuits against Merck and Pfizer alleging that the patient had suffered a serious cardiovascular injury due to ingestion of Vioxx and/or Celebrex and/or Bextra. All of the Federal court claims against Merck were consolidated by the Multi-District Litigation Panel ("MDL") and transferred to the Federal District Court in New Orleans. All of the Federal court claims involving Celebrex and Bextra were consolidated in an MDL action and transferred to Judge Charles R. Breyer of the Federal District Court in San Francisco and all of the New York State Celebrex and Bextra claims were joined and transferred to this court. A joint Federal/New York State hearing on general causation in the Celebrex cases was held in the District Court on October 9-11, 2007, regarding the issues raised in the instant motions. This court and Judge Breyer presided at that hearing with Judge Fern Smith, special master. On November 19, 2007, Judge Breyer issued his memorandum and order determining that plaintiffs failed to demonstrate scientifically reliable evidence that Celebrex causes heart attacks or strokes when ingested at the 200 mg/d dose. Judge Breyer denied defendants' motion to exclude opinion testimony that Celebrex causes heart attacks or strokes when ingested at the 400 or 800 mg/d doses. In all other respects, the parties' motions were denied.[3]

_____

[2] The European Medicine Agency also has issued recommendations on coxibs' use. It recommends that selective COX-2 inhibitors be considered contraindicated in patients with ischemic heart disease and/or stroke, that they be avoided in patients with risk factors for coronary heart disease and that all patients take the lowest effective dose for the shortest time necessary to control symptoms. *Id*

[3] Judge Breyer made his determination using the *Daubert*, not the *Frye*, standard. *See Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993). *Daubert*, which is based upon the

II.    *The Parties' Positions*

Plaintiffs assert that the scientific tests and literature show that Celebrex significantly increases the risk of cardiovascular thrombotic events at all doses and for all durations. Plaintiffs further contend that the underlying biological mechanism of action (the "imbalance hypothesis" or "Fitzgerald theory") not only explains why certain of the clinical trials and observational studies show a significantly increased risk of cardiovascular events, but also constitutes independent proof of general causation at any dose. Plaintiffs rely on the conclusions of six proposed experts, reports and opinions issued by the Food and Drug Administration ("FDA") and the American Heart Association ("AHA"), the FDA's requirement that Celebrex's label include a "black box warning" and certain clinical and observational studies which establish a significant risk of cardiovascular thrombotic events, myocardial infarction and stroke from the ingestion of Celebrex.

Four of plaintiffs' experts testified at the joint hearing. Dr. Joel S. Bennett, a hematologist and professor of pharmacology, was presented to support the opinion that Celebrex increases the risk of cardiovascular events at all doses and that causation can be shown through the underlying biological mechanism of action, the imbalance theory. Dr. Neil E. Doherty III, a clinical

---

Federal Rules of Evidence, has as its linchpin evidentiary reliability based upon scientific validity. *Daubert, id.* at 588-90. A *Daubert* hearing, thus, determines "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-3. Important to this determination is the following: 1) whether the theory or technique can be tested; 2) whether it has been subjected to peer review and publication, a criterion which the Court noted did not necessarily correlate with reliability; 3) submission to the scrutiny of the scientific community; 4) the known or potential rate of error; 5) the existence and maintenance of standards controlling the technique's operation; and 6) general acceptance in the relevant scientific community. *Id.* at 593-4.

cardiologist, testified to his opinion that Celebrex increases the risk of cardiovascular events at all doses and at all durations. Dr. Nicholas P. Jewell, a statistician, was presented to opine that Celebrex at 200 mg/d is capable of causing a myocardial infarction ("MI"). And, plaintiffs' fourth expert to testify, Dr. Marilyn M. Rymer, a neurologist with a sub-specialty in stroke, opined that because the mechanism for ischemic stroke is the same as for heart attacks, data showing that Celebrex increases the risk of heart attacks also applies to strokes.

Defendants challenge the qualifications of plaintiffs' experts and the reliability of their methodologies and conclusions. Defendants' expert Dr. Milton Packer, a cardiologist and professor of clinical research, testified at the joint hearing. Additionally, defendants presented the written testimony and analyses of Muhammad Mamdani, an epidemiologist, and Professor Lee Jen-Wei, a bio-statistician, opining on the results of the many clinical trials and observational studies, which they argue show the lack of causation for stroke at any dose, the lack of causation for MIs at 200 mg or 400 mg and the lack of causation for stroke or MI at any dose absent a relative risk that exceeds 2.0. Plaintiffs characterize defendants' arguments as going to the weight and not the admissibility of plaintiffs' experts' conclusions.

III.    Legal Principles

Liability here is predicated on failure to warn of dangers of which the manufacturers knew or with adequate testing should have known. See Wolfgruber v Upjohn Co., 72 AD2d 59 (4th Dept. 1979), aff'd on opn below 52 NY2d 768 (1980). Such a claim, though it may be couched in terms of strict liability, is indistinguishable from a negligence claim. Id. Accord Enright v. Ely Lilly & Co., 77 N.Y.2d 377, 387 (1991). Liability will not be found unless: (1) the product is "defective" because it is not reasonably safe as marketed; (2) the product was used for

9

a normal purpose; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff by the exercise of reasonable care would not have both discovered the defect and apprehended its danger; and (5) the plaintiff would not have otherwise avoided the injury by the exercise of ordinary care. *Wolfgruber, supra* at 62. Causation in toxic tort or pharmaceutical personal injury cases is analyzed in terms of general (or generic) causation as a threshold issue; then if plaintiff clears that hurdle, the court (and jury) will grapple with the issue of specific causation -- whether the drug or the toxin was the cause "in fact" of the particular plaintiff's disease. *See, e.g.,* Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter, *Reference Guide on Medical Testimony, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 439, 444 (Fed. Jud. Ctr., 2d ed. 2000). The pending motions concern the issue of general causation – whether plaintiffs have met their burden of proving that Celebrex is capable of causing the types of cardiovascular injuries allegedly suffered by plaintiffs in these consolidated actions.

