UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING,
        SALES PRACTICES AND
        PRODUCTS LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

ALL PRODUCTS LIABILITY CASES IDENTIFIED ON
EXHIBIT 1 TO THE DECLARATION OF SCOTT W.
SAYLER, ESQ.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS PFIZER INC. AND WARNER-LAMBERT COMPANY LLC'S
## MOTION FOR SUMMARY JUDGMENT

Defendants Pfizer Inc. and Warner-Lambert Company LLC (together, "Pfizer")

submit this memorandum in support of their motion for summary judgment in all products

liability cases in which the alleged injury is suicide, suicide attempt, suicidal gesture or suicidal

ideation (with or without physical injury)[1] on two independent grounds:  (1) plaintiffs' claims

are preempted by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., and its

implementing regulations, because those claims directly conflict with federal statutes and

regulations governing the labeling for Neurontin® (gabapentin) (hereinafter "Neurontin"); and

(2) plaintiffs lack admissible expert testimony required to satisfy plaintiffs' burden of proving

general causation, i.e., that Neurontin is capable of causing suicide-related events.[2]

---

[1] These terms are collectively referred to herein as "suicide-related events."

[2] The facts discussed herein are set forth in the accompanying Local Rule 56.1 Statement of Material Facts with citations to the source materials.

## PRELIMINARY STATEMENT

Plaintiffs allege that they (or their decedents) were prescribed Neurontin and attempted or completed suicide, made suicidal gestures, and/or experienced suicidal ideation (with or without physical injury) as a result of taking Neurontin.[3]  The gravamen of plaintiffs' state-law tort claims is that Pfizer should have provided a warning that Neurontin increases the risk of suicide-related events – a warning that FDA rejected for lack of scientific support.[4]  Despite having repeatedly considered the issue, FDA has never concluded that Neurontin causes an increased risk of suicide-related events or even that Neurontin is associated with such an increased risk, and has never required or permitted inclusion of a suicide warning in the Neurontin label.  Because plaintiffs' claims directly conflict with the FDA-mandated labeling for Neurontin, and would frustrate the federal regulatory structure for prescription drugs established by Congress, any imposition of liability on Pfizer for not including a suicide warning is preempted by federal law.

As FDA recently stated in a drug preemption case soon to be heard by the United States Supreme Court:  "[Plaintiffs'] claims are impliedly preempted by the FDCA because they challenge labeling that FDA approved, after being informed of the relevant health risk, based on its expert weighing of the risks and benefits of requiring additional or different warnings."  Brief of the United States as *Amicus Curiae* Supporting Defendant, *Wyeth v. Levine*, on Petition for

---

[3]  This motion is made in illustrative cases in which the plaintiffs allege solely suicide-related injuries.  Pfizer suggests that it is most efficient to secure a ruling as a precedent in these cases, and – if appropriate – move for partial or full summary judgment at a later date in all cases where plaintiffs claim non-suicide related injuries either alone or in addition to suicide-related injuries.

Exhibit 1 to the Declaration of Scott W. Sayler, Esq. lists the cases in which plaintiffs allege solely suicide-related injuries, whose claims are the subject of this motion.  Pfizer affirms that the injuries listed in Exhibit 1 are as alleged in plaintiffs' complaints.  (*See* Sayler Decl., Ex. 1 at ¶ 2.)

[4]  Plaintiffs' claims are based on theories of negligence, breach of warranty, and strict liability.

Writ of Certiorari, (U.S. filed Dec. 21, 2007) (No. 06-1249) ("*Levine Amicus* Br.") (*See* Declaration of Scott W. Sayler, Esq. ("Sayler Decl."), Ex. 11 at 7.)[5]

In 1993, after thoroughly reviewing the safety and effectiveness of Neurontin over a two-year period, FDA approved the drug as safe and effective for adjunctive use in epilepsy. The agency conducted another review prior to approving a second indication for the management of postherpetic neuralgia in adults in 2002. As part of its reviews, FDA examined clinical and postmarketing data on Neurontin, including adverse events reported in all patients using the drug, regardless of indication. Among these adverse events were reports of depression and suicidal behavior. Following its extensive reviews in 1993 and 2002, FDA chose to include these events in the Adverse Reactions section of the Neurontin labeling but did not include a warning of any kind regarding an increased risk of suicide-related events because it found no such increased risk in patients taking Neurontin.

In September and November 2004, at FDA's request, Pfizer again submitted its clinical trial and postmarketing data on suicide-related events in Neurontin patients to FDA at the agency's request. After receiving this information, FDA asked Pfizer in October 2005 to make "minor revisions" to the terminology used to describe suicide-related events in the Adverse Reactions section of the label,[6] but did not require the company to include in the labeling any warning whatsoever relating to suicide-related events, and otherwise made no changes to the labeling.

---

[5] The question presented to the Supreme Court in *Wyeth v. Levine*, which has clear implications here, is: "Whether the prescription drug labeling judgments imposed on manufacturers by the [FDA] pursuant to FDA's comprehensive safety and efficacy authority under the [FDCA] preempt state law product liability claims premised on the theory that different labeling judgments were necessary to make drugs reasonably safe for use." Pet. for Cert. in *Wyeth v. Levine*, O.T. 2007, No. 06-1249, p. i.

[6] The Adverse Reactions section of the labeling lists adverse events reported in patients using Neurontin according to the frequency of those events.

In January 2008, after reviewing clinical trial data for eleven antiepileptic drugs (including Neurontin), FDA observed – for the first time – that there appears to be an increased risk of suicidal behavior and thinking in patients using antiepileptic drugs.[7]  It is undisputed that the Neurontin-specific data failed to show any increased risk of suicidal behavior or thinking. Indeed, the suicide-related events analyzed by FDA were no more frequent in patients treated with Neurontin than patients treated with placebo.  Even though an increased risk of suicidal behavior and thinking was found in patients taking drugs other than Neurontin, Pfizer obviously cannot be held liable for any alleged failure to warn because the Neurontin data showed no such risk and the data of other manufacturers was not, and is not to this day, in Pfizer's possession.

Under these circumstances, all state-law claims premised on the allegation that Pfizer is liable for failing to warn of suicide risks related to Neurontin are preempted because such a warning would have conflicted with the labeling that FDA repeatedly determined to be appropriate for the safe use of the medication and that the agency required Pfizer to issue *verbatim* with the medication.  In fact, changing a label under such circumstances would "misbrand" the drug in violation of 21 U.S.C. § 352(a), and prohibit its distribution, *id.* § 331(a), thereby exposing Pfizer to civil and criminal enforcement, *id.* §§ 332-334.  Plaintiffs' state-law product liability and personal injury claims are therefore preempted.

Plaintiffs' claims also fail on the independent ground that Pfizer had no duty to warn of information that the company neither knew nor was capable of knowing through the exercise of reasonable care.  It is undisputed that the Neurontin controlled clinical data fail to show an increased risk of suicide-related events.  The findings in the FDA Alert were reportedly based on controlled clinical trial data relating to *other* antiepileptic drugs – data that Pfizer did

---

[7] FDA expressly declined to state a conclusion regarding any causal connection between antiepileptic drugs and suicide:  "Posting this information does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue."  (Sayler Decl., at Ex. 4.)

not possess, and still does not possess today.  Because plaintiffs' claims pre-date the FDA Alert and the release of this proprietary data, Pfizer cannot be held liable for failure to warn patients who took Neurontin years earlier.  Summary judgment is therefore appropriate.

Finally, Pfizer is entitled to summary judgment on the ground that plaintiffs lack admissible expert testimony required to satisfy their burden of proving general causation, i.e., that Neurontin is capable of causing their alleged injuries.  As set forth in Pfizer's Motion to Exclude the Testimony of Doctors Trimble, Kruszewski, and Blume, filed concurrently herewith, plaintiffs have no scientifically reliable expert opinion evidence that Neurontin is capable of causing suicide-related events.  Absent the foregoing, plaintiffs cannot establish an essential element of their claims, and summary judgment is required.

## BACKGROUND

## I.    FEDERAL REGULATORY FRAMEWORK FOR PRESCRIPTION DRUGS

The Food and Drug Administration ("FDA") is the federal agency charged by Congress in the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, et seq., with the authority and responsibility to regulate every aspect of the safety, effectiveness, labeling, marketing, and promotion of prescription drugs.  To obtain FDA approval, a manufacturer must submit a new drug application ("NDA"), 21 U.S.C. § 355(b), which includes, among many other things, full reports of investigations conducted to determine the safety and effectiveness of the drug, *id.* § 355(b)(1)(A).  FDA carefully reviews the NDA and identifies any safety risks posed by the drug.  The agency then decides how these risks should be disclosed in the prescribing information that accompanies the drug.

