# EXHIBIT 6

Page 1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
 2

 3   - - - - - - - - - - - X
     IN RE:  NEW YORK NEURONTIN        :
 4   PRODUCTS LIABILITY LITIGATION     :
                                       :Case Management.
 5   vs.                               :Index No. 765000/2006
                                       :Hon. Marcy S. Friedman
 6   THIS DOCUMENT APPLIES TO ALL      :
     CASES                             :
 7   - - - - - - - - - - - X
 8
 9
10
11        DEPOSITION OF:     CHERYL D. BLUME, PH.D.
12
          DATE:              February 29, 2008
13
14        TIME:              12:57 p.m. to 2:52 p.m.
15
          PLACE:             13902 N. Dale Mabry Hwy
16                           Tampa, Florida
17
          BEFORE:            CAROLYN R. LOUDEN, RPR
18                           Notary Public, State of
                             Florida at Large
19
                             Pages 1 - 92
20
21
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2      ANDREW G. FINKELSTEIN, ESQUIRE
          Finkelstein & Partners, LLP
 3        436 Robinson Avenue
          Newburgh, New York 12550
 4        (845) 562-3492
            Attorney for Plaintiff
 5
        LORI CONNORS McGRODER, ESQUIRE
 6      VINCE GUNTER, ESQUIRE (Via teleconference)
          Shook, Hardy & Bacon, LLP
 7        2555 Grand Boulevard
          Kansas City, Missouri 64108
 8        (816) 474-6550
          -and-
 9      MICHAEL J. WASICKO, ESQUIRE
          Goodell, DeVries, Leech & Dann, LLP
10        One South Street, 20th Floor
          Baltimore, Maryland 21202
11        (410) 783-4000
            Attorney for Defendants
12          Pfizer and Warner-Lambert Company, LLC
13              INDEX
14  DIRECT EXAMINATION BY MS. MCGRODER        3
15  WITNESS' SIGNATURE PAGE                  90
16  CERTIFICATE OF OATH                      91
17  REPORTER'S CERTIFICATE                   92
18              EXHIBITS
19         (No exhibits marked.)
20
21
22
23
24
25
```

Page 3

```
 1           CHERYL D. BLUME, Ph.D.,
 2  the witness herein, being first duly sworn on oath, was
 3  examined and deposed as follows:
 4        THE WITNESS: I do.
 5              DIRECT EXAMINATION
 6  BY MS. McCRODER:
 7      Q. Dr. Blume, you agree the FDA alert expressly
 8  states that posting this information does not mean that
 9  FDA has concluded there is a causal relationship between
10  the drug products and the emerging safety issue? You
11  agree?
12      A. I agree that FDA stated that.
13      Q. And the FDA also states that it is not
14  advising healthcare providers to discontinue prescribing
15  these products. Agree?
16      A. Agree.
17      Q. So doctors today are still prescribing
18  Neurontin?
19      A. I don't know, but I would think so.
20      Q. Do you agree that the Neurontin specific
21  controlled clinical trial data do not show an increased
22  risk of suicide?
23      A. I do not believe I saw any suicides in the
24  placebo-controlled studies.
25      Q. When you read the FDA alert, what did it tell
```

Page 4

```
 1  you about Neurontin that you did not know when you wrote
 2  your report?
 3      And I'm not talking about other antiepileptic
 4  drugs, specifically with respect to Neurontin.
 5      A. The report told me that FDA had spent two or
 6  three years following the receipt of the requested data
 7  and reviewed the various reports from different
 8  perspectives and concluded that across the category of
 9  antiepileptics there was an increased risk of suicide
10  behavior and that the risk was found across all the
11  members studied.
12      Q. Okay. That wasn't my question. My question
13  was specific to Neurontin. What did you learn about
14  Neurontin, when you read that FDA alert, that you did
15  not know when you wrote your Neurontin report?
16      A. I learned that FDA reviewed the data that was
17  provided to them and analyzed the data and included
18  Neurontin in the group of 11 drugs for which they found
19  an increase in suicide behavior and that that applied to
20  Neurontin, as well as to the other ten members in the
21  group.
22      Q. You do not know what the incidence of suicide
23  behaviors or ideation is for any of the specific drugs
24  identified in that report other than Neurontin, correct?
25      A. Correct. I do not have those databases, and I
```

Page 5

```
 1  do not know the methods used by the FDA to calculate
 2  that.
 3      Q. Do you agree that the FDA, in its analysis of
 4  the antiepileptic drugs that are included in this alert,
 5  looked only at placebo-controlled clinical trial data
 6  for these 11 drugs?
 7      A. Well, I don't have any idea what FDA has done
 8  in total. I know that they requested data from
 9  placebo-controlled studies, as well as active-controlled
10  and post-marketing data, but I believe that their
11  initial analyses, for the purposes of this alert,
12  relates to the placebo-controlled trials. But I have no
13  idea of the totality of what FDA has reviewed to date.
14      Q. You haven't discussed the FDA's analysis of
15  these data with anyone from FDA; is that correct?
16      A. I have not.
17      Q. And you know from looking at the FDA alert
18  that the FDA analyzed reports of suicidality, suicidal
19  behavior, or ideation from placebo-controlled clinical
20  studies of 11 drugs to treat epilepsy, as well as
21  psychiatric disorders and other conditions, correct?
22      A. Yes. The background data indicates that they
23  reviewed the placebo-controlled trials for the purposes
24  of this alert.
25      Q. The FDA did not look at post-marketing
```