# EXHIBIT 9

PETER D. KEISLER
  Assistant Attorney General


JEFFREY BUCHOLTZ
  Deputy Assistant Attorney General


PAUL M. WARNER (#3389)
  United States Attorney
STEPHEN J. SORENSON (#3049)
  Assistant United States Attorney

DOUGLAS N. LETTER
Telephone:  (202) 514-3602
Facsimile:  (202) 514-8151
E-mail:  douglas.letter@usdoj.gov
ROBERT D. KAMENSHINE
Telephone:  (202) 514-2494
Facsimile:  (202) 514-9405
E-mail:  robert.kamenshine@usdoj.gov
  Attorneys
  Civil Division, Rm. 7213
  950 Pennsylvania Ave, N.W.
  Washington, D.C. 20530-0001

OF COUNSEL
PAULA M. STANNARD
  Acting General Counsel
  U.S. Department of
  Health And Human
  Services

SHELDON BRADSHAW
  Chief Counsel
ERIC M. BLUMBERG
  Deputy Chief Counsel
  Food and Drug Division
  U.S. Department of
  Health and Human
  Services
  Office of General
  Counsel

FILED

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF UTAH, CENTRAL DIVISION


KEN B. KALLAS and
ANGELA R. KALLAS,

          Plaintiffs,

     vs.

PFIZER, INC.

          Defendant.

Case No. 2:04CV0998 PGC


Amicus Brief for the
United States


Judge Paul G. Cassell

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . 12

Pre-November 2002 . . . . . . . . . . . . . . . . . . . 13

Post-November 2002 . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 23

    I.   A STATE MAY NOT HOLD A DRUG MANUFACTURER
        LIABLE FOR HAVING OMITTED A WARNING THAT
        WOULD HAVE THEN MISBRANDED THE DRUG IN
        VIOLATION OF FEDERAL LAW . . . . . . . . . . . . . 23

    II.  AS OF NOVEMBER 2002, IN FDA'S JUDGMENT, THERE
        WAS NOT REASONABLE EVIDENCE OF AN ASSOCIATION
        BETWEEN ZOLOFT, OR SSRIS GENERALLY, AND AN
        INCREASED RISK OF SUICIDE OR SUICIDALITY . . . . . 26

        A.   November 2002 Preemption Of Warning
           Of Increased Risk of Suicide . . . . . . . . 29

        B.   October/November 2002 Preemption of
           Warning of Increased Risk of Suicidality . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 38

## INTRODUCTION

This brief is submitted as requested in this Court's order of June 30, 2005 and pursuant to 28 U.S.C. 517.

In the June 30 order, this Court noted that, in the briefing on defendant Pfizer, Inc.'s motion for summary judgment based on federal preemption, "[b]oth sides have heavily discussed the applicability of [the] brief the Government submitted in the Ninth Circuit case of Motus v. Pfizer * * *." June 30, 2005 Order 2. This Court stated that "new briefing from the government explaining the FDA's position would be helpful in determining the outcome of Pfizer's motion." Id. In particular, this Court requested that the Government submit an amicus brief stating "the government's positions as to whether the FDA had considered the issue of whether there was an association between Zoloft (or similar [selective serotonin reuptake inhibitors (SSRIs)]) and an increased risk of suicide prior to November 2002," "in contrast to the issue of whether Zoloft (or similar drugs) can and does cause suicide (causation rather than association)."[1]  Id.  Additionally, this Court "invite[d] the government to better educate this Court on any other issue it views as important to the preemption issue before it, including

---

[1]    As we discuss below, although this Court's order refers specifically to the issue of an increased risk of "suicide," because FDA has (subsequent to Shyra Kallas's death), added warnings to the labeling of antidepressants regarding an increased risk of "suicidality," this brief addresses both "suicide" and "suicidality."  The term "suicidality" refers to suicidal thoughts and behavior.

whether the position taken in the <u>amicus</u> brief (previously filed in 2002) is applicable in this case." <u>Id</u>. at 2-3.

The United States hereby reaffirms the points made in its <u>Motus</u> brief, and explains that they are applicable here as well. As we discuss below, the Government's position is that the state tort law claims in this case - under which the plaintiffs argue that defendant Pfizer should be liable for using only the labeling for Zoloft approved by FDA - are preempted because they would punish Pfizer for not using a label that, as of November 2002, would have misbranded the drug.

Although the Government has the deepest sympathy for the plaintiffs because of the loss of their daughter, it is important that the substantial interests served by the relevant federal prescription drug regulatory laws not be frustrated. The Government's position in this area is driven by the strong concern that state tort law not be applied to undermine FDA's responsibility and ability to protect the public health through enforcement of the prohibition in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 301 <u>et seq</u>. ("FDCA"), against false or misleading labeling of drug products. For state law to hold Pfizer liable - either through legislation or through tort judgments - for not warning in its labeling of an association between Zoloft and an increased risk of suicide or suicidality where, at the relevant time, in FDA's judgment there was not

reasonable evidence of such an association, would be to demand a warning statement that would have been false or misleading, and thus contrary to federal law.    In such a case, federal law must prevail.    See Hurley v. Lederle Labs., 863 F.2d 1173, 1179 (5th Cir. 1988) ("assuming that the FDA has processed all the relevant and available information in arriving at the prescribed warning, its decision as to the proper wording must preempt by implication that of a state").[2]

## STATUTORY AND REGULATORY BACKGROUND

**A.**    An understanding of the underlying statutory and regulatory scheme is essential here.

As the previous briefing in this case makes clear, FDA is the expert federal agency charged by Congress with regulating the manufacture, sale, and labeling of prescription drug products.[3] The courts have emphasized that "FDA possesses the requisite know-how * * * to determine the most accurate and up-to-date

---

[2]    See Robert B. Leflar & Robert S. Adler, The Preemption Pentad: Federal Preemption Of Products Liability Claims After Medtronic, 64 Tenn. L. Rev. 691, 717 (1997) (supporting preemption "if FDA is aware of the full evidence concerning the alleged risk * * * and has determined * * * that because of the data's speculative nature, that the alleged risk may not be included in the drug's labeling").

[3]    FDA is a component of the United States Department of Health and Human Services.    The FDCA vests regulatory and enforcement authority in the Secretary of Health and Human Services, who has delegated his authority to the Commissioner of Food and Drugs.    FDA Staff Manual Guides, Vol. II, § 1410.10 (available at http://www.fda.gov/smg/1410_10.html).

3

information regarding a particular drug, and how those data affect human usage."  Henley v. FDA, 77 F.3d 616, 621 (2d Cir. 1996).  Accord Public Citizen Health Research Group v. Commissioner, FDA, 740 F.2d 21, 28 (D.C. Cir. 1984) (Congress has entrusted to FDA "subtle scientific judgments" as to whether a drug "'may be dangerous'").

