# EXHIBIT 12

COMMONWEALTH OF KENTUCKY
PIKE CIRCUIT COURT
DIVISION NO. I
ACTION NO. 04-CI-1022

MONICA SMITH, Individually, MONICA SMITH,
as Administratrix of the Estate of KENNETH SMITH, deceased;
and MONICA SMITH as legal guardian and next friend of
GAVIN CHRISTOPHER SMITH, minor child
of KENNETH SMITH                                             PLAINTIFF

v.

**MOTION TO DISMISS
DEFENDANT METHODIST HOSPITAL OF KENTUCKY, INC.
d/b/a PIKEVILLE METHODIST HOSPITAL'S
THIRD PARTY COMPLAINT**

Pikeville Methodist Hospital, et al.                         DEFENDANTS

************************

Comes the Plaintiff, by counsel, and respectfully gives notice that this Motion will be on the docket for Friday, June 30, 2006 at 9:00AM.

Comes the Plaintiff, by counsel, and respectfully requests this Court to dismiss the Third Party Complaint filed herein by Defendant, Methodist Hospital of Kentucky, Inc. d/b/a Pikeville Methodist Hospital (hereinafter referred to as "PMH").

**MOTION**

Defendant PMH has filed a Third Party Complaint against Third Party Defendants Pfizer, Inc., Parke Davis, and Warner-Lambert Company alleging a potential right to common law indemnity or potential contribution in the event of any judgment against PMH. As this Court is fully aware this is a medical malpractice action pending in Pike Circuit Court filed by Plaintiffs against PMH and several physicians alleging negligence which resulted in the suicide of Plaintiff's decedent Kenneth Smith. This case has been pending in Pike Circuit Court since July 22, 2004 and has been actively litigated now for two years. Defendant PMH first became aware of a class action pending in New York regarding the medication Neurontin that decedent was taking by way of Plaintiff's answers to interrogatories on December 14, 2004. Furthermore, Defendant PMH was

aware of this class action lawsuit as it was discussed with Plaintiff, Monica Smith in her deposition of January 24, 2005 (@ pages 141-142). Plaintiff's counsel in this case has not asserted any claims against any of the drug manufacturers of the drug Neurontin nor has there been any theory espoused which relates to the drug Neurontin in any way. In fact, the evidence is quite the contrary in this case. Plaintiff's experts Dr. Serra and Dr. Granacher have both testified that they believe that Neurontin had nothing to do with Kenneth Smith's suicide in this case. Furthermore, the physicians have testified that they know of no scientific link between the drug Neurontin and suicidality and that this medication is well known to them and is generally tolerated well by their patients. (See Dr. Granacher's depo pgs 53-54 and Dr. Serra's depo pg 19)

Furthermore, Defendant PMH has by way of their expert disclosure of December 1, 2005 listed no expert critical of any of the Third Party Defendants nor has any of the defense experts opined that Neurontin had anything to do with Kenneth Smith's eventual suicide. (See Defendant PMH's expert disclosure dated December 1, 2005) To date all of Defendant PMH's experts have been deposed except for Dr. Cooley, whose deposition is scheduled for July 6, 2006. To date none of Defendant PMH's experts have been critical of the drug Neurontin or its manufacturers. Dr. Cooley is a forensic psychiatrist and simply would not be able to give any credible scientific expert opinion about the pharmacology of the drug Neurontin that would be acceptable to any Court under the Rules of Evidence and the Daubert standard. Nor has any opinions along those lines been disclosed pursuant to CR 26.02.

Simply put, Defendant PMH has filed a Third Party Complaint against these corporate defendants in an attempt to somehow apportion liability against them while having no expert, no evidence, and no proof that would give a jury any credible evidence to apportion liability against any of these Third Party Defendants.

Defendant PMH has had two years within which to attempt to make a case against the drug Neurontin and its manufacturers but has now waited until the month before trial to file this frivolous Third Party Complaint. The mere existence of a class action against the drug Neurontin and its makers and the fact that Plaintiff has joined the class action is simply not enough to allow this Third Party Complaint or allow any apportionment against Third Party Defendants where no evidence has been elicited against them. To allow this Third Party Complaint to proceed and allow apportionment against these Third Party Defendants would be highly prejudicial to the Plaintiff and therefore the Third Party Complaint should be stricken from the record.

