# EXHIBIT 7

**Memorandum**    Department of Health and Human Services
Public Health Service
Food and Drug Administration
Center for Drug Evaluation and Research

---

DATE:      December 13, 1993

FROM:      Paul Leber, M.D.
           Director,
           Division of Neuropharmacological Drug Products
           HFD-120

SUBJECT:   Approvable Action Memorandum
           NDA 20-235: Neurontin™, Warner Lambert brand of gabapentin

TO:        File NDA 20-235
                  &
           Robert Temple, M. D.
           Director,
           Office of Drug Evaluation I
           HFD-100

---

The Division's review of NDA 20-235 has been completed. The review team, headed by Dr. Russell Katz, has concluded that the evidence submitted to the NDA supports the conclusion that gabapentin is safe for use and effective in use as an adjunct for the management of partial and secondary generalized tonic clonic seizures. Accordingly, the Division recommends that NDA 20-235 for Neurontin®, Warner Lambert's brand of gabapentin, be declared approvable provided that Neurontin is marketed under the conditions of use described in the draft labeling attached to the approvable action letter being forwarded to the Office for signature.

I have some comments to offer about the basis for the Division's recommendations.

**Effectiveness:**

Results of 3 randomized, placebo controlled, 'add-on,' clinical investigations (877-210, 945-5 and 945-6) provide 'substantial' evidence of gabapentin's effectiveness as an antiepileptic agent when it is administered, in combination with other antiepileptic drug products (AEDs), to patients with partial seizures at daily doses of between 600 and 1800 mg. The results also provide support for the claim that

Neurontin Approvable Action memorandum [Leber]                      page 2

gabapentin suppresses the incidence of secondary generalized tonic clonic convulsions.

The relationship between gabapentin dose and treatment response has not been evaluated in depth. To begin, the sponsor conducted only one study, 945-5, that examines a sufficient number of doses, (i.e., subjects randomized to fixed daily doses of 600 mg, 1200 mg and 1800 mg) to allow a within study estimate of the shape of the dose response relationship. Unfortunately, as the diagram[1] which follows illustrates, that study reveals a seemingly inconsistent dose response relationship. On the other hand, if dose and the magnitude of treatment effect are compared across all 3 studies, there is a suggestion of a monotonic relationship.



---

[1] In the figure, treatment effect magnitude, measured on the Y axis in terms of the difference in the proportion of gabapentin and placebo assigned patients attaining a 50% or greater reduction in seizure frequency from baseline, is plotted against the daily dose of gabapentin administered (X axis).

Neurontin Approvable Action memorandum [Leber]                    page 3

Furthermore, the seemingly anomalous dose response profile observed in study 945-5 must be considered in light of the experimental conditions and the nature of the population studied. Epileptic patients are heterogeneous and vary among each other and within themselves (i.e., from occasion to occasion) in the degree to which they manifest the epiphenomena (i.e., seizures) of their illness. Furthermore, quantitative estimates of seizure counts, especially counts of partial seizures, tend to be imprecise[2]. Another factor potentially confounding attempts to estimate the shape of the dose response 'surface' is the non-proportional relationship between the dose of gabapentin administered orally and the fraction of that dose absorbed (i.e., the fraction not absorbed increases with increasing dose). Given these sources of uncontrolled variation, it is neither surprising nor disconcerting that the treatment response in Study 945-5 fails to exhibit a positive monotonic association with dose.

In any case, although the best regimen for administering gabapentin has yet to be identified with certainty, the clinical trial experience provides more than a sufficient basis to justify recommending gabapentin's administration at doses in the range of 900 mg to 1800 mg per day.

**Safety in Use: the risks and benefits of gabapentin.**

Based on its evaluation of reports of preclinical tests and reports on clinical experience amassed in some 2000 or so human subjects, the review team has concluded that gabapentin, provided it is administered under the conditions of use described in the Division's proposed draft labeling, is 'safe for use'

Given the often unrealistic expectations that many of the laity have about the capacity of drug regulatory authorities to guarantee the safety of new

---

[2] Both Dr. McCormick, the primary clinical reviewer, and Dr. Katz, the group leader for Neurological Drug Products, make note of the difficulties experienced in providing numerical counts of seizure activity in studies 945-5 and 945-6, in particular when seizures occurred in so-called 'flurries (i.e., clusters of seizures that occurred at such closely spaced intervals that their discrete number could not be reliably counted).

Neurontin Approvable Action memorandum [Leber]                          page 4

drugs, it seems prudent to state explicitly in the record that the Division's conclusion that Neurontin™ is 'safe for use' is not a warrant that the use of Neurontin is without risk. Rather the conclusion reflects a judgment by the review team that the risks attributed [3] to the use of Neurontin™ are reasonably acceptable in light of the benefits that the use of Neurontin™ is expected to provide when it is administered under the conditions of use recommended in its approved product labeling.

