# EXHIBIT C

Page 1

 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
 3                                    :
                                      :
    IN RE NEURONTIN MARKETING         : MDL DOCKET NO. 1629
 4  AND SALES PRACTICES               : Master File No. 04-10981
    LITIGATION                        : Judge Patti B. Saris
 5                                    : Magistrate Leo T. Sorokin
                                      :
 6                                    :
    --------------------------   X ------------------------
 7  SUPREME COURT OF THE STATE        : Case Management
    OF NEW YORK                       : Index No. 765,000/2006
 8  COUNTY OF NEW YORK                : Hon. Marcy S. Friedman
    --------------------------   :
 9  IN RE: NEW YORK NEURONTIN         :
    PRODUCTS LIABILITY                :    VIDEOTAPED DEPOSITION
10  LITIGATION                        : UPON ORAL EXAMINATION OF
                                      :    30(b)(6) DESIGNEE
11                                    :    JEFFERSON STIERHEIN
                                      :      HENDERSON III
12                                    :
    --------------------------   :       VOLUME 1
13                               X ------------------------
14
15              CONTAINS CONFIDENTIAL INFORMATION
16           TRANSCRIPT of testimony as taken by and before
17     MARK SCHAFFER, a Certified Shorthand Reporter and
18     Notary Public of the States of New Jersey and New
19      York, at the offices of Davis, Polk, 450 Lexington
20     Avenue, New York, New York 10022 on Wednesday,
21     December 5, 2007, commencing at 10:05 in the forenoon.
22
23
24
25

Page 2

```
1   A P P E A R A N C E S
2
3
    ROBINS, KAPLAN, MILLER & CIRESI
4   2800 LaSalle Plaza
    800 LaSalle Avenue
5   Minneapolis, Minnesota 55402-2015
    612-349-8431
6   BY:    ANNAMARIE A. DALEY, ESQ.
    aadaley@rkmc.com
7   Attorneys for the Assurant Plaintiffs
8
9
    JUSTIN BLOOM, ESQ.
10  29 West 70th Street
    New York, New York  10023
11  917-991-75493
    jbloom@justinbloomattorney.com
12  Attorneys for the Class Plaintiffs
13
14
    SHOOK, HARDY & BACON L.L.P.
15  2555 Grand Boulevard
    Kansas City, Missouri 64108-2613
16  816-474-6550
    BY:    NICHOLAS P. MIZELL, ESQ.
17  nmizell@shb.com
    For the Defendants
18
19
20  PFIZER, INC.
    LEGAL DIVISION
21  235 East 42nd Street
    New York, New York 10017
22  212-733-2085
    BY:    VIJAY V. BONDADA
23  Senior Corporate Counsel
24
25  ALSO PRESENT:   CRAIG ATELL, Videographer
```

Page 3

```
1            I N D E X
2
3   Witness                    Page
4
5   JEFFERSON STIERHEIN HENDERSON, III      5
6
    DIRECT EXAMINATION BY MS. DALEY         6
7
8
9
10
11
12         E X H I B I T S
13
14  Description                Page
15
16
    Plaintiffs' Notice of Deposition marked    8
17  Henderson-1
18
    Discovery Order No. 14 from United States  8
19  District Court, District of Massachusetts
    dated September 27, 2007 marked
20  Henderson-2
21
    E-mail Chain and Attachments bearing      138
22  Bates stamps Pfizer_SPiron_0011013
    through 0011059 marked Henderson-3
23
24  Handwritten Organizational Chart marked   219
    Henderson-4
25
```

Page 4

```
1            R E Q U E S T S
2
3   Description              Page
4
    Notes of conversations witness had with    172
5   individuals in preparation for this
    deposition
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1        THE VIDEOGRAPHER:  Good morning.  My name is
2   Craig Atell of Nationwide Video Services, located
3   in Roseland, New Jersey.  The date today is
4   December 5th, 2007 and the time is approximately
5   10:05.  This deposition is being held in the
6   office of Davis, Polk, located at 450 Lexington
7   Avenue, New York, New York.  The caption of this
8   case is Neurontin Marketing and Sales Practices
9   Products Liability Litigation.  The name of the
10  witness is Jeff Henderson.
11       At this time the attorneys will identify
12  themselves and the parties they represent, after
13  which our court reporter, Mark Schaffer of
14  Veritext, will swear in the witness so we can
15  proceed.
16       MS. DALEY: Anna Marie Daley, counsel for
17  Assurant plaintiffs.
18       MR. BLOOM: Justin Bloom for the class
19  plaintiffs.
20       MR. MIZELL: Nicholas Mizell, Shook, Hardy and
21  Bacon for the defendants.
22       MR. BONDADA: Veejay Bondada, Pfizer, Inc..
23
24  JEFFERSON STIERHEIN HENDERSON, III,
25  15 Kelly Court, Ossining, New York 10562, having been
```

Page 6

1  duly sworn according to the law by the Officer,
2  testified as follows:
3
4  DIRECT EXAMINATION B MS. DALEY:
5      MR. MIZELL: Annamarie, it's been our practice
6  to that we have a brief MDL statement that we'd
7  like to read into the record.
8      MS. DALEY:  And I will respond.
9      MR. MIZELL: Jeff Henderson is appearing for
10  deposition today with the understanding that the
11  following terms apply.
12      This deposition is being taken in accordance
13  with Case Management Order Numbers 3 and 5,
14  entered in In re:  Neurontin marketing sales
15  practices and products liability litigation, MDL
16  number 1629 and other applicable laws and
17  procedures.  Any examination and objection made by
18  an attorney for any plaintiff is adopted and
19  deemed validly made on behalf of all plaintiffs
20  represented in the MDL proceedings and all the Neurontin state
21  in the MDL proceedings and all the Neurontin state
22  court cases.
23      Any examination and objection made by an
24  attorney for a defendant is deemed validly made on
25  behalf of that defendant in the MDL proceedings

Page 7

1  and all Neurontin state court cases.
2      The use at trial and admissibility of any
3  portion of this deposition will be determined by
4  the applicable trial court in each case.
5  Participation in this deposition by examination or
6  by posing any objection shall not constitute an
7  appearance as counsel pro hoc vice in any state
8  court action.
9      This deposition is being taken subject to the
10  amended stipulated protective order entered in MDL
11  Number 1629 and any applicable protective orders
12  of confidentiality entered in Neurontin state
13  court cases.
14      Attendance at this deposition is limited to
15  counsel and parties who agree to be subject to the
16  amended stipulated protective order in the
17  Neurontin MDL, counsel and parties who have
18  executed the agreement of confidentiality attached
19  to the amended stipulated protective order if they
20  were not previously subject to this protective
21  order, and counsel and parties who are subject to
22  a protective order of confidentiality in their
23  respective Neurontin state court cases.
24      For purposes of this deposition only, the
25  amended stipulated protective order in MDL Number

Page 8

1  1629 is deemed applicable to Neurontin state court
2  cases in which no protective order has been
3  entered.  And subject to this understanding, the
4  defendants are prepared to begin the deposition.
5      MS. DALEY: Let me respond by saying that we
6  object to your statements that any examination or
7  objection by attorneys for defendants are deemed
8  validly made.
9      And with respect to your statement regarding
10  admissibility, obviously the MDL Judge, Judge
11  Saris, would also have the right to determine
12  admissibility of evidence for purposes of various
13  motions.
14      I also want to state that our court reporter
15  had actually been here at the offices of Davis,
16  Polk for some period of time, was directed to
17  first one wrong conference room and then another
18  wrong conference room.  So I want to make it clear
19  that we were prepared to start 9:30, other than
20  the fact that the court reporter has been
21  misdirected.
22      MR. MIZELL: That's fine.
23      (Plaintiffs' Notice of Deposition marked
24  Henderson-1 for identification.)
25      (Discovery Order No. 14 from United

Page 9

1  States District Court, District of
2  Massachusetts dated September 27, 2007
3  marked Henderson-2 for identification.)
4  Q.  Mr. Henderson, I am handing you what has been
5  marked as Henderson Deposition Exhibit Number 1.  And
6  Henderson Deposition Exhibit Number 1 is a copy of a
7  pleading entitled Plaintiffs' Notice of Deposition;
8  right?  Correct?
9  A.  Yes, that's what it says.
10  Q.  And are you the individual that the
11  defendants have designated to respond to questions
12  today at this -- today and tomorrow at this
13  deposition?
14  A.  Yes.
15  Q.  Have you had a chance to review Henderson
16  Deposition Exhibit Number 1 before?
17  A.  I believe this is what I reviewed.  Just a
18  second.
19      Yes, this is what I reviewed.
20  Q.  Let me also hand you what has been marked as
21  Henderson Exhibit Number 2.  And Henderson Exhibit
22  Number 2 is an order from the United States District
23  Court, District of Massachusetts, and it is identified
24  as Discovery Order Number 14.  In preparation for
25  today's deposition and the deposition of tomorrow, did

Page 10

1　you review any portion of Discovery Order Number 14?
2　　A.　I believe I reviewed this.　Please let me
3　look at this.
4　　Q.　Sure.
5　　　　I will point you to Pages 3 and 4 of
6　Discovery Order Number 14.　That's the portion of the
7　Court's order that has to do with this deposition.
8　　A.　Yes, on Page 3 is what I reviewed.
9　　Q.　Page 3 and Page 4?
10　　A.　Yes, Page 3 and Page 4.
11　　Q.　As the designee for defendants Pfizer and
12　Warner Lambert, are you currently employed by Pfizer?
13　　A.　I am employed by Pfizer.
14　　Q.　What is your title?
15　　A.　My title is Vice President, Customer Business
16　Unit, Business Unit Liaison Group.
17　　Q.　Where is your office located?
18　　A.　My office is located - 235 East 42nd street
19　is our headquarters.　I am in the 219 building.
20　　Q.　In Manhattan, New York?
21　　A.　In Manhattan, New York, New York.
22　　Q.　How long have you worked for Pfizer?
23　　A.　I've worked for Pfizer for just over 16
24　years.
25　　Q.　How long have you been Vice President,

Page 11

1　Customer Business Unit, Business Unit Liaison Group?
2　　　　Did I get that right?
3　　A.　You did.
4　　　　Since May, 2007.
5　　Q.　What did you did for Pfizer before you were
6　Vice President, Customer Business Unit, Business Unit
7　Liaison Group?
8　　　　Is there a shorthand for that that we should
9　use?
10　　A.　Business Unit Liaison.　So that's typically
11　what we say.
12　　Q.　Okay.　What did you do for Pfizer before you
13　were the Vice President of the Business Unit Liaison?
14　　A.　I was Vice President of Managed Markets West.
15　　Q.　How long did you hold that position?
16　　A.　I had that position from October, 2000 -- I'm
17　sorry -- September, 2005 until I took this position in
18　May of 2007.
19　　Q.　Before you were Vice President, Managed
20　Markets West, what did you do for Pfizer?
21　　A.　I was Senior Director, National Accounts,
22　Health Plans.
23　　Q.　How long did you hold that position?
24　　A.　I had that position from December of 2002
25　until I assumed the position of Vice President,

Page 12

1　Managed Markets West in September of 2005.
2　　Q.　Before you were Senior Director, National
3　Accounts Health Plans, what did you do for Pfizer?
4　　A.　I was the Area Manager of Federal Markets
5　East.
6　　Q.　How long did you hold that position?
7　　A.　I had that position from October, 2000 until
8　I assumed the Senior Director position in --
9　　Q.　December?
10　　A.　Yeah, in December of 2000 -- 2002.
11　　Q.　I'm getting in the habit here, what's -- or
12　the pattern here.
13　　　　What did you do for Pfizer before you were
14　the Area Manager, Federal Markets East?
15　　A.　I was the National Account Manager for the
16　VA, DOD.
17　　Q.　VA being Veterans Administration?
18　　A.　That is correct, and the Department of
19　Defense.
20　　Q.　Is DOD; right?
21　　A.　Is DOD.
22　　Q.　How long did you hold that position?
23　　A.　I held that position from April of 2000 until
24　I assumed the Area Manager position in October of
25　2000.

Page 13

1　　Q.　Before that, what did you do for Pfizer?
2　　A.　I was the regional -- I was a Regional
3　Account Manager.
4　　Q.　Located where?
5　　A.　In Charlotte, North Carolina.
6　　Q.　How long did you hold that position?
7　　A.　I had that position from October, 1996 until
8　I assumed the National Account Manager role in April
9　of 2000.
10　　Q.　Before you were a Regional Account Manager in
11　Charlotte, North Carolina, what did you do for Pfizer?
12　　A.　I was an Institutional Healthcare
13　Representative.
14　　Q.　How long did you hold that position?
15　　A.　I had that position from -- from October,
16　1994 until October, 1996, as I recall.　The start
17　date -- I may be wrong on the start date.
18　　Q.　Before that, what did you do for Pfizer?
19　　A.　I was a sales representative.
20　　Q.　How long were you a sales representative?
21　　A.　From October, 1991 until I assumed the
22　Institutional Healthcare Representative position in
23　October, '94.
24　　Q.　And have we gone through all the history of
25　your positions?

Page 14

1   A.   You have.
2   Q.   Before you worked at Pfizer, where were you
3   working?
4   A.   I worked for the United States Army.
5   Q.   Doing what?
6   A.   I was a field artillery officer.
7   Q.   How long were you in the United States Army?
8   A.   For nine years.
9   Q.   Did you see any combat duty?
10   A.   No, I did not.
11   Q.   Are you a graduate of college?
12   A.   I am.
13   Q.   Which one?
14   A.   The Virginia Military Institute.
15   Q.   VMI?
16   A.   VMI.
17   Q.   When did you graduate from VMI?
18   A.   I graduated from VMI in May of 1982.
19   Q.   Did you go into the United States Army
20   directly from VMI?
21   A.   Yes.
22   Q.   What kind of a degree did you obtain from
23   VMI?
24   A.   I had a BA in history.
25   Q.   When you started as a sales representative

Page 15

1   for Pfizer in October, 1991, where were you located?
2   A.   In San Bernardino, California.
3   Q.   Let's go back to the Henderson Exhibit Number
4   2, The Court's Discovery Order Number 14.  Would you
5   turn to Page 4.
6   The top of Page 4, you see that the Court
7   stated that the "Topic Number 10 would be limited to
8   Pfizer's organizational structure used for
9   communications with third-party payers, included but
10   not limited to -- including but not limited to the
11   identification of individuals responsible for such
12   communications, the types and categories of such
13   communications and to identify any databases that may
14   exist concerning the contents of such communications."
15   What did you do to be prepared to respond on
16   behalf of the defendants to questions regarding these
17   issues as described in the Court's Discovery Order
18   Number 14?
19   A.   I had a series of four meetings, three in
20   September, one yesterday, with counsel.  In addition
21   to that, we conducted a number of conference calls
22   with individuals that were familiar with the
23   situation, as well as some electronics communication
24   that went back and forth between the individuals.
25   In addition to that, I was provided three

Page 16

1   depositions which I reviewed, as well as some other
2   materials that were provided to me by counsel.
3   Q.   Which depositions were you -- did you review?
4   A.   Cavic, Desimone and Richter.
5   Q.   Did you read those three transcripts?
6   A.   I did.
7   Q.   Did you review the exhibits that were
8   attached to those transcripts?
9   A.   I reviewed some of the exhibits.
10   Q.   Did you speak with Mr. Cavic?
11   A.   I did not.
12   Q.   Did you speak with Mr. DeSimone?
13   A.   I did not.
14   Q.   Did you speak with Mr. Richter?
15   A.   I did not.
16   Q.   Do you know any of those individuals?
17   A.   I do not.
18   Q.   Did you have any electronic communications
19   with Mr. Cavic, Mr. DeSimone or Mr. Richter?
20   A.   No, I did not.
21   Q.   You said you had a number of conference calls
22   with individuals who are familiar with these issues.
23   Who were these individuals that you had conference
24   calls with?
25   A.   We had conference calls with Joe Butera, with

Page 17

1   Curtis Reese, John Dauser.
2   Q.   How do you spell Butera?
3   A.   B-u-t-e-r-a.
4   Q.   And what did you find out from Mr. Butera?
5   A.   From Mr. Butera, we reviewed the review of
6   the contract that existed with Parke Davis as we
7   merged and brought those contracts into Pfizer.
8   Q.   Which contract are you talking about?
9   A.   Any Neurontin contract or any Parke Davis
10   contract that existed for any product with any
11   third-party payer.
12   Q.   And the third-party payers would be companies
13   like Guardian Life Insurance Company; right?
14   A.   Actually no, Guardian Life Insurance
15   typically uses a PBM, and so the contract would be
16   through their PBM.
17   Q.   So these contracts that you reviewed were
18   contracts with PBMs, pharmacy benefit managers?
19   MR. MIZELL: Object to the form of the
20   question.
21   A.   Some contracts were with PBMs; however,
22   contracts can also be with a variety of different
23   entities, including health plans.
24   Q.   Such as Kaiser?
25   A.   Such as Kaiser.

5 (Pages 14 to 17)

Page 18

1    Q.   What's the name of the PBM whose contract you
2  reviewed for Guardian Life?
3         MR. MIZELL: Well, objection.  He hasn't
4    testified he reviewed any contracts.
5         MS. DALEY: Well, if you have an objection, Mr.
6    Mizell, state your objection and the grounds for
7    objection.
8         MR. MIZELL: Okay.  Well, objection.  Objection
9    to the form of the question.  It misstates the
10   testimony.
11   Q.   What's the name of the PBM of the contract
12 that you reviewed for Guardian Life Insurance Company?
13   A.   I didn't -- I didn't state that I reviewed a
14 contract for Guardian Life Insurance.
15   Q.   Did Mr. Butera review a PBM contract for
16 Guardian Life Insurance?
17   A.   I'm not aware.
18   Q.   When you say you reviewed with Mr. Butera the
19 review of contracts that existed with Parke Davis or
20 Pfizer regarding PBMs, what contracts are you
21 referring to?
22   A.   What actually I reviewed with Mr. Butera was
23 Pfizer's due diligence in reviewing contracts, and how
24 we were going to migrate those contracts over to
25 Pfizer.  We did not specifically talk about any PBM

Page 19

1  contracts.
2    Q.   And how is Pfizer's due diligence related to
3  the topic as described in the Court's order at the top
4  of Page 4, "Pfizer's organizational structure used for
5  communications with third-party payers, including but
6  not limited to, the identification of individuals
7  responsible for such communications, the types of
8  categories of such communications, and the
9  identification of any databases that may exist
10 concerning the contents of such communications"?
11   A.   I'm not sure I understand your question.
12   Q.   I'm trying to understand why you were talking
13 to Mr. Butera about due diligence in preparing to
14 answer questions about the topic as described in the
15 Court's order.
16       MR. MIZELL: I'm going to object to the form of
17   the question.
18   A.   Because Mr. Butera, in the position that he
19 was in, was responsible for reviewing information
20 contracts that are typically negotiated with
21 third-party payers.  You would expect that as part of
22 contracting with a third-party payer, that there is
23 going to be some type of communications.
24   Q.   So what did Mr. Butera tell you about these
25 communications, then, in negotiating contracts?

Page 20

1    A.   He explained to me the process that was
2  taking place or took place around reviewing existing
3  contracts, and then what -- what action Pfizer was
4  going to take as we either allowed the contracts to
5  expire or we determined what course of action we would
6  take with existing Pfizer contracts.
7    Q.   Did he tell you about any communications he
8  had with third-party payers?
9    A.   He did not.
10   Q.   Did he tell you that he had responsibility
11 for communications with third-party payers?
12   A.   He did not specifically say that he had
13 responsibility.  However, the organization, the folks
14 that worked for him, did.
15   Q.   Which folks that worked with Mr. Butera had
16 responsibility for communications with third-party
17 payers?
18   A.   Typically it would be Contract Compliance
19 Managers.
20   Q.   Who are those people?
21   A.   I'm not sure I understand your question.
22   Q.   Here's my specific question.  What is the
23 identification of individuals responsible for
24 communications with third-party payers?
25   A.   Contract Development Managers are typically

Page 21

1  the folks that are responsible for ensuring that
2  Pfizer receives the information that is necessary to
3  provide rebate to our customers.
4    Q.   Do --
5    A.   -- third-party payers.
6    Q.   Do Contract Development Managers have
7  communications with third-party payers?
8    A.   Yes.
9    Q.   Who are those people?
10   A.   Who are they within the third-party payers?
11   Q.   No.  Who are they within Pfizer?  I'm
12 looking for the identification of those individuals
13 responsible for those communications.
14   A.   The names of the individuals?
15   Q.   Correct.
16   A.   I -- I -- There are a handful of folks that I
17 know by name.  Suzanne Hammell is the -- the team
18 leader of that organization.  I don't recall any other
19 names.
20   Q.   Does Ms. Hammell have responsibility for
21 communications with third-party payers?
22   A.   Her team would have responsibility.  Whether
23 she directly does, I don't know.
24   Q.   Anything else that you did to prepare to
25 answer questions about the identification of

Page 22

1  individuals responsible for communications with third-
2  party payers?
3      A.  Yes.  I reviewed Pfizer's organization chart.
4      Q.  Which one?
5      A.  The organization of -- of the Customer
6  Business Unit as it exists today, as well as the
7  National Healthcare Operation as it existed several
8  years ago.
9      Q.  What is "several years ago"?   What year are
10  we talking about?
11      A.  That organization existed prior to me
12  joining -- becoming a Regional Account Manager in
13  1996, and existed in some form or fashion through
14  2005.
15      Q.  Okay.  So the organizational chart that you
16  reviewed in the National Healthcare Group, what was
17  the date of that organizational chart?
18      A.  It would have been when I was part of the
19  organization, from 1996 until 2005.
20      Q.  How many different organizational charts did
21  you review?
22      A.  That was the only one.
23      Q.  There was one organizational chart for the
24  National Healthcare Group from 1996 to 2005?
25      A.  The one that I looked at, yes.  I'm sure that

Page 23

1  there were -- were multiple variations of it that I'm
2  not aware of as they made minor changes to the
3  organization.
4      Q.  What was the date of the one you looked at?
5      A.  I'm -- I don't know.
6      Q.  But you understand that there are multiple
7  versions of that that would be out there?
8      A.  There could -- could be, yes.
9      Q.  And why could there be different -- multiple
10  versions of the organizational chart for the National
11  Healthcare Group out there?
12      A.  Because minor changes were made to the
13  organization.
14      Q.  Did people who worked in that group also
15  change over time?
16      A.  Yes.
17      Q.  And those names would be reflected on the
18  different multiple versions of the organizational
19  chart; right?
20      A.  Yes, I would assume, yes.
21      Q.  You mentioned Contract Compliance Managers in
22  Mr. Butera's group and Contract Development Managers.
23  Are they the same thing, or are they different?
24      A.  They are different.
25      Q.  How are they different?

Page 24

1      A.  A Contract Development Manager is responsible
2  for putting together the actual contract as it's
3  negotiated with a third-party payer.  A Contract
4  Compliance Manager is responsible for ensuring that
5  the data submissions that are submitted by the
6  third-party payer as part of the terms of the
7  agreement are accurate, as well as verifying that
8  certain terms that exist in the contract are accurate.
9      Q.  Explain how a Contract Compliance Manager
10  would ensure that different terms as they occur in the
11  contract are accurate?
12      A.  For example, in many contracts formulary
13  status is required to be listed; both listed if -- if
14  the third-party payer has an electronic website, that
15  it's listed on the website as well as -- so the
16  Contract Development -- Contract Compliance Manager
17  would actually go and check and make sure that it
18  actually -- the actual contracted access status is
19  accurately reflected on the third-party payer's
20  website.
21          In addition, many contracts stipulate that
22  hard copy formularies are provided to Pfizer.  And the
23  Contract Compliance Manager is responsible for
24  ensuring that that is done.
25      Q.  Why does Pfizer want to have copies of or

Page 25

1  have access to the third-party payers' formularies?
2          MR. MIZELL: Object to the form.
3      A.  So could you restate that question?
4      Q.  Sure.  Why does Pfizer want to have access to
5  or have copies of the third-party payers' formularies?
6          MR. MIZELL: Same objection.
7      A.  Pfizer -- To ensure that the third-party
8  payer's meeting the terms and conditions of the
9  contract.
10      Q.  What are the terms and conditions of the
11  contract that Pfizer is checking on?
12          MR. MIZELL: Object to the form.
13      A.  It varies by contract.
14      Q.  Can you give an example?
15      A.  Pfizer has a confidentiality agreement with
16  these third-party payers that we contract with.  So
17  unless counsel wants me to discuss that, I'm not
18  comfortable discussing that at this time.
19          MS. DALEY: We have a protective order in
20  place.
21          MR. MIZELL: Can we go off the record for a
22  second?
23          MS. DALEY: Sure.
24          MR. MIZELL: Okay.
25          THE VIDEOGRAPHER: The time is approximately

Page 26

1       10:35.  We are now going off the record.
2           (A discussion is held off the record.)
3           THE VIDEOGRAPHER: The time is approximately
4    10:39.  We are now back on the record.
5           MR. MIZELL: Would you please read back the
6    question.
7           (The question is read.)
8           MR. MIZELL: And for the record, subject to
9       those confidentiality agreements, we would have to
10      work out individual releases for those third-
11      party payers for Mr. Henderson to testify about
12      any particular terms of any particular contract.
13          So Mr. Henderson will testify about the
14      contracting process in general, but not as to any
15      particular contract.
16      A.   So in general, Pfizer contracts for formulary
17   access.
18      Q.   So that terms and conditions of the contract
19   that you are checking on is the terms and conditions
20   regarding formulary access?
21      A.   Correct.
22      Q.   What is formulary access?
23      A.   Formulary access varies by product.  It also
24   varies by channel.
25      Q.   Let's be specific to Neurontin.

Page 27

1       A.   I'm not -- Pfizer does -- does not contract
2    for Neurontin, so I'm not aware of -- of how we were
3    contracting for access, other than a contract with
4    Aetna for Neurontin.
5       Q.   What is a formulary?
6       A.   A formulary is typically something a
7    third-party payer implements as a pharmacy utilization
8    technique.
9       Q.   Is it a list of drugs that the third-party
10   payer will pay for?
11      A.   It is typically a list of drugs in which it
12   defines various -- various co-pays that have been
13   negotiated with employers.  So it's really around what
14   the employer in the negotiated pharmacy benefit design
15   is willing to pay for, at what level.
16      Q.   Now, you said there -- there's a contract
17   with Aetna for Neurontin?  Yes?
18      A.   Yes, there was a contract with Aetna for
19   Neurontin.
20      Q.   In preparation for today's deposition, did
21   you review that contract?
22      A.   Yes, I did review the contract.
23      Q.   What's the date on that contract?
24      A.   I'm not aware -- I don't recall the date.
25      Q.   What was that contract about?

Page 28

1       A.   Well, in doing my due diligence, when Pfizer
2    actually acquired Parke-Davis Warner-Lambert, there
3    was an existing agreement between Parke-Davis and
4    Aetna for a variety of products, of which Neurontin
5    was included; but other products like Neurontin --
6    Neurontin, Estrostep, Arthrotec and I don't recall the
7    others, were included in that contract.
8           It also was brought to my attention that that
9    contract was expiring -- or the existing Pfizer
10   contract was expiring.  So the decision was made to
11   amend the base Pfizer contract with the products that
12   Parke-Davis had already contracted for.
13      Q.   So in that -- with respect to Neurontin,
14   adding Neurontin to the Pfizer contract with Aetna?
15          MR. MIZELL: Object to the form.
16      A.   Adding all of the contracted Parke-Davis
17   products to the existing Pfizer contract, which
18   included Neurontin.
19      Q.   And was that contract with Aetna -- or did
20   that contract with Aetna address the issue of
21   formulary access for Pfizer's drugs?
22      A.   Yes, it did.
23      Q.   And did that contract with Aetna provide that
24   Pfizer's drugs, including -- or Pfizer's drug of
25   Neurontin be on Aetna's formulary?

Page 29

1       A.   Yes, it did.
2       Q.   Any other contracts with third-party payers
3    that you reviewed in preparation for today's
4    deposition?
5       A.   No.
6       Q.   Did you ask whether there were any other
7    contracts?
8       A.   I did.
9       Q.   What were you told?
10      A.   I was told that as far as anyone could
11   recall, that there were very few, if any, Neurontin
12   contracts other than the Aetna contract.
13      Q.   Who did you get -- you say as far as
14   anyone -- you were told as far as anyone could recall,
15   the only contract was the Aetna contract for
16   Neurontin?
17      A.   Yes.
18      Q.   Who told you that?
19      A.   Joe Butera.
20      Q.   Did he tell you who he checked with to reach
21   that conclusion?
22      A.   He -- he was the individual responsible for
23   reviewing the Parke-Davis Warner-Lambert contracts
24   when we acquired Warner-Lambert.
25      Q.   When was that?

Page 30

1    A.  I'm not sure of the date.
2    Q.  2000?
3    A.  I would assume, but I'm not sure.
4    Q.  Did Mr. Butera review any documents to -- let
5  me put it this way:  To your knowledge, did Mr. Butera
6  review any documents or speak with anyone before he
7  gave you his conclusion that as far as anyone could
8  recall, the only contract with Neurontin was with --
9  the one with Aetna?
10   A.  Yes.
11   Q.  Who did --
12   A.  I'm aware he spoke to Mike McEnroe.
13   Q.  Anyone else?
14   A.  Those -- that's the only person I'm aware of.
15   Q.  Did he review any documents?
16   A.  I am not aware of that.
17   Q.  So as far as you know sitting here today, Mr.
18  Butera reviewed no documents before he reached his
19  conclusion that he passed on to you that the only
20  contract for Neurontin was the one with Aetna;
21  correct?
22       MR. MIZELL:  Object to the form of the
23  question.
24   A.  Please restate that.
25   Q.  Sure.  As you sit here today, it is your

Page 31

1  understanding that Mr. Butera reviewed no documents
2  before he reached his conclusion that the only
3  contract for Neurontin was the one with Aetna's?
4       MR. MIZELL:  Object to form.
5    A.  It is not my understanding that he reviewed
6  no documents.  I'm not aware of what documents, if
7  any, he reviewed.
8    Q.  Did you ask him if he reviewed any documents?
9    A.  No, I did not.
10   Q.  Did he tell you that he reviewed any
11  documents?
12   A.  No, he did not.
13   Q.  Do you know of the identification of any
14  documents that he reviewed before he passed on to you
15  his conclusion that the only contract for Neurontin
16  was Aetna's?
17   A.  No.
18   Q.  Who is Mike McEnroe?
19   A.  Mike McEnroe was VP of Contracting.
20   Q.  Let me go back and just -- Did you ask if
21  anyone had reviewed documents to look for any other
22  contracts for Neurontin besides the one with Aetna?
23       MR. MIZELL:  Object to the form.
24   A.  I did not.
25   Q.  Okay.  Mr. McEnroe is Vice President of

Page 32

1  Contracting?
2    A.  Yes.
3    Q.  What did you speak -- did you speak with Mr.
4  McEnroe?
5    A.  Just informally.
6    Q.  So the answer is yes, you did speak with him?
7    A.  Yes.
8    Q.  What did you and Mr. McEnroe talk about?
9    A.  I -- I asked Mike if there were any contracts
10  that he was aware of other than the Aetna agreement.
11   Q.  What did he say?
12   A.  He told me he couldn't recall; however, Joe
13  Butera, who reported to Mike, had been the individual
14  charged with doing the due diligence during the
15  acquisition.
16   Q.  Back in 2000?
17   A.  Yes.
18   Q.  Over seven years ago?
19   A.  Yes.
20   Q.  So that then led you to Mr. Butera?
21   A.  Yes.
22   Q.  And that's when Mr. Butera told you that
23  based upon his recollection, the only contract was the
24  Aetna one?
25   A.  Correct.

