## Page 258

APPEARANCES

ROBINS, KAPLAN, MILLER & CIRESI
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-2015
612-349-8431
BY: ANNAMARIE A. DALEY, ESQ.
aadaley@rkmc.com
Attorneys for the Assurant Plaintiffs

JUSTIN BLOOM, ESQ.
29 West 70th Street
New York, New York 10023
917-991-75493
jbloom@justinbloomattorney.com
Attorneys for the Class Plaintiffs

SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
816-474-6550
BY: NICHOLAS P. MIZELL, ESQ.
nmizell@shb.com
For the Defendants

PFIZER, INC.
LEGAL DIVISION
235 East 42nd Street
New York, New York 10017
212-733-2085
BY: VIJAY V. BONDADA
Senior Corporate Counsel

ALSO PRESENT: CRAIG ATELL, Videographer

## Page 259

INDEX

| Witness | Page |
|---|---|
| CONTINUED DIRECT EXAMINATION BY MS. DALEY | 262 |
| CONTINUED DIRECT EXAMINATION BY MS. DALEY | 348 |
| CONTINUED DIRECT EXAMINATION BY MS. DALEY | 395 |
| CONTINUED DIRECT EXAMINATION BY MS. DALEY | 459 |
| CROSS EXAMINATION BY MR. MIZELL | 463 |
| REDIRECT EXAMINATION BY MS. DALEY | 502 |

EXHIBITS

| Description | Page |
|---|---|
| Memorandum marked Henderson-5 | 262 |
| E-Mail dated May 6, 2004 with Attachments marked Henderson-6 | 277 |

## Page 260

EXHIBITS (Continued)

| Description | Page |
|---|---|
| Presentation marked Henderson-7 | 309 |
| E-Mail Chain beginning March 31, 2003 marked Henderson-8 | 345 |
| Letter from Linda Guerrera on Behalf of Suzanne Doft of the Neurontin Team dated February 2, 2002 marked Henderson-9 | 348 |
| Executive Summary of March, 2002 PBM Advisory Board Meeting marked Henderson-10 | 350 |
| E-Mail dated November 30, 2001 from Suzanne Doft marked Henderson-11 | 374 |
| Executive Summary of Neuropathic Pain Advisory Board Meeting of January 24-25, 2002 marked Henderson-12 | 376 |
| E-Mail Chain marked Henderson-13 | 389 |
| Executive Summary of Advisory Board Meeting of June 24, 2002 marked Henderson-14 | 395 |
| document entitled "HMO Opportunity Reports" marked Henderson-15 | 409 |
| document entitled "Neurontin Managed Care Advisory Boards, Key Conclusions" dated April 15, 2002 marked Henderson-16 | 409 |

## Page 261

EXHIBITS (Continued)

| Description | Page |
|---|---|
| Document entitled Agenda For Support of NHO Initiatives For Neurontin, Tuesday, April 1st, 2003 marked Henderson-17 | 446 |
| Plaintiffs' Notice of Deposition marked Henderson-18 | 462 |

2 (Pages 258 to 261)

## 262

1    THE VIDEOGRAPHER: The date today is December
2  6th, 2007 and the time is approximately 9:34.
3  This begins Day 2 in the deposition of Jeff
4  Henderson. We are now on the record.
5
6  CONTINUED DIRECT EXAMINATION BY MS. DALEY:
7    Q. Mr. Henderson, you understand you are still
8  under oath?
9    A. I do.
10   Q. And you are required to give truthful
11 answers. Yes?
12   A. Yes, I understand.
13   Q. And you are being asked questions as a
14 designee for defendants Pfizer and Warner-Lambert;
15 right?
16   A. Yes.
17   Q. And you understand that; right?
18   A. Yes, I understand.
19      (Memorandum marked Henderson-5 for
20      identification.)
21   Q. Let me hand you what has been marked as
22 Henderson Exhibit 5. Yesterday you had testified that
23 you had reviewed a memo from Karen Katen in
24 preparation for this deposition. My question is
25 whether or not Exhibit 5 is that Karen Katen memo you

## 263

1  testified you reviewed in preparation for this
2  deposition?
3    A. Yes, this is the -- these are the two
4  memorandums that I reviewed.
5    Q. In preparation for the deposition today?
6    A. Yes.
7    Q. And yesterday?
8    A. Yes.
9    Q. Yes. And am I correct that you did not
10 receive either of these memos prior to receiving them
11 to prepare for this deposition?
12   A. You are correct.
13   Q. In 2001, were you under the umbrella of the
14 PPG U.S. marketing personnel?
15   A. No, I was not.
16   Q. In 2001, where would the managed market or
17 the Healthcare Cluster -- Healthcare Cluster NHO, I
18 guess is what it was being called in those days, what
19 group were they under?
20   A. They were under Sales.
21   Q. And under which group is the Sales Group
22 under?
23   A. So if you look on Page -- the last three --
24 463, the people that this memo is addressed to, Hank
25 McCrory, Executive Senior Vice President, Sales, was

## 264

1  the organization that I reported in to; and Hank
2  McCrory reported to Karen Katen, who led the Pfizer
3  Pharmaceutical Group.
4    Q. Okay. So let's look at the last three pages
5  of Henderson Exhibit 5, which is the Karen Katen
6  memos. The last three pages is the November 10, 2000
7  Karen Katen memo; right?
8    A. Yes, that's correct.
9    Q. Had you received this memo prior to your
10 preparation for this deposition?
11   A. That is correct.
12   Q. No. Had you received this memo prior to your
13 preparation for this deposition?
14   A. No, I had not. I had not received this memo.
15   Q. And one of the addressees, Hank McCrory,
16 was -- he was in charge of the Sales Group under which
17 you were housed, if I can use that word, located?
18   A. Yes, he was responsible for sales, and my
19 organization reported up through to Hank McCrory.
20   Q. And you see in the first sentence of Ms.
21 Katen's memo dated November 10th, 2007 that she says,
22 "In completion -- in connection with completion of the
23 merger earlier this year with the Warner-Lambert
24 company, Pfizer now has responsibility for Neurontin,
25 an exciting product which brings with it unique

## 265

1  challenges."
2       Do you see that?
3    A. I do see that, yes.
4    Q. And she goes on to say, "As we near
5  finalization of the 2001 operating plan, a number of
6  decisions have been made relevant to the promotion and
7  marketing of Neurontin which I believe appropriately
8  responds to these challenges. This memorandum is
9  intended to broadly outline these decisions."
10      Do you see that?
11   A. I do see that, yes.
12   Q. Now, she goes on to, in this memo, talk about
13 the various decisions that were made; right?
14      MR. MIZELL: Object to form.
15   A. Yes, that's one aspect of the memo, yes.
16   Q. And the -- the second page of her November
17 10, 2000 memo, the page with the last digits 464 on
18 the bottom has a section entitled "U.S. Sales Force."
19 Do you see that?
20   A. I do see that, yes.
21   Q. Would your group have been under this U.S.
22 Sales Force?
23   A. Yes.
24   Q. And she says, "Neurontin detailing
25 responsibility will be limited only to the U.S. RON

266

1  sales force, approximately 150 representatives."
2       Do you see that?
3     A.  I do see that, yes.
4     Q.  "RON" stands for what?
5     A.  I don't remember exactly what -- what the
6  acronym means.
7     Q.  Was this the PD2 sales force you were
8  testifying to yesterday?
9     A.  As I recall, these folks reported up through
10 PD2.  There -- the acronym has something to do with
11 the specialists that these -- these representatives
12 called on.
13    Q.  So then perhaps the "N" is neurologists?
14        MR. MIZELL:  Object to form.
15    A.  I would suspect that that is what -- what it
16 stands for.
17    Q.  So let me re-ask the question and make sure I
18 understand what you are saying.
19        Is it your understanding that this US RON
20 sales force, approximately 150 representatives, is the
21 same group that you testified to yesterday as the PD2
22 sales force?
23        MR. MIZELL:  Object to form.
24    A.  It is my understanding that our -- as I
25 recall, there was a specialized subset of

