318

1 accounts."
2       Is that what you talked about yesterday,
3 testified to yesterday about the operating plans that
4 the Managed Care Marketers worked with your National
5 Accounts Managers on?
6       MR. MIZELL: Object to the form.
7    A.   Yes. The Managed Market Marketers and the
8 National Account Managers worked together to develop
9 the operating plans for the national accounts.
10    Q.   The next bullet point says, "Co-lead account
11 cross functional teams." What is that?
12    A.   The cross functional team is individuals that
13 would be responsible for interacting with a customer.
14 So, for example, you have the -- the National Account
15 Manager responsible for Welpoint. There is a National
16 Account Marketer that is responsible for Welpoint.
17 There was a National Clinical Education Consultant
18 responsible for Welpoint.
19       The teams vary by the interaction. For
20 example, within the Kaiser team, the Kaiser team also
21 includes the two Kaiser District Managers. No other
22 team has that unique group.
23    Q.   And then the third bullet point says, "Act as
24 HQ," headquarters "hub for communication, analysis and
25 performance monitoring."

319

1       Is that right?
2    A.   That is correct.
3    Q.   And that's a reference to the Managed Care
4 Marketers acting as a headquarters hub?
5    A.   That is correct.
6    Q.   What type of communications, analysis and
7 performance monitoring did the Managed Care Marketers
8 act as headquarters hub for?
9    A.   An example would be -- at this time that an
10 individual product brand team, let's say the Lipitor
11 team would need an analysis on where we have positive
12 formulary access, second tier, unrestricted, and in
13 what markets we may be underperforming national share.
14    Q.   And the Managed Care Marketers would obtain
15 that information?
16    A.   They would obtain that information, and then
17 they would meet with the Product Team Managed Market
18 Marketer, and they would then share that information.
19    Q.   Is it your belief that the Managed Care
20 Marketers would have obtained information about
21 Neurontin?
22    A.   No, there was no reason to obtain information
23 about Neurontin unless it was requested. And to the
24 best of my knowledge, it wasn't requested.
25    Q.   How do you know that information about

320

1 Neurontin was never requested of the Managed Care
2 Marketers?
3    A.   I don't know that it was never requested. I
4 do know that it would not proactively be provided in
5 isolation, because the Payer Provider Management Group
6 supported the Healthcare Cluster, and the Healthcare
7 Cluster had no responsibilities for promoting
8 Neurontin.
9    Q.   Did the Healthcare Cluster obtain information
10 as to what formularies had Neurontin on them?
11    A.   Yes.
12    Q.   Did the Healthcare Cluster have any
13 responsibilities for obtaining information about
14 Neurontin?
15    A.   No.
16    Q.   But you did obtain information about whether
17 particular formularies -- formularies had Neurontin on
18 them; right?
19    A.   Yes. Most of that -- most of that
20 information is in the public domain, contained on
21 health plan and other third-party payer websites, as
22 well as in their published formularies. It's very
23 easy to obtain.
24    Q.   Before you looked at Henderson Exhibit Number
25 6; it showed the percentage sales through Medco for

321

1 Neurontin. Do you remember that?
2    A.   Yes, I remember that.
3    Q.   We did a couple of different regions. Would
4 the Healthcare Cluster have been responsible for
5 obtaining that information about Neurontin sales?
6    A.   No.
7    Q.   What group was responsible for obtaining that
8 information?
9    A.   In that particular deck, it -- it appears
10 that that deck was put together by National Account
11 PBM Marketing Team, which was part of the Payer
12 Provider Management Group, Dennis Kowalski's group.
13    Q.   Would Dennis Kowalski's group have any
14 communications with third-party payers?
15    A.   No.
16    Q.   How would he obtain that information about
17 Medco, then?
18       MR. MIZELL: Object to form.
19    A.   The source that was listed on those slides
20 was NDC. So he would typically reach out to the
21 Market Analytics Team that supports his team, and they
22 would access that data through the data that we've
23 purchased through NDC.
24    Q.   Would Mark Backen's team have any
25 communications with third-party payers?

17 (Pages 318 to 321)

**322**

1    A.  No.
2    Q.  Let's go back to the Page 385, the
3  organizational -- the new PPMG organizational
4  structure.
5    A.  Yes.
6    Q.  The last three digits, 385.
7      There is a reference to an Elizabeth Paul,
8  Senior Manager, Aetna and Humana; do you see that?
9    A.  Yes.
10   Q.  Do you know whether Ms. Paul ever had any
11 communications with Aetna?
12   A.  I do not know specifically whether Elizabeth
13 Paul had communications with Aetna. I do know,
14 however, that she would never have communications
15 directly with Aetna without the National Account
16 Manager being a part of any discussion that took
17 place.
18   Q.  How do you know that?
19   A.  That's our policy. The National Account
20 Managers are the sole, single face to Pfizer with all
21 third-party payer -- national account third-party
22 payers.
23   Q.  So you are saying that Ms. Paul could never
24 have any communication with Aetna without Mr. Backen
25 being present?

**323**

1    A.  No.
2      MR. MIZELL: Object to form.
3    A.  I am saying that Ms. Paul would not have had
4  any communications without the National Account
5  Manager being present or being part of those
6  discussions. Mr. Backen was not a National Account
7  Manager.
8    Q.  I realized afterwards I misunderstood what
9  you were saying.
10     And because the National Account Managers in
11 2004 reported up to you, you knew what every one of
12 them were doing?
13   A.  They --
14     MR. MIZELL: Object to form.
15   Q.  Is that correct?
16   A.  They didn't report up through me in 2004.
17 However, that was our standard policy across all
18 national accounts. Actually, all accounts. As you
19 can imagine, with an organization as large as Pfizer,
20 it is very important that we have a single point of
21 contact with our customers, in particular the national
22 account customers.
23     There are occasions when third-party payers
24 come to Pfizer headquarters and make presentations and
25 have meetings. It would be situations like that where

**324**

1  Elizabeth Paul may actually talk to somebody who's a
2  third-party payer.
3    Q.  The next bullet point says, "Supports product
4  pull through initiatives --"
5      I'm sorry. The next page. We are back on
6  the Page 386, each team -- how -- Page Number 386,
7  lower right-hand side, entitled, "Each team in PPMG
8  plays a distinct role in interacting with Marketing
9  and the HCC."
10     Are you there, Mr. Henderson?
11   A.  Yes, I am.
12   Q.  The last bullet point in the middle column
13 says, "Supports pull through initiatives and
14 relationships."
15     Do you see that?
16   A.  Yes.
17   Q.  What does that mean?
18   A.  I don't specifically know what they're
19 describing in this bullet. I do know that around
20 pull-through initiatives, they typically provided us
21 the data and analysis to support those initiatives.
22 They also were responsible for developing non branded
23 materials that facilitated and assisted the National
24 Account Managers in cultivating relationships within
25 the national accounts.

**325**

1    Q.  What's a pull-through initiative?
2    A.  A pull-through initiative is a field-based
3  initiative that's conducted by Sales -- by Sales
4  Representatives and their District Managers, targeting
5  physicians that may be part of any given third-party
6  payer's provider network in order to take advantage of
7  access opportunities.
8    Q.  When you say conducted by sales
9  representatives, you mean Pfizer sales
10 representatives?
11   A.  Yes, Pfizer sales representatives.
12   Q.  And how do you take advantage of formulary
13 access?
14   A.  So, for example, let's assume that a health
15 plan has changed their formulary positioning of a
16 product: Welpoint has moved Lipitor from third tier
17 to second tier, and they have moved all of the other
18 branded statins to third tier.
19     When the representatives are in Georgia,
20 Georgia's a wholly owned -- Blue Cross-Blue Shield of
21 Georgia is a wholly owned plan by Welpoint; the
22 representatives in Georgia, when they are talking to
23 doctors, could say something along the lines of:
24 "Doctor, Lipitor is the only branded statin in second
25 tier with Blue Cross-Blue Shield of Georgia."

