account manager decides out in the field is a priority customer may not be a priority customer in the eyes of Pfizer, Inc. And we may be getting erroneous information from these advisors and basing decisions on what these advisors say.

Q. So is that why the policy or the procedure was changed to not allow Pfizer personnel to nominate attendees to advisory board meetings?

A. That was one of the major reasons early on that we moved to the new system. Sometimes you were -- as you can see, John Lowry, the Regional Manager, sends this message out to his people. Some of his people may not even have bothered to take the time to fill the grid out.

Q. Was another reason why there was a change in that policy because Legal wanted the change to be made so that there would not be any promotional activities at advisory board meetings?

MR. MIZELL: Object to form. Outside the scope.

A. I -- I believe that an additional reason was the fact that Legal wanted to ensure that there could be no misinterpretation that any kind of promotional activities were taking place.

Q. Back to Henderson Exhibit 13, the top, the top e-mail then, the first page of Exhibit 13, is an



e-mail by someone asking that Ron Lyons from Trigon be added to the individual list, the invitation list; right?

A. Yes.

Q. And he identified Mr. Lyons in the categories of P&T Committee and pharmacist; right?

A. That's what it says, yes.

MS. DALEY: We need to take a break for tape.

THE VIDEOGRAPHER: The time is approximately 2:23. This marks the end of Tape Number 3. We are now going off the record.

(A recess is taken.)

CONTINUED DIRECT EXAMINATION BY MS. DALEY:

(Executive Summary of Advisory Board Meeting of June 24, 2002 marked Henderson-14 for identification.)

THE VIDEOGRAPHER: The time is approximately 2:40. This begins Tape Number 4. We are now on the record.

Q. Mr. Henderson, I've handed you what has been marked as Henderson Exhibit Number 14. Take an opportunity to look at that.

A. Okay.

Q. Henderson Exhibit Number 14 is the executive



summary for this third advisory board meeting; right?

MR. MIZELL: Object to form.

A. I -- I'm not sure whether it's the third one, but I -- just based on the dates, it appears to be the third one, yes.

Q. There was the one in Orlando in March of '02; right?

A. There was -- it looks like first there was the January ad board in Scottsdale, the March ad board in Orlando, and now we have this New York ad board.

Q. So the third of the ad boards that we have been talking about today; correct?

A. That's correct.

Q. So this Henderson Exhibit 14 is a copy of the executive summary for this third advisory board meeting?

A. Yes.

Q. And this advisory board meeting included invitees from HMOs and long term care; right?

A. Yes.

Q. And the second page of Henderson Exhibit 14, again just like the other two executive summaries, there is a section entitled "Introduction;" right?

A. Yes, there is.

Q. And the introduction says, "This executive



summary sets forth the finding and conclusions --" excuse me -- "the findings and conclusions of the third Neuropathic Pain Advisory Board Meeting held in 2002 for Pfizer's Neurontin team." Right?

A. Yes.

Q. And like the other executive summaries, it identifies Pfizer's goals for these panels; right?

A. That's correct.

Q. Including as a goal "Helping advisory board members learn more about Pfizer and the Neurontin team and its resources;" right?

A. That's correct.

Q. And like the other advisory board meetings, members of the Pfizer's Neurontin team nominated the attendees to this advisory board meeting in New York; right?

MR. MIZELL: Object to form.

A. Actually, no. This one states "Members of Pfizer's Neurontin team nominated the attendees." The other two that you showed me said members of NHO.

Q. So they were all invited -- for each of these advisory board meetings, they were invited by Pfizer -- or the attendees were nominated by Pfizer employees; right?

A. The attendees, yes, they were identified by

398

Pfizer employees.
Q. It goes on in the introduction to state that "This report summarizes the panel's major conclusions related to Pfizer, identifies Pfizer's opportunities with respect to neuropathic pain management, and reviews panel findings on various topics of interest;" right?
A. That is what it says, yes.
Q. Then it goes on, "Note that text in italics indicates a verbatim comment from a participant that represents a consensus of opinion." Right?
A. That's correct.
Q. Under "Major Conclusions," the next section, says that "Major conclusions derived from the HMO advisors at the June panel are consistent with findings from the January HMO advisor panel;" right?
A. That is what it says, that's correct.
Q. Under the section entitled "Additional Findings and Pfizer's Opportunities to Work With Health Plans," the second paragraph on the page with the last three digits 399, talks about "Plans have not reacted to Neurontin's recent PHN indication for several reasons."
Do you see that?
A. I do.

399

Q. When you took over as Senior Director, National Accounts for Health Plans about five months after this advisory board meeting was held, were you given a copy of any of these executive summaries of the advisory board meetings?
A. I was not; because, as I've reviewed the attendee list of all three of these, none of these were representative of the accounts that I was responsible for.
Q. Was United Healthcare an account you were responsible for when you were Senior Director of National Accounts?
A. I was responsible for United Healthcare as a national account. United Healthcare also has regional affiliates throughout the United States, and regional account managers are responsible for calling on the regional affiliates.
Q. Is that true for Kaiser as well?
A. Kaiser, they -- they don't call them regional affiliates. Kaiser has, operates -- they call them markets. So they operate in different markets. They have Kaiser Hawaii, Kaiser Northwest, which is Group Health; Kaiser Ohio, Kaiser Mid-Atlantic, Kaiser Georgia.
Q. Who calls on, for example, Kaiser

400

Mid-Atlantic?
A. Kaiser Mid Atlantic -- in the Kaisers where we have the ability to call on them, meaning we haven't been banned, like with Kaiser Georgia, we have a local regional account manager that calls on the account.
Q. Why was Kaiser banned from Kaiser Georgia?
A. As I mentioned before, the reason Kaiser developed and has a dedicated Kaiser sales force is because Kaiser has very strict rules and procedures that they expect manufacturers to follow when working and promoting within Kaiser properties.
Many, many years ago, I believe it was even before I joined Pfizer, a -- Kaiser Georgia made the decision that someone had violated the rules. I don't even know what -- what the details are behind that.
Q. Going back to this executive summary of the June advisory board meeting, in the middle of the page with the last three digits 399 is a paragraph that begins, "Health plans recognize a continuing increase in Neurontin utilization."
Do you see that?
A. I do read that, yes.
Q. "And voiced specific concerns about higher costs associated with an increase in physician

401

detailing and dosing escalations."
Do you see that?
A. I do see that, yes.
Q. And it goes on to say, "Advisors identified options for management of Neurontin utilization." The first one: "Switch Neurontin to third tier, noting high costs and off-label use to members as a basis for this change;" do you see that?
A. I do see that, yes.
Q. When you became Senior Director, National Accounts Health Plans, did you receive any reports on whether any national account was switching Neurontin from second tier to third tier?
MR. MIZELL: Object to form. Outside the scope.
A. Not that I recall.
Q. Would your National Account Managers provide you with reports on what was happening with Pfizer drugs on the formulary for that particular account?
A. The only thing that would have occurred is in part -- in fulfilling our obligations, where we actually populate the database where we track formulary status, if a National Account Manager noticed that formulary status had changed for Neurontin, they would have gone into the system and changed the status.

