394

1  account manager decides out in the field is a priority
2  customer may not be a priority customer in the eyes of
3  Pfizer, Inc. And we may be getting erroneous
4  information from these advisors and basing decisions
5  on what these advisors say.
6      Q. So is that why the policy or the procedure
7  was changed to not allow Pfizer personnel to nominate
8  attendees to advisory board meetings?
9      A. That was one of the major reasons early on
10 that we moved to the new system. Sometimes you
11 were -- as you can see, John Lowry, the Regional
12 Manager, sends this message out to his people. Some
13 of his people may not even have bothered to take the
14 time to fill the grid out.
15     Q. Was another reason why there was a change in
16 that policy because Legal wanted the change to be made
17 so that there would not be any promotional activities
18 at advisory board meetings?
19         MR. MIZELL: Object to form. Outside the scope.
20     A. I -- I believe that an additional reason was
21 the fact that Legal wanted to ensure that there could
22 be no misinterpretation that any kind of promotional
23 activities were taking place.
24     Q. Back to Henderson Exhibit 13, the top, the
25 top e-mail then, the first page of Exhibit 13, is an

395

1  e-mail by someone asking that Ron Lyons from Trigon be
2  added to the individual list, the invitation list;
3  right?
4      A. Yes.
5      Q. And he identified Mr. Lyons in the categories
6  of P&T Committee and pharmacist; right?
7      A. That's what it says, yes.
8         MS. DALEY: We need to take a break for tape.
9         THE VIDEOGRAPHER: The time is approximately
10 2:23. This marks the end of Tape Number 3. We
11 are now going off the record.
12        (A recess is taken.)
13
14 CONTINUED DIRECT EXAMINATION BY MS. DALEY:
15        (Executive Summary of Advisory Board
16 Meeting of June 24, 2002 marked Henderson-14
17 for identification.)
18        THE VIDEOGRAPHER: The time is approximately
19 2:40. This begins Tape Number 4. We are now on
20 the record.
21     Q. Mr. Henderson, I've handed you what has been
22 marked as Henderson Exhibit Number 14. Take an
23 opportunity to look at that.
24     A. Okay.
25     Q. Henderson Exhibit Number 14 is the executive

396

1  summary for this third advisory board meeting; right?
2         MR. MIZELL: Object to form.
3      A. I -- I'm not sure whether it's the third one,
4  but I -- just based on the dates, it appears to be the
5  third one, yes.
6      Q. There was the one in Orlando in March of '02;
7  right?
8      A. There was -- it looks like first there was
9  the January ad board in Scottsdale, the March ad board
10 in Orlando, and now we have this New York ad board.
11     Q. So the third of the ad boards that we have
12 been talking about today; correct?
13     A. That's correct.
14     Q. So this Henderson Exhibit 14 is a copy of the
15 executive summary for this third advisory board
16 meeting?
17     A. Yes.
18     Q. And this advisory board meeting included
19 invitees from HMOs and long term care; right?
20     A. Yes.
21     Q. And the second page of Henderson Exhibit 14,
22 again just like the other two executive summaries,
23 there is a section entitled "Introduction;" right?
24     A. Yes, there is.
25     Q. And the introduction says, "This executive

397

1  summary sets forth the finding and conclusions --"
2  excuse me -- "the findings and conclusions of the
3  third Neuropathic Pain Advisory Board Meeting held in
4  2002 for Pfizer's Neurontin team." Right?
5      A. Yes.
6      Q. And like the other executive summaries, it
7  identifies Pfizer's goals for these panels; right?
8      A. That's correct.
9      Q. Including as a goal "Helping advisory board
10 members learn more about Pfizer and the Neurontin team
11 and its resources;" right?
12     A. That's correct.
13     Q. And like the other advisory board meetings,
14 members of the Pfizer's Neurontin team nominated the
15 attendees to this advisory board meeting in New York;
16 right?
17        MR. MIZELL: Object to form.
18     A. Actually, no. This one states "Members of
19 Pfizer's Neurontin team nominated the attendees." The
20 other two that you showed me said members of NHO.
21     Q. So they were all invited -- for each of these
22 advisory board meetings, they were invited by
23 Pfizer -- or the attendees were nominated by Pfizer
24 employees; right?
25     A. The attendees, yes, they were identified by

398

1  Pfizer employees.
2      Q.  It goes on in the introduction to state that
3  "This report summarizes the panel's major conclusions
4  related to Pfizer, identifies Pfizer's opportunities
5  with respect to neuropathic pain management, and
6  reviews panel findings on various topics of interest;"
7  right?
8      A.  That is what it says, yes.
9      Q.  Then it goes on, "Note that text in italics
10 indicates a verbatim comment from a participant that
11 represents a consensus of opinion."  Right?
12     A.  That's correct.
13     Q.  Under "Major Conclusions," the next section,
14 says that "Major conclusions derived from the HMO
15 advisors at the June panel are consistent with
16 findings from the January HMO advisor panel;" right?
17     A.  That is what it says, that's correct.
18     Q.  Under the section entitled "Additional
19 Findings and Pfizer's Opportunities to Work With
20 Health Plans," the second paragraph on the page with
21 the last three digits 399, talks about "Plans have not
22 reacted to Neurontin's recent PHN indication for
23 several reasons."
24         Do you see that?
25     A.  I do.

399

1      Q.  When you took over as Senior Director,
2  National Accounts for Health Plans about five months
3  after this advisory board meeting was held, were you
4  given a copy of any of these executive summaries of
5  the advisory board meetings?
6      A.  I was not; because, as I've reviewed the
7  attendee list of all three of these, none of these
8  were representative of the accounts that I was
9  responsible for.
10     Q.  Was United Healthcare an account you were
11 responsible for when you were Senior Director of
12 National Accounts?
13     A.  I was responsible for United Healthcare as a
14 national account.  United Healthcare also has regional
15 affiliates throughout the United States, and regional
16 account managers are responsible for calling on the
17 regional affiliates.
18     Q.  Is that true for Kaiser as well?
19     A.  Kaiser, they -- they don't call them regional
20 affiliates.  Kaiser has, operates -- they call them
21 markets.  So they operate in different markets.  They
22 have Kaiser Hawaii, Kaiser Northwest, which is Group
23 Health; Kaiser Ohio, Kaiser Mid-Atlantic, Kaiser
24 Georgia.
25     Q.  Who calls on, for example, Kaiser

400

1  Mid-Atlantic?
2      A.  Kaiser Mid Atlantic -- in the Kaisers where
3  we have the ability to call on them, meaning we
4  haven't been banned, like with Kaiser Georgia, we have
5  a local regional account manager that calls on the
6  account.
7      Q.  Why was Kaiser banned from Kaiser Georgia?
8      A.  As I mentioned before, the reason Kaiser
9  developed and has a dedicated Kaiser sales force is
10 because Kaiser has very strict rules and procedures
11 that they expect manufacturers to follow when working
12 and promoting within Kaiser properties.
13         Many, many years ago, I believe it was even
14 before I joined Pfizer, a -- Kaiser Georgia made the
15 decision that someone had violated the rules.  I don't
16 even know what -- what the details are behind that.
17     Q.  Going back to this executive summary of the
18 June advisory board meeting, in the middle of the page
19 with the last three digits 399 is a paragraph that
20 begins, "Health plans recognize a continuing increase
21 in Neurontin utilization."
22         Do you see that?
23     A.  I do read that, yes.
24     Q.  "And voiced specific concerns about higher
25 costs associated with an increase in physician

401

1  detailing and dosing escalations."
2          Do you see that?
3      A.  I do see that, yes.
4      Q.  And it goes on to say, "Advisors identified
5  options for management of Neurontin utilization."  The
6  first one:  "Switch Neurontin to third tier, noting
7  high costs and off-label use to members as a basis for
8  this change;" do you see that?
9      A.  I do see that, yes.
10     Q.  When you became Senior Director, National
11 Accounts Health Plans, did you receive any reports on
12 whether any national account was switching Neurontin
13 from second tier to third tier?
14         MR. MIZELL:  Object to form.  Outside the scope.
15     A.  Not that I recall.
16     Q.  Would your National Account Managers provide
17 you with reports on what was happening with Pfizer
18 drugs on the formulary for that particular account?
19     A.  The only thing that would have occurred is in
20 part -- in fulfilling our obligations, where we
21 actually populate the database where we track
22 formulary status, if a National Account Manager
23 noticed that formulary status had changed for
24 Neurontin, they would have gone into the system and
25 changed the status.

