454

1  Do you see that?
2  A. Yes, I see that name.
3  Q. And the bullet under that says, "Ellen to get
4  independent medical grant going for McCarver."
5  Do you know whether Mr. McCarver is a doctor
6  with Kaiser?
7  A. I do not know whether Mr. McCarver a -- is a
8  doctor.
9  Q. Does Pfizer provide independent medical
10 grants to non-doctors?
11     MR. MIZELL: Object to form. Outside the
12 scope.
13 A. So in the context of this memorandum, all of
14 the attendees here are part of Outcomes Research in
15 Medical. They are the arm responsible for doing
16 research for Pfizer.
17     In this case, Outcomes Research is -- is what
18 it is to determine outcomes. Kaiser actually does a
19 lot of clinical research through our clinical trials
20 drug program. So products that are in Phase 2 and 3
21 getting ready to come to market, additionally they do
22 outcomes research.
23     The people within any given organization that
24 conduct research are not necessarily physicians. They
25 could be PharmDs, PhDs, various disciplines.

455

1  Q. Beneath that it says under Discussion
2  Comments, Roman Numeral One, or not Roman Numeral one,
3  excuse me. Beneath that, under Discussion Comments
4  the first item says, "No slide kit, because it's
5  promotional." Right?
6  A. Yes.
7  Q. I'm going to go back to Henderson Exhibit
8  Number 8. This is Mr. Partain's memo. He says in
9  this memo in the second page that "There are ten reps
10 in his region actively selling Neurontin in Kaiser."
11     Do you have the names of those
12 representatives selling Neurontin in Kaiser?
13     MR. MIZELL: Outside the scope.
14 A. I do not have the names of Mr. Partain's
15 representatives, nor do I know that they were actively
16 selling Neurontin in Kaiser.
17 Q. Would -- if a representative was selling
18 Neurontin in Kaiser, would that representative be
19 communicating with Kaiser about Neurontin?
20     MR. MIZELL: Object to form. Outside the scope.
21 A. Again, I think it is very important to
22 understand communicating to Kaiser, which is a
23 third-party payer account, and communicating with
24 Kaiser physicians.
25     What these representatives would be doing, if

456

1  they were indeed calling on Kaiser doctors, they would
2  be calling on Kaiser doctors, in the same way that
3  sales representatives call on doctors throughout the
4  United States.
5  Q. So you are saying that if a representative
6  from Pfizer is calling on a Kaiser doctor, that that's
7  not a third-party payer communication?
8  A. That is correct.
9  Q. Do you know what the types and categories of
10 communications are that these representatives had
11 regarding Neurontin in Kaiser?
12     MR. MIZELL: Object to form. Outside the
13 scope of the designation.
14 A. Again, I don't know that these
15 representatives were calling on Kaiser; and because
16 they were receiving no sales credit, logic would
17 dictate there is no reason for them to call on Kaiser
18 doctors.
19 Q. Do you know the -- whether there are any
20 databases that may exist that would contain the
21 contents of any communications that these sales
22 representatives had when they were selling Neurontin
23 in Kaiser?
24     MR. MIZELL: Object to form. And outside the
25 scope.

457

1  A. The -- The only database we typically
2  maintain for representatives that I'm aware of
3  resolves around starters. And so when a
4  representative leaves starters with a physician, just
5  because of our obligations and requirements by the
6  FDA, those -- those types of things are tracked and
7  logged.
8  Q. And where are they tracked and logged in?
9     MR. MIZELL: Object to form. Outside the
10 scope.
11 A. Again, I -- since I am not part of that
12 group, I -- I -- I believe it's part of the Sherlock
13 system, but I can't say for sure.
14 Q. And are you prepared to answer questions
15 about the types of documents created or maintained at
16 the Warner-Lambert Healthcare Management Unit?
17 A. Just as it relates to the -- to the
18 preparation that I did prior to this -- this
19 deposition.
20 Q. Reviewing the three deposition transcripts?
21 A. Correct.
22 Q. That's all you know about the types of
23 documents created or maintained at the Warner-Lambert
24 Healthcare Management Unit?
25 A. That is correct.

51 (Pages 454 to 457)

Page 458

1   Q. And have you told us everything you have done
2   regarding your preparation to answer questions about
3   Pfizer's due diligence related to alleged off-label
4   marketing with respect to Neurontin during the
5   acquisition by Pfizer of Warner-Lambert and its
6   Parke-Davis Division?
7   A. Yes.
8   Q. And that's strictly related to the discussion
9   you had with Mr. Butera regarding the contract issues;
10  right?
11      MR. MIZELL: Object to form.
12  A. Please rephrase the question. I'm not sure
13  exactly what you are asking.
14  Q. Your preparation to answer questions about
15  Pfizer's due diligence related to alleged off-label
16  marketing with respect to Neurontin during the
17  acquisition by Pfizer of Warner-Lambert and its
18  Parke-Davis Division is strictly limited to the
19  conversations you had with Mr. Butera about
20  contracting?
21      MR. MIZELL: Object to form.
22  A. About contracting, yes. It is strictly
23  limited to my conversations with Mr. Butera and Mr.
24  McEnroe.
25      MS. DALEY: Give us a couple of minutes, a

Page 459

1   couple of minutes here so I can see how much I
2   have left.
3       THE VIDEOGRAPHER: The time is approximately
4   4:39. We are now going off the record.
5       (A recess is taken.)
6
7   CONTINUED DIRECT EXAMINATION BY MS. DALEY:
8       THE VIDEOGRAPHER: The time is approximately
9   4:40. We are now back on the record.
10  Q. I have a few additional questions, Mr.
11  Henderson.
12      Do you know anything about Pfizer's due
13  diligence related to the alleged off-label marketing
14  with respect to Neurontin during the acquisition by
15  Pfizer of Warner-Lambert and its Park Division --
16  Parke-Davis Division, other than the contracting issue
17  that Mr. Butera told you about?
18      MR. MIZELL: Object. Object to form.
19  A. Nothing else other than what I've previously
20  described.
21  Q. With respect to the exhibits that have been
22  marked, other than Henderson Exhibit 4, which is the
23  chart that you did, and Exhibits 1 and 2, which are
24  the deposition notice and the court order, are the
25  other documents which have been marked as exhibits

Page 460

1   documents that were maintained by Pfizer?
2       MR. MIZELL: Object to the form. Outside of
3   scope.
4   A. I'm not sure I understand the question.
5   Q. Are they Pfizer documents? All the
6   deposition exhibits, other than -- well, let me re-ask
7   the question.
8       It will be deposition Exhibits 3 and 5
9   through 17.
10      MR. MIZELL: You should look at them one at a
11  time in your answer.
12  A. So Exhibit 3 --
13  Q. Let me make sure you know the question. The
14  question is: Are these documents that were maintained
15  by Pfizer?
16  A. Maintained by Pfizer?
17  Q. Right. Kept by Pfizer?
18  A. Exhibit 3 --
19      MR. MIZELL: Object to form.
20  A. I mean --
21      MR. MIZELL: And outside the scope.
22      Go ahead.
23  A. I really don't know whether they were
24  maintained by Pfizer or not. Your definition of
25  Pfizer is Pfizer employees, former Pfizer employees?

