# EXHIBIT 2

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MASSACHUSETTS

3    MDL Docket No. 1629

4    Master File No. 04-10981

5

6    *  *  *  *  *  *  *  *  *  *  *  *  *  *

7    IN RE:  NEURONTIN MARKETING, SALES        *

8    PRACTICES, AND PRODUCTS LIABILITY         *

9    LITIGATION                                *

10   ------------------------------------      *

11   THIS DOCUMENT RELATES TO:                 *

12   ALL MARKETING AND SALES PRACTICES         *

13   ACTIONS                                   *

14   *  *  *  *  *  *  *  *  *  *  *  *  *  *

15

16                  VOLUME I

17                 PAGES 1-311

18

19

20         VIDEOTAPED DEPOSITION OF

21       MEREDITH B. ROSENTHAL, Ph.D.

22   DATE:  TUESDAY, OCTOBER 24, 2006

23   TIME:  9:12 A.M. TO 5:01 P.M.

24

25

**2**

1    VIDEOTAPED DEPOSITION OF MEREDITH B.
2  ROSENTHAL, Ph.D., a witness called on behalf
3  of the Defendants, pursuant to the Federal
4  Rules of Civil Procedure, before Jessica L.
5  Williamson, Registered Merit Reporter,
6  Certified Realtime Reporter and Notary
7  Public in and for the Commonwealth of
8  Massachusetts, at the Offices of Hare &
9  Chaffin, 160 Federal Street, Boston,
10  Massachusetts, on Tuesday, October 24, 2006,
11  commencing at 9:12 a.m.
12
13  A P P E A R A N C E S
14
15  HAGENS BERMAN SOBOL SHAPIRO LLP
16    (By Edward Notargiacomo, Esq.)
17    One Main Street
18    Fourth Floor
19    Cambridge, Massachusetts  02142
20    (617) 482-3700
21    ed@hbsslaw.com
22    Counsel for the Plaintiffs
23
24
25

**3**

1  A P P E A R A N C E S, Continued
2
3  ZIMMERMAN REED PLLP
4    (By Ronald S. Goldser, Esq.)
5    651 Nicollet Mall
6    Suite 501
7    Minneapolis, Minnesota  55402
8    (612) 341-0040
9    rsg@zimmreed.com
10    Counsel for the Plaintiffs and
11    Midwest Health Plan
12    (Present by telephone.)
13
14  DAVIS POLK & WARDWELL
15    (By Edmund Polubinski III, Esq.
16    and Paul Mishkin, Esq.)
17    450 Lexington Avenue
18    New York, New York  10017
19    (212) 450-4429
20    edmund.polubinski@dpw.com
21    paul.mishkin@davispolk.com
22    Counsel for the Defendants
23
24  ALSO PRESENT:
25    Rahul Guha, Cornerstone Research

**4**

1            I N D E X
2  DEPONENT                    PAGE
3  MEREDITH B. ROSENTHAL, Ph.D.
4  Examination By Mr. Polubinski      7
5
6        E X H I B I T S
7  NO.                         PAGE
8  1 Expert Declaration of Meredith    6
       B. Rosenthal in Support of
9      Plaintiffs' Motion for Class
       Certification
10
     2 Curriculum Vitae             6
11
     3 Retention letter dated May 26,  36
12     2005
13  4 GMA Invoice, GMA000054 -     41
       GMA000074
14
     5 GMA Invoice, GMA000289 -    41
15     GMA294
16  6 Document headed "Rosenthal    66
       Time - 2005 Neurontin"
17
     7 Document headed "Greylock     69
18     McKinnon Associates Listing"
       dated 1/20/2006
19
     8 Expert Declaration of Raymond  105
20     S. Hartman in Support of
       Plaintiffs' Motion for Class
21     Certification
22  9 Notice of Deposition       123
23  10 Amended Class Action Complaint  152
24  11 Second Amended Class Action  152
       Complaint
25

**5**

1        E X H I B I T S
     NO.                       PAGE
2
     12 Document headed "1998       163
3      Strategic Plan and A&P
       Allocation Grid, Neurontin"
4
     13 Article headed "The U.S.     255
5      Pharmaceutical Industry: Why
       major growth in times of cost
6      containment"
7  14 Declaration of Meredith     272
       Rosenthal in Response to
8      Defendants' Expert Keith E.
       Argenbright, M.D.
9
10
11
12
13
14
15
16  Note:  Original Exhibits 1 - 14 were
17  retained by the court reporter and forwarded
18  to Veritext New York for distribution.
19
20
21
22
23
24
25

**6**

```
1           PROCEEDINGS
2           (Exhibit No. 1, Expert Declaration
3    of Meredith B. Rosenthal in Support of
4    Plaintiffs' Motion for Class Certification,
5    premarked for identification.)
6           (Exhibit No. 2, Curriculum Vitae,
7    premarked for identification.)        09:12:40
8           THE VIDEOGRAPHER:  Good morning.   09:12:40
9    We are recording and are now on the record.  09:12:41
10   Today's date is October 24th, 2006, and the  09:12:42
11   time is 9:12 p.m.  My name is George         09:12:45
12   Dobrentey.  I'm a legal videographer for     09:12:49
13   Veritext New York.  This is the deposition   09:12:51
14   of Meredith Rosenthal, In Re:  Neurontin     09:12:53
15   Marketing and Practices Litigation in the    09:12:56
16   United States District Court for the         09:12:58
17   District of Massachusetts, Master File No.   09:12:59
18   04-10981.                                     09:13:02
19          This deposition is being taken at 160  09:13:04
20   Federal Street, Boston, Massachusetts.  The  09:13:07
21   court reporter is Jessica Williamson.  The   09:13:09
22   counsel will state their appearances, and    09:13:12
23   the court reporter will administer the oath.  09:13:13
24          MR. NOTARGIACOMO:  Edward            09:13:14
25   Notargiacomo, Hagens Berman Sobol Shapiro,   09:13:16
```

**7**

```
1    for the plaintiffs.                          09:13:18
2           MR. POLUBINSKI:  Ted Polubinski       09:13:19
3    from Davis Polk & Wardwell for the           09:13:21
4    defendants.                                  09:13:23
5           MR. GOLDSER:  And on the telephone    09:13:24
6    my name is Ron Goldser, G-O-L-D-S-E-R.  I'm  09:13:25
7    for the plaintiffs, and in particular I      09:13:28
8    represent Midwest Health Plan.               09:13:30
9           MR. MISHKIN:  I'm Paul Mishkin from   09:13:33
10   Davis Polk for the defendants.               09:13:36
11          MR. GUHA:  I'm Rahul Guha,            09:13:38
12   Cornerstone Research.                        09:13:39
13
14          MEREDITH B. ROSENTHAL, Ph.D.
15   a witness called by counsel for the
16   Defendants, being first duly sworn, was
17   examined and testified as follows:
18
19          DIRECT EXAMINATION
20
21   BY MR. POLUBINSKI:                           09:13:50
22   Q.  Can you state your full name, please.    09:13:50
23   A.  Meredith B. Rosenthal.                   09:13:51
24   Q.  Now, what do you prefer, Dr. Rosenthal?  09:13:53
25   A.  Professor Rosenthal.                     09:13:55
```

**8**

```
1    Q.  Professor Rosenthal?                     09:13:56
2    A.  I have worked with a lot of clinicians, so  09:13:58
3        we distinguish between the M.D.s and the   09:14:00
4        Ph.D.s.                                     09:14:02
5    Q.  Fair enough.  I'll do my best.  I hope     09:14:03
6        you'll forgive me if I slip every now and  09:14:06
7        then.                                       09:14:08
8    A.  No problem.                                09:14:08
9    Q.  Okay.  Can you give me your business       09:14:08
10       address.                                    09:14:08
11   A.  My business address is 677 Huntington Avenue  09:14:08
12       in Boston.                                  09:14:12
13   Q.  And you prepared a declaration in this case  09:14:13
14       in support of plaintiffs' motion for class   09:14:15
15       certification, correct?                      09:14:19
16   A.  That's correct.                            09:14:19
17   Q.  I am handing you now a document that we've  09:14:19
18       marked as Rosenthal Exhibit 1, and I'll ask  09:14:21
19       you once you've had a chance to look at it   09:14:26
20       whether you recognize the document.         09:14:29
21   A.  Yes, I do.                                 09:14:31
22   Q.  Exhibit 1 is your declaration and class    09:14:33
23       certification, right?                        09:14:36
24   A.  That's correct.                            09:14:37
25   Q.  And when we talk about this, I'll refer to  09:14:37
```

**9**

```
1    it as your declaration.  I may also refer to  09:14:40
2    it as your report.  In both cases it would    09:14:42
3    be great if we could agree that what I'm      09:14:45
4    referring to is this document, Exhibit 1.     09:14:47
5    Does that work for you?                        09:14:49
6    A.  Yes.                                      09:14:49
7    Q.  Great.  Let's turn to Page 21.  Looks like  09:14:50
8        you're at Page 21.  Is the signature there  09:15:04
9        your signature?                             09:15:06
10   A.  Yes, it is.                               09:15:07
11   Q.  And the date on Page 21 is August 8th, 2005,  09:15:07
12       correct?                                    09:15:10
13   A.  That's correct.                            09:15:11
14   Q.  Is that the date that you signed your      09:15:12
15       declaration?                                09:15:14
16   A.  That's correct.                            09:15:15
17   Q.  Now, this declaration, I assume, contains an  09:15:15
18       accurate summary of your opinions in this    09:15:19
19       matter?                                      09:15:21
20   A.  That's correct.                            09:15:21
21   Q.  Are there any opinions that you intend to   09:15:21
22       offer at this stage in the proceeding that   09:15:25
23       aren't contained somewhere in your           09:15:27
24       declaration?                                09:15:28
25   A.  No.                                       09:15:29
```

3 (Pages 6 to 9)

10

1  Q.  All right.  Let me also hand to you now a        09:15:30
2     document that we've marked as Rosenthal          09:15:34
3     Exhibit 2 and ask you to take a look at that     09:15:36
4     as well.  Why don't I tell you, Exhibit 2 is     09:15:41
5     a document that plaintiffs' counsel produced     09:15:49
6     to us last week.  It's my understanding that    09:15:51
7     it's your current CV; is that correct?           09:15:55
8  A.  That's correct.                                 09:15:57
9  Q.  Okay.  Now, looking back to Exhibit 1           09:15:57
10    there's also a CV there.  Attached is            09:16:04
11    Attachment A.1; is that correct?                 09:16:08
12 A.  Yes, that's correct.                             09:16:14
13 Q.  All right.  And the second page of that CV       09:16:14
14    contains a heading titled "Testimony"?           09:16:21
15 A.  Yes.  I'm sorry, we're at the old CV, yes.      09:16:27
16 Q.  We're talking about the CV --                    09:16:30
17 A.  That's correct.                                  09:16:32
18 Q.  -- that's attached to Exhibit 1?                 09:16:32
19 A.  Yes.                                             09:16:33
20 Q.  And actually, that raises a question.           09:16:34
21    Looking at Exhibit 2 there doesn't appear        09:16:35
22    that there's a similar heading; is that          09:16:38
23    true?                                            09:16:40
24 A.  That's correct.  This is my academic CV.         09:16:40
25 Q.  Are there any other differences between your    09:16:42

11

1     academic CV and what would be your CV for        09:16:44
2     purposes of this matter?                         09:16:47
3  A.  I would have to compare them one to one, but    09:16:48
4     I think it's just the inclusion of               09:16:49
5     testimony.                                       09:16:51
6  Q.  Is there any reason why you wouldn't include    09:16:52
7     testimony on your academic CV?                   09:16:54
8  A.  It's not relevant.  We have a standard CV        09:16:56
9     format for -- that we use for purposes of        09:16:59
10    things like promotion, annual reviews, and       09:17:02
11    so this was based on my standard School of       09:17:05
12    Public Health CV format, so that's my            09:17:09
13    current updated one, yeah.                       09:17:11
14 Q.  Looking back, then, at your CV that's           09:17:13
15    attached to Exhibit 1, we can set Exhibit 2      09:17:17
16    to one side for now.                             09:17:20
17 A.  Okay.                                           09:17:21
18 Q.  You provided testimony in each of the three    09:17:21
19    cases that are listed here under                 09:17:26
20    "Testimony" --                                   09:17:28
21 A.  Of --                                           09:17:29
22 Q.  -- on Page 2?                                    09:17:30
23 A.  That's correct.  Actually, I'm looking at       09:17:31
24    Augmentin.  I provided written testimony         09:17:37
25    there.                                           09:17:39

