# EXHIBIT 2

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MASSACHUSETTS

3    MDL Docket No. 1629

4    Master File No. 04-10981

5

6    * * * * * * * * * * * * * *

7    IN RE:  NEURONTIN MARKETING, SALES          *

8    PRACTICES, AND PRODUCTS LIABILITY           *

9    LITIGATION                                  *

10   -------------------------------------       *

11   THIS DOCUMENT RELATES TO:                   *

12   ALL MARKETING AND SALES PRACTICES           *

13   ACTIONS                                     *

14   * * * * * * * * * * * * * *

15

16            VOLUME I

17            PAGES 1-311

18

19

20        VIDEOTAPED DEPOSITION OF

21        MEREDITH B. ROSENTHAL, Ph.D.

22   DATE:  TUESDAY, OCTOBER 24, 2006

23   TIME:  9:12 A.M. TO 5:01 P.M.

24

25

2

```
1        VIDEOTAPED DEPOSITION OF MEREDITH B.
2    ROSENTHAL, Ph.D., a witness called on behalf
3    of the Defendants, pursuant to the Federal
4    Rules of Civil Procedure, before Jessica L.
5    Williamson, Registered Merit Reporter,
6    Certified Realtime Reporter and Notary
7    Public in and for the Commonwealth of
8    Massachusetts, at the Offices of Hare &
9    Chaffin, 160 Federal Street, Boston,
10   Massachusetts, on Tuesday, October 24, 2006,
11   commencing at 9:12 a.m.
12
13   A P P E A R A N C E S
14
15   HAGENS BERMAN SOBOL SHAPIRO LLP
16     (By Edward Notargiacomo, Esq.)
17     One Main Street
18     Fourth Floor
19     Cambridge, Massachusetts  02142
20     (617) 482-3700
21     ed@hbsslaw.com
22     Counsel for the Plaintiffs
23
24
25
```

3

```
1    A P P E A R A N C E S, Continued
2
3    ZIMMERMAN REED PLLP
4      (By Ronald S. Goldser, Esq.)
5      651 Nicollet Mall
6      Suite 501
7      Minneapolis, Minnesota  55402
8      (612) 341-0040
9      rsg@zimmreed.com
10     Counsel for the Plaintiffs and
11     Midwest Health Plan
12     (Present by telephone.)
13
14   DAVIS POLK & WARDWELL
15     (By Edmund Polubinski III, Esq.
16     and Paul Mishkin, Esq.)
17     450 Lexington Avenue
18     New York, New York  10017
19     (212) 450-4429
20     edmund.polubinski@dpw.com
21     paul.mishkin@davispolk.com
22     Counsel for the Defendants
23
24   ALSO PRESENT:
25     Rahul Guha, Cornerstone Research
```

4

```
1              I N D E X
2    DEPONENT                        PAGE
3    MEREDITH B. ROSENTHAL, Ph.D.
4    Examination By Mr. Polubinski      7
5
6         E X H I B I T S
7    NO.                             PAGE
8    1 Expert Declaration of Meredith    6
       B. Rosenthal in Support of
9      Plaintiffs' Motion for Class
       Certification
10
     2 Curriculum Vitae                6
11
     3 Retention letter dated May 26,  36
12     2005
13   4 GMA Invoice, GMA000054 -        41
       GMA000074
14
     5 GMA Invoice, GMA000289 -        41
15     GMA294
16   6 Document headed "Rosenthal      66
       Time - 2005 Neurontin"
17
     7 Document headed "Greylock       69
18     McKinnon Associates Listing"
       dated 1/20/2006
19
     8 Expert Declaration of Raymond  105
20     S. Hartman in Support of
       Plaintiffs' Motion for Class
21     Certification
22   9 Notice of Deposition           123
23   10 Amended Class Action Complaint  152
24   11 Second Amended Class Action    152
       Complaint
25
```

5

```
1          E X H I B I T S
     NO.                             PAGE
2
     12 Document headed "1998         163
3      Strategic Plan and A&P
       Allocation Grid, Neurontin"
4
     13 Article headed "The U.S.      255
5      Pharmaceutical Industry: Why
       major growth in times of cost
6      containment"
7    14 Declaration of Meredith       272
       Rosenthal in Response to
8      Defendants' Expert Keith E.
       Argenbright, M.D.
9
10
11
12
13
14
15
16   Note:  Original Exhibits 1 - 14 were
17   retained by the court reporter and forwarded
18   to Veritext New York for distribution.
19
20
21
22
23
24
25
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                516-608-2400

6

```
1          PROCEEDINGS
2          (Exhibit No. 1, Expert Declaration
3  of Meredith B. Rosenthal in Support of
4  Plaintiffs' Motion for Class Certification,
5  premarked for identification.)
6          (Exhibit No. 2, Curriculum Vitae,
7  premarked for identification.)           09:12:40
8          THE VIDEOGRAPHER:  Good morning.        09:12:40
9  We are recording and are now on the record.     09:12:41
10 Today's date is October 24th, 2006, and the     09:12:42
11 time is 9:12 p.m.  My name is George            09:12:45
12 Dobrentey.  I'm a legal videographer for        09:12:49
13 Veritext New York.  This is the deposition      09:12:51
14 of Meredith Rosenthal, In Re:  Neurontin        09:12:53
15 Marketing and Practices Litigation in the       09:12:56
16 United States District Court for the            09:12:58
17 District of Massachusetts, Master File No.      09:12:59
18 04-10981.                    09:13:02
19      This deposition is being taken at 160      09:13:04
20 Federal Street, Boston, Massachusetts.  The     09:13:07
21 court reporter is Jessica Williamson.  The      09:13:09
22 counsel will state their appearances, and       09:13:12
23 the court reporter will administer the oath.    09:13:13
24      MR. NOTARGIACOMO:  Edward                  09:13:14
25 Notargiacomo, Hagens Berman Sobol Shapiro,      09:13:16
```

7

```
1  for the plaintiffs.               09:13:18
2      MR. POLUBINSKI:  Ted Polubinski           09:13:19
3  from Davis Polk & Wardwell for the            09:13:21
4  defendants.                    09:13:23
5      MR. GOLDSER:  And on the telephone        09:13:24
6  my name is Ron Goldser, G-O-L-D-S-E-R.  I'm   09:13:25
7  for the plaintiffs, and in particular I       09:13:28
8  represent Midwest Health Plan.                09:13:30
9      MR. MISHKIN:  I'm Paul Mishkin from       09:13:33
10 Davis Polk for the defendants.                09:13:36
11     MR. GUHA:  I'm Rahul Guha,                09:13:38
12 Cornerstone Research.                09:13:39
13
14     MEREDITH B. ROSENTHAL, Ph.D.
15 a witness called by counsel for the
16 Defendants, being first duly sworn, was
17 examined and testified as follows:
18
19          DIRECT EXAMINATION
20
21 BY MR. POLUBINSKI:                   09:13:50
22 Q.  Can you state your full name, please.       09:13:50
23 A.  Meredith B. Rosenthal.                09:13:51
24 Q.  Now, what do you prefer, Dr. Rosenthal?     09:13:53
25 A.  Professor Rosenthal.                09:13:55
```

8

```
1  Q.  Professor Rosenthal?                09:13:56
2  A.  I have worked with a lot of clinicians, so  09:13:58
3      we distinguish between the M.D.s and the    09:14:00
4      Ph.Ds.                     09:14:02
5  Q.  Fair enough.  I'll do my best.  I hope      09:14:03
6      you'll forgive me if I slip every now and   09:14:06
7      then.                      09:14:08
8  A.  No problem.                    09:14:08
9  Q.  Okay.  Can you give me your business        09:14:08
10     address.                    09:14:08
11 A.  My business address is 677 Huntington Avenue 09:14:08
12     in Boston.                   09:14:12
13 Q.  And you prepared a declaration in this case  09:14:13
14     in support of plaintiffs' motion for class  09:14:15
15     certification, correct?                09:14:19
16 A.  That's correct.                   09:14:19
17 Q.  I am handing you now a document that we've   09:14:19
18     marked as Rosenthal Exhibit 1, and I'll ask 09:14:21
19     you once you've had a chance to look at it   09:14:26
20     whether you recognize the document.         09:14:29
21 A.  Yes, I do.                     09:14:31
22 Q.  Exhibit 1 is your declaration and class     09:14:33
23     certification, right?                09:14:36
24 A.  That's correct.                   09:14:37
25 Q.  And when we talk about this, I'll refer to  09:14:37
```

9

```
1      it as your declaration.  I may also refer to 09:14:40
2      it as your report.  In both cases it would   09:14:42
3      be great if we could agree that what I'm     09:14:45
4      referring to is this document, Exhibit 1.    09:14:47
5      Does that work for you?                09:14:49
6  A.  Yes.                       09:14:49
7  Q.  Great.  Let's turn to Page 21.  Looks like   09:14:50
8      you're at Page 21.  Is the signature there   09:15:04
9      your signature?                09:15:06
10 A.  Yes, it is.                     09:15:07
11 Q.  And the date on Page 21 is August 8th, 2005, 09:15:07
12     correct?                    09:15:10
13 A.  That's correct.                   09:15:11
14 Q.  Is that the date that you signed your        09:15:12
15     declaration?                   09:15:14
16 A.  That's correct.                   09:15:15
17 Q.  Now, this declaration, I assume, contains an 09:15:15
18     accurate summary of your opinions in this    09:15:19
19     matter? .                    09:15:21
20 A.  That's correct.                   09:15:21
21 Q.  Are there any opinions that you intend to    09:15:21
22     offer at this stage in the proceeding that   09:15:25
23     aren't contained somewhere in your           09:15:27
24     declaration?                   09:15:28
25 A.  No.                        09:15:29
```

3  (Pages 6 to 9)

10

1 Q.  All right.  Let me also hand to you now a          09:15:30
2      document that we've marked as Rosenthal           09:15:34
3      Exhibit 2 and ask you to take a look at that      09:15:36
4      as well.  Why don't I tell you, Exhibit 2 is      09:15:41
5      a document that plaintiffs' counsel produced      09:15:49
6      to us last week.  It's my understanding that     09:15:51
7      it's your current CV; is that correct?           09:15:55
8 A.  That's correct.                                    09:15:57
9 Q.  Okay.  Now, looking back to Exhibit 1             09:15:57
10     there's also a CV there.  Attached is             09:16:04
11     Attachment A.1; is that correct?                  09:16:08
12 A.  Yes, that's correct.                              09:16:14
13 Q.  All right.  And the second page of that CV       09:16:14
14     contains a heading titled "Testimony"?           09:16:21
15 A.  Yes.  I'm sorry, we're at the old CV, yes.       09:16:27
16 Q.  We're talking about the CV --                     09:16:30
17 A.  That's correct.                                   09:16:32
18 Q.  -- that's attached to Exhibit 1?                  09:16:32
19 A.  Yes.                                              09:16:33
20 Q.  And actually, that raises a question.            09:16:34
21     Looking at Exhibit 2 there doesn't appear        09:16:35
22     that there's a similar heading; is that          09:16:38
23     true?                                             09:16:40
24 A.  That's correct.  This is my academic CV.         09:16:40
25 Q.  Are there any other differences between your     09:16:42

11

1      academic CV and what would be your CV for        09:16:44
2      purposes of this matter?                          09:16:47
3 A.  I would have to compare them one to one, but     09:16:48
4      I think it's just the inclusion of               09:16:49
5      testimony.                                        09:16:51
6 Q.  Is there any reason why you wouldn't include      09:16:52
7      testimony on your academic CV?                    09:16:54
8 A.  It's not relevant.  We have a standard CV        09:16:56
9      format for -- that we use for purposes of         09:16:59
10     things like promotion, annual reviews, and      09:17:02
11     so this was based on my standard School of      09:17:05
12     Public Health CV format, so that's my           09:17:09
13     current updated one, yeah.                       09:17:11
14 Q.  Looking back, then, at your CV that's           09:17:13
15     attached to Exhibit 1, we can set Exhibit 2      09:17:17
16     to one side for now.                              09:17:20
17 A.  Okay.                                             09:17:21
18 Q.  You provided testimony in each of the three     09:17:21
19     cases that are listed here under                 09:17:26
20     "Testimony" --                                    09:17:28
21 A.  Of --                                             09:17:29
22 Q.  -- on Page 2?                                     09:17:30
23 A.  That's correct.  Actually, I'm looking at       09:17:31
24     Augmentin.  I provided written testimony        09:17:37
25     there.                                            09:17:39

12

1 Q.  When you say "written testimony," what do        09:17:41
2      you mean?                                         09:17:42
3 A.  A declaration.                                    09:17:42
4 Q.  Okay.  But you didn't provide oral testimony     09:17:44
5      in that matter at all?                            09:17:46
6 A.  No.                                               09:17:48
7 Q.  Okay.  How about the first matter that's        09:17:48
8      listed there, "In Re:  Lupron," L-U-P-R-O-N,     09:17:51
9      "Marketing and Sales Practices Litigation";     09:17:55
10     did you offer testimony there?                   09:17:56
11 A.  I offered oral testimony there.                  09:17:58
12 Q.  Deposition or trial, both?                       09:18:00
13 A.  Not exactly at trial.  It was at -- I'm        09:18:03
14     sorry, I don't know the legal terms very       09:18:06
15     well.  It was related to the allocation of      09:18:07
16     the ultimate settlement.                         09:18:09
17 Q.  So is it a -- would I be correct to assume      09:18:12
18     that it was a hearing related to allocation?    09:18:15
19 A.  That sounds right.  It was a hearing.          09:18:16
20 Q.  In federal court?                                09:18:19
21 A.  In the federal court.                            09:18:20
22 Q.  Approximately when was that?                     09:18:21
23 A.  That was either December '04 or December       09:18:22
24     '05, but I think it must be December '04.       09:18:28
25          MR. NOTARGIACOMO:  I think that's          09:18:31

13

1      right.                                           09:18:33
2 A.  I'm sorry, I can check the date, but I think    09:18:33
3      it's December '04.                               09:18:35
4 Q.  And the third case that's listed here, "In      09:18:37
5      Re:  Pharmaceutical Industry Average            09:18:39
6      Wholesale Price Litigation"?                     09:18:41
7 A.  That's correct.                                   09:18:43
8 Q.  Have you offered testimony in that case?         09:18:43
9 A.  I offered an oral testimony.  It was a         09:18:45
10     somewhat unusual situation.  The judge had     09:18:51
11     asked for a tutorial on pricing in the         09:18:53
12     pharmaceutical industry.  And so I had a       09:18:58
13     written report, and I testified and was        09:19:00
14     cross-examined on that.  But it's not          09:19:02
15     exactly in the trial, right?  It was sort of   09:19:04
16     a pretrial session that she held.              09:19:06
17 Q.  You were cross-examined also in court on the    09:19:08
18     tutorial --                                     09:19:14
19 A.  I was.                                           09:19:15
20 Q.  -- that you provided?                            09:19:14
21 A.  Yes, I was.                                      09:19:15
22 Q.  Did you offer deposition testimony in that     09:19:16
23     case?                                            09:19:18
24 A.  Yes, I did.                                      09:19:18
25 Q.  In addition to the cross-examination in        09:19:19

4  (Pages 10 to 13)

14

