**Page 78**

1  Q.  -- presumably?  10:52:34
2  A.  That's my understanding, yes.  10:52:35
3  Q.  What about "backup"; do you know what he's  10:52:37
4      referring to there?  10:52:38
5  A.  Yes. So, for example, when I cite an  10:52:39
6      academic article, that backup is the article  10:52:42
7      itself.  10:52:48
8  Q.  Are there other examples aside from  10:52:52
9      assembling academic articles that you cite?  10:52:57
10 A.  There may have been documents from the  10:52:58
11     Franklin materials.  10:52:59
12 Q.  If you look at the entry that's dated August  10:53:02
13     10th, 2005, do you see the description is  10:53:06
14     "Neurontin backup binder"?  10:53:10
15 A.  (No verbal response.)  10:53:12
16 Q.  Do you know what "Neurontin backup binder"  10:53:14
17     means?  10:53:18
18 A.  It's an assemblage of those academic  10:53:18
19     articles and discovery documents that are  10:53:22
20     cited specifically in the report.  10:53:24
21 Q.  Do you have a copy of the Neurontin backup  10:53:28
22     binder?  10:53:30
23 A.  With me right now?  10:53:31
24 Q.  No, just --  10:53:32
25 A.  Yes.  10:53:33

**Page 79**

1  Q.  -- do you have one in your --  10:53:33
2  A.  I do.  10:53:36
3  Q.  -- possession?  10:53:36
4  A.  I do.  10:53:37
5  Q.  Have you taken notes on it, written on the  10:53:38
6      documents at all?  10:53:40
7  A.  I don't think so.  10:53:41
8  Q.  All right. Next name is -- let's look at  10:53:41
9      Page 81. You can help me with this  10:53:54
10     pronunciation as well, O. B-I-Z-A-N?  10:53:56
11 A.  Yeah, I don't actually know how to pronounce  10:54:01
12     it, but his last name is B-I-Z-A-N, first  10:54:04
13     name Oded, O-D-E-D. It's Israeli, I  10:54:06
14     believe.  10:54:13
15 Q.  So do you know Mr. Bizan?  10:54:13
16 A.  He was a -- he was another Ph.D. at Greylock  10:54:16
17     McKinnon at the time. He's no longer there.  10:54:23
18 Q.  Did he work with you on your declaration?  10:54:26
19 A.  He did not work on my declaration, that I  10:54:28
20     know of. He may have done some supporting  10:54:33
21     work that related to it.  10:54:35
22 Q.  Let's look at GMA Page 81, and in particular  10:54:39
23     the two entries on August 1st and August  10:54:44
24     2nd. The dec -- or the description reads,  10:54:47
25     "Compile cites for MR report"?  10:54:50

**Page 80**

1  A.  Uh-huh.  10:54:53
2  Q.  MR report, I take it --  10:54:53
3  A.  Would be my --  10:54:55
4  Q.  -- would be your report?  10:54:55
5      Do you have a sense for what Mr. Bizan  10:54:58
6      was doing on August 1st and August 2nd?  10:55:01
7  A.  I don't. It was a while ago, and I was not  10:55:04
8      directly overseeing him.  10:55:07
9  Q.  Would you have received comments from Mr.  10:55:13
10     Bizan at all?  10:55:15
11 A.  I don't believe so.  10:55:15
12 Q.  And just to circle back to Mr. Bechtel,  10:55:19
13     would you have received comments directly  10:55:22
14     from him?  10:55:25
15 A.  I don't believe so. Again, he may have  10:55:26
16     filled in specific references that I  10:55:29
17     indicated needed to be filled in. If you  10:55:31
18     consider that to be a comment, then it's  10:55:33
19     certainly possible.  10:55:35
20 Q.  And going back yet again to Mr. Augusteijn,  10:55:43
21     you mentioned that he did similar work like  10:55:46
22     the work that you had described filling in  10:55:47
23     references and things like that. Would he  10:55:49
24     have given you any more substantive comments  10:55:51
25     than that?  10:55:53

**Page 81**

1  A.  No, I don't think so.  10:55:54
2  Q.  Okay. The next name is Professor Frank.  10:55:57
3      And we've discussed a little bit the work  10:56:04
4      that he's done with you in this matter, and  10:56:06
5      we've also discussed that he would have  10:56:11
6      reviewed a draft of your report at some  10:56:12
7      point. If we could take a look at the page  10:56:14
8      that's been marked GMA82. There are two  10:56:17
9      time entries here for Professor Frank,  10:56:25
10     correct?  10:56:27
11 A.  Uh-huh. Yes.  10:56:28
12 Q.  This, I assume, is the same Professor Frank  10:56:28
13     that we've been talking about in this  10:56:32
14     deposition?  10:56:34
15 A.  Yes, it is.  10:56:34
16 Q.  Would you think that -- well, withdraw that.  10:56:46
17     The two time entries are dated June  10:56:48
18     1st, 2005 and July 1st, 2005. The  10:56:50
19     descriptions in both of them are  10:56:54
20     "Discussions with counsel, case team," and  10:56:55
21     the total amount of time between those two  10:56:58
22     entries is five hours?  10:57:00
23 A.  I see that, yes.  10:57:13
24 Q.  Would you think that these two time entries  10:57:05
25     reflect all the time that Professor Frank  10:57:08

82

1   consulted with you on this matter?    10:57:10
2  A. We may have had conversations subsequently    10:57:14
3   that he did not bill. To be honest, I am    10:57:16
4   not certain.    10:57:20
5  Q. But five hours of consultation would be    10:57:24
6   within the realm of what you would have    10:57:27
7   expected that he would have spent on that,    10:57:29
8   on the engagement with you?    10:57:31
9  A. I think that sounds reasonable, yes.    10:57:32
10 Q. Why did you consult with Professor Frank?    10:57:42
11 A. Professor Frank has significant experience    10:57:45
12  in looking at pharmaceutical promotion, in    10:57:49
13  particular, and its effects. As you may    10:57:53
14  know, he has a very long CV and some    10:58:03
15  important papers in the literature related    10:58:05
16  to pharmaceutical promotion.    10:58:08
17 Q. Did you rely on his advice for any of your    10:58:13
18  work or any of his conclusions?    10:58:15
19 A. No. The conclusions are my own. The work    10:58:17
20  is my own. We discussed it, again, as I    10:58:18
21  mentioned earlier, yes, in particular, the    10:58:22
22  theoretical underpinnings.    10:58:24
23 Q. Are there any particular parts of your    10:58:26
24  declaration that you would attribute more to    10:58:30
25  him than others?    10:58:31

83

1  A. As I mentioned before, I recall a particular    10:58:32
2   discussion about the theoretical    10:58:37
3   underpinnings and how to frame that most    10:58:41
4   usefully in the document, but the work is my    10:58:43
5   own.    10:58:47
6  Q. How did you generally communicate with    10:58:53
7   Professor Frank on this engagement?    10:58:55
8  A. I believe that -- as you see here, I believe    10:58:57
9   that he might have been in one of the early    10:59:01
10  face-to-face meetings, and then I spoke with    10:59:04
11  him on the phone.    10:59:07
12 Q. Would you have sent e-mail back and forth    10:59:10
13  with him on the subject of your engagement    10:59:12
14  in this matter?    10:59:14
15 A. It's possible.    10:59:15
16 Q. But it sounds like you wouldn't have e-mails    10:59:18
17  still from that time period on your system?    10:59:21
18 A. I would not.    10:59:23
19 Q. Would you have taken notes from any of your    10:59:24
20  meetings with him?    10:59:31
21 A. I don't believe so, no.    10:59:32
22 Q. Would you have taken notes more generally in    10:59:35
23  any of the other meetings that you had in    10:59:36
24  this matter either with counsel or with    10:59:39
25  others at Greylock McKinnon?    10:59:41

84

1  A. I may have taken some notes to jog my memory    10:59:42
2   about things to follow up on.    10:59:45
3  Q. Do you still have them?    10:59:47
4  A. I'm not sure.    10:59:50
5  Q. Have you looked for them?    10:59:55
6  A. I looked for everything that I could find    10:59:57
7   that was relevant to the case. I can't be    11:00:00
8   certain that there's not a piece of    11:00:02
9   notepaper somewhere, but I don't take    11:00:03
10  extensive notes.    11:00:05
11 Q. You mentioned Dr. Frank, or Professor Frank,    11:00:09
12  by name in your declaration, correct --    11:00:15
13 A. That's correct.    11:00:19
14 Q. -- in Paragraph 5 which is on Page 3?    11:00:20
15  Why did you decide to mention him in    11:00:25
16  the declaration but none of the other    11:00:27
17  individuals at Greylock McKinnon who appear    11:00:29
18  to have spent time on your report?    11:00:31
19 A. Dr. Frank is -- Professor Frank, to be    11:00:33
20  consistent, is an expert in this area, and,    11:00:37
21  again, our discussions were at a pretty high    11:00:40
22  level, talking about the theory here which    11:00:44
23  is particularly relevant, and so I decided    11:00:49
24  to mention him because he was an important    11:00:51
25  source of information, just like looking at    11:00:53

85

1   the literature.    11:00:56
2  Q. Was he a more important source for    11:01:04
3   information than other folks with whom you    11:01:06
4   might have consulted?    11:01:10
5  A. I believe so. I believe he's a reference in    11:01:10
6   and of himself just like the published    11:01:13
7   literature is.    11:01:14
8  Q. The next name is Joshua Peteet?    11:01:16
9  A. P-E-T-E-E-T.    11:01:19
10 Q. Thank you. Do you know Mr. Peteet?    11:01:21
11 A. I do.    11:01:25
12 Q. Did he work on your report?    11:01:31
13 A. I believe he's provided support, and I know    11:01:32
14  he's provided support over the subsequent    11:01:34
15  months in preparation, for example, for this    11:01:36
16  meeting.    11:01:42
17 Q. What sorts of support would he have provided    11:01:43
18  in the subsequent months?    11:01:45
19 A. Again, finding additional documents, that    11:01:48
20  kind of thing.    11:01:51
21 Q. If we could look at his time on Pages GMA84    11:02:03
22  and 85.    11:02:08
23 A. Uh-huh.    11:02:13
24 Q. He appears to have spent a fairly    11:02:13
25  substantial amount of time in July and into    11:02:16

22 (Pages 82 to 85)

## Page 86

1  August of 2005 on "Data analysis," as it's            11:02:19
2  described in these time records.                       11:02:26
3  A. Yes, I see that.                                    11:02:29
4  Q. Do you know what he was doing?                      11:02:31
5  A. I am not certain the scope of what he was           11:02:31
6  doing or what he calls "Data analysis." I              11:02:38
7  see the concordance training there, and I              11:02:43
8  wonder if that's about discovery documents.            11:02:45
9  I don't understand -- I have a sort of                 11:02:50
10 limited knowledge about concordance, but --            11:02:52
11 Q. You're lucky.                                       11:02:54
12 A. So I'm not sure exactly. And, again,                11:02:56
13 because Professor Hartman also had a report            11:02:59
14 here, I don't know what of his time would              11:03:00
15 have been on my work. As I mentioned, there            11:03:04
16 was some data that came to us, as I                    11:03:10
17 mentioned in my declaration, from Tom                  11:03:13
18 Greene's office, and we looked at those                11:03:16
19 data. So maybe that is what the issue is.              11:03:18
20 Q. Which data are you referring to?                    11:03:24
21 A. National Disease and Therapeutic Index data         11:03:27
22 from IMS.                                              11:03:30
23 Q. Have you reviewed that data?                        11:03:38
24 A. I have.                                             11:03:40
25 Q. What sort of data is it?                            11:03:40

## Page 87

1  A. It's data that looks at prescriptions of            11:03:41
2  Neurontin by diagnosis.                                11:03:45
3  Q. I'll ask you more about it later. Do you            11:04:01
4  know whether it's been produced in response            11:04:03
5  to your subpoena to the defendants?                    11:04:05
6  A. The data were in the Franklin documents, is         11:04:09
7  my understanding.                                      11:04:12
8  Q. Okay.                                               11:04:13
9  A. They are not data that we produced                  11:04:16
10 ourselves. We reviewed something, again,               11:04:18
11 that was from the prior case.                          11:04:20
12 Q. You also testified that when Mr. Peteet             11:04:34
13 helped you prepare for "this meeting," you             11:04:39
14 meant this deposition by "this meeting,"               11:04:42
15 correct?                                               11:04:44
16 A. That's correct.                                     11:04:44
17 Q. Did he give you any new materials that you          11:04:45
18 hadn't seen before in preparation for this             11:04:47
19 deposition?                                            11:04:49
20 A. No, I don't believe he give me any new              11:04:51
21 materials. He looked back at -- helped me              11:04:53
22 search through the documents that would have           11:04:57
23 been in -- footnoted here, the Bates-                  11:05:00
24 numbered documents that would have been                11:05:04
25 footnoted in my declaration.                           11:05:04

