## Page 78

1  Q. -- presumably?                                10:52:34
2  A. That's my understanding, yes.                 10:52:35
3  Q. What about "backup"; do you know what he's    10:52:37
4     referring to there?                           10:52:38
5  A. Yes. So, for example, when I cite an          10:52:39
6     academic article, that backup is the article  10:52:42
7     itself.                                       10:52:48
8  Q. Are there other examples aside from           10:52:52
9     assembling academic articles that you cite?   10:52:57
10 A. There may have been documents from the        10:52:58
11    Franklin materials.                           10:52:59
12 Q. If you look at the entry that's dated August  10:53:02
13    10th, 2005, do you see the description is     10:53:06
14    "Neurontin backup binder"?                    10:53:10
15 A. (No verbal response.)                         10:53:12
16 Q. Do you know what "Neurontin backup binder"    10:53:14
17    means?                                        10:53:18
18 A. It's an assemblage of those academic          10:53:18
19    articles and discovery documents that are     10:53:22
20    cited specifically in the report.             10:53:24
21 Q. Do you have a copy of the Neurontin backup    10:53:28
22    binder?                                       10:53:30
23 A. With me right now?                            10:53:31
24 Q. No, just --                                   10:53:32
25 A. Yes.                                          10:53:33

## Page 79

1  Q. -- do you have one in your --                 10:53:33
2  A. I do.                                         10:53:36
3  Q. -- possession?                                10:53:36
4  A. I do.                                         10:53:37
5  Q. Have you taken notes on it, written on the    10:53:38
6     documents at all?                             10:53:40
7  A. I don't think so.                             10:53:41
8  Q. All right. Next name is -- let's look at      10:53:41
9     Page 81. You can help me with this            10:53:54
10    pronunciation as well, O. B-I-Z-A-N?          10:53:56
11 A. Yeah, I don't actually know how to pronounce  10:54:01
12    it, but his last name is B-I-Z-A-N, first     10:54:04
13    name Oded, O-D-E-D. It's Israeli, I           10:54:06
14    believe.                                      10:54:13
15 Q. So do you know Mr. Bizan?                     10:54:13
16 A. He was a -- he was another Ph.D. at Greylock  10:54:16
17    McKinnon at the time. He's no longer there.   10:54:23
18 Q. Did he work with you on your declaration?     10:54:26
19 A. He did not work on my declaration, that I     10:54:28
20    know of. He may have done some supporting     10:54:33
21    work that related to it.                      10:54:35
22 Q. Let's look at GMA Page 81, and in particular  10:54:39
23    the two entries on August 1st and August      10:54:44
24    2nd. The dec -- or the description reads,     10:54:47
25    "Compile cites for MR report"?                10:54:50

## Page 80

1  A. Uh-huh.                                       10:54:53
2  Q. MR report, I take it --                       10:54:53
3  A. Would be my --                                10:54:55
4  Q. -- would be your report?                      10:54:55
5     Do you have a sense for what Mr. Bizan        10:54:58
6     was doing on August 1st and August 2nd?       10:55:01
7  A. I don't. It was a while ago, and I was not    10:55:04
8     directly overseeing him.                      10:55:07
9  Q. Would you have received comments from Mr.     10:55:13
10    Bizan at all?                                 10:55:15
11 A. I don't believe so.                           10:55:15
12 Q. And just to circle back to Mr. Bechtel,       10:55:19
13    would you have received comments directly     10:55:22
14    from him?                                     10:55:25
15 A. I don't believe so. Again, he may have        10:55:26
16    filled in specific references that I          10:55:29
17    indicated needed to be filled in. If you      10:55:31
18    consider that to be a comment, then it's      10:55:33
19    certainly possible.                           10:55:35
20 Q. And going back yet again to Mr. Augusteijn,   10:55:43
21    you mentioned that he did similar work like   10:55:46
22    the work that you had described filling in    10:55:47
23    references and things like that. Would he     10:55:49
24    have given you any more substantive comments  10:55:51
25    than that?                                    10:55:53

## Page 81

1  A. No, I don't think so.                         10:55:54
2  Q. Okay. The next name is Professor Frank.       10:55:57
3     And we've discussed a little bit the work     10:56:04
4     that he's done with you in this matter, and   10:56:06
5     we've also discussed that he would have       10:56:11
6     reviewed a draft of your report at some       10:56:12
7     point. If we could take a look at the page    10:56:14
8     that's been marked GMA82. There are two       10:56:17
9     time entries here for Professor Frank,        10:56:25
10    correct?                                      10:56:27
11 A. Uh-huh. Yes.                                  10:56:28
12 Q. This, I assume, is the same Professor Frank   10:56:28
13    that we've been talking about in this         10:56:32
14    deposition?                                   10:56:34
15 A. Yes, it is.                                   10:56:34
16 Q. Would you think that -- well, withdraw that.  10:56:46
17    The two time entries are dated June           10:56:48
18    1st, 2005 and July 1st, 2005. The             10:56:50
19    descriptions in both of them are              10:56:54
20    "Discussions with counsel, case team," and    10:56:55
21    the total amount of time between those two    10:56:58
22    entries is five hours?                        10:57:00
23 A. I see that, yes.                              10:57:13
24 Q. Would you think that these two time entries   10:57:05
25    reflect all the time that Professor Frank     10:57:08

## Page 82

```
 1    consulted with you on this matter?              10:57:10
 2  A.  We may have had conversations subsequently    10:57:14
 3    that he did not bill. To be honest, I am        10:57:16
 4    not certain.                                    10:57:20
 5  Q.  But five hours of consultation would be       10:57:24
 6    within the realm of what you would have         10:57:27
 7    expected that he would have spent on that,      10:57:29
 8    on the engagement with you?                     10:57:31
 9  A.  I think that sounds reasonable, yes.          10:57:32
10  Q.  Why did you consult with Professor Frank?     10:57:42
11  A.  Professor Frank has significant experience    10:57:45
12    in looking at pharmaceutical promotion, in      10:57:49
13    particular, and its effects. As you may         10:57:53
14    know, he has a very long CV and some            10:58:03
15    important papers in the literature related      10:58:05
16    to pharmaceutical promotion.                    10:58:08
17  Q.  Did you rely on his advice for any of your    10:58:13
18    work or any of his conclusions?                 10:58:15
19  A.  No. The conclusions are my own. The work      10:58:17
20    is my own. We discussed it, again, as I         10:58:18
21    mentioned earlier, yes, in particular, the      10:58:22
22    theoretical underpinnings.                      10:58:24
23  Q.  Are there any particular parts of your        10:58:26
24    declaration that you would attribute more to    10:58:30
25    him than others?                                10:58:31
```

## Page 83

```
 1  A.  As I mentioned before, I recall a particular   10:58:32
 2    discussion about the theoretical                 10:58:37
 3    underpinnings and how to frame that most         10:58:41
 4    usefully in the document, but the work is my    10:58:43
 5    own.                                             10:58:47
 6  Q.  How did you generally communicate with        10:58:53
 7    Professor Frank on this engagement?              10:58:55
 8  A.  I believe that -- as you see here, I believe   10:58:57
 9    that he might have been in one of the early      10:59:01
10    face-to-face meetings, and then I spoke with     10:59:04
11    him on the phone.                                10:59:07
12  Q.  Would you have sent e-mail back and forth     10:59:10
13    with him on the subject of your engagement      10:59:12
14    in this matter?                                  10:59:14
15  A.  It's possible.                                 10:59:15
16  Q.  But it sounds like you wouldn't have e-mails   10:59:18
17    still from that time period on your system?     10:59:21
18  A.  I would not.                                   10:59:23
19  Q.  Would you have taken notes from any of your   10:59:24
20    meetings with him?                               10:59:31
21  A.  I don't believe so, no.                        10:59:32
22  Q.  Would you have taken notes more generally in  10:59:35
23    any of the other meetings that you had in       10:59:36
24    this matter either with counsel or with         10:59:39
25    others at Greylock McKinnon?                     10:59:41
```

## Page 84

```
 1  A.  I may have taken some notes to jog my memory   10:59:42
 2    about things to follow up on.                    10:59:45
 3  Q.  Do you still have them?                        10:59:47
 4  A.  I'm not sure.                                  10:59:50
 5  Q.  Have you looked for them?                      10:59:55
 6  A.  I looked for everything that I could find      10:59:57
 7    that was relevant to the case. I can't be        11:00:00
 8    certain that there's not a piece of              11:00:02
 9    notepaper somewhere, but I don't take            11:00:03
10    extensive notes.                                 11:00:05
11  Q.  You mentioned Dr. Frank, or Professor Frank,   11:00:09
12    by name in your declaration, correct --          11:00:15
13  A.  That's correct.                                11:00:19
14  Q.  -- in Paragraph 5 which is on Page 3?          11:00:20
15    Why did you decide to mention him in             11:00:25
16    the declaration but none of the other            11:00:27
17    individuals at Greylock McKinnon who appear      11:00:29
18    to have spent time on your report?               11:00:31
19  A.  Dr. Frank is -- Professor Frank, to be         11:00:33
20    consistent, is an expert in this area, and,      11:00:37
21    again, our discussions were at a pretty high    11:00:40
22    level, talking about the theory here which       11:00:44
23    is particularly relevant, and so I decided      11:00:49
24    to mention him because he was an important      11:00:51
25    source of information, just like looking at     11:00:53
```

## Page 85

```
 1    the literature.                                  11:00:56
 2  Q.  Was he a more important source for             11:01:04
 3    information than other folks with whom you      11:01:06
 4    might have consulted?                            11:01:10
 5  A.  I believe so. I believe he's a reference in    11:01:10
 6    and of himself just like the published           11:01:13
 7    literature is.                                   11:01:14
 8  Q.  The next name is Joshua Peteet?                11:01:16
 9  A.  P-E-T-E-E-T.                                   11:01:19
10  Q.  Thank you. Do you know Mr. Peteet?            11:01:21
11  A.  I do.                                          11:01:25
12  Q.  Did he work on your report?                    11:01:31
13  A.  I believe he's provided support, and I know    11:01:32
14    he's provided support over the subsequent        11:01:34
15    months in preparation, for example, for this     11:01:36
16    meeting.                                         11:01:42
17  Q.  What sorts of support would he have provided   11:01:43
18    in the subsequent months?                        11:01:45
19  A.  Again, finding additional documents, that      11:01:48
20    kind of thing.                                   11:01:51
21  Q.  If we could look at his time on Pages GMA84    11:02:03
22    and 85.                                          11:02:08
23  A.  Uh-huh.                                        11:02:13
24  Q.  He appears to have spent a fairly              11:02:13
25    substantial amount of time in July and into      11:02:16
```

## Page 86

1  August of 2005 on "Data analysis," as it's            11:02:19
2  described in these time records.                      11:02:26
3  A. Yes, I see that.                                   11:02:29
4  Q. Do you know what he was doing?                     11:02:31
5  A. I am not certain the scope of what he was          11:02:31
6  doing or what he calls "Data analysis." I             11:02:38
7  see the concordance training there, and I             11:02:43
8  wonder if that's about discovery documents.           11:02:45
9  I don't understand -- I have a sort of                11:02:50
10 limited knowledge about concordance, but --           11:02:52
11 Q. You're lucky.                                      11:02:54
12 A. So I'm not sure exactly. And, again,               11:02:56
13 because Professor Hartman also had a report           11:02:59
14 here, I don't know what of his time would             11:03:00
15 have been on my work. As I mentioned, there           11:03:04
16 was some data that came to us, as I                   11:03:10
17 mentioned in my declaration, from Tom                 11:03:13
18 Greene's office, and we looked at those               11:03:16
19 data. So maybe that is what the issue is.             11:03:18
20 Q. Which data are you referring to?                   11:03:24
21 A. National Disease and Therapeutic Index data        11:03:27
22 from IMS.                                             11:03:30
23 Q. Have you reviewed that data?                       11:03:38
24 A. I have.                                            11:03:40
25 Q. What sort of data is it?                           11:03:40

## Page 87

1  A. It's data that looks at prescriptions of           11:03:41
2  Neurontin by diagnosis.                               11:03:45
3  Q. I'll ask you more about it later. Do you           11:04:01
4  know whether it's been produced in response           11:04:03
5  to your subpoena to the defendants?                   11:04:05
6  A. The data were in the Franklin documents, is        11:04:09
7  my understanding.                                     11:04:12
8  Q. Okay.                                              11:04:13
9  A. They are not data that we produced                 11:04:16
10 ourselves. We reviewed something, again,              11:04:18
11 that was from the prior case.                         11:04:20
12 Q. You also testified that when Mr. Peteet            11:04:34
13 helped you prepare for "this meeting," you            11:04:39
14 meant this deposition by "this meeting,"              11:04:42
15 correct?                                              11:04:44
16 A. That's correct.                                    11:04:44
17 Q. Did he give you any new materials that you         11:04:45
18 hadn't seen before in preparation for this            11:04:47
19 deposition?                                           11:04:49
20 A. No, I don't believe he give me any new             11:04:51
21 materials. He looked back at -- helped me             11:04:53
22 search through the documents that would have          11:04:57
23 been in -- footnoted here, the Bates-                 11:05:00
24 numbered documents that would have been               11:05:04
25 footnoted in my declaration.                          11:05:04

