## 158

1  Rosenthal 10? 01:24:25
2 A. As I stated in my declaration, I assume that 01:24:26
3  the allegations are true, and then I look at 01:24:29
4  what the effect would be under economic 01:24:34
5  theory under empirical evidence that we have 01:24:36
6  to date. So no, I did not judge whether the 01:24:39
7  allegations were true. 01:24:43
8 Q. So -- and you don't have any independent 01:24:44
9  knowledge as to whether they're true? 01:24:47
10 A. I guess -- 01:24:48
11  MR. NOTARGIACOMO: Objection. You 01:24:51
12  can answer. 01:24:52
13 A. I'm not sure what would be included in that. 01:24:52
14  I have looked at discovery materials that 01:24:56
15  support those allegations. Would you 01:24:59
16  consider that to be independent knowledge or 01:25:01
17  that's material provided to me under the 01:25:03
18  case? So... 01:25:05
19 Q. Let me ask it to you this way: You're not 01:25:08
20  offering an opinion as to the truth of any 01:25:10
21  of the factual allegations in the complaint, 01:25:12
22  are you? 01:25:15
23  MR. NOTARGIACOMO: Objection. 01:25:15
24 Q. I mean, aside from what's in your -- well, 01:25:15
25  let me just phrase it that way. You're not 01:25:18

## 159

1  offering an opinion as to the truth of any 01:25:19
2  of the underlying factual allegations that 01:25:21
3  are in the complaint? 01:25:23
4 A. No, I am not. 01:25:24
5 Q. Okay. And do you expect to? 01:25:26
6 A. I do not. You mean a legal opinion about 01:25:27
7  whether -- 01:25:32
8 Q. Whether they're true or not. 01:25:32
9 A. No. 01:25:34
10 Q. Okay. Now, so at bottom, I guess, when 01:25:34
11  we're talking about what the allegations are 01:25:48
12  that are described in Paragraph 7 and 01:25:50
13  subparagraphs, what we're really talking 01:25:53
14  about, I guess, is the number of allegedly 01:25:55
15  improper statements by defendants about the 01:25:57
16  off-label use of Neurontin; is that a fair 01:26:01
17  characterization? 01:26:03
18  MR. NOTARGIACOMO: Objection. 01:26:04
19 A. So the summary here, going back to the 01:26:05
20  error -- 01:26:08
21 Q. Sure. 01:26:09
22 A. -- describes a number of different 01:26:09
23  activities as they were summarized in the 01:26:11
24  first amended class action complaint, and 01:26:15
25  some of them have to do with statements. 01:26:18

## 160

1  Others -- I mean, I guess if you take 01:26:21
2  studies promoting studies as statements as 01:26:25
3  well, perhaps you mean to consider all of 01:26:31
4  these things as statements. I think they're 01:26:33
5  not quite all statements. 01:26:35
6 Q. Okay. Fair enough. That's a good 01:26:36
7  clarification. I guess, though, using the 01:26:38
8  broadest definition of statements, you don't 01:26:49
9  know, yourself, whether any of the allegedly 01:26:51
10  improper or unlawful statements that are 01:26:53
11  mentioned in the complaint were, in fact, 01:26:54
12  untruthful; is that right? 01:26:56
13  MR. NOTARGIACOMO: Objection. 01:26:58
14 A. Again, I guess I'm having a little trouble 01:26:59
15  just because some of the discovery materials 01:27:06
16  I have reviewed suggest deliberate 01:27:09
17  strategies that as a layperson it seemed 01:27:13
18  untruthful to me, but I am not trying to 01:27:16
19  judge whether or not those are truthful. 01:27:21
20  Again, I have been asked to assume those 01:27:24
21  allegations are true and proceed from there. 01:27:26
22 Q. Okay. But -- and -- fair enough. We'll 01:27:29
23  leave it at that. 01:27:33
24  Who wrote the subparagraphs for 01:27:34
25  Paragraph 7? 01:27:41

## 161

1 A. I did. 01:27:41
2 Q. What did you base your work upon in doing 01:27:43
3  that? 01:27:47
4 A. I reviewed the complaint. 01:27:47
5 Q. Anything else? 01:27:52
6 A. I may have reviewed some other discovery 01:27:53
7  documents which you see are cited there, so 01:27:56
8  those are documents as they're cited, but 01:27:58
9  that's essentially what I reviewed, yes. 01:28:01
10 Q. Okay. And would it be correct to say that 01:28:04
11  your descriptions in Paragraph 7 are based 01:28:09
12  principally upon the allegations in the 01:28:13
13  complaint? 01:28:14
14 A. My descriptions in Paragraph 7 and the 01:28:15
15  subparts thereof were my understanding of 01:28:19
16  the allegations as they were presented in 01:28:20
17  the complaint. 01:28:22
18 Q. Look at Paragraph 8, which is on Page 6. 01:28:23
19 A. Okay. 01:28:37
20 Q. Paragraph 8 describes "detailing visits" by 01:28:37
21  Parke-Davis employees, correct? 01:28:44
22 A. Yes. 01:28:48
23 Q. Is there any reason why Paragraph 8 of your 01:28:48
24  report is not Paragraph 7h)? 01:28:51
25 A. My recollection is that while the discovery 01:28:53

41 (Pages 158 to 161)

162

```
 1   documents relate to that, I don't believe          01:28:57
 2   that that was characterized in that way in          01:28:59
 3   the document, and so I haven't included it          01:29:02
 4   in Paragraph 7, which I describe as my             01:29:05
 5   summary of the allegations in the complaint.       01:29:08
 6 Q. So by "the document" in your last answer you      01:29:11
 7   mean the complaint?                                01:29:12
 8 A. I'm sorry, the complaint, yes.                    01:29:15
 9 Q. So Paragraph 8, I guess, derives from an          01:29:20
10   independent review that you would have done        01:29:22
11   of the documents and not your review of the        01:29:23
12   complaint?                                         01:29:26
13 A. It was from a review of other discovery           01:29:26
14   materials presented to me in the case, yes,        01:29:30
15   but you're right, it's -- I believe it's not       01:29:33
16   from the complaint itself. So if you               01:29:35
17   believe that to be independent review, yes.        01:29:38
18 Q. Fair enough. You cite as a couple of              01:29:40
19   footnotes in Paragraph 8 two specific              01:29:45
20   documents.                                         01:29:48
21 A. Yes.                                              01:29:48
22 Q. Are there other documents aside from those        01:29:50
23   two that you would have reviewed to support        01:29:53
24   your conclusions -- or support the                 01:29:55
25   description that you gave in Paragraph 8?          01:29:58
```

163

```
 1 A. Those were the documents that -- from            01:30:00
 2   Paragraph 8.                                        01:30:04
 3 Q. Those two documents, the memorandum from J.       01:30:05
 4   Rizzo?                                              01:30:08
 5 A. That's right.                                      01:30:09
 6 Q. And the 1998 strategic plan?                       01:30:09
 7 A. That's my belief that it's only those two         01:30:11
 8   documents. Again, I wrote this, I'm sorry,          01:30:15
 9   a year ago, so I would have to check, but it        01:30:18
10   is my recollection, as you suggest, that the        01:30:20
11   detailing issues not described in the               01:30:22
12   first amended class action complaint.              01:30:25
13 Q. Okay.                                             01:30:27
14       MR. POLUBINSKI: All right. Let's              01:30:34
15   mark the next one.                                  01:30:35
16       (Exhibit No. 12, Document headed              01:30:52
17   "1998 Strategic Plan and A&P Allocation             01:30:52
18   Grid, Neurontin," marked for                        01:30:52
19   identification.)                                    01:30:54
20 Q. I'm handing you now a document that's been        01:30:54
21   marked as Rosenthal Exhibit 12.                    01:30:57
22 A. Okay.                                             01:30:59
23 Q. So the last sentence of Paragraph 8 reads,       01:30:59
24   "During these 'detailing,' samples                  01:31:13
25   were also strategically used to encourage          01:31:14
```

164

```
 1   physicians to initiate off-label treatment         01:31:18
 2   for new patients"; is that correct?                01:31:20
 3 A. I'm sorry.                                        01:31:22
 4 Q. Did I read it right? I apologize.                 01:31:23
 5 A. I need to go back. I must have the wrong          01:31:24
 6   exhibit, so I'm going back to this.                01:31:27
 7 Q. Yeah, this is part of Exhibit 1, exactly,        01:31:29
 8   Paragraph 8.                                       01:31:31
 9 A. Paragraph 8, yeah. And please tell me what       01:31:32
10   you were just reading from.                        01:31:39
11 Q. Yeah, the last sentence.                          01:31:39
12 A. "During these 'detailing,'" yes.                  01:31:41
13 Q. Okay. The footnote at the end of that            01:31:44
14   sentence refers to a document that's               01:31:48
15   described in your report as "1998 strategic        01:31:50
16   plan and A&P allocation grid" --                    01:31:55
17 A. Yes.                                              01:31:59
18 Q. -- is that correct?                               01:32:00
19 A. Yes, that's correct.                              01:32:00
20 Q. Okay. Now, is the document that I've just        01:32:02
21   handed you, Rosenthal Exhibit 12, the             01:32:03
22   document that's referred to in Footnote 25?        01:32:05
23 A. I believe it is. Page 4073, yes, it is.          01:32:07
24 Q. And just looking at it, this looks like a        01:32:12
25   strategic plan grid, I guess --                    01:32:17
```

165

```
 1 A. It does.                                          01:32:18
 2 Q. -- for 1998?                                      01:32:19
 3     This is a forward-looking document,             01:32:20
 4   isn't it?                                          01:32:22
 5 A. I would assume a strategic plan is a             01:32:22
 6   forward-looking document, yes.                     01:32:24
 7 Q. And so it doesn't actually state what amount     01:32:26
 8   of money would have been spent on sampling;        01:32:28
 9   is that right?                                      01:32:31
10 A. That's correct.                                   01:32:31
11 Q. How does this document support your              01:32:31
12   statement that samples were also used             01:32:35
13   strategically -- or strategically used to         01:32:37
14   encourage physicians to initiate off-label        01:32:41
15   treatment for new patients?                        01:32:43
16 A. Well, again, samples were part of the           01:32:45
17   strategic plan, and the document -- on the        01:32:48
18   first page, "Expand Neurontin use in              01:32:50
19   epilepsy through the introduction of             01:32:53
20   monotherapy."                                      01:32:57
21 Q. All right. So on this first page you read       01:32:58
22   from the language in the top box which           01:33:00
23   reads, "Expand Neurontin use in epilepsy          01:33:02
24   through the introduction of monotherapy,"        01:33:06
25   correct?                                          01:33:09
```

42  (Pages 162 to 165)

166

1  A.  Yes.                                          01:33:09
2  Q.  And then there is a separate line part way    01:33:09
3      down in the document that reads "Samples"?     01:33:12
4  A.  That's correct.                               01:33:14
5  Q.  And then amounts that seem to be associated    01:33:14
6      with that line entry, correct?                 01:33:17
7  A.  Yes, that was my understanding.                01:33:19
8  Q.  Now, the doctors who would have received       01:33:21
9      these samples would have been doctors who      01:33:22
10     treated epileptics, correct?                   01:33:25
11 A.  Presumably.                                    01:33:26
12 Q.  Would you agree with me that there would be    01:33:29
13     nothing inherently wrong with giving a         01:33:32
14     sample of Neurontin to an epileptologist?      01:33:34
15         MR. NOTARGIACOMO:  Objection.              01:33:36
16 A.  Again, I don't want to opine on a legal        01:33:37
17     issue like that.                               01:33:40
18 Q.  Let me ask it a different way.  You're aware   01:33:45
19     that in 1998 Neurontin was approved by the     01:33:49
20     FDA for use in treating epileptic seizures;    01:33:52
21     is that correct?                               01:33:55
22 A.  I'm aware of the indications for which it      01:33:55
23     was approved, right.  So you said 1998?        01:33:59
24 Q.  By 1998, which is the date on --              01:34:02
25 A.  Right.                                         01:34:02

167

1  Q.  -- the documents.                             01:34:04
2  A.  It was improvements earlier than that for     01:34:04
3      partial seizures as a secondary line -- a     01:34:07
4      second line of treatment, right.              01:34:10
5  Q.  And wouldn't it make sense that doctors who   01:34:15
6      would be prescribing the drug for on-label    01:34:18
7      uses at the time would have been people who   01:34:20
8      were treating epileptics?                     01:34:22
9          MR. NOTARGIACOMO:  Objection.             01:34:24
10 A.  It would make sense that some of those        01:34:24
11     physicians would treat patients who were      01:34:27
12     epileptics.                                   01:34:29
13 Q.  And so for a Pfizer sales -- for a            01:34:30
14     Parke-Davis sales representative to give a    01:34:33
15     sample to an epileptologist in 1998 would     01:34:37
16     not necessarily have been encouraging an      01:34:40
17     epileptologist to use that drug for an        01:34:43
18     off-label use?                                01:34:45
19         MR. NOTARGIACOMO:  Objection.             01:34:46
20 A.  I don't think I'm in a position to respond    01:34:49
21     to that intelligently, I'm sorry.  I think    01:34:52
22     that that's asking for an evaluation that I   01:34:55
23     can't really make.                            01:34:57
24 Q.  Okay.  Do you have any knowledge as to        01:34:58
25     whether sampling for FDA-approved uses is     01:35:07

168

1      permissible?                                  01:35:09
2  A.  As a -- from a layperson's perspective --     01:35:10
3  Q.  Sure.                                         01:35:16
4  A.  -- it's my understanding that sampling is     01:35:16
5      permissible.                                  01:35:18
6  Q.  Okay.  Would you have any way, based on this  01:35:18
7      document or anything else, to distinguish     01:35:27
8      between samples that were given to an         01:35:29
9      epileptologist for an on-label use versus     01:35:32
10     samples that were given for an off-label      01:35:37
11     use?                                          01:35:39
12 A.  Based on this document and my understanding   01:35:40
13     about the way a pharmaceutical company        01:35:44
14     tracks their promotional activities, I would  01:35:47
15     expect that they may track these activities   01:35:50
16     historically in the same way as they look     01:35:54
17     forward to what those activities -- what      01:36:00
18     those tactics are to achieve their strategic  01:36:02
19     plan.  And so I would look to data that       01:36:06
20     Parke-Davis or Pfizer may have where they     01:36:09
21     had documented their own sampling activities  01:36:12
22     by indication.                                01:36:14
23 Q.  The first question I guess is I gather you    01:36:19
24     haven't seen any data like that to date?      01:36:21
25 A.  I have seen some -- as are in my footnotes    01:36:24

169

1      here, some data where they evaluate their    01:36:28
2      own promotional activities for return on     01:36:32
3      investment after meetings, for example,      01:36:34
4      looking at return on investment.  Those are  01:36:38
5      cited in here.  And so I would look for       01:36:40
6      similar kinds of documents related to        01:36:43
7      sampling.                                     01:36:46
8  Q.  Do you have an expectation as to whether --   01:36:47
9      or a recollection from having reviewed the   01:36:50
10     documents as to whether there would be       01:36:52
11     documents that would distinguish between     01:36:53
12     samples that were given for on-label uses    01:36:55
13     for epileptics and samples that were given   01:36:58
14     for off-label uses for epileptics?           01:37:00
15 A.  I do not have a specific recollection about  01:37:02
16     samples.  I would expect that free samples,  01:37:07
17     for example, that would be given to          01:37:09
18     psychiatrists could be easily distinguished  01:37:10
19     from free samples that were given to         01:37:14
20     neurologists and that that kind of tracking  01:37:17
21     could take place.                            01:37:20
22 Q.  Let's look at Paragraph 9 of Exhibit 1,      01:37:31
23     which is your declaration.  Paragraph 9      01:37:34
24     begins, if I'm reading it correctly,         01:37:41
25     "Assuming these allegations are true, the    01:37:44

43  (Pages 166 to 169)

## 170

1  economic impacts to the class would be the     01:37:46
2  following."     01:37:48
3      For purposes of that clause, these     01:37:53
4  allegations, does that mean the allegations     01:37:55
5  in Paragraph 7?     01:37:58
6  A.  Yes, the allegations in Paragraph 7.     01:37:59
7  Q.  Would it also include the facts that     01:38:03
8  you've -- would it also include the material     01:38:07
9  in Paragraph 8?     01:38:10
10 A.  The material in Paragraph 8 is there because     01:38:11
11 there's an interrelationship, in my view,     01:38:14
12 between those kinds of promotional     01:38:17
13 activities detailing in free samples, so I     01:38:19
14 include it in the models, but I would rely     01:38:24
15 on counsel to tell me which effects were     01:38:25
16 going to be considered in terms of the     01:38:29
17 ultimate impact. These promotional     01:38:31
18 activities, they have an interrelationship.     01:38:33
19 Q.  Okay. I'm asking you something I think much     01:38:36
20 more simple than that, actually, with     01:38:37
21 respect to Paragraph 9. And I'm really just     01:38:39
22 trying to get at which of the allegations     01:38:41
23 you're talking about for purposes of     01:38:43
24 Paragraph 9 and what their conclusions are     01:38:45
25 that are laid forth there. Are you focused     01:38:47

## 171

1  on just the allegations in Paragraph 7, or     01:38:51
2  do you also have Paragraph 8 in mind as     01:38:53
3  well?     01:38:55
4  A.  To be technically correct, it would just be     01:38:55
5  Paragraph 7, yeah.     01:39:02
6  Q.  Okay. So how dependent are the opinions     01:39:03
7  that you give in Paragraphs 9a) and b) on     01:39:05
8  the assumptions in Paragraph 7?     01:39:10
9      MR. NOTARGIACOMO: Objection.     01:39:13
10 A.  How dependent are they on the truth of the     01:39:17
11 allegations broadly?     01:39:21
12 Q.  Yeah.     01:39:24
13 A.  I guess they're fully dependent on the truth     01:39:26
14 of those allegations.     01:39:30
15 Q.  Okay. So if one of the assumptions or if     01:39:32
16 one of the allegations that's listed in     01:39:34
17 Paragraph 7 turned out not to be well-     01:39:37
18 founded and wasn't supported by the facts as     01:39:40
19 they developed in the case, what effect     01:39:42
20 would that have on the conclusions that you     01:39:44
21 reach in Paragraphs 9a) and 9b)?     01:39:47
22 A.  Well, I guess --     01:39:50
23      MR. NOTARGIACOMO: Objection. You     01:39:51
24 can answer.     01:39:51
25      THE WITNESS: Sorry.     01:39:52

## 172

1  A.  I guess I would just like to back up a     01:39:53
2  sec that --     01:39:57
3  Q.  Sure.     01:39:57
4  A.  -- if all of the allegations were -- turned     01:39:57
5  out to be untrue in the legal sense, that     01:40:01
6  they were determined to be untrue then, then     01:40:04
7  the models would no longer relate. If     01:40:08
8  selected pieces of the allegations were     01:40:10
9  untrue, then there would be different     01:40:13
10 indications included in the ultimate     01:40:16
11 analysis and different elements of     01:40:18
12 promotional strategy in the analysis, but     01:40:20
13 the overall picture would be the same. The     01:40:25
14 general conclusions about where the economic     01:40:28
15 theory relates to the impact and what the     01:40:29
16 empirical strategy would be for identifying     01:40:33
17 it are generalizable.     01:40:34
18 Q.  Okay. Again, I think I might be asking     01:40:36
19 something that's a little bit more simple,     01:40:39
20 which is -- maybe just take a second to take     01:40:40
21 a look at the --     01:40:42
22 A.  Okay.     01:40:43
23 Q.  -- conclusions that you list specifically in     01:40:43
24 Paragraphs 9a) and 9b). We'll talk about     01:40:47
25 them more specifically later --     01:40:51

