158

```
 1  Rosenthal 10?                              01:24:25
 2  A.  As I stated in my declaration, I assume that  01:24:26
 3      the allegations are true, and then I look at   01:24:29
 4      what the effect would be under economic        01:24:34
 5      theory under empirical evidence that we have   01:24:36
 6      to date. So no, I did not judge whether the    01:24:39
 7      allegations were true.                         01:24:43
 8  Q.  So -- and you don't have any independent       01:24:44
 9      knowledge as to whether they're true?          01:24:47
10  A.  I guess --                                     01:24:48
11          MR. NOTARGIACOMO: Objection. You           01:24:51
12      can answer.                                    01:24:52
13  A.  I'm not sure what would be included in that.   01:24:52
14      I have looked at discovery materials that      01:24:56
15      support those allegations. Would you           01:24:59
16      consider that to be independent knowledge or   01:25:01
17      that's material provided to me under the       01:25:03
18      case? So...                                    01:25:05
19  Q.  Let me ask it to you this way: You're not      01:25:08
20      offering an opinion as to the truth of any     01:25:10
21      of the factual allegations in the complaint,   01:25:12
22      are you?                                       01:25:15
23          MR. NOTARGIACOMO: Objection.               01:25:15
24  Q.  I mean, aside from what's in your -- well,      01:25:15
25      let me just phrase it that way. You're not     01:25:18
```

159

```
 1      offering an opinion as to the truth of any     01:25:19
 2      of the underlying factual allegations that     01:25:21
 3      are in the complaint?                          01:25:23
 4  A.  No, I am not.                                  01:25:24
 5  Q.  Okay. And do you expect to?                    01:25:26
 6  A.  I do not. You mean a legal opinion about       01:25:27
 7      whether --                                     01:25:32
 8  Q.  Whether they're true or not.                   01:25:32
 9  A.  No.                                            01:25:34
10  Q.  Okay. Now, so at bottom, I guess, when         01:25:34
11      we're talking about what the allegations are   01:25:48
12      that are described in Paragraph 7 and          01:25:50
13      subparagraphs, what we're really talking       01:25:53
14      about, I guess, is the number of allegedly     01:25:55
15      improper statements by defendants about the    01:25:57
16      off-label use of Neurontin; is that a fair     01:26:01
17      characterization?                              01:26:03
18          MR. NOTARGIACOMO: Objection.               01:26:04
19  A.  So the summary here, going back to the         01:26:05
20      error --                                       01:26:08
21  Q.  Sure.                                          01:26:09
22  A.  -- describes a number of different             01:26:09
23      activities as they were summarized in the      01:26:11
24      first amended class action complaint, and      01:26:15
25      some of them have to do with statements.       01:26:18
```

160

```
 1      Others -- I mean, I guess if you take          01:26:21
 2      studies promoting studies as statements as     01:26:25
 3      well, perhaps you mean to consider all of      01:26:31
 4      these things as statements. I think they're    01:26:33
 5      not quite all statements.                      01:26:35
 6  Q.  Okay. Fair enough. That's a good               01:26:36
 7      clarification. I guess, though, using the      01:26:38
 8      broadest definition of statements, you don't   01:26:49
 9      know, yourself, whether any of the allegedly   01:26:51
10      improper or unlawful statements that are       01:26:53
11      mentioned in the complaint were, in fact,      01:26:54
12      untruthful; is that right?                     01:26:56
13          MR. NOTARGIACOMO: Objection.               01:26:58
14  A.  Again, I guess I'm having a little trouble     01:26:59
15      just because some of the discovery materials   01:27:06
16      I have reviewed suggest deliberate             01:27:09
17      strategies that as a layperson it seemed       01:27:13
18      untruthful to me, but I am not trying to       01:27:16
19      judge whether or not those are truthful.       01:27:21
20      Again, I have been asked to assume those       01:27:24
21      allegations are true and proceed from there.   01:27:26
22  Q.  Okay. But -- and -- fair enough. We'll         01:27:29
23      leave it at that.                              01:27:33
24      Who wrote the subparagraphs for               01:27:34
25      Paragraph 7?                                   01:27:41
```

161

```
 1  A.  I did.                                         01:27:41
 2  Q.  What did you base your work upon in doing      01:27:43
 3      that?                                          01:27:47
 4  A.  I reviewed the complaint.                      01:27:47
 5  Q.  Anything else?                                 01:27:52
 6  A.  I may have reviewed some other discovery       01:27:53
 7      documents which you see are cited there, so    01:27:56
 8      those are documents as they're cited, but      01:27:58
 9      that's essentially what I reviewed, yes.       01:28:01
10  Q.  Okay. And would it be correct to say that      01:28:04
11      your descriptions in Paragraph 7 are based     01:28:09
12      principally upon the allegations in the        01:28:13
13      complaint?                                     01:28:14
14  A.  My descriptions in Paragraph 7 and the        01:28:15
15      subparts thereof were my understanding of      01:28:19
16      the allegations as they were presented in      01:28:20
17      the complaint.                                 01:28:22
18  Q.  Look at Paragraph 8, which is on Page 6.       01:28:23
19  A.  Okay.                                          01:28:37
20  Q.  Paragraph 8 describes "detailing visits" by   01:28:37
21      Parke-Davis employees, correct?               01:28:44
22  A.  Yes.                                           01:28:48
23  Q.  Is there any reason why Paragraph 8 of your   01:28:48
24      report is not Paragraph 7h)?                   01:28:51
25  A.  My recollection is that while the discovery   01:28:53
```

41 (Pages 158 to 161)

162

```
 1      documents relate to that, I don't believe      01:28:57
 2      that that was characterized in that way in      01:28:59
 3      the document, and so I haven't included it      01:29:02
 4      in Paragraph 7, which I describe as my         01:29:05
 5      summary of the allegations in the complaint.   01:29:08
 6   Q. So by "the document" in your last answer you   01:29:11
 7      mean the complaint?                            01:29:12
 8   A. I'm sorry, the complaint, yes.                 01:29:15
 9   Q. So Paragraph 8, I guess, derives from an       01:29:20
10      independent review that you would have done    01:29:22
11      of the documents and not your review of the    01:29:23
12      complaint?                                     01:29:26
13   A. It was from a review of other discovery        01:29:26
14      materials presented to me in the case, yes,    01:29:30
15      but you're right, it's -- I believe it's not   01:29:33
16      from the complaint itself. So if you           01:29:35
17      believe that to be independent review, I       01:29:38
18   Q. Fair enough. You cite as a couple of          01:29:40
19      footnotes in Paragraph 8 two specific          01:29:45
20      documents.                                     01:29:48
21   A. Yes.                                           01:29:48
22   Q. Are there other documents aside from those     01:29:50
23      two that you would have reviewed to support    01:29:53
24      your conclusions -- or support the             01:29:55
25      description that you gave in Paragraph 8?      01:29:58
```

163

```
 1   A. Those were the documents that -- from          01:30:00
 2      Paragraph 8.                                    01:30:04
 3   Q. Those two documents, the memorandum from J.     01:30:05
 4      Rizzo?                                          01:30:08
 5   A. That's right.                                   01:30:09
 6   Q. And the 1998 strategic plan?                    01:30:09
 7   A. That's my belief is that it's only those two    01:30:11
 8      documents. Again, I wrote this, I'm sorry,      01:30:15
 9      a year ago, so I would have to check, but it    01:30:18
10      is my recollection, as you suggest, that the    01:30:20
11      detailing issues not described in the           01:30:22
12      first amended class action complaint.           01:30:25
13   Q. Okay.                                           01:30:27
14         MR. POLUBINSKI: All right. Let's             01:30:34
15      mark the next one.                              01:30:35
16         (Exhibit No. 12, Document headed             01:30:52
17      "1998 Strategic Plan and A&P Allocation         01:30:52
18      Grid, Neurontin," marked for                    01:30:52
19      identification.)                                01:30:54
20   Q. I'm handing you now a document that's been      01:30:54
21      marked as Rosenthal Exhibit 12.                 01:30:57
22   A. Okay.                                           01:30:59
23   Q. So the last sentence of Paragraph 8 reads,      01:30:59
24      "During these 'detailing,' samples              01:31:13
25      were also strategically used to encourage       01:31:14
```

164

```
 1      physicians to initiate off-label treatment      01:31:18
 2      for new patients"; is that correct?             01:31:20
 3   A. I'm sorry.                                       01:31:22
 4   Q. Did I read it right? I apologize.               01:31:23
 5   A. I need to go back. I must have the wrong        01:31:24
 6      exhibit, so I'm going back to this.             01:31:27
 7   Q. Yeah, this is part of Exhibit 1, exactly,       01:31:29
 8      Paragraph 8.                                     01:31:31
 9   A. Paragraph 8, yeah. And please tell me what      01:31:32
10      you were just reading from.                     01:31:39
11   Q. Yeah, the last sentence.                        01:31:39
12   A. "During these 'detailing visits,'" correct.    01:31:41
13   Q. Okay. The footnote at the end of that           01:31:44
14      sentence refers to a document that's            01:31:48
15      described in your report as "1998 strategic     01:31:50
16      plan and A&P allocation grid" --                01:31:55
17   A. Yes.                                            01:31:59
18   Q. -- is that correct?                             01:32:00
19   A. Yes, that's correct.                           01:32:00
20   Q. Okay. Now, is the document that I've just       01:32:02
21      handed you, Rosenthal Exhibit 12, the           01:32:03
22      document that's referred to in Footnote 25?     01:32:05
23   A. I believe it is. Page 4073, yes, it is.        01:32:07
24   Q. And just looking at it, this looks like a       01:32:12
25      strategic plan grid, I guess --                 01:32:17
```

165

```
 1   A. It does.                                        01:32:18
 2   Q. -- for 1998?                                    01:32:19
 3      This is a forward-looking document,             01:32:20
 4      isn't it?                                        01:32:22
 5   A. I would assume a strategic plan is a           01:32:22
 6      forward-looking document, yes.                  01:32:24
 7   Q. And so it doesn't actually state what amount    01:32:26
 8      of money would have been spent on sampling;     01:32:28
 9      is that right?                                  01:32:31
10   A. That's correct.                                 01:32:31
11   Q. How does this document support your             01:32:31
12      statement that samples were also used           01:32:35
13      strategically -- or strategically used to       01:32:37
14      encourage physicians to initiate off-label      01:32:41
15      treatment for new patients?                     01:32:43
16   A. Well, again, samples were part of the          01:32:45
17      strategic plan to initiate off-label use in     01:32:48
18      first page, "Expand Neurontin use in            01:32:50
19      epilepsy through the introduction of            01:32:53
20      monotherapy."                                    01:32:57
21   Q. All right. So on this first page you read      01:32:58
22      from the language in the top box which          01:33:00
23      reads, "Expand Neurontin use in epilepsy        01:33:02
24      through the introduction of monotherapy,"       01:33:06
25      correct?                                        01:33:09
```

42  (Pages 162 to 165)

166

1  A.  Yes.                                          01:33:09
2  Q.  And then there is a separate line part way     01:33:09
3      down in the document that reads "Samples"?      01:33:12
4  A.  That's correct.                                01:33:14
5  Q.  And then amounts that seem to be associated    01:33:14
6      with that line entry, correct?                 01:33:17
7  A.  Yes, that was my understanding.                01:33:19
8  Q.  Now, the doctors who would have received       01:33:21
9      these samples would have been doctors who      01:33:22
10     treated epileptics, correct?                   01:33:25
11 A.  Presumably.                                    01:33:26
12 Q.  Would you agree with me that there would be    01:33:29
13     nothing inherently wrong with giving a         01:33:32
14     sample of Neurontin to an epileptologist?      01:33:34
15         MR. NOTARGIACOMO:  Objection.              01:33:36
16 A.  Again, I don't want to opine on a legal        01:33:37
17     issue like that.                               01:33:40
18 Q.  Let me ask it a different way.  You're aware   01:33:45
19     that in 1998 Neurontin was approved by the     01:33:49
20     FDA for use in treating epileptic seizures;    01:33:52
21     is that correct?                               01:33:55
22 A.  I'm aware of the indications for which it      01:33:55
23     was approved, right.  So you said 1998?        01:33:59
24 Q.  By 1998, which is the date on --               01:34:02
25 A.  Right.                                         01:34:02

167

1  Q.  -- the documents.                             01:34:04
2  A.  It would make sense earlier than that for     01:34:04
3      partial seizures as a secondary line -- a     01:34:07
4      second line of treatment, right.              01:34:10
5  Q.  And wouldn't it make sense that doctors who    01:34:15
6      would be prescribing the drug for on-label    01:34:18
7      uses at the time would have been people who    01:34:20
8      were treating epileptics?                     01:34:22
9          MR. NOTARGIACOMO:  Objection.             01:34:24
10 A.  It would make sense that some of those        01:34:24
11     physicians would treat patients who were      01:34:27
12     epileptics.                                    01:34:29
13 Q.  And so for a Pfizer sales -- for a             01:34:30
14     Parke-Davis sales representative to give a     01:34:33
15     sample to an epileptologist in 1998 would     01:34:37
16     not necessarily have been encouraging an      01:34:40
17     epileptologist to use that drug for an        01:34:43
18     off-label use?                                 01:34:45
19         MR. NOTARGIACOMO:  Objection.             01:34:46
20 A.  I don't think I'm in a position to respond    01:34:49
21     to that intelligently, I'm sorry.  I think    01:34:52
22     that that's asking for an evaluation that I   01:34:55
23     can't really make.                            01:34:57
24 Q.  Okay.  Do you have any knowledge as to        01:34:58
25     whether sampling for FDA-approved uses is     01:35:07

168

1      permissible?                                  01:35:09
2  A.  As a -- from a layperson's perspective --     01:35:10
3  Q.  Sure.                                         01:35:16
4  A.  -- it's my understanding that sampling is     01:35:16
5      permissible.                                  01:35:18
6  Q.  Okay.  Would you have any way, based on this  01:35:18
7      document or anything else, to distinguish     01:35:27
8      between samples that were given to an         01:35:29
9      epileptologist for an on-label use versus     01:35:32
10     samples that were given for an off-label      01:35:37
11     use?                                          01:35:39
12 A.  Based on this document and my understanding   01:35:40
13     about the way a pharmaceutical company        01:35:44
14     tracks their promotional activities, I would  01:35:47
15     expect that they may track these activities   01:35:50
16     historically in the same way as they look     01:35:54
17     forward to what those activities -- what      01:36:00
18     those tactics are to achieve their strategic  01:36:02
19     plan.  And so I would look to data that       01:36:06
20     Parke-Davis or Pfizer may have where they     01:36:09
21     had documented their own sampling activities  01:36:12
22     by indication.                                01:36:14
23 Q.  The first question I guess is I gather you    01:36:19
24     haven't seen any data like that to date?      01:36:21
25 A.  I have seen some -- as are in my footnotes    01:36:24

169

1      here, some data where they evaluate their     01:36:28
2      own promotional activities for return on      01:36:32
3      investment after meetings, for example,       01:36:34
4      looking at return on investment.  Those are   01:36:38
5      cited in here.  And so I would look for        01:36:40
6      similar kinds of documents related to         01:36:43
7      sampling.                                      01:36:46
8  Q.  Do you have an expectation as to whether --   01:36:47
9      or a recollection from having reviewed the    01:36:50
10     documents as to whether there would be        01:36:52
11     documents that would distinguish between      01:36:53
12     samples that were given for on-label uses     01:36:55
13     for epileptics and samples that were given    01:36:58
14     for off-label uses for epileptics?            01:37:00
15 A.  I do not have a specific recollection about   01:37:02
16     samples.  I would expect that free samples,   01:37:07
17     for example, that would be given to           01:37:09
18     psychiatrists could be easily distinguished   01:37:10
19     from free samples that were given to          01:37:14
20     neurologists and that that kind of tracking   01:37:17
21     could take place.                             01:37:20
22 Q.  Let's look at Paragraph 9 of Exhibit 1,       01:37:31
23     which is your declaration.  Paragraph 9       01:37:34
24     begins, if I'm reading it correctly,          01:37:41
25     "Assuming these allegations are true, the     01:37:44

43  (Pages 166 to 169)

170

```
 1   economic impacts to the class would be the      01:37:46
 2   following."                                      01:37:52
 3       For purposes of that clause, these          01:37:53
 4   allegations, does that mean the allegations      01:37:55
 5   in Paragraph 7?                                  01:37:58
 6 A. Yes, the allegations in Paragraph 7.           01:37:59
 7 Q. Would it also include the facts that          01:38:03
 8   you've -- would it also include the material     01:38:07
 9   in Paragraph 8?                                  01:38:10
10 A. The material in Paragraph 8 is there because  01:38:11
11   there's an interrelationship, in my view,        01:38:14
12   between those kinds of promotional               01:38:17
13   activities detailing in free samples, so I       01:38:19
14   include it in the models, but I would rely       01:38:24
15   on counsel to tell me which effects were         01:38:25
16   going to be considered in terms of the           01:38:29
17   ultimate impact. These promotional               01:38:31
18   activities, they have an interrelationship.      01:38:33
19 Q. Okay. I'm asking you something I think much   01:38:36
20   more simple than that, actually, with            01:38:37
21   respect to Paragraph 9. And I'm really just      01:38:39
22   trying to get at which of the allegations        01:38:41
23   you're talking about for purposes of             01:38:43
24   Paragraph 9 and what their conclusions are       01:38:45
25   that are laid forth there. Are you focused       01:38:47
```

171

```
 1   on just the allegations in Paragraph 7, or       01:38:51
 2   do you also have Paragraph 8 in mind as          01:38:53
 3   well?                                            01:38:55
 4 A. To be technically correct, it would just be   01:38:55
 5   Paragraph 7, yeah.                               01:39:02
 6 Q. Okay. So how dependent are the opinions       01:39:03
 7   that you give in Paragraphs 9a) and b) on       01:39:05
 8   the assumptions in Paragraph 7?                  01:39:10
 9       MR. NOTARGIACOMO: Objection.                01:39:13
10 A. How dependent are they on the truth of the     01:39:17
11   allegations broadly?                             01:39:21
12 Q. Yeah.                                           01:39:24
13 A. I guess they're fully dependent on the truth  01:39:26
14   of those allegations.                            01:39:30
15 Q. Okay. So if one of the assumptions or if      01:39:32
16   one of the allegations that's listed in          01:39:34
17   Paragraph 7 turned out not to be well-           01:39:37
18   founded and wasn't supported by the facts as     01:39:40
19   they developed in the case, what effect          01:39:42
20   would that have on the conclusions that you      01:39:44
21   reach in Paragraphs 9a) and 9b)?                 01:39:47
22 A. Well, I guess --                               01:39:50
23       MR. NOTARGIACOMO: Objection. You            01:39:51
24   can answer.                                      01:39:51
25       THE WITNESS: Sorry.                          01:39:52
```

172

```
 1 A. I guess I would just like to back up a        01:39:53
 2   see that --                                      01:39:57
 3 Q. Sure.                                           01:39:57
 4 A. -- if all of the allegations were -- turned   01:39:57
 5   out to be untrue in the legal sense, that        01:40:01
 6   they were determined to be untrue then, then     01:40:04
 7   the models would no longer relate. If            01:40:08
 8   selected pieces of the allegations were          01:40:11
 9   untrue, then there would be different            01:40:13
10   indications included in the ultimate             01:40:16
11   analysis and different elements of               01:40:18
12   promotional strategy in the analysis, but        01:40:20
13   the overall picture would be the same. The       01:40:25
14   general conclusions about where the economic     01:40:28
15   theory relates to the impact and what the        01:40:29
16   empirical strategy would be for identifying      01:40:33
17   it are generalizable.                            01:40:34
18 Q. Okay. Again, I think I might be asking        01:40:36
19   something that's a little bit more simple,       01:40:39
20   which is -- maybe just take a second to take     01:40:40
21   a look at the --                                 01:40:42
22 A. Okay.                                          01:40:43
23 Q. -- conclusions that you list specifically in  01:40:43
24   Paragraphs 9a) and 9b). We'll talk about        01:40:47
25   them more specifically later --                  01:40:51
```

