278

1  I assume, is the determining whether a          04:25:21
2  particular drug had a particular effect on a     04:25:25
3  particular patient would be a difficult, in      04:25:27
4  fact, intensive inquiry, if it were to be        04:25:31
5  done?                                            04:25:34
6  A.  If you were trying to look patient by        04:25:34
7  patient to look for an effect, it would take     04:25:37
8  some inquiry, yes.                               04:25:41
9  Q.  Would you say it would be a difficult, in    04:25:42
10  fact, intensive inquiry?                        04:25:45
11  A.  Well, I'm not a clinical expert to know     04:25:47
12  exactly what one would need to gather in        04:25:50
13  this case for evidence.  In the case of         04:25:54
14  specific indications I imagine it might         04:25:57
15  differ.                                         04:25:59
16  Q.  I assume that in order to conduct the       04:26:07
17  inquiry as to an individual patient, you        04:26:09
18  need to make inquiry of the specific            04:26:12
19  patient.  Would that make sense?                04:26:16
20  A.  If you wanted to find out whether a specific 04:26:17
21  patient benefited, again, I believe the, in    04:26:20
22  my view, effectiveness needs to be             04:26:27
23  determined in a setting where you can rule      04:26:34
24  out other causes of improvement or lack of      04:26:36
25  improvement.  And so if we're looking at a      04:26:39

279

1  patient outside of that setting, I believe      04:26:41
2  the challenges are very substantial, and so     04:26:45
3  I guess, you know, it would require a lot of     04:26:50
4  data to rule out all possible causes, and in    04:26:54
5  particular we would require more data that I     04:26:57
6  can imagine one could collect.                  04:26:59
7  Q.  What sorts of data would you have in mind if 04:27:01
8  you were to start collecting the data,          04:27:05
9  recognizing how difficult it is?                04:27:07
10  A.  Well, again, I'm not a clinical expert, so I 04:27:09
11  don't know for these specific conditions        04:27:11
12  exactly how one would measure effectiveness.    04:27:12
13  Q.  All right.  You just said that you're not a  04:27:15
14  clinical expert.  I think you've said that a    04:27:34
15  few times during the course of this            04:27:36
16  deposition.  Have you ever participated as a    04:27:37
17  researcher or an investigator or in some        04:27:41
18  other role in a clinical trial analyzing        04:27:44
19  safety or efficacy of a medication?             04:27:47
20  A.  No, I have not.                             04:27:49
21  Q.  Have you ever participated in the design of  04:27:50
22  a clinical trial analyzing the safety or        04:27:54
23  efficacy of a medication?                       04:27:57
24  A.  No, I have not.                             04:27:58
25  Q.  Do you have any experience in analyzing the  04:28:00

280

1  clinical efficacy of a drug for a given         04:28:03
2  patient or for a given patient population?      04:28:07
3  A.  No.                                          04:28:09
4  Q.  And I assume that you also haven't published 04:28:10
5  on the clinical efficacy of a particular        04:28:12
6  drug in treating a particular patient           04:28:15
7  population?                                      04:28:17
8  A.  No, I have not.                              04:28:18
9  Q.  And I assume you haven't taught clinical     04:28:18
10  medical school classes, either?                04:28:23
11  A.  No, I have not.                             04:28:26
12  Q.  I do understand, though, that you've        04:28:26
13  conducted peer review for a medical journal,   04:28:30
14  for the Journal of the American Medical        04:28:32
15  Association; is that right?                     04:28:35
16  A.  Among others, yes, that's true.            04:28:36
17  Q.  As a referee for the Journal of the American 04:28:41
18  Medical Association do you review articles      04:28:44
19  that report on the results of clinical         04:28:46
20  trials on the effects of medications in        04:28:47
21  patient populations?                           04:28:49
22  A.  No, I do not.                               04:28:52
23  Q.  What sorts of articles do you review?       04:28:53
24  A.  I review articles that relate to health     04:28:55
25  policy issues.                                  04:28:58

281

1  Q.  You wouldn't expect that the Journal of the  04:29:04
2  American Medical Association would ask an       04:29:07
3  economist to review articles reporting on      04:29:08
4  the results of clinical trials, I assume?      04:29:13
5  A.  I would not expect that, no.               04:29:16
6  Q.  In view of this, do you have any            04:29:18
7  qualifications to offer an opinion as to       04:29:20
8  what would or wouldn't stand up to peer        04:29:22
9  review in terms of an article reporting on     04:29:24
10  results of clinical trials?                    04:29:26
11      MR. NOTARGIACOMO:  Objection.             04:29:28
12  A.  My credentials are that I have a Ph.D., I do 04:29:29
13  work in health services research.  The         04:29:35
14  research design principles are broad.  The     04:29:38
15  notion of causal inference comes from          04:29:42
16  statistics generally, which are the same       04:29:45
17  methods that I use.  It's all in the same      04:29:48
18  methodological context.  And so the fact       04:29:52
19  that this is looking particularly at           04:29:54
20  clinical research I don't believe to be the    04:29:56
21  central issue.  The central issue is about     04:29:59
22  causal inference, and that's something that    04:30:01
23  I have a great deal of expertise in.           04:30:03
24  Q.  But do you have specific expertise on what a 04:30:05
25  medical journal would or wouldn't accept on    04:30:08

71  (Pages 278 to 281)

282

1  the subject?                              04:30:10
2 A.  The statements that I made are based on my   04:30:11
3    expertise as a health services researcher.   04:30:22
4    I feel qualified to make those statements   04:30:24
5    generally about what's required for      04:30:26
6    research.                               04:30:29
7 Q.  Okay.  In conducting your analysis in your   04:30:29
8    declaration that's been marked as Exhibit   04:31:11
9    1 — you can set Exhibit 14 to one side —   04:31:13
10   you state on the first page of the        04:31:20
11   declaration, the executive summary, you   04:31:25
12   considered three different matters "(1) the   04:31:31
13   economic incentives for off-label promotion,   04:31:35
14   (2) whether empirical evidence and theory   04:31:39
15   suggests that pharmaceutical promotion could   04:31:40
16   have caused the class to be impacted, and   04:31:42
17   (3) whether such impact can be quantified   04:31:45
18   using standard methods."                 04:31:47
19 A.  Yes, I see that.                        04:31:51
20 Q.  Why did you consider the economic incentives   04:31:52
21   for off-label promotions in conducting your   04:31:54
22   analysis?                               04:31:56
23 A.  I think it's important to put these       04:31:56
24   allegations into the context of how this   04:32:00
25   could happen in a marketplace setting, and   04:32:03

283

1    in particular why we expect there to be   04:32:07
2    significant reason for off-label promotion,   04:32:10
3    that goes back to that Dorfman-Steiner   04:32:12
4    theorem because it's essentially the      04:32:15
5    profitability.  Once a drug is — once the   04:32:18
6    R&D has been done for a drug, there is every   04:32:21
7    reason because of very low marginal costs of   04:32:25
8    production to try to increase the volume of   04:32:28
9    that drug.  And so in my view, the economic   04:32:31
10   incentives, it's an important condition   04:32:34
11   under which the allegations occur.       04:32:37
12 Q.  In what way is that analysis relevant to   04:32:39
13   this specific question of the impact of the   04:32:49
14   alleged conduct?  And it sounds to me as   04:32:51
15   though you analyzed it — you analyzed that   04:32:55
16   data in order to get an understanding of   04:32:58
17   what the incentives are for a manufacturer   04:33:00
18   to conduct additional promotion.  What's the   04:33:03
19   relevance to what the actual impact would be   04:33:05
20   on class members?                       04:33:07
21 A.  So my view of the relevance here is to     04:33:08
22   inform the Court as to this particular     04:33:13
23   setting, a setting which many courts are not   04:33:16
24   familiar with in great detail, and to show   04:33:22
25   that the context in which the allegations   04:33:24

284

1    take place is one in which there is       04:33:28
2    reasonable expectation that the defendants   04:33:32
3    would have profited from this kind of     04:33:35
4    impact.  I would have been motivated to do   04:33:37
5    that.  It's been my view it's part of the   04:33:40
6    important story of how this happened as much   04:33:43
7    as what impact it has.                   04:33:45
8 Q.  I guess I maybe didn't follow from the     04:33:46
9    answer.  Would you say that it is relevant   04:33:55
10   to the question of what the impact of the   04:33:58
11   alleged conduct was other than as —       04:34:01
12 A.  It's rel —                             04:34:06
13 Q.  — background?                          04:34:04
14 A.  I'm sorry.                             04:34:05
15 Q.  That's fine.                           04:34:07
16 A.  I believe it's relevant to showing that this   04:34:08
17   could have a broad effect.  If, for example,   04:34:13
18   in other markets where the knowledge about   04:34:20
19   the experience of a good disciplines this   04:34:23
20   kind of promotional activity where consumers   04:34:26
21   ultimately verify that the good is or isn't   04:34:29
22   worth what it was set out to be, then this   04:34:32
23   wouldn't expect to have a sustained effect.   04:34:36
24   It would only affect some small portion of   04:34:38
25   the market, and so it's relevant for        04:34:41

285

1    thinking about the magnitude of impact here.   04:34:43
2    It's talking about here's the setting where   04:34:46
3    there's imperfect information, and the      04:34:48
4    insurance coverage means there's very little   04:34:50
5    price sensitivity, and therefore there are   04:34:54
6    these large price margins and the incentives   04:34:56
7    are such that off-label promotion could be a   04:34:58
8    very profitable opportunity.             04:35:01
9 Q.  Okay.  Insofar as it's relevant, it's      04:35:03
10   relevant from a theoretical perspective; is   04:35:05
11   that correct?                           04:35:08
12      MR. NOTARGIACOMO:  Objection.           04:35:08
13 A.  It's relevant from an institutional and    04:35:08
14   theoretical — if you're including sort of   04:35:14
15   the institutional aspects of that as       04:35:17
16   theoretical, it's the context.           04:35:19
17 Q.  Okay.  You cited a number of studies on Page   04:35:22
18   7 of your declaration for the proposition   04:35:31
19   that doctors can be and sometimes are      04:35:34
20   influenced in their prescribing habits by   04:35:37
21   pharmaceutical promotion?               04:35:40
22 A.  I'm sorry, we're on pages or paragraphs?   04:35:43
23 Q.  Pages this time, Pages 7 through 10.       04:35:45
24 A.  7 through 10, okay.  Yes.               04:35:47
25 Q.  Do any of these studies relate specifically   04:35:49

72 (Pages 282 to 285)

286

| | | |
|---|---|---|
| 1 | to Neurontin? | 04:35:54 |
| 2 | A. I don't believe any of these studies relate | 04:35:54 |
| 3 | specifically to Neurontin, no. | 04:35:58 |
| 4 | Q. Are any of these studies focused in any way | 04:36:02 |
| 5 | on specific activities of Parke-Davis or | 04:36:05 |
| 6 | Warner-Lambert or Pfizer? | 04:36:10 |
| 7 | A. Not to my knowledge. | 04:36:12 |
| 8 | Q. And so the studies here are all general | 04:36:14 |
| 9 | studies that aren't specific to the | 04:36:16 |
| 10 | defendants or the prescription drug at issue | 04:36:20 |
| 11 | in this case? | 04:36:22 |
| 12 | A. That's correct. | 04:36:23 |
| 13 | MR. POLUBINSKI: Can we go off the | 04:36:47 |
| 14 | record for just ten seconds? We can go | 04:36:48 |
| 15 | right back on again. | 04:36:50 |
| 16 | THE VIDEOGRAPHER: The time is | 04:36:52 |
| 17 | 4:36. We're off the record. | 04:36:54 |
| 18 | (Discussion off the record.) | 04:36:56 |
| 19 | THE VIDEOGRAPHER: The time is | 04:37:15 |
| 20 | 4:37. We are back on the record. | 04:37:19 |
| 21 | BY MR. POLUBINSKI: | 04:37:21 |
| 22 | Q. All right. Let's take a look at Paragraph | 04:37:21 |
| 23 | 29 of your declaration. | 04:37:27 |
| 24 | A. Okay. | 04:37:31 |
| 25 | Q. Paragraph 29 indicates, among other things, | 04:37:31 |

287

| | | |
|---|---|---|
| 1 | that the regression methods like those -- | 04:37:43 |
| 2 | that regression methods like those that you | 04:37:47 |
| 3 | propose to use in your model can "estimate | 04:37:49 |
| 4 | average or aggregate effects on a set of | 04:37:55 |
| 5 | variables on an outcome of interest, such as | 04:37:59 |
| 6 | the quantity of a prescription drug sold." | 04:38:02 |
| 7 | Did I read that basically right? | 04:38:06 |
| 8 | A. You've read that correctly, yes. | 04:38:08 |
| 9 | Q. Okay. Great. Thanks. I boiled down that's | 04:38:09 |
| 10 | what you say -- that's what you would say | 04:38:12 |
| 11 | you propose to do with your model in this | 04:38:13 |
| 12 | case? | 04:38:15 |
| 13 | A. That's correct. | 04:38:16 |
| 14 | Q. And so in that sense it's correct to say | 04:38:18 |
| 15 | that your model seeks to determine aggregate | 04:38:20 |
| 16 | effects or average effects? | 04:38:22 |
| 17 | A. That's correct. | 04:38:24 |
| 18 | Q. In Paragraph 6 of your Clark rebuttal, which | 04:38:24 |
| 19 | you may still have in front of you, you | 04:38:32 |
| 20 | wrote that you and Dr. Hartman have put | 04:38:34 |
| 21 | forward a "methodology to analyze at the | 04:38:37 |
| 22 | aggregate class-wide level that portion of | 04:38:38 |
| 23 | total sales of Neurontin that would have | 04:38:41 |
| 24 | occurred absent the illegal promotional | 04:38:43 |
| 25 | activities and the incremental amount that | 04:38:46 |

288

| | | |
|---|---|---|
| 1 | was induced by the illegal promotional | 04:38:49 |
| 2 | activities." | 04:38:50 |
| 3 | A. That's correct. You've read that correctly | 04:38:52 |
| 4 | and understood it correctly. | 04:38:55 |
| 5 | Q. Now, is that a correct statement of what | 04:38:55 |
| 6 | you've done in this case as well? | 04:38:57 |
| 7 | A. The models include variables that will | 04:38:58 |
| 8 | capture the underlying off-label promotion | 04:39:02 |
| 9 | that happens for other reasons and separate | 04:39:07 |
| 10 | out what happens due to the allegedly | 04:39:09 |
| 11 | illegal promotional activities, that's | 04:39:13 |
| 12 | correct. | 04:39:15 |
| 13 | Q. Okay. And just to make it simple, is the | 04:39:15 |
| 14 | language that we just read from the Clark | 04:39:19 |
| 15 | rebuttal, is that language equally | 04:39:22 |
| 16 | applicable in this case? | 04:39:24 |
| 17 | A. Yes, that's right. | 04:39:25 |
| 18 | Q. And so it's correct to say that your | 04:39:26 |
| 19 | methodologies and analysis would reach a | 04:39:28 |
| 20 | level -- or reach a conclusion, rather, at | 04:39:29 |
| 21 | the aggregate class-wide level only, | 04:39:32 |
| 22 | correct? | 04:39:33 |
| 23 | A. That's correct. That's what I've been asked | 04:39:34 |
| 24 | to do is propose a method to estimate | 04:39:35 |
| 25 | aggregate class-wide damages -- I mean, | 04:39:39 |

289

| | | |
|---|---|---|
| 1 | quantities that relate to damages. | 04:39:41 |
| 2 | Q. And so I think we've been through this, but | 04:39:43 |
| 3 | just to make sure it's clear, your analysis | 04:39:48 |
| 4 | doesn't provide a means of determining | 04:39:50 |
| 5 | whether a given individual class member was | 04:39:52 |
| 6 | economically harmed, correct? | 04:39:55 |
| 7 | MR. NOTARGIACOMO: Objection. | 04:39:57 |
| 8 | A. My understanding is that I -- the model is | 04:39:57 |
| 9 | intended to generate the aggregate that I | 04:40:01 |
| 10 | don't look at any individual class members | 04:40:05 |
| 11 | to determine what, you know, their | 04:40:07 |
| 12 | individual impact was. | 04:40:11 |
| 13 | Q. Okay. And so the model that you propose at | 04:40:12 |
| 14 | least wouldn't enable you to identify | 04:40:15 |
| 15 | individual class members for whom Neurontin | 04:40:18 |
| 16 | was effective, I take it? | 04:40:20 |
| 17 | MR. NOTARGIACOMO: Objection. | 04:40:22 |
| 18 | A. No, it would not. | 04:40:22 |
| 19 | Q. And it wouldn't enable you to identify | 04:40:24 |
| 20 | individual class members who were prescribed | 04:40:26 |
| 21 | Neurontin for a use for which it was never | 04:40:31 |
| 22 | actually promoted? | 04:40:33 |
| 23 | MR. NOTARGIACOMO: Objection. | 04:40:35 |
| 24 | A. The model will look at those specific | 04:40:35 |
| 25 | indications again for which there were | 04:40:44 |

73 (Pages 286 to 289)

290

```
 1    allegedly illegal promotional activities, so    04:40:47
 2    if we're talking about an off-label use for     04:40:51
 3    a different indication, then that won't be       04:40:53
 4    in the data that I'm looking at ultimately.     04:40:57
 5 Q. Okay. And that will be -- which indications     04:41:01
 6    to include or not to include will be            04:41:04
 7    something upon which you receive                04:41:06
 8    instructions before you run the model?          04:41:11
 9 A. That's my understanding, yes. That's what I      04:41:12
10    anticipate.                                     04:41:14
11 Q. Okay. But you won't actually be conducting       04:41:15
12    that analysis yourself, I take it?              04:41:16
13 A. I believe that I will be instructed by           04:41:18
14    counsel which indications will be subject to     04:41:20
15    the ultimate legal matter.                      04:41:22
16 Q. Okay. Your analysis in the model that you        04:41:24
17    proposed would not enable you to identify        04:41:28
18    individual class members whose doctors were      04:41:31
19    never exposed to any alleged misstatement        04:41:33
20    about Neurontin at the time of the              04:41:36
21    prescription?                                   04:41:37
22         MR. NOTARGIACOMO: Objection, asked          04:41:38
23    and answered.                                   04:41:39
24 A. No. I won't be doing that level of               04:41:39
25    analysis, no.                                   04:41:42
```

