278

1  I assume, is the determining whether a          04:25:21
2  particular drug had a particular effect on a    04:25:25
3  particular patient would be a difficult, in     04:25:27
4  fact, intensive inquiry, if it were to          04:25:31
5  done?                                           04:25:34
6  A.  If you were trying to look patient by       04:25:34
7  patient to look for an effect, it would take    04:25:37
8  some inquiry, yes.                              04:25:41
9  Q.  Would you say it would be a difficult, in   04:25:42
10 fact, intensive inquiry?                        04:25:45
11 A.  Well, I'm not a clinical expert to know     04:25:47
12 exactly what one would need to gather in        04:25:50
13 this case for evidence.  In the case of         04:25:54
14 specific indications I imagine it might         04:25:57
15 differ.                                         04:25:59
16 Q.  I assume that in order to conduct the       04:26:07
17 inquiry as to an individual patient, you        04:26:09
18 need to make inquiry of the specific            04:26:12
19 patient.  Would that make sense?                04:26:16
20 A.  If you wanted to find out whether a specific 04:26:17
21 patient benefited, again, I believe the, in     04:26:20
22 my view, effectiveness needs to be              04:26:27
23 determined in a setting where you can rule      04:26:34
24 out other causes of improvement or lack of      04:26:36
25 improvement.  And so if we're looking at a      04:26:39

279

1  patient outside of that setting, I believe      04:26:41
2  the challenges are very substantial, and so     04:26:45
3  I guess, you know, it would require a lot of     04:26:50
4  data to rule out all possible causes, and in    04:26:54
5  particular we would require more data that I     04:26:57
6  can imagine one could collect.                  04:26:59
7  Q.  What sorts of data would you have in mind if 04:27:01
8  you were to start collecting the data,          04:27:05
9  recognizing how difficult it is?                04:27:07
10 A.  Well, again, I'm not a clinical expert, so I 04:27:09
11 don't know for these specific conditions        04:27:11
12 exactly how one would measure effectiveness.    04:27:12
13 Q.  All right.  You just said that you're not a  04:27:15
14 clinical expert.  I think you've said that a    04:27:34
15 few times during the course of this             04:27:36
16 deposition.  Have you ever participated as a    04:27:37
17 researcher or an investigator or in some        04:27:41
18 other role in a clinical trial analyzing        04:27:44
19 safety or efficacy of a medication?             04:27:47
20 A.  No, I have not.                             04:27:49
21 Q.  Have you ever participated in the design of  04:27:50
22 a clinical trial analyzing the safety or        04:27:54
23 efficacy of a medication?                       04:27:57
24 A.  No, I have not.                             04:27:58
25 Q.  Do you have any experience in analyzing the  04:28:00

280

1  clinical efficacy of a drug for a given         04:28:03
2  patient or for a given patient population?      04:28:07
3  A.  No.                                         04:28:09
4  Q.  And I assume that you also haven't published 04:28:10
5  on the clinical efficacy of a particular        04:28:12
6  drug in treating a particular patient           04:28:15
7  population?                                      04:28:17
8  A.  No, I have not.                             04:28:18
9  Q.  And I assume you haven't taught clinical     04:28:18
10 medical school classes, either?                 04:28:23
11 A.  No, I have not.                             04:28:26
12 Q.  I do understand, though, that you've         04:28:26
13 conducted peer review for a medical journal,    04:28:30
14 for the Journal of the American Medical         04:28:32
15 Association; is that right?                      04:28:35
16 A.  Among others, yes, that's true.            04:28:36
17 Q.  As a referee for the Journal of the American 04:28:41
18 Medical Association do you review articles      04:28:44
19 that report on the results of clinical          04:28:46
20 trials on the effects of medications in         04:28:47
21 patient populations?                            04:28:49
22 A.  No, I do not.                              04:28:52
23 Q.  What sorts of articles do you review?        04:28:53
24 A.  I review articles that relate to health     04:28:55
25 policy issues.                                   04:28:58

281

1  Q.  You wouldn't expect that the Journal of the  04:29:04
2  American Medical Association would ask an        04:29:07
3  economist to review articles reporting on       04:29:08
4  the results of clinical trials, I assume?       04:29:13
5  A.  I would not expect that, no.               04:29:16
6  Q.  In view of this, do you have any             04:29:18
7  qualifications to offer an opinion as to         04:29:20
8  what would or wouldn't stand up to peer          04:29:22
9  review in terms of an article reporting on       04:29:24
10 results of clinical trials?                      04:29:26
11     MR. NOTARGIACOMO:  Objection.              04:29:28
12 A.  My credentials are that I have a Ph.D., I do 04:29:29
13 work in health services research.  The          04:29:35
14 research design principles are broad.  The      04:29:38
15 notion of causal inference comes from           04:29:42
16 statistics generally, which are the same        04:29:45
17 methods that I use.  It's all in the same       04:29:48
18 methodological context.  And so the fact        04:29:52
19 that this is looking particularly at            04:29:54
20 clinical research I don't believe to be the     04:29:56
21 central issue.  The central issue is about      04:29:59
22 causal inference, and that's something that     04:30:01
23 I have a great deal of expertise in.           04:30:03
24 Q.  But do you have specific expertise on what a 04:30:05
25 medical journal would or wouldn't accept on     04:30:08

71  (Pages 278 to 281)

282

```
 1   the subject?                              04:30:10
 2 A.  The statements that I made are based on my    04:30:11
 3   expertise as a health services researcher.    04:30:22
 4   I feel qualified to make those statements    04:30:24
 5   generally about what's required for        04:30:26
 6   research.                                  04:30:29
 7 Q.  Okay.  In conducting your analysis in your   04:30:29
 8   declaration that's been marked as Exhibit    04:31:11
 9   1 -- you can set Exhibit 14 to one side --   04:31:13
10   you state on the first page of the          04:31:20
11   declaration, the executive summary, you     04:31:25
12   considered three different matters "(1) the  04:31:31
13   economic incentives for off-label promotion, 04:31:35
14   (2) whether empirical evidence and theory    04:31:39
15   suggests that pharmaceutical promotion could 04:31:40
16   have caused the class to be impacted, and    04:31:42
17   (3) whether such impact can be quantified    04:31:45
18   using standard methods."                    04:31:47
19 A.  Yes, I see that.                          04:31:51
20 Q.  Why did you consider the economic incentives 04:31:52
21   for off-label promotions in conducting your  04:31:54
22   analysis?                                   04:31:56
23 A.  I think it's important to put these        04:31:56
24   allegations into the context of how this    04:32:00
25   could happen in a marketplace setting, and  04:32:03
```

283

```
 1   in particular why we expect there to be       04:32:07
 2   significant reason for off-label promotion,   04:32:10
 3   that goes back to that Dorfman-Steiner        04:32:12
 4   theorem because it's essentially the          04:32:15
 5   profitability.  Once a drug is -- once the    04:32:18
 6   R&D has been done for a drug, there is every  04:32:21
 7   reason because of very low marginal costs of  04:32:25
 8   production to try to increase the volume of   04:32:28
 9   that drug.  And so in my view, the economic   04:32:31
10   incentives, it's an important condition       04:32:34
11   under which the allegations occur.            04:32:37
12 Q.  In what way is that analysis relevant to     04:32:39
13   this specific question of the impact of the   04:32:49
14   alleged conduct?  And it sounds to me as      04:32:51
15   though you analyzed it -- you analyzed that   04:32:55
16   data in order to get an understanding of      04:32:58
17   what the incentives are for a manufacturer    04:33:00
18   to conduct additional promotion.  What's the  04:33:03
19   relevance to what the actual impact would be  04:33:05
20   on class members?                             04:33:07
21 A.  So my view of the relevance here is to       04:33:08
22   inform the Court as to this particular        04:33:13
23   setting, a setting which many courts are not  04:33:16
24   familiar with in great detail, and to show    04:33:22
25   that the context in which the allegations     04:33:24
```

284

```
 1   take place is one in which there is           04:33:28
 2   reasonable expectation that the defendants    04:33:32
 3   would have profited from this kind of         04:33:35
 4   impact.  I would have been motivated to do    04:33:37
 5   that.  It's been my view it's part of the     04:33:40
 6   important story of how this happened as much  04:33:43
 7   as what impact it has.                        04:33:45
 8 Q.  I guess I maybe didn't follow from the       04:33:46
 9   answer.  Would you say that it is relevant    04:33:55
10   to the question of what the impact of the     04:33:58
11   alleged conduct was other than as --          04:34:01
12 A.  It's rel --                                  04:34:06
13 Q.  -- background?                               04:34:04
14 A.  I'm sorry.                                   04:34:05
15 Q.  That's fine.                                 04:34:07
16 A.  I believe it's relevant to showing that this 04:34:08
17   could have a broad effect.  If, for example,  04:34:13
18   in other markets where the knowledge about    04:34:20
19   the experience of a good disciplines this     04:34:23
20   kind of promotional activity where consumers  04:34:26
21   ultimately verify that the good is or isn't   04:34:29
22   worth what it was set out to be, then this    04:34:32
23   wouldn't expect to have a sustained effect.   04:34:36
24   It would only affect some small portion of    04:34:38
25   the market, and so it's relevant for          04:34:41
```

285

```
 1   thinking about the magnitude of impact here.  04:34:43
 2   It's talking about here's the setting where   04:34:46
 3   there's imperfect information, and the        04:34:48
 4   insurance coverage means there's very little  04:34:50
 5   price sensitivity, and therefore there are    04:34:54
 6   these large price margins and the incentives  04:34:56
 7   are such that off-label promotion could be a  04:34:58
 8   very profitable opportunity.                  04:35:01
 9 Q.  Okay.  Insofar as it's relevant, it's        04:35:03
10   relevant from a theoretical perspective; is   04:35:05
11   that correct?                                 04:35:08
12       MR. NOTARGIACOMO:  Objection.             04:35:08
13 A.  It's relevant from an institutional and      04:35:08
14   theoretical -- if you're including sort of    04:35:14
15   the institutional aspects of that as          04:35:17
16   theoretical, it's the context.               04:35:19
17 Q.  Okay.  You cited a number of studies on Page 04:35:22
18   7 of your declaration for the proposition     04:35:31
19   that doctors can be and sometimes are         04:35:34
20   influenced in their prescribing habits by     04:35:37
21   pharmaceutical promotion?                     04:35:40
22 A.  I'm sorry, we're on pages or paragraphs?     04:35:43
23 Q.  Pages this time, Pages 7 through 10.         04:35:45
24 A.  7 through 10, okay.  Yes.                    04:35:47
25 Q.  Do any of these studies relate specifically  04:35:49
```

72  (Pages 282 to 285)

## 286

```
1    to Neurontin?                          04:35:54
2 A. I don't believe any of these studies relate   04:35:54
3    specifically to Neurontin, no.         04:35:58
4 Q. Are any of these studies focused in any way    04:36:02
5    on specific activities of Parke-Davis or       04:36:05
6    Warner-Lambert or Pfizer?               04:36:10
7 A. Not to my knowledge.                    04:36:12
8 Q. And so the studies here are all general    04:36:14
9    studies that aren't specific to the     04:36:16
10   defendants or the prescription drug at issue   04:36:20
11   in this case?                          04:36:22
12 A. That's correct.                        04:36:23
13       MR. POLUBINSKI: Can we go off the     04:36:47
14   record for just ten seconds? We can go    04:36:48
15   right back on again.                    04:36:50
16       THE VIDEOGRAPHER: The time is       04:36:52
17   4:36. We're off the record.             04:36:54
18   (Discussion off the record.)            04:36:56
19       THE VIDEOGRAPHER: The time is       04:37:15
20   4:37. We are back on the record.        04:37:19
21 BY MR. POLUBINSKI:                        04:37:21
22 Q. All right. Let's take a look at Paragraph    04:37:21
23   29 of your declaration.                 04:37:27
24 A. Okay.                                  04:37:31
25 Q. Paragraph 29 indicates, among other things,   04:37:31
```

## 287

```
1    that the regression methods like those --  04:37:43
2    that regression methods like those that you   04:37:47
3    propose to use in your model can "estimate   04:37:49
4    average or aggregate effects on a set of   04:37:55
5    variables on an outcome of interest, such as   04:37:59
6    the quantity of a prescription drug sold."   04:38:02
7    Did I read that basically right?        04:38:06
8 A. You've read that correctly, yes.       04:38:08
9 Q. Okay. Great. Thanks. I boiled down that's   04:38:09
10   what you say -- that's what you would say   04:38:12
11   you propose to do with your model in this   04:38:13
12   case?                                  04:38:15
13 A. That's correct.                        04:38:16
14 Q. And so in that sense it's correct to say   04:38:18
15   that your model seeks to determine aggregate   04:38:20
16   effects or average effects?            04:38:22
17 A. That's correct.                        04:38:24
18 Q. In Paragraph 6 of your Clark rebuttal, which   04:38:24
19   you may still have in front of you, you   04:38:32
20   wrote that you and Dr. Hartman have put   04:38:34
21   forward a "methodology to analyze at the   04:38:37
22   aggregate class-wide level that portion of   04:38:38
23   total sales of Neurontin that would have   04:38:41
24   occurred absent the illegal promotional   04:38:43
25   activities and the incremental amount that   04:38:46
```

## 288

```
1    was induced by the illegal promotional   04:38:49
2    activities."                           04:38:50
3 A. That's correct. You've read that correctly   04:38:52
4    and understood it correctly.            04:38:55
5 Q. Now, is that a correct statement of what   04:38:55
6    you've done in this case as well?       04:38:57
7 A. The models include variables that will   04:38:58
8    capture the underlying off-label promotion   04:39:02
9    that happens for other reasons and separate   04:39:07
10   out what happens due to the allegedly    04:39:09
11   illegal promotional activities, that's   04:39:13
12   correct.                               04:39:15
13 Q. Okay. And just to make it simple, is the   04:39:15
14   language that we just read from the Clark   04:39:19
15   rebuttal, is that language equally       04:39:22
16   applicable in this case?               04:39:24
17 A. Yes, that's right.                     04:39:25
18 Q. And so it's correct to say that your   04:39:26
19   methodologies and analysis would reach a   04:39:28
20   level -- or reach a conclusion, rather, at   04:39:29
21   the aggregate class-wide level only,     04:39:32
22   correct?                               04:39:33
23 A. That's correct. That's what I've been asked   04:39:34
24   to do is propose a method to estimate    04:39:35
25   aggregate class-wide damages -- I mean,   04:39:39
```

## 289

```
1    quantities that relate to damages.      04:39:41
2 Q. And so I think we've been through this, but   04:39:43
3    just to make sure it's clear, your analysis   04:39:48
4    doesn't provide a means of determining    04:39:50
5    whether a given individual class member was   04:39:52
6    economically harmed, correct?           04:39:55
7       MR. NOTARGIACOMO: Objection.        04:39:57
8 A. My understanding is that I -- the model is   04:39:57
9    intended to generate the aggregate that I   04:40:01
10   don't look at any individual class members   04:40:05
11   to determine what, you know, their        04:40:07
12   individual impact was.                  04:40:11
13 Q. Okay. And so the model that you propose at   04:40:12
14   least wouldn't enable you to identify    04:40:15
15   individual class members for whom Neurontin   04:40:18
16   was effective, I take it?               04:40:20
17       MR. NOTARGIACOMO: Objection.        04:40:22
18 A. No, it would not.                      04:40:22
19 Q. And it wouldn't enable you to identify   04:40:24
20   individual class members who were prescribed   04:40:26
21   Neurontin for a use for which it was never   04:40:31
22   actually promoted?                     04:40:33
23       MR. NOTARGIACOMO: Objection.        04:40:35
24 A. The model will look at those specific   04:40:35
25   indications again for which there were   04:40:44
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                              516-608-2400

290

```
1    allegedly illegal promotional activities, so    04:40:47
2    if we're talking about an off-label use for    04:40:51
3    a different indication, then that won't be    04:40:53
4    in the data that I'm looking at ultimately.    04:40:57
5 Q.  Okay. And that will be -- which indications    04:41:01
6    to include or not to include will be    04:41:04
7    something upon which you receive    04:41:06
8    instructions before you run the model?    04:41:11
9 A.  That's my understanding, yes. That's what I    04:41:12
10   anticipate.    04:41:14
11 Q.  Okay. But you won't actually be conducting    04:41:15
12   that analysis yourself, I take it?    04:41:16
13 A.  I believe that I will be instructed by    04:41:18
14   counsel which indications will be subject to    04:41:20
15   the ultimate legal matter.    04:41:22
16 Q.  Okay. Your analysis in the model that you    04:41:24
17   proposed would not enable you to identify    04:41:28
18   individual class members whose doctors were    04:41:31
19   never exposed to any alleged misstatement    04:41:33
20   about Neurontin at the time of the    04:41:36
21   prescription?    04:41:37
22       MR. NOTARGIACOMO: Objection, asked    04:41:38
23   and answered.    04:41:39
24 A.  No. I won't be doing that level of    04:41:39
25   analysis, no.    04:41:42
```

291

```
1 Q.  And it wouldn't -- your model wouldn't    04:41:42
2    enable you to identify individual class    04:41:44
3    members whose doctors never relied on any    04:41:46
4    alleged misstatement about Neurontin at the    04:41:49
5    time of the prescription?    04:41:52
6       MR. NOTARGIACOMO: Objection, asked    04:41:52
7    and answered.    04:41:53
8 A.  No, it will not.    04:41:53
9 Q.  And your model wouldn't enable you to    04:41:55
10   identify individual class members whose    04:41:58
11   prescriptions were not caused in any way at    04:42:01
12   all by the alleged misstatement about    04:42:04
13   Neurontin?    04:42:05
14       MR. NOTARGIACOMO: Objection.    04:42:06
15 A.  The econometric analysis will pull out in    04:42:07
16   the aggregate the effects of the promotion,    04:42:12
17   separating that from other trends in    04:42:15
18   off-label promotion, other off-label    04:42:18
19   promotion that's associated with articles    04:42:19
20   published, that sort of thing, that are not    04:42:23
21   in the allegations. I will not look at    04:42:25
22   individual consumers or individual    04:42:28
23   physicians.    04:42:31
24 Q.  And so in that way you wouldn't be able to    04:42:31
25   identify individual class members or    04:42:33
```

292

```
1    individual patients whose prescriptions    04:42:35
2    wouldn't have been caused by any alleged    04:42:37
3    misstatement about Neurontin, correct?    04:42:40
4 A.  That's correct.    04:42:42
5 Q.  And finally, your analysis wouldn't enable    04:42:43
6    you to identify individual class members    04:42:47
7    whose doctors elected to prescribe Neurontin    04:42:50
8    to them even though they knew about the    04:42:52
9    alleged improper promotion?    04:42:54
10 A.  That's correct.    04:42:55
11 Q.  Okay. In your report you write that you    04:42:57
12   plan to use regression analysis; is that    04:43:03
13   correct?    04:43:05
14 A.  That's correct.    04:43:05
15 Q.  In the context of regression analysis, what    04:43:06
16   is an error term?    04:43:10
17 A.  Error term is the part of the unexplained    04:43:11
18   variation in whatever the outcome of    04:43:15
19   interest is.    04:43:19
20 Q.  Every regression model will have some degree    04:43:21
21   of error, I take it?    04:43:24
22 A.  That's correct.    04:43:26
23 Q.  One of the things your Clark rebuttal says    04:43:26
24   is that it describes all economic models as    04:43:31
25   a simplification of reality and that all    04:43:34
```

293

