Page 473

```
 1   the analysis. Generally speaking, of              12:15:26
 2   course, we're going to look for more              12:15:31
 3   degrees of freedom than just one or two,          12:15:33
 4   so, you know, I can't really say what's a         12:15:36
 5   less extreme limit. There will be a               12:15:40
 6   natural limit. As we continue to add              12:15:42
 7   variables, the standard errors are going to       12:15:44
 8   get larger and larger. And at some point          12:15:47
 9   it'll be hard to find a significant effect        12:15:50
10   of any kind.                                      12:15:52
11 Q. Is that what you mean when you refer to the      12:15:57
12   power of the analysis that we're looking          12:15:59
13   for?                                              12:16:02
14 A. Yes. And so that's a function of the             12:16:02
15   number of variables you include but also of      12:16:04
16   the underlying variability in the dependent       12:16:06
17   variable, as well as the variability of the       12:16:09
18   independent variables.                            12:16:11
19 Q. Okay. How, if at all, would you account          12:16:11
20   for continuing effects of promotional             12:16:18
21   spending and activities beyond the month in       12:16:21
22   which they occur in your model?                   12:16:24
23 A. There are a couple possible ways. A simple       12:16:28
24   approach is to include what's called the          12:16:31
25   stock of promotional activities, and so           12:16:33
```

Page 474

```
 1   that's a discounted sum of, say,                  12:16:36
 2   promotional spending over time. So imagine        12:16:39
 3   you have in your model current spending           12:16:44
 4   plus a discounted sum of all previous             12:16:46
 5   spending.                                         12:16:49
 6 Q. How would you arrive at the discount if you      12:16:50
 7   are using a stock?                                12:16:53
 8 A. It can be estimated, and there are               12:16:53
 9   depreciation rates available in the               12:16:57
10   literature that have been fairly commonly         12:16:59
11   used. But it can be estimated in the model        12:17:01
12   itself.                                           12:17:07
13 Q. Is it the case that the effects of               12:17:07
14   off-label promotion would diminish over           12:17:14
15   time?                                             12:17:17
16 A. It's been found for other promotional            12:17:17
17   efforts that there is this pattern of             12:17:20
18   diminishing effects over time, so they            12:17:23
19   don't disappear between Month 1 and Month         12:17:28
20   2, but they depreciate. So I would expect         12:17:32
21   them to last over time at a diminishing           12:17:35
22   rate, yes.                                        12:17:39
23 Q. The literature that you referred to, does        12:17:42
24   it refer to a constant rate across                12:17:44
25   different prescription drugs, or does it          12:17:47
```

Page 475

```
 1   vary from drug to drug, from promotion to         12:17:48
 2   promotion?                                        12:17:51
 3 A. You know, I would have to double-check, but      12:17:52
 4   my recollection of the literature is that         12:17:54
 5   generally they estimate one depreciation          12:17:57
 6   rate for the whole class of drugs that            12:17:59
 7   they're looking at. So I'm thinking of            12:18:02
 8   Professor Berndt's paper, which I believe         12:18:06
 9   looks at proton pump inhibitors, a specific       12:18:09
10   class of drugs. I think they have one             12:18:12
11   depreciation rate for all the drugs.              12:18:13
12 Q. Okay. You had mentioned that one way of          12:18:17
13   doing this would be through stock analysis,       12:18:22
14   stock variable. Are there other ways that         12:18:28
15   you can think of through which you could do       12:18:32
16   this analysis?                                    12:18:33
17 A. You could actually put the lagged values on      12:18:34
18   the right-hand side.                              12:18:37
19 Q. What does that mean?                             12:18:39
20 A. It means not only putting this month's           12:18:40
21   spending but last month's spending,               12:18:42
22   spending from the month before and estimate       12:18:45
23   explicitly those coefficients for each one.       12:18:48
24 Q. So in other words, making them separate          12:18:51
25   independent variables?                            12:18:53
```

Page 476

```
 1 A. That's right.                                    12:18:53
 2 Q. Each month's spending?                           12:18:54
 3 A. That's right.                                    12:18:55
 4 Q. And the same would be true of each month's      12:18:56
 5   promotional activities, if that's the             12:18:59
 6   way -- you know, if you ended up using            12:19:01
 7   lagged values on the right-hand side?             12:19:04
 8 A. If one chose to do that, yes.                    12:19:05
 9 Q. Will you use a similar lag structure for         12:19:13
10   the M variable?                                   12:19:15
11 A. Potentially all of these variables, as you       12:19:16
12   know, are -- they vary over time, and it          12:19:21
13   may be appropriate to include either lags         12:19:24
14   or some estimate of the stock of prior            12:19:26
15   activities, so but possibly.                      12:19:30
16 Q. Would you use a similar lag structure for        12:19:40
17   the XJT variable as well?                         12:19:42
18 A. It would depend on the specific variable we      12:19:44
19   were talking about, but potentially, yes.         12:19:50
20   I don't know that -- I mean, we certainly         12:19:57
21   look for these kinds of effects over time         12:19:59
22   for each of the variables. I don't know           12:20:04
23   that there's data to suggest that they            12:20:05
24   exist for all types of promotion, but we          12:20:07
25   would investigate that.                           12:20:09
```

42 (Pages 473 to 476)

Page 477

1  Q. Can I direct your attention to Paragraph  12:20:15
2  34b) --  12:20:18
3  A. Okay.  12:20:19
4  Q. -- of your declaration. It's on Page 15.  12:20:20
5  A. Yes.  12:20:28
6  Q. And I want to look specifically at the  12:20:28
7  first bullet point.  12:20:31
8  A. Okay.  12:20:32
9  Q. If you read the tail end of the paragraph  12:20:33
10  before the bullet point, it reads, "It may  12:20:37
11  be necessary to --  12:20:39
12  A. Uh-huh.  12:20:40
13  Q. -- "experiment with non-linear versions of  12:20:41
14  Equation 1." What types of non-linear  12:20:43
15  versions of Equation 1 do you plan on  12:20:49
16  experimenting with?  12:20:52
17  A. So, for example, it may be appropriate to  12:20:52
18  suggest that the underlying trend in  12:20:54
19  off-label use of Neurontin is not linear  12:20:57
20  but quadratic or CORDIC or something else.  12:21:01
21  As you can imagine, a diffusion curve for a  12:21:05
22  drug, a natural diffusion curve would --  12:21:08
23  might not be linear.  12:21:10
24  Q. Maybe you could imagine that.  12:21:11
25  A. So there --  12:21:11

Page 478

1  Q. I was an English major, so it's harder for  12:21:13
2  me to imagine that.  12:21:16
3  A. There are early adopters, and then people  12:21:17
4  start learning about a specific drug, and  12:21:19
5  so it picks up in the rate. And so that  12:21:21
6  might be more consistent with either a  12:21:23
7  quadratic, which would include a squared  12:21:26
8  term, or a cubic, which would include a  12:21:28
9  third degree term. So you could put in  12:21:32
10  literally time and time squared.  12:21:36
11  Q. Sure. Sure. Is there any reason why you  12:21:38
12  wouldn't conduct the same experiments with  12:21:40
13  Equation 2 in addition to Equation 1?  12:21:42
14  A. In either one they both have an underlying  12:21:45
15  time trend.  12:21:48
16  Q. Okay. But there's no reason why the  12:21:49
17  statement that's in this first bullet point  12:21:54
18  wouldn't also apply with respect to  12:21:55
19  modifications that you might make to the  12:21:58
20  model in Equation 2?  12:22:01
21  A. No. Perhaps the text is unclear, but these  12:22:02
22  were intended to be broader issues that  12:22:04
23  would apply to all models.  12:22:06
24  Q. That makes sense to me.  12:22:07
25  A. Okay.  12:22:08

Page 479

1  Q. I just wanted to be clear about it.  12:22:09
2     MR. POLUBINSKI: Now, I'm at a  12:22:13
3  decent stopping point for a break now. We  12:22:17
4  can either break for lunch, or I'm happy to  12:22:20
5  keep going for a little while, whatever  12:22:22
6  your preference is.  12:22:24
7     THE WITNESS: This is a good time  12:22:26
8  for me, I guess, as opposed to going  12:22:27
9  another hour, so...  12:22:29
10    MR. POLUBINSKI: Sure. Okay.  12:22:29
11  Let's break then.  12:22:30
12    THE WITNESS: Okay.  12:22:30
13    MR. POLUBINSKI: Go off the  12:22:32
14  record.  12:22:33
15    THE VIDEOGRAPHER: The time is  12:22:33
16  12:22, and we are off the record.  12:22:38
17    (Lunch recess taken.)  12:22:45

Page 480

1          AFTERNOON SESSION  12:22:54
2     THE VIDEOGRAPHER: The time is  13:12:27
3  1:12 p.m., and we are back on the record.  13:12:30
4                                             13:12:30
5  (MEREDITH B. ROSENTHAL, Ph.D., Resumed.)  13:12:30
6  DIRECT EXAMINATION, Continued  13:12:30
7                                             13:12:32
8  BY MR. POLUBINSKI:  13:12:32
9  Q. So, Professor Rosenthal, I think you  13:12:33
10  testified that you have not actually  13:12:39
11  attempted to run a version of your model  13:12:41
12  yet, correct?  13:12:42
13 A. That's correct.  13:12:43
14 Q. And you haven't yet collected all of the  13:12:43
15  data that you would need to do so; is that  13:12:45
16  correct, too?  13:12:48
17 A. That's correct.  13:12:49
18 Q. So you don't yet know for certain precisely  13:12:49
19  what data you will be able to collect; is  13:12:53
20  that correct?  13:12:55
21 A. That's correct beyond the examples that  13:12:55
22  I've shown you and mentioned in my  13:12:59
23  declaration of data sources that I've seen.  13:13:01
24 Q. Right. But you do -- you would need to  13:13:03
25  collect additional data beyond what you've  13:13:07

Page 481

```
 1   already seen in order to run your model,            13:13:09
 2   correct?                                            13:13:11
 3  A. I would say that's true. I certainly need         13:13:11
 4   additional data on the allegedly illegal            13:13:16
 5   activities.                                         13:13:20
 6  Q. Okay. So therefore you don't know whether         13:13:21
 7   there are any possible deficiencies or any          13:13:22
 8   deficiencies in the data that you would             13:13:25
 9   claim to collect?                                   13:13:27
10  A. I don't know what the deficiencies of the         13:13:28
11   data that I haven't seen yet are, no.               13:13:30
12  Q. Precisely.                                        13:13:32
13  A. Yes.                                              13:13:33
14  Q. And you also haven't identified yet all of        13:13:33
15   the possible variables that may impact              13:13:37
16   prescription behavior?                              13:13:39
17  A. That's correct.                                   13:13:39
18  Q. And you don't yet know what endogeneity           13:13:40
19   problems you might encounter in the course          13:13:46
20   of your work?                                       13:13:49
21  A. Without the data I can't again run those          13:13:50
22   tests and examine the data, no, so I                13:13:53
23   don't -- I can't see that yet.                      13:13:56
24  Q. Right. So you don't know for sure whether         13:13:57
25   you'll be able to address or correct them?          13:14:00
```

