**Page 473**

1. the analysis. Generally speaking, of
2. course, we're going to look for more
3. degrees of freedom than just one or two,
4. so, you know, I can't really say what's a
5. less extreme limit. There will be a
6. natural limit. As we continue to add
7. variables, the standard errors are going to
8. get larger and larger. And at some point
9. it'll be hard to find a significant effect
10. of any kind.
11. Q. Is that what you mean when you refer to the
12. power of the analysis that we're looking
13. for?
14. A. Yes. And so that's a function of the
15. number of variables you include but also of
16. the underlying variability in the dependent
17. variable, as well as the variability of the
18. independent variables.
19. Q. Okay. How, if at all, would you account
20. for continuing effects of promotional
21. spending and activities beyond the month in
22. which they occur in your model?
23. A. There are a couple possible ways. A simple
24. approach is to include what's called the
25. stock of promotional activities, and so

**Page 474**

1. that's a discounted sum of, say,
2. promotional spending over time. So imagine
3. you have in your model current spending
4. plus a discounted sum of all previous
5. spending.
6. Q. How would you arrive at the discount if you
7. are using a stock?
8. A. It can be estimated, and there are
9. depreciation rates available in the
10. literature that have been fairly commonly
11. used. But it can be estimated in the model
12. itself.
13. Q. Is it the case that the effects of
14. off-label promotion would diminish over
15. time?
16. A. It's been found for other promotional
17. efforts that there is this pattern of
18. diminishing effects over time, so they
19. don't disappear between Month 1 and Month
20. 2, but they depreciate. So I would expect
21. them to last over time at a diminishing
22. rate, yes.
23. Q. The literature that you referred to, does
24. it refer to a constant rate across
25. different prescription drugs, or does it

**Page 475**

1. vary from drug to drug, from promotion to
2. promotion?
3. A. You know, I would have to double-check, but
4. my recollection of the literature is that
5. generally they estimate one depreciation
6. rate for the whole class of drugs that
7. they're looking at. So I'm thinking of
8. Professor Berndt's paper, which I believe
9. looks at proton pump inhibitors, a specific
10. class of drugs. I think they have one
11. depreciation rate for all the drugs.
12. Q. Okay. You had mentioned that one way of
13. doing this would be through stock analysis,
14. stock variable. Are there other ways that
15. you can think of through which you could do
16. this analysis?
17. A. You could actually put the lagged values on
18. the right-hand side.
19. Q. What does that mean?
20. A. It means not only putting this month's
21. spending but last month's spending,
22. spending from the month before and estimate
23. explicitly those coefficients for each one.
24. Q. So in other words, making them separate
25. independent variables?

**Page 476**

1. A. That's right.
2. Q. Each month's spending?
3. A. That's right.
4. Q. And the same would be true of each month's
5. promotional activities, if that's the
6. way -- you know, if you ended up using
7. lagged values on the right-hand side?
8. A. If one chose to do that, yes.
9. Q. Will you use a similar lag structure for
10. the M variable?
11. A. Potentially all of these variables, as you
12. know, are -- they vary over time, and it
13. may be appropriate to include either lags
14. or some estimate of the stock of prior
15. activities, so but possibly.
16. Q. Would you use a similar lag structure for
17. the XJT variable as well?
18. A. It would depend on the specific variable we
19. were talking about, but potentially, yes.
20. I don't know that -- I mean, we certainly
21. look for these kinds of effects over time
22. for each of the variables. I don't know
23. that there's data to suggest that they
24. exist for all types of promotion, but we
25. would investigate that.

### Page 477

1  Q. Can I direct your attention to Paragraph          12:20:15
2     34b) --                                            12:20:18
3  A. Okay.                                              12:20:19
4  Q. -- of your declaration. It's on Page 15.           12:20:20
5  A. Yes.                                               12:20:28
6  Q. And I want to look specifically at the             12:20:28
7     first bullet point.                                12:20:31
8  A. Okay.                                              12:20:32
9  Q. If you read the tail end of the paragraph          12:20:33
10    before the bullet point, it reads, "It may         12:20:37
11    be necessary to --                                 12:20:39
12 A. Uh-huh.                                            12:20:40
13 Q. -- "experiment with non-linear versions of         12:20:41
14    Equation 1." What types of non-linear              12:20:43
15    versions of Equation 1 do you plan on              12:20:49
16    experimenting with?                                12:20:52
17 A. So, for example, it may be appropriate to          12:20:52
18    suggest that the underlying trend in               12:20:54
19    off-label use of Neurontin is not linear           12:20:57
20    but quadratic or CORDIC or something else.         12:21:01
21    As you can imagine, a diffusion curve for a        12:21:05
22    drug, a natural diffusion curve would --           12:21:08
23    might not be linear.                               12:21:10
24 Q. Maybe you could imagine that.                      12:21:11
25 A. So there --                                        12:21:11

### Page 478

1  Q. I was an English major, so it's harder for        12:21:13
2     me to imagine that.                                12:21:16
3  A. There are early adopters, and then people         12:21:17
4     start learning about a specific drug, and          12:21:19
5     so it picks up in the rate. And so that            12:21:21
6     might be more consistent with either a             12:21:23
7     quadratic, which would include a squared           12:21:26
8     term, or a cubic, which would include a            12:21:28
9     third degree term. So you could put in             12:21:32
10    literally time and time squared.                   12:21:36
11 Q. Sure. Sure. Is there any reason why you           12:21:38
12    wouldn't conduct the same experiments with         12:21:40
13    Equation 2 in addition to Equation 1?              12:21:42
14 A. In either one they both have an underlying         12:21:45
15    time trend.                                        12:21:48
16 Q. Okay. But there's no reason why the                12:21:49
17    statement that's in this first bullet point        12:21:54
18    wouldn't also apply with respect to                12:21:55
19    modifications that you might make to the           12:21:58
20    model in Equation 2?                               12:22:01
21 A. No. Perhaps the text is unclear, but these         12:22:02
22    were intended to be broader issues that            12:22:04
23    would apply to all models.                         12:22:06
24 Q. That makes sense to me.                            12:22:07
25 A. Okay.                                              12:22:08

### Page 479

1  Q. I just wanted to be clear about it.               12:22:09
2     MR. POLUBINSKI: Now, I'm at a                      12:22:13
3     decent stopping point for a break now. We          12:22:17
4     can either break for lunch, or I'm happy to        12:22:20
5     keep going for a little while, whatever            12:22:22
6     your preference is.                                12:22:24
7     THE WITNESS: This is a good time                   12:22:26
8     for me, I guess, as opposed to going               12:22:27
9     another hour, so...                                12:22:29
10    MR. POLUBINSKI: Sure. Okay.                        12:22:29
11    Let's break then.                                  12:22:30
12    THE WITNESS: Okay.                                 12:22:30
13    MR. POLUBINSKI: Go off the                         12:22:32
14    record.                                            12:22:33
15    THE VIDEOGRAPHER: The time is                      12:22:33
16    12:22, and we are off the record.                  12:22:38
17    (Lunch recess taken.)                              12:22:45

### Page 480

1              AFTERNOON SESSION                         12:22:54
2     THE VIDEOGRAPHER: The time is                      13:12:27
3     1:12 p.m., and we are back on the record.          13:12:30
4                                                        13:12:30
5     (MEREDITH B. ROSENTHAL, Ph.D., Resumed.)           13:12:30
6     DIRECT EXAMINATION, Continued                      13:12:30
7                                                        13:12:32
8  BY MR. POLUBINSKI:                                    13:12:32
9  Q. So, Professor Rosenthal, I think you               13:12:33
10    testified that you have not actually               13:12:39
11    attempted to run a version of your model           13:12:41
12    yet, correct?                                      13:12:42
13 A. That's correct.                                    13:12:43
14 Q. And you haven't yet collected all of the           13:12:43
15    data that you would need to do so; is that         13:12:45
16    correct, too?                                      13:12:48
17 A. That's correct.                                    13:12:49
18 Q. So you don't yet know for certain precisely        13:12:49
19    what data you will be able to collect; is          13:12:53
20    that correct?                                      13:12:55
21 A. That's correct beyond the examples that            13:12:55
22    I've shown you and mentioned in my                 13:12:59
23    declaration of data sources that I've seen.        13:13:01
24 Q. Right. But you do -- you would need to             13:13:03
25    collect additional data beyond what you've         13:13:07

481

| | | |
|---|---|---|
| 1 | already seen in order to run your model, | 13:13:09 |
| 2 | correct? | 13:13:11 |
| 3 | A. I would say that's true. I certainly need | 13:13:11 |
| 4 | additional data on the allegedly illegal | 13:13:16 |
| 5 | activities. | 13:13:20 |
| 6 | Q. Okay. So therefore you don't know whether | 13:13:21 |
| 7 | there are any possible deficiencies or any | 13:13:22 |
| 8 | deficiencies in the data that you would | 13:13:25 |
| 9 | claim to collect? | 13:13:27 |
| 10 | A. I don't know what the deficiencies of the | 13:13:28 |
| 11 | data that I haven't seen yet are, no. | 13:13:30 |
| 12 | Q. Precisely. | 13:13:32 |
| 13 | A. Yes. | 13:13:33 |
| 14 | Q. And you also haven't identified yet all of | 13:13:33 |
| 15 | the possible variables that may impact | 13:13:37 |
| 16 | prescription behavior? | 13:13:39 |
| 17 | A. That's correct. | 13:13:39 |
| 18 | Q. And you don't yet know what endogeneity | 13:13:40 |
| 19 | problems you might encounter in the course | 13:13:46 |
| 20 | of your work? | 13:13:49 |
| 21 | A. Without the data I can't again run those | 13:13:50 |
| 22 | tests and examine the data, no, so I | 13:13:53 |
| 23 | don't -- I can't see that yet. | 13:13:56 |
| 24 | Q. Right. So you don't know for sure whether | 13:13:57 |
| 25 | you'll be able to address or correct them? | 13:14:00 |

482

| | | |
|---|---|---|
| 1 | A. I know that there are standard approaches | 13:14:02 |
| 2 | available for correcting those problems, | 13:14:06 |
| 3 | for addressing those problems. I guess I'm | 13:14:08 |
| 4 | not sure what you mean. | 13:14:10 |
| 5 | Q. Right. You don't yet know the extent to | 13:14:11 |
| 6 | which those standard methods will enable | 13:14:14 |
| 7 | you to create a sufficiently reliable model | 13:14:17 |
| 8 | because you haven't done it yet? | 13:14:21 |
| 9 | A. I guess that may be true. Again, I've run | 13:14:23 |
| 10 | models like this before and overcome | 13:14:26 |
| 11 | similar problems, and of course the rest of | 13:14:30 |
| 12 | the published literature has as well, so I | 13:14:32 |
| 13 | guess I feel fairly confident that the | 13:14:34 |
| 14 | tools are out there that will be able to do | 13:14:36 |
| 15 | that. | 13:14:39 |
| 16 | Q. But you haven't actually done it yet? | 13:14:39 |
| 17 | A. But I have not done that. | 13:14:41 |
| 18 | Q. And you don't know precisely what | 13:14:42 |
| 19 | multicollinearity problems you may | 13:14:43 |
| 20 | encounter in the course of your work? | 13:14:45 |
| 21 | A. That's correct. | 13:14:46 |
| 22 | Q. And you don't know whether the estimates | 13:14:48 |
| 23 | that you ultimately reach based on the data | 13:14:50 |
| 24 | that you're able to collect will be | 13:14:53 |
| 25 | statistically significant, correct? | 13:14:56 |

