# EXHIBIT 7

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

**Page 2**

0001
1
2           UNITED STATES DISTRICT COURT
3           DISTRICT OF MASSACHUSETTS
4    ----------------------------X
5    In re: NEURONTIN MARKETING     MDL Docket No. 1629
6    SALES PRACTICES, AND PRODUCTS  Master File No.
7    LIABILITY LITIGATION        04-10981
8    ----------------------------X
9
10          DEPOSITION OF ATUL PANDE, M.D.
11              New York, New York
12              September 19, 2007
13
14
15
16
17
18
19
20   Reported by:
     Bonnie Pruszynski, RMR
21
22
23
24
25

**Page 4**

1
2
3
4                September 19, 2007
5                9:10 a.m.
6
7
8           Deposition of ATUL PANDE, M.D., held
9    at DAVIS, POLK & WARDWELL, LLP, 450
10   Lexington Avenue, New York, New York, before
11   Bonnie Pruszynski, a Notary Public of the
12   State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1
2    STATE OF NEW YORK
3    COUNTY OF NEW YORK
4    ----------------------------x
5    IN RE NEURONTIN PRODUCT
6    LIABILITY LITIGATION        Index Number 765000
7    ----------------------------x
8
9
10
11          DEPOSITION OF ATUL PANDE, M.D.
12              New York, New York
13              September 19, 2007
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1
2    A P P E A R A N C E S :
3    JACK LONDON, ESQ.
     Attorneys for Plaintiffs
4        3701 Bee Cave, Suite 200
         Austin, Texas 78746
5
6    SHOOK, HARDY & BACON, LLP
     Attorneys for Defendant Pfizer
7        2555 Grand Boulevard
         Kansas City, Missouri 64108
8    BY:    VINCENT GUNTHER, ESQ.
            LORI CONNORS MC GRODER, ESQ.
9
     GREENE & HOFFMAN
10   Attorneys for Plaintiffs
         125 Summer Street, Suite 1410
11       Boston, MA 02110
     BY:    THOMAS M. GREENE, ESQ.
12          ILYAS RONA, ESQ.
13   KAPLAN FOX & KILSHEIMER, LLP.
     Attorneys for Plaintiffs
14       805 Third Avenue, Suite 2200
         New York, New York 10022
15   BY:    LINDA NUSSBAUM, ESQ.
16
17
18   VIJAY V. BONDADA, ESQ.
     Senior Corporate Counsel, Litigation
19   Pfizer Inc. Legal Division
         235 East 42nd Street
20       New York, New York 10017
21   ALSO PRESENT:  Keith Altman, Finkelstein &
                     Partners
22
23
24
25

6

Atul Pande, M.D.
1
2       THE VIDEOGRAPHER:  My name is David
3   Sanders of Nationwide Video Productions,
4   Inc., located in Roseland, New Jersey.
5       The date today is September 19th,
6   2007, and the time is approximately
7   9:15 a.m.
8       This deposition is being held in the
9   office of on Davis, Polk and Wardwell
10  located at 450 Lexington Avenue, New York,
11  New York.
12      The caption of this case is In Re
13  Neurontin Marketing Sales Practices and
14  Products Litigation, MDL Docket Number 1629
15  and In Re Neurontin Product Liability
16  Litigation, Index Number 765000, in the
17  United States District Court, District of
18  Massachusetts.
19      The name of the witness is Atul
20  Pande.
21      At this time the attorneys will
22  identify themselves and the parties they
23  represent, after which our court reporter,
24  Bonnie Pruszynski, of Veritext Reporting,
25  will swear in the witness and we can

7

Atul Pande, M.D.
1
2   proceed.
3       MR. GREENE:  I'm Tom Greene.  I
4   represent the sales and marketing class
5   plaintiffs.
6       MR. RONAS:  Good morning.  Ilyas
7   Rona, also on behalf of the sales and
8   marketing.
9       MS. NUSSBAUM:  Linda Nussbaum on
10  behalf of the sales and marketing
11  coordinated plaintiffs.
12      MR. LONDON:  Jack London, plaintiffs,
13  in the products liability litigation.
14      MR. ALTMAN:  Keith Altman,
15  non-attorney, Finkelstein and Partners.
16      MR. BONDADA:  Vijay Bondada, Senior
17  Corporate Counsel for Pfizer.
18      MR. GUNTER:  Vince Gunter for Pfizer
19  from Shook Hardy and Bacon.
20      MS. MC GRODER:  Lori Mc Groder of
21  Shook Hardy and Bacon for Pfizer.
22      (Witness sworn.)
23      MS. MC GRODER:  Before we start, Mr.
24  Greene, I apologize.  I need to read a
25  statement on the record.

8

Atul Pande, M.D.
1
2       Dr. Pande is appearing for the
3   deposition today with the understanding that
4   the following terms apply:
5       This deposition, including the cross
6   noticing of it in certain state court cases,
7   is being taken in accordance with the case
8   management order numbers three and five
9   entered in In Re Neurontin Marketing Sales
10  Practices and Products Liability Litigation,
11  MDL Number 1629, and any other applicable
12  law and procedures.
13      Any examination and objection made by
14  an attorney for any plaintiff is adopted and
15  deemed validly made on behalf of all
16  plaintiffs represented or whose interests
17  are represented in the MDL proceedings in
18  all Neurontin state court cases.
19      Any examination and objection made by
20  any attorney for a defendant is deemed
21  validly made on behalf of that defendant in
22  the MDL proceedings and all Neurontin state
23  court cases.
24      The use at trial and admissibility of
25  any portion of this deposition will be

9

Atul Pande, M.D.
1
2   determined by the applicable trial court in
3   each case.
4       Participation in this deposition by
5   examination or by posing any objection shall
6   not constitute an appearance as counsel pro
7   haec vice in any state court action.
8       This deposition is being taken
9   subject to the amend stipulated protective
10  order entered In Re Neurontin Sale Practices
11  and Products Liability Litigation, MDL 1629,
12  and any applicable protective orders of
13  confidentiality entered in Neurontin State
14  court cases.
15      Attendance at this deposition is
16  limited to counsel and parties who agree to
17  be subject to the amended stipulated
18  protective order in the Neurontin MDL,
19  counsel and parties who have executed the
20  agreement of confidentiality attached to the
21  amended stipulated protective order, if they
22  were not previously subject to this
23  protective order, and counsel and parties
24  who are subject to a protective order of
25  confidentiality in their respective

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

10

1          Atul Pande, M.D.
2    Neurontin state court cases.
3          For purposes of this deposition only,
4    the amended stipulated protective order in
5    MDL number 1629 is deemed applicable to
6    Neurontin state court cases in which no
7    protective order has been entered.
8          Subject to this understanding, we are
9    prepared to begin the deposition.
10         Thank you.
11         MR. GREENE:  Now, and we object to
12   everything you just read to the extent it
13   varies from the case orders and case
14   management orders entered in the MDL.
15   ATUL PANDE, M.D.
16         called as a witness, having been first
17         duly sworn, was examined and testified
18         as follows:
19   EXAMINATION
20   BY MR. GREENE:
21   Q    Dr. Pande, could you state your name
22   for the record and your residential address,
23   please?
24   A    My name is Atul Pande.  My home
25   address?

11

1          Atul Pande, M.D.
2          MS. MC GRODER:  You can give your
3    business address.
4    Q    Well, I didn't ask you for your
5    business address.  I would like your residential
6    address.
7          MS. MC GRODER:  We object to giving
8    any personal or private information.
9          MR. GREENE:  Put your objection on
10   the record.  You have got your objection,
11   now I want the residential address.
12         Let's not start off on this foot,
13   ma'am.
14         MS. MC GRODER:  You know, I don't
15   mean to start you off on a bad note.  We
16   haven't allowed any witness to give their
17   personal, private residence information.
18   Why do you need that?
19   Q    I'm asking for your residential
20   address.
21   A    It's 116 Morris Branch Court, Cary,
22   North Carolina 27519.
23         (Pande Exhibit Number 1 marked for
24   identification as of this date.)
25   Q    Let me show you what we have marked

12

1          Atul Pande, M.D.
2    as Exhibit 1.
3          MS. MC GRODER:  Thank you.
4    Q    Ask you if you can identify that.
5    A    It appears to be a resume of my
6    academic and professional accomplishments.
7    Q    And can you tell me what year this
8    was prepared?
9    A    Just by looking at it, I couldn't
10   tell you for sure.  There is no date on this
11   document.
12   Q    All right.  It lists, under
13   professional appointments on the second page, at
14   the top of the second page, it says 2003 to the
15   present, Pfizer Global Research and Development.
16         Is that a department at Pfizer or was
17   that a department at Pfizer?
18   A    That is a -- research and
19   development division --
20   Q    Division.
21   A    -- of Pfizer, Inc.
22   Q    And you have listed your position as
23   Vice President, Neurosciences Development Leader;
24   correct?
25   A    That is correct.

13

1          Atul Pande, M.D.
2    Q    What period of time did you hold on
3    that position?
4    A    I held that position from 2003, until
5    my departure from Pfizer in 2005, which would have
6    been approximately in November of 2005.
7    Q    And why did you leave Pfizer?
8    A    I left Pfizer because I was, under a
9    reorganization plan, being asked to relocate from
10   my home in Ann Arbor, Michigan, to Connecticut,
11   which, for personal reasons, I did not wish to do.
12   Q    Okay.
13         And what was your next employment?
14   A    Thereafter, I started working, in
15   December of 2005, with a startup
16   bio-pharmaceutical company in North Carolina
17   called Cenerx.
18   Q    Would you spell it?
19   A    C-E-N-E-R-X Biopharma.
20   Q    What was your position there when you
21   started?
22   A    I was the Chief Medical Officer for
23   this company.
24   Q    That was December 2005?
25   A    That is correct.

14

```
 1              Atul Pande, M.D.
 2      Q    How long did you hold that position?
 3      A    I worked in that role until March of
 4   2007.
 5      Q    Did your role change --
 6          THE VIDEOGRAPHER:  Excuse me,
 7   Counselor.
 8          We are receiving technical
 9   interference from somebody's cell phone or
10   Blackberry.
11          MR. GREENE:  Does everybody have
12   their Blackberries off?
13          MS. MC GRODER:  Yes.
14          MR. GREENE:  How is that?
15      Q    Let me ask that question again.
16          I'm not sure if I got it out.
17          You said you were CMO until March of
18   2007; is that correct?
19      A    That is correct.
20      Q    What was your next position at that
21   company?
22      A    I left that company in March of 2007.
23      Q    Why did you leave?
24      A    Because I was offered another
25   position at Glaxosmithkline.
```

15

```
 1              Atul Pande, M.D.
 2      Q    And what position were you offered
 3   and when did you start?
 4      A    I started at Glaxosmithkline in April
 5   of 2007, as senior vice president of the
 6   Neurosciences Medicines Development Center.
 7      Q    How long did you hold that position?
 8      A    I am currently in that position.
 9      Q    Now, looking at Exhibit 1, does
10   Exhibit 1 on the second page describe various
11   positions you held at Parke Davis and Pfizer?
12      A    Yes, it does.
13      Q    Does it describe all the positions
14   you held at Parke Davis and Pfizer?
15      A    Yes, it does.
16      Q    Now, you are a medical doctor;
17   correct?
18      A    That is correct.
19      Q    And you are a psychiatrist?
20      A    Yes.
21      Q    And do you have a, within psychiatry,
22   do you have an area that you would consider that
23   you have expertise in?
24      A    When I was doing my training and
25   eventually in my academic career, I focused on the
```

16

```
 1              Atul Pande, M.D.
 2   treatment and research into mood disorders.  Since
 3   that time, while I have been in the pharmaceutical
 4   industry, I have continued to do research in many
 5   different areas related to brain disorders,
 6   including both neurology and psychiatry.
 7      Q    And let's talk, you talk about your
 8   experience in the pharmaceutical industry at Parke
 9   Davis.  Let me ask you about that.
10          Did you have an area at Parke Davis
11   or areas that you specialized in, that you had
12   specific expertise in?
13      A    My major focus was in psychiatric
14   disorders, but within the psychiatric disorders
15   there was not one area.  It really depended on
16   what projects were in the pipeline at any given
17   time, but my responsibility was primarily for the
18   drugs that were intended for psychiatric
19   treatment.
20      Q    According to your resume, it says
21   1994 through 1996, you were the director of
22   clinical research, Parke Davis Pharmaceutical
23   Research in Ann Arbor, Michigan; is that correct?
24      A    That is correct.
25      Q    And during that time period, was
```

17

```
 1              Atul Pande, M.D.
 2   Neurontin one of the drugs that you had
 3   responsibility for?
 4      A    Yes.
 5      Q    And describe for us what your
 6   responsibilities were.
 7      A    During that period of time, I was a
 8   member of the development team that was working on
 9   Neurontin, which at the beginning of that period
10   that you have just asked about, Neurontin had just
11   been marketed, and was -- the development team was
12   working on assessing what other development needed
13   to be done for that drug, and I was a member of
14   that team.
15      Q    All right.  I asked about your
16   responsibilities for Neurontin, and you told me
17   you were a member of the Neurontin development
18   team.
19          Is that the extent of your
20   responsibilities for Neurontin, being a member of
21   that team?
22          MS. MC GRODER:  Object to form.
23      A    Well, being a member of the team
24   involves many responsibilities and, certainly, if
25   that's what you are asking about, I can describe
```

18

Atul Pande, M.D.

1       Atul Pande, M.D.
2   it.
3       Q    Okay.  We will get to that in a
4   moment.  But when you say the development team,
5   does it have an official title?
6       A    I'm sure it did.  I don't recall what
7   it was.
8       Q    Well, was the name of the team the
9   Neurontin development team?
10      A    I don't recall the specific.
11      Q    You referred to it as the development
12  team?
13      A    Yes.
14      Q    Did the development team meet
15  periodically?
16      A    Yes, it did.
17      Q    And did it have members from various
18  departments within Parke Davis?
19      A    Yes, it did.
20      Q    Can you identify the departments or
21  divisions that had membership on that team?
22      A    I couldn't tell you every single
23  department.
24      Q    Based on your experience at Parke
25  Davis, did you become familiar with a marketing

19

Atul Pande, M.D.

1       Atul Pande, M.D.
2   needs document?
3       A    I would have to see which document
4   you are referring to.
5       Q    Well, I am just asking about a
6   marketing needs document.  Have you ever heard
7   that title?
8       A    Again, I don't specifically recall a
9   document specifically titled a marketing needs
10  document.
11      Q    Well, whether you have a specific
12  recall of a document, do you know what a marketing
13  needs document is?
14      A    I don't really have a recollection of
15  what Parke Davis or Warner Lambert called a
16  marketing needs document.  In general, in the
17  industry, there are documents of this sort that
18  companies used to assess further development of
19  drugs that they have in the pipeline.
20      Q    When you say further development of
21  drugs in the pipeline, what do you mean by that?
22      A    It means very often, for drugs that
23  are already marketed for an indication, they --
24  the companies try to assess what further
25  development should be carried out.

20

Atul Pande, M.D.

1       Atul Pande, M.D.
2       (Pande Exhibit Number 2 marked for
3   identification as of this date.)
4       Q    Okay.  I'm going to mark this as
5   Exhibit 2, and it's -- I only have a single copy
6   of it, but I will provide copies to everyone
7   shortly.  I'm going to print some out here.  I
8   just have a few questions about it.
9       In fact, I might, if you don't
10  object, stand over your shoulder just to ask you
11  couple questions about that document.
12      MS. NUSSBAUM:  We will have one copy
13  right now.
14      MR. GUNTER:  We will need a copy as
15  well.
16      MS. MC GRODER:  Before he's asked any
17  questions about it, I do need to see it.
18      MR. GREENE:  There it is.  You can
19  look at it.
20      MS. MC GRODER:  I am going to allow
21  Dr. Pande to look at it.
22      MR. GREENE:  Can you look at it at
23  the same time?  You are sitting beside him.
24      MS. MC GRODER:  If there is going to
25  be a copy in the next 30 seconds, I can

21

Atul Pande, M.D.

1       Atul Pande, M.D.
2   wait.
3       Are you printing another one?
4       MR. GREENE:  I want to make sure you
5   have a full copy.
6       MR. ALTMAN:  There are four copies.
7       MR. GREENE:  It's the last two digits
8   on the last page of his Bates.
9       MS. MC GRODER:  This one is not Bates
10  stamped.
11      MR. GREENE:  Let me see that document
12  if you don't mind.
13      THE WITNESS:  Sorry.
14      MS. MC GRODER:  Thank you.
15      Q    Have you had a chance to look at it,
16  Doctor?
17      A    Yes, I have.
18      Q    And can you identify what it is?
19      A    Well, the title of it says,
20  "Marketing needs document," and the first page
21  gives the table of contents.
22      Q    And you have had a chance to look at
23  it?
24      A    Briefly, yes.
25      Q    Can you describe what it is any more

22

Atul Pande, M.D.

1
2    than the title on the first page?
3        A    Well, it appears to be a document
4    that speaks to the planning process for marketing
5    a pharmaceutical.  Certainly I am no expert in
6    marketing, but it appears like it's a systematic
7    description of how the planning process sessions
8    work.
9        Q    Okay.  Were marketing needs documents
10   prepared for Neurontin during the period of time
11   you worked at Parke-Davis?
12       A    I don't have any specific
13   recollection of that.
14       Q    Aside from lacking a specific
15   recollection?
16       A    Yes.
17       Q    Do you have a general memory whether
18   marketing needs documents were prepared for
19   pharmaceutical products at Parke-Davis while you
20   worked there?
21       A    In general, that, that would have
22   been --
23       Q    Okay.
24       A    -- that would have been the case,
25   yes.

23

Atul Pande, M.D.

1
2        Q    Does Exhibit 2 just appear to be a
3    template of what should go into a marketing need
4    document?
5            MS. MC GRODER:  Objection, no
6    foundation.
7        A    No.  As I said previously, it appears
8    to be a description of the process by which a
9    planning document may be created.
10       Q    All right.
11       A    Yeah.
12       Q    And do you know whether a marketing
13   need document was prepared for Neurontin?
14           MS. MC GRODER:  Objection, asked and
15   answered.
16       A    I do not.
17       Q    You do not.
18           Now, I noted -- let me ask you.  Do
19   you hold some patents?
20       A    Yes.
21       Q    How many patents do you hold?
22       A    I believe that at last count there
23   were five or six.  I couldn't swear to exactly how
24   many were issued.
25       Q    And how many patents do you hold for

24

Atul Pande, M.D.

1
2    Neurontin?
3        A    I believe there is one patent for
4    Neurontin.
5        Q    Okay.  That you are listed as the
6    inventor on?
7        A    That is correct.
8            (Pande Exhibit Number 3 marked for
9    identification as of this date.)
10       Q    Let me show you what we marked as
11   Exhibit 3.
12           Have you had a chance to look at
13   that?
14       A    I am doing so right now.
15       Q    Okay.  Are you finished?
16       A    Yes.
17       Q    Okay.  And just identify what this is
18   for the record, Exhibit 3, please.
19       A    The document is a published United
20   States patent, patent number 5,510,381, dated
21   April 23, 1996.
22       Q    Did you apply for this patent?
23       A    Yes, I did, I was the inventor, and
24   Warner Lambert applied for the patent on my
25   behalf.

25

Atul Pande, M.D.

1
2        Q    Did you review the application before
3    it was filed?
4        A    Yes.
5        Q    And it contains a lot of the
6    information that is listed here; correct, the
7    claims, the description?
8        A    Correct.
9        Q    Summary of the invention; is that
10   correct?
11       A    That is correct.
12       Q    And then the patent office issued
13   this; correct?
14       A    That is correct.
15       Q    There is an abstract that appears on
16   the first page; is that correct?
17       A    Yes.
18       Q    Would you read the first sentence of
19   the abstract, please, what appears under the word
20   abstract?
21       A    The present invention is a novel
22   therapeutic use of gabapentin, its derivatives and
23   the pharmaceutical salts thereof.
24       Q    Why don't you read the next two
25   sentences?

26

Atul Pande, M.D.

2      A      "The compounds are useful in the
3   treatment of mania in all its various forms,
4   whether acute or chronic, single or recurrent, and
5   whether or not it is associated with depression.
6   The invention further includes the treatment of
7   bipolar disorder."
8      Q      Okay.  And above the abstract, are
9   the words method of treatment of mania and bipolar
10  disorder; correct?
11     A      That is correct.
12     Q      Is that a summary of the use?
13     A      That is correct.
14     Q      Okay.  And did you prepare that
15  abstract?
16     A      I provided the material for the
17  abstract.  It would have been written up by one of
18  the patent attorneys for Warner Lambert.
19     Q      Okay.  And the material for the
20  abstract that you provided is the information that
21  --
22     A      That is correct.
23     Q      -- that appears there that you just
24  read into the record; is that correct?
25     A      That is correct.

27

Atul Pande, M.D.

2      Q      And when you prepared that
3   information, that appears there in the abstract,
4   that was truthful information you provided to the
5   patent office, correct?
6      A      That is correct.
7      Q      And you were listed as the inventor
8   of this invention; correct?
9      A      That is correct.
10     Q      And were you the inventor?
11     A      Yes.
12     Q      And in the summary of the invention,
13  if you want to turn to page three of five, the
14  second sentence there, will you read that into the
15  record under summary of invention?
16     A      Invention concerns a method for
17  treating symptoms of mania in a human in need of
18  such treatment.
19     Q      That's information that you provided,
20  correct, to the lawyers that drafted up the patent
21  application?
22     A      That is the claim that I provided,
23  yes.
24     Q      Okay.  And you filed this -- strike
25  that.

28

Atul Pande, M.D.

2      Do you know who filed the patent
3   application?
4      A      I don't have specific knowledge of
5   who might have filed it.  It could have been
6   Warner Lambert, it could have been some other
7   agents that they employed to do so.  I would have
8   no direct knowledge of it.
9      Q      There is a filing date that the
10  patent was filed; correct?
11     A      Yes.
12     Q      What is that date?
13     A      It's May 15th, 1995.
14     Q      And then the patent issued on
15  April 23rd of 1996?
16     A      That is correct.
17     Q      Okay.  And if you turn again to page
18  three of five, under summary of the invention, the
19  next to the last paragraph, do you see that begins
20  with, "In the studies of epilepsy"?
21     A      I'm sorry, I'm lost, where?
22     Q      Page three of five, under summary of
23  the invention, the next to last paragraph under
24  that heading.
25     A      Un-huh.

29

Atul Pande, M.D.

2      Q      Would you read into the record the
3   last sentence?
4      A      "In studies of epilepsy" --
5      Q      No, I'm sorry, the last sentence.
6      A      Oh, the last sentence.
7          "This is an involved use for
8   gabapentin, which would not be obvious to a
9   medical practitioner of ordinary skill."
10     Q      That is information you provided to
11  the attorneys that prepared the patent
12  application; correct?
13     A      Correct.
14         (Pande Exhibit Number 4 marked for
15  identification as of this date.)
16     Q      Dr. Pande, let me show you what we
17  have marked as Exhibit 4.
18     A      Okay.
19     Q      If you would take a look and review
20  that for a minute.  All set?
21     A      Yes.
22     Q      I have a couple of questions I want
23  to ask you about this.
24         Can you tell us who doctor -- at the
25  top of this -- this is a memo on Parke-Davis

30

```
 1              Atul Pande, M.D.
 2   letterhead or stationery; is that correct?
 3       A   It appears to be, yes, um-hum.
 4       Q   And can you tell us who Dr. Claus --
 5   help me with that last name.
 6       A   Well, I would have said Lesecki, but
 7   I have no idea who he is.
 8       Q   We will go with your pronunciation.
 9   Dr. Claus Lesecki, who was or is Dr.
10   Lesecki?
11       A   I do not know.
12       Q   Never heard of him?
13       A   Never heard of him.
14       Q   How about Dr. Mark Pierce?
15       A   Dr. Mark Pierce, I do know.  Dr. Mark
16   Pierce, let's see, this is 1994, he would have
17   been a vice president in the clinical research
18   department at Parke-Davis.
19       Q   And that would have been in Ann
20   Arbor?
21       A   That is correct.
22       Q   That's where you worked?
23       A   That is correct.
24       Q   So Dr. Mark Pierce in May of 1994,
25   was he a colleague of yours?
```

31

```
 1              Atul Pande, M.D.
 2       A   I was not at Parke-Davis in May of
 3   1994.
 4       Q   Where were you?
 5       A   I was with Eli Lily & Company.
 6       Q   When did you start with Parke-Davis?
 7       A   August 1st, 1994.
 8       Q   A few months later.
 9           What was -- strike that.
10           Did you, when you started with
11   Parke-Davis, did you start out in clinical
12   research?
13       A   Yes, I did.
14       Q   In Ann Arbor?
15       A   Yes.
16       Q   And you worked with Dr. Mark Pierce?
17       A   Dr. Mark Pierce was my boss.
18       Q   He was your boss?
19       A   Yes.
20       Q   What was his title again?
21       A   He was vice president of clinical
22   research.
23       Q   What was your title when you started
24   in August 1994?
25       A   I was director of psychiatry,
```

32

```
 1              Atul Pande, M.D.
 2   clinical research.  Yeah.
 3       Q   And Ms. Lenny Ulrich, can you tell us
 4   who she was?
 5       A   I don't really have a clear
 6   recollection of who she might have been.  The name
 7   is familiar, I'm sure, I'm sure I knew her, but
 8   it's been a long time.
 9       Q   Okay.  Based on your experience at
10   Parke-Davis, did you become familiar with a
11   department known as marketing analytics?
12       A   Yes.
13       Q   Tell us what marketing analytics did.
14           MS. MC GRODER:  Object to form and
15   foundation.
16       Q   Do you know what marketing analytics
17   did?
18       A   I couldn't give you a completely
19   accurate description.  It was one of the
20   departments within the marketing area of Warner
21   Lambert that would have been responsible for
22   collecting various sorts of data on the
23   pharmaceutical market, including things such as
24   epidemiology, the sales of different drugs, and so
25   forth, so basically to collect a lot of data.
```

33

```
 1              Atul Pande, M.D.
 2       Q   Okay.  Do you know who Alan Walker
 3   was?
 4       A   I don't know who Alan Walker was.
 5       Q   If you look at the top of the page,
 6   it says A.K.I. Walker, regional president and
 7   general manager pharmaceuticals -- it looks like
 8   U.K.
 9       A   It might be Ireland.
10       Q   Scandinavia.
11       A   Yeah, I see that.
12       Q   Does that help you at all in
13   identifying who he is?
14       A   I still can't identify him.  I am
15   just reading that, I can imagine that he was one
16   of the senior people in the marketing group.
17       Q   Did you ever have any interaction
18   with him concerning Neurontin?
19       A   Not that I recall.
20       Q   Now, have you had an opportunity to
21   read the letter or the memo, the three, four
22   paragraphs?
23       A   Yes.
24       Q   Can you tell us who John Howard is?
25           MS. MC GRODER:  I'm going to object
```

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

```
34
                Atul Pande, M.D.
1
2       to the extent that any questions are based
3       on this document, since there is no
4       foundation for its use, but go ahead.
5           Q    Can you tell us who John Howard is?
6           A    I really have no recollection of
7       anybody by that name that I might have known.
8           Q    Do you know what this first paragraph
9       refers to?
10          MS. MC GRODER:  Objection, no
11      foundation.
12          A    I can read what it says, but...
13          Q    Why don't we start there, read what
14      it says.
15          MS. MC GRODER:  Objection, no
16      foundation.
17          A    I have been cogitating on John
18      Howard's very good critique of our estimate of
19      Neurontin's ultimate potential.  Particularly
20      telling is the relatively short U.S. protected
21      life.
22          Q    Based on your experience at
23      Parke-Davis, did you become aware that Neurontin
24      had a short U.S. protected patent life?
25          MS. MC GRODER:  Objection, no
```

```
35
                Atul Pande, M.D.
1
2       foundation to the extent that question
3       relates to the verbiage in this document.
4           Q    Go ahead, you can answer.
5           A    I don't know what short would have
6       meant, because that implies a relative comparison,
7       but I was aware of was that the exclusivity
8       period for Neurontin patent would have expired, I
9       believe, approximately in early 2000.
10          Q    Okay.  When did you become aware of
11      that?
12          A    Probably fairly shortly after I
13      arrived at Parke-Davis.
14          Q    Okay.  Now, have you had an
15      opportunity to read the second paragraph?
16          A    Yes.
17          Q    And do you know what the strategic
18      swerve is they are referring to there?
19          MS. MC GRODER:  Objection, no
20      foundation, calls for speculation.
21          A    Other than seeing the words, I have
22      no clue.
23          Q    And how about, do you know who Mr. de
24      Vink is?
25          A    Mr. de Vink was one of the very
```

```
36
                Atul Pande, M.D.
1
2       senior leaders at Warner Lambert, I believe at the
3       time, and I can't swear to it, but I believe at
4       the time he was the head of, head of the U.S. or
5       North American Pharmaceutical Division.
6           Q    Okay.
7                When you started in August of 1994,
8       in the following two, three, or four-year period,
9       did you have any discussion with any of your
10      colleagues at Parke-Davis about the potential
11      commercial value of Neurontin?
12          A    Of Neurontin as a whole?
13          Q    Yes, yes.
14          A    I couldn't tell you yes or no.
15          Q    Okay.
16          A    Because, you know, discussions of
17      commercial potential are not unusual in the
18      business, but I have no specific recollection
19      where I might have sat down with somebody and
20      talked about it.
21          Q    Let me be a little bit more specific.
22          A    Okay.
23          Q    When you joined Parke-Davis in August
24      of 1994, did you come to learn that Neurontin had
25      been approved by the FDA as an adjunctive use in
```

```
37
                Atul Pande, M.D.
1
2       treating epilepsy in adults?
3           A    In treating refractory epilepsy, yes.
4           Q    In adults?
5           A    Yes.
6           Q    At some point, did you come to learn
7       that that market for the patent life of Neurontin
8       had a value of $500 million?
9           MS. MC GRODER:  Object to form and
10      foundation.
11          A    I was not aware of that.
12          (Pande Exhibit Number 5 marked for
13      identification as of this date.)
14          Q    Okay.  Let me show you what we marked
15      as Exhibit 5.  Are you all set?
16          A    Yes.
17          Q    For the period of time that you were
18      employed at Parke-Davis, where was your office,
19      was it always in Ann Arbor?
20          A    With Parke-Davis, yes.
21          Q    And physically, did you always have
22      the same office?  Or did you -- do you recall?
23          A    I don't think it was in the same
24      location all of the time.
25          Q    Did you have a computer you used?
```

38

```
1              Atul Pande, M.D.
2     A    I'm sure I did.
3     Q    Did you receive e-mail?
4     A    Yes.
5     Q    Do you know when you started
6  receiving e-mail?  Would it have been as soon as
7  you started with Parke-Davis?
8       A    I would imagine fairly shortly after
9  that.
10    Q    And when you received e-mail that --
11 strike that.
12         Did you receive e-mail that concerned
13 Neurontin?
14    A    I'm sure I did.
15    Q    And would you read it?
16         MS. MC GRODER:  Objection to form.
17    A    Generally, yes.
18         MS. MC GRODER:  You need to give me
19 time to object.
20    Q    Would you read the e-mail that you
21 received that concerned the subject Neurontin?
22         MS. MC GRODER:  Objection to form.
23    A    Well, generally, I would, I think in
24 many cases it would depend upon whether I was
25 already aware of the matter the e-mail might have
```

39

```
1              Atul Pande, M.D.
2  been referring to, in which case I might or might
3  not.
4     Q    Did you save or archive your e-mail,
5  your Neurontin e-mail?
6         MS. MC GRODER:  Object to form.
7     A    I'm generally not in the habit of
8  saving a lot of e-mails as it is or, for that
9  matter, paper.
10    Q    Back when you worked for Parke-Davis
11 --
12    A    Yes.
13    Q    -- for the entire time that you
14 worked for Parke-Davis, did you save your
15 Neurontin e-mail?
16         MS. MC GRODER:  Object to form,
17 overbroad and calls for speculation.
18    A    I couldn't really tell you.
19    Q    Did you save some of the Neurontin
20 e-mail?
21         MS. MC GRODER:  Object to form.  Same
22 objection.
23    A    I would guess, I --
24    Q    And what would you, what would you do
25 to save it?
```

40

```
1              Atul Pande, M.D.
2     A    They would be left on the hard drive.
3     Q    Okay.
4     A    Yeah.
5     Q    Did you put it in an archived, a
6  Neurontin archive, or did you create a file or
7  folder for it?
8       A    I don't have specific recollection of
9  doing that.
10    Q    Okay.
11    A    Yeah.
12    Q    But if you did save it, it would just
13 be on the hard drive?
14    A    Yes.
15    Q    Did you ever printout copies of the
16 e-mail, Neurontin e-mail?
17    A    Almost never.
18    Q    If you received paper documents --
19    A    Yes.
20    Q    -- that concerned Neurontin, did you
21 save those documents?
22    A    Again, generally not, because most
23 documents that came to me on Neurontin would have
24 been in somebody else's possession as well, and so
25 there was no need for me to save them.
```

41

```
1              Atul Pande, M.D.
2     Q    Did you have a, did you have a file
3  cabinet in your office?
4     A    Yes, I did.
5     Q    And did you put Neurontin documents
6  in that file cabinet?
7       A    The ones that I would have saved,
8  yes.
9     Q    Did you have an indexing system for
10 that filing cabinet?
11    A    Nothing terribly fancy.  It was
12 simply by drug.
13    Q    Did you recreate it, the index
14 system?
15         MS. MC GRODER:  Object, form.  He
16 just said it didn't have an index system.
17    Q    Didn't you say that you had an index
18 system that was nothing fancy, but it was by drug?
19    A    It was a file by the name of the drug
20 and everything related to the drug would go in
21 there.  You have to understand that I was working
22 on many other programs at the same time that I was
23 working on Neurontin.
24    Q    So for Neurontin, if you saved a
25 paper document, it just went into a file named
```

42

Atul Pande, M.D.

1
2   Neurontin, is that your testimony?
3       A   That is correct.
4       Q   Now, can you take look at Exhibit 5.
5           Have you had an opportunity to review
6   it?
7       A   Yes, I have looked at it.
8       Q   And can you identify what the
9   document is?
10      A   The document appears to be an office
11  memo to which are attached the, what look like to
12  be the minutes of a Neurontin development strategy
13  meeting.
14      Q   A little bit earlier you said you
15  were a member of the development team.
16      A   Right.
17      Q   Okay.  And is that the Neurontin
18  development team?
19      A   I would guess so.
20      Q   Well, look at the second page of the
21  memo.
22      A   Yes.
23      Q   You see it says to, and it says
24  Neurontin, and within parentheses, anti-consultant
25  and then development team.

43

Atul Pande, M.D.

1
2       A   Correct.
3       Q   Is that the official name of the team
4   that you were a member of?
5       A   Yes.
6       Q   And they had periodic meetings;
7   didn't they?
8       A   That is correct.
9       Q   And you attended those meetings,
10  didn't you?
11          MS. MC GRODER:  Object to form.
12      A   Again, I can't swear that I attended
13  every single one, but yes.
14      Q   Minutes were made of the meetings?
15      A   Yes.
16      Q   Minutes were circulated in the
17  meetings?
18      A   Yes.
19      Q   And you received copies of the
20  minutes?
21      A   Yes.
22      Q   And the second page of Exhibit 5, are
23  these the minutes of a meeting that was held on
24  November 9th, 1994?
25      A   That is correct.

44

Atul Pande, M.D.

1
2       Q   Do you recall whether you attended
3   any Neurontin development team meetings prior to
4   November 9, 1994?
5       A   I have no specific recollection of
6   that.
7       Q   Can you tell us where the Neurontin
8   development team meetings were held?
9       A   They would have been held at the
10  Parke-Davis site in Ann Arbor.
11      Q   Okay.
12          And did people phone into those
13  meetings?
14      A   Yeah, people who were not located in
15  Ann Arbor or people from Ann Arbor who might have
16  been out of town on the day meeting was held might
17  have called in, yeah.
18      Q   So looking at the second page of
19  Exhibit 5, on the first page of the minutes, it
20  says present in Ann Arbor, and there are some
21  individuals listed including yourself; correct?
22      A   Yes.
23      Q   And then it says, "Present in MOPS."
24          That would be Morris Plains?
25      A   Yeah.

45

Atul Pande, M.D.

1
2       Q   Oliver Brandicourt and Lenny Ulrich
3   were present there.
4           Did they phone in or --
5       A   I would imagine that that was the
6   case.
7       Q   And then present in Holland is Jay
8   Zeller.
9           Do you see that?
10      A   I do.
11      Q   Is that someone else that would have
12  phoned in?
13          MS. MC GRODER:  Object to form.
14      A   Again, I would expect so, given that
15  they are not shown as being present in Ann Arbor.
16      Q   And looking at the first page, it
17  says, "The main purpose of the meeting was to
18  discuss the development strategy and steps to
19  defend the Neurontin franchise."
20          Do you see that?
21      A   I do.
22      Q   Do you know what that means?
23      A   I have absolutely not the faintest
24  idea.
25      Q   Do you know what the words

46

1          Atul Pande, M.D.
2    "development strategy" mean --
3        A   Yes.
4        Q   -- in the context of that sentence?
5        What do they mean?
6        A   Development strategy would mean a
7    plan for a further development of Neurontin beyond
8    the indication that would have been approved at
9    the time.
10       Q   Okay.  So we had mentioned it was
11   approved for adjunctive therapy in treating --
12       A   Refractory epilepsy, yes.
13       Q   Now, let's look at the next page of
14   that exhibit.  Under the heading "Additional
15   indications," do you see that?
16       A   Yes.
17       Q   And there is A, B and C.
18       Do you see those headings?
19       A   Yes.
20       Q   Okay.  And I would like to direct
21   your attention to B, it says, "Psychiatry."
22       A   Yes.
23       Q   Will you read that sentence into the
24   record, please?
25       A   Yes, "B, psychiatry.  A. Pande

47

1          Atul Pande, M.D.
2    suggested that gabapentin has utility in the
3    treatment of psychiatric disorders based on its
4    characteristics."
5        Q   Is that a suggestion that you made at
6    this meeting?
7        A   Yes.
8        Q   Do you recall any discussion at any
9    Neurontin development team meeting that you
10   attended prior to November 9, 1994, in which
11   gabapentin's utility in the treatment of
12   psychiatric disorders was discussed?
13       MS. MC GRODER:  Object to form.
14       A   I can't recall if they did or did
15   not.
16       Q   I'm just asking if you have a memory.
17       A   I don't.
18       Q   Did anybody else suggest that
19   gabapentin had utility in the treatment of
20   psychiatric disorders based on its characteristics
21   at this November 9, 1994 meeting aside from you?
22       A   Again, I don't specifically recall
23   that.
24       Q   Neurontin hadn't been approved for
25   the treatment of psychiatric disorders as of this

48

1          Atul Pande, M.D.
2    date; correct?
3        A   That is correct.
4        Q   In fact, Neurontin was never approved
5    for the treatment of psychiatric disorders,
6    correct?
7        A   That is correct.
8        Q   And then if you drop down toward the
9    bottom of the page, page two again of the minutes,
10   do you see there is an action item there.  Will
11   you read that into the record, please?
12       A   "Action, A. Pande and C. Taylor to
13   provide documents to marketing for analysis of the
14   commercial potential of Neurontin in psychiatric
15   indications and spasticity."
16       Q   Okay.  Can you tell us who C. Taylor
17   is?
18       A   That would be Charlie Taylor who, who
19   was a pharmacologist working in the drug discovery
20   group at Parke-Davis.
21       Q   Okay.  And again, for the record, the
22   A. Pande is referring to you; correct?
23       A   That is correct.
24       Q   And can you explain to us what this
25   action item called for you to do and what you did?

49

1          Atul Pande, M.D.
2        A   Again, I don't recall exactly what
3    this would have involved, because it's been a long
4    time, but based on the, the discussion that is
5    implied in this particular meeting minutes
6    document, I suspect what I was asked to provide
7    was a plan for how we might develop Neurontin for
8    psychiatric disorders.
9        Q   Okay.  Did you provide documents to
10   marketing?
11       A   If it says that in this document,
12   that that was done, then I would imagine that I
13   did.
14       Q   Well, correct me if I am wrong, but
15   you have -- I think you testified that when you
16   received Neurontin development team meeting
17   minutes, you would review them; correct?
18       MS. MC GRODER:  Objection to form,
19       misstates the testimony.
20       A   What I said was generally I would.
21   If I had been at the meeting and you, you know, I
22   -- I didn't have the responsibility of reading the
23   minutes word for word and correcting them for
24   grammar and so forth, so, so long as I knew the
25   gist of it, there was no need for me to review

50

Atul Pande, M.D.

2  them.

3      Q    Well, are you familiar with the
4  format, did you become familiar with the format of
5  the minutes of the Neurontin development team
6  meeting?

7      A    Well, I'm not even aware that there
8  was a fixed format.

9      Q    Do you recognize the format you are
10  looking at?

11      A    I recognize the document.

12      Q    Does "action" indicate that that was
13  action that you took?

14      A    Yes.

15      Q    That is something you did, isn't it?

16      A    Yes.

17          MS. MC GRODER:  Object to form.

18      That's what that means, isn't it?

19          MS. MC GRODER:  Object to form.

20      That's what it says, yes.

21      Q    The bolded print after the word

22  action means that that is, that is describing

23  something you did, correct?

24          MS. MC GRODER:  Well, object to form.

25      This says to provide.

51

Atul Pande, M.D.

2      MR. GREENE:  Just put your objection
3      on the record.  We don't need you reading
4      anything.

5          MS. MC GRODER:  I think your question
6      is misleading and misstates the document.

7      Q    You will have your opportunity to
8  correct it, if you think I'm misleading.

9          Can you tell me what documents you
10      provided to marketing?

11          MS. MC GRODER:  Object to form.

12      A    I don't, I don't recall.  I don't
13  recall.

14      Q    Did you provide documents to
15  marketing?

16      A    Well, there is a post-meeting note
17  here that says that a document from me was
18  forwarded to marketing, so I would imagine they
19  provided a document, but if you are asking whether
20  I recall what that document was, I do not.

21      Q    Did you do an analysis of the
22  commercial potential of Neurontin in psychiatric
23  indications?

24          MS. MC GRODER:  Object to form and
25      foundation.

52

Atul Pande, M.D.

2      A    It was not my role to do any
3  commercial analysis.  My responsibility was for
4  the research and development aspect, particularly
5  the clinical part of it, and so any document that
6  I would have generated would really have focused
7  on the clinical development possibilities rather
8  than on a commercial analysis.

9      Q    Okay.

10      A    I had no expertise in commercial
11  analysis.

12      Q    Read the next sentence into the
13  record, please, the post meeting note.

14      A    "The post meeting note.  M. Dong
15  forwarded the document from A. Pande to marketing.
16  Awaiting C. Taylor's document on spasticity.

17      Q    Okay.  Did Charlie Taylor provide a
18  document on spasticity and did you provide a
19  document on psychiatric disorders?

20          MS. MC GRODER:  Objection, compound.

21      A    Well, from this document, I can't
22  tell whether Charlie Taylor provided the document
23  or not.  What this --

24      Q    Okay.

25      A    What this document does say is that I

53

Atul Pande, M.D.

2  provided a document that was forwarded to
3  marketing and I have no reason to doubt that this
4  document is true.

5      Q    And given your specialty in
6  psychiatry, and given that this memo indicates you
7  suggested gabapentin had utility in the treatment
8  of the psychiatric disorders, would it be a
9  problem that the document that you did forward had
10  to do with psychiatric indications?

11          MS. MC GRODER:  Object to form.

12      Q    For Neurontin?

13      A    It may have, but I can't swear to it.

14          (Pande Exhibit Number 6 marked for
15      identification as of this date.)

16      Q    Let me show you what we marked as
17  Exhibit 6.

18          MS. MC GRODER:  For the record, did
19      somebody join by telephone?

20          Anybody else on the phone line?

21          MR. GUNTER:  I believe there was
22      somebody before, but it sounded like they
23      hung up.

24  BY MR. GREENE:

25      Q    Have you had a chance to look at

54

Atul Pande, M.D.

1
2  Exhibit 6?
3      A    Yes.
4      Q    The first page of Exhibit 6, can you
5  describe it, what it is for us?
6      A    It looks like a, what we would call a
7  time line chart for a clinical development program
8  of the gabapentin in psychiatric disorders, and
9  what it shows is development for generalized
10  anxiety disorder for social phobia, panic disorder
11  and acute mania.
12      Q    Acute mania, is that bipolar?
13      A    It's part of bipolar disorder, yes.
14      Q    Did you prepare this first page?
15      A    I have no, no way of identifying
16  whether I did or did not.
17      Q    Is this the type of document that you
18  would have prepared when you were working in drug
19  development in Parke-Davis back in 1994?
20      A    It is consistent with the kind of
21  documents I would have produced, yes.
22      Q    Can you tell us who Mi Donj is, M-I,
23  D-O-N-J?
24      A    G.
25      Q    G, excuse me.

56

Atul Pande, M.D.

1
2  speculation.
3      A    I can't think of who would.
4      Q    Then just again, directing your
5  attention to the first page here, under clinical
6  development for general anxiety disorder, it
7  indicates that there be a submission of a new drug
8  application for general anxiety disorder.
9      Do you see that?
10      A    Yes.
11      Q    There is actually a date, fourth
12  quarter of '98?
13      A    Yes.
14      MS. MC GRODER:  Objection, I'm sorry,
15  it's not an objection, Tom, I just don't see
16  where you are on the document.
17      THE WITNESS:  It's here.
18      MS. MC GRODER:  Okay, thanks.
19      Q    The document also indicates that
20  Parke-Davis was going to submit a new drug
21  application for social phobia in the second
22  quarter of '99, correct?
23      MS. MC GRODER:  Object, form.
24      A    I don't know what the intent was, but
25  this document?

55

Atul Pande, M.D.

1
2      A    Dong was the project manager for
3  Neurontin development team.
4      Q    Did you work with her?
5      A    Yes.
6      Q    Did she work in the same department
7  as you?
8      A    No, she was in what was called the
9  drug development department, which included
10  project management.
11      Q    Do you recognize the handwriting on
12  this first page?
13      A    I have, I haven't the faintest idea.
14  I can't even read what's on there in the
15  scribbles.
16      Q    Did you provide the information that
17  was placed in this chart to whoever created it?
18      MS. MC GRODER:  Object to form, no
19  foundation.
20      A    I think that is quite possible that I
21  did.  But do I recall providing the information?
22  I do not.
23      Q    Okay.  Well, if you didn't provide
24  it, who would have provided it, do you know?
25      MS. MC GRODER:  Objection, calls for

57

Atul Pande, M.D.

1
2      Q    Let me rephrase it.
3      The document shows a submission of a
4  new drug application for social phobia in the
5  second quarter of '99; is that correct?
6      A    Yes.
7      Q    And then for panic disorder, there is
8  no submission date for the new drug application;
9  is that correct?
10      A    That is correct.
11      Q    And for acute mania and maintenance
12  treatment of the bipolar disorder, again, there is
13  no submission date for the new drug application?
14      A    Not in this document, no.
15      Q    Let's turn to the second page of the
16  exhibit.
17      Can you tell us who John Montgomery
18  was?
19      A    I have no idea.
20      Q    John Boris?
21      A    John Boris was in the marketing group
22  at Warner Lambert.
23      Q    Was that marketing planning?
24      A    I don't know.
25      Q    Division?

58

1          Atul Pande, M.D.
2      A    I don't know what the department
3  specifically was called.
4      Q    You say Warner Lambert.  He was
5  stationed in Morris Plains; is that correct?
6      A    That is correct.
7      Q    And do you know what, see the subject
8  there on this subject page, the subject line, it
9  reads preliminary marketing assessment,
10  psychiatric indications?
11      A    I see it, yes.
12      Q    Is that something you assisted in the
13  preparation of?
14      A    I would not have made any marketing
15  assessment since that was not part of my
16  responsibility.
17      Q    Weren't you providing information to
18  the individuals that were preparing the
19  preliminary marketing assessment for psychiatric
20  indications?
21      A    There would have been two kinds of
22  information I did provide.  One would be the
23  nature of the disease that the development plan
24  was intended for, and I would have provided the
25  proposal for how we might study that disease using

59

1          Atul Pande, M.D.
2  Neurontin.
3      Q    Okay.  Did you develop a bipolar
4  clinical development program for Neurontin?
5      A    Yes.
6          MS. MC GRODER:  Object to form.
7      Q    And what was it?
8      A    Again, you know, I can't recall all
9  of the elements of that plan from 13 or 14 years
10  ago, whenever it was.  And so, if you are asking
11  me, you know, the specific elements of the plan, I
12  couldn't say.
13      Q    Well, why don't you describe --
14  strike that.
15          Was it a written development plan?
16      A    Almost certainly would have been a
17  written development plan.
18      Q    Can you describe the form it would
19  have taken?
20      A    Usually clinical development plans
21  were written documents that would have a narrative
22  that described what kind of studies would be done,
23  what the rationale for doing the studies was, and
24  it would have some indication of a time line for
25  the start and end of those studies.

60

1          Atul Pande, M.D.
2      Q    Okay.  Anything else you can think of
3  that would go into the clinical development
4  document?
5      A    That would generally be what a
6  clinical development plan would consist of.
7      Q    And your memory is you did prepare
8  one for bipolar?
9      A    Yes.
10      Q    Have you seen it recently?
11      A    I have not.
12      Q    Have you seen this document recently?
13      A    I have not.  In fact, I have
14  absolutely zero recollection of this document, so,
15  it's possible I might never have seen it.
16      Q    Let me direct your attention to the
17  middle of the second page of this document under
18  psychiatric indications.
19          Do you see that?
20      A    Yes.
21      Q    Did you, have you had a chance to
22  read those, that first paragraph under psychiatric
23  indications?
24      A    Yes.
25      Q    Do you know who Dr. Schatzberg is?

61

1          Atul Pande, M.D.
2      A    Allen Schatzberg is chairman of the
3  department of psychiatry at Stanford University.
4      Q    Did you talk to him prior to
5  February 23rd, 1995 about Neurontin's use in
6  treating bipolar?
7          MS. MC GRODER:  Object to foundation,
8  just to the extent your question relates to
9  the use of this document with this witness.
10      A    Again, I don't recall talking to him.
11      Q    Did you provide the information that
12  is in this paragraph to John Boris?
13          MS. MC GRODER:  Object to foundation.
14      A    Again, I don't recall.
15      Q    As of February 1995, did you feel
16  that Neurontin or the use of Neurontin in treating
17  psychiatric indications represented an attractive
18  commercial potential for Parke-Davis?
19          MS. MC GRODER:  Objection on
20  foundation grounds.
21      A    Yes, the, what I believed in, in late
22  1994 and early 1995 was that there was a -- a
23  significant likelihood that there would be a
24  medical utility for Neurontin in psychiatric
25  disorders, what that utility would be, of course

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

62

```
1          Atul Pande, M.D.
2   was not known, because there were no data
3   available to speak to that, which was the intent
4   of this development program to find out where it
5   might be most useful.
6       Q    Well, let me direct your attention to
7   under psychiatric indications, the last sentence
8   there which says, "In addition, the prevalence in
9   drug uses in this disorder represent attractive
10  commercial potential for Neurontin."
11          Do you know what attractive
12  commercial potential for Neurontin means?
13          MS. MC GRODER:  Object to form and
14  foundation.  He's already said he's never
15  seen this document.
16      A    Yeah, I don't know what's meant here.
17      Q    Well, let me ask you this:  Does
18  commercial potential mean sales of Neurontin, is
19  that what that means?
20          MS. MC GRODER:  Object to form and
21  foundation.
22      A    Yeah, you would really have to ask
23  the creator of this document what they meant.
24      Q    How many years did you work for
25  Parke-Davis?
```

63

```
1          Atul Pande, M.D.
2       A    I worked for Parke-Davis from 1994
3   until they were acquired by Pfizer in 2000.
4       Q    Was their business the sales of
5   pharmaceutical products?
6          MS. MC GRODER:  Object to form.
7       Q    Is that what the business of
8   Parke-Davis was when you worked for them?
9       A    No, it was not.
10          MS. MC GRODER:  Object to form.
11      Q    What was not?
12      A    What was it?
13          THE VIDEOGRAPHER:  I'm sorry,
14  counsel, your microphone fell off.
15      Q    You are about to enlighten me, and I
16  want to make sure I hear this.
17          MS. MC GRODER:  I object to that
18  commentary.  Also, we have been going over
19  an hour, let's take a break as soon as you
20  are prepared to.
21          MR. GREENE:  I'm not prepared yet.
22      Q    What was the business of Parke-Davis?
23          MS. MC GRODER:  Well, go ahead.
24      A    The business of FDA approval was to
25  carry out the research and development into
```

64

```
1          Atul Pande, M.D.
2   medicines for various kinds of diseases, and
3   eventually those medicines would get to the market
4   and be sold, but that was not the sole business of
5   Parke-Davis Warner Lambert.
6       Q    Was Parke Davis a non-profit
7   division?
8       A    No, it was not.
9       Q    Division of Warner Lambert?
10      A    It was not.
11      Q    Was Warner Lambert a non-profit
12  company?
13      A    It was not.
14      Q    Was Parke-Davis involved in
15  manufacturing drug products?
16      A    Yes, they were.
17      Q    Okay.  And Parke-Davis had
18  shareholders?
19      A    They did.
20      Q    And you owned stock in Parke-Davis at
21  the time you worked there?
22      A    Yes, I did.
23      Q    Did part of your compensation package
24  include a bonus?
25      A    Yes.
```

65

```
1          Atul Pande, M.D.
2       Q    And wasn't that bonus tied to how
3   well Warner Lambert -- strike that.
4          Wasn't part of that bonus tied to how
5   well the company did in the sale of its drug
6   products?
7          MS. MC GRODER:  Object to form,
8       assumes facts not in evidence.
9       A    The compensation was based on a
10  combination of salary and bonus.  The bonus scheme
11  was the same for every employee who was eligible
12  to receive a bonus, and part of that bonus did
13  depend on financial performance of the company,
14  but whether that financial performance came from,
15  you know, simply increase in sales or it came from
16  control in costs, it didn't matter.  It was the
17  performance of the company that contributed to
18  some portion of the bonus.
19      Q    Your compensation would increase if
20  the sales of the products increased potentially?
21          MS. MC GRODER:  Object to form.
22      A    If the total sales of the company met
23  their targets.
24      Q    Yes?
25      A    Yes.
```

66

| | |
|---|---|
| 1 | Atul Pande, M.D. |
| 2 | Q    So that would include Neurontin and |
| 3 | all the other drug products; correct? |
| 4 | A    That is correct. |
| 5 | Q    Do you recall what your bonus was |
| 6 | back in 1994? |
| 7 | A    I do not. |
| 8 | Q    Do you recall what your bonus was for |
| 9 | any year that you worked? |
| 10 | A    I do not. |
| 11 | Q    Was your bonus more than $10,000 in |
| 12 | any year that you worked for Parke-Davis? |
| 13 | MS. MC GRODER:  Object to form. |
| 14 | A    I imagine it was, yes. |
| 15 | Q    Was your bonus more than $20,000 for |
| 16 | any of the years that you worked for Parke-Davis? |
| 17 | A    Yes. |
| 18 | MS. MC GRODER:  Object to form and |
| 19 | foundation. |
| 20 | Q    Was your bonus more than 30,000? |
| 21 | MS. MC GRODER:  You need to wait |
| 22 | until I get my objection on the record. |
| 23 | Q    Was your bonus more than $30,000 for |
| 24 | any year that you worked for Parke-Davis? |
| 25 | MS. MC GRODER:  Object to form and |

67

| | |
|---|---|
| 1 | Atul Pande, M.D. |
| 2 | foundation. |
| 3 | A    Yes. |
| 4 | Q    For how many years was your bonus |
| 5 | greater than 30,000? |
| 6 | A    I would imagine that probably for |
| 7 | most of the years that I was there. |
| 8 | Q    Did your bonus ever exceed $50,000 |
| 9 | for any of the years that you worked for |
| 10 | Parke-Davis? |
| 11 | A    Well, now I am having trouble, |
| 12 | because the very first year I was only there for |
| 13 | five months or four months or whatever, I can't |
| 14 | swear to the number, whether what was more than |
| 15 | 50,000 or not. |
| 16 | Q    But my question was for any of the |
| 17 | years, not all of the years, so let me re-ask the |
| 18 | question, you may not have heard it. |
| 19 | Was your bonus greater than $50,000 |
| 20 | for any of the years that you worked for |
| 21 | Parke-Davis? |
| 22 | A    Yes. |
| 23 | Q    Okay.  Just approximately what was |
| 24 | the highest bonus you received during the time |
| 25 | period that you worked for Parke-Davis? |

68

| | |
|---|---|
| 1 | Atul Pande, M.D. |
| 2 | A    It would have been approximately |
| 3 | around $100,000. |
| 4 | Q    Aside from your first year, was the |
| 5 | bonus that you received from Parke-Davis, the |
| 6 | years you worked for Parke-Davis, did it average |
| 7 | approximately $100,000? |
| 8 | A    I don't know what the average was. |
| 9 | Q    In any year, did it exceed $100,000? |
| 10 | A    It may have, but again, I don't have |
| 11 | a specific recollection. |
| 12 | Q    What's your recollection of the |
| 13 | highest bonus you received at Parke-Davis, just |
| 14 | approximately? |
| 15 | A    Yeah, it would probably have been |
| 16 | 100,000, plus or minus. |
| 17 | Q    Did it exceed, did it ever exceed |
| 18 | 150,000? |
| 19 | A    I don't believe it did. |
| 20 | Q    Did -- |
| 21 | MR. GREENE:  Let me, I'm mindful of |
| 22 | your request.  If you just permit me, I just |
| 23 | have a few more questions with the document. |
| 24 | He indicates I have ten more minutes on the |
| 25 | tape. |

69

| | |
|---|---|
| 1 | Atul Pande, M.D. |
| 2 | Do you think you can last? |
| 3 | MS. MC GRODER:  That's perfect.  I |
| 4 | can last ten minutes. |
| 5 | Q    Are you all right, Doctor? |
| 6 | A    I'm all right for ten minutes, yeah. |
| 7 | Q    Let me direct your attention to Bates |
| 8 | number -- do you know what the Bates is, Doctor, |
| 9 | right?  I'm just going to give you the last two |
| 10 | digits. |
| 11 | It's the little number in the lower |
| 12 | right. |
| 13 | A    Okay. |
| 14 | Q    The last two digits are 37.  Could |
| 15 | you turn to that? |
| 16 | A    Yes. |
| 17 | Q    Now, you see this 5.2, it's called |
| 18 | FDA View. |
| 19 | Do you see that heading? |
| 20 | A    Yes. |
| 21 | Q    And you had a chance to review those |
| 22 | three paragraphs.  If you want to take another |
| 23 | look at it, you can.  I just have a simple |
| 24 | question for you -- |
| 25 | A    Okay. |

70

```
1              Atul Pande, M.D.
2         Q    -- when you are ready.
3         A    Yeah.
4         Q    Okay.
5              Is the -- have you had a chance to
6    review that, did you provide that information that
7    is contained in those three paragraphs, not
8    necessarily in those exact words?
9         A    Yeah.
10        Q    But did you provide that information
11   contained in those paragraphs to John Boris?
12             MS. MC GRODER:  Objection, no
13   foundation.
14        A    Yeah, what this, this section refers
15   to is the likelihood of regulatory acceptance of
16   development of Neurontin in psychiatric disorders.
17        Q    Um-hum.
18        A    And at Parke-Davis, it would have
19   been customary for someone who was from the
20   regulatory affairs department to provide that kind
21   of perspective.  In all likelihood, I would not
22   have done it.
23        Q    Do you know who back in the 1994,
24   1995 period from regulatory affairs would have
25   provided this information?
```

71

```
1              Atul Pande, M.D.
2              MS. MC GRODER:  Object, form.  Calls
3    for speculation.
4         A    I don't know who would have provided
5    the information.  I do recall who was the
6    regulatory affairs person on the Neurontin
7    development team, and that was a person by the
8    name of Jan Turner.
9         Q    And she worked out in Ann Arbor?
10        A    Yes, she did.
11        Q    And I think you said she was on the
12   Neurontin development team?
13        A    That is correct.
14        Q    Did you work closely with her on a
15   day-to-day basis?
16             MS. MC GRODER:  Object to form.
17        A    Only in the context of the
18   development program.
19        Q    Neurontin development program.
20        A    Yes, as I mentioned to you, I worked
21   on other programs also at the same time, and there
22   might have been other regulatory people working on
23   those programs.
24        Q    Where was her office located in
25   relation to yours?  Same building or --
```

72

```
1              Atul Pande, M.D.
2         A    It probably was in the same building,
3    I just don't have a clear recollection of it.
4         Q    Okay.
5              So looking at the, the degree of
6    development difficulty, again, same page, for the
7    record, the last two Bates digits 37, is this
8    information that you would have provided?
9              MS. MC GRODER:  Objection.
10        Q    That is listed below that heading of
11   5.3.
12             MS. MC GRODER:  Objection on
13   foundation grounds to the use of this
14   document with this witness.
15        A    You are referring to the information
16   that is under the heading bipolar disorder acute
17   mania, is that what you are referring to?
18        Q    Yes, I think the general heading is
19   5.3, the degree of development difficulty, it
20   says, "Listed below are potentially development
21   opportunities and issues associated with each
22   disorder."
23        A    Right.
24        Q    Then it mentions bipolar disorder on
25   the next page, general anxiety disorder panic
```

73

```
1              Atul Pande, M.D.
2    disorder, and social phobia.
3              Is this information that you would
4    have provided?
5         A    This is general --
6              MS. MC GRODER:  Same objection.
7         A    This is generally the kind of
8    information I would have provided, but whether I
9    actually provided this information for this
10   document, I don't know.  It could have been
11   extracted by this person from other documents that
12   I may have created, so, I wouldn't have actually
13   provided it to them for this purpose.
14        Q    Well, we can pull out the exhibit.
15             Do you recall we were looking at the
16   Neurontin development team meeting minutes?
17        A    Yes.
18        Q    And it says you were going to provide
19   some document or documentation, right?
20        A    Which we haven't seen?
21        Q    Is this the type of information you
22   would have provided?
23        A    This is generally the kind of
24   information, yes.
25        Q    Would anybody else have provided this
```

74

Atul Pande, M.D.

1
2  type of information from the development team?
3      A    If it was for psychiatric disorders?
4      Q    Yes.
5      A    Then in all likelihood I would have
6  been the one.
7      Q    Was there anybody on the Neurontin
8  development team for a period of time that you sat
9  on it that had expertise in psychiatric disorders?
10     A    I don't believe so.
11     Q    Okay.
12          Just turning to the next page, just a
13  couple more questions about this.
14          Do you see there number six, dosage
15  schedule?
16     A    Yes.
17     Q    Is that the type of information that
18  you would have collected to provide to -- let me
19  rephrase that question.
20          It's that the type of information
21  that you would have provided to marketing for
22  analysis of the commercial potential of Neurontin
23  in psychiatric indications?
24          MS. MC GRODER:  Object to form and
25          foundation.  Are you referring to all three

75

Atul Pande, M.D.

1
2  of these paragraphs under this schedule?
3      Q    Under dosage schedule, yeah.
4          MS. MC GRODER:  Same objection,
5          overbroad.
6      A    It could have been the kind of
7  information that I might have provided, but all of
8  the information that is contained in here, with
9  the exception of the last paragraph, would have
10  been public information easily accessible to
11  anybody who wanted to read the labels for these
12  various drugs.
13     Q    Okay.
14     A    So again, I can't swear that I was
15  the one that provided this information.
16     Q    Let me ask you to turn to the page,
17  the last two digits, 43.
18     A    Yes.
19     Q    Do you recognize that page?
20     A    I don't recognize it, since I have no
21  recollection of this document.
22     Q    Okay.
23     A    But what it appears to show is the,
24  the costs for doing studies in acute mania, panic
25  disorder or social phobia.

76

Atul Pande, M.D.

1
2      Q    Did you, did you provide that
3  information?
4      A    Again, I am speculating, but in all
5  likelihood I would have been the one estimating
6  these costs.
7      Q    Do you recognize the fax number on
8  the side of the margin there?
9      A    It looks like it was the fax number
10  for the clinical research department.
11     Q    That's your department; correct?
12     A    Yes.
13     Q    Do you have any memory of faxing this
14  or --
15     A    I don't.
16     Q    -- or having someone fax it to
17  Mr. Boris?
18     A    I do not.
19     Q    But is this the -- back in the 1995
20  time period, is this the type of information you
21  would collect -- is this the type of information
22  you would collect if you were going to do a budget
23  estimate for gabapentin in psychiatric studies?
24          MS. MC GRODER:  Objection on
25          foundation grounds to the extent your

77

Atul Pande, M.D.

1
2  questions are based on this document, which
3  he has never seen.
4      A    Yes.
5      Q    Where would you collect this
6  information that goes into this, this page that we
7  are looking at?  Again, for the record, last two
8  digits, 43.
9          MS. MC GRODER:  Same objection, no
10          foundation.
11     A    Yeah, this kind of information would
12  have been generated from a number of different
13  sources, one of which is the past experience of
14  having done studies in these various disorders,
15  and then there were some proprietary database
16  tools that were available to estimate what it
17  might cost to study different diseases.
18     Q    Okay.
19     A    And so this would probably have been
20  a combination of that, but again, I can't tell you
21  right now, you know, what exact elements went into
22  estimating this cost.
23     Q    Let's turn to the page last two
24  digits 46, do you see that?
25     A    Yes.

78

```
1              Atul Pande, M.D.
2      Q    All right.  Now, this is a document
3  you prepared, correct?
4      A    It looks like this page has two
5  different documents.
6      Q    All right.  Let's look at the top.
7      A    The top.
8      Q    It says interoffice memo, right, from
9  Atul Pande?
10      A    Yes.
11      Q    That's you, correct?
12      A    Yes.
13      Q    Is that your e-mail address?
14      A    I imagine it was.  Yeah.
15      Q    Dated March 23, 1995, correct?
16      A    That is correct.
17      Q    And you sent it to John Boris?
18      A    Yes.
19      Q    He's in marketing planning in Morris
20  Plains; correct?
21      A    I believe so.
22      Q    And did you work with him in
23  developing a marketing assessment for Neurontin's
24  use in psychiatric indications?
25          MS. MC GRODER:  Objection, asked and
```

79

```
1              Atul Pande, M.D.
2  answered.
3      A    I provided to him the clinical
4  information that he would then have used to create
5  the marketing assessment.
6      Q    When I say the marketing assessment
7  for psychiatric indications, do you know the
8  document I am referring to?
9      A    No.  Have we seen that document?  I
10  don't --
11      Q    You don't know?
12      A    I don't know which one you are
13  referring to.
14      Q    Have you seen the marketing
15  assessment for psychiatric indications for
16  Neurontin recently?
17          MS. MC GRODER:  Object to form and
18  foundation.
19      A    Yeah, I don't believe so, I -- if you
20  show me the document, I might be able to tell you.
21      Q    Okay.  I will.  We will get to it.
22      A    Okay.
23      Q    And just, again, for the record, who
24  is Ronald Martin?
25      A    Ron Martin was the head of the
```

80

```
1              Atul Pande, M.D.
2  Neurontin development team.
3      Q    Okay.  Where was he located?
4      A    He was in Ann Arbor.
5      Q    And Oliver Brandicourt?
6      A    Oliver Brandicourt was in the
7  marketing group and he was located in Morris
8  Plains.
9      Q    And Mark Pierce you identified, just
10  for the record, at this point.
11      A    Mark Pierce was a vice president in
12  the clinical research group based in Ann Arbor,
13  and he was my direct boss.
14      Q    Okay.  We are almost out of time.
15  Why don't we take our break?  I have one or two
16  questions about him.
17          I ask you not to discuss this
18  document with your counsel during the break.  We
19  are in the middle of an examination on it.
20      A    Okay.
21          THE VIDEOGRAPHER:  The time is 10:26.
22  This ends tape one of the videotape
23  deposition of Atul Pande.
24          We are off the record.
25          (Recess taken.)
```

81

```
1              Atul Pande, M.D.
2          THE VIDEOGRAPHER:  The time is 10:38.
3  This begins tape two of the videotape
4  deposition of Atul Pande.  We are on the
5  record.
6      Q    For the record, Doctor, I have been
7  asking you some questions concerning Exhibit 6.
8          Do you still have it before you?
9      A    Yes.
10      Q    And where you turn to the page, the
11  last two digits, 46?
12      A    Yes.
13      Q    Do you have that?
14      A    Um-hum.
15      Q    And I think before we took a break
16  you had testified that at least the top part of
17  this interoffice memo was a memo that you
18  prepared; correct?
19      A    Yes.
20      Q    And the bottom approximately third of
21  the page appears to be an interoffice memo from
22  Gracia Briard.  How do I pronounce that?
23      A    I have no idea.
24      Q    Do you know who that person is?
25      A    Not a clue.
```

82

```
1              Atul Pande, M.D.
2       Q    Okay.  Well, I just want to question
3   you about the part of the memo that you prepared.
4   Okay?
5       A    Okay.
6       Q    So this is a memo you wrote to John
7   Boris; correct?
8       A    Yes.
9       Q    And it's dated March 23, 1995?
10      A    Yes.
11      Q    And you say, "The enclosed Lotus file
12  contains my estimates for the cost of doing one
13  study each in the three psychiatric indications we
14  discussed last week."
15          And then you identify acute mania,
16  bipolar disorder, panic disorder and social
17  phobia; is that correct?
18      A    Yes.
19      Q    And if I turn back -- would you have
20  attached a Lotus file to this memo and e-mailed it
21  to John Boris?
22      A    If that's what it says in the memo, I
23  have done it, yes.
24      Q    Let me direct you back to the same
25  exhibit Bates last two pages 43.
```

83

```
1              Atul Pande, M.D.
2       Do you see that?
3       A    Yes.
4       Q    And that's got a date in the upper
5   left-hand corner of March 23, correct?
6       A    Yes.
7       Q    That's the same date as the memo that
8   you wrote to Mr. Boris; correct?
9       A    Yes.
10      Q    Is this a hard copy, this page I am
11  looking at, last two digits, 43, is this the hard
12  copy of what was in the Lotus file?
13      A    I couldn't tell you.  You know, not
14  --
15      Q    Do you think that is a fair inference
16  --
17          MS. MC GRODER:  Objection to form.
18      Q    -- or do you think it's not fair?
19          MS. MC GRODER:  Same objection.
20      A    I would have to make a guess.
21      Q    Now, let me direct your attention to
22  the last paragraph.  You write, "If we should
23  desire full regulatory submission, I would
24  estimate the cost at least three times the cost
25  for a single study."
```

84

```
1              Atul Pande, M.D.
2       Do you see that?
3       A    Yes.
4       Q    In full regulatory submission, does
5   that refer to submitting an NDA to the FDA, new
6   drug application?
7       A    Yes.
8       Q    To the FDA?
9       A    Yes.
10      Q    To get approval for Neurontin use in
11  any of those three psychiatric indications?
12      A    Yes.
13      Q    Okay.  And you say that the reason
14  for that not only would we need to do one
15  additional study in each indication that we intend
16  to register, but will also need to generate the
17  patient exposure data to support the regulatory
18  package?
19      A    That is correct.
20      Q    Okay.  And the last sentence, "Safety
21  exposure data does not need to be from a
22  double-blind study, hence the cost would be less
23  than the two pivotal studies."
24          Correct?
25      A    That's correct.
```

85

```
1              Atul Pande, M.D.
2       Q    I do understand that you meant if you
3   were going to seek regulatory approval for a new
4   indication such as bipolar, you needed to submit
5   two double-blind placebo controlled or comparator
6   controlled trials to the FDA, plus some safety
7   exposure data from a third study.
8       A    That is correct.  Yes.
9       Q    Do you recall some discussion as of
10  March 1995 concerning whether Parke-Davis would
11  pursue and seek a full regulatory submission for
12  Neurontin's use in a psychiatric indication or
13  pursue a publication strategy and not file for a
14  regulatory approval for psychiatric indications?
15          MS. MC GRODER:  Object to form.
16      A    The discussion that I do recall were
17  that we were.
18          Starting from late in 1994, and going
19  into 1995, the possibility of studying Neurontin
20  for psychiatric disorders, and just to, to make a
21  complete answer, I would like to give you the
22  background to this discussion and how that was
23  changing is that as we were talking within the
24  company about exploring these development options,
25  that there was interest growing among experts in
```

86

Atul Pande, M.D.

1
2        the field as well and so that in 1995, at the time
3        that, you know, this note would have been written,
4        we were interested in figuring out whether
5        Neurontin worked in these conditions or not, and
6        there were a few experts in the area who were also
7        starting to ask the question about, you know,
8        whether we intend to study Neurontin in these
9        conditions.
10       Q    Well, there was virtually no use of
11       Neurontin in these psychiatric indication back in
12       March of 1995, was there?
13           MS. MC GRODER:  Object, form and
14           foundation.
15       A    I have no idea.
16       Q    You have no idea?
17       A    Yeah.
18       Q    We will get to some documents that
19       will address that issue, sir.
20           MS. MC GRODER:  I object to that
21           colloquy.
22       Q    Let me direct your attention to the
23       next page.
24       A    Which page is that?
25       Q    The last two digits.  I can't see

87

Atul Pande, M.D.

1
2        them on mine.
3           MR. RONAS:  Forty-seven.
4        Q    Forty-seven.
5           Have you ever seen the information
6        that is shown on this page?
7        A    I don't remember whether I have seen
8        exactly this information, but I am aware of
9        information of this kind.
10       Q    Okay.  And did you collect
11       information of this kind --
12       A    I would not have.
13       Q    You would not have?
14       A    I would not have.
15       Q    Who would have?
16       A    That would have been someone in the
17       marketing department.
18       Q    Were you familiar with what the
19       medical practice was for treating bipolar
20       disorders back in 1995?
21       A    Yes.
22       Q    And were you familiar with the
23       medical practice for treating bipolar disorders in
24       the United States back in 1995?
25       A    Yes.

88

Atul Pande, M.D.

1
2        Q    Can you turn to, I think it might be
3        the next page, it's one or two pages?
4        A    Forty-nine.
5           MS. MC GRODER:  1849.
6        A    I have a staple going through my
7        Bates, so I can't -- did you have an opportunity
8        to review that?
9        A    Yes.
10       Q    Does that accurately reflect what the
11       medical practice was for treating bipolar
12       disorders in the United States back in 1995?
13           MS. MC GRODER:  Object to form and
14           foundation for the use of this document with
15           this witness.
16       A    I think this is generally consistent
17       with the state of medical practice in this area at
18       the time.
19       Q    Was Valproic acid approved by the FDA
20       to treat mania in 1995?
21       A    I don't recall when it exactly got
22       approved, but it would have been close to that
23       time frame.
24       Q    And again, Neurontin was not part of
25       the medical practice in treating bipolar disorder

89

Atul Pande, M.D.

1
2        back in 1995 in the U.S, was it?
3           MS. MC GRODER:  Object to form and
4           foundation.
5        Q    Go ahead, you can answer.
6        A    It was not considered to be standard
7        practice.  Whether it was being used by some
8        people, I could neither say yes or no.
9           (Pande Exhibit Number 7 marked for
10          identification as of this date.)
11       Q    Doctor, let me show you what we have
12       marked as Exhibit 7.
13           Have you had a chance to read it?
14       A    Yes.
15       Q    Have you seen this document recently?
16       A    Not recently, but --
17       Q    Did you review any documents in
18       preparing for your deposition today?
19       A    I reviewed some documents.
20       Q    Where did you get those documents
21       that you reviewed?
22       A    They were provided by Shook, Hardy &
23       Bacon.
24       Q    When were they provided to you?
25       A    They would have been provided over

90

1           Atul Pande, M.D.
2    the last, I don't know, maybe six weeks or so.
3        Q    Prior to that, did you review any
4    documents in preparing for your deposition?
5        A    I don't think so.
6        Q    When were you first notified that
7    your deposition had been noticed?
8        A    I don't have a recollection of the
9    date.
10        Q    Were you noticed -- were you notified
11    that your, that we wanted to take your deposition
12    either in May or June of 2007?
13           MS. MC GRODER:  Objection, calls for
14    speculation.
15        A    I don't remember the specific time
16    frame.
17        Q    Did you review any documents that
18    were provided to you by Pfizer in preparing for
19    your deposition?
20        A    No.
21        Q    Did you review any documents that
22    were provided to you by the lawyers from Davis
23    Polk in preparing for your deposition?
24        A    No.
25        Q    What was the volume of documents that

91

1           Atul Pande, M.D.
2    Shook, Hardy provided you to review?
3           MS. MC GRODER:  Objection, that calls
4        for attorney-client privilege work product
5        and I am going to instruct the witness not
6        to answer.
7           MR. GREENE:  The number of documents
8        that he was given?
9           MS. MC GRODER:  Well, yeah.
10        Q    Can you estimate how many documents
11    you reviewed in preparing for your deposition?
12        A    Again, if I am guessing, maybe a
13    dozen or so.
14        Q    Okay.  Did it fill a banker's box?
15           MS. MC GRODER:  Object to form.
16        A    Certainly not.
17        Q    Were those the only, were those dozen
18    or so documents, were those the only documents you
19    reviewed in preparing for your deposition?
20        A    As best as I recall, yes.
21        Q    Did you do any research online in
22    preparing for your deposition?
23        A    I did not.
24        Q    Did you meet with attorneys from
25    Shook Hardy to prepare for your deposition?

92

1           Atul Pande, M.D.
2        A    Yes.
3        Q    How many occasion did you meet with
4    them?
5        A    Again, without looking at my
6    calendar, I don't have a specific recollection of
7    number of times, but probably three, four times
8    maybe.
9        Q    When was the first meeting?
10        A    I don't have a recollection of that
11    date.
12        Q    During the summer?
13        A    I am guessing it was either early
14    summer or late spring.
15        Q    Late spring?
16        A    June.
17        Q    Was it Shook Hardy lawyers you met
18    with in late spring or June?
19        A    Yes.
20        Q    Any other lawyers present?
21        A    There was one occasion on which
22    Mr. Bondada was present.
23        Q    Who is Mr. Bondada?
24        A    He's an attorney for Pfizer.
25        Q    And he's here at the table today?

93

1           Atul Pande, M.D.
2        A    Yes, he is.
3        Q    Where did that meeting take place?
4        A    In, in Raleigh, Durham, North
5    Carolina.
6        Q    Was that the only meeting that Pfizer
7    had a representative at the meeting with you at?
8        A    That is correct.
9        Q    The other -- were the Shook Hardy
10    lawyers at that meeting?
11        A    Yes.
12        Q    Any other lawyers?
13        A    I don't recall.
14        Q    Did you review documents at that
15    meeting?
16        A    No.
17        Q    How long did that meeting take?
18        A    A couple of hours probably.
19        Q    Were you paid for your time during
20    that meeting?
21        A    Yes.
22        Q    How much were you paid?
23        A    The rate that I am paid at is $500 an
24    hour, which is what I charge as my consulting rate
25    when I consult for other companies.

94

Atul Pande, M.D.

2  Q    So that meeting where you met in
3  Raleigh --
4     A    Yes.
5     Q    -- I think you said Raleigh -- with
6  the Pfizer attorney and the Shook Hardy attorney
7  was for two hours?
8     A    Approximately.
9     Q    You were paid $1,000?
10    A    If it was a couple of hours, that's
11 what I would have been paid.
12    Q    Did you prepare that, for that
13 meeting at all?
14    A    Did I prepare for that meeting?
15    Q    Yes.
16    A    No, I did not.
17    Q    Was that the first meeting you had
18 with Shook Hardy attorneys?
19    A    I believe so.
20    Q    When was the next meeting?
21    A    I don't really remember when the next
22 meeting was, but probably several weeks later.
23    Q    Okay.  How long did you spend in that
24 meeting?
25    A    I think maybe three or four hours.

95

Atul Pande, M.D.

2     Q    And how much were you paid for that
3  meeting?
4        MS. MC GRODER:  Object to form.
5     A    It would have been at the same rate
6  as what I described.
7     Q    So, you were paid for your time that
8  you spent with the Shook Hardy lawyers during the
9  second meeting; correct?
10    A    That is correct.
11    Q    And you say it's three or four hours?
12    A    Yes.
13    Q    It was 1,500 to $2,000 approximately?
14    A    Correct.
15    Q    So that is approximately 2,500 to
16 $3,000 that you were paid for your time in those
17 two meetings?
18    A    That is approximately right, yes.
19    Q    How many more meetings did you have
20 with attorneys to prepare for your deposition?
21    A    I am guessing, perhaps, a couple more
22 after that.
23    Q    Two more?
24    A    Yeah.
25    Q    And where did those meetings occur?

96

Atul Pande, M.D.

2     A    Well, one of them took place in
3  Durham, North Carolina, and another one in New
4  York City.
5     Q    And were there Shook Hardy lawyers at
6  both meetings?
7     A    That is correct.
8     Q    The one you referred to that is in
9  Durham, how long was that?
10    A    That was also approximately three and
11 a half to four hours.
12    Q    That would have been the third
13 meeting?
14    A    Correct.
15    Q    And the fourth meeting would be in
16 New York City?
17    A    Right.
18    Q    Where was that, where did that
19 meeting occur?
20    A    That was at the offices of Davis
21 Polk.
22    Q    That is the law firm we are sitting
23 in today; correct?
24    A    That is correct.
25    Q    The offices of that law firm?

97

Atul Pande, M.D.

2     A    Yes.
3     Q    Who was present at that meeting?
4     A    The same Shook Hardy lawyers that met
5  with me at previous meetings.
6     Q    Who were they, could you identify
7  them for me, please?
8     A    Mr. Vince Gunter and Ms. Lori
9  McGroder.
10    Q    Those are the two attorneys who are
11 here today?
12    A    That is correct.
13    Q    Do they represent you?
14    A    They do not.
15    Q    Have they ever represented you?
16    A    They have not.
17    Q    How long was the meeting in New York?
18    A    The meeting in New York was
19 approximately about six hours or so.
20    Q    When was that meeting?
21    A    That was on Monday of this week.
22    Q    Okay.  And again, you were paid for
23 your time at the rate of $500 an hour at that
24 meeting?
25    A    That is correct.

98

Atul Pande, M.D.

1
2      Q      And are you being paid for your time
3   here today?
4      A      Correct.
5      Q      Are you being paid for your travel
6   time to get here?
7      A      No, I am not.
8      Q      And they are paying your expenses to
9   get here?
10     A      Yes.
11     Q      Hotel room?
12     A      Yes.
13     Q      When I say they, I mean Pfizer.
14     A      Yes.
15     Q      Pfizer has been paying for all this
16  time; is that correct?
17            MS. MC GRODER:  Object to form.
18     A      Yes.
19     Q      Pfizer has been paying for the time
20  that you spent with the attorneys in preparing for
21  the deposition?
22     A      That is correct.
23     Q      And what is your rate here at the
24  deposition?  Is it the same, $500 an hour?
25     A      In my consulting contracts, if the

99

Atul Pande, M.D.

1
2   client wants me for a limited number of hours, I
3   charge $500 an hour.  If they want me for a whole
4   day, then my rate is $3,000 for the entire day.
5      Q      Okay.
6      A      And that's an eight-hour working day.
7      Q      And Pfizer is your client?
8      A      That is correct.
9      Q      Do you have a written consulting
10  agreement with them?
11     A      I do.
12     Q      When did you enter into that written
13  consulting agreement?
14     A      I don't recall the specific date.
15     Q      Approximately?
16     A      Approximately it would have been in
17  the May, June time frame.
18     Q      And how did, how did it come about
19  that you entered into that consulting agreement?
20     A      I am not sure what you mean by that.
21     Q      Well, I guess what I am asking is:
22  Did you call Pfizer and say can I be a consultant
23  for you, or did they call you and ask you to be a
24  consultant for them?
25            MS. MC GRODER:  Object to form.

100

Atul Pande, M.D.

1
2      A      It was the latter.
3      Q      Tell me who contacted you from Pfizer
4   with regard to entering into a consulting
5   agreement?
6      A      It would have been a person by the
7   name of Christine Mylod in the Pfizer legal
8   department.
9      Q      Okay.  And you say that she contacted
10  you in the May or June time period?
11     A      That's my recollection, yes.
12     Q      Was that a phone conversation?
13     A      Yes.  Well, e-mail and phone
14  conversation.
15     Q      She sent you an e-mail?
16     A      Yes.
17     Q      What did she say in the e-mail?
18     A      That she was interested in talking to
19  me about -- about a possible consulting
20  arrangement.
21     Q      In the e-mail, did she inform you
22  that we had noticed your deposition?
23     A      No.
24     Q      In the phone, you said she telephoned
25  you as well; correct?

101

Atul Pande, M.D.

1
2      A      Yes.
3      Q      Did that follow the e-mail?
4      A      Yes.
5      Q      How long did that phone conversation
6   last?
7      A      Oh, maybe 10 or 15 minutes.
8      Q      And what did she say to you in that
9   phone conversation?
10     A      I don't have a specific
11  recollection.
12            But I think it was essentially to
13  request me to consider entering into a consulting
14  contract, and that it was in connection with
15  litigation on Neurontin.
16     Q      Did she tell you in that conversation
17  that your deposition had been noticed by
18  plaintiffs in this case?
19     A      No.
20     Q      When were you informed that your --
21  strike that.
22            Did you agree to enter into a
23  consulting agreement with Pfizer?
24     A      Yes.
25     Q      And when did you make that agreement?

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

102

Atul Pande, M.D.

2  A  Again, I don't recall the specific
3  date.
4  Q  Was it in a phone conversation?
5  A  It would have been after, after they,
6  you know, I agreed to look at the consulting
7  contract, and so that would have been perhaps
8  several days or maybe a week or two after that I
9  would have signed the contract.
10  Q  Okay.  And so did she send you a
11  written consulting agreement?
12  A  Yes.
13  Q  How many pages was that?
14  A  I don't remember.
15  Q  Do you have a copy of it?
16  A  Not at this moment, I don't.
17  Q  Do you have a copy of it in your
18  office?
19  A  Yes.
20  Q  We are going to subpoena it from you.
21  A  Okay.
22  Q  Don't destroy it, don't alter it.
23  MS. MC GRODER:  I object to the
24  instruction from counsel making some
25  suggestion that he might destroy or alter

103

Atul Pande, M.D.

2  it.  That is a very objectionable comment.
3  Q  Do you recall when you signed it?
4  A  No.  I don't.
5  Q  Did you sign it -- strike that.
6  Were you informed by Pfizer that we
7  had subpoenaed you for this deposition before you
8  signed that consulting agreement?
9  MS. MC GRODER:  Object to form and
10  foundation.  There was no subpoena for this
11  deposition.  It's a very misleading
12  question.
13  Q  Go ahead.
14  A  I don't actually recall when those
15  two occurred in relation to each other.
16  Q  So, you may have been informed that
17  we wanted to take your deposition and signed the
18  consulting agreement after that date, or you may
19  have signed the consulting agreement first and
20  then been informed, you just don't recall?  Is
21  that your testimony?
22  A  I don't recall that, yeah.
23  Q  In the consulting agreement, is there
24  any reference to a deposition?
25  MS. MC GRODER:  Object.

104

Atul Pande, M.D.

2  MR. GUNTER:  I'm going to object,
3  too, because that you, you are asking for stuff
4  that goes back seven months, he says he
5  doesn't recall.  You are laying a
6  foundation, are you implying that?
7  MR. GREENE:  We don't need a speaking
8  objection, Vince.  Make your objection.  You
9  know what the rules are.
10  MR. GUNTER:  Take caution of your
11  tongue.
12  MR. GREENE:  I am not going to take
13  caution with my tongue.
14  MR. GUNTER:  You can speak to me
15  professionally.
16  MR. GREENE:  Make an objection.
17  MR. GUNTER:  You are implying that
18  the consulting agreement was entered after
19  he was noticed for deposition as opposed to
20  before.
21  MR. GREENE:  It may be an inference
22  you are drawing.
23  Q  Tell me what the terms, to the best
24  of your memory, are, of the consulting agreement.
25  A  Again, it's an agreement to consult

105

Atul Pande, M.D.

2  on matters related to Neurontin, but other than
3  that, I don't recall what all of the specifics
4  are.
5  Q  Just one or two more questions on
6  this subject, and I would like to move on.
7  Have you sent Pfizer an invoice for
8  your time?
9  A  I have for the very first meeting, I
10  have sent an invoice to Shook, Hardy & Bacon.
11  Q  Just for the very first meeting?
12  A  Just for the very first one.
13  Q  Have you sent any invoices out since?
14  A  Not since.
15  Q  Either to Pfizer or Shook Hardy?
16  A  No, I have not.
17  Q  Have you prepared them?
18  A  No, I have not.
19  Q  Can you estimate your time is
20  into the case prior to today?
21  MS. MC GRODER:  Objection, isn't that
22  what he just testified about for the last
23  five minutes?
24  A  Yeah, again, I am basically
25  estimating in a very approximate manner, because I

106

Atul Pande, M.D.

1
2   don't have my calendar in front of me to tell you
3   precisely how many hours.
4       Q   Okay.
5       A   But you know, maybe 20 hours.
6       Q   Let me ask you:  Does the consulting
7   agreement contemplate that you would give trial
8   testimony in this case?
9       A   I don't recall.
10      Q   Directing your attention to Exhibit
11  7, have you had a chance to look at that?
12      A   Yes.
13      Q   This is a memo that you prepared
14  dated March 28, '95?
15      A   Yes.
16      Q   And you sent it to John Boris?
17      A   Yes.
18      Q   Again, he's marketing planning in
19  Morris Plains?
20      A   He is in the marketing group, yes.
21      Q   Okay.  When you say marketing group,
22  do you, in your mind, is there a distinction
23  between the marketing group and marketing
24  planning?
25      A   The marketing group, as I use the

107

Atul Pande, M.D.

1
2   term, includes various components of the marketing
3   area, one of which you referred to previously,
4   such as Market Analytics, and there would have
5   been marketing planning in there, so what I am
6   trying to make a distinction is, I can't swear --
7       Q   Okay, fine.
8       A   -- which individual worked in which
9   of those departments.
10      Q   Was there a marketing department in
11  Morris Plains?
12      A   Yes, there was.
13      Q   Was there a marketing analytic
14  department in Morris Plains?
15      A   Yes, there was.
16      Q   And was there marketing planning in
17  Morris Plains?
18      A   I believe there was, yes.
19      Q   Do you know what the marketing
20  planning group is?
21      MS. MC GRODER:  Object, foundation.
22      A   Their main role would have been to
23  evaluate the opportunities that were available for
24  development of any of the compounds that were in
25  Parke-Davis Warner Lambert's pipeline.

108

Atul Pande, M.D.

1
2       As part of their responsibility, they
3   would also have had other responsibilities of
4   which I only have a vague understanding having to
5   do with creating marketing plans for drugs that
6   were already approved.
7       Q   Okay.
8       A   And available.
9       Q   Let me ask you a couple questions
10  about Exhibit 7.
11      You say in this sentence there, the
12  first sentence, you say, "John, do you have a
13  current list of countries where gabapentin is
14  approved and marketed," and then say, "As I am
15  working on the study plans in psychiatry, it seems
16  to me that if the objective is only to publish the
17  studies, then for some indications it may be
18  useful to conduct studies outside the United
19  States."
20      A   That's what it says, yes.
21      Q   You wrote that, correct?
22      A   My name is signed to it, yes.
23      Q   You wrote it?
24      A   I have no reason to believe that I
25  didn't.

109

Atul Pande, M.D.

1
2       Q   Okay.  You are working on study plans
3   in psychiatry.
4       What does that mean, Doctor?
5       A   Which part, the study plans?
6       Q   Yes, study plans.
7       A   What that means is that I was
8   devising the development plan for studies that
9   would be or might be conducted in psychiatric
10  disorders, and at the same time started to draft
11  the protocols for how those studies would be done.
12      Q   Was there anybody else at Parke-Davis
13  that was working with you on that?
14      A   There might have been, there, you
15  know, there might have been, you know, my, some of
16  my associates, but I would have had the primary
17  responsibility.
18      Q   That's what I am asking, to use your
19  phrase, primary responsibility, you had the
20  primary responsibility for drawing up the study
21  plan for Neurontin's use in psychiatry; correct?
22      A   The development plan, yes.
23      Q   Well, study plans is what your memo
24  says.
25      A   Development plans also include the

110

Atul Pande, M.D.

1
2   study plan, right.
3        Q    Then it seems to me that if the
4   objective is only to publish the studies, what is
5   that referring to, that portion of the sentence I
6   just read?
7        A    What that refers to is the background
8   that was evolving which I referred to previously,
9   with experts in the field, and many clinicians who
10  were starting to ask here, is this new
11  anticonvulsant drug, and are people at Warner
12  Lambert considering doing studies in this area,
13  because people want to know does it work in
14  psychiatric disorders like the other
15  anticonvulsant drugs do and so the -- right from
16  the outset when this discussion began about doing
17  these studies, there was the assumption that
18  whatever studies we did would be made available to
19  practitioners, clinicians or experts who were
20  involved in research and practice in the area, and
21  so what this refers to is that in the event that a
22  registration was not achieved for any of these
23  indications, that those studies will still be
24  published and they would be available for people
25  to use in making their own judgments.

111

Atul Pande, M.D.

1
2        Q    Well, one way physicians get
3   information about a pharmaceutical drug is through
4   reading studies?
5        A    That's correct.
6        Q    In published literature, correct?
7        A    That's correct.
8        Q    So you say here, "If the objective is
9   only to publish the studies, it may be useful to
10  conduct the studies outside the United States."
11       Why did you want to, why were you
12  suggesting it might be useful to publish, to
13  conduct the studies outside the United States if
14  the objective was just to publish the studies?
15       A    As I recall at the time, there was a
16  considerable amount of interest from academic
17  psychiatrists in Europe who were quite keen on
18  either doing the studies or at least in knowing
19  what the answer was to the question that they were
20  asking about the utility of gabapentin for
21  psychiatric disorders, so...
22       Q    Were some of these experts outside
23  the United States?
24       A    Yeah.
25       Q    In the March '95 time period that

112

Atul Pande, M.D.

1
2   we're asking you about, the utility of gabapentin
3   in treating psychiatric indications --
4        A    Yes.
5        Q    -- who were they?
6        A    Well, are you asking the name?
7        Q    Yes.
8        A    Well, one of them would be professor
9   of psychiatry at Imperial College in London, his
10  name is Stuart Montgomery.
11       There was --
12       Q    Did he e-mail you?
13       A    No, these are people they generally
14  see at scientific meetings.
15       Q    Did he write you?
16       MS. MC GRODER:  Object to the
17  interruption.  You can go ahead and complete
18  your answer.  Wait until he finishes his
19  answer.
20       Were you finished with your answer,
21  Doctor?
22       THE WITNESS:  I was naming --
23       MS. MAC GRODOR:  You can continue to
24  do that because that was the question asked,
25  go ahead and complete your answer.

113

Atul Pande, M.D.

1
2        A    There was --
3        Q    All right.  So we have got
4   Montgomery.
5        MS. MC GRODER:  No, I won't allow
6   that.  Let him complete his answer.
7        Q    We have got Montgomery.  Who else do
8   you want to list?
9        A    There is Yves Lecrubier.
10       Q    Spell it.
11       A    Y-V-E-S, Yves, L-E-C-R-U-B-I-E-R.
12       Q    Where is that?
13       A    He is in, he is at what's called the
14  Inserm, I-N-S-E-R-M.  That is sort of the
15  equivalent of NIH in France, and he is a professor
16  of psychiatry.
17       I can keep going on with the list of
18  people who had approached me to ask whether we
19  were considering doing studies of not.
20       Q    You say here in Exhibit 7, the next
21  sentence, "Obviously, the object of a publication
22  strategy" -- and you put those two words in quotes
23  -- "publication strategy would be to disseminate
24  the information as widely as possible through the
25  world's medical literature."

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

114

Atul Pande, M.D.

1
2        Did you write that?
3        A    I think we have already addressed
4    that it looks like a memo that is written by me.
5        Q    And publication strategy, you put it
6    in quotes, why did you put it in quotes?
7        A    I can't recall why I would have.
8        Q    Well, wasn't, was there a discussion
9    back in March of '95 about pursuing a publication
10   strategy for Neurontin?
11       A    No, what the discussion was was that
12   we were considering doing these studies and
13   regardless of whether we pursued a program of
14   studies or we just did the exploratory studies, it
15   was my belief then, and it has always been a
16   principle for me, that every study outcome
17   should be published in the medical literature if
18   it is accepted by medical journals.
19           You have to realize that there is a
20   bias in the medical literature against negative
21   studies, which is, you know, it not due to
22   anything that we did or did not do.  It's just,
23   you know, the nature of research publications.
24           So we were, when we were talking
25   about publishing, what we were talking about was

115

Atul Pande, M.D.

1
2    disclosing all information that might be
3    generated, whether we did a single exploratory
4    study, or we did a full program to see
5    registration with any regulatory agency.
6        Q    Am I correct that pursuing a
7    publication -- there is a distinction between
8    pursuing a publication strategy for Neurontin, and
9    pursuing a regulatory submission for Neurontin?
10       A    The only difference between the two
11   would have been the number of studies that might
12   be conducted, as I think we covered in other
13   documents previously.
14           For regulatory submission, you need
15   more than one study.  You need a program of
16   studies that satisfy the regulatory requirements.
17       Q    But did the publication strategy for
18   Neurontin call for the dissemination of the study
19   results in the world's medical literature without
20   submitting the studies for approval?
21       A    They -- the idea of disseminating the
22   information was integral to both whether we
23   pursued just the exploratory program or we did an
24   entire registration program.  So the idea that
25   publication was an objective of only one of the

116

Atul Pande, M.D.

1
2    approach, I don't agree with.
3        Q    I don't think I suggested that.
4        Publication strategy didn't call for
5    speaking FDA approval, did it?
6        MS. MC GRODER:  Object to form.
7        A    The, the way, the way it appears to
8    be described here, I would have to agree with you.
9        Q    Well, you wrote the document, didn't
10   you?
11       A    Yeah.
12       Q    Isn't that what you meant, Doctor,
13   when you wrote it?
14       MS. MC GRODER:  Object to form.
15       A    I wrote this document.
16       MS. MC GRODER:  You have to give me
17   time to object.  Go ahead.
18       A    I wrote this document 13 years ago.
19       Q    What do you mean by that, do you want
20   to disown it today?
21       A    No, I don't.
22       MS. MC GRODER:  Object to the form of
23   that.  It's argumentative and inappropriate.
24       A    You are asking me to speak to the
25   intent.

117

Atul Pande, M.D.

1
2    Q    All right.
3    A    That was many years ago.
4        Q    We will come to some other documents.
5        Are you having trouble determining
6    what your intent was when you prepared this
7    document?
8        A    No, I'm not.
9        MS. MC GRODER:  Object to the form of
10   that question.  It's argumentative.
11   Q    Are you?
12   A    No, I'm not.
13       Q    I mean, didn't you write that the
14   publication strategy calling for the publication
15   and dissemination of Neurontin studies in the
16   world literature could be accomplished very
17   effectively by spreading the studies over several
18   different countries?
19       MS. MC GRODER:  Object to form.
20   Misstates the documents and the doctor's
21   testimony.
22   Q    Can you answer my question?
23       MS. MC GRODER:  Same objection.
24       A    That's what the words say, yes.
25       Q    That was the intent of your message

118

Atul Pande, M.D.

1
2      in this memo, wasn't it?
3              MS. MC GRODER:  Object to form.
4      A    I don't think the document speaks to
5      intent.
6      Q    Okay.
7          You had said that I think you abided
8      by the principle, I think is the word you used.
9      A    Yes.
10     Q    When you worked at Parke-Davis, you
11     personally, to publish all studies results whether
12     positive or negative?
13     A    Yeah.
14     Q    Is that your sworn testimony?
15     A    Yes, it is.
16     Q    And you considered that important to
17     do, don't you?
18     A    I absolutely do.
19     Q    And you did, when you worked at
20     Parke-Davis; correct?
21     A    Yes.
22     Q    And think it's important, and you
23     thought it was important for Parke-Davis to get
24     the word out about Neurontin study results,
25     whether it was positive or negative?

119

Atul Pande, M.D.

1
2      A    That is correct.
3      Q    Isn't that right?  That's because
4      physicians have to know the study results?
5      A    That is correct.
6      Q    And you wanted them to know whether
7      it was effective or not effective, Neurontin was
8      effective or not effective in treating various
9      indications, isn't that right?
10     A    Yes.
11             MS. MC GRODER:  Object, form.
12         You have to give me time to object.
13     Just pause before you give your answer.
14             THE WITNESS:  Okay.
15     Q    And would you believe that if a
16     Neurontin study result was negative, and it was
17     suppressed, that that would be misleading
18     physicians?
19             MS. MC GRODER:  Object to form.
20     A    Well, it would certainly be
21     concealing information that could be germane to
22     their decision.
23     Q    If a Neurontin study result was
24     negative and suppressed, it would be dishonest to
25     do, wouldn't it?

120

Atul Pande, M.D.

1
2              MS. MC GRODER:  Object to form and
3      foundation, and it's an improper
4      hypothetical that assumes facts not in
5      evidence.
6      A    Well, it's certainly not consistent
7      with the standard of scientific conduct.
8      Q    It would be deceptive conduct to
9      suppress a negative Neurontin study, wouldn't it?
10             MS. MAC GRODOR:  Object to form and
11     foundation, improper foundation and
12     hypothetical and assumes facts not in
13     evidence.
14         Calls for speculation.
15     A    I don't know how you are defining
16     deceptive here, because studies don't get
17     published for all sort of reasons.
18     Q    Do you know what "deceptive" means?
19             MS. MC GRODER:  Go ahead.
20     Q    Had you finished your answer?
21     A    No, I hadn't.
22     Q    Go ahead and finish your answer.
23     A    Studies are sometimes not published
24     because journals just won't accept them for
25     publication, so I don't know if you are sort of

121

Atul Pande, M.D.

1
2      generalizing to whether any study that doesn't get
3      published is necessarily their deceptive intent.
4          But I do believe that all information
5      on marketed drugs that comes from controlled
6      studies should be revealed to people who are going
7      to be making the judgment about using these drugs.
8      Q    Were you aware of any Neurontin
9      studies that were negative and not published
10     during any time during your tenure at Parke-Davis
11     or at Pfizer?
12     A    None they ever worked on, but I,
13     again, whether there were or were not, I can't
14     speak to it.
15     Q    I didn't, I wasn't qualifying the
16     question to ones that you worked on, so my
17     question again is during the period of time that
18     you were employed at Parke-Davis and at Pfizer,
19     were you ever aware of a negative Neurontin
20     clinical trial that was not published?
21             MS. MC GRODER:  Objection, asked and
22     answered.  He just answered that very same
23     question.
24         You can answer it the same way.
25     A    Yeah, again, I mean, I am telling you

122

Atul Pande, M.D.

1
2    that the only studies that I would have known
3    about, whether they were published or not, are the
4    ones that I worked on.  There were other studies
5    being done by other people in the group they might
6    not have known about.
7        Q    You are just not aware of those?
8        A    Yes.
9        Q    Were you aware of the POPP study?
10       A    I'm sorry?
11       Q    POPP study referred to as the POPP
12   study, P-O-P-P?
13       A    I don't --
14       Q    Conducted in Scandinavia.
15       A    I don't recall that study.
16       Q    Negative, never published?
17           MS. MC GRODER:  Object to form and
18   foundation.  Calls for speculation, it's
19   argumentative, it's an improper hypothetical
20   and it assumes facts not in evidence.
21           MR. GREENE:  Don't know where you
22   have been, ma'am, but the evidence has been
23   in a half a dozen depositions.  Maybe you
24   ought to go read them.
25           MS. MC GRODER:  There is no reason

123

Atul Pande, M.D.

1
2    for you to scream at this deposition, Mr.
3    Greene, and I resent it.  Try to be
4    professional and keep your tone in a normal
5    voice.  Are you withdrawing the question?  I
6    assume you are.
7            MR. GREENE:  You are providing good
8    comic relief this morning.
9            MR. GUNTER:  As you are, too.
10   Unfortunately, it's very unprofessional of
11   you, Mr. Greene.
12           (Pande Exhibit Number 8 marked for
13   identification as of this date.)
14       Q    I show you what we marked as Exhibit
15   8.  Have you had a chance to read it?
16       A    Very quickly, yes.
17       Q    Can you identify what it is?
18       A    It appears to be a document
19   summarizing the minutes from a Neurontin
20   development team meeting on March 14th, 1995.
21       Q    Well, it's entitled on the subject
22   line, "Minutes, March 14, '95, Neurontin
23   development team meeting."
24           Correct?
25       A    Are these the minutes from that

124

Atul Pande, M.D.

1
2    meeting?  I have no reason to believe they are
3    not.
4        Q    You are listed as present in Ann
5    Arbor on that date for that meeting.
6        A    Yes.
7        Q    And you have had a chance to review
8    it.
9        A    Yes.
10       Q    Let me direct your attention to
11   Bates, the last two digits, 72.
12           Do you see paragraph two, clinical
13   plan/marketing input?
14       A    Correct.
15       Q    And in clinical plans, again, that is
16   information that you would provide, correct?
17       A    For the psychiatric.
18       Q    For Neurontin's use in psychiatric
19   indications?
20       A    Yes.
21       Q    And do you see the -- well, why don't
22   you read that paragraph and read the first
23   sentence, please?
24       A    "Based on the preclinical data
25   described above, anxiety disorders are an

125

Atul Pande, M.D.

1
2    attractive area to study."
3        Q    Was that your opinion at this
4    meeting?
5        A    Yes.
6        Q    And why were the anxiety disorders an
7    attractive area to study?
8        A    Well, it says based on the
9    preclinical data above.
10       Q    All right.
11       A    Which I believe --
12       Q    Without reviewing it, and you can if
13   you want, but do you know why it would be an
14   attractive area.
15       A    Well, the data that are referred to
16   on the previous page were the preclinical data
17   described by Tom Hefner, recorded in the section,
18   the bottom of the page, the previous page.
19       Q    Okay.
20       A    And that suggests that gabapentin may
21   have activity in the anxiety disorders.
22       Q    Okay.
23       A    So attractive in this instance more
24   than likely means that it's likely to have a
25   beneficial effect.

126

1          Atul Pande, M.D.
2      Q    All right.  Then the next sentence
3  refers to, "Generalized disorder in social phobia
4  should be considered highest among anxiety
5  disorders for a clinical program."
6          Is that correct?
7      A    Yes.
8      Q    Why would that be?
9      A    The preclinical tests that are
10 referred to in the previous page are generally
11 believed to be predictive of beneficial effects in
12 generalized anxiety disorder, which is what is
13 being referred to here, and you know, that is -- I
14 think it's a, it's a typographical error that
15 generalized anxiety disorder is represented as
16 generalized disorder.  I think in all likelihood
17 it means generally.
18     Q    The next sentence, "There are limited
19 preclinical data to support work in mood
20 disorders."
21     A    Yes.
22     Q    That would include bipolar?
23     A    Yes.
24     Q    And why was that?  What, what does
25 that statement mean?

127

1          Atul Pande, M.D.
2      A    What that means is that there were no
3  animal studies which would have suggested that
4  Neurontin might work in mood disorders, and what
5  the reference here is not to the fact that there
6  were preclinical studies suggesting it wouldn't
7  work, but that the data just didn't exist.
8      Q    Preclinical studies, does that phrase
9  generally refer to the studies that go on on
10 animals before they test humans?
11     A    That is generally correct, yes.
12     Q    Would you read the next sentence in
13 the letter into the record that starts with A.
14 Pande?
15     A    "A. Pande felt if we consider patent
16 and exclusivity situations, bipolar disorder may
17 not be a good area to work on (five to six years
18 to complete frame)."
19     Q    Okay.  Is that an opinion you
20 expressed at the meeting?
21     A    Yes.
22     Q    And can you briefly explain what you
23 meant?
24     A    What I meant by this is I think this
25 sentence has to be taken in concert with the

128

1          Atul Pande, M.D.
2  previous one, that the likelihood of being
3  successful in bipolar disorder was not as high as
4  for the anxiety disorder because of the lack of
5  any preclinical data, and that even if we did
6  undertake studies, that it would be a lengthy and
7  possibly expensive program.
8      Q    Because you would have to do the
9  preclinical studies before you started to do your
10 phase one, phase two --
11     A    That is generally the case, right.
12     Q    -- phase three trials.
13         And I will read the next sentence,
14 "He also indicated the study is hard to conduct
15 and will be expensive."
16         Is that an opinion you expressed at
17 this meeting?
18     A    Yes.
19     Q    Why would Neurontin study of bipolar
20 disorder, Neurontin use for bipolar disorder be
21 hard to conduct?
22         MS. MC GRODER:  Object to form.
23     A    Well, at the time --
24     Q    Well, let me strike that.
25         Is that the study that you meant that

129

1          Atul Pande, M.D.
2  would be hard to conduct, the bipolar study?
3      A    Yes.
4      Q    And why would the bipolar study be
5  hard to conduct?
6      A    Because at the time, when this
7  discussion was going on, the recommendation or the
8  proposal on the table that was being discussed was
9  to do a study in acute mania.  Those studies can
10 only be done in people who are hospitalized for
11 the treatment of acute mania.  They are not
12 generally done on outpatients, and doing any
13 inpatient study pushes up the cost of the study
14 for one thing, because there is hospitalization
15 costs and so forth that are involved, plus the
16 fact that these people who are suffering from
17 acute mania require a considerable amount of
18 hospital management that makes many patients
19 ineligible to go into the study.
20         So recruitment takes longer, and so
21 that, those are the kind of things that are being
22 referred to in the difficult to do phrase here.
23     Q    So, it would be hard to conduct, and
24 it would be expensive?
25     A    Yes.

130

1          Atul Pande, M.D.
2      Q    All right.  Now, read the next
3  sentence.
4      A    "A. Pande pointed out that a
5  publication study will be less expensive and focus
6  on what management organization and clinician want
7  to know."
8      Q    And that publication study that you,
9  what did you mean by that sentence, Doctor, why
10  don't you tell us?
11      A    What, what I meant by this is that if
12  we didn't do an entire program of studies in
13  bipolar disorder, we can still do the exploratory
14  phase of development and at least be able to get
15  the answers that, that different people were
16  asking for, people within the company, and people
17  outside the company.
18          And of course, as I said previously,
19  the underlying principle was that we would publish
20  whatever work we did.
21      Q    You are referring to doing a single
22  study and publishing the results?
23      A    That is correct.
24      Q    For bipolar use, for Neurontin use in
25  treating bipolar?

131

1          Atul Pande, M.D.
2      A    To understand whether Neurontin
3  worked in bipolar disorder or not.
4      Q    And Janice Turner wanted to do a
5  number of clinical studies and get FDA approval
6  for Neurontin's use in treating bipolar?
7          MS. MC GRODER:  Object to form and
8      foundation, assumes facts not in evidence.
9      A    Well, what the sentence says is that
10  Janet Turner expressed an interest in pursuing
11  clinical studies.
12      Q    Why don't you read the sentence.
13      A    "J. Turner expressed interest in
14  pursuing clinical studies for the regulatory
15  purpose instead of publication."
16      Q    Okay.  Was there some disagreement
17  or -- strike that.
18          Was there some discussion on whether,
19  amongst the team members at this meeting, whether
20  a publication strategy versus a regulatory filing
21  strategy should be pursued for the study of
22  Neurontin in treating bipolar?
23          MS. MC GRODER:  Object to form.
24      A    Again, I don't have a recollection of
25  what that discussion was, but certainly these

132

1          Atul Pande, M.D.
2  minutes seem to reflect that there probably was.
3      Q    Okay.  And did Jan Turner express the
4  opinion that she wanted to conduct the requisite
5  number of studies of Neurontin in treating bipolar
6  and seek regulatory approval?
7          MS. MC GRODER:  Object to form, and
8      foundation.  Calls for speculation.
9      A    Yes.  Again, I don't specifically
10  recall, but, but what I can, what I can say is
11  that, that Jan Turner worked in regulatory
12  affairs, and certainly it would not be surprising
13  for her to be rendering opinion that a regulatory
14  program should be done.
15      Q    Okay.
16      A    So, but, as to what the discussion
17  was, I have no recollection of that.
18      Q    Let me ask you this:  At this
19  meeting, are you a proponent of conducting only a
20  single study and publishing the results and not
21  seeking FDA approval for Neurontin's use in
22  treating bipolar?
23          MS. MC GRODER:  Object to form.
24      A    I was a proponent of doing studies to
25  understand the effect of Neurontin in psychiatric

133

1          Atul Pande, M.D.
2  disorders.  The decision whether or not to seek
3  regulatory approval would not have been made by
4  me, it would have been made collectively by the
5  team and by the company's management.
6      Q    Just drop down a few paragraphs
7  there.
8          Do you see the sentence, "The team
9  discussed whether clinical studies should focus on
10  a publication strategy or a regulatory program"?
11      A    I see that, yes.
12      Q    And again, a publication strategy,
13  that would not involve seeking FDA approval, would
14  it?
15          MS. MC GRODER:  Object to form.
16      Misstates his testimony.
17      A    Well, publication would be involved
18  in either case.
19      Q    I'm asking about the use of
20  publication strategy in this sentence.
21      A    Yes.
22      Q    The publication strategy referred to
23  in this sentence wouldn't require or call for
24  getting FDA approval, would it?
25          MS. MC GRODER:  Object to form and

134

Atul Pande, M.D.

1
2       foundation, and misstates his testimony.
3           A    Again, I mean, I don't really recall
4       all of the discussion.  But in either case, the
5       studies would have been published, the difference
6       being that in one case there would have been a
7       full program of multiple studies that would have
8       achieved the regulatory indication, that is the
9       difference between those two options.
10          Q    And I think your testimony is this is
11      a decision that you ultimately didn't make,
12      correct?
13          A    Correct.
14          Q    Do you know who did make it?
15              MS. MC GRODER:  Objection, maybe you
16          guys are on the same page, I'm not.  What do
17          you mean, "it"?
18          A    Which decision are you referring to?
19          Q    The decision of a publication
20      strategy or a regulatory program for Neurontin's
21      use in treating bipolar, was a decision ultimately
22      made on which avenue would be pursued?
23              MS. MC GRODER:  Object to form.
24          A    Well, there would have been several
25      parts to the decision.  The first would have been

135

Atul Pande, M.D.

1
2       what kind of development program to pursue, which
3       would have been a decision that was ultimately
4       made by the, what was called the new products
5       committee that I think has been referred to in one
6       of the previous documents.
7           Q    It's right in the next paragraph.  It
8       is an action item.  Isn't where the decision was
9       going to ultimately be made at the new product
10      committee level and meeting in April?
11          A    Correct.
12              MS. MC GRODER:  Object to form and
13          foundation.
14          Q    Read the action item for the record.
15              MS. MC GRODER:  Please do not be
16          belligerent with my witness.  You could
17          state that same question in a professional
18          manner.
19          Q    Go ahead.
20          A    "Action, teleconference between
21      marketing planning, marketing clinical research
22      and drug development should be held before the
23      April NPC meeting" -- NPC being the New Products
24      Committee -- "to reach a final consensus."
25          Q    Did you ever attend any of those new

136

Atul Pande, M.D.

1
2       product committee meetings?
3           A    Occasionally if there was an agenda
4       item that referred to a project that I was working
5       on.
6           Q    Do you know Mr. Pieroni is or
7       was? J.P. Pieroni.
8           A    I recall the name.  I don't really
9       remember who he was.
10          Q    He worked at Parke-Davis.
11          A    Yes, I believe he did.
12          Q    In marketing planning?
13          A    It's possible.  Yes.
14          Q    Let me show you, maybe this will help
15      out.
16              (Pande Exhibit Number 9 marked for
17          identification as of this date.)
18              MS. MC GRODER:  Is this 9?
19              MR. GREENE:  Yes, I think it is.
20          A    A couple of questions.
21          A    Sure.
22          Q    Do you know who Mr. J.P. Pieroni is?
23              MS. MC GRODER:  Objection, asked and
24          answered.
25          A    As I said, the name sounds familiar.

137

Atul Pande, M.D.

1
2       I believe he worked at Parke-Davis.  Exactly what
3       his role was, I wouldn't have any way of telling
4       you.
5           Q    I wonder, after reviewing Exhibit 9,
6       if it refreshes your memory.
7           A    I don't believe I have ever seen this
8       document.
9           Q    I didn't ask you if you saw the
10      document.  I just asked you if after reviewing it
11      did it refresh your memory as to who J.P. Pieroni
12      was.
13              MS. MC GRODER:  Object to form.
14          A    It does not.
15          Q    Do you know what Meta Planning is?
16          A    I have no idea.
17      Do you know what a marketing assessment is?
18              MS. MC GRODER:  Objection.  Asked and
19          answered.
20          A    I believe marketing assessment is the
21      evaluation of the marketing potential of an
22      approved product.
23          Q    When you say the -- I think you said
24      the marketing potential --
25          A    Yeah.

138

Atul Pande, M.D.

1
2     Q     -- of the approved product?
3     A     Yeah.
4     Q     What do you mean by that, "the
5  marketing potential of approved product"?
6        MS. MC GRODER: Objection. No
7        foundation.
8     A     I'm not an expert in marketing, so I
9  can only tell you more or less in an informed --
10    Q     That's fine.
11    A     -- layman's perspective, but what
12  market potential refers to in the industry
13  typically is a complex of the epidemiology of the
14  disease, how many patients there are, what kinds
15  of treatments are available out there, and out of
16  all of those people who are being treated for the
17  disease, what is the likely proportion of people
18  who might take a given product, and so that would
19  be the assessment of market potential.
20    Q     Okay. So, it, market potential,
21  would it mean what percentage or portion of the
22  market could be captured?
23       MS. MC GRODER: Objection. No
24       foundation, and asked and answered. He just
25       told you what it means to him.

139

Atul Pande, M.D.

1
2     Q     Can you answer my question?
3     A     Yeah.
4        Again, I have to disavow any
5  expertise in the marketing area, but it could mean
6  that.
7     Q     How about a prelaunch marketing plan,
8  do you know what that is?
9        MS. MC GRODER: Objection, no
10       foundation.
11    A     Yeah. Again, I would be stepping out
12  of my -- my area of skill and expertise to try and
13  tell you what a premarketing or a prelaunch
14  marketing plan is.
15    Q     Based on your experience at Parke
16  Davis, had you ever heard of a prelaunch marketing
17  plan for Neurontin?
18       MS. MC GRODER: Objection to form and
19       foundation, also to the extent your
20       questions are, based on the use of this
21       document he has never seen --
22    Q     Go ahead.
23       MS. MC GRODER: -- there is no
24       foundation.
25    A     I had heard of a plan, yes.

140

Atul Pande, M.D.

1
2     Q     The prelaunch marketing plan?
3     A     Yes.
4     Q     Had you ever seen it?
5     A     No.
6     Q     When did you hear of it?
7     A     I probably heard of it in one of the
8  team meetings, but there would have been really no
9  reason for me to see the plan or to have any, any
10  deep discussions on it, because that wasn't where
11  I was skilled and expert, so --
12    Q     Would you have provided any
13  information that would have been incorporated in
14  the prelaunch marketing plan for Neurontin?
15       MS. MC GRODER: Objection to form and
16       foundation. Calls for speculation.
17    A     That would generally only be in the
18  case of indications that were approved that --
19  that we would be asked to provide information from
20  the clinical department.
21    Q     Okay. Is it your testimony --
22    A     I don't have a specific recollection
23  of doing so.
24    Q     Do you know who would have prepared
25  the prelaunch marketing plan for Neurontin?

141

Atul Pande, M.D.

1
2        MS. MC GRODER: Objection to form and
3        foundation. Calls for speculation.
4     A     I don't know.
5     Q     Well, the date of this memo is
6  April 5th, 1995, and Neurontin had been approved
7  in December of 1993. That was the only approved
8  use as of that date.
9        So, do you know what pre-launch
10  marketing plan was being referred to?
11    A     What was the approved -- you said
12  what was the only approved use?
13    Q     As of December 3rd -- excuse me, as
14  of December 1993, for epilepsy adjunctive --
15    A     Correct.
16    Q     -- treatment for epilepsy.
17    A     Correct.
18    Q     What prelaunch marketing plan is
19  being referred to in this memo, do you know?
20       MS. MC GRODER: Objection to form and
21       foundation. Calls for speculation.
22    A     I have no way of knowing.
23    Q     Did you ever see the marketing needs
24  document for Neurontin?
25    A     I don't believe I did.  Yeah.

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

142

Atul Pande, M.D.
1
2     Q     Do you see the next paragraph down,
3   it says support programs?
4     A     Yes.
5     Q     Do you know what that means?
6         MS. MC GRODER:  Objection to form and
7   foundation.
8     A     I don't know.
9     Q     Pardon me?
10    A     I don't know.
11    Q     There seems to be -- do you see the
12  first sentence there seems to be general agreement
13  in the area of symposia.  What is symposia?
14        MS. MC GRODER:  Object to form and
15  foundation.  There is no foundation for use
16  of this document with this witness.
17        MR. GREENE:  Do you want to just have
18  a standing objection to every question I
19  ask?
20        MS. MC GRODER:  No.  I just prefer to
21  make them where they are appropriate as I
22  have been.
23        Thanks, though.
24    A     Symposia, in general, would be
25  referring to continuing medical education

143

Atul Pande, M.D.
1
2   programs.
3     Q     Would you consider symposia a support
4   program?
5     A     I don't know what support program
6   means in this context.
7     Q     How about the next sentence with
8   respect to core programs, there is still some
9   debate about selection of agencies and specific
10  content of programs.
11        Do you know what "core programs" is
12  referring to in that sentence?
13        MS. MC GRODER:  Objection.  No
14  foundation.
15    A     I have no idea.
16    Q     "Selection of agencies," do you know
17  what that is referring to?
18        MS. MC GRODER:  Objection.  No
19  foundation.
20        We about ready for a break, but I
21  know we are going on the lunch hour.  I --
22        MR. GREENE:  I suggest we go to one,
23  if you can, before we break for lunch.  If
24  you want to break now, how long have we been
25  going?

144

Atul Pande, M.D.
1
2         MS. MC GRODER:  An hour and 15
3   minutes.
4         THE VIDEOGRAPHER:  An hour and six
5   minutes on the record for this tape, and
6   2:28 total for this deposition.
7         (Discussion held off the record.)
8         MR. GREENE:  If you want to break
9   now, we can take a short break and try to go
10  to one.
11        MS. NUSSBAUM:  I would like to make a
12  request on the record before we take a
13  break, and that is we would request the
14  consulting agreement and any e-mails or
15  other documents or correspondence between
16  Pfizer and Dr. Pande for our examination,
17  which is going to occur after Mr. Greene's
18  examination.  We believe that those
19  documents are covered by prior requests that
20  have been served in this case.  The
21  documents have not been produced, and if
22  they are not produced so that we can have
23  them in time to review them and conduct our
24  examination, we are going to be forced to
25  have Dr. Pande return for continued

145

Atul Pande, M.D.
1
2   examination.
3         MS. MC GRODER:  Well, I understand
4   your request and I take it under advisement.
5         If you can identify the request for
6   production for which the consulting
7   agreement with a former company employee of
8   Pfizer and Parke Davis would fall, then I
9   will do what I can.  Right now, I can't
10  think of a single request pursuant to which
11  those documents you would be entitled.
12        So, and there was no subpoena for
13  this deposition or subpoena duces tecum.
14  So.
15        I don't think right now we have only
16  any obligation to produce that to you before
17  your examination.
18        MR. LONDON:  May I join?
19        MS. NUSSBAUM:  We will go through the
20  requests and, if necessary, I guess we will
21  subpoena Dr. Pande this afternoon for him to
22  produce the documents tomorrow.
23        Clearly, they are all electronic,
24  they are available to you.  Certainly
25  e-mails that Dr. Pande testified that he had

146

```
1           Atul Pande, M.D.
2   with people from Pfizer are electronic.  I
3   suspect that there are other e-mails as I
4   will go into in my examination.
5           MS. MC GRODER:  That is your --
6           MS. NUSSBAUM:  As well, I would
7   suspect that the consulting agreement is
8   available electronically as well.  We have
9   counsel from Pfizer and Shook Hardy here.
10          As we all know, the discovery cut off
11  is approaching here and we want to be able
12  to fully examine Dr. Pande.
13          I'm asking you, during the lunch
14  break, to consider this.  Alternatively,
15  we'll have a subpoena prepared and subpoena
16  him this afternoon for those documents.  We
17  need those documents so we can take a full
18  examination, otherwise, we'll go to court
19  and ask for his deposition to be continued.
20          MS. MC GRODER:  There was a lot of
21  suspicion in your request.  I'm not sure any
22  of it is accurate.
23          If you can identify, as I said, the
24  request under which these documents would
25  fall, showing you have some entitlement to
```

147

```
1           Atul Pande, M.D.
2   them or we have an obligation to produce
3   them.
4           MR. LONDON:  May I join in the
5   request?  If believe it would be disclosable
6   pursuant to Rule 26.1 disclosures.
7           MR. GREENE:  It does.
8           MS. MC GRODER:  I disagree with that,
9   respectfully.
10  A    If you can --
11          MR. LONDON:  It's Rule 26.1.  That is
12  my position.
13          MS. MC GRODER:  I disagree with that.
14          If you have a particular request for
15  production in mind, show it to me, okay?
16          Let's take a break.
17          VIDEOGRAPHER:  The time is 11:47.
18          This ends tape two of the videotape
19  deposition of Atul Pande.
20          We are off the record.
21          (Recess taken.)
22          (Pande Exhibit Number 10 marked for
23  identification as of this date.)
24          THE VIDEOGRAPHER:  The time is 12:06.
25          This begins tape three of the
```

148

```
1           Atul Pande, M.D.
2   videotape deposition of Atul Pande.
3           We are on the record.
4   BY MR. GREENE:
5   Q    Doctor, a moment ago I handed you
6   Exhibit 10.
7           Will you take a look at it and see if
8   you can identify what it is first.
9   A    It's a document that is titled
10  Neurontin Marketing Assessment in Psychiatric
11  Disorders, May 19th, 1995.
12  Q    Did you, in the sessions that you had
13  with the Shook Hardy attorneys and the Pfizer
14  attorney, or the sessions that you had with the
15  Shook Hardy attorneys, did you review a copy of
16  this document?
17          MS. MC GRODER:  Objection.  That
18  calls for attorney work product and you
19  don't need to answer that question.
20          MR. GREENE:  What work product?
21          MS. MC GRODER:  The selection of
22  documents to show to the witness is attorney
23  work product.
24          MR. GREENE:  You don't represent him.
25          MS. MC GRODER:  Well, despite his
```

149

```
1           Atul Pande, M.D.
2   testimony that we don't represent him, in
3   fact, for purposes of this deposition, he is
4   represented and any preparation he had with
5   attorneys for Pfizer to prepare for this
6   deposition are privileged.
7           MR. GREENE:  You testified a moment
8   ago that you are not representing him.
9           MS. MC GRODER:  You asked him for a
10  legal conclusion about whether he's
11  represented.  I don't think he understands
12  that.
13          MR. GREENE:  Has he retained you?
14          MS. MC GRODER:  Well, for purposes of
15  this deposition, he is represented by us,
16  and our communications leading up to this
17  deposition are privileged and your request
18  for documents shown to him invade the
19  attorney work product privilege.
20          MR. GREENE:  When did he retain you?
21          MS. MC GRODER:  I'm not under
22  deposition here.
23          MR. GREENE:  He asked you to
24  represent him?
25          MS. MC GRODER:  I'm not under
```

150

```
1           Atul Pande, M.D.
2    deposition.  I'm not going to answer your
3    questions.  I'm telling you.
4           MR. GREENE:  Has he given you a
5    retainer?
6           When did you, when did you first
7    represent him?
8           MS. MC GRODER:  I'm not answering
9    your questions.  I'm telling you that my
10   communications with him for preparation of
11   this deposition in a context of his
12   employment at Parke-Davis and Pfizer, which
13   are the questions that you are asking him
14   about, are privileged communications and so
15   are the documents to which he, that we
16   selected for his preparation, they are
17   subject to the work product doctrine.
18      Q    When was the last time you saw this
19   document we marked as Exhibit 10?
20      A    It was probably many, many years ago.
21      Q    Okay.  Have you seen a copy of what's
22   been marked as Exhibit 10 in recent months?
23      A    I have not.
24      Q    Okay.  Do you recall receiving a copy
25   of this document in May of 1995?
```

151

```
1           Atul Pande, M.D.
2    A   Do I recall receiving this?
3    Q   Yes.
4    A   I do not.
5    Q   Have you had a chance to look at the
6    document?
7    A   I'm just leafing through it.
8    Q   Let me direct your attention to the
9    second page of the document.
10   A   Okay.
11   Q   That's a memo from Oliver
12   Brandicourt; is that correct?
13   A   That is correct.
14   Q   You identified him earlier?
15   A   Yes.
16   Q   He works in product planning in
17   Morris Plains?
18   A   Yes.
19   Q   In May of 1995?
20   A   Yes.
21   Q   Is that correct?
22          MR. GUNTER:  What page are you on?
23   Here we go.
24          MR. GREENE:  The second page.
25   Q   The memo, the document is distributed
```

152

```
1           Atul Pande, M.D.
2    to a list of individuals; is that correct?
3    A   That's correct.
4    Q   It says, "To:  Distribution."
5    A   Yes.
6    Q   Will you turn to the distribution
7    list?
8           Do you have that?
9    A   Yes.
10   Q   Okay.  And for our record, the last
11   two digits of the Bates is 24, is that what you
12   have?
13   A   Yes.
14   Q   The distribution list is identified
15   there.
16   A   That is correct.
17   Q   One group of individuals in the
18   left-hand corner of that square are on the new
19   product committee; is that correct?
20   A   That's correct.
21   Q   And then it was also distributed to
22   marketing council members?
23   A   That's correct.
24   Q   And development team members?
25   A   Yes.
```

153

```
1           Atul Pande, M.D.
2    Q   And then it was cc'd to you, correct?
3    A   Yes.
4    Q   Let me turn you back to the, or ask
5    if you would turn back to the second page of the
6    document.
7           The memo states, "Enclosed is the
8    final version of the marketing assessment for
9    Neurontin in psychiatric indications.  The New
10   Products Committee decisions have been
11   incorporated, i.e. an exploratory study in bipolar
12   disorder and a phase two study in social phobia
13   and panic disorder."
14          Correct?  Is that what it says?
15          MS. MC GRODER:  I object to the use
16   of this document with this witness.  You
17   have not laid a foundation.
18   Q   Is that what it states?
19          MS. MC GRODER:  Same objection.
20   A   Yes.
21   Q   Okay.  And you received a copy of the
22   document; correct?
23   A   That's what it shows on the
24   distribution list.
25   Q   You just don't have a memory of
```

154

1              Atul Pande, M.D.
2    having received it?
3         A    I do not.
4         Q    You identified who Oliver Brandicourt
5    was.
6         A    Yes.
7         Q    Mark Pierce, who was he again?
8              MS. MC GRODER:  Objection, asked and
9    answered.
10        A    Mark Pierce was a vice president in
11   the clinical research department at Parke-Davis.
12        Q    Did he work with you?
13        A    He was my boss, yes.
14        Q    He was your boss.
15             And the second paragraph says, "The
16   results, if positive, will be publicized in
17   medical congresses and published in peer-reviewed
18   journals, but there is no intention to fully
19   develop these indications at this point."
20             Is that what it says?
21             MS. MC GRODER:  Object to form and
22   foundation.
23        A    That's what the memo says.
24        Q    And you understood what that meant
25   when you received this?

155

1              Atul Pande, M.D.
2              MS. MC GRODER:  Objection to form and
3    foundation.
4         A    Yeah, I took it to mean what it says.
5         Q    That the results of the exploratory
6    study in bipolar and a phase two study in social
7    phobia and panic disorder, if they were positive,
8    would be publicized in medical congresses and
9    published in peer-reviewed journals but there is
10   no intention to fully develop these indications at
11   this point?
12             MS. MC GRODER:  Objection, no
13   foundation.
14        Q    Is that right?
15        A    That is what it does say, yes.
16        Q    Okay.  And you understood that that
17   was the final decision of the new product
18   committee as of May 1995?
19             MS. MC GRODER:  Objection, no
20   foundation.
21        A    From this memo, that appears to be
22   true.
23        Q    Well, did you object to that
24   recommendation?
25             MS. MC GRODER:  Objection, no

156

1              Atul Pande, M.D.
2    foundation.
3         A    I don't, I don't recall specifically
4    objecting to it.  No.
5         Q    Did you send an e-mail or
6    correspondence or a memo saying that you objected
7    to this decision?
8              MS. MC GRODER:  Objection, no
9    foundation.
10        A    I have, I have no recall of that.
11        Q    Did you talk to Oliver Brandicourt
12   and tell him that you objected to the new product
13   committee decisions that are set forth on the
14   second page of this exhibit?
15             MS. MC GRODER:  Objection, no
16   foundation.
17        A    Oliver and I had many discussions
18   about this decision, and I don't recall a specific
19   discussion, but the one that we talked about the
20   most was the fact they believed that the drug was
21   likely to work in anxiety disorders and that in
22   all likelihood it would have been a better option
23   to pursue a program of studies rather than just
24   single studies.
25        Q    My question --

157

1              Atul Pande, M.D.
2         A    Yeah.
3         Q    -- maybe I should repeat it.
4         A    Yeah.
5         Q    Did you talk with Oliver Brandicourt
6    and tell him that you objected to the new product
7    committee decisions that are listed on the second
8    page of this exhibit?
9         A    I don't have, I don't have recall of
10   doing so.
11        Q    Okay.
12             Let me turn to, have you turn to the
13   next page.
14             That's entitled PD Marketing
15   Planning.
16        A    Yes.
17        Q    Okay.  And that's Parke-Davis
18   marketing planning division?
19        A    Yes.
20        Q    And that's in Morris Plains?
21        A    Was, yes.
22        Q    Was, okay.
23        A    Um-hum.
24        Q    And this page indicates, do you see
25   the line, it says, prepared by and then it says

158

Atul Pande, M.D.

1  John Boris?
2  
3      A    Yes.
4      Q    Do you recognize his signature?
5      A    I see the signature line, and his
6  name typed below it.
7      Q    You don't recognize it?
8      A    I don't recognize his signature.
9      Q    Do you see approved by and Oliver
10 Brandicourt and then Joseph Pieroni?
11     A    Yes.
12     Q    Did Oliver Brandicourt tell you that
13 he didn't approve of the new product committee
14 decisions that are listed on the second page of
15 this exhibit?
16     A    I have no recollection of him doing
17 so or not doing so.
18     Q    Okay. And you have no recollection
19 of voicing any formal opposition to the new
20 product committee decisions that are outlined in
21 the sector page of this exhibit?
22     MS. MC GRODER:  Object to form and
23 foundation.
24     A    That's what I said before, I don't
25 have recollection of that.

159

Atul Pande, M.D.

1  
2      Q    Okay. Now, will you turn to the page
3  where the last two digits of the Bates are 25.
4          Do you have that?
5      A    Fifty-two, you mean -- or 25, yeah.
6      Q    Do you see that?
7      A    Um-hum.
8      Q    And this is, do you recognize this
9  portion of the document or the exhibit, and I am
10 saying this portion, the one entitled, "Marketing
11 assessment, Neurontin in psychiatric disorders."
12     A    I see what it is.
13     Q    Do you recognize it is my question?
14     A    I don't, actually.
15     Q    Did you ever see any versions, any
16 drafts of this document, back in the 1995 time
17 period, when you were working at Parke-Davis?
18     A    I probably but, you know, whether I
19 actually recall seeing it or not, I can't until.
20     Q    Well, did you, did you provide
21 information to John Boris for him to put in this
22 marketing assessment that we have marked as
23 Exhibit 10?
24     MS. MC GRODER:  Well, object to form
25 and foundation. How could he know that if

160

Atul Pande, M.D.

1  
2  he doesn't recognize the document?  This
3  looks like 100-page document.  Do you want
4  him to look at every page?
5      Q    Can you answer my question?
6      MS. MC GRODER:  Objection. Calls for
7  speculation, no foundation.
8      Q    Have you had a chance to review this
9  document?
10     A    I have not.
11     Q    Take a look at it and tell me, is
12 there any information that is in this document
13 that you provided?
14     MS. MC GRODER:  And my objection on
15 foundation grounds remains.
16     Q    Doctor, as you are going through it,
17 would it be helpful as you turn a page to just be
18 able to inform us whether this is the type of
19 information that you would have provided or the
20 type of information you would not have provided?
21 Maybe we can do it a little more quickly.
22     MS. MC GRODER:  If you want him to
23 answer questions about a document he doesn't
24 recognize, he's going to have to review the
25 document, and you can't instruct the witness

161

Atul Pande, M.D.

1  
2  to review it more quickly, Mr. Greene.  He
3  will review it at whatever pace it takes to
4  respond to your question in an appropriate
5  manner.
6      Q    Do you think my suggestion would --
7  let's try it.
8      A    Well, if I can just have a couple
9  minutes, I think I can answer your question.
10     Q    Okay, fine.
11     MS. MC GRODER:  Well, take your time,
12 Doctor, and review the document before you
13 respond to questions about it.
14     A    Yes, so looking at the -- looking at
15 the document, it seems to me that most of the
16 information that is contained in here would in all
17 likelihood have been compiled by the people in the
18 marketing group.
19         The information that would have come
20 from me would have been about the proposed studies
21 for Neurontin in bipolar disorder, panic disorder
22 and social phobia.  That would have been
23 specifically my input to this document.
24     Q    Did you assist in the preparation of
25 this document?

162

Atul Pande, M.D.

1
2    A    I would not have.  This is a --
3    Q    Did you provide any information that
4    is in this document?
5    A    I told you --
6         MS. MC GRODER:  Objection, asked and
7    answered.
8         Go ahead.
9    A    I told you that.
10   Q    Did you, though?  You said the type
11   of information you would have provided.
12        Now I am asking you:  Did you provide
13   information that is in this document?
14   A    I don't remember that I did.
15   Q    Yeah.
16   A    But it would have come from me,
17   because it's in here, it would have come from me.
18   Q    All right.  Why don't you identify
19   what would have come from you that's in there?
20   And if you start off using the Bates, the small
21   digits Bates, just the last two pages, last two
22   numbers.
23   A    So, it would be 40.
24   Q    40?
25   A    Yep.

163

Atul Pande, M.D.

1
2    Q    Let me, just give me a second so I
3    can get to that page.
4    A    So that would have been the section
5    under item number nine, Neurontin development.
6    And this is where the studies are described that,
7    that could be done.
8    Q    When you say here is where they're
9    described, what pages are you referring to?  Just
10   40?
11   A    40, yes.
12   Q    40, and just the top three lines, on
13   41.
14        So you didn't prepare the forecast?
15   A    I did not.
16   Q    On 41?
17   A    I would not have.
18   Q    Do you know who would have done that?
19   A    It would be someone in marketing.
20   Q    Okay.  Anything else in this document
21   that you would have provided?
22   A    Well --
23        MS. MC GRODER:  Objection.  Are we
24   talking about authoring it or providing the
25   information?

164

Atul Pande, M.D.

1
2    Q    Go ahead, can you answer my question?
3         MS. MC GRODER:  What is the question?
4    A    Yeah.
5         MS. MC GRODER:  Your question
6    "provided," I don't know what that means.
7    Q    There is a question on the table,
8    he's responding to it and I thought you were
9    responding by identifying information that you
10   provided that is used in this document.
11        MS. MC GRODER:  Okay.
12   A    Yes, so the next one would have been
13   on page 53?
14   Q    Okay.
15   A    Again, under item number nine, which
16   is Neurontin development?
17   Q    Okay.
18   A    And then the last one would have been
19   page 63, that would be item number eight.
20   Q    Okay.  That's it.
21   A    That's it.
22   Q    Okay.  Now, I think you testified
23   earlier, and correct me if I am wrong, but there
24   were some new product committee meetings that you
25   attended.

165

Atul Pande, M.D.

1
2    A    Yes.
3    Q    Did you attend any of the meetings
4    where members of that committee discussed
5    publication strategy for Neurontin versus a full
6    claim development for Neurontin?
7         MS. MC GRODER:  Object to form.
8    A    I don't have recall of any such
9    meeting, but you know, I couldn't say whether they
10   occurred or not.
11   Q    Okay.  Let me direct your attention
12   then to the overall conclusion recommended,
13   recommendation page, last two digits, 26.
14        Do you have that?
15   A    Yes.
16   Q    Okay.  And it states, "Overall
17   conclusions and recommendations."
18        Do you see that paragraph?
19   A    Yes.
20   Q    And it says, "After review of the
21   different market situations for bipolar disorders
22   and anxiety disorders with PD, North America
23   portfolio management and the European marketing
24   group's recommendations have been made to the New
25   Products Committee, New Products Committee,

166

1           Atul Pande, M.D.
2    April 7, 1995."
3           Correct?
4    A    Yes.
5           MS. MC GRODER:  Objection, no
6    foundation.
7    Q    "And the New Products Committee in
8    agreement with the overall recommendations made
9    the following decisions."
10          Correct?
11          MS. MC GRODER:  Objection, no
12   foundation.
13   Q    Is that what it states?
14   A    That's what it states, yes.
15   Q    And they list their decisions.  The
16   first is to start an exploratory study in acute
17   mania and highlight the results through a
18   peer-reviewed publication in psychiatric
19   congresses; correct?
20          MS. MC GRODER:  Objection, no
21   foundation.
22   A    That is what it says.
23   Q    The second recommendation and
24   decision is to start two well-designed phase two
25   trials in panic disorders and social phobia and

167

1           Atul Pande, M.D.
2    apply the same publication strategy and congress
3    activity as mentioned above; correct?
4           MS. MC GRODER:  Objection, no
5    foundation.
6    A    That is what it says, yes.
7    Q    And the third recommendation and
8    decision of the New Product Committee was "not to
9    consider any study at this stage in general
10   anxiety due to difficult U.S. or possible" --
11   what's that, European --
12   A    European community.
13   Q    -- "competitive situation versus
14   genericize benzodiazepines."
15          Correct?
16          MS. MC GRODER:  Objection, no
17   foundation.
18   A    That's what it says, yes.
19   Q    Then there is a final paragraph
20   there; is that right?
21   A    Yes.
22   Q    And the second sentence says, "The
23   use generated by the three studies in the U.S. (40
24   to 60 million a year in 1999 when patent extension
25   ends) would largely justify the investment in the

168

1           Atul Pande, M.D.
2    clinical program."
3           Is that what it says?
4           MS. MC GRODER:  Objection, no
5    foundation.
6    A    That's what the document says, yes.
7    Q    In the three studies they are
8    referring to are the exploratory study in acute
9    mania and the two well-designed phrase two trial
10   in panic disorder and social phobia; correct?
11          MS. MC GRODER:  Objection, no
12   foundation.
13   A    I believe that is correct.
14   Q    And this recommendation page closes
15   with this last sentence, "Should the actual patent
16   situation change, a full claim development
17   strategy would be considered."
18          Correct?
19          MS. MC GRODER:  Objection, no
20   foundation.
21   A    That is the concluding sentence, yes.
22   Q    All right.
23          And do you know what that sentence
24   means?
25          MS. MC GRODER:   objection, no

169

1           Atul Pande, M.D.
2    foundation.
3    A    I think it means what it says, which
4    --
5    Q    Can you explain it to me --
6           MS. MC GRODER:  Objection, no
7    foundation.
8    Q    -- a lay person?
9           MS. MC GRODER:  Objection, no
10   foundation.
11          Go ahead.
12   A    At the time that these discussions
13   were ongoing, there were other efforts underway to
14   expand the intellectual property on Neurontin, and
15   so what I believe is referred to here is that in
16   the event that any of those efforts are
17   successful, and the exclusivity period became
18   longer, that there would be consideration given to
19   a more complete program of studies.
20   Q    It also says, "A full claim
21   development strategy would be considered."
22          Right?
23   A    Yes.
24   Q    And a full claim development strategy
25   would be more expensive because you would need

170

Atul Pande, M.D.
1
2   more studies; correct?
3           MS. MC GRODER:  Objection, no
4   foundation.
5       A    More studies and definitely more
6   time.
7       Q    And at the time that these
8   recommendations were made, there was a narrow
9   window of exclusivity on Neurontin patent, wasn't
10  it?
11          MS. MC GRODER:  Objection, no
12  foundation.
13      A    As I think I already stated, the best
14  understanding at the time was that the exclusivity
15  would last until sometime in 2000.
16      Q    Yeah, that's what you have testified
17  earlier; correct?
18      A    Yes.
19      Q    That is about five years away
20  approximately from the date of this marketing
21  assessment?
22      A    That is about right, yes.
23      Q    You said the study of bipolar to do a
24  full regulatory submission would take, I think you
25  estimated in one of the earlier exhibits, five

171

Atul Pande, M.D.
1
2   years, didn't you?
3       A    Five to six years, yes.
4       Q    If the patent expired, the generic
5   manufacturers would be in the marketplace?
6           MS. MC GRODER:  Objection, no
7   foundation.
8       A    That would generally be the case.
9       Q    And when that happened, Neurontin
10  sales would go down, correct?
11          MS. MC GRODER:  Objection, no
12  foundation, calls for speculation.
13      A    I can't speculate on what would or
14  would not happen to Neurontin sales, since I am no
15  expert on marketing.
16      Q    Let's turn to the next page, "Bipolar
17  disorders situation analysis."
18          Do you see that?
19      A    Yes.
20      Q    Do you know what a situation analysis
21  is?
22      A    Situation analysis is a term that's
23  used in many different ways in the industry.  In
24  general, situation analysis is used to mean for
25  any given situation, assessment of all of the

172

Atul Pande, M.D.
1
2   parameters that apply to that situation and -- and
3   it is sort of like a snapshot of how things stand
4   at one particular point in time.
5       Q    Is that what it means in this context
6   on this page?
7           MS. MC GRODER:  Objection, no
8   foundation.
9       A    I believe that is what is intended
10  here.
11      Q    Okay.
12          And the purpose is to provide an
13  assessment of the market potential for Neurontin
14  in the treatment of the bipolar disorder, right?
15          MS. MC GRODER:  Objection, no
16  foundation.
17      A    That is what the document says, yes.
18      Q    And part of that assessment would
19  include the number of patents that would take
20  Neurontin for bipolar?
21          MS. MC GRODER:  Objection, no
22  foundation.
23      A    Well, what it would start with is the
24  number of patients with the disease that exist in,
25  in the entire population, and how many of those

173

Atul Pande, M.D.
1
2   would be potentially likely to take, take
3   Neurontin.
4       Q    Okay.
5       A    Assuming that that was prescribed for
6   their condition.
7       Q    So that was part of the assessment,
8   right?
9       A    That would be part of the assessment,
10  yes.
11      Q    And part of the assessment would also
12  determine the amount of sales based on the number
13  of patients in the population of patients that
14  have bipolar, that would take Neurontin; correct?
15          MS. MC GRODER:  Objection, no
16  foundation, to the extent you are asking him
17  questions based on a marketing document that
18  he doesn't recognize.
19      A    Yeah, I think I have said enough
20  number of times that I am not an expert in
21  marketing, so I wouldn't know all the details of
22  how these assessments are carried out.  I have
23  never done one.
24      Q    We will, I will narrow that question
25  for you.

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

174

```
1              Atul Pande, M.D.
2      A   Okay.
3      Q   Do you see the recommendation
4  paragraph?
5      A   Yes.
6      Q   Okay.  The first sentence reads, "The
7  observations of other anticonvulsants as
8  mood-stabilizing agents, along with well-noted
9  patient reports of improved mood and decreased
10  anxiety from epilepsy trials, suggest that
11  Neurontin may be effective in treatment of
12  prophylaxis of bipolar disorder."
13     A   That's what it says, yes.
14     Q   Did you write that?
15     A   I did not.
16     Q   Did you provide that information that
17  is in that sentence?
18     A   I would have provided the information
19  from the epilepsy trials because I did do an
20  analysis of those trials.
21     Q   When you say in the information from
22  the epilepsy trials, you are referring to the
23  epilepsy trials for Neurontin; correct?
24     A   That is correct.
25     Q   When you say the information from
```

175

```
1              Atul Pande, M.D.
2  those trials, you are referring to a handful of
3  patients that said they felt better or had
4  improved mood when they were on Neurontin?
5          MS. MC GRODER:  Object to the form.
6      A   This was an analysis that was carried
7  out on the entire database of epilepsy studies
8  that were available at that time, with the intent
9  of gathering information on patients who may have
10  experienced improvements in their mood and well
11  being while they were in the epilepsy trials.
12     Q   That was a post haec analysis, wasn't
13  it.  That was not a primary outcome measure that
14  was being studied in epilepsy patients; correct?
15         MS. MC GRODER:  Objection to form.
16     Q   Correct?
17         MS. MC GRODER:  Same objection.
18     A   It was a post haec analysis, yes.
19     Q   The next sentence reads, "The U.S.
20  market for bipolar disorders is an attractive
21  commercial opportunity that warrants clinical
22  development of Neurontin."
23         Did you write that sentence?
24         MS. MC GRODER:  Objection, no
25  foundation.
```

176

```
1              Atul Pande, M.D.
2          Go ahead.
3      A   I did not.
4      Q   Do you know what that means?
5          MS. MC GRODER:  Objection.  No
6  foundation, calls for speculation.
7      A   I don't.
8      Q   Attractive commercial opportunity,
9  does that mean that Parke-Davis could sell a lot
10  of Neurontin for bipolar disorder?
11         MS. MC GRODER:  Objection, no
12  foundation, calls for speculation.  He just
13  told you he doesn't know what it means.
14     A   I am not a marketing expert, so I
15  couldn't interpret that term for you.
16     Q   All right.  So, how many years did
17  you work at Parke-Davis?
18     A   Six years at Parke-Davis until they
19  were acquired by Pfizer.
20     Q   And how many years at Pfizer?
21         MS. MC GRODER:  Object to, asked and
22  answered.  I think you have now asked this,
23  this is the third time you have now asked
24  those exact same questions.
25     A   Approximately five years.
```

177

```
1              Atul Pande, M.D.
2      Q   What was the next company you worked
3  for?
4          MS. MC GRODER:  Objection, asked and
5  answered.
6      Q   What is it?
7      A   A company call Cenerx Biopharma.
8      Q   How many years did you work there?
9          MS. MC GRODER:  Objection, asked and
10  answered.
11     A   About a year.
12         MS. MC GRODER:  Wait until I object.
13     Q   The next company, how many years did
14  you work at the next drug company?
15         MS. MC GRODER:  Objection, asked and
16  answered.
17     A   I have been there about six months.
18     Q   Based on all that experience, when
19  you read this sentence that reads, "The U.S.
20  market for bipolar disorders is an attractive
21  commercial opportunity that warrants clinical
22  development of Neurontin," is it your sworn
23  testimony that you don't know what the phrase
24  "attractive commercial opportunity" means?
25         MS. MC GRODER:  Objection, that
```

178

Atul Pande, M.D.

1       Atul Pande, M.D.
2    question is misleading, argumentative, and
3    it's, there is no foundation to ask him what
4    specific words in a document he didn't
5    author and doesn't recognize what they mean.
6       Q    Go ahead.
7       A    Yes, I can only interpret for you
8    things that I wrote or didn't write.  You know, I
9    can't --
10      Q    You mean in your practice as a
11   physician, that you can only interpret what you
12   authored or what you wrote and you can't interpret
13   anything else you read?
14      MS. MC GRODER:  Objection,
15   argumentative.
16      A    If it relates to my field of
17   expertise, yes, I can interpret it.  But this does
18   not.
19      Q    The next sentence reads, "Based on
20   the current patent situation, an investment in
21   full clinical regulatory filing and approval would
22   occur close to patent expiration."
23      Is that what that sentence states?
24      MS. MC GRODER:  Objection, no
25   foundation.

179

Atul Pande, M.D.

1       Atul Pande, M.D.
2       A    That is what it does say, yes.
3       Q    Can you, do you know what that means?
4       MS. MC GRODER:  Same objection.
5       A    I believe what it's referring to is
6    that, that a program of multiple studies intended
7    for regulatory filing would complete at or about
8    the time of the patent expiration.
9       Q    Okay.  So was that a reason for not
10   pursuing full clinical -- full clinical regulatory
11   filing for Neurontin's use in treatment of bipolar
12   disorder?
13      MS. MC GRODER:  Objection to the
14   extent that question is based on the text of
15   this document, there is no foundation.
16      Go ahead.
17      Q    Go ahead.
18      A    I suspect that that was one of the
19   factors that was taken into account.
20      Q    The next sentence reads, "In
21   addition, due to the lack of scientific rationale
22   since Neurontin has a different mechanism of
23   action in the mood-stabilizing antiepileptics,
24   it's recommended to implement only an exploratory
25   study in outpatients with bipolar disorders and

180

Atul Pande, M.D.

1       Atul Pande, M.D.
2    with the results highlighted through a
3    peer-reviewed publication."
4       Is that what that study states?
5       MS. MC GRODER:  Objection, no
6    foundation.
7       A    This document states that, yes.
8       Q    Did you write that sentence?
9       A    I did not.
10      Q    Did you provide Mr. Boris with the
11   information that is in that sentence?
12      A    I don't believe I did.
13      Q    And did you know that there was a
14   lack of scientific rationale for, because
15   Neurontin had a different mechanism of the action
16   than the mood-stabilizing antiepileptics?
17      MS. MC GRODER:  Object to form and
18   foundation.
19      A    I think in my view there was a weaker
20   rationale for bipolar disorder than there was for
21   the anxiety disorders.
22      As I have said before, because there
23   was pre-clinical data supporting the, the effect
24   or the anticipation of beneficial effect in
25   anxiety disorders, that was considered to be a

181

Atul Pande, M.D.

1       Atul Pande, M.D.
2    greater likelihood opportunity as compared to
3    bipolar disorder where there was no preclinical
4    data.
5       Q    Doctor, this sentence is not talking
6    about preclinical data for Neurontin's use in
7    treating bipolar, is it?
8       MS. MC GRODER:  Object to form and
9    foundation.  Are you asking about documents
10   he has never seen and told you he didn't
11   author?  No foundation for that question.
12      Q    Go ahead.
13      A    A scientific rationale is built upon
14   multiple factors of which preclinical data is one,
15   and there may be other pieces of evidence that are
16   taken into account in building a scientific
17   rationale.
18      What I am pointing out to is that
19   there were more data available at the time to have
20   confidence in the rationale for activity in
21   anxiety disorders than there was for bipolar
22   disorder.
23      Q    You have made that point twice and I
24   asked about that.
25      MS. MC GRODER:  Quit asking him the

182

Atul Pande, M.D.

1       Atul Pande, M.D.
2   same questions.
3       Q    Now I am asking you about this
4   sentence, this sentence isn't mentioning
5   preclinical data for Neurontin in treating
6   bipolar; is it?
7       MS. MC GRODER:  Object to form and
8   foundation.  He told you he can only answer
9   the question based on his own experience.
10  That question is misleading, and asked and
11  answered.
12      A    It is speaking to the scientific
13  rationale.
14      Q    The scientific rationale referred to
15  in this sentence is that Neurontin has a different
16  mechanism of action than mood stabilizing
17  antiepilepsy in it?
18      MS. MC GRODER:  Objection?
19      A    Which is one of the factors that
20  would be taken in building the scientific
21  rationale.
22      Q    Then the last sentence under the
23  recommendation paragraph reads, "Should the
24  results be positive and the patent situation
25  change, a full development program would be

183

Atul Pande, M.D.

1       Atul Pande, M.D.
2   considered."
3       Do you see that?
4       A    Yes, I do.
5       Q    Did you write that?
6       A    I did not.
7       Q    Do you know what that means?
8       MS. MC GRODER:  Objection, no
9   foundation.
10      A    I believe what it -- what it
11  indicates is that under certain conditions this
12  decision to do only an exploratory study could be
13  changed.
14      Q    And the conditions would be if the
15  result of the exploratory study of Neurontin in
16  the treatment of bipolar disorder was positive --
17      A    Yes.
18      Q    -- and the patent situation changed,
19  then a full development program would be
20  considered by Parke-Davis; is that correct?
21      A    That's correct.
22      MS. MC GRODER:  Objection, no
23  foundation.
24      Go ahead.
25      A    That is correct.

184

Atul Pande, M.D.

1       Atul Pande, M.D.
2       Q    Could you turn to Bates 39, the last
3   two digits 39, small number.
4       Again, for the record, this is
5   Exhibit 10.
6       Do you see the section, "Issues and
7   opportunities"?
8       A    Yes.
9       Q    Do you recall reviewing this, when
10  you received a copy of this document?
11      MS. MC GRODER:  Well, objection,
12  asked and answered.  He told you he doesn't
13  recognize the document, how could he recall
14  seeing this?
15      Q    Go ahead, you can answer my question.
16      A    I am sure I reviewed it, but I have
17  no recollection of it.
18      Q    Do you agree that the, in May of
19  1995, the gold standard in the United States and
20  Europe was lithium, which cost pennies per day to
21  treat bipolar?
22      MS. MC GRODER:  Objection, no
23  foundation.
24      A    It was the gold standard for the
25  treatment of acute mania, yes.

185

Atul Pande, M.D.

1       Atul Pande, M.D.
2       Q    Okay.  And do you know, what do you
3   know it to cost approximately pennies per day back
4   in 1995?
5       A    I would have no way of knowing that.
6       Q    In 1995, how long was lithium on the
7   market?
8       MS. MC GRODER:  Objection, no
9   foundation.
10      A    It would have been about 20, 20 --
11  maybe four years, 23, or something like that.
12      Q    It was no longer on patent at the
13  time, was it?
14      A    In fact, Neurontin was never on
15  patent.
16      Q    Lithium.
17      A    Lithium, I'm sorry, was never on
18  patent, and I think there may have been data
19  exclusivity for some limited period of time, so
20  that is about as much as I can recall about it.
21      Q    You say it was never on patent, but
22  there was data exclusivity for some period of
23  time.
24      A    What -- by patent I mean composition
25  of matter patent, which is the longer patent, and

186

Atul Pande, M.D.

1
2      data exclusivity is much more limited and can be
3      granted by the FDA for any data package that is
4      submitted, even on a compound that doesn't have
5      composition of matter patent.
6          Q    Okay.  Turn to, just look at the same
7      page, under opportunities, do you see A there?
8          A    Yes.
9          Q    Read that into the record, please.
10             MS. MC GRODER:  Objection, no
11     foundation.
12         A    "The bipolar disorders market is
13     undervalued due to lithium's inexpensive cost per
14     day of therapy and availability of generic
15     carbamazepine."
16         Q    Carbamazepine was the other drug that
17     was used at the time to treat bipolar; correct?
18         A    That is correct.
19         Q    And that was relatively inexpensive,
20     wasn't it?
21             MS. MC GRODER:  Object to form.
22         A    I don't remember what the prices
23     were, so I couldn't --
24         Q    Approximately 65 cents a day.
25             MS. MC GRODER:  Object to form, and

187

Atul Pande, M.D.

1
2      foundation.
3          Q    Does that refresh your memory?
4              MS. MC GRODER:  Same objection.
5          A    No, it does not.
6          Q    Did you know lithium was 35 cents a
7      day?
8              MS. MC GRODER:  Were you completing
9      your answer?
10         A    No, I think - I am finished with that
11     one.
12         Q    Does it refresh your memory that
13     carbamazepine was 65 cents a day?
14             MS. MC GRODER:  Object to form and
15     foundation.
16         A    No.
17         Q    How about lithium, do you know what
18     the cost of that was a day for bipolar?
19         A    No.
20         Q    If I told you it was 35 cents a day,
21     would that surprise you?
22         A    It would not.
23         Q    Valproic acid, that just got approved
24     by the FDA, I say just got approved February 7,
25     1995, several months before this marketing

188

Atul Pande, M.D.

1
2      assessment, correct?
3              MS. MC GRODER:  If you know.  No
4      foundation.
5          A    Yeah.  I don't remember the date.  I
6      think I mentioned that before, it was approved
7      sometime in 1995.
8          Q    Look under the issues paragraph D,
9      Bates number 39, same Exhibit 10, and D says,
10     "Valproic acid achieved FDA approval February 7,
11     1995 for the treatment of manic episodes of
12     bipolar disorder."
13         Correct?
14             MS. MC GRODER:  Objection, no
15     foundation.
16         A    That's what it does say, yes.
17         Q    Were you aware of that in May 1995?
18         A    I would have been aware, but you are,
19     if you are asking me to recall if I can swear to
20     whether I knew at the time, I can't.  I don't have
21     a specific memory of it.
22         Q    Do you know how much Neurontin cost
23     to take for a day in May of 1995?
24         A    I don't.
25         Q    Would it surprise you to know it was

189

Atul Pande, M.D.

1
2      approximately $3 a day?
3              MS. MC GRODER:  Object to form and
4      foundation.
5          A    No.
6          Q    Well, assuming that fact to be
7      true -- strike that.
8              Now, the next page of Exhibit 15,
9      last two digits 40, under Neurontin development,
10     you told us that this is something that you had
11     prepared in this marketing assessment; is that
12     correct?
13         A    I would have provided the input, yes.
14     I wouldn't actually have written the words here
15     because that's, this is a marketing document.  But
16     I would have provided the input, yes.
17         Q    Were you involved in the drafting of
18     this section?
19             MS. MC GRODER:  Object to form.  He
20     just explained what his role was.
21         A    Yeah, I would have provided the
22     information that went in here.  As to the actual
23     form of what was written, that would have been
24     somebody else's responsibility.
25         Q    Who wrote up section nine, do you

190

```
 1              Atul Pande, M.D.
 2   know?
 3       A   I would expect that the signatory on
 4   the first pages would have written the entire
 5   document.
 6       Q   Well, the signatory on, there are
 7   several of them on the first page, and one of
 8   them, John Boris on his signature line indicates
 9   that the document was prepared by him; correct?
10       A   Yes.
11       Q   Is it your memory that he wrote the
12   words in section nine?
13       A   I -- I don't have specific memory of
14   it.  But I believe that the entire document was
15   drafted by John Boris.
16       Q   Did he ever send you a draft of the
17   document to review?
18       A   I don't recall.
19       Q   Did he ever send you a draft of
20   section nine to review?
21       A   I don't recall that either.
22       Q   Okay.  Now, under publication
23   strategy, the first sentence says, "This strategy
24   would mirror Abbott's between 1988 and 1994, when
25   only data from the first pivotal study was
```

191

```
 1              Atul Pande, M.D.
 2   available.  With these results, Abbott was able to
 3   generate a tremendous interest in the psychiatric
 4   community and consequently the use indicated
 5   earlier."
 6       Does that mean that Abbott published
 7   the results of that study and got doctors in the
 8   psychiatric community to use the drug?
 9       MS. MC GRODER:  Objection, no
10   foundation.
11       A   I think that's what it implies, yes.
12       Q   You provided that information to
13   Mr. Boris, right?
14       A   Again, I'm telling you that I
15   provided information as to the treatments that
16   were available, the studies that had been done,
17   and what studies we were proposing to do for
18   Neurontin.  How this language was crafted really
19   was Mr. Boris' responsibility.
20       Q   You must have done some research
21   about Abbott and their drug valproic acid,
22   correct?
23       A   Yes.
24       Q   And you found out that Abbott
25   conducted a study, and in between '88 and '94,
```

192

```
 1              Atul Pande, M.D.
 2   used the study, only the data from that study and
 3   with those results generated a tremendous interest
 4   in the psychiatric community, and consequently the
 5   use of that drug for that indication, correct?
 6       MS. MC GRODER:  Objection to form.
 7   Misstates the document.
 8       A   That's what the document says.  But I
 9   would have no way of establishing what kind of
10   uses valproate would have gotten, so if you are
11   asking me whether these were my words, I don't
12   believe they are.
13       Q   Okay.  Next sentence, it is
14   understood that the recommended study, and is that
15   referring to under the publication strategy?
16       A   I think it goes on to say the
17   recommended study with gabapentin being
18   exploratory.
19       Q   Okay.  "It is understood that the
20   recommended study with gabapentin being
21   exploratory, the results might generate less
22   interest than result from a pivotal study."
23       Correct?
24       MS. MC GRODER:  Objection, no
25   foundation.
```

193

```
 1              Atul Pande, M.D.
 2       A   That's what it says.
 3       Q   And, "It is proposed to conduct an
 4   adjunctive study in outpatients who fail lithium
 5   therapy.  That would involve 60 patients from four
 6   to five sites and caused approximately $360,000."
 7       A   That's what it says, yes.
 8       Q   That is information you provided to
 9   Mr. Boris?
10       A   That would have come from me, yes.
11       Q   That would mirror Abbott's strategy
12   for valproic acid; correct?
13       MS. MC GRODER:  Objection to form and
14   foundation.
15       A   I really can't say, I mean...
16       Q   Okay.
17       A   I think what it suggests to
18   Parke-Davis was to undertake the exploratory
19   study.  The decisions that were made beyond that,
20   about how the study could be used or whether there
21   would be an additional program of studies or not,
22   was not my decision to make.
23       Q   Well, did you express an opinion
24   whether to pursue the publication strategy or to
25   have a claim fully developed and presented to the
```

194

Atul Pande, M.D.

1     Atul Pande, M.D.
2  FDA for approval?
3     A     The proposal that I put forward was
4  to conduct the exploratory program, and then on
5  that basis, to decide whether to pursue any
6  further development or not.
7     Q     Well, wasn't the exploratory program
8  strategy to publish the results of it and not get
9  FDA approval?
10     MS. MC GRODER: Objection to form.
11     A     The intent of doing the exploratory
12  program was that regardless of the outcome of
13  those studies.
14       In other words, if it was positive,
15  we pursued additional studies, and if it was
16  negative and we didn't, that the publications
17  would still take place, because the information we
18  believe was still relevant for clinicians and
19  researchers to know.
20     Q     And you conducted a study of
21  Neurontin in treatment of bipolar, didn't you?
22     A     Yes, I did.
23     Q     And the primary outcome of that study
24  was negative, wasn't it?
25     A     Well, I think, I think, I don't know

195

1     Atul Pande, M.D.
2  how you mean negative because in the scientific
3  interpretation of clinical trials, or any kind of
4  treatment studies for that matter, there are some
5  conventions about the use of the terms positive,
6  negative and failed studies, and so I don't know
7  with what precision you want me to answer that.
8       But maybe what you are referring to
9  is that the study did not show that there was a
10  beneficial effect of Neurontin in the treatment of
11  the bipolar patients. I think that would be a
12  conclusion that I can agree with --
13     Q     Okay.
14     A     -- without getting into whether it's
15  negative or failed.
16     Q     And did you ever use the word
17  negative when talking to colleagues to describe
18  the results of the bipolar trial that you
19  conducted?
20     A     I may have.
21     Q     Okay. And when did you first obtain
22  preliminary results from your study, your bipolar
23  study?
24     A     You mean after the study was
25  completed?

196

1     Atul Pande, M.D.
2     MR. LONDON: Say that again, I just
3  couldn't hear you.
4     MS. MC GRODER: His question was you
5  mean after the study was completed.
6     Q     No, my question is when did you
7  first, when did you first obtain preliminary
8  results from your study.
9     MS. MC GRODER: Do you understand the
10  question?
11     THE WITNESS: Yes.
12     A     I'm just trying to remember when it
13  would have been. I believe the study, at least
14  the initial analysis of the study would have been
15  known in 1998, maybe in the June time frame.
16     Q     And when you say initial analysis,
17  what do you mean by that?
18     A     Well, what I mean by it is that in
19  all clinical trials, there are a variety of
20  measurements that are taken on the patients who
21  are in the study. And some of these are
22  considered to be primary efficacy or safety
23  measures and others are considered to be
24  secondary.
25       And when, when the study is analyzed,

197

1     Atul Pande, M.D.
2  usually what we try to look at as soon as possible
3  is the primary measures so that there is a general
4  indication of whether the study is, is, you know,
5  showing the results that support the hypothesis on
6  which the study was based or not. So that would
7  be the initial analysis.
8       To complete the rest of the analysis
9  it can take some, anywhere from three to six,
10  maybe nine months because of the effort involved.
11     Q     But the initial analysis of primary
12  efficacy for study 209, that is your bipolar study
13  --
14     A     Correct.
15     Q     -- when was that done?
16     MS. MC GRODER: Objection, asked and
17  answered.
18     A     I believe I said it would have been
19  in approximately the June 1998 time frame. If it
20  was a few weeks plus or minus, I can't swear to
21  it.
22     Q     How many study sites did you have at
23  study number 209?
24     A     I don't recall that. I think there
25  have been 13 or 14 sites.

198

Atul Pande, M.D.

1
2    Q    And they enrolled patients at
3    different times, correct?
4    A    That is correct.
5    Q    And those study sites completed their
6    results a lot different times, didn't they?
7    A    I don't know what you mean by that.
8    The study ran for a certain period of time.  And
9    we were targeting a, a sample of patients, I
10   think.
11        If I recall correctly, the number was
12   probably around just a little over 100 patients,
13   and once that many patients had been entered into
14   the study, then all of the sites stopped entering
15   anymore patients, so I think it's, it's incorrect
16   to say that some studies finished before the
17   others did.
18   Q    Okay.
19   A    Because the study only stopped for
20   every one at a certain point, and that would have
21   been the same for every site.
22   Q    Was the trial completed?
23   A    I don't actually recall.
24   Q    Approximate date?
25   A    I'm guessing in early 1998.

199

Atul Pande, M.D.

1
2    Q    When was the code broken?
3    A    Once again, I don't have a
4    recollection of the dates.
5    Q    Can you give me an approximate time
6    period?  I'm not looking for a day.
7        MS. MC GRODER:  Just don't guess.  If
8    you can give him an approximation, go ahead,
9    but don't guess.
10   A    If we had the initial analysis in
11   June, the code might have been broken in April of
12   1998.
13   Q    Just for our record, when I use the
14   phrase code broken, what does that mean?
15   A    Breaking the code means identifying
16   which patients in the study took which treatment.
17   So that you can then sort them into the treatment
18   groups and make the comparisons on the various
19   measurements that have been taken and complete the
20   analysis of the data.
21   Q    Okay.  And so when the code was
22   broken, is that when the data was available?
23        MS. MC GRODER:  Object to form.
24   A    That's when the data would have been
25   available for analysis.

200

Atul Pande, M.D.

1
2    Q    Okay.
3    A    Yeah.
4    Q    And you said, we will get to it a
5    little bit later today.  But you said you thought
6    you had maybe 100 patients in the trial?
7    A    I think it was a little over 100,
8    yeah, might have been 110 or 12, something like
9    that.
10   Q    Would that be 50 receiving gabapentin
11   and 50 approximately receiving placebo?
12        MS. MC GRODER:  Object to form.  If
13   you want him to be precise, why don't you
14   show him the study.  Otherwise, he's just
15   guessing.
16   Q    Go ahead.
17        MS. MC GRODER:  And I don't want you
18   guessing, Doctor.
19   A    What I can tell you is there would
20   have been what's called equal randomization, which
21   means patients were intended to be allocated to
22   those patient groups in equal numbers.
23   Q    Was 209 an exploratory study?
24   A    Yes, it was.
25   Q    And one group of patients took

201

Atul Pande, M.D.

1
2    lithium and gabapentin and a equal number of
3    patients took lithium and placebo, right?
4    A    I think that is only part of the
5    study design.  If you would like me to describe
6    the study design, I can.
7    Q    I do want to describe it, and I
8    digressed a bit from the document we had in front
9    of you.
10   A    Okay.
11   Q    I am going to come back to it, and I
12   will have some of the study documents here and you
13   will have them in front of you.
14        MS. MC GRODER:  Tom --
15   Q    We can talk about study design then.
16        MS. MC GRODER:  -- it's 1 o'clock
17   about, are you going to keep going on this
18   document?
19        MR. GREENE:  Yes.  Can you give me a
20   minute, maybe I can just finish this
21   section.  I have other stuff in the
22   document.  Let me just try to finish up this
23   section.
24   Q    Again, for our record, we are on
25   Exhibit 10, and we are on the page, last two Bates

202

```
1              Atul Pande, M.D.
2    digits 40s, the small numbers, the second nine
3    Neurontin development.
4         Do you have that in front of you,
5    Doctor?
6         A    Yes, I do.
7         Q    I have been asking, just for the
8    record, I think you said you provided the
9    information that is in this section to Mr. Boris,
10   and he or somebody would have actually written up
11   these paragraphs.
12        A    That is correct.
13             MS. MC GRODER:  Object to form.
14        Q    I'm not sure if I have asked you this
15   question, but the first paragraph under
16   publication strategy, the last two sentences, that
17   discusses the proposed adjunctive study in
18   patients who fail lithium therapy, involving 60
19   patients from four to five sites and costing
20   approximately $360,000.
21             Is that the study that you conducted
22   that we were talking about which I have referred
23   to as study 209?
24        A    Well, if you are, if you are
25   literally looking at these two sentences and
```

203

```
1              Atul Pande, M.D.
2    comparing them to the study design, there were
3    differences in the study that eventually got done.
4         Q    Okay.
5         A    In that there were, the patients who
6    were entered into the study that actually took
7    place were taking either lithium, or valproate
8    rather, than just lithium alone, as it says here,
9    and then the second difference was that there were
10   more than patients enrolled in this study with
11   more sites, and eventually it cost more.
12        Q    Okay.  The next paragraph says, "The
13   study could start at the end of '95 and would run
14   for 12 months.  It would be finalized, excuse me,
15   "first quarter of '97 with presentation of the
16   data to the American Psychiatric Association
17   conference in May of '97."
18             Is that what it states?
19        A    That's what it says.
20        Q    That was part of the publication
21   strategy, correct?
22             MS. MC GRODER:  Objection, no
23   foundation.
24        A    That's what the document says.
25        Q    It's listed under the publication
```

204

```
1              Atul Pande, M.D.
2    strategy, correct?
3         A    Yes.
4         Q    Then it says, "The full publication
5    in a peer-reviewed journal would require 12 months
6    after final analysis of the study, i.e. first
7    quarter '98."
8             Correct?
9             MS. MC GRODER:  Objection, no
10   foundation.
11        A    That's what the document says, yes.
12        Q    So the study, data from the study
13   would be presented to physicians who attended the
14   American Psychiatric Association Congress in May
15   '97, according to this paragraph; is that right?
16             MS. MC GRODER:  Objection, no
17   foundation.
18        A    Yes, that's what the paragraph
19   states.
20        Q    The other way that Parke-Davis could
21   disseminate this study data was a full publication
22   in a peer-reviewed journal, is that right?
23             MS. MC GRODER:  No foundation.
24        A    Yeah, that's what the document says,
25   that peer-reviewed publication would take place.
```

205

```
1              Atul Pande, M.D.
2         Q    Okay.  Based on your experience at
3    Parke-Davis and the other pharmaceutical companies
4    you have worked for, aren't those two means or
5    measures, presentation of data at medical
6    congresses and presentation of data in
7    peer-reviewed journals two methods that drug
8    companies use to get the word out to physicians?
9             MS. MC GRODER:  Object to form.  And
10   foundation.
11        A    Yeah, I think, you know, you are
12   asking me a very broad question about my
13   experience across several months.  The
14   dissemination of data from any clinical studies
15   can take multiple forms, including the ones that
16   are described here, which is true presentation at
17   scientific meetings, as well as publication in
18   peer-reviewed journals.
19        Q    Okay.  And, you know, based on your
20   experience, are there other ways that data from
21   clinical trials gets disseminated to the medical
22   community by a pharmaceutical company?
23        A    Well, one of the other ways is when,
24   when physicians or researchers specifically ask
25   for that kind of information then companies will
```

206

```
             Atul Pande, M.D.
1
2    provide it.
3         Q    So, that you mean they could write a
4    letter to the company?
5         A    They could write later or they could
6    verbally transmit the information, you know,
7    between -- exchanging it between the clinicians or
8    the scientists.
9         Q    Where would that, what setting would
10   that information be exchanged between the
11   clinicians and the scientists?
12        MS. MC GRODER:  Objection.  Calls for
13   speculation.
14        A    Again, I, you know, I would be
15   guessing because --
16        Q    I don't want you to guess.  If you
17   know, tell me; if you don't know, say I don't
18   know.
19        A    Yeah, I don't.  Because that was not
20   part of my responsibility at most of the companies
21   I have been at.
22        Q    Aside from what you testified, can
23   you think of any other ways that a drug company
24   could disseminate information from a clinical
25   trial to physicians?
```

207

```
             Atul Pande, M.D.
1
2         MS. MC GRODER:  Well, object to form.
3         A    I think those would be the ways that
4    I have just described to you.
5         Q    Now, the next paragraph is full claim
6    development.
7         Do you see that?
8         A    Yes.
9         Q    The information in that paragraph is
10   information you provided to Mr. Boris; correct?
11        MS. MC GRODER:  Objection.  Misstates
12   his testimony.
13        A    Yeah.  This kind of information would
14   have come from me.
15        Q    Okay.
16        A    I don't know that the actual words
17   are mine.
18        Q    I think you made that clear.
19        I think your testimony, correct me if
20   I am wrong, I thought your testimony was for
21   section nine, on the page we are on in Exhibit 10,
22   was information that you provided to Mr. Boris,
23   you said you didn't write it but you gave him the
24   information, am I right?
25        MS. MC GRODER:  Object to form.
```

208

```
             Atul Pande, M.D.
1
2         A    Yeah.
3         Q    Am I right?
4         A    Yeah.  I provided the information
5    that went in there.
6         Q    All right.  So, the full claim
7    development option that is set forth in this
8    section, does this mean to file and get FDA
9    approval for Neurontin's use in treating bipolar,
10   is that what is being described in this paragraph?
11        MS. MC GRODER:  Objection.  No
12   foundation.
13        A    I believe it is, yes.
14        Q    All right.  And in -- it reads:  This
15   option will require two pivotal studies and the
16   need to generate sufficient patient exposure to
17   complete the patient registration package; right?
18        A    That's what it says, right.
19        Q    And the registration package, that is
20   referring to what's needed to put in the New Drug
21   Application that is submitted to the FDA; correct?
22        A    That is correct.
23        Q    Okay.  All right.  And then it says,
24   the first trial will be a placebo-controlled trial
25   in acute mania with two to three weeks' treatment
```

209

```
             Atul Pande, M.D.
1
2    on an inpatient basis; is that right?
3         A    Yes.
4         Q    And you told us that that trial would
5    be expensive to conduct because the patients are
6    hospitalized; correct?
7         A    That is correct.
8         Q    You say gabapentin -- strike that.
9         The document reads:  Gabapentin dose
10   should be flexible, up to 3800 milligrams with a
11   two- to three-day titration period and 60 patients
12   from four to five sites would enter this study.
13        That is a description of the first
14   trial; is that right?
15        A    That is a description of an inpatient
16   trial, yes.
17        Q    Well, under this scenario, if you are
18   going to seek FDA approval --
19        A    Right.
20        Q    -- that would be a description of the
21   first trial?
22        A    Yes.
23        Q    The second study would be a placebo
24   controlled and potentially an add-on trial to
25   lithium; correct?
```

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

210

Atul Pande, M.D.
1
2   A   Correct.
3   Q   Okay.  And then you, this document
4   reads, a direct head-to-head comparison to lithium
5   would be too difficult to implement due to lithium
6   plasma levels monitoring; right?
7   A   That's correct.
8   Q   And the last sentence here says, this
9   option would only be considered if registration
10  was the intended goal; right?
11  A   That's what it says, yes.
12  Q   The next page says, the total cost of
13  the first study would be $1,080,000; right?
14  A   Yes.
15  Q   And the next, last sentence in that
16  paragraph reads:  For registration, the total cost
17  would be more than double due to the necessary
18  patient exposure data; correct?
19  A   That is correct.
20  Q   And then "more than double," that is
21  referring to more than double what the cost would
22  be to pursue a publication study; correct?
23      MS. MC GRODER:  Objection.  No
24  foundation.
25  A   What it's referring to is that the

211

Atul Pande, M.D.
1
2   cost would be more than double of doing just one
3   study.
4   Q   And in the publication strategy, only
5   one study was proposed; correct?
6   A   One exploratory study, yes.
7   Q   So, it's going to cost $360,000 to do
8   one study and publish the results, and it's going
9   to cost $1,080,000 if you want to do the two
10  pivotal studies that would be needed for FDA
11  approval; correct?
12      MS. MC GRODER:  Object to form and
13  foundation.
14  A   Those are entirely different studies.
15  So comparing the cost doesn't really tell you the
16  information that is going to be generated.
17  Q   I wasn't getting at the type of
18  information that was being generated.  I was just
19  saying one approach is a lot cheaper than the
20  other.  Would you agree with that?
21      MS. MC GRODER:  Object to form.
22  A   Yeah.  Because it involves fewer
23  studies, of course.
24  Q   And that's what Parke Davis did, they
25  took the cheaper route, didn't that?

212

Atul Pande, M.D.
1
2      MS. MC GRODER:  Object to form.
3   A   They took the route that provided
4   the -- the best avenue at the time for answering
5   the question of whether Neurontin was likely to be
6   beneficial for bipolar disorder or not.
7   Q   They never -- had you finished your
8   answer?
9   A   And I believe the study that was done
10  provided that information on the basis of which
11  and no additional work was carried out.
12  Q   They never filed for FDA approval;
13  correct?
14      MS. MC GRODER:  Object to form.
15  A   They did not.
16  Q   Can you turn to the next page of the
17  exhibit, 41.  Last two digits, 41.
18  A   Yeah.
19  Q   The forecast section.
20      Do you know what department would
21  have provided that information for the information
22  that is in that section?
23  A   I think this would have come from
24  someone in marketing is my guess.
25  Q   All right.  Did you review this when

213

Atul Pande, M.D.
1
2   you received it?
3      MS. MC GRODER:  Objection.  Asked and
4   answered.
5   A   Yeah, I think I have said that I
6   don't have specific recollection of reviewing this
7   document, so I couldn't tell you whether I
8   reviewed this particular section or not.
9   Q   But it would have been your practice
10  to review it?
11  A   Generally, yes.
12  Q   Let me just ask you to turn to the
13  next page.
14      Do you have that spreadsheet in front
15  of you?
16      This page here, for the record, 42.
17  A   Yes.
18  Q   And the top of it says, bipolar
19  disorder, publication only.
20      Do you see that?
21  A   Yes.
22  Q   So, that's, according to the
23  document, a Neurontin forecast in the United
24  States?
25  A   Yes.

214

Atul Pande, M.D.
2    Q    Okay.  And the next page, just to
3    orient you, is bipolar disorder indication.
4         Do you see that?
5    A    Yes.
6    Q    So, these are forecasts that someone
7    did at Parke Davis, if a publication strategy was
8    pursued if an indication, meaning FDA approval
9    strategy was pursued for Neurontin for bipolar;
10   correct?
11        MS. MC GRODER:  Objection.  No
12   foundation.
13   A    Yeah.  Without reviewing this in much
14   greater detail, yes, I believe that is what it
15   does reflect.
16   Q    Do you see the market share profile?
17   A    Which line would that be?
18   Q    Right here.
19   A    Okay.
20   Q    Market share profile.
21        Do you see that?
22   A    Yes.
23   Q    This is something you described
24   earlier, didn't you, as saying this is part of a
25   marketing assessment where they assess what the

215

Atul Pande, M.D.
2    market share is for various drugs for a condition
3    or indication?
4         MS. MC GRODER:  Objection, misstates
5    his testimony and there is no foundation.
6    A    This kind of information would be
7    part of the marketing assessment, yes.
8    Q    And this is showing what the market
9    share was of various drugs that were used to treat
10   bipolar disorder; is that right?
11        MS. MC GRODER:  Objection.  No
12   foundation.
13   A    I think you are referring to lithium,
14   valproic acid and carbamazepine.
15   Q    Yes, yes.
16        Is that what this document shows or
17   is that part of this document?
18        MS. MC GRODER:  Objection, no
19   foundation.
20   A    That is part of the information on
21   these two pages.
22   Q    Okay.  And Neurontin had no market
23   share, according to this document, in '92, '93,
24   '94, '95, or '96, for the treatment of the bipolar
25   disorder; is that correct?

216

Atul Pande, M.D.
2        MS. MC GRODER:  Well, object to form.
3    The date of this document is May of '95.  So
4    that year must be projections.
5    Q    Can you answer it?
6        MS. MC GRODER:  No.  No foundation
7    for that question.
8        It's also misleading.
9    A    For those years, the line for
10   Neurontin says zero.
11   Q    Okay.  And as your counsel points
12   out, this was prepared in 1995.
13        So, let me ask you, based on your
14   experience back in '92, '93, and '94, did
15   Neurontin have any market share for treating
16   bipolar disorder?
17        MS. MC GRODER:  Objection.  No
18   foundation.
19   A    Well, Neurontin was only approved at
20   the end of '93, so '92 and 93 are irrelevant for
21   this discussion.
22   Q    So, it had no market share?
23        MS. MC GRODER:  Objection.  No
24   foundation.
25        Wait until I object.

217

Atul Pande, M.D.
2    Objection, no foundation.
3    Q    Based on your experience, did
4    Neurontin have any market share to treat bipolar
5    disorder in the year 1992?
6        MS. MC GRODER:  Well, objection.  No
7    foundation.
8    A    I would have no way --
9        MS. MC GRODER:  It's a misleading
10   question.
11   A    I would have no way of knowing the
12   market share information.  What I am speaking to
13   is the fact that the drug was not on the market in
14   '92 and '93, and, therefore, it could not
15   conceivably have any share of the market.
16   Q    Okay.  In this marketing assessment,
17   this page indicates that it had no market share in
18   '94 or '95; correct?
19        MS. MC GRODER:  Objection to
20   foundation.  Calls for speculation.
21   A    That's what the two pages show.
22   Q    And then it shows a market share of
23   one percent in 1997; correct?
24        MS. MC GRODER:  Objection.  No
25   foundation.

218

Atul Pande, M.D.

2    A    That's what is on the spreadsheet,
3    yes.
4    Q    And that, that is a forecast of what
5    is going to happen in 1997, according to this
6    document; is that right?
7        MS. MC GRODER:  Objection.  No
8    foundation.
9    A    It would appear to be.
10   Q    And then for '98, it would be
11   4 percent, for '99 it looks like 6 percent.
12       Do you see that?
13   A    Yes.
14   Q    Those are forecasts that were being
15   made?
16       MS. MC GRODER:  Objection, no
17   foundation.
18   Q    Right?
19       MS. MC GRODER:  Same objection.
20   A    I have already told you that I am
21   guessing that it's a forecast.
22   Q    Looking at this, looking at this
23   today, do you understand that this forecast was
24   done for a publication strategy?
25       MS. MC GRODER:  Objection.  No

219

Atul Pande, M.D.

2    foundation.
3    Q    Do you see that?
4    A    If you are referring to page 42?
5    Q    Yes.
6    A    That's what it says.
7    Q    And -- so, is it fair for me to
8    assume that these forecasts or these projections
9    for '97 of 1 percent, and '98 for 4 percent, '99
10   for -- if that's 6 percent, if that's what that
11   says, that the market share would be increasing
12   for Neurontin for treatment of bipolar disorder as
13   the result of a single study being published in
14   the medical literature?
15       MS. MC GRODER:  Objection.  No
16   foundation.  Calls for speculation.
17   A    I think, again, I'm not the marketing
18   expert here.
19   Q    Yes.
20   A    So, I can't tell you how these
21   projections were arrived at, but I think I
22   would -- I would be very cautious about making a
23   cause and effect association between a publication
24   and these projections for market share, because
25   drugs tend to be used by physicians using their

220

Atul Pande, M.D.

2    own experience and judgment, even sometimes in the
3    absence of any kind of clinical studies that are
4    available.
5        Whether this market share grew
6    because of a publication or it grew because
7    clinicians started to try the drug, I would have
8    no way of knowing.  So, I think you are asking me
9    a question that I am not qualified to answer.
10   Q    Where did physicians get their
11   information about Neurontin's use for treating
12   bipolar disorder in 1994?
13       MS. MC GRODER:  Objection.  No
14   foundation.  Calls for speculation.
15   A    I don't know that they did.
16   Q    Okay.
17       MS. MC GRODER:  You know, we have
18   been going for, Tom --
19   Q    Where did they get their --
20       MS. MC GRODER:  You said you were
21   going to have a lunch break at 1 o'clock.
22   He's now been going for an hour and 15
23   minutes --
24       MR. GUNTER:  Dr. Pande, if you are
25   ready for a break --

221

Atul Pande, M.D.

2        MR. GREENE:  Can I just finish this
3    line of examination?
4        MS. MC GRODER:  You said you were
5    going to finish the line of examination on
6    this page, and now we are on this page.
7    Are you really going to finish?
8        MR. GREENE:  Let me just finish with
9    this line, all right?
10   Q    So what was the -- again, Exhibit 10,
11   Bates 42, last two digits.  You have that page in
12   front of you, Doctor, correct?
13   A    Yes.
14   Q    So, for the year 1995, where it says
15   0 percent of Neurontin market share, what was the
16   source of information to physicians that were --
17   that was available in 1995 about Neurontin's
18   effectiveness in treating bipolar disorder?
19       MS. MC GRODER:  Objection.  No
20   foundation.
21   A    I would have no way of knowing.
22   Q    Where would the -- I think you
23   testified that physicians get information from
24   clinical trial results that are published in
25   medical journals; correct?

222

```
1            Atul Pande, M.D.
2     A    That is correct.
3     Q    And don't physicians get information
4  about clinical trial results that are presented in
5  poster presentations at scientific symposia?
6     A    They do.
7     Q    And don't physicians get information
8  about clinical trial results that are presented at
9  continuing medical education conferences?
10    A    Yeah, they could.
11    Q    And I think you said they get,
12 physicians get information from drug companies
13 about clinical trial results if they -- if they
14 write to the drug company and the drug company
15 writes back?
16    A    That is correct.
17    Q    Just a couple more questions about
18 this page and then we will wrap up.
19         Do you see the market value profile
20 heading?
21    A    Yes.
22    Q    Okay.  And then it says, bipolar
23 market and there is a line that goes across and,
24 does that purport to represent the value of the
25 bipolar market for those years?
```

223

```
1            Atul Pande, M.D.
2         MS. MC GRODER:  Objection.  No
3  foundation.
4     A    Yes.  I suspect what it reflects is
5  the total value of the prescriptions for the
6  bipolar disorders market.
7         MS. MC GRODER:  Doctor, do you know?
8     A    I don't know for sure, but --
9  that's -- that's my best, best guess.
10    Q    Okay.  And it has a market value
11 there for Neurontin.
12         Do you see that?
13    A    I do.
14    Q    And the market value for '92 is zero
15 dollars, $0 for '93, $0 for '94, $0 for '95 and
16 '96 and then 5.9 million, I'm rounding off a
17 little bit there, but 5.9 million for '97; is that
18 correct.
19         MS. MC GRODER:  Objection.  No
20 foundation.
21    A    Yes.
22    Q    And then for 1998, 24.1 million?
23         MS. MC GRODER:  Objection, no
24 foundation.
25    A    Yes.
```

224

```
1            Atul Pande, M.D.
2         MS. MC GRODER:  Are you asking him if
3  that's what the document says?
4     Q    And then the Neurontin value for 1999
5  is 36.4 million?
6         MS. MC GRODER:  Same objection.  No
7  foundation.  Calls for speculation.
8     A    As best as I can read it, yeah.
9     Q    Then it starts to drop off a bit.
10         Do you see that for 2000, drops down
11 to 30 million; 2001, 24 million; and it looks like
12 it drops down, the projection drops down to either
13 18 or 15 million for 2002.
14         Do you see that?
15    A    That's what the document says.
16         MS. MC GRODER:  Objection.
17    Q    Do you know why those projections
18 were dropping off?
19         MS. MC GRODER:  Objection.  No
20 foundation.
21    A    I don't really know.
22    Q    Will you look at the top of the
23 document, so you see where it says patent expiry
24 in the year 1999?
25    A    Yes.
```

225

```
1            Atul Pande, M.D.
2     Q    Having seen that and based on your
3  earlier testimony, are the projections dropping
4  off because they are expecting the Neurontin
5  patent to expire sometime in 1999?
6         MS. MC GRODER:  Objection.  No
7  foundation.
8         Now, you are asking for an expert
9  opinion in marketing.  There is no
10 foundation.  It calls for speculation.  He
11 doesn't know.
12    Q    Go ahead.  You can answer the
13 question.
14    A    Again, I am not an expert on either
15 marketing or the dynamics of how a market changes
16 when patents expire, so I --
17    Q    All right, Doctor.
18    A    -- I can't really answer that
19 question.
20    Q    We will take this up after you have
21 had a -- after you get some lunch.
22         MS. MC GRODER:  Did you finish with
23 your answer?  Did you get the tail end of
24 that answer?
25         (Record read.)
```

226

```
1            Atul Pande, M.D.
2       MS. MC GRODER:  All right.
3       THE VIDEOGRAPHER:  The time is 1:24.
4   This ends tape three of the videotape
5   deposition of Atul Pande.
6       We are off the record.
7       (Recess taken.)
8       THE VIDEOGRAPHER:  The time is 2:15.
9   This begins tape four of the
10  videotape deposition of Atul Pande.
11      We are on the record.
12  BY MR. GREENE:
13      Q    Doctor, I want to ask you some
14  questions about the consulting agreement that you
15  entered into with Pfizer.
16      I think you testified that that was
17  sometime in May or June of 2007; is that correct?
18      A    That's my best recollection, yes.
19      Q    And you have a copy of that
20  consulting agreement; correct?
21      A    You mean in my possession right now?
22      Q    I think you said you don't have it in
23  your possession right now?
24      A    Right.
25      Q    But it's in your office?
```

227

```
1            Atul Pande, M.D.
2       A    It's either in my office or at home,
3   yes.
4       Q    Are there other documents that you
5   have in that file that pertain to Neurontin, where
6   you have the consulting agreement?
7       MS. MC GRODER:  Objection to form.
8       A    I do not.
9       Q    Pardon me?
10      A    I do not.
11      Q    You said you sent out an invoice for
12  services rendered under the consulting agreement;
13  is that correct?
14      A    Yes.  One.
15      Q    And did you receive a check?
16      A    Yes.
17      Q    And did you deposit the check?
18      A    Yes.
19      Q    What bank did you deposit it at?
20      A    I bank with Bank of --
21      MS. MC GRODER:  Wait, I object.
22      On what basis do you need to know the
23  bank that he uses.  That's personal
24  information that doesn't need to be on the
25  record.  If you want know off the record, we
```

228

```
1            Atul Pande, M.D.
2   will tell you.  I just don't think that
3   needs to be on the record.
4       MR. GREENE:  Well, thank you.
5       Q    What bank did you deposit it at?
6       MS. MC GRODER:  I object.  If you
7   feel comfortable giving that information on
8   the record, go ahead.
9       A    Bank of America.
10      Q    And is that where you do your
11  banking?
12      A    Yes.
13      Q    Okay.  And is that in Cary, North
14  Carolina?
15      A    Yes.
16      Q    And that's the only check you
17  received from Pfizer --
18      A    That is correct.
19      Q    -- under the consulting agreement?
20      A    That is correct.
21      Q    I think you testified, just correct
22  me if I am wrong, I may have asked you, I want to
23  make sure I have it on the record, that you had no
24  conversations preparing for your deposition with
25  any attorneys from Davis Polk; is that correct?
```

229

```
1            Atul Pande, M.D.
2       A    That's correct.
3       Q    And that you have identified all of
4   the attorneys that you have had conversations for
5   in preparing for your deposition; correct?
6       A    I believe so.
7       Q    And you don't have personal counsel
8   representing you here today, do you?
9       MS. MC GRODER:  Objection to --
10      objection to form.
11      Q    Do you?
12      A    I do not.
13      Q    Have you retained personal counsel to
14  represent you that are not present today?
15      A    I have not.
16      Q    And I think you said you testified
17  that you had received an e-mail from a Pfizer
18  in-house attorney; is that correct?
19      A    I don't know if she is an attorney.
20      Q    Okay.  What was her name again?
21      A    Christine Mylod.
22      Q    Mylod?
23      A    Yeah, M-Y-L-O-D.
24      Q    And did you only receive one e-mail
25  from her?
```

230

```
1              Atul Pande, M.D.
2       A   I believe so.
3       Q   Okay.  Did you receive any other
4   e-mails from Pfizer after -- strike that.
5           Did you receive any e-mails from
6   Pfizer concerning this deposition or your
7   deposition testimony, aside from that e-mail you
8   have identified?
9           MS. MC GRODER:  Object to form.
10      A   I did not.
11          MS. MC GRODER:  That assume facts not
12   in evidence.
13          MR. GREENE:  I think you have got
14   that one right.
15          MS. MC GRODER:  The question was,
16   Tom -- I'm not trying to be obstreperous.
17   The question was about your deposition
18   testimony.  You haven't established that
19   Christine Mylod's e-mail was about
20   deposition testimony.
21      Q   What was your answer?
22      A   I did not receive any other e-mails
23   from Pfizer.
24      Q   Have you received e-mails from the
25   Shook Hardy attorneys concerning this deposition?
```

231

```
1              Atul Pande, M.D.
2       A   Only in regard to setting up dates
3   and times for meetings.
4       Q   You testified you reviewed
5   approximately 12 documents in preparing for the
6   deposition; is that correct?
7       A   I believe I said a dozen or so, yes.
8       Q   Okay.  And were they Parke Davis-era
9   documents?
10          MS. MC GRODER:  Object to form, and
11          that question calls for attorney-client
12          privilege, work-product communication.
13          So, I instruct the witness not to
14          answer.
15      Q   Did you review any Pfizer era
16   documents?
17          MS. MC GRODER:  Same objection.
18          Don't answer the question.
19      Q   Did you review any documents or memos
20   that were prepared by the Shook Hardy attorneys?
21          MS. MC GRODER:  Same objection.
22          Don't answer the question.  And my objection
23          is attorney-client privilege, work-product
24          doctrine.
25      Q   Do you have any objection to
```

232

```
1              Atul Pande, M.D.
2   providing me with a copy of the consulting
3   agreement?
4           MS. MC GRODER:  Objection.
5       Q   Go ahead.  You can answer.
6       A   I don't have any problem with
7   providing it.
8       Q   Okay.  Did you, can you, will you
9   provide me with a copy of it so I can ask you
10   questions about it tomorrow?
11          MS. MC GRODER:  I don't think that is
12          appropriate.  If you want to make a document
13          request, the witness is not in a position to
14          understand the discovery, the discovery
15          obligations or duties of discovery in this
16          case.  Whether he objects to it or not is
17          irrelevant.
18      Q   Can you get a copy of that and have
19   it faxed overnight to us or e-mailed?
20          MS. MC GRODER:  Well, I object to
21          that question.  You have no obligation to do
22          that, and that does not even warrant a
23          response.
24      Q   Can you do that?
25          MS. MC GRODER:  If you have a
```

233

```
1              Atul Pande, M.D.
2   document request you direct it to me,
3   Counsel, not the witness.
4       Q   Can you do that?
5           MS. MC GRODER:  Don't answer the
6          question.
7       Q   When you met with the Shook Hardy
8   attorneys, or the in-house counsel for Pfizer you
9   identified earlier in your testimony, did you make
10   any notes?
11      A   I did not.
12      Q   When you, after the meeting or
13   meetings that you had with the Shook Hardy
14   attorneys, and/or the Pfizer in-house counsel, did
15   you make any notes?
16      A   I did not.
17      Q   I think you said the last meeting
18   that you had with the Shook Hardy attorneys was
19   this week?
20      A   Yes.
21      Q   And what day of the week was it?
22          MS. MC GRODER:  Objection.  Asked and
23          answered.
24      A   I believe that was a Monday.
25      Q   And where was that meeting?
```

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

234

Atul Pande, M.D.

1
2      MS. MC GRODER:  Same objection.
3      A    That was at Davis Polk.
4      Q    At Davis Polk.
5           And did you re-- have you remained in
6    New York since Monday?
7      A    No, I have not.
8      Q    You went back to North Carolina?
9      A    No.  Actually I had business in
10   Philadelphia.
11     Q    Did it pertain to Neurontin or
12   Pfizer?
13     A    It did not.
14     Q    I believe you testified that you left
15   Pfizer in November of 2005; is that correct?
16     A    That's correct.
17     Q    And from November 2005, up until May
18   or June of 2007, when you signed this consulting
19   agreement with Pfizer, have you ever, during that
20   time period, done any consulting for Pfizer --
21     A    No.
22     Q    -- on any other matter?
23     A    No, I have not.
24     Q    Did Pfizer ever ask you to sign a
25   consulting agreement on any other drug or any

235

Atul Pande, M.D.

1
2    other matter between November 2005 and May or June
3    of 2007?
4      A    They did not.
5      Q    I'm not sure if I asked you this
6    question, but can you tell me the identity of the
7    individual who first informed you that the
8    plaintiffs in this matter wanted to depose you?
9      A    To the best of my recollection, that
10   would be Mr. Gunter.
11     Q    Pardon me?
12     A    That would be Mr. Gunter.
13     Q    Mr. Gunter?
14     A    Yes.
15     Q    And can you tell me when that was,
16   approximately?
17          MS. MC GRODER:  Objection, asked and
18   answered.
19     A    My best recollection is it was
20   probably in June of this year or so.
21     Q    June of this year?
22     A    Yes.
23     Q    Do you know whether you had signed
24   the consulting agreement with Pfizer before
25   Mr. Gunter informed you that we wanted to take

236

Atul Pande, M.D.

1
2    your deposition?
3      A    To the best of my recollection, yes.
4      Q    Yes, you had signed it?
5      A    Yes.
6      Q    Okay.  To the best of your
7    recollection, you were retained by Pfizer and
8    signed a consulting agreement before you knew we
9    wanted to depose you?
10     A    That's correct.
11          MS. MC GRODER:  Object to form.
12     Q    So, it would be fair to say that to
13   the best of your memory when you received the
14   e-mail from the Pfizer employee concerning the
15   consulting agreement, you did not know that we
16   wanted to depose you when you received that
17   e-mail?
18     A    To the best of my recollection, yes.
19     Q    And I think you said you took several
20   days before you decided to become a consultant for
21   Pfizer; is that correct?
22          MS. MC GRODER:  Object to form.
23     A    I believe that is what I said.
24     Q    And during the period of time,
25   several days or however long it was from the time

237

Atul Pande, M.D.

1
2    you received the e-mail from Pfizer asking to you
3    be a consultant up until the time you agreed to
4    become a consultant, you don't have any memory of
5    being informed that we wanted to depose you?
6          MS. MC GRODER:  Asked and answered.
7      A    Yeah.  I don't have any recollection
8    of that happening.
9      Q    Now, prior to the break we had been
10   talking about Exhibit 10.
11          Do you have a copy of in that front
12   of you?
13     A    Yes.
14     Q    And I had been asking you some
15   questions about the section of the exhibit that
16   was labeled forecast, and which began on paragraph
17   number ten, Bates last two digits 53.
18     A    Yes.
19     Q    And I think, actually, I think I was
20   probably questioning you concerning page 41, which
21   is the forecast section under bipolar.
22          So, again, Exhibit 10, last two
23   digits of the Bates 41, do you have that?
24     A    Yes.
25     Q    And the forecast section of this

238

```
 1            Atul Pande, M.D.
 2    memo, you said, was prepared by a department at
 3    Pfizer; correct?
 4            MS. MC GRODER:  Object to form.
 5    A    The marketing department, yes.
 6    Q    Marketing department.
 7            And have you seen these -- wait a
 8    minute until this quiets down.
 9            (Telephone interruption.)
10    Q    Okay.  I have forgotten where we were
11    before that interruption, but do you have Exhibit
12    10, the forecast section, Bates 41, in front of
13    you?
14    A    Yes.
15    Q    And this was a section prepared by
16    the Marketing Department?
17    A    That's correct.
18    Q    And during the period of time that
19    you worked for Parke Davis, did you see
20    information from the Marketing Department that was
21    labeled forecast, whether it had to do with
22    Neurontin or other drugs, was that information
23    that you would see periodically?
24    A    I would see it.
25    Q    Okay.
```

239

```
 1            Atul Pande, M.D.
 2    A    Usually in the context of development
 3    team meetings.
 4    Q    Is the information in the forecast
 5    that becomes market of a marketing assessment
 6    information that the company relies upon to make
 7    business decisions?
 8            MS. MC GRODER:  Object to form and
 9    foundation.
10    A    Well, there are a lot of things that
11    the company relies upon in making decisions and
12    the forecast assumptions are one of those.
13    Q    One of those?
14    A    Yeah.
15    Q    Okay.
16            MS. MC GRODER:  Could counsel who has
17    joined by phone put your name on the record?
18            MR. KEENAN:  Chris Keenan.
19            MR. GUNTER:  Were you here during the
20    morning?
21            MR. KEENAN:  Yes.
22            (Pande Exhibit Number 11 marked for
23    identification as of this date.)
24    Q    Let me show you what we are going to
25    mark as Exhibit 11 --
```

240

```
 1            Atul Pande, M.D.
 2    A    Okay.
 3    Q    -- which was produced by Pfizer's
 4    counsel as a separate document.  It's a little bit
 5    different than the Exhibit 10 that we just looked
 6    at.
 7            And I would look to direct your
 8    attention to the Bates, last two digits, 25, 425,
 9    the last three digits.
10            Do you have that page in front of
11    you?
12    A    Yes.
13    Q    Physicians World, do you see that?
14    A    Yes.
15    Q    Do you know who Physicians World
16    Communication Group was?
17    A    I do not.
18    Q    This appears to be a fax cover sheet?
19    A    Yes.
20    Q    Okay.  And do you know who -- it's
21    from Vince Stahl.
22            Do you know who Vince Stahl is?
23    A    I do not.
24    Q    To John Boris.
25            You know who John Boris is, you have
```

241

```
 1            Atul Pande, M.D.
 2    identified him earlier.
 3    A    Yes, I have.
 4    Q    The subject Neurontin psychiatric
 5    advisory board.
 6    A    Yes.
 7    Q    Did you ever attend any Neurontin
 8    psychiatric advisory boards when you worked at
 9    Parke Davis?
10    A    During the time that I was planning
11    the psychiatric disorders program.
12    Q    Okay.  And what time period was
13    that that you were planning the psychiatric
14    program?
15    A    That would have been in '94, '95.
16    Q    And how many advisory boards did you
17    attend, Neurontin psychiatric advisory boards did
18    you attend in that time period?
19    A    My best recollection is that there
20    was at least one, there may have been two, but I
21    am not completely sure.
22    Q    Okay.  And do you have a memory of
23    where one of them or both of them were held?
24    A    Well, the one that I have memory of
25    was the one that helped to give shape to the
```

242

```
1           Atul Pande, M.D.
2    development program and that was held in, I
3    believe, in Chicago.
4        Q    And you made a presentation at that
5    advisory board, didn't you?
6        A    Yes.
7        Q    If you turn to the second page, now,
8    you will see, executive summary, Parke Davis
9    Neurontin Psychiatric Advisory Board, Chicago,
10   June 9, 1995?
11       A    Yes.
12       Q    And that is the one you attended,
13   isn't it?
14       A    Yes.
15       Q    Do you know who prepared this
16   executive summary?
17       A    I really don't know.
18       Q    Okay.  Would you have reviewed it?
19       A    Yes.
20       Q    Okay.  Dr. Alan Shatz, you identified
21   him; correct?
22       A    I did, yes.
23       Q    And was he a -- strike that.
24            Do you recall -- strike that.
25            Do you know who convened this
```

243

```
1           Atul Pande, M.D.
2    advisory board?
3        A    I believe this was convened by me and
4    John Boris to seek advice from these advisors.
5        Q    Okay.  Well, the objectives are
6    listed there on the first page, after the cover
7    page, the Bates, the last three digits 427; is
8    that right?
9        A    That's correct.
10       Q    The objective of this meeting was to
11   identify the potential market and clinical trials
12   protocols for gabapentin, Neurontin therapy and
13   the treatment of patients with psychiatric
14   disorders.  That is the first sentence of the
15   objective paragraph; is that correct?
16       A    That's correct.
17       Q    It says, Parke Davis presented
18   marketing perspectives and an overview of the
19   efficacy of the drug and the treatment of
20   epilepsy.
21            Who made that presentation.
22       A    I don't specifically recall who might
23   have made that presentation.  It's possible
24   Mr. Boris may have.
25       Q    Okay.  Did you?
```

244

```
1           Atul Pande, M.D.
2        A    No, I did not.
3        Q    The next sentence says, Dr. Atul
4    Pande and Charles Taylor presented preclinical and
5    clinical studies relevant to psychiatric uses of
6    gabapentin; correct?
7        A    Yes.
8        Q    And then in the introduction
9    paragraph, the first paragraph, you see that, it
10   begins with, by August 1995 --
11       A    Yes.
12       Q    -- the patient experience base will
13   number 100,000; is that right?
14       A    That's what it says, yes.
15       Q    And the majority of those uses were
16   for the treatment of epilepsy; is that correct?
17       A    That is correct.
18            MS. MC GRODER:  Object to form.
19       A    That's what it says on the document
20   here.
21       Q    The last sentence says, psychiatric
22   indications presently comprise four to
23   five percent of Neurontin use?
24       A    That's what it does say, yes.
25       Q    Okay.  Did you know that as of the
```

245

```
1           Atul Pande, M.D.
2    date of this advisory board?
3        A    Did I have personal knowledge of it?
4        Q    Yes.
5        A    No, but I heard it at this meeting.
6        Q    Okay.  So, is that the first time you
7    heard that the psychiatric indications presently
8    comprise four to five percent of Neurontin use as
9    of the date of the meeting?
10       A    It could very well have been.
11       Q    Well, would it be fair to say that as
12   of June '95 that the average practicing physician
13   had no knowledge of the use of Neurontin to treat
14   bipolar disorder?
15            MS. MC GRODER:  Object to form and
16   foundation, and that misstates the document.
17       A    That is a very general statement that
18   I would have no way of knowing what American
19   physicians knew or didn't know.
20       Q    Well, you filed a patent application,
21   didn't you?
22       A    Yes.
23       Q    And you made certain claims under
24   oath, didn't you?
25            MS. MC GRODER:  Object to form.
```

246

Atul Pande, M.D.

2  Q   Didn't you?
3      MS. MC GRODER:  Under oath.
4  Q   Didn't you?
5      MS. MC GRODER:  Object to form and
6  foundation.
7  Q   You filed a patent application?
8  A   We did file a patent application.
9  Q   And the patent application is filed
10 under oath, isn't it.
11     MS. MC GRODER:  Object to form and
12 foundation.
13 Q   Isn't it filed under the pains and
14 penalty of perjury, sir?
15 A   Yes.
16     MS. MC GRODER:  Object to form,
17 foundation.
18 Q   And the statements that you made in
19 the patent application, you swore to be true;
20 correct?
21 A   Yes.
22     MS. MC GRODER:  Object to form and
23 foundation.
24 Q   And one of the statements was this is
25 a novel use for gabapentin, which would not be

247

Atul Pande, M.D.

2  obvious to a medical practitioner of ordinary
3  skill; correct?
4  A   That is what the patent states.
5  Q   Right.
6      And the use that was referring to is
7  the treatment of mania and all its various forms,
8  whether acute, chronic, single recurrent, whether
9  or not it is associated with depression.  The
10 invention further includes the treatment of
11 bipolar disorder; correct?
12 A   That is the claim, yes.
13 Q   You claimed and stated under oath
14 that it was a novel use, which would not be
15 obvious to a medical practitioner of ordinary
16 skill; correct?
17     MS. MC GRODER:  Object to form.
18 Q   Correct?
19 A   That's what the patent said, yes.
20 Q   And you filed that on May 15, 1995,
21 isn't that right?
22 A   I don't know the date.
23 Q   Do you want to see the date of it
24 again?
25     MS. MC GRODER:  Do you have the

248

Atul Pande, M.D.

2  filing date in front of you?
3  A   Yes, May 15.
4  Q   What date was it?
5  A   May 15th.
6  Q   1995?
7  A   1995.
8  Q   And the marketing assessment, will
9  you get that?  Exhibit 10, it's right there in
10 front of you, Doctor.
11     That's May 19, 1995; right.
12 A   Yes.
13 Q   So, that is what, six days later
14 after you filed the patent application?
15 A   Right.
16 Q   And in the -- strike that.
17     And in the marketing assessment you
18 have made representations in here about
19 Neurontin's efficacy for treatment of the bipolar;
20 correct?
21     MS. MC GRODER:  Object to form and
22 foundation.  He already testified that he
23 didn't author that document that is Exhibit
24 10.
25     So, your question assumes facts not

249

Atul Pande, M.D.

2  in evidence.
3  A   Which part of document ten are you
4  referring to?
5  Q   Well, let's take a look at the
6  Neurontin development section, which is 4-0.
7      Let me direct your attention to a
8  different page.
9      Twenty-seven, under the
10 recommendation paragraph.  I direct your attention
11 to the mid, the middle of that paragraph where it
12 says:  In addition, due to the lack of scientific
13 rationale, since Neurontin has a different
14 mechanism of action than the mood stabilizing
15 antiepileptics.
16     Do you see that?
17 A   Yes.
18 Q   And I think you testified that you
19 were the inventor for this patent; right?
20 A   Yes.
21 Q   What is it that you were referring to
22 when you filed the application, and you said that
23 they are useful, the compounds are useful in the
24 treatment of mania in its various forms, whether
25 acute or chronic, single or recurrent, whether or

250

Atul Pande, M.D.

1
2  not associated with depression, and the invention
3  further includes the treatment of bipolar
4  disorder.
5      A    Yeah.  What it refers to is, I
6  believe I mentioned about the retrospective data
7  analysis that was done on the epilepsy studies
8  that had been completed in order for Neurontin to
9  be approved for the treatment of epilepsy, and
10  during those trials there were data generated that
11  suggested that there was improvement in, in mood
12  and well being of these patients, and those were
13  the data that we were using in order to make the
14  claim that if those effects were seen in bipolar
15  patients that that would be a novel utility for
16  the drug.
17      Q    I think you testified that that was a
18  post haec analysis, meaning it was done sometime
19  after the epilepsy trials were conducted; right?
20      A    That is correct.
21      Q    And you gave that data to the patent
22  office, didn't you?
23      A    That is correct.
24      Q    And you are referring to 16 different
25  patients, aren't you?

251

Atul Pande, M.D.

1
2      A    That is correct.
3      Q    So, how many thousands of patients
4  did you say were in the epilepsy trials?
5      A    I don't recall the exact number of
6  patients in the analysis that we did.
7      Q    Okay.  But you list 16 patients and
8  you rely on patient number one, the effect was
9  more relaxed; patient number two -- do you have
10  those in front of you?
11      A    Yes, I do.
12      Q    Patient number two, more socially
13  responsive, better concentration.
14          Patient number three, more sharp
15  cognitively, more relaxed, decreased confusion,
16  increased comprehension.
17          Patient number five, more relaxed.
18          Patient number, six less insomnia.
19          Skip patient four.  Less nervous
20  energy, more serene.
21          So, this is the type of data that you
22  were relying on as a basis for the opinion that
23  Neurontin was useful in the treatment of mania in
24  all of its various forms, whether acute or
25  chronic, single or recurrent and whether or not

252

Atul Pande, M.D.

1
2  associated with depression?
3      A    That's correct.
4      Q    When you filed the patent
5  application, did you have any personal experience
6  in treating patients with Neurontin for bipolar?
7      A    I did not.
8      Q    And when you filed the patent
9  application in May of 1995, there was no
10  pre-clinical data for Neurontin for use in
11  treating bipolar; correct?
12      A    That's correct.
13      Q    How is it that you were the inventor?
14          MS. MC GRODER:  Object to form.
15      Q    I mean, did you invent this?
16          MS. MC GRODER:  Object to form.
17      Q    Did you invent Neurontin for treating
18  bipolar?
19          MS. MC GRODER:  Object to form.
20          You are asking for a legal
21  conclusion, the way the legal verbiage is
22  used in a patent application.  He's not a
23  patent lawyer.
24          Answer as best you can.
25      A    Right.  So I am definitely not the

253

Atul Pande, M.D.

1
2  inventor of Neurontin, the --
3      Q    No, I didn't mean that.  And I'm
4  going to stop you right there, because I didn't
5  mean that question and I don't want you answering
6  that.
7          But you claim to be the inventor of
8  Neurontin's use for treating bipolar disorder in
9  treatment of mania in all its various forms,
10  whether acute, chronic, single or recurrent, and
11  whether or not associated with depression; right?
12      A    Yes.
13          MS. MC GRODER:  You interrupted his
14  answer, Counsel.
15          You can complete your answer to the
16  question that is still pending.
17          MR. GREENE:  I don't think there is a
18  question still pending.
19          Why don't we have that question read
20  back?
21          MS. MC GRODER:  The original question
22  that you interrupted him in the middle of.
23  Let's have that question read back.
24          MR. GREENE:  Let's just go on.
25      Q    Have you completed your answer?  If

254

```
1              Atul Pande, M.D.
2   you feel there is some question that is pending,
3   go ahead and answer it.
4        A    The question you were asking was
5   whether I was the inventor of the use of Neurontin
6   in the treatment of acute mania and its various
7   forms.
8        Q    And were you?
9        A    I was.
10       Q    Yet you had no experience in treating
11  patients on it; correct?
12       A    That is correct.
13       Q    All right.  And Parke Davis had no
14  clinical data for Neurontin use opinion treating
15  bipolar, clinical data?
16       A    At that time, yes, that's correct.
17       Q    Were there any other inventors,
18  coinventors?
19       A    There were not.
20       Q    So, what was the basis for your
21  statement that the invention further includes the
22  treatment of bipolar disorder that you made in
23  your May 15, 1995 application?
24           MS. MC GRODER:  Where are you reading
25       from, Counsel?
```

255

```
1              Atul Pande, M.D.
2           MR. GREENE:  From the exhibit.
3           MS. MC GRODER:  Oh.  Well, that has
4       additional context, but -- so, I object on
5       the basis of your question being misleading.
6       Answer it if you can.
7        A    I have already told you that the
8   basis for the invention was the behavioral effects
9   that were seen in epilepsy patients, and it was in
10  my clinical judgment a reasonable conclusion that
11  if those effects occurred in patients with bipolar
12  disorder that they would be beneficial.
13       Q    Okay.  And just so our record is
14  clear, those 16 patents where you have listed had
15  the benefit that is described in the patent
16  application, those are patients from an epilepsy
17  trial, not a trial of Neurontin for bipolar;
18  correct?
19       A    That is correct.
20       Q    Now, you made a presentation at the
21  psychiatric advisory board; correct?
22       A    Yes.
23       Q    And back, back at the time that
24  you -- strike that.
25           Back in May of 1995, did you know
```

256

```
1              Atul Pande, M.D.
2   what dose Neurontin should be prescribed at for
3   treatment of bipolar?
4        A    I'm sorry.  What date did you say?
5        Q    In May of 1995.
6        A    I did not.
7        Q    Did you know what dose Neurontin
8   should be prescribed at for the other two
9   psychiatric indications, social phobia and panic
10  disorder, in May of 1995?
11       A    I did not.
12       Q    And at the advisory board, there were
13  a number of psychiatrists that attended that
14  advisory board?
15       A    Yes.
16       Q    Do you recall how many?
17       A    I don't actually.
18       Q    Okay.  Was it the consensus of those
19  psychiatrists that attended the advisory board --
20  can I refer to them as faculty?
21       A    Yes.
22       Q    Okay.  Was it the consensus of the
23  faculty that attended that advisory board that
24  Depakote's effective use of medical education to
25  transmit information to the medical community was
```

257

```
1              Atul Pande, M.D.
2   a good model for Parke Davis to follow with regard
3   to communicating information about Neurontin to
4   the medical community?
5           MS. MC GRODER:  Object to form and
6       foundation.
7        A    I don't know what you are basing it
8   on.  And, again, I have no recollection that there
9   was that kind of a statement ever made at the
10  meeting.
11       Q    You were there, right?  You were at
12  the advisory board?
13       A    Yes.
14       Q    You were there for -- do you know how
15  long it lasted?
16       A    Probably six hours or something like
17  that.
18       Q    Why don't you turn to exhibit, the
19  exhibit you have before you.  What is that number?
20  Is it 11?
21           What's the number of the exhibit,
22       just for our record?  Is it 11?
23       A    Yes, it's 11.
24       Q    Thank you.  Bates 430.
25           And you see the section of the memo
```

258

Atul Pande, M.D.

1
2  entitled Dr. Pande's summary?
3      A   Yes.
4      Q   Okay.  You might want to take a
5  minute to look at it, and then I just want to ask
6  you, does that summarize what you said at the
7  advisory board?
8          Does that summarize what you said at
9  the advisory board?
10     A   Yes.
11     Q   When you say that data from the
12  ongoing studies in the Cambridge labs on tolerance
13  withdrawal self-administration are expected at the
14  end of the third quarter, what studies were you
15  referring to there?
16     A   These would have been preclinical
17  studies, because that's what the Cambridge
18  Laboratory was charged with doing.
19     Q   But preclinical studies of -- of
20  Neurontin for bipolar?
21     A   No.  For what it says here, tolerance
22  withdrawal in self-administration, are
23  potential adverse effects that can occur in
24  psychiatric patients treating with drugs.
25     Q   The summary indicates that you said

259

Atul Pande, M.D.

1
2  dosing for psychiatric indications are not known;
3  correct?
4      A   That's correct.
5      Q   And this summary indicates that you
6  said, low potency (with potential high dosing)
7  impacts cost of the treatment per day and patient
8  compliance.
9          Is that something you said in your
10  presentation?
11     A   Yes.
12     Q   By low potency, what did you mean by
13  that sentence?  Why don't you explain it to us?
14     A   Low potency means that, milligram for
15  milligram, you need more of the drug in order to
16  achieve an effect.
17     Q   You are talking about Neurontin;
18  correct?
19     A   Yes, yes.
20     Q   Do you mean to suggest here that
21  Neurontin is not a very potent drug at low doses?
22     A   Potency, in the sense of purely a
23  milligram comparison.  So, as compared to another
24  drug that may produce an effect at 500 milligrams,
25  if Neurontin does it at 300 milligrams, that would

260

Atul Pande, M.D.

1
2  be a low dose of drug.
3      Q   What this is summarizing, I'm not
4  trying to put words in your mouth, this is
5  summarizing something you said at the advisory
6  board; correct?
7          MS. MC GRODER:  Object to form.
8      Q   Is that right, this sentence --
9      A   Yes.
10     Q   -- that I am directing your attention
11  to, under Dr. Pande's summary?
12     A   Yes.
13     Q   Is this summarizing something you
14  said at the advisory board?
15     A   Yes.
16     Q   And low potency impacting cost of
17  treatment per day, does that mean that you have
18  got to prescribe more to the patient because of
19  the low potency?
20     A   Yes.
21     Q   And as the milligrams go up, or the
22  more you prescribe to the patient, the cost goes
23  up; is that right?
24     A   Yes.
25     Q   Now, you see the faculty consensus

261

Atul Pande, M.D.

1
2  paragraph?  I just want to ask you a couple
3  questions about that first paragraph under faculty
4  consensus.
5          MS. MC GRODER:  I think if he's going
6      to answer questions about this document he
7      said he needs to read the whole document.
8      There could be context to what you are
9      asking him in the remainder, remaining six
10     or eight pages of this document.
11     Q   Are you all set?
12     A   Yes.
13     Q   Have you had chance to read the
14  faculty consensus paragraphs?
15     A   Yes.
16     Q   Does that summarize what the
17  consensus of the faculty was at that advisory
18  board?
19         MS. MC GRODER:  Object to form?
20     A   I don't have an independent
21  recollection of it, but I just read it.
22     Q   Having read it, let me just ask you,
23  the second sentence, psychiatric indications,
24  including mood elevation in neuropathic pain,
25  suggest the marketing avenues.

262

1           Atul Pande, M.D.
2           Do you know what that means?
3           MS. MC GRODER:  Object to form and
4    foundation.
5        A   Yes.  Again, I am not an expert on
6    marketing I have told you that several times.
7        Q   I have heard that several times.
8    Aside from not being an expert on marketing --
9        A   Right.
10       Q   -- can you tell me what that means?
11          MS. MC GRODER:  Object to foundation.
12   No foundation.
13       A   I think what it does suggest is that
14   there may be opportunity in those areas, yes.
15       Q   To market Neurontin for mood
16   elevation and neuropathic pain; correct?
17       A   Yes.
18          MS. MC GRODER:  Object to form and
19   foundation.
20          You have to let me get my objection
21   in before you answer.
22       Q   Depakote, what is Depakote?
23       A   Depakote is valproate, sodium
24   valproate.
25       Q   So, Depakote's effective use of

263

1           Atul Pande, M.D.
2    medical education to transmit information to the
3    medical community is a good model.
4           Is that what that statement says?
5           MS. MC GRODER:  Object to form and
6    foundation.
7        A   That's what the statement does say.
8        Q   Do you know what that means?
9           MS. MC GRODER:  Same objection.
10       A   I think it's referring to
11   dissemination of information, from the -- from the
12   studies, the proposed studies.
13       Q   Does that mean that Parke Davis could
14   follow Depakote's example and use medical
15   education to transfer -- excuse me, to transmit
16   information about Neurontin's use for psychiatric
17   indications to the medical community?
18          MS. MC GRODER:  Objection to form,
19   foundation, and calls for speculation.
20       A   Can you repeat the question again?
21       Q   I can have her read it back.  If I am
22   interpreting it incorrectly, because I can't
23   interpret things I don't write, but if I am
24   interpreting it incorrectly, just let me know.
25          MS. MC GRODER:  He didn't write the

264

1           Atul Pande, M.D.
2    document, which you just implied in your
3    objectionable colloquy, so, he can't
4    interpret it any more than you, but go ahead
5    and ask.
6           (Record read.)
7           MS. MC GRODER:  Object to that
8    question.
9        A   I don't think it says anything about
10   whether Parke Davis could follow the example or
11   not.  I think all it says is that Depakote had
12   success using medical education to transmit the
13   information.
14       Q   To transmit the information to the
15   medical community is a good model, a good model
16   for Parke Davis to follow.
17          MS. MC GRODER:  Object to form and
18   foundation, and calls for speculation.
19       A   I don't really know.
20       Q   You don't know.  Okay, Doctor.
21          MR. GUNTER:  Do you guys have a
22   better copy?
23          MR. GREENE:  You know what --
24          MR. HOEFFNER:  They have a Xerox
25   machine a few doors down that will blow

265

1           Atul Pande, M.D.
2    things up.  If you think that will make it
3    easier, you can get them to make copies.
4           MR. GUNTER:  That is not really our
5    task to provide legible copies.
6           MR. GREENE:  Can we go off the record
7    for a second?
8           THE VIDEOGRAPHER:  The time is
9    3 o'clock.  We are going off the record.
10          (Discussion held off the record.)
11          THE VIDEOGRAPHER:  The time is 3:02.
12   We are on the record.
13          (Pande Exhibit Number 12 marked for
14   identification as of this date.)
15   BY MR. GREENE:
16       Q   Do you have Exhibit 12 before you,
17   Doctor?
18       A   Yes.
19       Q   Can you identify what it is?
20       A   It's a document that is titled:
21   Gabapentin in Psychiatric Disorders, Rationale and
22   Strategy."
23       Q   Is this a document you prepared?
24       A   I appears to be that.
25       Q   It's got your name on it?

266

Atul Pande, M.D.

1

2    A    Yes.
3    Q    And can you tell me approximately
4    when you prepared this?
5    A    It would have been during the time
6    that I was planning for the psychiatric studies in
7    Neurontin, on Neurontin, so that would have been
8    probably in the early part of 1995.
9    Q    And why did you prepare this
10   document?
11   A    I believe this was prepared for the
12   discussion with the advisory board that was held
13   in Chicago.
14   Q    Okay.  And you made a presentation at
15   that advisory board?
16   A    Yes.
17   Q    And some of the things you said were
18   summarized in the exhibit we reviewed a few
19   moments ago?
20   A    Yes.
21   Q    Did you give a PowerPoint
22   presentation at that advisory board?
23   A    I don't remember what the
24   presentation software was, but, yes, I did give a
25   presentation.

267

Atul Pande, M.D.

1

2    Q    Looking at Exhibit 12, are these
3    slides that were presented, copies of slides that
4    were presented to the advisory board?
5    A    It appears to be a set of slides.
6    Q    Okay.
7    A    I don't have an independent
8    recollection that these were the slides that were
9    presented.
10   Q    Okay.  Doctor, can you turn to the
11   second page of Exhibit 12?
12   Does that page have what appear to be
13   three slides, copies of three slides?
14   A    Yes.
15   Q    Can you read the slide that is in the
16   middle or bottom of the page?
17   A    Not very well.
18   Q    Okay.  I have got some -- I have blown
19   up or had somebody blow up the slides.
20   A    Okay.
21   Q    I am going to give you a copy and I
22   have a copy, and then we will make some copies for
23   others.
24   MS. MC GRODER:  Thanks.
25   MR. GREENE:  If that's all right.

268

Atul Pande, M.D.

1

2    MS. MC GRODER:  Do you want to mark
3    it or --
4    Should we like make it 12 A or 13?
5    MR. GREENE:  Yeah.  Why don't we do
6    that?  We will make it Exhibit 13.
7    And, for the record, Exhibit 13 is
8    two pages and they are just a blow up of the
9    slides that appear on page two of Exhibit
10   12.
11   MS. MC GRODER:  Oh, so these are --
12   Exhibit 13 is two pages but they are, it's
13   the same thing, different magnitudes of the
14   same slide?  Okay.
15   (Pande Exhibit Number 13 marked for
16   identification as of this date.)
17   BY MR. GREENE:
18   Q    Do you have that in front of you?
19   A    Yes.
20   Q    One of your slides was entitled:
21   Gabapentin for Psychiatric Disorders, the
22   rationale.
23   Do you see that?
24   A    Yes.
25   Q    Then you have empirical and

269

Atul Pande, M.D.

1

2    anecdotal.  What does "empirical" mean?
3    A    Empirical refers to external data.
4    Q    Efficacy of CVZ and ZKP.  What are
5    you referring to there?
6    A    Carbamazepine and valproate.
7    Q    As of the date of the presentation to
8    the psychiatric advisory board, those two drugs
9    were approved for bipolar disorder, weren't they?
10   A    Valproate was.  I am not sure if
11   carbamazepine was.
12   Q    Okay.  And then the next item under
13   that is preclinical data to gabapentin.  That is
14   referring to the epilepsy preclinical data?
15   A    No, what it's referring to is the
16   preclinical data that referred, or that supported
17   the potential utility in anxiety disorders.
18   Q    What preclinical data is that you are
19   referring to?
20   A    I believe it's -- it was in one of
21   the -- mentioned in one of the documents
22   previously.  I think if you look at Exhibit 8,
23   Bates 71, towards the bottom of the page under
24   preclinical data.
25   Q    Okay.  You are talking about the

270

Atul Pande, M.D.

1
2      studies on the rats?
3         A    That's correct.
4         Q    Rats for our record, R-A-T-S.
5         A    Well, the studies that are referred
6      to here are not all in rats.
7         Q    What are they in?  What are the ones
8      that are not in rats?
9         A    There is one that is in a mouse.
10        Q    Okay.
11        A    And another one is in a type of small
12     monkey.  It's called a marmoset.
13        Q    Okay.  These are all studies that,
14     the preclinical data studies are involved with
15     animals and for anxiety; is that correct?
16        A    That's correct.
17        Q    Not for bipolar?
18        A    No.
19        Q    There was no preclinical data for
20     Neurontin's use for treating bipolar?
21        A    That is correct.
22        Q    And the other rationale that you list
23     in your presentation to the psychiatric advisory
24     board is anecdotal; correct?
25        A    Yes.

271

Atul Pande, M.D.

1
2         Q    And anecdotal for our record, why
3      don't you define what that is?
4         A    Anecdotal refers to in controlled
5      data, meaning they don't come from formal studies
6      or, if they do, they are part of a retrospective
7      analysis.  But anecdotal could also mean single
8      case reports.  So, that's -- that's what would
9      have been referred to there.
10        Q    Then you refer to the epilepsy
11     trials, and those are the 16 patients that we
12     talked about that were listed in the patent
13     application; is that right?
14        A    The 16 that were included in the
15     patent application, but what this is referring to
16     is the entire analysis of which that 16 was, was a
17     subset.
18        Q    Well, is it your testimony that there
19     were more than 16 patients in the epilepsy trials
20     that showed beneficial use of Neurontin, more than
21     the 16 you identified?
22        A    There may very well have been.
23        Q    I'm not asking you to guess.  I'm
24     asking you were there.
25        A    Without looking at the analysis that

272

Atul Pande, M.D.

1
2      I did, I would have no way of saying yes or no.
3         Q    Well, you only identified 16 when you
4      filed for your patent application, correct?
5         A    Sixteen that were shown in the patent
6      application, yes.
7         Q    Well, that's data that you provided
8      to the patent office; right?
9         A    That is correct.
10        Q    Then if you turn, again, in Exhibit
11     12, to the Bates number 742, the last slide,
12     gabapentin for psychiatric uses, you list some
13     disadvantages; correct?
14        A    Yes.
15        Q    You say short elimination half-life?
16        A    Yes.
17        Q    Does that mean the drug is excreted
18     quickly?
19        A    Yes.
20        Q    And then you say it's low potency;
21     correct?
22        A    Yes.
23        Q    Meaning Neurontin is not very potent
24     at low doses?
25        A    That's correct.

273

Atul Pande, M.D.

1
2         Q    And then you have a bullet here,
3      patent life; correct?
4         A    Yes.
5         Q    And that means that there is a narrow
6      window or a short-term of exclusivity for
7      Neurontin as of the date that you made this
8      presentation?
9         A    That is correct.
10        Q    Were you involved in collecting
11     information that was put into a marketing
12     assessment for Neurontin in neuropathic pain and
13     spacticity?
14        A    I was not.
15        Q    Do you recall receiving copies of the
16     marketing assessment for Neurontin's use in
17     neuropathic pain and spacticity?
18        A    I don't have an independent
19     recollection of that.
20             (Pande Exhibit Number 14 marked for
21             identification as of this date.)
22        Q    Let me show you Exhibit 14.
23             Let me know when you are ready.  I
24     only have a few questions I want to ask you about
25     that.  Feel free to look through it if you like.

274

```
 1            Atul Pande, M.D.
 2            Okay.  Have you had a chance to look
 3  at Exhibit 14?
 4       A    I have glanced at it, it's a pretty
 5  extensive document, for just a few minutes.
 6       Q    I want to ask you about that.
 7            You testified a little earlier that
 8  you conducted a trial for Neurontin and treatment
 9  of bipolar; correct?
10       A    Yes.
11       Q    And I have referred to it as 209, but
12  I think the official number is 945-209.
13       A    That's correct.
14       Q    And that was a double blinded,
15  placebo controlled trial; correct?
16       A    Yes.
17       Q    Was that a pivotal trial?
18       A    I am not sure what you mean by
19  "pivotal."
20       Q    Do you know what -- can you define
21  "pivotal trial" for me?
22            MS. MC GRODER:  Objection, no
23  foundation.
24       Q    What it means to you?
25            MS. MC GRODER:  Objection, no
```

275

```
 1            Atul Pande, M.D.
 2  foundation.
 3       A    As used in common parlance in the
 4  industry, a pivotal trial means one that would
 5  support part of the requirement for regulatory
 6  approval, although even the FDA has shied away
 7  from defining what a pivotal trial is.
 8       Q    Using your definition of pivotal
 9  trial, was your bipolar study 209 a pivotal trial?
10       A    As designed, and I have said this
11  before, the trial was intended to be an
12  exploratory trial.  In that sense, you could
13  probably say there was a phase two trial, which is
14  intended to obtain the first evidence of efficacy,
15  if it exists, and subsequent to that, in a
16  development program, there would be additional
17  trials that would be carried out to confirm
18  whatever effect might have been seen in the
19  exploratory trial.
20            Now, generally when the FDA considers
21  the evidence in order to make a judgment about
22  approving a drug, they do take into account each
23  of those trials that might have been done as
24  exploratory studies, if they support the overall
25  conclusion that the decision drug is effective and
```

276

```
 1            Atul Pande, M.D.
 2  safe, then it would contribute towards that
 3  decision to approve.
 4       Q    Was your study 209 the first
 5  exploratory study that was done for Neurontin in
 6  treating bipolar patients?
 7       A    To my knowledge, yes.
 8       Q    Are you familiar with Dr. Fry's
 9  study?
10       A    I am.
11       Q    Was his an exploratory study?
12       A    His, his study used a design that --
13  at that time would probably not have been
14  acceptable for regulatory purposes, and the reason
15  for that was that they were using what's called a
16  crossover design, where people who are suffering
17  from the disease receive several different
18  treatments and, after some period of time, are
19  then switched from one treatment group to another
20  in an attempt to compare the outcome on different
21  treatments.  That kind of a design is not accepted
22  as yet, to my knowledge, by the regulatory
23  agencies.
24            So, in that sense it would not have
25  been a -- an exploratory study that would
```

277

```
 1            Atul Pande, M.D.
 2  eventually meet regulatory purpose.
 3       Q    Have you had -- let me direct your
 4  attention back to Exhibit 14.
 5            Have you had a chance to look at it?
 6       A    Yes, I have glanced at it.
 7       Q    Is Exhibit 14 the Parke Davis
 8  marketing assessment for the Neurontin and
 9  neuropathic pain and spacticity?
10       A    That's what the document says, yes.
11       Q    Okay.  And you received a copy of
12  this according to the distribution list?
13       A    It appears so.
14            MS. MC GRODER:  Is that a question?
15       Q    Yes.
16            You received a copy of this according
17  to the distribution list; is that correct?
18       A    It appears so, yes.
19       Q    Okay.  And this marketing assessment,
20  according to the distribution list, was circulated
21  to you on or about July 31, 1995?
22            MS. MC GRODER:  Object to form and
23  foundation.
24       A    That's the date of the memo, yes.
25       Q    Of the memo.
```

278

Atul Pande, M.D.
1
2       And the memo indicates that the,
3   states enclosed is the final version of the
4   marketing assessment for Neurontin and neuropathic
5   pain and spacticity; correct?
6       A   Yes.
7       Q   The results of the recommended
8   exploratory trials in neuropathic pain, if
9   positive, will be publicized in medical congresses
10  and published, but there is no intention to fully
11  develop this indication at this point; correct?
12          MS. MC GRODER: Objection. No
13      foundation.
14      Q   Is that what it states?
15      A   That's what it states.
16      Q   Do you understand what that sentence
17  means?
18          MS. MC GRODER: Objection. No
19      foundation.
20      A   I believe what the statement says is
21  that there is an intent to do studies in
22  neuropathic pain, but there is not an intent to
23  proceed to a program of studies that might lead to
24  approval.
25      Q   Okay. So, the studies, you say

279

Atul Pande, M.D.
1
2   studies, but the wording here is exploratory
3   trials; correct.
4       A   That would be covered by what I
5   referred to as studies, sure.
6       Q   What you left out in your answer is
7   that the results, if positive, would be publicized
8   in medical congresses and published; is that
9   correct?
10          MS. MC GRODER: Object to form and
11      foundation.
12      Q   In that what the recommendation says?
13          MS. MC GRODER: Same objection.
14      A   That's what it says.
15      Q   And the purpose of publicizing the
16  results of the exploratory trials in medical
17  congresses and publishing would be to get to word
18  out to physicians about the results of the
19  studies?
20          MS. MC GRODER: Object to form and
21      foundation.
22      A   It is to inform physicians about the
23  findings of the studies.
24      Q   Okay. And was one of the purposes in
25  doing that to encourage the physicians to

280

Atul Pande, M.D.
1
2   prescribe Neurontin for neuropathic pain?
3          MS. MC GRODER: Object to form and
4      foundation.
5       A   I think I have said this before, that
6   my job was research and development. So, that
7   would not have been my purpose. But, you know,
8   if, there were other people that were charged with
9   worrying about the marketing aspect, I would have
10  no way of knowing all the details or of making any
11  decisions about it.
12      Q   Is it your testimony that you don't
13  know if one of the purposes of publicizing the
14  results of the neuropathic pain exploratory trials
15  in medical congresses and publications was to
16  encourage Neurontin's use amongst physicians?
17          MS. MC GRODER: Objection. No
18      foundation. Calls for speculation, and
19      asked and answered.
20      A   I don't know for sure.
21      Q   Okay. Now, come July 31 of 1995, you
22  had been at the company about a year; correct?
23      A   Close, yes.
24      Q   Do you know what your bonus was for
25  the year 1995?

281

Atul Pande, M.D.
1
2       A   I do not.
3       Q   More than it was for the year 1994?
4          MS. MC GRODER: Object to form and
5      foundation.
6       A   I have no way of knowing without
7   referring back to actual documents.
8       Q   Okay. But I think you said you
9   started in August of '94.
10      A   That's correct.
11          MR. GUNTER: If we are getting to a
12      good stopping point, just whenever you are
13      ready.
14  BY MR. GREENE:
15      Q   Can you turn to the Bates 869, last
16  three digits, 869.
17          Have you got that page?
18      A   Yes.
19      Q   This is entitled Parke Davis
20  Marketing Assessment, Neurontin and Neuropathic
21  Pain and Spacticity, Overall Conclusions/
22  Recommendations.
23      A   Yes.
24      Q   Do you know if these conclusions and
25  recommendations were accepted by the new product

282

Atul Pande, M.D.

1
2 committee?
3           MS. MC GRODER:  Objection.  No
4 foundation.
5     A    I don't actually know.
6     Q    You don't know.
7           Will you turn to page 868?  Do you
8 have the page here?
9     A    Yes.
10    Q    That was signed by Mr. Boris?
11    A    Yes.
12    Q    Does that indicate he prepared the
13 document?
14    A    That's what it shows.
15    Q    And Mr. Brandicourt, he signed the
16 document.  Does he indicate he and Mr. Pieroni
17 approved the document?
18    A    That's what it shows, yes.
19    Q    Now, if you come back to page 869,
20 there are two bullet items in that page.
21           Do you see that?
22    A    Yes.
23    Q    And the first is a recommendation to
24 start exploratory trials in neuropathic pain
25 associated with peripheral nerve damage due to

283

Atul Pande, M.D.

1
2 diabetes mellitus, trigeminal neuralgia,
3 post-herpetic neuralgia, neuropathic facial pain,
4 reflex sympathetic dystrophy in some of the larger
5 pain centers, Carolina pain center, St.
6 Elizabeth's Hospital in Boston with a clinical
7 grant and drug supply and disseminate the results
8 through publication in neurological and pain
9 congresses.
10           Is that what it says?
11           MS. MC GRODER:  Objection.  No
12 foundation.
13    A    That's what it says.
14    Q    And Parke Davis would be the provider
15 of the drug supply in studies that were done
16 involving Neurontin; correct?
17    A    Yes.
18    Q    And the next paragraph has a
19 recommendation.  The first sentence says, the
20 market for spacticity is small and does not
21 warrant an investment in clinical development.
22           Do you see that?
23    A    Yes.
24    Q    Let me have you drop down to that
25 last paragraph.  About midway in the paragraph, I

284

Atul Pande, M.D.

1
2 want to read you a sentence.
3           The use generated by exploratory
4 trials in neuropathic pain associated with
5 peripheral nerve damage due to diabetes mellitus
6 in the U.S. should approach 12 to 15 million a
7 year by 1999 when the patent extension ends.
8           Can you tell me how the use generated
9 by exploratory trials in neuropathic pain would
10 produce 12 to 15 million a year?
11           MS. MC GRODER:  Objection.  No
12 foundation.  Calls for speculation.
13    A    I really can't answer that, because,
14 first of all, I didn't generate this document, and
15 second, I have said probably 15 times that I am
16 not an expert in marketing.  So, for me to answer
17 this question I think I would be overreaching, my
18 -- my expertise.
19    Q    Okay.  Well, based on your
20 experience, based on your education and your
21 training as a physician, your experience as a
22 physician, your experience at Parke-Davis, your
23 experience at these other drug companies you have
24 worked for, can you tell me, is a pharmaceutical
25 company allowed to promote a drug for use before

285

Atul Pande, M.D.

1
2 the FDA approves it?
3           MS. MC GRODER:  Object to form and
4 foundation.
5    Q    Pardon me?
6    A    It is not.
7    Q    Based on your experience at
8 Parke-Davis-Davis, did you come to learn that the
9 government investigated Parke-Davis-Davis for its
10 marketing of Neurontin?
11    A    I heard about it.
12    Q    And where did you hear about it, at
13 work?
14    A    I don't have a specific recollection
15 of how I might have heard, whether it was through,
16 through people at work or in the media, or
17 however.  I don't recall.
18    Q    Okay.  What did you hear?
19    A    I heard about an investigation into,
20 into marketing practices.
21    Q    Whose marketing practices?
22    A    Warner Lambert.
23    Q    And Parke-Davis-Davis is a division
24 of Warner Lambert; correct?
25           MS. MC GRODER:  Object to form.

286

```
1          Atul Pande, M.D.
2      A    Right.
3      Q    And you worked for Parke Davis?
4      A    That's correct.
5      Q    And what you heard, was it an
6   investigation into the marketing,
7   Parke-Davis-Davis marketing practices for the drug
8   Neurontin?
9      A    I believe so.
10     Q    And did you hear that the government
11  was investigating Parke-Davis-Davis for the
12  off-label promotion of Neurontin?
13     A    I did not know the details of what
14  the investigation was.
15     Q    I didn't ask you if knew the details.
16  I just asked you:  Did you hear the government was
17  investigating Parke-Davis for the off-label
18  promotion of Neurontin?
19         MS. MC GRODER:  Object to form, it's
20  argumentative, asked and answered.
21     A    I'm just not sure what, what I heard
22  at the time.
23     Q    At some point, did you become aware
24  that the government was investigating Parke-Davis
25  for off-label promotion of Neurontin?
```

287

```
1          Atul Pande, M.D.
2          MS. MC GRODER:  Object to form, asked
3   and answered.
4      A    Yeah, I mean -- you are asking me
5   something very specific, I just can't recall.
6      Q    At sometime did you come to learn
7   that Parke-Davis pled guilty of violation of the
8   Food Drug and Cosmetic Act for off-label promotion
9   of Neurontin?
10         MS. MC GRODER:  Object to form and
11  foundation.
12     A    I knew that there was a guilty plea.
13  What the specifics of the plea were, I really
14  don't, don't understand it.
15     Q    But based on your experience, you
16  know it's improper for a drug company to promote
17  the use of a drug before they get FDA approval for
18  the drug, right?
19         MS. MC GRODER:  Objection, no
20  foundation.
21     A    Yeah, companies are only allowed to
22  promote the approved uses of a drug.
23     Q    Right.  And drug companies promote
24  the approved uses of a drug to generate sales of
25  the drug, don't they?
```

288

```
1          Atul Pande, M.D.
2          MS. MC GRODER:  Objection, form and
3   foundation.
4      A    It's to inform physicians about the
5   appropriate use of the drug.  Ultimately the
6   judgment about whether or not the use of the drug
7   is made by the clinicians based on the information
8   that the company may have provided, plus the
9   experience and judgment of the physician acting on
10  their own.
11     Q    Did Parke-Davis promote the approved
12  use of Neurontin?
13         MS. MC GRODER:  No foundation.
14     A    Which approved use are you talking
15  about?
16     Q    Well, you worked at Parke-Davis for a
17  period of time you told us.
18     A    Yes.
19     Q    And you know that it was approved as
20  adjunctive therapy for treating adults with
21  generalized --
22     A    Refactory epilepsy.
23     Q    -- refactory seizure, correct?
24     A    Yes.
25     Q    In May 2002, the FDA approved it for
```

289

```
1          Atul Pande, M.D.
2   management of post-herpetic neuralgia, correct?
3      A    That is correct.
4      Q    All right.  And based on your
5   experience at the company, can you tell us:  Do
6   you know whether Warner Lambert or Parke-Davis
7   promoted Neurontin for those two FDA approved
8   uses?
9          MS. MC GRODER:  Objection, no
10  foundation.  He wasn't in sales and
11  marketing.
12     A    Yeah, I have no direct knowledge of
13  whether they did or did not.
14     Q    Okay.
15         So, it's your testimony here under
16  oath you have no idea whether FDA promoted
17  approved uses of Neurontin, is that what you want
18  to leave the jury with?
19         MS. MC GRODER:  Objection, no
20  foundation.  Argumentative.
21     A    That is not what I said.  What I said
22  is that I have no direct knowledge of how they
23  promoted, since my job was not in the field, I
24  wasn't there with salespeople to be able to speak
25  to whether they did or did not promote for those
```

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

290

Atul Pande, M.D.

1
2 uses.
3     Q    Do you have indirect knowledge that
4 Parke-Davis promotes Neurontin for approved uses?
5         MS. MC GRODER:  Objection, no
6 foundation.
7     A    Yes.
8     Q    And isn't your bonus in part based on
9 how well Neurontin does?
10        MS. MC GRODER:  Objection, no
11 foundation.
12    Q    Or did?
13        MS. MC GRODER:  And it calls for
14 speculation, assumes facts not in evidence.
15    A    Part of my bonus was dependent on the
16 overall sales of the company in the same
17 proportion as any other employee who was eligible
18 for the bonus.
19    Q    Which included the sales of
20 Neurontin; correct, Doctor?
21    A    It did.
22    Q    Okay.  Will you turn to the next page
23 of the exhibit?
24        And this is entitled, "Neuropathic
25 pain associated with diabetic peripheral

291

Atul Pande, M.D.

1
2 neuropathy situation analysis."
3         Correct?
4     A    That's correct.
5         MS. MC GRODER:  Tom, how much more do
6 you have on this document?  I mean, we have
7 been going for an hour-and-a-half.  We are
8 ready for a break.
9         MR. GREENE:  Okay.
10        MR. GUNTER:  Your tape is probably
11 about out.
12        MR. GREENE:  Good time to take a
13 break.
14        MS. MC GRODER:  We can go two
15 minutes.
16        MR. GREENE:  We can take a break now.
17        VIDEOGRAPHER:  The time is 3:36.
18 This ends tape four of the videotape
19 deposition of Atul Pande.  We are off the
20 record.
21        MR. GREENE:  Doctor, I remind you you
22 have an exhibit in front of you and you
23 shouldn't have any discussion with counsel
24 about that exhibit.
25        (Recess taken.)

292

Atul Pande, M.D.

1
2         THE VIDEOGRAPHER:  The time is 4:02.
3 This begins tape five of the videotape
4 deposition of Atul Pande.  We are on the
5 record.
6     Q    Back when you worked at Parke-Davis,
7 did you ever have any interaction with Phil
8 Majestro?
9     A    I probably did.
10    Q    Okay.  For the record, who was Phil
11 Majestro?
12    A    Phil Majestro worked in the Marketing
13 Department of Parke-Davis Warner Lambert.
14    Q    Did you have any discussion with him
15 about the publications strategy for Neurontin?
16    A    I don't have any specific
17 recollection of that.
18    Q    Did you ever have any discussion with
19 him about Dr. Gorson's study of Neurontin for
20 diabetic peripheral neuropathy?
21    A    I don't recall that, and it would be
22 highly unlikely given that my responsibility was
23 not for any of the development for neuropathic
24 pain.
25    Q    Who had that responsibility in your

293

Atul Pande, M.D.

1
2 department?
3     A    It was not my department, it was Mark
4 Pierce's department, right?
5     Q    I'm sorry.
6     A    And I think the physician who would
7 have had responsibility for it more than likely
8 would have been Betty Garofalo who was a
9 neurologist working on the pain development
10 program.
11    Q    And was Mark Pierce her superior?
12    A    Yes.
13    Q    And was there another physician in
14 that department that worked on Neurontin and
15 neuropathic pain?
16    A    Which time frame are we talking
17 about?
18    Q    During the period of time you were
19 working at Parke-Davis.
20    A    If you are talking about the entire
21 time period?
22    Q    Yes, I am.
23    A    The entire six years.  Then there was
24 another physician who joined later on named Mike
25 Poole.

294

Atul Pande, M.D.

1
2    Q    P-O-O-L-E?
3    A    Yes.
4    Q    And he worked on Neurontin and
5    neuropathic pain?
6    A    That's correct.
7    Q    Any other physicians that you can
8    identify?
9    A    I don't remember.
10   Q    But were the only physicians working
11   on Neurontin's use or study for psychiatric
12   indications; is that correct?
13   A    That is correct.
14        (Pande Exhibit Number 15 marked for
15        identification as of this date.)
16   Q    I showed you what we marked as
17   Exhibit 15.  Have you had a chance to read it?
18   A    Yes.
19   Q    It's a letter you wrote to Dr.
20   Soupus --
21   A    Soupus.
22   Q    -- Soupus; is that correct?
23   A    Yes.
24   Q    Was she one of the investigators in
25   your study 945-209?

295

Atul Pande, M.D.

1
2    A    Eventually she became an
3    investigator, yes.
4    Q    When you say eventually, was she not
5    an inventor at the beginning of the study?
6    A    No, she was, but I don't recall when
7    the study actually started, so, this letter is
8    dated August 3rd, 1995, I'm not sure the study had
9    actually begun by that time.
10   Q    Well, look at the handwriting on the
11   upper right-hand corner of your letter,
12   945-209-11.
13        What does that refer to?
14   A    I think what it refers to is that is
15   the study for which she would have been considered
16   as an investigator.
17   Q    That your study for bipolar?
18   A    That is correct.
19   Q    Does 11 refer to the study site
20   number?
21   A    I don't really remember this.
22   Q    You don't, okay.
23   A    This numbering system.
24   Q    Do you know what 11 stands for?
25   A    I don't.  I don't.

296

Atul Pande, M.D.

1
2    Q    In your second paragraph there, are
3    you referring to the study design for 209?
4    A    Yes.
5    Q    And you write, "I believe the most
6    feasible study would involve the use of gabapentin
7    or placebo as an adjunct to previously (partially)
8    effective or ineffective."
9        MS. MC GRODER:  The word there is
10       previous.
11       MR. GREENE:  I thought that's what I
12       said.
13       MS. MC GRODER:  You said previously.
14   Q    Why don't you read the sentence into
15   the record?
16   A    "I believe the most feasible study
17   would involve the use of gabapentin (or placebo)
18   as an adjunct to previous (partially effective or
19   ineffective?) therapy."
20   Q    What does that mean?
21   A    What that means is it's offering a
22   number of options for discussion about the design
23   of the study, and so, there is two things that are
24   being referred to in this statement.
25       One is about the study being at a

297

Atul Pande, M.D.

1
2    comparison of gabapentin with placebo, inpatients
3    who have either had a partial response to
4    treatment or have had a complete nonresponse to
5    treatment.
6        Those are all options that would be
7    possible for doing that kind of a trial.  So
8    that's what is being stated in this first
9    sentence.
10   Q    Okay.  And your next sentence, could
11   you read that into the record?
12   A    "The latter would be held constant
13   and the dependent measure would be mood
14   stability."
15   Q    "However defined"?
16   A    "However defined," yes.
17   Q    And what does that mean?
18   A    What that means is that the
19   background treatment, the treatment that the
20   patient was already on, would be held constant
21   during the course of the trial, and then they
22   would have gabapentin or placebo added on top of
23   that background treatment and would be assessed
24   using a measure of mood stability, and the reason
25   that it says "however defined" is because at that

298

Atul Pande, M.D.

1
2      time, there was still continued debate about the
3      best way in clinical trials to measure mood
4      stability.
5             There are rating instruments that are
6      used, none of which is adequate for clinical
7      trials, and so people have continuously kept
8      working on those instruments to refine them.  So
9      what's implied here is that we were keeping an
10     open mind as to what that rating instrument would
11     be.
12         Q     Okay.  In the partially effective or
13     ineffective therapy, the design you were
14     describing here would require that that partially
15     effective or ineffective therapy be held constant,
16     correct?
17         A     That is correct.
18         Q     And that means not changed; correct?
19         A     That is correct.
20         Q     That means fixed at a certain dose
21     and not changing during the course of trial?
22         A     That is correct.
23         Q     Okay.  And was study 209, your
24     bipolar study, designed in that way?
25         A     Yes, it was.

299

Atul Pande, M.D.

1
2         Q     In your study 209, was it partially
3      effective or ineffective therapy?
4         A     The previous therapy?  The previous
5      therapy was either lithium or valproate, or
6      sometimes patients receive a combination of the
7      two, and we were willing to include in the study
8      patients who were in either of those treatment
9      situations.
10        Q     But those treatments remained fixed
11     in your study design?
12        A     Yes, the way the study was designed,
13     once the patient entered the study, there was a
14     stabilization period over which the doses of the
15     background treatments were adjusted in order to
16     make sure that --
17            (Telephone interruption.)
18        A     The background treatments were
19     adjusted in order to make sure that for the
20     double-blind randomized phase of the study, that
21     it would be possible to keep the patient, you
22     know, without changing the doses of those three
23     drugs, lithium, valproate or the combination, so
24     the stabilization period was given for the
25     clinician to exercise judgment.

300

Atul Pande, M.D.

1
2         For example, it's quite possible that
3      a patient would come in receiving lithium or
4      valproate who is not responding to treatment,
5      perhaps the only reason they are not responding is
6      they are not receiving an adequate dose.
7             The purpose of the stabilization
8      period was to allow for that to be corrected,
9      after which time the doses would be held constant
10     and then the effect of gabapentin versus placebo
11     would be tested.
12        Q     And do you recall what the length of
13     the stabilization period was in 945-209?
14        A     I don't have a precise recollection
15     of that.  I haven't looked at that study in quite
16     some time.
17            (Pande Exhibit Number 16 marked for
18     identification as of this date.)
19        Q     Let me show you what we marked as
20     Exhibit 16.
21            MR. GREENE:  Who is on the phone?
22     Could you identify yourself again, please?
23            MR. KEENAN:  Chris Keenan.
24            MR. GREENE:  This is Tom Greene
25     calling.  There is an awful lot of noise

301

Atul Pande, M.D.

1
2      coming through on the system here.  I think
3      that is emanating from your hand.
4             MR. KEENAN:  I will put the
5      hands-free off.
6             MR. GREENE:  I appreciate that.  As
7      you know, we are recording this and...
8             MR. KEENAN:  No problem.
9             MR. GREENE:  Thanks very much, Chris.
10            MR. KEENAN:  No problem.
11        Q     Have you had a chance to review
12     Exhibit 16?
13        A     Yes.
14        Q     And based on your experience at
15     Parke-Davis, can you tell us what Exhibit 16 is?
16        A     Exhibit 16 is a memo with an
17     accompanying document with the memo being titled,
18     "Neurontin marketing assessment."
19        Q     And the accompanying document, can
20     you tell us what that is?
21        A     The accompanying document is titled,
22     "Marketing assessment, Neurontin in migraine."
23        Q     Okay.
24            Now, were you provided with a copy of
25     this document?

302

Atul Pande, M.D.

1
2     A    I really can't tell.  I -- I don't
3  have a recollection of it, and the distribution
4  list page has some information missing.
5     Q    Well, why don't you turn to
6  distribution page 1588 and tell me if you are not
7  identified there, A. Pande, Ann Arbor, as
8  receiving a copy of the document?
9     A    Okay, I see it there.
10         MS. MC GRODER:  Object to form.  It
11  says he was cc'd.  It doesn't say he
12  received it.
13     Q    Does this distribution list indicate
14  to you that you received a copy of this document?
15     A    It is likely that I did, yes.
16     Q    And you would have reviewed it?
17     A    I can't say with any certainty.
18     Q    Well, did you have any responsibility
19  in your department for assisting in the
20  preparation of the marketing assessment for
21  Neurontin for the treatment of migraine?
22     A    I did not.
23     Q    Was there a physician in your
24  department, in the department that you worked in
25  that had responsibility for migraine?

303

Atul Pande, M.D.

1
2     A    Again, more than likely it would have
3  been Betsy Garofalo.
4     Q    Why do you say that?
5     A    Because her responsibility -- she is
6  a neurologist, and her responsibility was for the
7  neurological indications that were being studied.
8     Q    For pain?
9     A    For pain as well, yes.
10     Q    Will you turn to the page 1586, the
11  last four Bates, 1586 in the lower right-hand
12  corner?
13         This is a memo Mr. Boris prepared?
14         MS. MC GRODER:  Objection, no
15  foundation.
16     A    It appears that way, yes.
17     Q    It's got a signature on it?
18     A    Yes.
19     Q    And he indicates that, "Enclosed is
20  the final version of the marketing assessment for
21  Neurontin in migraine prophylaxis, which includes
22  the recommendations approved at the last NPC
23  meeting."
24         MS. MC GRODER:  Objection.  The
25         document speaks for itself.

304

Atul Pande, M.D.

1
2     A    That's what it says.
3     Q    He writes, "The decision is to
4  conduct only publication studies in the U.S. due
5  to the current patent situation in the U.S.,
6  limited use of anticonvulsants in the EC and
7  favorable preclinical results in analgesia seen in
8  CI-1008."
9         MS. MC GRODER:  Objection, no
10  foundation.
11     A    That's what it says.
12     Q    Do you know what CI-1008 is?
13     A    That was another drug that was in
14  development at Parke-Davis at the time.
15     Q    And what drug was that?
16     A    It's a drug called pregabalin.
17     Q    Do you know anything about
18  pregabalin?
19     A    I do know about pregabalin, yes.
20     Q    You did some studies involving
21  pregabalin?
22     A    Yes, I did.
23     Q    Did you know that Parke-Davis touted
24  pregabalin as being 30 times stronger than
25  Neurontin?

305

Atul Pande, M.D.

1
2         MS. MC GRODER:  Object to form and
3  foundation.
4     A    I don't know what you mean by touted,
5  so I can't really answer that question.
6     Q    Well, based on the work you did on
7  pregabalin and your experience at Parke-Davis, did
8  you ever come to learn that it was felt that
9  pregabalin was 30 times more stronger than
10  Neurontin?
11         MS. MC GRODER:  Objection to form and
12  foundation.
13     A    As a scientist, I really can't speak
14  to your question, because what potency or being
15  more powerful might mean to you might mean
16  completely different things to me.
17         You would have to be very specific
18  about how you, what piece of information you are
19  referring to on the basis of which that conclusion
20  is made.
21     Q    Did you head up any studies of
22  pregabalin?
23     A    Yes.
24     Q    And what were they?
25     A    They were studies in a number of

306

Atul Pande, M.D.

1
2  different psychiatric disorders.
3      Q   What were they?
4          MS. MC GRODER:  Objection.  Just to
5  relevance.
6          Go ahead and answer.
7      A   They were studies in generalized
8  anxiety disorder, studies in panic disorder,
9  social phobia, and one study in acute mania.
10     Q   Did Parke-Davis or Pfizer file any
11  NDAs for pregabalin for use in any of those
12  indications you just identified?
13     A   Yes, they did.
14     Q   Which ones?
15     A   For generalized anxiety disorder.
16     Q   How about social phobia?
17     A   They did not.
18     Q   Did they get approved for GAD?
19     A   They did not.
20     Q   What was the result of that, of the
21  filing?  Did they get a disapproval letter?
22         MS. SCULLION:  Well, I object on the
23         basis of relevance.  What does this have to
24         do with gabapentin and this litigation and
25         this deposition is about Dr. Pande's

307

Atul Pande, M.D.

1
2  experience with gabapentin.  I let you go a
3  little ways down this path related to
4  pregabalin, but it has no relevance.
5      Q   Go ahead, you can answer.
6      A   It was not approved because of the
7  FDA's assessment of some preclinical toxicity data
8  as not being favorable for use in anxiety
9  disorders.
10     Q   Okay.  Did they ever file an NDA or
11  -- for bipolar?
12     A   They did not.
13     Q   Do you know what the FDA approved
14  pregabalin for?
15     A   It was approved for the treatment of
16  the refractory epilepsy, and for pain associated
17  with post-herpetic neuralgia and diabetic
18  neuropathy.
19     Q   Okay.  Directing your attention again
20  back to Exhibit 16.
21         The final paragraph, there is, "The
22  results, if positive, will therefore be publicized
23  in medical congresses and published in peer review
24  journals."
25         Do you see that?

308

Atul Pande, M.D.

1
2      A   I see it.
3      Q   All right.  And that was the
4  recommendation of the new product committee?
5          MS. MC GRODER:  Objection, no
6  foundation, calls for speculation.
7      A   I really don't know whose
8  recommendation it was.
9      Q   Okay.
10         Can you tell me what Parke-Davis
11  North America Portfolio Management was?
12     A   I could not tell you.
13     Q   Let me direct your attention to 1608,
14  the same exhibit, the last four digits of the
15  Bates.
16         Do you see the issues and
17  opportunities, section eight.  Do you have that?
18     A   Yes.
19     Q   Under issues A.  "There is no
20  established preclinical rationale that would
21  support the use of Neurontin in migraine
22  prophylaxis"?
23     A   Yes.
24     Q   Did you know that as of July 1996?
25         MS. MC GRODER:  Objection, no

309

Atul Pande, M.D.

1
2  foundation.
3      A   I have no expertise in the migraine
4  prophylaxis area, so I would really have no reason
5  to either research this area or to be current with
6  what was known about Neurontin.
7      Q   Okay.
8      A   In migraine prophylaxis.
9      Q   Let me ask you about issue B.
10         Do you see that a 12-week migraine
11  prophylaxis study was conducted in Europe during
12  the late 1980's and revealed no statistically
13  significant difference between the placebo and
14  900 milligrams of Neurontin therapy?
15     A   I see that.
16     Q   Do you know what that means?
17         MS. MC GRODER:  Objection, no
18  foundation.
19     A   I think it's referring to a study
20  where no effect of 900 milligrams of Neurontin was
21  shown over placebo in migraine prophylaxis.
22     Q   Okay, okay, so it was not effective
23  when compared to placebo --
24     A   Yes.
25     Q   -- at that dose?

310

1      Atul Pande, M.D.
2      MS. MC GRODER:  Objection, no
3    foundation.
4      A    Yes.
5      Q    Do you recall at any time during
6    1996, participating in a discussion about the
7    publication strategy or the indication strategy
8    for Neurontin use in treating migraine?
9      A    I do not.
10      Q    Again, I think you said it was Betsy
11    Garofalo that would have been the physician within
12    your department?
13      A    Yes.
14      Q    That would have had responsibility
15    for migraine, Neurontin study for treating
16    migraine?
17      A    Right.
18      Q    Did you attend an APA advisory board
19    in May of 1997 at the Ritz-Carlton Laguna Niguel
20    in Dana Point, California?
21      A    I don't have any recollection of
22    that.
23      Q    Do you know what the APA refers to?
24      A    I believe you are talking about the
25    American Psychiatric Association.

311

1      Atul Pande, M.D.
2      Q    All right.  And did they have
3    periodic or annual meetings?
4      A    They had an annual meeting in the
5    spring, yes.
6      Q    Was it your practice to attend that
7    meeting?
8      A    Not usually.
9      (Pande Exhibit Number 17 marked for
10    identification as of this date.)
11      Q    Let me show you what we marked as
12    Exhibit 17.  Are you all set, Doctor?
13      A    Yes.
14      Q    Have you had a chance to review it?
15      A    Yes.
16      Q    Do you know who Alan Crook was?
17      A    I believe he was in the Marketing
18    Department of Parke-Davis Warner Lambert.
19      Q    Did he have some responsibilities for
20    Neurontin?
21      A    I think he did.
22      Q    Was he product manager for Neurontin?
23      A    I don't recall, but he may have been.
24      Q    How about Vic DiLamatta, do you know
25    who he is?

312

1      Atul Pande, M.D.
2      A    He was also in the marketing group.
3      Q    Have you ever heard of Cline Davis
4    Mann?
5      A    I'm sorry?
6      Q    Have you ever heard of a company
7    Cline Davis Mann?
8      A    No.  No, I have not.
9      Q    Do you know who Vina O'Brien is?
10      A    I do not.
11      Q    Do you, after having read this, does
12    it refresh your memory as to whether you attended
13    the APA advisory board meeting on May 17th, 1997
14    at the Ritz-Carlton Laguna Niguel at Dana Point?
15      A    I am almost 100 percent certain that
16    I did not.
17      Q    Okay.  Do you recognize some of
18    physicians that are listed in this first page of
19    this exhibit?
20      A    I recognize all of them.
21      Q    And were some of them involved in
22    your bipolar studies?
23      A    Yes, I believe at least three of
24    them.
25      Q    Could you identify them for me?

313

1      Atul Pande, M.D.
2      A    That would be Joe Calabrese, Terri
3    Ketter and Mark Frye.  Mark Frye, I am not totally
4    certain if he was or not.  I suspect he may have
5    been.
6      Q    All right.  Which bipolar study was
7    Dr. Calabrese involved in?
8      A    That was the 945-209 study that we
9    discussed before.
10      Q    Was he an investigator in 945-209?
11      A    Yes, he was.
12      Q    What site was he located at?
13      A    I believe he was still at Case
14    Western in Cleveland.
15      Q    Okay.  Was Mark Frye an investigator
16    in 945-209?
17      A    I am not totally sure, but he may
18    have been.
19      Q    And do you know what site he was at?
20      A    He is showing that he was at the NIMH
21    at the time.  That's what making me hesitate to
22    say that he might have been an investigator.
23      A    I think you mentioned Dr. Ketter.
24      A    Dr. Ketter, yes.
25      Q    Was he an investigator in 945-209?

314

Atul Pande, M.D.

2   A   He was.
3   Q   Who invited these three physicians to
4   be investigated in 945-209?
5   A   I would have.
6   Q   And did you know Dr. Calabrese prior
7   to inviting him?
8   A   Yes.
9   Q   And did you know Dr. Frye prior to
10  inviting him?
11  A   I got to know him. I didn't, I knew
12  the person that he worked with at the NIMH, his
13  mentor.
14  Q   Who is that?
15  A   That is Dr. Robert Post.
16  Q   Is Robert Post a psychiatrist?
17  A   Yes, he is.
18  Q   And do you know when you invited Dr.
19  Calabrese to be an investigator?
20  A   When as in a date?
21  Q   Yes, approximate date.
22  A   I don't think I can, I can reasonably
23  tell you a date.
24  Q   How about Dr. Frye?
25  A   Same, same applies for him.

315

Atul Pande, M.D.

2   Q   Do you have a memory of approximately
3   when the study began, again, for the record, study
4   945-209?
5   A   I don't actually remember when it
6   started.
7   Q   Were you aware Dr. Frye conducted a
8   study of his own of Neurontin in the treatment of
9   bipolar?
10  A   Yes, that was the study that was
11  conducted by Dr. Robert Post at the NIMH. And Dr.
12  Frye was one of the coinvestigators in that study.
13  Q   Okay.
14  A   And eventually ended up being the
15  first author.
16  Q   Do you know when the study results
17  were presented?
18  A   For Dr. Price?
19  Q   Yes.
20  A   I do not.
21  Q   Did anybody tell you that they were
22  presented at the APA meeting in May of 1997 in the
23  form of a poster presentation?
24      I didn't hear your answer.
25  A   You are asking if somebody told me,

316

Atul Pande, M.D.

2   no.
3   Q   And so you have no memory of
4   presenting slides at the APA advisory board
5   meeting?
6   A   I do not.
7   Q   Do you have any memory of making
8   slides for presentation at the APA advisory board
9   in May of 1997?
10  A   I do not.
11  Q   Now, you mentioned Dr. Frye was an
12  investigator on your 945-209.
13  A   I said he may have been, I am just
14  not 100 percent certain.
15  Q   Did he ever tell you that the results
16  of his study were negative for bipolar, for
17  Neurontin use in treating bipolar?
18  A   Did he ever?
19  Q   Yes.
20  A   Yes.
21  Q   When did he tell you that?
22  A   I don't remember that.
23  Q   Did he tell you that while your study
24  was underway?
25  A   I don't remember.

317

Atul Pande, M.D.

2   Q   Did he tell you that his study
3   results were negative before you began your study?
4   A   No, he did not.
5   Q   Did he tell you his study results
6   were negative after you completed your study?
7   A   I have told you, I can't recall when
8   he might have told me.
9   Q   And Dr. Ketter, you have identified
10  him as an investigator for 209 as well; right?
11  A   Yes.
12  Q   And you knew Dr. Ketter, didn't you?
13  A   Yes.
14  Q   And considered him a friend of yours,
15  didn't you?
16      MS. MC GRODER: Object to form.
17  A   I consider him to be a colleague,
18  yes.
19  Q   A professional colleague?
20  A   Yes.
21  Q   Did you ever review any of Dr.
22  Ketter's work?
23      MS. MC GRODER: Object to form.
24      Do you understand the question?
25  A   I don't know what you mean by

318

Atul Pande, M.D.
1
2   reviewing his work.  Can you be a little more
3   specific about what kind of work?
4       Q    Well, his study results involving
5   Neurontin and treatment of bipolar patients.
6       A    The only way that I might have
7   reviewed any of his work is that I sometimes act
8   as an editorial reviewer for scientific journals.
9   That is the only way in which there would have
10  been a reason for me to review his work.
11      Q    Look at the second page of this
12  exhibit.
13      The first box there lists the most
14  frequently used anticonvulsants to treat
15  psychiatric disorders; is that correct?
16      MS. MC GRODER:  Objection.  There is
17  no foundation for the use of this document
18  with this witness.
19      Q    Go ahead, you can answer.
20      A    Yes.
21      Q    And the next box down, "Current
22  ongoing studies."
23      Do you see that?
24      A    I see it.
25      Q    Okay.  Based on your experience at

319

Atul Pande, M.D.
1
2   Parke-Davis, is it your memory that as of June of
3   1997, that those three studies were underway
4   having been sponsored by Parke-Davis?
5       A    To the best of my recollection, yes.
6       Q    Were you involved in the social
7   phobia study?
8       A    Yes.
9       Q    Were you involved in the panic
10  disorder study?
11      A    Yes.
12      Q    And you were involved in the bipolar
13  disorder study?
14      A    Yes.
15      Q    The bipolar disorder study that is
16  listed on the second page of Exhibit 17, is that
17  the study 945-209?
18      MS. MC GRODER:  Objection, as it
19  relates to the use of this document.  No
20  foundation.
21      You can answer.
22      A    I can guess that it is.
23      Q    Based on your experience at
24  Parke-Davis, can you tell me, is the bipolar study
25  that is referenced on the second page of this

320

Atul Pande, M.D.
1
2   exhibit the study that you were heading up,
3   945-209?
4       A    More than likely.
5       MS. MC GRODER:  Wait, there is still
6   no foundation.  Just because he had
7   experience at Parke-Davis doesn't lay a
8   foundation for this document.
9       MR. GREENE:  You have got your
10  objection on the record.  Why don't you have
11  a standing objection to every question I
12  have.
13      MS. MC GRODER:  Why don't you use
14  exhibits that he laid his eyes on before?
15      MR. GREENE:  Fortunately, I get to
16  conduct the deposition, I get to pick the
17  exhibits.
18      MS. MC GRODER:  Then if you don't
19  want me to object on foundation grounds,
20  choose documents that he has involvement in
21  or has seen before.
22      MR. GREENE:  Your objections on
23  foundation are going nowhere.
24      MS. MC GRODER:  That is your opinion
25  and unsupportable.

321

Atul Pande, M.D.
1
2       Q    Could you turn to the next page of
3   exhibit?
4       A    Yes.
5       Q    Do you have that page in front of
6   you?
7       A    Yes.
8       Q    Do you see the study entitled acute
9   treatment of bipolar epilepsy studies depression
10  with gabapentin?
11      MS. MC GRODER:  Objection, no
12  foundation.
13      Q    Do you see that study referenced
14  there?
15      A    Yes.
16      Q    Are you familiar or were you familiar
17  in June of 1997 with that study?
18      MS. MC GRODER:  Objection, no
19  foundation.
20      Do you even know what study that is?
21      Q    That might be a good question.
22      Do you know what study that is?
23      A    I don't actually know.
24      Q    You don't know?
25      A    No.

322

Atul Pande, M.D.

1
2      Q    Have you ever seen the results of
3  that study?
4          MS. MC GRODER:  Objection, no
5      foundation, he doesn't know what study it
6      is.
7      Q    Have you ever seen the results of
8  that study?
9          MS. MC GRODER:  How could he if he
10     doesn't know what the study is?
11     Objection, no foundation.
12     Q    Go ahead.
13     A    I don't know whether I have or not.
14 If it was published, I may have seen it.
15     Q    Do you see the study referred to
16 above that entitled monotherapy study on mania
17 bipolar?
18     A    Yes.
19     Q    Is that the Dr. Frye study that you
20 referred to earlier?
21     A    That appears to be one, yes.
22     Q    Is that the study that had the
23 negative outcome?
24         MS. MC GRODER:  Objection, no
25     foundation.

323

Atul Pande, M.D.

1
2      A    I am only aware of one Frye study on
3  Neurontin in bipolar disorder, so that would be
4  the one.
5      Q    And that one was negative; correct?
6      A    Yes.
7      Q    Now, will you turn to the last page.
8          Do you see the general suggestions
9  that were made there?
10     A    Yes.
11     Q    Deliver safety and efficacy message
12 to psychiatric community.
13         Now, can you tell me how that message
14 could be delivered?
15         MS. MC GRODER:  Objection, no
16     foundation, calls for speculation and
17     assumes facts not in evidence.
18     Q    Okay.
19     A    I have no idea what message this is
20 referring to.
21     Q    Well, it says deliver safety and
22 efficacy message to psychiatric community.
23     A    About what?
24         MS. MC GRODER:  Same objection.
25     Q    How about the next suggestion,

324

Atul Pande, M.D.

1
2  establish a way for representatives to visit
3  psychiatrist offices.
4      Q    Do you know how that could be done?
5          MS. MC GRODER:  Objection, no
6      foundation, it calls for speculation,
7      assumes facts not in evidence.
8      A    I wouldn't know how that would be
9  done.
10     Q    Okay.  I mean, sales representatives
11 couldn't detail psychiatrists for Neurontin's use
12 in treating a psychiatric condition in May of '97,
13 could they?
14         MS. MC GRODER:  Objection, no
15     foundation.
16     A    The drug was only approved for the
17 treatment of refractory epilepsy, so that's what
18 they could have promoted it for.
19     Q    And they couldn't have detailed or
20 promoted Neurontin's use to psychiatrists because
21 it was not approved for that use; is that correct?
22         MS. MC GRODER:  Objection, no
23     foundation.
24     A    I can't agree with that statement
25 because there are psychiatrists who treat epilepsy

325

Atul Pande, M.D.

1
2  patients, so I can't agree with your statement the
3  way you phrased it.
4      Q    I'm talking about detailing
5  psychiatrists for Neurontin's use in treating
6  psychiatric indications, not epilepsy.  They are
7  not permitted to do that in May and June '97, are
8  they?
9          MS. MC GRODER:  Objection to form,
10     foundation.
11     A    That would be outside of the label.
12     Q    When you say outside of the label,
13 for our record, a salesman would be prohibited
14 from detailing if it's outside the label; correct?
15         MS. MC GRODER:  Object to form and
16     foundation.
17     A    That is correct.
18     Q    Let me direct your attention to the
19 next paragraph, under educational suggestion, do
20 you see that?
21     A    Yes.
22     Q    Do you know if Parke-Davis ever
23 sponsored any CME programs where information
24 concerning Neurontin's use in treating psychiatric
25 indications was disseminated to the attendees?

326

Atul Pande, M.D.

1
2    A    I have no personal knowledge of it.
3    Q    Did you ever prepare any slides for
4    use at a CME program?
5         MS. MC GRODER:  Ever on anything?
6         MR. GREENE:  Yes.
7         MS. MC GRODER:  Well, I object.  It's
8    overbroad.
9    Q    Go ahead.
10   A    That's very broad, I think.
11   Q    Let's set out broad and then we will
12   get narrow.  The question is very broad.
13        Can you answer it?
14   A    Have I ever prepared --
15   Q    Yes.
16   A    -- slides for CME presentations?
17   Q    Yes.  Yes.
18        The slides you prepared for CME
19   presentations, did they concern approved uses of
20   the drug?
21        MS. MC GRODER:  Object to form.
22   A    Once again, I have to go back to my
23   answer, have I ever prepared slides for CME
24   presentations.
25        I have over 15 years in the industry

327

Atul Pande, M.D.

1
2    and I have worked on more drugs than Neurontin.
3    You asked me that question, my answer is
4    applicable to all those 15 years.  If you are
5    asking if I prepared CME slides for presentations
6    in Neurontin, I don't recall that I did.
7         In any case, that would not have been
8    my responsibility.
9    Q    Whose responsibility would that be?
10   A    CME was typically handled by the
11   medical affairs department of Warner Lambert
12   Parke-Davis.  And I didn't really have, have much
13   to do with them.
14   Q    Okay.  Do you see the next bullet
15   item, "Blanket psychiatric convention market, with
16   satellite symposia."
17        Do you know if that was ever done
18   with regard to information concerning Neurontin's
19   use to treat psychiatric indications?
20        MS. MC GRODER:  Objection, no
21   foundation.
22   A    I don't know.
23   Q    How about a blanket psychiatric
24   convention market with posters and papers?
25        Was that ever done with regard to

328

Atul Pande, M.D.

1
2    Neurontin's use in treating bipolar?
3         MS. MC GRODER:  Objection, no
4    foundation.
5    A    I don't know.
6    Q    Okay.  Did you ever -- I want to drop
7    down a few bullets.
8         Do you see the line create a slide
9    kit?  "Create a slight kit which would entail new
10   data from ongoing and future studies, Neurontin
11   slides and summary slides."
12        Did you ever assist in the
13   preparation of any of those slides?
14        MS. MC GRODER:  Objection.  No
15   foundation.  Assumes facts not in evidence
16   Q    Go ahead.
17   A    I don't recall doing so.
18   Q    How about the next bullet item,
19   "Generate mailings to the psychiatric community on
20   updated relevant information on anticonvulsant and
21   psychiatric disorders."
22        Do you know if that was done?
23        MS. MC GRODER:  Objection, no
24   foundation, calls for speculation.
25   A    I don't know if it was done.

329

Atul Pande, M.D.

1
2    Q    How about the next bullet, "Following
3    the completion of the ongoing and additional
4    studies, write and publish papers in psychiatric
5    journals."
6         Was that done with regard to
7    Neurontin's use in treating bipolar?
8         MS. MC GRODER:  Objection, no
9    foundation.
10   A    Yes.
11   Q    What do you have in mind?
12   A    It's the study 945-209.
13   Q    That was published in the year 2000?
14   A    That is correct.
15   Q    In what journal was that published
16   in?
17   A    It was published in a journal called
18   Bipolar Disorders.
19   Q    Do you know what the circulation of
20   that journal is?
21   A    I don't.
22   Q    Would it surprise you to know the
23   circulation of that journal is 450 subscribers?
24        MS. MC GRODER:  Objection to form and
25   foundation.  It's basically your testimony.

330

Atul Pande, M.D.

1
2    On what basis?  That's ridiculous.
3        A    I don't know if I should be surprised
4    or not.  It is a specialty journal focused on
5    bipolar disorder research.
6        Q    You mentioned earlier that sometimes
7    journals are not, I don't know whether you said
8    anxious or don't readily publish negative clinical
9    trial results.
10        A    That's often been the case, yes.
11        Q    And did you encounter that with
12    regard to 945-209?
13        A    I did not.
14        Q    So you published it in the journal
15    you just identified?
16        A    Yes.
17        Q    Did you take any steps to see that
18    the results of 945-209 were disseminated to the
19    medical community beyond the publication of that
20    in the journal you identified?
21        A    The results of that study were
22    presented at the bipolar disorders congress, which
23    is the largest such meeting on the research into
24    bipolar disorders held every two years by the
25    University of Pittsburgh.

331

Atul Pande, M.D.

1
2        Q    Did you make that presentation?
3        A    I did.
4        Q    And you had some slides?
5        A    Yes.
6        Q    And aside from that congress or that
7    presentation, did you take any steps to
8    disseminate the results of 945-209 beyond that?
9        MS. MC GRODER:  Object to form.
10        A    Disseminate to who?
11        Q    To anyone?
12        MS. MC GRODER:  Same objection.
13        Q    Well, let's say physicians.
14        A    Yeah, we communicated the results to
15    the investigators, which is normal practice, and
16    then we presented to the scientific congress and
17    then published the data.
18        Q    Okay.  And you identified where you
19    published it?
20        A    Yes.
21        Q    And you identified the congress in
22    Pittsburgh that you presented your slides to?
23        A    Yes.
24        Q    Did you take any other steps to
25    disseminate the information from the study results

332

Atul Pande, M.D.

1
2    of 945-209 in any other meeting of physicians?
3        A    Well, typically once research
4    findings have been published, there is really no
5    scientific meeting that is going to accept
6    presentations on that same material.
7        Q    Well, are you familiar with -- strike
8    that.
9        Do you know what educational tactics
10    are?
11        A    I really don't know how to answer
12    that.
13        Q    Okay.  Direct your attention to the
14    last sentence on the document you have in front of
15    you, on page 7310, which reads, "With this in
16    mind, it's important to rapidly execute the
17    studies and educational tactics mentioned above in
18    order to bypass the other anticonvulsants within
19    this market."
20        Do you know what that means?
21        MS. MC GRODER:  Objection, no
22    foundation, calls for speculation.
23        A    I can't answer without trying to
24    guess at it.
25        Q    Does it help if I read the sentence

333

Atul Pande, M.D.

1
2    that presides that?  This, incidentally, comes
3    under the conclusion paragraph of this memo;
4    correct?
5        A    Yes.
6        Q    And the sentence reads, "Furthermore,
7    there was a general consensus that gabapentin has
8    a positive anxiolytic effect profile, lack of drug
9    interactions, nonaddictive hypnotic effects and
10    overall safety and efficacy.  Therefore, it can
11    move rapidly to the front of the anticonvulsant
12    class in the treatment of psychiatric disorder.
13    With this in mind, it's important to rapidly
14    execute the study in order to bypass the other
15    anticonvulsants within this market."
16        Having read those two sentences, do
17    you know what that is referring to?
18        MS. MC GRODER:  Objection to form and
19    foundation and calls for speculation.
20        A    I think it's referring to the bullet
21    points that are contained in the upper half of
22    this page.
23        Q    Under educational suggestions?
24        A    I believe so.
25        Q    Okay.

334

```
1          Atul Pande, M.D.
2          (Pande Exhibit Number 18 marked for
3      identification as of this date.)
4          Take a look at Exhibit 18.
5          Okay.  Can you identify what Exhibit
6   18 is?
7      A    Exhibit 18 is a letter on Parke-Davis
8   letterhead from me to David L. Dunner, who is a
9   psychiatrist at the University of Washington
10  Medical Center, and the letter summarizes the
11  results from the 945-209 study.
12     Q    Dr. Dunner was one of the
13  investigators in your 945-209 study?
14     A    That is correct.
15     Q    And you were just informing him of
16  the results of the study in this letter?
17     A    That's correct.
18     Q    And you mentioned, before I ask you
19  that, can you define for me the Young mania rating
20  scale and the Hamilton depression rating scale?
21     A    Yeah, these are two symptom rating
22  scales that are used to assess the severity of
23  symptoms in patients who are suffering from
24  bipolar disorder.
25          Young mania rating scale assesses
```

335

```
1          Atul Pande, M.D.
2   various manic or hypomanic symptoms and
3   essentially is completed by the clinical
4   investigator through a clinical interview of the
5   patient.  The Hamilton depression scale similarly
6   is also administered by the clinician and gives a
7   total score, which indicates the severity of
8   depressive symptoms.
9      Q    What does primary outcome measure
10  mean?
11     A    I think I referred to this
12  previously, that in any study there are many
13  measurements taken, some are declared up-front as
14  being primary measures, which in the clinical
15  trials area is taken to mean that that is the
16  measure by which the success or failure of the
17  study will be declared.
18          The other measures that are
19  considered secondary measures are often used to
20  try and fill in the data, and, you know, get an
21  assessment, a fuller assessment of the patient
22  population.
23     Q    And what were the primary outcome
24  measures in study 945-209?
25     A    I believe in this study the primary
```

336

```
1          Atul Pande, M.D.
2   efficacy measure was the young mania rating scale.
3      Q    Don't you say here, "The efficacy
4   measure included the young mania rating scale, the
5   Hamilton depression rating scale and the internal
6   state scale?"
7      A    Yes.
8      Q    Were all three scales the primary
9   outcome measure for efficacy in 945-209?
10     A    I don't believe they were.
11     Q    So you think just the young mania?
12     A    I believe that was the primary
13  efficacy measure.
14     Q    And again, that primary outcome
15  measure for efficacy, the young mania rating
16  scale, showed -- failed to show significant
17  separation between Neurontin and placebo; is that
18  correct?
19     A    That is correct.
20     Q    And that's considered negative in its
21  primary outcome in your study?
22     A    It would be considered negative, yes.
23     Q    Now, had you taken some steps as of
24  July 1998 to write-up your study results?
25     A    Yeah, I think the, as I recall, the
```

337

```
1          Atul Pande, M.D.
2   manuscript for the trial was being prepared along
3   with completing the rest of the data analyses.
4      Q    Can you tell me what a research
5   report is?
6      A    A research report is an internal
7   document that is used by pharmaceutical companies
8   to summarize the results of every single trial
9   that the companies undertake.
10     Q    Okay.  Was there a research report
11  for study 945-209?
12     A    I believe there was.
13     Q    And did you participate in the
14  drafting of that report?
15     A    Almost certainly I would have.
16     Q    Do you know when that report was
17  completed?
18     A    I don't specifically recall when the
19  report was completed.
20     Q    Okay.  We touched on this a little
21  bit earlier, and that is when the preliminary
22  study results became available for 945-209.
23          Do you recall that?
24     A    Yes.
25     Q    And having seen this Exhibit 18, the
```

338

1           Atul Pande, M.D.
2    letter to Dr. Dunner, can you provide anymore
3    specificity with regard to when those preliminary
4    results became available?
5           MS. MC GRODER:  Object to form.
6       A    I believe I said previously that it
7    would have been in the June time frame is when the
8    results became available.
9       Q    I thought you said that preliminary
10   results became available in early 1998?
11      A    I did not.
12      Q    So certainly by July 28, 1998, the
13   final results of study 209 had been known to you;
14   correct?
15          MS. MC GRODER:  Object to form.
16      A    On the measures that are in the
17   letter, for sure.
18      Q    Okay.
19      A    But as I have mentioned before, there
20   are many other analyses that need to be completed
21   before a research report can be written.
22      Q    Okay.  And you don't recall the date
23   of the research report?
24      A    I do not.
25      Q    Do you have the 945-209 study group?

339

1           Atul Pande, M.D.
2       A    Yes.  That would be the investigators
3    who were all members of the study group.
4       Q    Okay.  And did you communicate with
5    them through a newsletter?
6       A    I believe we may have.
7       Q    And how often did you communicate
8    with them, do you recall?
9       A    I don't actually recall that.
10      Q    Do you recall making a change in the
11   primary efficacy parameters in study 945-209?
12      A    I don't remember that.
13      Q    Do you recall changing the patient
14   rated internal state scale to a secondary efficacy
15   parameter?
16      A    I don't recall that.
17          (Pande Exhibit Number 19 marked for
18   identification as of this date.)
19      Q    Let me show you what we have marked
20   as Exhibit 19.
21          Can you identify what Exhibit 19 is?
22      A    It's titled, "945-209, Newsletter."
23      Q    Okay.  Is this the study group
24   newsletter you referred to a few moments ago?
25      A    Yes.

340

1           Atul Pande, M.D.
2       Q    Was this sent out periodically by you
3    to the investigators?
4       A    Yes.
5       Q    And who drafted the newsletters?
6       A    Typically it would have been drafted
7    by the study manager, who was Gerri Crockett at
8    the time.
9       Q    And who did Gerri Crockett work for?
10      A    She worked for me.
11      Q    Do you see the paragraph entitled
12   Efficacy Parameters?
13      A    Yes.
14      Q    And will you just read that first
15   couple sentences into the record.  I want to ask
16   you a question about it after you are done.
17      A    "A memo will be sent to all sites
18   regarding a change in the primary efficacy
19   parameter.  The Hamilton depression scale and the
20   young mania rating scale will remain as the
21   preliminary primary efficacy measures."
22      Q    I wanted to stop you after that
23   second sentence.
24          Those are the two primary efficacy
25   measures that you referred to in the letter to Dr.

341

1           Atul Pande, M.D.
2    Dunner?
3       A    Yes.
4       Q    That we marked as Exhibit 18;
5    correct?
6       A    Yes.
7       Q    Now, will you read the next sentence?
8       A    "The patient rated internal state
9    scale may be change to a secondary efficacy
10   parameter along with CGIS, CGIC, NINH Life Chart
11   and the Hamilton anxiety scale."
12      Q    Who changed those?
13          MS. MC GRODER:  Why don't you let him
14   complete the paragraph.
15          MR. GREENE:  I asked him to read the
16   sentence.  If you want to do something with
17   the exhibit, you can.
18          MS. MC GRODER:  You are taking it out
19   of context.  You should let him read the
20   last sentence.
21      Q    Who decided to change those patient
22   rater scales to a secondary efficacy parameter?
23      A    This was through consultations
24   between, between me and some of the study
25   investigators who were experts on the internal

342

```
 1            Atul Pande, M.D.
 2   state scale.
 3            In fact, they were the ones who
 4   revised the scale and that was Dr. July at the
 5   University of Pennsylvania and Dr. Mark Powers at
 6   Brown University, who were essentially the
 7   creators of that scale.
 8            Through conversations with them, it
 9   turned out that actually the data that were being
10   collected on the internal state scale were likely
11   to be very difficult to analyze -- it's a
12   complicated scale.  It collects a lot of data,
13   almost on a daily basis, and I believe what we
14   were encountering in the study was a lot of
15   missing data, because, you know, patients often
16   weren't filling out the forms that they were
17   supposed to, and so the decision was made to
18   change that to a secondary parameter.
19       Q    And was that done?
20       A    That was done.
21       Q    How about those other tests or
22   measures that are identified there?
23            CGIS, what is that?
24       A    It's what's called the clinical
25   global impression of severity, so it's a
```

343

```
 1            Atul Pande, M.D.
 2   clinicians overall assessment of how severely
 3   symptomatic a given patient is.
 4       Q    And has that changed from primary to
 5   secondary?
 6       A    It was always a secondary measure.
 7       Q    It was always, okay.
 8            And were those remaining ones always
 9   --
10       A    They were always secondary measure,
11   yes.
12       Q    The last sentence says, "This change
13   will not affect study conduct or patient care."
14       A    That's correct.
15       Q    The bottom of the page identifies
16   various sites and the number of patients enrolled
17   as of the date September 22, '97; is that correct?
18       A    Yes.
19       Q    How often did you send out these
20   newsletters?
21       A    I don't really recall that there was
22   a fixed schedule to it.
23            MS. MC GRODER:  Tom, are we at a
24   decent stopping point for like a five-minute
25   break?
```

344

```
 1            Atul Pande, M.D.
 2            MR. GREENE:  Sure.
 3            THE VIDEOGRAPHER:  The time is 5:09.
 4   This is tape five of the videotape
 5   deposition of Atul Pande.  We are off the
 6   record.
 7            (Recess taken.)
 8            THE VIDEOGRAPHER:  The time is 5:21.
 9   This begins tape six of the videotape
10   deposition of Atul Pande.  We are on the
11   record.
12       Q    Doctor, do you know what the
13   Neurontin publication subcommittee was?
14       A    I don't.
15       Q    You don't.
16            (Pande Exhibit Number 20 marked for
17   identification as of this date.)
18            Let me show you what we have marked
19   as Exhibit 20.  Have you ever seen this document
20   before?
21       A    I have no recollection of this
22   document.
23       Q    Okay.  Do you know who Lloyd Knapp
24   is?
25       A    Yes.
```

345

```
 1            Atul Pande, M.D.
 2       Q    And who, who -- did you work with him
 3   at Pfizer?
 4       A    Yes.
 5       Q    Did you work with him at Warner
 6   Lambert?
 7       A    Yes.
 8       Q    And what position did he hold?
 9       A    I believe he was a director in the
10   clinical research department at Warner Lambert.
11       Q    And he worked on Neurontin?
12       A    He did.
13       Q    Let me direct your attention to the
14   third entry down on the first page of this Exhibit
15   20, under author publications, it says under Atul
16   C. Pande, M.D. psychiatric applications of
17   gabapentin.
18            Do you see that?
19       A    Yes.
20       Q    Is that a publication you authored?
21            MS. MC GRODER:  Objection, no
22   foundation for the use of this document with
23   this witness.
24       A    I don't recall this at all.
25       Q    Did you ever write a manuscript
```

346

Atul Pande, M.D.
1
2    entitled, "Psychiatric Applications of
3    Gabapentin"?
4        A    I reviewed the literature, as of that
5    date, and summarized it.  But I don't recall that
6    there was a manuscript created out of that.
7        Q    When you say you reviewed the
8    literature as of that date, are you referring to
9    February 21, 2001?
10       A    Yes.
11       Q    When you say I reviewed the
12   literature as of that date, can you describe what
13   you did?
14       A    Yes, it's searching the published
15   literature for references to Neurontin's use for
16   psychiatric disorders and creating a summary of
17   that.
18       Q    When did you do that?
19       A    I have, I told you I don't have
20   a specific recollection of when I did it.
21       Q    Do you think you did it February
22   2001?
23       A    It would not have been a short
24   process, so, you know, it would probably have
25   taken many weeks, perhaps months.

347

Atul Pande, M.D.
1
2        Q    So, is it fair to say you collected
3    all the medical literature you could that
4    described psychiatric applications of gabapentin?
5        MS. MC GRODER:  Object to form.
6        A    Well, I told you that I gathered all
7    the published literature up to that point.
8        Q    This is what I am trying to get at.
9    I'm not sure I heard you.
10       Did you say that you wrote up
11   something after you reviewed all this literature
12   you gathered on gabapentin's uses in psychiatric
13   indications?
14       A    I -- I, like I said, I created a
15   summary of those papers that I reviewed.
16       Q    Okay.  And where did you have any
17   summary on your computer?
18       A    I would imagine that's where it was.
19       Q    Have you seen that summary recently?
20       A    I have not.
21       Q    Was it a document you reviewed in
22   preparing for your deposition?
23       A    No, I did not.
24       Q    Do you have that summary today?
25       A    No.

348

Atul Pande, M.D.
1
2        Q    Incidentally, when you left Pfizer,
3    did you take any documents with you that pertained
4    to Neurontin?
5        A    I did not.
6        Q    What was the purpose in reviewing the
7    literature on psychiatric uses of gabapentin?
8        A    The primary purpose of that for me
9    was to, to have a current understanding of the
10   ways in which gabapentin possibly might be useful
11   in psychiatric disorders, because at that same
12   time we were engaged in developing another drug
13   with some similarities to gabapentin for
14   psychiatric disorders.
15       Q    That was pregabalin?
16       A    That would be pregabalin.
17       Q    And so that was your primary purpose
18   in doing that?
19       A    Yes.
20       Q    Now, do you ever recall -- after you
21   conducted this search that you have described --
22       A    Yes.
23       Q    -- and the review and you prepared
24   your summary, do you ever recall John Marino
25   discussing with you that the Pfizer strategy no

349

Atul Pande, M.D.
1
2    longer included the study of gabapentin for
3    psychiatric uses?
4        MS. MC GRODER:  Object to form,
5        foundation, calls for speculation and
6        assumes facts not in evidence.
7        A    I don't specifically recall having a
8    conversation.
9        Q    Directing your attention to Exhibit
10   20, and that line we were looking at, do you see
11   the discussion strategy field?
12       A    Yes.
13       Q    And coming down to the third entry
14   down there, which is opposite line 15, Atul Pande,
15   psychiatric applications of gabapentin.  The
16   discussion says, "Not consistent with strategy,
17   John Marino has conveyed this to Atul.  Suggest
18   non-Pfizer author."
19       Do you know who that refers to?
20       A    I don't --
21       MS. MC GRODER:  Object to form.  Go
22       ahead, Dr. Pande.
23       A    I don't actually know what that
24   refers to.
25       Q    You said you reviewed the literature

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

350

Atul Pande, M.D.

2  of psychiatric applications of gabapentin.

3      You wrote up a summary of the

4  literature; is that correct?

5      A   Yes.

6      Q   Was that summary ever published by

7  anyone?

8      A   I don't know.

9      Q   Was that summary ever provided to

10  someone else to appear as the author?

11      MS. MC GRODER:  Object to form and

12  foundation, calls for speculation.  I don't

13  actually know.

14      Q   Pardon me?

15      A   I don't know.

16      Q   And then the next field over status

17  says, "Leslie to follow up with Atul."

18      Do you know who the Leslie is

19  referred to in that?

20      MS. MC GRODER:  Objection, no

21  foundation.

22      A   I would have to guess, but --

23      Q   Would that be Leslie Magnus Miller?

24      MS. MC GRODER:  Same objection.

25      A   No, in 2001, it would not have been.

351

Atul Pande, M.D.

2      Q   Leslie Tive?

3      MS. MC GRODER:  Same objection.  Go

4  ahead.  She is more likely.

5      Q   Okay.  Did she ever follow-up and

6  have any discussion with you about your research

7  in writing up this summary that you have

8  described?

9      A   I don't recall that.

10      Q   Okay.  At any time from, let's say,

11  from 1999 up to the date of merger, with Pfizer,

12  June of 2000, did anyone come to your office and

13  copy your files or information off your computer

14  that pertained to Neurontin?

15      A   I don't recall.

16      Q   And from the date of merger,

17  June 2000 up to the date that the government

18  announced the settlement with Pfizer May 13, 2004,

19  during that time period, did anybody come to your

20  office and copy your files or any information on

21  your computer that pertained to Neurontin?

22      A   Again, I don't have a specific

23  recollection of that.

24      (Pande Exhibit Number 21 marked for

25  identification as of this date.)

352

Atul Pande, M.D.

2      Q   Let me show you what we marked as

3  Exhibit 21.  And, Doctor, I might represent to

4  you, it's an e-mail string so you might want to

5  start with the first e-mail to get some context to

6  the e-mail that you authored.

7      A   Okay.

8      Q   All set?

9      A   Yes.

10      Q   Okay.  Can you identify what Exhibit

11  21 is?

12      A   Exhibit 21 is a e-mail string

13  starting with an e-mail from someone by the name

14  of Angela Crespo.

15      Q   Do you know who Angela Crespo was?

16      A   Vaguely.

17      Q   And what is your vague memory?

18      A   That she was in the Pfizer marketing

19  group in New York City.

20      Q   Okay.  So she starts off an e-mail

21  dated September 12, 2001, and sends it to Marino,

22  Garcia; is that correct?

23      A   That's correct.

24      Q   And a number of other people, Lloyd

25  Knapp, Leslie Tive, Allison Fannon, Robert

353

Atul Pande, M.D.

2  Glanzman, Elizabeth Mutisya, Steve Pomerantz are

3  cc'd; is that correct?

4      A   Yes.

5      Q   The subject is gabapentin bipolar

6  disorder?

7      A   That's correct.

8      Q   And in her first sentence there, she

9  indicates that she was reviewing all literature

10  MAC sent us regarding the use of our product on

11  that condition.

12      Do you see that?

13      A   Yes.

14      Q   And do you know who MAC is?

15      A   I have no idea.

16      Q   Have you ever heard of Medical Action

17  Communications, Inc.?

18      A   No.

19      Q   She refers to 20 good papers, pilot

20  trials, open-label studies, with more than 50

21  patients included, showing the benefit to use the

22  product for this disease, correct?

23      A   Yes, that's what it says.

24      Q   All right.

25      Then she refers to an open label

354

Atul Pande, M.D.

1
2    trial in the next paragraph, correct?
3        A    Yes.
4        Q    All right.  And a couple more on the
5    same disease comparing gabapentin and valproic
6    acid.
7        A    Yes.
8        Q    But then she says, "The best clinical
9    trial we have is negative," and then she says,
10   refers to you, A. Pande; correct?
11       A    Yes.
12       Q    "But I wonder if we can do something
13   more.  I am aware that it is difficult to have
14   good results on that kind of study, and if I am
15   not wrong, there were some concerns about the
16   design, et cetera, on the Pande one."
17            Do you see that?
18       A    Yes.
19       Q    She refers to a clinical trial
20   conducted in major market 21-291 randomized
21   placebo controlled that is being performed in
22   Italy and Spain.
23            Do you see that?
24       A    Yes.
25       Q    Are you familiar with the outcome of

355

Atul Pande, M.D.

1
2    that study?
3        A    I am not.
4        Q    Did you ever learn that the bipolar
5    study done by Pfizer in Spain was negative?
6            MS. MC GRODER:  Object to form and
7    foundation.
8        A    No.
9        Q    No, haven't heard that?
10       A    No.
11       Q    You read this e-mail when you got it,
12   didn't you?
13       A    Yes.
14       Q    And you read Angela Crespo's
15   reference to this study being performed in Italy,
16   in Spain?
17       A    Yes.
18       Q    And was this the first you had heard
19   about it?
20       A    I would have to speculate to say yes
21   or no.
22       Q    But as you sit here today, do you
23   have any memory of it?
24       A    I don't.
25       Q    And then Lloyd Knapp, who had

356

Atul Pande, M.D.

1
2    received a copy of Angela Crespo's e-mail,
3    forwarded it to you; is that correct?
4        A    Yes.
5        Q    And he asked you what your thoughts
6    on the bipolar results were, correct?
7        A    Yes.
8        Q    Now, you write back to him, "I think
9    we are whistling in the wind to think that we
10   could easily get an indication in bipolar
11   disorder."
12            Right?
13       A    Yes.
14       Q    That's what you felt back on
15   September 13th when you responded to Mr. Knapp,
16   correct?
17       A    Yes.
18       Q    You say, "The disease is complicated.
19   Studies are difficult and prolonged.  Gabapentin
20   has a weak, if any, anti-manic effect."
21            Correct?
22       A    Yes.
23       Q    And what was your basis for saying
24   gabapentin has a weak, if any, anti-manic effect?
25       A    It's the sort of collective

357

Atul Pande, M.D.

1
2    assessment of all of the information that was
3    available at the time.
4        Q    When did you reach the opinion?
5        A    The --
6            MS. MC GRODER:  Were you finished
7    with your answer?
8        Q    Yeah --
9        A    The controlled studies up to that
10   point had not shown evidence of anti-manic effect.
11       Q    What are the controlled studies that
12   you are referring to?
13       A    That's the 945-209 study and the Frye
14   study, which were at the time the only controlled
15   studies in the literature, which did not suggest
16   an anti-manic effect, and yet there were case
17   series and case reports being published with some
18   frequency that suggested that there may be
19   beneficial effect, and so the conclusion that is
20   stated in this e-mail really takes sort of a
21   global view of that information.
22       Q    When you say case series, what, are
23   you referring to a case series concerning
24   Neurontin's use?
25       A    Yes.

358

```
1              Atul Pande, M.D.
2     Q    For bipolar?
3     A    Yes.
4     Q    The case series, Doctor, just for our
5  record, can you define what a case series is?
6     A    A case series would be where an
7  experienced clinician treats a number of patients
8  with a disease without formally having a study
9  protocol, but in their clinical experience, and
10 the reports on the outcome of those patients, and
11 those can provide some evidence, but usually that
12 kind of evidence is only useful in creating a
13 hypothesis rather than in actually confirming it.
14    Q    Okay.  Case series is not a
15 scientific study; is it, Doctor?
16         MS. MC GRODER:  Object to form.
17    A    It is a form of evidence, but it is
18 not the highest form of evidence used in
19 scientific research.
20    Q    Is it the lowest form of evidence
21 used in scientific research?
22    A    Well, it's just barely above the
23 single case report.
24    Q    The single case report, the anecdotal
25 report is the lowest, the lowest evidence
```

359

```
1              Atul Pande, M.D.
2  available to a doctor when he's looking at whether
3  a drug is effective for a particular use, right?
4     A    That is the convention in, in
5  clinical trial research, yes.
6     Q    Why is it the lowest level of
7  evidence?
8     A    The reason that it's considered the
9  lowest level of evidence is because there is no
10 way of knowing whether the effect that was seen
11 occurred solely by chance.  And so, you know, a
12 single observation cannot be used to make a
13 general rule.
14    Q    There is no way of telling whether
15 the patient that took the drug, if are you giving
16 a single case report, if the effect of the drug
17 was not a placebo effect, right?
18    A    Right.
19    Q    There is no control present?
20    A    That is correct.
21    Q    And that's why you do double-blinded
22 placebo controlled studies, correct?
23    A    That is direct.
24    Q    You said the next, above a case
25 report, the next lowest form of evidence is a case
```

360

```
1              Atul Pande, M.D.
2  review series; correct?
3     A    Well, I would say the next higher.
4     Q    The next higher?
5     A    Yeah.
6     Q    But on the totem pole, that is the
7  second lowest; correct?
8     A    Yes.
9     Q    And then above the case review, what
10 would be the next level of evidence available to
11 the physician?
12         MS. MC GRODER:  Object to form.  Is
13    case review the same as case series in your
14    question?
15    Q    Well, is review the same as case
16 series?
17    A    I don't know, we generally refer to
18 them as case series.
19    Q    Case series.
20         So, for our record, you described a
21 case report as being the lowest form of evidence;
22 correct?
23    A    Right.
24    Q    And the case review is being, excuse
25 me, series being the next step up on the totem
```

361

```
1              Atul Pande, M.D.
2  pole?
3     A    Right.
4     Q    In terms of level of evidence;
5  correct?
6     A    Correct.
7     Q    What would the next step up be?
8     A    I have to just offer a little
9  clarification here.  The case series can be of two
10 kinds, and those are different hierarchy.
11         The first one is a retrospective case
12 series where a clinician continues to treat a
13 population of patients that have been treated with
14 a treatment, whether they will be a drug or
15 non-drug treatment and they go back in the record
16 and analyze all of the patients that have received
17 the treatment and make some conclusion about the
18 utility of the treatment.
19         Another level of case series is
20 called the prospective case series, where in an
21 open label fashion the clinician starts to treat
22 patients and gathers data on them with the intent
23 of assessing the utility of the treatment, but it
24 is an open label study.
25    Q    None of these are blinded?
```

362

Atul Pande, M.D.

2   A     These are not blinded.
3   Q     The patient knows what he's getting,
4   the physician knows what he's prescribing,
5   correct?
6   A     That is correct.
7   Q     The next level of evidence, what is
8   that?
9   A     The next level of evidence would be a
10  controlled study.
11  Q     Where you talked about prospective
12  and retrospective case studies, is one higher than
13  the other?
14  A     The prospective is considered to be,
15  to be a higher level of proof.
16  Q     And then you identified open label?
17  A     A prospective case series can be
18  close to an open label study, yes.
19  Q     So after open label study, what is
20  the next level of evidence?
21  A     The next level would be controlled
22  study.
23  Q     And when you say control, that can be
24  blinded study?
25  A     They generally are blinded studies.

363

Atul Pande, M.D.

2   Q     Well, they can be single-blind and
3   double-blind?
4   A     Yes, they can.
5   Q     The highest level of evidence is a
6   double-blinded placebo controlled or comparative
7   controlled trial?
8   A     That is correct.
9   Q     I think you testified that these
10  lower level of evidence studies, case reports,
11  case series, help provide a hypothesis that needs
12  to be tested in a double-blind placebo controlled
13  trial?
14  A     That is correct.
15  Q     And the only double-blinded placebo
16  controlled trials that existed as of September 13,
17  2001 for treating bipolar were both negative in
18  their primary outcome?
19  MS. MC GRODER:  Objection to form and
20  foundation.  Just related to the Frye study,
21  because, I don't know that it was
22  double-blind.
23  A     Yes.
24  Q     Didn't you testify the Frye study was
25  double-blind?

364

Atul Pande, M.D.

2   A     That was a double-blind controlled
3   study, yes.
4   MS. MC GRODER:  I apologize.
5   A     Yes, both of the studies were
6   negative, but I think the, the difference between
7   the studies was one was in acute mania, the other
8   one was in patients who had failed treatment but
9   could have either mania or depression along with
10  the mania.
11  Q     All right.
12  A     And so they are not exactly identical
13  populations which I think points outs the
14  complexity of studying bipolar disorder in that
15  any given study can only be used to make a
16  conclusion about a sub population within the
17  entire universe of diseased people, so --
18  Q     Well, you knew that when you
19  undertook your study and designed your study;
20  didn't you?
21  A     Yes.
22  Q     And Dr. Frye knew that as well?
23  A     Yes.
24  Q     Let me direct your attention to the
25  next sentence in your e-mail, you write,

365

Atul Pande, M.D.

2   "Unfortunately, gabapentin and pregabalin have
3   shown negligible evidence of anti-manic effect."
4   Again, the basis for that statement
5   is what you have just described, the two negative
6   studies --
7   A     Yes.
8   Q     -- for bipolar, for Neurontin and
9   bipolar, and were there negative studies as of the
10  date of this e-mail for pregabalin?
11  MS. MC GRODER:  Object to form.
12  A     I don't have a specific recollection
13  of when the pregabalin study delivered its
14  results, but if the, you know, if this e-mail is
15  any guide, I would guess that the data were in
16  hand.
17  Q     The data were on hand.
18  Your next sentence, you write in your
19  e-mail is, "There is pretty good consensus among
20  experts in the area that gabapentin is not a good
21  anti-manic treatment."
22  A     Yes.
23  Q     Again, you are referring to -- when
24  you say good consensus among experts, who is it
25  that you are referring to?

366

Atul Pande, M.D.

2  A  These are the people who are experts
3  in the research into bipolar disorders, people
4  that I, I stay in reasonably regular such touch
5  with.
6  Q  Would that include Dr. Frye?
7  A  That would include Dr. Frye, yes.
8  Q  Dr. Ketter?
9  A  Yes.
10  Q  Dr. Calabrese?
11  A  Yes.
12  Q  Dr. Norman Sussman.
13  A  Dr. Norman Sussman is an academic
14  psychiatrist, but I think his specialty area is
15  not necessarily bipolar disorder.  He does treat
16  bipolar disorder patients, but I think he would
17  be, if I am not mistaken, considered a general
18  psychiatrist.
19  Q  Your next sentence says, "Almost all
20  of the published reports of good" -- you put that
21  word in quotations -- "good effect concern
22  adjunctive use in patients receiving multiple
23  medications."
24      Is that right?
25  A  Yes.

368

Atul Pande, M.D.

2  MS. MC GRODER:  Objection, asked and
3  answered.
4  A  Yeah, those were the only controlled
5  studies that I was aware of.
6  Q  And as of today's date, so let's say
7  between the date of this e-mail, September 13,
8  2001, and today's date, have you become aware of
9  other double-blinded placebo controlled trials
10  that study Neurontin's use in treating bipolar
11  that were negative in their primary outcome
12  measures?
13  A  I am not aware of any, but I have
14  stopped following that area for some period of
15  time.
16  Q  All right.  If I mention the Guille
17  study, G-U-I-L-L-E, which studies Neurontin for
18  bipolar and was negative, does that refresh your
19  memory at all?
20  A  It does not.
21  Q  Do you know who John Marino is?
22  A  Yes.
23  Q  Who was he?
24  A  John Marino was the product manager
25  for Neurontin.

367

Atul Pande, M.D.

2  Q  By that, that would be patients that
3  were on medication for their bipolar and then took
4  Neurontin on top of that?
5  A  That's correct.
6  Q  And those published reports for the
7  most part involve case studies, case review and
8  open label trials; correct?
9  A  That's correct.
10  Q  And then you write, "That is exactly
11  the situation which is very difficult to separate
12  the use -- excuse me, separate the active drug
13  from placebo."
14      Right?
15  A  That's correct.
16  Q  As of September 13, 2001, as of that
17  date, were you called upon at all in your
18  employment for Pfizer to do any additional studies
19  or research with regard to Neurontin's use in
20  treating bipolar?
21  A  No.
22  Q  Did you become aware of other
23  negative studies of the Neurontin's use in
24  treating bipolar disorder aside from your own
25  study and the Frye study?

369

Atul Pande, M.D.

2  Q  Do you recall having discussions with
3  John Marino about Neurontin's use in psychiatric
4  indications?
5  A  I don't have specific recollection of
6  discussion.
7  Q  John Marino was in marketing?
8  A  Yes.
9  Q  Would it be fair to say John Marino
10  wanted to expand the use and sales of Neurontin?
11  MS. MC GRODER:  Object to form and
12  foundation, calls for speculation.
13  A  I would have no way of knowing.
14  Q  Is that what marketers want to do,
15  they want to increase the use of the product?
16  MS. MC GRODER:  Marketers as opposed
17  to mouseketeer or musketeer?  Object to form
18  and foundation.
19  A  Again, I am not a marketing expert,
20  so I can't tell what marketers do or don't want to
21  do.
22  Q  Okay.
23  MR. GREENE:  Off the record.
24  VIDEOGRAPHER:  The time is 5:50.  We
25  are going off the record.

370

| | |
|---|---|
| 1 | Atul Pande, M.D. |
| 2 | (Recess taken.) |
| 3 | THE VIDEOGRAPHER:  The time is the |
| 4 | 5:52.  We are on the record. |
| 5 | MR. GREENE:  We had a discussion off |
| 6 | the record.  We have 14 minutes left in our |
| 7 | examination on behalf of sales and marketing |
| 8 | class plaintiffs and coordinated plaintiffs, |
| 9 | product liability plaintiffs, to reach our |
| 10 | seven hours allotted time for the first day, |
| 11 | and we have agreed that we will start |
| 12 | tomorrow at 8:45 a.m.  So we are going to |
| 13 | tack on the 14 or 15 minutes, whatever it |
| 14 | is, to the seven hours that all parties have |
| 15 | to use by tomorrow. |
| 16 | Now, while we are on the record -- |
| 17 | MS. MC GRODER:  Before you, oh, okay. |
| 18 | MR. GREENE:  How much time did the |
| 19 | defendants need? |
| 20 | MS. MC GRODER:  We reserved two |
| 21 | hours. |
| 22 | MR. GREENE:  And do you expect to use |
| 23 | all of it? |
| 24 | MS. MC GRODER:  Yes. |
| 25 | MR. GREENE:  Because if you don't, we |

371

| | |
|---|---|
| 1 | Atul Pande, M.D. |
| 2 | are entitled to it. |
| 3 | MS. MC GRODER:  I'm aware of that. |
| 4 | MR. GREENE:  Or to that portion you |
| 5 | don't use.  I want to have your two hours if |
| 6 | you don't want it. |
| 7 | MS. MC GRODER:  I do.  Okay.  Thank |
| 8 | you. |
| 9 | MR. GREENE:  You are going to, we |
| 10 | served -- I should say the videographer |
| 11 | served Pfizer's counsel with a subpoena this |
| 12 | afternoon. |
| 13 | MS. MC GRODER:  Well, then we object |
| 14 | to improper service.  I'm kidding. |
| 15 | MR. LONDON:  We videotaped it. |
| 16 | MR. GREENE:  I don't want to get in |
| 17 | trouble here, anyway.  Service was accepted |
| 18 | and you will inform us before we start |
| 19 | tomorrow morning whether you are going to |
| 20 | produce those documents that are called for |
| 21 | in the subpoena or what you are going to |
| 22 | produce, if anything. |
| 23 | MS. MC GRODER:  Yes. |
| 24 | MR. GREENE:  And we have had some |
| 25 | discussion off the record about that, so if |

372

| | |
|---|---|
| 1 | Atul Pande, M.D. |
| 2 | you are going to produce something, you are |
| 3 | going to give it to us before we start. |
| 4 | MS. MC GRODER:  I would propose for |
| 5 | purposes of time on the record if we don't |
| 6 | agree on what we produce or you don't agree |
| 7 | to the objections, I assert that we take |
| 8 | that up off the record at some separate |
| 9 | time, my proposal. |
| 10 | MS. NUSSBAUM:  We will get back to |
| 11 | you in the morning on that. |
| 12 | MS. MC GRODER:  Okay. |
| 13 | THE VIDEOGRAPHER:  The time is 5:55. |
| 14 | This ends today's videotape |
| 15 | deposition of the Atul Pande consisting of |
| 16 | six videotapes. |
| 17 | This deposition will continue |
| 18 | tomorrow. |
| 19 | We are off the record. |
| 20 | oOo |
| 21 | I, ATUL PANDE, M.D., the witness herein, |
| 22 | do hereby certify that the foregoing testimony of |
| 23 | the pages of this deposition to be a true and |
| 24 | correct transcript, subject to the corrections, if |
| 25 | any, shown on the attached page. |

373

| | |
|---|---|
| 1 | Atul Pande, M.D. |
| 2 | _____ |
| 3 | ATUL PANDE M.D. |
| 4 | Subscribed and sworn to before me this |
| 5 | _____day of _____,_____. |
| 6 | |
| 7 | NOTARY PUBLIC |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Pande, Atul (MDL)  9/19/2007  6:43:00 PM

374

```
1
2    STATE OF NEW YORK  )       Pg.   of Pgs.
3    COUNTY OF NEW YORK )
4         I wish to make the following changes
5    for the following reasons:
6    PAGE  LINE
7    _____ _____    CHANGE:_____
8              REASON:_____
9    _____ _____    CHANGE:_____
10             REASON:_____
11   _____ _____    CHANGE:_____
12             REASON:_____
13   _____ _____    CHANGE:_____
14             REASON:_____
15   _____ _____    CHANGE:_____
16             REASON:_____
17   _____ _____    CHANGE:_____
18             REASON:_____
19   _____ _____    CHANGE:_____
20             REASON:_____
21   _____ _____    CHANGE:_____
22             REASON:_____
23   _____ _____    CHANGE:_____
24             REASON:_____
25
```

376

```
1
2              C E R T I F I C A T E
3    STATE OF NEW YORK   )
4                       : SS.
5    COUNTY OF NEW YORK  )
6
7         I, BONNIE PRUSZYNSKI, a Notary
8    Public with and for the State of New York,
9    do hereby certify:
10        That ATUL PANDE, M.D., the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such deposition
13   is a true record of the testimony given by
14   the witness.
15        I further certify that I am not related
16   to any of the parties to this action by
17   blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 4th of October, 2007.
21
22              _____
23              Bonnie Pruszynski
24
25
```

375

```
1
2    _____ _____    CHANGE:_____
3              REASON:_____
4    _____ _____    CHANGE:_____
5              REASON:_____
6    _____ _____    CHANGE:_____
7              REASON:_____
8    _____ _____    CHANGE:_____
9              REASON:_____
10   _____ _____    CHANGE:_____
11             REASON:_____
12   _____ _____    CHANGE:_____
13             REASON:_____
14   _____ _____    CHANGE:_____
15             REASON:_____
16   _____ _____    CHANGE:_____
17             REASON:_____
18   _____ _____    CHANGE:_____
19             REASON:_____
20   _____ _____    CHANGE:_____
21             REASON:_____
22   _____ _____    CHANGE:_____
23             REASON:_____
24             _____
25              ATUL PANDE, M.D.
```

-

```
1
2              I N D E X
3    WITNESS                        PAGE
4    ATUL PANDE, M.D.
5    BY MR. GREENE                    9
6         E X H I B I T S
7    Pande 1   Curriculum Vitae        10
     Pande 2   Marketing Needs Document    18
8    Pande 3   U.S. Patent Number 5,510,381  23
     Pande 4   Memo                 28
9    Pande 5   Document             36
     Pande 6   Time line Chart        52
10   Pande 7   Document             77
     Pande 8   Minutes, March 14th, 1995   122
11   Pande 9   Document            139
     Pande 10  Neurontin Marketing Assessment 146
12   Pande 11  Document            238
     Pande 12  Gabapentin in Psychiatric   264
13       Disorders, Rationale and Strategy
     Pande 13  Excerpt of Exhibit 12     267
14   Pande 14  Document            272
     Pande 15  Letter              293
15   Pande 16  Neurontin Marketing Assessment 299
     Pande 17  Document            310
16   Pande 18  Letter              333
     Pande 19  945-209, Newsletter      338
17   Pande 20  Document            343
     Pande 21  E-mails             351
18
19
20
21
22
23
24
25
```