Where, as here, it is impossible to offer direct evidence of causation, New York law allows plaintiffs to rely on expert analyses based on statistical data to meet their burden. *See Nonnon v. City of New York,* 32 A.D.3d 91, 105 (1st Dept. 2006). "The admissibility and scope of ... [expert] testimony is addressed to the trial court's sound discretion." *Hudson v Lansingburgh Cent. Sch.Dist.,* 27 A.D3d 1027, 1028-1029 (3d Dept. 2006). To be admissible, an expert must be qualified and his/her opinion must be generally accepted in the relevant scientific community. *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (D.C. Cir. 1923). *See People v. Wesley,* 83 N.Y.2d 417, 422, 423 n.2 (1994) (Court utilized *Frye* standard and specifically stated *Daubert* was not applicable in New York); *Heckstall v. Pincus,* 19 A.D.3d 203 (1st Dept. 2005). "[G]eneral acceptance does not necessarily mean that a majority of the scientists involved

10

subscribe to the conclusion. Rather it means that those espousing the theory or opinion have

followed generally accepted scientific principles and methodology in evaluating clinical data to

reach their conclusions."[4]  *Beck v. Warner-Lambert Co.* (NYLJ, Sept. 13, 2002, at 18, col 2). *See*

*Lewin v. County of Suffolk,* 18 A.D.3d 621, 622 (2d Dept. 2005) (where no scientific

organization or national board had expressly recognized plaintiff's theory and peer-reviewed

scientific articles and textbooks relied upon by plaintiff's experts did not establish causal

relationship, expert's testimony was "fundamentally speculative" and inadmissible); *Pauling v.*

*Orentreich Med. Group,* 14 A.D.3d 357 (1st Dept.), *lv. denied* 4 N.Y.3d 710 (2005) (plaintiff

failed to meet burden of proof at *Frye* hearing where no medical literature submitted to support

theory and no scientific or medical board recognized causal relationship); *Marsh v. Smyth,* 12

A.D.3d 307(1st Dept. 2004) (*Frye* test met where expert's deductions were supported by medical

literature); *Saulpaugh v. Krafte,* 5 A.D.3d 934 (3d Dept.), *lv. denied* 3 N.Y.3d 610 (2004) (broad

statement of scientific acceptance without accompanying support, insufficient to establish

scientific acceptance of theory); *Lara v. N.Y.C. Health and Hosps. Corp.,* 305 A.D.2d 106 (1st

Dept. 2003) (*Frye* test not met where no reported medical cases or formal studies supported

---

[4] A scientifically-reliable methodology to establish the relationship between an individual's disease and a specific factor suspected of causing that disease entails a three-step process: (1) a determination of the plaintiff's level of exposure to the toxin in question; (2) proof gleaned from the scientific literature that the toxin is capable of producing the illness (general causation) and at what level of exposure the toxin produces illness (*i.e.,* the dose-response relationship); and (3) establishment of specific causation by demonstrating the probability that the toxin caused the particular plaintiff's illness, which involves weighing the possibility of other causes of the illness. *Manusco v Consolidated Edison Co. of New York, Inc.,* 56 F. Supp. 2d 391, 399 (1999); *In re Joint E. & S. Dist. Asbestos Litig.,* 52 F.3d 1124, 1131 (1995); *Wills v Amerada Hess Corp.,* 2002 WL 140542, 2002 U.S. Dist. LEXIS 1546 (S.D.N.Y. Jan. 31, 2002); *Amorgianos v National R.R. Passenger Corp.,* 303 F.3d 256, 268 (2002); *Castellow v Chevron,* 97 F. Supp. 2d 780, 795-798 (2000).

theory); *Selig v. Pfizer, Inc.*, 290 A.D.2d 319 (1st Dept.), *lv. denied* 98 N.Y.2d 603 (2002) (where clinical data did not support expert's theory of causal link and expert failed to set forth other scientific evidence based on accepted principles to support causal link, expert precluded).

When there is "no particular novel methodology at issue for which the Court needs to determine whether there is general acceptance . . ., the inquiry ... is more akin to whether there is an appropriate foundation for the experts' opinions, rather than whether the opinions are admissible under *Frye*." *Parker v. Mobil Oil Corp.*, 7 NY3d 434, 447 (2006). The foundational inquiry shifts away from the "general reliability concerns of *Frye* to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial." *People v. Wesley, supra* at 429. *Accord People v. LeGrand*, 8 N.Y.3d 449, 457 (2007) . The burden is on the proponent of the evidence to demonstrate the generally accepted reliability of the proffered testimony. *Parker, supra* at 437. Thus, plaintiffs here must show that their experts not only rely on generally accepted scientific principles and methodologies, but also that in arriving at their conclusions, they look at the totality of the evidence and do not ignore contrary data. *See Selig v. Pfizer, Inc.*, 185 Misc.2d 600, 607 (Sup. Ct. N.Y.County 2000) (finding that expert failed to follow accepted scientific methodology by ignoring contrary clinical studies), *aff'd*, 290 A.D.2d 319 (1st Dept. 2002).

*IV.    Principles of Epidemiology*

Nearly all of the scientific evidence regarding the efficacy and risk of Celebrex is derived from epidemiological sources, that is, statistical analysis of data from clinical trials and observational studies. Epidemiology is hardly novel. It is a reliable scientific methodology that focuses on the question of general causation (*i.e.*, is the agent capable of causing disease?) rather

than that of specific causation (*i.e.*, did it cause disease in a particular individual?). Reference Guide on Epidemiology (p 336), found in the Reference Manual on Scientific Evidence (2d ed) (2000) ("the Guide"). The Guide emphasizes that "an association is not equivalent to causation" [*id.* (emphasis in original)], and that the question of "specific causation... [is] beyond the domain of the science of epidemiology." *Id.* at 381. The parties' experts, by and large, agree with these fundamental principles of epidemiological evaluation as related to causation.