Drug labeling must include specific information required by 21 C.F.R. § 201.57 under mandated section headings, including contraindications, warnings, precautions, and

adverse reactions. 21 C.F.R. § 201.56(d). The labeling must be revised to include a warning as soon as there is reasonable evidence of an association with a drug. *Id.* § 201.57(c)(6)(i). FDA has interpreted the regulatory phrase "reasonable evidence of an association" to mean "an association where there is reasonable evidence that the drug may have a role in increasing the likelihood of the adverse event (e.g., suicide or suicidality)." Brief of the United States as *Amicus Curiae* Supporting Defendant, *Kallas v. Pfizer Inc.*, No. 04CV0998 (D. Utah filed Sept. 15, 2005) ("*Kallas Amicus* Br.") (Sayler Decl., Ex. 9 at 8.)

Based on the known scientific evidence, warnings are carefully developed by FDA to disclose established risks. At the same time, FDA must avoid representations of unsubstantiated risks that could unnecessarily deter use of the drug, thereby depriving patients of beneficial treatment and leaving them exposed to the risks associated with their underlying conditions. The FDA's approach in establishing appropriate warnings is discussed in its Third Circuit *amicus* brief in *Colacicco v. Apotex, Inc.*:

> [I]t is critical to understand that, where warnings are concerned, more is not always better. In setting standards for drug labeling, FDA seeks to encourage the optimal level of use in light of reasonable safety concerns, by requiring scientific evidence that establishes an association between a drug and a particular hazard before warning of that association on a drug's labeling. Under-use of a drug based on dissemination of unsubstantiated warnings may deprive patients of efficacious and possibly lifesaving treatment. Further, allowing unsubstantiated warnings would likely diminish the impact of valid warnings by creating an unnecessary distraction and making even valid warnings less credible. In order to make appropriate judgments about drug use, prescribers need a "careful and truthful representation of benefits and risks," which does not discourage appropriate use of a beneficial drug" through the inclusion of unsubstantiated risks.

Brief of the United States as *Amicus Curiae* Supporting Defendants, *Colacicco v. Apotex, Inc.*, No. 06-3107 (3d Cir. filed Dec. 4, 2006) ("*Colacicco* 3d Cir. *Amicus* Br.") (citing 71 Fed. Reg. 2922, 3935 (2006)) (internal citation omitted) (Sayler Decl., Ex. 10 at 16-17.)

In the preamble to its January 2006 Final Rule on prescription drug labeling, FDA states that the FDA-approved labeling for a drug establishes both a "floor" and a "ceiling" with regard to disclosure of risk information, such that inclusion of unsubstantiated risk information is prohibited.  71 Fed. Reg. 3922, 3935.  "Given the comprehensiveness of FDA regulation of drug safety, effectiveness, and labeling under the [FDCA], additional requirements for the disclosure of risk information are not necessarily more protective of patients.  Instead, they can erode and disrupt the careful and truthful representation of benefits and risks that prescribers need to make appropriate judgments about drug use.  Exaggeration of risk could discourage appropriate use of a beneficial drug."  *Id.*

FDA specifies its product-specific labeling requirements in an "approvable" letter informing the manufacturer that the NDA will be approved if the manufacturer satisfies specified conditions.  *Id.* § 314.110(a).  Final approval is "conditioned upon the applicant incorporating the specified labeling changes ***exactly as directed***, and upon the applicant submitting to FDA a copy of the final printed labeling prior to marketing."  *Id.* § 314.105(b) (emphasis added).

After final approval, FDA continues to exercise extensive control over the safety of prescription drugs and the content of their labeling.  *See* 71 Fed. Reg. 3922, 3934 ("FDA continuously works to evaluate the latest available scientific information to monitor the safety of products and to incorporate information into the product's labeling when appropriate.").  In particular, FDA imposes extensive postmarketing reporting requirements on manufacturers, including among other things, the submission of adverse event reports and reports of published and unpublished clinical trials on the drug.  *See* 21 C.F.R. §§ 314.80-81.

If a manufacturer seeks FDA approval for additional indications or dosage forms, as was done with Neurontin, it must file a supplemental new drug application ("sNDA") and

provide new supporting data to FDA, including updated integrated summaries of safety ("ISS") and effectiveness ("ISE"). 21 C.F.R. § 314.50(d)(5)(v) and (vi)(a); *id.* § 314.71. These compilations of available information on safety and effectiveness often lead to the identification of new safety issues or additional evidence regarding adverse events, which may prompt changes to the product's labeling. If FDA concludes that information from postmarketing reports or updated safety information submitted with an sNDA warrants a change in the drug's warnings, it will require that the company make the change. 21 C.F.R. § 201.57(c)(6)(i) (labeling must be revised to include a warning as soon as there is "reasonable evidence" of an association with the drug).

FDA retains exclusive authority over all labeling changes and "the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the act." 71 Fed. Reg. at 3934; 44 Fed. Reg. 37,434, 37,447 (June 26, 1979) ("[T]he decision as to whether a warning is legally required for the labeling of a drug must rest with the agency."). A manufacturer must notify FDA anytime it makes a change to the labeling of a prescription drug. 21 C.F.R. § 314.70. In general, a manufacturer must obtain FDA approval before making any labeling changes. However, § 314.70(c) contains a limited exception to this rule that allows a manufacturer to change labeling without prior FDA approval when the change adds or strengthens a warning based on new and scientifically valid evidence of an association between the drug and the hazard. In such circumstances, a manufacturer must file a Changes Being Effected ("CBE") supplement with the agency concomitantly with implementation of any such change, subjecting the change to FDA review and acceptance or rejection by the agency.

As FDA explained when this regulation was proposed in 1982, labeling changes may be made without prior FDA approval only "to correct concerns about *newly discovered risks*

from the use of the drug."   47 Fed. Reg. 46,622, 46,623 (Oct. 19, 1982) (emphasis added);
*Levine Amicus* Br. at 13.   More specifically, any labeling changes made without prior FDA
approval "must be based on material new information – not information that was previously
available to FDA, nor even cumulative new information that does not add materially to the
information that was previously available to the agency."   *Levine Amicus* Br. at 14.   Further,
warnings remain subject to 21 C.F.R. § 201.57(c)(6)(i) and may only be added when there is
reasonable evidence of an association between the hazard and the drug.   *See also* 73 Fed. Reg.
2848-01 (Jan. 16, 2008) (setting forth FDA's proposed amendment to § 314.70(c) to reaffirm and
clarify these labeling requirements).

## II.    FDA REGULATION OF NEURONTIN

An understanding of Neurontin's extensive regulatory history, and FDA's
historical review, evaluation, and conclusions regarding the adequacy of the drug's warnings and
labeling, including the agency's evaluation of the possible relationship between Neurontin and
suicide-related events, is essential to the legal issues raised in this motion.

### A.    FDA Approved Neurontin for Use as Adjunctive Therapy for Epilepsy in December 1993 and Expressly Determined All Aspects of the Neurontin Labeling

On January 15, 1992, Warner-Lambert submitted to FDA an NDA seeking
approval to market Neurontin for use as adjunctive therapy in the treatment of partial seizures in
patients with epilepsy.   The initially-submitted NDA comprised 250 volumes of safety and
efficacy data, including an Integrated Summary of Safety.   In December 1992, after a careful
review of the Neurontin safety data, FDA summarized its clinical data review of the initial NDA
submission and multiple safety updates in a comprehensive 113-page report.   FDA evaluated all
adverse events from the clinical trials to identify potential safety risks, including adverse events

of depression and suicidality.  In the FDA report, Dr. Cynthia McCormick, the FDA Medical Review Officer who was primarily responsible for reviewing the Neurontin clinical safety data, specifically analyzed and discussed suicide-related events in Neurontin patients.

Dr. McCormick reviewed the Neurontin clinical safety data at length and found no evidence that Neurontin increases the risk of or causes depression or suicidal behavior.  Had she concluded there was an increased risk of these events with Neurontin, Dr. McCormick said, she would have recommended that the drug not be approved or, at a minimum, required that the issue be "prominently noted in a warning in the final approved labeling."  (Sayler Decl., Ex. 2 at ¶ 14.)

Dr. McCormick was not the only FDA official who concluded that the labeling need not include any warning of an increased risk of suicide-related events.  Specifically, Dr. Russell Katz, Deputy Director of FDA's Division of Neuropharmacological Drug Products, prepared a report, dated October 11, 1993, in which he noted that one patient committed suicide "after having been off drug for a considerable time" and ten patients [out of 2,048] discontinued the trial due to depression or suicidal ideation.  (Declaration of Mary Ann Coronel, R.Ph. ("Coronel Decl."), Ex. 6 at 13-14.)  Dr. Katz further observed that seven of 78 adverse events reported as "serious" involved depression, of which four events were considered either "possibly" or "probably" related to Neurontin.  (*Id.* at 15.)  As with Dr. McCormick, Dr. Katz never concluded from this limited number of adverse events that Neurontin increases the risk of suicide-related events, and he also recommended approval without the inclusion of any such warning.  Dr. Paul Leber, Director of FDA's Neuropharmacological Division, also prepared a report of the safety and effectiveness of Neurontin, entitled, "Approval Action Memorandum,"

dated December 13, 1993.  Dr. Leber's findings were consistent with those of Dr. Katz and Dr. McCormick.