**B.**  Congress has charged FDA with ensuring that drugs sold in the United States are safe and effective (21 U.S.C. 355(d) and 393(b)(2)(B)), and not misbranded.  21 U.S.C. 331(a), (b), and (k), 321(n), and 352.

To obtain FDA's approval to market a drug, a manufacturer must submit a New Drug Application (NDA).  21 U.S.C. 355(b).  The applicant must provide "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use."  21 U.S.C. 355(b)(1)(A).  The applicant must also include "adequate tests * * * to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling * * *."  21 U.S.C. 355(d).

An applicant seeking approval of a new drug must submit proposed labeling in its New Drug Application.  21 U.S.C. 355(b)(1)(F).  In addition, the applicant must furnish "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use

4

prescribed, recommended, or suggested in the proposed labeling * * * *."  21 U.S.C. 355(d)(5).

**C.**  The preemption issue here centers around the labeling provisions in the FDCA, and their implementation by the FDA. FDA's regulations provide that drug labeling must provide "the essential scientific information needed for the safe and effective use of the drug."  21 C.F.R. 201.56(a).  When FDA concludes that a prescription drug is both safe and effective under the conditions of use prescribed, recommended, or suggested in the proposed labeling, the agency approves the New Drug Application.  21 U.S.C. 355.

FDA's regulations establish specific requirements for prescription drug product labeling.  See 21 C.F.R. Part 201 (Subparts A, B, G).  These requirements are designed to mandate warnings that reflect the known risks based on reliable scientific evidence.  21 C.F.R. 201.56, 201.57.[4]

Thus, under federal law, the evaluation of a drug's safety and effectiveness is inextricably intertwined with its labeling. FDA's decision as to appropriate labeling is based on the evidence submitted by the applicant, as well as on the agency's

---

[4]  The labeling contains specific information under such headings as "Description," "Clinical Pharmacology," "Indications and Usage," "Contraindications," "Warnings," "Precautions," "Adverse Reactions," etc.  21 C.F.R. 201.56(d)(1).  The "Warnings" section describes "serious adverse reactions and potential safety hazards, limitations on use imposed by them, and steps that should be taken if they occur."  21 C.F.R. 201.57(e).

5

review of other relevant scientific information.  Commonly, a drug manufacturer and FDA will discuss in detail the proposed drug labeling, including the exact wording of the various warnings to be placed on the product.  Based on the scientific evidence known to FDA, appropriate warnings are carefully drafted to express the established risks, while avoiding the statement of unsubstantiated risks that may unnecessarily deter use of the drug.

When the agency approves a New Drug Application, it also approves the final version of the product's labeling.  By statute, FDA may not approve a New Drug Application that includes labeling that is false or misleading in any particular.  21 U.S.C. 355(c), 355(d)(7).

**C.**  The FDCA prohibits the misbranding of drugs in interstate commerce.  21 U.S.C. 331(a), (b), (k).  Violators may be subject to regulatory and enforcement actions, including injunction (21 U.S.C. 332), seizure (21 U.S.C. 334(a)), and criminal prosecution (21 U.S.C. 333(a)).  A drug is misbranded when, among other things, its labeling is false or misleading in any particular or does not provide adequate warnings against any use dangerous to health.  21 U.S.C. 352(a), (f), (j), and 321(n).

Drug manufacturers generally may not deviate from FDA-approved product labeling without submitting a New Drug Application supplement providing a full explanation for the basis

6

of the change. 21 C.F.R. 314.70. Labeling must be revised,
however, to include a warning "as soon as there is reasonable
evidence of an association of a serious hazard with a drug; a
causal relationship need not have been proved." 21 C.F.R.
201.57(e).

    In light of this FDA regulation, the meaning of the term
"association" is important. This word in some contexts can be
used to mean nothing more than that two events have occurred
together. Used in that manner, for example, any drug that is
indicated to treat coronary artery disease could be said to be
"associated" with heart attacks, because the patients being
treated with such drugs will have an inherently greater than
normal risk of having a heart attack. However, to include a
heart attack association "warning" in the labeling of such a
drug, without having any basis for believing that use of the drug
had a role in increasing the likelihood of heart attacks, would
be essentially meaningless. Adding spurious associations, or
unsupported ones, would fill labeling with misinformation, a
disservice to people who might benefit from the drug.

    Thus, in order to ensure that "warning" statements in the
labeling of drugs are accurate and informative and not
misleading, the FDA attempts to distinguish between events that
are the effects of the drug from those that result from the
underlying disease. Making this distinction is most difficult

7

where the adverse event in question (here, suicide or suicidality) is known to be a consequence of the disease being treated (here, depression). See, e.g., Transcript of February 2, 2004 Advisory Committee Meeting at 221 (statement of Dr. Mosholder) ("[t]he problem * * * is that the outcome of interest that we are tracking, which is suicidality, is also an outcome of the indication for which the drug is prescribed, so that it is very difficult to sort out whether the drug played a role or whether it was the underlying disorder from evaluating" spontaneous reports of adverse events); FDA Public Health Alert "Reports of Suicidality In Pediatric Patients Being Treated With Antidepressant Medications For Major Depressive Disorder (MDD)" dated Oct. 27, 2003 (noting that suicide attempts and suicides in pediatric patients receiving antidepressants have been reported to FDA but that such reports "are very difficult to interpret, in the absence of a control group, as these events also occur in untreated patients with depression.").

For this reason, the regulatory phrase "reasonable evidence of an association," is used in this brief to mean an association where there is reasonable evidence that the drug may have a role in increasing the likelihood of the adverse event (e.g., suicide or suicidality). The agency's judgment concerning whether such evidence exists for a particular drug and a particular adverse event can depend on complex scientific analyses. As discussed

8

below, FDA conducted such complex analyses of available information on Selective Serotonin Reuptake Inhibitors and potential adverse events.

**E.**    The FDCA permits two kinds of labeling supplements by manufacturers: (1) "prior approval supplements," which require FDA approval before the manufacturer may make the change; and (2) "changes being effected (CBE) supplements," which the manufacturer may implement before FDA approval.  21 C.F.R. 314.70(b), (c). A manufacturer may use a changes-being-effected supplement to make labeling changes to add or strengthen a warning,[5] but must still give to FDA "a full explanation of the [scientific] basis for the change."  21 C.F.R. 314.70(c)(3).  FDA then conducts an analysis to determine whether the proposed labeling change is scientifically substantiated and appropriate. If the agency disapproves the proposed changes, the manufacturer may not use the unapproved labeling.  21 U.S.C. 352, 355(a).

**F.**    FDA has approved the use of the prescription drug Zoloft for, among other things, treatment of Major Depressive Disorder (MDD), Panic Disorder, Posttraumatic Stress Disorder, and

---

[5]    There are two types of changes-being-effected supplements: supplements that must be submitted at least 30 days prior to distribution of the drug product made using the change, and those where the manufacturer may commence distribution of the drug product involved upon FDA's receipt of the supplement for the change.  Changes-being-effected  supplements to add or strengthen a warning fall into this latter category.  See 21 C.F.R. 314.70(c)(6)(iii)(A).