Respectfully submitted,

David B. Gray
GOLDBERG & SIMPSON, P.S.C.
9300 Shelbyville Rd.
Suite 600
Louisville, Kentucky 40222
502-589-4440
COUNSEL FOR PLAINTIFF

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was sent via facsimile this 27th day of June, 2006 to the following:

Regina Triplett                                            sent via facsimile (606) 432-9139
Pam May Law Firm, P.S.C.
131 Main Street
US Bank Building, 3rd Floor
P.O. Box 1439
Pikeville, KY 41502
*Counsel for Defendants, Thad R. Manning, DO,*
*Pikeville Methodist Hospital, and Don Morando, M.D.*

Gregory K. Jenkins                                         sent via facsimile (859) 254-1995
Jenkins Pisacano Robinson & Bailey
269 West Main Street, Suite 100
Court Square Building
Lexington, KY 40507
*Counsel for Raymond C. Jackson, M.D.*

COUNSEL FOR PLAINTIFF

Deposition of MONICA SMITH taken January 24, 2005
SMITH VS. JACKSON, ET AL.

141
1  problem or difficulty or injury from taking the
2  Neurontin?
3      A.  Can you repeat that?
4      Q.  Okay. Did your husband have a
5  particular problem from taking the Neurontin?
6      A.  Well, they gave it to him for carpal
7  tunnel.
8      Q.  Okay. And the nature of your suit
9  was that they shouldn't have given it to him for
10 that?
11     A.  Yes, it has – it's been – they
12 have – it's only been approved for epilepsy, but
13 they have been trying to push the medicine for
14 every – everything else, as well, and it's only
15 been approved for epilepsy.
16     Q.  Did your husband have any side
17 effects or symptoms from taking the medication?
18     A.  It may have played a, a little part
19 in him being depressed.
20     Q.  Okay, was your involvement in this
21 litigation before your husband's death or after?
22     A.  After.
23     Q.  So from his taking this medication,
24 it's your belief or suspicion that the medication
25 itself may have contributed to his depression or

142
1  anxiety or whatever that may have played a role in
2  his suicide?
3      A.  Yes, it has probably a part in it,
4  yes.
5      Q.  Now, where is this lawsuit filed?
6      A.  New York.
7      Q.  Is it part of like a class action?
8      A.  It's not a class action, no.
9      Q.  It's an individual suit by him
10 against Pfizer?
11     A.  Yes.
12     Q.  And you've got Finkelstein &
13 Partners listed in Newberg, New York. Are those
14 the attorneys that are handling it for you?
15     A.  Yes.
16     Q.  Is there actually a lawsuit that has
17 been filed?
18     A.  Yes, they have – I have filed a
19 case.
20     Q.  Do you have a copy of any of the
21 papers from that lawsuit?
22     A.  No. No, they just sent me some
23 questions, and I answered the questions, and then we
24 correspond back and forth through letters, but there
25 is nothing –. I don't have anything as far as –

143
1  other than their letter stating that they are in the
2  process of working on this case, is all.
3      MR. JENKINS: Okay. David, would
4  you be able to help us in getting the particulars on
5  that lawsuit, litigation or claim?
6      MR. GRAY: I will do my best. I
7  will contact these guys.
8      Q.  Also in that answer, you had
9  indicated that your son was getting Social Security
10 benefits. How much is he receiving a month?
11     A.  $1,168.
12     Q.  And are you getting any benefits
13 from Social Security on account of your husband's
14 death?
15     A.  Partial.
16     Q.  Partial?
17     A.  Yes.
18     Q.  And what do you receive a month?
19     A.  I don't get the benefits every
20 month, so they hold – they hold it out for part of
21 the year where I work, because of where I – because
22 of where I work. So I only get benefits for part
23 of the year. They go based on my salary. So I
24 did receive some last year, but only for like five
25 months, and it's for –

144
1      Q.  Okay, do you remember what you
2  received approximately in total last year?
3      A.  I received $1,168.
4      Q.  The same as your son?
5      A.  Yes. But only for five months.
6      Q.  But you got that each month for five
7  months?
8      A.  Yes.
9      Q.  Are you working full-time now?
10     A.  Yes.
11     Q.  And were you working full-time in
12 2004?
13     A.  Yes.
14     Q.  As I listened to you describe some
15 of your husband's activities during those few days
16 between the 25th and the 29th, you had mentioned
17 that he would like leave the room if he was going to
18 talk to somebody on the phone or maybe take the
19 phone and go outside so that you couldn't overhear
20 his conversations with others. Is that was
21 something that he would normally do from time to
22 time, or was this something that was different
23 during these few days?
24     A.  It – he – it was different during
25 these couple of days.