Moreover, the validity of the review team's conclusion turns, in part, on assumptions about evidence that cannot be evaluated by objective means. In particular, while the probable cause of common adverse events reported in the controlled trial clinical experience can ordinarily be evaluated using quantitative methods, events that occur during open, uncontrolled use cannot. In the absence of a suitable control to serve as a basis for comparison, there is simply no objective means to discover whether observed events are spontaneous, manifestations of the illness being treated, or an untoward effect of the drug.

An important example of the problem is the interpretation given to the 28 deaths reported among approximately 2100 patients treated with gabapentin through March 1993, the cutoff date for the count of fatalities used in the sponsor's 3rd safety update. There is no way to know with any degree of certainty, absent a reliable estimate of the incidence of death expected in a population of epileptic patients like those admitted to study with gabapentin, whether or not these deaths are in some manner caused and/or contributed to by gabapentin.

The review team took the following approach. Deaths were classified as to whether they could reasonably be attributed to a cause other than drug treatment. The review team concluded [4] that 21 deaths could be so

---

[3] at the time the judgment is offered

[4] Dr. McCormick reviewed reports of each death individually, classifying each death as to whether it could be explained. By her reckoning, a patient dying following a seizure is not considered to have suffered a drug related death. A note of caution is in order, however, There is no absolute means to exclude the possibility that drug contributed to a death classified as being explained by other factors. A patient might have suffered a seizure because of drug treatment or might

explained; 7, however, were classified as sudden unexplained deaths (SUDs). It was recognized that these SUDs, occurring at an estimated incidence [5] of approximately 0.0025 deaths per patient year of exposure, might or might not be caused by gabapentin. Without knowledge of the incidence of SUD in a population similar to the one studied, however, there was, once again, no certain means to resolve the question.

The review team, despite this uncertainty, concluded that these unexplained deaths are most reasonably explained by factors other than treatment with gabapentin. This judgment is defensible, but, obviously, is far from infallible. The review team based its conclusion on several considerations. First, experts in epilepsy with whom the matter was discussed accepted the incidence (0.0025 deaths/patient year) as within the range expected in a population of chronic, treatment resistant, epileptic patients. The literature provides some support for this view, recording rates as high as 0.005 per patient year among patients (treatment status unknown) with refractory epilepsy. The review team gave greatest weight, however, to the fact that the incidence of SUD among patients who participated in the antiepileptic drug development program for Lamictal, a program carried out more or less contemporaneously with the one for Neurontin, was nearly identical (i.e., ⎯⎯ patient year vs. ⎯⎯ patient year for Neurontin). The degree of reassurance provided by this comparison, however, depends upon the validity of the assumption that Lamictal does not itself increase the risk of SUD.

Another question about Neurontin's safety in use, one raised by an in-vivo lifetime carcinogenicity study in rats, involves gabapentin's potential to cause tumors. This issue was at one point considered serious enough to justify suspension of clinical testing. However, upon further

---

have aspirated because of some adverse effect of the drug on some ordinarily operative protective mechanism (e.g., gag reflex) that acts to prevent aspiration.

[5] The clinical experience, measured in terms of patient years of exposure, from which these 7 cases arose is not yet available. Accordingly, for comparative purposes, the estimate of SUD associated with gabapentin is based on 5 deaths arising from a 'sea' of experience for which patient time is known (i.e., from the 9/15/92 cutoff in the 2nd Safety update).

Neurontin Approvable Action memorandum (Leber)                                page 6

consideration of the findings and at the advice of the PCNS AC, the signal has now been largely discounted, the findings in rats being accepted as having no reliable predictive value vis a vis human tumorigenic risk.

Although the review team has concluded that the incidence of SUDs and the findings of the rat carcinogenicity study are not a barrier to the approval of Neurontin™, they also believe that it would be improper to fail to disclose these findings in product labeling. Accordingly, the Warnings section of the draft labeling crafted by the Division includes statements about both gabapentin's rate of SUD and its 'tumorigenic potential.'

The firm may well have concerns about these proposed statements, in particular, their placement in the Warnings section, but there is really no other location in labeling that will serve as well. In any case, I believe the text we have developed is fair and militates against causing undue alarm among either patients or prescribers.

The remaining adverse clinical phenomena associated with the use of gabapentin seem relatively unremarkable for an antiepileptic drug product.

**Conclusions and Recommendations:**

NDA 20-235 is approvable under the conditions of use recommended in the draft labeling attached to the approvable action letter. The approvable action letter should be issued.

Paul Leber, M.D.
12/13/93

Neurontin Approvable Action memorandum [Leber]                              page 7

cc NDA 20-235
    HFD-100: Temple
    HFD-120:
        Katz
        McCormick
        Fitizgerald
        Blum
        Chamberlin
    HFD-713
        Nevius
        Taneja