Page 33

1    Q.  How long did Mr. Butera -- Well, let me
2  strike -- step back for a second.
3       Is Mr. Butera still a Pfizer employee?
4    A.  Yes, he is.
5    Q.  And how long had -- I'm assuming that Mr.
6  Butera worked for Warner-Lambert Parke-Davis before he
7  worked for Pfizer?
8       MR. MIZELL:  Object to the form.
9    A.  No, that is -- that's incorrect.
10   Q.  How long has Mr. Butera worked for Pfizer?
11   A.  I -- I don't know exactly how long.
12   Q.  Was Mr. Butera working for Pfizer in 2000
13  when Pfizer acquired Warner-Lambert?
14   A.  Yes, he was.
15   Q.  And what was Mr. Butera's responsibilities in
16  connection with the due diligence that Pfizer did of
17  Warner-Lambert as part of that acquisition?
18   A.  He was the Director/Team Leader of Commercial
19  Contracts.
20   Q.  And what did he do in connection with that
21  due diligence regarding these third-party payer
22  contracts?
23   A.  I'm not exactly familiar with -- with what
24  took place.
25   Q.  Do you have a general understanding?

9 (Pages 30 to 33)

Page 34

1     A.   My general understanding is that Mr. Butera's
2  Contracting Group was responsible for reviewing all
3  contracts.
4     Q.   Were there any, to your knowledge, any
5  summaries prepared of those contracts as part of that
6  due diligence effort that Mr. Butera's group did?
7     A.   I am not aware of any summaries.
8     Q.   Did Mr. Butera himself personally review
9  contracts?
10    A.   I am not aware.
11    Q.   Did Mr. Butera tell you why he recalled that
12 over seven years ago there was a contract with Aetna?
13        MR. MIZELL: Object to the form.
14    A.   Yes, because there were so few contracts that
15 it was very easy for him to recall.
16    Q.   So few contracts that Warner-Lambert had with
17 third-party payers?
18        MR. MIZELL: Object to the form.
19    Q.   Is that what you are saying?
20    A.   That is what I'm saying, yes.
21        Actually, I would --
22        MR. MIZELL: There is no question pending.
23    Q.   Did you want to clarify something?
24    A.   No.
25        MR. MIZELL: No.  Just ask him a follow-up

Page 35

1  question.
2         MS. DALEY: If he wanted to clarify something,
3  I wanted to give him a chance to do it.
4     A.   I actually would like to clarify that --
5         MR. MIZELL: All right.  Go ahead.
6     A.   -- that there are so few Parke-Davis
7  contracts that included Neurontin.
8     Q.   You used the phrase Parke-Davis contracts,
9  Warner-Lambert contracts.  Are you using those terms
10 interchangeably?
11    A.   I am.
12    Q.   Okay.  I just want to make sure I understand
13 what you are trying to communicate.
14        Okay.  Anything else that you discussed with
15 Mr. Butera?
16    A.   No.
17    Q.   Anything else you discussed with Mr. McEnroe?
18    A.   No.
19    Q.   You said you spoke with Curtis Reese?
20    A.   Yes.
21    Q.   Who is Curtis Reese?
22    A.   Curtis Reese is a District Manager with the
23 Kaiser sales force.
24    Q.   As a District Manager with the Kaiser sales
25 force, is he a Kaiser employee or a Pfizer employee?

Page 36

1     A.   Pfizer employee, the Kaiser Pfizer sales
2  force.
3     Q.   How many individuals are on the Kaiser Pfizer
4  sales force?
5     A.   There are 16 Sales Representatives, Two
6  District Managers and one National Account Manager.
7     Q.   That are on the Kaiser Pfizer sales force?
8     A.   Yes.
9     Q.   Are there any other third-party payer sales
10 forces that are as large as the Kaiser Pfizer sales
11 force?
12    A.   No.
13    Q.   Why is the Kaiser Pfizer sales force so
14 large?
15    A.   Kaiser is a very large customer in
16 California.
17    Q.   A very large customer of Pfizer's?
18    A.   Of Pfizer's.  They have a very large presence
19 in general in the managed markets arena in California.
20    Q.   And Curtis Reese is one of the two District
21 Managers on the Kaiser Pfizer sales force?
22    A.   That is correct.
23    Q.   Who is the National Account Manager for the
24 Kaiser Pfizer sales force?
25    A.   Kirk Bachman, B-a-c-h-m-a-n.

Page 37

1     Q.   Did you speak with him?
2     A.   I did.
3     Q.   Who is the other District Sales Manager --
4  excuse me -- the District Manager for the Kaiser
5  Pfizer sales force?
6     A.   John Dauser.
7     Q.   And you spoke with him; right?
8     A.   I did.
9     Q.   Any other members of the Kaiser Pfizer sales
10 force that you spoke with?
11    A.   No.
12    Q.   What did Mr. Reese tell you about
13 communications with -- well, let me step back for a
14 second.
15        Did he tell you only about communications
16 with Kaiser, or any -- or were there any other
17 third-party payers that he had communications with?
18    A.   We only discussed communications with Kaiser.
19    Q.   Did you ask him whether he had communications
20 with any other third-party payers?
21    A.   I did not.
22    Q.   What did you and Mr. Reese discuss?
23    A.   We discussed the fact that Kaiser did not --
24 that Pfizer did not promote Neurontin at -- in Kaiser.
25    Q.   What do you mean, Kaiser (sic) did not

Page 38

1  promote Neurontin?
2      A.  Pfizer did not promote Neurontin in Kaiser.
3      Q.  I got that backwards.  Let me re-ask the
4  question.
5          So you discussed that Pfizer did not promote
6  Neurontin --
7      A.  Correct.
8      Q.  -- in its communications with Kaiser?
9      A.  Correct.
10     Q.  And how did Mr. Reese know that?
11     A.  He was the District Manager at the time of
12  the Warner-Lambert/Parke-Davis acquisition.
13     Q.  Was he a Pfizer employee or a Warner-Lambert
14  employee?
15     A.  Pfizer employee.
16     Q.  Who was the Warner-Lambert employee or
17  employees in charge of Kaiser at the time of the
18  Pfizer acquisition of Warner-Lambert?
19     A.  I don't recall.
20     Q.  Who are the individuals at Pfizer who are
21  responsible for communications with Kaiser?
22     A.  That would be Kirk Bachman, as well as the
23  two Sales District Managers and the 16 Sales
24  Representatives.
25     Q.  Okay.  So that's Kirk Bachman, Curtis Reese

Page 39

1  and John Dauser?
2      A.  Correct.
3      Q.  And then 16 other individuals?
4      A.  Sixteen sales representatives, yes.
5      Q.  And the identification of those sales
6  individuals is?  The names of those individuals?
7      A.  I don't recall their names.
8      Q.  Did those individuals, those 16 individuals,
9  have communications with Kaiser?
10     A.  Yes.
11     Q.  Did those six individuals (sic) remain the
12  same -- excuse me -- have those 16 individuals
13  remained the same 16 individuals since Pfizer acquired
14  Warner-Lambert in 2000?
15     A.  No.
16     Q.  So there is more than 16 individuals out
17  there?
18     A.  I would assume, yes.
19     Q.  And then the names -- the identification of
20  the individuals responsible for communications with
21  Kaiser prior to Pfizer's acquisition of Warner-Lambert
22  with respect to Neurontin would be?
23     A.  I don't have the names of those individuals.
24     Q.  Did Pfizer hire any of the Warner-Lambert
25  individuals who had communications with Kaiser after

Page 40

1  the acquisition of Warner-Lambert?
2          MR. MIZELL: Object to the form.
3      A.  I'm not aware.
4      Q.  You said Kirk Bachman is the National Account
5  Manager?
6      A.  That's correct.
7      Q.  Is his only account Kaiser?
8      A.  No.  He also is responsible for MedImpact,
9  which is a PBM in southern California.
10     Q.  Any other third-party payers?
11     A.  Not that I'm aware of.
12     Q.  Do Curtis Reese or John Dauser call on any
13  third-party payers other than Kaiser?
14     A.  No.
15     Q.  Do the 16 individuals -- and I understand
16  their names have changed over time.  Did they -- that
17  report to Curtis Reese and John Dauser.  Did they call
18  on any third-party payers besides Kaiser?
19     A.  No.
20     Q.  Do you know whether Warner-Lambert
21  communicated with Kaiser about Neurontin prior to
22  Pfizer's acquisition?
23     A.  I'm only aware inasmuch as I have read in the
24  Cavic deposition.
25     Q.  What do you know from that deposition?

Page 41

1      A.  Very little.
2      Q.  So tell me what you know?
3      A.  It -- It appears that they had folks that
4  were calling on Kaiser.  Whether they were promoting
5  Neurontin, I don't recall reading that.
6      Q.  So based upon your review of Mr. Cavic's
7  deposition testimony, it appears that Warner-Lambert
8  had individuals who called on Kaiser; right?
9      A.  Yes.
10     Q.  But you, as you sit here today, do not know
11  whether in those communications with Kaiser,
12  Warner-Lambert was promoting Neurontin; correct?
13     A.  That is correct.
14     Q.  Did you make any efforts to determine whether
15  any of the Warner-Lambert individuals promoted
16  Neurontin to Kaiser?
17     A.  No, I did not.
18     Q.  Did you make any effort to determine whether
19  any of the Warner-Lambert individuals promoted
20  Neurontin to Aetna?
21     A.  No, I did not.
22     Q.  Did you make any effort to determine whether
23  any of the Warner-Lambert individuals promoted
24  Neurontin to Guardian?
25     A.  No, I did not.

11 (Pages 38 to 41)

Page 42

1    Q.  Did you make any effort to determine whether
2  any of the Warner-Lambert individuals promoted
3  Neurontin in communications with Harden Manufacturing?
4    A.  With who?
5    Q.  Harden Manufacturing.
6    A.  No, I did not.
7    Q.  Did you make any effort to determine whether
8  any of the Warner-Lambert individuals promoted
9  Neurontin to Louisiana Health Service Indemnity
10  Company doing business as Blue Cross/Blue Shield of
11  Louisiana?
12    A.  No, I did not.
13    Q.  Did you make any effort to determine whether
14  any of the Warner-Lambert individuals promoted
15  Neurontin to the International Union of Operating
16  Engineers, Local Number 68 Welfare Fund?
17    A.  No, I did not.
18    Q.  Did you make any effort to determine whether
19  any of the Warner-Lambert individuals promoted
20  Neurontin to ASE, AFSCME Local 52 Health Benefits
21  Trust?
22    A.  No, I did not.
23    Q.  So if you didn't make any efforts, you
24  wouldn't know the identification of any of those
25  individuals responsible for such communications;

Page 43

1  right?
2        MR. MIZELL: Object to the form.
3    A.  That is -- that is correct.
4    Q.  What are the types of categories of Pfizer's
5  communications to Kaiser?
6    A.  To Kaiser?
7    Q.  Uh-huh, or with Kaiser.
8    A.  Typically there are two types of
9  communications.  There are promotional communications
10  and there are medical communications.
11    Q.  What's the difference between promotional
12  communications and medical communications?
13    A.  Promotional communications are -- are
14  communications that are made through approved
15  promotional materials that have been approved by our
16  Regulatory to ensure that we are in compliance with
17  FDA guidance.
18        Medical presentations can take two forms:
19  Either promotional, where we are giving a clinical
20  presentation that is promotional in nature; or it can
21  be in response to a unsolicited medical request.
22    Q.  How do you define "unsolicited medical
23  request"?
24    A.  A customer asked a question which is not
25  within scope of our label.

Page 44

1    Q.  When a customer asks a question that is not
2  within the scope of the label, is that also referred
3  to as "off-label"?
4    A.  It -- It could be interpreted as off-label.
5  It could also be an inquiry into something that a -- a
6  clinical reprint, for example, that has not been
7  approved by our Regulatory Affairs folks for
8  promotional use.
9    Q.  When you refer to your Regulatory --
10  Regulatory Affairs folks, who are you referring to?
11    A.  By name?
12    Q.  Right.
13    A.  I don't have names.
14    Q.  When you think of the Regulatory Affairs
15  folks, who do you think of?
16    A.  I typically think of lawyers.  They're
17  employed by Pfizer.
18    Q.  So when you think of these reprints or
19  marketing materials approved by the Regulatory Affairs
20  folks, you are thinking of Pfizer lawyers?
21    A.  Yes.
22    Q.  You said a medical communication can be
23  promotional or in response to an unsolicited medical
24  request.  How can a medical communication be
25  promotional?

Page 45

1        MR. MIZELL: Object to the form.
2    A.  For example, a formulary slide kit is a slide
3  kit that is designed to provide the customer on-label
4  information that they can use when making formulary
5  decisions.
6    Q.  So a formulary slide kit is considered to be
7  promotional?
8        MR. MIZELL: Object to the form.
9    A.  Yes.
10    Q.  Have you ever seen a formulary slide kit for
11  Neurontin?
12    A.  No, I have not.
13    Q.  Is a formulary slide kit a communication that
14  you would have with a third-party payer?
15    A.  Yes.
16    Q.  You said that you were told by either Curtis
17  Reese or Mr. Dauser that there was no promotion of
18  Pfizer to Kaiser of Neurontin; right?
19    A.  That is right.
20    Q.  Was there promotion by Pfizer to Kaiser about
21  Lyrica?
22        MR. MIZELL: Object to the form.  It is
23  outside the scope of the deposition.
24    A.  Yes.
25    Q.  And Lyrica is through the -- the next

Page 46

1  generation of drugs from Neurontin; right?
2      MR. MIZELL: Outside the form.  It's outside
3  the scope.  We are not going to testify about
4  Lyrica today.
5      Don't answer the question.
6      MS. DALEY: You are instructing him not to
7  answer the question?
8      MR. MIZELL: Yes.
9    Q.  You are following your counsel's
10  instructions?
11    A.  I am.
12    Q.  Let me ask the next question.
13      What were the communications that Pfizer had
14  to Kaiser regarding Lyrica?
15      MR. MIZELL: The same instruction not to
16  answer.
17    Q.  Are you following your counsel's
18  instructions?
19    A.  I am.
20    Q.  In connection with any of communications that
21  Pfizer had with Kaiser about Lyrica, was there any
22  mention of Neurontin?
23      MR. MIZELL: Counsel, same objection, same
24  instruction.  Let's move on.
25    Q.  Are you following your counsel's instruction?

Page 47

1    A.  I am.
2    Q.  Do you know whether there were any
3  communications by Pfizer with Aetna about Lyrica?
4      MR. MIZELL: Same objection and instruction.
5  Let's keep -- let's stay within the scope of the
6  designation.
7      MS. DALEY: I'm entitled to ask these
8  questions.  You are going to instruct him not to
9  answer any of these questions?
10      MR. MIZELL: Well, to clarify.  Mr. Henderson
11  is designated to testify pursuant to Discovery
12  Order 14 about the marketing or promotion of
13  Neurontin directly to the main third-party payers.
14  He is designated to testify about Pfizer's
15  organizational structure used for communications
16  with third-party payers.  He is also designated to
17  testify about the types of documents created or
18  maintained at Warner-Lambert Healthcare Management
19  Unit and Pfizer's due diligence related to alleged
20  off-label marketing with respect to Neurontin
21  during the acquisition by Pfizer of Warner-Lambert
22  and its Parke-Davis Division.
23      That is the scope of the designation for the
24  deposition.  That is what he is going to answer
25  questions about.

Page 48

1      MS. DALEY: Well, that's not my understanding
2  of the scope of this deposition.  But I understand
3  you are instructing this witness not to answer the
4  questions and he is following your instructions;
5  right?
6      MR. MIZELL: He is going to testify as to these
7  designated areas.
8      MS. DALEY: Only?
9      MR. MIZELL: Yes.
10      MS. DALEY: As you have just read into the
11  record?
12      MR. MIZELL: Yes.
13      MS. DALEY: Well, we'll have to take this up
14  with the Judge at a later date, but we are going
15  to go ahead and proceed forward to address the
16  issues, and we are reserving our rights to file a
17  motion with the Court.
18      You understand; right? Mr. Mizell?
19      MR. MIZELL: I heard you.
20
21  CONTINUED DIRECT EXAMINATION BY MS. DALEY:
22    Q.  Who are the individuals at Pfizer who are
23  responsible for communications with Aetna?
24    A.  The National Account Manager is responsible,
25  as well as the Account Director.

Page 49

1    Q.  Who are those people?
2    A.  At this time, the National Account Manager
3  who calls on Aetna is Kent McKinney, M-c-K-i-n-n-e-y.
4  The Account Director, who is the individual Kent
5  reports to, is Tanya Carr, C-a-r-r, hyphen, Waldron,
6  W-a-l-d-r-o-n.
7    Q.  Any other individuals at Pfizer that are
8  responsible for communications with Aetna?
9    A.  They are the individuals that are primarily
10  charged with communicating with Aetna.
11    Q.  Any other individuals at Pfizer that are
12  responsible for communications with Aetna?
13    A.  I'm sorry.  I don't understand.
14    Q.  My question is:  I need identification of all
15  individuals responsible for communications with Aetna
16  besides --
17    A.  They are --
18    Q.  -- besides Mr. McKinney and Ms. Carr-Waldron,
19  are there any others?
20    A.  They are the ones directly responsible.
21    Q.  Are there any individuals that are indirectly
22  responsible for communications with Aetna?
23    A.  Potentially there could be a Compliance
24  Manager that communicates with Aetna.
25    Q.  Who is that?

Page 50

1      A.  I don't know who is assigned to Aetna.
2      Q.  Did you check to determine whether there was
3  a Compliance Officer who was responsible for
4  communications with Aetna?
5      A.  Actually, the title is Contract Compliance
6  Manager.  And no, I did not check.
7      Q.  Any other individuals at Pfizer who are
8  directly or indirectly responsible for communications
9  with Aetna?
10         MR. MIZELL: Object to the form.
11     A.  Not that I'm aware of.
12     Q.  Did you check to determine whether there were
13  any other such individuals?
14         MR. MIZELL: Object to the form.
15     A.  No.
16     Q.  How long has Mr. McKinney been in his
17  position?
18     A.  He has been in that position since, as I
19  recall, January of 2007.
20     Q.  Who held that position before Mr. McKinney?
21     A.  Greg Park.
22     Q.  How long was he National Account Manager
23  responsible for Aetna?
24     A.  I don't know the exact length of time, but
25  I -- I definitively know he was from 2000 to 2006.

Page 51

1      Q.  Who was the Account Director --
2         Well, was Ms. Tanya Carr-Waldron the Account
3  Director with responsibility for Aetna from 2000 to
4  present?
5      A.  No.
6      Q.  Who was in that position before she --
7      A.  That's a newly-created position.  I believe
8  she took that position in February or March of this
9  year, 2007.
10     Q.  What are the types and categories of
11  communications she had with Aetna?
12     A.  What -- The ones that I am familiar with are
13  telephonic, face-to-face; and those are the only ones
14  that I definitively am aware of.
15     Q.  Did you ask her whether she had any
16  communications with Aetna about Neurontin?
17     A.  No.
18     Q.  Do you know whether she had any
19  communications with Aetna about Neurontin?
20     A.  I -- No, not that I'm aware of.
21     Q.  Did Mr. McKinney have any communications with
22  Aetna about Neurontin?
23     A.  None that I'm aware of.
24     Q.  Did you ask him whether he had any
25  communications with Aetna about Neurontin?

Page 52

1      A.  I did not.
2      Q.  What types and categories of communications
3  did Mr. McKinney have with Aetna about Neurontin?
4      A.  As I previously stated, I'm not aware that he
5  had any communications about Neurontin with Aetna.
6      Q.  Because you didn't ask.  You don't know;
7  right?
8         MR. MIZELL: Object to the form.
9      A.  No, I did not ask.
10     Q.  What -- Anyone else at Pfizer -- let me put
11  it this way:  Who at Pfizer is responsible for
12  communications with Guardian Life?
13     A.  No one is responsible for communications with
14  Guardian Life.
15     Q.  Does anyone at Pfizer have any
16  communications?
17     A.  None that I am aware.
18     Q.  And, again, we are talking about Guardian
19  Life?
20     A.  Right.
21     Q.  How do you know that?
22     A.  Because Guardian Life is not an assigned
23  account.
24     Q.  Does anyone at Pfizer call on third-party
25  payers that are not assigned accounts?

Page 53

1      A.  None that I'm aware.
2      Q.  How do you know that if an account is not an
3  assigned account, no one from Pfizer calls on that
4  account?
5      A.  I don't know definitively that someone is not
6  calling on the account.  However, I also know
7  definitively that the account has no ability to impact
8  our business directly.
9      Q.  What do you mean?  You are saying that
10  Guardian does not have the ability to impact your
11  business directly?
12     A.  Correct.
13     Q.  What do you mean by that?
14     A.  Guardian is not a health plan, so they don't
15  have any kind of formulary measures or pharmacy
16  utilization measures that I'm aware of to impact
17  Pfizer's business.
18     Q.  So if a third-party payer has a pharmacy
19  utilization or formulary, then they would impact
20  Pfizer's business?
21         MR. MIZELL: Object to the form.
22     A.  Potentially.
23     Q.  How is it a potential impact on Pfizer?
24         MR. MIZELL: Same objection.
25     A.  They can restrict access to our products.

Page 54

1    Q.  Is it important to Pfizer that third-party
2  payers allow access to Pfizer's drugs on their
3  formularies?
4    A.  It is important to Pfizer that all patients
5  have access to our products.
6    Q.  Why is that?
7    A.  Because Pfizer makes life-saving medications.
8    Q.  Does Neurontin save lives?
9    A.  I --
10     MR. MIZELL: Object.  It's outside the scope of
11  the deposition.
12    Q.  Does Neurontin save lives?
13     MR. MIZELL: Objection to the form of the
14  question.  It is also outside the scope.  And for
15  the record, and for the entirety of the
16  deposition, to the extent that the witness offers
17  answers for which a scope objection has been
18  lodged, it is testimony on behalf of the witness,
19  not on behalf of the defendants.
20     Go ahead, answer.
21    A.  I am not a trained clinician, so I can't
22  answer that question.
23    Q.  Has anyone ever told you that Neurontin saves
24  lives?
25     MR. MIZELL: Same objection.  Outside the

Page 55

1  scope.
2    A.  No one has ever told me that.
3    Q.  You have been an employee of Pfizer for 16
4  years.  Do you believe that Neurontin saves lives?
5     MR. MIZELL: Outside the scope of the
6  deposition.  Object to form.
7    A.  I am not in a position to answer that.
8    Q.  Actually, I'm just asking for your belief.
9     MR. MIZELL: Same objections.
10    Q.  Do you believe, as a 16-year employee of
11  Pfizer, that Neurontin saves lives?
12     MR. MIZELL: Same objections.
13    A.  I believe -- I believe that Neurontin --
14  Neurontin -- I'm not familiar enough with Neurontin to
15  make any kind of judgement.
16    Q.  So you don't have a judgement one way or the
17  other as to whether Neurontin saves lives.  Is that
18  correct?
19     MR. MIZELL: Objection to form.  Outside the
20  scope.
21    A.  That is correct.
22    Q.  So going back to your original statement, you
23  said it was important to Pfizer that all patients have
24  access to their products; right?
25    A.  That's correct.

Page 56

1    Q.  And if that patient has access to your
2  product, then that means that Pfizer's products will
3  be used by that patient; right?
4     MR. MIZELL: Object to the form.
5    Q.  Or could be used by that patient?
6     MR. MIZELL: Same objection.
7    A.  Correct.
8    Q.  And when patients use Pfizer's products, that
9  has an impact on Pfizer's sales; right?
10     MR. MIZELL: Object to the form.
11    A.  Not necessarily.
12    Q.  Your title is Vice President of Sales?
13    A.  No, Vice President, Customer Business Unit,
14  Business Unit Liaison Group.
15    Q.  Are Pfizer sales -- is Pfizer's sales
16  important to you as a vice president?
17    A.  Yes, Pfizer's sales are important.
18    Q.  And sales of Pfizer's drugs are made when
19  patients either directly purchase or through their
20  health benefit plans purchase Pfizer's drugs; right?
21     MR. MIZELL: Object to the form.
22    A.  Pfizer's sales, the sales of our products are
23  typically made through a variety of channels.
24    Q.  What are those channels?
25    A.  That could include trade, which involves the

Page 57

1  wholesalers who purchase Pfizer products.  There are
2  customers that buy product direct.
3    Q.  Any other channels?
4    A.  Of course, all the commercial channels;
5  Medicare, Medicaid, long term care, prisons; just to
6  name a few.
7    Q.  You say one of the channels is trading.  You
8  are talking about the wholesale pharmacies?
9    A.  It's the wholesaler.  It can also be through
10  a retail pharmacy.  It depends on how the retail
11  pharmacy acquires their product, whether they use a
12  wholesaler or not.
13    Q.  By retail, you are thinking about a
14  Walgreen's or CVS, the big ones?
15    A.  Correct.
16    Q.  Wholesalers would be selling to smaller
17  pharmacies, then; right?
18     MR. MIZELL: Object to the form.
19    A.  They could.
20    Q.  Who are the identification -- who are the
21  individuals at Pfizer responsible for communications
22  with Blue Cross/Blue Shield of Louisiana, Louisiana
23  Health Service Indemnity Company?
24    A.  I don't know.
25    Q.  Did you check?

Page 58

1    A.  I did not.
2    Q.  Who are the individuals at Pfizer responsible
3  for communication with Harden Manufacturing?
4    A.  To the best of my knowledge, no one's
5  responsible for calling on Harden Manufacturing.
6    Q.  Did you check?
7    A.  No, I did not.
8    Q.  Who at Pfizer is responsible for
9  communications with the International Union of
10  Operating Engineers, Local Number 68 Welfare fund?
11    A.  I am not aware of anyone that calls on -- on
12  that particular union.
13    Q.  Did you check?
14    A.  I did not.
15    Q.  Who at Pfizer is responsible for
16  communications with AFC, AFSCME, Local 52 Health
17  Benefits Trust?
18    A.  I am not aware of anyone who calls on that
19  account.
20    Q.  Did you check?
21    A.  I did not.
22    Q.  What did John Dauser tell you about his
23  communications with Kaiser?
24    A.  He told me there was no communication with
25  Kaiser around Neurontin.

Page 59

1    Q.  What are the databases that Pfizer has that
2  may contain the contents of communications they had
3  with any third-party payers?
4    A.  HC Exchange is the primary database.
5    Q.  Any others?
6    A.  It could also be contained in the operating
7  plans for the individual national accounts.
8    Q.  Any other databases?
9    A.  The only other database would be contained
10  within the Contracting Department.
11    Q.  Did you look at the HC Exchange database to
12  determine whether there were any communications in
13  there with Kaiser?
14    A.  No, I did not.
15    Q.  Did you ask anyone to look at that database
16  to determine whether there were any communications
17  with Kaiser?
18    A.  No, I did not.
19    Q.  Did you look at the HC Exchange to determine
20  whether there were any communications with Aetna?
21    A.  No, I did not.
22    Q.  Did you ask anyone to look at the HC Exchange
23  database to see if there were any communications with
24  Aetna?
25    A.  No, I did not.

Page 60

1    Q.  Did you look at the HC Exchange database to
2  determine whether there were any communications with
3  Guardian Life?
4    A.  No, I did not.
5    Q.  Did you ask anyone to look at the database to
6  determine whether there were any communications in
7  there with Guardian Life?
8    A.  No, I did not.
9    Q.  Did you look at the HC Exchange to determine
10  whether there were any communications with Louisiana
11  Health Service Indemnity Company doing business as
12  Blue Cross/Blue Shield of Louisiana?
13    A.  No, I did not.
14    Q.  Did you ask anyone to do that?
15    A.  No, I did not.
16    Q.  Let's sort of cut to the chase.
17      The same sets of questions with respect to
18  Harden Manufacturing, the International Union of
19  Operating Engineers, Local Number 68, and the AFSCME,
20  Local 52 Health Benefits Trust?
21      MR. MIZELL: I object to the form.
22    Q.  The questions -- These are the two questions.
23  Did you look at HC Exchange database to see if there
24  were any communications with any of those three
25  entities?

Page 61

1    A.  No, I did not.
2    Q.  Did you ask anyone to look at the HC Exchange
3  database to see if it contained any communications
4  with those three entities?
5    A.  No, I did not.
6    Q.  Okay.  You said there also is databases
7  operating plans for individual national accounts?
8    A.  Yes.
9    Q.  Is there an operating plan for Kaiser?
10    A.  Yes.
11    Q.  Did you look at that?
12    A.  Yes.
13    Q.  What were the dates of the operating plans
14  for Kaiser that you looked at?
15    A.  I looked at the most-recent 2006 operating
16  plan.
17    Q.  Were there operating plans before the 2006
18  plan?
19    A.  Yes.
20    Q.  For what years?
21    A.  I'm not aware.
22    Q.  You know there were plans, you just don't
23  know --
24    A.  That's correct.
25    Q.  -- what they were?

Page 62

1    And what did you -- what do you recall about
2  the operating plan for Kaiser for 2006 that you
3  reviewed?
4    A.   There was no mention of Neurontin.
5    Q.   Was gabapentin mentioned in there?
6    A.   I do not recall any references to gabapentin.
7    Q.   Gabapentin is the generic name for Neurontin;
8  right?
9    A.   That is correct.
10    Q.   Did you look to see whether or not there was
11  any reference of gabapentin there?
12    A.   No, I did not.
13    Q.   As you sit here today, you just don't know
14  one way or the other whether it's in -- if gabapentin
15  is mentioned in the operating plan of 2006 for Kaiser;
16  right?
17    MR. MIZELL: Object to the form.
18    A.   I definitively know that there is no strategy
19  or tactics listed around promoting gabapentin.  It
20  is, however, possible that gabapentin could be
21  included on a chart because it is part of the AED
22  market basket.
23    Q.   What do you mean by "the AED market basket"?
24    A.   Those are anti epileptic drugs.
25    Q.   And what does it mean to say that something

Page 63

1  is in the AED market basket?
2    A.   It takes drugs that have similar indications
3  and puts them together in what we define as a
4  therapeutic grouping of products.
5    MS. DALEY: We need to break for a tape?
6    THE VIDEOGRAPHER: The time is approximately
7    11:29.  This ends Tape Number 1.  We are now going
8    off the record.
9    (A recess is taken.)
10
11  CONTINUED DIRECT EXAMINATION BY MS. DALEY:
12    THE VIDEOGRAPHER: The time is approximately
13    11:40.  This begins Tape Number 2.  We are now on
14    the record.
15    Q.   Mr. Henderson, as Vice President of Customer
16  Business Unit, Business Unit Liaison Group, what do
17  you do?
18    A.   My team and me are responsible for liaisoning
19  between the Customer Business Unit and the Therapeutic
20  Business Units in our U.S. healthcare operations.
21    Q.   What do you mean by liaisoning between these
22  two units?
23    A.   Providing information around managed markets
24  to these business units.  The healthcare dynamic in
25  the U.S. being what it is, the third-party payers

Page 64

1  would prefer to only see one single account manager
2  from any individual company.  Back in January of 2007,
3  Pfizer broke out the U.S. business unit into four
4  separate therapeutic business units.
5    And so the Customer Business Unit has
6  liaisons assigned to each of the individual
7  therapeutic business units.
8    Q.   What are the four separate therapeutic
9  business units?
10    A.   The Pratt Business Unit, the Steere Business
11  Unit, the Specialty Business Unit, and the Powers
12  Business Unit.
13    Q.   How do you spell Pratt?
14    A.   P-r-a-t-t.
15    Q.   The Steere, how do you spell that?
16    A.   S-t-e-e-r-e.
17    Q.   Is Pratt an acronym?
18    A.   No, they are all, with the exception of
19  "Specialty," they are all former CEOs of Pfizer.  So
20  they were named after the former CEOs of Pfizer.
21    Q.   Okay.  So the Pratt Business Unit is named
22  after a former Pfizer CEO?
23    A.   Correct.
24    Q.   What therapeutic class or classes is in the
25  Pratt CBU -- or business unit, excuse me?