267

1  representatives that reported through the PD2 Sales
2  Division.  The Sales Division was -- was a very large
3  division, and there was a subset of folks, as I
4  recall, that specifically called on specialists such
5  as neurologists.
6     Q.  Now, what does "detailing mean?
7     A.  Detailing is a pharma industry term that
8  refers to representatives meeting with healthcare
9  providers, typically physicians; and detailing or
10 providing information that has been approved by -- by
11 the Pfizer Regulatory Team to physicians.
12    Q.  If a representative -- When you say
13 "representative," you are talking about a
14 pharmaceutical company representative?
15    A.  Yes, I'm talking about a pharmaceutical sales
16 representative.
17    Q.  So if a pharmaceutical sales representative
18 went in to meet with a physician and provided
19 information that was off-label, would that still be
20 considered detailing?
21        MR. MIZELL:  Object to form.
22    A.  No.  Primarily because they would not go in
23 and talk to physicians about off-label information.
24 They -- Detailing specifically refers to what we -- we
25 reference as the visual aid.  So it is a -- a document

268

1  which goes -- goes page-by-page through approved
2  materials that we share with physicians.
3     Q.  What if the pharmaceutical sales
4  representative went in to meet with a doctor and
5  provided information that was not on-label?  What
6  would you call that?
7     A.  I would --
8         MR. MIZELL:  Object to form and outside the
9     scope.
10    A.  I would call that noncompliance to existing
11 Pfizer policies and procedures.
12    Q.  Are you aware that in the pharmaceutical
13 industry, there have been pharmaceutical sales
14 representatives who met with physicians and provided
15 information about a product that was not on-label?
16        MR. MIZELL:  Object to form.  Outside the
17    scope.
18    A.  Anecdotally I have read stories or -- or
19 heard references to that occurring.  However, I
20 don't -- don't have firsthand knowledge of that ever
21 happening.
22    Q.  Did you ever hear of -- let's go back to Ms.
23 Katen's first memo, the first page of Henderson
24 Exhibit 5.  This is the March, 2001 memo.
25        The third paragraph says, "To reiterate an

269

1  important point in Karen Katen's memorandum, these
2  items are in no way intended to reflect a judgement or
3  conclusion by Pfizer concerning any practice or
4  procedure that may have been in place under the former
5  Warner-Lambert Company."
6         Do you see that?
7     A.  I do see that, yes.
8     Q.  Do you know what practice or procedure Mr.
9  Kelly is referring to there?
10        MR. MIZELL:  Object to form.
11    A.  No.
12    Q.  Let's go back to Ms. Katen's November, 2000
13 memo.  And you were looking at the second page of
14 that, the page with the last three digits in the lower
15 right-hand corner, 464.  And the section, U.S. Sales
16 Force, talking about the Neurontin detailing
17 responsibility.
18    A.  Yes, I see that.
19    Q.  Under the NHO or HCC, your -- Pfizer's
20 managed care organization, did the Kaiser -- any
21 personnel from the Kaiser sales force call on Kaiser
22 physicians?
23        MR. MIZELL:  Object to form.
24    A.  Could you clarify your question?
25    Q.  Sure.  It was my understanding yesterday you

4 (Pages 266 to 269)

**Page 270**

1  talked about the Kaiser group. There was a National
2  Account Manager, Kirk Bachman; right?
3    A. That is correct.
4    Q. And then there are the two district managers,
5  Curtis Reese and John Dauser, Dauser?
6    A. That's correct.
7    Q. And then beneath Mr. Dauser and Mr. Reese are
8  16 individuals; right?
9    A. That's correct.
10   Q. Do those 16 individuals call on Kaiser
11 physicians?
12   A. Yes, they call on Kaiser physicians.
13   Q. And when those 16 individuals call on Kaiser
14 physicians, do you consider that to be detailing?
15   A. Yes, I do consider that to be detailing.
16   Q. Do you know whether any of those individuals
17 called on Kaiser physicians to talk about Neurontin?
18   A. They did not call on -- on Kaiser physicians
19 to talk about Neurontin.
20   Q. And how do you know that?
21   A. Because -- Well, several reasons. They --
22 they were never trained on Neurontin. It was clearly
23 articulated by our sales management that only the 150
24 or so specialty representatives would -- would be
25 calling on neurologists.

**Page 271**

1       Secondly, as I reiterated yesterday around
2  Kaiser's lack of data, there is no way to have any
3  kind of incentive compensation system around promoting
4  this product within Kaiser.
5    Q. So because you can't have access to Pfizer
6  (sic) data, you can't develop an incentive system and
7  so you don't have your sales force that's under Mr.
8  Reese or Mr. Dauser call on Kaiser physicians to talk
9  about Pfizer drugs? Is that what you are saying?
10      MR. MIZELL: Object to form.
11   A. In this case with Neurontin, the decision was
12 made we weren't going to -- to promote Neurontin
13 anyway. So -- but that is further compounded by the
14 fact that because of the lack of data, there would be
15 no reason to have a representative calling on Kaiser
16 doctors around information around Neurontin.
17   Q. Do any of these 16 individuals under Mr.
18 Reese or under Mr. Dauser call on Kaiser physicians to
19 talk about any Pfizer drugs?
20   A. Yes, they do.
21   Q. And is there an incentive compensation system
22 for the 16 sales representatives for those Pfizer
23 drugs?
24   A. Yes, there is.
25   Q. And how is that set up?

**Page 272**

1    A. That's set up through a purchasing agreement
2  arrangement that exists between Pfizer and Kaiser.
3    Q. When you spoke with Mr. Bachman to prepare
4  for this deposition, did you talk about whether
5  Neurontin had always been on Kaiser's formulary?
6    A. No, we did not talk about that.
7    Q. Are you aware that Neurontin has not been on
8  Kaiser's formulary at all times?
9       MR. MIZELL: Object to form.
10   A. I am not aware of that.
11   Q. Do you know whether there were any -- did you
12 ask. Let's put it that way. Did you ask whether
13 there were any efforts by any Pfizer individual to try
14 to get Neurontin on Kaiser's formulary?
15   A. I did not ask the question, primarily because
16 I was aware that there were no efforts to get
17 Neurontin on Kaiser's formulary.
18   Q. And how is it that you were aware that there
19 were no -- I'm assuming you are saying that because
20 you had firsthand knowledge that there was no efforts
21 to get Neurontin on Kaiser's formulary?
22      MR. MIZELL: Object to form.
23   A. That's correct.
24      (A discussion is held off the record.)
25   A. Yes, I had firsthand knowledge.