18 (Pages 322 to 325)

326

1      That would be an example of a pull-through
2  initiatives.
3      Q.  What's the reference to "pull-through" mean?
4      A.  "Pull-through" is pulling through an
5  opportunity that has been created in the marketplace.
6      Q.  Trying to get physicians to prescribe Lipitor
7  in that situation?
8      A.  Yes.
9      Q.  If you could turn to the next page of
10 Henderson Exhibit 7, it's a page entitled "Managed
11 Care Contact List."
12      Do you see that?
13      A.  I do see that.
14      Q.  And this is the way it's been produced to the
15 plaintiffs in this case by Pfizer, so I have to
16 apologize for the light print, but this is the best we
17 have.
18      In the left-hand column, there is a list of
19 Pfizer drugs; right?
20      A.  Yes, there is Pfizer drugs as well as others.
21      Q.  Included in that list is Neurontin; right?
22      A.  Yes.
23      Q.  So on this managed care contact list, the
24 drug Neurontin is identified; right?
25      A.  Yes.

327

1      Q.  And it says that Steve Piron or Piron is next
2  to the name of the drug Neurontin; right?
3      A.  That -- I believe that's what it says.  It's
4  difficult to read.
5      Q.  And then it has a listing of managed care
6  customers, "check all that apply for each contact."
7  Do you see that?
8      A.  Yes.
9      Q.  And there are Xs in all of those boxes for
10 Neurontin; right?
11      A.  Yes.
12      Q.  Why was Mr. Piron's name being given as a
13 manage -- on this managed care contact list?
14      MR. MIZELL: Object to form.
15      A.  Well, this goes to your earlier question and
16 answers your earlier question: Was there a Managed
17 Markets Marketer on the Neurontin brand team?
18      So if you refer back to Henderson Exhibit 7,
19 the first page, the e-mail message, the people that
20 were invited to this breakfast, if you reconcile and
21 cross index the names of the people on there versus
22 the names that are listed on Page 387 of Henderson
23 Exhibit 7, you should see that it is essentially the
24 same list of people.
25      So these are the individual Managed Market

328

1  Marketers on the individual brand teams.
2      The Xs indicate what channels those Managed
3  Market Marketers are responsible for.  The reason for
4  that is that many times on an -- on any given team,
5  like I will refer you to the Zyrtec team, you will
6  notice that they have two Managed Market Marketers
7  listed.  One person is responsible for one channel,
8  while the other person is responsible for four
9  channels.
10      Q.  So when it came to Neurontin, Mr. Piron was
11 responsible for all four channels?
12      MR. MIZELL: Object to form.
13      A.  Actually, it appears he was responsible for
14 five channels.  And what responsibility for the
15 channel meant typically was being aware of what was
16 going on with your brand in any given channel.
17      Q.  So what are the five channels?
18      A.  Well, as they have defined them on this
19 sheet, as best as I can read them, it appears VA DOD.
20      Q.  Is one channel; right?
21      A.  Is one channel.  It looks like "Health
22 Plans, PBMs" is another channel.  The next one I -- I
23 can't read.  The next one is "Long Term Care," and the
24 next channel is "Medicaid-Medicare."
25      Q.  Why would Pfizer have someone of -- a Managed

329

1  Market Marketer on the Neurontin brand team if
2  Neurontin was not being promoted in the managed care
3  market?
4      A.  Well, as you can see here, it appears all of
5  these brands have people.  For example, we were not
6  promoting Inspira in managed markets either, and they
7  have someone assigned.  And that person's
8  responsibilities vary by product team; but it -- on
9  most teams they are the individuals charged with
10 gathering information and know -- knowing what's going
11 on in the marketplace; not necessarily developing any
12 kind of promotional pieces.
13      And in the case of Neurontin, because we
14 weren't promoting with third-party payers, he -- he
15 would not have been charged with developing pieces
16 like that for managed markets.
17      Q.  And, again, when you say Pfizer was not
18 promoting Neurontin with third-party payers, you are
19 saying that you weren't going in there providing
20 on-label information about Neurontin?
21      MR. MIZELL: Object to form.
22      A.  I'm saying that we weren't going in there and
23 talking about Neurontin at all with third-party
24 payers.
25      Q.  And if a question was asked about Neurontin

19 (Pages 326 to 329)

330

1  by third-party payers, what would happen?
2      A.  They would be referred to Medical
3  Information.
4      Q.  Whether it was an on-label or an off-label
5  question?
6      A.  That's correct.
7      Q.  And that's because that was Pfizer's policy?
8  That's why you say that?
9      A.  That's correct.
10         MR. MIZELL: Object to form.
11     A.  That's correct.
12     Q.  Can I have you turn to Page 400 in the lower
13  right-hand corner in Henderson Exhibit 7.
14         This is a page entitled, "National Formulary
15  Status Across Health Plans and PBMs;" right?
16     A.  Yes.
17     Q.  And the second column shows Neurontin; right?
18     A.  Yes, it does.
19     Q.  What does -- was Neurontin in all formularies
20  for health plans and PBMs, or is there some portion
21  that's not on?
22         MR. MIZELL: Object to form.
23     A.  Because this slide isn't in color, it's
24  difficult for me to assess exactly how -- what the
25  formulary status was.  However, with the white bar

331

1  that is at the bottom of the Neurontin bar, it appears
2  that coincides with "Available."
3         So, no, it would not have been on 100 percent
4  of the formularies that are in the health plans, PBMs
5  and Medicaids that were queried in this analysis.
6      Q.  And again, the source of this information was
7  the HC Exchange; right?
8         MR. MIZELL: Object to form.
9      A.  Well, that -- that's what it says.
10     Q.  What's the difference between "available" and
11  "access"?
12     A.  It -- It depends on benefit designs within
13  individual entities.  So I'll give you an example.
14         If you were to ask Kaiser about availability
15  of products, they would tell you that for their
16  members, all products are available.  Kaiser runs a
17  formulary, but Kaiser also has a non-formulary drug
18  request -- request process.
19         So essentially what they're saying is that if
20  the physician feels strongly enough about getting a
21  non-formulary product, they fill out this request form
22  and it's dispensed by the pharmacy.  That's typically
23  how we categorize "available."
24     Q.  And then "access"?
25     A.  "Access" typically refers to unrestricted

332

1  second tier access.  In this case it could possibly
2  include third tier unrestricted access, but I don't
3  know, when they did this query, how they defined it.
4      Q.  Can you turn to the next page, 401.
5      A.  Yes.
6      Q.  It's a slide entitled, "Where Do You Find
7  Access Opportunities"?  Do you see that?
8      A.  Yes.
9      Q.  Under the access -- well, let's look at the
10  "Source" column.  First it says, the first line under
11  Source says, "Cdrill.Pfizer.com."
12         Do you see that?
13     A.  Yes I do.
14     Q.  What is that a reference to?
15     A.  That's a reference to the customer drill down
16  report.
17     Q.  What does that mean?
18     A.  The customer drill down report identifies who
19  the top payers are in any given market, based on
20  Pfizer sales.  Top payers can also include categories
21  like cash.
22         So when you click on that report in a given
23  district, let's say Charlotte, North Carolina, it
24  would list, based on Pfizer sales, the -- the top
25  payers in that market.