Q. Would you have received a special memo about that at all, or would it just have happened?
MR. MIZELL: Object to form.
A. Typically there was -- there was a -- and there is -- what's called a formulary change report; because each -- many health plans, as you might expect, don't change their formularies a lot. And the reason for that is when they are selling their benefits during the enrollment year, and the enrollment period usually takes place at the end of any calendar year, part of what they're selling is their formulary.
So when you make changes to your formulary, you have to communicate that out to employers, you have to communicate that out -- out to patients. So the health -- the national health plans routinely don't make those -- those radical changes like that.
So consequently, the National Account Managers were required once a month to certify that the formulary status that was reflected in the system was accurate. It was rare that there was a huge number of changes to the formulary status. So, yes, when I saw the formulary status report, there would be a few changes here and there.
Q. Did you ever see a formulary status report



where the status of Neurontin was changing?
A. I don't recall.
Q. Did you keep those formulary status reports?
A. They actually were just generated as notifications to me that there was a formulary status report available in HC Exchange. I'd pop in the system, I'd look at it, and then the next month it would re-populate over the previous month.
Q. So did you archive these notifications of changes in formulary status?
A. No reason to -- to archive it. It's just a message that alerts me that within HC Exchange, there is a formulary status report.
Q. I actually didn't ask if there was any reason to archive this. I asked: Did you archive these notices of changes in formulary status reports?
Excuse me. Did you archive these notices of change in formulary status?
MR. MIZELL: Object to form.
A. I did not archive the e-mail alert messages notifying me that there were changes -- a change report available in the HC Exchange system.
Q. How did you decide what information to archive and what not to archive?
A. I just base it --



MR. MIZELL: Object to form.
Go ahead.
A. I base it on the legal notifications, hold notifications that I receive from the Pfizer Legal Department.
Q. Do you have any understanding as to whether or not you were to archive all e-mails regarding Neurontin?
A. I don't remember when I received that notification. Again, with a formulary change report, there was no mention of any specific product in the e-mail.
Q. You would have to go to the HC Exchange to see what the change was?
A. That's correct.
Q. And how would you figure out what the change was on the HC Exchange?
A. It would just tell you. It would say "Aetna, Tier 2 to Tier 3" for a specific product.
Q. Now let's turn to the list of attendees at this advisory board meeting. It's page 404, the last three digits in the lower right-hand corner.
Do you see that?
A. I do.
Q. Now, there are various health plans that are



identified on -- under the listing of "Organizations." Right?
A. Yes.
Q. Would you describe all of these as small health plans?
A. I would describe the -- the representation of the health plan that's listed here -- because it could be misleading. You can see a name and naturally make the assumption that it's a national health plan.
However, by looking at the individual and looking where they are, you can see that, yes, if you ask me is United Healthcare a large health plan, my response would be yes. However, United Healthcare in Manchester, Connecticut, where the medical director is located, is relatively small. These are all regional accounts.
Q. Is Oxford considered a regional account?
A. Yes.
Q. Humana?
A. Humana is considered a national account. However, Humana Choice Care which is a wholly-owned subsidiary, or was at this time, was a very small subsidiary of Humana.
Q. What about Horizon?
A. Horizon is a -- or was a regional account.

Q. Is that a national account today?
A. No.
Q. Would you consider all of these to be small accounts?
MR. MIZELL: Object to form.
A. I would ask you to define "small."
Q. Perhaps I misunderstood you. I thought you mentioned earlier with respect to the January advisory meeting that they were just small health plans, not the larger health plans.
MR. MIZELL: Is there a question pending?
Q. I wanted to know what you were meant by "small" when you were -- identified that distinction for the attendees of the January meeting?
MR. MIZELL: Object to form. And outside the scope.
A. "Small" based on number of lives that these individuals from these organizations represent; yes, they are very small in the grand scheme of things.
Q. So what would be a small number of lives vis-a-vis a large number of lives to be carried?
A. I would say anything over a million lives is large.
Q. Everything else would be small?
A. Yes.



Q. Let's go to the agenda, which is -- begins on the page with the last three digits 407.
A. Yes.
Q. Advisory board meeting, another agenda item, 45 minutes entitled "Treating Neuropathic Pain With Neurontin;" right?
A. Yes, I see that here.
Q. And then let's go back to the list of attendees, which is one page prior, 406.
A. Okay.
Q. Do you see any individuals from Pfizer's Legal Department identified as an attendee at this advisory board meeting?
A. Not everyone's title is listed, so I don't see any lawyers or names that I recognize of individuals that are lawyers.
Q. There are also individuals from the organization called Cline, Davis, Mann under the heading of Pfizer attendees; right?
A. Yes.
Q. What is Cline, Davis, Mann?
A. It's a marketing agency.
Q. That Pfizer has hired; right?
MR. MIZELL: Object to form.
A. Pfizer has hired Cline, Davis, Mann as a marketing agency in the past.



Q. Then let's go to Appendix B. And that begins on Page 410. It's entitled "Developing an Outpatient Case Management System For Management of Neuropathic Pain."
Do you see that?
A. Yes.
Q. When you started as Senior Director National Accounts Health Plans, was there any effort underway as Pfizer to develop an outpatient case management system for management of neuropathic pain?
A. Not that I'm aware of. However, in the context of reading through Appendix B, and then based on what you have referred to under the goals on Page 397, the fourth bullet, "Help advisory board members learn more about Pfizer and the Neurontin team and its resources," this would indicate to me that, as we have engaged these people as advisors to discuss things that Pfizer can do with them in the future, this would be a classic example of trying to accomplish that goal.
Q. Would you turn to Page 412. And that page begins with "Designing a patient outcome study for neuropathic pain."
Do you see that?