402

1  Q. Would you have received a special memo about
2  that at all, or would it just have happened?
3      MR. MIZELL: Object to form.
4  A. Typically there was -- there was a -- and
5  there is -- what's called a formulary change report;
6  because each -- many health plans, as you might
7  expect, don't change their formularies a lot. And the
8  reason for that is when they are selling their
9  benefits during the enrollment year, and the
10 enrollment period usually takes place at the end of
11 any calendar year, part of what they're selling is
12 their formulary.
13     So when you make changes to your formulary,
14 you have to communicate that out to employers, you
15 have to communicate that out -- out to patients. So
16 the health -- the national health plans routinely
17 don't make those -- those radical changes like that.
18     So consequently, the National Account
19 Managers were required once a month to certify that
20 the formulary status that was reflected in the system
21 was accurate. It was rare that there was a huge
22 number of changes to the formulary status. So, yes,
23 when I saw the formulary status report, there would be
24 a few changes here and there.
25 Q. Did you ever see a formulary status report

403

1  where the status of Neurontin was changing?
2  A. I don't recall.
3  Q. Did you keep those formulary status reports?
4  A. They actually were just generated as
5  notifications to me that there was a formulary status
6  report available in HC Exchange. I'd pop in the
7  system, I'd look at it, and then the next month it
8  would re-populate over the previous month.
9  Q. So did you archive these notifications of
10 changes in formulary status?
11 A. No reason to -- to archive it. It's just a
12 message that alerts me that within HC Exchange, there
13 is a formulary status report.
14 Q. I actually didn't ask if there was any reason
15 to archive this. I asked: Did you archive these
16 notices of changes in formulary status reports?
17     Excuse me. Did you archive these notices of
18 change in formulary status?
19     MR. MIZELL: Object to form.
20 A. I did not archive the e-mail alert messages
21 notifying me that there were changes -- a change
22 report available in the HC Exchange system.
23 Q. How did you decide what information to
24 archive and what not to archive?
25 A. I just base it --

404

1      MR. MIZELL: Object to form.
2      Go ahead.
3  A. I base it on the legal notifications, hold
4  notifications that I receive from the Pfizer Legal
5  Department.
6  Q. Do you have any understanding as to whether
7  or not you were to archive all e-mails regarding
8  Neurontin?
9  A. I don't remember when I received that
10 notification. Again, with a formulary change report,
11 there was no mention of any specific product in the
12 e-mail.
13 Q. You would have to go to the HC Exchange to
14 see what the change was?
15 A. That's correct.
16 Q. And how would you figure out what the change
17 was on the HC Exchange?
18 A. It would just tell you. It would say "Aetna,
19 Tier 2 to Tier 3" for a specific product.
20 Q. Now let's turn to the list of attendees at
21 this advisory board meeting. It's page 404, the last
22 three digits in the lower right-hand corner.
23     Do you see that?
24 A. I do.
25 Q. Now, there are various health plans that are

405

1  identified on -- under the listing of "Organizations."
2  Right?
3  A. Yes.
4  Q. Would you describe all of these as small
5  health plans?
6  A. I would describe the -- the representation of
7  the health plan that's listed here -- because it could
8  be misleading. You can see a name and naturally make
9  the assumption that it's a national health plan.
10     However, by looking at the individual and
11 looking where they are, you can see that, yes, if you
12 ask me is United Healthcare a large health plan, my
13 response would be yes. However, United Healthcare in
14 Manchester, Connecticut, where the medical director is
15 located, is relatively small. These are all regional
16 accounts.
17 Q. Is Oxford considered a regional account?
18 A. Yes.
19 Q. Humana?
20 A. Humana is considered a national account.
21 However, Humana Choice Care which is a wholly-owned
22 subsidiary, or was at this time, was a very small
23 subsidiary of Humana.
24 Q. What about Horizon?
25 A. Horizon is a -- or was a regional account.

406

1  Q. Is that a national account today?
2  A. No.
3  Q. Would you consider all of these to be small
4  accounts?
5     MR. MIZELL: Object to form.
6  A. I would ask you to define "small."
7  Q. Perhaps I misunderstood you. I thought you
8  mentioned earlier with respect to the January advisory
9  meeting that they were just small health plans, not
10 the larger health plans.
11    MR. MIZELL: Is there a question pending?
12 Q. I wanted to know what you were meant by
13 "small" when you were -- identified that distinction
14 for the attendees of the January meeting?
15    MR. MIZELL: Object to form. And outside the
16    scope.
17 A. "Small" based on number of lives that these
18 individuals from these organizations represent; yes,
19 they are very small in the grand scheme of things.
20 Q. So what would be a small number of lives
21 vis-a-vis a large number of lives to be carried?
22 A. I would say anything over a million lives is
23 large.
24 Q. Everything else would be small?
25 A. Yes.

407

1  Q. Let's go to the agenda, which is -- begins on
2  the page with the last three digits 407.
3  A. Yes.
4  Q. Advisory board meeting, another agenda item,
5  45 minutes entitled "Treating Neuropathic Pain With
6  Neurontin;" right?
7  A. Yes, I see that here.
8  Q. And then let's go back to the list of
9  attendees, which is one page prior, 406.
10 A. Okay.
11 Q. Do you see any individuals from Pfizer's
12 Legal Department identified as an attendee at this
13 advisory board meeting?
14 A. Not everyone's title is listed, so I don't
15 see any lawyers or names that I recognize of
16 individuals that are lawyers.
17 Q. There are also individuals from the
18 organization called Cline, Davis, Mann under the
19 heading of Pfizer attendees; right?
20 A. Yes.
21 Q. What is Cline, Davis, Mann?
22 A. It's a marketing agency.
23 Q. That Pfizer has hired; right?
24    MR. MIZELL: Object to form.
25 A. Pfizer has hired Cline, Davis, Mann as a

408

1  marketing agency in the past.
2  Q. Then let's go to Appendix B. And that begins
3  on Page 410. It's entitled "Developing an Outpatient
4  Case Management System For Management of Neuropathic
5  Pain."
6     Do you see that?
7  A. Yes.
8  Q. When you started as Senior Director National
9  Accounts Health Plans, was there any effort underway
10 as Pfizer to develop an outpatient case management
11 system for management of neuropathic pain?
12 A. Not that I'm aware of. However, in the
13 context of reading through Appendix B, and then based
14 on what you have referred to under the goals on Page
15 397, the fourth bullet, "Help advisory board members
16 learn more about Pfizer and the Neurontin team and its
17 resources," this would indicate to me that, as we have
18 engaged these people as advisors to discuss things
19 that Pfizer can do with them in the future, this would
20 be a classic example of trying to accomplish that
21 goal.
22 Q. Would you turn to Page 412. And that page
23 begins with "Designing a patient outcome study for
24 neuropathic pain."
25    Do you see that?