Page 461

1   I don't understand the question.
2   Q. Okay. The definition of Pfizer is anyone
3   who's ever worked for Pfizer; okay?
4   A. Okay.
5   Q. Including Warner-Lambert employees.
6   A. Okay.
7   Q. So -- because you are the designee for Pfizer
8   and Warner-Lambert here today?
9       MR. MIZELL: But not with respect to document
10  retention issues.
11      MS. DALEY: So you are telling me that I have
12  to ask the business records questions of the
13  document retention person?
14      Because if that's what you are telling me,
15  I'll wait and ask all those questions at that
16  time.
17      MR. MIZELL: There is a pending 30(b)(6) notice
18  for a document retention witness, and my
19  understanding is that that deposition has yet to
20  take place.
21      MS. DALEY: So I should ask all these business
22  record questions of that person?
23      MR. MIZELL: You can ask your questions
24  however you want to, but he is not designated to
25  testifying as to Pfizer's document retention

462

1  policies or document production issues.
2      MS. DALEY: If your representation to me is
3  that I should reserve all these questions and ask
4  that designee, then that's what I'll do. I just
5  don't want someone to say I waived my chance to do
6  it with this deponent.
7      MR. MIZELL: Well, you would waive your chance
8  with this deponent, but he is not here to testify
9  as to those issues. And there is a pending
10 30(b)(6) notice for a document retention,
11 production. Those questions are probably better
12 posed there.
13     MS. DALEY: Then I will do it at that time.
14     MR. MIZELL: Okay.
15     MS. DALEY: I have no further questions at this
16 time.
17     MR. MIZELL: We can go off the record for a few
18 minutes.
19     THE VIDEOGRAPHER: The time is approximately
20 4:43. We are going off the record.
21     (A recess is taken.)
22     (Plaintiffs' Notice of Deposition marked
23 Henderson-18 for identification.)
24     THE VIDEOGRAPHER: The time is approximately
25 4:51. We are now back on the record.

463

1      MS. DALEY: In order to be clear, I think I
2  mentioned this several times during this
3  deposition, the plaintiffs reserve their right, in
4  addition to asking any questions after you do your
5  examination, Mr. Mizell, but to make a
6  determination as to whether they will seek a court
7  order regarding the preparedness of this witness
8  for these -- for this deposition, and other issues
9  which have been identified in the deposition.
10     MR. MIZELL: Okay. I understand.
11
12 CROSS EXAMINATION BY MR. MIZELL:
13     Q. Okay. Mr. Henderson, I'm putting in front of
14 you Deposition Exhibit 1, and I'm also handing you
15 Exhibit 18. And just to clarify --
16     MS. DALEY: Can you just identify for the
17 record what Exhibit 18 is.
18     MR. MIZELL: Yes, sure. For the record,
19 Exhibit 18 is the plaintiffs' notice of deposition
20 dated June 11, 2007.
21     It is, if you will agree with this
22 characterization, it is plaintiffs' notice of
23 deposition regarding third-party payer
24 communication issues that was dated June 11, 2007.
25     MS. DALEY: And there were other items. But I

464

1  understand what you are saying, yes.
2      MR. MIZELL: Right. Okay.
3      Q. And you had testified yesterday that you had
4  seen Deposition Exhibit 1 when preparing for this
5  deposition; and we can represent that, in fact, that
6  meeting took place the morning of December 4th, right,
7  when you saw that exhibit, Exhibit 1, the deposition
8  notice?
9      A. That's correct.
10     Q. Okay. And so the exhibit -- the notice you
11 actually saw is Deposition Exhibit 18, which was the
12 June, 2007 notice; correct?
13     A. That's correct.
14     Q. Okay. And I think that disposes of that
15 issue. I just wanted to clear that up for the
16 record.
17     Would you please put Exhibit 5, would you
18 please pull that out and put that in front of you.
19     A. Okay.
20     Q. And would you please remind the jury what
21 Exhibit 5 is.
22     A. Exhibit 5 is a -- is two memorandums, one
23 memorandum from Karen Katen Executive Vice President
24 of Pfizer Pharmaceutical Group, to three of her direct
25 reports: Joe Fesco from Medical and Regulatory, Pat

465

1  Kelly from Worldwide Marketing and Frank McCrory from
2  Sales.
3      And then the second memorandum is a copy of
4  Pat Kelly's memorandum to the U.S. Marketing
5  personnel. And the memorandum is titled "Neurontin,"
6  in parentheses, "gabapentin."
7      Q. And that's true for both memoranda?
8      A. That's correct.
9      Q. And what do these two memoranda discuss?
10     A. Both memoranda talk about -- they give some
11 background on Neurontin, and then they basically
12 outline what Pfizer -- what Pfizer is going to -- what
13 policies Pfizer is going to follow when engaging in
14 sales and marketing activity for Neurontin.
15     So you have the guidance to the U.S.
16 Marketing team, the U.S. Sales force, as well as U.S.
17 Medical.
18     Q. And the -- the second memorandum, the
19 November 10, 2000 memorandum from Karen, is it Katen?
20     A. Karen Katen.
21     Q. Karen Katen, all references in your testimony
22 to the Karen Katen memo were to this memo?
23     A. That's correct.
24     Q. And were the contents of this two memoranda
25 communicated to you prior to 2002?