12

1  Q.  When you say "written testimony," what do       09:17:41
2     you mean?                                        09:17:42
3  A.  A declaration.                                  09:17:42
4  Q.  Okay.  But you didn't provide oral testimony   09:17:44
5     in that matter at all?                           09:17:46
6  A.  No.                                             09:17:48
7  Q.  Okay.  How about the first matter that's       09:17:48
8     listed there, "In Re:  Lupron," L-U-P-R-O-N,     09:17:51
9     "Marketing and Sales Practices Litigation";      09:17:55
10    did you offer testimony there?                   09:17:56
11 A.  I offered oral testimony there.                  09:17:58
12 Q.  Deposition or trial, both?                       09:18:00
13 A.  Not exactly at trial.  It was at -- I'm          09:18:03
14    sorry, I don't know the legal terms very         09:18:06
15    well.  It was related to the allocation of       09:18:07
16    the ultimate settlement.                         09:18:09
17 Q.  So is it a -- would I be correct to assume       09:18:12
18    that it was a hearing related to allocation?     09:18:15
19 A.  That sounds right.  It was a hearing.            09:18:16
20 Q.  In federal court?                                09:18:19
21 A.  In the federal court.                            09:18:20
22 Q.  Approximately when was that?                     09:18:21
23 A.  That was either December '04 or December        09:18:22
24    '05, but I think it must be December '04.        09:18:28
25        MR. NOTARGIACOMO:  I think that's             09:18:31

13

1     right.                                           09:18:33
2  A.  I'm sorry, I can check the date, but I think    09:18:33
3     it's December '04.                               09:18:35
4  Q.  And the third case that's listed here, "In     09:18:37
5     Re:  Pharmaceutical Industry Average            09:18:39
6     Wholesale Price Litigation"?                     09:18:41
7  A.  That's correct.                                 09:18:43
8  Q.  Have you offered testimony in that case?        09:18:43
9  A.  I offered an oral testimony.  It was a          09:18:45
10    somewhat unusual situation.  The judge had       09:18:51
11    asked for a tutorial on pricing in the          09:18:53
12    pharmaceutical industry.  And so I had a         09:18:58
13    written report, and I testified and was          09:19:00
14    cross-examined on that.  But it's not            09:19:02
15    exactly in the trial, right?  It was sort of     09:19:04
16    a pretrial session that she held.                09:19:06
17 Q.  You were cross-examined also in court on the    09:19:08
18    tutorial --                                      09:19:14
19 A.  I was.                                          09:19:15
20 Q.  -- that you provided?                           09:19:14
21 A.  Yes, I was.                                     09:19:15
22 Q.  Did you offer deposition testimony in that     09:19:16
23    case?                                            09:19:18
24 A.  Yes, I did.                                     09:19:18
25 Q.  In addition to the cross-examination in        09:19:19

4  (Pages 10 to 13)

## 14

1  court?                                        09:19:22
2  A. That's right. And so -- that's right. So    09:19:23
3     the deposition was earlier this year. I     09:19:25
4     could check the date, but, yeah, but the    09:19:28
5     testimony in court was last December.       09:19:30
6  Q. Okay. And I assume you have not testified   09:19:32
7     at trial in that case?                      09:19:36
8  A. That trial's coming up.                     09:19:38
9  Q. Do you expect to testify at trial in that   09:19:40
10    case?                                       09:19:44
11 A. I do, although -- I do expect to testify. I  09:19:44
12    haven't heard the final schedule, but I     09:19:46
13    expect to.                                  09:19:49
14 Q. Are there any other cases in which you've   09:19:49
15    offered testimony, other than the three that 09:19:52
16    are listed in your CV that's attached to    09:19:53
17    Exhibit 1?                                  09:19:56
18 A. No.                                         09:19:58
19 Q. Okay. Have you, yourself, ever been a party 09:20:00
20    to a lawsuit before?                        09:20:02
21 A. No.                                         09:20:03
22 Q. Okay. So you wouldn't, yourself, have ever  09:20:04
23    tried to be a lead plaintiff in a class     09:20:05
24    action?                                     09:20:08
25 A. No.                                         09:20:08

## 15

1  Q. All right. You've obviously testified a     09:20:08
2     fair amount before, but in spite of that,   09:20:12
3     just to make the record clear, I'll go      09:20:14
4     forward with just a couple of rules that    09:20:16
5     you're probably perfectly familiar with --  09:20:18
6  A. Great.                                      09:20:20
7  Q. -- and you've probably spoken about already 09:20:20
8     with plaintiffs' counsel. The first is just 09:20:23
9     that you understand your testimony here is  09:20:25
10    under oath?                                 09:20:26
11 A. Yes.                                        09:20:27
12 Q. And you also understand that if you don't   09:20:27
13    understand one of my questions, you let me  09:20:28
14    know, you won't just answer it?             09:20:31
15 A. Yes.                                        09:20:32
16 Q. Great. Can you give me your educational     09:20:33
17    background, starting with college.          09:20:40
18 A. I have a BA, AB from Brown University in    09:20:41
19    international relations with a focus on     09:20:45
20    economics, certified track within          09:20:48
21    international relations. And subsequent to  09:20:50
22    that I got a Ph.D. at Harvard. There's a    09:20:52
23    university level Ph.D. in health policy.    09:20:55
24    Again, I did the economics track in that, so 09:20:58
25    my training is largely economics with      09:21:01

## 16

1  application to health policy.                  09:21:04
2  Q. And your Ph.D., which department would that 09:21:05
3     have been in? Was it in the economics       09:21:07
4     department, or was it in specialized --     09:21:09
5  A. It's a faculty program, so it's actually a  09:21:11
6     department of its own. Health policy        09:21:14
7     essentially is a department only for the    09:21:17
8     purpose of offering a Ph.D., so the         09:21:18
9     coursework for the economics track is the   09:21:20
10    same as a Ph.D. in economics minus          09:21:23
11    macroeconomic theory plus a selection of    09:21:25
12    health policy courses from the School of    09:21:29
13    Public Health, Kennedy School, other places 09:21:32
14    around the university. So it's an           09:21:34
15    interdepartmental, interfaculty Ph.D.       09:21:35
16    program.                                    09:21:39
17 Q. Makes sense. And actually, just now that    09:21:39
18    reminded me there is one other rule of the  09:21:41
19    road. If you can be careful to let me       09:21:45
20    finish my questions even though I do have a 09:21:47
21    tendency to trail off when I ask them, it   09:21:51
22    generally will go better for Jessica and    09:21:52
23    also for us and for the record.             09:21:54
24 A. Yes. And feel free to remind me of that.    09:21:55
25    I'm afraid I have a tendency to speak too   09:21:58

## 17

1     quickly.                                    09:22:01
2  Q. All right. So going back again to your      09:22:01
3     educational background. You don't actually  09:22:03
4     have a medical degree; is that correct?     09:22:07
5  A. That's correct.                             09:22:08
6  Q. And as part of your coursework or otherwise, 09:22:08
7     have you ever attended any medical school?  09:22:11
8  A. No.                                         09:22:14
9  Q. Have you taken coursework in clinical       09:22:14
10    medicine at all?                            09:22:16
11 A. No.                                         09:22:17
12 Q. You don't have a degree in pharmacology     09:22:21
13    either, I take it.                          09:22:23
14    (Phone ringing.)                            09:22:26
15    MR. NOTARGIACOMO: Excuse me.                09:22:27
16 A. No.                                         09:22:28
17    MR. POLUBINSKI: Do we need to go            09:22:29
18    off the record?                             09:22:30
19    MR. NOTARGIACOMO: No.                       09:22:31
20 Q. Okay. Have you ever taken courses in        09:22:32
21    pharmacology?                               09:22:34
22 A. No.                                         09:22:34
23 Q. And you don't have a law degree, either, I  09:22:34
24    take it?                                    09:22:38
25 A. No.                                         09:22:38

5 (Pages 14 to 17)

18

1 Q. Have you taken any law classes?          09:22:39
2 A.   No.                    09:22:40
3 Q. All right.  What -- aside from your Ph.D.,          09:22:41
4    what other professional degrees or licenses          09:22:46
5    do you have, if any?          09:22:48
6 A.  That's all.          09:22:49
7 Q. So you're not licensed to practice medicine;          09:22:50
8    is that right?          09:22:53
9 A.  No, I'm not.          09:22:53
10 Q. And you wouldn't hold yourself out as an          09:22:53
11    expert in the practice of medicine, I take          09:22:55
12    it?          09:22:57
13 A.  I would not.          09:22:57
14 Q. And you're not licensed to prescribe          09:22:58
15    medication, either, correct?          09:23:01
16 A.  That's correct.          09:23:02
17 Q. And you've never prescribed a drug before?          09:23:02
18 A.  That's correct.          09:23:06
19 Q. What experience, if any, do you actually          09:23:06
20    have in the prescription writing process?          09:23:10
21 A.  Other than as a consumer of prescriptions,          09:23:12
22    none.          09:23:16
23 Q. You're familiar with the term "third-party          09:23:16
24    payer" as it's used in the complaints in          09:23:21
25    this case?          09:23:24

19

1 A.  Yes, I am.          09:23:25
2 Q. Have you ever done any work for an entity          09:23:25
3    that would qualify as part of the          09:23:28
4    plaintiffs' third-party subclass?          09:23:29
5 A.  I've worked for -- I sit on an advisory          09:23:32
6    panel for Blue Cross/Blue Shield of          09:23:35
7    Massachusetts.  They have a group of local          09:23:38
8    experts, including clinicians, as well as          09:23:42
9    policy people such as myself advising them          09:23:44
10    on how to use quality information for public          09:23:47
11    reporting, pay for performance, the kinds of          09:23:51
12    things that, as you probably know, my work          09:23:54
13    relates to.          09:23:56
14 Q. Can you tell me what quality information          09:23:56
15    means, as you used it in that answer?          09:23:58
16 A.  Yes, sure.  Generally, the data come from          09:24:00
17    either clinical charts or claims data and          09:24:04
18    profile things like appropriate use of          09:24:07
19    preventive screenings.  So looking at          09:24:10
20    physicians, trying to establish whether a          09:24:13
21    physician has done all the right cancer          09:24:16
22    screenings for his or her patients or for          09:24:18
23    his or her diabetic patients, have they          09:24:21
24    gotten the right tests to make sure that          09:24:25
25    they control their diabetes.          09:24:26

20

1 Q. So am I right that you look at information          09:24:28
2    relating to specific physicians, then?          09:24:29
3 A.  No.  We -- the advisory panel has seen          09:24:31
4    aggregate data and discussed more          09:24:35
5    conceptually about how the data might be          09:24:37
6    appropriately used.          09:24:39
7 Q. Where does the aggregate data come from?  Is          09:24:40
8    it internal to Blue Cross/Blue Shield, or          09:24:44
9    does it come from someplace else?          09:24:44
10 A.  They have another consultant, Health          09:24:46
11    Dialogue, that does a lot of analysis for          09:24:48
12    them, and Health Dialogue has brought to the          09:24:52
13    meeting PowerPoint presentations from their          09:24:55
14    data analysis.          09:24:56
15 Q. Do you know where their data comes from?          09:24:57
16 A.  I think their data comes largely from Blue          09:24:59
17    Cross/Blue Shield's old administrative          09:25:02
18    databases, but I'm not certain if they use          09:25:06
19    other data as well.          09:25:08
20 Q. How long have you served on this advisory          09:25:09
21    panel with Blue Cross/Blue Shield?          09:25:17
22 A.  That's a good question.  I think September          09:25:18
23    of 2005 was the first meeting, and there          09:25:19
24    have been three or four since then, but I          09:25:22
25    could check the dates for you.          09:25:26

21

1 Q. And how long do the meetings tend to run?          09:25:28
2    Is it approximately --          09:25:31
3 A.  About two-hour meetings.  They were dinner          09:25:32
4    meetings.          09:25:34
5 Q. And the discussions centered around these          09:25:36
6    PowerPoint presentations that Health          09:25:39
7    Dialogue prepares?          09:25:42
8 A.  That's correct.          09:25:43
9 Q. Aside from your work on the advisory panel          09:25:44
10    with Blue Cross/Blue Shield, have you ever          09:25:46
11    done any other work for a member of the          09:25:48
12    third-party payer subclass, as you          09:25:50
13    understand it?          09:25:52
14 A.  I have not done work for third-party payers.          09:25:53
15    I collaborate doing research with some          09:25:57
16    third-party payers.  They don't pay me, and          09:26:00
17    they don't -- they don't set the research          09:26:03
18    questions or direct the results in any way,          09:26:06
19    but there have been collaborations.          09:26:08
20 Q. Are you paid for your work on the advisory          09:26:10
21    panel with Blue Cross/Blue Shield?          09:26:12
22 A.  I am.  I'm paid $500 for each meeting.          09:26:13
23 Q. Do you have an understanding approximately          09:26:16
24    how many meetings you'll have per year?          09:26:22
25 A.  No, actually.  And it's been somewhat          09:26:24