```
1    court?                              09:19:22
2 A. That's right.  And so -- that's right.  So    09:19:23
3    the deposition was earlier this year.  I      09:19:25
4    could check the date, but, yeah, but the      09:19:28
5    testimony in court was last December.         09:19:30
6 Q. Okay.  And I assume you have not testified    09:19:32
7    at trial in that case?                09:19:36
8 A. That trial's coming up.             09:19:38
9 Q. Do you expect to testify at trial in that     09:19:40
10   case?                                09:19:44
11 A. I do, although -- I do expect to testify.  I  09:19:44
12   haven't heard the final schedule, but I       09:19:46
13   expect to.                           09:19:49
14 Q. Are there any other cases in which you've     09:19:49
15   offered testimony, other than the three that   09:19:52
16   are listed in your CV that's attached to       09:19:53
17   Exhibit 1?                           09:19:56
18 A. No.                                09:19:58
19 Q. Okay.  Have you, yourself, ever been a party  09:20:00
20   to a lawsuit before?                  09:20:02
21 A. No.                                09:20:03
22 Q. Okay.  So you wouldn't, yourself, have ever   09:20:04
23   tried to be a lead plaintiff in a class        09:20:05
24   action?                              09:20:08
25 A. No.                                09:20:08
```

15

```
1 Q. All right.  You've obviously testified a      09:20:08
2    fair amount before, but in spite of that,      09:20:12
3    just to make the record clear, I'll go        09:20:14
4    forward with just a couple of rules that       09:20:16
5    you're probably perfectly familiar with --     09:20:18
6 A. Great.                             09:20:20
7 Q. -- and you've probably spoken about already   09:20:20
8    with plaintiffs' counsel.  The first is just   09:20:23
9    that you understand your testimony here is     09:20:25
10   under oath?                          09:20:26
11 A. Yes.                               09:20:27
12 Q. And you also understand that if you don't     09:20:27
13   understand one of my questions, you let me     09:20:28
14   know, you won't just answer it?       09:20:31
15 A. Yes.                               09:20:32
16 Q. Great.  Can you give me your educational      09:20:33
17   background, starting with college.    09:20:40
18 A. I have a BA, AB from Brown University in      09:20:41
19   international relations with a focus on        09:20:45
20   economics, certified track within           09:20:48
21   international relations.  And subsequent to     09:20:50
22   that I got a Ph.D. at Harvard.  There's a      09:20:52
23   university level Ph.D. in health policy.       09:20:55
24   Again, I did the economics track in that, so   09:20:58
25   my training is largely economics with         09:21:01
```

16

```
1    application to health policy.        09:21:04
2 Q. And your Ph.D., which department would that   09:21:05
3    have been in?  Was it in the economics        09:21:07
4    department, or was it in specialized --       09:21:09
5 A. It's a faculty program, so it's actually a     09:21:11
6    department of its own.  Health policy         09:21:14
7    essentially is a department only for the       09:21:17
8    purpose of offering a Ph.D., so the           09:21:18
9    coursework for the economics track is the      09:21:20
10   same as a Ph.D. in economics minus           09:21:23
11   macroeconomic theory plus a selection of       09:21:25
12   health policy courses from the School of       09:21:29
13   Public Health, Kennedy School, other places    09:21:32
14   around the university.  So it's an            09:21:34
15   interdepartmental, interfaculty Ph.D.         09:21:35
16   program.                             09:21:39
17 Q. Makes sense.  And actually, just now that     09:21:39
18   reminded me there is one other rule of the     09:21:41
19   road.  If you can be careful to let me         09:21:45
20   finish my questions even though I do have a    09:21:47
21   tendency to trail off when I ask them, it      09:21:51
22   generally will go better for Jessica and       09:21:52
23   also for us and for the record.      09:21:54
24 A. Yes.  And feel free to remind me of that.     09:21:55
25   I'm afraid I have a tendency to speak too      09:21:58
```

17