## Page 88

1  Q. All right. And aside from the names that            11:05:13
2  we've just talked about, in addition to the            11:05:15
3  names that we discussed before, folks who              11:05:17
4  would have provided comments on your draft,            11:05:19
5  are there any other people who would have              11:05:21
6  worked with you on this engagement?                    11:05:23
7  A. I'm thinking back a year ago. Let me just           11:05:28
8  think about it for a minute. As far as I               11:05:30
9  know, this would be it. I believe that's               11:05:43
10 all.                                                   11:05:45
11 Q. Let's take a look back at the document that         11:06:02
12 has been marked as Rosenthal Exhibit 4. I              11:06:05
13 think that's the right number.                         11:06:07
14 A. Okay.                                               11:06:08
15 Q. It's the bigger stack of invoices.                  11:06:08
16 A. Okay. Okay.                                         11:06:11
17 Q. And if we could turn to the page that's been        11:06:16
18 marked GMA62.                                          11:06:18
19 A. Okay.                                               11:06:20
20 Q. This is one of your time entries, correct?          11:06:20
21 A. I believe it's a summary. I didn't prepare          11:06:27
22 this, so I believe it's a summary of my                11:06:30
23 time.                                                  11:06:32
24 Q. The description here for this period of             11:06:32
25 time, which appears to be December of 2005,            11:06:35

## Page 89

1  reads, "Review materials; meetings with                11:06:38
2  counsel" -- or "meeting with counsel and               11:06:43
3  case team."                                            11:06:45
4  Who would have comprised the case team                 11:06:53
5  for purposes of this description?                      11:06:56
6  A. At that time I believe that it would have           11:07:02
7  included Oded Bizan. I believe he was still            11:07:04
8  there during that time period. That's July.            11:07:09
9  As well as Professor Hartman, Professor                11:07:13
10 Frank and then the staff, whoever was                  11:07:15
11 available. I can't be certain who would                11:07:21
12 have been at the meeting, but it might have            11:07:22
13 included either Mr. Augusteijn or Mr.                  11:07:24
14 Bechtel.                                               11:07:27
15 Q. The beginning of your answer you said "at           11:07:30
16 that time." Has the case team changed over             11:07:32
17 time?                                                  11:07:36
18 A. Again, Mr. -- Dr. Bizan is no longer at             11:07:36
19 Greylock McKinnon, and I believe he was in             11:07:42
20 on the -- some of those early meetings, as             11:07:44
21 certainly his time suggests. That's the                11:07:47
22 only real difference. You know, we haven't             11:07:50
23 met actively on this case in a while, as you           11:07:55
24 can see.                                               11:07:59
25 Q. So I asked you before about the specific            11:08:14

### Page 90

1  prep binder that Greylock McKinnon prepared    11:08:17
2  in connection with your declaration.    11:08:21
3      MR. NOTARGIACOMO: Objection. I    11:08:23
4  don't -- I think you're mischaracterizing    11:08:25
5  her previous testimony.    11:08:28
6  Q. All right. Do you recall testifying --    11:08:29
7      MR. NOTARGIACOMO: You can answer    11:08:30
8  the question.    11:08:31
9  Q. -- about a prep binder?    11:08:32
10 A. A binder with backup materials --    11:08:34
11 Q. A backup binder, thank you.    11:08:35
12 A. -- that linked to --    11:08:35
13 Q. I was mischaracterizing.    11:08:39
14 A. -- my declaration.    11:08:39
15 Q. My apologies. It wasn't intentional.    11:08:40
16     Aside from the materials in the backup    11:08:43
17 binder, do you have a collection of case    11:08:45
18 materials?    11:08:46
19 A. I think the backup binder constitutes    11:08:48
20 everything that I have other than my    11:08:52
21 declarations.    11:08:55
22 Q. Would you have had copies of the documents    11:08:58
23 that are cited in your declaration prior to    11:09:00
24 their being assembled in the backup binder?    11:09:04
25 A. I certainly saw copies of all those    11:09:06

### Page 91

1  documents as I was preparing my declaration.    11:09:08
2  Whether I had other hard copies around my    11:09:12
3  office, I can't say.    11:09:15
4  Q. In what context would you have seen those    11:09:17
5  documents?    11:09:19
6  A. I would have reviewed them as relevant to    11:09:20
7  the particular issues that I was looking at.    11:09:24
8  Q. Would you have reviewed them at Greylock    11:09:26
9  McKinnon's offices or in your office?    11:09:29
10 A. It's likely that I would have reviewed them    11:09:30
11 at Greylock McKinnon's offices.    11:09:32
12 Q. Would you have taken notes of those    11:09:33
13 documents?    11:09:36
14 A. Do you mean physically on the documents    11:09:36
15 themselves?    11:09:38
16 Q. Either physically on the documents    11:09:40
17 themselves or notes just to remind you of    11:09:42
18 what you saw for when you prepared your    11:09:45
19 declaration.    11:09:49
20 A. I don't believe so. I don't believe that I    11:09:49
21 took notes on those documents, no.    11:09:52
22 Q. I think we can set these to one side for    11:09:56
23 now. Have you communicated in any way with    11:10:02
24 either of the named individual plaintiffs in    11:10:06
25 this case?    11:10:08

### Page 92

1  A. No, I have not.    11:10:08
2  Q. Have you communicated at all with their    11:10:09
3  doctors?    11:10:12
4  A. No, I have not.    11:10:13
5  Q. Have you communicated in any way with any    11:10:14
6  representatives of the named third-party    11:10:19
7  payer plaintiffs in this case?    11:10:22
8  A. When you say "representatives," do you mean    11:10:24
9  other than counsel?    11:10:26
10 Q. Yes, for now. Yes.    11:10:27
11 A. No, I have not.    11:10:31
12 Q. You have obviously communicated with counsel    11:10:32
13 for plaintiffs generally in this case?    11:10:34
14 A. Yes, I have.    11:10:36
15 Q. Have you reviewed any documents that relate    11:10:36
16 specifically to either of the named    11:10:42
17 individual plaintiffs or their doctors?    11:10:44
18 A. No, I have not.    11:10:45
19 Q. So, for example, you wouldn't have seen    11:10:47
20 medical records for any of those -- for    11:10:49
21 either of the named individual plaintiffs?    11:10:52
22 A. No, I have not.    11:10:54
23 Q. Have you reviewed any documents that have    11:10:55
24 been provided to you by the third-party    11:11:00
25 payer plaintiffs?    11:11:03

### Page 93

1  A. I do not believe I have reviewed any    11:11:04
2  documents provided by the third-party payer    11:11:09
3  plaintiffs. I'm sorry, it's just been a    11:11:12
4  little while since the detail work for this,    11:11:14
5  but I believe the answer is no.    11:11:17
6  Q. Have you reviewed any transcripts of    11:11:20
7  testimony or depositions by any of the named    11:11:21
8  individual plaintiffs or their doctors?    11:11:24
9  A. No, I have not.    11:11:25
10 Q. How about for any of the named third-party    11:11:28
11 payer plaintiffs' representatives?    11:11:34
12 A. No, I have not.    11:11:37
13 Q. Now, in connection with your work in this    11:11:38
14 case, have you communicated with any class    11:11:42
15 members, as you understand them to be    11:11:46
16 defined for purposes of your report?    11:11:48
17 A. No, I have not.    11:11:49
18 Q. All right. This isn't the first time that    11:11:50
19 your deposition had been scheduled in this    11:11:57
20 case, correct?    11:11:59
21 A. That's correct. I believe it was scheduled    11:12:00
22 for January.    11:12:01
23 Q. What's your understanding for why the    11:12:03
24 deposition didn't go forward then as    11:12:05
25 scheduled?    11:12:07

24 (Pages 90 to 93)

## Page 94

1  A. My understanding is that there was a legal   11:12:07
2     issue that needed to be resolved before the   11:12:10
3     case could go forward.   11:12:13
4  Q. Do you have any understanding as to what the   11:12:13
5     legal issue is or was?   11:12:15
6  A. I do not.   11:12:16
7  Q. Are you familiar with a report and   11:12:18
8     recommendation that the magistrate judge in   11:12:26
9     this case would have issued relating to the   11:12:28
10    defendants' motion to dismiss the   11:12:30
11    complaints?   11:12:33
12 A. I am familiar with it. I don't understand   11:12:34
13    the legal issues, though.   11:12:36
14 Q. Have you reviewed that report and   11:12:37
15    recommendation?   11:12:40
16 A. Not in detail. I believe I may have seen   11:12:40
17    it.   11:12:44
18 Q. Have you had discussions with plaintiffs'   11:12:49
19    counsel about it?   11:12:52
20 A. We have discussed the issue generally.   11:12:52
21    Again, I have such limited understanding I   11:12:55
22    couldn't relate to you what the issue was,   11:12:57
23    though.   11:12:59
24 Q. When would you have discussed it with them?   11:12:59
25 A. I would have discussed it with them when I   11:13:01

## Page 95

1     learned that the deposition was not to be in   11:13:03
2     January and perhaps again when the   11:13:07
3     deposition was scheduled -- rescheduled.   11:13:11
4  Q. With whom would you have discussed it?   11:13:13
5  A. I believe it would have been Mr.   11:13:16
6     Notargiacomo.   11:13:18
7  Q. Do you remember anything about the substance   11:13:19
8     of those conversations? Were they related   11:13:21
9     to scheduling, or were they related to the   11:13:24
10    substance of the decision?   11:13:25
11 A. I believe most of the discussion was related   11:13:29
12    to scheduling.   11:13:31
13 Q. You said "most of the discussion." Was any   11:13:35
14    part of the discussion related to something   11:13:38
15    other than scheduling?   11:13:40
16 A. Mr. Notargiacomo might have said something   11:13:42
17    about the decision that you referenced.   11:13:47
18 Q. But it sounds like you don't recall   11:13:49
19    precisely what he said?   11:13:51
20 A. No, I don't.   11:13:53
21        MR. NOTARGIACOMO: But it was   11:13:53
22    brilliant.   11:13:54
23 A. It was brilliant, and it went over my head.   11:13:55
24 Q. I have no doubt. I have no doubt that it   11:13:58
25    was brilliant. I won't assume that it went   11:14:00

## Page 96

1     over your head or not.   11:14:03
2        Have you had discussions with Dr.   11:14:04
3     Hartman about the magistrate judge's report   11:14:06
4     and recommendation?   11:14:08
5  A. I have not.   11:14:09
6  Q. Now, since that time are you aware that   11:14:10
7     Judge Saris ruled on objections to the   11:14:17
8     report and recommendation?   11:14:20
9  A. I don't believe that I have knowledge of   11:14:23
10    this, no.   11:14:24
11 Q. Okay. Are you aware that plaintiffs have   11:14:24
12    filed a new complaint in this action?   11:14:29
13 A. Yes, I have seen a new amended complaint.   11:14:31
14 Q. And so have you reviewed the new amended   11:14:35
15    complaint?   11:14:37
16 A. I have.   11:14:38
17 Q. The new amended complaint is obviously not   11:14:38
18    on the list of documents that you considered   11:14:47
19    that's attached as attachments to your   11:14:49
20    report in Exhibit 1. I would assume that it   11:14:51
21    should be on an updated list if one were to   11:14:54
22    be created?   11:14:57
23 A. It should be, yes.   11:14:58
24 Q. Are there other documents that you can think   11:14:59
25    of aside from the new complaint that should   11:15:01

## Page 97

1     be on such a list?   11:15:04
2  A. I can't, but I would have to look back over   11:15:05
3     the last week. For the most part, I   11:15:09
4     reviewed those documents that were cited in   11:15:14
5     my declaration. I did review the new   11:15:15
6     complaint. I believe that would be it, but   11:15:18
7     I would need to check for sure.   11:15:24
8  Q. Did you consider revising your report in   11:15:30
9     view of the decision on the motion to   11:15:32
10    dismiss and/or the new complaint?   11:15:34
11 A. No, I did not. To the extent that I had a   11:15:35
12    discussion with the lawyers about the   11:15:41
13    decision, I was -- it was not indicated that   11:15:43
14    I should consider revising my report in   11:15:47
15    light of that decision.   11:15:49
16 Q. I assume that the topic wasn't raised as to   11:15:50
17    whether or not you would need to?   11:15:55
18 A. I believe it wasn't raised.   11:15:56
19 Q. And you didn't independently consider   11:15:59
20    whether you should or shouldn't revise your   11:16:01
21    declaration?   11:16:04
22 A. In my view, this was a legal matter, and I   11:16:04
23    didn't see the relevance.   11:16:09
24 Q. I assume that you have no intention now of   11:16:18
25    submitting a revised report in connection   11:16:20