## Page 88

1  Q. All right. And aside from the names that           11:05:13
2  we've just talked about, in addition to the           11:05:15
3  names that we discussed before, folks who             11:05:17
4  would have provided comments on your draft,           11:05:19
5  are there any other people who would have             11:05:21
6  worked with you on this engagement?                   11:05:23
7  A. I'm thinking back a year ago. Let me just          11:05:28
8  think about it for a minute. As far as I              11:05:30
9  know, this would be it. I believe that's              11:05:43
10 all.                                                  11:05:45
11 Q. Let's take a look back at the document that        11:06:02
12 has been marked as Rosenthal Exhibit 4. I             11:06:05
13 think that's the right number.                        11:06:07
14 A. Okay.                                              11:06:08
15 Q. It's the bigger stack of invoices.                 11:06:08
16 A. Okay. Okay.                                        11:06:11
17 Q. And if we could turn to the page that's been       11:06:16
18 marked GMA62.                                         11:06:18
19 A. Okay.                                              11:06:20
20 Q. This is one of your time entries, correct?         11:06:20
21 A. I believe it's a summary. I didn't prepare         11:06:27
22 this, so I believe it's a summary of my               11:06:30
23 time.                                                 11:06:32
24 Q. The description here for this period of            11:06:32
25 time, which appears to be December of 2005,           11:06:35

## Page 89

1  reads, "Review materials; meetings with               11:06:38
2  counsel" -- or "meeting with counsel and              11:06:43
3  case team."                                           11:06:45
4     Who would have comprised the case team             11:06:53
5  for purposes of this description?                     11:06:56
6  A. At that time I believe that it would have          11:07:02
7  included Oded Bizan. I believe he was still           11:07:04
8  there during that time period. That's July.           11:07:09
9  As well as Professor Hartman, Professor               11:07:13
10 Frank and then the staff, whoever was                 11:07:15
11 available. I can't be certain who would               11:07:21
12 have been at the meeting, but it might have           11:07:22
13 included either Mr. Augusteijn or Mr.                 11:07:24
14 Bechtel.                                              11:07:27
15 Q. The beginning of your answer you said "at          11:07:30
16 that time." Has the case team changed over            11:07:32
17 time?                                                 11:07:36
18 A. Again, Mr. -- Dr. Bizan is no longer at            11:07:36
19 Greylock McKinnon, and I believe he was in            11:07:42
20 on the -- some of those early meetings, as            11:07:44
21 certainly his time suggests. That's the               11:07:47
22 only real difference. You know, we haven't            11:07:50
23 met actively on this case in a while, as you          11:07:55
24 can see.                                              11:07:59
25 Q. So I asked you before about the specific           11:08:14

Page 90

```
1   prep binder that Greylock McKinnon prepared       11:08:17
2   in connection with your declaration.              11:08:21
3        MR. NOTARGIACOMO: Objection. I               11:08:23
4   don't -- I think you're mischaracterizing         11:08:25
5   her previous testimony.                           11:08:28
6 Q. All right. Do you recall testifying --           11:08:29
7        MR. NOTARGIACOMO: You can answer             11:08:30
8   the question.                                     11:08:31
9 Q. -- about a prep binder?                          11:08:32
10 A. A binder with backup materials --               11:08:34
11 Q. A backup binder, thank you.                     11:08:35
12 A. -- that linked to --                            11:08:35
13 Q. I was mischaracterizing.                        11:08:39
14 A. -- my declaration.                              11:08:39
15 Q. My apologies. It wasn't intentional.            11:08:40
16      Aside from the materials in the backup        11:08:43
17  binder, do you have a collection of case          11:08:45
18  materials?                                        11:08:46
19 A. I think the backup binder constitutes           11:08:48
20  everything that I have other than my              11:08:52
21  declarations.                                     11:08:55
22 Q. Would you have had copies of the documents      11:08:58
23  that are cited in your declaration prior to       11:09:00
24  their being assembled in the backup binder?       11:09:04
25 A. I certainly saw copies of all those             11:09:06
```

Page 91

```
1   documents as I was preparing my declaration.      11:09:08
2   Whether I had other hard copies around my         11:09:12
3   office, I can't say.                              11:09:15
4 Q. In what context would you have seen those        11:09:17
5   documents?                                        11:09:19
6 A. I would have reviewed them as relevant to        11:09:20
7   the particular issues that I was looking at.      11:09:24
8 Q. Would you have reviewed them at Greylock         11:09:26
9   McKinnon's offices or in your office?             11:09:29
10 A. It's likely that I would have reviewed them     11:09:30
11  at Greylock McKinnon's offices.                   11:09:32
12 Q. Would you have taken notes of those             11:09:33
13  documents?                                        11:09:36
14 A. Do you mean physically on the documents         11:09:36
15  themselves?                                       11:09:38
16 Q. Either physically on the documents              11:09:40
17  themselves or notes just to remind you of         11:09:42
18  what you saw for when you prepared your           11:09:45
19  declaration.                                      11:09:49
20 A. I don't believe so. I don't believe that I      11:09:49
21  took notes on those documents, no.                11:09:52
22 Q. I think we can set these to one side for        11:09:56
23  now. Have you communicated in any way with        11:10:02
24  either of the named individual plaintiffs in      11:10:06
25  this case?                                        11:10:08
```

Page 92

```
1 A. No, I have not.                                  11:10:08
2 Q. Have you communicated at all with their          11:10:09
3   doctors?                                          11:10:12
4 A. No, I have not.                                  11:10:13
5 Q. Have you communicated in any way with any       11:10:14
6   representatives of the named third-party          11:10:19
7   payer plaintiffs in this case?                    11:10:22
8 A. When you say "representatives," do you mean     11:10:24
9   other than counsel?                               11:10:26
10 Q. Yes, for now. Yes.                              11:10:27
11 A. No, I have not.                                 11:10:31
12 Q. You have obviously communicated with counsel    11:10:32
13  for plaintiffs generally in this case?            11:10:34
14 A. Yes, I have.                                    11:10:36
15 Q. Have you reviewed any documents that relate     11:10:36
16  specifically to either of the named               11:10:42
17  individual plaintiffs or their doctors?           11:10:44
18 A. No, I have not.                                 11:10:45
19 Q. So, for example, you wouldn't have seen         11:10:47
20  medical records for any of those -- for           11:10:49
21  either of the named individual plaintiffs?        11:10:52
22 A. No, I have not.                                 11:10:54
23 Q. Have you reviewed any documents that have       11:10:55
24  been provided to you by the third-party           11:11:00
25  payer plaintiffs?                                 11:11:03
```

Page 93

```
1 A. I do not believe I have reviewed any             11:11:04
2   documents provided by the third-party payer       11:11:09
3   plaintiffs. I'm sorry, it's just been a           11:11:12
4   little while since the detail work for this,      11:11:14
5   but I believe the answer is no.                   11:11:17
6 Q. Have you reviewed any transcripts of             11:11:20
7   testimony or depositions by any of the named      11:11:21
8   individual plaintiffs or their doctors?           11:11:24
9 A. No, I have not.                                  11:11:25
10 Q. How about for any of the named third-party      11:11:28
11  payer plaintiffs' representatives?                11:11:34
12 A. No, I have not.                                 11:11:37
13 Q. Now, in connection with your work in this       11:11:38
14  case, have you communicated with any class        11:11:42
15  members, as you understand them to be             11:11:46
16  defined for purposes of your report?              11:11:48
17 A. No, I have not.                                 11:11:49
18 Q. All right. This isn't the first time that       11:11:50
19  your deposition had been scheduled in this        11:11:57
20  case, correct?                                    11:11:59
21 A. That's correct. I believe it was scheduled      11:12:00
22  for January.                                      11:12:01
23 Q. What's your understanding for why the           11:12:03
24  deposition didn't go forward then as              11:12:05
25  scheduled?                                        11:12:07
```

Page 94

```
 1  A.  My understanding is that there was a legal         11:12:07
 2      issue that needed to be resolved before the        11:12:10
 3      case could go forward.                             11:12:13
 4  Q.  Do you have any understanding as to what the       11:12:13
 5      legal issue is or was?                             11:12:15
 6  A.  I do not.                                          11:12:16
 7  Q.  Are you familiar with a report and                 11:12:18
 8      recommendation that the magistrate judge in        11:12:26
 9      this case would have issued relating to the        11:12:28
10      defendants' motion to dismiss the                  11:12:30
11      complaints?                                        11:12:33
12  A.  I am familiar with it. I don't understand          11:12:34
13      the legal issues, though.                          11:12:36
14  Q.  Have you reviewed that report and                  11:12:37
15      recommendation?                                    11:12:40
16  A.  Not in detail. I believe I may have seen           11:12:40
17      it.                                                11:12:44
18  Q.  Have you had discussions with plaintiffs'          11:12:49
19      counsel about it?                                  11:12:52
20  A.  We have discussed the issue generally.             11:12:52
21      Again, I have such limited understanding I         11:12:55
22      couldn't relate to you what the issue was,         11:12:57
23      though.                                            11:12:59
24  Q.  When would you have discussed it with them?        11:12:59
25  A.  I would have discussed it with them when I         11:13:01
```

Page 95

```
 1      learned that the deposition was not to be in       11:13:03
 2      January and perhaps again when the                 11:13:07
 3      deposition was scheduled -- rescheduled.           11:13:11
 4  Q.  With whom would you have discussed it?             11:13:13
 5  A.  I believe it would have been Mr.                   11:13:16
 6      Notargiacomo.                                      11:13:18
 7  Q.  Do you remember anything about the substance       11:13:19
 8      of those conversations? Were they related          11:13:21
 9      to scheduling, or were they related to the         11:13:24
10      substance of the decision?                         11:13:25
11  A.  I believe most of the discussion was related       11:13:29
12      to scheduling.                                     11:13:31
13  Q.  You said "most of the discussion." Was any         11:13:35
14      part of the discussion related to something        11:13:38
15      other than scheduling?                             11:13:40
16  A.  Mr. Notargiacomo might have said something         11:13:42
17      about the decision that you referenced.            11:13:47
18  Q.  But it sounds like you don't recall                11:13:49
19      precisely what he said?                            11:13:51
20  A.  No, I don't.                                       11:13:53
21          MR. NOTARGIACOMO:  But it was                  11:13:53
22      brilliant.                                         11:13:54
23  A.  It was brilliant, and it went over my head.        11:13:55
24  Q.  I have no doubt. I have no doubt that it           11:13:58
25      was brilliant. I won't assume that it went         11:14:00
```

Page 96

```
 1      over your head or not.                             11:14:03
 2          Have you had discussions with Dr.              11:14:04
 3      Hartman about the magistrate judge's report        11:14:06
 4      and recommendation?                                11:14:08
 5  A.  I have not.                                        11:14:09
 6  Q.  Now, since that time are you aware that            11:14:10
 7      Judge Saris ruled on objections to the             11:14:17
 8      report and recommendation?                         11:14:20
 9  A.  I don't believe that I have knowledge of           11:14:23
10      this, no.                                          11:14:24
11  Q.  Okay. Are you aware that plaintiffs have          11:14:24
12      filed a new complaint in this action?              11:14:29
13  A.  Yes, I have seen a new amended complaint.          11:14:31
14  Q.  And so have you reviewed the new amended           11:14:35
15      complaint?                                         11:14:37
16  A.  I have.                                            11:14:38
17  Q.  The new amended complaint is obviously not         11:14:38
18      on the list of documents that you considered       11:14:47
19      that's attached as attachments to your             11:14:49
20      report in Exhibit 1. I would assume that it        11:14:51
21      should be on an updated list if one were to        11:14:54
22      be created?                                        11:14:57
23  A.  It should be, yes.                                 11:14:58
24  Q.  Are there other documents that you can think      11:14:59
25      of aside from the new complaint that should        11:15:01
```

Page 97

```
 1      be on such a list?                                 11:15:04
 2  A.  I can't, but I would have to look back over        11:15:05
 3      the last week. For the most part, I                11:15:09
 4      reviewed those documents that were cited in        11:15:14
 5      my declaration. I did review the new               11:15:15
 6      complaint. I believe that would be it, but         11:15:18
 7      I would need to check for sure.                    11:15:24
 8  Q.  Did you consider revising your report in          11:15:30
 9      view of the decision on the motion to              11:15:32
10      dismiss and/or the new complaint?                  11:15:34
11  A.  No, I did not. To the extent that I had a         11:15:35
12      discussion with the lawyers about the              11:15:41
13      decision, I was -- it was not indicated that       11:15:43
14      I should consider revising my report in            11:15:47
15      light of that decision.                            11:15:49
16  Q.  I assume that the topic wasn't raised as to       11:15:50
17      whether or not you would need to?                  11:15:55
18  A.  I believe it wasn't raised.                        11:15:56
19  Q.  And you didn't independently consider             11:15:59
20      whether you should or shouldn't revise your        11:16:01
21      declaration?                                       11:16:04
22  A.  In my view, this was a legal matter, and I        11:16:04
23      didn't see the relevance.                          11:16:09
24  Q.  I assume that you have no intention now of        11:16:18
25      submitting a revised report in connection          11:16:20
```