## 173

1  A.  Okay.     01:40:53
2  Q.  -- but just take a second to look at them.     01:40:53
3  A.  Okay. So the conclusions in 9a) would still     01:40:56
4  hold as long as one of the allegations, any     01:40:59
5  one of those allegations, are true. And 9b)     01:41:03
6  of course relates specifically to the     01:41:09
7  allegation with regard to dosing. And this     01:41:11
8  would depend on ---     01:41:16
9  Q.  Now, with respect to 9a) when you say "any     01:41:18
10 one of the allegations," when do you have in     01:41:20
11 mind when you say "allegations"?     01:41:22
12 A.  So let's say, for example, it turned out     01:41:25
13 that the only thing the Court determined was     01:41:28
14 illegal here was about the published     01:41:32
15 studies, funding certain published studies     01:41:39
16 or rewriting the conclusions of certain     01:41:41
17 published studies. Then that would -- the     01:41:44
18 analysis would be restricted to the impact     01:41:46
19 of those particular promotional strategies,     01:41:47
20 tactics and whatever indication that related     01:41:51
21 to, so it would be the same general model,     01:41:54
22 but it would be narrowed to a certain     01:41:58
23 mechanism and certain indications that would     01:42:00
24 relate to that mechanism.     01:42:02
25 Q.  Okay.     01:42:04

44 (Pages 170 to 173)

174

```
 1  A.  Is that clear?                          01:42:04
 2  Q.  Uh-huh.  All right.  Let's focus now on what  01:42:05
 3      the specific conclusions in 9a) and 9b) are.  01:42:18
 4  A.  Okay.                                   01:42:21
 5  Q.  Let's start with 9a) --                 01:42:21
 6  A.  Okay.                                   01:42:23
 7  Q.  -- Paragraph 9a) on Page 7 of Exhibit 1,  01:42:24
 8      which reads, "The Class paid for many more  01:42:28
 9      prescriptions of Neurontin for off-label  01:42:30
10      uses than it would have absent the off-label  01:42:32
11      promotional activities."                01:42:35
12          What do you mean by "many more      01:42:40
13      prescriptions"?                         01:42:42
14          MR. NOTARGIACOMO:  Objection.  You  01:42:43
15      can answer.                             01:42:44
16  A.  I guess that's a somewhat general statement  01:42:44
17      that given the data I've reviewed, the  01:42:48
18      impact would be something greater than a  01:42:53
19      small amount and so that more prescriptions  01:42:55
20      of Neurontin at some significant level would  01:43:01
21      be -- would have been written based on what  01:43:04
22      appears to be the widespread promotional  01:43:05
23      activities related to these off-label uses.  01:43:10
24  Q.  Is your -- well, is there any sort of   01:43:12
25      threshold as to what some significant level  01:43:20
```

175

```
 1      is, in your mind?                       01:43:23
 2  A.  No.                                     01:43:24
 3  Q.  Is your conclusion with respect to the many  01:43:24
 4      more prescriptions -- well, let me withdraw  01:43:36
 5      the question.                           01:43:41
 6          And what's the basis for that       01:43:42
 7      conclusion?                             01:43:43
 8  A.  The basis for the conclusion is a review of  01:43:44
 9      the economics of promotion, review of the  01:43:48
10      empirical literature showing the response to  01:43:51
11      promotion and review of the discovery   01:43:53
12      documents.                              01:43:55
13  Q.  Is it based at all on your model?       01:43:56
14  A.  Have I done any empirical analysis with the  01:44:00
15      model?  No.  The model is a model.      01:44:05
16  Q.  And so this conclusion is based -- let me  01:44:07
17      withdraw the question.                  01:44:18
18          Have you done any quantitative work to  01:44:18
19      support the conclusion that you reach in  01:44:27
20      Paragraph 9a)?                          01:44:29
21  A.  I have not done any of my own analysis.  As  01:44:29
22      we discussed earlier, I've reviewed some  01:44:33
23      analysis that was done in the Franklin  01:44:35
24      matter, but I have not -- this data, I   01:44:37
25      haven't analyzed them myself.           01:44:43
```

176

```
 1  Q.  Let me ask you about the analysis that was  01:44:45
 2      done in the Franklin matter.  Is it referred  01:44:47
 3      to anywhere in your list of documents relied  01:44:49
 4      on in Attachment A.2 of your declaration?  01:44:53
 5  A.  It's in the notes.  Let me find the note for  01:44:56
 6      a moment.  I'm going to cross-reference.  It  01:44:59
 7      should be towards the end.  Footnote 72  01:45:15
 8      references -- it's all part of the Franklin  01:45:25
 9      documents, so I don't know if it -- if that  01:45:27
10      was picked up in the documents.  I guess  01:45:34
11      that could have been an oversight, but it's  01:45:37
12      referenced there.                       01:45:40
13  Q.  Do you know whether any of that material has  01:45:45
14      been produced to defendants?            01:45:47
15  A.  I would have thought that it was.  It was my  01:45:48
16      understanding that it was.  If it hasn't,  01:45:51
17      I'm afraid that's an oversight.          01:45:55
18          MR. NOTARGIACOMO:  Just for the     01:45:56
19      record, it's my understanding that there's  01:45:57
20      an agreement between counsel that any    01:45:59
21      documents that were produced in the Franklin  01:46:01
22      case, whether it be from plaintiffs to   01:46:02
23      defendants or defendants to plaintiffs can  01:46:04
24      be used in this litigation without       01:46:06
25      reproducing those documents again to the  01:46:07
```

177

```
 1      party that produced them in the first place.  01:46:09
 2          MR. POLUBINSKI:  Fair enough.  I     01:46:11
 3      guess, the thing that we're working on here  01:46:12
 4      is really -- the issue that we're working  01:46:14
 5      with here is that we don't know precisely  01:46:17
 6      what documents these are.  I don't think  01:46:19
 7      they've ever been described to us, and it  01:46:20
 8      makes it difficult for us to ask about them  01:46:23
 9      if we don't know what they are.  So let me  01:46:26
10      just ask that if you can -- or, Professor  01:46:28
11      Rosenthal, if you can let us know which   01:46:31
12      documents those are, and if they are indeed  01:46:33
13      ones that have come from us, that's fine,  01:46:35
14      but we would like to know what they are.  01:46:37
15          MR. NOTARGIACOMO:  Well, I think     01:46:38
16      the witness has just pointed to Paragraph --  01:46:39
17      I'm sorry, Footnote 73 which --          01:46:41
18          THE WITNESS:  72 actually.           01:46:44
19          MR. POLUBINSKI:  She pointed to      01:46:45
20      Footnote 72 which doesn't contain any sort  01:46:46
21      of reference to a particular set of      01:46:49
22      documents.                              01:46:50
23          THE WITNESS:  Although maybe 73 is   01:46:51
24      the correct reference for that same --   01:46:52
25          MR. NOTARGIACOMO:  My understanding  01:46:54
```

45  (Pages 174 to 177)

178

```
1    is that the affidavit of Seth Landefeld,        01:46:54
2    M.D. and Michael Steiman, M.D. --              01:46:56
3         THE WITNESS:  That is where it             01:46:56
4    comes from.                                     01:46:56
5         MR. NOTARGIACOMO:  -- is where it          01:46:59
6    comes from.                                     01:47:00
7         MR. POLUBINSKI:  Okay.                     01:47:01
8         MR. NOTARGIACOMO:  Which should be         01:47:02
9    something that was filed in the Franklin        01:47:04
10   case, so the defendants should have copies      01:47:05
11   of that.                                        01:47:07
12        MR. POLUBINSKI:  Fair.                     01:47:08
13   BY MR. POLUBINSKI:                              01:47:08
14 Q.  Okay.  So just to make the record clear,      01:47:08
15   Professor Rosenthal, is that true that the      01:47:10
16   rollout of these data and the preliminary       01:47:13
17   analysis with them is contained in Exhibit B    01:47:15
18   attached to the affidavit of Seth Landefeld     01:47:18
19   and Michael Steiman?                            01:47:26
20 A.  I believe that to be true.  I don't have the  01:47:31
21   document in front of me, but now that I see     01:47:32
22   this I do believe that to be true.  There       01:47:34
23   are some documents that are attached as         01:47:36
24   Exhibit B to that document.                     01:47:37
25 Q.  Okay.  All right.  Going back to before --    01:47:43
```

179

```
1    to the questions that I asked before about      01:47:53
2    Paragraph 9a) in the conclusion that's set      01:47:58
3    forth in Paragraph 9a), have you, yourself,     01:47:59
4    done any quantitative work to support this      01:48:03
5    conclusion?                                     01:48:05
6  A.  At this time I have not been asked to do      01:48:05
7    quantitative analysis.                          01:48:07
8  Q.  Okay.  And is this Exhibit B document to the  01:48:08
9    Landefeld/Steiman declaration one of the        01:48:11
10   items that you would have relied upon in        01:48:15
11   reaching this conclusion?                       01:48:17
12 A.  It was, yes, it was.                          01:48:18
13 Q.  Now, the analysis that you did here to come   01:48:28
14   to this conclusion that the class paid for      01:48:33
15   many more prescriptions of Neurontin for        01:48:37
16   off-label uses than it would have absent the    01:48:38
17   off-label promotional activities, is the        01:48:41
18   analysis that you did to support that           01:48:44
19   statement the type of analysis that you've      01:48:46
20   done -- type of analysis that you've done       01:48:49
21   before?                                         01:48:51
22 A.  Yes, it's certainly consistent with the type 01:48:51
23   of analysis that I've done, looking, for        01:48:57
24   example, at the impact of direct consumer       01:48:58
25   advertising on prescription drug spending.      01:49:00
```

180

```
1  Q.  Now, in your other work in which you've done 01:49:03
2    this analysis, do you typically do your own     01:49:23
3    economic analysis to support it as well?        01:49:25
4  A.  I guess I'm not sure I understand the         01:49:26
5    question.  You're distinguishing my own         01:49:31
6    economic analysis to support --                 01:49:34
7  Q.  From review of the literature and review of   01:49:36
8    documents.                                      01:49:39
9  A.  In my publishable academic work I certainly   01:49:40
10   review the literature and previous models,      01:49:43
11   and that's, you know, sort of part of every     01:49:47
12   analysis, and then proceed with the analysis    01:49:50
13   itself, yeah.                                   01:49:53
14 Q.  Okay.  Let's look at Paragraph 9b) --         01:49:53
15 A.  Okay.                                         01:50:11
16 Q.  -- which reads, "For all clinical             01:50:11
17   indications (both approved and unapproved),     01:50:14
18   the class paid for greater dosing of            01:50:17
19   Neurontin (either as many more pills or as      01:50:19
20   increased dosage for the same number of         01:50:21
21   pills) than it would have absent Parke-         01:50:25
22   Davis's promotional activities."                01:50:27
23   Did I read that one right?                      01:50:29
24 A.  Yes, you did.                                 01:50:31
25 Q.  Great.  And here what did you mean -- or      01:50:32
```

181

```
1    what do you mean by "many more pills"?          01:50:36
2  A.  Again, this was a general statement about     01:50:39
3    the fact that I expect to find an impact        01:50:43
4    that's substantial based on discovery           01:50:47
5    materials, based on my knowledge and            01:50:50
6    expertise in health economics research and     01:50:53
7    particularly with regard to pharmaceutical      01:50:58
8    promotion.                                      01:51:00
9  Q.  Are the bases for your conclusion on this     01:51:00
10   point the same as the bases for your            01:51:04
11   conclusion with respect to the many more        01:51:06
12   prescriptions described in Paragraph 9a),       01:51:09
13   generally speaking?                             01:51:11
14 A.  Generally speaking, they come from discovery  01:51:12
15   documents, the allegations, the literature,     01:51:14
16   yes.                                            01:51:17
17 Q.  And here, too, did you do any quantitative    01:51:20
18   work to support this conclusion?                01:51:24
19 A.  At this time I have not been asked to do      01:51:25
20   quantitative work to support that.              01:51:28
21 Q.  Okay.  In terms of your prior published       01:51:30
22   work, have you ever published an article        01:51:35
23   that would have reached a general statement-    01:51:39
24   type conclusion like this based only on         01:51:43
25   literature review and review of documents?      01:51:45
```

46 (Pages 178 to 181)

182

1 A.  Well, this -- I mean, just say that the                01:51:47
2     scope of what I was asked to do in this               01:51:53
3     matter did not include data analysis because          01:51:56
4     those data are not complete yet, they have            01:52:00
5     not been provided to me, particularly                 01:52:02
6     promotional data that will need to come from          01:52:05
7     the defendants. And so generally when I'm             01:52:07
8     writing an academic paper, I'm not in a               01:52:11
9     position where I have to get to the next              01:52:14
10    stage of the litigation to get -- to                  01:52:16
11    actually obtain the data. So I mean, it               01:52:19
12    just seems like comparing apples and oranges          01:52:22
13    to me.                                                01:52:25
14 Q.  Fair enough.                                         01:52:25
15      MR. POLUBINSKI: But, Jessica,                       01:52:27
16    would you mind reading back the question              01:52:28
17    again.                                                01:52:29
18      (Record read.)                                      01:52:29
19      MR. NOTARGIACOMO: I'm just going                    01:52:46
20    to object to the question. It was vague               01:52:47
21    before. You can answer it.                            01:52:48
22 A.  I've certainly published papers that have no         01:52:49
23    quantitative analysis in them that lead to            01:52:54
24    policy conclusions. I can't say that I have           01:52:56
25    done something exactly like this. I guess             01:53:01

183

1     it seems -- it seems hard to answer that              01:53:04
2     question, but I have certainly published              01:53:06
3     papers that reach conclusions about policies          01:53:10
4     and about what's going on in the market               01:53:14
5     without doing data analysis.                          01:53:16
6 Q.  What are the -- thinking about the articles          01:53:18
7     that you have in mind, what are the bases             01:53:25
8     that support your conclusions in those                01:53:27
9     articles?                                             01:53:29
10      MR. NOTARGIACOMO: Objection.                        01:53:32
11 A.  So thinking about some papers, for example,          01:53:32
12    our original direct consumer advertising              01:53:41
13    paper in the New England Journal, we look at          01:53:44
14    market trends in direct consumer                      01:53:48
15    advertising, spending, and based on what we           01:53:54
16    know about the economics of the market and            01:53:57
17    those trends in spending, we draw some                01:53:59
18    conclusions about what effects they may have          01:54:02
19    even though at that point we didn't have the          01:54:06
20    data to actually estimate the effects.                01:54:06
21 Q.  Where did you get -- did you have data on            01:54:11
22    trends in spending?                                   01:54:13
23 A.  We had spending data from -- that can be             01:54:14
24    purchased publicly.                                   01:54:16
25 Q.  Okay. You know what? Let's move on and               01:54:17

184

1     turn to Paragraph 12.                                 01:54:30
2 A.  Okay.                                                 01:54:33
3 Q.  Paragraph 12 of your declaration discusses,          01:54:33
4     among other things, in the second sentence,          01:54:41
5     traditions as, quote, "a trusted                      01:54:47
6     intermediary in prescription drug (and all           01:54:49
7     health care) decision making," correct?              01:54:52
8 A.  That's correct.                                       01:54:56
9 Q.  What do you mean by "trusted intermediary."          01:54:56
10 A.  I use that term to describe essentially a            01:55:00
11    collaborative decision-making process about           01:55:05
12    what drugs individuals take, so individual            01:55:07
13    consumers don't make these decisions                  01:55:12
14    independently and to differing degrees rely           01:55:15
15    on their physicians to advise them on what            01:55:18
16    drugs they should take.                                01:55:20
17 Q.  What's the basis for your understanding of           01:55:25
18    what a trusted intermediary is for purposes           01:55:27
19    of this declaration?                                  01:55:30
20 A.  Broadly, my training and expertise in health        01:55:30
21    economics.                                             01:55:36
22 Q.  And that would be your coursework, your             01:55:37
23    research, other things?                               01:55:42
24 A.  Both, my coursework, my research. I do a            01:55:43
25    lot of interdisciplinary research with                01:55:48

185

1     physicians on related issues.                         01:55:50
2 Q.  Moving down in Paragraph 12, reading the             01:55:53
3     next sentence, "While patient preferences             01:56:01
4     play a role in the choice of therapy,                 01:56:04
5     physicians have enormous influence over               01:56:06
6     health care decisions, particularly for               01:56:08
7     serious medical conditions."                          01:56:10
8      Did I read that correctly?                           01:56:15
9 A.  Yes, you did.                                         01:56:18
10 Q.  Does the extent of patient involvement or           01:56:19
11    preferences vary depending on the situation?          01:56:21
12 A.  That would be my conclusion from, again,             01:56:25
13    theory as well as my research experience.             01:56:28
14 Q.  You know, based on theory and your research         01:56:32
15    experience, would you say that patients with          01:56:35
16    certain conditions are more likely to be              01:56:37
17    actively involved in choices with respect to          01:56:39
18    their treatment than others?                          01:56:43
19 A.  My understanding, and I don't think there's         01:56:44
20    terrific empirical evidence on this, would            01:56:48
21    be that patients are more involved when it            01:56:51
22    comes to a chronic condition where they have          01:56:53
23    significant experience with the same problem          01:56:56
24    over and over again and also where that               01:56:59
25    condition or the drugs are not subject to             01:57:03

47 (Pages 182 to 185)

186

1  sort of a life-threatening issue.    01:57:09
2      So the more serious the condition, my    01:57:11
3  understanding from economics and the    01:57:14
4  psychology that runs alongside that is that    01:57:17
5  patients are less likely to be involved when    01:57:20
6  it's a life-threatening issue.    01:57:22
7 Q.  So just to be clear about it, patients are    01:57:24
8  less likely to be involved in life-    01:57:30
9  threatening issues, more likely --    01:57:34
10 A.  In making independent decisions about    01:57:35
11  treatments when there's a life-threatening    01:57:38
12  condition or very serious condition.    01:57:41
13 Q.  Would you say that -- you know, over the    01:57:43
14  period we're talking about in the class    01:57:44
15  period since 1994, would you say that the    01:57:44
16  extent of patient involvement in health care    01:57:46
17  decisions or treatment decisions has changed    01:57:49
18  over time?    01:57:51
19 A.  It's a speculation.  I don't know that we    01:57:51
20  have evidence to that effect, but I do think    01:57:55
21  that people in the industry believe that to    01:57:57
22  be true, what with direct consumer    01:57:59
23  advertising for one thing that consumers    01:58:01
24  have become more involved.    01:58:05
25 Q.  And so would you agree that consumers are    01:58:06

187

1  increasingly seeking active participation in    01:58:09
2  their own health care?    01:58:11
3 A.  I believe that's a statement that I would    01:58:12
4  agree with.    01:58:15
5 Q.  Now, despite patients' roles, you also state    01:58:18
6  that physicians have enormous influence over    01:58:22
7  health care decisions, particularly for    01:58:25
8  serious medical conditions?    01:58:28
9 A.  Yes.    01:58:31
10 Q.  What conditions would you describe as being    01:58:32
11  serious medical conditions for purposes of    01:58:33
12  this statement?    01:58:36
13 A.  Again, I think the sort of main    01:58:36
14  characteristic that I was thinking of when I    01:58:40
15  said that was if it were a life-threatening    01:58:42
16  condition.  Decision-making under those    01:58:44
17  circumstances is very difficult, and    01:58:47
18  patients are most likely to defer to their    01:58:49
19  trusted physician in that case.    01:58:53
20 Q.  Are there other categories of serious    01:58:58
21  medical conditions that you would have in    01:59:00
22  mind aside from life-threatening conditions,    01:59:02
23  or is it the same thing for purposes of this    01:59:04
24  analysis?    01:59:06
25 A.  I guess I haven't thought it through to that    01:59:10