173

```
 1 A. Okay.                                          01:40:53
 2 Q. -- but just take a second to look at them.    01:40:53
 3 A. Okay. So the conclusions in 9a) would still   01:40:56
 4   hold as long as one of the allegations, any      01:40:59
 5   one of those allegations, are true. And 9b)     01:41:03
 6   of course relates specifically to the            01:41:09
 7   allegation with regard to dosing. And this      01:41:11
 8   would depend on ---                              01:41:16
 9 Q. Now, with respect to 9a) when you say "any   01:41:18
10   one of the allegations," what do you have in    01:41:20
11   mind when you say "allegations"?                01:41:22
12 A. So let's say, for example, it turned out     01:41:25
13   that the only thing the Court determined was    01:41:28
14   illegal here was about the published            01:41:32
15   studies, funding certain published studies      01:41:39
16   or rewriting the conclusions of certain          01:41:41
17   published studies. Then that would -- the       01:41:44
18   analysis would be restricted to the impact      01:41:46
19   of those particular promotional strategies,     01:41:47
20   tactics and whatever indication that related    01:41:51
21   to, so it would be the same general model,      01:41:54
22   but it would be narrowed to a certain           01:41:58
23   mechanism and certain indications that would    01:42:00
24   relate to that mechanism.                       01:42:02
25 Q. Okay.                                          01:42:04
```

44 (Pages 170 to 173)

174

1  A. Is that clear?                                01:42:04
2  Q. Uh-huh. All right. Let's focus now on what    01:42:05
3     the specific conclusions in 9a) and 9b) are.  01:42:18
4  A. Okay.                                         01:42:21
5  Q. Let's start with 9a) --                       01:42:21
6  A. Okay.                                         01:42:23
7  Q. -- Paragraph 9a) on Page 7 of Exhibit 1,      01:42:24
8     which reads, "The Class paid for many more    01:42:28
9     prescriptions of Neurontin for off-label      01:42:30
10    uses than it would have absent the off-label  01:42:32
11    promotional activities."                      01:42:35
12       What do you mean by "many more             01:42:40
13    prescriptions"?                               01:42:42
14       MR. NOTARGIACOMO: Objection. You           01:42:43
15    can answer.                                   01:42:44
16 A. I guess that's a somewhat general statement   01:42:44
17    that given the data I've reviewed, the        01:42:48
18    impact would be something greater than a      01:42:53
19    small amount and so that more prescriptions   01:42:55
20    of Neurontin at some significant level would  01:43:01
21    be -- would have been written based on what   01:43:04
22    appears to be the widespread promotional      01:43:05
23    activities related to these off-label uses.   01:43:10
24 Q. Is your -- well, is there any sort of         01:43:12
25    threshold as to what some significant level   01:43:20

175

1     is, in your mind?                             01:43:23
2  A. No.                                           01:43:24
3  Q. Is your conclusion with respect to the many   01:43:24
4     more prescriptions -- well, let me withdraw   01:43:36
5     the question.                                 01:43:41
6        And what's the basis for that             01:43:42
7     conclusion?                                   01:43:43
8  A. The basis for the conclusion is a review of   01:43:44
9     the economics of promotion, review of the    01:43:48
10    empirical literature showing the response to  01:43:51
11    promotion and review of the discovery         01:43:53
12    documents.                                    01:43:55
13 Q. Is it based at all on your model?             01:43:56
14 A. Have I done any empirical analysis with the   01:44:00
15    model? No. The model is a model.             01:44:05
16 Q. And so this question is based -- let me       01:44:07
17    withdraw the question.                        01:44:18
18       Have you done any quantitative work to     01:44:18
19    support the conclusion that you reach in      01:44:27
20    Paragraph 9a)?                                01:44:29
21 A. I have not done any of my own analysis. As    01:44:29
22    we discussed earlier, I've reviewed some      01:44:33
23    analysis that was done in the Franklin        01:44:35
24    matter, but I have not -- this data, I        01:44:37
25    haven't analyzed them myself.                 01:44:43

176

1  Q. Let me ask you about the analysis that was    01:44:45
2     done in the Franklin matter. Is it referred  01:44:47
3     to anywhere in your list of documents relied  01:44:49
4     on in Attachment A.2 of your declaration?     01:44:53
5  A. It's in the notes. Let me find the note for   01:44:56
6     a moment. I'm going to cross-reference. It    01:44:59
7     should be towards the end. Footnote 72        01:45:15
8     references -- it's all part of the Franklin   01:45:25
9     documents, so I don't know if it -- if that   01:45:27
10    was picked up in the documents. I guess       01:45:34
11    that could have been an oversight, but it's   01:45:37
12    referenced there.                             01:45:40
13 Q. Do you know whether any of that material has  01:45:45
14    been produced to defendants?                  01:45:47
15 A. I would have thought that it was. It was my   01:45:48
16    understanding that it was. If it hasn't,      01:45:51
17    I'm afraid that's an oversight.               01:45:55
18       MR. NOTARGIACOMO: Just for the             01:45:56
19    record, it's my understanding that there's    01:45:57
20    an agreement between counsel that any         01:45:59
21    documents that were produced in the Franklin  01:46:01
22    case, whether it be from plaintiffs to        01:46:02
23    defendants or defendants to plaintiffs can    01:46:04
24    be used in this litigation without            01:46:06
25    reproducing those documents again to the      01:46:07

177

1     party that produced them in the first place.  01:46:09
2        MR. POLUBINSKI: Fair enough. I             01:46:11
3     guess, the thing that we're working on here   01:46:12
4     is really -- the issue that we're working     01:46:14
5     with here is that we don't know precisely     01:46:17
6     what documents these are. I don't think       01:46:19
7     they've ever been described to us, and it     01:46:20
8     makes it difficult for us to ask about them   01:46:23
9     if we don't know what they are. So let me     01:46:26
10    just ask that if you can -- or, Professor      01:46:28
11    Rosenthal, if you can let us know which       01:46:31
12    documents those are, and if they are indeed   01:46:33
13    ones that have come from us, that's fine,      01:46:35
14    but we would like to know what they are.      01:46:37
15       MR. NOTARGIACOMO: Well, I think            01:46:38
16    the witness has just pointed to Paragraph --  01:46:39
17    I'm sorry, Footnote 73 which --               01:46:41
18       THE WITNESS: 72 actually.                  01:46:44
19       MR. POLUBINSKI: She pointed to             01:46:45
20    Footnote 72 which doesn't contain any sort    01:46:46
21    of reference to a particular set of           01:46:49
22    documents.                                    01:46:50
23       THE WITNESS: Although maybe 73 is          01:46:51
24    the correct reference for that same --        01:46:52
25       MR. NOTARGIACOMO: My understanding         01:46:54

178

```
 1    is that the affidavit of Seth Landefeld,        01:46:54
 2    M.D. and Michael Steiman, M.D. --               01:46:56
 3         THE WITNESS: That is where it              01:46:56
 4    comes from.                                     01:46:56
 5         MR. NOTARGIACOMO: -- is where it           01:46:59
 6    comes from.                                     01:47:00
 7         MR. POLUBINSKI: Okay.                      01:47:01
 8         MR. NOTARGIACOMO: Which should be          01:47:02
 9    something that was filed in the Franklin        01:47:04
10    case, so the defendants should have copies      01:47:05
11    of that.                                        01:47:07
12         MR. POLUBINSKI: Fair.                      01:47:08
13    BY MR. POLUBINSKI:                              01:47:08
14 Q. Okay. So just to make the record clear,         01:47:08
15    Professor Rosenthal, is that true that the      01:47:10
16    rollout of these data and the preliminary       01:47:13
17    analysis with them is contained in Exhibit B    01:47:15
18    attached to the affidavit of Seth Landefeld     01:47:18
19    and Michael Steiman?                            01:47:26
20 A. I believe that to be true. I don't have the     01:47:31
21    document in front of me, but now that I see     01:47:32
22    this I do believe that to be true. There        01:47:34
23    are some documents that are attached as         01:47:36
24    Exhibit B to that document.                     01:47:37
25 Q. Okay. All right. Going back to before --        01:47:43
```

179

```
 1    to the questions that I asked before about      01:47:53
 2    Paragraph 9a) in the conclusion that's set      01:47:58
 3    forth in Paragraph 9a), have you, yourself,     01:47:59
 4    done any quantitative work to support this      01:48:03
 5    conclusion?                                     01:48:05
 6 A. At this time I have not been asked to do        01:48:05
 7    quantitative analysis.                          01:48:07
 8 Q. Okay. And is this Exhibit B document to the     01:48:08
 9    Landefeld/Steiman declaration one of the        01:48:11
10    items that you would have relied upon in        01:48:15
11    reaching this conclusion?                       01:48:17
12 A. It was, yes, it was.                            01:48:18
13 Q. Now, the analysis that you did here to come     01:48:28
14    to this conclusion that the class paid for      01:48:33
15    many more prescriptions of Neurontin for        01:48:37
16    off-label uses than it would have absent the    01:48:38
17    off-label promotional activities, is the        01:48:41
18    analysis that you did to support that           01:48:44
19    statement the type of analysis that you've      01:48:46
20    done -- type of analysis that you've done       01:48:49
21    before?                                         01:48:51
22 A. Yes, it's certainly consistent with the type   01:48:51
23    of analysis that I've done, looking, for        01:48:57
24    example, at the impact of direct consumer       01:48:58
25    advertising on prescription drug spending.      01:49:00
```

180

```
 1 Q. Now, in your other work in which you've done    01:49:03
 2    this analysis, do you typically do your own     01:49:23
 3    economic analysis to support it as well?        01:49:25
 4 A. I guess I'm not sure I understand the           01:49:26
 5    question. You're distinguishing your own        01:49:31
 6    economic analysis to support --                 01:49:34
 7 Q. From review of the literature and review of     01:49:36
 8    documents.                                      01:49:39
 9 A. In my publishable academic work I certainly     01:49:40
10    review the literature and previous models,      01:49:43
11    and that's, you know, sort of part of every     01:49:47
12    analysis, and then proceed with the analysis    01:49:50
13    itself, yeah.                                   01:49:53
14 Q. Okay. Let's look at Paragraph 9b) --            01:49:53
15 A. Okay.                                           01:50:11
16 Q. -- which reads, "For all clinical               01:50:11
17    indications (both approved and unapproved),     01:50:14
18    the class paid for greater dosing of            01:50:17
19    Neurontin (either as many more pills or as      01:50:19
20    increased dosage for the same number of         01:50:21
21    pills) than it would have absent Parke-         01:50:25
22    Davis's promotional activities."                01:50:27
23    Did I read that one right?                      01:50:29
24 A. Yes, you did.                                   01:50:31
25 Q. Great. And here what did you mean -- or         01:50:32
```

181

```
 1    what do you mean by "many more pills"?          01:50:36
 2 A. Again, this was a general statement about       01:50:39
 3    the fact that I expect to find an impact        01:50:43
 4    that's substantial based on discovery           01:50:47
 5    materials, based on my knowledge and            01:50:50
 6    expertise in health economics research and      01:50:53
 7    particularly with regard to pharmaceutical      01:50:58
 8    promotion.                                      01:51:00
 9 Q. Are the bases for your conclusion on this       01:51:00
10    point the same as the bases for your            01:51:04
11    conclusion with respect to the many more        01:51:06
12    prescriptions described in Paragraph 9a),       01:51:09
13    generally speaking?                             01:51:11
14 A. Generally speaking, they come from discovery    01:51:12
15    documents, the allegations, the literature,     01:51:14
16    yes.                                            01:51:17
17 Q. And here, too, did you do any quantitative      01:51:20
18    work to support this conclusion?                01:51:24
19 A. At this time I have not been asked to do        01:51:25
20    quantitative work to support that.              01:51:28
21 Q. Okay. In terms of your prior published          01:51:30
22    work, have you ever published an article        01:51:35
23    that would have reached a general statement-    01:51:39
24    type conclusion like this based only on         01:51:43
25    literature review and review of documents?      01:51:45
```

46 (Pages 178 to 181)

182

```
 1  A.  Well, this -- I mean, just say that the      01:51:47
 2      scope of what I was asked to do in this      01:51:53
 3      matter did not include data analysis because 01:51:56
 4      those data are not complete yet, they have   01:52:00
 5      not been provided to me, particularly        01:52:02
 6      promotional data that will need to come from 01:52:05
 7      the defendants.  And so generally when I'm   01:52:07
 8      writing an academic paper, I'm not in a      01:52:11
 9      position where I have to get to the next     01:52:14
10      stage of the litigation to get -- to        01:52:16
11      actually obtain the data.  So I mean, it     01:52:19
12      just seems like comparing apples and oranges 01:52:22
13      to me.                                       01:52:25
14  Q.  Fair enough.                                 01:52:25
15          MR. POLUBINSKI:  But, Jessica,           01:52:27
16      would you mind reading back the question     01:52:28
17      again.                                       01:52:29
18          (Record read.)                           01:52:29
19          MR. NOTARGIACOMO:  I'm just going        01:52:46
20      to object to the question.  It was vague     01:52:47
21      before.  You can answer it.                  01:52:48
22  A.  I've certainly published papers that have no 01:52:49
23      quantitative analysis in them that come to  01:52:54
24      policy conclusions.  I can't say that I have 01:52:56
25      done something exactly like this.  I guess   01:53:01
```

183

```
 1      it seems -- it seems hard to answer that     01:53:04
 2      question, but I have certainly published     01:53:08
 3      papers that reach conclusions about policies 01:53:10
 4      and about what's going on in the market      01:53:14
 5      without doing data analysis.                 01:53:16
 6  Q.  What are the -- thinking about the articles  01:53:18
 7      that you have in mind, what are the bases     01:53:25
 8      that support your conclusions in those       01:53:27
 9      articles?                                    01:53:29
10          MR. NOTARGIACOMO:  Objection.            01:53:32
11  A.  So thinking about some papers, for example,  01:53:32
12      our original direct consumer advertising     01:53:41
13      paper in the New England Journal, we look at 01:53:44
14      market trends in direct consumer            01:53:48
15      advertising, spending, and based on what we 01:53:54
16      know about the economics of the market and  01:53:57
17      those trends in spending, we draw some       01:53:59
18      conclusions about what effects they may have 01:54:02
19      even though at that point we didn't have the 01:54:06
20      data to actually estimate the effects.       01:54:06
21  Q.  Where did you get -- did you have data on    01:54:11
22      trends in spending?                          01:54:13
23  A.  We had spending data from -- that can be     01:54:14
24      purchased publicly.                          01:54:16
25  Q.  Okay.  You know what?  Let's move on and     01:54:17
```

184

```
 1      turn to Paragraph 12.                        01:54:30
 2  A.  Okay.                                        01:54:33
 3  Q.  Paragraph 12 of your declaration discusses,  01:54:33
 4      among other things, in the second sentence,  01:54:41
 5      traditions as, quote, "a trusted             01:54:47
 6      intermediary in prescription drug (and all   01:54:49
 7      health care) decision making," correct?      01:54:52
 8  A.  That's correct.                              01:54:56
 9  Q.  What do you mean by "trusted intermediary."  01:54:56
10  A.  I use that term to describe essentially a    01:55:00
11      collaborative decision-making process about  01:55:05
12      what drugs individuals take, so individual   01:55:07
13      consumers don't make these decisions         01:55:12
14      independently and to differing degrees rely  01:55:15
15      on their physicians to advise them on what   01:55:18
16      drugs they should take.                      01:55:20
17  Q.  What's the basis for your understanding of   01:55:25
18      what a trusted intermediary is for purposes  01:55:27
19      of this declaration?                         01:55:30
20  A.  Broadly, my training and expertise in health 01:55:30
21      economics.                                   01:55:36
22  Q.  And that would be your coursework, your      01:55:37
23      research, other things?                      01:55:42
24  A.  Both, my coursework, my research.  I do a    01:55:43
25      lot of interdisciplinary research with       01:55:48
```