291

```
 1 Q. And it wouldn't -- your model wouldn't          04:41:42
 2    enable you to identify individual class          04:41:44
 3    members whose doctors never relied on any        04:41:46
 4    alleged misstatement about Neurontin at the      04:41:49
 5    time of the prescription?                        04:41:52
 6         MR. NOTARGIACOMO: Objection, asked          04:41:52
 7    and answered.                                    04:41:53
 8 A. No, it will not.                                 04:41:53
 9 Q. And your model wouldn't enable you to            04:41:55
10    identify individual class members whose          04:41:58
11    prescriptions were not caused in any way at      04:42:01
12    all by the alleged misstatement about            04:42:04
13    Neurontin?                                       04:42:05
14         MR. NOTARGIACOMO: Objection.                04:42:06
15 A. The econometric analysis will pull out in        04:42:07
16    the aggregate the effects of the promotion,      04:42:12
17    separating that from other trends in             04:42:15
18    off-label promotion, other off-label             04:42:18
19    promotion that's associated with articles        04:42:19
20    published, that sort of thing, that are not      04:42:23
21    in the allegations. I will not look at           04:42:25
22    individual consumers or individual               04:42:28
23    physicians.                                      04:42:31
24 Q. And so in that way you wouldn't be able to       04:42:31
25    identify individual class members or             04:42:33
```

292

```
 1    individual patients whose prescriptions         04:42:35
 2    wouldn't have been caused by any alleged         04:42:37
 3    misstatement about Neurontin, correct?          04:42:40
 4 A. That's correct.                                  04:42:42
 5 Q. And finally, your analysis wouldn't enable       04:42:43
 6    you to identify individual class members         04:42:47
 7    whose doctors elected to prescribe Neurontin     04:42:50
 8    to them even though they knew about the          04:42:52
 9    alleged improper promotion?                     04:42:54
10 A. That's correct.                                  04:42:55
11 Q. Okay. In your report you write that you          04:42:57
12    plan to use regression analysis; is that         04:43:03
13    correct?                                        04:43:05
14 A. That's correct.                                  04:43:05
15 Q. In the context of regression analysis, what      04:43:06
16    is an error term?                               04:43:10
17 A. Error term is the part of the unexplained        04:43:11
18    variation in whatever the outcome of            04:43:15
19    interest is.                                    04:43:19
20 Q. Every regression model will have some degree     04:43:21
21    of error, I take it?                            04:43:24
22 A. That's correct.                                  04:43:26
23 Q. One of the things your Clark rebuttal says       04:43:26
24    is that it describes all economic models as      04:43:31
25    a simplification of reality and that all        04:43:34
```

293

```
 1    such models are simplified in some way?         04:43:38
 2 A. That's correct. A model by definition is         04:43:41
 3    not the real thing.                             04:43:43
 4 Q. So your model in this case isn't an              04:43:44
 5    exception to that general principle?            04:43:46
 6 A. All economic models conform to that general      04:43:48
 7    principle, and mine is no exception.            04:43:51
 8 Q. What does it mean for a model to be a            04:43:53
 9    simplification of reality?                      04:43:55
10 A. It means that in the real world there are        04:43:58
11    any number of factors that affect every         04:44:02
12    outcome, everything that happens to every       04:44:06
13    economic factor, to the weather, to             04:44:10
14    everything. And a model looks to identify        04:44:13
15    the most important factors, and summarize       04:44:16
16    them in a sort of a finite number of            04:44:23
17    variables.                                      04:44:27
18 Q. Okay. So in that sense a model, your model      04:44:27
19    in particular, will differ in some way from     04:44:32
20    what you describe as the real world; is that     04:44:34
21    correct?                                        04:44:36
22 A. You're correct that the model will not be as     04:44:36
23    complete as the real world.                     04:44:43
24 Q. And that some level of error will be            04:44:44
25    tolerable in a model?                           04:44:47
```

74 (Pages 290 to 293)

294

```
 1  A.  That some level of error is the standard of     04:44:47
 2      practice for economic analysis.               04:44:50
 3  Q.  And so for that reason you expect that your    04:44:58
 4      model will have some amount of built-in        04:45:01
 5      error as well?                                 04:45:04
 6  A.  I would expect all models, including mine,     04:45:05
 7      to have an error.                              04:45:08
 8  Q.  I guess a variation on the same theme, one     04:45:17
 9      of the other things that you write in the      04:45:23
10      Clark rebuttal is that "It is nearly always    04:45:25
11      the case that the researcher cannot account    04:45:27
12      for all of the factors that influence an       04:45:29
13      economic outcome."                             04:45:31
14          Does that sound correct to you?            04:45:33
15  A.  That sounds correct to me.                     04:45:35
16  Q.  Do you expect that you will encounter that     04:45:37
17      difficulty in applying your model in this      04:45:39
18      case?                                          04:45:41
19  A.  As I noted in my rebuttal, I don't see that    04:45:41
20      as a difficulty particular to this model.      04:45:45
21  Q.  Okay.                                          04:45:48
22  A.  In all economic models one has to, again,      04:45:48
23      identify the most important factors,           04:45:52
24      particularly factors that may be correlated    04:45:56
25      with, either negatively or positively, the     04:45:58
```

295

```
 1      variable of interest which would here be the   04:46:01
 2      allegedly illegal activities. And so this      04:46:05
 3      is not a problem unique to my model, it's      04:46:09
 4      something that's common to all models.         04:46:13
 5  Q.  Fair enough. But circling back to the         04:46:14
 6      question, you do expect that you will          04:46:17
 7      encounter that difficulty in applying your     04:46:19
 8      model in this case?                            04:46:22
 9          MR. NOTARGIACOMO:  Objection.              04:46:23
10  A.  I'm sorry, I just -- the word "difficulty"     04:46:24
11      I'm having trouble with --                     04:46:28
12  Q.  Sure. Okay.                                    04:46:29
13  A.  -- but I expect that I will have to deal       04:46:29
14      with issues related to error in the model.     04:46:32
15  Q.  Okay. And I guess maybe to -- just to use a    04:46:36
16      different word than "difficulty" or to ask     04:46:45
17      the question differently, do you expect that   04:46:47
18      you'll encounter the inability to account      04:46:52
19      for all of the factors that influence an       04:46:54
20      economic outcome, to use the words from your   04:46:57
21      Clark rebuttal, in applying your model in      04:46:59
22      this case?                                     04:47:02
23  A.  In black-and-white terms, yes, but as an      04:47:03
24      economist I don't view that as a difficulty.   04:47:09
25      I view my challenge is to identify the most    04:47:12
```

296

```
 1      relevant variables and, again, the ones that   04:47:16
 2      are likely to be correlated with the           04:47:18
 3      variables of interest here and to model        04:47:22
 4      those appropriately. It would never occur      04:47:24
 5      to me to worry about modeling every factor     04:47:28
 6      that went into a decision.                     04:47:31
 7  Q.  All right. In your declaration you propose     04:47:34
 8      two versions of your model designed to         04:47:41
 9      measure the effects of off-label promotional   04:47:44
10      events and expenditures on total units of      04:47:47
11      Neurontin sold?                                04:47:49
12  A.  That's correct.                                04:47:50
13  Q.  One version of that model, Equation 1, does    04:47:50
14      not differentiate among diagnoses, correct?    04:47:58
15  A.  That's correct. It's a simplified version      04:48:00
16      of the model, yes.                             04:48:03
17  Q.  And that the other version, Equation 2, does   04:48:04
18      disaggregate by diagnosis or indication?       04:48:08
19  A.  That's correct.                                04:48:10
20  Q.  For Equation 2, would you be running a         04:48:10
21      separate regression for each dosage and        04:48:14
22      indication combination?                        04:48:18
23  A.  That's the way the model is written, and so    04:48:20
24      that's certainly one thing that I would do     04:48:22
25      is run by dosage and indication.               04:48:24
```

297

```
 1  Q.  When you say it's one thing that you would     04:48:30
 2      do, is there some --                           04:48:32
 3  A.  To the extent that the data --                 04:48:32
 4  Q.  Is there a way in which --                     04:48:33
 5  A.  -- were available and broken out in that       04:48:34
 6      level of detail, if that's not possible        04:48:36
 7      depending on how the data look in the end,     04:48:44
 8      will aggregate dosages and look across         04:48:46
 9      dosages by indication.                         04:48:50
10  Q.  Okay. Without actually conducting the         04:48:53
11      analysis with whatever data you end up         04:48:54
12      using, you can't know at this point whether    04:48:58
13      you would run a separate regression for each   04:49:01
14      indication and dosage combination?             04:49:04
15  A.  I don't have all the data yet, which is why    04:49:06
16      I tried to talk about the possibilities and    04:49:08
17      to also describe that the more detailed the    04:49:12
18      model and the data could be, the better        04:49:15
19      would be the model.                            04:49:18
20  Q.  Okay. But at this point you don't know how     04:49:19
21      many total regressions you would therefore     04:49:22
22      be able to run?                                04:49:24
23  A.  You're correct, I don't know.                  04:49:25
24  Q.  You write in Paragraphs 37 and 38 of your      04:49:29
25      declaration that it's possible that you        04:49:34
```

298

1  would use an even further refined model; is    04:49:39
2  that correct?    04:49:41
3 A.  Yes, that's correct.    04:49:41
4 Q.  The one possibility would be using a    04:49:41
5  comparator drug or set of comparator drugs?    04:49:44
6 A.  Yes, that's correct.    04:49:47
7 Q.  And that another possibility might be    04:49:47
8  disaggregating by geographical or clinical    04:49:50
9  submarkets?    04:49:55
10 A.  Yes, that's correct.    04:49:55
11 Q.  And then after having done that, you'd do    04:49:56
12  some version of Equation 1 or 2 perhaps as    04:50:03
13  informed by this -- or perhaps a further    04:50:05
14  refined version of Equation 1 or 2 to    04:50:09
15  calculate the number of -- or to calculate a    04:50:11
16  number for the amount of Neurontin that    04:50:17
17  would have been prescribed but for the    04:50:18
18  conduct described in the complaint?    04:50:22
19 A.  That's correct.    04:50:25
20 Q.  And then you would then use that amount to    04:50:25
21  calculate the amount of Neurontin that was    04:50:30
22  caused by defendants' allegedly improper    04:50:33
23  conduct; is that right?    04:50:37
24 A.  Well, that would be -- the amount that was    04:50:37
25  caused would be that amount that was    04:50:40

299

1  associated with the variables that capture    04:50:42
2  the allegedly illegal activities, right? So    04:50:46
3  that itself the coefficients would allow for    04:50:50
4  estimation of that quantity.    04:50:53
5 Q.  Okay. Now, the implication of using or    04:50:56
6  coming up with a but for number, I assume,    04:51:03
7  isn't there some amount of Neurontin that    04:51:08
8  still would have been prescribed to members    04:51:10
9  of the punitive class for off-label uses    04:51:11
10  even but for the allegedly improper conduct    04:51:15
11  described in the complaint; is that right?    04:51:17
12 A.  That's correct.    04:51:18
13 Q.  Okay. In Equations 1 and 2 you use two    04:51:18
14  discrete sets of time variant factors that    04:51:25
15  impact the prescription behavior of    04:51:28
16  physicians regarding Neurontin; is that    04:51:33
17  right?    04:51:34
18 A.  I'm not sure if there are two discrete. It    04:51:34
19  depends -- in Equation 2 it's written out in    04:51:39
20  a bit more detail, and there's several    04:51:43
21  discrete sets, but maybe you can tell me    04:51:46
22  what you mean by the "two discrete sets."    04:51:49
23 Q.  Yeah, maybe that was an unfortunate choice    04:51:51
24  of words. I don't think it probably matters    04:51:55
25  all that much.    04:51:57

300

1 A.  Okay.    04:51:58
2 Q.  I just want to make sure I understand what    04:51:58
3  the difference pieces --    04:52:01
4 A.  Absolutely.    04:52:02
5 Q.  -- of the model are.    04:52:03
6  XJT are the factors that are not    04:52:06
7  subject to the alleged violations described    04:52:17
8  in the complaint, correct?    04:52:21
9 A.  That's correct.    04:52:23
10 Q.  Okay. And so these would include things    04:52:23
11  like lawful promotional activities by the    04:52:25
12  defendants?    04:52:27
13 A.  That's correct.    04:52:28
14 Q.  And so I guess you would agree with me that    04:52:35
15  there are reasons that doctors would have    04:52:37
16  prescribed Neurontin off-label that are    04:52:39
17  unrelated to the alleged improper promotion?    04:52:40
18 A.  I would agree with that statement.    04:52:43
19 Q.  Okay. Now, XKT and XKDT, those are the    04:52:45
20  factors that are subject to the alleged    04:52:50
21  violations; is that right?    04:52:52
22 A.  That's correct.    04:52:53
23 Q.  Are they meant to include all unlawful    04:52:53
24  promotion or just fraudulent promotion?    04:52:59
25 A.  They are meant to include that promotion    04:53:07

301

1  which counsel instructs me the impact of    04:53:10
2  which is subject to this claim, and so I    04:53:14
3  don't know how to distinguish that in your    04:53:19
4  terminology.    04:53:21
5 Q.  Okay. It sounds like that's not an analysis    04:53:21
6  that you've had to do yet in --    04:53:24
7 A.  To examine which were fraudulent or illegal.    04:53:27
8 Q.  Or just which factors to include within XKDT    04:53:31
9  as opposed to XJT?    04:53:37
10 A.  I have a general sense of what is in XJT,    04:53:40
11  which would include promotion for    04:53:46
12  indications, for example, that have been    04:53:48
13  approved by the FDA. And XKT will include    04:53:51
14  promotion, those promotional activities that    04:53:57
15  I'm understood to believe are illegal    04:54:00
16  pertaining to the indications from which    04:54:02
17  there is not an approval. Earlier you    04:54:04
18  mentioned that some of those may be legal,    04:54:17
19  but I don't know the distinction.    04:54:18
20 Q.  Okay. Now, you would agree that it's    04:54:20
21  important in conducting your analysis that    04:54:21
22  you be able to determine whether a    04:54:24
23  particular factor falls within XJT on one    04:54:25
24  hand and XKT on the other hand?    04:54:28
25 A.  Yes, absolutely.    04:54:30

76 (Pages 298 to 301)

302

1  Q.  And that's in part because you determine but    04:54:31
2     for prescriptions, as we've described    04:54:34
3     before, by setting the variables related to    04:54:36
4     alleged illegal promotional activities or    04:54:39
5     improper promotional activities to zero,    04:54:42
6     correct?    04:54:44
7  A.  That's correct.    04:54:44
8  Q.  Okay.  Now, each of the equations also    04:54:44
9     includes a variable for legitimate    04:54:49
10     expenditures for promotional activities on    04:54:50
11     off-label uses, which is denoted as MT?    04:54:53
12  A.  Those, I believe, are legitimate    04:54:57
13     expenditures for promotion for on-label    04:54:59
14     uses.    05:04:04
15  Q.  Is it just promotions for on-label uses?    04:55:04
16  A.  I'm sorry, I have to actually check to see    04:55:07
17     how it's written.  For label -- no, for    04:55:10
18     standard -- on the indications for which    04:55:12
19     there's an approval.    04:55:14
20  Q.  Okay.  And so under MT there would be no --    04:55:15
21     well, let me withdraw the question.    04:55:28
22         OT and ODT, those are variables that    04:55:31
23     include illegitimate expenditures for    04:55:37
24     off-label promotion --    04:55:40
25  A.  That's correct.    04:55:40

303

1  Q.  -- correct?    04:55:41
2  A.  Yes.    04:55:42
3  Q.  And these are the expenditures that would    04:55:42
4     have funded the sorts of allegedly improper    04:55:48
5     activities described in the complaint?    04:55:51
6  A.  That's correct.    04:55:55
7  Q.  Now, again, I'm assuming here that OT or ODT    04:55:55
8     is not going to be limited to expenditures    04:55:58
9     for just fraudulent promotion?    04:56:00
10  A.  I cannot -- I'm afraid that I'm not in a    04:56:04
11     position to make the distinction between    04:56:07
12     fraudulent promotion and promotional    04:56:10
13     activities that are covered in the    04:56:12
14     complaint.  I guess I would have put them in    04:56:15
15     the same category, in my naive view, that    04:56:16
16     fraudulent was the general term for what was    04:56:21
17     allegedly illegal here.    04:56:22
18  Q.  Okay.  But in any event, OT and ODT as    04:56:25
19     currently envisioned includes all    04:56:29
20     expenditures for all off-label promotion at    04:56:32
21     this point?    04:56:34
22  A.  They include, again, those off-label    04:56:34
23     promotional activities that I'm told by    04:56:39
24     counsel are subject to the allegations and    04:56:41
25     ultimately will be subject to the impact    04:56:44

304

1     analysis.    04:56:46
2  Q.  Okay.  Here again you would agree that it's    04:56:47
3     important in conducting your analysis that    04:56:49
4     you be able to distinguish between whether a    04:56:52
5     particular factor falls within the MT    04:56:54
6     category on the one hand and the OT or ODT    04:56:56
7     category on the other hand, correct?    04:57:00
8  A.  I believe that's correct.  In the limit one    04:57:02
9     would have to include a category -- an    04:57:07
10     expenditure in the legitimate side to be    04:57:10
11     conservative if one couldn't tell.    04:57:12
12  Q.  Okay.  Can you give us a list of the type of    04:57:14
13     legitimate promotional activities for which    04:57:26
14     you expect to have data for purposes of your    04:57:29
15     analysis?    04:57:34
16  A.  For example, spending on detailing, netting    04:57:34
17     out that detailing that, for example, might    04:57:45
18     have been identified in these strategic    04:57:47
19     documents as being related to one of the    04:57:49
20     off-label indications.    04:57:51
21  Q.  Any others?    04:57:53
22  A.  Similarly journal advertising related to an    04:57:54
23     approved indication.    04:58:01
24  Q.  Any others?    04:58:02
25  A.  Again, I guess go down the list, free    04:58:08

305

1     samples after netting out those that were    04:58:16
2     identified in the strategic documents as    04:58:18
3     being associated with an off-label use.    04:58:21
4  Q.  Okay.  I assume you don't have a definitive    04:58:22
5     list at this point?    04:58:29
6  A.  I don't have a definitive list at this    04:58:29
7     point, no.  I've seen examples of all of    04:58:32
8     these above.    04:58:34
9  Q.  And again you recognize the importance of    04:58:35
10     each of these of netting out -- of    04:58:38
11     separating on the one hand actions or    04:58:40
12     expenditures on on-label activities on the    04:58:43
13     one hand and expenditures or activities    04:58:48
14     related to off-label activities on the other    04:58:50
15     hand?    04:58:52
16  A.  To the extent possible, and, again, you    04:58:52
17     know, where distinctions can't be made, then    04:58:55
18     the model would have to ignore those    04:58:58
19     activities.    04:59:00
20  Q.  When you say "ignore those activities," what    04:59:02
21     do you mean?    04:59:04
22  A.  They would have to be included in the    04:59:04
23     legitimate expenditures.  We certainly have    04:59:05
24     good data on total promotional expenditures.    04:59:10
25     These data can be purchased from sources    04:59:12

77 (Pages 302 to 305)