```
1    such models are simplified in some way?    04:43:38
2 A.  That's correct. A model by definition is    04:43:41
3    not the real thing.    04:43:43
4 Q.  So your model in this case isn't an    04:43:44
5    exception to that general principle?    04:43:46
6 A.  All economic models conform to that general    04:43:48
7    principal, and mine is no exception.    04:43:51
8 Q.  What does it mean for a model to be a    04:43:53
9    simplification of reality?    04:43:55
10 A.  It means that in the real world there are    04:43:58
11   any number of factors that affect every    04:44:02
12   outcome, everything that happens to every    04:44:06
13   economic factor, to the weather, to    04:44:10
14   everything. And a model looks to identify    04:44:13
15   the most important factors, and summarize    04:44:16
16   them in a sort of a finite number of    04:44:23
17   variables.    04:44:27
18 Q.  Okay. So in that sense a model, your model    04:44:27
19   in particular, will differ in some way from    04:44:32
20   what you describe as the real world; is that    04:44:34
21   correct?    04:44:36
22 A.  You're correct that the model will not be as    04:44:36
23   complete as the real world.    04:44:43
24 Q.  And that some level of error will be    04:44:44
25   tolerable in a model?    04:44:47
```

74  (Pages 290 to 293)

294

```
 1 A.  That some level of error is the standard of     04:44:47
 2      practice for economic analysis.                04:44:50
 3 Q.  And so for that reason you expect that your     04:44:58
 4      model will have some amount of built-in         04:45:01
 5      error as well?                                 04:45:04
 6 A.  I would expect all models, including mine,      04:45:05
 7      to have an error.                              04:45:08
 8 Q.  I guess a variation on the same theme, one      04:45:17
 9      of the other things that you write in the       04:45:23
10      Clark rebuttal is that "It is nearly always     04:45:25
11      the case that the researcher cannot account     04:45:27
12      for all of the factors that influence an        04:45:29
13      economic outcome."                             04:45:31
14          Does that sound correct to you?            04:45:33
15 A.  That sounds correct to me.                      04:45:35
16 Q.  Do you expect that you will encounter that      04:45:37
17      difficulty in applying your model in this       04:45:39
18      case?                                          04:45:41
19 A.  As I noted in my rebuttal, I don't see that     04:45:41
20      as a difficulty particular to this model.       04:45:45
21 Q.  Okay.                                           04:45:48
22 A.  In all economic models one has to, again,       04:45:48
23      identify the most important factors,            04:45:52
24      particularly factors that may be correlated     04:45:56
25      with, either negatively or positively, the      04:45:58
```

295

```
 1      variable of interest which would here be the    04:46:01
 2      allegedly illegal activities. And so this       04:46:05
 3      is not a problem unique to my model, it's       04:46:09
 4      something that's common to all models.          04:46:13
 5 Q.  Fair enough. But circling back to the           04:46:14
 6      question, you do expect that you will           04:46:17
 7      encounter that difficulty in applying your      04:46:19
 8      model in this case?                            04:46:22
 9          MR. NOTARGIACOMO: Objection.               04:46:23
10 A.  I'm sorry, I just -- the word "difficulty"      04:46:24
11      I'm having trouble with --                     04:46:28
12 Q.  Sure. Okay.                                     04:46:29
13 A.  -- but I expect that I will have to deal        04:46:29
14      with issues related to error in the model.     04:46:32
15 Q.  Okay. And I guess maybe to -- just to use a     04:46:36
16      different word than "difficulty" or to ask      04:46:45
17      the question differently, do you expect that    04:46:47
18      you'll encounter the inability to account       04:46:52
19      for all of the factors that influence an        04:46:54
20      economic outcome, to use the words from your    04:46:57
21      Clark rebuttal, in applying your model in       04:46:59
22      this case?                                     04:47:02
23 A.  In black-and-white terms, yes, but as an       04:47:03
24      economist I don't view that as a difficulty.    04:47:09
25      I view my challenge is to identify the most    04:47:12
```

296

```
 1      relevant variables and, again, the ones that    04:47:16
 2      are likely to be correlated with the            04:47:18
 3      variables of interest here and to model         04:47:22
 4      those appropriately. It would never occur       04:47:24
 5      to me to worry about modeling every factor      04:47:28
 6      that went into a decision.                      04:47:31
 7 Q.  All right. In your declaration you propose      04:47:34
 8      two versions of your model designed to          04:47:41
 9      measure the effects of off-label promotional    04:47:44
10      events and expenditures on total units of       04:47:47
11      Neurontin sold?                                 04:47:49
12 A.  That's correct.                                 04:47:50
13 Q.  One version of that model, Equation 1, does     04:47:50
14      not differentiate among diagnoses, correct?     04:47:58
15 A.  That's correct. It's a simplified version       04:48:00
16      of the model, yes.                             04:48:03
17 Q.  And that the other version, Equation 2, does    04:48:04
18      disaggregate by diagnosis or indication?        04:48:08
19 A.  That's correct.                                 04:48:10
20 Q.  For Equation 2, would you be running a          04:48:10
21      separate regression for each dosage and         04:48:14
22      indication combination?                         04:48:18
23 A.  That's the way the model is written, and so     04:48:20
24      that's certainly one thing that I would do      04:48:22
25      is run by dosage and indication.               04:48:24
```

297

```
 1 Q.  When you say it's one thing that you would      04:48:30
 2      do, is there some --                           04:48:32
 3 A.  To the extent that the data --                  04:48:33
 4 Q.  Is there a way in which --                      04:48:33
 5 A.  -- were available and broken out in that        04:48:34
 6      level of detail, if that's not possible         04:48:36
 7      depending on how the data look in the end,      04:48:44
 8      will aggregate dosages and look across          04:48:46
 9      dosages by indication.                         04:48:50
10 Q.  Okay. Without actually conducting the           04:48:53
11      analysis with whatever data you end up          04:48:54
12      using, you can't know at this point whether     04:48:58
13      you would run a separate regression for each    04:49:01
14      indication and dosage combination?             04:49:04
15 A.  I don't have all the data yet, which is why     04:49:06
16      I tried to talk about the possibilities and     04:49:08
17      to also describe that the more detailed the     04:49:12
18      model and the data could be, the better         04:49:15
19      would be the model.                            04:49:18
20 Q.  Okay. But at this point you don't know how     04:49:19
21      many total regressions you would therefore      04:49:22
22      be able to run?                                 04:49:24
23 A.  You're correct, I don't know.                   04:49:25
24 Q.  You write in Paragraphs 37 and 38 of your       04:49:29
25      declaration that it's possible that you         04:49:34
```

75 (Pages 294 to 297)

## 298

1  would use an even further refined model; is   04:49:39
2  that correct?   04:49:41
3  A.  Yes, that's correct.   04:49:41
4  Q.  The one possibility would be using a   04:49:41
5  comparator drug or set of comparator drugs?   04:49:44
6  A.  Yes, that's correct.   04:49:47
7  Q.  And that another possibility might be   04:49:47
8  disaggregating by geographical or clinical   04:49:50
9  submarkets?   04:49:55
10 A.  Yes, that's correct.   04:49:55
11 Q.  And then after having done that, you'd do   04:49:56
12 some version of Equation 1 or 2 perhaps as   04:50:03
13 informed by this -- or perhaps a further   04:50:05
14 refined version of Equation 1 or 2 to   04:50:09
15 calculate the number of -- or to calculate a   04:50:11
16 number for the amount of Neurontin that   04:50:17
17 would have been prescribed but for the   04:50:18
18 conduct described in the complaint?   04:50:22
19 A.  That's correct.   04:50:25
20 Q.  And then you would then use that amount to   04:50:25
21 calculate the amount of Neurontin that was   04:50:30
22 caused by defendants' allegedly improper   04:50:33
23 conduct; is that right?   04:50:37
24 A.  Well, that would be -- the amount that was   04:50:37
25 caused would be that amount that was   04:50:40

## 299

1  associated with the variables that capture   04:50:42
2  the allegedly illegal activities, right? So   04:50:46
3  that itself the coefficients would allow for   04:50:50
4  estimation of that quantity.   04:50:53
5  Q.  Okay.  Now, the implication of using or   04:50:56
6  coming up with a but for number, I assume,   04:51:03
7  isn't there some amount of Neurontin that   04:51:08
8  still would have been prescribed therefore   04:51:10
9  of the punitive class for off-label uses   04:51:11
10 even but for the allegedly improper conduct   04:51:15
11 described in the complaint; is that right?   04:51:17
12 A.  That's correct.   04:51:18
13 Q.  Okay.  In Equations 1 and 2 you use two   04:51:18
14 discrete sets of time variant factors that   04:51:25
15 impact the prescription behavior of   04:51:28
16 physicians regarding Neurontin; is that   04:51:33
17 right?   04:51:34
18 A.  I'm not sure if there are two discrete. It   04:51:34
19 depends -- in Equation 2 it's written out in   04:51:39
20 a bit more detail, and there's several   04:51:43
21 discrete sets, but maybe you can tell me   04:51:46
22 what you mean by the "two discrete sets."   04:51:49
23 Q.  Yeah, maybe that was an unfortunate choice   04:51:51
24 of words.  I don't think it probably matters   04:51:55
25 all that much.   04:51:57

## 300

1  A.  Okay.   04:51:58
2  Q.  I just want to make sure I understand what   04:51:58
3  the difference pieces --   04:52:01
4  A.  Absolutely.   04:52:02
5  Q.  -- of the model are.   04:52:03
6  XJT are the factors that are not   04:52:06
7  subject to the alleged violations described   04:52:17
8  in the complaint, correct?   04:52:21
9  A.  That's correct.   04:52:23
10 Q.  Okay.  And so these would include things   04:52:23
11 like lawful promotional activities by the   04:52:25
12 defendants?   04:52:27
13 A.  That's correct.   04:52:28
14 Q.  And so I guess you would agree with me that   04:52:35
15 there are reasons that doctors would have   04:52:37
16 prescribed Neurontin off-label that are   04:52:39
17 unrelated to the alleged improper promotion?   04:52:40
18 A.  I would agree with that statement.   04:52:43
19 Q.  Okay.  Now, XKT and XKDT, those are the   04:52:45
20 factors that are subject to the alleged   04:52:50
21 violations; is that right?   04:52:52
22 A.  That's correct.   04:52:53
23 Q.  Are they meant to include all unlawful   04:52:53
24 promotion or just fraudulent promotion?   04:52:59
25 A.  They are meant to include that promotion   04:53:07

## 301

1  which counsel instructs me the impact of   04:53:10
2  which is subject to this claim, and so I   04:53:14
3  don't know how to distinguish that in your   04:53:19
4  terminology.   04:53:21
5  Q.  Okay.  It sounds like that's not an analysis   04:53:21
6  that you've had to do yet in --   04:53:24
7  A.  To examine which were fraudulent or illegal.   04:53:27
8  Q.  Or just which factors to include within XKDT   04:53:31
9  as opposed to XJT?   04:53:37
10 A.  I have a general sense of what is in XJT,   04:53:40
11 which would include promotion for   04:53:46
12 indications, for example, that have been   04:53:48
13 approved by the FDA.  And XKT will include   04:53:51
14 promotion, those promotional activities that   04:53:57
15 I'm understood to believe are illegal   04:54:00
16 pertaining to the indications from which   04:54:02
17 there is not an approval.  Earlier you   04:54:04
18 mentioned that some of those may be legal,   04:54:17
19 but I don't know the distinction.   04:54:18
20 Q.  Okay.  Now, you would agree that it's   04:54:20
21 important in conducting your analysis that   04:54:21
22 you be able to determine whether a   04:54:24
23 particular factor falls within XJT on one   04:54:25
24 hand and XKT on the other hand?   04:54:28
25 A.  Yes, absolutely.   04:54:30

76  (Pages 298 to 301)

1 Q. And that's in part because you determine but 04:54:31
2 for prescriptions, as we've described 04:54:34
3 before, by setting the variables related to 04:54:36
4 alleged illegal promotional activities or 04:54:39
5 improper promotional activities to zero, 04:54:42
6 correct? 04:54:44
7 A. That's correct. 04:54:44
8 Q. Okay. Now, each of the equations also 04:54:44
9 includes a variable for legitimate 04:54:49
10 expenditures for promotional activities on 04:54:50
11 off-label uses, which is denoted as MT? 04:54:53
12 A. Those, I believe, are legitimate 04:54:57
13 expenditures for promotion for on-label 04:54:59
14 uses. 04:55:04
15 Q. Is it just promotions for on-label uses? 04:55:04
16 A. I'm sorry, I have to actually check to see 04:55:07
17 how it's written. For label -- no, for 04:55:10
18 standard -- on the indications for which 04:55:12
19 there's an approval. 04:55:14
20 Q. Okay. And so under MT there would be no -- 04:55:15
21 well, let me withdraw the question. 04:55:28
22 OT and ODT, those are variables that 04:55:31
23 include illegitimate expenditures for 04:55:37
24 off-label promotion -- 04:55:40
25 A. That's correct. 04:55:40

1 Q. -- correct? 04:55:41
2 A. Yes. 04:55:42
3 Q. And these are the expenditures that would 04:55:42
4 have funded the sorts of allegedly improper 04:55:48
5 activities described in the complaint? 04:55:51
6 A. That's correct. 04:55:55
7 Q. Now, again, I'm assuming here that OT or ODT 04:55:55
8 is not going to be limited to expenditures 04:55:58
9 for just fraudulent promotion? 04:56:00
10 A. I cannot -- I'm afraid that I'm not in a 04:56:04
11 position to make the distinction between 04:56:07
12 fraudulent promotion and promotional 04:56:10
13 activities that are covered in the 04:56:12
14 complaint. I guess I would have put them in 04:56:15
15 the same category, in my naive view, that 04:56:16
16 fraudulent was the general term for what was 04:56:21
17 allegedly illegal here. 04:56:22
18 Q. Okay. But in any event, OT and ODT as 04:56:25
19 currently envisioned includes all 04:56:29
20 expenditures for all off-label promotion at 04:56:32
21 this point? 04:56:34
22 A. They include, again, those off-label 04:56:34
23 promotional activities that I'm told by 04:56:39
24 counsel are subject to the allegations and 04:56:41
25 ultimately will be subject to the impact 04:56:44

1 analysis. 04:56:46
2 Q. Okay. Here again you would agree that it's 04:56:47
3 important in conducting your analysis that 04:56:49
4 you be able to distinguish between whether a 04:56:52
5 particular factor falls within the MT 04:56:54
6 category on the one hand and the OT or ODT 04:56:56
7 category on the other hand, correct? 04:57:00
8 A. I believe that's correct. In the limit one 04:57:02
9 would have to include a category -- an 04:57:07
10 expenditure in the legitimate side to be 04:57:10
11 conservative if one couldn't tell. 04:57:12
12 Q. Okay. Can you give us a list of the type of 04:57:14
13 legitimate promotional activities for which 04:57:26
14 you expect to have data for purposes of your 04:57:29
15 analysis? 04:57:34
16 A. For example, spending on detailing, netting 04:57:34
17 out that detailing that, for example, might 04:57:45
18 have been identified in these strategic 04:57:47
19 documents as being related to one of the 04:57:49
20 off-label indications. 04:57:51
21 Q. Any others? 04:57:53
22 A. Similarly journal advertising related to an 04:57:54
23 approved indication. 04:58:01
24 Q. Any others? 04:58:02
25 A. Again, I guess go down the list, free 04:58:08

1 samples after netting out those that were 04:58:16
2 identified in the strategic documents as 04:58:18
3 being associated with an off-label use. 04:58:21
4 Q. Okay. I assume you don't have a definitive 04:58:22
5 list at this point? 04:58:29
6 A. I don't have a definitive list at this 04:58:29
7 point, no. I've seen examples of all of 04:58:32
8 these above. 04:58:34
9 Q. And again you recognize the importance of 04:58:35
10 each of these of netting out -- of 04:58:38
11 separating on the one hand activities or 04:58:40
12 expenditures on on-label activities on the 04:58:43
13 one hand and expenditures or activities 04:58:48
14 related to off-label activities on the other 04:58:50
15 hand? 04:58:52
16 A. To the extent possible, and, again, you 04:58:52
17 know, where distinctions can't be made, then 04:58:55
18 the model would have to ignore those 04:58:58
19 activities. 04:59:00
20 Q. When you say "ignore those activities," what 04:59:02
21 do you mean? 04:59:04
22 A. They would have to be included in the 04:59:04
23 legitimate expenditures. We certainly have 04:59:05
24 good data on total promotional expenditures. 04:59:10
25 These data can be purchased from sources 04:59:12

77 (Pages 302 to 305)

306

```
 1    like IMS Health.                      04:59:15
 2 Q. Okay.  On the same note you haven't at this    04:59:20
 3    point undertaken to begin an analysis of     04:59:26
 4    separating out legitimate expenditures      04:59:30
 5    activities (sic) on the one hand from       04:59:35
 6    improper activities expenditures on the     04:59:37
 7    other hand?                         04:59:41
 8 A. I am not -- I haven't received access to the   04:59:41
 9    data with which I'm going to do that, so     04:59:46
10    there were documents requested to that      04:59:49
11    effect.                             04:59:53
12 Q. Do you think there's any chance that you      04:59:53
13    would employ Equation 1 instead of Equation   04:59:57
14    2 when you run your model in this case?      04:59:59
15 A. My understanding of the case at this point    05:00:02
16    is that it's likely to be done indication by    05:00:07
17    indication.  So Model 2 seems the most       05:00:11
18    likely result.                      05:00:14
19 Q. Would there have been a reason even back      05:00:16
20    when you wrote your declaration why you      05:00:19
21    would have run Equation 1 instead of        05:00:23
22    Equation 2?                         05:00:25
23 A. Largely it's there as a simple starting       05:00:26
24    point before adding the complexity of        05:00:32
25    looking by indication.                05:00:34
```

307

```
 1 Q. Now, even if you weren't separating out      05:00:35
 2    indication by indication, Equation 1 doesn't   05:00:39
 3    provide any way at all to exclude increases    05:00:42
 4    in on-label prescriptions due to its -- due   05:00:45
 5    to the defendants' promotion for off-label    05:00:50
 6    uses, does it?                      05:00:52
 7 A. It's the feedback effect from the off-label    05:00:53
 8    promotion, not as it's written.  It's a very   05:00:59
 9    general equation, so it doesn't distinguish    05:01:03
10    by indication, and therefore it doesn't do    05:01:05
11    what you're saying, yes.              05:01:07
12        MR. POLUBINSKI:  Okay.  It's a      05:01:18
13    little after 5:00.  I don't know if you're    05:01:19
14    still interested in ending it at 5:00.  I     05:01:21
15    think I've actually made decent progress, so   05:01:24
16    I'm fairly confident that we could get       05:01:27
17    through this in seven hours tomorrow if we    05:01:30
18    break now.  Sounds, Professor Rosenthal, as   05:01:33
19    though you're losing your voice.          05:01:36
20        THE WITNESS:  That sounds good.      05:01:39
21        MR. POLUBINSKI:  Then why don't we   05:01:41
22    call it a day.                      05:01:42
23        THE WITNESS:  That's good.  Then we   05:01:42
24    can try to start promptly tomorrow since we   05:01:43
25    were getting set up today.             05:01:45
```

308