Page 482

```
 1  A. I know that there are standard approaches         13:14:02
 2   available for correcting those problems,            13:14:06
 3   for addressing those problems. I guess I'm          13:14:08
 4   not sure what you mean.                             13:14:10
 5  Q. Right. You don't yet know the extent to           13:14:11
 6   which those standard methods will enable            13:14:14
 7   you to create a sufficiently reliable model         13:14:17
 8   because you haven't done it yet?                    13:14:21
 9  A. I guess that may be true. Again, I've run         13:14:23
10   models like this before and overcome                13:14:26
11   similar problems, and of course the rest of         13:14:30
12   the published literature has as well, so I          13:14:32
13   guess I feel fairly confident that the              13:14:34
14   tools are out there that will be able to do         13:14:36
15   that.                                               13:14:39
16  Q. But you haven't actually done it yet?             13:14:39
17  A. But I have not done that.                         13:14:41
18  Q. And you don't know precisely what                 13:14:42
19   multicollinearity problems you may                  13:14:43
20   encounter in the course of your work?               13:14:45
21  A. That's correct.                                   13:14:46
22  Q. And you don't know whether the estimates          13:14:48
23   that you ultimately reach based on the data         13:14:50
24   that you're able to collect will be                 13:14:53
25   statistically significant, correct?                 13:14:56
```

Page 483

```
 1  A. That's correct.                                   13:14:56
 2  Q. Are you familiar with the concept of fit in       13:15:00
 3   the context of a regression analysis?               13:15:01
 4  A. Yes.                                              13:15:03
 5  Q. What is fit?                                      13:15:05
 6  A. Well, in very general terms it's how well         13:15:06
 7   the model you've constructed actually               13:15:08
 8   matches up with the data themselves, and            13:15:11
 9   one measure of fit might be how well you            13:15:16
10   can predict the variables of interest.              13:15:18
11  Q. Okay. And one way to describe it would be         13:15:21
12   to say the better the fit of a model is,            13:15:25
13   the better it describes reality?                    13:15:27
14  A. That seems like a fair way to describe it,        13:15:28
15   yes.                                                13:15:31
16  Q. Okay. And you don't know what the fit of          13:15:31
17   your model will be before you actually run          13:15:36
18   the regression, correct?                            13:15:38
19  A. Certainly not.                                    13:15:38
20  Q. And it's certainly possible that after            13:15:41
21   running the model you could discover it has         13:15:42
22   a poor fit?                                         13:15:44
23  A. I guess it would depend on what you mean by       13:15:47
24   "a poor fit." There will be a range. If             13:15:49
25   we were, for example, looking at a measure          13:15:53
```

Page 484

```
 1   like the R squared, which is the percent of         13:15:54
 2   the variation that you explain,                     13:15:56
 3   effectively, there are -- I can't predict           13:15:58
 4   what that R squared is going to be right            13:16:01
 5   now.                                                13:16:03
 6  Q. Do you have an understanding now for what         13:16:04
 7   an acceptable R squared would be?                   13:16:07
 8  A. It actually typically depends on the class        13:16:09
 9   of model you're doing, right? So --                 13:16:14
10  Q. Sorry.                                            13:16:17
11  A. That's okay.                                      13:16:17
12      -- in certain models we expect to                13:16:19
13   a find better fit than others, time series          13:16:21
14   models. Generally, we can explain the fair          13:16:27
15   amount of the variation, so it would really         13:16:30
16   depend. In the published literature you'll          13:16:33
17   see R squareds varying from, you know,              13:16:36
18   below .1 to much, much higher.                      13:16:40
19  Q. Is there a threshold beyond which -- a            13:16:42
20   threshold in terms of R squared beyond              13:16:53
21   which you would deem a model to be                  13:16:55
22   insufficiently reliable for purposes of             13:16:58
23   your work in this case?                             13:17:01
24  A. At this point I certainly have not                13:17:02
25   considered such a threshold.                        13:17:05
```

M. ROSENTHAL

Page 485

```
 1  Q. All right. In Paragraph 41 of your          13:17:09
 2     declaration, which is Exhibit 1 --          13:17:22
 3  A. Okay.                                       13:17:24
 4  Q. -- you write at the beginning of the        13:17:25
 5     paragraph that "Sufficient data exists to   13:17:28
 6     implement and estimate these models."       13:17:30
 7  A. I see that.                                 13:17:35
 8  Q. Based on what you've just told me, are you  13:17:35
 9     certain that that's true?                   13:17:43
10  A. Again, there are two sets of variables.     13:17:48
11     One relates to the utilization of           13:17:52
12     Neurontin, and not having looked at the     13:17:55
13     National Disease and Therapeutic Index      13:17:59
14     data, I'm aware of what's contained in the  13:18:02
15     National Ambulatory Medical Care survey, I  13:18:06
16     feel confident that these data are          13:18:08
17     available. On the promotional side I've     13:18:10
18     seen documents from defendants that show    13:18:12
19     representative data that I think would be   13:18:15
20     sufficient to estimate -- to model those    13:18:18
21     right-hand side variables, the on- and      13:18:22
22     off-label promotional meetings and events.  13:18:24
23         I have not seen a complete set of       13:18:28
24     them as relates to all the allegations that 13:18:31
25     I will ultimately be asked to estimate the  13:18:34
```

Page 486

```
 1     impact of, but what I've seen suggests that 13:18:35
 2     those data exist.                           13:18:39
 3  Q. At the time that you wrote the statement   13:18:40
 4     you certainly hadn't collected obviously    13:18:47
 5     all of the data that you would envision     13:18:50
 6     using in your model, correct?               13:18:53
 7  A. That's correct.                             13:18:55
 8  Q. Why don't we see if we can, you know, try   13:18:55
 9     as best we can to isolate the specific      13:19:22
10     kinds of data here --                       13:19:22
11  A. Okay.                                       13:19:22
12  Q. -- that we're talking about, and I think    13:19:22
13     what you write here is that in the third    13:19:22
14     sentence there are two key types of data    13:19:23
15     that are necessary for you to run your      13:19:28
16     analysis and that those two types of data   13:19:33
17     are "data on patterns of promotional        13:19:35
18     spending and data on use of Neurontin." Is  13:19:40
19     that correct?                               13:19:46
20  A. That's correct.                             13:19:46
21  Q. Let's look first at data on patterns of     13:19:46
22     promotional spending. Which data on         13:19:51
23     patterns of promotional spending would you  13:19:53
24     think are necessary for you to run your     13:19:56
25     model?                                      13:20:00
```

Page 487

```
 1  A. So the data on promotional spending would   13:20:02
 2     vary depending on the model, but generally  13:20:06
 3     speaking, promotion by the type of          13:20:08
 4     activity, so, for example, if there was     13:20:13
 5     spending on consumer advertising versus     13:20:15
 6     detailing overall for Neurontin, and then   13:20:21
 7     as it relates to these allegations.         13:20:26
 8  Q. What do you mean by "as it relates to these 13:20:34
 9     allegations"?                               13:20:37
10  A. So, again, if we determined that spending   13:20:37
11     that's related to supporting research       13:20:42
12     projects for physicians, that this was      13:20:45
13     subject to the allegations -- there's some  13:20:48
14     allegations to that effect in the           13:20:50
15     complaint, as I recall -- that funds were   13:20:52
16     given to physicians to do these trials with 13:20:54
17     a purpose that was other standard research  13:20:58
18     purposes. And so I would have the overall   13:21:02
19     promotional spending as well as spending on 13:21:07
20     those types of interpromotional activities, 13:21:10
21     if I can use that broad term, that are      13:21:13
22     allegedly illegal.                          13:21:14
23  Q. Would your data need to be broken down --   13:21:17
24     well, for the data on promotional spending  13:21:22
25     do you envision that it would be company    13:21:25
```

Page 488

```
 1     data or publicly available data?            13:21:27
 2  A. I believe it was a combination of company   13:21:28
 3     data and publicly available data. If we     13:21:30
 4     called the IMS Health -- that publicly      13:21:32
 5     available data, which, as you know, there   13:21:35
 6     is some issue about using those without     13:21:37
 7     subpoena.                                   13:21:39
 8  Q. Right. Would you need -- would either one   13:21:41
 9     by itself be sufficient, or would you need  13:21:48
10     both, both company data and third-party     13:21:50
11     data?                                       13:21:54
12  A. If I only had the publicly available --     13:21:55
13         MR. NOTARGIACOMO: Go ahead.             13:21:58
14         THE WITNESS: It's okay to go            13:22:00
15     ahead?                                      13:22:01
16         MR. NOTARGIACOMO: Yeah.                 13:22:01
17  A. If I only had the publicly available data,  13:22:01
18     then I would need some other data to allow  13:22:03
19     me to allocate spending to the alleged      13:22:07
20     illegal activities versus the standard      13:22:10
21     legal promotional activities.               13:22:15
22  Q. And that data would be company data, is     13:22:17
23     what you're envisioning?                    13:22:19
24  A. Perhaps company data. I'm not entirely      13:22:21
25     clear if it weren't company data where it   13:22:24
```

45 (Pages 485 to 488)

M. ROSENTHAL

**489**

```
 1   would come from. It seems possible it             13:22:28
 2   could come from third parties, for example,      13:22:30
 3   from those companies that ran meetings and        13:22:33
 4   events for the defendants.                       13:22:35
 5 Q. For the sort of data that we were just          13:22:36
 6   talking about would you need -- would you        13:22:46
 7   need that broken down reliably by                13:22:51
 8   indication?                                      13:22:54
 9 A. I would need to be able to attach it to an     13:22:54
10   indication. In some instances, as you           13:22:57
11   might imagine, there would be a natural         13:22:59
12   connection. So, for example, if there were      13:23:01
13   funds provided to a psychiatrist to do a        13:23:04
14   small case series on the use of Neurontin       13:23:07
15   for bipolar disorder, then that would be        13:23:10
16   clearly linked to the indication for            13:23:13
17   bipolar disorder. But in general, I would       13:23:15
18   need to be able to link it to the specific      13:23:17
19   indication or indications that were the         13:23:19
20   subject of the promotional activity.            13:23:21
21 Q. Would you also need this data on a monthly    13:23:23
22   basis?                                          13:23:27
23 A. It would not necessarily be true that every   13:23:31
24   variable needs to be on a monthly basis.       13:23:33
25 Q. Why not?                                      13:23:36
```

**490**

```
 1 A. Well, for one thing, the spending might         13:23:36
 2   just happen at a point in time, and I could    13:23:38
 3   code it in for the month in which it           13:23:42
 4   happened, right? And for another, if there     13:23:44
 5   were only annual spending available, I         13:23:48
 6   could use annual data.                         13:23:50
 7 Q. Now, if the data that you're describing      13:23:51
 8   isn't available either in company documents   13:24:10
 9   or in the sort of third-party documents       13:24:10
10   that you described for some point in time     13:24:10
11   during the class period, what impact would    13:24:11
12   that have on your ability to do your          13:24:13
13   analysis?                                     13:24:14
14 A. It would sort of depend on exactly what     13:24:14
15   you're talking about. If I were missing,     13:24:18
16   say, one month in the middle of a longer    13:24:20
17   period, it might be possible to             13:24:22
18   interpolate, so that is essentially to      13:24:24
19   assume a consistent trend between the point 13:24:27
20   before the data missing and the point       13:24:30
21   after. It would depend.                     13:24:32
22 Q. Okay. And if it were something more than  13:24:34
23   just a month in a larger period?            13:24:36
24 A. It might not be possible to do the analysis 13:24:38
25   for that period of time.                    13:24:40
```