483

| | | |
|---|---|---|
| 1 | A. That's correct. | 13:14:56 |
| 2 | Q. Are you familiar with the concept of fit in | 13:15:00 |
| 3 | the context of a regression analysis? | 13:15:01 |
| 4 | A. Yes. | 13:15:03 |
| 5 | Q. What is fit? | 13:15:05 |
| 6 | A. Well, in very general terms it's how well | 13:15:06 |
| 7 | the model you've constructed actually | 13:15:08 |
| 8 | matches up with the data themselves, and | 13:15:11 |
| 9 | one measure of fit might be how well you | 13:15:16 |
| 10 | can predict the variables of interest. | 13:15:18 |
| 11 | Q. Okay. And one way to describe it would be | 13:15:21 |
| 12 | to say the better the fit of a model is, | 13:15:25 |
| 13 | the better it describes reality? | 13:15:27 |
| 14 | A. That seems like a fair way to describe it, | 13:15:28 |
| 15 | yes. | 13:15:31 |
| 16 | Q. Okay. And you don't know what the fit of | 13:15:31 |
| 17 | your model will be before you actually run | 13:15:36 |
| 18 | the regression, correct? | 13:15:38 |
| 19 | A. Certainly not. | 13:15:38 |
| 20 | Q. And it's certainly possible that after | 13:15:41 |
| 21 | running the model you could discover it has | 13:15:42 |
| 22 | a poor fit? | 13:15:44 |
| 23 | A. I guess it would depend on what you mean by | 13:15:47 |
| 24 | "a poor fit." There will be a range. If | 13:15:49 |
| 25 | we were, for example, looking at a measure | 13:15:53 |

484

| | | |
|---|---|---|
| 1 | like the R squared, which is the percent of | 13:15:54 |
| 2 | the variation that you explain, | 13:15:56 |
| 3 | effectively, there are -- I can't predict | 13:15:58 |
| 4 | what that R squared is going to be right | 13:16:01 |
| 5 | now. | 13:16:03 |
| 6 | Q. Do you have an understanding now for what | 13:16:04 |
| 7 | an acceptable R squared would be? | 13:16:07 |
| 8 | A. It actually typically depends on the class | 13:16:09 |
| 9 | of model you're doing, right? So -- | 13:16:14 |
| 10 | Q. Sorry. | 13:16:17 |
| 11 | A. That's okay. | 13:16:17 |
| 12 | -- in certain models we expect to | 13:16:19 |
| 13 | a find better fit than others, time series | 13:16:21 |
| 14 | models. Generally, we can explain the fair | 13:16:27 |
| 15 | amount of the variation, so it would really | 13:16:30 |
| 16 | depend. In the published literature you'll | 13:16:33 |
| 17 | see R squareds varying from, you know, | 13:16:36 |
| 18 | below .1 to much, much higher. | 13:16:40 |
| 19 | Q. Is there a threshold beyond which -- a | 13:16:42 |
| 20 | threshold in terms of R squared beyond | 13:16:53 |
| 21 | which you would deem a model to be | 13:16:55 |
| 22 | insufficiently reliable for purposes of | 13:16:58 |
| 23 | your work in this case? | 13:17:01 |
| 24 | A. At this point I certainly have not | 13:17:02 |
| 25 | considered such a threshold. | 13:17:05 |

44 (Pages 481 to 484)

M. ROSENTHAL

Page 485

```
 1  Q. All right. In Paragraph 41 of your           13:17:09
 2     declaration, which is Exhibit 1 --           13:17:22
 3  A. Okay.                                        13:17:24
 4  Q. -- you write at the beginning of the         13:17:25
 5     paragraph that "Sufficient data exists to    13:17:28
 6     implement and estimate these models."        13:17:30
 7  A. I see that.                                  13:17:35
 8  Q. Based on what you've just told me, are you   13:17:35
 9     certain that that's true?                    13:17:43
10  A. Again, there are two sets of variables.      13:17:48
11     One relates to the utilization of            13:17:52
12     Neurontin, and not having looked at the      13:17:55
13     National Disease and Therapeutic Index       13:17:59
14     data, I'm aware of what's contained in the   13:18:02
15     National Ambulatory Medical Care survey, I   13:18:06
16     feel confident that these data are           13:18:08
17     available. On the promotional side I've      13:18:10
18     seen documents from defendants that show     13:18:12
19     representative data that I think would be    13:18:15
20     sufficient to estimate -- to model those     13:18:18
21     right-hand side variables, the on- and       13:18:22
22     off-label promotional meetings and events.   13:18:24
23        I have not seen a complete set of         13:18:28
24     them as relates to all the allegations that  13:18:31
25     I will ultimately be asked to estimate the   13:18:34
```

Page 486

```
 1     impact of, but what I've seen suggests that  13:18:35
 2     those data exist.                            13:18:39
 3  Q. At the time that you wrote the statement     13:18:40
 4     you certainly hadn't collected obviously     13:18:47
 5     all of the data that you would envision      13:18:50
 6     using in your model, correct?                13:18:53
 7  A. That's correct.                              13:18:55
 8  Q. Why don't we see if we can, you know, try    13:18:55
 9     as best we can to isolate the specific       13:19:22
10     kinds of data here --                        13:19:22
11  A. Okay.                                        13:19:22
12  Q. -- that we're talking about, and I think     13:19:22
13     what you write here is that in the third     13:19:22
14     sentence there are two key types of data     13:19:23
15     that are necessary for you to run your       13:19:28
16     analysis and that those two types of data    13:19:33
17     are "data on patterns of promotional         13:19:35
18     spending and data on use of Neurontin." Is   13:19:40
19     that correct?                                13:19:46
20  A. That's correct.                              13:19:46
21  Q. Let's look first at data on patterns of      13:19:46
22     promotional spending. Which data on          13:19:51
23     patterns of promotional spending would you   13:19:53
24     think are necessary for you to run your      13:19:56
25     model?                                       13:20:00
```

Page 487

```
 1  A. So the data on promotional spending would    13:20:02
 2     vary depending on the model, but generally   13:20:06
 3     speaking, promotion by the type of           13:20:08
 4     activity, so, for example, if there was      13:20:13
 5     spending on consumer advertising versus      13:20:15
 6     detailing overall for Neurontin, and then    13:20:21
 7     as it relates to these allegations.          13:20:26
 8  Q. What do you mean by "as it relates to these  13:20:34
 9     allegations"?                                13:20:37
10  A. So, again, if we determined that spending    13:20:37
11     that's related to supporting research        13:20:42
12     projects for physicians, that this was       13:20:45
13     subject to the allegations -- there's some   13:20:48
14     allegations to that effect in the            13:20:50
15     complaint, as I recall -- that funds were    13:20:52
16     given to physicians to do these trials with  13:20:54
17     a purpose that was other standard research   13:20:58
18     purposes. And so I would have the overall    13:21:02
19     promotional spending as well as spending on  13:21:07
20     those types of interpromotional activities,  13:21:10
21     if I can use that broad term, that are       13:21:13
22     allegedly illegal.                           13:21:14
23  Q. Would your data need to be broken down --    13:21:17
24     well, for the data on promotional spending   13:21:22
25     do you envision that it would be company     13:21:25
```

Page 488

```
 1     data or publicly available data?             13:21:27
 2  A. I believe it was a combination of company    13:21:28
 3     data and publicly available data. If we      13:21:30
 4     called the IMS Health -- that publicly       13:21:32
 5     available data, which, as you know, there    13:21:35
 6     is some issue about using those without      13:21:37
 7     subpoena.                                    13:21:39
 8  Q. Right. Would you need -- would either one    13:21:41
 9     by itself be sufficient, or would you need   13:21:48
10     both, both company data and third-party      13:21:50
11     data?                                        13:21:54
12  A. If I only had the publicly available --      13:21:55
13        MR. NOTARGIACOMO: Go ahead.               13:21:58
14        THE WITNESS: It's okay to go              13:22:00
15     ahead?                                       13:22:01
16        MR. NOTARGIACOMO: Yeah.                   13:22:01
17  A. If I only had the publicly available data,   13:22:01
18     then I would need some other data to allow   13:22:03
19     me to allocate spending to the alleged       13:22:07
20     illegal activities versus the standard       13:22:10
21     legal promotional activities.                13:22:15
22  Q. And that data would be company data, is      13:22:17
23     what you're envisioning?                     13:22:19
24  A. Perhaps company data. I'm not entirely       13:22:21
25     clear if it weren't company data where it    13:22:24
```

45 (Pages 485 to 488)

**489**

1 would come from. It seems possible it 13:22:28
2 could come from third parties, for example, 13:22:30
3 from those companies that ran meetings and 13:22:33
4 events for the defendants. 13:22:35
5 Q. For the sort of data that we were just 13:22:36
6 talking about would you need -- would you 13:22:46
7 need that broken down reliably by 13:22:51
8 indication? 13:22:54
9 A. I would need to be able to attach it to an 13:22:54
10 indication. In some instances, as you 13:22:57
11 might imagine, there would be a natural 13:22:59
12 connection. So, for example, if there were 13:23:01
13 funds provided to a psychiatrist to do a 13:23:04
14 small case series on the use of Neurontin 13:23:07
15 for bipolar disorder, then that would be 13:23:10
16 clearly linked to the indication for 13:23:13
17 bipolar disorder. But in general, I would 13:23:15
18 need to be able to link it to the specific 13:23:17
19 indication or indications that were the 13:23:19
20 subject of the promotional activity. 13:23:21
21 Q. Would you also need this data on a monthly 13:23:23
22 basis? 13:23:27
23 A. It would not necessarily be true that every 13:23:31
24 variable needs to be on a monthly basis. 13:23:33
25 Q. Why not? 13:23:36

**490**

1 A. Well, for one thing, the spending might 13:23:36
2 just happen at a point in time, and I could 13:23:38
3 code it in for the month in which it 13:23:42
4 happened, right? And for another, if there 13:23:44
5 were only annual spending available, I 13:23:48
6 could use annual data. 13:23:50
7 Q. Now, if the data that you're describing 13:23:51
8 isn't available either in company documents 13:24:10
9 or in the sort of third-party documents 13:24:10
10 that you described for some point in time 13:24:10
11 during the class period, what impact would 13:24:11
12 that have on your ability to do your 13:24:13
13 analysis? 13:24:14
14 A. It would sort of depend on exactly what 13:24:14
15 you're talking about. If I were missing, 13:24:18
16 say, one month in the middle of a longer 13:24:20
17 period, it might be possible to 13:24:22
18 interpolate, so that is essentially to 13:24:24
19 assume a consistent trend between the point 13:24:27
20 before the data missing and the point 13:24:30
21 after. It would depend. 13:24:32
22 Q. Okay. And if it were something more than 13:24:34
23 just a month in a larger period? 13:24:36
24 A. It might not be possible to do the analysis 13:24:38
25 for that period of time. 13:24:40