The parties further acknowledge the method for applying these principles as explained in the Guide. Hence, an expert must first determine "whether an association exists between exposure to the agent and the disease." The Guide at 348. An association must be based on an assessment of the totality of the evidence and must be statistically significant, that is, beyond the play of chance. *Id.* "Once an association has been found between exposure to an agent and development of a disease, researchers consider whether the association reflects a true cause-effect relationship." *Id.* at 374.

Epidemiologists speak in the statistical language of risks and probabilities. The risk of injury from a suspected cause is expressed as relative risk. To calculate relative risk, the number of occurrences of an illness or injury in an exposed group is divided by the number of occurrences in the control, or unaffected group. If the given illness or injury occurs with equal frequency between the exposed and control groups, the relative risk would be 1.0. A relative risk of 1.0 is considered inconclusive, in that a researcher cannot state that a suspected agent does or does not cause the illness or injury (*i.e.*, the "null hypothesis" or "no association"). *Id.* The Guide at 348-9. A relative risk of less than 1.0 suggests that a suspected agent does not cause the disease. A relative risk greater than 1.0 suggests that the substance may cause a given disease.

13

To gauge the reliability and credibility of their reports, statisticians use a proposition known as the confidence interval. The confidence interval is not a "burden of proof" in the legal sense. Rather, it is a common sense mechanism upon which statisticians rely to confirm their findings. The confidence interval has two components -- a percentage and an interval or range. The percentage portion is established by the statistician in advance of performing the studies. Frequently, this percentage is set at 95 percent, although that value is somewhat arbitrary. The interval, on the other hand, represents a range of possible values at high and low ends of a scale of relative risk. *Id.* at 354-5, 389. *See, e.g.*, Kenneth Rothman, *Modern Epidemiology* 119 (1986). At a 95 percent interval the true relative risk value will be between the high and low ends of the confidence interval 95 percent of the time. *See* Neil Cohen, *Confidence in Probability: Burdens of Persuasion in a World of Imperfect Knowledge*, 60 N.Y.U.L. Rev. 385, 398-400 (1985) ("*Confidence in Probability*").

As Judge Breyer so aptly explained in his recent opinion in the Celebrex MDL litigation, "[I]f a given study showed a relative risk of 1.40 (a 40 percent increased risk of adverse events), but the 95 percent confidence interval is .8 to 1.9, we would say that we are 95 percent confident that the true value, that is, the actual relative risk, is between .8 and 1.9. Because the confidence interval includes results which do not show any increased risk, and indeed, show a decreased risk, that is, it includes values less than 1.0, we would say the study does not demonstrate a 'statistically significant' increased risk of an adverse outcome." When a study does show a relative risk where both the top and the bottom values are greater than 1.0, the study supports finding a "statistically significant" increased risk. *See In Re Silicone Gel Breast Implant Prod. Liab. Lit.*, 318 F.Supp.2d 879, 892 (C.D. Ca. 2004). Proof that a relative risk is greater than 2.0 is

14

arguably relevant to the issue of specific, as opposed to general, causation and is not required for plaintiffs to meet their burden in opposing defendants' motion.

Even when an appropriately designed study yields evidence of a statistical association between a given substance and a given health outcome, epidemiologists generally do not accept such an association by itself as proof of a causal relationship between the exposure and the outcome. The Guide at 374. Epidemiologists generally look to several additional criteria to determine whether a statistical association is indeed causal. These criteria are sometimes referred to as the Bradford

Hill criteria, after the author of a leading statement of the relevant principles, which are: (1) strength of association; (2) consistency of association; (3) specificity of association; (4) temporality of the association; (5) biological plausibility; (6) coherence; (7) experimental verification; (8) biological analogy; and (9) dose-response relationship. A. Bradford Hill, *The Environment and Disease: Association or Causation,* 58 PROC. ROYAL SOC'Y MED. 295, 295-300 (1965).

V.    *Conclusions of Law*

The lion's share of evidence offered by plaintiffs to carry their burden is comprised of epidemiological data, an established and reliable scientific field based on the gathering of data and the statistical analysis of the information. The issue before the court, therefore, is not the general acceptance of epidemiology by the relevant scientific community, but rather the challenged experts' application of the accepted scientific principles – the foundation for the

15

experts' opinions. *See Parker, supra* at 447 (once method deemed accepted, inquiry made as to whether accepted method appropriately employed in particular case).

    *A.    Dose*

    The court is in complete accord with the MDL court's conclusions that "dose matters" and that plaintiffs' experts have essentially conceded this point. MDL court's decision at p.10. As stated in the Reference Manual on Scientific Evidence, "a dose-response relationship means that the more intense the exposure, the greater the risk of disease." Ann. Ref. Man. Sci. Evid. 2d ed., 2005-06, p.531. Plaintiffs rely heavily on the *Parker* decision to argue that dose should not be material to this court's decision. The Court of Appeals in *Parker* determined that specific quantification of the dose or exposure level is not always necessary to find an expert opinion on causation reliable. *Parker, supra,* 7 N.Y.3d at 448. The *Parker* decision did not, however, distinguish between proof of general versus specific causation, but rather concluded that the proffered evidence fell short of proving either level of causation. *Id.* at 449 (finding insufficient reliable proof supporting experts' conclusion that exposure to benzene as component of gasoline caused plaintiff's illness). Key to the *Parker* decision was the difficulty in an environmental toxin exposure case of establishing with specificity the level of toxicity in general, as well as any individual's actual exposure. Environmental toxin cases are distinguishable from pharmaceutical cases; pharmaceuticals are dose-specific. Moreover, the plaintiffs in *Parker* presented no epidemiological studies showing an increased risk of the plaintiff's illness as a result of exposure to the specific toxin in question. Nor was there a plethora of scientific evidence showing a lack of significant association. The exception to the general rule that dose is an important factor in assessing causation, noted in *Parker,* simply does not apply here.