An independent panel of outside experts, FDA's Peripheral and Central Nervous System Drugs Advisory Committee, also evaluated the data on Neurontin.  Dr. McCormick's clinical review was provided to the Committee and she discussed with the Committee the various adverse events reported in the clinical trials, including the suicide-related events, during its December 15, 1992 meeting.  None of the experts at the panel meeting concluded that Neurontin causes or increases the risk of these events and the panel voted unanimously in favor of FDA approval.

On December 30, 1993, after two years of review, FDA concluded that Neurontin was safe and effective for its intended use and issued an approval letter.  FDA approved Neurontin on the condition that the final printed labeling be identical to the draft labeling FDA had reviewed, edited, and approved or the company would be in violation of federal law.  FDA's approval letter stated in pertinent part:

> The final printed labeling (FPL) must be identical to the draft labeling/PPI enclosed as Attachment 1 with this letter.  Marketing the product with FPL that is not identical to the draft labeling may render the product misbranded and an unapproved new drug.

(Coronel Decl., at Ex. 8.)

As of the time of approval in December 1993, FDA found that there was no scientific evidence supporting an increased risk of suicidal behavior and thinking with Neurontin and the agency did not include any such warning in the labeling.  According to the principal clinical reviewer, Dr. McCormick:

> Given the relatively low frequency of suicidal adverse events reported in the clinical trials and the high background rate of suicidal behavior in patients with epilepsy, the FDA did not believe it would have been appropriate to address

-11-

suicidal behavior in the warnings, precautions, or contraindications sections. Accordingly, *the FDA's scientific judgment in December 1993 was that there was no reasonable evidence of an association with Neurontin and suicidal behavior or any psychiatric adverse event. To include a warning or other prominent listing of suicide-related events would have been inconsistent with the clinical trial data and a mischaracterization of the risks associated with Neurontin.* In addition, such a warning would have had significant potential to impact public health adversely; both by diluting scientifically supported information in the labeling and by improperly discouraging the use of Neurontin.

(Sayler Decl., Ex. 2 at ¶ 29) (emphasis added).[8]

**B.    FDA Approved Neurontin for Use in the Management of Postherpetic Neuralgia in May 2002 and Again Determined All Aspects of the Neurontin Labeling**

In August 2001, Pfizer filed a supplemental new drug application for Neurontin seeking an indication for the management of neuropathic pain. Though Pfizer ultimately sought approval only for use in treating one type of neuropathic pain, postherpetic neuralgia ("PHN"), the results of the clinical trials also included "confirmatory safety findings in other neuropathic pain conditions." (Coronel Decl., Ex. 9 at 3.) Pfizer submitted an ISS to FDA in August 2001 and a safety update in December 2001.

The FDA clinical reviewer with responsibility for the PHN application, Dr. Sharon Hertz, prepared a report, dated May 24, 2002, detailing her analysis of the clinical data. Similar to the agency's earlier evaluation of the epilepsy NDA, Dr. Hertz analyzed all the adverse events data, including reports of depression and suicide-related events from the clinical trials in neuropathic pain disorders. Dr. Hertz found that the incidence of treatment-emergent

---

[8] FDA's comprehensive control over the Neurontin labeling is further demonstrated by its actions regarding the description of Neurontin's mechanism of action. During its 1993 review of the draft labeling, FDA removed Warner-Lambert's proposed language from the Mechanism of Action section discussing the effect of Neurontin on certain neurotransmitters in the brain. Specifically, FDA removed the statement: "Gabapentin slightly reduces the release of monoamine neurotransmitters in vitro." (Coronel Decl., Ex. 1 at Pfizer_LCastro_0039688, Ex. 14, Ex. 15 at WLC_CBU_119984, Ex. 16 at WLC_JTurner_000827.) FDA's action is significant because plaintiffs assert that reduction of monoamine levels is a mechanism by which Neurontin causes worsening depression and suicidal behavior, and that the absence of this (or similar) language in the labeling is a basis for their failure-to-warn claims.

-12-

depression in the neuropathy studies was higher in patients on *placebo* than patients taking Neurontin (2.2% vs. 1.3%). With regard to suicidality, Dr. Hertz noted one incident of intentional overdose, which Pfizer had reported as a suicide attempt. The patient developed somnolence after taking a higher dose of medication, but only the somnolence was attributed to Neurontin, not the overdose. In sum, Dr. Hertz concluded that no suicide-related events were attributed to Neurontin.

Based on her review of the safety and efficacy data, Dr. Hertz recommended approval of Neurontin for the management of PHN. Dr. Robert Rappaport, the Deputy Director of FDA's Division of Anesthetic, Critical Care, and Addiction Drug Products ("DACCADP"), concurred with Dr. Hertz's conclusions and also recommended approval.

Dr. McCormick, who reviewed the original Neurontin NDA and, by this time, was the Director of the DACCADP, prepared a report, dated May 22, 2002, "Review and Basis for Approval Action," in which she stated that there had been an adequate demonstration of safety and effectiveness of Neurontin in the treatment of PHN to support approval. Dr. McCormick did not discuss suicidality in her report because, among other things, "Neurontin had in 2002 been in use throughout the world for nearly a decade and had not given rise to a safety signal involving any psychiatric adverse event or suicidality." (Sayler Decl., Ex. 2 at ¶¶ 38-39.)[9]

---

[9] As it had done nine years earlier when it approved the initial Neurontin labeling, FDA again removed certain proposed language from the Mechanism of Action section when determining the final PHN labeling. In particular, FDA deleted the following language:

> Gabapentin reduces the stimulated release of noradrenaline, dopamine, and glutamate under certain laboratory conditions. Gabapentin administration to humans increases the total brain content of GABA after a single dose. However, the relevance of these findings to clinical use is not yet clear.

(Sayler Decl., Ex. 2 at ¶¶ 40-41; Coronel Decl., Ex. 11 at 3.) As before, FDA's rejection of this language, on which plaintiffs base their failure-to-warn claims, reflected the agency's belief that this information was not clinically significant.

2854840v1

On May 24, 2002, FDA issued an approval letter for the treatment of PHN.  FDA again conditioned approval on the **verbatim** use of the FDA-approved labeling and warnings, stating that marketing the product with final printed labeling that is not identical to the approved labeling could render the drug misbranded.  As with the prior approved labeling, FDA did not require warnings that Neurontin causes or increases the risk of suicide-related events.  The references to suicide-related events from the epilepsy add-on trials contained in the Adverse Reactions section remained unchanged.

C.    **FDA Reaffirmed the Safety of Neurontin in December 2005**

On April 26, 2004, FDA asked Pfizer to perform a comprehensive search, pursuant to specific FDA-mandated protocols, of the Neurontin clinical trial and postmarketing data for cases of suicide and suicide attempt.[10]  Pfizer responded to FDA's request by filing two submissions, in September and November 2004, respectively.  The September 2004 submission included the results of the search for cases of suicide and suicide attempts in 92 Phase 2-4 placebo-controlled, non-placebo controlled, and open-label (uncontrolled) Neurontin studies included in the investigational new drug applications ("INDs"), NDAs, and sNDAs, as well as

---

[10]  Further evidence that FDA, at all pertinent times, specifically considered and determined how the Neurontin labeling should address suicide-related events includes the fact that in March 2004, Andrew Finkelstein of Finkelstein & Partners contacted FDA to report incidents of suicide in patients using Neurontin. Thereafter, in May 2004, Finkelstein & Partners filed a Citizen's Petition with FDA, asking the agency to require suicide warnings for Neurontin.  Mr. Finkelstein's request was based on numerous uncontrolled adverse event reports, mirroring plaintiffs' products liability claims in this litigation.  Mr. Finkelstein renewed his call to the agency to require suicide warnings for Neurontin in the spring of 2005.  As discussed *infra*, FDA reviewed the suicide data provided by Pfizer in response to the agency's request and decided not to include any suicide warning in revised Neurontin labeling as Mr. Finkelstein had requested.  Instead, in May 2006, the agency approved and required Pfizer to issue labeling that continued to describe suicide-related data in the Adverse Reactions section of the labeling. That plaintiffs' counsel squarely raised the suicide labeling issue with FDA in 2004 and 2005 and the agency did not include a suicide warning in the Neurontin labeling approved in 2006 is further evidence that FDA did not conclude a warning was scientifically supported by the data for Neurontin.

the analysis of postmarketing data.  These studies included patients with psychiatric disorders such as bipolar disorder, panic disorder, and social phobia.[11]

The November 2004 submission included 55 Phase I Neurontin clinical trials in healthy volunteers and patients.  There were no cases of suicide or suicide attempt in any placebo-controlled or non-placebo controlled studies in healthy volunteers or patients.