9

Premenstrual Dysphoric Disorder in adults, and the use of Zoloft
for treatment of Obsessive-Compulsive Disorder (OCD) in both
adults and pediatric patients.  FDA has not, however, approved
Zoloft for the treatment of Major Depressive Disorder in
pediatric patients.  Thus, the prescription of Zoloft for 15-year
old Shyra Kallas to treat for depression was an "off-label" use
by the physician, i.e., use in a patient in whom the drug has not
yet been shown effective.[6]

Neither the FDCA nor FDA regulates "off-label"
prescriptions, meaning prescriptions written by doctors for
approved drugs, but for uses of those drugs that FDA has not
approved.  The FDCA does regulate, however, the promotion of
drugs for off-label uses.

**G.**  It has generally been difficult to obtain satisfactory
information about the safety and effectiveness of drugs in
children.  Congress has in recent years amended the statutory
scheme to take into account special concerns involving pediatric
use of drugs that are approved for adult use.  Through the mid-
1990s, pharmaceutical firms tested only a few marketed drugs for
safety and effectiveness in children.  Thus, despite efforts by

---

[6]  FDA's regulations provide that "[a] specific warning
relating to a use not provided for under the 'Indications and
Usage' section of the labeling may be required if the drug is
commonly prescribed for a disease or condition, and there is lack
of substantial evidence of effectiveness for that disease or
condition, and such usage is associated with serious risk or
hazard."  21 C.F.R. 201.57(e).

FDA to encourage labeling for pediatric patients, it was common for pediatricians to write off-label prescriptions for their patients.[7]  See generally Lauren Hammer Breslow, The Best Pharmaceuticals For Children Act of 2002: The Rise Of The Voluntary Incentive And Congressional Refusal To Require Pediatric Testing, 40 Harv. J. On Leg. 133 (2003).

In an effort to encourage pediatric testing, Congress included a five-year experimental program in the FDA Modernization Act of 1997 (FDAMA).[8]  Under this provision, a drug manufacturer could receive six months of market exclusivity to add to an existing patent or marketing exclusivity period on a particular drug if the manufacturer conducted a pediatric study of the drug in response to a written request issued by FDA.

Because of its belief that the FDAMA provision would likely leave significant gaps in pediatric labeling, in 1998, FDA issued a rule empowering the agency to require pediatric testing of already marketed drugs, and instituting a presumption favoring pediatric testing for new drugs.  Regulations Requiring Manufacturers to Assess Safety and Effectiveness Of New Drugs and Biologic Products in Pediatric Patients, 63 Fed. Reg. 66,632

---

[7]  See Specific Requirements on Content and Format Labeling for Human Prescription Drugs; Revision of "Pediatric Use" Subsection on Labeling, 59 Fed. Reg. 64,240 (Dec. 3, 1994) (codified at 21 C.F.R. pts. 201, 312, 314, and 601).

[8]  The pediatric exclusivity provision was subject to a January 1, 2002 sunset clause. 21 U.S.C. 355A(j).

11

(1998) (codified at 21 C.F.R. pts. 201, 312, 314, and 601) (the
Pediatric Rule).   The Pediatric Rule, however, was later held
invalid.   <u>Ass'n of Am. Physicians and Surgeons, Inc.</u> v. <u>FDA</u>, 226
F. Supp. 2d 204 (D.D.C. 2002).   Congress subsequently enacted the
Pediatric Research Equity Act of 2003 (PREA), Pub. L. 108-155,
117 Stat. 1936, codifying the major provisions of the Pediatric
Rule and granting FDA explicit authority to require pediatric
testing in certain circumstances.

In 2002, Congress enacted the Best Pharmaceuticals for
Children Act of 2002 (BPCA), Pub. L. No. 107-109, 115 Stat. 1408
(codified as amended in various sections of 21 U.S.C. and 42
U.S.C.).   This legislation reauthorized and expanded the
pediatric exclusivity provision of FDAMA and provided funding
mechanisms to help conduct pediatric research in cases where the
manufacturers choose not to conduct studies for children.

### FACTUAL BACKGROUND

This Court has asked, <u>inter alia</u>, "whether the FDA had
considered the issue of whether there was an <u>association</u> between
Zoloft (or similar SSRIs) and an increased risk of suicide prior
to November 2002 * * * ."   June 30, 2005 Order 2.   As we discuss
below, in November 2002, when Shyra Kallas tragically took her
life, the FDA did not believe that there was reasonable evidence
of an association between Zoloft (or similar SSRIs) and an
increased risk of suicide.   Indeed, even today, after examining

12

all controlled trials in children and adults, FDA has not found

reasonable evidence of an association between SSRIs and

an increased risk of <u>suicide</u>.  After November 2002, however, FDA

has concluded that there is reasonable evidence of an association

between SSRIs and suicidality in children and adolescents, and

has directed that manufacturers of all antidepressant drugs

include a "black box" warning in their labeling about that risk.[9]

Thus, although October/November 2002 is the relevant time frame

for purposes of determining the preemption issue at bar,[10] we

briefly describe below how FDA came to require this "black box"

warning on antidepressant labeling.

### Pre-November 2002

As we explained in our brief in Motus, in 1991, FDA did not

consider there to be any link between Zoloft and suicide when the

agency approved the drug as a treatment for depression.

Subsequently, in response to petitions making similar allegations

as to Prozac, FDA found no link between antidepressants and

suicide.  Additionally, the Psycho-Pharmacological Drugs Advisory

---

[9]  FDA may require warnings regarding "[s]pecial problems,
particularly those that may lead to death or serious injury * * *
to be placed in a prominently displayed box." 21 C.F.R.
201.57(e).

[10]  We use the term "October/November 2002" because the
prescription at issue was written in October, while the suicide
occurred in November.  For the reasons discussed in this brief,
it does not matter whether October or November is the key date,
and we thus do not address that question here.

Committee voted unanimously that there was no "credible evidence
(1) to support a conclusion the antidepressant drugs cause the
emergence and/or intensification of suicidality and/or other
violent behaviors," or (2) "to indicate that a particular drug or
drug class poses a greater risk for the emergence and/or
intensification of suicidal thoughts and acts and/or violent
behaviors."  In 2002, the agency completed an internal review of
SSRIs.  See Andrew D. Mosholder, Medical Officer, FDA Division of
Neuropharmacological Drug Products, Mortality and Suicide Rates
in Randomized Controlled Trials of Psychiatric Drugs: Update
2002, 42nd Annual National Institute of Mental Health's New
Clinical Drug Evaluation Unit Meeting (June 10-13, 2002).  That
review disclosed no difference in the risk of suicide between
those on SSRIs and those on placebos.