## Page 53

1  A  Yes, sir, Rule 26 disclosure.
2  Q  Would we be able to get a copy of that?
3  A  Sure, yeah.
4     MR. WILLARD: I believe that's all the
5     questions I have for you at this time.
6     MS. TRIPLETT: I just have a couple
7     more.
8     REDIRECT EXAMINATION
9  BY MS. TRIPLETT:
10 Q  Actually, Doctor, I had failed earlier to ask
11    you whether the fact that Mr. Smith was taking
12    Neurontin for carpal tunnel syndrome, whether
13    that had any significance to you at all when
14    you reviewed this case?
15 A  It had a significance because I've become aware
16    that there are some lawyers across the country
17    that have a theory that Neurontin leads to
18    suicide and have -- are attempting to bring
19    class actions because of that. In fact, I've
20    been asked by two different lawyers to actually
21    research that.
22        In my opinion there is no general
23    causation evidence from a pharmaceutical level
24    that it does, and there is no specific
25    causation evidence in any case that I've ever

## Page 54

1     seen that it does. Neurontin is widely used.
2     It's all over the city. It's everywhere. I
3     use it myself in patients. I've never heard of
4     such a thing, but I guess anything's possible.
5     There doesn't seem to be any scientific
6     evidence that there's a causal link between
7     Neurontin and suicide.
8  Q  Earlier we talked a little bit about psychosis
9     and Mr. Smith exhibiting some psychotic
10    behavior. What are causes, in your experience
11    and to your knowledge in your professional
12    opinion, what are the causes of sudden onset of
13    psychosis such as what we see here in
14    Mr. Smith?
15 A  In his age group there would be three principal
16    causes of psychosis: Bipolar illness,
17    schizophrenia, or substance abuse. There are
18    many other causes beyond our discussion but
19    those would be the three principal causes that
20    you will see in an emergency department.
21 Q  You believe we can rule out substance abuse,
22    correct --
23 A  There's no evidence --
24 Q  -- in this patient?
25 A  Yes, ma'am, I think that's clear. Also you can

## Page 55

1     rule out schizophrenia. That usually starts
2     younger than he, in teenagers. It's a very
3     severe brain disorder that leads to chronic
4     psychosis. He would have shown an illness
5     before.
6         And by the way, there's no evidence that
7     he has bipolar disorder. I merely brought that
8     up as a psychiatrist, that's what you would
9     think. I don't expect the emergency room
10    doctors to see that or to understand that.
11 Q  So is there -- is there any evidence at all --
12    have you done that research, by the way, that
13    the attorneys have asked you to conduct
14    regarding Neurontin? Have you looked at that
15    yet?
16 A  Oh, yeah. I've looked at it, yeah.
17 Q  Did you see anything at all that would suggest
18    that possibly Neurontin could cause sudden
19    onset of psychosis in any group of patients?
20 A  Yeah, on high doses. There's been evidence --
21    we don't know if it's psychosis or an
22    encephalopathy. In other words, it may just be
23    a toxin brain creation called encephalopathy
24    not really a psychosis, confusional episode.
25    That's usually a dose ranges in above 2,400

## Page 56

1     milligrams a day.
2  Q  2,400 milligrams a day?
3  A  Uh-huh.
4  Q  Okay. Is there -- is there any case in which
5     or you saw or know of this sudden onset of
6     psychosis in a patient taking Neurontin where
7     the dosage was lower than that, the daily
8     dosage?
9  A  Confusion, but confusion is not the same as
10    psychosis but confusion can occur -- yes,
11    ma'am. Some people are just susceptible to the
12    drug.
13 Q  Were you aware that Monica Smith is actually
14    suing the makers of Neurontin for, in her
15    opinion, basically -- well, alleging that the
16    drug caused -- at least in part -- was the
17    causation of her husband's suicide?
18 A  I've been made aware of that but I did not
19    evaluate that for Mr. Gray. So in this case I
20    don't know anything about that.
21    MS. TRIPLETT: That's all I have.
22    MR. WILLARD: Dr. Granacher, just a few
23    more questions.
24       RECROSS EXAMINATION
25 BY MR. GRAY:

Richard K. Serra, M.D.                    10/11/05                    Page 19

1   A    I don't think that it was significant in terms of
2   any decision making that I believe he should have made.
3   Q    Okay. What do you know about the drug Neurontin,
4   Doctor?
5   A    Neurontin is used for a variety of different
6   things, including seizures, but there are a lot of off label
7   usages in terms of chronic pain syndromes and sometimes other
8   psychiatric patients. I'm not totally familiar with all the
9   uses of Neurontin.
10  Q    Do you--do you know the side effects of Neurontin?
11  A    It's usually well tolerated by most people. There
12  are few side effects under most circumstances. I'm sure
13  there's a long laundry list of things that can occur under
14  some circumstances that are far less frequent. They're not
15  necessarily expected side effects, but they've been
16  associated with the drug.
17  Q    Okay. And what are those side effects that have
18  been associated that stick out in your mind?
19  A    I think most of the time it's a well tolerated
20  drug, and there are no side effects from its use.
21  Q    Okay. Are you aware that Neurontin is now being
22  linked to suicide in patients taking it?
23  A    I'm not aware of any specific link. I'm aware
24  that that question has been raised, but I don't think there's
25  any link that's established.