Page 65

1    A.   Cardiovascular.
2    Q.   Any others?
3    A.   No.
4    Q.   What therapeutic classes are in the Steere
5  Business Unit?
6    A.   Uro-respiratory, which includes smoking
7  cessation.
8    Q.   Any others?
9    A.   No.
10    Q.   What therapeutic classes are in the Specialty
11  Business Unit?
12    A.   Specialty encompasses a wide variety of
13  products, not -- not specifically grouped in a
14  therapeutic area.  It does include anti infectives; it
15  also includes endocrine, HIV, special products that
16  Pfizer sells.
17    Q.   And the Powers Business Unit?
18    A.   Powers is responsible for arthritis pain as
19  well as neuroscience.
20    Q.   Is Neurontin in the Powers Unit?
21    A.   No.
22    Q.   Which one --
23    A.   Neurontin is not a promoted product.
24    Q.   What do you mean by a "promoted product"?
25    A.   The business units are only responsible for

Page 66

1  promoted products.
2  Q.  And what makes something a promoted product?
3  A.  A promoted product is -- is typically a
4  product that has not gone generic, and products in
5  which Pfizer is actively promoting through their sales
6  force to customers.
7  Q.  So Neurontin is not a promoted product
8  because there is a generic available?
9  MR. MIZELL: Object to the form.
10  A.  That is correct.
11  Q.  When did Pfizer cease promoting Neurontin?
12  A.  Pfizer actually, since the
13  acquisition of Warner-Lambert, only promoted Neurontin
14  through 150 specialized representatives.  When they
15  actually concluded, I'm not sure of the exact date,
16  but it was when Neurontin went generic.
17  Q.  2004?
18  A.  I believe that's the correct date.
19  Q.  So somewhere in 2004, Pfizer ceased promoting
20  Neurontin?
21  A.  That is correct.
22  Q.  Does Pfizer still sell Neurontin today?
23  A.  If Pfizer sells Neurontin, it would be
24  because a customer would try to buy it through --
25  through various channels.  So it would be handled by

Page 67

1  our diversified group, and potentially through our
2  generic subsidiary.
3  Q.  Okay.  Let me go back to my question.
4  Does Pfizer sell Neurontin today?
5  A.  I don't specifically know.
6  Q.  And you mentioned a generic subsidiary.  What
7  is the name of that subsidiary?
8  A.  Greenstone, G-r-e-e-n-s-t-o-n-e.
9  Q.  Where is Greenstone headquartered?
10  A.  At 245 East 42nd Street, New York, New York.
11  Q.  Same as Pfizer's offices?  Yes?
12  A.  Yes.  Correct.  I'm sorry.
13  Q.  That's okay.
14  A.  I forget.  I'm nodding my head.
15  Q.  Do you know whether Greenstone sells the
16  generic for Neurontin, which is gabapentin?
17  A.  I do not, no.
18  Q.  Do you know whether Greenstone promotes
19  gabapentin?
20  A.  Greenstone doesn't promote any products.
21  Q.  But they do sell generic drugs; right?
22  A.  That is correct.
23  MR. MIZELL: Object to the form.
24  A.  That is correct.
25  Q.  When you were preparing for today's

Page 68

1  deposition, did you ask for information only about
2  Neurontin, or did you also ask for information about
3  gabapentin, which is Neurontin, the generic name for
4  Neurontin?
5  A.  I asked specifically about Neurontin.
6  Q.  Did you ask about gabapentin at all?
7  A.  I --
8  MR. MIZELL: Object to form.
9  A.  I -- I did not.
10  Q.  Neurontin is actually the trademark name that
11  Pfizer has for its gabapentin drug; right?
12  A.  It's the branded name of gabapentin.
13  Q.  Do you understand that it's also trademarked
14  by Pfizer?
15  A.  That I'm not aware.  We -- we refer to
16  branded products.
17  Q.  So Neurontin is the branded name for the
18  gabapentin product --
19  A.  That is correct.
20  Q.  -- that Pfizer sold; right?
21  A.  Yes.
22  Q.  And gabapentin is a drug that would fall into
23  what you had described earlier as the AED market
24  basket?
25  A.  Yes.

Page 69

1  Q.  What is Pfizer's organizational structure
2  used for communications with third-party payers?
3  A.  Could you please clarify that question?
4  Q.  Sure.  Your lawyer said you were designated
5  to respond to questions on behalf of Pfizer as to
6  Pfizer's organizational structure used for
7  communications with third-party payers.
8  So my question is:  What is Pfizer's
9  organizational structure for communications with
10  third-party payers?
11  A.  The organizational structure for
12  communicating with third-party payers is done through
13  the Customer Business Unit.
14  Q.  How many Customer Business Units does Pfizer
15  have?
16  A.  One.
17  Q.  Who is in charge of it?
18  A.  Michael Suesserman.
19  Q.  Is there any particular division or group
20  within the Customer Business Unit -- well, let me step
21  back for a second.
22  What does the Customer Business Unit do?
23  A.  The Customer Business Unit is charged with
24  calling on third-party payers; developing Pfizer's
25  marketing materials that are non brand specific; for

Page 70

1 developing Pfizer's customer strategy; for developing
2 Pfizer's market strategy. Additionally, we are
3 responsible for liaisoning with the Therapeutic
4 Business Units and managing contracts.
5    Q. With third-party payers?
6    A. With third-party payers and others.
7    Q. Who are the others?
8    A. The others could include government
9 entities -- entities.
10    Q. In preparation for this deposition, did you
11 speak with Michael Suesserman?
12    A. I -- Yes, I did.
13    Q. What did you and Mr. Suesserman talk about?
14    A. The fact that I was going to be participating
15 in this deposition.
16    Q. Anything else?
17    A. No.
18    Q. Did you ask Mr. Suesserman about any
19 information he had regarding the marketing or
20 promotion of Neurontin directly to third-party payers?
21    A. I did not ask him, primarily because he was
22 not in a position to know that information.
23    Q. Did he tell you that?
24    A. He did not tell me that directly.
25    Q. He is in charge, though, of this Customer

Page 71

1 Business Unit that has as part of its responsibilities
2 the communications with third-party payers; right?
3    A. That is --
4    MR. MIZELL: Object to form.
5    A. That is correct.
6    Q. Besides speaking with Mr. Suesserman about
7 the fact that you were going to be doing this
8 deposition, did you have any other communications or
9 conversations about Pfizer's communications with
10 third-party payers, Pfizer's marketing or promotion of
11 Neurontin directly to third-party payers, or Pfizer's
12 organizational structure --
13    MR. MIZELL: Object to the form.
14    Q. -- used for communications with third-party
15 payers?
16    MR. MIZELL: Sorry. Object to the form of the
17 question.
18    A. Not with Michael Suesserman.
19    Q. So you just made the assumption that Mr.
20 Suesserman was not in a position to know about these
21 issues. Is that correct?
22    MR. MIZELL: Object to the form.
23    A. I made the assumption based on my position
24 and the fact that I report to Mr. Suesserman.
25    Q. Do you have any communications with

Page 72

1 third-party payers?
2    A. That -- in my current position, I do not.
3    Q. Have you ever had communications with
4 third-party payers?
5    A. Yes.
6    Q. In what position?
7    A. When I was a Regional Account Manager, when I
8 was a National Account Manager, when I was an Area
9 Manager, when I was the Vice President of Managed
10 Markets West, and when I was the Senior Director of
11 National Accounts, Health Plans.
12    Q. In any of those positions, did you ever have
13 any communications with third-party payers regarding
14 Neurontin?
15    A. I did not.
16    Q. Which third-party payers did you have
17 communications with in any of those positions?
18    A. That is a very long list. I will start when
19 I was a Regional Account Manager in Charlotte, North
20 Carolina. Partners National Health Plan, CIGNA,
21 Aetna. These are regional subsidiaries of those
22 organizations. Carolinas Medical Center.
23    A number of health plans -- Well Care --
24 WellChoice, health plans that have been purchased and
25 don't exist today.

Page 73

1    Those are the ones that immediately come to
2 mind.
3    Blue Cross, Blue Shield of North Carolina. I
4 called on the Department of Veterans Affairs, the
5 Department of Defense, Aetna national, CIGNA national,
6 Kaiser, Medco --
7    Q. Wait, wait. Is this all while you were
8 regional?
9    A. No, now I'm moving on. Sorry.
10    Q. Okay. Which ones --
11    A. So now I'll move to the National Account
12 Manager job. I called on the Department of Veterans
13 Affairs and the Department of Defense.
14    Then when I was an area manager, they were
15 still Veterans Affairs and Department of Defense
16 customers, however, they were more local. So they
17 would be individual military treatment facilities.
18 VISN headquarters. VISN stands for Veterans
19 Integrated Systems Network, which is how the VA
20 healthcare system is subdivided across the United
21 States and managed.
22    Then when I became the Senior Director of
23 National Accounts, CIGNA, Aetna, Health Net, Kaiser,
24 Medco; CMS, that's the Centers for Medicare and
25 Medicare Services. That's a government entity.

Page 74

1  Welpoint; Anthem, prior to Anthem purchasing Welpoint.
2      I believe I have them all.  If I think of
3  another one, I'll let you know.
4      Then when I was the Vice President of Managed
5  Markets West, Kaiser, Regents, Blue Cross-Blue Shield
6  of Arizona, Health Net, both primarily regional
7  subsidiaries of Health Net, Iowa Medicaid.  Health
8  Partners, Blue Cross-Blue Shield of Minnesota.  Kaiser
9  Colorado, Blue Cross-Blue Shield of Texas.
10     I'm sure there are others, but that's all I
11  can recall at this time.
12     Q.   And in -- is it correct that in not one of
13  those communications you had with any of those
14  third-party payers, did you ever discuss Neurontin?
15     A.   That is correct.  Pfizer did not -- or the
16  Managed Markets organization in its various forms did
17  not promote Neurontin.
18     Q.   Today are you still in some way responsible
19  for Managed Markets, the Managed Markets organization
20  for Pfizer?
21     A.   In my capacity today, I'm responsible for
22  communicating all the activities that take -- take
23  place with our managed markets customers, as well as
24  the development of our strategies with managed markets
25  to the business units.

Page 75

1      Q.   Does Pfizer promote any drug to the Managed
2  Markets organization -- to the managed markets?
3      A.   Yes.
4      Q.   Which ones?
5      MR. MIZELL:  Object to the form.
6      A.   I'll start with Powers.  The Powers Business
7  Unit promotes Aricept, Geodon, Lyrica, Rebif, and
8  Celebrex.
9      The Steere Business Unit promotes Detrol LA,
10  Viagra and Chantix.  And they have been promoting
11  Zyrtec, but it's -- it's gone off patent.
12     The Pratt Business Unit promotes Lipitor and
13  Caduet.
14     The Specialty Business Unit and I'll try to
15  get all the products that they are responsible for
16  promoting, because many of these products are not
17  utilized by third-party payers or managed markets,
18  they're hospital-based markets.  Eraxis, Vfend,
19  Genatropine, Sutent, Aromacin.  We have a new HIV
20  product out.  We have Viracept and there is one other
21  HIV product and I don't recall -- oh, Selzentry.  Oh,
22  and Xalatan.
23     Q.   Any others?
24     A.   Not that I recall.
25     Q.   Going become to the database issues, you

Page 76

1  talked about the operating plan for Kaiser that you
2  reviewed in 2006.  And you --
3      Q.   Did you determine whether there were any
4  operating plans for Aetna?
5      A.   Yes, there is.
6      Q.   Did you review those documents?
7      A.   I reviewed the 2006 Aetna operating plan.
8      Q.   Were there operating plans for Aetna before
9  2006?
10     A.   Yes.
11     Q.   Did you review those?
12     A.   They were -- they -- a number of them have
13  been presented to me.  I did not review them in
14  preparation for this.
15     Q.   When you say a number of them have been
16  presented to you, does that mean you have copies of
17  them, you just didn't look at them?
18     A.   No, it means I sat in a meeting room in which
19  the presentation was made to me by the National
20  Account Manager responsible for Aetna.
21     Q.   And he went through the operating plans?
22     A.   That is correct.
23     Q.   What did he tell you about the operating
24  plans for Aetna?
25     MR. MIZELL:  Object to form.

Page 77

1      A.   Essentially every operating plan is --
2  follows a similar format.  And it has a -- an
3  executive summary, a situational analysis, and then
4  individual product strategies and tactics.  The
5  products included in the operating plan are only
6  products that Pfizer is actively promoting.
7      Q.   Were the operating plans for Aetna -- did the
8  operating plans for Aetna before Pfizer quit promoting
9  Neurontin contain information about promotions for
10  Neurontin?
11     MR. MIZELL:  Object to the form.
12     A.   None that I am aware of.
13     Q.   Did you look at them?
14     A.   I would have looked at -- Let's see.  I would
15  have looked at them after Pfizer promoted Neurontin --
16  stopped promoting Neurontin.
17     Q.   So you didn't look at any of the operating
18  plans for Aetna before Pfizer stopped promoting
19  Neurontin?
20     MR. MIZELL:  Objection.
21     A.   I'm not aware that there were operating plans
22  for Aetna prior to that time.
23     Q.   Did you ask if there were operating plans
24  prior to Pfizer's cessation, stopping of promoting
25  Neurontin?

Page 78

1    A.   I did not.
2         MR. MIZELL: Object to the form.  Object to the
3    form.
4    A.   I did not.
5    Q.   Would the operating plans for Kaiser have
6    followed the same general structure, with an executive
7    summary, situational analysis and then individual
8    product strategies and tactics?
9    A.   Yes.
10   Q.   Did you review any operating plans -- let's
11   just put a date in here.   2004 is when Pfizer stopped
12   promoting Neurontin?
13        MR. MIZELL: Object to the form.
14   Q.   Correct?
15        MR. MIZELL: Same objection.
16   A.   Kaiser stopped -- Pfizer stopped promoting
17   Neurontin when it went generic.  I'm not sure
18   specifically when in 2004 that -- or if it even was
19   2004.
20   Q.   I was just trying to shorten up the question.
21   That's what I was trying to do.
22        If it is correct that Pfizer ceased promoting
23   Neurontin in 2004 when it went generic, do you know --
24   well, did you review any of the operating plans before
25   that date?

Page 79

1    A.   I am only aware of the operating plans that
2    existed when I assumed responsibility for the national
3    accounts.  So the answer to your question is no, I did
4    not, because I don't know whether they exist.
5    Q.   And you assumed that position in 2007; right?
6    A.   No, I assumed that position in two thousand
7    -- let's see -- 2002.
8    Q.   Okay.  So you would know what was in
9    operating plans between 2002 and 2004?
10   A.   Correct.
11   Q.   And the operating plan for Kaiser -- in any
12   operating plan for Kaiser between 2002 and 2004, are
13   there any references to Neurontin?
14   A.   No, because we were not promoting Neurontin.
15   Q.   To Kaiser?
16   A.   We were not promoting Neurontin to any of our
17   third-party payers.
18   Q.   And you know that because of what Mr. Butera
19   told you?
20        MR. MIZELL: Object to the form.
21   A.   No, I know that because of my position in
22   leadership and that that was the guidance that was
23   given.
24   Q.   By who?
25   A.   By our senior management, starting --

Page 80

1    starting as high as Karen Katen, who was the President
2    of Pfizer Pharmaceuticals.
3    Q.   Did Ms. Katen tell you that directly?
4    A.   She did not tell me directly.  I, however,
5    have read a memorandum that she wrote.
6    Q.   What memoranda are you talking about?
7    A.   It was a memorandum that went to her direct
8    report -- or at least three people who reported
9    directly to her, outlining Pfizer's -- Pfizer's
10   position on promoting Neurontin.
11   Q.   Is that the memo where she talked about
12   promoting Neurontin for off-label uses?
13        MR. MIZELL: Object to the form.
14   A.   I'm not sure if that is the memo that you are
15   referring to.
16   Q.   I'm trying to figure out which one you are
17   referring to, so...
18        Do you recall whether in this Katen memo that
19   you recall there was any reference to the off-label
20   promotion of Neurontin?
21   A.   I do not recall whether that was mentioned in
22   the memo.
23   Q.   What does it mean to off-label promote a
24   drug?
25        MR. MIZELL: Object to the form.

Page 81

1    A.   Promoting a product off-label is promoting a
2    product for a non-FDA-approved indication.
3    Q.   Do you know what the FDA approved indications
4    were for Neurontin?
5    A.   Upon the acquisition of
6    Warner-Lambert/Parke-Davis, it was indicated, as I
7    recall, for epilepsy, the treatment of epilepsy.
8    Q.   Anything else?
9    A.   It eventually received an indication for
10   post-herpetic neuralgia.
11   Q.   Anything else?
12   A.   Not that I'm aware of.
13   Q.   Do you know whether Neurontin was approved by
14   the FDA for only certain treatments of epilepsy?
15   A.   I am not aware of that.
16   Q.   When you were Area -- let's go back.
17        When you were Senior Director of National
18   Accounts Health Plans, what were your
19   responsibilities?
20   A.   I was responsible for supervising the
21   National Account Managers, who called on 11 accounts,
22   the largest 11 health plans in the country, as well as
23   Medco and CMS, the centers for Medicaid and Medicare
24   Services.
25   Q.   Who are these 11 accounts?

21 (Pages 78 to 81)

Page 82

1    A.  The 11 accounts were Aetna, CIGNA, Welpoint,
2  Health Net, Kaiser, Medco, CMS, United.
3        I'm running through them in my head.  There
4  are two more.  Humana and Anthem.
5    Q.  Let me give you a piece of paper and we'll go
6  through them.  I only have ten.  Would it help you?
7    A.  Health Net, CIGNA, Aetna, CMS, Medco, United,
8  Humana, Welpoint, Anthem, Kaiser.
9    Q.  So when you said there were 11 accounts --
10    A.  And CMS, did I say CMS?
11    Q.  You did say CMS.
12        You said there were 11 accounts, Medco and
13  CMS?  When you say 11, did that include Medco and CMS?
14    A.  Yes, that is correct.  It includes those.
15  So it was actually nine defined health plans, and then
16  Medco, because Medco is the PBM for United.
17    Q.  When you say United, you are talking about
18  United Health?
19    A.  Health Group.
20    Q.  What does a PBM do for a health benefit plan?
21    A.  PBMs, pharmacy benefit managers, offer a
22  variety of services for their client.  The services
23  can range from just straight claims adjudication that
24  takes place within the retail pharmacy, to disease
25  management, to mail order services, to actually

Page 83

1  managing an employer's entire pharmacy benefit that
2  they offer to their employees.
3    Q.  And the services that a particular PBM
4  provides to a health benefit plan will depend upon the
5  particular arrangement or contract between that PBM
6  and the plan; right?
7    A.  That is correct.
8    Q.  Does Pfizer have any operating plans -- well,
9  let's step back for a second.
10        Did Warner-Lambert have operating plans for
11  Kaiser?
12    A.  I -- I don't know.
13    Q.  Did you ask anyone?
14    A.  I did not.
15    Q.  Did Warner-Lambert have any operating plans
16  for Aetna?
17    A.  I don't know.
18    Q.  Do you know -- excuse me.  Did you ask
19  anyone?
20    A.  No, I did not.
21    Q.  Does Pfizer have an operating plan for
22  Guardian Life?
23    A.  No, we do not.
24    Q.  Do you know whether Warner-Lambert had an
25  operating plan for Guardian Life?

Page 84

1    A.  I do not know.
2    Q.  Does Pfizer have an operating plan for
3  Louisiana Health Service Indemnity Company, doing
4  business as Blue Cross-Blue Shield of Louisiana?
5    A.  No, we do not.
6    Q.  And how do you know that?
7    A.  Because for regional accounts, we have
8  business plans.  Operating plans are only done for
9  large, national accounts.
10    Q.  Does Pfizer have a business plan for Blue
11  Cross-Blue Shield of Louisiana?
12    A.  I don't know.
13    Q.  Did you ask anyone?
14    A.  I did not.
15    Q.  If Pfizer has a business plan for Blue
16  Cross-Blue Shield of Louisiana, might that plan have
17  information about communications with Blue Cross-Blue
18  Shield of Louisiana?
19        MR. MIZELL: Object to form.
20    A.  That would be speculative, whether it's
21  there.
22    Q.  You don't know one way or the other?
23    A.  I do not know.
24    Q.  So let me understand:  From a structure
25  perspective, Pfizer has operating plans for the larger

Page 85

1  third-party payers and then -- correct?
2    A.  That is correct.
3    Q.  And then for the smaller third-party payers,
4  like Blue Cross-Blue Shield of Louisiana, you would
5  have business plans?
6    A.  We have business plans for assigned accounts.
7    Q.  And if Blue Cross-Blue Shield of Louisiana is
8  an assigned account, then there would be a business
9  plan?
10    A.  That is correct.
11    Q.  What type of information is in a business
12  plan?
13    A.  A business plan typically lists what types
14  of -- first they would have some type of situational
15  analysis, much less comprehensive than an operating
16  plan.  Then it would contain specific goals.  And then
17  there would be a list of -- an ongoing list of tactics
18  that have been implemented to accomplish those goals.
19    Q.  Who prepares the business plans for assigned
20  accounts?
21    A.  Account managers.
22    Q.  Who prepares the operating plans for the
23  larger accounts?
24    A.  The National Account Operator -- National
25  Account Managers, in conjunction with the Account

Page 86

1 Directors and the Customer Development Managers.
2    Q.   So for Kaiser, for instance, the operating
3 plan would be prepared by Mr. -- well, who would the
4 operating plan be prepared by for Kaiser?
5    A.   The National Account Manager.
6    Q.   Kirk Bachman?
7    A.   That's correct.
8    Q.   And then anyone else that would work on the
9 operating plan for Kaiser?
10    A.   Yes, the Account Director.
11    Q.   And who is the Account Director for Kaiser?
12    A.   Michelle Gile is currently.
13    Q.   And then the Customer Development Manager
14 would also participate in the preparation of the
15 operating plan for Kaiser?
16    A.   Yes, in the future.
17    Q.   Is that condition currently filled?
18    A.   It's filled now; but at the time, when the
19 operating plan was developed, it was not filled. It's
20 a newly-created position.
21    Q.   So for the Kaiser operating plan for 2006,
22 was that prepared by Kirk Bachman and Michelle Gile?
23    A.   Yes.
24       Oh, no.  For 2006?
25    Q.   Right.

Page 87

1    A.   No.  It was -- Michelle Gile in her account
2 director position, that is a newly created position.
3 That was created in January 2007.  So the 2006
4 operating plan would have been prepared by Kirk
5 Bachman.
6    Q.   Anyone else?
7    A.   There may have been a Managed Market Marketer
8 assigned, but I'm not aware if that actually -- that
9 assignment actually existed.
10    Q.   Does the managed market -- do the Managed
11 Market Marketers report to you?
12    A.   No.
13    Q.   Indirectly?
14    A.   No, they don't.
15    Q.   What division of Pfizer are they under?
16    A.   They used to be under Managed Markets
17 Marketing.  When Pfizer did the transformation at
18 which -- which fell under U.S. Marketing, which fell
19 under the U.S. Business Group.
20       In January, when Pfizer went to the
21 Therapeutic Business Unit as well as the Customer
22 Business Unit, that position moved over into the
23 Customer Business Unit, and the duties and
24 responsibilities of that position changed to the
25 newly-created Customer Development Manager position.

Page 88

1    Q.   Was there a particular Managed Markets
2 Marketing person with responsibility for Kaiser prior
3 to this organizational change?
4    A.   Not that I am aware of.
5    Q.   Did you ask?
6    A.   No, I did not.
7    Q.   Was there a Managed Market Marketing person
8 responsible for Aetna prior to this organizational
9 change?
10    A.   Yes.
11    Q.   Who was that?
12    A.   The last one I recall, because several of
13 those individuals left the company, is Elizabeth Paul.
14    Q.   Do you know whether she assisted in the
15 preparation of the operating plan for Aetna?
16       MR. MIZELL: Object to form.
17    A.   She -- she did.  However, she left the
18 company.  So when she was with the company in this
19 capacity as a Managed Market Marketer, she did help
20 prepare several of the operating plans for Aetna.
21    Q.   Do you know whether she helped to prepare
22 operating plans for any other third-party payer?
23    A.   Yes.
24    Q.   Which ones?
25    A.   Welpoint and CIGNA are the only two that I

Page 89

1 recall, other than Aetna.
2    Q.   Before Ms. Paul had that position, who had
3 her role?
4    A.   No one that had role specifically, because it
5 was a newly created role.
6    Q.   Were there other Managed Market Marketers who
7 assisted in preparing operating plans for other
8 third-party payers?
9    A.   Yes.
10    Q.   Who?
11    A.   The individuals that I can recall, Colleen
12 Reilly, Greg Brazola (phonetic), Julie Cheu, C-h-e-u.
13 And I don't recall the names of -- of others.
14    Q.   You mentioned that the business plan would
15 contained specific goals?
16    A.   Yes.
17    Q.   Can you give us some examples of goals?
18    A.   A goal would be to -- to obtain second tier
19 formulary access for an individual product.
20    Q.   A Pfizer product?
21    A.   Yes.
22    Q.   So the goals were about what kind of access
23 you were seeking for a particular Pfizer product?
24    A.   The goals centered around three areas:
25 Performance, access and relationships.

1   Q.   What do you mean when you say "performance"?
2   A.   Performance of a product; whether that's
3   market share growth, increased dollar volume.
4   Q.   Any other ways that you evaluate performance?
5   A.   Those are the two primary ways.
6   Q.   How do you evaluate access?
7   A.   Formulary access.
8   Q.   And in particular being on one tier versus
9   another tier?
10  A.   Potentially.  It varies product by product.
11  Q.   Anything else that you define as access?
12  A.   No, that's the primary definition.
13  Q.   And then "relationships," what does that
14  mean?
15  A.   It's cultivating relationships within the
16  organization that you are calling on.
17  Q.   Any particular individuals within the
18  third-party payers that you would focus on?
19  A.   Pharmacy Directors.
20  Q.   Any others?
21  A.   Every third-party payer looks different.
22  Os -- And depending on the individual channel, the
23  different people that you would be interacting with
24  are different.  It could in a generic way be a Medical
25  Director.  If the plan contracts, it could be

1   cultivating a relationship with the Contract Manager.
2   Q.   And so those goals, to the extent they are
3   relationship-oriented, are specific to the particular
4   plan that you are calling on?
5       MR. MIZELL:  Object to form.
6   A.   The plan or whatever third-party payer or
7   entity has been assigned to you.
8   Q.   Do you know what a P&T Committee is?
9   A.   Yes, I know what a P&T Committee is.
10  Q.   And P&T stands for?
11  A.   Pharmacy and Therapeutics Committee.
12  Q.   Is access or calling on P&T Committee members
13  important to Pfizer?
14      MR. MIZELL:  Object to form.
15  A.   The decisions made by the P&T Committee are
16  important to Pfizer.
17  Q.   Why do you say that?
18  A.   Because Pharmacy and Therapeutic Committees
19  typically made recommendations around formulary
20  additions.
21  Q.   And who would typically, or what types of
22  individuals, typically sit on P&T Committees?
23  A.   It depends on the customer, the third-party
24  payer.
25  Q.   Would you consider business plans to be part

1   Pfizer's database that may contain contents of
2   communications with third-party payers?
3   A.   Yes.  And to clarify my earlier reference to
4   database, business plans are housed in HC Exchange.
5   Q.   Are operating plans housed within the HC
6   Exchange as well?
7   A.   No.
8   Q.   Where are they housed?
9   A.   They are posted on MMWeb, which stands for
10  "Managed Markets Web."
11  Q.   And you also mention as a database the
12  Contracting Department?
13  A.   Yes.
14  Q.   What type of information would be in the
15  Contracting Department?
16  A.   The Contracting Department maintains a
17  variety of records; records that -- of -- of hard copy
18  communications between customers, contracts;
19  additionally, in their contract software application
20  where the development of the contract takes place, the
21  various versions of the contract as it goes back and
22  forth throughout negotiation are housed there.
23      In addition, on the contract compliance side,
24  an extensive database is maintained based on the
25  claims that have been submitted by the third-party

1   payer that we have contracted with.
2       And then all of the subsequent data scrubs
3   that take place, as well as Pfizer's final
4   reconciliation of the data that was submitted by a
5   customer and what rebates -- rebates, if any, were
6   paid.
7   Q.   Does Pfizer consider third-party payers to be
8   part of their customers?
9   A.   Yes.
10  Q.   When you were talking about under contract
11  compliance the extensive database based on claims
12  submitted by third-party payers.  What types of claims
13  would the third-party payers submit to Pfizer?
14  A.   Well, in order for -- when you negotiate a
15  contract with a customer, generally the contract
16  requires some type of data submission so we can know
17  exactly what the utilization is of a given product to
18  pay a rebate.
19      So as I previously indicated, most retail
20  pharmacies out there use wholesalers to obtain their
21  product.  A patient goes to a pharmacy to pick up
22  their prescription.  Their prescription is then
23  adjudicated back to whoever the ultimate third-party
24  payer is.  It's that submission, that claim that the
25  payer is submitting to us for reimbursement.

Page 94

1    Now, we run an extensive process around
2  duplicate claims.  Every claim has an individual
3  identifier.  And there are many situations where a
4  claim will go through an individual PBM, for example,
5  and be assigned back to an employer, and we may get it
6  submitted -- what we call a duplicate claim.  But it's
7  how we pay a rebate.
8    Q.  How much detailed information do you get
9  about the claims?
10   A.  Well, we get a lot of information in
11 accordance with HIPAA requirements.  So, for example,
12 we don't get patients' names or anything like that.
13 It's typically the -- the product, the dose, day's --
14 days supply, units.
15   There may be other fields, but those are the
16 primary ones.
17   Q.  Do you get information on diagnosis or
18 indication for which the drug is prescribed?
19   A.  No.
20   Q.  Do you know whether the third-party payers
21 get that type of information?
22   A.  They might.  There's -- there's no mechanism
23 in a pharmacy channel to actually marry those two up.
24   Q.  The prescription --
25   A.  Versus the diagnosis.

Page 95

1    Q.  In the work that you have done as a Pfizer
2  employee, do you obtain information about Pfizer's
3  analysis of what types of indications its drugs are
4  used for?
5    A.  I -- I have seen that information as -- as
6  best as we are able to determine that.
7    Q.  And how do you get information to make those
8  conclusions?
9    A.  That information typically is acquired
10 through outside consulting firms.
11   Q.  Such as?
12   A.  IMS.
13   Q.  Any others?
14   A.  Wolters Kluwer.
15   Q.  Any others?
16   A.  Those are the two primary ones that I'm
17 familiar with.
18   Q.  Did you ever heard of an outside consulting
19 firm called Scott Levin?
20   A.  Yes.
21   Q.  Is that another one?
22     MR. MIZELL: Object to form.
23   A.  I don't know whether they give
24 indication-specific data.
25   Q.  As a Pfizer employee, have you relied upon

Page 96

1  information obtained through IMS to determine for what
2  indications Pfizer drugs might be used?
3      MR. MIZELL: Object to form and outside the
4  scope.
5    A.  Not to determine.
6    Q.  To estimate?
7      MR. MIZELL: Same objections.
8    A.  Not to estimate.  I mean, the indications are
9  the indications.
10   Q.  So is it important to you as a Pfizer
11 employee to understand how your drugs are being used?
12   A.  I mean, the indications are the indications.
13 So when the data comes in and you are indicated for
14 AED, it's going to say:  This is the percentage of the
15 data -- of the data that they have available around
16 AED use.
17   However, as I already indicated, that is very
18 difficult information to accurately obtain.
19   Q.  So, for instance, you mentioned AED.
20 Neurontin is used as an anti epileptic drug; right?
21   A.  That is correct.
22   Q.  And Neurontin is used sometimes for AED, but
23 it can be used -- AED, but it can be used for other
24 purposes as well; right?
25   A.  Neurontin has two indications that I am aware

Page 97

1  of:  The treatment of epilepsy, as well as
2  post-herpetic neuralgia.
3    Q.  Do you know whether Neurontin is used for any
4  other indications?
5    A.  That's certainly something that could happen.
6  Physicians practice medicine and they have access to
7  data that I am not privy to.
8    Q.  Do you know whether Neurontin is used for any
9  other indications other than epilepsy and
10 post-herpetic neuralgia?
11     MR. MIZELL: Object to the form.
12   A.  In the United States, Neurontin is indicated
13 for those two products.
14   Q.  Do you mean --
15   A.  I mean those two indications.
16   Q.  Do you know whether Neurontin is used for any
17 other indications other than epilepsy or post-herpetic
18 neuralgia?
19     MR. MIZELL: Object to the form.
20   A.  I do not have firsthand knowledge of
21 Neurontin being used for other -- other things than
22 the approved indications.
23   Q.  Do you consider yourself to be an executive
24 of Pfizer?
25   A.  Yes.