**Page 273**

1    Q. And that firsthand knowledge is what?
2    A. Because Kaiser reported up through me
3  until -- until May of 2007.
4    Q. Well, Kaiser reported up through you from
5  December, 2002 until May, 2007; right?
6    A. That is correct.
7    Q. So Kaiser did not report up through you prior
8  to December, 2002?
9    A. That is correct.
10   Q. Do you know whether there were any efforts
11 prior to December, 2002, to get Neurontin on Kaiser's
12 formulary?
13   A. I do not know.
14   Q. Did you ask anyone whether there were any
15 efforts prior to December, 2002 to get Neurontin on
16 Kaiser's formulary?
17   A. I did not ask anyone.
18   Q. Do you know whether Neurontin was on Kaiser's
19 formulary throughout the entire time period from
20 December, 2002 until May, 2007?
21   A. No, I don't know.
22   Q. Does Kaiser have neurologists?
23   A. Yes, they have neurologists.
24   Q. Would the U.S. RON sales force of Pfizer or
25 the Pfizer PD2 sales force call on Kaiser

274

1  neurologists?
2    A. No.
3    MR. MIZELL: Object to form.
4    A. No.
5    Q. Would that -- was responsibility for
6  detailing Kaiser neurologists the responsibility of
7  the 16 under Mr. Reese and Mr. Dauser?
8    MR. MIZELL: Object to form.
9    A. The responsibility for detailing any Kaiser
10 physician falls on the two sales teams that report to
11 Mr. Reese and Mr. Dauser. That is because Kaiser has
12 very strict policies around what types of promotional
13 activities can take place on that -- their properties.
14   If Pfizer was promoting Neurontin in Kaiser
15 and we were not, that would fall under the
16 responsibilities of the Kaiser sales team reporting to
17 Mr. Dauser and Mr. Reese.
18   Q. Back to Ms. Katen's memo from November, 2000.
19 We were looking at the second page of that, last three
20 digits, 464, lower right-hand corner. Do you see
21 above the section for the second full paragraph right
22 above U.S. Marketing Team, it says, "Again, the items
23 below are in no way intended to reflect a judgement or
24 conclusion by Pfizer --"
25   MR. MIZELL: I'm sorry. I don't think -- I

275

1  don't think the witness is with you yet.
2    Q. Are we in the same place?
3    A. Yes.
4    Q. Okay. That paragraph, yes. It's the second
5  full paragraph on the page with the last three digits
6  464, Henderson Exhibit 5.
7    Are you there, Mr. Henderson?
8    A. Yes, I see it.
9    Q. And, again, the first sentence in that
10 paragraph says, "The items below are in no way
11 intended to reflect a judgement or conclusion by
12 Pfizer concerning any practice or procedure that may
13 have been in place under the former Warner-Lambert
14 Company."
15   Do you see that?
16   A. I do see that.
17   Q. Do you know what practice or procedure of
18 Warner-Lambert Company Ms. Katen was referring to?
19   A. No, I do not know.
20   Q. Then at the bottom, the last bullet point on
21 this page, Ms. Katen says, "Sales representatives may
22 not participate in any Pfizer-supported CME programs
23 or other programs supported by Pfizer unrestricted
24 educational grants that may -- might be relevant to
25 Neurontin, except for those programs clearly related

276

1  only to epilepsy."
2    Do you see that?
3    A. I do see that.
4    Q. Did Pfizer's NHO group or HCC, Healthcare
5  Cluster, participate in any CME programs or programs
6  supported by Pfizer unrestricted educational grants?
7    MR. MIZELL: Object to form.
8    A. Yes.
9    Q. When Ms. Katen is referring to sales
10 representatives that may not participate in these
11 certain CME programs and other programs, would that
12 include a person like you at that time?
13   MR. MIZELL: Object to form.
14   Q. In 2000?
15   A. Well, let me step back. Your question
16 actually was: Do we participate or could we have
17 participated in CME programs and Pfizer unrestricted
18 educational grants?
19   Globally, yes, that is possible. However, as
20 it relates to Neurontin, we would not have
21 participated in any -- any of those types of
22 activities.
23   Q. Okay. I had asked another question; and the
24 question goes to this -- her use of the phrase "sales
25 representatives." In 2000, were you a sales

277

1  representative?
2    A. No, I was not.
3    Q. In 2002, December of 2002, when you moved to
4  become a Senior Director of National Accounts Manager,
5  would you then become a sales representative?
6    A. No, I would not.
7    Q. Turn to the last page.
8    And just to be sure the record is clear, I do
9  move to strike the answer that you first gave about --
10 in response to my question about the sales
11 representatives the first time I asked the question.
12   MR. MIZELL: The answer was responsive and
13 clarifying, his previous answer to the question.
14   MS. DALEY: Well, it wasn't responsive, that's
15 for sure.
16   Q. The last paragraph of Henderson Exhibit 3
17 says, "Please provide these guidelines to all members
18 of your staffs."
19   Do you see that?
20   A. I do see that.
21   Q. Mr. Henderson, I am handing you what has been
22 marked as Henderson Exhibit 6.
23   (E-Mail dated May 6, 2004 with
24 Attachments marked Henderson-6 for
25 identification.)

6 (Pages 274 to 277)

**278**

1  A. Okay.
2  Q. Henderson Exhibit 6 is a copy of an e-mail
3  with the attachments; right?
4  A. Yes.
5  Q. And it's an e-mail dated May 6, 2004, sent by
6  Patrick McElerney?
7  A. McElerney.
8  Q. McElerney, to a number of individuals;
9  right?
10  A. Yes.
11  Q. Do you know Patrick McElerney?
12  A. Yes.
13  Q. Who is he?
14  A. At the time he was here, he was the NHO Area
15  Manager for the Southeast.
16  Q. And this e-mail is sent to a number of
17  individuals. Do you recognize any of them?
18  A. Yes.
19  Q. Can you go through each of them and identify
20  who they are?
21  A. I recognize the names of Brad Bailey, who was
22  a Regional Manager. I don't recall which individual
23  sales force each one of these individuals were part
24  of. Jim Bezila, a Regional Manager, Kim Brett, a
25  Regional Manager. And Thomas Brett -- Britt, I'm

**279**

1  sorry, was Patrick McElerney's -- I believe he was his
2  AAM. Oh, yes, that's what it says, AAM; which is
3  Assistant to the Area Manager.
4  Q. Are all of these individuals that received
5  this e-mail to your knowledge part of the NHO --
6  A. No.
7  Q. -- at the time?
8  A. No. As it's addressed, Southeast Cluster A,
9  Regional Managers, these individuals would be the
10  regional managers from the various sales forces that
11  were part of Cluster A that were responsible for the
12  Southeast.
13  Q. Was the National Healthcare organization part
14  of Cluster A?
15  A. No.
16  Q. Part of Cluster X?
17  A. No.
18  Q. Which cluster?
19  A. The Healthcare Cluster.
20  Q. HCC?
21  A. Yes.
22  Q. But there was interaction between area
23  managers in the Healthcare Cluster and managers in the
24  Southeast Cluster?
25  MR. MIZELL: Object to form.

**280**

1  A. There was interaction -- All the regions
2  mirrored each other, so there was always interaction
3  between the Area Managers and the Sales Regional
4  Managers.
5  Q. Area Managers for the National Healthcare
6  organization?
7  A. Yes, Area Managers were part of the National
8  Healthcare Operations.
9  Q. The subject is "POA2 Medco Access
10  Workshop/Cluster A;" right?
11  A. That's what the type -- what this is titled,
12  yes.
13  Q. And the reference to POA-2, Plan of Action?
14  A. Plan of Action Meeting. This is a reference
15  to the POA 2 Plan of Action Meeting.
16  Q. And Medco is one of the PBMs; right?
17  A. Medco is a PBM, that is correct. Pharmacy
18  Benefit Manager.
19  Q. And Medco is one of the 11 accounts that was
20  under your supervision in May of 2004; right?
21  A. That is correct.
22  Q. Were you at this meeting?
23  A. Yes, I was. I was at the POA2 meeting. I
24  don't -- I wasn't at the Southeast Regional Break-out
25  Meeting.