333

1      Q.  Would a customer include a third-party payer
2  like Kaiser?
3      A.  Yes, it could potentially have Kaiser in
4  there, yes.
5      Q.  Would a customer include Aetna?
6      A.  Yes.
7      Q.  Would it include -- Would a customer include
8  Blue Cross-Blue Shield of Louisiana?
9      A.  Again, it would only include who the top
10  payers are in any given market.   So if Aetna, Kaiser,
11  Blue Cross-Blue Shield of Louisiana are a top payer
12  in that market, they would be listed.
13     Q.  Would it include Guardian Life Insurance
14  Company?
15     A.  In -- because Guardian -- based on what you
16  previously showed me in Henderson Exhibit 6, it
17  appears that Guardian Health was a client of Medco, so
18  no, it would not.
19     Q.  But it might include Medco?
20     A.  It might include Medco if Medco was a top
21  payer in that individual market.
22     Q.  How would you define top payer in an
23  individual market?
24     A.  So, again, it's based on Pfizer's sales.  So
25  if -- if there's large sales attributed to that payer

20 (Pages 330 to 333)

334

1    in that market, that's how it would be identified.
2    Q.  Would you be able to go into the
3    Cdrill.Pfizer.com database and identify the sales of
4    Neurontin by the top customers --
5    A.  No.
6    Q.  -- or top payers?
7        MR. MIZELL: Object to form.  Outside the
8    scope.
9    Q.  It's just the total Pfizer sales?
10       MR. MIZELL: Same objections.
11   A.  It's just top payers in an individual market.
12   Q.  Oh, it doesn't have the dollar volume next to
13   the top payers?
14       MR. MIZELL: Same objections.
15   Q.  Is that what you are saying?
16       MR. MIZELL: Same.
17   A.  I -- If it has the dollar volume, it's an
18   aggregate of Pfizer -- total Pfizer sales.  It's not
19   broken out by individual brands.
20   Q.  And is there a minimum amount of Pfizer sales
21   that make a particular payer qualify as a top payer?
22       MR. MIZELL: Outside the scope.
23   A.  The report just lists the top ten payers.
24   Q.  So if you looked over on the left-hand column
25   under "Access," there is this listing of "Anthem

335

1    Prescription Management, Tower Health Plan, Omni Care,
2    3M," those would be that list of top -- the top payers
3    for a particular market?
4        MR. MIZELL: Object to form.
5    A.  That's correct.
6    Q.  Next page, 402.  It's a slide entitled, "What
7    Does It Look Like in Sherlock"?
8    A.  Yes.
9    Q.  What is Sherlock?
10   A.  Sherlock is a software application made
11   available to representatives that provides them a wide
12   variety of information.  The information that you have
13   here on the slide is the information that provides --
14   that's provided a representative around access.
15   Q.  Access being the formulary access?
16   A.  Yes.
17   Q.  And the bottom left-hand corner it says, "HC
18   exchange access grid incorporated into Sherlock;" do
19   you see that?
20   A.  Yes.
21   Q.  What does that mean?
22   A.  It means that within the Sherlock
23   application, data that is -- that is available in HC
24   Exchange feeds into the Sherlock application.
25   Q.  What information is available in Sherlock?

336

1        MR. MIZELL: Outside the scope.
2    A.  I don't know what all the tabs are because,
3    again, it's for sales representatives.  I know it
4    has -- has physician data in it.  That's what it was
5    primarily developed for.
6        The one component of Sherlock that I am
7    familiar with is the access component.  And it
8    basically is providing representatives a view of their
9    marketplace, who the top payers are, and that
10   information is fed from the previously-discussed
11   customer drill-down report, cross referencing that
12   with formulary access which is fed from HC Exchange.
13   Q.  We can go to a page further on down, last
14   three digits in the lower right corner, 405, slide
15   that's entitled "Success is Both Qualitative and
16   Quantitative."
17       Do you see that?
18   A.  Yes.
19   Q.  So this shows a slide in the left-hand side,
20   "Ames, Iowa TACU," T-A-C-U, "access positively
21   influences results."
22       Do you see that?
23   A.  Yes.
24   Q.  With this Sherlock database cross-referencing
25   the HC Exchange database, could a sales representative

337

1    go in for a particular region and look at Neurontin
2    new prescription share?  Like in this one, there is
3    Zocar and Lipitor in new prescription share?
4        MR. MIZELL: Object to form.  Outside scope.
5    A.  Well, first of all, this has nothing to do
6    with Sherlock, so it's difficult for me to respond to
7    your question.
8    Q.  Well, let me ask the question this way:  The
9    slide is entitled, "Success is Both Qualitative and
10   Quantitative."
11       What does it mean by qualitative?
12       MR. MIZELL: Object to form.  Outside scope.
13   A.  I don't know.
14   Q.  What does it mean by "quantitative"?
15       MR. MIZELL: Same objections.
16   A.  This is showing that by doing -- by
17   successful -- successfully implementing a
18   pull-through -- I believe this is pull-through -- or
19   by seeing positive changes in formulary status, that
20   it is showing that when you capitalize on positive
21   formulary status, that you see an increase in market
22   share.
23   Q.  Let me have you turn to the second-to-last
24   page of this exhibit, last three digits 436.  It says
25   "Co-promote Utilization Continues to Grow, Template

21 (Pages 334 to 337)

338

1   Order Growth By Month.  HCC managers using Karma
2   website."
3       Do you see that?
4   A.   Yes.
5   Q.   What is the Karma website?
6   A.   The Karma website is a website where -- where
7   templates are housed.  They are Regulatory approved
8   product templates that we -- that account managers in
9   the Healthcare Cluster are able to take into a
10  third-party payer, and based on the third-party
11  payer's approval -- and the Account Manager has to
12  have approval, meaning a signature from a party
13  within -- within that organization, a piece is
14  produced that sales representatives can use in their
15  promotional detailing.
16  Q.   Do you know whether the Karma website housed
17  any template for Neurontin?
18  A.   It did not.
19  Q.   How do you know that?
20  A.   Because Neurontin was not a product that was
21  promoted by the Healthcare Cluster.  The only product
22  templates that are housed in karma are product
23  templates for products that are promoted by Account
24  Managers within the Healthcare Cluster.
25  Q.   Did you ever go look to see whether the Karma

339

1   website had Neurontin information on it?
2   A.   I went into the Karma website to look at what
3   was housed there, not specifically to look and see if
4   there were Neurontin pieces housed there.
5   Q.   When did you do that look?
6   A.   The last time I looked at it was in May of
7   2007, as I took on my new responsibilities as the Vice
8   President of the Business Unit Liaison Group, as we
9   were looking to do our due diligence as to what pieces
10  were housed in Karma.
11  Q.   Before May, 2007, how -- when was the time --
12  when had you looked at Karma?
13  A.   At various times throughout my -- since the
14  inception of Karma, I would periodically get into
15  Karma.  I would also be copied once the Karma piece
16  had been approved by the third-party payer as to the
17  production of the piece.
18  Q.   When was Karma established?
19  A.   I don't know.
20  Q.   Do you recall the first time you accessed
21  Karma?
22  A.   I do not recall.
23  Q.   Was Karma in existence when you took over as
24  Senior Director of National Accounts in December of
25  2002?

340

1   A.   Yes.
2   Q.   Was Karma in existence when you were Area
3   Manager of Federal Markets East?
4   A.   I don't recall, primarily because the
5   government entities were not willing to enter into any
6   kind of co-promote piece with pharma manufacturers, so
7   it was not within the scope of my responsibilities to
8   access Karma.
9   Q.   Yesterday you testified as to your analysis
10  and conclusions regarding the practices and procedures
11  of Warner-Lambert.
12      Are you aware, Mr. Henderson, that in 2004
13  Warner-Lambert pled guilty to two counts of violation
14  of Title 21, United States Code Sections 331A, 331D,
15  333A, 352F1 and 355A?
16      MR. MIZELL: Object to form.  Outside the
17  scope.
18  A.   I'm somewhat confused.  Was Warner-Lambert --
19  they -- Warner-Lambert in 2004?
20      So after the -- the Pfizer acquisition,
21  Warner-Lambert pleaded guilty?  I don't fully
22  understand.
23  Q.   Well, here's the question I asked you.
24      Are you -- Yesterday you testified that from
25  your review of -- of various items, you had concluded

341

1   Warner-Lambert had not engaged in any off-label
2   promotion; right?
3   A.   Yes.
4   Q.   And my question is:  Are you aware that in
5   2004, Warner-Lambert pled guilty to two counts of
6   violations of various sections of Title 21 of the
7   United States Code?
8       MR. MIZELL: Object to form.  Outside the scope.
9   A.   I'm -- I'm not aware of what you are
10  referencing.
11  Q.   And are you aware that Pfizer -- or that
12  those violations had involved the distribution of
13  Neurontin as a misbranded drug for unapproved uses?
14      MR. MIZELL: Object to form.  Outside the scope.
15  A.   As -- could you clarify the question?
16  Q.   Sure.  Are you aware that those violations
17  by Warner-Lambert involved the distribution of
18  Neurontin as a misbranded drug for unapproved uses?
19      MR. MIZELL: Object to form.  Outside the
20  scope.
21  A.   I'm not fully aware of what you are
22  referencing.
23  Q.   Are you aware that Pfizer paid a criminal
24  fine of 240 million dollars as a result of these
25  violations?