A. I do.
Q. And the goal for that is to "Prove the need to keep Neurontin on the preferred tier;" right?
A. That is what's listed here.
Q. Preferred tier is Tier 2?
A. It -- It could be. It is typically defined as second tier, unrestricted access.
(Document entitled "HMO Opportunity Reports" marked Henderson-15 for identification.)
Q. I am going to show you what has been marked as Henderson Exhibit 15.
A. Okay.
Q. Okay. And I'm also going to hand you what has been marked at Henderson Exhibit 16.
(Document entitled "Neurontin Managed Care Advisory Boards, Key Conclusions" dated April 15, 2002 marked Henderson-16 for identification.)
A. Okay.
Q. Let's look at Exhibit 16 first. This is a document entitled "Neurontin Managed Care Advisory Boards, Key Conclusions" dated April 15, 2002; right?
A. That's correct.
Q. And in the second page of Henderson Exhibit

16 is the heading "Objectives of Neurontin Advisory Panels;" right?
A. Yes, that's correct.
Q. And the fourth bullet point states, "To disseminate information about Pfizer and Neurontin;" right?
A. That's what it states, correct.
Q. And the fifth bullet point of the objectives of the Neurontin advisory panels is "To allow Pfizer the opportunity to work with and learn from a group of their managed care customers;" right?
A. That's correct, that's what it states.
Q. And then the next page on Henderson Exhibit 16 under "Key Conclusions," begins this sentence -- we talked about in the earlier executive summaries; "Health plans do not manage neuropathic pain aggressively." Right?
A. That's what it states, yes.
Q. It goes on to say, "Managed care customer have limited resources and need to provide the best care within a fixed budget."
Do you agree with that statement?
MR. MIZELL: Object to form. Outside the scope.
A. Is your question do I personally believe



that -- that --
Q. "Managed care customers have limited resources and need to provide the best care within a fixed budget"? Do you personally agree with that?
A. I believe that --
MR. MIZELL: Same objections.
A. I believe that the best care should be provided. Budgets always exist.
Q. Do you agree with the conclusion that "managed care customers have limited resources"?
MR. MIZELL: Same objections.
A. Not -- Not necessarily. It depends on -- on who you are talking about.
Q. In terms of managed care customers?
A. Yes.
Q. Turning to the page last three digits 847, another page entitled "Key Conclusions"?
A. Okay.
Q. It says "NP lacks multiple triggers for disease management."
Do you see that?
A. Yes, I do.
Q. Then the big bullet point under that heading is that "Multiple factors contribute to managed care customers' lack of attention to neuropathic pain."



Do you see that?
A. I do, yes.
Q. And then it goes on in the fourth bullet point, "Lack of knowledge of the true cost of treating neuropathic plan, few plans are able to link medical and pharmacy claims." Is that what you were referring to before about marrying up the data?
A. That's correct.
MR. MIZELL: Object to form.
THE WITNESS: Sorry.
Q. If you could turn to a page, a couple of pages back, last three digits, 850, another page under the heading "Key Conclusions"?
A. Okay.
Q. And the heading on this page is, under Key Conclusions, "Short term, Neurontin will retain broad formulary access."
Right?
A. That's what it says, yes.
Q. It goes on to say, "Neurontin is an anti convulsant and plans want easy access to anticonvulsants for epilepsy patients."
Do you see that?
A. I do.
Q. Now, do you agree with that statement, that



"Neurontin is an anticonvulsant and plans want easy access to anticonvulsants for epilepsy patients"?
MR. MIZELL: Object to form. Outside the scope.
A. Neurontin was classified as an anti epileptic drug, and plans did want to ensure that patients that had epilepsy had access to the appropriate therapies.
Q. Let me break this down, then.
Are you disagreeing that Neurontin is an anticonvulsant?
MR. MIZELL: Object --
Q. Is that what you are disagreeing with?
MR. MIZELL: Object to form.
A. I'm not disagreeing. I'm just making the statement that Neurontin is -- is considered a drug -- an anti epileptic drug and --
Q. Is that different from an anti convulsant?
MR. MIZELL: Object to form. Outside the scope.
A. No.
Q. And do you agree with the second part of the sentence, "Plans want easy access to anticonvulsants for epilepsy patients"?
MR. MIZELL: Same objections.
A. Yes.
Q. Turn to the next page. It has the last three digits 851. This one says, "key Conclusions: Long

term, Neurontin utilization will gain attention."
Do you see that?
A. I do.
Q. The first, and the only large bullet point says, "What will trigger increased MCO interest in managing Neurontin?"
Do you see that?
A. I do.
Q. It goes on to say in the first bullet point, "Significant increases in Neurontin utilization, movement to Top 20 list."
Do you see that?
A. I do.
Q. What's a Top 20 list?
A. Most third-party payers maintain a list of the top 20 most utilized and expensive products. So they basically take the utilization data, the net unit cost of a product, and they determine an aggregate dollar value, if you will, dollar total for a given product. And they'll run a list of those products. Whether it's 20 or ten, it varies by third party payer.
Q. As a Pfizer employee, have you been involved in discussions about Pfizer drugs that are on a top 20 list?



MR. MIZELL: Object to form. Outside the scope.
A. I don't know whether I discussed the top 20 list. I've seen a number of top 20 lists.
Q. How do the top 20 lists get created?
MR. MIZELL: Same objections.
A. Typically a pharmacy department in a third-party payer will just do a query of their database to determine the top 20.
Q. Have you ever seen a top 20 list for Aetna?
MR. MIZELL: Object to form. Outside the scope.
A. I don't recall seeing one for -- for Aetna.
Q. Do you know if Neurontin is on a top 20 list for Aetna?
A. I don't know.
Q. Do you get a top 20 list for Kaiser?
A. I haven't seen a top 20 list for Kaiser. Typically, these documents are internal documents to -- to a third-party payer. They are not things that they make readily available to the public.
Additionally, they change because they're almost always centered around branded products, because rarely is a generic product more expensive. And so as products go off patent, you will see changes in this list, products coming and going.
Q. Let me turn to the next page, Bates number