409

1  A. I do.
2  Q. And the goal for that is to "Prove the need
3  to keep Neurontin on the preferred tier;" right?
4  A. That is what's listed here.
5  Q. Preferred tier is Tier 2?
6  A. It -- It could be. It is typically defined
7  as second tier, unrestricted access.
8     (Document entitled "HMO Opportunity
9     Reports" marked Henderson-15 for
10    identification.)
11 Q. I am going to show you what has been marked
12 as Henderson Exhibit 15.
13 A. Okay.
14 Q. Okay. And I'm also going to hand you what
15 has been marked at Henderson Exhibit 16.
16    (Document entitled "Neurontin Managed
17    Care Advisory Boards, Key Conclusions" dated
18    April 15, 2002 marked Henderson-16 for
19    identification.)
20 A. Okay.
21 Q. Let's look at Exhibit 16 first. This is a
22 document entitled "Neurontin Managed Care Advisory
23 Boards, Key Conclusions" dated April 15, 2002; right?
24 A. That's correct.
25 Q. And in the second page of Henderson Exhibit

Page 410

1  16 is the heading "Objectives of Neurontin Advisory
2  Panels;" right?
3     A.  Yes, that's correct.
4     Q.  And the fourth bullet point states, "To
5  disseminate information about Pfizer and Neurontin;"
6  right?
7     A.  That's what it states, correct.
8     Q.  And the fifth bullet point of the objectives
9  of the Neurontin advisory panels is "To allow Pfizer
10 the opportunity to work with and learn from a group of
11 their managed care customers;" right?
12    A.  That's correct, that's what it states.
13    Q.  And then the next page on Henderson Exhibit
14 16 under "Key Conclusions," begins this sentence -- we
15 talked about in the earlier executive summaries;
16 "Health plans do not manage neuropathic pain
17 aggressively." Right?
18    A.  That's what it states, yes.
19    Q.  It goes on to say, "Managed care customer
20 have limited resources and need to provide the best
21 care within a fixed budget."
22        Do you agree with that statement?
23        MR. MIZELL: Object to form. Outside the
24 scope.
25    A.  Is your question do I personally believe

Page 411

1  that -- that --
2     Q.  "Managed care customers have limited
3  resources and need to provide the best care within a
4  fixed budget"? Do you personally agree with that?
5     A.  I believe that --
6         MR. MIZELL: Same objections.
7     A.  I believe that the best care should be
8  provided. Budgets always exist.
9     Q.  Do you agree with the conclusion that
10 "managed care customers have limited resources"?
11        MR. MIZELL: Same objections.
12    A.  Not -- Not necessarily. It depends on -- on
13 who you are talking about.
14    Q.  In terms of managed care customers?
15    A.  Yes.
16    Q.  Turning to the page last three digits 847,
17 another page entitled "Key Conclusions"?
18    A.  Okay.
19    Q.  It says "NP lacks multiple triggers for
20 disease management."
21        Do you see that?
22    A.  Yes, I do.
23    Q.  Then the big bullet point under that heading
24 is that "Multiple factors contribute to managed care
25 customers' lack of attention to neuropathic pain."

Page 412

1         Do you see that?
2     A.  I do, yes.
3     Q.  And then it goes on in the fourth bullet
4  point, "Lack of knowledge of the true cost of treating
5  neuropathic plan, few plans are able to link medical
6  and pharmacy claims." Is that what you were referring
7  to before about marrying up the data?
8     A.  That's correct.
9         MR. MIZELL: Object to form.
10        THE WITNESS: Sorry.
11    Q.  If you could turn to a page, a couple of
12 pages back, last three digits, 850, another page under
13 the heading "Key Conclusions"?
14    A.  Okay.
15    Q.  And the heading on this page is, under Key
16 Conclusions, "Short term, Neurontin will retain broad
17 formulary access."
18        Right?
19    A.  That's what it says, yes.
20    Q.  It goes on to say, "Neurontin is an anti
21 convulsant and plans want easy access to
22 anticonvulsants for epilepsy patients."
23        Do you see that?
24    A.  I do.
25    Q.  Now, do you agree with that statement, that

Page 413

1  "Neurontin is an anticonvulsant and plans want easy
2  access to anticonvulsants for epilepsy patients"?
3         MR. MIZELL: Object to form. Outside the scope.
4     A.  Neurontin was classified as an anti epileptic
5  drug, and plans did want to ensure that patients that
6  had epilepsy had access to the appropriate therapies.
7     Q.  Let me break this down, then.
8         Are you disagreeing that Neurontin is an
9  anticonvulsant?
10        MR. MIZELL: Object --
11    Q.  Is that what you are disagreeing with?
12        MR. MIZELL: Object to form.
13    A.  I'm not disagreeing. I'm just making the
14 statement that Neurontin is -- is considered a drug --
15 an anti epileptic drug and --
16    Q.  Is that different from an anti convulsant?
17        MR. MIZELL: Object to form. Outside the scope.
18    A.  No.
19    Q.  And do you agree with the second part of the
20 sentence, "Plans want easy access to anticonvulsants
21 for epilepsy patients"?
22        MR. MIZELL: Same objections.
23    A.  Yes.
24    Q.  Turn to the next page. It has the last three
25 digits 851. This one says, "key Conclusions: Long

40 (Pages 410 to 413)

414

1  term, Neurontin utilization will gain attention."
2      Do you see that?
3   A.  I do.
4   Q.  The first, and the only large bullet point
5  says, "What will trigger increased MCO interest in
6  managing Neurontin?"
7      Do you see that?
8   A.  I do.
9   Q.  It goes on to say in the first bullet point,
10 "Significant increases in Neurontin utilization,
11 movement to Top 20 list."
12     Do you see that?
13  A.  I do.
14  Q.  What's a Top 20 list?
15  A.  Most third-party payers maintain a list of
16 the top 20 most utilized and expensive products.  So
17 they basically take the utilization data, the net unit
18 cost of a product, and they determine an aggregate
19 dollar value, if you will, dollar total for a given
20 product.  And they'll run a list of those products.
21 Whether it's 20 or ten, it varies by third party
22 payer.
23  Q.  As a Pfizer employee, have you been involved
24 in discussions about Pfizer drugs that are on a top 20
25 list?

415

1      MR. MIZELL:  Object to form.  Outside the scope.
2   A.  I don't know whether I discussed the top 20
3  list.  I've seen a number of top 20 lists.
4   Q.  How do the top 20 lists get created?
5      MR. MIZELL:  Same objections.
6   A.  Typically a pharmacy department in a
7  third-party payer will just do a query of their
8  database to determine the top 20.
9   Q.  Have you ever seen a top 20 list for Aetna?
10     MR. MIZELL:  Object to form.  Outside the scope.
11  A.  I don't recall seeing one for -- for Aetna.
12  Q.  Do you know if Neurontin is on a top 20 list
13 for Aetna?
14  A.  I don't know.
15  Q.  Do you get a top 20 list for Kaiser?
16  A.  I haven't seen a top 20 list for Kaiser.
17 Typically, these documents are internal documents
18 to -- to a third-party payer.  They are not things
19 that they make readily available to the public.
20     Additionally, they change because they're
21 almost always centered around branded products,
22 because rarely is a generic product more expensive.
23 And so as products go off patent, you will see changes
24 in this list, products coming and going.
25  Q.  Let me turn to the next page, Bates number

416

1  852 under the heading "Implications For Pfizer:
2  Opportunities and Threats For Neurontin."
3      Do you see that?
4   A.  I do see that.
5   Q.  At any time while you worked -- have been
6  working with Pfizer, have you been involved in a
7  discussion about the opportunities and threats for
8  Neurontin?
9      MR. MIZELL:  Object to form.
10  A.  No.
11  Q.  The first threat listed here is that "MCOs
12 may edit based on dose to segment epilepsy patients
13 they do not want to manage from NP patients they do
14 want to manage."
15     Do you know what that means?
16     MR. MIZELL:  Object to form.  Outside the scope.
17  A.  Because Neurontin was never indicated for
18 neuropathic pain, and because I was never trained on
19 the product, I don't know the dosing between epilepsy
20 and what the clinical trials were indicating it would
21 be for neuropathic pain.
22     And reading this statement, it's basically
23 saying that, as I've explained to you, it's very
24 difficult to marry pharmacy claims databases to
25 diagnoses and indications.  So if you -- if there are