466

1  A. The contents --
2      MS. DALEY: Objection, leading.
3  A. The contents were definitely communicated to
4  me as they applied to me.
5  Q. And were the contents of these memoranda in
6  turn -- and did you in turn communicate the contents
7  of these memoranda to your reports prior to 2002?
8      MS. DALEY: Objection, leading.
9  A. Yes, I did.
10 Q. Can I please direct your attention to
11 Henderson Exhibit 8.
12 A. Okay.
13 Q. And is this the exhibit to which your
14 testimony in respect to the Alan Partain e-mail
15 concerns?
16 A. Yes, when I'm talking about the Alan Partain
17 e-mails, it's referring to Henderson Exhibit 8.
18 Q. And would you please remind the jury what
19 this e-mail thread is about?
20 A. The e-mail originated from Alan Partain to my
21 boss, Claire Kennedy, who was the Vice President of
22 National Accounts, in which he was proposing a -- a
23 Kaiser contract. And when he e-mailed it to Claire
24 Kennedy, she directed that the e-mail be sent to me,
25 because I was the Senior Director of National Account

467

1  HMOs, and I was responsible for Kaiser.
2      She copied me on her response -- I'm sorry --
3  she actually addressed it to both me and Alan Partain;
4  and I responded to Alan Partain, notifying him that
5  Pfizer does not contract for Neurontin.
6  Q. Actually to follow up, would you please read
7  for the jury your response to Alan.
8  A. "Alan, hopefully our conference call on
9  Friday addressed your questions about a possible
10 Neurontin contract with Kaiser. I think it is
11 important to note, Alan, that Pfizer does not contract
12 with customers specifically for data. Our Contracting
13 Department receives data as part of our contracts and
14 as a method of validating a customer's claim for
15 rebates, but our contracting strategy is to contract
16 for performance and access.
17     "In the case of Neurontin, we do not contract
18 this product with any customers. As far as Relpax, my
19 team is beginning the contract process with Kaiser and
20 we will keep you updated as to our progress. If you
21 have any questions, feel free to call me."
22 Q. And why did you provide the information in
23 the first paragraph to Alan in your response?
24 A. Primarily because throughout the -- the
25 second page of Alan Partain's e-mail message, he

468

1  specifically is requesting to contract so that we can
2  get some kind of sales data from Kaiser, because his
3  sales representatives are not getting sales credit.
4      Then further to tell him two things. One:
5  Pfizer does not contract to get sales credit data; and
6  Two: We don't contract for Neurontin and we did not
7  contract with them for Neurontin.
8  Q. And to clarify in the second page of the
9  exhibit which includes the body of the e-mail from
10 Alan Partain to Claire Kennedy, to the extent he's
11 referencing contacts with Kaiser, he's speaking to
12 contacts with physicians, and not Kaiser as a managed
13 care entity. Is that correct?
14     MS. DALEY: Objection. Leading. Lack of
15 foundation.
16 A. That's correct. The only way he would have
17 any information, or any of his sales colleagues would
18 have any information about Kaiser, would be through
19 representative promotional detailing to physicians.
20 Representatives, sales representatives don't call on
21 the account, as Pfizer defines the account as the
22 Contracting Department, the Medical Director, Pharmacy
23 Director, folks in the C suite, such as the CEO, COO.
24     So that's the only place that he could
25 possibly have obtained this information. And just

469

1  from the general inaccuracies in this message, it's
2  difficult to say whether this was anecdotal, whether
3  this was something he was speculating or not.
4  Q. Just to clarify, there is a distinction
5  between Kaiser as a managed care organization and then
6  references to Kaiser physicians; correct?
7  A. Absolutely.
8  Q. Okay. Could you please explain that
9  distinction.
10 A. So -- and maybe -- I'll do Kaiser, but maybe
11 it's better to explain it with another account.
12     For example, Aetna contracts with physicians
13 all over the country. They are part of the physician
14 network. So when a representative is calling on a
15 physician that happens to contract with Aetna, they
16 are not calling on Aetna, they are not calling on
17 Aetna as a third-party payer. They are calling on a
18 physician that actually is treating a patient and has
19 Aetna Insurance.
20     It's the same exact thing with Kaiser. When
21 you are calling on a Kaiser doctor, a sales
22 representative, they are calling on a doctor that
23 happens to take Kaiser -- or happens to treat patients
24 that have Kaiser as their insurer.
25     But calling on Kaiser, the account, is the

54 (Pages 466 to 469)

470

1  responsibility -- or was the responsibility of my
2  organization.
3           MS. DALEY: Objection to the extent that the
4     answer is non-responsive to the question.
5     Q. And Alan Partain was not in your
6  organization?
7     A. Alan Partain was a Regional Sales Manager and
8  was not part of my organization.
9     Q. Can I please direct your attention to Exhibit
10 13.
11    A. Yes.
12    Q. And could you please remind us what Exhibit
13 13 is.
14    A. Exhibit 13 originated from Tina Grogan, who
15 was on the Neurontin brand team, in which she is -- is
16 sending a list of names that are on -- it appears on a
17 series of spreadsheets. And the e-mail is going out
18 to Chris Chapman, Claire Kennedy, Jon Kaskie. I'm not
19 sure who Doug is.
20          And she's basically telling them about an HMO
21 advisory board that's going to take place in New York
22 City.
23    Q. Okay. And do you recall answering questions
24 from plaintiffs' counsel on the second page of this
25 exhibit and the discussion that followed the -- I

471

1  guess the top half of the second page of this exhibit?
2  Following the "Hi, Chris, Claire, John and Doug"
3  passage?
4     A. Yes, I do.
5     Q. Okay. Could you please read the second
6  sentence.
7     A. "Suzanne has collected --
8     Q. I'm sorry. Not the second paragraph. The
9  second sentence.
10    A. Oh. "It will be the last one conducted prior
11 to the launch of neuropathic pain for Neurontin."
12    Q. And --
13    A. Actually it says, "N-E-P." I'm assuming
14 based on conversations we've had during this
15 deposition that that references to neuropathic pain.
16    Q. So this communication is written with the
17 understanding that there is an anticipated or
18 impending launch of neuropathic pain for Neurontin.
19 Is that correct?
20          MS. DALEY: Objection. Leading. Lack of
21    foundation.
22    A. Yes, that is correct.
23    Q. Could I please direct your attention to
24 Exhibit 11.
25    A. Yes.

472

1     Q. And are you familiar with this document?
2     A. I am, yes.
3     Q. Do you see the third paragraph in the body of
4  the message that begins with "These programs"?
5     A. Yes, I do.
6     Q. Could you please read that sentence for us.
7     A. Yes.
8           "These programs will include presentations
9  and workshops to obtain advisors' feedback and advice
10 regarding the treatment of patients with neuropathic
11 pain."
12    Q. Okay. And to what programs does this refer?
13          MS. DALEY: Objection. Lack of foundation.
14    A. When it says "Programs," just in the context
15 of this e-mail message, it's referring to the advisory
16 boards that are being conducted.
17    Q. And is that the same advisory boards that
18 we've discussed today that were -- that were
19 summarized in Exhibits 10, 12, 14 and 16?
20    A. That's correct.
21    Q. Okay. And is it consistent with your
22 understanding that the purpose of these programs is to
23 obtain advisors' feedback and advice?
24          MS. DALEY: Objection. Leading, lack of
25    foundation.