6  (Pages 18 to 21)

## 22

1     sporadic. We haven't had one for six to   09:26:27
2     nine months.   09:26:29
3 Q.  And who decides whether to have the   09:26:29
4     meetings? Last question on this.   09:26:33
5 A.  There's a quality -- one of their executives   09:26:34
6     in the quality area who oversees the   09:26:37
7     meetings and she contacts the advisory panel   09:26:40
8     and puts together the meetings.   09:26:42
9 Q.  Actually, this isn't -- that wasn't the last   09:26:44
10    question. The last question I think is   09:26:46
11    going to be, how did you get involved with   09:26:47
12    your work on the advisory panel?   09:26:50
13 A.  I publish widely in the area of pay for   09:26:52
14     performance and public reporting, and they   09:26:56
15     had seen my work, and since I was local it   09:27:00
16     made sense. They wanted to have a, you   09:27:02
17     know, an academic expert on this advisory   09:27:04
18     panel, and I was a natural --   09:27:07
19 Q.  Who contacted -- I'm sorry, I cut you off.   09:27:09
20    Who contacted you?   09:27:12
21 A.  Originally I was contacted by Harold Picken,   09:27:13
22     who is one of their medical directors. He   09:27:16
23     is no longer with them, and actually, by the   09:27:17
24     time we had our first meeting he left, and   09:27:20
25     Karen Boudreau, who I believe also has the   09:27:21

## 23

1     title medical director -- they have numerous   09:27:24
2     medical directors at this level -- she runs   09:27:27
3     the meetings.   09:27:30
4 Q.  Have you ever worked in any capacity for any   09:27:31
5    governmental entity that has any involvement   09:27:42
6    in pharmaceutical reimbursement under any   09:27:44
7    federal or state program?   09:27:46
8 A.  No, I have not.   09:27:48
9 Q.  Do you have any direct experience with the   09:27:50
10    pharmaceutical reimbursement process?   09:27:55
11 A.  Again, only as a consumer. No.   09:28:00
12 Q.  Have you ever worked directly or indirectly   09:28:02
13    with the FDA?   09:28:04
14 A.  No. In my work on direct consumer   09:28:08
15     advertising I have presented on panels with   09:28:13
16     the FDA, Janet Woodcock, but I have never   09:28:14
17     done any work for them or a project   09:28:22
18     sponsored by them in any way.   09:28:24
19 Q.  Who's Janet Woodcock?   09:28:25
20 A.  She -- you know, I just don't know her   09:28:27
21     position, but I think that her   09:28:29
22     responsibility is in the promotional area.   09:28:30
23     She's fairly high up in the FDA and still   09:28:35
24     there, to my knowledge.   09:28:38
25 Q.  So you haven't been directly involved with   09:28:42

## 24

1     an application to the FDA to approve a new   09:28:44
2     drug, I assume?   09:28:47
3 A.  No, I have not.   09:28:48
4 Q.  And that you wouldn't involve -- withdrawn.   09:28:48
5     You also wouldn't have been involved   09:28:51
6     with an application for approval of a   09:28:53
7     supplemental indication of an approved drug?   09:28:56
8 A.  No, I have not.   09:28:59
9 Q.  Have you ever been involved in a clinical   09:29:00
10    trial involving a prescription drug?   09:29:02
11 A.  No, I have not.   09:29:04
12 Q.  Have you ever taken Neurontin?   09:29:05
13 A.  No, I have not.   09:29:11
14 Q.  To the best of your knowledge, do you know   09:29:12
15    anybody who's ever taken Neurontin?   09:29:15
16 A.  To the best of my knowledge, I don't.   09:29:17
17 Q.  Again, to the best of your knowledge, have   09:29:20
18    you ever spoken with anybody who's ever   09:29:22
19    taken Neurontin?   09:29:24
20 A.  To the best of my knowledge, I have -- I   09:29:25
21     have no knowledge of having spoken to anyone   09:29:27
22     who's taken Neurontin.   09:29:29
23 Q.  And I assume, based on your prior answers to   09:29:31
24    your prior questions, that you wouldn't have   09:29:35
25    been directly involved in any prescription   09:29:37

## 25

1     being written for Neurontin?   09:29:39
2 A.  That's correct.   09:29:41
3 Q.  And also that you wouldn't have been   09:29:41
4     involved in the reimbursement for any   09:29:45
5     prescription written for Neurontin?   09:29:48
6 A.  That's correct.   09:29:50
7 Q.  Have you ever spoken with a doctor about the   09:29:51
8     prescribing of Neurontin?   09:29:53
9 A.  I have not.   09:29:54
10 Q.  All right. Now you're currently at the   09:30:05
11    Harvard School For Public Health, correct?   09:30:08
12 A.  That's correct.   09:30:09
13 Q.  And what's your position there?   09:30:09
14 A.  I'm associate professor of health economics   09:30:11
15     and policy.   09:30:13
16 Q.  What is health economics and policy?   09:30:13
17 A.  That's my title. The area relates to the   09:30:15
18     application of economic principles to health   09:30:19
19     policy.   09:30:21
20 Q.  Would you say it's principally an economics   09:30:21
21    position or something else?   09:30:30
22 A.  I would say it's applied economics in the   09:30:32
23     area of health policy.   09:30:39
24 Q.  Do you supervise graduate students?   09:30:45
25 A.  I do.   09:30:47

7 (Pages 22 to 25)

26

1 Q. Have any of your graduate students assisted    09:30:48
2    you at all in your consulting work?    09:30:50
3 A. No, they have not.    09:30:52
4 Q. All right. Let's look again at Exhibit 1,    09:30:53
5    which is your declaration in the case, at    09:30:58
6    Paragraph 3 and specifically at the sentence    09:31:09
7    that carries over between Pages 2 and 3. It    09:31:11
8    reads, "Presently I am engaged in a large-    09:31:14
9    scale evaluation of the effects of    09:31:17
10    prescription drug formularies on drug choice    09:31:19
11    and health care spending."    09:31:21
12 A. That's correct.    09:31:24
13 Q. When did that study start?    09:31:24
14 A. I would have to check the precise dates, but    09:31:26
15    I believe the work began about two years    09:31:32
16    ago. The funding started subsequent to    09:31:37
17    that, but I could check the dates both on    09:31:39
18    when the project started and when the    09:31:42
19    funding started. So we started doing some    09:31:44
20    of the work to prepare to submit a federal    09:31:46
21    grant. The federal grant was funded about a    09:31:49
22    year and a half ago.    09:31:52
23 Q. How far along is the project along now?    09:31:52
24 A. The project is fairly far along. We have    09:31:56
25    one paper that's final that's under review    09:31:59

27

1    and a second paper that's close.    09:32:02
2 Q. With whom are you working on it?    09:32:05
3 A. The principal investigator is Bruce Landon,    09:32:06
4    who's a physician at the Harvard Medical    09:32:10
5    School.    09:32:14
6 Q. What specialty does he practice in?    09:32:14
7 A. He's an internist.    09:32:17
8 Q. And you had mentioned something about    09:32:18
9    funding before. Who's funding it?    09:32:24
10 A. The funding comes from the Agency For Health    09:32:25
11    Care Research and Quality.    09:32:27
12 Q. And I confess, I don't know what that is.    09:32:30
13    Can you tell me?    09:32:33
14 A. The Agency For Health Care Research and    09:32:34
15    Quality is the primary funder for health    09:32:36
16    policy research. They're a small agency    09:32:39
17    under HHS, very small. And rather than    09:32:43
18    going to NIH, people like me who do this    09:32:47
19    kind of health policy work tend to look to    09:32:51
20    the HRQ, as it's called, for funding.    09:32:53
21 Q. So it sounds like you've got one or maybe    09:32:58
22    two papers that are underway now. Have you    09:33:05
23    reached any conclusions that are either    09:33:07
24    preliminary or final about what the effects    09:33:08
25    of formularies are?    09:33:10

28

1 A. Overall the results show that -- the    09:33:11
2    specific question was whether moving to a    09:33:18
3    single-tiered formulary to a three-tiered    09:33:22
4    formulary and changes in the co-payments,    09:33:25
5    whether that would save the payer, in this    09:33:28
6    case the insurance plan, money. And so    09:33:32
7    overall we find yes. Another finding is    09:33:36
8    that there's an increase in the rate of mail    09:33:40
9    order fulfillment under higher co-payments    09:33:43
10    because mail order essentially saves you one    09:33:47
11    co-payment. And another finding was that    09:33:50
12    generic substitution increases.    09:33:54
13 Q. So would it be fair to say that your    09:34:03
14    conclusions are that prescription drug    09:34:06
15    formularies do have an impact on drug choice    09:34:10
16    in individual cases?    09:34:13
17 A. Yes, that's correct.    09:34:15
18 Q. Are written results available to the public    09:34:17
19    on this at all?    09:34:20
20 A. On the paper?    09:34:21
21 Q. Yeah.    09:34:22
22 A. No. Traditionally in my field you can't    09:34:22
23    disseminate drafts of papers. If you want    09:34:26
24    to publish them, medical journals -- it's    09:34:29
25    called the Inglefinger rule after a New    09:34:32

29

1    England Journal of Medicine editor who made    09:34:36
2    this rule. The clinical journals are very    09:34:39
3    sensitive about having those results out, so    09:34:39
4    we hope that the paper would be accepted and    09:34:41
5    published soon, but right now it's under    09:34:43
6    wraps.    09:34:46
7 Q. When do you anticipate, or if you can    09:34:46
8    anticipate, when it would actually be    09:34:49
9    available and published?    09:34:52
10 A. It's a little hard to anticipate, but I    09:34:53
11    would say probably spring.    09:34:56
12 Q. Now, you also work for Greylock McKinnon    09:34:57
13    Associates, correct?    09:35:05
14 A. That's correct.    09:35:06
15 Q. What is Greylock McKinnon?    09:35:07
16 A. It's a consulting organization. They do    09:35:09
17    litigation support and some other kinds of    09:35:12
18    consulting.    09:35:13
19 Q. What's your position there?    09:35:13
20 A. Excuse me. I'm an academic affiliate. So    09:35:14
21    I'm not an employee per se, but I work with    09:35:20
22    them, and I do expert witness work like    09:35:25
23    this, it all goes through them. I'm    09:35:30
24    supported by their staff.    09:35:32
25 Q. Now, aside from being supported by their    09:35:35

8  (Pages 26 to 29)



### 30

1   staff, what does it mean that your work goes   09:35:37
2   through them?   09:35:39
3 A.   They do all the billing on my behalf and all   09:35:39
4   the administrative work relating to the   09:35:44
5   retention agreements.   09:35:50
6 Q.   How many academic affiliates are there at   09:35:53
7   Greylock McKinnon, if you know?   09:35:58
8 A.   I don't know.   09:36:00
9 Q.   Do you have an approximate sense?   09:36:00
10 A.   I would guess three or four.   09:36:02
11 Q.   Do you know any of the other academic   09:36:03
12   affiliates?   09:36:08
13 A.   Richard Frank. He's the one I'm certain   09:36:08
14   about, and I'm not certain about the others.   09:36:12
15   I think it's actually on their website,   09:36:15
16   though.   09:36:17
17 Q.   What portion of your work at Greylock   09:36:18
18   McKinnon is devoted to litigation support?   09:36:20
19 A.   That's all I do through them. I know they   09:36:22
20   have these other strategic consulting   09:36:25
21   projects on occasion, but I've only done   09:36:27
22   litigation work with them.   09:36:29
23 Q.   How large a business is it; do you know?   09:36:30
24 A.   I have no idea.   09:36:42
25 Q.   Do you have an office there?   09:36:42