```
1    quickly.                             09:22:01
2 Q. All right.  So going back again to your       09:22:01
3    educational background.  You don't actually    09:22:03
4    have a medical degree; is that correct?       09:22:07
5 A. That's correct.                    09:22:08
6 Q. And as part of your coursework or otherwise,   09:22:08
7    have you ever attended any medical school?     09:22:11
8 A. No.                                09:22:14
9 Q. Have you taken coursework in clinical         09:22:14
10   medicine at all?                     09:22:16
11 A. No.                                09:22:17
12 Q. You don't have a degree in pharmacology      09:22:21
13   either, I take it.                   09:22:23
14   (Phone ringing.)                     09:22:26
15   MR. NOTARGIACOMO:  Excuse me.         09:22:27
16 A. No.                                09:22:28
17   MR. POLUBINSKI:  Do we need to go     09:22:29
18   off the record?                      09:22:30
19   MR. NOTARGIACOMO:  No.               09:22:31
20 Q. Okay.  Have you ever taken courses in         09:22:32
21   pharmacology?                        09:22:34
22 A. No.                                09:22:34
23 Q. And you don't have a law degree, either, I    09:22:34
24   take it?                             09:22:38
25 A. No.                                09:22:38
```

**VERITEXT NEW YORK REPORTING COMPANY**

18

1  Q.  Have you taken any law classes?                09:22:39
2  A.  No.                                    09:22:40
3  Q.  All right.  What -- aside from your Ph.D.,      09:22:41
4      what other professional degrees or licenses   09:22:46
5      do you have, if any?                        09:22:48
6  A.  That's all.                              09:22:49
7  Q.  So you're not licensed to practice medicine;   09:22:50
8      is that right?                            09:22:53
9  A.  No, I'm not.                             09:22:53
10 Q.  And you wouldn't hold yourself out as an       09:22:53
11     expert in the practice of medicine, I take     09:22:55
12     it?                                       09:22:57
13 A.  I would not.                             09:22:57
14 Q.  And you're not licensed to prescribe          09:22:58
15     medication, either, correct?               09:23:01
16 A.  That's correct.                           09:23:02
17 Q.  And you've never prescribed a drug before?     09:23:02
18 A.  That's correct.                           09:23:06
19 Q.  What experience, if any, do you actually      09:23:06
20     have in the prescription writing process?     09:23:10
21 A.  Other than as a consumer of prescriptions,    09:23:12
22     none.                                     09:23:16
23 Q.  You're familiar with the term "third-party     09:23:16
24     payer" as it's used in the complaints in      09:23:21
25     this case?                                 09:23:24

19

1  A.  Yes, I am.                               09:23:25
2  Q.  Have you ever done any work for an entity      09:23:25
3      that would qualify as part of the           09:23:28
4      plaintiffs' third-party payer subclass?      09:23:29
5  A.  I've worked for -- I sit on an advisory       09:23:32
6      panel for Blue Cross/Blue Shield of          09:23:35
7      Massachusetts.  They have a group of local    09:23:38
8      experts, including clinicians, as well as     09:23:42
9      policy people such as myself advising them    09:23:44
10     on how to use quality information for public   09:23:47
11     reporting, pay for performance, the kinds of   09:23:51
12     things that, as you probably know, my work     09:23:54
13     relates to.                               09:23:56
14 Q.  Can you tell me what quality information       09:23:56
15     means, as you used it in that answer?        09:23:58
16 A.  Yes, sure.  Generally, the data come from      09:24:00
17     either clinical charts or claims data and     09:24:04
18     profile things like appropriate use of        09:24:07
19     preventive screenings.  So looking at         09:24:10
20     physicians, trying to establish whether a     09:24:13
21     physician has done all the right cancer       09:24:16
22     screenings for his or her patients or for     09:24:18
23     his or her diabetic patients, have they       09:24:21
24     gotten the right tests to make sure that      09:24:25
25     they control their diabetes.               09:24:26

20

1  Q.  So am I right that you look at information     09:24:28
2      relating to specific physicians, then?       09:24:29
3  A.  No.  We -- the advisory panel has seen        09:24:31
4      aggregate data and discussed more           09:24:35
5      conceptually about how the data might be      09:24:37
6      appropriately used.                        09:24:39
7  Q.  Where does the aggregate come from?  Is       09:24:40
8      it internal to Blue Cross/Blue Shield, or     09:24:44
9      does it come from someplace else?           09:24:44
10 A.  They have another consultant, Health          09:24:46
11     Dialogue, that does a lot of analysis for     09:24:48
12     them, and Health Dialogue has brought to the   09:24:52
13     meeting PowerPoint presentations from their    09:24:55
14     data analysis.                            09:24:56
15 Q.  Do you know where their data comes from?      09:24:57
16 A.  I think their data comes largely from Blue     09:24:59
17     Cross/Blue Shield's old administrative        09:25:02
18     databases, but I'm not certain if they use    09:25:06
19     other data as well.                        09:25:08
20 Q.  How long have you served on this advisory     09:25:09
21     panel with Blue Cross/Blue Shield?          09:25:17
22 A.  That's a good question.  I think September     09:25:18
23     of 2005 was the first meeting, and there      09:25:19
24     have been three or four since then, but I     09:25:21
25     could check the dates for you.              09:25:26

21

1  Q.  And how long do the meetings tend to run?     09:25:28
2      Is it approximately --                      09:25:31
3  A.  About two-hour meetings.  They were dinner    09:25:32
4      meetings.                                 09:25:34
5  Q.  And the discussions centered around these     09:25:36
6      PowerPoint presentations that Health         09:25:39
7      Dialogue prepares?                        09:25:40
8  A.  That's correct.                           09:25:43
9  Q.  Aside from your work on the advisory panel    09:25:44
10     with Blue Cross/Blue Shield, have you ever     09:25:46
11     done any other work for a member of the       09:25:48
12     third-party payer subclass, as you          09:25:50
13     understand it?                            09:25:52
14 A.  I have not done work for third-party payers.   09:25:53
15     I collaborate doing research with some        09:25:57
16     third-party payers.  They don't pay me, and    09:26:00
17     they don't -- they don't set the research     09:26:03
18     questions or direct the results in any way,    09:26:06
19     but there have been collaborations.          09:26:08
20 Q.  Are you paid for your work on the advisory    09:26:10
21     panel with Blue Cross/Blue Shield?          09:26:12
22 A.  I am.  I'm paid $500 for each meeting.        09:26:13
23 Q.  Do you have an understanding approximately    09:26:16
24     how many meetings you'll have per year?       09:26:22
25 A.  No, actually.  And it's been somewhat        09:26:24

6  (Pages 18 to 21)

**VERITEXT NEW YORK REPORTING COMPANY**

## 22

1   sporadic. We haven't had one for six to          09:26:27
2   nine months.                                     09:26:29
3 Q. And who decides whether to have the             09:26:29
4   meetings? Last question on this.                 09:26:33
5 A. There's a quality -- one of their executives    09:26:34
6   in the quality area who oversees the             09:26:37
7   meetings and she contacts the advisory panel     09:26:40
8   and puts together the meetings.                  09:26:42
9 Q. Actually, this isn't -- that wasn't the last    09:26:44
10   question. The last question I think is          09:26:46
11   going to be, how did you get involved with      09:26:47
12   your work on the advisory panel?                09:26:50
13 A. I publish widely in the area of pay for        09:26:52
14   performance and public reporting, and they      09:26:56
15   had seen my work, and since I was local it      09:27:00
16   made sense. They wanted to have a, you          09:27:02
17   know, an academic expert on this advisory       09:27:04
18   panel, and I was a natural --                    09:27:07
19 Q. Who contacted -- I'm sorry, I cut you off.     09:27:09
20   Who contacted you?                              09:27:12
21 A. Originally I was contacted by Harold Picken,   09:27:13
22   who is one of their medical directors. He       09:27:16
23   is no longer with them, and I met at the        09:27:17
24   time we had our first meeting he left, and      09:27:20
25   Karen Boudreau, who I believe also has the      09:27:21

## 23

1   title medical director -- they have numerous     09:27:24
2   medical directors at this level -- she runs      09:27:27
3   the meetings.                                    09:27:30
4 Q. Have you ever worked in any capacity for any    09:27:31
5   governmental entity that has any involvement     09:27:42
6   in pharmaceutical reimbursement under any        09:27:44
7   federal or state program?                        09:27:46
8 A. No, I have not.                                 09:27:48
9 Q. Do you have any direct experience with the      09:27:50
10   governmental reimbursement process?            09:27:55
11 A. Again, only as a consumer. No.                 09:28:00
12 Q. Have you ever worked directly or indirectly    09:28:02
13   with the FDA?                                   09:28:04
14 A. No. In my work on direct consumer             09:28:08
15   advertising I have presented on panels with    09:28:13
16   the FDA, Janet Woodcock, but I have never      09:28:14
17   done any work for them or a project            09:28:22
18   sponsored by them in any way.                  09:28:24
19 Q. Who's Janet Woodcock?                          09:28:25
20 A. She -- you know, I just don't know her        09:28:27
21   position, but I think that her                 09:28:29
22   responsibility is in the promotional area.     09:28:30
23   She's fairly high up in the FDA and still      09:28:35
24   there, to my knowledge.                        09:28:38
25 Q. So you haven't been directly involved with     09:28:42

## 24

1   an application to the FDA to approve a new       09:28:44
2   drug, I assume?                                  09:28:47
3 A. No, I have not.                                 09:28:48
4 Q. And that you wouldn't involve -- withdrawn.     09:28:48
5   You also wouldn't have been involved           09:28:51
6   with an application for approval of a          09:28:53
7   supplemental indication of an approved drug?   09:28:56
8 A. No, I have not.                                 09:28:59
9 Q. Have you ever been involved in a clinical      09:29:00
10   trial involving a prescription drug?          09:29:02
11 A. No, I have not.                                09:29:04
12 Q. Have you ever taken Neurontin?                 09:29:05
13 A. No, I have not.                                09:29:11
14 Q. To the best of your knowledge, do you know    09:29:12
15   anybody who's ever taken Neurontin?           09:29:15
16 A. To the best of my knowledge, I don't.         09:29:17
17 Q. Again, to the best of your knowledge, have    09:29:20
18   you ever spoken with anybody who's ever       09:29:22
19   taken Neurontin?                              09:29:24
20 A. To the best of my knowledge, I have -- I      09:29:25
21   have no knowledge of having spoken to anyone   09:29:27
22   who's taken Neurontin.                        09:29:29
23 Q. And I assume, based on your prior answers to  09:29:31
24   your prior questions, that you wouldn't have   09:29:35
25   been directly involved in any prescription    09:29:37

## 25

1   being written for Neurontin?                     09:29:39
2 A. That's correct.                                 09:29:41
3 Q. And also that you wouldn't have been           09:29:41
4   involved in the reimbursement for any          09:29:45
5   prescription written for Neurontin?            09:29:48
6 A. That's correct.                                 09:29:50
7 Q. Have you ever spoken with a doctor about the   09:29:51
8   prescribing of Neurontin?                      09:29:53
9 A. I have not.                                     09:29:54
10 Q. All right. Now you're currently at the        09:30:05
11   Harvard School For Public Health, correct?    09:30:08
12 A. That's correct.                                09:30:09
13 Q. And what's your position there?               09:30:09
14 A. I'm associate professor of health economics  09:30:11
15   and policy.                                    09:30:13
16 Q. What is health economics and policy?          09:30:13
17 A. That's my title. The area relates to the      09:30:15
18   application of economic principles to health  09:30:19
19   policy.                                        09:30:21
20 Q. Would you say it's principally an economics   09:30:21
21   position or something else?                    09:30:30
22 A. I would say it's applied economics in the     09:30:32
23   area of health policy.                         09:30:39
24 Q. Do you supervise graduate students?           09:30:45
25 A. I do.                                          09:30:47

7 (Pages 22 to 25)

26

1 Q. Have any of your graduate students assisted          09:30:48
2    you at all in your consulting work?          09:30:50
3 A. No, they have not.          09:30:52
4 Q. All right. Let's look again at Exhibit 1,          09:30:53
5    which is your declaration in the case, at          09:30:58
6    Paragraph 3 and specifically at the sentence          09:31:09
7    that carries over between Pages 2 and 3. It          09:31:11
8    reads, "Presently I am engaged in a large-          09:31:14
9    scale evaluation of the effects of          09:31:17
10   prescription drug formularies on drug choice          09:31:19
11   and health care spending."          09:31:21
12 A. That's correct.          09:31:24
13 Q. When did that study start?          09:31:24
14 A. I would have to check the precise dates, but          09:31:26
15   I believe the work began about two years          09:31:32
16   ago. The funding started subsequent to          09:31:37
17   that, but I could check the dates both on          09:31:39
18   when the project started and when the          09:31:42
19   funding started. So we started doing some          09:31:44
20   of the work to prepare to submit a federal          09:31:46
21   grant. The federal grant was funded about a          09:31:49
22   year and a half ago.          09:31:52
23 Q. How far along is the project along now?          09:31:52
24 A. The project is fairly far along. We have          09:31:56
25   one paper that's final that's under review          09:31:59

27

1    and a second paper that's close.          09:32:02
2 Q. With whom are you working on it?          09:32:05
3 A. The principal investigator is Bruce Landon,          09:32:06
4    who's a physician at the Harvard Medical          09:32:10
5    School.          09:32:14
6 Q. What specialty does he practice in?          09:32:14
7 A. He's an internist.          09:32:17
8 Q. And you had mentioned something about          09:32:18
9    funding before. Who's funding it?          09:32:24
10 A. The funding comes from the Agency For Health          09:32:25
11   Care Research and Quality.          09:32:27
12 Q. And I confess, I don't know what that is.          09:32:30
13   Can you tell me?          09:32:32
14 A. The Agency For Health Care Research and          09:32:34
15   Quality is the primary funder for health          09:32:36
16   policy research. They're a small agency          09:32:39
17   under HHS, very small. And rather than          09:32:43
18   going to NIH, people like me who do this          09:32:47
19   kind of health policy work tend to look to          09:32:51
20   the HRQ, as it's called, for funding.          09:32:53
21 Q. So it sounds like you've got one or maybe          09:32:58
22   two papers that are underway now. Have you          09:33:05
23   reached any conclusions that are either          09:33:07
24   preliminary or final about what the effects          09:33:08
25   of formularies are?          09:33:10

28

1 A. Overall the results show that -- the          09:33:11
2    specific question was whether moving to a          09:33:18
3    single-tiered formulary to a three-tiered          09:33:22
4    formulary and changes in the co-payments,          09:33:25
5    whether that would save the payer, in this          09:33:28
6    case the insurance plan, money. And so          09:33:32
7    overall we find yes. Another finding is          09:33:36
8    that there's an increase in the rate of mail          09:33:40
9    order fulfillment under higher co-payments          09:33:43
10   because mail order essentially saves you one          09:33:47
11   co-payment. And another finding was that          09:33:50
12   generic substitution increases.          09:33:54
13 Q. So would it be fair to say that your          09:34:03
14   conclusions about that prescription drug          09:34:06
15   formularies do have an impact on drug choice          09:34:10
16   in individual cases?          09:34:13
17 A. Yes, that's correct.          09:34:15
18 Q. Are there results available to the public          09:34:17
19   on this at all?          09:34:20
20 A. On the paper?          09:34:21
21 Q. Yeah.          09:34:22
22 A. No. Traditionally in my field you can't          09:34:22
23   publish them, medical journals -- it's          09:34:26
24   to publish them, medical journals -- it's          09:34:29
25   called the Inglefinger rule after a New          09:34:32

29

1    England Journal of Medicine editor who made          09:34:36
2    this rule. The clinical journals are very          09:34:37
3    sensitive about having those results out, so          09:34:39
4    we hope that the paper would be accepted and          09:34:41
5    published soon, but right now it's under          09:34:43
6    wraps.          09:34:46
7 Q. When do you anticipate, or if you can          09:34:46
8    anticipate, when it would actually be          09:34:49
9    available and published?          09:34:52
10 A. It's a little hard to anticipate, but I          09:34:53
11   would say probably spring.          09:34:56
12 Q. Now, you also work for Greylock McKinnon          09:34:57
13   Associates, correct?          09:35:05
14 A. That's correct.          09:35:06
15 Q. What is Greylock McKinnon?          09:35:07
16 A. It's a consulting organization. They do          09:35:09
17   litigation support and some other kinds of          09:35:12
18   consulting.          09:35:13
19 Q. What's your position there?          09:35:13
20 A. Excuse me. I'm an academic affiliate. So          09:35:14
21   I'm not an employee per se, but I work with          09:35:20
22   them, and when I do expert witness work like          09:35:25
23   this, it all goes through them. I'm          09:35:30
24   supported by their staff.          09:35:32
25 Q. Now, aside from being supported by their          09:35:35

8  (Pages 26 to 29)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                              516-608-2400




**30**

1    staff, what does it mean that your work goes    09:35:37
2    through them?    09:35:39
3 A.    They do all the billing on my behalf and all    09:35:39
4    the administrative work relating to the    09:35:44
5    retention agreements.    09:35:50
6 Q.    How many academic affiliates are there at    09:35:53
7    Greylock McKinnon, if you know?    09:35:58
8 A.    I don't know.    09:36:00
9 Q.    Do you have an approximate sense?    09:36:00
10 A.    I would guess three or four.    09:36:02
11 Q.    Do you know any of the other academic    09:36:03
12    affiliates?    09:36:08
13 A.    Richard Frank. He's the one I'm certain    09:36:08
14    about, and I'm not certain about the others.    09:36:12
15    I think it's actually on their website,    09:36:15
16    though.    09:36:17
17 Q.    What portion of your work at Greylock    09:36:18
18    McKinnon is devoted to litigation support?    09:36:20
19 A.    That's all I do through them. I know they    09:36:22
20    have these other strategic consulting    09:36:25
21    projects on occasion, but I've only done    09:36:27
22    litigation work with them.    09:36:29
23 Q.    How large a business is it; do you know?    09:36:30
24 A.    I have no idea.    09:36:42
25 Q.    Do you have an office there?    09:36:42

**31**

1 A.    No.    09:36:44
2 Q.    In a typical month -- well, let me withdraw    09:36:45
3    that question.    09:36:50
4       Do you ever spend any time at their    09:36:51
5    offices?    09:36:54
6 A.    Occasionally, but it's rare.    09:36:54
7 Q.    Do you receive a regular paycheck from them?    09:37:01
8 A.    I do, not a paycheck per se since I'm not an    09:37:04
9    employee. I receive a fixed monthly amount,    09:37:08
10    and then we reconcile every six months or    09:37:12
11    something.    09:37:15
12 Q.    And what is the fixed monthly amount based    09:37:16
13    on? Is it a salary, or is it dependent on    09:37:21
14    the amount of work that you do?    09:37:23
15 A.    It's based on the amount of work that I do,    09:37:24
16    right. So it's a guess at what an average    09:37:27
17    monthly computation would be at my early    09:37:29
18    rate for the formal number of hours I work,    09:37:35
19    which of course in reality varies month to    09:37:37
20    month.    09:37:40
21 Q.    When did you start working there?    09:37:42
22 A.    I began working with them when I was a    09:37:44
23    doctoral student supporting -- doing    09:37:49
24    obviously much more rudimentary background    09:37:52
25    work for them running regressions, doing    09:37:56

**32**

1    data analysis. I believe 1996 is my best    09:37:58
2    guess as to when that first started.    09:38:00
3 Q.    How did you first decide to do it?    09:38:01
4       MR. NOTARGIACOMO:  Objection. You    09:38:09
5    can answer.    09:38:10
6       THE WITNESS:  Okay.    09:38:11
7 A.    Some of my colleagues, my advisor was    09:38:12
8    working with them, and I'm interested in    09:38:16
9    industrial organization which you may know    09:38:20
10    is the field of economics that is -- largely    09:38:22
11    comes into play, particularly in antitrust    09:38:25
12    matters. So many -- most of the original    09:38:29
13    work was antitrust or related Hatch-Waxman    09:38:31
14    work.    09:38:36
15 Q.    Who is your advisor that had been working    09:38:37
16    with them?    09:38:39
17 A.    Richard Frank.    09:38:39
18 Q.    So who approached whom?    09:38:40
19 A.    I believe Richard asked me, and I think the    09:38:46
20    first thing I worked on -- I'm not certain    09:38:51
21    actually whether it was this. There was an    09:38:53
22    antitrust case brought against the    09:38:57
23    pharmaceutical wholesalers, and then I did    09:38:58
24    some work supporting the tobacco litigation    09:39:02
25    in Massachusetts. And both of those cases    09:39:05

**33**

1    were interesting intellectually and related    09:39:08
2    to my own interests.    09:39:12
3 Q.    And neither of those cases were cases in    09:39:13
4    which you offered testimony; is that    09:39:16
5    correct?    09:39:17
6 A.    That's correct.    09:39:17
7 Q.    Are you employed by any other entity beside    09:39:25
8    the School of Public Health and Greylock    09:39:28
9    McKinnon?    09:39:31
10 A.    I'm only employed by the School of Public    09:39:31
11    Health, that's correct.    09:39:34
12 Q.    Do you do any paid consulting outside of the    09:39:34
13    work that you do for Greylock McKinnon?    09:39:38
14 A.    From time to time I get paid in -- I guess    09:39:41
15    as a consultant, so, for example, the    09:39:43
16    Institute of Medicine recently put together    09:39:47
17    a committee on pay for performance, which is    09:39:51
18    an area that I have done a great deal of    09:39:54
19    research in, and they asked me, with Dr.    09:39:56
20    Landon, to write a background report for    09:39:59
21    them and paid us a fixed sum of money for    09:40:02
22    that. So I guess that would be consulting,    09:40:04
23    yes, but that kind of thing every once in a    09:40:06
24    while.    09:40:10
25 Q.    But you don't have a formal consulting    09:40:10

9  (Pages 30 to 33)

**34**

1   arrangement with any other group, I take it?   09:40:12
2 A.  Oh, no.   09:40:13
3 Q.  Do you ever do litigation consulting, aside   09:40:15
4   from the work that you do through Greylock   09:40:16
5   McKinnon?   09:40:19
6 A.  No.   09:40:19
7 Q.  Now, as between your positions at the School   09:40:25
8   of Public Health and your work for Greylock   09:40:28
9   McKinnon, in a typical year how does your   09:40:32
10   income from those two sources break out, if   09:40:34
11   you understand my question?   09:40:38
12 A.  I do.  My income breaks out I think on   09:40:39
13   average fairly evenly, 50/50, in that   09:40:44
14   neighborhood.   09:40:49
15 Q.  Okay.  Aside from this matter and the AWP   09:40:56
16   matter that we talked about before, are you   09:40:57
17   active in other matters at Greylock McKinnon   09:40:59
18   now?   09:41:02
19 A.  I am.   09:41:02
20 Q.  How many?   09:41:03
21 A.  I would want to check to be sure that I'm   09:41:09
22   correct about this, but I think there are   09:41:12
23   two other matters.   09:41:15
24 Q.  Are they both litigation-related?   09:41:17
25 A.  Yes, they are.   09:41:19

**35**

1 Q.  What are those matters, if you can tell us?   09:41:20
2   THE WITNESS:  Is it -- I never know   09:41:24
3   what I'm allowed to tell.  Is it okay?   09:41:26
4   MR. NOTARGIACOMO:  You can talk   09:41:28
5   about what other cases you're involved in,   09:41:29
6   yes.   09:41:31
7 A.  I've been retained to work in a case related   09:41:32
8   to the drug Serostim.   09:41:34
9 Q.  Can you spell that for my benefit and the   09:41:36
10   court reporter?   09:41:38
11 A.  S-E-R-O-S-T-I-M.  And also for the drug   09:41:38
12   Zyprexa, Z-Y-P-R-E-X-A.   09:41:47
13 Q.  And those are two discrete matters, I take   09:41:54
14   it?   09:41:57
15 A.  They are discrete matters.   09:41:57
16 Q.  With whom at GMA, Greylock McKinnon, have   09:41:59
17   you been working, on the same team or   09:42:02
18   different teams?   09:42:05
19 A.  It would be the same team.  You mean the   09:42:05
20   staff?   09:42:09
21 Q.  Uh-huh.   09:42:10
22 A.  Yes, although both of those matters are in   09:42:10
23   the very early days.  There has not been a   09:42:12
24   great deal of work.   09:42:15
25 Q.  Are you working with lawyers in either of   09:42:15

**36**

1   those cases?   09:42:17
2 A.  Yes.   09:42:17
3 Q.  Who are they?   09:42:19
4 A.  On Serostim, it's David Nalven from Hagens   09:42:19
5   Berman Sobol Shapiro, and on Zyprexa --   09:42:30
6   THE WITNESS:  It's Tom, isn't it?   09:42:32
7   MR. NOTARGIACOMO:  I believe so.   09:42:34
8 A.  All right.  Tom Sobol, also Hagens Berman   09:42:35
9   Sobol Shapiro.   09:42:40
10 Q.  Okay.  When were you retained in this case?   09:42:41
11 A.  You know what?  I would have to check the   09:42:50
12   documentation for when the retention was   09:42:53
13   actually done.  I believe it would be early   09:42:55
14   last year, but I actually don't know the   09:42:58
15   date.  I'm sorry.   09:43:00
16 Q.  Why don't we make it easier for you and mark   09:43:01
17   the next exhibit.  That's great.   09:43:03
18   (Exhibit No. 3, Retention letter   09:43:03
19   dated May 26, 2005, marked for   09:43:03
20   identification.)   09:43:03
21 Q.  So the court reporter just handed you what   09:43:30
22   we've marked Rosenthal Exhibit 3.  Could you   09:43:32
23   take a look at it, please.   09:43:36
24 A.  Yes.   09:43:37
25 Q.  Is this your retention letter in this   09:43:43

**37**

1   matter?   09:43:45
2 A.  Yes, I believe it is.   09:43:45
3 Q.  Was it ever signed?   09:43:47
4 A.  It doesn't appear to be.   09:43:48
5 Q.  Do you know whether it was ever signed?   09:43:50
6 A.  I don't believe it was, no.   09:43:53
7 Q.  Do you know why it wouldn't have been?   09:43:55
8 A.  I don't.  I'm sorry.   09:43:56
9 Q.  Now, this agreement, unless I'm misreading   09:44:03
10   it, doesn't mention Greylock McKinnon; is   09:44:05
11   that correct?   09:44:08
12 A.  That's correct, yes.  I'm afraid that I   09:44:08
13   would have to amend.  I forgot that this   09:44:12
14   letter was written directly to me and not to   09:44:16
15   Greylock McKinnon.  It's the only case that   09:44:19
16   I have that's like this.  So this doesn't go   09:44:21
17   through Greylock McKinnon.   09:44:24
18 Q.  But your work on this matter isn't being   09:44:28
19   done independently of Greylock McKinnon, I   09:44:31
20   take it?   09:44:32
21 A.  That's correct.  I do get support from   09:44:32
22   Greylock McKinnon.   09:44:35
23 Q.  So by "support" do you mean you use Greylock   09:44:35
24   McKinnon's staff or other resources in the   09:44:38
25   work that you've performed so far?   09:44:41

10 (Pages 34 to 37)

**38**

1  A.  Yes, that's correct.                                    09:44:42
2  Q.  Do you continue to expect to use Greylock      09:44:43
3      McKinnon's support staff?                       09:44:45
4  A.  I do.                                           09:44:46
5  Q.  And Greylock McKinnon would have actually     09:44:49
6      submitted your bills in this matter; is that    09:44:52
7      correct?                                        09:44:54
8  A.  That's correct.                                 09:44:54
9  Q.  Okay.  Is there any other agreement that you   09:44:56
10     know of that governs your provision of          09:44:58
11     services in this case?                          09:45:01
12 A.  Not that I know of.                             09:45:01
13 Q.  Okay.  Can you describe your first contact      09:45:07
14     with plaintiffs' counsel in this case?          09:45:09
15 A.  To the best of my recollection, there was a     09:45:12
16     meeting, which may have actually have been a    09:45:18
17     conference call, but I believe it was a         09:45:20
18     face-to-face meeting where I met with Tom       09:45:22
19     Sobol and Tom Greene, and there may have        09:45:27
20     been others, I believe, from Tom Green's        09:45:32
21     office there to discuss the matter.             09:45:35
22 Q.  Do you know approximately when the meeting      09:45:36
23     would have taken place?                         09:45:39
24 A.  Well, I would have said it was early 2005,      09:45:40
25     perhaps around this time.                       09:45:43

**39**

1  Q.  Who contacted whom?                             09:45:45
2  A.  The offices of Hagens Berman Sobol Shapiro      09:45:46
3      contacted me.                                   09:45:53
4  Q.  Did they contact you directly?                  09:45:53
5  A.  Probably through Greylock McKinnon.             09:45:55
6  Q.  What was said at this first meeting or          09:45:56
7      conference call, to the best of your            09:46:01
8      recollection?                                   09:46:03
9  A.  To the best of my --                            09:46:04
10         MR. NOTARGIACOMO:  Objection.  You          09:46:05
11     can answer.                                     09:46:07
12 A.  To the best of my recollection, there was a     09:46:07
13     broad discussion about the history of the       09:46:10
14     case, including the prior federal matter.       09:46:13
15 Q.  Do you have an understanding of how the         09:46:25
16     plaintiffs' counsel would have learned of       09:46:27
17     you or why they would have retained you?        09:46:28
18 A.  I have worked with Hagens Berman Sobol          09:46:30
19     Shapiro on a number of matters.                 09:46:34
20 Q.  And so your assumption is that based upon       09:46:39
21     your past work, that they were aware that       09:46:41
22     you might be interested or willing to           09:46:42
23     working on this case?                           09:46:45
24 A.  That would be my assumption.                    09:46:46
25 Q.  But you haven't had discussions with them      09:46:48

**40**

1      specifically about that, I take it?            09:46:51
2  A.  Specifically about why they asked me to work   09:46:53
3      for them on this case?                          09:46:56
4  Q.  Yes.                                            09:46:58
5  A.  No, I have not.                                 09:46:58
6  Q.  Just one last question on this -- on           09:46:59
7      Rosenthal Exhibit 3.  It sounds like you did   09:47:06
8      do some work prior to May 26th of 2005 in      09:47:10
9      this case?                                      09:47:14
10 A.  I believe I did review some documents.          09:47:14
11 Q.  Okay.  Now, at the time you wrote your          09:47:16
12     declaration your hourly rate was $375 an        09:47:21
13     hour; is that correct?                          09:47:26
14 A.  That's correct.                                 09:47:27
15 Q.  Now, is it still?                               09:47:28
16 A.  No.  I've been told that it's been raised to    09:47:28
17     $450.                                           09:47:32
18 Q.  That's an interesting way of phrasing your      09:47:34
19     answer to the question.  Who told you that     09:47:35
20     it's been raised to $450 an hour?               09:47:38
21 A.  Greylock McKinnon.  They -- when I was          09:47:41
22     promoted, we talked about an adjustment and     09:47:44
23     they said that would be a good adjustment.      09:47:47
24 Q.  So does Greylock McKinnon decide your hourly    09:47:49
25     rate for you?                                   09:47:52

**41**

1  A.  They advise me on it.                           09:47:53
2  Q.  Is the decision yours as to how much to        09:47:55
3      charge on an hourly basis?                      09:47:59
4  A.  Of course ultimately it's my decision.          09:48:00
5  Q.  But it sounds like it's based on their         09:48:02
6      advice?                                         09:48:05
7  A.  That's correct.                                 09:48:05
8  Q.  I've got another exhibit coming up.             09:48:05
9          MR. POLUBINSKI:  Could we mark this        09:48:23
10     one as Rosenthal 4, please.                     09:48:24
11         (Exhibit No. 4, GMA Invoice,                09:48:24
12     GMA000054 - GMA000074, marked for               09:48:24
13     identification.)                                09:48:46
14         MR. POLUBINSKI:  And while we're at         09:48:46
15     it, why don't we mark this one as Rosenthal    09:48:47
16     5.                                              09:48:50
17         (Exhibit No. 5, GMA Invoice,                09:48:50
18     GMA000289 - GMA294, marked for                  09:48:50
19     identification.)                                09:48:52
20 Q.  All right.  While you're looking these over,   09:48:52
21     we've handed you two documents --               09:49:12
22 A.  Okay.                                           09:49:13
23 Q.  -- marked Rosenthal Exhibit 4 and 5; is that   09:49:13
24     right?  I'll just explain to you that we        09:49:18
25     received these invoices from plaintiffs'        09:49:26

11 (Pages 38 to 41)

42

1  counsel in response to our request for all      09:49:28
2  invoices, and what we've done here is           09:49:30
3  organize them in chronological order to the     09:49:32
4  best of our ability.                            09:49:34
5  A.  Okay.                                        09:49:36
6  Q.  The reason that there are two separate       09:49:36
7    exhibits is that one of them was a batch       09:49:39
8    that was produced to us last -- well, last     09:49:40
9    winter, and then the other is a smaller        09:49:42
10   batch that was produced to us last week.       09:49:45
11   Your time appears to have been billed in       09:49:48
12   both of these invoices, although you can       09:49:50
13   look.  And the one other just administrative   09:49:52
14   point that I should probably make on the       09:49:56
15   record is that they were produced to us        09:49:57
16   without control numbers or Bates numbers of    09:50:00
17   any kind.                                      09:50:02
18       So just for organization's sake what       09:50:02
19   we've done is we've affixed numbers to each    09:50:06
20   of the pages.  The prefix on each of the       09:50:08
21   pages begins GMA, and the -- though I'm not    09:50:12
22   sure that any of these pages start with the    09:50:16
23   numeral 1 the first of the materials that      09:50:18
24   were produced to us do start with the          09:50:21
25   numeral 1.                                     09:50:22

43

1  A.  Okay.  Thank you.                            09:50:23
2  Q.  Were you involved in the preparation of      09:50:24
3    these invoices?                                09:50:26
4  A.  No, I was not.                               09:50:26
5  Q.  Are you aware of any other invoices that     09:50:27
6    would have been submitted in relation to the   09:50:31
7    time that you've spent on this engagement?     09:50:32
8  A.  To my knowledge, that's -- this would be all 09:50:34
9    of it.                                         09:50:38
10 Q.  And so, again, just to sort of clear this    09:50:38
11   up, relative to your retention letter it was   09:50:44
12   Greylock McKinnon that submitted bills to      09:50:47
13   plaintiffs' counsel for time that you billed   09:50:48
14   to this matter?                                09:50:50
15 A.  That's correct.  I submit my hours to them,  09:50:51
16   and they submit the invoices.                  09:50:53
17 Q.  All right.  Other than the fees that are     09:50:59
18   billed here, the hourly fees that are billed   09:51:02
19   by Greylock McKinnon for your time and the     09:51:06
20   time of their employees, do you expect that    09:51:08
21   you or Greylock McKinnon will receive any      09:51:13
22   payment of any other kind in connection with   09:51:14
23   this litigation?                               09:51:17
24 A.  No.  We are only paid for the hourly rates,  09:51:17
25   the hourly bills.                              09:51:21

44

1  Q.  Now, it sounds like you've been retained by  09:51:22
2    at least some of the counsel for plaintiffs    09:51:26
3    in this case on other occasions; is that       09:51:28
4    right?                                         09:51:30
5  A.  That's correct.                             09:51:30
6  Q.  Are all of those counsel at Hagens Berman,   09:51:30
7    or have you worked with other plaintiffs'      09:51:35
8    counsel that are part of the plaintiffs'       09:51:37
9    counsel group in this case?                    09:51:39
10 A.  In this case I've met some of the other      09:51:40
11   counsel such as the gentleman on the phone,    09:51:45
12   but largely I work with Ed and others at       09:51:47
13   Hagens Berman.                                 09:51:50
14 Q.  And is that true of your work in other       09:51:51
15   cases?                                         09:51:53
16 A.  It is largely true.  I do have contact with  09:51:53
17   other counsel outside of Hagens Berman, but    09:51:58
18   for the most part it's been the counsel for    09:52:01
19   Hagens Berman.                                 09:52:04
20 Q.  Have you ever worked in a litigation support 09:52:05
21   capacity in any case in which Hagens Berman    09:52:07
22   was not counsel?                               09:52:11
23 A.  I was once asked actually a long time ago,   09:52:13
24   maybe five years ago, five years ago it        09:52:18
25   would be, to work on a malpractice case        09:52:21

45

1    related to physician compensation.  It         09:52:24
2    didn't go anywhere.  The judge threw out the   09:52:28
3    issue related to physician compensation, so    09:52:32
4    there was -- but this was a law firm in        09:52:34
5    Phoenix.                                       09:52:36
6  Q.  Was your work in that case done through      09:52:37
7    Greylock McKinnon?                             09:52:39
8  A.  No.  It actually wasn't.  It was before I    09:52:39
9    started working to a great degree with them,   09:52:42
10   so I was contacted directly by counsel based   09:52:46
11   on, again, work that I had published.          09:52:51
12 Q.  Do you remember the name of the law firm in  09:52:53
13   Phoenix?                                       09:52:55
14 A.  I don't, but I can find it.                  09:52:56
15 Q.  Have you ever done any work for a            09:52:57
16   pharmaceutical company before?                 09:53:07
17 A.  No, I have not.                              09:53:08
18 Q.  And that includes Pfizer and Warner-Lambert, 09:53:09
19   I take it?                                     09:53:13
20 A.  That's correct.                             09:53:13
21 Q.  Has any pharmaceutical company ever provided 09:53:14
22   financial support for any of your research     09:53:17
23   or academic work?                              09:53:19
24 A.  No, they have not.                          09:53:20
25 Q.  Now, the declaration that you submitted in   09:53:24

12 (Pages 42 to 45)

46