## Page 98

1  with your opinions on class certification?  11:16:24
2  A.  That's correct, I have no intention.  11:16:26
3  Q.  Now, you were also retained to offer similar  11:16:27
4  opinions in a case pending in Pennsylvania  11:16:37
5  as well?  11:16:39
6  A.  That's correct.  11:16:39
7  Q.  And will you understand if I refer to that  11:16:40
8  case as the Clark case?  11:16:44
9  A.  I will if you tell me that's what it's  11:16:45
10  called.  11:16:48
11  Q.  Fair enough. I'll tell you that's what it's  11:16:48
12  called --  11:16:51
13  A.  Okay.  11:16:51
14  Q.  -- just to make things easier. It's easier  11:16:52
15  to say "Clark" than "Pennsylvania." In  11:16:55
16  fact, you submitted a declaration -- you  11:16:56
17  submitted your declaration in this matter as  11:16:59
18  an attachment to your declaration -- to a  11:17:01
19  declaration that you submitted in the Clark  11:17:03
20  case; is that correct?  11:17:05
21  A.  That's correct.  11:17:09
22  Q.  When were you first retained in the  11:17:10
23  Pennsylvania case, the Clark case?  11:17:11
24  A.  I don't know the exact date, but it would  11:17:13
25  have been not long after being retained in  11:17:16

## Page 99

1  this matter.  11:17:19
2  Q.  Would it have been before or after you  11:17:23
3  actually submitted your declaration in this  11:17:27
4  case?  11:17:29
5  A.  I'm sorry, I don't know the answer to that  11:17:29
6  question. I can check.  11:17:33
7  Q.  Let me ask it another way. Would you have  11:17:34
8  had in mind the fact that the declaration  11:17:37
9  that you were preparing in this case would  11:17:39
10  then later be submitted in the Clark case  11:17:40
11  while you were preparing your declaration in  11:17:42
12  this case?  11:17:43
13  A.  I don't believe so.  11:17:44
14  Q.  How were you approached by counsel in the  11:17:45
15  Clark case to offer an opinion in that case?  11:17:52
16  A.  I was approached through the counsel in this  11:17:56
17  case.  11:17:59
18  Q.  Was that Mr. Notargiacomo?  11:18:03
19  A.  I believe actually it was through Mr.  11:18:06
20  Greene's office.  11:18:08
21  Q.  What did Mr. Greene say to you when he  11:18:16
22  approached you about it?  11:18:18
23  A.  I'm not sure that the conversation -- the  11:18:19
24  original conversation was with me or with  11:18:21
25  Ms. Rushnawitz, so I don't know the exact  11:18:26

## Page 100

1  words of the conversation. I --  11:18:29
2  Q.  That's fair. What's your best recollection  11:18:31
3  as to what the substance of the conversation  11:18:33
4  would have been?  11:18:35
5  A.  I honestly don't know. I think the issue of  11:18:35
6  whether there would be any potential  11:18:46
7  conflict between being on both cases may be  11:18:50
8  what arose, but that's -- I have no  11:18:54
9  recollection really of the substance.  11:19:00
10  Q.  Would Mr. Greene have suggested that you be  11:19:02
11  in touch with plaintiffs' counsel in the  11:19:05
12  Clark case?  11:19:07
13  A.  He may have. I'm not certain.  11:19:07
14  Q.  Have you ever discussed your work in the  11:19:17
15  Clark case with counsel for plaintiffs in  11:19:18
16  this matter?  11:19:20
17  A.  I may have at some level.  11:19:21
18  Q.  When you say "at some level," what do you  11:19:23
19  mean?  11:19:25
20  A.  They would have been aware that I was on the  11:19:25
21  case. As you may know, the only thing  11:19:27
22  that's happened in that case is sort of,  11:19:32
23  again -- I haven't been deposed in that  11:19:35
24  case, for example, but I'm sure that they  11:19:37
25  know that I'm on the case.  11:19:42

## Page 101

1  Q.  Would they have been aware that you would  11:19:44
2  have attached the declaration in this matter  11:19:47
3  as an attachment to your declaration in the  11:19:49
4  Clark matter?  11:19:52
5  A.  They would have been aware of that, yes.  11:19:53
6  Q.  Would you have discussed that with him  11:19:54
7  specifically?  11:19:56
8  A.  I may have. Again, not with Mr.  11:19:56
9  Notargiacomo, but maybe with Mr. Greene.  11:19:59
10  Q.  Have your discussed your work in this case  11:20:05
11  with counsel in the Clark matter?  11:20:07
12  A.  No, I have not.  11:20:08
13  Q.  Did counsel in the Clark matter have  11:20:15
14  questions at all about your declaration as  11:20:17
15  it was submitted in this matter?  11:20:19
16  A.  They -- so obviously the declaration itself  11:20:20
17  was submitted in that matter, so they saw  11:20:25
18  the declaration. We would have spoken about  11:20:27
19  that declaration.  11:20:29
20  Q.  Would they have seen drafts of it before it  11:20:34
21  was finalized?  11:20:36
22  A.  No, because in Pennsylvania the declaration  11:20:37
23  had already been finalized, as you know,  11:20:44
24  before it was -- so it had been finalized in  11:20:48
25  the MDL, and then it was submitted as an  11:20:51

## Page 102

1  attachment in Pennsylvania. They would not   11:20:55
2  have seen drafts.   11:20:57
3  Q. I assume you've never participated in joint   11:20:58
4  discussions with plaintiffs' counsel in   11:21:08
5  Clark and plaintiffs' counsel in this   11:21:10
6  matter?   11:21:12
7  A. No, I have not.   11:21:12
8  Q. Now, last November, November 2005, you   11:21:13
9  submitted a document in the Clark case that   11:21:24
10  was titled "Response to Defendants' Expert   11:21:26
11  Sara Fisher-Ellison, Declaration of Meredith   11:21:31
12  Rosenthal," correct?   11:21:34
13  A. That's correct. I was not sure that that   11:21:38
14  had been filed.   11:21:41
15  Q. Okay. But you did sign such a document; is   11:21:41
16  that right?   11:21:44
17  A. I did sign such a document, yes.   11:21:44
18  Q. And will you know what I mean if I refer to   11:21:46
19  this document as the Clark rebuttal?   11:21:49
20  A. Yes.   11:21:51
21  Q. Thank you. It's a little less of a   11:21:51
22  mouthful.   11:21:54
23     Why did you prepare the Clark   11:21:54
24  rebuttal?   11:21:57
25     MR. NOTARGIACOMO: I'm just going   11:21:57

## Page 103

1  to object to the line of questioning because   11:21:58
2  the rebuttal is not, I believe, within the   11:22:02
3  scope of the deposition notice per se, but   11:22:04
4  I'll allow her to answer the questions with   11:22:06
5  that objection on the record.   11:22:08
6  A. By the counsel in the Clark case I received   11:22:11
7  a report submitted by Sara Fisher-Ellison,   11:22:18
8  which was a response to my declaration and   11:22:23
9  Professor Hartman's declaration. And I   11:22:29
10  responded to that response. I was asked to   11:22:34
11  prepare a written response.   11:22:38
12  Q. Who asked you to prepare it?   11:22:41
13  A. Counsel in Clark.   11:22:42
14  Q. Did you communicate with counsel in this   11:22:48
15  case about your rebuttal report in the Clark   11:22:52
16  case?   11:22:53
17  A. No, I did not.   11:22:53
18  Q. Did you communicate with counsel in this   11:22:54
19  case about the fact that you were preparing   11:22:58
20  and signing a rebuttal in Clark in the first   11:23:00
21  instance?   11:23:04
22  A. I don't believe so. It was last year, so I   11:23:04
23  can't remember precisely. They're aware now   11:23:09
24  of this report, but at the time I don't   11:23:11
25  believe there was any communication with   11:23:13

## Page 104

1  them about this.   11:23:15
2  Q. Do you know how they're aware now of your   11:23:20
3  report?   11:23:22
4  A. I have discussed it with Mr. Notargiacomo   11:23:22
5  subsequently.   11:23:25
6  Q. Did you draft the rebuttal in the Clark case   11:23:30
7  in the same manner that you would have   11:23:32
8  prepared your declaration in this case that   11:23:34
9  we talked about?   11:23:36
10  A. Yes. I drafted it.   11:23:37
11  Q. Did you have some degree of involvement in   11:23:38
12  the preparation of your rebuttal declaration   11:23:44
13  in Clark by staff members at GMA?   11:23:46
14  A. Staff members, again, would have supported   11:23:50
15  it to the extent that there were any   11:23:53
16  references, for example, to find literature   11:23:55
17  to search, yes, so it would have been the   11:23:59
18  same process.   11:24:00
19  Q. Would you have communicated about your   11:24:04
20  rebuttal report with Dr. Hartman?   11:24:06
21  A. Yes, I would have.   11:24:08
22  Q. Would you have shared drafts with Dr.   11:24:10
23  Hartman?   11:24:11
24  A. Yes, I'm certain I shared at least one draft   11:24:11
25  with him.   11:24:15

## Page 105

1  Q. Would you have e-mailed him a draft the same   11:24:15
2  way we discussed before?   11:24:18
3  A. Yes.   11:24:19
4  Q. Would you have shared drafts -- excuse me,   11:24:19
5  withdrawn.   11:24:22
6     Would you have shared drafts with   11:24:22
7  others other than Dr. Hartman, drafts of the   11:24:25
8  Rosenthal rebuttal declaration in Clark?   11:24:28
9  A. I believe that I would have shared it with   11:24:30
10  Ms. Rushnawitz and then whichever staff I   11:24:34
11  was working with at the time, which -- and,   11:24:37
12  again, there's often delegation, so...   11:24:41
13  Q. Do you know if those drafts still exist?   11:24:43
14  A. I don't know if those drafts still exist.   11:24:52
15  They do not on my computer.   11:24:56
16     MR. POLUBINSKI: Okay. We're going   11:25:08
17  to mark a new exhibit.   11:25:09
18     (Exhibit No. 8, Expert Declaration   11:25:10
19  of Raymond S. Hartman in Support of   11:25:10
20  Plaintiffs' Motion for Class Certification,   11:25:10
21  marked for identification.)   11:25:31
22     MR. NOTARGIACOMO: What number are   11:25:31
23  we up to?   11:25:32
24     THE WITNESS: 8.   11:25:33
25  Q. All right. So we've handed you what is   11:25:39

## Page 106

| | | |
|---|---|---|
| 1 | marked as Rosenthal Exhibit 8, which is the | 11:25:41 |
| 2 | Expert Declaration of Raymond S. Hartman in | 11:25:45 |
| 3 | Support of Plaintiffs' Motion For Class | 11:25:48 |
| 4 | Certification. | 11:25:50 |
| 5 A. | I see that. Thank you. | 11:25:52 |
| 6 Q. | You are aware that Dr. Hartman submitted a | 11:25:54 |
| 7 | declaration in this case? | 11:25:58 |
| 8 A. | Yes, I am. | 11:25:58 |
| 9 Q. | And Dr. Hartman is the president of Greylock | 11:25:59 |
| 10 | McKinnon? | 11:26:03 |
| 11 A. | That's correct. | 11:26:03 |
| 12 Q. | Was it he that would have engaged you as an | 11:26:03 |
| 13 | academic affiliate at Greylock McKinnon? | 11:26:08 |
| 14 A. | Yes, that's correct. | 11:26:11 |
| 15 Q. | Was he involved at all in your decision to | 11:26:11 |
| 16 | work in this matter? | 11:26:14 |
| 17 A. | Could you explain what you mean by | 11:26:15 |
| 18 | "involved"? | 11:26:17 |
| 19 Q. | Did he have any input into your decision to | 11:26:18 |
| 20 | work on this matter? | 11:26:27 |
| 21 A. | I don't believe so. I believe there was a | 11:26:28 |
| 22 | meeting again that we discussed earlier | 11:26:34 |
| 23 | where Mr. Sobol and Mr. Greene presented the | 11:26:37 |
| 24 | history of the case. | 11:26:39 |
| 25 Q. | Was Dr. Hartman at the meeting? | 11:26:41 |

## Page 107

| | | |
|---|---|---|
| 1 A. | Dr. Hartman would have been at the meeting. | 11:26:43 |
| 2 Q. | Did Dr. Hartman arrange the meeting? | 11:26:45 |
| 3 A. | The meeting was at Greylock McKinnon. Dr. | 11:26:49 |
| 4 | Hartman arranged -- he did. He would have | 11:26:54 |
| 5 | arranged the meeting, that's right, yes. | 11:26:58 |
| 6 Q. | Did you speak with him about the case before | 11:27:02 |
| 7 | you spoke with Mr. Sobol and Mr. Greene? By | 11:27:05 |
| 8 | "him" I mean Dr. Hartman. | 11:27:08 |
| 9 A. | It's possible that we had an early | 11:27:10 |
| 10 | conversation about it, yes. | 11:27:11 |
| 11 Q. | To what extent was he involved in the | 11:27:18 |
| 12 | preparation of your declaration in the case? | 11:27:21 |
| 13 A. | To what ex -- Dr. Hartman, as we've | 11:27:23 |
| 14 | discussed, reviewed a draft, maybe two. | 11:27:25 |
| 15 Q. | Would you say that he edited your | 11:27:34 |
| 16 | declaration? | 11:27:36 |
| 17 A. | No, I would not say that. | 11:27:36 |
| 18 Q. | Let's look back at this document, the number | 11:27:43 |
| 19 | of which unfortunately I failed to write | 11:27:47 |
| 20 | down. I believe it's Exhibit 8. | 11:27:52 |
| 21 A. | Did you say 8? | 11:27:57 |
| 22 Q. | 8, I think. | 11:27:58 |
| 23 | MR. NOTARGIACOMO: That's Dr. | 11:27:58 |
| 24 | Rosenthal's report. | 11:27:59 |
| 25 A. | That's okay. I can find it. | 11:27:59 |