25 (Pages 94 to 97)


## Page 98

1   with your opinions on class certification?    11:16:24
2  A. That's correct, I have no intention.    11:16:26
3  Q. Now, you were also retained to offer similar    11:16:27
4   opinions in a case pending in Pennsylvania    11:16:37
5   as well?    11:16:39
6  A. That's correct.    11:16:39
7  Q. And will you understand if I refer to that    11:16:40
8   case as the Clark case?    11:16:44
9  A. I will if you tell me that's what it's    11:16:45
10   called.    11:16:48
11 Q. Fair enough. I'll tell you that's what it's    11:16:48
12   called --    11:16:51
13 A. Okay.    11:16:51
14 Q. -- just to make things easier. It's easier    11:16:52
15   to say "Clark" than "Pennsylvania." In    11:16:55
16   fact, you submitted a declaration -- you    11:16:56
17   submitted your declaration in this matter as    11:16:59
18   an attachment to your declaration -- to a    11:17:01
19   declaration that you submitted in the Clark    11:17:03
20   case; is that correct?    11:17:05
21 A. That's correct.    11:17:09
22 Q. When were you first retained in the    11:17:10
23   Pennsylvania case, the Clark case?    11:17:11
24 A. I don't know the exact date, but it would    11:17:13
25   have been not long after being retained in    11:17:16

## Page 99

1   this matter.    11:17:19
2  Q. Would it have been before or after you    11:17:23
3   actually submitted your declaration in this    11:17:27
4   case?    11:17:29
5  A. I'm sorry, I don't know the answer to that    11:17:29
6   question. I can check.    11:17:33
7  Q. Let me ask it another way. Would you have    11:17:34
8   had in mind the fact that the declaration    11:17:37
9   that you were preparing in this case would    11:17:39
10   then later be submitted in the Clark case    11:17:40
11   while you were preparing your declaration in    11:17:42
12   this case?    11:17:43
13 A. I don't believe so.    11:17:44
14 Q. How were you approached by counsel in the    11:17:45
15   Clark case to offer an opinion in that case?    11:17:52
16 A. I was approached through the counsel in this    11:17:56
17   case.    11:17:59
18 Q. Was that Mr. Notargiacomo?    11:18:03
19 A. I believe actually it was through Mr.    11:18:06
20   Greene's office.    11:18:08
21 Q. What did Mr. Greene say to you when he    11:18:16
22   approached you about it?    11:18:18
23 A. I'm not sure that the conversation -- the    11:18:19
24   original conversation was with me or with    11:18:21
25   Ms. Rushnawitz, so I don't know the exact    11:18:26

## Page 100

1   words of the conversation. I --    11:18:29
2  Q. That's fair. What's your best recollection    11:18:31
3   as to what the substance of the conversation    11:18:33
4   would have been?    11:18:35
5  A. I honestly don't know. I think the issue of    11:18:35
6   whether there would be any potential    11:18:46
7   conflict between being on both cases may be    11:18:50
8   what arose, but that's -- I have no    11:18:54
9   recollection really of the substance.    11:19:00
10 Q. Would Mr. Greene have suggested that you be    11:19:02
11   in touch with plaintiffs' counsel in the    11:19:05
12   Clark case?    11:19:07
13 A. He may have. I'm not certain.    11:19:07
14 Q. Have you ever discussed your work in the    11:19:17
15   Clark case with counsel for plaintiffs in    11:19:18
16   this matter?    11:19:20
17 A. I may have at some level.    11:19:21
18 Q. When you say "at some level," what do you    11:19:23
19   mean?    11:19:25
20 A. They would have been aware that I was on the    11:19:25
21   case. As you may know, the only thing    11:19:27
22   that's happened in that case is sort of,    11:19:32
23   again -- I haven't been deposed in that    11:19:35
24   case, for example, but I'm sure that they    11:19:37
25   know that I'm on the case.    11:19:42

## Page 101

1  Q. Would they have been aware that you would    11:19:44
2   have attached the declaration in this matter    11:19:47
3   as an attachment to your declaration in the    11:19:49
4   Clark matter?    11:19:52
5  A. They would have been aware of that, yes.    11:19:53
6  Q. Would you have discussed that with him    11:19:54
7   specifically?    11:19:56
8  A. I may have. Again, not with Mr.    11:19:56
9   Notargiacomo, but maybe with Mr. Greene.    11:19:59
10 Q. Have your discussed your work in this case    11:20:05
11   with counsel in the Clark matter?    11:20:07
12 A. No, I have not.    11:20:08
13 Q. Did counsel in the Clark matter have    11:20:15
14   questions at all about your declaration as    11:20:17
15   it was submitted in this matter?    11:20:19
16 A. They -- so obviously the declaration itself    11:20:20
17   was submitted in that matter, so they saw    11:20:25
18   the declaration. We would have spoken about    11:20:27
19   that declaration.    11:20:29
20 Q. Would they have seen drafts of it before it    11:20:34
21   was finalized?    11:20:36
22 A. No, because in Pennsylvania the declaration    11:20:37
23   had already been finalized, as you know,    11:20:44
24   before it was -- so it had been finalized in    11:20:48
25   the MDL, and then it was submitted as an    11:20:51

## Page 102

1  attachment in Pennsylvania. They would not  11:20:55
2  have seen drafts.  11:20:57
3 Q. I assume you've never participated in joint  11:20:58
4  discussions with plaintiffs' counsel in  11:21:08
5  Clark and plaintiffs' counsel in this  11:21:10
6  matter?  11:21:12
7 A. No, I have not.  11:21:12
8 Q. Now, last November, November 2005, you  11:21:13
9  submitted a document in the Clark case that  11:21:24
10  was titled "Response to Defendants' Expert  11:21:26
11  Sara Fisher-Ellison, Declaration of Meredith  11:21:31
12  Rosenthal," correct?  11:21:34
13 A. That's correct. I was not sure that that  11:21:38
14  had been filed.  11:21:41
15 Q. Okay. But you did sign such a document; is  11:21:41
16  that right?  11:21:44
17 A. I did sign such a document, yes.  11:21:44
18 Q. And will you know what I mean if I refer to  11:21:46
19  this document as the Clark rebuttal?  11:21:49
20 A. Yes.  11:21:51
21 Q. Thank you. It's a little less of a  11:21:51
22  mouthful.  11:21:54
23     Why did you prepare the Clark  11:21:54
24  rebuttal?  11:21:57
25     MR. NOTARGIACOMO: I'm just going  11:21:57

## Page 103

1  to object to the line of questioning because  11:21:58
2  the rebuttal is not, I believe, within the  11:22:02
3  scope of the deposition notice per se, but  11:22:04
4  I'll allow her to answer the questions with  11:22:06
5  that objection on the record.  11:22:08
6 A. By the counsel in the Clark case I received  11:22:11
7  a report submitted by Sara Fisher-Ellison,  11:22:18
8  which was a response to my declaration and  11:22:23
9  Professor Hartman's declaration. And I  11:22:29
10  responded to that response. I was asked to  11:22:34
11  prepare a written response.  11:22:38
12 Q. Who asked you to prepare it?  11:22:41
13 A. Counsel in Clark.  11:22:42
14 Q. Did you communicate with counsel in this  11:22:48
15  case about your rebuttal report in the Clark  11:22:52
16  case?  11:22:53
17 A. No, I did not.  11:22:53
18 Q. Did you communicate with counsel in this  11:22:54
19  case about the fact that you were preparing  11:22:58
20  and signing a rebuttal in Clark in the first  11:23:00
21  instance?  11:23:04
22 A. I don't believe so. It was last year, so I  11:23:04
23  can't remember precisely. They're aware now  11:23:09
24  of this report, but at the time I don't  11:23:11
25  believe there was any communication with  11:23:13

## Page 104

1  them about this.  11:23:15
2 Q. Do you know how they're aware now of your  11:23:20
3  report?  11:23:22
4 A. I have discussed it with Mr. Notargiacomo  11:23:22
5  subsequently.  11:23:25
6 Q. Did you draft the rebuttal in the Clark case  11:23:30
7  in the same manner that you would have  11:23:32
8  prepared your declaration in this case that  11:23:34
9  we talked about?  11:23:36
10 A. Yes. I drafted it.  11:23:37
11 Q. Did you have some degree of involvement in  11:23:38
12  the preparation of your rebuttal declaration  11:23:44
13  in Clark by staff members at GMA?  11:23:46
14 A. Staff members, again, would have supported  11:23:50
15  it to the extent that there were any  11:23:53
16  references, for example, to find literature  11:23:55
17  to search, yes, so it would have been the  11:23:59
18  same process.  11:24:00
19 Q. Would you have communicated about your  11:24:04
20  rebuttal report with Dr. Hartman?  11:24:06
21 A. Yes, I would have.  11:24:08
22 Q. Would you have shared drafts with Dr.  11:24:10
23  Hartman?  11:24:11
24 A. Yes, I'm certain I shared at least one draft  11:24:11
25  with him.  11:24:15

## Page 105

1 Q. Would you have e-mailed him a draft the same  11:24:15
2  way we discussed before?  11:24:18
3 A. Yes.  11:24:19
4 Q. Would you have shared drafts -- excuse me,  11:24:19
5  withdrawn.  11:24:22
6     Would you have shared drafts with  11:24:22
7  others other than Dr. Hartman, drafts of the  11:24:25
8  Rosenthal rebuttal declaration in Clark?  11:24:28
9 A. I believe that I would have shared it with  11:24:30
10  Ms. Rushnawitz and then whichever staff I  11:24:34
11  was working with at the time, which -- and,  11:24:37
12  again, there's often delegation, so...  11:24:41
13 Q. Do you know if those drafts still exist?  11:24:43
14 A. I don't know if those drafts still exist.  11:24:52
15  They do not on my computer.  11:24:56
16     MR. POLUBINSKI: Okay. We're going  11:25:08
17  to mark a new exhibit.  11:25:09
18     (Exhibit No. 8, Expert Declaration  11:25:10
19  of Raymond S. Hartman in Support of  11:25:10
20  Plaintiffs' Motion for Class Certification,  11:25:10
21  marked for identification.)  11:25:31
22     MR. NOTARGIACOMO: What number are  11:25:31
23  we up to?  11:25:32
24     THE WITNESS: 8.  11:25:33
25 Q. All right. So we've handed you what is  11:25:39

## Page 106

1  marked as Rosenthal Exhibit 8, which is the    11:25:41
2  Expert Declaration of Raymond S. Hartman in    11:25:45
3  Support of Plaintiffs' Motion For Class    11:25:48
4  Certification.    11:25:50
5  A. I see that. Thank you.    11:25:52
6  Q. You are aware that Dr. Hartman submitted a    11:25:54
7  declaration in this case?    11:25:58
8  A. Yes, I am.    11:25:58
9  Q. And Dr. Hartman is the president of Greylock    11:25:59
10  McKinnon?    11:26:03
11 A. That's correct.    11:26:03
12 Q. Was it he that would have engaged you as an    11:26:03
13  academic affiliate at Greylock McKinnon?    11:26:08
14 A. Yes, that's correct.    11:26:11
15 Q. Was he involved at all in your decision to    11:26:11
16  work in this matter?    11:26:14
17 A. Could you explain what you mean by    11:26:15
18  "involved"?    11:26:17
19 Q. Did he have any input into your decision to    11:26:18
20  work on this matter?    11:26:27
21 A. I don't believe so. I believe there was a    11:26:28
22  meeting again that we discussed earlier    11:26:34
23  where Mr. Sobol and Mr. Greene presented the    11:26:37
24  history of the case.    11:26:39
25 Q. Was Dr. Hartman at the meeting?    11:26:41

## Page 107

1  A. Dr. Hartman would have been at the meeting.    11:26:43
2  Q. Did Dr. Hartman arrange the meeting?    11:26:45
3  A. The meeting was at Greylock McKinnon. Dr.    11:26:49
4  Hartman arranged -- he did. He would have    11:26:54
5  arranged the meeting, that's right, yes.    11:26:58
6  Q. Did you speak with him about the case before    11:27:02
7  you spoke with Mr. Sobol and Mr. Greene? By    11:27:05
8  "him" I mean Dr. Hartman.    11:27:08
9  A. It's possible that we had an early    11:27:10
10  conversation about it, yes.    11:27:11
11 Q. To what extent was he involved in the    11:27:18
12  preparation of your declaration in the case?    11:27:21
13 A. To what ex -- Dr. Hartman, as we've    11:27:23
14  discussed, reviewed a draft, maybe two.    11:27:25
15 Q. Would you say that he edited your    11:27:34
16  declaration?    11:27:36
17 A. No, I would not say that.    11:27:36
18 Q. Let's look back at this document, the number    11:27:43
19  of which unfortunately I failed to write    11:27:47
20  down. I believe it's Exhibit 8.    11:27:52
21 A. Did you say 8?    11:27:57
22 Q. 8, I think.    11:27:58
23       MR. NOTARGIACOMO: That's Dr.    11:27:58
24  Rosenthal's report.    11:27:59
25 A. That's okay. I can find it.    11:27:59