188

1  degree of detail, but other conditions with    01:59:12
2  serious medical consequences.    01:59:17
3 Q.  Now, even setting aside the parameters that    01:59:18
4  you discussed before about patients who have    01:59:35
5  chronic illnesses versus non-chronic    01:59:39
6  illness, patients who have serious    01:59:43
7  conditions versus less serious conditions,    01:59:44
8  will individual patients still even outside    01:59:47
9  of those categories -- will it vary the    01:59:49
10  extent to which individual patients will    01:59:56
11  have input into their health care decisions,    01:59:58
12  into their treatment decisions?    02:00:01
13 A.  Certainly there will be some variation in    02:00:02
14  that, yes.    02:00:03
15 Q.  And some consumers of health care will    02:00:06
16  necessarily be more inquisitive than others?    02:00:08
17 A.  Yes, I would agree with that statement.    02:00:11
18 Q.  Okay.  Would you agree that the extent to    02:00:12
19  which a patient is involved in his or her    02:00:18
20  health care decisions will depend on a range    02:00:20
21  of factors?    02:00:21
22      MR. NOTARGIACOMO:  Objection.  You    02:00:26
23  can answer.    02:00:27
24 A.  I guess it would vary.  It might be that    02:00:27
25  there are some predictable factors.  Is that    02:00:30

189

1  what you mean?    02:00:31
2 Q.  Yeah.    02:00:32
3 A.  Some specific factors that are associated    02:00:32
4  with it.    02:00:34
5 Q.  So, for example, age might be a predictive    02:00:34
6  factor?    02:00:37
7 A.  Potentially.    02:00:37
8 Q.  Education level?    02:00:38
9      MR. NOTARGIACOMO:  Objection.    02:00:40
10 A.  I don't have any data on this, so if you're    02:00:40
11  asking me to speculate, then I could    02:00:44
12  speculate along with you that those might be    02:00:47
13  important.    02:00:50
14 Q.  I guess what I'm asking for is what -- you    02:00:50
15  know, is what your understanding would be    02:00:54
16  based on, you know, the work that you do and    02:00:55
17  the work that you've done in this area and    02:00:59
18  consumer choice in health care decisions,    02:01:00
19  things like that.    02:01:03
20 A.  Based on the work that I've done in this    02:01:03
21  area, it does seem -- broadly in consumerism    02:01:05
22  it does seem that age is a factor.  That's    02:01:09
23  one that comes to mind.    02:01:12
24 Q.  Okay.  Would you think that education level    02:01:16
25  would be, too?    02:01:18

48  (Pages 186 to 189)

```
                                          190

 1          MR. NOTARGIACOMO: Objection.          02:01:18
 2 A. Again, it seems reasonable, but I don't have    02:01:19
 3    any specific data on that.                  02:01:21
 4 Q. Okay. Fair enough. There may be any number    02:01:22
 5    of factors, I guess, that could, you know,   02:01:24
 6    in the aggregate impact on the extent to     02:01:26
 7    which people are involved in their health    02:01:29
 8    care decisions, right?                       02:01:30
 9          MR. NOTARGIACOMO: Objection.          02:01:31
10 A. There may be factors that influence whether   02:01:31
11    people are involved in their individual      02:01:35
12    health decisions, yes.                       02:01:37
13 Q. But none of the factors by themselves would   02:01:38
14    tell us whether a particular individual was   02:01:40
15    more involved or less involved in a          02:01:42
16    particular prescription decision, for        02:01:44
17    example?                                     02:01:46
18          MR. NOTARGIACOMO: Objection.          02:01:46
19 A. There is some randomness in which a person    02:01:47
20    is more or less involved, you mean, so there  02:01:53
21    may be factors that are important, but they   02:01:56
22    wouldn't predict perfectly.                  02:01:58
23 Q. I'm not sure that randomness is necessarily   02:01:59
24    a -- but that there's -- that each           02:02:01
25    individual circumstance will be different    02:02:03
```

```
                                          191

 1    based on factors -- based on a range of     02:02:04
 2    unquantifiable factors?                     02:02:11
 3          MR. NOTARGIACOMO: Objection.          02:02:12
 4 A. I'm not sure. There are many factors.       02:02:13
 5    There may be factors that we've not         02:02:20
 6    discussed. Whether they're unquantifiable    02:02:21
 7    or not, that seems like a strong statement,  02:02:25
 8    but there are no doubt many factors that     02:02:27
 9    affect whether an individual patient decides  02:02:30
10    to get involved in decision-making around    02:02:31
11    prescription drugs.                          02:02:34
12 Q. Okay. And here's another question that       02:02:35
13    relates to that: I assume that there's no    02:02:37
14    accepted or reliable way to measure patient  02:02:40
15    involvement, that you're aware of?           02:02:42
16          MR. NOTARGIACOMO: Objection.          02:02:43
17 A. Well, there are general scales. There's a    02:02:44
18    patient activation scale that's been         02:02:52
19    developed by Judy Hibbard at the University  02:02:54
20    of Oregon. She's a psychologist, and she's   02:02:57
21    been motivated by this general area about    02:03:02
22    how to get consumers more involved in their  02:03:04
23    health and health care, and so she developed  02:03:06
24    a scale that measures their knowledge and    02:03:09
25    ability to become engaged in self-care and   02:03:13
```

```
                                          192

 1    choosing providers based on quality         02:03:18
 2    information.                                 02:03:20
 3 Q. Have you used her scale before?              02:03:21
 4 A. I haven't used her scale, no, I have not.    02:03:23
 5 Q. You wouldn't, I assume, anticipate using it  02:03:26
 6    in your work in this case, would you?        02:03:30
 7 A. I had not -- I don't believe it's relevant   02:03:31
 8    to my analysis, so I had not planned to use  02:03:34
 9    it, no.                                      02:03:36
10 Q. Here's another general question: You would   02:03:43
11    agree that some doctors would be more        02:03:46
12    accepting or inviting of patient involvement  02:03:47
13    than others?                                 02:03:49
14          MR. NOTARGIACOMO: Objection.          02:03:50
15 A. It would be hard to disagree with that       02:03:51
16    statement.                                   02:03:54
17 Q. Okay. That some doctors will provide more    02:03:54
18    information to their patients than others?   02:03:57
19 A. I would agree --                             02:03:59
20          MR. NOTARGIACOMO: Objection.          02:04:00
21          THE WITNESS: Sorry.                    02:04:01
22 Q. You can answer.                              02:04:03
23 A. Yes, I would agree with that.                02:04:03
24 Q. Some doctors may, for example, give patients  02:04:05
25    articles or excerpts of articles regarding   02:04:08
```

```
                                          193

 1    medications that they prescribe?            02:04:11
 2          MR. NOTARGIACOMO: Objection.          02:04:12
 3 A. I can imagine that would be the case in some  02:04:12
 4    cases.                                       02:04:18
 5 Q. And that many don't?                         02:04:18
 6          MR. NOTARGIACOMO: Objection.          02:04:20
 7 A. And I can imagine that would also be the     02:04:20
 8    case.                                        02:04:23
 9 Q. Okay. Next sentence is "Professional         02:04:24
10    norms -- next sentence in Paragraph 12 of    02:04:30
11    your declaration is "Professional norms       02:04:32
12    require physicians to use their clinical     02:04:35
13    skills, knowledge and experience to make     02:04:37
14    therapeutic choices that are in the best     02:04:39
15    interest of their patients."                 02:04:41
16          What do you mean by "professional      02:04:48
17    norms"?                                      02:04:49
18 A. I was speaking broadly there, but you could   02:04:49
19    think narrowly of the Hippocratic Oath,     02:04:54
20    which in addition to do no harm has          02:05:00
21    something to do with treating patients,      02:05:00
22    doing the best for patients.                 02:05:05
23 Q. When you say you were thinking broadly, are   02:05:06
24    there things besides the Hippocratic Oath    02:05:10
25    that you had in mind when you wrote this?    02:05:13
```

49  (Pages 190 to 193)

194

1  A.  Again, sort of broad notions of professional    02:05:15
2    norms that physicians are obliged to try to    02:05:17
3    improve the health of their patients or    02:05:22
4    maintain the health of their patients to the    02:05:23
5    best of their ability.    02:05:26
6  Q.  Are the norms that you have in mind -- I    02:05:32
7    take it -- well, withdrawn.    02:05:33
8      I take it from your answer that the    02:05:35
9    norms that you have in mind aren't    02:05:36
10    necessarily written down someplace?    02:05:37
11  A.  That's right.    02:05:39
12  Q.  Would you include within the professional    02:05:42
13    norms that you're describing here things    02:05:43
14    like practice guidelines?    02:05:46
15  A.  No. I guess I would think of practice    02:05:48
16    guidelines not as being professional norms,    02:05:50
17    they are more external advice. The point of    02:05:54
18    this describing professional norms is to say    02:05:59
19    that we don't expect physicians to act like    02:06:04
20    other profit-maximizing firms, that the only    02:06:07
21    thing that matters to them is, for example,    02:06:12
22    profit, as we do in other industries. We    02:06:14
23    actually expect physicians to do things that    02:06:16
24    may not be in their best financial interest,    02:06:19
25    for example, but are in the interest of    02:06:21

195

1    patients. Practice guidelines I would    02:06:23
2    consider to be an external imposition in a    02:06:26
3    way.    02:06:31
4  Q.  Okay. Okay. Taking you back to what    02:06:31
5    professional norms might be, would you    02:06:37
6    include -- well, let me withdraw that    02:06:42
7    question, too.    02:06:45
8      THE VIDEOGRAPHER: Excuse me. Five    02:06:51
9    minutes.    02:06:52
10      MR. POLUBINSKI: Okay.    02:06:52
11  Q.  Well, I assume -- well, just to back up, I    02:06:53
12    guess, do the norms that you have in mind    02:06:58
13    here vary at all from state to state, the    02:07:00
14    professional norms?    02:07:03
15  A.  Professional norms? No. I was referring    02:07:04
16    more generally to, again, sort of    02:07:07
17    physicians' commitments to their patients.    02:07:10
18  Q.  Right. Which I guess it may not vary state    02:07:14
19    to state, but presumably it might vary from    02:07:16
20    doctor to doctor?    02:07:18
21  A.  Again, I think of these kinds of    02:07:19
22    professional norms as being very broad and    02:07:24
23    about the commitments physicians make, all    02:07:28
24    physicians make when they, you know, receive    02:07:30
25    their degree and when they enter into    02:07:34

196

1    practice around something as broad as the    02:07:36
2    Hippocratic Oath which applies to    02:07:39
3    physicians.    02:07:41
4  Q.  I guess what I'm saying is that if it's so    02:07:42
5    broad that we can't look somewhere to see    02:07:45
6    where it's written down and that there's    02:07:49
7    some difficulty articulating what it is,    02:07:50
8    wouldn't you imagine that different doctors    02:07:52
9    might have different understandings of what    02:07:54
10    those professional norms are?    02:07:56
11      MR. NOTARGIACOMO: Objection.    02:07:57
12  A.  Different doctors may operationalize those    02:07:58
13    professional norms in different ways, yes.    02:08:04
14  Q.  Okay. But you would expect that most    02:08:06
15    doctors would take the requirement to use    02:08:08
16    their skills and knowledge seriously?    02:08:09
17  A.  I would.    02:08:11
18      MR. POLUBINSKI: I see we've got    02:08:23
19    very little time left on the videotape. I    02:08:24
20    think this might be a good time to take a    02:08:26
21    break.    02:08:29
22      THE WITNESS: Too bad it's not...    02:08:30
23      MR. POLUBINSKI: Yeah, maybe we can    02:08:32
24    just take enough of a break to switch tapes.    02:08:33
25      THE VIDEOGRAPHER: The time is    02:08:36

197

1    2:08. This is the end of Tape 3, and we are    02:08:37
2    off the record.    02:08:43
3      (Videographer changes tape.)    02:10:04
4      THE VIDEOGRAPHER: The time is    02:10:09
5    2:10. This is the beginning of Tape 4, and    02:10:10
6    we are back on the record.    02:10:12
7  BY MR. POLUBINSKI:    02:10:17
8  Q.  Okay. Professor Rosenthal, if you could    02:10:23
9    take a look at Paragraph 16 of your    02:10:26
10    declaration.    02:10:27
11  A.  Okay.    02:10:28
12  Q.  All right. Now, you write here that "The    02:10:33
13    FDA requires that manufacturers demonstrate    02:10:35
14    both the safety and efficacy of new drugs    02:10:37
15    before marketing them for sale."    02:10:41
16      Is that a correct description?    02:10:42
17  A.  That's correct.    02:10:44
18  Q.  Okay. The FDA first approved Neurontin for    02:10:45
19    marketing in 1994?    02:10:47
20  A.  I thought it was 1993, but I'll take your    02:10:48
21    word for it.    02:10:51
22  Q.  Well, why don't we take a look back at    02:10:51
23    Paragraph 7a) of your declaration.    02:10:55
24  A.  Okay.    02:10:58
25  Q.  You know what? In fact --    02:11:08

50  (Pages 194 to 197)

198

1  A.  Approved in December '93.                02:11:10
2  Q.  Yeah. Okay. You're right.                02:11:11
3  A.  You're right, they began selling in January    02:11:13
4      '94.                                     02:11:16
5  Q.  In January of '94. So you're not --      02:11:16
6  A.  So --                                    02:11:16
7  Q.  -- shortly (sic) right. Yeah, okay.      02:11:17
8  A.  Okay.                                    02:11:18
9  Q.  Neurontin was initially approved for     02:11:19
10     treatment of what condition?             02:11:22
11 A.  For partial seizures for adjunctive therapy,  02:11:22
12     is my understanding.                     02:11:29
13 Q.  Okay. Now, you also write in your        02:11:30
14     declaration -- and I think this is in    02:11:32
15     Paragraph 7c), the top of Page 5 -- that  02:11:34
16     Parke-Davis began seeking FDA approval for  02:11:39
17     other indications, which include pediatric  02:11:42
18     adjunctive treatment for seizures and also  02:11:45
19     for postherpetic neuralgia; is that correct?  02:11:49
20 A.  That's in 7c)? Yes.                      02:11:53
21 Q.  What do you mean by "began seeking"?     02:11:55
22 A.  Again, this is based on the complaint and  02:12:06
23     some of the documents that came along with  02:12:08
24     it, internal memos, that they were       02:12:10
25     undertaking the clinical studies necessary  02:12:15

199

1      to get those new indications listed.     02:12:17
2  Q.  Okay. Does it mean -- in your mind, does it  02:12:21
3      mean filing of supplemental new drug     02:12:24
4      applications?                            02:12:27
5  A.  I'm afraid it doesn't mean something quite  02:12:27
6      that detailed in my mind at all --       02:12:32
7  Q.  Okay.                                    02:12:34
8  A.  -- but my understanding was more that it was  02:12:34
9      related to launching the clinical trials  02:12:37
10     necessary to do that.                    02:12:38
11 Q.  Now, Neurontin was eventually approved for  02:12:46
12     pediatric adjunctive treatment, correct?  02:12:47
13 A.  That's correct.                          02:12:51
14 Q.  And it was eventually approved for PHN and,  02:12:51
15     correct?                                 02:12:54
16 A.  That is correct.                         02:12:55
17 Q.  What is PHN, by the way?                  02:12:55
18     MR. NOTARGIACOMO: Objection.             02:12:56
19 A.  My understanding is that it's pain       02:13:00
20     associated with herpes.                  02:13:02
21 Q.  Where does your understanding come from?  02:13:06
22 A.  Review of the documents.                 02:13:13
23 Q.  Do you understand PHN to be a type of    02:13:15
24     neuropathic pain?                        02:13:18
25     MR. NOTARGIACOMO: Objection.             02:13:19

200

1  A.  I'm not a clinical expert, so I would not  02:13:19
2      have made that connection, no.           02:13:22
3  Q.  Okay. What does FDA approval of Neurontin  02:13:24
4      for these indications mean in terms of   02:13:28
5      safety?                                  02:13:30
6  A.  My understanding is that they were able to  02:13:31
7      meet certain standards for the level of  02:13:34
8      evidence from clinical trials that was   02:13:37
9      provided in terms of whether the trials were  02:13:40
10     sufficiently large, well-designed to show  02:13:44
11     evidence that the -- that Neurontin was safe  02:13:47
12     and effective for those indications.     02:13:49
13 Q.  Okay. You've mentioned certain standards --  02:13:56
14 A.  Uh-huh.                                  02:14:02
15 Q.  -- that were met in order to gain approval  02:14:02
16     for those indications. What is your      02:14:05
17     understanding for what those standards are?  02:14:08
18 A.  The standards -- my understanding is that  02:14:09
19     the standards are generally that there need  02:14:13
20     to be two trials of sufficient size, and  02:14:16
21     generally the standard is a double-blind  02:14:20
22     randomized control trial.                02:14:24
23 Q.  Do you know what "sufficient size" means?  02:14:25
24 A.  I do not specifically, no.               02:14:28
25 Q.  Do you have a general understanding?     02:14:31

201

1  A.  I have a general understanding that it    02:14:32
2      relates to the statistical power of the  02:14:35
3      analysis, but I don't know what that would  02:14:39
4      be in this case.                         02:14:41
5  Q.  Upon what is your understanding based on in  02:14:42
6      terms of what the standards are for FDA  02:14:47
7      approval?                                02:14:50
8  A.  I've reviewed FDA regulations in the past.  02:14:51
9  Q.  Are you aware of whether there's any      02:15:01
10     follow-up reporting to keep the drug on the  02:15:03
11     market?                                  02:15:06
12 A.  Whether there's any post-marketing       02:15:06
13     surveillance -- oh, reporting required of  02:15:08
14     the manufacturers --                     02:15:10
15 Q.  Precisely.                               02:15:11
16 A.  -- as opposed to by the FDA --           02:15:12
17 Q.  Yes.                                     02:15:15
18 A.  -- itself?                               02:15:15
19 Q.  Yes.                                     02:15:16
20 A.  That's a good question. I don't know the  02:15:17
21     answer to that, no.                      02:15:19
22 Q.  After a drug is approved, do manufacturers  02:15:21
23     generally continue to conduct studies to  02:15:25
24     determine its effectiveness for other    02:15:27
25     conditions?                              02:15:30

51 (Pages 198 to 201)

## 202

1     MR. NOTARGIACOMO: Objection.    02:15:31
2  A.  I don't know whether that would be a    02:15:31
3     generalization.  Would I expect in other    02:15:35
4     cases that it might be done to try to find    02:15:38
5     new indications for a drug, for example?  It    02:15:40
6     certainly seems possible.    02:15:44
7  Q.  Why might a company choose to conduct such    02:15:45
8     additional studies?  Can you think of    02:15:54
9     reasons why they would?    02:15:56
10     MR. NOTARGIACOMO: Objection.    02:15:57
11 A.  I think generally a company would do so to    02:15:57
12     try to increase its sales.    02:16:02
13 Q.  Can you think of reasons why a company might    02:16:05
14     choose not to conduct additional studies?    02:16:12
15     MR. NOTARGIACOMO: Objection.    02:16:15
16 A.  I could imagine that a company might not    02:16:15
17     conduct those additional studies if they    02:16:20
18     were very close to, for example, patent    02:16:23
19     expiration or exclusivity expiration.    02:16:26
20 Q.  If subsequent studies show that a drug is    02:16:30
21     efficacious in treating other indications,    02:16:41
22     are pharmaceutical manufacturers required to    02:16:42
23     pursue FDA approval for those additional    02:16:44
24     indications?    02:16:46
25     MR. NOTARGIACOMO: Objection.    02:16:47