185

```
 1      physicians on related issues.                01:55:50
 2  Q.  Moving down in Paragraph 12, reading the     01:55:55
 3      next sentence, "While patient preferences    01:56:01
 4      play a role in the choice of therapy,        01:56:04
 5      physicians have enormous influence over      01:56:06
 6      health care decisions, particularly for      01:56:08
 7      serious medical conditions."                 01:56:10
 8          Did I read that correctly?               01:56:15
 9  A.  Yes, you did.                                01:56:18
10  Q.  Does the extent of patient involvement or    01:56:19
11      preferences vary depending on the situation? 01:56:21
12  A.  That would be my conclusion from, again,     01:56:25
13      theory as well as my research experience.    01:56:28
14  Q.  You know, based on theory and your research  01:56:32
15      experience, would you say that patients with 01:56:35
16      certain conditions are more likely to be     01:56:37
17      actively involved in choices with respect to 01:56:39
18      their treatment than others?                 01:56:43
19  A.  My understanding, and I don't think there's  01:56:44
20      terrific empirical evidence on this, would   01:56:48
21      be that patients are more involved when it   01:56:51
22      comes to a chronic condition where they have 01:56:53
23      significant experience with the same problem 01:56:56
24      over and over again and also where that      01:56:59
25      condition or the drugs are not subject to    01:57:03
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                        516-608-2400

186

| | | |
|---|---|---|
| 1 | sort of a life-threatening issue. | 01:57:09 |
| 2 | So the more serious the condition, my | 01:57:11 |
| 3 | understanding from economics and the | 01:57:14 |
| 4 | psychology that runs alongside it is that | 01:57:17 |
| 5 | patients are less likely to be involved when | 01:57:20 |
| 6 | it's a life-threatening issue. | 01:57:22 |
| 7 Q. | So just to be clear about it, patients are | 01:57:24 |
| 8 | less likely to be involved in life- | 01:57:30 |
| 9 | threatening issues, more likely -- | 01:57:34 |
| 10 A. | In making independent decisions about | 01:57:35 |
| 11 | treatments when there's a life-threatening | 01:57:38 |
| 12 | condition or very serious condition. | 01:57:41 |
| 13 Q. | Would you say that -- you know, over the | 01:57:43 |
| 14 | period we're talking about in the class | 01:57:44 |
| 15 | period since 1994, would you say that the | 01:57:44 |
| 16 | extent of patient involvement in health care | 01:57:46 |
| 17 | decisions or treatment decisions has changed | 01:57:49 |
| 18 | over time? | 01:57:51 |
| 19 A. | It's a speculation. I don't know that we | 01:57:51 |
| 20 | have evidence to that effect, but I do think | 01:57:55 |
| 21 | that people in the industry believe that to | 01:57:57 |
| 22 | be true, what with direct consumer | 01:57:59 |
| 23 | advertising for one thing that consumers | 01:58:01 |
| 24 | have become more involved. | 01:58:05 |
| 25 Q. | And so would you agree that consumers are | 01:58:06 |

187

| | | |
|---|---|---|
| 1 | increasingly seeking active participation in | 01:58:09 |
| 2 | their own health care? | 01:58:11 |
| 3 A. | I believe that's a statement that I would | 01:58:12 |
| 4 | agree with. | 01:58:15 |
| 5 Q. | Now, despite patients' roles, you also state | 01:58:18 |
| 6 | that physicians have enormous influence over | 01:58:22 |
| 7 | health care decisions, particularly for | 01:58:25 |
| 8 | serious medical conditions? | 01:58:28 |
| 9 A. | Yes. | 01:58:31 |
| 10 Q. | What conditions would you describe as being | 01:58:32 |
| 11 | serious medical conditions for purposes of | 01:58:33 |
| 12 | this statement? | 01:58:36 |
| 13 A. | Again, I think the sort of main | 01:58:36 |
| 14 | characteristic that I was thinking of when I | 01:58:40 |
| 15 | said that was if it were a life-threatening | 01:58:42 |
| 16 | condition. Decision-making under those | 01:58:44 |
| 17 | circumstances is very difficult, and | 01:58:47 |
| 18 | patients are most likely to defer to their | 01:58:49 |
| 19 | trusted physician in that case. | 01:58:53 |
| 20 Q. | Are there other categories of serious | 01:58:58 |
| 21 | medical conditions that you would have in | 01:59:00 |
| 22 | mind aside from life-threatening conditions, | 01:59:02 |
| 23 | or is it the same thing for purposes of this | 01:59:04 |
| 24 | analysis? | 01:59:06 |
| 25 A. | I guess I haven't thought it through to that | 01:59:10 |

188

| | | |
|---|---|---|
| 1 | degree of detail, but other conditions with | 01:59:12 |
| 2 | serious medical consequences. | 01:59:17 |
| 3 Q. | Now, even setting aside the parameters that | 01:59:18 |
| 4 | you discussed before about patients who have | 01:59:35 |
| 5 | chronic illnesses versus non-chronic | 01:59:39 |
| 6 | illness, patients who have serious | 01:59:43 |
| 7 | conditions versus less serious conditions, | 01:59:44 |
| 8 | will individual patients still even outside | 01:59:47 |
| 9 | of those categories -- will it vary the | 01:59:49 |
| 10 | extent to which individual patients will | 01:59:56 |
| 11 | have input into their health care decisions, | 01:59:58 |
| 12 | into their treatment decisions? | 02:00:01 |
| 13 A. | Certainly there will be some variation in | 02:00:02 |
| 14 | that, yes. | 02:00:03 |
| 15 Q. | And some consumers of health care will | 02:00:06 |
| 16 | necessarily be more inquisitive than others? | 02:00:08 |
| 17 A. | Yes, I would agree with that statement. | 02:00:11 |
| 18 Q. | Okay. Would you agree that the extent to | 02:00:12 |
| 19 | which a patient is involved in his or her | 02:00:18 |
| 20 | health care decisions will depend on a range | 02:00:20 |
| 21 | of factors? | 02:00:21 |
| 22 | MR. NOTARGIACOMO: Objection. You | 02:00:26 |
| 23 | can answer. | 02:00:27 |
| 24 A. | I guess it would vary. It might be that | 02:00:27 |
| 25 | there are some predictable factors. Is that | 02:00:30 |

189

| | | |
|---|---|---|
| 1 | what you mean? | 02:00:31 |
| 2 Q. | Yeah. | 02:00:32 |
| 3 A. | Some specific factors that are associated | 02:00:32 |
| 4 | with it. | 02:00:34 |
| 5 Q. | So, for example, age might be a predictive | 02:00:34 |
| 6 | factor? | 02:00:37 |
| 7 A. | Potentially. | 02:00:37 |
| 8 Q. | Education level? | 02:00:38 |
| 9 | MR. NOTARGIACOMO: Objection. | 02:00:40 |
| 10 A. | I don't have any data on this, so if you're | 02:00:40 |
| 11 | asking me to speculate, then I could | 02:00:44 |
| 12 | speculate along with you that those might be | 02:00:47 |
| 13 | important. | 02:00:50 |
| 14 Q. | I guess what I'm asking for is what -- you | 02:00:50 |
| 15 | know, is what your understanding would be | 02:00:54 |
| 16 | based on, you know, the work that you do and | 02:00:55 |
| 17 | the work that you've done in this area and | 02:00:59 |
| 18 | consumer choice in health care decisions, | 02:01:00 |
| 19 | things like that. | 02:01:03 |
| 20 A. | Based on the work that I've done in this | 02:01:03 |
| 21 | area, it does seem -- broadly in consumerism | 02:01:05 |
| 22 | it does seem that age is a factor. That's | 02:01:09 |
| 23 | one that comes to mind. | 02:01:12 |
| 24 Q. | Okay. Would you think that education level | 02:01:16 |
| 25 | would be, too? | 02:01:18 |

48  (Pages 186 to 189)

190

1          MR. NOTARGIACOMO:  Objection.          02:01:18
2  A.  Again, it seems reasonable, but I don't have     02:01:19
3       any specific data on that.                02:01:21
4  Q.  Okay. Fair enough. There may be any number    02:01:22
5       of factors, I guess, that could, you know,    02:01:24
6       in the aggregate impact on the extent to     02:01:27
7       which people are involved in their health    02:01:29
8       care decisions, right?                    02:01:30
9          MR. NOTARGIACOMO:  Objection.          02:01:31
10 A.  There may be factors that influence whether    02:01:31
11      people are involved in their individual     02:01:35
12      health decisions, yes.                    02:01:37
13 Q.  But none of the factors by themselves would    02:01:38
14      tell us whether a particular individual was    02:01:40
15      more involved or less involved in a        02:01:42
16      particular prescription decision, for      02:01:44
17      example?                               02:01:46
18         MR. NOTARGIACOMO:  Objection.          02:01:46
19 A.  There is some randomness in which a person     02:01:47
20      is more or less involved, you mean, so there    02:01:53
21      may be factors that are important, but they    02:01:56
22      wouldn't predict perfectly.              02:01:58
23 Q.  I'm not sure that randomness is necessarily    02:01:59
24      a -- but that there's -- that each         02:02:01
25      individual circumstance will be different    02:02:03

191

1       based on factors -- based on a range of     02:02:04
2       unquantifiable factors?                  02:02:11
3          MR. NOTARGIACOMO:  Objection.          02:02:12
4  A.  I'm not sure. There are many factors.       02:02:13
5       There may be factors that we've not        02:02:20
6       discussed. Whether they're unquantifiable    02:02:21
7       or not, that seems like a strong statement,    02:02:25
8       but there are no doubt many factors that    02:02:27
9       affect whether an individual patient decides    02:02:30
10      to get involved in decision-making around    02:02:31
11      prescription drugs.                      02:02:34
12 Q.  Okay. And here's another question that       02:02:35
13      relates to that:  I assume that there's no    02:02:37
14      accepted or reliable way to measure patient    02:02:40
15      involvement, that you're aware of?         02:02:42
16         MR. NOTARGIACOMO:  Objection.          02:02:43
17 A.  Well, there are general scales. There's a     02:02:44
18      patient activation scale that's been       02:02:52
19      developed by Judy Hibbard at the University    02:02:54
20      of Oregon. She's a psychologist, and she's    02:02:57
21      been motivated by this general area about    02:03:02
22      how to get consumers more involved in their    02:03:04
23      health and health care, and so she developed    02:03:06
24      a scale that measures their knowledge and    02:03:09
25      ability to become engaged in self-care and    02:03:13

192

1       choosing providers based on quality        02:03:18
2       information.                            02:03:20
3  Q.  Have you used her scale before?            02:03:21
4  A.  I haven't used her scale, no, I have not.    02:03:23
5  Q.  You wouldn't, I assume, anticipate using it    02:03:26
6       in your work in this case, would you?      02:03:30
7  A.  I had not -- I don't believe it's relevant    02:03:31
8       to my analysis, so I had not planned to use    02:03:34
9       it, no.                               02:03:36
10 Q.  Here's another general question:  You would    02:03:43
11      agree that some doctors would be more      02:03:46
12      accepting or inviting of patient involvement    02:03:47
13      than others?                           02:03:49
14         MR. NOTARGIACOMO:  Objection.          02:03:50
15 A.  It would be hard to disagree with that       02:03:51
16      statement.                             02:03:54
17 Q.  Okay. That some doctors will provide more    02:03:54
18      information to their patients than others?    02:03:57
19 A.  I would agree --                         02:03:59
20         MR. NOTARGIACOMO:  Objection.          02:04:00
21         THE WITNESS:  Sorry.                  02:04:01
22 Q.  You can answer.                         02:04:03
23 A.  Yes, I would agree with that.             02:04:03
24 Q.  Some doctors may, for example, give patients    02:04:05
25      articles or excerpts of articles regarding    02:04:08

193

1       medications that they prescribe?          02:04:11
2          MR. NOTARGIACOMO:  Objection.          02:04:12
3  A.  I can imagine that would be the case in some    02:04:12
4       cases.                                02:04:18
5  Q.  And that many don't?                     02:04:18
6          MR. NOTARGIACOMO:  Objection.          02:04:20
7  A.  And I can imagine that would also be the     02:04:20
8       case.                                 02:04:23
9  Q.  Okay. Next sentence is "Professional         02:04:24
10      norms -- next sentence in Paragraph 12 of    02:04:30
11      your declaration is "Professional norms     02:04:32
12      require physicians to use their clinical    02:04:35
13      skills, knowledge and experience to make    02:04:37
14      therapeutic choices that are in the best    02:04:39
15      interest of their patients."             02:04:41
16      What do you mean by "professional         02:04:48
17      norms"?                              02:04:49
18 A.  I was speaking broadly there, but you could    02:04:49
19      think narrowly of the Hippocratic Oath,    02:04:54
20      which in addition to do no harm has        02:04:57
21      something to do with treating patients,    02:05:00
22      doing the best for patients.             02:05:05
23 Q.  When you say you were thinking broadly, are    02:05:05
24      there things besides the Hippocratic Oath    02:05:10
25      that you had in mind when you wrote this?    02:05:13

49  (Pages 190 to 193)

194

1 A.  Again, sort of broad notions of professional    02:05:15
2     norms that physicians are obliged to try to    02:05:17
3     improve the health of their patients or    02:05:22
4     maintain the health of their patients to the    02:05:23
5     best of their ability.    02:05:26
6 Q.  Are the norms that you have in mind -- I    02:05:32
7     take it -- well, withdrawn.    02:05:33
8         I take it from your answer that the    02:05:35
9     norms that you have in mind aren't    02:05:36
10    necessarily written down someplace?    02:05:37
11 A.  That's right.    02:05:39
12 Q.  Would you include within the professional    02:05:42
13    norms that you're describing here things    02:05:43
14    like practice guidelines?    02:05:46
15 A.  No. I guess I would think of practice    02:05:48
16    guidelines not as being professional norms,    02:05:50
17    they are more external advice. The point of    02:05:54
18    this describing professional norms is to say    02:05:59
19    that we don't expect physicians to act like    02:06:04
20    other profit-maximizing firms, that the only    02:06:07
21    thing that matters to them is, for example,    02:06:12
22    profit, as we do in other industries. We    02:06:14
23    actually expect physicians to do things that    02:06:16
24    may not be in their best financial interest,    02:06:19
25    for example, but are in the interest of    02:06:21

195

1     patients. Practice guidelines I would    02:06:23
2     consider to be an external imposition in a    02:06:26
3     way.    02:06:31
4 Q.  Okay. Okay. Taking you back to what    02:06:31
5     professional norms might be, would you    02:06:37
6     include -- well, let me withdraw that    02:06:42
7     question, too.    02:06:45
8         THE VIDEOGRAPHER: Excuse me. Five    02:06:51
9     minutes.    02:06:52
10        MR. POLUBINSKI: Okay.    02:06:52
11 Q.  Well, I assume -- well, just to back up, I    02:06:53
12    guess, do the norms that you have in mind    02:06:58
13    here vary at all from state to state, the    02:07:00
14    professional norms?    02:07:03
15 A.  Professional norms? No. I was referring    02:07:04
16    more generally to, again, sort of    02:07:07
17    physicians' commitments to their patients.    02:07:10
18 Q.  Right. Which I guess it may not vary state    02:07:14
19    to state, but presumably it might vary from    02:07:16
20    doctor to doctor?    02:07:18
21 A.  Again, I think of these kinds of    02:07:19
22    professional norms as being very broad and    02:07:24
23    about the commitments physicians make, all    02:07:28
24    physicians make when they, you know, receive    02:07:30
25    their degree and when they enter into    02:07:34

196

1     practice around something as broad as the    02:07:36
2     Hippocratic Oath which applies to all    02:07:39
3     physicians.    02:07:41
4 Q.  I guess what I'm saying is that if it's so    02:07:42
5     broad that we can't look somewhere to see    02:07:45
6     where it's written down and that there's    02:07:49
7     some difficulty articulating what it is,    02:07:50
8     wouldn't you imagine that different doctors    02:07:52
9     might have different understandings of what    02:07:54
10    those professional norms are?    02:07:56
11        MR. NOTARGIACOMO: Objection.    02:07:57
12 A.  Different doctors may operationalize those    02:07:58
13    professional norms in different ways, yes.    02:08:04
14 Q.  Okay. But you would expect that most    02:08:06
15    doctors would take the requirement to use    02:08:08
16    their skills and knowledge seriously?    02:08:09
17 A.  I would.    02:08:11
18        MR. POLUBINSKI: I see we've got    02:08:23
19    very little time left on the videotape. I    02:08:24
20    think this might be a good time to take a    02:08:26
21    break.    02:08:29
22        THE WITNESS: Too bad it's not...    02:08:30
23        MR. POLUBINSKI: Yeah, maybe we can    02:08:32
24    just take enough of a break to switch tapes.    02:08:33
25        THE VIDEOGRAPHER: The time is    02:08:36

197

1 2:08. This is the end of Tape 3, and we are    02:08:37
2     off the record.    02:08:43
3         (Videographer changes tape.)    02:10:04
4         THE VIDEOGRAPHER: The time is    02:10:09
5     2:10. This is the beginning of Tape 4, and    02:10:10
6     we are back on the record.    02:10:12
7 BY MR. POLUBINSKI:    02:10:17
8 Q.  Okay. Professor Rosenthal, if you could    02:10:23
9     take a look at Paragraph 16 of your    02:10:26
10    declaration.    02:10:27
11 A.  Okay.    02:10:28
12 Q.  All right. Now, you write here that "The    02:10:33
13    FDA requires that manufacturers demonstrate    02:10:35
14    both the safety and efficacy of new drugs    02:10:37
15    before marketing them for sale."    02:10:41
16        Is that a correct description?    02:10:42
17 A.  That's correct.    02:10:44
18 Q.  Okay. The FDA first approved Neurontin for    02:10:45
19    marketing in 1994?    02:10:47
20 A.  I thought it was 1993, but I'll take your    02:10:48
21    word for it.    02:10:51
22 Q.  Well, why don't we take a look back at    02:10:51
23    Paragraph 7a) of your declaration.    02:10:55
24 A.  Okay.    02:10:58
25 Q.  You know what? In fact --    02:11:08

50  (Pages 194 to 197)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

198

```
 1  A.  Approved in December '93.              02:11:10
 2  Q.  Yeah.  Okay.  You're right.            02:11:11
 3  A.  You're right, they began selling in January    02:11:13
 4      '94.                                    02:11:16
 5  Q.  In January of '94.  So you're not --   02:11:16
 6  A.  So --                                   02:11:16
 7  Q.  -- shortly (sic) right.  Yeah, okay.   02:11:17
 8  A.  Okay.                                   02:11:18
 9  Q.  Neurontin was initially approved for   02:11:19
10      treatment of what condition?           02:11:22
11  A.  For partial seizures for adjunctive therapy,   02:11:22
12      is my understanding.                    02:11:29
13  Q.  Okay.  Now, you also write in your     02:11:30
14      declaration -- and I think this is in   02:11:32
15      Paragraph 7c), the top of Page 5 -- that   02:11:34
16      Parke-Davis began seeking FDA approval for   02:11:39
17      other indications, which include pediatric   02:11:42
18      adjunctive treatment for seizures and also   02:11:45
19      for postherpetic neuralgia; is that correct?   02:11:49
20  A.  That's in 7c)?  Yes.                    02:11:53
21  Q.  What do you mean by "began seeking"?   02:11:55
22  A.  Again, this is based on the complaint and   02:12:06
23      some of the documents that came along with   02:12:08
24      it, internal memos, that they were      02:12:10
25      undertaking the clinical studies necessary   02:12:15
```

199

```
 1      to get those new indications listed.    02:12:17
 2  Q.  Okay.  Does it mean -- in your mind, does it   02:12:21
 3      mean filing of supplemental new drug    02:12:24
 4      applications?                           02:12:27
 5  A.  I'm afraid it doesn't mean something quite   02:12:27
 6      that detailed in my mind at all --      02:12:32
 7  Q.  Okay.                                   02:12:34
 8  A.  -- but my understanding was more that it was   02:12:34
 9      related to launching the clinical trials   02:12:37
10      necessary to do that.                   02:12:38
11  Q.  Now, Neurontin was eventually approved for   02:12:46
12      pediatric adjunctive treatment, correct?   02:12:47
13  A.  That's correct.                         02:12:51
14  Q.  And it was eventually approved for PHN also,   02:12:51
15      correct?                               02:12:54
16  A.  That is correct.                        02:12:55
17  Q.  What is PHN, by the way?                02:12:55
18          MR. NOTARGIACOMO:  Objection.      02:12:56
19  A.  My understanding is that it's pain      02:13:00
20      associated with herpes.                 02:13:02
21  Q.  Where does your understanding come from?   02:13:06
22  A.  Review of the documents.                02:13:13
23  Q.  Do you understand PHN to be a type of   02:13:15
24      neuropathic pain?                       02:13:18
25          MR. NOTARGIACOMO:  Objection.      02:13:19
```

200

```
 1  A.  I'm not a clinical expert, so I would not   02:13:19
 2      have made that connection, no.          02:13:22
 3  Q.  Okay.  What does FDA approval of Neurontin   02:13:24
 4      for these indications mean in terms of   02:13:28
 5      safety?                                 02:13:30
 6  A.  My understanding is that they were able to   02:13:31
 7      meet certain standards for the level of   02:13:34
 8      evidence from clinical trials that was   02:13:37
 9      provided in terms of whether the trials were   02:13:40
10      sufficiently large, well-designed to show   02:13:44
11      evidence that the -- that Neurontin was safe   02:13:47
12      and effective for those indications.    02:13:49
13  Q.  Okay.  You've mentioned certain standards --   02:13:56
14  A.  Uh-huh.                                 02:14:02
15  Q.  -- that were met in order to gain approval   02:14:02
16      for those indications.  What is your    02:14:05
17      understanding for what those standards are?   02:14:08
18  A.  The standards -- my understanding is that   02:14:09
19      the standards are generally that there need   02:14:13
20      to be two trials of sufficient size, and   02:14:16
21      generally the standard is a double-blind   02:14:20
22      randomized control trial.               02:14:24
23  Q.  Do you know what "sufficient size" means?   02:14:25
24  A.  I do not specifically, no.              02:14:28
25  Q.  Do you have a general understanding?    02:14:31
```

201

```
 1  A.  I have a general understanding that it   02:14:32
 2      relates to the statistical power of the   02:14:35
 3      analysis, but I don't know what that would   02:14:39
 4      be in this case.                        02:14:41
 5  Q.  Upon what is your understanding based on in   02:14:42
 6      terms of what the standards are for FDA   02:14:47
 7      approval?                              02:14:50
 8  A.  I've reviewed FDA regulations in the past.   02:14:51
 9  Q.  Are you aware of whether there's any    02:15:01
10      follow-up reporting to keep the drug on the   02:15:03
11      market?                                02:15:06
12  A.  Whether there's any post-marketing      02:15:06
13      surveillance -- oh, reporting instead of   02:15:08
14      the manufacturers --                   02:15:10
15  Q.  Precisely.                             02:15:11
16  A.  -- as opposed to by the FDA --         02:15:12
17  Q.  Yes.                                   02:15:15
18  A.  -- itself?                             02:15:15
19  Q.  Yes.                                   02:15:16
20  A.  That's a good question.  I don't know the   02:15:17
21      answer to that, no.                    02:15:19
22  Q.  After a drug is approved, do manufacturers   02:15:21
23      generally continue to conduct studies to   02:15:25
24      determine its effectiveness for other   02:15:27
25      conditions?                            02:15:30
```

## 202