306

```
1   like IMS Health.                     04:59:15
2 Q. Okay.  On the same note you haven't at this   04:59:20
3   point undertaken to begin an analysis of   04:59:26
4   separating out legitimate expenditures   04:59:30
5   activities (sic) on the one hand from   04:59:35
6   improper activities expenditures on the   04:59:37
7   other hand?                          04:59:41
8 A. I am not -- I haven't received access to the   04:59:41
9   data with which I'm going to do that, so   04:59:46
10  there were documents requested to that   04:59:49
11  effect.                              04:59:53
12 Q. Do you think there's any chance that you   04:59:53
13  would employ Equation 1 instead of Equation   04:59:57
14  2 when you run your model in this case?   04:59:59
15 A. My understanding of the case at this point   05:00:02
16  is that it's likely to be done indication by   05:00:07
17  indication.  So Model 2 seems the most   05:00:11
18  likely result.                       05:00:14
19 Q. Would there have been a reason even back   05:00:16
20  when you wrote your declaration why you   05:00:19
21  would have run Equation 1 instead of   05:00:23
22  Equation 2?                          05:00:25
23 A. Largely it's there as a simple starting   05:00:26
24  point before adding the complexity of   05:00:32
25  looking by indication.               05:00:34
```

307

```
1 Q. Now, even if you weren't separating out   05:00:35
2   indication by indication, Equation 1 doesn't   05:00:39
3   provide any way at all to exclude increases   05:00:42
4   in on-label prescriptions due to its -- due   05:00:45
5   to the defendants' promotion for off-label   05:00:50
6   uses, does it?                       05:00:52
7 A. It's the feedback effect from the off-label   05:00:53
8   promotion, not as it's written.  It's a very   05:00:59
9   general equation, so it doesn't distinguish   05:01:03
10  by indication, and therefore it doesn't do   05:01:05
11  what you're saying, yes.             05:01:07
12     MR. POLUBINSKI:  Okay.  It's a   05:01:18
13  little after 5:00.  I don't know if you're   05:01:19
14  still interested in ending it at 5:00.  I   05:01:21
15  think I've actually made decent progress, so   05:01:24
16  I'm fairly confident that we could get   05:01:27
17  through this in seven hours tomorrow if we   05:01:30
18  break now.  Sounds, Professor Rosenthal, as   05:01:33
19  though you're losing your voice.     05:01:36
20     THE WITNESS:  That sounds good.   05:01:39
21     MR. POLUBINSKI:  Then why don't we   05:01:41
22  call it a day.                       05:01:42
23     THE WITNESS:  That's good.  Then we   05:01:42
24  can try to start promptly tomorrow since we   05:01:43
25  were getting set up today.           05:01:45
```

308

```
1       MR. POLUBINSKI:  That will be good,   05:01:45
2   yeah.                                05:01:45
3       THE WITNESS:  Hopefully tomorrow   05:01:47
4   will be more efficient.              05:01:48
5       MR. POLUBINSKI:  Good.  Good.    05:01:49
6   Okay.  Well, thanks.  We'll be back at 9:00   05:01:51
7   a.m. tomorrow.                       05:01:53
8       THE WITNESS:  Okay.               05:01:54
9       THE VIDEOGRAPHER:  The time is   05:01:54
10  5:01.  This is the end of Tape 5, the   05:01:57
11  deposition's adjourned, and we are off the   05:02:02
12  record.                              05:02:05
13       (Whereupon the deposition was   05:02:06
14       adjourned at 5:01 p.m.)
15
16
17  _____
18  MEREDITH B. ROSENTHAL
19
20
21  Subscribed and sworn to before me
22  this    day of       , 2006.
23
24
    _____
25       NOTARY PUBLIC
```

309

```
1       ATTACH TO THE DEPOSITION OF
        MEREDITH B. ROSENTHAL, Ph.D.
2   CASE:  IN RE:  NEURONTIN MARKETING, SALES
        PRACTICES, AND PRODUCTS LIABILITY LITIGATION
3
        ERRATA SHEET
4
    INSTRUCTIONS:  After reading the transcript
5   of your deposition, note any change or
    correction to your testimony and the reason
6   therefor on this sheet.  DO NOT make any
    marks or notations on the transcript volume
7   itself.  Sign and date this errata sheet
    (before a Notary Public, if required).
8   Refer to Page 311 of the transcript for
    errata sheet distribution instructions.
9
    PAGE  LINE
10        CHANGE:
          REASON:
11        CHANGE:
          REASON:
12        CHANGE:
          REASON:
13        CHANGE:
          REASON:
14        CHANGE:
          REASON:
15        CHANGE:
          REASON:
16        CHANGE:
          REASON:
17        CHANGE:
          REASON:
18        CHANGE:
          REASON:
19        CHANGE:
          REASON:
20
21  I have read the foregoing transcript of my
    deposition and except for any corrections or
22  changes noted above, I hereby subscribe to
    the transcript as an accurate record of the
23  statements made by me.
24
25  MEREDITH B. ROSENTHAL, PH.D.    DATE
```

310

1    United States District Court
2    District of Massachusetts
3
4       I, Jessica L. Williamson, Registered,
5    Merit Reporter, Certified Realtime Reporter
6    and Notary Public in and for the
7    Commonwealth of Massachusetts, do hereby
8    certify that MEREDITH B. ROSENTHAL, Ph.D.,
9    the witness whose deposition is hereinbefore
10   set forth, was duly sworn by me and that
11   such deposition is a true record of the
12   testimony given by the witness.
13      I further certify that I am neither
14   related to or employed by any of the parties
15   in or counsel to this action, nor am I
16   financially interested in the outcome of
17   this action.
18      In witness whereof, I have hereunto set
19   my hand and seal this 27th day of October,
20   2006.
21
22
23      Jessica L. Williamson, RMR, RPR, CRR
24   Notary Public, CSR No. 138795
25   My commission expires: 12/18/2009

311

1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3
4       The original of the Errata Sheet has
5    been delivered to Edward Notargiacomo, Esq.
6       When the Errata Sheet has been
7    completed by the deponent and signed, a copy
8    thereof should be delivered to each party of
9    record and the ORIGINAL delivered to Edmund
10   Polubinski III, Esq. to whom the original
11   deposition transcript was delivered.
12
13      INSTRUCTIONS TO DEPONENT
14
15      After reading this volume of your
    deposition, indicate any corrections or
16   changes to your testimony and the reasons
    therefor on the Errata Sheet supplied to you
17   and sign it. DO NOT make marks or notations
    on the transcript volume itself.
18   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
19   COMPLETED AND SIGNED ERRATA SHEET WHEN
20   RECEIVED.
21
22
23
24
25

79  (Pages 310 to 311)

M. ROSENTHAL

312

1           UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3             MDL Docket No. 1629

4            Master File No. 04-10981

5

6   *   *   *   *   *   *   *   *   *   *   *   *   *   *

7   IN RE:  NEURONTIN MARKETING, SALES        *

8   PRACTICES, AND PRODUCTS LIABILITY         *

9   LITIGATION                                *

10  - - - - - - - - - - - - - - - - - - - - - - - -   *

11  THIS DOCUMENT RELATES TO:                 *

12  ALL MARKETING AND SALES PRACTICES         *

13  ACTIONS                                   *

14  *   *   *   *   *   *   *   *   *   *   *   *   *   *

15

16                VOLUME II

17              PAGES 312 - 546

18

19

20    CONTINUED VIDEOTAPED DEPOSITION OF

21       MEREDITH B. ROSENTHAL, Ph.D.

22

23

24  DATE:  WEDNESDAY, OCTOBER 25, 2006

25  TIME:  9:03 A.M. TO 2:35 P.M.

M. ROSENTHAL

313

1    CONTINUED VIDEOTAPED DEPOSITION OF
2 MEREDITH B. ROSENTHAL, Ph.D., a witness
3 called on behalf of the Defendants,
4 pursuant to the Federal Rules of Civil
5 Procedure, before Jessica L. Williamson,
6 Registered Merit Reporter, Certified
7 Realtime Reporter and Notary Public in and
8 for the Commonwealth of Massachusetts, at
9 the Offices of Hare & Chaffin, 160 Federal
10 Street, Boston, Massachusetts, on
11 Wednesday, October 25, 2006, commencing at
12 9:03 a.m.
13
14 A P P E A R A N C E S
15
16 HAGENS BERMAN SOBOL SHAPIRO LLP
17    (By Edward Notargiacomo, Esq.)
18    One Main Street
19    Fourth Floor
20    Cambridge, Massachusetts  02142
21    (617) 482-3700
22    ed@hbsslaw.com
23    Counsel for the Plaintiffs
24
25

314

1 A P P E A R A N C E S, Continued
2
3 DAVIS POLK & WARDWELL
4    (By Edmund Polubinski III, Esq.
5    and Paul Mishkin, Esq.)
6    450 Lexington Avenue
7    New York, New York  10017
8    (212) 450-4429
9    edmund.polubinski@dpw.com
10    paul.mishkin@davispolk.com
11    Counsel for the Defendants
12
13 ALSO PRESENT:
14    Rahul Guha, Cornerstone Research
15
16
17
18
19
20
21
22
23
24
25

315

1            I N D E X
2 DEPONENT            PAGE
3 MEREDITH B. ROSENTHAL, Ph.D.
4 Examination By Mr. Polubinski    315
5
6        E X H I B I T S
7 NO.                PAGE
8  15 Document headed "ICD-9 Codes    391
9     for Neurontin, From IMS File,
9     Ben Sommers, August 3, 2005"
10 16 Affidavit of C. Seth        410
10     Landefeld, M.D. and Michael
11     Steiman, M.D.
12 17 Document headed "National    425
12     Ambulatory Medical Care
13     Survey, 2006 Patient Record"
14
15
16
17
18
19
20 Note:  Original Exhibits 15 - 17 were
21 retained by the court reporter and
22 forwarded to Veritext New York for
23 distribution.
24
25

316

1      P R O C E E D I N G S        09:03:09
2        THE VIDEOGRAPHER:  Good morning.    09:03:09
3 We are recording and are now on the record.    09:03:18
4 Today's date is October 25th, 2006, and the    09:03:20
5 time is 9:03 a.m.  My name is George    09:03:23
6 Dobrentey.  I'm a legal videographer for    09:03:27
7 Veritext New York.  This is the deposition    09:03:31
8 of Meredith Rosenthal, In Re:  Neurontin    09:03:32
9 Marketing and Practices Litigation in the    09:03:35
10 U.S. District Court for the District of    09:03:37
11 Massachusetts, Master File No. 04-10981.    09:03:39
12        This deposition is being taken at    09:03:43
13 160 Federal Street in Boston,    09:03:46
14 Massachusetts.  The court reporter is    09:03:48
15 Jessica Williamson.  The counsel will state    09:03:49
16 their appearances, and the court reporter    09:03:51
17 will administer the oath.    09:03:53
18        MR. POLUBINSKI:  Ted Polubinski    09:03:55
19 from Davis Polk representing the    09:03:57
20 defendants.    09:03:59
21        MR. MISHKIN:  Paul Mishkin from    09:04:00
22 Davis Polk for the defendants.    09:04:01
23        MR. GUHA:  Rahul Guha from    09:04:05
24 Cornerstone Research.    09:04:06
25        MR. NOTARGIACOMO:  Ed    09:04:06

2 (Pages 313 to 316)

M. ROSENTHAL

317

```
1   Notargiacomo, Hagens Berman Sobol Shapiro,    09:04:08
2   for the plaintiffs.                           09:04:09
3
4       MEREDITH B. ROSENTHAL, Ph.D.,
5   a witness called on behalf of the
6   Defendants, having first been duly sworn,
7   was deposed and testifies as follows:
8
9       DIRECT EXAMINATION
10
11  BY MR. POLUBINSKI:                             09:04:17
12  Q. Good morning, Professor Rosenthal.          09:04:17
13  A. Good morning.                               09:04:21
14  Q. You would agree that a range of factors may 09:04:22
15   influence individual doctors' individual      09:04:25
16   prescription decisions, correct?             09:04:29
17       MR. NOTARGIACOMO: Objection.             09:04:31
18  A. Yes, I would agree with that.              09:04:31
19  Q. And if a particular factor might influence  09:04:32
20   a particular describing decision, is it       09:04:35
21   least possible that the same factor could     09:04:37
22   also influence doctors' prescription          09:04:40
23   decisions in the aggregate?                   09:04:42
24       MR. NOTARGIACOMO: Objection.             09:04:44
25  A. I'm not sure if I understand, but if a      09:04:44
```

318

```
1    factor influences an individual physician     09:04:49
2    and we're looking at the aggregate and that   09:04:51
3    physician's part of that aggregate, it        09:04:54
4    would certainly play out that way.            09:04:55
5   Q. Do you have a complete list of such factors 09:04:59
6    in mind now?                                  09:05:01
7   A. I have not created an exhaustive list of    09:05:02
8    such factors. I list examples in the         09:05:07
9    declaration. When I have more data            09:05:10
10   according to the data that we've requested,   09:05:15
11   I'll begin to develop a more exhaustive       09:05:17
12   list of factors.                             09:05:19
13  Q. Okay. We would agree, though, that you     09:05:20
14   will need to at least consider all of the    09:05:24
15   various factors that might influence         09:05:26
16   prescribing behavior in developing your      09:05:28
17   model?                                       09:05:30
18  A. I will consider those factors, and as I    09:05:31
19   mentioned yesterday, in particular I'm       09:05:34
20   going to focus on factors, that is, the      09:05:36
21   primary factors that drive prescribing       09:05:38
22   choices, and those factors that might be     09:05:40
23   correlated with the variables of interest    09:05:42
24   here are the off-label, allegedly illegal    09:05:45
25   off-label promotional activities.            09:05:50
```

319

```
1   Q. Before we keep going I can tell that your   09:05:52
2    voice is --                                   09:05:58
3   A. I'm sorry.                                  09:05:58
4   Q. -- that you're having trouble with your     09:05:59
5    voice, so please let me know if you need to   09:06:00
6    take breaks at any point or if we can get     09:06:02
7    water for you or anything else --             09:06:04
8   A. Thank you.                                  09:06:06
9   Q. -- just so you know.                        09:06:06
10       What I would like to do now is go         09:06:07
11   through a list of factors, and what I would   09:06:11
12   like you to do is to tell me whether you      09:06:15
13   agree that it's possible that the following   09:06:16
14   factors could affect a doctor's decision to   09:06:19
15   prescribe Neurontin off-label in a            09:06:22
16   particular case.                              09:06:24
17  A. Okay. I understand.                         09:06:26
18       MR. NOTARGIACOMO: Just for               09:06:28
19   clarification, the question is whether it     09:06:28
20   would affect them -- whether it would         09:06:30
21   affect an individual doctor's prescribing     09:06:33
22   decision --                                   09:06:37
23       MR. POLUBINSKI: You know,                09:06:37
24   let's --                                      09:06:38
25       MR. NOTARGIACOMO: -- or are you          09:06:39
```

320

```
1    asking that in the aggregate?                 09:06:40
2        MR. POLUBINSKI: Well, that's a           09:06:42
3    good question.                                09:06:42
4   BY MR. POLUBINSKI:                             09:06:42
5   Q. I'd initially been thinking we would ask    09:06:43
6    about individual doctors, but maybe just to   09:06:45
7    cut through this a little bit why don't we    09:06:48
8    ask whether these factors could affect        09:06:51
9    doctors' prescribing decisions in the         09:06:51
10   aggregate.                                    09:06:52
11  A. We can agree that the aggregate is the sum  09:06:53
12   of the individuals, and --                    09:06:55
13  Q. Exactly. And that the two are connected in  09:06:55
14   the same way that you've just testified,      09:06:58
15   correct?                                      09:07:00
16  A. I can agree with that, yes.                 09:07:01
17  Q. All right. The first possible factor is a   09:07:04
18   new article in a peer-reviewed medical        09:07:07
19   publication on the use of Neurontin to        09:07:07
20   treat the applicable condition?               09:07:11
21  A. That may have an effect, yes.               09:07:14
22  Q. How about a new case report in a more       09:07:16
23   informal medical publication on the use of    09:07:18
24   Neurontin to treat the applicable            09:07:20
25   condition?                                    09:07:21
```

3 (Pages 317 to 320)

M. ROSENTHAL

321

1  A.  Potentially that can have an effect as well         09:07:21
2      if it were disseminated.         09:07:25
3  Q.  How about a new article in a peer-reviewed         09:07:26
4      medical publication or any other medium         09:07:28
5      really on the use of a drug with a similar         09:07:30
6      mechanism of action to Neurontin to treat         09:07:32
7      the applicable condition?         09:07:35
8          MR. NOTARGIACOMO:  Objection.         09:07:37
9  A.  That may be possible.         09:07:37
10  Q.  How about a new article in a peer-reviewed         09:07:40
11      medical publication or some other medium on         09:07:42
12      the inefficacy of a different drug that had         09:07:44
13      been used to treat the applicable         09:07:47
14      condition?         09:07:48
15          MR. NOTARGIACOMO:  Objection.         09:07:49
16  A.  It seems like we're getting further and         09:07:49
17      further away from a main effect here, but         09:07:52
18      it's certainly possible that that could         09:07:54
19      have some effect.         09:07:55
20  Q.  Okay.  How about a new article in a peer-         09:07:57
21      reviewed medical publication or any other         09:08:01
22      medium on the safety of Neurontin?         09:08:03
23  A.  I can imagine that having an effect on its         09:08:05
24      use, yes.         09:08:10
25  Q.  How about a new article in a peer-reviewed         09:08:10

322

1      medical publication or some other medium on         09:08:15
2      the safety of a different drug that has         09:08:17
3      been used to treat the applicable         09:08:18
4      condition?         09:08:20
5          MR. NOTARGIACOMO:  Objection.         09:08:20
6          MR. POLUBINSKI:  What's -- can I         09:08:22
7      ask what the grounds of the objection are?         09:08:23
8          MR. NOTARGIACOMO:  I think "or any         09:08:25
9      other medium" is vague.  It could just be         09:08:28
10      about anything, so that's my objection.  I         09:08:31
11      think the questions are vague.         09:08:33
12          MR. POLUBINSKI:  All right.  Well,         09:08:34
13      let me just -- let me hone it.  That's         09:08:35
14      fine.         09:08:37
15  BY MR. POLUBINSKI:         09:08:38
16  Q.  A new article in any medical publication on         09:08:38
17      the safety of a different drug that had         09:08:43
18      been used to treat the applicable         09:08:45
19      condition?         09:08:47
20          MR. NOTARGIACOMO:  Objection.         09:08:48
21  A.  Yes, that could have an effect.         09:08:48
22  Q.  How about an initiative by a manufacturer         09:08:50
23      to disseminate any of those publications?         09:08:55
24  A.  Yes, that could certainly have an effect as         09:08:57
25      well.         09:09:01