```
 1        MR. POLUBINSKI:  That will be good,   05:01:45
 2    yeah.                               05:01:45
 3        THE WITNESS:  Hopefully tomorrow     05:01:47
 4    will be more efficient.               05:01:48
 5        MR. POLUBINSKI:  Good.  Good.        05:01:49
 6    Okay.  Well, thanks.  We'll be back at 9:00   05:01:51
 7    a.m. tomorrow.                      05:01:53
 8        THE WITNESS:  Okay.                 05:01:54
 9        THE VIDEOGRAPHER:  The time is       05:01:54
10    5:01.  This is the end of Tape 5, the        05:01:57
11    deposition's adjourned, and we are off the    05:02:03
12    record.                             05:02:05
13        (Whereupon the deposition was        05:02:06
14         adjourned at 5:01 p.m.)
15
16
17    _____
18    MEREDITH B. ROSENTHAL
19
20
21    Subscribed and sworn to before me
22    this     day of        , 2006.
23
24
25    _____
            NOTARY PUBLIC
```

309

```
 1       ATTACH TO THE DEPOSITION OF
          MEREDITH B. ROSENTHAL, Ph.D.
 2    CASE:  IN RE:  NEURONTIN MARKETING, SALES
          PRACTICES, AND PRODUCTS LIABILITY LITIGATION
 3
 4          ERRATA SHEET
      INSTRUCTIONS:  After reading the transcript
 5    of your deposition, note any change or
      correction to your testimony and the reason
 6    therefor on this sheet.  DO NOT make any
      marks or notations on the transcript volume
 7    itself.  Sign and date this errata sheet
      (before a Notary Public, if required).
 8    Refer to Page 311 of the transcript for
      errata sheet distribution instructions.
 9
      PAGE  LINE
10          CHANGE:
            REASON:
11          CHANGE:
            REASON:
12          CHANGE:
            REASON:
13          CHANGE:
            REASON:
14          CHANGE:
            REASON:
15          CHANGE:
            REASON:
16          CHANGE:
            REASON:
17          CHANGE:
            REASON:
18          CHANGE:
            REASON:
19          CHANGE:
            REASON:
20
21    I have read the foregoing transcript of my
      deposition and except for any corrections or
22    changes noted above, I hereby subscribe to
      the transcript as an accurate record of the
23    statements made by me.
24
25    _____
      MEREDITH B. ROSENTHAL, Ph.D.    DATE
```

78  (Pages 306 to 309)

310

1    United States District Court
2    District of Massachusetts
3
4        I, Jessica L. Williamson, Registered,
5    Merit Reporter, Certified Realtime Reporter
6    and Notary Public in and for the
7    Commonwealth of Massachusetts, do hereby
8    certify that MEREDITH B. ROSENTHAL, Ph.D.,
9    the witness whose deposition is hereinbefore
10   set forth, was duly sworn by me and that
11   such deposition is a true record of the
12   testimony given by the witness.
13       I further certify that I am neither
14   related to or employed by any of the parties
15   in or counsel to this action, nor am I
16   financially interested in the outcome of
17   this action.
18       In witness whereof, I have hereunto set
19   my hand and seal this 27th day of October,
20   2006.
21
22
23       Jessica L. Williamson, RMR, RPR, CRR
24       Notary Public, CSR No. 138795
25       My commission expires: 12/18/2009

311

1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3
4        The original of the Errata Sheet has
5    been delivered to Edward Notargiacomo, Esq.
6        When the Errata Sheet has been
7    completed by the deponent and signed, a copy
8    thereof should be delivered to each party of
9    record and the ORIGINAL delivered to Edmund
10   Polubinski III, Esq. to whom the original
11   deposition transcript was delivered.
12
13       INSTRUCTIONS TO DEPONENT
14
15       After reading this volume of your
     deposition, indicate any corrections or
16   changes to your testimony and the reasons
     therefor on the Errata Sheet supplied to you
17   and sign it. DO NOT make marks or notations
     on the transcript volume itself.
18   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
19   COMPLETED AND SIGNED ERRATA SHEET WHEN
20   RECEIVED.
21
22
23
24
25

79  (Pages 310 to 311)

312

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3            MDL Docket No. 1629

4           Master File No. 04-10981

5

6     *   *   *   *   *   *   *   *   *   *   *   *   *   *

7     IN RE:  NEURONTIN MARKETING, SALES          *

8     PRACTICES, AND PRODUCTS LIABILITY           *

9     LITIGATION                                  *

10    - - - - - - - - - - - - - - - - - - - - - - - - -    *

11    THIS DOCUMENT RELATES TO:                   *

12    ALL MARKETING AND SALES PRACTICES           *

13    ACTIONS                                     *

14    *   *   *   *   *   *   *   *   *   *   *   *   *   *

15

16                   VOLUME II

17.              PAGES 312 - 546

18

19

20      CONTINUED VIDEOTAPED DEPOSITION OF

21         MEREDITH B. ROSENTHAL, Ph.D.

22

23

24    DATE:  WEDNESDAY, OCTOBER 25, 2006

25    TIME:  9:03 A.M. TO 2:35 P.M.

M. ROSENTHAL

313

1      CONTINUED VIDEOTAPED DEPOSITION OF
2  MEREDITH B. ROSENTHAL, Ph.D., a witness
3  called on behalf of the Defendants,
4  pursuant to the Federal Rules of Civil
5  Procedure, before Jessica L. Williamson,
6  Registered Merit Reporter, Certified
7  Realtime Reporter and Notary Public in and
8  for the Commonwealth of Massachusetts, at
9  the Offices of Hare & Chaffin, 160 Federal
10  Street, Boston, Massachusetts, on
11  Wednesday, October 25, 2006, commencing at
12  9:03 a.m.
13
14  A P P E A R A N C E S
15
16  HAGENS BERMAN SOBOL SHAPIRO LLP
17    (By Edward Notargiacomo, Esq.)
18    One Main Street
19    Fourth Floor
20    Cambridge, Massachusetts  02142
21    (617) 482-3700
22    ed@hbsslaw.com
23    Counsel for the Plaintiffs
24
25

315

1           I N D E X
2  DEPONENT                    PAGE
3  MEREDITH B. ROSENTHAL, Ph.D.
4  Examination By Mr. Polubinski       315
5
6         E X H I B I T S
7  NO.                         PAGE
8  15  Document headed "ICD-9 Codes     391
9      for Neurontin, From IMS File,
        Ben Sommers, August 3, 2005"
10  16  Affidavit of C. Seth            410
        Landefeld, M.D. and Michael
11      Steiman, M.D.
12  17  Document headed "National       425
        Ambulatory Medical Care
13      Survey, 2006 Patient Record"
14
15
16
17
18
19
20  Note:  Original Exhibits 15 - 17 were
21  retained by the court reporter and
22  forwarded to Veritext New York for
23  distribution.
24
25

314

1  A P P E A R A N C E S, Continued
2
3  DAVIS POLK & WARDWELL
4    (By Edmund Polubinski III, Esq.
5    and Paul Mishkin, Esq.)
6    450 Lexington Avenue
7    New York, New York  10017
8    (212) 450-4429
9    edmund.polubinski@dpw.com
10    paul.mishkin@davispolk.com
11    Counsel for the Defendants
12
13  ALSO PRESENT:
14    Rahul Guha, Cornerstone Research
15
16
17
18
19
20
21
22
23
24
25

316

1        P R O C E E D I N G S      09:03:09
2      THE VIDEOGRAPHER:  Good morning.   09:03:09
3  We are recording and are now on the record.   09:03:18
4  Today's date is October 25th, 2006, and the   09:03:20
5  time is 9:03 a.m.  My name is George   09:03:23
6  Dobrentey.  I'm a legal videographer for   09:03:27
7  Veritext New York.  This is the deposition   09:03:31
8  of Meredith Rosenthal, In Re:  Neurontin   09:03:32
9  Marketing and Practices Litigation in the   09:03:35
10  U.S. District Court for the District of   09:03:37
11  Massachusetts, Master File No. 04-10981.   09:03:39
12      This deposition is being taken at   09:03:43
13  160 Federal Street in Boston,   09:03:46
14  Massachusetts.  The court reporter is   09:03:48
15  Jessica Williamson.  The counsel will state   09:03:49
16  their appearances, and the court reporter   09:03:51
17  will administer the oath.   09:03:53
18      MR. POLUBINSKI:  Ted Polubinski   09:03:55
19  from Davis Polk representing the   09:03:57
20  defendants.   09:03:59
21      MR. MISHKIN:  Paul Mishkin from   09:04:00
22  Davis Polk for the defendants.   09:04:01
23      MR. GUHA:  Rahul Guha from   09:04:05
24  Cornerstone Research.   09:04:06
25      MR. NOTARGIACOMO:  Ed   09:04:06

2 (Pages 313 to 316)

M. ROSENTHAL

```
                                                    317
1    Notargiacomo, Hagens Berman Sobol Shapiro,     09:04:08
2    for the plaintiffs.                            09:04:09
3
4        MEREDITH B. ROSENTHAL, Ph.D.,
5    a witness called on behalf of the
6    Defendants, having first been duly sworn,
7    was deposed and testifies as follows:
8
9        DIRECT EXAMINATION
10
11   BY MR. POLUBINSKI:                             09:04:17
12 Q. Good morning, Professor Rosenthal.            09:04:17
13 A. Good morning.                                 09:04:21
14 Q. You would agree that a range of factors may   09:04:22
15   influence individual doctors' individual       09:04:25
16   prescription decisions, correct?              09:04:29
17       MR. NOTARGIACOMO: Objection.               09:04:31
18 A. Yes, I would agree with that.                 09:04:31
19 Q. And if a particular factor might influence    09:04:32
20   a particular describing decision, is it        09:04:35
21   least possible that the same factor could      09:04:37
22   also influence doctors' prescription          09:04:40
23   decisions in the aggregate?                    09:04:42
24       MR. NOTARGIACOMO: Objection.               09:04:44
25 A. I'm not sure if I understand, but if a        09:04:44
```

```
                                                    318
1    factor influences an individual physician      09:04:49
2    and we're looking at the aggregate and that    09:04:51
3    physician's part of that aggregate, it         09:04:54
4    would certainly play out that way.             09:04:55
5  Q. Do you have a complete list of such factors   09:04:59
6    in mind now?                                   09:05:01
7  A. I have not created an exhaustive list of      09:05:02
8    such factors. I list examples in the          09:05:07
9    declaration. When I have more data            09:05:10
10   according to the data that we've requested,    09:05:15
11   I'll begin to develop a more exhaustive        09:05:17
12   list of factors.                               09:05:19
13 Q. Okay. We would agree, though, that you        09:05:20
14   will need to at least consider all of the      09:05:24
15   various factors that might influence           09:05:26
16   prescribing behavior in developing your        09:05:28
17   model?                                         09:05:30
18 A. I will consider those factors, and as I       09:05:31
19   mentioned yesterday, in particular I'm         09:05:34
20   going to focus on factors, that is, the        09:05:36
21   primary factors that drive prescribing         09:05:38
22   choices, and those factors that might be       09:05:40
23   correlated with the variables of interest      09:05:42
24   here are the off-label, allegedly illegal      09:05:45
25   off-label promotional activities.              09:05:50
```

```
                                                    319
1  Q. Before we keep going I can tell that your     09:05:52
2    voice is --                                     09:05:58
3  A. I'm sorry.                                     09:05:58
4  Q. -- that you're having trouble with your       09:05:59
5    voice, so please let me know if you need to    09:06:00
6    take breaks at any point or if we can get      09:06:02
7    water for you or anything else --              09:06:04
8  A. Thank you.                                     09:06:06
9  Q. -- just so you know.                           09:06:06
10       What I would like to do now is go          09:06:07
11   through a list of factors, and what I would    09:06:11
12   like you to do is to tell me whether you       09:06:15
13   agree that it's possible that the following    09:06:16
14   factors could affect a doctor's decision to    09:06:19
15   prescribe Neurontin off-label in a            09:06:22
16   particular case.                               09:06:24
17 A. Okay. I understand.                           09:06:26
18       MR. NOTARGIACOMO: Just for                 09:06:28
19   clarification, the question is whether it      09:06:28
20   would affect them -- whether it would          09:06:30
21   affect an individual doctor's prescribing      09:06:33
22   decision --                                    09:06:37
23       MR. POLUBINSKI: You know,                  09:06:37
24   let's --                                       09:06:38
25       MR. NOTARGIACOMO: -- or are you            09:06:39
```