**491**

```
 1 Q. Do you need data on each of the factors         13:24:41
 2   that you hypothesize in XKT?                    13:24:46
 3 A. Each of the factors that I decide are          13:24:48
 4   relevant to put into XKT I would need data      13:24:51
 5   for.                                            13:24:54
 6 Q. What sorts of data would you envision          13:24:54
 7   collecting?                                     13:24:57
 8 A. I guess, you know, those XKT events -- I      13:24:57
 9   have to remember my own model. The KT are      13:25:04
10   the off-label promotional events.              13:25:06
11 Q. You're welcome to --                          13:25:08
12 A. Yeah, thank you.                              13:25:08
13 Q. -- refer to it if you like.                   13:25:09
14 A. Subscripts, they fade over time.              13:25:10
15 Q. I'm glad it's not just me.                    13:25:14
16 A. Yeah, so those are -- the meetings, events   13:25:16
17   that are subject to the allegations. And      13:25:22
18   so, again, having seen some documents and     13:25:24
19   some documents in Franklin that show that     13:25:29
20   these events are tracked by the defendants,   13:25:31
21   those are the kinds of data I would imagine   13:25:35
22   would go into XKT.                             13:25:37
23 Q. And I assume as we've discussed before that  13:25:39
24   the data for both promotional activities      13:25:49
25   and promotional spending will need to         13:25:51
```

**492**

```
 1   distinguish between proper and improper        13:25:53
 2   marketing? And for purposes of that           13:25:59
 3   question I think improper -- why don't we     13:26:03
 4   just agree that "improper" means something    13:26:06
 5   that would generate liability in this case?   13:26:09
 6 A. Okay. Thank you. That's useful. Yes, as    13:26:11
 7   we've discussed, I would need to be able to   13:26:16
 8   distinguish them, and if there were such an  13:26:19
 9   occasion at which I could not distinguish    13:26:21
10   in a particular case, I would need to        13:26:24
11   attribute that to proper promotional         13:26:26
12   activities.                                  13:26:30
13 Q. All right. The other category of data that 13:26:30
14   you say you need to collect is data on the   13:26:39
15   use of Neurontin?                            13:26:42
16 A. Yes, that's right.                          13:26:44
17 Q. For that data were you envisioning that you 13:26:45
18   would need company data or third-party       13:26:49
19   data?                                        13:26:55
20 A. The third-party data I had in mind for that 13:26:55
21   would be the, for example, the National      13:26:58
22   Disease and Therapeutic Index data or the    13:27:02
23   NAMCS.                                       13:27:04
24 Q. Had you envisioned that you would also      13:27:04
25   collect company data, or would you rely      13:27:11
```

46 (Pages 489 to 492)

493

```
 1  exclusively on the third-party data that         13:27:13
 2  you described?                                   13:27:15
 3  A.  The company data play a role, as you know,   13:27:15
 4      in giving a total number of units sold, so   13:27:17
 5      the company invoice data would be used to    13:27:20
 6      get the universe by condition -- I mean,     13:27:24
 7      sorry, not by condition, by dosage site.     13:27:29
 8  Q.  And the company data presumably would not    13:27:32
 9      distinguish between off-label and on-label   13:27:38
10      prescriptions?                               13:27:41
11  A.  The company probably has data from IMS       13:27:41
12      again on those distinctions, but in their    13:27:45
13      own data systems I don't expect them to      13:27:49
14      track that, no, as opposed to data they      13:27:51
15      purchase.                                    13:27:54
16  Q.  Okay.  At least as far as the third-party    13:27:54
17      data goes, we discussed the need for those   13:28:01
18      data to be broken down reliably by           13:28:02
19      indication, correct?                         13:28:05
20  A.  That's correct.                              13:28:06
21  Q.  And would you need monthly data for each of  13:28:06
22      those, for whichever data set you end up     13:28:08
23      using?                                       13:28:16
24  A.  No, not necessarily.                         13:28:16
25  Q.  Why not?                                     13:28:17
```

494

```
 1  A.  Well, monthly is just one way of             13:28:19
 2      categorizing this.  If some of the data are  13:28:21
 3      only available annually, we can only use     13:28:23
 4      annual data and then interpolate across      13:28:26
 5      months.                                      13:28:29
 6  Q.  If you needed to use annual data, wouldn't   13:28:29
 7      that mean that you would have fewer          13:28:35
 8      observations with which to conduct your      13:28:36
 9      analysis?                                    13:28:39
10  A.  If, for example, we're only using it for a   13:28:39
11      variable, what essentially you have is       13:28:42
12      you've reduced variation because you've      13:28:45
13      taken an annual variable and stretched it    13:28:47
14      across months.  So in effect you're right,   13:28:50
15      you have reduced power.                      13:28:51
16  Q.  Okay.  And the consequences of reduced       13:28:52
17      power are?                                   13:28:56
18  A.  Well, again, it may make the confidence      13:28:58
19      intervals basically around the estimates     13:29:01
20      larger, the harder to find a significant     13:29:04
21      event.                                       13:29:07
22  Q.  All right.  Let's look at 41a) in            13:29:07
23      particular --                                13:29:30
24  A.  Okay.                                        13:29:31
25  Q.  -- Paragraph 41a) of your declaration.       13:29:31
```

495

```
 1  A.  Okay.                                        13:29:36
 2  Q.  I'm sorry, Paragraph 41a) of your            13:29:36
 3      declaration, Exhibit 1.                      13:29:39
 4  A.  Okay.  I'm with you now.                     13:29:40
 5  Q.  Great.  You write here that "As a matter of  13:29:41
 6      good business practice, companies such as    13:29:46
 7      the Defendants' document marketing           13:29:48
 8      activities by product line and in extensive  13:29:50
 9      detail"; is that correct?                    13:29:53
10  A.  That's correct.                              13:29:55
11  Q.  Now, has your preliminary review suggested   13:29:56
12      to you that defendants in this case          13:30:09
13      maintain this data?                          13:30:11
14  A.  In my review I've seen documentation,        13:30:12
15      again, like the strategic grid that we       13:30:15
16      discussed yesterday that is Footnote 71      13:30:18
17      here.  And so information about this         13:30:22
18      promotional effectiveness system that's in   13:30:28
19      Footnote 70, that indicates the ability to   13:30:30
20      track some promotional activities and their  13:30:34
21      effects.                                     13:30:38
22  Q.  Other than these two categories, can you     13:30:38
23      think of any other sorts of documents that   13:30:41
24      you've seen to date at least that was --     13:30:44
25  A.  That than --                                 13:30:44
```

496

```
 1  Q.  -- in this category?                         13:30:46
 2  A.  Actually, I see the previous footnote as     13:30:47
 3      well, but you're right, these categories     13:30:49
 4      are promotional marketing strategy and       13:30:52
 5      analyses of the effectiveness of marketing   13:30:57
 6      as the major categories.  I understand that  13:31:01
 7      product profits -- excuse me, product        13:31:04
 8      profit and loss statements are often         13:31:07
 9      constructed as well, and so brand by brand   13:31:10
10      there will be promotional and sales          13:31:13
11      spending.                                    13:31:15
12  Q.  Have you seen those documents in this case?  13:31:15
13  A.  I confess I can't remember.  I could check   13:31:18
14      my footnotes to see if I've noted one of     13:31:23
15      these here.                                  13:31:25
16  Q.  You're welcome to take a look if you would   13:31:25
17      like.                                        13:31:28
18  A.  Okay.  There doesn't seem to be a reference  13:31:28
19      in this section at least.  It's probably     13:31:39
20      profit and loss.  I may have seen them for   13:31:40
21      other drugs.                                 13:31:42
22  Q.  But you don't recall having seen them for    13:31:46
23      Neurontin?                                   13:31:48
24  A.  I'm not certain, yeah.  Footnote 68 talks    13:31:48
25      about documents that I can picture now       13:31:52
```

47 (Pages 493 to 496)

**Page 497**

1  where they look at promotional spending for                13:31:53
2  Neurontin across the customer business                      13:31:56
3  units, which is not quite the same as the                   13:31:58
4  product profit and loss.                                    13:32:06
5  Q. Okay. How certain are you that there's a                 13:32:08
6  complete set of documents containing all of                 13:32:15
7  this data for all of the periods of time                    13:32:19
8  that your model will cover?                                 13:32:23
9  A. Can I take that in pieces?                               13:32:26
10 Q. Sure.                                                    13:32:29
11 A. First, I know that sources like IMS Health               13:32:30
12 track promotional spending by category                      13:32:36
13 routinely and that those data exist.                        13:32:39
14 Second, I know, having looked at some of                    13:32:44
15 these discovery documents, having consulted                 13:32:46
16 with Professor King about whom we spoke                     13:32:48
17 yesterday, Charles King, that companies do                  13:32:51
18 track their marketing expenditures at the                   13:32:55
19 very least and their effects generally as                   13:32:58
20 routine matter of, as I say here, good                      13:33:00
21 business practice.                                          13:33:02
22 So I feel quite confident that                              13:33:03
23 these documents existed at one time. I                      13:33:06
24 guess I can't say for sure that the                         13:33:08
25 defendants can still produce those                          13:33:11

**Page 498**

1  documents, whether they existed. And what                   13:33:13
2  I've seen in discovery suggests that the                    13:33:15
3  discovery materials may yield some of these                 13:33:19
4  data.                                                       13:33:21
5  Q. Okay. Let me take your answer in pieces.                 13:33:22
6  The first piece relates to the IMS data,                    13:33:26
7  correct?                                                    13:33:29
8  A. Yes.                                                     13:33:29
9  Q. I think we discussed before how the IMS                  13:33:29
10 data on promotional activity at least                       13:33:33
11 wouldn't distinguish from indication to                     13:33:37
12 indication --                                               13:33:39
13 A. That's correct.                                          13:33:40
14 Q. -- is that correct?                                      13:33:40
15 A. Overall, yes.                                            13:33:41
16 Q. The second piece relates to your                         13:33:42
17 conversations with Professor King, correct?                 13:33:46
18 A. Yes.                                                     13:33:49
19 Q. And that if I understand it correctly,                   13:33:49
20 Professor King advised you that companies                   13:33:53
21 as a general matter do tend to track                        13:33:56
22 promotional spending; is that correct?                      13:34:00
23 A. Pharmaceutical companies in particular.                  13:34:01
24 Q. Okay. Does your conversation with                        13:34:10
25 Professor King suggest to you that the                      13:34:11

**Page 499**

1  defendants necessarily would have done this                 13:34:18
2  tracking of Neurontin by indication for                     13:34:21
3  every period of time that's covered by the                  13:34:26
4  class period?                                               13:34:29
5  A. That's a very comprehensive statement, and               13:34:31
6  I would say my understanding, again, having                 13:34:38
7  seen selected documents in Franklin,                        13:34:42
8  documents that form the basis of the                        13:34:45
9  complaint, is that these data were tracked                  13:34:46
10 extensively, and I can think of no reason                   13:34:49
11 why there would be any point in time that                   13:34:52
12 the defendants would have stopped tracking                  13:34:55
13 them. I can't think of any reason why                       13:34:57
14 there would be a gap.                                       13:34:59
15 Q. Could there be a point in time before which              13:35:00
16 they started tracking prescriptions by                      13:35:03
17 indication --                                               13:35:06
18 A. Possibly.                                                13:35:06
19 Q. -- promotional expenditures by indication?               13:35:07
20 A. That's possible.                                         13:35:10
21 Q. And you don't know whether the documents                 13:35:10
22 would reflect that one way or the other?                    13:35:12
23 A. I don't know whether I could establish that              13:35:14
24 with the documents I've reviewed yet. If                    13:35:17
25 that were to be the case, then I guess                      13:35:19