**491**

1 Q. Do you need data on each of the factors 13:24:41
2 that you hypothesize in XKT? 13:24:46
3 A. Each of the factors that I decide are 13:24:48
4 relevant to put into XKT I would need data 13:24:51
5 for. 13:24:54
6 Q. What sorts of data would you envision 13:24:54
7 collecting? 13:24:57
8 A. I guess, you know, those XKT events -- I 13:24:57
9 have to remember my own model. The KT are 13:25:04
10 the off-label promotional events. 13:25:06
11 Q. You're welcome to -- 13:25:08
12 A. Yeah, thank you. 13:25:08
13 Q. -- refer to it if you like. 13:25:09
14 A. Subscripts, they fade over time. 13:25:10
15 Q. I'm glad it's not just me. 13:25:14
16 A. Yeah, so those are -- the meetings, events 13:25:16
17 that are subject to the allegations. And 13:25:22
18 so, again, having seen some documents and 13:25:24
19 some documents in Franklin that show that 13:25:29
20 these events are tracked by the defendants, 13:25:31
21 those are the kinds of data I would imagine 13:25:35
22 would go into XKT. 13:25:37
23 Q. And I assume as we've discussed before that 13:25:39
24 the data for both promotional activities 13:25:49
25 and promotional spending will need to 13:25:51

**492**

1 distinguish between proper and improper 13:25:53
2 marketing? And for purposes of that 13:25:59
3 question I think improper -- why don't we 13:26:03
4 just agree that "improper" means something 13:26:06
5 that would generate liability in this case? 13:26:09
6 A. Okay. Thank you. That's useful. Yes, as 13:26:11
7 we've discussed, I would need to be able to 13:26:16
8 distinguish them, and if there were such an 13:26:19
9 occasion at which I could not distinguish 13:26:21
10 in a particular case, I would need to 13:26:24
11 attribute that to proper promotional 13:26:26
12 activities. 13:26:30
13 Q. All right. The other category of data that 13:26:30
14 you say you need to collect is data on the 13:26:39
15 use of Neurontin? 13:26:42
16 A. Yes, that's right. 13:26:44
17 Q. For that data were you envisioning that you 13:26:45
18 would need company data or third-party 13:26:49
19 data? 13:26:55
20 A. The third-party data I had in mind for that 13:26:55
21 would be the, for example, the National 13:26:58
22 Disease and Therapeutic Index data or the 13:27:02
23 NAMCS. 13:27:04
24 Q. Had you envisioned that you would also 13:27:04
25 collect company data, or would you rely 13:27:11

46 (Pages 489 to 492)

Page 493

```
1    exclusively on the third-party data that          13:27:13
2    you described?                                    13:27:15
3 A. The company data play a role, as you know,        13:27:15
4    in giving a total number of units sold, so        13:27:17
5    the company invoice data would be used to         13:27:20
6    get the universe by condition -- I mean,          13:27:24
7    sorry, not by condition, by dosage site.          13:27:29
8 Q. And the company data presumably would not         13:27:32
9    distinguish between off-label and on-label        13:27:38
10   prescriptions?                                    13:27:41
11 A. The company probably has data from IMS           13:27:41
12   again on those distinctions, but in their         13:27:45
13   own data systems I don't expect them to           13:27:49
14   track that, no, as opposed to data they           13:27:51
15   purchase.                                         13:27:54
16 Q. Okay. At least as far as the third-party         13:27:54
17   data goes, we discussed the need for those        13:28:01
18   data to be broken down reliably by                13:28:02
19   indication, correct?                              13:28:05
20 A. That's correct.                                  13:28:06
21 Q. And would you need monthly data for each of      13:28:06
22   those, for whichever data set you end up          13:28:08
23   using?                                            13:28:16
24 A. No, not necessarily.                             13:28:16
25 Q. Why not?                                         13:28:17
```

Page 494

```
1 A. Well, monthly is just one way of                  13:28:19
2    categorizing this. If some of the data are       13:28:21
3    only available annually, we can only use         13:28:23
4    annual data and then interpolate across          13:28:26
5    months.                                          13:28:29
6 Q. If you needed to use annual data, wouldn't       13:28:29
7    that mean that you would have fewer              13:28:35
8    observations with which to conduct your          13:28:36
9    analysis?                                        13:28:39
10 A. If, for example, we're only using it for a      13:28:39
11   variable, what essentially you have is           13:28:42
12   you've reduced variation because you've          13:28:45
13   taken an annual variable and stretched it        13:28:47
14   across months. So in effect you're right,        13:28:50
15   you have reduced power.                          13:28:51
16 Q. Okay. And the consequences of reduced           13:28:52
17   power are?                                       13:28:56
18 A. Well, again, it may make the confidence         13:28:58
19   intervals basically around the estimates         13:29:01
20   larger, the harder to find a significant         13:29:04
21   event.                                           13:29:07
22 Q. All right. Let's look at 41a) in                13:29:07
23   particular --                                    13:29:30
24 A. Okay.                                           13:29:31
25 Q. -- Paragraph 41a) of your declaration.         13:29:31
```

Page 495

```
1 A. Okay.                                            13:29:36
2 Q. I'm sorry, Paragraph 41a) of your                13:29:36
3    declaration, Exhibit 1.                          13:29:39
4 A. Okay. I'm with you now.                          13:29:40
5 Q. Great. You write here that "As a matter of      13:29:41
6    good business practice, companies such as       13:29:46
7    the Defendants' document marketing              13:29:48
8    activities by product line and in extensive     13:29:50
9    detail"; is that correct?                       13:29:53
10 A. That's correct.                                 13:29:55
11 Q. Now, has your preliminary review suggested      13:29:56
12   to you that defendants in this case             13:30:09
13   maintain this data?                              13:30:11
14 A. In my review I've seen documentation,           13:30:12
15   again, like the strategic grid that we          13:30:15
16   discussed yesterday that is Footnote 71        13:30:18
17   here. And so information about this             13:30:22
18   promotional effectiveness system that's in     13:30:28
19   Footnote 70, that indicates the ability to    13:30:30
20   track some promotional activities and their   13:30:34
21   effects.                                       13:30:38
22 Q. Other than these two categories, can you      13:30:38
23   think of any other sorts of documents that    13:30:41
24   you've seen to date at least that was --      13:30:44
25 A. That than --                                   13:30:44
```

Page 496

```
1 Q. -- in this category?                             13:30:46
2 A. Actually, I see the previous footnote as         13:30:47
3    well, but you're right, these categories       13:30:49
4    are promotional marketing strategy and        13:30:52
5    analyses of the effectiveness of marketing   13:30:57
6    as the major categories. I understand that   13:31:01
7    product profits -- excuse me, product         13:31:04
8    profit and loss statements are often          13:31:07
9    constructed as well, and so brand by brand    13:31:10
10   there will be promotional and sales           13:31:13
11   spending.                                     13:31:15
12 Q. Have you seen those documents in this case?  13:31:15
13 A. I confess I can't remember. I could check    13:31:18
14   my footnotes to see if I've noted one of      13:31:23
15   these here.                                   13:31:25
16 Q. You're welcome to take a look if you would   13:31:25
17   like.                                          13:31:28
18 A. Okay. There doesn't seem to be a reference   13:31:28
19   in this section at least. It's probably       13:31:39
20   profit and loss. I may have seen them for    13:31:40
21   other drugs.                                   13:31:42
22 Q. But you don't recall having seen them for    13:31:46
23   Neurontin?                                     13:31:48
24 A. I'm not certain, yeah. Footnote 68 talks    13:31:48
25   about documents that I can picture now       13:31:52
```

**497**

1  where they look at promotional spending for   13:31:53
2  Neurontin across the customer business   13:31:56
3  units, which is not quite the same as the   13:31:58
4  product profit and loss.   13:32:06
5  Q. Okay. How certain are you that there's a   13:32:08
6  complete set of documents containing all of   13:32:15
7  this data for all of the periods of time   13:32:19
8  that your model will cover?   13:32:23
9  A. Can I take that in pieces?   13:32:26
10 Q. Sure.   13:32:29
11 A. First, I know that sources like IMS Health   13:32:30
12 track promotional spending by category   13:32:36
13 routinely and that those data exist.   13:32:39
14 Second, I know, having looked at some of   13:32:44
15 these discovery documents, having consulted   13:32:46
16 with Professor King about whom we spoke   13:32:48
17 yesterday, Charles King, that companies do   13:32:51
18 track their marketing expenditures at the   13:32:55
19 very least and their effects generally as   13:32:58
20 routine matter of, as I say here, good   13:33:00
21 business practice.   13:33:02
22     So I feel quite confident that   13:33:03
23 these documents existed at one time. I   13:33:06
24 guess I can't say for sure that the   13:33:08
25 defendants can still produce those   13:33:11

**498**

1  documents, whether they existed. And what   13:33:13
2  I've seen in discovery suggests that the   13:33:15
3  discovery materials may yield some of these   13:33:19
4  data.   13:33:21
5  Q. Okay. Let me take your answer in pieces.   13:33:22
6  The first piece relates to the IMS data,   13:33:26
7  correct?   13:33:29
8  A. Yes.   13:33:29
9  Q. I think we discussed before how the IMS   13:33:29
10 data on promotional activity at least   13:33:33
11 wouldn't distinguish from indication to   13:33:37
12 indication --   13:33:39
13 A. That's correct.   13:33:40
14 Q. -- is that correct?   13:33:40
15 A. Overall, yes.   13:33:41
16 Q. The second piece relates to your   13:33:42
17 conversations with Professor King, correct?   13:33:46
18 A. Yes.   13:33:49
19 Q. And that if I understand it correctly,   13:33:49
20 Professor King advised you that companies   13:33:53
21 as a general matter do tend to track   13:33:56
22 promotional spending; is that correct?   13:34:00
23 A. Pharmaceutical companies in particular.   13:34:01
24 Q. Okay. Does your conversation with   13:34:10
25 Professor King suggest to you that the   13:34:11

**499**

1  defendants necessarily would have done this   13:34:18
2  tracking of Neurontin by indication for   13:34:21
3  every period of time that's covered by the   13:34:26
4  class period?   13:34:29
5  A. That's a very comprehensive statement, and   13:34:31
6  I would say my understanding, again, having   13:34:38
7  seen selected documents in Franklin,   13:34:42
8  documents that form the basis of the   13:34:45
9  complaint, is that these data were tracked   13:34:46
10 extensively, and I can think of no reason   13:34:49
11 why there would be any point in time that   13:34:52
12 the defendants would have stopped tracking   13:34:55
13 them. I can't think of any reason why   13:34:57
14 there would be a gap.   13:34:59
15 Q. Could there be a point in time before which   13:35:00
16 they started tracking prescriptions by   13:35:03
17 indication --   13:35:06
18 A. Possibly.   13:35:06
19 Q. -- promotional expenditures by indication?   13:35:07
20 A. That's possible.   13:35:10
21 Q. And you don't know whether the documents   13:35:10
22 would reflect that one way or the other?   13:35:12
23 A. I don't know whether I could establish that   13:35:14
24 with the documents I've reviewed yet. If   13:35:17
25 that were to be the case, then I guess   13:35:19