16

B.    *Celebrex at 400 and 800 mg/d*

Defendants rightfully have conceded that taking more than 800 mg/d of Celebrex for more than a brief period increases the risk of cardiovascular injury. Direct Examination of Muhammad Mamdani at p. 24 [CONCLUSION]; Direct Examination of Milton Packer at p. 8; Defendants' Motion at p. 7; Packer Hrg. Tr. at 628. The court's analysis, therefore, will focus on the more commonly prescribed doses, 200 (discussed below) and 400 mg/d. Evidence of increased risk at 400 mg/d exists. As discussed above, APC was a large, long-term, randomized, placebo-controlled, double-blind, multi-center clinical trial. It was designed by defendant Pfizer with the National Cancer Institute, to compare Celebrex with a placebo for the prevention of polyps, and it included a committee to develop guidelines and monitor cardiovascular safety. That committee stopped the trial after 33 months because it demonstrated a statistically significant risk of heart attack, stroke and heart failure at 400 mg/d (confidence interval of 1.1 to 6.1), and 800 mg/d (confidence interval of 1.5 to 7.9). People were getting hurt, and the committee made the ethical decision to stop administering the drug.

Plaintiffs' reliance on the APC results is not, as defendants argue, "cherry-picking." The APC trial was the only long-term trial of its size and duration to date. As defendants themselves concede, double-blind, randomized clinical trials are the "gold standard" for assessing whether an exposure is associated with an outcome. Mamdani Direct at p. 6. Although defendants note certain imperfections in APC – it was stopped early and its results have not been replicated by other randomized controlled clinical studies – these imperfections do not render APC so unreliable as to exclude it from the scientific evidence underlying the experts' opinions. Further, PreSAP, a colon polyp prevention clinical trial of Celebrex at 400 mg/d, also sponsored by the

17

National Cancer Institute and Pfizer, was stopped early by the same safety committee that

stopped APC and for the same reasons (a demonstrable risk of harm to the participants). The

PreSAP trial results, when not viewed in a vacuum, did not exclude the possibility of a risk ratio

like the one found by APC. In 2006, a published analysis of the combined data from APC and

PreSAP concluded, "Celecoxib at 200 or 400 mg twice daily showed a nearly 2-fold-increased

cardiovascular risk." Solomon, et al., *Effect of Celecoxib on Carsdiovascular Events and Blood

Pressure in Two Trials for the Prevention of Colorectal Adenomas, Circulation,* 2006; 114:1028-

1035 (MDL 1699 Exh. L). The weight of this evidence can be debated by the parties' experts at

trial, but the court will not exclude it and the opinions based on it at this preliminary stage.

Moreover, there was ADAPT, an Alzheimer's trial of Celebrex at 200 mg twice daily

(400 mg/d). Although it showed no increased cv risk for Celebrex versus placebo, certain factors

individual to this study suggest that the results are questionable. For example, as the American

Heart Association found, the ADAPT trial had "major limitations." The trial included a very

high rate of patients lost to follow-up (almost 10%), a large number of enrollees who did not

receive their study medication, a lack of specified criteria for the cardiovascular events, no

central adjudication of the reported nonfatal events and a small number of reported

cardiovascular deaths, myocardial infarctions and strokes. *See* Use of Nonsteroidal

Antiinflammatory Drugs, An Update for Clinicians: A Scientific Statement From the American

Heart Association; circulation 1-9, 2007 (MDL 1699 Exh. EE). Further, as the MDL court

recognized, it is possible that the study participants' risk factors differed from the general

population because their eligibility to participate hinged on a family history of Alzheimer's

disease. This court agrees that "the results of ADAPT need to be weighed with the APC results,

18

but ADAPT's conclusions do not make reliance on APC scientifically invalid." MDL opinion at p. 23. Indeed, the Kearney meta-analysis of all randomized clinical trials comparing Celebrex 400 mg/d to a placebo or naproxen, found a relative risk greater than 1.0 with a confidence interval that barely crossed 1.0. This result could be fatal to plaintiffs' case if the underlying trials were shown to be identical, as well as perfectly constructed and implemented. Alas, that was not the case. Otherwise the parties would have nothing about which to argue.

The parties, too, have presented the court with a wealth of additional materials, including published and unpublished studies, meta-analyses of studies, and articles. Some appear to support plaintiffs' position and some appear to support defendants' position, depending on which set of experts is interpreting the results. The reliability of each of these studies was hotly debated by the parties, and the court has reviewed each study and the parties' various interpretations and conclusions. It appears that when a particular study reaches a result unsupportive of one party's position, the latter has an argument as to why that study is unreliable. Although close analysis does reveal a certain element of unreliability in some of the studies (*e.g.*, Andersohn, discussed *infra*), and the relevance of certain studies is questionable for various reasons (*e.g.*, the study was not stratified by dose, it combined Celebrex with other coxibs or it was the wrong type of study [cohort vs. case control, etc.], there is still enough evidence to admit plaintiffs' expert conclusions as to the higher doses of Celebrex, particularly as to patients with a history of cardiovascular problems or who use aspirin. *E.g.*, APC, APC combined with PreSAP, Brophy Study, Gislason Study, Singh Study, Abraham Study, Johnsen Study. As discussed below, however, the same cannot be said for Celebrex at 200 mg/d.