On October 20, 2005, after a review of the September and November 2004 submissions, the agency asked Pfizer to make "minor labeling changes" to the terminology in the Adverse Reactions section of the Neurontin label regarding suicide-related events.[12]  (Coronel Decl., at Ex. 21-24.)  FDA did <u>not</u> find that Neurontin increased the risk of suicide-related events and, accordingly, did not ask Pfizer to add any warning whatsoever to the label, let alone a warning relating to suicide.

On December 21, 2005, Pfizer submitted the minor labeling changes to FDA.  On May 3, 2006, FDA issued an approval letter, which stated in relevant part:

> We have completed our review of these applications.  These applications are approved, effective on the date of this letter, for use as recommended in the agreed-upon labeling text.
>
> The final printed labeling (FPL) **_must be identical_** to the submitted labeling (package insert submitted December 21, 2005).

---

[11] Contrary to plaintiffs' assertion that patients using Neurontin for psychiatric illnesses are at a greater risk for suicide compared to other Neurontin patients, there were no reports of suicide or suicide attempts in the psychiatric studies.

[12] FDA asked Pfizer to modify the "Other Adverse Events Observed During All Clinical Trials: Clinical Trials in Adults and Adolescents with Epilepsy" section by changing the terms "suicidal" and "suicide gesture" to "suicide attempt" and "suicide," as infrequent and rare events, respectively.  Similarly, in the subsection entitled "Clinical Trials in Adults With Neuropathic Pain of Various Etiologies," FDA added "suicide attempts" as an infrequent event.  Finally, FDA asked that the information in the label reflecting the number of patients exposed to Neurontin in the epilepsy add-on trials be updated to reflect the numbers Pfizer provided with its suicidality analyses in 2004. Following additional coordination, on November 22, 2005, FDA directed Pfizer to "proceed with the minor labeling changes pertaining to suicide-related events." (Coronel Decl., at Ex. 21-24.)

(Coronel Decl., at Ex. 26.) (emphasis added). Having considered clinical and postmarketing data relating to suicide-related events from *all* patient populations – including those patients taking the product for epilepsy, neuropathic pain, bipolar and other psychiatric indications – FDA once again determined that Neurontin's label should not include any suicide warning.[13]

> ### D. The FDA Alert in January 2008 Also Did Not Conclude That Neurontin Causes Suicide and Made No Findings Specific To Neurontin

After FDA was contacted by the manufacturer of an antiepileptic drug ("AED") other than Neurontin, FDA asked the manufacturers of eleven AEDs (including Neurontin) to analyze "possibly suicide-related adverse events" occurring in randomized double-blind, placebo-controlled trials. (Sayler Decl., Ex. 3 at 1; Coronel Decl., at Ex. 27.) Using criteria established by FDA, in June 2006 Pfizer submitted data to FDA on 49 controlled clinical studies relating to Neurontin. The data showed <u>no</u> suicidal behavior (i.e., completed suicides, suicide attempts, or preparatory acts) in the Neurontin-treated group, and the tiny numerical difference in the incidence of suicide ideation between the Neurontin and placebo groups (0.039% vs. 0.037%) was not statistically significant.

In January 2008, after analyzing aggregate, pooled data from placebo-controlled trials involving <u>all eleven AEDs</u>, FDA stated that the patients receiving one or more of these

---

[13] Plaintiffs may argue that FDA never considered the risk of suicide-related events in patients using Neurontin for off-label purposes. This argument is without merit. First, FDA is, and has been, fully aware that Neurontin, like all antiepileptic drugs, is routinely prescribed for off-label uses. (*See, e.g.,* Coronel Decl., Ex. 9 at 14-15.) Further, the suicidality data Pfizer submitted to FDA in 2004 and 2006 included data from <u>all</u> patient populations – and it reflected <u>no signal or increased risk of suicide-related events in any group</u>, including those using Neurontin for off-label uses. Finally, any suggestion that patients using Neurontin for off-label uses were at a greater risk of suicide-related events than patients using the drug for epilepsy is belied not only by the Neurontin-specific data, but also by FDA's reported analysis of the eleven antiepileptic drugs. Specifically, the FDA Alert states that the increased risk of suicide is higher in patients with epilepsy compared to patients using these drugs for psychiatric or other conditions.

-16-

eleven AEDs in clinical trials had shown an increased risk of suicidal behavior or thinking.[14] FDA issued an alert advising that patients using AEDs should be closely monitored for suicidality and other unusual changes in behavior. FDA further stated that it would be working with AED manufacturers to include this "new" information in the labeling for these products, and that FDA will discuss these data at an upcoming advisory committee hearing. To date, the FDA has not required any change to the Neurontin label. Notably, the FDA Alert made clear that the agency had not concluded there was a causal relationship between any of the antiepileptic drugs and suicide: "Posting this information does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue." (Sayler Decl., at Ex. 4.)

Whatever information FDA may ultimately require Pfizer to include in the Neurontin label is new and based on data that was not previously known to Pfizer. Pfizer did not possess and had no knowledge of the data relating to AEDs manufactured by other companies. There is no dispute that the Neurontin-specific data fail to show any increased risk of suicidal behavior or thinking associated with Neurontin. *See* Prods. Liab. Pls.' Mem. in Opposition to Defs.' Emergency Mot. to Modify the November 9, 2007 Case Management Order, at 10 (Docket No. #1134) (*plaintiffs "do not dispute that Defendants' Neurontin-specific data . . . show no increased risk of suicide*.") (emphasis added).[15] Notably, FDA has never stated – in the FDA Alert or anywhere else – that an increased risk of suicide-related events was seen in the Neurontin data or in patients taking Neurontin.

---

[14] FDA reported that all AED patients combined had approximately twice the risk of suicidal behavior or thinking compared to placebo-treated patients (0.43% vs. 0.22%). The agency's determination reportedly was based on an analysis of 27,863 drug-treated patients and 16,029 placebo-treated patients in 199 placebo-controlled clinical trials covering the eleven different AEDs.

[15] Further, plaintiffs' experts do not dispute that the Neurontin-specific data fail to show an increased risk of suicidal behavior and thinking. (Sayler Decl., Ex. 5 at 692, Ex. 6 at 3.)

-17-

## LAW AND ARGUMENT

## I.    PLAINTIFFS' STATE-LAW CLAIMS ARE PREEMPTED BY FEDERAL LAW

A direct conflict of law exists here because Pfizer could not have, consistent with federal law, included the suicide-related warning for Neurontin that plaintiffs contend was required by state tort law.  Put another way, had Pfizer included the warning that plaintiffs seek, it would have violated the FDCA.  FDA has never concluded that Neurontin increases the risk of suicide.  Further, Pfizer obviously had no duty to include in the label the results of the FDA Alert, which resulted from an analysis of data to which Pfizer did not (and does not) have access.  Finally, allowing courts and juries to impose their labeling judgments on manufacturers through state-law tort liability would frustrate the federal regulatory structure for prescription drugs created by Congress, which has vested FDA with exclusive authority for determining the content of drug labeling.  For all these reasons, plaintiffs' claims are preempted and must be dismissed.

### A.    State-Law Claims That Conflict with the FDCA and FDA Regulations Are Preempted

The Supremacy Clause of the United States Constitution preempts state laws that conflict with the exercise of federal power.  U.S. Const. art. VI, cl. 2; *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Conflict preemption arises when it is either "impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[16]  *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002) (internal citation and quotation marks omitted).  *See also Crosby v. Nat'l Foreign Trade Council*, 530

---

[16]  As set forth in *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002), a finding of conflict preemption is appropriate whenever (1) it is impossible for a party to comply with both state and federal requirements; or (2) state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Though Pfizer need only establish one of these grounds, as discussed *infra*, plaintiffs' claims are preempted for both reasons.  The other two forms of preemption recognized by the Supreme Court, express preemption and field preemption, *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990), are not applicable here.

U.S. 363, 372-73 (2000).    Agency regulations promulgated pursuant to federal statutory authority, such as those promulgated by FDA, "have no less pre-emptive effect than federal statutes." *de la Cuesta*, 458 U.S. at 153.