Pursuant to the FDAMA pediatric exclusivity provision
discussed above, FDA requested that manufacturers of seven
antidepressants (Prozac (fluoxetine), Zoloft (setraline), Paxil
(paroxetine), Celexa (citalopram), Effexor (venlafaxine), Serzone
(nefazodone), and Remeron (mirtazapine)) submit controlled
studies of their drugs (that is, drug compared with placebo) in
pediatric patients for the treatment of Major Depressive
Disorder.  See Memorandum from Thomas P. Laughren, M.D., Team
Leader, Psychiatric Drug Products, Division of Neuropharmalogical
Drug Products, Center for Drug Evaluation and Research (CDER),

14

FDA, to Members of the Psychopharmological Drugs and Pediatric
Drugs Subcommittee of the Anti-Infective Drugs Advisory
Committees (advisory committee) dated January 5, 2004 (January
2004 Laughren Memo) at 4.    In December, 2001, Pfizer submitted
its New Drug Application supplement reporting the results of
studies in Zoloft and asking approval of labeling to recommend
use of the drug for the treatment of pediatric Major Depressive
Disorder.    New Drug Application supplements were also submitted
by the sponsors of the other six drugs.

No suicides were reported in any of the pediatric clinical
trials conducted for these seven drugs, and FDA's clinical
reviews of the seven New Drug Application supplements for
pediatric Major Depressive Disorder between 2001 and 2003 did not
reveal a signal of an increased risk of suicidality in the drug
treated patients.    See Transcript of February 2, 2004 Advisory
Committee Meeting at 235 (statement of Dr. Laughren) ("We
reviewed those supplements over this period of three to four
years, and suicidality did not emerge as a matter of concern
based on those reviews."). FDA Public Health Advisory of October
14, 2004.

With regard to Zoloft, FDA's review of the Zoloft New Drug
Application supplement determined that the submitted studies had
failed to demonstrate "the efficacy of Zoloft in pediatric [Major
Depressive Disorder]."    Letter from FDA to Pfizer, Inc. Dated

15

September 30, 2002.  On September 30, 2002, only eight days
before the writing of the Zoloft prescription for Shyra Kallas
and 35 days before her suicide, FDA issued a "Not Approvable"
letter to Pfizer for pediatric Major Depressive Disorder.  FDA
did, however, at that time request from Pfizer a labeling
supplement based on safety-related information contained in the
submitted studies.  Of particular importance, FDA's requested
labeling change was entirely unrelated to suicide or suicidality,
but instead concerned weight loss.

    Subsequently, however, during FDA's October 2002 review of
the supplemental New Drug Application submitted by
GlaxoSmithKline that contained the requested studies of the use
of Paxil (paroxetine) in children, the FDA reviewers noted a
greater number of adverse events coded under the term "emotional
lability" in the group of patients treated with Paxil compared to
placebos in some, but not all, of the studies.  The FDA reviewers
noted that the actual events coded under this term included
suicide thoughts and attempts as well as other forms of
non-suicidal, self-injurious behavior.  See Transcript of
February 2, 2004 Advisory Committee Meeting at 20-21, 235-36
(statements of Drs. Katz and Laughren); see also January 2004
Laughren Memo at 7.  In an effort to better understand these
events and to further explore the extent of episodes of
suicidality in children treated with Paxil, on October 10, 2002,

FDA requested that GlaxoSmithKline reanalyze its data and better characterize the adverse events identified under the term emotional lability.  Id.

### Post-November 2002

On May 22, 2003, approximately seven months after the suicide of Shyra Kallas, GlaxoSmithKline responded to FDA's request, submitting a report that "suggested an increased risk (Paxil v. placebo) of various thoughts and behaviors coded as events considered 'possibly suicide related' and also for the subgroup of events that met [GlaxoSmithKline's] criteria for representing 'suicide attempts.'" January 2004 Laughren Memo at 7.  FDA issued a Talk Paper on June 19, 2003 "recommending that Paxil not be used in children and adolescents for the treatment of MDD [(Major Depressive Disorder)]."  "FDA Statement Regarding the Anti-Depressant Paxil for Pediatric Population," dated June 19, 2003 (available at http://www.fda.gov/bbs/topics /ANSWERS/2003/ANS01230.html).[11]

FDA also expanded its investigation of a possible more general link between use of antidepressants in children and suicidality by requesting data similar to that submitted by GlaxoSmithKline from the manufacturers of eight other anti-depressant drugs that had been studied in children.

---

[11]    On June 10, 2003, the British Medicines and Healthcare products Regulatory Agency issued a public statement contraindicating use of Paxil in children.

17

Transcript of February 2, 2004 Advisory Committee Meeting at 21

(statement of Dr. Katz); January 2004 Laughren Memo at 9.

Accordingly, on July 22, 2003, requests for data were sent to the

manufacturers of Prozac, Zoloft, Luvox (fluvoxamine), Celexa,

Wellbutrin (bupropion), Effexor, Serzone, and Remeron.   Id.   In

particular, FDA requested that the sponsors for those products

identify possibly "'suicide-related events' for their pediatric

studies, in a 'blinded' manner using two search strategies."[12]

Id.   These data requests, and the submissions from the

manufacturers in response to them, have provided the core data on

which the FDA has based its analysis of association between

antidepressants and suicidality.

     While awaiting the sponsors' responses to the July 2003 data

request, FDA reexamined the data on suicidality and suicide

attempts from the eight other pediatric psychopharmacology

---

     [12]   In August 2003, Wyeth, the sponsor of the
antidepressant, Effexor and Effexor XR, decided to make labeling
changes for these two products by adding the following statement
to the "PRECAUTIONS/Usage in Children" section: "In pediatric
clinical trials, there were increased reports of hostility and,
especially in [Major Depressive Disorder] suicide-related adverse
events such as suicidal ideation and self harm."   The change was
accompanied by a "Dear Health Care Professional" letter noting
the findings and noting that these products are not recommended
for use in pediatric patients).   See January 2004 Laughren Memo
at 10-11.   Wyeth's action was based on the company's re-analysis
of data from the Effexor pediatric trials in response to FDA's
July 22, 2003 request.   In May 2004, FDA required Wyeth to revise
its labeling to conform to the standard warning being required
for all antidepressants following the February 2004 advisory
committee meeting.   See Letter from FDA to Wyeth Pharmaceuticals,
Inc. dated May 13, 2004.

clinical trials to determine whether the apparent increase in
suicidal behaviors with pediatric use of Paxil was unique to that
drug or occurred with other drugs as well. Data on adverse events
from those trials were placed into categories of "possibly
suicide-related events" and the subset of "suicide attempts" (as
GlaxoSmithKline had classified its data), and reviewed and
combined for analysis with the Paxil data.  This preliminary
analysis of the data suggested that the association between drug
use and suicidality "may be a class effect rather than a unique
effect of [Paxil]."  See Memorandum from Andrew Mosholder, M.D.,
M.P.H. to Russell Katz, M.D., dated September 4, 2003 at 2.
However, the findings were not consistent across the studies,
even for individual drugs.