From: Goldberg & Simpson    To: 2186719    Page: 8/10    Date: 6/29/2006 2:51:12 PM

From: 60643291390    Page: 4/22    Date: 12/1/2005 4:52:55 PM

COMMONWEALTH OF KENTUCKY
PIKE CIRCUIT COURT
DIVISION NO. 1
ACTION NO. 04-CI-1022

MONICA SMITH, Individually; MONICA SMITH, as
Administratrix of the Estate of KENNETH SMITH,
Deceased; and MONICA SMITH, as Legal Guardian and
Next Friend of GAVIN CHRISTOPHER SMITH, Minor
Child of KENNETH SMITH                                         PLAINTIFF

VS.

RAYMOND C. JACKSON, M.D.; METHODIST
HOSPITAL OF KENTUCKY, INC. d/b/a PIKEVILLE
METHODIST HOSPITAL; THAD R. MANNING, D.O.;
and DON MORANDO, D.O.                                          DEFENDANTS

*********************************
DEFENDANT, PIKEVILLE MEDICAL CENTER, INC.'S
RULE 26.02 EXPERT DISCLOSURES
*********************************

Comes the Defendant, Pikeville Medical Center, Inc., by and through counsel, and hereby submits its disclosures of expert witnesses retained by the Defendant to be used at Trial, pursuant to CR 26.02, as follows:

1. <u>Douglas A. Rund, M.D., FACEP</u>: Dr. Rund is a specialist in Emergency Medicine, practicing in Columbus, Ohio. His qualifications and publications are described in his Curriculum Vitae, which is attached hereto. Dr. Rund's opinions are expected to be based upon his training and experience and upon his review of the pertinent medical records and depositions in this case. It is anticipated that Dr. Rund's opinions will be based upon a reasonable degree of medical probability or certainty. Dr. Rund will testify as to the standard of care of emergency

1

room professionals. He will discuss Susan Jones' responsibility under the particular factual circumstances of this case.

2. <u>Andrew Cooley, M.D.</u>: Dr. Cooley is a certified forensic psychiatrist practicing in Louisville, Kentucky, whose CV is attached hereto. Dr. Cooley's opinions are expected to be based upon his training and experience and upon his review of the pertinent medical records and depositions in this case. It is anticipated that Dr. Cooley's opinions will be based upon a reasonable degree of medical probability or certainty. Andrew Cooley will opine that Kenneth Smith's behavior in the emergency room does not meet the definition of "acutely suicidal". He will testify as to the standard of care regarding patients presenting under the particular factual circumstances and scenarios of this case.

3. <u>Willena Moore, R.N.</u>: Nurse Moore a Registered Nurse, whose CV is attached hereto. Nurse Moore's opinions are expected to be based upon her training and experience and upon her review of the pertinent medical records and depositions in this case. It is anticipated that Nurse Moore's opinions will be based upon a reasonable degree of medical probability or certainty. Willena Moore will testify that Susan Jones did not breach the standard of care when she failed to demand a particular timeframe from Dr. Jackson within which to schedule the Mountain Comprehensive Care evaluation. She will testify that a nurse is trained to question an order as a patient advocate when the particular circumstances require elaboration, interpretation, or other explanations or acts on the part of the doctor.

F:\CLIENTS\Smith-Mooles(AJO)\26.02 Disclosures 12-01-05\mm.doc

2

Respectfully submitted,

PAM MAY LAW FIRM, P.S.C.
131 Main Street
US Bank Building, Suite 300
P.O. Box 1439
Pikeville, Kentucky 41502
Telephone: (606) 432-0400
Telefax: (606) 432-0139

By: _____
Pamela T. May
Regena Triplett

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was duly mailed this ____ day of December, 2005, to the following:

David B. Gray, Esq.
Goldberg & Simpson, P.S.C.
3000 National City Tower
101 S. Fifth Street
Louisville, Kentucky 40202
(502) 589-4440

Gregory K. Jenkins, Esq.
Jenkins, Pisacano, Robinson & Bailey
269 West Main Street, Suite 100
Court Square Building
Lexington, Kentucky 40507
(859) 225-9625

_____
Regena Triplett

3