25 (Pages 94 to 97)

Page 98

1  Q.  As a Pfizer executive, is it your
2  understanding that Neurontin is used by doctors for
3  indications other than epilepsy or post-herpetic
4  neuralgia?
5      MR. MIZELL: Object to the form and outside the
6  scope.
7  A.  I don't call on physicians, so how physicians
8  prescribe the product is beyond what I'm aware of.
9  Q.  As a Pfizer executive, do you believe that
10 Neurontin is used solely to treat epilepsy and
11 post-herpetic neuralgia?
12     MR. MIZELL: Object to the form and outside the
13 scope.
14 A.  I am sure that physicians use a number of
15 products based on their own clinical practice.
16 Q.  That wasn't my question.  And that wasn't an
17 answer to my question.
18     Here's the question, Mr. Henderson:  As a
19 Pfizer executive, is it your understanding that
20 Neurontin is used to treat conditions other than
21 epilepsy or post-herpetic neuralgia?
22     MR. MIZELL: Object to the form and outside the
23 scope.
24 A.  It is possible.
25 Q.  Do you have any understanding that it is used

Page 99

1  for any other indications?
2  A.  I have no --
3      MR. MIZELL: Object to the form.  Outside the
4  scope of the designation.
5  A.  I have no firsthand knowledge of it being
6  used.
7  Q.  I understand you have no firsthand knowledge.
8  Because I assume -- and I assume you are saying that
9  because you are not in the doctors' office when
10 prescription are written; right?
11 A.  That is correct.
12 Q.  So let's put aside any information that you
13 have because you don't sit in doctors' offices, other
14 than I assume for family members or for yourself when
15 prescriptions are written.  As an executive of a
16 pharmacy -- pharmaceutical company, do you have any
17 understanding as to how Neurontin is used?
18 A.  No --
19     MR. MIZELL: Object to the form.  Outside the
20 scope of the designation.
21 A.  No, and it's not just because I don't call on
22 doctors.  It's also because we didn't -- we didn't
23 promote Neurontin.  So I did not enter into
24 discussions with any third-party payers around
25 Neurontin and what it was being used for.

Page 100

1  Q.  When Pfizer first acquired Warner-Lambert,
2  what were the drugs that Warner-Lambert had in its
3  portfolio?
4      MR. MIZELL: Outside the scope.
5      But go ahead and answer if you can.
6  A.  I'll answer it as best I can from memory.
7      Arthrotec; of course, Lipitor; Neurontin,
8  Estrostep, and Dilantin.  And those are the ones that
9  I definitively recall.
10 Q.  Okay.  So you do recall that one of the drugs
11 that Warner-Lambert had in its portfolio when Pfizer
12 acquired it was Neurontin; right?
13 A.  Yes.
14 Q.  And at the time that Pfizer acquired
15 Warner-Lambert, were the sales of Neurontin in excess
16 of a billion dollars?
17 A.  I don't recall.
18     MR. MIZELL: Outside the scope of the
19 designation.
20     But answer if you can.
21 A.  I don't recall.
22 Q.  Was Neurontin one of the significant drugs
23 that Warner-Lambert had in its portfolio?
24     MR. MIZELL: Object to form.  Outside the
25 scope.

Page 101

1  A.  I don't -- I don't recall.
2  Q.  Have you ever seen any analyses of the uses
3  of Neurontin?
4      MR. MIZELL: Object to form.
5  A.  None that I am aware of.
6  Q.  Have you ever seen any Pfizer operating plans
7  or marketing plans for Neurontin?
8  A.  For Neurontin, no.
9  Q.  Did you ever see any Pfizer marketing or
10 operating plans where Neurontin is mentioned?
11 A.  Not Neurontin as a branded product.
12 Q.  Marketing plans referencing -- have you seen
13 operating plans or marketing plans representing
14 gabapentin?
15 A.  Yes.
16     MR. MIZELL: Object to form.
17     THE WITNESS:  Sorry.  I've got to slow down.
18 Q.  Let me break that down.
19     Did you see an operating plan for gabapentin?
20     MR. MIZELL: Object to form.
21 A.  I have not seen an operating plan for
22 gabapentin.  I have seen operating plans that mention
23 gabapentin.
24 Q.  Have you seen a marketing plan that mentions
25 gabapentin?

26 (Pages 98 to 101)

1    A.  Yes.
2    Q.  And what -- let's start with the operating
3  plan.
4         What did the operating plan that you recall
5  say about gabapentin?
6         MR. MIZELL: Object to form.
7    A.  The operating plans don't say anything about
8  gabapentin.  They list gabapentin as one of the
9  products that are part of the anti epileptic drug
10  market basket, as defined by products that are
11  indicated for epilepsy, which includes branded and
12  generic products.
13    Q.  And how did the marketing plans mention
14  gabapentin?
15    A.  The marketing plan just listed gabapentin as
16  a product that was indicated for the treatment of
17  epilepsy.
18    Q.  What is the time period of these operating or
19  marketing plans that you are referencing?
20    A.  The most recent one that I saw was 2008, a
21  2008 operating plan.
22    Q.  In connection with those -- well, let's step
23  back.  Do you see or have you ever --
24         MS. DALEY: Strike that.
25    Q.  Have you ever seen operating plans mentioning

1  gabapentin prior to the 2008 one?
2         MR. MIZELL: Object to form.
3    A.  Yes.
4    Q.  Which ones?
5         MR. MIZELL: Same objection.
6    A.  Which operating plans?
7    Q.  Correct.
8    A.  The most recent ones that I had seen have
9  been the Lyrica operating plans.
10    Q.  Any others?
11    A.  As I mentioned earlier, it is possible in an
12  operating plan that there is a reference to gabapentin
13  being part of the anti epileptic drug therapeutic
14  basket, but I don't recall seeing that in any other
15  operating plans.
16    Q.  What marketing plans other than the most
17  recent one do you recall that mention gabapentin?
18    A.  Lyrica.
19         MR. MIZELL: Object to form.
20    A.  Lyrica.
21    Q.  Any others?
22    A.  No.
23    Q.  Is Lyrica considered to be an anti epileptic
24  drug?
25    A.  Lyrica -- Lyrica is a product that is used

1  for partial onset seizures.  It's indicated for that.
2  So as we define the therapeutic market basket for the
3  anti epileptic drugs, Lyrica is part of that market
4  basket.
5    Q.  Do you recall when Neurontin was approved by
6  the FDA for post-herpetic neuralgia?
7    A.  I don't recall the exact date.  I think it
8  was 2002, but I -- I'm not -- I don't know
9  definitively if that's correct.
10    Q.  Let's just assume it's correct.  In 2002,
11  when the FDA approved Neurontin for post-herpetic
12  neuralgia, did Pfizer communicate to any third-party
13  payers that approval by the FDA?
14    A.  I am not aware of Pfizer proactively
15  communicating that indication to any third-party
16  payers.
17    Q.  Did you ask anyone if they did?
18    A.  No.  And the reason I did not ask anyone is
19  because I was part of the meetings that occurred in
20  which the decision was made that we would respond only
21  to requests by third-party payers.
22    Q.  What meeting are you talking about?
23    A.  This was a PHN, post-herpetic neuralgia,
24  launch meeting in which the Managed Markets Group was
25  informed that we were going to get this indication,

1  and it was possible that we might get a medical
2  inquiry into the indication.
3    Q.  Who was at that meeting?
4    A.  Claire Kennedy.
5    Q.  Anyone else?
6    A.  -- who was the Director of National Accounts
7  who I reported to.   The Account -- the Area Manager,
8  myself in the east.  Ron Woodyard in the west; as well
9  as the National Account Managers that were employed by
10  Pfizer at the time.
11    Q.  Who are they?
12    A.  I -- I can't recall all their names.
13    Q.  Was the decision to respond only to requests
14  by third-party payers made by the entire group or made
15  by an individual within that group?
16    A.  No, actually it was made by senior management
17  within Pfizer, I'm sure at the highest levels.
18  Because we were not promote Neurontin, nor had any of
19  us been trained on Neurontin.
20    Q.  When you mean -- when you say that you are
21  sure that the decision had been made at the highest
22  levels of Pfizer not to promote Neurontin, who are you
23  speaking of?
24    A.  Karen Katen, Pat Kelly, Hank McCrory.
25    Q.  Did you ever receive any training on

27 (Pages 102 to 105)

Page 106

1 promoting Neurontin?
2     A.  No.
3     Q.  Did any of the people reporting to you
4 receive training on promoting Neurontin?
5     A.  No.
6     Q.  Did any of people above you, to your
7 knowledge, receive training on how to promote
8 Neurontin?
9     A.  No -- Oh, wait.  Let me clarify that.  Your
10 question was on how to promote Neurontin.
11     Q.  Right.
12     A.  That is very different than training on an
13 individual product.
14         The training on how to promote Neurontin was
15 quite simple:  You are not to promote Neurontin.  The
16 training on the individual disease state and the
17 product and its indications we did not receive.
18     Q.  Now, when you say you received the training
19 to not promote Neurontin, you are referencing back to
20 the Katen memo?
21     A.  I'm referencing --
22         MR. MIZELL: Object to form.
23         Go ahead.
24     A.  I'm actually referencing to the guidance that
25 we were given when we acquired

Page 107

1 Warner-Lambert/Parke-Davis.
2     Q.  And how was that guidance given to you?
3     A.  That guidance was cascaded out through Field
4 Sales.
5     Q.  What do you mean by "cascaded out"?
6     A.  I don't recall the exact mechanism, whether
7 it was electronic or voicemail or a letter to -- to
8 our homes.
9         However, we were -- it was communicated to us
10 that only one sales group within all of Sales would be
11 promoting Neurontin.  That would be the 150 designated
12 folks I guess in the PD2 sales force, and that no one
13 else would be communicating anything about Neurontin;
14 and if we received any requests about it, requests for
15 information, we were to refer whoever was requesting
16 the information to our Medical Inquiry.
17     Q.  Is that part of the 150 people in the PD2
18 sales force?
19     A.  I'm not sure I understand your question.
20     Q.  Well, you said that only 150 -- only 150
21 people in the PD2 sales force were to be promoting
22 Neurontin; right?
23     A.  That is correct.
24     Q.  But if you received an inquiry --
25     A.  Oh --

Page 108

1     Q.  -- you were to send it to the Medical Group?
2     A.  No.  If we received an inquiry, we would
3 refer them to our Medical Information Group, where
4 medical inquiries go.  That is not the 150 people.
5     Q.  Did anyone ever tell you why this guidance
6 was given?
7     A.  I was not directly told why this guidance was
8 given.
9     Q.  What was your understanding as to why you
10 were told that you were not to promote Neurontin?
11     A.  My understanding was that there were
12 questions about how Neurontin had been promoted by
13 Warner-Lambert, Parke-Davis.
14     Q.  What were the questions about how
15 Warner-Lambert had promoted Neurontin?
16     A.  That was -- I was not made aware of.
17     Q.  Do you have any understanding as to what
18 these concerns were about how Warner-Lambert had
19 promoted Neurontin?
20     A.  I had no understanding at the time.  I was
21 not made aware.  I was just informed of the decision.
22     Q.  Did you ever obtain an understanding at a
23 later point in time?
24         MR. MIZELL: Object to form.
25     A.  Actually, in doing my due diligence for this

Page 109

1 deposition.
2     Q.  What did you find out?
3     A.  I actually was made aware of the Karen Katen
4 memo and read the Karen Katen memo.
5     Q.  Had you read the Karen Katen memo before you
6 began preparation for this deposition?
7     A.  No.
8     Q.  Did you start your preparation for this
9 deposition in September, 2007?
10     A.  Yes.
11         MS. DALEY: Do you want to take a break?
12         THE REPORTER: I always want to take a break.
13         THE VIDEOGRAPHER:  The time is approximately
14 12:49.  This ends Tape Number 2.  We are going off
15 the record.
16         (The luncheon recess is taken.)
17
18 CONTINUED DIRECT EXAMINATION BY MS. DALEY:
19         THE VIDEOGRAPHER: The time is approximately
20 1:40.  This begins Tape Number 3.  We are now on
21 the record.
22     Q.  Mr. Henderson, why did you decide to review
23 the Richter, Cavic and DeSimone deposition transcripts
24 prior to today's deposition?
25     A.  I did so at the recommendation of counsel to

28 (Pages 106 to 109)

1  have a further understanding of how Warner-Lambert/
2  Parke-Davis operated with third party payers.
3      Q.  And what did you learn from your review of
4  those transcripts regarding how Warner-Lambert
5  operated with respect to third-party payers?
6      A.  I learned that, based on what I read in the
7  depositions, that it was -- their method of operation
8  is very consistent with -- with the way Pfizer
9  operates.  And I adopt and accept the things that were
10  stated in that deposition -- those three depositions.
11     Q.  As Pfizer's -- on behalf of Pfizer and as its
12  designee, you adopt everything that was said in the
13  Richter, DeSimone and Cavic depositions?
14         MR. MIZELL:  I would clarify.  That would be
15         only with respect to the areas that he is
16         designated to testify about.
17     A.  Yes.
18     Q.  When you say Warner-Lambert's methods of
19  operation are very consistent with how Pfizer
20  operates, what do you mean?
21     A.  I mean just their organizational structure;
22  the way they called upon accounts and third-party
23  payers.
24     Q.  Okay.  What do you mean by "the way they
25  called on accounts and third-party payers"?

1      A.  How they interacted with third-party payers,
2  having account managers as the designated individuals
3  that would go in and provide on-label promotion to
4  their products.
5      Q.  Did you review any Warner-Lambert documents
6  to prepare for today's deposition?
7      A.  The only Warner-Lambert document I reviewed
8  was the Cavic exhibit that illustrated -- that he
9  hand-illustrated their organization, their org chart.
10     Q.  Any other Warner-Lambert documents you looked
11  at?
12     A.  No.
13     Q.  And when you reference Warner-Lambert's
14  interaction with third-party payers, having account
15  managers as the designated rep to provide on-label
16  promotion of their products, you are relying upon what
17  was said in those depositions?
18     A.  That is correct.
19     Q.  Would the marketing of Neurontin for bipolar
20  indications have been an off-label promotion?
21         MR. MIZELL:  Object to form.
22     A.  I'm not sure in what -- in what -- Are you
23  asking did Warner-Lambert and Parke-Davis -- I'm not
24  sure I follow you.
25     Q.  Would the marketing of Neurontin for use to

1  treat bipolar disorder have been an off-label
2  promotion?
3         MR. MIZELL:  Object to the form.
4      A.  Promotional -- and when I say promotional, I
5  think it's very important that I define the fact that
6  promotional is -- are materials that are approved by
7  Regulatory to promote.
8         Promoting products is on-label promotion.  So
9  when you say if you are talking about bipolar, that is
10  an off-label discussion, but that is certainly not
11  promotion.
12     Q.  Well, what do you mean by -- it seems to me
13  you are drawing a distinction between discussion and
14  promotion?
15         MR. MIZELL:  Object to form.
16     Q.  Am I wrong in that assumption --
17  understanding?
18     A.  Yes, you are.
19     Q.  Okay.
20     A.  What I am getting at is:  Within the Sales
21  organization, you are only allowed to talk to
22  customers about approved -- RC-approved, on-label
23  promotional materials.  Outside of that, you don't
24  have discussions, you don't have any kind of
25  communications around non-promotional, meaning non

1  approved, off-label diseases.
2      Q.  And is it your understanding that the way
3  that Warner-Lambert was set up, that they did not have
4  off-label promotions?
5         MR. MIZELL:  Object to form.
6      A.  Based on what I read in the depositions, that
7  is my understanding.
8      Q.  In connection with your preparation for
9  today's deposition, were you given the guilty plea
10  that was entered into in connection with what's been
11  referred to as the Franklin lawsuit?
12         MR. MIZELL:  Object to form.
13     A.  No.
14     Q.  Do you know anything about Warner-Lambert or
15  Pfizer admitting to off-label promotion?
16         MR. MIZELL:  Object to form.
17     A.  No, other than the fact that I've heard the
18  name Franklin, but that's --
19     Q.  Do you know anything about Warner-Lambert or
20  Pfizer admitting to off-label promotion of Neurontin?
21         MR. MIZELL:  Object to form.
22     A.  Not off-label promotion.
23     Q.  What do you mean by Franklin?
24     A.  The name.  And that there was some type of
25  settlement.  But that is as far as it goes.

1    Q.  Do you know that as part of that settlement,
2  hundreds of millions of dollars were paid by Pfizer
3  for penalties?
4       MR. MIZELL: Object to form.
5    A.  Again, I know the name and I know that there
6  was a settlement.
7    Q.  Do you know what the settlement -- what drug
8  was involved in that settlement?
9    A.  Anecdotally I've heard Neurontin, but I don't
10  even know that that was -- that it was exclusively
11  Neurontin.
12    Q.  Now, you mentioned earlier the Karen Katen
13  memo that you reviewed in preparation for today's
14  deposition; right?
15    A.  Uh-huh.
16    Q.  Yes?
17    A.  Yes.
18    Q.  Sorry.  You just have to answer verbally.
19    A.  Yes, yeah.
20    Q.  And that was a document you had not seen
21  before; right?
22    A.  That is correct.
23    Q.  It was given to you in preparation for this
24  deposition; right?
25    A.  That is correct.

1    Q.  Given to you by counsel?
2    A.  That is correct.
3    Q.  And you said that there was some type of
4  communication, whether it was voicemail or a letter
5  that came to the home that said only that the PD2 --
6  PD2 group could promote Neurontin.  Do you remember
7  that?
8       MR. MIZELL: Object to form.
9    A.  That is correct.  That is what I said.
10    Q.  When did that communication come out?
11    A.  It was some time after the acquisition,
12  during the transition of bringing
13  Warner-Lambert/Parke-Davis onboard with Pfizer.
14    Q.  Who sent that communication?
15    A.  I think the communication cascaded through
16  the Sales organization.  So it would have originated
17  through Hank McCrory.  Now, whether it was Hank
18  McCrory providing that information to his direct
19  reports and they sent it out to the rest of the
20  organization, I don't recall.
21    Q.  Who told you that it originated with Hank
22  McCrory?
23    A.  Hank McCrory was the Vice President in
24  charge -- in charge of Sales.
25    Q.  Was his name on the communication?

1    A.  No.
2    Q.  How do you know --
3    A.  No that I recall.
4    Q.  How do you know it originated through Mr.
5  McCrory?
6       MR. MIZELL: Object to form.
7    A.  Because Hank McCrory was responsible for the
8  entire Sales organization.
9    Q.  So you are making an assumption?
10       MR. MIZELL: Object to form.
11    A.  I'm making -- I'm making an assumption based
12  on my experiences within the Pfizer organization.
13    Q.  And you said this communication cascaded
14  throughout the Sales organization?
15    A.  Yes.
16    Q.  Who did you get it from?
17    A.  I know I definitely got it from my boss at
18  the time, Claire Kennedy.
19    Q.  And you definitely know this?
20    A.  Yes.
21    Q.  And what do you mean when you say you
22  definitively know this?
23    A.  I mean that I recall Claire notifying us
24  verbally that the products that were being acquired
25  through Parke-Davis/Warner-Lambert, it's very

1  important to recognize that Neurontin was one of a
2  number of products that Pfizer acquired, many of which
3  we were not planning on promoting as branded, on-label
4  products.
5    Q.  So you definitively recall now that this
6  communication came to you through Claire Kennedy
7  verbally?
8    A.  Uh-huh.
9    Q.  Yes?
10    A.  Yes.
11    Q.  And what did Ms. Kennedy tell you
12  specifically?
13    A.  She told us the products that we would be
14  promoting and the products that we would not.
15    Q.  What products were you promoting?
16    A.  Lipitor.  Lipitor was the only one that I
17  recall we were going to promote.
18    Q.  And what were the products you would not be
19  promoting?
20    A.  As I recall the list of products that we
21  acquired from Warner-Lambert/Parke-Davis, it would
22  include Arthrotec, Estrostep, Neurontin. I think
23  Accuretic was one. I don't recall.
24    Q.  So Ms. Kennedy told you that you would not be
25  promoting Neurontin, Arthrotec, Estrostep, Accuretic?

Page 118

1    A.  Yes, as I recall.
2    Q.  Who else did she provide this notification
3  to?
4    A.  She provided it to the other Federal Area
5  Manager, Ron Woodyard, as well as the National Account
6  Managers that reported up into her organization.
7    Q.  How do you know that went to Mr. Woodyard and
8  the other National Account Managers?
9    A.  Because we were all told at the same time.
10    Q.  Were you all in a room when you were told
11  that?
12    A.  Yes.
13    Q.  What room were you in?
14    A.  What room?
15    Q.  Right.
16    A.  I don't remember which room.
17    Q.  Where were you?  Were you in New York?
18    A.  Yes.
19    Q.  Was this a meeting that was called
20  specifically for this communication?
21    A.  The meeting was called around the entire
22  transition of the -- the Parke-Davis Warner-Lambert
23  acquisition.  As you can imagine, there are many, many
24  activities that need to take place when two companies
25  of this size merge.

Page 119

1    Q.  Did you -- Was there anything in writing ever
2  on this instruction from Ms. Kennedy?
3    A.  No, not that I'm aware of, or that I recall.
4    Q.  Does Ms. Kennedy still work for Pfizer?
5    A.  No.
6    Q.  Where does she work?
7    A.  She doesn't.
8    Q.  She retired?
9    A.  Yes.
10    Q.  Do you know where she lives?
11    A.  Yes.
12    Q.  Where?
13    A.  She lives in a suburb of Queens, New York.
14    Q.  So if this, the acquisition, occurred in
15  2000, do you think this meeting occurred some time in
16  2000?
17    A.  Yes.  There were a series of meetings that
18  occurred during that time.
19    Q.  Did you transmit this information to anyone
20  who reported to you?
21    A.  Yes, the Government Account Managers.
22    Q.  How did you transmit this information?
23    A.  As I recall, I did it via conference call,
24  and then reinforced it during our first plan of action
25  meeting.

Page 120

1    Q.  During your first plan of action meeting, was
2  that with your government accounts?
3    A.  Yes, Government Account Managers.
4    Q.  Okay.  "POA" stands for plan of action?
5    A.  That's correct.
6    Q.  Any other times you transmitted this
7  information?
8    A.  Not that I recall.
9    Q.  Other than this one meeting where Ms. Kennedy
10  provided this list of drugs that -- Warner-Lambert
11  drugs that were not to be promoted and the statement
12  that Lipitor was to be promoted, did you have any
13  other conversations about the issue of promoting
14  Neurontin?
15        MR. MIZELL: Object to form.
16    A.  I am sure that those conversations took
17  place.  However, I don't recall the specifics.
18    Q.  Now, you -- we talked before lunch about your
19  definition of "promoting."  Are you using that same
20  definition here?
21    A.  So let me clarify.  When I am talking about
22  promoting, I am talking specifically how it applies to
23  our, the Pfizer sales force and the Pfizer definition
24  of promotion.
25        So promoting a product means that we are

Page 121

1  using approved -- Regulatory-approved pieces to have
2  on-label discussions with customers.
3    Q.  So if they're off-label discussions, they
4  would not be considered promoting?
5    A.  No.  We don't have off-label discussions.
6    Q.  Is it your understanding that Warner-Lambert
7  used the same definition of promoting?
8    A.  From what I read in the dep -- the
9  depositions, the three depositions that I -- I read,
10  that was what was implied.
11    Q.  Was it your understanding that Warner-Lambert
12  did not have off-label discussions --
13        MR. MIZELL: Object to form.
14    Q.  -- on Neurontin?
15    A.  From what I read in the depositions, that was
16  what was implied.
17    Q.  Are you considered part of the Pfizer field
18  sales force?
19    A.  At this time, I'm not.
20    Q.  Have you ever?
21    A.  Yes.
22    Q.  When were you considered to be part of the
23  Pfizer field sales force?
24    A.  From October, 1991 until May of 2007.
25    Q.  And then you became an executive in May of

31 (Pages 118 to 121)

1   2007?  And that's --
2      A.  No, because of my responsibilities running
3   the Business Unit Liaison Group, I no longer fall
4   under the Sales arm.
5      Q.  Okay.  Does Pfizer have a handbook or a sales
6   guide that it uses with its field sales force?
7      A.  Yes.
8         MR. MIZELL: Object to form.
9      A.  Yes it's called the Orange Guide.
10     Q.  How long has Pfizer had -- have they always
11  called it the Orange Guide?
12     A.  Not to my knowledge.  They've always had
13  policies.
14     Q.  How long has it been called the Orange Guide?
15     A.  Since it's been published in an orange
16  binder, which I don't recall exactly what day -- I
17  mean what year, but it's been around for several
18  years.
19     Q.  Do you know why Pfizer decided to issue the
20  field sales force guide or the Orange Guide?
21     A.  I don't specifically know why.  I'm sure
22  there's a variety of reasons, part of which may be to
23  address the agreements as part of the pharma code.
24        But I do know that they wanted to -- when I
25  say "they,"  senior leadership wanted to ensure that

1   there was very specific guidance and direction around
2   activities that occur out in the field.
3      Q.  Including off-label promotion?
4      A.  Defining that -- further defining that you
5   would not -- you would not be participating in any
6   off-label promotion.  But, again, I hesitate to use
7   the word "promotion" because you are not promoting.
8   You do not talk about off-label use of a product.
9      Q.  Okay.  So if someone's out there talking
10  about the off-label use of the product, I understand
11  you are saying it's not promotion.
12        What would you call those discussions
13  someone's having with a customer about off-label uses?
14        MR. MIZELL: Object to form.
15     A.  Violations of corporate policy.
16     Q.  In connection with today's deposition, did
17  you undertake any investigation to determine whether
18  there were any violations of corporate policy
19  regarding Neurontin?
20        MR. MIZELL: Object to form.
21     A.  No, I did not.
22     Q.  In connection with your preparation for
23  today's deposition, did you undertake any efforts to
24  determine whether or not during the Warner-Lambert
25  area, there were violations of corporate policies

1   against off-label?
2         MR. MIZELL: Object to form.
3      A.  No, I did not.
4      Q.  I should say, regarding off-label
5   discussions.
6         MR. MIZELL: Same objection.
7      A.  Yes.
8      Q.  I'll try to remember to use the word
9   "discussions" rather than promotions.  Okay?
10        You understand that we are talking about
11  discussions regarding the off-label use of a
12  particular drug like Neurontin?
13     A.  Yes, I understand what you are saying.
14     Q.  What were the types of documents created or
15  maintained at the Warner-Lambert Healthcare Management
16  Unit?
17     A.  As I -- as I read in the deposition, it
18  sounded like they maintained formulary status; that
19  they maintained records around customer interactions.
20  But that was the most that I could glean from those
21  depositions.
22     Q.  Besides these two categories, the formulary
23  status and records around customer interactions, what
24  are the other types of documents created or maintained
25  at the Warner-Lambert Healthcare Management Unit?

1         MR. MIZELL: Object to form.
2      A.  I'm not aware of what documents were -- were
3   created by -- by that particular unit or maintained,
4   other than the ones that I -- I just talked about.
5   Because those were the only ones that I recall being
6   referenced in the depositions I read.
7      Q.  Do you know what happened to Mr. Cavic's or
8   Mr. Disimone's or Mr. Richter's files after Pfizer
9   acquired Warner-Lambert?
10        MR. MIZELL: Object to form.  Outside the
11  scope.
12     A.  No.
13     Q.  Do you recall reading in those depositions
14  where Mr. Cavic and Mr. DeSimone talked about how they
15  boxed things up and sent them to Morristown?
16        MR. MIZELL: Object to form.
17     A.  Yes, I do recall that, as well as I recall it
18  in Mr. Richter's deposition as well.
19     Q.  Did you ask anyone what happened to those
20  files?
21     A.  No.
22     Q.  Did you -- were you provided with access to
23  those files?
24     A.  No.
25     Q.  Have you ever seen any of the files that Mr.

Page 126

1  Richter, Mr. DeSimone and Mr. Cavic described in their
2  depositions?
3     A.  No.
4     Q.  Do you know whether those files still exist?
5     A.  No.
6     Q.  Do you know whether Pfizer maintains any of
7  the documents that were created from Warner-Lambert's
8  Healthcare Management Unit?
9     A.  No.
10       MR. MIZELL: To clarify that, you don't know
11    one way or the other?
12       THE WITNESS:  That is correct.  I don't know
13    one way or the other.
14       MS. DALEY: Thanks.  I didn't mean to ask a
15    confusing question.  I appreciate that.
16    Q.  Besides the documents created or mentioned by
17  Mr. Richter, Mr. DeSimone and Mr. Cavic, do you know
18  whether there were any other Warner-Lambert employees
19  who created or maintained documents at the
20  Warner-Lambert Healthcare Management Unit?
21    A.  No, I'm not aware of any other employees
22  creating those types of documents.
23    Q.  Did you ask anyone whether there were any
24  other employees who would have created documents or
25  maintained documents for the Warner-Lambert Healthcare

Page 127

1  Management Unit?
2     A.  No.
3        MR. MIZELL: Object to form.
4     A.  No, I didn't ask.
5     Q.  What types of documents were maintained by
6  the Warner-Lambert Healthcare Management Unit around
7  customer interactions?
8     A.  I'm not sure exactly what type.  There was
9  just a reference that they had some type of mechanism
10  for recording their customer interactions.  Whether
11  that was an Excel spreadsheet, a Word document, a
12  database, I don't know.
13    Q.  Had you seen any of those documents?
14    A.  No.
15    Q.  Have you seen any of the documents regarding
16  maintenance of formulary status?
17    A.  No.
18    Q.  Do you know whether any of those documents
19  exist today?
20    A.  No.
21       MR. MIZELL: Object to form.  Outside the
22    scope.
23    A.  No, I don't know whether any of those
24  documents exist today.
25    Q.  Is there any other information that you have

Page 128

1  to provide us in this deposition regarding the types
2  of documents created or maintained at the
3  Warner-Lambert Healthcare Management Unit?
4     A.  No.
5     Q.  What did you do to prepare to respond to
6  questions regarding Pfizer's due diligence related to
7  alleged off-label marketing with respect to Neurontin
8  during the acquisition by Pfizer of Warner-Lambert and
9  its Parke-Davis Division?
10    A.  Please repeat the question.
11    Q.  Sure.  What did you do to prepare to answer
12  questions about Pfizer's due diligence related to
13  alleged off-label marketing with respect to Neurontin
14  during the acquisition by Pfizer of Warner-Lambert and
15  its Parke-Davis Division?
16    A.  Okay.  I -- To prepare for this deposition, I
17  read the three depositions that were provided to me by
18  counsel, the Cavic, DeSimone and Richter depositions.
19  I had four meetings with counsel to discuss.
20       In addition to that, I communicated and had
21  teleconferences with various Pfizer employees that had
22  been involved in -- in the whole due diligence
23  process.
24    Q.  Was there anything in the three depositions
25  that you read that provided you with information

Page 129

1  regarding Pfizer's due diligence?
2        MR. MIZELL: Object to form.
3     A.  I'm not sure I understand the question.
4     Q.  You said to prepare for the deposition, you
5  had listed a couple of different things you did.  One
6  was reading the three depositions --
7     A.  Right.
8     Q.  -- of Mr. Cavic, Richter, DeSimone; right?
9     A.  Uh-huh.
10    Q.  Yes?
11    A.  Yes.
12    Q.  What information in there prepared you to
13  answer questions about Pfizer's due diligence relating
14  to alleged off-label marketing with respect to
15  Neurontin?
16    A.  The information that was contained in those
17  depositions, they referenced some of the engagements
18  that took place between Pfizer management and -- and
19  them as they prepared for the acquisition and the --
20  the trans -- transformation.
21    Q.  Okay.  And what with respect to those
22  engagements between them and Pfizer management related
23  to Pfizer's due diligence on alleged off-label
24  marketing?
25    A.  There wasn't specific -- specific references

1   in there around Pfizer's due diligence to off-label
2   marketing.  They more referred to the transfer of
3   information between the two organizations.
4       Q.   And specifically was there any information
5   transferred regarding the alleged off-label marketing
6   of Neurontin?
7           MR. MIZELL: Object to form.
8       A.   There were no specific references to the
9   transfer of information around the alleged off-label
10  marketing of Neurontin that I recall reading.
11      Q.   Okay.  So let's move on to the next thing you
12  said you did to prepare for the deposition, the four
13  meetings with counsel.
14          What information did you receive in those
15  meetings with counsel to prepare for you for -- to
16  prepare you to answer questions regarding Pfizer's due
17  diligence related to alleged off-label marketing of
18  Neurontin?
19          MR. MIZELL: Well, I object to that.
20      I would not -- do not answer the question.
21  It asked for the contents of communications with
22  outside counsel.
23          MS. DALEY: Are you instructing him not to
24  answer the question?
25          MR. MIZELL: Yes.