**281**

1  Q. Were there regional break-outs for Medco
2  for -- were there other regional break-outs for Medco
3  at the POA2 May, 2004 meeting?
4  MR. MIZELL: Object to form.
5  A. I don't recall.
6  Q. Do you receive copies of documents like this
7  set of slides that were reviewed at the POA 2
8  Southeast Cluster Medco Access Break-out?
9  MR. MIZELL: Object to form. Object to form.
10  A. Yes, I would have received documents such as
11  this.
12  Q. Did you keep them?
13  A. Not -- I did not.
14  Q. Would you archive them?
15  A. I do not recall archiving this. The manner
16  in which I received it could easily have been a
17  presentation done by the Managed Markets Marketer
18  and/or the National Account Manager responsible for
19  Medco.
20  Q. Do you recall who the National Account
21  Manager responsible for Medco was in May, 2004?
22  A. As I recall, in May, 2004 it was Donna
23  Florio, F-l-o-r-i-o.
24  Q. In 2004, who did Patrick McElerney report to?
25  A. Patrick McElerney reported to Steve Harper.

Page 282

1  Q. And Steve Harper reported to you?
2  A. No. Steve Harper reported to Carl Wilbanks.
3  Q. And who did Carl Wilbanks report to?
4  A. Carl Wilbanks reported to Mick Mosebrook.
5  Q. What group was Mick Mosebrook in?
6  A. Mick Mosebrook was the Executive Vice
7  President of the U.S. Sales Organization.
8  Q. So was Patrick McElerney part of the U.S.
9  Sales Organization?
10 A. Yes.
11 Q. Was he part of the Healthcare Cluster?
12 A. Yes.
13 Q. I'll have you go through some of these
14 slides. The title page says, "Pfizer, Southeast
15 Regional Break-out Cluster a, Access At Medco, the
16 2004 Opportunity, May 2004;" right?
17 A. Yes, that's what it says.
18 Q. Would there typically at the POA2 meetings be
19 regional break-outs like this?
20     MR. MIZELL: Object to form.
21 A. Yes.
22 Q. And would you discuss access at the
23 various -- at the 11 accounts that you mentioned
24 yesterday?
25     MR. MIZELL: Object to form.

Page 283

1  A. During the regional break-outs, they would
2  discuss a variety of accounts, not just the 11. As
3  you can see in the last part of this deck, there are
4  references to Florida Medicaid, which were not part of
5  the 11 accounts that I mentioned yesterday.
6  Q. In preparation for this deposition, did you
7  review any documents regarding regional break-out
8  discussions of Kaiser?
9     MR. MIZELL: Object to form.
10 A. No, because there wouldn't have been regional
11 break-out discussions around Kaiser.
12 Q. Because everything's done through the
13 Healthcare Cluster organization?
14    MR. MIZELL: Object to form.
15 Q. The Bachman/Reese sales force?
16 A. That's correct.
17 Q. Is that okay if I just refer to them as the
18 Bachman/Reese sales force? That means the 16
19 individuals you have been talking about earlier?
20 A. Well, Bachman isn't part --
21 Q. Excuse me.
22 A. It's actually Curtis Reese and John Dauser.
23 Q. John Dauser. Thank you.
24    So if we refer to them as the Dauser/Reese
25 sales force, that refers to the 16?

Page 284

1  A. I think the best way to -- to describe them
2  is they are the Pfizer Kaiser sales force.
3  Q. Thank you. I was just looking for a
4  shorthand way of referring to them.
5     Would there be -- in connection with your
6  preparation for this deposition, did you review any
7  documents regarding any POA2 or 1 discussions or
8  regional break-outs for Aetna?
9     MR. MIZELL: Object to form.
10 A. I did not. And, again, POA1 and POA2 refer
11 to meetings that are held annually. So POA1 is
12 typically held in October-November. POA2 is typically
13 held in May.
14 Q. Do you recall whether there were ever any
15 break-out discussions at either POA1 or POA2 meetings
16 regarding Aetna?
17 A. I do not recall.
18 Q. Since they were one of the 11 accounts, would
19 you expect that there would have been break-out
20 discussions about Aetna from time to time?
21    MR. MIZELL: Object to form.
22 A. As this break-out deck indicates, slide deck
23 indicates, it was around opportunities that existed
24 with individual accounts. So if an opportunity -- an
25 access opportunity did not exist with Aetna, it would

Page 285

1  not be included in the break-out session.
2  Q. What's an access opportunity?
3  A. It's an opportunity where products have a
4  favorable formulary position.
5  Q. Pfizer products have a favorable formulary
6  position?
7  A. That is correct.
8  Q. And by "favorable formulary position," do you
9  mean, as you testified to yesterday, a Tier 2
10 position?
11 A. Typically, in general terms, favorable
12 formulary position is second tier, unrestricted.
13 Q. Could you please turn to the page with the
14 last three numbers 194 in this break-out slide deck,
15 the page entitled "Medco Background."
16 A. Yes.
17 Q. Now, you see there is on the left-hand side a
18 set of products with the heading "all Pfizer Products
19 Have Access." Do you see that?
20 A. I do see that, yes.
21 Q. What does it mean to say that, "All Pfizer
22 products have access"?
23 A. It's difficult for me to determine exactly,
24 because I don't -- I don't -- oh, I do see. These
25 aren't different colors.

8 (Pages 282 to 285)

Page 286

1  So what this is saying, that all products are
2  on formulary in second or third tier with no
3  restrictions.
4      Q. And if it's third tier, what does that mean?
5      A. It is -- it typically means that it is a
6  product that the patient pays a higher co-pay.
7      Q. Than second tier?
8      A. That's correct.
9      Q. Now, you notice that Neurontin is identified
10 in this list of all Pfizer products that have access;
11 right?
12     A. Yes, I see that.
13     Q. And beneath that in the lower left-hand
14 corner, it says, "Source, HC Exchange;" right?
15     A. That is correct.
16     Q. Is the HC Exchange reference here the same
17 database that you testified to yesterday as the HC
18 Exchange database?
19     A. That is correct.
20     Q. Does the HC Exchange database have a listing
21 of formularies for third-party payers?
22     A. Yes, it does.
23     Q. And so all you have to do at Pfizer then
24 would be to go to the HC Exchange database to
25 determine whether Neurontin is on a particular

Page 287

1  third-party payer's formulary; right?
2      MR. MIZELL: Object to form.
3      A. You would not be able to do that today,
4  because Neurontin is not included in that database.
5  We only include products that Pfizer is actively
6  promoting.
7      Q. In 2004?
8      MR. MIZELL: Object to form.
9      A. In 2004 -- in 2004, it would have been
10 listed.
11     Q. Neurontin would have been listed on the HC
12 Exchange?
13     A. That is correct.
14     MR. MIZELL: Object to form.
15     Q. When was Neurontin taken off the HC Exchange?
16     A. I don't know the exact date when Neurontin
17 was pulled out of the HC Exchange database; however,
18 it is normally -- our normal practice is when a
19 product goes generic or if the product is moved to
20 Diversified or a product is removed from the market,
21 it is taken out of the database.
22     Q. When a product goes generic, is it -- is the
23 branded product removed from the database immediately,
24 or is there some time lag there?
25     MR. MIZELL: Object to form.