22 (Pages 338 to 341)

342

1  MR. MIZELL: Object to form. Outside the
2  scope.
3  A. Yes, I am.
4  Q. And how did you become aware that Pfizer paid
5  a criminal fine of 240 million dollars as a result of
6  those violations?
7  MR. MIZELL: Object to form. Outside the scope.
8  A. I first became aware when I read it in the
9  newspaper.
10  Q. Are you aware that that criminal fine was
11  paid as a result of distribution efforts regarding
12  Neurontin?
13  MR. MIZELL: Object to form. Outside the scope.
14  A. As -- As I read it -- read the description of
15  it, that's what was referenced, yes.
16  Q. Neurontin distribution was referenced as the
17  reason for the payment of the 240 million dollar
18  criminal fine?
19  MR. MIZELL: Object to form. Outside the
20  scope.
21  A. Yes, yes, as I recall the headline was --
22  was -- I don't even recall.
23  Q. Were you also aware that Pfizer paid a civil
24  settlement of an additional 228 million dollars as a
25  result of the distribution of Neurontin as a

343

1  misbranded drug for unapproved uses?
2  MR. MIZELL: Object to form. Outside the scope.
3  A. Not specifically. And now, as I think about
4  it, I may have -- the -- the only reference may have
5  been with both those in aggregate together.
6  Q. In excess of 400 million dollars being paid
7  out as a result of the distribution of Neurontin as a
8  misbranded drug for unapproved uses; correct?
9  MR. MIZELL: Object to form. Outside the scope
10  of the designation.
11  A. As I recall, that's -- that's what I
12  understand.
13  Q. Since you were aware that Pfizer had paid in
14  excess of 400 million dollars regarding these charges
15  of distributing Neurontin as a misbranded drug for
16  unapproved uses, did you ask whether there was any
17  other information to be reviewed before reaching a
18  conclusion that Warner-Lambert had not engaged in any
19  off-label activities?
20  MR. MIZELL: Object to form. Outside the scope.
21  A. No, I did not.
22  Q. Were the three deposition transcripts that
23  you received, Mr. Richter's, Mr. Cavic's and Mr.
24  Disimone's transcripts, that you received from
25  Pfizer's counsel?

344

1  A. Those are transcripts that I received from,
2  yes, Pfizer counsel had them sent to me.
3  MS. DALEY: Mr. Mizell, yesterday Mr. Henderson
4  talked about notes that he had taken with
5  communications with various Pfizer employees to
6  prepare for this deposition. Have you considered
7  my request for the production of those notes?
8  MR. MIZELL: No.
9  MS. DALEY: Well, I asked that the notes be
10  produced yesterday so that they can be used in
11  connection with this deposition.
12  MR. MIZELL: I don't recall that request.
13  MS. DALEY: Well, I'll refresh your
14  recollection right now. Will those notes be
15  produced today so that they can be used in
16  connection with this deposition?
17  MR. MIZELL: We'll consider the request.
18  MS. DALEY: Fine. I guess that will have to be
19  added to the motion to compel that will be filed
20  in connection with the fact that this witness has
21  not been prepared for the -- for this deposition,
22  and other issues that have come up in connection
23  with this deposition.
24  MR. MIZELL: The witness has been adequately
25  prepared to testify as to all areas with which he

345

1  has been designated.
2
3  CONTINUED DIRECT EXAMINATION BY MS. DALEY:
4  Q. Mr. Henderson, in connection with your
5  preparation for this deposition, did you review any of
6  Pfizer's policies or field guides?
7  A. I did not, in preparation for this
8  deposition. However, Pfizer has a very extensive
9  on-line compliance course that everyone within my
10  organization is required to take annually. So my
11  thought in preparing for this deposition was, because
12  I have repeatedly completed this course, that I was
13  adequately prepared to address any questions that you
14  might ask me.
15  (E-Mail Chain beginning March 31, 2003
16  marked Henderson-8 for identification.)
17  Q. Let me hand you, Mr. Henderson, what has been
18  mark as Henderson Exhibit 8.
19  A. Okay.
20  Q. What is Henderson Exhibit 8?
21  A. It's an e-mail chain between Allen Partain,
22  the PD2 Regional Manager in the Mid Atlantic Region;
23  and Claire Kennedy, who was the Vice President of
24  National Accounts; and me, the Senior Director of
25  National Accounts.

23 (Pages 342 to 345)

346

1    Q.  The first e-mail at the top of Henderson
2  Exhibit 8 is dated March 31, 2003; right?
3    A.  That's correct.
4    Q.  And it's actually an e-mail from you to Alan
5  Partain; right?
6    A.  It is actually a response from me to an
7  inquiry from Alan Partain.
8    Q.  But it is also an e-mail from you to him;
9  right?
10    MR. MIZELL: Object to the form.
11    Q.  -- regarding your response?
12    MR. MIZELL: Object to form.
13    A.  Yes, it's an e-mail from me responding to a
14  question from Alan Partain.
15    Q.  And the question from Mr. Partain was what?
16    A.  Alan Partain was asking for -- for whether
17  Pfizer would consider contracting with Kaiser for
18  Neurontin and Relpax.
19    Q.  Why was Mr. Partain asking that question?
20    MR. MIZELL: Object to form.
21    A.  Well, as I indicated to you yesterday, within
22  Kaiser, because Kaiser's data is not revealed and the
23  only way that data can be obtained for sales incentive
24  compensation is through purchasing agreements, because
25  Kaiser has a small presence in the Washington, D.C.

347

1  area, these are not classic Kaiser staff model HMOs as
2  you would see in California, Alan Partain is
3  requesting that we negotiate a purchasing agreement,
4  he refers to that as a contract, in order for Pfizer
5  to start obtaining some type of sales data so that he
6  and his representatives can get sales credit for that.
7    Q.  In March, 2003, was Neurontin on Kaiser's
8  formulary?
9    A.  I am not aware of whether it was on formulary
10  or not.
11    MS. DALEY: Mr. Mizell, I just realized that
12  there was a Post-it on it, so we need to put this
13  aside and we can redo this and we can get a clean
14  copy, if that's okay?
15    MR. MIZELL: Okay.
16    MS. DALEY: We'll come back to that.
17    MR. MIZELL: Is it good time to break for
18  lunch?
19    MS. DALEY: Okay. I guess.
20    MR. MIZELL: All right.
21    MS. DALEY: How long for lunch? Stay on. I
22  want to be on the record here.
23    MR. MIZELL: Thirty minutes.
24    MS. DALEY: Thirty minutes. Okay, that's good.
25    THE VIDEOGRAPHER: The time is now

348

1  approximately 12:15. We are now going off the
2  record.
3    (The luncheon recess is taken.)
4
5  CONTINUED DIRECT EXAMINATION BY MS. DALEY:
6    THE VIDEOGRAPHER: The time is approximately
7  1:02. This begins Tape Number 3. We are now on
8  the record.
9    Q.  Mr. Henderson, let me make sure I understood
10  something you had said earlier.
11    Did I understand you correctly when you said
12  that no one was -- no one at Pfizer was talking about
13  Neurontin with any of the third-party payers? Is that
14  correct?
15    MR. MIZELL: Object to form.
16    A.  Yeah, not that I'm aware of. Certainly
17  nobody in the Managed Markets or Healthcare Cluster at
18  the time was talking to third-party payers.
19    Q.  And was that because it was, as far as you
20  are concerned, against Pfizer policy to talk to the
21  third-party payers about Neurontin?
22    MR. MIZELL: Object to form.
23    A.  That's correct.
24    (Letter from Linda Guerrera on Behalf of
25  Suzanne Doft of the Neurontin Team dated