852 under the heading "Implications For Pfizer: Opportunities and Threats For Neurontin."
Do you see that?
A. I do see that.
Q. At any time while you worked -- have been working with Pfizer, have you been involved in a discussion about the opportunities and threats for Neurontin?
MR. MIZELL: Object to form.
A. No.
Q. The first threat listed here is that "MCOs may edit based on dose to segment epilepsy patients they do not want to manage from NP patients they do want to manage."
Do you know what that means?
MR. MIZELL: Object to form. Outside the scope.
A. Because Neurontin was never indicated for neuropathic pain, and because I was never trained on the product, I don't know the dosing between epilepsy and what the clinical trials were indicating it would be for neuropathic pain.
And reading this statement, it's basically saying that, as I've explained to you, it's very difficult to marry pharmacy claims databases to diagnoses and indications. So if you -- if there are



different doses involved for different indications, with some customers -- and it's very, very few, it takes a sophisticated claims process, but they can enter into what we call a step edit, and step edits are electronic, in which if a prescription is written above the dose for an indication, that that will flag that prescription for the pharmacist.
Q. And then I want to have you turn to the last two pages of Henderson Exhibit 16. The second-to-the last page is headed "Advisors Represented."
Do you see that?
A. I do.
Q. And before you were talking about the attendees of these advisor board meetings being perhaps employees of third-party payers. When this list of advisors represented has been put together, is it identifying the individuals or the third-party payers?
MR. MIZELL: Object to form.
A. Well, this is a classic example, because this is Health Strategies Group that has put this all together, and they make their own interpretation.
So from all of the attendees that you showed me, the mere fact that they are trying to self-promote how successful these ad boards were that they

418

conducted by listing all of these accounts is very misleading. And it's a classic reason why we stopped querying the field to get potential attendees to come to these ad boards.

So, yes, they have listed a whole lot of -- of names, but do those names that are listed here accurately represent that third-party payer? And based on what you have shown me, I would say no.

MS. DALEY: Okay. I move to strike the answer as being non-responsive.

Q. Here's my question, very simple: On this list of advisors represented, does the listing identify the name of the individual or the company at which they work?

MR. MIZELL: Object to form. Asked and answered.

A. I don't even know if the individuals work for the companies that were listed here.

Q. Let me ask the question this way: Does this list of advisors represented identify any individual names?

A. I do not --

MR. MIZELL: Object to form.

A. I do not see any individual names listed on this sheet.

419

Q. And the last page of Henderson Exhibit 16, which is identification of the confirmed attendees for the June panel, is there any individual name identified?

MR. MIZELL: Object to form.

A. I don't see any individual names.

Q. Let's turn back, then, to Henderson Exhibit 15. Henderson Exhibit 15 is a document entitled "HMO Opportunity Reports;" correct?

A. That's correct.

Q. Have you ever seen an HMO opportunity report before?

A. I have not.

Q. This is an HMO opportunity report for Neurontin; right?

A. That's what it states, yes.

Q. Have you ever heard of the reference to an HMO opportunity?

A. I have --

MR. MIZELL: Object to form.

A. I have not.

Q. HMO refers to "Healthcare Management Organization"?

A. Yes, it does.

Q. The first sentence on the first page of

420

Henderson Exhibit 15 states, "The following is the Q1 '02 HMO opportunity report for Neurontin, modeling the quarterly sales and upside potential by local plan; right?

A. Yes.

Q. Q1/02 would have been what time period?

A. Quarter one, 2002.

Q. Does Pfizer have a calendar -- is Quarter 1 the first quarter of the calendar year?

A. Yes, it would be January, February, March.

Q. It says "For Neurontin, modeling the quarterly sales and upside potential by local plan."

What would be a local plan?

A. It appears in looking at the report that they're defining a -- they're taking a plan and then cross indexing that to a Pfizer sales district.

Q. What constitutes a local plan?

A. So that would be a local plan that is in that individual Pfizer sales district.

Q. Okay. Let's go to -- I'm going to try to understand what you are saying. The third page of Henderson Exhibit 15, the last three digits, the Bates Number is 868.

It's a page entitled "Neurontin Summary of Largest Opportunities, First Quarter, 2002;" right?

421

A. That's correct.

Q. If we go to about two-thirds of the way down, there is a reference to "Kaiser Foundation, Mid Atlantic." Do you see that?

A. I do see that, yes.

Q. Is that -- can you describe in the context of that Kaiser Foundation Mid Atlantic reference what is a local plan?

A. So Kaiser operates in different markets; and in -- in the Washington, D.C. area, they are known as Kaiser Mid Atlantic. So the Washington D.C. sales district has -- Pfizer Washington, D.C. sales district has been cross indexed with Kaiser Mid Atlantic.

Q. And would Regional Account Managers then call on that Kaiser facility, as opposed to the Reese/Dauser 16 sales force?

MR. MIZELL: Object to form.

A. Well, it's -- it's different, because the Kaiser sales district, those are representatives. So a better way to equate this is a Regional Account Manager is calling on this regional Kaiser; whereas Kirk Bachman, the Kaiser National Account Manager, calls on Kaiser in California.

Q. Would the Regional Account Manager that would be calling on Kaiser in DC report to either Mr. Reese

or Mr. Dauser?
A. No.
Q. Who would they report to?
A. They would report to the Mid Atlantic Area Manager.
Q. Above that is -- well, let's go back. The original question was the local plan.
So in the context of the Kaiser Foundation Mid Atlantic, what would be a local plan?
A. I'm -- could you restate that question?
Q. Sure. I'm trying to understand, the first sentence of this HMO opportunity report says that "The following is the first quarter, 2002, HMO opportunity report for Neurontin, modeling the quarterly sales and upside potential by local plan."
So I'm trying to understand in the context of Kaiser Mid Atlantic, what a local plan is referencing?
MR. MIZELL: Object to form.
A. Kaiser Mid Atlantic is a stand-alone Kaiser operation in the mid Atlantic. In -- in the Washington, D.C. area.
Q. Would there have been a separate local operating plan or business plan for Kaiser Mid Atlantic?
A. There would have been a business plan by the



Regional Account Manager that would have been housed in HC Exchange.
Q. So the reference to "local plan" there is a reference to the geographic areas for the health benefit plans?
A. Yes. Again, I -- I hadn't seen this report before. I am familiar with -- with these types of reports.
But what it is typically -- what these reports are typically designed to do is identify -- it's similar to some of the previous reports that we have looked -- looked at. You might recall the customer drill-down report, Sherlock. So this one is very similar to the customer drill-down report.
And what it has done is it has taken Pfizer sales districts, where it says, "District TACU" in the second column; and it has identified individual accounts that operate within that sales district, where there is an opportunity as defined by this sales report.
Q. Let's go up to the section right above the Kaiser Washington, D.C., do you see where it says, "Kaiser San Francisco." Do you see that?
A. Kaiser San Francisco? Yes, I do.
Q. And it says Kaiser Foundation, North Carolina



(sic)?
A. I see that, yes.
MR. MIZELL: Just to clarify, I think you said North Carolina?
MS. DALEY: Northern California.
A. I'm sorry.
Q. It says "Kaiser San Francisco, Kaiser Foundation North California;" right?
A. Yes, I do see that.
Q. Where is Kaiser headquartered?
A. Kaiser is headquartered in Oakland, California.
Q. And the city there is defined as Oakland, California; right?
A. I'm sorry.
Q. And the city is identified as Oakland, California on this chart. Is that right?
A. That's correct.
Q. It goes on to say "2.5 million covered lives;" right?
A. That's what this report is stating, and this is a classic example of why when reports are generated like this in isolation without input those from those closest to managed markets, it's rife with inaccuracies.