417

1  different doses involved for different indications,
2  with some customers -- and it's very, very few, it
3  takes a sophisticated claims process, but they can
4  enter into what we call a step edit, and step edits
5  are electronic, in which if a prescription is written
6  above the dose for an indication, that that will flag
7  that prescription for the pharmacist.
8   Q.  And then I want to have you turn to the last
9  two pages of Henderson Exhibit 16.  The second-to-the
10 last page is headed "Advisors Represented."
11     Do you see that?
12  A.  I do.
13  Q.  And before you were talking about the
14 attendees of these advisor board meetings being
15 perhaps employees of third-party payers.  When this
16 list of advisors represented has been put together, is
17 it identifying the individuals or the third-party
18 payers?
19     MR. MIZELL:  Object to form.
20  A.  Well, this is a classic example, because this
21 is Health Strategies Group that has put this all
22 together, and they make their own interpretation.
23     So from all of the attendees that you showed
24 me, the mere fact that they are trying to self-promote
25 how successful these ad boards were that they

41 (Pages 414 to 417)

418

1 conducted by listing all of these accounts is very
2 misleading. And it's a classic reason why we stopped
3 querying the field to get potential attendees to come
4 to these ad boards.
5     So, yes, they have listed a whole lot of --
6 of names, but do those names that are listed here
7 accurately represent that third-party payer? And
8 based on what you have shown me, I would say no.
9     MS. DALEY: Okay. I move to strike the answer
10     as being non-responsive.
11 Q. Here's my question, very simple: On this
12 list of advisors represented, does the listing
13 identify the name of the individual or the company at
14 which they work?
15     MR. MIZELL: Object to form. Asked and
16     answered.
17 A. I don't even know if the individuals work for
18 the companies that were listed here.
19 Q. Let me ask the question this way: Does this
20 list of advisors represented identify any individual
21 names?
22 A. I do not --
23     MR. MIZELL: Object to form.
24 A. I do not see any individual names listed on
25 this sheet.

419

1 Q. And the last page of Henderson Exhibit 16,
2 which is identification of the confirmed attendees for
3 the June panel, is there any individual name
4 identified?
5     MR. MIZELL: Object to form.
6 A. I don't see any individual names.
7 Q. Let's turn back, then, to Henderson Exhibit
8 15. Henderson Exhibit 15 is a document entitled "HMO
9 Opportunity Reports;" correct?
10 A. That's correct.
11 Q. Have you ever seen an HMO opportunity report
12 before?
13 A. I have not.
14 Q. This is an HMO opportunity report for
15 Neurontin; right?
16 A. That's what it states, yes.
17 Q. Have you ever heard of the reference to an
18 HMO opportunity?
19 A. I have --
20     MR. MIZELL: Object to form.
21 A. I have not.
22 Q. HMO refers to "Healthcare Management
23 Organization"?
24 A. Yes, it does.
25 Q. The first sentence on the first page of

420

1 Henderson Exhibit 15 states, "The following is the Q1
2 '02 HMO opportunity report for Neurontin, modeling the
3 quarterly sales and upside potential by local plan;
4 right?
5 A. Yes.
6 Q. Q1/02 would have been what time period?
7 A. Quarter one, 2002.
8 Q. Does Pfizer have a calendar -- is Quarter 1
9 the first quarter of the calendar year?
10 A. Yes, it would be January, February, March.
11 Q. It says "For Neurontin, modeling the
12 quarterly sales and upside potential by local plan."
13     What would be a local plan?
14 A. It appears in looking at the report that
15 they're defining a -- they're taking a plan and then
16 cross indexing that to a Pfizer sales district.
17 Q. What constitutes a local plan?
18 A. So that would be a local plan that is in that
19 individual Pfizer sales district.
20 Q. Okay. Let's go to -- I'm going to try to
21 understand what you are saying. The third page of
22 Henderson Exhibit 15, the last three digits, the Bates
23 Number is 868.
24     It's a page entitled "Neurontin Summary of
25 Largest Opportunities, First Quarter, 2002;" right?

421

1 A. That's correct.
2 Q. If we go to about two-thirds of the way down,
3 there is a reference to "Kaiser Foundation, Mid
4 Atlantic." Do you see that?
5 A. I do see that, yes.
6 Q. Is that -- can you describe in the context of
7 that Kaiser Foundation Mid Atlantic reference what is
8 a local plan?
9 A. So Kaiser operates in different markets; and
10 in -- in the Washington, D.C. area, they are known as
11 Kaiser Mid Atlantic. So the Washington D.C. sales
12 district has -- Pfizer Washington, D.C. sales district
13 has been cross indexed with Kaiser Mid Atlantic.
14 Q. And would Regional Account Managers then call
15 on that Kaiser facility, as opposed to the
16 Reese/Dauser 16 sales force?
17     MR. MIZELL: Object to form.
18 A. Well, it's -- it's different, because the
19 Kaiser sales district, those are representatives. So
20 a better way to equate this is a Regional Account
21 Manager is calling on this regional Kaiser; whereas
22 Kirk Bachman, the Kaiser National Account Manager,
23 calls on Kaiser in California.
24 Q. Would the Regional Account Manager that would
25 be calling on Kaiser in DC report to either Mr. Reese

42 (Pages 418 to 421)

422

1  or Mr. Dauser?
2    A. No.
3    Q. Who would they report to?
4    A. They would report to the Mid Atlantic Area
5  Manager.
6    Q. Above that is -- well, let's go back. The
7  original question was the local plan.
8        So in the context of the Kaiser Foundation
9  Mid Atlantic, what would be a local plan?
10   A. I'm -- could you restate that question?
11   Q. Sure. I'm trying to understand, the first
12 sentence of this HMO opportunity report says that "The
13 following is the first quarter, 2002, HMO opportunity
14 report for Neurontin, modeling the quarterly sales and
15 upside potential by local plan."
16       So I'm trying to understand in the context of
17 Kaiser Mid Atlantic, what a local plan is referencing?
18       MR. MIZELL: Object to form.
19   A. Kaiser Mid Atlantic is a stand-alone Kaiser
20 operation in the mid Atlantic. In -- in the
21 Washington, D.C. area.
22   Q. Would there have been a separate local
23 operating plan or business plan for Kaiser Mid
24 Atlantic?
25   A. There would have been a business plan by the

423

1  Regional Account Manager that would have been housed
2  in HC Exchange.
3    Q. So the reference to "local plan" there is a
4  reference to the geographic areas for the health
5  benefit plans?
6    A. Yes. Again, I -- I hadn't seen this report
7  before. I am familiar with -- with these types of
8  reports.
9        But what it is typically -- what these
10 reports are typically designed to do is identify --
11 it's similar to some of the previous reports that we
12 have looked -- looked at. You might recall the
13 customer drill-down report, Sherlock. So this one is
14 very similar to the customer drill-down report.
15       And what it has done is it has taken Pfizer
16 sales districts, where it says, "District TACU" in the
17 second column; and it has identified individual
18 accounts that operate within that sales district,
19 where there is an opportunity as defined by this sales
20 report.
21   Q. Let's go up to the section right above the
22 Kaiser Washington, D.C., do you see where it says,
23 "Kaiser San Francisco." Do you see that?
24   A. Kaiser San Francisco? Yes, I do.
25   Q. And it says Kaiser Foundation, North Carolina

424

1  (sic)?
2    A. I see that, yes.
3        MR. MIZELL: Just to clarify, I think you said
4  North Carolina?
5        MS. DALEY: Northern California.
6    A. I'm sorry.
7    Q. It says "Kaiser San Francisco, Kaiser
8  Foundation North California;" right?
9    A. Yes, I do see that.
10   Q. Where is Kaiser headquartered?
11   A. Kaiser is headquartered in Oakland,
12 California.
13   Q. And the city there is defined as Oakland,
14 California; right?
15   A. I'm sorry.
16   Q. And the city is identified as Oakland,
17 California on this chart. Is that right?
18   A. That's correct.
19   Q. It goes on to say "2.5 million covered
20 lives;" right?
21   A. That's what this report is stating, and this
22 is a classic example of why when reports are generated
23 like this in isolation without input those from those
24 closest to managed markets, it's rife with
25 inaccuracies.