473

1     A. Yes, absolutely, that's the intent of the
2  advisory boards.
3     Q. Could you please explain why that's important
4  for Pfizer to the jury?
5           MS. DALEY: Objection. Lack of foundation.
6     A. Because as a standard matter of practice
7  before Pfizer launches a product or before we are
8  introducing a new indication to the marketplace, we --
9  we conduct advisory boards to get the insights of
10 individuals that work in various positions, various
11 channels, so that they can explain to us their
12 thoughts around the -- the product, their thoughts
13 around an indication.
14          It better helps us determine how we need to
15 market and position our product.
16    Q. And could you please read the second sentence
17 of the second paragraph that begins with, "We
18 anticipate that --" I'm sorry. I think it's the
19 third, third sentence?
20    A. "We anticipate that these meetings will lead
21 to, one, a better understanding of neuropathic pain
22 management treatment by managed care customers; Two:
23 Expert feedback on disease management initiatives;
24 Three: The identification of needs for working with
25 these customers; and Four: A constructive exchange of

474

1  ideas and information."
2    Q. And is it consistent with your understanding
3  with respect to advisory boards that these are the
4  kind of information that Pfizer is seeking when it --
5  when it participates in them?
6        MS. DALEY: Objection. Leading. Lack of
7    foundation.
8    A. Very much so. An example might be as -- as
9  I've looked through the agenda of some of these
10 exhibits, and then have read -- have read some of the
11 exhibits, you have customers identifying the fact that
12 there are not tools available to adequately diagnose
13 certain -- certain symptoms and what does that mean.
14       Advisory boards like this are critical in
15 identifying where gaps like that may exist, and where
16 Pfizer could possibly assist with helping develop
17 those kinds of tools.
18   Q. And those are tools for whom to use?
19   A. Those would be tools for doctors to use to
20 diagnose, as I read them in here.
21   Q. Could I please direct your attention to
22 Exhibit 16?
23   A. Okay.
24   Q. And the second page of the exhibit?
25   A. Yes.

475

1    Q. Do you recall answering questions from
2  plaintiffs' counsel regarding this page of the
3  exhibit?
4    A. Yes, I do.
5    Q. And this -- and to put this into additional
6  context, would you please read to the jury the first
7  three bullets?
8    A. "To gain insight into HMO and PBM management
9  of neuropathic pain; to learn about issues and
10 opportunities in caring for patients with neuropathic
11 pain; to work with managed care customers to develop
12 disease management programs -- or disease management
13 and program strategy concepts."
14   Q. And plaintiffs' counsel -- plaintiffs'
15 counsel had you read the fourth bullet. Would you
16 please complete the list by reading the fifth bullet?
17   A. The fifth bullet.
18      "To allow -- "
19       MS. DALEY: Just one second, I'm going to
20   object to the prefatory comments being made by
21   Pfizer's counsel.
22   Q. You can answer.
23   A. "To allow Pfizer the opportunity to work with
24 and learn from a group of their managed care
25 customers."

476

1    Q. And these other four bullets that you have
2  just read were objectives of this advisory panel?
3        MS. DALEY: Objection. Lack of foundation,
4    leading.
5    A. Actually I believe the series of I believe
6  just two of the advisory panels, yes; because the
7  other one occurred after this.
8    Q. Okay. Is that consistent with your
9  understanding as to objectives that Pfizer has with
10 respect to advisory panels?
11       MS. DALEY: Objection. Leading. Lack of
12   foundation.
13   A. Yes, I think it's very important to recognize
14 that Pfizer is a healthcare company. We manufacture
15 pharmaceuticals.
16       The FDA has established very rigorous
17 criteria around how we promote our prescription drugs.
18 That being said, when we are getting ready to bring a
19 drug to market, or when we have submitted to the FDA
20 for an indication, we have been required to do
21 numerous clinical trials.
22       And in doing those clinical trials, it
23 teaches a lot to Pfizer about individual diseases and
24 how those diseases impact patients and impact patient
25 lives. Forums like this allow us to have a scientific

477

1  interchange, to exchange some of the information that
2  we've learned, and to assess from our managed care
3  customers and others how they might be able to use
4  some of this -- these materials in helping their
5  patients.
6        MS. DALEY: Move to strike as non-responsive.
7    Q. Can I please direct your attention to Page 8
8  of the exhibit.
9        MS. DALEY: Can you give us the last three
10   numbers.
11       MR. MIZELL: Yes, sure. The Bates is 49850.
12   A. I'm there.
13   Q. Okay. And would you please read the second
14 bullet for the jury?
15   A. "Neurontin will not be re-reviewed when it
16 receives its NP indication."
17       Sub bullets are Neurontin is --
18   Q. No, I just need the second bullet.
19   A. Okay.
20   Q. And is it consistent with your understanding
21 that this conveys that this document was prepared with
22 the thought that a neuropathic pain indication was
23 pending or to be applied for for Neurontin?
24       MS. DALEY: Objection. Leading. Lack of
25   foundation.

56 (Pages 474 to 477)

478

1   A.  Yes, it is.
2   Q.  Was this document created by Pfizer?
3       MS. DALEY: Objection.
4   A.  No, no, it was not.
5       MS. DALEY: Leading.
6   A.  It was created by Health Strategies Group.
7   Q.  Can I please direct your attention to Exhibit
8   12.
9   A.  Okay.
10  Q.  Do you recognize this exhibit?
11  A.  I do.
12  Q.  Would you please remind us what it is?
13  A.  It is the Pfizer Neuropathic Panel HMO
14  Advisory Board Executive Summary of the advisory board
15  held January 24th and 25th in Scott -- 2002 in
16  Scottsdale, Arizona.
17  Q.  Was this document created by Pfizer?
18  A.  No, it was not.
19  Q.  Who -- who created it?
20      MS. DALEY: Objection.  Lack of foundation.
21  A.  Health Strategies -- it was prepared by
22  health Strategies Group.
23  Q.  And could you please turn to the next page of
24  the exhibit, which is labeled 22339.
25  A.  Okay.