### 31

1 A.   No.   09:36:44
2 Q.   In a typical month -- well, let me withdraw   09:36:45
3   that question.   09:36:50
4   Do you ever spend any time at their   09:36:51
5   offices?   09:36:54
6 A.   Occasionally, but it's rare.   09:36:54
7 Q.   Do you receive a regular paycheck from them?   09:37:01
8 A.   I do, not a paycheck per se since I'm not an   09:37:04
9   employee. I receive a fixed monthly amount,   09:37:08
10   and then we reconcile every six months or   09:37:12
11   something.   09:37:15
12 Q.   And what is the fixed monthly amount based   09:37:16
13   on? Is it a salary, or is it dependent on   09:37:21
14   the amount of work that you do?   09:37:23
15 A.   It's based on the amount of work that I do,   09:37:24
16   right. So it's a guess at what an average   09:37:27
17   monthly computation would be at my early   09:37:29
18   rate for the formal number of hours I work,   09:37:35
19   which of course in reality varies month to   09:37:37
20   month.   09:37:40
21 Q.   When did you start working there?   09:37:42
22 A.   I began working with them when I was a   09:37:44
23   doctoral student supporting -- doing   09:37:49
24   obviously much more rudimentary background   09:37:52
25   work for them running regressions, doing   09:37:56

### 32

1   data analysis. I believe 1996 is my best   09:37:58
2   guess as to when that first started.   09:38:00
3 Q.   How did you first decide to do it?   09:38:01
4   MR. NOTARGIACOMO: Objection. You   09:38:09
5   can answer.   09:38:10
6   THE WITNESS: Okay.   09:38:11
7 A.   Some of my colleagues, my advisor was   09:38:12
8   working with them, and I'm interested in   09:38:16
9   industrial organization which you may know   09:38:20
10   is the field of economics that is -- largely   09:38:22
11   comes into play, particularly in antitrust   09:38:25
12   matters. So many -- most of the original   09:38:29
13   work was antitrust or related Hatch-Waxman   09:38:31
14   work.   09:38:36
15 Q.   Who is your advisor that had been working   09:38:37
16   with them?   09:38:39
17 A.   Richard Frank.   09:38:39
18 Q.   So who approached whom?   09:38:40
19 A.   I believe Richard asked me, and I think the   09:38:46
20   first thing I worked on -- I'm not certain   09:38:51
21   actually whether it was this. There was an   09:38:53
22   antitrust case brought against the   09:38:57
23   pharmaceutical wholesalers, and then I did   09:38:59
24   some work supporting the tobacco litigation   09:39:02
25   in Massachusetts. And both of those cases   09:39:05

### 33

1   were interesting intellectually and related   09:39:08
2   to my own interests.   09:39:12
3 Q.   And neither of those cases were cases in   09:39:13
4   which you offered testimony; is that   09:39:16
5   correct?   09:39:17
6 A.   That's correct.   09:39:17
7 Q.   Are you employed by any other entity beside   09:39:25
8   the School of Public Health and Greylock   09:39:28
9   McKinnon?   09:39:31
10 A.   I'm only employed by the School of Public   09:39:31
11   Health, that's correct.   09:39:34
12 Q.   Do you do any paid consulting outside of the   09:39:34
13   work that you do for Greylock McKinnon?   09:39:38
14 A.   From time to time I get paid in -- I guess   09:39:41
15   as a consultant, so, for example, the   09:39:43
16   Institute of Medicine recently put together   09:39:47
17   a committee on pay for performance, which is   09:39:51
18   an area that I have done a great deal of   09:39:54
19   research in, and they asked me, with Dr.   09:39:56
20   Landon, to write a background report for   09:39:59
21   them and paid us a fixed sum of money for   09:40:02
22   that. So I guess that would be consulting,   09:40:04
23   yes, that kind of thing every once in a   09:40:06
24   while.   09:40:10
25 Q.   But you don't have a formal consulting   09:40:10

9 (Pages 30 to 33)

34

1    arrangement with any other group, I take it?    09:40:12
2 A.  Oh, no.    09:40:13
3 Q.  Do you ever do litigation consulting, aside    09:40:15
4    from the work that you do through Greylock    09:40:16
5    McKinnon?    09:40:19
6 A.  No.    09:40:19
7 Q.  Now, as between your positions at the School    09:40:25
8    of Public Health and your work for Greylock    09:40:28
9    McKinnon, in a typical year how does your    09:40:32
10    income from those two sources break out, if    09:40:34
11    you understand my question?    09:40:38
12 A.  I do.  My income breaks out I think on    09:40:39
13    average fairly evenly, 50/50, in that    09:40:44
14    neighborhood.    09:40:49
15 Q.  Okay.  Aside from this matter and the AWP    09:40:56
16    matter that we talked about before, are you    09:40:57
17    active in other matters at Greylock McKinnon    09:40:59
18    now?    09:41:02
19 A.  I am.    09:41:02
20 Q.  How many?    09:41:03
21 A.  I would want to check to be sure that I'm    09:41:09
22    correct about this, but I think there are    09:41:12
23    two other matters.    09:41:15
24 Q.  Are they both litigation-related?    09:41:17
25 A.  Yes, they are.    09:41:19

35

1 Q.  What are those matters, if you can tell us?    09:41:20
2    THE WITNESS:  Is it -- I never know    09:41:24
3    what I'm allowed to tell.  Is it okay?    09:41:26
4    MR. NOTARGIACOMO:  You can talk    09:41:28
5    about what other cases you're involved in,    09:41:29
6    yes.    09:41:31
7 A.  I've been retained to work in a case related    09:41:32
8    to the drug Serostim.    09:41:34
9 Q.  Can you spell that for my benefit and the    09:41:36
10    court reporter?    09:41:38
11 A.  S-E-R-O-S-T-I-M.  And also for the drug    09:41:38
12    Zyprexa, Z-Y-P-R-E-X-A.    09:41:47
13 Q.  And those are two discrete matters, I take    09:41:54
14    it?    09:41:57
15 A.  They are discrete matters.    09:41:57
16 Q.  With whom at GMA, Greylock McKinnon, have    09:41:59
17    you been working, on the same team or    09:42:02
18    different teams?    09:42:05
19 A.  It would be the same team.  You mean the    09:42:05
20    staff?    09:42:09
21 Q.  Uh-huh.    09:42:10
22 A.  Yes, although both of those matters are in    09:42:10
23    the very early days.  There has not been a    09:42:12
24    great deal of work.    09:42:15
25 Q.  Are you working with lawyers of either of    09:42:15

36

1    those cases?    09:42:17
2 A.  Yes.    09:42:17
3 Q.  Who are they?    09:42:19
4 A.  On Serostim, it's David Nalven from Hagens    09:42:19
5    Berman Sobol Shapiro, and on Zyprexa --    09:42:30
6    THE WITNESS:  It's Tom, isn't it?    09:42:32
7    MR. NOTARGIACOMO:  I believe so.    09:42:34
8 A.  All right.  Tom Sobol, also Hagens Berman    09:42:35
9    Sobol Shapiro.    09:42:40
10 Q.  Okay.  When were you retained in this case?    09:42:41
11 A.  You know what?  I would have to check the    09:42:50
12    documentation for when the retention was    09:42:53
13    actually done.  I believe it would be early    09:42:55
14    last year, but I actually don't know the    09:42:58
15    date.  I'm sorry.    09:43:00
16 Q.  Why don't we make it easier for you and mark    09:43:01
17    the next exhibit.  That's great.    09:43:03
18    (Exhibit No. 3, Retention letter    09:43:03
19    dated May 26, 2005, marked for    09:43:03
20    identification.)    09:43:30
21 Q.  So the court reporter just handed you what    09:43:30
22    we've marked Rosenthal Exhibit 3.  Could you    09:43:32
23    take a look at it, please.    09:43:36
24 A.  Yes.    09:43:37
25 Q.  Is this your retention letter in this    09:43:43

37

1    matter?    09:43:45
2 A.  Yes, I believe it is.    09:43:45
3 Q.  Was it ever signed?    09:43:47
4 A.  It doesn't appear to be.    09:43:48
5 Q.  Do you know whether it was ever signed?    09:43:50
6 A.  I don't believe it was, no.    09:43:53
7 Q.  Do you know why it wouldn't have been?    09:43:55
8 A.  I don't.  I'm sorry.    09:43:56
9 Q.  Now, this agreement, unless I'm misreading    09:44:03
10    it, doesn't mention Greylock McKinnon; is    09:44:05
11    that correct?    09:44:08
12 A.  That's correct, yes.  I'm afraid that I    09:44:08
13    would have to amend.  I forgot that this    09:44:12
14    letter was written directly to me and not to    09:44:16
15    Greylock McKinnon.  It's the only case that    09:44:19
16    I have that's like this.  So this doesn't go    09:44:21
17    through Greylock McKinnon.    09:44:24
18 Q.  But your work on this matter isn't being    09:44:28
19    done independently of Greylock McKinnon, I    09:44:31
20    take it?    09:44:32
21 A.  That's correct.  I do get support from    09:44:32
22    Greylock McKinnon.    09:44:35
23 Q.  So by "support" do you mean you use Greylock    09:44:35
24    McKinnon's staff or other resources in the    09:44:38
25    work that you've performed so far?    09:44:41

10 (Pages 34 to 37)

---

**38**

1  A.  Yes, that's correct.                        09:44:42
2  Q.  Do you continue to expect to use Greylock      09:44:43
3     McKinnon's support staff?                   09:44:45
4  A.  I do.                                     09:44:46
5  Q.  And Greylock McKinnon would have actually   09:44:49
6     submitted your bills in this matter; is that   09:44:52
7     correct?                                   09:44:54
8  A.  That's correct.                           09:44:54
9  Q.  Okay. Is there any other agreement that you   09:44:56
10     know of that governs your provision of       09:44:58
11     services in this case?                      09:45:01
12  A.  Not that I know of.                        09:45:01
13  Q.  Okay. Can you describe your first contact    09:45:07
14     with plaintiffs' counsel in this case?        09:45:09
15  A.  To the best of my recollection, there was a   09:45:12
16     meeting, which may have actually have been a   09:45:18
17     conference call, but I believe it was a       09:45:20
18     face-to-face meeting where I met with Tom     09:45:22
19     Sobol and Tom Greene, and there may have     09:45:27
20     been others, I believe, from Tom Green's      09:45:32
21     office there to discuss the matter.          09:45:35
22  Q.  Do you know approximately when the meeting   09:45:36
23     would have taken place?                     09:45:39
24  A.  Well, I would have said it was early 2005,   09:45:40
25     perhaps around this time.                   09:45:43

---

**39**

1  Q.  Who contacted whom?                        09:45:45
2  A.  The offices of Hagens Berman Sobol Shapiro   09:45:46
3     contacted me.                              09:45:53
4  Q.  Did they contact you directly?             09:45:53
5  A.  Probably through Greylock McKinnon.         09:45:55
6  Q.  What was said at this first meeting or       09:45:56
7     conference call, to the best of your         09:46:01
8     recollection?                              09:46:03
9  A.  To the best of my --                       09:46:04
10         MR. NOTARGIACOMO: Objection. You can     09:46:05
11     answer.                                    09:46:07
12  A.  To the best of my recollection, there was a   09:46:07
13     broad discussion about the history of the     09:46:10
14     case, including the prior federal matter.     09:46:13
15  Q.  Do you have an understanding of how the      09:46:25
16     plaintiffs' counsel would have learned of     09:46:27
17     you or why they would have retained you?     09:46:28
18  A.  I have worked with Hagens Berman Sobol       09:46:30
19     Shapiro on a number of matters.             09:46:34
20  Q.  And so your assumption is that based upon    09:46:39
21     your past work, that they were aware that     09:46:41
22     you might be interested or willing in         09:46:42
23     working on this case?                       09:46:45
24  A.  That would be my assumption.               09:46:46
25  Q.  But you haven't had discussions with them    09:46:48

---

**40**

1     specifically about that, I take it?          09:46:51
2  A.  Specifically about why they asked me to work   09:46:53
3     for them on this case?                      09:46:56
4  Q.  Yes.                                       09:46:58
5  A.  No, I have not.                            09:46:58
6  Q.  Just one last question on this -- on         09:46:59
7     Rosenthal Exhibit 3. It sounds like you did   09:47:06
8     do some work prior to May 26th of 2005 in    09:47:10
9     this case?                                  09:47:14
10  A.  I believe I did review some documents.      09:47:14
11  Q.  Okay. Now, at the time you wrote your       09:47:16
12     declaration your hourly rate was $375 an     09:47:21
13     hour; is that correct?                      09:47:26
14  A.  That's correct.                           09:47:27
15  Q.  Now, is it still?                          09:47:28
16  A.  No. I've been told that it's been raised to   09:47:28
17     $450.                                      09:47:32
18  Q.  That's an interesting way of phrasing your   09:47:34
19     answer to the question. Who told you that   09:47:35
20     it's been raised to $450 an hour?           09:47:38
21  A.  Greylock McKinnon. They -- when I was       09:47:41
22     promoted, we talked about an adjustment and   09:47:44
23     they said that would be a good adjustment.   09:47:47
24  Q.  So does Greylock McKinnon decide your hourly   09:47:49
25     rate for you?                              09:47:52