```
 1    this case does discuss other instances in      09:53:32
 2    which they've consulted or provided testimony   09:53:35
 3    related to the health care or pharmaceutical    09:53:37
 4    industries?                                     09:53:39
 5  A. That's correct.                                09:53:48
 6  Q. Are the cases that are listed here in          09:53:48
 7    Paragraph 2 of Exhibit 1 -- let me withdraw     09:53:49
 8    the question.                                   09:53:58
 9         Aside from the three cases that we         09:53:58
10    discussed in the beginning of your              09:54:01
11    testimony, are any of the cases that are        09:54:03
12    listed in the footnotes of Paragraph 2 of       09:54:06
13    your declaration cases in which you have        09:54:09
14    provided testimony?                             09:54:11
15  A. Sorry, can you point me to exactly which       09:54:15
16    cases you're looking at?  The ones after the    09:54:18
17    colon, or are you -- you're in a footnote?      09:54:21
18  Q. Probably the easiest thing to do is just to    09:54:25
19    look at the footnotes --                        09:54:27
20  A. Okay.                                          09:54:28
21  Q. -- footnotes 1 through 5.  And there are a     09:54:28
22    number of cases that are listed there.  The     09:54:30
23    first three are cases that we discussed and     09:54:32
24    that are listed on your CV --                   09:54:35
25  A. Uh-huh.                                        09:54:36
```

47