## Page 108

| | | |
|---|---|---|
| 1 Q. | It's Rosenthal Exhibit 7 -- | 11:28:01 |
| 2 A. | Okay. | 11:28:01 |
| 3 Q. | -- just so we're clear. And if we could | 11:28:03 |
| 4 | flip to -- well, we don't have to flip | 11:28:03 |
| 5 | anywhere, we can just look at the first | 11:28:07 |
| 6 | page -- | 11:28:08 |
| 7 A. | Yeah. | 11:28:08 |
| 8 Q. | -- which is GMA75? | 11:28:08 |
| 9 A. | Yes, I see it. | 11:28:13 |
| 10 Q. | If I could direct your attention to the | 11:28:14 |
| 11 | entry for August 1st, 2005? | 11:28:18 |
| 12 A. | Yes, I see it. | 11:28:22 |
| 13 Q. | The description in the entry reads, "Edit | 11:28:23 |
| 14 | and finalize Hartman declaration; edit | 11:28:28 |
| 15 | Rosenthal declaration." | 11:28:31 |
| 16 A. | Yes, I see -- | 11:28:33 |
| 17 Q. | Did I read that correctly? | 11:28:34 |
| 18 A. | Yes, you read that correctly. | 11:28:35 |
| 19 Q. | Now, it's not clear to me at least when he | 11:28:37 |
| 20 | did this, based on this document alone, but | 11:28:39 |
| 21 | I guess my assumption would be that it | 11:28:45 |
| 22 | appears to cover time from August 1st | 11:28:47 |
| 23 | through August 31st of 2005, that he would | 11:28:50 |
| 24 | have done this work in August. Does this | 11:28:54 |
| 25 | make sense to you? | 11:28:56 |

## Page 109

| | | |
|---|---|---|
| 1 A. | That appears to be true, yes. | 11:28:57 |
| 2 Q. | And that just given the nature of what he's | 11:28:58 |
| 3 | working on and the fact that both | 11:29:00 |
| 4 | declarations were signed on August 8th, that | 11:29:02 |
| 5 | the work that he's referring to here would | 11:29:05 |
| 6 | have been done sometime approximately in the | 11:29:07 |
| 7 | first week of August? | 11:29:09 |
| 8 A. | That seems like a fair assumption. | 11:29:10 |
| 9 Q. | And the total amount of time that's | 11:29:12 |
| 10 | associated with this entry appears to be 24 | 11:29:15 |
| 11 | hours? | 11:29:18 |
| 12 A. | That's correct. | 11:29:18 |
| 13 Q. | Now, one of the -- one piece of Dr. | 11:29:19 |
| 14 | Hartman's description here is "edit | 11:29:29 |
| 15 | Rosenthal declaration"? | 11:29:31 |
| 16 A. | I see that's the way he puts it, yes. | 11:29:33 |
| 17 Q. | When you say "that's the way he puts it," do | 11:29:35 |
| 18 | you take issue with the description? | 11:29:38 |
| 19 A. | Well, "edit" sounds a little more proactive. | 11:29:39 |
| 20 | I believe he reviewed the document, and he | 11:29:42 |
| 21 | puts his comments in redline. | 11:29:45 |
| 22 Q. | And the redline would have been sent back to | 11:29:49 |
| 23 | you by e-mail, I take it? | 11:29:51 |
| 24 A. | I believe that would be the case. | 11:29:52 |
| 25 Q. | Do you know if he did this once or more than | 11:29:54 |

Page 110

```
1     once?                                    11:29:56
2  A. I don't know. I would think only once.   11:29:56
3  Q. Now, you mentioned before, I think, and if 11:30:08
4     I'm mischaracterizing your testimony in any 11:30:11
5     way, feel free to correct me, but I think 11:30:13
6     you mentioned before that he had suggested 11:30:15
7     that you expand descriptions or provide more 11:30:17
8     examples in the empirical section of your 11:30:20
9     report.                                   11:30:22
10 A. That's right.                            11:30:24
11 Q. Am I getting it right?                   11:30:25
12 A. Yes, that's correct.                     11:30:26
13 Q. Can you be any more specific about the ways 11:30:27
14    he suggested that you do those things?   11:30:29
15 A. Specifically around expressing those     11:30:31
16    equations and all the variations in how the 11:30:33
17    models might be estimated, so there's quite 11:30:39
18    a lot of description in that section, as you 11:30:41
19    see now, about the different considerations 11:30:43
20    about variables to include, about the way 11:30:46
21    that the time patterns of promotional    11:30:51
22    effects would be modeled specifically.   11:30:54
23 Q. Did he suggest additional variables to   11:30:58
24    include that may not have been mentioned in 11:31:00
25    the original draft that you had sent to him? 11:31:01
```

Page 111

```
1  A. He may have suggested examples of additional 11:31:03
2     variables or categories.                 11:31:07
3  Q. Aside from the suggestions that he made to 11:31:15
4     you that we've just discussed about the  11:31:19
5     empirical section of your report, are there 11:31:22
6     other suggestions that he would have made in 11:31:24
7     the context of his providing comments?   11:31:25
8  A. I'm sure there were other places. I can't 11:31:27
9     remember exactly what those comments were. 11:31:29
10    I remember specifically it was around    11:31:31
11    expanding the empirical section, but I don't 11:31:34
12    know that there weren't other comments.  11:31:37
13 Q. Okay. And just to ask you once more, the 11:31:39
14    redlined markups that he would have sent 11:31:49
15    back to you, do you still have copies of 11:31:52
16    those?                                   11:31:53
17 A. I wouldn't have copies of those. I would 11:31:54
18    have then decided which comments to act on 11:31:58
19    and done an edited version which became the 11:32:03
20    final version.                           11:32:07
21 Q. What would you have done with the copies? 11:32:09
22    Excuse me, withdrawn.                    11:32:12
23    What would you have done with the        11:32:13
24    redline comments that he would have sent 11:32:14
25    you?                                     11:32:16
```

Page 112

```
1  A. They would essentially have been saved over. 11:32:16
2  Q. When you say "saved over," what do you mean? 11:32:21
3  A. Can I -- so if there's a comment, "Expand 11:32:26
4     this here, consider discussing X, Y and Z," 11:32:30
5     I would have either decided not to or    11:32:35
6     decided to expand here, and then I would 11:32:37
7     have deleted the comment, revised, and it 11:32:39
8     would form a new saved document.         11:32:42
9  Q. And so you would have taken the attachment 11:32:44
10    that he sent to you, used that attachment as 11:32:47
11    your working document and then saved over 11:32:49
12    the document that was saved on your system? 11:32:52
13 A. Not necessarily. I may have gone to the -- 11:32:54
14    back to the document that was in my system. 11:32:58
15 Q. In which case what would have happened to 11:33:00
16    the attachment that he sent you?         11:33:03
17 A. It just would have been deleted with the 11:33:04
18    rest of my e-mail.                       11:33:07
19 Q. Let's look again at Rosenthal Exhibit 7,  11:33:18
20    again at Page 75, GMA75.                 11:33:22
21 A. Uh-huh. Yes.                             11:33:26
22 Q. That's a time entry that's immediately above 11:33:26
23    the one we just discussed, the time entry 11:33:29
24    that begins on July 1st of 2005. The     11:33:31
25    description there reads, "Review documents; 11:33:34
```

Page 113

```
1     write damage declaration; edit Frank-     11:33:37
2     Rosenthal white paper."                   11:33:40
3     Did I read that correctly?                11:33:42
4  A. That's correct.                           11:33:43
5  Q. Are you familiar with the Frank-Rosenthal  11:33:43
6     white paper that's referred to in this time 11:33:53
7     entry?                                    11:33:55
8  A. That was an early draft of what became my  11:33:55
9     declaration. At the time it wasn't clear  11:33:58
10    who was going to take the lead on this work. 11:34:00
11 Q. When you say "it wasn't clear who was going 11:34:03
12    to take the lead," do you mean as between 11:34:06
13    you and Professor Frank?                  11:34:08
14 A. That's correct.                           11:34:10
15 Q. Who drafted the Frank-Rosenthal white paper 11:34:10
16    such as it is?                            11:34:12
17 A. I did.                                    11:34:13
18 Q. Would Professor Frank have provided comments 11:34:14
19    on that document?                         11:34:21
20 A. Ultimately. When it was drafted, he was in 11:34:22
21    Europe.                                   11:34:25
22 Q. So to what extent -- was it truly a Frank- 11:34:30
23    Rosenthal white paper and not just a      11:34:33
24    Rosenthal white paper?                    11:34:35
25 A. Originally it was just a Rosenthal white   11:34:36
```

## Page 114

1  paper.  11:34:39
2  Q.  Now, again, it appears that Dr. Hartman has  11:34:40
3     indicated here that he edited the Frank-  11:34:42
4     Rosenthal white paper?  11:34:45
5  A.  Yes.  11:34:46
6  Q.  Do you know what he was doing?  11:34:50
7  A.  Again, he would have provided redline  11:34:51
8     comments.  11:34:54
9  Q.  Now, do you recall that Professor Frank was  11:34:59
10    in Europe at the time you were drafting  11:35:00
11    this -- well, withdrawn.  11:35:02
12      The drafting, I take it, for this  11:35:06
13    portion of -- or this early draft of your  11:35:08
14    report would have taken place in July or  11:35:10
15    possibly sometime before that?  11:35:12
16 A.  I believe that's right. We could look at my  11:35:13
17    time to confirm that.  11:35:15
18 Q.  If you would like to do that, you can.  11:35:16
19 A.  Okay.  11:35:18
20    MR. NOTARGIACOMO: 4?  11:35:30
21 A.  Again, that's one that's a nice sum --  11:35:30
22 Q.  Thank you. I've lost track. 6, Rosenthal  11:35:34
23    6?  11:35:36
24 A.  Right. So that's -- oh, there's typos.  11:35:37
25    This should all be July, that's right. Yes.  11:35:40

## Page 115

1  Q.  So the Frank-Rosenthal white paper he refers  11:35:47
2     to would presumably be the draft report that  11:35:50
3     appears on Rosenthal Exhibit 6 that you  11:35:53
4     began drafting on June 20 -- or July 27th?  11:35:55
5  A.  That's correct.  11:35:58
6  Q.  And then as you said the fact that it reads  11:35:58
7     June 27th on Rosenthal 6 is a typographical  11:36:02
8     error and that it should read July 27th?  11:36:06
9  A.  Yes, that's correct.  11:36:08
10 Q.  So it sounds like you would have sent an  11:36:09
11    initial draft of your report to Dr. Hartman  11:36:16
12    at some point in July of 2005?  11:36:20
13 A.  Yes, that's right.  11:36:22
14 Q.  And that he would have -- you would have  11:36:22
15    sent it to him by e-mail, I take it?  11:36:27
16 A.  I believe so, yes.  11:36:29
17 Q.  And he would have provided comments to you  11:36:30
18    in the same way we just discussed, in the  11:36:32
19    form of a redlined markup?  11:36:35
20 A.  That's correct.  11:36:37
21 Q.  Do you still have a copy of that redline?  11:36:37
22 A.  I don't believe I do. I believe I submitted  11:36:39
23    everything I have.  11:36:41
24 Q.  To what extent were you involved in the  11:36:48
25    preparation of Dr. Hartman's declaration in  11:36:50

## Page 116

1  this case, which we've marked as Rosenthal  11:36:53
2  Exhibit 8?  11:36:55
3  A.  I would have given him comments in the same  11:36:58
4     manner that he gave me comments on my  11:37:01
5     document.  11:37:03
6  Q.  Which is to say he would have e-mailed you  11:37:05
7     copies of his draft?  11:37:07
8  A.  I believe that's how it would have happened  11:37:09
9     is by e-mail, yes.  11:37:11
10 Q.  And that you would have returned to him a  11:37:13
11    redlined markup?  11:37:16
12 A.  It's possible that we would have spoken just  11:37:18
13    by phone and we would have walked through  11:37:21
14    it. It would depend on how extensive my  11:37:23
15    comments were.  11:37:25
16 Q.  Can you remember one way or the other  11:37:25
17    whether you would have sent in redlined  11:37:27
18    markups in this case?  11:37:29
19 A.  I cannot.  11:37:30
20 Q.  Do you know how far in advance of August 8th  11:37:30
21    you would have seen a draft of his -- an  11:37:36
22    initial draft of his report?  11:37:38
23 A.  I do not. Again, I could check my hours,  11:37:39
24    but I don't know how far in advance.  11:37:43
25 Q.  Would you like to check your hours and see  11:37:47