## Page 108

1  Q. It's Rosenthal Exhibit 7 --    11:28:01
2  A. Okay.    11:28:01
3  Q. -- just so we're clear. And if we could    11:28:03
4  flip to -- well, we don't have to flip    11:28:03
5  anywhere, we can just look at the first    11:28:07
6  page --    11:28:08
7  A. Yeah.    11:28:08
8  Q. -- which is GMA75?    11:28:08
9  A. Yes, I see it.    11:28:13
10 Q. If I could direct your attention to the    11:28:14
11  entry for August 1st, 2005?    11:28:18
12 A. Yes, I see it.    11:28:22
13 Q. The description in the entry reads, "Edit    11:28:23
14  and finalize Hartman declaration; edit    11:28:28
15  Rosenthal declaration."    11:28:31
16 A. Yes, I see --    11:28:33
17 Q. Did I read that correctly?    11:28:34
18 A. Yes, you read that correctly.    11:28:35
19 Q. Now, it's not clear to me at least when he    11:28:37
20  did this, based on this document alone, but    11:28:39
21  I guess my assumption would be that it    11:28:45
22  appears to cover time from August 1st    11:28:47
23  through August 31st of 2005, that he would    11:28:50
24  have done this work in August. Does this    11:28:54
25  make sense to you?    11:28:56

## Page 109

1  A. That appears to be true, yes.    11:28:57
2  Q. And that just given the nature of what he's    11:28:58
3  working on and the fact that both    11:29:00
4  declarations were signed on August 8th, that    11:29:02
5  the work that he's referring to here would    11:29:05
6  have been done sometime approximately in the    11:29:07
7  first week of August?    11:29:09
8  A. That seems like a fair assumption.    11:29:10
9  Q. And the total amount of time that's    11:29:12
10  associated with this entry appears to be 24    11:29:15
11  hours?    11:29:18
12 A. That's correct.    11:29:18
13 Q. Now, one of the -- one piece of Dr.    11:29:19
14  Hartman's description here is "edit    11:29:29
15  Rosenthal declaration"?    11:29:31
16 A. I see that's the way he puts it, yes.    11:29:33
17 Q. When you say "that's the way he puts it," do    11:29:35
18  you take issue with the description?    11:29:38
19 A. Well, "edit" sounds a little more proactive.    11:29:39
20  I believe he reviewed the document, and he    11:29:42
21  puts his comments in redline.    11:29:45
22 Q. And the redline would have been sent back to    11:29:49
23  you by e-mail, I take it?    11:29:51
24 A. I believe that would be the case.    11:29:52
25 Q. Do you know if he did this once or more than    11:29:54

**110**

1  once?  11:29:56
2  A.  I don't know. I would think only once.  11:29:56
3  Q.  Now, you mentioned before, I think, and if  11:30:08
4      I'm mischaracterizing your testimony in any  11:30:11
5      way, feel free to correct me, but I think  11:30:13
6      you mentioned before that he had suggested  11:30:15
7      that you expand descriptions or provide more  11:30:17
8      examples in the empirical section of your  11:30:20
9      report.  11:30:22
10 A.  That's right.  11:30:24
11 Q.  Am I getting it right?  11:30:25
12 A.  Yes, that's correct.  11:30:26
13 Q.  Can you be any more specific about the ways  11:30:27
14     he suggested that you do those things?  11:30:29
15 A.  Specifically around expressing those  11:30:31
16     equations and all the variations in how the  11:30:33
17     models might be estimated, so there's quite  11:30:39
18     a lot of description in that section, as you  11:30:41
19     see now, about the different considerations  11:30:43
20     about variables to include, about the way  11:30:46
21     that the time patterns of promotional  11:30:51
22     effects would be modeled specifically.  11:30:54
23 Q.  Did he suggest additional variables to  11:30:58
24     include that may not have been mentioned in  11:31:00
25     the original draft that you had sent to him?  11:31:01

**111**

1  A.  He may have suggested examples of additional  11:31:03
2      variables or categories.  11:31:07
3  Q.  Aside from the suggestions that he made to  11:31:15
4      you that we've just discussed about the  11:31:19
5      empirical section of your report, are there  11:31:22
6      other suggestions that he would have made in  11:31:24
7      the context of his providing comments?  11:31:25
8  A.  I'm sure there were other places. I can't  11:31:27
9      remember exactly what those comments were.  11:31:29
10     I remember specifically it was around  11:31:31
11     expanding the empirical section, but I don't  11:31:34
12     know that there weren't other comments.  11:31:37
13 Q.  Okay. And just to ask you once more, the  11:31:39
14     redlined markups that he would have sent  11:31:49
15     back to you, do you still have copies of  11:31:52
16     those?  11:31:53
17 A.  I wouldn't have copies of those. I would  11:31:54
18     have then decided which comments to act on  11:31:58
19     and done an edited version which became the  11:32:03
20     final version.  11:32:07
21 Q.  What would you have done with the copies?  11:32:09
22     Excuse me, withdrawn.  11:32:12
23     What would you have done with the  11:32:13
24     redline comments that he would have sent  11:32:14
25     you?  11:32:16

**112**

1  A.  They would essentially have been saved over.  11:32:16
2  Q.  When you say "saved over," what do you mean?  11:32:21
3  A.  Can I -- so if there's a comment, "Expand  11:32:26
4      this here, consider discussing X, Y and Z,"  11:32:30
5      I would have either decided not to or  11:32:35
6      decided to expand here, and then I would  11:32:37
7      have deleted the comment, revised, and it  11:32:39
8      would form a new saved document.  11:32:42
9  Q.  And so you would have taken the attachment  11:32:44
10     that he sent to you, used that attachment as  11:32:47
11     your working document and then saved over  11:32:49
12     the document that was saved on your system?  11:32:52
13 A.  Not necessarily. I may have gone to the --  11:32:54
14     back to the document that was in my system.  11:32:58
15 Q.  In which case what would have happened to  11:33:00
16     the attachment that he sent you?  11:33:03
17 A.  It just would have been deleted with the  11:33:04
18     rest of my e-mail.  11:33:07
19 Q.  Let's look again at Rosenthal Exhibit 7,  11:33:18
20     again at Page 75, GMA75.  11:33:22
21 A.  Uh-huh. Yes.  11:33:26
22 Q.  That's a time entry that's immediately above  11:33:26
23     the one we just discussed, the time entry  11:33:29
24     that begins on July 1st of 2005. The  11:33:31
25     description there reads, "Review documents;  11:33:34

**113**

1  write damage declaration; edit Frank-  11:33:37
2  Rosenthal white paper."  11:33:40
3      Did I read that correctly?  11:33:42
4  A.  That's correct.  11:33:43
5  Q.  Are you familiar with the Frank-Rosenthal  11:33:43
6      white paper that's referred to in this time  11:33:53
7      entry?  11:33:55
8  A.  That was an early draft of what became my  11:33:55
9      declaration. At the time it wasn't clear  11:33:58
10     who was going to take the lead on this work.  11:34:00
11 Q.  When you say "it wasn't clear who was going  11:34:03
12     to take the lead," do you mean as between  11:34:06
13     you and Professor Frank?  11:34:08
14 A.  That's correct.  11:34:10
15 Q.  Who drafted the Frank-Rosenthal white paper  11:34:10
16     such as it is?  11:34:12
17 A.  I did.  11:34:13
18 Q.  Would Professor Frank have provided comments  11:34:14
19     on that document?  11:34:21
20 A.  Ultimately. When it was drafted, he was in  11:34:22
21     Europe.  11:34:25
22 Q.  So to what extent -- was it truly a Frank-  11:34:30
23     Rosenthal white paper and not just a  11:34:33
24     Rosenthal white paper?  11:34:35
25 A.  Originally it was just a Rosenthal white  11:34:36

## Page 114

1  paper.                                            11:34:39
2 Q. Now, again, it appears that Dr. Hartman has     11:34:40
3     indicated here that he edited the Frank-       11:34:42
4     Rosenthal white paper?                         11:34:45
5 A. Yes.                                            11:34:46
6 Q. Do you know what he was doing?                  11:34:50
7 A. Again, he would have provided redline           11:34:51
8     comments.                                      11:34:54
9 Q. Now, do you recall that Professor Frank was     11:34:59
10    in Europe at the time you were drafting        11:35:00
11    this -- well, withdrawn.                       11:35:02
12       The drafting, I take it, for this           11:35:06
13    portion of -- or this early draft of your      11:35:08
14    report would have taken place in July or       11:35:10
15    possibly sometime before that?                 11:35:12
16 A. I believe that's right. We could look at my    11:35:13
17    time to confirm that.                          11:35:15
18 Q. If you would like to do that, you can.         11:35:16
19 A. Okay.                                          11:35:18
20       MR. NOTARGIACOMO: 4?                        11:35:30
21 A. Again, that's one that's a nice sum --         11:35:30
22 Q. Thank you. I've lost track. 6, Rosenthal       11:35:34
23    6?                                             11:35:36
24 A. Right. So that's -- oh, there's typos.         11:35:37
25    This should all be July, that's right. Yes.    11:35:40

## Page 115

1 Q. So the Frank-Rosenthal white paper he refers    11:35:47
2     to would presumably be the draft report that   11:35:50
3     appears on Rosenthal Exhibit 6 that you        11:35:53
4     began drafting on June 20 -- or July 27th?     11:35:55
5 A. That's correct.                                 11:35:58
6 Q. And then as you said the fact that it reads    11:35:58
7     June 27th on Rosenthal 6 is a typographical    11:36:02
8     error and that it should read July 27th?       11:36:06
9 A. Yes, that's correct.                            11:36:08
10 Q. So it sounds like you would have sent an       11:36:09
11    initial draft of your report to Dr. Hartman   11:36:16
12    at some point in July of 2005?                 11:36:20
13 A. Yes, that's right.                             11:36:22
14 Q. And that he would have -- you would have       11:36:22
15    sent it to him by e-mail, I take it?           11:36:27
16 A. I believe so, yes.                             11:36:29
17 Q. And he would have provided comments to you    11:36:30
18    in the same way we just discussed, in the      11:36:32
19    form of a redlined markup?                     11:36:35
20 A. That's correct.                                11:36:37
21 Q. Do you still have a copy of that redline?      11:36:37
22 A. I don't believe I do. I believe I submitted    11:36:39
23    everything I have.                             11:36:41
24 Q. To what extent were you involved in the        11:36:48
25    preparation of Dr. Hartman's declaration in    11:36:50

## Page 116

1     this case, which we've marked as Rosenthal    11:36:53
2     Exhibit 8?                                    11:36:55
3 A. I would have given him comments in the same    11:36:58
4     manner that he gave me comments on my         11:37:01
5     document.                                     11:37:03
6 Q. Which is to say he would have e-mailed you     11:37:05
7     copies of his draft?                          11:37:07
8 A. I believe that's how it would have happened    11:37:09
9     is by e-mail, yes.                            11:37:11
10 Q. And that you would have returned to him a     11:37:13
11    redlined markup?                              11:37:16
12 A. It's possible that we would have spoken just  11:37:18
13    by phone and we would have walked through     11:37:21
14    it. It would depend on how extensive my       11:37:23
15    comments were.                                11:37:25
16 Q. Can you remember one way or the other         11:37:25
17    whether you would have sent in redlined       11:37:27
18    markups in this case?                         11:37:29
19 A. I cannot.                                     11:37:30
20 Q. Do you know how far in advance of August 8th  11:37:30
21    you would have seen a draft of his -- an      11:37:36
22    initial draft of his report?                  11:37:38
23 A. I do not. Again, I could check my hours,      11:37:39
24    but I don't know how far in advance.          11:37:43
25 Q. Would you like to check your hours and see    11:37:47

## Page 117

1     if they help you in that at all?              11:37:50
2 A. It doesn't specifically mention that, so I     11:37:52
3     don't always provide a lot of detail in       11:37:55
4     there, so I can't tell.                       11:37:56
5 Q. Do you remember anything about the substance   11:38:01
6     of the comments that you would have provided  11:38:02
7     to Dr. Hartman on his declaration?            11:38:03
8 A. I do not, no. I'm sorry.                       11:38:06
9 Q. Do you remember whether he would have          11:38:10
10    accepted your comments?                       11:38:14
11 A. I do not remember that, no.                   11:38:15
12 Q. And just circling back to your Clark          11:38:21
13    rebuttal, was Dr. Hartman involved at all in  11:38:24
14    your decision to prepare the Clark rebuttal?  11:38:26
15 A. In the decision as to whether to write a      11:38:30
16    written response?                             11:38:32
17 Q. Yes.                                          11:38:33
18 A. I don't recall if he was involved in that     11:38:33
19    decision.                                     11:38:37
20 Q. Would he have been involved in the            11:38:37
21    preparation of the declaration itself?        11:38:39
22 A. Again, in that case I would have shown him a  11:38:41
23    draft. He would have made comments.           11:38:44
24 Q. Okay. And you would have shown him the        11:38:46
25    draft, and you would have received comments   11:38:49

30 (Pages 114 to 117)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                              516-608-2400