## 203

1  A.  I do not believe so, no.    02:16:47
2  Q.  Do you know if they're encouraged or advised    02:16:52
3     by the FDA to seek additional indications --    02:16:54
4     seek approval for additional indications?    02:16:58
5  A.  I know that in specific cases I'm aware --    02:17:01
6     maybe "no" is a little too deep-sounding.    02:17:04
7     I'm aware that in specific cases, for    02:17:06
8     example, for pediatric indications the FDA    02:17:09
9     has programs that encourage manufacturers to    02:17:12
10     do additional clinical trials by extending    02:17:13
11     exclusivity.    02:17:17
12 Q.  Aside from that circumstance, are you aware    02:17:18
13     of -- are you aware of any other    02:17:23
14     circumstances in which a manufacturer might    02:17:28
15     be encouraged or advised by the FDA to    02:17:31
16     pursue additional indications?    02:17:33
17 A.  I'm not aware of any specific instances.    02:17:35
18 Q.  And can you imagine any circumstances under    02:17:37
19     which a company might decide not to pursue    02:17:47
20     additional indications even where subsequent    02:17:49
21     studies might show efficacy?    02:17:51
22     MR. NOTARGIACOMO: Objection.    02:17:52
23 A.  Again, I could imagine the case where the    02:18:01
24     patent is due to expire very quickly, that    02:18:03
25     that would be the case.    02:18:06

## 204

1  Q.  Are you aware that other countries have    02:18:13
2     analogous regulatory structures to the FDA?    02:18:15
3  A.  It's my understanding that other certainly    02:18:17
4     OECD countries, developed countries, have    02:18:20
5     analogous institutions.    02:18:23
6  Q.  Can you tell us what you mean by "OECD    02:18:26
7     countries"?    02:18:30
8  A.  Sorry, Organization -- you're going to test    02:18:30
9     my recollection, Organization For Economic    02:18:32
10     Development.  I can't remember what the C is    02:18:35
11     for.  It's an organization of western    02:18:38
12     economies that probably dates back to the    02:18:40
13     '60s, and they have aligned for a variety of    02:18:44
14     things, at one time exchange rate    02:18:48
15     stabilization, but now it's just sort of --    02:18:51
16     it's a group of mostly northern European    02:18:56
17     countries, the U.S. and Canada.    02:18:59
18 Q.  Okay.  Why don't we take the European Union    02:19:01
19     as an example of this.    02:19:08
20 A.  Okay.    02:19:09
21 Q.  How much do you know about the European    02:19:09
22     Union system for approving prescription    02:19:12
23     drugs for marketing?    02:19:14
24 A.  I don't know very much.  I understand that    02:19:15
25     it's something that -- it's a policy area    02:19:18

## 205

1     that's not fully coordinated yet, so the --    02:19:21
2  Q.  Coordinated in what way?    02:19:25
3  A.  The countries within the European Union I    02:19:26
4     believe still reserve their own right to    02:19:29
5     approve drugs, so they don't do it all as a    02:19:30
6     union, is my understanding, at least my    02:19:34
7     latest knowledge.    02:19:36
8  Q.  Okay.  Insofar as there is -- well, insofar    02:19:37
9     as the European Medicines Agency does    02:19:40
10     actually conduct this sort of review, do you    02:19:43
11     have any sense for how that -- how its    02:19:44
12     process differs from the FDA's process?    02:19:47
13 A.  I do not.    02:19:49
14 Q.  I assume, though, that you don't have any    02:19:53
15     reason to believe that regulators in the    02:19:55
16     European Union aren't committed, generally    02:19:57
17     speaking, to patient safety?    02:20:00
18     MR. NOTARGIACOMO: Objection.    02:20:01
19 A.  I don't have any reason to believe that    02:20:02
20     they're not committed to patient safety.    02:20:04
21 Q.  I didn't think you would, don't worry.    02:20:06
22     And you don't have any reason to think    02:20:08
23     that regulators in the EU are committed to    02:20:11
24     approving drugs only for indications for    02:20:14
25     which they've been proven to be effective?    02:20:17

52  (Pages 202 to 205)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                  516-608-2400

## 206

```
 1        MR. NOTARGIACOMO: Objection.        02:20:19
 2  A.  I'm sorry, I think there was a double      02:20:20
 3      negative in there, and I just didn't hear   02:20:22
 4      which way it went, so could you repeat?     02:20:24
 5        MR. POLUBINSKI: Maybe if you could    02:20:26
 6      read it back.                               02:20:28
 7  A.  That would be great.                        02:20:29
 8      (Record read.)                              02:20:30
 9  Q.  Well, maybe I should read it again. Sounds  02:20:46
10      like one of my double or triple negatives   02:20:48
11      wasn't picked up.                           02:20:51
12  A.  Actually, it was a missing negative that    02:20:52
13      I --                                        02:20:53
14  Q.  I think you're right, so let me ask it more  02:20:54
15      slowly. You don't have any reason to think  02:20:56
16      that regulators in the EU are not committed 02:20:57
17      to approving drugs only for indications for 02:21:01
18      which they've been proven to be effective?  02:21:03
19        MR. NOTARGIACOMO: Objection.        02:21:05
20  A.  I don't have any reason to draw that        02:21:07
21      conclusion, no.                             02:21:10
22  Q.  And I assume also you don't have any reason  02:21:11
23      to doubt the competence of the applicable   02:21:13
24      regulators in the EU?                       02:21:15
25        MR. NOTARGIACOMO: Objection.        02:21:16
```

## 207

```
 1  A.  I have no information about the competence  02:21:17
 2      of the regulators in the EU. I have no      02:21:20
 3      reason to doubt it.                         02:21:23
 4  Q.  And so you wouldn't have any basis on which  02:21:24
 5      to second-guess an official determination by 02:21:26
 6      the European Medicines Agency that a drug is 02:21:28
 7      safe and effective for a particular         02:21:31
 8      indication?                                 02:21:33
 9        MR. NOTARGIACOMO: Objection.        02:21:33
10  A.  I wouldn't have any basis, nor would I be    02:21:34
11      asked to render such an opinion.            02:21:39
12  Q.  Fair enough. And why wouldn't you be asked  02:21:40
13      to render such an opinion?                  02:21:42
14  A.  Because I'm not an expert on clinical        02:21:43
15      effectiveness.                              02:21:46
16  Q.  Fair enough. Neuropathic pain is one of the  02:21:47
17      off-label indications at issue in the case,  02:21:52
18      right?                                      02:21:54
19  A.  Yes, I believe that's true.                  02:21:54
20  Q.  And Neurontin's not approved for treatment   02:21:55
21      of neuropathic pain generally in the U.S.,   02:21:58
22      right?                                      02:22:01
23  A.  You mean, generally accepted in the case of  02:22:01
24      postherpetic neuralgia?                     02:22:04
25  Q.  Precisely, yeah.                            02:22:04
```

## 208

```
 1  A.  Right.                                       02:22:07
 2  Q.  Are you aware that Neurontin is approved for  02:22:07
 3      the treatment of neuropathic pain in the     02:22:11
 4      European Union?                             02:22:14
 5        MR. NOTARGIACOMO: Objection.        02:22:15
 6  A.  I believe that was mentioned in the          02:22:15
 7      complaint.                                  02:22:16
 8  Q.  And are you aware that it had previously      02:22:17
 9      been approved for neuropathic pain in a      02:22:19
10      number of countries like Germany, France or  02:22:22
11      the U.K.?                                   02:22:24
12  A.  I believe you if you tell me that. I do       02:22:25
13      recall that it had been approved somewhere.  02:22:27
14  Q.  Do you have any reason to believe that the    02:22:29
15      conclusion of those regulatory bodies in     02:22:37
16      those countries is unsupported by            02:22:39
17      scientifically valid evidence that Neurontin 02:22:40
18      is effective for treatment of neuropathic    02:22:42
19      pain?                                       02:22:45
20        MR. NOTARGIACOMO: Objection.        02:22:45
21  A.  Other than the allegations made in the       02:22:46
22      complaint, I have no reason to believe that  02:22:48
23      that is unsubstantiated.                    02:22:51
24  Q.  Which allegations in the complaint do you    02:22:53
25      mean?                                       02:22:56
```

## 209

```
 1  A.  Because there are allegations in the         02:22:56
 2      complaint with regard to neuropathic pain    02:22:57
 3      that suggests that there must be something   02:23:00
 4      in the effectiveness evidence.               02:23:01
 5  Q.  And you're aware that Neurontin -- well,      02:23:08
 6      withdrawn.                                  02:23:10
 7      Are you aware that Neurontin was             02:23:11
 8      approved for treatment of neuropathic pain   02:23:13
 9      in several countries outside of Europe, too? 02:23:15
10  A.  I was not specifically aware of it. Again,    02:23:17
11      I was aware that some of these indications   02:23:20
12      had been approved elsewhere, but I don't     02:23:22
13      have the specific details in my head.        02:23:24
14  Q.  And you wouldn't have the details of any of   02:23:27
15      those countries' approvals of Neurontin for  02:23:28
16      treatment of neuropathic pain, I assume,     02:23:31
17      either?                                     02:23:33
18  A.  No, I wouldn't.                              02:23:33
19  Q.  Do you have any view as to whether a drug     02:23:40
20      that's been approved for another indication  02:23:42
21      in another country, but not in the U.S., is  02:23:43
22      unsafe?                                     02:23:46
23        MR. NOTARGIACOMO: Objection.        02:23:47
24  A.  I don't have a view on that, no.             02:23:48
25  Q.  Do you have a view as to whether a drug       02:23:54
```

53 (Pages 206 to 209)

210

1   that's been approved for an indication in        02:23:56
2   another country but not in the U.S. for a         02:23:59
3   particular indication is inefficacious for        02:24:01
4   the indication for which it has not been          02:24:05
5   approved in the U.S.?                             02:24:08
6        MR. NOTARGIACOMO: Objection.                 02:24:09
7   A. I actually followed that.                      02:24:10
8   Q. Good.                                          02:24:12
9   A. No, I don't have any expertise to evaluate     02:24:13
10  that.                                             02:24:16
11       MR. POLUBINSKI: Okay. I think                02:24:21
12  we're at a good stopping point for your           02:24:21
13  call, if that makes sense.                        02:24:25
14       MR. NOTARGIACOMO: Except my call             02:24:26
15  doesn't start for another nine minutes. It        02:24:27
16  starts at 2:30. So we can break, and it'll        02:24:29
17  just be a longer break.                           02:24:34
18       MR. POLUBINSKI: Yeah, why don't we           02:24:36
19  go off the record. What time do you have?         02:24:38
20       THE VIDEOGRAPHER: 2:24.                       02:24:42
21       MR. POLUBINSKI: It's all right.              02:24:42
22       THE VIDEOGRAPHER: Go off the                 02:24:45
23  record?                                           02:24:45
24       MR. POLUBINSKI: Yes. Yeah.                   02:24:45
25       THE VIDEOGRAPHER: The time is                02:24:47

211

1   2:24. We're off the record.                       02:24:48
2        (Recess taken.)                              02:24:52
3        THE VIDEOGRAPHER: The time is 2:57           02:57:16
4   p.m., and we are back on the record.              02:57:19
5   BY MR. POLUBINSKI:                                02:57:23
6   Q. So, Professor Rosenthal, what is off-label     02:57:26
7   use?                                              02:57:31
8   A. My working definition of off-label use was     02:57:32
9   use of a drug for a diagnosis or indication       02:57:37
10  other than that which is approved and             02:57:41
11  therefore covered on the FDA-approved label.      02:57:45
12  Q. Would you agree that FDA doesn't               02:57:51
13  restrict a doctor's discretion in deciding        02:57:54
14  whether to prescribe a drug off-label?            02:57:57
15  A. That's correct.                                02:58:00
16  Q. Do you have an understanding for why           02:58:01
17  off-label prescription is permitted by the        02:58:03
18  FDA?                                              02:58:05
19  A. I do not have an understanding of what their   02:58:05
20  reasons are, no.                                  02:58:08
21  Q. Okay. Let's look at Paragraph 13 of your       02:58:08
22  report.                                           02:58:10
23  A. Okay.                                          02:58:10
24  Q. And look at the --                             02:58:10
25  A. Oh, I'm sorry, I'm on Page 13.                 02:58:23

212

1   Q. That's okay.                                   02:58:25
2   A. I'm sorry.                                     02:58:26
3        MR. NOTARGIACOMO: Page 13.                   02:58:26
4   A. Okay. All right. I'm with you.                 02:58:29
5   Q. And I'm looking at the second sentence. And    02:58:31
6   I think probab -- well, the second sentence       02:58:33
7   reads, "As the 'learned intermediary,' there      02:58:35
8   are times when it is legitimate for a             02:58:38
9   physician to carefully prescribe and monitor      02:58:40
10  off-label use of pharmaceuticals for              02:58:42
11  specific patients for specific indications."      02:58:45
12       Did I read that correctly?                   02:58:49
13  A. Yes, you did.                                  02:58:50
14  Q. And what's the basis for that statement?       02:58:51
15  A. My general training and experience working     02:58:53
16  in this area, that off-label use is a             02:58:55
17  routine part of clinical practice.                02:58:57
18  Q. Does a doctor need to inform a patient when    02:59:00
19  he or she prescribes a drug off-label?            02:59:09
20       MR. NOTARGIACOMO: Objection.                 02:59:11
21  A. You know, I'm not sure if that would be the    02:59:12
22  case. I'm not sure the answer to that             02:59:16
23  question. You mean ethically does the             02:59:18
24  doctor need to inform a patient, or do you        02:59:20
25  mean legally?                                     02:59:22

213

1   Q. Any requirement that you're aware of at all.   02:59:23
2   Is there any requirement that you're aware        02:59:27
3   of that a doctor inform the patient that he       02:59:28
4   or she is prescribing a drug off-label?           02:59:30
5   A. I'm not aware of any requirement, no.          02:59:33
6   Q. Do you have an understanding for whether       02:59:35
7   some doctors do inform their patients that        02:59:37
8   they're prescribing a drug off-label?             02:59:39
9   A. I don't have any evidence on that point.       02:59:41
10  Q. Would you have any reason to believe that      02:59:46
11  some doctors do -- or don't, I should say?        02:59:47
12       MR. NOTARGIACOMO: Objection.                 02:59:51
13  Q. Let me think of a clearer way to phrase the    02:59:52
14  question.                                         02:59:56
15  A. Sure.                                          02:59:56
16  Q. You wouldn't disagree with me if I told you    02:59:56
17  that some doctors informed patients that          03:00:01
18  they're prescribing drugs off-label,              03:00:04
19  correct?                                          03:00:06
20  A. I wouldn't be surprised that some doctors do   03:00:07
21  inform their patients that they're               03:00:09
22  prescribing off-label.                            03:00:11
23  Q. And you wouldn't be surprised to learn that    03:00:12
24  some doctors don't inform their patients          03:00:14
25  that they're prescribing drugs off-label?         03:00:15

54 (Pages 210 to 213)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                              516-608-2400

214

```
 1          MR. NOTARGIACOMO: Objection.        03:00:17
 2  A.  I would not be surprised to learn that.    03:00:17
 3  Q.  And I assume -- well, are you aware of any   03:00:21
 4      way to know with respect to the           03:00:27
 5      prescriptions that are at issue in your     03:00:30
 6      report which of those prescriptions are ones  03:00:32
 7      in which a doctor informed his or her       03:00:35
 8      patient that the drug Neurontin was being    03:00:39
 9      prescribed off-label?                      03:00:42
10  A.  No, there wouldn't be any way to know that.   03:00:42
11  Q.  Looking back at your -- at the sentence that   03:00:46
12      we just read, what does the word          03:00:50
13      "legitimate" mean in the sentence?        03:00:55
14  A.  I was using that term in a general        03:00:56
15      colloquial meaning of within the scope of   03:00:59
16      the physician's discretion, within the scope  03:01:03
17      of his or her professional discretion.      03:01:06
18  Q.  So were you using it in a legal sense?      03:01:09
19  A.  No. Again, I was using it in a colloquial   03:01:12
20      sense.                                    03:01:15
21  Q.  Okay. By "colloquial," is that -- I guess   03:01:16
22      I'm still trying to understand quite what   03:01:19
23      that means. Is it legitimate in a clinical   03:01:21
24      sense?                                    03:01:24
25  A.  I meant it in the sense that it would be    03:01:24
```

215

```
 1      reasonable that there would be a basis upon   03:01:31
 2      which the physician could reasonably justify   03:01:34
 3      off-label prescribing.                     03:01:39
 4  Q.  To justify it in a clinical sense?         03:01:42
 5  A.  In a professional sense. Perhaps that's    03:01:47
 6      what you mean by "clinical."               03:01:52
 7  Q.  Sure. Can you provide an example of an     03:01:54
 8      acceptable or legitimate off-label          03:01:58
 9      prescribing circumstance?                  03:02:01
10  A.  I could imagine a circumstance in which     03:02:02
11      there is no approved treatment for a       03:02:06
12      condition, and a physician in that case     03:02:09
13      might choose to prescribe something        03:02:14
14      off-label.                                03:02:16
15  Q.  And what would make that off-label         03:02:19
16      prescription legitimate?                   03:02:21
17  A.  I guess, again, in the way that I understood   03:02:22
18      and used this term, based on some clinical   03:02:29
19      knowledge about the mechanism for whatever   03:02:33
20      illness it was and the drug itself.        03:02:37
21  Q.  I assume that for a prescription to be      03:02:46
22      legitimate there must be some basis for the   03:02:48
23      doctor to believe that the drug will be     03:02:51
24      effective for the patient for the off-label   03:02:53
25      use at issue; is that right?              03:02:55
```

216

```
 1  A.  That's correct. That's perhaps a clearer   03:02:56
 2      way of what I was trying to say, that there   03:03:01
 3      was a condition that had a characteristic   03:03:03
 4      that somehow fit with the way a drug acts.   03:03:05
 5  Q.  Okay. And whether or not it's legitimate I   03:03:08
 6      assume would be based on the specific      03:03:11
 7      circumstance of a patient?                 03:03:14
 8          MR. NOTARGIACOMO: Objection.        03:03:16
 9  A.  Again, I was using the term broadly that   03:03:17
10      there would be a professional justification   03:03:21
11      for doing so based on the patient and the   03:03:23
12      drug at hand.                             03:03:27
13  Q.  Medicaid reimburses for at least some      03:03:28
14      off-label prescriptions; is that correct?   03:03:35
15  A.  I don't know the full details of how       03:03:37
16      Medicaid treats off-label use.             03:03:39
17  Q.  Do you know any of the details about how   03:03:45
18      Medicaid treats off-label use?             03:03:47
19  A.  I've certainly read something broadly about   03:03:49
20      it, but I'm afraid I don't feel qualified to   03:03:52
21      summarize what it is I read about it.       03:03:55
22  Q.  Okay. Are you aware that private insurers   03:03:57
23      also reimburse for off-label uses?         03:04:04
24  A.  That, I am aware of.                       03:04:08
25  Q.  Do you have any understanding for why they   03:04:09
```

217

```
 1      do it?                                    03:04:10
 2          MR. NOTARGIACOMO: Objection.        03:04:11
 3  A.  I don't know why, no.                      03:04:11
 4  Q.  Okay. Let's look at Paragraph 13, which is   03:04:15
 5      also on Page 7.                           03:04:29
 6  A.  Yes, I'm there.                            03:04:33
 7  Q.  The third sentence reads, "Such off-label   03:04:34
 8      prescribing can benefit both individual     03:04:39
 9      patients and patient populations as clinical   03:04:40
10      experience leads to the formation of       03:04:43
11      hypotheses to be tested in structured      03:04:46
12      clinical trials."                         03:04:49
13          Did I read that one correctly?        03:04:50
14  A.  Yes, you did.                             03:04:51
15  Q.  What do you mean by "benefit" in this      03:04:52
16      sentence as respects individual patients?   03:05:00
17  A.  Let's see. Let me see if there's a way to   03:05:02
18      describe it. I mean generally with respect   03:05:12
19      to individual patients that they might --   03:05:18
20      they might have an improvement in their    03:05:21
21      condition as a result of prescribing, and   03:05:24
22      then with regard to populations --        03:05:29
23  Q.  Uh-huh. Yes.                             03:05:32
24  A.  -- I mean in the sense of increasing the   03:05:32
25      available information with which to base   03:05:36
```