```
1        MR. NOTARGIACOMO: Objection.        02:15:31
2  A.  I don't know whether that would be a        02:15:31
3      generalization. Would I expect in other     02:15:35
4      cases that it might be done to try to find  02:15:38
5      new indications for a drug, for example? It 02:15:40
6      certainly seems possible.                   02:15:44
7  Q.  Why might a company choose to conduct such  02:15:45
8      additional studies? Can you think of        02:15:54
9      reasons why they would?                     02:15:56
10       MR. NOTARGIACOMO: Objection.        02:15:57
11 A.  I think generally a company would do so to  02:15:57
12     try to increase its sales.                  02:16:02
13 Q.  Can you think of reasons why a company might 02:16:05
14     choose not to conduct additional studies?   02:16:12
15       MR. NOTARGIACOMO: Objection.        02:16:15
16 A.  I could imagine that a company might not     02:16:15
17     conduct those additional studies if they    02:16:20
18     were very close to, for example, patent     02:16:23
19     expiration or exclusivity expiration.       02:16:26
20 Q.  If subsequent studies show that a drug is   02:16:30
21     efficacious in treating other indications,  02:16:41
22     are pharmaceutical manufacturers required to 02:16:42
23     pursue FDA approval for those additional    02:16:44
24     indications?                                02:16:46
25       MR. NOTARGIACOMO: Objection.        02:16:47
```

## 203

```
1  A.  I do not believe so, no.                    02:16:47
2  Q.  Do you know if they're encouraged or advised 02:16:52
3      by the FDA to seek additional indications -- 02:16:54
4      seek approval for additional indications?   02:16:58
5  A.  I know that in specific cases I'm aware --   02:17:01
6      maybe "no" is a little too deep-sounding.    02:17:04
7      I'm aware that in specific cases, for        02:17:06
8      example, for pediatric indications the FDA   02:17:09
9      has programs that encourage manufacturers to 02:17:12
10     do additional clinical trials by extending   02:17:13
11     exclusivity.                                 02:17:17
12 Q.  Aside from that circumstance, are you aware  02:17:18
13     of -- are you aware of any other             02:17:23
14     circumstances in which a manufacturer might  02:17:28
15     be encouraged or advised by the FDA to       02:17:31
16     pursue additional indications?               02:17:33
17 A.  I'm not aware of any specific instances.     02:17:35
18 Q.  And can you imagine any circumstances under  02:17:37
19     which a company might decide not to pursue   02:17:47
20     additional indications even where subsequent 02:17:49
21     studies might show efficacy?                 02:17:51
22       MR. NOTARGIACOMO: Objection.        02:17:52
23 A.  Again, I could imagine the case where the    02:18:01
24     patent is due to expire very quickly, that   02:18:03
25     that would be the case.                      02:18:06
```

## 204

```
1  Q.  Are you aware that other countries have      02:18:13
2      analogous regulatory structures to the FDA?  02:18:15
3  A.  It's my understanding that other certainly   02:18:17
4      OECD countries, developed countries, have    02:18:20
5      analogous institutions.                      02:18:23
6  Q.  Can you tell us what you mean by "OECD        02:18:26
7      countries"?                                  02:18:30
8  A.  Sorry, Organization -- you're going to test  02:18:30
9      my recollection, Organization For Economic   02:18:32
10     Development. I can't remember what the C is  02:18:35
11     for. It's an organization of western         02:18:36
12     economies that probably dates back to the    02:18:40
13     '60s, and they have aligned for a variety of 02:18:44
14     things, at one time exchange rate            02:18:48
15     stabilization, but now it's just sort of --  02:18:51
16     it's a group of mostly northern European     02:18:56
17     countries, the U.S. and Canada.              02:18:59
18 Q.  Okay. Why don't we take the European Union   02:19:01
19     as an example of this.                       02:19:08
20 A.  Okay.                                        02:19:09
21 Q.  How much do you know about the European      02:19:09
22     Union system for approving prescription      02:19:12
23     drugs for marketing?                         02:19:14
24 A.  I don't know very much. I understand that    02:19:15
25     it's something that -- it's a policy area    02:19:18
```

## 205

```
1      that's not fully coordinated yet, so the --  02:19:21
2  Q.  Coordinated in what way?                     02:19:25
3  A.  The countries within the European Union I    02:19:26
4      believe still reserve their own right to     02:19:29
5      approve drugs, so they don't do it all as a  02:19:30
6      union, is my understanding, at least my      02:19:34
7      latest knowledge.                            02:19:36
8  Q.  Okay. Insofar as there is -- well, insofar   02:19:37
9      as the European Medicines Agency does        02:19:40
10     actually conduct this sort of review, do you 02:19:43
11     have any sense for how that -- how its       02:19:44
12     process differs from the FDA's process?      02:19:47
13 A.  I do not.                                    02:19:49
14 Q.  I assume, though, that you don't have any    02:19:53
15     reason to believe that regulators in the     02:19:55
16     European Union aren't committed, generally   02:19:57
17     speaking, to patient safety?                 02:20:00
18       MR. NOTARGIACOMO: Objection.        02:20:01
19 A.  I don't have any reason to believe that      02:20:02
20     they're not committed to patient safety.     02:20:04
21 Q.  I didn't think you would, don't worry.       02:20:06
22     And you don't have any reason to think       02:20:08
23     that regulators in the EU are committed to   02:20:11
24     approving drugs only for indications for     02:20:14
25     which they've been proven to be effective?   02:20:17
```

52  (Pages 202 to 205)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

206

```
 1        MR. NOTARGIACOMO: Objection.      02:20:19
 2  A.  I'm sorry, I think there was a double    02:20:20
 3     negative in there, and I just didn't hear  02:20:22
 4     which way it went, so could you repeat?    02:20:24
 5        MR. POLUBINSKI: Maybe if you could    02:20:26
 6     read it back.                     02:20:28
 7  A.  That would be great.              02:20:29
 8     (Record read.)                   02:20:30
 9  Q.  Well, maybe I should read it again. Sounds  02:20:46
10     like one of my double or triple negatives    02:20:48
11     wasn't picked up.                 02:20:51
12  A.  Actually, it was a missing negative that    02:20:52
13     I --                           02:20:53
14  Q.  I think you're right, so let me ask it more  02:20:54
15     slowly. You don't have any reason to think   02:20:56
16     that regulators in the EU are not committed  02:20:57
17     to approving drugs only for indications for  02:21:01
18     which they've been proven to be effective?   02:21:03
19        MR. NOTARGIACOMO: Objection.      02:21:05
20  A.  I don't have any reason to draw that     02:21:07
21     conclusion, no.                  02:21:10
22  Q.  And I assume also you don't have any reason  02:21:11
23     to doubt the competence of the applicable   02:21:13
24     regulators in the EU?              02:21:15
25        MR. NOTARGIACOMO: Objection.      02:21:16
```

207

```
 1  A.  I have no information about the competence   02:21:17
 2     of the regulators in the EU. I have no     02:21:20
 3     reason to doubt it.               02:21:23
 4  Q.  And so you wouldn't have any basis on which  02:21:24
 5     to second-guess an official determination by  02:21:26
 6     the European Medicines Agency that a drug is  02:21:28
 7     safe and effective for a particular       02:21:31
 8     indication?                     02:21:33
 9        MR. NOTARGIACOMO: Objection.      02:21:33
10  A.  I wouldn't have any basis, nor would I be    02:21:34
11     asked to render such an opinion.        02:21:39
12  Q.  Fair enough. And why wouldn't you be asked  02:21:40
13     to render such an opinion?           02:21:42
14  A.  Because I'm not an expert on clinical      02:21:43
15     effectiveness.                  02:21:46
16  Q.  Fair enough. Neuropathic pain is one of the  02:21:47
17     off-label indications at issue in the case,   02:21:52
18     right?                         02:21:54
19  A.  Yes, I believe that's true.         02:21:54
20  Q.  And Neurontin's not approved for treatment   02:21:55
21     of neuropathic pain generally in the U.S.,   02:21:58
22     right?                         02:22:01
23  A.  You mean, generally accepted in the case of  02:22:01
24     postherpetic neuralgia?             02:22:04
25  Q.  Precisely, yeah.                 02:22:04
```

208

```
 1  A.  Right.                         02:22:07
 2  Q.  Are you aware that Neurontin is approved for  02:22:07
 3     the treatment of neuropathic pain in the   02:22:11
 4     European Union?                  02:22:14
 5        MR. NOTARGIACOMO: Objection.      02:22:15
 6  A.  I believe that was mentioned in the      02:22:15
 7     complaint.                     02:22:16
 8  Q.  And are you aware that it had previously    02:22:17
 9     been approved for neuropathic pain in a     02:22:19
10     number of countries like Germany, France or  02:22:22
11     the U.K.?                      02:22:24
12  A.  I believe you if you tell me that. I do     02:22:25
13     recall that it had been approved somewhere.  02:22:27
14  Q.  Do you have any reason to believe that the   02:22:29
15     conclusion of those regulatory bodies in    02:22:37
16     those countries is unsupported by        02:22:39
17     scientifically valid evidence that Neurontin  02:22:40
18     is effective for treatment of neuropathic    02:22:42
19     pain?                          02:22:45
20        MR. NOTARGIACOMO: Objection.      02:22:45
21  A.  Other than the allegations made in the     02:22:46
22     complaint, I have no reason to believe that  02:22:48
23     that is unsubstantiated.            02:22:51
24  Q.  Which allegations in the complaint do you   02:22:53
25     mean?                          02:22:56
```

209

```
 1  A.  Because there are allegations in the      02:22:56
 2     complaint with regard to neuropathic pain   02:22:57
 3     that suggests that there must be something   02:23:00
 4     in the effectiveness evidence.         02:23:01
 5  Q.  And you're aware that Neurontin -- well,    02:23:08
 6     withdrawn.                     02:23:10
 7        Are you aware that Neurontin was      02:23:11
 8     approved for treatment of neuropathic pain   02:23:13
 9     in several countries outside of Europe, too?  02:23:15
10  A.  I was not specifically aware of it. Again,  02:23:17
11     I was aware that some of these indications   02:23:20
12     had been approved elsewhere, but I don't    02:23:22
13     have the specific details in my head.      02:23:24
14  Q.  And you wouldn't have the details of any of  02:23:27
15     those countries' approvals of Neurontin for  02:23:28
16     treatment of neuropathic pain, I assume,    02:23:31
17     either?                        02:23:33
18  A.  No, I wouldn't.                 02:23:33
19  Q.  Do you have any view as to whether a drug   02:23:40
20     that's been approved for another indication  02:23:42
21     in another country, but not in the U.S., is  02:23:43
22     unsafe?                        02:23:46
23        MR. NOTARGIACOMO: Objection.      02:23:47
24  A.  I don't have a view on that, no.       02:23:48
25  Q.  Do you have a view as to whether a drug    02:23:54
```

53 (Pages 206 to 209)

210

1  that's been approved for an indication in    02:23:56
2  another country but not in the U.S. for a     02:23:59
3  particular indication is inefficacious for    02:24:01
4  the indication for which it has not been      02:24:05
5  approved in the U.S.?                         02:24:08
6       MR. NOTARGIACOMO: Objection.            02:24:09
7 A.  I actually followed that.                  02:24:10
8 Q.  Good.                                      02:24:12
9 A.  No, I don't have any expertise to evaluate 02:24:13
10    that.                                      02:24:16
11      MR. POLUBINSKI: Okay. I think          02:24:21
12 we're at a good stopping point for your       02:24:21
13 call, if that makes sense.                    02:24:25
14      MR. NOTARGIACOMO: Except my call        02:24:26
15 doesn't start for another nine minutes. It    02:24:27
16 starts at 2:30. So we can break, and it'll    02:24:29
17 just be a longer break.                       02:24:34
18      MR. POLUBINSKI: Yeah, why don't we      02:24:36
19 go off the record. What time do you have?     02:24:38
20      THE VIDEOGRAPHER: 2:24.                 02:24:42
21      MR. POLUBINSKI: It's all right.         02:24:42
22      THE VIDEOGRAPHER: Go off the            02:24:45
23 record?                                       02:24:45
24      MR. POLUBINSKI: Yes. Yeah.              02:24:45
25      THE VIDEOGRAPHER: The time is           02:24:47

211

1  2:24. We're off the record.                   02:24:48
2  (Recess taken.)                               02:24:52
3       THE VIDEOGRAPHER: The time is 2:57     02:57:16
4  p.m., and we are back on the record.          02:57:19
5 BY MR. POLUBINSKI:                             02:57:23
6 Q.  So, Professor Rosenthal, what is off-label 02:57:26
7  use?                                          02:57:31
8 A.  My working definition of off-label use was 02:57:32
9  use of a drug for a diagnosis or indication   02:57:37
10 other than that which is approved and         02:57:41
11 therefore covered on the FDA-approved label.  02:57:45
12 Q.  Would you agree that FDA doesn't           02:57:51
13 restrict a doctor's discretion in deciding    02:57:54
14 whether to prescribe a drug off-label?        02:57:57
15 A.  That's correct.                           02:58:00
16 Q.  Do you have an understanding for why       02:58:01
17 off-label prescription is permitted by the    02:58:03
18 FDA?                                          02:58:05
19 A.  I do not have an understanding of what their 02:58:05
20 reasons are, no.                              02:58:08
21 Q.  Okay. Let's look at Paragraph 13 of your   02:58:08
22 report.                                       02:58:10
23 A.  Okay.                                     02:58:10
24 Q.  And look at the --                         02:58:10
25 A.  Oh, I'm sorry, I'm on Page 13.            02:58:23

212

1 Q.  That's okay.                               02:58:25
2 A.  I'm sorry.                                 02:58:26
3       MR. NOTARGIACOMO: Page 13.              02:58:26
4 A.  Okay. All right. I'm with you.            02:58:29
5 Q.  And I'm looking at the second sentence. And 02:58:33
6  I think probab -- well, the second sentence  02:58:33
7  reads, "As the 'learned intermediary,' there 02:58:35
8  are times when it is legitimate for a        02:58:38
9  physician to carefully prescribe and monitor 02:58:40
10 off-label use of pharmaceuticals for         02:58:42
11 specific patients for specific indications." 02:58:45
12      Did I read that correctly?              02:58:49
13 A.  Yes, you did.                             02:58:50
14 Q.  And what's the basis for that statement?   02:58:51
15 A.  My general training and experience working 02:58:53
16 in this area, that off-label use is a         02:58:55
17 routine part of clinical practice.            02:58:59
18 Q.  Does a doctor need to inform a patient when 02:59:00
19 he or she prescribes a drug off-label?        02:59:09
20      MR. NOTARGIACOMO: Objection.            02:59:11
21 A.  You know, I'm not sure if that would be the 02:59:12
22 case. I'm not sure the answer to that         02:59:16
23 question. You mean ethically does the         02:59:18
24 doctor need to inform a patient, or do you    02:59:20
25 mean legally?                                 02:59:22

213

1 Q.  Any requirement that you're aware of at all. 02:59:23
2  Is there any requirement that you're aware   02:59:27
3  of that a doctor inform the patient that he  02:59:28
4  or she is prescribing a drug off-label?      02:59:30
5 A.  I'm not aware of any requirement, no.     02:59:33
6 Q.  Do you have an understanding for whether    02:59:35
7  some doctors do inform their patients that   02:59:37
8  they're prescribing a drug off-label?        02:59:39
9 A.  I don't have any evidence on that point.  02:59:41
10 Q.  Would you have any reason to believe that   02:59:46
11 some doctors do -- or don't, I should say?    02:59:47
12      MR. NOTARGIACOMO: Objection.            02:59:51
13 Q.  Let me think of a clearer way to phrase the 02:59:52
14 question.                                     02:59:56
15 A.  Sure.                                     02:59:56
16 Q.  You wouldn't disagree with me if I told you 02:59:56
17 that some doctors informed patients that     03:00:01
18 they're prescribing drugs off-label,         03:00:04
19 correct?                                      03:00:06
20 A.  I wouldn't be surprised that some doctors do 03:00:07
21 inform their patients that they're           03:00:09
22 prescribing off-label.                        03:00:11
23 Q.  And you wouldn't be surprised to learn that 03:00:12
24 some doctors don't inform their patients      03:00:14
25 that they're prescribing drugs off-label?    03:00:15

54 (Pages 210 to 213)

214

```
 1        MR. NOTARGIACOMO:  Objection.      03:00:17
 2  A.  I would not be surprised to learn that.    03:00:17
 3  Q.  And I assume — well, are you aware of any   03:00:21
 4     way to know with respect to the          03:00:27
 5     prescriptions that are at issue in your     03:00:30
 6     report which of those prescriptions are ones   03:00:32
 7     in which a doctor informed his or her      03:00:35
 8     patient that the drug Neurontin was being    03:00:39
 9     prescribed off-label?               03:00:42
10  A.  No, there wouldn't be any way to know that.   03:00:42
11  Q.  Looking back at your -- at the sentence that   03:00:46
12     we just read, what does the word         03:00:50
13     "legitimate" mean in the sentence?        03:00:55
14  A.  I was using that term in a general       03:00:56
15     colloquial meaning of within the scope of   03:00:59
16     the physician's discretion, within the scope  03:01:03
17     of his or her professional discretion.      03:01:06
18  Q.  So were you using it in a legal sense?     03:01:09
19  A.  No. Again, I was using it in a colloquial   03:01:12
20     sense.                         03:01:15
21  Q.  Okay. By "colloquial," is that -- I guess    03:01:16
22     I'm still trying to understand quite what    03:01:19
23     that means. Is it legitimate in a clinical   03:01:21
24     sense?                         03:01:24
25  A.  I meant it in the sense that it would be    03:01:24
```

215

```
 1     reasonable that there would be a basis upon   03:01:31
 2     which the physician could reasonably justify  03:01:34
 3     off-label prescribing.              03:01:39
 4  Q.  To justify it in a clinical sense?        03:01:42
 5  A.  In a professional sense. Perhaps that's    03:01:47
 6     what you mean by "clinical."            03:01:52
 7  Q.  Sure. Can you provide an example of an     03:01:54
 8     acceptable or legitimate off-label        03:01:58
 9     prescribing circumstance?             03:02:01
10  A.  I could imagine a circumstance in which     03:02:02
11     there is no approved treatment for a      03:02:06
12     condition, and a physician in that case     03:02:09
13     might choose to prescribe something       03:02:14
14     off-label.                      03:02:16
15  Q.  And what would make that off-label        03:02:19
16     prescription legitimate?              03:02:21
17  A.  I guess, again, in the way that I understood   03:02:22
18     and used this term, based on some clinical   03:02:29
19     knowledge about the mechanism for whatever   03:02:33
20     illness it was and the drug itself.       03:02:37
21  Q.  I assume that for a prescription to be     03:02:46
22     legitimate there must be some basis for the   03:02:48
23     doctor to believe that the drug will be     03:02:51
24     effective for the patient for the off-label   03:02:53
25     use at issue; is that right?            03:02:55
```

216

```
 1  A.  That's correct. That's perhaps a clearer    03:02:56
 2     way of what I was trying to say, that there   03:03:01
 3     was a condition that had a characteristic    03:03:03
 4     that somehow fit with the way a drug acts.   03:03:05
 5  Q.  Okay. And whether or not it's legitimate I   03:03:08
 6     assume would be based on the specific      03:03:11
 7     circumstance of a patient?            03:03:14
 8        MR. NOTARGIACOMO:  Objection.     03:03:16
 9  A.  Again, I was using the term broadly that    03:03:17
10     there would be a professional justification   03:03:21
11     for doing so based on the patient and the   03:03:23
12     drug at hand.                    03:03:27
13  Q.  Medicaid reimburses for at least some      03:03:28
14     off-label prescriptions; is that correct?    03:03:35
15  A.  I don't know the full details of how      03:03:37
16     Medicaid treats off-label use.          03:03:39
17  Q.  Do you know any of the details about how    03:03:45
18     Medicaid treats off-label use?          03:03:47
19  A.  I've certainly read something broadly about   03:03:49
20     it, but I'm afraid I don't feel qualified to   03:03:53
21     summarize what it is I read about it.      03:03:55
22  Q.  Okay. Are you aware that private insurers   03:03:57
23     also reimburse for off-label uses?        03:04:04
24  A.  That, I am aware of.               03:04:08
25  Q.  Do you have any understanding for why they   03:04:09
```

217