323

1  Q.  How about a continuing medical education         09:09:01
2      seminar addressing the use of Neurontin to         09:09:04
3      treat the applicable condition?         09:09:06
4  A.  I'm sorry, so that's the main thing we're         09:09:07
5      talking about, right?  So this is a         09:09:13
6      continuing education seminar on whatever         09:09:15
7      the indication, was the original subject         09:09:17
8      here that we're looking at.         09:09:20
9  Q.  And the use of Neurontin to treat that         09:09:21
10      condition.         09:09:24
11  A.  Yes, certainly.         09:09:24
12  Q.  How about a more informal talk given by --         09:09:24
13      just a more informal talk maybe given by an         09:09:28
14      authority in the field that addresses the         09:09:31
15      use of Neurontin to treat the applicable         09:09:32
16      condition?         09:09:34
17  A.  Potentially that could have an effect as         09:09:34
18      well.         09:09:38
19  Q.  How about a continuing medical education         09:09:38
20      seminar that addresses the use of a drug         09:09:40
21      with a similar mechanism of action to         09:09:42
22      Neurontin to treat the applicable         09:09:44
23      condition?         09:09:46
24  A.  Again, similarly it could have an effect.         09:09:46
25  Q.  How about a continuing medical education         09:09:50

324

1      seminar on the inefficacy of a different         09:09:52
2      drug that had been used to treat the same         09:09:55
3      condition we've been talking about?         09:09:57
4  A.  Yes, that could have an effect, too.         09:09:58
5  Q.  How about an informal conversation among         09:10:01
6      doctors about the doctor's clinical         09:10:03
7      experience in the use of Neurontin to treat         09:10:06
8      the condition that we're talking about?         09:10:08
9  A.  Yes, that could affect prescribing         09:10:09
10      patterns, too.         09:10:13
11  Q.  How about an informal conversation among         09:10:15
12      doctors about their clinical experience on         09:10:17
13      the use of a drug with a similar mechanism         09:10:19
14      of action to Neurontin to treat the         09:10:21
15      applicable condition?         09:10:22
16  A.  I'm losing score here, but I think if we         09:10:24
17      haven't already covered that one, I think         09:10:28
18      that, yes, that could have an effect.         09:10:29
19  Q.  Okay.  How about a change in formal         09:10:31
20      practice guidelines within an institution         09:10:33
21      or a professional group?         09:10:37
22  A.  Can you explain what you mean by "formal         09:10:38
23      practice guidelines"?         09:10:42
24  Q.  Do you have an understanding of what a         09:10:44
25      formal practice guideline might be with         09:10:47

4 (Pages 321 to 324)

M. ROSENTHAL

**325**

1    respect to a prescription drug?    09:10:49
2  A.  Yes.  My understanding is often guidelines    09:10:51
3    are not specific to drugs, so usually the    09:10:53
4    guidelines refer to class of drugs or to    09:10:56
5    the pharmaceutical treatment following    09:11:02
6    surgery, for example, but there may be    09:11:04
7    guidelines that are specific to a specific    09:11:07
8    drug in terms of whether to use it only    09:11:09
9    after a patient has failed on something    09:11:12
10    else, for example.  So are those the kinds    09:11:14
11    of guidelines that you're talking about?    09:11:19
12  Q.  Yeah.  Let's focus on the latter that    09:11:20
13    you've just described --    09:11:22
14  A.  Okay.    09:11:23
15  Q.  -- that sort of deal with the use of a    09:11:23
16    particular prescription drug.  Could a    09:11:25
17    change in those guidelines affect the    09:11:28
18    prescription of Neurontin for a particular    09:11:30
19    off-label condition?    09:11:31
20  A.  Assuming such guidelines existed that were    09:11:33
21    specific to Neurontin, yes.    09:11:35
22  Q.  And the same would be true for informal    09:11:36
23    practice guidelines, the same way they    09:11:39
24    would be for more formal ones?    09:11:41
25  A.  Can you tell me what you mean by "informal    09:11:42

**326**

1    practice guidelines"?    09:11:45
2  Q.  Why don't -- why don't I withdraw the    09:11:48
3    question and just -- I'll withdraw the    09:11:51
4    question, that's fine.    09:11:53
5  A.  Okay.    09:11:54
6  Q.  How about a new development in the    09:11:54
7    underlying science in the particular field    09:11:56
8    that relates to the particular indication?    09:11:58
9  A.  So you mean the basic science --    09:12:01
10  Q.  Yes.    09:12:05
11  A.  -- underpinnings?    09:12:05
12       I guess if -- I don't know how    09:12:07
13    those kinds of changes translate into    09:12:09
14    clinical practice.  That information would    09:12:12
15    have to disseminate somehow.    09:12:13
16  Q.  Should it have disseminated somehow, could    09:12:14
17    it have impacted doctors' prescribing    09:12:17
18    behavior with respect to Neurontin for that    09:12:19
19    indication?    09:12:21
20  A.  I guess potentially, again, it seems second    09:12:23
21    order relative to clinical changes.    09:12:26
22  Q.  How about a discussion of the use of    09:12:27
23    Neurontin in a medical school class to    09:12:30
24    treat the applicable condition?    09:12:33
25  A.  What effect would it have on current    09:12:33

**327**

1    practice?  Because it seems tenuous to me,    09:12:37
2    but...    09:12:41
3  Q.  What about an effect on practice at some    09:12:42
4    point in the future?    09:12:45
5  A.  Perhaps at some point in the future it    09:12:46
6    could have an effect if those students took    09:12:48
7    that knowledge and used it in practice    09:12:51
8    subsequently.    09:12:54
9  Q.  How about a change in the availability of    09:12:54
10    therapeutic substitutes for treating a    09:12:56
11    particular condition?    09:12:59
12  A.  That would certainly have an effect.    09:12:59
13  Q.  How about FDA approval of Neurontin for a    09:13:03
14    related use?    09:13:05
15  A.  That can potentially have an effect as    09:13:05
16    well.    09:13:09
17  Q.  How about FDA approval of a drug with a    09:13:09
18    similar mechanism of action to Neurontin    09:13:11
19    for the applicable use?    09:13:13
20  A.  I'm sorry, could you repeat it?  I'm again    09:13:14
21    losing all --    09:13:21
22  Q.  Yeah, sure.    09:13:21
23  A.  -- the questions.    09:13:22
24       MR. POLUBINSKI:  Do you want to    09:13:22
25    read it back.    09:13:23

**328**

1  A.  Thank you.    09:13:23
2       (Record read.)    09:13:23
3  A.  Yes, that could have an effect.    09:13:32
4  Q.  How about FDA approval of a drug with a    09:13:33
5    similar mechanism of action to Neurontin    09:13:36
6    for a related use?    09:13:39
7  A.  Potentially that could have an effect as    09:13:41
8    well.  Again, it seems second order.    09:13:42
9  Q.  How about approval of Neurontin for the    09:13:44
10    applicable use in another country?    09:13:46
11  A.  I guess possibly it could have an effect.    09:13:47
12    I think it's an empirical question.  I    09:13:52
13    don't actually know.    09:13:54
14  Q.  Okay.  And when you say "it's an empirical    09:13:55
15    question," what does that mean?    09:13:58
16  A.  I mean, it's not clear to me that    09:13:59
17    physicians in this country would be    09:14:01
18    influenced by -- would know or be    09:14:03
19    influenced by what was proved in other    09:14:05
20    countries.    09:14:09
21  Q.  But you couldn't rule out the possibility    09:14:09
22    without examining the data; is that    09:14:11
23    correct?    09:14:13
24  A.  That's correct.  If I were interested in    09:14:13
25    that question, I would need to look at the    09:14:15

5 (Pages 325 to 328)

M. ROSENTHAL

<table>
<tr><td>

329

1    data.                                          09:14:17
2  Q. How about approval of Neurontin for a        09:14:17
3    related use in another country?               09:14:21
4  A. Yes, that could have an effect in the same   09:14:22
5    way.                                           09:14:26
6  Q. An approval of a drug with a similar         09:14:26
7    mechanism of action for the applicable use    09:14:29
8    in another country?                           09:14:31
9  A. Yes.                                          09:14:33
10 Q. How about a change in information on         09:14:35
11   Neurontin in the Physicians' Desk             09:14:37
12   Reference?                                     09:14:40
13 A. Yes. I guess depending on what kind of       09:14:42
14   information you're talking about, if it       09:14:44
15   were salient information of some kind. I'm    09:14:45
16   not sure what kind of information you're      09:14:48
17   talking about.                                 09:14:49
18 Q. Well, let's think of a couple of examples.   09:14:52
19 A. Okay.                                         09:14:54
20 Q. What about a change to the long list of      09:14:55
21   possible adverse events; could that have an  09:14:57
22   impact on prescribing behavior?               09:15:01
23 A. Potentially.                                  09:15:02
24 Q. How about a warning on the label?            09:15:02
25 A. Potentially.                                  09:15:04

</td><td>

331

1    any other informational content?              09:16:10
2  A. I'm --                                        09:16:13
3  Q. Does my question make sense?                 09:16:16
4  A. So you mean a detailer who comes, drops off 09:16:17
5    samples and runs away without discussing     09:16:20
6    the drug?                                      09:16:22
7  Q. Without actually getting in to speak with    09:16:22
8    the doctor.                                    09:16:25
9  A. We think free samples do have an effect      09:16:25
10   independently of the detailing visit,         09:16:28
11   although it's often difficult to tell.        09:16:29
12 Q. How about provision of samples of            09:16:31
13   competitor drugs without any other           09:16:34
14   informational content?                         09:16:35
15 A. Yes, that would have an effect.               09:16:37
16 Q. How about dissemination of the               09:16:38
17   manufacturer's own literature or brochures   09:16:39
18   or things like that?                          09:16:42
19 A. Potentially that would have an effect.       09:16:42
20 Q. What about the relative cost or price of     09:16:46
21   Neurontin relative to -- withdrawn.           09:16:50
22        How about the cost of Neurontin          09:16:53
23   relative to competitor drugs?                 09:16:55
24 A. Cost to whom?                                 09:16:57
25 Q. Good question. Let's take, for example,      09:16:58

</td></tr>
<tr><td>

330

1  Q. Okay. How about a change in information in   09:15:05
2    the Physicians' Desk Reference on other       09:15:12
3    drugs with a similar mechanism of action?     09:15:14
4  A. That could potentially have an effect again 09:15:15
5    in substitution.                              09:15:18
6  Q. Okay. How about information posted on a      09:15:19
7    bulletin board on the Internet about          09:15:20
8    Neurontin and treating the applicable         09:15:24
9    condition?                                     09:15:26
10 A. I suppose plausibly that someone could use  09:15:27
11   that information.                             09:15:31
12 Q. How about more specifically information      09:15:33
13   that's posted on a medical information site  09:15:34
14   on the Internet on treatment of the          09:15:37
15   applicable condition with Neurontin.         09:15:40
16 A. I guess that could also have an effect      09:15:42
17   potentially.                                  09:15:45
18 Q. How about detailing visits about Neurontin? 09:15:52
19 A. As we discussed yesterday, we'd certainly   09:15:55
20   expect detailing visits to affect all        09:15:58
21   prescribing.                                  09:16:01
22 Q. How about detailing visits about            09:16:02
23   competitive drugs?                            09:16:05
24 A. Yes, those should have an effect as well.   09:16:06
25 Q. Provision of samples of Neurontin without   09:16:08

</td><td>

332

1    the cost to a consumer who's paying for the   09:17:05
2    prescription him or herself.                  09:17:07
3  A. So you mean a change in the co-payment, for 09:17:08
4    example?                                       09:17:10
5  Q. Uh-huh. Or for somebody who's not insured   09:17:11
6    or for whom the prescription isn't insured.  09:17:14
7  A. That price in theory would have an effect.  09:17:17
8    As you know, these price effects are hard    09:17:20
9    to identify because of the fact that most    09:17:22
10   people don't pay those prices out of         09:17:24
11   pocket.                                        09:17:26
12 Q. Okay. How about a change in the relative    09:17:26
13   cost or price of a drug paid by third-party  09:17:30
14   payers, reimbursement for the drug?          09:17:35
15 A. Potentially there could be some kind of     09:17:36
16   effect there. It's not clear that it's a     09:17:38
17   linear effect, that there is an effect for   09:17:40
18   every increment that has to do with the --   09:17:44
19   at some level the relative price may         09:17:46
20   matter.                                        09:17:47
21 Q. How about insurance coverage guidelines for 09:17:49
22   Neurontin?                                     09:17:51
23 A. Can you explain what you mean by "insurance 09:17:52
24   coverage guidelines"? Just simply whether    09:17:56
25   it's covered or not?                          09:17:58

</td></tr>
</table>

6 (Pages 329 to 332)

M. ROSENTHAL

333

1  Q. Yeah.                                        09:18:00
2  A. Certainly whether it's covered or not will    09:18:00
3     have an effect on its use.                   09:18:02
4  Q. And will whether or not a competitor drug    09:18:04
5     is covered have an effect on Neurontin's     09:18:08
6     use for that condition -- for the           09:18:10
7     applicable condition?                       09:18:12
8  A. Yes.                                          09:18:17
9  Q. Now, we've been talking about insurance      09:18:19
10    coverage guidelines. How about coverage      09:18:21
11    guidelines for PBMs? Do you know what I'm    09:18:23
12    talking about when I say PBM?                09:18:25
13 A. I do know what you're talking about when     09:18:27
14    you say PBM. And, again, do you mean just    09:18:29
15    whether or not it's covered?                 09:18:32
16 Q. I do.                                         09:18:34
17 A. Okay. Then the same way, must ensure that    09:18:35
18    a PBM is acting essentially as the insurer   09:18:41
19    for pharmaceuticals, so...                   09:18:43
20 Q. How about the use of a prior authorization   09:18:45
21    program by a third-party payer for           09:18:53
22    Neurontin?                                   09:18:54
23 A. If a third-party payer required prior        09:18:55
24    authorization, that would have an effect on  09:18:57
25    Neurontin prescribing.                       09:18:59

334

1  Q. Do you know what a disease management        09:19:00
2     program is?                                  09:19:06
3  A. I do. Do you?                                09:19:06
4  Q. Why don't I ask you to tell me what it is,   09:19:08
5     at least as you understand it.               09:19:12
6  A. A disease management programs are usually    09:19:13
7     condition-specific, although sometimes       09:19:15
8     they're more complex efforts to coordinate   09:19:17
9     and improve the quality of care for people   09:19:21
10    with chronic diseases, clearly.              09:19:23
11 Q. Okay. Would the implementation of a          09:19:25
12    disease management program have an           09:19:27
13    impact -- an implementation of a disease     09:19:29
14    management program that offers guidelines    09:19:31
15    in the treatment of the applicable           09:19:35
16    condition have an impact on the use of       09:19:37
17    Neurontin to treat that condition?           09:19:40
18 A. Again, if that program had guidelines that   09:19:41
19    were specific to Neurontin therapy, then     09:19:45
20    that could have an effect.                   09:19:48
21 Q. Are you familiar with the term "academic     09:19:51
22    detailing"?                                  09:19:53
23 A. I am.                                         09:19:54
24 Q. What does that mean?                         09:19:55
25 A. Academic detailing is an effort to inform    09:19:55

335

1     physicians about pharmaceutical therapies    09:20:00
2     generally, it could be on any topic, but     09:20:04
3     pharmaceutical therapies in the same way     09:20:06
4     that the industry does but using scientific  09:20:08
5     data instead of commercial promotional       09:20:12
6     information. So it's one-on-one. That's      09:20:14
7     the important piece of it, is that it's      09:20:18
8     peer-to-peer, one-on-one counseling.         09:20:21
9  Q. Would the implementation of an academic      09:20:22
10    detailing program on Neurontin have an       09:20:29
11    impact on prescription behavior with         09:20:31
12    respect to Neurontin?                        09:20:34
13 A. If such a program were targeting Neurontin   09:20:35
14    use, then yes.                               09:20:38
15 Q. All right. How about the availability of     09:20:41
16    Neurontin on a hospital or insurance         09:20:43
17    formulary?                                   09:20:45
18 A. Whether it's on the formulary would be       09:20:46
19    similar to whether it's covered, so yes,     09:20:48
20    the same way.                                09:20:51
21 Q. And how about the availability of a          09:20:52
22    competitor drug on a formulary, an           09:20:54
23    insurance or hospital formulary?             09:20:57
24 A. Yes, same.                                    09:20:59
25 Q. How about a decision by a hospital to bar    09:21:00

336

1     acceptance of samples by its professionals?  09:21:03
2  A. Yes, I would expect that to have some        09:21:05
3     effect.                                      09:21:09
4  Q. How about a newspaper article reflecting     09:21:09
5     concerns about improper promotion by         09:21:13
6     defendants for off-label uses?               09:21:16
7  A. I suppose that could have some effect as     09:21:18
8     well.                                        09:21:21
9  Q. And you're familiar with the Franklin case;  09:21:21
10    you testified about that yesterday?          09:21:25
11 A. Yes.                                          09:21:27
12 Q. How about a news broadcast on the Franklin   09:21:27
13    case; would that have an impact on doctors'  09:21:30
14    prescribing behavior of Neurontin?           09:21:33
15 A. Potentially.                                  09:21:36
16 Q. How about an advertisement by a law firm     09:21:38
17    seeking to recruit individuals who have      09:21:40
18    taken Neurontin to file personal injury      09:21:42
19    lawsuits against the defendants?             09:21:44
20 A. I guess I'm not sure how those would get     09:21:46
21    out to physicians, but if physicians saw     09:21:51
22    such advertisements, possibly.               09:21:55
23 Q. So am I correct that your model would need   09:21:58
24    to at least consider whether to take into    09:22:10
25    account each of the factors that we've just  09:22:12

7 (Pages 333 to 336)

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                    516-608-2400

M. ROSENTHAL

337

| | | |
|---|---|---|
| 1 | discussed in determining the effects of | 09:22:15 |
| 2 | off-label promotional events and | 09:22:17 |
| 3 | expenditures on total aggregate | 09:22:19 |
| 4 | prescriptions of Neurontin? | 09:22:21 |
| 5 | A. So the model -- in setting up the model | 09:22:22 |
| 6 | I'll consider those factors that I deem to | 09:22:26 |
| 7 | be important determinants of quantity and | 09:22:30 |
| 8 | in particular time I would spend most of | 09:22:33 |
| 9 | my time worrying about those where the | 09:22:36 |
| 10 | timing is correlated with the off-label | 09:22:38 |
| 11 | promotions, the levels. The intensity of | 09:22:40 |
| 12 | these other factors could be correlated and | 09:22:44 |
| 13 | therefore confused with the off-label | 09:22:47 |
| 14 | promotions. | 09:22:48 |
| 15 | In addition, there are elements of | 09:22:50 |
| 16 | the model intended to capture some of these | 09:22:53 |
| 17 | other factors. For example, by using time | 09:22:55 |
| 18 | trends, linear quadratic time trends to | 09:22:59 |
| 19 | capture other secular trends in what's | 09:23:04 |
| 20 | happening in the market by including | 09:23:07 |
| 21 | variables on other drugs. So certainly | 09:23:09 |
| 22 | those factors would be considered and | 09:23:12 |
| 23 | incorporated either explicitly or captured | 09:23:14 |
| 24 | in the time trend, the secular trend. | 09:23:16 |
| 25 | Q. Okay. Just so I understand it, though, I | 09:23:19 |