```
                                                    320
1    asking that in the aggregate?                  09:06:40
2        MR. POLUBINSKI: Well, that's a             09:06:42
3    good question.                                 09:06:42
4  BY MR. POLUBINSKI:                               09:06:42
5  Q. I'd initially been thinking we would ask      09:06:43
6    about individual doctors, but maybe just to    09:06:45
7    cut through this a little bit why don't we     09:06:48
8    ask whether these factors could affect         09:06:50
9    doctors' prescribing decisions in the         09:06:51
10   aggregate.                                     09:06:52
11 A. We can agree that the aggregate is the sum    09:06:53
12   of the individuals, and --                     09:06:55
13 Q. Exactly. And that the two are connected in    09:06:55
14   the same way that you've just testified,       09:06:58
15   correct?                                       09:07:00
16 A. I can agree with that, yes.                   09:07:01
17 Q. All right. The first possible factor is a     09:07:04
18   new article in a peer-reviewed medical         09:07:07
19   publication on the use of Neurontin to         09:07:07
20   treat the applicable condition?                09:07:11
21 A. That may have an effect, yes.                 09:07:14
22 Q. How about a new case report in a more         09:07:16
23   informal medical publication on the use of     09:07:18
24   Neurontin to treat the applicable             09:07:20
25   condition?                                     09:07:21
```

3 (Pages 317 to 320)

M. ROSENTHAL

321

1  A.  Potentially that can have an effect as well        09:07:21
2      if it were disseminated.                           09:07:25
3  Q.  How about a new article in a peer-reviewed         09:07:26
4      medical publication or any other medium            09:07:28
5      really on the use of a drug with a similar         09:07:30
6      mechanism of action to Neurontin to treat          09:07:32
7      the applicable condition?                          09:07:35
8          MR. NOTARGIACOMO:  Objection.                  09:07:37
9  A.  That may be possible.                              09:07:37
10 Q.  How about a new article in a peer-reviewed         09:07:40
11     medical publication or some other medium on        09:07:42
12     the inefficacy of a different drug that had        09:07:44
13     been used to treat the applicable                  09:07:47
14     condition?                                 09:07:48
15         MR. NOTARGIACOMO:  Objection.                  09:07:49
16 A.  It seems like we're getting further and            09:07:49
17     further away from a main effect here, but          09:07:52
18     it's certainly possible that that could            09:07:54
19     have some effect.                                  09:07:55
20 Q.  Okay.  How about a new article in a peer-          09:07:57
21     reviewed medical publication or any other          09:08:01
22     medium on the safety of Neurontin?                 09:08:03
23 A.  I can imagine that having an effect on its         09:08:05
24     use, yes.                                  09:08:10
25 Q.  How about a new article in a peer-reviewed         09:08:10

322

1      medical publication or some other medium on    09:08:15
2      the safety of a different drug that has            09:08:17
3      been used to treat the applicable                  09:08:18
4      condition?                                 09:08:20
5          MR. NOTARGIACOMO:  Objection.               09:08:20
6          MR. POLUBINSKI:  What's -- can I            09:08:22
7      ask what the grounds of the objection are?        09:08:23
8          MR. NOTARGIACOMO:  I think "or any          09:08:25
9      other medium" is vague.  It could just be         09:08:28
10     about anything, so that's my objection.  I        09:08:31
11     think the questions are vague.                     09:08:33
12         MR. POLUBINSKI:  All right.  Well,           09:08:34
13     let me just -- let me hone it.  That's            09:08:35
14     fine.                                      09:08:37
15 BY MR. POLUBINSKI:                                     09:08:38
16 Q.  A new article in any medical publication on       09:08:38
17     the safety of a different drug that had           09:08:43
18     been used to treat the applicable                 09:08:45
19     condition?                                 09:08:47
20         MR. NOTARGIACOMO:  Objection.               09:08:48
21 A.  Yes, that could have an effect.                    09:08:48
22 Q.  How about an initiative by a manufacturer         09:08:50
23     to disseminate any of those publications?         09:08:55
24 A.  Yes, that could certainly have an effect as       09:08:57
25     well.                                      09:09:01

323

1  Q.  How about a continuing medical education          09:09:01
2      seminar addressing the use of Neurontin to        09:09:04
3      treat the applicable condition?                    09:09:06
4  A.  I'm sorry, so that's the main thing we're         09:09:07
5      talking about, right?  So this is a               09:09:13
6      continuing education seminar on whatever          09:09:15
7      the indication, was the original subject          09:09:17
8      here that we're looking at.                        09:09:20
9  Q.  And the use of Neurontin to treat that            09:09:21
10     condition.                                 09:09:24
11 A.  Yes, certainly.                                    09:09:24
12 Q.  How about a more informal talk given by --         09:09:24
13     just a more informal talk maybe given by an        09:09:28
14     authority in the field that addresses the         09:09:31
15     use of Neurontin to treat the applicable          09:09:32
16     condition?                                 09:09:34
17 A.  Potentially that could have an effect as          09:09:34
18     well.                                      09:09:38
19 Q.  How about a continuing medical education          09:09:38
20     seminar that addresses the use of a drug          09:09:40
21     with a similar mechanism of action to             09:09:42
22     Neurontin to treat the applicable                 09:09:44
23     condition?                                 09:09:46
24 A.  Again, similarly it could have an effect.         09:09:46
25 Q.  How about a continuing medical education          09:09:50

324

1      seminar on the inefficacy of a different      09:09:52
2      drug that had been used to treat the same         09:09:55
3      condition we've been talking about?               09:09:57
4  A.  Yes, that could have an effect, too.              09:09:58
5  Q.  How about an informal conversation among          09:10:01
6      doctors about the doctor's clinical              09:10:03
7      experience in the use of Neurontin to treat       09:10:06
8      the condition that we're talking about?           09:10:08
9  A.  Yes, that could affect prescribing               09:10:09
10     patterns, too.                             09:10:13
11 Q.  How about an informal conversation among          09:10:15
12     doctors about their clinical experience on        09:10:17
13     the use of a drug with a similar mechanism        09:10:19
14     of action to Neurontin to treat the              09:10:21
15     applicable condition?                            09:10:22
16 A.  I'm losing score here, but I think if we          09:10:24
17     haven't already covered that one, I think         09:10:28
18     that, yes, that could have an effect.            09:10:29
19 Q.  Okay.  How about a change in formal               09:10:31
20     practice guidelines within an institution         09:10:33
21     or a professional group?                         09:10:37
22 A.  Can you explain what you mean by "formal          09:10:38
23     practice guidelines"?                       09:10:42
24 Q.  Do you have an understanding of what a            09:10:44
25     formal practice guideline might be with          09:10:47

4 (Pages 321 to 324)

M. ROSENTHAL

325

1    respect to a prescription drug?                     09:10:49
2 A. Yes. My understanding is often guidelines           09:10:51
3    are not specific to drugs, so usually the           09:10:53
4    guidelines refer to class of drugs or to            09:10:56
5    the pharmaceutical treatment following              09:11:02
6    surgery, for example, but there may be              09:11:04
7    guidelines that are specific to a specific          09:11:07
8    drug in terms of whether to use it only             09:11:09
9    after a patient has failed on something             09:11:12
10   else, for example.  So are those the kinds          09:11:14
11   of guidelines that you're talking about?            09:11:19
12 Q. Yeah.  Let's focus on the latter that              09:11:20
13   you've just described --                            09:11:22
14 A. Okay.                                              09:11:23
15 Q. -- that sort of deal with the use of a             09:11:23
16   particular prescription drug.  Could a              09:11:25
17   change in those guidelines affect the               09:11:28
18   prescription of Neurontin for a particular          09:11:30
19   off-label condition?                                09:11:31
20 A. Assuming such guidelines existed that were         09:11:33
21   specific to Neurontin, yes.                         09:11:35
22 Q. And the same would be true for informal            09:11:36
23   practice guidelines, the same way they              09:11:39
24   would be for more formal ones?                      09:11:41
25 A. Can you tell me what you mean by "informal         09:11:42

326

1    practice guidelines"?                               09:11:45
2 Q. Why don't -- why don't I withdraw the               09:11:48
3    question and just -- I'll withdraw the              09:11:51
4    question, that's fine.                              09:11:53
5 A. Okay.                                               09:11:54
6 Q. How about a new development in the                  09:11:54
7    underlying science in the particular field         09:11:56
8    that relates to the particular indication?          09:11:58
9 A. So you mean the basic science --                    09:12:01
10 Q. Yes.                                               09:12:05
11 A. -- underpinnings?                                  09:12:05
12      I guess if -- I don't know how               09:12:07
13   those kinds of changes translate into              09:12:09
14   clinical practice.  That information would          09:12:12
15   have to disseminate somehow.                        09:12:13
16 Q. Should it have disseminated somehow, could         09:12:14
17   it have impacted doctors' prescribing              09:12:17
18   behavior with respect to Neurontin for that         09:12:19
19   indication?                                         09:12:21
20 A. I guess potentially, again, it seems second        09:12:23
21   order relative to clinical changes.                 09:12:26
22 Q. How about a discussion of the use of               09:12:27
23   Neurontin in a medical school class to              09:12:30
24   treat the applicable condition?                     09:12:33
25 A. What effect would it have on current               09:12:33

327

1    practice?  Because it seems tenuous to me,          09:12:37
2    but...                                              09:12:41
3 Q. What about an effect on practice at some            09:12:42
4    point in the future?                                09:12:45
5 A. Perhaps at some point in the future it              09:12:46
6    could have an effect if those students took        09:12:48
7    that knowledge and used it in practice             09:12:51
8    subsequently.                                       09:12:54
9 Q. How about a change in the availability of          09:12:54
10   therapeutic substitutes for treating a            09:12:56
11   particular condition?                               09:12:59
12 A. That would certainly have an effect.              09:12:59
13 Q. How about FDA approval of Neurontin for a          09:13:03
14   related use?                                        09:13:05
15 A. That can potentially have an effect as            09:13:05
16   well.                                               09:13:09
17 Q. How about FDA approval of a drug with a            09:13:09
18   similar mechanism of action to Neurontin           09:13:11
19   for the applicable use?                             09:13:13
20 A. I'm sorry, could you repeat it?  I'm again         09:13:14
21   losing all --                                       09:13:21
22 Q. Yeah, sure.                                        09:13:21
23 A. -- the questions.                                  09:13:22
24      MR. POLUBINSKI:  Do you want to             09:13:22
25   read it back.                                       09:13:23

328

1 A. Thank you.                                          09:13:23
2      (Record read.)                               09:13:23
3 A. Yes, that could have an effect.                     09:13:32
4 Q. How about FDA approval of a drug with a             09:13:33
5    similar mechanism of action to Neurontin           09:13:36
6    for a related use?                                  09:13:39
7 A. Potentially that could have an effect as           09:13:41
8    well.  Again, it seems second order.                09:13:42
9 Q. How about approval of Neurontin for the            09:13:44
10   applicable use in another country?                  09:13:46
11 A. I guess possibly it could have an effect.          09:13:47
12   I think it's an empirical question.  I              09:13:52
13   don't actually know.                                09:13:54
14 Q. Okay.  And when you say "it's an empirical         09:13:55
15   question," what does that mean?                     09:13:58
16 A. I mean, it's not clear to me that                  09:13:59
17   physicians in this country would be                09:14:01
18   influenced by -- would know or be                   09:14:03
19   influenced by what was proved in other             09:14:05
20   countries.                                          09:14:09
21 Q. But you couldn't rule out the possibility          09:14:09
22   without examining the data; is that                09:14:11
23   correct?                                            09:14:13
24 A. That's correct.  If I were interested in          09:14:13
25   that question, I would need to look at the          09:14:15

5 (Pages 325 to 328)

M. ROSENTHAL

329

1    data.                                          09:14:17
2  Q. How about approval of Neurontin for a          09:14:17
3    related use in another country?               09:14:21
4  A. Yes, that could have an effect in the same     09:14:22
5    way.                                          09:14:26
6  Q. An approval of a drug with a similar           09:14:26
7    mechanism of action for the applicable use     09:14:29
8    in another country?                           09:14:31
9  A. Yes.                                           09:14:33
10 Q. How about a change in information on           09:14:35
11   Neurontin in the Physicians' Desk              09:14:37
12   Reference?                                    09:14:40
13 A. Yes. I guess depending on what kind of         09:14:42
14   information you're talking about, if it        09:14:44
15   were salient information of some kind. I'm     09:14:45
16   not sure what kind of information you're       09:14:48
17   talking about.                                09:14:49
18 Q. Well, let's think of a couple of examples.     09:14:52
19 A. Okay.                                          09:14:54
20 Q. What about a change to the long list of        09:14:55
21   possible adverse events; could that have an    09:14:57
22   impact on prescribing behavior?               09:15:01
23 A. Potentially.                                   09:15:02
24 Q. How about a warning on the label?              09:15:02
25 A. Potentially.                                   09:15:04

330

1  Q. Okay. How about a change in information in     09:15:05
2    the Physicians' Desk Reference on other        09:15:12
3    drugs with a similar mechanism of action?      09:15:14
4  A. That could potentially have an effect again    09:15:15
5    in substitution.                              09:15:18
6  Q. Okay. How about information posted on a        09:15:19
7    bulletin board on the Internet about           09:15:20
8    Neurontin and treating the applicable          09:15:24
9    condition?                                    09:15:26
10 A. I suppose plausibly that someone could use     09:15:27
11   that information.                             09:15:31
12 Q. How about more specifically information        09:15:33
13   that's posted on a medical information site    09:15:34
14   on the Internet on treatment of the           09:15:37
15   applicable condition with Neurontin.          09:15:40
16 A. I guess that could also have an effect         09:15:42
17   potentially.                                  09:15:45
18 Q. How about detailing visits about Neurontin?    09:15:52
19 A. As we discussed yesterday, we'd certainly      09:15:55
20   expect detailing visits to affect all         09:15:58
21   prescribing.                                  09:16:01
22 Q. How about detailing visits about              09:16:02
23   competitive drugs?                            09:16:05
24 A. Yes, those should have an effect as well.      09:16:06
25 Q. Provision of samples of Neurontin without      09:16:08

331

1    any other informational content?              09:16:10
2  A. I'm --                                         09:16:13
3  Q. Does my question make sense?                   09:16:16
4  A. So you mean a detailer who comes, drops off    09:16:17
5    samples and runs away without discussing       09:16:20
6    the drug?                                     09:16:22
7  Q. Without actually getting in to speak with      09:16:22
8    the doctor.                                   09:16:25
9  A. We think free samples do have an effect        09:16:25
10   independently of the detailing visit,         09:16:28
11   although it's often difficult to tell.        09:16:29
12 Q. How about provision of samples of             09:16:31
13   competitor drugs without any other            09:16:34
14   informational content?                        09:16:35
15 A. Yes, that would have an effect.               09:16:37
16 Q. How about dissemination of the               09:16:38
17   manufacturer's own literature or brochures     09:16:39
18   or things like that?                          09:16:42
19 A. Potentially that would have an effect.        09:16:42
20 Q. What about the relative cost or price of       09:16:46
21   Neurontin relative to -- withdrawn.           09:16:50
22     How about the cost of Neurontin             09:16:53
23   relative to competitor drugs?                 09:16:55
24 A. Cost to whom?                                  09:16:57
25 Q. Good question. Let's take, for example,        09:16:58

332

1    the cost to a consumer who's paying for the    09:17:05
2    prescription him or herself.                  09:17:07
3  A. So you mean a change in the co-payment, for    09:17:08
4    example?                                      09:17:10
5  Q. Uh-huh. Or for somebody who's not insured     09:17:11
6    or for whom the prescription isn't insured.    09:17:14
7  A. That price in theory would have an effect.     09:17:17
8    As you know, these price effects are hard      09:17:20
9    to identify because of the fact that most      09:17:22
10   people don't pay those prices out of          09:17:24
11   pocket.                                       09:17:26
12 Q. Okay. How about a change in the relative       09:17:26
13   cost or price of a drug paid by third-party    09:17:30
14   payers, reimbursement for the drug?           09:17:35
15 A. Potentially there could be some kind of        09:17:36
16   effect there. It's not clear that it's a      09:17:38
17   linear effect, that there is an effect for     09:17:40
18   every increment that has to do with the --     09:17:44
19   at some level the relative price may          09:17:46
20   matter.                                       09:17:47
21 Q. How about insurance coverage guidelines for    09:17:49
22   Neurontin?                                    09:17:51
23 A. Can you explain what you mean by "insurance    09:17:52
24   coverage guidelines"? Just simply whether      09:17:56
25   it's covered or not?                          09:17:58

6 (Pages 329 to 332)

M. ROSENTHAL

333

1  Q.  Yeah.                                        09:18:00
2  A.  Certainly whether it's covered or not will   09:18:00
3      have an effect on its use.                   09:18:02
4  Q.  And will whether or not a competitor drug    09:18:04
5      is covered have an effect on Neurontin's     09:18:08
6      use for that condition -- for the            09:18:10
7      applicable condition?                        09:18:12
8  A.  Yes.                                         09:18:17
9  Q.  Now, we've been talking about insurance      09:18:19
10     coverage guidelines. How about coverage      09:18:21
11     guidelines for PBMs? Do you know what I'm    09:18:23
12     talking about when I say PBM?                09:18:25
13 A.  I do know what you're talking about when     09:18:27
14     you say PBM. And, again, do you mean just    09:18:29
15     whether or not it's covered?                 09:18:32
16 Q.  I do.                                        09:18:34
17 A.  Okay. Then the same way, must ensure that    09:18:35
18     a PBM is acting essentially as the insurer   09:18:41
19     for pharmaceuticals, so...                   09:18:43
20 Q.  How about the use of a prior authorization   09:18:45
21     program by a third-party payer for           09:18:53
22     Neurontin?                                   09:18:54
23 A.  If a third-party payer required prior        09:18:55
24     authorization, that would have an effect on  09:18:57
25     Neurontin prescribing.                       09:18:59

334

1  Q.  Do you know what a disease management        09:19:00
2      program is?                                  09:19:06
3  A.  I do. Do you?                                09:19:06
4  Q.  Why don't I ask you to tell me what it is,   09:19:08
5      at least as you understand it.               09:19:12
6  A.  Disease management programs are usually      09:19:13
7      condition-specific, although sometimes       09:19:15
8      they're more complex efforts to coordinate   09:19:17
9      and improve the quality of care for people   09:19:21
10     with chronic diseases, clearly.              09:19:23
11 Q.  Okay. Would the implementation of a          09:19:25
12     disease management program have an           09:19:27
13     impact -- an implementation of a disease     09:19:29
14     management program that offers guidelines    09:19:31
15     in the treatment of the applicable           09:19:35
16     condition have an impact on the use of       09:19:37
17     Neurontin to treat that condition?           09:19:40
18 A.  Again, if that program had guidelines that   09:19:41
19     were specific to Neurontin therapy, then     09:19:45
20     that could have an effect.                   09:19:48
21 Q.  Are you familiar with the term "academic     09:19:51
22     detailing"?                                  09:19:53
23 A.  I am.                                        09:19:54
24 Q.  What does that mean?                         09:19:55
25 A.  Academic detailing is an effort to inform    09:19:55

335

1      physicians about pharmaceutical therapies    09:20:00
2      generally, it could be on any topic, but     09:20:04
3      pharmaceutical therapies in the same way     09:20:06
4      that the industry does but using scientific  09:20:08
5      data instead of commercial promotional       09:20:12
6      information. So it's one-on-one. That's      09:20:14
7      the important piece of it, is that it's      09:20:18
8      peer-to-peer, one-on-one counseling.         09:20:21
9  Q.  Would the implementation of an academic      09:20:22
10     detailing program on Neurontin have an       09:20:29
11     impact on prescription behavior with         09:20:31
12     respect to Neurontin?                        09:20:34
13 A.  If such a program were targeting Neurontin   09:20:35
14     use, then yes.                               09:20:38
15 Q.  All right. How about the availability of     09:20:41
16     Neurontin on a hospital or insurance         09:20:43
17     formulary?                                   09:20:45
18 A.  Whether it's on the formulary would be       09:20:46
19     similar to whether it's covered, so yes,     09:20:48
20     the same way.                                09:20:51
21 Q.  And how about the availability of a          09:20:53
22     competitor drug on a formulary, an           09:20:54
23     insurance or hospital formulary?             09:20:57
24 A.  Yes, same.                                   09:20:59
25 Q.  How about a decision by a hospital to bar    09:21:00

336

1      acceptance of samples by its professionals?  09:21:03
2  A.  Yes, I would expect that to have some        09:21:05
3      effect.                                      09:21:09
4  Q.  How about a newspaper article reflecting     09:21:09
5      concerns about improper promotion by         09:21:13
6      defendants for off-label uses?               09:21:16
7  A.  I suppose that could have some effect as     09:21:18
8      well.                                        09:21:21
9  Q.  And you're familiar with the Franklin case;  09:21:21
10     you testified about that yesterday?          09:21:25
11 A.  Yes.                                         09:21:27
12 Q.  How about a news broadcast on the Franklin   09:21:27
13     case; would that have an impact on doctors'  09:21:30
14     prescribing behavior of Neurontin?           09:21:33
15 A.  Potentially.                                 09:21:36
16 Q.  How about an advertisement by a law firm     09:21:38
17     seeking to recruit individuals who have      09:21:40
18     taken Neurontin to file personal injury      09:21:42
19     lawsuits against the defendants?             09:21:44
20 A.  I guess I'm not sure how those would get     09:21:46
21     out to physicians, but if physicians saw     09:21:51
22     such advertisements, possibly.               09:21:55
23 Q.  So am I correct that your model would need   09:21:58
24     to at least consider whether to take into    09:22:10
25     account each of the factors that we've just  09:22:12

7 (Pages 333 to 336)

M. ROSENTHAL

**337**

1 discussed in determining the effects of 09:22:15
2 off-label promotional events and 09:22:17
3 expenditures on total aggregate 09:22:19
4 prescriptions of Neurontin? 09:22:21
5 A. So the model -- in setting up the model 09:22:22
6 I'll consider those factors that I deem to 09:22:26
7 be important determinants of quantity and 09:22:30
8 in particular like I would spend most of 09:22:33
9 my time worrying about those where the 09:22:36
10 timing is correlated with the off-label 09:22:38
11 promotions, the levels. The intensity of 09:22:40
12 these other factors could be correlated and 09:22:44
13 therefore confused with the off-label 09:22:47
14 promotions. 09:22:48
15 In addition, there are elements of 09:22:50
16 the model intended to capture some of these 09:22:53
17 other factors. For example, by using time 09:22:55
18 trends, linear quadratic time trends to 09:22:59
19 capture other secular trends in what's 09:23:04
20 happening in the market by including 09:23:07
21 variables on other drugs. So certainly 09:23:09
22 those factors would be considered and 09:23:12
23 incorporated either explicitly or captured 09:23:14
24 in the time trend, the secular trend. 09:23:16
25 Q. Okay. Just so I understand it, though, I 09:23:19

**338**

1 think you are saying that you would need to 09:23:21
2 at least consider the various factors that 09:23:23
3 we talked about? 09:23:25
4 A. Can we agree what "consider" means? 09:23:26
5 Q. Consider to the extent they need to be 09:23:29
6 reflected in your model. 09:23:32
7 A. Certainly I'll consider a wide range of 09:23:33
8 factors, including the types that we've 09:23:35
9 just discussed. 09:23:38
10 Q. Do you know how many in total there could 09:23:39
11 be? 09:23:43
12 A. No, I don't think it's possible to say. 09:23:43
13 And certainly the numbers depend on whether 09:23:47
14 you define them as finely as you have done 09:23:49
15 or if you, say, consider, you know, 09:23:52
16 promotional efforts of competitors, new 09:23:54
17 drug introduction, so there may be many 09:24:00
18 that we consider. 09:24:01
19 Q. There could be -- withdrawn. 09:24:06
20 How do you plan to consider these 09:24:08
21 different factors? 09:24:11
22 A. Well, I will start with the literature on 09:24:12
23 what -- the impact of promotion on drug 09:24:16
24 utilization and look at models that have 09:24:21
25 been done in the past and what factors 09:24:23

**339**

1 they've included, and certainly of course 09:24:25
2 those do include things like, as you've 09:24:29
3 mentioned, competitor new drug entry into 09:24:31
4 the class, competitors' promotional 09:24:35
5 efforts, other secular trends that may 09:24:38
6 affect prescribing. 09:24:41
7 Q. Aside from reviewing the literature to see 09:24:42
8 what past models have done, what else would 09:24:46
9 you need to do? 09:24:48
10 A. The first place I would start is the 09:24:49
11 literature for sure. I may consult some of 09:24:52
12 my clinical colleagues as well. 09:24:54
13 Particularly I may try to find experts in 09:24:57
14 the treatment -- in the areas of treatment 09:24:58
15 for the indications that ultimately I'm 09:25:01
16 asked to model the indications. 09:25:05
17 Q. Do you need, yourself, to actually look at 09:25:06
18 data with respect to some number or all of 09:25:09
19 these factors to figure out whether they 09:25:11
20 had a measurable impact on prescription 09:25:13
21 decisions? 09:25:17
22 A. Not necessarily. Modeling strategies 09:25:17
23 generally -- and economics you start with a 09:25:20
24 good theoretical model and include those 09:25:23
25 variables that should theoretically be 09:25:26

**340**

1 included. There is, of course, some point 09:25:28
2 when you're specifying the model itself 09:25:30
3 that you need to look at data. You can't 09:25:33
4 always include all variables because of 09:25:34
5 high degrees of correlation, for example. 09:25:36
6 Then at that point I would need to see 09:25:40
7 data, but the starting point is really to 09:25:41
8 develop a good theory. 09:25:43
9 Q. But at some point -- I guess would you rely 09:25:46
10 on your theory alone, then, to rule out 09:25:49
11 whether to consider individual factors in 09:25:51
12 running your model? 09:25:55
13 A. Not alone, but in some cases I might rely 09:25:56
14 alone on the theories. For example, there 09:26:00
15 are some things that I wouldn't include, 09:26:03
16 the ambient temperature based on the theory 09:26:06
17 that it has no affect on Neurontin 09:26:09
18 prescribing, and so I wouldn't consider 09:26:12
19 data on that. 09:26:14
20 Q. Fair enough. I think what we're talking 09:26:14
21 about are the factors that we've just 09:26:16
22 discussed. For purposes of those factors 09:26:18
23 do you anticipate relying on the literature 09:26:19
24 to exclude any of them from your analysis? 09:26:21
25 A. I would anticipate relying on the 09:26:24

8 (Pages 337 to 340)

M. ROSENTHAL

**341**