**Page 500**

1  there would not be sufficient support for                   13:35:23
2  analysis for those time periods.                            13:35:25
3  MR. POLUBINSKI: Okay. Why don't                             13:35:30
4  we take just a quick break to change the                    13:35:31
5  tape?                                                       13:35:33
6  THE WITNESS: Okay. I'll take                                13:35:34
7  advantage so we don't have to break again.                  13:35:36
8  MR. POLUBINSKI: The time is 1:35.                           13:35:38
9  This is the end of Tape 2 -- Tape 3, excuse                 13:35:43
10 me, and we're off the record.                               13:35:45
11 (Recess taken.)                                             13:35:48
12 THE VIDEOGRAPHER: The time is                               13:38:53
13 1:39. This is the beginning of Tape 4, and                  13:38:57
14 we're back on the record.                                   13:39:01
15 BY MR. POLUBINSKI:                                          13:39:02
16 Q. So, Professor Rosenthal, I'm going to ask                13:39:02
17 you to dig a document out of the stack of                   13:39:05
18 exhibits that's sitting next to you.                        13:39:07
19 A. Okay.                                                    13:39:10
20 Q. If you could look for Rosenthal Exhibit 12,              13:39:10
21 that would be great. Can I help you find                    13:39:14
22 it?                                                         13:39:31
23 A. Okay. It's the promotional grid. Got it.                 13:39:32
24 Thank you.                                                  13:39:34
25 Q. The bottom of the stack, of course.                      13:39:35

48 (Pages 497 to 500)

**Page 501**

1  A. Yes, of course. Okay. I have it.  13:39:37
2  Q. Rosenthal Exhibit 12 is the document that  13:39:42
3     we discussed yesterday that is cited in  13:39:44
4     Footnote 71, correct?  13:39:46
5  A. That is correct.  13:39:48
6  Q. It's the 1998 Strategic Plan and A&P  13:39:48
7     Allocation Grid, right?  13:39:52
8  A. Right.  13:39:54
9  Q. And that this is the document that you  13:39:54
10    identify in 41a) that you write permits you  13:39:57
11    to track spending on off-label promotions  13:40:04
12    in the form of speaking engagements and  13:40:09
13    consultancies; am I getting that right?  13:40:11
14 A. I'm sorry, can I just see where you're  13:40:16
15    reading?  13:40:20
16 Q. Yeah, of course. It's the language on the  13:40:20
17    carry-over sentence at the end of the page.  13:40:23
18 A. Okay.  13:40:26
19 Q. I'll read the sentence for you. It's  13:40:26
20    "Finally, I have seen numerous agreements  13:40:29
21    such as Bates-stamped document V084073 to  13:40:31
22    078 that track spending on off-label  13:40:38
23    promotion in the form of speaking  13:40:41
24    engagements and consultancies."  13:40:42
25 A. Right. So, for example, you'll see rows  13:40:47

**Page 502**

1     that say "Physician honoraria and travel,"  13:40:49
2     "Speakers Bureau"?  13:40:51
3  Q. Where are you looking?  13:40:53
4  A. Under "Local Tactics."  13:40:54
5  Q. This is on the first page of the document?  13:40:57
6  A. On the first page, yes, sorry.  13:40:58
7  Q. Okay. Just a general question about the  13:41:01
8     document. We did agree that this is a  13:41:05
9     prospective document, correct?  13:41:06
10 A. Right. You indicated that, and I agree.  13:41:07
11    It makes sense. It's a strategic plan,  13:41:10
12    so...  13:41:14
13 Q. And just so that I'm square on this, can  13:41:20
14    you point to any documents that actually  13:41:23
15    demonstrate what defendants actually spent  13:41:25
16    on the promotion -- actually spent for  13:41:27
17    promotion of Neurontin?  13:41:29
18 A. This grid, if in fact it is only a plan,  13:41:30
19    doesn't show that. Again, as I mentioned  13:41:35
20    before in the promotional effectiveness  13:41:40
21    system, those kinds of activity -- tracking  13:41:42
22    mechanisms look at actual events, spending  13:41:45
23    and their effects.  13:41:49
24 Q. Those are the documents that you referred  13:41:54
25    to in Footnote 70?  13:41:56

**Page 503**

1  A. That's right. Let me just verify that, but  13:41:57
2     I believe that's right. Yes.  13:42:04
3  Q. All right. Looking at this document and  13:42:07
4     again sort of just looking at the first  13:42:09
5     page, is there a way that you can discern  13:42:11
6     off-label promotional spending versus  13:42:18
7     on-label promotional spending just on the  13:42:20
8     basis of this document?  13:42:22
9  A. Well, if we're looking at the planned  13:42:24
10    spending and taking that as representative  13:42:32
11    of what actually happened, as you see, the  13:42:33
12    heading on the first page says "Expend  13:42:37
13    Neurontin use on epilepsy through the  13:42:40
14    introduction of monotherapy." So that's  13:42:43
15    for a particular off-label use, and then  13:42:45
16    there's spending associated with it.  13:42:48
17 Q. I guess, didn't we agree that the  13:42:49
18    physicians who would be targeted, for lack  13:42:56
19    of a better word, by the sorts of  13:42:59
20    activities described in Section 1 here of  13:43:05
21    on the first page would be epileptologists,  13:43:08
22    correct?  13:43:12
23 A. That's correct.  13:43:12
24 Q. And that some amount of this activity could  13:43:12
25    well be directed to on-label uses of  13:43:21

**Page 504**

1     Neurontin as adjunctive therapy for  13:43:25
2     treatment of seizures?  13:43:27
3  A. Well, in my view, this grid shows  13:43:28
4     defendants' own estimate of the dollars to  13:43:33
5     be spent promoting monotherapy. Whether or  13:43:37
6     not it's for the same individuals, I'm not  13:43:39
7     sure that I understand your point.  13:43:43
8  Q. Let me -- let's -- let me ask you this: Is  13:43:44
9     the spending that's envisioned in this  13:43:50
10    document organized annually or by monthly  13:43:53
11    outlays?  13:43:56
12 A. My understanding is that this is for the  13:43:57
13    entire year 1998.  13:44:00
14 Q. Would you be able to create a monthly  13:44:02
15    series of promotional expenditures using a  13:44:07
16    document like this?  13:44:09
17 A. Again, as I mentioned before, if some  13:44:10
18    variables are only available on an annual  13:44:13
19    basis, I would interpolate them, excuse me,  13:44:15
20    interpolate the monthly data and thereby  13:44:19
21    lose some power, but this is frequently  13:44:23
22    done in studies like this.  13:44:26
23 Q. Okay.  13:44:28
24 A. Okay.  13:44:28
25 Q. You can set this one, too, aside.  13:44:29

M. ROSENTHAL

### Page 505

```
 1  A.  Okay.  I'll leave it on the top.              13:44:36
 2  Q.  All right.  Let me direct your attention to   13:44:54
 3      Paragraph 7d) on Page 5 of your               13:44:56
 4      declaration, Exhibit 1 to your deposition.    13:44:59
 5  A.  I'm sorry?                                    13:45:05
 6  Q.  Paragraph 7d).                                13:45:06
 7  A.  70?                                           13:45:07
 8  Q.  Uh-huh.                                       13:45:09
 9  A.  And then -- okay.  I'm sorry.  I'm sorry,     13:45:09
10      Paragraph 70 of my --                         13:45:17
11  Q.  7d).                                          13:45:18
12  A.  7d), oh, sorry.  I thought I was losing it.   13:45:21
13  Q.  We're going backwards.                        13:45:26
14  A.  That's a shame.                               13:45:28
15  Q.  Yeah, well, not for long.                     13:45:29
16  A.  All right.                                    13:45:30
17  Q.  Okay.                                         13:45:31
18  A.  Okay.                                         13:45:35
19  Q.  So in this paragraph you write that           13:45:36
20      "Parke-Davis made the explicit calculation    13:45:38
21      that seeking FDA approval would not be        13:45:40
22      worthwhile, given the short remaining         13:45:42
23      patent life for Neurontin," correct?          13:45:44
24  A.  That's correct.                               13:45:47
25  Q.  What's the basis for that statement?          13:45:47
```

### Page 506

```
 1  A.  That comes -- and you'll see there are        13:45:49
 2      footnotes there in the documents, but         13:45:53
 3      essentially it's a summary of my              13:45:55
 4      understanding of what the complaint was       13:45:57
 5      saying.                                       13:45:59
 6  Q.  What's the extent of your knowledge about     13:45:59
 7      the process involved in a manufacturer        13:46:07
 8      seeking approval from the FDA for             13:46:10
 9      additional indications for an existing        13:46:12
10      drug?                                         13:46:15
11  A.  My knowledge is fairly rudimentary on that    13:46:17
12      subject, and my understanding is that         13:46:21
13      additional clinical trials need to be done.   13:46:23
14  Q.  Do you have any knowledge for how expensive   13:46:26
15      the process might be?                         13:46:27
16  A.  I understand that undertaking clinical        13:46:28
17      trials, particularly randomized control       13:46:31
18      double-blind trials, is very expensive in     13:46:34
19      general, and so I mean, it's well-known       13:46:37
20      that under the process of drug development,   13:46:41
21      that is, getting approval from the FDA, is    13:46:46
22      expensive and is essentially a barrier to     13:46:48
23      entry for new drugs.                          13:46:51
24  Q.  Do you have any knowledge of how long the     13:46:52
25      process can take of running the clinical      13:46:59
```

### Page 507

```
 1      trials and then seeking the approval from     13:47:00
 2      the agency?                                   13:47:02
 3  A.  Again, I've certainly seen discussions in     13:47:03
 4      the policy literature about how long it       13:47:06
 5      takes to get FDA approval.  There have been   13:47:10
 6      efforts, as you know, over the last decade    13:47:13
 7      or two to try to shorten that length of       13:47:16
 8      time, but so my understanding is that it's    13:47:18
 9      a substantial consideration, that it takes    13:47:21
10      quite a while.                                13:47:24
11  Q.  By "quite a while," are we talking years?     13:47:25
12  A.  It would be -- that would be my -- again,    13:47:28
13      my not terribly expert opinion on this is     13:47:31
14      that it would take a couple of years, and     13:47:35
15      it would represent a significant sum of       13:47:36
16      money to undertake.                           13:47:39
17  Q.  Would you agree with the assumption that      13:47:40
18      manufacturers of prescription drugs are by    13:47:45
19      and large rational economic actors?           13:47:47
20  A.  And if you mean profit-maximizing firms, I    13:47:53
21      would agree with that assumption.             13:47:56
22  Q.  And so based on that assumption, would you    13:48:05
23      say that it's also a reasonable assumption    13:48:08
24      that Parke-Davis, as you lay it out here      13:48:14
25      (indicating) in your declaration, that        13:48:17
```