**500**

1  there would not be sufficient support for   13:35:23
2  analysis for those time periods.   13:35:25
3      MR. POLUBINSKI: Okay. Why don't   13:35:30
4  we take just a quick break to change the   13:35:31
5  tape?   13:35:33
6      THE WITNESS: Okay. I'll take   13:35:34
7  advantage so we don't have to break again.   13:35:36
8      MR. POLUBINSKI: The time is 1:35.   13:35:38
9  This is the end of Tape 2 -- Tape 3, excuse   13:35:43
10 me, and we're off the record.   13:35:45
11     (Recess taken.)   13:35:48
12     THE VIDEOGRAPHER: The time is   13:38:53
13 1:39. This is the beginning of Tape 4, and   13:38:57
14 we're back on the record.   13:39:01
15 BY MR. POLUBINSKI:   13:39:02
16 Q. So, Professor Rosenthal, I'm going to ask   13:39:02
17 you to dig a document out of the stack of   13:39:05
18 exhibits that's sitting next to you.   13:39:07
19 A. Okay.   13:39:10
20 Q. If you could look for Rosenthal Exhibit 12,   13:39:10
21 that would be great. Can I help you find   13:39:14
22 it?   13:39:31
23 A. Okay. It's the promotional grid. Got it.   13:39:32
24 Thank you.   13:39:34
25 Q. The bottom of the stack, of course.   13:39:35

48 (Pages 497 to 500)

M. ROSENTHAL

Page 501

| | | |
|---|---|---|
| 1 | A. Yes, of course. Okay. I have it. | 13:39:37 |
| 2 | Q. Rosenthal Exhibit 12 is the document that | 13:39:42 |
| 3 | we discussed yesterday that is cited in | 13:39:44 |
| 4 | Footnote 71, correct? | 13:39:46 |
| 5 | A. That is correct. | 13:39:48 |
| 6 | Q. It's the 1998 Strategic Plan and A&P | 13:39:48 |
| 7 | Allocation Grid, right? | 13:39:52 |
| 8 | A. Right. | 13:39:54 |
| 9 | Q. And that this is the document that you | 13:39:54 |
| 10 | identify in 41a) that you write permits you | 13:39:57 |
| 11 | to track spending on off-label promotions | 13:40:04 |
| 12 | in the form of speaking engagements and | 13:40:09 |
| 13 | consultancies; am I getting that right? | 13:40:11 |
| 14 | A. I'm sorry, can I just see where you're | 13:40:16 |
| 15 | reading? | 13:40:20 |
| 16 | Q. Yeah, of course. It's the language on the | 13:40:20 |
| 17 | carry-over sentence at the end of the page. | 13:40:23 |
| 18 | A. Okay. | 13:40:26 |
| 19 | Q. I'll read the sentence for you. It's | 13:40:26 |
| 20 | "Finally, I have seen numerous agreements | 13:40:29 |
| 21 | such as Bates-stamped document V084073 to | 13:40:31 |
| 22 | 078 that track spending on off-label | 13:40:38 |
| 23 | promotion in the form of speaking | 13:40:41 |
| 24 | engagements and consultancies." | 13:40:42 |
| 25 | A. Right. So, for example, you'll see rows | 13:40:47 |

Page 502

| | | |
|---|---|---|
| 1 | that say "Physician honoraria and travel," | 13:40:49 |
| 2 | "Speakers Bureau"? | 13:40:51 |
| 3 | Q. Where are you looking? | 13:40:53 |
| 4 | A. Under "Local Tactics." | 13:40:54 |
| 5 | Q. This is on the first page of the document? | 13:40:57 |
| 6 | A. On the first page, yes, sorry. | 13:40:58 |
| 7 | Q. Okay. Just a general question about the | 13:41:01 |
| 8 | document. We did agree that this is a | 13:41:05 |
| 9 | prospective document, correct? | 13:41:06 |
| 10 | A. Right. You indicated that, and I agree. | 13:41:07 |
| 11 | It makes sense. It's a strategic plan, | 13:41:10 |
| 12 | so... | 13:41:14 |
| 13 | Q. And just so that I'm square on this, can | 13:41:20 |
| 14 | you point to any documents that actually | 13:41:23 |
| 15 | demonstrate what defendants actually spent | 13:41:25 |
| 16 | on the promotion -- actually spent for | 13:41:27 |
| 17 | promotion of Neurontin? | 13:41:29 |
| 18 | A. This grid, if in fact it is only a plan, | 13:41:30 |
| 19 | doesn't show that. Again, as I mentioned | 13:41:35 |
| 20 | before in the promotional effectiveness | 13:41:40 |
| 21 | system, those kinds of activity -- tracking | 13:41:42 |
| 22 | mechanisms look at actual events, spending | 13:41:45 |
| 23 | and their effects. | 13:41:49 |
| 24 | Q. Those are the documents that you referred | 13:41:54 |
| 25 | to in Footnote 70? | 13:41:56 |

Page 503

| | | |
|---|---|---|
| 1 | A. That's right. Let me just verify that, but | 13:41:57 |
| 2 | I believe that's right. Yes. | 13:42:04 |
| 3 | Q. All right. Looking at this document and | 13:42:07 |
| 4 | again sort of just looking at the first | 13:42:09 |
| 5 | page, is there a way that you can discern | 13:42:11 |
| 6 | off-label promotional spending versus | 13:42:18 |
| 7 | on-label promotional spending just on the | 13:42:20 |
| 8 | basis of this document? | 13:42:22 |
| 9 | A. Well, if we're looking at the planned | 13:42:24 |
| 10 | spending and taking that as representative | 13:42:32 |
| 11 | of what actually happened, as you see, the | 13:42:33 |
| 12 | heading on the first page says "Expend | 13:42:37 |
| 13 | Neurontin use on epilepsy through the | 13:42:40 |
| 14 | introduction of monotherapy." So that's | 13:42:43 |
| 15 | for a particular off-label use, and then | 13:42:45 |
| 16 | there's spending associated with it. | 13:42:48 |
| 17 | Q. I guess, didn't we agree that the | 13:42:49 |
| 18 | physicians who would be targeted, for lack | 13:42:56 |
| 19 | of a better word, by the sorts of | 13:42:59 |
| 20 | activities described in Section 1 here of | 13:43:05 |
| 21 | on the first page would be epileptologists, | 13:43:08 |
| 22 | correct? | 13:43:12 |
| 23 | A. That's correct. | 13:43:12 |
| 24 | Q. And that some amount of this activity could | 13:43:12 |
| 25 | well be directed to on-label uses of | 13:43:21 |

Page 504

| | | |
|---|---|---|
| 1 | Neurontin as adjunctive therapy for | 13:43:25 |
| 2 | treatment of seizures? | 13:43:27 |
| 3 | A. Well, in my view, this grid shows | 13:43:28 |
| 4 | defendants' own estimate of the dollars to | 13:43:33 |
| 5 | be spent promoting monotherapy. Whether or | 13:43:37 |
| 6 | not it's for the same individuals, I'm not | 13:43:39 |
| 7 | sure that I understand your point. | 13:43:43 |
| 8 | Q. Let me -- let's -- let me ask you this: Is | 13:43:44 |
| 9 | the spending that's envisioned in this | 13:43:50 |
| 10 | document organized annually or by monthly | 13:43:53 |
| 11 | outlays? | 13:43:56 |
| 12 | A. My understanding is that this is for the | 13:43:57 |
| 13 | entire year 1998. | 13:44:00 |
| 14 | Q. Would you be able to create a monthly | 13:44:02 |
| 15 | series of promotional expenditures using a | 13:44:07 |
| 16 | document like this? | 13:44:09 |
| 17 | A. Again, as I mentioned before, if some | 13:44:10 |
| 18 | variables are only available on an annual | 13:44:13 |
| 19 | basis, I would interpolate them, excuse me, | 13:44:15 |
| 20 | interpolate the monthly data and thereby | 13:44:19 |
| 21 | lose some power, but this is frequently | 13:44:23 |
| 22 | done in studies like this. | 13:44:26 |
| 23 | Q. Okay. | 13:44:28 |
| 24 | A. Okay. | 13:44:28 |
| 25 | Q. You can set this one, too, aside. | 13:44:29 |

Page 505

1  A. Okay. I'll leave it on the top.
2  Q. All right. Let me direct your attention to
3     Paragraph 7d) on Page 5 of your
4     declaration, Exhibit 1 to your deposition.
5  A. I'm sorry?
6  Q. Paragraph 7d).
7  A. 70?
8  Q. Uh-huh.
9  A. And then -- okay. I'm sorry. I'm sorry,
10    Paragraph 70 of my --
11 Q. 7d).
12 A. 7d), oh, sorry. I thought I was losing it.
13 Q. We're going backwards.
14 A. That's a shame.
15 Q. Yeah, well, not for long.
16 A. All right.
17 Q. Okay.
18 A. Okay.
19 Q. So in this paragraph you write that
20    "Parke-Davis made the explicit calculation
21    that seeking FDA approval would not be
22    worthwhile, given the short remaining
23    patent life for Neurontin," correct?
24 A. That's correct.
25 Q. What's the basis for that statement?

Page 506

1  A. That comes -- and you'll see there are
2     footnotes there in the documents, but
3     essentially it's a summary of my
4     understanding of what the complaint was
5     saying.
6  Q. What's the extent of your knowledge about
7     the process involved in a manufacturer
8     seeking approval from the FDA for
9     additional indications for an existing
10    drug?
11 A. My knowledge is fairly rudimentary on that
12    subject, and my understanding is that
13    additional clinical trials need to be done.
14 Q. Do you have any knowledge for how expensive
15    the process might be?
16 A. I understand that undertaking clinical
17    trials, particularly randomized control
18    double-blind trials, is very expensive in
19    general, and so I mean, it's well-known
20    that under the process of drug development,
21    that is, getting approval from the FDA, is
22    expensive and is essentially a barrier to
23    entry for new drugs.
24 Q. Do you have any knowledge of how long the
25    process can take of running the clinical

Page 507

1     trials and then seeking the approval from
2     the agency?
3  A. Again, I've certainly seen discussions in
4     the policy literature about how long it
5     takes to get FDA approval. There have been
6     efforts, as you know, over the last decade
7     or two to try to shorten that length of
8     time, but so my understanding is that it's
9     a substantial consideration, that it takes
10    quite a while.
11 Q. By "quite a while," are we talking years?
12 A. It would be -- that would be my -- again,
13    my not terribly expert opinion on this is
14    that it would take a couple of years, and
15    it would represent a significant sum of
16    money to undertake.
17 Q. Would you agree with the assumption that
18    manufacturers of prescription drugs are by
19    and large rational economic actors?
20 A. And if you mean profit-maximizing firms, I
21    would agree with that assumption.
22 Q. And so based on that assumption, would you
23    say that it's also a reasonable assumption
24    that Parke-Davis, as you lay it out here
25    (indicating) in your declaration, that

Page 508

1     Parke-Davis made the implicit calculation
2     that they wouldn't earn sufficient profit
3     to make seeking an additional use
4     worthwhile?
5  A. That is my understanding, that it was an
6     explicit (sic) calculation, yes.
7  Q. All right. Let me ask you a hypothetical
8     question on this. Assume the manufacturer
9     had a drug whose patent will run out in
10    three years --
11 A. Okay.
12 Q. -- and discovers that this drug which has
13    already been approved by the FDA for one
14    condition is almost surely effective for an
15    additional unapproved condition. The
16    manufacturer estimates that it will cost
17    them $2 million and two years to complete
18    the studies they need to complete and to
19    end -- assuming that the results are
20    favorable in those studies, to secure the
21    FDA approval of that new use.
22    I have no sense for whether those
23    numbers -- they're probably low-balled in
24    a, you know, in a serious way, but for
25    purposes of this hypothetical let's use