C.    *Celebrex at 200 mg/d*

19

### 1.    *Regulatory and Industry Warnings and Opinions*

To the extent that plaintiffs and their experts rely on conclusions reached by the FDA advisory panel, as expressed in its April 6, 2005 Decision Memorandum and related materials, their reliance is misplaced. Although the panel's conclusions were reached after a review of scientifically reliable data, the conclusions themselves do not address the issue of whether 200 mg/d of celebrex is capable of causing heart attacks and strokes. The FDA's advisory panel reviewed a large body of data: an internal survey by the FDA's Center for Drug Evaluation and Research of available data regarding the cardiovascular safety issues for COX-2 inhibitors and NSAIDs; the regulatory histories, New Drug Applications, and postmarketing databases of the various NSAIDs; FDA and sponsor background documents prepared for the advisory committee meeting; all the materials, data and presentations of interested parties; and the results of the numerous clinical trials and epidemiological studies concerning NSAIDs. Yet, neither the panel nor the FDA concluded from the plethora of materials that 200 mg/d of Celebrex poses a significant cv risk. Nor is the Black Box Warning required by the FDA on all marketed Celebrex (200 mg/d being the commonly prescribed dose) dose specific. It speaks only of a possible increase in risk for people with heart disease.

Plaintiffs and their experts also rely on the warnings of the American Heart Association, as expressed in the Guidelines on coxib use they issued in 2005 and the Update they issued in 2007, co-authored by plaintiffs' expert Dr. Joel S. Bennet.[5] Although the court finds the

---

[5] Interestingly, Dr. Bennett conceded at the hearing that he could not say that at 200mg/d, the preponderance of clinical evidence suggests celebrex is associated with cv events. Bennett Hrg. Tr. at 166-167.

recommendations and analyses of both the FDA advisory panel (comprised of prestigious scientists and scientific organizations) and the AHA persuasive, they do not establish the necessary causative link. As the court in *Parker* recognized, "[S]tandards promulgated by regulatory agencies as protective measures are inadequate to demonstrate legal causation." 7 N.Y.3d at 450.

    2.    *Epidemiological Evidence*

The scientific evidence does not support plaintiffs' position of general causation at 200 mg/d. Plaintiffs' experts' analyses of the various trials and studies, in key respects, are inconsistent with generally accepted standards, and their alternative theories are insufficient to bridge the considerable gap between a possible and a significant risk of association at 200 mg/d. The court wants to emphasize that its decision is based on the statistical evidence presented by plaintiffs, which represents the evidence known to date on the toxic effects of Celebrex. As repeatedly noted by plaintiffs, that evidence does not include long-term, randomized clinical trials at the 200 mg/d dose.[6] Future studies, such as the PRECISION trial, might yield different results. However, the instant motions must be decided on the science and data available today.

To begin, the meta-analyses do not support causation at 200 mg/d. A meta-analysis cited by all of the experts ("Kearney meta-analysis") included published and unpublished tabular data from 138 randomized trials (145,373 patients) comparing COX-2 inhibitors either to placebo or to a traditional NSAIDs. Patricia Kearney, et al., *Do selective cycol-oxygenase-2 inhibitors and traditional nonsteroidal ant-inflammatory drugs increase the risk of atherothrombosis? Meta-*

_____

    [6] The court cannot help but recognize at this juncture, that plaintiffs claim that ingestion of Celebrex *at any duration* increases cv events. Thus, short term studies are relevant.

21

*analysis of randomized trials*, British Medical Journal 2006. *See* Direct Examination of Dr.

Milton Packer, Exh. 7. The Kearney meta-analysis included information on myocardial

infarction, stroke and vascular death rates in patients treated with Celebrex, and it combined the

particular doses. At 200 mg/d the mean was below 1.0, which indicates lack of a significant risk

at that dose. The study concluded, "Overall, we found no significant difference in the incidence

of serious vascular events between selective COX-2 inhibitors and traditional NSAIDs." *Id.*

Similarly, a meta-analysis of 11 observational studies of patients taking Celebrex at doses

commonly used in the community that was conducted by Patricia McGettigan, the most

comprehensive analysis of Celebrex observational studies published to date, showed that while

Vioxx increased the risk of adverse cv events, Celebrex as compared to Naproxen, did not.

McGettigan, et al., JAMA 2006; 296:1633-44 (Brown Aff., Exh. 38). *See* Bennett Deposition at

249-50, 515-16, 572-73; Moye Bibliography, Ref. 100 (Brown Aff., Exh. 39); Rymer Deposition

at 337; Bennett Hrg. Tr. at 165. Dr. Wei's meta-analysis is consistent with these meta-analyses.

Moreover, out of 32 studies (29 published) cited by defendants, plaintiffs chose only 8 to

plead their case. This smacks of "cherry-picking", skewing their analysis by only looking at the

helpful studies. Such practice contradicts the accepted method for an expert's analysis of

epidemiological data. As explained in the Guide (cited *supra* at 348), determination of "whether

an association exists between exposure to the agent and the disease" must be based on

assessment of the totality of the evidence. Adding insult to injury, of the 8 studies plaintiffs cite,

2 do not provide any analysis stratified by dose (Johnsen and Helin-Salmivaara). Consequently,

plaintiffs' experts cannot rely on them as a sufficient foundation for their opinions regarding 200

mg/d.