Although a statement of congressional intent is not necessary for conflict preemption,[17] Congress recognized the need to avoid placing drug manufacturers in the position of having to choose between avoiding tort liability and complying with federal law when it established the modern drug approval process.    The 1962 amendments to the FDCA expressly provide that state law is preempted whenever "***there is a direct and positive conflict***" with the amendments.  Pub. L. No. 87-781, § 202, 76 Stat. 780, 793 (1962) (emphasis added).

The imposition of damages under state tort law is a form of state action subject to preemption.    *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).    Though state and federal laws may have the same goal, a state-law claim is preempted "if it interferes with the methods by which the federal statute was designed to reach this goal."  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987); *Perez v. Campbell*, 402 U.S. 637, 650-52 (1971) (whether conflict exists between state and federal law depends not on state law's purpose, but on its effect on the operation of federal law).

        **B.**        **Plaintiffs' State-Law Claims Directly Conflict with the FDA-Mandated Labeling for Neurontin**

Plaintiffs assert that the FDA-approved Neurontin labeling was inadequate because it should have included a warning regarding an increased risk of suicide-related events – a warning that FDA did not deem appropriate after reviewing clinical and postmarketing data on

---

[17] *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (an agency's authority to preempt state law "does not depend on express congressional authorization to displace state law").  Moreover, "in the absence of a clear congressional command as to pre-emption, courts may infer that the relevant administrative agency possesses a degree of leeway to determine which rules, regulations, or other administrative actions will have pre-emptive effect." *Medtronic v. Lohr*, 518 U.S. 470, 505 (1996) (Breyer, J., concurring in part and concurring in the judgment).

Neurontin on multiple occasions, both *before and after* plaintiffs allegedly used Neurontin and were injured. Such claims conflict with FDA's authoritative determinations as to the content and format of the Neurontin labeling.

Federal law required Pfizer to follow FDA's labeling regulations and to use the FDA-approved labeling **verbatim**. 21 C.F.R. § 314.150(b). Federal law prohibited Pfizer from revising the Neurontin label to include a warning of an increased risk of suicide in the absence of "reasonable evidence" of an association between Neurontin and suicide. 21 C.F.R. § 201.57(c)(6)(i). If Pfizer had departed from federal requirements and included scientifically unsubstantiated warnings during the relevant time period, Pfizer would have been in violation of federal law. *See* U.S.C. §§ 352(a) and (f); *see also* §§ 321(n); 331(a), (b), and (k); 332; 333(a); 334(a)(1). FDA has explicitly affirmed this point. 71 Fed. Reg. at 3934-35; *Colacicco* 3d Cir. *Amicus* Br. at 18-19.[18]

To this day, the evidence available to Pfizer has not established, and FDA has never concluded, that the *Neurontin* data justify the existence of a suicide warning or that a causal relationship between use of the medication and suicide-related events exists. State law – in the form of a request for damages or any other type of relief – simply cannot be used to require such a warning. *See Kallas Amicus* Br. at 23-24 ("[S]tate law may not validly require the manufacturer of a drug to warn of a specific danger that FDA, based on the agency's scientific analysis, did not believe to be sufficiently supported to warrant a warning.").

---

[18] Preemption applies not just to "warnings" in Neurontin's package insert, but to other aspects of the package insert, including, for example, the precautions and adverse reactions sections, and, beyond the package insert, to other means for disseminating information to physicians, such as "Dear Doctor" letters. *See, e.g.*, *Kordel v. United States*, 335 U.S. 345, 349-50 (1948) (literature sent by manufacturer was "labeling" under FDCA when it supplemented or explained materials sent with the drug); *Walls v. Armour Pharm. Co.*, 832 F. Supp. 1467, 1482-83 (M.D. Fla. 1993) ("Dear Doctor" letter is a form of labeling) (citing 21 U.S.C. § 321(m)). FDA found no reliable scientific evidence to support an increased risk of suicide-related events with Neurontin. Thus, any language suggesting such an increased risk – be it placed in a warning, precaution, or "Dear Doctor" letter – would have been contrary to FDA's authoritative conclusions and mandated labeling, and, therefore, prohibited by the FDCA.

It is undisputed that FDA received and specifically reviewed available data on suicide-related events occurring in patients using Neurontin (i) before approving the drug as adjunctive therapy for epilepsy in December 1993; (ii) before approving it for PHN in May 2002; and (iii) in December 2005 after Pfizer submitted data to FDA relating to suicide-related events. In fact, FDA's most recent review of suicide-related events in January 2008 did not result in a finding of an increased risk specifically in patients using Neurontin. Moreover, any potential change to the label as a result of the January 2008 analysis will be the result of new information that Pfizer did not have in its possession prior to the time plaintiffs here were prescribed Neurontin. In fact, Pfizer still does not have access to this data.

Because plaintiffs' claims seek warnings that FDA specifically analyzed and chose not to include in Neurontin's label, Pfizer could not have complied with both state and federal law, and plaintiffs' claims are preempted. *See Hurley v. Lederle Labs.*, 863 F.2d 1173, 1179 (5th Cir. 1988) ("[A]ssuming that the FDA has processed all the relevant and available information in arriving at the prescribed warning, its decision as to the proper wording must preempt by implication that of a state."); 71 Fed. Reg. at 3935 ("State laws conflict with and stand as an obstacle to achievement of the full objectives and purposes of Federal law when they purport to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated.").

When considering FDA preemption of state laws relating to prescription drug labeling courts have not been in agreement. However, a majority of recently decided cases, and the better reasoned ones, have found that FDA-approved labeling and regulations preempt state-law tort claims in these circumstances. *See Dobbs v. Wyeth Pharms.*, --- F. Supp. 2d ---, 2008 WL 169021 (W.D. Okla. Jan. 17, 2008) (plaintiffs' claims that manufacturer of Effexor failed to

warn of risk of suicide were preempted because FDA had evaluated the scientific data and concluded that a warning was not supported by credible evidence); *Tucker v. SmithKline Beecham Corp.*, No. 1:04-cv-1748-DFH-WTL, 2007 WL 2726259 (S.D. Ind. Sept. 19, 2007) (plaintiff's claims were preempted because they would have required the manufacturer to include language in Paxil's labeling that directly conflicts with the FDA's findings and required labeling); *Miller v. SmithKline Beecham Corp.*, No. 03-CV-393-GKF-FHM, 2008 WL 510449 (N.D. Okla. Feb. 15, 2008) (citing *Dobbs* and *Tucker*); *Sykes v. Glaxo-Smithkline*, 484 F. Supp. 2d 289, 318 (E.D. Pa. 2007) (plaintiff's claims were preempted because proposed warning was not scientifically supported and would have been false and misleading under federal law, and the additional labeling would have posed a threat to the federal regulatory objectives of FDA); *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514 (E.D. Pa. 2006), *appeal docketed*, No. 06-3107 (3d Cir. June 21, 2006); *In re Bextra & Celebrex Mktg. & Sales Pracs. & Prods. Liab. Litig.*, No. M:05-1699 CRB, 2006 WL 2374742 (N.D. Cal. Aug. 16, 2006); *Dusek v. Pfizer Inc.*, No. Civ. A. H-02-3559, 2004 WL 2191804 (S.D. Tex. Feb. 20, 2004); *Needleman v. Pfizer Inc.*, No. Civ. A. 3:03-CV-3074-N, 2004 WL 1773697 (N.D. Tex. Aug. 6, 2004); *Ehlis v. Shire Richwood, Inc.*, 233 F. Supp. 2d 1189 (D.N.D. 2002), *aff'd on other grounds*, 367 F.3d 1013 (8th Cir. 2004); *Conte v. Wyeth, Inc.*, No. CGC-04-437382, 2006 WL 2692469 (Cal. Super. Ct. Sept. 14, 2006); *Abramowitz v. Cephalon, Inc.*, No. BER-L-617-04, 2006 WL 560639 (N.J. Super. Ct. Law Div. Mar. 3, 2006).

Recently, in *O'Neal v. SmithKline Beecham Corp.*, No. CIV S-06-1063 FCD/DAD, 2008 WL 275782 (E.D. Cal. Jan. 30, 2008), the parents of a 13-year-old boy who died in 1997 from injuries sustained during a suicide attempt alleged that Glaxosmithkline ("GSK") should have warned of an increased risk of suicide in pediatric patients with the drug

Paxil, an antidepressant in the SSRI class.  The court held that plaintiffs' claims were preempted because it was not until several years after the decedent's death that FDA "first recognized 'a possible increased risk'" of suicide in pediatric patients and required labeling changes to warn of the risk plaintiffs assert should have been implemented prior to 1997.  *Id*. at \*9.  Moreover, the court found that, because such a warning was not supported by reasonable evidence at the time of the decedent's death, a state-law determination that a warning *was* required would "create[] a conflict between federal and state law and impose[] inconsistent federal and state obligations, thus warranting a finding of preemption."  *Id.* at \*10.