On September 16, 2003, FDA approved a New Drug Application
supplement for Zoloft to revise the labeling to add safety
information derived from the pediatric exclusivity studies of
that drug.   As noted above, the added safety information did not
relate to suicide or suicidality.  See Letter from FDA to Pfizer,
Inc. dated September 16, 2003. .

Once the data requested from the eight other sponsors was
received, FDA began its extensive analysis of these more
definitive data on suicidality.  FDA subsequently retained
experts at Columbia University to conduct a blinded

reclassification of all of the events of potential interest received from the sponsors.  January 2004 Laughren Memo. At 14.

FDA also issued a Public Health Advisory on October 27, 2003, informing physicians of "reports of the occurrence of suicidality (both suicidal ideation and suicide attempts) in clinical trials for various antidepressant drugs in pediatric patients with [Major Depressive Disorder]* * * * [P]reliminary data suggest an excess of such reports for patients assigned to several of these antidepressant drugs compared to those assigned to placebo."  See FDA Public Health Advisory "Reports of Suicidality In Pediatric Patients Being Treated With Antidepressant Medications For Major Depressive Disorder (Major Depressive Disorder)" dated Oct. 27, 2003 (available at http://www.fda.gov/cder/drug/advisory/mdd.htm).

The Public Health Advisory stated that FDA had completed a "preliminary review" of the reports and had determined that "additional data and analysis, and also a public discussion of available data, are needed."  Id.  FDA also noted that reports of suicide attempts and completed suicides in press and medical journals "are very difficult to interpret, in the absence of a control group, as these events also occur in untreated patients with depression."  Id.  FDA advised that "these drugs must be used with caution," and with close monitoring of patients, as already recommended in all antidepressant labeling.  The Public

Health Advisory also announced FDA's intention to hold an
advisory committee meeting on February 2, 2004.  Id.  In November
and December 2003, the agency issued follow-up requests to the
sponsors who had received the agency's July 2003 data requests.[13]

On February 2, 2004, FDA held a meeting of the advisory
committee.  Consistent with the recommendations of the Advisory
Committee, on March 22, 2004, FDA issued another Public Health
Advisory and asked manufacturers of Prozac, Zoloft, Paxil, Luvox,
Celexa, Lexapro, Wellbutrin, Effexor, Serzone, and Remeron, to
include a warning statement recommending "close observation of
adult and pediatric patients treated with those drugs for
worsening depression or the emergence of suicidality."  See FDA
Public Health Advisory "Worsening Depression and Suicidality in
Patients Being Treated with Antidepressant Medications," dated
March 22, 2004 (available at http://www.fda.gov/cder/drug/
antidepressants/AntidepressanstPHA.htm).

The requested warning stated: "Although FDA has not
concluded that these drugs cause worsening depression or
suicidality, health care providers should be aware that worsening
symptoms could be due to the underlying disease or might be the
result of drug therapy."  The requested warning further stated
that, although FDA "has not concluded that" anxiety, agitation,

---

[13]    In December 2003, the relevant British regulatory agency
contraindicated all remaining SSRI antidepressants in pediatric
depression (except Prozac).  See January 2004 Laughren Memo. 6.

panic attacks, insomnia, irritability, hostility, impulsivity,
akathisia (severe restlessness), hypomania, and mania "are a
precursor to either worsening of depression or the emergence of
suicidal impulses, there is concern that patients who experience
one or more of these symptoms may be at increased risk for
worsening depression or suicidality."  Id.

In June 2004, Columbia University submitted the
reclassified data to FDA.  The agency analyzed those data and
presented the results of its analyses to the Advisory Committee
at a meeting on September 13-14, 2004.  In October 2004, FDA
issued another Public Health Advisory, announcing that it was
directing the manufacturers of all antidepressants "to include a
boxed warning and expanded warning statements that alert health
care providers to an increased risk of suicidality (suicidal
thinking and behavior) in children and adolescents being treated
with those drugs."[14]  FDA Public Health Advisory "Suicidality in
Children and Adolescents Being Treated With Antidepressant

---

[14]    Most recently, on June 30, 2005, FDA issued another
Public Health Advisory stating: "Several recent scientific
publications suggest the possibility of an increased risk for
suicidal behavior in adults who are being treated with
antidepressant medications."  FDA explained: "Even before these
reports became available, the FDA began a complete review of all
available data to determine whether there is an increased risk of
suicidality (suicidal thinking or behavior) in adults being
treated with antidepressant medications."  The agency noted that
its review was ongoing, and urged close watching of patients. FDA
Public Health Advisory, "Suicidality in Adults Being Treated with
Antidepressant Medications," dated June 30, 2005 (available at
http://www.fda.gov/cder/drug/advisory/SSRI200507.htm).

Medications," dated Oct. 15, 2004 (available at

http://www.fda.gov/cder/drug/antidepressants/SSRIPHA200410.htm).

Thus, the FDA-approved labeling now states that

"[a]ntidepressants increased the risk of suicidal thinking and

behavior (suicidality) in short-term studies in children and

adolescents with [Major Depressive Disorder] and other

psychiatric disorders."  Plntfs. Exhb. 12. 68.

**ARGUMENT**

I.   **A STATE MAY NOT HOLD A DRUG MANUFACTURER
     LIABLE FOR HAVING OMITTED A WARNING THAT
     WOULD HAVE THEN MISBRANDED THE DRUG IN
     VIOLATION OF FEDERAL LAW**

Under the Supremacy Clause (U.S. Const. Art. VI, cl.2), a

state may not cause a drug manufacturer to choose either to avoid

state tort liability or comply with federal law.  Geier v. Am.

Honda Motor Co., 529 U.S. 861, 873 (2000) (Supremacy Clause

forbids "'conflicts' that make it 'impossible' for private

parties to comply with both state and federal law"); Florida Lime

& Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963)

("federal exclusion of state law is inescapable and requires no

inquiry into congressional design where compliance with both

federal and state regulations is a physical impossibility").

Thus, state law may not validly require the manufacturer of

a drug to warn of a specific danger that FDA, based on the

agency's scientific analysis, did not believe to be sufficiently

23

supported to warrant such a warning.[15]  See Restatement (Third)
Of Torts, Products Liability §6 cmt. b (1998) (recognizing that
federal law may preempt state law as to adequate warnings).  Such
a warning label, one not based on reliable scientific evidence of
known risks (21 C.F.R. 201.56, 201.57.), would be "false or
misleading" (21 U.S.C. 352(a), 352(f)), and thus would misbrand
the drug.  21 U.S.C. 331(a), (b).  And, as discussed above, it is
a violation of the FDCA to market a misbranded product.  21
U.S.C. 331(a), (b), and (k).[16]

     Moreover, as Supreme Court precedent demonstrates, the
preemptive effect of FDA's scientific findings regarding risks
posed by a drug must be determined as of the time the drug was
prescribed for, and taken by, the patient (in this instance,
October-November 2002); plaintiffs' contrary suggestion that the

---

[15]  Federal food and drug regulation legislation, first
enacted in 1906, has been in place for nearly 100 years.
Accordingly, the presumption that, absent express preemption,
Congress does not intend to displace state law in areas such as
health and safety, which the states have traditionally regulated,
is not applicable here.  See United States v. Locke, 529 U.S. 89,
108 (2000) ("'assumption'" of non-preemption is not triggered
when the State regulates in an area where there has been a
history of significant federal presence").