1       Q.   I assume you are following your counsel's
2   instruction?
3       A.   Yes, I am.
4       Q.   Okay.
5           MS. DALEY: I didn't mean the "okay" to mean I
6   agree with the objection and the instruction, but
7   I'll move on.  We will reserve that for another
8   date.
9       Q.   Let me ask the question this way:  Did you
10  have discussions with counsel regarding Pfizer's due
11  diligence related to alleged off-label marketing of
12  Neurontin --
13          MR. MIZELL: Same objection.
14      Same instruction.
15      I'm sorry.
16          MS. DALEY: Wait.  I just want to finish my
17  question.
18      Q.   -- that prepared you to answer questions
19  regarding that topic today?
20          MR. MIZELL: You can answer, but do not reveal
21  the contents of any communications with counsel.
22      A.   Yes.
23      Q.   Did you have any -- then you also mentioned
24  to prepare for today's deposition, that you had
25  communications and telecommunications with various

1   Pfizer employees; right?
2       A.   Yes.
3       Q.   Which of these employees did you have
4   communications about Pfizer's due diligence on the
5   off-label marketing of Neurontin?
6           MR. MIZELL: Object to form.
7       A.   All of the three individuals that I referred
8   to before, Joe Butera, Curtis Reese and John Dauser.
9       Q.   Anyone else?
10      A.   Not specifically related to this topic.
11      Q.   "This topic" being the due diligence on the
12  off-label marketing of Neurontin?
13      A.   Yes.
14      Q.   Okay.  And before the lunch break, you talked
15  about your conversations with Mr. Butera, Mr. Reese
16  and Mr. Dauser.  Is there anything more beyond what
17  you have already testified to in those conversations
18  that provided you with information regarding Pfizer's
19  due diligence regarding off-label marketing of
20  Neurontin?
21      A.   No.
22      Q.   What did Pfizer -- Well, what did Pfizer do
23  to conduct due diligence regarding the alleged
24  off-label marketing of Neurontin?
25      A.   I've already described the activities that I

1   am aware of within the scope of my duties and
2   responsibilities around third-party payers.
3       Q.   Anything else that Pfizer did in conducting
4   due diligence on off-label marketing of Neurontin?
5           MR. MIZELL: Objection to form and outside the
6   scope.
7       A.   Not that I'm aware of.
8       Q.   Do you know as part of the due diligence
9   whether Pfizer reviewed any of the files of the
10  Healthcare Management Customer Business Unit for
11  Warner-Lambert?
12      A.   I am not aware of whether that was done or
13  not.
14      Q.   Do you know whether as part of the due
15  diligence, Pfizer reviewed these records of customer
16  interactions?
17          MR. MIZELL: Object to form.
18      A.   I'm not aware or not, whether it was done.
19      Q.   Do you know whether as part of Pfizer's due
20  diligence regarding the off-label marketing of
21  Neurontin, Pfizer reviewed any of the Neurontin
22  situational analyses that Warner-Lambert had?
23          MR. MIZELL: Object to form.
24      A.   I'm not aware of whether it was done or not.
25          I'm not aware of what a situational analysis

34 (Pages 130 to 133)

Page 134

1  is.
2      Q.  Have you ever heard of a Neurontin
3  situational analysis before?
4      A.  I have not.
5      Q.  In these four meetings you had with counsel,
6  three were in September, you said, and one was
7  yesterday?
8      A.  That is correct.
9      Q.  How long were the meetings in September?
10     A.  Two to three hours.
11     Q.  So that's a total of six to nine hours in
12 September?
13     A.  In September, that's correct.
14     Q.  And then yesterday's meeting?
15     A.  Yesterday's meeting was from eight until just
16 before noon, almost four hours.
17     Q.  So a total of ten to 13 hours?
18     A.  I think that would be fair to say.
19     Q.  And besides the deposition transcripts, did
20 you review any other documents?
21     A.  Yes.
22     Q.  Which ones?
23     A.  I received a packet of 28 documents that I
24 was asked to review.
25     Q.  And what was in that packet of 28 documents?

Page 135

1      A.  It -- Most of the communications in that
2  packet were around the existing Parke-Davis
3  Warner-Lambert contract -- multi-product contract that
4  existed between Parke-Davis and Aetna; and then
5  communications around how we were going to deal with
6  the pending expiration of the Pfizer contract; and --
7  and this contract that -- that in force with
8  Parke-Davis/Warner-Lambert.
9      Q.  Do you remember anything else in that packet
10 of 28 documents?
11     A.  That was the bulk of it.  There was one
12 other communication that I recall between a -- a
13 clinical education consultant and some -- someone --
14 some employee of Aetna responding to indications.
15 Indications and dosing, as I recall.
16     Q.  Regarding Neurontin?
17     A.  Regarding Neurontin.  Actually, I think the
18 message was titled "Neurontin and Relpax."  I think
19 they had questions about Relpax, too, but I don't
20 recall.
21     Q.  Were you involved in the efforts of Pfizer
22 regarding the PHN launch for Neurontin?
23     A.  Yes.
24     Q.  And what was your involvement there?
25     A.  It was nothing more than to listen to the

Page 136

1  information that was being -- being provided to the
2  PD2 sales representatives and managers that were going
3  to be responsible for launching PHN.
4      Q.  What were the PD2 representatives told about
5  launching Neurontin for PHN?
6         MR. MIZELL: Object to form.  Outside the
7  scope.
8      A.  Essentially they -- they -- as I recall this
9  launch meeting, it was done actually via a broadcast.
10 And I recall participating in it in the Reston,
11 Virginia office.
12        And the representatives were told -- and
13 representatives and their managers were told about the
14 disease state, and then Neurontin and how it was dosed
15 for this indication.  There was clinical information
16 provided as well, but I don't recall the exact
17 contents of all the materials that were used during
18 that launch.
19     Q.  Is your understanding that the Worldwide
20 Neurontin Team is part of the PD2?
21     A.  No, it is not my understanding.
22     Q.  So the Worldwide Neurontin Team would be
23 separate from the PD2 group?
24     A.  That is correct.
25     Q.  Do you know a John Marino?

Page 137

1      A.  No, I don't.
2      Q.  Who -- what customers would the PD2 -- or
3  what individuals would the PD2 group call on?
4      A.  PD2 -- and to clarify, that was the title of
5  one of our sales divisions.  So they fell under the
6  sales umbrella of the U.S. Pharmaceuticals Group.
7         PD2 representatives called on doctors or
8  healthcare providers.  And that would include
9  neurologists.
10     Q.  What's a PCP?
11     A.  Primary care provider.
12     Q.  Is a neurologist a PCP?
13     A.  Typically -- It -- It's possible, but
14 typically they are not.  They are classified as
15 specialists by health plans.  But that's a health plan
16 term.
17     Q.  The specialist reference?
18     A.  No.
19     Q.  Or the PCP?
20     A.  The PCP is a healthcare term.  It actually
21 was coined back when managed care first got started,
22 because PCPs were typically designated as your
23 gatekeeper.  And you had to go to your PCP before you
24 could be referred to a specialist.
25     Q.  So typically the neurologists are

35 (Pages 134 to 137)

Page 138

1   specialists, the primary care physicians are not
2   specialists?
3       A.   For the most part, yes.
4       Q.   They are more general practitioners of
5   medicine?
6       A.   Possibly.  There are specialists that have
7   chosen to go more the route around PCPs.  It depends
8   on the market, compensation, etc.
9       Q.   Were you present for any training that was
10  provided to PD2 representatives regarding Neurontin?
11      MR. MIZELL: Object to form and outside the
12  scope.
13      A.   The only -- technically, no training.  The
14  only forum I ever participated in was the PHN launch,
15  which was not classified as training.
16      Q.   So is it correct, then, that you were not
17  physically present or personally present for any
18  training that may have been given to PD2
19  representatives regarding Neurontin?
20      MR. MIZELL: Object to form.
21      A.   That is correct.
22      (E-mail Chain and Attachments bearing
23      Bates stamps Pfizer_SPiron_0011013 through
24      0011059 marked Henderson-3 for
25      identification.)

Page 139

1       Q.   Let me hand you what has been marked as
2   Henderson Exhibit 3.
3       (A discussion is held off the record.)
4       A.   Okay.
5       Q.   The first page of Henderson Exhibit Number 3
6   is a series of e-mails to which is attached a document
7   called Neurontin --
8       Let me start again.
9       Henderson Exhibit Number 3, the first page is
10  a series of e-mails to which is attached a multipage
11  document entitled "Neurontin Pregabalin Strategic
12  Priority Discussion, June 10th, 2003;" right?
13      A.   That is correct.
14      Q.   Now, pregabalin is the generic for the drug
15  branded by Pfizer called Lyrica; right?
16      A.   That is correct.
17      Q.   And is a strategic priority discussion
18  something that Pfizer employees would typically do?
19      MR. MIZELL: Object to form.
20      A.   While I was not at the level where these
21  kinds of discussions took place in 2003, my experience
22  is that these are the types of discussions that took
23  place under our old U.S. Business Unit organization
24  between the Marketing team and the U.S. Leadership
25  Team.

Page 140

1       Q.   Okay.  So you said you were not at the level
2   at which these discussions, these strategic priority
3   discussions, would have occurred in 2003?
4       A.   Yes.  Meaning I was not present at any of
5   these types of -- of discussions.
6       Q.   Are these discussions that would have
7   occurred between individuals higher up than you in the
8   organization, Pfizer organization?
9       MR. MIZELL: Object to form.
10      A.   Yes, that is correct.
11      Q.   If you turn to the document that is labeled,
12  the last three numbers, 016, at the bottom.  Do you
13  see that?  It's a page entitled, "Core Franchise Goals
14  For Strategic Planning, Period 2004 to 2008."
15      Do you see that?
16      A.   Yes.
17      Q.   And it says, "Core franchise goal."  What
18  does Pfizer mean when it refers to something as a
19  "franchise"?
20      A.   Typically a franchise is -- is -- is a
21  grouping of products that we consider -- consider to
22  be similar in -- whether it's the indication, whether
23  it's in the -- the -- group of -- of providers that
24  it's presented to.  For example, neuroscience.
25      Q.   So is it your understanding that Neurontin

Page 141

1   and pregabalin were part of the same franchise for
2   Pfizer?
3       MR. MIZELL: Object to form.  Outside the
4   scope.
5       A.   I -- I'm not aware of whether they were or
6   not.
7       Q.   Well, here it says, "Core franchise goal:
8   Maintain the contribution of the A2D franchise through
9   the transition from Neurontin to pregabalin and
10  increase contribution by end of planning period."
11      Do you see that?
12      A.   I do see that.
13      Q.   Do you know what is meant by "maintain the
14  contribution of the A2D franchise"?
15      First let me break it out.  A2D, do you know
16  what that means?
17      A.   I know A2D is typically referred to some
18  element of pharmacology.
19      Q.   You don't know what element, just some
20  element of pharmacology?
21      A.   Yeah.  Yes.  I said that soft.
22      Q.   And when a core franchise goal is described
23  as "maintain the contribution of the A2D franchise
24  through transition from Neurontin to pregabalin and
25  increase contribution by end of planning period,"

36 (Pages 138 to 141)

1  what's the "contribution" that's being referenced
2  there?
3      MR. MIZELL: Outside the scope.
4      A.  I have no idea.  It would require
5  speculation, and I don't even want to speculate.
6      Q.  And then the next core franchise goal is
7  identified under Neurontin; do you see that?  It says,
8  "Neurontin"?
9      A.  Yes.
10     Q.  And the goal is described as "Maximize
11 revenue from Neurontin despite the potential threat of
12 generic gabapentin;" right?
13     A.  Yes.  I see where you are reading at.
14     Q.  Let's turn to the two pages back.  The last
15 three digits are 018, lower right-hand corner, page
16 entitled "Business Drivers and Strategies"?
17     Are you on that page?
18     A.  Yes.
19     Q.  And the first top half of the section is
20 entitled "Competitive Threats" and the bottom half is
21 "Market Drivers;" right?
22     A.  Yes, that's what I'm reading.
23     Q.  All right.  And then under "Competitive
24 Threats" it talks about "increased threat of generic
25 gabapentin market entry by end of 2004," and then it

1  goes on, "To continue to defend market exclusivity for
2  Neurontin and prepare to transition to pregabalin."
3      Do you see that?
4      A.  Yes, I do see that.
5      Q.  In your role of working -- or managing
6  Pfizer's communications with third-party payers, were
7  you involved in any discussions regarding this
8  competitive threat as described as "continuing to
9  defend market exclusivity for Neurontin and prepare to
10 transition to pregabalin"?
11     A.  No.
12     MR. MIZELL: Object to form.  Outside the
13 scope.
14     A.  No.
15     Q.  The second competitive threat is described as
16 "Increased competitive activity and interest in
17 neuropathic pain and GAD."  Do you see that?
18     A.  I do see that.
19     Q.  Do you know what "GAD" stands for?
20     A.  Yes, General Anxiety Disorder.
21     Q.  Is it your understanding that Neurontin was
22 used to treat Generalized Anxiety Disorder?
23     MR. MIZELL: Object to form and outside the
24 scope.
25     A.  No, it's my understanding that Neurontin was

1  not indicated for treating General Anxiety Disorder in
2  the U.S.
3      Q.  And to the right of that is the strategy of
4  "Establish high level of awareness of pregabalin pre
5  launch and clear understanding of the superior profile
6  and positioning at launch."
7      Do you see that?
8      A.  Yes, I do read that.
9      Q.  Did you, in your role involving third-party
10 payers, were you involved in any discussions regarding
11 establishing the high level awareness of pregabalin
12 pre launch?
13     A.  No.
14     MR. MIZELL: I'm sorry.  I thought you were
15 going to read the entire phrase there, so just for
16 the record I object to form and outside the scope
17 on that question.
18     MS. DALEY: Well, I was just focusing on the
19 pre launch part.
20     MR. MIZELL: I understand.
21     Q.  Underneath that, then, is the market drivers.
22 Do you see that?
23     A.  Yes, I do read that.
24     Q.  It says, "Neuropathic pain market
25 underdeveloped and suboptimally treated by PCPs;"

1  right?
2      A.  Yes, that's what it says.
3      Q.  Were you involved in any discussions with
4  anyone at Pfizer regarding this concept that the
5  neuropathic pain market was underdeveloped and
6  suboptimally treated by PCPs?
7      MR. MIZELL: Object to form.  Outside the scope
8  of the designation.
9      A.  No, I did not have those conversations.
10     Q.  The next market driver says, "Epilepsy market
11 smaller, more conservative and driven by specialists."
12 Do you see that?
13     A.  I do see that.
14     Q.  Is it your understanding that the epilepsy
15 market is smaller, more conservative, and driven by
16 specialists?
17     MR. MIZELL: Object to form.  Outside the scope
18 of the designation.
19     A.  No, it is not my understanding.  I -- I have
20 no understanding about the size and scope of that
21 market.
22     Q.  Do you know whether anyone from Pfizer or
23 Warner-Lambert had any communications with any
24 third-party payer regarding the use of Neurontin for
25 Generalized Anxiety Disorder?

Page 146

1    MR. MIZELL: Object to form.
2    A.  I'm not aware of anyone within Pfizer and
3  based on what I read in the depositions within
4  Parke-Davis/Warner-Lambert, having discussions with
5  third-party payers around General Anxiety Disorder,
6  specifically because that would be an off-label
7  discussion.
8    Q.   And hence, you are saying, prohibited by
9  Warner-Lambert and Pfizer policy; right?
10   A.   That is correct.
11   Q.   And, therefore, it's your assumption that
12  off-label discussions didn't occur either at
13  Warner-Lambert or Pfizer; right?
14   A.   That is my assumption, yes.  And I'm not
15  aware of any -- of these discussions taking place.
16   Q.   Did you have any discussions with any
17  Warner-Lambert employees about off-label discussions
18  of Neurontin --
19   A.   No.
20    MR. MIZELL: Object to form.
21   Q.  -- for Generalized Anxiety Disorder?
22    MR. MIZELL: Object to form.
23   A.   No.
24   Q.   Did you have any discussions with any
25  Warner-Lambert employees about --

Page 147

1    MS. DALEY: Let me rephrase that.
2    Q.   Did you have any communications with any
3  Warner-Lambert employees about off-label discussions
4  regarding Neurontin for pain?
5    MR. MIZELL: Object to form.
6    A.   No.
7    Q.   Did you have any communications with any
8  Warner-Lambert employee about off-label discussions
9  regarding Neurontin for use in diabetic peripheral
10  neuropathy?
11   A.   No.
12    MR. MIZELL: Object to form.
13   Q.   Did you have any communications with any
14  Warner-Lambert employee about off-label discussions
15  regarding Neurontin for restless leg syndrome?
16   A.   No.
17    MR. MIZELL: Object to form.
18   A.   No.
19   Q.   Did you have any communications with any
20  Warner-Lambert employee about off-label discussions
21  regarding Neurontin for bipolar disorder?
22    MR. MIZELL: Object to form.
23   A.   No.
24   Q.   Did you have any communications with any
25  Warner-Lambert employee about off-label discussions

Page 148

1  regarding Neurontin for social phobia?
2    MR. MIZELL: Object to form.
3    A.   No.
4    Q.   Did you have any communications with any
5  Warner-Lambert employee about off-label discussions
6  regarding Neurontin for panic disorder?
7    MR. MIZELL: Object to form.
8    A.   No.
9    Q.   Did you have any communications with any
10  Warner-Lambert employee about off-label discussions
11  regarding Neurontin for migraine?
12    MR. MIZELL: Object to form.
13   A.   No.
14   Q.   Did you have any communications with any
15  Warner-Lambert employee regarding Neurontin for
16  monotherapy for epilepsy?
17    MR. MIZELL: Object to form.
18   A.   No.
19   Q.   Did you have any communications with any
20  Warner-Lambert employee about Neurontin being
21  prescribed in dosages above the FDA approved maximum?
22    MR. MIZELL: Object to form.
23   A.   No.
24   Q.   Did you see any documents regarding any of
25  those topics?

Page 149

1    MR. MIZELL: Object to form.
2    A.   No.
3    Q.   The next page, Henderson Exhibit 3, it's a
4  page entitled "Key Issues for Today."
5    Do you see that?
6    A.   Yes, I see that.
7    Q.   It says at the very first heading, "The U.S.
8  Neurontin team is seeking support for:  1.  Full year
9  of promotion with a lead, primary weighted PCP sales
10  force."
11    Do you see that?
12   A.   I do see that.
13   Q.   Is the U.S. Neurontin team part of the PD2
14  sales force you were talking about earlier?
15   A.   No.
16   Q.   They are separate?
17   A.   Yes.
18   Q.   Under 2, it goes on to say, "Actively engage
19  the HCC, PPMG, and LMT to maintain Neurontin access
20  and prepare for pregabalin."
21    Do you see that?
22   A.   I do see that.
23   Q.   What's the HCC?
24   A.   Healthcare Cluster.
25   Q.   Is that part of the Managed Markets Group at

38 (Pages 146 to 149)

Page 150

1 all?
2     A.  Yes, that's the former name of what now is
3 the Customer Business Unit.
4     Q.  Were you part of the HCC?
5     A.  Yes.
6     Q.  So under "Key Issues For Today" where it
7 says, "The U.S Neurontin team is seeking support for
8 actively engaging the --" I'm sorry -- is it
9 healthcare?
10     A.  Healthcare cluster.
11     Q.  "-- healthcare cluster," that's a reference
12 to Managed Markets Group?
13         MR. MIZELL: Object to the form.
14     A.  That -- That is a reference to the Healthcare
15 Cluster as it existed prior to January, 2007, and it
16 did include aspects of -- of the current Customer
17 Business Unit.
18     Q.  Would that include third-party payers?
19         MR. MIZELL: Object to form.
20     A.  I'm not sure I understand your question.
21     Q.  Well, would the HCC have any responsibility
22 for communications with third-party payers?
23     A.  Yes.  The HCC had sole responsibility for
24 communication with third-party payers.
25     Q.  Would those third-party payers include Aetna?

Page 151

1     A.  Yes.
2     Q.  Kaiser?
3     A.  Yes.
4     Q.  Blue Cross-Blue Shield of Louisiana?
5     A.  I am not sure whether that was an assigned
6 account.
7     Q.  Because you didn't -- didn't check whether
8 that was part of the list of assigned accounts;
9 right?
10         MR. MIZELL: Object to form.
11     Q.  -- before today's deposition?
12     A.  Because I'm not aware of whether it was an
13 assigned account.
14     Q.  But you had the opportunity before today to
15 go check it out; you just didn't; right?
16         MR. MIZELL: Object to form.
17     A.  I did not look into whether Blue Cross-Blue
18 Shield of Louisiana was an assigned account.
19     Q.  Could you, before you came to this deposition
20 today, have checked it out?
21     A.  Yes, I could have.
22     Q.  So in this list of strategic priorities, the
23 U.S. Neurontin team, it says here, "The U.S. Neurontin
24 team is seeking support for actively engaging the HCC
25 to maintain Neurontin access and to prepare for

Page 152

1 pregabalin;" right?
2         MR. MIZELL: Object to form.
3     A.  That's what it says.
4     Q.  It also references "actively engaging the
5 PPMG." What does that acronym stand for?
6     A.  PPMG stand for Payer Provider Management
7 Group.
8     Q.  Is that part of the HCC?
9     A.  No.
10     Q.  What is the Payer Provider Management Group?
11     A.  It was part of the Marketing organization.
12     Q.  Did that have responsibility or some
13 responsibility for marketing to third-party payers?
14     A.  They had responsibility for developing
15 materials for the folks in the HCC to promote -- they
16 actually developed non branded, non product-specific
17 materials to promote Pfizer through the HCC.
18         They also were responsible for market
19 strategy as well as customer strategy.
20     Q.  Customer strategy like strategy to Kaiser?
21         MR. MIZELL: Object to form.
22     A.  Customer strategy, yes.
23     Q.  Could that include a customer like Kaiser?
24     A.  It could include a customer like Kaiser.
25     Q.  Could it also include a customer like Aetna?

Page 153

1     A.  Yes.
2     Q.  This page entitled "Key Issues For Today,"
3 where it says, "The U.S. Neurontin team is seeking
4 support for actively engaging the HCC, PPMG and LMT to
5 maintain Neurontin's access"?
6         What does the LMT stand for?
7     A.  The LMT stands for the Local Market Team.
8     Q.  Does the Local Market Team have any
9 involvement in communications with third-party payers?
10     A.  No.
11     Q.  Is that -- are the Local Market Teams part of
12 the PD2?
13     A.  No.
14     Q.  Who are the Local Market Teams?
15     A.  They are part of Marketing.
16     Q.  Is the Payer Provider Management Group part
17 of Marketing, too?
18     A.  Yes.
19     Q.  Is HCC part of Marketing?
20     A.  No.
21     Q.  What does the Local Market Team do as part of
22 Marketing?
23     A.  In this organization, when the LMT existed,
24 they had local markets and various markets in the
25 United States that were responsible for doing analysis

Page 154

1    of those marketplaces, and participating in local
2    outreach programs that involve things like reaching
3    out to the Hispanic community on managing various
4    diseases.  It was -- it was non branded activities.
5        Q.  Based upon geographic areas or based upon
6    ethnic groups?
7        A.  It varied.  All of the above.  It could have
8    been areas where there was a -- a high concentration
9    of various ethnic groups, a high -- a dense population
10   in a given urban area.
11       Q.  If the U.S. Neurontin team was seeking
12   support to have the HCC actively engaged in
13   maintaining Neurontin access, would you have known
14   about that?
15       A.  Yes -- No.  Let me step back.
16          I would not have known about them seeking --
17   or I did not know that they were seeking this.  I
18   would have been made aware if the U.S. Leadership Team
19   had granted what they were requesting; which clearly
20   they did not, because we didn't engage in these
21   activities.
22       Q.  What would you have to do to be actively
23   engaged in maintaining Neurontin access and prepare
24   for pregabalin?
25       A.  That really requires speculation.  I -- since

Page 155

1    this was never approved or discussed within the
2    Healthcare Cluster, I am not even sure what they were
3    thinking when they came up with this.
4        Q.  How do you know this was not approved?
5        A.  Because I would have --
6           MR. MIZELL:  Object to form.
7        A.  I would have been one of the people
8    implementing it.
9        Q.  And how do you know this wasn't discussed?
10          MR. MIZELL:  Object to form.
11       A.  Because I would have been one of the people
12   included in the discussion.
13       Q.  Let's go back to the first page of Henderson
14   Exhibit 3.  The top e-mail is from Steve Piron to
15   Bruce Parsons.  Did I pronounce Mr. Piron's name
16   right?
17       A.  I believe so.
18       Q.  And the subject is Operating Plan Documents;
19   right?
20       A.  Actually, I read it "NEU-0304824, line, Op
21   Plan Documents," yes.
22       Q.  Op plan, do you think that means operating
23   plan?
24       A.  Yes, that is a reference to operating plan.
25       Q.  Okay.  It says in -- in the top e-mail, it

Page 156

1    says, "The first file is the high priority
2    walk-through that you Suzanne/Teri gave to PGP
3    leadership last week."
4           Do you see that?
5        A.  I do see that.
6        Q.  Were you part of the PGP leadership?
7        A.  No.
8        Q.  What is the PGP leadership?
9        A.  PGP leadership is -- was very senior
10   executives at Pfizer under the old -- the pre-January,
11   2007 structure.
12       Q.  Who was part of that PGP leadership?
13       A.  At this time I'm not sure whether this was --
14   I believe it's Karen Katen's leadership team, but I'm
15   not sure if that's the exact reference, because
16   eventually when Pat Kelly was promoted to be President
17   of U.S. Pharmaceuticals, it could also interchangeably
18   refer to Pat Kelly's leadership team.
19       Q.  Do you know who Suzanne is that's referenced
20   here?
21       A.  Just based on this message and the topic, I
22   am speculating it is Suzanne Doft.
23       Q.  And were you aware that there was a
24   presentation that Suzanne Doft gave to PGP leadership
25   regarding Neurontin?

Page 157

1           MR. MIZELL:  Object to form.
2        A.  No, no.
3        Q.  In the second paragraph of the e-mail, it
4    says, "My sense is that both documents should give you
5    a good sense of the key issues facing the brand so we
6    can begin aligning the 2004 medical plan."
7           Do you see that?
8        A.  I do see that.
9        Q.  It goes on to say, "I see dosing as a real
10   point to focus on."  Do you see that?
11       A.  I do see that.
12       Q.  What is "dosing" in connection with
13   Neurontin?
14       A.  I have no idea what this is in reference to.
15       Q.  Do you know what is the 2004 medical plan?
16       A.  I don't know what they are referring to.
17       Q.  It goes on to say, "In the process of setting
18   up a meeting with  RMRs/CECs."
19          Do you see that?
20       A.  I do see that.
21       Q.  What's an RMR?
22       A.  Regional Medical Research Specialist.
23       Q.  And a CEC?
24       A.  Clinical Education Consultant.
25          MS. DALEY:  We need to break for a tape?

Page 158

1  THE VIDEOGRAPHER: The time is approximately
2  three p.m. This ends Tape Number 3.  We are now
3  going off the record.
4  (A recess is taken.)
5
6  CONTINUED DIRECT EXAMINATION BY MS. DALEY:
7  THE VIDEOGRAPHER: The time is approximately
8  3:10.  This begins Tape Number 4.  We are now on
9  the record.
10  Q.  Mr. Henderson, have you hold us everything
11  that you recall about your conversation with John
12  Dauser that you had to prepare for today, for the
13  deposition today?
14  A.  I don't recall whether I've told you
15  everything, so I'll just revisit what John Dauser and
16  I spoke about.
17  Primarily the discussion centered around John
18  Dauser in his position as a District Manager with the
19  Kaiser sales -- sales folks.  And issues around
20  whether Neurontin was promoted by his Kaiser
21  representatives in Kaiser.  He made it emphatically
22  clear to me that they did not promote Neurontin in
23  Kaiser.
24  Q.  And how did he know that?
25  A.  Because the sales representatives report to

Page 159

1  him.
2  Additionally, he was only responsible for --
3  his representatives had certain products they were
4  responsible for, and Curtis Reese's representatives
5  had certain products they were responsible for.  And
6  John Dauser's folks specialized primarily in the
7  cardiovascular products.
8  Q.  So Curtis Reese's folks were the ones who had
9  responsibility for products such as Neurontin?
10  A.  No, Curtis Reese's folks actually did not
11  promote Neurontin either in Kaiser, because we -- we
12  weren't promoting Neurontin.  But his folks did have
13  products that would fall in -- in what Pfizer broadly
14  classifies as neuroscience products, such as Arisept.
15  Q.  Such as Lyrica?
16  A.  He could -- Lyrica, if we were promoting
17  Lyrica in Kaiser, that would fall under his umbrella
18  of products.
19  Q.  Curtis's umbrella?
20  A.  Curtis Reese's umbrella of products, yes.
21  Q.  Do you know whether he promoted or his people
22  promoted Lyrica to Kaiser?
23  MR. MIZELL: No.  Objection and same
24  instruction from this morning, that it's outside
25  the scope of his designation.

Page 160

1  He is not going to testify about Lyrica.
2  Q.  Do you know whether he promoted -- he or his
3  people promoted Lyrica?
4  MR. MIZELL: Same objection and instruction.
5  MS. DALEY: You are instructing him not to
6  answer the question?
7  MR. MIZELL: Yes, exactly.
8  A.  Yes, I am following my attorney's
9  instruction.
10  Q.  Okay.  Do you have any understanding of why
11  it would be important to maintain Neurontin access as
12  part of the preparation for the pregabalin launch?
13  MR. MIZELL: Object to form.  Outside the
14  scope.
15  A.  I have no idea.
16  Q.  When there is a reference to maintaining
17  Neurontin access in the context of the Healthcare
18  Cluster, is it your understanding that that's a
19  reference to maintaining access -- Neurontin access on
20  the formularies?
21  A.  It's difficult for me to say exactly what
22  they're referencing here.
23  Q.  Have you already covered all the
24  conversations you have had with Curtis Reese regarding
25  your preparation for this deposition?