Page 288

1      A. The HC Exchange database is managed by --
2  it's typically -- I couldn't give you the exact number
3  of weeks, but it occurs relatively quickly. Because
4  the database is so large and contains so much
5  information, we want to pull things that are no longer
6  relevant out as quickly as possible.
7      Q. Why would the fact that there was now a
8  generic available for Neurontin mean that whether
9  Neurontin was on formulary or that Neurontin was in a
10 HC Exchange database no longer relevant?
11     MR. MIZELL: Object to form.
12     A. Because we are no longer promoting the
13 product.
14     Q. So once the product goes generic, Pfizer no
15 longer promotes the branded product?
16     A. That is correct.
17     Q. Why is that?
18     A. Typically when a product goes generic,
19 it's -- and is made available via multi source generic
20 companies, pharmacists in pharmacies typically do a
21 therapeutic substitution. So they immediately start
22 dispensing the generic product.
23     So it doesn't matter whether a physician
24 writes a prescription for Neurontin or not. Unless
25 they have somehow mandated that it -- and I don't know

Page 289

1  how they would do that, that it be a branded product,
2  the prescription is changed at the formula -- at the
3  pharmacy.
4      So it's not a best use of our time to deploy
5  our resources to try and sell a product that is
6  generic.
7      Q. Is that because the generic is cheaper than
8  the branded product?
9      A. Typically the generic is cheaper, yes. But
10 also retail pharmacies make more money dispensing
11 generic products.
12     Q. On the right-hand side of this page that's
13 part of Henderson Exhibit 6, Bates on the bottom, 194,
14 it's another table, it says, "Medco Formulary Design."
15 Do you see that?
16     A. Yes, I do.
17     Q. And it has I guess maybe kind of a bar graph
18 on the left-hand side there. It says, "50 percent."
19 Do you see that?
20     A. Yes, I do.
21     Q. And it says, "Two tier, equal co-pay, but
22 Medco proposal advantaged products."
23 Do you see that?
24     A. I do see that.
25     Q. What's an advantaged product?

290

1    MR. MIZELL: Object to form.
2    A.  Typically "advantaged" is interchangeable
3  with the term that I used yesterday, "preferred," and
4  so they will highlight various products in various
5  therapeutic classes that are preferred or advantaged.
6    Q.  What does it mean to say "equal co-pay"?
7    A.  "Equal co-pay" means that all the products in
8  the second tier, whether they are labeled preferred or
9  advantaged by Medco or not, are -- the patient ends up
10 paying the same co-pay.
11   Q.  How does Medco, then, promote advantaged
12 products?
13      MR. MIZELL: Object to form.
14   A.  Medco has a variety of mechanisms that --
15 that they might use.  Those mechanisms could include
16 bolding a product in any given therapeutic class on
17 their formulary listing.
18   Q.  Does Pfizer compensate or incentivize Medco
19 to -- to promote a Pfizer product by bolding it in a
20 formulary listing?
21   A.  When Pfizer contracts, we contract for
22 access -- performance and access.  But in this case,
23 this is a reference to access, and whether it's bolded
24 or not, we don't provide any other incentive.  It's
25 just unrestricted access.

291

1    Q.  And underneath it says, "Three tier.  Pfizer
2  is second tier advantage, versus three tier for
3  competitors."
4       Do you see that?
5    A.  I do see that.
6    Q.  And it has a "45 percent" next to that.  What
7  does it mean "Pfizer second tier advantage versus
8  third tier for competitors"?
9    A.  What that means specifically is that a
10 patient pays a higher co-pay for a product that's on
11 third tier versus a product on second tier.
12   Q.  And then beneath that, it says, "Five percent
13 closed:  Competitive off-formulary products are not
14 reimbursed."
15      Do you see that?
16   A.  I do see that.
17   Q.  What does that mean?
18   A.  Well, there are various clients of Medco that
19 actually will purchase as part of their pharmacy
20 benefit what is called a closed design, in which they
21 will specifically require that any product that is not
22 listed on their formulary, regardless of tier, that
23 the patient would pay cash for.
24   Q.  Let's turn to the next page, Henderson
25 Exhibit 6.  Bates numbers last three digits 195 in the

292

1  lower right-hand corner.  There is a listing of the
2  top Medco clients.  Do you see that?
3    A.  I do see that.
4    Q.  Does Pfizer obtain information about the
5  clients for PBMs like Medco?
6    A.  Typically we obtain the client list from the
7  customer, meaning Medco would have to provide this
8  information for us; unless an account we call, on such
9  as Blue Cross-Blue Shield of North Carolina, told us
10 specifically that they -- they contracted with --
11 through Medco.
12   Q.  I want you to turn to the next page.  This is
13 a page, last three digits 196, entitled "Regional
14 Impact of Medco, All Products."
15      Do you see that?
16   A.  I do see that, yes.
17   Q.  This is a description of the percentage of
18 sales Pfizer made to -- or Medco's purchases from
19 Pfizer, as compared to all Pfizer's U.S. sales.  Is
20 that correct?
21      MR. MIZELL: Object to form.
22   A.  What this represents is:  This graph is
23 showing all of U.S. pharmaceuticals retail sales of
24 promoted Pfizer products, the products that are listed
25 at the bottom of this exhibit; and how -- how much --

293

1  and it's listed by region from left to right, the
2  eight sales regions that we have -- or had at this
3  time; and then what percentage of that business goes
4  through and is adjudicated by Medco.  And this is
5  retail data only.
6    Q.  And in this listing of promoted Pfizer
7  products is Neurontin; right?
8    A.  That is correct.
9    Q.  I'll have you turn to the page with the last
10 three digits 198, a couple of pages back in Henderson
11 Exhibit 6.  This is a slide entitled "Impact of Medco
12 Cluster a Products;" right?
13   A.  That is what the slide is titled, yes.
14   Q.  And there is a listing of Pfizer-promoted
15 products on the X axis; right?
16   A.  These are Pfizer-promoted products, but only
17 the Cluster A products.
18   Q.  And in that list of Pfizer-promoted products
19 is Neurontin; right?
20   A.  That is correct.
21   Q.  Now, it says here that Neurontin is 11
22 percent?
23   A.  No, actually what this is saying is that of
24 all of Neurontin's USP, meaning U.S. pharmaceuticals,
25 retail sales in the United States, 11 percent of those

### Page 294

1  sales are adjudicated through Medco.
2  Q. How would Pfizer be able to know that number?
3  MR. MIZELL: Object to form. Outside the scope.
4  A. This, the source here is -- is NDC; and NDC
5  is one of those consulting companies that provide the
6  retail data. So my assumption is that we purchased it
7  from NDC.
8  Q. Can you turn to the page, last three digit
9  201. And you see the -- that portion of the bar --
10  A. I'm sorry?
11  Q. Yes. 201.
12  A. 201. Okay.
13  Q. It's a slide entitled "Impact of Medco
14  Cluster a Products, Southeast."
15  Do you see that?
16  A. I do.
17  Q. And, again, there is a portion of the bar
18  graph that is about Neurontin sales; right?
19  A. Yes.
20  Q. And what does that -- what information is
21  reflected in that portion of the bar graph regarding
22  Neurontin?
23  MR. MIZELL: Object to form. Outside the
24  scope.
25  A. This is showing that, of the U.S.