349

1  February 2, 2002 marked Henderson-9 for
2  identification.)
3    Q.  I'm handing you what has been marked as
4  Henderson Exhibit 9. Henderson Exhibit 9 is a copy of
5  a letter from Linda Guerrera on behalf of Suzanne Doft
6  of the Neurontin team dated February 2, 2002; right?
7    A.  Yes, that's correct.
8    Q.  And the letter starts out, "Dear Pfizer, I am
9  pleased to invite you to attend and participate in the
10  PBM Advisory Board Meetings on Neuropathic Pain to be
11  held March 3 through 4, 2002 at the Disney Boardwalk
12  Resort in Orlando, Florida." Right?
13    A.  No, actually it says "Dear Colleagues." Not
14  "Dear Pfizer."
15    Q.  Let me rephrase the question so it's clear.
16    The letter is on Pfizer letterhead; right?
17    A.  That's correct.
18    Q.  And it says "Dear colleagues, I am pleased to
19  invite you to attend and participate in the PBM
20  advisory board meetings on neuropathic pain to be held
21  March 3 to 4, 2002 at the Disney Boardwalk Resort in
22  Orlando, Florida." Correct?
23    A.  That is correct.
24    Q.  It goes on to say, "This meeting will be
25  composed of approximately 12 medical and pharmacy

24 (Pages 346 to 349)

350

1  directors from leading PBMs, as well as several
2  pharmacy directors from government payors (VA, DOD)."
3      Right?
4    A.  That's correct.
5    Q.  Would these medical and pharmacy directors
6  from leading PBMs be third-party payers?
7    A.  It's possible.
8    Q.  Would government payers, VA and DOD, be
9  considered third-party payers?
10   A.  Yes.
11   Q.  Did you attend a PBM Advisory Board Meeting
12 on Neuropathic Pain in March, 2002 at the Disney
13 Boardwalk Resort in Orlando, Florida?
14   A.  No.
15   Q.  Did you ever hear about that advisory board
16 meeting?
17   A.  I did not.
18   Q.  Mr. Henderson, I'm handing you what has been
19 marked as Henderson Exhibit 10?
20     (Executive Summary of March, 2002 PBM
21     Advisory Board Meeting marked Henderson-10
22     for identification.)
23   A.  Okay.
24   Q.  Is Henderson Exhibit Number 10 an executive
25 summary of a PBM advisory board meeting that was held

351

1  for Pfizer in March, 2002 in Orlando, Florida?
2      MR. MIZELL: Object to form.
3    A.  That's what it says.
4    Q.  In preparation for this deposition, were you
5  given by Pfizer's lawyers a copy of this executive
6  summary to prepare?
7    A.  No.
8    Q.  In the introduction, the second page of
9  Henderson Exhibit 10, it says that, "This executive
10 summary sets forth the findings and conclusions of the
11 second of three Neuropathic Pain Advisory Board
12 Meetings held for Pfizer's Neurontin team."
13     Do you know anything about the first or the
14 third Neuropathic Pain Advisory Board Meeting held for
15 Pfizer's Neurontin team?
16   A.  No.
17     MR. MIZELL: Object to form.
18   A.  No.
19   Q.  Do you see that in this executive -- or in
20 the introduction here, it says that "Pfizer's goals
21 for these panels include the following"?  Do you see
22 that?
23     It's the second sentence in the introduction.
24   A.  Yes, yes.
25   Q.  One of the goals that Pfizer had for these

352

1  advisory board meetings was to help the advisory board
2  members learn more about Pfizer and the Neurontin team
3  and its resources; right?
4    A.  Yes, as I read it, to help the advisory
5  board members learn more about Pfizer and the Neurontin
6  team's -- and it's resources, yes.
7    Q.  In the following paragraph, it goes on to
8  say, "The panel was held in Orlando, Florida March 3
9  through 4, 2002.  12 senior executives attended; ten
10 from regional and national prescription benefit
11 management organizations, (PBMs), and two pharmacy
12 directors from government payroll organizations (VA
13 and DOD organizations.)"
14     Right?
15   A.  Yes.
16   Q.  It goes on to say, "Members of Pfizer's NHO
17 team nominated the attendees."  Do you see that?
18   A.  I do see that.
19   Q.  At this time, March 2002, was Pfizer's NHO
20 team part of the Healthcare Cluster?
21   A.  Pfizer's -- yes.
22   Q.  And was it consistent with Pfizer's policies
23 that members of Pfizer's NHO teams nominate attendees
24 to an advisory board meeting?
25     MR. MIZELL: Object to form.

353

1    A.  There was a time, back probably around 2002
2  and earlier, in which when Pfizer was conducting ad
3  boards, it was a standard practice to query the field
4  and query the National Healthcare Operations, and say,
5  "We will be conducting an advisory board.  If you have
6  people --" and they typically would lay out criteria,
7  the criteria being people that managed formularies,
8  things like that; "that would be able to provide us
9  good insights, could you please provide us their
10 names."
11   Q.  What was Pfizer's policy at that time, March,
12 2002, about whether the field could nominate attendees
13 to advisory board meetings?
14     MR. MIZELL: Object to form. Outside the scope.
15   A.  As I previously described, we would -- we
16 would query -- they -- we would get a query from --
17 from -- typically the Director of Sales Operations.
18 It would originate from the individual brand team.
19 And they would say, "We're looking for medical
20 directors of PBMs.  Please provide us the contact
21 information of those individuals."
22     That -- that information would then be
23 collected in Pfizer headquarters and provided to the
24 brand team, who would provide it to their -- whoever
25 was conducting the ad board on their behalf.

25 (Pages 350 to 353)

354

1    Q.   What was Pfizer's policy in March, 2002 about
2    whether members of the field could nominate attendees
3    to advisory board meetings?
4         MR. MIZELL: Object to form. Outside the scope.
5    A.   Again, we would get queries from headquarters
6    asking us to provide a list of names of people that --
7    of whatever they were looking for.  For example, we
8    might get a query that says: "We are going to be
9    conducting an ad board around quality measures
10   associated with HEDA standards.   Please send us the
11   contact information of quality directors in regional
12   health plans."
13        Q.   I understand that you actually received those
14   queries.  The question I have was: What was Pfizer's
15   policy about whether members of the field could
16   nominate attendees to advisory board meetings?
17        MR. MIZELL: Object to form. Outside the scope.
18   A.   At the time, I don't know whether there was a
19   policy.  There was a standard of practice.
20        Q.   What was the standard of practice?
21        MR. MIZELL: Same objections.
22   A.   The standard of practice involved whenever a
23   brand team or one of the headquarters functions was
24   conducting an ad board, they would send out a query
25   out to the field requesting specific types of

355

1    individuals.  Those individuals were specifically
2    identified, either via whatever channel they were a
3    part of, or whatever function they may hold within
4    their organization.
5         Q.   Does Pfizer have a policy today --
6    A.   Yes.
7         Q.   -- about whether field members can nominate
8    attendees to advisory board meetings?
9    A.   Yes.
10        Q.   What's Pfizer's policy today?
11        MR. MIZELL: Object to form. Outside the scope.
12   A.   We do not directly provide that information
13   any more.
14        Q.   Do you indirectly provide the names of --
15   nominate the names of attendees to advisory board
16   meetings today?
17        MR. MIZELL: Object to form. Outside the scope.
18   A.   I'm not aware of any time when it's been done
19   indirectly.  Typically when ad boards are held these
20   days, the -- whatever consulting company we're using
21   that's putting the ad board together comes in with
22   their -- their own list of potential contacts.  And
23   that is not vetted by anyone in Sales.
24        Q.   When did that policy or when did the standard
25   operating procedure that was in place in March, 2002