Q. What's inaccurate about that?
A. You -- you have got no context around the lives. We don't know whether those are pharmacy lives, medical lives. Just because it says '02 Q1, that doesn't necessarily mean that this number accurately reflects the number of lives that are in Kaiser during the first quarter of 2002.
Q. The next column says "Projected Annualized Sales, 3.57 Million;" right?
A. Yes, another classic example of erroneous data that -- that could be contained in this report.
As I've indicated before, Kaiser doesn't sell their data. So based on who they used with NDC, it's difficult to say whether they did some modeling and calculated on scripts that were filled in the retail network. This wouldn't capture scripts necessarily that are filled within Pfizer -- Kaiser's self-contained pharmacies.
Q. Well, this says "projected annualized sales;" right?
A. Yes, that's what it says.
Q. Do you think that this is an erroneous projected annualized sales?
A. Yes, I think this report is -- is -- I mean, clearly, nobody from the Healthcare Cluster was

involved in the development of this report. And I would say that there are numerous inaccuracies here.

Also, the mere fact that this report is listed here and the Kaiser sales representatives were not selling Neurontin or promoting Neurontin, the mere fact that it's on this report indicates that whoever did it has no real-world knowledge of how Pfizer was promoting Neurontin.

Q. On second -- first quarter of 2002, were you responsible for Kaiser?

A. I was not.

Q. You were actually in Virginia -- Virginia working on the -- and as an Area Manager of Federal Markets East; right?

A. That's correct.

Q. In preparation for this deposition, did you receive a copy of this HMO opportunity report?

A. I did not.

Q. In preparation for this deposition, did you analyze the number of covered lives and projected annualized sales for Kaiser Foundation for Neurontin?

A. I did not, because of my experience. It was not necessary for me to do that.

Q. Do you know who prepared Henson Exhibit 15?

A. I don't know specifically who prepared it.



We have a very good indication of where the data came from.

Q. And is that from the NDC?

A. That's what I read, yes.

Q. Do you know whether this was prepared by -- well, at the top of it it says "Neurontin, gabapentin;" right?

A. Yes, typically when it says "Neurontin/gabapentin" like that, a report like this would be somehow generated through the Neurontin DMT, which also includes a management science and a market analytics component.

Those individuals in the past would contract with organizations like NDC, as well as on the second page of this document, where it references Hewitt and Innerstudy, to get the number of lives, they would contract with those folks.

Q. How do you know that?

A. Because it says on the second page: "Number of lives managed by the local plan as reported by Hewitt and Innerstudy."

Q. Who is -- what does DMT stand for?

A. Disease Management Team, it's an interchangeable term for a product brand team.

Q. So it's your understanding that Henderson



Exhibit 15 was prepared by Pfizer's Neurontin brand team?

A. It's not my understanding. It's just that the -- the way it is put together, that it is done the way we -- these types of reports are typically prepared.

Q. By --

A. By a brand team.

Q. Yes. And since this report is done by the Neurontin -- since this report is done about Neurontin, to your understanding it was done by the Neurontin brand team; right?

A. Yes, that's who would normally put a report like this together.

Q. Why would the Neurontin brand team be looking at the -- or interested in looking at the HMO opportunities for Neurontin?

MR. MIZELL: Object to form. Outside the scope.

A. What -- what they typically are doing is looking at -- similar to what we discussed earlier today, around pull-through. They are marrying up accounts that have access to Neurontin, and they are trying to show that if you were to pull through Neurontin, that you would be able to increase share.

These types of reports were generated in the



past. We realized several years ago that they were completely inaccurate and misleading, and we stopped producing these kinds of reports.

Q. When did Pfizer reach their conclusion that these types of reports were completely inaccurate and misleading?

MR. MIZELL: Object to form. Outside the scope.

A. It actually was during the period when I was Senior Director of National Accounts. I believe it was in 2003.

Q. Who made that decision?

MR. MIZELL: Same objection.

A. It was actually a decision made collectively. And the reason -- and I will give you a -- a solid illustration.

When you would typically add up the number of lives that reports like this sometimes included, many times if you took all the channels, including Medicaid, the VA, DOD, they would far and away exceed the population of the United States.

So what would happen is many times senior executives in the organization were provided information that caused them to make statements that we have determined may not have been accurate. They were accurate based on the information that those

430

executives received at the time; but we undertook a concerted effort to ensure that these types of reports were very accurate in the future.

Q. So are these types of reports generated by Pfizer today?

A. Reports of this kind are generated, yes. They are not typically generated -- in fact, I haven't seen any report generated like this in this type of format.

We have tried to -- we haven't tried. We have built a common platform now that all of the management, science and Market Analytics folks access, so that all reports utilize the same database, have a consistent number of lives in the report -- that was another thing that we would find is that depending on which vendor an individual brand team engaged, they would be, during the same time period, reporting different numbers of lives.

I actually was one of the sponsors on the team that put all of the -- the reporting tools together, and I have been actively involved in making sure that our reports are now consistent and as accurate as they possibly can be.

Q. Let's stay on this line entitled "Kaiser San Francisco." Above that it says, "Status covered."

431

What does that mean?

A. That would refer to the formulary status. As I indicated before, Kaiser has a two-tiered, closed formulary in California. So a product is either on formulary or off. However, all Kaiser physicians have the ability to get access to any product through their formulary exception process.

Q. So when it says, "Covered," does that mean available?

A. That's an interchangeable term.

Q. And then beneath that, you were looking at earlier Kaiser Washington, D.C., it says "Status Restricted." What does that mean?

A. Kaiser Washington, D.C. is a different model than the staff model HMO that exists in Kaiser California. So in Kaiser California, because the doctors are housed typically in Kaiser facilities, many times with Kaiser formularies, Kaiser California is able to use this -- this medical exception prescription that a doctor writes.