425

1    Q. What's inaccurate about that?
2    A. You -- you have got no context around the
3  lives. We don't know whether those are pharmacy
4  lives, medical lives. Just because it says '02 Q1,
5  that doesn't necessarily mean that this number
6  accurately reflects the number of lives that are in
7  Kaiser during the first quarter of 2002.
8    Q. The next column says "Projected Annualized
9  Sales, 3.57 Million;" right?
10   A. Yes, another classic example of erroneous
11 data that -- that could be contained in this report.
12       As I've indicated before, Kaiser doesn't sell
13 their data. So based on who they used with NDC, it's
14 difficult to say whether they did some modeling and
15 calculated on scripts that were filled in the retail
16 network. This wouldn't capture scripts necessarily
17 that are filled within Pfizer -- Kaiser's
18 self-contained pharmacies.
19   Q. Well, this says "projected annualized sales;"
20 right?
21   A. Yes, that's what it says.
22   Q. Do you think that this is an erroneous
23 projected annualized sales?
24   A. Yes, I think this report is -- is -- I mean,
25 clearly, nobody from the Healthcare Cluster was

```
                                        426
 1  involved in the development of this report. And I
 2  would say that there are numerous inaccuracies here.
 3      Also, the mere fact that this report is
 4  listed here and the Kaiser sales representatives were
 5  not selling Neurontin or promoting Neurontin, the mere
 6  fact that it's on this report indicates that whoever
 7  did it has no real-world knowledge of how Pfizer was
 8  promoting Neurontin.
 9   Q. On second -- first quarter of 2002, were you
10  responsible for Kaiser?
11   A. I was not.
12   Q. You were actually in Virginia -- Virginia
13  working on the -- and as an Area Manager of Federal
14  Markets East; right?
15   A. That's correct.
16   Q. In preparation for this deposition, did you
17  receive a copy of this HMO opportunity report?
18   A. I did not.
19   Q. In preparation for this deposition, did you
20  analyze the number of covered lives and projected
21  annualized sales for Kaiser Foundation for Neurontin?
22   A. I did not, because of my experience. It was
23  not necessary for me to do that.
24   Q. Do you know who prepared Henson Exhibit 15?
25   A. I don't know specifically who prepared it.
```

```
                                        427
 1  We have a very good indication of where the data came
 2  from.
 3   Q. And is that from the NDC?
 4   A. That's what I read, yes.
 5   Q. Do you know whether this was prepared by --
 6  well, at the top of it it says "Neurontin,
 7  gabapentin;" right?
 8   A. Yes, typically when it says
 9  "Neurontin/gabapentin" like that, a report like this
10  would be somehow generated through the Neurontin DMT,
11  which also includes a management science and a market
12  analytics component.
13      Those individuals in the past would contract
14  with organizations like NDC, as well as on the second
15  page of this document, where it references Hewitt and
16  Innerstudy, to get the number of lives, they would
17  contract with those folks.
18   Q. How do you know that?
19   A. Because it says on the second page: "Number
20  of lives managed by the local plan as reported by
21  Hewitt and Innerstudy."
22   Q. Who is -- what does DMT stand for?
23   A. Disease Management Team, it's an
24  interchangeable term for a product brand team.
25   Q. So it's your understanding that Henderson
```

```
                                        428
 1  Exhibit 15 was prepared by Pfizer's Neurontin brand
 2  team?
 3   A. It's not my understanding. It's just that
 4  the -- the way it is put together, that it is done the
 5  way we -- these types of reports are typically
 6  prepared.
 7   Q. By --
 8   A. By a brand team.
 9   Q. Yes. And since this report is done by the
10  Neurontin -- since this report is done about
11  Neurontin, to your understanding it was done by the
12  Neurontin brand team; right?
13   A. Yes, that's who would normally put a report
14  like this together.
15   Q. Why would the Neurontin brand team be looking
16  at the -- or interested in looking at the HMO
17  opportunities for Neurontin?
18      MR. MIZELL: Object to form. Outside the scope.
19   A. What -- what they typically are doing is
20  looking at -- similar to what we discussed earlier
21  today, around pull-through. They are marrying up
22  accounts that have access to Neurontin, and they are
23  trying to show that if you were to pull through
24  Neurontin, that you would be able to increase share.
25      These types of reports were generated in the
```

```
                                        429
 1  past. We realized several years ago that they were
 2  completely inaccurate and misleading, and we stopped
 3  producing these kinds of reports.
 4   Q. When did Pfizer reach their conclusion that
 5  these types of reports were completely inaccurate and
 6  misleading?
 7      MR. MIZELL: Object to form. Outside the scope.
 8   A. It actually was during the period when I was
 9  Senior Director of National Accounts. I believe it
10  was in 2003.
11   Q. Who made that decision?
12      MR. MIZELL: Same objection.
13   A. It was actually a decision made collectively.
14  And the reason -- and I will give you a -- a solid
15  illustration.
16      When you would typically add up the number of
17  lives that reports like this sometimes included, many
18  times if you took all the channels, including
19  Medicaid, the VA, DOD, they would far and away exceed
20  the population of the United States.
21      So what would happen is many times senior
22  executives in the organization were provided
23  information that caused them to make statements that
24  we have determined may not have been accurate. They
25  were accurate based on the information that those
```

44 (Pages 426 to 429)

430

1  executives received at the time; but we undertook a
2  concerted effort to ensure that these types of reports
3  were very accurate in the future.
4      Q. So are these types of reports generated by
5  Pfizer today?
6      A. Reports of this kind are generated, yes.
7  They are not typically generated -- in fact, I haven't
8  seen any report generated like this in this type of
9  format.
10     We have tried to -- we haven't tried. We
11 have built a common platform now that all of the
12 management, science and Market Analytics folks access,
13 so that all reports utilize the same database, have a
14 consistent number of lives in the report -- that was
15 another thing that we would find is that depending on
16 which vendor an individual brand team engaged, they
17 would be, during the same time period, reporting
18 different numbers of lives.
19     I actually was one of the sponsors on the
20 team that put all of the -- the reporting tools
21 together, and I have been actively involved in making
22 sure that our reports are now consistent and as
23 accurate as they possibly can be.
24     Q. Let's stay on this line entitled "Kaiser San
25 Francisco." Above that it says, "Status covered."

431

1  What does that mean?
2      A. That would refer to the formulary status. As
3  I indicated before, Kaiser has a two-tiered, closed
4  formulary in California. So a product is either on
5  formulary or off. However, all Kaiser physicians have
6  the ability to get access to any product through their
7  formulary exception process.
8      Q. So when it says, "Covered," does that mean
9  available?
10     A. That's an interchangeable term.
11     Q. And then beneath that, you were looking at
12 earlier Kaiser Washington, D.C., it says "Status
13 Restricted." What does that mean?
14     A. Kaiser Washington, D.C. is a different model
15 than the staff model HMO that exists in Kaiser
16 California. So in Kaiser California, because the
17 doctors are housed typically in Kaiser facilities,
18 many times with Kaiser formularies, Kaiser California
19 is able to use this -- this medical exception
20 prescription that a doctor writes.
21     But because in Washington, D.C. Kaiser
22 doesn't own the pharmacies, there is no mechanism for
23 having some kind of prescription for a non-formulary
24 product for a Kaiser doctor when patients get their
25 drugs filled in a retail pharmacy.