479

1   Q.  Now, earlier plaintiffs' counsel had you read
2   the third bullet under the Introduction paragraph, and
3   to give full context to this, would you please read
4   the other three bullets.
5       MS. DALEY: Objection to prefatory comments by
6   counsel.
7   A.  "To gain insights on market trends on
8   managing neuropathic pain; to elicit from managed care
9   customers their needs in managing neuropathic pain;
10  and to provide Pfizer guidance in developing program
11  concepts to meet these needs and to enhance Pfizer's
12  relationships with important managed care customers."
13  Q.  And is this consistent with your
14  understanding that advisory boards serve as an
15  information-gathering function for Pfizer?
16      MS. DALEY: Objection.  Leading.  Lack of
17  foundation.
18  A.  That is correct.
19  Q.  Going a little further down on this page to
20  the third paragraph that begins with "The advisors."
21      Would you please read the second sentence.
22  A.  "This report summarizes the panel's major
23  conclusions relating to Pfizer, identifies Pfizer's
24  opportunities with respect to neuropathic pain
25  management, and reviews panel findings on various

480

1   topics of interest."
2   Q.  And are these references in the second
3   sentence to the word -- to the panel, the individuals
4   listed on Page 8, which is stamped 22346?
5       MS. DALEY: Objection.  Lack of foundation,
6   leading.
7   A.  That's correct.
8   Q.  Okay.  And so to the extent the report
9   summarizes the conclusions or panel's findings, it's
10  summarizing the conclusions and findings of the
11  individuals listed on the eighth page of the Exhibit
12  stamped 22346?
13      MS. DALEY: Objection.  Lack of foundation.
14  Leading.
15  A.  That's correct.
16  Q.  Would you please turn to Page 3 of the
17  exhibit, stamped 23341.
18  A.  Okay.
19  Q.  And do you see the heading at the lower part
20  of the page, it reads, "Customers recognize Neurontin
21  as safe and effective therapy for neuropathic pain"?
22  A.  Yes.
23  Q.  To whom does "customers" refer?
24      MS. DALEY: Objection.  Lack of foundation.
25  A.  In this context, it's referring to HMOs.

481

1   Q.  Is another term for HMOs third-party payers?
2   A.  Yes.
3   Q.  Is another term for HMOs managed care
4   organizations?
5   A.  Yes.
6   Q.  Could you please turn to the next page of the
7   exhibit.  Do you see the heading "Opportunities For
8   Pfizer to Assist Health Plans"?
9   A.  Yes.
10  Q.  Would you please read the lead, the lead-in
11  paragraph that follows the heading?
12  A.  "Health plans recognize that they are
13  spending considerable resources managing neuropathic
14  pain.  This is an area where health plans would
15  welcome assistance from Pfizer.  Specifically,
16  advisors suggested the following as opportunities."
17  Q.  And then what follows is a list of bullet
18  points that summarizes these opportunities?
19      MS. DALEY: Objection, leading.
20  A.  That's correct.
21  Q.  Would you please read the second bullet
22  point.
23  A.  "Develop a CME program for broad pain
24  treatment.  There is a specific opportunity in
25  California, whereas of January, 2002, providers have a

482

1 CME requirement specifically in pain treatment."
2  Q. And so this second bullet that you just read
3 is a suggestion of the advisors that were listed on
4 Page 8 of the exhibit?
5  A. That's --
6    MS. DALEY: Objection. Leading. Lack of
7    foundation.
8  A. That's correct.
9  Q. Would you please read the last bullet in this
10 list, which is actually on the next page of the
11 exhibit.
12  A. "Assist plans in educating physicians on
13 appropriate use of Neurontin and on eliminating use of
14 multiple therapies, some of which may be ineffective."
15  Q. And, again, this is another suggestion of the
16 advisory board?
17    MS. DALEY: Objection. Leading. Lack of
18    foundation.
19  A. Yes.
20  Q. And are you still on Page 5 of the exhibit?
21  A. That's correct.
22  Q. Excellent. Do you see the heading at the
23 bottom that starts, "Pfizer's Relationships With
24 Health Plans"?
25  A. Yes.

483

1  Q. Would you please read the first two
2 sentences?
3  A. "The advisors recognized Pfizer as a leading
4 company in the industry and an organization with
5 multiple resources that could help their
6 organizations. Neuropathic pain is an area where
7 payers lack expertise, yet have significant interest
8 and would welcome assistance."
9  Q. And there is a reference in the first page to
10 "advisors," is that a reference to those listed on
11 Page 8 of the exhibit?
12    MS. DALEY: Objection. Leading. Lack of
13    foundation.
14  A. Yes, it is.
15  Q. And turning back to Page 8.
16    MS. DALEY: The Bates number, please?
17    MR. MIZELL: Bates 22346.
18  Q. Is Guardian -- is anyone from Guardian
19 included on this list?
20  A. No.
21  Q. Anyone from Kaiser?
22  A. No.
23  Q. And anyone from Aetna?
24  A. No.
25  Q. Anyone from Harden Manufacturing?

484

1  A. No.
2  Q. Louisiana Health Service Indemnity Company?
3  A. No.
4  Q. ASEA/AFSCME Local 52 Health Benefits Trust?
5  A. No.
6  Q. Could I please direct your attention to Pages
7 13 and 14 of the exhibit.
8    MS. DALEY: Bates number?
9    MR. MIZELL: 22351 and the following page.
10  Q. And do you see the column on the right that
11 continues on both pages under "Opportunities for
12 Pfizer to Assist"?
13  A. Yes.
14  Q. And these are opportunities for Pfizer to
15 assist third-party payers?
16    MS. DALEY: Objection, leading, lack of
17    foundation.
18  A. Yes.
19  Q. Are these opportunities the conclusions of
20 the advisory board?
21    MS. DALEY: Objection. Leading. Lack of
22    foundation.
23  A. Yes.
24  Q. Can I please direct your attention to Exhibit
25 10.

485

1  A. Okay.
2  Q. And could you please remind the jury what
3 this exhibit is?
4  A. This -- Exhibit 10 is Pfizer Neuropathic Pain
5 PBM Advisory Board Executive Summary on March 3rd and
6 4th, 2002 -- it was held March 3rd and 4th, 2002 in
7 Orlando, Florida.
8  Q. Was this document created by Pfizer?
9  A. No.
10  Q. Who created it?
11  A. Health --
12    MS. DALEY: Objection. Lack of foundation.
13  A. Health Strategies Group.
14  Q. Could I please direct your attention to Page
15 3, which is Bates 22367.
16  A. Yes.
17  Q. Do you see the heading "PBMs will not
18 re-review Neurontin"?
19  A. Yes.
20  Q. Could you please go ahead and read that
21 paragraph?
22  A. "Neurontin is already on most formularies."
23 Neurontin --
24  Q. I'm sorry. I think it was "almost." Could
25 you go ahead and start over?