---

**41**

1  A.  They advise me on it.                       09:47:53
2  Q.  Is the decision yours as to how much to      09:47:55
3     charge on an hourly basis?                  09:47:59
4  A.  Of course ultimately it's my decision.      09:48:00
5  Q.  But it sounds like it's based on their       09:48:02
6     advice?                                    09:48:05
7  A.  That's correct.                            09:48:05
8  Q.  I've got another exhibit coming up.         09:48:05
9         MR. POLUBINSKI: Could we mark this       09:48:23
10     one as Rosenthal No. 4, please.            09:48:24
11         (Exhibit No. 4, GMA Invoice,            09:48:24
12     GMA000054 - GMA000074, marked for          09:48:24
13     identification.)                           09:48:46
14         MR. POLUBINSKI: And while we're at      09:48:46
15     it, why don't we mark this one as Rosenthal   09:48:47
16     5.                                         09:48:50
17         (Exhibit No. 5, GMA Invoice,            09:48:50
18     GMA000289 - GMA294, marked for             09:48:50
19     identification.)                           09:48:52
20  Q.  All right. While you're looking these over,   09:48:52
21     we've handed you two documents --           09:49:12
22  A.  Okay.                                      09:49:13
23  Q.  -- marked Rosenthal Exhibit 4 and 5; is that   09:49:13
24     right? I'll just explain to you that we      09:49:18
25     received these invoices from plaintiffs'      09:49:26

---

11 (Pages 38 to 41)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

42

1  counsel in response to our request for all      09:49:28
2  invoices, and what we've done here is           09:49:30
3  organize them in chronological order to the     09:49:32
4  best of our ability.                            09:49:34
5 A.  Okay.                                        09:49:36
6 Q.  The reason that there are two separate       09:49:36
7  exhibits is that one of them was a batch        09:49:39
8  that was produced to us last -- well, last      09:49:40
9  winter, and then the other is a smaller         09:49:42
10  batch that was produced to us last week.       09:49:45
11  Your time appears to have been billed in       09:49:48
12  both of these invoices, although you can       09:49:50
13  look.  And the one other just administrative   09:49:52
14  point that I should probably make on the       09:49:56
15  record is that they were produced to us        09:49:57
16  without control numbers or Bates numbers of    09:50:00
17  any kind.                                       09:50:02
18       So just for organization's sake what      09:50:02
19  we've done is we've affixed numbers to each    09:50:06
20  of the pages.  The prefix on each of the       09:50:08
21  pages begins GMA, and the -- though I'm not    09:50:12
22  sure that any of these pages start with the    09:50:16
23  numeral 1 the first of the materials that      09:50:18
24  were produced to us do start with the          09:50:21
25  numeral 1.                                      09:50:22

43

1 A.  Okay.  Thank you.                           09:50:23
2 Q.  Were you involved in the preparation of     09:50:24
3  these invoices?                                 09:50:26
4 A.  No, I was not.                               09:50:26
5 Q.  Are you aware of any other invoices that    09:50:27
6  would have been submitted in relation to the   09:50:31
7  time that you've spent on this engagement?     09:50:32
8 A.  To my knowledge, that's -- this would be all  09:50:34
9  of it.                                          09:50:38
10 Q.  And so, again, just to sort of clear this  09:50:38
11  up, relative to your retention letter it was  09:50:44
12  Greylock McKinnon that submitted bills to     09:50:47
13  plaintiffs' counsel for time that you billed  09:50:48
14  to this matter?                                09:50:50
15 A.  That's correct.  I submit my hours to them, 09:50:51
16  and they submit the invoices.                  09:50:53
17 Q.  All right.  Other than the fees that are   09:50:59
18  billed here, the hourly fees that are billed  09:51:02
19  by Greylock McKinnon for your time and the    09:51:06
20  time of their employees, do you expect that   09:51:08
21  you or Greylock McKinnon will receive any     09:51:13
22  payment of any other kind in connection with  09:51:14
23  this litigation?                               09:51:17
24 A.  No.  We are only paid for the hourly rates, 09:51:17
25  the hourly bills.                              09:51:21

44

1 Q.  Now, it sounds like you've been retained by  09:51:22
2  at least some of the counsel for plaintiffs    09:51:26
3  in this case on other occasions; is that       09:51:28
4  right?                                          09:51:30
5 A.  That's correct.                             09:51:30
6 Q.  Are all of those counsel at Hagens Berman,  09:51:30
7  or have you worked with other plaintiffs'      09:51:35
8  counsel that are part of the plaintiffs'       09:51:37
9  counsel group in this case?                     09:51:39
10 A.  In this case I've met some of the other    09:51:40
11  counsel such as the gentleman on the phone,   09:51:45
12  but largely I work with Ed and others at      09:51:47
13  Hagens Berman.                                 09:51:50
14 Q.  And is that true of your work in other     09:51:51
15  cases?                                         09:51:53
16 A.  It is largely true.  I do have contact with  09:51:53
17  other counsel outside of Hagens Berman, but   09:51:58
18  for the most part it's been the counsel for   09:52:01
19  Hagens Berman.                                 09:52:04
20 Q.  Have you ever worked in a litigation support  09:52:05
21  capacity in any case in which Hagens Berman   09:52:07
22  was not counsel?                               09:52:11
23 A.  I was once asked actually a long time ago,  09:52:13
24  maybe five years ago, five years ago it       09:52:18
25  would be, to work on a malpractice case       09:52:21

45

1  related to physician compensation.  It        09:52:24
2  didn't go anywhere.  The judge threw out the  09:52:28
3  issue related to physician compensation, so   09:52:32
4  there was -- but this was a law firm in       09:52:34
5  Phoenix.                                       09:52:36
6 Q.  Was your work in that case done through    09:52:37
7  Greylock McKinnon?                             09:52:39
8 A.  No.  It actually wasn't.  It was before I   09:52:39
9  started working to a great degree with them,  09:52:42
10  so I was contacted directly by counsel based  09:52:46
11  on, again, work that I had published.         09:52:51
12 Q.  Do you remember the name of the law firm in  09:52:53
13  Phoenix?                                       09:52:55
14 A.  I don't, but I can find it.                09:52:56
15 Q.  Have you ever done any work for a          09:52:57
16  pharmaceutical company before?                09:53:07
17 A.  No, I have not.                            09:53:08
18 Q.  And that includes Pfizer and Warner-Lambert,  09:53:09
19  I take it?                                     09:53:13
20 A.  That's correct.                            09:53:13
21 Q.  Has any pharmaceutical company ever provided  09:53:14
22  financial support for any of your research    09:53:17
23  or academic work?                             09:53:19
24 A.  No, they have not.                         09:53:20
25 Q.  Now, the declaration that you submitted in  09:53:24

12  (Pages 42 to 45)

## 46

1    this case does discuss other instances in    09:53:32
2    which you've consulted or provided testimony    09:53:35
3    related to the health care or pharmaceutical    09:53:37
4    industries?    09:53:39
5  A.  That's correct.    09:53:48
6  Q.  Are the cases that are listed here in    09:53:48
7    Paragraph 2 of Exhibit 1 -- let me withdraw    09:53:49
8    the question.    09:53:58
9       Aside from the three cases that we    09:53:58
10    discussed in the beginning of your    09:54:01
11    testimony, are any of the cases that are    09:54:03
12    listed in the footnotes of Paragraph 2 of    09:54:06
13    your declaration cases in which you have    09:54:09
14    provided testimony?    09:54:11
15  A.  Sorry, can you point me to exactly which    09:54:15
16    cases you're looking at?  The ones after the    09:54:18
17    colon, or are you -- you're in a footnote?    09:54:21
18  Q.  Probably the easiest thing to do is just to    09:54:25
19    look at the footnotes --    09:54:27
20  A.  Okay.    09:54:28
21  Q.  -- footnotes 1 through 5.  And there are a    09:54:28
22    number of cases that are listed there.  The    09:54:30
23    first three are cases that we discussed and    09:54:32
24    that are listed on your CV --    09:54:35
25  A.  Uh-huh.    09:54:36

## 47

1  Q.  -- as cases in which you've provided    09:54:37
2    testimony?    09:54:39
3  A.  Right.    09:54:40
4  Q.  The cases that are listed in Footnotes 4 and    09:54:41
5    5 are not.  So my question really is, what's    09:54:43
6    the nature of the services that you provided    09:54:48
7    in those cases, and specifically did you    09:54:50
8    serve in any sort of a testifying role in    09:54:55
9    any of those cases?    09:54:58
10  A.  I was a consulting expert in those cases, so    09:54:59
11    I conducted data analysis, reviewed    09:55:02
12    reimbursement issues, that kind of thing.    09:55:06
13  Q.  Okay.  Looking back at the cases that are    09:55:08
14    listed in Footnotes 1 through 3, which are    09:55:11
15    the ones that are listed in your --    09:55:13
16  A.  Yes.    09:55:15
17  Q.  -- CV, did you provide testimony in support    09:55:15
18    of class certification in any of those    09:55:19
19    cases?    09:55:22
20  A.  In Augmentin -- now, I would have to check    09:55:22
21    this to be sure I wrote a document, but I    09:55:30
22    believe the case was settled before it was    09:55:33
23    ever filed.    09:55:37
24  Q.  So with respect to Augmentin, you would not    09:55:37
25    have submitted testimony in support of --    09:55:39

## 48

1  A.  I think there's no -- I'm afraid my memory    09:55:41
2    is terrible, but I believe the answer is no.    09:55:44
3  Q.  How about Lupron?    09:55:46
4  A.  No.    09:55:49
5  Q.  And how about the AWP case?    09:55:50
6  A.  No.  I have the two documents that I filed    09:55:52
7    there were the tutorial and a declaration in    09:55:59
8    support of liability issues.    09:56:06
9  Q.  What was the subject matter of your    09:56:09
10    tutorial?    09:56:12
11  A.  The subject matter of the tutorial was    09:56:12
12    broadly about reimbursement for    09:56:16
13    pharmaceuticals in the U.S. with a focus in    09:56:19
14    particular on injectable drugs.  And --    09:56:26
15  Q.  And the tutorial I take it just described    09:56:32
16    the business generally?    09:56:35
17  A.  The tutorial describes how Medicare paid for    09:56:38
18    drugs through Part B.  It described how the    09:56:41
19    private sector reimburses drugs, both the    09:56:48
20    injectable drugs but also orals and    09:56:54
21    competition at various levels in the    09:57:01
22    industry and the economic issues -- economic    09:57:03
23    incentives around prescribing.    09:57:06
24  Q.  And the tutorial, I take it, was directed to    09:57:08
25    the Court in that case?    09:57:13

## 49

1  A.  It was directed to the court.    09:57:15
2  Q.  And I take it that, your understanding, the    09:57:17
3    aim of the tutorial was to provide    09:57:19
4    background knowledge about the area, or was    09:57:22
5    there something more?    09:57:24
6  A.  The aim was to provide background knowledge    09:57:25
7    on the institutions, how things worked and    09:57:27
8    the economic incentives.    09:57:30
9  Q.  So it sounds like, then, that this is the    09:57:32
10    first case in which you provided testimony    09:57:42
11    in support of class certification; is that    09:57:44
12    correct?    09:57:48
13  A.  I believe that's correct.    09:57:48
14  Q.  And so I take it, then, that it is the    09:57:48
15    case -- withdrawn.    09:57:57
16       So this would be the first case in    09:58:00
17    which you have analyzed whether causation or    09:58:02
18    injury could be proved on a class-wide    09:58:04
19    basis?    09:58:06
20  A.  As the primary expert, that's correct.  As a    09:58:07
21    consultant in other matters, certainly my    09:58:14
22    work related to that.    09:58:16
23  Q.  Well, let's split that up.  When you say "as    09:58:21
24    a primary expert," what do you mean?  Do you    09:58:23
25    mean as a testifying expert?    09:58:25

13 (Pages 46 to 49)