```
 1  Q. -- as cases in which you've provided           09:54:37
 2    testimony?                                       09:54:39
 3  A. Right.                                          09:54:40
 4  Q. The cases that are listed in Footnotes 4 and    09:54:41
 5    5 are not.  So my question really is, what's     09:54:43
 6    the nature of the services that you provided     09:54:48
 7    in those cases, and specifically did you         09:54:50
 8    serve in any sort of a testifying role in        09:54:55
 9    any of those cases?                              09:54:58
10  A. I was a consulting expert in those cases, so    09:54:59
11    I conducted data analysis, reviewed             09:55:02
12    reimbursement issues, that kind of thing.        09:55:06
13  Q. Okay.  Looking back at the cases that are       09:55:08
14    listed in Footnotes 1 through 3, which are       09:55:11
15    the ones that are listed in your --              09:55:13
16  A. Yes.                                            09:55:15
17  Q. -- CV, did you provide testimony in support     09:55:15
18    of class certification in any of those           09:55:19
19    cases?                                           09:55:22
20  A. In Augmentin -- now, I would have to check      09:55:22
21    this to be sure I wrote a document, but I        09:55:30
22    believe the case was settled before it was       09:55:33
23    ever filed.                                      09:55:37
24  Q. So with respect to Augmentin, you would not     09:55:37
25    have submitted testimony in support of --        09:55:39
```

48

```
 1  A. I think there's no -- I'm afraid my memory      09:55:41
 2    is terrible, but I believe the answer is no.     09:55:44
 3  Q. How about Lupron?                               09:55:46
 4  A. No.                                             09:55:49
 5  Q. And how about the AWP case?                     09:55:50
 6  A. No.  I have the two documents that I filed      09:55:52
 7    there were the tutorial and a declaration in     09:55:59
 8    support of liability issues.                     09:56:06
 9  Q. What was the subject matter of your             09:56:09
10    tutorial?                                        09:56:12
11  A. The subject matter of the tutorial was         09:56:12
12    broadly about reimbursement for               09:56:16
13    pharmaceuticals in the U.S. with a focus in     09:56:19
14    particular on injectable drugs.  And --         09:56:26
15  Q. And the tutorial I take it just described       09:56:32
16    the business generally?                          09:56:35
17  A. The tutorial describes how Medicare paid for   09:56:38
18    drugs through Part B.  It described how the     09:56:41
19    private sector reimburses drugs, both the       09:56:48
20    injectable drugs but also and the               09:56:54
21    competition at various levels in the            09:57:01
22    industry and the economic issues -- economic    09:57:03
23    incentives around prescribing.                  09:57:06
24  Q. And the tutorial, I take it, was directed to    09:57:08
25    the Court in that case?                          09:57:13
```

49

```
 1  A. It was directed to the court.                   09:57:15
 2  Q. And I take it that, your understanding, the     09:57:17
 3    aim of the tutorial was to provide               09:57:19
 4    background knowledge about the area, or was      09:57:22
 5    there something more?                            09:57:24
 6  A. The aim was to provide background knowledge     09:57:25
 7    on the institutions, how things worked and      09:57:27
 8    the economic incentives.                        09:57:30
 9  Q. So it sounds like, then, that this is the       09:57:32
10    first case in which you provided testimony       09:57:42
11    in support of class certification; is that       09:57:44
12    correct?                                         09:57:48
13  A. I believe that's correct.                       09:57:48
14  Q. And so I take it, then, that it is the          09:57:48
15    case -- withdrawn.                               09:57:57
16         So this would be the first case in          09:58:00
17    which you have analyzed whether causation or     09:58:02
18    injury could be proved on a class-wide           09:58:04
19    basis?                                           09:58:06
20  A. As the primary expert, that's correct.  As a   09:58:07
21    consultant in other matters, certainly my       09:58:14
22    work related to that.                           09:58:16
23  Q. Well, let's split that up.  When you say "as    09:58:21
24    a primary expert," what do you mean?  Do you     09:58:23
25    mean as a testifying expert?                     09:58:25
```

13  (Pages 46 to 49)

50