## Page 117

1  if they help you in that at all?  11:37:50
2  A.  It doesn't specifically mention that, so I  11:37:52
3     don't always provide a lot of detail in  11:37:55
4     there, so I can't tell.  11:37:56
5  Q.  Do you remember anything about the substance  11:38:01
6     of the comments that you would have provided  11:38:02
7     to Dr. Hartman on his declaration?  11:38:03
8  A.  I do not, no. I'm sorry.  11:38:06
9  Q.  Do you remember whether he would have  11:38:10
10    accepted your comments?  11:38:14
11 A.  I do not remember that, no.  11:38:15
12 Q.  And just circling back to your Clark  11:38:21
13    rebuttal, was Dr. Hartman involved at all in  11:38:24
14    your decision to prepare the Clark rebuttal?  11:38:26
15 A.  In the decision as to whether to write a  11:38:30
16    written response?  11:38:32
17 Q.  Yes.  11:38:33
18 A.  I don't recall if he was involved in that  11:38:33
19    decision.  11:38:37
20 Q.  Would he have been involved in the  11:38:37
21    preparation of the declaration itself?  11:38:39
22 A.  Again, in that case I would have shown him a  11:38:41
23    draft. He would have made comments.  11:38:44
24 Q.  Okay. And you would have shown him the  11:38:46
25    draft, and you would have received comments  11:38:49

30 (Pages 114 to 117)

VERITEXT NEW YORK REPORTING COMPANY
212-267-6868                                          516-608-2400

Page 118

1  in the same mechanical way that we've been    11:38:50
2  describing?    11:38:53
3  A. Yes, that's correct.    11:38:54
4  Q. Which is to say that you would send him a    11:38:54
5  draft by e-mail, he would send back to you a    11:38:57
6  marked-up redlined version of the draft by    11:39:00
7  e-mail?    11:39:02
8  A. Usually that's the way it happens.    11:39:02
9  Sometimes, again, he would make oral    11:39:06
10  comments by phone.    11:39:07
11  Q. What did you do to prepare for this    11:39:08
12  deposition?    11:39:11
13  A. I reviewed the new complaint, as I    11:39:11
14  mentioned. I reviewed my declaration and    11:39:15
15  the supporting documents. I reviewed    11:39:18
16  Professor Fisher-Ellison's rebuttal and my    11:39:27
17  response.    11:39:30
18  Q. In the Clark case, I take it?    11:39:31
19  A. In the Clark case.    11:39:32
20  Q. Anything else?    11:39:35
21  A. I met with Mr. Notargiacomo.    11:39:36
22  Q. Did you meet with anybody else?    11:39:45
23  A. The gentleman on the phone, Mr. Goldser.    11:39:46
24  Q. When did you first meet with them?    11:39:51
25  A. We met last --    11:39:54

Page 119

1  Q. In the context of your preparation for this    11:39:56
2  deposition?    11:39:59
3  A. Sorry. We met last week.    11:39:59
4  Q. Did you meet once or more than once?    11:40:01
5  A. We met once.    11:40:03
6  Q. For how long, approximately?    11:40:04
7  A. For half a day, approximately, four hours.    11:40:06
8  Q. Was Dr. Hartman present for that meeting?    11:40:10
9  A. No, he was not.    11:40:15
10  Q. Was anybody else present other than Mr.    11:40:16
11  Notargiacomo and Mr. Goldser?    11:40:20
12  A. No.    11:40:23
13  Q. What was the subject matter of your    11:40:23
14  discussions at the meeting?    11:40:24
15  A. The subject matter related to what issues we    11:40:25
16  were likely to concentrate on, but    11:40:30
17  essentially that's sort of what seemed to be    11:40:36
18  the issues that defendants were likely to    11:40:39
19  fix on.    11:40:41
20  Q. Did you prepare at all last winter for your    11:40:43
21  deposition when it was first scheduled?    11:40:46
22  A. I would have to look at my time sheets. I    11:40:48
23  believe it was canceled fairly far in    11:40:54
24  advance of the deposition itself, but I'm    11:40:56
25  afraid that that's too far back for me to    11:40:58

Page 120

1  recall precisely.    11:41:03
2  Q. Fair enough. You had mentioned that you had    11:41:03
3  reviewed documents in preparation for your    11:41:06
4  deposition; is that correct?    11:41:08
5  A. That's correct.    11:41:09
6  Q. Who would have selected the documents that    11:41:10
7  you used to prepare?    11:41:12
8  A. The documents that I looked at came -- for    11:41:13
9  the most part, I believe, all of them are    11:41:18
10  those documents that are cited in my    11:41:20
11  declaration, and those came -- I understand    11:41:23
12  that the GMA staff got those out of the    11:41:26
13  Franklin case, the documents in Franklin.    11:41:31
14  So I would say, you know, "Are there    11:41:34
15  promotional documents?", and they would find    11:41:37
16  documents.    11:41:41
17  Q. Okay. Now, what you're just describing is    11:41:41
18  how documents were selected when you    11:41:43
19  initially prepared your declaration --    11:41:45
20  A. Right.    11:41:47
21  Q. -- in this case; is that right? Okay.    11:41:47
22  I'm talking more just about the    11:41:49
23  preparation, your deposition preparation    11:41:51
24  that you did. I take it for that did you    11:41:52
25  select documents yourself, or did -- or were    11:41:54

Page 121

1  they provided to you by somebody else?    11:41:57
2  A. Again, in the last week I have asked the    11:41:59
3  staff in a couple of cases, "Can you find me    11:42:04
4  a document that has this in it?", and then    11:42:08
5  they would have looked in concordance to.    11:42:10
6  I'm not sure if those documents go outside    11:42:13
7  of my declaration. I would have to check    11:42:15
8  the Bates numbers, but they're largely these    11:42:16
9  kinds of promotional documents that are    11:42:19
10  similar to the ones that are cited in my    11:42:21
11  declaration. So the staff at GMA would have    11:42:23
12  produced them.    11:42:25
13  Q. Okay. And then aside from the new complaint    11:42:25
14  and Professor Fisher-Ellison's declaration,    11:42:31
15  are there any materials that you recall    11:42:36
16  reviewing that would not have been listed as    11:42:37
17  documents that you considered in your    11:42:41
18  declaration?    11:42:43
19  MR. NOTARGIACOMO: I'm going to    11:42:46
20  object to the question as I don't understand    11:42:47
21  it, but if she does, she can answer it.    11:42:50
22  MR. POLUBINSKI: Let me try it    11:42:52
23  again.    11:42:53
24  Q. It sounds like some of the documents that    11:42:55
25  you reviewed in preparation for your    11:42:57

31 (Pages 118 to 121)

## Page 122

1  deposition today are documents that you    11:42:59
2  would have listed as documents you    11:43:01
3  considered when you first wrote the    11:43:03
4  declaration in the case, correct?    11:43:05
5  A.  That's correct.    11:43:06
6  Q.  There are -- you also reviewed the new    11:43:06
7  complaint in the case, correct?    11:43:11
8  A.  That's correct.    11:43:12
9  Q.  Which is not listed --    11:43:13
10 A.  That's correct.    11:43:14
11 Q.  -- in your report?    11:43:14
12     You also reviewed Professor Fisher-    11:43:16
13 Ellison's report in the Clark case which is    11:43:19
14 also not listed as a document that you've    11:43:20
15 considered in your declaration in this case,    11:43:22
16 correct?    11:43:24
17 A.  Yes, that's correct.    11:43:24
18 Q.  Other than those two documents, the new    11:43:25
19 complaint, Professor Fisher-Ellison's    11:43:29
20 report, are there any other documents that    11:43:31
21 you reviewed in your preparation for this    11:43:32
22 deposition that do not appear as documents    11:43:34
23 that you've considered in your declaration?    11:43:37
24 A.  I don't believe there's anything else.    11:43:39
25 Q.  Okay.    11:43:41

## Page 123

1     MR. POLUBINSKI:  Let's mark the    11:43:54
2  next exhibit.    11:43:55
3     (Exhibit No. 9, Notice of    11:43:55
4  Deposition, marked for identification.)    11:44:16
5  Q.  I'm handing you a document that we've marked    11:44:16
6  as Rosenthal Exhibit 9.  I assume that    11:44:18
7  you've seen this before?    11:44:27
8  A.  I have seen this before.    11:44:27
9  Q.  If you look three pages into the document,    11:44:33
10 you'll see the subpoena pursuant to which    11:44:36
11 you're testifying today, correct?    11:44:39
12 A.  That's correct.    11:44:41
13 Q.  Now, the subpoena also requests documents    11:44:41
14 from you; is that right?    11:44:45
15 A.  That's correct.    11:44:47
16 Q.  And you were aware of that, right?    11:44:48
17 A.  I was aware of that.    11:44:50
18 Q.  What, if anything, did you do to locate the    11:44:51
19 documents that are described in the document    11:44:59
20 request?    11:45:01
21 A.  The document request was responded to by    11:45:01
22 Greylock McKinnon, obviously with my input,    11:45:03
23 but they pulled together the documents to    11:45:06
24 respond to this.    11:45:09
25 Q.  Now, you mentioned that they did it with    11:45:11

## Page 124

1  your input?    11:45:13
2  A.  Uh-huh.    11:45:14
3  Q.  To what extent did you have input in that    11:45:14
4  process?    11:45:17
5  A.  Well, again, the documents that are listed    11:45:18
6  in my declaration, that are referenced in my    11:45:23
7  declaration, I obviously made that list, so    11:45:26
8  that is the primary place where they drew    11:45:33
9  from in terms of the documents to be    11:45:36
10 produced.  And I tried to be complete about    11:45:37
11 anything that I looked at for the    11:45:41
12 declaration, and so I believe that that's    11:45:44
13 what was sent, unless it was publicly    11:45:47
14 available and then they traditionally don't    11:45:49
15 send those publicly available documents.    11:45:51
16 Q.  So am I right that the extent of your input    11:45:53
17 into the process of searching for the    11:45:56
18 documents would have been your having put    11:45:58
19 together the list of documents that you    11:46:00
20 considered when you first wrote the    11:46:01
21 declaration; is that correct?    11:46:03
22 A.  That's correct.    11:46:04
23 Q.  Did you do anything else specifically to    11:46:04
24 assist people at GMA, Greylock McKinnon, in    11:46:07
25 responding to the documentary portion of    11:46:12

## Page 125

1  your subpoena?    11:46:14
2  A.  Again, I would have -- I looked to see if I    11:46:15
3  had drafts, which I did not, to produce, so    11:46:17
4  what was on my hard drive.    11:46:22
5  Q.  Did you look for notes at all that I would    11:46:26
6  have taken?    11:46:28
7  A.  I did look for notes, but -- yes.    11:46:28
8  Q.  Did you look through your office for any    11:46:31
9  other materials that you might have had in    11:46:33
10 connection with this case?    11:46:36
11 A.  I did, and I don't have any other documents    11:46:36
12 in my office that I could locate.    11:46:41
13 Q.  And that includes -- well, just to circle    11:46:44
14 back to the last question, I take it you    11:46:46
15 didn't find notes when you looked for them?    11:46:49
16 A.  I didn't find notes, no.    11:46:51
17 Q.  All right.  We've been talking about    11:47:12
18 Attachment A.2 to your declaration, which is    11:47:13
19 Exhibit 1, which is described as "Documents    11:47:15
20 Relied Upon."  Do you see that?    11:47:20
21 A.  I do see that.    11:47:28
22 Q.  Now, aside from -- well, let me just ask it    11:47:29
23 more cleanly.  Have you since -- since the    11:47:35
24 time you prepared this, sometime on or prior    11:47:40
25 to August 8th, 2005, have you since reviewed    11:47:43

## Page 126

1  other documents that you would include on
2  this list if you were to prepare it from
3  scratch?
4      MR. NOTARGIACOMO: Objection. I
5  think it's been asked and answered twice,
6  but I'll let her answer it again.
7  A.  I would add the Fisher-Ellison rebuttal and
8  my response to it, I guess, would count as
9  reviewing. And I would add the new amended
10 complaint.
11 Q.  Anything else?
12 A.  I don't believe so.
13 Q.  Okay. Who selected the legal documents that
14 appear listed as "Legal Documents" on the
15 first page of Attachment A.2 of Exhibit 1?
16 A.  I was provided these documents by counsel.
17 I don't know if you -- what you mean by
18 "selected," but I was provided all of those
19 documents.
20 Q.  Did you have any input into the documents --
21 I'll withdraw the question.
22     Who selected for your review the
23 document -- who decided to put the -- well,
24 let me withdraw both of those questions.
25     Who selected the documents listed as

## Page 127

1  Bates-numbered documents for inclusion in
2  this list?
3  A.  That would have been the staff at GMA.
4  Q.  Would you have had any input into the
5  specific documents that are listed here?
6  A.  I would have given direction about the topic
7  areas, the keywords to look for.
8  Q.  Did you review all the documents yourself
9  that are listed here under "Bates-numbered
10 documents"?
11 A.  I have seen all these documents, yes.
12 Q.  Have you seen documents other than the ones
13 that are listed here?
14 A.  I may have seen other documents that I then
15 did not rely on.
16 Q.  How many other documents? Do you have a
17 rough sense?
18 A.  I don't.
19 Q.  Would it have been more than the total
20 number of documents that are listed here
21 under "Bates-numbered documents" or less or
22 about the same?
23 A.  I'm sorry, I really don't know. This was
24 over a year ago.
25 Q.  Did you rely at all on Mr. King or anybody

## Page 128

1  else at Greylock McKinnon for selection of
2  marketing documents?
3  A.  Mr. King may have been involved in
4  identifying the documents. That is
5  possible.
6  Q.  Were there any materials that you requested
7  from anybody at Greylock McKinnon or from
8  counsel that you didn't receive?
9  A.  No.
10 Q.  Any categories of materials that you would
11 have wanted to see that you weren't able to
12 see?
13 A.  No.
14 Q.  Okay.
15     MR. NOTARGIACOMO: I've lost track
16 of time, but it might be a good time for a
17 break whenever --
18     MR. POLUBINSKI: I was going to say
19 this isn't a bad time for a break. It's
20 about five minutes to 12:00 if my watch is
21 right. Maybe we can take a short break and
22 then come back and work a little bit and
23 then break for lunch sometime around a
24 quarter of 1:00 or 1:00. Does that sound
25 good?