## Page 118

1  in the same mechanical way that we've been  11:38:50
2  describing?  11:38:53
3  A.  Yes, that's correct.  11:38:54
4  Q.  Which is to say that you would send him a  11:38:54
5  draft by e-mail, he would send back to you a  11:38:57
6  marked-up redlined version of the draft by  11:39:00
7  e-mail?  11:39:02
8  A.  Usually that's the way it happens.  11:39:02
9  Sometimes, again, he would make oral  11:39:06
10  comments by phone.  11:39:07
11 Q.  What did you do to prepare for this  11:39:08
12  deposition?  11:39:11
13 A.  I reviewed the new complaint, as I  11:39:11
14  mentioned. I reviewed my declaration and  11:39:15
15  the supporting documents. I reviewed  11:39:18
16  Professor Fisher-Ellison's rebuttal and my  11:39:27
17  response.  11:39:30
18 Q.  In the Clark case, I take it?  11:39:31
19 A.  In the Clark case.  11:39:32
20 Q.  Anything else?  11:39:35
21 A.  I met with Mr. Notargiacomo.  11:39:36
22 Q.  Did you meet with anybody else?  11:39:45
23 A.  The gentleman on the phone, Mr. Goldser.  11:39:46
24 Q.  When did you first meet with them?  11:39:51
25 A.  We met last --  11:39:54

## Page 119

1  Q.  In the context of your preparation for this  11:39:56
2  deposition?  11:39:59
3  A.  Sorry. We met last week.  11:39:59
4  Q.  Did you meet once or more than once?  11:40:01
5  A.  We met once.  11:40:03
6  Q.  For how long, approximately?  11:40:04
7  A.  For half a day, approximately, four hours.  11:40:06
8  Q.  Was Dr. Hartman present for that meeting?  11:40:10
9  A.  No, he was not.  11:40:15
10 Q.  Was anybody else present other than Mr.  11:40:16
11  Notargiacomo and Mr. Goldser?  11:40:20
12 A.  No.  11:40:23
13 Q.  What was the subject matter of your  11:40:23
14  discussions at the meeting?  11:40:24
15 A.  The subject matter related to what issues we  11:40:25
16  were likely to concentrate on, but  11:40:30
17  essentially that's sort of what seemed to be  11:40:36
18  the issues that defendants were likely to  11:40:39
19  fix on.  11:40:41
20 Q.  Did you prepare at all last winter for your  11:40:43
21  deposition when it was first scheduled?  11:40:46
22 A.  I would have to look at my time sheets. I  11:40:48
23  believe it was canceled fairly far in  11:40:54
24  advance of the deposition itself, but I'm  11:40:56
25  afraid that that's too far back for me to  11:40:58

## Page 120

1  recall precisely.  11:41:03
2  Q.  Fair enough. You had mentioned that you had  11:41:03
3  reviewed documents in preparation for your  11:41:06
4  deposition; is that correct?  11:41:08
5  A.  That's correct.  11:41:09
6  Q.  Who would have selected the documents that  11:41:10
7  you used to prepare?  11:41:12
8  A.  The documents that I looked at came -- for  11:41:13
9  the most part, I believe, all of them are  11:41:18
10  those documents that are cited in my  11:41:20
11  declaration, and those came -- I understand  11:41:23
12  that the GMA staff got those out of the  11:41:26
13  Franklin case, the documents in Franklin.  11:41:31
14  So I would say, you know, "Are there  11:41:34
15  promotional documents?", and they would find  11:41:37
16  documents.  11:41:41
17 Q.  Okay. Now, what you're just describing is  11:41:41
18  how documents were selected when you  11:41:43
19  initially prepared your declaration --  11:41:45
20 A.  Right.  11:41:47
21 Q.  -- in this case; is that right? Okay.  11:41:47
22  I'm talking more just about the  11:41:49
23  preparation, your deposition preparation  11:41:51
24  that you did. I take it for that did you  11:41:52
25  select documents yourself, or did -- or were  11:41:54

## Page 121

1  they provided to you by somebody else?  11:41:57
2  A.  Again, in the last week I have asked the  11:41:59
3  staff in a couple of cases, "Can you find me  11:42:04
4  a document that has this in it?", and then  11:42:08
5  they would have looked in concordance to.  11:42:10
6  I'm not sure if those documents go outside  11:42:13
7  of my declaration. I would have to check  11:42:15
8  the Bates numbers, but they're largely these  11:42:16
9  kinds of promotional documents that are  11:42:19
10  similar to the ones that are cited in my  11:42:21
11  declaration. So the staff at GMA would have  11:42:23
12  produced them.  11:42:25
13 Q.  Okay. And then aside from the new complaint  11:42:25
14  and Professor Fisher-Ellison's declaration,  11:42:31
15  are there any materials that you recall  11:42:36
16  reviewing that would not have been listed as  11:42:37
17  documents that you considered in your  11:42:41
18  declaration?  11:42:43
19  MR. NOTARGIACOMO: I'm going to  11:42:46
20  object to the question as I don't understand  11:42:47
21  it, but if she does, she can answer it.  11:42:50
22  MR. POLUBINSKI: Let me try it  11:42:52
23  again.  11:42:53
24 Q.  It sounds like some of the documents that  11:42:55
25  you reviewed in preparation for your  11:42:57

## Page 122

1  deposition today are documents that you           11:42:59
2  would have listed as documents you                11:43:01
3  considered when you first wrote the               11:43:03
4  declaration in the case, correct?                 11:43:05
5  A. That's correct.                                11:43:06
6  Q. There are -- you also reviewed the new         11:43:06
7  complaint in the case, correct?                   11:43:11
8  A. That's correct.                                11:43:12
9  Q. Which is not listed --                         11:43:13
10 A. That's correct.                                11:43:14
11 Q. -- in your report?                             11:43:14
12     You also reviewed Professor Fisher-           11:43:16
13 Ellison's report in the Clark case which is       11:43:19
14 also not listed as a document that you've         11:43:20
15 considered in your declaration in this case,      11:43:22
16 correct?                                          11:43:24
17 A. Yes, that's correct.                           11:43:24
18 Q. Other than those two documents, the new        11:43:25
19 complaint, Professor Fisher-Ellison's             11:43:29
20 report, are there any other documents that        11:43:31
21 you reviewed in your preparation for this         11:43:32
22 deposition that do not appear as documents        11:43:34
23 that you've considered in your declaration?       11:43:37
24 A. I don't believe there's anything else.         11:43:39
25 Q. Okay.                                          11:43:41

## Page 123

1      MR. POLUBINSKI: Let's mark the                11:43:54
2  next exhibit.                                     11:43:55
3      (Exhibit No. 9, Notice of                     11:43:55
4  Deposition, marked for identification.)           11:44:16
5  Q. I'm handing you a document that we've marked   11:44:16
6  as Rosenthal Exhibit 9. I assume that             11:44:18
7  you've seen this before?                          11:44:27
8  A. I have seen this before.                       11:44:27
9  Q. If you look three pages into the document,     11:44:33
10 you'll see the subpoena pursuant to which         11:44:36
11 you're testifying today, correct?                 11:44:39
12 A. That's correct.                                11:44:41
13 Q. Now, the subpoena also requests documents      11:44:41
14 from you; is that right?                          11:44:45
15 A. That's correct.                                11:44:47
16 Q. And you were aware of that, right?             11:44:48
17 A. I was aware of that.                           11:44:50
18 Q. What, if anything, did you do to locate the    11:44:51
19 documents that are described in the document      11:44:59
20 request?                                          11:45:01
21 A. The document request was responded to by       11:45:01
22 Greylock McKinnon, obviously with my input,       11:45:03
23 but they pulled together the documents to        11:45:06
24 respond to this.                                  11:45:09
25 Q. Now, you mentioned that they did it with       11:45:11

## Page 124

1  your input?                                       11:45:13
2  A. Uh-huh.                                        11:45:14
3  Q. To what extent did you have input in that      11:45:14
4  process?                                          11:45:17
5  A. Well, again, the documents that are listed     11:45:18
6  in my declaration, that are referenced in my      11:45:23
7  declaration, I obviously made that list, so       11:45:26
8  that is the primary place where they drew         11:45:33
9  from in terms of the documents to be              11:45:36
10 produced. And I tried to be complete about        11:45:37
11 anything that I looked at for the                 11:45:41
12 declaration, and so I believe that that's         11:45:44
13 what was sent, unless it was publicly             11:45:47
14 available and then they traditionally don't       11:45:49
15 send those publicly available documents.          11:45:51
16 Q. So am I right that the extent of your input    11:45:53
17 into the process of searching for the             11:45:56
18 documents would have been your having put         11:45:58
19 together the list of documents that you           11:46:00
20 considered when you first wrote the               11:46:01
21 declaration; is that correct?                     11:46:03
22 A. That's correct.                                11:46:04
23 Q. Did you do anything else specifically to       11:46:04
24 assist people at GMA, Greylock McKinnon, in       11:46:07
25 responding to the documentary portion of          11:46:12

## Page 125

1  your subpoena?                                    11:46:14
2  A. Again, I would have -- I looked to see if I    11:46:15
3  had drafts, which I did not, to produce, so       11:46:17
4  what was on my hard drive.                        11:46:22
5  Q. Did you look for notes at all that I would     11:46:26
6  have taken?                                       11:46:28
7  A. I did look for notes, but -- yes.              11:46:28
8  Q. Did you look through your office for any       11:46:31
9  other materials that you might have had in        11:46:33
10 connection with this case?                        11:46:36
11 A. I did, and I don't have any other documents    11:46:36
12 in my office that I could locate.                 11:46:41
13 Q. And that includes -- well, just to circle      11:46:44
14 back to the last question, I take it you          11:46:46
15 didn't find notes when you looked for them?       11:46:49
16 A. I didn't find notes, no.                       11:46:51
17 Q. All right. We've been talking about            11:47:12
18 Attachment A.2 to your declaration, which is      11:47:13
19 Exhibit 1, which is described as "Documents       11:47:15
20 Relied Upon." Do you see that?                    11:47:20
21 A. I do see that.                                 11:47:28
22 Q. Now, aside from -- well, let me just ask it    11:47:29
23 more cleanly. Have you since -- since the         11:47:35
24 time you prepared this, sometime on or prior      11:47:40
25 to August 8th, 2005, have you since reviewed      11:47:43

## Page 126

1  other documents that you would include on   11:47:46
2  this list if you were to prepare it from   11:47:49
3  scratch?   11:47:52
4      MR. NOTARGIACOMO: Objection. I   11:47:54
5  think it's been asked and answered twice,   11:47:55
6  but I'll let her answer it again.   11:47:58
7  A.  I would add the Fisher-Ellison rebuttal and   11:47:59
8  my response to it, I guess, would count as   11:48:03
9  reviewing. And I would add the new amended   11:48:07
10 complaint.   11:48:14
11 Q. Anything else?   11:48:15
12 A.  I don't believe so.   11:48:16
13 Q. Okay. Who selected the legal documents that   11:48:17
14 appear listed as "Legal Documents" on the   11:48:26
15 first page of Attachment A.2 of Exhibit 1?   11:48:31
16 A.  I was provided these documents by counsel.   11:48:37
17 I don't know if you -- what you mean by   11:48:40
18 "selected," but I was provided all of those   11:48:42
19 documents.   11:48:44
20 Q. Did you have any input into the documents --   11:48:49
21 I'll withdraw the question.   11:48:56
22     Who selected for your review the   11:48:57
23 document -- who decided to put the -- well,   11:49:01
24 let me withdraw both of those questions.   11:49:03
25     Who selected the documents listed as   11:49:07

## Page 127

1  Bates-numbered documents for inclusion in   11:49:11
2  this list?   11:49:12
3  A.  That would have been the staff at GMA.   11:49:14
4  Q. Would you have had any input into the   11:49:15
5  specific documents that are listed here?   11:49:18
6  A.  I would have given direction about the topic   11:49:19
7  areas, the keywords to look for.   11:49:22
8  Q. Did you review all the documents yourself   11:49:34
9  that are listed here under "Bates-numbered   11:49:36
10 documents"?   11:49:40
11 A.  I have seen all these documents, yes.   11:49:41
12 Q. Have you seen documents other than the ones   11:49:43
13 that are listed here?   11:49:45
14 A.  I may have seen other documents that I then   11:49:46
15 did not rely on.   11:49:48
16 Q. How many other documents? Do you have a   11:49:54
17 rough sense?   11:49:56
18 A.  I don't.   11:49:56
19 Q. Would it have been more than the total   11:50:03
20 number of documents that are listed here   11:50:05
21 under "Bates-numbered documents" or less or   11:50:06
22 about the same?   11:50:10
23 A.  I'm sorry, I really don't know. This was   11:50:11
24 over a year ago.   11:50:14
25 Q. Did you rely at all on Mr. King or anybody   11:50:31