55  (Pages 214 to 217)

218

1    future clinical trials.                          03:05:39
2 Q.  Okay. So with respect to individual            03:05:44
3    patients, I guess you would agree that in       03:05:49
4    some circumstances at least an individual       03:05:54
5    patient can enjoy a tangible benefit by         03:05:55
6    virtue of an off-label prescription?            03:05:58
7 A.  Yes, that would certainly be true in some      03:06:02
8    cases.                                           03:06:05
9 Q.  And that -- is there any way to quantify       03:06:05
10   that benefit?                                    03:06:44
11 A.  Could you be more specific? Is there any      03:06:45
12   way to quantify --                               03:06:48
13 Q.  You know, why don't I withdraw the question,  03:06:50
14   actually. That's fine.                           03:06:52
15      Let's look at Paragraph 17, and in          03:06:53
16   particular let's look at the third sentence     03:07:08
17   here. "In particular, promotional materials     03:07:10
18   may only make claims that are supported by      03:07:13
19   scientific evidence (supported by strict        03:07:17
20   scientific procedures) and they may not be      03:07:20
21   false or misleading."                            03:07:23
22      Did I read that correctly?                   03:07:27
23 A.  Yes, you did.                                  03:07:28
24 Q.  Upon what do you base that statement?         03:07:28
25 A.  A review of the -- I believe the code is      03:07:32

219

1    cited there, the Federal 21 CFR 202.1, just     03:07:38
2    a general, again, layman's review. These        03:07:43
3    are sort of the underlying regulations in       03:07:45
4    this area.                                       03:07:47
5 Q.  Anything else?                                  03:07:48
6 A.  That's it.                                      03:07:49
7 Q.  What does "supported by strict scientific      03:07:50
8    procedures" mean?                                03:07:56
9 A.  So, again, with regard to the scientific       03:07:57
10   evidence that was used to gain approval for     03:07:59
11   the drug for that indication, so clinical       03:08:02
12   trials, randomized control trials.              03:08:05
13 Q.  Is there -- is that all, or are there other   03:08:10
14   things?                                          03:08:19
15 A.  My understanding is that there are a number   03:08:19
16   of rules around how the trials can be run,      03:08:21
17   how patients are selected, that sort of         03:08:24
18   thing. Those all, again, are the same rules     03:08:26
19   about what kind of evidence will be used for    03:08:29
20   approval.                                        03:08:32
21 Q.  Does your statement that I just read in       03:08:32
22   Paragraph 17 apply only to written             03:08:40
23   materials, or does this statement also apply    03:08:43
24   to oral communications?                          03:08:45
25 A.  I believe it also applies to oral             03:08:47

220

1    communications. Certainly the promotional      03:08:49
2    materials can be oral that are governed         03:08:52
3    by -- these rules also govern consumer          03:08:55
4    advertising which is broadcast on TV and        03:08:59
5    radio.                                           03:09:05
6 Q.  And so this statement would apply, I assume,   03:09:05
7    also to the physician-oriented marketing        03:09:09
8    efforts that are described in Paragraph 19      03:09:12
9    on the next page of your declaration?           03:09:14
10 A.  That's my understanding.                      03:09:16
11 Q.  Things like detailing, free samples,          03:09:17
12   sponsorship, medical education events?          03:09:20
13 A.  My understanding with regard to the           03:09:24
14   promotional claims, that they not be false      03:09:26
15   or misleading and are supported by evidence     03:09:29
16   and that they apply to all promotional          03:09:32
17   activities.                                      03:09:34
18 Q.  Okay. You also write in Paragraph 17, "FDA    03:09:34
19   regulations call for 'fair balance' in all      03:09:42
20   promotional claims and materials."              03:09:45
21 A.  That is correct.                               03:09:49
22 Q.  What is "fair balance"?                        03:09:50
23 A.  Well, that's a quote, as you see, from the    03:09:53
24   code itself, and my layperson's              03:09:56
25   interpretation is that risks and benefits be    03:10:00

221

1    represented in fair proportion to their         03:10:04
2    actual magnitude.                                03:10:08
3 Q.  So it's a balancing of the presentation of     03:10:09
4    risks and benefits?                              03:10:17
5 A.  That's my understanding, and I have worked     03:10:18
6    most directly with this as it relates to        03:10:21
7    consumer advertising, and so in television      03:10:24
8    ads that means the level of volume, the size    03:10:28
9    of the fonts, whether the person is speaking    03:10:31
10   in the foreground or the background, but,       03:10:34
11   again, sort of the extent to which risks and    03:10:37
12   benefits are presented proportionally to        03:10:38
13   their potential impact.                          03:10:42
14 Q.  Now, taking as an example the direct          03:10:44
15   consumer advertising, would it be correct to    03:10:49
16   say that what is or isn't fair balance will     03:10:53
17   depend on the circumstances of the specific     03:10:55
18   communication?                                   03:10:58
19      MR. NOTARGIACOMO: Objection.               03:11:01
20 A.  I can imagine that there's a -- factors       03:11:01
21   that one would look at in a television ad       03:11:07
22   for example, would be somewhat different        03:11:10
23   than in a print ad. As I mentioned,             03:11:13
24   obviously the print ad, it's really all         03:11:15
25   about font size and color and that sort of      03:11:17

56  (Pages 218 to 221)

222

1  thing where -- on the television. I know    03:11:19
2  there's been a lot of question about the    03:11:21
3  type of speaker, the volume of speech, the    03:11:24
4  speed of speech, so...    03:11:27
5  Q.  What about the content?    03:11:28
6  A.  Certainly the content matters, but I think a    03:11:29
7  lot of what I've seen relates to how the    03:11:34
8  content is presented. The content, I    03:11:38
9  believe, typically comes from the approved    03:11:42
10  labeling.    03:11:45
11  Q.  In the case of the advertisements, correct?    03:11:46
12  A.  That's correct.    03:11:49
13  Q.  So that obviously couldn't be true of    03:11:49
14  something like a discussion at a continuing    03:11:57
15  medical education event; is that correct?    03:12:00
16  A.  You can imagine that there would be an    03:12:01
17  analogous yardstick.    03:12:03
18  Q.  Right. But how the yardstick is applied    03:12:05
19  would be based on the individual    03:12:08
20  circumstances, correct?    03:12:09
21      MR. NOTARGIACOMO: Objection.    03:12:15
22  A.  I imagine that it would be applied somewhat    03:12:15
23  differently looking at a professional    03:12:18
24  conference.    03:12:19
25  Q.  All right. Let's move ahead to Paragraph 18    03:12:20

223

1  where you write, quote, "Promotional    03:12:31
2  materials must be consistent with the FDA-    03:12:34
3  approved product labeling."    03:12:37
4  A.  I see that, yes.    03:12:42
5  Q.  What does this mean in terms of    03:12:43
6  communications by manufacturers on off-label    03:12:49
7  uses?    03:12:52
8  A.  My understanding is that manufacturers    03:12:52
9  cannot promote their products according to    03:12:57
10  the FDA, that they cannot promote their    03:12:59
11  products for indications for which there has    03:13:02
12  not been approval.    03:13:05
13  Q.  When you say "manufacturers cannot promote    03:13:12
14  their products," you don't mean, do you,    03:13:15
15  that a manufacturer can never under any    03:13:17
16  circumstances communicate any truthful or    03:13:19
17  non-misleading information about an    03:13:22
18  off-label use to a doctor, do you?    03:13:24
19      MR. NOTARGIACOMO: Objection.    03:13:26
20  A.  I guess that's such a specific statement, it    03:13:26
21  seems that it calls for expertise that I    03:13:31
22  don't have. My understanding was that the    03:13:34
23  regulatory basis here was that promotion    03:13:36
24  needed to be consistent with what was    03:13:38
25  approved.    03:13:40

224

1  Q.  Okay. I'm just asking you mainly about, you    03:13:40
2  know, about the statement that's actually in    03:13:44
3  your declaration itself. Do you have any    03:13:46
4  understanding for how this statement that's    03:13:50
5  in your declaration would apply generally to    03:13:52
6  communications that are made by a    03:13:56
7  manufacturer about an off-label use of a    03:13:57
8  drug?    03:13:59
9  A.  Do you mean --    03:14:00
10      MR. NOTARGIACOMO: Objection.    03:14:03
11  A.  Do you mean communications to physicians?    03:14:04
12  Q.  Yes, I do.    03:14:06
13  A.  Okay. My understanding was that -- and    03:14:07
14  perhaps it's a misunderstanding, but my    03:14:11
15  understanding was that the FDA did not allow    03:14:13
16  manufacturers to promote through    03:14:18
17  communications to physicians their products    03:14:21
18  for indications for which they had not been    03:14:27
19  approved.    03:14:30
20  Q.  Okay. And I guess my question is, by the    03:14:33
21  verb "promote" is that meant to cover all    03:14:36
22  communications of any kind by a manufacturer    03:14:39
23  about off-label uses of one of its drugs?    03:14:41
24  A.  It's meant to cover, I guess, those things    03:14:44
25  that I consider to be promotion, which would    03:14:49

225

1  include detailing, those kinds of meetings    03:14:51
2  where the speakers were there for continuing    03:14:58
3  medical education -- where the speakers    03:15:00
4  cannot be the promotional staff from the    03:15:08
5  manufacturers, the kinds of promotional    03:15:10
6  events and things like detailing, those    03:15:13
7  sorts of visits that we talked about    03:15:16
8  earlier. That's what I mean by "promotion."    03:15:18
9  Q.  Okay. So do you have an understanding as to    03:15:24
10  whether there may be some communications by    03:15:28
11  a manufacturer on off-label uses to doctors    03:15:30
12  that may not qualify as promotion, as you    03:15:33
13  define it --    03:15:33
14  A.  No.    03:15:33
15  Q.  -- in your answers?    03:15:39
16  A.  I don't have an understanding about that,    03:15:40
17  no.    03:15:42
18  Q.  Do you have an understanding -- let me give    03:15:42
19  you a couple of examples. Do you have an    03:15:48
20  understanding that the FDA rule that you    03:15:51
21  describe in your declaration would limit or    03:15:58
22  prohibit a doctor -- limit or prohibit a    03:16:01
23  manufacturer from providing a reprint of an    03:16:04
24  article published in the Journal of the    03:16:09
25  American Medical Association, for example,    03:16:13

226

1  that describes an off-label use if the          03:16:13
2  doctor asks the manufacturer for a reprint      03:16:15
3  of that article?                                03:16:18
4      MR. NOTARGIACOMO:  Objection.              03:16:19
5  A.  I think that's an area that goes a little    03:16:19
6  bit beyond my understanding, so I don't know    03:16:22
7  the specific restrictions.                      03:16:24
8  Q.  Okay.  I'm really just asking you as to      03:16:27
9  whether that sort of a circumstance is what     03:16:28
10  you had in mind when you wrote this first       03:16:30
11  sentence of Paragraph 18.                       03:16:32
12  A.  What I had in mind in the sentence was to    03:16:34
13  generally make the point that the FDA as an     03:16:40
14  institution govern promotional activities in    03:16:44
15  the pharmaceutical sector and that the          03:16:47
16  general rules were that promotional             03:16:49
17  activities should be restricted to approved     03:16:52
18  uses.  Whether there are some exceptions to     03:16:54
19  that, I don't know.  And it sounds like         03:16:59
20  you're suggesting that if the physician         03:17:01
21  requests information on an off-label use,        03:17:03
22  maybe that's an exception, but my knowledge     03:17:05
23  doesn't go that deep.                           03:17:09
24  Q.  Okay.  Fair enough.  I guess maybe can we    03:17:10
25  agree that there may be types of                03:17:13

227

1  communications between a manufacturer and a     03:17:14
2  doctor on off-label uses that don't fall        03:17:18
3  within the promotional materials guidance       03:17:22
4  that you describe in Paragraph 18?              03:17:26
5      MR. NOTARGIACOMO:  Objection.              03:17:29
6  A.  I would be willing to accept that, yes.      03:17:29
7  Q.  Okay.  For the next couple of questions why  03:17:35
8  don't we just assume for purposes of my         03:17:46
9  questions that some kinds of activity like      03:17:48
10  distribution of peer-reviewed journal           03:17:52
11  articles to doctors are, in fact, permitted     03:17:55
12  under the FDA's regulatory scheme.  Again,      03:17:59
13  just for purposes of these questions, let's     03:18:01
14  assume that.  Is that okay?                     03:18:03
15  A.  Yes, that's okay with me.                    03:18:05
16  Q.  Okay.  You would agree that that sort of     03:18:06
17  activity might have an impact on                03:18:08
18  prescriptions written for off-label uses?       03:18:10
19  A.  I would expect that the distribution of      03:18:12
20  materials, if they were positive, showed        03:18:18
21  effectiveness from these peer-reviewed          03:18:21
22  articles, might have an effect on               03:18:23
23  prescribing, yes.                               03:18:28
24  Q.  And I assume you wouldn't be able to         03:18:30
25  identify which promotional off-label            03:18:33

228

1  activities might be permitted by the FDA and    03:18:34
2  which would not be, again, assuming that        03:18:37
3  some -- you know, that some are and some        03:18:39
4  aren't?                                         03:18:41
5      MR. NOTARGIACOMO:  Objection.              03:18:42
6  A.  I guess I'm not sure -- I'm happy to assume  03:18:42
7  that some are and some aren't, but are you      03:18:48
8  telling me that I can't tell which ones are     03:18:50
9  permitted and which ones aren't?  So I don't    03:18:52
10  know what is the criterion for                  03:18:55
11  "permissible."                                  03:18:57
12  Q.  Yeah, I guess it's a hard question to answer  03:18:58
13  if you're not aware of what the distinction    03:19:00
14  is.  I'm fine with withdrawing the question.    03:19:02
15  A.  Okay.                                        03:19:05
16  Q.  Again, looking just at the first sentence of  03:19:06
17  Paragraph 16 and the statement that it         03:19:18
18  gives, under -- just following this            03:19:24
19  statement would it be correct to say that      03:19:31
20  the FDA would limit the circumstances in       03:19:35
21  which a manufacturer might provide what is     03:19:38
22  entirely truthful information about a drug?    03:19:40
23      MR. NOTARGIACOMO:  Objection.              03:19:45
24  A.  This is sort of the converse of what you     03:19:48
25  asked me to assume before, that there are      03:19:51

229

1  some circumstances in which truthful           03:19:54
2  information is limited by the FDA.              03:19:56
3  Q.  Yeah, I mean, I think that's right.          03:20:02
4  A.  My understanding, again, there may be        03:20:11
5  truthful information but which has not led      03:20:12
6  to the approval of an indication and           03:20:15
7  therefore cannot, for example, be included     03:20:17
8  in the product label which could be seen as    03:20:18
9  a form of promotion, so my understanding is    03:20:21
10  that that is correct.                           03:20:25
11  Q.  Okay.  Maybe a simpler way of putting it     03:20:25
12  would be to say that the FDA doesn't permit    03:20:27
13  a manufacturer to say whatever it wants to     03:20:29
14  about an off-label use, even if the            03:20:31
15  manufacturer's statements are entirely         03:20:33
16  truthful?                                       03:20:36
17  A.  That was my understanding, yes.              03:20:36
18  Q.  And so, again, just based on your            03:20:38
19  understanding as it's set forth in the         03:20:50
20  declaration, a manufacturer who provides       03:20:52
21  this truthful information about an off-label    03:20:54
22  use could very well violate federal laws or    03:20:56
23  the FDA's policies prohibiting off-label       03:20:59
24  promotion, correct?                             03:21:01
25      MR. NOTARGIACOMO:  Objection.              03:21:02

58  (Pages 226 to 229)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                      516-608-2400

230

```
 1 A.  I guess that's correct. I don't know --       03:21:03
 2      when you say laws versus regulations, I       03:21:10
 3      don't want to make a legal opinion that       03:21:13
 4      doesn't make sense, but...                    03:21:14
 5 Q.   That's fine. As opposed to laws or legal --   03:21:16
 6      or regulation, let's just say, would violate  03:21:19
 7      the policy that you describe in your          03:21:22
 8      declaration?                                  03:21:24
 9 A.  My understanding of the policy is that the     03:21:25
10      regulation applies to information whether     03:21:28
11      it's truthful or not.                         03:21:30
12 Q.   Okay. Are you offering an opinion in the      03:21:32
13      case on any matters that are related to the   03:21:45
14      FDA's regulation of the promotion of          03:21:47
15      prescription drugs?                           03:21:50
16 A.  My discussion of the FDA regulations was       03:21:51
17      sort of in the context of supporting sort of  03:21:53
18      the institutional setting of what's going     03:21:56
19      on, so I'm not making an opinion about FDA    03:21:59
20      regulations per say, but it's an important    03:22:01
21      part of the context.                          03:22:04
22 Q.   Let's turn back to Paragraph 12 of your       03:22:05
23      declaration, and I think I would like to      03:22:16
24      focus particularly on the last sentence --    03:22:24
25 A.  Okay.                                          03:22:27
```

231

```
 1 Q.   -- which reads, "Thus, as I will describe in  03:22:27
 2      more detail below, physicians are often not   03:22:31
 3      aware of the latest scientific evidence on    03:22:34
 4      treatments and rely heavily on commercial     03:22:37
 5      sources of information, such as               03:22:39
 6      pharmaceutical company promotional            03:22:41
 7      materials."                                   03:22:44
 8      Did I read that correctly?                    03:22:44
 9 A.  Yes, you did.                                  03:22:45
10 Q.   Now, the first part of this statement that    03:22:49
11      physicians are often not aware of the latest  03:22:51
12      scientific evidence on treatments, what's     03:22:53
13      the basis for that statement?                 03:22:55
14 A.  The statement is based on the review of        03:22:57
15      studies that follows, and these studies have  03:23:02
16      been done at various points in time through   03:23:06
17      various methods, but showing that physicians  03:23:08
18      do rely on commercial sources of information  03:23:12
19      and are influenced by them.                   03:23:14
20 Q.   When you say that "physicians are often not   03:23:15
21      aware," what does that mean? What does the    03:23:24
22      word "often" mean there?                      03:23:26
23 A.  It's a -- I'm using it in very general         03:23:27
24      terms, that it's -- this is not an uncommon   03:23:32
25      situation.                                    03:23:35
```

232

```
 1 Q.   But the statement's obviously not true of     03:23:37
 2      all physicians -- for all physicians,         03:23:40
 3      correct?                                      03:23:42
 4 A.  It could not be said to be true of all         03:23:42
 5      physicians for all evidence.                  03:23:46
 6 Q.   Sure. That some physicians are more aware     03:23:49
 7      than others of the latest evidence on --      03:23:52
 8      latest scientific evidence on treatments,     03:23:56
 9      right?                                        03:23:59
10 A.  That's right.                                  03:24:00
11 Q.   Why are physicians often not aware of the     03:24:00
12      latest scientific evidence on treatments?     03:24:06
13 A.  Well, the whys are the subject of theories.    03:24:10
14      It's sometimes hard to test that sort of      03:24:14
15      thing, but there are a couple of reasons      03:24:16
16      that you can imagine. First, there are many   03:24:19
17      new treatments every year, and in addition    03:24:23
18      to those new approved indications and drugs,  03:24:27
19      there are experiments going on and being      03:24:31
20      published in the literature, as you cited,    03:24:34
21      so there is just a substantial volume of      03:24:38
22      information; two, physician practice is       03:24:41
23      increasingly complicated, compressed due to   03:24:48
24      constraints on the payment system,            03:24:53
25      particularly for primary care physicians, so  03:24:55
```