```
 1     do it?                        03:04:10
 2        MR. NOTARGIACOMO:  Objection.     03:04:11
 3  A.  I don't know why, no.               03:04:11
 4  Q.  Okay. Let's look at Paragraph 13, which is   03:04:15
 5     also on Page 7.                   03:04:29
 6  A.  Yes, I'm there.                   03:04:33
 7  Q.  The third sentence reads, "Such off-label   03:04:34
 8     prescribing can benefit both individual     03:04:39
 9     patients and patient populations as clinical   03:04:40
10     experience leads to the formation of      03:04:43
11     hypotheses to be tested in structured      03:04:46
12     clinical trials."                 03:04:49
13        Did I read that one correctly?      03:04:50
14  A.  Yes, you did.                    03:04:51
15  Q.  What do you mean by "benefit" in this     03:04:52
16     sentence as respects individual patients?    03:05:00
17  A.  Let's see. Let me see if there's a way to   03:05:02
18     describe it. I mean generally with respect   03:05:12
19     to individual patients that they might --    03:05:18
20     they might have an improvement in their     03:05:21
21     condition as a result of prescribing, and    03:05:24
22     then with regard to populations --        03:05:29
23  Q.  Uh-huh. Yes.                    03:05:32
24  A.  -- I meant in the sense of increasing the   03:05:32
25     available information with which to base     03:05:36
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                        516-608-2400

218

```
 1    future clinical trials.                    03:05:39
 2 Q.  Okay. So with respect to individual       03:05:44
 3    patients, I guess you would agree that in   03:05:49
 4    some circumstances at least an individual   03:05:54
 5    patient can enjoy a tangible benefit by     03:05:55
 6    virtue of an off-label prescription?        03:05:58
 7 A.  Yes, that would certainly be true in some  03:06:02
 8    cases.                                       03:06:05
 9 Q.  And that -- is there any way to quantify   03:06:05
10    that benefit?                               03:06:44
11 A.  Could you be more specific?  Is there any  03:06:45
12    way to quantify --                          03:06:48
13 Q.  You know, why don't I withdraw the question, 03:06:50
14    actually. That's fine.                      03:06:52
15       Let's look at Paragraph 17, and in       03:06:53
16    particular let's look at the third sentence 03:07:08
17    here. "In particular, promotional materials 03:07:10
18    may only make claims that are supported by  03:07:13
19    scientific evidence (supported by strict    03:07:17
20    scientific procedures) and they may not be  03:07:20
21    false or misleading."                        03:07:23
22       Did I read that correctly?               03:07:27
23 A.  Yes, you did.                               03:07:28
24 Q.  Upon what do you base that statement?      03:07:28
25 A.  A review of the -- I believe the code is   03:07:32
```

219

```
 1    cited there, the Federal 21 CFR 202.1, just 03:07:38
 2    a general, again, layman's review. These    03:07:43
 3    are sort of the underlying regulations in   03:07:45
 4    this area.                                   03:07:47
 5 Q.  Anything else?                             03:07:48
 6 A.  That's it.                                  03:07:49
 7 Q.  What does "supported by strict scientific  03:07:50
 8    procedures" mean?                           03:07:56
 9 A.  So, again, with regard to the scientific   03:07:57
10    evidence that was used to gain approval for 03:07:59
11    the drug for that indication, so clinical   03:08:02
12    trials, randomized control trials.          03:08:05
13 Q.  Is there -- is that all, or are there other 03:08:10
14    things?                                     03:08:11
15 A.  My understanding is that there are a number 03:08:19
16    of rules around how the trials can be run,  03:08:21
17    how patients are selected, that sort of     03:08:24
18    thing. Those all, again, are the same rules 03:08:26
19    about what kind of evidence will be used for 03:08:29
20    approval.                                    03:08:32
21 Q.  Does your statement that I just read in    03:08:32
22    Paragraph 17 apply only to written          03:08:40
23    materials, or does this statement also apply 03:08:43
24    to oral communications?                     03:08:45
25 A.  I believe it also applies to oral          03:08:47
```

220

```
 1    communications.  Certainly the promotional  03:08:49
 2    materials can be oral that are governed      03:08:52
 3    by -- these rules also govern consumer       03:08:55
 4    advertising which is broadcast on TV and     03:08:59
 5    radio.                                       03:09:05
 6 Q.  And so this statement would apply, I assume, 03:09:05
 7    also to the physician-oriented marketing    03:09:09
 8    efforts that are described in Paragraph 19   03:09:12
 9    on the next page of your declaration?        03:09:14
10 A.  That's my understanding.                    03:09:16
11 Q.  Things like detailing, free samples,       03:09:17
12    sponsorship, medical education events?      03:09:20
13 A.  My understanding with regard to the        03:09:24
14    promotional claims, that they not be false  03:09:26
15    or misleading and are supported by evidence 03:09:29
16    and that they apply to all promotional      03:09:32
17    activities.                                  03:09:34
18 Q.  Okay. You also write in Paragraph 17, "FDA 03:09:34
19    regulations call for 'fair balance' in all  03:09:42
20    promotional claims and materials."          03:09:45
21 A.  That is correct.                            03:09:49
22 Q.  What is "fair balance"?                     03:09:50
23 A.  Well, that's a quote, as you see, from the 03:09:53
24    code itself, and my layperson's            03:09:56
25    interpretation is that risks and benefits be 03:10:00
```

221

```
 1    represented in fair proportion to their     03:10:04
 2    actual magnitude.                            03:10:08
 3 Q.  So it's a balancing of the presentation of 03:10:09
 4    risks and benefits?                          03:10:17
 5 A.  That's my understanding, and I have worked 03:10:18
 6    most directly with this as it relates to    03:10:21
 7    consumer advertising, and so in television  03:10:24
 8    ads that means the level of volume, the size 03:10:28
 9    of the fonts, whether the person is speaking 03:10:31
10    in the foreground or the background, but,    03:10:34
11    again, sort of the extent to which risks and 03:10:37
12    benefits are presented proportionally to    03:10:38
13    their potential impact.                      03:10:42
14 Q.  Now, taking as an example the direct       03:10:44
15    consumer advertising, would it be correct to 03:10:49
16    say that what is or isn't fair balance will 03:10:53
17    depend on the circumstances of the specific 03:10:55
18    communication?                              03:10:58
19       MR. NOTARGIACOMO:  Objection.           03:11:01
20 A.  I can imagine that there's a -- the factors 03:11:01
21    that one would look at in a television ad   03:11:07
22    for example, would be somewhat different     03:11:10
23    than in a print ad.  As I mentioned,        03:11:13
24    obviously the print ad, it's really all     03:11:15
25    about font size and color and that sort of  03:11:17
```

56 (Pages 218 to 221)

222

```
1    thing where -- on the television. I know      03:11:19
2    there's been a lot of question about the      03:11:21
3    type of speaker, the volume of speech, the    03:11:24
4    speed of speech, so...                 03:11:27
5 Q. What about the content?                 03:11:28
6 A.  Certainly the content matters, but I think a  03:11:29
7    lot of what I've seen relates to how the      03:11:34
8    content is presented. The content, I        03:11:38
9    believe, typically comes from the approved    03:11:42
10   labeling.                            03:11:45
11 Q. In the case of the advertisements, correct?   03:11:46
12 A.  That's correct.                     03:11:49
13 Q. So that obviously couldn't be true of        03:11:49
14   something like a discussion at a continuing    03:11:57
15   medical education event; is that correct?     03:12:00
16 A.  You can imagine that there would be an       03:12:01
17   analogous yardstick.                   03:12:03
18 Q. Right. But how the yardstick is applied      03:12:05
19   would be based on the individual            03:12:08
20   circumstances, correct?                 03:12:09
21      MR. NOTARGIACOMO: Objection.          03:12:15
22 A.  I imagine that it would be applied somewhat   03:12:15
23   differently looking at a professional        03:12:18
24   conference.                         03:12:19
25 Q. All right. Let's move ahead to Paragraph 18   03:12:20
```

223

```
1    where you write, quote, "Promotional         03:12:31
2    materials must be consistent with the FDA-    03:12:34
3    approved product labeling."              03:12:37
4 A.  I see that, yes.                      03:12:42
5 Q. What does this mean in terms of            03:12:43
6    communications by manufacturers on off-label  03:12:49
7    uses?                              03:12:52
8 A.  My understanding is that manufacturers       03:12:52
9    cannot promote their products according to    03:12:57
10   the FDA, that they cannot promote their      03:12:59
11   products for indications for which there has   03:13:02
12   not been approval.                     03:13:05
13 Q. When you say "manufacturers cannot promote    03:13:12
14   their products," you don't mean, do you,      03:13:15
15   that a manufacturer can never under any      03:13:17
16   circumstances communicate any truthful or     03:13:19
17   non-misleading information about an          03:13:22
18   off-label use to a doctor, do you?          03:13:24
19      · MR. NOTARGIACOMO: Objection.         03:13:26
20 A.  I guess that's such a specific statement, it  03:13:26
21   seems that it calls for expertise that I      03:13:31
22   don't have. My understanding was that the    03:13:34
23   regulatory basis here was that promotion     03:13:36
24   needed to be consistent with what was        03:13:38
25   approved.                           03:13:40
```

224

```
1 Q. Okay. I'm just asking you mainly about, you   03:13:40
2    know, about the statement that's actually in   03:13:44
3    your declaration itself. Do you have any      03:13:46
4    understanding for how this statement that's   03:13:50
5    in your declaration would apply generally to   03:13:52
6    communications that are made by a           03:13:56
7    manufacturer about an off-label use of a      03:13:57
8    drug?                              03:13:59
9 A.  Do you mean --                       03:14:00
10      MR. NOTARGIACOMO: Objection.          03:14:03
11 A.  Do you mean communications to physicians?    03:14:04
12 Q. Yes, I do.                          03:14:06
13 A.  Okay. My understanding was that -- and      03:14:07
14   perhaps it's a misunderstanding, but my      03:14:11
15   understanding was that the FDA did not allow   03:14:13
16   manufacturers to promote through            03:14:18
17   communications to physicians their products   03:14:21
18   for indications for which they had not been    03:14:27
19   approved.                           03:14:30
20 Q. Okay. And I guess my question is, by the     03:14:33
21   verb "promote" is that meant to cover all     03:14:36
22   communications of any kind by a manufacturer  03:14:39
23   about off-label uses of one of its drugs?     03:14:41
24 A.  It's meant to cover, I guess, those things   03:14:44
25   that I consider to be promotion, which would   03:14:49
```

225

```
1    include detailing, those kinds of meetings    03:14:51
2    where the speakers were there for continuing   03:14:58
3    medical education -- where the speakers      03:15:00
4    cannot be the promotional staff from the      03:15:08
5    manufacturers, the kinds of promotional      03:15:10
6    events and things like detailing, those      03:15:13
7    sorts of visits that we talked about        03:15:16
8    earlier. That's what I mean by "promotion."    03:15:18
9 Q. Okay. So do you have an understanding as to   03:15:24
10   whether there may be some communications by    03:15:28
11   a manufacturer on off-label uses to doctors   03:15:30
12   that may not qualify as promotion, as you     03:15:33
13   define it --                        03:15:33
14 A.  No.                             03:15:33
15 Q. -- in your answers?                    03:15:39
16 A.  I don't have an understanding about that,    03:15:40
17   no.                               03:15:42
18 Q. Do you have an understanding -- let me give   03:15:42
19   you a couple of examples. Do you have an     03:15:48
20   understanding that the FDA rule that you      03:15:51
21   describe in your declaration would limit or   03:15:58
22   prohibit a doctor -- limit or prohibit a      03:16:01
23   manufacturer from providing a reprint of an   03:16:04
24   article published in the Journal of the       03:16:09
25   American Medical Association, for example,    03:16:13
```

226

```
1    that describes an off-label use if the          03:16:13
2    doctor asks the manufacturer for a reprint      03:16:15
3    of that article?                                03:16:18
4         MR. NOTARGIACOMO:  Objection.              03:16:19
5  A.  I think that's an area that goes a little      03:16:19
6    bit beyond my understanding, so I don't know   03:16:22
7    the specific restrictions.                     03:16:24
8  Q.  Okay.  I'm really just asking you as to       03:16:27
9    whether that sort of a circumstance is what    03:16:28
10   you had in mind when you wrote this first      03:16:30
11   sentence of Paragraph 18.                      03:16:32
12 A.  What I had in mind in the sentence was to     03:16:34
13   generally make the point that the FDA as an    03:16:40
14   institution govern promotional activities in  03:16:44
15   the pharmaceutical sector and that the        03:16:47
16   general rules were that promotional           03:16:49
17   activities should be restricted to approved   03:16:52
18   uses.  Whether there are some exceptions to   03:16:54
19   that, I don't know.  And it sounds like       03:16:59
20   you're suggesting that if the physician       03:17:01
21   requests information on an off-label use,     03:17:03
22   maybe that's an exception, but my knowledge   03:17:05
23   doesn't go that deep.                          03:17:09
24 Q.  Okay.  Fair enough.  I guess maybe can we    03:17:10
25   agree that there may be types of              03:17:13
```

227

```
1    communications between a manufacturer and a    03:17:14
2    doctor on off-label uses that don't fall       03:17:18
3    within the promotional materials guidance      03:17:22
4    that you describe in Paragraph 18?             03:17:26
5         MR. NOTARGIACOMO:  Objection.             03:17:29
6  A.  I would be willing to accept that, yes.      03:17:29
7  Q.  Okay.  For the next couple of questions why  03:17:35
8    don't we just assume for purposes of my       03:17:46
9    questions that some kinds of activity like    03:17:48
10   distribution of peer-reviewed journal         03:17:52
11   articles to doctors are, in fact, permitted   03:17:55
12   under the FDA's regulatory scheme.  Again,    03:17:59
13   just for purposes of these questions, let's   03:18:01
14   assume that.  Is that okay?                    03:18:03
15 A.  Yes, that's okay with me.                     03:18:05
16 Q.  Okay.  You would agree that that sort of     03:18:06
17   activity might have an impact on              03:18:08
18   prescriptions written for off-label uses?     03:18:10
19 A.  I would expect that the distribution of      03:18:12
20   materials, if they were positive, showed      03:18:18
21   effectiveness from these peer-reviewed        03:18:21
22   articles, might have an effect on             03:18:23
23   prescribing, yes.                             03:18:28
24 Q.  And I assume you wouldn't be able to         03:18:30
25   identify which promotional off-label          03:18:33
```

228

```
1    activities might be permitted by the FDA and   03:18:34
2    which would not be, again, assuming that       03:18:37
3    some -- you know, that some are and some       03:18:39
4    aren't?                                         03:18:41
5         MR. NOTARGIACOMO:  Objection.             03:18:42
6  A.  I guess I'm not sure -- I'm happy to assume  03:18:42
7    that some are and some aren't, but are you     03:18:48
8    telling me that I can't tell which ones are    03:18:50
9    permitted and which aren't?  So I don't       03:18:52
10   know what is the criterion for               03:18:55
11   "permissible."                                03:18:57
12 Q.  Yeah, I guess it's a hard question to answer  03:18:58
13   if you're not aware of what the distinction   03:19:00
14   is.  I'm fine with withdrawing the question.  03:19:02
15 A.  Okay.                                         03:19:05
16 Q.  Again, looking just at the first sentence of  03:19:06
17   Paragraph 16 and the statement that it        03:19:18
18   gives, under -- just following this           03:19:24
19   statement would it be correct to say that     03:19:31
20   the FDA would limit the circumstances in      03:19:35
21   which a manufacturer might provide what is    03:19:38
22   entirely truthful information about a drug?   03:19:40
23        MR. NOTARGIACOMO:  Objection.             03:19:45
24 A.  This is sort of the converse of what you     03:19:48
25   asked me to assume before, that there are     03:19:51
```

229

```
1    some circumstances in which truthful          03:19:54
2    information is limited by the FDA.            03:19:56
3  Q.  Yeah, I mean, I think that's right.          03:20:02
4  A.  My understanding, again, there may be        03:20:11
5    truthful information but which has not led     03:20:12
6    to the approval of an indication and          03:20:15
7    therefore cannot, for example, be included   03:20:17
8    in the product label which could be seen as  03:20:18
9    a form of promotion, so my understanding is  03:20:21
10   that that is correct.                         03:20:25
11 Q.  Okay.  Maybe a simpler way of putting it     03:20:25
12   would be to say that the FDA doesn't permit   03:20:27
13   a manufacturer to say whatever it wants to    03:20:29
14   about an off-label use, even if the           03:20:31
15   manufacturer's statements are entirely        03:20:33
16   truthful?                                     03:20:36
17 A.  That was my understanding, yes.              03:20:36
18 Q.  And so, again, just based on your            03:20:38
19   understanding as it's set forth in the        03:20:50
20   declaration, a manufacturer who provides      03:20:52
21   this truthful information about an off-label  03:20:54
22   use could very well violate federal laws or   03:20:56
23   the FDA's policies prohibiting off-label      03:20:59
24   promotion, correct?                           03:21:01
25        MR. NOTARGIACOMO:  Objection.             03:21:02
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                          516-608-2400

230

```
 1  A.  I guess that's correct. I don't know --      03:21:03
 2      when you say laws versus regulations, I       03:21:10
 3      don't want to make a legal opinion that       03:21:13
 4      doesn't make sense, but...                    03:21:14
 5  Q.  That's fine.  As opposed to law or legal --   03:21:16
 6      or regulation, let's just say, would violate  03:21:19
 7      the policy that you describe in your          03:21:22
 8      declaration?                                  03:21:24
 9  A.  My understanding of the policy is that the    03:21:25
10      regulation applies to information whether     03:21:28
11      it's truthful or not.                         03:21:30
12  Q.  Okay.  Are you offering an opinion in the     03:21:32
13      case on any matters that are related to the   03:21:45
14      FDA's regulation of the promotion of          03:21:47
15      prescription drugs?                           03:21:50
16  A.  My discussion of the FDA regulations was      03:21:51
17      sort of in the context of supporting sort of  03:21:53
18      the institutional setting of what's going     03:21:56
19      on, so I'm not making an opinion about FDA    03:21:59
20      regulations per say, but it's an important    03:22:01
21      part of the context.                          03:22:04
22  Q.  Let's turn back to Paragraph 12 of your       03:22:05
23      declaration, and I think I would like to      03:22:16
24      focus particularly on the last sentence --    03:22:24
25  A.  Okay.                                         03:22:27
```

231

```
 1  Q.  -- which reads, "Thus, as I will describe in  03:22:27
 2      more detail below, physicians are often not   03:22:31
 3      aware of the latest scientific evidence on    03:22:34
 4      treatments and rely heavily on commercial     03:22:37
 5      sources of information, such as               03:22:39
 6      pharmaceutical company promotional            03:22:41
 7      materials."                                   03:22:44
 8      Did I read that correctly?                    03:22:44
 9  A.  Yes, you did.                                 03:22:45
10  Q.  Now, the first part of this statement that    03:22:49
11      physicians are often not aware of the latest  03:22:51
12      scientific evidence on treatments, what's     03:22:53
13      the basis for that statement?                 03:22:55
14  A.  The statement is based on the review of       03:22:57
15      studies that follows, and these studies have  03:23:02
16      been done at various points in time through   03:23:06
17      various methods, but showing that physicians  03:23:08
18      do rely on commercial sources of information  03:23:12
19      and are influenced by them.                   03:23:14
20  Q.  When you say that "physicians are often not   03:23:15
21      aware," what does that mean?  What does the   03:23:24
22      word "often" mean there?                      03:23:26
23  A.  It's a -- I'm using it in very general        03:23:27
24      terms, that it's -- this is not an uncommon   03:23:32
25      situation.                                    03:23:35
```

232