338

| | | |
|---|---|---|
| 1 | think you are saying that you would need to | 09:23:21 |
| 2 | at least consider the various factors that | 09:23:23 |
| 3 | we talked about? | 09:23:25 |
| 4 | A. Can we agree what "consider" means? | 09:23:26 |
| 5 | Q. Consider to the extent they need to be | 09:23:29 |
| 6 | reflected in your model. | 09:23:32 |
| 7 | A. Certainly I'll consider a wide range of | 09:23:33 |
| 8 | factors, including the types that we've | 09:23:35 |
| 9 | just discussed. | 09:23:38 |
| 10 | Q. Do you know how many in total there could | 09:23:39 |
| 11 | be? | 09:23:43 |
| 12 | A. No, I don't think it's possible to say. | 09:23:43 |
| 13 | And certainly the numbers depend on whether | 09:23:47 |
| 14 | you define them as finely as you have done | 09:23:49 |
| 15 | or if you, say, consider, you know, | 09:23:52 |
| 16 | promotional efforts of competitors, new | 09:23:54 |
| 17 | drug introduction, so there may be many | 09:24:00 |
| 18 | that we consider. | 09:24:01 |
| 19 | Q. There could be -- withdrawn. | 09:24:06 |
| 20 | How do you plan to consider these | 09:24:08 |
| 21 | different factors? | 09:24:11 |
| 22 | A. Well, I will start with the literature on | 09:24:12 |
| 23 | what -- the impact of promotion on drug | 09:24:16 |
| 24 | utilization and look at models that have | 09:24:21 |
| 25 | been done in the past and what factors | 09:24:23 |

339

| | | |
|---|---|---|
| 1 | they've included, and certainly of course | 09:24:25 |
| 2 | those do include things like, as you've | 09:24:29 |
| 3 | mentioned, competitor new drug entry into | 09:24:31 |
| 4 | the class, competitors' promotional | 09:24:35 |
| 5 | efforts, other secular trends that may | 09:24:38 |
| 6 | affect prescribing. | 09:24:41 |
| 7 | Q. Aside from reviewing the literature to see | 09:24:42 |
| 8 | what past models have done, what else would | 09:24:46 |
| 9 | you need to do? | 09:24:48 |
| 10 | A. The first place I would start is the | 09:24:49 |
| 11 | literature for sure. I may consult some of | 09:24:52 |
| 12 | my clinical colleagues as well. | 09:24:54 |
| 13 | Particularly I may try to find experts in | 09:24:57 |
| 14 | the treatment -- in the areas of treatment | 09:24:58 |
| 15 | for the indications that ultimately I'm | 09:25:01 |
| 16 | asked to model the indications. | 09:25:05 |
| 17 | Q. Do you need, yourself, to actually look at | 09:25:06 |
| 18 | data with respect to some number or all of | 09:25:09 |
| 19 | these factors to figure out whether they | 09:25:11 |
| 20 | had a measurable impact on prescription | 09:25:13 |
| 21 | decisions? | 09:25:17 |
| 22 | A. Not necessarily. Modeling strategies | 09:25:17 |
| 23 | generally -- and economics you start with a | 09:25:20 |
| 24 | good theoretical model and include those | 09:25:23 |
| 25 | variables that should theoretically be | 09:25:26 |

340

| | | |
|---|---|---|
| 1 | included. There is, of course, some point | 09:25:28 |
| 2 | when you're specifying the model itself | 09:25:30 |
| 3 | that you need to look at data. You can't | 09:25:33 |
| 4 | always include all variables because of | 09:25:34 |
| 5 | high degrees of correlation, for example. | 09:25:36 |
| 6 | Then at that point I would need to see | 09:25:40 |
| 7 | data, but the starting point is really to | 09:25:41 |
| 8 | develop a good theory. | 09:25:43 |
| 9 | Q. But at some point -- I guess would you rely | 09:25:46 |
| 10 | on your theory alone, then, to rule out | 09:25:49 |
| 11 | whether to consider individual factors in | 09:25:51 |
| 12 | running your model? | 09:25:55 |
| 13 | A. Not alone, but in some cases I might rely | 09:25:56 |
| 14 | alone on the theories. For example, there | 09:26:00 |
| 15 | are some things that I wouldn't include, | 09:26:03 |
| 16 | the ambient temperature based on the theory | 09:26:06 |
| 17 | that it has no affect on Neurontin | 09:26:09 |
| 18 | prescribing, and so I wouldn't consider | 09:26:12 |
| 19 | data on that. | 09:26:14 |
| 20 | Q. Fair enough. I think what we're talking | 09:26:14 |
| 21 | about are the factors that we've just | 09:26:16 |
| 22 | discussed. For purposes of those factors | 09:26:18 |
| 23 | do you anticipate relying on the literature | 09:26:19 |
| 24 | to exclude any of them from your analysis? | 09:26:21 |
| 25 | A. I would anticipate relying on the | 09:26:24 |

8 (Pages 337 to 340)

M. ROSENTHAL

341

```
 1    literature and data where possible, but it        09:26:27
 2    does seem possible to me that I won't have         09:26:29
 3    data on every one of those factors, and            09:26:31
 4    then I would rely on theory and the                09:26:33
 5    literature as to whether it was an                 09:26:35
 6    important factor.                                  09:26:41
 7 Q. Maybe just to get a little more precision          09:26:54
 8    on this why don't we go back and look at a         09:26:57
 9    few of these individual things --                  09:27:00
10 A. Okay. The ones you mentioned?                      09:27:00
11 Q. Yeah, a few of the factors that we                 09:27:01
12    discussed --                                       09:27:03
13 A. Okay.                                              09:27:03
14 Q. -- that you said might impact physician            09:27:03
15    prescribing behavior. Let's start with the        09:27:05
16    first one, which is an article in a peer-          09:27:09
17    reviewed medical publication on the use of         09:27:12
18    Neurontin to treat the applicable                  09:27:13
19    condition.                                         09:27:15
20 A. Okay.                                              09:27:15
21 Q. How do you anticipate that you would go            09:27:15
22    about finding out whether you would include        09:27:20
23    that particular publication -- whether you         09:27:22
24    would include publication of a particular          09:27:24
25    article in your model?                             09:27:25
```

343

```
 1    have had some impact on prescribing                09:28:38
 2    behavior of Neurontin --                           09:28:41
 3        MR. NOTARGIACOMO: Objection.                    09:28:42
 4 Q. -- for off-label uses?                             09:28:43
 5 A. I believe I've already said it's at least          09:28:44
 6    possible.                                          09:28:46
 7 Q. Okay. We also talked about new articles in         09:28:46
 8    peer-reviewed medical publications on the          09:28:55
 9    use of drugs with similar mechanisms of            09:28:59
10    action to Neurontin to treat conditions.           09:29:01
11    How would you go about determining whether         09:29:04
12    that's a factor that you would include in          09:29:06
13    your model?                                        09:29:08
14 A. I think in that case I would need to               09:29:09
15    consult a clinical expert in those areas.          09:29:12
16    Clearly I couldn't make that judgment about        09:29:15
17    whether it was a similar mechanism.                09:29:18
18 Q. And once -- well, first question is, you           09:29:28
19    haven't consulted a clinical expert on that        09:29:30
20    now, I take it?                                    09:29:32
21 A. No, I have not.                                    09:29:32
22 Q. Okay. And then when you did, if you came           09:29:33
23    up with a list of drugs with a similar             09:29:37
24    mechanism of action, would you do the same         09:29:39
25    sort of search of PubMed that you described        09:29:42
```

342

```
 1 A. In that case of those articles, if there           09:27:28
 2    were significant studies published, new            09:27:32
 3    data published on Neurontin, in all                09:27:34
 4    likelihood we would search PubMed and find         09:27:36
 5    those articles and look to see about their         09:27:41
 6    timing and see whether it made sense to            09:27:43
 7    include them in the model.                         09:27:46
 8 Q. And so you would analyze each individual           09:27:50
 9    article as to whether it fit that -- fit           09:27:52
10    those criteria?                                    09:27:54
11 A. In all likelihood the number of articles          09:27:55
12    providing new data on Neurontin is a              09:27:58
13    reasonable number that we can find in the         09:28:00
14    literature review and decide which of them        09:28:02
15    provides new data on either effects or side       09:28:05
16    effects of Neurontin.                             09:28:09
17 Q. What would you believe the reasonable             09:28:10
18    number to be for purposes of your last           09:28:14
19    answer?                                           09:28:16
20 A. You mean whether it would be feasible?            09:28:16
21 Q. Yeah.                                             09:28:19
22 A. I don't know. Something less than a              09:28:19
23    thousand.                                         09:28:21
24 Q. Okay. But it's at least possible that some        09:28:21
25    number less than a thousand articles would        09:28:35
```

344

```
 1    before --                                          09:29:45
 2 A. Poten --                                           09:29:45
 3 Q. -- for articles?                                   09:29:46
 4 A. Sorry. I'm still cutting you off.                  09:29:47
 5        Potentially in combination with                09:29:52
 6    some input from said clinical expert, so it        09:29:54
 7    would certainly make sense to use some             09:29:56
 8    clinical expertise on what were the                09:30:02
 9    important trends in treatment in this area.        09:30:04
10 Q. Okay. One of the other factors that we            09:30:06
11    discussed was a continuing medical                 09:30:16
12    education seminar addressing the use of            09:30:18
13    Neurontin to treat an applicable condition.        09:30:20
14    How would you go about determining whether         09:30:22
15    a particular seminar would have had an             09:30:25
16    impact on prescribing behavior?                    09:30:27
17 A. So in part we have seen data collected by          09:30:28
18    Parke-Davis, fill in Warner-Lambert there.         09:30:34
19 Q. We can say defendants, to make it easier.          09:30:39
20 A. Defendants. The defendants have some data          09:30:41
21    on CME, continuing medical education, for          09:30:42
22    Neurontin. They have documented events and         09:30:47
23    attendance, that sort of thing. So we do           09:30:50
24    have some data there. And so I would start         09:30:53
25    with that.                                         09:30:57
```

9 (Pages 341 to 344)

M. ROSENTHAL

345

1  Q. Are there any other sources of data that          09:30:57
2     you would look to on this, or would that be       09:30:59
3     the principal source?                             09:31:01
4  A. I think that would be the principal source.       09:31:02
5     There are also data collected by IMS Health       09:31:04
6     in the aggregate on meetings and events           09:31:08
7     associated with drugs, including Neurontin        09:31:11
8     and Neurontin's competitors.                      09:31:14
9  Q. Okay. In terms of the first category of          09:31:16
10    data, the data from defendants, is it your        09:31:22
11    understanding that that data will include         09:31:29
12    information about events that the                  09:31:31
13    defendants didn't sponsor? When I say            09:31:33
14    "events," I mean continuing medical               09:31:36
15    education events.                                  09:31:38
16 A. I'm not altogether clear on whether they          09:31:39
17    only have data on events that they                09:31:43
18    sponsored or events where they had                09:31:44
19    sponsored a speaker, for example, so made a      09:31:46
20    payment for a physician to give a talk            09:31:50
21    about research. So it may be that there          09:31:53
22    are some meetings and events that they           09:31:56
23    don't have direct spending -- direct record      09:31:58
24    of.                                               09:32:00
25 Q. Is it your view that meetings or events          09:32:03

346

1     that weren't supported by the defendants         09:32:06
2     could have had an impact on prescribing           09:32:08
3     behavior of Neurontin for off-label uses?         09:32:10
4  A. Potentially.                                      09:32:12
5  Q. And how would you go about finding out           09:32:15
6     whether those events had a measurable             09:32:16
7     impact?                                            09:32:18
8  A. I think at this point I haven't tried to         09:32:18
9     get all the data on this, but I guess as a        09:32:23
10    starting place I would start with the             09:32:25
11    relevant medical societies. So, again,            09:32:27
12    condition by condition there would be             09:32:32
13    different relevant medical societies.             09:32:33
14 Q. When you say you would start with the            09:32:38
15    relevant medical societies, what would you        09:32:40
16    do?                                                09:32:43
17 A. So contact, excuse me, the medical               09:32:43
18    education staff at the medical societies          09:32:45
19    for neurology, for psychiatry, yes, as was        09:32:48
20    relevant, see what kind of data they had.         09:32:53
21 Q. And what impact would it have on your            09:32:57
22    analysis if they didn't have data                 09:33:00
23    stretching back to the beginning of the           09:33:02
24    class period, 1994?                               09:33:03
25 A. Then I would have to consider other              09:33:05

347

1     mechanisms for modeling that effect.              09:33:09
2  Q. What other mechanisms would you consider?        09:33:17
3  A. So in part the time trend might pick up          09:33:20
4     these kinds of events. The other variables       09:33:23
5     that we talked about, including publication       09:33:28
6     of new articles, might pick up the timing         09:33:30
7     of these events. If the publication of new        09:33:33
8     articles, you know, was -- as you may know,       09:33:35
9     the timing of publication of new releases         09:33:40
10    is often coordinated with national                09:33:42
11    meetings.                                          09:33:45
12       So, for example, you always see           09:33:45
13    the latest results of cardiovascular             09:33:47
14    disease clinical trials come out at the          09:33:51
15    same time as the big CME events for              09:33:53
16    cardiovascular specialists. And so I             09:33:57
17    looked at those kinds of data.                    09:34:00
18 Q. When you say in your last answer "pick up        09:34:02
19    the timing of these events" --                    09:34:05
20 A. Yes.                                              09:34:08
21 Q. -- can you tell me what that means?              09:34:08
22 A. It would be because the events in the model      09:34:09
23    essentially would be capturing a point in        09:34:11
24    time. There are indicator variables as I         09:34:17
25    described, so if there was an event, there       09:34:19

348

1     would be a variable for the point in time        09:34:21
2     at which that happens, and then potentially      09:34:23
3     the time since the event, and therefore if       09:34:26
4     a meeting and an article come out at the         09:34:30
5     same time, they essentially are capturing        09:34:32
6     the same information as far as the model's       09:34:34
7     concerned.                                         09:34:37
8  Q. Assuming that the two are coordinated?           09:34:38
9  A. Right.                                            09:34:40
10 Q. How would you decide whether they're            09:34:40
11    sufficiently coordinated that you would be       09:34:44
12    able to use that analysis?                        09:34:46
13 A. Well, I would have to review on a case-by-      09:34:47
14    case basis.                                       09:34:50
15 Q. When you say "a case-by-case basis,"            09:34:50
16    that be with respect to each individual          09:34:54
17    event?                                            09:34:55
18 A. Again, I think in this area I would consult     09:34:56
19    someone who's an expert in the treatment of      09:35:00
20    this particular condition for a way to           09:35:02
21    prioritize what are the important meetings,      09:35:05
22    for example, what were the important             09:35:09
23    clinical findings from this era.                 09:35:11
24 Q. And, again, just going back to where you        09:35:18
25    would come up with a list of meetings,          09:35:20

10 (Pages 345 to 348)

M. ROSENTHAL

349

```
 1   other than reaching out to the relevant        09:35:23
 2   medical societies?                             09:35:25
 3 A. And defendants' own data. Again, IMS          09:35:26
 4   Health tracks these, tracks spending for       09:35:31
 5   events, meetings and events, and I would       09:35:32
 6   look to other data sources in the industry.    09:35:35
 7 Q. Okay. Let's go on to one of the other         09:35:37
 8   factors.                                       09:35:40
 9 A. Okay.                                          09:35:40
10 Q. One of the other things that we agreed        09:35:41
11   might impact prescribing behavior in the       09:35:43
12   aggregate would be an informal conversation    09:35:45
13   among doctors -- or informal conversations     09:35:49
14   among doctors -- let's put it that way --      09:35:52
15 A. Yes.                                           09:35:54
16 Q. -- about the doctors' clinical experience     09:35:54
17   in the use of Neurontin to treat the           09:35:57
18   applicable condition. How would you decide     09:35:58
19   whether to incorporate that into your          09:36:00
20   model?                                         09:36:02
21 A. So clearly that would not be incorporated     09:36:02
22   into the model. That's -- as we talked         09:36:04
23   about yesterday, the model doesn't include     09:36:08
24   every factor. It's a simplification of         09:36:11
25   reality that focuses on major factors and      09:36:15
```

350

```
 1   particularly those that might be correlated    09:36:19
 2   with the variable of interest, again, the      09:36:21
 3   allegedly illegal promotional activity.        09:36:24
 4        And so in the case of                     09:36:27
 5   conversations between doctors I have no         09:36:28
 6   reason to believe that those, other than       09:36:32
 7   those caused by the allegedly illegal          09:36:34
 8   activities, would be correlated with the       09:36:36
 9   allegedly illegal activities. And in           09:36:40
10   effect transmission of information among       09:36:43
11   physicians would be captured in that time      09:36:46
12   trend.                                         09:36:49
13 Q. How confident are you that conversations     09:36:49
14   among doctors couldn't be correlated with      09:36:55
15   off-label promotion in some way? So in         09:36:57
16   other words, you know, isn't it possible or    09:36:59
17   least that, you know, by virtue of, you        09:37:01
18   know, buzz in the medical community, for       09:37:07
19   lack of a better word, about a particular      09:37:09
20   off-label use that the defendants would        09:37:10
21   increase off-label promotion?                  09:37:11
22 A. Well, again, the model will took to the      09:37:12
23   specific timing of the promotional events,     09:37:16
24   and so if the buzz preceded the promotional   09:37:18
25   events or activities, then the buzz would      09:37:21
```

351

```
 1   be captured as something other than caused     09:37:25
 2   by the allegedly illegal activities.           09:37:29
 3        And so because I'll be looking at         09:37:31
 4   the specific time of these events and          09:37:34
 5   separating out secular trends, which would     09:37:35
 6   include the sort of natural diffusion of       09:37:38
 7   information about Neurontin, I'm fairly        09:37:40
 8   confident that those things can be             09:37:43
 9   separated.                                     09:37:45
10 Q. If they couldn't be separated, your results  09:37:52
11   would be biased; is that correct?             09:37:57
12 A. If there was a correlation between them,     09:37:58
13   then there would be some bias, yes.           09:38:04
14 Q. And if they were correlated -- well, I'll    09:38:12
15   withdraw the question.                         09:38:17
16        All right. One of the other             09:38:20
17   things that we discussed was changes in       09:38:23
18   practice guidelines within an institution     09:38:26
19   or professional group on the use of           09:38:29
20   Neurontin to treat a particular condition?    09:38:31
21 A. Yes.                                          09:38:34
22 Q. We agreed that that could potentially        09:38:34
23   impact prescribing behavior in the            09:38:36
24   aggregate, correct?                            09:38:37
25 A. Yes, we did.                                  09:38:38
```