```
1    literature and data where possible, but it        09:26:27
2    does seem possible to me that I won't have          09:26:29
3    data on every one of those factors, and             09:26:31
4    then I would rely on theory and the                 09:26:33
5    literature as to whether it was an                  09:26:35
6    important factor.                        09:26:41
7  Q. Maybe just to get a little more precision          09:26:54
8    on this why don't we go back and look at a          09:26:57
9    few of these individual things --           09:27:00
10 A. Okay. The ones you mentioned?               09:27:00
11 Q. Yeah, a few of the factors that we               09:27:01
12    discussed --                          09:27:03
13 A. Okay.                           09:27:03
14 Q. -- that you said might impact physician           09:27:03
15    prescribing behavior. Let's start with the        09:27:05
16    first one, which is an article in a peer-          09:27:09
17    reviewed medical publication on the use of         09:27:12
18    Neurontin to treat the applicable               09:27:13
19    condition.                        09:27:15
20 A. Okay.                          09:27:15
21 Q. How do you anticipate that you would go           09:27:15
22    about finding out whether you would include       09:27:20
23    that particular publication -- whether you        09:27:22
24    would include publication of a particular         09:27:24
25    article in your model?                 09:27:25
```

**342**

```
1  A. In that case of those articles, if there         09:27:28
2    were significant studies published, new           09:27:32
3    data published on Neurontin, in all               09:27:34
4    likelihood we would search PubMed and find         09:27:36
5    those articles and look to see about their        09:27:41
6    timing and see whether it made sense to           09:27:43
7    include them in the model.                09:27:46
8  Q. And so you would analyze each individual         09:27:50
9    article as to whether it fit that -- fit       09:27:52
10    those criteria?                    09:27:54
11 A. In all likelihood the number of articles         09:27:55
12    providing new data on Neurontin is a             09:27:58
13    reasonable number that we can find in the        09:28:00
14    literature review and decide which of them       09:28:02
15    provides new data on either effects or side      09:28:05
16    effects of Neurontin.                09:28:09
17 Q. What would you believe the reasonable           09:28:10
18    number to be for purposes of your last           09:28:14
19    answer?                         09:28:16
20 A. You mean whether it would be feasible?          09:28:16
21 Q. Yeah.                          09:28:19
22 A. I don't know. Something less than a             09:28:19
23    thousand.                        09:28:21
24 Q. Okay. But it's at least possible that some       09:28:21
25    number less than a thousand articles would       09:28:35
```

**343**

```
1    have had some impact on prescribing            09:28:38
2    behavior of Neurontin --                09:28:41
3        MR. NOTARGIACOMO: Objection.          09:28:42
4  Q. -- for off-label uses?                 09:28:43
5  A. I believe I've already said it's at least      09:28:44
6    possible.                        09:28:46
7  Q. Okay. We also talked about new articles in      09:28:46
8    peer-reviewed medical publications on the         09:28:55
9    use of drugs with similar mechanisms of          09:28:59
10    action to Neurontin to treat conditions.         09:29:01
11    How would you go about determining whether       09:29:04
12    that's a factor that you would include in        09:29:06
13    your model?                       09:29:08
14 A. I think in that case I would need to             09:29:09
15    consult a clinical expert in those areas.        09:29:12
16    Clearly I couldn't make that judgment about       09:29:15
17    whether it was a similar mechanism.          09:29:18
18 Q. And once -- well, first question is, you          09:29:28
19    haven't consulted a clinical expert on that       09:29:30
20    now, I take it?                    09:29:32
21 A. No, I have not.                   09:29:32
22 Q. Okay. And then when you did, if you came         09:29:33
23    up with a list of drugs with a similar          09:29:37
24    mechanism of action, would you do the same       09:29:39
25    sort of search of PubMed that you described       09:29:42
```

**344**

```
1    before --                        09:29:45
2  A. Poten --                       09:29:45
3  Q. -- for articles?                  09:29:46
4  A. Sorry. I'm still cutting you off.            09:29:47
5        Potentially in combination with          09:29:52
6    some input from said clinical expert, so it       09:29:54
7    would certainly make sense to use some          09:29:56
8    clinical expertise on what were the             09:30:02
9    important trends in treatment in this area.       09:30:04
10 Q. Okay. One of the other factors that we           09:30:06
11    discussed was a continuing medical              09:30:16
12    education seminar addressing the use of          09:30:18
13    Neurontin to treat an applicable condition.       09:30:20
14    How would you go about determining whether       09:30:22
15    a particular seminar would have had an          09:30:25
16    impact on prescribing behavior?             09:30:27
17 A. So in part we have seen data collected by        09:30:28
18    Parke-Davis, fill in Warner-Lambert there.       09:30:34
19 Q. We can say defendants, to make it easier.       09:30:36
20 A. Defendants. The defendants have some data        09:30:41
21    on CME, continuing medical education, for         09:30:42
22    Neurontin. They have documented events and       09:30:47
23    attendance, that sort of thing. So we do         09:30:50
24    have some data there. And so I would start       09:30:53
25    with that.                        09:30:57
```

9 (Pages 341 to 344)

M. ROSENTHAL

| | 345 |
|---|---|
| 1 | Q. Are there any other sources of data that 09:30:57 |
| 2 | you would look to on this, or would that be 09:30:59 |
| 3 | the principal source? 09:31:01 |
| 4 | A. I think that would be the principal source. 09:31:02 |
| 5 | There are also data collected by IMS Health 09:31:04 |
| 6 | in the aggregate on meetings and events 09:31:08 |
| 7 | associated with drugs, including Neurontin 09:31:11 |
| 8 | and Neurontin's competitors. 09:31:14 |
| 9 | Q. Okay. In terms of the first category of 09:31:16 |
| 10 | data, the data from defendants, is it your 09:31:22 |
| 11 | understanding that that data will include 09:31:29 |
| 12 | information about events that the 09:31:31 |
| 13 | defendants didn't sponsor? When I say 09:31:33 |
| 14 | "events," I mean continuing medical 09:31:36 |
| 15 | education events. 09:31:38 |
| 16 | A. I'm not altogether clear on whether they 09:31:39 |
| 17 | only have data on events that they 09:31:43 |
| 18 | sponsored or events where they had 09:31:44 |
| 19 | sponsored a speaker, for example, so made a 09:31:46 |
| 20 | payment for a physician to give a talk 09:31:50 |
| 21 | about research. So it may be that there 09:31:53 |
| 22 | are some meetings and events that they 09:31:56 |
| 23 | don't have direct spending -- direct record 09:31:58 |
| 24 | of. 09:32:00 |
| 25 | Q. Is it your view that meetings or events 09:32:03 |

| | 346 |
|---|---|
| 1 | that weren't supported by the defendants 09:32:06 |
| 2 | could have had an impact on prescribing 09:32:08 |
| 3 | behavior of Neurontin for off-label uses? 09:32:10 |
| 4 | A. Potentially. 09:32:12 |
| 5 | Q. And how would you go about finding out 09:32:15 |
| 6 | whether those events had a measurable 09:32:16 |
| 7 | impact? 09:32:18 |
| 8 | A. I think at this point I haven't tried to 09:32:18 |
| 9 | get all the data on this, but I guess as a 09:32:23 |
| 10 | starting place I would start with the 09:32:25 |
| 11 | relevant medical societies. So, again, 09:32:27 |
| 12 | condition by condition there would be 09:32:32 |
| 13 | different relevant medical societies. 09:32:33 |
| 14 | Q. When you say you would start with the 09:32:38 |
| 15 | relevant medical societies, what would you 09:32:40 |
| 16 | do? 09:32:43 |
| 17 | A. So contact, excuse me, the medical 09:32:43 |
| 18 | education staff at the medical societies 09:32:45 |
| 19 | for neurology, for psychiatry, yes, as was 09:32:48 |
| 20 | relevant, see what kind of data they had. 09:32:53 |
| 21 | Q. And what impact would it have on your 09:32:57 |
| 22 | analysis if they didn't have data 09:33:00 |
| 23 | stretching back to the beginning of the 09:33:02 |
| 24 | class period, 1994? 09:33:03 |
| 25 | A. Then I would have to consider other 09:33:05 |

| | 347 |
|---|---|
| 1 | mechanisms for modeling that effect. 09:33:09 |
| 2 | Q. What other mechanisms would you consider? 09:33:17 |
| 3 | A. So in part the time trend might pick up 09:33:20 |
| 4 | these kinds of events. The other variables 09:33:23 |
| 5 | that we talked about, including publication 09:33:28 |
| 6 | of new articles, might pick up the timing 09:33:30 |
| 7 | of these events. If the publication of new 09:33:33 |
| 8 | articles, you know, was -- as you may know, 09:33:35 |
| 9 | the timing of publication of new releases 09:33:40 |
| 10 | is often coordinated with national 09:33:42 |
| 11 | meetings. 09:33:45 |
| 12 | So, for example, you always see 09:33:45 |
| 13 | the latest results of cardiovascular 09:33:47 |
| 14 | disease clinical trials come out at the 09:33:51 |
| 15 | same time as the big CME events for 09:33:53 |
| 16 | cardiovascular specialists. And so I 09:33:57 |
| 17 | looked at those kinds of data. 09:34:00 |
| 18 | Q. When you say in your last answer "pick up 09:34:02 |
| 19 | the timing of these events" -- 09:34:05 |
| 20 | A. Yes. 09:34:08 |
| 21 | Q. -- can you tell me what that means? 09:34:08 |
| 22 | A. It would be because the events in the model 09:34:09 |
| 23 | essentially would be capturing a point in 09:34:11 |
| 24 | time. There are indicator variables as I 09:34:17 |
| 25 | described, so if there was an event, there 09:34:19 |

| | 348 |
|---|---|
| 1 | would be a variable for the point in time 09:34:21 |
| 2 | at which that happens, and then potentially 09:34:23 |
| 3 | the time since the event, and therefore if 09:34:26 |
| 4 | a meeting and an article come out at the 09:34:30 |
| 5 | same time, they essentially are capturing 09:34:32 |
| 6 | the same information as far as the model's 09:34:34 |
| 7 | concerned. 09:34:37 |
| 8 | Q. Assuming that the two are coordinated? 09:34:38 |
| 9 | A. Right. 09:34:40 |
| 10 | Q. How would you decide whether they're 09:34:40 |
| 11 | sufficiently coordinated that you would be 09:34:44 |
| 12 | able to use that analysis? 09:34:46 |
| 13 | A. Well, I would have to review on a case-by- 09:34:47 |
| 14 | case basis. 09:34:50 |
| 15 | Q. When you say "a case-by-case basis," would 09:34:50 |
| 16 | that be with respect to each individual 09:34:54 |
| 17 | event? 09:34:55 |
| 18 | A. Again, I think in this area I would consult 09:34:56 |
| 19 | someone who's an expert in the treatment of 09:35:00 |
| 20 | this particular condition for a way to 09:35:02 |
| 21 | prioritize what are the important meetings, 09:35:05 |
| 22 | for example, what were the important 09:35:09 |
| 23 | clinical findings from this era. 09:35:11 |
| 24 | Q. And, again, just going back to where you 09:35:18 |
| 25 | would come up with a list of meetings, 09:35:20 |

10 (Pages 345 to 348)

M. ROSENTHAL

349

```
1    other than reaching out to the relevant        09:35:23
2    medical societies?                              09:35:25
3 A.  And defendants' own data.  Again, IMS          09:35:26
4    Health tracks these, tracks spending for        09:35:31
5    events, meetings and events, and I would        09:35:32
6    look to other data sources in the industry.     09:35:35
7 Q.  Okay.  Let's go on to one of the other         09:35:37
8    factors.                                        09:35:40
9 A.  Okay.                                          09:35:40
10 Q.  One of the other things that we agreed        09:35:41
11    might impact prescribing behavior in the       09:35:43
12    aggregate would be an informal conversation    09:35:45
13    among doctors -- or informal conversations     09:35:49
14    among doctors -- let's put it that way --      09:35:52
15 A.  Yes.                                          09:35:54
16 Q.  -- about the doctors' clinical experience     09:35:54
17    in the use of Neurontin to treat the           09:35:57
18    applicable condition.  How would you decide    09:35:58
19    whether to incorporate that into your          09:36:00
20    model?                                         09:36:02
21 A.  So clearly that would not be incorporated     09:36:02
22    into the model.  That's -- as we talked        09:36:04
23    about yesterday, the model doesn't include     09:36:08
24    every factor.  It's a simplification of        09:36:11
25    reality that focuses on major factors and      09:36:15
```

350

```
1    particularly those that might be correlated     09:36:19
2    with the variable of interest, again, the       09:36:21
3    allegedly illegal promotional activity.         09:36:24
4         And so in the case of                       09:36:27
5    conversations between doctors I have no          09:36:28
6    reason to believe that those, other than        09:36:32
7    those caused by the allegedly illegal            09:36:34
8    activities, would be correlated with the         09:36:36
9    allegedly illegal activities.  And in            09:36:40
10    effect transmission of information among         09:36:43
11    physicians would be captured in that time        09:36:46
12    trend.                                           09:36:49
13 Q.  How confident are you that conversations       09:36:49
14    among doctors couldn't be correlated with        09:36:55
15    off-label promotion in some way?  So in          09:36:57
16    other words, you know, isn't it possible at      09:36:59
17    least that, you know, by virtue of, you          09:37:01
18    know, buzz in the medical community, for         09:37:07
19    lack of a better word, about a particular        09:37:09
20    off-label use that the defendants would          09:37:10
21    increase off-label promotion?                    09:37:11
22 A.  Well, again, the model will took to the        09:37:12
23    specific timing of the promotional events,       09:37:16
24    and so if the buzz preceded the promotional      09:37:18
25    events or activities, then the buzz would        09:37:21
```

351

```
1    be captured as something other than caused      09:37:25
2    by the allegedly illegal activities.            09:37:29
3         And so because I'll be looking at          09:37:31
4    the specific time of these events and           09:37:34
5    separating out secular trends, which would      09:37:35
6    include the sort of natural diffusion of        09:37:38
7    information about Neurontin, I'm fairly         09:37:40
8    confident that those things can be              09:37:43
9    separated.                                      09:37:45
10 Q.  If they couldn't be separated, your results   09:37:52
11    would be biased; is that correct?              09:37:57
12 A.  If there was a correlation between them,      09:37:58
13    then there would be some bias, yes.            09:38:04
14 Q.  And if they were correlated -- well, I'll     09:38:12
15    withdraw the question.                         09:38:17
16         All right.  One of the other             09:38:20
17    things that we discussed was changes in       09:38:23
18    practice guidelines within an institution     09:38:26
19    or professional group on the use of           09:38:29
20    Neurontin to treat a particular condition?    09:38:31
21 A.  Yes.                                         09:38:34
22 Q.  We agreed that that could potentially        09:38:34
23    impact prescribing behavior in the            09:38:36
24    aggregate, correct?                           09:38:37
25 A.  Yes, we did.                                 09:38:38
```

352