### Page 508

```
 1      Parke-Davis made the implicit calculation     13:48:18
 2      that they wouldn't earn sufficient profit     13:48:20
 3      to make seeking an additional use             13:48:24
 4      worthwhile?                                   13:48:26
 5  A.  That is my understanding, that it was an     13:48:27
 6      explicit (sic) calculation, yes.              13:48:30
 7  Q.  All right.  Let me ask you a hypothetical     13:48:35
 8      question on this.  Assume the manufacturer    13:48:37
 9      had a drug whose patent will run out in       13:48:42
10      three years --                                13:48:44
11  A.  Okay.                                         13:48:45
12  Q.  -- and discovers that this drug which has     13:48:45
13      already been approved by the FDA for one      13:48:57
14      condition is almost surely effective for an   13:48:59
15      additional unapproved condition.  The         13:49:01
16      manufacturer estimates that it will cost      13:49:05
17      them $2 million and two years to complete     13:49:07
18      the studies they need to complete and to      13:49:11
19      end -- assuming that the results are          13:49:16
20      favorable in those studies, to secure the     13:49:17
21      FDA approval of that new use.                 13:49:19
22        I have no sense for whether those           13:49:22
23      numbers -- they're probably low-balled in     13:49:24
24      a, you know, in a serious way, but for        13:49:27
25      purposes of this hypothetical let's use       13:49:29
```

50 (Pages 505 to 508)

Page 509

1  them.
2  And then they estimate that the
3  potential profit for the drug over the one
4  year of its remaining patent life after the
5  two-year approval period is a million
6  dollars. What would you imagine the
7  manufacturer would choose to do in that
8  circumstance?
9  A. I'm sorry, I think I lost some important
10  elements of the word problem. I need a
11  pencil, but what was the cost of the
12  clinical trials? It took two years to --
13  Q. Two years and 2 million, just so we keep
14  the numerals simple.
15  A. That's right. Excellent. We're good.
16  Right. So, again, you know, I believe that
17  there's a math calculation. It's a simple
18  one. If the profits are a million dollars
19  and the cost is $2 million, no matter what
20  discount rate you use, you come to a
21  conclusion that it doesn't make sense to go
22  through the process.
23  Q. Okay. And you wouldn't suggest the
24  manufacturer has done anything wrong by not
25  going through the process?

Page 510

1  A. No.
2  Q. Does it matter for purposes of your answer
3  whether the drug is or isn't effective for
4  the supplemental use?
5  A. For the calculation?
6  Q. For the answer to your -- answer to the
7  last question, which is that they haven't
8  done anything wrong in not seeking approval
9  for the additional use.
10  A. Well, we're getting --
11  MR. NOTARGIACOMO: Economically,
12  morally, legally? Where are we now?
13  MR. POLUBINSKI: Professor
14  Rosenthal answered the question.
15  Q. What were you thinking when you answered
16  it?
17  A. I believe I was trapped. But in the first
18  example I was speculating on the cost/
19  benefit comparison, and in no way did the
20  rightness of launching the drug for that
21  indication enter into my calculation. I
22  was merely comparing the $2 million to the
23  million dollars. That was a profit-
24  maximizing decision.
25  Q. Sure.

Page 511

1  A. And if you want me to say something about
2  whether or not it's right if there's no
3  effectiveness, then I need to use some
4  other standard. I don't know what the
5  right standard to use is there.
6  Q. Okay. Are you aware of any standard, I
7  guess, under which it would be wrong for
8  them not to go and seek additional approval
9  for that use?
10  MR. NOTARGIACOMO: Objection.
11  A. I'm not aware of any standard to evaluate
12  that decision.
13  Q. Okay. Now, let me ask you also to assume
14  just for purposes of this question that
15  Neurontin is 100 percent effective for a
16  given off-label use. Could you imagine the
17  defendants making a rational economic
18  decision not to even pursue FDA approval
19  for that use based on the amount of time
20  left in the patent life of the drug?
21  A. Again, my response to your original
22  question didn't assume anything about
23  effectiveness. So the economic -- rational
24  economic decision was just one about costs
25  and benefits in terms of profitability --

Page 512

1  Q. And --
2  A. -- and therefore I would respond the same
3  way.
4  Q. Okay. And that they could in fact make a
5  rational economic decision not to even
6  sponsor a single clinical trial?
7  A. Yes, absolutely. The rational economic
8  decision is based only on profits.
9  Q. And their decision to do that or not to do
10  that wouldn't mean anything with regard to
11  whether Neurontin was or wasn't perfectly
12  effective for that use?
13  A. Again, I believe that one can abstract that
14  decision in terms of purely profits and
15  that it could be the same decision no
16  matter what the effectiveness is, and so I
17  think the answer is yes, but I believe I've
18  already answered it, unless I haven't been
19  clear.
20  Q. No, that's fine -- right. I guess by
21  itself, then, the fact that Neurontin was
22  not approved by the FDA for a given use
23  doesn't mean that Neurontin wasn't
24  perfectly effective for that use?
25  A. By itself that does not indicate anything

Page 513

1  about the true effectiveness of Neurontin,  13:53:34
2  no.  13:53:36
3  Q. Okay. All right. You've said in your  13:53:41
4     model that you proposed to quantify the  13:53:47
5     effect of wrongful conduct on a class-wide  13:53:49
6     level, correct?  13:53:53
7  A. Uh-huh.  13:53:53
8  Q. I take it you'll -- that you expect to be  13:53:53
9     able to quantify the extent of the impact  13:53:58
10    suffered by each of the subclasses. So in  13:54:01
11    other words, the consumer subclass as well  13:54:04
12    as the third-party payer subclass, correct?  13:54:07
13 A. That's correct.  13:54:09
14 Q. Do you know how large the third-party payer  13:54:09
15    subclass is?  13:54:13
16 A. Can you tell me what you mean by "large"?  13:54:13
17    You mean number of members --  13:54:17
18 Q. Yes.  13:54:17
19 A. -- or number of dollars?  13:54:18
20 Q. Number of members.  13:54:19
21 A. I don't know the number of members. If you  13:54:21
22    look at third-party payers, commercial  13:54:26
23    insurers generally, the number is in the  13:54:31
24    several hundred. If you add in the Taft-  13:54:34
25    Hartley plans, there are probably another  13:54:39

Page 514

1  hundred or so. That's order of magnitude.  13:54:41
2  Q. Are there others that you would have to  13:54:45
3     include?  13:54:46
4  A. On the third-party payer side?  13:54:47
5  Q. Yeah.  13:54:49
6  A. I believe the commercial plans -- the Taft-  13:54:49
7     Hartley funds and the commercial plans are  13:55:02
8     the principal members of the third-party  13:55:03
9     payer subclass. I could check the  13:55:05
10    complaint.  13:55:07
11 Q. And I guess just adding up the two  13:55:07
12    categories that you've just described, I  13:55:13
13    guess we would agree that the, to the best  13:55:16
14    of your knowledge now, the third-party  13:55:19
15    payer subclass would be at least several  13:55:21
16    hundred entities large, possibly over a  13:55:24
17    thousand?  13:55:27
18 A. Possibly.  13:55:27
19 Q. Okay. I assume that your model would seek  13:55:28
20    to determine aggregate impact on the third-  13:55:39
21    party payer subclass; is that correct?  13:55:41
22 A. I have been asked to develop a model to  13:55:43
23    estimate aggregate impact, yes.  13:55:45
24 Q. And that your model wouldn't purport to  13:55:47
25    determine whether each member, each  13:55:50

Page 515

1  individual member of the third-party payer  13:55:51
2  subclass suffered an injury as a result of  13:55:53
3  the conduct at issue?  13:55:55
4  A. Well, as you know, in sort of the context  13:56:00
5     of a class like this you're looking at  13:56:03
6     aggregate impact that is common to all the  13:56:05
7     class members, so -- but I don't identify  13:56:08
8     if what you mean is to look specifically at  13:56:10
9     Blue Cross/Blue Shield of Kansas City and  13:56:13
10    their effects.  13:56:15
11 Q. Okay. We've discussed before in your  13:56:16
12    declaration how physicians -- let's  13:56:23
13    actually look at Paragraph 12.  13:56:26
14 A. 12, thank you. Okay.  13:56:29
15 Q. We've discussed before how in your  13:56:40
16    declaration how physicians "face numerous  13:56:43
17    constraints, including limited time and  13:56:45
18    cognitive ability to digest the continuous  13:56:48
19    flow of information about new treatments"?  13:56:50
20 A. Yes.  13:56:53
21 Q. Will that statement be true of at least  13:56:53
22    some of the third-party payers as well?  13:56:59
23 A. I'm not sure what you mean by that.  13:57:01
24 Q. Would you agree that third-party payers do  13:57:07
25    process to some degree information about  13:57:12

Page 516

1  the different treatments for which they  13:57:15
2  reimburse?  13:57:17
3  A. I believe that third-party payers make  13:57:17
4     coverage decisions. For example, they make  13:57:21
5     coverage decisions -- I don't know the  13:57:25
6     extent to which -- I know that they  13:57:29
7     incorporate some of this information that I  13:57:31
8     believe was referenced yesterday through  13:57:33
9     the Drugdex which tracks studies on  13:57:35
10    particular uses of particular drugs, and so  13:57:39
11    if that's what you mean by they sort of  13:57:41
12    incorporate new information in their  13:57:44
13    policies -- is that the kind of thing that  13:57:46
14    you had in mind?  13:57:47
15 Q. Yeah. And do -- third-party payers, I'd  13:57:48
16    assume to some degree at least, make  13:57:51
17    coverage decisions about whether they'll  13:57:53
18    reimburse for particular drugs for  13:57:56
19    particular uses, correct?  13:57:57
20 A. To some degree they make those policies.  13:57:58
21    As you know, they don't tend to apply those  13:58:02
22    policies patient by patient.  13:58:05
23 Q. Sure. No, of course.  13:58:08
24 A. So for example --  13:58:10
25 Q. Of course.  13:58:12

**517**

1  A. Right. Okay. 13:58:12
2  Q. But in the context of making decisions 13:58:13
3     about what to cover and what not to cover, 13:58:16
4     they do receive and process information 13:58:18
5     about various treatments? 13:58:21
6  A. I imagine that there's a function in the 13:58:23
7     third-party payers where they do this -- I 13:58:25
8     guess what I'm having a little trouble with 13:58:28
9     is I can see how this happens for an 13:58:30
10    initial coverage decision. I don't know 13:58:32
11    the extent to which third-party payers 13:58:34
12    revisit existing drugs with regard to new 13:58:35
13    indications. 13:58:38
14 Q. Could you imagine that the answer to that 13:58:39
15    question might vary from third-party payer 13:58:41
16    to third-party payer? 13:58:43
17 A. Perhaps. 13:58:44
18 Q. That some of them might revisit this on 13:58:44
19    several occasions? 13:58:48
20 A. Again, since I'm not entirely sure the 13:58:50
21    extent to which this happens at all, I 13:58:53
22    could imagine that it would happen 13:58:57
23    differentially, so that's certainly in the 13:58:59
24    realm of possibility. 13:59:00
25 Q. All right. Also in Paragraph 12 you write 13:59:01