509-512

Page 509

1  them.  13:49:30
2       And then they estimate that the  13:49:31
3  potential profit for the drug over the one  13:49:33
4  year of its remaining patent life after the  13:49:35
5  two-year approval period is a million  13:49:37
6  dollars. What would you imagine the  13:49:42
7  manufacturer would choose to do in that  13:49:43
8  circumstance?  13:49:45
9  A. I'm sorry, I think I lost some important  13:49:46
10  elements of the word problem. I need a  13:49:49
11  pencil, but what was the cost of the  13:49:52
12  clinical trials? It took two years to --  13:49:53
13  Q. Two years and 2 million, just so we keep  13:49:56
14  the numerals simple.  13:49:58
15  A. That's right. Excellent. We're good.  13:49:59
16  Right. So, again, you know, I believe that  13:50:00
17  there's a math calculation. It's a simple  13:50:02
18  one. If the profits are a million dollars  13:50:04
19  and the cost is $2 million, no matter what  13:50:07
20  discount rate you use, you come to a  13:50:09
21  conclusion that it doesn't make sense to go  13:50:11
22  through the process.  13:50:14
23  Q. Okay. And you wouldn't suggest the  13:50:14
24  manufacturer has done anything wrong by not  13:50:17
25  going through the process?  13:50:19

Page 510

1  A. No.  13:50:20
2  Q. Does it matter for purposes of your answer  13:50:24
3  whether the drug is or isn't effective for  13:50:26
4  the supplemental use?  13:50:28
5  A. For the calculation?  13:50:29
6  Q. For the answer to your -- answer to the  13:50:32
7  last question, which is that they haven't  13:50:36
8  done anything wrong in not seeking approval  13:50:37
9  for the additional use.  13:50:40
10  A. Well, we're getting --  13:50:41
11       MR. NOTARGIACOMO: Economically,  13:50:46
12  morally, legally? Where are we now?  13:50:46
13       MR. POLUBINSKI: Professor  13:50:48
14  Rosenthal answered the question.  13:50:50
15  Q. What were you thinking when you answered  13:50:50
16  it?  13:50:56
17  A. I believe I was trapped. But in the first  13:50:57
18  example I was speculating on the cost/  13:51:01
19  benefit comparison, and in no way did the  13:51:03
20  rightness of launching the drug for that  13:51:05
21  indication enter into my calculation. I  13:51:11
22  was merely comparing the $2 million to the  13:51:14
23  million dollars. That was a profit-  13:51:16
24  maximizing decision.  13:51:17
25  Q. Sure.  13:51:18

Page 511

1  A. And if you want me to say something about  13:51:19
2  whether or not it's right if there's no  13:51:21
3  effectiveness, then I need to use some  13:51:23
4  other standard. I don't know what the  13:51:25
5  right standard to use is there.  13:51:27
6  Q. Okay. Are you aware of any standard, I  13:51:29
7  guess, under which it would be wrong for  13:51:32
8  them not to go and seek additional approval  13:51:34
9  for that use?  13:51:36
10       MR. NOTARGIACOMO: Objection.  13:51:38
11  A. I'm not aware of any standard to evaluate  13:51:39
12  that decision.  13:51:43
13  Q. Okay. Now, let me ask you also to assume  13:51:44
14  just for purposes of this question that  13:51:54
15  Neurontin is 100 percent effective for a  13:51:57
16  given off-label use. Could you imagine the  13:51:59
17  defendants making a rational economic  13:52:04
18  decision not to even pursue FDA approval  13:52:07
19  for that use based on the amount of time  13:52:09
20  left in the patent life of the drug?  13:52:11
21  A. Again, my response to your original  13:52:14
22  question didn't assume anything about  13:52:17
23  effectiveness. So the economic -- rational  13:52:19
24  economic decision was just one about costs  13:52:21
25  and benefits in terms of profitability --  13:52:23

Page 512

1  Q. And --  13:52:27
2  A. -- and therefore I would respond the same  13:52:27
3  way.  13:52:30
4  Q. Okay. And that they could in fact make a  13:52:30
5  rational economic decision not to even  13:52:33
6  sponsor a single clinical trial?  13:52:35
7  A. Yes, absolutely. The rational economic  13:52:36
8  decision is based only on profits.  13:52:41
9  Q. And their decision to do that or not to do  13:52:44
10  that wouldn't mean anything with regard to  13:52:52
11  whether Neurontin was or wasn't perfectly  13:52:57
12  effective for that use?  13:53:00
13  A. Again, I believe that one can abstract that  13:53:01
14  decision in terms of purely profits and  13:53:08
15  that it could be the same decision no  13:53:10
16  matter what the effectiveness is, and so I  13:53:12
17  think the answer is yes, but I believe I've  13:53:15
18  already answered it, unless I haven't been  13:53:17
19  clear.  13:53:19
20  Q. No, that's fine -- right. I guess by  13:53:19
21  itself, then, the fact that Neurontin was  13:53:22
22  not approved by the FDA for a given use  13:53:24
23  doesn't mean that Neurontin wasn't  13:53:27
24  perfectly effective for that use?  13:53:28
25  A. By itself that does not indicate anything  13:53:31

51 (Pages 509 to 512)

Page 513

```
 1    about the true effectiveness of Neurontin,           13:53:34
 2    no.                                                  13:53:36
 3 Q. Okay. All right. You've said in your                 13:53:41
 4    model that you proposed to quantify the              13:53:47
 5    effect of wrongful conduct on a class-wide           13:53:49
 6    level, correct?                                      13:53:53
 7 A. Uh-huh.                                              13:53:53
 8 Q. I take it you'll -- that you expect to be            13:53:53
 9    able to quantify the extent of the impact            13:53:58
10    suffered by each of the subclasses. So in            13:54:01
11    other words, the consumer subclass as well           13:54:04
12    as the third-party payer subclass, correct?          13:54:07
13 A. That's correct.                                      13:54:09
14 Q. Do you know how large the third-party payer          13:54:09
15    subclass is?                                         13:54:13
16 A. Can you tell me what you mean by "large"?            13:54:13
17    You mean number of members --                        13:54:17
18 Q. Yes.                                                 13:54:17
19 A. -- or number of dollars?                             13:54:18
20 Q. Number of members.                                   13:54:19
21 A. I don't know the number of members. If you           13:54:21
22    look at third-party payers, commercial               13:54:26
23    insurers generally, the number is in the             13:54:31
24    several hundred. If you add in the Taft-             13:54:34
25    Hartley plans, there are probably another            13:54:39
```

Page 514

```
 1    hundred or so. That's order of magnitude.            13:54:41
 2 Q. Are there others that you would have to              13:54:45
 3    include?                                             13:54:46
 4 A. On the third-party payer side?                       13:54:47
 5 Q. Yeah.                                                13:54:49
 6 A. I believe the commercial plans -- the Taft-          13:54:49
 7    Hartley funds and the commercial plans are           13:55:02
 8    the principal members of the third-party             13:55:03
 9    payer subclass. I could check the                    13:55:05
10    complaint.                                           13:55:07
11 Q. And I guess just adding up the two                   13:55:07
12    categories that you've just described, I             13:55:13
13    guess we would agree that the, to the best           13:55:16
14    of your knowledge now, the third-party                13:55:19
15    payer subclass would be at least several             13:55:21
16    hundred entities large, possibly over a              13:55:24
17    thousand?                                            13:55:27
18 A. Possibly.                                            13:55:27
19 Q. Okay. I assume that your model would seek            13:55:28
20    to determine aggregate impact on the third-          13:55:39
21    party payer subclass; is that correct?               13:55:41
22 A. I have been asked to develop a model to              13:55:43
23    estimate aggregate impact, yes.                      13:55:45
24 Q. And that your model wouldn't purport to              13:55:47
25    determine whether each member, each                  13:55:50
```

Page 515

```
 1    individual member of the third-party payer           13:55:51
 2    subclass suffered an injury as a result of           13:55:53
 3    the conduct at issue?                                13:55:55
 4 A. Well, as you know, in sort of the context            13:56:00
 5    of a class like this you're looking at               13:56:03
 6    aggregate impact that is common to all the           13:56:05
 7    class members, so -- but I don't identify            13:56:08
 8    if what you mean is to look specifically at          13:56:10
 9    Blue Cross/Blue Shield of Kansas City and            13:56:13
10    their effects.                                       13:56:15
11 Q. Okay. We've discussed before in your                 13:56:16
12    declaration how physicians -- let's                  13:56:23
13    actually look at Paragraph 12.                       13:56:26
14 A. 12, thank you. Okay.                                 13:56:29
15 Q. We've discussed before how in your                   13:56:40
16    declaration how physicians "face numerous            13:56:43
17    constraints, including limited time and              13:56:45
18    cognitive ability to digest the continuous           13:56:48
19    flow of information about new treatments"?           13:56:50
20 A. Yes.                                                 13:56:53
21 Q. Will that statement be true of at least              13:56:53
22    some of the third-party payers as well?              13:56:59
23 A. I'm not sure what you mean by that.                  13:57:01
24 Q. Would you agree that third-party payers do           13:57:07
25    process to some degree information about             13:57:12
```

Page 516

```
 1    the different treatments for which they              13:57:15
 2    reimburse?                                           13:57:17
 3 A. I believe that third-party payers make               13:57:17
 4    coverage decisions. For example, they make           13:57:21
 5    coverage decisions -- I don't know the               13:57:25
 6    extent to which -- I know that they                  13:57:29
 7    incorporate some of this information that I          13:57:31
 8    believe was referenced yesterday through             13:57:33
 9    the Drugdex which tracks studies on                  13:57:35
10    particular uses of particular drugs, and so         13:57:39
11    if that's what you mean by they sort of              13:57:41
12    incorporate new information in their                 13:57:44
13    policies -- is that the kind of thing that           13:57:46
14    you had in mind?                                     13:57:47
15 Q. Yeah. And do -- third-party payers, I'd              13:57:48
16    assume to some degree at least, make                 13:57:51
17    coverage decisions about whether they'll             13:57:53
18    reimburse for particular drugs for                   13:57:56
19    particular uses, correct?                            13:57:57
20 A. To some degree they make those policies.            13:57:58
21    As you know, they don't tend to apply those          13:58:02
22    policies patient by patient.                         13:58:05
23 Q. Sure. No, of course.                                 13:58:08
24 A. So for example --                                    13:58:10
25 Q. Of course.                                           13:58:12
```

52 (Pages 513 to 516)

M. ROSENTHAL

**517**

1  A. Right. Okay.  13:58:12
2  Q. But in the context of making decisions  13:58:13
3     about what to cover and what not to cover,  13:58:16
4     they do receive and process information  13:58:18
5     about various treatments?  13:58:21
6  A. I imagine that there's a function in the  13:58:23
7     third-party payers where they do this -- I  13:58:25
8     guess what I'm having a little trouble with  13:58:28
9     is I can see how this happens for an  13:58:30
10    initial coverage decision. I don't know  13:58:32
11    the extent to which third-party payers  13:58:34
12    revisit existing drugs with regard to new  13:58:35
13    indications.  13:58:38
14 Q. Could you imagine that the answer to that  13:58:39
15    question might vary from third-party payer  13:58:41
16    to third-party payer?  13:58:43
17 A. Perhaps.  13:58:44
18 Q. That some of them might revisit this on  13:58:44
19    several occasions?  13:58:48
20 A. Again, since I'm not entirely sure the  13:58:50
21    extent to which this happens at all, I  13:58:53
22    could imagine that it would happen  13:58:57
23    differentially, so that's certainly in the  13:58:59
24    realm of possibility.  13:59:00
25 Q. All right. Also in Paragraph 12 you write  13:59:01