22

Three of the studies did evaluate the relation of Celecoxib dose to cardiovascular event, and in that regard, they have greater relevance. Nonetheless, on closer scrutiny, these studies do not hold up. The Brophy, et al. study, published on line in 2006 and in hard copy in 2007 (MDL 1699 Exh. W), found a significant risk for patients with a history of myocardial infarction (95% CI: 1.06 to 1.84) and no significant risk for patients with no such history (95% CI: 0.88 to 1.20). The finding with respect to patients with a prior MI history, however, was limited to those using higher doses of Celebrex, ≥200 mg/d (95% CI: 1.00 to 2.54). Two studies by Andersohn, et al. (MDL 1699 Exh. S) showed a significant risk of MI for patients taking low and high doses of Celebrex, but the findings are questionable. They suggested an increased risk only where patients took the drug for less than 3 months, not for longer durations, a finding contrary to the standard warning accompanying the marketed product. Additionally, the second Andersohn study, which focused on patients who had experienced a schemetic stroke, found no increased risk associated with Celebrex as a function of dose or duration. Then too, Andersohn involved only 15 events. All of the experts emphasized that the fewer the events, the less reliable the study results.

Another study completed in 2006 by Gislason (MDL 1699 Exh. X) and cited by plaintiffs, used two study designs which yielded contradictory results. Data analyzed using the first design did find a significant risk in patients with a history of cv problems, but data analyzed using the case-crossover design, an analysis employed to compensate for confounders, showed no significant risk associated with use of Celebrex at low doses. Furthermore, the study did not control for smoking or aspirin use, both acknowledged confounding factors, and involved only 6 events.

23

Finally, plaintiffs rely on an unpublished, non-peer reviewed study from a managed care organization ("the Wellpoint Report"). However, the Wellpoint Report combined all doses of Celebrex and failed to account for critical confounding factors such as smoking. Rymer, Hrg. Tr. 512-519, 544-546. As the MDL court observed in its opinion, "[I]t is thus unsurprising that most of plaintiffs' experts agree that the available evidence at 200 mg/d is inadequate to prove causation." MDL opinion at p. 12; Hrg Tr. at 159:1-11, 166:8-167:19 [Bennett]; Bennett Depo. at 92-93; 537 [Brown Reply Aff., Exh. 108]; Wright Depo. at 82-83, 92 [Brown Reply Aff., Exh. 106]; Moye Depo. at 268 [Brown Reply Aff., Exh. 109]; Jewell Depo. at 130-31 [Brown Reply Aff., Exh. 110]. *See* Jewell Hrg. Tr. At 412, 417, 418, 422.

### 3.    *Other Arguments*

Plaintiffs seek to fill the statistical gap by making the following arguments: (1) You can extrapolate from statistical results for higher doses of Celebrex (400 ansd 800 mg/d) or for other COX-2 drugs (Vioxx and Bextra); (2) Dose is not dispositive because COX-2 drugs "as a class" significantly increase the risk of thrombotic events; and (3) The underlying biological mechanism of action, the imbalance theory, independently establishes a significant risk of thrombotic events. The court will address these arguments in the context of discussing the qualifications and opinions of particular experts.

### *Dr. Neil Doherty*

Plaintiffs' cardiology expert Dr. Neil Doherty is simply not qualified to draw expert conclusions based on the use of epidemiological evidence. He is a clinical cardiologist who sees patients 98 percent of his physician time. He does not have any specialized epidemiology

24

training. He has not published any research since 1992, and his 13 publications are unrelated to the subject matter of these lawsuits. He has never participated in an observational study of any kind, had not designed a clinical trial since 1977 while a student, and his testimony displayed his lack of experience regarding epidemiological principles and terminology. Doherty, Hrg Tr at 325-357. [7]

Doherty's testimony also conflicted with that of plaintiffs' other experts in key respects. At his deposition, Doherty identified the heart attack portion of the Andersohn study as the "strongest" evidence of risk at 200 mg/d, even though that portion of the study failed to adjust for confounding factors such as aspirin use and the severity of heart disease. Doherty later contradicted himself and testified at the hearing that studies should adjust for heart disease, which was consistent with the testimony of plaintiffs' stroke expert Dr. Rymer, who criticized the stroke portion of the Andersohn study for its failure to adjust for aspirin use. Andersohn, et al. STROKE 2006; 37:1725-1730, at 1727; Doherty Rep. at 8; Doherty, Hrg Tr at 322:6-9;

---

[7] For example, during Doherty's deposition he was unable to explain the difference between a cohort study and a case control study, the two main types of observational studies. He, then, managed to deliver a scholarly response at the joint hearing, showing that his education on this subject had occurred between the time of his deposition and the hearing. Doherty, Hrg Tr at 348-355. A cohort study identifies patients who are taking the drug and those who are not, then follows both groups for a certain amount of time to determine if they have the alleged bad outcome, which in this case could be a cardiovascular problem of some kind. The study then compares the rate of bad outcomes in both groups to compute the "relative risk." *See* Federal Judicial Center, Reference Manual on Scientific Evidence 338-340 (2d ed. 2000), cited *supra*. A control study identifies people who had a cardiovascular problem, then reviews their medical records to determine how many of them were taking the drug around the time their problem manifested. The study then identifies an equal number of people who did not have a cardiovascular problem and determines how many of them were taking the drug. An "odds ratio" is then computed from the data, and if it is 1.0, then it means that the percentage of people taking Celebrex in both groups is the same, or that taking Celebrex did not increase their risk of a cardiovascular problem. *Id.*

25

Rymer Written Direct Examination ¶ 34. Although Doherty had based his expert opinion primarily on the Andersohn study, he incorrectly identified it as a "cohort" study and insisted that the analysis used by that study was a "cox proportional analysis," the one most commonly used for cohort studies. As the MDL court noted, the Andersohn study was instead a "case control study nested within a cohort study," and it used a "logistic regression" analysis.   MDL decision at pp. 15-16.  Doherty's lapses are more than minor *faux pas*; they reveal a fundamental flaw in his ability to reliably analyze epidemiological information.  What is more, Doherty apparently became interested in Celebrex and its possible association with cv risk after he was retained by plaintiffs in this litigation, well after the connection between COX-2 inhibitors and adverse cv events became an issue of public concern.