Preemption is warranted here for the same reasons.  Despite having considered the available suicidality data on Neurontin on multiple occasions over the last 15 years, FDA has not, at any time during this period, concluded there is reasonable evidence of an association between Neurontin and suicide-related events and, accordingly, has not required warnings of any kind regarding an increased risk of these events.  Moreover, even if the FDA Alert in January 2008 can be read to conclude that Neurontin increases the risk of suicide-related events, that determination would have been based on data that is still not available to Pfizer and could not have been included prior to the time plaintiffs allegedly were prescribed Neurontin.

Courts that have declined to find preemption in prescription drug cases typically have done so on the grounds that FDA regulations establish only a "minimum safety standard" and state tort law may be used to impose higher standards and additional warnings.[19]  FDA, however, has made clear that agency regulations do not represent minimum standards.  In its January 2006 Preamble to the Final Rule on prescription drug labeling, FDA expressly stated

---

[19] *See, e.g., Eve v. Sandoz Pharm. Corp.*, No. IP 98-1429-C-Y/S, 2002 WL 181972 (S.D. Ind. Jan. 28, 2002); *Zikis v. Pfizer, Inc.*, No. 04 C 8104, 2005 WL 1126909 (N.D. Ill. May 9, 2005); *Cartwright v. Pfizer, Inc.*, 369 F. Supp. 2d 876 (E.D. Tex. 2005); *McNellis v. Pfizer, Inc.*, No. Civ. 05-1286(JBS), 2006 WL 2819046 (D.N.J. Sept. 29, 2006) (*appeal pending*); *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 776 (E.D. La.  2007).

-23-

that its labeling regulations "establish both a 'floor' and a 'ceiling,' such that additional disclosures of risk information can expose a manufacturer to liability under the [FDCA] if the additional statement is unsubstantiated or otherwise false and misleading."  71 Fed. Reg. at 3935. *See* 21 U.S.C. § 352 (labeling is subject to enforcement action if added information makes the labeling false and misleading).    FDA's interpretation of its own regulation is entitled to significant deference.  *See Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1010 (2008) (preempting state-law claims of personal injury from an FDA-approved medical device; stating that "[FDA's] reading of its own rule is entitled to substantial deference") (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

Even if FDA regulations did establish only a minimum safety standard that a manufacturer could exceed by including additional warnings – as plaintiffs no doubt will argue – Pfizer was not free to file a CBE supplement regarding an increased risk of suicide-related events because there was no "reasonable evidence" of an association supporting such an addition to the labeling.  *See* 21 C.F.R. § 201.57(c)(6)(i).  *See O'Neal*, 2008 WL 275782, at *13 ("Absent reasonable evidence of a risk, GSK had no basis to petition FDA and simply did not have the option under federal law to include or secure a warning for [a] risk [of suicide] in the drug's labeling.  Had it done so, GSK would have misbranded the drug in violation of the FDCA . . . .").

Further, it has been FDA's position since at least 1982 that a manufacturer can make labeling changes without FDA approval pursuant to 21 C.F.R. § 314.70(c) only "to correct concerns about *newly discovered risks* from the use of the drug."  47 Fed. Reg. at 46,623 (emphasis added); 73 Fed. Reg. at 2849 (FDA has proposed to amend § 314.70(c) "to reaffirm that a CBE supplement is appropriate . . . only to reflect newly acquired information and to clarify that a CBE supplement may be used to add or strengthen . . . a warning, precaution, or

-24-

adverse reaction . . . only if there is sufficient evidence of a causal association with the drug . . . .").

In FDA's view, any such changes "must be based on material new information – not information that was previously available to FDA, nor even cumulative new information that does not add materially to the information that was previously available to the agency." *Levine Amicus* Br. at 14; *id.* at 12 ("If manufacturers were free to make unilateral changes to labeling the day after FDA's approval, based on information that was previously available to FDA, the approval process would be greatly undermined and the agency's careful balancing of risks and benefits thwarted."). *See also Dowhal v. SmithKline Beecham Consumer Healthcare*, 88 P.3d 1, 10 (Cal. 2004) ("The possibility that new data may justify a change in the warning does not invalidate [FDA] approval of the existing warning."); *Kallas Amicus* Br. at 34, 37-38 (explaining that a product is misbranded if a manufacturer adds a warning that FDA does not believe is supported *at that time*).

Here, it is undisputed that Pfizer had no "material new information" on which to base the addition of a suicide-related warning to Neurontin's labeling. Indeed, the information in Pfizer's possession regarding suicide-related events with Neurontin was provided to FDA on multiple occasions. In short, FDA knew what Pfizer knew. Pfizer could not have unilaterally revised the Neurontin labeling to add the warning plaintiffs propose.

C.    **Plaintiffs' State-Law Claims Interfere with FDA's Objective of Ensuring That All Prescription Drug Labeling Is Supported by Credible Scientific Evidence and Is Not False or Misleading**

Labeling is the "centerpiece of risk management for prescription drugs," as it "reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal, authoritative conclusions" regarding drug safety and efficacy. 71 Fed. Reg. at 3934. FDA is charged by Congress with ensuring that all statements in

-25-

prescription drug labeling are accurate and supported by reliable scientific evidence, and therefore not false or misleading.   21 C.F.R. §§ 201.56, 201.57; 44 Fed. Reg. at 37,435 (June 26, 1979).

FDA has stated on numerous occasions that speculative warnings can harm the public and therefore should be avoided.  *See Levine Amicus* Br.; *Colacicco* 3d Cir. *Amicus* Br.; *Kallas Amicus* Br.; Brief of the United States as *Amicus Curiae* Supporting Defendant, *Motus v. Pfizer Inc.*, No. 02-55372 (9th Cir. filed Sept. 3, 2002) ("*Motus* Amicus Br.") (Sayler Decl., Ex. 8 at 23-24.)  Sound policy reasons support this view.  First, unsubstantiated warnings detract from more serious, scientifically confirmed risks.  *See* 71 Fed. Reg. at 3935 ("[L]abeling that includes theoretical hazards not well-grounded in scientific evidence can cause meaningful risk information to 'lose its significance.'") (quoting 44 Fed. Reg. 37,434, 37,447) (June 26, 1979)); *see also Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 815 (5th Cir. 1992) ("To be reasonable, the warning should neither understate nor overstate the known risks associated with the use of a particular product.").

Moreover, unsubstantiated warnings may give physicians false impressions of a drug's risks and thus over-deter its use.  Because FDA's regulation of prescription drugs is designed to ensure each drug's optimal use, underutilization of a drug based on scientifically unsupported warnings can frustrate the purpose of federal regulation as much as over-utilization from failure to disclose scientifically demonstrated adverse effects.  *See* 71 Fed. Reg. at 3935 ("Exaggeration of risk could discourage appropriate use of a beneficial drug."); *Colacicco* 3d Cir. *Amicus* Br. at 16-17; *Kallas Amicus* Br. at 26-27.

Finally, unsupported warnings unnecessarily alarm patients who may discontinue the medication, ultimately harming themselves as they seek to avoid the alleged, but speculative

risks. *Colacicco* 3d Cir. *Amicus* Br. at 16-17; *see also Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 146 (S.D.N.Y. 1987) (FDA must consider not only possible hazards to public health but also the interest of the public in freedom from groundless alarm).

In its January 2006 Preamble to the Final Rule on prescription drug labeling, FDA discussed its position that state-law tort claims are preempted if they conflict with its regulation of prescription drug labeling:

> State laws conflict with and stand as an obstacle to achievement of the full objectives and purposes of Federal law when they purport to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated. In such cases, including the statement in labeling or advertising would render the drug misbranded under the act (21 U.S.C. § 352 (a) and (f)).

71 Fed. Reg. at 3935; *id.* at 3936 (stating "claims that a sponsor breached an obligation to warn by failing to include contraindications or warnings that are not supported by evidence" are preempted). *See also Levine Amicus* Br. at 7 (explaining agency's view that claims challenging labeling that FDA approved after being informed of the particular risk also are preempted). Thus, FDA's position is that a claim is preempted if, as here, the warning plaintiffs seek to impose was not supported by the evidence before FDA.

### D.    Plaintiffs' State-Law Claims Stand as an Obstacle to the Full Purposes and Objectives of Congress

Plaintiffs' claims also stand as an obstacle to Congress's intent that FDA exclusively regulate prescription drugs sold in the United States. *See* FDCA, 21 U.S.C. § 301, et seq. Congress created a regulatory structure that grants FDA exclusive authority and responsibility for resolving complex scientific and public health issues related to prescription drug labeling. *See Premo Pharm. Labs., Inc. v. United States*, 629 F.2d 795, 803 (2d Cir. 1980) ("The entire statutory scheme envisages that the FDA will perform the difficult task of investigation and scientific evaluation usually required to determine whether a drug product is

safe and effective."); *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d at 518 (Congress has "vested the FDA with authority to regulate the specifics of drug labeling, making important judgments of what is required for safety of the consuming public, what new drugs may appear in the marketplace, and what their instructions and labels must carry.").