[16]  There is also no requirement that FDA state in advance
that a particular warning would misbrand a product in order to
make the giving of such a warning a violation of federal law;
the manufacturer's inclusion of a false or misleading warning
misbrands the product per se.  See Geier 529 U.S. at 884 ("the
Court has never before required a specific, formal agency
statement identifying conflict in order to conclude that such a
conflict in fact exists").

present date is the relevant one is wrong.  Thus, in _Geier_, the Supreme Court held that a state law negligent design tort action against an automobile manufacturer for failure to install particular safety equipment in a 1987 car was preempted by the fact that the manufacturer had met a 1984 federal safety standard, although the accident in question occurred in 1992.  It was irrelevant whether, by the time of the accident, the Government, based on further study, reflection, and refinement of technology, had later mandated the safety equipment that the plaintiffs contended should have been in the automobile when it was made.

The effect of a judgment for the plaintiffs in _Geier_ would have been to retroactively impose on the manufacturer a state-mandated standard in conflict with the federal standard that had governed the manufacturer at the time it built the automobile at issue.  If state law could impose, after the fact, standards of product safety conflicting with federal standards that were in effect at the time of the relevant conduct, the state would be holding the defendant liable for having complied with the federal law.  The Supremacy Clause forbids such a result, and the fact that the defendant lacked notice of the conflict between state and federal law at the time it complied with federal law hardly militates against preemption   The same is true as to the imposition of an after-the-fact requirement of a warning as to an

25

aspect of a drug's safety where, at the time, in FDA's judgment,
the warning would have misbranded the drug.  Whether the FDA
would require defendant to do in 2005 what plaintiffs contend
should have been done in 2002 is not the relevant question,
because FDA's permission in 2005 would not mitigate the relevant
conflict.  Thus, the actions taken by FDA to revise the labeling
for Zoloft in the time that has passed since Shyra Kallas
committed suicide are not relevant to the preemption issue.

**II.   AS OF NOVEMBER 2002, IN FDA'S JUDGMENT, THERE
WAS NOT REASONABLE EVIDENCE OF AN ASSOCIATION
BETWEEN ZOLOFT, OR SSRIS GENERALLY, AND AN
INCREASED RISK OF SUICIDE OR SUICIDALITY**

To understand the Government's position here, it is
necessary to recognize that, in the realm of warnings with regard
to prescription drugs, more is not always better.  Requiring
additional warnings for a medication is not the same as requiring
that it meet a higher level of safety.  Mandating an additional
warning for a medication will be beneficial to public health only
if that warning reflects a scientifically supportable additional
danger.  Otherwise, that warning would be false or misleading,
and therefore would misbrand the drug.

FDA's regulation of prescription drugs is designed to ensure
each drug's optimal use by requiring scientifically substantiated
warnings.  Under-utilization of a drug based on dissemination of
scientifically unsubstantiated warnings would deprive some
patients of beneficial treatment (here, among other things,

26

treatment of depression in adults, and Obsessive Compulsive Disorder in adults and children), and thus frustrate the purposes of federal regulation.   Moreover, allowing unsubstantiated warnings might also diminish the impact of valid warnings by creating an unnecessary distraction and making even valid warnings less credible.   See Lars Noah, Medicine's Epistemology: Mapping The Haphazard Diffusion Of Knowledge In The Biomedical Community, 44 Ariz. L. Rev. 373, 454-55 (2002); Thomas Scarlett, The Relationship Among Adverse Drug Reaction Reporting, Drug Labeling, Product Liability, and Federal Preemption, 46 Food Drug. Cosm. L. J. 31, 36 (1991) ("overstated warnings could tip judgment of the medical profession in an undesirable direction"). At the same time, over-utilization of a drug resulting from a failure to disclose the drug's scientifically demonstrable adverse effects is obviously injurious to public health goals.

We believe that plaintiffs' opposition to preemption in this case at bottom fails to take account of these important principles, which form a central part of the federal prescription drug labeling regulatory policy.   Although plaintiffs repeatedly insist that FDA's mandated warning was merely a "minimum standard," they ultimately do "agree that requiring a manufacturer to include warnings which have no basis in fact or

science would be inappropriate." Plntfs. Resp. To Pfizer's Mot. For Sum. J. at 13.[17]

The key question in this litigation is whether in October/November 2002, in FDA's judgment, there was reasonable evidence of an association between Zoloft (or SSRIs generally) and an increased risk of suicide or suicidality in children and adolescents.[18] As we show, at the relevant time, FDA did not

---

[17] The "example" plaintiffs offer of an "'association' type warning" that Pfizer should have given is as follows:

> POTENTIAL ASSOCIATION WITH THE OCCURRENCE OF
> BEHAVIOURIAL AND EMOTIONAL CHANGES, INCLUDING SELF-HARM
> . . .
> Adults and Pediatrics: Additional data
> There are clinical trial and post-marketing reports
> with SSRIs and other newer antidepressants, in both
> pediatrics and adults, of severe agitation-type adverse
> events coupled with self-harm or harm to others.  The
> agitation-type events include: akathisia, agitation,
> disinhibition, emotional liability [sic], hostility,
> aggression, depersonalization.  In some cases, the
> events occurred within several weeks of starting
> treatment.  Rigorous clinical monitoring for suicidal
> ideation or other indicators of potential for suicidal
> behavior is advised in patients of all ages.  This
> includes monitoring for agitation-type emotional and
> BEHAVIOURAL changes."

Plntfs Response to Pfizer's Motion for Summary Judgment, Exhibit A ¶ 1-2. This "example" warning is an excerpt from a warning added to certain drugs marketed in Canada, including Zoloft, by Health Canada on or about May 26, 2004.

[18] See Labeling and Prescription Drug Advertising; Content and Format for Labeling for Human Prescription Drugs, 44 Fed. Reg. 37434, 37447 (June 26, 1979) ("Although FDA often refers questions of whether a warning should be included in the labeling of a drug to its standing advisory committees, the decision as to whether a warning is legally required for the labeling of a drug must rest with the agency").

believe that there was reasonable evidence of an association between Zoloft (or SSRIs generally) and an increased risk of suicide or suicidality.  Therefore, a warning stating the existence of such an association would have misbranded the product.