Page 161

1  A.  Yes.
2  Q.  And you already covered all your
3  conversations with Mr. Bachman regarding your
4  preparation for today's deposition?
5  A.  I don't believe we have -- we have talked
6  specifically about Kirk Bachman in his role as
7  National Account Manager covering Kaiser.
8  But the -- our basic discussion centered
9  around the fact that he was not promoting Neurontin in
10  Kaiser, nor were we contracting for Neurontin in
11  Kaiser.
12  Q.  When you say you are not contracting for
13  Neurontin with Kaiser, is that a direct sale contract
14  you are talking about, or a formulary access contract?
15  A.  In Kaiser -- Kaiser contracts only --
16  Kaiser's a unique health plan in that they are
17  primarily a staff modelled health plan, and when they
18  contract with pharma they typically do not enter into
19  access agreements.
20  Q.  Do they have rebate contracts?
21  A.  They typically do not have rebate contracts.
22  Q.  Do you know whether there is a rebate
23  contract between Pfizer and Kaiser regarding
24  Neurontin?
25  A.  There is not.

41 (Pages 158 to 161)

Page 162

1    Q.  You checked that one out?
2    A.  Yes.
3    Q.  Is there a rebate contract between Pfizer and
4  Aetna for Neurontin?
5        MR. MIZELL: Object to form.
6    A.  Your question -- you are phrasing this as
7  "is" and that implies present tense, which means
8  today.  And the answer to that question is no.
9    Q.  Was there a rebate contract between Pfizer
10  and Aetna regarding Neurontin?
11   A.  Yes.  Pfizer took the existing
12  Parke-Davis/Warner-Lambert multi-product contract that
13  was -- existed before the acquisition, and we rolled
14  it over via an amendment into the base Pfizer
15  contract.
16   Q.  At that -- at the time of the acquisition of
17  Warner-Lambert by Pfizer, did Pfizer have a rebate
18  contract with Aetna for other drugs?
19   A.  Yes.
20   Q.  And so you were able to just add Neurontin to
21  that existing rebate contract vis-a-vis an amendment?
22   A.  We were able to amend the existing Pfizer
23  agreement for all of the Warner-Lambert Parke-Davis
24  products that were contracted for between
25  Warner-Lambert Parke-Davis and Aetna, which included

Page 163

1  Neurontin.
2    Q.  Let's go back to Henderson -- let's finish up
3  on the rebate issue.
4        Do you know or do you recall what the terms
5  of the rebate were, of the contract were -- was,
6  between Pfizer and Aetna?
7        MR. MIZELL: To the extent you can answer that
8      without any confidentiality concerns between
9      Pfizer and Aetna.
10   A.  So the answer to your question is yes, I can
11  recall.  Because of our confidentiality agreement that
12  exists with Aetna, I would in general terms say it was
13  a performance and access agreement.
14   Q.  What's a performance and access agreement?
15   A.  An access agreement is around formulary
16  access; and performance is defined -- defined as how a
17  given product performs in a given market basket.  And
18  market basket again is defined as similar products,
19  "similar" being defined as products that treat
20  similar -- the same indication.  So in this case, the
21  anti epileptic drugs define that market basket.
22   Q.  So as an example, performance would be, and
23  I'm just going to pull numbers out of the air, you
24  would get one rebate if Neurontin was ten percent of
25  the AED market basket, but a different rebate if it

Page 164

1  was 20 percent of the AED market basket?
2    A.  Conceptually that is how a performance
3  contract works.  Those are clearly not accurate
4  numbers, but...
5    Q.  I was just pulling numbers out of the air.
6    A.  Yeah.
7    Q.  I was trying to understand what you were
8  trying to say.
9        And just so I understand whether or not it's
10  worth to come back to this, as you sit here today, do
11  you recall what the specific performance and access
12  terms were of the contract between Pfizer and Aetna
13  regarding Neurontin?
14   A.  No, I don't.
15   Q.  So even if your lawyer would let you answer
16  the question, you wouldn't be able to answer it
17  anyway.  Is that correct?
18   A.  That's correct.
19        And just to further clarify, every product
20  that is contracted has a different set of tiers.  So
21  it would be very difficult for anyone to reasonably
22  expect anyone to rattle off all those numbers
23  accurately.
24   Q.  Let's go back to Henderson Exhibit 3.  And if
25  you turn to the next page of Three, with the last

Page 165

1  number is 020.  It's a slide entitled "Delays in Legal
2  Process Makes 2004 a Full Year to Operate."
3        Do you know anything about delays in legal
4  process regarding Neurontin?
5    A.  No, I don't.
6    Q.  In preparation for this deposition, did you
7  obtain any information about any specific goals that
8  Pfizer or Warner-Lambert had regarding Neurontin?
9        MR. MIZELL: Object to form.
10   A.  Goals?  Goals around what?
11   Q.  Well, why don't you turn to the next page,
12  Bates Number 021, the last three digits.  It's a page
13  entitled "2004 Goals and Expectations."
14   A.  Okay.
15   Q.  The first one, it says, "Achieve 2004 sales
16  objective, 2.4 billion dollars?"
17        Do you see that?
18   A.  I do see that.
19   Q.  In preparing for this deposition, did you
20  seek information about goals that Pfizer had for
21  Neurontin?
22   A.  No, I did not.
23   Q.  The next bullet point in the 2004 goals And
24  Expectations says "Participate in both POAs in 2004."
25        Do you see that?

42 (Pages 162 to 165)

Page 166

1   A.  I do see that.
2   Q.  Did Pfizer have separate plans of attack for
3  Neurontin and Lyrica?
4       MR. MIZELL: Object to form.  Outside the
5  scope.
6   A.  I'm not aware of what a plan of attack is.
7   Q.  Plan of action?  Is that what POA means?
8       MR. MIZELL: Same objection.
9   A.  But when we say POAs as written in this
10  context, it is because we hold two -- we typically
11  hold two POAs a year.  So it is referring to a
12  meeting, as opposed to an actual plan.
13  Q.  Okay.  So what does the POA mean when it
14  says -- when it refers to a meeting?
15  A.  It means a meeting where we get together and
16  discuss a variety of topics.  It's actually very --
17  a -- it's the wrong term for the meetings, because we
18  will discuss a variety of topics; HR topics; they may
19  go through incentive compensation; as well as things
20  that are going on with individual brands that we are
21  promoting.
22  Q.  So what is it?  What does POA in the context
23  of the meeting mean?  What does it stand for?
24  A.  As I read this, it says that they want to
25  participate in the meetings.  Whether that means

Page 167

1  attend the meetings, which it could mean, because not
2  everyone attends these meetings, or take an active
3  role, I don't know.
4   Q.  What does the POA mean?  What does it stand
5  for?
6   A.  The actual POA is Plan of Action.
7   Q.  So there are two meetings that are called POA
8  meetings at Pfizer?
9   A.  That is correct.  Typically.
10  Q.  And do you attend those meetings?
11  A.  Yes.
12  Q.  What categories of individuals attend those
13  POA meetings?
14  A.  It varies, and depends on the individual
15  meetings in this -- this whole -- the whole POA
16  meeting structure has evolved over the years.
17      But our typical definition today is:  One of
18  those meetings is Regional Managers and above.  So we
19  call it the Regional Managers Headquarters Meeting.
20  The second meeting is District Managers and above.
21  It's a much larger group of individuals.
22  Q.  Regional managers from what units?
23  A.  All units.
24  Q.  So that would be besides your unit, what
25  other units would be involved?

Page 168

1   A.  Pratt -- well, today Powers, Pratt, Steere
2  and Specialty, those business units.
3   Q.  Before Powers, Pratt, Steere and Specialty
4  were created, where would -- under what group would a
5  drug like Neurontin have fallen?
6   A.  It fell under -- it was the PD2 sales
7  Division, and because it was so highly specialized,
8  we -- we just thought of it in the PD2 Sales Division.
9  And I believe PD2 reported up through Cluster X.
10      But it may have been Cluster A.  In fact, now
11  that I think about it, it probably was Cluster A.
12  Q.  And the organization that those individuals
13  who were part of the worldwide Neurontin team, would
14  they have been in Cluster X Or Cluster A?
15  A.  No, all those clusters, those designations,
16  are purely Field Sales designations.  Marketing
17  teams -- Marketing was a stand-alone entity.
18  Q.  The next page, last three digits, 022 in the
19  lower right-hand corner.  Do you see where it says,
20  "Neurontin is market leader"?
21  A.  Yes.
22  Q.  Looking at the drugs that are listed here, is
23  this the market basket, AED market basket?
24  A.  I'm not sure if this is how the AED market
25  basket was defined at that given place and time.

Page 169

1   Q.  Are these drugs listed here anti epileptic
2  drugs?
3   A.  There are some products here that I am aware
4  of that have that indication.
5   Q.  The next page, last three digits, 023, page
6  entitled "Competition Growing Among PCPs."
7       Do you see that?
8   A.  Yes, I do.
9   Q.  And there is five different drugs listed
10  there.  Do you see that?
11  A.  I do.
12  Q.  And it references "Topamax filed for
13  migraine."
14      Do you see that?
15  A.  I do.
16  Q.  And "Lamictal filed for bipolar;" right?
17  A.  That's what I read, yes.
18  Q.  Let's turn to -- you have no responsibility
19  for detailing PCPs; right?
20  A.  No.
21  Q.  So let's turn to the page that has the last
22  three digits 028.  It's entitled "Issue Number 2,
23  Maintain Managed Care Access."
24      Do you see that?
25  A.  I do see that.

43 (Pages 166 to 169)

1    Q.  Now, that would be your business unit; right?
2    A.  Yes.
3    Q.  And beneath that, then, it says,
4  "Description:  Neurontin is well positioned in managed
5  care, with Tier 2 status in over 90 percent of plans."
6    Do you see that?
7    A.  That's what it says, yes.
8    Q.  In June, 2003, is it your understanding that
9  Neurontin was well positioned in managed care with
10  Tier 2 status in over 90 percent of plans?
11    A.  Based on this document, I'm going to assume
12  that's accurate; but I don't know.
13    Q.  Does it seem -- does it seem accurate to you?
14    A.  I have no idea, because we didn't track the
15  formulary status of Neurontin, because we weren't
16  promoting Neurontin.
17    Q.  You say "we didn't track the formulary status
18  of Neurontin."  Who is "we"?
19    A.  The Healthcare Cluster.
20    Q.  Do you have any idea where Susan Doft, Marino
21  Garcia, Steve Piron, would have obtained information
22  about the status of Neurontin on formularies?
23    MR. MIZELL:  Object to form.  Outside the
24  scope.
25    A.  They -- I have no idea where they got it.

1  It's very easy to obtain this information.  Most of it
2  is contained in the public domain, on websites, in
3  formulary books.   And so there are organizations out
4  there that sell market research.
5    Q.  Do you know whether Warner-Lambert tracked
6  formulary status of Neurontin?
7    A.  I -- I don't know.
8    Q.  Do you know whether Warner-Lambert employees
9  or healthcare management employees were evaluated on
10  the basis of whether Warner-Lambert drugs such as
11  Neurontin were on formulary?
12    A.  Inasmuch as what I read in the three
13  depositions, it was never referenced in there that
14  they were in any way incentivized or compensated for
15  formulary access.  That's the limit of my knowledge
16  around that.
17    MS. DALEY:  Can you repeat that answer back.
18    (The answer is read.)
19    Q.  How much time did you spend reviewing the
20  three deposition transcripts?
21    A.  I probably -- with -- with the breaks, and
22  I'm sure that everyone in here can appreciate reading
23  those when you have never read one before, probably a
24  total of 12 hours.
25    Q.  And do you believe that you thoroughly

1  reviewed those deposition transcripts?
2    A.  I do.
3    Q.  Did you take any notes while you were
4  reviewing the deposition transcripts?
5    A.  I did not.
6    Q.  Did you take any notes of the conversations
7  you had with any of the individuals in preparation for
8  this deposition?
9    A.  I did.
10    Q.  Did you review those notes to refresh your
11  recollection before today?
12    A.  Yes.
13    Q.  Do you have those notes with you?
14    A.  No.
15    MS. DALEY:  Counsel, I'd ask that those notes
16  be --
17    Q.  Well, let me ask this question:  Did your
18  review of those notes refresh your recollection as to
19  what those individuals told you?
20    A.  No, not really, because I had remembered.  It
21  was relatively recent.
22    MS. DALEY:  I am still going to ask for these
23  notes to be produced.
24    MR. MIZELL:  I know you requested it on the
25  record, but we can deal with that separately.

1    MS. DALEY:  I'm sorry.  What did you say?
2    MR. MIZELL:  We could deal with that
3  separately.
4    Q.  The next bullet point under "Number 2,
5  Maintain Managed Care Access," it says the following:
6  "Recent research suggests that plans tend not to
7  manage epilepsy products and have limited resources to
8  manage other uses of the AEDs."
9    Do you see that?
10    A.  Yes, I see that.
11    Q.  Are you aware of this recent research that
12  suggested that "plans tend not to manage epilepsy
13  products and have limited resources to manage other
14  uses of AEDs"?
15    A.  I am not aware of the -- the recent research,
16  "recent" being defined as 2003 by it's listed in here.
17    Q.  Do you agree that plans tend not to manage
18  epilepsy products and have limited resources to manage
19  other uses of AEDs?
20    MR. MIZELL:  Object to form.  It's outside the
21  scope.
22    A.  I believe at this time, that probably was the
23  case.  I don't agree that today, with the advances in
24  technology, that that is the case.
25    Q.  Okay.  So "this time" being June of 2003;

1  right?
2      A.  Yes.
3      Q.  The next bullet point says, "However, some
4  local plans in a few states have challenged access."
5          Do you see that?
6      A.  I do.
7      Q.  "Plans:  BCBS/Georgia instituted prior
8  authorization."
9          Do you see that?
10     A.  I do see that.
11     Q.  And then "States:  Massachusetts instituted
12  prior authorization; Wyoming, Washington and Missouri
13  considering prior authorization."
14         Do you see that?
15     A.  I do see that.
16     Q.  What's "prior authorization"?
17     A.  A prior authorization as defined by Pfizer is
18  any type of -- of -- of paper documentation that a
19  physician is required to fill out in order for a
20  patient to get a specific prescription.
21     Q.  When you say any type of paper documentation
22  that a physician is required to complete, would that
23  include electronic information as well?
24     A.  Conceivably in today's technology with
25  E-prescribing, although it is not -- E-prescribing is

1  not broadly utilized in the United States, conceivably
2  it could be done electronically.
3      Q.  And from Pfizer's perspective, are prior
4  authorizations a good thing?
5      A.  No, a prior authorization is not necessarily
6  a good thing.
7      Q.  Why?
8      A.  Because it requires the doctor to go through
9  some type of hurdle in order to get the prescription
10  filled on behalf of the patient.
11     Q.  And what happens when a doctor has to go
12  through a hurdle before he or she can write a
13  prescription for a Pfizer drug?
14         MR. MIZELL: Object to form.  Outside the
15  scope.
16     A.  So ask the question again, because Pfizer
17  drugs represents a broad portfolio of products.
18     Q.  Well, Neurontin is a Pfizer drug; right?
19     A.  When -- when we -- Yes.
20     Q.  So if a doctor has to obtain prior
21  authorization before he writes a prescription for
22  Neurontin, what does that mean from Pfizer's
23  perspective?
24         MR. MIZELL: Object to form.  Outside the
25  scope.

1      A.  Well, that actually isn't correct.  A doctor
2  writes the prescription and then typically what will
3  happen is the -- the patient will go to a pharmacy.
4  Unless the doctor is fully aware that a prior
5  authorization is required by an individual third-party
6  payer, the patient goes to the pharmacy to try to get
7  the prescription filled.
8          The pharmacist typically rejects the
9  prescription and either calls the physician themselves
10  and says, "you need to get prior authorization or
11  authorization from --" the term is "prior
12  authorization," but it's used interchangeably to mean
13  real-time authorization, or they can get it prior to
14  the prescription getting filled.
15         And the doctor then has to go through the
16  process of getting that approved for the individual
17  third-party payer.
18     Q.  Within your Managed Care Group or whatever
19  it's called because it goes through a lot of different
20  name changes, is removing a prior authorization
21  requirement something you would hope your Account
22  Managers can do?
23         MR. MIZELL: Object to form.
24     A.  Well, Account Managers don't have the ability
25  to remove the prior authorization.  They have the

1  ability to work with third-party payers to evaluate
2  whether that prior authorization should or should not
3  be in place.
4      Q.  How would you work with a third-party payer
5  to determine whether a prior authorization requirement
6  should be in place?
7      A.  There's a variety of ways.  It really depends
8  on the prior authorization, what the prior
9  authorization is for, what the requirements are that
10  are listed in the prior authorization.
11     Q.  And then back to Henderson Exhibit 3.  The
12  last bullet point under "Description" references,
13  "Initiating managed care activities will prepare the
14  market for pregabalin."
15         Do you see that?
16     A.  I do see that.
17     Q.  Were you involved in any discussions
18  regarding working with managed care accounts to
19  prepare the market for pregabalin?
20         MR. MIZELL: Object to form and outside the
21  scope.
22     A.  I am not sure what activities they're
23  referencing here, and I wasn't involved in any kind of
24  activities.
25     Q.  So if there were such activities, you don't

1  know what they were?
2         MR. MIZELL: Same objections.
3     A.  Well, I guess we have to define "activities."
4  And if -- if any kind of discussion took place, I
5  would be aware of it, yes.
6     Q.  Who do you report to, Mr. Henderson?
7     A.  Michael Suesserman.
8     Q.  And who does he report to?
9     A.  Marie-Caroline Sainpay.
10    Q.  And who does she report to?  Do you know?
11    A.  Ian Reid.
12    Q.  And who does he report to?
13    A.  Jeff Kindler.
14    Q.  The CEO?
15    A.  CEO.
16    Q.  What's Mr. Suesserman's title?
17    A.  VP, Customer Business Unit.
18    Q.  Marie-Caroline Sainpay's title?
19    A.  General Manager -- today the title is
20  Commercial Operations/Customer Business Unit.
21    Q.  Is there a VP in front of that or --
22    A.  Well, it's General Manager.
23    Q.  General manager.
24    A.  Which is SCP.
25    Q.  Ian Reed's title?

1     A.  Ian Reed is President of the World -- the
2  Worldwide Pharmaceutical Operations.
3     Q.  Back to Henderson Exhibit 3, the document
4  with the last three digits 028.  We were talking about
5  this page entitled "Issue Number 2, Maintain Managed
6  Care Access."
7         The bottom part of that says, "Strategic
8  approach.  Engage HCC, PPMG and LMT to assess at-risk
9  plans and proactively seek opportunities for Neurontin
10  and to prepare for pregabalin."
11    Q.  Do you see that?
12    A.  I do see that.
13    Q.  What are "at-risk plans"?
14    A.  I'm not sure how they are defining "at-risk
15  plans" here in this document.  My assumption is
16  access, but I don't know.
17    Q.  Loss of access for Neurontin?  Is that what
18  you are trying to say?
19    A.  Yes, plans -- just based on the reference
20  above, plans that are planning on somehow restricting
21  access.
22    Q.  Who is in charge of the PPMG?
23    A.  It was Will Kane.
24    Q.  How long has he been in charge of the PPMG?
25    A.  It no longer exists.

1     Q.  When did it cease existing?
2     A.  It ceased to exist in January of 2007.
3     Q.  What group now performs those same duties?
4     A.  The Customer Strategy Team, which is a sub
5  unit of the Customer Business Unit.
6     Q.  Who is in charge of the Customer Strategy
7  Team for Managed Care?
8     A.  Steve Harper.
9     Q.  Is Mr. Kane still around?
10    A.  No.
11    Q.  Did he retire?
12    A.  I don't believe he retired.
13    Q.  Do you know if he is working for another
14  company?
15    A.  I have heard anecdotally he is.
16    Q.  Do you know which one?
17    A.  I don't know.
18    Q.  How long was Mr. Kane in charge of the PPMG?
19    A.  I'm not sure of the exact time.  I first
20  started working with him I believe in 2000.  I
21  believe.
22    Q.  Was he in charge of PPMG at that time?
23    A.  I believe, yes.
24    Q.  Who is in charge of the HCC in June, 2003?
25    A.  June, 2003, Carl Wilbanks was in charge.

1     Q.  Is Mr. Wilbanks still in charge of the group
2  that took over for HCC?
3     A.  No.
4     Q.  When did he leave?
5     A.  He has not left.
6     Q.  When did he change responsibilities for HCC?
7     A.  That would have been in August of 2005.
8     Q.  Where did he go?
9     A.  He was named Executive Vice President of
10  Sales.
11    Q.  Do you know whether Mr. Wilbanks was involved
12  in any discussions about maintaining managed care
13  access for Neurontin in the summer of 2003?
14    A.  I'm not aware.
15    Q.  Did you speak with Mr. Wilbanks in
16  preparation for this deposition?
17    A.  I did not.
18    Q.  Did you review any documents from Mr.
19  Wilbanks' files in connection with preparation for
20  this deposition?
21    A.  I did not.
22    Q.  How long was Mr. Wilbanks in charge of HCC?
23    A.  I believe it was from 2001 until 2005.
24    Q.  Was there an HCC before 2001?
25    A.  Before 2001, HCC did not exist.  It was --

Page 182

1  the organization was known as NHO, National Healthcare
2  Operations.
3      Q.   Who was in charge of National Healthcare
4  Operations in the summer of 2000?
5      A.   In the summer of 2000?  Actually, let me step
6  back.  Actually -- actually, I believe we did have the
7  Healthcare Cluster in the summer of 2000, and that was
8  led by Bill Pelton.
9      And so the leader of National Healthcare
10  Operations -- well, it was some time in that time that
11  Bill Pelton, who had been in charge of National
12  Healthcare Operations, took over as the head of the
13  newly-created Healthcare Cluster, and Forest Harper
14  took over as the Vice President of National Healthcare
15  Operations.
16     Q.   So when did the NHO become the HCC?
17     A.   It was some time, as I recall, in 2001.
18         And the impetus behind the creation was that
19  we had -- National Healthcare Operations had increased
20  in size such that it warranted being part -- dividing
21  two of the entities -- making two of the entities
22  separate.
23         And then to reflect the rest of the cluster
24  structure that we had created, the Healthcare Cluster
25  was created within Sales.

Page 183

1      Q.   Okay.  So National Healthcare Operations was
2  split up into the Healthcare Cluster -- Healthcare
3  Cluster?
4      A.   The National Healthcare Operations was
5  divided into two organization.  One organization
6  remained named National Healthcare Operations.  And it
7  is -- it is definitely a misnomer, because then we
8  also spun off another entity called National Accounts.
9         So National Healthcare Operations and
10  National Accounts, which were each led by vice
11  presidents, reported in to the Senior Vice President
12  of the Healthcare Cluster.
13     Q.   So the NHO became the HCC?
14     A.   Became one -- one of the groups within the
15  HCC.
16     Q.   And Forest Tucker was in charge of what
17  group?  Forest Harper?
18     A.   Forest Harper was in charge of National
19  Healthcare Operations.
20     Q.   What customers did the new National
21  Healthcare Operations unit call on?
22         MR. MIZELL:  Objection to form.
23     A.   They had -- They had responsibility for
24  regional accounts.
25     Q.   Can you give me an example?

Page 184

1      A.   Blue Cross-Blue Shield of Louisiana.
2      Q.   And the National Accounts then had
3  responsibility for the national accounts?
4      A.   National accounts, but also the government
5  accounts.
6      Q.   What's a non-government national account?
7  What is that?
8      A.   Medco.
9      Q.   Would Kaiser have been within the NHO?
10     A.   No, Kaiser was a national account.
11     Q.   The 11 that you mentioned before were all
12  national accounts?
13     A.   Yes, those 11, plus others.
14     Q.   Let me make sure I understand.
15         Forest Harper was in charge of the National
16  Healthcare Operations, and who was in charge of
17  National Accounts?
18     A.   Claire Kennedy was the Vice President in
19  charge of National Accounts.
20     Q.   And this occurred in 2001?
21     A.   As I recall.
22     Q.   What types of documents did the National
23  Healthcare Operations organization -- National
24  Healthcare Operations group maintain regarding its
25  communications with third-party payers prior to the

Page 185

1  split?
2      A.   Primarily formulary, we tracked formulary.
3         Some of the account managers within that
4  group maintained -- maintained business plans, but
5  there wasn't a single repository for the business
6  plans, which led to the creation of HC Exchange.
7      Q.   Was HC Exchange created as part of the
8  Healthcare Cluster?
9      A.   It was -- it -- yes, it was part of that
10  entire transformation.
11     Q.   How long has the HC Exchange existed?
12     A.   Since -- since -- I want to say 2001;
13  essentially the same time as the creation of the
14  Healthcare Cluster.
15     Q.   Do you know that for sure?
16     A.   I don't know exactly. I just know that at the
17  time that it went live, because I had Government
18  Account Managers working for me, that is when their --
19  their business plans started getting housed in that --
20  in that application, as well as formulary access.
21     Q.   How far back are the business plans
22  maintained in the Healthcare Exchange?
23     A.   To the best of my knowledge, every year a
24  switch is flipped.   You basically can take
25  information from your previous year's business plan,

Page 186

1 but then you are starting live on your new business
2 plan. So I know of no archive function that exists.
3     Q.  So the old business plans get written over in
4 the Healthcare Exchange?  Is that what you are saying?
5     A.  Essentially.
6     Q.  So if I was looking for the business plan for
7 Blue Cross-Blue Shield of Louisiana, if it existed,
8 for 2004, there wouldn't be, because there is no
9 archive function?
10         MR. MIZELL: Object to form and outside the
11     scope.
12     A.  Yes.  I mean, if you went into HC Exchange,
13 you would see the 2007 business plan for that account.
14     Q.  With respect to the operating plans for the
15 national accounts, where are they housed again?
16     A.  MMWeb, Managed Markets Web.
17     Q.  And are the operating plans for the national
18 accounts archived on the MMWeb?
19     A.  They were not.  We would -- we would --
20 basically MMWeb was nothing more than a place where
21 you would -- you would put a -- give people access to
22 the national account operating plan.  And it typically
23 was a matter of policy, so that we wouldn't create
24 confusion, to remove old operating plans.
25     Q.  So if I was looking for the operating plan

Page 187

1 for 2003 for Kaiser, it wouldn't exist on the MMWeb.
2 Is that right?
3     A.  That's correct.
4         MR. MIZELL: Object to form.  Outside the
5     scope.
6     A.  That's correct.
7     Q.  Do you know whether the operating plan for
8 Kaiser for 2003 exists anywhere else?
9         MR. MIZELL: Object to form.
10     A.  I'm not aware.
11     Q.  If you were to go look for it, where would
12 you find it?
13         MR. MIZELL: Object to form.
14     Q.  Excuse me.  If you were to look for it, who
15 would you ask to see if they still had it?
16     A.  I would ask me.
17     Q.  And as far as you know, it doesn't exist,
18 so...
19     A.  That's correct.
20     Q.  Okay.
21     A.  And the reason I would ask is because in
22 2003, I was responsible for Kaiser.
23     Q.  Was there an operating plan in 2003 for
24 Kaiser?
25     A.  Yes.

Page 188

1     Q.  But you threw yours out?
2         MR. MIZELL: Object to form.
3     A.  I'm not even sure I had a paper copy of it,
4 but yes.
5     Q.  And the same would be true for any operating
6 plan you had for Kaiser for 2002?
7         MR. MIZELL: Object to form.
8     A.  Yes, that's correct.
9     Q.  The same would be true for any operating plan
10 you had for Kaiser for 2001?
11     A.  I wouldn't have had one in 2001.
12     Q.  You were still working for the government?
13     A.  Yes.
14     Q.  Okay.  How about 2004?  If you had an
15 operating plan for Kaiser in 2004, would that be gone?
16     A.  Yes.
17     Q.  Are those operating plans documents that
18 would be part of the National Accounts Department?
19     A.  When the National Accounts Group existed,
20 yes.
21     Q.  Would the business plans that you have been
22 talking about be part of the documents of the National
23 Accounts Department?
24     A.  No.  They would have been part of the NHO
25 organization, followed by the Managed Markets

Page 189

1 organization, followed by what exists today, the
2 Account Management Organization.
3     Q.  Lots of changes in organizational structure
4 over time?
5     A.  Yes.
6     Q.  And during that same time period, operating
7 plans for the national accounts would be located in
8 the National Accounts Department, and then it would
9 have changed to a different department?
10     A.  Yes.  Where it is today falls under the
11 Customer Strategy Group.
12         MS. DALEY: I want to take a five-minute break.
13         THE VIDEOGRAPHER: The time is approximately
14     3:57.  We are now going off the record.
15         (A recess is taken.)
16
17 CONTINUED DIRECT EXAMINATION BY MS. DALEY:
18         THE VIDEOGRAPHER: The time is approximately
19     4:06.  This begins Tape Number 5.  We are now on
20     the record.
21     Q.  Mr. Henderson, have you ever spoken with
22 Suzanne Doft?
23     A.  I believe so, casually.
24     Q.  So just social conversation --
25     A.  Yes.

48 (Pages 186 to 189)

Page 190

1    Q.  -- nothing business?
2    A.  Yes.
3    Q.  Okay.  What about Steve Piron?
4    A.  Same, socially, nothing business-related that
5  I recall.
6    Q.  Bruce Parsons?
7    A.  I don't know Bruce Parsons.
8    Q.  Marino Garcia?
9    A.  I don't know Marino Garcia.
10    Q.  Kathleen Dodd?
11    A.  Yes.
12    Q.  Something beyond social conversations?
13    A.  Yes.
14    Q.  Anything having to do with Neurontin?
15    A.  No.
16    Q.  Nicky Hall?
17    A.  I don't know Nicky Hall.  Nicky Hall.
18    Q.  Turning to Page, the header says Exhibit 3,
19  last two digits 029, the page entitled, "Issue Number
20  3: Effectively Bridging From Neurontin to Pregabalin,
21  Global Franchise Transition Strategy."
22        Do you see that?
23    A.  I do see that.
24    Q.  Under the column entitled "Product Driven
25  Approach," the first bullet says, "Maximize

Page 191

1  Neurontin's presence (field force promotion, optimize
2  dosing, increase tablet use.)"
3        Do you see that?
4    A.  I do see that.
5    Q.  When you were part of the Pfizer field force,
6  did you receive any information about Neurontin?
7        MR. MIZELL: Object to form.
8    A.  When I was part of the Pfizer field force, I
9  was part of the Managed Care Organization and the
10  various names that I have provided earlier, such as
11  the National Healthcare Operations, National Accounts,
12  the Healthcare Cluster.  And in all of those
13  positions, I never received any of this information.
14    Q.  None.  Not this information.  Any information
15  at all about Neurontin?
16    A.  Other than the fact that we were not to
17  promote Neurontin, and if we were to -- if we got
18  requests around the PHN, post-herpetic neuralgia,
19  indication, we were to refer the customers to our
20  Medical Information Group.
21    Q.  In connection with this lawsuit, did you ever
22  receive any instructions about maintaining files
23  regarding any of the particular plaintiffs in this
24  case, Kaiser, Aetna, Blue Cross/Blue Shield of
25  Louisiana, Guardian Life?

Page 192

1    A.  A legal hold notice was sent out.
2    Q.  Did you receive a legal hold notice?
3    A.  Yes.
4    Q.  And when you refer to a "legal hold notice,"
5  what are you referring to?
6    A.  It's a notice that's sent out by the Pfizer
7  Legal Department telling us exactly what types of
8  documents we are required to save around any
9  particular issue.  So it could mention a product.  It
10  could mention an account.
11    Q.  Did you receive a legal hold notice regarding
12  this case involving Neurontin?
13    A.  I don't know whether the legal hold was
14  specifically around this case.  It was a legal hold on
15  products related to Neurontin -- I mean on any
16  documents, communications, around Neurontin.
17    Q.  When did you receive that legal hold notice?
18    A.  I don't recall.
19    Q.  What did you do to ensure compliance with
20  that notice?
21    A.  Well, because of my position I am under many,
22  many legal holds, so I maintain archives within my --
23  my computer, and I archive everything.  And then when
24  I receive documentation, I maintain files in my office
25  on the various products that I've gotten notification

Page 193

1  to maintain legal hold.
2    Q.  So do you have in your archives the operating
3  plans for Kaiser for 2002?
4    A.  No, I do not.
5    Q.  Do you have in your archives the operating
6  plans for Kaiser for 2003?
7    A.  I do not.
8    Q.  So in reality, you are not archiving
9  everything, then?
10        MR. MIZELL: Object to form.
11    A.  I started archiving things electronically.
12  I'm not sure that I received those Kaiser operating
13  plans electronically, but I didn't start habitually
14  archiving everything until probably 2004.
15    Q.  Do you have the operating plan for Kaiser for
16  2004?
17    A.  I do not have the operating plan for 2004.
18    Q.  But if you started archiving everything
19  electronically in 2004, wouldn't you have had the 2004
20  operating plan, then?
21        MR. MIZELL: Object to form.
22    A.  I would have it if I received it
23  electronically.
24    Q.  Were you working on -- Were you responsible
25  for the Kaiser account in 2004?