### Page 295

1  pharmaceutical retail sales that have been mapped to
2  the Southeast Sales region, that of those sales
3  Medco's Neurontin sales -- retail sales represent 14
4  percent of that number.
5  Q. Turn to the next page. It's a page entitled
6  "TACU Impact of Medco."
7  Do you see that?
8  A. I do see that.
9  Q. What does T-A-C-U mean?
10  A. Targeted Account, Customer Unit, commonly
11  referred to as TACU.
12  Q. What makes a particular account a Targeted
13  Account, Customer Unit?
14  A. It's an acronym used to describe the local --
15  when I say local, it's a district group of individuals
16  that include the NHO Regional Account Manager, as well
17  as the Sales District Managers.
18  Q. So in this situation, it would have included
19  Patrick McElerney?
20  MR. MIZELL: Object to form.
21  A. No. Patrick McElerney would -- would
22  facilitate a larger -- a group of people that are the
23  people that supervise the people that participate in
24  the TAC -- TACU. So the entity that was above the
25  TACU was called the Regional Council. That was

### Page 296

1  facilitated by the Area Manager and the regional --
2  Sales Regional Managers participated in that.
3  Then the Account Managers, Regional Account
4  Managers that reported to Patrick McElerney, would
5  convene a TACU, which would consist of the Regional
6  Account Manager who reported to Patrick McElerney, and
7  the Sales District Managers that reported to the Sales
8  Regional Managers.
9  Q. There is also another acronym in here, LAT;
10  what does that stand for?
11  A. L-A-T stands for LAT, Local Account Team.
12  Q. Is it above or below the account customer --
13  A. It is below and essentially mirrors the TACU.
14  So the LAT is the group of sales representatives.
15  Q. I'll have you turn to the page within
16  Henderson Exhibit 6 that's 202 in the lower right-hand
17  corner.
18  A. Yes.
19  Q. Do you see in the right-hand side -- or
20  left-hand side -- excuse me.
21  Well, first of all, this is a slide entitled
22  "Orlando TACU" T-A-C-U, dash, "Key Medco Clients;"
23  right?
24  Is that the title of the slide, Mr.
25  Henderson?

### Page 297

1  A. Oh, yes.
2  Q. And on the left-hand corner, there is a
3  listing of top employers; right?
4  A. Yes.
5  Q. Listed, included within that list of top
6  employers is Guardian Life Insurance Company of
7  America; right?
8  A. Yes, it is on the list.
9  Q. How did Pfizer obtain the information about
10  Guardian Life Insurance Company as a top employer, key
11  Medco client?
12  MR. MIZELL: Object to form. Outside the scope.
13  A. Typically, as I said before, because we don't
14  call on these types of organizations, that -- that
15  information is provided to Pfizer by Medco.
16  Q. Why do you want that information?
17  MR. MIZELL: Object to form.
18  A. Well, pharmacy benefit managers are
19  interesting organizations because they provide
20  pharmacy services not only to health plans, but in
21  many cases they provide pharmacy services to
22  employers -- I mean, yes, to employers.
23  So when you are out -- a sales representative
24  is out, out talking to a physician, and the physician
25  says, "Is it Lipitor on formulary at -- with Verizon?"

298

1  You -- if you have that information, you can respond.
2  Because if a sales representative says,
3  "Doctor, Lipitor is on formulary with Medco," most
4  physicians don't know what Medco is. Medco is a
5  transparent entity to them, because they are only
6  providing claims adjudication for most of these
7  employers.
8  Q. But the doctors or the physicians are
9  interested in knowing about whether or not a
10 particular drug is on a formulary for a particular
11 employer?
12     MR. MIZELL: Object to form. Outside the scope.
13 A. It depends on the marketplace, but in certain
14 marketplaces where physicians practice, there are
15 typically -- there could be a single employer. For
16 example, in Memphis, doctors want to know if -- if
17 Federal Express employees have access to given
18 products because that large employer is -- is
19 typically the -- the biggest employer in town.
20 Q. So that's why Pfizer asks PBMs like Medco for
21 the information about whether -- or who the top
22 employers are that contract through that particular
23 PBM?
24     MR. MIZELL: Object to form.
25 A. That's certainly one reason we ask for that

299

1  information, yes.
2  Q. Is Guardian Life Insurance Company an
3  employer?
4  A. I would assume that Guardian Life employs
5  people, but I don't know.
6  Q. On the right-hand side, under "Top Health
7  Plans," there is a listing of three entities, BCBS
8  Association. Do you know what that is?
9  A. Yes, the Blue Cross-Blue Shield Association
10 is an association that consists of many of the Blue
11 Cross-Blue Shield health plans throughout the country.
12 They come together informally. They -- because of the
13 way Blue Cross-Blue Shield health plans are licensed
14 in the various states, they -- they aren't -- they are
15 not an entity that -- that is able to do anything
16 other than get together and discuss common issues that
17 they are dealing with.
18 Q. The second health plan that's listed under
19 "Top Health Plans" is United Health Group?
20 A. That's correct.
21 Q. Is that the same United Health Group that you
22 mentioned yesterday?
23 A. That is the same United Health Group that I
24 mentioned yesterday that's headquartered in Minnesota.
25 Q. And then the third is Health First Health

300

1  Plan?
2  A. Yes.
3  Q. Where are they located?
4  A. I don't recall where Health First is located.
5  I -- I -- I believe they have been purchased by
6  Conventry, but I don't recall. It's a -- it's a
7  regional account.
8  Q. The next slide is entitled "Product Strategy
9  Template to Develop Message."
10     Do you see that?
11 A. Yes, I do.
12 Q. Have you seen this slide or something like it
13 before?
14 A. Yes, I have.
15 Q. In what context?
16 A. I believe it was actually this -- this slide
17 that I saw. But it was -- it was -- the context was
18 it was designed to help representatives articulate
19 where we have formulary access.
20 Q. What do you mean by the "where," when you say
21 this slide or this template was designed to help
22 representatives articulate "where" we have formulary
23 access?
24 A. Well, as I explained in my previous answer,
25 pharmacy benefit management companies are very

301

1  difficult organizations for physicians to identify.
2  Physicians typically identify large health plans or
3  large employers in their -- in their market.
4     So rather than have a representative walk in
5  and say, when the physician says, "Is Lipitor on
6  formulary," rather than the physician (sic) say "Yes,
7  Doctor, it's on Medco's formulary," we have taught the
8  representatives how to identify who the prominent
9  health plans are that are clients of Medco's or
10 employers, and to be able to respond in terms that the
11 physician would understand.
12 Q. Would it be your expectation that Pfizer
13 sales representatives would be asked or could be asked
14 the question: "Is Neurontin on formulary"?
15     MR. MIZELL: Object to form. Outside the scope.
16 A. Again, because of the people that -- that are
17 on this list, Pfizer had 150 or so individuals that
18 were responsible for promoting Neurontin. They would
19 have been spread across the United States within the
20 eight sales regions.
21     One of the Sales Regional Managers here, my
22 assumption is, would have a select group of those
23 individuals that are responsible for promoting
24 Neurontin to neurologists; so it's highly likely that
25 a neurologist would -- would ask the question, "Is

12 (Pages 298 to 301)

**Page 302**

1  Neurontin on formulary."
2    Q.  If a sales representative was asked by a
3  physician is Neurontin --
4      MS. DALEY: Strike that.
5    Q.  If a Pfizer sales representative was asked by
6  a physician, not a neurologist, is Neurontin on
7  formulary, would that sales representative be allowed
8  to answer that question?
9      MR. MIZELL: Object to form. Outside the scope.
10   A.  The only people that would respond to that
11 question are -- that are promoting that or even
12 talking about Neurontin are the individuals that are
13 responsible for Neurontin. It is -- It is not --
14 It's -- In my experience, I have never seen a
15 physician ask a representative about formulary access
16 for a product that they're not promoting.
17   Q.  So it's your understanding that physicians
18 only ask whether a particular product is on formulary
19 if the Pfizer sales representative is in there
20 promoting that product?
21     MR. MIZELL: Object to form.
22   Q.  Is that correct?
23     MR. MIZELL: Outside the scope.
24   A.  That is -- That -- That is correct.
25   Q.  Let me go back to the first page of Henderson