356

1    change to the policy that you have today, which
2    prohibits you from nominating names of attendees for
3    advisory board meetings?
4         MR. MIZELL: Object to form. Outside scope.
5    A.   I don't know the actual day -- date, but it
6    was an evolution.  So the next evolution was as part
7    of -- and I forgot the -- the acronym.  But we
8    maintained a database that basically had all the
9    contact information of everyone from a myriad of
10   customers that we called on.  And that information was
11   just loaded in, and then as brand teams were -- were
12   conducting ad boards, they would do their own
13   independent query.
14        And then that evolved -- because that
15   database, one, it was very difficult to keep current,
16   because there was no -- no real reason for anybody --
17   any of the account managers to go in there and
18   continually update it, so it was very difficult to
19   manage.  So as that phased out, we went to more of
20   this new system that I just described, where you have
21   these outside organizations that come in with their
22   own independent lists.
23        So I can't give you an exact date.
24        Q.   Do you know approximately the year?
25        A.   Oh, no.  I don't.

357

1         Q.   Pfizer's policy that's in existence today,
2    where you cannot directly provide the names of
3    invitees for advisory board meetings, how long has
4    that been the policy at Pfizer?
5         MR. MIZELL: Object to form. Outside scope.
6    A.   Well, again I don't know that it's
7    necessarily a policy as much as a procedure that we
8    don't nominate or provide these names of individuals.
9         Q.   At these advisory board meetings, would there
10   be communications with third-party payers?
11        MR. MIZELL: Object to form.
12   A.   As -- in as such that as I'm reading this
13   attendee list, it appears that some of these attendees
14   were employees of third-party payers, so a
15   communication took place.
16        Q.   So the advisory board meetings would
17   constitute a communication with third-party payers?
18        MR. MIZELL: Object to form.
19   A.   An advisory board meeting would constitute a
20   communication between the individual attendees there,
21   who happen to be employed by third-party payers.
22        Q.   Let's turn to the third page of Henderson
23   Exhibit 10.  It states, "Major Conclusions.  PBMs have
24   a limited motivation to address neuropathic pain."
25        Do you see that?

26 (Pages 354 to 357)

### 358

```
 1        MR. MIZELL: Can you give him the Bates
 2    numbers?
 3    Q.  Last three digits, 366 in the lower left-hand
 4    corner.  Third page of Henderson Exhibit 10.
 5    Q.  So what am I looking for?
 6    Q.  The heading on this page is "Major
 7    Conclusions;" do you see that?
 8    A.  Yes.
 9    Q.  And the first major conclusion is: "PBMs
10    have a limited motivation to address neuropathic
11    pain."
12        Do you see that?
13    A.  I do see that.
14    Q.  Does this surprise you that from this
15    advisory board meeting, one of the major conclusions
16    was that PBMs have a limited motivation to address
17    neuropathic pain?
18        MR. MIZELL: Object to form. Outside scope.
19    A.  Based on -- on what I'm reading, I'm just
20    going to assume that that's the conclusion that the
21    people that attended that meeting came to.
22    Q.  Okay.  But that wasn't my question.
23        My question is:  Does it surprise you that --
24    let's put it this way:  Based upon your work in the
25    managed care market, do you believe that PBMs have a
```

### 359

```
 1    limited motivation to address neuropathic pain?
 2        MR. MIZELL: Object to form. Outside scope.
 3    A.  Based on what I've read in this document and
 4    how -- and many of the things that existed back in
 5    2002, it does not surprise me.
 6    Q.  Why do you believe that PBMs back in 2002 had
 7    limited motivation to address neuropathic pain?
 8    A.  Well, again I was not calling on PBMs or
 9    responsible for PBMs at this time, not until -- at
10    this time.  But based on what I'm reading here and the
11    things that they have -- have brought out in this
12    document, as I've indicated before, PBMs, pharmacy
13    benefit managers, are primarily responsible for claims
14    adjudication.
15        And it is very difficult for, if not
16    impossible, and they are indicating here that it's
17    impossible for some of these PBMs to actually marry up
18    an indication with a pharmacy claim.  Because
19    indications, meaning what the product is being
20    prescribed for by the doctor, is not on the
21    prescription.
22        Additionally, they have highlighted in here
23    that by putting prior authorizations, which are
24    paper -- typically paper documents that require the
25    physician to provide this type of information is
```

### 360

```
 1    costly for the PBMs to -- to utilize.
 2    Q.  Now, I understand that you weren't in charge
 3    of PBMs in March of 2002 when this board meeting was
 4    held, but you subsequently became Senior Director,
 5    National Accounts, later that same year, in December,
 6    2002; right?
 7    A.  Senior Director, National Accounts, Health
 8    Plans.  There was a Senior Director National Accounts,
 9    PBMs.
10    Q.  Who was that person?
11    A.  Sandra Morgan.
12    Q.  Although as Senior Director National Accounts
13    Health Plans, you had Medco in your group; right?
14        MR. MIZELL: Object to form.
15    A.  I did not have Medco the entire time.
16    Q.  When did you get Medco as part of your
17    responsibility?
18    A.  I assumed responsibility for Medco in I
19    believe early 2007 -- I'm sorry -- 2005.
20    Q.  Before that, was Medco under the direction of
21    the Senior Director of National Accounts PBMs?
22    A.  That's correct.
23    Q.  Why the switch to you?
24    A.  Because the largest client for Medco was --
25    was United Healthcare.  Additionally, at the time
```

### 361

```
 1    Medco was Pfizer's largest customer, and Sandra Morgan
 2    was promoted.
 3        And based on my experience and their
 4    relationship with United, the decision was made to
 5    have that National Account Manager report to me.
 6    Q.  In March of 2002, was Neurontin approved by
 7    the FDA for use to treat neuropathic pain?
 8    A.  I don't recall when -- when it got approval.
 9    I know it was definitely not indicated for neuropathic
10    pain.  It eventually got an indication for
11    post-herpetic neuralgia.
12    Q.  But that's different.  Post-herpetic
13    neuralgia is different from an indication approved by
14    the FDA for neuropathic pain; right?
15        MR. MIZELL: Object to form.
16    A.  That is correct.
17    Q.  Going under this "Major Conclusion:  PBMs
18    have a limited motivation to address neuropathic
19    pain," the first bullet point is the point I think you
20    have -- you already mentioned, "PBMs do not have an
21    effective way to identify or manage these patients"
22    because of the inability to marry up the data.  Is
23    that right?
24        MR. MIZELL: Object to form.
25    A.  Their inability to manage it is based on the
```

27 (Pages 358 to 361)

362

1   fact that they don't get the diagnosis, so they don't
2   know what the provider, the physician, prescribed the
3   product for.
4       Q.  The second bullet point then, it says, "Pain
5   is an emotional area, and even if customers request
6   management, PBMs will be hesitant to manage Neurontin
7   utilization, the definition of pain is subjective and
8   it is difficult to differentiate neuropathic pain from
9   chronic pain."
10      Do you see that?
11      A.  Yes, I do see that.
12      Q.  Is that consistent with your understanding
13  about pain and how PBMs address it?
14      MR. MIZELL: Object to form. Outside scope.
15      A.  No, I have -- I have no way of knowing that.
16  I don't know whether that is an accurate assessment of
17  how all PBMs feel or whether this is an N of one
18  voicing their own opinion.
19      Q.  In connection with any of your work as a
20  Pfizer employee, have you seen any other materials
21  where Pfizer talks about the definition of pain being
22  subjective?
23      MR. MIZELL: Outside scope.
24      A.  I haven't seen any materials like that.
25      Q.  Let's go on to the last bullet point on this

363

1   page, under "PBMs have a limited motivation to address
2   neuropathic pain."
3       It says that "The cost of Neurontin is
4   overshadowed by the cost of other pain drugs,
5   particularly OxyContin and the cox-2s."
6       Do you see that?
7       A.  I do see that, yes.
8       Q.  "PBMs will look at curbing inappropriate use
9   of these drugs and opiates long before considering
10  management with Neurontin."
11      Do you see it, that?
12      A.  I do see that, yes.
13      Q.  Based upon the work that you subsequently did
14  with Medco, does this conclusion seem to be consistent
15  with the information you have?
16      MR. MIZELL: Object to form. Outside scope.
17      A.  I -- based on my information, I have no way
18  of knowing whether this is accurate or not.
19      Q.  And the second major conclusion that's in
20  this summary of the ad board meeting in March of 2002,
21  it says that "PBMs will not re-review Neurontin."
22      Do you see that?
23      A.  I'm sorry. What page.
24      Q.  That's the page with 367 in the lower
25  right-hand corner.