But because in Washington, D.C. Kaiser doesn't own the pharmacies, there is no mechanism for having some kind of prescription for a non-formulary product for a Kaiser doctor when patients get their drugs filled in a retail pharmacy.

432

So this is indicating that there is some type of restriction in Kaiser Mid Atlantic as reflected in -- in a retail pharmacy.

Q. So prior authorization might be a restriction?

MR. MIZELL: Object to form.

A. It could be. It could be a prior authorization. It could be a step edit. It could be a quantity limit. There are any -- there could be dosage restrictions. There's any number of things that could be listed there.

Q. Okay. Let's go back to the Kaiser San Francisco line. Under the column "Upside Potential" is the amount 1.5 million; right?

A. That's what's listed here.

Q. What does that mean, "upside potential"?

MR. MIZELL: Object to form. Outside the scope.

A. As they are listing it here, they are saying -- that first they -- they've determined what the dollar value of a one-share point increase is. So with -- with the methodology that they are using here and they are projecting here, they are projecting that if they were to increase a certain number of market share points, that they could potentially realize 1,547,973.

433

Again, the methodology I understand. I absolutely question the actual data.

Q. Is the upside potential additional sales dollars or additional profit?

A. I'm sorry?

Q. Is the upside potential of 1.5 plus million dollars additional sales dollars or additional profit?

A. All -- All -- It's actually neither. Because that number is calculated based on WACs, the wholesale acquisition cost. And the wholesale acquisition cost is a dollar value that is determined not by Pfizer, but outside Pfizer. It's a standard industry practice that's being revised. So it's not real dollars.

Q. Under the listing of "Competitors," it says Depakote, Topamax, Keppra. Do you see that?

A. Yes, do, yes.

Q. Are those competitive products to Neurontin?

A. As I have seen in previous slide decks, those specific products have some type of epilepsy indication, and have been grouped in the AED market basket, the anti epileptic drug market basket.

Q. Can we go back to Henderson Exhibit 8 and --

A. Eight.

Q. We'll fix this second page later. I am just going to give you a copy of the second page for right

now.
A. Okay.
Q. Henderson Exhibit 8 is this two-page document where the first page is an e-mail from you to Alan Partain?
A. Yes.
MR. MIZELL: Object to form.
I didn't know you were done.
Q. Let's turn to the second page. It says, "Background challenge for 2003, applied to Neurontin and Relpax 40 milligram."
Do you see that?
A. I do see that, yes.
Q. Beneath it says, "The following outlines the following Neurontin situation. There are ten reps in my region actively selling Neurontin in Kaiser and receiving no sales credit."
Do you see that?
A. I do see that.
Q. It goes on to say, "Neurontin is being heavily promoted for its new indication, is on formulary. The challenge is that it's not on contract." Right?
A. I see that.
Q. And then beneath that in the third bullet



point it says, "Neurontin was a contracted product with Kaiser until 2000 (BD contract)."
Do you see that?
A. I do see that.
Q. In preparation for this deposition, did you make any effort to go obtain and review the contract that's referenced here with Kaiser?
MR. MIZELL: Object to form.
A. I did not, other than asking Joe Butera in the Contracting Department if we had any records on hand as to any existing Kaiser contracts -- I mean any existing Neurontin contracts. And he only made reference to the Aetna contract.
Q. Did you ask Mr. Butera if there were any prior contracts with Kaiser on Neurontin?
A. I did not.
Q. Did you ask Mr. Butera if there were any prior contracts Neurontin for Blue Cross-Blue Shield of Louisiana?
A. I did not.
Q. Did you ask Mr. Butera whether there were any prior contracts regarding Neurontin for Guardian Life?
A. I did not, and would not, since Guardian Life is not an entity that Pfizer would contract with.
Q. Beneath that bullet point it says, "Kaiser



received only a two percent rebate from our understanding, per Anne Marie McDonald, PD2 Western Regional Manager, but Pfizer discontinued the contract."
Do you see that?
A. I do.
Q. Did you have any conversations with anyone about communications regarding -- communications between Pfizer and Kaiser regarding the discontinuation of this Neurontin rebate contract to prepare for this deposition?
A. No, I did not.
Q. Do you know if there were any communications between Pfizer and Kaiser regarding the discontinuation of the Neurontin contract?
A. Other than the fact that the contract expired, and -- and they would know that it expired because they would no longer be getting the price, no, I know of no other communication.
Q. This doesn't actually say the contract expired. It says that Pfizer discontinued the contract; right?
A. Well, yes. But again, this is where -- this e-mail is being generated by a Sales Regional Manager who has not been trained in contracting, who is using



terms that he is not completely aware of exactly what he is saying.
Kaiser doesn't do rebate contracts. So the mere fact that he has said that leads anybody -- allows anybody that knows anything about Kaiser that this individual is just basing this message on hearsay.
Q. Well, do you know whether there was a contract that Pfizer discontinued in 2000?
MR. MIZELL: Object to form.
A. There was a purchasing agreement. Purchasing agreements typically are one year in duration, and they are typically annual, and they have the ability at the end of any given year to be discontinued.
Q. Have you seen the purchasing agreement between Kaiser and Parke-Davis?
A. I have not.
Q. Have you talked to anyone about what the terms were of that purchasing agreement --
MR. MIZELL: Object to form.
Q. -- between Kaiser and Parke-Davis?
MR. MIZELL: Object to form.
A. A number of people when I was responsible for National Accounts, during this entire period of this two percent discussion, made me aware that there was a

purchasing agreement between Kaiser and Parke-Davis. They told me that it was a two-percent agreement, without going into the specific terms. I never, however, saw the contract.
Q. Okay. So Mr. Partain is correct in his statement that Kaiser received a two-percent rebate, based on the information that you were told; right?
MR. MIZELL: Objection. Object to form.
A. Based on the information that I was told. However, I would also point out that all of the individuals that were telling me that this agreement existed were individuals that would not necessarily have direct knowledge of the purchasing agreement. They would not necessarily have seen it.
Q. Do you know whether the people who talked to you saw the purchasing agreement?
A. Again, I do not know that they saw it. However, based on their positions, they would not be in a position to see it.
Q. In a purchasing agreement a contract, as far as you understand?
A. A purchasing agreement is very different in Pfizer terminology of how we put together a -- a contract, a performance and access contract. It is just what it says it is. It's a purchasing agreement.