432

1      So this is indicating that there is some type
2  of restriction in Kaiser Mid Atlantic as reflected
3  in -- in a retail pharmacy.
4      Q. So prior authorization might be a
5  restriction?
6      MR. MIZELL: Object to form.
7      A. It could be. It could be a prior
8  authorization. It could be a step edit. It could be
9  a quantity limit. There are any -- there could be
10 dosage restrictions. There's any number of things
11 that could be listed there.
12     Q. Okay. Let's go back to the Kaiser San
13 Francisco line. Under the column "Upside Potential"
14 is the amount 1.5 million; right?
15     A. That's what's listed here.
16     Q. What does that mean, "upside potential"?
17     MR. MIZELL: Object to form. Outside the scope.
18     A. As they are listing it here, they are
19 saying -- that first they -- they've determined what
20 the dollar value of a one-share point increase is. So
21 with -- with the methodology that they are using here
22 and they are projecting here, they are projecting that
23 if they were to increase a certain number of market
24 share points, that they could potentially realize
25 1,547,973.

433

1      Again, the methodology I understand. I
2  absolutely question the actual data.
3      Q. Is the upside potential additional sales
4  dollars or additional profit?
5      A. I'm sorry?
6      Q. Is the upside potential of 1.5 plus million
7  dollars additional sales dollars or additional profit?
8      A. All -- All -- It's actually neither. Because
9  that number is calculated based on WACs, the wholesale
10 acquisition cost. And the wholesale acquisition cost
11 is a dollar value that is determined not by Pfizer,
12 but outside Pfizer. It's a standard industry practice
13 that's being revised. So it's not real dollars.
14     Q. Under the listing of "Competitors," it says
15 Depakote, Topamax, Keppra. Do you see that?
16     A. Yes, do, yes.
17     Q. Are those competitive products to Neurontin?
18     A. As I have seen in previous slide decks, those
19 specific products have some type of epilepsy
20 indication, and have been grouped in the AED market
21 basket, the anti epileptic drug market basket.
22     Q. Can we go back to Henderson Exhibit 8 and --
23     A. Eight.
24     Q. We'll fix this second page later. I am just
25 going to give you a copy of the second page for right

45 (Pages 430 to 433)

```
                                                    434
1   now.
2       A.  Okay.
3       Q.  Henderson Exhibit 8 is this two-page document
4   where the first page is an e-mail from you to Alan
5   Partain?
6       A.  Yes.
7           MR. MIZELL: Object to form.
8           I didn't know you were done.
9       Q.  Let's turn to the second page.  It says,
10  "Background challenge for 2003, applied to Neurontin
11  and Relpax 40 milligram."
12          Do you see that?
13      A.  I do see that, yes.
14      Q.  Beneath it says, "The following outlines the
15  following Neurontin situation.  There are ten reps in
16  my region actively selling Neurontin in Kaiser and
17  receiving no sales credit."
18          Do you see that?
19      A.  I do see that.
20      Q.  It goes on to say, "Neurontin is being
21  heavily promoted for its new indication, is on
22  formulary.  The challenge is that it's not on
23  contract."  Right?
24      A.  I see that.
25      Q.  And then beneath that in the third bullet
```

```
                                                    435
1   point it says, "Neurontin was a contracted product
2   with Kaiser until 2000 (BD contract)."
3           Do you see that?
4       A.  I do see that.
5       Q.  In preparation for this deposition, did you
6   make any effort to go obtain and review the contract
7   that's referenced here with Kaiser?
8           MR. MIZELL: Object to form.
9       A.  I did not, other than asking Joe Butera in
10  the Contracting Department if we had any records on
11  hand as to any existing Kaiser contracts -- I mean any
12  existing Neurontin contracts.  And he only made
13  reference to the Aetna contract.
14      Q.  Did you ask Mr. Butera if there were any
15  prior contracts with Kaiser on Neurontin?
16      A.  I did not.
17      Q.  Did you ask Mr. Butera if there were any
18  prior contracts Neurontin for Blue Cross-Blue Shield
19  of Louisiana?
20      A.  I did not.
21      Q.  Did you ask Mr. Butera whether there were any
22  prior contracts regarding Neurontin for Guardian Life?
23      A.  I did not, and would not, since Guardian Life
24  is not an entity that Pfizer would contract with.
25      Q.  Beneath that bullet point it says, "Kaiser
```

```
                                                    436
1   received only a two percent rebate from our
2   understanding, per Anne Marie McDonald, PD2 Western
3   Regional Manager, but Pfizer discontinued the
4   contract."
5           Do you see that?
6       A.  I do.
7       Q.  Did you have any conversations with anyone
8   about communications regarding -- communications
9   between Pfizer and Kaiser regarding the
10  discontinuation of this Neurontin rebate contract to
11  prepare for this deposition?
12      A.  No, I did not.
13      Q.  Do you know if there were any communications
14  between Pfizer and Kaiser regarding the
15  discontinuation of the Neurontin contract?
16      A.  Other than the fact that the contract
17  expired, and -- and they would know that it expired
18  because they would no longer be getting the price, no,
19  I know of no other communication.
20      Q.  This doesn't actually say the contract
21  expired.  It says that Pfizer discontinued the
22  contract; right?
23      A.  Well, yes.  But again, this is where -- this
24  e-mail is being generated by a Sales Regional Manager
25  who has not been trained in contracting, who is using
```

```
                                                    437
1   terms that he is not completely aware of exactly what
2   he is saying.
3           Kaiser doesn't do rebate contracts.  So the
4   mere fact that he has said that leads anybody --
5   allows anybody that knows anything about Kaiser that
6   this individual is just basing this message on
7   hearsay.
8       Q.  Well, do you know whether there was a
9   contract that Pfizer discontinued in 2000?
10          MR. MIZELL: Object to form.
11      A.  There was a purchasing agreement.  Purchasing
12  agreements typically are one year in duration, and
13  they are typically annual, and they have the ability
14  at the end of any given year to be discontinued.
15      Q.  Have you seen the purchasing agreement
16  between Kaiser and Parke-Davis?
17      A.  I have not.
18      Q.  Have you talked to anyone about what the
19  terms were of that purchasing agreement --
20          MR. MIZELL: Object to form.
21      Q.  -- between Kaiser and Parke-Davis?
22          MR. MIZELL: Object to form.
23      A.  A number of people when I was responsible for
24  National Accounts, during this entire period of this
25  two percent discussion, made me aware that there was a
```

46 (Pages 434 to 437)

438

1 purchasing agreement between Kaiser and Parke-Davis.
2 They told me that it was a two-percent agreement,
3 without going into the specific terms. I never,
4 however, saw the contract.
5     Q. Okay. So Mr. Partain is correct in his
6 statement that Kaiser received a two-percent rebate,
7 based on the information that you were told; right?
8         MR. MIZELL: Objection. Object to form.
9     A. Based on the information that I was told.
10 However, I would also point out that all of the
11 individuals that were telling me that this agreement
12 existed were individuals that would not necessarily
13 have direct knowledge of the purchasing agreement.
14 They would not necessarily have seen it.
15     Q. Do you know whether the people who talked to
16 you saw the purchasing agreement?
17     A. Again, I do not know that they saw it.
18 However, based on their positions, they would not be
19 in a position to see it.
20     Q. In a purchasing agreement a contract, as far
21 as you understand?
22     A. A purchasing agreement is very different in
23 Pfizer terminology of how we put together a -- a
24 contract, a performance and access contract. It is
25 just what it says it is. It's a purchasing agreement.