486

1    A. Oh, I'm sorry.
2         "Neurontin is already on almost all
3    formularies. Neurontin is perceived as safe and
4    efficacious. PBMs will not re-review Neurontin when
5    it receives its neuropathic pain indication."
6    Q. Now, I think you said "received," is that
7    because you perceive that as a typographical error?
8    A. "When it received," yes.
9    Q. Okay.
10   A. It's a typographical error.
11        MS. DALEY: Well, objection.
12   A. That's how I interpret it.
13        MS. DALEY: Objection. Lack of foundation.
14   Leading.
15   Q. And as with the previous summary that we just
16   talked about, is this document the -- a report of the
17   conclusions of the advisory board?
18        MS. DALEY: Objection. Leading. Lack of
19   foundation.
20   A. Yes.
21   Q. Is it consistent with your understanding that
22   this third sentence about, "Neurontin will not be
23   re-reviewed when it receives its neuropathic pain
24   indication" that it indicates a belief that that
25   indication is pending or applied for?

487

1         MS. DALEY: Objection. Leading. Lack of
2    foundation.
3    A. Yes.
4    Q. In fact, could you please read the first
5    sentence of the next paragraph?
6    A. "Advisors recognize Neurontin as already
7    widely utilized for neuropathic pain, and some
8    questioned whether a formal indication will notably
9    expand the market."
10   Q. And, again, that's consistent with your
11   understanding that this was written at a time when a
12   neuropathic pain indication was seen as forthcoming?
13        MS. DALEY: Objection. Leading.
14   A. Yes.
15        MS. DALEY: Lack of foundation.
16   A. Yes.
17   Q. Could I please direct your attention to Page
18   4 of the exhibit, which is Bates 22368.
19   A. Yes.
20   Q. Do you see in the middle of the page it says,
21   "Needs expressed for Pfizer"?
22   A. Yes.
23   Q. And under that it's "PBMs desire, standard
24   support services to assist in management of NP"?
25   A. Yes.

488

1    Q. Is it your understanding that "NP" is
2    neuropathic pain?
3    A. Yes.
4    Q. Could you please go ahead and read the first
5    sentence.
6    A. "Customers expressed a desire for standard
7    educational and promotional -- and program materials."
8    Q. And to whom does "customers" refer in this
9    sentence?
10        MS. DALEY: Objection. Lack of foundation.
11   A. PBMs, pharmacy benefit managers.
12   Q. And they are expressing a desire for the
13   standard educational program materials to be provided
14   from whom?
15   A. To be provided from Pfizer.
16        MS. DALEY: Objection. Lack of foundation.
17   Q. In fact, to expand on that, would you please
18   turn to the fifth page of the exhibit, Bates stamped
19   22369, and read the heading there in the middle of
20   page, along with the paragraph that follows?
21        MS. DALEY: Objection to the prefatory comment.
22   A. The heading, "PBMs desire information on
23   Neurontin's new indication for their customers." The
24   paragraph reads, "Neurontin is already established as
25   both safe and efficacious."

489

1    Q. Could I just stop you there for a second.
2    Again, this document is summarizing the conclusions of
3    the advisory board?
4         MS. DALEY: Objection. Leading. Lack of
5    foundation.
6    A. That's correct.
7    Q. So that sentence says that Neurontin has
8    already established as safe and efficacious is the
9    opinion, is the consensus opinion of those listed on
10   Appendix B, Page 7, which is Bates stamped 22371?
11        MS. DALEY: Objection. Leading, lack of
12   foundation.
13   A. That's correct, sir.
14   Q. Okay. Would you please go ahead and continue
15   reading.
16   A. "PBMs will not re-review Neurontin on the
17   basis of its new indication, but do have a need for
18   information prior to Neurontin's launch for NP.
19   Neuropathic pain is an area where the advisors openly
20   admitted they lack expertise and would welcome
21   assistance. PBMs will be asked questions about
22   Neurontin and have specific informational needs.
23   These needs include a one-to-two-page product
24   monograph of clinical information for Neurontin's new
25   indication. Simple answers to cost analysis questions

490

1  employers and health plans will ask PBMs, specifically
2  how much is this going to cost me. Information on the
3  status of various Neurontin patients --" I'm sorry --
4  "information on the status of various Neurontin
5  patients --"
6      Q. I'm sorry. I believe that's patents?
7      A. "Patents." And I went back to it.
8          So "information on the status of various
9  Neurontin patents; information on how Pfizer will
10 position Neurontin with the launch of pregabalin,
11 epidemiology data broken down --"
12         MS. DALEY: I'm going to make an objection,
13     because the witness is just constantly reading
14     from the document.
15         MR. MIZELL: He's only got one more bullet
16     left.
17         MS. DALEY: But my objection is him reading all
18     these documents.
19         MR. MIZELL: It is foundation, it is foundation
20     to a question going to be asked.
21     A. "Epidemiology data broken down by geography,
22 parentheses, "(slide kits); a modeling tool with the
23 capability of allowing PBMs to modify their own input
24 parameters."
25     Q. Okay. So these -- these six bulleted items

491

1  are needs identified for pharmaceutical benefit
2  managers identified by this advisory board; correct?
3         MS. DALEY: Objection, leading -- objection,
4     leading, lack of foundation.
5     A. That's correct.
6     Q. And from whom did this advisory board want
7  this information to be communicated to the pharmacy
8  benefit managers?
9         MS. DALEY: Objection. Lack of foundation.
10    A. They wanted the information from Pfizer.
11    Q. Okay. Please turn your attention to Page 7
12 of the exhibit, Bates stamped 22371. You are familiar
13 with the fact that the named third party players in
14 this litigation are Guardian, Kaiser, Aetna, Hardin
15 Manufacturing, Louisiana Blue Cross/Blue Shield and
16 ASEA/AFSCME Local 52?
17    A. Yes.
18    Q. Are any of those entities listed here?
19    A. No.
20    Q. Can you please turn your attention to Page 9
21 of the exhibit, Bates stamped 22373.
22    A. Yes.
23    Q. Do you see the entry listed on the agenda
24 from ten to 11 a.m. reading "Treating neuropathic pain
25 with Neurontin"?

492

1      A. Yes.
2      Q. Do you recall plaintiffs' counsel asking you
3  about that particular segment of the agenda?
4      A. Yes.
5      Q. Do you recall being asked if this was a
6  segment of the agenda for each of these three advisory
7  boards?
8      A. Yes.
9      Q. Why would that information be included in the
10 advisory board?
11         MS. DALEY: Objection. Lack of foundation.
12     A. Well, it's important to get, if you are going
13 to get feedback from the advisors, to establish some
14 kind of baseline. And so it's important for our
15 medical folks to explain about the treating of
16 neuropathic pain with Neurontin, so that we can then
17 ask subsequent questions and adequately determine what
18 their needs are.
19     Q. So does that presentation inform the
20 suggestions that -- and conclusions that Pfizer is
21 seeking to obtain from the advisory board
22 participants?
23         MS. DALEY: Objection, leading. Lack of
24     foundation.
25     A. I'm not sure I understand the question.