50

```
 1  A.  As a testifying expert.                    09:58:27
 2  Q.  Okay.  So this is the first time that you've     09:58:28
 3      offered a report on those issues?          09:58:30
 4  A.  That's correct.                            09:58:31
 5  Q.  You had mentioned that you have provided   09:58:32
 6      advice on those issues as a consultant; is 09:58:36
 7      that correct?                              09:58:38
 8  A.  Oh, I'm sorry.  There's a case I'm missing. 09:58:38
 9      I'm sorry.  Can I back up?                 09:58:42
10  Q.  Of course.                                 09:58:45
11  A.  Wellbutrin SR.                             09:58:46
12  Q.  Have you provided testimony in the         09:58:55
13      Wellbutrin SR case?                        09:59:01
14  A.  I have filed a report in the Wellbutrin SR 09:59:03
15      case.  I'm sorry.                          09:59:07
16  Q.  When did you file it?                      09:59:10
17  A.  You know, I need to check the date.  It    09:59:11
18      should be -- it should be in -- I guess it's 09:59:13
19      subsequent to this, so it's not in the    09:59:19
20      footnotes.  Can I get you the date?       09:59:21
21  Q.  Sure.                                      09:59:22
22  A.  I don't know it precisely right now.       09:59:23
23  Q.  Sure.  Can you just ballpark it?  It was   09:59:24
24      after your report in this case --         09:59:27
25  A.  It was after --                            09:59:28
```

51

```
 1  Q.  -- the time after August of --            09:59:29
 2  A.  Yes, it was sometime --                   09:59:29
 3  Q.  -- 2005?                                  09:59:30
 4  A.  Yes, it was.  And I'm sorry, I just can't  09:59:31
 5      ballpark it right now, but I would be happy 09:59:35
 6      to get it for you at the next break.      09:59:37
 7  Q.  And I take it your work in the Wellbutrin  09:59:39
 8      case is work that you're doing through    09:59:42
 9      Greylock McKinnon?                        09:59:44
10  A.  And Hagens Berman Sobol Shapiro.          09:59:44
11  Q.  Do you know where the case is pending?    09:59:47
12  A.  I do not.                                 09:59:49
13      MR. POLUBINSKI:  Ed, do you know?         09:59:54
14      MR. NOTARGIACOMO:  Not off the top        09:59:55
15      of my head.  I wasn't involved in         09:59:56
16      Wellbutrin, but...                        09:59:59
17      MR. POLUBINSKI:  Fair enough.             09:59:59
18      That's the last question I'll ask you, if I 10:00:00
19      can avoid it.                             10:00:02
20  A.  I will follow up with you on that.  I...  10:00:04
21  Q.  Okay.  Can you tell me, just generally    10:00:07
22      speaking, what the subject matter of your 10:00:11
23      report in that case is?                   10:00:13
24  A.  It is related to class certification in a 10:00:14
25      Hatch-Waxman case.                        10:00:21
```

52

```
 1  Q.  What's your understanding of what a Hatch-  10:00:22
 2      Waxman case is?                           10:00:25
 3  A.  It has to do with Paragraph 4,            10:00:25
 4      certification, so generic entry under a   10:00:30
 5      circumstance where the generic manufacturer 10:00:32
 6      claims that patent's invalid.             10:00:34
 7  Q.  And so in a nutshell would it be correct to 10:00:44
 8      describe the Wellbutrin case as a patent  10:00:48
 9      dispute?                                  10:00:52
10  A.  I'm not sure.  That's a legal question, I'm 10:00:53
11      afraid.  I'm not sure.                    10:00:57
12  Q.  Fair enough.                              10:00:59
13      MR. NOTARGIACOMO:  I'm supposed to        10:00:59
14      be objecting, not you.                    10:01:00
15  Q.  And can you tell me what your report related 10:01:05
16      to class certification purports to opine on? 10:01:08
17  A.  In the matter of Wellbutrin?              10:01:11
18  Q.  Wellbutrin, yes, thank you.               10:01:16
19  A.  Purports to opine on common impact and    10:01:18
20      issues related to whether that impact can be 10:01:24
21      estimated reasonably using aggregate data. 10:01:27
22  Q.  Have you offered testimony in that case?   10:01:36
23  A.  I have not.  Oral testimony?              10:01:37
24  Q.  Yeah.                                     10:01:40
25  A.  No, I have not.                           10:01:40
```

53

```
 1  Q.  Do you know whether the Court has ruled on 10:01:42
 2      the class certification motion in that case? 10:01:45
 3  A.  I do not know.  I do not believe so.      10:01:47
 4  Q.  Okay.  So aside from the Wellbutrin matter, 10:01:50
 5      this is the first case in which you've    10:02:04
 6      analyzed whether causation or injury can be 10:02:06
 7      proved on a class-wide basis for purposes of 10:02:10
 8      a class certification motion?             10:02:13
 9  A.  That's correct.                           10:02:14
10  Q.  Has any of your published work dealt with  10:02:14
11      alleged or deceptive marketing of the drug? 10:02:24
12  A.  No, it has not.                           10:02:25
13  Q.  Has any of your published work dealt with  10:02:28
14      alleged or deceptive marketing of any     10:02:31
15      product?                                  10:02:35
16  A.  No, it has not.                           10:02:36
17  Q.  Do you have any prior experience with issues 10:02:39
18      related to FDA approval of prescription   10:02:41
19      drugs?                                    10:02:44
20      MR. NOTARGIACOMO:  Objection.  You        10:02:44
21      can answer.                               10:02:45
22  A.  I have certainly reviewed issues as they're 10:02:45
23      relevant, as a consulting expert reviewed  10:02:50
24      new drug approval documents, that kind of 10:02:54
25      thing, but do you mean industry experience? 10:02:56
```

14  (Pages 50 to 53)

**54**

1  Q.  No, just any experience at all.          10:03:00
2  A.  So I've looked at new drug approval and          10:03:02
3     ANDA-abbreviated new drug approval documents     10:03:08
4     on the FDA website.          10:03:12
5  Q.  What sort of documents?  Are they          10:03:13
6     documents -- let me phrase the question more     10:03:17
7     precisely.          10:03:21
8        Are they documents that relate to          10:03:22
9     specific drugs, or are they more general     10:03:23
10    policy-related documents?          10:03:27
11 A.  Looking at letters from the FDA to          10:03:28
12    manufacturers in the cases of specific     10:03:34
13    drugs.          10:03:37
14 Q.  Can you think of any of those specific drugs     10:03:40
15    now off the top of your head?  Can you     10:03:43
16    recall them?          10:03:45
17 A.  Well, for example, for cases like Wellbutrin     10:03:45
18    SR I've looked at the letters that go out to     10:03:48
19    the generic manufacturers in response to     10:03:54
20    their abbreviated new drug applications.     10:03:58
21 Q.  Any others that you can remember?          10:04:01
22 A.  Specifically, no.  But this is a common part     10:04:09
23    of what we look at in these cases, so I     10:04:11
24    would say for many of these cases I have     10:04:14
25    looked at those letters.          10:04:16

**55**

1  Q.  When you say "these cases," do you mean all     10:04:17
2     of your cases or Wellbutrin and some other     10:04:19
3     smaller subset of cases?          10:04:23
4  A.  The cases that involve generic entry, which     10:04:25
5     would include Hytrin, Relafen, Cipro.     10:04:31
6  Q.  Do you have any prior experience with issues     10:04:38
7     related to off-label uses of a drug?     10:04:44
8  A.  No, I do not.          10:04:47
9  Q.  Okay.  Let's turn to your work in this case.     10:05:02
10    What have you been retained to do in this     10:05:04
11    case?          10:05:05
12 A.  I have been retained to provide written and     10:05:05
13    oral testimony related to whether or not it     10:05:14
14    can be shown that off-label promotion --     10:05:18
15    that certain allegations regarding off-label     10:05:22
16    promotion caused prescribing for Neurontin,     10:05:24
17    as well as increased dosing of Neurontin,     10:05:30
18    whether there's an economic theory to     10:05:37
19    support that, whether there's an empirical     10:05:40
20    model and finally whether there's data to     10:05:44
21    estimate such an empirical model to do that.     10:05:49
22 Q.  Anything else?          10:05:52
23 A.  Essentially that's obviously in the context     10:05:53
24    of the class whether these claims can be     10:05:59
25    shown to be common and whether the class     10:06:02

**56**

1     methods or the aggregate method makes sense     10:06:07
2     to estimate their effects.          10:06:11
3  Q.  Now, what you've just said sounds like you     10:06:16
4     might have limited your description of what     10:06:18
5     you did or what you've done related to class     10:06:20
6     certification.  Is there other work that     10:06:23
7     you've been retained to do in this case?     10:06:25
8  A.  That's the work that you have in front of     10:06:26
9     you.  That's essentially it.          10:06:30
10 Q.  And other than the work that's in front of     10:06:32
11    me, and you're referring to Exhibit No. 1,     10:06:34
12    there isn't, I take it, other work that     10:06:39
13    you're doing in the case?          10:06:41
14 A.  No, there isn't.          10:06:42
15 Q.  Okay.  Referring to Exhibit 1, you wrote the     10:06:47
16    declaration, correct?          10:06:50
17 A.  That's correct.          10:06:52
18 Q.  Who assisted you in writing, if anyone?     10:06:52
19 A.  I essentially wrote it myself.  As I     10:06:55
20    mentioned in the report, I consulted in     10:06:59
21    discussions with Richard Frank.          10:07:01
22 Q.  Now, aside from your discussions with     10:07:09
23    Richard Frank, are there any other ways in     10:07:11
24    which you would consider yourself not to     10:07:14
25    have written the report?  The reason I ask     10:07:16

**57**

1     that is that you said you essentially wrote     10:07:19
2     it yourself.          10:07:21
3  A.  I wrote the report myself.          10:07:22
4  Q.  Okay.  So you actually typed it yourself?     10:07:26
5  A.  Yes, I did.          10:07:28
6  Q.  Did you work on it at home or in your     10:07:28
7     office?  I assume you didn't work on it at     10:07:33
8     Greylock McKinnon?          10:07:35
9  A.  That's correct.  I probably mostly worked on     10:07:35
10    it at home.  It's possible I did some of the     10:07:38
11    work at my Harvard office.          10:07:42
12 Q.  When did the drafting begin?          10:07:43
13 A.  I'm not sure that I can say when the     10:07:48
14    drafting began.  Probably -- if it was filed     10:07:52
15    in August, probably about no more than a     10:07:57
16    month before that.          10:08:01
17 Q.  Did you prepare an outline before you     10:08:03
18    drafted the report?          10:08:08
19 A.  No, I did not.  I don't believe I did.     10:08:08
20 Q.  When did you complete -- to the best of your     10:08:14
21    recollection, when did you complete a first     10:08:18
22    draft?          10:08:20
23 A.  I'm sorry, I really don't recall.  I believe     10:08:20
24    that it would have been very close to that     10:08:27
25    filing date.          10:08:28

15  (Pages 54 to 57)

## 58

1 Q. And do you recall in this case ever having       10:08:29
2    printed drafts to review them?       10:08:34
3 A. Could you please repeat the question?       10:08:37
4 Q. Sure. And maybe I'll break it up. It       10:08:41
5    sounds like you typed the report yourself       10:08:44
6    presumably on your computer or your laptop       10:08:46
7    or something else; is that correct?       10:08:48
8 A. That's correct.       10:08:50
9 Q. Okay. In order to review it, did you always       10:08:50
10    review it on the screen, or did you print       10:08:55
11    out copies of the report, interim drafts and       10:08:57
12    bring them home and mark them up, that sort       10:09:00
13    of thing?       10:09:01
14 A. I believe I worked on the screen. I usually       10:09:02
15    do.       10:09:04
16 Q. Did you share drafts of the report with       10:09:05
17    other people on your team at all?       10:09:07
18 A. Again, I consulted with Richard. I may have       10:09:09
19    shown him parts of the document, asked his       10:09:12
20    opinion about them.       10:09:16
21 Q. Would you have sent in drafts of the       10:09:16
22    document by e-mail?       10:09:18
23 A. I may have.       10:09:19
24 Q. Other than Richard Frank, is there anybody       10:09:25
25    else with whom you would have shared drafts?       10:09:28