```
 1  A.  As a testifying expert.                    09:58:27
 2  Q.  Okay. So this is the first time that you've   09:58:28
 3      offered a report on those issues?           09:58:30
 4  A.  That's correct.                            09:58:31
 5  Q.  You had mentioned that you have provided     09:58:32
 6      advice on those issues as a consultant; is   09:58:36
 7      that correct?                               09:58:38
 8  A.  Oh, I'm sorry. There's a case I'm missing.   09:58:38
 9      I'm sorry. Can I back up?                   09:58:42
10  Q.  Of course.                                  09:58:45
11  A.  Wellbutrin SR.                              09:58:46
12  Q.  Have you provided testimony in the          09:58:55
13      Wellbutrin SR case?                         09:59:01
14  A.  I have filed a report in the Wellbutrin SR   09:59:03
15      case. I'm sorry.                            09:59:07
16  Q.  When did you file it?                       09:59:10
17  A.  You know, I need to check the date. It      09:59:11
18      should be -- it should be in -- I guess it's 09:59:13
19      subsequent to this, so it's not in the      09:59:19
20      footnotes. Can I get you the date?          09:59:21
21  Q.  Sure.                                       09:59:22
22  A.  I don't know it precisely right now.        09:59:23
23  Q.  Sure. Can you just ballpark it? It was      09:59:24
24      after your report in this case --           09:59:27
25  A.  It was after --                             09:59:28
```

51

```
 1  Q.  -- the time after August of --              09:59:29
 2  A.  Yes, it was sometime --                     09:59:29
 3  Q.  -- 2005?                                    09:59:30
 4  A.  Yes, it was. And I'm sorry, I just can't    09:59:31
 5      ballpark it right now, but I would be happy 09:59:35
 6      to get it for you at the next break.        09:59:37
 7  Q.  And I take it your work in the Wellbutrin   09:59:39
 8      case is work that you're doing through      09:59:42
 9      Greylock McKinnon?                          09:59:44
10  A.  And Hagens Berman Sobol Shapiro.            09:59:44
11  Q.  Do you know where the case is pending?      09:59:47
12  A.  I do not.                                   09:59:49
13          MR. POLUBINSKI:  Ed, do you know?       09:59:54
14          MR. NOTARGIACOMO:  Not off the top      09:59:55
15      of my head. I wasn't involved in            09:59:56
16      Wellbutrin, but...                          09:59:59
17          MR. POLUBINSKI:  Fair enough.           09:59:59
18      That's the last question I'll ask you, if I  10:00:00
19      can avoid it.                               10:00:02
20  A.  I will follow up with you on that. I...     10:00:04
21  Q.  Okay. Can you tell me, just generally       10:00:07
22      speaking, what the subject matter of your   10:00:11
23      report in that case is?                     10:00:13
24  A.  It is related to class certification in a   10:00:14
25      Hatch-Waxman case.                          10:00:21
```

52

```
 1  Q.  What's your understanding of what a Hatch-   10:00:22
 2      Waxman case is?                             10:00:25
 3  A.  It has to do with Paragraph 4,              10:00:25
 4      certification, so generic entry under a     10:00:30
 5      circumstance where the generic manufacturer 10:00:32
 6      claims that patent's invalid.               10:00:34
 7  Q.  And so in a nutshell would it be correct to 10:00:44
 8      describe the Wellbutrin case as a patent    10:00:48
 9      dispute?                                    10:00:52
10  A.  I'm not sure. That's a legal question, I'm  10:00:53
11      afraid. I'm not sure.                       10:00:57
12  Q.  Fair enough.                                10:00:59
13          MR. NOTARGIACOMO:  I'm supposed to      10:00:59
14      be objecting, not you.                      10:01:00
15  Q.  And can you tell me what your report related 10:01:05
16      to class certification purports to opine on? 10:01:08
17  A.  In the matter of Wellbutrin?               10:01:11
18  Q.  Wellbutrin, yes, thank you.                 10:01:16
19  A.  Purports to opine on common impact and     10:01:18
20      issues related to whether that impact can be 10:01:24
21      estimated reasonably using aggregate data.   10:01:27
22  Q.  Have you offered testimony in that case?    10:01:36
23  A.  I have not. Oral testimony?                 10:01:37
24  Q.  Yeah.                                       10:01:40
25  A.  No, I have not.                             10:01:40
```

53

```
 1  Q.  Do you know whether the Court has ruled on  10:01:42
 2      the class certification motion in that case? 10:01:45
 3  A.  I do not know. I do not believe so.         10:01:47
 4  Q.  Okay. So aside from the Wellbutrin matter,  10:01:50
 5      this is the first case in which you've      10:02:04
 6      analyzed whether causation or injury can be  10:02:06
 7      proved on a class-wide basis for purposes of 10:02:10
 8      a class certification motion?               10:02:13
 9  A.  That's correct.                             10:02:14
10  Q.  Has any of your published work dealt with   10:02:14
11      alleged or deceptive marketing of the drug? 10:02:24
12  A.  No, it has not.                             10:02:25
13  Q.  Has any of your published work dealt with   10:02:28
14      alleged or deceptive marketing of any       10:02:31
15      product?                                    10:02:35
16  A.  No, it has not.                             10:02:36
17  Q.  Do you have any prior experience with issues 10:02:39
18      related to FDA approval of prescription     10:02:41
19      drugs?                                      10:02:44
20          MR. NOTARGIACOMO:  Objection. You       10:02:44
21      can answer.                                 10:02:45
22  A.  I have certainly reviewed issues as they're 10:02:45
23      relevant, as a consulting expert reviewed   10:02:50
24      new drug approval documents, that kind of   10:02:54
25      thing, but do you mean industry experience?  10:02:56
```

14 (Pages 50 to 53)

## 54

1  Q.  No, just any experience at all.        10:03:00
2  A.  So I've looked at new drug approval and        10:03:02
3      ANDA-abbreviated new drug approval documents        10:03:08
4      on the FDA website.        10:03:12
5  Q.  What sort of documents?  Are they        10:03:13
6      documents -- let me phrase the question more        10:03:17
7      precisely.        10:03:21
8          Are they documents that relate to        10:03:22
9      specific drugs, or are they more general        10:03:23
10     policy-related documents?        10:03:27
11 A.  Looking at letters from the FDA to the        10:03:32
12     manufacturers in the cases of specific        10:03:34
13     drugs.        10:03:37
14 Q.  Can you think of any of those specific drugs        10:03:40
15     now off the top of your head?  Can you        10:03:43
16     recall them?        10:03:45
17 A.  Well, for example, for cases like Wellbutrin        10:03:45
18     SR I've looked at the letters that go out to        10:03:48
19     the generic manufacturers in response to        10:03:54
20     their abbreviated new drug applications.        10:03:58
21 Q.  Any others that you can remember?        10:04:01
22 A.  Specifically, no.  But this is a common part        10:04:09
23     of what we look at in these cases, so I        10:04:11
24     would say for many of these cases I have        10:04:14
25     looked at those letters.        10:04:16

## 55

1  Q.  When you say "these cases," do you mean all        10:04:17
2      of your cases or Wellbutrin and some other        10:04:19
3      smaller subset of cases?        10:04:23
4  A.  The cases that involve generic entry, which        10:04:25
5      would include Hytrin, Relafen, Cipro.        10:04:31
6  Q.  Do you have any prior experience with issues        10:04:38
7      related to off-label uses of a drug?        10:04:44
8  A.  No, I do not.        10:04:47
9  Q.  Okay.  Let's turn to your work in this case.        10:05:02
10     What have you been retained to do in this        10:05:04
11     case?        10:05:05
12 A.  I have been retained to provide written and        10:05:05
13     oral testimony related to whether or not it        10:05:14
14     can be shown that off-label promotion --        10:05:18
15     that certain allegations regarding off-label        10:05:22
16     promotion caused prescribing for Neurontin,        10:05:24
17     as well as increased dosing of Neurontin,        10:05:30
18     whether there's an economic theory to        10:05:37
19     support that, whether there's an empirical        10:05:40
20     model and finally whether there's data to        10:05:44
21     estimate such an empirical model to do that.        10:05:49
22 Q.  Anything else?        10:05:52
23 A.  Essentially that's obviously in the context        10:05:53
24     of the class whether these claims can be        10:05:59
25     shown to be common and whether the class        10:06:02

## 56

1      methods or the aggregate method makes sense        10:06:07
2      to estimate their effects.        10:06:11
3  Q.  Now, what you've just said sounds like you        10:06:16
4      might have limited your description of what        10:06:18
5      you did or what you've done related to class        10:06:20
6      certification.  Is there other work that        10:06:23
7      you've been retained to do in this case?        10:06:25
8  A.  That's the work that you have in front of        10:06:26
9      you.  That's essentially it.        10:06:30
10 Q.  And other than the work that's in front of        10:06:32
11     me, and you're referring to Exhibit No. 1,        10:06:34
12     there isn't, I take it, other work that        10:06:39
13     you're doing in the case?        10:06:41
14 A.  No, there isn't.        10:06:42
15 Q.  Okay.  Referring to Exhibit 1, you wrote the        10:06:47
16     declaration, correct?        10:06:50
17 A.  That's correct.        10:06:52
18 Q.  Who assisted you in writing, if anyone?        10:06:52
19 A.  I essentially wrote it myself.  As I        10:06:55
20     mentioned in the report, I consulted in        10:06:59
21     discussions with Richard Frank.        10:07:01
22 Q.  Now, aside from your discussions with        10:07:09
23     Richard Frank, are there any other ways in        10:07:11
24     which you would consider yourself not to        10:07:14
25     have written the report?  The reason I say        10:07:16

## 57

1      that is that you said you essentially wrote        10:07:19
2      it yourself.        10:07:21
3  A.  I wrote the report myself.        10:07:22
4  Q.  Okay.  So you actually typed it yourself?        10:07:26
5  A.  Yes, I did.        10:07:28
6  Q.  Did you work on it at home or in your        10:07:28
7      office?  I assume you didn't work on it at        10:07:33
8      Greylock McKinnon?        10:07:35
9  A.  That's correct.  I probably mostly worked on        10:07:35
10     it at home.  It's possible I did some of the        10:07:38
11     work at my Harvard office.        10:07:42
12 Q.  When did the drafting begin?        10:07:43
13 A.  I'm not sure that I can say when the        10:07:48
14     drafting began.  Probably -- if it was filed        10:07:52
15     in August, probably about no more than a        10:07:57
16     month before that.        10:08:01
17 Q.  Did you prepare an outline before you        10:08:03
18     drafted the report?        10:08:08
19 A.  No, I did not.  I don't believe I did.        10:08:08
20 Q.  When did you complete -- to the best of your        10:08:14
21     recollection, when did you complete a first        10:08:18
22     draft?        10:08:20
23 A.  I'm sorry, I really don't recall.  I believe        10:08:20
24     that it would have been very close to that        10:08:27
25     filing date.        10:08:28

15  (Pages 54 to 57)

58

```
 1  Q.  And do you recall in this case ever having      10:08:29
 2      printed drafts to review them?                  10:08:34
 3  A.  Could you please repeat the question?            10:08:37
 4  Q.  Sure.  And maybe I'll break it up.  It          10:08:41
 5      sounds like you typed the report yourself       10:08:44
 6      presumably on your computer or your laptop      10:08:46
 7      or something else; is that correct?             10:08:48
 8  A.  That's correct.                                 10:08:50
 9  Q.  Okay.  In order to review it, did you always    10:08:50
10      review it on the screen, or did you print       10:08:55
11      out copies of the report, interim drafts and    10:08:57
12      bring them home and mark them up, that sort     10:09:00
13      of thing?                                        10:09:01
14  A.  I believe I worked on the screen.  I usually    10:09:02
15      do.                                             10:09:04
16  Q.  Did you share drafts of the report with         10:09:05
17      other people on your team at all?               10:09:07
18  A.  Again, I consulted with Richard.  I may have    10:09:09
19      shown him parts of the document, asked his      10:09:12
20      opinion about them.                             10:09:16
21  Q.  Would you have sent in drafts of the            10:09:16
22      document by e-mail?                             10:09:18
23  A.  I may have.                                      10:09:19
24  Q.  Other than Richard Frank, is there anybody      10:09:25
25      else with whom you would have shared drafts?    10:09:28
```

59