## Page 129

1      MR. NOTARGIACOMO: Yes. It's just
2  that I have a very short ten-minute
3  conference call I need to be on at 2:30. So
4  if we could break at 2:30, it's a natural
5  place.
6      MR. POLUBINSKI: Okay. We should
7  be able to do that, and maybe what we'll do
8  is if we can be back soon, we can try to --
9  we'll break a little earlier for lunch so
10 that we don't have -- we can go off the
11 record now.
12     THE VIDEOGRAPHER: The time is
13 11:52. This is the end of Tape 2, and we
14 are off the record.
15     (Recess taken.)
16     THE VIDEOGRAPHER: The time is
17 12:01 p.m. This is the beginning of Tape 3,
18 and we are back on the record.
19 BY MR. POLUBINSKI:
20 Q.  All right. Professor Rosenthal, if you
21 could take a look, please, at Exhibit 1 to
22 your deposition, which is your declaration
23 in the case, and turn to Page 1 of the
24 declaration. Page 1 reads, very beginning
25 of the executive summary, "I have been asked

33 (Pages 126 to 129)

## Page 130

1  to analyze and determine whether consumers   12:01:35
2  and third-party payers who purchased or   12:01:37
3  reimbursed for Neurontin for indications not   12:01:40
4  approved by the Food and Drug Administration   12:01:42
5  (FDA) would have been and continue to be   12:01:45
6  impacted as a class and suffer economic   12:01:49
7  damages as a result of the violations   12:01:52
8  alleged in this matter."   12:01:54
9  Did I read that correctly?   12:01:56
10 A. Yes, you did.   12:01:57
11 Q. The violations alleged in this sentence,   12:01:59
12    violations alleged in this matter, that   12:02:03
13    refers to the allegations in the amended   12:02:05
14    complaint?   12:02:07
15 A. That's correct. Of course, at the time of   12:02:07
16    my writing, that was the complaint that was   12:02:11
17    then...   12:02:13
18 Q. Right. So looking again at this first   12:02:15
19    sentence, does this mean, then, that you set   12:02:18
20    out to analyze and determine whether   12:02:20
21    defendants' allegedly improper off-label   12:02:23
22    promotion did, in fact, impact consumers and   12:02:27
23    third-party payers as a class?   12:02:32
24 A. As I say there, "would have been impacted."   12:02:34
25    So whether there's economic theory and   12:02:37

## Page 131

1  evidence to support the idea that that   12:02:40
2  promotion would have caused damages if the   12:02:42
3  allegations were true.   12:02:46
4 Q. What does it mean to be impacted as a class?   12:02:49
5 A. Whether the consumers and third-party payers   12:02:51
6    would have been affected by a common   12:02:56
7    mechanism and in the same way.   12:02:59
8 Q. What do you mean by "in the same way"?   12:03:04
9 A. They -- the effect would have been similar   12:03:07
10   across the class; that is, they all -- in   12:03:10
11   this case they all would have consumed more   12:03:13
12   Neurontin than otherwise.   12:03:16
13 Q. Does this mean -- would that mean that each   12:03:23
14   member of the class, so each individual   12:03:26
15   who's a member of the class would have   12:03:28
16   somehow been impacted by defendants'   12:03:30
17   allegedly unlawful conduct, excuse me, or   12:03:32
18   does it mean something else?   12:03:34
19 A. It means that in the aggregate that the   12:03:35
20   class would have been affected in this way.   12:03:38
21   I'm not sure what you mean by "each member"   12:03:40
22   as opposed to all.   12:03:42
23 Q. Have you determined -- I guess another way   12:03:45
24   to put it is, have you determined that each   12:03:47
25   member of the class would have suffered some   12:03:48

## Page 132

1  sort of injury, some sort of economic injury   12:03:50
2  as a result of the conduct described in the   12:03:53
3  complaint?   12:03:55
4 A. Well, at this stage of what I've done here   12:03:55
5    is I have examined the economic theory and   12:03:58
6    evidence as to the effects of promotion as   12:04:04
7    it relates to the allegations in this case   12:04:10
8    and what effect that would have on class   12:04:12
9    members, that being consumers and third-   12:04:14
10   party payers, and their likelihood of   12:04:17
11   getting Neurontin for these off-label   12:04:19
12   indications. And so overall I've assessed   12:04:20
13   whether the class and all those included in   12:04:24
14   it would have been impacted, yes.   12:04:26
15 Q. I guess to expect to be able to determine,   12:04:29
16   to expect that you would determine using   12:04:33
17   your model that each member of the class,   12:04:35
18   each and every individual member of the   12:04:38
19   class would have suffered some economic   12:04:40
20   injury?   12:04:42
21 A. My understanding of what's appropriate in a   12:04:42
22   class matter like this is that I will do the   12:04:48
23   analysis at the aggregate level. This will   12:04:51
24   not be an issue where I'll look at every   12:04:55
25   individual class member.   12:04:57

## Page 133

1 Q. Okay. So in answer to the question, you do   12:04:58
2    not expect to do that analysis to determine   12:05:00
3    whether each individual member of the class   12:05:03
4    would have been injured?   12:05:05
5 A. I do not expect to analyze individual class   12:05:06
6    members, no.   12:05:09
7 Q. Do you anticipate that you conclude that   12:05:23
8    there are any members of the class that have   12:05:24
9    not suffered a loss of some kind, an   12:05:26
10   economic loss?   12:05:28
11       MR. NOTARGIACOMO: Objection. You   12:05:30
12   can answer.   12:05:31
13 A. Let me just -- can I think about the   12:05:31
14   question for a second?   12:05:33
15 Q. Of course.   12:05:34
16 A. I guess it would -- again, by definition   12:05:41
17   those in the class are individuals who   12:05:44
18   received Neurontin as a result of off-label   12:05:48
19   promotion, and so I anticipate that there --   12:05:52
20   this impact is common to all class members.   12:05:58
21 Q. This is taking things slightly out of the   12:06:01
22   order that I expected to do it, but can you   12:06:11
23   look at Paragraph 6 of your complaint -- not   12:06:13
24   your complaint, your declaration, excuse me.   12:06:17
25 A. Okay.   12:06:19

VERITEXT NEW YORK REPORTING COMPANY
212-267-6868                                    516-608-2400

Case 1:04-cv-10981-PBS   Document 1175-4   Filed 03/14/2008   Page 15 of 20

**Page 134**

1  Q. And it contains a definition of the class
2    there, correct?
3  A. Yes.
4  Q. Do you want to take a second to just read
5    it?
6  A. Yes, I see it. Yes.
7  Q. I think that you described to me the class
8    was only people who purchased Neurontin by
9    virtue of defendants' conduct, defendants'
10   off-label promotion just a second ago. Did
11   I understand your answer correctly?
12 A. Yes, and perhaps I misstated it. What I
13   have been asked to do is to at this stage
14   identify whether there would have been an
15   effect and a model for identifying how that
16   effect would play out in the class. So what
17   I've been asked to look at is only the
18   incremental off-label use that is due to the
19   allegations, and that would apply to this
20   class of those purchasing Neurontin for
21   off-label uses as a whole.
22 Q. So am I right that your model wouldn't
23   provide you with a way of identifying any
24   individuals, specific individuals, who would
25   have not suffered an economic loss?

**Page 135**

1  A. That's correct.
2  Q. All right. A related question, I guess, is
3    that you set out to analyze and determine
4    whether class members were impacted and
5    therefore suffered some amount of damages
6    as a result of the violations alleged in
7    this matter, correct?
8  A. That's correct.
9  Q. And then looking down in Paragraph 3 of your
10   executive summary on Page 1 of Exhibit 1 you
11   write, "There exists standard research
12   methods that may be applied to readily
13   available data to compute the quantity of
14   Neurontin purchased that was directly
15   induced by the allegedly illegal marketing
16   scheme."
17       Did I read that right?
18 A. Yes, you did.
19 Q. I'm assuming that your model would not
20   enable you to include -- conclude, rather,
21   that every class member suffered some harm
22   that was directly induced by the allegedly
23   illegal marketing scheme; is that correct?
24 A. My analysis will look at the class as a
25   whole and will not look at effects at the

**Page 136**

1    individual level. Is that my correct
2    understanding of your question?
3  Q. I think so. And so your model wouldn't
4    enable you to tell -- to determine whether a
5    particular given individual prescription was
6    written as a result of the conduct that's
7    described in the complaint?
8  A. Yes, that's correct.
9  Q. All right. Going back to the first sentence
10   and the term "violations alleged in this
11   matter," let's hold that phrase in mind.
12   And then look to the first sentence of the
13   second paragraph. Now, you also describe
14   there "unlawful conduct alleged in the
15   amended complaint."
16      Did I read that --
17 A. Yes.
18 Q. -- correctly?
19 A. Yes, you read that correctly.
20 Q. And then in the third paragraph, you
21   describe in the first sentence "wrongful
22   conduct"?
23 A. Yes, I see that.
24 Q. And then you also describe in the second
25   sentence, "the allegedly illegal marketing

**Page 137**

1    scheme"?
2  A. Yes, I see that.
3  Q. Those four terms, do you mean to use those
4    interchangeably for purposes of this
5    executive summary in your declaration?
6  A. Yes, I do.
7  Q. Okay. What makes a particular aspect of
8    defendants' conduct, so, for example, a
9    conversation between a sales representative
10   and a doctor, a violation for purposes of
11   your analysis?
12       MR. NOTARGIACOMO: Objection, calls
13   for a legal conclusion, but you can answer.
14 A. My understanding is that there are some
15   legal principles that apply to the
16   pharmaceutical company's provision of
17   information around the uses of its drugs,
18   and in the allegations there are claims
19   about misrepresentation of clinical findings
20   around those drugs and the like.
21 Q. I guess going back to Mr. Notargiacomo's
22   objection, do you understand the
23   determination as to whether something is or
24   isn't a violation to be a legal
25   determination?