## Page 128

1  else at Greylock McKinnon for selection of   11:50:34
2  marketing documents?   11:50:36
3  A.  Mr. King may have been involved in   11:50:37
4  identifying the documents. That is   11:50:42
5  possible.   11:50:44
6  Q. Were there any materials that you requested   11:50:52
7  from anybody at Greylock McKinnon or from   11:50:54
8  counsel that you didn't receive?   11:50:56
9  A.  No.   11:50:59
10 Q. Any categories of materials that you would   11:50:59
11 have wanted to see that you weren't able to   11:51:01
12 see?   11:51:03
13 A.  No.   11:51:03
14 Q. Okay.   11:51:04
15     MR. NOTARGIACOMO: I've lost track   11:51:20
16 of time, but it might be a good time for a   11:51:22
17 break whenever --   11:51:25
18     MR. POLUBINSKI: I was going to say   11:51:25
19 this isn't a bad time for a break. It's   11:51:26
20 about five minutes to 12:00 if my watch is   11:51:28
21 right. Maybe we can take a short break and   11:51:31
22 then come back and work a little bit and   11:51:34
23 then break for lunch sometime around a   11:51:37
24 quarter of 1:00 or 1:00. Does that sound   11:51:39
25 good?   11:51:40

## Page 129

1      MR. NOTARGIACOMO: Yes. It's just   11:51:40
2  that I have a very short ten-minute   11:51:40
3  conference call I need to be on at 2:30. So   11:51:41
4  if we could break at 2:30, it's a natural   11:51:44
5  place.   11:51:47
6      MR. POLUBINSKI: Okay. We should   11:51:48
7  be able to do that, and maybe what we'll do   11:51:48
8  is if we can be back soon, we can try to --   11:51:48
9  we'll break a little earlier for lunch so   11:51:48
10 that we don't have -- we can go off the   11:51:50
11 record now.   11:51:53
12     THE VIDEOGRAPHER: The time is   11:51:53
13 11:52. This is the end of Tape 2, and we   11:51:54
14 are off the record.   11:51:57
15     (Recess taken.)   11:51:58
16     THE VIDEOGRAPHER: The time is   12:01:01
17 12:01 p.m. This is the beginning of Tape 3,   12:01:09
18 and we are back on the record.   12:01:11
19 BY MR. POLUBINSKI:   12:01:13
20 Q. All right. Professor Rosenthal, if you   12:01:13
21 could take a look, please, at Exhibit 1 to   12:01:21
22 your deposition, which is your declaration   12:01:24
23 in the case, and turn to Page 1 of the   12:01:24
24 declaration. Page 1 reads, very beginning   12:01:28
25 of the executive summary, "I have been asked   12:01:32

## Page 130

1  to analyze and determine whether consumers   12:01:35
2  and third-party payers who purchased or   12:01:37
3  reimbursed for Neurontin for indications not   12:01:40
4  approved by the Food and Drug Administration   12:01:42
5  (FDA) would have been and continue to be   12:01:45
6  impacted as a class and suffer economic   12:01:49
7  damages as a result of the violations   12:01:52
8  alleged in this matter."   12:01:54
9  Did I read that correctly?   12:01:56
10 A. Yes, you did.   12:01:57
11 Q. The violations alleged in this sentence,   12:01:59
12  violations alleged in this matter, that   12:02:03
13  refers to the allegations in the amended   12:02:05
14  complaint?   12:02:07
15 A. That's correct. Of course, at the time of   12:02:07
16  my writing, that was the complaint that was   12:02:11
17  then....   12:02:13
18 Q. Right. So looking again at this first   12:02:15
19  sentence, does this mean, then, that you set   12:02:18
20  out to analyze and determine whether   12:02:20
21  defendants' allegedly improper off-label   12:02:23
22  promotion did, in fact, impact consumers and   12:02:27
23  third-party payers as a class?   12:02:32
24 A. As I say there, "would have been impacted."   12:02:34
25  So whether there's economic theory and   12:02:37

## Page 131

1  evidence to support the idea that that   12:02:40
2  promotion would have caused damages if the   12:02:42
3  allegations were true.   12:02:46
4 Q. What does it mean to be impacted as a class?   12:02:49
5 A. Whether the consumers and third-party payers   12:02:51
6  would have been affected by a common   12:02:56
7  mechanism and in the same way.   12:02:59
8 Q. What do you mean by "in the same way"?   12:03:04
9 A. They -- the effect would have been similar   12:03:07
10  across the class; that is, they all -- in   12:03:10
11  this case they all would have consumed more   12:03:13
12  Neurontin than otherwise.   12:03:16
13 Q. Does this mean -- would that mean that each   12:03:23
14  member of the class, so each individual   12:03:26
15  who's a member of the class would have   12:03:28
16  somehow been impacted by defendants'   12:03:30
17  allegedly unlawful conduct, excuse me, or   12:03:32
18  does it mean something else?   12:03:34
19 A. It means that in the aggregate that the   12:03:35
20  class would have been affected in this way.   12:03:38
21  I'm not sure what you mean by "each member"   12:03:40
22  as opposed to all.   12:03:42
23 Q. Have you determined -- I guess another way   12:03:45
24  to put it is, have you determined that each   12:03:47
25  member of the class would have suffered some   12:03:48

## Page 132

1  sort of injury, some sort of economic injury   12:03:50
2  as a result of the conduct described in the   12:03:53
3  complaint?   12:03:55
4 A. Well, at this stage of what I've done here   12:03:55
5  is I have examined the economic theory and   12:03:58
6  evidence as to the effects of promotion as   12:04:04
7  it relates to the allegations in this case   12:04:10
8  and what effect that would have on class   12:04:12
9  members, that being consumers and third-   12:04:14
10  party payers, and their likelihood of   12:04:17
11  getting Neurontin for these off-label   12:04:19
12  indications. And so overall I've assessed   12:04:20
13  whether the class and all those included in   12:04:24
14  it would have been impacted, yes.   12:04:26
15 Q. I guess to expect to be able to determine,   12:04:29
16  to expect that you would determine using   12:04:33
17  your model that each member of the class,   12:04:35
18  each and every individual member of the   12:04:38
19  class would have suffered some economic   12:04:40
20  injury?   12:04:42
21 A. My understanding of what's appropriate in a   12:04:42
22  class matter like this is that I will do the   12:04:48
23  analysis at the aggregate level. This will   12:04:51
24  not be an issue where I'll look at every   12:04:55
25  individual class member.   12:04:57

## Page 133

1 Q. Okay. So in answer to the question, you do   12:04:58
2  not expect to do that analysis to determine   12:05:00
3  whether each individual member of the class   12:05:03
4  would have been injured?   12:05:05
5 A. I do not expect to analyze individual class   12:05:06
6  members, no.   12:05:09
7 Q. Do you anticipate that you conclude that   12:05:23
8  there are any members of the class that have   12:05:24
9  not suffered a loss of some kind, an   12:05:26
10  economic loss?   12:05:28
11  MR. NOTARGIACOMO: Objection. You   12:05:30
12  can answer.   12:05:31
13 A. Let me just -- can I think about the   12:05:31
14  question for a second?   12:05:33
15 Q. Of course.   12:05:34
16 A. I guess it would -- again, by definition   12:05:41
17  those in the class are individuals who   12:05:44
18  received Neurontin as a result of off-label   12:05:48
19  promotion, and so I anticipate that there --   12:05:52
20  this impact is common to all class members.   12:05:58
21 Q. This is taking things slightly out of the   12:06:01
22  order that I expected to do it, but can you   12:06:11
23  look at Paragraph 6 of your complaint -- not   12:06:13
24  your complaint, your declaration, excuse me.   12:06:17
25 A. Okay.   12:06:19

**Page 134**

1  Q. And it contains a definition of the class    12:06:19
2     there, correct?    12:06:22
3  A. Yes.    12:06:23
4  Q. Do you want to take a second to just read    12:06:26
5     it?    12:06:28
6  A. Yes, I see it. Yes.    12:06:29
7  Q. I think that you described to me the class    12:06:31
8     was only people who purchased Neurontin by    12:06:33
9     virtue of defendants' conduct, defendants'    12:06:36
10    off-label promotion just a second ago. Did    12:06:39
11    I understand your answer correctly?    12:06:42
12 A. Yes, and perhaps I misstated it. What I    12:06:44
13    have been asked to do is to at this stage    12:06:46
14    identify whether there would have been an    12:06:49
15    effect and a model for identifying how that    12:06:53
16    effect would play out in the class. So what    12:06:57
17    I've been asked to look at is only the    12:07:01
18    incremental off-label use that is due to the    12:07:03
19    allegations, and that would apply to this    12:07:06
20    class of those purchasing Neurontin for    12:07:09
21    off-label uses as a whole.    12:07:11
22 Q. So am I right that your model wouldn't    12:07:15
23    provide you with a way of identifying any    12:07:17
24    individuals, specific individuals, who would    12:07:19
25    have not suffered an economic loss?    12:07:23

**Page 135**

1  A. That's correct.    12:07:25
2  Q. All right. A related question, I guess, is    12:07:25
3     that you set out to analyze and determine    12:07:33
4     whether class members were impacted and    12:07:35
5     therefore suffered some amount of damages    12:07:37
6     as a result of the violations alleged in    12:07:40
7     this matter, correct?    12:07:42
8  A. That's correct.    12:07:46
9  Q. And then looking down in Paragraph 3 of your    12:07:46
10    executive summary on Page 1 of Exhibit 1 you    12:07:51
11    write, "There exists standard research    12:07:56
12    methods that may be applied to readily    12:07:59
13    available data to compute the quantity of    12:08:02
14    Neurontin purchased that was directly    12:08:04
15    induced by the allegedly illegal marketing    12:08:06
16    scheme."    12:08:08
17       Did I read that right?    12:08:09
18 A. Yes, you did.    12:08:11
19 Q. I'm assuming that your model would not    12:08:14
20    enable you to include -- conclude, rather,    12:08:18
21    that every class member suffered some harm    12:08:21
22    that was directly induced by the allegedly    12:08:23
23    illegal marketing scheme; is that correct?    12:08:27
24 A. My analysis will look at the class as a    12:08:29
25    whole and will not look at effects at the    12:08:32

**Page 136**

1     individual level. Is that my correct    12:08:34
2     understanding of your question?    12:08:38
3  Q. I think so. And so your model wouldn't    12:08:39
4     enable you to tell -- to determine whether a    12:08:44
5     particular given individual prescription was    12:08:48
6     written as a result of the conduct that's    12:08:51
7     described in the complaint?    12:08:55
8  A. Yes, that's correct.    12:08:56
9  Q. All right. Going back to the first sentence    12:08:56
10    and the term "violations alleged in this    12:09:12
11    matter," let's hold that phrase in mind.    12:09:15
12    And then look to the first sentence of the    12:09:19
13    second paragraph. Now, you also describe    12:09:22
14    there "unlawful conduct alleged in the    12:09:25
15    amended complaint."    12:09:28
16       Did I read that --    12:09:31
17 A. Yes.    12:09:31
18 Q. -- correctly?    12:09:32
19 A. Yes, you read that correctly.    12:09:32
20 Q. And then in the third paragraph, you    12:09:34
21    describe in the first sentence "wrongful    12:09:36
22    conduct"?    12:09:39
23 A. Yes, I see that.    12:09:39
24 Q. And then you also describe in the second    12:09:40
25    sentence, "the allegedly illegal marketing    12:09:43

**Page 137**

1     scheme"?    12:09:46
2  A. Yes, I see that.    12:09:48
3  Q. Those four terms, do you mean to use those    12:09:50
4     interchangeably for purposes of this    12:09:53
5     executive summary in your declaration?    12:09:54
6  A. Yes, I do.    12:09:56
7  Q. Okay. What makes a particular aspect of    12:09:58
8     defendants' conduct, so, for example, a    12:10:04
9     conversation between a sales representative    12:10:07
10    and a doctor, a violation for purposes of    12:10:08
11    your analysis?    12:10:11
12       MR. NOTARGIACOMO: Objection, calls    12:10:12
13    for a legal conclusion, but you can answer.    12:10:13
14 A. My understanding is that there are some    12:10:15
15    legal principles that apply to the    12:10:23
16    pharmaceutical company's provision of    12:10:26
17    information around the uses of its drugs,    12:10:29
18    and in the allegations there are claims    12:10:33
19    about misrepresentation of clinical findings    12:10:35
20    around those drugs and the like.    12:10:39
21 Q. I guess going back to Mr. Notargiacomo's    12:10:53
22    objection, do you understand the    12:10:56
23    determination as to whether something is or    12:10:59
24    isn't a violation to be a legal    12:11:01
25    determination?    12:11:03

**Page 138**

1  A. I do, yes.                                   12:11:03
2  Q. Do you have an understanding for how that    12:11:06
3     determination is going to be made?           12:11:09
4  A. Again, I don't understand all the legal      12:11:10
5     issues here. My sense from looking at the    12:11:15
6     allegations is that it's somewhat            12:11:18
7     complicated, but I understand -- my current  12:11:21
8     understanding and my understanding at the    12:11:24
9     time was that I would be given more specific 12:11:25
10    information about which individual           12:11:28
11    promotional activities would ultimately be a 12:11:32
12    subject of the damage analysis when it gets  12:11:37
13    to implementation stage.                     12:11:41
14 Q. And do you know who would be providing that  12:11:48
15    to you?                                      12:11:54
16 A. I would expect counsel to provide that to    12:11:54
17    me.                                          12:11:56
18 Q. So would you have any involvement in         12:11:56
19    determining whether a particular type of     12:11:58
20    conduct was unlawful or wrongful?            12:12:00
21 A. No, I would not.                             12:12:03
22 Q. Would you have any involvement in            12:12:04
23    determining whether a particular conduct --  12:12:05
24    piece of conduct was fraudulent?             12:12:08
25 A. No, I would not.                             12:12:09