233

```
 1      there's limited amount of time that they can  03:25:02
 2      use to read the literature; and third, many   03:25:04
 3      physicians aren't really trained to evaluate  03:25:08
 4      clinical studies scientifically.              03:25:11
 5 Q.   Is that it, those three?                      03:25:20
 6 A.  Those would be my three major issues, yeah.    03:25:21
 7 Q.   Okay. I assume that none of the three is      03:25:24
 8      that the information just isn't available;     03:25:26
 9      is that correct?                              03:25:29
10 A.  That the information isn't available about     03:25:29
11      what studies have been done on new            03:25:33
12      treatments?                                   03:25:37
13 Q.   Yeah, what the latest scientific evidence on  03:25:37
14      treatments is?                                03:25:41
15 A.  I guess by definition it seems like the        03:25:41
16      latest scientific evidence is available.      03:25:44
17 Q.   Okay. Pursuing a couple of these by           03:25:45
18      reference to --                               03:25:54
19 A.  Okay.                                          03:25:55
20 Q.   -- your Paragraph 12 --                       03:25:55
21 A.  Okay.                                          03:26:00
22 Q.   -- you write in what I think is the next --   03:26:01
23      sentence, maybe not the next sentence. There is 03:26:05
24      a sentence that starts in the middle of the   03:26:08
25      paragraph that begins, "In practice, however  03:26:10
```

59  (Pages 230 to 233)

234

1  they," meaning physicians, I take it, "face        03:26:13
2  numerous constraints, including limited time        03:26:15
3  and cognitive ability to digest the        03:26:18
4  continuous flow of information about new        03:26:21
5  treatments."        03:26:22
6  A.  That's correct.        03:26:23
7  Q.  And that statement sort of encompasses at        03:26:23
8  least the last two of the three on your        03:26:29
9  list, I would think; is that correct?        03:26:30
10  A.  That is correct.  It encompasses all three.        03:26:32
11  Q.  Okay.  Will the time constraints facing        03:26:36
12  physicians vary from doctor to doctor?        03:26:44
13  A.  They may, yes.        03:26:45
14  Q.  Would they likely vary from specialty to        03:26:46
15  specialty as well?        03:26:49
16  A.  It's possible.        03:26:49
17  Q.  When you say that doctors have limited        03:26:51
18  cognitive ability, what do you mean by that?        03:26:58
19  A.  The ability to synthesize information from a        03:27:00
20  variety of sources, a variety of types when        03:27:05
21  there are many studies.        03:27:09
22  Q.  I'm assuming from there that you're not        03:27:16
23  suggesting that doctors in the aggregate        03:27:18
24  have more limited cognitive ability than the        03:27:19
25  population as a whole, even setting aside        03:27:22

235

1  economics, Ph.D.s and people with law        03:27:23
2  degrees?        03:27:25
3  A.  I would not ever make such a statement.  I        03:27:26
4  really mean as all human beings given that        03:27:30
5  there are 10, 20 clinical journals published        03:27:34
6  in a given physician's discipline every        03:27:38
7  week, there's just too much information for        03:27:41
8  anyone to process even if one had the time        03:27:43
9  to read it all.        03:27:47
10  Q.  Would you agree that doctors on the whole        03:27:48
11  are knowledgeable about matters relating to        03:27:50
12  medical care?        03:27:55
13  A.  I would agree that doctors on the whole are        03:27:55
14  knowledgeable about matters relating to        03:27:58
15  medical care.        03:28:00
16  Q.  And in terms of cognitive ability, cognitive        03:28:05
17  ability is something that will obviously        03:28:10
18  vary from doctor to doctor?        03:28:12
19  A.  I would expect cognitive ability to vary        03:28:13
20  from doctor to doctor, yes.        03:28:17
21  Q.  And the ability to process the various        03:28:18
22  sources of information that are available to        03:28:20
23  doctors will vary from doctor to doctor?        03:28:22
24  A.  That could certainly be true, yes.        03:28:25
25  Q.  So I think we agreed that some doctors are        03:28:33

236

1  better informed about scientific evidence        03:28:35
2  and treatments than others; is that right?        03:28:37
3  A.  Yes, I would agree with that statement.        03:28:40
4  Q.  Okay.  What are the things that would        03:28:42
5  account for variations and the extent to        03:28:46
6  which a particular doctor is well-informed?        03:28:48
7        MR. NOTARGIACOMO:  Objection.        03:28:52
8  A.  One thing might be training.  So, for        03:28:52
9  example, a physician with a degree in public        03:28:57
10  health might be better able to synthesize        03:29:00
11  the literature.        03:29:04
12  Q.  What about geographic location?  Does that        03:29:06
13  make any difference?        03:29:11
14        MR. NOTARGIACOMO:  Objection.        03:29:11
15  A.  I don't have a theory as to why it would        03:29:12
16  make a difference, no.        03:29:14
17  Q.  How about the institutional setting in which        03:29:14
18  the doctor works?        03:29:17
19  A.  That might make --        03:29:18
20        MR. NOTARGIACOMO:  Objection.        03:29:19
21  A.  That might make a difference.        03:29:20
22  Q.  And so would you say that, for example, a        03:29:27
23  doctor who works in a large University        03:29:29
24  Hospital will generally be more likely to be        03:29:32
25  aware of the latest scientific treatments        03:29:34

237

1  than, say, a doctor who works in a remote        03:29:36
2  rural practice?        03:29:39
3  A.  As a theory it sounds like a reasonable one.        03:29:39
4  I don't have any empirical evidence on that,        03:29:47
5  but...        03:29:49
6  Q.  Fair enough.  But in any event, it's        03:29:50
7  something that will ultimately depend on the        03:29:52
8  individual physician, him or herself, right?        03:29:54
9        MR. NOTARGIACOMO:  Objection.        03:29:56
10  A.  There will be variation across physicians in        03:29:56
11  terms of their ability to make use of this        03:30:00
12  information, yes.        03:30:03
13  Q.  And won't individual doctors' level of        03:30:09
14  knowledge change from one point in time to        03:30:12
15  another?        03:30:14
16        MR. NOTARGIACOMO:  Objection.        03:30:15
17  A.  Yes.  I imagine a physician might read an        03:30:15
18  article, and their level of knowledge would        03:30:22
19  change.        03:30:24
20  Q.  Precisely.  Or they might be better informed        03:30:24
21  after having just attended a stretch of        03:30:28
22  continuing medical education?        03:30:30
23        MR. NOTARGIACOMO:  Objection.        03:30:33
24  A.  As an example, that seems like a reasonable        03:30:34
25  supposition.        03:30:39

60  (Pages 234 to 237)

238

1  Q.  Okay. Also in Paragraph 12 -- let's figure    03:30:40
2      which sentence it is -- in the last sentence    03:30:46
3      you say that physicians "rely heavily on    03:30:53
4      commercial sources of information such as    03:30:58
5      pharmaceutical company promotional    03:31:00
6      materials"?    03:31:02
7  A.  Yes, that's correct.    03:31:03
8  Q.  What's the basis for that statement?    03:31:05
9  A.  There are some studies that I cite that    03:31:06
10     provide evidence of -- in specific    03:31:09
11     instances, but as also you may be aware and    03:31:12
12     I'm aware through my own research and    03:31:15
13     training that physicians have these sources    03:31:17
14     of information in their offices, and studies    03:31:20
15     show that they are influenced by them.    03:31:23
16 Q.  When you say the "sources of information in    03:31:28
17     their offices," what sources do you mean?    03:31:30
18 A.  Pamphlets, promotional -- even promotional    03:31:32
19     materials like pens and notepads.    03:31:35
20 Q.  So setting aside the pens and the notepads,    03:31:46
21     are the commercial sources of information    03:31:49
22     that you refer to necessarily different from    03:31:51
23     the latest scientific evidence of treatments    03:31:51
24     that you referred to elsewhere in the same    03:31:54
25     paragraph?    03:31:56

239

1  A.  Are they necessarily different?    03:31:56
2  Q.  (No verbal response.)    03:31:59
3  A.  They may overlap, but they also include    03:31:59
4      evidence that's not necessarily in the    03:32:02
5      scientific literature. As you might have    03:32:04
6      noticed in some of the studies, they    03:32:07
7      particularly look at information that was    03:32:09
8      provided through promotional materials but    03:32:11
9      was inconsistent with the latest scientific    03:32:13
10     literature.    03:32:15
11 Q.  But we can agree that they do in some cases    03:32:16
12     at least overlap?    03:32:21
13 A.  We can agree on that, yes.    03:32:25
14 Q.  How aware do you think doctors are that a    03:32:30
15     manufacturer's promotional materials may be    03:32:33
16     less than perfectly balanced?    03:32:35
17 A.  Based on the survey data that I cite here,    03:32:36
18     physicians are aware in general that    03:32:45
19     pharmaceutical materials may not be    03:32:46
20     perfectly balanced. They report that.    03:32:48
21 Q.  So to what extent do you believe that    03:32:54
22     doctors could look with some skepticism at    03:32:55
23     the promotional efforts by manufacturers?    03:32:58
24 A.  I would expect physicians to look with some    03:33:01
25     skepticism, yes, on those promotional    03:33:03

240

1      efforts.    03:33:10
2  Q.  Do you believe that all doctors can be    03:33:10
3      expected to respond to manufacturer    03:33:12
4      information in the same way?    03:33:13
5  A.  I believe that the mechanism is the same.    03:33:18
6      The quantum of response may vary from    03:33:20
7      physician to physician.    03:33:22
8  Q.  When you say "the mechanism is the same,"    03:33:24
9      what do you mean?    03:33:27
10 A.  Well, physicians are exposed to promotional    03:33:28
11     activities, and it influences their    03:33:32
12     prescribing behavior because it changes the    03:33:40
13     information they have in their head about an    03:33:42
14     indication or a drug and whether consciously    03:33:45
15     or not it affects their prescribing, as has    03:33:48
16     been shown certainly in the literature of    03:33:53
17     the impact of physician promotional    03:33:54
18     activities.    03:33:56
19 Q.  Now, I think you said that at least the    03:33:57
20     quantum, so in other words, the -- what I    03:34:00
21     understand to be the impact -- the extent to    03:34:03
22     which the manufacturer promotional materials    03:34:06
23     affect an individual doctor's decision will    03:34:10
24     vary from doctor to doctor; is that correct?    03:34:12
25 A.  That's correct, it will vary.    03:34:15

241

1  Q.  And the -- I think we probably also agree    03:34:17
2      that the degree of skepticism with which a    03:34:22
3      manufacturer's promotional materials are    03:34:26
4      reviewed by a given doctor will vary from    03:34:27
5      doctor to doctor; is that correct, too?    03:34:29
6          MR. NOTARGIACOMO: Objection.    03:34:33
7  A.  That's correct.    03:34:33
8  Q.  Now, I would imagine also -- well, let me    03:34:34
9      withdraw it and phrase it a different way.    03:34:39
10         Wouldn't a doctor's level of    03:34:41
11     skepticism also vary depending on the    03:34:44
12     context in which the particular kind of    03:34:46
13     promotional activity occurs?    03:34:48
14         MR. NOTARGIACOMO: Objection.    03:34:51
15 A.  Could you be more specific? I'm not sure    03:34:51
16     what kind of context you mean.    03:34:53
17 Q.  Yeah, no. Sure, that's fine. A good    03:34:55
18     example might be, in the case of detailing    03:34:57
19     wouldn't you imagine that some sales    03:35:00
20     representatives would be more credible to    03:35:02
21     certain doctors than others?    03:35:04
22         MR. NOTARGIACOMO: Objection.    03:35:06
23 A.  I could certainly imagine that would be the    03:35:07
24     case.    03:35:09
25 Q.  Or, for example, that a particular sales    03:35:10

61  (Pages 238 to 241)

242

```
1    representative might have a particularly        03:35:12
2    good relationship with a specific doctor?       03:35:14
3         MR. NOTARGIACOMO: Objection.               03:35:16
4  A.  That could also be the case, sure.            03:35:17
5  Q.  And would a specific relationship -- I        03:35:24
6    guess, would those differences also impact      03:35:31
7    the degree of skepticism that a particular      03:35:36
8    doctor applied to a particular piece of         03:35:39
9    manufacturer promotion?                         03:35:48
10 A.  Possibly.                                      03:35:51
11 Q.  Now, in view of the fact -- I think you        03:35:52
12   testified that levels of knowledge of           03:36:05
13   scientist -- latest scientist evidence will     03:36:07
14   vary from doctor to doctor, correct?            03:36:10
15 A.  That's correct.                                03:36:11
16 Q.  And that different doctors might have          03:36:11
17   different levels of skepticism as respects       03:36:14
18   individual promotional activity, correct?        03:36:17
19 A.  Correct.                                       03:36:19
20 Q.  In view of this -- if some number of           03:36:19
21   different doctors all heard the same untrue      03:36:26
22   statement about a drug, isn't it possible        03:36:31
23   that some might be deceived, but some might      03:36:32
24   not?                                             03:36:35
25        MR. NOTARGIACOMO: Objection.               03:36:36
```

243

```
1  A.  It is possible that some physicians might     03:36:36
2    not be deceived by some untruthful              03:36:40
3    information if it was presented that way,       03:36:43
4    yes.                                            03:36:46
5  Q.  And can you think of any way to identify      03:36:46
6    which doctors were deceived and which were      03:36:49
7    not without some sort of individualized         03:36:51
8    inquiry into each individual doctor?            03:36:54
9  A.  If the purpose of my inquiry were to figure   03:36:58
10   out which doctors were deceived and which        03:37:03
11   were not, I guess the first thing I would        03:37:05
12   look at was their behavior, but -- if that       03:37:08
13   were the purpose of my inquiry.                  03:37:13
14 Q.  And it would be an individualized look at      03:37:14
15   their behavior, I take it?                       03:37:17
16 A.  Well, I guess that's --                        03:37:18
17 Q.  If that's what you were looking at. I          03:37:19
18   understand that --                               03:37:22
19 A.  Sorry, but, yes, it sounds like an             03:37:24
20   individualized question, and so therefore it     03:37:25
21   would require individualized inquiry.            03:37:28
22 Q.  Are there some physicians who don't ever       03:37:31
23   come into contact -- well, withdrawn. Let        03:37:33
24   me try that one again.                           03:37:36
25        Are there some physicians who do not        03:37:37
```

244

```
1    ever come into contact with representatives     03:37:41
2    of manufacturers of particular drugs?           03:37:43
3  A.  I believe that may be true, yes.               03:37:46
4  Q.  And so you're aware that there are some        03:37:48
5    doctors or institutions that have policies      03:37:50
6    against meeting with sales representatives?      03:37:52
7  A.  I've heard of that, yes.                        03:37:54
8  Q.  And you're probably also aware that there      03:37:55
9    will be some doctors who will choose not to     03:37:57
10   attend company-sponsored gatherings or          03:38:00
11   continuing medical education programs,          03:38:05
12   correct?                                        03:38:07
13 A.  Yes, that's certainly true.                    03:38:07
14 Q.  And that some doctors or institutions have     03:38:09
15   policies that forbid them from accepting        03:38:12
16   samples from drug manufacturers; is that        03:38:16
17   correct?                                        03:38:18
18 A.  I've heard that as well, yes.                  03:38:19
19 Q.  In view of all that, there are definitely      03:38:21
20   going to be some doctors who prescribe          03:38:23
21   Neurontin for off-label uses during the        03:38:27
22   class period who had no contact whatsoever      03:38:28
23   with the defendants; would you agree with      03:38:30
24   that?                                           03:38:31
25 A.  That --                                        03:38:33
```

245

```
1         MR. NOTARGIACOMO: Objection.               03:38:33
2  A.  That certainly would follow from that         03:38:33
3    statement, yes.                                 03:38:35
4  Q.  And you wouldn't know of any way to identify   03:38:41
5    which doctors those were other than by a        03:38:44
6    doctor-by-doctor survey?                        03:38:47
7  A.  I have not thought about identifying --        03:38:48
8    trying to identify those doctors, so I don't    03:38:53
9    know how to go about doing that.                03:38:55
10 Q.  As you sit here today, can you think of any    03:38:58
11   way to do it other than by doing an            03:39:01
12   individual doctor-by-doctor survey?            03:39:03
13 A.  I can't think, other than maybe an             03:39:05
14   institutional survey, but I think an           03:39:07
15   individual doctor's participation in events    03:39:09
16   or through the defendants' data on             03:39:11
17   participants in their own events.              03:39:14
18 Q.  All right. Let's turn to Paragraph 15 of      03:39:19
19   your declaration.                              03:39:21
20 A.  Okay.                                          03:39:23
21 Q.  And let's read the first sentence, which      03:39:23
22   reads as follows: "Both physicians and         03:39:34
23   patients face an information problem in        03:39:37
24   selecting pharmaceutical treatments that       03:39:39
25   challenges typical conclusions about           03:39:41
```

62  (Pages 242 to 245)

246

```
1    well-functioning markets."              03:39:43
2        Did I read that one correctly?      03:39:47
3  A.  Yes, you did.                         03:39:48
4  Q.  What do you mean by "an information   03:39:49
5    problem"?                               03:39:57
6  A.  In this case there is not perfect     03:39:57
7    information available about how a        03:40:00
8    pharmaceutical treatment will work for an 03:40:02
9    individual patient, so there may be some 03:40:04
10   information about the drug broadly, but  03:40:07
11   whether or not it will work for an       03:40:12
12   individual patient is unknown and may -- 03:40:13
13   there may be cases where the physician has 03:40:19
14   more information about this than a patient 03:40:22
15   does.  There may be cases where the      03:40:23
16   pharmaceutical manufacturer has more     03:40:26
17   information about this than either       03:40:28
18   physicians or patients have.             03:40:29
19       So it has the characteristics, not  03:40:30
20   just of broad uncertainty, but of certain 03:40:33
21   asymmetry between the physicians -- among 03:40:36
22   the physicians, patients and manufacturers. 03:40:39
23 Q.  So with respect to your last answer in this 03:40:46
24   statement, are you talking generally about 03:40:48
25   pharmaceutical products generally, or are 03:40:50
```

247

```
1    you talking specifically about Neurontin 03:40:52
2    here?                                    03:40:53
3  A.  Here I'm talking generally about       03:40:54
4    pharmaceutical products and health care more 03:40:56
5    broadly as well.                         03:40:59
6  Q.  Okay.  Do you have an opinion as to whether 03:41:00
7    all doctors would approach the information 03:41:17
8    problem that you've just described in the 03:41:19
9    same way?                                03:41:20
10 A.  I'm sorry, what do you mean by "approached"? 03:41:21
11   Do you mean try to mitigate or --        03:41:28
12 Q.  How do they respond to it in the context of 03:41:31
13   their prescription-writing decisions?    03:41:33
14 A.  Well, I guess one aspect of that response, 03:41:35
15   as we discussed before, might be to use the 03:41:42
16   scientific literature, and that might     03:41:50
17   differ, as we discussed before.          03:41:53
18 Q.  When you refer to markets in Paragraph 15 at 03:41:54
19   the end of that sentence --              03:42:04
20 A.  Uh-huh.                                 03:42:05
21 Q.  -- what do you mean?                    03:42:05
22 A.  A market is where buyers and sellers come 03:42:08
23   together and a good or service is exchanged 03:42:15
24   at a price that's agreeable to both, for  03:42:19
25   those markets clear.  And so here I'm     03:42:21
```