```
 1  Q.  But the statement's obviously not true of     03:23:37
 2      all physicians -- for all physicians,         03:23:40
 3      correct?                                      03:23:42
 4  A.  It could not be said to be true of all        03:23:42
 5      physicians for all evidence.                  03:23:46
 6  Q.  Sure.  That some physicians are more aware    03:23:49
 7      than others of the latest evidence on --      03:23:52
 8      latest scientific evidence on treatments,     03:23:56
 9      right?                                        03:23:59
10  A.  That's right.                                 03:24:00
11  Q.  Why are physicians often not aware of the     03:24:00
12      latest scientific evidence on treatments?     03:24:06
13  A.  Well, the whys are the subject of theories.   03:24:10
14      It's sometimes hard to test that sort of      03:24:14
15      thing, but there are a couple of reasons      03:24:16
16      that you can imagine.  First, there are many  03:24:19
17      new treatments every year, and in addition    03:24:23
18      to those new approved indications and drugs,  03:24:27
19      there are experiments going on and being      03:24:31
20      published in the literature, as you cited,    03:24:34
21      so there is just a substantial volume of      03:24:38
22      information; two, physician practice is       03:24:41
23      increasingly complicated, compressed due to   03:24:48
24      constraints on the payment system,            03:24:53
25      particularly for primary care physicians, so  03:24:55
```

233

```
 1      there's limited amount of time that they can  03:25:02
 2      use to read the literature; and third, many   03:25:04
 3      physicians aren't really trained to evaluate  03:25:08
 4      clinical studies scientifically.              03:25:11
 5  Q.  Is that it, those three?                      03:25:20
 6  A.  Those would be my three major issues, yeah.   03:25:21
 7  Q.  Okay.  I assume that none of the three is     03:25:24
 8      that the information just isn't available;    03:25:26
 9      is that correct?                              03:25:29
10  A.  That the information isn't available about    03:25:29
11      what studies have been done on new            03:25:33
12      treatments?                                   03:25:37
13  Q.  Yeah, what the latest scientific evidence on  03:25:37
14      treatments is?                                03:25:41
15  A.  I guess by definition it seems like the       03:25:41
16      latest scientific evidence is available.      03:25:44
17  Q.  Okay.  Pursuing a couple of these by          03:25:45
18      reference to --                               03:25:54
19  A.  Okay.                                         03:25:55
20  Q.  -- your Paragraph 12 --                       03:25:55
21  A.  Okay.                                         03:26:00
22  Q.  -- you write in what I think is the next --   03:26:01
23      well, maybe not the next sentence.  There is  03:26:05
24      a sentence that starts in the middle of the   03:26:08
25      paragraph that begins, "In practice, however  03:26:10
```

59  (Pages 230 to 233)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

**234**

1  they," meaning physicians, I take it, "face   03:26:13
2  numerous constraints, including limited time   03:26:15
3  and cognitive ability to digest the   03:26:18
4  continuous flow of information about new   03:26:21
5  treatments."   03:26:22
6  A. That's correct.   03:26:23
7  Q. And that statement sort of encompasses at   03:26:23
8  least the last two of the three on your   03:26:29
9  list, I would think; is that correct?   03:26:30
10 A. That is correct. It encompasses all three.   03:26:32
11 Q. Okay. Will the time constraints facing   03:26:36
12 physicians vary from doctor to doctor?   03:26:44
13 A. They may, yes.   03:26:45
14 Q. Would they likely vary from specialty to   03:26:46
15 specialty as well?   03:26:49
16 A. It's possible.   03:26:49
17 Q. When you say that doctors have limited   03:26:51
18 cognitive ability, what do you mean by that?   03:26:58
19 A. The ability to synthesize information from a   03:27:00
20 variety of sources, a variety of types when   03:27:05
21 there are many studies.   03:27:09
22 Q. I'm assuming from there that you're not   03:27:16
23 suggesting that doctors in the aggregate   03:27:18
24 have more limited cognitive ability than the   03:27:19
25 population as a whole, even setting aside   03:27:22

**235**

1  economics, Ph.D.s and people with law   03:27:23
2  degrees?   03:27:25
3  A. I would not ever make such a statement. I   03:27:26
4  really mean as all human beings given that   03:27:30
5  there are 10, 20 clinical journals published   03:27:34
6  in a given physician's discipline every   03:27:38
7  week, there's just too much information for   03:27:41
8  anyone to process even if one had the time   03:27:43
9  to read it all.   03:27:47
10 Q. Would you agree that doctors on the whole   03:27:48
11 are knowledgeable about matters relating to   03:27:50
12 medical care?   03:27:55
13 A. I would agree that doctors on the whole are   03:27:55
14 knowledgeable about matters relating to   03:27:58
15 medical care.   03:28:00
16 Q. And in terms of cognitive ability, cognitive   03:28:05
17 ability is something that will obviously   03:28:10
18 vary from doctor to doctor?   03:28:12
19 A. I would expect cognitive ability to vary   03:28:13
20 from doctor to doctor, yes.   03:28:17
21 Q. And the ability to process the various   03:28:18
22 sources of information that are available to   03:28:20
23 doctors will vary from doctor to doctor?   03:28:22
24 A. That could certainly be true, yes.   03:28:25
25 Q. So I think we agreed that some doctors are   03:28:33

**236**

1  better informed about scientific evidence   03:28:35
2  and treatments than others; is that right?   03:28:37
3  A. Yes, I would agree with that statement.   03:28:40
4  Q. Okay. What are the things that would   03:28:42
5  account for variations and the extent to   03:28:45
6  which a particular doctor is well-informed?   03:28:48
7  MR. NOTARGIACOMO: Objection.   03:28:52
8  A. One thing might be training. So, for   03:28:52
9  example, a physician with a degree in public   03:28:57
10 health might be better able to synthesize   03:29:00
11 the literature.   03:29:04
12 Q. What about geographic location? Does that   03:29:06
13 make any difference?   03:29:11
14 MR. NOTARGIACOMO: Objection.   03:29:11
15 A. I don't have a theory as to why it would   03:29:12
16 make a difference, no.   03:29:14
17 Q. How about the institutional setting in which   03:29:14
18 the doctor works?   03:29:17
19 A. That might make --   03:29:18
20 MR. NOTARGIACOMO: Objection.   03:29:19
21 A. That might make a difference.   03:29:20
22 Q. And so would you say that, for example, a   03:29:27
23 doctor who works in a large University   03:29:29
24 Hospital will generally be more likely to   03:29:32
25 aware of the latest scientific treatments   03:29:34

**237**

1  than, say, a doctor who works in a remote   03:29:36
2  rural practice?   03:29:39
3  A. As a theory it sounds like a reasonable one.   03:29:39
4  I don't have any empirical evidence on that,   03:29:47
5  but...   03:29:49
6  Q. Fair enough. But in any event, it's   03:29:50
7  something that will ultimately depend on the   03:29:52
8  individual physician, him or herself, right?   03:29:54
9  MR. NOTARGIACOMO: Objection.   03:29:56
10 A. There will be variation across physicians in   03:29:56
11 terms of their ability to make use of this   03:30:00
12 information, yes.   03:30:03
13 Q. And won't individual doctors' level of   03:30:09
14 knowledge change from one point in time to   03:30:12
15 another?   03:30:14
16 MR. NOTARGIACOMO: Objection.   03:30:15
17 A. Yes. I imagine a physician might read an   03:30:15
18 article, and their level of knowledge would   03:30:22
19 change.   03:30:24
20 Q. Precisely. Or they might be better informed   03:30:24
21 after having just attended a stretch of   03:30:28
22 continuing medical education?   03:30:30
23 MR. NOTARGIACOMO: Objection.   03:30:33
24 A. As an example, that seems like a reasonable   03:30:34
25 supposition.   03:30:39

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868        516-608-2400

238

```
 1  Q.  Okay. Also in Paragraph 12 -- let's figure       03:30:40
 2      which sentence it is -- in the last sentence      03:30:46
 3      you say that physicians "rely heavily on          03:30:53
 4      commercial sources of information such as         03:30:58
 5      pharmaceutical company promotional               03:31:00
 6      materials"?                                       03:31:02
 7  A.  Yes, that's correct.                              03:31:03
 8  Q.  What's the basis for that statement?              03:31:05
 9  A.  There are some studies that I cite that           03:31:06
10      provide evidence of -- in specific                03:31:09
11      instances, but as also you may be aware and       03:31:12
12      I'm aware through my own research and             03:31:15
13      training that physicians have these sources       03:31:17
14      of information in their offices, and studies      03:31:20
15      show that they are influenced by them.            03:31:23
16  Q.  When you say the "sources of information in       03:31:28
17      their offices," what sources do you mean?         03:31:30
18  A.  Pamphlets, promotional -- even promotional        03:31:32
19      materials like pens and notepads.                 03:31:35
20  Q.  So setting aside the pens and the notepads,       03:31:46
21      are the commercial sources of information         03:31:49
22      that you refer to necessarily different from      03:31:51
23      the latest scientific evidence of treatments      03:31:51
24      that you referred to elsewhere in the same        03:31:54
25      paragraph?                                        03:31:56
```

239

```
 1  A.  Are they necessarily different?                   03:31:56
 2  Q.  (No verbal response.)                             03:31:59
 3  A.  They may overlap, but they also include           03:31:59
 4      evidence that's not necessarily in the            03:32:02
 5      scientific literature. As you might have          03:32:04
 6      noticed in some of the studies, they              03:32:07
 7      particularly look at information that was         03:32:09
 8      provided through promotional materials but        03:32:11
 9      was inconsistent with the latest scientific       03:32:13
10      literature.                                       03:32:15
11  Q.  But we can agree that they do in some cases       03:32:16
12      at least overlap?                                 03:32:21
13  A.  We can agree on that, yes.                         03:32:25
14  Q.  How aware do you think doctors are that a         03:32:30
15      manufacturer's promotional materials may be       03:32:33
16      less than perfectly balanced?                     03:32:35
17  A.  Based on the survey data that I cite here,        03:32:36
18      physicians are aware in general that              03:32:45
19      pharmaceutical materials may not be               03:32:46
20      perfectly balanced. They report that.             03:32:48
21  Q.  So to what extent do you believe that            03:32:54
22      doctors could look with some skepticism on       03:32:55
23      the promotional efforts by manufacturers?         03:32:58
24  A.  I would expect physicians to look with some       03:33:01
25      skepticism, yes, on those promotional             03:33:03
```

240

```
 1      efforts.                                          03:33:10
 2  Q.  Do you believe that all doctors can be            03:33:10
 3      expected to respond to manufacturer               03:33:12
 4      information in the same way?                       03:33:13
 5  A.  I believe that the mechanism is the same.         03:33:18
 6      The quantum of response may vary from             03:33:20
 7      physician to physician.                            03:33:22
 8  Q.  When you say "the mechanism is the same,"         03:33:24
 9      what do you mean?                                 03:33:27
10  A.  Well, physicians are exposed to promotional       03:33:28
11      activities, and it influences their               03:33:32
12      prescribing behavior because it changes the       03:33:40
13      information they have in their head about an       03:33:42
14      indication or a drug and whether consciously      03:33:45
15      or not it affects their prescribing, as has       03:33:48
16      been shown certainly in the literature of         03:33:53
17      the impact of physician promotional               03:33:54
18      activities.                                       03:33:56
19  Q.  Now, I think you said that at least the           03:33:57
20      quantum, so in other words, the -- what I         03:34:00
21      understand to be the impact -- the extent to      03:34:03
22      which the manufacturer promotional materials      03:34:06
23      affect an individual doctor's decision will       03:34:10
24      vary from doctor to doctor; is that correct?      03:34:12
25  A.  That's correct, it will vary.                     03:34:15
```

241

```
 1  Q.  And the -- I think we probably also agree         03:34:17
 2      that the degree of skepticism with which a        03:34:22
 3      manufacturer's promotional materials are          03:34:26
 4      reviewed by a given doctor will vary from         03:34:27
 5      doctor to doctor; is that correct, too?           03:34:29
 6          MR. NOTARGIACOMO:  Objection.                 03:34:33
 7  A.  That's correct.                                   03:34:33
 8  Q.  Now, I would imagine also -- well, let me         03:34:34
 9      withdraw it and phrase it a different way.         03:34:39
10          Wouldn't a doctor's level of                 03:34:41
11      skepticism also vary depending on the            03:34:44
12      context in which the particular kind of           03:34:46
13      promotional activity occurs?                      03:34:48
14          MR. NOTARGIACOMO:  Objection.                 03:34:51
15  A.  Could you be more specific? I'm not sure         03:34:51
16      what kind of context you mean.                    03:34:53
17  Q.  Yeah, no. Sure, that's fine. A good              03:34:55
18      example might be, in the case of detailing        03:34:57
19      wouldn't you imagine that some sales              03:35:00
20      representatives would be more credible to         03:35:02
21      certain doctors than others?                      03:35:04
22          MR. NOTARGIACOMO:  Objection.                 03:35:06
23  A.  I could certainly imagine that would be the      03:35:07
24      case.                                             03:35:09
25  Q.  Or, for example, that a particular sales         03:35:10
```

1 representative might have a particularly 03:35:12
2 good relationship with a specific doctor? 03:35:14
3 MR. NOTARGIACOMO: Objection. 03:35:16
4 A. That could also be the case, sure. 03:35:17
5 Q. And would a specific relationship -- I 03:35:24
6 guess, would those differences also impact 03:35:31
7 the degree of skepticism that a particular 03:35:36
8 doctor applied to a particular piece of 03:35:39
9 manufacturer promotion? 03:35:48
10 A. Possibly. 03:35:51
11 Q. Now, in view of the fact -- I think you 03:35:52
12 testified that levels of knowledge of 03:36:05
13 scientist -- latest scientist evidence will 03:36:07
14 vary from doctor to doctor, correct? 03:36:10
15 A. That's correct. 03:36:11
16 Q. And that different doctors might have 03:36:11
17 different levels of skepticism as respects 03:36:14
18 individual promotional activity, correct? 03:36:17
19 A. Correct. 03:36:19
20 Q. In view of this -- if some number of 03:36:19
21 different doctors all heard the same untrue 03:36:26
22 statement about a drug, isn't it possible 03:36:31
23 that some might be deceived, but some might 03:36:32
24 not? 03:36:35
25 MR. NOTARGIACOMO: Objection. 03:36:36

1 A. It is possible that some physicians might 03:36:36
2 not be deceived by some unthruthful 03:36:40
3 information if it was presented that way, 03:36:43
4 yes. 03:36:46
5 Q. And can you think of any way to identify 03:36:46
6 which doctors were deceived and which were 03:36:49
7 not without some sort of individualized 03:36:51
8 inquiry into each individual doctor? 03:36:54
9 A. If the purpose of my inquiry were to figure 03:36:58
10 out which doctors were deceived and which 03:37:03
11 were not, I guess the first thing I would 03:37:05
12 look at was their behavior, but -- if that 03:37:08
13 were the purpose of my inquiry. 03:37:13
14 Q. And it would be an individualized look at 03:37:14
15 their behavior, I take it? 03:37:17
16 A. Well, I guess that's -- 03:37:18
17 Q. If that's what you were looking at. I 03:37:19
18 understand that -- 03:37:22
19 A. Sorry, but, yes, it sounds like an 03:37:24
20 individualized question, and so therefore it 03:37:25
21 would require individualized inquiry. 03:37:28
22 Q. Are there some physicians who don't ever 03:37:31
23 come into contact -- well, withdrawn. Let 03:37:33
24 me try that one again. 03:37:36
25 Are there some physicians who do not 03:37:37

1 ever come into contact with representatives 03:37:41
2 of manufacturers of particular drugs? 03:37:43
3 A. I believe that may be true, yes. 03:37:46
4 Q. And so you're aware that there are some 03:37:48
5 doctors or institutions that have policies 03:37:50
6 against meeting with sales representatives? 03:37:52
7 A. I've heard of that, yes. 03:37:54
8 Q. And you're probably also aware that there 03:37:55
9 will be some doctors who will choose not to 03:37:57
10 attend company-sponsored gatherings or 03:38:00
11 continuing medical education programs, 03:38:05
12 correct? 03:38:07
13 A. Yes, that's certainly true. 03:38:07
14 Q. And that some doctors or institutions have 03:38:09
15 policies that forbid them from accepting 03:38:12
16 samples from drug manufacturers; is that 03:38:16
17 correct? 03:38:18
18 A. I've heard that as well, yes. 03:38:19
19 Q. In view of all that, there are definitely 03:38:21
20 going to be some doctors who prescribe 03:38:23
21 Neurontin for off-label uses during the 03:38:27
22 class period who had no contact whatsoever 03:38:28
23 with the defendants; would you agree with 03:38:30
24 that? 03:38:31
25 A. That -- 03:38:33

1 MR. NOTARGIACOMO: Objection. 03:38:33
2 A. That certainly would follow from that 03:38:33
3 statement, yes. 03:38:35
4 Q. And you wouldn't know of any way to identify 03:38:41
5 which doctors those were other than by a 03:38:44
6 doctor-by-doctor survey? 03:38:47
7 A. I have not thought about identifying -- 03:38:48
8 trying to identify those doctors, so I don't 03:38:53
9 know how to go about doing that. 03:38:55
10 Q. As you sit here today, can you think of any 03:38:58
11 way to do it other than by doing an 03:39:01
12 individual doctor-by-doctor survey? 03:39:03
13 A. I can't think, other than maybe an 03:39:05
14 institutional survey, but I think an 03:39:07
15 individual doctor's participation in events 03:39:09
16 or through the defendants' data on 03:39:11
17 participants in their own events. 03:39:14
18 Q. All right. Let's turn to Paragraph 15 of 03:39:19
19 your declaration. 03:39:21
20 A. Okay. 03:39:23
21 Q. And let's read the first sentence, which 03:39:23
22 reads as follows: "Both physicians and 03:39:34
23 patients face an information problem in 03:39:37
24 selecting pharmaceutical treatments that 03:39:39
25 challenges typical conclusions about 03:39:41

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                                   516-608-2400

246

```
 1    well-functioning markets."                    03:39:43
 2         Did I read that one correctly?           03:39:47
 3  A.  Yes, you did.                               03:39:48
 4  Q.  What do you mean by "an information         03:39:49
 5    problem"?                                     03:39:57
 6  A.  In this case there is not perfect          03:39:57
 7    information available about how a             03:40:00
 8    pharmaceutical treatment will work for an     03:40:02
 9    individual patient, so there may be some      03:40:04
10    information about the drug broadly, but       03:40:07
11    whether or not it will work for an            03:40:12
12    individual patient is unknown and may --      03:40:13
13    there may be cases where the physician has    03:40:19
14    more information about this than a patient    03:40:22
15    does.  There may be cases where the           03:40:23
16    pharmaceutical manufacturer has more          03:40:26
17    information about this than either            03:40:28
18    physicians or patients have.                  03:40:29
19         So it has the characteristics, not       03:40:30
20    just of broad uncertainty, but of certain     03:40:33
21    asymmetry between the physicians -- among     03:40:36
22    the physicians, patients and manufacturers.   03:40:39
23  Q.  So with respect to your last answer in this 03:40:46
24    statement, are you talking generally about    03:40:48
25    pharmaceutical products generally, or are     03:40:50
```

247

```
 1    you talking specifically about Neurontin       03:40:52
 2    here?                                          03:40:53
 3  A.  Here I'm talking generally about            03:40:54
 4    pharmaceutical products and health care more   03:40:56
 5    broadly as well.                               03:40:59
 6  Q.  Okay.  Do you have an opinion as to whether  03:41:00
 7    all doctors would approach the information     03:41:17
 8    problem that you've just described in the      03:41:19
 9    same way?                                      03:41:20
10  A.  I'm sorry, what do you mean by "approached"? 03:41:21
11    Do you mean try to mitigate or --             03:41:28
12  Q.  How do they respond to it in the context of  03:41:31
13    their prescription-writing decisions?          03:41:33
14  A.  Well, I guess one aspect of that response,   03:41:35
15    as we discussed before, might be to use the    03:41:42
16    scientific literature, and that might          03:41:50
17    differ, as we discussed before.                03:41:53
18  Q.  When you refer to markets in Paragraph 15 at 03:41:54
19    the end of that sentence --                    03:42:04
20  A.  Uh-huh.                                       03:42:05
21  Q.  -- what do you mean?                          03:42:05
22  A.  A market is where buyers and sellers come    03:42:08
23    together and a good or service is exchanged    03:42:15
24    at a price that's agreeable to both, if        03:42:19
25    those markets clear.  And so here I'm          03:42:21
```

248