352

```
 1 Q. How would you go about determining whether   09:38:39
 2   or not to include that factor in your         09:38:42
 3   model?                                         09:38:43
 4 A. I guess, again, in this case it would make   09:38:44
 5   sense to consult a clinical expert for the    09:38:47
 6   conditions considered.                         09:38:49
 7 Q. What information would you get from the      09:38:50
 8   clinical expert?                               09:38:52
 9 A. About standard practices in terms of        09:38:52
10   guidelines. Guidelines are variably used,    09:38:57
11   as you know, by condition, for cancer, for   09:39:02
12   example. Cancer treatment is almost purely   09:39:06
13   protocol-driven. That's well-known. Many     09:39:08
14   other kinds of conditions there are very     09:39:11
15   few protocols for treatment, particularly    09:39:15
16   specific protocols about drugs. So I would   09:39:17
17   talk to clinical experts to understand       09:39:20
18   better the patterns of treatment with        09:39:22
19   regard to these protocols.                    09:39:24
20 Q. Would you expect the clinical expert to be  09:39:28
21   able to provide you with information about    09:39:30
22   implementation of particular practice        09:39:34
23   guidelines at particular institutions?       09:39:36
24 A. It's not clear to me that that would be     09:39:37
25   relevant until I consulted with the          09:39:40
```

11 (Pages 349 to 352)

M. ROSENTHAL

353

1  clinical expert to find out whether          09:39:42
2  guidelines such as these are used at all.    09:39:43
3  Q. Fair enough. But at this point you haven't 09:39:46
4  had that consultation?                        09:39:48
5  A. At this point I have not had that          09:39:49
6  consultation.                                 09:39:51
7  Q. All right. One of the other factors that  09:39:52
8  we discussed was a new development in the     09:39:53
9  underlying science of the particular field?   09:39:55
10 A. Yes.                                        09:39:59
11 Q. Assuming that that were disseminated       09:39:59
12 somehow to the prescribing public, how        09:40:02
13 would your model seek to take that into       09:40:06
14 account?                                       09:40:08
15 A. Well, again, I think it would make sense to 09:40:08
16 look at large significant trends in basic     09:40:11
17 science as it relates to these particular     09:40:15
18 types of drugs and conditions, and that       09:40:17
19 would take some clinical expertise, some      09:40:19
20 scientific expertise.                          09:40:21
21 Q. And so is that another category of issues  09:40:24
22 on which you would consult with a clinical    09:40:26
23 expert?                                        09:40:28
24 A. I think that probably would be --          09:40:28
25 Q. And the consult -- go ahead. I'm sorry, I  09:40:31

354

1  didn't mean to cut you off.                   09:40:34
2  A. -- would be in the category of            09:40:36
3  understanding better the clinical decisions   09:40:37
4  around each specific condition that I         09:40:40
5  model, and all of these factors, trends and   09:40:43
6  treatment, new drugs, new science, would be   09:40:45
7  part of that conversation.                     09:40:48
8  Q. And what information would you seek to get 09:40:51
9  out of the conversation, at least with        09:40:57
10 respect to this particular issue, a new       09:40:58
11 development in the underlying science?        09:41:01
12 A. So, again, potentially it's not altogether 09:41:03
13 clear to me that this is relevant, so the     09:41:06
14 new development in the science may have a     09:41:08
15 similar effect, for example, on all drugs     09:41:12
16 in the therapeutic class, and therefore it    09:41:16
17 may not enter the model in the same way.      09:41:18
18 So I guess I would hope to understand in      09:41:21
19 talking with a clinical expert if there      09:41:23
20 were trends that were likely to change the    09:41:26
21 off-label uses, change the use of off-label   09:41:29
22 prescribing.                                   09:41:32
23    And so I think without a specific          09:41:33
24 example it's hard for me to tell you          09:41:37
25 exactly how that would enter the model, but   09:41:39

355

1  if there was information, for example,        09:41:41
2  suddenly that this -- the whole class of      09:41:44
3  drugs is -- becomes clear that it's less      09:41:47
4  useful for treating this condition, then I    09:41:50
5  would expect that to have an effect, not      09:41:53
6  only on Neurontin prescribing, but on         09:41:56
7  prescribing of competitor drugs for the       09:41:58
8  same off-label uses.                           09:42:00
9  Q. Okay. Let's take that example that you     09:42:02
10 just gave.                                     09:42:04
11 A. Okay.                                       09:42:05
12 Q. If you learned -- if you learned that there 09:42:05
13 were trends of that kind, that it became      09:42:10
14 clear that, you know, at some point in time   09:42:13
15 that this whole class of drugs is less        09:42:17
16 useful in treating the applicable            09:42:19
17 condition, how would you seek to             09:42:21
18 incorporate that into your model?            09:42:22
19 A. Generally speaking, through another        09:42:24
20 variable about the dissemination, another    09:42:27
21 indicator variable about the dissemination   09:42:30
22 of that information, and it could be         09:42:32
23 modeled again as in the more detailed model  09:42:34
24 that I described in my declaration using a   09:42:36
25 comparison drug that should have the same    09:42:40

356

1  effect.                                        09:42:42
2  Q. How would you determine the timing of that 09:42:43
3  effect?                                        09:42:51
4  A. Based on publication of literature, in all 09:42:51
5  likelihood.                                    09:43:01
6  Q. All right. Here's another one: How about   09:43:04
7  FDA approval of a drug with a similar         09:43:06
8  mechanism of action for the applicable use?   09:43:08
9  We talked about how this might impact         09:43:11
10 prescribing behavior in the aggregate. How   09:43:13
11 would you go about -- how do you go about     09:43:16
12 determining how to incorporate that into     09:43:19
13 your model?                                    09:43:22
14 A. If there were a new entrant in the class, I 09:43:22
15 would in all likelihood include the entry    09:43:27
16 of that drug as part of the model.           09:43:28
17 Q. How would you identify which drug to       09:43:36
18 include?                                       09:43:38
19 A. Can you explain --                          09:43:38
20 Q. In other words, how would you identify     09:43:42
21 whether a particular drug other than         09:43:43
22 Neurontin is relevant in terms of an        09:43:44
23 additional approval by the FDA?              09:43:46
24 A. Sorry, I'm still not sure that -- so       09:43:48
25 whether a drug is a clinical substitute for  09:43:55

12 (Pages 353 to 356)

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                      516-608-2400

M. ROSENTHAL

357

1 Neurontin for a particular indication, how    09:43:58
2 would I identify that?    09:44:00
3 Q. Let's just back up. I think we had agreed    09:44:01
4 that FDA approval of a drug with a similar    09:44:03
5 mechanism of action for the applicable use    09:44:07
6 might impact physicians' prescribing    09:44:10
7 behavior in the aggregate; is that right?    09:44:13
8     MR. NOTARGIACOMO: Objection,    09:44:14
9 asked and answered.    09:44:15
10 A. Yes. And I think I understood that to    09:44:16
11 mean --    09:44:19
12 Q. Okay.    09:44:19
13 A. -- a drug that was potentially    09:44:19
14 substitutable for Neurontin --    09:44:22
15 Q. Fair enough.    09:44:22
16 A. -- for the treatment.    09:44:24
17 Q. Okay. Fair enough. How would you come up    09:44:25
18 with a list of drugs that would potentially    09:44:27
19 be substitutable for Neurontin?    09:44:29
20 A. Again, such a list would be developed in    09:44:30
21 consultation with a clinical expert in the    09:44:33
22 area.    09:44:35
23 Q. Okay. And, again, you haven't had that    09:44:35
24 consultation at this point?    09:44:38
25 A. No, I have not.    09:44:40

358

1 Q. How about approval of a drug with a similar    09:44:41
2 mechanism of action for the applicable use    09:44:55
3 in another country? We agreed that that    09:44:57
4 might impact physician prescribing    09:44:59
5 behavior. How would you go about    09:45:02
6 determining whether to incorporate that    09:45:03
7 factor into your model?    09:45:05
8     MR. NOTARGIACOMO: Objection.    09:45:06
9 A. That factor, I would expect to have    09:45:10
10 information on that from defendants. I'm    09:45:11
11 sorry, are we talking about Neurontin?    09:45:14
12 Q. We're talking about a drug with a similar    09:45:15
13 mechanism of action.    09:45:17
14 A. I'm -- it's not clear to me that that's    09:45:18
15 going to be an important factor, and I    09:45:21
16 haven't thought about how to incorporate    09:45:23
17 it. I believe that we're getting further    09:45:25
18 and further away from the central issue.    09:45:28
19 Q. How would you determine whether it's an    09:45:34
20 important factor or not? You said it's not    09:45:35
21 clear to you now whether or not it is.    09:45:37
22 A. I guess, you know, I would review the data,    09:45:38
23 and to my knowledge, that kind of factor is    09:45:42
24 not generally included looking at use of    09:45:46
25 drugs, for example, in all the studies that    09:45:48

359

1 we've looked at before, so it's not clear    09:45:50
2 to me that there's a very strong tie there.    09:45:53
3     So, you know, I would certainly    09:45:55
4 consider that in reviewing the literature    09:45:57
5 and sort of developing the theoretical    09:46:00
6 model, but it seems like a second order    09:46:04
7 issue to me at this point.    09:46:06
8 Q. Without yet having reviewed the data or --    09:46:07
9 A. Without having seen the complete data yet.    09:46:10
10 Q. We'll only do this for a couple more.    09:46:16
11     Information posted on a medical    09:46:22
12 information site on the Internet related to    09:46:25
13 use of Neurontin for treatment of the    09:46:27
14 applicable condition, we agreed that that    09:46:29
15 might impact prescribing behavior in the    09:46:32
16 aggregate, correct?    09:46:34
17     MR. NOTARGIACOMO: Objection.    09:46:35
18 A. That's correct.    09:46:35
19 Q. How would you go about determining whether    09:46:37
20 or not to include that factor in your    09:46:41
21 model?    09:46:43
22 A. I think that would fall -- I mean, I would    09:46:44
23 certainly have to consider it, but I think    09:46:46
24 that falls in the category of factors that    09:46:48
25 are in the background. I have no    09:46:50

360

1 theoretical reason to believe it's    09:46:52
2 correlated with the off-label prescribing,    09:46:53
3 the illegally -- excuse me, the allegedly    09:46:58
4 illegal off-label prescribing activities.    09:47:01
5 Q. Okay. Let me ask you a couple things about    09:47:03
6 that. When you say you think it's    09:47:05
7 something that's in the background, what    09:47:06
8 does that mean?    09:47:08
9 A. There's a notion that there are many    09:47:08
10 unmeasurable factors that may have small    09:47:11
11 effects on the decision to prescribe a drug    09:47:14
12 or take a drug and that the model would not    09:47:19
13 capture every one of these factors, would    09:47:23
14 capture the major ones and those that I    09:47:25
15 believe have the greatest potential to be    09:47:28
16 confounded with the variable of interest.    09:47:31
17 Q. Okay. Do you have an understanding as to    09:47:32
18 the extent to which doctors might consult    09:47:34
19 medical information sites in making    09:47:36
20 treatment decisions?    09:47:38
21 A. I don't have any -- you mean, do I have a    09:47:39
22 quantitative estimate of that?    09:47:42
23 Q. (No verbal response.)    09:47:43
24 A. I do not.    09:47:44
25 Q. Do you have any sense for that, I mean,    09:47:45

13 (Pages 357 to 360)

M. ROSENTHAL

| | 361 | |
|---|---|---|
| 1 | whether it's something that doctors might | 09:47:47 |
| 2 | do in deciding how to treat their patients? | 09:47:48 |
| 3 | A. I don't have a sense that that is | 09:47:50 |
| 4 | scientifically backed up, so I wouldn't | 09:47:57 |
| 5 | want to give you my just general | 09:48:00 |
| 6 | impression. | 09:48:02 |
| 7 | Q. Yeah, I guess I'm just trying to | 09:48:02 |
| 8 | understand, I think, what the -- you know, | 09:48:03 |
| 9 | what -- at least at this point what the | 09:48:04 |
| 10 | basis is for your assumption that this | 09:48:05 |
| 11 | would be an issue that's in the background. | 09:48:07 |
| 12 | A. The basis for my assumption is that it's -- | 09:48:10 |
| 13 | there's no reason to believe that suddenly | 09:48:13 |
| 14 | that would start happening independently. | 09:48:15 |
| 15 | Again, independently it's happening at just | 09:48:17 |
| 16 | the same time that defendants began | 09:48:21 |
| 17 | promoting their drug for an off-label use. | 09:48:24 |
| 18 | Q. You would agree that it's at least possible | 09:48:33 |
| 19 | that the defendants would be monitoring the | 09:48:34 |
| 20 | same medical information websites that | 09:48:35 |
| 21 | doctors might be, correct? | 09:48:37 |
| 22 | A. It is at least possible, but, again, since | 09:48:39 |
| 23 | I'm relying on timing for identification in | 09:48:43 |
| 24 | my model, if the website preceded the | 09:48:45 |
| 25 | defendants' allegedly illegal activities, | 09:48:49 |

| | 362 | |
|---|---|---|
| 1 | it would get picked up in the time trend | 09:48:52 |
| 2 | and not picked up in those variables that | 09:48:54 |
| 3 | represent the activities. | 09:48:57 |
| 4 | Q. How would you go about determining when the | 09:48:58 |
| 5 | postings on the website would have | 09:49:00 |
| 6 | occurred? | 09:49:02 |
| 7 | A. Again, I wouldn't -- that's not the way the | 09:49:02 |
| 8 | model would work. I determine when the | 09:49:06 |
| 9 | allegedly illegal activities occurred, and | 09:49:09 |
| 10 | these other activities that may change over | 09:49:11 |
| 11 | time that may diffuse over time would get | 09:49:13 |
| 12 | picked up in the time trend. | 09:49:16 |
| 13 | Q. Right. But I guess what we're talking | 09:49:19 |
| 14 | about, I guess -- well, withdrawn. | 09:49:22 |
| 15 | If you're relying on the timing to | 09:49:23 |
| 16 | separate out any possible correlation | 09:49:26 |
| 17 | between the two, isn't it important to know | 09:49:27 |
| 18 | the timing that the posting on the medical | 09:49:29 |
| 19 | information website -- the timing of the | 09:49:32 |
| 20 | posting on the particular medical | 09:49:35 |
| 21 | information website? | 09:49:37 |
| 22 | A. It's only important to separate out if it | 09:49:38 |
| 23 | is miraculously simultaneous to the timing | 09:49:47 |
| 24 | of the events that I'm modeling; that is, | 09:49:51 |
| 25 | it doesn't -- it's not that it's going on | 09:49:56 |

| | 363 | |
|---|---|---|
| 1 | at the same time but that it begins -- it | 09:49:57 |
| 2 | has a similar pattern over time. And so | 09:50:00 |
| 3 | that's -- and rather than test for any | 09:50:02 |
| 4 | possible events that might have had that | 09:50:05 |
| 5 | same timing, one has to consider whether | 09:50:07 |
| 6 | it's possible for events to have the same | 09:50:09 |
| 7 | idiosyncratic patterns as the events of | 09:50:12 |
| 8 | interest here. | 09:50:15 |
| 9 | Q. Let me ask it another way. Are you aware | 09:50:22 |
| 10 | of any way, as you sit here now, in which | 09:50:25 |
| 11 | you would be able to determine the timing | 09:50:30 |
| 12 | of postings on the Internet on medical | 09:50:31 |
| 13 | information websites on the use of | 09:50:35 |
| 14 | Neurontin to treat certain off-label -- | 09:50:36 |
| 15 | certain off-label conditions? | 09:50:41 |
| 16 | A. It's not an issue I've looked into, no, | 09:50:42 |
| 17 | so... | 09:50:45 |
| 18 | Q. And assuming that the posting of | 09:50:45 |
| 19 | information on the use of Neurontin to | 09:50:53 |
| 20 | treat an applicable condition does have an | 09:50:56 |
| 21 | impact on prescribing behavior and assuming | 09:50:59 |
| 22 | that it's possible at least that it's | 09:51:02 |
| 23 | correlated with the defendants' promotion | 09:51:03 |
| 24 | for that off-label use, isn't it important | 09:51:07 |
| 25 | that you be able to tell which came first, | 09:51:13 |

| | 364 | |
|---|---|---|
| 1 | a posting on the medical information | 09:51:16 |
| 2 | website or the promotion? | 09:51:18 |
| 3 | MR. NOTARGIACOMO: Objection, | 09:51:21 |
| 4 | asked and answered. | 09:51:23 |
| 5 | A. I think, again, that's -- the way the model | 09:51:23 |
| 6 | works is that if they're exactly -- if you | 09:51:27 |
| 7 | want me to assume that they happen at | 09:51:33 |
| 8 | exactly the same time, then they are | 09:51:36 |
| 9 | perfectly correlated and by definition | 09:51:41 |
| 10 | can't be separated, but when you do an | 09:51:44 |
| 11 | event study such as this, we look at the | 09:51:47 |
| 12 | timing of the event of interest. We don't | 09:51:50 |
| 13 | then measure every other event, and in part | 09:51:54 |
| 14 | some of the identification comes from the | 09:51:59 |
| 15 | fact that we can compare, for example, | 09:52:01 |
| 16 | treatment -- treatment for the particular | 09:52:05 |
| 17 | indication by use of Neurontin with other | 09:52:08 |
| 18 | drugs in the same class at the same time to | 09:52:12 |
| 19 | get additional identification. | 09:52:15 |
| 20 | So if that information were | 09:52:17 |
| 21 | disseminated and were broadly about the | 09:52:19 |
| 22 | use, for example, of anticonvulsants for | 09:52:22 |
| 23 | bipolar disorder, then we could see it | 09:52:25 |
| 24 | being picked up in these other drugs and | 09:52:27 |
| 25 | separate out the activities there from what | 09:52:29 |

14 (Pages 361 to 364)

M. ROSENTHAL

365

```
 1   was going on with Neurontin. So there are        09:52:32
 2   ways of identifying that in part, but the         09:52:34
 3   general strategy is not to look at the            09:52:36
 4   timing of every possible confounding event        09:52:38
 5   but to be as detailed as possible about the       09:52:41
 6   events in question.                               09:52:44
 7       (Pause.)                                      09:53:17
 8 Q. Okay. We discussed yesterday that in order       09:53:18
 9   to conduct your analysis, you or somebody         09:53:20
10   would need to determine whether a given           09:53:24
11   factor or a given expenditure is subject to       09:53:26
12   the alleged violations; is that correct?          09:53:28
13 A. That I would be directed by counsel about        09:53:30
14   which particular activities were subject to       09:53:34
15   the action in question, yes.                      09:53:36
16 Q. Maybe -- well, let's -- I think that's one       09:53:40
17   of the things that I would like to try to         09:53:45
18   unwind.                                           09:53:47
19 A. Okay.                                            09:53:48
20 Q. We did agree that it's important to              09:53:48
21   determine which factors fall within XJT and       09:53:50
22   which factors fall within XKT?                    09:53:55
23 A. Yes, that's right.                               09:53:58
24 Q. Okay. Is it correct that you are going to        09:53:59
25   be relying on counsel to identify whether         09:54:04
```