```
1 Q.  How would you go about determining whether    09:38:39
2    or not to include that factor in your          09:38:42
3    model?                                         09:38:43
4 A.  I guess, again, in this case it would make    09:38:44
5    sense to consult a clinical expert for the     09:38:47
6    conditions considered.                         09:38:49
7 Q.  What information would you get from the       09:38:50
8    clinical expert?                               09:38:52
9 A.  About standard practices in terms of         09:38:52
10    guidelines.  Guidelines are variably used,     09:38:57
11    as you know, by condition, for cancer, for     09:39:02
12    example.  Cancer treatment is almost purely    09:39:06
13    protocol-driven.  That's well-known.  Many     09:39:08
14    other kinds of conditions there are very       09:39:11
15    few protocols for treatment, particularly      09:39:15
16    specific protocols about drugs.  So I would    09:39:17
17    talk to clinical experts to understand         09:39:20
18    better the patterns of treatment with          09:39:22
19    regard to these protocols.                     09:39:24
20 Q.  Would you expect the clinical expert to be    09:39:28
21    able to provide you with information about      09:39:30
22    implementation of particular practice          09:39:34
23    guidelines at particular institutions?         09:39:36
24 A.  It's not clear to me that that would be       09:39:37
25    relevant until I consulted with the            09:39:40
```

11 (Pages 349 to 352)

M. ROSENTHAL

353

1   clinical expert to find out whether          09:39:42
2   guidelines such as these are used at all.     09:39:43
3  Q. Fair enough. But at this point you haven't   09:39:46
4   had that consultation?                        09:39:48
5  A. At this point I have not had that           09:39:49
6   consultation.                                09:39:51
7  Q. All right. One of the other factors that    09:39:52
8   we discussed was a new development in the     09:39:53
9   underlying science of the particular field?   09:39:55
10 A. Yes.                                        09:39:59
11 Q. Assuming that that were disseminated        09:39:59
12  somehow to the prescribing public, how        09:40:02
13  would your model seek to take that into       09:40:06
14  account?                                      09:40:08
15 A. Well, again, I think it would make sense to  09:40:08
16  look at large significant trends in basic     09:40:11
17  science as it relates to these particular     09:40:15
18  types of drugs and conditions, and that       09:40:17
19  would take some clinical expertise, some      09:40:19
20  scientific expertise.                         09:40:21
21 Q. And so is that another category of issues   09:40:24
22  on which you would consult with a clinical    09:40:26
23  expert?                                       09:40:28
24 A. I think that probably would be --           09:40:28
25 Q. And the consult -- go ahead. I'm sorry, I   09:40:31

354

1   didn't mean to cut you off.                   09:40:34
2  A. -- would be in the category of              09:40:36
3   understanding better the clinical decisions   09:40:37
4   around each specific condition that I         09:40:40
5   model, and all of these factors, trends and   09:40:43
6   treatment, new drugs, new science, would be   09:40:45
7   part of that conversation.                    09:40:48
8  Q. And what information would you seek to get   09:40:51
9   out of the conversation, at least with        09:40:57
10  respect to this particular issue, a new       09:40:58
11  development in the underlying science?        09:41:01
12 A. So, again, potentially it's not altogether  09:41:03
13  clear to me that this is relevant, so the     09:41:06
14  new development in the science may have a     09:41:08
15  similar effect, for example, on all drugs     09:41:12
16  in the therapeutic class, and therefore it    09:41:16
17  may not enter the model in the same way.      09:41:18
18  So I guess I would hope to understand in      09:41:21
19  talking with a clinical expert if there       09:41:23
20  were trends that were likely to change the    09:41:26
21  off-label uses, change the use of off-label   09:41:29
22  prescribing.                                  09:41:32
23      And so I think without a specific         09:41:33
24  example it's hard for me to tell you          09:41:37
25  exactly how that would enter the model, but   09:41:39

355

1   if there was information, for example,        09:41:41
2   suddenly that this -- the whole class of      09:41:44
3   drugs is -- becomes clear that it's less      09:41:47
4   useful for treating this condition, then I    09:41:50
5   would expect that to have an effect, not      09:41:53
6   only on Neurontin prescribing, but on        09:41:56
7   prescribing of competitor drugs for the       09:41:58
8   same off-label uses.                          09:42:00
9  Q. Okay. Let's take that example that you      09:42:02
10  just gave.                                    09:42:04
11 A. Okay.                                       09:42:05
12 Q. If you learned -- if you learned that there  09:42:05
13  were trends of that kind, that it became     09:42:10
14  clear that, you know, at some point in time   09:42:13
15  that this whole class of drugs is less        09:42:17
16  useful in treating the applicable            09:42:19
17  condition, how would you seek to              09:42:21
18  incorporate that into your model?             09:42:22
19 A. Generally speaking, through another          09:42:24
20  variable about the dissemination, another     09:42:27
21  indicator variable about the dissemination    09:42:30
22  of that information, and it could be          09:42:32
23  modeled again as in the more detailed model   09:42:34
24  that I described in my declaration using a    09:42:36
25  comparison drug that should have the same     09:42:40

356

1   effect.                                       09:42:42
2  Q. How would you determine the timing of that  09:42:43
3   effect?                                       09:42:51
4  A. Based on publication of literature, in all  09:42:51
5   likelihood.                                   09:43:01
6  Q. All right. Here's another one: How about    09:43:04
7   FDA approval of a drug with a similar         09:43:06
8   mechanism of action for the applicable use?   09:43:08
9   We talked about how this might impact         09:43:11
10  prescribing behavior in the aggregate. How   09:43:13
11  would you go about -- how do you go about     09:43:16
12  determining how to incorporate that into     09:43:19
13  your model?                                   09:43:22
14 A. If there were a new entrant in the class, I  09:43:22
15  would in all likelihood include the entry    09:43:27
16  of that drug as part of the model.            09:43:28
17 Q. Would you identify which drug to            09:43:36
18  include?                                      09:43:38
19 A. Can you explain --                          09:43:38
20 Q. In other words, how would you identify      09:43:42
21  whether a particular drug other than          09:43:43
22  Neurontin is relevant in terms of an          09:43:44
23  additional approval by the FDA?               09:43:46
24 A. Sorry, I'm still not sure that -- so        09:43:48
25  whether a drug is a clinical substitute for   09:43:55

12 (Pages 353 to 356)

M. ROSENTHAL

357

1   Neurontin for a particular indication, how      09:43:58
2   would I identify that?      09:44:00
3   Q. Let's just back up. I think we had agreed      09:44:01
4   that FDA approval of a drug with a similar      09:44:03
5   mechanism of action for the applicable use      09:44:07
6   might impact physicians' prescribing      09:44:10
7   behavior in the aggregate; is that right?      09:44:13
8       MR. NOTARGIACOMO: Objection,      09:44:14
9   asked and answered.      09:44:15
10  A. Yes. And I think I understood that to      09:44:16
11  mean --      09:44:19
12  Q. Okay.      09:44:19
13  A. -- a drug that was potentially      09:44:19
14  substitutable for Neurontin --      09:44:22
15  Q. Fair enough.      09:44:22
16  A. -- for the treatment.      09:44:24
17  Q. Okay. Fair enough. How would you come up      09:44:25
18  with a list of drugs that would potentially      09:44:27
19  be substitutable for Neurontin?      09:44:29
20  A. Again, such a list would be developed in      09:44:30
21  consultation with a clinical expert in the      09:44:33
22  area.      09:44:35
23  Q. Okay. And, again, you haven't had that      09:44:35
24  consultation at this point?      09:44:38
25  A. No, I have not.      09:44:40

358

1   Q. How about approval of a drug with a similar      09:44:41
2   mechanism of action for the applicable use      09:44:55
3   in another country? We agreed that that      09:44:57
4   might impact physician prescribing      09:44:59
5   behavior. How would you go about      09:45:02
6   determining whether to incorporate that      09:45:03
7   factor into your model?      09:45:05
8       MR. NOTARGIACOMO: Objection.      09:45:06
9   A. That factor, I would expect to have      09:45:10
10  information on that from defendants. I'm      09:45:11
11  sorry, are we talking about Neurontin?      09:45:14
12  Q. We're talking about a drug with a similar      09:45:15
13  mechanism of action.      09:45:17
14  A. I'm -- it's not clear to me that that's      09:45:18
15  going to be an important factor, and I      09:45:21
16  haven't thought about how to incorporate      09:45:23
17  it. I believe that we're getting further      09:45:25
18  and further away from the central issue.      09:45:28
19  Q. How would you determine whether it's an      09:45:34
20  important factor or not? You said it's not      09:45:35
21  clear to you now whether or not it is.      09:45:37
22  A. I guess, you know, I would review the data,      09:45:39
23  and to my knowledge, that kind of factor is      09:45:42
24  not generally included looking at use of      09:45:46
25  drugs, for example, in all the studies that      09:45:48

359

1   we've looked at before, so it's not clear      09:45:50
2   to me that there's a very strong tie there.      09:45:53
3       So, you know, I would certainly      09:45:55
4   consider that in reviewing the literature      09:45:57
5   and sort of developing the theoretical      09:46:00
6   model, but it seems like a second order      09:46:04
7   issue to me at this point.      09:46:06
8   Q. Without yet having reviewed the data or --      09:46:07
9   A. Without having seen the complete data yet.      09:46:10
10  Q. We'll only do this for a couple more.      09:46:16
11      Information posted on a medical      09:46:22
12  information site on the Internet related to      09:46:25
13  use of Neurontin for treatment of the      09:46:27
14  applicable condition, we agreed that that      09:46:29
15  might impact prescribing behavior in the      09:46:32
16  aggregate, correct?      09:46:34
17      MR. NOTARGIACOMO: Objection.      09:46:35
18  A. That's correct.      09:46:35
19  Q. How would you go about determining whether      09:46:37
20  or not to include that factor in your      09:46:41
21  model?      09:46:43
22  A. I think that would fall -- I mean, I would      09:46:44
23  certainly have to consider it, but I think      09:46:46
24  that falls in the category of factors that      09:46:48
25  are in the background. I have no      09:46:50

360

1   theoretical reason to believe it's      09:46:52
2   correlated with the off-label prescribing,      09:46:53
3   the illegally -- excuse me, the allegedly      09:46:58
4   illegal off-label prescribing activities.      09:47:01
5   Q. Okay. Let me ask you a couple things about      09:47:03
6   that. When you say you think it's      09:47:05
7   something that's in the background, what      09:47:06
8   does that mean?      09:47:08
9   A. There's a notion that there are many      09:47:08
10  unmeasurable factors that may have small      09:47:11
11  effects on the decision to prescribe a drug      09:47:14
12  or take a drug and that the model would not      09:47:19
13  capture every one of these factors, would      09:47:23
14  capture the major ones and those that I      09:47:25
15  believe have the greatest potential to be      09:47:28
16  confounded with the variable of interest.      09:47:31
17  Q. Okay. Do you have an understanding as to      09:47:32
18  the extent to which doctors might consult      09:47:34
19  medical information sites in making      09:47:36
20  treatment decisions?      09:47:38
21  A. I don't have any -- you mean, do I have a      09:47:39
22  quantitative estimate of that?      09:47:42
23  Q. (No verbal response.)      09:47:43
24  A. I do not.      09:47:44
25  Q. Do you have any sense for that, I mean,      09:47:45

13 (Pages 357 to 360)

M. ROSENTHAL

| | 361 |
|---|---|
| 1 | whether it's something that doctors might | 09:47:47 |
| 2 | do in deciding how to treat their patients? | 09:47:48 |
| 3 | A. I don't have a sense that that is | 09:47:50 |
| 4 | scientifically backed up, so I wouldn't | 09:47:57 |
| 5 | want to give you my just general | 09:48:00 |
| 6 | impression. | 09:48:02 |
| 7 | Q. Yeah, I guess I'm just trying to | 09:48:02 |
| 8 | understand, I think, what the -- you know, | 09:48:03 |
| 9 | what -- at least at this point what the | 09:48:04 |
| 10 | basis is for your assumption that this | 09:48:05 |
| 11 | would be an issue that's in the background. | 09:48:07 |
| 12 | A. The basis for my assumption is that it's -- | 09:48:10 |
| 13 | there's no reason to believe that suddenly | 09:48:13 |
| 14 | that would start happening independently. | 09:48:15 |
| 15 | Again, independently it's happening at just | 09:48:17 |
| 16 | the same time that defendants began | 09:48:21 |
| 17 | promoting their drug for an off-label use. | 09:48:24 |
| 18 | Q. You would agree that it's at least possible | 09:48:33 |
| 19 | that the defendants would be monitoring the | 09:48:34 |
| 20 | same medical information websites that | 09:48:35 |
| 21 | doctors might be, correct? | 09:48:37 |
| 22 | A. It is at least possible, but, again, since | 09:48:39 |
| 23 | I'm relying on timing for identification in | 09:48:43 |
| 24 | my model, if the website preceded the | 09:48:45 |
| 25 | defendants' allegedly illegal activities, | 09:48:49 |

| | 362 |
|---|---|
| 1 | it would get picked up in the time trend | 09:48:52 |
| 2 | and not picked up in those variables that | 09:48:54 |
| 3 | represent the activities. | 09:48:57 |
| 4 | Q. How would you go about determining when the | 09:48:58 |
| 5 | postings on the website would have | 09:49:00 |
| 6 | occurred? | 09:49:02 |
| 7 | A. Again, I wouldn't -- that's not the way the | 09:49:02 |
| 8 | model would work. I determine when the | 09:49:06 |
| 9 | allegedly illegal activities occurred, and | 09:49:09 |
| 10 | these other activities that may change over | 09:49:11 |
| 11 | time that may diffuse over time would get | 09:49:13 |
| 12 | picked up in the time trend. | 09:49:16 |
| 13 | Q. Right. But I guess what we're talking | 09:49:19 |
| 14 | about, I guess -- well, withdrawn. | 09:49:22 |
| 15 | If you're relying on the timing to | 09:49:23 |
| 16 | separate out any possible correlation | 09:49:26 |
| 17 | between the two, isn't it important to know | 09:49:27 |
| 18 | the timing that the posting on the medical | 09:49:29 |
| 19 | information website -- the timing of the | 09:49:32 |
| 20 | posting on the particular medical | 09:49:35 |
| 21 | information website? | 09:49:37 |
| 22 | A. It's only important to separate out if it | 09:49:38 |
| 23 | is miraculously simultaneous to the timing | 09:49:47 |
| 24 | of the events that I'm modeling; that is, | 09:49:51 |
| 25 | it doesn't -- it's not that it's going on | 09:49:56 |

| | 363 |
|---|---|
| 1 | at the same time but that it begins -- it | 09:49:57 |
| 2 | has a similar pattern over time. And so | 09:50:00 |
| 3 | that's -- and rather than test for any | 09:50:02 |
| 4 | possible events that might have had that | 09:50:05 |
| 5 | same timing, one has to consider whether | 09:50:07 |
| 6 | it's possible for events to have the same | 09:50:09 |
| 7 | idiosyncratic patterns as the events of | 09:50:12 |
| 8 | interest here. | 09:50:15 |
| 9 | Q. Let me ask it another way. Are you aware | 09:50:22 |
| 10 | of any way, as you sit here now, in which | 09:50:25 |
| 11 | you would be able to determine the timing | 09:50:30 |
| 12 | of postings on the Internet on medical | 09:50:31 |
| 13 | information websites on the use of | 09:50:35 |
| 14 | Neurontin to treat certain off-label -- | 09:50:36 |
| 15 | certain off-label conditions? | 09:50:41 |
| 16 | A. It's not an issue I've looked into, no, | 09:50:42 |
| 17 | so... | 09:50:45 |
| 18 | Q. And assuming that the posting of | 09:50:45 |
| 19 | information on the use of Neurontin to | 09:50:53 |
| 20 | treat an applicable condition does have an | 09:50:56 |
| 21 | impact on prescribing behavior and assuming | 09:50:59 |
| 22 | that it's possible at least that it's | 09:51:02 |
| 23 | correlated with the defendants' promotion | 09:51:03 |
| 24 | for that off-label use, isn't it important | 09:51:07 |
| 25 | that you be able to tell which came first, | 09:51:13 |

| | 364 |
|---|---|
| 1 | a posting on the medical information | 09:51:16 |
| 2 | website or the promotion? | 09:51:18 |
| 3 | MR. NOTARGIACOMO: Objection, | 09:51:21 |
| 4 | asked and answered. | 09:51:23 |
| 5 | A. I think, again, that's -- the way the model | 09:51:23 |
| 6 | works is that if they're exactly -- if you | 09:51:27 |
| 7 | want me to assume that they happen at | 09:51:33 |
| 8 | exactly the same time, then they are | 09:51:36 |
| 9 | perfectly correlated and by definition | 09:51:41 |
| 10 | can't be separated, but when you do an | 09:51:44 |
| 11 | event study such as this, we look at the | 09:51:47 |
| 12 | timing of the event of interest. We don't | 09:51:50 |
| 13 | then measure every other event, and in part | 09:51:54 |
| 14 | some of the identification comes from the | 09:51:59 |
| 15 | fact that we can compare, for example, | 09:52:01 |
| 16 | treatment -- treatment for the particular | 09:52:05 |
| 17 | indication by use of Neurontin with other | 09:52:08 |
| 18 | drugs in the same class at the same time to | 09:52:12 |
| 19 | get additional identification. | 09:52:15 |
| 20 | So if that information were | 09:52:17 |
| 21 | disseminated and were broadly about the | 09:52:19 |
| 22 | use, for example, of anticonvulsants for | 09:52:22 |
| 23 | bipolar disorder, then we could see it | 09:52:25 |
| 24 | being picked up in these other drugs and | 09:52:27 |
| 25 | separate out the activities there from what | 09:52:29 |

14 (Pages 361 to 364)

M. ROSENTHAL

365

1   was going on with Neurontin. So there are          09:52:32
2   ways of identifying that in part, but the           09:52:34
3   general strategy is not to look at the              09:52:36
4   timing of every possible confounding event          09:52:38
5   but to be as detailed as possible about the         09:52:41
6   events in question.                                 09:52:44
7       (Pause.)                                        09:53:17
8 Q. Okay. We discussed yesterday that in order         09:53:18
9   to conduct your analysis, you or somebody           09:53:20
10  would need to determine whether a given             09:53:24
11  factor or a given expenditure is subject to         09:53:26
12  the alleged violations; is that correct?            09:53:28
13 A. That I would be directed by counsel about         09:53:30
14  which particular activities were subject to         09:53:34
15  the action in question, yes.                        09:53:36
16 Q. Maybe -- well, let's -- I think that's one        09:53:40
17  of the things that I would like to try to           09:53:45
18  unwind.                                             09:53:47
19 A. Okay.                                             09:53:48
20 Q. We did agree that it's important to               09:53:48
21  determine which factors fall within XJT and         09:53:50
22  which factors fall within XKT?                      09:53:55
23 A. Yes, that's right.                                09:53:58
24 Q. Okay. Is it correct that you are going to         09:53:59
25  be relying on counsel to identify whether           09:54:04

366

1   each individual factor should fall within           09:54:07
2   XKT or XJT?                                         09:54:09
3 A. I'm not sure if I understand precisely, but        09:54:11
4   maybe I could give an example --                    09:54:16
5 Q. Sure.                                              09:54:17
6 A. -- of what I expect to learn. That, for            09:54:18
7   example, I expect the counsel to tell me            09:54:20
8   for which indications the promotional              09:54:26
9   activities appear to be illegal and for             09:54:29
10  which ones are being pursued, so for                09:54:33
11  example, maybe the commercial activities            09:54:36
12  with regard to some indications will be             09:54:37
13  considered allegedly illegal and some              09:54:40
14  won't. That will, of course, determine             09:54:44
15  which indications I model in general.               09:54:45
16      And then in particular it may be               09:54:48
17  deemed that certain kinds of activities,            09:54:50
18  meetings and events versus dinners, will be         09:54:54
19  considered to be the activities that               09:54:57
20  counsel's determined are part of the               09:55:03
21  allegations ultimately, and those are the           09:55:05
22  ones that I will be looking at the effects          09:55:07
23  of. But in part also it may be that some            09:55:09
24  things are not separable, as we talked             09:55:19
25  about yesterday.                                    09:55:21

367

1       So, for example, detailing, if in              09:55:21
2   the data I can't determine whether the              09:55:24
3   detailing was for an indication using               09:55:26
4   information that was allegedly illegal in           09:55:32
5   the sense that it's going to be part of             09:55:35
6   this action, then those would have to be            09:55:37
7   left in the other side of promotion, the            09:55:41
8   routine -- what's considered to be routine          09:55:47
9   and legal promotional activities?                   09:55:49
10 Q. In terms of the last determination that you       09:55:51
11  just discussed --                                   09:55:53
12 A. Yeah.                                             09:55:55
13 Q. -- who's making that decision, you or             09:55:55
14  counsel or somebody else?                           09:55:57
15 A. Well, in part it would have to do with the        09:55:58
16  data in consultation with counsel about             09:56:01
17  what the Court has indicated they can look          09:56:05
18  at in terms of -- so we -- you know, as we          09:56:08
19  discussed yesterday, I'm confused about the         09:56:11
20  difference between fraudulent and illegal,          09:56:12
21  but if there is some nuance there and               09:56:14
22  certain kinds of information is deemed to           09:56:18
23  be -- that we won't look at the impact of           09:56:21
24  that, then that would have some                     09:56:23
25  determination of what goes in XJT versus            09:56:25

368

1   XKT.                                                09:56:28
2 Q. Do you expect that you would make that            09:56:28
3   determination or that that determination           09:56:31
4   would be made by someone at least on an             09:56:34
5   activity-by-activity basis?                         09:56:35
6 A. I would imagine it would be categories of          09:56:37
7   activities.                                         09:56:41
8 Q. So in other words, I guess, let's think           09:56:42
9   about -- let's think about meetings.                09:56:44
10 A. Okay.                                             09:56:48
11 Q. I'm assuming that individual meetings could       09:56:49
12  qualify as factors in either XJT or XKT in          09:56:52
13  your model, right?                                  09:56:57
14 A. Yes, that's correct.                              09:56:57
15 Q. You need to determine with respect to each        09:56:59
16  individual meeting, correct, whether it             09:57:03
17  falls into XJT or XKT?                              09:57:04
18 A. That's correct.                                   09:57:07
19 Q. Is the same true of specific continuing           09:57:07
20  medical education seminars?                         09:57:10
21 A. Potentially, yes.                                 09:57:12
22 Q. Is the same true of detailing visits?             09:57:13
23 A. Detailing, I think we would have to make an       09:57:16
24  aggregate determination. I have seen some           09:57:21
25  detailed data on detailing reports that            09:57:22

15 (Pages 365 to 368)

212-267-6868                                                        516-608-2400

M. ROSENTHAL

<table>
<tr><td colspan="2">369</td></tr>
<tr><td>1</td><td>show what was discussed during the</td><td>09:57:27</td></tr>
<tr><td>2</td><td>detailing visit, but without seeing the</td><td>09:57:28</td></tr>
<tr><td>3</td><td>data it's not clear to me how detailed</td><td>09:57:30</td></tr>
<tr><td>4</td><td>we'll be able to be on each of these</td><td>09:57:34</td></tr>
<tr><td>5</td><td>different promotional activities.  So once</td><td>09:57:37</td></tr>
<tr><td>6</td><td>I have all the data, it'll be a lot clearer</td><td>09:57:40</td></tr>
<tr><td>7</td><td>whether there is an aggregate decision or a</td><td>09:57:44</td></tr>
<tr><td>8</td><td>much more detailed analysis.</td><td>09:57:46</td></tr>
<tr><td>9</td><td>Q.  In the case of expenditures, how do you</td><td>09:57:53</td></tr>
<tr><td>10</td><td>anticipate identifying which spending</td><td>09:57:57</td></tr>
<tr><td>11</td><td>should be characterized as O and which</td><td>09:57:58</td></tr>
<tr><td>12</td><td>spending should be categorized as M for</td><td>09:58:00</td></tr>
<tr><td>13</td><td>purposes of your model?</td><td>09:58:03</td></tr>
<tr><td>14</td><td>A.  Again, I don't have complete data yet, but</td><td>09:58:04</td></tr>
<tr><td>15</td><td>in the data -- some of the data that I've</td><td>09:58:06</td></tr>
<tr><td>16</td><td>seen in the discovery documents, as I</td><td>09:58:08</td></tr>
<tr><td>17</td><td>illustrate in my declaration a few</td><td>09:58:10</td></tr>
<tr><td>18</td><td>examples, it does seem like defendants</td><td>09:58:12</td></tr>
<tr><td>19</td><td>break out spending for specific</td><td>09:58:15</td></tr>
<tr><td>20</td><td>indications, for example, as it relates to</td><td>09:58:17</td></tr>
<tr><td>21</td><td>bipolar disorder, as an example.</td><td>09:58:18</td></tr>
<tr><td>22</td><td>Q.  Will you be relying entirely on defendants</td><td>09:58:23</td></tr>
<tr><td>23</td><td>breaking out the data as between improper</td><td>09:58:28</td></tr>
<tr><td>24</td><td>activity on the one hand and proper</td><td>09:58:35</td></tr>
<tr><td>25</td><td>activity on the other hand?</td><td>09:58:39</td></tr>
</table>

<table>
<tr><td colspan="2">370</td></tr>
<tr><td>1</td><td>A.  It's not clear to me that entirely is the</td><td>09:58:40</td></tr>
<tr><td>2</td><td>right characterization of that.  Again, I</td><td>09:58:44</td></tr>
<tr><td>3</td><td>haven't pulled all the data together, but I</td><td>09:58:46</td></tr>
<tr><td>4</td><td>do believe the defendants' own tracking of</td><td>09:58:49</td></tr>
<tr><td>5</td><td>their promotional activities will be a</td><td>09:58:51</td></tr>
<tr><td>6</td><td>prime source of information here.  But as</td><td>09:58:53</td></tr>
<tr><td>7</td><td>we discussed also, there may be other kinds</td><td>09:58:55</td></tr>
<tr><td>8</td><td>of information such as publications that</td><td>09:58:58</td></tr>
<tr><td>9</td><td>appear in the general literature.</td><td>09:59:00</td></tr>
<tr><td>10</td><td>Q.  How would publications that appear in the</td><td>09:59:03</td></tr>
<tr><td>11</td><td>general literature inform your</td><td>09:59:06</td></tr>
<tr><td>12</td><td>understanding of whether a particular</td><td>09:59:07</td></tr>
<tr><td>13</td><td>expenditure should be categorized as O or</td><td>09:59:09</td></tr>
<tr><td>14</td><td>M?</td><td>09:59:13</td></tr>
<tr><td>15</td><td>A.  Sorry.  I was back on X.  So in terms of</td><td>09:59:16</td></tr>
<tr><td>16</td><td>spending, I believe it'll largely come from</td><td>09:59:23</td></tr>
<tr><td>17</td><td>defendants' data, but, again, I can't say</td><td>09:59:25</td></tr>
<tr><td>18</td><td>that will be exclusively true.</td><td>09:59:27</td></tr>
<tr><td>19</td><td>Q.  Can you think, as you sit here today, of</td><td>09:59:29</td></tr>
<tr><td>20</td><td>anything other than defendants' data that</td><td>09:59:31</td></tr>
<tr><td>21</td><td>would provide you any insight on the</td><td>09:59:33</td></tr>
<tr><td>22</td><td>determination of whether a particular</td><td>09:59:35</td></tr>
<tr><td>23</td><td>expenditure is O or M?</td><td>09:59:37</td></tr>
<tr><td>24</td><td>A.  I would look again to data sources such as</td><td>09:59:39</td></tr>
<tr><td>25</td><td>those that I've described before, IMS</td><td>09:59:42</td></tr>
</table>

<table>
<tr><td colspan="2">371</td></tr>
<tr><td>1</td><td>Health, Verispan, that do track promotional</td><td>09:59:46</td></tr>
<tr><td>2</td><td>spending, and I don't know all the details</td><td>09:59:49</td></tr>
<tr><td>3</td><td>of all their products, but they do track</td><td>09:59:50</td></tr>
<tr><td>4</td><td>prescriptions by diagnosis.  It's possible</td><td>09:59:53</td></tr>
<tr><td>5</td><td>that they have more detailed data on</td><td>09:59:55</td></tr>
<tr><td>6</td><td>promotional spending as well.</td><td>09:59:58</td></tr>
<tr><td>7</td><td>Q.  But you haven't conducted that analysis yet</td><td>09:59:59</td></tr>
<tr><td>8</td><td>or made those inquiries of IMS or Verispan</td><td>10:00:07</td></tr>
<tr><td>9</td><td>yet?</td><td>10:00:10</td></tr>
<tr><td>10</td><td>A.  With regard to the promotional data, not</td><td>10:00:10</td></tr>
<tr><td>11</td><td>yet, no.</td><td>10:00:12</td></tr>
<tr><td>12</td><td>Q.  Why not?</td><td>10:00:13</td></tr>
<tr><td>13</td><td>A.  I've not been asked to bring data together</td><td>10:00:14</td></tr>
<tr><td>14</td><td>for this.  I found potential data sources</td><td>10:00:16</td></tr>
<tr><td>15</td><td>in the discovery documents and also by</td><td>10:00:19</td></tr>
<tr><td>16</td><td>talking to IMS Health and Verispan about</td><td>10:00:23</td></tr>
<tr><td>17</td><td>their prescribing data to satisfy me that</td><td>10:00:25</td></tr>
<tr><td>18</td><td>the data were available to estimate this</td><td>10:00:28</td></tr>
<tr><td>19</td><td>model.</td><td>10:00:31</td></tr>
<tr><td>20</td><td>Q.  But this particular aspect of data you</td><td>10:00:33</td></tr>
<tr><td>21</td><td>didn't speak with them about; is that</td><td>10:00:35</td></tr>
<tr><td>22</td><td>right?</td><td>10:00:38</td></tr>
<tr><td>23</td><td>A.  Not as supplementing defendants' data, but</td><td>10:00:38</td></tr>
<tr><td>24</td><td>I observed that defendants tracked their</td><td>10:00:41</td></tr>
<tr><td>25</td><td>spending in a fairly detailed way.</td><td>10:00:43</td></tr>
</table>

<table>
<tr><td colspan="2">372</td></tr>
<tr><td>1</td><td>Q.  When do you expect the determination of</td><td>10:00:47</td></tr>
<tr><td>2</td><td>whether a particular expenditure would fall</td><td>10:00:56</td></tr>
<tr><td>3</td><td>into O on the one hand or M on the other</td><td>10:00:58</td></tr>
<tr><td>4</td><td>hand would occur?</td><td>10:01:00</td></tr>
<tr><td>5</td><td>A.  When do I suspect that would occur?</td><td>10:01:01</td></tr>
<tr><td>6</td><td>Q.  (No verbal response.)</td><td>10:01:03</td></tr>
<tr><td>7</td><td>A.  I guess I'm not really clear what you mean.</td><td>10:01:06</td></tr>
<tr><td>8</td><td>At the point at which I'm asked to proceed</td><td>10:01:09</td></tr>
<tr><td>9</td><td>with estimating my model, which I have not</td><td>10:01:11</td></tr>
<tr><td>10</td><td>been asked to do yet, then I would begin to</td><td>10:01:16</td></tr>
<tr><td>11</td><td>gather the data and specify all the</td><td>10:01:19</td></tr>
<tr><td>12</td><td>variables, and at that point that would be</td><td>10:01:22</td></tr>
<tr><td>13</td><td>relevant, whenever that is.</td><td>10:01:25</td></tr>
<tr><td>14</td><td>Q.  Again, in the case of sampling you would</td><td>10:01:28</td></tr>
<tr><td>15</td><td>agree that some kinds of sampling are not</td><td>10:01:36</td></tr>
<tr><td>16</td><td>subject to the alleged violations; is that</td><td>10:01:39</td></tr>
<tr><td>17</td><td>correct?</td><td>10:01:40</td></tr>
<tr><td>18</td><td>A.  Yes, I would agree with that.</td><td>10:01:40</td></tr>
<tr><td>19</td><td>Q.  But you also understand that some kinds do</td><td>10:01:45</td></tr>
<tr><td>20</td><td>constitute allegedly improper promotion for</td><td>10:01:47</td></tr>
<tr><td>21</td><td>purposes of this case?</td><td>10:01:50</td></tr>
<tr><td>22</td><td>A.  I believe that was described in the</td><td>10:01:51</td></tr>
<tr><td>23</td><td>allegations, yes.</td><td>10:01:53</td></tr>
<tr><td>24</td><td>Q.  How do you intend to differentiate between</td><td>10:01:54</td></tr>
<tr><td>25</td><td>appropriate sampling and improper sampling</td><td>10:01:58</td></tr>
</table>

16 (Pages 369 to 372)

M. ROSENTHAL

373

1    for purposes of your analysis?                    10:02:00
2  A.  To the extent that it's possible to use         10:02:01
3    defendants' own tracking of those data.           10:02:04
4  Q.  Is that something that you've done yet?          10:02:07
5  A.  As we discussed yesterday, looking at the       10:02:10
6    strategic documents, they talk specifically       10:02:13
7    in those documents about use of samples.          10:02:14
8  Q.  When you refer to "these documents," both       10:02:18
9    in this context and in your previous              10:02:20
10   answers, I'm assuming that the documents          10:02:23
11   you're referring to would be included             10:02:25
12   within the documents that you list as             10:02:26
13   having relied on in your declaration?             10:02:28
14 A.  Yes, in particular that strategic grid we       10:02:30
15   looked at yesterday is the one I'm talking        10:02:34
16   about.                                            10:02:36
17 Q.  And so it's those sorts of documents, the       10:02:36
18   strategic-grid-type documents, that you           10:02:41
19   anticipate relying on for purposes of doing       10:02:43
20   this analysis?                                    10:02:45
21 A.  And we understand from other materials that     10:02:46
22   defendants have tracked the profitability,        10:02:50
23   return on investment related to their             10:02:52
24   promotional activities, and so we would           10:02:54
25   look for those kinds of documents as well.        10:02:56

374

1  Q.  Have you reviewed any of those documents to     10:03:01
2    date?                                             10:03:04
3  A.  I've reviewed a large number of documents       10:03:06
4    at one point, but I don't recall seeing any       10:03:09
5    specific accounting documents on these            10:03:11
6    return on investment models. I know that          10:03:14
7    they are referenced, and I note some              10:03:16
8    references in my declaration. There's             10:03:19
9    promo track analyses.                             10:03:22
10 Q.  Anything else?                                  10:03:30
11 A.  I believe there's a footnote in my              10:03:31
12   declaration that lists a couple of                10:03:32
13   examples, but I believe promo track was the      10:03:34
14   principal and -- promotional effectiveness        10:03:36
15   system that they have.                            10:03:41
16     THE WITNESS:  Maybe a short break?              10:03:50
17     MR. POLUBINSKI:  Sure.  Sure.                   10:03:51
18   Let's take a break.  That's fine.                 10:03:52
19     THE VIDEOGRAPHER:  The time is                  10:03:54
20   10:04.  This is the end of Tape 1, and we         10:03:56
21   are off the record.                               10:03:58
22     (Recess taken.)                                 10:03:59
23     THE VIDEOGRAPHER:  The time is                  10:14:05
24   10:14.  This is the beginning of Tape 2,          10:14:18
25   and we are back on the record.                    10:14:19

375

1    BY MR. POLUBINSKI:                                10:14:21
2  Q.  So, Professor Rosenthal, in the case of         10:14:21
3    detailing, whether or not a given detailing       10:14:33
4    visit is appropriate, will necessarily            10:14:35
5    depend on what's said in the course of that       10:14:38
6    visit; is that correct?                           10:14:41
7  A.  Whether or not the allegations apply to         10:14:41
8    that detailing visit, you mean?                   10:14:44
9  Q.  Yes.                                            10:14:46
10 A.  Okay.  That seems like that's the right way     10:14:46
11   to characterize it, what's said, what's           10:14:51
12   disseminated.                                     10:14:53
13 Q.  Right.  And that like sampling not all          10:14:54
14   detailing is subject to the alleged               10:15:00
15   violations?                                       10:15:02
16 A.  I think that's right.                           10:15:02
17 Q.  With respect to detailing, how do you           10:15:03
18   intend to differentiate between appropriate       10:15:08
19   detailing and allegedly improper detailing?       10:15:11
20 A.  With respect to detailing, I have two kinds     10:15:13
21   of information that I think will be               10:15:17
22   relevant, one -- and forgive me, I forget         10:15:18
23   the names of these reports, but one is            10:15:24
24   information on the detailing visits               10:15:27
25   themselves that the physicians who are            10:15:30

376

1    detailed provide that describes what was          10:15:32
2    discussed during the visit, and, two, again       10:15:37
3    are the strategic and marketing documents         10:15:40
4    that I've seen that quantify detailing for        10:15:43
5    specific indications.                             10:15:49
6  Q.  With respect to the first, to what extent       10:15:56
7    do you expect -- well, withdrawn.                 10:16:01
8      Would you expect to make an                     10:16:03
9    individual determination as to each               10:16:06
10   specific detailing visit and whether that         10:16:08
11   detailing visit constituted improper or           10:16:10
12   proper behavior?                                  10:16:13
13 A.  I would expect to make a determination in       10:16:14
14   the aggregate as to the proportion of             10:16:16
15   detailing that would fall into those              10:16:18
16   categories, so not -- I don't believe that        10:16:20
17   that's what you mean by "individual               10:16:24
18   determination" like visit per visit, but to       10:16:27
19   characterize overall.                             10:16:30
20 Q.  Fair enough.  But you've used this data on      10:16:32
21   individual visits to inform your                  10:16:36
22   conclusions about -- to inform your               10:16:37
23   aggregate conclusions?                            10:16:39
24 A.  At this time I think that data is to be one     10:16:40
25   of the things I use to try to break apart         10:16:44

17 (Pages 373 to 376)

M. ROSENTHAL

**377**

1    the detailing spending.                    10:16:46
2  Q.  With respect to the information on those  10:16:52
3    individual detailing visits, how would you  10:16:54
4    intend to distinguish between fraudulent   10:16:56
5    detailing on the one hand and detailing    10:16:59
6    that was not fraudulent on the other hand?  10:17:01
7  A.  Again, determination of what's fraudulent 10:17:03
8    or illegal in some other manner, I would    10:17:05
9    expect counsel to advise me on how to       10:17:07
10    categorize that.                    10:17:12
11  Q.  So will counsel be making the individual  10:17:13
12    determinations about whether a specific     10:17:15
13    detailing visit involved fraudulent         10:17:17
14    behavior or not?                    10:17:20
15        MR. NOTARGIACOMO:  Objection.  I      10:17:21
16    think that mischaracterizes her testimony.  10:17:24
17    . .  MR. POLUBINSKI:  Well, I am asking     10:17:24
18    her the question.                   10:17:24
19        MR. NOTARGIACOMO:  Fair enough.      10:17:25
20  A.  I would expect to get input.  I would     10:17:26
21    expect to be advised on what kinds of       10:17:29
22    things I should count in the allegedly      10:17:30
23    illegal bucket and what kinds of things I   10:17:35
24    shouldn't.                     10:17:37
25  Q.  And so you would get -- do you imagine you 10:17:37

**378**

1    might get guidelines or some other sort of   10:17:38
2    instruction that would enable you to make    10:17:40
3    this determination?                 10:17:42
4  A.  That might be the case.  Without knowing   10:17:43
5    exactly how this will play out, I can't      10:17:44
6    say.                        10:17:48
7  Q.  All right.  Aside from the events that we  10:18:16
8    discussed earlier this morning that might    10:18:17
9    impact aggregate quantities of Neurontin    10:18:19
10    prescribed for off-label uses, I'm going to  10:18:22
11    give you a much, much shorter list now and   10:18:25
12    ask you whether the following would be      10:18:27
13    additional individual factors that might    10:18:30
14    play into an individual physician's         10:18:33
15    prescribing decision.  And if we can go     10:18:35
16    through each one and if you can just tell    10:18:36
17    me whether or not they might or might not,   10:18:38
18    that would be great.                10:18:40
19        The first one is an individual --     10:18:41
20    is an individual doctor's medical school    10:18:42
21    education.                     10:18:44
22  A.  Would affect prescribing patterns in      10:18:44
23    general.                      10:18:49
24  Q.  And a decision on whether or not to       10:18:49
25    prescribe Neurontin for an off-label use in 10:18:51

**379**

1    a given case?                   10:18:54
2  A.  I suppose it might.                 10:18:54
3  Q.  How about the doctor's fellowships that he 10:18:55
4    or she might have had after their medical    10:18:58
5    school?                       10:19:02
6  A.  It might.  And may I just say that all of  10:19:03
7    these factors seem like second order to a    10:19:09
8    decision about off-label prescribing.       10:19:11
9  Q.  How about the patient's specific systems?  10:19:13
10  A.  Yes, that might affect prescribing.        10:19:15
11  Q.  And that that wouldn't be a second order   10:19:19
12    impact in a particular individual          10:19:22
13    prescription decision?              10:19:25
14  A.  As to whether or not the prescription for  10:19:25
15    Neurontin were given versus some other      10:19:30
16    drug?  I mean, certainly the symptoms would  10:19:32
17    be relevant.                    10:19:34
18  Q.  How about the patient's medical history?   10:19:35
19  A.  Yes, that would be relevant.             10:19:37
20  Q.  How about other medications that the       10:19:39
21    patient might be taking at the time?        10:19:41
22  A.  Yes.                       10:19:42
23  Q.  How about a specific request from a        10:19:42
24    specific patient?                  10:19:46
25  A.  Possibly.                     10:19:49

**380**

1  Q.  How about the doctor's individual          10:19:50
2    independent review of the scholarly        10:19:55
3    literature?                    10:19:58
4  A.  Yes, I believe we talked about that        10:19:58
5    yesterday.                     10:20:01
6  Q.  And how about the doctor's individual       10:20:01
7    consultation of medical information         10:20:06
8    websites on the Internet?              10:20:08
9  A.  Yes.                       10:20:09
10  Q.  Okay.  We discussed yesterday the fact that 10:20:09
11    Neurontin was approved to treat PHN in       10:20:23
12    2002, correct?                   10:20:26
13  A.  Yes, correct.                   10:20:27
14  Q.  Have plaintiffs' counsel instructed you at  10:20:27
15    this point to make any particular          10:20:31
16    assumptions with respect to Neurontin's     10:20:33
17    efficacy in treating PHN?              10:20:35
18  A.  For the purposes of my work, I'm to        10:20:37
19    consider only the total quantity induced    10:20:43
20    without regard to efficacy.             10:20:46
21  Q.  Okay.  Let me put it another way.  Do you   10:20:47
22    know whether plaintiffs' counsel will ask    10:20:51
23    you to include prescriptions for PHN prior   10:20:53
24    to May 2002 in your analysis in the model?   10:20:56
25  A.  I don't know at this point exactly which    10:20:58

18 (Pages 377 to 380)

M. ROSENTHAL

381

1    indications will be included in the final          10:21:00
2    analysis, no.                                      10:21:03
3  Q. But those indications would have been             10:21:05
4    off-label uses, correct, prescriptions of          10:21:07
5    Neurontin for PHN prior to May 2002?               10:21:08
6  A. That's certainly described in the                 10:21:11
7    allegations, so...                            10:21:14
8  Q. On the other hand, because Neurontin was      10:21:15
9    approved for treatment of PHN in May of            10:21:18
10   2002, I think we can be confident that you         10:21:20
11   would not seek to include prescriptions of         10:21:24
12   Neurontin for PHN after that date in your          10:21:28
13   model, correct?                          10:21:31
14 A. I think I'm probably going to need a little       10:21:37
15   more direction on the legal issues here.           10:21:38
16   As you know, promotional activities have a         10:21:41
17   long-lived impact, and so there will be            10:21:45
18   some continued impact of promotional               10:21:48
19   activities that took place before the              10:21:51
20   approval, but I don't know where that              10:21:53
21   stands as a legal matter.  As an economic          10:21:57
22   matter there are effects.                     10:21:59
23 Q. I guess here's my question:                       10:22:01
24 A. Okay.                            10:22:04
25 Q. As set forth in your declaration the class        10:22:04

382

1    includes, among others, "individuals who           10:22:12
2    for purposes other than resale, purchased,         10:22:20
3    reimbursed, and/or paid for Neurontin for          10:22:22
4    indications not approved by the FDA."              10:22:25
5  A. So from a legal perspective it sounds like        10:22:29
6    those uses may be out, but you understand          10:22:32
7    what I mean by the --                         10:22:36
8  Q. I do.  I understand --                      10:22:36
9  A. -- effects might be --                      10:22:36
10 Q. -- precisely.  I don't -- I'm not --              10:22:36
11 A. -- lasting?                             10:22:37
12 Q. And I'm not taking issue with that.  The          10:22:38
13   only thing I'm saying is that just by              10:22:42
14   reference to the definition of the class in        10:22:45
15   this case, you wouldn't expect to include          10:22:47
16   prescriptions for PHN after it was approved        10:22:53
17   by the FDA in your analysis of impact on           10:22:56
18   the class?                            10:23:00
19 A. Not being a legal expert, I'm not sure -- I       10:23:01
20   wouldn't necessarily have read that that           10:23:04
21   way, but as you read it, perhaps that's the        10:23:07
22   right interpretation of the class            10:23:09
23   definition.                          10:23:11
24 Q. If counsel instructs you to include              10:23:12
25   prescriptions for PHN prior to May 2002, I         10:23:15

383

1    think you had said this before, but let me         10:23:21
2    confirm, your model would assume that all          10:23:22
3    such prescriptions for PHN are ineffective;        10:23:25
4    is that right?                          10:23:28
5  A. Essentially the model does not account for        10:23:28
6    any health benefits from the prescriptions.        10:23:30
7  Q. And so you would include all PHN                   10:23:32
8    prescriptions from that time frame in the Q        10:23:37
9    number that you provide to Dr. Hartman for         10:23:40
10   him to calculate damages; is that correct?         10:23:43
11 A. If so directed by counsel, that's what I          10:23:45
12   would do, yes.                          10:23:47
13 Q. Are you aware of any reason why Neurontin         10:23:50
14   would have been less effective in treating         10:23:52
15   PHN prior to the FDA's supplemental               10:23:55
16   approval in 2002 than it was after?              10:23:58
17 A. I'm not aware of any reason, no.                   10:24:00
18 Q. Do you have an understanding for why              10:24:04
19   defendants sought approval for Neurontin to        10:24:05
20   treat PHN when they did?                     10:24:07
21 A. I'm not sure what you mean by "why."  Why        10:24:09
22   that timing and not another --               10:24:19
23 Q. Sure.                             10:24:20
24 A. -- or not at all?                        10:24:20
25 Q. Yeah, what the circumstances were that           10:24:21

384

1    would have driven the defendants to seek           10:24:23
2    approval for PHN at that time?                 10:24:26
3  A. I don't think I do know the answer to that,       10:24:27
4    no.                              10:24:30
5  Q. Okay.  And you don't know, do you, whether        10:24:31
6    defendants had information at the time that        10:24:34
7    might have supported approval for another          10:24:36
8    indication, do you?                       10:24:38
9  A. Not as I sit here.  I know there are              10:24:38
10   numerous discovery documents about                10:24:43
11   strategic planning for obtaining new              10:24:46
12   indications with the FDA on a variety of           10:24:49
13   these conditions, but as I sit here, I            10:24:52
14   can't tell you if there was anything else          10:24:54
15   in the works at the time.                   10:24:56
16 Q. And I guess the -- going back to what I           10:24:57
17   think my question was, which may not have          10:25:02
18   been perfectly phrased, do you know whether        10:25:04
19   defendants had information or data at the          10:25:06
20   time that would have actually supported an         10:25:09
21   application for approval of another               10:25:12
22   indication from the FDA?                     10:25:16
23 A. And so, again, I'm afraid my answer wasn't        10:25:18
24   clear, either.  I know there are discovery         10:25:21
25   documents that talk about those kinds of           10:25:23

19 (Pages 381 to 384)

M. ROSENTHAL

385

| | | |
|---|---|---|
| 1 | data, but I don't know at that particular | 10:25:27 |
| 2 | time if there were -- if they had clinical | 10:25:29 |
| 3 | trial evidence, is I assume what you | 10:25:33 |
| 4 | mean -- | 10:25:34 |
| 5 | Q. Yeah. | 10:25:35 |
| 6 | A. -- to support another application, no, I | 10:25:35 |
| 7 | don't. I believe it may be knowable, but I | 10:25:38 |
| 8 | don't know. | 10:25:43 |
| 9 | Q. We discussed yesterday that neuropathic | 10:25:43 |
| 10 | pain is one of the off-label indications at | 10:25:45 |
| 11 | issue in the case, correct? | 10:25:47 |
| 12 | A. That's correct, neuropathic pain not | 10:25:49 |
| 13 | including HPN. | 10:25:51 |
| 14 | Q. PHN? | 10:25:53 |
| 15 | A. PHN. | 10:25:54 |
| 16 | Q. At least after May of 2002, right? | 10:25:55 |
| 17 | A. Yes. | 10:25:57 |
| 18 | Q. And why don't -- actually, for purposes of | 10:25:57 |
| 19 | this series of questions, why don't we | 10:26:02 |
| 20 | assume since it's such a mouthful to say | 10:26:04 |
| 21 | neuropathic pain other than PHN after May | 10:26:07 |
| 22 | of 2002 -- | 10:26:09 |
| 23 | A. Just pain. | 10:26:10 |
| 24 | Q. -- can I just say pain? | 10:26:11 |
| 25 | A. Pain. | 10:26:12 |

386

| | | |
|---|---|---|
| 1 | Q. Great. Okay. Subject to further | 10:26:13 |
| 2 | instructions from your counsel, your model | 10:26:15 |
| 3 | would seek to measure the additional | 10:26:17 |
| 4 | incremental prescriptions for pain, | 10:26:20 |
| 5 | correct? | 10:26:22 |
| 6 | A. Again, assuming that -- I understand that | 10:26:22 |
| 7 | some of the legal issues are in flux, or at | 10:26:28 |
| 8 | least that's my understanding about which | 10:26:30 |
| 9 | indications, but if I were told that pain | 10:26:32 |
| 10 | was one of the indications that we were | 10:26:33 |
| 11 | looking at, that's what I would do. | 10:26:35 |
| 12 | Q. Okay. We discussed that Neurontin has been | 10:26:36 |
| 13 | approved for the treatment of neuropathic | 10:26:42 |
| 14 | pain throughout Europe and elsewhere | 10:26:44 |
| 15 | yesterday, correct? | 10:26:46 |
| 16 | A. I believe we did discuss that, yes. | 10:26:46 |
| 17 | Q. Okay. Let's assume for a moment that a | 10:26:48 |
| 18 | class member would have paid for a | 10:26:51 |
| 19 | prescription in the United States for | 10:26:52 |
| 20 | Neurontin to treat neuropathic pain and the | 10:26:56 |
| 21 | prescription worked, the patient's pain | 10:26:59 |
| 22 | went away. Had that patient received that | 10:27:00 |
| 23 | prescription in the United States, your | 10:27:04 |
| 24 | model would conclude that class member | 10:27:08 |
| 25 | would have been impacted and would suffer | 10:27:10 |

387

| | | |
|---|---|---|
| 1 | economic damages; is that correct? | 10:27:12 |
| 2 | A. As I've been directed by counsel to assume | 10:27:14 |
| 3 | that the relevant measure of economic | 10:27:17 |
| 4 | damages here is what was paid for those | 10:27:20 |
| 5 | units of Neurontin induced by the allegedly | 10:27:21 |
| 6 | illegal promotion, so, yes. | 10:27:26 |
| 7 | Q. And if the patient received the very same | 10:27:27 |
| 8 | prescription from a doctor in Europe whose | 10:27:30 |
| 9 | regulatory authority tells her that | 10:27:32 |
| 10 | Neurontin is effective for treatment of | 10:27:34 |
| 11 | neuropathic pain, would that patient have | 10:27:36 |
| 12 | been impacted and suffer economic damages? | 10:27:38 |
| 13 | A. The question of the patient in Europe is | 10:27:42 |
| 14 | outside the realm of that which I've been | 10:27:44 |
| 15 | asked to consider. They're not in the | 10:27:46 |
| 16 | class here, so I don't know what you mean. | 10:27:47 |
| 17 | This is based on a legal theory about, you | 10:27:50 |
| 18 | know, what -- based on a legal theory about | 10:27:54 |
| 19 | what the illegal behavior was, and I'm | 10:27:57 |
| 20 | directed to look at the economic | 10:27:59 |
| 21 | consequences of that. | 10:28:00 |
| 22 | Q. I guess what I'm asking is maybe just from | 10:28:02 |
| 23 | your perspective, are the economic | 10:28:05 |
| 24 | consequences of the prescription that's | 10:28:07 |
| 25 | written in Europe any different from the | 10:28:09 |

388

| | | |
|---|---|---|
| 1 | economic consequences for the prescription | 10:28:11 |
| 2 | that's written in the States for the same | 10:28:14 |
| 3 | indication? | 10:28:16 |
| 4 | A. I'm not sure with what you mean by "the | 10:28:16 |
| 5 | economic consequences." | 10:28:18 |
| 6 | Q. The economic consequences for the | 10:28:19 |
| 7 | individual patient. | 10:28:21 |
| 8 | A. The consequences that I have -- | 10:28:22 |
| 9 | Q. And/or -- I'm sorry. For the individual | 10:28:23 |
| 10 | patient and/or whatever entity is paying | 10:28:26 |
| 11 | for the individual patient's prescription? | 10:28:28 |
| 12 | A. If you want to ask whether the effects are | 10:28:31 |
| 13 | likely to differ on health status, whether | 10:28:35 |
| 14 | the effects are likely to differ in Europe | 10:28:40 |
| 15 | versus the U.S., I have no reason to | 10:28:42 |
| 16 | believe that the health effects differ, but | 10:28:44 |
| 17 | I've not been asked to consider those | 10:28:46 |
| 18 | health effects. | 10:28:47 |
| 19 | Q. Right. I'm asking about the economic | 10:28:48 |
| 20 | effects. You know, what you say in your | 10:28:50 |
| 21 | report that you do in the very first page | 10:28:52 |
| 22 | is that you already tell whether consumers or | 10:28:55 |
| 23 | third-party payers would have and continue | 10:29:06 |
| 24 | to be impacted and suffer economic damages, | 10:29:08 |
| 25 | and so I guess what I'm asking is whether | 10:29:12 |

20 (Pages 385 to 388)

M. ROSENTHAL

**389**