**518**

1     the "Physicians are often not aware of the 13:59:14
2     latest scientific evidence on treatments 13:59:17
3     and rely heavily on commercial sources of 13:59:22
4     information, such as pharmaceutical company 13:59:24
5     promotional materials." 13:59:26
6        In terms of awareness of the 13:59:32
7     latest scientific evidence, would your 13:59:34
8     statement as it's laid out here in your 13:59:39
9     declaration be true of third-party payers? 13:59:41
10 A. Again, it's sort of a -- I'm having a 13:59:43
11    little trouble casting the third-party 13:59:48
12    payer as medical decision-makers because 13:59:50
13    they're so enormous, but would the medical 13:59:51
14    director of a third-party payer be aware of 13:59:54
15    the latest scientific evidence to some 13:59:57
16    degree? 14:00:00
17 Q. Okay. 14:00:03
18 A. I suppose. 14:00:03
19 Q. And that degree would vary from third-party 14:00:04
20    payer to third-party payer? 14:00:06
21 A. I suppose. 14:00:07
22 Q. There might be some third-party payers that 14:00:08
23    may not even have a medical director as 14:00:10
24    such? 14:00:12
25 A. That, I have trouble believing. 14:00:12

**519**

1  Q. Okay. 14:00:15
2  A. But I can believe that medical directors 14:00:15
3     vary. 14:00:18
4  Q. Okay. All right. You state in Paragraph 14:00:18
5     33 of your declaration -- actually Footnote 14:00:25
6     49. 14:00:37
7  A. Okay. 49? 14:00:37
8  Q. Yeah. 14:00:39
9        -- that "price plays a relatively 14:00:42
10    minor role here because most patients 14:00:43
11    receiving Neurontin are covered by 14:00:47
12    insurance so they only pay" -- "they only 14:00:49
13    face the co-payment amount." 14:00:51
14       Does price play a similarly minor 14:00:55
15    role in decision-making on reimbursement by 14:00:57
16    third-party payers? 14:01:00
17 A. I think it would depend on the situation, 14:01:01
18    but clearly -- so can I be a little 14:01:03
19    specific here for a second? 14:01:06
20 Q. Please. 14:01:08
21 A. So the price we're talking about in the 14:01:08
22    Rizzo model and in general is -- 14:01:10
23 Q. In the which model? 14:01:14
24 A. I'm sorry, in the Rizzo model in Footnote 14:01:16
25    49, R-I-Z-Z-O, is something like that AWP 14:01:18

**520**

1     price. In all likelihood it's the AWP, the 14:01:22
2     list price for the drug. And most of these 14:01:25
3     models are about overall consumption of the 14:01:30
4     drug. So sort of looking at total units 14:01:32
5     consumed as a function of this list price, 14:01:34
6     the relationship is not all that clear, 14:01:37
7     because, again, the individuals pay 14:01:41
8     something out of pocket. 14:01:43
9        So now you're asking, I think, 14:01:44
10    does that same list price affect a third- 14:01:46
11    party payer's coverage decision? I think 14:01:50
12    it would depend -- for the most part 14:01:53
13    third-party payers cover -- open 14:01:56
14    formularies are the most common form, so 14:01:59
15    they cover all drugs. They may put 14:02:01
16    differential co-payments in for certain 14:02:03
17    kinds of high cost drugs in cases where 14:02:05
18    they have lower cost substitutes in 14:02:09
19    general. It'll depend on the class of 14:02:11
20    drugs, but you can imagine there's some 14:02:13
21    very high cross-biological drugs that don't 14:02:15
22    have high co-payments simply because there 14:02:18
23    aren't alternatives, and so using that kind 14:02:21
24    of co-payment mechanism doesn't make sense 14:02:23
25    for trying to get consumers to try a 14:02:24

521
1   different drug.                                14:02:26
2   Q. All right. And different third-party        14:02:27
3      payers, I take it, could make different     14:02:28
4      decisions on this even with respect to the  14:02:29
5      same drug; is that correct?                 14:02:32
6   A. In the cross-section there may be           14:02:33
7      differences in co-payments. There           14:02:36
8      certainly are differences in co-payments.   14:02:38
9   Q. Okay. The third-party payers, generally     14:02:40
10     speaking, have a significant economic stake 14:02:42
11     in persuading or directing physicians not   14:02:45
12     to prescribe drugs for indications for      14:02:48
13     which they're known to be ineffective; is   14:02:51
14     that correct?                               14:02:54
15  A. Could you read that back? I just ---        14:02:54
16        MR. POLUBINSKI: If you could read        14:03:01
17     it, that would be great.                    14:03:02
18        (Record read.)                           14:03:18
19        MR. NOTARGIACOMO: Objection.             14:03:18
20  A. I guess the way you phrase that, it's       14:03:19
21     certainly true that third-party payers      14:03:29
22     generally do better when spending is less,  14:03:31
23     and given that they want to constrict       14:03:38
24     spending, eliminating ineffective use makes 14:03:42
25     more sense than effective use, but that     14:03:44

522
1   statement doesn't characterize very well       14:03:46
2   what we know about how the market works in     14:03:48
3   this area. There are lots of treatments        14:03:52
4   that are known to be ineffective, low          14:03:54
5   effectiveness that are covered.                14:03:58
6   Q. Do third-party payers have different ways   14:04:07
7      of affecting physician or patient decision- 14:04:09
8      making with respect to drugs that they      14:04:12
9      believe to be ineffective for treating      14:04:14
10     particular indications?                     14:04:18
11        MR. NOTARGIACOMO: Objection.             14:04:19
12  A. The -- yes, there are financial incentives, 14:04:20
13     pre-authorization requirements, for         14:04:27
14     example, and, of course, coverage           14:04:30
15     decisions.                                  14:04:35
16  Q. Okay. Let's talk about some of these. All   14:04:35
17     right. How about a prior authorization      14:04:47
18     program; could you describe just briefly    14:04:48
19     how such a program would work in this       14:04:53
20     context?                                    14:04:55
21  A. A prior authorization program might, for    14:04:55
22     example, require that a physician supply    14:04:58
23     some clinical information about a patient   14:05:01
24     before the prescription drug would be       14:05:03
25     reimbursed.                                 14:05:06

523
1   Q. I think we agreed in some of the early      14:05:09
2      questions that we did today that the        14:05:16
3      implementation of a prior authorization     14:05:18
4      program might impact prescription decisions 14:05:19
5      in the aggregate. Am I correct on that?     14:05:22
6   A. So it would depend on how the prior         14:05:24
7      authorization program -- well, let's say,   14:05:26
8      for example, it was for any patient getting 14:05:28
9      Neurontin there had to be a prior           14:05:30
10     authorization. That would certainly affect  14:05:31
11     overall prescribing of any kind. If the     14:05:34
12     prior authorization were specific to        14:05:36
13     off-label use, then it would have that more 14:05:38
14     specific effect.                            14:05:41
15  Q. Will your model take into consideration all 14:05:42
16     of the occasions in which third-party       14:05:44
17     payers implemented prior authorization      14:05:46
18     programs for Neurontin?                     14:05:48
19  A. My model will again focus on the main       14:05:49
20     predictors of the use of Neurontin for      14:05:56
21     off-label uses, and in particular the       14:05:58
22     concern is with regard to those variables   14:06:02
23     that might occur with a pattern over time   14:06:04
24     identical to the allegedly illegal          14:06:09
25     activities. So to the extent that there --  14:06:12

524
1   that my research shows that there's a          14:06:16
2   concern, there's a simultaneous effect of      14:06:18
3   these kinds of formulary decisions or prior    14:06:23
4   authorization programs, then I'll try to       14:06:25
5   model it.                                      14:06:29
6        In reality, though, as you know,          14:06:30
7   if, for example, you were to posit a story     14:06:32
8   such as is follows: Defendants increase        14:06:36
9   off-label promotions, third-party payers       14:06:38
10  make it harder and harder to get Neurontin     14:06:40
11  for off-label use, it'll just -- it'll bias    14:06:41
12  my estimate downwards if I don't model         14:06:46
13  those. It's really only -- if you can tell     14:06:49
14  a story, again, about they're being            14:06:51
15  correlated in time that it causes a            14:06:53
16  problem. And in this case that story would     14:06:55
17  really have to be one that would result in     14:06:56
18  a downward bias in the estimate of the         14:06:58
19  impact.                                        14:07:00
20  Q. Okay. Let's talk about financial            14:07:00
21     incentives, too. That was another --        14:07:03
22  A. Okay.                                       14:07:06
23  Q. -- category of ways in which third-party    14:07:06
24     payers might affect physician prescribing   14:07:08
25     decisions. What sorts of financial          14:07:11

Page 525

```
1    incentives would you have in mind when you        14:07:16
2    answer the question?                              14:07:19
3  A. I think the chief ones in this realm would      14:07:19
4    be consumer co-payments.                          14:07:21
5  Q. That the co-payments would differ from drug     14:07:26
6    to drug?                                          14:07:29
7  A. As you're probably aware, they don't            14:07:31
8    typically differ from drug to drug, but          14:07:34
9    there are categories of drugs. There are         14:07:37
10   preferred drugs, not preferred drugs,            14:07:39
11   generic drugs, which are typically all the       14:07:42
12   best category of drugs. And so the               14:07:44
13   co-payments vary across those categories.        14:07:47
14 Q. The best category of drugs from the             14:07:50
15   perspective of the third-party payers,           14:07:52
16   correct?                                         14:07:53
17 A. That's right. So where a generic exists         14:07:55
18   for a particular molecule --                     14:07:57
19 Q. Right.                                          14:07:57
20 A. -- yeah.                                        14:07:59
21 Q. Is this the same thing as a situation in        14:07:59
22   which a TPP, or third-party payer, has a         14:08:01
23   different tier within its formulary?             14:08:03
24 A. That's right, those are exactly those kinds     14:08:05
25   of tiers.                                        14:08:07
```

Page 526

```
1  Q. We talked also, I think, earlier today          14:08:12
2    about disease management programs?               14:08:13
3  A. We did.                                         14:08:14
4  Q. Is that a way that a third-party payer          14:08:17
5    might be able to affect prescribing              14:08:19
6    behavior with respect to Neurontin?              14:08:21
7  A. If there were a disease management program,    14:08:22
8    for example, for one of the off-label            14:08:27
9    indications, is that what you had in mind?       14:08:31
10 Q. Sure.                                           14:08:31
11 A. So let's say bipolar disorder.                  14:08:34
12 Q. Or one that relates to one of the off-label     14:08:36
13   indications --                                   14:08:39
14 A. Okay.                                           14:08:39
15 Q. -- in some way.                                 14:08:39
16 A. It might -- I'm afraid my in-depth              14:08:40
17   knowledge of disease management programs is      14:08:41
18   not deep enough to tell you if they specify      14:08:44
19   certain drugs, but if you ask me to assume       14:08:48
20   that the disease management program had          14:08:51
21   recommendations with regards to drugs,           14:08:53
22   disease management programs generally work       14:08:56
23   around physicians and patients. They don't       14:08:59
24   tend to get involved in the physician/           14:09:01
25   patient decision-making.                         14:09:03
```

Page 527

```
1    So they are third-party payers'                  14:09:04
2    efforts, I think, generally speaking, to         14:09:10
3    overcome the lack of coordination in the         14:09:12
4    health care system itself. So it seems           14:09:14
5    strange to me to think about a disease           14:09:18
6    management program trying to affect              14:09:19
7    physician decision-making. Usually instead       14:09:21
8    they contact patients directly and say,          14:09:23
9    "You should lose weight. You should be           14:09:25
10   taking your medications," but they don't --      14:09:26
11   they're not in a position actually treat         14:09:29
12   the patient. They advise the patient on          14:09:31
13   behavior.                                        14:09:33
14 Q. And through their advising the patient on       14:09:33
15   behavior, could you imagine that that's          14:09:36
16   something that could conceivably impact the      14:09:37
17   extent to which a physician was -- or a          14:09:39
18   patient, rather, received prescriptions for      14:09:43
19   Neurontin for an off-label use?                  14:09:44
20 A. Possibly. Again, it's not very consistent       14:09:46
21   with my vision of the way these programs         14:09:50
22   work, but I think it could be possible,          14:09:53
23   yes.                                             14:09:55
24 Q. Do you know what a drug utilization review      14:09:59
25   program is?                                      14:10:01
```