**518**

1     the "Physicians are often not aware of the  13:59:14
2     latest scientific evidence on treatments  13:59:17
3     and rely heavily on commercial sources of  13:59:22
4     information, such as pharmaceutical company  13:59:24
5     promotional materials."  13:59:26
6        In terms of awareness of the  13:59:32
7     latest scientific evidence, would your  13:59:34
8     statement as it's laid out here in your  13:59:39
9     declaration be true of third-party payers?  13:59:41
10 A. Again, it's sort of a -- I'm having a  13:59:43
11    little trouble casting the third-party  13:59:48
12    payer as medical decision-makers because  13:59:50
13    they're so enormous, but would the medical  13:59:51
14    director of a third-party payer be aware of  13:59:54
15    the latest scientific evidence to some  13:59:57
16    degree?  14:00:00
17 Q. Okay.  14:00:03
18 A. I suppose.  14:00:03
19 Q. And that degree would vary from third-party  14:00:04
20    payer to third-party payer?  14:00:06
21 A. I suppose.  14:00:07
22 Q. There might be some third-party payers that  14:00:08
23    may not even have a medical director as  14:00:10
24    such?  14:00:12
25 A. That, I have trouble believing.  14:00:12

**519**

1  Q. Okay.  14:00:15
2  A. But I can believe that medical directors  14:00:15
3     vary.  14:00:18
4  Q. Okay. All right. You state in Paragraph  14:00:18
5     33 of your declaration -- actually Footnote  14:00:25
6     49.  14:00:37
7  A. Okay. 49?  14:00:37
8  Q. Yeah.  14:00:39
9        -- that "price plays a relatively  14:00:42
10    minor role here because most patients  14:00:43
11    receiving Neurontin are covered by  14:00:47
12    insurance so they only pay" -- "they only  14:00:49
13    face the co-payment amount."  14:00:51
14       Does price play a similarly minor  14:00:55
15    role in decision-making on reimbursement by  14:00:57
16    third-party payers?  14:01:00
17 A. I think it would depend on the situation,  14:01:01
18    but clearly -- so can I be a little  14:01:03
19    specific here for a second?  14:01:06
20 Q. Please.  14:01:08
21 A. So the price we're talking about in the  14:01:08
22    Rizzo model and in general is --  14:01:10
23 Q. In the which model?  14:01:14
24 A. I'm sorry, in the Rizzo model in Footnote  14:01:16
25    49, R-I-Z-Z-O, is something like that AWP  14:01:18

**520**

1     price. In all likelihood it's the AWP, the  14:01:22
2     list price for the drug. And most of these  14:01:25
3     models are about overall consumption of the  14:01:30
4     drug. So sort of looking at total units  14:01:32
5     consumed as a function of this list price,  14:01:34
6     the relationship is not all that clear,  14:01:37
7     because, again, the individuals pay  14:01:41
8     something out of pocket.  14:01:43
9        So now you're asking, I think,  14:01:44
10    does that same list price affect a third-  14:01:46
11    party payer's coverage decision? I think  14:01:50
12    it would depend -- for the most part  14:01:53
13    third-party payers cover -- open  14:01:56
14    formularies are the most common form, so  14:01:59
15    they cover all drugs. They may put  14:02:01
16    differential co-payments in for certain  14:02:03
17    kinds of high cost drugs in cases where  14:02:05
18    they have lower cost substitutes in  14:02:09
19    general. It'll depend on the class of  14:02:11
20    drugs, but you can imagine there's some  14:02:13
21    very high cross-biological drugs that don't  14:02:15
22    have high co-payments simply because there  14:02:18
23    aren't alternatives, and so using that kind  14:02:21
24    of co-payment mechanism doesn't make sense  14:02:23
25    for trying to get consumers to try a  14:02:24

Page 521

1  different drug.
2  Q. All right. And different third-party
3     payers, I take it, could make different
4     decisions on this even with respect to the
5     same drug; is that correct?
6  A. In the cross-section there may be
7     differences in co-payments. There
8     certainly are differences in co-payments.
9  Q. Okay. The third-party payers, generally
10    speaking, have a significant economic stake
11    in persuading or directing physicians not
12    to prescribe drugs for indications for
13    which they're known to be ineffective; is
14    that correct?
15 A. Could you read that back? I just ---
16        MR. POLUBINSKI: If you could read
17    it, that would be great.
18        (Record read.)
19        MR. NOTARGIACOMO: Objection.
20 A. I guess the way you phrase that, it's
21    certainly true that third-party payers
22    generally do better when spending is less,
23    and given that they want to constrict
24    spending, eliminating ineffective use makes
25    more sense than effective use, but that

Page 522

1  statement doesn't characterize very well
2  what we know about how the market works in
3  this area. There are lots of treatments
4  that are known to be ineffective, low
5  effectiveness that are covered.
6  Q. Do third-party payers have different ways
7     of affecting physician or patient decision-
8     making with respect to drugs that they
9     believe to be ineffective for treating
10    particular indications?
11        MR. NOTARGIACOMO: Objection.
12 A. The -- yes, there are financial incentives,
13    pre-authorization requirements, for
14    example, and, of course, coverage
15    decisions.
16 Q. Okay. Let's talk about some of these. All
17    right. How about a prior authorization
18    program; could you describe just briefly
19    how such a program would work in this
20    context?
21 A. A prior authorization program might, for
22    example, require that a physician supply
23    some clinical information about a patient
24    before the prescription drug would be
25    reimbursed.

Page 523

1  Q. I think we agreed in some of the early
2     questions that we did today that the
3     implementation of a prior authorization
4     program might impact prescription decisions
5     in the aggregate. Am I correct on that?
6  A. So it would depend on how the prior
7     authorization program -- well, let's say,
8     for example, it was for any patient getting
9     Neurontin there had to be a prior
10    authorization. That would certainly affect
11    overall prescribing of any kind. If the
12    prior authorization were specific to
13    off-label use, then it would have that more
14    specific effect.
15 Q. Will your model take into consideration all
16    of the occasions in which third-party
17    payers implemented prior authorization
18    programs for Neurontin?
19 A. My model will again focus on the main
20    predictors of the use of Neurontin for
21    off-label uses, and in particular the
22    concern is with regard to those variables
23    that might occur with a pattern over time
24    identical to the allegedly illegal
25    activities. So to the extent that there --

Page 524

1  that my research shows that there's a
2  concern, there's a simultaneous effect of
3  these kinds of formulary decisions or prior
4  authorization programs, then I'll try to
5  model it.
6         In reality, though, as you know,
7  if, for example, you were to posit a story
8  such as is follows: Defendants increase
9  off-label promotions, third-party payers
10 make it harder and harder to get Neurontin
11 for off-label use, it'll just -- it'll bias
12 my estimate downwards if I don't model
13 those. It's really only -- if you can tell
14 a story, again, about they're being
15 correlated in time that it causes a
16 problem. And in this case that story would
17 really have to be one that would result in
18 a downward bias in the estimate of the
19 impact.
20 Q. Okay. Let's talk about financial
21    incentives, too. That was another --
22 A. Okay.
23 Q. -- category of ways in which third-party
24    payers might affect physician prescribing
25    decisions. What sorts of financial

Page 525

```
1    incentives would you have in mind when you         14:07:16
2    answer the question?                               14:07:19
3  A. I think the chief ones in this realm would        14:07:19
4    be consumer co-payments.                           14:07:21
5  Q. That the co-payments would differ from drug       14:07:26
6    to drug?                                           14:07:29
7  A. As you're probably aware, they don't              14:07:31
8    typically differ from drug to drug, but            14:07:34
9    there are categories of drugs. There are           14:07:37
10   preferred drugs, not preferred drugs,              14:07:39
11   generic drugs, which are typically all the         14:07:42
12   best category of drugs. And so the                 14:07:44
13   co-payments vary across those categories.          14:07:47
14 Q. The best category of drugs from the               14:07:50
15   perspective of the third-party payers,             14:07:52
16   correct?                                           14:07:53
17 A. That's right. So where a generic exists           14:07:55
18   for a particular molecule --                       14:07:57
19 Q. Right.                                            14:07:57
20 A. -- yeah.                                          14:07:59
21 Q. Is this the same thing as a situation in          14:07:59
22   which a TPP, or third-party payer, has a           14:08:01
23   different tier within its formulary?               14:08:03
24 A. That's right, those are exactly those kinds       14:08:05
25   of tiers.                                          14:08:07
```

Page 526

```
1  Q. We talked also, I think, earlier today           14:08:12
2    about disease management programs?                14:08:13
3  A. We did.                                          14:08:14
4  Q. Is that a way that a third-party payer           14:08:17
5    might be able to affect prescribing               14:08:19
6    behavior with respect to Neurontin?               14:08:21
7  A. If there were a disease management program,      14:08:22
8    for example, for one of the off-label             14:08:27
9    indications, is that what you had in mind?        14:08:31
10 Q. Sure.                                            14:08:31
11 A. So let's say bipolar disorder.                   14:08:34
12 Q. Or one that relates to one of the off-label      14:08:36
13   indications --                                    14:08:39
14 A. Okay.                                            14:08:39
15 Q. -- in some way.                                  14:08:39
16 A. It might -- I'm afraid my in-depth               14:08:40
17   knowledge of disease management programs is       14:08:41
18   not deep enough to tell you if they specify       14:08:44
19   certain drugs, but if you ask me to assume        14:08:48
20   that the disease management program had           14:08:51
21   recommendations with regards to drugs,            14:08:53
22   disease management programs generally work        14:08:56
23   around physicians and patients. They don't        14:08:59
24   tend to get involved in the physician/            14:09:01
25   patient decision-making.                          14:09:03
```

Page 527

```
1    So they are third-party payers'                   14:09:04
2    efforts, I think, generally speaking, to          14:09:10
3    overcome the lack of coordination in the          14:09:12
4    health care system itself. So it seems            14:09:14
5    strange to me to think about a disease            14:09:18
6    management program trying to affect               14:09:19
7    physician decision-making. Usually instead        14:09:21
8    they contact patients directly and say,           14:09:23
9    "You should lose weight. You should be            14:09:25
10   taking your medications," but they don't --       14:09:26
11   they're not in a position actually treat          14:09:29
12   the patient. They advise the patient on           14:09:31
13   behavior.                                         14:09:33
14 Q. And through their advising the patient on        14:09:33
15   behavior, could you imagine that that's           14:09:36
16   something that could conceivably impact the       14:09:37
17   extent to which a physician was -- or a           14:09:39
18   patient, rather, received prescriptions for       14:09:43
19   Neurontin for an off-label use?                   14:09:44
20 A. Possibly. Again, it's not very consistent        14:09:46
21   with my vision of the way these programs          14:09:50
22   work, but I think it could be possible,           14:09:53
23   yes.                                              14:09:55
24 Q. Do you know what a drug utilization review       14:09:59
25   program is?                                       14:10:01
```