Doherty (and Dr. Rymer to some degree) sought to overcome the lack of direct statistical evidence by arguing that you can extrapolate general causation at 200 mg by looking at the results of trials and studies involving 400 and 800 mg/d. Doherty's rationale for this theory is just another example of his lack of scientific experience and expertise. He testified that you can take the relative risk point for 400 mg/d and just cut it in half, ignoring the confidence interval; he failed to identify any scientific support for this theory. Doherty, Hrg. Tr. at pp. 304, 340-343, 378-79. Nor did plaintiffs provide any scientific or other support for Doherty's theory, which is contradicted by the evidence developed to date showing no significant risk of association between 200 mg/d of Celebrex and cv problems.

For all of these reasons, Doherty is excluded as an expert witness for plaintiffs on the issue of general causation. If, however, the plaintiffs wish to call him as a clinical cardiologist to establish *specific* causation of a particular plaintiff's cv problems and his testimony is relevant to

26

the underlying biological mechanism of disease (not the imbalance hypothesis), then the court will consider whether to allow such testimony at the appropriate time.

### Dr. Joel S. Bennett

Dr. Joel S. Bennett, a Hematologist and Professor of Pharmacology, testified to his opinion to a reasonable degree of medical certainty that Celebrex increases *the risk* of cardiovascular events. Dr. Bennett is eminently qualified to testify as an expert regarding the thrombotic risks associated with taking Celebrex, both from a mechanistic and epidemiological standpoint. Although he is neither a cardiologist nor a statistician, he has abundant experience working with the relevant scientific concept and COX-2 inhibitors, including Celebrex. He has authored a plethora of published journal articles, texts, chapters, editorials and abstracts, has received numerous awards, including in the area of cardiology, has lectured extensively, and is jointly board certified in both Internal Medicine and Hematology. He is a member of numerous national societies, including the American Heart Association (AHA). His accomplishments are impressive, and include his co-authoring an article for the AHA entitled, *Use of Nonsteroidal Antiinflammatory Drugs, An Update for Clinicians: A Scientific Statement From the American Heart Association;* circulation 1-9, 2007: 115 (MDL 1699 Exh. EE). Prior to publication of that Update, which was issued by the AHA to guide physicians in their recommendations about the use of NSAIDS, including Celecoxib, he was also a co-author of a 2005 Advisory from the AHA on the use of NSAIDS. *The Use of Nonsteroidal Anti-Inflammatory Drugs (NSAIDS): A Science Advisory from the American Heart Association;* Circulation; 111:1713-1716, 2005 (MDL Exh. 41).

As a result, Dr. Bennett's testimony that the clinical evidence does not demonstrate a

significant risk of Celebrex at 200 mg/d increasing cardiovascular risk on a population basis, is

compelling. Bennett Hrg. Tr. at 159, 166-7.[8] He explicitly stated that he was not testifying to

causation (*Id.* at 160) and refused to testify that Celebrex at 200mg/d could be a causative factor.

*Id.* at 161. Nevertheless, Dr. Bennett testified that regardless of the statistical results, the

underlying biological mechanism of action (the "imbalance hypothesis" or the "Fitzgerald

theory"), *could be* a risk factor contributing to the causation of cardiovascular problems in a

given patient. *Id.* at 159-161. Dr. Bennett explained the hypothesis, which was originally

developed by Dr. Garrett Fitzgerald. In essence, the hypothesis asserts that COX-2 inhibitors as a

class, inhibit the COX-2 enzyme, thereby preventing the cells in arteries from making

prostacyclin (an anti-clotting agent) and making them more reactive to "aggregates" like

thrombaxane, which promote clotting. Hence, the hypothesis posits, the resulting imbalance

could increase the risk of a thrombus (clot) occurring when plaque ruptures, causing blood flow

to the heart or brain to cease. *Id.* at 100-160, 203. *See* Gunnar H. Gislason, et al., *Risk of Death*

*or Reincarnation Associated With the Use of Selective Cyclooxygenase-2 Inhibitors and*

*Nonselective Nonsteroidal Antiinflammatory Drugs After Acute Myocardial Infarction,*

*Circulation,* 2006 June 27; 113(25): 2906-13.

The court is troubled by Dr. Bennett's testimony that the theory is premised on a

biological effect of COX-2 inhibitors as a class, instead of identifying the effect of specific COX-

2s, since he also testified that Vioxx, Celebrex and Bextra "are different drugs, and they are

---

[8] Dr. Jewell also testified that the statistical evidence does not show an increased risk at
200 mg/d (Jewell Hrg. Tr. at 412, 417, 418, 422).

different biochemically" (*id.* at 123:2-3), and he explained that biochemical differences in drugs relate to different potencies. *Id.* at 123:23-25. Accordingly, any use of this theory to establish causation would have to be tailored to Celebrex, as opposed to a different COX-2 or COX-2s in general. More important, Dr. Bennett testified, "An hypothesis is an idea that leads to experimentation so you can derive facts." *Id.* at 217. The facts derived from experimentation, here, do not support the hypothesis that Celebrex at 200mg/d causes cv events. As explained *supra*, there is insufficient statistical evidence to support any conclusion that Celebrex is capable of causing cv problems at 200 mg/d. So, at least with respect to that category of cases, the Fitzgerald Hypothesis is irrelevant. Without proof of an association, the hypothesis is inadmissible.

### Dr. Marilyn M. Rymer

Dr. Rymer, plaintiffs' stroke expert, is a Professor of Medicine at UMKC School of Medicine and Medical Director for the Brain Stroke Institute in Kansas City, one of the prominent stroke programs in the country. She is a Fellow of the American Heart Association, author of the stroke center handbook and of the Stroke Atlas and served as an expert consultant to Pfizer on stroke. She opined, to a reasonable degree of medical certainty, that: (1) because the mechanism for ischemic stroke (not the "imbalance" theory) is the same as for heart attacks, data showing that Celebrex increases the risk of heart attacks also applies to ischemic strokes (Rymer Hrg. Tr. at 482:16-25, 485:13-22.); (2) the mechanism of COX-2 inhibitors, including Celebrex, causes strokes and other cardiovascular events by increasing thrombogenesis due to an increase in prostacyclin synthesis (the imbalance effect) (*id.* at 485:23-486:5.); and (3) the increase in

29

blood pressure caused by all NSAIDs, but particularly COX-2 inhibitors, increases the risk of small vessel disease strokes. *Id.* at 488-9, 491.