Accordingly, courts have properly reasoned that it is FDA, not courts or juries, that should determine whether a prescription drug is accompanied by warnings because "FDA possesses the requisite know-how to conduct such analyses, by sifting through the scientific evidence to determine the most accurate and up-to-date information regarding a particular drug." *Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996); *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 797 (8th Cir. 2001) (en banc) (applying Justice Breyer's conflict preemption analysis to a medical device case; discussing dangers of overwarning; contrasting FDA's broad perspective on labeling considerations with the narrow view of "a jury focused on a single case," and holding that regulation of labeling by FDA allows the agency to "craft labels that maximize safety and effectiveness"); *see also Premo Pharm. Labs., Inc.*, 629 F.2d at 803 (whether a drug is safe and effective "is to be determined by the FDA which, as distinguished from a court, possesses superior expertise").

In its January 2006 Preamble, FDA explained how and why state-law tort claims frustrate the federal regulatory structure for prescription drug labeling:

> State law actions also threaten FDA's statutorily prescribed role as the expert Federal agency responsible for evaluating and regulating drugs. State actions are not characterized by centralized expert evaluation of drug regulatory issues. Instead, they encourage, and in fact require, lay judges and juries to second-guess the assessment of benefits versus risks of a specific drug to the general public--the central role of FDA--sometimes on behalf of a single individual or group of individuals. That individualized reevaluation of the benefits and risks of a product can result in relief--including the threat of significant damage awards or penalties--that creates pressure on manufacturers to attempt to add warnings that FDA has neither approved nor found to be scientifically required. This could

-28-

encourage manufacturers to propose "defensive labeling" to avoid State liability, which, if implemented, could result in scientifically unsubstantiated warnings and underutilization of beneficial treatments.

71 Fed. Reg. at 3935. Further, FDA observed that "[i]f State authorities, including judges and juries applying State law, were permitted to reach conclusions about the safety and effectiveness information disseminated with respect to drugs for which FDA has already made a series of regulatory determinations based on its considerable institutional expertise and comprehensive statutory authority, the federal system for regulation of drugs would be disrupted." *Id.* at 3969. *See In re Bextra*, 2006 WL 2374742, at *9 ("The FDA is in a better position than the Court to determine whether state laws that encourage manufacturers to propose defensive labels upset the FDA's careful balance of statutory objectives.").[20]

### E.       FDA's Official Interpretation of Its Own Regulations Is Due Deference

FDA's own views of the preemptive scope of its regulations are entitled to substantial deference. *See Riegel v. Medtronic, Inc.*, 128 S. Ct. at 1010 (preempting state-law claims of personal injury from an FDA-approved medical device; stating that "[FDA's] reading of its own rule is entitled to substantial deference") (citing *Auer*, 519 U.S. at 461). An agency's interpretation of its own regulations is controlling unless "plainly erroneous or inconsistent with the regulation[s]." *Auer*, 519 U.S. at 461; *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984); *S. Shore Hospital, Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002).

---

[20] FDA has further set forth its position on preemption in several *amicus* briefs filed since 2000. *See*, *e.g.*, Statement of Interest of United States, *Bernhardt v. Pfizer Inc.*, No. 00 Civ. 4042 (LMM) (S.D.N.Y. filed Nov. 13, 2000); Brief of the United States as *Amicus Curiae* Supporting Defendant, *Motus v. Pfizer Inc.*, No. 02-55372 (9th Cir. filed Sept. 3, 2002); Brief of the United States as *Amicus Curiae* Supporting Defendant, *Kallas v. Pfizer Inc.*, No. 04CV0998 (D. Utah filed Sept. 15, 2005); Brief of the United States as *Amicus Curiae* Supporting Defendants, *Colacicco v. Apotex, Inc.*, No. 06-3107 (3d Cir. filed Dec. 4, 2006); Brief of the United States as *Amicus Curiae* Supporting Defendant, *Wyeth v. Levine*, on Petition for Writ of Certiorari, (U.S. filed Dec. 21, 2007) (No. 06-1249). These briefs are attached as Exhibits 7 through 11 to the Sayler Declaration.

Further, the Supreme Court has found FDA "uniquely qualified to determine whether a particular form of state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and, therefore, whether it should be pre-empted." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496 (1996) (internal quotation marks and citation omitted); *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985) (FDA's position on preemptive scope of its authority generally "is dispositive"). *Cf. Geier*, 529 U.S. at 883 (giving weight to Department of Transportation's conclusion that tort suit was preempted because "Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive" and DOT is "uniquely qualified to comprehend the likely impact of state requirements") (citations and internal quotations omitted); *Sprietsma*, 537 U.S. at 67-68 (giving weight to Coast Guard's interpretation of the preemptive effect of its regulations).

The First Circuit similarly has deferred to federal agencies' interpretations of their own regulations. In *Rucker v. Lee Holding Co.*, 471 F.3d 6 (1st Cir. 2006), the issue was whether an employee who had left his employer and returned several years later was eligible for medical leave pursuant to the Family and Medical Leave Act. The decision turned on ambiguous language in a regulation promulgated by the Department of Labor ("DOL"). The court found the agency's interpretation of the regulation controlling:

> When interpreting an agency regulation, courts must give substantial deference to the agency's own interpretation of its regulations, so long as that interpretation is consistent with the regulation and reflect[s] the agency's fair and considered judgment on the matter in question [citing *Auer*]. In this case, DOL has expressed the view that the first sentence in its regulation, allowing for non-consecutive months, is not limited by the sentences that follow, discussing how to count weeks of employment. The DOL expressed this view first in the regulatory preamble to the regulation and then in an amicus brief filed in this case (as requested by this court). Its views, which are consistently held and consonant with the language of the regulation, are entitled to controlling weight here.

-30-

*Id.* at 12 (internal quotation marks omitted); *id.* at 13 ("We agree with the DOL that there are important policy issues involved here; the point of the *Chevron* doctrine is that the DOL, in the exercise of its statutory authority, must resolve these issues in the first instance.")  *See also S. Shore Hospital, Inc.*, 308 F.3d at 97 (deferring to Health Care Financing Administration's interpretation of Medicare regulation where regulation concerned "a complex and highly technical regulatory program" requiring "significant expertise" and "the exercise of judgment grounded in policy concerns").

   Finally, this Court has previously ruled that the views of the Department of Health and Human Services ("HHS") on the preemptive scope of federal law are due deference.  In *In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d 187 (D. Mass. 2004), the Court asked the HHS Secretary to submit an *amicus* brief on whether the federal Medicare Rebate Statute preempts certain state-law fraud claims.  The Court concluded that the Secretary's interpretation of the applicable law was "entitled to judicial deference," reasoning as follows:

> The Court asked the agency for its views, and it is not a party with a stake in the litigation.  An agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency.  *The agency's positions in its brief are well-reasoned, and the Court considers its specialized experience particularly valuable in determining the extent to which it would be burdened by states' claims.*

*Id.* at 200 (internal citations and quotation marks omitted) (emphasis added).  FDA's views on the preemptive scope of applicable federal statutes and regulations and the effect of state-law tort claims on the federal regulatory scheme for prescription drugs (as expressed in the Preamble to the Final Rule and its *amicus* briefs) are deserving of the same deference.

## II.    PLAINTIFFS' CLAIMS MUST FAIL BECAUSE PFIZER HAD NO DUTY TO WARN OF INFORMATION THAT IT DID NOT AND COULD NOT KNOW

It is axiomatic that one is not liable for failing to warn of alleged risks that it did not know, and could not have known, through the exercise of reasonable care. *See, e.g.*, *Anderson v. Owens-Illinois, Inc.*, 799 F.2d 1, 2 (1st Cir. 1986) (holding that the duty to warn extends only to such dangers or defects about which a manufacturer either actually knew or about which it reasonably should have known, based on the state of medical and scientific knowledge in the field at the time); *Lindsay v. Ortho Pharm. Corp.*, 637 F.2d 87, 91 (2d Cir. 1980) ("The manufacturer's duty is to warn of all potential dangers which it knew, or in the exercise of reasonable care should have known, to exist.").

If FDA ultimately requires a change to the Neurontin label based on the findings it outlined in the FDA Alert, it is undisputed that the Neurontin controlled clinical data fail to show the alleged risks described in the FDA Alert.  In fact, as set forth above, plaintiffs and their experts have repeatedly admitted that the Neurontin-specific data show no increased risk of, or association with, suicide-related events.  It is obvious, therefore, that the findings in the FDA Alert were the result of controlled clinical trial results relating to other antiepileptic drugs.  Pfizer obviously did not possess such data prior to the FDA Alert, and still does not possess it today.