### A.   November 2002 Preemption Of Warning Of Increased Risk of Suicide

This Court's June 30 order requested that the Government submit an amicus brief stating "the government's positions as to whether the FDA had considered the issue of whether there was an association between Zoloft (or similar SSRIs) and an increased risk of suicide prior to November 2002 * * * *" June 30, 2005 Order 2.  The short answer to the Court's question is that FDA has, over a period of years, considered whether SSRIs increase the risk of suicide, and the agency has consistently concluded that no increased risk of suicide has been established.  Although in October 2004 the agency directed the manufacturers of antidepressants to add a warning related to an increased risk of suicidality in children and adolescents to their labeling, that warning does not state that antidepressants cause or have been associated with an increased risk of suicide.

By 2002, FDA had addressed the risk of suicide (and suicidality) based on clinical trials with adult patients taking

29

Zoloft (as well as other antidepressants), and the agency's
assessment was reflected in the warning label that it approved
and mandated be used by manufacturers verbatim.  Exhibit F to
Defendant's Exhibits 267.  And, contrary to plaintiffs' claim,
the labeling mandated by FDA was not limited by Pfizer's proposed
labeling, but represented instead this expert federal agency's
independent judgment, after appropriate consultations, as to what
was scientifically warranted.

The information that FDA determined Pfizer had to provide as
to Zoloft as of 2002, included a section on "Suicide" under the
labeling's heading for "Precautions," but did not suggest that
Zoloft use led to an increased risk of suicide.  Rather, the
agency-mandated label cautioned that, because "[t]he possibility
of suicide attempt is inherent in major depressive disorders and
may persist until significant remission occurs," "[c]lose
supervision of high risk patients should accompany initial drug
therapy."  See Letter from FDA to Pfizer, Inc. Dated May 16,
2002, attached labeling at 11.

Pfizer was further required to list "suicide ideation" in
the "Adverse Reactions" section of the labeling - among the
"rare" (fewer than 1/1000 patients) "psychiatric disorders."  Id.
at 26.  Pfizer was also required to list "agitation," "anxiety,"
and "nervousness" among the adverse reactions.  Id. at 20-22.  In
addition, FDA required the section on adverse events in pediatric

30

patients to state that "hyperkinesia" and "emotional lability"
were "reported at an incidence of at least 2% and occurred at a
rate of at least twice the placebo rate in a controlled trial
(N=187)." Id. At 24. And, FDA further specified that the
labeling state that "although the events reported occurred during
treatment with ZOLOFT, they were not necessarily caused by it."
Id. At 25; see also id. At 18.

Significantly, the agency's letter to Pfizer approving the
Zoloft New Drug Application in September 1991, stated that FDA
believed that the labeling "presents a fair summary of the
information available on the benefits and risks of [Zoloft]," and
required Pfizer to "use the proposed text verbatim." See Letter
from FDA to Pfizer, Inc. dated Sept. 30, 1991 (attached to
Pfizer's Motion as Exhibit F); see also Letter from FDA to
Pfizer, Inc, dated May 16, 2002 ("The final printed labeling must
be identical to the enclosed * * * agreed-upon labeling text
* * *.").

We emphasize this point because it is central to the issue
here:  in order to comply with federal law, if Pfizer wished to
market Zoloft in 2002, it was required to use the identical
warning directed by FDA.  Pfizer's other option would have been
to submit a "changes being effected" supplement to make labeling
changes to add or strengthen a warning.  Nevertheless, Pfizer
would still have had to give to FDA "a full explanation of the

31

[scientific] basis for the change," 21 C.F.R. 314.70(c), and
Pfizer would not legally have been permitted to make a change
that would have misbranded the drug.

Given the state of available information as of
October/November 2002, "Federal law would have barred Pfizer from
giving a warning that could reasonably have been construed as
suggesting a causal relation to suicide, federal law would have
barred Pfizer from giving it." Motus Br. 22. We went on to
state in our <u>Motus</u> brief that "in 1998, when Zoloft was
prescribed for Victor Motus, <u>any</u> warning, no matter how worded,
that could reasonably have been read as describing or alluding to
such a relation would have been false or misleading, and
therefore in conflict with federal law because there was no (and
still is not) scientific support for such a warning." <u>Id</u>.

Moreover, there were no suicides in the pediatric Major
Depressive Disorder studies for Zoloft or for the six other
antidepressants that were the subject of FDA's written request
for such studies. January 7, 2004 Laughren Memo at 10. <u>See also</u>
FDA Public Health Advisory dated Oct. 15, 2004 (noting that "No
suicides occurred" in 24 trials of 9 antidepressants in children
and adolescents with Major Depressive Disorder, Obsessive
Compulsive Disorder, and other psychiatric disorders).

In addition, in a January 2004 background memorandum to
members of the Advisory Committee, Dr. Laughren explained that

32

"FDA has done several analyses on completed suicides for adult
data sets provided to us in response to a request for patient
level data sets for all relevant studies involving 20
antidepressant drugs studied in 234 randomized controlled trials
with Major Depressive Disorder.  Based on our initial analyses of
these data, we have reached a * * * conclusion * * * that there
does not appear to be an increased risk of completed suicide
associated with assignment to either active drug or placebo in
adults with MDD."  January 7, 2004 Laughren Memo at 4 (citing
Tarek Hammad, Andrew Mosholder, Gerard Boehm, Judith Racoosin,
Thomas Laughren, "Incidence of suicide in randomized controlled
trials of patients with major depressive disorder."
Pharmacoepidemiology and Drug Safety 2003; 12: S1–S156
(Abstract)).[19]

---

[19]    The recent reports in the British Medical Journal that
were the subject of FDA's June 30, 2005 Public Health Advisory
did not report an increased risk of suicide.  See David Gunnell,
Julia Saperia, and Deborah Ashby, "Selective serotonin reuptake
inhibitors (SSRIs) and suicide in adults: meta-analysis of drug
company data from placebo controlled randomized controlled trials
submitted to the MHRA's safety review," Brit. Med. J. 2005;
330:1–5.  The authors reported a finding of "weak evidence of an
increased risk of self harm"; however, they stated that "[w]e
found no evidence that SSRIs increased the risk of suicide," but
noted that "because of the low incidence of suicide, it is not
possible to rule out either a threefold increase or a decrease in
its occurrence among people treated with SSRIs."  Dean Fergusson,
Steve Doucette, Kathleen Glass, et al., "Association between
suicide attempts and selective serotonin reuptake inhibitors:
systematic review of randomized controlled trials," Brit. Med. J.
2005; 330:1–7.  The authors reported "a significant increase in
the odds of suicide attempts * * * for patients receiving SSRIs
compared with placebo" but in "comparing fatal suicide attempts,

33

Thus, in answer to this Court's specific inquiry, in FDA's
judgment, as of October/November 2002, there was not reasonable
evidence of an association between Zoloft (or SSRIs generally)
and suicide. Accordingly, in FDA's judgment, a warning stating
such an association between Zoloft (or SSRIs generally) and an
increased risk of suicide would have misbranded the drug.

We address next the issue of suicidality, focusing in
particular on the critical time, October/November 2002, when
Zoloft was prescribed for and taken by plaintiffs' daughter.