Page 194

1    A.  Yes.
2    Q.  But since the operating plan for Kaiser would
3  have been on the MMWeb, you didn't receive it
4  electronically.  Is that what you are saying?
5    A.  Yes.
6    Q.  So you just had access to it on the MMWeb,
7  and, therefore, you would not have archived it because
8  you didn't receive it?
9    A.  That's correct.
10    Q.  Do you know whether those operating plans
11  that were on the MMWeb or business plans that were on
12  the HC Exchange were archived somewhere?
13    A.  I -- I -- as I previously indicated, I do not
14  know that they are archived anywhere.  We
15  habitually -- HC Exchange is set up so that it -- just
16  because of sheer capacity, that each year you can only
17  view that current year's business plan.
18        The operating plans that were made available
19  on MMWeb, because they were updated every year and
20  they were so vastly different, because of mergers and
21  acquisitions that occurred in the third-party payer
22  community, to ensure there was no confusion, we would
23  only keep the current version posted on MMWeb.
24    Q.  Can you turn to Page, the last three digits,
25  032.

Page 195

1        MR. MIZELL: The last page of the exhibit?
2        MS. DALEY: The last three numbers of the
3  exhibit are 032.
4    Q.  And this is a terminology question I have for
5  you.  This is a page entitled "selling Pregabalin to
6  PCPs."
7        The question I have is:  There is a reference
8  to "Hook."  Do you know what that means in Pfizer
9  terminology?
10        MR. MIZELL: Object to form.
11    A.  I have no idea.
12    Q.  Next page, 033 in the lower right-hand
13  corner.  Entitled -- this is a page entitled, "Issue
14  Number 5, Establish the A2D Class Pre Launch."
15        And, again, it's your understanding that
16  Neurontin is in this A2D class; correct?
17    A.  Actually it's not my understanding.  I'm not
18  sure.  A2D class is some pharmacology classification.
19  Whether that refers to mechanism or action -- of
20  action or not, I -- I'm not sure.
21    Q.  And you say that because there is a reference
22  to MOA there?
23    A.  That's --
24        MR. MIZELL: Objection to form.
25    A.  That is correct.  That's why I said --

Page 196

1  referenced mechanism of action.
2    Q.  It's your understanding that MOA means
3  mechanism of action?
4    A.  Yes.
5    Q.  Why don't you turn to the page with the last
6  three numbers 035.  And this is a page entitled "Issue
7  Number 7, Pregabalin Takes Leadership Role in Epilepsy
8  and Neuropathic Pain Market Development;" right?
9    A.  That --
10        MR. MIZELL: Object to form.
11    A.  That's what it says, yes.
12    Q.  And it says under "Description," "Neurontin
13  team resources are focused on PHN."
14        Do you see that?
15    A.  I do see that.
16    Q.  Do you know who was part of the Neurontin
17  team in June of 2003?
18    A.  I -- I don't.
19    Q.  "PHN" refers to post-herpetic neuralgia;
20  right?
21    A.  That is correct.
22    Q.  The next bullet says, "Pregabalin offers
23  greater breadth in pain education."  Right?
24    A.  That's what it says.
25    Q.  And then the third bullet point in the

Page 197

1  "Description," "Neurontin return on EPI leadership
2  diminished versus pregabalin."
3        Do you see that?
4    A.  I do see that.
5    Q.  Do you know what is meant by "Neurontin
6  return on EPI leadership"?
7    A.  I have no idea, other than EPI is previously
8  listed in here it looks like referring to epilepsy,
9  but I don't know what that means.
10    Q.  Did you speak with Claire Kennedy at all in
11  preparation for this deposition?
12    A.  Yes.
13    Q.  What did Ms. Kennedy tell you?
14    A.  I just -- I briefly talked to her and told
15  her that I was getting deposed in conjunction with
16  this.  And her only comment was, "Well, we didn't
17  promote Neurontin in managed markets with the third-
18  party payers."
19        And I just responded, "Yes, I'm aware of
20  that."
21    Q.  Did you do any monitoring of any of the
22  individuals that worked for you to make sure they
23  didn't promote Neurontin to any third-party payers?
24        MR. MIZELL: Object to form.
25    A.  As a standard of practice, I monitor everyone

50 (Pages 194 to 197)

1  that works for me to ensure that they are in
2  compliance with Pfizer's policies and procedures.
3      Q.  How do you do that?
4      A.  Through getting copied on e-mail messages,
5  through doing field rides with individuals that work
6  for me.
7      Q.  Do you get copied on every e-mail message
8  that gets sent out by people that work under you?
9      A.  No.
10     Q.  Which ones are they instructed to copy you
11 on?
12     A.  They are instructed to copy me on typically
13 communications that -- back when, in my former role
14 when I had responsibility for customers, on any
15 communication that went out to a customer, meaning
16 anyone outside of Pfizer; or anyone that was being
17 copied or communicated to that was at my level or
18 above within the Pfizer organization.
19     Q.  And how do you know that they did that?
20     A.  My assumption is that they were doing what
21 they were told to do.
22     Q.  And you said you also went along with some of
23 your people that visits?
24     A.  On many, many field rides.
25     Q.  Did you go on any field rides to Aetna?

1      A.  Yes.
2      Q.  When?
3      A.  I can't give you exact dates.  There were
4  many, many field rides to Aetna and many conference
5  calls with various executives within Aetna.
6      Q.  When was the last field ride that you did
7  with Aetna?
8      A.  It would have been -- it would have been some
9  time prior to assuming my new responsibilities as Vice
10 President of Managed Markets West in September of
11 2005.
12     Q.  When was the last field ride you did with
13 Kaiser?
14     A.  The -- the same, prior to assuming my new
15 responsibilities in September, 2005.
16     Q.  What was the last e-mail message that you
17 were copied on in a communication with Aetna?
18     A.  I don't recall.
19     Q.  What was the last e-mail that you received a
20 copy of regarding a communication between Pfizer and
21 Kaiser?
22     A.  I don't recall.
23     Q.  In the last year?
24     A.  No, it would have been in 2005.  Well,
25 actually I say that -- actually in my old role as

1  Vice President of Managed Markets West, there may have
2  been times when I was copied on communications to
3  Kaiser, because when we moved to the new organization,
4  Kaiser moved with me.
5      Q.  Do you have copies of those communications
6  with Kaiser?
7      A.  If I do, they would be archived.
8      Q.  Did you go through those to determine whether
9  or not there were any communications with Kaiser
10 regarding Neurontin?
11     A.  I have.
12     Q.  How did you go about doing that?
13     A.  I did a word search.
14     Q.  And what were the words you put in there?
15     A.  I put in "Neurontin" and "gabapentin."  I
16 also put in "PHN" and "AED."
17     Q.  Were there any hits in communications -- in
18 those e-mails with Kaiser regarding Neurontin?
19     A.  No.
20     Q.  Gabapentin?
21     A.  No.
22     Q.  PHN?
23     A.  No.
24     Q.  AEDs?
25     A.  No.

1      Q.  Did you ask the people who worked under you
2  to do those same searches?
3      A.  I did not.
4      Q.  Why not?
5      A.  Because, one, they no longer worked for me.
6  But, two, again they were Curtis Reese, John Dauser,
7  Kirk Bachman; and I had conference calls with them and
8  discussed whether there was any promotion of Neurontin
9  within Kaiser.  And because they both -- all three
10 stated no, I did not instruct them to do a word
11 search.
12     Q.  So to the extent that there are e-mail
13 communications that Mr. Reese, Mr. Bachman, Mr. Dauser
14 or anyone else in the Kaiser field -- Kaiser field
15 force had with -- the Pfizer field force had with
16 Kaiser, those e-mails were not checked; correct?
17         MR. MIZELL: Object to form.
18     A.  They were not checked by me.  That doesn't
19 mean to say that as part of whatever due diligence
20 process took place around the document hold and Pfizer
21 Legal, it could very well have been checked.
22     Q.  So you don't know one way or the other, is
23 what you are saying?
24     A.  No.  I'm saying that I didn't check them,
25 but I am not aware that they weren't checked by other

1  people.
2      Q.  So you don't know one way or the other, you
3  don't know if they were checked or they weren't
4  checked, is what you are saying?
5      A.  That's correct.
6      Q.  Did you -- did you see operating plans for --
7  oh, step back for a second.
8          Would Pfizer have operating plans for
9  different brands?
10     A.  Yes.
11     Q.  And have you ever seen an operating plan for
12  Neurontin?
13     A.  I have not.
14     Q.  Do you know whether or not the Neurontin plan
15  for 2001 has any reference to the managed care
16  markets?
17         MR. MIZELL: Object to form.
18     A.  I -- I don't know.
19     Q.  Do you know whether the Neurontin operating
20  plan for 2001 has any reference to third-party payers?
21         MR. MIZELL: Object to form.
22     A.  I haven't seen the -- the Neurontin 2001
23  operating plan, so I don't know.
24     Q.  What about the Neurontin operating plan for
25  2002?

1          MR. MIZELL: Object to form.
2      A.  I haven't seen the Neurontin operating plan
3  for 2002, so I don't know.
4      Q.  And you haven't seen the Neurontin operating
5  plan for 2003 or 2004; right?
6          MR. MIZELL: Object to form.
7      A.  Actually, if this is a component of the
8  operating plan for 2003, then I would say as of today,
9  I've seen this.  I had not seen an operating plan for
10  2004.
11     Q.  And "this," you are referring to Henderson
12  Exhibit Number 3; right?
13     A.  Yes, I'm referring to Henderson Exhibit
14  Number 3.
15     Q.  Does Pfizer have marketing plans for its
16  brands?
17     A.  Typically, marketing plan and operating plan
18  are synonymous.
19     Q.  Did you ever ask anyone to review the files
20  that Mr. Richter or Mr. Cavic or Mr. DeSimone sent to
21  Morris Plains?
22     A.  No, I did not.
23     Q.  Did you ask to see any of the marketing plans
24  or operating plans that were discussed by Mr. Richter,
25  Mr. DeSimone or Mr. Cavic in their depositions?

1      A.  No, I did not.
2      Q.  Did you have copies of those documents?
3      A.  No, I did not.
4      Q.  Were you given the exhibits to the Richter,
5  DeSimone or Cavic depositions?
6      A.  Yesterday I reviewed just selected exhibits.
7      Q.  Who did the selecting?
8      A.  Well, it was more of me doing the requesting,
9  as well as counsel specifically highlighting the
10  organization chart to me.
11     Q.  Which ones did you request to see?
12     A.  I -- I don't recall.
13     Q.  I'm going to hand you the Cavic exhibits.
14  You said there was an organizational chart in there
15  that you looked at.  Can you identify which one that
16  is?
17         MR. MIZELL: Aren't there more than this?
18         MS. DALEY: What?
19         MR. MIZELL: Aren't there more than this?
20         MS. DALEY: Yes, there are.
21         MR. MIZELL: I don't think this is a complete
22  set.
23     A.  Unless it's in one of these individual
24  documents, I don't see it.  It's handwritten.
25     Q.  Are there any of the Cavic exhibits there

1  that you did request to see or that were selected for
2  your review?
3          MR. MIZELL: Object to form.
4      A.  I saw this one.
5      Q.  This one being --
6      A.  Which is Cavic-6.  However, I didn't see this
7  one yesterday.  It was in the previous meeting we
8  had -- oh, I'm sorry.  Is it Cavic -- the folder is
9  actually labeled Cavic-1; yeah, Cavic-1.
10     Q.  That is the one that you referred to as the
11  handwritten one?
12     A.  No, no, I saw this in a previous session
13  where -- where we were talking about the organization
14  chart.  But that is not the one that I referred to as
15  the handwritten one.
16         No, those are the -- that's -- that's it in
17  this group.
18     Q.  So the only documents you wanted to look at
19  from these depositions were the organizational charts?
20     A.  Yes.
21     Q.  Why did you want to see only the
22  organizational charts?
23     A.  So I would have a better understanding of --
24  of how the Warner-Lambert/Parke-Davis Customer
25  Business Unit was -- was structured.  Typically the

1  language is very common within our industry that's
2  used by all organizations.  So the organizational
3  chart was really all I needed to provide clarity
4  around some of the communications that were going on.
5      Q.  Did you reach that conclusion on your own or
6  did someone else suggest that to you?
7      A.  I reached that conclusion on my own.
8      Q.  Did you ask to see any of the other documents
9  identified in the deposition?
10      A.  No, I did not.
11      Q.  Why not?
12      A.  It didn't seem to me to be necessary.
13      Q.  In your review of the deposition testimony,
14  was there testimony about non-FDA-approved uses of
15  Neurontin?
16      A.  As I recall in reading the depositions, there
17  were references to medical symposiums that were
18  conducted, but there was no reference to specific
19  Neurontin off-label promotion or discussion taking
20  place at those, those medical symposiums.
21      Q.  Was there deposition testimony about the use
22  of Neurontin for non-FDA-approved indications?
23      MR. MIZELL: Object to form.
24      A.  I don't recall.
25      Q.  Was there deposition testimony about the use

1  of Neurontin for bipolar disorder?
2      A.  I don't recall.
3      Q.  Was there deposition testimony about the
4  marketing of Neurontin for bipolar disorder?
5      MR. MIZELL: Object to form.
6      A.  My only recollection, again, and it was not
7  specific to bipolar, was around a series of medical
8  symposiums that apparently were held in various
9  locations.  So I don't recall anything about
10  references to promotion of Neurontin around bipolar.
11      Q.  Would a medical symposium ever be considered
12  promotional activities?
13      A.  No.
14      MR. MIZELL: Objection to form.
15      A.  No, it would not.
16      Q.  Would there be certain requirements that
17  would have to exist in connection with that medical
18  symposium to ensure that it is not a promotional
19  activity?
20      A.  Yes.
21      Q.  What are those requirements?
22      A.  I don't specifically know what the
23  requirements were at Parke-Davis/Warner-Lambert, so
24  it's difficult for me to say exactly what -- what the
25  parameters were that they established around holding

1  those symposiums.
2      Q.  Do you know for a fact that there were no
3  medical symposiums held by Warner-Lambert/Parke-Davis,
4  that -- let me rephrase this question.
5      Do you know for a fact whether any of the
6  medical symposiums that were held by
7  Warner-Lambert/Parke-Davis constituted promotional
8  activities under the FDA regulations?
9      MR. MIZELL: Object to form and outside the
10  scope.
11      A.  Based on what I read within the depositions,
12  the three depositions that I reviewed, it did not
13  appear to me that any of their medical symposiums that
14  were held were outside the scope of FDA regulations.
15      Q.  Do you recall any testimony regarding the
16  publication strategy for Neurontin?
17      MR. MIZELL: Object to form.
18      A.  I don't recall reading specifically about a
19  publication strategy.
20      Q.  Do you recall any discussion in those
21  depositions about emerging markets for Neurontin?
22      MR. MIZELL: Object to form.
23      A.  I do not recall.
24      Q.  Do you recall anything in those depositions
25  about Neurontin being used for general -- Generalized

1  Anxiety Disorder?
2      MR. MIZELL: Object to form.
3      A.  I do not recall any references to Neurontin
4  being used for General Anxiety Disorder within those
5  three depositions.
6      Q.  Do you recall any testimony in those three
7  depositions about Neurontin being used for migraine?
8      MR. MIZELL: Object to form.
9      A.  No, I do not recall.
10      Q.  Do you recall any testimony in those three
11  deposition about Neurontin -- Neurontin being used for
12  restless leg syndrome?
13      MR. MIZELL: Object to form.
14      A.  I do not recall in any of the three
15  depositions any references to Neurontin being used for
16  restless leg syndrome.
17      Q.  Do you recall any testimony in those
18  depositions about Neurontin being used for monotherapy
19  for epilepsy?
20      MR. MIZELL: Object to form.
21      A.  I do not recall in any of those three
22  depositions any references to Neurontin being used for
23  monotherapy for epilepsy.
24      Q.  Do you recall any testimony in those
25  depositions about the different types of indications

1   for which Neurontin was being prescribed?
2      A.  I do recall a reference to Neurontin being
3   used in the treatment of epilepsy, but the treatments
4   that I recall were all approved indications,
5   references.
6      Q.  Do you recall any deposition testimony about
7   Warner-Lambert's Neurontin Extended Disease Team?
8      A.  I don't recall.  I don't recall any
9   references to the Extended Disease Team.
10     Q.  What about any references in the deposition
11  testimony to a marketing agency called Cline, Davis,
12  Mann?
13     A.  It's difficult because I'm -- I'm very
14  familiar with Cline, Davis, Mann.   It's difficult for
15  me to recall whether I actually saw them referenced in
16  those three depositions.
17     Q.  How are you familiar with Cline, Davis, Mann?
18     A.  Cline, Davis, Mann is a -- a -- agency that a
19  number of pharma companies use.
20     Q.  For what purpose?
21     A.  For marketing.
22     Q.  Of branded drugs?
23     A.  Yes, actually for developing marketing
24  materials for branded, promotional, promoted drugs.
25     Q.  Have you ever worked with Cline, Davis, Mann?

1      A.  I have not.
2      Q.  But you know Pfizer individuals who have?
3      A.  I know of Pfizer brand teams that have used
4   Cline, Davis, Mann in the past.
5          And let me say when I say I haven't worked
6   with them, I have been in rooms where people from
7   Cline, Davis, Mann have been there.
8      Q.  Who from Cline, Davis, Mann have you sat in a
9   room and had a presentation given?
10     A.  I did not say that I sat in a room and had a
11  presentation given by anyone from Cline, Davis, Mann.
12  They were people from Cline, Davis, Mann in rooms and
13  they were in very large forums and I just know they
14  were from Cline, Davis, Mann.   I don't know specific
15  individuals.
16     Q.  Were these Pfizer meetings?
17     A.  Yes, they were.
18     Q.  Pfizer meetings at which Cline, Davis, Mann
19  representatives attended?
20     A.  Yes.
21     Q.  And these were meetings at which marketing
22  issues were addressed?
23     A.  Yes.
24     Q.  How long to your knowledge has Pfizer used
25  Cline, Davis, Mann?

1      A.  I -- I have no idea.  It was always done
2   within the function -- Marketing function of the
3   company.  And I don't evening know if any of the brand
4   teams still utilize Cline, Davis, Mann.
5      Q.  When was the last time you were in attendance
6   at a meeting where there was a Cline, Davis, Mann
7   representative?
8      A.  I don't recall.
9      Q.  More than a year ago?
10     A.  Yes.
11     Q.  More than two years ago?
12     A.  It's tough to -- it was definitely more than
13  a year ago.
14     Q.  And when was the first time that you recall
15  sitting in at a meeting or being in a conference call
16  where there was a Cline, Davis, Mann representative
17  also in attendance?
18         MR. MIZELL: Object to form.
19     A.  I don't recall ever being on a conference
20  call with anyone from Cline, Davis, Mann.  Probably
21  the first time I had any interaction with them was
22  when I moved to my position as Senior Director,
23  National Accounts, which meant that I was a
24  headquarters-based employee and attended
25  headquarters-based meetings.

1      Q.  When did you move to Pfizer's headquarters?
2      A.  I started my job in December of 2002.
3      Q.  Is that when you started at the Pfizer
4   headquarters?
5      A.  Yes.
6      Q.  Here in New York?
7      A.  Yes.
8      Q.  Before that, where were you located?
9      A.  I was located in our Reston, Virginia sales
10  office.
11     Q.  Near D.C.?
12     A.  Near D.C.
13     Q.  And that was when you were working on the
14  government accounts?
15     A.  That is correct.
16     Q.  Before that, where were you located?
17     A.  Before I actually moved into that office, I
18  was home office based and I lived in Alexandria,
19  Virginia.
20     Q.  Before that?
21     A.  Charlotte, North Carolina.
22     Q.  Is that where you started, was in Charlotte?
23     A.  No, I started in Southern California.
24     Q.  Okay.  So before Charlotte, North Carolina,
25  where were you?

Page 214

1    A.  I worked in Redlands, California.
2    Q.  You talked about deposition testimony,
3  Richter, DeSimone and Cavic, about medical symposiums.
4  Do you recall any deposition testimony about a company
5  called Physicians World?
6    A.  I don't recall any references to Physicians
7  World.
8    Q.  Do you know what Physicians World is?
9    A.  I do not.
10   Q.  Have you ever heard of that before?
11   A.  I never heard of that organization.
12   Q.  Have you heard of an organization called
13  Sudler Hennessy?
14   A.  I'm sorry?
15   Q.  Sudler Hennessy?
16   A.  I have not heard of that organization.
17   Q.  How about Healthcare Strategies Group?
18   A.  I have heard of Healthcare Strategies Group.
19   Q.  What do you know about them?
20   A.  Healthcare Strategies Group is a consulting
21  firm that specialized in managed markets.  They do a
22  lot of research around how pharmaceutical companies
23  are perceived by managed care organizations.  And
24  that's -- that's where I'm most familiar with their
25  work.

Page 215

1    They also do work around formulary strength
2  assessments.  But it's typically market research.
3    Q.  Are you responsible for the contract between
4  Pfizer and Healthcare Strategies Group?
5    A.  No.
6    Q.  Who is?
7    A.  I believe it would fall under our Vendor
8  Management Group, but at this point with the changes
9  in the organization, I -- I don't know.
10   Q.  Does that -- the cost for Healthcare
11  Strategies Group come out of your budget?
12   MR. MIZELL: Object to form.
13   A.  I'm not sure what --
14   Q.  Well, I made an assumption you had a budget
15  that you were in charge of.  So let me ask a
16  foundational question.
17   Do you have a budget that you are in charge
18  of?
19   A.  I do not have a budget other than just
20  operational expenses; and I'm talking things like
21  travel, which would include airfare, hotel, things
22  like that, for the business unit liaisons who report
23  to me -- that report to me.
24   Any kind of budget around any kind of market
25  research would come out of the CBU budget, which would

Page 216

1  be supervised by Michael Suesserman.
2    Q.  How many people do you have that report to
3  you today?
4    A.  I have a total of five.
5    Q.  So your budget that you are in charge of is
6  for your travel and then the travel of those five
7  individuals?
8    A.  Really it's for the travel -- two of the
9  individuals are administrative assistants, so they
10  don't travel.  They are not authorized to travel.  So
11  it's for me and my other three liaisons.
12   Q.  And what do your three liaisons do
13  specifically?
14   A.  Each one of them is assigned to a separate
15  business unit.  They sit on the business units'
16  leadership team.  They are involved in the development
17  and execution of managed access strategy with the
18  individual brand teams.  They are responsible for
19  coordinating with the Business Units and the Contract
20  Strategy Group, the development of contract strategy;
21  as well as ensuring that the individual Business Units
22  are kept up-to-date with changes in the U.S.
23  healthcare environment.
24   Q.  So you have one liaison who is assigned to
25  Pratt?

Page 217

1    A.  That's correct.
2    Q.  Another liaison assigned to Steere?
3    A.  That's correct.
4    Q.  A third liaison assigned to --
5    A.  Specialty.
6    Q.  Specialty.  Do you have anyone assigned to
7  the fourth group?
8    A.  Yes, that's me.
9    Q.  So your group is which one?
10   A.  Powers.
11   Q.  Powers.
12   Do the individuals who call on Kaiser report
13  to you?
14   A.  They do not anymore.
15   Q.  Who do they report to?
16   A.  Right now they report to Michelle Gile, who
17  is the Account Director in a -- in an interim position
18  responsible for Kaiser.
19   Q.  So we need you to hand write an
20  organizational chart for your group.  Let me give you
21  a piece of paper to do that.
22   A.  For my group?
23   Q.  Your group.  And then I'm trying to figure
24  out how the current Kaiser Managed Care Organization
25  is structured.

Page 218

1    Do you need a pen?
2    A.  Yeah, thank you.
3    Q.  Can you reach that?
4        MS. DALEY:  Have you produced all these
5    operating plans and business plans?
6        While he is doing that, can I ask you a
7    question?
8        MR. MIZELL: I would have to check and see
9    what's produced.
10       MS. DALEY: Can you find out before tomorrow?
11   Because as far as I know, they have not been
12   produced.
13       MR. MIZELL: I'm confident that all documents
14   that would be responsive to requests for
15   production have been produced.
16       MS. DALEY: I'm sorry, you said what?
17       MR. MIZELL: I'm confident that all documents
18   that would be responsive to requests for
19   production have been produced.
20       MS. DALEY: Okay.  Well, let's try it.  Court
21   orders?
22       MR. MIZELL: Yes, any documents that we have
23   been required to produce have been produced.
24       MS. DALEY: So documents relating to
25   communications with a named third-party payer

Page 219

1    regarding Neurontin have all been produced?
2        MR. MIZELL: Yes.  And in fact, to clarify, Mr.
3    Henderson's testimony about the set of documents,
4    I believe he said there were 28 or so documents,
5    are the documents that were responsive to that
6    order.
7        MS. DALEY: That's it?
8        MR. MIZELL: And they were produced.
9        MS. DALEY: That's it?
10       MR. MIZELL: Yes.
11       MS. DALEY: So the operating plans -- never
12   mind.
13       MR. MIZELL: I believe that was the production
14   that took place about two or three weeks ago.
15
16   CONTINUED DIRECT EXAMINATION BY MS. DALEY:
17       A.  This is a brief overview of -- and here's
18   your pen.
19       (Handwritten Organizational Chart marked
20   Henderson-4 for identification.)
21       Q.  Maybe you can just walk through the
22   organizational chart you did, which has just been
23   marked as Henderson Exhibit Number 4.
24       A.  Okay.
25       Q.  And tell us where you are in that

Page 220

1    organizational chart?
2        THE WITNESS: Can I borrow your pen?
3        A.  We have Account Management East, which --
4        Q.  On the far left-hand side of Henderson
5    Exhibit 4; right?
6        A.  Yes, far left-hand side of Henderson Exhibit
7    4.  These are Regional Account Managers that are in
8    the area Pfizer defines as the Eastern Area, which is
9    essentially the eastern half of the U.S.
10       We have Account Management West, next going
11   from left to right; and these are the Regional Account
12   Managers responsible essentially for the western half
13   of the country.
14       We have the Customer Strategy Group, which
15   has two organizations; it has the Account Directors,
16   and the National Account Managers report to the six
17   Account Directors.
18       And we have the Customer Development Team,
19   which includes the Customer Development Managers.
20       Next we have the Market Analytics Team.  Next
21   to the right we have the Business Unit Liaisons, which
22   is my team.
23       Next we have Contracting.  And finally on the
24   far right-hand side we have the Market Strategy Group,
25   which consists of three separate departments.  One is

Page 221

1    Market Strategy, one is Government -- Government
2    Strategy & Associations; and the final one is
3    Employers.
4        Q.  And all of those individuals report up to
5    who?
6        A.  They all report into Michael Suesserman.
7        So the leaders of each of these individual
8    entities report up to Michael Suesserman.
9        Q.  What does the Marketing Analytics Group do?
10       A.  They do a lot of modeling, break-even
11   analysis modeling around contracting.
12       Q.  So they are looking at specific customers, as
13   compared to looking at specific brands?
14       A.  It -- It could be a little of both; but
15   primarily to date their focus has been on particular
16   customers.
17       Q.  Have you ever participated in any PBM
18   Advisory Boards or TPP Advisory Boards?
19       MR. BLOOM: Object to form.
20       A.  TP -- TPP meaning Third-party Payer?
21       Q.  Right.
22       A.  I -- I have probably participated in, as I
23   recall, only one Third-Party Payer Advisory Board, but
24   I have not participated in any PBM-specific Advisory
25   Boards.

Page 222

1    Q.   Are there any rules or requirements regarding
2  how those boards are set up to ensure that are not
3  promotional?
4    A.   Oh, there are very specific rules --
5    Q.   What are those rules?
6    A.   -- outlining -- there are rules around who
7  can be invited, who does the inviting, they -- what --
8  what types of information can be discussed.  The
9  requirement really is -- these advisory boards are
10 designed for us to get our customers in -- in a
11 setting where they can provide feedback on what market
12 dynamics exist around given therapeutic classes and to
13 just get the -- gain their insights.
14   Q.   So would an example of a therapeutic class be
15 anti epileptic drugs?
16   A.   It could be.
17   Q.   You said you recall participating in one
18 advisory board.  Do you recall what the topic of that
19 advisory board was?
20   A.   Yes, it was a cholesterol advisory board that
21 was held out in California.
22   Q.   Do you know of any advisory boards involving
23 anti epileptic drugs?
24   A.   I'm not aware of any advisory boards that
25 Pfizer has held around anti epileptic drugs.

Page 223

1    Q.   At the time of the acquisition by Pfizer of
2  Warner-Lambert, you were in D.C.?
3    A.   Yes, that's correct.
4    Q.   And you were working there as the National
5  Account Manager for the VA, DOD or Area Manager
6  Federal Markets East.  Is that correct?
7    A.   As soon as the acquisition took place is when
8  I became the Area Manager.
9    Q.   Okay.  So at the time that the acquisition
10 was being worked on, you were a National Account
11 Manager for the VA/DOD; right?
12   A.   That's correct.
13   Q.   Were you involved at that time in any
14 communications with Kaiser?
15   A.   Not with Kaiser, no.
16   Q.   Were you involved at that time in any
17 communications with Aetna?
18   A.   No.
19   Q.   The sole customers that you were talking to
20 at that time, being 2000, was the government?
21   A.   Well, specifically the Department of Veterans
22 Affairs and the Department of Defense.
23   Q.   Okay.  Not even -- a particular part of the
24 government is who you were communicating with; right?
25   A.   I'm sorry?

Page 224

1    Q.   You were talking with a particular division
2  of the government, is what you are saying?
3    A.   That's correct.
4    Q.   Yes.
5    A.   I clarify that because there are many, many
6  different government entities that -- that Pfizer
7  interacts with.
8    Q.   And then you took over as Senior Director,
9  National Accounts, in December of 2002; right?
10   A.   That is correct.
11   Q.   How long had Mr. Reese been working on Kaiser
12 sales?
13   A.   I don't know prior to the acquisition,
14 because I didn't ask him; but I know that at least
15 from the time of the acquisition until present, he has
16 been the District Manager there, because I asked him
17 that question.
18   Q.   What about Mr. Dauser?
19   A.   Mr. Dauser assumed -- assumed responsibility
20 for that I want to say in 2001.  But it was definitely
21 after the acquisition.
22   Q.   And their boss?
23   A.   Well, their boss has changed over the years.
24   Q.   I'm trying to remember his name, the guy you
25 talked to? Kirk?