**Page 303**

1  Exhibit 6. Which of the representatives received this
2  e-mail and slide deck?
3    A.  I'm not aware of any representatives
4  receiving this e-mail or slide deck.
5    Q.  Okay. Let me ask the question another way.
6  Which one of the individuals from Pfizer who
7  received this slide deck, which is in Henderson
8  Exhibit 6, are part of the 150 person RON sales force
9  that was mentioned in Ms. Katen's memo?
10     MR. MIZELL: Object to form.
11   A.  As I recall and remember these names and
12 people changed positions, the PD2 Regional Manager in
13 the Southeast was Kim Brett.
14   Q.  Did you say Kim Brett?
15   A.  As I recall, yes, Kim Brett.
16   Q.  If others were not promoting Neurontin, why
17 was Neurontin on these slide decks? Or on this slide
18 deck?
19     MR. MIZELL: Object to form.
20   A.  All of the Regional Managers on this list are
21 Southeast Cluster A Regional Managers, so every
22 product that the Southeast Cluster A Regional Managers
23 were responsible for promoting are listed in this
24 slide deck.
25   Q.  Is there any mention in the slide deck that

**Page 304**

1  Neurontin is limited to being promoted to Mr. Brett's
2  group?
3    A.  No, not that I saw.
4    Q.  Yesterday you talked about the cascading
5  message about how you were not to be promoting
6  Neurontin. Was there ever anything in writing that
7  you received, or any electronic e-mail that you
8  received, regarding this instruction not to promote
9  Neurontin?
10     MR. MIZELL: Object to form.
11   A.  Not that I recall.
12   Q.  Do you have anything in writing?
13     MR. MIZELL: Object to form.
14   A.  Not that I recall.
15   Q.  When you took over as Senior Account Manager
16 in December, 2002 -- Senior Director, National
17 Accounts in 2002, did you issue any instructions about
18 the promotion of Neurontin to the people under you?
19   A.  I did not.
20   Q.  At any time that you were Senior Director of
21 National Accounts from December, 2002 until September
22 of 2005, did you issue any instructions regarding the
23 promotion of Neurontin?
24   A.  I did not.
25   Q.  While you were Vice President of Managed

**Page 305**

1  Markets West from September, 2005 until May, 2007, did
2  you issue any instructions regarding the promotion of
3  Neurontin?
4    A.  I did not.
5    Q.  Did you ever pass on any guidelines or
6  instructions about the promotion of Neurontin between
7  December, 2002 through May, 2007?
8      MR. MIZELL: Object to form.
9    A.  I did not.
10   Q.  You understand when I use the phrase "pass
11 on," it means just forwarding information or
12 instructions you received?
13   A.  Yes, I understand what you are asking.
14   Q.  Between December, 2002 and May, 2007, were
15 there any changes in the personnel that reported up to
16 you or through you? Through you?
17   A.  Yes.
18   Q.  Who? What changes were there?
19   A.  Well, when I was promoted in 2005 and I was
20 no longer responsible for the National Account
21 Managers, I had Managed Markets Regional Managers
22 reporting to me. Because I was -- I had taken charge
23 of a completely different organization.
24   Q.  During the time that you were Senior
25 Director, National Accounts Health Plans, were there

306

1  any personnel that you had, any National Account
2  Managers Or Regional Account Managers, did they all
3  stay the same or were there people that changed from
4  time to time?
5    A.  When I was Senior Director of National
6  Accounts I only had National Account Managers
7  reporting to me; and yes, there were personnel
8  changes.
9    Q.  How many National Account Managers did you
10  have reporting to you between December of 2002 and
11  September of 2005?
12    A.  It started at nine and went to 11.
13    Q.  And during the time period of December, 2002
14  until September, 2005, how many personnel changes were
15  there?
16    A.  I believe there were three.
17    Q.  During the time that you were Senior
18  Director, National Accounts from December, 2002 until
19  September, 2005, did you have any discussions with any
20  of the National Account Managers regarding the
21  promotion of Neurontin?
22    A.  No.
23    Q.  Any communications in any form with any of
24  the National Account Managers who reported to you
25  about the promotion of Neurontin?

307

1    A.  None that I can recall.
2    Q.  As Senior Director of National Accounts,
3  Health Plans, did you prepare any marketing plans or
4  operating plans?
5      MR. MIZELL: Object to form.
6    A.  I did not prepare the operating plans.  The
7  National Account Managers in conjunction with the
8  Managed Market Marketers and others prepared the
9  individual account operating plans.
10    Q.  Did you prepare an operating plan for your
11  entire group, ever, or was it always just the
12  individual plans?
13      MR. MIZELL: Object to form.
14    A.  It was always just the individual plans.
15    Q.  How did you report up to your supervisor the
16  performance of your group?
17    A.  Through the accomplishment of the goals that
18  were listed in the individual operating plans.
19    Q.  Was that a report that you submitted on a
20  regular basis?
21      MR. MIZELL: Object to form.
22    A.  No, it was a -- an annual discussion that
23  took place typically during my performance review.
24  There were times in the year when the individual
25  National Account Managers would make presentations on

308

1  where they stood in accomplishing their goals.
2    Q.  Let's go back to Henderson Exhibit 6.  You
3  are looking at the page with the last three digits,
4  207 in the lower right-hand corner.  207.
5    A.  Yes.
6    Q.  A page entitled "Product Strategy Template to
7  Develop Message"?
8    A.  Yes.
9    Q.  Underneath the heading "The Making of a Medco
10  Opportunity:  How To Leverage Access on Your Calls,"
11  it says, "Ready for unique opportunity to increase the
12  value you bring to your customers?  Good, because now
13  Medco provides access to all Pfizer products, and that
14  means a significant untapped potential to drive Pfizer
15  sales and overall value."
16      Did I read that correctly?
17    A.  That's how I read it, yes.
18    Q.  Is this a message to Pfizer employees?
19      MR. MIZELL: Object to form.  Outside the scope.
20    Q.  Or is this meant to be a message to
21  physicians?
22      MR. MIZELL: Same objections.
23    A.  This is designed to help representatives put
24  together a message as -- as part of their presentation
25  to healthcare providers.

309

1    Q.  Third-party payers?
2    A.  No, this is not designed for third-party
3  payers.
4    Q.  Healthcare providers then being physicians?
5    A.  Typically physicians, nurse practitioners,
6  physicians' assistants.
7    Q.  Okay.  We have a need for a tape break.
8      THE VIDEOGRAPHER: The time is approximately
9  10:55.  This ends Tape Number 1.  We are now going
10  off the record.
11      (A recess is taken.)
12
13  CONTINUED DIRECT EXAMINATION BY MS. DALEY:
14      THE VIDEOGRAPHER: The time is approximately
15  11:12.  This begins Tape Number 2.  We are now on
16  the record.
17      (Presentation marked Henderson-7 for
18  identification.)
19    Q.  Mr. Henderson, I am going to hand you what
20  has been marked as Henderson Exhibit Number 7.
21    A.  Okay.
22    Q.  Henderson Exhibit 7 is a -- the first page is
23  a series of e-mails; correct?
24    A.  The first page, yes.
25    Q.  And then attached to it is some slides?