364

1       The heading of "Major Conclusion: PBMs will
2   not re-review Neurontin"?
3       A.  Yes, I see it.
4       Q.  It says: "Neurontin is on almost all
5   formularies." It goes on to say, "Neurontin is
6   perceived as safe and efficacious. PBMs will not
7   re-review Neurontin when it receives its neuropathic
8   pain indication."
9       Do you see that?
10      A.  I do see that.
11      Q.  Did Pfizer to your knowledge ever engage in
12  any information campaigns to advise doctors or PBMs or
13  health benefit plans that information that might have
14  been put out in the marketplace about Neurontin
15  regarding off-label uses had been provided in
16  violation of FDA regulations by Warner-Lambert?
17      MR. MIZELL: Object to form. Object to form.
18  Outside scope.
19      A.  I'm not fully sure I understand your
20  question.
21      Q.  Sure.
22      A.  Could you restate it?
23      Q.  Well, part of it may be because you also said
24  you didn't believe that Warner-Lambert ever did any
25  off-label promotion. Am I correct in understanding

365

1   that that's your conclusion?
2       MR. MIZELL: Object to form.
3       A.  That is how I -- based on the materials I've
4   reviewed, yes.
5       Q.  Okay. I'll waive the question.
6       The third major conclusion from this advisory
7   boarding meeting is that "the attitude towards NP
8   management is likely to change."
9       Does "NP" stand for neuropathic pain?
10      A.  I -- I don't know. Just reading the next
11  sentence, I -- it sounds like it, but I don't know.
12      Q.  In preparation for this deposition, did you
13  speak to Suzanne Doft?
14      A.  No.
15      Q.  Were you given Ms. Doft's deposition
16  transcript by Pfizer counsel to review in preparation
17  for this deposition?
18      A.  No.
19      Q.  Did you have any electronic or written
20  communication with Ms. Doft in preparation for this
21  deposition?
22      A.  No.
23      Q.  Were you given any of Ms. Doft's files to
24  prepare for today's deposition?
25      A.  No.

28 (Pages 362 to 365)

366

1    Q.  Can you turn to Page 7.  Actually the last
2  three digits are 371, of Henderson Exhibit 10?
3    A.  Okay.
4    Q.  This is Appendix B, it is entitled
5  "Neuropathic Pain Management, PBM Advisory Board," and
6  it identifies the people that attended the advisory
7  board meeting in Orlando, Florida in March, 2002;
8  correct?
9    A.  Yes, that's what it says.
10    Q.  And one of the representatives was Jim
11  Ballinger from Merck, Medco; right?
12    A.  Yes, that's what it says.
13    Q.  If you would turn to the next page, Bates
14  Number last three digits 372.  There is a listing of
15  Pfizer attendees at this advisory board meeting;
16  right?
17    A.  Yes.
18    Q.  One is Suzanne Doft, Director, Neurontin U.S.
19  Marketing Team; right?
20    A.  Yes.
21    Q.  And then there are eight other Pfizer
22  employees who attended the meeting; right?
23    A.  That's correct.  That's what's listed.
24    Q.  Including one of the Pfizer lawyers, Valerie
25  Flapen?

367

1       MR. MIZELL: Object to form.
2    A.  That's her title.  I don't know Valerie
3  Flapen.
4    Q.  Tina Grogan, Product Manager.  Is that the
5  Product Manager for Neurontin?
6    A.  I -- I would assume that -- Product Manager
7  is typically a title given to a product marketer, so
8  I -- I don't know whether she was on the Neurontin
9  marketing team or not.
10    Q.  Jon Kaskie, Director of Sales Operations, do
11  you know whether he was working on Neurontin?
12    A.  No.  Jon Kaskie was the Director of Sales
13  Operations at this time for the Healthcare Cluster.
14    Q.  So who did Mr. Kaskie report to?
15    A.  I believe at this time he reported to Carl
16  Wilbanks.
17    Q.  And he was part of the Healthcare Cluster?
18    A.  Yes.
19    Q.  John Marino, Director, Worldwide Team Leader
20  for Neurontin; correct?
21    A.  It does not say Neurontin, so I don't know
22  whether he was on the Neurontin -- worldwide Neurontin
23  team or not.
24    Q.  Do you know Jennifer Samuels, Leslie Tyler or
25  Tim Watson?

368

1    A.  I do not.
2    Q.  And then the last two pages of Henderson
3  Exhibit Number 10 are the agenda; right?
4    A.  That is correct.
5    Q.  And on the agenda is a section entitled
6  "Treating Neuropathic Pain with Neurontin;" right?
7    A.  That's what it says, yes.
8    Q.  And, again, to prepare for this deposition,
9  you did not ask anyone any questions about what
10  actually happened at this advisory board meeting in
11  March, 2002; right?
12       MR. MIZELL: Object to form.
13    A.  I wasn't even aware that this ad board took
14  place.
15    Q.  So you didn't ask anyone any questions about
16  what was said at it because you didn't even know it
17  had occurred.  Is that correct?
18       MR. MIZELL: Object to form.
19    A.  That is correct.
20    Q.  You had assumed that no one had been talking
21  about Neurontin to any third-party payers; right?
22       MR. MIZELL: Object to form.
23    A.  No, actually ad boards are a standard of
24  practice that exist in the industry, and it is very
25  common for -- for some of our medical folks and brand

369

1  teams to conduct ad boards in order to do market
2  research.  The objective is not necessarily to get a
3  third-party payer's perspective from the ad board.  It
4  is to get an individual who works for a third-party
5  payer through their lens.
6       Many times you get individuals attending
7  these ad boards that aren't currently employed by
8  third-party payers.  So it's in their capacity, based
9  on their experience, that they are attending the ad
10  board, not in their capacity as perhaps being an
11  employee of a third-party payer.
12    Q.  Let go back to the attendees from the
13  third-party payers in Henderson Exhibit Number 10.
14  This is the page, last three digits, 371.
15       Do you see where it says James Ballinger was
16  the first attendee?
17    A.  Yes, I do.
18    Q.  It says, "Title:  Regional Account Executive;
19  Organization, Merck Medco."
20       Do you think at the time that Mr. Ballinger
21  attended this Pfizer advisory board meeting in March
22  of 2002, he was an employee of Merck Medco?
23       MR. MIZELL: Object to form.  Outside scope.
24    A.  It's possible.  It is also possible, because
25  he is listed as a speaker, that -- on the agenda, that

29 (Pages 366 to 369)

370

1   he was engaged based on his expertise in PBMs to
2   provide his own personal insights.
3       Many of these attendees are not authorized to
4   speak on behalf of their -- their employer.
5       Q.  So let me ask you the question:  To the
6   extent that it was Pfizer's policy not to have any
7   communications, not to talk about Neurontin with any
8   third-party payers, are you drawing a distinction when
9   you talk to individuals who work -- who just happened
10  to work for third-party payers --
11      MR. MIZELL: Objection --
12      Q.  -- as opposed to talking with a third-party
13  payer?
14      MR. MIZELL: Object to form.
15      A.  I'm stating it was Pfizer's policy not to
16  promote Neurontin to third-party payers; that
17  individuals that attended ad boards may or may not
18  have been currently employed by a third-party payer;
19  and they may or may not have been attending as an
20  individual, not a representation -- representative of
21  the third-party payer.
22      Q.  Well, how do you know if someone's
23  attending -- someone is an employee of a third-party
24  payer.  How do you know if they are attending as a
25  representative of the third-party payer or in their