It's an agreement between Kaiser and Pfizer on purchasing product.
Q. So when you use the word "contract," to you it means that there is a performance or a market share piece that's part of the agreement between Pfizer and a third-party payer; right?
MR. MIZELL: Object to form.
A. When -- when I use the term "contract," there are many, many different things that are different between a contract and a purchasing agreement. A purchasing agreement is an agreement between the two entities to purchase a certain product at a given net price, which means that that net price is front loaded into a system. And contracts typically revolve around rebates.
Q. This looks like it was a -- this Parke-Davis contract had a rebate; right?
A. Again, the person writing this message is not trained in contracting and is using the wrong terminology.
Q. Okay.
A. It would have --
Q. Let's go on to the next one. The next star, it says, "By discontinuing the contract, Kaiser was upset with Pfizer."



Do you see that?
A. Yeah, I do see that.
Q. Is this the first time that you had heard that Kaiser was upset with Pfizer for discontinuing the contract?
MR. MIZELL: Object to form.
A. Kaiser continually is upset with Pfizer over a myriad of issues revolving around purchase agreements. And whether we continue with them, whether we don't. So this is -- this is not something that's isolated to this particular situation.
Q. Prior to receiving this e-mail from Mr. Partain, had you ever heard that Kaiser was upset with Pfizer for discontinuing the two-percent rebate on Neurontin?
A. I had not heard that specifically, no.
Q. Mr. Partain goes on the next bullet point to say, "Recently there has been word from the pharmacy to cut back the overuse of Neurontin."
Do you see that?
A. I see that he says that, yes.
Q. Had you heard that before?
A. I had not.
Q. Did you hear that after you received this e-mail from Mr. Partain again?



A. No, the only time I heard it was when I read it in his e-mail. And it's so rife with inaccuracies, it's difficult to determine what in here is Alan Partain pontificating and making assumptions, and what's accurate.
Q. Is Mr. Partain still at Pfizer?
A. No, he is not.
Q. Where is he at now?
A. I don't know.
Q. Is he fired?
A. He was terminated from the company.
Q. When did that occur?
A. -- it was either late 2005 or early 2006.
Q. Were you involved in the decision to terminate him?
A. I was not.
Q. Do you know who was?
A. Yes.
Q. Who?
A. It would have been Tim George and Carl Wilbanks.
Q. Do you have an understanding of why he was terminated?
A. Just anecdotally.
Q. What do you know anecdotally?

A. That it was around his behavior, and harassment, sexual harassment is what I was told.
Q. Mr. Partain goes on to say, "There is a high volume of Neurontin currently written within Kaiser. In 1999, Neurontin exceeded 14 million dollars;" right?
A. He says that. Again, I have no way of knowing how accurate it is, and I have no way of knowing where he even got this information.
Q. Okay. Let's go back to the very top. The very top bullet point of this page says that there are ten reps in my region actively selling Neurontin in Kaiser. Do you think that statement is correct?
A. I have no way of knowing. I would be shocked, since they are receiving no sales credit, why any representative would be selling a product, since they are compensated and incentivized on sales credit. So it doesn't make any sense to me at all.
Additionally, since Kaiser Mid Atlantic isn't that big, the fact that he is stating there's ten representatives calling on these customers is quite surprising. I would venture to say that it -- you would have more like two or three territories that would cover Kaiser Mid Atlantic.
But -- but I don't know for sure. I don't



know how he had his representatives deployed.
Q. So do you think he is lying when he said "There are ten reps in my region actively selling Neurontin in Kaiser"?
MR. MIZELL: Object to form.
A. Whether he is lying or pontificating or exaggerating, I don't know. It would sound to me like if you were responsible for the sales of Pfizer's products, that you would not take your precious selling asset, your sales representatives, and deploy them selling in a place where they can't get sales credit.
Q. But Neurontin was a Pfizer product; right? In 2003?
A. Neurontin was a Pfizer product; but as I've explained, Kaiser data is not available. So it's not included in any kind of sales quotas. It -- there -- as far as Pfizer representatives are concerned, it doesn't exist, because they're not getting any kind of sales credit for it.
Q. So do Pfizer sales representatives only promote the Pfizer products that they get sales credit for?
MR. MIZELL: Object to form.
A. Yes.



Q. How do you know that?
A. Because that's how they're incentivized and compensated. There's -- the -- the products they're trained on are the products that they get sales credit for.
Q. Do you know whether Mr. Partain's sales representatives were trained on Neurontin?
A. It is a matter of standard practice that once a representative is hired, that they go through our sales training program. So my -- we don't allow people to -- to promote our products unless they are trained. And it's a very comprehensive sales training program that takes many months to complete.
Q. So my question is: Do you know whether Mr. Partain's representatives were trained to sell Neurontin?
A. And I would have to respond that in order for his representatives to sell and promote Neurontin, they would have to have been trained.
Q. Do you believe that his sales representatives were selling and promoting Neurontin?
A. Do I belive -- yeah, I mean his sales division was responsible for promoting and selling Neurontin, so, yes.
Q. Do you believe that Mr. Partain is accurate



where he says that "Neurontin is being heavily promoted for its new indication"?
A. Again, based on this message and the inaccuracies that are contained in it, it's difficult do say what's accurate and what's not.
Q. So that's why I'm going back through this.
Do you believe that Mr. Partain is accurate when he says that "Neurontin is being heavily promoted for its new indication"?
MR. MIZELL: Object to form.
A. I have no way of knowing that or validating it.
Q. So you don't know as you sit here whether it's true or not true; right?
MR. MIZELL: Object to form.
A. That -- that's correct. I know for a fact that it's being promoted for approved indications, so one would make the assumption that Neurontin is being promoted for its indications, and that would include its new indications.
"Heavily" or not is the word that -- that I have a challenge with; because, again, I don't know what that means, and I don't know why you would have sales representatives promoting a product when they're not getting sales credit.

446

Q. How do you know for a fact that Neurontin was being approved for -- excuse me. How do you know for a fact that Neurontin was being promoted for approved indications?

A. Pfizer policy is that sales representatives only sell Pfizer products for promoted -- for approved indications, utilizing Regulatory-approved promotional pieces.

MS. DALEY: Let's take a tape break.

THE VIDEOGRAPHER: The time is approximate the 4:02. This ends Tape Number 4. We are now going off the record.

(A recess is taken.)

CONTINUED DIRECT EXAMINATION BY MS. DALEY:

(Document entitled Agenda For Support of NHO Initiatives For Neurontin, Tuesday, April 1st, 2003 marked Henderson-17 for identification.)

THE VIDEOGRAPHER: The time is approximately 4:19. This is the beginning of Tape Number 5. We are now on the record.