439

1 It's an agreement between Kaiser and Pfizer on
2 purchasing product.
3     Q. So when you use the word "contract," to you
4 it means that there is a performance or a market share
5 piece that's part of the agreement between Pfizer and
6 a third-party payer; right?
7         MR. MIZELL: Object to form.
8     A. When -- when I use the term "contract," there
9 are many, many different things that are different
10 between a contract and a purchasing agreement. A
11 purchasing agreement is an agreement between the two
12 entities to purchase a certain product at a given net
13 price, which means that that net price is front loaded
14 into a system. And contracts typically revolve around
15 rebates.
16     Q. This looks like it was a -- this Parke-Davis
17 contract had a rebate; right?
18     A. Again, the person writing this message is not
19 trained in contracting and is using the wrong
20 terminology.
21     Q. Okay.
22     A. It would have --
23     Q. Let's go on to the next one. The next star,
24 it says, "By discontinuing the contract, Kaiser was
25 upset with Pfizer."

440

1     Do you see that?
2     A. Yeah, I do see that.
3     Q. Is this the first time that you had heard
4 that Kaiser was upset with Pfizer for discontinuing
5 the contract?
6         MR. MIZELL: Object to form.
7     A. Kaiser continually is upset with Pfizer over
8 a myriad of issues revolving around purchase
9 agreements. And whether we continue with them,
10 whether we don't. So this is -- this is not something
11 that's isolated to this particular situation.
12     Q. Prior to receiving this e-mail from Mr.
13 Partain, had you ever heard that Kaiser was upset with
14 Pfizer for discontinuing the two-percent rebate on
15 Neurontin?
16     A. I had not heard that specifically, no.
17     Q. Mr. Partain goes on the next bullet point to
18 say, "Recently there has been word from the pharmacy
19 to cut back the overuse of Neurontin."
20     Do you see that?
21     A. I see that he says that, yes.
22     Q. Had you heard that before?
23     A. I had not.
24     Q. Did you hear that after you received this
25 e-mail from Mr. Partain again?

441

1     A. No, the only time I heard it was when I read
2 it in his e-mail. And it's so rife with inaccuracies,
3 it's difficult to determine what in here is Alan
4 Partain pontificating and making assumptions, and
5 what's accurate.
6     Q. Is Mr. Partain still at Pfizer?
7     A. No, he is not.
8     Q. Where is he at now?
9     A. I don't know.
10     Q. Is he fired?
11     A. He was terminated from the company.
12     Q. When did that occur?
13     A. -- it was either late 2005 or early 2006.
14     Q. Were you involved in the decision to
15 terminate him?
16     A. I was not.
17     Q. Do you know who was?
18     A. Yes.
19     Q. Who?
20     A. It would have been Tim George and Carl
21 Wilbanks.
22     Q. Do you have an understanding of why he was
23 terminated?
24     A. Just anecdotally.
25     Q. What do you know anecdotally?

47 (Pages 438 to 441)

442

1  A. That it was around his behavior, and
2  harassment, sexual harassment is what I was told.
3  Q. Mr. Partain goes on to say, "There is a high
4  volume of Neurontin currently written within Kaiser.
5  In 1999, Neurontin exceeded 14 million dollars;"
6  right?
7  A. He says that. Again, I have no way of
8  knowing how accurate it is, and I have no way of
9  knowing where he even got this information.
10 Q. Okay. Let's go back to the very top. The
11 very top bullet point of this page says that there are
12 ten reps in my region actively selling Neurontin in
13 Kaiser. Do you think that statement is correct?
14 A. I have no way of knowing. I would be
15 shocked, since they are receiving no sales credit, why
16 any representative would be selling a product, since
17 they are compensated and incentivized on sales credit.
18 So it doesn't make any sense to me at all.
19    Additionally, since Kaiser Mid Atlantic isn't
20 that big, the fact that he is stating there's ten
21 representatives calling on these customers is quite
22 surprising. I would venture to say that it -- you
23 would have more like two or three territories that
24 would cover Kaiser Mid Atlantic.
25    But -- but I don't know for sure. I don't

443

1  know how he had his representatives deployed.
2  Q. So do you think he is lying when he said
3  "There are ten reps in my region actively selling
4  Neurontin in Kaiser"?
5     MR. MIZELL: Object to form.
6  A. Whether he is lying or pontificating or
7  exaggerating, I don't know. It would sound to me like
8  if you were responsible for the sales of Pfizer's
9  products, that you would not take your precious
10 selling asset, your sales representatives, and deploy
11 them selling in a place where they can't get sales
12 credit.
13 Q. But Neurontin was a Pfizer product; right? In
14 2003?
15 A. Neurontin was a Pfizer product; but as I've
16 explained, Kaiser data is not available. So it's not
17 included in any kind of sales quotas. It -- there --
18 as far as Pfizer representatives are concerned, it
19 doesn't exist, because they're not getting any kind of
20 sales credit for it.
21 Q. So do Pfizer sales representatives only
22 promote the Pfizer products that they get sales credit
23 for?
24    MR. MIZELL: Object to form.
25 A. Yes.

444

1  Q. How do you know that?
2  A. Because that's how they're incentivized and
3  compensated. There's -- the -- the products they're
4  trained on are the products that they get sales credit
5  for.
6  Q. Do you know whether Mr. Partain's sales
7  representatives were trained on Neurontin?
8  A. It is a matter of standard practice that once
9  a representative is hired, that they go through our
10 sales training program. So my -- we don't allow
11 people to -- to promote our products unless they are
12 trained. And it's a very comprehensive sales training
13 program that takes many months to complete.
14 Q. So my question is: Do you know whether Mr.
15 Partain's representatives were trained to sell
16 Neurontin?
17 A. And I would have to respond that in order for
18 his representatives to sell and promote Neurontin,
19 they would have to have been trained.
20 Q. Do you believe that his sales representatives
21 were selling and promoting Neurontin?
22 A. Do I belive -- yeah, I mean his sales
23 division was responsible for promoting and selling
24 Neurontin, so, yes.
25 Q. Do you believe that Mr. Partain is accurate

445

1  where he says that "Neurontin is being heavily
2  promoted for its new indication"?
3  A. Again, based on this message and the
4  inaccuracies that are contained in it, it's difficult
5  do say what's accurate and what's not.
6  Q. So that's why I'm going back through this.
7     Do you believe that Mr. Partain is accurate
8  when he says that "Neurontin is being heavily promoted
9  for its new indication"?
10    MR. MIZELL: Object to form.
11 A. I have no way of knowing that or validating
12 it.
13 Q. So you don't know as you sit here whether
14 it's true or not true; right?
15    MR. MIZELL: Object to form.
16 A. That -- that's correct. I know for a fact
17 that it's being promoted for approved indications, so
18 one would make the assumption that Neurontin is being
19 promoted for its indications, and that would include
20 its new indications.
21    "Heavily" or not is the word that -- that I
22 have a challenge with; because, again, I don't know
23 what that means, and I don't know why you would have
24 sales representatives promoting a product when they're
25 not getting sales credit.

48 (Pages 442 to 445)

**Page 446**

1  Q. How do you know for a fact that Neurontin was
2  being approved for -- excuse me. How do you know for
3  a fact that Neurontin was being promoted for approved
4  indications?
5  A. Pfizer policy is that sales representatives
6  only sell Pfizer products for promoted -- for approved
7  indications, utilizing Regulatory-approved promotional
8  pieces.
9      MS. DALEY: Let's take a tape break.
10     THE VIDEOGRAPHER: The time is approximate the
11 4:02. This ends Tape Number 4. We are now going
12 off the record.
13     (A recess is taken.)
14
15 CONTINUED DIRECT EXAMINATION BY MS. DALEY:
16     (Document entitled Agenda For Support of
17 NHO Initiatives For Neurontin, Tuesday,
18 April 1st, 2003 marked Henderson-17 for
19 identification.)
20     THE VIDEOGRAPHER: The time is approximately
21 4:19. This is the beginning of Tape Number 5. We
22 are now on the record.
23  Q. Mr. Henderson, I hand you what we have marked
24 as Henderson Exhibit 17. Do you have that before
25 you?