493

1          MR. MIZELL: Do you want to read it back?
2          (The question is read.)
3          MS. DALEY: Same objection.
4          MR. MIZELL: I can restate it.
5      Q. Was that presentation included so that the
6  suggestions and conclusions from the advisory board
7  panel -- so that -- to inform their decisions and
8  comments to Pfizer?
9          MS. DALEY: Objection. Leading. Lack of
10     foundation.
11     A. This presentation is done in such a way so
12 that Pfizer can glean information from them prior to
13 bringing the product to market, so we can know exactly
14 what our -- or prior to receiving approval for a new
15 indication, so we can identify what tools and
16 materials they need.
17     Q. Please direct your attention to Exhibit 14.
18     A. Okay.
19     Q. And could you please remind the jury what
20 this exhibit is?
21     A. This is Pfizer -- Exhibit 14, Pfizer
22 Neuropathic Pain Management HMO and Long Term Care
23 Advisory Board Executive Summary, held June 24th,
24 2002, New York, New York.
25     Q. So this is a summary of the third advisory

### 494

1  board that you have discussed in your testimony today?
2  A. That's correct.
3  Q. Is this document created by Pfizer?
4  A. No.
5  Q. Who prepared it?
6     MS. DALEY: Objection. Lack of foundation.
7  A. Health Strategies Group.
8  Q. Now, earlier in your testimony, plaintiffs'
9  counsel asked you to read the fourth bullet point
10 underneath the Introduction on the second page, Bates
11 stamped 22397.
12    And for the sake of completeness, would you
13 please read the other four bullets?
14    MS. DALEY: Objection to counsel's prefatory
15    comments.
16 A. "Gain insights on market trends on managing
17 neuropathic pain, elicit from managed care customers
18 their needs in managing neuropathic pain; provide
19 Pfizer guidance in developing program concepts to meet
20 these needs; enhance Pfizer's relationships with
21 important managed care customers."
22 Q. Is that consistent with your understanding
23 that advisory boards are conducted for Pfizer to gain
24 insights and guidance from the managed care industry?
25    MS. DALEY: Objection. Leading, lack of

### 495

1  foundation.
2  A. Yes.
3  Q. Just going a little bit further down, the
4  third paragraph below the bullets begins, "This report
5  summarizes." Would you please read that?
6  A. "This report summarizes the panel's major
7  conclusions relating to Pfizer, identifies Pfizer's
8  opportunities with respect to neuropathic pain
9  management, and reviews panel findings on various
10 topics of interest."
11 Q. So as with --
12    MS. DALEY: Can I just have a standing
13    objection to reading into the record statements
14    out of the reports? Is that okay?
15    MR. MIZELL: Yeah. You don't have to -- you
16    don't have to object each time.
17    MS. DALEY: Okay.
18 Q. And as with the other two summary documents
19 from Health Strategies Group, this report is again
20 summarizing the conclusions and findings in this
21 instance of the panel that's listed on Page 9, Bates
22 stamped 2404?
23    MS. DALEY: Objection. Leading, lack of
24    foundation.
25 A. Yes, Page 9 and Page 10.

### 496

1  Q. Yes. Thank you.
2     And to confirm that understanding, Page 7
3  Bates stamped 2402, would you please read the heading
4  there at the bottom and those two sentences that
5  follow?
6     MS. DALEY: Objection to the prefatory comment.
7  Suggestive, leading, and lack of foundation.
8  A. I'm not sure what you asked me to read.
9  Q. Are you on Bates stamp 2402?
10 A. Yes.
11 Q. The summary?
12 A. "Summary of findings from breakout groups.
13 The advisors met in three breakout groups. Key
14 conclusions and opportunities for Pfizer are included
15 in Appendix B."
16 Q. And so turning to Appendix B, which is on
17 Page 15, Bates stamp 2410, and continues for three
18 pages to Bates stamp 2413, do you see the column on
19 the right entitled "Opportunities For Pfizer to
20 Assist"?
21 A. Yes.
22 Q. So each of these bulleted items are
23 opportunities for Pfizer to assist as determined by
24 this advisory board?
25    MS. DALEY: Objection. Leading. Lack of

### 497

1  foundation.
2  A. Yes.
3  Q. And I direct you back to Page 9, Bates
4  stamped 2404; are any of the named third-party payers
5  in this litigation listed as advisors?
6  A. No, they are not.
7  Q. Okay. Are any employees from those
8  organizations?
9  A. No, they are not listed.
10 Q. Could I please direct your attention to
11 Exhibit 15.
12 A. Yes.
13 Q. Could you please remind us what this exhibit
14 is?
15 A. This exhibit is an H -- is titled "HMO
16 Opportunity Reports."
17 Q. And this is the exhibit to which you
18 testified about the various figures and numbers and
19 calculations that were described on Page -- well, I
20 guess it's Bates stamped 69868, with respect to Kaiser
21 Foundation and Kaiser Foundation Mid Atlantic?
22 A. Yes.
23 Q. Okay. On the -- on the first page of the
24 exhibit, do you see the two bullets under, "Looking at
25 this report you should keep several caveats in mind"?

Page 498

1    A. Yes.
2    Q. And what does that first sentence after the
3 first bullet read?
4    A. "These are estimated sales figures, not to be
5 shared with our customers. These figures --"
6    Q. Go ahead.
7    A. "These figures are probably under estimates,
8 but will be useful in comparing the relative
9 importance of plans."
10    Q. And would you please read the first sentence
11 of the second bullet?
12    A. "Since the -- since the report's
13 prioritization is based in part on NDC script level
14 data, a plan may be missed in the report if NDC
15 attributes its script to a PBM or a national account
16 unknown bucket."
17    Q. There is a lot of terminology in there.
18 Would you please explain that sentence to the jury?
19       MS. DALEY: Objection. Lack of foundation.
20    A. NDC was an organization that could provide
21 data. Pharmacy data is -- is -- is very difficult to
22 accurately capture. So typically what can happen,
23 when a patient goes to a drug store to get a
24 prescription filled, that prescription is given some
25 type of claim identification number. That claim

Page 499

1 identification number is what is used to get that
2 prescription attributed to the appropriate third party
3 payer.
4       There are many, many fallacies in the system.
5 As you may have, for example, a patient that has Aetna
6 for their medical benefit, but Caremark for their
7 pharmacy benefit. And so many times these scripts --
8 these prescriptions are not accurately attributed to
9 the appropriate third party payer.
10       Which is one reason this data is used more,
11 not as a definitive quantifiable data, but more for
12 just trending.
13    Q. And how did you come about that
14 understanding?
15    A. I have been working with this data for a long
16 time within Pfizer, various sets of data; and I
17 actually have recently just completed a massive
18 project that Pfizer has undertaken over a long period
19 of time to try to ensure that the data that we obtain
20 is the most accurate data.
21       And that data revolves around not just
22 tracking prescriptions to the appropriate third-party
23 payers, but just things that seem simple, like the
24 number of lives that an individual plan has attributed
25 to it.