## 59

1 A. I would have shared drafts -- the staff       10:09:29
2    would have helped with the footnote, so I       10:09:33
3    would have shared a draft with Greylock       10:09:35
4    McKinnon so that they could fill in case       10:09:37
5    numbers, that sort of thing.       10:09:39
6 Q. And so would you have e-mailed them a copy       10:09:41
7    or printed them out a copy?       10:09:42
8 A. I would have e-mailed a copy.       10:09:44
9 Q. Do you know if those e-mails still exist?       10:09:57
10 A. I do not. On my outbound end we have very       10:09:58
11    limited space, so I wouldn't have the       10:10:03
12    outbound e-mail.       10:10:05
13 Q. So other than an e-mail that you may have       10:10:06
14    sent to Richard Frank and an e-mail that you       10:10:14
15    may have sent with a draft of the document       10:10:16
16    to Greylock McKinnon, are there others with       10:10:18
17    whom you would have shared drafts?       10:10:20
18 A. No.       10:10:21
19 Q. Would you have sent more than a draft to       10:10:22
20    any of these groups of people?       10:10:23
21 A. It's possible that I would have sent an       10:10:24
22    early draft and a later draft.       10:10:27
23 Q. Did you receive comments on the drafts of       10:10:32
24    your declaration?       10:10:36
25 A. Yes, I did.       10:10:38

## 60

1 Q. From whom?       10:10:38
2 A. I certainly received comments from Richard,       10:10:39
3    and I received comments from Ray Hartman at       10:10:47
4    Greylock McKinnon.       10:10:52
5 Q. Anyone else?       10:10:53
6 A. I'm not certain, but I think Renee       10:10:54
7    Rushnawitz, she often provides comments as       10:10:58
8    to form.       10:11:02
9 Q. Were they -- well, let's go through them one       10:11:07
10    at a time. With respect to Professor       10:11:09
11    Frank's comments --       10:11:12
12 A. Uh-huh.       10:11:13
13 Q. -- would they have been conveyed in a       10:11:13
14    handwritten markup or orally or some other       10:11:15
15    way?       10:11:17
16 A. Orally.       10:11:17
17 Q. Do you remember what his comments were?       10:11:19
18 A. I remember largely that his comments related       10:11:20
19    to where the Dorfman-Steiner theory applied,       10:11:28
20    its relevance. That's -- I remember a lot       10:11:34
21    of our discussion was about that.       10:11:38
22 Q. Can you tell me what the Dorfman-Steiner       10:11:49
23    theory is?       10:11:51
24 A. It has to do with the underpinnings of       10:11:51
25    advertising and the economics of       10:11:53

## 61

1    advertising. Why do firms advertise, and       10:11:54
2    why don't we expect that advertising is       10:11:57
3    important in particular in the       10:12:00
4    pharmaceutical industry. Excuse me.       10:12:02
5 Q. When you say "important," what do you mean?       10:12:05
6 A. Why will it be substantial? Because of the       10:12:07
7    fact that there are substantial price       10:12:15
8    margins.       10:12:18
9 Q. When you say "substantial," do you mean       10:12:21
10    substantial in a monetary way?       10:12:24
11 A. I do. That it'll be a significant activity.       10:12:25
12    So just to clarify, in industries where the       10:12:30
13    goods are commodities and essentially       10:12:35
14    they're interchangeable, they're very small       10:12:38
15    profit margins on those commodities. We       10:12:42
16    expect to find little advertising.       10:12:44
17    Pharmaceuticals, they're -- for a variety of       10:12:46
18    reasons are higher profit margins, and we       10:12:52
19    would expect to find more advertising.       10:12:54
20 Q. And how did you respond to the comments that       10:12:55
21    you received from Professor Frank on the       10:12:58
22    subject?       10:13:00
23 A. I think I clarified and edited that section.       10:13:00
24 Q. Okay. How about Dr. Hartman; were his       10:13:07
25    comments conveyed to you orally or in a       10:13:11

16 (Pages 58 to 61)

62

```
 1   handwritten markup or some combination of      10:13:13
 2   the two?                                       10:13:15
 3 A. I believe they were oral.                     10:13:15
 4 Q. What were the substance of his comments?      10:13:17
 5 A. The substance of his comments largely were    10:13:22
 6   about expanding some of the descriptions,      10:13:26
 7   providing more examples in the empirical       10:13:29
 8   section.                                       10:13:34
 9 Q. And the empirical section of your report, if  10:13:37
10   you can direct us to that --                   10:13:42
11 A. Yes. Sure.                                    10:13:43
12 Q. -- so I know that we're on the same page.     10:13:43
13 A. The section -- Section 6 in particular        10:13:46
14   around Paragraph 30 --                         10:13:55
15 Q. Section -- I'm sorry.                          10:13:56
16 A. Sorry. Section 6.                             10:13:57
17      MR. NOTARGIACOMO: Page 13.                  10:13:59
18 Q. Roman numeral VI?                             10:14:00
19 A. Roman numeral VI, yes, Page 13, but in        10:14:02
20   particular the section with the formulas       10:14:03
21   that follows.                                  10:14:05
22 Q. Right. How did you respond to his comments?   10:14:09
23 A. I expanded the examples I used and provided   10:14:10
24   more description about how the models might    10:14:15
25   actually be implemented.                       10:14:19
```

63

```
 1 Q. And how about Renee Rushnawitz; how were her  10:14:20
 2   comments conveyed, if you remember?            10:14:28
 3 A. I think Renee may have actually provided      10:14:30
 4   suggestions either on a hard copy or           10:14:33
 5   redline, and, again, she generally works       10:14:39
 6   about things like appropriate footnoting and   10:14:48
 7   appropriate reference to what's in the         10:14:53
 8   complaint, so she would have provided some     10:14:56
 9   technical, essentially editorial, comments.    10:14:58
10 Q. Do you still have the hard copy markup that   10:15:07
11   she did, or redline, whichever the case may    10:15:09
12   be?                                            10:15:09
13 A. I don't believe I do, no.                     10:15:13
14 Q. Do you know what you would have done with     10:15:14
15   it?                                            10:15:17
16 A. I don't think I would have saved it. I        10:15:17
17   would have had it shredded, I guess.           10:15:19
18 Q. Okay. Other than Professor Frank, Dr.         10:15:23
19   Hartman, and Dr. Rushnawitz, Ms.               10:15:30
20   Rushnawitz --                                  10:15:34
21 A. Ms.                                           10:15:34
22 Q. -- Ms. Rushnawitz, did anybody else receive   10:15:35
23   drafts of your declaration prior to its        10:15:38
24   being finalized?                               10:15:40
25 A. I'm sure I sent a draft to the lawyers.       10:15:41
```

64

```
 1 Q. How far in advance of the filing would you    10:15:43
 2   have done that?                                10:15:53
 3 A. I'm sorry, I don't know, but I don't          10:15:53
 4   think -- I don't think it would have been      10:15:55
 5   very long in advance. I teach during this      10:16:01
 6   period in the summer, and so it's a very       10:16:03
 7   tight -- would have been a very tight          10:16:07
 8   timeline for me.                               10:16:10
 9 Q. Sure. And how would you have sent the draft   10:16:11
10   to the lawyers?                                10:16:16
11 A. I would have sent it by e-mail.               10:16:17
12 Q. Did you receive comments from them?           10:16:19
13 A. I spoke with Tom Sobol.                       10:16:21
14 Q. Anybody else?                                 10:16:27
15 A. That's all that I recall.                     10:16:28
16 Q. Would you have received written comments      10:16:30
17   from Mr. Sobol or oral comments?               10:16:34
18 A. They would have been oral.                    10:16:36
19 Q. Do you recall the substance of his comments?  10:16:37
20 A. I don't. I recall that he did not have        10:16:42
21   specific comments about the declaration. I     10:16:50
22   don't recall any direct comments. I know       10:16:57
23   that we had a conversation about it, but I     10:16:59
24   don't -- I don't recall anything specific      10:17:06
25   that he suggested or any changes that I made   10:17:07
```

65

```
 1   subsequent to that conversation.               10:17:10
 2 Q. Do you remember whether you did make changes  10:17:12
 3   subsequent to the conversation?                10:17:14
 4 A. I don't recall making changes subsequent to   10:17:16
 5   the conversation, no.                          10:17:19
 6 Q. Would that have been because you disagreed    10:17:24
 7   with comments that he made?                    10:17:25
 8 A. No, that was not what happened.               10:17:26
 9 Q. When you say you don't recall making changes  10:17:33
10   in response to your conversation with him,     10:17:36
11   is it that you don't have a recollection one   10:17:38
12   way or the other as to whether you did, or     10:17:40
13   is it your best recollection that you          10:17:43
14   didn't?                                        10:17:45
15 A. My best recollection is that I didn't. It     10:17:45
16   was a year ago.                                10:17:47
17 Q. Sure.                                         10:17:48
18 A. I recall a conversation, and I don't believe  10:17:49
19   that there were specific recommendations.      10:17:52
20 Q. Okay. When did you complete your              10:17:55
21   declaration?                                   10:18:11
22      MR. NOTARGIACOMO: Objection. You            10:18:11
23   can answer.                                    10:18:12
24 A. I'm sorry, I don't know the exact date. I     10:18:12
25   know the date it was filed, but I don't --     10:18:18
```

17 (Pages 62 to 65)

66

```
1   since it was a year ago, I don't know the    10:18:20
2   exact date that I completed it.              10:18:21
3 Q.  Relative to the -- right. Relative to the  10:18:24
4   date that it was signed, which appears to be 10:18:26
5   August 8th, 2005 --                          10:18:28
6 A.  Right.                                     10:18:31
7 Q.  -- how far in advance of that date would you 10:18:31
8   have finished your edits on the document?    10:18:33
9 A.  I'm not certain, but typically very -- it  10:18:35
10    would have been very close to the date      10:18:39
11    itself.                                      10:18:40
12 Q.  Okay. I've got one more exhibit for you.   10:18:44
13      (Exhibit No. 6, Document headed           10:18:56
14    "Rosenthal Time - 2005 Neurontin," marked   10:18:56
15    for identification.)                         10:19:13
16 Q.  So we have just handed you a document that 10:19:13
17    is marked as Rosenthal Exhibit 6. Do you    10:19:21
18    recognize this document?                     10:19:24
19 A.  I do.                                       10:19:25
20 Q.  What is it?                                 10:19:26
21 A.  It's a summary of my hours.                 10:19:27
22 Q.  Who would have prepared it?                 10:19:28
23 A.  What goes in here was prepared by me. It    10:19:30
24    was consolidated by someone else on this     10:19:35
25    page, so -- but these I recognize as the way 10:19:37
```

67

```
1   that I record my time.                       10:19:41
2 Q.  Do you know who would have consolidated it? 10:19:42
3   Is it someone at Greylock McKinnon?          10:19:45
4 A.  I can't be certain. I would think that it   10:19:46
5   would be someone at Greylock McKinnon.       10:19:49
6 Q.  And so you record your time in handwritten  10:19:51
7   notations and then communicate it to         10:19:54
8   somebody else to record it; is that how that 10:19:56
9   works? And if I'm -- if I've got it wrong,   10:19:59
10    you can maybe just tell me from scratch what 10:20:03
11    your process is and how this would have been 10:20:06
12    created.                                     10:20:08
13 A.  So during a month I record my time on my   10:20:09
14    calendar or in handwritten notes to myself  10:20:11
15    what I did, how long it took. At the end of 10:20:13
16    the month I submit hours to Greylock        10:20:16
17    McKinnon, and I submit them in a format that 10:20:20
18    looks like this for each project I worked    10:20:22
19    on. So there will be a monthly invoice with 10:20:25
20    a series of projects, whatever I worked on.  10:20:27
21    And so this is obviously the Neurontin       10:20:30
22    sections of those monthly invoices pulled    10:20:32
23    together.                                    10:20:35
24 Q.  So do you invoice Greylock McKinnon? Do you 10:20:35
25    send them a formal bill?                     10:20:39
```

68

```
1 A.  I send them a recording of my hours. I     10:20:40
2   don't know if that's a formal bill.          10:20:42
3 Q.  And do you do it by e-mail or by -- you     10:20:43
4   know, in some other document?                10:20:46
5 A.  Yes, that's right. I send it by e-mail.     10:20:47
6 Q.  Is it correct that Rosenthal Exhibit 6      10:20:57
7   represents the total number of hours that    10:21:00
8   you would have spent in 2005 on this         10:21:02
9   engagement?                                   10:21:04
10 A.  That's correct.                            10:21:05
11 Q.  And I won't ask you to do the math, but if I 10:21:09
12    were to add these numbers up and come up     10:21:15
13    with a number that in the aggregate is just  10:21:18
14    shy of 70 hours, would that be a correct     10:21:21
15    cumulation of the total number of hours that 10:21:25
16    you've spent on the engagement in 2005?      10:21:27
17 A.  Assuming your math is correct, that number 10:21:30
18    looks approximately right.                   10:21:32
19 Q.  It's a very shaky assumption, but it's one  10:21:35
20    that I think we can verify later, if         10:21:37
21    necessary. And let's take a look at the      10:21:38
22    block of time for August. You'll see there   10:21:44
23    that for August 7 you've got four and a half 10:21:50
24    hours spent revising MR declaration.         10:21:53
25 A.  Uh-huh, that's correct.                     10:21:58
```