```
 1  A.  I would have shared drafts -- the staff         10:09:29
 2      would have helped with the footnote, so I       10:09:33
 3      would have shared a draft with Greylock         10:09:35
 4      McKinnon so that they could fill in case        10:09:37
 5      numbers, that sort of thing.                    10:09:39
 6  Q.  And so would you have e-mailed them a copy      10:09:41
 7      or printed them out a copy?                      10:09:42
 8  A.  I would have e-mailed a copy.                    10:09:44
 9  Q.  Do you know if those e-mails still exist?       10:09:57
10  A.  I do not.  On my outbound end we have very      10:09:58
11      limited space, so I wouldn't have the          10:10:03
12      outbound e-mail.                                10:10:05
13  Q.  So other than an e-mail that you may have       10:10:06
14      sent to Richard Frank and an e-mail that you    10:10:14
15      may have sent with a draft of the document      10:10:16
16      to Greylock McKinnon, are there others with     10:10:18
17      whom you would have shared drafts?              10:10:20
18  A.  No.                                             10:10:21
19  Q.  Would you have sent more than one draft to      10:10:22
20      any of these groups of people?                  10:10:23
21  A.  It's possible that I would have sent an        10:10:24
22      early draft and a later draft.                  10:10:27
23  Q.  Did you receive comments on the drafts of       10:10:32
24      your declaration?                               10:10:36
25  A.  Yes, I did.                                      10:10:38
```

60

```
 1  Q.  From whom?                                       10:10:38
 2  A.  I certainly received comments from Richard,     10:10:39
 3      and I received comments from Ray Hartman at     10:10:47
 4      Greylock McKinnon.                              10:10:52
 5  Q.  Anyone else?                                     10:10:53
 6  A.  I'm not certain, but I think Renee              10:10:54
 7      Rushnawitz, she often provides comments as      10:10:58
 8      to form.                                         10:11:02
 9  Q.  Were they -- well, let's go through them one    10:11:07
10      at a time.  With respect to Professor           10:11:09
11      Frank's comments --                             10:11:12
12  A.  Uh-huh.                                          10:11:13
13  Q.  -- would they have been conveyed in a           10:11:13
14      handwritten markup or orally or some other      10:11:15
15      way?                                            10:11:17
16  A.  Orally.                                          10:11:17
17  Q.  Do you remember what his comments were?         10:11:19
18  A.  I remember largely that his comments related   10:11:20
19      to where the Dorfman-Steiner theory applied,   10:11:28
20      its relevance.  That's -- I remember a lot     10:11:34
21      of our discussion was about that.              10:11:38
22  Q.  Can you tell me what the Dorfman-Steiner       10:11:49
23      theory is?                                       10:11:51
24  A.  It has to do with the underpinnings of         10:11:51
25      advertising and the economics of               10:11:53
```

61

```
 1      advertising.  Why do firms advertise, and       10:11:54
 2      why don't we expect that advertising is         10:11:57
 3      important in particular in the                  10:12:00
 4      pharmaceutical industry.  Excuse me.            10:12:02
 5  Q.  When you say "important," what do you mean      10:12:05
 6  A.  Why will it be substantial?  Because of the     10:12:07
 7      fact that there are substantial price           10:12:15
 8      margins.                                        10:12:18
 9  Q.  When you say "substantial," do you mean         10:12:21
10      substantial in a monetary way?                  10:12:24
11  A.  I do.  That it'll be a significant activity.    10:12:25
12      So just to clarify, in industries where the    10:12:30
13      goods are commodities and essentially           10:12:35
14      they're interchangeable, they're very small    10:12:38
15      profit margins on those commodities.  We        10:12:42
16      expect to find little advertising.              10:12:44
17      Pharmaceuticals, they're -- for a variety of    10:12:46
18      reasons are higher profit margins, and we       10:12:52
19      would expect to find more advertising.          10:12:54
20  Q.  And how did you respond to the comments that    10:12:55
21      you received from Professor Frank on the        10:12:58
22      subject?                                        10:13:00
23  A.  I think I clarified and edited that section.    10:13:00
24  Q.  Okay.  How about Dr. Hartman; were his          10:13:07
25      comments conveyed to you orally or in a         10:13:11
```

16 (Pages 58 to 61)

**62**

```
 1    handwritten markup or some combination of      10:13:13
 2    the two?                                        10:13:15
 3 A. I believe they were oral.                       10:13:15
 4 Q. What were the substance of his comments?        10:13:17
 5 A. The substance of his comments largely were      10:13:22
 6    about expanding some of the descriptions,       10:13:26
 7    providing more examples in the empirical        10:13:29
 8    section.                                         10:13:34
 9 Q. And the empirical section of your report, if    10:13:37
10    you can direct us to that --                    10:13:42
11 A. Yes.  Sure.                                      10:13:43
12 Q. -- so I know that we're on the same page.        10:13:43
13 A. The section -- Section 6 in particular           10:13:46
14    around Paragraph 30 --                           10:13:55
15 Q. Section -- I'm sorry.                            10:13:56
16 A. Sorry.  Section 6.                               10:13:57
17         MR. NOTARGIACOMO:  Page 13.                 10:13:59
18 Q. Roman numeral VI?                                10:14:00
19 A. Roman numeral VI, yes, Page 13, but in           10:14:02
20    particular the section with the formulas         10:14:03
21    that follows.                                    10:14:05
22 Q. Right.  How did you respond to his comments?    10:14:09
23 A. I expanded the examples I used and provided      10:14:10
24    more description about how the models might      10:14:15
25    actually be implemented.                         10:14:19
```

**63**

```
 1 Q. And how about Renee Rushnawitz; how were her    10:14:20
 2    comments conveyed, if you remember?             10:14:28
 3 A. I think Renee may have actually provided         10:14:30
 4    suggestions either on a hard copy or             10:14:33
 5    redline, and, again, she generally reports       10:14:39
 6    about things like appropriate footnoting and     10:14:48
 7    appropriate reference to what's in the           10:14:53
 8    complaint, so she would have provided some       10:14:56
 9    technical, essentially editorial, comments.      10:14:58
10 Q. Do you still have the hard copy markup that     10:15:07
11    she did, or redline, whichever the case may     10:15:09
12    be?                                              10:15:09
13 A. I don't believe I do, no.                        10:15:13
14 Q. Do you know what you would have done with        10:15:14
15    it?                                              10:15:17
16 A. I don't think I would have saved it.  I          10:15:17
17    would have had it shredded, I guess.             10:15:19
18 Q. Okay.  Other than Professor Frank, Dr.          10:15:23
19    Hartman, and Dr. Rushnawitz, Ms.                 10:15:30
20    Rushnawitz --                                    10:15:34
21 A. Ms.                                              10:15:34
22 Q. -- Ms. Rushnawitz, did anybody else receive     10:15:35
23    drafts of your declaration prior to its         10:15:38
24    being finalized?                                 10:15:40
25 A. I'm sure I sent a draft to the lawyers.          10:15:41
```

**64**

```
 1 Q. How far in advance of the filing would you      10:15:43
 2    have done that?                                 10:15:53
 3 A. I'm sorry, I don't know, but I don't             10:15:53
 4    think -- I don't think it would have been        10:15:55
 5    very long in advance.  I teach during this       10:16:01
 6    period in the summer, and so it's a very         10:16:03
 7    tight -- would have been a very tight            10:16:07
 8    timeline for me.                                 10:16:10
 9 Q. Sure.  And how would you have sent the draft    10:16:11
10    to the lawyers?                                 10:16:16
11 A. I would have sent it by e-mail.                  10:16:17
12 Q. Did you receive comments from them?             10:16:19
13 A. I spoke with Tom Sobol.                          10:16:21
14 Q. Anybody else?                                   10:16:27
15 A. That's all that I recall.                        10:16:28
16 Q. Would you have received written comments        10:16:30
17    from Mr. Sobol or oral comments?                10:16:34
18 A. They would have been oral.                       10:16:36
19 Q. Do you recall the substance of his comments?    10:16:37
20 A. I don't.  I recall that he did not have          10:16:42
21    specific comments about the declaration.  I      10:16:50
22    don't recall any direct comments.  I know        10:16:57
23    that we had a conversation about it, but I       10:16:59
24    don't -- I don't recall anything specific        10:17:06
25    that he suggested or any changes that I made     10:17:07
```

**65**