### Page 138

1  A.  I do, yes.    12:11:03
2  Q.  Do you have an understanding for how that    12:11:06
3  determination is going to be made?    12:11:09
4  A.  Again, I don't understand all the legal    12:11:10
5  issues here. My sense from looking at the    12:11:15
6  allegations is that it's somewhat    12:11:18
7  complicated, but I understand -- my current    12:11:21
8  understanding and my understanding at the    12:11:24
9  time was that I would be given more specific    12:11:25
10  information about which individual    12:11:28
11  promotional activities would ultimately be a    12:11:32
12  subject of the damage analysis when it gets    12:11:37
13  to implementation stage.    12:11:41
14  Q.  And do you know who would be providing that    12:11:48
15  to you?    12:11:54
16  A.  I would expect counsel to provide that to    12:11:54
17  me.    12:11:56
18  Q.  So would you have any involvement in    12:11:56
19  determining whether a particular type of    12:11:58
20  conduct was unlawful or wrongful?    12:12:00
21  A.  No, I would not.    12:12:03
22  Q.  Would you have any involvement in    12:12:04
23  determining whether a particular conduct --    12:12:05
24  piece of conduct was fraudulent?    12:12:08
25  A.  No, I would not.    12:12:09

### Page 139

1  Q.  Here's a question: Is it your understanding    12:12:11
2  that conduct that you characterize here as a    12:12:25
3  violation is the same thing as conduct that    12:12:28
4  would generate liability in this case? So    12:12:31
5  in other words, assuming -- and assuming    12:12:35
6  that it caused injury to a consumer or    12:12:37
7  third-party payer?    12:12:40
8        MR. NOTARGIACOMO: Objection.    12:12:40
9  A.  I am not sure I even would begin to know how    12:12:42
10  to answer that.    12:12:46
11  Q.  Okay. Let me think of a... You know, I'll    12:12:48
12  withdraw the question. That's fine.    12:12:55
13        Are there violations or wrongful    12:12:58
14  conduct that you can think of that would not    12:13:06
15  generate liability? I guess maybe that's    12:13:08
16  another way to put it.    12:13:10
17        MR. NOTARGIACOMO: Objection.    12:13:11
18  A.  I just -- that's such a broad question I'm    12:13:12
19  afraid I don't know how to answer it.    12:13:16
20  Q.  Okay. I guess -- I think I'll withdraw that    12:13:17
21  one, too. It's probably not necessary.    12:13:27
22        Let me ask you about Dr. Hartman's    12:13:29
23  report. What's your understanding of how    12:13:41
24  your report interacts with Dr. Hartman's?    12:13:43
25  A.  My understanding is that I am to look at    12:13:44

### Page 140

1  issues of the class definition essentially,    12:13:48
2  issues of whether there was a common impact,    12:13:53
3  whether there are sort of economic    12:13:55
4  circumstances that explain that common    12:13:59
5  impact, and talk about estimating the    12:14:01
6  quantity of Neurontin that was prescribed as    12:14:07
7  a result of the allegedly fraudulent or    12:14:12
8  illegal, whatever the appropriate way to    12:14:18
9  describe it is, behavior. Then Dr. Hartman    12:14:20
10  would use those quantities to estimate    12:14:23
11  damages.    12:14:25
12  Q.  So I guess, to boil it down, would it be    12:14:25
13  correct to say that Dr. Hartman's report    12:14:33
14  offers a methodology by which he would take    12:14:35
15  as an input your conclusions on class-wide    12:14:38
16  impact and then based on that input    12:14:42
17  calculate class-wide damages?    12:14:45
18  A.  That's my understanding.    12:14:48
19  Q.  Dr. Hartman's doesn't -- or withdrawn.    12:14:51
20        Dr. Hartman's report doesn't reach an    12:14:54
21  independent conclusion as to class-wide    12:14:56
22  impact, does it?    12:14:58
23        MR. NOTARGIACOMO: Objection. It's    12:14:59
24  beyond the scope. She didn't write Dr.    12:15:00
25  Hartman's report, and she's not here to    12:15:01

### Page 141

1  testify about Dr. Hartman's report. But    12:15:03
2  I'll let you answer the question.    12:15:05
3  Q.  Well, let me ask it this way: You've    12:15:06
4  reviewed Dr. Hartman's report, right?    12:15:08
5  A.  I have.    12:15:10
6  Q.  And you provided comments on his draft    12:15:10
7  report, correct?    12:15:12
8  A.  That's correct.    12:15:14
9  Q.  Do you have an understanding, based on your    12:15:15
10  review of his reports -- or his report, I    12:15:17
11  should say, as to whether he reaches -- or    12:15:20
12  it reaches an independent conclusion as to    12:15:23
13  class-wide impact?    12:15:25
14  A.  I don't believe it does. I'm not sure that    12:15:25
15  I understand that term in the same way that    12:15:28
16  you do, but I believe, as we discussed, that    12:15:29
17  it talks about the methodology for    12:15:31
18  estimating damages from quantities.    12:15:33
19  Q.  So I guess, as you've described it, would it    12:15:35
20  be correct to say that neither you nor Dr.    12:15:47
21  Hartman have proposed a methodology which,    12:15:50
22  standing alone, would be capable of    12:15:54
23  calculating class-wide damages?    12:15:58
24        MR. NOTARGIACOMO: Object to the    12:16:01
25  question.    12:16:02

**Page 142**

1  Q. Well, let me put it another way. Your  12:16:06
2     report and Dr. Hartman's report are  12:16:08
3     interdependent for purposes of determining  12:16:09
4     class-wide damages?  12:16:12
5  A. That's correct. That's my understanding.  12:16:13
6  Q. Okay. All right. Let's look again at  12:16:15
7     Paragraph 6, which is the definition of the  12:16:31
8     class, and why don't I just read it. It  12:16:32
9     reads, "All individuals and entities in the  12:16:37
10    United States and its territories who, for  12:16:39
11    purposes other than resale, purchased,  12:16:42
12    reimbursed, and/or paid for Neurontin for  12:16:44
13    indications not approved by the FDA during  12:16:47
14    the period from January 1, 1994, through the  12:16:50
15    present. For purposes of the Class  12:16:53
16    definition, individuals and entities  12:16:56
17    purchased Neurontin if they paid some or all  12:16:58
18    of the purchase price."  12:17:01
19        Did I read that correctly?  12:17:02
20 A. Yes, you did.  12:17:04
21 Q. Where does this definition come from?  12:17:05
22 A. The definition comes from the amended class  12:17:07
23    action complaint dated February 1, 2005.  12:17:09
24 Q. Did you have any involvement in the crafting  12:17:15
25    of the definition of the class in this case?  12:17:18

**Page 143**

1  A. No, I did not.  12:17:20
2  Q. What's your understanding of what "the  12:17:22
3     present" is for purposes of the class  12:17:28
4     definition?  12:17:32
5        MR. NOTARGIACOMO: Objection. You  12:17:34
6     can answer.  12:17:40
7  A. If I were to think about what the  12:17:40
8     understanding was -- I thought I was working  12:17:43
9     off the assumption that it was the present  12:17:45
10    at the time that I was drafting that, but  12:17:48
11    obviously it would have been the present at  12:17:49
12    the time the complaint was filed, that being  12:17:53
13    February 1, 2005.  12:17:57
14 Q. Does the date make a difference for purposes  12:18:03
15    of your analysis in your declaration?  12:18:06
16 A. Would it affect the --  12:18:09
17 Q. Any of the conclusions that you reached?  12:18:13
18 A. -- quantum of impact? Oh, for the  12:18:15
19    conclusions that I reached? No, it does not  12:18:18
20    make a difference.  12:18:21
21 Q. Have you participated in any discussions  12:18:23
22    about whether the class definition remains  12:18:25
23    appropriate in view of the Court's rulings  12:18:28
24    over the past year?  12:18:30
25 A. The subject did come up last week when we  12:18:31

**Page 144**

1     were reviewing as to whether the date would  12:18:36
2     be changed by the Court.  12:18:39
3  Q. Specifically when you say "the subject," you  12:18:41
4     mean the subject of the date?  12:18:43
5  A. Of the end date in particular for the class.  12:18:46
6  Q. And when you say, "we had a discussion," who  12:18:49
7     is "we"?  12:18:54
8  A. That would be Mr. Notargiacomo, Mr. Goldser  12:18:54
9     and I.  12:18:57
10 Q. What was the general content of the  12:18:57
11    discussion?  12:19:00
12 A. I think it was something to the effect of  12:19:00
13    the -- you know, it's not clear what the  12:19:05
14    Court's ruling -- what implication that has  12:19:11
15    for when the class -- for the class  12:19:13
16    definition in terms of the end date of it.  12:19:15
17 Q. Did you discuss any other aspect of the  12:19:20
18    class definition in that conversation or any  12:19:24
19    other conversation about the Court's recent  12:19:27
20    rulings?  12:19:29
21 A. The one thing we discussed was that it was  12:19:30
22    likely that my work when it comes to  12:19:32
23    implementation of this approach would need  12:19:36
24    to be done indication by indication.  12:19:39
25 Q. When did -- did you have that discussion  12:19:41

**Page 145**

1     last week for the first time?  12:19:49
2  A. In terms of the Court's ruling. As you  12:19:50
3     know, in the declaration I talk about doing  12:19:54
4     the analysis indication by indication.  12:19:56
5  Q. Right. But so in terms of the implication  12:20:00
6     of the Court's ruling on your analysis, the  12:20:05
7     first discussion was last week?  12:20:07
8  A. I believe so.  12:20:08
9  Q. And it was in the same conversation that we  12:20:14
10    just described, the conversation between  12:20:16
11    you, Mr. Notargiacomo and Mr. Goldser?  12:20:18
12 A. Yes, that's correct.  12:20:21
13 Q. And what was the substance of that  12:20:26
14    conversation beyond what you've just  12:20:27
15    described?  12:20:29
16 A. Again, this was when we met last week to  12:20:29
17    prepare, and the substance -- it was very  12:20:33
18    brief. Again, the issue came up as to  12:20:36
19    whether the final class definition would  12:20:40
20    include an earlier end date, and I don't  12:20:42
21    remember everything that was said, but the  12:20:49
22    idea was it was unclear, we didn't know yet,  12:20:50
23    and that we would work with it as it became  12:20:55
24    clear.  12:20:57
25 Q. All right. You are aware that Neurontin was  12:21:00

146

| | | |
|---|---|---|
| 1 | approved by the FDA for the treatment of | 12:21:06 |
| 2 | postherpetic neuralgia in May of 2002, | 12:21:09 |
| 3 | correct? | 12:21:13 |
| 4 | A. Yes, that's correct. | 12:21:13 |
| 5 | Q. And I hope you'll understand if I refer to | 12:21:15 |
| 6 | postherpetic neuralgia as PHN. Does that | 12:21:19 |
| 7 | work for you? | 12:21:25 |
| 8 | A. I'll try to remember that, yes. | 12:21:25 |
| 9 | Q. Okay. If there's confusion at all, please | 12:21:27 |
| 10 | let me know. | 12:21:29 |
| 11 | A. Okay. | 12:21:30 |
| 12 | Q. What's your understanding for how the class | 12:21:30 |
| 13 | definition accounts for individuals and | 12:21:33 |
| 14 | entities who purchased, reimbursed and/or | 12:21:34 |
| 15 | paid for Neurontin for PHN? | 12:21:37 |
| 16 | A. Before or after May 2002? | 12:21:49 |
| 17 | Q. Well, I guess that's the question. | 12:21:52 |
| 18 | A. Yeah. Well, my understanding is that I -- | 12:21:53 |
| 19 | obviously I read the complaint and tried to | 12:21:57 |
| 20 | summarize the allegations as best I could | 12:22:00 |
| 21 | here, my understanding, but I believe that | 12:22:02 |
| 22 | at the time I conduct my analysis I will get | 12:22:07 |
| 23 | direction from counsel about what specific | 12:22:10 |
| 24 | off-label promotions are to be considered as | 12:22:12 |
| 25 | illegal and during what time period. And I | 12:22:17 |

147

| | | |
|---|---|---|
| 1 | would imagine that would change for | 12:22:26 |
| 2 | something like postherpetic neuralgia which | 12:22:28 |
| 3 | received that approval in May 2002, so that | 12:22:30 |
| 4 | it might be different in 1996, for example, | 12:22:32 |
| 5 | than in 2002, but I don't -- I think that's | 12:22:35 |
| 6 | a legal issue. | 12:22:37 |
| 7 | Q. Well, let's talk about it just in terms of | 12:22:40 |
| 8 | who the members of the class are. | 12:22:42 |
| 9 | A. Okay. | 12:22:44 |
| 10 | Q. Would you say that individuals and entities | 12:22:44 |
| 11 | who, quote, purchased, reimbursed and/or | 12:22:48 |
| 12 | paid for Neurontin, end quote, for PHN prior | 12:22:52 |
| 13 | to May 2002 would have -- are members of the | 12:22:56 |
| 14 | class? | 12:23:04 |
| 15 | MR. NOTARGIACOMO: Objection. | 12:23:04 |
| 16 | Calls for a legal conclusion. | 12:23:04 |
| 17 | MR. POLUBINSKI: I'm asking for her | 12:23:07 |
| 18 | understanding, though. | 12:23:08 |
| 19 | A. That was certainly my understanding at the | 12:23:08 |
| 20 | time of writing this, was that all those | 12:23:10 |
| 21 | that received an off-label prescription for | 12:23:14 |
| 22 | Neurontin for off-label uses would be | 12:23:17 |
| 23 | included, and so that that would follow to | 12:23:19 |
| 24 | this conclusion that you mentioned. | 12:23:22 |
| 25 | Q. And that individuals or entities who | 12:23:23 |