**Page 139**

1  Q. Here's a question: Is it your understanding  12:12:11
2     that conduct that you characterize here as a 12:12:25
3     violation is the same thing as conduct that  12:12:28
4     would generate liability in this case? So    12:12:31
5     in other words, assuming -- and assuming     12:12:35
6     that it caused injury to a consumer or       12:12:37
7     third-party payer?                           12:12:40
8        MR. NOTARGIACOMO: Objection.              12:12:40
9  A. I am not sure I even would begin to know how 12:12:42
10    to answer that.                              12:12:46
11 Q. Okay. Let me think of a... You know, I'll    12:12:48
12    withdraw the question. That's fine.          12:12:55
13    Are there violations or wrongful             12:12:58
14    conduct that you can think of that would not 12:13:06
15    generate liability? I guess maybe that's     12:13:08
16    another way to put it.                       12:13:10
17       MR. NOTARGIACOMO: Objection.              12:13:11
18 A. I just -- that's such a broad question I'm   12:13:12
19    afraid I don't know how to answer it.        12:13:16
20 Q. Okay. I guess -- I think I'll withdraw that  12:13:17
21    one, too. It's probably not necessary.       12:13:27
22    Let me ask you about Dr. Hartman's           12:13:29
23    report. What's your understanding of how     12:13:41
24    your report interacts with Dr. Hartman's?    12:13:43
25 A. My understanding is that I am to look at     12:13:44

**Page 140**

1     issues of the class definition essentially,  12:13:48
2     issues of whether there was a common impact, 12:13:53
3     whether there are sort of economic           12:13:55
4     circumstances that explain that common       12:13:59
5     impact, and talk about estimating the        12:14:01
6     quantity of Neurontin that was prescribed as 12:14:07
7     a result of the allegedly fraudulent or      12:14:12
8     illegal, whatever the appropriate way to     12:14:18
9     describe it is, behavior. Then Dr. Hartman   12:14:20
10    would use those quantities to estimate       12:14:23
11    damages.                                     12:14:25
12 Q. So I guess, to boil it down, would it be     12:14:25
13    correct to say that Dr. Hartman's report     12:14:33
14    offers a methodology by which he would take  12:14:35
15    as an input your conclusions on class-wide   12:14:38
16    impact and then based on that input          12:14:42
17    calculate class-wide damages?                12:14:45
18 A. That's my understanding.                     12:14:48
19 Q. Dr. Hartman's doesn't -- or withdrawn.       12:14:51
20    Dr. Hartman's report doesn't reach an        12:14:54
21    independent conclusion as to class-wide      12:14:56
22    impact, does it?                             12:14:58
23       MR. NOTARGIACOMO: Objection. It's         12:14:59
24    beyond the scope. She didn't write Dr.       12:15:00
25    Hartman's report, and she's not here to      12:15:01

**Page 141**

1     testify about Dr. Hartman's report. But      12:15:03
2     I'll let you answer the question.            12:15:05
3  Q. Well, let me ask it this way: You've         12:15:06
4     reviewed Dr. Hartman's report, right?        12:15:08
5  A. I have.                                      12:15:10
6  Q. And you provided comments on his draft       12:15:10
7     report, correct?                             12:15:12
8  A. That's correct.                              12:15:14
9  Q. Do you have an understanding, based on your  12:15:15
10    review of his reports -- or his report, I    12:15:17
11    should say, as to whether he reaches -- or   12:15:20
12    it reaches an independent conclusion as to   12:15:23
13    class-wide impact?                           12:15:25
14 A. I don't believe it does. I'm not sure that   12:15:25
15    I understand that term in the same way that  12:15:28
16    you do, but I believe, as we discussed, that 12:15:29
17    it talks about the methodology for           12:15:31
18    estimating damages from quantities.          12:15:33
19 Q. So I guess, as you've described it, would it 12:15:35
20    be correct to say that neither you nor Dr.   12:15:47
21    Hartman have proposed a methodology which,   12:15:50
22    standing alone, would be capable of          12:15:54
23    calculating class-wide damages?              12:15:58
24       MR. NOTARGIACOMO: Object to the           12:16:01
25    question.                                    12:16:02

Page 142

1  Q.  Well, let me put it another way.  Your    12:16:06
2      report and Dr. Hartman's report are       12:16:08
3      interdependent for purposes of determining 12:16:09
4      class-wide damages?                       12:16:12
5  A.  That's correct. That's my understanding.  12:16:13
6  Q.  Okay. All right. Let's look again at      12:16:15
7      Paragraph 6, which is the definition of the 12:16:31
8      class, and why don't I just read it. It   12:16:32
9      reads, "All individuals and entities in the 12:16:37
10     United States and its territories who, for 12:16:39
11     purposes other than resale, purchased,    12:16:42
12     reimbursed, and/or paid for Neurontin for 12:16:44
13     indications not approved by the FDA during 12:16:47
14     the period from January 1, 1994, through the 12:16:50
15     present. For purposes of the Class        12:16:53
16     definition, individuals and entities      12:16:56
17     purchased Neurontin if they paid some or all 12:16:58
18     of the purchase price."                   12:17:01
19         Did I read that correctly?            12:17:02
20 A.  Yes, you did.                             12:17:04
21 Q.  Where does this definition come from?     12:17:05
22 A.  The definition comes from the amended class 12:17:07
23     action complaint dated February 1, 2005.  12:17:09
24 Q.  Did you have any involvement in the crafting 12:17:15
25     of the definition of the class in this case? 12:17:18

Page 143

1  A.  No, I did not.                            12:17:20
2  Q.  What's your understanding of what "the    12:17:22
3      present" is for purposes of the class     12:17:28
4      definition?                               12:17:32
5          MR. NOTARGIACOMO: Objection. You      12:17:34
6      can answer.                               12:17:40
7  A.  If I were to think about what the         12:17:40
8      understanding was -- I thought I was working 12:17:43
9      off the assumption that it was the present 12:17:45
10     at the time that I was drafting that, but 12:17:48
11     obviously it would have been the present at 12:17:49
12     the time the complaint was filed, that being 12:17:53
13     February 1, 2005.                         12:17:57
14 Q.  Does the date make a difference for purposes 12:18:03
15     of your analysis in your declaration?     12:18:06
16 A.  Would it affect the --                    12:18:09
17 Q.  Any of the conclusions that you reached?  12:18:13
18 A.  -- quantum of impact? Oh, for the         12:18:15
19     conclusions that I reached? No, it does not 12:18:18
20     make a difference.                        12:18:21
21 Q.  Have you participated in any discussions  12:18:23
22     about whether the class definition remains 12:18:25
23     appropriate in view of the Court's rulings 12:18:28
24     over the past year?                       12:18:30
25 A.  The subject did come up last week when we 12:18:31

Page 144

1      were reviewing as to whether the date would 12:18:36
2      be changed by the Court.                  12:18:39
3  Q.  Specifically when you say "the subject," you 12:18:41
4      mean the subject of the date?             12:18:43
5  A.  Of the end date in particular for the class. 12:18:46
6  Q.  And when you say, "we had a discussion," who 12:18:49
7      is "we"?                                  12:18:54
8  A.  That would be Mr. Notargiacomo, Mr. Goldser 12:18:54
9      and I.                                    12:18:57
10 Q.  What was the general content of the       12:18:57
11     discussion?                               12:19:00
12 A.  I think it was something to the effect of 12:19:00
13     the -- you know, it's not clear what the  12:19:05
14     Court's ruling -- what implication that has 12:19:11
15     for when the class -- for the class       12:19:13
16     definition in terms of the end date of it. 12:19:15
17 Q.  Did you discuss any other aspect of the   12:19:20
18     class definition in that conversation or any 12:19:24
19     other conversation about the Court's recent 12:19:27
20     rulings?                                  12:19:29
21 A.  The one thing we discussed was that it was 12:19:30
22     likely that my work when it comes to      12:19:32
23     implementation of this approach would need 12:19:36
24     to be done indication by indication.      12:19:39
25 Q.  When did -- did you have that discussion  12:19:41

Page 145

1      last week for the first time?            12:19:49
2  A.  In terms of the Court's ruling. As you    12:19:50
3      know, in the declaration I talk about doing 12:19:54
4      the analysis indication by indication.    12:19:56
5  Q.  Right. But so in terms of the implication 12:20:00
6      of the Court's ruling on your analysis, the 12:20:05
7      first discussion was last week?           12:20:07
8  A.  I believe so.                             12:20:08
9  Q.  And it was in the same conversation that we 12:20:14
10     just described, the conversation between  12:20:16
11     you, Mr. Notargiacomo and Mr. Goldser?    12:20:18
12 A.  Yes, that's correct.                      12:20:21
13 Q.  And what was the substance of that        12:20:26
14     conversation beyond what you've just      12:20:27
15     described?                                12:20:29
16 A.  Again, this was when we met last week to  12:20:29
17     prepare, and the substance -- it was very 12:20:33
18     brief. Again, the issue came up as to     12:20:36
19     whether the final class definition would  12:20:40
20     include an earlier end date, and I don't  12:20:42
21     remember everything that was said, but the 12:20:49
22     idea was it was unclear, we didn't know yet, 12:20:50
23     and that we would work with it as it became 12:20:55
24     clear.                                    12:20:57
25 Q.  All right. You are aware that Neurontin was 12:21:00

Page 146

1  approved by the FDA for the treatment of          12:21:06
2  postherpetic neuralgia in May of 2002,            12:21:09
3  correct?                                          12:21:13
4  A. Yes, that's correct.                           12:21:13
5  Q. And I hope you'll understand if I refer to     12:21:15
6  postherpetic neuralgia as PHN. Does that          12:21:19
7  work for you?                                     12:21:25
8  A. I'll try to remember that, yes.                12:21:25
9  Q. Okay. If there's confusion at all, please      12:21:27
10 let me know.                                      12:21:29
11 A. Okay.                                          12:21:30
12 Q. What's your understanding for how the class    12:21:30
13 definition accounts for individuals and           12:21:33
14 entities who purchased, reimbursed and/or         12:21:34
15 paid for Neurontin for PHN?                       12:21:37
16 A. Before or after May 2002?                      12:21:49
17 Q. Well, I guess that's the question.             12:21:52
18 A. Yeah. Well, my understanding is that I --      12:21:53
19 obviously I read the complaint and tried to       12:21:57
20 summarize the allegations as best I could         12:22:00
21 here, my understanding, but I believe that        12:22:02
22 at the time I conduct my analysis I will get      12:22:07
23 direction from counsel about what specific        12:22:10
24 off-label promotions are to be considered as      12:22:12
25 illegal and during what time period. And I        12:22:17

Page 147

1  would imagine that would change for               12:22:26
2  something like postherpetic neuralgia which       12:22:28
3  received that approval in May 2002, so that       12:22:30
4  it might be different in 1996, for example,       12:22:32
5  than in 2002, but I don't -- I think that's       12:22:35
6  a legal issue.                                    12:22:37
7  Q. Well, let's talk about it just in terms of     12:22:40
8  who the members of the class are.                 12:22:42
9  A. Okay.                                          12:22:44
10 Q. Would you say that individuals and entities    12:22:44
11 who, quote, purchased, reimbursed and/or          12:22:48
12 paid for Neurontin, end quote, for PHN prior      12:22:52
13 to May 2002 would have -- are members of the      12:22:56
14 class?                                            12:23:04
15     MR. NOTARGIACOMO: Objection.                  12:23:04
16 Calls for a legal conclusion.                     12:23:04
17     MR. POLUBINSKI: I'm asking for her            12:23:07
18 understanding, though.                            12:23:08
19 A. That was certainly my understanding at the     12:23:08
20 time of writing this, was that all those          12:23:10
21 that received an off-label prescription for       12:23:14
22 Neurontin for off-label uses would be             12:23:17
23 included, and so that that would follow to        12:23:19
24 this conclusion that you mentioned.               12:23:22
25 Q. And that individuals or entities who           12:23:23

Page 148

1  purchased, reimbursed and/or paid for             12:23:26
2  Neurontin for PHN after May 2002 after the        12:23:29
3  approval of PHN by the FDA would not be           12:23:32
4  included in the class?                            12:23:34
5      MR. NOTARGIACOMO: Objection, calls            12:23:35
6  for a legal conclusion.                           12:23:36
7  A. That would have been my understanding.         12:23:38
8  Q. Now, is this an understanding that you         12:23:45
9  developed yourself in reading the class           12:23:46
10 definition, or did you have conversations         12:23:48
11 with anybody about the question?                  12:23:49
12 A. It was my understanding of reading the         12:23:50
13 complaint and the way I understood the            12:23:53
14 allegations.                                      12:23:56
15 Q. Now, your model assumes that you'll somehow    12:23:56
16 be able to identify all PHN prescriptions?        12:24:04
17 A. That's correct.                                12:24:06
18 Q. How do you anticipate doing that?              12:24:08
19 A. I anticipate using the National Disease and    12:24:10
20 Therapeutic Index for one example. That's a       12:24:13
21 database that describes prescriptions by          12:24:17
22 diagnosis.                                        12:24:21
23 Q. Are there other examples?                      12:24:27
24 A. I've also requested additional data from the   12:24:28
25 defendants from their own documents tracking      12:24:32