248

```
1    talking specifically about the normative 03:42:29
2    conclusions that economists usually derive 03:42:30
3    from looking at markets.  And so in many  03:42:33
4    markets we say if a market is sustained, it 03:42:37
5    must be, for example, that the consumers are 03:42:41
6    willing to pay when the suppliers are     03:42:43
7    willing to accept for a good, that the level 03:42:45
8    of quality is consistent with the price.  So 03:42:49
9    consumers are willing to pay that, it must 03:42:52
10   be worth that in terms of welfare.  And so 03:42:55
11   we start thinking about health care markets 03:43:01
12   in that context of making a judgment about 03:43:03
13   the welfare of individuals based on what  03:43:05
14   kinds of interactions they have in this   03:43:08
15   marketplace as buyers and sellers.        03:43:11
16 Q.  So the market that you're describing as the 03:43:16
17   market for prescription drugs, it's not a  03:43:19
18   market for information or something else,  03:43:20
19   correct?                                  03:43:22
20 A.  The market I'm describing is the market for 03:43:22
21   prescription drugs, yes.                  03:43:26
22 Q.  You also refer here to "typical conclusions 03:43:41
23   about well-functioning markets."  Although 03:43:43
24   to some degree you may have already provided 03:43:49
25   an answer to this question in your last    03:43:51
```

249

```
1    answer, if you could tell me what those   03:43:53
2    typical --                                03:43:56
3  A.  Make it a little less --                03:43:56
4  Q.  -- conclusions are.                     03:43:56
5  A.  -- opaque.  The typical conclusions are that 03:43:58
6    competition ensures Pareto efficiency, so 03:44:02
7    ensures that there's no waste in the market. 03:44:09
8    And under assumptions that often have to do 03:44:11
9    with information issues, then competition  03:44:16
10   makes sure that we get the best allocation 03:44:22
11   and production of goods.                  03:44:25
12       And that means broadly the quality of 03:44:27
13   goods will be right, the quantity consumed 03:44:29
14   will be right.  And so in the health care  03:44:32
15   market one characteristic that really is the 03:44:40
16   motivating challenge I think for the entire 03:44:44
17   field of health economics is the failure of 03:44:47
18   that to happen for a variety of reasons, in 03:44:51
19   large part because of the fact that there's 03:44:54
20   missing information about the benefits that 03:44:55
21   a mutual patient will get from a treatment. 03:44:59
22 Q.  So is that the way in which typical        03:45:05
23   conclusions about well-functioning markets 03:45:08
24   are challenged in this context?           03:45:10
25 A.  In particular, that what is consumed is the 03:45:13
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

250

```
 1  right amount in the sense of Pareto          03:45:18
 2  efficiency, so that if there were a $10      03:45:23
 3  chocolate bar out there and people were      03:45:29
 4  eating a lot of them, you wouldn't assume    03:45:31
 5  that there was some inefficiency, just that  03:45:33
 6  people were willing to pay $10. In the       03:45:36
 7  health care market it's never clear.         03:45:39
 8 Q. The next sentence in the same paragraph    03:45:46
 9  reads, "Prescription drugs are 'credence     03:45:48
10  goods,' which means their effect may never   03:45:51
11  be known because of the interplay of myriad  03:45:54
12  factors that can affect the course of acute  03:45:58
13  or chronic wellness."                        03:46:00
14       What is a credence good?                03:46:02
15 A. That should say "illness." I'm not sure why 03:46:06
16  it says "wellness."                          03:46:07
17       A credence good is one whose value      03:46:09
18  is -- has to be accepted, essentially, by    03:46:15
19  the buyer.                                   03:46:18
20 Q. Why does it need to be accepted by the     03:46:21
21  buyer?                                       03:46:24
22 A. Well, in this specific instance, the best  03:46:24
23  way of understanding that is imagine that    03:46:27
24  you get drug treatment, and what happens is  03:46:31
25  you get no worse, but you don't know whether 03:46:35
```

251

```
 1  that was because of the drug that you're on  03:46:39
 2  currently or something that happened with    03:46:43
 3  your condition itself or other things that   03:46:44
 4  may be happening, for example, you know, a   03:46:48
 5  change in the environment, that affected     03:46:51
 6  your outcome. So there, again, many          03:46:54
 7  clinical and non-clinical factors that       03:46:58
 8  interact for an individual patient, and      03:47:02
 9  they can never be certain which factor led   03:47:04
10  them to get better, worse...                 03:47:08
11 Q. Okay. We'll get back to that concept --    03:47:11
12 A. Okay.                                      03:47:14
13 Q. -- at some point later. A couple of other 03:47:14
14  terms for you. What is a search good?        03:47:16
15 A. A search good is a good, so there's -- to  03:47:20
16  distinguish from an experienced good, a      03:47:29
17  search good is one that you can evaluate     03:47:31
18  without having to individually consume.      03:47:33
19 Q. Okay.                                      03:47:38
20 A. An experience good --                      03:47:38
21 Q. That was my next question.                 03:47:40
22 A. -- is one where you have to try it. So     03:47:42
23  imagine the chocolate example. You can't     03:47:45
24  tell by looking at the chocolate bar how     03:47:48
25  good it is, but once you try it, you know    03:47:51
```

252

```
 1  how good it is.                              03:47:53
 2 Q. Now, when we talk about these three        03:47:54
 3  different categories, search goods,          03:47:58
 4  experience goods and credence goods, we're   03:48:00
 5  not talking about exclusive goods, are we?   03:48:04
 6 A. You're right. These are general concepts   03:48:07
 7  that may apply in part and differentially to 03:48:10
 8  goods.                                       03:48:14
 9 Q. So a product could have attributes of an   03:48:15
10  experienced good and a search good at the    03:48:19
11  same time?                                   03:48:21
12 A. Certainly.                                 03:48:21
13 Q. You may have already baked this into one of 03:48:22
14  your answers already, but just so that I     03:48:32
15  understand, what's the basis of your         03:48:33
16  conclusion that all prescription drugs or    03:48:35
17  that prescription drugs are credence goods?  03:48:37
18 A. The basis of that conclusion really has to 03:48:39
19  do with the notion of understanding clinical 03:48:43
20  effectiveness, broadly speaking, as a        03:48:49
21  scientific issue at the individual patient   03:48:52
22  level. And so the issue is a -- is really    03:48:55
23  one that's conceptual, that there are        03:49:02
24  patient health factors that are not          03:49:04
25  measurable, and so if we look at one         03:49:07
```

253

```
 1  individual patient experiencing a new drug,  03:49:11
 2  for example, it's not possible to tell for   03:49:14
 3  that one patient for sure whether their      03:49:18
 4  treatment worked or didn't work based on     03:49:22
 5  their own experience.                        03:49:24
 6 Q. Have you relied on any published literature 03:49:25
 7  in reaching your conclusion about            03:49:29
 8  pharmaceutical products as credence goods?   03:49:31
 9 A. This is generally based on my experience and 03:49:34
10  training in health economics. I can't cite  03:49:37
11  a specific article here. The subject is      03:49:40
12  part of the Arrow paper that I described.    03:49:46
13 Q. The which paper?                           03:49:49
14 A. The Footnote 30, the Kenneth Arrow paper,  03:49:49
15  which I cite in the previous sections.       03:49:59
16 Q. Okay. Is Neurontin any more a credence good 03:50:01
17  than other pharmaceutical products?          03:50:06
18 A. No. It's a characteristic of these goods.  03:50:09
19 Q. Now, prescription drugs aren't exclusively 03:50:16
20  credence goods, right?                       03:50:20
21 A. Do they have characteristics of search goods 03:50:21
22  and experience goods? Certainly.            03:50:27
23 Q. You probably agree that pharmaceuticals, in 03:50:28
24  fact, have non-trivial experience qualities  03:50:31
25  as well; is that correct?                    03:50:38
```

64  (Pages 250 to 253)

254

```
 1  A.  I would agree that people might be able to      03:50:39
 2      draw fairly good conclusions, for example,      03:50:41
 3      if they took a drug and immediately had a       03:50:43
 4      reaction to that drug, that they -- that        03:50:46
 5      would be an experience-like quality. I          03:50:48
 6      would say nonetheless, the overarching          03:50:53
 7      conceptual problem is one in which there are    03:50:55
 8      so many patient factors and other influences    03:50:58
 9      on health that it's difficult to be certain     03:51:01
10      that -- to disentangle. But on a continuum      03:51:04
11      I guess I would agree with your statement.      03:51:09
12  Q.  Are you familiar with Ernst R. Berndt,          03:51:11
13      B-E-R-N-D-T?                             03:51:17
14  A.  I am familiar with Professor Berndt.            03:51:18
15  Q.  Who is Professor Berndt?                 03:51:21
16  A.  He is a co-author of mine on some papers.       03:51:23
17      He is a professional at MIT and an expert in    03:51:26
18      pharmaceutical promotion.                03:51:29
19  Q.  That answers my questions, which -- or          03:51:30
20      question, which is you would describe him as    03:51:33
21      an expert on the economics of pharmaceutical    03:51:35
22      markets, generally?                      03:51:39
23  A.  I would.                               03:51:40
24          MR. POLUBINSKI: Why don't we          03:51:50
25      actually mark the next exhibit.            03:51:50
```

255

```
 1          (Exhibit No. 13, Article headed       03:52:25
 2      "The U.S. Pharmaceutical Industry: Why     03:52:25
 3      major growth in times of cost containment,"  03:52:29
 4      marked for identification.)              03:52:11
 5          MR. NOTARGIACOMO: What number?         03:52:12
 6          MR. POLUBINSKI: 13.                   03:52:12
 7  Q.  I've handed you, Professor Rosenthal, what's   03:52:13
 8      been marked as Rosenthal Exhibit 13. It is    03:52:17
 9      an article by Professor Berndt. The title    03:52:21
10      of the article is "The U.S. Pharmaceutical    03:52:25
11      Industry: Why major growth in times of cost    03:52:27
12      containment."                          03:52:31
13          I would like you to turn to Page 111.  03:52:33
14  A.  Okay.                                03:52:42
15  Q.  And read along with me the beginning of the    03:52:42
16      second full paragraph, and in particular      03:52:45
17      which reads, "Clearly, prescription drugs     03:52:52
18      are predominantly experience goods." The      03:52:54
19      sentence goes on, but that's the portion of    03:52:58
20      the sentence I was going to ask you about.    03:53:00
21          Do you have any reason to disagree     03:53:01
22      with Professor Berndt on this point?         03:53:02
23          MR. NOTARGIACOMO: I'm sorry, you       03:53:06
24      just point -- I just lost my place. Could     03:53:08
25      you point out which paragraph?            03:53:11
```

256

```
 1          MR. POLUBINSKI: Yeah, the first       03:53:11
 2      sentence of Paragraph 2.                 03:53:12
 3          MR. NOTARGIACOMO: Thank you.           03:53:14
 4  A.  So Professor Berndt is distinguishing          03:53:15
 5      between search and experience goods here and   03:53:18
 6      noting that the fact that prescription drugs   03:53:23
 7      are not predominantly search goods results    03:53:26
 8      in their having high advertising-to-sales     03:53:32
 9      ratios, which incidentally is the Dorfman-    03:53:34
10      Steiner theorem that I mentioned earlier.     03:53:37
11      And I don't know that he would disagree with   03:53:42
12      my characterization of pharmaceutical         03:53:44
13      products as having aspects of credence goods   03:53:47
14      as well.                               03:53:52
15          I think he's distinguishing them from   03:53:52
16      consumer products where we can look at the    03:53:54
17      attributes and the prices and we know most    03:53:57
18      of what we need to know. So I'm not sure      03:53:59
19      that he disagrees with me.               03:54:03
20  Q.  Would you agree with him, I guess, with his    03:54:05
21      statement to the effect that pharmaceutical    03:54:07
22      drugs are predominantly experience goods?     03:54:10
23  A.  I believe they have some characteristics of    03:54:14
24      experience goods and some of credence goods,   03:54:17
25      so I guess maybe I wouldn't have used the     03:54:20
```

257