```
 1    talking specifically about the normative       03:42:29
 2    conclusions that economists usually derive     03:42:30
 3    from looking at markets.  And so in many       03:42:33
 4    markets we say if a market is sustained, it    03:42:37
 5    must be, for example, that the consumers are   03:42:41
 6    willing to pay what the suppliers are          03:42:43
 7    willing to accept for a good, that the level   03:42:45
 8    of quality is consistent with the price.  So   03:42:49
 9    consumers are willing to pay that, it must     03:42:52
10    be worth that in terms of welfare.  And so     03:42:55
11    we start thinking about health care markets    03:43:01
12    in that context of making a judgment about     03:43:03
13    the welfare of individuals based on what       03:43:05
14    kinds of interactions they have in this        03:43:08
15    marketplace as buyers and sellers.             03:43:11
16  Q.  So the market that you're describing as the  03:43:16
17    market for prescription drugs, it's not a      03:43:19
18    market for information or something else,       03:43:20
19    correct?                                       03:43:22
20  A.  The market I'm describing is the market for  03:43:22
21    prescription drugs, yes.                       03:43:26
22  Q.  You also refer here to "typical conclusions  03:43:41
23    about well-functioning markets."  Although     03:43:43
24    to some degree you may have already provided   03:43:49
25    an answer to this question in your last        03:43:51
```

249

```
 1    answer, if you could tell me what those        03:43:53
 2    typical --                                     03:43:56
 3  A.  Make it a little less --                     03:43:56
 4  Q.  -- conclusions are.                          03:43:56
 5  A.  -- opaque.  The typical conclusions are that 03:43:58
 6    competition ensures Pareto efficiency, so      03:44:02
 7    ensures that there's no waste in the market.   03:44:09
 8    And under assumptions that often have to do    03:44:11
 9    with information issues, then competition      03:44:16
10    makes sure that we get the best allocation     03:44:22
11    and production of goods.                       03:44:25
12         And that means broadly the quality of     03:44:27
13    goods will be right, the quantity consumed     03:44:29
14    will be right.  And so in the health care      03:44:32
15    market one characteristic that really is the   03:44:40
16    motivating challenge I think for the entire    03:44:44
17    field of health economics is the failure of    03:44:47
18    that to happen for a variety of reasons, in    03:44:51
19    large part because of the fact that there's    03:44:54
20    missing information about the benefits that    03:44:55
21    a mutual patient will get from a treatment.    03:44:59
22  Q.  So is that the way in which typical          03:45:05
23    conclusions about well-functioning markets     03:45:08
24    are challenged in this context?                03:45:10
25  A.  In particular, that what is consumed is the  03:45:13
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                            516-608-2400

250

```
1   right amount in the sense of Pareto          03:45:18
2   efficiency, so that if there were a $10       03:45:23
3   chocolate bar out there and people were       03:45:29
4   eating a lot of them, you wouldn't assume     03:45:31
5   that there was some inefficiency, just that   03:45:33
6   people were willing to pay $10.  In the       03:45:36
7   health care market it's never clear.          03:45:39
8 Q. The next sentence in the same paragraph      03:45:46
9   reads, "Prescription drugs are 'credence      03:45:48
10  goods,' which means their effect may never    03:45:51
11  be known because of the interplay of myriad   03:45:54
12  factors that can affect the course of acute   03:45:58
13  or chronic wellness."                         03:46:00
14      What is a credence good?                  03:46:02
15 A. That should say "illness."  I'm not sure why 03:46:06
16  it says "wellness."                           03:46:07
17      A credence good is one whose value        03:46:09
18  is -- has to be accepted, essentially, by     03:46:15
19  the buyer.                                    03:46:18
20 Q. Why does it need to be accepted by the      03:46:21
21  buyer?                                        03:46:24
22 A. Well, in this specific instance, the best   03:46:24
23  way of understanding that is imagine that     03:46:27
24  you get drug treatment, and what happens is   03:46:31
25  you get no worse, but you don't know whether  03:46:35
```

251

```
1   that was because of the drug that you're on   03:46:39
2   currently or something that happened with     03:46:43
3   your condition itself or other things that    03:46:44
4   may be happening, for example, you know, a    03:46:48
5   change in the environment, that affected      03:46:51
6   your outcome.  So there, again, many          03:46:54
7   clinical and non-clinical factors that        03:46:58
8   interact for an individual patient, then      03:47:02
9   they can never be certain which factor led    03:47:04
10  them to get better, worse...                  03:47:08
11 Q. Okay.  We'll get back to that concept --    03:47:11
12 A. Okay.                                       03:47:14
13 Q. -- at some point later.  A couple of other  03:47:14
14  terms for you.  What is a search good?        03:47:16
15 A. A search good is a good, so there's -- to   03:47:20
16  distinguish from an experienced good, a       03:47:29
17  search good is one that you can evaluate      03:47:31
18  without having to individually consume.       03:47:33
19 Q. Okay.                                       03:47:38
20 A. An experience good --                       03:47:38
21 Q. That was my next question.                  03:47:40
22 A. -- is one where you have to try it.  So     03:47:42
23  imagine the chocolate example.  You can't     03:47:45
24  tell by looking at the chocolate bar how      03:47:48
25  good it is, but once you try it, you know     03:47:51
```

252

```
1   how good it is.                               03:47:53
2 Q. Now, when we talk about these three          03:47:54
3   different categories, search goods,           03:47:58
4   experience goods and credence goods, we're    03:48:00
5   not talking about exclusive goods, are we?    03:48:04
6 A. You're right.  These are general concepts    03:48:07
7   that may apply in part and differentially to  03:48:10
8   goods.                                        03:48:14
9 Q. So a product could have attributes of an     03:48:15
10  experienced good and a search good at the     03:48:19
11  same time?                                    03:48:21
12 A. Certainly.                                   03:48:21
13 Q. You may have already baked this into one of  03:48:22
14  your answers already, but just so that I      03:48:32
15  understand, what's the basis of your          03:48:33
16  conclusion that all prescription drugs or     03:48:35
17  that prescription drugs are credence goods?   03:48:37
18 A. The basis of that conclusion really has to  03:48:39
19  do with the notion of understanding clinical  03:48:43
20  effectiveness, broadly speaking, as a         03:48:49
21  scientific issue at the individual patient    03:48:52
22  level.  And so the issue is a -- is really    03:48:55
23  one that's conceptual, that there are         03:49:02
24  patient health factors that are not           03:49:04
25  measurable, and so if we look at one          03:49:07
```

253

```
1   individual patient experiencing a new drug,   03:49:11
2   for example, it's not possible to tell for    03:49:14
3   that one patient for sure whether their       03:49:18
4   treatment worked or didn't work based on      03:49:22
5   their own experience.                         03:49:24
6 Q. Have you relied on any published literature  03:49:25
7   in reaching your conclusion about             03:49:29
8   pharmaceutical products as credence goods?    03:49:31
9 A. This is generally based on my experience and 03:49:34
10  training in health economics.  I can't cite   03:49:37
11  a specific article here.  The subject is      03:49:40
12  part of the Arrow paper that I described.     03:49:46
13 Q. The which paper?                            03:49:49
14 A. The Footnote 30, the Kenneth Arrow paper,   03:49:49
15  which I cite in the previous sections.        03:49:59
16 Q. Okay.  Is Neurontin any more a credence good 03:50:01
17  than other pharmaceutical products?           03:50:06
18 A. No.  It's a characteristic of these goods.  03:50:09
19 Q. Now, prescription drugs aren't exclusively  03:50:16
20  credence goods, right?                        03:50:20
21 A. Do they have characteristics of search goods 03:50:21
22  and experience goods?  Certainly.            03:50:27
23 Q. You probably agree that pharmaceuticals, in  03:50:28
24  fact, have non-trivial experience qualities   03:50:31
25  as well; is that correct?                     03:50:38
```

254

1  A.  I would agree that people might be able to      03:50:39
2      draw fairly good conclusions, for example,      03:50:41
3      if they took a drug and immediately had a      03:50:43
4      reaction to that drug, that they -- that      03:50:46
5      would be an experience-like quality.  I      03:50:48
6      would say nonetheless, the overarching      03:50:55
7      conceptual problem is one in which there are      03:50:55
8      so many patient factors and other influences      03:50:58
9      on health that it's difficult to be certain      03:51:01
10     that -- to disentangle.  But on a continuum      03:51:04
11     I guess I would agree with your statement.      03:51:09
12  Q.  Are you familiar with Ernst R. Berndt,      03:51:11
13     B-E-R-N-D-T?      03:51:17
14  A.  I am familiar with Professor Berndt.      03:51:18
15  Q.  Who is Professor Berndt?      03:51:21
16  A.  He is a co-author of mine on some papers.      03:51:23
17     He is a professional at MIT and an expert in      03:51:26
18     pharmaceutical promotion.      03:51:29
19  Q.  That answers my questions, which -- or      03:51:30
20     question, which is you would describe him as      03:51:33
21     an expert on the economics of pharmaceutical      03:51:35
22     markets, generally?      03:51:39
23  A.  I would.      03:51:40
24     MR. POLUBINSKI:  Why don't we      03:51:50
25     actually mark the next exhibit.      03:51:50

255

1          (Exhibit No. 13, Article headed      03:52:25
2      "The U.S. Pharmaceutical Industry: Why      03:52:25
3      major growth in times of cost containment,"      03:52:29
4      marked for identification.)      03:52:11
5      MR. NOTARGIACOMO:  What number?      03:52:12
6      MR. POLUBINSKI:  13.      03:52:12
7  Q.  I've handed you, Professor Rosenthal, what's      03:52:13
8      been marked as Rosenthal Exhibit 13.  It is      03:52:17
9      an article by Professor Berndt.  The title      03:52:21
10     of the article is "The U.S. Pharmaceutical      03:52:25
11     Industry:  Why major growth in times of cost      03:52:27
12     containment."      03:52:31
13         I would like you to turn to Page 111.      03:52:33
14  A.  Okay.      03:52:42
15  Q.  And read along with me the beginning of the      03:52:42
16     second full paragraph, and in particular      03:52:45
17     which reads, "Clearly, prescription drugs      03:52:52
18     are predominantly experience goods."  The      03:52:54
19     sentence goes on, but that's the portion of      03:52:58
20     the sentence I was going to ask you about.      03:53:00
21         Do you have any reason to disagree      03:53:01
22     with Professor Berndt on this point?      03:53:02
23     MR. NOTARGIACOMO:  I'm sorry, you      03:53:06
24     just point -- I just lost my place.  Could      03:53:08
25     you point out which paragraph?      03:53:11

256

1      MR. POLUBINSKI:  Yeah, the first      03:53:11
2      sentence of Paragraph 2.      03:53:12
3      MR. NOTARGIACOMO:  Thank you.      03:53:14
4  A.  So Professor Berndt is distinguishing      03:53:15
5      between search and experience goods here and      03:53:18
6      noting that the fact that prescription drugs      03:53:23
7      are not predominantly search goods results      03:53:26
8      in their having high advertising-to-sales      03:53:32
9      ratios, which incidentally is the Dorfman-      03:53:34
10     Steiner theorem that I mentioned earlier.      03:53:37
11     And I don't know that he would disagree with      03:53:42
12     my characterization of pharmaceutical      03:53:44
13     products as having aspects of credence goods      03:53:47
14     as well.      03:53:52
15         I think he's distinguishing them from      03:53:52
16     consumer products where we can look at the      03:53:54
17     attributes and the prices and we know most      03:53:57
18     of what we need to know.  So I'm not sure      03:53:59
19     that he disagrees with me.      03:54:03
20  Q.  Would you agree with him, I guess, with his      03:54:05
21     statement to the effect that pharmaceutical      03:54:07
22     drugs are predominantly experience goods?      03:54:10
23  A.  I believe they have some characteristics of      03:54:14
24     experience goods and some of credence goods,      03:54:17
25     so I guess maybe I wouldn't have used the      03:54:20

257

1      word "predominantly," which I guess means we      03:54:22
2      disagree.      03:54:26
3  Q.  Fair enough.  Now, but I guess you would      03:54:26
4      agree that they do have -- they do have      03:54:34
5      features of experience goods?      03:54:40
6  A.  I would agree with that statement, yes.      03:54:43
7  Q.  Now, in view of that, assume that a doctor      03:54:45
8      prescribes Neurontin to several patients for      03:54:52
9      an off-label use, for neuropathic pain, for      03:54:55
10     example.  Would a doctor's future decisions      03:54:59
11     as to whether to prescribe Neurontin to      03:55:02
12     other patients for that same off-label use      03:55:04
13     be included by that doctor's understanding      03:55:07
14     of the degree of success experienced with      03:55:09
15     earlier patients?      03:55:11
16  A.  That would certainly be one piece of      03:55:12
17     information I would expect the physician to      03:55:14
18     use in his or her judgments.      03:55:16
19  Q.  And so it's pretty -- it therefore stands to      03:55:23
20     reason, I guess, that doctors would be      03:55:26
21     influenced by their past experience with      03:55:27
22     Neurontin in future prescription decisions?      03:55:30
23  A.  I would expect that to be an influence, yes.      03:55:32
24  Q.  Why don't you turn to Paragraph 15 of your      03:55:40
25     report.      03:55:42

258

1  A.  Okay.                                            03:55:43
2  Q.  And turn specifically to the concept of the      03:55:43
3      market as you've described it.  Would you        03:55:48
4      agree that the market that you describe in       03:55:51
5      Paragraph 15 differs in a number of ways         03:55:54
6      from other markets for other functional          03:55:57
7      goods?  I think you would, based on what we      03:56:01
8      just discussed.                                  03:56:03
9  A.  I would agree with that.  Of course, again,      03:56:05
10     it's all a continuum.  I'm sure we could         03:56:07
11     find another good that has the same              03:56:10
12     characteristics.  Often legal services are       03:56:13
13     used as a comparison.  You can never be sure     03:56:16
14     whether that guilty verdict would have           03:56:18
15     happened with another lawyer.                    03:56:20
16 Q.  Whether or not this shares attributes for        03:56:22
17     this legal services market, you do write,        03:56:27
18     for example, in the pharmaceutical market        03:56:29
19     that price plays little or no role in            03:56:31
20     individual prescribing decisions?                03:56:34
21 A.  That's correct.  Price has a very strange        03:56:36
22     role here, and there are multiple prices,        03:56:38
23     unlike in most markets where we have a           03:56:40
24     single market clearing price.                    03:56:43
25 Q.  In this case at least, the price of a drug       03:56:44

259

1      doesn't -- does not fluctuate in response to     03:56:48
2      new information generally, does it?              03:56:52
3  A.  Generally speaking, if we're talking about       03:56:53
4      the AWP of the drug, the -- are we talking       03:56:58
5      about the list price of a drug?                  03:57:04
6  Q.  Why don't we do that, yes, that's fine.          03:57:06
7  A.  Generally speaking, I believe the AWP is set     03:57:15
8      with -- well, I don't know all the factors       03:57:18
9      that influence a manufacturer's setting of       03:57:21
10     the AWP, but I know in many cases it stays       03:57:24
11     fairly stable over time.                         03:57:27
12 Q.  Okay.  And that the AWP didn't fluctuate in      03:57:29
13     response to new information about a drug's        03:57:33
14     efficacy, generally speaking?                    03:57:35
15 A.  I can't -- I just can't say for certain, but     03:57:37
16     I don't know of any --                           03:57:40
17 Q.  Fair enough.                                     03:57:41
18 A.  -- evidence that that does happen.               03:57:42
19 Q.  Okay.  And I guess also information in this      03:57:44
20     market isn't disseminated as it might be in      03:57:49
21     the context of, say, the securities market?      03:57:54
22 A.  I would expect the information flows much        03:57:56
23     more efficiently in the securities market.       03:57:57
24 Q.  There's no requirement, for example, that        03:58:00
25     information be released simultaneously or in     03:58:04

260

1      a publicly digestible format, information --     03:58:08
2      (Mr. Goldser disconnected.)                      03:58:14
3          MR. NOTARGIACOMO:  He was going to           03:58:14
4      go off at 4:00, so that's fine.                  03:58:15
5          MR. POLUBINSKI:  I don't blame him.          03:58:17
6  Q.  Let me start that question again.                03:58:20
7  A.  Sure.                                            03:58:22
8  Q.  There is no equivalent to the securities         03:58:22
9      laws that would require that information be      03:58:24
10     released simultaneously in a publicly            03:58:25
11     digestible format?                               03:58:29
12 A.  Not to my knowledge, no.                         03:58:31
13 Q.  Okay.  So no 8-K equivalent -- 8-K filing        03:58:32
14     equivalent in the pharmaceutical industry?       03:58:34
15 A.  Not to my knowledge, no.                         03:58:36
16 Q.  And there's no analyst community with regard     03:58:42
17     to prescription drugs the same way there is      03:58:44
18     in the securities market?                        03:58:46
19 A.  Other than the analysts in the securities        03:58:47
20     market who, of course, looked at clinical        03:58:50
21     information to try to figure out what the        03:58:52
22     manufacturer's stocks are going to do, but I     03:58:54
23     don't know of any whose objective is             03:58:56
24     clinical.                                        03:58:58
25 Q.  Okay.  And you wouldn't suggest that the         03:58:59

261

1      doctors look to the analyst community to         03:59:04
2      inform their knowledge of appropriate            03:59:06
3      clinical treatment; is that correct?             03:59:08
4  A.  I guess I wouldn't -- no, I guess I wouldn't     03:59:10
5      suggest that.                                    03:59:18
6  Q.  You would be surprised if they did?             03:59:18
7  A.  I would be surprised if they did, yes.           03:59:20
8  Q.  Okay.  And that there are necessarily -- I       03:59:31
9      guess would you agree that there will            03:59:32
10     necessarily be information differences with      03:59:34
11     regard to a particular pharmaceutical            03:59:36
12     product from geographic area to geographic       03:59:37
13     area?                                            03:59:40
14 A.  Again, as before, I didn't have a strong         03:59:41
15     theory about geography in this case, but         03:59:44
16     certainly there may be differences in            03:59:48
17     information.  So, for example, if a clinical     03:59:50
18     trial took place at a particular health          03:59:52
19     industry, the physicians in that health          03:59:55
20     industry might learn about its results           03:59:58
21     before everyone else did.                        04:00:00
22 Q.  Sure.  And there would inevitably be             04:00:02
23     information differences from doctor to           04:00:04
24     doctor, too?                                     04:00:05
25 A.  As we discussed earlier.                         04:00:06

66  (Pages 258 to 261)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

262

```
 1  Q.  Now, in view of all of this, in view of the      04:00:11
 2      information problems that you've discussed,       04:00:14
 3      you wouldn't describe the market such as it       04:00:16
 4      is for pharmaceutical products as being an        04:00:20
 5      efficient market, would you?                      04:00:23
 6  A.  If you mean "efficient" in the same way that      04:00:24
 7      I mean "efficient," I would not describe          04:00:28
 8      the -- the theory relates to the efficiency       04:00:30
 9      of the theorized outcome of a perfectly           04:00:34
10      competitive market. It's possible with           04:00:37
11      regulation you get a fairly efficient             04:00:39
12      market, but I would guess that it's not a         04:00:41
13      very efficient market, no.                        04:00:43
14          MR. POLUBINSKI: Okay. I think                 04:00:46
15      we're about to run out of videotape, so           04:00:46
16      let's just take a quick break while we            04:00:48
17      switch that.                                      04:00:51
18          THE WITNESS: Okay. I'll be really             04:00:51
19      quick.                                            04:00:51
20          MR. POLUBINSKI: Okay.                         04:00:52
21          THE VIDEOGRAPHER: The time is 4:01            04:00:52
22      p.m. This is the end of Tape 4, and we are        04:00:57
23      off the record.                                   04:01:00
24          (Recess taken.)                               04:06:12
25          THE VIDEOGRAPHER: The time is 4:06            04:06:16
```