366

```
 1   each individual factor should fall within         09:54:07
 2   XKT or XJT?                                        09:54:09
 3 A. I'm not sure if I understand precisely, but      09:54:11
 4   maybe I could give an example --                  09:54:16
 5 Q. Sure.                                            09:54:17
 6 A. -- of what I expect to learn. That, for          09:54:18
 7   example, I expect the counsel to tell me          09:54:20
 8   for which indications the promotional             09:54:26
 9   activities appear to be illegal and for           09:54:29
10   which ones are being pursued, so for              09:54:33
11   example, maybe the commercial activities          09:54:36
12   with regard to some indications will be           09:54:37
13   considered allegedly illegal and some             09:54:40
14   won't. That will, of course, determine            09:54:44
15   which indications I model in general.             09:54:45
16       And then in particular it may be              09:54:48
17   deemed that certain kinds of activities,          09:54:50
18   meetings and events versus dinners, will be       09:54:54
19   considered to be the activities that              09:54:57
20   counsel's determined are part of the              09:55:01
21   allegations ultimately, and those are the         09:55:05
22   ones that I will be looking at the effects        09:55:07
23   of. But in part also it may be that some          09:55:09
24   things are not separable, as we talked            09:55:19
25   about yesterday.                                  09:55:21
```

367

```
 1       So, for example, detailing, if in            09:55:21
 2   the data I can't determine whether the            09:55:24
 3   detailing was for an indication using             09:55:26
 4   information that was allegedly illegal in          09:55:32
 5   the sense that it's going to be part of            09:55:35
 6   this action, then those would have to be           09:55:37
 7   left in the other side of promotion, the          09:55:41
 8   routine -- what's considered to be routine        09:55:47
 9   and legal promotional activities?                 09:55:49
10 Q. In terms of the last determination that you      09:55:51
11   just discussed --                                 09:55:53
12 A. Yeah.                                            09:55:55
13 Q. -- who's making that decision, you or            09:55:55
14   counsel or somebody else?                         09:55:57
15 A. Well, in part it would have to do with the       09:55:58
16   data in consultation with counsel about           09:56:01
17   what the Court has indicated they can look        09:56:05
18   at in terms of -- so we -- you know, as we        09:56:08
19   discussed yesterday, I'm confused about the       09:56:11
20   difference between fraudulent and illegal,        09:56:12
21   but if there is some nuance there and             09:56:14
22   certain kinds of information is deemed to         09:56:18
23   be -- that we won't look at the impact of         09:56:21
24   that, then that would have some                    09:56:23
25   determination of what goes in XJT versus          09:56:25
```

368

```
 1   XKT.                                              09:56:28
 2 Q. Do you expect that you would make that          09:56:28
 3   determination or that that determination         09:56:31
 4   would be made by someone at least on an          09:56:34
 5   activity-by-activity basis?                      09:56:35
 6 A. I would imagine it would be categories of       09:56:37
 7   activities.                                      09:56:41
 8 Q. So in other words, I guess, let's think         09:56:42
 9   about -- let's think about meetings.             09:56:44
10 A. Okay.                                           09:56:48
11 Q. I'm assuming that individual meetings could     09:56:49
12   qualify as factors in either XJT or XKT in       09:56:52
13   your model, right?                               09:56:57
14 A. Yes, that's correct.                            09:56:57
15 Q. You need to determine with respect to each      09:56:59
16   individual meeting, correct, whether it          09:57:03
17   falls into XJT or XKT?                           09:57:04
18 A. That's correct.                                 09:57:07
19 Q. Is the same true of specific continuing         09:57:07
20   medical education seminars?                      09:57:10
21 A. Potentially, yes.                               09:57:12
22 Q. Is the same true of detailing visits?          09:57:13
23 A. Detailing, I think we would have to make an     09:57:16
24   aggregate determination. I have seen some        09:57:21
25   detailed data on detailing reports that         09:57:22
```

15 (Pages 365 to 368)

M. ROSENTHAL

|  | 369 |
|---|---|
| 1 | show what was discussed during the        09:57:27 |
| 2 | detailing visit, but without seeing the        09:57:28 |
| 3 | data it's not clear to me how detailed        09:57:30 |
| 4 | we'll be able to be on each of these        09:57:34 |
| 5 | different promotional activities. So once        09:57:37 |
| 6 | I have all the data, it'll be a lot clearer        09:57:40 |
| 7 | whether there is an aggregate decision or a        09:57:44 |
| 8 | much more detailed analysis.        09:57:46 |
| 9 | Q. In the case of expenditures, how do you        09:57:53 |
| 10 | anticipate identifying which spending        09:57:57 |
| 11 | should be characterized as O and which        09:57:58 |
| 12 | spending should be categorized as M for        09:58:00 |
| 13 | purposes of your model?        09:58:03 |
| 14 | A. Again, I don't have complete data yet, but        09:58:04 |
| 15 | in the data -- some of the data that I've        09:58:06 |
| 16 | seen in the discovery documents, as I        09:58:08 |
| 17 | illustrate in my declaration a few        09:58:10 |
| 18 | examples, it does seem like defendants        09:58:12 |
| 19 | break out spending for specific        09:58:15 |
| 20 | indications, for example, as it relates to        09:58:17 |
| 21 | bipolar disorder, as an example.        09:58:18 |
| 22 | Q. Will you be relying entirely on defendants        09:58:23 |
| 23 | breaking out the data as between improper        09:58:28 |
| 24 | activity on the one hand and proper        09:58:35 |
| 25 | activity on the other hand?        09:58:39 |

|  | 370 |
|---|---|
| 1 | A. It's not clear to me that entirely is the        09:58:40 |
| 2 | right characterization of that. Again, I        09:58:44 |
| 3 | haven't pulled all the data together, but I        09:58:46 |
| 4 | do believe the defendants' own tracking of        09:58:49 |
| 5 | their promotional activities will be a        09:58:51 |
| 6 | prime source of information here. But as        09:58:53 |
| 7 | we discussed also, there may be other kinds        09:58:55 |
| 8 | of information such as publications that        09:58:58 |
| 9 | appear in the general literature.        09:59:00 |
| 10 | Q. How would publications that appear in the        09:59:03 |
| 11 | general literature inform your        09:59:06 |
| 12 | understanding of whether a particular        09:59:07 |
| 13 | expenditure should be categorized as O or        09:59:09 |
| 14 | M?        09:59:13 |
| 15 | A. Sorry. I was back on X. So in terms of        09:59:16 |
| 16 | spending, I believe it'll largely come from        09:59:23 |
| 17 | defendants' data, but, again, I can't say        09:59:25 |
| 18 | that will be exclusively true.        09:59:27 |
| 19 | Q. Can you think, as you sit here today, of        09:59:29 |
| 20 | anything other than defendants' data that        09:59:31 |
| 21 | would provide you any insight on the        09:59:33 |
| 22 | determination of whether a particular        09:59:35 |
| 23 | expenditure is O or M?        09:59:37 |
| 24 | A. I would look again to data sources such as        09:59:39 |
| 25 | those that I've described before, IMS        09:59:42 |

|  | 371 |
|---|---|
| 1 | Health, Verispan, that do track promotional        09:59:46 |
| 2 | spending, and I don't know all the details        09:59:49 |
| 3 | of all their products, but they do track        09:59:50 |
| 4 | prescriptions by diagnosis. It's possible        09:59:53 |
| 5 | that they have more detailed data on        09:59:55 |
| 6 | promotional spending as well.        09:59:58 |
| 7 | Q. But you haven't conducted that analysis yet        09:59:59 |
| 8 | or made those inquiries of IMS or Verispan        10:00:07 |
| 9 | yet?        10:00:10 |
| 10 | A. With regard to the promotional data, not        10:00:10 |
| 11 | yet, no.        10:00:12 |
| 12 | Q. Why not?        10:00:13 |
| 13 | A. I've not been asked to bring data together        10:00:14 |
| 14 | for this. I found potential data sources        10:00:16 |
| 15 | in the discovery documents and also by        10:00:19 |
| 16 | talking to IMS Health and Verispan about        10:00:23 |
| 17 | their prescribing data to satisfy me that        10:00:25 |
| 18 | the data were available to estimate this        10:00:28 |
| 19 | model.        10:00:31 |
| 20 | Q. But this particular aspect of data you        10:00:33 |
| 21 | didn't speak with them about; is that        10:00:35 |
| 22 | right?        10:00:38 |
| 23 | A. Not as supplementing defendants' data, but        10:00:38 |
| 24 | I observed that defendants tracked their        10:00:41 |
| 25 | spending in a fairly detailed way.        10:00:43 |

|  | 372 |
|---|---|
| 1 | Q. When do you expect the determination of        10:00:47 |
| 2 | whether a particular expenditure would fall        10:00:56 |
| 3 | into O on the one hand or M on the other        10:00:58 |
| 4 | hand would occur?        10:01:00 |
| 5 | A. When do I suspect that would occur?        10:01:01 |
| 6 | Q. (No verbal response.)        10:01:03 |
| 7 | A. I guess I'm not really clear what you mean.        10:01:06 |
| 8 | At the point at which I'm asked to proceed        10:01:09 |
| 9 | with estimating my model, which I have not        10:01:11 |
| 10 | been asked to do yet, then I would begin to        10:01:16 |
| 11 | gather the data and specify all the        10:01:19 |
| 12 | variables, and at that point that would be        10:01:22 |
| 13 | relevant, whenever that is.        10:01:25 |
| 14 | Q. Again, in the case of sampling you would        10:01:28 |
| 15 | agree that some kinds of sampling are not        10:01:36 |
| 16 | subject to the alleged violations; is that        10:01:39 |
| 17 | correct?        10:01:40 |
| 18 | A. Yes, I would agree with that.        10:01:40 |
| 19 | Q. But you also understand that some kinds do        10:01:45 |
| 20 | constitute allegedly improper promotion for        10:01:47 |
| 21 | purposes of this case?        10:01:50 |
| 22 | A. I believe it was described in the        10:01:51 |
| 23 | allegations, yes.        10:01:53 |
| 24 | Q. How do you intend to differentiate between        10:01:54 |
| 25 | appropriate sampling and improper sampling        10:01:58 |

16 (Pages 369 to 372)

M. ROSENTHAL

373

1   for purposes of your analysis?               10:02:00
2 A. To the extent that it's possible to use     10:02:01
3   defendants' own tracking of those data.      10:02:04
4 Q. Is that something that you've done yet?      10:02:07
5 A. As we discussed yesterday, looking at the   10:02:10
6   strategic documents, they talk specifically  10:02:13
7   in those documents about use of samples.     10:02:14
8 Q. When you refer to "these documents," both   10:02:18
9   in this context and in your previous         10:02:20
10  answers, I'm assuming that the documents      10:02:23
11  you're referring to would be included        10:02:25
12  within the documents that you list as        10:02:26
13  having relied on in your declaration?        10:02:28
14 A. Yes, in particular that strategic grid we   10:02:30
15  looked at yesterday is the one I'm talking    10:02:34
16  about.                                        10:02:36
17 Q. And so it's those sorts of documents, the   10:02:36
18  strategic-grid-type documents, that you       10:02:41
19  anticipate relying on for purposes of doing  10:02:43
20  this analysis?                                10:02:45
21 A. And we understand from other materials that 10:02:46
22  defendants have tracked the profitability,   10:02:50
23  return on investment related to their        10:02:52
24  promotional activities, and so we would      10:02:54
25  look for those kinds of documents as well.   10:02:56

374

1 Q. Have you reviewed any of those documents to 10:03:01
2   date?                                         10:03:04
3 A. I've reviewed a large number of documents    10:03:06
4   at one point, but I don't recall seeing any  10:03:09
5   specific accounting documents on these       10:03:11
6   return on investment models. I know that     10:03:14
7   they are referenced, and I note some         10:03:16
8   references in my declaration. There's        10:03:19
9   promo track analyses.                         10:03:22
10 Q. Anything else?                               10:03:30
11 A. I believe there's a footnote in my          10:03:31
12  declaration that lists a couple of           10:03:32
13  examples, but I believe promo track was the  10:03:34
14  principal and -- promotional effectiveness   10:03:36
15  system that they have.                        10:03:41
16      THE WITNESS: Maybe a short break?         10:03:50
17      MR. POLUBINSKI: Sure. Sure.               10:03:51
18  Let's take a break. That's fine.             10:03:52
19      THE VIDEOGRAPHER: The time is            10:03:54
20  10:04. This is the end of Tape 1, and we     10:03:56
21  are off the record.                           10:03:58
22      (Recess taken.)                          10:03:59
23      THE VIDEOGRAPHER: The time is            10:14:05
24  10:14. This is the beginning of Tape 2,      10:14:18
25  and we are back on the record.               10:14:19

375

1   BY MR. POLUBINSKI:                           10:14:21
2 Q. So, Professor Rosenthal, in the case of     10:14:21
3   detailing, whether or not a given detailing  10:14:33
4   visit is appropriate, will necessarily       10:14:35
5   depend on what's said in the course of that  10:14:38
6   visit; is that correct?                       10:14:41
7 A. Whether or not the allegations apply to     10:14:41
8   that detailing visit, you mean?              10:14:44
9 Q. Yes.                                         10:14:46
10 A. Okay. That seems like that's the right way  10:14:46
11  to characterize it, what's said, what's      10:14:51
12  disseminated.                                 10:14:53
13 Q. Right. And that like sampling not all      10:14:54
14  detailing is subject to the alleged          10:15:00
15  violations?                                   10:15:02
16 A. I think that's right.                       10:15:02
17 Q. With respect to detailing, how do you      10:15:03
18  intend to differentiate between appropriate  10:15:08
19  detailing and allegedly improper detailing?  10:15:11
20 A. With respect to detailing, I have two kinds 10:15:13
21  of information that I think will be          10:15:17
22  relevant, one -- and forgive me, I forget    10:15:18
23  the names of these reports, but one is       10:15:24
24  information on the detailing visits          10:15:27
25  themselves that the physicians who are       10:15:30

376

1   detailed provide that describes what was     10:15:32
2   discussed during the visit, and, two, again  10:15:37
3   are the strategic and marketing documents    10:15:40
4   that I've seen that quantify detailing for   10:15:43
5   specific indications.                         10:15:49
6 Q. With respect to the first, to what extent   10:15:56
7   do you expect -- well, withdrawn.            10:16:01
8       Would you expect to make an              10:16:03
9   individual determination as to each          10:16:06
10  specific detailing visit and whether that    10:16:08
11  detailing visit constituted improper or      10:16:10
12  proper behavior?                              10:16:13
13 A. I would expect to make a determination in   10:16:14
14  the aggregate as to the proportion of        10:16:16
15  detailing that would fall into those         10:16:18
16  categories, so not -- I don't believe that   10:16:20
17  that's what you mean by "individual          10:16:24
18  determination" like visit per visit, but to  10:16:27
19  characterize overall.                         10:16:30
20 Q. Fair enough. But you've used this data on   10:16:32
21  individual visits to inform your             10:16:36
22  conclusions about -- to inform your          10:16:37
23  aggregate conclusions?                        10:16:39
24 A. At this time I think that data is to be one 10:16:40
25  of the things I use to try to break apart    10:16:44

17 (Pages 373 to 376)

M. ROSENTHAL

<table>
<tr><td colspan="2">377</td></tr>
</table>

1  the detailing spending.                    10:16:46
2  Q. With respect to the information on those    10:16:52
3     individual detailing visits, how would you   10:16:54
4     intend to distinguish between fraudulent     10:16:56
5     detailing on the one hand and detailing      10:16:59
6     that was not fraudulent on the other hand?   10:17:01
7  A. Again, determination of what's fraudulent    10:17:03
8     or illegal in some other manner, I would     10:17:05
9     expect counsel to advise me on how to        10:17:07
10    categorize that.                        10:17:12
11 Q. So will counsel be making the individual    10:17:13
12    determinations about whether a specific     10:17:15
13    detailing visit involved fraudulent         10:17:17
14    behavior or not?                        10:17:20
15        MR. NOTARGIACOMO: Objection. I      10:17:21
16    think that mischaracterizes her testimony.  10:17:22
17    . .  MR. POLUBINSKI: Well, I am asking      10:17:24
18    her the question.                       10:17:24
19        MR. NOTARGIACOMO: Fair enough.     10:17:25
20 A. I would expect to get input. I would        10:17:26
21    expect to be advised on what kinds of       10:17:29
22    things I should count in the allegedly       10:17:30
23    illegal bucket and what kinds of things I    10:17:35
24    shouldn't.                              10:17:37
25 Q. And so you would get -- do you imagine you  10:17:37

<table>
<tr><td colspan="2">378</td></tr>
</table>

1     might get guidelines or some other sort of   10:17:38
2     instruction that would enable you to make    10:17:40
3     this determination yourself?            10:17:42
4  A. That might be the case. Without knowing     10:17:43
5     exactly how this will play out, I can't      10:17:44
6     say.                               10:17:48
7  Q. All right. Aside from the events that we    10:18:16
8     discussed earlier this morning that might    10:18:17
9     impact aggregate quantities of Neurontin     10:18:19
10    prescribed for off-label uses, I'm going to  10:18:22
11    give you a much, much shorter list now and   10:18:25
12    ask you whether the following would be       10:18:27
13    additional individual factors that might     10:18:30
14    play into an individual physician's         10:18:33
15    prescribing decision. And if we can go       10:18:35
16    through each one and if you can just tell    10:18:36
17    me whether or not they might or might not,   10:18:38
18    that would be great.                    10:18:40
19        The first one is an individual --      10:18:41
20    is an individual doctor's medical school     10:18:42
21    education.                          10:18:44
22 A. Would affect prescribing patterns in       10:18:44
23    general.                            10:18:49
24 Q. And a decision on whether or not to         10:18:49
25    prescribe Neurontin for an off-label use in  10:18:51

<table>
<tr><td colspan="2">379</td></tr>
</table>

1     a given case?                          10:18:54
2  A. I suppose it might.                     10:18:54
3  Q. How about the doctor's fellowships that he  10:18:55
4     or she might have had after their medical    10:18:58
5     school?                             10:19:02
6  A. It might. And may I just say that all of    10:19:03
7     these factors seem like second order to a    10:19:09
8     decision about off-label prescribing.        10:19:11
9  Q. How about the patient's specific systems?   10:19:13
10 A. Yes, that might affect prescribing.        10:19:15
11 Q. And that that wouldn't be a second order    10:19:19
12    impact in a particular individual          10:19:22
13    prescription decision?                  10:19:25
14 A. As to whether or not the prescription for   10:19:25
15    Neurontin were given versus some other      10:19:30
16    drug? I mean, certainly the symptoms would  10:19:32
17    be relevant.                           10:19:34
18 Q. How about the patient's medical history?   10:19:35
19 A. Yes, that would be relevant.             10:19:37
20 Q. How about other medications that the       10:19:39
21    patient might be taking at the time?        10:19:41
22 A. Yes.                                10:19:42
23 Q. How about a specific request from a        10:19:42
24    specific patient?                      10:19:46
25 A. Possibly.                            10:19:49