```
1    those same individuals or entities would        10:29:14
2    have been any more impacted or suffer any        10:29:18
3    more economic damages in the United States       10:29:20
4    for the exact same prescription as they          10:29:22
5    would have had they been prescribed the          10:29:25
6    same drug in Europe.                             10:29:29
7 A. That's again -- excuse me. My conclusions        10:29:30
8    are based on being directed to assume that       10:29:33
9    there were no clinical benefits to be            10:29:35
10   counted against the spending, and so that        10:29:39
11   conclusion is relevant to that model where       10:29:41
12   those clinical benefits cannot be shown.         10:29:43
13   So you're asking me to assume a different        10:29:46
14   framework in which those clinical benefits       10:29:49
15   can be shown to exist, and so -- is that         10:29:50
16   what you would like me to assume?                10:29:54
17 Q. No, I don't think so. I'm just sort of          10:29:55
18   looking at what the practical reality of         10:30:04
19   the situation is and what the economic           10:30:06
20   impacts of it are. Is there any greater          10:30:09
21   economic impact on the patient than we           10:30:12
22   talked about in the United States than the       10:30:14
23   patient in Europe?                               10:30:15
24 A. I guess I need to -- again, I'm sorry, I         10:30:17
25   don't mean to be difficult, but I need to        10:30:21
```

**390**