Page 528

```
1  A. Yes. So like standard utilization review,       14:10:02
2    drug utilization review is a way of              14:10:07
3    generally retrospectively looking at             14:10:13
4    patterns of drug use, and typically it's an      14:10:15
5    informational activity. So, for example,         14:10:18
6    you could do drug utilization review at the      14:10:23
7    individual physician level. We look at all       14:10:26
8    your prescribing patterns for your               14:10:28
9    epileptic patients, just to take an              14:10:31
10   example, and we compare those to your            14:10:33
11   peers'.                                          14:10:35
12       We give you that information and             14:10:36
13   say, "Look, Dr. Smith, you're an outlier.        14:10:37
14   You're using a lot more of this expensive        14:10:40
15   drug X and everyone else is using Y."            14:10:43
16   That's a typical drug review program.            14:10:45
17 Q. Okay. Can we take a look at Paragraph           14:10:47
18   27b).                                            14:11:03
19 A. Okay.                                           14:11:03
20 Q. 27d), I'm sorry.                                14:11:03
21 A. Okay.                                           14:11:09
22 Q. In 27d) you refer to marketing literature       14:11:10
23   by -- you might have to help me with the         14:11:21
24   pronunciation, Manchanda, Chintagunta and        14:11:25
25   Gertzis --                                       14:11:29
```

**Page 529**

1 A. That sounds right to me.    14:11:32
2 Q. Okay.    14:11:32
3    -- that report that "detailing has    14:11:43
4    a significant positive impact on the number    14:11:45
5    of prescriptions written for a drug by the    14:11:50
6    physician."    14:11:52
7 A. Yes.    14:12:02
8 Q. Do you have a view as to the qualifications    14:12:03
9    of Professors Manchanda, Chintagunta and    14:12:05
10    Gertzis to reach this conclusion?    14:12:09
11 A. The qualifications? My understanding of    14:12:11
12    the authors -- the first author in    14:12:15
13    particular, that he's a marketing professor    14:12:17
14    at the University of Chicago. I'm afraid I    14:12:20
15    don't know the other authors.    14:12:22
16 Q. Okay. With respect to the first author --    14:12:23
17 A. Yeah.    14:12:26
18 Q. -- do you know anything more about what he    14:12:27
19    does at the University of Chicago?    14:12:30
20 A. I do not. I just -- I believe he's a    14:12:31
21    marketing professor there.    14:12:34
22 Q. Okay. On the subject of detailing, you had    14:12:35
23    mentioned academic detailing before?    14:12:41
24 A. Yes.    14:12:43
25 Q. Is that another means through which a    14:12:45

**Page 530**

1    third-party payer could seek to affect    14:12:53
2    prescription writing decisions by    14:12:55
3    physicians?    14:12:57
4 A. Theoretically. I'm not actually aware of,    14:12:59
5    other than demonstration projects,    14:13:03
6    third-party payers having academic    14:13:05
7    detailing programs, but in theory it could.    14:13:07
8 Q. Okay. Would you agree that at some level    14:13:10
9    at least each third-party payer can and    14:13:33
10    generally did make its own decisions on    14:13:37
11    which uses of Neurontin it would reimburse    14:13:40
12    for?    14:13:42
13    MR. NOTARGIACOMO: Objection.    14:13:42
14 A. Well, I think that's a somewhat complicated    14:13:43
15    statement. As you know, Neurontin is an    14:13:47
16    oral pharmaceutical that patients purchase    14:13:51
17    through a retail pharmacy, pick up at the    14:13:54
18    pharmacy and third-party payers reimburse    14:13:57
19    through pharmaceutical claims. Those    14:14:00
20    claims, as you know, do not include    14:14:03
21    diagnosis codes. So whether a third-party    14:14:06
22    payer could in practice require such    14:14:11
23    diagnostic information through, for    14:14:15
24    example, a pre-authorization program as we    14:14:18
25    described before, I would say it is    14:14:21

**Page 531**

1    possible, at very high cost to do, of    14:14:22
2    course, for all Neurontin prescriptions.    14:14:26
3    They would have to consider the    14:14:28
4    problem with potentially preventing    14:14:29
5    appropriate Neurontin prescriptions,    14:14:32
6    consider the problem of making their    14:14:35
7    physicians in their network very angry    14:14:36
8    about the extra work. But in theory they    14:14:39
9    could request that clinical information be    14:14:43
10    provided and therefore construct such a    14:14:45
11    detailed policy.    14:14:49
12 Q. Okay. Would you agree that to the extent    14:14:53
13    that an individual third-party payer made a    14:15:14
14    conscious affirmative decision not to    14:15:16
15    implement a pre-authorization program along    14:15:18
16    the lines of what you've just described,    14:15:21
17    despite its belief that Neurontin was    14:15:24
18    ineffective for some number of off-label    14:15:26
19    uses, that by virtue of that conscious    14:15:34
20    decision the unlawful promotion    14:15:36
21    described -- allegedly unlawful promotion    14:15:38
22    described in the complaint was not a direct    14:15:40
23    cause of any loss to that third-party    14:15:42
24    payer?    14:15:46
25    MR. NOTARGIACOMO: Objection,    14:15:46

**Page 532**

1    calls for a legal conclusion.    14:15:47
2 Q. Well, I'm not -- let's clarify the    14:15:48
3    question. I'm not asking for a legal    14:15:51
4    conclusion, I'm just asking for a -- your    14:15:52
5    own economic analysis as to causality.    14:15:54
6 A. Could you perhaps --    14:16:00
7    MR. NOTARGIACOMO: I'm going to    14:16:01
8    still object on the same basis.    14:16:02
9 A. Could you please restate it in some chunks?    14:16:04
10    Because I'm a little unclear. So I assume    14:16:10
11    that the third-party payer knows Neurontin    14:16:13
12    to be ineffective?    14:16:14
13 Q. Sure. For a given off-label indication or    14:16:16
14    any number of off-label indications --    14:16:20
15 A. So --    14:16:22
16 Q. -- or at least that it believes Neurontin    14:16:24
17    to be ineffective?    14:16:26
18 A. It knows or believes Neurontin to be    14:16:28
19    ineffective, and it knows -- I'm not sure    14:16:31
20    how -- that Neurontin's being used for    14:16:35
21    these off-label indications given that they    14:16:36
22    don't have a prior authorization program.    14:16:40
23    I guess that's the problem with -- if I    14:16:44
24    assume that they know Neurontin to be    14:16:47
25    ineffective and they know that it's being    14:16:49

56 (Pages 529 to 532)

M. ROSENTHAL

Page 533

1  used for those off-label uses -- 14:16:51
2  Q. Right. And maybe they learned that it's 14:16:53
3  being used for the off-label uses by 14:16:55
4  watching Dateline or something like that 14:16:57
5  and seeing a piece about David Franklin, 14:16:59
6  his case? 14:17:05
7  A. Okay. Although I don't think that tells 14:17:06
8  them, you know, how it's being used -- 14:17:08
9  Q. Fair enough. 14:17:11
10 A. -- in their population necessarily. Then 14:17:11
11 why is the cause of that off-label use not 14:17:15
12 still the allegedly illegal promotional 14:17:19
13 activities? 14:17:24
14 Q. I guess my question goes to the extent that 14:17:28
15 the third-party payer knows that the 14:17:34
16 allegedly illegal activities are going on, 14:17:38
17 and it affirmatively decides not to 14:17:40
18 implement a program through which it would 14:17:42
19 not need to reimburse for those 14:17:43
20 indications, how can it be said that the 14:17:49
21 promotional activity resulted in the loss 14:17:51
22 to that third-party payer? 14:17:58
23     MR. NOTARGIACOMO: Objection, 14:17:59
24 calls for a legal conclusion. 14:18:00
25 A. Well, in my view, that really does ask a 14:18:01

Page 534

1  legal question, because then you could pose 14:18:04
2  a case where there's always some means by 14:18:08
3  which someone can avert fraud, but if it's 14:18:10
4  very, very high cost, I mean, how can you 14:18:12
5  say that that's the fault of the person who 14:18:15
6  was defrauded? And that's a really poor 14:18:17
7  sort of coffee-table legal opinion, and 14:18:22
8  so -- but that's sort of where your 14:18:24
9  question leads me, so I'm afraid I can't 14:18:25
10 really respond. 14:18:28
11 Q. Okay. I won't ask you for the coffee- 14:18:29
12 table -- 14:18:31
13 A. Okay. 14:18:31
14 Q. -- legal opinion. 14:18:32
15 A. Thank you. I know it's offensive. 14:18:33
16 Q. No, not at all. 14:18:35
17     All right. Wouldn't you agree 14:18:36
18 though that the class does -- the third- 14:18:37
19 party payer subclass does contain a wide 14:18:39
20 range of third-party payers that range from 14:18:41
21 large multi-state insurance companies with 14:18:44
22 many employees to small local businesses 14:18:46
23 with just a few employees? 14:18:49
24 A. I would imagine that to be true, yes. 14:18:50
25 Q. And that you would agree that -- I assume, 14:18:53

Page 535

1  that in view of this, the third-party 14:18:54
2  payers would have varying levels of 14:18:56
3  knowledge or sophistication as to efficacy 14:18:58
4  of various drugs for various indications? 14:18:59
5  A. Again, as I said before, I would agree that 14:19:01
6  there's probably variation along those 14:19:05
7  lines. 14:19:07
8  Q. And you would also agree that your model 14:19:07
9  doesn't seek to account for those 14:19:09
10 differences from third-party payer to 14:19:11
11 third-party payer because it's an aggregate 14:19:13
12 model? 14:19:16
13 A. That's correct. 14:19:16
14 Q. What analysis, if any, have you done into 14:19:16
15 the amount and quality of the medical 14:19:24
16 claims data that are maintained by the 14:19:25
17 different third-party payers? 14:19:27
18 A. Specific to this case? 14:19:28
19 Q. Uh-huh. 14:19:35
20 A. I have not planned to use claims data 14:19:36
21 specifically in the models that we've 14:19:38
22 discussed, so I have not looked into those 14:19:40
23 data. I have extensive experience using 14:19:43
24 claims data both on the prescription drug 14:19:47
25 and in general, so I have a general sense 14:19:49

Page 536

1  of those data. 14:19:51
2  Q. Okay. But you don't plan on using them in 14:19:52
3  your analysis in this case? 14:19:54
4  A. I believe there are places where they might 14:19:55
5  be informative, but in general, as we 14:19:59
6  talked about, I plan to use the National 14:20:02
7  Disease and Therapeutic Index data for the 14:20:04
8  quantities and then the promotional data 14:20:07
9  for promotional spending. 14:20:09
10 Q. Would you agree that individual third-party 14:20:22
11 payers may have delegated decision-making 14:20:24
12 authority regarding reimbursement for 14:20:26
13 prescription drugs to different entities 14:20:28
14 that I'll refer to by acronyms, and maybe 14:20:30
15 we can go through them one by one. The 14:20:34
16 first is TPAs, the second are PBMs, and the 14:20:36
17 third are EBCs. 14:20:39
18     MR. NOTARGIACOMO: Objection. 14:20:41
19 Q. Are you familiar with any of those three 14:20:42
20 groups of acronyms? 14:20:44
21 A. Two, and I could guess what the third is, 14:20:45
22 but -- 14:20:46
23 Q. Well, let's work on just the two that 14:20:47
24 you -- 14:20:49
25 A. Excellent. 14:20:49