Page 528

```
1  A. Yes. So like standard utilization review,        14:10:02
2    drug utilization review is a way of               14:10:07
3    generally retrospectively looking at              14:10:13
4    patterns of drug use, and typically it's an       14:10:15
5    informational activity. So, for example,          14:10:18
6    you could do drug utilization review at the       14:10:23
7    individual physician level. We look at all        14:10:26
8    your prescribing patterns for your                14:10:28
9    epileptic patients, just to take an               14:10:31
10   example, and we compare those to your             14:10:33
11   peers'.                                           14:10:35
12     We give you that information and                14:10:36
13   say, "Look, Dr. Smith, you're an outlier.         14:10:37
14   You're using a lot more of this expensive         14:10:40
15   drug X and everyone else is using Y."             14:10:43
16   That's a typical drug review program.             14:10:45
17 Q. Okay. Can we take a look at Paragraph            14:10:47
18   27b).                                             14:11:03
19 A. Okay.                                            14:11:03
20 Q. 27d), I'm sorry.                                 14:11:03
21 A. Okay.                                            14:11:09
22 Q. In 27d) you refer to marketing literature        14:11:10
23   by -- you might have to help me with the          14:11:21
24   pronunciation, Manchanda, Chintagunta and         14:11:25
25   Gertzis --                                        14:11:29
```

**Page 529**

1  A. That sounds right to me.  14:11:32
2  Q. Okay.  14:11:32
3  -- that report that "detailing has  14:11:43
4  a significant positive impact on the number  14:11:45
5  of prescriptions written for a drug by the  14:11:50
6  physician."  14:11:52
7  A. Yes.  14:12:02
8  Q. Do you have a view as to the qualifications  14:12:03
9  of Professors Manchanda, Chintagunta and  14:12:05
10  Gertzis to reach this conclusion?  14:12:09
11  A. The qualifications? My understanding of  14:12:11
12  the authors -- the first author in  14:12:15
13  particular, that he's a marketing professor  14:12:17
14  at the University of Chicago. I'm afraid I  14:12:20
15  don't know the other authors.  14:12:22
16  Q. Okay. With respect to the first author --  14:12:23
17  A. Yeah.  14:12:26
18  Q. -- do you know anything more about what he  14:12:27
19  does at the University of Chicago?  14:12:30
20  A. I do not. I just -- I believe he's a  14:12:31
21  marketing professor there.  14:12:34
22  Q. Okay. On the subject of detailing, you had  14:12:35
23  mentioned academic detailing before?  14:12:41
24  A. Yes.  14:12:43
25  Q. Is that another means through which a  14:12:45

**Page 530**

1  third-party payer could seek to affect  14:12:53
2  prescription writing decisions by  14:12:55
3  physicians?  14:12:57
4  A. Theoretically. I'm not actually aware of,  14:12:59
5  other than demonstration projects,  14:13:03
6  third-party payers having academic  14:13:05
7  detailing programs, but in theory it could.  14:13:07
8  Q. Okay. Would you agree that at some level  14:13:10
9  at least each third-party payer can and  14:13:33
10  generally did make its own decisions on  14:13:37
11  which uses of Neurontin it would reimburse  14:13:40
12  for?  14:13:42
13  MR. NOTARGIACOMO: Objection.  14:13:42
14  A. Well, I think that's a somewhat complicated  14:13:43
15  statement. As you know, Neurontin is an  14:13:47
16  oral pharmaceutical that patients purchase  14:13:51
17  through a retail pharmacy, pick up at the  14:13:54
18  pharmacy and third-party payers reimburse  14:13:57
19  through pharmaceutical claims. Those  14:14:00
20  claims, as you know, do not include  14:14:03
21  diagnosis codes. So whether a third-party  14:14:06
22  payer could in practice require such  14:14:11
23  diagnostic information through, for  14:14:15
24  example, a pre-authorization program as we  14:14:18
25  described before, I would say it is  14:14:21

**Page 531**

1  possible, at very high cost to do, of  14:14:22
2  course, for all Neurontin prescriptions.  14:14:26
3  They would have to consider the  14:14:28
4  problem with potentially preventing  14:14:29
5  appropriate Neurontin prescriptions,  14:14:32
6  consider the problem of making their  14:14:35
7  physicians in their network very angry  14:14:36
8  about the extra work. But in theory they  14:14:39
9  could request that clinical information be  14:14:43
10  provided and therefore construct such a  14:14:45
11  detailed policy.  14:14:49
12  Q. Okay. Would you agree that to the extent  14:14:53
13  that an individual third-party payer made a  14:15:14
14  conscious affirmative decision not to  14:15:16
15  implement a pre-authorization program along  14:15:18
16  the lines of what you've just described,  14:15:21
17  despite its belief that Neurontin was  14:15:24
18  ineffective for some number of off-label  14:15:26
19  uses, that by virtue of that conscious  14:15:34
20  decision the unlawful promotion  14:15:36
21  described -- allegedly unlawful promotion  14:15:38
22  described in the complaint was not a direct  14:15:40
23  cause of any loss to that third-party  14:15:42
24  payer?  14:15:46
25  MR. NOTARGIACOMO: Objection,  14:15:46

**Page 532**

1  calls for a legal conclusion.  14:15:47
2  Q. Well, I'm not -- let's clarify the  14:15:48
3  question. I'm not asking for a legal  14:15:51
4  conclusion, I'm just asking for a -- your  14:15:52
5  own economic analysis as to causality.  14:15:54
6  A. Could you perhaps --  14:16:00
7  MR. NOTARGIACOMO: I'm going to  14:16:01
8  still object on the same basis.  14:16:02
9  A. Could you please restate it in some chunks?  14:16:04
10  Because I'm a little unclear. So I assume  14:16:10
11  that the third-party payer knows Neurontin  14:16:13
12  to be ineffective?  14:16:14
13  Q. Sure. For a given off-label indication or  14:16:16
14  any number of off-label indications --  14:16:20
15  A. So --  14:16:22
16  Q. -- or at least that it believes Neurontin  14:16:24
17  to be ineffective?  14:16:26
18  A. It knows or believes Neurontin to be  14:16:28
19  ineffective, and it knows -- I'm not sure  14:16:31
20  how -- that Neurontin's being used for  14:16:35
21  these off-label indications given that they  14:16:36
22  don't have a prior authorization program.  14:16:40
23  I guess that's the problem with -- if I  14:16:44
24  assume that they know Neurontin to be  14:16:47
25  ineffective and they know that it's being  14:16:49

56 (Pages 529 to 532)

Page 533

```
 1    used for those off-label uses --              14:16:51
 2  Q. Right. And maybe they learned that it's      14:16:53
 3    being used for the off-label uses by          14:16:55
 4    watching Dateline or something like that      14:16:57
 5    and seeing a piece about David Franklin,      14:16:59
 6    his case?                                     14:17:05
 7  A. Okay. Although I don't think that tells      14:17:06
 8    them, you know, how it's being used --        14:17:08
 9  Q. Fair enough.                                 14:17:11
10  A. -- in their population necessarily. Then    14:17:11
11    why is the cause of that off-label use not    14:17:15
12    still the allegedly illegal promotional       14:17:19
13    activities?                                   14:17:24
14  Q. I guess my question goes to the extent that  14:17:28
15    the third-party payer knows that the          14:17:34
16    allegedly illegal activities are going on,    14:17:38
17    and it affirmatively decides not to           14:17:40
18    implement a program through which it would    14:17:42
19    not need to reimburse for those               14:17:43
20    indications, how can it be said that the      14:17:49
21    promotional activity resulted in the loss     14:17:51
22    to that third-party payer?                    14:17:58
23        MR. NOTARGIACOMO: Objection,              14:17:59
24    calls for a legal conclusion.                 14:18:00
25  A. Well, in my view, that really does ask a    14:18:01
```

Page 534

```
 1    legal question, because then you could pose   14:18:04
 2    a case where there's always some means by     14:18:08
 3    which someone can avert fraud, but if it's    14:18:10
 4    very, very high cost, I mean, how can you     14:18:12
 5    say that that's the fault of the person who   14:18:15
 6    was defrauded? And that's a really poor       14:18:17
 7    sort of coffee-table legal opinion, and       14:18:22
 8    so -- but that's sort of where your           14:18:24
 9    question leads me, so I'm afraid I can't      14:18:25
10    really respond.                               14:18:28
11  Q. Okay. I won't ask you for the coffee-        14:18:29
12    table --                                      14:18:31
13  A. Okay.                                        14:18:31
14  Q. -- legal opinion.                            14:18:32
15  A. Thank you. I know it's offensive.            14:18:33
16  Q. No, not at all.                              14:18:35
17        All right. Wouldn't you agree             14:18:36
18    though that the class does -- the third-      14:18:37
19    party payer subclass does contain a wide      14:18:39
20    range of third-party payers that range from   14:18:41
21    large multi-state insurance companies with    14:18:44
22    many employees to small local businesses      14:18:46
23    with just a few employees?                    14:18:49
24  A. I would imagine that to be true, yes.        14:18:50
25  Q. And that you would agree that -- I assume,   14:18:53
```

Page 535

```
 1    that in view of this, the third-party         14:18:54
 2    payers would have varying levels of           14:18:56
 3    knowledge or sophistication as to efficacy    14:18:58
 4    of various drugs for various indications?     14:18:59
 5  A. Again, as I said before, I would agree that  14:19:01
 6    there's probably variation along those        14:19:05
 7    lines.                                        14:19:07
 8  Q. And you would also agree that your model     14:19:07
 9    doesn't seek to account for those             14:19:09
10    differences from third-party payer to         14:19:11
11    third-party payer because it's an aggregate   14:19:13
12    model?                                        14:19:16
13  A. That's correct.                              14:19:16
14  Q. What analysis, if any, have you done into    14:19:16
15    the amount and quality of the medical         14:19:24
16    claims data that are maintained by the        14:19:25
17    different third-party payers?                 14:19:27
18  A. Specific to this case?                       14:19:28
19  Q. Uh-huh.                                      14:19:35
20  A. I have not planned to use claims data        14:19:36
21    specifically in the models that we've         14:19:38
22    discussed, so I have not looked into those    14:19:40
23    data. I have extensive experience using       14:19:43
24    claims data both on the prescription drug     14:19:47
25    and in general, so I have a general sense     14:19:49
```

Page 536

```
 1    of those data.                                14:19:51
 2  Q. Okay. But you don't plan on using them in    14:19:52
 3    your analysis in this case?                   14:19:54
 4  A. I believe there are places where they might  14:19:55
 5    be informative, but in general, as we         14:19:59
 6    talked about, I plan to use the National      14:20:02
 7    Disease and Therapeutic Index data for the    14:20:04
 8    quantities and then the promotional data      14:20:07
 9    for promotional spending.                     14:20:09
10  Q. Would you agree that individual third-party  14:20:22
11    payers may have delegated decision-making     14:20:24
12    authority regarding reimbursement for         14:20:26
13    prescription drugs to different entities      14:20:28
14    that I'll refer to by acronyms, and maybe     14:20:30
15    we can go through them one by one. The        14:20:34
16    first is TPAs, the second are PBMs, and the   14:20:36
17    third are EBCs.                               14:20:39
18        MR. NOTARGIACOMO: Objection.              14:20:41
19  Q. Are you familiar with any of those three     14:20:42
20    groups of acronyms?                           14:20:44
21  A. Two, and I could guess what the third is,    14:20:45
22    but --                                        14:20:46
23  Q. Well, let's work on just the two that        14:20:47
24    you --                                        14:20:49
25  A. Excellent.                                   14:20:49
```