The court rejects defendants' argument that Dr. Rymer is unqualified to testify about observational studies. Although a large part of her work has involved clinical trials, she has devised and worked with observational studies involving patients in her institute's stroke database (*id.* at 467:25-472:4.) and is intimately familiar with the review and analysis of epidemiological evidence. Her specific opinions regarding the toxic effect of Celebrex on stroke pose greater difficulty.

None of the studies or trials that were done were adequately designed or powered to specifically detect stroke. *Id.* at 521-522. However, as the MDL court concluded, "[N]early all studies of COX-2 inhibitors and cv risk lump strokes together with heart attacks." MDL Opinion at p. 24. Moreover, Dr. Rymer testified that the underlying mechanism for ischemic stroke (blockage of blood flow) is the same as for heart attacks and that people at risk for heart attacks are equally at risk for ischemic stroke. *Id.* at pp. 481-485, 534-535, 547-551. Further, she testified that hypertension and a rise in blood pressure, a side effect of NSAIDs, is a cause of stroke, particularly small vessel disease stroke. Defendants have not presented the court with any evidence to conclude "there is a generally or widely held view in the scientific community rejecting ... [Dr. Rymer's] conclusions outright." *Marso v. Novak,* 42 A.D.3d 377, 378 (1st Dept. 2007). Without definitive scientific proof to the contrary, the court is not prepared to exclude expert testimony finding that Celebrex at doses of 400 mg/d or greater is capable of causing ischemic stroke. On the other hand, with regard to Celebrex at 200mg/d, the scientific evidence, whether for heart attack or stroke, is just not there. Dr. Rymer's reliance on Wellpoint, an

30

unpublished study which did not adjust for major confounders such as smoking and did not distinguish between dose, is to no avail.

### 4.    Remaining Issues

Defendants' seek to exclude any opinion that Celebrex is capable of causing cv events more than three days after a patient stops taking it. This point is not in dispute, and there was no related expert testimony proffered. Consequently, such opinion testimony is precluded. The court, however, denies defendants' motion to exclude any opinion that Celebrex is capable of causing cv events when taken continuously for less than 33 months. The APC trial was ended at 33 months because patients were getting hurt. There is simply no scientific correlation between the 33 month period and the onset of cv problems.

Moreover, the court denies plaintiffs' motion to preclude the testimony of defendants' expert Dr. Milton Packer. Dr. Packer is a cardiologist who has spent his career to date researching the mechanisms of action, and evaluating the efficacy and safety, of cardiovascular drugs. He has held many leadership positions in the cardiovascular field and received prestigious academic appointments. Dr. Packer is currently the Chair of the Department of Clinical Sciences at the University of Texas Southwestern Medical school, where he also holds the Gayle and Paul Stoffel Distinguished Chair in cardiology and leads a Master's program educating and training physicians on designing, analyzing and interpreting clinical research studies. He has authored nearly 300 papers, articles, reviews, book chapters and other reference materials that have been published in peer-reviewed journals and other scientific venues, and he has presented to the FDA on the principles and methods of interpreting clinical research studies.

31

Dr. Packer disputes the validity and relevance of the Fitzgerald "imbalance hypothesis." In brief, Dr. Packer contends that the hypothesis has not been accepted in the scientific community since it has not been clinically proven. Packer, Written Direct at 23. Further, he raises serious concerns about the validity and reliability of the "imbalance" hypothesis grounded in the lack of scientific evidence and medical testimony regarding prostacyclin, thrombaxane and hypertension. Given his credentials and the scientific bases for his opinions, Dr. Packer's testimony may come in to refute plaintiffs' imbalance hypothesis.

Plaintiffs' motion to exclude the meta-analyses of defendants' experts, also, is denied. Plaintiffs' objections go to the weight of these experts' analyses and testimony, and not their admissibility. Finally, at this juncture, the court denies defendants' motion to preclude evidence of specific causation absent a relative risk that exceeds 2.0. The hearing was concerned with general causation alone. Accordingly, it is

ORDERED that the Pfizer defendants' motion to exclude the opinion by plaintiffs' experts that 200 mg of Celebrex daily is capable of causing cardiovascular injury is granted; and it is further

ORDERED the Pfizer defendants' motion to exclude the opinion by plaintiffs' experts that 400 mg of Celebrex daily is capable of causing cardiovascular injury is denied; and it is further

ORDERED that the Pfizer defendants' motion to exclude the opinion by plaintiffs' experts that 800 mg of Celebrex daily is capable of causing cardiovascular injury is denied; and it is further

ORDERED that the Pfizer defendants' motion to exclude the opinion by plaintiffs' experts that absent reliable proof of a relative risk that exceeds 2.0, Celebrex is capable of causing any individual plaintiff's cardiovascular injury, is denied without prejudice; and it is further

ORDERED that the Pfizer defendants' motion to exclude the opinion by plaintiffs' experts that Celebrex causes heart attacks or strokes at durations of less than 33 months of continuous daily use is denied; and it is further

ORDERED that plaintiffs' motion to exclude the meta-analyses of defendants' experts is denied; and it is further

ORDERED that the parties' motions to exclude testimony both supporting and refuting the imbalance hypothesis is denied.

January 7, 2008                              ENTER

                                             _____
                                                    J.S.C.

33