Because all of plaintiffs' claims pre-date not only the FDA Alert, but also the future potential release of such proprietary data, Pfizer cannot be liable for failing to warn patients who took Neurontin years earlier.  Accordingly, Pfizer is entitled to summary judgment as to all of plaintiffs' claims because those claims are based on a failure to warn of information that Pfizer neither knew nor was capable of knowing through the exercise of reasonable care.

-32-

III.   **PLAINTIFFS' CLAIMS FAIL BECAUSE THEY HAVE ADDUCED NO SCIENTIFICALLY RELIABLE EVIDENCE THAT NEURONTIN CAN CAUSE SUICIDE-RELATED EVENTS**

Pfizer also is entitled to summary judgment on the independent ground that plaintiffs lack admissible evidence that Neurontin is capable of causing their alleged injuries.  As the Court is aware, if a plaintiff fails to establish a genuine issue of material fact as to <u>any</u> <u>single</u> <u>element</u> of his or her claim, this Court must grant the defendants summary judgment and dismiss the case.  *See, e.g., Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 57 (1st Cir. 2000).

A.    **Proof of Causation Is an Essential Element of Plaintiffs' Claims**

All claims asserted by plaintiffs fail unless plaintiffs prove, among other things, that Neurontin caused plaintiffs' alleged suicide-related injuries.  *See e.g., Habecker v. Copperloy Corp.*, 893 F.2d 49, 54 (3d Cir. 1990) ("Causation is an essential element of a products liability (or any other tort) action."); *Bingham v. Terminix Int'l Co. L.P.*, 158 F.R.D. 97, 99 n.3 (S.D. Miss. 1994) ("It is indisputable that proof of causation . . . is an essential element of plaintiff's claims seeking damages for his cancer.").

Plaintiffs must prove general causation—that Neurontin is capable of causing suicide—and specific causation—that Neurontin actually caused the injuries alleged by each plaintiff.  *See e.g., Grimes v. Hoffmann-LaRoche, Inc.*, 907 F. Supp. 33, 38 (D.N.H. 1995) (excluding plaintiff's expert's opinion on general and specific causation before granting defendant's motion for summary judgment); *Bingham*, 158 F.R.D. at 99-100 (granting summary judgment in favor of defendants because there was no competent record proof that would support plaintiff's allegation that [the product] causes cancer, or more particularly, that it is likely that this product caused or contributed to [plaintiff's] cancer"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 830 (E.D. Tex. 2002) (requirement that plaintiffs establish both

general and specific causation is "similar in all United States jurisdictions"; using summary judgment to dismiss hundreds of scientifically baseless claims in MDL proceeding); *In re: Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1224 (D. Colo. 1998) ("In order to establish their claims, Plaintiffs must show both general and specific causation") (citation omitted) (citing cases).

### B. Plaintiffs Must Prove Causation Through Expert Testimony

Expert testimony is necessary because the complex issue of general causation involves psychopharmacology, neurology, suicidology, epidemiology, and psychiatry. Courts facing such complex issues in prescription drug cases have uniformly required expert testimony to prove medical causation. For instance, in *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193 (10th Cir. 2002), the plaintiff alleged that her ingestion of the prescription drug Parlodel caused her to have a stroke. The Tenth Circuit held that, in order to determine the alleged effects of the drug, the jury would be required to assess a wide variety of scientific evidence, which is not within the realm of jurors' ordinary experience. *Id.* at 1214. The court held that plaintiff could only sustain her burden of proof with admissible expert testimony. *Id.*; *see also Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 972 (4th Cir. 1990) (proof of causation required to be established by expert testimony in case involving DTP vaccine); *Bernhardt v. Richardson-Merrell, Inc.*, 892 F.2d 440, 445 (5th Cir. 1990) (expert testimony was required to establish that Bendectin caused a birth defect, and summary judgment was granted when there was insufficient expert testimony to create a genuine issue of material fact); *Novak v. United States*, 865 F.2d 718, 724-25 (6th Cir. 1989) (expert testimony required on causation in vaccination case); *Chaney v. SmithKline Beckman Corp.*, 764 F.2d 527, 529-30 (8th Cir. 1985) (jury cannot speculate about a key element of the case, and jury cannot decide whether the drug caused a physical injury without the assistance of expert testimony).

-34-

**C.**    **Plaintiffs Cannot Establish A Triable Issue As To Causation Because They Have Adduced No Reliable and Relevant Expert Testimony**

As set forth in detail in Pfizer's Motion to Exclude the Testimony of Doctors Trimble, Kruszewski, and Blume, plaintiffs' experts' general causation opinions are neither relevant nor reliable and fail Rule 702 and *Daubert*'s requirements.  In addition, two of plaintiffs' experts—Drs. Kruszewski and Blume—are not even qualified to offer the opinions they give.  Because plaintiffs' experts' opinions are inadmissible, there is no genuine issue of material fact concerning the essential element of general causation and summary judgment is therefore proper.  *See, e.g., Sutera v. Perrier Group of Am., Inc.*, 986 F. Supp. 655, 668 (D. Mass. 1997) (allowing defendants' motion for summary judgment after concluding that plaintiffs failed to offer reliable evidence of general causation); *Grimes*, 907 F. Supp. at 39 (same).

**D.**    **Plaintiffs Lack Required and Necessary Evidence of General Causation**

The undisputed facts establish that plaintiffs lack fundamental evidence required to satisfy their burden of proving general causation.  First, it is undisputed that no clinical or epidemiological evidence establishes an association between Neurontin and suicide-related events.  Second, it is undisputed that neither plaintiffs nor their experts have initiated or conducted any epidemiological testing required to establish an association between Neurontin and suicide-related events.  Third, it is undisputed that, outside of plaintiffs' hired experts in this litigation, no scientist, scientific or medical organization, or regulatory authority has ever opined or concluded that Neurontin can cause suicide-related events.

Based on these undisputed facts, and independent of the Court's *Daubert* analysis, plaintiffs lack the fundamental evidence needed to establish that Neurontin can cause suicide-related events, which is an essential element of their claims on which plaintiffs bear the burden of proof.  *See, e.g., Lynch v. Merrell-National Labs.*, 830 F.2d 1190, 1194, 1197 (1st Cir. 1987)

-35-

(granting summary judgment where plaintiffs did not have the "confirmatory epidemiological data" necessary to prove general causation); *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 878, 884 (W.D. Tex. 1997) (granting summary judgment where plaintiffs failed to prove an association between a pharmaceutical product and a disease); *Nelson v. Am. Home Prods. Corp.*, 92 F. Supp. 2d 954, 972 (W.D. Mo. 2000) (granting summary judgment where plaintiffs' experts failed to test their theories); *Conde v. Velsicol Chem. Corp.,* 804 F. Supp. 972, 1025-26 (S.D. Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir. 1994) (granting summary judgment where plaintiffs' causation theory was not generally accepted in the scientific community and contrary to the scientific consensus); *In re Breast Implant Litig.*, 11 F. Supp. 2d at 1233 n.5; Michael D. Green, et al., *Reference Guide on Epidemiology,* in Reference Manual on Scientific Evidence, 337, 374 (2d ed. 2000). Accordingly, Pfizer is entitled to summary judgment.

So clear is the total lack of evidence tying Neurontin to suicide-related events that one of the products liability plaintiffs, Monica Smith, has argued in a contemporaneous litigation in another jurisdiction that Neurontin <u>cannot</u> cause suicidal behavior. Specifically, Ms. Smith, in reliance on opinion testimony of an expert that she retained, argued that Neurontin had nothing to do with the suicide death of her husband, Kenneth Smith. (Sayler Decl., at Ex. 12.) In fact, she took the position in that litigation that a lawsuit alleging that Neurontin causes suicidal behavior would be "frivolous." (*Id.*) Notably, the *Smith* case is one of the 70 cases that plaintiffs' liaison counsel, Finkelstein & Partners, chose to certify to this Court, stating their belief that "pursuit of the action is warranted." (Docket No. 989.)

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant summary judgment in their favor in all products liability cases in which the alleged injury is

suicide, suicide attempt, suicidal gesture or suicidal ideation, as identified in Exhibit 1 to the Declaration of Scott W. Sayler, Esq.

Respectfully submitted,

DAVIS POLK & WARDWELL

By:    /s/ James P. Rouhandeh
        James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

SHOOK, HARDY & BACON L.L.P.

By:    /s/ Scott W. Sayler
        Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

- and -

HARE & CHAFFIN

By:    /s/ David B. Chaffin
        David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on March 7, 2008.

/s/ David B. Chaffin

2854840v1