### B. October/November 2002 Preemption of Warning of Increased Risk of Suicidality

As of October/November 2002, based on the available
scientific evidence, in FDA's judgment there was not "reasonable
evidence of an association" between Zoloft (or SSRIs generally)
and an increased risk of suicidality.[20] At that time, a warning

---

we did not detect any differences between SSRIs and placebo
* * * *." Id.

[20]   In this section, we focus on warnings related to an
increased risk of suicidality in children and adolescents, both
because Shyra Kallas was 15 years old at the time of her death
and because children and adolescents are the focus of the black
box warning that has been added to antidepressant labeling.   On
June 30, 2005, FDA issued a Public Health Advisory stating:
"Several recent scientific publications suggest the possibility
of an increased risk for suicidal behavior in adults who are
being treated with antidepressant medications."  FDA explained:
"Even before these reports became available, the FDA began a
complete review of all available data to determine whether there
is an increased risk of suicidality (suicidal thinking or
behavior) in adults being treated with antidepressant
medications."  FDA noted that its review was ongoing, and urged
close watching of patients.

34

stating that there was such an "association" would have would
have been a misbranding.

    FDA's initial clinical reviews of the seven New Drug
Application supplements for pediatric Major Depressive Disorder
did not reveal a signal of an increased risk of suicidality.  See
Transcript of February 2, 2004 Advisory Committee Meeting at 235
(statement of Dr. Laughren) ("We reviewed those supplements over
this period of three to four years, and suicidality did not
emerge as a matter of concern based on those reviews.").  Indeed,
FDA had completed its review of Pfizer's December 14, 2001 New
Drug Application supplement for pediatric Major Depressive
Disorder shortly before Shyra Kallas was prescribed Zoloft.  On
September 30, 2002, only eight days before the writing of the
Zoloft prescription for Shyra Kallas and 35 days before her
suicide, FDA issued a "Not Approvable" letter to Pfizer, stating
that the submitted studies had failed to "demonstrate the
efficacy of Zoloft in pediatric patients with MDD."  Letter from
FDA to Pfizer, Inc. dated September 30, 2002.  FDA did, however,
at that time request from Pfizer a labeling supplement based on
safety-related information contained in the submitted studies.
As discussed above, importantly, the changes addressed were
unrelated to suicidality, concerning only issues such as weight
loss.  See id.

Had FDA believed in October/November 2002, that the available scientific information (including the pediatric Major Depressive Disorder studies of Zoloft), showed reasonable evidence of an "association" between Zoloft and adolescent suicidality, the agency would have required Pfizer to amend its labeling, as FDA did regarding the risk of weight loss. Ultimately, as discussed in detail above, FDA's concerns regarding the coding of the Paxil data in the New Drug Application supplement for pediatric Major Depressive Disorder for that drug triggered a series of events that led the agency to conclude that there is reasonable evidence of an association between SSRIs and suicidality in children and adolescents. But Shyra Kallas' death preceded FDA's receipt of the May 2003 Paxil report, FDA's request for and receipt of additional information from antidepressant New Drug Application sponsors, Columbia University's reclassification of the sponsors' data, and FDA's preliminary and subsequent analyses of the sponsors' data. Thus, in October/November 2002, FDA did not believe that there was reasonable evidence of an association between Zoloft and an increased risk of suicidality in either adult or pediatric patients.

\* \* \* \* \*

FDA has given great attention to the issue of major public health significance that underlies this case. This expert agency, assigned regulatory authority by Congress, has been striving to strike the proper balance in light of the scientific evidence - not wishing to require scientifically unsubstantiated warnings, but simultaneously not wanting to fail to require warnings of substantiated dangers.

FDA's accomplishment of its responsibilities would be disrupted and undermined if, driven in part by concerns about later state law tort liability, drug manufacturers were to engage in their own labeling determinations by adding warnings that, in FDA's judgment, were not based on reasonable scientific evidence of an association or causation. Instead, FDA's actions reveal an agency determined to keep relatively tight regulatory control of this labeling issue in order to meet its statutory public health duties.

Given the course of FDA's careful deliberations and actions on the issue of adolescent suicidality, the preemption issue here is straightforward as it relates to the circumstances in October/November 2002. A state tort law judgment against Pfizer for failing to depart from the FDA-approved labeling to add a warning of an association between Zoloft and adolescent suicidality/suicide is preempted because it seeks to hold Pfizer

37

liable for failing to add a warning that in FDA's judgment, was
not, at the time, supported by the available scientific evidence
and consequently would have misbranded the drug.

### CONCLUSION

For the foregoing reasons, this Court should hold that a
state tort law action against Pfizer for failing to depart from
the FDA-approved labeling to add a warning of an association
between Zoloft and adolescent suicidality/suicide is preempted.

Dated: September 15, 2005

> Respectfully submitted
> PAUL M. WARNER
> United States Attorney
>
> *Carie Unstin*
> for
> STEPHEN J. SORENSON
> Assistant United States Attorney
> 185 South Lake Street
> Salt Lake City, Utah 84111
> Telephone: (801) 325-3218

PETER D. KEISLER                        OF COUNSEL
Assistant Attorney General              PAULA M. STANNARD
                                        Acting General Counsel
                                        U.S. Department of
                                        Health And Human Services

JEFFREY BUCHOLTZ
Deputy Assistant Attorney General

> SHELDON BRADSHAW
> Chief Counsel
> ERIC M. BLUMBERG
> Deputy Chief Counsel
> Food and Drug Division
> U.S. Department of
> Health and Human Services

38

DOUGLAS N. LETTER
Telephone:  (202) 514-3602                    Office of General
Facsimile:  (202) 514-8151                        Counsel
E-mail:  douglas.letter@usdoj.gov
ROBERT D. KAMENSHINE
Telephone:  (202) 514-2494
Facsimile:  (202) 514-9405
E-mail:  robert.kamenshine@usdoj.gov
Attorneys
Civil Division, Rm. 7213
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530-0001

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Amicus Brief

for the United States was served by U.S. Mail, postage pre-paid,

upon:

> Edward B. Havas
> DEWSNUP, KING & OLSON
> 2020 Beneficial Life Tower
> 36 South State Street
> Salt Lake City, UT 841111
> *Counsel for Plaintiffs*

> Arnold Anderson Vickery
> VICKERY & WALDNER, LLP
> One Riverway Drive, Suite 1150
> Houston, TX 77056-1920
> *Counsel for Plaintiffs*

> Terence L. Rooney
> SNOW, CHRISTENSEN & MARTINEAU
> 10 Exchange Place, 11th Floor
> P.O. Box 45000
> Salt Lake City, UT 84145
> *Counsel for Defendant*

> Malcolm E. Wheeler
> WHEELER, TRIGG KENNEDY, LLP
> 1801 California Street, Suite 3600
> Denver, CO 80202
> *Counsel for Defendant*