Page 225

1    A.   Oh, Bachman.
2    Q.   Kirk Bachman, thank you.
3    A.   To clarify, they do not report to Kirk
4  Bachman.  Kirk is the National Account Manager.  So
5  they are kept in a separate  -- they don't directly
6  report to Kirk.  Kirk assumed responsibility for
7  Kaiser, I believe it was in 2004.
8    Q.   Who was the National Account Manager for
9  Kaiser before Mr. Bachman?
10   A.   Mark Emtiaz.
11   Q.   Did you talk to him in preparation for
12 today's deposition?
13   A.   I did not.
14   Q.   Where is he?
15   A.   He left the company, and I don't know where
16 he is.
17   Q.   How long did Mr. Emtiaz -- how long was Mr.
18 Emtiaz the National Account Manager with
19 responsibility for Kaiser?
20   A.   I believe he was probably hired in 1999, but
21 I don't know definitively.
22   Q.   From 1994 to 2004, was he the National
23 Account Manager for Kaiser?
24   A.   It is some very similar timeline.  I don't
25 know if those are the exact dates, but, yes, that's

Page 226

1   the period.
2       Q.   What is the difference in responsibilities
3   between a National Account Manager for Kaiser and a
4   District Manager for Kaiser?
5       A.   Well, I guess it really comes down to the
6   difference between account management versus sales.
7   District managers are part of the traditional pharma
8   sales model, meaning that they have representatives
9   that report to them that call on healthcare providers
10  who write prescriptions.
11      Account managers typically call -- they do
12  not call on the healthcare providers that write the
13  prescriptions.  They call on various entities within
14  accounts, and there's a wide variety of accounts, and
15  provide promotional information to -- to people such
16  as pharmacy directors.
17      Q.   Okay.  So the District Managers for Kaiser
18  would be calling actually on the physicians?
19      A.   Actually, the District Managers are
20  supervising the representatives that are calling on
21  healthcare providers, mainly physicians.
22      Q.   And the account manager is the one calling
23  them on the pharmacy director or the medical director
24  within the Kaiser organization?
25      A.   That's correct.  But there are other -- so,

Page 227

1   for example, in Kaiser they also call on the DICs, the
2   Drug Information Clinicians.  They also call on the
3   Contracting Department, which is part of their -- I
4   believe their Acquisition Department in Kaiser.
5       Account managers are also the ones charged
6   within Pfizer to negotiate contracts with entities
7   that meet Pfizer's criteria for contracting.
8       Q.   How are Account Managers compensated for
9   their work?
10      A.   Well, it varies, and it varies by level.  But
11  in general, account managers have a component of their
12  work that is based on overall performance of U.S.
13  pharmaceuticals, overall performance of whatever team
14  they are a part of, and then market share and market
15  share change within their individual account.  That's
16  part of their compensation.
17      The other part of their compensation centers
18  around accomplishment of business plan goals or
19  operating plan goals.  And then finally, they
20  typically have a component in their -- their
21  compensation that resolves around other objectives.
22  They could, for example, be around mentoring, things
23  that are -- are consistent with Pfizer's values and
24  leader behaviors.
25      Q.   So when you were Senior Director of National

Page 228

1   Accounts For Health Plans in December of 2002 to
2   September, 2005, were these factors that you just
3   mentioned criteria that was used in determining
4   compensation for the Account Managers who reported to
5   you?
6       A.   Actually, it has evolved over time.  There
7   were difficulties back when I started in 2002 with --
8   with some of the data sets that -- that we used for
9   incentive compensation.  But fundamentally the -- the
10  tenets that I outlined were basically the same
11  buckets:  The buckets around performance at a U.S.
12  level; my team, meaning the National Account, Health
13  Plan team; and then the individual account, as much as
14  we could get the data.
15      An interesting side note is that a unique
16  anomaly around Kaiser is Kaiser is one of the only
17  accounts in the U.S. that doesn't sell their data.  So
18  consequently there is no mechanism for getting Kaiser
19  sales data.  So we are unable to incentivize the
20  account manager around any kind of sales data, other
21  than what Kaiser buys directly from Pfizer.
22      And because -- because of the way the
23  agreements are structured, it's not an accurate
24  measure of anyone's performance.
25      Q.   So rather than using Kaiser as an example,

Page 229

1   let's use Aetna as an example.
2       A.   Okay.
3       Q.   And I'm assuming that Aetna sells their data
4   so they can evaluate it?
5       A.   Yes, and when I say they sell their data,
6   it's not that they sell it to Pfizer.  They actually
7   -- it's actually when I say sell -- sell it, it makes
8   it sound like Aetna is selling it, whereas it's
9   typically to wholesalers that service the pharmacies
10  that are in Aetna's pharmacy network.
11      Q.   Okay.  So Aetna is not actually selling the
12  data?
13      A.   Correct.
14      Q.   Okay.
15      A.   They are -- typically they are cognizant that
16  their data is being sold through whatever wholesaler
17  is servicing their pharmacy network.
18      Q.   But at the time of that sale, it is actually
19  the wholesaler' number, it is not Aetna's number?
20      A.   No, there is an identifier on the data when--
21  where it ultimately is adjudicated back to.  And it
22  goes back to Aetna.
23      But consequently this is why there is so much
24  inaccuracy of all of the data sets that we get.
25      Q.   When you say that you look at market share

Page 230

1  and market share changes within an individual account
2  in incentivizing account managers, what do you mean by
3  market share and market share changes?
4      A.  So you benchmark what the current market
5  share is and how that market share relates to like
6  accounts.  So, for example, when you establish the
7  baseline, you don't compare a state Medicaid baseline
8  to a commercial health plan baseline.  You -- the
9  comparison is to an apples-to-apples comparison.
10     Q.  So for Aetna, what would be an
11 apples-to-apples comparison?
12     A.  CIGNA.
13     Q.  And when you are looking at market share, you
14 are looking at overall market share of Pfizer drugs
15 vis-a-vis other company's drugs?  Or how is that
16 market share calculated?
17     A.  The market share is calculated back to these
18 -- these therapeutic market baskets that have been
19 created for each of our products.
20     Q.  So you would have this, for instance anti
21 epileptic drug market basket that you would look at
22 over time?
23     A.  That is correct.
24     Q.  And looking at what share of Pfizer drugs
25 Aetna would use in the anti epileptic drug market

Page 231

1  basket?
2      A.  If you were compensating on that market
3  basket.  We only compensate and only measure on the
4  products that we are actively promoting.  So it's not
5  all Pfizer products.  It is just Pfizer products that
6  are promoted.
7      Q.  Do the account managers get a list of the
8  Pfizer drugs that are being actively promoted?
9      A.  Oh, they are very -- I mean they are not
10 handed a list per se.  Typically what used to happen,
11 and it's a reference you saw in one of the documents
12 around the lead waiting, is they will get a document
13 that shows all of the Pfizer products and who is
14 selling which individual products within each
15 individual business unit and what it's weighted.
16     Q.  Is that in the Henderson Exhibit Number 3
17 where you saw that, which is right in front of you, I
18 think?
19     A.  Yeah, yes.  You --
20     Q.  Where did you see that?
21     A.  I saw that there was some recommendation
22 on -- okay.
23         So if you go to Henderson Exhibit Number 3,
24 Page 19 where it says they are looking for -- they are
25 looking for a full-year promotion --

Page 232

1      MR. MIZELL:  I'm sorry, Jeff.  Just a second.
2  You mean 19, in the bottom right-hand corner?
3      THE WITNESS:  Yes, 19 in the bottom right-hand
4  corner, and the slide is titled "Key Issues For
5  Today."
6      A.  And the reference is Number 1 where it says,
7  "Full year for promotion with a lead primary weighted
8  PCP field force."
9          What that reference is to is not necessarily
10 that they are -- what this is talking about.  It's
11 just talking about, in Pfizer jargon, weighted
12 products.  So when a sales force has a weighted
13 product, the weighting prioritizes for them how -- how
14 they are going to sell that product, meaning where
15 it's going to fall in the mix of products they're
16 responsible for.  Because most sales reps are
17 responsible for multiple products.
18     Q.  So the Neurontin team was looking here to
19 make Neurontin a -- to have the incentive go out to
20 the sales force to focus on Neurontin?
21     A.  The way I read this --
22     MR. MIZELL:  Object to form.
23     Q.  I'm just trying to understand it, yeah.
24     A.  The way I read this is the Neurontin team was
25 actually asking for two things -- three things here.

Page 233

1  Because as -- as we know, only a selected group of
2  representatives in PD2 were promoting this product.
3          So they are asking for full coverage of an
4  entire sales force that call not only on specialists,
5  but call on P -- PCPs; as well as have that product
6  the lead product, which means it's the most heavily
7  weighted product.
8      Q.  There is more incentive bonus or compensation
9  tied to that product if you make those sales.  Is that
10 what you are saying?
11     A.  That is correct.
12     Q.  At the time that Pfizer acquired
13 Warner-Lambert and as part of the due diligence that
14 Pfizer did, did it obtain information about formulary
15 access for Neurontin at the various Healthcare
16 Management customers?
17     A.  I am not aware of -- of -- of any type of
18 initiative that was done within the Healthcare Cluster
19 or the previous versions of the Healthcare Cluster.
20 I -- I don't know exactly what kind of market research
21 was conducted.
22     Q.  In connection with your work in the Managed
23 Care Group, whatever it gets called, Healthcare
24 Cluster, etc., is there a concept that you are
25 familiar with where you try to keep a particular drug

Page 234

1    below the radar so that third-party payers are not
2    focusing their attention on how a drug is being
3    utilized?
4        MR. MIZELL: Object to form.
5        A.  I'm not familiar with a concept like that,
6    because in -- in my world, all third-party payers are
7    acutely aware of brand drug utilization.
8        Q.  And by "brand drug utilization," what do you
9    mean?
10       A.  I mean that from a pharmacy expenditure point
11   of view, branded drugs are typically their biggest
12   cost driver; and because of automation the way it is
13   and technology the way it is, they -- "they" meaning
14   pharmacy directors and others responsible for -- for
15   pharmacy expenditure within third-party payers,
16   carefully track branded drug utilization.
17       Q.  And when you say "branded drug utilization,"
18   you are referring to the total expenditures, not the
19   indications for which the drug is being prescribed;
20   right?
21       A.  Actually -- I am talking about actually unit
22   cost.  As I previously indicated, it is virtually
23   impossible for -- for third-party payers to take
24   pharmacy claims data and marry it up to medical data
25   to know what the indications are.

Page 235

1        So if you take Aetna, for example, Aetna does
2    not own doctors.  Aetna contracts with doctors.
3    Doctors run -- doctors have medical records on their
4    patients that they maintain in their own offices.  So
5    when a patient goes to a pharmacy to get a
6    prescription filled, the pharmacist is just doing what
7    the physician directed.  Unless it comes up on the
8    health plan -- or on the screen and it requires a
9    prior authorization or something else like that.
10       Unless Aetna does their own audit of their
11   own providers in their network to marry up pharmacy
12   claims data with medical claims data, there is no
13   automated mechanism within most organizations, most
14   third-party payers, to do that.
15       Q.  Now, you talked about earlier, about the
16   claims information or the expenditure information that
17   comes back to Pfizer under the contracts that you have
18   with the various third-party payers; right?
19       A.  Yes.
20       Q.  And that's for purposes of determining
21   rebates?
22       A.  That is correct.  When we enter into a
23   negotiation, third-party payers that enter into a
24   contract with Pfizer are required to submit data to us
25   in order to -- to get their rebate.

Page 236

1        That being said, they don't submit data to us
2    on products that are not contracted.  So it's only
3    contracted products.
4        Q.  Why does Pfizer have rebate agreements with
5    third-party payers?
6        A.  Pfizer enters into -- Pfizer enters into
7    agreements with third-party payers to ensure that
8    access exists for our products so that the patients
9    that are within these third-party payer organizations
10   have access to the products.
11       Q.  How is it that rebates provide access to the
12   products?
13       A.  Because our -- typically our contracts are
14   access- and performance-based contracts, and the
15   mechanism for -- for incentivizing the plan, if you
16   will, for putting us in a more favorable formulary
17   position, is through rebates.
18       Q.  What do you mean by a "more favorable
19   formulary position"?
20       A.  Pfizer contracts typically for --
21   philosophically, we contract for second tier
22   unrestricted access.
23       Q.  What's first tier?
24       A.  First tier -- first tier by most standards is
25   a generic tier, a very low co-pay.

Page 237

1        Q.  And is there something beyond a second tier?
2        A.  And that's why I say typically we only
3    contract for second tier unrestricted.
4        In the healthcare market in the U.S. today,
5    that are multiple tiers.  But in general, most plans
6    have the following formulary structure: Tier 1 is
7    generics, Tier 2 is preferred brands, and Tier 3 is
8    all other brands.
9        You then get into specialty products, which
10   are very, very costly, typically for diseases that are
11   very uncommon, and that's when you get Tier 4,
12   coinsurance and things like that.
13       Q.  What do you mean by a preferred brand?
14       A.  Plans typically will prefer a product, and they
15   typically will do that because they have entered into
16   a contract with a manufacturer.  However, there are
17   cases where they will determine that because of
18   medical necessity, a product needs to be moved to
19   second tier.
20       Q.  So, for instance -- and, again, let's take a
21   drug like an AED drug.
22       (A discussion is held off the record.)
23       Q.  If Pfizer is looking for a particular drug to
24   be on Tier 2, and let's say it's in an -- it's an AED
25   drug, are you looking to be the preferred brand for

60 (Pages 234 to 237)

Page 238

1  the AEDs?
2      A.  We -- we typically do not contract to -- for
3  a better position.  In a given class, typically -- and
4  this is where -- first of all, we don't contract any
5  kind of performance agreements in the AED class.
6      Why is that?  Well, we -- because many of the
7  products in the AED class have different indications,
8  it's very difficult to lump them into an individual
9  class.  So with the exception of the Aetna agreement,
10 and maybe others that I'm not aware of, but I've been
11 told that it's only Aetna, that was the only agreement
12 that came over from Parke-Davis, Warner-Lambert
13 that -- that had -- included Neurontin.
14     But typically we are not trying to exclude
15 anyone else, is the answer to your question.
16     Q.  I am trying to go back to this preferred
17 brand, so it's more just trying to get on the Tier 2
18 co-pay level.  Is that correct?
19     A.  Preferred brand is an industry term, and when
20 I say "industry," I'm talking managed care term, where
21 they put their preferred brands across all classes.
22     Q.  Who actually at Pfizer would do the
23 negotiations to determine at what tier your drugs end
24 up?
25     A.  The National Account Manager does -- is

Page 239

1  responsible for all contract negotiations with
2  national accounts.  The -- the process for which that
3  takes place is:  The first thing is a confidentiality
4  agreement is negotiated between the customer and
5  Pfizer.
6      Following that, the National Account Manager
7  will work with the Contract Development Manager to
8  come up with a term sheet that has prospective terms
9  that we begin to negotiate through.
10     Typically, the customer will provide us a
11 list of the products that they want to contract for.
12     Q.  So when it came to the contract that
13 Warner-Lambert Parke-Davis had with Aetna, do you know
14 who negotiated that contract?
15     A.  Actually the contract -- under the strict
16 definition of "negotiation," the contract wasn't
17 negotiated.  We basically took an amendment that had
18 all of the existing contracted products, and just
19 amended the existing Pfizer contract.  And Greg Park
20 was the National Account Manager responsible for that.
21     Q.  Let me go back to my question.
22     I understand that an amendment was made to
23 the Pfizer contract with Aetna.  But who, when it was
24 the Warner-Lambert Parke-Davis contract with Aetna,
25 who negotiated that contract?

Page 240

1      A.  I don't know.
2      Q.  Did you ask anyone?
3      A.  I did not.
4      Q.  Do you know whether there was a National
5  Account Manager at Warner-Lambert who was in charge of
6  Aetna?
7      A.  I do not know.
8      Q.  Do you know whether there was a National
9  Account Manager at Warner-Lambert that was in charge
10 of Kaiser?
11     A.  I do not know.
12     Q.  Do you know whether there was a National
13 Account Manager at Warner-Lambert who was in charge of
14 Blue Cross-Blue Shield of Louisiana?
15     A.  I do not know, but I would speculate because
16 it is just in Louisiana, that it wouldn't be a
17 National Account Manager.
18     Q.  Did you talk with Greg Park about the
19 contract with Aetna?
20     A.  I did not.
21     Q.  Is he still a Pfizer employee?
22     A.  No.
23     Q.  When did he leave?
24     A.  He left in December of 2006.
25     Q.  Do you know where he's at?

Page 241

1      A.  I believe he's in New Jersey.
2      Q.  Do you know who is Financial Account Manager
3  for Aetna right now?
4      A.  Yes.
5      Q.  Who?
6      A.  Kent McKinney.
7      Q.  Does the contract with Aetna today provide
8  for rebates for purchases of Neurontin?
9      A.  No.
10     Q.  That got changed?
11     A.  As soon as the original contract with Aetna
12 expired, Pfizer by that time had had time to do their
13 due diligence around a contracting strategy for
14 Neurontin, and it was decided we would not contract
15 for Neurontin with any customers.
16     MS. DALEY:  We will take a break for the tape.
17     THE VIDEOGRAPHER:  The time is approximately
18 5:29.  This ends Tape Number 5.  We are now going
19 off the record.
20     (A recess is taken.)
21
22 CONTINUED DIRECT EXAMINATION BY MS. DALEY:
23     THE VIDEOGRAPHER:  The time is approximate the
24 5:46.  This begins Tape Number 6.  We are now on
25 the record.

Page 242

1   Q.  Mr. Henderson, you testified that -- before
2  the break that Pfizer had had time to do due diligence
3  around a contracting strategy for Neurontin.  Do you
4  remember that?
5   A.  Yes, I do remember that.
6   Q.  What did Pfizer decide to do due diligence
7  around a contracting strategy for Neurontin?
8   A.  We do a contracting strategy around every
9  product.  And because there was this existing contract
10  that existed for -- for the -- for Aetna, we just did
11  our due diligence to see if -- if there was some
12  reason to contract for this product.
13   Q.  What did you do in connection with the due
14  diligence to determine whether to have a contracting
15  strategy around Neurontin?
16   A.  Well, one of the things we did, and I do want
17  to clarify around the Aetna contract, the amendment
18  for the Aetna contract, Warner-Lambert Parke-Davis
19  only contracted for access only.  Pfizer
20  philosophically believes in contracting for
21  performance and access.  In this --
22   Q.  So -- so can I -- sorry to interrupt.  But I
23  want to understand the difference.
24   "Access" only means whether or not they are
25  on formulary, as opposed to rebates for performance?

Page 243

1   A.  That's correct.
2   Q.  So Warner-Lambert wasn't providing rebates
3  for Neurontin?
4   A.  No, that is incorrect.
5   Q.  Okay.
6   A.  Warner-Lambert was somehow, in their
7  contractual arrangement with Aetna, was contracting
8  for access only, meaning formulary position for
9  Neurontin with Aetna.
10   Q.  Was there a rebate tied to that?
11   A.  Yes.
12   Q.  How did it change, then, when Pfizer took
13  over?
14   A.  It didn't change when Pfizer took over.
15   Q.  It stayed the same?
16   A.  Yes.  We were -- we -- we took the existing
17  terms and conditions and amended Pfizer's existing
18  contract with Aetna, recognizing that all of the other
19  products that Pfizer had contracted with Aetna had an
20  access and performance component.
21   But since Warner-Lambert Parke-Davis had this
22  access only contract, we-amended our contract to -- to
23  just continue on with the Pfizer-based contract.
24   Q.  Okay.  Going back to then my question was
25  trying to follow up on your comment that Pfizer did

Page 244

1  due diligence around a contracting strategy for
2  Neurontin.
3   What did you do in this due diligence to
4  determine a contracting strategy for Neurontin?
5   A.  Well, in part of the due diligence you
6  determine formulary access, whether you need to
7  contract or not.  Again, because Pfizer contracts for
8  performance, we recognized that because of the various
9  indications that exist in the AED class around a lot
10  of the products, that a performance rebate couldn't be
11  done.  You couldn't put it together to be consistent
12  with the way we contract with our other brands.
13   Q.  Because Neurontin was being used for so many
14  different indications?
15   A.  Oh, no, no.
16   MR. MIZELL: Object to form.
17   A.  It's around the fact that you can't -- you
18  can't define.  So when you have products in an
19  individual market basket that have other indications,
20  they just happen to have the same indication as
21  Neurontin as far as the treatment of epilepsy, it's
22  difficult to define the market basket in contracting
23  terms.
24   Q.  So did Pfizer find it difficult to define a
25  market basket for Neurontin?

Page 245

1   A.  Not defining a market basket in the sense of
2  the word as a market basket in which we were going
3  to -- to look at Neurontin.
4   But as far as defining it in a contracting
5  market basket, yes, we found it was impossible.
6   Q.  And why was it impossible to define Neurontin
7  in terms of a contracting market basket?
8   A.  Because the other products that are in that
9  basket are indicated for other things.  So if you were
10  going to accurately measure performance and measure
11  market share, as in a contractual relationship, you
12  need to have an apples-to-apples comparison.
13   Q.  What are these other products in the market
14  basket -- the contracting market basket for Neurontin?
15   A.  We didn't --
16   MR. MIZELL: Object to form.
17   A.  We didn't have a contracting market basket,
18  because we did our due diligence and chose not to
19  contract for Neurontin.
20   Q.  Well, I'm trying to understand the testimony
21  you just gave.
22   So it was difficult to define a market basket
23  because other products in that basket are indicated
24  for other things.  What do you mean by that?
25   A.  So when you have products with multiple

Page 246

1 indications in multiple therapeutic areas --
2    Q.   Was Neurontin a product with multiple
3 indications in multiple therapeutic areas?
4       MR. MIZELL: Were you finished with your
5    answer?
6       MS. DALEY: Oh, I'm sorry.
7       MR. MIZELL: Just let him finish real quick.
8    A.   When you have products with multiple
9 indications in multiple therapeutic areas, it makes it
10 very difficult to do an apples-to-apples comparison,
11 and really doesn't make good fiscal sense to enter
12 into a contractual performance relationship with a
13 third-party payer.
14    Q.   Was Neurontin a product with multiple
15 indications in multiple therapeutic areas?
16    A.   At the time that we acquired Parke-Davis,
17 Warner-Lambert, no, it had one indication.
18    Q.   Okay.  So what was the problem, then, with
19 having a market basket for Neurontin?
20       MR. MIZELL: Object to form.  Outside scope.
21    A.   As our people were doing their due diligence,
22 they recognized that there was a possibility during
23 the duration of the contract that we could get other
24 indications.
25    Q.   At the time -- was this due diligence done in

Page 247

1 2000?
2    A.   I believe it was done in 2000 and 2001.  We
3 typically revisit contracting strategies annually.
4    Q.   At the time that Pfizer acquired
5 Warner-Lambert, were there other -- were there
6 applications for other indications on file with the
7 FDA for Neurontin?
8    A.   I'm not familiar with that.
9    Q.   Well, you said that your team recognized or
10 the team recognized that it was possible during the
11 contracting period that there could be other
12 indications obtained for Neurontin.  Did I understand
13 that correctly?
14    A.   When the Contract Strategy Team meets with
15 any given brand team, part of the discussion centers
16 around a brand team's projection on future indications
17 around a product.  Because our contracts are
18 multi-year products -- are multi-year contracts,
19 issues like I have described around multiple
20 indications, future approval of multiple indications,
21 are taken into account.
22    Q.   Who is on the Contract Strategy Team?
23    A.   At -- At the time, I know Joe Butera was
24 charged with that.  Whether he did it individually
25 himself, or one of his designees of somebody on the

Page 248

1 Contract Commercial Team did that due diligence, I
2 don't know.
3    Q.   What did he tell you about this determination
4 in the contracting strategy regarding Neurontin?
5       MR. MIZELL: Object to form.
6    A.   For one, it was clear that Warner-Lambert
7 Parke-Davis didn't have contracts in place, and there
8 was a reason for that; and the reason was because the
9 product had great access and there was no reason to
10 contract for it.
11       And additionally, because of concerns about
12 being consistent with Pfizer's current contracting
13 strategy around performance and access for our
14 products.
15    Q.   What did Mr. Butera tell you about when the
16 Contracting Strategy Team met with the Neurontin brand
17 team, what he found out or his designee found out?
18    A.   He didn't tell me.  He told me the output of
19 what the Contract Strategy Team recommended, which was
20 to not contract for Neurontin with third-party payers.
21    Q.   Did he tell you that the Contract Strategy
22 made that recommendation based upon discussion with
23 the Neurontin brand team?
24    A.   Yes, he made it clear to me that a discussion
25 took place between the Contract Strategy Team and the

Page 249

1 Neurontin brand team.
2    Q.   Do you know who was on the Neurontin brand
3 team?
4    A.   I do not.
5    Q.   And do you know who was on the Contract
6 Strategy Team?
7    A.   Again, Joe Butera, the Director/Team Leader
8 for the contract -- Commercial Contracting Group was
9 charged with doing the due diligence and developing
10 commercial contracts for Pfizer.
11    Q.   What were these other indications that were
12 possibly -- or possible to be obtained for Neurontin
13 at the time that this due diligence was being done?
14    A.   The only one that I am aware of was
15 post-herpetic neuralgia.
16    Q.   To your knowledge, has Pfizer ever had any
17 drugs other than Neurontin that were approved for
18 indications in two or more different classes?
19    A.   Yes.
20    Q.   Can you give me an example?
21    A.   Lyrica.
22    Q.   Does Pfizer have performance-based contracts
23 with third-party payers on Lyrica?
24       MR. MIZELL: Let's use a different example,
25    based on the objection and instruction that Lyrica

63 (Pages 246 to 249)

Page 250

1  is not within the designation today.
2      THE WITNESS:  Okay.
3      MS. DALEY: Well, I want my question answered,
4  or if you are going to instruct this witness not
5  to answer the question, I want to know if that's
6  what you are going to do.
7      MR. MIZELL: Yes, we are not going to answer
8  the question and I suggest we ask for another
9  example.
10      THE WITNESS:  Okay.
11      MS. DALEY: Wait.
12      So now you are instructing him not to answer my
13  question?
14      MR. MIZELL:  Right.
15  Q.   And you are following your counsel's
16  instructions?
17  A.   Yes.
18  Q.   So now your counsel has instructed you to
19  give another example. Do you have one that you can
20  give?
21  A.   The closest I can come to, it's not multiple
22  indications, it's Celebrex.  And the reason I bring
23  that up, we only contract for access, because
24  Celebrex, with the removal of Vioxx and Bextra from
25  the market is the only Cox 2 that consists.

Page 251

1      So it's not possible to define a market
2  basket, a contracting market basket.
3  Q.   Because it's the only one in the basket?
4  A.   That is correct.
5  Q.   And the basket is the Cox 2 inhibitors?
6  A.   Yes, that's correct.
7  Q.   If you were to have a drug that has more --
8  two or more indications approved by the FDA in
9  different therapeutic classes, how would you go about
10  creating a performance-based term for that drug?
11      MR. MIZELL: Outside the scope.
12  A.   That's -- that's speculative.  However, we
13  have been unable to determine any mechanism to do
14  that.  So consequently to date when we have multiple
15  indications outside different therapeutic classes, we
16  only contract for access.
17  Q.   Were you involved in any analysis at the time
18  of the acquisition by Pfizer of Warner-Lambert of the
19  formulary status issues?
20      MR. MIZELL: Object to form.
21  A.   I was not.
22  Q.   Do you know of anyone who was from Pfizer?
23      MR. MIZELL: Same objection.
24  A.   I don't know specifically who -- who would
25  have been involved in that.

Page 252

1  Q.   You believe there was one done?
2  A.   I do believe that, yes.
3  Q.   And do you believe that there was an analysis
4  done to determine whether or not Neurontin --
5      MS. DALEY: Well, strike that.
6  Q.   -- what the formulary access was for various
7  third-party payers for Neurontin?
8  A.   Based on Henderson Exhibit 3, I do believe
9  that analysis was done.
10  Q.   Do you know whether any of the operating
11  plans that Pfizer has for Neurontin have any reference
12  to the Healthcare Cluster or any of the Managed Care
13  units?
14  A.   Other than what I saw in Henderson Exhibit 3,
15  and I don't even know that this is an operating plan,
16  because while the cover e-mail sheet says "Op Plan
17  Documents," the title page, 014, does not say
18  Operating Plan.
19      Other than this document, I am not aware of
20  any references to the Healthcare Cluster.
21      MS. DALEY: I notice it's 6:01.
22      We'll break for the day.
23      THE WITNESS: Great.
24      MR. MIZELL: Can we start at nine tomorrow?
25      MS. DALEY: Yes.

Page 253

1      MR. BLOOM: The time is approximately 6:02.
2  This concludes today's deposition. We are now
3  going off the record.
4      (Mr. Mizell retains the exhibits for
5  tomorrow's deposition.)
6      (The deposition is adjourned.)
7
8
9              *    *    *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

64 (Pages 250 to 253)

Page 254

1   C E R T I F I C A T E
2
3
4        I, MARK SCHAFFER, a Shorthand Reporter and
5   Notary Public of the States of New York and New
6   Jersey, do hereby certify that prior to the
7   commencement of the examination the witness was sworn
8   by me to testify to the truth, the whole truth and
9   nothing but the truth.
10       I do further certify that the foregoing is a
11  true and accurate transcript of the testimony as taken
12  stenographically by and before me at the time, place
13  and on the date hereinbefore set forth.
14       I do further certify that I am neither of
15  counsel nor attorney for any party in this action and
16  that I am not interested in the event nor outcome of
17  this litigation.
18
19
20
21
            MARK SCHAFFER, C.S.R.
22
23  New Jersey C.S.R. License Number XI00794
    Notary Public of the State of New Jersey
24  Commission No. 55985 Expiring September 13, 2011
    Notary Public of the State of New York
25  Registration No. 01SC4953912 Expiring July 31, 2009

Page 255

1   IN RE NEURONTIN MARKETING      )
    AND SALES PRACTICES LITIGATION )
2                                  )
3   IN RE: NEW YORK NEURONTIN      )
    PRODUCTS LIABILITY LITIGATION  )
4        Defendants.     )
5   ------------------------------X
6
7
8
9
10       I have read the foregoing transcript and found
11  it to be a truthful and accurate representation of the
12  testimony I gave in connection with the captioned
13  matter on_____.
14
15
16
17       _____
         JEFFERSON S. HENDERSON, III
18
19
20  The State of:
    County of:
21
22
23  Sworn and subscribed before me
    this      day of     , 2007
24  My commission expires:
25

Page 256

1   E R R A T A   S H E E T
2
3        Please list any correction with the
    corresponding page and line numbers.
4
         PAGE   LINE           CORRECTIONS
5   1.           :
6   2.           :
7   3.           :
8   4.           :
9   5.           :
10  6.           :
11  7.           :
12  8.           :
13  9.           :
14  10.          :
15  11.          :
16  12.          :
17  13.          :
18  14.          :
19  15.          :
20  16.          :
21  17.          :
22  18.          :
23  19.          :
24  20.          :
25

257

<pre>
  1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
  2

  3                                  :
     IN RE NEURONTIN MARKETING       : MDL DOCKET NO. 1629
  4  AND SALES PRACTICES             : Master File No. 04-10981
     LITIGATION                      : Judge Patti B. Saris
  5                                  : Magistrate Leo T. Sorokin
                                     :
  6  --------------------------  X  ------------------------
  7  SUPREME COURT OF THE STATE  : Case Management
     OF NEW YORK                 : Index No. 765,000/2006
  8  COUNTY OF NEW YORK          : Hon. Marcy S. Friedman
     --------------------------  :
  9  IN RE: NEW YORK NEURONTIN   :
     PRODUCTS LIABILITY          :   VIDEOTAPED DEPOSITION
 10  LITIGATION                  : UPON ORAL EXAMINATION OF
                                 :    30(b)(6) DESIGNEE
 11                              :   JEFFERSON STIERHEIN
                                 :      HENDERSON III
 12                              :
     --------------------------          VOLUME 2
 13                              X  ------------------------

 14

 15

 16         TRANSCRIPT of testimony as taken by and before

 17  MARK SCHAEFER, a Certified Shorthand Reporter and

 18  Notary Public of the States of New Jersey and New

 19  York, at the offices of Davis, Polk, 450 Lexington

 20  Avenue, New York, New York 10022 on Thursday,

 21  December 6, 2007, commencing at 10:05 in the forenoon.

 22

 23         REPORTING SERVICES ARRANGED THROUGH:
            VERITEXT/NEW JERSEY REPORTING COMPANY
 24             25B Vreeland Road, Suite 301
             Florham Park, New Jersey 07932
 25     Phone:  (973) 410-4040   Fax:  (973) 410-1313
</pre>