14 (Pages 306 to 309)

Page 310

1  A. Yes, attached to it is a slide deck.
2  Q. Now, the date of the memo at the top on the
3  first page of Henderson Exhibit 7 is March 8, 2004;
4  correct?
5  A. That's correct.
6  Q. And the subject is, it says, "NEU-0012032."
7  Do you see that?
8  A. Yes. Followed by "managed Care, Marketers'
9  Breakfast Meeting."
10 Q. What does NEU stand for?
11 A. I -- I have no idea. At this time the Payer
12 Provider Management Group used a slide-making company,
13 Image Dog. And Image Dog would assign descriptors to
14 various slide decks that they were putting together,
15 so I don't know whether that is in reference to that.
16 Q. What is a Managed Care Marketers' breakfast
17 meeting?
18 A. On every one of the product teams, there is
19 an individual responsible for what is called managed
20 care marketing. That can encompass a variety of
21 things: Keeping track of formulary access, developing
22 managed care-specific pieces, developing pieces for
23 the people at this time in the Healthcare Cluster that
24 can be used with -- with third-party payers.
25      So the breakfast meeting was bringing all of

Page 311

1  these individuals together so that they could -- that
2  the Payer Provider Management Group, which was the
3  marketing, which had the marketing responsible for
4  managed markets, to educate all of them in a single
5  forum on circumstances that were common to everyone.
6  Q. So on every one of the product teams there
7  was someone from the Managed Marketing Group?
8  A. No. On every product team, there is
9  typically one person designated to be the Managed Care
10 Marketer.
11 Q. Was there a Neurontin Product Team?
12 A. There was a product -- a Neurontin Product
13 Team. I am not aware of them having somebody
14 designated as a Managed Care Marketer.
15 Q. Do you know whether the Neurontin team ever
16 had a Managed Care Marketer on its team?
17 A. I do not know.
18 Q. In preparation for this deposition, did you
19 ask anyone for information about whether the Neurontin
20 Team ever had a Managed Care Marketer on its team?
21 A. I did not ask.
22 Q. Under which section of Pfizer would the
23 product team be housed? Or is that cross clusters?
24 A. No, the product teams at this time were all
25 part of the Marketing organization.

Page 312

1  Q. At this time being May -- or March, 2004?
2  A. That is correct.
3  Q. On the first page of Henderson Exhibit 7, the
4  last e-mail, says, "Hello, colleagues. Thanks so
5  much for taking time out of your schedules to join us
6  this morning for our first Managed Care Marketers'
7  meeting of the year."
8      Before March, 2004 were there Managed Care
9  Marketers' meetings?
10 A. Because these were strictly held within --
11 by -- within Marketing, I did not participate in these
12 types of meetings. I know that at some point they
13 were trying to hold them quarterly. But whether they
14 had them prior to this date, I don't know.
15 Q. On the listing of recipients of the slide
16 deck, are any of them in -- were any of them a part of
17 the HCC, Healthcare Cluster?
18      MR. MIZELL: Object to form.
19 A. On the -- are you referring to the original
20 message?
21 Q. Any of the -- there's three different e-mails
22 here. It looks like it was forwarded a couple of
23 times.
24 A. On the original message in the "CC" line,
25 there were four individuals from the Healthcare

Page 313

1  Cluster.
2  Q. And those individuals would be who?
3  A. Carl Wilbanks, Senior Vice President of the
4  Healthcare Cluster; Claire Kennedy, Vice President of
5  National Accounts; Steve Harper, Vice President of
6  National Healthcare Operations; and Bob Sikora, Vice
7  President of the Clinical Education Consultants.
8      I also see, as I look here, three other
9  individuals: Nora Tsivgas, who was the Sales
10 Operations Director for Carl Wilbanks; Diane Borst,
11 who was the Sales Operations Director for Bob Sikora;
12 Tanya Carr-Waldron, who is the Sales Operations
13 Director for Steve Harper; and Phil Neal, who is the
14 Sales Operations Director for Claire Kennedy.
15     Additionally, Susan Donnelly is listed here.
16 And as I recall, she was doing a headquarters
17 internship during this time.
18 Q. As part of the Healthcare Cluster?
19 A. Yes.
20 Q. Let's turn to the first page of the slide
21 deck. It's entitled "Pfizer, Payer/Provider
22 Management Group, Managed Care Marketers' Breakfast,
23 March 5, 2003;" right?
24 A. That is correct.
25 Q. And then the next slide is sort of the

314

1  agenda; right?
2      A. That is correct.
3      Q. The third slide, Bates number, lower
4  right-hand corner last three digits, 385; it says "New
5  PPMG Organizational Structure;" right?
6      A. That is correct.
7      Q. Is the Healthcare Cluster in this
8  organizational structure at all?
9      A. No, it is not.
10     Q. Are the Managed Care Marketers part of the
11 PPMG organizational structure?
12     A. Yes, they are.
13     Q. Where are they located?
14     A. They are the individuals that are listed
15 under the team leaders. So, for example, Marian
16 Knowles, who is listed under Dennis Kowalski, is the
17 Managed Markets Marketer for Care Mark and Advanced
18 PCS.
19     Q. When you were Senior Director, National
20 Accounts Health Plans, did you work with Mr. Kowalski?
21     A. Yes.
22     Q. In what capacity?
23     A. He was one of the team leaders. And
24 eventually when Medco was -- was moved over to me, I
25 worked directly with him. My primary interactions

315

1  were with Mark Backen (phonetic), who supervised the
2  Managed Market Marketers responsible for the national
3  health plans.
4      Q. So you worked with both Mr. Backen and Mr.
5  Kowalski?
6      A. Yes.
7      Q. So Mr. Kowalski was the team leader for
8  the -- this pharmacy management, is that the PBMs?
9      A. He was responsible for the PBM Managed Market
10 Marketers.
11     Q. And Mr. Backen was responsible for the health
12 plans?
13     A. The health plan, National Managed -- National
14 Account Managed Market Marketers, yes.
15     Q. To the right of Mr. Kowalski is the Team
16 Leader For Customer Programs. What customers are
17 referenced there?
18     A. That's Laura Babola, and her group was
19 responsible for developing non-branded programs to
20 support the Healthcare Cluster.
21     Q. Would that be disease management-type
22 programs?
23     A. Disease management type programs are -- are
24 one example, yes.
25     Q. And then as we go back on this chart and look

316

1  to the left, "Team Leader Government Channel Analysis
2  and Strategy," those would be the Managed Marketers,
3  Managed Care Marketers for the government agencies?
4      A. Yes, for government entities. It also
5  included long term care.
6      Q. And then Bruce Levitt, "Team Leader,
7  Commercial Channel Analysis and Strategy." What
8  customers are in this category?
9      A. This doesn't -- was not customer specific.
10 It was channel specific.
11     Q. What do you mean by "channel specific"?
12     A. So, for example, they would look at medical
13 groups as a -- as a channel. So they would look at
14 how the trends that exist in the healthcare landscape
15 around medical groups. They would look at the trends
16 that exist around correctional health, long term --
17 no, long term care fell under another group.
18          So those channels are groupings of like
19 entities.
20     Q. Turn to the next page in Exhibit 7. It's a
21 slide that is entitled "Each Team in PPMG Plays a
22 District Role in Interacting With Marketing and the
23 HCC;" right?
24     A. That's correct.
25     Q. HCC there -- HCC there stands for Healthcare

317

1  Cluster?
2      A. That's correct.
3      Q. And in 2004 -- excuse me -- 2003 -- nope --
4  2004, the middle column, "PBM in Health Plan National
5  Account Teams," that would have included the group
6  you -- not the Managed Care Marketers, but you were
7  working as Senior Director, National Accounts; right?
8          MR. MIZELL: Object to form.
9      A. I'm not sure I understand your question.
10     Q. Sure. The question wasn't very artfully
11 asked, so I apologize for that.
12          I was trying to understand which section you
13 would have worked with, and I'm assuming it's the
14 middle column of Managed Care Marketers, the PBM and
15 Health Plan National Account Teams?
16     A. When I was Senior Director of National
17 Accounts, it was that -- that center function that I
18 primarily interacted with. However, I did have
19 interactions with the other teams.
20     Q. While you were Senior Director of National
21 Accounts?
22     A. Yes.
23     Q. Under the center column, "PBM and Health Plan
24 National Account Teams," the first bullet point says
25 "Develop strategic operating plans for key national

16 (Pages 314 to 317)