371

1   individual capacity?
2       MR. MIZELL: Object to form.
3       A.  That's a question that each individual has to
4   answer.
5       Q.  Are they asked to fill out a question before
6   they attend the PBM advisory board meeting on that
7   issue?
8       MR. MIZELL: Object to form.
9       A.  We did not, to the best of my knowledge, ask
10  them to do this.
11      Q.  And, again, when you say it was Pfizer's
12  policy not to promote Neurontin to third-party payers,
13  by that you mean it was Pfizer's policy not to talk
14  about Neurontin to third-party payers; right?
15      MR. MIZELL: Object to form.
16      A.  No, what I'm saying is it was Pfizer's policy
17  that the U.S. sales force would not promote Neurontin
18  to third-party payers.
19      Q.  And when you say that someone would not
20  promote Neurontin to third-party payers, does that
21  mean that they would not talk about Neurontin to
22  third-party payers?
23      MR. MIZELL: Object to form.
24      A.  Members of the U.S. sales force would not
25  talk to third-party payers about Neurontin.

372

1       Q.  Were there members of other groups or
2   divisions or clusters within Pfizer who could talk to
3   third-party payers about Neurontin?
4       MR. MIZELL: Object to form.
5       A.  Individuals from Medical Information, when we
6   received unsolicited medical requests, could
7   correspond to third-party payers.
8       Q.  Under any other circumstances, could any
9   other Pfizer employees talk about Neurontin with
10  third-party payers?
11      MR. MIZELL: Object to form.
12      A.  Well, it appears, based on this advisory
13  board, that if this person happened to be employed by
14  a third-party payer, one could loosely connect that
15  there might have been some -- some level of
16  interaction.
17      However, I would also point out that this was
18  being done under the direction of our -- our corporate
19  counsel and a medical director or an M.D., anyway, and
20  the brand team in doing their due diligence around the
21  product that some form of communication took place.
22      MS. DALEY: Would you repeat that answer back,
23  please.
24      (The answer is read.)
25      Q.  How do you know that this advisory board

373

1   meeting was being done under the direction of Pfizer's
2   corporate counsel and a medical director?
3       MR. MIZELL: Object to form. Outside the scope.
4       A.  I don't know that it was being done under --
5   at their direction.  It was being done under their
6   supervision.
7       Q.  How do you know that this advisory board
8   meeting was being done under the supervision of
9   Pfizer's corporate counsel and a medical director?
10      MR. MIZELL: Object to form. Outside the scope.
11      A.  Well, as you pointed out to me, those are the
12  Pfizer attendees that are listed, Corporate Counsel,
13  Medical Director, Team Leader.
14      Q.  So you are making the assumption that it was
15  being -- this advisory board meeting was being done
16  under their supervision?
17      A.  I'm -- I'm -- based on my experience with
18  Pfizer, the reason you would have those folks
19  attending an ad board such as this is because that's
20  their function.
21      Q.  To supervise?
22      A.  To oversee what is being done during the ad
23  board and what content is being discussed.
24      Q.  Let me hand you what has been marked as
25  Henderson Exhibit 11.

30 (Pages 370 to 373)

374

1   (E-Mail dated November 30, 2001 from
2   Suzanne Doft marked Henderson-11 for
3   identification.)
4   A.   Okay.
5   Q.   Henderson Exhibit 11 is an e-mail dated
6   November 30, 2001 from Suzanne Doft to a number of
7   individuals regarding an HMO advisory panel to be held
8   on January 24 and 25 at the Four Seasons True North in
9   Scottsdale, Arizona; right?
10  A.   That's what it reads, yes.
11  Q.   In preparation for this deposition, did you
12  contact anyone about any of the communications that
13  occurred at this HMO advisory board meeting on
14  neuropathic pain in January, 2002?
15      MR. MIZELL: Object to form.
16  A.   No, I did not.
17  Q.   Henderson Exhibit Number 11 states that the
18  meeting will be composed of approximately 15 medical
19  and pharmacy directors from leading HMOs.  Do you see
20  that?
21  A.   I do see that, yes.
22  Q.   Would HMOs be considered by you to be
23  third-party payers?
24  A.   HMOs are third-party payers, yes.
25  Q.   Ms. Doft goes on to say, "The convening of

376

1       MR. MIZELL: Object to form. Outside the scope.
2   A.   And I would reply that I don't know whether
3   we submitted for approval for Neurontin for
4   neuropathic pain.   In order to approve a product for
5   an indication, you must submit for approval.
6   Q.   Well, let me ask the question one more time:
7   To your knowledge, did the FDA ever approve the use of
8   Neurontin for treating neuropathic pain?
9   A.   No.
10      MR. MIZELL: Outside the scope.
11  A.   No.
12      (Executive Summary of Neuropathic Pain
13  Advisory Board Meeting of January 24-25,
14  2002 marked Henderson-12 for
15  identification.)
16  Q.   I hand you what has been marked as Henderson
17  Exhibit 12.
18  A.   Okay.
19  Q.   Henderson Exhibit Number 12 is a copy of the
20  executive summary from the Pfizer Neuropathic Pain HMO
21  Advisory Board Meeting being held in Scottsdale,
22  Arizona in January, 2002; right?
23  A.   That's what it says, yes.
24  Q.   The second page of Henderson Exhibit Number
25  12 is the heading under Executive Summary

375

1   these advisory boards represents our commitment to
2   work with the most knowledgeable advisors in
3   developing programs and materials that will support
4   Neurontin's use in neuropathic pain management with
5   managed care customers;" right?
6   A.   That's what it says, yes.
7   Q.   In November, 2001 was Neurontin approved by
8   the FDA for use in treating neuropathic pain?
9       MR. MIZELL: Outside the scope.
10  A.   No, Neurontin was not indicated for the
11  treatment of neuropathic pain.
12  Q.   When you say Neurontin was not indicated for
13  the treatment of neuropathic pain, does that mean that
14  the FDA had not approved Neurontin for treatment of
15  neuropathic pain?
16      MR. MIZELL: Object to form. Outside the scope.
17  A.   Actually, I don't know; because if -- if I
18  interpret your question, you actually are saying, did
19  the FDA consider approving Neurontin for indications,
20  and deny that approval.
21      I am clarifying and saying Neurontin was not
22  indicated for neuropathic pain.
23  Q.   Actually, I wasn't asking if the FDA
24  considered it.  My question was:  Did the FDA approve
25  Neurontin for the use in treating neuropathic pain?

377

1   Introduction; right?
2   A.   Yes.
3   Q.   And like the goals for the advisory board
4   meeting that was held with the PBMs in Orlando, here
5   are the Pfizer goals again; right?
6   A.   Yes, that's correct.
7   Q.   And Pfizer's goals include to help the
8   advisory board members learn more about Pfizer and the
9   Neurontin team and its resources; right?
10  A.   That's what it states, yes.
11  Q.   It goes on to say that the panel was held in
12  Scottsdale, Arizona, January 24th and 25th, 2002;
13  right?
14  A.   Yes, that's what it says.
15  Q.   "Ten senior executives attended, nine from
16  regional and national health plans and one from an
17  employer benefits management group;" right?
18  A.   Yes, that's what it says.
19  Q.   It goes on to say "Members of the Pfizer's
20  NHO team nominated the attendees;" right?
21  A.   That's what it says, ys.
22  Q.   Now, the NHO team for HMOs would be what
23  group?
24  A.   Well, the NHO team for HMOs would be those
25  individuals that are responsible for regional

31 (Pages 374 to 377)