Q. Mr. Henderson, I hand you what we have marked as Henderson Exhibit 17. Do you have that before you?

447

A. I do.

Q. This is a document entitled "Agenda, OR Support of NHO Initiatives For Neurontin, Tuesday, April 1st, 2003, 12 to 1:00 p.m.;" right?

A. Yes.

Q. Do you want to take an opportunity to look at it?

A. Yes, please.

Okay.

Q. This is an "Agenda, OR Support of NHO Initiatives For Neurontin;" right?

A. Yes.

Q. What does "OR" stand for?

A. Outcomes Research.

Q. And NHO is?

A. National Healthcare Operations.

Q. The list of the attendees is Craig Glover, Tim Highland, Steve Zempa, Bruce Parsons, Ellen Dukes and Alicia Sidowski; right?

A. That's what's listed here, yes.

Q. Are any of these individuals or were any of these individuals in April, 2003 part of the Healthcare Cluster?

A. Steve Zempa was a Clinical Education Consultant Team Manager, but he was not part of

448

National Healthcare Operations. They're -- they are -- they are all advanced degree pharmacists, and fell somewhat under the designation of Medical. They were a completely stand-alone group.

Q. So were any of these individuals part of the Healthcare Cluster?

A. Yeah, Steve Zempa, the CEC Team Manager, Clinical Education Consultant, was part of the Healthcare Cluster.

Q. Is Outcomes Research part of the Healthcare Cluster?

A. No.

Q. What group is that part of?

A. It falls under Outcomes Research.

Q. And is that part of the U.S. Sales group?

A. No. Back -- it is completely separate. It's part of Medical.

Q. The first bullet point in this agenda -- agenda is "Discuss NHO pushback issues, that is resistance." Correct?

A. Yes, that's what it says.

Q. What is -- what are NHO pushback issues?

MR. MIZELL: Object to form.

A. I have no idea. Just what they're saying here, resistance.

449

Q. And under the first bullet point it says, "During meeting with Bill McCarver at APS, Dave Murphy mentioned NHOs getting some push back with Neurontin."

Do you see that?

A. I see. I see that.

Q. Who would fall in the categories of NHOs?

A. Well, again, this is where -- because NHOs, and this is where there are inaccuracies in this message, because there are no such thing as NHOs. NHO is an organization.

Q. Would NHOs perhaps refer to employees in the NHO Group?

MR. MIZELL: Object to form.

A. Possibly that's what they could be saying.

Q. Who is Dave Murphy?

A. Dave Murphy was an Account Manager at one time. He was also a District Manager. I'm not sure what else he's done.

Q. An Account Manager in the Healthcare Cluster?

A. Yes.

Q. Do you know whose account he was in charge of?

A. As I recall it was -- it was one of the Gulf Coast states or somewhere in the panhandle of Florida, somewhere down there.

Q. He was an account manager down there?
A. As I recall, yes. Which...
Q. Did you check with Dave Murphy to find out what he was told regarding Neurontin in preparation for this deposition?
A. I did not. I don't even know if Dave Murphy is still with the company. I don't believe he is.
Q. Who is Bill McCarver at APS?
A. I have no idea.
Q. This agenda goes on to say, "Apparently the NHOs are worried about the money spent on Neurontin for primarily off-label use."
Do you see that?
A. I do see it.
Q. And then it goes on to say, "Seeing Neurontin as a drug being used outside of its label." Right?
A. That's what this says, yes.
Q. Under Item Number C it says, "Group Health in Seattle, Kaiser Permanente and the Massachusetts VA are all threatening action."
Do you see that?
A. I see that.
Q. Did you talk to anyone to find out what action was being threatened by Kaiser Permanente regarding Neurontin in preparation for this deposition?
MR. MIZELL: Object to form.
A. I did not; and quite frankly, in reading this, I'm not sure where this information would have even come from, since the Account Managers in NHO were not promoting Neurontin.
Q. And you know that because the policy was that no one was to be talking about Neurontin to third-party payers; right?
A. That's correct.
Q. So in preparation for this deposition, you didn't check on whether Kaiser Permanente had communicated with anyone at Pfizer about Neurontin as a drug being used outside of its label; right?
MR. MIZELL: Object to form.
A. No, that's actually not correct. I checked with Kirk Bachman, Curtis Reese and John Dauser to talk about Neurontin and whether it was being promoted in Kaiser or not; whether it was being discussed or not. And determined that they were not promoting or discussing Neurontin with -- with Kaiser.
Q. "They" being Mr. Bachman and Mr. Dauser and Mr. --
A. Reese, and their teams. The Pfizer Kaiser sales representatives.





Q. We have to go back to Mr. Partain's memo, which is Henderson Exhibit 8. The ten reps that he referred to in his region that were actively selling Neurontin in Kaiser, would that be part of the Dauser/Reese, Kaiser Pfizer sales force?
A. No. In Southern California, because they're a group model HMO, and that's where 90 percent of Kaiser's lives are located, we have dedicated Kaiser sales representatives.
In the Mid Atlantic, where Kaiser is located, and that's where Mr. Partain is referencing this, Kaiser has medical groups where their doctors practice medicine. They don't have the same group model facilities. So Mr. Partain's representatives are calling on Kaiser doctors -- or at least he's -- he's saying here that they are. There's no way of validating that they actually were. But he is saying that they are calling on the Kaiser doctors that practice medicine in the Mid Atlantic Kaiser. They don't call on "the account."
Q. Does the Pfizer Kaiser sales force call on the account?
A. No, they do not. As we define the account as -- again, they are calling on doctors. When I say "the account," I'm referring to the contract negotiators, the Pharmacy -- Medical Director, the Pharmacy Director, Quality Director. It could be C-Suite level individuals.
Q. Let's go onto the second bullet point. It says, "OR support for Neurontin limited to PHN;" do you see that?
A. I do.
Q. And, again, "OR" there stands for Outcomes Research?
A. That's correct.
Q. Under 8 it says "Change in use of opioids"?
A. Opioids, yes.
Q. "Among patients with PHN beginning treatment with gabapentin;" right?
A. Yes.
Q. Then. A says, "Can paper be published in US? Answer: Yes." Right?
A. Yes, that's what it says.
Q. And it says, "B, cannot be sales piece. Bruce does not see as promotional material for RC."
Who is RC?
A. RC stands for Regulatory Committee.
Q. Then let's drop down to Number Roman Numeral III: "Potential for study with Kaiser Permanente. Bill McCarver."