**Page 447**

1  A. I do.
2  Q. This is a document entitled "Agenda, OR
3  Support of NHO Initiatives For Neurontin, Tuesday,
4  April 1st, 2003, 12 to 1:00 p.m.;" right?
5  A. Yes.
6  Q. Do you want to take an opportunity to look at
7  it?
8  A. Yes, please.
9      Okay.
10 Q. This is an "Agenda, OR Support of NHO
11 Initiatives For Neurontin;" right?
12 A. Yes.
13 Q. What does "OR" stand for?
14 A. Outcomes Research.
15 Q. And NHO is?
16 A. National Healthcare Operations.
17 Q. The list of the attendees is Craig Glover,
18 Tim Highland, Steve Zempa, Bruce Parsons, Ellen Dukes
19 and Alicia Sidowski; right?
20 A. That's what's listed here, yes.
21 Q. Are any of these individuals or were any of
22 these individuals in April, 2003 part of the
23 Healthcare Cluster?
24 A. Steve Zempa was a Clinical Education
25 Consultant Team Manager, but he was not part of

**Page 448**

1  National Healthcare Operations. They're -- they
2  are -- they are all advanced degree pharmacists, and
3  fell somewhat under the designation of Medical. They
4  were a completely stand-alone group.
5  Q. So were any of these individuals part of the
6  Healthcare Cluster?
7  A. Yeah, Steve Zempa, the CEC Team Manager,
8  Clinical Education Consultant, was part of the
9  Healthcare Cluster.
10 Q. Is Outcomes Research part of the Healthcare
11 Cluster?
12 A. No.
13 Q. What group is that part of?
14 A. It falls under Outcomes Research.
15 Q. And is that part of the U.S. Sales group?
16 A. No. Back -- it is completely separate. It's
17 part of Medical.
18 Q. The first bullet point in this agenda --
19 agenda is "Discuss NHO pushback issues, that is
20 resistance." Correct?
21 A. Yes, that's what it says.
22 Q. What is -- what are NHO pushback issues?
23     MR. MIZELL: Object to form.
24 A. I have no idea. Just what they're saying
25 here, resistance.

**Page 449**

1  Q. And under the first bullet point it says,
2  "During meeting with Bill McCarver at APS, Dave Murphy
3  mentioned NHOs getting some push back with Neurontin."
4      Do you see that?
5  A. I see. I see that.
6  Q. Who would fall in the categories of NHOs?
7  A. Well, again, this is where -- because NHOs,
8  and this is where there are inaccuracies in this
9  message, because there are no such thing as NHOs. NHO
10 is an organization.
11 Q. Would NHOs perhaps refer to employees in the
12 NHO Group?
13     MR. MIZELL: Object to form.
14 A. Possibly that's what they could be saying.
15 Q. Who is Dave Murphy?
16 A. Dave Murphy was an Account Manager at one
17 time. He was also a District Manager. I'm not sure
18 what else he's done.
19 Q. An Account Manager in the Healthcare Cluster?
20 A. Yes.
21 Q. Do you know whose account he was in charge
22 of?
23 A. As I recall it was -- it was one of the Gulf
24 Coast states or somewhere in the panhandle of Florida,
25 somewhere down there.

Page 450

1   Q. He was an account manager down there?
2   A. As I recall, yes. Which...
3   Q. Did you check with Dave Murphy to find out
4   what he was told regarding Neurontin in preparation
5   for this deposition?
6   A. I did not. I don't even know if Dave Murphy
7   is still with the company. I don't believe he is.
8   Q. Who is Bill McCarver at APS?
9   A. I have no idea.
10  Q. This agenda goes on to say, "Apparently the
11  NHOs are worried about the money spent on Neurontin
12  for primarily off-label use."
13      Do you see that?
14  A. I do see it.
15  Q. And then it goes on to say, "Seeing Neurontin
16  as a drug being used outside of its label." Right?
17  A. That's what this says, yes.
18  Q. Under Item Number C it says, "Group Health in
19  Seattle, Kaiser Permanente and the Massachusetts VA
20  are all threatening action."
21      Do you see that?
22  A. I see that.
23  Q. Did you talk to anyone to find out what
24  action was being threatened by Kaiser Permanente
25  regarding Neurontin in preparation for this

Page 451

1   deposition?
2       MR. MIZELL: Object to form.
3   A. I did not; and quite frankly, in reading
4   this, I'm not sure where this information would have
5   even come from, since the Account Managers in NHO were
6   not promoting Neurontin.
7   Q. And you know that because the policy was that
8   no one was to be talking about Neurontin to third-
9   party payers; right?
10  A. That's correct.
11  Q. So in preparation for this deposition, you
12  didn't check on whether Kaiser Permanente had
13  communicated with anyone at Pfizer about Neurontin as
14  a drug being used outside of its label; right?
15      MR. MIZELL: Object to form.
16  A. No, that's actually not correct. I checked
17  with Kirk Bachman, Curtis Reese and John Dauser to
18  talk about Neurontin and whether it was being promoted
19  in Kaiser or not; whether it was being discussed or
20  not. And determined that they were not promoting or
21  discussing Neurontin with -- with Kaiser.
22  Q. "They" being Mr. Bachman and Mr. Dauser and
23  Mr. --
24  A. Reese, and their teams. The Pfizer Kaiser
25  sales representatives.

Page 452

1   Q. We have to go back to Mr. Partain's memo,
2   which is Henderson Exhibit 8. The ten reps that he
3   referred to in his region that were actively selling
4   Neurontin in Kaiser, would that be part of the
5   Dauser/Reese, Kaiser Pfizer sales force?
6   A. No. In Southern California, because they're
7   a group model HMO, and that's where 90 percent of
8   Kaiser's lives are located, we have dedicated Kaiser
9   sales representatives.
10      In the Mid Atlantic, where Kaiser is located,
11  and that's where Mr. Partain is referencing this,
12  Kaiser has medical groups where their doctors practice
13  medicine. They don't have the same group model
14  facilities. So Mr. Partain's representatives are
15  calling on Kaiser doctors -- or at least he's -- he's
16  saying here that they are. There's no way of
17  validating that they actually were. But he is saying
18  that they are calling on the Kaiser doctors that
19  practice medicine in the Mid Atlantic Kaiser. They
20  don't call on "the account."
21  Q. Does the Pfizer Kaiser sales force call on
22  the account?
23  A. No, they do not. As we define the account as
24  -- again, they are calling on doctors. When I say
25  "the account," I'm referring to the contract

Page 453

1   negotiators, the Pharmacy -- Medical Director, the
2   Pharmacy Director, Quality Director. It could be
3   C-Suite level individuals.
4   Q. Let's go onto the second bullet point. It
5   says, "OR support for Neurontin limited to PHN;" do
6   you see that?
7   A. I do.
8   Q. And, again, "OR" there stands for Outcomes
9   Research?
10  A. That's correct.
11  Q. Under 8 it says "Change in use of opioids"?
12  A. Opioids, yes.
13  Q. "Among patients with PHN beginning treatment
14  with gabapentin;" right?
15  A. Yes.
16  Q. Then. A says, "Can paper be published in US?
17  Answer: Yes." Right?
18  A. Yes, that's what it says.
19  Q. And it says, "B, cannot be sales piece.
20  Bruce does not see as promotional material for RC."
21      Who is RC?
22  A. RC stands for Regulatory Committee.
23  Q. Then let's drop down to Number Roman Numeral
24  III: "Potential for study with Kaiser Permanente.
25  Bill McCarver."

50 (Pages 450 to 453)