Page 500

1    Q. That caveat continues. The -- just to move
2 along to the third sentence that says, "There are some
3 plans to which we cannot calculate product sales or
4 shares because prescription data is not captured by
5 NDC."
6       Is that consistent with the explanation you
7 just offered and your understanding?
8       MS. DALEY: Objection. Leading.
9    A. Absolutely; and in addition, NDC typically
10 only captures retail data. They don't capture mail
11 order data. For example, mail order with Medco and
12 Medco's clients is a huge component of pharmacy data;
13 again to my point, that's why this data is -- is
14 generally inaccurate.
15    Q. And when you say "this data," to what data
16 are you referring?
17    A. Data that is attributed to an individual
18 third-party payer. So prescription data.
19    Q. And who generates -- and who generates or
20 collects this prescription data?
21    A. There are various consulting houses, IMS
22 being one of them.
23    Q. Can you name any others?
24    A. I believe NDC was bought by Wolters Kluwer
25 and that Wolters Kluwer is another one. I -- Scott

Page 501

1 Levin I believe does it.
2       We -- Pfizer is -- is migrating from Wolters
3 Kluwer to IMS because of inaccuracies in Wolters
4 Kluwer's database.
5       MS. DALEY: Object to the extent that part of
6 that answer was non-responsive to the question.
7    Q. And so your testimony about the inaccuracies
8 and inherent flaws in this data refers to data
9 provided by agencies such as the three you just
10 listed?
11       MS. DALEY: Objection. Leading. Lack of
12 foundation.
13    A. Yes. And also as it was listed on the second
14 page where it said number of lives as reported by
15 Hewitt and Innerstudy. There is just -- these data
16 sources are -- are notorious for being inaccurate.
17    Q. So this is not an exact science?
18       MS. DALEY: Objection. Lack of foundation.
19 Leading.
20    A. That is correct.
21    Q. These are more in the nature of models or
22 projections or estimates?
23       MS. DALEY: Objection. Leading. Lack of
24 foundation.
25    A. Yes.

62 (Pages 498 to 501)

502

1  MR. MIZELL: Okay. I have no further
2  questions.
3
4  REDIRECT EXAMINATION BY MS. DALEY:
5  Q. Mr. Henderson, Mr. Mizell is your lawyer;
6  right?
7  A. Yes.
8  Q. He's hired by Pfizer, as far as you know;
9  right?
10 A. Yes.
11 Q. And you are a Pfizer employee; right?
12 A. That's correct.
13 Q. You have been a Pfizer employee for 16 years;
14 right?
15 A. Yes.
16 Q. Do you have any stock options or stock in
17 Pfizer?
18 A. Yes.
19 Q. Pfizer's lawyer asked you questions about the
20 neuropathic pain indication.
21     Do you know whether Pfizer ever applied to
22 the FDA for approval to have Neurontin used in
23 treating neuropathic pain?
24     MR. MIZELL: Outside the scope.
25 A. I'm not aware.

503

1  Q. You don't know one way or the other?
2  A. I do not know one way or the other.
3  Q. And if a neuropathic pain indication was
4  forthcoming --
5     MS. DALEY: Well, strike that. I have no
6  further questions at this time, subject to the
7  reservations I stated before.
8     THE VIDEOGRAPHER: The time is approximately
9  5:48. This concludes today's deposition. We are
10 now going off the record.
11    (The witness is excused.)
12    (The deposition is adjourned.)
13    (The court reporter retains the exhibits from
14 both days.)
15
16
17      *       *       *
18
19
20
21
22
23
24
25

504

1           CERTIFICATE
2
3
4     I, MARK SCHAFFER, a Shorthand Reporter and
5  Notary Public of the States of New York and New
6  Jersey, do hereby certify that prior to the
7  commencement of the examination the witness was sworn
8  by me to testify to the truth, the whole truth and
9  nothing but the truth.
10    I do further certify that the foregoing is a
11 true and accurate transcript of the testimony as taken
12 stenographically by and before me at the time, place
13 and on the date hereinbefore set forth.
14    I do further certify that I am neither of
15 counsel nor attorney for any party in this action and
16 that I am not interested in the event nor outcome of
17 this litigation.
18
19
20
21
22           MARK SCHAFFER, C.S.R.
23 New Jersey C.S.R. License Number XI00794
   Notary Public of the State of New Jersey
24 Commission No. 55985 Expiring September 13, 2011
   Notary Public of the State of New York
25 Registration No. 01SC4953912 Expiring July 31, 2009

505

1  IN RE NEURONTIN MARKETING    )
   AND SALES PRACTICES LITIGATION )
2                                )
                                  )
3  IN RE: NEW YORK NEURONTIN     )
   PRODUCTS LIABILITY LITIGATION )
4                                )
         Defendants.      )
5  ------------------------------X
6
7
8
9
10    I have read the foregoing transcript and found
11 it to be a truthful and accurate representation of the
12 testimony I gave in connection with the captioned
13 matter on_____.
14
15
16
17    _____
        JEFFERSON S. HENDERSON, III
18
19
20 The State of:
   County of:
21
22
23 Sworn and subscribed before me
   this      day of       , 2007
24 My commission expires:
25

63 (Pages 502 to 505)

```
                                                     506
 1              E R R A T A   S H E E T
 2
           Please list any correction with the
 3      corresponding page and line numbers.
 4
            PAGE  LINE         CORRECTIONS
 5      1.         :
 6      2.         :
 7      3.         :
 8      4.         :
 9      5.         :
10      6.         :
11      7.         :
12      8.         :
13      9.         :
14     10.         :
15     11.         :
16     12.         :
17     13.         :
18     14.         :
19     15.         :
20     16.         :
21     17.         :
22     18.         :
23     19.         :
24     20.         :
25
```