69

```
1 Q.  I'm assuming "MR declaration" is your       10:21:58
2   declaration in this case, Exhibit 1; is that 10:22:01
3   correct?                                     10:22:04
4 A.  That's correct.                             10:22:04
5 Q.  And so it would be safe to say, based on    10:22:04
6   this document, that you were revising your   10:22:06
7   declaration up until the day before it was   10:22:09
8   filed?                                       10:22:11
9 A.  That's correct.                             10:22:11
10      MR. POLUBINSKI: Now, we've been           10:22:17
11    going about an hour and ten minutes. I'm    10:22:17
12    happy to keep going if you would like or     10:22:19
13    take a break, whatever your pleasure.        10:22:21
14      MR. NOTARGIACOMO: Let's take a            10:22:22
15    break.                                       10:22:24
16      THE WITNESS: That would be great.         10:22:24
17    Thank you.                                   10:22:26
18      THE VIDEOGRAPHER: The time is            10:22:27
19    10:22. This is the end of Tape 1, and we     10:22:29
20    are off the record.                          10:22:31
21      (Recess taken.)                            10:22:35
22      (Exhibit No. 7, Document headed           10:22:35
23    "Greylock McKinnon Associates Listing,"      10:22:35
24    dated 1/20/2006, marked for identification.) 10:42:42
25      THE VIDEOGRAPHER: The time is            10:42:42
```

18 (Pages 66 to 69)

**70**

```
 1    10:42. This is the beginning of Tape No. 2,    10:42:43
 2    and we are back on the record.    10:42:45
 3    BY MR. POLUBINSKI:    10:42:47
 4  Q.  All right. Let's start by handing you,    10:42:47
 5    Professor Rosenthal, a document marked as    10:42:52
 6    Rosenthal Exhibit 7. We previously showed    10:42:54
 7    you the Greylock McKinnon invoices that we    10:43:01
 8    received, which included your own invoices.    10:43:03
 9    And what this is is another document that we    10:43:04
10    received from plaintiffs' counsel back last    10:43:06
11    winter, also apparently reflecting Greylock    10:43:09
12    McKinnon time records. Have you seen this    10:43:14
13    before?    10:43:17
14  A.  I haven't, no.    10:43:17
15  Q.  If you would turn to the page that we've    10:43:19
16    marked as GMA86.    10:43:21
17  A.  Yes. Oh, sorry, 86.    10:43:28
18  Q.  Yeah.    10:43:30
19  A.  Yeah.    10:43:30
20  Q.  You'll see that it does contain some time    10:43:31
21    for you; is that correct?    10:43:33
22  A.  I see that, yes.    10:43:35
23  Q.  This doesn't appear to be all the time that    10:43:41
24    you've spent on this engagement, correct?    10:43:44
25  A.  I don't believe so, looking at it, since we    10:43:46
```

**71**

```
 1    looked at that other document. It had other    10:43:49
 2    time, right?    10:43:53
 3  Q.  Sure. But the time that does appear on Page    10:43:53
 4    86 does appear to be correct, as far as it    10:44:00
 5    goes at least?    10:44:03
 6  A.  As far as it goes. I would have to check my    10:44:03
 7    records.    10:44:05
 8  Q.  Fair enough. But you don't have any reason    10:44:05
 9    to think that it wouldn't be correct, I    10:44:08
10    assume?    10:44:11
11  A.  No, I don't have any reason to think that.    10:44:11
12  Q.  The first one is Charles King?    10:44:14
13  A.  Okay.    10:44:16
14  Q.  Do you know Charles King?    10:44:17
15  A.  I do.    10:44:18
16  Q.  What is his -- withdrawn.    10:44:19
17    Does he work for Greylock McKinnon?    10:44:21
18  A.  Yes, he does. And I don't know technically    10:44:22
19    what his position is, but he works there    10:44:26
20    more or less full time, I think.    10:44:30
21  Q.  Did he work with you on your declaration in    10:44:32
22    this case?    10:44:34
23  A.  Again, this was a year ago. I'm certain    10:44:35
24    that we would have spoken. In particular,    10:44:38
25    we talked about marketing documents and    10:44:44
```

**72**

```
 1    about what kinds of things to look for. Dr.    10:44:48
 2    King, Professor King, is formerly a    10:44:54
 3    marketing professor at Harvard Business    10:44:56
 4    School and so he has expertise in marketing    10:45:00
 5    strategy.    10:45:03
 6  Q.  Do you remember any specific conversations    10:45:05
 7    that you had with him?    10:45:07
 8  A.  I don't, although I do -- again, I believe    10:45:08
 9    it was with regard to what kinds of    10:45:15
10    documents we should request and look for in    10:45:18
11    the materials that we had access to.    10:45:22
12  Q.  Do you remember what the substance of those    10:45:27
13    conversations were, what he has to say about    10:45:30
14    documents?    10:45:33
15  A.  He named some specific terms for documents.    10:45:34
16    One that I remember is called a SWOT,    10:45:40
17    capital S, capital W, capital O, capital T,    10:45:44
18    strengths, weaknesses, opportunities and    10:45:48
19    threats, a kind of analysis that's standard    10:45:51
20    in marketing, sort of how to describe the kinds of    10:45:53
21    again, sort of how to describe the kinds of    10:45:59
22    marketing documents that would be useful.    10:46:04
23  Q.  Would these be documents that the defendants    10:46:05
24    would have, documents that some of the    10:46:11
25    plaintiffs might have, or something else?    10:46:12
```

**73**

```
 1  A.  These were documents that the defendants    10:46:14
 2    might have.    10:46:16
 3  Q.  Would you have taken any notes of your    10:46:22
 4    conversation with Mr. King, Dr. King,    10:46:24
 5    Professor King?    10:46:26
 6  A.  I don't believe so.    10:46:27
 7  Q.  All right. I'm going to need to ask you to    10:46:36
 8    look at Page 77 to tell me how to pronounce    10:46:38
 9    the name of this person whose name appears    10:46:41
10    here.    10:46:43
11  A.  Augusteijn.    10:46:55
12  Q.  Augusteijn. Do you know who M. Augusteijn    10:46:56
13    is?    10:47:00
14  A.  I do. Michael is a senior staff person at    10:47:00
15    Greylock McKinnon.    10:47:04
16  Q.  Did he work on your report?    10:47:08
17  A.  He, like the other staff, would have    10:47:10
18    provided support for the report doing    10:47:13
19    background work.    10:47:18
20  Q.  Do you have a sense for what background work    10:47:23
21    he would have been doing?    10:47:26
22  A.  I believe that he would have been looking at    10:47:27
23    some of the documents that were made    10:47:29
24    available to us, but I can't say for sure.    10:47:30
25  Q.  I would like to direct your attention on    10:47:34
```

19 (Pages 70 to 73)

74

```
1    Pages -- Page 77 to the entries for August    10:47:35
2    1st, 2nd, 3rd, 4th, 5th and 8th. The    10:47:41
3    description under these time entries reads    10:47:50
4    "Hartman and Rosenthal affidavits."    10:47:53
5 A.  I see that.    10:47:56
6 Q.  Would you have been aware that Mr.    10:48:00
7    Augusteijn was spending somewhere in the    10:48:01
8    range of 30, 35 hours in that first week of    10:48:03
9    August on your report and Dr. Hartman's?    10:48:06
10 A.  I wouldn't have been aware of what his time    10:48:12
11    was since he works in a separate office. I    10:48:15
12    would have been aware that he was helping to    10:48:18
13    support my report.    10:48:19
14 Q.  You don't have -- do you have any sense    10:48:22
15    specifically for what he might have been    10:48:24
16    doing in those days?    10:48:26
17 A.  I can't say precisely. Often one of the    10:48:28
18    things they do is essentially check every    10:48:33
19    statement, check every footnote to make sure    10:48:36
20    that it can be backed up.    10:48:39
21 Q.  Did you ever receive comments directly from    10:48:42
22    Mr. Augusteijn on your declaration?    10:48:46
23 A.  You know, I can't be certain. It is    10:48:48
24    possible -- again, I might have sent a    10:48:52
25    document, for example, that was missing a    10:48:55
```

75

```
1    complete footnote, and he would be filling    10:48:58
2    in the complete footnote, that kind of    10:49:01
3    thing. That might have happened in a    10:49:04
4    redlined document. It would have been    10:49:05
5    purely of that kind of editorial nature.    10:49:09
6 Q.  When you say a redlined document, tell me    10:49:11
7    what you mean. Would he have sent back a    10:49:16
8    version of the document redlined to reflect    10:49:18
9    changes that he might have made in it?    10:49:21
10 A.  That's correct. Again, pursuant    10:49:24
11    specifically to my instructions, "I need the    10:49:26
12    correct volume number for this," for    10:49:29
13    example.    10:49:31
14 Q.  How would you have communicated your    10:49:34
15    instructions to him? Would you have sent    10:49:35
16    him an e-mail with the instructions    10:49:36
17    attaching the document?    10:49:39
18 A.  I believe so.    10:49:40
19 Q.  Would you still have a copy of any e-mail    10:49:40
20    that you would have sent like that?    10:49:46
21 A.  I would not. Again, we have very limited    10:49:47
22    space that we're allocated through the    10:49:53
23    e-mail that I use through Harvard, and so my    10:49:56
24    sent mail is only about a month old, maybe    10:50:01
25    less.    10:50:04
```

76

```
1 Q.  And so you would have -- well, I guess just    10:50:05
2    to back up, with respect to all of the    10:50:08
3    various e-mails, the sending of drafts by    10:50:13
4    e-mail that we've discussed over the course    10:50:15
5    of the past hour or so, less than that    10:50:17
6    really, all of that e-mail would have been    10:50:19
7    sent by you and to you at your Harvard    10:50:23
8    e-mail address?    10:50:27
9 A.  That's correct.    10:50:27
10 Q.  Do you have a personal e-mail address, too?    10:50:28
11 A.  I don't use another e-mail address.    10:50:30
12 Q.  Okay. All right. The next name is Andrew    10:50:33
13    Bechtel.    10:50:39
14 A.  B-E-C-H-T-E-L.    10:50:43
15 Q.  Thank you. Do you know Mr. Bechtel?    10:50:46
16 A.  I do. He's another staff person at Greylock    10:50:49
17    McKinnon.    10:50:51
18 Q.  Did he work with you on your declaration?    10:50:53
19 A.  Yes, I believe he did.    10:50:55
20 Q.  Do you know what he did?    10:50:56
21 A.  The same kind of thing that Michael would    10:50:57
22    have done.    10:51:00
23 Q.  So would you have sent drafts of your    10:51:00
24    declaration to Mr. Bechtel as well with    10:51:09
25    instructions to fill in parts of it or to    10:51:11
```

77

```
1    make specific changes?    10:51:14
2 A.  More likely, Michael would have delegated    10:51:15
3    some work to him. Michael is senior to him.    10:51:17
4 Q.  And I would like you to turn to Page 79.    10:51:22
5    You may already be there.    10:51:29
6 A.  Yes, I am.    10:51:32
7 Q.  And I would like to direct your attention to    10:51:32
8    the time entries on that page for August    10:51:34
9    4th, 5th, 7th and 8th. The description for    10:51:38
10    each of those entries reads "Neurontin    10:51:44
11    reports and backup," correct?    10:51:48
12 A.  That's correct.    10:51:50
13 Q.  Do you know what Mr. Bechtel would have been    10:51:50
14    doing during those days?    10:51:55
15 A.  Well, he would have been working on backup    10:51:57
16    for my report, as well as Dr. Hartman's; you    10:52:04
17    know, Dr. Hartman had a report filed at the    10:52:06
18    same time. And, again, they try to verify    10:52:09
19    every claim, every statement with some    10:52:13
20    documentation, the appropriate footnote, and    10:52:16
21    gather those documents to make sure that    10:52:19
22    everything can be backed up.    10:52:28
23 Q.  So Neurontin reports would have been your    10:52:30
24    declaration and Dr. Hartman's declaration --    10:52:32
25 A.  That's --    10:52:32
```

20 (Pages 74 to 77)