```
 1    subsequent to that conversation.                 10:17:10
 2 Q. Do you remember whether you did make changes    10:17:12
 3    subsequent to the conversation?                 10:17:14
 4 A. I don't recall making changes subsequent to      10:17:16
 5    the conversation, no.                            10:17:19
 6 Q. Would that have been because you disagreed      10:17:24
 7    with comments that he made?                     10:17:25
 8 A. No, that was not what happened.                  10:17:26
 9 Q. When you say you don't recall making changes    10:17:33
10    in response to your conversation with him,      10:17:36
11    is it that you don't have a recollection one    10:17:38
12    way or the other as to whether you did, or      10:17:40
13    is it your best recollection that you           10:17:43
14    didn't?                                         10:17:45
15 A. My best recollection is that I didn't.  It       10:17:45
16    was a year ago.                                  10:17:47
17 Q. Sure.                                           10:17:48
18 A. I recall a conversation, and I don't believe     10:17:49
19    that there were specific recommendations.        10:17:52
20 Q. Okay.  When did you complete your               10:17:55
21    declaration?                                     10:18:11
22         MR. NOTARGIACOMO:  Objection.  You          10:18:11
23    can answer.                                      10:18:12
24 A. I'm sorry, I don't know the exact date.  I       10:18:12
25    know the date it was filed, but I don't --       10:18:18
```

17 (Pages 62 to 65)

66

1  since it was a year ago, I don't know the          10:18:20
2  exact date that I completed it.                    10:18:21
3  Q.  Relative to the -- right.  Relative to the     10:18:24
4  date that it was signed, which appears to be       10:18:26
5  August 8th, 2005 --                                10:18:28
6  A.  Right.                                         10:18:31
7  Q.  -- how far in advance of that date would you   10:18:31
8  have finished your edits on the document?          10:18:33
9  A.  I'm not certain, but typically very -- it      10:18:35
10  would have been very close to the date            10:18:39
11  itself.                                           10:18:40
12  Q.  Okay.  I've got one more exhibit for you.     10:18:44
13       (Exhibit No. 6, Document headed             10:18:56
14  "Rosenthal Time - 2005 Neurontin," marked        10:18:56
15  for identification.)                             10:19:13
16  Q.  So we have just handed you a document that   10:19:13
17  is marked as Rosenthal Exhibit 6.  Do you        10:19:21
18  recognize this document?                         10:19:24
19  A.  I do.                                         10:19:25
20  Q.  What is it?                                   10:19:26
21  A.  It's a summary of my hours.                   10:19:27
22  Q.  Who would have prepared it?                   10:19:28
23  A.  What goes in here was prepared by me.  It     10:19:30
24  was consolidated by someone else on this         10:19:35
25  page, so -- but these I recognize as the way     10:19:37

67

1  that I record my time.                            10:19:41
2  Q.  Do you know who would have consolidated it?   10:19:42
3  Is it someone at Greylock McKinnon?               10:19:45
4  A.  I can't be certain.  I would think that it    10:19:46
5  would be someone at Greylock McKinnon.            10:19:49
6  Q.  And so you record your time in handwritten    10:19:51
7  notations and then communicate it to             10:19:54
8  somebody else to record it; is that how that     10:19:56
9  works?  And if I'm -- if I've got it wrong,       10:19:59
10  you can maybe just tell me from scratch what     10:20:03
11  your process is and how this would have been     10:20:06
12  created.                                         10:20:08
13  A.  So during a month I record either on my      10:20:09
14  calendar or in handwritten notes to myself       10:20:11
15  what I did, how long it took.  At the end of     10:20:13
16  the month I submit hours to Greylock            10:20:16
17  McKinnon, and I submit them in a format that    10:20:20
18  looks like this for each project I worked       10:20:22
19  on.  So there will be a monthly invoice with    10:20:25
20  a series of projects, whatever I worked on.     10:20:27
21  And so this is obviously the Neurontin          10:20:30
22  sections of those monthly invoices pulled       10:20:32
23  together.                                        10:20:35
24  Q.  So do you invoice Greylock McKinnon?  Do you 10:20:35
25  send them a formal bill?                         10:20:39

68

1  A.  I send them a recording of my hours.  I       10:20:40
2  don't know if that's a formal bill.              10:20:42
3  Q.  And do you do it by e-mail or by -- you       10:20:43
4  know, in some other document?                    10:20:46
5  A.  Yes, that's right.  I send it by e-mail.      10:20:47
6  Q.  Is it correct that Rosenthal Exhibit 6        10:20:57
7  represents the total number of hours that        10:21:00
8  you would have spent in 2005 on this             10:21:02
9  engagement?                                       10:21:04
10  A.  That's correct.                              10:21:05
11  Q.  And I won't ask you to do the math, but if I 10:21:09
12  were to add these numbers up and come up        10:21:15
13  with a number that in the aggregate is just     10:21:18
14  shy of 70 hours, would that be a correct        10:21:21
15  cumulation of the total number of hours that    10:21:25
16  you've spent on the engagement in 2005?         10:21:27
17  A.  Assuming your math is correct, that number   10:21:30
18  looks approximately right.                       10:21:32
19  Q.  It's a very shaky assumption, but it's one   10:21:35
20  that I think we can verify later, if            10:21:37
21  necessary.  And let's take a look at the        10:21:38
22  block of time for August.  You'll see there     10:21:44
23  that for August 7 you've got four and a half    10:21:50
24  hours spent revising MR declaration.            10:21:53
25  A.  Uh-huh, that's correct.                      10:21:58

69

1  Q.  I'm assuming "MR declaration" is your         10:21:58
2  declaration in this case, Exhibit 1; is that     10:22:01
3  correct?                                         10:22:04
4  A.  That's correct.                              10:22:04
5  Q.  And so it would be safe to say, based on     10:22:04
6  this document, that you were revising your      10:22:06
7  declaration up until the day before it was      10:22:09
8  filed?                                           10:22:11
9  A.  That's correct.                              10:22:11
10       MR. POLUBINSKI:  Now, we've been          10:22:17
11  going about an hour and ten minutes.  I'm       10:22:17
12  happy to keep going if you would like or        10:22:19
13  take a break, whatever your pleasure.           10:22:21
14       MR. NOTARGIACOMO:  Let's take a            10:22:22
15  break.                                          10:22:24
16       THE WITNESS:  That would be great.         10:22:24
17  Thank you.                                       10:22:26
18       THE VIDEOGRAPHER:  The time is            10:22:27
19  10:22.  This is the end of Tape 1, and we       10:22:29
20  are off the record.                             10:22:31
21       (Recess taken.)                           10:22:35
22       (Exhibit No. 7, Document headed           10:22:35
23  "Greylock McKinnon Associates Listing,"         10:22:35
24  dated 1/20/2006, marked for identification.)    10:42:42
25       THE VIDEOGRAPHER:  The time is            10:42:42

18 (Pages 66 to 69)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                         516-608-2400

70

1  10:42. This is the beginning of Tape No. 2,  10:42:43
2  and we are back on the record.  10:42:45
3  BY MR. POLUBINSKI:  10:42:47
4  Q.  All right. Let's start by handing you,  10:42:47
5  Professor Rosenthal, a document marked as  10:42:52
6  Rosenthal Exhibit 7. We previously showed  10:42:54
7  you the Greylock McKinnon invoices that we  10:43:01
8  received, which included your own invoices.  10:43:03
9  And what this is is another document that we  10:43:04
10  received from plaintiffs' counsel back last  10:43:06
11  winter, also apparently reflecting Greylock  10:43:09
12  McKinnon time records. Have you seen this  10:43:14
13  before?  10:43:17
14 A.  I haven't, no.  10:43:17
15 Q.  If you would turn to the page that we've  10:43:19
16  marked as GMA86.  10:43:21
17 A.  Yes. Oh, sorry, 86.  10:43:28
18 Q.  Yeah.  10:43:30
19 A.  Yeah.  10:43:30
20 Q.  You'll see that it does contain some time  10:43:31
21  for you; is that correct?  10:43:33
22 A.  I see that, yes.  10:43:35
23 Q.  This doesn't appear to be all the time that  10:43:41
24  you've spent on this engagement, correct?  10:43:44
25 A.  I don't believe so, looking at it, since we  10:43:46

71

1  looked at that other document. It had other  10:43:49
2  time, right?  10:43:53
3 Q.  Sure. But the time that does appear on Page  10:43:53
4  86 does appear to be correct, as far as it  10:44:00
5  goes at least?  10:44:03
6 A.  As far as it goes. I would have to check my  10:44:03
7  records.  10:44:05
8 Q.  Fair enough. But you don't have any reason  10:44:05
9  to think that it wouldn't be correct, I  10:44:08
10  assume?  10:44:11
11 A.  No, I don't have any reason to think that.  10:44:11
12 Q.  The first one is Charles King?  10:44:14
13 A.  Okay.  10:44:16
14 Q.  Do you know Charles King?  10:44:17
15 A.  I do.  10:44:18
16 Q.  What is his -- withdrawn.  10:44:19
17  Does he work for Greylock McKinnon?  10:44:21
18 A.  Yes, he does. And I don't know technically  10:44:22
19  what his position is, but he works there  10:44:26
20  more or less full time, I think.  10:44:30
21 Q.  Did he work with you on your declaration in  10:44:32
22  this case?  10:44:34
23 A.  Again, this was a year ago. I'm certain  10:44:35
24  that we would have spoken. In particular,  10:44:38
25  we talked about marketing documents and  10:44:44

72

1  about what kinds of things to look for. Dr.  10:44:48
2  King, Professor King, is formerly a  10:44:54
3  marketing professor at Harvard Business  10:44:56
4  School and so he has expertise in marketing  10:45:00
5  strategy.  10:45:03
6 Q.  Do you remember any specific conversations  10:45:05
7  that you had with him?  10:45:07
8 A.  I don't, although I do -- again, I believe  10:45:08
9  it was with regard to what kinds of  10:45:15
10  documents we should request and look for in  10:45:18
11  the materials that we had access to.  10:45:22
12 Q.  Do you remember what the substance of those  10:45:27
13  conversations were, what he has to say about  10:45:30
14  documents?  10:45:33
15 A.  He named some specific terms for documents.  10:45:34
16  One that I remember is called a SWOT,  10:45:40
17  capital S, capital W, capital O, capital T,  10:45:44
18  strengths, weaknesses, opportunities and  10:45:48
19  threats, a kind of analysis that's standard  10:45:51
20  in marketing, and he had expertise in,  10:45:53
21  again, sort of how to describe the kinds of  10:45:59
22  marketing documents that would be useful.  10:46:04
23 Q.  Would these be documents that the defendants  10:46:05
24  would have, documents that some of the  10:46:11
25  plaintiffs might have, or something else?  10:46:12

73

1 A.  These were documents that the defendants  10:46:14
2  might have.  10:46:16
3 Q.  Would you have taken any notes of your  10:46:22
4  conversation with Mr. King, Dr. King,  10:46:24
5  Professor King?  10:46:26
6 A.  I don't believe so.  10:46:27
7 Q.  All right. I'm going to need to ask you to  10:46:36
8  look at Page 77 to tell me how to pronounce  10:46:38
9  the name of this person whose name appears  10:46:41
10  here.  10:46:43
11 A.  Augusteijn.  10:46:55
12 Q.  Augusteijn. Do you know who M. Augusteijn  10:46:56
13  is?  10:47:00
14 A.  I do. Michael is a senior staff person at  10:47:00
15  Greylock McKinnon.  10:47:04
16 Q.  Did he work on your report?  10:47:08
17 A.  He, like the other staff, would have  10:47:10
18  provided support for the report doing  10:47:13
19  background work.  10:47:18
20 Q.  Do you have a sense for what background work  10:47:23
21  he would have been doing?  10:47:26
22 A.  I believe that he would have been looking at  10:47:27
23  some of the documents that were made  10:47:29
24  available to us, but I can't say for sure.  10:47:30
25 Q.  I would like to direct your attention on  10:47:34

19  (Pages 70 to 73)

74

1  Pages -- Page 77 to the entries for August    10:47:35
2  1st, 2nd, 3rd, 4th, 5th and 8th.  The    10:47:41
3  description under these time entries reads    10:47:50
4  "Hartman and Rosenthal affidavits."    10:47:53
5 A.  I see that.    10:47:56
6 Q.  Would you have been aware that Mr.    10:48:00
7  Augusteijn was spending somewhere in the    10:48:01
8  range of 30, 35 hours in that first week of    10:48:03
9  August on your report and Dr. Hartman's?    10:48:06
10 A.  I wouldn't have been aware of what his time    10:48:12
11  was since he works in a separate office.  I    10:48:15
12  would have been aware that he was helping to    10:48:18
13  support my report.    10:48:19
14 Q.  You don't have -- do you have any sense    10:48:22
15  specifically for what he might have been    10:48:24
16  doing in those days?    10:48:26
17 A.  I can't say precisely.  Often one of the    10:48:28
18  things they do is essentially check every    10:48:33
19  statement, check every footnote to make sure    10:48:36
20  that it can be backed up.    10:48:39
21 Q.  Did you ever receive comments directly from    10:48:42
22  Mr. Augusteijn on your declaration?    10:48:46
23 A.  You know, I can't be certain.  It is    10:48:48
24  possible -- again, I might have sent a    10:48:52
25  document, for example, that was missing a    10:48:55

75

1  complete footnote, and he would be filling    10:48:58
2  in the complete footnote, that kind of    10:49:01
3  thing.  That might have happened in a    10:49:04
4  redlined document.  It would have been    10:49:05
5  purely of that kind of editorial nature.    10:49:09
6 Q.  When you say a redlined document, tell me    10:49:11
7  what you mean.  Would he have sent back a    10:49:16
8  version of the document redlined to reflect    10:49:18
9  changes that he might have made in it?    10:49:21
10 A.  That's correct.  Again, pursuant    10:49:24
11  specifically to my instructions, "I need the    10:49:26
12  correct volume number for this," for    10:49:29
13  example.    10:49:31
14 Q.  How would you have communicated your    10:49:34
15  instructions to him?  Would you have sent    10:49:35
16  him an e-mail with the instructions    10:49:36
17  attaching the document?    10:49:39
18 A.  I believe so.    10:49:40
19 Q.  Would you still have a copy of any e-mail    10:49:40
20  that you would have sent like that?    10:49:46
21 A.  I would not.  Again, we have very limited    10:49:47
22  space that we're allocated through the    10:49:53
23  e-mail that I use through Harvard, and so my    10:49:56
24  sent mail is only about a month old, maybe    10:50:01
25  less.    10:50:04

76

1 Q.  And so you would have -- well, I guess just    10:50:05
2  to back up, with respect to all of the    10:50:08
3  various e-mails, the sending of drafts by    10:50:13
4  e-mail that we've discussed over the course    10:50:15
5  of the past hour or so, less than that    10:50:17
6  really, all of that e-mail would have been    10:50:19
7  sent by you and to you at your Harvard    10:50:23
8  e-mail address?    10:50:27
9 A.  That's correct.    10:50:27
10 Q.  Do you have a personal e-mail address, too?    10:50:28
11 A.  I don't use another e-mail address.    10:50:30
12 Q.  Okay.  All right.  The next name is Andrew    10:50:33
13  Bechtel.    10:50:39
14 A.  B-E-C-H-T-E-L.    10:50:43
15 Q.  Thank you.  Do you know Mr. Bechtel?    10:50:46
16 A.  I do.  He's another staff person at Greylock    10:50:49
17  McKinnon.    10:50:51
18 Q.  Did he work with you on your declaration?    10:50:53
19 A.  Yes, I believe he did.    10:50:55
20 Q.  Do you know what he did?    10:50:56
21 A.  The same kind of thing that Michael would    10:50:57
22  have done.    10:51:00
23 Q.  So would you have sent drafts of your    10:51:00
24  declaration to Mr. Bechtel as well with    10:51:09
25  instructions to fill in parts of it or to    10:51:11

77

1  make specific changes?    10:51:14
2 A.  More likely, Michael would have delegated    10:51:15
3  some work to him.  Michael is senior to him.    10:51:17
4 Q.  And I would like you to turn to Page 79.    10:51:22
5  You may already be there.    10:51:29
6 A.  Yes, I am.    10:51:32
7 Q.  And I would like to direct your attention to    10:51:32
8  the time entries on that page for August    10:51:34
9  4th, 5th, 7th and 8th.  The description for    10:51:38
10  each of those entries reads "Neurontin    10:51:44
11  reports and backup," correct?    10:51:48
12 A.  That's correct.    10:51:50
13 Q.  Do you know what Mr. Bechtel would have been    10:51:50
14  doing during those days?    10:51:55
15 A.  Well, he would have been working on backup    10:51:57
16  for my report, as well as Dr. Hartman's; you    10:52:04
17  know, Dr. Hartman had a report filed at the    10:52:06
18  same time.  And, again, they try to verify    10:52:09
19  every claim, every statement with some    10:52:13
20  documentation, the appropriate footnote, and    10:52:16
21  gather those documents to make sure that    10:52:19
22  everything can be backed up.    10:52:28
23 Q.  So Neurontin reports would have been your    10:52:30
24  declaration and Dr. Hartman's declaration --    10:52:32
25 A.  That's --    10:52:32

20  (Pages 74 to 77)