148

| | | |
|---|---|---|
| 1 | purchased, reimbursed and/or paid for | 12:23:26 |
| 2 | Neurontin for PHN after May 2002 after the | 12:23:29 |
| 3 | approval of PHN by the FDA would not be | 12:23:32 |
| 4 | included in the class? | 12:23:34 |
| 5 | MR. NOTARGIACOMO: Objection, calls | 12:23:35 |
| 6 | for a legal conclusion. | 12:23:36 |
| 7 | A. That would have been my understanding. | 12:23:38 |
| 8 | Q. Now, is this an understanding that you | 12:23:45 |
| 9 | developed yourself in reading the class | 12:23:46 |
| 10 | definition, or did you have conversations | 12:23:48 |
| 11 | with anybody about the question? | 12:23:49 |
| 12 | A. It was my understanding of reading the | 12:23:50 |
| 13 | complaint and the way I understood the | 12:23:53 |
| 14 | allegations. | 12:23:56 |
| 15 | Q. Now, your model assumes that you'll somehow | 12:23:56 |
| 16 | be able to identify all PHN prescriptions? | 12:24:04 |
| 17 | A. That's correct. | 12:24:06 |
| 18 | Q. How do you anticipate doing that? | 12:24:08 |
| 19 | A. I anticipate using the National Disease and | 12:24:10 |
| 20 | Therapeutic Index for one example. That's a | 12:24:13 |
| 21 | database that describes prescriptions by | 12:24:17 |
| 22 | diagnosis. | 12:24:21 |
| 23 | Q. Are there other examples? | 12:24:27 |
| 24 | A. I've also requested additional data from the | 12:24:28 |
| 25 | defendants from their own documents tracking | 12:24:32 |

149

| | | |
|---|---|---|
| 1 | prescriptions by diagnosis. As I mention in | 12:24:35 |
| 2 | some of my footnotes, I've seen some | 12:24:38 |
| 3 | examples. | 12:24:40 |
| 4 | Q. Anything else? | 12:24:41 |
| 5 | A. I also said I reviewed the National | 12:24:45 |
| 6 | Ambulatory Medical Care Survey, which is a | 12:24:49 |
| 7 | federally funded survey by the CDC that also | 12:24:51 |
| 8 | looks at office visits and prescribing | 12:24:54 |
| 9 | associated with those office visits and | 12:24:58 |
| 10 | diagnoses. | 12:25:00 |
| 11 | Q. So do you envision for purposes of your -- | 12:25:04 |
| 12 | or I'm sorry, before we go on to that, is | 12:25:06 |
| 13 | there anything else other than the last | 12:25:08 |
| 14 | category you mentioned? | 12:25:11 |
| 15 | A. Those are the data sources that I know of | 12:25:12 |
| 16 | and I know are available. I would do a | 12:25:14 |
| 17 | broader search to see if there were other | 12:25:17 |
| 18 | alternative databases. I understand that | 12:25:19 |
| 19 | Verispan, which is another consulting | 12:25:21 |
| 20 | company, offers a database that's similar to | 12:25:24 |
| 21 | the National Disease and Therapeutic Index, | 12:25:27 |
| 22 | but I have not reviewed those data. | 12:25:30 |
| 23 | Q. So we discussed before that your model | 12:25:33 |
| 24 | assumes that you'll be able to identify all | 12:25:41 |
| 25 | PHN prescriptions, correct? | 12:25:44 |

150

1  A. That's correct.                                  12:25:45
2  Q. How does your model propose to treat             12:25:45
3     situations where the prescription was            12:25:51
4     written before FDA approval in May 2002 but      12:25:53
5     was paid for or reimbursed after May 2002?       12:25:57
6  A. The data on the National Drug -- Disease and    12:26:01
7     Therapeutic Index, for example, are              12:26:09
8     documentation of when the prescribing took       12:26:12
9     place, which at least preliminarily that         12:26:13
10    seems like the right date to look to, is         12:26:16
11    when the prescription was written as opposed     12:26:24
12    to when it was reimbursed, to answer your        12:26:25
13    question.                                        12:26:27
14 Q. Does your model propose identifying and          12:26:27
15    distinguishing between situations where a        12:26:31
16    patient received a prescription for the          12:26:33
17    first time for PHN and when a patient            12:26:34
18    received a prescription for a refill of PHN      12:26:39
19    or -- of Neurontin for PHN?                      12:26:43
20 A. I guess I would have to think about that         12:26:46
21    issue a little bit and decide how to             12:26:48
22    appropriately incorporate that into my           12:26:53
23    analysis. I would need a little time to          12:26:56
24    think about that.                                12:26:58
25 Q. Okay.                                            12:26:59

151

1  A. That's not described specifically in here,      12:27:00
2     though, to answer your question, but that        12:27:02
3     might be relevant to the analysis.               12:27:04
4        MR. POLUBINSKI: I've got another              12:27:18
5     long section that I'm about ready to start       12:27:19
6     now, and I would be happy to do it, or if        12:27:21
7     you would like to break now for lunch, we        12:27:23
8     can come back and get a chunk in before your     12:27:24
9     call.                                            12:27:27
10       MR. NOTARGIACOMO: Yeah, why don't             12:27:27
11    we do that, break now and get a chunk in         12:27:28
12    before we break. Like I said, it'll be           12:27:32
13    about 15 minutes.                                12:27:34
14       MR. POLUBINSKI: Sounds good.                  12:27:35
15    Okay. Go off the record.                         12:27:36
16       THE VIDEOGRAPHER: The time is                 12:27:37
17    12:27 p.m., and we're off the record.            12:27:38
18       (Lunch recess taken.)                         12:27:41
19
20
21
22
23
24
25

152

1            AFTERNOON SESSION                         01:15:41
2         (Exhibit No. 10, Amended Class               01:17:48
3     Action Complaint, marked for                     01:17:48
4     identification.)                                 01:17:49
5         (Exhibit No. 11, Second Amended              01:17:49
6     Class Action Complaint, marked for               01:17:49
7     identification.)                                 01:17:48
8         THE VIDEOGRAPHER: The time is 1:18           01:17:50
9     p.m. We're back on the record.                   01:18:10
10                                                     01:18:10
11    (MEREDITH B. ROSENTHAL, Ph.D., Resumed.)         01:18:10
12        DIRECT EXAMINATION, Continued                01:18:10
13                                                     01:18:12
14    BY MR. POLUBINSKI:                               01:18:12
15 Q. All right. Professor Rosenthal, could you        01:18:12
16    look, please, at Exhibit 1, which is your        01:18:18
17    declaration in this case, the beginning of       01:18:20
18    Paragraph 7, which is on Page 4.                 01:18:25
19 A. Okay.                                            01:18:31
20 Q. The very first sentence of Paragraph 7           01:18:31
21    reads, "For purposes of my analysis, I have      01:18:34
22    been directed by counsel to assume the           01:18:38
23    following facts as alleged in the complaint      01:18:39
24    to be true."                                     01:18:43
25    Did I read that correctly?                       01:18:44

153

1  A. Yes, you did.                                    01:18:45
2  Q. And is it true that you've done that?            01:18:46
3  A. Yes, it's true.                                  01:18:47
4  Q. All right. I'm going to hand you two             01:18:48
5     documents. The first one has been marked as     01:18:52
6     Rosenthal Exhibit 10. The second one has        01:18:54
7     been marked as Rosenthal Exhibit 11.             01:18:58
8  A. Okay.                                            01:19:01
9  Q. All right. Looking first at Rosenthal            01:19:13
10    Exhibit 10, that's the complaint that you're    01:19:15
11    referring to in --                                01:19:21
12 A. Okay.                                            01:19:22
13 Q. -- the first sentence of Paragraph 7 of your    01:19:23
14    report, correct?                                 01:19:26
15 A. I'm just looking for the date on it. So         01:19:27
16    that would be the earlier complaint, right?     01:19:28
17    I --                                             01:19:31
18 Q. Yes --                                           01:19:31
19 A. Can I trust you on that?                         01:19:32
20 Q. You are welcome to trust me on that.             01:19:34
21 A. Very good, yeah. Yes, I understand this to     01:19:36
22    be the complaint that was in effect at the      01:19:38
23    time I wrote my report.                          01:19:40
24 Q. And that's the complaint that you referred      01:19:41
25    to in the first sentence of Paragraph 7?         01:19:43

### Page 154

1  A.  That's correct.                              01:19:48
2  Q.  Okay. And as we have discussed, you're      01:19:48
3      aware that plaintiffs have amended their     01:19:51
4      complaint since then?                        01:19:52
5  A.  Yes, I understand that.                     01:19:53
6  Q.  And if you take a look at Rosenthal Exhibit  01:19:54
7      11, can you tell me if that is the second    01:19:57
8      amended complaint in this matter, the        01:19:59
9      amendment to the complaint that we           01:20:01
10     discussed?                                   01:20:02
11 A.  Yes, I believe that we've done that         01:20:03
12     complaint, yes, the amended -- second        01:20:05
13     amended class action complaint.              01:20:06
14 Q.  All right. You're aware that the Court in   01:20:08
15     this case has determined that some of the    01:20:17
16     allegations in the original class action     01:20:18
17     complaint were insufficient to state a claim 01:20:20
18     and should be dismissed, correct?            01:20:24
19         MR. NOTARGIACOMO: Objection. You         01:20:26
20     can answer.                                  01:20:27
21 A.  I'm aware that the Court made some decision  01:20:27
22     that pertained to the legal structure of the 01:20:30
23     case, and I would certainly believe your     01:20:34
24     assessment that that's what happened. I --   01:20:37
25     again, I don't thoroughly understand the     01:20:39

### Page 155

1      legal issues myself, but I do understand    01:20:42
2      that there was some decision that pertained 01:20:43
3      to the way this was going to be approached  01:20:47
4      legally.                                    01:20:49
5  Q.  Okay. All right. Let me direct your         01:20:49
6      attention in Rosenthal Exhibit 11, please,  01:21:04
7      to the very first page of the complaint,    01:21:07
8      Page 1, which is actually a couple of pages 01:21:10
9      into the document.                          01:21:12
10 A.  I see Page 1.                               01:21:14
11 Q.  And what I would like to do is ask you to   01:21:15
12     look at the Footnote No. 1 that appears at  01:21:19
13     the bottom of the first page. And it's kind 01:21:24
14     of a mouthful, so I think I may not read it 01:21:31
15     into the record, if you don't mind.         01:21:34
16     Although frankly maybe it makes sense just  01:21:42
17     to do it. It reads in the second amended    01:21:45
18     class action complaint, "Plaintiffs have    01:21:48
19     amended their allegations to provide        01:21:50
20     additional facts in support of their claims 01:21:51
21     and to correct certain deficiencies in the  01:21:53
22     first amended class action complaint as     01:21:56
23     determined by the Court (the allegations    01:21:59
24     concerning social phobia and restless leg   01:22:04
25     syndrome), but have left the remainder of   01:22:07

### Page 156

1      the FCAC largely undisturbed (e.g., the     01:22:10
2      allegations concerning the composition of   01:22:14
3      various RICO enterprises alleged)           01:22:17
4      notwithstanding the Court's adverse rulings 01:22:19
5      concerning the sufficiency of certain of    01:22:22
6      those allegations (e.g., the Court's        01:22:24
7      determination that certain of the alleged   01:22:26
8      RICO enterprises were not sufficiently      01:22:28
9      pled). Plaintiffs have left these           01:22:31
10     allegations undisturbed to preserve their   01:22:33
11     appellate rights, not to require the Court  01:22:36
12     to revisit those issues at this time."      01:22:37
13         Did I read that correctly --            01:22:41
14 A.  I believe you did.                          01:22:42
15 Q.  -- as best you can tell? Okay. Thanks.      01:22:42
16         MR. NOTARGIACOMO: You get an A in       01:22:46
17     reading.                                    01:22:47
18         MR. POLUBINSKI: I'm pretty good at      01:22:48
19     it.                                         01:22:51
20 Q.  Do you have an understanding of what the    01:22:51
21     certain deficiencies in the first amended   01:22:54
22     class action complaint are for purposes of  01:22:56
23     this footnote?                              01:22:58
24 A.  I do not.                                   01:22:58
25 Q.  Okay. And then in the last sentence which   01:22:59

### Page 157

1      reads, "The plaintiffs have left these      01:23:09
2      allegations undisturbed," do you know which 01:23:11
3      allegations those are?                      01:23:13
4  A.  I do not.                                   01:23:15
5  Q.  So I take it, then, that whether or not     01:23:16
6      those allegations, the ones that are        01:23:23
7      referred to in Footnote 1, are still in the 01:23:25
8      case have not impacted your analysis in your 01:23:28
9      declaration?                                01:23:31
10 A.  My analysis relates to the overall economic 01:23:31
11     incentives in this environment, the impact  01:23:35
12     of promotion as we know it and my ability to 01:23:38
13     model the effects of promotional activities 01:23:43
14     that ultimately are deemed to be within the 01:23:48
15     scope of the case. And so if I were told    01:23:50
16     that certain activities were no longer in   01:23:52
17     the scope of the allegations for the        01:23:56
18     purposes of conducting a damage analysis, I 01:23:58
19     would remove those. So it does not affect   01:24:02
20     my analysis as it appears in my report.     01:24:04
21 Q.  Do you have any independent knowledge or    01:24:11
22     have you done any independent investigation 01:24:14
23     into the truth of any of the allegations in, 01:24:15
24     let's refer to the complaint that you looked 01:24:19
25     at when you first drafted your report,      01:24:22