Page 149

1  prescriptions by diagnosis. As I mention in       12:24:35
2  some of my footnotes, I've seen some              12:24:38
3  examples.                                         12:24:40
4  Q. Anything else?                                 12:24:41
5  A. I also said I reviewed the National            12:24:45
6  Ambulatory Medical Care Survey, which is a        12:24:49
7  federally funded survey by the CDC that also      12:24:51
8  looks at office visits and prescribing            12:24:54
9  associated with those office visits and           12:24:58
10 diagnoses.                                        12:25:00
11 Q. So do you envision for purposes of your --     12:25:04
12 or I'm sorry, before we go on to that, is         12:25:06
13 there anything else other than the last           12:25:08
14 category you mentioned?                           12:25:11
15 A. Those are the data sources that I know of      12:25:12
16 and I know are available. I would do a            12:25:14
17 broader search to see if there were other         12:25:17
18 alternative databases. I understand that          12:25:19
19 Verispan, which is another consulting             12:25:21
20 company, offers a database that's similar to      12:25:24
21 the National Disease and Therapeutic Index,       12:25:27
22 but I have not reviewed those data.               12:25:30
23 Q. So we discussed before that your model         12:25:33
24 assumes that you'll be able to identify all       12:25:41
25 PHN prescriptions, correct?                       12:25:44

38 (Pages 146 to 149)

### Page 150

1  A. That's correct.  12:25:45
2  Q. How does your model propose to treat  12:25:45
3  situations where the prescription was  12:25:51
4  written before FDA approval in May 2002 but  12:25:53
5  was paid for or reimbursed after May 2002?  12:25:57
6  A. The data on the National Drug -- Disease and  12:26:01
7  Therapeutic Index, for example, are  12:26:09
8  documentation of when the prescribing took  12:26:12
9  place, which at least preliminarily that  12:26:13
10  seems like the right date to look to, is  12:26:16
11  when the prescription was written as opposed  12:26:24
12  to when it was reimbursed, to answer your  12:26:25
13  question.  12:26:27
14  Q. Does your model propose identifying and  12:26:27
15  distinguishing between situations where a  12:26:31
16  patient received a prescription for the  12:26:33
17  first time for PHN and when a patient  12:26:34
18  received a prescription for a refill of PHN  12:26:39
19  or -- of Neurontin for PHN?  12:26:43
20  A. I guess I would have to think about that  12:26:46
21  issue a little bit and decide how to  12:26:48
22  appropriately incorporate that into my  12:26:53
23  analysis. I would need a little time to  12:26:56
24  think about that.  12:26:58
25  Q. Okay.  12:26:59

### Page 151

1  A. That's not described specifically in here,  12:27:00
2  though, to answer your question, but that  12:27:02
3  might be relevant to the analysis.  12:27:04
4      MR. POLUBINSKI: I've got another  12:27:18
5  long section that I'm about ready to start  12:27:19
6  now, and I would be happy to do it, or if  12:27:21
7  you would like to break now for lunch, we  12:27:23
8  can come back and get a chunk in before your  12:27:24
9  call.  12:27:27
10      MR. NOTARGIACOMO: Yeah, why don't  12:27:27
11  we do that, break now and get a chunk in  12:27:28
12  before we break. Like I said, it'll be  12:27:32
13  about 15 minutes.  12:27:34
14      MR. POLUBINSKI: Sounds good.  12:27:35
15  Okay. Go off the record.  12:27:36
16      THE VIDEOGRAPHER: The time is  12:27:37
17  12:27 p.m., and we're off the record.  12:27:38
18      (Lunch recess taken.)  12:27:41

### Page 152

1      AFTERNOON SESSION  01:15:41
2      (Exhibit No. 10, Amended Class  01:17:48
3  Action Complaint, marked for  01:17:48
4  identification.)  01:17:49
5      (Exhibit No. 11, Second Amended  01:17:49
6  Class Action Complaint, marked for  01:17:49
7  identification.)  01:17:48
8      THE VIDEOGRAPHER: The time is 1:18  01:17:50
9  p.m. We're back on the record.  01:18:10
10  01:18:10
11  (MEREDITH B. ROSENTHAL, Ph.D., Resumed.)  01:18:10
12  DIRECT EXAMINATION, Continued  01:18:10
13  01:18:12
14  BY MR. POLUBINSKI:  01:18:12
15  Q. All right. Professor Rosenthal, could you  01:18:12
16  look, please, at Exhibit 1, which is your  01:18:18
17  declaration in this case, the beginning of  01:18:20
18  Paragraph 7, which is on Page 4.  01:18:25
19  A. Okay.  01:18:31
20  Q. The very first sentence of Paragraph 7  01:18:31
21  reads, "For purposes of my analysis, I have  01:18:34
22  been directed by counsel to assume the  01:18:38
23  following facts as alleged in the complaint  01:18:39
24  to be true."  01:18:43
25  Did I read that correctly?  01:18:44

### Page 153

1  A. Yes, you did.  01:18:45
2  Q. And is it true that you've done that?  01:18:46
3  A. Yes, it's true.  01:18:47
4  Q. All right. I'm going to hand you two  01:18:48
5  documents. The first one has been marked as  01:18:52
6  Rosenthal Exhibit 10. The second one has  01:18:54
7  been marked as Rosenthal Exhibit 11.  01:18:58
8  A. Okay.  01:19:01
9  Q. All right. Looking first at Rosenthal  01:19:13
10  Exhibit 10, that's the complaint that you're  01:19:15
11  referring to in --  01:19:21
12  A. Okay.  01:19:22
13  Q. -- the first sentence of Paragraph 7 of your  01:19:23
14  report, correct?  01:19:26
15  A. I'm just looking for the date on it. So  01:19:27
16  that would be the earlier complaint, right?  01:19:28
17  I --  01:19:31
18  Q. Yes --  01:19:31
19  A. Can I trust you on that?  01:19:32
20  Q. You are welcome to trust me on that.  01:19:34
21  A. Very good, yeah. Yes, I understand this to  01:19:36
22  be the complaint that was in effect at the  01:19:38
23  time I wrote my report.  01:19:40
24  Q. And that's the complaint that you referred  01:19:41
25  to in the first sentence of Paragraph 7?  01:19:43

154

| | | |
|---|---|---|
| 1 A. | That's correct. | 01:19:48 |
| 2 Q. | Okay. And as we have discussed, you're | 01:19:48 |
| 3 | aware that plaintiffs have amended their | 01:19:51 |
| 4 | complaint since then? | 01:19:52 |
| 5 A. | Yes, I understand that. | 01:19:53 |
| 6 Q. | And if you take a look at Rosenthal Exhibit | 01:19:54 |
| 7 | 11, can you tell me if that is the second | 01:19:57 |
| 8 | amended complaint in this matter, the | 01:19:59 |
| 9 | amendment to the complaint that we | 01:20:01 |
| 10 | discussed? | 01:20:02 |
| 11 A. | Yes, I believe that we've done that | 01:20:03 |
| 12 | complaint, yes, the amended -- second | 01:20:05 |
| 13 | amended class action complaint. | 01:20:06 |
| 14 Q. | All right. You're aware that the Court in | 01:20:08 |
| 15 | this case has determined that some of the | 01:20:17 |
| 16 | allegations in the original class action | 01:20:18 |
| 17 | complaint were insufficient to state a claim | 01:20:20 |
| 18 | and should be dismissed, correct? | 01:20:24 |
| 19 | MR. NOTARGIACOMO: Objection. You | 01:20:26 |
| 20 | can answer. | 01:20:27 |
| 21 A. | I'm aware that the Court made some decision | 01:20:27 |
| 22 | that pertained to the legal structure of the | 01:20:30 |
| 23 | case, and I would certainly believe your | 01:20:34 |
| 24 | assessment that that's what happened. I -- | 01:20:37 |
| 25 | again, I don't thoroughly understand the | 01:20:39 |

155

| | | |
|---|---|---|
| 1 | legal issues myself, but I do understand | 01:20:42 |
| 2 | that there was some decision that pertained | 01:20:43 |
| 3 | to the way this was going to be approached | 01:20:47 |
| 4 | legally. | 01:20:49 |
| 5 Q. | Okay. All right. Let me direct your | 01:20:49 |
| 6 | attention in Rosenthal Exhibit 11, please, | 01:21:04 |
| 7 | to the very first page of the complaint, | 01:21:07 |
| 8 | Page 1, which is actually a couple of pages | 01:21:10 |
| 9 | into the document. | 01:21:12 |
| 10 A. | I see Page 1. | 01:21:14 |
| 11 Q. | And what I would like to do is ask you to | 01:21:15 |
| 12 | look at the Footnote No. 1 that appears at | 01:21:19 |
| 13 | the bottom of the first page. And it's kind | 01:21:24 |
| 14 | of a mouthful, so I think I may not read it | 01:21:31 |
| 15 | into the record, if you don't mind. | 01:21:34 |
| 16 | Although frankly maybe it makes sense just | 01:21:42 |
| 17 | to do it. It reads in the second amended | 01:21:45 |
| 18 | class action complaint, "Plaintiffs have | 01:21:48 |
| 19 | amended their allegations to provide | 01:21:50 |
| 20 | additional facts in support of their claims | 01:21:51 |
| 21 | and to correct certain deficiencies in the | 01:21:53 |
| 22 | first amended class action complaint as | 01:21:56 |
| 23 | determined by the Court (the allegations | 01:21:59 |
| 24 | concerning social phobia and restless leg | 01:22:04 |
| 25 | syndrome), but have left the remainder of | 01:22:07 |

156

| | | |
|---|---|---|
| 1 | the FCAC largely undisturbed (e.g., the | 01:22:10 |
| 2 | allegations concerning the composition of | 01:22:14 |
| 3 | various RICO enterprises alleged) | 01:22:17 |
| 4 | notwithstanding the Court's adverse rulings | 01:22:19 |
| 5 | concerning the sufficiency of certain of | 01:22:22 |
| 6 | those allegations (e.g., the Court's | 01:22:24 |
| 7 | determination that certain of the alleged | 01:22:26 |
| 8 | RICO enterprises were not sufficiently | 01:22:28 |
| 9 | pled). Plaintiffs have left these | 01:22:31 |
| 10 | allegations undisturbed to preserve their | 01:22:33 |
| 11 | appellate rights, not to require the Court | 01:22:36 |
| 12 | to revisit those issues at this time." | 01:22:37 |
| 13 | Did I read that correctly -- | 01:22:41 |
| 14 A. | I believe you did. | 01:22:42 |
| 15 Q. | -- as best you can tell? Okay. Thanks. | 01:22:42 |
| 16 | MR. NOTARGIACOMO: You get an A in | 01:22:46 |
| 17 | reading. | 01:22:47 |
| 18 | MR. POLUBINSKI: I'm pretty good at | 01:22:48 |
| 19 | it. | 01:22:51 |
| 20 Q. | Do you have an understanding of what the | 01:22:51 |
| 21 | certain deficiencies in the first amended | 01:22:54 |
| 22 | class action complaint are for purposes of | 01:22:56 |
| 23 | this footnote? | 01:22:58 |
| 24 A. | I do not. | 01:22:58 |
| 25 Q. | Okay. And then in the last sentence which | 01:22:59 |

157

| | | |
|---|---|---|
| 1 | reads, "The plaintiffs have left these | 01:23:09 |
| 2 | allegations undisturbed," do you know which | 01:23:11 |
| 3 | allegations those are? | 01:23:13 |
| 4 A. | I do not. | 01:23:15 |
| 5 Q. | So I take it, then, that whether or not | 01:23:16 |
| 6 | those allegations, the ones that are | 01:23:23 |
| 7 | referred to in Footnote 1, are still in the | 01:23:25 |
| 8 | case have not impacted your analysis in your | 01:23:28 |
| 9 | declaration? | 01:23:31 |
| 10 A. | My analysis relates to the overall economic | 01:23:31 |
| 11 | incentives in this environment, the impact | 01:23:35 |
| 12 | of promotion as we know it and my ability to | 01:23:38 |
| 13 | model the effects of promotional activities | 01:23:43 |
| 14 | that ultimately are deemed to be within the | 01:23:48 |
| 15 | scope of the case. And so if I were told | 01:23:50 |
| 16 | that certain activities were no longer in | 01:23:52 |
| 17 | the scope of the allegations for the | 01:23:56 |
| 18 | purposes of conducting a damage analysis, I | 01:23:58 |
| 19 | would remove those. So it does not affect | 01:24:02 |
| 20 | my analysis as it appears in my report. | 01:24:04 |
| 21 Q. | Do you have any independent knowledge or | 01:24:11 |
| 22 | have you done any independent investigation | 01:24:14 |
| 23 | into the truth of any of the allegations in, | 01:24:15 |
| 24 | let's refer to the complaint that you looked | 01:24:19 |
| 25 | at when you first drafted your report, | 01:24:22 |

40 (Pages 154 to 157)