```
 1      word "predominantly," which I guess means we   03:54:22
 2      disagree.                              03:54:26
 3  Q.  Fair enough. Now, but I guess you would       03:54:26
 4      agree that they do have -- they do have       03:54:34
 5      features of experience goods?            03:54:40
 6  A.  I would agree with that statement, yes.        03:54:43
 7  Q.  Now, in view of that, assume that a doctor    03:54:45
 8      prescribes Neurontin to several patients for   03:54:52
 9      an off-label use, for neuropathic pain, for   03:54:55
10      example. Would a doctor's future decisions    03:54:59
11      as to whether to prescribe Neurontin to       03:55:02
12      other patients for that same off-label use    03:55:04
13      be included by that doctor's understanding     03:55:07
14      of the degree of success experienced with     03:55:09
15      earlier patients?                       03:55:11
16  A.  That would certainly be one piece of          03:55:12
17      information I would expect the physician to    03:55:14
18      use in his or her judgments.             03:55:16
19  Q.  And so it's pretty -- it therefore stands to   03:55:23
20      reason, I guess, that doctors would be       03:55:26
21      influenced by their past experience with      03:55:27
22      Neurontin in future prescription decisions?   03:55:30
23  A.  I would expect that to be an influence, yes.   03:55:32
24  Q.  Why don't you turn to Paragraph 15 of your    03:55:40
25      report.                               03:55:42
```

65  (Pages 254 to 257)

258

1 A. Okay.                                03:55:43
2 Q. And turn specifically to the concept of the    03:55:43
3    market as you've described it. Would you    03:55:48
4    agree that the market that you describe in    03:55:51
5    Paragraph 15 differs in a number of ways    03:55:54
6    from other markets for other functional    03:55:57
7    goods? I think you would, based on what we    03:56:01
8    just discussed.                          03:56:03
9 A. I would agree with that. Of course, again,    03:56:05
10    it's all a continuum. I'm sure we could    03:56:07
11    find another good that has the same    03:56:10
12    characteristics. Often legal services are    03:56:13
13    used as a comparison. You can never be sure    03:56:16
14    whether that guilty verdict would have    03:56:18
15    happened with another lawyer.            03:56:20
16 Q. Whether or not this shares attributes for    03:56:22
17    this legal services market, you do write,    03:56:27
18    for example, in the pharmaceutical market    03:56:29
19    that price plays little or no role in    03:56:31
20    individual prescribing decisions?        03:56:34
21 A. That's correct. Price has a very strange    03:56:36
22    role here, and there are multiple prices,    03:56:38
23    unlike in most markets where we have a    03:56:40
24    single market clearing price.            03:56:43
25 Q. In this case at least, the price of a drug    03:56:44

259

1    doesn't -- does not fluctuate in response to    03:56:48
2    new information generally, does it?        03:56:52
3 A. Generally speaking, if we're talking about    03:56:53
4    the AWP of the drug, the -- are we talking    03:56:58
5    about the list price of a drug?           03:57:04
6 Q. Why don't we do that, yes, that's fine.    03:57:06
7 A. Generally speaking, I believe the AWP is set    03:57:15
8    with -- well, I don't know all the factors    03:57:18
9    that influence a manufacturer's setting of    03:57:21
10    the AWP, but I know in many cases it stays    03:57:24
11    fairly stable over time.                  03:57:27
12 Q. Okay. And that the AWP didn't fluctuate in    03:57:29
13    response to new information about a drug's    03:57:33
14    efficacy, generally speaking?            03:57:35
15 A. I can't -- I just can't say for certain, but    03:57:37
16    I don't know of any --                    03:57:40
17 Q. Fair enough.                            03:57:41
18 A. -- evidence that that does happen.        03:57:42
19 Q. Okay. And I guess also information in this    03:57:44
20    market isn't disseminated as it might be in    03:57:49
21    the context of, say, the securities market?    03:57:54
22 A. I would expect the information flows much    03:57:56
23    more efficiently in the securities market.    03:57:57
24 Q. There's no requirement, for example, that    03:58:00
25    information be released simultaneously or in    03:58:04

260

1    a publicly digestible format, information --    03:58:08
2        (Mr. Goldser disconnected.)            03:58:14
3        MR. NOTARGIACOMO: He was going to    03:58:14
4    go off at 4:00, so that's fine.            03:58:15
5        MR. POLUBINSKI: I don't blame him.    03:58:17
6 Q. Let me start that question again.        03:58:20
7 A. Sure.                                   03:58:22
8 Q. There is no equivalent to the securities    03:58:22
9    laws that would require that information be    03:58:24
10    released simultaneously in a publicly    03:58:25
11    digestible format?                        03:58:29
12 A. Not to my knowledge, no.                 03:58:31
13 Q. Okay. So no 8-K equivalent -- 8-K filing    03:58:32
14    equivalent in the pharmaceutical industry?    03:58:34
15 A. Not to my knowledge, no.                 03:58:36
16 Q. And there's no analyst community with regard    03:58:42
17    to prescription drugs the same way there is    03:58:44
18    in the securities market?                 03:58:46
19 A. Other than the analysts in the securities    03:58:47
20    market who, of course, looked at clinical    03:58:50
21    information to try to figure out what the    03:58:52
22    manufacturer's stocks are going to do, but I    03:58:54
23    don't know of any whose objective is    03:58:56
24    clinical.                                 03:58:58
25 Q. Okay. And you wouldn't suggest that the    03:58:59

261

1    doctors look to the analyst community to    03:59:04
2    inform their knowledge of appropriate    03:59:06
3    clinical treatment; is that correct?      03:59:08
4 A. I guess I wouldn't -- no, I guess I wouldn't    03:59:10
5    suggest that.                            03:59:18
6 Q. You would be surprised if they did?      03:59:18
7 A. I would be surprised if they did, yes.    03:59:20
8 Q. Okay. And that there are necessarily -- I    03:59:31
9    guess would you agree that there will      03:59:32
10    necessarily be information differences with    03:59:34
11    regard to a particular pharmaceutical      03:59:36
12    product from geographic area to geographic    03:59:37
13    area?                                    03:59:40
14 A. Again, as before, I didn't have a strong    03:59:41
15    theory about geography in this case, but    03:59:44
16    certainly there may be differences in      03:59:48
17    information. So, for example, if a clinical    03:59:50
18    trial took place at a particular health    03:59:52
19    industry, that the physicians in that health    03:59:55
20    industry might learn about its results      03:59:58
21    before everyone else did.                 04:00:00
22 Q. Sure. And there would inevitably be        04:00:02
23    information differences from doctor to      04:00:04
24    doctor, too?                             04:00:05
25 A. As we discussed earlier.                 04:00:06

66 (Pages 258 to 261)

262

1  Q.  Now, in view of all of this, in view of the    04:00:11
2      information problems that you've discussed,    04:00:14
3      you wouldn't describe the market such as it    04:00:16
4      is for pharmaceutical products as being an    04:00:20
5      efficient market, would you?    04:00:23
6  A.  **If you mean "efficient" in the same way that    04:00:24**
7      **I mean "efficient," I would not describe    04:00:28**
8      **the -- the theory relates to the efficiency    04:00:30**
9      **of the theorized outcome of a perfectly    04:00:34**
10     **competitive market. It's possible with    04:00:37**
11     **regulation you get a fairly efficient    04:00:39**
12     **market, but I would guess that's not a    04:00:41**
13     **very efficient market, no.    04:00:43**
14         MR. POLUBINSKI:  Okay.  I think    04:00:46
15     we're about to run out of videotape, so    04:00:46
16     let's just take a quick break while we    04:00:48
17     switch that.    04:00:51
18         THE WITNESS:  Okay.  I'll be really    04:00:51
19     quick.    04:00:51
20         MR. POLUBINSKI:  Okay.    04:00:52
21         THE VIDEOGRAPHER:  The time is 4:01    04:00:52
22     p.m.  This is the end of Tape 4, and we are    04:00:57
23     off the record.    04:01:00
24         (Recess taken.)    04:06:12
25         THE VIDEOGRAPHER:  The time is 4:06    04:06:16

263

1      p.m.  This is the beginning of Tape 5, and    04:06:20
2      we are back on the record.    04:06:23
3  BY MR. POLUBINSKI:    04:06:25
4  Q.  Okay.  Professor Rosenthal, in the Clark    04:06:25
5      case in Pennsylvania you were asked to    04:06:34
6      assume that there is not adequate evidence    04:06:35
7      that Neurontin provided any clinical benefit    04:06:38
8      for off-label uses; is that correct?    04:06:40
9  A.  **I believe that that's correct. When you    04:06:44**
10     **mention the Clark case, I just don't have my    04:06:49**
11     **declaration in front of me, and it's been a    04:06:51**
12     **while, but I believe that's correct.    04:06:52**
13  Q. Okay.  Did you make a similar assumption in    04:06:54
14     this case -- or the same assumption, I    04:06:56
15     should say?    04:06:59
16  A.  **For the purposes of my work I was focusing    04:06:59**
17     **on the effect on quantity and asked to    04:07:02**
18     **assume that all of that quantity would be    04:07:05**
19     **relevant for the ultimate estimate of    04:07:09**
20     **damages, so I believe I was asked to make    04:07:13**
21     **that same or similar assumption.    04:07:17**
22  Q.  The assumption --    04:07:20
23  A.  **I just need to look to see how it was    04:07:21**
24     **exactly phrased, but I believe that was the    04:07:23**
25     **assumption that I was asked to make, yes.    04:07:26**

264

1  Q.  You know what?  Just to make things easier,    04:07:28
2      I think we have a copy of the Clark    04:07:30
3      rebuttal, and I could just hand it to you.    04:07:32
4  A.  **Okay.  That would be great.    04:07:34**
5  Q.  We don't need to mark it as an exhibit.    04:07:45
6  A.  **Okay.    04:07:48**
7  Q.  On Page 3.    04:07:49
8      (Witness reviews document.)    04:08:04
9  A.  **Right.  So that's exactly what I said, and    04:08:04**
10     **so that's exactly what I was asked to    04:08:06**
11     **assume.    04:08:08**
12  Q.  And is that exactly what you were asked to    04:08:09
13     assume in this case as well?    04:08:11
14  A.  **That's my understanding as well, yes.  For    04:08:12**
15     **my analysis, that was...    04:08:22**
16  Q.  So for your analysis does your assumption    04:08:24
17     about Neurontin's efficacy apply to all of    04:08:26
18     its off-label uses or just certain uses?    04:08:30
19  A.  **I expect -- so in my declaration I talk    04:08:33**
20     **about the off-label uses that were covered    04:08:36**
21     **in the first amended class action complaint.    04:08:38**
22     **I expect to be directed as to exactly which    04:08:41**
23     **of those indications I will be asked    04:08:44**
24     **ultimately to do the analysis on, and it    04:08:49**
25     **will be for those where that's the correct    04:08:52**

265

1      **assumption, so, yes.    04:08:55**
2  Q.  Okay.  For the indications that are    04:08:58
3      identified for you at that time, you will    04:08:59
4      assume that all prescriptions of Neurontin    04:09:01
5      for those indications were ineffective?    04:09:05
6  A.  **That's my understanding is that that's what    04:09:10**
7      **I'll be asked to assume in the final    04:09:14**
8      **analysis.    04:09:15**
9  Q.  Okay.  And so maybe just to make sure it's    04:09:16
10     crystal clear, for the purposes of your    04:09:49
11     analysis you would assume for the    04:09:52
12     indications that we're talking about, at    04:09:53
13     least, that Neurontin was ineffective for    04:09:55
14     every patient who was prescribed the drug    04:09:58
15     for an off-label use for that indication?    04:10:00
16  A.  **For the purposes of my analysis, what I    04:10:02**
17     **understand the relevant assumption is,    04:10:08**
18     **excuse me, for members of the class where I    04:10:12**
19     **estimate the quantity of Neurontin use that    04:10:17**
20     **was caused by off-label promotion, that    04:10:19**
21     **there will be no relevance to any potential    04:10:21**
22     **clinical benefits that those patients may    04:10:25**
23     **have gotten or purported to have gotten. So    04:10:28**
24     **for none of the patients will I calculate or    04:10:36**
25     **consider clinical benefits.    04:10:39**

67  (Pages 262 to 265)

1 Q.  Now, is that because none of the patients  04:10:41
2     for those uses will have received any  04:10:43
3     clinical benefit?  04:10:46
4 A.  **I'm not really in a position to judge that.**  04:10:47
5     **As you know, I'm not a clinical expert.**  04:10:50
6     **Sorry.**  04:10:53
7 Q.  Do you have any understanding at all as to  04:10:57
8     whether the drug may well have been  04:10:59
9     effective for some number of those patients?  04:11:01
10        MR. NOTARGIACOMO:  Objection.  04:11:04
11 A.  **I really don't have any expertise to judge**  04:11:04
12    **that.**  04:11:06
13 Q.  Now, if it is the case that the drug was  04:11:15
14    indeed effective for some number of these  04:11:20
15    patients, does that mean that some number of  04:11:23
16    patients for whom Neurontin was perfectly  04:11:25
17    effective would be compensated under your  04:11:27
18    model?  04:11:30
19 A.  **I believed it would be tautologically true**  04:11:30
20    **if you're telling me that if the drug were**  04:11:39
21    **effective, that some of those individuals**  04:11:41
22    **who were compensated were also -- also got**  04:11:45
23    **clinical benefit, then it seems**  04:11:48
24    **tautologically true that that would be the**  04:11:50
25    **case.**  04:11:52

1 Q.  Okay.  Another way, I guess, to ask -- or  04:11:53
2     maybe to ask a similar question, your model  04:11:55
3     itself wouldn't provide a way to identify  04:11:58
4     patients for whom the drug was effective and  04:12:00
5     patients for whom it wasn't, correct?  04:12:03
6 A.  **That's correct.**  04:12:07
7 Q.  Okay.  And it sounds like you don't have any  04:12:07
8     independent opinion on the question of  04:12:08
9     whether Neurontin was or was not effective  04:12:09
10    with respect to any individual prescription?  04:12:11
11        MR. NOTARGIACOMO:  Objection.  04:12:14
12 A.  **No, I don't have an opinion on that.**  04:12:14
13 Q.  And do not have an independent opinion on  04:12:19
14    the more general question of whether  04:12:23
15    Neurontin was, as a general matter,  04:12:25
16    effective for any given off-label  04:12:27
17    indication?  04:12:29
18        MR. NOTARGIACOMO:  Objection.  04:12:30
19 A.  **No, I do not.**  04:12:32
20 Q.  Do you have any understanding as to the type  04:12:43
21    of showing of -- on efficacy that would be  04:12:44
22    necessary to cause you -- or really I guess  04:12:47
23    to cause plaintiffs' counsel or whoever's  04:12:52
24    making this decision to opt to include a  04:12:54
25    particular indication in the analysis that  04:12:59

1     you'll do in your model?  04:13:02
2 A.  **No, I do not.**  04:13:04
3 Q.  Okay.  Again, let's just assume for now that  04:13:07
4     the assumption doesn't hold and that  04:13:23
5     Neurontin, you know, actually is effective  04:13:25
6     for off-label uses for some number of  04:13:28
7     people.  Are you aware of any way, short of  04:13:30
8     an individual inquiry, of telling on an  04:13:35
9     individual-by-individual basis for whom  04:13:37
10    Neurontin was effective?  04:13:39
11        MR. NOTARGIACOMO:  Objection.  04:13:40
12 A.  **I am not aware of a good way of telling**  04:13:41
13    **whether it was effective for those patients**  04:13:46
14    **even within an individual inquiry because of**  04:13:49
15    **the difficulty of determining from an**  04:13:51
16    **observational study whether a drug was**  04:13:54
17    **effective for a patient or not.  I'm sorry,**  04:13:57
18    **I'm losing my voice.**  04:13:59
19 Q.  Are you aware of any way, then, to make a  04:14:02
20    determination on an individual basis as to  04:14:04
21    whether Neurontin was effective for a given  04:14:07
22    prescription for a given patient?  04:14:10
23        MR. NOTARGIACOMO:  Objection.  04:14:11
24 A.  **In the standard -- with the standards of**  04:14:11
25    **research that I typically use, I believe it**  04:14:17

1     would be very difficult to do.  04:14:19
2 Q.  Now, again assuming that Neurontin really is  04:14:45
3     effective for off-label uses for some number  04:14:48
4     of people, that would mean that some number  04:14:50
5     of individual class members would not have  04:14:52
6     suffered any injury as a result of the  04:14:54
7     defendants' conduct here; is that correct?  04:14:58
8 A.  **Based on the theory of injury, I guess I'm**  04:15:02
9     **not entirely sure how to translate the legal**  04:15:07
10    **theory of injury under here whether or not**  04:15:10
11    **they received some clinical benefit.  There**  04:15:14
12    **may still be some legal theory of injury**  04:15:16
13    **based on having been misled, for example,**  04:15:19
14    **but I'm afraid this is getting outside of my**  04:15:22
15    **expertise.**  04:15:24
16 Q.  Okay.  I guess just thinking about a purely  04:15:25
17    economic out-of-pocket injury, or again  04:15:35
18    assuming that Neurontin is actually  04:15:38
19    effective for off-label uses for some number  04:15:40
20    of people, that some number of individual  04:15:42
21    class members would not have suffered any  04:15:45
22    sort of out-of-pocket economic injury as a  04:15:47
23    result of having paid for a prescription for  04:15:50
24    Neurontin that worked?  04:15:52
25        MR. NOTARGIACOMO:  Objection.  04:15:53

68  (Pages 266 to 269)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                516-608-2400

270

1 A.  I think that the problem is a little more    04:15:56
2    complicated than that, so for example, if I    04:15:58
3    were trying to look at the issue of clinical    04:16:01
4    benefit compared to, you know, what their    04:16:08
5    co-payment was, those would need to be    04:16:10
6    compared, and a but for world would have to    04:16:12
7    be constructed.  Had there not been the    04:16:16
8    allegedly illegal off-label promotion, would    04:16:18
9    they have gotten another drug that would    04:16:20
10    have been more effective?  I think it's not    04:16:22
11    quite as straightforward as to whether or    04:16:24
12    not they got any clinical benefit.    04:16:25
13 Q.  Fair enough.  And it sounds like it would be    04:16:27
14    a difficult inquiry that would require a    04:16:29
15    look into the specific circumstances in the    04:16:34
16    individual patient's case?    04:16:36
17 A.  If you are asking this question about    04:16:37
18    whether an individual patient's clinical    04:16:39
19    benefit would mean that they were injured or    04:16:41
20    not, that is an individual question.    04:16:45
21 Q.  Okay.  Your model doesn't set out to reduce    04:16:47
22    the total number of off-label Neurontin    04:16:54
23    prescriptions to account for amounts that    04:16:56
24    were spent on off-label prescriptions for    04:17:02
25    which Neurontin was perfectly effective?    04:17:04

271

1 A.  My model would look at those promotional    04:17:06
2    activities that were ultimately described to    04:17:12
3    me by counsel to be subject to the    04:17:16
4    allegations, and so if those included the    04:17:19
5    indications that you are suggesting were    04:17:26
6    perfectly ineffective, then that might be the    04:17:29
7    case.  I'm sorry, did I not answer your    04:17:31
8    question?  It was a long question.    04:17:34
9 Q.  No, no, no.  It was a long answer.  I think    04:17:36
10    you did cover it, though.    04:17:39
11 A.  Okay.    04:17:40
12 Q.  Do you have an understanding as to whether    04:17:40
13    this inquiry as to whether Neurontin was    04:17:44
14    effective for an individual patient or not    04:17:46
15    will occur at some point in the litigation?    04:17:48
16    MR. NOTARGIACOMO:  Objection.    04:17:51
17 A.  My understanding is that this is a class    04:17:52
18    matter and that there will not be    04:17:55
19    individual -- individualized inquiries.    04:17:57
20    There may be evidence presented, and I don't    04:18:01
21    know of this for certain on scientific    04:18:06
22    studies, but aggregate impact.    04:18:08
23 Q.  Okay.  Fair enough.  But you don't,    04:18:12
24    yourself, anticipate engaging in any sort of    04:18:14
25    analysis at any time on an individual    04:18:17

272

1    patient-by-patient level?    04:18:19
2 A.  Looking at clinical effectiveness or    04:18:20
3    anything else, no.    04:18:22
4 Q.  Okay.    04:18:23
5    MR. POLUBINSKI:  Let's do the next    04:18:29
6    exhibit.    04:18:30
7    (Exhibit No. 14, Declaration of    04:18:30
8    Meredith Rosenthal in Response to    04:18:30
9    Defendants' Expert Keith E. Argenbright,    04:18:30
10    M.D., marked for identification.)    04:18:51
11 Q.  All right.  So we've handed you what is    04:18:58
12    marked as Rosenthal Exhibit --    04:19:08
13 A.  14.    04:19:12
14 Q.  -- 14, thank you.  I'm glad someone was    04:19:12
15    keeping track that I am.  This is your    04:19:17
16    declaration that you submitted to the Court    04:19:21
17    in this case; is that correct?    04:19:22
18 A.  Excuse me.  Yes, it is correct.    04:19:24
19 Q.  Sorry to get you right in the middle of your    04:19:26
20    sip of water.    04:19:28
21 A.  I'm sorry, I'm just trying to sound a little    04:19:28
22    bit less fried here.  It's just -- I've just    04:19:31
23    been losing my voice for the last couple of    04:19:33
24    days, and I think it's just a long day.  But    04:19:39
25    if -- I'm okay.    04:19:40

273

1    THE WITNESS:  (To the reporter.)    04:19:40
2    If you can still -- can you still hear me    04:19:40
3    okay?    04:19:40
4 A.  It doesn't hurt.    04:19:41
5 Q.  All right.  If it's a problem, let me know.    04:19:41
6 A.  It's wear and tear.    04:19:42
7 Q.  Who asked you to prepare this?    04:19:44
8 A.  Specifically Ed asked me to prepare this.    04:19:45
9 Q.  When you say "Ed," you mean Mr.    04:19:51
10    Notargiacomo?    04:19:54
11 A.  I'm sorry, Mr. Notargiacomo.  I beg your    04:19:54
12    pardon.    04:19:58
13 Q.  That's okay.  I call him Ed, too.    04:19:58
14    When did you start work on it?    04:20:01
15 A.  Not very long before it was filed.  It was a    04:20:02
16    rather quick deadline.  So I would have to    04:20:09
17    look at my billing files to be sure, so it    04:20:11
18    was filed -- let me just take a quick look.    04:20:14
19    Oh, sorry, it was filed September 14th.    04:20:22
20    Without looking at my billing records I    04:20:25
21    would guess that I first reviewed the    04:20:27
22    materials, in particular Dr. Argenbright's    04:20:29
23    declaration, maybe a week to ten days    04:20:33
24    before.    04:20:36
25 Q.  Did anyone else work with you on your    04:20:40

69  (Pages 270 to 273)

## 274

1  declaration, which is to say Rosenthal    04:20:42
2  Exhibit 14?    04:20:45
3  A.  I would have had support again from the    04:20:46
4  staff at GMA and including Renee Rushnawitz    04:20:51
5  and Joshua Peteet and maybe others, but    04:20:59
6  those are the two that come to mind, again    04:21:03
7  with footnotes, questions about the    04:21:08
8  databases, that kind of thing.    04:21:10
9  Q.  Did you share drafts with Ms. Rushnawitz and    04:21:16
10  Mr. Peteet in the context that we described    04:21:19
11  before?    04:21:21
12  A.  I believe that I shared a draft certainly    04:21:23
13  with the two of them again for helping put    04:21:25
14  together the footnotes, and Renee Rushnawitz    04:21:28
15  would have read the draft and given me    04:21:31
16  feedback as to form.    04:21:33
17  Q.  Did she give you feedback as to anything    04:21:35
18  other than form?    04:21:38
19  A.  She might have raised questions where    04:21:38
20  something was unclear, but typically her    04:21:40
21  role is to provide feedback with respect to    04:21:42
22  form.    04:21:45
23  Q.  How did they provide feedback? How did Ms.    04:21:47
24  Rushnawitz and/or Mr. Peteet provide    04:21:51
25  feedback to you?    04:21:54

## 275

1  A.  I believe Ms. Rushnawitz would have    04:21:54
2  redlined.    04:21:58
3  Q.  She would have redlined the document and    04:21:59
4  e-mailed it back to you, I take it?    04:22:01
5  A.  I believe so.    04:22:02
6  Q.  Okay. Would you still have her e-mails with    04:22:04
7  the redlined versions attached?    04:22:08
8  A.  I don't believe I do. Again, this is    04:22:10
9  September, and we really don't have much    04:22:14
10  capacity, so I think my e-mails go back only    04:22:18
11  within the month.    04:22:21
12  Q.  Can we ask you to go back and take a look    04:22:22
13  and see if you do have copies of it?    04:22:25
14  A.  With regards --    04:22:27
15  MR. NOTARGIACOMO: If there are    04:22:29
16  requests for the witness to pull documents    04:22:30
17  or data, I would only ask that it be    04:22:31
18  directed at counsel rather than the witness.    04:22:34
19  MR. POLUBINSKI: Fair enough. So    04:22:35
20  then I'll direct you to do that. If we    04:22:36
21  could take a look for any of these that you    04:22:38
22  might have and produce them.    04:22:39
23  MR. NOTARGIACOMO: We will look    04:22:42
24  into it.    04:22:42
25  MR. POLUBINSKI: Okay.    04:22:50

## 276

1  BY MR. POLUBINSKI:    04:22:52
2  Q.  Do you have workpapers or other notes that    04:22:52
3  you would have prepared in conducting your    04:22:55
4  work on this declaration?    04:22:56
5  A.  No, I would not.    04:22:57
6  (Discussion off the record.)    04:23:07
7  Q.  Okay. Let's flip to Page 2, Paragraph 6.    04:23:08
8  Maybe I'm wrong about that.    04:23:12
9  A.  Okay.    04:23:14
10  MR. NOTARGIACOMO: Page 3?    04:23:17
11  Q.  I think we're Page 3, Paragraph 6.    04:23:18
12  MR. POLUBINSKI: Thank you, Ed.    04:23:23
13  A.  Mr. Notargiacomo.    04:23:24
14  Q.  Second sentence reads, "Inferences about the    04:23:25
15  causal effects of a drug cannot be made    04:23:27
16  patient by patient."    04:23:29
17  A.  Yes, I see that.    04:23:30
18  Q.  What do you mean by "causal effects" there?    04:23:33
19  A.  It's a term used in statistical analysis    04:23:35
20  pertaining to, as it suggests, the true    04:23:41
21  causal effects that the drug caused some    04:23:47
22  change in condition as opposed to an    04:23:53
23  association between the improvement or lack    04:23:55
24  of -- or lack of improvement, as the case    04:23:58
25  may be, as a result of the drug. So it    04:24:03

## 277

1  relates specifically to a causal chain as    04:24:06
2  opposed to an associate observation.    04:24:09
3  Q.  Are you saying in this sentence and in your    04:24:10
4  declaration that it would be impossible to    04:24:17
5  determine with a reasonable degree of    04:24:19
6  scientific certainly whether a particular    04:24:21
7  causal effect -- whether a particular drug    04:24:24
8  had a particular causal effect on a patient?    04:24:27
9  A.  I'm saying the scientific standards for    04:24:29
10  understanding the causal effects of clinical    04:24:32
11  treatments generally and prescription drugs    04:24:35
12  in particular do not look at individual    04:24:37
13  patients in observation to determine the    04:24:40
14  effects. They rely on randomized control    04:24:43
15  trials.    04:24:46
16  Q.  Let me ask the question again. Are you    04:24:47
17  saying that it's impossible to determine to    04:24:54
18  a reasonable degree of scientific certainty    04:24:56
19  whether a drug had a particular causal    04:24:59
20  effect on a particular patient?    04:25:01
21  A.  In my view, it's -- it is impossible to say    04:25:03
22  with a sufficient degree of certainty the    04:25:06
23  level of scientific evidence that I would    04:25:10
24  use.    04:25:12
25  Q.  All right. One thing that we can agree on,    04:25:18

70  (Pages 274 to 277)