263

```
 1      p.m. This is the beginning of Tape 5, and         04:06:20
 2      we are back on the record.                        04:06:23
 3  BY MR. POLUBINSKI:                                    04:06:25
 4  Q.  Okay. Professor Rosenthal, in the Clark           04:06:25
 5      case in Pennsylvania you were asked to            04:06:34
 6      assume that there is not adequate evidence        04:06:35
 7      that Neurontin provided any clinical benefit      04:06:38
 8      for off-label uses, is that correct?             04:06:40
 9  A.  I believe that that's correct. When you           04:06:44
10      mention the Clark case, I just don't have my      04:06:49
11      declaration in front of me, and it's been a      04:06:51
12      while, but I believe that's correct.             04:06:52
13  Q.  Okay. Did you make a similar assumption in        04:06:54
14      this case -- or the same assumption, I            04:06:56
15      should say?                                       04:06:59
16  A.  For the purposes of my work I was focusing        04:06:59
17      on the effect on quantity and asked to           04:07:02
18      assume that all of that quantity would be        04:07:05
19      relevant for the ultimate estimate of           04:07:09
20      damages, so I believe I was asked to make        04:07:13
21      that same or similar assumption.                 04:07:17
22  Q.  The assumption --                                 04:07:20
23  A.  I just need to look to see how it was             04:07:21
24      exactly phrased, but I believe that was the      04:07:23
25      assumption that I was asked to make, yes.        04:07:26
```

264

```
 1  Q.  You know what? Just to make things easier,        04:07:28
 2      I think we have a copy of the Clark               04:07:30
 3      rebuttal, and I could just hand it to you.        04:07:32
 4  A.  Okay. That would be great.                        04:07:34
 5  Q.  We don't need to mark it as an exhibit.           04:07:45
 6  A.  Okay.                                             04:07:48
 7  Q.  On Page 3.                                        04:07:49
 8      (Witness reviews document.)                       04:08:04
 9  A.  Right. So that's exactly what I said, and         04:08:04
10      so that's exactly what I was asked to            04:08:06
11      assume.                                           04:08:08
12  Q.  And is that exactly what you were asked to        04:08:09
13      assume in this case as well?                      04:08:11
14  A.  That's my understanding as well, yes. For         04:08:12
15      my analysis, that was...                          04:08:22
16  Q.  So for your analysis does your assumption         04:08:24
17      about Neurontin's efficacy apply to all of        04:08:26
18      its off-label uses or just certain uses?          04:08:30
19  A.  I expect -- so in my declaration I talk           04:08:33
20      about the off-label uses that were covered        04:08:36
21      in the first amended class action complaint.      04:08:38
22      I expect to be directed as to exactly which       04:08:41
23      of those indications I will be asked              04:08:44
24      ultimately to do the analysis on, and it          04:08:49
25      will be for those where that's the correct        04:08:52
```

265

```
 1      assumption, so, yes.                              04:08:55
 2  Q.  Okay. For the indications that are                04:08:58
 3      identified for you at that time, you will         04:08:59
 4      assume that all prescriptions of Neurontin        04:09:01
 5      for those indications were ineffective?           04:09:05
 6  A.  That's my understanding is that that's what       04:09:10
 7      I'll be asked to assume in the final              04:09:14
 8      analysis.                                         04:09:15
 9  Q.  Okay. And so maybe just to make sure it's         04:09:16
10      crystal clear, for the purposes of your           04:09:49
11      analysis you would assume for the                 04:09:52
12      indications that we're talking about, at          04:09:53
13      least, that Neurontin was ineffective for         04:09:55
14      every patient who was prescribed the drug         04:09:58
15      for an off-label use for that indication?         04:10:00
16  A.  For the purposes of my analysis, what I           04:10:02
17      understand the relevant assumption is,            04:10:08
18      excuse me, for members of the class where I       04:10:12
19      estimate the quantity of Neurontin use that       04:10:17
20      was caused by off-label promotion, that           04:10:19
21      there will be no relevance to any potential       04:10:21
22      clinical benefits that those patients may         04:10:25
23      have gotten or purported to have gotten. So       04:10:28
24      for none of the patients will I calculate or      04:10:36
25      consider clinical benefits.                       04:10:39
```

67  (Pages 262 to 265)

1  Q.  Now, is that because none of the patients    04:10:41
2      for those uses will have received any    04:10:43
3      clinical benefit?    04:10:46
4  A.  I'm not really in a position to judge that.    04:10:47
5      As you know, I'm not a clinical expert.    04:10:50
6      Sorry.    04:10:53
7  Q.  Do you have any understanding at all as to    04:10:57
8      whether the drug may well have been    04:10:59
9      effective for some number of those patients?    04:11:01
10         MR. NOTARGIACOMO:  Objection.    04:11:04
11  A.  I really don't have any expertise to judge    04:11:04
12      that.    04:11:06
13  Q.  Now, if it is the case that the drug was    04:11:15
14      indeed effective for some number of these    04:11:20
15      patients, does that mean that some number of    04:11:23
16      patients for whom Neurontin was perfectly    04:11:25
17      effective would be compensated under your    04:11:27
18      model?    04:11:30
19  A.  I believed it would be tautologically true    04:11:30
20      if you're telling me that if the drug were    04:11:39
21      effective, that some of those individuals    04:11:41
22      who were compensated were also -- also got    04:11:45
23      clinical benefit, then it seems    04:11:48
24      tautologically true that that would be the    04:11:50
25      case.    04:11:52

1  Q.  Okay. Another way, I guess, to ask -- or    04:11:53
2      maybe to ask a similar question, your model    04:11:55
3      itself wouldn't provide a way to identify    04:11:58
4      patients for whom the drug was effective and    04:12:00
5      patients for whom it wasn't, correct?    04:12:03
6  A.  That's correct.    04:12:07
7  Q.  Okay. And it sounds like you don't have any    04:12:07
8      independent opinion on the question of    04:12:08
9      whether Neurontin was or was not effective    04:12:09
10      with respect to any individual prescription?    04:12:11
11         MR. NOTARGIACOMO:  Objection.    04:12:14
12  A.  No, I don't have an opinion on that.    04:12:14
13  Q.  And do not have an independent opinion on    04:12:19
14      the more general question of whether    04:12:23
15      Neurontin was, as a general matter,    04:12:25
16      effective for any given off-label    04:12:27
17      indication?    04:12:29
18         MR. NOTARGIACOMO:  Objection.    04:12:30
19  A.  No, I do not.    04:12:32
20  Q.  Do you have any understanding as to the type    04:12:43
21      of showing of -- on efficacy that would be    04:12:44
22      necessary to cause you -- or really I guess    04:12:47
23      to cause plaintiffs' counsel or whoever's    04:12:52
24      making this decision to opt to include a    04:12:54
25      particular indication in the analysis that    04:12:59

1      you'll do in your model?    04:13:02
2  A.  No, I do not.    04:13:04
3  Q.  Okay. Again, let's just assume for now that    04:13:07
4      the assumption doesn't hold and that    04:13:23
5      Neurontin, you know, actually is effective    04:13:25
6      for off-label uses for some number of    04:13:28
7      people. Are you aware of any way, short of    04:13:30
8      an individual inquiry, of telling on an    04:13:35
9      individual-by-individual basis for whom    04:13:37
10      Neurontin was effective?    04:13:39
11         MR. NOTARGIACOMO:  Objection.    04:13:40
12  A.  I am not aware of a good way of telling    04:13:41
13      whether it was effective for those patients    04:13:46
14      even within an individual inquiry because of    04:13:49
15      the difficulty of determining from an    04:13:51
16      observational study whether a drug was    04:13:54
17      effective for a patient or not. I'm sorry,    04:13:57
18      I'm losing my voice.    04:13:59
19  Q.  Are you aware of any way, then, to make a    04:14:02
20      determination on an individual basis as to    04:14:04
21      whether Neurontin was effective for a given    04:14:07
22      prescription for a given patient?    04:14:10
23         MR. NOTARGIACOMO:  Objection.    04:14:11
24  A.  In the standard -- with the standards of    04:14:11
25      research that I typically use, I believe it    04:14:17

1      would be very difficult to do.    04:14:19
2  Q.  Now, again assuming that Neurontin really is    04:14:45
3      effective for off-label uses for some number    04:14:48
4      of people, that would mean that some number    04:14:50
5      of individual class members would not have    04:14:52
6      suffered any injury as a result of the    04:14:54
7      defendants' conduct here; is that correct?    04:14:58
8  A.  Based on the theory of injury, I guess I'm    04:15:02
9      not entirely sure how to translate the legal    04:15:07
10      theory of injury under here whether or not    04:15:10
11      they received some clinical benefit. There    04:15:14
12      may still be some legal theory of injury    04:15:16
13      based on having been misled, for example,    04:15:19
14      but I'm afraid this is getting outside of my    04:15:22
15      expertise.    04:15:24
16  Q.  Okay. I guess just thinking about a purely    04:15:25
17      economic out-of-pocket injury, or again    04:15:35
18      assuming that Neurontin is actually    04:15:38
19      effective for off-label uses for some number    04:15:40
20      of people, that some number of individual    04:15:42
21      class members would not have suffered any    04:15:45
22      sort of out-of-pocket economic injury as a    04:15:47
23      result of having paid for a prescription for    04:15:50
24      Neurontin that worked?    04:15:52
25         MR. NOTARGIACOMO:  Objection.    04:15:53

270

1  A.  I think that the problem is a little more        04:15:56
2     complicated than that, so for example, if I       04:15:58
3     were trying to look at the issue of clinical      04:16:01
4     benefit compared to, you know, what their         04:16:08
5     co-payment was, those would need to be            04:16:10
6     compared, and a but for world would have to       04:16:12
7     be constructed.  Had there not been the           04:16:16
8     allegedly illegal off-label promotion, would      04:16:18
9     they have gotten another drug that would          04:16:22
10     have been more effective?  I think it's not       04:16:22
11     quite as straightforward as to whether or         04:16:24
12     not they got any clinical benefit.                04:16:25
13  Q.  Fair enough.  And it sounds like it would be    04:16:27
14     a difficult inquiry that would require a          04:16:29
15     look into the specific circumstances in the       04:16:34
16     individual patient's case?                        04:16:36
17  A.  If you are asking this question about            04:16:37
18     whether an individual patient's clinical          04:16:39
19     benefit would mean that they were injured or      04:16:41
20     not, that is an individual question.              04:16:45
21  Q.  Okay.  Your model doesn't set out to reduce     04:16:47
22     the total number of off-label Neurontin          04:16:54
23     prescriptions to account for amounts that        04:16:56
24     were spent on off-label prescriptions for        04:17:02
25     which Neurontin was perfectly effective?         04:17:04

271

1  A.  My model would look at those promotional        04:17:06
2     activities that were ultimately described to      04:17:12
3     me by counsel to be subject to the               04:17:16
4     allegations, and so if those included the        04:17:19
5     indications that you are suggesting were          04:17:26
6     perfectly effective, then that might be the       04:17:29
7     case.  I'm sorry, did I not answer your           04:17:31
8     question?  It was a long question.                04:17:34
9  Q.  No, no, no.  It was a long answer.  I think     04:17:36
10     you did cover it, though.                         04:17:39
11  A.  Okay.                                            04:17:40
12  Q.  Do you have an understanding as to whether     04:17:40
13     this inquiry as to whether Neurontin was         04:17:44
14     effective for an individual patient or not       04:17:46
15     will occur at some point in the litigation?      04:17:48
16     MR. NOTARGIACOMO:  Objection.                     04:17:51
17  A.  My understanding is that this is a class       04:17:52
18     matter and that there will not be                04:17:55
19     individual -- individualized inquiries.           04:17:57
20     There may be evidence presented, and I don't     04:18:01
21     know of this for certain on scientific           04:18:06
22     studies, but aggregate impact.                    04:18:08
23  Q.  Okay.  Fair enough.  But you don't,            04:18:12
24     yourself, anticipate engaging in any sort of     04:18:14
25     analysis at any time on an individual            04:18:17

272

1     patient-by-patient level?                          04:18:19
2  A.  Looking at clinical effectiveness or            04:18:20
3     anything else, no.                                04:18:22
4  Q.  Okay.                                            04:18:23
5     MR. POLUBINSKI:  Let's do the next                04:18:29
6     exhibit.                                           04:18:30
7     (Exhibit No. 14, Declaration of                    04:18:30
8     Meredith Rosenthal in Response to                  04:18:30
9     Defendants' Expert Keith E. Argenbright,          04:18:30
10     M.D., marked for identification.)                 04:18:51
11  Q.  All right.  So we've handed you what is         04:18:58
12     marked as Rosenthal Exhibit --                     04:19:08
13  A.  14.                                              04:19:12
14  Q.  -- 14, thank you.  I'm glad someone was        04:19:12
15     keeping better track than I am.  This is a        04:19:17
16     declaration that you submitted to the Court       04:19:21
17     in this case; is that correct?                    04:19:22
18  A.  Excuse me.  Yes, it is correct.                  04:19:24
19  Q.  Sorry to get you right in the middle of your   04:19:26
20     sip of water.                                      04:19:28
21  A.  I'm sorry, I'm just trying to sound a little    04:19:28
22     bit less fried here.  It's just -- I've just      04:19:31
23     been losing my voice for the last couple of       04:19:33
24     days, and I think it's just a long day.  But      04:19:39
25     if -- I'm okay.                                    04:19:40

273

1     THE WITNESS:  (To the reporter.)                   04:19:40
2     If you can still -- can you still hear me          04:19:40
3     okay?                                              04:19:40
4  A.  It doesn't hurt.                                  04:19:41
5  Q.  All right.  If it's a problem, let me know.     04:19:41
6  A.  It's wear and tear.                               04:19:42
7  Q.  Who asked you to prepare this?                    04:19:44
8  A.  Specifically Ed asked me to prepare this.        04:19:45
9  Q.  When you say "Ed," you mean Mr.                  04:19:51
10     Notargiacomo?                                      04:19:54
11  A.  I'm sorry, Mr. Notargiacomo.  I beg your        04:19:54
12     pardon.                                            04:19:58
13  Q.  That's okay.  I call him Ed, too.               04:19:58
14     When did you start work on it?                     04:20:01
15  A.  Not very long before it was filed.  It was a    04:20:02
16     rather quick deadline.  So I would have to        04:20:09
17     look at my billing files to be sure, so it        04:20:11
18     was filed -- let me just take a quick look.        04:20:14
19     Oh, sorry, it was filed September 14th.           04:20:22
20     Without looking at my billing records I           04:20:25
21     would guess that I first reviewed the             04:20:27
22     materials, in particular Dr. Argenbright's        04:20:29
23     declaration, maybe a week to ten days            04:20:33
24     before.                                            04:20:36
25  Q.  Did anyone else work with you on your          04:20:40

274

1    declaration, which is to say Rosenthal          04:20:42
2    Exhibit 14?                          04:20:45
3  A.  I would have had support again from the       04:20:46
4    staff at GMA and including Renee Rushnawitz      04:20:51
5    and Joshua Peteet and maybe others, but         04:20:59
6    those are the two that come to mind, again       04:21:03
7    with footnotes, questions about the            04:21:08
8    databases, that kind of thing.               04:21:10
9  Q.  Did you share drafts with Ms. Rushnawitz and   04:21:16
10   Mr. Peteet in the context that we described      04:21:19
11   before?                          04:21:21
12 A.  I believe that I shared a draft certainly      04:21:23
13   with the two of them again for helping put      04:21:25
14   together the footnotes, and Renee Rushnawitz     04:21:28
15   would have read the draft and given me         04:21:31
16   feedback as to form.                    04:21:33
17 Q.  Did she give you feedback as to anything      04:21:35
18   other than form?                      04:21:38
19 A.  She might have raised questions where         04:21:38
20   something was unclear, but typically her       04:21:40
21   role is to provide feedback with respect to     04:21:42
22   form.                           04:21:45
23 Q.  How did they provide feedback? How did Ms.     04:21:47
24   Rushnawitz and/or Mr. Peteet provide          04:21:51
25   feedback to you?                      04:21:54

275

1  A.  I believe Ms. Rushnawitz would have          04:21:54
2    redlined.                         04:21:58
3  Q.  She would have redlined the document and       04:21:59
4    e-mailed it back to you, I take it?          04:22:01
5  A.  I believe so.                       04:22:02
6  Q.  Okay. Would you still have her e-mails with    04:22:04
7    the redlined versions attached?            04:22:08
8  A.  I don't believe I do. Again, this is         04:22:10
9    September, and we really don't have much       04:22:14
10   capacity, so I think my e-mails go back only     04:22:18
11   within the month.                     04:22:21
12 Q.  Can we ask you to go back and take a look      04:22:22
13   and see if you do have copies of it?          04:22:25
14 A.  With regards --                      04:22:27
15      MR. NOTARGIACOMO: If there are          04:22:29
16   requests for the witness to pull documents      04:22:30
17   or data, I would only ask that it be         04:22:31
18   directed at counsel rather than the witness.     04:22:34
19      MR. POLUBINSKI: Fair enough. So         04:22:35
20   then I'll direct you to do that. If we        04:22:36
21   could take a look for any of these that you     04:22:38
22   might have and produce them.             04:22:39
23      MR. NOTARGIACOMO: We will look          04:22:42
24   into it.                         04:22:42
25      MR. POLUBINSKI: Okay.              04:22:50

276

1    BY MR. POLUBINSKI:                    04:22:52
2  Q.  Do you have workpapers or other notes that     04:22:52
3    you would have prepared in conducting your      04:22:55
4    work on this declaration?               04:22:56
5  A.  No, I would not.                     04:22:57
6      (Discussion off the record.)           04:23:07
7  Q.  Okay. Let's flip to Page 2, Paragraph 6.      04:23:08
8    Maybe I'm wrong about that.              04:23:12
9  A.  Okay.                          04:23:14
10      MR. NOTARGIACOMO: Page 3?             04:23:17
11 Q.  I think we're Page 3, Paragraph 6.          04:23:17
12      MR. POLUBINSKI: Thank you, Ed.          04:23:23
13 A.  Mr. Notargiacomo.                    04:23:24
14 Q.  Second sentence reads, "Inferences about the    04:23:25
15   causal effects of a drug cannot be made        04:23:27
16   patient by patient."                   04:23:29
17 A.  Yes, I see that.                     04:23:30
18 Q.  What do you mean by "causal effects" there?    04:23:33
19 A.  It's a term used in statistical analysis      04:23:35
20   pertaining to, as it suggests, the true       04:23:41
21   causal effects that the drug caused some       04:23:47
22   change in condition as opposed to an         04:23:53
23   association between the improvement or lack     04:23:55
24   of -- or lack of improvement, as the case      04:23:58
25   may be, as a result of the drug. So it        04:24:03

277

1    relates specifically to a causal chain as      04:24:06
2    opposed to an associate observation.         04:24:09
3  Q.  Are you saying in this sentence and in your    04:24:10
4    declaration that it would be impossible to     04:24:17
5    determine with a reasonable degree of        04:24:19
6    scientific certainly whether a particular      04:24:21
7    causal effect -- whether a particular drug     04:24:24
8    had a particular causal effect on a patient?    04:24:27
9  A.  I'm saying the scientific standards for       04:24:29
10   understanding the causal effects of clinical     04:24:32
11   treatments generally and prescription drugs     04:24:35
12   in particular do not look at individual       04:24:37
13   patients in observation to determine the       04:24:40
14   effects. They rely on randomized control       04:24:43
15   trials.                          04:24:46
16 Q.  Let me ask the question again. Are you        04:24:47
17   saying that it's impossible to determine to     04:24:54
18   a reasonable degree of scientific certainty     04:24:56
19   whether a drug had a particular causal        04:24:59
20   effect on a particular patient?            04:25:01
21 A.  In my view, it's -- it is impossible to say    04:25:03
22   with a sufficient degree of certainty the      04:25:06
23   level of scientific evidence that I would      04:25:10
24   use.                           04:25:12
25 Q.  All right. One thing that we can agree on,     04:25:18

70   (Pages 274 to 277)