<table>
<tr><td colspan="2">380</td></tr>
</table>

1  Q. How about the doctor's individual          10:19:50
2     independent review of the scholarly        10:19:55
3     literature?                           10:19:58
4  A. Yes, I believe we talked about that        10:19:58
5     yesterday.                           10:20:01
6  Q. And how about the doctor's individual      10:20:01
7     consultation of medical information         10:20:06
8     websites on the Internet?               10:20:08
9  A. Yes.                                10:20:09
10 Q. Okay. We discussed yesterday the fact that  10:20:09
11    Neurontin was approved to treat PHN in      10:20:23
12    2002, correct?                         10:20:26
13 A. Yes, correct.                         10:20:27
14 Q. Have plaintiffs' counsel instructed you at  10:20:27
15    this point to make any particular          10:20:31
16    assumptions with respect to Neurontin's     10:20:33
17    efficacy in treating PHN?               10:20:35
18 A. For the purposes of my work, I'm to        10:20:37
19    consider only the total quantity induced    10:20:43
20    without regard to efficacy.              10:20:46
21 Q. Okay. Let me put it another way. Do you    10:20:47
22    know whether plaintiffs' counsel will ask    10:20:51
23    you to include prescriptions for PHN prior   10:20:53
24    to May 2002 in your analysis in the model?  10:20:56
25 A. I don't know at this point exactly which    10:20:58

18 (Pages 377 to 380)

M. ROSENTHAL

381

1    indications will be included in the final     10:21:00
2    analysis, no.     10:21:03
3  Q.  But those indications would have been     10:21:05
4    off-label uses, correct, prescriptions of     10:21:07
5    Neurontin for PHN prior to May 2002?     10:21:08
6  A.  That's certainly described in the     10:21:11
7    allegations, so...     10:21:14
8  Q.  On the other hand, because Neurontin was     10:21:15
9    approved for treatment of PHN in May of     10:21:18
10    2002, I think we can be confident that you     10:21:20
11    would not seek to include prescriptions of     10:21:24
12    Neurontin for PHN after that date in your     10:21:28
13    model, correct?     10:21:31
14  A.  I think I'm probably going to need a little     10:21:37
15    more direction on the legal issues here.     10:21:38
16    As you know, promotional activities have a     10:21:41
17    long-lived impact, and so there will be     10:21:45
18    some continued impact of promotional     10:21:48
19    activities that took place before the     10:21:51
20    approval, but I don't know where that     10:21:53
21    stands as a legal matter.  As an economic     10:21:57
22    matter there are effects.     10:21:59
23  Q.  I guess here's my question:     10:22:01
24  A.  Okay.     10:22:04
25  Q.  As set forth in your declaration the class     10:22:04

382

1    includes, among others, "individuals who     10:22:12
2    for purposes other than resale, purchased,     10:22:20
3    reimbursed, and/or paid for Neurontin for     10:22:22
4    indications not approved by the FDA."     10:22:25
5  A.  So from a legal perspective it sounds like     10:22:29
6    those uses may be out, but you understand     10:22:33
7    what I mean by the --     10:22:36
8  Q.  I do.  I understand --     10:22:36
9  A.  -- effects might be --     10:22:36
10  Q.  -- precisely.  I don't -- I'm not --     10:22:36
11  A.  -- lasting?     10:22:37
12  Q.  And I'm not taking issue with that.  The     10:22:38
13    only thing I'm saying is that just by     10:22:42
14    reference to the definition of the class in     10:22:45
15    this case, you wouldn't expect to include     10:22:47
16    prescriptions for PHN after it was approved     10:22:53
17    by the FDA in your analysis of impact on     10:22:56
18    the class?     10:23:00
19  A.  Not being a legal expert, I'm not sure -- I     10:23:01
20    wouldn't necessarily have read that that     10:23:04
21    way, but as you read it, perhaps that's the     10:23:07
22    right interpretation of the class     10:23:09
23    definition.     10:23:11
24  Q.  If counsel instructs you to include     10:23:12
25    prescriptions for PHN prior to May 2002, I     10:23:15

383

1    think you had said this before, but let me     10:23:21
2    confirm, your model would assume that all     10:23:22
3    such prescriptions for PHN are ineffective;     10:23:25
4    is that right?     10:23:28
5  A.  Essentially the model does not account for     10:23:28
6    any health benefits from the prescriptions.     10:23:30
7  Q.  And so you would include all PHN     10:23:32
8    prescriptions from that time frame in the Q     10:23:37
9    number that you provide to Dr. Hartman for     10:23:40
10    him to calculate damages; is that correct?     10:23:43
11  A.  If so directed by counsel, that's what I     10:23:45
12    would do, yes.     10:23:47
13  Q.  Are you aware of any reason why Neurontin     10:23:50
14    would have been less effective in treating     10:23:52
15    PHN prior to the FDA's supplemental     10:23:55
16    approval in 2002 than it was after?     10:23:58
17  A.  I'm not aware of any reason, no.     10:24:00
18  Q.  Do you have an understanding for why     10:24:04
19    defendants sought approval for Neurontin to     10:24:05
20    treat PHN when they did?     10:24:07
21  A.  I'm not sure what you mean by "why."  Why     10:24:09
22    that timing and not another --     10:24:19
23  Q.  Sure.     10:24:20
24  A.  -- or not at all?     10:24:20
25  Q.  Yeah, what the circumstances were that     10:24:21

384

1    would have driven the defendants to seek     10:24:23
2    approval for PHN at that time?     10:24:26
3  A.  I don't think I do know the answer to that,     10:24:27
4    no.     10:24:30
5  Q.  Okay.  And you don't know, do you, whether     10:24:31
6    defendants had information at the time that     10:24:34
7    might have supported approval for another     10:24:36
8    indication, do you?     10:24:38
9  A.  Not as I sit here.  I know there are     10:24:38
10    numerous discovery documents about     10:24:43
11    strategic planning for obtaining new     10:24:46
12    indications with the FDA on a variety of     10:24:49
13    these conditions, but as I sit here, I     10:24:52
14    can't tell you if there was anything else     10:24:54
15    in the works at the time.     10:24:56
16  Q.  And I guess the -- going back to what I     10:24:57
17    think my question was, which may not have     10:25:02
18    been perfectly phrased, do you know whether     10:25:04
19    defendants had information or data at the     10:25:06
20    time that would have actually supported an     10:25:09
21    application for approval of another     10:25:12
22    indication from the FDA?     10:25:16
23  A.  And so, again, I'm afraid my answer wasn't     10:25:18
24    clear, either.  I know there are discovery     10:25:21
25    documents that talk about those kinds of     10:25:23

19 (Pages 381 to 384)

M. ROSENTHAL

385

1  data, but I don't know at that particular          10:25:27
2  time if there were -- if they had clinical          10:25:29
3  trial evidence, is I assume what you              10:25:33
4  mean --                                          10:25:34
5  Q.  Yeah.                                        10:25:35
6  A.  -- to support another application, no, I        10:25:35
7  don't.  I believe it may be knowable, but I         10:25:38
8  don't know.                                      10:25:43
9  Q.  We discussed yesterday that neuropathic        10:25:43
10  pain is one of the off-label indications at        10:25:45
11  issue in the case, correct?                       10:25:47
12  A.  That's correct, neuropathic pain not           10:25:49
13  including HPN.                                   10:25:51
14  Q.  PHN?                                         10:25:53
15  A.  PHN.                                         10:25:54
16  Q.  At least after May of 2002, right?             10:25:55
17  A.  Yes.                                         10:25:57
18  Q.  And why don't -- actually, for purposes of      10:25:57
19  this series of questions, why don't we            10:26:02
20  assume since it's such a mouthful to say           10:26:04
21  neuropathic pain other than PHN after May         10:26:07
22  of 2002 --                                       10:26:09
23  A.  Just pain.                                    10:26:10
24  Q.  -- can I just say pain?                         10:26:11
25  A.  Pain.                                         10:26:12

386

1  Q.  Great.  Okay.  Subject to further               10:26:13
2  instructions from your counsel, your model         10:26:15
3  would seek to measure the additional             10:26:17
4  incremental prescriptions for pain,               10:26:20
5  correct?                                         10:26:22
6  A.  Again, assuming that -- I understand that       10:26:22
7  some of the legal issues are in flux, or at         10:26:28
8  least that's my understanding about which         10:26:30
9  indications, but if I were told that pain          10:26:32
10  was one of the indications that we were          10:26:33
11  looking at, that's what I would do.               10:26:35
12  Q.  Okay.  We discussed that Neurontin has been    10:26:36
13  approved for the treatment of neuropathic         10:26:42
14  pain throughout Europe and elsewhere           10:26:44
15  yesterday, correct?                              10:26:46
16  A.  I believe we did discuss that, yes.             10:26:46
17  Q.  Okay.  Let's assume for a moment that a         10:26:48
18  class member would have paid for a              10:26:51
19  prescription in the United States for             10:26:52
20  Neurontin to treat neuropathic pain and the       10:26:56
21  prescription worked, the patient's pain           10:26:59
22  went away.  Had that patient received the          10:27:00
23  prescription in the United States, your           10:27:04
24  model would conclude that class member          10:27:08
25  would have been impacted and would suffer        10:27:10

387

1  economic damages; is that correct?               10:27:12
2  A.  As I've been directed by counsel to assume     10:27:14
3  that the relevant measure of economic            10:27:17
4  damages here is what was paid for those           10:27:20
5  units of Neurontin induced by the allegedly        10:27:21
6  illegal promotion, so, yes.                        10:27:26
7  Q.  And if the patient received the very same       10:27:27
8  prescription from a doctor in Europe whose        10:27:30
9  regulatory authority tells her that              10:27:32
10  Neurontin is effective for treatment of           10:27:34
11  neuropathic pain, would that patient have        10:27:36
12  been impacted and suffer economic damages?      10:27:38
13  A.  The question of the patient in Europe is        10:27:42
14  outside the realm of that which I've been          10:27:44
15  asked to consider.  They're not in the            10:27:46
16  class here, so I don't know what you mean.         10:27:47
17  This is based on a legal theory about, you         10:27:50
18  know, what -- based on a legal theory about        10:27:54
19  what the illegal behavior was, and I'm            10:27:57
20  directed to look at the economic                10:27:59
21  consequences of that.                            10:28:00
22  Q.  I guess what I'm asking is maybe just from      10:28:02
23  your perspective, are the economic              10:28:05
24  consequences of the prescription that's           10:28:07
25  written in Europe any different from the          10:28:09

388

1  economic consequences for the prescription        10:28:11
2  that's written in the States for the same          10:28:14
3  indication?                                      10:28:16
4  A.  I'm not sure with what you mean by "the        10:28:16
5  economic consequences."                         10:28:18
6  Q.  The economic consequences for the            10:28:19
7  individual patient.                              10:28:21
8  A.  The consequences that I have --               10:28:22
9  Q.  And/or -- I'm sorry.  For the individual        10:28:23
10  patient and/or whatever entity is paying          10:28:26
11  for the individual patient's prescription?         10:28:28
12  A.  If you want to ask whether the effects are      10:28:31
13  likely to differ on health status, whether        10:28:35
14  the effects are likely to differ in Europe         10:28:40
15  versus the U.S., I have no reason to              10:28:42
16  believe that the health effects differ, but        10:28:44
17  I've not been asked to consider those            10:28:46
18  health effects.                                  10:28:47
19  Q.  Right.  I'm asking about the economic          10:28:48
20  effects.  You know, what you say in your          10:28:50
21  report that you do in the very first page          10:28:52
22  is that your analysis, whether consumers or       10:28:55
23  third-party payers would have and continue       10:29:06
24  to be impacted and suffer economic damages,       10:29:08
25  and so I guess what I'm asking is whether         10:29:12

20 (Pages 385 to 388)

M. ROSENTHAL

389

| | | |
|---|---|---|
| 1 | those same individuals or entities would | 10:29:14 |
| 2 | have been any more impacted or suffer any | 10:29:18 |
| 3 | more economic damages in the United States | 10:29:20 |
| 4 | for the exact same prescription as they | 10:29:22 |
| 5 | would have had they been prescribed the | 10:29:25 |
| 6 | same drug in Europe. | 10:29:29 |
| 7 | A. That's again -- excuse me. My conclusions | 10:29:30 |
| 8 | are based on being directed to assume that | 10:29:33 |
| 9 | there were no clinical benefits to be | 10:29:35 |
| 10 | counted against the spending, and so that | 10:29:39 |
| 11 | conclusion is relevant to that model where | 10:29:41 |
| 12 | those clinical benefits cannot be shown. | 10:29:43 |
| 13 | So you're asking me to assume a different | 10:29:46 |
| 14 | framework in which those clinical benefits | 10:29:49 |
| 15 | can be shown to exist, and so -- is that | 10:29:50 |
| 16 | what you would like me to assume? | 10:29:54 |
| 17 | Q. No, I don't think so. I'm just sort of | 10:29:55 |
| 18 | looking at what the practical reality of | 10:30:04 |
| 19 | the situation is and what the economic | 10:30:06 |
| 20 | impacts of it are. Is there any greater | 10:30:09 |
| 21 | economic impact on the patient than we | 10:30:12 |
| 22 | talked about in the United States than the | 10:30:14 |
| 23 | patient in Europe? | 10:30:15 |
| 24 | A. I guess I need to -- again, I'm sorry, I | 10:30:17 |
| 25 | don't mean to be difficult, but I need to | 10:30:21 |

390

| | | |
|---|---|---|
| 1 | make some assumption about the clinical | 10:30:22 |
| 2 | effectiveness of the drug, and if you want | 10:30:24 |
| 3 | me to assume that drug was clinically | 10:30:27 |
| 4 | effective for those patients who got it in | 10:30:30 |
| 5 | the U.S. in a similar way to those patients | 10:30:32 |
| 6 | who got it in Europe, then the difference | 10:30:35 |
| 7 | would be the total spending on the drug, | 10:30:36 |
| 8 | which, as you know, is much less in Europe. | 10:30:38 |
| 9 | Q. I guess here's my question: Is there any | 10:30:40 |
| 10 | reason that that assumption -- that you can | 10:30:42 |
| 11 | think of that that assumption should be any | 10:30:44 |
| 12 | different for a patient in the U.S. than a | 10:30:45 |
| 13 | patient in Europe? | 10:30:47 |
| 14 | A. I don't know of any reason, but, again, | 10:30:49 |
| 15 | I've not been asked to consider this case. | 10:30:51 |
| 16 | Q. Okay. Your report says that you intend to | 10:31:05 |
| 17 | group diagnoses into five categories by | 10:31:07 |
| 18 | reference to ICD-9 codes, correct? | 10:31:09 |
| 19 | A. I did categorize -- excuse me, can I look | 10:31:12 |
| 20 | at that again in my report? | 10:31:16 |
| 21 | Q. Sure. I think it's on Page 16, Footnote | 10:31:18 |
| 22 | 64. | 10:31:51 |
| 23 | (Discussion off the record.) | 10:31:51 |
| 24 | A. I see there's a typo in there, too. | 10:31:52 |
| 25 | Q. What's the typo that you mentioned you | 10:31:57 |

391

| | | |
|---|---|---|
| 1 | noticed? | 10:31:59 |
| 2 | A. That says "IVD" in the very last | 10:31:59 |
| 3 | characterization of ICD-9. Yes, so this | 10:32:02 |
| 4 | was sort of a preliminary grouping of | 10:32:10 |
| 5 | indications, but as we talked about before, | 10:32:11 |
| 6 | when we look individually by indication, | 10:32:15 |
| 7 | there may be some change -- my | 10:32:20 |
| 8 | understanding is there may be some change | 10:32:21 |
| 9 | in which indications I'm asked to look at | 10:32:23 |
| 10 | specifically. | 10:32:25 |
| 11 | Q. So these may not be the groups -- the | 10:32:26 |
| 12 | groupings that you ultimately use at the | 10:32:29 |
| 13 | end of the day; is that your -- | 10:32:30 |
| 14 | A. Ultimately. This is sort of based on my | 10:32:32 |
| 15 | preliminary examination of those ICD-9 | 10:32:34 |
| 16 | codes and what was in the original | 10:32:36 |
| 17 | complaint. | 10:32:39 |
| 18 | Q. Okay. | 10:32:45 |
| 19 | MR. POLUBINSKI: Let's mark the | 10:32:48 |
| 20 | next document. | 10:32:48 |
| 21 | (Exhibit No. 15, Document headed | 10:32:49 |
| 22 | "ICD-9 Codes for Neurontin, From IMS File, | 10:32:49 |
| 23 | Ben Sommers, August 3, 2005," marked for | 10:32:49 |
| 24 | identification.) | 10:32:49 |
| 25 | Q. All right. I'm handing you a document that | 10:33:06 |

392

| | | |
|---|---|---|
| 1 | we've marked as Rosenthal Exhibit 15. | 10:33:08 |
| 2 | A. Thank you. | 10:33:12 |
| 3 | Q. Can you take a look at the document and let | 10:33:13 |
| 4 | me know when you've had a chance to look | 10:33:15 |
| 5 | through it. | 10:33:18 |
| 6 | A. Yeah. | 10:33:19 |
| 7 | Q. Do you recognize this document? | 10:33:19 |
| 8 | A. In the way that I would recognize a | 10:33:20 |
| 9 | document that I looked at about a year ago, | 10:33:22 |
| 10 | but, yes, it does look familiar. | 10:33:24 |
| 11 | Q. Okay. This document was produced to the | 10:33:26 |
| 12 | defendants in January 2006 by plaintiffs' | 10:33:28 |
| 13 | counsel. Do you know why it would have | 10:33:34 |
| 14 | been produced to us? | 10:33:35 |
| 15 | A. I don't know. Perhaps in relationship to a | 10:33:36 |
| 16 | data request. | 10:33:46 |
| 17 | Q. Okay. Did you review this document in | 10:33:47 |
| 18 | connection with your work on this matter at | 10:33:48 |
| 19 | all? | 10:33:50 |
| 20 | A. I certainly reviewed it. Not being an | 10:33:50 |
| 21 | expert in clinical coding myself, I | 10:33:52 |
| 22 | wouldn't say that I could have checked it | 10:33:53 |
| 23 | in any real sense. Is that what you're | 10:33:56 |
| 24 | asking? I'm familiar with it. | 10:33:58 |
| 25 | Q. Okay. Did you rely on the document in any | 10:34:05 |

21 (Pages 389 to 392)