```
1    make some assumption about the clinical          10:30:22
2    effectiveness of the drug, and if you want       10:30:24
3    me to assume that drug was clinically            10:30:27
4    effective for those patients who got it in       10:30:30
5    the U.S. in a similar way to those patients      10:30:32
6    who got it in Europe, then the difference        10:30:35
7    would be the total spending on the drug,         10:30:36
8    which, as you know, is much less in Europe.      10:30:38
9 Q. I guess here's my question: Is there any         10:30:40
10   reason that that assumption -- that you can      10:30:42
11   think of that that assumption should be any      10:30:44
12   different for a patient in the U.S. than a       10:30:45
13   patient in Europe?                               10:30:47
14 A. I don't know of any reason, but, again,         10:30:49
15   I've not been asked to consider this case.       10:30:51
16 Q. Okay. Your report says that you intend to       10:31:05
17   group diagnoses into five categories by          10:31:07
18   reference to ICD-9 codes, correct?               10:31:09
19 A. I did categorize -- excuse me, can I look       10:31:12
20   at that again in my report?                      10:31:16
21 Q. Sure. I think it's on Page 16, Footnote         10:31:18
22   64.                                              10:31:51
23        (Discussion off the record.)                10:31:51
24 A. I see there's a typo in there, too.             10:31:52
25 Q. What's the typo that you mentioned you          10:31:57
```

**391**

```
1    noticed?                                         10:31:59
2 A. That says "IVD" in the very last                 10:31:59
3    characterization of ICD-9. Yes, so this          10:32:02
4    was sort of a preliminary grouping of            10:32:10
5    indications, but as we talked about before,      10:32:11
6    when we look individually by indication,         10:32:15
7    there may be some change -- my                    10:32:20
8    understanding is there may be some change        10:32:21
9    in which indications I'm asked to look at        10:32:23
10   specifically.                                    10:32:25
11 Q. So these may not be the groups -- the           10:32:26
12   groupings that you ultimately use at the         10:32:29
13   end of the day; is that your --                  10:32:30
14 A. Ultimately. This is sort of based on my         10:32:32
15   preliminary examination of those ICD-9           10:32:34
16   codes and what was in the original               10:32:36
17   complaint.                                       10:32:39
18 Q. Okay.                                           10:32:45
19        MR. POLUBINSKI: Let's mark the              10:32:48
20   next document.                                   10:32:48
21        (Exhibit No. 15, Document headed            10:32:49
22   "ICD-9 Codes for Neurontin, From IMS File,       10:32:49
23   Ben Sommers, August 3, 2005," marked for        10:32:49
24   identification.)                                 10:32:49
25 Q. All right. I'm handing you a document that      10:33:06
```

**392**

```
1    we've marked as Rosenthal Exhibit 15.            10:33:08
2 A. Thank you.                                       10:33:12
3 Q. Can you take a look at the document and let      10:33:13
4    me know when you've had a chance to look         10:33:15
5    through it.                                       10:33:18
6 A. Yeah.                                            10:33:19
7 Q. Do you recognize this document?                  10:33:19
8 A. In the way that I would recognize a              10:33:20
9    document that I looked at about a year ago,      10:33:22
10   but, yes, it does look familiar.                 10:33:24
11 Q. Okay. This document was produced to the         10:33:26
12   defendants in January 2006 by plaintiffs'        10:33:28
13   counsel. Do you know why it would have           10:33:34
14   been produced to us?                             10:33:35
15 A. I don't know. Perhaps in relationship to a      10:33:36
16   data request.                                    10:33:46
17 Q. Okay. Did you review this document in           10:33:47
18   connection with your work on this matter at      10:33:48
19   all?                                             10:33:50
20 A. I certainly reviewed it. Not being an           10:33:50
21   expert in clinical coding myself, I              10:33:52
22   wouldn't say that I could have checked it        10:33:53
23   in any real sense. Is that what you're           10:33:56
24   asking? I'm familiar with it.                    10:33:58
25 Q. Okay. Did you rely on the document in any       10:34:05
```

21 (Pages 389 to 392)