**537**

1  Q. Okay. 14:20:50
2  A. Third-party administrators, they 14:20:50
3  essentially process claims data for -- 14:20:53
4  often for these plans like Taft-Hartley 14:20:59
5  funds. They have a third-party 14:21:01
6  administrator. Third-party administrator 14:21:04
7  runs claims through a repricing system, so 14:21:07
8  they adjudicate claims, pay claims, that 14:21:11
9  kind of thing. 14:21:14
10      PBMs have a -- so the TPAs, 14:21:15
11  they're -- maybe just to give a sense, 14:21:18
12  they're administrative entities. They -- 14:21:21
13  most of what they do is about processing 14:21:26
14  the bills. 14:21:28
15      PBMs, pharmacy benefit managers, 14:21:29
16  in contrast do a lot more. They set 14:21:34
17  formularies in particular, as well as 14:21:38
18  process claims. They often have mail order 14:21:42
19  facilities of their own. And I don't know 14:21:44
20  what the last one is, but I can make it up. 14:21:52
21 Q. Don't make it up. 14:21:55
22     Would you agree that the extent to 14:21:56
23  which and the manner in which individual 14:22:00
24  TPPs delegate decision-making authority to 14:22:02
25  either PBMs or TPAs will vary from third- 14:22:06

**538**

1  party payer to third-party payer? 14:22:09
2  A. I would assume that the specific functions 14:22:14
3  they ask the -- particularly the TPAs to 14:22:18
4  undertake could vary. 14:22:21
5  Q. Okay. I think you also said -- and correct 14:22:25
6  me if I'm getting this wrong -- that 14:22:28
7  individual third-party payers may have 14:22:30
8  different policies regarding coverage of 14:22:31
9  prescription drugs for off-label uses? 14:22:34
10 A. I believe that's true. 14:22:36
11 Q. Okay. Would you also agree that different 14:22:38
12  third-party payers even with the same 14:22:41
13  policies regarding coverage may have 14:22:43
14  different enforcement practices with 14:22:45
15  respect to those policies? 14:22:48
16 A. That may be true as well. 14:22:49
17 Q. Would you agree that differing policies of 14:22:52
18  TPPs or different enforcement practices of 14:23:00
19  TPPs could alter the effect of the 14:23:03
20  allegedly unlawful promotional activities 14:23:09
21  with respect to each individual TPP? 14:23:13
22 A. Let's be clear for a moment. 14:23:15
23 Q. That would be good for a change, right? 14:23:18
24 A. The difference in policies as a general 14:23:21
25  term across third-party payers may affect 14:23:25

**539**

1  their sort of cross-sectional impact. 14:23:31
2  Those differences will not confound my 14:23:34
3  estimates of the aggregate impact because, 14:23:37
4  again, there's no reason to believe that 14:23:42
5  they're correlated over time precisely with 14:23:44
6  the allegedly illegal activities. So 14:23:46
7  they're not confounding the aggregate 14:23:49
8  estimate. 14:23:50
9      If you want me to say that a TPP 14:23:53
10  that requires prior authorization for 14:23:56
11  Neurontin will be differently affected than 14:23:58
12  when it doesn't -- is that your question? 14:24:01
13 Q. That had been the question, yeah. 14:24:03
14 A. Okay. I'm sorry. So it is true that there 14:24:05
15  will be a different quantum of effect 14:24:08
16  across TPPs depending on whether, for 14:24:11
17  example, they have prior authorization for 14:24:13
18  Neurontin. 14:24:15
19 Q. Now, just to make sure I understand your 14:24:20
20  answer, it is the case that changes in 14:24:24
21  policies regarding coverage of Neurontin 14:24:29
22  for off-label uses or changes in 14:24:31
23  enforcement practices of those policies 14:24:33
24  could affect prescription-writing behavior 14:24:36
25  in the aggregate, correct? 14:24:39

**540**

1      MR. NOTARGIACOMO: Objection, 14:24:41
2  asked and answered. 14:24:43
3 A. Yes. Those changes could affect 14:24:43
4  prescription-writing behavior, but, again, 14:24:47
5  they would not confound my estimates unless 14:24:50
6  they were correlated. And one would think 14:24:52
7  they would be negatively correlated, if 14:24:55
8  anything. 14:24:57
9 Q. Would you agree that different third-party 14:25:03
10  payers were responsible for ensuring 14:25:06
11  substantially different membership 14:25:09
12  demographics? 14:25:11
13 A. The third-party payers have different kinds 14:25:12
14  of patients that they cover, yes. 14:25:18
15 Q. Different kinds of beneficiaries, right? 14:25:19
16 A. That's right, yes. 14:25:21
17 Q. And that the percentage of women versus the 14:25:23
18  percentage of men covered might vary from 14:25:28
19  TPP to TPP? 14:25:30
20 A. I would guess that this might happen for a 14:25:32
21  large population probably not so much, but 14:25:37
22  some of the smaller ones potentially. 14:25:39
23 Q. How about general age demographics again? 14:25:41
24 A. Potentially there might be some variation, 14:25:45
25  yes. 14:25:47

**541**

1  Q. Region of the country?  14:25:49
2  A. Surely.  14:25:50
3  Q. Occupations of the people who are covered?  14:25:50
4  A. By definition with the Taft-Hartley plans.  14:25:54
5  Q. In view of these differences, isn't it  14:25:57
6  necessarily the case that the effect of the  14:26:05
7  alleged promotional activity on individual  14:26:07
8  TPP class members could vary from TPP to  14:26:10
9  TPP?  14:26:12
10 A. Again, individual TPPs, the magnitude of  14:26:17
11  the effect, for example, because they have  14:26:22
12  many patients on Neurontin versus not many  14:26:24
13  patients on Neurontin, could certainly  14:26:27
14  vary.  14:26:29
15 Q. Okay. Would you agree that the cost  14:26:29
16  containment programs that we described  14:26:38
17  earlier, prior authorization programs,  14:26:39
18  things like that, may very well have  14:26:41
19  changed over time with respect to even an  14:26:43
20  individual third-party payer?  14:26:46
21 A. That certainly may be true. Again, I don't  14:26:47
22  see how it would confound the estimates I'm  14:26:53
23  concerned about, but they may have changed.  14:26:56
24      MR. POLUBINSKI: Okay. Why don't  14:27:00
25  we take a break.  14:27:01

**542**

1      MR. NOTARGIACOMO: Okay.  14:27:02
2      THE VIDEOGRAPHER: The time is  14:27:03
3  2:27. We are off the record.  14:27:04
4      (Recess taken.)  14:27:05
5      THE VIDEOGRAPHER: The time is  14:34:30
6  2:34, and we are back on the record.  14:34:35
7      MR. POLUBINSKI: All right. I  14:34:38
8  don't have any further questions at this  14:34:39
9  time, but I would like to say that the  14:34:41
10 defendants reserve the right to continue  14:34:43
11 the deposition in the event that Professor  14:34:45
12 Rosenthal offers new or revised opinions at  14:34:47
13 some point later in the case or in the  14:34:49
14 event that plaintiffs produce additional  14:34:51
15 documents that should have been produced  14:34:53
16 prior to this deposition.  14:34:54
17     MR. NOTARGIACOMO: I have no other  14:34:55
18 questions for the plaintiffs. I believe we  14:34:59
19 should conclude the deposition, but if it  14:35:04
20 turns out that there's an issue, we can  14:35:05
21 fight about that later.  14:35:07
22     MR. POLUBINSKI: Exactly. I think  14:35:08
23 we -- it's not ripe for fighting about at  14:35:09
24 this time --  14:35:14
25     MR. NOTARGIACOMO: Absolutely.  14:35:14

**543**

1      MR. POLUBINSKI: -- as much as --  14:35:14
2      MR. NOTARGIACOMO: As much as I'd  14:35:15
3  love to fight with you.  14:35:17
4      MR. POLUBINSKI: Yeah. It's  14:35:18
5  always a pleasure. We can go off the  14:35:19
6  record.  14:35:22
7      THE VIDEOGRAPHER: The time is  14:35:22
8  2:35. This is the end of Tape 4. The  14:35:24
9  deposition is concluded, and we are off the  14:35:29
10 record.  14:35:32
11     (Whereupon the deposition was  14:35:32
12 adjourned at 2:35 p.m.)  14:35:36

**544**

2  CASE: IN RE: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
4      ERRATA SHEET
5  INSTRUCTIONS: After reading the transcript of your deposition, note any change or correction to your testimony and the reason therefor on this sheet. DO NOT make any marks or notations on the transcript volume itself. Sign and date this errata sheet (before a Notary Public, if required). Refer to Page 546 of the transcript for errata sheet distribution instructions.
10 PAGE  LINE
    CHANGE:
11  REASON:
    CHANGE:
12  REASON:
    CHANGE:
13  REASON:
    CHANGE:
14  REASON:
    CHANGE:
15  REASON:
    CHANGE:
16  REASON:
    CHANGE:
17  REASON:
    CHANGE:
18  REASON:
    CHANGE:
19  REASON:
    CHANGE:
20  REASON:
21
22  I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

```
                                                  545
 1   United States District Court
 2   District of Massachusetts
 3         I, Jessica L. Williamson, Registered,
 4   Merit Reporter, Certified Realtime Reporter
 5   and Notary Public in and for the
 6   Commonwealth of Massachusetts, do hereby
 7   certify that MEREDITH B. ROSENTHAL, Ph.D.,
 8   the witness whose deposition is
 9   hereinbefore set forth, was duly sworn by
10   me and that such deposition is a true
11   record of the testimony given by the
12   witness.
13         I further certify that I am neither
14   related to or employed by any of the
15   parties in or counsel to this action, nor
16   am I financially interested in the outcome
17   of this action.
18         In witness whereof, I have hereunto set
19   my hand and seal this 30th day of October,
20   2006.
21
22
23         Jessica L. Williamson, RMR, RPR, CRR
24         Notary Public, CSR No. 138795
25         My commission expires: 12/18/2009
```

```
                                                  546
 1   DEPONENT'S ERRATA SHEET
 2   AND SIGNATURE INSTRUCTIONS
 3
 4         The original of the Errata Sheet has
 5   been delivered to Edward Notargiacomo, Esq.
 6         When the Errata Sheet has been
 7   completed by the deponent and signed, a
 8   copy thereof should be delivered to each
 9   party of record and the ORIGINAL delivered
10   to Edmund Polubinski III, Esq. to whom the
11   original deposition transcript was
12   delivered.
13
14         INSTRUCTIONS TO DEPONENT
15
16         After reading this volume of your
     deposition, indicate any corrections or
17   changes to your testimony and the reasons
     therefor on the Errata Sheet supplied to
18   you and sign it. DO NOT make marks or
     notations on the transcript volume itself.
19   REPLACE THIS PAGE OF THE TRANSCRIPT WITH
20   THE COMPLETED AND SIGNED ERRATA SHEET WHEN
21   RECEIVED.
22
23
24
25
```

60 (Pages 545 to 546)