M. ROSENTHAL

```
                                                          537
 1  Q. Okay.                                         14:20:50
 2  A. Third-party administrators, they              14:20:50
 3     essentially process claims data for --        14:20:53
 4     often for these plans like Taft-Hartley       14:20:59
 5     funds. They have a third-party                14:21:01
 6     administrator. Third-party administrator      14:21:04
 7     runs claims through a repricing system, so    14:21:07
 8     they adjudicate claims, pay claims, that      14:21:11
 9     kind of thing.                                14:21:14
10        PBMs have a -- so the TPAs,                14:21:15
11     they're -- maybe just to give a sense,        14:21:18
12     they're administrative entities. They --      14:21:21
13     most of what they do is about processing      14:21:26
14     the bills.                                    14:21:28
15        PBMs, pharmacy benefit managers,           14:21:29
16     in contrast do a lot more. They set           14:21:34
17     formularies in particular, as well as         14:21:38
18     process claims. They often have mail order    14:21:42
19     facilities of their own. And I don't know     14:21:44
20     what the last one is, but I can make it up.   14:21:52
21  Q. Don't make it up.                             14:21:55
22        Would you agree that the extent to         14:21:56
23     which and the manner in which individual      14:22:00
24     TPPs delegate decision-making authority to    14:22:02
25     either PBMs or TPAs will vary from third-     14:22:06
```

```
                                                          538
 1     party payer to third-party payer?             14:22:09
 2  A. I would assume that the specific functions    14:22:14
 3     they ask the -- particularly the TPAs to      14:22:18
 4     undertake could vary.                         14:22:21
 5  Q. Okay. I think you also said -- and correct    14:22:25
 6     me if I'm getting this wrong -- that          14:22:28
 7     individual third-party payers may have        14:22:30
 8     different policies regarding coverage of      14:22:31
 9     prescription drugs for off-label uses?        14:22:34
10  A. I believe that's true.                        14:22:36
11  Q. Okay. Would you also agree that different     14:22:38
12     third-party payers even with the same         14:22:41
13     policies regarding coverage may have          14:22:43
14     different enforcement practices with          14:22:45
15     respect to those policies?                    14:22:48
16  A. That may be true as well.                     14:22:49
17  Q. Would you agree that differing policies of    14:22:52
18     TPPs or different enforcement practices of    14:23:00
19     TPPs could alter the effect of the            14:23:03
20     allegedly unlawful promotional activities     14:23:09
21     with respect to each individual TPP?          14:23:13
22  A. Let's be clear for a moment.                  14:23:15
23  Q. That would be good for a change, right?       14:23:18
24  A. The difference in policies as a general       14:23:21
25     term across third-party payers may affect     14:23:25
```

```
                                                          539
 1     their sort of cross-sectional impact.         14:23:31
 2     Those differences will not confound my        14:23:34
 3     estimates of the aggregate impact because,    14:23:37
 4     again, there's no reason to believe that      14:23:42
 5     they're correlated over time precisely with   14:23:44
 6     the allegedly illegal activities. So          14:23:46
 7     they're not confounding the aggregate         14:23:49
 8     estimate.                                     14:23:50
 9        If you want me to say that a TPP           14:23:53
10     that requires prior authorization for         14:23:56
11     Neurontin will be differently affected than   14:23:58
12     when it doesn't -- is that your question?     14:24:01
13  Q. That had been the question, yeah.             14:24:03
14  A. Okay. I'm sorry. So it is true that there    14:24:05
15     will be a different quantum of effect         14:24:08
16     across TPPs depending on whether, for         14:24:11
17     example, they have prior authorization for    14:24:13
18     Neurontin.                                    14:24:15
19  Q. Now, just to make sure I understand your      14:24:20
20     answer, it is the case that changes in        14:24:24
21     policies regarding coverage of Neurontin      14:24:29
22     for off-label uses or changes in              14:24:31
23     enforcement practices of those policies       14:24:33
24     could affect prescription-writing behavior    14:24:36
25     in the aggregate, correct?                    14:24:39
```

```
                                                          540
 1        MR. NOTARGIACOMO: Objection,               14:24:41
 2     asked and answered.                           14:24:43
 3  A. Yes. Those changes could affect               14:24:43
 4     prescription-writing behavior, but, again,    14:24:47
 5     they would not confound my estimates unless   14:24:50
 6     they were correlated. And one would think     14:24:52
 7     they would be negatively correlated, if       14:24:55
 8     anything.                                     14:24:57
 9  Q. Would you agree that different third-party    14:25:03
10     payers were responsible for ensuring          14:25:06
11     substantially different membership            14:25:09
12     demographics?                                 14:25:11
13  A. The third-party payers have different kinds   14:25:12
14     of patients that they cover, yes.             14:25:18
15  Q. Different kinds of beneficiaries, right?      14:25:19
16  A. That's right, yes.                            14:25:21
17  Q. And that the percentage of women versus the   14:25:23
18     percentage of men covered might vary from     14:25:28
19     TPP to TPP?                                   14:25:30
20  A. I would guess that this might happen for a    14:25:32
21     large population probably not so much, but    14:25:37
22     some of the smaller ones potentially.         14:25:39
23  Q. How about general age demographics again?     14:25:41
24  A. Potentially there might be some variation,    14:25:45
25     yes.                                          14:25:47
```

541

1  Q. Region of the country?                              14:25:49
2  A. Surely.                                             14:25:50
3  Q. Occupations of the people who are covered?          14:25:50
4  A. By definition with the Taft-Hartley plans.          14:25:54
5  Q. In view of these differences, isn't it              14:25:57
6     necessarily the case that the effect of the         14:26:05
7     alleged promotional activity on individual          14:26:07
8     TPP class members could vary from TPP to            14:26:10
9     TPP?                                                14:26:12
10 A. Again, individual TPPs, the magnitude of            14:26:17
11    the effect, for example, because they have          14:26:22
12    many patients on Neurontin versus not many          14:26:24
13    patients on Neurontin, could certainly              14:26:27
14    vary.                                               14:26:29
15 Q. Okay. Would you agree that the cost                 14:26:29
16    containment programs that we described              14:26:38
17    earlier, prior authorization programs,              14:26:39
18    things like that, may very well have                14:26:41
19    changed over time with respect to even an           14:26:43
20    individual third-party payer?                       14:26:46
21 A. That certainly may be true. Again, I don't          14:26:47
22    see how it would confound the estimates I'm         14:26:53
23    concerned about, but they may have changed.         14:26:56
24       MR. POLUBINSKI: Okay. Why don't                  14:27:00
25    we take a break.                                    14:27:01

542

1         MR. NOTARGIACOMO: Okay.                         14:27:02
2         THE VIDEOGRAPHER: The time is                   14:27:03
3     2:27. We are off the record.                        14:27:04
4         (Recess taken.)                                 14:27:05
5         THE VIDEOGRAPHER: The time is                   14:34:30
6     2:34, and we are back on the record.                14:34:35
7         MR. POLUBINSKI: All right. I                    14:34:38
8     don't have any further questions at this            14:34:39
9     time, but I would like to say that the              14:34:41
10    defendants reserve the right to continue            14:34:43
11    the deposition in the event that Professor          14:34:45
12    Rosenthal offers new or revised opinions at         14:34:47
13    some point later in the case or in the              14:34:49
14    event that plaintiffs produce additional            14:34:51
15    documents that should have been produced            14:34:53
16    prior to this deposition.                           14:34:54
17        MR. NOTARGIACOMO: I have no other               14:34:55
18    questions for the plaintiffs. I believe we          14:34:59
19    should conclude the deposition, but if it           14:35:04
20    turns out that there's an issue, we can             14:35:05
21    fight about that later.                             14:35:07
22        MR. POLUBINSKI: Exactly. I think                14:35:08
23    we -- it's not ripe for fighting about at           14:35:09
24    this time --                                        14:35:14
25        MR. NOTARGIACOMO: Absolutely.                   14:35:14

543

1         MR. POLUBINSKI: -- as much as --                14:35:14
2         MR. NOTARGIACOMO: As much as I'd                14:35:15
3     love to fight with you.                             14:35:17
4         MR. POLUBINSKI: Yeah. It's                      14:35:18
5     always a pleasure. We can go off the                14:35:19
6     record.                                             14:35:22
7         THE VIDEOGRAPHER: The time is                   14:35:22
8     2:35. This is the end of Tape 4. The                14:35:24
9     deposition is concluded, and we are off the         14:35:29
10    record.                                             14:35:32
11        (Whereupon the deposition was                   14:35:32
12        adjourned at 2:35 p.m.)                         14:35:36

544

CASE: IN RE: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, note any change or correction to your testimony and the reason therefor on this sheet. DO NOT make any marks or notations on the transcript volume itself. Sign and date this errata sheet (before a Notary Public, if required). Refer to Page 546 of the transcript for errata sheet distribution instructions.

PAGE   LINE
       CHANGE:
       REASON:
       CHANGE:
       REASON:
       CHANGE:
       REASON:
       CHANGE:
       REASON:
       CHANGE:
       REASON:
       CHANGE:
       REASON:
       CHANGE:
       REASON:
       CHANGE:
       REASON:
       CHANGE:
       REASON:

I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

_____

M. ROSENTHAL

```
                                        545
1    United States District Court
2    District of Massachusetts
3         I, Jessica L. Williamson, Registered,
4    Merit Reporter, Certified Realtime Reporter
5    and Notary Public in and for the
6    Commonwealth of Massachusetts, do hereby
7    certify that MEREDITH B. ROSENTHAL, Ph.D.,
8    the witness whose deposition is
9    hereinbefore set forth, was duly sworn by
10   me and that such deposition is a true
11   record of the testimony given by the
12   witness.
13        I further certify that I am neither
14   related to or employed by any of the
15   parties in or counsel to this action, nor
16   am I financially interested in the outcome
17   of this action.
18        In witness whereof, I have hereunto set
19   my hand and seal this 30th day of October,
20   2006.
21
22
23        Jessica L. Williamson, RMR, RPR, CRR
24        Notary Public, CSR No. 138795
25        My commission expires: 12/18/2009
```

```
                                        546
1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3
4         The original of the Errata Sheet has
5    been delivered to Edward Notargiacomo, Esq.
6         When the Errata Sheet has been
7    completed by the deponent and signed, a
8    copy thereof should be delivered to each
9    party of record and the ORIGINAL delivered
10   to Edmund Polubinski III, Esq. to whom the
11   original deposition transcript was
12   delivered.
13
14        INSTRUCTIONS TO DEPONENT
15
16        After reading this volume of your
     deposition, indicate any corrections or
17   changes to your testimony and the reasons
     therefor on the Errata Sheet supplied to
18   you and sign it. DO NOT make marks or
     notations on the transcript volume itself.
19   REPLACE THIS PAGE OF THE TRANSCRIPT WITH
20   THE COMPLETED AND SIGNED ERRATA SHEET WHEN
21   RECEIVED.
22
23
24
25
```

60 (Pages 545 to 546)