# EXHIBIT 17

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

**1**

1        UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3    _____
4    IN RE:  NEURONTIN MARKETING   )
5    SALES PRACTICES, AND          )
6    PRODUCTS LIABILITY            ) MDL Docket
7    LITIGATION                    ) No. 1629
8    _____ ) Master File No.
9    THIS DOCUMENT RELATES TO:     ) 04-10981
10                                 ) Judge Patti B.
11   ALL MARKETING AND SALES       ) Saris
12   PRACTICES ACTIONS             ) Mag. Judge Leo
13   _____) T. Sorokin
14
15        VIDEOTAPED DEPOSITION of RENA M.
16   CONTI, Ph.D., called as a witness by and on behalf
17   of Pfizer, Inc., pursuant to the applicable
18   provisions of the Federal Rules of Civil Procedure,
19   before P. Jodi Ohnemus, Notary Public, Certified
20   Shorthand Reporter, Certified Realtime Reporter,
21   and Registered Merit Reporter, within and for the
22   Commonwealth of Massachusetts, at the offices of
23   Hare & Chaffin, 160 Federal Street, Boston,
24   Massachusetts, on Tuesday, 12 February, 2008,
25   commencing at 9:09 a.m.

**2**

1    APPEARANCES:
2
3        GREENE & HOFFMAN, P.C.
4        By:  Ilyas J. Rona, Esq.
5        125 Summer Street
6        Suite 1410
7        Boston, MA  02110
8        617 261-0040
9        Irona@greenehoffman.com
10       For the Plaintiffs
11
12
13       DAVIS, POLK, & WARDWELL
14       BY:  Edmund Polubinski, III, Esq.
15          -and-
16       Paul Mishkin, Esq.
17       450 Lexington Avenue
18       New York, NY  10017
19       212 250-4695
20       Edmund.polubinski@dpw.com
21       Paul.mishkin@davispolk.com
22       For Pfizer, Inc.
23
24
25

**3**

1    APPEARANCES:  (CONT'D)
2
3        (Via Telephone)
4        SHOOK, HARDY & BACON
5        BY:  James Muehlberger, Esq.
6        255 Grand Boulevard
7        Kansas City, MO  64108
8        816 559-2372
9        For the Defendants
10
11
12   ALSO PRESENT:
13
14
15
16       Palko Goldman
17       George Dobrentey, Videographer
18
19
20
21
22
23
24
25

**4**

1                I N D E X
2
3    TESTIMONY OF:                    PAGE
4
5    RENA M. CONTI, Ph.D.
6    (By Mr. Polubinski)              7
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

5

1          E X H I B I T S

2

3    EXHIBIT          DESCRIPTION          PAGE

4    Conti Exhibit 1  Declaration of Rena Conti,

5              12/19/07          6

6    Conti Exhibit 2  Revision to the Declaration

7              of Rena Conti,          6

8    Conti Exhibit 3  GMA 387-389          100

9    Conti Exhibit 4  GMA 390-397          100

10   Conti Exhibit 5  GMA 398-406          100

11   Conti Exhibit 6  "Class Plaintiffs' Motion For

12             Enlargement of Time to File

13             Renewed Motion For Class

14             Certification."          152

15   Conti Exhibit 7  "Expert Declaration of Meredith

16             B. Rosenthal in Support of

17             Plaintiffs' Motion For Class

18             Certification."          172

19   Conti Exhibit 8  "Reply Declaration of Professor

20             Meredith Rosenthal.          173

21   Conti Exhibit 9  Subpoena          185

22   Conti Exhibit 10 NDTI, Volume 1, 1Q 2006      278

23   Conti Exhibit 11 "Neurontin NDTI Drug Uses By

24             Fraudulent marketing

25             Indication category"          313

6

1          (Conti Exhibit 1, Declaration of Rena

2    Conti, 12/19/07.)

3          (Conti Exhibit 2, Revision to the

4    Declaration of Rena Conti.)

5          VIDEO OPERATOR:  Good morning.  We are

6    recording and are now on the record.  Today's date

7    is February the 12th, 2008, and the time is 9:09

8    a.m.

9          My name is George Dobrentey.  I'm a legal

10   videographer for Veritext New Jersey.  This is the

11   deposition of Rena Conti, In Re:  Neurontin

12   Marketing Sales Practices and Products Liability

13   Litigation, in the United States District Court,

14   for the District of Massachusetts, MDL Docket No.

15   1629.

16         This deposition is being taken at Hare &

17   Chaffin, in Boston, Massachusetts.  The court

18   reporter is Jodi Ohnemus.  The counsel will state

19   their appearances and the court reporter will

20   administer the oath.

21         MR. POLUBINSKI:  Ted Polubinski from

22   Davis, Polk & Wardwell, for the Defendants.

23         MR. MISHKIN:  Paul Mishkin from Davis,

24   Polk & Wardwell for the Defendants.

25         MR. RONA:  Ilyas Rona from Greene &

7

1    Hoffman on behalf of the sales and marketing

2    Plaintiffs, and I'm joined this morning by Palko

3    Goldman, also of Greene & Hoffman.  He is a

4    nonattorney.

5          MR. POLUBINSKI:  The other thing it

6    probably makes sense just to mention at the start

7    is that we had cross-noticed this deposition in a

8    number of other proceedings -- no need to go into

9    that.  The deposition notice reflects it, but just

10   so that the record reflects it, too.

11         RENA M. CONTI, Ph.D., having

12         satisfactorily been identified by

13         the production of a driver's license,

14         and being first duly sworn by the Notary

15         Public, was examined and testified as

16         follows to interrogatories

17   BY MR. POLUBINSKI:

18   Q.   Good morning.

19   A.   Good morning.

20   Q.   Would you please state your full name.

21   A.   Sure.  Rena Marie Conti.

22   Q.   Do you prefer to be called Doctor Conti,

23   Professor Conti?

24   A.   Doctor Conti is fine.  Thank you.

25   Q.   Okay.  And what's your business address,

8

1    Doctor Conti?

2    A.   5841 South Maryland Avenue in Chicago,

3    Illinois.

4    Q.   Doctor Conti, you prepared a declaration

5    in this case in support of Plaintiffs' renewed

6    motion for class certification, correct?

7    A.   Yes.

8    Q.   Okay.  We've premarked two exhibits that

9    are sitting now in front of you.  You might take a

10   look at them.  The first one, Exhibit 1, is titled,

11   "Declaration of Rena Conti, Ph.D. in Support of

12   Plaintiffs' Renewed Motion For Class

13   Certification."

14         Exhibit No. 2 is titled, "Revision to the

15   Declaration of Rena Conti, Ph.D. in Support of

16   Plaintiffs' Renewed Motion For Class

17   Certification."

18         Let's look first at Exhibit 1.  Is this

19   the declaration that you prepared --

20   A.   Yes.

21   Q.   -- that we just discussed?  When we talk

22   about this, I will refer to it as your declaration

23   sometimes.  I may also refer to it as your report.

24         Just for the purposes of keeping the

25   record clear, can we agree that I'm talking about

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

9

1  the same thing --
2     A.  Yes.
3     Q.  -- when I say both?  Terrific.  And at
4  both times I'll be referring to Exhibit 1.  And
5  then Exhibit 2 I'll probably refer to as your
6  revised declaration, though I may also refer to it
7  at times as your revised report.  And if we can
8  agree that we're in both cases talking about
9  Exhibit 2, that would be great.
10    A.  Yes.
11    Q.  Does that work for you?  Great.  So
12  looking at Exhibit 1, let's flip to Page 28,
13  please.
14       This is your signature on Page 28; is that
15  correct?
16    A.  Yes.
17    Q.  And the date underneath your signature is
18  December 19th, 2007, correct?
19    A.  Yes.
20    Q.  It says, "Executed December 19th, 2007";
21  is that correct?
22    A.  Yes.
23    Q.  Which is to say that you signed the report
24  on that date; is that right?
25    A.  Yes.

11

1        MR. RONA:  First, I don't think -- you're
2  trying to imply she physically filed the document
3  herself, and I just want to point out that this is
4  a portion of an ECF document.  It says, "Page 15 of
5  112" on the first page, and I'm assuming that this
6  is complete, but I'm -- if you're going to ask her
7  questions about what -- if this is a complete
8  report, I ask that she be given time to -- to look
9  at this report and see if it's complete.
10       MR. POLUBINSKI:  That's fine.  And she's
11  welcome to take as much time as she wants.
12       MR. RONA:  Doctor Conti, if you'd like to
13  make sure this is a complete copy of the
14  declaration that was submitted on your behalf in
15  this case, feel free to do so now.
16       THE WITNESS:  Okay.  (Witness reviews
17  document.)
18       MR. RONA:  And by "this," I'm referring to
19  Exhibit 1.
20    Q.  Okay.  We'll be asking plenty of questions
21  about Exhibit 1, so no reason not to take -- you
22  know, take your time and figure out now whether
23  there's anything there that shouldn't be, or
24  anything that should be there that isn't.
25    A.  (Witness reviews document.)

10

1     Q.  Okay.  Let's do the same thing with
2  Exhibit 2.  If we can just flip to Page 1 there, it
3  looks like there's an electronic signature there or
4  a typewritten signature; is that correct?
5     A.  Yes.
6     Q.  And it says it was executed January 18th,
7  2008; is that correct?
8     A.  Yes.
9     Q.  And that's your name there, correct?
10    A.  Yes.
11    Q.  Okay.  And executed January 18th, 2008 is
12  to say that your signature was assigned to this
13  document on that date?
14    A.  Yes.
15    Q.  Okay.  So referring back to Exhibit 1 --
16  well, let's say Exhibit 1 is -- is the declaration
17  that you filed in this case, correct?
18    A.  Yes.
19    Q.  And that it's been modified in certain
20  ways by Exhibit 2; is that correct?
21    A.  Yes.
22    Q.  I'd like --
23       MR. RONA:  I'm sorry.  Just -- can I just
24  stop you right there?
25       MR. POLUBINSKI:  Sure.

12

1     Q.  And Doctor Conti, this isn't to suggest
2  that you shouldn't take all the time you need to
3  look at the document, but I'm certainly willing to
4  represent to you that we intended to give you every
5  page that was filed by Plaintiffs on December 19th.
6        So if that makes it easier for you to
7  review, you know, I'm -- we're happy to make that
8  representation.
9     A.  (Witness reviews document.)  Okay.
10    Q.  All set?  Okay.  So this report that you
11  just looked through in Exhibit 1, I assume as
12  modified by Exhibit 2, contains an accurate summary
13  of your opinions in this matter; is that correct?
14    A.  It contains a summary of the work that I
15  did on this case, yes.
16    Q.  And it's accurate, correct?
17    A.  Yes.
18    Q.  And are there any opinions that you intend
19  to offer in this case that are not contained in
20  Exhibit 1 as modified by Exhibit 2?
21    A.  No.
22    Q.  Okay.  Let's look at Attachment A-1, which
23  is on Page 71 of the ECF marks that Ilyas helpfully
24  pointed out.
25       Are you there?

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

---

13

1    A.  I am.
2    Q.  This is your CV, correct?
3    A.  Yes.
4    Q.  Is it current?
5    A.  Yes.
6    Q.  Has anything on here changed since you
7    filed -- or since this declaration was filed?
8    A.  It's current as of now, yes.
9    Q.  Have you ever testified under oath before?
10   A.  Yes.
11   Q.  When?
12   A.  I think around 12 years ago.
13   Q.  Only once, or have you testified more than
14   once under oath?
15   A.  Once.
16   Q.  What case was that?
17   A.  It was -- I couldn't tell you actually the
18   name of the case or the number.  It was -- I was a
19   fact witness for the Attorney General for the State
20   of Wisconsin.
21   Q.  Was the case pending in Wisconsin, as best
22   you understood?
23   A.  No, it wasn't.  I think it was -- my
24   understanding -- and again, it was a very long time
25   ago -- was that it was -- I think it was a second

---

14

1    -- a second 24-hour waiting law that the attorney
2    general was interested in promulgating in the
3    state.
4    Q.  When you say, "a second 24-hour waiting
5    law," what do you mean?
6    A.  A 24-hour waiting law.  So I worked for
7    Planned Parenthood of Wisconsin, and there was a --
8    an interest in passing a -- or interest in passing
9    a 24-hour waiting law to restrict abortions or to
10   kind of -- to inhibit abortions in the state.
11   Q.  You were -- I think you testified about
12   this, but just to clarify, you were testifying as a
13   fact witness, not as a retained expert witness,
14   correct?
15   A.  That's correct.  Uh-huh.
16   Q.  Were you testifying in deposition or at
17   trial or both?
18   A.  Just for deposition.
19   Q.  How long did the deposition last?
20   A.  About ten hours.
21   Q.  Were you a party to the case or just a
22   witness?
23   A.  What does that mean?
24   Q.  So in other words, were you a plaintiff or
25   a defendant in the case?

---

15

1    A.  Neither.
2    Q.  Okay.  Do you remember who the parties
3    were?
4    A.  I don't.
5    Q.  Okay.  So this would be, I guess, the
6    first time that you've testified as a retained
7    expert before; is that correct?
8    A.  That's correct.
9    Q.  And would it also be correct to assume
10   that you've never been accepted before as an expert
11   by any court; is that correct?
12   A.  What does that mean?
13   Q.  Have you ever submitted expert testimony
14   to a court before?
15   A.  No.
16   Q.  So a court's never accepted your expert --
17   your proposed expert testimony before; is that
18   correct?
19   A.  No -- or yes.
20   Q.  Why don't you -- just to straighten it
21   out --
22   A.  Okay.
23   Q.  -- you have not been accepted by a court
24   as a retained expert witness before; is that
25   correct?

---

16

1    A.  That's correct.
2    Q.  Okay.  Have you, yourself, ever been a
3    party to a lawsuit?
4    A.  No.
5    Q.  Okay.  You probably heard all of this 12
6    years ago the first time that you were deposed, but
7    these are some basic rules of the road and some
8    basic reminders about depositions, generally.  I'll
9    just give you a few of them.  I'm sure you've heard
10   them from Ilyas or somebody else before, too.
11       The first is, is that you understand that
12   your testimony is under oath today; is that
13   correct?
14   A.  Yes.
15   Q.  And you also know that, if you don't
16   understand one of my questions, you should ask me
17   or tell me that you don't understand it, and I'll
18   try to make it clearer; is that right?
19   A.  Yes.
20   Q.  Okay.  And the other thing is that we
21   should be careful not to speak over one another.
22   It's difficult for Jodi to take down the
23   transcription she needs to take down if we do that.
24   I assume you know that as well, correct?
25   A.  Yes.

---

17

1      Q.   Okay.  And are you taking any medication
2   today?
3      A.   No.
4      Q.   Okay.  All right.  Could you give me your
5   educational background, starting with college.
6      A.   I went to Kenyon College from 1988 through
7   1992.  I then enrolled in premedical course work at
8   the University of Wisconsin, Madison from 1994
9   through 1998.  I entered into the Harvard Ph.D.
10   program starting in 2000, which I completed in
11   2006.
12      Q.   Okay.  Let me ask you about your graduate
13   degree, and let's look here at Attachment 1, your
14   CV to Exhibit 1, which I think you have in front of
15   you now.
16          Your CV reflects graduate studies at
17   Harvard, but does not reflect that you actually
18   earned your Ph.D. there, right?  I assume that
19   there isn't any reason for that -- reason for it
20   its not reflecting your having earned a Ph.D.; is
21   that right?
22      A.   It says that I completed it June 2006.
23      Q.   Right.  It says you completed a thesis, I
24   guess, but fair enough.  It is the case that you
25   earned a Ph.D. from Harvard in 2006; is that

18

1   correct?
2      A.   It is the case, yes.
3      Q.   Okay.  And focusing there, I guess, on the
4   thesis that you -- that you have listed on your CV,
5   is that the same thing as a dissertation?
6      A.   Yes.
7      Q.   The title of your thesis is "The Economic
8   Value of New Treatments For Depression," correct?
9      A.   Yes.
10      Q.   Was the thesis published?
11      A.   The thesis is in three parts.  There are
12   three papers that are related to this topic:  One
13   paper has been published -- actually, it's
14   forthcoming in a book published by I think the
15   University of Chicago.  I think it's a -- it may be
16   a Bureau of Economic Research volume called "Health
17   in Older Ages."
18      Q.   Hold -- I'm sorry.
19      A.   It's called, "Health in --" the book is
20   called "Health in Older Ages."  And I just actually
21   saw the last drafts of the -- of the paper.  So it
22   will be in press -- or it is -- how do I say this?
23   It is in press, but it is -- the book will be
24   available in the next couple of months.
25      Q.   So that's the first part of your thesis?

19

1      A.   That's correct.
2      Q.   What about the other two parts?
3      A.   The other two papers are -- are in
4   manuscript form.  So one of them is -- has been
5   presented at multiple public presentations.  It is
6   now being prepared for submission.  It's actually
7   been submitted for publication.
8      Q.   Okay.  So are any of the parts of the --
9   of the thesis right now publicly available, or are
10   they -- or are they all potentially some day
11   publicly available?
12      A.   They are potentially publicly available.
13      Q.   By the way, is there a reason why you
14   refer to it as a thesis, as opposed to a
15   dissertation?
16      A.   No, it's -- it's -- honestly, it's the
17   format for Harvard, and people who are finished
18   with graduate work.  That's how we call it a
19   thesis.
20      Q.   In a nutshell what is your thesis about?
21   I understand that it's probably a fairly long
22   document, but if you can condense it a little bit
23   and explain what it's about, that would be great.
24      A.   Uh-huh.  So the thesis is about the impact
25   of mental illness on individuals' employment, and

20

1   also, the economic value or the economic benefits
2   relative to their costs of new treatments for some
3   mental illnesses relative to old treatments.
4      Q.   Does your thesis talk about off-label use
5   at all?
6          MR. RONA:  Objection.
7      Q.   You can answer if you understand the
8   question.
9      A.   One of my thesis papers examines the --
10   the on-label and off-label use of antidepressant
11   medications in a representative US population.
12      Q.   Does it focus on any antidepressant
13   medications in particular?
14      A.   Yes.
15      Q.   Which ones?
16      A.   The SSRI -- the antidepressants within the
17   SSRI class, and some other newer medications as
18   well, in newer classes.
19      Q.   Which medications in newer classes?
20      A.   So Effexor, Serzone -- I'm trying to
21   think -- Wellbutrin, and a handful of older
22   tricyclic antidepressants.
23      Q.   When you said before that your thesis
24   looks at the economic benefits of new treatments
25   relative to old treatments --

21

1    A.  Uh-huh.
2    Q.  -- is it comparing medications in the SSRI
3  class with the newer treatments that you just
4  described?
5    A.  It's comparing the side effect profiles,
6  dosing schedules, and other quality indicators of
7  the SSRIs to older medications in the TCA class.
8    Q.  What conclusion does it reach, upon doing
9  that comparison?
10    A.  So I conclude that some medications in the
11  SSRI class appear to have a net benefit relative to
12  -- relative to older medications.
13    Q.  When you say, "net benefit," what do you
14  mean?  Net benefit in terms of efficacy, or
15  something else?
16    A.  No, it's in terms of economic benefit.  So
17  the newer medications have different side effect
18  profiles relative to older medications.  And so I
19  estimate a dollar value attached to either of those
20  increments in side effect profiles.  And then those
21  are compared to the out-of-pocket costs that
22  individuals pay for those newer treatments relative
23  to older treatments.
24    So it's a net benefit, net cost
25  calculation.

22

1    Q.  Did your thesis focus at all on the
2  promotion of pharmaceuticals?
3    A.  No.
4    Q.  Did your thesis focus at all on the
5  factors that lead doctors to prescribe
6  pharmaceuticals -- one product over another?
7    A.  In my thesis, I only take into account the
8  changes in quality attached to newer treatments
9  relative to older ones.
10    Q.  When you say, "quality," what do you mean?
11    A.  Side effect profiles, dosing schedules,
12  the presence of titrate -- having to titrate a
13  medication or not.  And this is only for people who
14  had a diagnosis of major depression.
15    Q.  In addition to side effect profiles and
16  dosing schedules, did you also take into
17  consideration relative efficacy of the drugs when
18  you were thinking about quality?
19    A.  What do you mean by that?
20    Q.  What do I mean by what?  Do you want me
21  to --
22    MR. POLUBINSKI:  Why don't you read back
23  the question, and let me know what it is that you
24  don't understand about it.
25    (Question read back.)

23

1    A.  Define what you mean by "efficacy."
2    Q.  Why don't you tell me what you think of
3  when -- do you ever use the term "efficacy"?  Do
4  you have an understanding of what it means?
5    A.  Are you asking me whether I took into
6  account the -- the ability for the medication to
7  address the -- to alleviate the symptoms of
8  depression?
9    Q.  Well, let me ask it this way:  That's what
10  I think of when I think of efficacy.
11    A.  Uh-huh.
12    Q.  Do you think of efficacy differently from
13  that?
14    A.  No.
15    Q.  Okay.  Then that's what I was asking.
16    A.  Okay.  No.
17    Q.  Why not?
18    A.  Because in general, the clinical
19  literature shows that newer medications -- newer
20  antidepressants, particularly in the SSRI class --
21  are not any better at alleviating the depression --
22  the symptoms associated with depression; that their
23  main advantage is associated with effectiveness.
24    Q.  When you say that, "their main advantage
25  is associated with effectiveness," what does that

24

1  mean?
2    A.  Again, dosing schedule, titration, the
3  ability for a physician to manage a patient, and
4  also the side effect profiles of the drugs are --
5  are easily -- are easier tolerated by patients
6  relative to the older TCAs.
7    Q.  I think -- well, let me just try to clear
8  this up.  I think you had said that their main
9  advantage was associated with effectiveness.
10    Did you mean to say their main advantage
11  was not associated with effectiveness in a previous
12  answer a couple of questions ago?
13    A.  I -- their main advantage is not -- is --
14  has to do with effectiveness.  Again, this whole
15  notion of side effect profiles, titration, ease of
16  dosing, ease of taking relative to older
17  medications.  Their main advantage is not treating
18  the underlying symptoms of depression.
19    Q.  Which -- for which the drugs are
20  essentially fungible, is what you're saying; is
21  that correct?
22    A.  What do you mean by "fungible"?
23    MR. RONA:  Objection.
24    Q.  What do you think I mean by fungible?
25  What do you -- do you have -- do you have an

25

1    understanding of what the term "fungible" means?
2       A.  I do not.
3       Q.  Okay.  I think what you had said before is
4    that there's no -- there's no appreciable
5    difference in their ability to alleviate the
6    symptoms; is that correct, between the drugs --
7    newer and older classes?
8       A.  My read of the literature is that the
9    SSRIs, as a class, do not confer any efficacy gains
10   for treating the underlying symptoms of depression
11   relative to the older TCAs class.
12      Q.  Okay.  Did you receive any -- withdrawn.
13   Did you receive any support in the form of grants
14   while you were working on your thesis?
15      A.  Yes.
16      Q.  From whom?
17      A.  From the National Institutes of Mental
18   Health.
19      Q.  Any others?
20      A.  No.
21      Q.  Okay.  Okay.  On your CV undergraduate
22   studies, you describe the Interfaculty Initiative
23   in Health Policy and Economics at Harvard as being
24   the place where you did your graduate studies; is
25   that correct?

26

1       A.  Yes, that's correct.
2       Q.  Okay.  What school or college at Harvard
3    ultimately conferred the degree?
4       A.  GSAS, the Graduate School of Arts and
5    Sciences.
6       Q.  Any particular department within the
7    Graduate School of Arts and Sciences?
8       A.  The program is called the Interfaculty
9    Initiative in Health Policy.  It spans a variety --
10   a number of different schools within Harvard, but
11   its degree-conferring ability comes from the
12   Graduate School of Arts and Sciences.
13      Q.  So your degree isn't in the economics
14   department as such.  It's sort of a combination of
15   different departments.  Is that a fair
16   understanding?
17      A.  It's -- I have a -- right.  So my -- my
18   degree comes from the Graduate School of Arts and
19   Sciences, but my program is a recognized program in
20   GC -- GSAS that's inter -- that is
21   interdepartmental.
22      Q.  Okay.  When you say, "interdepartmental,"
23   it means it sort of crosses different departments;
24   is that -- is that right?
25      A.  That's correct.

27

1       Q.  And one of them that I had mentioned
2    before, because it's on your CV, is economics.
3       A.  That's correct.
4       Q.  What are the other departments that are --
5    that are involved in this interdepartmental
6    discipline?
7       A.  Uh-huh.  So the -- so the main department
8    in GSAS that I took courses in is in the economics
9    department.  There are two other schools that are
10   involved:  The Kennedy School of Government, and
11   also the medical school, and really, the school of
12   public health, too.
13      Q.  All of which are part of the Graduate
14   School of Arts and Sciences?
15      A.  Well, this is where it gets confusing.
16   No.
17      Q.  Okay.  Of that group, is it only economics
18   that is part of the Graduate School of Arts and
19   Sciences?
20      A.  That's correct.
21      Q.  Okay.  Okay.  Your CV also reflects -- and
22   you've mentioned before -- course work in
23   premedical science and bioethics at the University
24   of Wisconsin, Madison.
25      A.  Yes, that's correct.

28

1       Q.  Did you receive a degree there?
2       A.  I did not.
3       Q.  Why not?
4       A.  I was taking premedical course work to --
5    just to compliment my undergraduate studies.
6       Q.  Did you ever intend to get a degree?
7       A.  No.
8       Q.  Okay.  So you don't have a medical -- a
9    medical degree as such, correct?
10      A.  I do not.
11      Q.  Okay.  Have you ever attended medical
12   school as such --
13      A.  No.
14      Q.  -- as a medical student?  Okay.  Have you
15   done any course work in medicine?
16      A.  No.
17      Q.  And you don't have a degree in
18   pharmacology either, I assume --
19      A.  I do not, no.
20      Q.  -- correct?  Have you ever taken any
21   courses in pharmacology?
22      A.  Yes.
23      Q.  Where have you taken them?
24      A.  Actually -- actually, technically, I think
25   it's psychopharmacology.  And that was at Kenyon

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

29

1  College.
2  Q.  What's the difference between
3  psychopharmacology and pharmacology?
4  A.  I think I need someone else to tell me
5  that -- the answer to that question.  I -- my
6  understanding is that I -- that I mostly focused on
7  psychiatric drugs.
8  Q.  Did you take one class at Kenyon --
9  A.  I did.
10  Q.  -- in psychopharmacology?
11  A.  Uh-huh.
12  Q.  Okay.  What was the -- what was the
13  general subject matter of the class --
14  A.  Psychopharmacology.
15  Q.  -- aside from introduction to
16  psychopharmacology?
17  A.  Yes.
18  Q.  Okay.  And aside from that one class in
19  psychopharmacology, whatever that -- that is -- and
20  I certainly don't profess to know what it is
21  myself -- you haven't taken any classes in
22  pharmacology; is that correct?
23  A.  No.
24  Q.  Okay.  And you don't have a law degree
25  either.

30

1  A.  I do not.
2  Q.  Good for you.  Ever taken any courses in
3  law?
4  A.  No.
5  Q.  Okay.  Do you have any professional
6  degrees or licenses?
7  A.  I have a Ph.D.
8  Q.  Aside from your Ph.D., do you have any
9  professional degrees or licenses?
10  A.  No.
11  Q.  And you're not licensed to practice
12  medicine?
13  A.  No.
14  Q.  And so you wouldn't consider yourself to
15  be an expert in the practice of medicine, I assume?
16  A.  No.
17  Q.  Okay.  You're not licensed to prescribe
18  medication either, I assume, correct?
19  A.  No.
20  Q.  And I assume you've never prescribed a
21  drug before.  Is that -- is that a fair assumption?
22  A.  Yes.
23  Q.  Do you have any experience in the actual
24  prescription-writing process, other than maybe
25  having had prescriptions written for you before,

31

1  the way most of us have probably have?
2  A.  No.
3  MR. RONA:  Objection.
4  Q.  You'd agree with me that you're not an
5  expert in the prescribing of drugs, then, correct?
6  MR. RONA:  Objection.
7  Q.  You can answer.
8  A.  I would agree with -- well, can you
9  rephrase the question.
10  MR. POLUBINSKI:  Can you read it back,
11  please.
12  (Question read back.)
13  A.  So are you asking me that from a
14  physician's point of view or pharmacologist's point
15  of view, I am not an expert?
16  Q.  Yes.
17  A.  Yes, I am not an expert -- or no, I am not
18  an expert.
19  Q.  Okay.  Would you consider yourself to be
20  an expert in some other way?
21  A.  So I know something about the observation
22  of prescription uses or prescriptions that are
23  described or -- in observational datasets or in
24  survey datasets.
25  Q.  So your knowledge is about the observation

32

1  of prescriptions, I guess?
2  A.  That's correct.  In survey data or in
3  claims data.
4  Q.  It's not in the actual prescription
5  writing process, correct?
6  A.  That's correct.
7  Q.  Okay.  I'll ask you more about the -- the
8  former later, but we'll --
9  A.  Uh-huh.
10  Q.  -- keep going for now.  Are you familiar
11  with the term "third-party payer"?
12  A.  Yes.
13  Q.  Have you done any work before for an
14  entity that would qualify as a member or that would
15  qualify as a third-party payer?
16  A.  No.
17  Q.  Are you familiar with the term "PBM"?
18  A.  Yes.
19  Q.  What does PBM stand for?
20  A.  Pharmacy benefit manager.
21  Q.  Have you ever worked for a pharmacy
22  benefit manager?
23  A.  No.
24  Q.  Have you ever worked for any governmental
25  entity that has any involvement in pharmaceutical

33

1  reimbursement under federal or state laws?
2      A.  No.
3      Q.  Do you have any direct experience in the
4  pharmaceutical reimbursement process?
5      Can you be more specific, please?
6      Q.  My question's pretty general, actually.
7      A.  Uh-huh.
8      Q.  Is there any -- and it means -- it
9  specifically means to be general.
10     MR. POLUBINSKI:  Maybe you could read it
11  back, Jodi, and -- and if there -- if there are
12  nuances to the question that -- that make it
13  difficult to answer, maybe you'll let me know.
14     (Question read back.)
15     A.  So I guess I don't know what you mean by
16  "direct" in this case.
17     Q.  Then why don't we eliminate the word
18  "direct."
19     A.  Okay.
20     Q.  And just say, "experience."
21     A.  So again, I know something about the
22  recording of charges in observational and survey
23  data that are related to pharmaceutical purchases.
24     Q.  Okay.  Other than the recording of charges
25  in observational and survey data, do you have any

34

1  experience with the pharmaceutical reimbursement
2  process?
3      A.  No.
4      Q.  And when you say, "the recording of
5  charges in observational and survey data that are
6  related to pharmaceutical purchases," what do you
7  mean by that?
8      A.  I mean that I have experience using
9  observational data and survey data that records and
10 that describes charges that are related to
11 individuals purchasing medication.
12     Q.  Then your knowledge doesn't relate to the
13 underlying decision by a third-party payer to
14 reimburse or not reimburse, correct?  It's the --
15 how it's reflected in the data is where your
16 knowledge lies?
17     A.  That's correct.
18     Q.  Okay.  You wouldn't consider yourself to
19 be an expert in the underlying decision-making
20 process by a third-party payer; is that correct?
21     A.  So if you mean by that -- so I do know
22 something about formularies and the -- the prices
23 of medications that are placed in a formulary and
24 something -- a little bit about the -- the choice
25 of tiering.

35

1      Q.  Would you consider yourself to be an
2  expert in either of those fields?  I know you said
3  you know something about it.
4      A.  Uh-huh.  So part of my training in my --
5  in my graduate school work has to do with the --
6  with the workings of PBMs and with the
7  reimbursement of pharmaceuticals.
8      Q.  Would you consider yourself to be an
9  expert in those areas or -- or would it be safer to
10 say that you know something about those areas?
11     A.  I know something about those areas.
12     Q.  Or would you not say you were an expert,
13 but maybe you know something about it?  I'm trying
14 to be just as specific as we can in this.
15     MR. RONA:  Objection.
16     A.  I'm --
17     Q.  Maybe let's say it this way:  You're
18 comfortable saying you know something about these
19 areas.  You're not comfortable saying you're an
20 expert.  Is that a fair assumption?
21     A.  Well, I haven't -- my dissertation is not
22 about the reimbursement of pharmaceutical -- the
23 market for reimbursement of pharmaceuticals in the
24 United States.
25     I have not -- but I do know -- you know, I

36

1  have done quite a lot of reading and thinking about
2  reimbursement and policy related to that --
3      Q.  I guess maybe we can --
4      A.  -- as part of my training.
5      Q.  Fair enough.  Maybe just to circle back to
6  what my question was, would you agree or disagree
7  with the question which is, "you're comfortable
8  saying you know something about these areas.
9  You're not comfortable saying that you're an expert
10 in the area"?
11     A.  I don't know what the standard for expert
12 is.
13     Q.  Whatever your own vision of expert is.
14     MR. RONA:  Objection.
15     Q.  Okay.  You can answer.
16     MR. RONA:  I don't mean to -- to butt in,
17 but it seems to me that there's, you know, the word
18 "expert" has --
19     MR. POLUBINSKI:  Then let's -- let's -- I
20 understand.  I'm not asking for a -- I'm asking for
21 her own knowledge of it.
22     MR. RONA:  Well, that's why now I'm -- I'm
23 concerned about the relevance of if her definition
24 deviates from the definition.
25     MR. POLUBINSKI:  This is a speaking

37

1    objection, Ilyas.  You can -- you can stop here,
2    okay.  You've registered your objection for the
3    record.  If Ms. Conti understands the question, she
4    can answer it.
5        A.  I don't know what your standard for expert
6    is, so it's very difficult for me to answer
7    honestly.
8        Q.  Right, which is why -- which is why I'm
9    offering you the opportunity to use your own --
10       A.  Uh-huh.
11       Q.  -- standard for what an expert is or
12   isn't.  Do you consider yourself to be an expert?
13           MR. RONA:  Same objection.
14       A.  Yes.
15       Q.  And you consider yourself to be an expert
16   because of the reading and -- and thinking you've
17   done about the subject?
18       A.  That's correct.
19           MR. RONA:  Objection.
20       Q.  You haven't written articles about the
21   subject, correct?
22       A.  I have written some work -- I have written
23   some papers that do look at PBMs and do look at
24   reim -- and issues around reimbursement in the
25   United States.

38

1        Q.  Which -- which papers?
2        A.  So in the book chapter, "Ensuring Mental
3    Health Care in the Age of Managed Care," there is a
4    discussion of -- of insurance practices and also
5    PBMs and also -- and the use of formularies.
6            And similarly, in a paper that I cowrote
7    with a number of other authors, "Prescription Drug
8    Use and Expenditures in California," we do discuss
9    reimbursement and also --
10       Q.  I'm sorry.  Which -- I'm sorry.
11       A.  In the Policy Report --
12       Q.  Uh-huh.
13       A.  -- "Prescription Drug Use and Expenditures
14   in California."  We do discuss insurance practices,
15   reimbursement, the use of formularies, the use of
16   PBMs.
17       Q.  Have you ever worked directly or
18   indirectly for the FDA?
19       A.  No.
20       Q.  Have you ever been involved with the
21   application to the FDA for approval of a new drug?
22       A.  No.
23       Q.  How about a supplemental indication for a
24   new drug?
25       A.  No.

39

1        Q.  Have you ever been involved in a clinical
2    trial involving a prescription drug?
3        A.  No.
4        Q.  You wouldn't consider yourself to be an
5    expert in FDA law or regulation --
6        A.  No.
7        Q.  -- or in the FDA approval process as such?
8        A.  What do you mean by that?
9        Q.  What do you understand the FDA approval
10   process to be?
11       A.  So I have a general understanding of the
12   process of FDA approval.
13       Q.  Is there some aspect of the process of FDA
14   approval in which you consider yourself to be an
15   expert?
16       A.  No.
17       Q.  Okay.  I assume you wouldn't consider
18   yourself to be an expert in the design or
19   implementation of clinical trials for prescription
20   medicines; is that correct?
21       A.  No.
22       Q.  Have you ever done any work for a
23   pharmaceutical company before?
24       A.  No.
25       Q.  And I assume no pharmaceutical company has

40

1    ever provided financial support for any of your
2    research --
3        A.  No.
4        Q.  -- or your other academic work.
5            Have you ever taken Neurontin?
6        A.  No.
7        Q.  Do you know anyone who has ever taken
8    Neurontin?
9        A.  No.
10       Q.  Have you ever spoken with anyone, to the
11   best of your knowledge, who's been prescribed
12   Neurontin?
13       A.  No.
14       Q.  I assume you have never been directly
15   involved with the prescription of Neurontin --
16       A.  No.
17       Q.  -- or the reimbursement of a prescription
18   for Neurontin?
19       A.  No.
20       Q.  Have you ever spoken with a doctor about
21   the prescribing of Neurontin?
22       A.  No.
23       Q.  Okay.  Let's look back at your CV, and
24   also think a little bit about the timeline that you
25   laid out when we talked about your educational

41

1    background before.
2      A.   Sure.
3      Q.   What did you do for the two years between
4    your graduation from Kenyon in 1992, and the time
5    when you began your studies at the University of
6    Wisconsin in 1994?
7      A.   So I worked for Planned Parenthood.
8      Q.   Anything else?
9      A.   I did some traveling.
10     Q.   Okay.  Just looking at your CV here, and I
11   don't mean to trip you up --
12     A.   That's okay.
13     Q.   -- because I know if someone asked me what
14   I did between college and law school.  I'd have to
15   rack my brain to think about it.
16     A.   Yeah.
17     Q.   But looking under "Research Experience and
18   Other Employment," the second-to-last line from the
19   bottom, reads, "Planned Parenthood of Wisconsin,
20   Madison, Wisconsin."
21     A.   Yes.
22     Q.   And the dates associated with that are
23   1995 through 1998.  Did you work for Planned
24   Parenthood before that time?
25     A.   I think I did actually work in 1994.  I

42

1    apologize for that.  It's a typo.
2      Q.   Okay.  And prior to 1994, between 1992 and
3    1994 --
4      A.   Uh-huh.
5      Q.   -- were you working, or were you just
6    traveling during those years?
7      A.   I was working.  So I worked as a bartender
8    and as a waitress, and I also traveled.  I did some
9    temp. work.
10     Q.   What kind of temp. work?
11     A.   Just administrative.
12     Q.   Related at all to the pharmaceutical
13   industry?
14     A.   No.
15     Q.   To medicine?
16     A.   No.
17     Q.   Is your position in Chicago now a
18   full-time position?
19     A.   Yes.
20     Q.   When did you start there?
21     A.   In August of 2006.
22     Q.   So within months of your completing your
23   Ph.D., I take it?
24     A.   That's correct.
25     Q.   Prior to the current position that you

43

1    have at Chicago, have any of your jobs been
2    full-time positions up until then?
3      A.   Yes.
4      Q.   Which ones?
5      A.   So I worked full time for Planned
6    Parenthood of Wisconsin.  I worked full time for --
7    at the school of public health.
8      Q.   Starting with Planned Parenthood of
9    Wisconsin, your full-time employment went from
10   when, 1994 to 1998?
11     A.   Uh-huh.  That's correct.
12     Q.   And so your course work at the University
13   of Wisconsin was in addition to the work that you
14   were doing there.
15     A.   That's correct.
16     Q.   What was your position at Planned
17   Parenthood?
18     A.   So I was a clinic assistant and a patient
19   educator.
20     Q.   In a nutshell, what were your
21   responsibilities as a clinic assistant?
22     A.   So I counseled patients.  I helped the
23   nurse practitioners and the physicians with their
24   responsibilities in taking care of patients.  I --
25   I entered patient information into a database.  I

44

1    generated bills for patients.
2      Q.   Anything else?
3      A.   That's it.
4      Q.   How about as a patient educator, what were
5    your responsibilities?
6      A.   Same story.  So basically as a patient
7    educator, I educated patients about, you know, the
8    use of birth control.
9      Q.   And the full-time work that you did for
10   the school of public health, was that in 1998
11   through 2000?
12     A.   That was, yes.
13     Q.   And your job there was that you were a
14   research assistant or project director, I guess?
15     A.   As a project director.
16     Q.   What -- what's a project director?
17     A.   So there were three main projects that I
18   was involved in, and I was involved in the daily
19   management and execution of those projects.  So
20   database management, grants management; I had a
21   number of people that were working -- in one form
22   or another -- on these projects doing data entry or
23   filing patient surveys, other types of surveys that
24   -- that I was involved in directing.
25     Q.   You mentioned three projects.  What are

45

```
1    the three projects?
2      A.  So one looked at the racial disparities in
3    renal transplantation and involved a survey.
4          The second --
5      Q.  Second one?
6      A.  The second --
7      Q.  Go ahead.
8      A.  -- examined the use of financial and
9    nonfinancial incentives to medical groups in
10   California.
11     Q.  Do you remember the third?
12     A.  Third is kind of an all-encompassing
13   category.  So one -- so within that, there has been
14   various research projects that I was involved in,
15   the most -- the most notable one was looking at the
16   causes and consequences of -- of -- sorry -- of
17   prescription medication use and costs in
18   California.
19     Q.  Okay.  I think we'll circle back to that a
20   little bit later, but let's look now on Page 2 of
21   your declaration -- your report.
22     A.  Uh-huh.  Yes.
23         THE WITNESS:  So may I ask, may I have
24   some more water, please, and I'd like to take a
25   break for just a minute to go to the bathroom.
```

46

```
1          MR. POLUBINSKI:  Sure.  Sure.  Why don't
2    we do that now.
3          THE WITNESS:  Okay.  That would be great.
4    Thank you.
5          VIDEO OPERATOR:  The time is 10:03 a.m.,
6    and we are off the record.
7          (Recess was taken.)
8          VIDEO OPERATOR:  The time is 10:12 a.m.,
9    and we are back on the record.
10     Q.  So Doctor Conti, by the way, I should have
11   said this before at the beginning of the
12   deposition, but when you need to take breaks, any
13   time you want, please let me know.  We're happy to
14   do it.
15     A.  Thank you.
16     Q.  So.  Okay.  So let's look back at Exhibit
17   1, which is your report -- your declaration, and
18   Page 2, where you may already be.  You write in
19   Paragraph 1 that, "I am an instructor of health
20   economics at the University of Chicago, and an
21   academic affiliate of Greylock McKinnon Associates,
22   GMA, a consulting and litigation support firm."
23         Did I read that right?
24     A.  That's correct.
25     Q.  Let's focus first on your position at the
```

47

```
1    University of Chicago.  What is an instructor?
2      A.  An instructor is a full-time academic
3    position for individuals who either have -- who
4    have a secondary degree, in one form or another --
5    in this case I have a Ph.D.; other individuals will
6    have an MD.
7      Q.  How is an instructor different from a
8    professor?
9      A.  It really just indicates that the amount
10   of time that I've been out of school.  At the
11   University of Chicago, the majority of individuals
12   who -- who have a position at the medical school
13   when they begin after finishing a Ph.D., start as
14   an instructor.
15     Q.  So is it a permanent position?
16     A.  Is it a what?
17     Q.  A permanent position.
18     A.  Well, there's nothing permanent in this
19   world, but --
20     Q.  Fair enough.
21     A.  -- I have a three-year contract, with the
22   understanding that after my second year, I will
23   become assistant professor.
24     Q.  So in that sense, is it on -- on tenure
25   track, this --
```

48

```
1      A.  That's correct.  I'm on tenure track.
2      Q.  How long is the track?
3      A.  I think it's seven years, but it does not
4    include the instructor years.
5      Q.  Okay.  So the seven years would start once
6    you become assistant professor --
7      A.  That's correct.
8      Q.  -- which would be at some point in the
9    future --
10     A.  In the --
11     Q.  -- relatively soon?
12     A.  That's right.
13     Q.  Okay.  I think you alluded to this before,
14   but what school at the University of Chicago is
15   your appointment in?
16     A.  In the medical school.
17     Q.  And do you have an office there?
18     A.  I do.
19     Q.  Is that the business address that you gave
20   us at the beginning of the deposition?
21     A.  That's correct.  Actually, can I be
22   specific about that?
23     Q.  I'd love you to be specific.
24     A.  Thank you.  So I am an instructor at the
25   University of Chicago, and it's a University
```

49

1  appointment, but my affiliation is at the medical
2  school in the department of pediatrics.
3      Q.  Thank you.  What is health economics?
4      A.  It's the economic study of the health care
5  industry and sector of the economy.
6      Q.  Okay.  In Paragraph 2 you write that, "At
7  the University of Chicago, I have taught master's
8  level health economics courses on a variety of
9  health policy topics."
10         What courses have you taught?
11     A.  So I have taught a week-long intensive
12  health policy and health economics course this past
13  summer that examined issues of underlying framework
14  for thinking about what -- the supply and demand
15  for medical care services.
16     Q.  Okay.  Any others?
17     A.  No.
18     Q.  So the course work that you referred to
19  here that -- that you've taught at University of
20  Chicago is just the one-week long class last
21  summer?
22     A.  That's correct.  I mean, I've taught other
23  seminars on various topics.  But that's correct,
24  the kind of majority of the course work that I've
25  taught has been in this one week-long intensive

50

1  course.
2      Q.  You referred to -- okay.  You mentioned
3  other seminars.
4      A.  Uh-huh.
5      Q.  What other seminar work or what other
6  seminar teaching have you done in addition to this
7  week-long --
8      A.  So I've taught a number of seminars in the
9  work that I have done specifically on specific
10  research projects that I am working on.  And also
11  -- and I've taught medical students about -- I have
12  given medical students a general introduction to
13  health economics and the kind of trajectory of
14  course work and experience that you need in order
15  to get a Ph.D. in health economics.
16     Q.  Have you done that in the context of any
17  classes in which they actually register as
18  students, or has it been --
19     A.  Yes.
20     Q.  -- more informal than that?
21     A.  So no, it's -- it's formal in that this is
22  -- these are seminars that -- that fellows -- that
23  research fellows at the medical school will be
24  enrolled in and will get credit for.
25     Q.  How long do the seminars last?

51

1      A.  Usually an hour to two hours.
2      Q.  But they're sort of one-shot deals.  It's
3  a -- it's a one -- it's a one-hour chunk, and
4  that's the extent of the seminar, right?  It's not
5  something that occurs over the course of weeks.
6      A.  Right.  So it's a rotating group of
7  professors at the university that will teach at
8  these things.  So I will have a slot of two hours
9  to talk about my topic.  But then other people will
10  also -- you know, other professors will also be
11  talking about research work that they are working
12  on at different slots, and this is -- these are
13  regular seminars that meet weekly at the
14  university.
15     Q.  And so these are presentations,
16  essentially, on the work that you're doing?
17     A.  That's correct.
18     Q.  Okay.  But they're not formal courses in
19  which students enroll.
20     A.  No, students do enroll.  They do get
21  credit for being a part of them.  But it's not like
22  a course in health economics.  Right.  It's a
23  course in research -- in the kind of -- in research
24  methods.
25     Q.  Okay, which you teach, along with other --

52

1      A.  That's correct.
2      Q.  -- other teachers.  How many teachers
3  total would teach one of these things?
4      A.  So I'm trying to think about the number of
5  -- so again, these are -- these are research
6  seminars that students -- fellows -- will get
7  credit for doing it -- for doing, but there are --
8  or for enrolling in and participating in.  There
9  are probably ten to 15 professors who present their
10  research in these seminars.
11     Q.  And you're one of the ten to 15
12  professors?
13     A.  That's correct.
14     Q.  Okay.  Was -- in terms of the one
15  week-long actual course that you described --
16     A.  Uh-huh.
17     Q.  -- were you the only teacher who was
18  teaching that, or were there others involved there,
19  too?
20     A.  Again, so it was a -- I think it was a
21  six-week course, and --
22     Q.  I see.
23     A.  -- each -- this is very common in policy
24  -- in policy-related courses.  So I think it was a
25  -- you know, a multiple-week course and a number of

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

53

1  us divvied up the topics, and we were responsible
2  for different -- different sections of the course.
3      Q.  And the portion that you covered was a
4  week long, I take it?
5      A.  That's right.  Week-long course in health
6  economics.
7      Q.  During the course of that week, how -- how
8  often would this course have met?
9      A.  Every day.
10     Q.  For how long?
11     A.  Three hours.
12     Q.  Okay.  Have you taught undergraduates at
13  all?
14     A.  I have.
15     Q.  At University of Chicago?
16     A.  No.
17     Q.  Okay.  And have you -- at the University
18  of Chicago -- taught a full-blown course in which
19  you were the lead professor teaching it?
20     A.  No.
21     Q.  Okay.  Have you taught anything at the
22  University of Chicago about -- or anywhere,
23  actually, about the impact of pharmaceutical
24  promotion on sales of prescription drugs?
25     A.  No.

54

1      Q.  Okay.  Let's look at the next sentence in
2  Paragraph 2.  You write that, "At Harvard
3  University, I have taught undergraduate level and
4  master's level health economics courses on a
5  variety of health policy topics."
6          Did I read that one correctly, too?
7      A.  Yes.
8      Q.  Let's turn back to your CV, which, again,
9  I think is on Page 71 in the little writing at the
10  top of the pages.  And maybe keep a thumb on Page 2
11  -- or whichever finger you like.
12     A.  Okay.
13     Q.  On your CV, there's a category here, the
14  heading of which is, "Teaching Experience"; is that
15  correct?
16     A.  Yes.
17     Q.  And under "Teaching Experience," it looks
18  like you list a total of three classes here in 2001
19  and 2002; is that correct?
20     A.  That's correct.
21     Q.  And in each of these classes, it appears
22  that you were a teaching fellow; is that correct?
23     A.  That's correct.
24     Q.  Were you the only teaching fellow for
25  those three classes?

55

1      A.  No -- ah, that's not true -- so sorry.  I
2  should be more specific.
3      Q.  Why don't we do them one at a time if it's
4  easier, yeah.
5      A.  Yeah, right.
6      Q.  Let's do the first one, which is in the
7  fall of 2001 in health economics, a teaching fellow
8  for Professor David M. Cutler.
9      A.  Correct.
10     Q.  Were you the only teaching fellow for that
11  class?
12     A.  No.
13     Q.  Okay.  How many were there?
14     A.  I think there was two.  Myself and someone
15  else.
16     Q.  Okay.  How about the second one, also in
17  the health economics department, teaching fellow
18  for Professor Cutler in fall of 2002?
19     A.  There are three of us, inclusive.
20     Q.  And then the last one, the spring of 2001?
21     A.  I was the only one.
22     Q.  Do you have other teaching experience at
23  Harvard beyond your being a teaching fellow in
24  these three classes --
25     A.  No.

56

1      Q.  -- back in 2001, 2002?
2      A.  Sorry.  No.
3      Q.  Thanks.  And so flipping back to Page 2,
4  were those the undergraduate level and master's
5  level health economics courses that you list here
6  as having taught?
7      A.  That's correct.
8      Q.  Do you supervise graduate students?
9      A.  At the University of Chicago?
10     Q.  Yes.
11     A.  I supervise medical students and medical
12  -- medical fellows.
13     Q.  What's a medical fellow?
14     A.  I think they are in their internship or
15  residency years doing a research project.
16     Q.  These are -- these are people who have
17  already received their M.D. degree, but are in the
18  process of completing whatever requirements they
19  need to complete before being licensed to practice
20  medicine; is that right?
21     A.  Yes.
22     Q.  Okay.  How many medical students, total,
23  would you say you supervise?
24     A.  One.
25     Q.  What year?  What year is the student?

57

1    A.  She has finished -- I think she's -- she's
2  a fellow.  I think she's a second-year fellow.
3    Q.  So she already has her M.D. degree?
4    A.  That's correct.
5    Q.  So she's an MD fellow, as opposed to an
6  actual, you know, medical student in medical
7  school?
8    A.  She's not a medical student.
9    Q.  Okay.  Do you supervise any medical
10  students at such?
11    A.  No.
12    Q.  Did she assist you at all in your work in
13  this matter?
14    A.  No.
15    Q.  Okay.  We talked about teaching.  Have you
16  done any research on the impact of pharmaceutical
17  promotion on sales of pharmaceutical products?
18    A.  No.
19    Q.  Let's look again at Page 2, in Paragraph
20  3, it's the third sentence that reads, "Specific
21  topics:  Specific topics I have studied include the
22  on- and off-label usage and associated spending of
23  prescription medications and the health benefit of
24  new prescription medications relative to their
25  costs."

58

1    Did I read that one right?
2    A.  Yes.
3    Q.  Can you describe the research that you --
4  that this sentence refers to?
5    A.  Sure.  So I have written a number of
6  papers related to the use and costs of prescription
7  medications.  The vast majority of the work has
8  related to the on-label uses for medications for
9  their FDA-approved indication.  I am -- for my
10  dissertation research, one of my papers examined
11  the on- and off-label usage of antidepressant
12  medications, and their associated spending for both
13  public and private payers.
14    And another aspect of the work that I have
15  done has been to estimate -- using a variety of
16  economic methods -- the impact of illness on
17  individuals' employment history, and also the
18  impact of the potential health benefits associated
19  with newer medications relative to older ones
20  relative to their incremental costs.
21    Q.  Okay.  Let's shift gears and talk about
22  your work with Greylock McKinnon Associates.  You
23  describe yourself as an academic affiliate of
24  Greylock McKinnon, I think, in this first
25  paragraph; is that correct?

59

1    A.  Yes.
2    Q.  What does that mean?
3    A.  That means that I have been hired to
4  analyze some data and produce a report for GMA.
5    Q.  How long have you been an academic
6  affiliate at Greylock McKinnon?
7    A.  For less than six months.
8    Q.  Is your work as an academic affiliate with
9  Greylock McKinnon limited to this matter?
10    A.  Yes.
11    Q.  So you hadn't done any work with them
12  prior to this matter, correct?
13    A.  No.
14    Q.  You don't need to actually look at your
15  CV, but I -- I don't recall seeing anything on
16  there that refers to your status as an academic
17  affiliate of Greylock McKinnon there.
18    A.  Uh-huh.
19    Q.  Is that correct?  You're welcome to look.
20    A.  I can look.  (Witness reviews document.)
21  No.  This CV is really an academic CV, so there's
22  no reason -- in a formal academic CV -- I would
23  have listed that.
24    Q.  Why not?
25    A.  I think that it's not -- so this CV is

60

1  really for academic purposes.  So it doesn't -- it
2  doesn't encompass all of the work -- it wouldn't
3  necessarily encompass all of the professional
4  activities that I pursue.
5    Q.  Are there other professional activities
6  that you pursue that are not reflected on your
7  CV --
8    A.  Yes.
9    Q.  -- other than Greylock McKinnon --
10    A.  Yes.  So I also am a member of a number of
11  professional societies that are not listed on this.
12    Q.  Which ones?
13    A.  So the American Medical -- sorry.  Gosh,
14  help me.  The American Economic Association.  I'm
15  trying to think what else.  The American Health
16  Economics Association.  I'm a reviewer for a number
17  of different types of publications.  I also don't
18  have that listed here.
19    Q.  I assume you don't have an office at
20  Greylock McKinnon; is that correct?
21    A.  I do not.
22    Q.  And I assume you don't receive a regular
23  paycheck from them; is that correct?
24    A.  That's correct.
25    Q.  How did you first decide to become an

61

1  academic affiliate there?
2      A.  So I was contacted by Meredith Rosenthal
3  and asked if I would be interested in preparing --
4  in analyzing some data, looking at trends in use
5  and costs of prescription medications.
6      Q.  When were you contacted by Ms. --
7  Professor Rosenthal?
8      A.  I think last week of September/beginning
9  of October.  How about the end of
10 September/beginning of October of 2006 -- or 2007.
11 Sorry.
12     Q.  Okay.  We'll -- we'll talk more about that
13 contact later, but -- but just returning, again, to
14 your work with Greylock McKinnon more generally,
15 are you currently employed by any entity other than
16 Greylock McKinnon or University of Chicago?  I know
17 you mentioned these professional societies of which
18 you're a member but --
19     A.  No.
20     Q.  Okay.  And going back to the professional
21 societies, I'm assuming --
22     A.  Uh-huh.
23     Q.  -- your membership involves your paying
24 dues and maybe getting magazines and invitations to
25 conferences and the like?

62

1      A.  That's correct.
2      Q.  Is there anything more to it than that?
3      A.  I organized a conference on personalized
4  medicine for the Society For Medical
5  Decision-Making this past year.  So as part of my
6  membership, I was asked to do some more organizing
7  work.
8      Q.  Okay.  The Society For Medical
9  Decision-Making --
10     A.  That's correct.
11     Q.  -- I assume is another -- is an additional
12 professional society?
13     A.  That's correct.
14     Q.  Aside from your work in organizing this
15 conference --
16     A.  Uh-huh.
17     Q.  -- is it fair to say that your work for
18 these other professional societies and for the
19 Society of Medical Decision-Making is -- you know,
20 is limited to, again, sort of paying dues,
21 receiving, you know, information, and invitations
22 to events, and things like that.
23     MR. RONA:  Objection.
24     A.  So it really varies, depending on the year
25 and depending on what I -- what -- what my

63

1  involvement is.  For example, for the American
2  Medical -- for the American Economics Association,
3  the annual meeting this past year, I organized a
4  seminar on a variety of -- on a specific topic, and
5  invited four people to give talks, and then
6  reviewed those papers, invited speakers to come
7  comment on them.
8      For the Society For Medical
9  Decision-Making, in addition to being a member,
10 paying dues, attending the meetings, I also was a
11 part of the organizing committee for a particular
12 seminar -- half-day seminar -- looking at
13 personalized medicine there.
14     I invited speakers, did a lot of
15 organization around who to talk about what, the
16 order in which people would talk about it, reviewed
17 the content of all of that -- all of the seminar --
18 the content of the seminars or of the specific
19 speakers' presentations.
20     Q.  Okay.  Neither -- none of these are
21 full-time jobs, though, correct?
22     A.  No, none of these are full-time jobs.
23     Q.  And you're not -- and you're not paid for
24 any of these; is that correct?
25     A.  No, that's correct.  That's correct.

64

1      MR. POLUBINSKI:  We need to change the
2  tapes.  Why don't we do that now.
3      VIDEO OPERATOR:  The time is 10:36 a.m.
4  This is the end of Tape 1, and we are off the
5  record.
6      (Discussion off the record.)
7      VIDEO OPERATOR:  The time is 10:39 a.m.
8  This is the beginning of Tape 2, and we are back on
9  the record.
10     Q.  So just to make sure that I'm -- I'm clear
11 about this, you're not active now in any other
12 litigation matters for Greylock McKinnon, correct?
13     A.  That's correct.
14     Q.  This is the only matter on which you've
15 worked up 'til now.
16     A.  That's correct.
17     Q.  And the only matter on which you're
18 currently working?
19     A.  That's correct.
20     Q.  Do you like working for Greylock McKinnon?
21     A.  Yes.
22     Q.  Would you like to do more work with them?
23     A.  Sure.
24     Q.  So when were you retained in this case?  I
25 know you had this conversation with Professor

65

1  Rosenthal --
2     A.  Uh-huh.
3     Q.  -- in late September/beginning of
4  October --
5     A.  Uh-huh.
6     Q.  -- but when were you actually retained?
7     A.  What do you mean by "retained"?
8     Q.  When were you formally hired by Greylock
9  McKinnon to do this work?
10    A.  I think middle of -- middle to end of
11 October.  It could have been the first week of
12 November, too.  I'm not exactly sure.
13    Q.  Do you have any retention agreement with
14 them?  When I say, "them," Greylock McKinnon.
15    A.  Yes.
16    Q.  Were you aware that your retention
17 agreement with Greylock McKinnon was requested as
18 part of the subpoena pursuant to which you're
19 appearing today?
20    A.  No.
21       MR. POLUBINSKI:  Okay.  We call for its
22 production now.
23    Q.  When was the retention agreement signed?
24    A.  When I was hired.  So sometime in October
25 or November.  I can't -- I'm sorry.  I can't

66

1  remember the exact date.
2     Q.  But the same time when you would have been
3  formally hired in the case?
4     A.  That's correct.
5     Q.  Is that the only agreement that you're
6  aware of that governs the provision of your
7  services in this matter?
8     A.  That's my understanding.
9     Q.  So you don't have a separate agreement,
10 for example, with Plaintiffs' counsel; is that
11 correct?
12    A.  Not that I know of.
13    Q.  There isn't one that you've signed,
14 though, that you can recall at this time, correct?
15    A.  Not that I remember.
16    Q.  Okay.  Let's look at Page 3, Paragraph 4.
17 The last sentence of the paragraph reads, "Greylock
18 McKinnon Associates is compensated for my time at a
19 rate of $425 per hour."
20       Did I read that correctly?
21    A.  Yes.
22    Q.  Okay.  How do you know that that's your
23 billing rate?
24    A.  That's by -- what I was told my billing
25 rate would be.

67

1     Q.  By whom?
2     A.  I think by Renee Rushnawitz, the managing
3  director at GMA.
4     Q.  Are you compensated hourly for the work
5  that you do for Greylock McKinnon?
6     A.  Yes.
7     Q.  How much do you receive?
8     A.  I haven't received anything yet.
9     Q.  How much do you anticipate receiving per
10 hour?
11    A.  My understanding is $350 per hour.
12    Q.  When did you anticipate receiving your
13 compensation from them?
14    A.  I don't know.
15    Q.  I take it you don't receive any
16 compensation directly from Plaintiffs' counsel.
17    A.  Not that I know of.
18    Q.  Do you anticipate any circumstances under
19 which you might?
20    A.  No.
21    Q.  Other than fees for services that you or
22 other Greylock McKinnon employees will provide on
23 an hourly basis, are you aware of any other payment
24 that you or Greylock McKinnon would receive in
25 connection with this case?

68

1     A.  No.
2     Q.  You're not aware of any success fee, for
3  example, that you or Greylock McKinnon would
4  receive, depending on the resolution of this class
5  certification motion, are you?
6     A.  No.
7     Q.  Or a success fee in connection with this
8  litigation, more generally?
9     A.  No.
10    Q.  What have you been retained to do in this
11 case?
12    A.  I have been retained to do three things.
13 The first is to really -- I'm sorry.  Let me back
14 up.  I've been retained to provide a set of
15 analyses, the results of which I report in the
16 report.
17       I've been asked to analyze data on the
18 number of prescriptions and the number of
19 physicians prescribing Neurontin over a defined --
20 sorry -- defined time period.  And I've also been
21 asked to provide an estimate of account of
22 consumers and third-party payers that paid for
23 Neurontin over a time period -- over the time
24 period.
25    Q.  When you say -- I think -- did you mean to

69

1    say an estimated count or an estimated account?
2    A.  An estimated count.
3    Q.  That's what I thought.  Anything else.
4    A.  No.
5    Q.  I assume you don't intend, at least at
6    this time, to do anything beyond the work that's
7    reflected in your report; is that correct?
8    A.  That's correct.
9    Q.  And you don't have any other work in
10   progress that's not reflected in your declaration
11   or in the revision to it?
12   A.  No.
13   Q.  Is there any work that you've been asked
14   to do in this matter that you haven't done?
15   A.  No.
16   Q.  Do you have any expectation at all as to
17   whether you might do more work in this matter?
18   A.  No.
19   Q.  Okay.  Let's circle back to how you first
20   became aware of this case.  I'm assuming the first
21   time you became aware of the case was the
22   conversation with Professor Rosenthal that you
23   would have had in the last week of September or
24   beginning of October 2007; is that correct?
25   A.  Yes, that's correct.

70

1    Q.  Who contacted whom?
2    A.  Meredith contacted me.
3    Q.  Did she do so by phone?
4    A.  I was -- no, in person.
5    Q.  Where did it happen?
6    A.  At her office in -- at the school of
7    public health.
8    Q.  Had you been in Boston for other reasons?
9    A.  That's correct.
10   Q.  Had you spoken with her about this
11   engagement before you arrived at her office that
12   day?
13   A.  No.
14   Q.  Was anybody else present?
15   A.  No.
16   Q.  How long did the meeting last?
17   A.  Probably about a half an hour.
18   Q.  What was said at the meeting?
19   A.  Meredith suggest -- Meredith told me that
20   she had been retained in this case for GMA, and
21   that they were looking for someone who could do --
22   who had experience with observational data analysis
23   on prescription uses, and suggested that I may be a
24   good -- that I may have the skills to -- to do this
25   for this case.

71

1    Q.  What did you say?
2    A.  I said yes.
3    Q.  On the spot?
4    A.  I think -- so I think what I said,
5    honestly, was, That sounds interesting, and I'd
6    love to learn a little bit more about it, and I'm
7    -- so, please, put me in contact with the people
8    that I should speak to about it.
9    Q.  Did you ask Professor Rosenthal more about
10   it at the time?
11   A.  I did not.
12   Q.  Did you discuss other things during this
13   half hour, or was -- or was it really just
14   potential retention in this case?
15   A.  We spoke about our families and just other
16   personal stuff.
17   Q.  Okay.  So the part relating to this case,
18   how much of that half hour would you say that
19   portion of the conversation took up?
20   A.  I would say about 15 minutes or so.
21   Q.  Did Professor Rosenthal say anything about
22   what your role would be, beyond just analyzing the
23   data?
24   A.  No.
25   Q.  Did she talk about your role as a

72

1    potential testifying expert?
2    A.  She told me that I may have -- that I may
3    be deposed, based on the report that I prepare.
4    Q.  And she told you that you'd be preparing a
5    report, I take it, from your last answer?
6    A.  Yes.
7    Q.  Did she say anything to you about how much
8    work it would take to do that?
9    A.  No.
10   Q.  Did she say anything about why she was
11   asking you to undertake -- to consider the
12   assignment?
13   A.  She suggested that I had the skills
14   necessary to do the analysis.
15   Q.  The data analysis?
16   A.  That's correct.
17   Q.  Okay.  Did she discuss at the time with
18   you the possibility that you would do anything more
19   than that?
20   A.  Any -- I'm sorry.  Can you be specific.
21   Q.  Anything more than analyze -- ana -- do
22   the -- withdrawn.
23   Anything more than data analyses on
24   prescription uses --
25   A.  Uhm.

73

1    Q. -- preparing a declaration and then
2    possibly testifying?
3    A. No.
4    Q. Did she discuss with you the possibility
5    of your working with another expert on this, or was
6    it envisioned -- as she described it -- that you'd
7    be working alone?
8    A. I don't know what you mean by "another
9    expert."
10   Q. Well, let me just simplify the question a
11   little bit.
12   A. Okay.
13   Q. As she described it, did she describe a
14   situation where you'd be working alone on the
15   report?
16   A. No, she suggested that I would have staff
17   that would help me do the analysis and prepare the
18   report.
19   Q. But was the assumption that you would be
20   the only person who actually signed the report?
21   A. Yes, absolutely.
22   Q. That there wouldn't have been a co-signer,
23   for example.
24   A. That's correct.
25   Q. Was it envisioned from the very start that

74

1    you would be the testifying expert, as opposed to
2    somebody who would be -- well, withdrawn.
3          Was it envisioned from the start that
4    you'd be the person who'd actually sign the report,
5    as opposed to somebody who might support another
6    person who'd sign the report?
7    MR. RONA: Objection.
8    A. I'm sorry. I didn't talk with Meredith
9    about this at that time at all.
10   Q. That's fine. Do you have an understanding
11   of whether you were the only person who Plaintiffs'
12   counsel considered to provide the opinions you
13   provide in your declaration?
14   A. I don't know.
15   MR. RONA: Objection.
16   Q. Do you know if they ever considered
17   whether Professor Rosenthal or anyone else might
18   have submitted a declaration in connection with the
19   renewed motion for class certification?
20   MR. RONA: Objection.
21   A. I don't know.
22   MR. RONA: I'm sorry.
23   THE WITNESS: I'm sorry.
24   Q. Did you ever have any conversations about
25   that?

75

1    A. No.
2    Q. Was it your understanding that at that
3    point in time when you spoke with Professor
4    Rosenthal, that work had already started on the
5    data analyses or the declaration prior to your
6    being retained?
7    A. No.
8    Q. Okay. I think you said that at the
9    conclusion of the conversation, you asked to be put
10   in touch with somebody else who could tell you more
11   about the assignment; is that correct?
12   A. That's correct.
13   Q. Did Professor Rosenthal do that? Did she
14   put you in touch with somebody else?
15   A. She gave me the number of Renee
16   Rushnawitz, who I subsequently spoke to.
17   Q. Did you speak with her by phone or in
18   person in this first contact?
19   A. By phone.
20   Q. When did you speak with her by phone?
21   A. I think within the week of meeting
22   Meredith.
23   Q. And just circle back to the time that you
24   met with Professor Rosenthal.
25   A. Uh-huh.

76

1    Q. Is it possible for you to put a finer
2    point on what the date is, just so that we have a
3    signpost here?
4    A. Uh-huh.
5    Q. Again, you were in Boston evidently --
6    A. Uh-huh.
7    Q. -- on other business or other matters.
8    A. Uh-huh.
9    Q. Can you remember when that was?
10   A. Sure. So I think it was -- again, it was
11   either the last week of September or the beginning
12   of October.
13   Q. Okay. And so the conversation you had
14   with Ms. Rushnawitz would have been sometime in
15   early October?
16   A. That's correct.
17   Q. When you spoke with her, was she the only
18   other person on the line, Ms. Rushnawitz?
19   A. Yes.
20   Q. What was said in the conversation you had
21   with her?
22   A. We had -- we reviewed my qualifications
23   for doing -- we reviewed the task and what she was
24   -- what I was being asked to -- what data was
25   available and what the question was I was -- that I

77

1    was going to be asked to provide data in relation
2    to; and we discussed my qualifications for -- for
3    doing that, and the time -- and I'm sorry -- and
4    the -- and the time frame in which the analysis had
5    to be done.
6        Q.  Let's talk about each of those things --
7        A.  Uh-huh.
8        Q.  -- maybe in reverse order.  What did she
9    say about the time frame in which the analysis
10    would need to be done?
11       A.  She told me that there was a -- that the
12    time was limited in the amount of -- I'm sorry --
13    there was a limited amount of time in which I would
14    need to do the data analysis and prepare the
15    report.
16       Q.  How limited?
17       A.  Uhm.
18       Q.  Did she give you a sense, for example, for
19    a deadline at that point?
20       A.  She told me that there was -- that there
21    was in the court order a -- a deadline of a
22    specific date, but I don't -- I'm not sure she told
23    me exactly when that was, but she did tell me that
24    time was limited.
25       Q.  What was your response to that?

78

1        A.  That would -- that's fine.
2        Q.  You said that she also told you what the
3    question -- or informed you what the question that
4    was asked --
5        A.  Uh-huh.
6        Q.  Withdrawn.  She also told you the question
7    that you were going to be asked to answer; is that
8    correct?
9        A.  She told me that it was a very specific
10    set of data analyses that they were interested in
11    -- in my performing.
12       Q.  What did she say about that?
13       A.  So again, that I was asked to analyze the
14    number of prescriptions, the number of physician --
15    and physicians prescribing Neurontin over a defined
16    time period, and also to give an estimate of the
17    number of consumers and number of third-party
18    payers who may have paid for Neurontin over the
19    time period.
20       Q.  Let me just ask you this:  In addition to
21    -- to those -- those two broad categories of --
22       A.  Uh-huh.
23       Q.  -- of things that you were asked to do,
24    both of which I think are reflected in your
25    declaration, more or less --

79

1        A.  Uh-huh.
2        Q.  -- your declaration also seeks to describe
3    the likelihood that particular third-party payers
4    actually reimbursed -- for particular indications
5    -- prescriptions of Neurontin; is that correct?
6        A.  That's part of the second broad category.
7    And again, so it's the -- I mean, likelihood, I
8    think what you mean by that is that there is a
9    statistical likelihood that a certain amount of
10    individual -- of individuals or third-party payers
11    did pay.  But that's really part of the analysis,
12    not -- not of -- not the task that I was asked to
13    perform.
14       The task I was asked to perform was to
15    give an estimated count of the number of possible
16    consumers and number of possible third-party payers
17    in the US that would have paid for Neurontin for
18    certain indications.
19       Q.  So -- so this part of the second broad
20    category --
21       A.  Uh-huh.
22       Q.  -- determining the statistical likelihood,
23    as you put it --
24       A.  Uh-huh.  Actually, as you put it.
25       Q.  -- was that something -- I think you may

80

1    have said, "statistical likelihood," actually, so I
2    hope we're on the same page.  I don't mean to trip
3    you up.
4        A.  Okay.
5        Q.  But is this second part of the -- of the
6    second category, is this something that you
7    discussed with Professor -- or with Ms. Rushnawitz
8    at the time?
9        A.  I did.
10       Q.  Okay.  So it's not something that emerged
11    later in the course of your work.  It's something
12    that you'd been planning to do from the start.
13       A.  That's correct, or at least that's what I
14    was -- it was part of the set of tasks I was asked
15    to perform.
16       Q.  Okay.  The last thing you said you
17    discussed with her was what data was available.
18    What do you remember about what she told you about
19    that?
20       A.  Actually to be honest, I was not -- in the
21    initial conversation with Renee, I -- we did not
22    talk about the data that was available, and so we
23    really just talked about the task and the time
24    frame and whether or not my -- my experience could
25    bear on that -- on these questions.

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

81

1    Q.   Did you talk at all about the logistics of
2    actually doing the work?
3    A.   I did not, no.
4    Q.   Did you have a subsequent conversation in
5    which you did that with Ms. Rushnawitz or somebody
6    else?
7    A.   Only after I was retained.
8    Q.   Okay.  From the conversation with Ms.
9    Rushnawitz up until the time that you were
10   retained, what happened?
11        MR. RONA:   Objection.
12   A.   I think I spoke with Plaintiffs' counsel.
13   I spoke with counsel -- with Ed.
14   Q.   When you say, "Ed," do you mean Ed
15   Notargiacomo?
16   A.   Yes.
17   Q.   When did you speak with him?
18   A.   Within a week -- within a couple of days
19   of speaking with Renee.
20   Q.   By the phone, I take it?
21   A.   Yes.
22   Q.   Was this another -- withdrawn.
23   Timingwise, this would have been mid October?
24   A.   Yes.
25   Q.   How long a conversation was that?

82

1    A.   Approximately a half hour.
2    Q.   What did you talk about with Mr.
3    Notargiacomo?
4    A.   Again, it was mostly review of the tasks
5    that I was asked to perform.
6    Q.   Anything additional beyond what Ms.
7    Rushnawitz had described?
8    A.   Not really, no.
9    Q.   When you say, "not really," was --
10   A.   Sorry.
11   Q.   -- was there anything additional?
12   A.   Honestly, I'm just trying to think about
13   whether -- what the -- if there was anything
14   different.
15        I think Ed described to me a task that I
16   was -- well, how about this:  Ed and I discussed
17   the task that I was asked to -- the analysis that I
18   was asked to perform.
19        He, I think, told me a little bit about
20   the court order.
21   Q.   What did he tell you about the court
22   order?
23   A.   That the analyses that I was asked to
24   perform were directly related to the -- what the
25   court had ordered.  Specifically, to provide a

83

1    number of prescriptions and a number of physicians
2    prescribing Neurontin that were linked to
3    indications.  And also a count of potential
4    consumers and third-party payers that would have
5    paid for Neurontin for specifications.
6    Q.   Okay.  Aside from discussing the analysis
7    that you were going to do --
8    A.   Uh-huh.
9    Q.   -- and telling you a little bit about the
10   court order --
11   A.   Uh-huh.
12   Q.   -- did you discuss anything else with Mr.
13   Notargiacomo at the time?
14   A.   Again, just a sense of the time frame in
15   which this analysis needed to be done.
16   Q.   What did he tell you at that time?
17   A.   I think my understanding was that the
18   court order -- there was a limited amount of time
19   of a couple of months -- maybe, that the analysis
20   had to be done.
21   Q.   Okay.  Couple of months from the time of
22   your conversation with him?
23   A.   No, I think he told me that the court
24   order had happened sometime in September, and they
25   were limited in the amount of time that the

84

1    analysis needed to be done, based on the -- the
2    time frame of the court order.
3    Q.   Okay.  Anything else in that conversation
4    with Mr. Notargiacomo?
5    A.   No.
6    Q.   Did you ever --
7    A.   I'm sorry.  Just to interrupt, so -- and
8    again, we just reviewed my qualifications.
9    Q.   Did you have any other conversations
10   regarding this matter between that conversation
11   with Mr. Notargiacomo and the time that you were
12   retained?
13   A.   No.
14   Q.   How did the retention actually happen?
15   Did it happen as part of that phone call with Mr.
16   Notargiacomo, or did it happen separately?
17   A.   It happened separately.
18   Q.   How did it happen?
19   A.   I was informed by Renee that I would be
20   retained in the case --
21   Q.   Uh-huh.
22   A.   -- within a couple of days of speaking to
23   counsel.
24   Q.   And was it at that time that a retention
25   agreement of some kind was executed?

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

85

1   A.  Yes, that's correct.
2   Q.  And the retention agreement -- so I
3   understand it right -- was between you and Greylock
4   McKinnon, correct?
5   A.  That's correct.
6   Q.  Was it -- does the retention agreement
7   refer specifically to this matter, or is it more
8   general?
9   A.  I want to say I don't remember.
10  Q.  Who wrote your declaration, Exhibit 1?
11  A.  I wrote my declaration.
12  Q.  Did you actually type it yourself?
13  A.  I did.
14  Q.  Did you type it on a laptop or on -- on a
15  home computer or a computer at your office?
16  A.  I typed it at my work computer.
17  Q.  Did you do all of the edits to the
18  document yourself, or did somebody else do any of
19  those for you?
20  A.  I did all of the edits to the document.
21  Q.  When did your drafting begin?
22  A.  I think probably in November -- middle of
23  -- of November.
24  Q.  Did you prepare an outline at the time?
25  A.  I had an electronic outline.

86

1   Q.  When you say, "I had an electronic
2   outline," what does that mean?
3   A.  So -- so I had a general sense of the
4   content of the report, and you know, had a sense of
5   what -- what -- kind of a general outline of what
6   needed to be filled in.
7   Q.  Do you still have the electronic outline
8   that you prepared?
9   A.  No.
10  Q.  What happened to it?
11  A.  It's contained in this document now.
12  Q.  So when you say that, you modified the
13  outline into the document; is that correct?
14  A.  That's correct.  So really, the headings
15  that you see are the headings -- in one form or
16  another -- that were part of the -- the kind of
17  general headings were part of -- were the -- what
18  you see now were part of that outline.
19  Q.  Did you ever print copies of the outline?
20  A.  No.
21  Q.  Did you ever send copies of it by email to
22  anybody?
23  A.  No.
24  Q.  When did you complete a first draft of the
25  declaration itself?

87

1   A.  Probably end of November.
2   Q.  Did you share the draft with others?
3   A.  Yes.
4   Q.  With whom did you share it?
5   A.  With Mike Augusteijn.
6   Q.  Anybody else?
7   A.  And Forrest -- I don't know Forrest's last
8   name.  I apologize.  I'm sorry.  I don't know
9   Forrest's last name, but he works at GMA.
10  Q.  Does Mr. Augusteijn also work at GMA?
11  A.  Yes.
12  Q.  Anybody else?
13  A.  No.
14  Q.  How did you share your draft with them?
15  In other words, did you email it to them, or fax it
16  to them?
17  A.  Yeah, I think I faxed it to them.
18  Q.  So you printed a copy yourself, and then
19  sent it to them by fax?
20  A.  Actually, to be honest, I think I emailed
21  it --
22  Q.  Okay.
23  A.  -- if I really remember right.
24  Q.  Do you still have that draft?
25  A.  No.

88

1   Q.  What did you do with it?
2   A.  I tossed it.
3   Q.  When you say you "tossed it," you tossed a
4   hard copy that you would have printed?
5   A.  No, I electronically deleted the file.
6   Q.  Okay.  Did you receive comments on the
7   draft?
8   A.  No, what I received was -- what I had was
9   a conversation with Mike and with Forrest,
10  because -- so I came up with a method -- I came up
11  with a methodology for thinking about how we would
12  estimate what the problems were with the data that
13  we had, and how we would go about estimating both
14  uses and -- and number of physicians using
15  Neurontin over the time period, and then -- then we
16  can take the consumer and TPP issue out for a
17  second, and we can talk about that as well.
18  So the -- and then I directed them to help
19  me with some aspects of the analyses and -- and to
20  help -- so -- and Mike helped me with certain
21  aspects of the -- of the data that I didn't have
22  kind of immediate practical knowledge of or
23  practical experience with.
24  So it was really a back-and-forth -- a
25  conversation about certain technical or fact

89

1    aspects of either the data that we were using or
2    the analysis that we were doing.
3        Q.   I want to ask you about a couple of things
4    in your answer.
5        A.   Sure.
6        Q.   The first is, you referred to problems
7    with the data.
8        A.   Uh-huh.
9        Q.   What were you thinking of there?
10       A.   Well, there were a number of problems with
11   the data.  The first is that the Wolters Kluwer
12   data which reports the number of physicians -- or
13   we can be -- it can be used to report an aggregate
14   number of -- sorry -- to estimate an aggregate
15   number of physicians over a defined time period,
16   and also we can break it out into specialty, had
17   very poor reports of physician specialty.
18       And what I mean by that is something very
19   -- actually, very technical, which is that there
20   were -- the vast majority of data fields related to
21   physician specialty were -- were not reported --
22   were missing.
23       Q.   Okay.  Any other problems with the data?
24       A.   Yes.  So we were not able to directly --
25   in the Wolters Kluwer data -- estimate or link

90

1    physicians or uses to indications.
2        Q.   Okay.  Any other problems?
3        A.   It's also -- it was also provided to us in
4    a very limited time frame.
5        Q.   Anything else?
6        A.   Not that I know of, no.
7        Q.   Now, you just referred only to Wolters
8    Kluwer data --
9        A.   Uh-huh.
10       Q.   -- correct?  You didn't refer to IMS
11   Xponent data or NDTI?
12       A.   Uh-huh.
13       Q.   Were there problems with those data sets
14   at that time as well?
15       A.   So -- so honestly, I started with the
16   Wolters Kluwer data, because that's what was
17   provided to us.  And I wanted to make sure that we
18   could answer the questions that were -- that we
19   were asked to answer -- sorry -- do the analysis
20   that we were asked to do using that data set.
21       I was also -- so I first thought about the
22   advantages and disadvantages of the Wolters Kluwer
23   data.  I was then informed that we also had access
24   -- that we had also purchased IMS Xponent data that
25   would similarly provide counts of uses and of -- on

91

1    numbers of unique physicians.
2        Q.   Did you learn that you had access?
3        MR. RONA:  I'm sorry.  Were you finished
4    with your answer?
5        THE WITNESS:  Sorry, no.
6        Q.   Okay.  Keep going.  Sorry.
7        A.   And -- and that was for a limited time
8    frame.
9        Q.   The IMS Xponent data was for a limited
10   time frame?
11       A.   That's correct.
12       Q.   Okay.  So is it the case that you first
13   learned about the IMS Xponent data after you
14   prepared this draft, or did I misunderstand
15   something?
16       A.   No, you misunderstand.
17       Q.   Okay.  When did you first learn about it?
18       A.   So -- well, I know about the -- I mean, so
19   for this case and for this report, I knew that
20   there are a number of different data sets that we
21   had access to to do this analysis.  But in my own
22   thinking about how we would go about analyzing this
23   data, I started with what we had -- what had been
24   provided by -- to me by counsel or by the
25   Plaintiffs, and then went from there to kind of

92

1    understand what the pros and cons of each dataset
2    were, and how they could be complimentary to answer
3    -- to answering the three questions that I was
4    asked.
5        Q.   Okay.  But in this -- in these
6    conversations that you had after this first draft
7    was prepared --
8        A.   Uh-huh.
9        Q.   -- when you discussed problems with the
10   data, were the problems that you discussed ones
11   that were limited to Wolters Kluwer, or did you
12   discuss problems with the other datasets, too?
13       A.   So I'm sorry.  I think that we should back
14   up.  The -- the report was prepared after some of
15   the analyses had been done.  So there was an
16   outline in terms of how the analyses should go in
17   terms of addressing the -- the questions at hand.
18   But then the analyses were done, so I knew
19   something about the data, both its advantages and
20   disadvantages, before the report was written, of
21   course.  The report was written, predicated on the
22   analysis being done -- or at least kind of
23   preliminary runs of the analyses being done.
24       Q.   Okay.  I'm -- I think I'm just trying to
25   be limited, if we can be, to that initial

93

1  conversation that you had after the -- after the
2  draft was prepared that you described, I think,
3  with Mr. Augusteijn, maybe also with somebody else
4  -- with Forrest.
5      A.  Okay.
6      Q.  I think you had mentioned that you
7  discussed at the time -- at that time --
8      A.  Uh-huh.
9      Q.  -- problems with the dataset; is that
10  correct --
11      A.  Uhm --
12      Q.  -- or did I misunderstand your answer
13  there?
14      A.  I think you misunderstood.  So -- so part
15  of my ongoing -- or how about this:  In -- once I
16  was retained, in thinking about the task at hand,
17  part of the kind of -- the -- the kind of thinking
18  that I was doing but also the talking that I was
19  doing with my staff -- with Mike and with Forrest
20  -- about how the analyses should go was predicated
21  on -- on an understanding of the advantages and
22  disadvantages of the data that we had at hand.
23      So that was done before the -- the report
24  was -- the first draft of the report was written.
25      Q.  Okay.  And it may be that your answer was

94

1  -- was referring more broadly to conversations that
2  you might have had over the course of time with Mr.
3  Augusteijn and -- and others, but -- but I'd -- I'd
4  -- I've got written down here that I think one of
5  the other things that you discussed --
6      A.  Uh-huh.
7      Q.  I thought in the context of your
8  initial draft -- but maybe it was in a different
9  context -- was aspects of the data with which you
10  were not immediately familiar.
11      A.  Uhm.
12      Q.  Did you have discussions along those lines
13  with -- with Mr. Augusteijn or others at some point
14  in time?
15      A.  At the time of the draft?
16      Q.  Sure, or -- or really, at any time if you
17  didn't have it at the time of the draft.
18      A.  So there are some technicalities about how
19  the data, you know, what the actual data fields
20  look like that I -- or you know, what -- how clean
21  was -- were some of the analyses -- were some of
22  the fields that were recorded in the datasets that
23  I had conversations with before the draft was
24  written and also afterwards.
25      Q.  When you say how clean some of the fields

95

1  were, what do you mean?
2      A.  What I mean by that was that we had very
3  large observational datasets that we're using --
4  Wolters Kluwer, with IMS Xponent data, and also
5  with NDTI.  And you know, for any observational
6  dataset, there is going to be -- each field
7  recorded is going to be kind of a varying quality
8  or varying -- and needs some cleaning or not.  And
9  so in doing -- in planning any analysis, one of the
10  things that you need to know is, how good are the
11  variables that you're using for your analysis?
12      And so you do that by running some quick
13  checks on the data, and -- and also some
14  not-so-quick checks on the data.  So since Forrest
15  -- since I was directing Forrest -- since Forrest
16  had the data, I was directing Forrest to do those
17  checks.
18      Q.  Okay.  Let's back up a level of generality
19  here --
20      A.  Okay.
21      Q.  -- and -- and -- and do a couple of
22  things.  Aside from this initial draft of the
23  report that you said you prepared --
24      A.  Yes.
25      Q.  -- in the November -- at the end of

96

1  November 2007 --
2      A.  Uh-huh.
3      Q.  -- did you prepare other drafts that you
4  shared with others before you completed your
5  declaration on December 19th?
6      A.  I'm sorry.  Can you -- so -- I'm sorry.
7  Can you restate the question.
8      MR. POLUBINSKI:  Do you want to just read
9  it back, Jodi.
10      (Question read back.)
11      A.  So are you asking me did I -- after this
12  report was -- after the draft of the report was
13  prepared, did I revise this draft?
14      Q.  Sure.  Let's start there.  Did you revise
15  the draft?
16      A.  Yes.
17      Q.  Okay.  After making the revisions to the
18  draft, did you -- did you then share subsequent
19  drafts with others before you actually signed and
20  -- signed the -- the report on December 19th?
21      A.  So are you -- are you asking me if I
22  revised the draft and then shared the revised draft
23  with others?
24      Q.  Yes.
25      A.  Yes, I did.

97

1    Q.  Okay.  How many times?
2    A.  A handful.  I can't tell you exactly off
3    the top of my head.
4    Q.  With whom would you have shared those
5    drafts?
6    A.  Again, with Mike and with Forrest to make
7    sure that they were factually correct.
8    Q.  Anybody else?
9    A.  No.
10   Q.  Was it your understanding that they were
11   sharing drafts with anybody, aside from just the
12   two of them?
13   A.  No.
14   Q.  Do you not have an understanding one way
15   or the other, or was it your understanding that
16   they weren't sharing drafts with other people?
17   A.  I don't have an understanding either way.
18   Q.  Okay.  Did they provide additional
19   comments to you on the drafts that you had shared
20   with them?
21   A.  So we had updated -- we had conversation
22   about certain aspects of the analysis, and that
23   were being updated as we were running the analyses,
24   so certain con -- conclusions or the -- we were
25   preparing some of the figures, and there were some

98

1    questions around -- around, you know, the
2    formatting of the figures, that type of stuff that
3    we discussed.
4    Q.  Okay.  Just limiting ourselves to the --
5    sort of the typewritten portions --
6    A.  Uh-huh.
7    Q.  -- of your declaration, which is to say,
8    the declaration itself, and I think Attachments B &
9    E --
10   A.  Yes.
11   Q.  -- did you receive comments on -- on the
12   actual writing in those from Mr. Augusteijn or from
13   Forrest or from anybody else?
14   A.  So comments on the actual writing?  Do you
15   mean did they -- do you mean by that did they
16   texturally edit my document?  Did they actually
17   provide written comments on my document?
18   Q.  Well, I was going to start by asking if
19   they provided --
20   A.  Okay.
21   Q.  -- specific comments at all, whether
22   written or otherwise.
23   A.  Yes, there are specific comments they did
24   provide.
25   Q.  How did they provide the comments, in

99

1    writing or orally?
2    A.  Orally.
3    Q.  Did they provide any comments in writing
4    at all?
5    A.  No.
6    Q.  Did they provide hand markups of any kind?
7    A.  No.
8    Q.  Okay.  Let's talk about the figures that
9    appear after Page 28.
10   A.  Sure.
11       THE WITNESS:  May I ask for a break,
12   please.
13       MR. POLUBINSKI:  Of course, yeah.
14       THE WITNESS:  Great.  Thank you.
15       VIDEO OPERATOR:  The time is 11:20 a.m.,
16   and we are off the record.
17       THE WITNESS:  Great.  Thank you.
18       (Recess was taken.)
19       (Conti Exhibit 3, GMA 387-389.)
20       (Conti Exhibit 4, GMA 390-397.)
21       (Conti Exhibit 5, GMA 398-406.)
22       VIDEO OPERATOR:  The time is 11:31 a.m.,
23   and we are back on the record.
24       MR. RONA:  Before we restart, I understand
25   that people have joined this deposition by

100

1    telephone.  Could such people identify themselves
2    for the record.
3        MR. MUEHLBERGER:  This is James
4    Muehlberger of Shook, Hardy & Bacon, appearing on
5    behalf of the Defendants.
6        MR. RONA:  Thanks, James.  And James, if
7    you could -- to avoid any interference -- keep your
8    phone on mute as much as you can.
9        MR. MUEHLBERGER:  Will do.
10       MR. POLUBINSKI:  Thanks, Jim.
11   Q.  Okay.  When we left off, I was going to
12   ask you about the figures that appear at the end of
13   your declaration.
14       Who prepared the figures that appear at
15   the end of your declaration?
16   A.  So I prepared the figures in consultation
17   with Forrest and Mike Augusteijn -- sorry.  It's
18   Forrest McCleur and Mike Augusteijn.
19   Q.  Okay.  Did you actually -- well,
20   withdrawn.  Do you know what -- what electronic
21   program was used to prepare the -- the figures?
22   A.  No.
23   Q.  Okay.  So you wouldn't have actually
24   prepared the figure on your own computer, correct?
25   A.  I did not prepare the figures on my own

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

101

1 computer.
2     Q.   Who did?
3     A.   Forrest McCleur and Mike Augusteijn.
4     Q.   Both of whom are employees of Greylock
5 McKinnon, correct?
6     A.   That's correct, they are my staff.
7     Q.   And when did you first see drafts of the
8 figures?
9     A.   Probably at the -- middle to end of
10 November.
11    Q.   How were they shared with you?
12    A.   They were electronic -- oh, I'm trying to
13 think.  Were they electronically shared?  I think
14 they were emailed to me, but I'm not a hundred
15 percent sure if that's true.
16    Q.   When you say that they were emailed to
17 you, you think they were emailed as attachments or
18 sent as attachments to email to you?
19    A.   That's correct.
20    Q.   Do you know if it would have come from
21 either Mr. Augusteijn or -- is it Mr. McCleur or
22 Ms. McCleur?
23    A.   I think it's Professor McCleur.  But so
24 yes, I think that -- right.  But honestly, I'm not
25 sure whether that was -- actually, sorry, I want to

102

1 retract that.  Now I remember, and I'm sorry about
2 that.  I just wasn't paying attention -- I wasn't
3 thinking a minute.
4         They were -- they were mailed to me
5 through FedEx.
6     Q.   Okay.  So have you ever seen electronic
7 versions of the figures at the end of your report?
8     A.   So the final report -- I'm trying to
9 think.  Did the final report have figures?  No,
10 they have always been FedExed to me.
11    Q.   Okay.  How many times would they have been
12 FedExed to you, drafts of them?
13    A.   Draft of them?  So I think I've received
14 two drafts in probably November and December, and
15 then updated drafts after -- in November -- or I'm
16 sorry -- in December or January.
17    Q.   When you say, "updated drafts --"
18    A.   Uh-huh.
19    Q.   -- do you mean the drafts that are
20 reflected in the revision to your report --
21    A.   That's correct.
22    Q.   -- Exhibit 2?
23    A.   That's correct.
24    Q.   So you think you've received -- prior to
25 December 19th --

103

1     A.   Uh-huh.
2     Q.   -- do you think you've received two drafts
3 of the figures?
4     A.   That's correct.
5     Q.   Do you still have those drafts?
6     A.   No, I do not.
7     Q.   What did you do with them?
8     A.   I shredded them.
9     Q.   Did you do any hand markups on the
10 drafts --
11    A.   No --
12    Q.   -- when you received them?  No was the
13 answer?  I'm sorry.  I didn't hear you.
14    A.   No is the answer.
15    Q.   Thank you.  Did you have comments on the
16 drafts of the figures?
17    A.   Yes.
18    Q.   Did you communicate those comments to
19 anybody?
20    A.   Yes, through the telephone.
21    Q.   To whom did you communicate them?
22    A.   To Mike Augusteijn.
23    Q.   Do you recall what the comments were?
24    A.   Yes, they were mostly having to do with
25 presentation and -- and titling.  So again, making

104

1 sure that the scale of the -- the scale of the X
2 and Y axes for each figure corresponded and was
3 consistent through the report when it needed to be
4 so that it would be very easy to understand what
5 was -- the information that was being presented.
6     Q.   Anything else?
7     A.   The -- again, the labeling of some -- of
8 some of the -- of the titles, and also of the
9 legends, the order of some of the figures and how
10 they were presented.
11    Q.   Anything else?
12    A.   No.
13    Q.   Did you record the time that you spent on
14 this engagement?
15    A.   Yes.
16    Q.   How did you do so?
17    A.   I have -- I have an electronic -- I have a
18 Blackberry that tells me -- that I can record
19 engagements -- you know, time spent on things or
20 kind of -- I would block out time to work on this.
21    Q.   You block out time on a -- on a calendar,
22 essentially --
23    A.   Right.
24    Q.   -- on your Blackberry?
25    A.   Right, an electronic calendar, correct, so

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

105

1  I can keep track.
2    Q.  Is it reflected only in your Blackberry,
3  or is it reflected somehow in your personal
4  computer as well?
5    A.  Just in my Blackberry.
6    Q.  Did you submit time records to Greylock
7  McKinnon?
8    A.  I did.
9    Q.  Were they different from what was in your
10 Blackberry at all --
11   A.  No.
12   Q.  -- or was it somehow just printed off of
13 your Blackberry?
14   A.  It was neither.
15   Q.  Okay.
16   A.  So no, they were not different than what
17 was in my Black -- well, I don't know if they were
18 different than what was -- was -- according to my
19 Blackberry.  But I use my Blackberry's, you know,
20 time record as the basis for my -- for my billing
21 records or for my time records, and that's what I
22 sent to Renee.
23   Q.  When you say you don't know if they were
24 different from what was your Blackberry --
25   A.  Uh-huh.

106

1    Q.  -- are you aware of any differences that
2  there might have been?
3    A.  No.
4    Q.  You intended for the time records that you
5  sent to match what was in your Blackberry, I take
6  it?
7    A.  That's correct.
8    Q.  Do you still have, by the way, the records
9  reflected in your Blackberry?
10   A.  I do not.
11   Q.  Okay.  What did you do --
12   A.  I actually have a new Blackberry, because
13 my old Blackberry died --
14   Q.  Okay.
15   A.  -- over Christmas so --
16   Q.  And the records that you had on your
17 Blackberry presumably died with it?
18   A.  Yes, all things died with it -- with my
19 Blackberry.
20   Q.  My condolences to your Blackberry.
21   A.  That's all right.
22   Q.  And then when you said you sent your
23 billing records to Renee, you meant to Ms.
24 Rushnawitz, correct?
25   A.  That's correct.

107

1    Q.  Okay.  We've premarked a document here
2  that I'm going to hand to you now --
3    A.  Okay.
4    Q.  -- as Conti Exhibit 3.  This is a
5  three-page document that was produced to us in
6  response to your subpoena by Plaintiffs' counsel.
7    A.  (Witness nods.)
8    Q.  We added the little numbers at the very
9  bottom of the document --
10   A.  Uh-huh.
11   Q.  -- that you see really just in the
12 interest of housekeeping and trying to keep
13 everybody on the same page.  They read GMA 387
14 through GMA 389.
15      Have you seen those documents before --
16 these pages before?
17   A.  Yes.
18   Q.  What are they?
19   A.  They're my time sheets submitted to GMA.
20   Q.  So these are the documents that you would
21 have sent to Ms. Rushnawitz?
22   A.  That's correct.
23   Q.  How did you send them to her?
24   A.  Electronically.
25   Q.  So attached to an email?

108

1    A.  (Witness nods.)  That's correct.
2    Q.  That reminds me of something.  Let me just
3  circle back.
4    A.  Of course.
5    Q.  Do the -- the figures that you would have
6  received by email from Mr. Augusteijn or Professor
7  McCleur --
8    A.  I didn't receive any.
9    Q.  Or I'm sorry, that you -- withdrawn.
10 Withdrawn.  You're right.
11      Here's the question I meant to ask:  The
12 drafts that you sent to them of your actual
13 declaration and of the attachments --
14   A.  Yes.
15   Q.  -- would you have included messages in the
16 text of those emails at all?
17   A.  Not -- no.
18   Q.  Would the emails have then just been
19 blank?
20   A.  The emails would have said, Here is the
21 document, or, Thank you, because the vast majority
22 of -- again my -- I was directing my staff -- Mike
23 and Forrest -- to help me with the analyses and
24 with certain kind of factual things that needed to
25 be placed into the document, or with making sure

109

1    that my text was -- was very clear about exactly
2    what we did and that would -- would be kind of
3    easily understood by -- for the audience that it
4    was prepared for.
5        Q.  When you say the audience for whom it was
6    prepared --
7        A.  Uh-huh.
8        Q.  -- what do you mean?
9        A.  A bunch of lawyers and for the judge.
10       Q.  So understanding that that was the -- that
11   that was the -- the purpose, I guess, of what you
12   were directing --
13       A.  Uh-huh.
14       Q.  -- those folks to do for you, would the
15   emails have contained, you know, any -- you know,
16   any questions as to, you know, as to, you know, how
17   -- how something should be put or the like?
18       A.  No.
19       Q.  Okay.  Do you still have the emails?
20       A.  No.
21       Q.  What happened to them?
22       A.  So unfortunately, my mail server at the
23   University of Chicago is very limited in the amount
24   of space that I have allotted, so I have to purge
25   every ten days to two weeks.

110

1        Q.  Okay.  And you wouldn't have actually
2    printed copies of these emails yourself?
3        A.  No.
4        Q.  And when you purge, it means you have to
5    delete what's in your sent mail and in your inbox,
6    correct?
7        A.  Absolutely everything is deleted.
8        Q.  Okay.  Looking again at Exhibit 3, do
9    these time sheets -- these three pages here --
10   reflect all of the time that you have spent in your
11   work on this matter, at least up through the end of
12   January?
13       A.  Yes.
14       Q.  Okay.  Let's look at the first page, which
15   reads, "November 2007 invoice for GMA for economics
16   expert consulting."  The first entry on this page
17   is for November 16th, correct?
18       A.  Yes.
19       Q.  Is that the first day that you would have
20   actually performed work on your assignment in this
21   case?
22       A.  Yes.
23       Q.  So this is -- this is about a month, it
24   sounds like, after you actually would have been
25   retained in the case, as best you'd remembered it

111

1    before --
2        A.  Yes.
3        Q.  -- is that correct, or does that change
4    your recollection as to when you were retained?
5        A.  No, that's about right; that it took some
6    time between when I was retained and -- actually,
7    to be honest, I think -- I'm not sure that I signed
8    the retention document until November, and that it
9    took some time between discussing with --
10   discussing with Renee what I was being asked to do
11   for -- to actually start work on the -- on the
12   report.
13       Q.  Do you have an understanding for the
14   reason why it took time to do that?
15       A.  My understanding is that we were waiting
16   for data.
17       Q.  Where did that understanding come from?
18       A.  Through talking with Mike.  I'm sorry.
19   Strike that.  Through talking with Renee.
20       Q.  So is it Ms. Rushnawitz who told you that
21   you didn't have data, and therefore, were unable to
22   start working on the --
23       A.  I think she told me that there was -- that
24   we were limit -- that we were waiting to get data
25   in order to start -- that we couldn't start any

112

1    analyses or any of the work that needed to be done
2    until there was data to -- that needed to be kind
3    of cleaned and -- that needed to be imported and
4    cleaned.
5        Q.  Was it your understanding that it was she
6    who was ordering the data or --
7        A.  I don't know.
8        MR. RONA:  Objection.
9        Q.  Did you make any more specific inquiries
10   at that point in time about, you know, what the
11   status of the data collection was?
12       A.  No.  Honestly, I was happy to have the
13   time.  I was in the middle of a crunch for other
14   things.
15       Q.  Okay.  So this first entry on November
16   16th, the description here is, "Review data and
17   documents."
18       A.  Yes.
19       Q.  What data did you review at that time?
20       A.  I think I reviewed a description of NDTI
21   data, a description of the Wolters Kluwer data, and
22   a description of the IMS Xponent data.
23       Q.  When you say a description --
24       A.  Uh-huh.
25       Q.  -- of the data, what do you mean?

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

113

1     A.   So I think that Mike and Forrest prepared
2   for me -- just raw, really, an aggregate report of
3   the number of Neurontin prescriptions per month
4   over the time period that we had data for, and --
5   and probably -- probably also a number of physician
6   -- the number of physicians prescribing Neurontin
7   per month or quarterly -- I can't remember which --
8   using the data that we had at hand -- that they had
9   at hand.
10     Q.   So is the description that you would have
11   reviewed, was it a hard copy, or was it an
12   electronic copy of something?
13     A.   It was a hard copy.
14     Q.   Do you still have that description?
15     A.   I don't.  It looks very similar, honestly,
16   to what the figures are that are presented.
17     Q.   So it would have been -- when you say
18   figures presented, you're referring to the figures
19   at the end of your declaration in Exhibit 1?
20     A.   That's correct.  So again, just really raw
21   numbers of new prescriptions and of numbers of
22   prescriptions.
23     Q.   But they would have been presented
24   graphically, as opposed to --
25     A.   I think so.

114

1     Q.   -- in a spreadsheet or the like?
2     A.   That's right.
3     Q.   Okay.  And were they hard copies --
4     A.   Yes.
5     Q.   -- of these things?  And I think you said
6   you didn't still have copies of what had been
7   provided to you at that time?
8     A.   I don't have copies, no.
9     Q.   What happened to them?
10     A.   I shredded them.  You should look at my --
11   you should see my office, you would understand why
12   I have to do that.
13     Q.   Did you receive any instructions at all
14   from Greylock McKinnon or from Plaintiffs' counsel
15   or anybody about preserving documents?
16     A.   No.
17     Q.   Let me ask you this, too:  I'm assuming,
18   since this is the first task that you would have
19   completed --
20     A.   Uh-huh.
21     Q.   -- in the -- in the matter, that you
22   wouldn't have directed Mr. Augusteijn or Professor
23   McCleur to have prepared this; is that correct?
24     A.   That's correct.
25     Q.   They prepared them on their own

115

1   initiative?
2     A.   No.  So what I -- actually, what I asked
3   for was just, again, raw counts of number of
4   Neurontin prescriptions and number of physicians
5   with the available data that we had, and this is
6   what they prepared for me, just to kind of get my
7   head around what data we did have and what it could
8   be, you know, in kind of an understanding of the
9   trends.
10     Q.   And at this time -- well, withdrawn.  I
11   gather from your answer a few questions ago --
12     A.   Uh-huh.
13     Q.   -- that at this time you would have had
14   data at this point already for both Wolters Kluwer,
15   IMS Xponent --
16     A.   Uh-huh.
17     Q.   -- and NDTI; is that correct?
18     A.   So to be honest, I'm not exactly sure.  I
19   don't remember exactly the time frame of when the
20   data came.  I knew there was -- I remember there
21   was an issue about what data was available and how
22   clean it was and -- and when it was going to be
23   available for analyses, and I don't know the exact
24   -- I don't remember the exact timing.  I know -- I
25   can tell you that by the time I started really

116

1   writing and editing the document towards the end of
2   November that -- that the -- that we did have all
3   of -- that we did have the data for each of the
4   datasets in workable -- in workable form.
5     Q.   This entry for November 16th --
6     A.   Uh-huh.
7     Q.   -- also indicates that you reviewed
8   documents?
9     A.   Uh-huh.
10     Q.   What documents did you review at that
11   time?
12     A.   There was a count of -- there was a count
13   of psychiatrists, and also of, I think,
14   neurologists that had been provided to us by
15   counsel.  And so I -- I looked at those documents
16   as well.
17          And I think I also looked at the court --
18   court order.
19     Q.   The -- the documents that you referred to
20   as providing a count of psychiatrists and
21   neurologists --
22     A.   Uh-huh.
23     Q.   -- are those documents that would have
24   been listed in the documents you considered that's
25   attached to the end of your report?

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

117

1    A.  Yes, it's in the report --
2    Q.  Exhibit 1?  Okay.
3    A.  -- it's -- supporting documents --
4    actually, you know what?  That's a good question
5    whether -- sorry about this.  Excuse me.  (Witness
6    reviews document.)  It's not in this document, but
7    it's in supporting documents that were --
8    Q.  Let me -- let me see if I can help here.
9    A.  Yeah, because --
10   Q.  Why don't you look at -- I believe it's
11   Attachment A-2 of your report, which begins on Page
12   74, if you look at the little court -- court stamp
13   at ECF.
14   A.  72.
15   Q.  Attachment A-2 lists, "Documents Relied
16   Upon."
17   A.  I'm sorry.  Did you say 72?
18   Q.  No, I think I said -- if I did, I
19   misspoke.  I meant to say 74.
20   A.  Okay.
21   Q.  Is this the list that you were referring
22   to?
23   A.  Yes, and actually, what I mean by that is
24   I think that it's the Bate -- Bates number
25   documents.

119

1    time in terms of how do you graphically report that
2    to -- in the report?
3        What else did we talk about?  I think
4    that's it -- and I think the sequence of the
5    analyses and how it would have to be done in order
6    to kind of produce the document.
7    Q.  Okay.  And then after that entry, if you
8    look at listed entries between November 23rd and
9    November 30th, it appears that you were doing work
10   reviewing data analyses, drafting the document,
11   editing the document, following up with staff?
12   A.  Right.
13   Q.  Would I be correct to understand that you
14   essentially drafted the declaration and the other
15   materials in the space of that period of time, a
16   little more than a week?
17   A.  That's correct.
18   Q.  Let's flip to the next page --
19   A.  Okay.
20   Q.  -- which reports hours for December of
21   2007, correct?
22   A.  Yes.
23   Q.  It looks like there was no time entered
24   between the end of November and December 12th; is
25   that correct?

118

1    Q.  Right.  These are the documents that are
2    listed in the category, "Bates Number Documents" on
3    Page 2 of Attachment A-2, correct?
4    A.  That's correct.
5    Q.  Okay.  So at this time, November 16th, did
6    you know that you would be preparing a declaration
7    for Plaintiffs' counsel?
8    A.  Yes.
9    Q.  Let's look at the next entry, November
10   19th.  The time entry there is for "Conference
11   call, follow up with staff."  And the total amount
12   of time spent appears to be 3 1/2 hours; is that
13   correct?
14   A.  That's correct.
15   Q.  Who was on the conference call?
16   A.  Mike Augusteijn and Forrest McCleur.
17   Q.  What was discussed?
18   A.  We went through -- we discussed data that
19   was available to us for doing the analysis.  We
20   discussed the advantages and disadvantages of each
21   of the datasets, and in particular, their
22   limitations in addressing the questions that I was
23   asked to -- the analyses that I was asked to
24   perform.  We discussed how to report some of the
25   trends in uses and in -- trends in physicians over

120

1    A.  That's correct.
2    Q.  Were you not working on the matter during
3    those weeks?
4    A.  I was not.
5    Q.  Why not?
6    A.  I had -- two things happened:  The first
7    is that I felt reasonably comfortable with the
8    document as it was and wanted to let it sit.  I'm
9    -- to be honest, I'm a very slow writer, and so
10   usually my technique is to do the analysis, really
11   try to understand exactly what the analyses say,
12   try to write a draft of the document, and then kind
13   of fill in and clarify at -- parts of the text as
14   -- kind of as -- as the analysis comes available.
15   And then I -- to be honest, I like to let things
16   sit a little bit and not work on them so intently.
17   Q.  And --
18   A.  And then I was -- and then I was
19   traveling.
20   Q.  Okay.  Traveling during the whole period?
21   A.  For -- between November and December 12th,
22   right, I was -- I was traveling back and forth to
23   New York.  In time I also gave a seminar during
24   that period in time, so I was busy with other
25   things.

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

121

1    Q.   Are you aware that Plaintiffs' counsel
2    produced drafts of the document to us that appear
3    to have been modified during the time that you were
4    not working on the document?
5    A.   No.  I don't know anything about that.
6    Q.   So for example, I think we've got two
7    different drafts that are dated December 1st, and
8    another draft on December 5th.  Were you aware of
9    that?
10   A.   I'm assuming that the -- that the November
11   -- well, I don't know anything about that.
12   Q.   Was anybody in charge of the project
13   during the time that you were away from it?
14   A.   Uh-huh.  So my staff, Mike Augusteijn, was
15   involved in, you know, in -- he had the kind of
16   final draft of the document.
17   Q.   When you say he had the final draft of the
18   document --
19   A.   Uh-huh.
20   Q.   -- what does that mean?
21   A.   So he had the -- my final edited version
22   of the document that I had kind of finished working
23   on November 30th.
24   Q.   Uh-huh.
25   A.   And he was in charge of that, because I

122

1    was doing all this other stuff.
2    Q.   Would he have made changes to that
3    document?
4    A.   Not without consulting with me, no.
5    Q.   Do you know if he ever did make changes of
6    the -- to the document himself?  I thought you had
7    said before you were person who typed all the
8    changes?
9    A.   No, he would never have made changes to
10   the document.  Again, it is possible that he made
11   -- that in consultation with me during this time
12   period.  There were -- you know, I would have asked
13   him to do something, but I don't really recall that
14   happening, so --
15   Q.   Okay.  Let's turn you to other documents
16   which we've premarked, which I've managed to mix up
17   with my other documents here.  The first has been
18   marked as Conti Exhibit 4, the second has been
19   marked as Conti Exhibit 5.
20        These are materials that were also
21   produced to us by Plaintiffs' counsel, and we've
22   added the same little numbers to these as well, for
23   the same reason of trying to keep everything
24   straight.
25        Have you seen these before?

123

1    A.   No.
2    Q.   So you don't know who would have prepared
3    them, correct?
4    A.   Correct.
5    Q.   Why don't we take a look at the first one,
6    Exhibit 4.  Just flip through it.  I think -- what
7    I see here is -- is three separate invoices, all
8    addressed to Tom Sobol.  Does that look right to
9    you?
10   A.   (Witness reviews document.)  What do you
11   mean by "three separate invoices"?  I'm sorry.  I
12   don't know the --
13   Q.   Two are --
14   A.   Oh, yes.  I see what you mean.  Okay.
15   Q.   So in other words, three separate
16   documents that are separated by divider pages.
17   A.   Yes.
18   Q.   One of the -- the first divider page -- on
19   the first page of the document reads, "Neurontin,"
20   correct?
21   A.   Yes.
22   Q.   And then there's another divider further
23   into the report that says, "Neurontin Conti."
24   A.   (Witness reviews document.)  Yes.
25   Q.   And then a final divider page in the

124

1    second-to-last page of the document that reads,
2    "Neurontin Rosenthal," correct?
3    A.   Yes.
4    Q.   Why don't we take a quick look at Exhibit
5    5, too, and if you can just let me know whether
6    Exhibit 5's functionally the same; that it's --
7    it's three invoices broken into the same three
8    pieces.
9    A.   (Witness reviews document.)  Yes.
10   Q.   Let's look back at Exhibit 4 and look in
11   particular at the pages that follow the first page
12   that just read simply, "Neurontin."
13        You can see that it lists here names of a
14   number of people; is that correct --
15   A.   Yes.
16   Q.   -- followed by what appear to be
17   descriptions of time that they may have spent,
18   hours, and an hourly rate and a total amount.  Does
19   that look right?
20   A.   Yes.
21   Q.   Just flipping through these first two
22   pages of the -- of the bill, do you recognize all
23   the names in this -- on these pages?
24   A.   No.
25   Q.   Which names do you recognize?

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

125

1    A.  So, Mike Augusteijn, Stan Finkelstein, Ray
2    Hartman, Forrest McCleur, Renee Rushnawitz, and
3    that's it.
4    Q.  Okay.  Let's look at that first page, the
5    entry by Mr. Augusteijn.  We've talked about his
6    work before, I take it?
7    A.  Uh-huh.
8    Q.  Was Mr. Augusteijn working at your
9    direction on this matter?
10   A.  Yes.
11   Q.  What do you know about his qualifications?
12   A.  I know that he's worked for GMA for a
13   couple of years, and that he seems very qualified
14   for what he does, but that's -- I have never looked
15   at his qualifications.
16   Q.  Okay.  Did you supervise his work?
17   A.  I did.
18   Q.  How did you do so?
19   A.  Over the telephone.
20   Q.  Did you ever communicate with him by
21   email?
22   A.  I mostly communicated with him over the
23   telephone.  We did have a handful of email
24   exchanges, but they were very brief.
25   Q.  Do you still have those emails?

126

1    A.  Again, everything is purged on a ten-day
2    basis.
3    Q.  Okay.  You also mentioned Forrest
4    McCleur --
5    A.  Yes.
6    Q.  -- who's reflected here on the second
7    page.
8    A.  Yes.
9    Q.  Was he working on -- at your direction, as
10   well, on this matter?
11   A.  Yes.
12   Q.  What do you know about his qualifications?
13   A.  Again, I know that he has extensive
14   analysis -- analytical experience working with
15   claims data and with other observational datasets
16   and that he has some experience looking at
17   diffusion curves for prescription medication.
18   Q.  You had mentioned before that you thought
19   he was a professor; is that true?
20   A.  I think he has Ph.D., but I'm not exactly
21   -- I'm not a hundred percent sure that he does.
22   Q.  You don't know that he has a Ph.D.
23   A.  Unh-unh.
24   Q.  One way or the other?
25   A.  No.

127

1    Q.  Do you -- do you know if he's -- if he's
2    ever taught at a university before?
3    A.  I don't know, no.
4    Q.  So you don't know whether he's a professor
5    or not, I take it?
6    A.  Well, I don't -- I mean --
7    Q.  Do you --
8    A.  -- I have no -- so professor, what I mean
9    by that is that he has a Ph.D. in the kind of
10   European sense of a professor.
11   Q.  Okay.  So do you think he does have a
12   Ph.D., or do you not know for sure?
13   A.  I think he either has a master's degree or
14   a Ph.D. in economics or statistics.
15   Q.  Do you know where his degree is from?
16   A.  No.
17   Q.  How about Mr. Augusteijn, do you know if
18   he has any advanced degrees?
19   A.  No.
20   Q.  Do you know anything else about Mr.
21   McCleur's qualifications?
22   A.  No.
23   Q.  The description on this page says, "Data
24   and econometric analysis."  What econometric
25   analysis do you understand he was doing?

128

1    A.  So for part of the report we -- because we
2    had missing data for a number of years over the
3    class period, we both extrapolated and also
4    backcast the observed data that we did have from
5    Wolters Kluwer and also from IMS.  So that was the
6    econometric analysis that he was doing.
7    Q.  Did you supervise Mr. McCleur's work?
8    A.  I did.
9    Q.  How did you do so?
10   A.  Through telephone conversations.
11   Q.  Have you ever met Mr. McCleur in person?
12   A.  I have.
13   Q.  How many times?
14   A.  Once.
15   Q.  When?
16   A.  Friday.
17   Q.  Before this past Friday, you'd never met
18   him before in person?
19   A.  No.
20   Q.  Have you ever met Mr. Augusteijn in
21   person?
22   A.  Yes.
23   Q.  When?
24   A.  Friday.
25   Q.  Friday was a big day, I guess, huh?

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

129

1    A.  Uh-huh.
2    Q.  Aside from this past Friday, you'd never
3  met Mr. Augusteijn in person, correct?
4    A.  No.
5    Q.  Do you ever communicate with Mr. McCleur
6  by email?
7    A.  Yes, I have communicated with him in -- by
8  email.
9    Q.  Do you still have those email
10  communications?
11    A.  No.
12    Q.  They, too, are deleted?
13    A.  Again, all emails are deleted.  In fact, I
14  don't even do it.  The server -- the server
15  administrator does it.
16    Q.  Okay.  But you wouldn't have actually
17  printed any of the emails, I take it?
18    A.  No.
19    Q.  Okay.  It looks like we need to change the
20  tape.  Why don't we just try and do a quick break
21  now and do that if that works.
22        VIDEO OPERATOR:  The time is 12:06 p.m.
23  This is the end of Tape 2, and we are off the
24  record.
25        (Recess was taken.)

130

1        VIDEO OPERATOR:  The time is 12:10 p.m.
2  This is the beginning of Tape 3, and we are back on
3  the record.
4    Q.  Okay.  Still looking at Exhibit 4, the
5  second page, the very bottom of the page a person's
6  name is listed there, the person's name is Roshni
7  Kapadia; is that correct?
8    A.  Yes.
9    Q.  If I -- if I took notes carefully enough,
10  is that somebody who -- who you don't know?
11    A.  I do not know Roshni.
12    Q.  Okay.  So you don't know -- do you know if
13  Roshni's a man or a woman?
14    A.  I -- no.
15    Q.  Okay, or what his or her qualifications
16  are?
17    A.  No.
18    Q.  Okay.  Were you aware that -- we'll say
19  Roshni -- spent time working on -- on this project?
20    A.  No.
21    Q.  Okay.  Let's flip the page.  At the top of
22  the next page, the third page of Exhibit 4, there's
23  a name Jayeeta Kundu --
24    A.  Yes.
25    Q.  -- which I am likely butchering in the

131

1  pronunciation.  Do you know who this person is?
2    A.  I do.
3    Q.  Who is it?
4    A.  She is a master's level analyst at GMA.
5    Q.  When you say, "master's level analyst,"
6  what does that mean?
7    A.  I think she's technically -- technically
8  her term -- her title is research analyst, but I'm
9  not a hundred percent sure.
10    Q.  Was she working at your direction?
11    A.  She was working on my behalf through
12  Forrest and Mike.
13    Q.  Do you know anything about her
14  qualifications?
15    A.  Yes.
16    Q.  What do you know?
17    A.  That she has a master's I think in policy
18  for -- or technological policy from MIT.
19    Q.  Anything else?
20    A.  No.
21    Q.  Did you have communications directly with
22  Ms. Kundu?
23    A.  No.
24    Q.  What's your understanding for what she
25  would have been doing in -- in this matter?

132

1    A.  I don't know.
2    Q.  Did you supervise her work?
3    A.  No.
4    Q.  Did you ever communicate with her?
5    A.  No.
6    Q.  Okay.  Now let's -- we've already talked
7  about Mr. McCleur.  Next person down is Joshua
8  Peteet.  Do you know who that is?
9    A.  No.
10    Q.  Were you aware that he'd been working on
11  this project?
12    A.  No.
13    Q.  Have you ever met him before?
14    A.  No.
15    Q.  Had you ever met Ms. Kundu before?
16    A.  Yes.
17    Q.  When?
18    A.  Yesterday.
19    Q.  Had you met her before yesterday?
20    A.  No.
21    Q.  Okay.  We'll skip Ms. Rushnawitz, whom
22  we've been talking about already, also, and go down
23  to L. Selker.  Do you know who that is?
24    A.  No.
25    Q.  Do you know whether L. Selker is a man or

133

1   a woman?
2     A.  No.
3     Q.  Do you know anything about his or her
4   qualifications?
5     A.  No.
6     Q.  Were you aware that he or she was working
7   on your report or on your project?
8     A.  No.
9     Q.  Do you know anything about his or her --
10  withdrawn.  I assume you didn't supervise Mr. or
11  Ms. Selker, correct?
12    A.  No.
13    Q.  Last name on this list is Katherine Young.
14  Do you know who that is?
15    A.  No.
16    Q.  Were you aware that Ms. Young was working
17  on this project?
18    A.  No.
19    Q.  Do you know anything about her
20  qualifications?
21    A.  No.
22    Q.  Have you ever met her before?
23    A.  No.
24    Q.  Okay.  And so you didn't supervise her
25  work either, I take it?

134

1     A.  No.
2     Q.  Let's -- let's look ahead to Exhibit 5,
3   and let's look at the third page of Exhibit 5,
4   which is the second page of the invoice.  There's
5   another name on this invoice as well --
6     A.  Oh.  Uh-huh.
7     Q.  -- here that I hadn't seen on the other
8   one.  The second name down is Nicholas Peddle.  Do
9   you know who that is?
10    A.  I'm sorry.  I don't see that.
11    A.  I'm sorry.  Are you looking at Exhibit 5?
12    A.  Oh, yes.  Okay.
13    Q.  Okay.  Nicholas Peddle?
14    A.  Yes.
15    Q.  Do you know who that is?
16    A.  Yes.
17    Q.  Who is it?
18    A.  I met him yesterday at GMA.
19    Q.  Okay.
20    A.  And I don't know what he does at GMA.
21    Q.  Okay.  Do you know anything about his
22  qualifications?
23    A.  No.
24    Q.  Are you aware that he had been working on
25  your report?

135

1     A.  I think he sent me my backup -- I think he
2   sent me my backup binders, as it says here, but I
3   -- I don't know.
4     Q.  Okay.  Understood.  It looks like he spent
5   12 hours, at least according to this time entry --
6     A.  Uh-huh.
7     Q.  -- doing "Preparation of backup binders"?
8     A.  Uh-huh.
9     Q.  And it appears from the dates on this that
10  that was sometime in December of 2007, correct?
11    A.  Right.
12    Q.  What are those backup binders?
13    A.  So it contains my report as submitted.  It
14  retains the figures -- it contains the figures.  It
15  contains the -- a list -- some of the documents
16  that are listed in -- in the report, and also
17  contains some of the -- the reference -- copy --
18  paper copies of the references that we reference in
19  the report.
20    Q.  Anything else?
21    A.  No.
22    Q.  Did you take any notes on the backup
23  binders?
24    A.  No.
25    Q.  Did anyone else write anything on any of

136

1   those documents in the backup binders?
2     A.  No.
3     Q.  Looking at -- at Exhibit 5 and Exhibit 4
4   together, I just want to make sure I share an
5   understanding with you as -- as best we can piece
6   it together --
7     A.  Uh-huh.
8     Q.  -- for how these work.  As I look at
9   Exhibit 4, I see that it appears to cover time for
10  in between November 1st, 2007 to November 30th,
11  2007.  Does that look right to you?
12    A.  (Witness reviews document.)  That's
13  correct.
14    Q.  And as I look at Exhibit 5, I see that it
15  covers time between December 1st, 2007 and December
16  31st, 2007.  Does that look right to you?
17    A.  Yes.
18    Q.  Are you aware of any work that was done on
19  your report or the analyses reflected in your
20  report that isn't somehow reflected in these two
21  invoices?
22    A.  Are you asking me whether -- are you
23  asking me if I'm aware of the analyses that were
24  done in November and in December on these -- on
25  these data?

137

1  Q.  I think I'm not.  I think I'm really just
2  asking you whether there's any time that people
3  would have spent on your report and its data
4  analyses --
5  A.  Uh-huh.
6  Q.  -- that wouldn't be reflected in these two
7  invoices?
8  A.  Not that I know of.
9  Q.  Okay.  So there wouldn't have been time in
10  October of 2007?
11  A.  So -- well, that's why I was asking the
12  question.  So the analyses and the -- the
13  production of the document were done over this --
14  over these two months.  In order to do any analyses
15  you require -- you have to get the data, you have
16  to get the data in order.  You have to read it.
17  You have to make sure that it's clean.  And my
18  understanding is that that -- some of that work was
19  done in October.
20  Q.  By whom?
21  A.  By Mike and by Forrest.
22  Q.  And where does your understanding come
23  from?
24  A.  Through talking with Mike and Forrest
25  about -- and with Renee about getting -- about the

138

1  -- the data that was available to us, its
2  limitations, and -- and other data that would be
3  available to us for doing the analysis.
4  Q.  So it was your understanding that Mr.
5  Augusteijn and Mr. McCleur would have been --
6  withdrawn.
7  Is it your understanding that the work
8  that Mr. Augusteijn and Mr. McCleur might have done
9  in October would have been limited to collecting
10  the data and analyzing what its limitations might
11  be?
12  A.  I don't know the full scope of what Mike
13  and Forrest did on the data, but my understanding
14  of of what they were doing in October on the data
15  was -- was getting the data into analysis form,
16  reviewing its limitations, and -- and getting it
17  used for any analysis that we would do on it.
18  Q.  Is it your understanding that they were
19  doing this work before you had actually been
20  retained as a testifying expert?
21  MR. RONA:  Objection.
22  A.  Well, what do you mean by "this work"?
23  Q.  The work that you just described.
24  A.  Again, what do you mean by "this work"?
25  Q.  Let's see if I can read it back to you.

139

1  Yeah, you -- I think you testified that, "In
2  October they were getting the data into analysis
3  form, reviewing its limitations, and getting it
4  used for any analysis that we would do on it."
5  Were they doing that work that I just read
6  from your testimony before you were actually
7  retained?
8  MR. RONA:  Objection.
9  A.  I don't know exactly when they were doing
10  that work.
11  Q.  Is it your understanding that they were
12  doing some work along those lines before you were
13  retained?
14  A.  It's my understanding that during the time
15  -- so when I was retained, that was something that
16  was in the works.  I don't know if they were
17  actually doing it or not, and when they started
18  doing it.
19  Q.  Who was supervising it before you were
20  retained?
21  MR. RONA:  Objection.
22  A.  I don't know.
23  Q.  Did you ever ask?
24  A.  No.
25  Q.  Let's take a look at Exhibit 4 and Exhibit

140

1  5 again.
2  For Exhibit 4, let's -- for both of them
3  let's turn to Page 3.
4  At the very top of each of these pages
5  there's a column that reads, "Hours."  Do you
6  follow me?
7  A.  I do.
8  Q.  Underneath that column on Exhibit 4 the
9  number appears to be 333.25, correct?
10  A.  Yes.
11  Q.  Underneath that column on Exhibit 5, which
12  is the December time, that number reads 453.75,
13  correct?
14  A.  Yes.
15  Q.  Is it your understanding that those
16  numbers that I just read to you are the aggregate
17  total of hours spent on -- on your project by the
18  individuals listed in this document?
19  A.  I have no idea.
20  Q.  Do you want to take a look and see if that
21  looks right to you?
22  A.  No looking at this document is going to
23  tell you -- is going to give me any information
24  that's going to revise my answer.
25  Q.  Okay.  Fair enough.  But you don't have

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

141

1   any reason, as you sit here today, to doubt that
2   these were hours that were spent by these folks on
3   this project, correct?
4       MR. RONA: Objection.
5       Q. You can answer.
6       A. I don't know.
7       Q. Okay. One other question: Your name
8   isn't reflected in the list of people on these
9   first two pages, correct, that appear above this
10  total number of hours?
11      A. (Witness reviews document.) That's
12  correct.
13      Q. And Professor Rosenthal's name doesn't
14  appear there either; is that correct?
15      A. That's correct.
16      Q. Now, you don't have to necessarily agree
17  with me here, but -- but is -- using my calculator,
18  I added up, you know, these two hours together --
19  these two numbers that -- that we just discussed
20  together and came up with 787 hours. Any reason to
21  disagree that that's the right number?
22      MR. RONA: Objection.
23      Q. And if you want, I can hand you a
24  calculator, and you're welcome to add them up
25  yourself.

142

1       A. I agree that if you add those two numbers,
2   you will get that number.
3       Q. Okay. Fair enough. I guess my question
4   is, were you aware that other people at Greylock
5   McKinnon would have spent an aggregate total of 787
6   hours on this project in November and December, not
7   including your hours or Professor Rosenthal's?
8       A. No.
9       Q. Now --
10      A. I'm sorry. I'm sorry. Just to interrupt,
11  to be specific, I do not know how many hours was
12  spent in aggregate by any of these individuals
13  on this project at any point in time, or
14  particularly for those two months.
15      Q. Okay. Looking back at Exhibit 3, if we
16  add up the total number of hours that -- that you
17  spent in November and -- and December, we end up
18  with a little more than 40 hours; is that correct?
19      A. That's correct.
20      Q. Okay. So again, assuming that these
21  invoices are correct --
22      A. Uh-huh.
23      Q. -- the amount of time that you would have
24  spent would have been somewhere in the range of 5
25  percent of the total time, 787; is that correct?

143

1       A. For the hours they represented for these
2   other individuals.
3       Q. Okay. And it's your testimony that during
4   this time --
5       A. Uh-huh.
6       Q. -- you actually drafted the declaration
7   itself, the 28-page declaration in Exhibit 1,
8   correct?
9       A. Yes, I did draft the -- the declaration.
10      Q. And it -- like me, I guess, your -- you
11  characterized yourself as a slow writer; is that
12  correct?
13      A. Yes, I am a slow writer.
14      Q. Okay. Am I right that this is the first
15  expert report that you've ever prepared?
16      A. Yes.
17      Q. And so am I right that you're asking the
18  Court to accept this declaration to which you swore
19  at the end, having spent five percent of the hours
20  that the rest of your team had spent on it?
21      A. I do not agree with that statement.
22      Q. What do you disagree with?
23      A. So I don't know how many hours were spent
24  by all of these other people. I can only tell you
25  how many hours I spent on -- on the analysis and

144

1   also on drafting this report. So I don't -- so
2   maybe you should restate the question so you can
3   ask me, but -- I guess the point is, I don't
4   exactly know what your question is or what the
5   statement that you're asking me to agree to is.
6       Q. I guess my question is, the -- the number
7   of hours that you spent on the report are
8   accurately reflected in Exhibit 3, correct?
9       A. That's correct.
10      Q. You have no reason to dispute that the
11  hours that are reflected in the bills that were
12  sent by Greylock McKinnon to Tom Sobol that were
13  produced to us by Plaintiffs in response to your
14  subpoena were inaccurate, correct?
15      A. I have no knowledge either way of how much
16  time was spent on this report by these other
17  individuals. I just know how much time I spent on
18  -- on the preparation of the analysis on the
19  report.
20      Q. Other than the people whose names are
21  reflected in these two documents -- Exhibit 4 and
22  Exhibit 5 -- have you had substantive discussions
23  with anyone else about your work in this matter?
24      A. No.
25      Q. You're aware that Plaintiffs submitted

145

1    your report on or about December 19th as part of
2    their renewed motion for class certification,
3    correct?
4        A.   Yes.
5        Q.   We talked before about how you had had
6    discussions about a deadline for completion of your
7    report.
8        A.   Yes.
9        Q.   Has December 19th, 2007 always been the
10   deadline for completion of your report?
11       A.   I didn't know an exact deadline. I never
12   had a -- I'm not sure that I knew of the exact date
13   of the report when I was retained.
14       Q.   At any point along the line after you were
15   retained, did you ever learn there was a different
16   deadline other than December 19th? So for example,
17   a deadline in early December, perhaps?
18       A.   Yes.
19       Q.   Any other dates?
20       A.   Not that I know of --
21       Q.   I assume --
22       A.   -- or that I can recall.
23       Q.   Sure. I assume that you weren't ever told
24   that your report needed to be completed by early
25   November; is that correct?

146

1        A.   No.
2        Q.   Okay. You hadn't even started working on
3    the project by then, right?
4        A.   I think I probably had been retained by
5    that time, or at least had had -- again, I had had
6    initial conversations by that time. But no, I was
7    not told that there was a date at that time.
8        Q.   Right. And that you hadn't actually, you
9    know, begun work on your report as reflected in
10   Exhibit 3 --
11       A.   That's correct.
12       Q.   -- at the time that you submitted for
13   reimbursement.
14            Did you ever tell Plaintiffs' counsel that
15   you would need more time to complete your report?
16       A.   No, I did not.
17       Q.   Have you ever had discussions directly, by
18   the way, with Plaintiffs' counsel other than one
19   conversation that you had with Mr. Notargiacomo?
20   And let's limit this to the time period before
21   December 19.
22       A.   Uh-huh. So I think the -- I've had one
23   other conversation with Ed about the scheduling of
24   my deposition.
25       Q.   Was that before December 19th or after --

147

1        A.   Uhm.
2        Q.   -- as best you can recall.
3        A.   Yeah, I think it was in December, but I
4    couldn't tell you.
5        Q.   Okay.
6        A.   And I think I -- actually, that's not
7    true. I had two conversations with Ed about the
8    scheduling of my deposition: One in December and
9    one in January.
10       Q.   Okay.
11       A.   And I'm sorry. Can we back up? There was
12   a question that you asked before this question that
13   I -- that I wanted to say something about, but I
14   couldn't -- can't tell you what the question is.
15   Now can we back up?
16       Q.   Can you remember even vaguely what the
17   question was about -- the subject matter, just to
18   try to cut through this --
19            (Prior recent testimony read.)
20            THE WITNESS: Sorry. No. No. No. It
21   was again it was about when I started working on
22   the project and when the analysis was -- were
23   begun.
24       Q.   What did you want to add, do you remember?
25       A.   No, that's my problem. There was a --

148

1    there was something specific I wanted to qualify
2    with my answer, but I couldn't tell you. I guess
3    we'll have to --
4        Q.   Maybe we'll get back to it.
5        A.   Okay.
6        Q.   If it comes to you at any point, please
7    just let me know.
8        A.   Okay.
9        Q.   So just to get back on track here, you
10   didn't ever tell Plaintiffs' counsel that you
11   needed more time to complete your report, correct,
12   or did you?
13       A.   Ah. Thank you. So I think I did, and
14   that had to do with, again, getting the data in
15   shape and making sure that the analysis that we
16   were presenting and the way in which we were
17   presenting the analysis was accurate to the data
18   that we had.
19       Q.   Was that a discussion that you had with
20   Plaintiffs' counsel or one that you would have had
21   others at Greylock McKinnon?
22       A.   I'm sorry. It was not a discussion I had
23   with counsel at all. I never had a conversation
24   with counsel. I had a conversation with Mike and
25   with Forrest about our ability to -- to do the --

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

149

1  to do the analysis that we were asked to do and to
2  -- to present that analysis kind of faithfully in
3  the document.  And that -- and I think I reported
4  that we were -- that there was time -- that we were
5  under pressure to produce the report that we felt
6  would be accurate, and I think I reported that to
7  Renee.
8      Q.  Okay.  Can you -- in looking at Exhibit 3
9  at all --
10     A.  Uh-huh.
11     Q.  -- if that helps, can you pinpoint
12  approximately when this would have been?
13     A.  Yeah.  Honestly, can I really tell -- I
14  think by the end of November it was clear that we
15  -- that we needed more time, but when exactly I
16  communicated that -- so I -- I mean, honestly, I
17  know that -- I can tell you that in November it was
18  clear that it was going to be -- that we were under
19  time pressure to produce the analysis and produce
20  the report, and that I can't -- but honestly, I
21  cannot tell you exactly when I communicated that to
22  Renee.
23     Q.  And -- and the reasons that you felt like
24  you were under this pressure --
25     A.  Uh-huh.

150

1      Q.  -- to complete the report, what was -- was
2  there something in particular that was slower than
3  you had anticipated?
4      A.  You know, with any analysis, it just --
5  honestly these are very large datasets that we're
6  working with and making sure that they are cleaned
7  and merged properly and making -- you know, writing
8  the SAS code and getting it done, all of that
9  stuff, making it -- making sure it works.  All of
10  that stuff takes time.  It just takes time.
11     Q.  Okay.  It wasn't a function of not having
12  received the data, for example, until end of
13  November/beginning of December?
14     A.  I think that there was some data that we
15  were waiting for in November as well.
16     Q.  Do you know what data that was?
17     A.  I don't recall off the top of my head.
18     Q.  Do you know when it actually arrived?
19     A.  I don't.
20     Q.  It did arrive before you finished your
21  report, though, I take it?
22     A.  I hope so, yes.
23     Q.  Were you ever engaged on another matter
24  that interfered with your meeting the original
25  deadline --

151

1      A.  No.
2      Q.  -- in this matter?  Are you aware of any
3  other potential expert in this matter who was
4  engaged on another matter that prevented him or her
5  from working on this project?
6      A.  No.
7          MR. RONA:  Objection.  If you could just
8  give me a --
9          THE WITNESS:  Of course.  I'm sorry.
10         MR. RONA:  -- a brief window of time to
11  make an objection.  Thank you.
12         THE WITNESS:  Thank you.
13         MR. POLUBINSKI:  Okay.  Let's mark the
14  next document.
15         (Conti Exhibit 6, "Class Plaintiffs'
16         Motion For Enlargement of Time to File
17         Renewed Motion For Class Certification.")
18     Q.  Okay.  So Jodi just handed you a document
19  that's titled, the "Class Plaintiffs' Motion for
20  Enlargement of Time to File Renewed Motion For
21  Class Certification," correct?
22     A.  Yes.
23     Q.  So this is a document that Plaintiffs'
24  counsel submitted to the Court on or about October
25  30, 2007?

152

1      A.  Uh-huh.
2      Q.  You can see the -- the date at the top of
3  the page, asking for an extension from November 5th
4  to December 5th to complete their renewed motion
5  for class certification -- and that's the motion
6  with which your report was submitted --
7      A.  Uh-huh.
8      Q.  -- correct?  Have you seen this document
9  before?
10     A.  No.
11     Q.  So you wouldn't have had any input into
12  this document, at least that you're aware of,
13  correct?
14     A.  No.
15     Q.  Okay.  Let's look at the bottom of the
16  first page, the beginning of the carry-over
17  paragraph, it reads "Plaintiffs, together with
18  their experts have been working diligently to
19  provide the Court with the requested information,
20  but respectfully request an extension of 30 days
21  from November 5th, 2007 until December 5th, 2007 to
22  complete their submission."
23         We'll talk about the rest of the sentence
24  later, but did I read that part of it correctly?
25     A.  Yes.

153

1  Q.  Okay.  Were you one of Plaintiffs' experts
2  who was working on this matter as of this --
3  October 30, 2007?
4  A.  Again, I'm not exactly sure what --
5  MR. RONA:  I'm sorry.  Objection.  You can
6  answer.
7  THE WITNESS:  Thank you.
8  A.  I'm not exactly sure what date I was
9  retained, and I -- I don't know.
10  Q.  Okay.  But you hadn't submitted bills at
11  least as of October 30th, correct?
12  A.  No.
13  Q.  Okay.  Do you have any understanding as to
14  who else this statement might refer to?
15  A.  No.
16  MR. RONA:  Objection.
17  Q.  Okay.  The sentence goes on to give two
18  reasons for the requested extension.  The first one
19  is -- and we'll do these in order -- "Due to gaps
20  in the data produced thus far in discovery,
21  Plaintiffs have had to purchase custom data runs to
22  complete the requested analysis, which data did not
23  arrive until November 5th or 6th, 2007."
24  Do you know one way or the other if this
25  is an accurate statement?

154

1  MR. RONA:  Objection.
2  A.  I don't know.
3  Q.  At this point, at least, you hadn't done
4  anything to identify potential gaps in -- in any
5  data, correct?
6  A.  What do you mean by "done anything"?
7  Q.  I think "done anything" is pretty broad.
8  Had you done anything as of that time?
9  MR. RONA:  I'm going to object.  Vague.
10  Overbroad.
11  A.  I think that I knew something about the
12  gaps in Wolters Kluwer data at this time.
13  Q.  Okay.  Do you know if anybody else was
14  analyzing the data at that point in time, meaning
15  -- "that point in time" meaning October 30, 2007?
16  A.  What I understand, again, was what I
17  described was that I know that Mike and Forrest
18  were making sure that the data that we did have was
19  clean and ready for analysis.
20  Q.  Okay.  The second stated reason here is
21  that, "One of Plaintiffs' expert --" withdrawn.
22  The second stated reason for the requested
23  extension is, "One of Plaintiffs' experts and their
24  staff have been fully engaged on another matter
25  through today, October 30, 2007, and they estimate

155

1  they will need until November 30, 2007 to complete
2  their analysis."
3  Did I read that correctly?
4  A.  Yes.
5  Q.  Do you know whom that sentence refers to?
6  MR. RONA:  Objection.
7  A.  Uhm.
8  Q.  You can answer.
9  A.  Uhm.  Are you asking me if I am the
10  Plaintiffs' -- Plaintiffs' expert that it is being
11  -- that this document is referring to?
12  Q.  No, I think my question's a little broader
13  than that.  It's just, do you know to whom the
14  sentence refers?
15  A.  I do not.
16  MR. RONA:  Same objection.
17  THE WITNESS:  I'm sorry.
18  Q.  You can set that exhibit to one side.
19  Have you taken any notes at meetings or on
20  phone conferences that you've had as you've
21  discussed or reviewed materials in this case?
22  A.  No.
23  Q.  Have you marked up copies of any of the
24  materials that you've received?
25  A.  No.

156

1  Q.  Have you communicated in any way with
2  either of -- or any of the named individual
3  Plaintiffs in this case?
4  A.  No.
5  Q.  How about their doctors?
6  A.  No.
7  Q.  Have you communicated in any way with a
8  representative of the named third-party payer
9  Plaintiffs in connection with this case?
10  A.  No.
11  Q.  Have you reviewed any documents relating
12  to any of the individual Plaintiffs or their
13  doctors?
14  A.  No.
15  Q.  I gather you've reviewed some claims data
16  from the three named third-party payer Plaintiffs,
17  correct?
18  A.  That's correct.
19  Q.  Okay.  Aside from the claims data, have
20  you reviewed any other documents provided to you by
21  the named third-party payer Plaintiffs?
22  A.  No.
23  Q.  Have you reviewed any transcripts of
24  testimony and depositions of any of the named
25  Plaintiffs in this case?

157

1    A.  No.
2    Q.  How about of their doctors?
3    A.  No.
4    Q.  Have you communicated with any class
5    members, either individuals or third-party payers,
6    in connection with your work on this case?
7    A.  No.
8    Q.  Are you aware that Professor Rosenthal has
9    submitted two declarations in this case?
10   A.  No.
11   Q.  I promised we'd get back to the work that
12   you did in 1998 and 2000 --
13   A.  Uh-huh.
14   Q.  -- for Professor Rosenthal as a project
15   director.  How long did that work last?  Was it
16   just those two years?
17   A.  That's correct.
18   Q.  How did it end, or why did it end?
19   A.  I entered graduate school.
20   Q.  Was any sort of a report or article or
21   anything else published from the work that you had
22   done at that time?
23   A.  Uhm, so the -- the drivers of costs and
24   the use of -- related to prescription drugs in
25   California was produced at that time.

158

1    Q.  And -- and just so that I am on the same
2    page, is that -- that's a document that's listed on
3    your CV?
4    A.  That's correct.
5        THE WITNESS:  I'm sorry.  May I have just
6    a break to grab some water, please.  Great.  Thank
7    you.
8        VIDEO OPERATOR:  The time is 12:42, and we
9    are off the record.
10       THE WITNESS:  Thank you.
11       (Whereupon the deposition recessed at
12       12:42 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

159

1        Afternoon SESSION (1:41 PM)
2        VIDEO OPERATOR:  The time is 1:41 p.m.,
3    and we are back on the record.
4    Q.  When we broke for lunch, Doctor Conti, I
5    think we were speaking about the document that
6    emerged from the work that you had done for
7    Professor Rosenthal in the late '90s; is that
8    correct?
9    A.  That's correct.
10   Q.  And I think --
11   A.  I think late -- I think 2000, but --
12   Q.  Okay.  Thank you.  Am I right that the
13   document was the policy report that's reflected on
14   the second page of your CV relating to prescription
15   drug use and expenditures in California?
16   A.  I just have to get to my CV.
17   Q.  Of course.
18   A.  Just give me a second.  (Witness reviews
19   document.)  Yeah, that's correct.
20   Q.  Okay.  Did any other published work come
21   out of your work those years as a project director?
22   A.  Yes.
23   Q.  What else?
24   A.  So -- so the Epstein, et al. paper on
25   "Racial Disparity in Access to Renal

160

1    Transplantation," that also came out.
2    Q.  Okay.  That's the first document that's
3    listed in your publication section of your CV,
4    correct?
5    A.  Yes, that's correct.
6    Q.  Anything else?
7    A.  No.
8    Q.  Okay.  Were you compensated for your work
9    as a project director?
10   A.  Yes.
11   Q.  By whom?
12   A.  By the school of public health.
13   Q.  So setting aside any work that you've done
14   with her on this case, have you worked at all with
15   Professor Rosenthal since your work as a project
16   director?
17   A.  No.
18       MR. RONA:  Objection.
19   Q.  Did you know that Professor Rosenthal is
20   also an academic --
21   A.  Oh, actually.  I'm sorry.  Can we -- can
22   you ask me that question again.
23   Q.  Sure.  Why don't you just go ahead and
24   tell me what the modification is to your answer.
25   A.  Okay.  So I did not -- I have not worked

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

161

1    directly with Meredith Rosenthal on this -- on the
2    production of this document.
3        Q.   Okay.
4        A.   And so I did work with Meredith Rosenthal
5    at the school of public health on a variety of
6    projects, some of which resulted in publications,
7    but --
8        Q.   Is this --
9        A.   I'm sorry.
10       Q.   Go ahead.  I didn't mean to cut you off.
11       A.   But this report is not a product of any
12   work that I did with Meredith Rosenthal.
13       Q.   Okay.  The variety of projects on which
14   you'd worked with her were projects that you worked
15   on while were you a graduate student at Harvard; is
16   that correct?
17       A.   No, that's incorrect.
18       Q.   Okay.  So I guess I'm trying to figure out
19   what -- when the variety of projects that you're
20   talking about happened.
21       A.   I worked with -- for Meredith Rosenthal
22   before I entered graduate school.
23       Q.   Understood.  So I guess my question to you
24   was, after the time that you ceased to work for her
25   as a project director --

162

1        A.   Yes.
2        Q.   -- up until the present time, have you
3    done any work for or with Professor Rosenthal?
4        A.   No.
5        Q.   Okay.
6        A.   Oh.  Actually, that's not true.  So there
7    is a project that Meredith and I worked on, looking
8    at comparing quality of care and also costs for
9    hospitals.  That was joint work that I did with
10   Meredith, and a number of other assistant
11   professors at the university -- sorry -- at Harvard
12   University that -- that I think is just coming out
13   for publication now that that I worked with
14   Meredith on.
15       Q.   When did you work on that project with
16   her?
17       A.   When I was a graduate student.  I think my
18   last year of graduate school and first year of
19   being a -- a professor.
20       Q.   So that would have been approximately
21   2005/2006?
22       A.   No, I didn't finish graduate school until
23   2006, and so I think the projects probably started
24   when I was -- it was my last bit of time in
25   graduate school.  So probably 2006 through 2007.

163

1        Q.   Okay.  Were you compensated for your work
2    on that project?
3        A.   No.
4        Q.   Anything else other than that?
5        A.   No.
6        Q.   I think I was starting to ask you whether
7    you knew if Professor Rosenthal is also an academic
8    affiliate at Greylock McKinnon?
9        A.   Yes, I do know that she is an academic
10   affiliate.
11       Q.   How do you know that?
12       A.   She told me.
13       Q.   Did -- did she tell you in the context of
14   her telling you about this case --
15       A.   No.
16       Q.   -- or some other context?  Was it before
17   then or after then?
18       A.   It was before the -- the -- this case.
19       Q.   Did she speak with you at all about her
20   work, the substance of her work?
21       A.   No.
22       Q.   Okay.  Aside from the initial conversation
23   that you testified about earlier that you had with
24   Professor Rosenthal about this case, have you
25   spoken with her at any other time about this case?

164

1        A.   I have consulted with Meredith on one
2    specific aspect of the analysis of this case.
3        Q.   When was that?
4        A.   So late November when the document was
5    being prepared and the analysis was being done.
6        Q.   Did you contact her at that time?
7        A.   I did.
8        Q.   And did you speak with her by phone?
9        A.   I did.
10       Q.   Was it just one conversation?
11       A.   Yes.
12       Q.   What was the specific aspect on which you
13   contacted her?
14       A.   So I consulted with Meredith Rosenthal
15   about the statistical basis for calculating the
16   estimated count of consumers and also the estimated
17   count of TPPs that -- that were in the class.
18       Q.   What specifically did you ask her about
19   with regard to those -- those two matters?
20       A.   So it requires -- because we have no data
21   to estimate -- no -- no observational data in which
22   we can actually do a count of consumers or of TPPs
23   that would have paid for off -- the off-label use
24   of Neurontin, we have to use statistical theory to
25   give us a sense of the likelihood of being a

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

165

1 consumer or being a TTP or -- sorry -- TPP that
2 would have -- would have paid for Neurontin over
3 this time period, the content of which -- the kind
4 of the basis of that is contained in one of the
5 appendices of the report.  But I consulted with
6 Meredith just to make sure that the way I was
7 thinking about it was the proper -- kind of the
8 proper way, statistically, of thinking about it.
9        I also consulted with a number of other
10 people who I considered to be experts in
11 statistical theory related to this as well.
12    Q.   Is the attachment that you referred to
13 Attachment E?
14    Yes.  Let's see.  Just make sure.
15 (Witness reviews document.)  Attachment E.  That's
16 correct.
17    Q.   What did she say in response to your
18 question about whether the way you were thinking
19 about it was proper -- the proper way of
20 statistically --
21    A.   So --
22    Q.   -- thinking about it?
23    A.   So she concurred that -- that it made
24 sense to think about it this way.  And I also had
25 another conversation with a friend of mine who is a

166

1 biostatistician about this as well to make sure.
2    Q.   Who's the -- who's the friend of yours
3 who's the biostatistician?
4    A.   MaryBeth Landrum, and she's a professor at
5 Harvard Medical School.
6    Q.   Is she the only other person that you
7 would have discussed this issue with?
8    A.   That's correct.
9    Q.   What did she say?
10    A.   She said that's correct.
11    Q.   Other than this -- this one specific time
12 in late November --
13    A.   Uh-huh.
14    Q.   -- in which you reached out to Professor
15 Rosenthal, have you spoken with her about the
16 substance of this case?
17    A.   No.
18    Q.   Was there ever any discussion with her or
19 with anybody else about -- withdrawn.
20        I know you testified before that you
21 weren't aware that Professor Rosenthal had
22 submitted declarations in this case; is that right?
23    A.   That's correct.
24    Q.   Did you know that Professor Rosenthal was
25 working on this case at all in any way?

167

1    A.   Yes, I did -- yes, I do.
2    Q.   Let's focus again on what you sort of knew
3 back at the time that you were --
4    A.   Uh-huh.
5    Q.   -- completing the report.  What did you
6 understand her role on the case was?
7    A.   To be honest, the only thing I know about
8 her role on the case is that she's working as a --
9 as an economic expert on -- on -- on trends
10 in Neurontin use over the time period.
11    Q.   But you didn't know one way or the other
12 whether or not she had submitted a declaration --
13    A.   No.
14    Q.   -- or more declarations at any point?  Did
15 you ever have any discussions with her or anybody
16 else about why she wasn't doing the work that
17 you're doing in this declaration?
18    A.   No.
19    Q.   Were you ever curious?
20    A.   No.
21    Q.   Did you ever discuss with her or with
22 anybody else how your work in this declaration fits
23 together with her work?
24    A.   No.
25    Q.   Would you agree with me that there might

168

1 be some overlap between the work that you just
2 described her as doing and the work that you're
3 doing here?
4        MR. RONA:  Objection.
5    A.   Are you asking me whether, in my
6 understanding of what I am doing for this case and
7 what she is doing for this case, that there would
8 -- that there is overlap in the content?
9    Q.   I'm not sure if that's exactly what I was
10 asking.  Let me see if I can back up and get the --
11 (reviews screen.)
12        Okay.  What I'll do now is try to read
13 back to you what I think your understanding is or
14 what I think you had said your understanding was of
15 what she is doing in this case, which is that she's
16 working as an economic expert on trends in
17 Neurontin use over the time period.
18        Would you say that also describes what you
19 are doing in this case?
20    A.   I have three tasks in this case, all of
21 which relate to data analysis and the preparation
22 of a report:  The first has to do with looking at
23 trends in the off-label uses of Neurontin over a
24 specific time period.
25        The second has to do with estimating the

169

1   unique number of physicians that are -- that are
2   using Neurontin overall, and by specific physician
3   specialties over a specific -- defined time period.
4   And the third is to estimate the number -- to kind
5   of give an estimate of the number of consumers and
6   third-party payers who would have paid for
7   Neurontin over this time period.
8        So that's my understanding of what I'm
9   doing for this case.  That is what I'm doing for
10  this case.  I don't know what Meredith is doing
11  specifically for this case.
12       Q.  Okay.  Fair enough.  And I'm not trying to
13  -- to trick you on this at all.  I -- I just -- in
14  terms of the first task that you just delineated --
15       A.  Uh-huh.
16       Q.  -- do you have an understanding for what
17  differences, if any, there are between what you're
18  doing and what Professor Rosenthal is doing?
19       A.  I don't know what Meredith Rosenthal is
20  doing for this case.
21       Q.  And it's not something, I take it, you've
22  ever asked?
23       A.  No.
24       Q.  You were never curious about what she
25  might be doing?

170

1        MR. RONA:  Objection.  Asked and answered.
2        Q.  You can answer it.
3        A.  Honestly, I'm very busy, and Meredith is
4   very busy, and we have lots to talk about when
5   we're together that has nothing to do with this
6   case.  So no.
7        Q.  Okay.  And just so I'm -- I'm sure I
8   understand, so between -- aside from the -- why
9   don't I withdraw the question.
10       Aside from the conversation that you had
11  with her, are you aware of any involvement that
12  Professor Rosenthal had in the preparation of your
13  declaration in this case?
14       A.  Meredith Rosenthal did not prepare any --
15  Meredith Rosenthal did not input -- how about this:
16  I'm sorry.  Can you strike that.
17       I prepared --
18       Q.  She can't strike it, but you can
19  certainly --
20       A.  Okay.  I prepared the document.  Meredith
21  Rosenthal had no input into the preparation of this
22  document.
23       Q.  Okay.  So in other words, you didn't have
24  discussions with her about -- about the document,
25  correct?

171

1        A.  That's correct.
2        Q.  Do you know one way or the other whether
3   Mr. Augusteijn had any conversations with her about
4   the document?
5        MR. RONA:  Objection.
6        A.  I don't know.
7        Q.  All right.  Do you know one way or the
8   other whether Mr. McCleur might have had
9   conversations with her about the document?
10       MR. RONA:  Objection.
11       MR. POLUBINSKI:  What's the ground?
12       MR. RONA:  How can she possibly know?
13       MR. POLUBINSKI:  I'm asking her if she
14  knows.  That's the question.
15       MR. RONA:  Okay.  I was objecting based on
16  the call for speculation.
17       Q.  I don't want you to speculate.  I just
18  want to know whether you know whether Mr. McCleur
19  has had conversations with Professor Rosenthal
20  about your document.
21       A.  I don't know.
22       Q.  Do you know one way or the other whether
23  Mr. McCleur or Mr. Augusteijn or somebody else
24  might have provided drafts of your declaration to
25  her?

172

1        MR. RONA:  Objection.
2        A.  Are you asking me if I know whether Mike
3   or Forrest provided documents -- copies of my
4   documents to Meredith?
5        MR. POLUBINSKI:  Why don't we read the
6   question back.
7        (Question read back.)
8        A.  I don't know.
9        MR. POLUBINSKI:  Okay.  Let's -- let's
10  mark the next two exhibits.
11       (Conti Exhibit 7, "Expert Declaration of
12       Meredith B. Rosenthal in Support of
13       Plaintiffs' Motion For Class
14       Certification.")
15       (Conti Exhibit 8, "Reply Declaration of
16       Professor Meredith Rosenthal.)
17       Q.  Okay.  So the court reporter just handed
18  you two documents that are marked as Conti Exhibit
19  7 and Conti Exhibit 8.  Conti Exhibit 7 is a
20  document entitled, "Expert Declaration of Meredith
21  B. Rosenthal in Support of Plaintiffs' Motion For
22  Class Certification"; is that correct?
23       A.  Yes.
24       Q.  Okay.  And then Exhibit 8 is, "Declaration
25  -- Reply Declaration of Professor Meredith

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

173

1    Rosenthal"; is that correct?
2        A.  Yes.
3        Q.  Okay.  I assume you've never seen either
4    of these documents before today?
5        A.  No.
6        Q.  Okay.  Then you can actually set them to
7    one side.
8            Were you aware that Professor Rosenthal
9    had been deposed in this matter?
10       A.  Yes.
11       Q.  How were you aware of that?
12       A.  She told me.
13       Q.  When did she tell you?
14       A.  Yesterday.
15       Q.  Is that the first time she told you?
16       A.  Yes.
17       Q.  What did she say about her deposition in
18   this matter?
19       A.  She told me that she spent a lot of time
20   talking with you about her -- in her deposition
21   talking about her qualifications.
22       Q.  Anything else?
23       A.  No.
24       Q.  She didn't tell you what a nice guy I was?
25       A.  I'm sorry, but no.

174

1            MR. RONA:  Assumes facts not in evidence.
2            MR. POLUBINSKI:  I'm disappointed.  That
3    should be in evidence.
4        Q.  I take it you haven't reviewed transcripts
5    of her deposition?
6        A.  No.
7        Q.  Were you aware before yesterday that she'd
8    been deposed in this matter?
9        A.  No.
10       Q.  Did you discuss Professor Rosenthal's
11   deposition with counsel at any time?
12       A.  No.
13       Q.  Are you aware of any work that Professor
14   Rosenthal is currently doing in connection with
15   this matter?
16       A.  No.
17       Q.  Do you have any sense for how much time
18   Professor Rosenthal has spent on this matter over
19   the past several months?
20       A.  No.
21       Q.  Let's take a -- a look back at Exhibits 4
22   and 5, which I think are probably somewhere there
23   in front of you.
24           I think we talked before about how the
25   second-to-last page of each of these exhibits

175

1    contains a divider page that reads, "Neurontin
2    Rosenthal," is that correct?
3        A.  Yes.
4        Q.  And then the very last page of both of
5    these documents appears to be an invoice from
6    Greylock McKinnon Associates to Thomas Sobol, both
7    of which are dated January 23rd, 2008, correct?
8        A.  That's correct.
9        Q.  And that both of these single-page
10   invoices include time that appears to be attributed
11   to Professor Rosenthal; is that correct?
12       A.  That's correct.
13       Q.  And in Exhibit 4, Exhibit 4 appears to
14   reflect that she spent 16 hours of time in November
15   of 2007, correct?
16       A.  That's correct.
17       Q.  And then Exhibit 5 appears to reflect that
18   she spent just shy of ten hours of time in December
19   of 2007, correct?
20       A.  That's correct.
21       Q.  Do you have any understanding for what
22   process Rosenthal would have been doing during
23   those months in these bills that were submitted to
24   us in response to your subpoena?
25           MR. RONA:  Objection.

176

1        A.  I have no idea.
2        Q.  Do you know one way or the other whether
3    she was doing work on your report during that time
4    frame?
5        A.  I have no idea.
6            MR. RONA:  Objection.
7        Again, Meredith did no work on my report.
8        Q.  That you're aware of, correct?
9        A.  Okay.  The document that I produced is
10   something that I produced under -- with the
11   direction -- with me directing Mike and Forrest to
12   help me with the analyses.  That's what I produced.
13   Meredith had no direct input in the drafting of
14   this document or in any of the analyses that I
15   requested Forrest or Mike to do.
16       Q.  Okay.  And maybe this is just a small
17   point of clarification, but you have no way of
18   knowing whether she had indirect input.  In your
19   answer -- in your answer you spoke about direct
20   input.  You have no way of knowing whether she may
21   have had indirect input through Mr. Augusteijn or
22   Mr. McCleur, correct?
23       A.  What would "indirect input" mean?
24       Q.  You know, I don't know is the answer to
25   the question, but it could include things like, you

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

177

1　know, conversations with them, discussions about
2　the data analyses that were done, things like that.
3　　　MR. RONA: Objection.
4　　A. I mean -- the document is a record of the
5　analyses that I undertook with Mike and Forrest.
6　As I mentioned, there is no input that Meredith
7　Rosenthal had with me about the production of this
8　document.
9　　Q. Okay. That's all --
10　　A. Other than what I've already mentioned to
11　you.
12　　Q. That's all I'm asking. And I guess just
13　to -- to close the loop, you don't know what it was
14　that Professor Rosenthal might have been doing in
15　these bills; is that correct?
16　　　MR. RONA: Asked and answered.
17　　Q. You can answer it.
18　　A. No. Actually, I'm going to -- I'm going
19　to retract. I'm going to say one more thing about
20　this: So I have no idea what Meredith is doing in
21　this time period with this. I assume that the
22　conversation she had with me about statistical
23　theory is reflected in this bill, but I don't know
24　that for a fact.
25　　Q. Fair enough. And -- and you don't know

178

1　what else might be reflected in there, too, because
2　the conversation you would have had on statistical
3　theory was less than 16 hours.
4　　A. Well, I hadn't had any other conversations
5　with Meredith.
6　　Q. Understood.
7　　A. So -- I mean, I will assume that the
8　direct conversation I had with Meredith about this
9　is reflected in this bill, but I don't know
10　anything else about Meredith -- what Meredith was
11　doing on this -- for this case in general, and the
12　document that I produced and the analysis that is
13　reflected in this document is my work that I did
14　with Mike and Forrest. There was no one else
15　involved in that work.
16　　Q. The last part, you just said that there
17　was no one else involved in this work.
18　　A. Uh-huh.
19　　Q. How do you know that?
20　　A. That I know of.
21　　Q. Okay.
22　　A. That I know of.
23　　Q. Okay. You're aware that --
24　　　THE WITNESS: I'm sorry. Excuse me.
25　Could I just grab some water please, for a second.

179

1　　　MR. POLUBINSKI: Sure.
2　　　THE WITNESS: Thank you.
3　　　VIDEO OPERATOR: Go off the record?
4　　　MR. POLUBINSKI: I don't know that we need
5　to.
6　　　THE WITNESS: Thank you.
7　　Q. Are you aware that Raymond Hartman has
8　submitted a declaration in this case?
9　　A. No.
10　　Q. Do you know who Raymond Hartman is?
11　　A. I do.
12　　Q. Who is he?
13　　A. I think he's principal at GMA.
14　　Q. Was he involved at all in your decision to
15　work on this matter?
16　　A. No.
17　　Q. Had you met him before you were retained
18　in this matter?
19　　A. No, I've never met Ray.
20　　Q. Have you ever spoken with him before?
21　　A. Yes.
22　　Q. How many times?
23　　A. Once.
24　　Q. When was that?
25　　A. When I was in graduate school, probably in

180

1　2004.
2　　Q. What was the context of the discussion?
3　　A. It's somewhat complicated, but a friend of
4　a family -- a family friend who's an attorney was
5　looking for someone to do some expert testimony in
6　a -- in a medical liability suit. And so I
7　contacted Ray on behalf of my family friend in
8　order for them to be together.
9　　Q. When you say a "medical liability suit,"
10　do you mean a medical malpractice case?
11　　A. Yeah.
12　　Q. Okay. How did you hear about Doctor
13　Hartman?
14　　A. How did I hear about Doctor Hartman? So
15　my -- one of my graduate advisors, Richard Frank,
16　is -- is a friend of Ray's and so I knew that -- I
17　-- as a graduate student, I knew about what GMA
18　did, and I knew who Ray was in relationship to
19　that.
20　　Q. Have you ever spoken with Doctor Hartman
21　about this case?
22　　A. No.
23　　Q. Looking at Exhibit 4, the second page,
24　were you aware before today that Doctor Hartman had
25　billed time on this matter in November of 2007?

181

1    A.  I'm sorry.  What?
2    Q.  Let's look at Exhibit 4 --
3    A.  Okay.
4    Q.  -- second page.  Do you see the first name
5    on this list on this invoice is, "Hartman, R.,"
6    correct --
7    A.  Yes.
8    Q.  -- which I assume is Doctor Hartman, the
9    same person we've been talking about, correct?
10    A.  Yes.
11    Q.  Okay.  Were you aware that Doctor Hartman
12    had -- was doing work on this matter in November of
13    2007?
14    A.  No.
15    Q.  Do you know one way or the other whether
16    he's reviewed drafts of your declaration?
17    A.  No.
18    Q.  The description I think in his time here
19    says, "Review data and models."  You don't have any
20    idea what that description refers to, do you?
21    A.  No.
22    Q.  I assume you weren't involved at all in
23    the preparation of his declarations in this case.
24    A.  No.
25    Q.  Okay.  And you don't list the declarations

182

1    that he did among the documents you considered; is
2    that correct?
3    A.  I would have to look.
4    Q.  Take a look if you want.
5    A.  But not to my knowledge.  I'm sorry.
6    Q.  Let me ask you it this way:  I mean, do
7    you recall ever having seen declarations that
8    Doctor Hartman has filed in this case?
9    A.  No.
10    Q.  Okay.  Were you aware that he was working
11    on this case --
12    A.  No.
13    Q.  -- at any time?
14    A.  No.
15    Q.  So I assume you weren't aware that he had
16    been deposed in this matter as well?
17    A.  No.
18    Q.  And you wouldn't have seen transcripts of
19    his deposition, obviously, right?
20    A.  No.
21    Q.  Okay.  And you're not aware one way or the
22    other of work that he has done or is doing in
23    connection with this matter currently.
24    A.  No.
25    Q.  Are you aware that Doctor Hartman -- at

183

1    least as of the time of his deposition in December
2    2006 -- was taking Neurontin?
3    A.  No.
4    Q.  That he was -- at least at the time and
5    maybe still is -- taking the medication for an
6    off-label use --
7    A.  No.
8    Q.  -- and therefore, is actually a member of
9    the class?
10    A.  No.
11    Q.  What did you do to prepare for this
12    deposition?
13    A.  I went to -- I flew to Washington to meet
14    with Mike Augusteijn and Forrest McCleur to -- to
15    review certain statistical aspects that are
16    contained in Attachment B about the forecast and
17    the backcasting exercises.
18    Q.  When did you have this meeting with them?
19    A.  Last Friday.  I think it was the 8th.
20    Q.  How long did you meet with them?
21    A.  A couple of hours.
22    Q.  Were they the only ones present?
23    A.  Yes.
24    Q.  Did anyone else participate by phone?
25    A.  No.

184

1    Q.  Other than the statistical aspects
2    contained in Attachment B about the forecast and
3    backcasting exercises, what did you speak about
4    with him?
5    A.  That's it.
6    Q.  Other than that one meeting with Mr.
7    Augusteijn and Mr. McCleur last Friday, what else
8    did you do to prepare for the deposition?
9    A.  I met with counsel yesterday.
10    Q.  When you say, "counsel," is that Mr. Rona?
11    A.  That's correct.
12    Q.  Anybody else?
13    A.  With Ed, via conference call.
14    Q.  Sorry to hear that for Ed's sake.  I
15    gather he's on vacation this week.  I'm sure he was
16    happy to join, though.
17    A.  I'm very pleasant, so I'm sure he was
18    happy to talk to me.
19    Q.  How long did your preparation session last
20    yesterday?
21    A.  A couple of hours.
22    Q.  What did you discuss?
23    A.  Mostly how I should -- what I should
24    expect in the deposition.
25    Q.  What did you understand you were to expect

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

185

1    in the deposition?
2        A.  That we would talk about my CV and that --
3    and then that there would be -- you know, that we
4    would talk about the declaration.
5        Q.  Anything else?
6        A.  No.
7        Q.  Did Ed or Ilyas disparage me at all?
8        A.  No.
9        Q.  I appreciate that.  Were you given any
10   documents to review?
11       A.  No.
12       Q.  Okay.  Aside from those --
13       A.  I'm sorry.  So Palko was there as well.
14       Q.  Who was?
15       A.  Palko was there as well (indicating).
16       Q.  Okay.  Got it.  Aside from those two
17   meetings, have you done anything else to prepare
18   for today's deposition?
19       A.  No.
20           MR. POLUBINSKI:  Okay.  Let's mark the
21   next document.
22           (Conti Exhibit 9, subpoena.)
23       Q.  Okay.  So we've just handed you a document
24   that's marked as Exhibit 9 in your deposition.  The
25   document says at the top of it, "Subpoena in a

186

1    Civil Case."
2           Have you ever seen this before?
3        A.  No.
4        Q.  Taking a look at this, do you have any
5    sense one way or the other whether this is the
6    subpoena pursuant to which you're testifying today?
7        A.  I'm sorry.  Can you just give me a second
8    to look at the document.
9        Q.  Sure.  Take your time.
10       A.  (Witness reviews document.)  No.
11       Q.  So you never received a copy of the
12   subpoena from anybody, I take it, prior to this
13   deposition?
14       A.  No.
15       Q.  You didn't see this in the context of --
16   of any of your preparation for your deposition,
17   correct?
18       A.  No, that's correct.
19       Q.  Do you see on the first page there are a
20   couple of handwritten Xs; is that correct?
21       A.  Yes.
22       Q.  One of them is next to the statement that
23   says, "You are commanded to appear at the place,
24   date, and time specified below to testify at the
25   taking of a deposition in the above case."

187

1           The -- the second one reads, "You are
2    commanded to produce and permit inspection and
3    copying of the following documents," etcetera,
4    etcetera and then below that says, "All documents
5    listed on Schedule A attached."
6           Were you aware that the subpoena also
7    requested documents from you?
8        A.  I didn't know anything about the subpoena,
9    so I don't know anything about the documents that
10   it was requested -- that were requested as part of
11   the subpoena.  So no.
12       Q.  Were you aware of any document request at
13   all to you in connection with this case or in
14   connection with this deposition?
15       A.  No.
16       Q.  So would I be correct to assume that you
17   didn't do anything to locate documents described in
18   the subpoena; is that correct?
19       A.  This is the first time I've seen the
20   subpoena.  And no, I have not done anything to
21   locate anything in relationship to the subpoena.
22       Q.  Okay.  Let's look at Exhibit 2, which I
23   think you should already have somewhere near the
24   bottom of your pile.
25           Exhibit 2, if I've got my numbers

188

1    straight, is your revised report, correct?
2        A.  (Witness reviews document.)  I'm still
3    looking Document 2.  Yes, okay.
4        Q.  So Exhibit 2 is your revised report,
5    correct?
6        A.  That's correct.
7        Q.  Okay.  Let's turn to Page 1 of the report.
8    In fact, it's the only page, I think, of the report
9    with text on it.
10          You write in the first sentence that,
11   "After the submission of my declaration of December
12   19th, 2007, it was discovered that a minor error
13   was introduced into the working NDTI dataset that I
14   used to generate several figures and tables."
15          Did I read that correctly?
16       A.  Yes, that's correct.
17       Q.  Who discovered the error?
18       A.  Forrest McCleur.
19       Q.  When did he discover it?
20       A.  I don't know.
21       Q.  When did you first hear about it?
22       A.  I heard about it the week of December
23   19th.
24       Q.  So you heard about it before the
25   declaration was actually submitted, or was it after

189

1    the declaration was submitted?
2        A.  It was after the declaration was
3    submitted.  Oh.  Actually, you know, I -- I'm very
4    sorry about that.  So just to be really clear, I
5    heard about it the week of January 18th.
6        Q.  Okay.
7        A.  The week previous to when the revision was
8    submitted.
9        Q.  That's fine.  I thought that might have
10   been what you meant.
11       A.  Yeah.  I'm sorry.  I apologize.
12       Q.  That's fine.  And how did you hear about
13   it from him?
14       A.  I did not hear about it from Forrest.  I
15   heard about it from Mike.  Mike called me to tell
16   me that there had been a data error that had been
17   discovered by Forrest.
18       Q.  What is the data error that Forrest had
19   discovered?
20       A.  It is -- it -- there were two datasets
21   that were being merged:  One, the NDTI dataset, and
22   another one that had a list of indications.  And
23   when they used the SAS to merge those two datasets
24   together, SAS -- both datasets had the same name
25   for one variable.  So what SAS did was read over

190

1    the first observation for -- in the NDTI dataset, I
2    think that that was the same as -- that
3    corresponded to the -- to the other dataset.
4        Q.  Do you know what the variable was that
5    overlapped between the two?
6        A.  I think it was indication.
7        Q.  And the two datasets that were merging,
8    one was a list of -- of indications without any
9    other data?
10       A.  (Witness nods.)
11       Q.  And then the other was the NDTI data that
12   contained all of the information that came from
13   IMS?
14       A.  That's correct.
15       Q.  Okay.  Do you have an understanding for
16   how Mr. McCleur discovered the error?
17       A.  I don't know.
18       Q.  Did you ask?
19       A.  I didn't.
20       Q.  How confident are you that there are no
21   other errors in the existing data?
22       A.  I feel pretty comfortable with the quality
23   of the data as it is now.  It has been subjected to
24   quite a few data checks, both related to this, but
25   to other -- other things as well.

191

1        Q.  Did you write this follow-up report
2    yourself?
3        A.  This (indicating)?
4        Q.  Yes.
5        A.  Yes.
6        Q.  And you typed out the -- the text here; is
7    that correct?
8        A.  Yes.
9        Q.  You hesitated on that.
10       A.  I'm sorry.  Actually, because I -- honest
11   -- to be honest, tell me -- you asking me
12   whether I drafted this -- these two paragraphs de
13   novo, or did I have -- or did I have any input from
14   other people in -- in drafting them?
15       Q.  Well, ultimately, I'm curious about both,
16   but let's do them in order.
17       A.  Okay.
18       Q.  I guess the first question is whether you
19   were the person who actually drafted these from
20   scratch.
21       A.  So what I had -- so Mike helped me in the
22   construction of these two paragraphs because I
23   don't -- I don't know how -- you know, this is my
24   first time working on a case as an expert, so I
25   didn't know what the proper legal form for what

192

1    this should look like would be.
2        So Mike helped me with the -- kind of the
3    format of it, but I -- but I actually drafted the
4    -- the text that talks about the error -- the total
5    data records, the figures in tables, the -- what
6    the -- how this revision would represent a change,
7    and what percentage of a change it would represent,
8    etcetera.
9        Q.  So it was just you and Mr. Augusteijn,
10   though, who had done the -- who had done the work
11   on this, I take it?
12       A.  That's -- that's correct.
13       Q.  Whose decision was it, as between the two
14   of you, to use the term "de minimis" in the
15   second-to-last sentence of the text?
16       A.  It's mine.
17       Q.  What do you understand that term to mean?
18       A.  I don't know what the legal term -- what
19   the legal definition of de minimis is.
20       Q.  Okay.  But what do you understand it to
21   mean?
22       A.  That these are extremely minor changes
23   that were made, and that really changed the -- the
24   figures in tables in the original declaration by 1
25   or 2 percent and that don't substantively change

193

1  the -- the analyses that are presented in the
2  declaration.
3      Q.  And so to you, de minimis means all of
4  those things sort of together.  It's not just a
5  quantitative measure, necessarily.  It's also the
6  qualitative nature of the change?
7      A.  I think my understanding is that there are
8  two issues:  The first is that it's a very small --
9  the quantity of the change is extremely small.  And
10  second -- secondly, that the quality of the change
11  is also very -- very small.
12      Q.  And you're referring to both when you use
13  the term "de minimis."
14      A.  I am.
15      MR. POLUBINSKI:  Okay.  Why don't we take
16  a break to switch the tape.
17      VIDEO OPERATOR:  The time is 2:27 p.m.
18  This is the end of Tape 3, and we are off the
19  record.
20      (Recess was taken.)
21      VIDEO OPERATOR:  The time is 2:36 p.m.
22  This is the beginning of Tape 4, and we are back on
23  the record.
24      Q.  Okay.  Let's -- let's look back at Exhibit
25  1, which is your -- your original declaration in

194

1  the matter.
2      A.  Actually, before we go to -- to Exhibit 1,
3  I wanted to make an addendum to what we were
4  talking about before we broke, which has to do with
5  data quality and discovering data errors.
6      So in my experience working with
7  observational datasets, it's very common to find --
8  to discover errors in the process and to try to
9  correct analyses based on those errors.
10      Sometimes those errors can happen kind of
11  late when you are -- you know, writing up your
12  report.  Some of those errors can be really small
13  errors that really don't change your analysis at
14  all.  Some of those errors can be big.
15      The -- in my experience, the error that we
16  discovered here in this dataset was very small.  It
17  really changed just a handful of records, really
18  just the first record of -- in any kind of merged
19  set, and -- and did not change the figures or the
20  table -- the numbers underlying the figures or the
21  tables much at all, "much" being -- you know, the
22  most being 1 percent, which, from my point of view
23  is really, really small.
24      So I feel very -- I guess what I'm trying
25  to say is that I feel comfortable in my experience

195

1  that these things happen and that, in general, the
2  -- the data error that we discovered was a very,
3  very small error that really didn't change the
4  substance of the report or any of the tables that
5  we present in the report at all.
6      Q.  Okay.  Can we look at Attachment A-2 of
7  your declaration.
8      A.  Yes.  I'm sorry.  What page?
9      Q.  I think, you know, again, if you look at
10  the little writing at the top of the page, it's --
11  it starts on Page 75.
12      A.  Okay.
13      Q.  Okay.  So in this list it appears that you
14  list here documents that you relied upon --
15      A.  Yes.
16      Q.  -- in forming your opinion in this matter;
17  is that correct?
18      A.  That's correct.
19      Q.  Does this list remain accurate, or have
20  you since reviewed other documents that you would
21  add to the list?
22      A.  This list remains accurate.
23      Q.  Who selected the electronic data sources
24  that appear below this very first heading on the
25  first page?

196

1      A.  I'm sorry.  What do you mean by "who
2  selected"?
3      Q.  Who selected them for inclusion in
4  Attachment A-2?
5      A.  Are you asking me whether I -- are you
6  asking me whether I used these data sources?
7      Q.  That wasn't quite what I was asking, but I
8  assume the answer is that you did use these data
9  sources, correct?
10      A.  Yes, yes.
11      Q.  How did you -- how were you provided these
12  data sources to use, I guess, is the question?
13      A.  Are you asking me who provided me the data
14  sources?
15      Q.  Why don't you tell me who provided you the
16  data sources.
17      A.  Okay.  So Mike and Forrest had -- had been
18  working -- how about this:  Mike and Forrest had
19  these data sources, had been working on getting
20  these data sources cleaned and ready for analyses
21  when I started working on this case.
22      Q.  So is it Mr. Augusteijn and Mr. McCleur
23  who would have selected these data sources?
24      A.  I don't know who selected these data
25  sources.

197

1    Q.   It was they who provided them to you?
2    A.   They provided them to me, correct.
3    Q.   Okay.  So do you know how it was that they
4    or whoever selected them made this -- made the
5    decision on what to select?
6         MR. RONA:  Objection.
7    A.   I don't know anything about the process of
8    selection --
9    Q.   Okay.
10   A.   -- with respect to that.
11   Q.   Let's look at the second page.  There's
12   another heading here that reads, "Bates number
13   documents," which we talked about earlier in your
14   testimony.
15   A.   Yes.
16   Q.   Were these documents selected for you the
17   same way?  In other words, provided to you the same
18   way as the electronic data sources that we just
19   discussed?
20   A.   My understanding is that these documents
21   were provided to my staff by counsel.
22   Q.   Do you know if these were the only
23   documents that were provided to your staff by
24   counsel?
25   A.   I don't know.

198

1    Q.   These were the only four documents -- the
2    only four Bates numbered documents that you've seen
3    in connection with this matter, though, right?
4    A.   That's correct.
5    Q.   And do you know how that selection was
6    made?  In other words, which four documents that
7    show you?
8    A.   No.
9    Q.   And in the "Other Documents," which I
10   think is the last category here, how are those
11   documents selected for inclusion on this list?
12   A.   I selected these documents, in --
13   Q.   How --
14   A.   -- in -- in consultation with Forrest for
15   a handful of them.
16   Q.   Okay.  Now, other than the documents that
17   are listed in Attachment A-2 here, did you review
18   any other documents in connection with your work on
19   this case?
20   A.   No.
21   Q.   Were there ever materials that you
22   requested from counsel or from Mr. McCleur or Mr.
23   Augusteijn that you didn't receive?
24   A.   No.
25   Q.   Did you ever ask to see a copy of the

199

1    complaint in this matter?
2    A.   No.
3    Q.   Did you ever ask to see more underlying
4    company marketing documents, other than the four
5    that are listed here in the Bates number documents?
6    A.   No.
7    Q.   In connection with your work in this
8    matter, did you review any materials on the
9    methodologies that the various data vendors, which
10   is to say, IMS and Wolters Kluwer, used to compile
11   the data that you used?
12   A.   Yes.
13   Q.   What did you do?
14   A.   So I reviewed the online documentation for
15   IMS and NDTI data, which is really just a
16   description of the data, and I also reviewed the
17   online description of the IMS Xponent data.
18   Q.   Anything else?
19   A.   I have used the NDTI data for some
20   research -- for a research project, so I knew -- I
21   had -- I have seen, in the past, documentation
22   related to the NDTI data.
23   Q.   Do you remember any documentation in
24   particular that you recall having seen?
25   A.   I think just code books, honestly.

200

1    Q.   "Code books," you said?
2    A.   Right.  So what variables are and what
3    they mean.
4    Q.   Anything else?
5    A.   No.
6    Q.   Do you list any of the online descriptions
7    that you just described among the documents that
8    you would have relied upon in connection with your
9    work in this matter in --
10   A.   So again, it's just -- no, I don't list
11   them.  Again, they weren't substantive documents
12   that changed the -- that were direct inputs into
13   anything that was produced for -- anything that was
14   directly produced for the -- for the drafting of
15   the report.
16        They were just for my own kind of general
17   understanding of the -- of the datasets, of what --
18   the universe that they cover, their unit of
19   analysis, and the general kind of, I don't know,
20   their general availability.
21   Q.   Okay.  Let's turn to Section 3 of your
22   report, which is -- I believe it starts on Page 3.
23        Okay.  The -- the title of -- of Section 3
24   is "Quantifying Neurontin Off-Label Prescriptions
25   and Prescribers," correct?

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

201

1    A.  Correct.
2    Q.  You write in the first sentence of -- of
3   Paragraph 6, "I understand that the court has
4   requested additional data analyses to support its
5   review of certification of the class (including
6   various subclasses) of Neurontin end payers that
7   were allegedly economically injured due to
8   fraudulent marketing and disclosure."
9        Did I read that one correctly?
10   A.  Yes, you did.
11   Q.  Okay.  Where did the understanding
12  reflected in this sentence come from?
13   A.  I think I -- I examined the court order.
14   Q.  Get to that in a minute.  Is that the only
15  source of your understanding?
16   A.  I think that I also discussed this with --
17  discussed the court order with Renee and with Ed.
18   Q.  Let me first ask you about the court
19  order.  I'm assuming that you're referring to the
20  Court's decision on the Plaintiffs' class
21  certification motion that would have come out end
22  of August/beginning of September; is that correct?
23   A.  That's correct.
24   Q.  Now, I think that document isn't listed
25  among the documents you considered in Attachment

203

1    A.  No.
2    Q.  And so your understanding here that's
3   reflected in the first sentence is something that
4   comes solely from your reading of the court's
5   order?
6    A.  Yes.
7    Q.  Do you read court documents ordinarily in
8   the context of the work that you do?
9    A.  I have read court documents before.
10   Q.  When?
11   A.  Trying to think.  So I read the Court
12  document for this.  I think that I was involved in
13  working on a -- on a medical malpractice case where
14  I read some court documents at that time.
15   Q.  When was that?
16   A.  When I was in graduate school in 2004,
17  2005.
18   Q.  Do you know what court documents those
19  were?
20   A.  No.
21   Q.  It's not something you routinely, though,
22  do as part of your work?
23   A.  No.
24   Q.  In fact, other than maybe the documents
25  that you remember reading in connection with the

202

1   A-2.  Am I right about that?
2    A.  I don't know.
3    Q.  Do you want to take a look?
4    A.  Sure.  (Witness reviews document.)  So I
5   don't know if it's one of these documents that are
6   numbered.  It's not listed.
7    Q.  Is there a reason why it's not listed?
8    A.  No, it's an oversight.
9    Q.  Okay.  So in addition to your own reading
10  of the -- of the Court's order --
11   A.  Uh-huh.
12   Q.  -- it sounds like you discussed it with
13  Ms. Rushnawitz at one point.
14   A.  There is a very brief discussion with --
15  with Renee, which just -- which actually just was
16  about getting me the court order, and similarly,
17  with Ed, it was just a -- it was a discussion that
18  there was a court order, more than what the content
19  of that court order was.
20   Q.  So you didn't discuss the substance of the
21  court order with either Ed Notargiacomo or Renee
22  Rushnawitz, correct?
23   A.  No.
24   Q.  Did you discuss the substance of the court
25  order with anybody?

204

1   medical malpractice case --
2    A.  Uh-huh.
3    Q.  -- can you recall ever having read a court
4   opinion before?
5    A.  I have.  I worked for a legal -- for New
6   York Legal Aid --
7    Q.  When?
8    A.  -- as --
9    Q.  I'm sorry.
10   A.  -- as a temp. many, many years ago, so I
11  had seen documents and read documents at that time.
12   Q.  Okay.  Many years ago, this is back before
13  Wisconsin or --
14   A.  This is back before Wisconsin, yeah.
15   Q.  Okay.  Was it during college or after
16  college?
17   A.  After college.
18   Q.  Okay.  And so am I right, though, that you
19  didn't seek to supplement your understanding of the
20  court order with conversations about the court
21  order with anybody else?
22   A.  No.
23   Q.  Okay.
24   A.  I didn't think the court order was that
25  complicated that it would require that, frankly.

205

1    Q.  Okay.  Next sentence you write, "To this
2  end, counsel has instructed me to provide a set of
3  data analyses, the results of which I report here."
4        Who gave you that instruction?
5    A.  Ed.
6    Q.  And that would have been the phone
7  conversation that we talked about before, sometime
8  probably in October --
9    A.  That's correct.
10    Q.  -- which would have -- I think we -- I
11  think we'd figured this out -- was the one phone
12  conversation that you would have had with Ed prior
13  to your signing the report on December 19th.
14    A.  Yes.  I think I may have had actually --
15  to be honest, I think I may have had two
16  conversations with Ed:  One that had to do with me
17  being interviewed for the case; and -- and second,
18  after I was retained about what the specific
19  parameters of what I'm being asked to do was.  So
20  -- so it was probably in that second conversation.
21    Q.  Okay.  Which, if I understand it right,
22  was the -- the one more substantive conversation
23  that you had with Mr. Notargiacomo --
24    A.  (Witness nods.)
25    Q.  -- that we talked about earlier in your

206

1  testimony at some length, correct?
2    A.  Exactly.  Exactly.
3    Q.  Okay.  I could read you the next sentence,
4  but actually, I think you say essentially the same
5  thing on Page 7.  So we might want to --
6  you're welcome to take a look at this carry-over
7  sentence or just flip straight ahead to Page 7 to
8  the very first sentence on that page.
9        You write that, "The focus of these
10  analyses is to provide information to the Court on
11  the number of prescriptions and the number of
12  physicians prescribing Neurontin for various
13  nonFDA-approved uses and doses over the proposed
14  class periods."
15        Did I read that one correctly?
16    A.  Yes, you did.
17    Q.  Okay.  And by "these analyses" in that
18  sentence, I assume you mean the analyses in Section
19  3 of your report; is that right?
20    A.  Yes, in the body of the document.
21    Q.  Okay.
22    A.  Correct.
23    Q.  And by "nonFDA approved uses" here, you --
24  you're referring to what could also be described as
25  off-label uses or off-label indications; is that

207

1  right?
2    A.  That's correct.
3    Q.  The terminology's basically the same, as
4  best you know?
5    A.  Yes.
6    Q.  Okay.  The next sentence reads, "However,
7  the data, as described above, cannot be used to
8  directly address this question, since no available
9  dataset will allow us to directly link the number
10  of physicians in the US to indications for use of
11  Neurontin over the proposed class periods."
12        Am I right that what you're saying here is
13  that there is essentially no data available that
14  can tell us, for example, the number of
15  psychiatrists who prescribe Neurontin for bipolar?
16    A.  Yes.
17    Q.  Okay.
18    A.  And specifically that the Wolters Kluwer
19  data that was provided to us by the Plaintiffs
20  cannot -- cannot directly link physicians to
21  indications.
22    Q.  And that would be true of the IMS Xponent
23  data, too; is that correct?
24    A.  That is true, yes.
25    Q.  Okay.  Okay.  And we'll circle back to the

208

1  datasets shortly.  And so the last sentence of this
2  -- of this paragraph you write, "Consequently, I
3  have produced analyses on the trends in the number
4  of Neurontin prescriptions and uses overall and by
5  indication, trends in the number of physicians
6  prescribing Neurontin overall and by specialty, and
7  trends in the number of Neurontin uses by daily
8  dose over the proposed class periods," correct?
9    A.  That's correct.
10    Q.  The analyses that you describe yourself as
11  having done in Section 3 is really analyses of
12  trends.  Is that -- is that a fair
13  characterization?
14    A.  Yes, that's correct.
15    Q.  Okay.
16    A.  Well, they're both point-in-time
17  estimates, and they're trends over time.
18    Q.  Okay.  Let's talk about the trends part.
19  What do you mean by "trends" in this context?
20    A.  So over a given set of time I'm looking at
21  the number of -- of prescriptions and the number of
22  physician -- of unique physicians prescribing
23  Neurontin.
24    Q.  Is that what you mean by "trends"?  I
25  mean, I guess -- I guess -- let me -- let me back

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

209

1    up a little bit. I guess I would have assumed that
2    "trends" means examining directionally, where
3    Neurontin use or prescriptions are going over time.
4    Is that -- is that a misdirection?
5        A. I think we're using it in two different
6    contexts.
7        Q. Okay.
8        A. So I'm not examining -- I'm examining the
9    quantity of -- of Neurontin uses and the unique
10   number of physicians prescribing Neurontin and at a
11   given point in time, and then I'm linking those --
12   those point-in-time estimates over time -- over a
13   defined period of time.
14       Q. Okay. And it's the -- it's the linking of
15   those estimates over time that is the examination
16   of trends. Am I right about that?
17       A. It's the linking over time that is --
18   right. It's a description of trends.
19       Q. Okay. Okay. And what you've also
20   mentioned here are point-in-time estimates.
21       A. Uh-huh.
22       Q. Can you tell us what point-in-time
23   estimates are for purposes of your work here?
24       A. Sure. So I'm using observational datasets
25   in order to estimate at any given point in time in

210

1    any quarter that I observe data in what the
2    estimated number of prescriptions of Neurontin is
3    overall, and also for specific -- for
4    specifications.
5            And similarly, the point-in-time estimate
6    for a physician is an estimated number of
7    physicians prescribing Neurontin overall and by
8    specialty.
9        Q. Okay. One of the things that you just
10   said is seeking to measure trends in the number of
11   -- of physicians prescribing Neurontin by
12   specialty.
13           What's your understanding of why you were
14   doing that?
15       A. So I was just asked to -- in the analysis
16   to describe trends or describe point in time and
17   trends over time in the uses of -- in the use of
18   Neurontin, Neurontin prescriptions, and in
19   physicians -- sorry -- prescribing Neurontin over
20   time. I don't have a full understanding of what
21   these analyses will be used for. I understand that
22   these analyses will be used in connection with --
23   with a -- I want to get the exact wording right.
24   So with -- with a -- a case related to trends in
25   Neurontin use and payment over time.

211

1        Q. Aside from that, do you have any
2    understanding about why that particular piece of
3    analysis would be relevant to this case?
4        A. No.
5        Q. Did you have conversations with counsel or
6    with others at Greylock McKinnon about it?
7        A. No.
8        Q. I guess a more simple question: You
9    understand, I assume, that you don't necessarily
10   need to be a pain specialist, for example, to
11   prescribe medication for pain; is that correct?
12       A. Are you asking my medical opinion of what
13   types of physicians should be prescribing
14   Neurontin?
15       Q. No, I'm just asking -- I'm asking, you
16   know, your opinion, as someone who observes the
17   data, that you wouldn't necessarily jump to the
18   conclusion that it's only pain medication -- that
19   it's only pain specialists who are prescribing
20   medications for pain, correct; that it may also --
21   that primary care physicians and others, for
22   example, may prescribe medications for pain?
23       A. I have no expertise to opine on that
24   comment at all.
25       Q. Okay. And so you wouldn't know one way or

212

1    the other either whether a pain specialist, in
2    observing the data, was prescribing for migraine or
3    neuropathic pain or nociceptive pain, for example,
4    correct?
5        A. So in the data I observe different types
6    of doctors prescribing Neurontin for different
7    indications.
8        Q. I thought -- I thought we'd established
9    that you couldn't link physicians by special --
10   well, withdrawn. I'll withdraw the question.
11           I guess a simpler question, which is, do
12   you know of any way -- well --
13       A. Well, actually, I should withdraw my --
14   I'm sorry. Go ahead.
15       Q. Well --
16       A. So in the data I can observe physicians
17   prescribing Neurontin by specialty. I can also
18   observe Neurontin prescriptions used for
19   specifications. I cannot observe in the data
20   physicians prescribing Neurontin for
21   specifications. There is no data that will allow
22   me to link those two together --
23       Q. Fair enough.
24       A. -- those three pieces of information
25   together.

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

213

1     Q.  Thank you.  That -- that was ultimately
2  where I was going.
3     A.  Okay.  Good.
4     Q.  And I guess my point is, though, that,
5  when you are looking at the folks who have been
6  identified as pain specialists --
7     A.  Yes.
8     Q.  -- who have prescribed Neurontin, you
9  would have no way of knowing, first, necessarily
10 whether they were prescribing Neurontin for use for
11 pain.  They could have been prescribing it for some
12 other use; is that correct?
13    A.  I have no medical understanding of why --
14    Q.  I just --
15    A.  -- a neurologist or a pain specialist
16 would be prescribing Neurontin for any set of
17 conditions other than pain.
18    Q.  Okay.  Fair enough.
19    A.  I'm not an expert in what doctors do and
20 what they use their medications for.
21    Q.  Okay.  And then, I guess my follow-on
22 question to that, though, is that, again, even
23 assuming that the pain specialists were prescribing
24 for pain, there would be no way of knowing whether
25 any -- you know, breaking out which prescriptions

214

1  are for neuropathic pain, on the one hand, and
2  which are for nociceptive pain, on the other hand,
3  or is there some way that you're aware of doing
4  that?
5     A.  I'm sorry.  Are you asking me whether --
6  in the observational dataset that I have, whether I
7  can link certain types of physician specialists and
8  their prescribing patterns as an indication?
9     Q.  Yes.
10    A.  Okay.  So as I've stated before, there is
11 no way in the observational datasets that I have to
12 link specific doctors and their specialty to a
13 prescription of Neurontin and a specification.
14    Q.  Okay.
15    A.  I have no expertise on what doctors should
16 be doing.
17    Q.  Okay.  Why don't you think of it this way:
18 Ask -- I guess it would be -- would you agree that
19 it would be a mistake on my part to view
20 prescriptions by pain specialists one way or the
21 other as a way of knowing a relative amount of
22 Neurontin that was prescribed for any particular
23 kind of pain?
24    MR. RONA:  Objection.
25    A.  I'm sorry.

215

1     Q.  Let me withdraw the question.
2     A.  Yeah.
3     Q.  That's fine.  That's fine.  Let's withdraw
4  it.
5     Let's -- let's talk about the specific
6  measure datasets that you used, which might be
7  helpful for this.
8     Those datasets are -- there are three of
9  those datasets, correct?
10    A.  That's correct.
11    Q.  Okay.  The first one is the IMS National
12 Disease and Therapeutic Index dataset; is that
13 correct --
14    A.  That's correct.
15    Q.  -- which is also called the NDTI dataset
16 we've referred to sometimes?
17    A.  That's correct.
18    Q.  Okay.  There's also a dataset from Wolters
19 Kluwer; is that correct?
20    A.  That's correct.
21    Q.  And then the third one is a dataset from
22 INS Xponent?
23    A.  That's correct.
24    THE WITNESS:  I'm sorry.  May I take a
25 break?

216

1     MR. POLUBINSKI:  Yeah.  Sure.
2     THE WITNESS:  Great.  Thank you.
3     VIDEO OPERATOR:  The time is 3:06 p.m.,
4  and we are off the record.
5     (Recess was taken.)
6     VIDEO OPERATOR:  The time is 3:09 p.m.,
7  and we are back on the record.
8     Q.  Okay.  Let's talk first about the Wolters
9  Kluwer dataset.
10    A.  Okay.
11    Q.  The Wolters Kluwer data is data that
12 Plaintiffs' counsel had received from Defendants,
13 correct?
14    A.  That's correct.
15    Q.  And that Plaintiffs' counsel then made
16 available to you; is that correct?
17    A.  That's correct.
18    Q.  Okay.  Did you use any Wolters Kluwer data
19 that did not come from Defendants?
20    A.  Not that I know of.
21    Q.  Okay.  So for example, you're not aware of
22 any that was purchased separately by Greylock
23 McKinnon or by Plaintiffs' counsel or anybody else?
24    A.  Not that I know of.
25    Q.  Okay.  You write in Page 5 of your report,

217

1  second sentence on Wolters Kluwer that, "These data
2  are not available prior to June 1997."
3      A.  Right.  That -- what that means is that
4  these data are not available to me prior to -- to
5  June 1997.
6      Q.  Okay.  Which is to say that the data that
7  you received from Plaintiffs which had come from
8  Defendants didn't go back prior to June 1997 --
9      A.  That's correct.
10     Q.  -- correct?  Okay.  Did you or Plaintiffs'
11 counsel or Greylock McKinnon, to the best of your
12 knowledge at least, attempt to acquire additional
13 Wolters Kluwer data from the vendor going back
14 before June of 1997?
15     A.  So I did not try to acquire data going
16 back before 1997.  I don't know what GMA did.
17     Q.  Did you ask -- I assume you didn't ask for
18 data from Wolters Kluwer prior to June 1997,
19 correct?
20     A.  I talked with my staff about the
21 availability of data that would go back before
22 1997, and I was told that the Wolters Kluwer data
23 was not available prior to June 1997.
24     Q.  Who on your staff did you speak with about
25 that?

218

1      A.  Mike Augusteijn.
2      Q.  Did you understand Mr. Augusteijn to mean
3  the data didn't exist with the vendor, or just that
4  it wasn't available to him?
5      A.  I don't know what he meant by it was not
6  available.
7      Q.  Okay.  Had you specifically asked him if
8  Wolters Kluwer data were available from before that
9  time period?
10     A.  I did not.
11     Q.  He told you this as sort of background
12 about what the data was that you had?
13     A.  That's correct.
14     Q.  Did you or anybody under your direction
15 attempt to acquire additional Wolters Kluwer data
16 from the vendor after December of 2004?
17     A.  Did I try to -- I -- I'm sorry.
18     Q.  Let me -- let me back up a minute.  If you
19 look at the very first sentence of your report as
20 it describes Wolters Kluwer data, it says that,
21 "Defendants have produced in discovery Wolters
22 Kluwer data between June 1997 and December of
23 2004," correct?
24     A.  It does.
25     Q.  Did you make any efforts or are you aware

219

1  of any efforts having been made by Greylock
2  McKinnon to acquire Wolters Kluwer data for the
3  period after December 2004?
4      A.  I did not make any efforts to acquire data
5  after December 19 -- 2004.
6      Q.  Do you know if data's available from
7  Wolters Kluwer after that date?
8      A.  I do not.
9      Q.  And why didn't you make efforts to get
10 data from that time period after December of 2004?
11     A.  Honestly, in my opinion, the Wolters
12 Kluwer data that was provided to us by the -- by
13 the Defendants was not a very high quality, in
14 particular if you wanted to analyze data by
15 specialty.  The data that was provided to us by the
16 Defendants only had records by specialty by less
17 than 30 percent -- by 29 percent of -- of the
18 records had any recorded specialty information.
19         So based on that information, it wouldn't
20 have been my first choice for getting data to
21 describe point-in-time estimates of physicians in
22 aggregate or by physician specialty prescribing
23 Neurontin.
24     Q.  When you say that the Wolters Kluwer data
25 is not a very high quality, do you mean something

220

1  other than that the physician specialty was not
2  populated --
3      A.  No --
4      Q.  -- beyond this 29 percent?
5      A.  -- I don't.
6      Q.  And so other than that, you have no bone
7  to pick with the quality of --
8      A.  Not at this moment in time, no.
9      Q.  -- Wolters Kluwer data?
10     A.  Other than, again, it was limited in its
11 scope, but really -- really, the big issue was
12 physician specialty.
13     Q.  Okay.  You write on Pages 5 and 6 that,
14 "The data contains the number of Neurontin
15 prescriptions filled monthly over this time period
16 and associated prescribing physician specialty
17 information drawn from an audit of prescriptions
18 filled at retail pharmacies in the US," correct?
19     A.  That's correct.
20     Q.  What do you mean by "An audit of
21 prescriptions filled at retail pharmacies"?
22     A.  What I mean by that -- are you asking me
23 to define audit?
24     Q.  I'm just asking you what you mean by that
25 sentence -- or maybe let me cut through it.

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

221

1        Do you mean that -- that it's a sample of
2  -- of prescriptions that have been filled?
3        A.  My understanding is that it's a very -- I
4  mean, it's not every prescription that's been
5  filled at a retail pharmacy in the United States.
6  I don't think there's any dataset that would be
7  able to provide that for you, but that it is --
8  that's right.  It's a sample of retail pharmacies
9  in the United States that prescribe medication --
10  that's -- sorry -- that contain prescription
11  information.
12       Q.  Okay.  So I think you said this, but just
13  to clear it up --
14       A.  Uh-huh.
15       Q.  -- it doesn't -- it doesn't reflect every
16  prescription that's been filled across the country.
17  It's just a sample; that's right?
18       A.  Unfortunately, there is no dataset in the
19  United States that is going to give you every
20  prescription -- information on every single
21  prescription filled --
22       Q.  Understood.
23       A.  -- at a -- at a retail pharmacy.
24       Q.  Understood.  And Wolters Kluwer's doesn't
25  do that, correct?

222

1        A.  Wolters Kluwer does not do that, and I
2  don't -- I -- there's no dataset that is going to
3  give that -- give you that information --
4        Q.  Okay.
5        A.  -- or give me that information.
6        Q.  What do you know about the -- the validity
7  or the reliability of the Wolters Kluwer sample?
8        A.  So I know that it is used by the industry
9  to track both point-in-time estimates, and also
10  trends in prescribing of prescription medication in
11  the United States.  And that it's a -- that you
12  know, it's a commonly-used dataset for doing that.
13       I know that there has been some academic
14  work that has also looked at Wolters Kluwer data in
15  -- in looking -- in describing trends in use and --
16  sorry -- physician prescribing patterns over time.
17       Q.  Do you know what percentage of pharmacy
18  transactions it covers?
19       A.  I do not.  Not off the top of my head, no.
20       Q.  Do you have a rough number?
21       A.  I'm happy -- no.  I don't.
22       Q.  What have you done, if anything, to
23  satisfy yourself that it covered -- covers a
24  representative portion of the country?
25       A.  So my understanding is from both reading

223

1  the description of the Wolters Kluwer data
2  available, and also -- available on the Web, but
3  also talking with Mike Augusteijn, that it -- it
4  does provide a representative sample of -- of
5  retail pharmacies.
6        Q.  And so the two things you've done on that
7  are, first, reading the description of the data on
8  the Web?
9        A.  Uh-huh.  Uh-huh.
10       Q.  And the second is talking to Mike
11  Augusteijn?
12       A.  That's correct.
13       Q.  Anything else?
14       A.  No.
15       Q.  Have you done anything to assure yourself
16  that it doesn't exclude a particular kind of
17  pharmacy in a way that would make your data less
18  reliable?
19       A.  Are you asking me whether it's my
20  understanding that there are retail pharmacies in
21  the US that are excluded from the sample?
22       Q.  No.  Not right now.
23           MR. POLUBINSKI:  Maybe let's just read the
24  question back.
25           (Question read back.)

224

1        A.  Are you -- all right.  I'm going to ask
2  again.  Are you asking me whether they are --
3  whether I'm aware of particular types of pharm --
4  of retail pharmacies that are excluded from their
5  sample?
6        Q.  No.  Again, I'm just asking you -- and
7  I'll read it again myself -- whether you've done
8  anything to assure yourself that it doesn't exclude
9  a particular kind of pharmacy in a way that would
10  make your -- your data less reliable?
11       A.  So I'm going to ask you again, so are you
12  asking me whether I know that particular types of
13  pharmacies were excluded from this audit
14  systematically?
15       Q.  No.  I'm asking you whether you've done
16  anything to assure yourself that -- that it doesn't
17  exclude any particular kind of pharmacy in a way
18  that makes your data less reliable?
19       A.  Uhm.
20       Q.  And -- I'm not sure what's confusing about
21  the question.
22       A.  Okay.  I'm going to ask you, what do you
23  mean by done anything to assure myself that it's --
24  the data is reliable?  What do you mean by "done
25  anything"?

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

225

1    Q.  It's a -- it's a pretty -- it seems like a
2    pretty straightforward concept.  I don't know how
3    to put it any more straightforwardly.  I think it's
4    a simple question.  I'm not trying to trip you up.
5    A.  Uh-huh.
6    Q.  I'm just -- I'm asking you if you've done
7    anything.  If the answer is no, it's no.
8    A.  So I guess what I'm thinking about, so
9    besides -- so typically, when one uses an
10   observational dataset, you would try to understand
11   what the universe of the dataset is, how well it
12   covers whatever the unit of analysis is that it's
13   trying to measure, and in what time frame it's
14   doing it.
15       You then undertake an analysis -- you then
16   -- if you get the data -- try to look to see how
17   clean the data is in terms of measuring the
18   specific things that you're interested in
19   measuring.  In order to -- in undertaking this
20   analysis, that's what I did in conjunction with my
21   staff.  I don't know --
22   Q.  Let me just circle back.
23   A.  I don't know what else you would -- what
24   -- what "anything else" would mean that you would
25   be referring to in terms of assuring myself about

227

1    following:  I reviewed the documentation around
2    what Wolters Kluwer data was in general, and what
3    the unit of analysis was, and kind of what -- and
4    -- and how well and what it's been used to do in
5    the past most -- most notably, and then -- sorry,
6    and then I reviewed assessments of the quality of
7    Wolters Kluwer data for addressing the specific
8    questions that I had been asked to -- to answer in
9    this report, which has to do with the number of
10   physicians prescribing Neurontin over this time
11   period in aggregate, and also by specialty.
12   Q.  The -- the documentation that you referred
13   to, is it something other than the Web pages that
14   we discussed?
15   A.  So again, the Web pages that we discussed,
16   and then a discussion with Mike Augusteijn about
17   that, with kind of a general understanding from
18   graduate school about kind of sources of data for
19   prescription uses that Wolters Kluwer is kind of --
20   is one of a commonly -- one of many commonly-used
21   datasets that the industry uses to track trends in
22   prescription uses and -- and prescriptions by
23   physicians.
24   Q.  Okay.  When you write, "Retail pharmacies"
25   in the sentence that we started with here, what do

226

1    the validity or the reliability of the data.
2    Q.  I don't know either, but let me just make
3    sure that you haven't done anything other than
4    reading the description on the Web that you'd
5    mentioned before, which I don't think was included
6    in your documents considered, but -- but the
7    description on the Web of the Wolters Kluwer
8    dataset on the one hand, and then, on the other
9    hand, talking to Mr. Augusteijn about the dataset,
10   correct?
11   A.  Okay.  So I think what you're asking me is
12   whether or not -- what I did to assure myself that
13   the data in -- contained in the Wolters Kluwer
14   dataset that was defined -- provided to me by the
15   Defendants was valid or reliable; is that correct?
16   Q.  I think my question was a little more
17   specific, but -- but you can answer that question
18   if you want to.
19   A.  Okay.  So what I did in order to figure
20   out whether the Wolters Kluwer data was reliable in
21   general for answering the questions that I was
22   asked to answer -- which were simply the number of
23   physicians -- unique physicians that were
24   prescribing Neurontin over the time period in
25   aggregate and also by -- by specialty -- is the

228

1    you mean there?  This is the carry-over sentence
2    between Pages 5 and 6.
3    A.  Okay.  So retail pharmacies are pharmacies
4    that sell prescription drugs to consumers.
5    Q.  Does it exclude any kind of pharmacy in
6    particular?
7    A.  Not -- I mean, the general description --
8    definition of a retail pharmacy does not exclude
9    any specific retail pharmacies that I know of.
10   Q.  Okay.  Let me ask you with respect to
11   that -- and this is, I think, a direction you were
12   going -- are you aware that, for the years at issue
13   at least, the survey did not include data on
14   prescriptions filled at Wal-Mart?
15   A.  I am not aware of that.
16   Q.  Okay.  And so you wouldn't have done
17   anything, I take it, to control for the absence of
18   Wal-Mart data?
19   A.  What do you mean by "control."
20   Q.  Well, what do you understand the word
21   "control" to mean?  I mean for purposes of data
22   analyses like this.
23   A.  I mean, there's a very -- there are a
24   number of very -- "control" can mean a lot of
25   different types of things.

229

1    Q.  Okay.  Did you --
2    A.  So you tell me what you mean.
3    Q.  Did you -- did you do anything to your
4    data to account for the fact that -- you know what
5    -- I'll withdraw the question.  It's actually -- it
6    -- that's fine.
7    A.  I mean, do -- does the industry do
8    anything to control for the lack of Wal-Mart data
9    in --  when it's using this data for -- for its own
10   internal purposes and --
11   Q.  (Indicating.)
12   A.  So I don't see what I'd be doing.
13   Q.  Let's see.  You're aware, aren't you, that
14   Wolters Kluwer data does not include data on
15   prescriptions filled in hospitals; is that right?
16   A.  Well, retail pharmacies, unless this --
17   they are a specific retail pharmacy that's
18   operating within a hospital but not as a hospital
19   pharmacy are typically -- typically -- well, how
20   about -- I should rephrase.
21      There are retail pharmacies that operate
22   in hospitals, but typically, we don't think of
23   retail pharmacies that are part of a hospital as
24   being included in a retail pharmacy.
25      So there are -- there are hospitals that

230

1    have their own internal pharmacy that -- that
2    service inpatient patients.  That is typically
3    excluded from the typical definition of a retail
4    pharmacy.
5    Q.  So they wouldn't be included in this
6    dataset, correct?
7    A.  My understanding is that when you're
8    looking at retail pharmacies, you're looking at
9    point of service pharmacies that exclude inpatient
10   hospital pharmacies.
11   Q.  And just, again, to make sure that the
12   record's clear on the answer to the question, they
13   wouldn't be included in this dataset, correct --
14   A.  That -- right, so --
15   Q.  -- to the best of your knowledge?
16   A.  Right, to the best of my knowledge.
17   Q.  Okay.  Are you aware that Wolters Kluwer
18   also doesn't collect data from clinic pharmacies?
19   A.  What do you mean by a clinic pharmacy?
20   Q.  A pharmacy associated with -- with certain
21   clinics.
22   A.  No, I'm not aware -- I mean, I guess it
23   would depend on your definition of clinic pharmacy,
24   which you have not defined for me, so I don't know.
25   Q.  I don't want to fight with you here about

231

1    this.
2    A.  Okay.
3    Q.  I'm just trying to ask questions and get
4    answers.
5    A.  Okay.
6    Q.  Are you familiar with the term
7    "closed-wall HMO"?
8    A.  No.  Oh, no.
9    Q.  There was a glimmer of recognition.  Is
10   that reflective of anything?
11   A.  I was thinking of just closed panel.  I
12   was confusing two terms.  So no.
13   Q.  Okay.  Have you ever heard of Kaiser
14   referred to as a closed-wall HMO?
15   A.  No.
16   Q.  Do you know one way or the other whether
17   Kaiser data -- no, I shouldn't say that.  Do you
18   know one way or the other whether data collected
19   from from Pfizer in connection with the Wolters
20   Kluwer audit?
21   A.  From Pfizer?
22   Q.  No, Kaiser, I should say.
23   A.  Oh, Kaiser Permanente?
24   Q.  Yes.
25   A.  No, I do not know.

232

1    Q.  Okay.  Let's look at the last sentence of
2    the Wolters Kluwer description.  It reads, "This
3    dataset does not contain the specification
4    associated with the Neurontin prescription, and as
5    a consequence, it cannot provide an actual count of
6    physicians prescribing Neurontin by indication in
7    the US."
8       Did I read that correctly?
9    A.  That's correct.
10   Q.  Okay.  And I think, as we had talked about
11   before, this dataset, the Wolters Kluwer dataset,
12   cannot provide any indication-specific data; is
13   that correct?
14   A.  Here's the problem:  Prescription claims
15   -- observational data on prescriptions at a retail
16   pharmacy level are very -- typically don't contain
17   indications.  There is no reason why -- in order to
18   fill a prescription, you don't -- the doctor does
19   not have to write down what the indication for that
20   prescription is.  And there's no -- there's no
21   medical or legal reason that I know of why retail
22   pharmacies would collect that information at the
23   point of service.
24      So because of that, datasets, in general,
25   that collect prescription information at the point

233

1    of service -- at the retail pharmacy level -- won't
2    contain indications. It's just a -- it's just a --
3    it's a simple fact about observational data on --
4    on this type of -- on these type of -- in looking
5    at prescriptions in general.
6        So Wolters Kluwer does not contain the --
7    a specification -- how to say this? Prescriptions
8    are not directly linked to the indication for which
9    they were written by the physician and for which
10   the -- the patient is taking the -- taking the
11   medication or filling the prescription for.
12       Q. I think I understand that. You say the
13   prescriptions are not directly linked to the
14   indication. Are they linked in any way? I think
15   the answer is no. I'm not trying to trip you up
16   here.
17       A. Yeah.
18       Q. I just want to make sure the record's
19   clear.
20       A. So in the -- in the observational dataset
21   like this, it's very difficult -- it -- I mean,
22   sometimes there will be some indication, but in my
23   understanding -- I mean, not in the dataset that
24   I've worked on with -- not on the Wolters Kluwer
25   data that I've worked on in this case, but

234

1    sometimes some prescriptions will be linked to an
2    indication, whether that record will be --
3    typically we consider that record to be very poor
4    quality.
5        Q. And you haven't used any of that data in
6    this case, that Wolters Kluwer data?
7        A. I have not, that's correct.
8        Q. Wolters Kluwer data does contain a monthly
9    measure of what's called "new prescriptions of
10   Neurontin," right?
11       A. Yes, that's correct.
12       Q. What's your understanding of what's meant
13   by "new prescription" in the Wolters Kluwer data?
14       A. My understanding is that it's a -- it's a
15   measure that has -- its -- that that patient has
16   not used -- has not filled a prescription for that
17   medication at that pharmacy.
18       Q. Where does that understanding come from?
19       A. Through my conversations with Mike and
20   with Forrest.
21       Q. Anything else?
22       A. No. And again, I guess my kind of general
23   understanding of what these datasets typically have
24   and what you're measuring with new versus existing
25   all -- or all observed prescription medication --

235

1    or kind of filling.
2        Q. Do you know one way or the other whether
3    the new prescription field is keyed off of a new
4    prescription number associated with a prescription,
5    or is it keyed off of the patient?
6        A. I don't know.
7        MR. RONA: Objection.
8        THE WITNESS: Thank you.
9        Q. Okay.
10       A. I don't know off of the Wolters Kluwer
11   data if that's the case.
12       Q. Okay.
13       A. I guess it could go either way.
14       Q. In any event -- in any event, it doesn't
15   exclude all refills, correct? And I guess maybe I
16   should be a little bit more precise. It doesn't
17   include -- it doesn't exclude all prescriptions --
18   all prescriptions of Neurontin written to a single
19   individual patient, correct? And so it doesn't --
20   it doesn't count those only once.
21       MR. RONA: Objection.
22       A. Are you asking me whether our measure of
23   new prescriptions captures, in general, new
24   prescriptions for the individual --
25       Q. I'm --

236

1        A. -- of Neurontin.
2        Q. Let me ask it this way: New
3    prescriptions, as you understand it at least, would
4    include Neurontin prescriptions filled by the same
5    patient, written by the same doctor, but at
6    different pharmacies, correct?
7        A. Not necessarily by the same doctor. There
8    could be lots of different reasons that a doctor --
9    that, you know, different doctors could prescribe a
10   different prescription. My understanding is that
11   -- so if it's at the patient level, then it would
12   be -- then it could be different doctors
13   prescribing Neurontin over, you know, over the
14   observed time period.
15       Q. Uh-huh.
16       A. That -- so we would count a new
17   prescription as the first observation of -- of an
18   individual prescribing -- individual filling a --
19   prescription for Neurontin, regardless of who the
20   prescribing physician was.
21       If it's at the prescription level, at the
22   number of the prescription, then it would be the
23   first -- the first mention of that -- of that
24   prescription number for that individual in the
25   observed dataset.

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

237

1    Q.  Okay.  But the same person could
2  presumably have multiple new prescriptions of
3  Neurontin in the dataset, correct?
4    A.  No, because, again, what we're trying to
5  -- what we're trying to identify is the first
6  prescription for that individual for Neurontin in
7  the dataset.  Are you asking -- so I guess -- I --
8  go ahead.
9    Q.  Well, no.  What I was going to say is that
10  the prescription would be counted or the individual
11  would be counted twice if one prescription was
12  written by one person -- one physician, and then a
13  follow-up prescription was written by another
14  physician.
15    A.  (Witness nods.)  It depends -- again, it
16  depends on the unit of analysis, and my
17  understanding is -- my understanding is that it's
18  at the patient level, not at the prescription
19  number level.  But it -- again -- yeah.
20    Q.  But you're not sure one way or the other
21  about that, or are you sure?
22    A.  I think we -- here I'm not -- I'm going to
23  -- give me a second to think about this.  I think
24  that we measure new use based on the first
25  prescription for that individual of Neurontin

238

1  observed in the retail pharmacy.  So it's linked,
2  both to the mention of -- the first mention of
3  Neurontin, for that patient.
4    Q.  So you believe that it is patient specific
5  not prescription number specific -- specific or
6  it's driven --
7    A.  Uhm.
8    Q.  -- by patient, as opposed to prescription?
9    A.  No, it's driven by prescription, but that
10  we check the patient as well.  That was my --
11  that's my understanding.
12    Q.  Where does that understanding come from?
13    A.  It's through conversations with Mike and
14  with Forrest.
15    Q.  And they are the ones who actually
16  performed the actual manipulations of the data --
17    A.  Right.  They did the linking, right.
18  That's right.
19    Q.  Do you know how new prescriptions differs
20  from the total prescription field?
21    A.  Can we just go back to that -- the last
22  question for a second?
23    Q.  Sure.
24    A.  I think what you're trying to get at is
25  that, at any given retail -- for any given retail

239

1  pharmacy, it is possible that a patient may fill
2  another prescription of Neurontin at another
3  pharmacy.  Right.  And if we look for just the
4  prescription number, then we're going to under --
5  or we're going to consider it to be new at -- and
6  if we don't have that data in that -- if we don't
7  have the retail pharmacy information for that other
8  retail pharmacy, we're going to -- we're going to
9  count this as a new prescription, when it could be
10  really an existing prescription.
11    Now, there is actual empirical data to --
12  that can -- we can use to kind of understand how
13  much of an issue that really is, and my -- my read
14  of the literature is that patients, over -- over
15  kind of defined periods of time, will actually be
16  very consistent in -- in where they're filling
17  their prescriptions; and that not only will they be
18  consistent in filling and refilling prescriptions
19  for a particular medication, but they'll also be
20  consistent for -- for a number of other drugs that
21  they may be using for other things.
22    So --
23    MR. POLUBINSKI:  I just want to say I'll
24  move to strike the last answer --
25    THE WITNESS:  Okay.

240

1    MR. POLUBINSKI:  -- as nonresponsive.
2    Q.  I think it's a little bit dangerous to
3  assume what I'm getting at one way or the other.
4  I'm sometimes not sure myself.
5    MR. RONA:  Was that last part necessary to
6  complete your answer?
7    THE WITNESS:  Yeah, it was.
8    A.  I mean, so -- I mean, so since you were
9  very -- I think that you were not -- I went -- I
10  was trying to ask over and over again what you
11  meant by exactly -- I was trying to ask you to
12  define as clearly as possible what you're asking
13  for me, and since we kind of went through it over
14  and over again and I didn't feel satisfied, I tried
15  to answer the specific questions as best as
16  possible.  But this past -- that past kind of --
17  that I just was talking about is part of my answer
18  in relationship to what you were asking me about
19  how confident I feel about -- or how I measured new
20  prescriptions, and what the potential limitations
21  of new prescriptions would be in my measurement.
22    Q.  Let's -- let's look at Page 11 of your
23  report, Paragraph 20.  I think it's the second
24  sentence that reads, "Given that this exercise
25  relates to the increase of a product's adoption by

241

1 physicians over its lifetime in response to
2 external events, (such as marketing efforts) it
3 made the most sense to focus on new prescriptions,
4 rather than refills of existing prescriptions."
5     A.  Uh-huh.
6     Q.  What do you mean by this exercise in the
7 sentence?
8     A.  So I was asked to do two things for this
9 report that are related to this:  The first was
10 count the number of Neurontin prescriptions by
11 individuals and by indication.  I was also asked
12 to -- to count the number of unique physicians overall
13 and by specific physician specialties that -- at a
14 point in time, and then over time.  That's what I
15 mean by "this exercise."
16     Q.  Okay.  So it's the work that you've done
17 in your declaration --
18     A.  That's correct.
19     Q.  -- is that right?  Your report doesn't
20 attempt to relate changes in prescription levels of
21 Neurontin to specific external events, does it?
22 That's not something your report tries to do?
23     A.  That was not the focus of my report.
24     Q.  Okay.
25     A.  The focus of my report is to report

242

1 point-in-time estimates and -- and a description of
2 trends over time in the number of prescription --
3 of prescriptions of Neurontin, and also the number
4 of unique physicians prescribing Neurontin over the
5 time period.
6     Q.  Understood.  Circling back to a question
7 that I had asked before, do you know how new
8 prescriptions differs from total prescriptions?
9     A.  Yes.  So total prescriptions include
10 refills of existing -- of an existing prescription
11 that a physician would give to a patient.
12         New prescriptions refer to the first new
13 mention -- first mention of Neurontin for a
14 specific individual observed in the dataset.
15     Q.  Did you do any analysis in connection with
16 your work in this matter on levels of total
17 prescriptions, as opposed to new prescriptions?
18     A.  Yes.
19     Q.  When?
20     A.  So I discussed with my staff a -- whether
21 or not to look at total prescriptions versus new
22 prescriptions, and it made sense, from my point of
23 view, that if you want to look at both
24 point-in-time estimates, but mostly a description
25 of trends that are related in any way to the supply

243

1 or demand of -- of prescription medications over
2 time in terms of getting a sense of what the --
3 what the market is doing over time, then you would
4 want to look at new prescriptions, as opposed to
5 refills --
6     Q.  And --
7     A.  -- or let's say the use of samples.
8     Q.  When -- so just focusing on that last part
9 of your answer, so you would not have wanted to
10 include samples, I take it, or would you have?
11     A.  Right.  So again, it's cleaner and more
12 conservative to just focus on new prescriptions.
13 If you want to have a sense of both point-in-time
14 estimates, but really trends over time to look at
15 new prescriptions, as opposed to all this other
16 stuff that's going on.
17     Q.  Okay.  The discussions you had with your
18 staff, was that with Mr. Augusteijn and Mr.
19 McCleur?
20     A.  That's correct.
21     Q.  Anybody else?
22     A.  No.  And honestly, that's based on my own
23 research, and also on my own -- on my doctoral
24 training that -- so one of the -- one of my
25 dissertation papers looks at the use of on -- on --

244

1 sorry -- the overall use of antidepressants in 2001
2 in a general US population, and it then breaks that
3 out into on-label and off-label uses.  And in that
4 -- in that paper, I look only at new uses or new
5 users of antidepressants, not existing users,
6 because, again, it's very difficult to have a sense
7 of why people are taking these drugs, what the
8 rationale behind them is at any given point in
9 time, and also, never mind trying to understand how
10 things would be changing over time with kind of all
11 drugs.
12     Q.  One of the other things that you write in
13 -- on Page 6 is that, "Wolters Kluwer data does
14 provide some information, at least, on the number
15 of unique physicians prescribing Neurontin overall
16 and by specialty"; is that right?
17     A.  I'm sorry.
18     Q.  It's the second-to-last sentence in the
19 part about Wolters Kluwer, that it -- the dataset
20 provides numbers on the number of unique
21 prescription -- or unique physicians, rather,
22 prescribing Neurontin overall and by specialty; is
23 that right?
24     A.  Right.  So in our -- in my analysis that I
25 present in this declaration or in this report, I

245

1  primarily use Wolters Kluwer data to measure the
2  unique -- the number of unique physicians in
3  aggregate that are prescribing Neurontin.  So
4  overall, right, at any given point in time that we
5  are observing the dataset.
6      We also do some analyses looking at --
7  looking at the use of -- of -- sorry -- certain
8  a count of physician specialty -- sorry -- certain
9  physicians within specialties prescribing Neurontin
10  over -- at any point in time and also over time,
11  but we don't -- when we disaggregate -- when I
12  disaggregate at the specialty level, I feel less
13  confident in the use of Wolters Kluwer data in
14  giving me a precise count or reliable count because
15  of the problem with the data fields in specialty --
16  in specialty being recorded.
17      Q.  Okay.  When you write, "unique physicians"
18  here, what's -- what's your understanding for how
19  Wolters Kluwer measures unique physicians or
20  identifies unique physicians?
21      A.  My understanding is that there's a unique
22  physician number.
23      Q.  Do you know if this -- if the Wolters
24  Kluwer data reflects in any way the number of new
25  prescriptions written by an individual doctor in a

246

1  particular month?
2      A.  I'm sorry.
3      MR. POLUBINSKI:  Maybe we can read it
4  back.
5      (Question read back.)
6      A.  Number -- okay.  So are you asking me
7  whether I -- in the dataset I would be able to
8  identify a specific physician and count the number
9  of prescriptions that he or she wrote for Neurontin
10  in a given period in time?
11      Q.  Yes.
12      A.  I -- my understanding is, if the
13  identifying number was -- I mean, again, so it's at
14  the retail pharmacy level.  So I wouldn't be able
15  to -- I don't observe every single prescription
16  that a physician would write for Neurontin.  I
17  mean, those prescriptions could be filled at any
18  pharmacy.
19      Q.  Fair enough.  And that makes perfect sense
20  to me.  I'm assuming your analysis doesn't seek to
21  do that.
22      A.  No.
23      Q.  Okay.  We've talked about the missing
24  specialty information --
25      A.  Uh-huh.

247

1      Q.  -- in the Wolters Kluwer data.  What's
2  your understanding for how Wolters Kluwer assigns
3  doctors particular specialties?
4      A.  I don't know.
5      Q.  Okay.  So I'm assuming you don't know one
6  way or the other how Wolters Kluwer would handle a
7  situation in which a doctor might have multiple
8  specialties.
9      A.  I don't know.
10      Q.  Let's talk about IMS Xponent data, which
11  is in the very next section in your report.  It
12  says -- your report says here that, "IMS Xponent
13  data was purchased by counsel and provided to my
14  staff."
15      Which -- which staff was it provided to?
16      A.  It was provided to Mike and to Forrest.
17      Q.  Whose idea was it to purchase the IMS
18  Xponent data, if you know?
19      A.  I don't know.
20      Q.  Did you ever ask?
21      A.  No.
22      Q.  Do you know when the decision was made to
23  purchase IMS Xponent data?
24      A.  No.
25      Q.  Do you have an understanding one way or

248

1  the other for whether the decision was made prior
2  to your retention in the case or after?
3      A.  I don't know.
4      Q.  Do you have any understanding for how it
5  was that IMS Xponent data was chosen for this
6  purpose?
7      A.  Uhm --
8      MR. RONA:  Objection.
9      A.  So I know something about the IMS data and
10  it's kind of generally accepted in the literature
11  about the reliability and validity of IMS Xponent
12  data for these purposes.  And IMS Xponent data is a
13  very commonly-used dataset for counting numbers of
14  prescriptions and number of physicians.  So I
15  wouldn't be surprised that it would be something
16  that people would use.
17      Q.  Okay.  But you don't have an understanding
18  for how it was that IMS Xponent data was chosen in
19  this case, understanding that you do know a lot
20  about the dataset?
21      A.  No.
22      Q.  Okay.
23      A.  Oh -- well, other than we have already
24  gone over the fact that Wolters Kluwer data does
25  not provide the information that we need to do the

249

1    analysis.  All right.  So again, Wolters Kluwer
2    data does not contain reliable information on
3    physician specialty.  So if we want to -- if I want
4    to measure the number of unique physicians in
5    aggregate and specifically at the physician -- at
6    the physician specialty level that are prescribing
7    any medication, I can't rely on the Wolters Kluwer
8    data that we're provided.  I need to think about
9    other potential data sources that would be able to
10   provide the Court with the information that was
11   provided -- that was asked for to be provided.
12       Q.  Are there other potential data sources
13   that you considered or discussed purchasing?
14       A.  So my understanding is that there's one
15   other data source called Verispan, I think it's
16   called -- I think it's PDDA -- but I couldn't tell
17   you what those -- those initials stand for off the
18   top of my head right now -- that also provides
19   information -- oh, wait.  I'm sorry.  Sorry about
20   that.
21           Actually, I want to -- I want to strike
22   that if I can.  I'm going to say no.
23       Q.  Okay.  We'll circle back to Verispan.
24       A.  Okay.
25       Q.  That's fine.

250

1           MR. POLUBINSKI:  I think we've got to
2    change the tape, so why don't we do that now.
3           THE WITNESS:  I need a break, too.  Thank
4    you.
5           VIDEO OPERATOR:  The time is 3:55 p.m.
6    This is the end of Tape 4, and we are off the
7    record.
8           (Recess was taken.)
9           VIDEO OPERATOR:  The time is 4:04 p.m.
10   This is the beginning of Tape 5, and we are back on
11   the record.
12       Q.  Okay.  Doctor Conti, we're still referring
13   to IMS's Xponent dataset, correct?
14       A.  Yes.
15       Q.  All right.
16       A.  Actually, can I back up for a second?
17       Q.  Sure.
18       A.  Thank you.  So I just wanted to say that
19   -- so I was -- in my last comment, I was confused.
20   So we were talking about the other -- other
21   potential datasets that could be used to describe
22   and count the actual number or number of physicians
23   prescribing Neurontin over this time period, and I
24   mentioned Verispan's PDDA data, and that's data
25   that's actually used to count numbers of

251

1    prescriptions and can be linked to medical
2    indications, not the number of physicians and --
3    that can be over this time period.  So I just
4    wanted to be really very clear about that record.
5        Q.  Okay.  Fair enough.  We'll --
6        A.  Okay.
7        Q.  -- be going back to -- to talk more about
8    Verispan -- a little bit more about Verispan later.
9        A.  Great.
10       Q.  What I was going to say in terms of IMS
11   Xponent data is that in the second sentence of your
12   report as it relates to IMS Xponent data on Page
13   6 --
14       A.  Uh-huh.
15       Q.  -- you write that, "The dataset contains
16   the number of Neurontin prescriptions filled
17   monthly between January 1996 and December 1998."
18   Is the available IMS Xponent data from IMS limited
19   to that date range?
20       A.  No.
21       Q.  Was that -- that's all the amount that was
22   available to you for purposes of your analysis?
23       A.  That's correct.
24       Q.  Was that all -- do you know whether
25   additional IMS data beyond the -- those two years

252

1    was purchased in connection with this matter?
2        A.  I -- my understanding is that it was not
3    or at least have -- how about -- let me rephrase.
4            My understanding is that this is the data
5    that was available to me for my analysis.  IMS
6    Xponent data is extremely expensive.  I think it's
7    somewhere between 10,000 and $20,000 per year to
8    purchase from IMS.  So I know, as a graduate
9    student, that when I was interested in looking at
10   this data for analyses that I had planned that, you
11   know, it was just cost prohibitive.  So it would
12   make sense to me that it would be -- that we would
13   have limited amounts of data for this.
14       Q.  So is it your understanding that cost was
15   the reason why you don't have additional data
16   beyond this time frame?
17       A.  No.
18       Q.  Or do you not have understanding one way
19   or the other?
20       A.  I don't have an understanding.  I'm just
21   saying from prima facie, I mean, just from the
22   outset, the fact that they have -- the fact that
23   there is IMS Xponent data is a good thing, because
24   it's -- we consider it to be pretty good quality.
25   But that I know it's very commonly used in the

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

253

1  industry, and that it's very expensive for -- for
2  people to purchase --
3      Q.  Did --
4      A.  -- for their own analyses.
5      Q.  Did you ever ask for data beyond the two
6  years that you've got?
7      A.  I did not, no.
8      Q.  If you had data for IMS Xponent going back
9  December of 1998 --
10     A.  Uh-huh.
11     Q.  -- it would have saved you from having to
12 extrapolate the IMS data; is that correct?
13     A.  Uhm.
14     Q.  So in other words, the reason that you
15 extrapolated is because you don't have data that
16 covers those years from IMS Xponent, correct?
17     A.  Right.  So in the absence of observed
18 data, I have to do something to fill in the missing
19 data, correct.
20     Q.  You also write here that, "IMS Xponent
21 data are not available prior to January 1996" -- a
22 couple of sentences down.
23     A.  Yes.
24     Q.  By "not available," you mean not available
25 to you for your work in this matter, correct?

254

1      A.  That's correct.
2      Q.  Do you know whether that data is available
3  for purchase from IMS?
4      A.  I do not know.
5      Q.  And I take it you didn't ask for data
6  before 1996 for IMS Xponent?
7      A.  No, I did not.
8      Q.  Did you have any discussions or
9  communications with anybody about whether or not to
10 try to get more IMS Xponent data for your work in
11 this matter?
12     A.  No, I did not.
13     Q.  Okay.  Like the Wolters Kluwer data, the
14 IMS Xponent data doesn't reflect every prescription
15 filled around the country, correct?
16     A.  Right, there is no dataset that's going to
17 contain every prescription filled in the United
18 States.
19     Q.  And IMS Xponent's no exception to that.
20     A.  That's right.
21     Q.  And that these data are also -- so --
22 well, withdrawn -- that these data are effectively
23 a sample as well.
24     A.  Right.  But --
25     Q.  Based on a sample, I should say.

255

1      A.  So this is not -- this is actual data that
2  is being observed at the retail pharmacy level and
3  reported.  This is not projected data or estimated
4  data.  This is actual data that's being observed at
5  the retail pharmacy level in -- in a sample that
6  contains, you know, thousands of -- of retail
7  pharmacies in the -- across the United States.
8      Q.  Let me make sure I understand that right.
9  So is the data that you reflect in your figures --
10 which we'll talk about a little bit later -- is
11 that not extrapolated data or not extrapolated data
12 that's not -- not projected data that seeks to come
13 up with a number for prescriptions all across the
14 country?  It's just raw data?
15     A.  Let me see if I can rephrase your question
16 and answer that one.  Is what you're asking whether
17 the -- the actual data that -- at point that we
18 report in our charts for -- that correspond to the
19 Wolters Kluwer data and the IMS Xponent data that's
20 observed in our dataset, so not -- excluding the
21 backcast and the extrapolation, if that is actual
22 counts of physicians -- of -- sorry, of
23 prescriptions or of physicians prescribing
24 Neurontin that are captured at the retail pharmacy?
25     Q.  (Nods.)

256

1      A.  Yes.  I'm sorry.  You nodded, so I'm
2  responding to that.
3      Q.  I guess maybe my question is, the -- the
4  data that you're reporting from IMS Xponent and
5  from Wolters Kluwer is just raw observational data
6  from -- from those data sources, or is it a
7  projection of what total prescription numbers would
8  be using the IMS or Wolters Kluwer methodologies
9  for projecting?
10     A.  Are you -- are you asking me whether there
11 is a waiting procedure that's used by IMS or by
12 Wolters Kluwer to -- to -- to go from the actual
13 observed counts to a representative sample?
14     Q.  Well, let me ask it this way:  You're --
15 you're measuring or seeking to measure new
16 prescriptions, correct?
17     A.  Correct.
18     Q.  Now, are those -- the new prescriptions
19 that you -- that you are reporting, are those just
20 the number of new prescriptions that are reported
21 to Wolters Kluwer in the case of Wolters Kluwer
22 data, or to IMS in the case of IMS --
23     A.  Ah, okay.
24     Q.  -- or are they projected to try to be a
25 complete aggregate number of prescriptions across

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

257

1   the United States?
2       A.  Okay.  So what you're asking me is whether
3   what I'm reporting is raw, unweighted data on
4   numbers of Neurontin prescriptions and numbers of
5   physicians in aggregate and in -- and by specialty
6   observed for these periods in time.  That's what
7   you're asking me, correct?
8       Q.  Yes.
9       A.  Okay.  So my understanding of Wolters
10  Kluwer data -- and also of IMS data -- is that it
11  -- that it provides counts of prescriptions and
12  counts of unique physicians that is based on raw
13  observation of retail pharmacy data that's observed
14  at the time period, but that it -- that IMS and
15  Wolters Kluwer use some, you know, weighting
16  procedure to -- I don't know how to say this --
17      Q.  To translate that into an estimated
18  aggregate number, correct or -- or no?
19      A.  To -- to weight it to the population.
20      Q.  Fair enough.
21      A.  To observe with the population.
22      Q.  I think we're on the same page.
23      A.  Okay.  Good.
24      Q.  Do you know what percentage of pharmacy
25  transactions IMS component data covers?

258

1       A.  I do not know the specific number.
2       Q.  We talked at some length about the steps
3   that you'd taken with Wolters Kluwer to try to
4   understand what you could about the validity of
5   the --
6       A.  Uh-huh.
7       Q.  -- of the sample that they used.  What
8   steps have you taken with the IMS Xponent data to
9   do the same thing?
10      A.  So it's very similar.  So again, I know
11  from my doctoral research and from a lot of the
12  work that I have read that IMS Xponent data is a
13  very commonly-used dataset by the industry for
14  understanding both counts of prescriptions, and
15  also counts of -- of physicians overall and by
16  specialty using different types of medications over
17  time -- or prescribing different types of
18  medication over time.
19          In addition, I -- you know, reviewed the
20  -- I -- I reviewed the kind of documentation on IMS
21  Xponent data that -- that's just kind of freely
22  available on the Web, and then I also had a
23  conversation with Mike Augusteijn and also with
24  Forrest McCleur about their experience with IMS
25  Xponent data, and specifically how clean the data

259

1   fields were that were kind of central to the -- the
2   questions that I was asked to provide information
3   on.
4           So specifically, you know, I was
5   interested in looking at was the types of
6   physicians -- of physician specialty -- the quality
7   of the physician specialty data.
8           Now, in contrast to the Wolters Kluwer
9   data that we were provided, the IMS Xponent data
10  has more than 90 percent of physician specialty
11  information recorded.
12      Q.  When you refer to the -- the cleanliness
13  of the data --
14      A.  Uh-huh.
15      Q.  -- are you talking about the extent to
16  which the physician specialty field was populated,
17  or something else?
18      A.  Yes, the physician specialty field is
19  populated.
20      Q.  Okay.  The documentation that you said
21  that you reviewed that was freely available --
22      A.  Uh-huh.
23      Q.  -- on the internet, is that documentation
24  that would have been on IMS's Web site?
25      A.  Yes.

260

1       Q.  Okay.  And documentation -- when you say,
2   "freely available," that would be available to
3   anybody who logged on to IMS.
4       A.  That's right.
5       Q.  Did you review any other documentation or
6   just the documentation that would be on IMS's Web
7   site that was freely available?
8       A.  So again, similar to Wolters Kluwer data,
9   I looked -- you know, I did a little literature
10  search to look at other papers that had -- that had
11  looked at prescription -- prescribing patterns and
12  their use of IMS Xponent data or Wolters Kluwer
13  data.
14          But again, that's kind of -- it was more
15  of a -- you know, my doctoral degree focuses on
16  health economics, in particular the economics of
17  the pharmaceutical industry.  So it's kind of more
18  of what my background is about and kind of specific
19  information about different types of observational
20  datasets that are available than any specific
21  review that was done for this case.  So I have a
22  general sense of how reliable and valid IMS Xponent
23  data is for the task at hand.
24      Q.  Okay.  Do you know one way or the other
25  whether IMS received data from Wal-Mart for the

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

261

1   years at issue?
2       A.   No, I don't know.
3       Q.   Do you know one way or the other whether
4   IMS would have received data on prescriptions
5   filled in all hospitals during the time period?
6       A.   Again, at the inpatient hospital level?
7       Q.   It says, "all hospitals," so either -- you
8   can make a distinction if you want, but --
9       A.   So at -- so if you -- what you're meaning
10  to ask is whether or not IMS data contained
11  inpatient hospital dispensing records, then my
12  understanding is that -- is, no, they did not
13  contain that information.
14      Q.   Okay.
15      A.   But that -- that instead, their -- their
16  kind of -- their universe is retail pharmacies in
17  the US.
18      Q.   Okay.  And like Wolters Kluwer data, I'm
19  assuming that you didn't modify the data in any way
20  to account for types of pharmacies that might not
21  have been part of the IMS sample.
22      A.   No.
23      Q.   The last sentence on Page 6 you write
24  that, "Like the Wolters Kluwer data, this dataset
25  does not contain the medical indication associated

262

1   with a new Neurontin prescription," correct?
2       A.   That's correct.
3       Q.   And then you go on to write that, "As a
4   consequence, it cannot provide an actual count of
5   physicians prescribing Neurontin by indication in
6   the US," correct?
7       A.   That's correct.  No dataset that is
8   available in the United States that can -- can link
9   Neurontin prescriptions to physician specialty and
10  indication.
11      Q.   What's your understanding of the ways in
12  which IMS Xponent generally differs from Wolters
13  Kluwer?  And let's just set aside the -- the
14  differences in reporting on physician
15  specialties --
16      A.   Uh-huh.
17      Q.   -- we've already talked about.  Are there
18  other ways in which they differ that you're aware
19  of?
20      A.   Well, for the purposes of this analysis,
21  the time frame in which they were available was --
22  were different.
23      Q.   Anything else?
24      A.   Not that was significantly notable to me.
25      Q.   Okay.  And do you know one way or the

263

1   other about --
2       A.   So -- I'm sorry.  Again, may I finish?
3       Q.   Yeah.
4       A.   So again, these are both very
5   commonly-used datasets by the pharmaceutical
6   industry for -- for tracking trends in
7   prescriptions of specific medication, also, by
8   physicians.  So -- and they're -- and not only are
9   they used by the industry, but also they're used by
10  academics interested in asking questions around
11  that.  So -- so again, you know, I consider them to
12  be commonly -- commonly-used datasets.
13      Q.   Did you do anything to investigate the
14  reason for the differences in specialty reporting
15  from Wolters Kluwer to IMS?
16      A.   Do you mean that -- do you mean to ask
17  whether I have an understanding of how -- of how
18  each -- or each company collects information on
19  physician specialty that's very -- that's detailed?
20      Q.   Well, maybe let me back up a little bit.
21  One of the differences between the two datasets
22  that we've talked about --
23      A.   Uh-huh.
24      Q.   -- is that the physician specialty
25  category is more populated --

264

1       A.   Uh-huh.
2       Q.   -- in the IMS Xponent category than it is
3   in Wolters Kluwer.
4       A.   Uh-huh.
5       Q.   Do you know why that is?
6       A.   No, I do not know.
7       Q.   Okay.  And have you done anything to try
8   to understand why?
9       A.   If you're asking me if I investigated the
10  -- why Wolters Kluwer does not provide complete or
11  even remotely complete records of physician --
12  physician specialty that was provided to me by the
13  Defendants, no, I do not know why Wolters Kluwer
14  did not -- that dataset did not contain that
15  information.
16      Q.   Okay.  And that -- and that you didn't do
17  any sort of further investigation to understand
18  why.  That was all the question was.
19      A.   (Witness nods.)
20      Q.   You shook your head, which I think means
21  no, which is something that Jodi can't pick up.
22      A.   No, I did not.
23      Q.   Thank you.  Is your understanding that a
24  new prescription for purposes of the IMS Xponent
25  data is the same thing as a new prescription for

265

1     the purposes of Wolters Kluwer data?
2         A.   My understanding is that they're
3     analogous, yes.
4         Q.   Okay.  Let me just ask a couple of quick
5     questions to try to see if I can sort out in my
6     mind what your understanding is of what new
7     prescriptions would cover --
8         A.   Uh-huh.
9         Q.   -- or not cover.  And what I'll do is I'll
10    walk you through a couple of hypotheticals --
11    'cause that's the way it works -- to explain it to
12    someone like me who's an English major, not a -- an
13    economist.
14            The first example would be where the
15    doctor writes a prescription for a patient for
16    Neurontin, the patient goes to a pharmacy and fills
17    the prescription -- the first prescription for
18    Neurontin the patient's ever received.  That's a
19    new prescription, correct?
20        A.   And in -- sorry.  Again, because I think
21    of it very differently than you do, and this is the
22    -- so the unit here is that this is the first
23    prescription that is being given to the patient for
24    Neurontin.
25        Q.   Yes.  This one's supposed to be the easy

266

1     example.
2         A.   Okay.
3         Q.   So it's the first prescription that's ever
4     been written any time anywhere by anybody.
5         A.   Okay.
6         Q.   And they go and fill it at a pharmacy.
7     That shows up as a new prescription, right?
8         A.   Okay.  Yes.
9         Q.   Okay.  And then if the same patient --
10        A.   Uh-huh.
11        Q.   -- goes back and refills that same
12    prescription at the same pharmacy, that would not
13    count as a new prescription, correct?
14        A.   Correct.
15        Q.   Okay.  Now, here are the ones that I'm
16    more confused about.  Okay.  What happens if the
17    same doctor writes a prescription -- a new
18    prescription with a new number -- to the same
19    patient, and that patient takes it and fills it at
20    the same pharmacy?
21        A.   What's the --
22        Q.   Is that a new prescription or not?
23        A.   What's the new number?
24        Q.   Different number.  Different number, but
25    also for Neurontin, same dose, everything else.

267

1         A.   What is the -- I'm sorry.  What is the
2     number that you're referring to?
3         Q.   Is -- does that count as a new
4     prescription for purposes of the Wolters Kluwer or
5     IMS data?
6         A.   No, but you -- in your description, you
7     say there's a new number --
8         Q.   A new prescription number.
9         A.   -- and what's the new number?
10        Q.   A new number at the top of the little
11    prescription pad that the person takes and --
12        Q.   So -- okay.  So in this scenario --
13            THE WITNESS:  So go back and read the
14    scenario to me again.
15            (Question read back.)
16        A.   So that is not a new prescription.
17        Q.   That's not a new prescription, because
18    it's the same patient.
19        A.   Well, it depends on what the units of
20    observation at the dataset level is.  But -- but
21    for purposes -- so just colloquially, if we're
22    talking about what a new prescription is, I would
23    tell you that, no, that's not a new prescription,
24    because the patient already has had a prescription
25    of Neurontin.

268

1         If we observe at the -- in the -- in the
2     dataset patient information that I can uniquely
3     identify a patient at that same pharmacy over time,
4     then it's not a new prescription, because that
5     unique -- it's the unique -- it's the observation
6     at the -- at the unique patient number or the
7     unique patient that's dictating whether it's a new
8     prescription for Neurontin or not.
9         Q.   Okay.  I think that -- I think that may --
10    let me just be clear about it.
11            So I think so, 'cause what I'm interested
12    in is what -- is how this is measured in your --
13        A.   Uh-huh.
14        Q.   -- in your report.  And so I think what
15    you're telling me is that, because the patient is
16    the same, that you --
17        A.   And the retail pharmacy is the same --
18        A.   And the retail pharmacy is the same --
19        A.   -- that I can observe -- I'm sorry.
20        Q.   That you -- that you wanted to and -- and
21    believe that your data counts that as a single
22    prescription -- that that is not a new
23    prescription.  In other words, the second
24    prescription that we just described.
25        A.   No.  What I'm saying to you is, if we're

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

269

1   just talking about, in general, how we would define
2   a new prescription --
3       Q.   But we're not.  We're talking about what
4   the -- what the data shows.
5       A.   Ah, okay.  And what --
6       Q.   I want to try to understand what you're
7   measuring the new prescriptions --
8       A.   Okay.  So my understanding is that it's
9   new prescriptions of Neurontin at that particular
10  pharmacy for that individual.  Right.  So if I
11  observe the -- if I observe a refill for that
12  patient on that same prescription, I exclude that
13  as a new -- a new --
14      Q.   Understood.
15      A.   Okay.
16      Q.   But what about the situation where it's a
17  new prescription, even if it's written by the same
18  doctor to the same patient and taken to the same
19  pharmacy, a refill of the existing prescription
20  but a new prescription with a new number?
21      A.   Uh-huh.
22      Q.   Would you count that as an additional
23  prescription, or is there a way of somehow not
24  counting it twice here?
25      A.   So it depends -- again, it depends on what

270

1   the data at that level can tell me, and to be -- to
2   be completely honest, I'm not sure that this data
3   -- I didn't do the mechanics of linking the
4   specific prescriptions to the specific doctor.  So
5   I can't tell you whether or not I can take a count
6   of that or not.
7       Q.   Okay.  So as we're sitting here today, you
8   don't know one way or the other whether that would
9   be a new prescription, or whether it would not be
10  counted for purposes of your analysis?
11      A.   No.  What I'm saying is that -- so my
12  understanding is that we were doing this at the --
13  sorry.  My understanding is that we're doing this
14  at the patient level; that we're observing this at
15  the patient level.  And so we can look at a -- at
16  the patient level, we can look at who is getting a
17  prescription over time, and then exclude kind of
18  multiple observations on the same -- sorry.  We can
19  exclude refills on that prescription for that
20  patient.
21      Q.   Okay.  But we're talking again about the
22  situation where it's not --
23      A.   (Witness nods.)
24      Q.   -- it's not a refill on the same
25  prescription.

271

1       A.   Right.
2       Q.   And I just try to -- I want to try to
3   understand, in -- in your report --
4       A.   Uh-huh.
5       Q.   -- which -- which category that person
6   falls into.  Are they a new prescription, or is
7   that not counted again?
8       A.   Okay, for --
9       Q.   And if you don't know, that's fine.
10      You tell me for which --
11      Q.   But --
12      A.   -- because we've now talked about three
13  different scenarios.
14      Q.   I know.  We're talking about the last one
15  which is the same patient, same doctor, new
16  prescription, same pharmacy.
17      A.   Say --
18      Q.   New prescription number is sort of a key
19  difference?
20      A.   Oh.  I think we count that as a refill.  I
21  think so.  But I'm not a hundred percent sure.
22      Q.   Okay.  Who would know?
23      A.   So Mike or -- actually, Forrest would
24  know, since he manipulated the data.
25      Q.   Okay.  What about a situation where the

272

1   doctor writes a new prescription to the same
2   patient, and she takes it not to the same pharmacy,
3   but to a different pharmacy?  Would that one be a
4   new prescription in your data or --
5       A.   Uhm.
6       Q.   -- or -- in your report, or is that also
7   excluded as a refill?
8       A.   That's not -- so that is not excluded as a
9   refill, because, again, we can only observe at the
10  retail pharmacy level what's happened.  We can't --
11  we're not correlating individuals over different
12  pharmacies.  So I think that there's actually no
13  way of doing that.  So -- but -- but my
14  understanding of the literature is that that's
15  probably a very small number of individuals,
16  because in general, the empirical literature shows
17  us that that people -- that people really do use
18  one pharmacy, both for the refill of their
19  prescriptions, but also for the -- also for any
20  kind of set of prescriptions that they're going to
21  use.
22      Q.   Which literature did you have in mind on
23  that?
24      A.   The -- there's the health economic
25  literature around that and the health policy

273

1  literature around that.
2      Q.  Can you think of examples of articles or
3  textbooks or anything?
4      A.  No, but I'm happy to -- no.
5      Q.  Not even one?
6      A.  No.
7      Q.  Okay.  Let me ask you this:  There's --
8  there's a difference in the data --
9      A.  Ah.
10     Q.  -- that you report between Wolters Kluwer
11  new prescriptions and IMS new prescriptions at
12  given -- for given months, correct?
13     A.  Uh-huh.
14     Q.  Do you know what accounts for the
15  differences?
16     A.  Yes.  So -- so my understanding is that
17  IMS includes mentions in addition to prescriptions.
18  Actually, I'm -- I'm sorry.
19     Q.  This is a Xponent?
20     A.  I'm sorry.  Can you -- I'm sorry.  Can you
21  restate the question.
22     Q.  Yeah.  IMS Xponent data and Wolters Kluwer
23  data --
24     A.  (Witness nods.)
25     Q.  You have -- you have data on numbers of --

274

1      A.  -- uh-huh.
2      Q.  -- prescriptions from pharmacies for the
3  same month for both of those datasets, correct?
4      A.  Right.
5      Q.  They're -- they're not exactly the same --
6      A.  Uh-huh.
7      Q.  -- for the whole period of overlap in
8  time.
9      A.  Uh-huh.
10     Q.  Do you know why that is?
11     A.  Actually, I think that they're very, very
12  close.  And I think when we looked at the
13  correlation, it was something like there was an
14  overlap of over 90 percent.  So I think that's --
15  for two different observational datasets that may
16  be using slightly different universes of retail
17  pharmacies -- that looks really pretty good.
18     Q.  Okay.  But they're -- the reason for the
19  difference, I guess, if I understand it right, is
20  that they may have slightly different samples.
21     A.  Sure.
22     Q.  What do you know about IMS's methodology
23  for determining a doctor's specialty for its
24  Xponent data?
25     A.  My understanding is that it's linked to

275

1  AMA records of specialty.
2      Q.  Where does that understanding come from?
3      A.  Kind of a general understanding of the IMS
4  Xponent data -- data from my graduate student --
5  from being a graduate student, but also through
6  talking with Mike.
7      Q.  Do you know if doctors can be listed as
8  having more than one specialty?
9      A.  Uhm.  I don't know.
10     Q.  Okay.  So I guess just summarizing just a
11  little bit on the IMS Xponent data and the Wolters
12  Kluwer data, am I right that you don't have actual
13  data from each of those datasets for any period of
14  time before the beginning of 1996?
15     A.  That's correct.
16     Q.  And you understand that Neurontin was
17  launched in early 1994, correct?
18     A.  Yes.
19     Q.  And so you don't have data from either of
20  those two datasets for approximately the first two
21  years that the medicine was on the market.
22     A.  That's correct.
23     Q.  Let's take a quick look at Page 4,
24  Footnote 1.
25     A.  4.

276

1      Q.  You identify in Footnote 1 several
2  different class periods.
3      A.  Yes.
4      Q.  Each one of these class periods, if I'm
5  looking at it right, begins prior to January of
6  1996; is that correct?
7      A.  That's correct.
8      Q.  So there's some amount of time for each of
9  these class periods for which you don't have data
10  from Xponent or from --  or from Wolters Kluwer,
11  correct?
12     A.  That's correct.
13     Q.  Let's shift gears and talk about NDTI.
14  NDTI's the -- the third dataset that you used,
15  right?
16     A.  Yes.
17     Q.  It's also produced by IMS?
18     A.  Yes.
19     Q.  And since we're already on Page 4 here,
20  this is where you have a discussion here of the
21  NDTI data on Pages 4 and 5, correct?
22     A.  Yes.
23     Q.  Okay.  Now, as I understand it, you relied
24  on the NDTI survey data to develop
25  indication-specific estimates of the number of

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

277

1      Neurontin uses over time; is that right?
2          A.   That's correct.
3          Q.   Okay.  And I think we discussed before
4      that Xponent and Wolters Kluwer do not break --
5      information -- the data out by indication; is that
6      correct?
7          A.   That's correct.
8          Q.   Okay.  And so it's really -- of the data
9      that we've talked about so far, it's only the NDTI
10     survey data that allows you to do any
11     indication-specific analysis?
12         A.   Yes, that's correct.
13         Q.   Okay.  NDTI is a survey-based data source;
14     is that correct?
15         A.   That's correct.
16         Q.   Okay, which is to say that it's derived
17     from surveys that collect data from a sample of US
18     physicians; is that right?
19         A.   That's correct.
20         Q.   Okay.  Do you know how large the sample
21     is?
22         A.   Not off the top of my head, no.
23         Q.   Okay.  Let me mark a document for you and
24     show it to you.
25             (Conti Exhibit 10, National Disease and

278

1             Therapeutic Index, Drug, Volume 1,
2             1Q 2006.)
3          Q.   Okay.  Have you ever seen this document
4      before?
5          A.   Yes.
6          Q.   Okay.  When have you seen it?
7          A.   I've seen it in the course of my graduate
8      school studies.
9          Q.   Did you consult a document like this in
10     the context of your work on this matter?
11         A.   No.
12         Q.   Okay.  You'd agree that, among other
13     things, this document --
14         A.   I'm sorry.  Can I --
15         Q.   Yeah.
16         A.   Since I didn't actually have a chance to
17     look through this --
18         Q.   Of course.  Take your time.  Take as much
19     time as you need.
20         A.   -- I would really like a little time just
21     to look through the document.
22         Q.   Sure.
23         A.   Thank you.  (Witness reviews document.)
24     So I've never seen this document before, not in the
25     course of my graduate studies or anything else.  I

279

1      -- I mean, what I've seen is this page and this
2      description of the audit specifications, this first
3      page --
4          A.   Uh-huh.
5          A.   -- and it looks like the data collection
6      part as well -- so Page 1, 2, and the frontis.
7      I've never seen the rest of these documents before.
8          Q.   Okay.  Okay.  Let's focus on this audit
9      specifications page here.  You understand this to
10     have produced -- or to reflect, I should say, the
11     audit specifications for NDTI for the first quarter
12     of 2006, which is the date on the front of this
13     document.
14         A.   I'm sorry.  What are you referring to?
15         Q.   Page 1, the audit specifications --
16         A.   Uh-huh.
17         Q.   -- page that you'd referred to and said
18     you'd seen before.
19         A.   Yes.
20         Q.   You understand this to be --
21         A.   Oh, but also, I'm sorry.  As I'm looking,
22     I've never seen NDTI estimates in 19 -- in 2006.  I
23     mean, I've seen for prior years, but I've never
24     seen --
25         Q.   Okay.

280

1          A.   Just to be really specific, I've never
2      seen this specific document related to 2006 data.
3          Q.   Okay.  2006 is one of the years for which
4      you acquired data in this case, though, right?
5          A.   (Witness nods.)
6          Q.   I think you nodded.
7          A.   Oh, yes.
8          Q.   Okay.  Thank you.  And are you aware of
9      any ways in which NDTI's methodology would have
10     changed at all between 1994 and 2006?
11         A.   No.
12         Q.   Okay.  Looking at this page that lists
13     audit specifications here, there's a section that
14     reads, "Sample," towards the bottom of the page.
15         A.   Yes.
16         Q.   Do you follow me?  And under the size of
17     the sample, it says that the total number is "4,143
18     physicians per quarter," correct?
19         A.   Yes.
20         Q.   Okay.  Do you have a -- a sense for the
21     total number of prescribing doctors in the country?
22         A.   No.
23         Q.   Actually, I -- I should have pointed you
24     to this before.  If you look above to "Universe" in
25     the "Universe" section here the first sentence

281

1    after "Universe" reads, "NDTI estimates in 2006 are
2    based on a universe of 483,681 physicians."
3        Did I read that right?
4    A.  Yes.
5    Q.  Okay.  Just mathematically, if you start
6    from the premise that that's the size of the
7    physician population, and 4,143 is the size of the
8    sample, you'd agree with me that the sample covers
9    a little bit less than 1 percent of the physician
10   population?
11   A.  Yes.
12   Q.  Now, you write --
13   A.  But it's not uncommon for survey data,
14   again, to -- you can't sort of -- you know, you
15   can't survey the entire universe.  So it's very
16   common to survey a certain portion of the universe.
17   Q.  Sure.  Let's -- let's look back at
18   Page 4.  In the first -- in the first sentence on
19   the NDTI data in your report you write that --
20   A.  Uh-huh.
21   Q.  -- the data contains information on
22   "Neurontin uses by a representative sample of US
23   physicians."
24       Upon what do you base your statement that
25   the sample is representative?

283

1    to do to be a part of NTD -- NDTI.
2    Q.  Okay.  And so I take it you don't know
3    whether physicians themselves are required to fill
4    this out, or whether they can delegate that task to
5    a physician's assistant or somebody else?
6    A.  I have no idea what individual physicians
7    do when they enroll in NDTI.
8    Q.  Okay.  Now, because it's for only two days
9    of -- well, let's -- let's just back up.  I'd --
10   would -- would you agree with me that, in a given
11   calendar quarter, a physician would probably have
12   on average about 60 working days, about 20 per
13   month?
14   A.  I'm sorry.  Can you ask the question
15   again.
16   Q.  Yeah.  Just generally speaking, you know,
17   as a statistical matter, I guess, would you agree
18   that it would be a fair assumption to say that a
19   given prescribing physician would have about 20
20   working days per quarter?
21   MR. RONA:  Objection.
22   A.  I have no idea what any given physician's
23   working days would be in a quarter.  It probably
24   varies by specialty.
25   Q.  Okay.  Okay.  Let's talk about the

282

1    A.  On the -- on NDTI's own claims for their
2    representative -- representative nature of the
3    sample.
4    Q.  Okay.  The -- the claims that are made in
5    what context?  Where?
6    A.  So if you look -- if you go to their Web
7    site that anyone could go to, they report that the
8    sample is a representative sample of physicians
9    practicing in the United States.
10   Q.  Okay.  So we'd find that if we went and
11   looked at their Web site?
12   A.  Absolutely.
13   Q.  Okay.  Any other source other than that?
14   A.  No.
15   Q.  All right.  On Page 5 you write that the
16   data -- you write a few sentences down, "The data
17   are based on a quarterly survey of physicians in
18   which they report information on their medical
19   practice for the previous two days."
20   A.  Uh-huh.
21   Q.  Physicians, I assume, are not required by
22   NDTI to fill out their surveys continuously over
23   the course of the two-day period that they're
24   audited; is that correct?
25   A.  I don't know what physicians are required

284

1    information that the survey physicians are supposed
2    to be including in their responses to the NDTI
3    survey.
4        In the carry-over sentence between Pages 4
5    and 5, you write that "The 'use' of Neurontin in
6    this dataset refers to a mention by the physician
7    regarding Neurontin during an office visit and
8    includes new prescriptions, the provision of free
9    samples, and recorded discussions about Neurontin
10   without associated prescription," correct?
11   A.  That's correct.
12   Q.  So you'd agree, therefore, that the "use,"
13   for purposes of NDTI at least, is broadly defined
14   to include more than an actual prescription of the
15   drug, correct?
16   A.  I'm sorry.
17   MR. POLUBINSKI:  Do you want to read it
18   back.
19   (Question read back.)
20   A.  That's correct.
21   Q.  It would also include situations where the
22   surveyed doctors provided patients with free
23   samples of Neurontin, right?
24   A.  That's correct.
25   Q.  It could also include situations where the

285

1    surveyed doctor discussed Neurontin with a patient,
2    even if no prescription ever resulted?
3       A.   That's correct.  My understanding is that
4    the latter two categories are a very percentage of
5    what is reported as a -- as a mention or as a use
6    in IMS.
7       Q.   What's that understanding based on?
8       A.   Again, my experience working with IMS
9    data, but also kind of a general read of the
10   literature that has used this -- that has used this
11   literature.
12      Q.   You've never seen data one way -- that
13   reflects -- that reflects an answer to that
14   question one way or the other, though, have you?
15      A.   Not -- I mean, I have kind of a general
16   sense, but I have never seen specific numbers, no.
17      Q.   Have you ever asked for specific numbers
18   from anybody?
19      A.   No.
20      Q.   Okay.  Going back to the other situations
21   that would be included within use that wouldn't
22   necessarily line up with actual prescriptions of
23   the drug, another example might be where the
24   surveyed doctor prescribed Neurontin to a patient,
25   but the patient never actually filled the

286

1    prescription.
2       A.   (Witness nods.)
3       Q.   You'd agree that that's -- and you nodded.
4    I'm sorry.
5       A.   Oh, yes.
6       Q.   Thanks.  You'd agree that that's something
7    that happens with some regularity?
8       A.   I have no idea how often, you know,
9    prescriptions of Neurontin specifically are written
10   but not filled.
11      Q.   Okay.  And I take it you haven't done any
12   work to -- to sort of figure out what the
13   prevalence of this phenomenon might be in Neurontin
14   prescribing here.
15      A.   For the purposes of this analysis, no, I
16   did not do any -- do that analysis.
17      Q.   Did you do it for any other purpose?
18      A.   No.
19      Q.   Okay.  How --
20      A.   To be honest, I don't know how I would
21   exactly do that, given -- given available
22   observational datasets, I don't know how I would be
23   able to figure out who -- who actually gets a
24   prescription and who actually fills that
25   prescription --

287

1       Q.   Okay.
2       A.   -- particularly given these datasets
3    (indicating).
4       Q.   Sure.  Sure.  So you're not aware of any
5    way you could figure out the answer to that
6    question, it sounds like.
7       A.   No, I am aware of -- there are probably
8    ways of going about doing it.  I haven't really
9    thought about exactly how I would do it for this
10   case.
11      Q.   Okay.
12      A.   But you know -- but I don't know of any
13   empirical data out there that's going to tell me
14   what the relative number of prescriptions --
15   prescriptions that are unfilled is in this
16   population.
17      Q.   Okay.  How --
18      A.   And so -- I'm sorry just to interrupt, but
19   -- and to conclude, and so because of that, I would
20   have no -- you know, I have no prior on that -- on
21   the relative percentage of unfilled Neurontin
22   prescriptions that are out there, other than kind
23   of what I -- we generally think about as being, you
24   know, as being the number of prescriptions that are
25   filled.

288

1       Q.   Okay.  Did you account at all in your
2    analysis for the overinclusiveness of the
3    definition of use that we've just been discussing?
4       A.   What do you mean by "account"?
5       MR. RONA:  Objection.
6       THE WITNESS:  Thank you.
7       Q.   Did you adjust the numbers that you have
8    from NDTI in any way to try to reflect only actual
9    prescriptions filled, or did you -- or are the
10   numbers -- all the numbers that are reflected here
11   from NDTI numbers that reflect total uses, which,
12   as we've just discussed, includes more than
13   prescriptions filled?
14      A.   So my general approach to analyzing data
15   where there may be an over or underestimate of
16   prescribing behavior is to just take the data as
17   simply as possible and be as conservative as
18   possible in the estimation.
19       So I have absolutely no specific
20   information on the number of -- of the total number
21   of Neurontin prescriptions, how many of them
22   included an actual prescription, a provision of
23   free samples, or associated -- or a -- a recorded
24   discussion, as opposed to a -- a true prescription.
25   And because of that, there's no way for me to

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

289

1  figure out whether or not that's a big number or a
2  small number for this specific case.
3      And because of that, the conservative
4  thing to do and the thing that's kind of most
5  generally accepted in the literature is to just
6  take what is observed in -- what is observed and
7  reported in this dataset. And that's what I did.
8      Q. Now, when you say, "conservative," I
9  wanted to just make sure I understand, the -- the
10  number that you're reporting of uses --
11     A. Uh-huh.
12     Q. -- would definitionally be higher than the
13  number of actual prescriptions, correct, because it
14  includes things other than actual prescriptions?
15     A. Uh-huh.
16        MR. RONA: Objection.
17     A. What I mean by that is my approach -- the
18  method for approaching this data -- not whether or
19  not this data at any given point in time is going
20  to provide a -- an estimate that may be bigger or
21  smaller than the actual number of prescriptions of
22  Neurontin out there.
23     Q. You'd agree with me, though, that again,
24  definitionally, I think the number that you'll
25  report for uses will be higher than what the actual

290

1  number is for prescriptions.
2        MR. RONA: Same objection.
3     A. So what I'm going to -- so if you're --
4  what you're asking me is, does the IMS data contain
5  both numbers of prescriptions, but also the
6  provision of free samples and mentions, yes, that's
7  factually correct.
8     Q. And also prescriptions that may have been
9  written but not filled.
10    A. Yes.
11    Q. Okay. And assuming that those latter
12  three things -- provision of free samples,
13  mentions, prescriptions not filled --
14    A. Uh-huh.
15    Q. -- are greater than zero, then the number
16  of uses would be greater than the number of
17  prescriptions actually filled, correct?
18    A. Yes, that's correct.
19    Q. Okay. Let's talk about ICD-9 codes.
20  Okay. I think, as we discussed, for each Neurontin
21  use doctors surveyed as part of the NDTI audit are
22  asked to provide information on the indications
23  associated with the use at issue; is that right?
24    A. Uh-huh.
25    Q. And that these indications are reflected

291

1  in the data that you get from IMS in the form of
2  ICD-9 codes, correct?
3     A. That's correct.
4     Q. And each of these ICD-9 codes corresponds
5  with a particular diagnosis; is that correct?
6     A. That's correct.
7     Q. Okay. Do you know who makes the decision
8  as to which ICD-9 code to match with a particular
9  diagnosis that's filled out by a physician's
10  office?
11       MR. RONA: Objection.
12    A. Are you asking me do I know the specific
13  procedure by which NDTI report -- links the patient
14  -- sorry -- patient diagnosis to NC -- ICD-9 code?
15    Q. I think so.
16    A. No.
17    Q. Do you -- do you understand that it's IMS
18  that does the linking, as opposed to someone in the
19  physician's -- in the individual physician's
20  offices?
21    A. I have no idea who does the linking.
22    Q. Okay. Okay. Let's look at Page 13 of
23  your report. The very last sentence here of
24  Paragraph 23, which is the carry-over paragraph,
25  reads, "The specific diagnostic codes with which I

292

1  identified use by the various indication categories
2  in the data are listed in Attachment C, as provided
3  to me by counsel."
4      Did I read that right?
5     A. Yes, you did.
6     Q. Attachment C is -- if we flip through your
7  report -- I believe starts on Page 88 or 89, as
8  reflected in the little numbers at the top of the
9  page; is that right?
10    A. (Witness reviews document.)
11       MR. RONA: I'd just like to point out
12  that, at least on my copy, there is no page marked
13  89. There is a page marked 88.
14       THE WITNESS: Oh, yeah.
15       MR. RONA: And then that -- the following
16  pages --
17       THE WITNESS: Are not numbered.
18       MR. POLUBINSKI: That's a good point.
19  That's the way it showed up on ours as well.
20    Q. Fair enough. So it starts on the page
21  after 88. Are you there?
22    A. Yes.
23    Q. Okay. And let's just quickly walk through
24  this document. The -- top of it reads,
25  "Attachment C: Classification of IMS NDTI ICD-9

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

293

1  Codes." It contains a series of columns, the first
2  column reads, "ICD-9 Code," underneath which are a
3  series of numbers.
4       Is it your understanding that the codes
5  that appear in this attachment are all of the
6  available ICD-9 codes that exist, or just the ICD-9
7  codes that correspond with reported Neurontin
8  prescriptions in the NDTI data?
9    A.  Attachment C was provided to me by
10  counsel. So I don't know how it was constructed.
11   Q.  Okay. Did -- did you have any involvement
12  in the preparation of the chart, or was it
13  prepared --
14   A.  (Witness nods.) No, I did not.
15   Q.  Okay. Which -- which counsel provided it
16  to you?
17   A.  So as -- it was actually provided to me by
18  GMA.
19   Q.  Okay.
20   A.  I was not -- it was not directly handed to
21  me by any counsel member.
22   Q.  Okay. Do you have any understanding for
23  who prepared the chart?
24   A.  No.
25   Q.  I assume you didn't ask one way or the

294

1  other who prepared it?
2    A.  No, I did not.
3    Q.  Okay. Do you have any understanding as --
4  as -- well, withdrawn. I assume you don't have any
5  understanding one way or the other of -- of what
6  the person's qualifications were who actually
7  prepared Attachment C, correct?
8    A.  I don't know anything about that.
9    Q.  Okay. And you didn't ask that question
10  either, I take it?
11   A.  No.
12   Q.  And I assume you don't know anything about
13  the methodology of whomever -- that whoever
14  prepared this used in preparing it.
15   A.  No.
16   Q.  And I assume that you are not, yourself,
17  offering an -- any opinion as to which ICD-9 codes
18  are appropriately associated with different
19  categories of -- of diagnosis; is that correct?
20   A.  No.
21   Q.  Okay. Let's just quickly walk through
22  this document and just -- and also just try to
23  understand what -- you know, what the rest of these
24  columns mean, at least as best you understand them.
25   A.  Uh-huh.

295

1    Q.  "ICD Description," I assume is a
2  description of whatever diagnosis corresponds with
3  the number; is that correct?
4    A.  Yes.
5    Q.  Okay. And then there are a series of
6  columns that follow, that read, "On-label All Other
7  Indications, Off-Label All Other Indications,
8  Off-Label Migraine, Off-Label Bipolar, Off-Label
9  Psych Other, Off-Label Pain Neuropathic, Off-Label
10  Pain Nociceptive," and "Off-Label Pain Other,"
11  correct?
12   A.  Yes.
13   Q.  And that each of these columns -- well, I
14  should say that each -- each row, each ICD-9 code
15  corresponds with an X under one of those columns;
16  is that correct?
17   A.  That's correct.
18   Q.  And the X is meant to indicate which ICD-9
19  codes are associated with the various classes at
20  issue in the case?
21   A.  (Witness nods.)
22   Q.  Right?
23   A.  Uhm.
24   Q.  And --
25   A.  I'm sorry.

296

1    Q.  Well, let me say it this way: The various
2  indication subgroups that you looked at in this
3  case.
4    A.  That's correct.
5    Q.  Okay. And that it's based on this
6  grouping that you did your work, seeking to chart
7  trends in Neurontin prescribing by indication.
8    A.  That's correct.
9    Q.  Okay. Okay. I'm looking at Page 5 of
10  your report, so you write -- this is about halfway
11  down your NDTI paragraph --
12   A.  That's --
13   Q.  Are you --
14   A.  Actually, just give me one second.
15   Q.  Sure. Take your time.
16   A.  Where is Page 5? Great.
17   Q.  Got it.
18   A.  Yes.
19   Q.  Okay. About halfway down on this Page 5,
20  which discusses NDTI data, you write, "These survey
21  data are then used by IMS to extrapolate national
22  figures using proprietary algorithms," correct?
23   A.  Yes.
24   Q.  Okay. What this is to say is that IMS,
25  the vendor, attempts to estimate prescription drug

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

297

1  usage by indication, based on the results of the
2  sample that it collects, correct?
3      A.  That's my understanding, yes.
4      Q.  Okay.  And so you're not performing the
5  extrapolation yourself, correct?  You're relying on
6  the extrapolation that NDTI does?
7      A.  That's correct.
8      Q.  Okay.  You -- you'd agree that, as a
9  statistical matter, that the size of the sample of
10  physicians surveyed as part of the NDTI survey
11  relates directly to the reliability of the
12  extrapolation.
13      A.  If what you're asking me is, does the size
14  of the sample provide a representative estimate
15  that can be -- sorry -- an estimate -- a -- if what
16  you're asking me is whether or not the -- the
17  sample of physicians that are used by IMS can be
18  reliably used to estimate national or
19  representative patterns of prescribing by
20  physicians in the US -- is that what you're asking
21  me?
22      Q.  It's actually a little bit of a more
23  general question than that --
24      A.  Uh-huh.
25      Q.  -- which is just, you know, sort of,

298

1  again, as a general matter that -- that -- the
2  bigger the sample, the more reliable, at the end of
3  the day, your extrapolation will be, correct?
4      A.  Not necessarily.  The question is simply
5  -- is how -- how representative is the sample to
6  the general population, not how big the sample is.
7  By -- when you increase your N, you have a higher
8  likelihood of representing the sample of
9  individuals or -- of -- of physicians, but it's not
10  -- they're not directly related to each other.
11      Q.  Fair enough, and that is, you decrease the
12  N, as you put it, the likelihood that you're
13  capturing a representative sample decreases?
14      A.  No, not necessarily.  It's just that it
15  just depends on how -- what the procedure is for
16  identifying the sample.  That's -- the reliability
17  and the generalizability of this data has to do
18  with the algorithm by which they -- NDTI identifies
19  physicians that are representative of the US
20  population.  And then you -- and how they weight
21  that -- those specific observations to the general
22  US physician population level.
23      Now, you need to have a certain amount
24  of size in order to do that, but the reliability --
25  once you get to that certain size, the reliability

299

1  of the data doesn't necessarily increase or
2  decrease based on that.
3      Q.  So you would disagree then with the notion
4  that the confidence intervals that you would apply
5  would differ, depending on the size of the sample
6  that you would use?
7      A.  Confidence interval?  Again, it depends on
8  what you mean by "confidence intervals" and in what
9  -- in what context are you using them?  What do you
10  mean by that?
11      Q.  Well, let's -- let's be a little bit more
12  specific then, I guess.
13      Have you done any specific analysis
14  yourself as to whether the extrapolations that
15  you refer to here are reliable in light of the
16  applicable sample sizes?
17      A.  Okay.  If you're asking me if I have done
18  any -- any statistical analyses to analyze whether
19  or not IMS NDTI data is -- is going to provide
20  reliable and generalizable information that can be
21  used to -- extrapolate up to the US population's
22  physicians, then I would say, no, I did not provide
23  any -- I did not do any of those statistical
24  analyses.
25      Q.  Okay.

300

1      A.  But again, this is a dataset that's used
2  commonly by the industry, and commonly by physician
3  -- by academics in assessing uses of prescription
4  medications by physicians and -- in its correlation
5  with -- or its association with indications.
6      Q.  Do you -- do you have any understanding
7  for -- in raw numbers -- nonextrapolated terms, how
8  many surveyed physicians each year reported usage
9  of Neurontin in the NDTI data that you received?
10      A.  Are you asking me whether I know what the
11  sample universe is for every single year that we
12  use in our analysis?
13      Q.  I guess I'm asking whether you know what
14  the unprojected numbers are for -- for NDTI or
15  whether you've only had access to the projected
16  numbers?
17      A.  Well, you just showed me unprojected
18  numbers of 100 -- of a thousand or 4,000 and
19  something, right, for 2006.
20      Q.  Right.  I guess I'm -- I'm thinking more
21  in terms of the actual data that you received.  So
22  in other words, you know, the number of
23  prescriptions or number of uses, I should say, for
24  a given indication for a given quarter.  The number
25  that you received from NDTI was just the projected

301

1     number, correct, not the actual number of doctors
2     who had, you know, filled out on their cards each
3     quarter that they had assigned a use to a
4     particular diagnosis?
5         A.  Right.  So the data that we have is the
6     data provided by IMS to anyone who had purchased.
7         Q.  Understood?
8         A.  NDTI data, right, which is -- which is
9     data that has been weighted using their proprietary
10    algorithms to the general US population.
11        Q.  Fair enough, and you don't have the
12    unweighted data, correct?
13        A.  I don't know anyone who does, but you
14    know, NDTI does, I'm sure.
15        Q.  Okay.  I'm not --
16        A.  But I don't have that data, no.
17        Q.  That's fine.  Okay.  You haven't supplied
18    any information or margins of error or confidence
19    intervals related to the data that you've got
20    here --
21        A.  Uh-huh.
22        Q.  -- have you?
23        A.  So if what you're asking me is do I know
24    what the confidence intervals that IMS reports for
25    their own datasets, no, I do not have that data.

302

1         Q.  Okay.  And your declaration doesn't refer
2     to confidence intervals one way or the other with
3     respect to any of the IMS data, correct?
4         A.  So I do not have, at my disposal -- how
5     about this:  I have not -- I do not have, for
6     myself, data from NDTI or data from IMS on the
7     confidence intervals of -- that are -- that they
8     use or that they provide about their -- the use of
9     their data.  I do not have that information.
10        Q.  Okay.  Let's look at the IMS document,
11    Exhibit 10, and flip to Page 14.  Have you ever
12    seen this before?
13        A.  No, I have not.
14        Q.  Have you ever seen anything like it
15    before?
16        A.  What do you mean by "like it"?
17        Q.  NDTI precision tables of any kind.
18        A.  No, I have not.
19        Q.  What I read -- when I say, "NDTI --" bless
20    you -- when I say, "NDTI precision tables," I'm
21    reading from the top of the document where it says,
22    "2006 NDTI Precision Tables."
23        Let's look back one page to Page 13 which,
24    I believe, provides a little explanation about the
25    precision tables.

303

1         At the very top of the page here, after it
2     says, "NDTI Precision Tables," IMS tells us, "The
3     need for precision tables arises from the fact that
4     the NDTI audit is based on a sample, and not a
5     census of physician workdays.  Inherent in all
6     sample-based estimates is the potential for
7     sampling error, which refers to how closely an
8     estimate based on sample data can reproduce the
9     true value based on census data."
10        Did I read that correctly?
11        A.  Yes.
12        Q.  You don't have any reason to disagree with
13    the accuracy of this assertion, correct?
14        A.  No.
15        Q.  Okay.  Let's move down to the second
16    paragraph.  The third sentence reads, "The
17    precision for NDTI estimates of drug appearances
18    based on this methodology are provided in Table 5
19    --" Table 5's the table on the next page, correct?
20        A.  Yes.
21        Q.  Okay.  "Confidence --"
22        A.  I should --
23        Q.  Take a look.  It goes on, "Confidence
24    intervals derived by this methodology are the most
25    appropriate set to use in any analysis of NDTI

304

1     data."
2         You have no reason to disagree with the
3     accuracy of this assertion by IMS, do you?
4         A.  No.
5         Q.  I think you said you hadn't seen a table
6     like this before, so I assume you didn't use a
7     table like this in your declaration, did you?
8         A.  No, I did not, not in preparing the
9     declaration.
10        Q.  And I think we'd talked before and
11    established that nowhere in your report do you even
12    mention confidence intervals; is that correct?
13        A.  That's correct.
14        Q.  So someone reading --
15        A.  And honestly, I mean, I'd have to go
16    through the entire document to tell you whether
17    that's factually correct or not.
18        Q.  Understood.  I'm -- which you can do, and
19    we can talk about it tomorrow, if you like.
20        A.  Okay.
21        Q.  Assuming that's right, though, someone
22    reading your report who isn't otherwise familiar
23    with the data wouldn't know that there might be
24    wide confidence intervals around each of these
25    numbers that you report?

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

305

1          THE WITNESS:  I'm sorry.  Can you repeat
2    the question.
3          (Question read back.)
4          MR. RONA:  Objection.
5      A.  I have no way of knowing whether there are
6    wide confidence intervals or not.  You
7    characterized the confidence intervals as being
8    wide, but I don't know that.
9      Q.  Okay.  Understood.  Let me -- let me then
10   narrow it a little bit.  We can talk about the
11   specific confidence intervals shortly, but just
12   asking the question again, someone reading your
13   report who isn't otherwise familiar with the data
14   wouldn't know that there would be any confidence
15   intervals associated with the NDTI numbers that you
16   report; is that correct?
17         MR. RONA:  Objection.
18     A.  Are you asking me whether any layperson
19   reading my report would know whether there were
20   confidence intervals associated with the data?
21     Q.  I guess I'm asking whether there's
22   anything in your report that would tell a layperson
23   reading the report -- your report -- that there
24   should be confidence intervals surrounding NDTI
25   data?

306

1          MR. RONA:  Objection.
2      A.  No.
3      Q.  Okay.
4      A.  I'm sorry.  Are you saying that -- just to
5    be -- just to be really specific, are you asking me
6    whether or not any layperson should know that there
7    are confidence intervals related to the NDTI data
8    by reading my report?
9      Q.  Yes.
10     A.  No.
11     Q.  Okay.  Looking at Page 5, and just --
12         Page 5 refers to what document?
13     Q.  Of your report, sorry, Exhibit 1, looking
14   at a sentence here, "While these data cannot
15   provide an actual count of physicians prescribing
16   Neurontin by indication over the class period in
17   the US, they can be used to link Neurontin
18   prescriptions to indications for use over the class
19   period."
20         Did I read that correctly?
21     A.  You did.
22     Q.  Okay.  Is the reason that these data
23   cannot provide an accurate count of physicians
24   prescribing Neurontin by indication that they don't
25   actually measure prescriptions themselves, correct?

307

1      A.  That's correct.
2          MR. RONA:  Objection.
3      Q.  It's also --
4          THE WITNESS:  I'm sorry.
5          MR. RONA:  I just wanted to be clear, you
6    said, "accurate," but the phrase she -- the word
7    she used was "actual."  I just want to --
8      Q.  Do you want to change that answer?
9      A.  Right, and it does actually change my
10   answer, and this is something that I want to back
11   up and just say, so the big issue with IMS NDTI
12   data is that it's based on a representative sample,
13   and then it's weighted up to the population based
14   on a proprietary algorithm.
15         So it does not provide an actual count of
16   prescriptions or an actual count of physicians
17   prescribing Neurontin.
18         This is as opposed to the Wolters Kluwer
19   data or kind of -- or other observational data that
20   we have that provides a -- that, from my
21   understanding, provides an actual count of
22   physicians and of -- of prescriptions.
23         MR. RONA:  How are you doing?
24     Q.  Okay.  I'm almost done with this stretch.
25     A.  Okay.

308

1      Q.  Is another reason that they can't provide
2    an actual count because of the potential margins of
3    error that we discussed?
4          MR. RONA:  Objection.
5      A.  That, again, has to do with the sampling
6    issue and the algorithms used.  It's not another
7    reason.  It's the same -- it's the same reason.
8      Q.  Okay.  Then you'd agree with me that there
9    isn't -- there isn't a dataset available that
10   provides a precise number of prescriptions by
11   indication, correct?
12     A.  No, I disagree with that statement.
13     Q.  How do you disagree with it?  What -- what
14   dataset does that that doesn't count, for example,
15   use?
16     A.  So if you're asking me whether NDTI data
17   will provide a reliable and valid estimate of the
18   number of Neurontin prescriptions that can be
19   linked to an indication -- is that what you're
20   asking me?
21     Q.  No, it's not, actually.  The question I
22   think was that there's no available dataset that
23   will provide for you a precise number of
24   prescriptions by indication for Neurontin, correct?
25     A.  Okay.  There is no available dataset

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

309

1  anywhere, in my understanding, that's going to
2  provide to me an actual count of the number of
3  prescriptions that were filled in the United States
4  by individuals that can be linked to indications in
5  -- in any period -- in -- over this time period.
6     Q.  Okay.  And in order to try to estimate
7  what that number is, you need to do so by looking
8  at uses, as reported in NDTI, correct?
9     A.  So because there is no actual count
10 available to anyone, we need to use the data that
11 we have.  The data that we have that we think of as
12 being reliable and valid for -- for doing exactly
13 this -- estimating the number of uses that can be
14 linked to a -- to an indication in a valid and
15 reliable way -- in general, is the NDTI data, and
16 that's what we use the NDTI data to do in this
17 specific case.
18    Q.  And when you say, "we use," you mean you
19 and your team on this -- in this report --
20    A.  That I use, right, with my -- with my team
21 helping me.  You got it.
22    Q.  Okay.  We talked before about Verispan
23 data.  Are you familiar with a company called
24 "Verispan"?
25    A.  I know that there is a company named

310

1  "Verispan."  Yes.  I know -- I know about Verispan,
2  the company.
3     Q.  What is it?
4     A.  It's a company.  To be honest, I don't
5  know that much about Verispan data.  My kind of
6  very general understanding of Verispan data or
7  Verispan is that it's a -- again, a -- another
8  for-profit private company -- or sorry.  It's
9  another private company that's a data vendor that's
10 commonly used in the -- by the industry.
11    Q.  Okay.  Have you ever used Verispan data
12 before?
13    A.  No.
14    Q.  Do you know one way or the other whether
15 Verispan produces a product that provides doctor
16 level data by indication?
17    A.  I have kind of a vague understanding that
18 Verispan does provide a dataset called PDDA that
19 provides physician -- that provides prescription
20 information that can be used -- that can be linked
21 to indications.
22    Q.  Okay.  Do you know one way or the other
23 whether Verispan's data is any more or less
24 reliable than IMS's NDTI data?
25    A.  I do not know.

311

1     Q.  Do you know the Defendants had actually
2  produced Verispan PDDA data to the Plaintiffs in
3  this case?
4     A.  No.
5     Q.  So you weren't informed one way or the
6  other that this data was available to you?
7     A.  No.
8     Q.  So you wouldn't have used it -- withdrawn.
9  So you didn't use it, obviously, as a -- you know,
10 sort of a check on the -- on the work that you did.
11    A.  No.
12    Q.  Okay.  Are you familiar --
13    A.  Actually, to be honest, the check that I
14 -- that I did was the data that we already had,
15 which was the Wolters Kluwer, and the -- the IMS
16 Xponent data can also give me a count of -- of
17 prescriptions.  So the check that I did was -- on
18 the IMS data was actually on the data that we were
19 using for other -- or that I was using for other --
20 for other purposes in preparation of the report,
21 which seemed, again, to be kind of cohesive and
22 make sense.
23    Q.  Right, but you didn't have -- you didn't
24 have a dataset that was indication specific that
25 would have provided you with a way of checking the

312

1  indication-specific data that you had from NDTI,
2  correct?
3     A.  Right.  That's correct.  So I did not -- I
4  was not able to use the Xponent data to check the
5  -- excuse me -- the Xponent or the Wolters Kluwer
6  data to check the indication levels -- level data,
7  but you know, what -- what's really -- I think
8  what's nice and made me feel more comfortable was
9  that the ND -- when I did the check with the NDTI
10 data relative -- on uses with the Wolters Kluwer
11 and the ND -- and the Xponent data, it comes up
12 very close.
13    Q.  Are you familiar with the NAMCS dataset?
14    A.  With NAMCS?
15    Q.  Yes.
16    A.  Yes.
17    Q.  What does it stand for, do you know?
18    A.  I don't know.
19    Q.  Okay.  That makes two of us.  Do you know
20 what it is?
21    A.  I -- so what I mean by familiar is that
22 I've heard of it, and I know that people use it for
23 prescription level data, but it's not something
24 that I have ever used.
25    Q.  Okay.  When you say, "prescription level

Conti, Rena (MDL) 2/12/2008 4:13:00 PM

313

1  data," do you know whether it provides data by
2  indication?
3      A.  I don't.
4      Q.  Okay.  Do you understand that a NAMCS or
5  NAMCS data is publicly available?
6      A.  Yes, I do under -- know that.
7      Q.  Did you ever consider using it in this
8  matter?
9      A.  No, I did not.
10     Q.  Why not?
11     A.  Because I'm not -- to be honest, I'm not
12 familiar with this dataset at all, and -- right.
13 I'm just not familiar with the dataset at all.
14     Q.  I take it you didn't have discussions one
15 way or the other with anyone about whether or not
16 to use NAMCS data, correct?
17     A.  No.
18         MR. POLUBINSKI:  Okay.  I think we're at
19 the end of the tape, it sounds like.
20         VIDEO OPERATOR:  The time is 5:21 p.m.
21 This is the end of Tape 5, and we are off the
22 record.
23         (Recess was taken.)
24         (Conti Exhibit 11, "Neurontin NDTI drug
25         Uses by fraudulent marketing indication

314

1          Category.")
2          VIDEO OPERATOR:  The time is 5:27 p.m.
3  This is the beginning of Tape 6, and we are back on
4  the record.
5      Q.  Okay.  Doctor Conti, we've just handed you
6  a document that we'd received from Plaintiffs'
7  counsel last month.  I understand this document to
8  be the backup showing estimated quarterly Neurontin
9  uses broken down by indication from NDTI; is that
10 right?
11     A.  Okay.  So I've never seen this document
12 before.  So I just need a second --
13     Q.  Sure.
14     A.  -- just to take a look at it.  (Witness
15 reviews document.)  Are you asking me whether or
16 not -- are you asking me whether this document
17 reports by quarter from 1994 through Quarter 1 of
18 2007 uses by -- by indication category?
19     Q.  Yes.
20     A.  Yes.
21     Q.  Okay.  And my understanding is that, you
22 know, again, this document was produced to us by
23 Plaintiffs' counsel.  My understanding -- you can
24 correct me if I'm wrong about this, is that this is
25 essentially the numerical equivalent of what's

315

1  reflected in Figure 7 through 10 of your report?
2      A.  Let me just make sure --
3      Q.  Sure.
4      A.  -- that I'm looking at -- we're talking
5  about the same figures (witness reviews document.)
6      Q.  No, of course.
7      A.  So you say --
8      Q.  You may want to look at Exhibit 2 on this,
9  too, only because I think some of those figures
10 changed in your revision.
11     A.  Okay.  And does -- is it your
12 understanding that there's no date on this
13 document?  So is it your understanding that this
14 data reflects the revised document?
15     Q.  That's -- that's my understanding.  And
16 this came to us literally at the same time that --
17 that your revised report did, so I think that's
18 right.  But again, we didn't create either
19 document, so I'm not sure.
20     A.  Okay.  Excuse me.  Okay.  So we're talking
21 about Figure 7 --
22     Q.  7 through 10, I think.  I think 10 takes
23 us up through migraine, right?
24     A.  (Witness reviews document.)  Okay.  So
25 we're talking about Figure 7 through 10.

316

1      Q.  (Nods.)
2      A.  Correct?  Okay.  Great.
3      Q.  Sound right to you?
4      A.  Yes.
5      Q.  Okay.  Great.  So I really want to focus
6  more on the -- on the table, not so much on the
7  figures now.  We'll talk about the figures probably
8  tomorrow at this point.
9      A.  Okay.
10     Q.  But -- but the table here, you know,
11 appears to -- to provide precise numbers -- precise
12 estimates for the number of uses for each quarter
13 for each of these subgroups of indications,
14 correct?
15     A.  Right.  So my understanding of this table,
16 which I just saw right now, is that it's --
17     Q.  I would have assumed you'd seen it before,
18 too.  My -- I didn't mean to spring it on you.
19     A.  Okay.  That's okay -- is that it provides
20 a report of drug uses estimated using the IMS NDTI
21 data by indication category between the first
22 quarter of 1994 through the first quarter of 2007.
23     Q.  Okay.  So I guess my question is that this
24 chart, at least, doesn't reflect any margin of
25 error or confidence interval around these numbers,

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

317

1  does it?
2      A.  The document that you just provided to me
3  does not have indicated on it any confidence
4  intervals associated with it.
5      Q.  Fair enough, and nor do the -- the figures
6  attached to your report to which it connects, at
7  least as far as I understand it.
8      A.  Right.  There's no confidence intervals --
9      Q.  Okay.
10     A.  -- reported on this document or on the
11  figures.
12     Q.  Okay.  And let's -- just for the sake of
13  these questions -- assume that -- that these
14  numbers here are accurate -- accurate reflections
15  of what's in Figures 7 through 10.  If it turns out
16  not to be the case, and what you all provided to us
17  is somehow different from what's in the figures,
18  you can let us know afterwards.
19         But just for the sake of simplicity, let's
20  -- let's make that assumption, understanding that
21  you haven't seen this before.
22     A.  Sure.  Just -- may I have one second.
23         THE WITNESS:  May have a tissue, please.
24  Thank you.  Thank you.  I'm back in Boston.
25         MR. POLUBINSKI:  Yeah, I think it's going

318

1  around.
2      A.  Yeah.
3      Q.  Okay.  Let's look back at the precision
4  table document that we've looked at before that's
5  part of Conti Exhibit 10.  It's on Page 14.
6      A.  Okay, Page 14?
7      Q.  Yes.  Got it?
8      A.  Yes.
9      Q.  Okay.  Now, let's walk through this a
10  little slowly.  I'm assuming that you haven't used
11  this table before.  I mean, since I think you -- it
12  sounds like you hadn't seen it before.  If we -- if
13  we flip forward to Page 13 --
14     A.  Page 13 --
15     Q.  -- 13 of --
16     A.  -- of the ND --
17     Q.  -- of Exhibit 10.  Yeah.  Exactly.
18     A.  Okay.
19     Q.  It provides instructions on how to use the
20  precision table.
21     A.  Uh-huh.
22     Q.  About two-thirds of the way down the page,
23  maybe the fourth paragraph, it writes, "An
24  illustration of the appropriate use of the
25  precision tables for constructing confidence

319

1  intervals follows."
2         As you can see here, you can take a look
3  at it, but I think the process involves identifying
4  the number of annual reported drug uses, and then
5  looking that number up in the precision table
6  printed on the following page.  Does that look
7  right to you?
8      A.  So I need some time to read -- since I've
9  never seen this --
10     Q.  Yeah.  Take a look.  Sure.
11     A.  -- I need to take some time to read it.
12     Q.  Uh-huh.
13     A.  (Witness reviews document.)
14     Q.  Just tell me when you're ready.
15     A.  Sure.  Just give me a second.  I just want
16  to walk through their methodology just to make sure
17  that I understand what they're saying --
18     Q.  Okay.
19     A.  -- before I agree to it.
20     Q.  No, of course.
21     A.  (Witness reviews document.)  I really
22  don't mean to be difficult, but I'm not exactly
23  sure how they get -- they walk through the -- how
24  they get what they get from the example.  So -- and
25  I'll just show you what I mean --

320

1      Q.  Sure.
2      A.  -- by this.  So they're -- so they say --
3  okay.  So the NDTI estimate for a particular
4  product is $2 million -- 2 million appearances per
5  year.
6      Q.  Uh-huh.
7      A.  At the 95 -- so on Table 5 -- go to Table
8  5 --
9      Q.  Uh-huh.
10     A.  -- and look at 2 million yearly national
11  estimate.
12     Q.  This may be the issue.  Do you see the
13  yearly national estimates in thousands, right, if
14  you look at the top of the column?
15     A.  Thank you.  Thank you.
16     Q.  So you're looking -- should be looking at
17  the one that reads 2000.
18     A.  Thank you.  Okay.
19     Q.  That's actually a helpful point and one --
20  one worth mentioning.
21     A.  Thank you.
22     Q.  No problem.
23     A.  Exactly.  Okay.
24     Q.  No, that's fine.  So I guess -- let's see
25  if we can walk through this slowly.  So what you

321

1    need to do first, I guess, is to identify an annual
2    number of uses.
3        A.   That's right.
4        Q.   And so to do this, you take a quarterly
5    estimate and just multiply it times four.
6        A.   Uh-huh.
7        Q.   Even an English major like me can sort of
8    figure that part of it out.  The illustration, by
9    the way, uses here a 95 percent level of
10    confidence.
11        A.   Uh-huh.
12        Q.   Is -- would you agree that that's a -- a
13    level that's commonly used in statistical analysis?
14        A.   Sure.  I mean, honestly, 90 to 95 percent
15    confidence all the way through 99 percent
16    confidence are -- is what would be typically
17    reported --
18        Q.   Okay.
19        A.   -- in any, you know --
20        Q.   Fair enough.
21        A.   -- general paper.
22        Q.   Okay.  And so what -- what we should do
23    here to get confidence intervals for these
24    estimates for the -- for the data in Conti Exhibit
25    11 would be to multiply these times four, and then

322

1    look up the associated confidence interval on Table
2    5, correct --
3        A.   Just a second.
4        Q.   -- since these are all quarterly
5    estimates?
6        A.   (Witness reviews document.)  From what
7    they're describing the procedure should be, yes,
8    that makes sense to me.
9        Q.   Okay.  And again, as we just discovered,
10    the precision table reports annual observations in
11    multiples of a thousand, right?
12        A.   Right.
13        Q.   Okay.  So --
14        A.   So this means -- just to be really
15    clear -- that whatever we -- what I report on this
16    -- on this Exhibit 11 --
17        Q.   Uh-huh.
18        A.   -- which I just saw for the first time,
19    right, would go up or down within, you know, that
20    the confidence interval would provide us or provide
21    you with a -- kind of a -- an understanding of how
22    much the data may kind of move up or down within a
23    particular confidence interval.
24        Q.   Right.
25        A.   Okay.

323

1        Q.   That's my understanding.
2        A.   Okay.
3        Q.   By the way, just for making sure that the
4    record's clear here.
5        A.   Uh-huh.
6        Q.   And I don't mean to suggest that you're
7    suggesting otherwise --
8        A.   Uh-huh.
9        Q.   -- but Conti Exhibit 11 was something that
10    was provided to us by Plaintiffs' counsel.  I would
11    have assumed that maybe you'd seen it before, and I
12    certainly didn't mean to spring on you here today.
13        A.   Uh-huh.
14        Q.   So I don't -- I don't want to leave the
15    record with the impression that -- that I'm
16    surprising with you this document.
17        So I've never seen Exhibit 11.
18        Q.   Fair enough.  Fair enough.  I think I
19    think we're all square on that.
20        A.   Okay.  Good.
21        Q.   Okay.  So let's -- let's apply this IMS
22    confidence interval methodology to some of the data
23    that's reflected in Exhibit 11.  Again, you know,
24    we'll assume for present purposes that this does
25    accurately reflect what's in your tables, Figures 7

324

1    through 10.  Let's start with bipolar.
2        Taking a look at bipolar, prior to 1999,
3    would you agree with me that, with one exception in
4    the fourth quarter of 1998, all of the quarterly
5    estimates are lower than 50,000?
6        A.   So looking at Exhibit 11 --
7        Q.   Uh-huh.
8        A.   -- bipolar --
9        Q.   Right.
10        A.   -- between Quarter 1 and Quarter 4 of
11    1994, correct?
12        Q.   I'm looking -- what I'm looking at is
13    really -- I'm trying to just cut through this.  All
14    of the different individual quarterly estimates for
15    every quarter prior to 1995 -- or 1999.  I'm sorry.
16        A.   Okay.
17        Q.   Prior to 1999.  Thank you.  Sorry.  Only
18    one of them -- and that's the one in the fourth
19    quarter of '98 -- is greater than 50,000.  All of
20    the others are less than 50,000.  Is that a correct
21    observation?
22        A.   That is a correct observation.
23        Q.   Okay.  And so the way we'd figure out what
24    the confidence intervals would be for each of these
25    quarterly estimates prior to the fourth quarter of

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

325

1   1998 is that we'd multiply -- we would multiply --
2   we'd multiply them times 4.  Each of these,
3   because --
4       A.  No.  No, we wouldn't multiply by -- times
5   4.  Instead, we would add -- because we have
6   quarterly data, so we would add across the
7   observation of quarterly data to make a year.
8       Q.  If you wanted to come up with a -- with an
9   aggregate confidence interval for that particular
10  year, but I think if you were focused on a
11  particular quarter --
12      A.  But that's --
13      Q.  -- and the numbers change --
14      A.  I'm sorry.  But that's not what in
15  procedure is giving you.  This procedure is giving
16  you the -- way of -- of coming up with a
17  confidence interval per year, which is stated
18  directly in this document on Page 13.
19      Q.  Right.  But let's take a look down at --
20  you know, the very bottom of the document where it
21  says -- there's an A, B, and a C listed down there,
22  right?
23          The first step that you're supposed to do
24  for a confidence interval for a nonannual estimate
25  is to annualize your estimate.  I'm quoting it.

327

1       A.  Okay.
2       Q.  -- because really, you know, I can let you
3   look at this.  You can come to your own conclusion
4   about how you want to use the data.  At the end of
5   the data, it really probably doesn't matter that
6   much in terms of what the applicable confidence
7   intervals are.  I don't think it's worth fighting
8   about either way.
9           But in any event, for this period, you
10  know, prior to 1998, you know, fourth quarter of
11  1998, on average, what we're talking about is
12  annualized numbers of less than 200,000; is that
13  correct?
14      A.  Annualized numbers prior to 1998 --
15      Q.  Uh-huh.
16      A.  -- prior to the first quarter of 1998,
17  right.
18      Q.  Fourth quarter.
19      A.  Fourth quarter of 1998.  We're talking
20  about for bipolar --
21      Q.  Uh-huh.
22      A.  -- annualized estimates that are below --
23  it looks like they're below a -- 39,000.
24      Q.  Annualized estimates below 39,000.
25      A.  Or I'm sorry.  Quarterly estimates before

326

1   Annualize your estimate.  "If it's a quarterly
2   estimate, multiply it by 4.  If it's a six-month
3   estimate, multiply by 2," correct?
4       A.  Yes, but to be honest, I mean, the
5   conservative way of going about doing this, since
6   you actually observe data, is not -- for each
7   quarter -- is not to just multiply by 4 or multiply
8   by 2, but it's actually to use the actual quarterly
9   estimate that's observed in the data.
10      Q.  But --
11      A.  So -- so for any exercise that I would do
12  doing this, I would use the actual quarterly data
13  that I observe in this dataset for each indication.
14  I would then -- I would add them up to make an
15  annual total, and then I would do -- and then I
16  would calculate the confidence interval around
17  that.
18      Q.  Which would give you a confidence interval
19  for the year, but it would be essentially smoothing
20  that confidence interval out across all four
21  quarters, even though there were differing numbers
22  each quarter, right?
23          MR. RONA:  Objection.
24      Q.  Listen, it's not worth -- it's not worth
25  fighting about this, to tell you the truth --

328

1   -- below 39,000.
2       Q.  Okay.  And so again, if we translate that
3   to annual numbers -- you can add them up -- it
4   would end up south of 200,000 per year, pretty
5   safely, I think in most cases, correct?
6       A.  Yes.
7       Q.  Okay.
8       A.  I mean --
9       Q.  Again --
10      A.  Again, I would have to do it.
11      Q.  I understand.
12      A.  Yes, it makes sense.
13      Q.  I understand.  Let's look up 200,000 on
14  the precision table.  It's the second one from the
15  bottom right.
16      A.  Uh-huh.
17      Q.  And so if we wanted to have a 95 percent
18  confidence -- if we wanted to be -- have a 95
19  percent confidence interval, if we wanted to have
20  95 percent confidence, the appropriate percentage
21  to apply would be 48.27 percent; is that correct?
22      A.  Right.  So my understanding of the
23  procedure they are recommending is that, in order
24  to be -- to have a 95 level -- to calculate a 95
25  percent confidence interval, I would -- the

329

1    associated relative sampling R would be equal to
2    plus or minus 4. -- 48.27 percentage --
3        Q.  Right.  Okay.
4        A.  -- right -- percent --
5        Q.  Okay.
6        A.  -- of the -- of the observed number.
7        Q.  Understood.  Understood.  Okay.  So just
8    to, you know, sort of play this out a little bit,
9    let's look at -- at the fourth quarter of 1997.
10       A.  For what indication?
11       Q.  For bipolar is what -- the one we're on, I
12   think?
13       A.  1997 fourth quarter.  So it reads,
14   24,795 --
15       Q.  Okay.
16       A.  -- is that correct?
17       Q.  It's what I read, too.
18       A.  Okay.  Good.
19       Q.  And you know what, I've got a calculator
20   here.  I'm not sure it's actually worth doing the
21   math, unless you want to, in which case I'm happy
22   to hand it to you, but --
23       A.  These numbers don't provide -- the
24   confidence interval doesn't provide anything to --
25   to help me with that, right?

330

1        Q.  Well --
2        A.  Does it?  No, it doesn't.
3        Q.  I think we just agreed that the confidence
4    interval would be plus or minus 48.27 percent,
5    correct?
6        A.  No.  We're talking about at the quarterly
7    observation, not at a given year.  So we're talking
8    about -- so we just added this up for 200 -- for
9    the year.  So across four quarters.  That would
10   equal 200,000 -- less -- less than 200,000 for the
11   year of 2000 -- sorry -- of 1997.
12       But now you're asking me to look at the
13   quarter, which is -- which number is 24,000 in the
14   -- in -- sorry -- 1997, and this table does not
15   provide any indication for how I would calculate a
16   confidence interval, because as you said, it's the
17   yearly national estimate that it provides
18   instruction for how to -- for how to calculate.
19       This is not a yearly estimate.  It's a
20   quarterly estimate.  Even if it was a quarterly
21   estimate, there's no way for me to -- for me to
22   tell this number -- sorry -- the bipolar number,
23   the 24,000 is too small.  It doesn't come -- it's
24   not listed in Table 5.
25       Q.  So there is -- well, there are a lot of

331

1    things in what you just said.  But you can see that
2    the confidence intervals increase as the numbers
3    get lower and lower, correct?  And so if it's not
4    even on the table, you've got to figure that it's
5    going to be even higher than this bottom level of
6    61 percent, correct?
7        A.  Uhm.
8        Q.  You don't have any reason to, disagree
9    with that, do you?
10       A.  Provide me the table.  I'm happy to
11   calculate it for you.
12       Q.  Let's look back at -- let's look back
13   at --
14       A.  But it's not provided in this information.
15   They provide a yearly national estimate, and then
16   show me how -- from a yearly national estimate -- I
17   can go to calculate a 95, 90th, or 80th percentile
18   confidence interval.
19       Q.  Let's --
20       A.  They don't provide a roadmap for doing
21   that for quarter, and they don't provide any
22   specific numbers for how to identify a confidence
23   interval for 95 or 90 or 80 percent for a number
24   that is lower than 100,000.
25       Q.  Let's -- let's back up to Page 13.

332

1        A.  Uh-huh.
2        Q.  And I know that this is probably at least
3    somewhat uncomfortable, because you have never seen
4    this document before, but if you look at the -- if
5    you look at this explanation at the bottom of the
6    page here and when it explains how to determine a
7    confidence interval for a nonannual estimate --
8        A.  Uh-huh.
9        Q.  -- isn't that what we're doing here?
10       A.  Well, that's what you're asking me to go
11   through this exercise.
12       Q.  Precisely, which is why I was --
13       A.  However -- however -- excuse me.
14       MR. RONA:  Counsel, allow her to finish.
15   You can answer, just for the record.
16       THE WITNESS:  Thank you.
17       A.  However, the actual chart that they
18   provide me on Table 5 does not provide me any way
19   of going from this yearly national estimate and the
20   confidence intervals that they provide to a
21   quarterly estimate, nor does it provide me a way of
22   actually estimating a confidence interval for a
23   number -- for a yearly -- for any estimate under
24   100,000 in a mention, so --
25       Q.  I'm trying to help here.

333

1    A.  Okay.
2    Q.  Look back -- let's look back at Page 13 --
3    A.  Okay.
4    Q.  -- which we -- I thought we'd read it to
5  start this whole exercise, where it -- it
6  specifically tells you what to do to determine a
7  confidence interval for a nonannual estimate,
8  including a quarterly estimate.
9       The first step which you resisted was to
10  annualize your estimate.
11    A.  I wasn't --
12    Q.  No.  No.  Listen.  Just --
13    MR. RONA:  I'm going to object to
14  characterizations of anything she's trying --
15    MR. POLUBINSKI:  That's fine.  That's a
16  speaking objection.  Okay.  You can object.
17    Well, hold on.  But I mean -- okay.  I did
18  not --
19    Q.  Let me finish my question, please.
20    A.  Okay.  That's fine.
21    Q.  Okay?  So the first -- the first step is
22  annualize your estimate, and I'm just reading from
23  the document.  Did I read that correctly?
24    A.  Yes.
25    Q.  Okay.  And then you "use this annualized

334

1  estimate to look up the sampling error in the
2  confidence interval table."  Now, did I read that
3  correctly?
4    A.  Yes.
5    Q.  And then "Apply this sampling error to
6  your original estimate."  Did I read that
7  correctly?
8    A.  You did.  Okay.
9    Q.  Is there anything that's unclear about
10  this?
11    A.  There are two issues:  The first is, my
12  problem with your characterization of how to
13  annualize your estimate is that I would always use
14  the actual observed data at the quarterly level.  I
15  would never -- if I had that data, I would never
16  multiply by 4 or multiply by some number, because
17  you lose precision by doing that.
18    Q.  And that's true --
19    A.  Number --
20    MR. RONA:  Counsel, can she please answer
21  the question.
22    Q.  Go ahead.  Go ahead, answer the question.
23  I thought you were done.
24    A.  So No. 2, what this is -- is telling me,
25  which, again, I've never seen before, but what just

335

1  -- if I read it, what it's telling me is that I
2  should annualize my estimate.  Okay.
3       Well, I can do that by literally -- by
4  literally adding up quarter by quarter in a given
5  year, Quarter 1 through Quarter 4 for any given
6  year, which is what I suggested that we do for the
7  given year that you suggested that we look at,
8  which is 1997.
9       Then it -- it says to me I should use this
10  annual estimate to look up the sampling error in
11  the confidence interval table.  What this tells me
12  is that it is -- I am only able to estimate a
13  confidence interval based on the annualized
14  estimate, not on the quarter estimate.  And Table 5
15  does not provide any instruction for how I would
16  estimate a confidence interval on a quarterly
17  estimate, so --
18    Q.  So --
19    A.  -- what you're asking me to do is
20  incorrect based on the instructions that you have
21  given me on -- from using NDI -- or NTDI data or
22  NDTI data.
23    Q.  I won't -- I don't intend to argue with
24  you about this.  We can find out from IMS what the
25  right way to do this or not do it --

336

1    A.  Okay.
2    Q.  I just --
3    A.  But I mean, you're --
4    Q.  Will you please let me finish me question.
5    A.  I'm sorry.
6    Q.  Okay.
7    A.  Uh-huh.
8    Q.  Thanks very much.  I take it, though, that
9  the premise -- part of the premise of what you're
10  saying is that you don't like IMS's suggestion that
11  you annualize your estimate?
12    A.  No.
13    Q.  Okay.
14    A.  That's not my problem.
15    Q.  That's not your problem.
16    A.  No.  My problem is that you -- you are
17  asking me to provide a confidence interval for a
18  quarterly estimate.  There is no procedure that --
19  that IMS provides for going from a quarterly
20  estimate to an annualized estimate if I -- using
21  this confidence interval.
22    Q.  Okay.
23    A.  It asks for me to provide an annualized
24  estimate.
25    Q.  Let's -- let's look back again here at the

337

1  last step, "Apply this sampling error to your
2  original estimate."  What do you understand
3  "original estimate" to be in a situation where
4  you're determining a confidence interval for a
5  nonannual estimate?
6     A.  I have no idea.
7     Q.  Okay.  And that's because you've never
8  seen this document before?
9     A.  No, it's because "original estimate" is
10  not -- is not -- No. 1, it's because I've never
11  seen this because -- but also -- I've never seen
12  this document, but also because "original estimate"
13  is not defined in any part on this paper.
14        There's no definition for what that would
15  mean.  So there's no way for me to precisely
16  understand what they're asking me to do or what the
17  -- what the procedure asks for it -- what the
18  procedure tells me to do.
19     Q.  So what you're saying is that you wouldn't
20  even have any idea how we'd come up with a
21  confidence interval for the numbers that are
22  reflected in your table?
23     A.  No.  That's not what I'm saying.  What I'm
24  saying is, you have just -- you've walked me
25  through an example, and what I'm saying -- and

338

1  you've asked me to go through a mental exercise
2  where I would come up with a sampling error based
3  on a quarterly estimate, based on what -- the
4  instructions for this -- contained in 13, Page 13,
5  and also contained in Table 5.  And what I'm
6  telling you is that, based on the information that
7  you've just handed to me, that is an incorrect
8  procedure.
9     Q.  Okay.  But you don't know what the correct
10  procedure is, correct?
11     A.  What I'm saying to you is the information
12  that you've provided me -- the -- the direction is
13  incorrect.
14     Q.  My question to you, though, is, you don't
15  know what the correct procedure is, do you --
16        MR. RONA:  Objection.
17     Q.  -- for determining a confidence interval
18  for these numbers?
19        MR. RONA:  Objection.
20     A.  I would have to think about it, and I
21  have not been -- in this case I have not been asked
22  to -- to provide a confidence interval related to
23  NDTI data using this methodology.
24     Q.  And this is not something that you've
25  thought about in connection with this exercise up

339

1  until today, correct?
2     A.  What's "this"?
3     Q.  Determining a confidence interval for the
4  NDTI numbers that you report.
5     A.  No, it's not.
6        MR. POLUBINSKI:  We're at about 6 o'clock.
7  Why don't we call it quits for the day.
8        MR. RONA:  Yeah, I think so.
9        VIDEO OPERATOR:  The time is 5:56 p.m.
10  This is the end of Tape 2.  The deposition has
11  adjourned -- correction:  This is the end of Tape
12  6.  The deposition has adjourned, and we're off the
13  record.
14        (Whereupon the deposition recessed at
15  5:56 p.m.)
16
17
18
19
20
21
22
23
24
25

340

1        DEPONENT'S ERRATA SHEET
2        AND SIGNATURE INSTRUCTIONS
3
4
5        The original of the Errata Sheet has
6  been delivered to Ilyas Rona, Esq.
7        When the Errata Sheet has been
8  completed by the deponent and signed, a copy
9  thereof should be delivered to each party of record
10  and the ORIGINAL delivered to Edmund Polubinski,
11  Esq. to whom the original deposition transcript was
12  delivered.
13
14
15        INSTRUCTIONS TO DEPONENT
16
17        After reading this volume of your
   deposition, indicate any corrections or changes to
18  your testimony and the reasons therefor on the
   Errata Sheet supplied to you and sign it.  DO NOT
19  make marks or notations on the transcript volume
   itself.
20
21
22
23
24  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
25  COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVE

Conti, Rena (MDL)  2/12/2008  4:13:00 PM

341

```
1    Commonwealth of Massachusetts
2    Middlesex, ss.
3
4
          I, P. Jodi Ohnemus, Notary Public
5    in and for the Commonwealth of Massachusetts,
     do hereby certify that there came before me
6    on the 12th day of February, 2008, the deponent
     herein, who was duly sworn by me; that the ensuing
7    examination upon oath of the said deponent was
     reported stenographically by me and transcribed
8    into typewriting under my direction and control;
     and that the within transcript is a true record of
9    the questions asked and answers given at said
     deposition.
10
11        I FURTHER CERTIFY that I am neither
     attorney nor counsel for, nor related to or
12   employed by any of the parties to the action
     in which this deposition is taken; and, further,
13   that I am not a relative or employee of any
     attorney or financially interested in the outcome
14   of the action.
15
          IN WITNESS WHEREOF I have hereunto set my
16   hand and affixed my seal of office this
     14th day of February, 2008, at Waltham.
17
18   _____
19   _____
20        P. Jodi Ohnemus, RPR, RMR, CRR
          Notary Public,
21        Commonwealth
          of Massachusetts
22        My Commission Expires:
          3/28/2014
23
24
25
```

342

```
1    ATTACH TO DEPOSITION OF:  RENA M. CONTI, Ph.D.
     CASE:  IN RE:  NEURONTIN MARKETING AND SALES
2
3             ERRATA SHEET
4    INSTRUCTIONS:  After reading the transcript of your
     deposition, note any change or correction to your
5    testimony and the reason therefor on this sheet.
     DO NOT make any marks or notations on the
6    transcript volume itself.  Sign and date this
     errata sheet (before a Notary Public, if required).
7    Refer to Page 340 of the transcript for errata
     sheet distribution instructions.
8    PAGE LINE
          CHANGE: _____
9         REASON: _____
          CHANGE: _____
10        REASON: _____
          CHANGE: _____
11        REASON: _____
          CHANGE: _____
12        REASON: _____
          CHANGE: _____
13        REASON: _____
          CHANGE: _____
14        REASON: _____
          CHANGE: _____
15        REASON: _____
          CHANGE: _____
16        REASON: _____
          CHANGE: _____
17        REASON: _____
18        I have read the foregoing transcript of
     my deposition and except for any corrections or
19   changes noted above, I hereby subscribe to the
     transcript as an accurate record of the statements
20   made by me.
          _____
21        RENA M. CONTI, Ph.D
22        Subscribed and sworn to before me
23   this _____ day of _____, 2008.
24   _____
     Notary Public
25   My Commission Expires:
```

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

343

```
1          UNITED STATES DISTRICT COURT
2          DISTRICT OF MASSACHUSETTS
3     _____
4     IN RE:  NEURONTIN MARKETING, )DAY II
5     SALES PRACTICES, AND         )
6     PRODUCTS LIABILITY           ) MDL Docket
7     LITIGATION,                  ) No. 1629
8     _____ ) Master File No.
9     THIS DOCUMENT RELATES TO:    ) 04-10981
10                                 ) Judge Patti B.
11    ALL MARKETING AND SALES      ) Saris
12    PRACTICES ACTIONS            ) Mag. Judge Leo
13    _____ ) T. Sorokin
14         CONTAINS CONFIDENTIAL INFORMATION
15            CONTINUED VIDEOTAPED DEPOSITION of
16    RENA M. CONTI, Ph.D., called as a witness by and on
17    behalf of Pfizer, Inc., pursuant to the applicable
18    provisions of the Federal Rules of Civil Procedure,
19    before P. Jodi Ohnemus, Notary Public, Certified
20    Shorthand Reporter, Certified Realtime Reporter,
21    and Registered Merit Reporter, within and for the
22    Commonwealth of Massachusetts, at the offices of
23    Hare & Chaffin, 160 Federal Street, Boston,
24    Massachusetts, on Wednesday, 13 February, 2008,
25    commencing at 9:06 a.m.
```

344

```
1     APPEARANCES:
2
3          GREENE & HOFFMAN, P.C.
4          By:  Ilyas J. Rona, Esq.
5          125 Summer Street
6          Suite 1410
7          Boston, MA  02110
8          617 261-0040
9          Irona@greenehoffman.com
10         For the Plaintiffs
11
12
13         DAVIS, POLK & WARDWELL
14         BY:  Edmund Polubinski, III, Esq.
15              -and-
16         Paul Mishkin, Esq.
17         450 Lexington Avenue
18         New York, NY  10017
19         212 250-4695
20         Edmund.polubinski@dpw.com
21         Paul.mishkin@davispolk.com
22
23
24
25
```

345

```
1     APPEARANCES:  (CONT'D)
2
3     ALSO PRESENT:
4
5
6
7          Palko Goldman
8          Ralph Scopa, Videographer
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

346

```
1                  I N D E X
2
3     TESTIMONY OF:                PAGE
4
5     RENA M. CONTI, Ph.D.
6     (Cont'd by Mr. Polubinski)      348
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

347

```
1           E X H I B I T S
2
3    EXHIBIT        DESCRIPTION        PAGE
4
5    Conti Exhibit 12   Draft, 12/1/70      461
6    Conti Exhibit 13   "Memorandum of Law in
7                       Support of Plaintiffs'
8                       Renewed Motion For
9                       Class Certification."   471
10   Conti Exhibit 14   Open Learning Courses,
11                      Taft-Hartley Funds   548
12   Conti Exhibit 15   Open Learning Courses
13                      Taft-Hartley Funds,
14                      1 of 10 pages      549
15
16
17
18
19
20
21
22
23
24
25
```

348

```
1          VIDEO OPERATOR:  Today is February 13th,
2    2008.  The time is 9:06 a.m.  This is the beginning
3    of Cassette 1, Day 2 in the deposition of Dr. Rena
4    Conti.  We are on the record.
5          RENA M. CONTI, Ph.D.,
6          having been previously sworn,
7          testified as follows to
8          continued interrogatories
9    BY MR. POLUBINSKI:
10   Q.  Good morning, Doctor Conti.
11   A.  Good morning.
12   Q.  What I'd like to do to start today is
13   start to look at some of the figures that are
14   attached to the end of your declaration, which is
15   Exhibit 1.  At times we may need to refer to
16   Exhibit 2 for figures that have been revised in
17   your revised report.
18   A.  Okay.
19   Q.  If we could turn first to the very first
20   figure in your report, which is Figure 1.a, that
21   would be great.
22   A.  (Witness reviews document.)
23   Q.  Have you got it?
24   A.  Yes.
25   Q.  Okay.  In Figure 1.a, you are depicting
```

349

```
1    here new prescriptions of Neurontin month by month
2    across all indications and all types of doctors,
3    correct?
4    A.  Across --
5          MR. RONA:  Objection.
6    A.  Across all physicians.
7    Q.  Fair enough.  And what -- what you've
8    included on this chart, if I understand it right,
9    are two measures:  One that came from IMS Xponent,
10   and one that came from Wolters Kluwer; is that
11   correct?
12   A.  That's correct.
13   Q.  And am I right that you haven't
14   extrapolated the data in any way or otherwise
15   adjusted it in any way in Figure 1.a?
16   A.  So the data is -- it comes from Xponent --
17   sorry, IMS Xponent --
18   Q.  Uh-huh.
19   A.  -- NRX field, and Wolters Kluwer NRX
20   field, which is provided to us by -- Wolters Kluwer
21   data was provided to us by the Defendant, and IMS
22   data was provided to us by IMS.
23          The data on new prescriptions comes from a
24   data field that IMS and Wolters Kluwer provide to
25   us directly, which says, "new prescriptions."  It's
```

350

```
1    labeled "new prescriptions" on it.
2          We have not -- myself and my staff -- have
3    not manipulated the data in any way.  This is the
4    raw data that we -- that we get from IMS and
5    Wolters Kluwer.
6    Q.  One question about the data:  The data you
7    have here is for Neurontin only, correct?
8    A.  That's correct.
9    Q.  So none of the data that you use here
10   includes figures for Gabapentin?
11   A.  My understanding is that it's total number
12   of Neurontin overall.
13   Q.  Okay.  Fair enough.  Again, does -- by
14   "Neurontin," you just mean brand name Neurontin,
15   not generic Gabapentin?
16   A.  Well, generic entry doesn't occur until
17   7/04, so -- which is clearly marked on Figure 1-a.
18   So there is no available Neurontin -- sorry.
19   Neurontin is not available generically before July
20   2004.  And because of that, the chart shows data
21   reported by IMS and Wolters Kluwer for new
22   prescriptions of Neurontin that is branded between
23   1996 and 2004.
24   Q.  Okay.  Understood.  Just -- just to be
25   clear, though, again, what the chart's -- because
```

351

1    the chart does continue for at least a little bit
2    of time after July '04 -- just to be clear, the --
3    the chart reflects just branded Neurontin, not
4    generic Gabapentin as well.
5         MR. RONA: Objection.
6    A. There is no generically-available
7    Neurontin between 1996 through 2004; and because of
8    that, the chart only shows Neurontin that's
9    available in a branded form between those two time
10   periods.
11        Q. Okay. What about after July of '04?
12        MR. RONA: Objection.
13   A. After July --
14        THE WITNESS: Thank you.
15   A. After July of '04, the report shows -- I
16   think it also reports branded Neurontin.
17        Q. Okay. You were referring to a dotted line
18   here that reads -- next to which there's a notation
19   that reads, "Generic entry (7/04)."
20        Did you put that dotted line on the --
21        MR. RONA: Was that a question?
22        MR. POLUBINSKI: I'm asking a question.
23        MR. RONA: It sounded like --
24        MR. POLUBINSKI: You interrupted my
25   question. Let me ask it again, please, and let me

352

1    ask it --
2         Q. I said that you referred to generic entry
3    for Gabapentin, and on your chart there is a dotted
4    line, next to which is a notation that reads,
5    "Generic entry (7/04)."
6         Did you add that dotted line in that
7    notation to their -- to your chart?
8         MR. RONA: Objection.
9    A. I personally did not put this notation on
10   the chart.
11        Q. Okay. Do you know who did?
12   A. No, I don't.
13        Q. Other than what's reflected on this chart,
14   do you have any personal knowledge as to when
15   generic entry occurred with respect to Gabapentin?
16   A. Are you asking me when generic entry of
17   Neurontin occurred?
18        Q. I think I'm asking you, other than what's
19   reflected on this chart, do you have any personal
20   knowledge as to when generic entry occurred with
21   respect to Gabapentin?
22   A. So you -- are you asking me whether or not
23   the chart provided me information about generic
24   entry?
25        Q. I'm asking you whether you have any

353

1    information about generic entry, other than what's
2    reflected in the chart.
3    A. Yes.
4         Q. What is that?
5    A. That it -- that Neurontin entered the
6    market in a generic form at the -- in the middle of
7    2004.
8         Q. And I guess my question is, where does
9    that knowledge come from?
10   A. I mean, to be honest, it's something that
11   I've just known for a while. It's not -- I can't
12   refer to a specific document that could tell --
13   that could -- that would be able to direct you
14   specifically to where I received that information.
15        But I did not -- the point is that I did
16   not learn about generic entry of Neurontin from --
17   from how this chart was constructed.
18        Q. Okay. That's fine. I guess I just am
19   trying to get a sense for how you learned about it,
20   whether it was from a document, or whether it was
21   from conversations from somebody else, for example.
22   A. It was -- I think it was from neither. I
23   think I did a Web search about Neurontin, and
24   specifically, I think I looked at the FDA Orange
25   Book, which is something that I use very commonly

354

1    in my own work, looking at prescription
2    medications.
3         Q. And do you think that's where your
4    knowledge came about generic entry?
5    A. Like I said, I'm not -- I'm not a hundred
6    percent sure exactly where my knowledge of generic
7    entry of Neurontin came from, but in the course of
8    doing this work, I definitely consulted the FDA
9    Orange Book at some point, which, again, it's just
10   -- it's something that I -- I do, I would say,
11   every three or four days, based on my own research
12   that I do for other work that I do.
13        Q. Okay. Let's keep going. I guess, again,
14   just to sort of round out this line of questioning,
15   you don't know one way or the other what happened
16   to levels of Gabapentin prescribing in the
17   aggregate after it went generic, correct?
18        MR. RONA: Objection.
19   A. That's not what I was -- so how do I say
20   this? The analysis that we did looked at the total
21   number of Neurontin new prescriptions per month for
22   all physicians.
23        I don't know what the total number of
24   Neurontin prescriptions overall by all physicians,
25   how that changed over -- after 2004. That's not

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

355

1 something that I looked at in the course of doing
2 this analysis.
3     What I was asked to do was simply look at
4 the total number of Neurontin new prescriptions per
5 month over all physicians, using these two
6 datasets, and that's what I did.
7     Q.  That's fine.  I'm not -- I'm not being
8 critical at all.  I just want to understand what
9 you did and didn't do.
10     In your last answer I think you said, "I
11 don't know what the total number of Neurontin
12 prescriptions overall by all physicians -- how that
13 changed after 2004."  I assume there you mean
14 overall Gabapentin, not just brand name Neurontin,
15 correct?
16     A.  Absolutely -- no, that's not what I said.
17 What I said was, I don't know the total number of
18 Neurontin prescriptions over all prescriptions --
19 new and refills -- per month for all physicians
20 after 2004 --
21     Q.  Okay.  Then that's --
22     A.  -- which is what -- that's what you asked
23 me, and what I am answering is that I don't know.
24     Q.  Okay.  I think that may not have been what
25 I asked you, but there's -- it doesn't matter here

356

1 or there.
2     What I meant to ask you -- if that's not
3 what I had asked you -- is whether you know
4 anything about overall Gabapentin prescriptions,
5 both branded Neurontin and generic, after generic
6 entry in 2004?
7     MR. RONA:  Objection.
8     MR. POLUBINSKI:  What's the objection?
9     MR. RONA:  It's confusing.
10     Q.  Are you confused?
11     A.  Can you restate the question, please.
12     MR. POLUBINSKI:  Can you read it back,
13 please.
14     (Question read back.)
15     MR. RONA:  I renew my objection -- "know
16 anything about."
17     A.  This chart shows the total number of
18 Neurontin new prescriptions per month over all
19 physicians.  It -- and my understanding of the
20 construction of this chart is that we were looking
21 at branded Neurontin new prescriptions over the
22 time period.
23     Q.  Okay.  I understand.  I just -- and I
24 don't think this is -- I'm not meaning to be
25 confusing or difficult, but I just want to make

357

1 sure that you didn't do any analysis one way or the
2 other about generic Gabapentin prescriptions,
3 correct?
4     A.  So I was not asked to examine the overall
5 generic -- the overall number of generic -- of
6 generic Neurontin prescriptions for all physicians
7 between 2004 and afterwards.  I was not asked the
8 task, and specifically what the figure shows is the
9 total number of Neurontin new prescriptions per
10 month over all -- over all physician classes
11 between 1996 through 2004.
12     And specifically, what we're really
13 concentrating on here, because that's the data that
14 we have for both IMS and Wolters Kluwer data for
15 new prescriptions, is between -- is between 1996
16 through 2004.  And particularly, the overlap that
17 you see in the chart is between 1997 through 2000
18 or through 1999.
19     Q.  Is it possible for you to give a yes-or-no
20 answer to the question of whether you considered
21 any data about generic Gabapentin?
22     MR. RONA:  Objection.
23     A.  In the construction of these charts, we
24 did not focus on new prescriptions of generic
25 Neurontin after 2004.

358

1     MR. POLUBINSKI:  Okay.  Can you read the
2 question, back, please.
3     (Question read back.)
4     A.  So --
5     MR. RONA:  Same objection.
6     Q.  It's a simple question.  I'm not -- I'm
7 not trying to be difficult here.  I'm not sure what
8 the problem is.
9     MR. RONA:  Objection.  And now -- I'm not
10 sure how many questions are before the witness now.
11 Which -- which question would you like her to
12 answer?
13     MR. POLUBINSKI:  The last question that
14 was posed, and I'll -- I'll say it again.  I -- I
15 guess the question is --
16     MR. RONA:  Is there now going to be a
17 third question?
18     MR. POLUBINSKI:  No, I'll withdraw any
19 pending question.  I'll just ask this question,
20 okay.
21     MR. RONA:  Okay.
22     Q.  The -- in any of the work that you did in
23 your report, did you consider any data about
24 generic Gabapentin?  It's a simple yes-or-no
25 question.

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

359

1     MR. RONA:  Objection.
2     A.  So my understanding of the construction of
3  the charts that we focused on -- that I focused on
4  -- was that we were, again, IMS data for NRX only
5  covers the 1996 through 1999 time period.  In that
6  time period, there was no generically-available
7  Neurontin at all.  So we did not concentrate on the
8  availability of generic Neurontin over this time
9  period in this dataset, because it was not
10  available.
11     Similarly, between 1997 or so and 2004, in
12  the Wolters Kluwer new prescription data there was
13  no available brand -- sorry -- generic Neurontin.
14  So we did not consider generically-available
15  Neurontin in a dataset -- in the Wolters Kluwer
16  data -- between 1997 and 2004, because there was
17  none available.
18     After -- so my question to you is, are you
19  asking me about whether we considered -- in IMS
20  data and Wolters Kluwer data -- between 1996 and
21  2004 -- whether we considered, in the construction
22  of this chart, generically-available Neurontin
23  during this time period?
24     Q.  Just listen to my question.  It's a really
25  easy question.

360

1     Any dataset that you considered anywhere
2  in the context of your report, whether it's Wolters
3  Kluwer, IMS Xponent, NDTI, any time period --
4     A.  Uh-huh.
5     Q.  -- did you consider any data at all --
6     A.  (Witness nods.)
7     Q.  -- on generic Gabapentin?  It's -- it's
8  not a trick question.
9     MR. RONA:  Objection.
10     A.  So generically-available Neurontin was
11  only available after 2004.
12     Q.  I'm not arguing with you about that.  I'm
13  talking about after 2004.  You've got NDTI data
14  after 2004.
15     A.  Uh-huh.
16     Q.  You've got Wolters Kluwer data after 2004.
17     A.  Uh-huh.
18     Q.  I just want to try to be clear about
19  whether you considered generic Gabapentin data
20  anywhere.  It's an easy question.
21     MR. RONA:  Objection.
22     Q.  You either did or you didn't, right?
23     MR. RONA:  Objection.
24     A.  So again, the intent of the report was to
25  look at numbers of new Neurontin prescriptions over

361

1  the -- the -- over a period where Neurontin was not
2  available generically.  There is a small portion of
3  the time period where generic entry was -- where --
4  I'm sorry -- where Neurontin was available
5  generically.
6     Over that time period, I think we did, at
7  some point, look at generically-available
8  Neurontin.  But whether -- but the intent of the
9  available -- the intent of the figures and the
10  intent of the report is to look at Neurontin, new
11  prescriptions by physicians, and count -- counts of
12  new prescription -- sorry -- counts of unique
13  physicians prescribing Neurontin when Neurontin was
14  not available generically.
15     Q.  Okay.  So you said you think you did look
16  at generic -- data on generic Gabapentin.
17     A.  Uhm.
18     Q.  Yes or no.
19     MR. RONA:  Objection.
20     A.  Are you asking me whether I think I did,
21  or are you asking me whether the charts reflect
22  that?
23     Q.  Let's do both.  Did the charts reflect it?
24     A.  Not that -- not to my knowledge.
25     Q.  Okay.  And --

362

1     A.  But honest -- to be honest, I will check
2  with my staff about whether or not the charts --
3  after 2004 for the Wolters Kluwer data -- report
4  generically available and generically --
5  generically -- sorry -- generic new prescriptions
6  per month for all physicians or not.
7     Q.  Okay.  So you -- you think that they don't
8  include it, but you're not completely sure; is that
9  correct?
10     A.  No.  You're putting words in my mouth.
11     MR. RONA:  Objection.
12     A.  No.  What I'm saying is, I can't tell you
13  for sure whether, after 2004, the charts reflect
14  for Neurontin avail -- new prescriptions of Neurontin
15  available generically.
16     Q.  Okay.
17     A.  But like I said, the intent of the figures
18  in general was to examine new prescriptions of
19  Neurontin when Neurontin was not available
20  generically -- was only a brand name -- a branded
21  drug.
22     Q.  Okay.
23     A.  And I'm happy to check with my staff to
24  find out whether generically-available or
25  generically -- generic new prescriptions of

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

363

1  Neurontin were counted in this after 2004.
2     Q.  Okay.  Let's ask the second part of the
3  question, which is, independent of what's reflected
4  in the charts, are you aware of any data on generic
5  Gabapentin that you reviewed in connection with
6  this report?
7     A.  I'm not sure.
8     Q.  Okay.  Let's turn the page.  Okay.  I'm
9  looking now at Figure 1.b, which is described here
10  as, "Number of physicians writing new prescriptions
11  for Neurontin, all physicians."
12     A.  Actually, I'm sorry.
13     Q.  And --
14     A.  I want to enter -- I'm sorry.  Go ahead.
15  I do want to interrupt.  I want to say something
16  about the line of questioning that from -- that we
17  just finished.
18        MR. RONA:  If you need to to make your
19  answer more complete, please feel free.
20     A.  Uh-huh.  Yes, please.  So the only thing I
21  wanted to say was about this NDTI entry, the two --
22  for Figure 1.a and Figure 1.b, the NTN entry to '94
23  and generic entry 7/04, I did not personally put
24  these signposts on the -- on the charts, but  in
25  the -- but my staff did, at my instruction in -- or

364

1  actually, I'm sorry, but my staff did.  And I
2  reviewed these charts before they went into my
3  report.
4     Q.  Okay.  Are you done?
5     A.  I am.
6     Q.  Good.  So in Figure 1.b, you're depicting
7  the number of physicians writing new prescriptions
8  month by month according to the Xponent and Wolters
9  Kluwer data that you had, correct?
10     A.  Correct.
11     Q.  And here, too, as in -- in Figure 1.a,
12  there's no extrapolation or other adjustment.
13  These are just reflecting the numbers that you got
14  from the data, correct?
15     A.  That's correct.
16     Q.  Okay.  Let's flip the page to Figure 2.
17     A.  And the intent of this figure is to show
18  that IMS data and Wolters Kluwer data for the data
19  -- for the period in which we have overlap do
20  appear to report approximately the same number of
21  physicians writing new prescriptions for Neurontin
22  over the time period where there is overlap, which
23  is between approximately 1997 and -- and 1999.
24     Q.  Ms. Conti, I'm happy to hear your answers
25  to my questions.

365

1     A.  Uh-huh.
2     Q.  If there are points you want to make about
3  the documents --
4     A.  Uh-huh.
5     Q.  -- you can do that when your counsel asks
6  you questions, but I've got a limited amount of
7  time, unfortunately, and I'd like to just ask the
8  questions that I want to ask, and hopefully you can
9  answer those.
10        You know, I appreciate your saying that,
11  and obviously, I have no dispute with what you
12  said, but just as a matter of, you know, sort of
13  handling this deposition, as I'm sure you've heard
14  from Mr. Rona and others, the way it works is that
15  I ask questions, and that you answer them.  And he
16  has an opportunity to ask you later if he thinks
17  that's appropriate.
18        MR. RONA:  And in that same vein, I think
19  if you could limit your remarks to questions.  And
20  objection to that speech.
21        MR. POLUBINSKI:  It's not a speech.  It's
22  an instruction.  It's -- and it's pretty common
23  sense.  I could also just move to strike the -- the
24  last speech that she made as nonresponsive.
25        MR. RONA:  Why don't you do that.

366

1        MR. POLUBINSKI:  Which maybe I'll do.
2  I'll move to strike as nonresponsive.
3        MR. RONA:  Save everybody time.
4        MR. POLUBINSKI:  I'm trying to say
5  everybody time.
6     Q.  Okay.  So Figure 2, can we look at that
7  one now?
8     A.  Yes.
9     Q.  Okay.  So there are three lines that are
10  plotted on Figure 2; is that correct?
11     A.  That's correct.
12     Q.  Okay.  Two of them are the same lines that
13  are plotted on Figure 1.b, correct, the IMS line
14  and the Wolters Kluwer line?
15     A.  Yes.  That's correct.
16        MR. RONA:  Objection.
17     Q.  Okay.  And the new line on Figure 2 is the
18  IMS extrapolated line, right?
19     A.  That's correct.
20        MR. RONA:  Objection.
21     Q.  The IMS extrapolated line describes or
22  shows -- withdrawn.  The IMS extrapolated line on
23  Figure 2 is how you project the IMS Xponent data
24  forward for the years that aren't covered by the
25  IMS Xponent data that were provided to you,

367

1  correct?
2      MR. RONA:  Objection.
3  A.  No.
4  Q.  Okay.  What is it?
5  A.  The IMS extrapolated data line is not a
6  methodology.  The IMS extrapolated line is the
7  result of a methodology that estimates relationship
8  between IMS data and Wolters Kluwer data over the
9  overlapping period of time that we have data, and
10  then projects out or forecasts what our best
11  estimate of the number of physicians writing new
12  prescriptions for Neurontin each month over all
13  physicians, between 1999 through 2005, based on the
14  data that we have.
15  Q.  Okay.  That's helpful.  Thank you.  Trying
16  to help out someone like me who's, you know, not a
17  technician in these sorts of things as may be the
18  case for some people reading the transcript, would
19  it be fair to say that the extrapolation is based
20  on the relationship between Wolters Kluwer and IMS
21  data for the years in which you have both sets?
22  A.  Yes, that's correct.
23  Q.  Okay.
24  A.  So -- okay.  And as you can see in the
25  Chart and in Figure 1.b, the data that we have for

368

1  the years of overlap between IMS and Wolters Kluwer
2  data there -- they -- they really overlap very
3  closely.  And so what we did was we estimated that
4  relationship using IMS data as the standard,
5  because of -- because it -- we think that it has --
6  it's much -- it's more reliable than Wolters Kluwer
7  data, particularly when we get down to the
8  individual specialty level, and then projected out
9  or forecasted the total number of physicians
10  writing new prescriptions for Neurontin over the
11  time period in which we do not observe IMS data.
12  Q.  Okay.  The -- the period of overlap
13  between the two datasets is June 1997 to December
14  '98; is that correct?
15  A.  I'd have to look at my notes to be
16  precise.
17  Q.  Okay.  Well, you can do that.
18  A.  (Witness reviews document.)  Right.  So
19  the -- the period of overlap of the two datasets is
20  between June 1997 and December 1998.
21  Q.  And so what you do is you create a formula
22  that you apply to the Wolters Kluwer data after
23  December of 1998 to come up with the IMS
24  extrapolated line.
25  A.  Just to be very precise, what we did was

369

1  we estimated the relationship -- the logged -- or
2  the lagged relationship between observed IMS data
3  and Wolters Kluwer data.
4      We then predicted, based on that
5  relationship, which, for the years that we observe
6  is very, very close.  Based on that very close
7  relationship, using IMS as the gold standard, we
8  project out -- we forecast what Wolters -- what our
9  best estimate of IMS would be over that time period
10  -- or I'm sorry -- of Wolters Kluwer data over that
11  time period.
12  Q.  Okay.  Thanks.  I'm correct the approach
13  that you take assumes that the observed
14  relationship between the two datasets during the
15  overlapping period remains the same afterwards,
16  correct?
17  A.  That's correct.  So the assumption
18  underneath the model is that the -- that the
19  relationship is stable.
20      Now, we feel -- we feel pretty good about
21  that assumption, because we have multiple quarters
22  of -- I'm sorry -- multiple observations over the
23  overlap, and the estimate -- and the -- for each
24  given period overall and for each given time period
25  that we estimate the -- the relationship is

370

1  actually very, very close.
2      So uhm, you know, barring -- so it's --
3  it's a very standard way of going about forecasting
4  data in time to try to rely on the observed data
5  that we do have feel -- try to feel as comfortable
6  as we possibly can about that relationship and the
7  stability of that relationship over the time
8  period, and then forecast -- forecast out.
9  Q.  Okay.  Other -- other than the comparison
10  between the overlapping time period, which I think
11  you just described --
12  A.  Uh-huh.
13  Q.  -- have you done anything else to test the
14  assumption that the relationship will remain the
15  same afterwards?
16  A.  If I can just look for one minute, please,
17  if you don't mind.
18  Q.  Please.
19  A.  (Witness reviews document.)  So if we flip
20  to Figure 4.
21  Q.  Uh-huh.
22  A.  So -- oh, actually.  I'm sorry -- for one
23  second.  Let me just -- I should think before I
24  talk.  (Witness reviews document.)
25      So one thing that we did in order to feel

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

371

1 a little bit comfortable about the -- about the
2 stability of the relationship in -- at least in
3 terms of the shape of the line, if not the absolute
4 numbers of the line was to look at the overlap
5 between -- about the shape of the raw data observed
6 between IMS data, Wolters Kluwer data over the time
7 period, and also NDTI data, that's in Figure 4.
8         So in this figure -- so Figure 4 looks at
9 total drug uses or total Neurontin uses compared to
10 total new prescriptions over all physicians.  And
11 here we estimate -- or here we're not estimating
12 anything.  We're just looking at raw data that we
13 have available over the time period, and you'll
14 see, again, that the IMS NRX and the Wolters Kluwer
15 NRX just in the raw period is -- overlaps over the
16 time period, very closely tracks each other both in
17 the -- both in the estimate -- the kind of total
18 count, but also in the -- in the shape of the trend
19 line.
20         When we look at -- at the period where
21 there isn't overlap -- or where we don't have IMS
22 NRX data after 1999 or after 1998 or so, the
23 absolute number of total new prescriptions differs
24 between NDTI and Wolters Kluwer data.  However, the
25 shape of the line doesn't change that much.

372

1         So that gives us a little bit of
2 confidence that even though, again, these are
3 forecasted numbers that we are, at least,
4 estimating a relationship in terms of the slope of
5 the line, if not the absolute numbers that that's
6 providing us a -- a -- a good estimate of the
7 relationship -- I'm sorry -- a good estimate of the
8 relationship going forward.
9    Q.  Okay.  We'll get back to Figure 4 and talk
10 about that a little more in a minute, but just to
11 make sure we finish up with your extrapolation,
12 other than a comparison between the overlapping
13 time periods, which you discussed, and then also
14 this comparison with NDTI data that you had
15 available --
16    A.  Uh-huh.
17    Q.  -- to you, were there other things that
18 you did to test the assumption, just so I know I've
19 got a complete list?
20    A.  So we did a standard -- so in -- in
21 estimating the relationship between IMS and Wolters
22 Kluwer data, we looked at goodness of fit
23 statistics.  We also looked at -- at the estimated
24 T statistic for the relationship between IMS and
25 Wolters Kluwer data and found it to be highly

373

1 statistically significant.
2    Q.  Okay.  The -- the goodness of fit
3 statistics that you looked at and the estimated T
4 statistics relate to the relationship between the
5 -- the two datasets during the overlapping time
6 period; is that correct?
7    A.  That's correct.  That's correct.  And
8 again, provides more confidence that, at least over
9 the observed time period, there's no reason that we
10 would expect that -- sorry -- at least over the
11 observed period that the -- that the relationship
12 between IMS and Wolters Kluwer data is providing
13 us, in general, the same or very similar estimate
14 of number of new -- number of physicians providing
15 new prescriptions of Neurontin over the observed
16 time period, and that gives us confidence in
17 extrapolating forward.
18    Q.  Okay.  Anything else to test the
19 assumption that -- that the relationship remains
20 the same or -- or have we covered it?
21    A.  No, that's it.
22    Q.  Okay.  Let's look at Figure 3.  Okay.  As
23 I understand it, at least, Figure 3 is the same as
24 Figure 2, but that it adds an additional line,
25 which is reflected by these blue circles, which are

374

1 described on the chart as "IMS backcast."
2    A.  That's correct.
3    Q.  Okay.  And the other lines, the line that
4 reads, "IMS --" the line that reads, "Wolters
5 Kluwer," the line that reads, "IMS Extrapolated"
6 are doing the same things that they were doing in
7 Figure 2; is that right?
8    A.  That's correct.
9    Q.  The -- the blue line -- the "IMS Backcast"
10 line covers the period from 1994 up through generic
11 entry; is that correct?
12    A.  The blue line covers the period between
13 1994 and -- and 2005 --
14    Q.  Okay.
15    A.  -- or sorry, and last quarter of 2004.
16    Q.  Okay.  And just so I can understand the
17 blue line, is it -- is it fair to say that what
18 this is is essentially a -- a smooth line that
19 seeks to approximate as closely as possible the
20 data points from Wolters Kluwer, IMS Xponent, and
21 the extrapolated version of IMS Xponent that you
22 have from Figure 2?
23         MR. RONA:  Objection.
24    A.  The blue line was generated as a -- to
25 backcast to fill in missing data.  Essentially, no

16590/014 -- Pfizer / Consumer Protection       Unsigned                    Page  371 - 374

375

1  dataset that we have that is available to us, IMS
2  Xponent data, or Wolters Kluwer data, and my
3  understanding is, no data that's commercially
4  available is going to be able to provide us the
5  number of physicians writing new prescriptions for
6  Neurontin previous to the mid '90s, previous to
7  1996.
8      So in order to -- in order to provide a --
9  a best estimate of the number of physicians writing
10  new prescriptions for Neurontin before the data is
11  available -- before 1996 -- we -- we did -- we
12  followed a very standard economic procedure for
13  backcasting data, based on the observed data that
14  we see in IMS and Wolters Kluwer data -- the actual
15  -- sorry -- the actual counts of physicians that
16  would be observed in IMS and Wolters Kluwer data.
17      So the blue line represents the results of
18  that very standard economic methodology for
19  backcasting when you have missing data.
20      Q.  Okay.  In terms of just trying to
21  understand what the economic procedure is that --
22  that you did in backcasting, am I correct to
23  understand that essentially what that is seeking
24  to superimpose a smooth line that continues the
25  trends that you observe in the data that you have?

376

1      MR. RONA:  Objection.
2      A.  The intent of the backcast is not to
3  provide a smooth line.  What the intent of the
4  backcast is -- is to provide -- is a methodology
5  for filling in missing data when we have no
6  observations of the number of physicians writing
7  new prescriptions for -- in any dataset between
8  1994 and the beginning of 1996.  That's what the
9  intent of the -- of the extrapolate -- of the
10  backcasting procedure is.
11      Q.  Okay.  Can you describe for me in maybe a
12  little more detail how you come up with the line
13  for the -- for the 1994 to 1996 period.
14      A.  Sure.
15      MR. RONA:  Objection.
16      A.  Sure.  So again, it's -- it's based on the
17  observed relationship between Wolters Kluwer data
18  and IMS data in the period in which there's
19  overlap.  We then went to the classic economic
20  literature on the diffusion of new technologies to
21  try to -- to come up with a methodology that would
22  allow us to estimate -- to fill in missing data in
23  the period where we observe any data on the number
24  of physicians -- so before 1996.
25      This literature -- excuse me -- we did an

377

1  extensive literature review to look at the
2  diffusion of new technologies, specifically
3  procedures for estimating the -- sorry --
4  estimating the -- the diffusion of new
5  prescriptions over using -- sorry -- so we did this
6  -- sorry.
7      We did this whole literature review
8  looking at both diffusion of new technology, but
9  also new prescriptions or new prescription
10  medications.  More specifically, we then looked at
11  the econometric literature and the statistical
12  literature for how you estimate diffusion patterns
13  over time.  We used that very standard -- I mean,
14  the very, very large literature that encompasses
15  both economic statistics, econometrics, marketing
16  literature, business literature that talks about
17  these relationships.  It's a -- it's a very well
18  flushed-out literature that -- to come up with the
19  kind of -- most standard -- excuse me --
20  conservative way of backcasting.
21      So here what we did is, again, we observe
22  data for a certain period of time.  That helps us
23  pick a model for -- a method for -- for going
24  backwards.
25      Q.  Okay.  The -- the literature review that

378

1  you just described --
2      A.  Uh-huh.
3      Q.  -- did you do that yourself?
4      A.  I did.  I did -- yes, I did a full
5  literature review of the diffusion literature, and
6  also my staff also did it -- a full literature -- a
7  full literature review of the analysis --
8      Q.  All right.
9      A.  -- of the -- of the diffusion literature.
10      Q.  Okay.  Are your sources you consulted in
11  the literature review included among the documents
12  you considered --
13      A.  Uhm.
14      Q.  -- that are attached to your report?
15      A.  Yes, they are.
16      Q.  Okay.  Are there any others?
17      A.  So subsequent to the submitting of this --
18  of this document, I also reviewed other literature,
19  so that I'm -- that I'm, you know, again, just to
20  flush out my knowledge of the diffusion literature
21  some more, but the --
22      Q.  So --
23      A.  -- but the main papers that we relied upon
24  to estimate the relationships that are contained in
25  the report are contained in -- in the documents

379

1    that were submitted to the Court.
2        Q.  Okay.  The -- the additional literature
3    that you reviewed --
4        A.  Uh-huh.
5        Q.  -- is that -- is that literature that you
6    rely on at all for purposes of your opinion?
7        A.  No.
8        Q.  Okay.
9        A.  It just provides more confidence for me in
10   -- in -- in our procedure that we present in the
11   documents.
12       Q.  Okay.  Do you recall what any of those
13   sources were now?
14       A.  No, but I -- I mean, I can tell you that I
15   did a standard literature review using economic --
16   you know, EconLit, J Store, and National Bureau of
17   Economic Working Papers.
18       Q.  Okay.  But again, just for purposes of our
19   figuring out what the sources are, you can't
20   remember precisely what they are now?
21       A.  No, not off the top of my head.
22       Q.  Okay.  One thing I think you had said as
23   part of your answer a few answers back was that it
24   was your understanding that there was no data
25   commercially available from IMS Xponent and Wolters

380

1    Kluwer prior to 1996.  Is that --
2        MR. RONA:  Objection.
3        Q.  Is that true?  Did I understand that
4    right?
5        A.  So I think I said two things:  The first
6    is that myself and my staff did not have available
7    to us IMS data or Wolters Kluwer data -- the
8    Wolters Kluwer data being provided to us by the
9    Defendants; that the IMS data that we -- I'm sorry
10   -- that was purchased to us and given to GMA; that
11   -- that -- that would provide any data on the
12   number of physicians writing new prescriptions
13   previous to 1996.
14       My general understanding is that there is
15   no commercially-available data that will be able to
16   provide representative numbers of physicians
17   prescribing medication in the US previous to the
18   mid '90s.
19       Q.  Okay.  So would you be surprised if there
20   were IMS Xponent data, for example, that was
21   available between 1994 and 1996?
22       A.  I don't think I'd be surprised.  In fact,
23   I'd be really happy.  My feeling is, is that more
24   actual data is great.  And we would be
25   absolutely -- you know, we would be thrilled to

381

1    have that data, and -- and be able to use that data
2    to generate these charts.
3        MR. RONA:  Can I clarify, are you talking
4    about Neurontin IMS Xponent data?
5        MR. POLUBINSKI:  Yes.
6        Q.  Does it change your answer?
7        MR. RONA:  I just want to make clear,
8    because there's two different things here.  There's
9    Neurontin data --
10       THE WITNESS:  Uh-huh.
11       MR. RONA:  -- and there's a product that
12   IMS sells.
13       MR. POLUBINSKI:  Understood.
14       A.  Okay.  So --
15       Q.  I'm assuming your answer is the same, but
16   if it's not, that's fine.
17       A.  So to be more specific, if IMS Xponent
18   data and Wolters Kluwer data and/or Wolters Kluwer
19   data are available, that can provide the same
20   reliable and valid counts of the number of
21   physicians writing new prescriptions for Neurontin.
22   Honestly, that would be fantastic, and we would be
23   happy to have that data to rerun these -- these --
24   the -- the creation of these charts.
25       The issue about the charts is that the

382

1    charts represent a methodology for going about
2    estimating the number of physicians writing new
3    prescriptions for Neurontin, not -- how do I say
4    this?  And so more data is -- more actual observed
5    data is always better.
6        Q.  Okay.  Just so the record's completely
7    clear, you didn't use actual pre1996 data to come
8    up with the backcast line, correct?  It's based on
9    data after that point?
10       A.  For the construction of Figure 3, we did
11   not use any actual data for estimating the number
12   of physicians writing new prescriptions for
13   Neurontin between 1994 and 2000 -- and 1996.
14   That's based on the observed relationship between
15   IMS and Wolters Kluwer data over the time -- over
16   the time period that we have the -- over the time
17   period that we observed those datasets.
18       Q.  Okay.  So none of the observations between
19   1994 and 1996 are based on actual observations from
20   data from that time period, correct?
21       A.  Right.  So for the construction of Figure
22   3, that's correct.  Again, it's based on a very
23   standard economic method for filling in missing
24   data that -- that is -- that is kind of commonly
25   used for -- that's -- that relies on a very large

Conti, Rena (MDL) 2/13/2008 6:30:00 PM

383

1 economic literature on the diffusion of new
2 technologies, and specifically the diffusion of
3 medications.
4    Q.  Okay.  You do have NDTI data from before
5 1996, correct?
6    A.  NDTI data will not provide the number of
7 physicians writing new -- new prescriptions for
8 Neurontin.  So it's not relevant to -- to the
9 exercise -- to the construction of Figure 3.
10    Q.  Did -- did you ever consider using NDTI
11 data to validate or inform your backcast line?
12       MR. RONA:  Objection.
13    A.  It's not relevant.
14    Q.  Let me make sure --
15    A.  Because it -- it's not relevant, because
16 it does not provide the number of physicians
17 writing new prescriptions for Neurontin.
18    Q.  Okay.  I -- I thought that you'd testified
19 before that one of the things that you'd done to
20 validate your forecast line was to look on Figure 4
21 at the NDTI data on uses; is that correct or -- or
22 did I misunderstand that?
23       MR. RONA:  Objection.
24    A.  But again, that's just to -- kind of as a
25 double-check on -- on the shape of the line that's

384

1 forecasted, not on the actual counts.
2       And that's not a strong test of -- of the
3 reliability of the forecast.  Again, it just
4 provides confidence to -- for our methodology.
5    Q.  But you didn't do that double-check
6 with respect to the backcast line, or did you?
7    A.  No, not to my knowledge, I did not do
8 that.
9    Q.  Okay.
10    A.  But again, it doesn't make any sense to do
11 that, honestly, because NDTI cannot provide point
12 estimates of the number of physicians writing new
13 prescriptions.  And the big issue for us between
14 1994 and 1996 is that these are a relatively small
15 number of physicians.  So I wouldn't want to -- and
16 -- and again, it's a very small time period.
17       So it's -- here I would really be relying
18 on the reliability of NDTI -- of NDTI to give me
19 kind of more precise, reliable point estimates of
20 the number of physicians, and it's simply not
21 intended to do that.  And it wouldn't make any --
22 it wouldn't -- it wouldn't be -- I don't think it
23 would make a lot of sense to do that.
24    Q.  Okay.  Let's look at Figure 4.  So
25 proceeding in -- in order here, this is the first

385

1 figure in your report in which you show a line
2 representing NDTI data; is that correct?
3    A.  Yes.
4    Q.  And on Figure 4, NDTI uses are represented
5 by this -- this blue line -- this blue line with
6 diamonds --
7    A.  That's correct.
8    Q.  -- for those of us who -- who don't have
9 color copies.  The other lines in that -- the
10 IMS Xponent line, which is red, and the Wolters
11 Kluwer line, which is grey, are showing new
12 prescriptions of Neurontin, correct?
13    A.  That's correct.
14    Q.  And the NDTI line is showing uses,
15 correct?
16    A.  That's correct.
17    Q.  And the NDTI line here I'm assuming shows
18 total uses exactly as they appear in the NDTI data
19 that you received; is that right?
20       MR. RONA:  Objection.
21    A.  Uhm.
22    Q.  I can clarify, if that's helpful.
23    A.  Okay.
24    Q.  You haven't performed any sort of
25 extrapolation or otherwise adjusted the numbers

386

1 that are reflected in the NDTI line.
2    A.  No, I have not.
3    Q.  Okay.  Do you have any -- well, you would
4 agree with me that, for a number of points in time
5 here, the line for NDTI total uses is less than the
6 numbers reflected in the Wolters Kluwer line or in
7 the IMS line; is that correct?
8    A.  Yes.
9       MR. RONA:  Objection.
10    Q.  Do -- do you have any understanding for
11 why that is?
12       MR. RONA:  Objection.
13    A.  So between 1996 and let's say, you know,
14 1999 or so, we observe NDTI uses, IMS NRX uses, and
15 Wolters Kluwer NRX uses all over that time period.
16 And it looks like there actually is a pretty --
17 pretty close correspondence between what is
18 reported as NDTI uses, IMS NRX uses, and Wolters
19 Kluwer NRX uses.
20       Previous to 1996, we only observe NDTI
21 uses.  We do not observe IMS or NRX or Wolters
22 Kluwer data.
23       After 19 -- end of 1998, we only observe
24 Wolters Kluwer NRX uses or NRXs and NDTI uses.  In
25 that time period -- so starting in 1998 through --

387

1   through end of 2004, what we observe is that NDTI
2   uses appear to be smaller than -- than Wolters
3   Kluwer new RX uses.  Is that what you are directing
4   my attention to?
5       Q.  Yeah.
6       A.  Okay.
7       Q.  Yeah.  No, I guess my question was whether
8   you -- you knew why that was.
9       A.  Yeah, I don't know why that is.  What I
10  can say about this is that NDTI uses and Wolters
11  Kluwer uses do not necessarily -- new uses do not
12  necessarily correspond to the same things.  I do
13  not know of any validation exercises, nor was I
14  asked to -- to do any validation exercises to
15  completely correspond or to completely estimate the
16  relationship between NDTI uses and Wolters Kluwer
17  new uses.
18      Q.  Okay.  Let's -- let's look at Footnote 3
19  on Page 9 of your declaration.
20          THE WITNESS:  I'm sorry.  May I take a
21  break, please.
22          MR. POLUBINSKI:  Sure, of course.
23          THE WITNESS:  Thank you.
24          VIDEO OPERATOR:  Time's 10:02.  This is
25  the end of Cassette 1 Day 2.  We are off the

388

1   record.
2           (Recess was taken.)
3           VIDEO OPERATOR:  The time is 10:13.  This
4   is the beginning of Tape 2 in the deposition of
5   Doctor Conti.  We are on the record.
6       A.  So in order to provide a more complete
7   estimate -- more complete answer to what we were
8   just discussing, can we just go back one question
9   just to look at Figure 4, because we're going to
10  continue to talk about Figure 4.
11      Q.  We'll still talk about Figure 4.
12      A.  Okay.
13      Q.  But why don't we do it when we return to
14  Figure 4, if that works for you.
15      A.  That's fine.
16      Q.  Okay.  All right.  What I wanted to look
17  at was on Page 9, Note 3.
18      A.  Yes.
19      Q.  You discuss Figure 4 in this footnote,
20  correct?
21      A.  Correct.
22      Q.  As I -- as I read the report -- at least I
23  think this is the only place in your declaration at
24  which you refer to Figure 4; is that correct?
25      A.  Yes.

389

1       Q.  What --
2       A.  That I know of.  I mean, I'd have to go
3   back and check.
4       Q.  Sure.
5       A.  Which, if you'd like me to, I can go
6   through every single document.
7       Q.  No, I don't need to test your memory on
8   this at all.
9       A.  Okay.
10      Q.  Why is that -- why would you have not
11  mentioned Figure 4 in the context of the body of
12  the report anywhere?
13      A.  So you're -- so if you'd like, I can go
14  through the entire document and see whether or not
15  I mention Figure 4 --
16      Q.  No.  No.  No.  No.
17      A.  -- at any point in time or any other point
18  in time.
19      Q.  Listen.  It's -- I don't want to waste the
20  time.
21          Okay.
22      Q.  I'll withdraw the question --
23      A.  Okay.
24      Q.  -- if you don't have a -- have an
25  immediate answer.

390

1           The second sentence of Figure 4 reads, "In
2   general, the number of prescriptions and uses --"
3       A.  I'm sorry.  Do you mean Footnote 3?
4       Q.  Yes.  Thank you very much.  Sorry about
5   that.
6       A.  Okay.
7       Q.  The second sentence of Footnote 3 about
8   Figure 4 reads, "In general, the number of
9   prescriptions and uses is similar in the periods of
10  overlap between the datasets."
11          Did I read that correctly?
12      A.  Yes, you did.
13      Q.  You would agree with me that that's not
14  universally true of the data reflected in Figure 4,
15  correct?
16          MR. RONA:  Objection.
17      A.  So again, what Figure 4 shows is the total
18  number of Neurontin users -- users compared to
19  total new prescriptions of Neurontin by all
20  physicians and displayed NDTI uses, IMS new uses,
21  and Wolters Kluwer new uses.
22          There is only a handful of quarters that
23  we observe where there is overlap between all three
24  datasets.  And that is -- that is -- on Figure 4 --
25  approximately between 1996 through -- it looks like

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

391

1  the third quarter of 1998.
2      Now, for the period in which -- or
3  actually, I'm sorry.  I should back up.  So between
4  199 -- the first quarter of 1996 and it looks like
5  the last quarter of 1997, we observe data between
6  IMS new prescriptions and NDTI uses.
7      In that time period, there looks like
8  there is pretty close correspondence between IMS
9  NRXs and NDTI uses -- the lines are pretty much on
10  top of each other -- give or take.
11      Then -- and -- and honestly, between 1996
12  through -- through kind of 1999 or so, IMS NRXs and
13  NDTI uses look like they're pretty much on top of
14  each other through that entire overlapped time
15  period.  It looks like there's a very close overlap
16  between these two datasets.
17      So -- I'm sorry.  And then between NDTI
18  uses and -- and then so kind of starting --
19  beginning at the end of 1997 through 1999 or so,
20  end of 1998, we observe data for NDTI uses, IMS
21  NRXs, and Wolters Kluwer NRXs.
22      For all three of these datasets, IMS NRXs,
23  Wolters Kluwer NRXs appear to be pretty much --
24  very correspondent, pretty much on top of each
25  other, and the NDTI uses and the IMS NRXs and the

392

1  Wolters Kluwer data -- so all three datasets
2  combined -- look to be pretty close.  They're not
3  completely on top of each other, but they also
4  aren't widely divergent either.
5      They look like they're -- they're pretty
6  close.
7      Q.  Okay.
8      A.  So based on that -- I would say based on
9  that -- seemed reasonable to say, in general, over
10  the period of overlap between the datasets that the
11  numbers of prescriptions that we -- and uses that
12  we observe is similar.
13      Q.  Okay.  I understand.  So the -- so the
14  statement -- the second sentence which we read in
15  Footnote 3 is meant to refer just to the period of
16  overlap up through the third quarter of '98 about
17  the similarity in --
18      A.  Right because --
19      Q.  -- number of prescriptions and uses?
20      A.  Because --
21      MR. RONA:  Objection.
22      A.  What I think it's intended to -- to refer
23  to is the period in which -- between 1996 through
24  1999 or so, where we have -- we observe at least --
25  sorry -- I'm sorry.  I should -- so I think what

393

1  it's referring to -- what I should be referring to
2  more specifically is, between the period of overlap
3  of all three datasets, between 1997 through 19 --
4  end of 1998/beginning of 1999, there appears to be
5  pretty good correspondence between the IMS NRXs
6  data, the Wolters Kluwer data, and the NDTI data.
7      Q.  Okay.
8      A.  It just so happens that the NDTI uses and
9  the IMS NRX uses over that period of overlap where
10  we don't observe Wolters Kluwer data, it also looks
11  like there's very good overlap between those two
12  datasets --
13      Q.  Okay.
14      A.  -- in the point estimates.
15      Q.  Okay.  So for the period after the -- the
16  complete overlap of all three datasets --
17      A.  Uh-huh.
18      Q.  -- you'd agree with me that it's not the
19  case that the number of prescriptions and uses is
20  similar in the periods of -- of overlap between
21  just Wolters Kluwer and IMS NDTI.
22      A.  Okay.
23      MR. RONA:  Objection.
24      A.  So in the period after -- of overlap -- so
25  I would say -- so of all three datasets, from IMS

394

1  new uses, Wolters Kluwer new uses, and NDTI uses,
2  so I would say beginning -- so really beginning end
3  of 1998 through -- through 2004, it looks like
4  Wolters Kluwer data provides pretty -- again, the
5  overlap isn't -- it's -- it's not completely on
6  top of each other, but they're also not widely
7  divergent in terms of the point estimates of the
8  actual number of drug uses or number of
9  prescriptions.
10      Q.  Okay.  Let's --
11      A.  Uhm.
12      Q.  Go ahead.  Sorry.
13      A.  But the footnote doesn't refer to the --
14  so the statement in the footnote, "In general the
15  number of prescriptions and uses is similar in the
16  periods of overlap really refers to the period
17  where there are -- all three datasets are
18  overlapping at the same time, which we have just
19  discussed.
20      And the second part of the footnote, which
21  reads, "The trend in prescriptions also appears to
22  be similar over the overlapping time periods,"
23  refers to that period of time where all three
24  datasets are available that we observe in the
25  dataset between 19 -- in the data that's between

395

1    1996 through end of 1998/beginning of 1999, but
2    also, you can see the trend in the overlap period
3    between just -- that we observe just between
4    Wolters Kluwer new uses and NDTI uses -- appears to
5    be similar.
6         What I mean by that is, the point
7    estimates these data provide aren't the same. And
8    we wouldn't -- there's no reason why we would
9    expect them to be the same, given that Wolters
10   Kluwer data is coming from retail pharmacy counts,
11   and NDTI data is coming from a survey of
12   physicians. But that -- the -- the slope of the
13   line -- the curvature of the line, and also the
14   trajectory of the line appears to be kind of
15   closely tracking each other.
16        Q. Okay. Couple of follow-ups: Do you
17   expect that the IMS Xponent line would differ
18   substantially from the Wolters Kluwer line after
19   the period of overlap?
20        MR. RONA: Objection.
21        A. I -- I -- that's -- I can only describe to
22   you what I observe in the IMS -- in the actual
23   data, and which is -- which is in the chart in
24   Figure 4.
25        Q. I guess maybe I'm confused. I thought you

396

1    forecasted IMS Xponent data, didn't you?
2         A. So are you asking me what -- based on my
3    forecast what I -- what my forecast suggests for
4    this data?
5         Q. I'm asking you, do you expect that the IMS
6    Xponent line, if we had IMS Xponent data, would
7    differ substantially from the Wolters Kluwer line
8    after the period of overlap?
9         MR. RONA: Objection.
10        A. So -- so in this figure and in the raw
11   data simply, I simply observe IMS raw counts of new
12   prescriptions of Neurontin and new prescriptions of
13   Wolters Kluwer data over this time period.
14        I don't -- I don't observe IMS new
15   prescriptions of Neurontin over -- after the time
16   period that we have.
17        I can tell you that we can use some
18   statistical methods to forecast what IMS new
19   prescriptions by overall physicians may look like,
20   based on the estimated relationship between Wolters
21   Kluwer data and IMS data, but there's no way --
22   mean, that's what the -- that's what the
23   methodology provides. But it doesn't provide me
24   any expectation for what the reality -- how do I
25   say this? I don't observe IMS data, so there's no

397

1    reason why I would have -- why I would expect it on
2    this figure.
3         (Counsel confer.)
4         Q. The --
5         A. If we had IMS data that provided this,
6    that would be great --
7         Q. Okay.
8         A. -- but again --
9         Q. Ah --
10        A. I'm sorry.
11        Q. Sorry. I had a question here. I was
12   going to ask you, 2000 -- let's look at 2001.
13        A. Actually, before we go -- I just want to
14   -- just to be really clear, again, these datasets
15   do not provide -- there's no reason to expect that
16   NDTI data, which is survey data of physicians, is
17   going to provide exactly the same information about
18   total uses than Wolters Kluwer new prescriptions or
19   IMS new prescriptions.
20        Similarly, there's no reason to expect
21   that IMS data gathered from retail pharmacies, and
22   Wolters Kluwer data gathered from retail pharmacies
23   is going to completely overlap in their estimates
24   over time.
25        For us it -- for the analysts, it made us

398

1    feel comfortable in backcasting and -- really in
2    forecasting, but also in backcasting, that there is
3    this -- there appears to be nice overlap or good
4    overlap between all three of these datasets, but
5    this just provides confidence in our procedure for
6    estimating IMS data over the time period.
7         It doesn't -- it just provides confidence
8    for us that -- you know, we want to use the data
9    that we actually observe as much as we possibly can
10   in coming up with a methodology and coming up with
11   best estimates.
12        Q. Okay. Let's look -- let's try to look at
13   a couple of points in time here. Let's look around
14   the -- what would be the first quarter of 2001,
15   first or second quarter of 2001. Are you with me?
16        MR. RONA: Which is it?
17        MR. POLUBINSKI: Either one. I said,
18   "first or second quarter."
19        Q. Are you with me?
20        A. First or second quarter, yes.
21        Q. Okay. Now, it's -- it's hard to -- it's
22   hard to -- to match this up precisely, but would
23   you agree with me that the number for -- you know,
24   reflected in the -- in the IMS NDTI uses line is
25   somewhere in the neighborhood of 1 million?

399

1    A.  Okay.  So for the first quarter of 2001,
2  it looks like it's over a million.
3    Q.  Right.  How much over?
4    A.  So you just -- (Witness reviews document.)
5  It looks like it's approximately over 1.1 million.
6    Q.  Okay.  What about the second quarter of
7  2001?
8    A.  It looks like it's around a million.
9    Q.  Okay.  Let's look at the number for the
10  Wolters Kluwer data for the second quarter of 2001.
11    A.  Okay.  So for the first quarter of 2001,
12  it's around 140 -- or 1.4 million; and for the --
13  hold on.
14    Q.  Sure.
15    A.  For the first quarter it looks like it's
16  over 1.5 million, and for the second quarter, it
17  looks like it's about approximately 1.6 million.
18    Q.  Okay.  So let's focus on the second
19  quarter of 2001.  As I understand it I think --
20    A.  Wait.  I just have to make sure --
21    Q.  Sure.
22    A.  -- that I'm completely doing that right.
23  (Witness reviews document.)  Second quarter.
24    Q.  Yes, of 2001.
25    A.  Okay.

400

1    Q.  Which is one of the two quarters you
2  looked at.  So the NDTI use numbers are -- for the
3  second quarter of 2001 are right around a million,
4  and the Wolters Kluwer use or total prescription or
5  new prescription numbers for the same period of
6  time are around 1.6 million.  Am I right that the
7  Wolters Kluwer numbers are half again as much as
8  NDTI --
9    MR. RONA:  Objection.
10    Q.  -- for that quarter?
11    MR. RONA:  Objection.
12    A.  Okay.  So what we estimate the Wolters
13  Kluwer data, which corresponds to new uses, as they
14  define it, corresponds to approximately 1.6
15  million.  The data from NDTI all uses is
16  approximately 1 million.
17    So one is larger than the other, and
18  they're -- differ by approximately 600,000.
19    Q.  Would you characterize these two numbers
20  as being similar?
21    MR. RONA:  Objection.
22    A.  Again, I am -- I don't ever state in my
23  report that they are similar.
24    Q.  I'm not suggesting you were.
25    A.  Okay.

401

1    Q.  I'm just asking.
2    A.  So -- and you know, they're within an
3  order of magnitude of similarity.  Again, I would
4  not expect that they would be exactly the same,
5  because again, the datasets are not intended to do
6  the same things.
7    NDTI uses are based on a survey of
8  physicians.  Wolters Kluwer data is based on a
9  survey of retail pharmacies.  So they look, within
10  order of magnitude, to be approximately the same,
11  but I wouldn't ever claim that they are exactly the
12  same, and nor should we expect them to be exactly
13  the same, because of what the -- the -- what they
14  are corresponding to.
15    Q.  Which of the two represents a more
16  accurate representation of actual prescriptions, in
17  your view?
18    MR. RONA:  Objection.
19    A.  I have no opinion.
20    Q.  They're just different, but neither one's
21  more accurate than the other --
22    MR. RONA:  Objection.
23    Q.  -- in reflecting actual prescriptions?
24    MR. RONA:  Objection.
25    A.  Okay.  So Wolters Kluwer data provides

402

1  information on new prescriptions of Neurontin over
2  this time period.  It covers a pretty good sample
3  of retail pharmacies in the United States over this
4  time period.  My understanding is that it's over 70
5  percent or so.
6    So I have -- and there's no other data
7  that I know of that's going to be able to provide,
8  you know, that I have -- well, how about this:
9    There's no data that I have to -- at my
10  disposal that's going to provide any better data
11  that anyone else would have or that the industry
12  would have or any other person who purchases
13  Wolters Kluwer data -- Kluwer's data on Neurontin
14  that would be able to provide any better estimate
15  of new prescriptions of Neurontin at this time
16  period.
17    Q.  Any better estimate than Wolters Kluwer,
18  is that the one you are talking --
19    A.  No, but --
20    Q.  -- about or NDTI?
21    A.  No, I'm talking about Wolters Kluwer data.
22    Q.  Okay.
23    A.  What I'm saying is simply that it's
24  providing a good estimate -- an estimate that's
25  apparently used by, you know, it's used in this

403

1    analysis, but it's used for a whole bunch of
2    different reasons, and particularly it's used by
3    the industry to -- to report new prescriptions and
4    other uses for -- for reporting new prescriptions.
5        So it's considered to be a valid and
6    reliable measure of -- of prescriptions in general
7    in the United States.
8        So NDTI's universe is -- or NDTI
9    corresponds to -- helps estimate -- its universe is
10   -- sorry. Its sample is physicians. That's a
11   representative sample of physicians in the United
12   States. It's a survey. It's based on two days of
13   their -- of their practice. It also is -- is
14   purported to provide reliable and valid estimates.
15       I have no opinion -- so given the two
16   differences of the datasets and the intention of
17   the datasets and also the underlying frame of the
18   datasets, I have no way of giving you an absolute
19   opinion about whether -- which -- which dataset
20   provides the best estimate of total new
21   prescriptions or total prescriptions in general.
22       And in fact, they corresponded to
23   different things. Wolters Kluwer data is really
24   about new prescriptions, and NDTI data is all about
25   all uses. So again, you know, we use this data in

404

1    order to feel comfortable in both the trends that
2    we're estimating that are supported by actual data,
3    and the point estimates that we have for the
4    forecast.
5        If we had better data, you know, or how
6    did I say this? Again, it's just to -- it's to
7    provide confidence that we compare these two
8    things. That's all.
9    Q.   Okay. Just --
10   A.   And that's very standard, again, in
11   empirical literature to use as much data that we
12   actually observe to have a kind of general sense of
13   where the market is in trying to kind of understand
14   where the market is and where it's going.
15   Q.   Okay. Focused on just this -- you know,
16   this one period of time that we've got here, the
17   second quarter of 2001 --
18   A.   Uh-huh.
19   Q.   -- do you have any opinion one way or the
20   other as to which estimate is closer to the actual
21   number of prescriptions, the 1.6 million that's
22   reflected on your chart for Wolters Kluwer, or the
23   1.0 million that's reflected on your chart for NDTI
24   uses --
25       MR. RONA:  Objection.

405

1    Q.   -- or do you not know or not have an
2    opinion?
3        MR. RONA:  Same objection.
4    A.   Again, I don't think that anyone knows
5    what the true actual number of new -- of Neurontin
6    prescriptions is.
7    Q.   I'm not arguing with you about that.
8    A.   Okay.
9    Q.   I'm just asking you which of these two you
10   think, as someone who has relied on both
11   datasets --
12   A.   Uh-huh.
13   Q.   -- in your declaration is more likely --
14   is -- is closer to what the real number might be.
15       MR. RONA:  Objection.
16   A.   I don't think anyone knows what the real
17   number is. So I don't think it's possible for me
18   to conjecture on what the real number is and how
19   well these datasets approximate the real number.
20       In doing empirical work for any -- for
21   anyone who's trying to get a sense of what the
22   market is at any point in time or how -- where it's
23   going, you just need to rely on the datasets that
24   you have available at the time and try to check the
25   validity and reliability of those datasets as best

406

1    you can and understand what the advantages of those
2    datasets are and also what its limitations.
3        I guess what I'm trying to say is that
4    this is the data that we have. And we feel pretty
5    comfortable, given the text that both have been
6    provided to us and the -- about this data, and the
7    fact that we have two datasets that are, in
8    general, providing similar trends and similar
9    estimates at -- in general, that we have a sense of
10   what the number of uses of Neurontin are in the --
11   in the period of time.
12       I don't know what the exact number is, and
13   I don't think anyone does.
14   Q.   And so in your view, the actual number of
15   prescriptions for Neurontin in the second quarter
16   of 2001 could be 1.6 million, could be 1.0 million,
17   could be some other number; just no way to know for
18   sure?
19       MR. RONA:  Objection.
20   A.   No, I disagree with that statement.
21   Q.   Okay. What do you disagree with about the
22   statement?
23       MR. RONA:  Objection.
24   A.   Based on the data that we have available,
25   in one dataset I observe that NDTI uses, Neurontin

407

1     uses, numbers approximately 1 million over this
2     time -- in this time period.
3          At the same point in time, Wolters Kluwer
4     data approximately numbers 1.6.  I can feel -- I
5     feel pretty comfortable that, in general, the truth
6     lies somewhere around there, around that general
7     estimate, but no one knows what the actual number
8     is, and I feel -- and I guess what I would say is
9     that I feel comfortable that it's somewhere in that
10    general vicinity.
11         And one of the reasons that I feel
12    comfortable about that is because, again, in some
13    -- I guess -- at any given point in time, you know,
14    I may not -- I may not have full -- how do I say
15    this properly?
16         I have confidence that I am -- that these
17    datasets are providing some reasonable estimate of
18    the number of Neurontin users -- uses at this given
19    point in time and also point in time -- and also
20    over time at any given quarter.
21    Q.  Okay.
22    A.  You can pick apart whether or not it's
23    really the actual number or not at any given point
24    in time, but we only have the data that we can use,
25    and we can only provide the best estimates based on

408

1     that, and I don't think anyone knows the true
2     underlying number of Neurontin prescriptions, based
3     on the dataset -- sets that we have available.
4     Q.  Okay.  One of the other things that you
5     write in Footnote 3 in the last sentence is that,
6     "The trend in prescriptions also appears to be
7     similar over the overlapping time periods."
8          Did I read that right?
9     A.  Yes.
10    Q.  Okay.  With respect to that last sentence
11    in Footnote 3, were you also focused on the period
12    of overlap between all three datasets?
13    A.  I was focused on the period of overlap
14    between all three datasets.  I was also focused on
15    the period of overlap between NDTI uses and IMS NRX
16    uses between 1996 through, you know, give or take
17    all of what we observe in 19 -- in IMS.  So from
18    1996 through the end of 1998.
19         I was also referring to the period of
20    overlap in NDTI data and Wolters Kluwer data,
21    specifically between -- let's say the quarter of
22    you know, the -- second-to-last quarter of 1997
23    through 1999.  The trend lines really are almost --
24    you know, they very, very closely track each other,
25    even when the data doesn't -- even when the point

409

1     estimates of each point in time of the quarter
2     don't -- don't completely overlap.
3          Subsequent to 1999 through 2004, again,
4     the trend lines don't -- the slope of the line, the
5     curvature of the line does not change so much
6     between -- or isn't significantly different between
7     Wolters Kluwer and NDTI data, just in kind of a
8     general kind of layman's, you know, inspection of
9     the two trend lines in the figure.
10    Q.  Okay.  Under -- understood.  You'd agree,
11    though, that for some of the periods of time after
12    1999, there are quarters in which NDTI uses fell,
13    while Wolters Kluwer new prescriptions rose; is
14    that correct?
15         MR. RONA:  Objection.
16    A.  So again, NDTI data looks to be -- looks
17    to be a little bit more noisy.  You know, we
18    worried about that a little bit.  You know, I
19    think, again, it has to do with what the purpose of
20    NDTI is, which is to report a representative sample
21    of physicians prescribing -- you know, practicing
22    medicine.  It's not intended to provide a -- to
23    estimate a representative sample of physicians
24    prescribing Neurontin over the time period.
25         And so we don't expect those estimates to

410

1     be -- to be smooth or to be kind of perfectly in
2     line.
3     Q.  Okay.  Let's --
4     A.  But again, the -- the universe of the
5     datasets is very different, so I wouldn't expect
6     them to be exactly on top of each other, and even
7     in terms of trend.  But again, they're moving in
8     the general direction.  They appear to have, in
9     general, the same slope.
10    Q.  Okay.
11    A.  Just in just looking at the raw data.
12    Q.  Okay.  Let's -- let's turn the page and
13    look at Figure 5.
14         THE WITNESS:  So I would like to take a
15    break for just one second, please.  Thank you.
16         MR. POLUBINSKI:  Okay.  Let's go off the
17    record.
18         VIDEO OPERATOR:  Off the record.  10:45.
19         (Recess was taken.)
20         VIDEO OPERATOR:  On the record.  10:49.
21    Q.  Okay.  So we're looking now at Figure 5 of
22    your declaration.
23    A.  Yes.
24    Q.  Are we on the same page there?  Great.
25    And here what you're depicting is total uses

411

1    according to the NDTI data, correct?
2      A.  That's correct.  Ah -- yes, it's -- it's
3    uses in the NDTI data, correct.
4      Q.  Okay.
5         MR. RONA:  Objection.
6      Q.  And -- and here what you're seeking to do
7    is to show a breakdown by broad indication group?
8         MR. RONA:  Objection.
9      A.  Figure 5 describes a count of total uses
10   by quarter between 1994 through 2007, the first
11   quarter in Neurontin uses overall for all
12   physicians in aggregate, and also, by -- by
13   on-label use, which in -- which, for our purposes,
14   is defined as epilepsy and PHN.  For all other
15   indications and all pain, psychiatric and migraine
16   combined, excluding PHN.
17     Q.  Okay.  The three categories of use that I
18   think you just described, I assume you -- you --
19   you derived that number or your team derived that
20   number by reference to uses by looking at -- at
21   ICD-9 codes -- let me -- let me rephrase the
22   question.  That was not a -- not a well-phrased
23   question.
24        I'm assuming that the grouping that's
25   reflected in the -- in the three colored portions

412

1    of this graph is a grouping that was done by
2    reference to the breakdown of NDTI uses reflected
3    in Attachment C to your report; is that correct?
4      A.  Let's go to Attachment C.
5      Q.  Sure.
6      A.  (Witness reviews document.)  Yes, it
7    appears to be pretty correspondent.
8      Q.  Okay.  So in creating Figure 5, the -- the
9    only dataset that you used was IMS NDTI data; is
10   that right?
11     A.  That's correct.
12     Q.  Okay.  So for example, you didn't take --
13   well, I'll withdraw the question.
14        Was there ever any discussion about using
15   any other data source or dataset for doing the
16   analysis you do in Figure 5?
17        MR. RONA:  Objection.
18     A.  Given the datasets that we have available,
19   the only dataset that we have that will allow us to
20   correspond use to indication is the NDTI data.  So
21   in the datasets that we do have, no.
22     Q.  Okay.  There is no discussion of, for
23   example, using percentages derived from NDTI data
24   and applying those to Wolters Kluwer or IMS
25   Xponent, correct?

413

1      A.  For the construction of Figure 5?
2      Q.  Yeah, or we can make it broader to try to
3    save time, the construction of Figures 5 through
4    10.
5      A.  I think we should stick on Figure 5.
6      Q.  Okay.  That's fine with me.
7      A.  So Figure 5 we used IMS data, which is the
8    only dataset that we have available that can
9    directly link a count of Neurontin uses to -- I'm
10   sorry -- a percentage of Neurontin uses to -- to
11   indication over all Neurontin use.
12     Q.  Okay.  Now, in doing your work in this
13   matter, more generally, I'm assuming that you only
14   looked at data on Neurontin prescriptions, correct?
15   And -- and by that I mean, just Neurontin, not
16   other -- other drugs.
17        MR. RONA:  Objection.
18     A.  So the scope of my report, and what I was
19   asked to do was to examine trend -- examine counts
20   of use and counts of unique physicians that
21   prescribed Neurontin over the time period.
22        I was not asked to look at counts of use
23   of other prescription medications or any other
24   off-label or any other over-the-counter medication.
25     Q.  Okay.  That -- that makes sense, and you

414

1    didn't do so because you weren't asked to do it,
2    correct?
3      A.  That's correct.
4      Q.  So it would be correct to say that you
5    haven't done any analysis that would give us a
6    sense, comparatively, for how the figures in Figure
7    5 or elsewhere compare with figures for other
8    comparable drugs.
9         MR. RONA:  Objection.
10     A.  That is not what's in the scope of what I
11   was asked to do at this time.
12     Q.  Okay.  Understood.  And you haven't done
13   it, correct?
14     A.  I have not done it.
15     Q.  Okay.  And just so the record's clear,
16   it's -- that's true of all your charts, not just
17   Figure 5, correct?
18        MR. RONA:  Objection.
19     A.  Which charts are you referring to?
20     Q.  Any of the charts in your report.
21     A.  So the scope of my report was to provide
22   the Court with information around the number of
23   Neurontin prescriptions and the percentage of unique
24   physicians prescribing Neurontin over this time
25   period.  It was not to provide the Court with any

415

1    other information about other counts in use or new
2    uses or counts in unique physicians using any other
3    prescription or over-the-counter available
4    medication.
5        Q.  Okay.
6        A.  So no.
7        Q.  Let's turn the page and take a look at
8    Figure 6.  In Figure 6 of your report -- and I'm
9    reading here from the title at the top of the
10   chart -- reflects, "Area A from Figure 5 Broken
11   Down By Specification Category," correct?
12       A.  That's correct.
13       Q.  And it includes, at the very bottom in
14   blue, a category for "All Other Pain and
15   Psychiatric Excluding PHN," correct?
16       A.  Correct.
17       Q.  Is it your understanding that those
18   indications are not currently part of any class in
19   this case?
20       MR. RONA:  Objection.
21       A.  Uhm.
22       MR. RONA:  That calls for a legal
23   conclusion.
24       MR. POLUBINSKI:  I'm asking for her
25   understanding.

416

1        A.  So I have no opinion about what
2    constitutes a class in this -- in this report, and
3    I was not asked to provide that opinion.
4        Q.  Okay.  That's fine.  I'm not -- let's --
5    let's take a quick look at -- at Page 4, Footnote 1
6    of your declaration.
7        I'll read it here.  It says, "I have been
8    informed by counsel to assume that class periods
9    for the various indications are as follows:
10   Bipolar and mood disorders, 11/95 to 12/04;
11   neuropathic pain, 7/95 through 12/04; nociceptive
12   pain, 9/95 through 12/04; migraine, 9/95 through
13   12/04; and doses over 1,800 milligrams per day,
14   3/95 through 12/04."
15       Did I read that correctly?
16       MR. RONA:  Objection.
17       A.  Yes.
18       Q.  Okay.  And you'll see in Figure 6 that
19   there is an area of the chart that reflects
20   bipolar, correct?
21       A.  Yes.
22       Q.  And there is an area of the chart that
23   reflects neuropathic pain, correct?
24       A.  Correct.
25       Q.  And an area of the chart that reflects

417

1    nociceptive pain?
2        A.  Correct.
3        Q.  And an area of the chart that reflects
4    migraine, correct?
5        A.  Correct.
6        Q.  Okay.  In Footnote 1, there isn't a class
7    period that was described to you by counsel that
8    corresponds for the category of "All Other Pain and
9    Psychiatric Excluding PHN," is there?
10       MR. RONA:  Objection.
11       A.  That's correct.
12       Q.  Okay.  What's your understanding for why
13   -- for why you included the indications reflected
14   in blue here, the "All Other Pain and Psychiatric
15   Indications" on Figure 6?
16       A.  We were just trying to provide a little
17   bit more data to the Court on -- on -- on pain and
18   -- and the uses of Neurontin for pain.
19       Q.  Okay.  Those -- the area reflected in blue
20   would also have been reflected in the orange area A
21   on Figure 5, correct?
22       A.  Let me just take a look.  (Witness reviews
23   document.)  Yes, that's correct.
24       Q.  Okay.  One other point about Figure 6, to
25   understand the growth or the trend, I guess, in any

418

1    -- withdrawn.
2        With regard to Figure 6, to understand the
3    trend in -- in any -- in any particular indication,
4    the right way to do that would be to essentially
5    look at the width of the colored band, correct?
6        MR. RONA:  Objection.
7        A.  I'm sorry.  May -- will you restate the
8    question.
9        Q.  Uh-huh.  Sure.  With regard to Figure 6,
10   if we want to understand the trend in uses of any
11   particular indication, the way to under -- to
12   understand that would be to look at the width of
13   the colored band corresponding to that indication.
14       MR. RONA:  Objection.
15       A.  It's really the -- it's really the area.
16   To understand total use, we would take the area of
17   the -- of each band.
18       Q.  Okay.
19       A.  All right.  That sounds -- okay.  (Reviews
20   documents.)  And just some -- I guess some quick
21   general questions about Figures 7 through 10.  I'm
22   assuming that -- that these all used just NDTI data
23   or -- I'm sorry.  Withdrawn.
24       I'm assuming that you -- that you all used
25   just IMS NDTI data in creating Figures 7 through

419

1   10; is that correct?
2       A.   So let me just go through the figures --
3       Q.   Sure.
4       A.   -- to make sure I know what you're talking
5   about, that I'm very -- on the same page about what
6   you're talking about.
7       Q.   Yeah.  Good idea.
8       A.   Okay.  (Witness reviews document.)  So in
9   constructing these charts, we were interested in
10  reporting to the Court the total number of
11  Neurontin uses for each indication.
12      Now, we don't have any other data other
13  than IMS NDTI data for this time period that will
14  directly link uses to indications.  The Wolters
15  Kluwer data and IMS Xponent would -- does not
16  provide reliable indication information -- may not
17  provide it at all.
18      So we can only rely on IMS NDTI data to
19  construct to give a count -- to provide the Court
20  with a count of the total Neurontin use by each
21  indication over the time period.
22      Q.   Okay.  Here's a question about Figures 5
23  and 6:  It looks to me, in looking at Figures 5 and
24  6, as though the scale in the Y axis, "Total Uses
25  By Quarter," is the same between these two figures;

420

1   is that correct?
2       A.   That's correct.
3       Q.   If we look at Figures 7, 8, 9, and 10, we
4   find that that doesn't hold for each of these other
5   figures; is that correct?
6       MR. RONA:  Objection.
7       A.   Okay.  So the Y axes scale for each figure
8   corresponds to trying to give the Court as much
9   information about total use for each given period
10  in time, and also the area under the curve or the
11  kind of total -- total use over the entire class
12  period.
13      The -- the Y axes are not constructed to
14  be completely analogous in Figures 7, 8, 9, and 10,
15  because they're not constructed to provide direct
16  comparison between each one of these figures.  But
17  it is correct that they do not provide the same Y
18  axes.
19      Q.   Okay.  I think I'm recalling yesterday
20  that you might have said that one of your comments
21  on the charts which had been prepared in the first
22  instance by staff at Greylock McKinnon related to
23  standardizing the scales or the Y axes.  Do I
24  remember that right?
25      A.   That's correct.  But that's for -- for

421

1   again, for providing the -- I mean, what I mean by
2   standardization is -- sorry.  I should unpack that
3   a little bit, I guess.
4       Again, for purposes of comparison, when
5   you're -- when the Court may want to look across
6   different uses over time, it makes sense to try to
7   use the same axes.  So for Figure 5 and for Figure
8   6, it made complete sense to use the same axes so
9   that there could be a full comparison of all
10  indication by category, and then for specifications
11  by category.
12      The intention of Figure 7, Figure 8,
13  Figure 9, and Figure 10 was to provide the Court
14  with estimates of total Neurontin use for each
15  indication, and not necessarily comparison --
16  comparisons across of -- across these indications.
17  That would be kind of easy, but -- but again,
18  that's a very simple exercise to do.
19      Q.   Okay.  Who made the decision on which
20  indications for which to do charts individually?
21      MR. RONA:  Objection.
22      So in other words, Figures 7 through 10.
23      A.   I did.
24      Q.   Okay.  Did you consider --
25      A.   And that's because, again, I was -- the

422

1   task of -- of my report is to provide the Court
2   with the number of total -- of Neurontin use for --
3   by indication.
4       Q.   Okay.  Did you consider doing a chart for
5   epilepsy?
6       MR. RONA:  Objection.
7       A.   Not off the top of my head.  I can't
8   recall.
9       Q.   How about for post herpetic neuralgia?
10      MR. RONA:  Objection.
11      A.   So again, the task of my report was to
12  provide information to the Court on the uses -- the
13  total number of Neurontin uses for -- for the
14  off-label -- specifically for -- overall and for
15  after-label uses, and so it made sense to me to
16  provide the Court with information on the off-label
17  uses, which include bipolar indications, pain
18  indications, and migraine indications.  And that's
19  what is -- is listed in -- in Footnote 1 on Page 4
20  of my report as well --
21      Q.   Okay.
22      A.   -- and is stated in the onset of the -- in
23  my report.
24      Q.   Okay.  And -- and so would I be correct
25  then to understand that you did not consider doing

423

1  a chart for -- for PHN, which is what we sometimes
2  refer to post herpetic neuralgia?
3      MR. RONA: Objection.
4      A. No, not that specifically, no.
5      Q. Okay. Did you ever consider --
6      A. It's -- it's -- actually, I mean, it's
7  contained within Figure 5 and Figure 6.
8      Q. Understood.
9      A. But I did not consider breaking it out,
10  no.
11      Q. Okay. Did you consider doing a separate
12  chart for other off-label uses?
13      A. Uhm.
14      Q. So in other words, for the area reflected
15  on Figure 5 in -- in -- Figure 6, rather, in blue
16  at the bottom?
17      A. I'm sorry. Can you restate the question.
18      Q. Sure. I -- my question is whether you
19  considered doing a separate figure for "All Other
20  Pain and Psychiatric, Excluding PHN," which is
21  reflected in Figure 6 as this -- as this blue area?
22      A. I'm sorry. I thought you said Figure 5.
23  So Figure 6. Okay. So looking at Figure 6, did I
24  consider -- are you asking me whether I considered
25  creating another chart that would have shown to the

424

1  Court all other pain and psychiatric conditions,
2  excluding PHN, that corresponds to the blue --
3      Q. Yes.
4      A. -- line? No, I didn't, but -- no, I
5  didn't.
6      Q. Okay.
7      A. Again, in the -- in the construction of
8  this report, I was really focused on -- on bipolar
9  and other mood disorders, neuropathic pain,
10  nociceptive pain, migraine in doses over 18 [sic]
11  milligrams per day.
12      Q. Okay. I want to back up just a little
13  bit. And if we can look at Page 1 of your
14  declaration, that would be great.
15      Okay. I'm looking at the second sentence
16  of the report, even up above, "Introduction." You
17  write, "I have not been asked to offer an opinion
18  as to class certification in this matter."
19      Did I read that correctly?
20      A. That's correct.
21      Q. Okay. What does that mean?
22      MR. RONA: Objection.
23      THE WITNESS: I'd like to take a break.
24      MR. POLUBINSKI: We can take a break, but
25  please answer the question first. We usually don't

425

1  take breaks while questions are pending.
2      THE WITNESS: Okay. Okay.
3      MR. RONA: Do you feel -- do you need to
4  take a break?
5      THE WITNESS: Yeah. Can I go to the
6  bathroom, please.
7      MR. RONA: We can have the question pend.
8      MR. POLUBINSKI: It's a simple question.
9  Let's just have an answer, and you can -- and we
10  can get back to it afterward.
11      MR. RONA: Well, object to the
12  characterization of counsel.
13      MR. POLUBINSKI: It should be a simple
14  question, I'll put it that way.
15      MR. RONA: Object to the characterization
16  of counsel.
17      THE WITNESS: Okay. I need to go to the
18  bathroom. May I go to the bathroom, please.
19      MR. POLUBINSKI: Sure. I'm not going to
20  stop you.
21      THE WITNESS: Okay.
22      MR. POLUBINSKI: You could have answered
23  the question in the time that we've had this back
24  and forth.
25      MR. RONA: And I object to that.

426

1      MR. POLUBINSKI: Why don't we go off the
2  record.
3      VIDEO OPERATOR: Off the record. 11:11.
4      (Recess was taken.)
5      VIDEO OPERATOR: On the record. 11:13.
6  Jodi, can you read back the question, please.
7      (Question read back.)
8      MR. RONA: I renew my objection.
9      A. Okay. So I was asked to do something -- I
10  was asked to prepare a report that asked -- that
11  tried to provide the Court with a number of -- with
12  a number of bits of information, the first being
13  the number of Neurontin uses overall and for
14  various FDA approved and nonFDA approved medical
15  indications.
16      This allowed me to present an analysis of
17  trends in the number of Neurontin prescriptions
18  overall by indication -- by indication in daily
19  dose and also trends in the number of unique
20  physicians prescribing Neurontin overall and by
21  physician specialty.
22      I was not asked to provide an opinion as
23  to the -- to the overall intent of the case and
24  honestly, I -- I have no knowledge of the full
25  overall intent of the case.

427

1    I only have what was provided to me in the
2   court -- in the court order.
3       Q.  Okay.  What is your understanding of what
4   class certification is?
5       MR. RONA:  I object.  Out of the scope.
6       MR. POLUBINSKI:  She writes it in her
7   report.  Okay.  I want to know what she -- what her
8   understanding is of the term as it's used in her
9   report.
10      MR. RONA:  So you're asking her what the
11  -- what the words "class certification" mean?
12      MR. POLUBINSKI:  I'm asking her what her
13  understanding of class certification -- which is
14  written in the second sentence of her report -- is.
15      MR. RONA:  Okay.  I object, but you may
16  answer.
17      A.  So again, my understanding of these two
18  words is a layperson's view.  I'm not a lawyer.  I
19  don't know -- I'm not intimately involved in this
20  case.  I was just asked to provide a series of --
21  of analyses that could be used in the case.
22      So my understanding is simply that -- that
23  there is a legal process for -- for allowing a case
24  to go through in a class -- in a class action, and
25  that this is part -- and that this is part of that

428

1   process, but I don't know what all of the details
2   for class certification are.  And -- yeah, and I
3   was not provided any of that information.
4       Q.  Okay.  Do you have any understanding of
5   what it would mean to "offer an opinion as to class
6   certification in this matter"?
7       A.  Again, I was just asked to provide --
8       MR. RONA:  Sorry.  Objection.  Answer.
9       A.  Again, I was just asked to provide some
10  information for the Court that was asked for in the
11  court order.  I don't have an opinion as to the
12  merits of this case or anything else, and I
13  wouldn't even know what that would entail,
14  honestly.
15      Q.  Okay.
16      A.  I have no experience and no understanding
17  of that.
18      Q.  That's fair.  So following up on that, I
19  guess, aside from analyzing the data and -- and
20  preparing the charts that you prepare in your
21  declaration, you haven't done any analysis of the
22  drug itself, correct?
23      MR. RONA:  Objection.
24      A.  Are you asking me whether I've performed
25  scientific tests on the drug?

429

1       Q.  Well, for example, you haven't done any
2   analysis into, for example, its efficacy for
3   treating particular conditions, correct?
4       A.  Are you asking me whether I've been
5   involved in clinical trials of Neurontin?
6       Q.  No.  I'm asking you whether you've done
7   any analysis into the efficacy of Neurontin for
8   treating any particular condition.
9       MR. RONA:  I object.
10      A.  So my understanding for the standard for
11  FDA approval and -- and the kind of assessment of
12  efficacy of a drug is that you would do a
13  randomized control trial.  You would design that
14  trial.  You would conduct that trial, then you
15  would analyze that trial.
16      Q.  Okay.
17      A.  I'm -- I have not been involved in a
18  clinical -- in a randomized clinical trial of
19  Neurontin and its use for any indication.
20      Q.  Okay.  Fair enough.  And you haven't done
21  any other analysis into its efficacy, I mean,
22  assuming that there's some other analysis that
23  could be done?
24      MR. RONA:  Objection.
25      A.  So I have a Ph.D. in health economics.  I

430

1   study the supply and demand of the health care
2   sector.  That's where my experience is in.  I am
3   not a pharmacologist.  I'm not a physician.  I am
4   not a geneticist.  I have no expertise in
5   measuring -- in human subjects -- a drug's efficacy
6   or effectiveness.
7       Q.  Okay.  Fair enough.  I'm not suggesting
8   you should have or -- or that you are anything
9   other than -- well, withdrawn.
10      I -- I assume it's also the case that you
11  haven't studied its side effect profile either?
12      MR. RONA:  Objection.
13      A.  So I have not done a randomized control
14  trial or been involved in a randomized control
15  trial, nor have I been involved in any
16  effectiveness study that assesses in human subjects
17  the side effect profile of Neurontin in specific
18  individuals.
19      Q.  Okay.
20      A.  That -- that is outside of my area of
21  expertise.
22      Q.  Okay.  And -- and you haven't done any
23  separate research or analysis into either of those
24  areas for purposes of your work on this case,
25  correct?

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

431

```
1        MR. RONA:  Objection.
2     A.  So in preparing the report, I was --
3   again, my expertise is in -- I'm a health
4   economist.  I have expertise in analyzing supply
5   and demand of -- in the medical care market, and
6   specifically in pharmaceuticals.  I have expertise
7   in the use of observational datasets for
8   understanding uses of medications I -- or
9   understanding -- No. 1, counts of medications, and
10  also, of uses and its correspondence to
11  indications.
12        I have no formal training in the
13  assessment in human subjects of efficacy or
14  effectiveness of -- of any medication.  And for my
15  own work in which I capture -- which I look at
16  effectiveness -- not efficacy, but effectiveness of
17  antidepressants, I rely on experts who both treat
18  patients with mental disorders and who also are
19  involved in the randomized -- in randomized control
20  trials of both the efficacy and the effectiveness
21  of those medications.
22        I am not an expert in -- in the medical
23  and the scientific basis of the use of Neurontin or
24  any other medication.
25     Q.  Understood.  I'm just -- I'm just trying
```

432

```
1   to understand the scope of what you did, and I
2   think we're on the same page, but -- but I just
3   want to make sure that you haven't actually -- it's
4   not part of your assignment to have done that
5   analysis in this case, correct?
6     A.  No.
7     Q.  Okay.  Along the same lines, you haven't
8   actually done any analysis of the actual marketing
9   of Neurontin as part of your assignment in this
10  case.
11    A.  No, I have not.
12    Q.  Okay.
13    A.  And again, that's, honestly, outside of my
14  -- my expertise.
15    Q.  Okay.  And so you're not offering an
16  opinion, are you, on the cause or causes of any of
17  the trends that your charts seek to analyze; is
18  that right?
19    A.  I am not.
20    Q.  Okay.  In your analysis of the data,
21  you're looking at Neurontin prescribing in the
22  aggregate, correct?
23        MR. RONA:  Objection.
24    A.  So I'm looking at two things:  I'm looking
25  at the use of Neurontin overall in the time period,
```

433

```
1   and also by specification, looking at using NDTI
2   data, and I'm also looking at unique counts of
3   physicians over all specialties in prescribing
4   Neurontin over the time period, and also, I am
5   looking at unique counts of physicians by specialty
6   over the time period.
7     Q.  Okay.  So -- so your analysis doesn't seek
8   to identify, for example, or wouldn't be able to
9   identify, for example, a particular patient who
10  received a particular prescription?
11        MR. RONA:  Objection.
12    Q.  That's -- that's not what your analysis
13  sets out to do, correct?
14        MR. RONA:  Objection.
15    A.  So the other part of my report is to
16  estimate the total number of consumers over the
17  class period and insurers over the class period
18  that may be -- that may have paid for Neurontin
19  over the class period.
20    Q.  Right.
21    A.  I've also been asked to give the Court a
22  reasonable estimate of whether or not sorting named
23  class members or proposed class members -- I'm
24  sorry -- I don't know the proper legal term -- have
25  -- in all -- in kind of statistical likelihood or
```

434

```
1   to a kind of -- to a -- to a reasonable certainty
2   paid for a prescription of Neurontin over the time
3   period that was off label.
4     Q.  Okay.  That -- that last bit of analysis
5   that you did refers to third-party payer class
6   representatives; is that correct?
7     A.  That's correct.
8     Q.  Not to actual individuals, right?
9     A.  That's correct.
10    Q.  Okay.  And your analysis doesn't at any
11  point seek to identify particular individuals who
12  might have been prescribed Neurontin, correct?
13    A.  No, I have not been asked to do that --
14  to --
15    Q.  Okay.
16    A.  -- to do that test.  That's not within the
17  scope of my report.
18    Q.  I'm assuming, also, that it wouldn't be
19  within the scope of your report to identify exactly
20  who paid for a particular prescription.  In other
21  words, whether it was an individual or a
22  third-party payer.  That's not one of the things
23  you were asked to do.
24        MR. RONA:  Objection.
25    A.  Okay.  So my report and this part --
```

435

1 portion of the report was -- I was asked to do
2 something very specific. I was asked to estimate
3 the total number of consumers over the US who
4 likely paid for a Neurontin or likely consumed an
5 off-label Neurontin prescription.
6 I was also asked to ascertain how many
7 third-party payers would likely have paid for an
8 off-label Neurontin prescription.
9 I was also asked to estimate whether or
10 not certain individual -- certain third-party
11 payers in the proposed class -- or a proposed
12 subclass likely paid for a Neurontin prescription.
13 That's the scope of my report, and that's what I
14 did. I didn't do anything else.
15 Q. Okay. Let's look at -- at Page 2 in your
16 description at the top.
17 A. Of my --
18 Q. Of your declaration.
19 A. Declaration.
20 Q. Thanks, yeah.
21 A. Okay.
22 Q. In particular, look at the description
23 there of what you do in Section IV, which I think
24 is consistent with what -- with what you've been
25 saying. The sentence reads, "In Section IV, I

436

1 enumerate the number of consumers and third-party
2 payers who paid for Neurontin for specific
3 off-label indications."
4 Just so I am sure I understand it, here,
5 too, you're coming up with just an aggregate
6 number, right?
7 A. That's correct.
8 Q. Okay. And that here, too, you're not
9 seeking to identify particular patients associated
10 with particular prescriptions.
11 A. That's not within the scope of the tasks
12 that I was asked to do, no.
13 Q. Understood. And here, too, you're not
14 seeking to identify, you know, what the -- what the
15 cause was of any particular prescription, correct?
16 A. No.
17 Q. Okay. Let's look at the next sentence,
18 which describes the work you did in Section V. It
19 reads, "Finally, in Section V, I present my
20 analysis showing the likelihood that the named
21 Plaintiff TPPs paid for off-label indications of
22 Neurontin."
23 We'll talk more about Section V as well as
24 Section IV later.
25 A. Uh-huh.

437

1 Q. But -- but just sort of at a high level, I
2 think, as you've described it, what you're doing in
3 Section V is a purely statistical analysis; is that
4 correct?
5 MR. RONA: Objection.
6 A. Can -- will you define for me what you
7 mean by a "purely statistical analysis."
8 Q. Why don't I ask a different question and
9 maybe -- maybe that will solve the issue. The
10 analysis that you're doing isn't based on any
11 analysis of particular reimbursement decisions of
12 particular third-party payers for particular
13 prescriptions.
14 MR. RONA: Objection.
15 A. Uhm.
16 Q. Correct?
17 A. Okay. I -- are you asking me whether I
18 employed -- in the analysis presented in Section V,
19 whether I employed statistical theory in order to
20 show the likelihood that the named Plaintiff TPPs
21 paid for off-label Neurontin use?
22 Q. That may be part of my question, so if you
23 -- you can answer that.
24 A. So the answer is yes.
25 Q. Uh-huh. And I guess my -- the second part

438

1 of the question, which is what I think I tried to
2 ask before, was that that analysis that you did
3 isn't based on particular reimbursement decisions
4 for particular prescriptions, is it? It's,
5 instead, based on claims data that was provided to
6 you by, you know, by the third-party payer
7 representatives.
8 MR. RONA: Objection.
9 A. So what I have at my disposal in
10 estimating the likelihood that the named TPPs paid
11 for off-label indications of Neurontin are two
12 things: The first is statistical theory, and the
13 second is claims data. That's what I use to
14 estimate the specific -- the likelihood that the
15 specific named Plaintiffs over the time period paid
16 for an off-label indication of Neurontin use.
17 Q. Okay. Based on the data that -- that
18 you've got and the methodology that you use, I'm
19 assuming that it's correct that your analysis
20 doesn't set out to reach a conclusion about what
21 caused a particular doctor to write a particular
22 prescription for which these third-party payers
23 reimbursed, correct?
24 A. I have no access to the minds of any
25 physicians prescribing any medication, and I

439

1   certainly don't have in this case as well.
2       Q.  Okay.
3       A.  So no.
4       Q.  Okay.
5       A.  I don't think anyone else does, but -- but
6   maybe that's not true.
7       Q.  Okay.  Did you conduct any analysis of
8   particular reimbursement guidelines for these
9   third-party payers as part of your work in Section
10  V?
11          MR. RONA:  Objection.
12      A.  Will you be more specific about
13  "reimbursement guidelines."
14      Q.  It's hard for me to be more specific.
15  It's -- it's a general question.  If there's
16  anything that you consider that fits within that
17  category, I'd love to hear about it.
18      A.  Okay.  So what I think you mean by
19  "reimbursement guidelines" are formularies.  Really
20  -- really the use of formularies in kind of on and
21  off -- off-formulary guidelines or other clinical
22  guidelines that may be used for -- for the choice
23  and the coverage of any specific medication.
24  That's kind of just my general gist of what you
25  mean by that.

440

1          And no, I did not -- I did not consider
2   that information in in -- in presenting the
3   analysis --
4          VIDEO OPERATOR:  Four minutes.  I'm sorry.
5       A.  -- in presenting the analysis in Section
6   V.
7          VIDEO OPERATOR:  Four minutes left on
8   tape.
9          MR. POLUBINSKI:  Okay.
10      Q.  Am I right that -- that you didn't set out
11  in your analysis to try to determine the average
12  duration of treatment for any particular
13  indication?
14          MR. RONA:  Objection.
15      A.  Okay.  So just to be really specific, are
16  you asking me -- so in which part of the analysis
17  are you asking me about duration?  Are you asking
18  me about use?
19      Q.  Any one, really.  I think it's a general
20  question.  As I -- as I read the declaration, I --
21  I don't -- it's my understanding that this is one
22  -- this wasn't a question that you had considered,
23  the average duration of Neurontin treatment, but
24  I'm asking you whether there's something that I'm
25  missing and there is some place that you considered

441

1   that.
2          MR. RONA:  Objection.
3       A.  So again, I was looking at new uses of
4   Neurontin for the specific -- for the first part of
5   the analysis, it's enumerating or trying to get an
6   estimate of uses of Neurontin, and also the unique
7   number of prescribers -- of physicians using
8   Neurontin.  I was looking at new uses, new
9   prescriptions of Neurontin.
10         I was not looking -- the intention of the
11  report -- and I'm sorry, the intention of the
12  report was to examine point-in-time and also trend
13  estimates in -- in changes in the -- in the demand
14  for and supply of Neurontin.
15         It was not -- the intention of the report
16  was not to estimate what individual patients are
17  doing over time.  I did not -- that was outside the
18  scope of my report.
19      Q.  Okay.  And an average -- did you consider
20  at all the average length of treatment or duration
21  of treatment of patient in the aggregate on
22  Neurontin?
23         MR. RONA:  Objection.
24      A.  Again, it's outside of the scope of the
25  report.

442

1       Q.  I'm --
2       A.  Because again, I'm looking at -- I'm
3   trying to provide the Court with information about
4   the number of uses -- the number of Neurontin
5   prescriptions and a number of physicians using
6   Neurontin over the time period and try to link that
7   to indication.
8          There -- there is -- it's completely
9   outside of the scope of my report to -- to look at
10  duration.  Again, in order to get a sense of -- to
11  -- in order to get the best sense of numbers of
12  prescriptions of Neurontin and numbers of
13  physicians using Neurontin by indication, the best
14  way of going about doing that is to look at new
15  uses.  Duration of use was completely outside the
16  scope of the report.
17         MR. POLUBINSKI:  Why don't we take a quick
18  break to change the tape.
19         VIDEO OPERATOR:  The time is 11:36.  This
20  is the end of Cassette 2.  We are off the record.
21         (Recess was taken.)
22         VIDEO OPERATOR:  The time is 11:45.  This
23  is the beginning of Cassette 3, Day 2 in the
24  deposition of Doctor Conti.  We are on the record.
25      Q.  So where we left off, I think, was talking

443

1    about an analysis of average duration of treatment
2    for various indications.  Are you aware of any data
3    that would permit you to -- to do an analysis like
4    that?
5        MR. RONA:  Objection.
6        A.  So within the scope of the -- of the data
7    that I had available for this analyses -- so
8    specifically that's IMS Xponent data, Wolters
9    Kluwer data, and IMS NDTI data, my understanding is
10   that NDTI data would not allow me to -- to estimate
11   that, because again, it's at the physician level
12   unit of analysis not at the patient level unit of
13   analysis.
14       Now, I have used other datasets that allow
15   me to get a sense of the duration of use over a
16   defined time period.  For example, the Medical
17   Expenditure Panel Survey will allow you to do that
18   for a certain group of people over time.  But I
19   have no experience using Wolters Kluwer data or IMS
20   Xponent data in order to do that, and I'd have to
21   really think about whether or not that would be
22   appropriate to -- to -- whether that dataset would
23   be appropriate to the task -- to that task at hand.
24       Q.  Okay.
25       A.  And I -- I honestly have not thought about

444

1    that.
2        Q.  Do you know whether it's possible, using
3    the datasets that you had here, to determine
4    whether some patients started, stopped, and then
5    started taking Neurontin again?
6        MR. RONA:  Objection.
7        A.  So again, this was not a specific question
8    that I really thought about how I would go -- what
9    the methodology would be that I would go about
10   estimating it, and so kind of what the -- what the
11   -- how to define the question, and then given the
12   datasets that we had, how would I go about -- is it
13   really possible for me to go about doing that and
14   how would I go about doing that, in a kind of
15   conservative, reliable kind of standard economic
16   way?  I can tell you that the IMS NDTI data would
17   not be able to provide that information just kind
18   of off the top of my head, because again, it's at
19   the physician level.  It does not observe
20   individuals over time.
21       Q.  How would -- how would your analysis in
22   Sections 4 and 5 count a patient like this, which
23   is to say, a patient that started, stopped, and
24   then started taking Neurontin again?
25       MR. RONA:  Objection.

445

1        A.  I'm sorry.  So what figure should I look
2    at?
3        Q.  No figure in particular, but -- but well,
4    let's -- let's back up a little bit.  Section --
5    Section IV of your report, if I understand it, is
6    the section in which you enumerate the "Number of
7    consumers and third-party payers who paid for
8    Neurontin for specific off-label indications."  I'm
9    reading from Page 2 here.
10       A.  Wait.  Okay.  Hold on.  So what page am I
11   on?
12       Q.  Let's look at Page 2.
13       A.  Page 2.  Okay.
14       Q.  The first sentence after the bullets says,
15   "In Section IV, I enumerate the number of consumers
16   and third-party payers who paid for Neurontin for
17   specific off-label indications."
18       A.  Okay.
19       Q.  Did I read that correctly?
20       A.  You did.  So now restate the question,
21   please.
22       Q.  Sure.  So for -- for purposes of the
23   enumeration that you do in Section IV, how would
24   you count a patient who started taking Neurontin,
25   stopped for some period of time, and then started

446

1    taking it again?  Would that patient be counted
2    once or twice?
3        MR. RONA:  Objection.
4        A.  Okay.  So in Section IV, I'm asked to
5    estimate the statistical likelihood, based on the
6    incidence of -- the observed incidence of Neurontin
7    prescriptions for specific -- or uses for -- for
8    certain off-label uses over -- in the aggregate of
9    US consumers, okay.
10       So this is a statistical exercise.  I
11   don't use and didn't consider for this analyses
12   using specific data that would allow me to identify
13   specific individuals who -- who took Neurontin
14   or -- and so I don't account for the potential for
15   new uses versus kind of refills or other kind of
16   other types of uses.  It's not -- that's out of the
17   scope of what I did.
18       Again, this is just -- this is an all --
19   this is kind of a much more general application of
20   statistical theory, joined with what we observe in
21   the data -- in NDTI data -- to kind of get a
22   general sense of -- of the -- the number of
23   consumers consuming Neurontin for off-label uses.
24       Q.  Okay.  Let's -- let's just take a quick
25   look on Page 23, Table 1.  This is a table that's

447

1    described as, "Estimated number of consumer class
2    members," correct?
3        A.  That's correct.
4        Q.  Okay.  For purposes of this table, Table
5    1, how are you counting patients who started,
6    stopped, and then started taking Neurontin again?
7        MR. RONA:  Objection.
8        A.  So I have no access to that data.  So what
9    I used to construct this chart is an incidence
10   number that's based on -- on the -- on observed
11   data in which we know something about new uses of
12   Neurontin that Wolters Kluwer and that IMS provides
13   to us.
14       I have no access to know how -- whether or
15   not IMS and Wolters Kluwer data provides -- you
16   know, how they check new uses.  I don't know how
17   they count or don't count on the specific case that
18   you're interested, and that was outside of the
19   scope of what I was asked to do.
20       I was not asked to validate IMS and
21   Wolters Kluwer data for its report of a field, and
22   I don't know of any published paper that provides a
23   validation of the new user field that IMS and
24   Wolters Kluwer has.
25       Q.  We'll circle back to this, but maybe just

448

1    let me ask one -- one more question about Table 1.
2        Is it your understanding that Table 1 was
3    constructed with Wolters Kluwer or IMS data?
4        A.  No.  I'm sorry.  I think it's NDTI data.
5    Sorry if I'm mis -- misunderstanding.  Let me
6    just -- if you don't mind --
7        Q.  Yeah.  Sure.
8        A.  -- just to be really specific, let me just
9    make sure that I'm really clear.  (Witness reviews
10   document.)  Right.  So I'm sorry.  Just to be
11   really specific, and I don't mean to be confusing,
12   my -- what I did was I used Neurontin use by
13   indication, which will only be provided to me by
14   NDTI data.
15       So in this case -- and again, I apologize
16   for being confusing -- it's already a long day --
17   that in this case, this dataset will provide me
18   uses, which is inclusive of new uses, and also of
19   samples and refills that we discussed for a
20   representative sample of patients of a
21   nationally-representative sample of physicians in
22   the US over this time period.
23       Q.  Okay.  I guess I thought I had understood
24   that the numbers in the top line which read,
25   "Unique patients that begin using Neurontin in a

449

1    given year," that those raw numbers were, if we
2    look at Paragraph 52 of your report, based on data
3    the Defendants have produced on "projected unique
4    patient counts for Neurontin for all indications
5    for --"
6        A.  Right.  That's correct, but the -- but the
7    -- the percent of use of bipolar indications,
8    that's from NDTI data.
9        Q.  Understood.
10       A.  So that's what I'm talking about.  So in
11   order to estimate any -- any number or any
12   incidence of off-label use, I need to use NDTI
13   data.  I can't rely on the Neurontin report to do
14   so.  That can only provide me unique patients that
15   began using Neurontin in a given year for this --
16   over this 1997 through 2002 time period.
17       Q.  Okay.  Shift gears just a little bit.  You
18   haven't been asked as part of your assignment to do
19   any analysis of the statements that Defendants made
20   with regard to Neurontin; is that correct?
21       A.  Uhm --
22       MR. RONA:  Objection.
23       A.  Are you asking me whether I have seen
24   statements of Neurontin -- of Defendants about
25   Neurontin?

450

1        Q.  I'm asking you whether you did any
2    analysis of that as part of your declaration.  I'm
3    assuming the answer is no, but -- but if that's not
4    the case, let me know.
5        A.  Okay.  Are you asking me whether I know
6    what statements the Defendant -- the Plaintiff --
7    anyone has made with respect to the other parts of
8    the lawsuit, other than what I've -- other than the
9    documents that I have seen and that are
10   enumerated --
11       Q.  Yeah, I mean other --
12       A.  -- in this report?
13       Q.  Right.  I'm asking you whether you've done
14   any analysis of it one way or the other.  I think
15   that's not part of the scope of what you did, but I
16   just want to try to understand it.
17       A.  Like I said, I -- I've seen the Court
18   order, and I've seen the other documents that are
19   listed in -- in -- in my report.  I haven't seen
20   anything else, and I haven't -- no one has told me
21   -- no one has made -- provided any statement to me
22   regarding any other aspect of this case.
23       Q.  Okay.  (Reviews documents.)  Has any of
24   your published work examined the reasons that use
25   of prescription drugs might increase or decrease

451

1  over time?
2  A.  Yes.
3  Q.  Which article?
4  A.  There is a policy report for the
5  California Health Care Foundation that describes
6  trends in cost and also trends in use of
7  prescription medications for the State of
8  California --
9  Q.  Okay.
10  A.  -- that's listed on my CV.
11  Q.  Okay.  Fair enough.  Did the policy report
12  reach any conclusion one way or the other on the
13  effect of cost on -- on trends in use?
14  A.  Honestly, I wrote this paper with a whole
15  bunch of people about seven years ago or six years
16  ago, way before graduate school.  I would have to
17  look at the report to tell you exactly what opinion
18  or -- we reached, if at all.
19  Q.  You'd agree, though, that cost
20  could be one factor that might influence use of a
21  prescription drug, correct?
22  A.  So cost.  So if what you mean by that is
23  price --
24  Q.  Uh-huh.
25  A.  -- of the medication that the individual

452

1  patient faces, then yes, standard economic theory
2  would tell you that -- that the price that an
3  individual faces for any good is going to influence
4  their demand for that good.
5  Q.  Okay.  Okay.  You've mentioned the one
6  policy report.  Were -- have there -- has there
7  been other published work that you've done that
8  examines the reasons that use of prescription drugs
9  might increase or decrease over time?
10  A.  Not that I can recall.
11  Q.  Okay.  Have you done any work other than
12  the work underlying the policy report, whether or
13  not it ever resulted in public -- in publication --
14  on the reasons that use of prescription drugs might
15  increase or decrease over time?
16  A.  No.  No.  No.  Not really.  I mean, I have
17  not done any -- I have not published any papers
18  that have focused on drugs of -- of use and of
19  prices or of overall costs of medication usage.
20  The vast majority of the work that I have
21  done has focused on two things:  Estimating the --
22  the impact of illness on people's economic lives,
23  and what I really mean by that is, how does an
24  illness impact people's employment and retirement
25  decisions?

453

1  The other main body of research that I
2  have focused on has been on estimating the benefits
3  -- the economic benefits of newer treatments
4  relative to older treatments.  And finally, I have
5  done some work looking at or describing the use of
6  antidepressant medications in a representative US
7  population both for on-label and also off-label
8  uses in a very defined time period.
9  So using -- using 2001 data drawn from the
10  Medical Expenditure Panel Survey.
11  Q.  Okay.  Now, just sort of speaking
12  generally here, not limiting our discussion
13  necessarily to Neurontin, you would agree that
14  there are a range of factors that can affect the
15  number of prescriptions written for a particular
16  medication over time; is that right?
17  MR. RONA:  Objection.
18  A.  Okay.
19  Q.  Or if you don't have an opinion or a view
20  one way or the other, I suppose that's fine, too.
21  You know, I don't want to put words in your mouth.
22  A.  So standard economic theory is going to
23  tell you that the supply and demand of -- of
24  prescription medications, like any good, is going
25  to depend on -- is going to be dependent on a whole

454

1  bunch of factors.
2  Q.  Okay.
3  A.  Now --
4  Q.  One of them might be price, as we
5  discussed, right?
6  A.  Yes, one of them might be price.
7  Absolutely.  And I mean, it's a little bit more
8  nuanced in the medical care sector, because this is
9  this agency relationship between physicians and
10  patients, so patients don't just go to a pharmacy
11  and order up anything they want, right.  That
12  instead, they rely on physicians.
13  Q.  They're not supposed to, at least, right?
14  A.  Not in this country anyway, right.  So
15  that, instead, they rely on physicians to provide
16  that information, and also to provide prescriptions
17  that they can then fill at a pharmacy.
18  Q.  Right.  Okay.  And so other factors that
19  might influence prescribing trends of a drug over
20  time might include the drug's efficacy relative to
21  other drugs for treating the same condition; would
22  you agree?
23  MR. RONA:  Objection.
24  A.  Are you asking me that whether or not a
25  physician -- are you asking me whether physicians

455

1  consider the effectiveness and efficacy of a drug
2  in prescribing a specific medication to a specific
3  patient? Not exactly.  More that -- that
4      Q.  Not exactly.  More that -- that
5  information about a drug's efficacy can impact
6  prescribing behavior in the aggregate.  If you
7  don't know one way or the other, that's fine, too.
8      MR. RONA:  Objection.
9      A.  So I don't think that there's been many
10 empirical, so I -- so one question would be -- so
11 one question I may ask you is, what do you mean by
12 -- do you mean efficacy as defined by -- by the
13 FDA, or do you mean effectiveness, which also
14 includes side effect profiles and other things.
15     Q.  Well, let's talk about side effect
16 profiles.
17     A.  Uh-huh.
18     Q.  That's something that could influence a
19 decision of whether or not to prescribe a
20 medication, right?
21     MR. RONA:  Objection.
22     A.  So my -- so my read of the medical -- so
23 again, I'm not a physician, and I am not an expert
24 in what makes physicians prescribe one medication
25 over another.  It is certainly reasonable to me

456

1  that -- that efficacy, based on FDA approval of a
2  medication and/or a randomized control trial that
3  is approved -- that is accepted by the FDA, seems
4  like a pretty good reason or -- or kind of
5  underlying rationale for why a physician may
6  prescribe a medication, because No. 1, it's, you
7  know, that -- that predicates its availability in
8  the United States.
9      Now, I don't know of many empirical
10 studies that have -- so any, really, that have
11 looked at changes in physician prescribing or
12 patient use dependent on changes in information on
13 the side effect profile or other measures of
14 effectiveness in -- for prescription drugs.
15     Q.  Right.  But would you -- would you
16 disagree with the statement that it's at least
17 possible that the side effect profile of a drug
18 will influence whether or not a doctor prescribes
19 it?
20     MR. RONA:  Objection.
21     A.  Okay.  So again, I'm not a physician.  So
22 I have -- I mean, I'm assuming -- so my kind of
23 general read of the literature is that side effect
24 profiles do impact a physician's decision whether
25 or not to prescribe a medication.  But I have no

457

1  access to any other empirical -- I have no access
2  to kind of specialized knowledge about that.  I
3  hope that's true, but I don't know if that's true.
4  Honestly.
5      Q.  I personally hope it's true, too.
6      A.  Right.
7      MR. POLUBINSKI:  Why don't we take a short
8  break.
9      VIDEO OPERATOR:  Off the record.  12:07.
10 (Whereupon the deposition recessed at
11 12:07 p.m.)

458

1      AFTERNOON SESSION (1:07 PM)
2      VIDEO OPERATOR:  On the record. 1:07.
3      Q.  Okay.  So the short break that we took
4  turned into a lunch break, but we're now back.  And
5  what I'd like to ask you about now, Doctor Conti,
6  is class periods.
7      Your -- your opinion or your declaration
8  refers in places to class periods, because I think
9  we've seen, for example, in -- in the footnote that
10 we looked at earlier.  What do you understand the
11 class period to be?
12     MR. RONA:  Objection.
13     A.  Again, I was asked to look at the uses of
14 Neurontin over -- by physicians over -- and by
15 consumers -- over -- over a defined time period,
16 and counsel provided to me a range of -- well, the
17 data that I have provides a range of information
18 that I'm able to provide to the Court about the
19 number of uses, also number of unique physicians
20 using Neurontin over the time -- over the time
21 period which includes -- which is inclusive of 1994
22 through 2004.
23     The -- counsel provided to me certain
24 subclasses, which includes bipolar, migraine,
25 nociceptive pain, neuropathic pain, and dosages

459

1  exceeding 1,800 milligrams.  I have no -- and the
2  period that they -- they -- the period that they
3  provided me in terms of the specific dates, again,
4  were provided to me by them.
5       I have no -- it was information that they
6  -- or dates that they were particularly interested
7  in looking at uses and counts of physicians, and
8  that's my understanding of what -- of what I was
9  asked to do.
10      I don't have any technical knowledge of
11 what that term means.
12      Q.  Okay.  Do you have any understanding for
13 how counsel came up with the class periods that
14 they provided to you?
15      A.  I do not.
16      MR. RONA:  Objection.
17      Q.  Did you have any input in that decision at
18 all?
19      A.  No.
20      Q.  Let's look specifically at the footnote
21 that I mentioned before, which is Footnote 1 on
22 Page 4 of your report.
23      Have the -- have the dates for the class
24 periods that are reflected in Footnote 1 always
25 been the same as long as you've been working on

460

1  this matter?
2       MR. RONA:  Objection.
3       A.  (Witness nods.)  So to be honest, I wasn't
4  -- my analysis wasn't specifically focused on
5  analyzing class periods.  So specific time periods
6  for these specifications, and that's -- that's --
7  that's reflective of what the report -- the content
8  of the report really shows or really describes.
9       What I was mostly focused on was -- was
10 describing patterns or describing points in time
11 and uses and also the unique number of physicians
12 -- sorry -- estimates of the unique number of
13 physicians and -- and number of prescriptions at
14 any given point in time, and then describing for
15 the Court trends in time for -- overall and then
16 for specifications.
17      I didn't -- the focus of my report wasn't
18 specifically on these class periods or I didn't
19 spend much time, honestly, thinking about these
20 class periods in preparing the report.  It was more
21 thinking about what the specific label and
22 off-label uses should be that I would be able to
23 provide the Court with information about.
24      So I was given this information.  I
25 can't -- and I -- I mean, this is the information

461

1  that I have about class periods.  I didn't
2  particularly focus on it -- and I haven't honestly
3  focused on whether or not it's changed at all.  But
4  this is what I've understood it to be, frankly.
5       MR. POLUBINSKI:  Okay.  Let's mark the
6  next exhibit.  Are we up to 11 now?
7       COURT REPORTER:  12.
8       (Conti Exhibit 12, draft 12/1/70.)
9       Q.  Okay.  Doctor Conti, you've been handed a
10 document that's been marked as Exhibit 12 in your
11 deposition.
12      A.  Uh-huh.
13      Q.  This is a document that was produced to us
14 by Plaintiffs' counsel about a week ago in response
15 to your subpoena.  It appears to me, at least, to
16 be a draft of your report.  Does that look right to
17 you?
18      A.  Yes.
19      Q.  The date on the top of the draft is
20 12/1/07.  Is that -- is that correct?
21      A.  (Witness reviews document.)  Yes.
22      Q.  Okay.  Is that -- what's the date on
23 which you would have completed this draft?
24      A.  I think I completed it the -- the day
25 before.

462

1       Q.  Okay.  Let's look at Page 19 of the draft.
2  And in particular, let's look at the asterisk
3  language underneath Table 1, which reads, "Because
4  counsel has instructed me to focus on consumers
5  that used Neurontin for bipolar and other mood
6  disorders after May 1997, I prorate the 1997
7  numbers for this group by 7/12th."
8       Did I read that correctly?
9       A.  You read this correctly, yes.
10      Q.  Okay.  And I think, if I understand it
11 right, that this sentence refers to your estimate
12 in the table above Table 1 to the number of
13 consumer class members, correct?
14      A.  So to be honest, I haven't seen this draft
15 of the report in two months, so I'd like to spend a
16 little time taking -- making sure that I read this
17 comment in context.
18      Q.  Sure.
19      A.  Because it's been a while.  Thank you.
20      Q.  You're welcome.
21      A.  (Witness reviews document.)  Ah.  Okay.
22 Thank you.
23      Q.  You're welcome.  Okay.  Let me ask the
24 last question again.  The sentence that we looked
25 at, the one next to the asterisk --

Conti, Rena (MDL) 2/13/2008 6:30:00 PM

463

1    A.  Uh-huh.

2    Q.  -- refers to your estimate in the table

3  about -- which is Table 1 -- to the number of

4  consumer class members, correct?

5    A.  Okay.  So -- right.  So the asterisk

6  comment, because counsel has instructed me to focus

7  on consumers that used Neurontin for bipolar and

8  other mood disorders after May 1997, I prorate the

9  1997 number for this group by 7/12ths, correct, and

10  it refers to numbers in Table 1 --

11    Q.  Okay.  So --

12    A.  -- that are specifically marked with an

13  asterisk.

14    Q.  So at this time in Table 1 --

15    A.  Uh-huh.

16    Q.  -- counsel was instructing you to come up

17  with an estimated number of consumer class members

18  for bipolar, starting in May 1997, correct?

19    MR. RONA:  Objection.

20    A.  Right.  So I was asked to -- to estimate

21  the number of unique class members, right, starting

22  in May 19 -- 1997.

23    Q.  Okay.  Not one of the earlier 1995 dates

24  that we'd seen reflected in Footnote 1, correct?

25    A.  There's no data available for me to

464

1  estimate unique class members for 1995 through

2  1996, or at least the information that I was

3  provided was provided to me through the Defendants

4  -- through counsel -- that only provides

5  information from 1997 through 2002.

6    So there's no way for me to provide that

7  information on 1995 or 1996.

8    Q.  Fair enough.  That's a good point, but --

9  but I guess to my question --

10    A.  I wouldn't be able to do it.

11    Q.  For the -- what you didn't do -- you

12  weren't seeking to find a number that included the

13  earlier parts of 1997 before May of 1997, Correct?

14    MR. RONA:  Objection.

15    A.  I'm sorry.  Are you asking me whether I

16  had data available to provide information for

17  previous -- within 1997 but before May of 1997?

18    Q.  Let me withdraw the question.  I think

19  we'd agreed that the analysis that you do for

20  unique members of bipolar in this chart begins in

21  May of 1997, correct?

22    A.  Okay.  And "this chart," being the draft

23  for 12/1/07, just to be really clear.

24    Q.  Yes, absolutely.

25    A.  Okay.

465

1    Q.  Draft of 12/1/07, Table 1?

2    A.  Okay.  Great.  Uh-huh.

3    Q.  Do I understand this correctly that

4  counsel later changed the class period and asked

5  you to focus on a different start date for bipolar?

6    MR. RONA:  Objection.

7    A.  So like I said, to be honest, I wasn't

8  really focused on -- on the defined -- the -- in

9  general, for the -- for the report, I wasn't

10  focused on the kind of specific time periods of the

11  class that I was being -- that I -- was provided to

12  me by counsel.

13    For the estimation of these numbers, I --

14  it made sense for us to think about starting --

15  sorry, just to -- I just want to be really precise

16  in my answer -- (witness reviews document)  -- to

17  start with -- with the class period that had been

18  provided to myself and provided to my staff for

19  estimating the number of consumer class members,

20  given the data that we were provided to --

21  provided by counsel through the Defendants.

22    Q.  Okay.  Do you recall when the class period

23  for bipolar changed?

24    A.  No.

25    MR. RONA:  Objection.

466

1    Q.  Do you have an understanding for why it

2  changed?

3    A.  No.

4    MR. RONA:  Objection.

5    Q.  Did you ever ask?

6    A.  No.

7    MR. RONA:  Objection.

8    Q.  Do you have an understanding one way or

9  the other about whether the change in the class

10  period occurred after counsel had seen drafts of

11  your data analysis?

12    MR. RONA:  Objection.

13    A.  No.

14    Q.  Okay.  Let's -- let's look at one of the

15  exhibits that we marked yesterday, Exhibit 11.

16    A.  Exhibit 11?

17    Q.  Yeah.  Exhibit 11 is the "Neurontin NDTI

18  drug uses document that was produced as part of

19  your backup.  It's a two-page document.

20    A.  Okay.  I'm sorry.

21    Q.  I'll show it to you.  Maybe that will

22  help.

23    A.  Oh, right.  It's this.  It's the

24  enumeration.

25    Q.  That's the one.

467

1    A.  Yes.  Okay.
2    Q.  Okay.  Let's look at the bipolar column.
3    A.  Okay.
4    Q.  And in particular, what I'd like to try to
5    do is focus on the May of 1997 period.  May of 1997
6    would fall within the second quarter of '97?
7    A.  Okay.
8    Q.  And what I'd like to do -- and you -- you
9    tell me how you want to do this -- I'd like to add
10    up the -- the numbers of uses for bipolar prior to
11    the second quarter of 1997.  I can give you a
12    calculator to do it.  I can tell you what my
13    addition came up with -- totally up to you how you
14    want to deal with it.
15    A.  Provided by Exhibit 11.
16    Q.  Yes, exact --
17    A.  Just to be really specific.
18    Q.  Yeah.
19    A.  Great.  So what you're asking -- so just
20    to be very specific, what you'd like me to do is
21    add up the number of NDTI drug uses --
22    Q.  Uh-huh.
23    A.  -- from Quarter 2, the second quarter of
24    1997, through or -- and previous from 1994, Quarter
25    1 through the second quarter of 1997.

468

1    Q.  Uh-huh.
2    A.  Is that what you're asking me to do?
3    Q.  Yeah, or actually, maybe not even counting
4    Quarter 2.  Maybe just prior to the Quarter 2 of
5    '97, and again, I've done the math, and I'm happy
6    to represent to you what it is, but you're also
7    welcome to do it yourself, and I'm happy to provide
8    you with a calculator, if that would be helpful.
9    A.  Okay.  So just to be really clear, so I'm
10    going to add -- so in 1994, Quarter 1 through
11    Quarter 4, we -- there are 0 drug uses recorded in
12    -- in IMS NDTI data, correct?
13    Q.  Yeah.  Yeah.
14    A.  And that's -- that's true for both Quarter
15    2 and Quarter 3 of 1995.  So may I have the
16    calculator, please --
17    Q.  Of course, yeah.
18    A.  -- and I'll calculate the rest.
19    Q.  Okay.  Great.
20    A.  Okay.  Thank you.
21    Q.  You're welcome.
22    A.  (Witness performs calculation.)  And you
23    want me to be inclusive of -- of the second quarter
24    of 1997, correct?
25    Q.  No.  I think we won't be inclusive.  If

469

1    you've done it already, that's fine, but --
2    A.  That's all right.  (Witness performs
3    calculation.)  Okay.
4    Q.  What do you come up with?
5    A.  81,867.
6    Q.  Wonderful.  We can agree on something.
7    A.  Oh, good.
8    Q.  That's great.  Okay.  So that number,
9    81,867, if I'm right, is the number of uses of
10    Neurontin that would have taken place before the
11    second quarter of 1997, as reflected in Conti
12    Exhibit 11; is that correct?
13    A.  As reported in IMS NDTI data.
14    Q.  Fair enough.
15    A.  Correct.
16    Q.  Do you have a view one way or the other as
17    to whether 81,000 uses is substantial?
18    MR. RONA:  Objection.
19    A.  I don't know what the legal definition of
20    substantial is, so I have no opinion on the legal
21    definition of whether or not this meets the legal
22    definition or not.
23    Q.  I'm not asking a legal question one way or
24    the other, just your -- your own view as an
25    economist --

470

1    MR. RONA:  Objection.
2    Q.  -- and someone who studies the data.
3    A.  It's certainly greater than zero.
4    MR. RONA:  Objection.
5    Q.  Okay.  Okay.
6    A.  And it's clearly zero over a -- you know,
7    over observed, you know, a consistently-observed
8    time period.
9    Q.  Okay.
10    A.  After being observed as zero from quarter
11    -- first quarter of 1994 through approximately the
12    third quarter of 1995.
13    Q.  Okay.  Okay.  As we discussed, I think,
14    setting aside the classes related to doses above
15    1,800 milligrams a day, your opinion focuses on
16    four different groupings of off-label indications,
17    by and large.
18    A.  That's correct.
19    Q.  And those four are?
20    A.  Actually, I'm sorry.  I'm going to
21    disagree.  I have no opinion about -- again, my
22    report is descriptive.  There is no opinion
23    contained in this report.
24    Q.  That's -- okay.  That's interesting.  So
25    what -- and I think this may just be a

471

1  terminological issue, but let me just make sure I
2  understand that when you say, "opinion" in your
3  last answer, what do you mean?
4      A.  I mean, I have not been asked to give an
5  opinion about the causes or consequences of the
6  uses of -- of Neurontin for any on or off-label
7  use.
8          I've been asked to describe observational
9  data about the uses of Neurontin at any given point
10  in time by consumers that -- and broken out by
11  specific indications; and I've also been asked to
12  provide the Court with estimates of the number of
13  unique physicians prescribing Neurontin over the
14  time period.
15     Q.  Okay.
16     A.  And finally, I guess I've been asked to
17  provide an estimate in aggregate of the likelihood
18  -- of the kind of likely number of consumers and
19  likely number of third-party payers that would have
20  paid for an off-label prescription of Neurontin
21  over the time period.
22     Q.  Okay.  Thanks.
23         MR. POLUBINSKI:  I think we'll mark the
24  next exhibit.  13.
25         (Conti Exhibit 13, "Memorandum of Law in

472

1          Support of Plaintiffs' Renewed Motion
2          For Class Certification." )
3      Q.  So Doctor Conti, we've just handed you an
4  exhibit that's been marked as Exhibit 13 of your
5  deposition.
6          Have you seen this document before?
7      A.  May I take a -- spend some time --
8      Q.  Please.  Yeah.
9      A.  -- so I can take a look at it?  Thank you.
10  (Witness reviews document.)  I'm sorry.  There's no
11  date on this -- there's no date on this document.
12     Q.  Yeah, I didn't prepare the document, so
13  I'm not sure quite what to say to that, although I
14  think if you look at Page 40, there's a -- there's
15  a date there, and I think you'll also see that
16  there's a date across the top of the document that
17  reflects a date on which it was filed.  And just so
18  the record's clear, as I'm explaining this, the
19  document we're talking about is titled, "Memorandum
20  of Law in Support of Plaintiffs' Renewed Motion For
21  Class Certification."
22         Does that help?
23     A.  (Witness reviews document.)  So -- okay.
24  So again, I'm not a legal expert, but I have never
25  seen this document, dated December 19th, 2007.

473

1      Q.  Okay.  That's -- that was going to be my
2  first question.  Have you ever seen drafts of -- of
3  documents like this?
4      A.  So can you give me the technical legal
5  term for what this document would be called,
6  because I don't know.
7      Q.  Okay.
8      A.  Uhm.
9      Q.  I understand this to be -- I understand
10  this to be Plaintiffs' brief in support of their
11  motion for class certification.
12     A.  Uh-huh.
13     Q.  It's a legal document in support of their
14  motion.  I don't want you to rely on that
15  representation --
16     A.  Uh-huh.
17     Q.  -- one way or the other, 'cause as I said,
18  I didn't prepare the document.
19     A.  Okay.
20     Q.  But I'm not sure if that helps
21  contextwise --
22     A.  Uh-huh.
23     Q.  -- in understanding my question.  Maybe
24  you want me to rephrase my question.  Have you ever
25  seen at any time a draft of Plaintiffs' brief in

474

1  support of their motion for class certification?
2      A.  So I've never heard the term "Plaintiffs'
3  brief" before, so I don't know exactly how to
4  define it.
5      Q.  Okay.
6      A.  If you could tell me, that would be great.
7  How would I define it?
8      Q.  Well, maybe let me ask you this:  Have you
9  ever seen before any documents prepared by
10  Plaintiffs' counsel --
11     A.  Uh-huh.
12     Q.  -- arguing to the Court one way or the
13  other whether or not class certification's
14  appropriate in this matter?
15         MR. RONA:  Objection.
16     A.  No, I have not, not that I know of.
17     Q.  Okay.  Let's look at Page 23.
18     A.  Of?
19     Q.  Of Exhibit 13.
20     A.  Exhibit 13 again.
21         MR. RONA:  When you say, "Page 23," are
22  you referring to the number at the -- on the header
23  on the top or --
24         MR. POLUBINSKI:  Yes, it's actually the
25  number at the bottom -- what I'm referring to,

475

1    which -- in the notation from the ECF filing system
2    at the top of the document would be Page 26 of 48.
3        Q.  Are you there?
4        A.  So Page 23 on the bottom, correct?
5        Q.  Yes.  Yes.
6        A.  Correct.
7        Q.  I think we're on the same page.  There's a
8    -- there's a chart on Page 23 that appears to have
9    been labeled "Figure 7.A," correct?
10       A.  Yes.
11       Q.  You don't have a Figure 7.a in your
12   report, correct?
13       A.  Not that I know of.
14       Q.  You're welcome to -- I'm pretty sure you
15   don't, but you can --
16       A.  Not that I know of, but hold on.  Let me
17   just take a look.  There are a whole bunch of
18   different documents here, so --  okay.  (Witness
19   reviews document.)  Okay.  I do not.
20       Q.  Okay.  Have you ever seen this chart
21   before, 7.a?
22       A.  No.
23       Q.  Okay.  So you didn't prepare this chart,
24   obviously, needless to say.
25       A.  No.

476

1        Q.  Okay.  You didn't prepare any chart with
2    arrows on it and notations on it like -- like this.
3        A.  No.
4        MR. RONA:  Objection.
5        Q.  Okay.  Let's look again at Exhibit 12,
6    which is the draft of your report.
7        A.  Okay.  Okay.  So I'm just shuffling a lot
8    of paper.  So if you can just give me a second.
9    Okay.  The draft of my report is -- let's see.
10   (Witness reviews document.)  Okay.  Okay.  What
11   page?
12       Q.  Page 9, please.
13       A.  Okay.  Okay.
14       Q.  I'm looking in particular at the last
15   sentence -- last two sentences of Paragraph 1.
16   They read, "NDTI indication Charts 1 through 4 also
17   include mention of key events in the various
18   timelines of alleged fraud."
19       A.  Uh-huh.
20       Q.  "These timeline events were provided to me
21   by counsel."  Did I read that correctly?
22       A.  Yes.
23       Q.  These sentences or sentences like these
24   don't appear in your final report --
25       A.  Uh-huh.

477

1        Q.  -- do they?
2        A.  (Witness reviews document.)  So again, I'd
3    have to go through my final report to make sure
4    that they're completely consistent.  But no, I need
5    to -- I would also need to look to see what the
6    charts are that I was referring to to be completely
7    sure -- you know, kind of sure of each -- to make
8    sure that I -- you know, what I mean?  Like, they
9    are completely consonant, one to the other.
10       Q.  Do you want to do that?
11       A.  Sure.  Okay.  So I don't know which NDT
12   indication charts of 1 through 4 are -- I'm
13   referring to in my final document.  So it's just
14   going to take me a second.
15       Q.  Okay.  That's fine.
16       A.  And you don't provide to me charts for --
17   for this draft.
18       Q.  I don't.  And the reason is that they
19   weren't provided to us.
20       A.  Okay.  (Witness reviews document.)
21       MR. RONA:  I just want to clarify before I
22   object that there's no representation that -- that
23   anyone knows whether there were drafts -- charts
24   actually attached to the draft.
25       MR. POLUBINSKI:  I'm asking questions, not

478

1    making representation -- or trying not to at least.
2        MR. RONA:  Well, there was a slight
3    implication there.  Before I object, I just want to
4    make clear that you're just saying that you're
5    providing what was provided to you in the way that
6    was provide and not implying that there were charts
7    that should have been there that weren't.
8        MR. POLUBINSKI:  There's -- I'm not making
9    any implication one way or the other.
10       MR. RONA:  Okay.
11       A.  Okay.  So I don't -- I don't have charts
12   that read NDTI Indication Charts 1 through 4 in the
13   final brief that correspond to exactly this, so I'm
14   not -- to be honest, I don't know exactly what this
15   is referring to.  If you're -- so what you're
16   asking me is -- I'm sorry.  You're trying to ask me
17   to draw some relationship between this draft and
18   the final report.
19       Q.  Right.
20       A.  That was the -- your question and --
21       Q.  Right.
22       A.  I'm just saying that I can't -- I can't do
23   that specific -- I can't do that directly, because
24   they're not here.
25       Q.  Okay.  Do you -- do you have any

479

1  recollection now as to what you meant when you
2  wrote this draft, when you wrote, "NDTI Indication
3  Charts 1 through 4"?
4      A.  So my -- again, I think, you know, we
5  drafted -- we mocked up charts, and what -- you
6  know, what the kind of sequence would look like,
7  and my impression was -- or kind of my recollection
8  is that NDTI indication charts would report
9  something about using, again, NDTI IMS data about
10  off-label and on-label indications of use, and
11  counts of use, but I don't --
12     Q.  Okay.
13     A.  I can't tell you exactly what they were
14  and what they, you know --
15     Q.  Right.  I obviously wasn't the person who
16  wrote this, but as someone --
17     A.  I know.  I was.  I was.  But I'm saying
18  that I don't know -- you know, I can't -- that was
19  my recollection --
20     Q.  Okay.
21     A.  -- of what they should be -- what the
22  sentence should be referring to.
23     Q.  Sure.  Sure.  And -- and no criticism
24  meant by it on my part.  I mean, I guess what I was
25  just -- in the interest of trying to figure this

480

1  out --
2      A.  Uh-huh.
3      Q.  -- I mean, to me, as a reader of the
4  report, I guess I would have assumed that the four
5  charts that you might be referring to as NDTI
6  Indication Charts 1 through 4 might well correspond
7  with Figure 7, Figure 8, Figure 9, and Figure 10 in
8  your final report?
9      A.  So, but they also --
10     MR. RONA:  Objection.
11     THE WITNESS:  I'm sorry.
12     A.  But they also might correspond to other
13  charts that -- you know, other charts.  They also
14  may correspond to -- I guess what I mean by that is
15  they could also have corresponded to any of the
16  charts that are listed, saying that they used IMS
17  NDTI data.
18     So Figure 5 reports Neurontin's on-label
19  use versus off-label use for all physicians.  Now,
20  Table 6 or Figure 6 reports Area A from Figure 5
21  broken down by specification category.  Figure 7
22  reports total Neurontin use for bipolar
23  indications, again, using IMS NDTI data.  Figure 8
24  uses the same data for neuropathic pain, Figure 9
25  for nociceptive pain, again, using the same data,

481

1  Figure 10 for migraine indications.  So there's no
2  way for me -- I can't directly correspond.
3      Q.  Okay.  Fair enough.
4      A.  Okay.
5      Q.  It could be any one of those charts,
6  Tables 5 through 6?
7      A.  It could be something different, you know,
8  that we thought about drafting or ultimately didn't
9  draft or ultimately didn't create.  I mean, you
10  know --
11     Q.  Okay.  I guess -- maybe I can ask my
12  question sort of broadly.  Do any of your charts in
13  any of the figures attached to your final report
14  include mention of key events in the various time
15  lines of alleged fraud?
16     A.  No, they do not.
17     Q.  Whose decision was it not to include that
18  information?
19     MR. RONA:  Objection.
20     A.  So I don't have that information, and that
21  information was never provided to me.  There was
22  some thought on my part that it may be helpful to
23  have that information at some point, but I never
24  saw timelines of events that were -- I never saw a
25  timeline that -- as the one presented in Figure

482

1  7.a, and I never included it in my report.  I never
2  did any analysis around that.
3      Q.  Okay.  So the last sentence which refers
4  to "Timeline events provided by counsel," the
5  timeline events never were provided to you; is that
6  correct?
7      A.  Wait.  So this is a draft, and similarly,
8  I don't know if you do this on your own, but for --
9  in my work, I will mock up drafts and say, This is
10  what -- you know, I will describe things that I
11  have not done yet or say, you know, this is what I
12  think I'm going to do and have it kind of laid out
13  like this.
14     This is what I did for drafting this
15  report.  I had a draft that said, This is what I'm
16  going to show in this, and this is kind of some
17  indication of maybe what I'll find or not find, and
18  I think probably -- I mean, you could probably pick
19  out lots of different sentences in the draft that
20  never really -- that never really amount to much.
21  And honestly, I never saw a timeline of drafts or a
22  timeline of events provided to me by counsel, and
23  you know, it's not reported in my final report.
24     Q.  Okay.
25     A.  And I suspect this is probably one of

483

1    those times where, you know, I should have edited
2    better or something.
3        Q.   I think you testified -- and you can
4    correct me if I'm not characterizing this right,
5    but that at some point in time you had some thought
6    that it might be helpful to do something along the
7    lines of what you describe in these two
8    sentences --
9        A.   Uh-huh.
10       Q.   -- that we've been looking at in Exhibit
11   12.
12           MR. RONA:  Objection.
13       Q.   Did you ever discuss that thought with
14   anybody else?
15           MR. RONA:  Objection.
16       A.   Again, just with my staff at GMA.
17       Q.   Which is to say, Mr. Augusteijn and Mr.
18   McCleur?
19       A.   Uh-huh.  And again, the whole notion is
20   that we did have some indication of what the class
21   periods were for each indication.  And so we could
22   -- you know, if we were going to think about
23   constructing charts that captured that, then we
24   would want --  then we would kind of try and
25   capture that --  kind of as -- that since we knew

484

1    something about the class period, we could kind of
2    try to present that information more -- in a more
3    defined way for a more defined time period for
4    specific indications.  That's all.
5        Q.   What was the reason that you ultimately
6    decided not to pursue this analysis?
7            MR. RONA:  Objection.
8        A.   This analysis wasn't necessarily ever, you
9    know, planned by me.  It just -- so you know, I
10   think that, to be honest, I was asked to do very
11   specific things to -- to give information to the
12   Court, and that's what, honestly, the final report
13   is -- is intended to do.  That's it.
14           It's not intended to do anything more than
15   that.  So my report was drafted to provide the
16   Court with information about the number of
17   Neurontin uses, the number of -- of unique
18   prescribing physicians, and try to link that to
19   indication, as best I can, in the data that is
20   available to me.  That's it.
21           And I just honestly in -- in editing this,
22   in going through kind of iterations of the editing
23   of this document, the only thing that I was trying
24   to do, honestly, was be as clear for the Court
25   about what the scope of my -- of my tasks were and

485

1    also -- and to provide that information in the
2    clearest, most -- clearest, most useful way
3    possible to the Court.  That's it.
4        Q.   Did anyone ever suggest to you one way or
5    the other whether or not you should do this
6    analysis --
7        A.   No.
8        Q.   -- that's reflected in these last two
9    sentences?
10       A.   No.
11           MR. RONA:  Objection.
12       Q.   Did Mr. Augusteijn or Mr. McCleur have a
13   view on whether or not you should do that analysis
14   when you discussed it with them?
15           MR. RONA:  Objection.
16       A.   So they're my staff.  I rely on them for a
17   whole bunch of -- you know, information and
18   opinions.  I rely on their opinion.  I don't -- you
19   know, everything that's contained in the report and
20   every decision that was made is ultimately my
21   decision.
22       Q.   Understood.  I'm just asking whether they
23   expressed a view to you, themselves, one way or the
24   other as to whether or not you should do this
25   analysis.

486

1            MR. RONA:  Objection.
2        A.   So again, this analysis wasn't ever
3    planned.  I never -- I never -- I never received
4    this information.  I never pursued it in any way.
5    I -- and I -- I don't recall having a specific
6    conversation with Mike or with Forrest about
7    whether, you know, we should even pursue this type
8    of analysis, frankly.
9        Q.   So was there a conscious decision at all
10   one way or the other whether or not to do it?
11           MR. RONA:  Objection.
12       A.   Again, to be honest, I just -- I had a
13   very specific defined task, as laid out, and I just
14   wanted to be as clear as possible with what that
15   task was and provide the clearest explanation --
16   the clearest charts that would support that --
17   charts and explanation that -- explanatory text
18   that would support those charts.  And particularly
19   -- and most importantly, to show a methodology that
20   is kind of based on standard economic methods for
21   estimating uses and the number of prescription --
22   or number of prescribers.
23           That was my task.  I tried to do it as
24   best I could, given the data that I had.  And there
25   was you know, again, you know, some -- in my view,

487

1   simplicity really rules the day.  So I wanted to be
2   as specific as possible, provide the most direct
3   information that was available to me as possible.
4   And that's it.
5       Q.  So going back to my question, was there a
6   conscious decision one way or the other whether or
7   not to do the analysis that's reflected in the last
8   two sentences of Paragraph 19 in Exhibit 12?
9       MR. RONA:  Objection.
10      A.  Again, I pursued the most direct answers
11  to the questions that the Court -- that I was asked
12  to provide to the Court.
13      You know, honestly, this discussion is
14  making more hay and providing more focus on it than
15  was ever provided -- that I actually ever thought
16  about or ever discussed with any of my staff
17  members.
18      I mean, literally, this conversation is
19  more thought that I've given -- than I've given to
20  this -- to this issue than I gave through the
21  entire operation of the report.
22      MR. POLUBINSKI:  Okay.  Jodi, can you read
23  the question again, please.
24      (Question read back.)
25      MR. RONA:  Objection.

488

1       MR. POLUBINSKI:  What's the objection?
2       MR. RONA:  Well, that's -- they're --
3   they're growing each time you ask the question, but
4   initially it was objecting to your characterization
5   of -- of the analysis, and I'm also objecting to
6   relevance.  And I'm objecting to -- based on asked
7   and answered.
8       MR. POLUBINSKI:  You know that relevance
9   isn't a valid objection.
10      Q.  You can answer the question.
11      MR. RONA:  I think it's a waste --
12  continue to waste more and more time on it.
13      MR. POLUBINSKI:  If the witness answers
14  the question, I'll stop asking it.
15      MR. RONA:  Well, I think she has answered
16  it.
17      A.  Are you asking me whether I intentionally
18  set out at the beginning of my analyses -- analytic
19  plan -- to provide the Court with key events that I
20  would have been -- provided to me by counsel that
21  would have been overlaid on -- or included in
22  charts of uses?  Is that what you're asking me?
23      Q.  No.
24      MR. POLUBINSKI:  Jodi, can you read the
25  question back, please.

489

1       (Question read back.)
2       A.  Okay.
3       Q.  It's a -- I think a simple question.
4       A.  I don't actually think it's a simple
5   question.
6       MR. RONA:  Objection to that
7   characterization.
8       A.  And I'm trying to -- I'm trying to ask
9   questions to clarify.  So I'm going to go back to
10  reading the last -- so the only way that I know
11  about how to go about -- about trying to figure
12  this out or trying to answer, appropriately, this
13  question is to go back and read the last two
14  sentences of the paragraph.  Okay?
15      Q.  Sure.
16      A.  Okay.  The last two sentences of the
17  paragraph read, "NDTI Indication Charts 1 through 4
18  also include mention of key events in the various
19  timelines of alleged fraud.  These timeline events
20  were provided to me by counsel."
21      Do you agree that those were the last two
22  -- those are the last two sentences?
23      Q.  Do I?
24      A.  Yes.
25      Q.  I -- I do.

490

1       A.  Okay.  Great.  So these two sentences do
2   not provide a description of an analytic plan for
3   me providing an opinion about anything, and they
4   don't provide a -- they don't provide a timeline or
5   a plan for any analyses that were planned by me.
6   All they describe is -- they describe two things:
7   They describe that there are -- that there would be
8   indication charts that would include a mention of
9   key events, and that these key events would be
10  provided to me by counsel.  That's all they suggest
11  to me, right?
12      Q.  You know, I'm not sure why this is getting
13  more confusing than -- than it was before.
14      A.  So -- I'm not sure either.  I mean, these
15  -- these two sentences do not provide -- I mean,
16  you're characterizing this as a decision that I had
17  some analyses that were planned that I chose to --
18  to pursue in one form -- you know, whether -- that
19  I chose to pursue or didn't choose to pursue.
20      Nothing in these two sentences would
21  suggest that to me.
22      Q.  Okay.  Let's -- let's do it this way:  The
23  first sentence says, "NDTI Indication Charts 1
24  through 4 also include mention of key events in the
25  various timelines of alleged fraud."

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

491

1    A.  Uh-huh.
2    Q.  I think we established that none of the
3    figures attached to your final declaration do
4    mention key events in the various timelines of
5    alleged fraud.  Am I right about that?
6    A.  So there is no -- so if what you mean by
7    that is that on Figure 7.a, as it's presented in
8    the Plaintiffs' brief, as you describe -- as you
9    described it --
10    Q.  That's not -- that's not what I mean.
11    A.  Okay.
12    Q.  I'm asking you whether attached -- you can
13    set aside the Plaintiffs' brief.  It's not relevant
14    to this question.  The question relates to the fact
15    that, in this sentence you contemplated four charts
16    that would "include mention of key events in the
17    various timelines of alleged fraud."
18    A.  Okay.  So --
19    Q.  You -- you didn't -- there are not charts
20    that do that that are attached to your final
21    declaration, are there?
22    MR. RONA:  Objection.  You can answer.
23    A.  Okay.  I don't -- this is not an analytic
24    plan for what I was planning to do in the final
25    declaration -- presented in the final draft --

492

1    declaration.  This is a draft.
2    Q.  That's not my question.
3    A.  No, no, but I want to --
4    Q.  My question was -- please answer my
5    question.
6    MR. RONA:  Did you -- can you let --
7    before you decide whether she's answering, can you
8    allow her to finish answering?
9    MR. POLUBINSKI:  She had finished.  She
10    had finished.
11    MR. RONA:  Had you finished answering your
12    question?
13    THE WITNESS:  No, I had not finished.
14    MR. RONA:  No.  Counsel, please kindly
15    allow her to answer the questions.
16    A.  Okay.  Just to be really specific, are you
17    asking me whether or not -- are you asking me to
18    characterize my draft as an analytic plan for what
19    I was planning to provide in my final declaration?
20    Are you -- are you -- is that what you're asking me
21    to do --
22    Q.  No.
23    A.  -- and specifically --
24    Q.  Will you --
25    A.  -- are you asking me to --

493

1    Q.  Are you going to let me answer your
2    question?
3    A.  I just want to be really specific --
4    really specific because I don't understand -- I
5    haven't understood the question that you're asking
6    me, and so I'm trying to be really specific so that
7    I can understand so I can answer honestly.
8    So -- and are you asking me specifically
9    to read the last two sentences of Paragraph 19 in
10    my draft as an analytic plan that I was choosing
11    whether or not to -- to pursue or not?
12    Q.  No, I --
13    VIDEO OPERATOR:  Five minutes.
14    Q.  Okay.  I thought I had asked you a simple
15    question about -- and I thought -- I thought you
16    had given me a simple answer as to whether or not
17    you provide charts that do this attached to your
18    declaration.  I thought the answer was no.
19    MR. RONA:  Objection.
20    Q.  Is there -- are there charts?
21    A.  Okay, so are you asking me whether or not
22    in my final declaration there are charts that
23    contain a timeline of events attached to that --
24    attached to charts that relate to NDTI uses by
25    indication over time?  Is that what you're asking

494

1    me?
2    Q.  Yes.
3    A.  There are no charts in my final
4    declaration that have any data on IMS NDT -- IMS
5    NDTI indications -- uses by indications -- with a
6    description of key events.  Those key events were
7    -- that timeline was never provided to me, and I
8    did not pursue -- and that is not contained in my
9    declaration.
10    Q.  Okay.  Going back to the question that I
11    think I had asked before, was a conscious decision
12    made at any point in time not to include charts in
13    your final declaration that have data on IMS NDTI
14    indications -- or uses by indication with a
15    description of key events?
16    A.  No.
17    MR. RONA:  Objection.
18    A.  I mean, if you're asking me whether I
19    consciously chose -- I mean, honestly, this
20    discussion has spent much more -- more time than I
21    have spent thinking about this concept at all.  But
22    honest -- to be honest, no.  I never really --
23    again, I was just trying to provide, in the
24    simplest way, the information that was asked for me
25    to -- that I was asked to provide.

495

1    And I didn't -- you know, I didn't ever
2   pursue thinking about this. It was just, honestly,
3   you know, it was all part of the drafting process.
4       Q.  There --
5       A.  Okay?  Yeah.
6       Q.  There.  It's taken a half an hour, but
7   there we are.  All right.  Let's move on to --
8       MR. RONA:  Objection to that colloquy.
9       Q.  Let's move on to Part 4 of your
10  declaration.
11      MR. POLUBINSKI:  Why don't we take a
12  break.  I'm sorry.  Thank you, Jodi.  Now we need
13  to change the tape.
14      VIDEO OPERATOR:  Time is 1:57.  This is
15  the end of Cassette 3.  We are off the record.
16      (Discussion off the record.)
17      VIDEO OPERATOR:  The time is 2:02.  This
18  is the beginning of Cassette 4 in the deposition of
19  Doctor Conti.  We are on the record.
20      Q.  Okay.  So looking ahead now to Part 4 of
21  your declaration, which starts on Page 21 --
22      A.  Okay.  So --
23      Q.  -- of Exhibit 1.
24      A.  Exhibit 1?
25      Q.  Yeah.

496

1       A.  I'm sorry.  What page?
2       Q.  Page 21 of Exhibit 1.
3       A.  Okay.  Okay.
4       Q.  So in this section you were asked by
5   counsel to undertake the enumeration of, "One,
6   unique consumers who use Neurontin for the
7   off-label indications identified above; and two,
8   unique third-party payers who paid for Neurontin
9   for these indications"; is that correct?
10      A.  That's correct.
11      Q.  Who asked you to do that?
12      A.  I think my -- my initial conversation with
13  Ed encompassed this.
14      Q.  Okay.  Do you have an understanding at all
15  about why you were asked by counsel to do this?
16      A.  No.
17      Q.  Okay.
18      A.  I mean -- I mean, I read the Court order,
19  so I understand that the Court has asked for kind
20  of general -- a general number of the unique number
21  of consumers who used Neurontin for the off-label
22  indications.  And also the -- a kind of a general
23  -- actually, a methodology for identifying or at
24  least counting unique third-party payers who paid
25  for Neurontin for this -- for these indications.

497

1       Q.  Okay.
2       A.  That's what I understand.  Nothing more
3   than that.
4       Q.  That understanding comes from your reading
5   of the Court order, correct?
6       A.  That's correct.
7       Q.  At the outset here in talking about Part
8   4, I wanted to circle back to something that you
9   had said yesterday in connection with this -- your
10  work in this -- in this portion of the declaration.
11      I think you'd said -- and I'm quoting from
12  the rough transcript that Jodi had provided -- "I
13  also consulted with a number of other people who I
14  consider to be experts in statistical theory
15  related to this as well."  And you listed Professor
16  Rosenthal and MaryBeth Landrum?
17      A.  Uh-huh.
18      Q.  Was this the analysis -- the analysis in
19  Part 4 in connection with which you did that
20  consultation?
21      A.  So again, to be honest, the -- the person
22  I relied on, who I can -- I should be more specific
23  with my response.  The person who I considered to
24  be an expert in statistical theory related to --
25  related to the task at hand is MaryBeth Landrum.

498

1       She is a professor of biostatistics at the
2   University -- I'm sorry -- at Harvard University --
3   at Harvard Medical School.  And so she's the person
4   I relied on most to think about -- to make sure
5   that I was thinking correctly about how to go about
6   estimating a unique count of consumers or a unique
7   third-party payer.  And that's really because there
8   are some assumptions underlying these numbers that
9   -- underlying the kind of rough numbers that I
10  calculate that require a statistical exercise, and
11  I just wanted to make sure that I was thinking
12  about that correctly.
13      And really, my conversation with Meredith
14  was about who should I speak to about this more
15  than -- more than her provide -- more than me
16  considering her to be an expert in statistical
17  theory.  You know, MaryBeth Landrum is an expert in
18  statistical theory.  But it was more that I knew
19  that Meredith would know who a good -- a kind of
20  good person on the fly I could ask about this --
21  these issues.
22      Q.  Were these the only issues in -- of those
23  that you dealt with in your declaration --
24      A.  Uh-huh.
25      Q.  -- on which you -- you sought sort of

499

1 independent advice?
2    A.  So I mean, I spoke to -- I spoke to
3 Meredith about a handful of other things that are
4 mostly about how to define certain things.  But
5 again, it was just -- it was measurement issues or
6 methodology issues.  How do I define -- you know,
7 how should I define or -- you know, in the data,
8 how would I define new uses, given her experience
9 using -- using this data, for example.
10        You know, some questions about diffusion
11 of technology, but again, it was really -- really
12 limited and to just kind of -- a general gist about
13 this type of stuff and a general gist about kind of
14 the format of what my declaration would look like,
15 more than -- more than anything that was
16 specifically content driven.
17    Q.  Okay.  You described Professor Landrum as
18 an expert in statistical theory.
19    A.  Uh-huh.
20    Q.  Do you consider yourself to be an expert
21 in statistical theory?
22    A.  So again, I -- I don't know what the
23 legal definition of expertise is.  I -- as part of
24 my course work, I took advanced graduate level,
25 Ph.D.-level courses in probability theory and

500

1 econometric analysis, and you know, in statistical
2 -- in statistics, both -- you know, at Harvard
3 University in the economics department, and also in
4 the statistics department.  And the analyses that
5 are performed in Part 4 aren't -- you know, don't
6 -- are pretty kind of basic statistical theory,
7 certainly things that I would have covered, in
8 general, in -- in those probability theory classes,
9 not more -- nothing more than that.
10    Q.  Would you consider your level of expertise
11 in statistical theory to be comparable to Professor
12 Landrum's?
13    A.  So --
14        MR. RONA:  Objection.
15    A.  I mean, MaryBeth is a professor at Harvard
16 Medical School in biostatistics.  She wrote her
17 thesis on statistical analysis.  I did not write my
18 dissertation on statistical theory.  I wrote my
19 dissertation on -- on topics central to health
20 economics.
21        So I don't consider myself, nor would I
22 portray myself as being someone who is -- has a
23 doctorate in statistical theory.  I do not have a
24 doctorate in statistical theory, but part of the
25 training that I received at Harvard University

501

1 that's part of my Ph.D. training relates to
2 probability theory, statistical theory, econometric
3 methods, and modeling.  And the scope of what's
4 contained in Section IV isn't out -- you know,
5 again, was covered in my basic probability theory
6 classes.
7    Q.  Okay.  Even if it was covered in your
8 basic probability theory classes, and even though I
9 think you described it as being pretty basic
10 statistical theory, you still felt it appropriate
11 to consult with Professor Landrum about it.
12        MR. RONA:  Objection.
13    A.  I did, absolutely.  So I haven't -- you
14 know, I have -- you know, I've been very rigorously
15 trained in my Ph.D. program.  I earned a Ph.D. at
16 Harvard University in health policy, with a
17 specialization in health economics.  I do all sorts
18 of statistics -- I rely on statistical probability
19 -- statistics and probability theory for a whole
20 bunch of stuff that I do on a regular basis.
21        This is not some -- this analysis is not
22 something that I did -- that I do every day, and so
23 I think it's completely reasonable for me to ask
24 someone who does this on a regular basis to make
25 sure that the method is completely consonant with

502

1 what an expert in statistical theory would think
2 about.  Absolutely.
3    Q.  Okay.  Looking in Paragraph 51 on Page 21,
4 the categories of off-label uses in the applicable
5 time periods here are the same ones that you had
6 looked at in connection with your analysis in
7 Section 3; is that right?
8    A.  Let me just make sure (Witness reviews
9 document.
10    Q.  Sure.
11    A.  And what are you referring to in Section
12 3, specifically?
13    Q.  Well, maybe the simplest way to do it is
14 to say that they're the same indications and
15 periods that are reflected in Footnote 1 on Page 4.
16    A.  Okay.  So now I'm looking at Footnote 1 on
17 Page 4, and I'm looking at Page 21, Paragraph 51,
18 and I'm going to -- I'm just going to assess
19 whether or not they are the same.
20    Q.  Okay.
21    A.  Okay?  (Witness reviews document.)  Okay.
22 So yes.  They appear to be the same.
23    Q.  Okay.  The first sentence of Paragraph 52
24 on Page 21 reads that, "There are no data available
25 to me that would permit direct computation of a

503

1  unique patient count for Neurontin by clinical
2  indication."
3       Did I read that correctly?
4  A.  Yes, you did.
5  Q.  Okay.  That means, if I understand it
6  right, that there are no data available that
7  identify unique patients, but that also identify
8  indications for which Neurontin was prescribed to
9  them?
10  A.  That are available to me.
11  Q.  Okay.
12  A.  So again, the data that I have available
13  is NDTI -- IMS NDTI data that directly links --
14  that directly assesses -- surveys physicians on
15  their prescribing patterns and can link specific
16  prescriptions that physicians provide to their
17  patients with a list of indications associated with
18  them, or a list of diagnoses associated with them.
19  The Wolters Kluwer data and also the IMS Xponent
20  data does not provide any information on indication
21  that I can use to link unique patient counts or --
22  unique numbers of patients or unique -- I can --
23  sorry -- that I can identify unique patients or
24  count the number of unique patients that use
25  Neurontin by clinical indication.

504

1  Q.  Very beginning of your last answer you
2  said, "That are available to me."  Are you aware of
3  any data to which you don't have access that would
4  enable you to answer this question -- that would
5  enable you to permit direct computation of a unique
6  patient count of Neurontin by clinical indication?
7  A.  So are you asking me whether there is data
8  out there that I know about that would allow me to
9  count -- over the entire US population -- how many
10  individuals got Neurontin by clinical indication?
11  Q.  Yeah, I'm -- I'm assuming the answer is
12  no, but I'm -- but that's -- that's my question.
13  If it's not known, if you know of some data source,
14  I'd love to know about it.
15  A.  No.
16  Q.  You don't know of a data source?
17  A.  I do not know of a data source that's
18  going to be able to provide me observation of every
19  single individual in the United States by
20  indication.
21  Q.  Okay.
22  A.  And by giving me prescriptions as well.
23  Q.  Okay.  So in order to do this, to come up
24  with a unique patient count by a clinical
25  indication, you need to come up with an estimate

505

1  based on more than one data source, and that's what
2  you do here; is that correct?
3  A.  (Witness reviews document.)  No, that's
4  not correct.
5  Q.  Okay.  How is it not correct?
6  A.  Okay.  So what I do in this exercise is I
7  am provided data on here -- I just want to be
8  really specific in my response, so -- (witness
9  reviews document.)
10  Okay.  What I need are unique patients,
11  new patients that began using Neurontin in a given
12  year.  Okay.  So I need some measure of the number
13  of new -- unique individuals taking or really, new
14  individuals taking Neurontin in a given year.
15  I also need some measure of their -- of
16  the indication for that use.  There is no dataset
17  that I know of that's going to be -- allow me to
18  identify and count unique patients that began using
19  Neurontin -- that are new users in any given year
20  that will link that information -- either at the
21  individual level or in aggregate -- to -- to a
22  specific medical indication for that use.
23  So because of that, I use two things:  The
24  first is, I use data that's provided to me and
25  that's contained in Neurontin Report 71 -- sorry --

506

1  701.A and Neurontin Report 1202 that provides -- by
2  -- that purports to provide unique patients new to
3  Neurontin in a year.
4  Okay.  Well, actually, what it -- what it
5  really provides is the unique number -- it's a
6  cumulative count of the unique patients in --  in
7  the -- in the year of question.  In order to count
8  unique patients, I subtract one year from the other
9  year.
10  Q.  Okay.
11  A.  So --
12  Q.  And then --
13  A.  And then --
14  Q.  -- from there?
15  A.  And then from there, in order to get
16  indication --  because, again, there's -- there's
17  no indication in these Neurontin reports.  It just
18  provides a count of individuals that I can then
19  estimate a unique patient count from year to year.
20  I apply the -- the probability of use for a
21  particular indication that's observed using NDTI
22  data, which is the only dataset that I have
23  available to me that can link -- that can tell me
24  anything about indication for use of Neurontin.
25  Q.  Okay.  So the first dataset that you

507

1  described, the data on projected unique patient
2  counts for Neurontin, you understand to have been
3  produced by Defendants, correct?
4      A.   That's correct.
5      Q.   Have you ever seen those data files
6  yourself?
7      A.   No.
8      Q.   Did you ever ask to see them?
9      A.   No.
10      Q.   Who would have done the work analyzing
11  them?
12      A.   There was no analysis done.  They're just
13  -- my understanding is they were just -- they are
14  Excel reports.  If you're asking me who did the
15  work to actually -- to do the -- who had the two
16  spreadsheets and subtracted them -- is that what
17  you're asking me?
18      Q.   Right.  I guess if you've never seen the
19  underlying sources themselves -- I'm assuming
20  someone on your team would have actually seen
21  them --
22      A.   Right.
23      Q.   -- and extracted data from them, correct?
24      A.   Right.  That's right.
25      Q.   Who would that have been, do you know?

508

1      A.   I think it's either Mike or Forrest, but I
2  can't remember.
3      Q.   Okay.  What's your understanding for how
4  this projected patient count data was compiled?
5      A.   I don't know.  I have no understanding,
6  other than what's been described to me.
7      Q.   So you don't know what the ultimate source
8  of the data was, correct --
9      A.   No.
10      Q.   -- or the methodology that would have been
11  employed to assemble or develop the data --
12      A.   No.
13      Q.   -- or whether it was complete one way or
14  the other or not.
15      A.   Again, my task was not to validate the
16  Neurontin reports that were provided to me by the
17  Defendant.
18          My tasks were to do -- to just try to
19  estimate for the Court the unique -- kind of a
20  general sense of the unique number of consumers who
21  used this Neurontin for this -- for off-label
22  indications over this time period.  It wasn't to
23  validate the data sources.
24      Q.   Okay.  I think you described it in the
25  second sentence of Paragraph 52 of your report,

509

1  Exhibit 1 --
2      A.   Uh-huh.
3      Q.   -- as "Data on projected unique patient
4  counts."
5      A.   Uh-huh.
6      Q.   Do you understand these data to be
7  projections?
8      A.   So again, I -- I can't tell you why I used
9  this specific -- you know, it's -- written in my
10  report as "projected."  I don't remember why I used
11  that specific term --
12      Q.   Okay.
13      A.   -- and what my understanding around that
14  term is, honestly.
15      Q.   So we don't know one way or the other
16  whether the data are projected data or not.
17      A.   You know, again, I would have to go
18  through -- I'd have to remember exactly what I
19  talked about with my staff about exactly their
20  understanding of what this data is, and you know,
21  what it referred to to kind of -- to understand
22  explicitly whether they're projected or not.  I
23  don't know.
24      Q.   Okay.  Do you know one way or the other
25  whether there's a confidence interval, a margin of

510

1  error around the data?
2      A.   I have no idea.
3      Q.   And I take it you don't know why the data
4  would have been requested by Defendants in the
5  first place or what use they would have put it to
6  in the first instance?
7      A.   No, I have no idea.  Again, I had a very
8  defined task, and I just tried to use the data that
9  was at hand to do this defined task as best as I
10  possibly could.
11      Q.   Okay.  The -- the data in Table 1 or the
12  patient count data that's reported in Table 1 has
13  been adjusted, I understand, in an attempt to
14  remove Medicaid recipients from those numbers; is
15  that correct?
16      A.   Uh-huh.
17      Q.   Why did you do that?
18      A.   Because my understanding is, is that they
19  are -- my understanding, talking to counsel, is
20  that they were not part of the class.
21      Q.   Which conversations with counsel were you
22  thinking of?
23      A.   So I think I mentioned that I had a
24  handful of conversations with Ed in November, or
25  maybe once in October and once in November.  And it

511

1  was through my understanding of that -- or through
2  that conversation that -- that I understood that
3  Medicaid wasn't on the class, that individuals
4  ensured by Medicaid were not in the class.
5      Q.  By "Ed" you mean Mr. Notargiacomo,
6  correct?
7      A.  I do.
8      Q.  Did you seek to remove Medicaid recipients
9  from your count by deducting a fixed 17 percent
10  from the patient count numbers?
11      A.  Yes, I did.  That's an average, and it
12  seemed -- with no other -- with no other -- with
13  no other specific information, it made sense just
14  to kind of compute the -- to think about what the
15  average was, and then just subtract that.  It just
16  seemed like the conservative thing to do.
17      Q.  What's the basis for your 17 percent
18  number?
19      A.  So I think, again, it's the share of
20  Neurontin use covered by Medicaid that was reported
21  in a number of documents obtained by Defendants.
22  And again, it's Attachment A-2 that has a list of
23  the data files used.  I -- again, this is on Page
24  22.  And this number was provided to me by my
25  staff.

513

1  number, and I don't want to necessarily use the
2  lowest number.
3      That's partially because I'm trying to get
4  just a general sense of the number of unique
5  consumers who are using Neurontin for the whole
6  time period.  And I -- but I only have data from --
7  provided to me from 1997 through 2002.
8      So I don't want to -- I don't want to
9  choose one number for one specific year that then
10  isn't going to be able to generalize to the --
11  over all the years.  And I want to try -- that
12  isn't going to be kind of true to all the years.
13  And I don't want to -- and I'm using this to kind
14  of -- again, give the Court a general sense of how
15  many unique consumers who use Neurontin for
16  different purposes were, that probably -- that's
17  going to spill over from these years that I don't
18  observe any data for.  So it seemed like a
19  reasonable procedure to try to use the average
20  number that I observe in each year.
21      Q.  So is it correct to describe that as
22  conservative, or just having been the reasonable
23  approach that you have taken?  And I guess I still
24  don't completely understand why it's conservative
25  one way or the other, and maybe that's just not the

512

1      Q.  Okay.  So I take it you don't know what --
2  exactly which data file it was --
3      A.  No.
4      Q.  -- that this number came from --
5      A.  No.
6      Q.  -- okay, or how it was derived by your
7  staff.
8      A.  No.
9      Q.  Do you know if the data -- if the number
10  is specific to Neurontin, or if it's a more generic
11  number?
12      A.  Like I said, I've never seen the data.  I
13  don't know --
14      Q.  Couple of answers ago I think you had
15  said -- in taking the 17 percent, that it seemed
16  like the conservative thing to do.
17      A.  Uh-huh.
18      Q.  What do you mean by that?
19      A.  So again, you just -- you want -- you
20  don't want to impose any -- how do I say this?
21  Okay.  I have observations over time for consumers
22  by payer, and I just want to get a sense of, on
23  average, how many -- you know, on average what
24  percentage of those individuals are insured by
25  Medicaid.  And I don't want to use the highest

514

1  right word, which is fine.
2      A.  All right.  So -- so if I took the lowest
3  number -- hold on.  Let me think about this for a
4  second.  If I took the lowest number, then I would
5  subtract unique patients from a very small percent
6  -- I would subtract an estimated number of -- of
7  Medicaid insured patients that -- that's small from
8  this unique patient count, right, and that would
9  provide kind of an upper bound, right, for the
10  number.
11      If I took the highest number of -- in a
12  given year observed to be -- of Neurontin users
13  observed to be paying for Neurontin through
14  Medicaid or insured by Medicaid -- by Medicaid,
15  then that would provide a lower bound if I applied
16  it to every single year.  Right.
17      So I want to try to smooth that
18  variability and not provide the Court with, you
19  know, something that I know would be an
20  overestimate or I know would be a -- or
21  underestimate.  Instead, I want to provide
22  something that seems reasonable to the Court for
23  these particular years -- for these particular
24  years that I observe, but also can be kind of more
25  -- more easily -- or kind of reasonably defended to

515

1　the years that kind of spill out -- or kind of
2　reasonably defended for the years that we don't
3　observe in the data.  So using the average is a
4　really pretty standard way in empirical data of
5　going about doing that.
6　　　Q.  Okay.  I'm not disputing that one way or
7　the other.
8　　　A.  Uh-huh.
9　　　Q.  Again, is it right to say that it's
10　conservative, or just that it's reasonable in a
11　standard way?  I mean --
12　　　A.  So I guess --
13　　　Q.  Go ahead.
14　　　A.  I consider it to be a conservative
15　measure.  Again, I don't want to overcount and
16　provide the -- provide the Court with data that --
17　that or kind of an estimate of unique consumer
18　counts that's going to be -- that I know is going
19　to be an overestimate, based on observed data that
20　I see.
21　　　　　And I don't want to undercount for these
22　exact same reasons.  I want to provide an estimate
23　that more -- I want to -- I want to try to subtract
24　out Medicaid or --  Medicaid users of Neurontin
25　that, you know, that seems -- that seems reasonable

517

1　of Exhibit 1.
2　　　A.  Right.
3　　　Q.  Okay.  If I understand it right, it's this
4　top line, the one that reads, "Unique patients that
5　began -- that began using Neurontin in a given
6　year."  That comes from the Defendants' data that
7　we just discussed --
8　　　A.  Uhm.
9　　　Q.  -- is that right?
10　　　A.  It's derived from the Defendants' data
11　that -- that we just discussed.  And what it is --
12　I'm sorry.
13　　　Q.  So I was just going to ask, so does that
14　mean that this is the number net of the Medicaid
15　prescriptions?
16　　　A.  This is the number of net of -- right.  So
17　this is the unique number that's net of the
18　Medicaid prescriptions, correct --
19　　　Q.  Okay.
20　　　A.  -- in 1997.
21　　　Q.  And then in each succeeding line, the
22　percentage numbers --
23　　　A.  So should I be reading down or across?
24　　　Q.  Yeah, let's read down.
25　　　A.  Okay.

516

1　to -- you know, at first blush, or kind of for like
2　a kind of -- I don't know how I should describe it
3　-- kind of -- you know, that seems like a
4　reasonable number to use, and not knowingly, for
5　me, either too high or too low.
6　　　Q.  Okay.  And for purposes --
7　　　A.  I consider that to be a conservative
8　estimate.  I think that's kind of -- maybe that's
9　economic colloquialism that I'm using.  I could
10　also -- I would not say a liberal -- I wouldn't
11　consider it to be a liberal or a -- right --
12　measure.
13　　　Q.  Okay.  To allocate the patient count data
14　that you report in Table 1 by indication --
15　　　A.  Uh-huh.
16　　　Q.  -- I think you had said that you applied
17　percentages that you derive from the NDTI data.
18　　　A.  Right.  It's percentage of all Neurontin
19　use that I observe in the NDTI data by indication.
20　　　Q.  Okay.
21　　　A.  And as I -- I'm sorry.  Go ahead.
22　　　Q.  I was just going to say, let's take a look
23　at -- at Table 1, just so that we're sure we can
24　actually -- that we're on the same page here.  This
25　is Page 23 -- speaking of being on the same page --

518

1　　　Q.  Reading lines -- or rows instead of
2　columns, so looking down the rows, each of the
3　percentages here for the different indications --
4　　　A.  Yes.
5　　　Q.  -- come from your analysis of NDTI data;
6　is that correct?
7　　　A.  So what you mean by analysis is, this is
8　the percentage of use of all Neurontin use over all
9　indications that -- that I attribute to bipolar
10　cases?
11　　　Q.  Right.
12　　　A.  Okay.
13　　　Q.  Okay.
14　　　A.  And just to be really specific, I just
15　want to go -- or I just want to flip to the
16　appendix or the attachment that discusses the exact
17　methodology for going about doing this so that
18　we're really -- I just want to make sure that I
19　have that information right at my fingertips while
20　we're talking so I can provide you the most
21　specific answers.  (Witness reviews document.)
22　Okay.  So I'm referring to Attachment E --
23　　　A.  Uh-huh.
24　　　A.  -- which is on Page 110, starting on Page
25　110 --

519

1    Q.  Okay.
2    A.  -- of the --
3    Q.  Are you ready?
4    A.  Yeah, I am.
5    Q.  Okay.  So I was going to say that the --
6  the numbers for unique members of each of these
7  classes come from an application of the percentage
8  to the total unique patient count?  Does that make
9  sense the way I tried to describe it?  I'm --
10   A.  So --
11   Q.  -- just trying to figure out where --
12 numerically how the numbers get to where they are.
13   A.  Uh-huh.  So -- so let me -- let me be very
14 specific.  So the percentages come from NDTI --  so
15 IMS NDTI data.  That's the only dataset that I have
16 available that's going to provide -- to link some
17 measure of use with some measure of indication,
18 okay, at the patient level.
19        So I use that percentage of -- the
20 percentage of bipolar indications --  sorry -- the
21 -- the percentage of bipolar indications as a
22 percentage of all -- as a measure of all -- overall
23 Neurontin use that is measured in NDTI data for --
24 for each indication grouping and for each year.
25        And then I multiply that percentage of use

520

1  for each indication -- I multiply that -- that
2  percentage by the unique patient count that's
3  listed on the -- at the first row of Table 1 to
4  derive the unique members -- an estimate of the
5  unique members for each -- each subclass.
6    Q.  Okay.  That makes a lot of sense.  So just
7  doing an example here, looking at the column for
8  1997, the percentage of use for bipolar indications
9  for 1997 that you derived is 6.6 percent, correct?
10   A.  That's correct.
11   Q.  And the way we --
12   A.  I mean, I -- I measured it --
13   A.  Sure.
14   A.  -- in the data.
15   Q.  Okay.
16   A.  It's not that I did -- I didn't do any
17 fancy manipulation --
18   Q.  Fair enough.
19   A.  -- to do that.  That's just -- that's
20 observed in the data as a -- you know, as a
21 percentage of a whole.
22   Q.  Okay.  And the way that we come up with
23 unique members for bipolar, the number of which is
24 35,240, is by taking 6.6 percent of 530,602, which
25 is the number total number of unique patients that

521

1  began using Neurontin in 1997.
2    A.  That's correct.
3    Q.  Okay.  Great.  Let's look at the last two
4  rows of the chart which relate to doses above 1,800
5  milligrams.
6    A.  Uh-huh.
7    Q.  These numbers here reflect numbers --
8  these numbers -- withdrawn.  The percentage here,
9  9.8 percent for 1997 --
10   A.  Uh-huh.
11   Q.  -- reflects the percentage of use of
12 Neurontin for doses over 1,800 milligrams for all
13 indications; is that correct?
14   A.  Yeah.  That's right.  That's right.
15   Q.  Okay.  And so that would include epilepsy
16 indications?
17   A.  That's my understanding.  That's right.
18 That includes -- it's inclusive.
19   Q.  Okay.  And -- and also it would also,
20 therefore, include bipolar indications as well?
21   A.  Yes, that's my understanding.
22   Q.  And neuropathic pain?
23   A.  That's my understanding.
24   Q.  And nociceptive pain, and migraine, too,
25 right?

522

1    A.  Again, that's my understanding, yes.
2    Q.  Okay.  So -- so Table 1 would count those
3  folks twice, correct?  So in other words, the
4  individuals who would have --
5    A.  So --
6      MR. RONA:  Objection.
7    Q.  -- who would have taken Neurontin for
8  bipolar would be reflected in the bipolar row, and
9  if those same individuals had also been taking it
10 over 1,800 milligrams per day, they'd be
11 reflected again in the bottom row, correct?
12     MR. RONA:  Objection.
13     THE WITNESS:  Can I -- there's something
14 -- there's a noise going on.  Can we just figure
15 out what that is for a second?
16     (Discussion off the record.)
17   A.  Okay.  So I'm sorry.  Restate the
18 question.
19     MR. POLUBINSKI:  You know, Jodi do you
20 want to just maybe read back the last two
21 questions.
22     (Prior two questions read back.)
23     MR. RONA:  I renew my objection.
24   A.  Okay.  So what the last two rows are going
25 to show is the number of unique members of

523

1   individuals irrespective of -- of indication who
2   took Neurontin over 1,800 milligrams.
3        Now, that is an estimate that is
4   independent of indication.  So because of that,
5   there are going to be members who will have --
6   would have taken Neurontin for -- for an off-label
7   indication -- a diagnostic indication like bipolar,
8   let's say, or migraine -- who would have also been
9   taking it over a -- over the dose of 1,800
10  milligrams.
11       So -- so I think what you're asking me is,
12  does this number include individuals who would take
13  Neurontin for bipolar and off-label indication over
14  1,800 milligrams?
15       Q.  Let me ask it -- let me ask it -- you
16  know, I think, actually, your answer covered the
17  ground that I had wanted to cover.
18       A.  Uh-huh.
19       Q.  But just to be clear, you -- you haven't
20  attempted to strip out of the numbers for unique
21  members for doses over 1,800 milligrams,
22  individuals who were taking Neurontin for bipolar
23  or neuropathic pain or nociceptive pain or
24  migraine, correct?
25       MR. RONA:  Objection.

524

1        A.  Okay.  If what you mean by strip out is
2   try to identify in the data unique percentage of
3   individuals who used Neurontin for each of these
4   off-label uses and who used Neurontin for doses
5   over 1,800 milligrams, then I -- then are you
6   asking me whether I -- I independently counted them
7   in -- and reported them in Table 1?
8        Q.  Yes.
9        A.  Okay.  I do not report them in Table 1.
10  Table 1 -- this last two rows is going to include
11  individuals who used Neurontin for indications for
12  -- it's inclusive of all indications over that --
13  that are used at a dose of 1,800 milligrams or
14  more.
15       It is -- it would be -- given the
16  methodology that -- that Table 1 is illustrative
17  of, there would be no problem with trying to
18  identify in the data -- NDTI data -- a kind of --
19  a rough number -- a count or a kind of rough count
20  of the number of individuals or the percentage of
21  individuals who used Neurontin at doses over 1,800
22  milligrams for each of these indications.
23       Q.  Did you ever do that?
24       A.  No.
25       Q.  Did you ever consider doing that?

525

1        A.  No.
2        Q.  Did you ever have discussions with anybody
3   else about how to define this last category,
4   whether or not to include individuals who would
5   also be inputted in one of the other subclasses?
6        A.  Okay.  I'm sorry.  Are you asking me
7   whether or not I ever had a conversation with
8   anyone else about trying to independently report
9   those individuals?
10       Q.  Yes.
11       A.  No.
12       Q.  Okay.  Let's talk about what your
13  declaration does with third-party payers.
14       A.  Okay.
15       Q.  In Section IV-B --
16       THE WITNESS:  I'm sorry.  May I take a
17  five-minute break?
18       MR. POLUBINSKI:  Sure.
19       THE WITNESS:  Great.  Thank you.
20       VIDEO OPERATOR:  Off the record at 2:44.
21       (Recess was taken.)
22       VIDEO OPERATOR:  On the record.  2:52.
23       Q.  Okay.  So we're looking now at Section
24  IV-B of your declaration, which I understand to be
25  where you seek to report a number of unique

526

1   third-party payers who reimbursed for one of the
2   off-label uses at issue at some point in the class
3   periods that we've been discussing; is that right?
4        A.  So the intent of Section B --
5        Q.  Uh-huh.
6        A.  -- is to compute -- is to give the Court
7   an estimate of the number of third-party payers
8   that paid for Neurontin for the identified over --
9   off-label uses during the class period, correct.
10       Q.  Okay.  And to do this, the first step was
11  that you created Table 2, which is on Page 24, but
12  which is one of the tables that's been revised in
13  your revised report, correct?
14       A.  I'm sorry?
15       MR. POLUBINSKI:  Did you -- do you want to
16  read it back, Jodi.
17       (Question read back.)
18       A.  Okay.  So to do this, I gathered
19  information on the total unique number of consumers
20  who used Neurontin for each indication during the
21  time period.  That's -- it's exactly the same
22  procedure that I did for Section A where I was
23  trying to identify consumers.
24       Again -- and again, relies on Neurontin
25  Report 07, Neurontin Report 12 that reports unique

527

1  patients new to Neurontin in a year that's provided
2  to me by the Defendants.
3      Okay.  So the big issue, again, is really
4  about missing data.  Again, I don't have any data
5  that's going to allow me to count the number of
6  insurers in the United States that paid for
7  Neurontin for an identified off-label use, that's
8  going to count number of payers over all payers
9  that can be linked to indication.
10     So again, I have to kind of come up with a
11 reasonable methodology for going about providing
12 the Court with a -- with a reasonable number of how
13 many unique third-party payers there are who -- who
14 paid for Neurontin for an off-label use during the
15 period.  That's the task at hand.
16     Q.  Okay.  And what Table 2 reflects is the
17 number of "Total numbers a TPP would need to cover
18 during the class period to be represented with 99
19 percent, 95 percent, and 90 percent probability,"
20 correct?
21     A.  That's correct.  So what I needed to do
22 first is have a sense of what -- for each
23 indication what the population incidence of a given
24 period is, okay.  So you'll see this listed on the
25 -- in the columns.  So the first column reports the

528

1  bipolar, the population incidence during the period
2  of -- being .5 percent, then neuropathic pain with
3  a population incidence during the period of being
4  .9, nociceptive pain with a population incidence
5  again approximately .3, migraine population
6  incidence during the period being approximately .1
7  percent, and then doses over 1,800 milligrams with
8  a population incidence during the period of being
9  approximately .3 percent.
10     Okay.  So that information I need in order
11 to do that.  Okay.  Then I need to assume a couple
12 of things.  The first is that the plan covers a
13 representative sample of the population.  Okay.
14 And then I can estimate -- using statistical theory
15 -- the probability that a plan of -- conditional on
16 a given size of that plan being the number of
17 members had at least one patient who received
18 Neurontin for a particular indication.  Okay.
19     So Table 2 reports the number of members
20 -- the kind of -- the number of -- of members of an
21 insurer or a -- unique members of an insurer that
22 -- necessary to ensure with a range of probability
23 that the -- that the insurer has at least one
24 member in that particular subclass.  Okay.
25     Q.  Yes.  Let me ask a couple of questions --

529

1      A.  Uh-huh.
2      Q.  -- to try to unpack that a little bit.
3  Have you ever -- withdrawn.  I assume that you
4  never constructed a version of Table 2 that would
5  report the same numbers -- let me withdraw that,
6  too.
7      I assume you never constructed a version
8  of Table 2 in which you report the numbers
9  necessary to assure with 99 percent, 95 percent,
10 and 90 percent probability respectively that a TPP
11 had at least two members in a particular subclass;
12 is that correct?
13     A.  Not that I recall, no.  I don't think I
14 did that.
15     Q.  Okay.  Could you have done that?  I'm not
16 suggesting you should have.  I'm just curious
17 whether you could have.
18     A.  Could I have done that?  I don't see why
19 not, but I didn't.  I have -- I mean, I have to
20 think about it, which I haven't done.  And you
21 know, on the fly, it's hard to kind of give a
22 definitive answer, but I think I probably -- you
23 know, I'd have to think about it and think, and
24 then I could probably come up with a -- with an
25 answer.

530

1      Q.  Okay.  But you wouldn't, as you sit here
2  today, be able to come up with even ballpark
3  numbers one way or the other, right?  I'm not
4  saying you should.  I don't want to take the time
5  to do it, but --
6      A.  I'm just saying in preparing -- in
7  preparing the report, I didn't go through that
8  exercise, so I'd have to kind of think about it,
9  and I couldn't provide you ballpark number -- I
10 wouldn't want to provide you or the Court
11 information that would be really off the mark.  So
12 I wouldn't be able to do that kind of right in my
13 head off the -- off the cuff.
14     Q.  Okay.  One of the other things you
15 mentioned -- and it's also reflected in your
16 declaration -- is that you used an assumption that,
17 "each plan covers a representative sample of the
18 population," correct?
19     A.  That's correct, but --
20     Q.  What -- I was going to say, what is your
21 basis for that assumption?
22     A.  Yeah, honestly, I don't have -- it seems
23 like, again, a very reasonable conservative
24 assumption to make that each -- that the population
25 taking Neurontin, No. 1, would be evenly

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

531

1    distributed across the population, and No. 2, that
2    individuals taking Neurontin for a particular
3    indication would also be evenly distributed across
4    the population.
5        I don't have any empirical data that would
6    allow me to assume anything else or know anything
7    else. So in the absence of any empirical data to
8    tell me something more than that, I don't have -- I
9    really don't -- I only have kind of the most
10   general assumption that I can make about the
11   distribution of Neurontin consumers, the
12   distribution of diagnoses across the US population,
13   and then the distribution of Neurontin users
14   conditional on the -- on a diagnosis.
15       Q. Did you seek any of the empirical data you
16   referred to in your last answer at any point during
17   your work on this declaration?
18       A. I don't know of any data that would
19   provide me information on the distribution of -- of
20   of the US population in terms of their diagnosis,
21   in terms of their use of Neurontin, or in terms of
22   their use of Neurontin conditional on diagnosis,
23   that can provide representative data or actual
24   enumeration of data across the US, or more
25   specifically in this case, across all third-party

532

1    payers in the United States.
2        Q. Did you discuss the decision whether or
3    not to make this assumption with anybody?
4        MR. RONA: Objection.
5        A. I did. And the person I -- I discussed
6    assumption with was MaryBeth Landrum, again, an
7    expert in statistical theory and a professor at the
8    -- at the Harvard Medical School. And again, it
9    was more that I -- in order to kind of make the
10   method go, you need to make this assumption if you
11   don't have -- in the absence of any other data.
12       So I wanted to kind of double-check with
13   her whether she thought this was a reasonable
14   assumption to make, based on her -- on her
15   expertise.
16       Q. Did you discuss it with anybody else?
17       A. No.
18       Q. And was -- your consultation with her, I
19   take it, you know, was whether or not it was
20   appropriate to make this assumption in the absence
21   of -- of any contrary data. Is that -- is that the
22   right understanding that I have?
23       THE WITNESS: I'm sorry. Will you repeat
24   the question.
25       (Question read back.)

533

1        A. No, it's not the right understanding.
2    What I -- what my consultation was -- so I came up
3    with this method, and understood deeply what the
4    assumption underlying this method were, in -- given
5    that I have no data that can tell me -- that can
6    tell me about the number of unique third parties
7    that paid for Neurontin for a specification. You
8    have to kind of do something in order to give the
9    Court what it's -- you know, I was charged with a
10   specific task to try to estimate, as best I could,
11   given the data that I had, what the number of
12   third-party payers would be who would have possibly
13   paid for Neurontin for these specific off-label
14   uses.
15       So given that I based the method on my own
16   training, and I also spoke to MaryBeth Landrum
17   about -- about the use of statistical theory, but
18   also about kind of the general -- I don't know --
19   as a kind of a check on the assumptions that
20   underlie this method.
21       Q. And what did she say to you with regard to
22   this particular assumption?
23       A. That again, in the absence of any
24   reasonable -- of any empirical data one way or the
25   other, it made sense to -- the kind of conservative

534

1    thing to do -- the reasonable thing to do was to
2    assume a -- a kind of equal distribution across the
3    population.
4        Q. Did she say anything more about why that
5    would be a reasonable assumption, or did she just
6    say that it would be?
7        A. Again, see, this is just -- just to kind
8    of double-check the kind of general thinking about
9    this. It -- it wasn't to probe MaryBeth Landrum's
10   mind about, you know, whether or not this was an
11   assumption that was reasonable or not. It was just
12   kind of a general kind of check on this.
13       Q. Okay. In Paragraph 55 you refer to
14   "Enumerating the third-party payers who paid for at
15   least one Neurontin prescription."
16       A. I'm sorry. In what paragraph?
17       Q. 55.
18       A. 55, okay.
19       Q. It's in the first sentence.
20       A. Uh-huh.
21       Q. When you write here, "Enumerating the
22   third-party payers who paid for at least one
23   Neurontin prescription," is that -- does that mean
24   that you're seeking to determine the number of
25   third-party payers that have more members than the

535

1  thresholds set forth in Table 2?
2      MR. RONA:  Objection.
3      A.  No.  What I'm seeking to do is give -- is
4  provide the Court with a rough -- with a best
5  estimate of the number of third-party payers who
6  paid for at least one Neurontin prescription for a
7  given indication.
8      Q.  Okay.  And I guess my understanding of the
9  way you would have done that is that you would have
10  figured out how many third-party payers had had
11  members that were equal to or greater than the
12  numbers that are reflected in Table 2?
13     A.  Oh, had -- oh, so I think what you're
14  asking me is, does this procedure -- is this
15  procedure dependent on the number of members in a
16  given third -- in a -- in a -- that a third-party
17  payer has?
18     Q.  Yes.
19     A.  So yes, it is dependent on that -- on that
20  observation.  Yes.
21     Q.  Okay.  For purposes of enumerating the
22  third-party payers who paid for at least one
23  Neurontin prescription, did you look at any one of
24  these numerical probabilistic thresholds for your
25  analysis?  So in other words, 99 percent, 95

536

1  percent, or 90 percent?
2      MR. RONA:  Objection.
3      A.  So I think in Table 3 -- just to be really
4  clear, so I use -- so for the remainder of the --
5  so Paragraphs 55, 56, 57, and 58 rely on -- on
6  thresholds at the 99 percent, 95, and 90 percentile
7  probability.
8      Q.  Okay.  Do they rely on any one of those
9  more than another?
10     A.  No.  I mean, as you'll see in the textural
11  description as we go through it, you know, one
12  paragraph relies on the -- you know, we want -- we
13  were looking at the 99th percent probability, the
14  95th percent probability, then the 90 percent
15  percentile for each one.
16     So again, it's a -- it's a method for
17  applying estimated numbers of covered lives or
18  estimated numbers of members in a given year to
19  these thresholds, and of -- because of that, we
20  want to look at the whole -- at each probability
21  threshold when we're kind of -- we're trying to
22  have a sense of how many third-party payers were
23  paying for each indication.
24     Q.  Okay.  Well, let's talk about that.
25     A.  Okay.

537

1      Q.  I'm not sure that I follow it, but maybe
2  we can figure it out as we walk through this.
3      A.  Okay.
4      Q.  The first -- the first category of
5  third-party payers that you consider are commercial
6  insurers, correct?
7      A.  That's correct.
8      Q.  And your conclusion is that the vast
9  majority of commercial insurers will exceed the
10  membership thresholds in Table 2.  I think I'm
11  reading there from --
12     A.  I'm sorry.  Where are you reading?
13     Q.  It's -- it's from the last sentence of
14  Paragraph 55.
15     A.  Okay.  Just to be really specific, on Page
16  35, in Paragraph 55, what it reads is, "It is
17  reasonable to conclude from this data that the vast
18  majority of commercial insurers will exceed the
19  membership threshold set out in Table 2 at the --
20  at the 99 percent threshold."
21     Q.  Do you do something --
22     A.  So --
23     Q.  -- other than assuming that all of them
24  are members of the class for purposes of the
25  conclusions that you reach in Paragraph 58?

538

1      A.  So --
2      MR. RONA:  Objection.
3      A.  Let me walk you through the calculation in
4  Paragraph 55 a little bit more kind of step by
5  step, because I think this will be a better way of
6  answering your question.
7      Okay.  So in order to give the Court a
8  sense of how many third-party payers paid for
9  Neurontin -- or at least paid for at least one
10  Neurontin prescription for any given off-label
11  indication, I need to have an approximate sense of
12  how many members are in that -- are -- are kind of
13  covered by each individual commercial health plan.
14     So there is no data that I was able to
15  find that provided approximate counts of membership
16  for each commercial health plan over the entire
17  time frame of the -- of -- of the period that I was
18  asked to examine.
19     So instead, what I did was, again, just
20  look to a reasonable source of data on membership
21  counts in a period -- in a time frame that -- that
22  is include -- that is included in the class period.
23     So for -- specifically, I looked at the
24  membership counts of the national trade
25  organization, the America's Health Insurance Plans,

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

539

1    AHIP.  So in 2002, AHIP reports approximately 1,300
2    members, and that includes all commercial health
3    plans.  Okay.
4         And of that, as of December 2001, the
5    latest data that they had available, the average US
6    commercial health plan had approximately 16 --
7    right, 160,000 covered lives.  And it also reports
8    in this annual survey that it considers plans with
9    fewer than 130,000 members to be small.
10        From that, I concluded that the vast
11   majority of commercial insurers would exceed the
12   membership thresholds for any one of these given
13   thresholds at the 90th percentile, at the 95th
14   probability -- percentile, and also, at the 99th
15   percent -- percentile.
16        So my assessment that it's reasonable to
17   conclude from these data that the vast majority of
18   commercial insurers would exceed the membership
19   thresholds is based on AHIP's annual survey of
20   their membership and the average health plan's
21   covered lives membership and this probability
22   table, and the thresholds laid out in -- in this
23   probability table.
24        MR. POLUBINSKI:  Jodi, it may take some
25   time to do it, but if you could go back and find

540

1    out what the question was, I'd appreciate it, and
2    read it back.
3         (Question read back.)
4    A.   Right.  So the answer is no.
5         MR. RONA:  Objection.
6    A.   I don't just assume.  Instead, I --
7    instead, I went through this exercise to try to
8    give the Court an approximate size of -- of kind of
9    average commercial health plan in the United
10   States, and then, based on that size, give the
11   Court a reasonable estimate of how many would be --
12   would have the membership number that would meet a
13   reasonable threshold for being -- for -- to be
14   considered actually paying for a Neurontin use off
15   label.
16        I didn't just assume.  Instead, I provided
17   -- went through an exercise to try to show the
18   Court a reasonable method for how to go about doing
19   this and -- and then provide the Court with a kind
20   of reasonable estimate for a reasonable
21   understanding of how many third-party payers would
22   have paid -- or how many commercial plans would
23   have paid for Neurontin never -- off-label use.
24   Q.   Am I right that the one source on which
25   you rely for your analysis here is your review of a

541

1    survey on the Web site in this health insurance
2    trade organization?
3    A.   That's right.  I actually did a literature
4    review and a Web search in order to try to find as
5    much information as possible about -- about -- I'm
6    sorry -- the average membership of a commercial
7    health plan in the US or in this kind of period
8    that would correspond to the data that we -- that
9    we had.  And this seemed like the best source of
10   data that I was able to find -- the most
11   comprehensive source of data that I was able to
12   find for this purpose.
13   Q.   And am I right that the two pieces of
14   information from that report on which you base your
15   opinion here are two things:  First is the average
16   size reported in the report of a US commercial
17   health plan in 2001, and the second is the fact
18   that the report appears to consider plans below a
19   certain size to be small?
20   A.   No.
21        MR. RONA:  Objection.
22   A.   Again, really, what I'm really doing --
23   what I'm really relying on is the average US
24   commercial health plan that had -- the reported
25   number of -- of members that the average commercial

542

1    health plan had in the AHIP annual survey.
2    Q.   Okay.  But you're aware that the --
3    A.   But -- and so that's the -- that's the
4    empirical information -- that's the main empirical
5    information, and then that's used in combination
6    with the probability thresholds for how many
7    members the -- any -- any plan has to have in order
8    to meet -- at -- in order to kind of provide an
9    estimate -- or sorry -- in order to kind of hit a
10   threshold where we feel comfortable at the 90th
11   percent probability or above in terms of certainty
12   that -- that they did cover one member that did
13   have a Neurontin that -- that was paid for by the
14   commercial payer employer.
15   Q.   Am I right that the report on which you
16   rely doesn't ever list the actual size of any of
17   the 1,300 member health plans, does it?
18   A.   (Witness nods.)
19   Q.   I think -- I think the Court reporter
20   couldn't -- I think you shook your head but --
21   A.   So I'm happy to -- I mean, it's been a
22   while since I went through the report.  I'm happy
23   to go through the report and tell you whether or
24   not it explicitly lists the size of the plans were
25   fewer than 130 members.  I can't -- I won't -- you

543

1  know, I wouldn't agree to a factual statement like
2  that without being -- having time to kind of go
3  through the report again.
4      Q.  Okay.  I think we probably don't have time
5  to do it, but at least, as we sit here today, you
6  don't have a recollection one way or the other
7  whether it lists the actual sizes of the 1,300
8  member health plans?
9      A.  If you're asking me if I know what the
10  estimated size of the membership that's considered
11  to be small is, I don't.  I don't recall off the
12  top of my head, no.
13     Q.  Okay.
14     A.  But again, the methodology could be used
15  for any estimate of commercial health plans and
16  their membership.  It doesn't need -- it -- this
17  method doesn't rely on the reporting of America's
18  health insurance plans.  The number -- the kind of
19  notion -- the kind of reasonable conclusion that
20  the vast majority of commercial insurers are going
21  to have more than, you know, a thousand or a couple
22  of thousand members, and thus are going to hit the
23  probability threshold -- kind of reasonable
24  probability thresholds to think that they're going
25  to hit -- they're going to cover that many lives

544

1  and are going -- are going to actually pay for one
2  Neurontin prescription that's for -- for an
3  off-label use, that -- those estimates rely on the
4  -- rely on this US average.
5      But there's -- if there was other data out
6  there that provided better or more reasonable or
7  more reliable -- the average membership of US
8  commercial health plans, this methodology could be
9  used to apply -- could be used for that average as
10  well.
11     MR. POLUBINSKI:  Okay.  I'll move to
12  strike the last bit of colloquy after I said,
13  "okay" as nonresponsive.
14     Q.  You don't remember what the question
15  pending was, do you?
16     MR. RONA:  Objection.  That's
17  argumentative.
18     A.  Why don't you restate the question.
19     MR. POLUBINSKI:  Let me -- you can read
20  back the last question that I just asked, which
21  was, "You don't remember --"
22     (Question read back.)
23     MR. RONA:  Same objection.
24     Q.  Do you remember?
25     A.  Oh, is that what we're waiting for?

545

1      THE WITNESS:  I'm happy to have you read
2  back the question, please.
3      (Question read back.)
4      A.  Right.  And so the answer is no, I don't
5  have a -- have a recollection one way or the other.
6  But again, this is a method for -- this is a method
7  that provide -- that provides the Court with a
8  reasonable estimate of the -- of the number of
9  commercial health plans that -- that we assume are
10  going to pay for a Neurontin -- that we estimate
11  are going to pay for a Neurontin use off label and
12  isn't -- and doesn't have to be -- but the
13  methodology itself could be applied to other
14  numbers as well.
15     Q.  It's correct that you needed Jodi to read
16  the question back, though?  You didn't remember
17  what it was?
18     MR. RONA:  Objection.  This is -- I don't
19  -- is this the point of this deposition?
20     MR. POLUBINSKI:  One of the points of the
21  deposition is that we've wasted a ton of time with
22  speeches that had nothing to do with the answers to
23  the question.  We've got a limited amount of time
24  to take the deposition.  And literally, in my years
25  of doing this, I have never, ever experienced

546

1  anything like this before.  And the concern that it
2  raises for me is that I don't know how we can do
3  this in two days if -- if I can't get simple
4  answers to simple questions.
5      MR. RONA:  Well --
6      MR. POLUBINSKI:  And one of the -- one of
7  the ways to -- to make that record is to find out
8  if the witness even knows what the question was
9  that she was answering at the end of the answer.
10     VIDEO OPERATOR:  Five minutes on tape.
11     MR. RONA:  Well, I thank you, Counsel, for
12  your speech and --
13     MR. POLUBINSKI:  I was responding to your
14  question, and you're welcome for the answer.
15     MR. RONA:  Okay.  Well, I appreciate that.
16  I think that the witness answered the question.  If
17  you're not satisfied with the answer, you're free
18  to ask follow-up questions.  But if -- I -- I just
19  -- in my opinion, you're wasting our time, court
20  reporter's time, videographer's time, and certainly
21  Doctor Conti's time asking her if she remembers the
22  question.
23     MR. POLUBINSKI:  It's a very simple
24  question for her to have answered.
25     MR. RONA:  No.

547

1          MR. POLUBINSKI:  She's refused to answer
2   it three times now, because --
3          THE WITNESS:  Okay.  I'll answer it.
4          MR. POLUBINSKI:  -- she couldn't remember
5   it.
6          THE WITNESS:  Yes, I'll answer it.
7      A.  Yes, I did remember the question.  And
8   again, I was just trying to provide you and the
9   Court with as much information so that you
10  understand that this is a -- this is a methodology
11  and -- that provides reasonable conclusions based
12  on -- based on the data that we have at hand.
13  That's all.
14     Q.  But you declined to answer -- you know
15  what, I'm not going to waste the time with it now.
16  We'll keep going.
17         MR. RONA:  Thank you, Counsel.
18     Q.  Okay.  Let's look at Paragraph 56.  The
19  first sentence of -- or well, withdrawn.
20         In Paragraph 56 you indicate that there
21  are approximately 2,500 Taft-Hartley fund plans
22  nationally, and that they average roughly 3,600
23  members per year; is that correct?
24     A.  That's correct.
25         MR. POLUBINSKI:  Mark a document.

548

1          (Conti Exhibit 14, Open Learning Courses,
2          Taft-Hartley Funds.")
3      Q.  So Doctor Conti, we've just handed you a
4   document that's been marked as Exhibit 14 to your
5   deposition.
6          Do you recognize this?
7      A.  (Witness reviews document.)  So are you
8   asking me whether I've seen this document, "Open
9   Learning Courses Taft-Hartley Funds" before?
10     Q.  I think I asked you whether you recognized
11  it?  Do you recognize it?
12         MR. RONA:  If you want to take some time
13  to review it, feel free, Doctor Conti.
14         THE WITNESS:  Yeah, please.
15     A.  (Witness reviews document.)  I mean, I
16  can't tell you whether or not I've seen this exact
17  document, but okay, it seems reasonable.
18     Q.  Okay.  What we tried to do here was to
19  print the Web page that you cite --
20     A.  Uh-huh.
21     Q.  -- in Footnote 10 --
22     A.  In Footnote 10.  Okay.
23     Q.  -- of your report, which is at the end of
24  the first sentence of Paragraph 56 --
25     A.  Okay.

549

1      Q.  -- on Taft-Hartley funds.
2      A.  Okay.
3          MR. RONA:  Just for the record, I note --
4          THE WITNESS:  Actually, yeah.
5          MR. RONA:  -- two things -- two things
6   about this document:  One, that the first page
7   says, "Page 2 of 10 pages," and there's not -- I'm
8   not sure what that was referring to.  But also,
9   that the first page doesn't have a URL address
10  listed at the bottom, as is customarily printed
11  when a Web page is printed.  The other pages do,
12  but the first page does not, nor do these indicate
13  whether there are page ranges here that are
14  consecutive or complete.
15         MR. POLUBINSKI:  I've got another copy of
16  the document.  If you want me to mark it, we can do
17  it.  It will just waste more time -- or we can
18  proceed with this.  It's up to you.
19         MR. RONA:  Well, I personally don't want
20  you to mark anything, but if -- you know, if you're
21  going to put a document in front of her, you
22  know --
23         MR. POLUBINSKI:  Okay.  Let's mark it.
24         (Conti Exhibit 15, Open Learning Courses
25         Taft-Hartley Funds, 1 of 10 pages.)

550

1          MR. RONA:  Do you have copies for us?
2          MR. POLUBINSKI:  I don't.
3          MR. RONA:  Well, I'm going to -- I'm going
4   to object then to using the document until a copy
5   can be made.  I don't know if -- the tape's about
6   to end, so maybe now is about the time --
7          MR. POLUBINSKI:  Are we -- are we at the
8   end of the tape?
9          VIDEO OPERATOR:  Yes.
10         MR. POLUBINSKI:  Okay.  We'll make a copy
11  then.
12         VIDEO OPERATOR:  The time is 3:26.  This
13  is the end of Cassette 4.  We are off the record.
14         (Recess was taken.)
15         VIDEO OPERATOR:  The time is 3:33.  This
16  is the beginning of Cassette 5 in the deposition of
17  Doctor Conti.  We are on the record.
18     Q.  Okay.  Doctor Conti, if you could take a
19  look at Conti Exhibit 15, which reflects a complete
20  printout from the series of Web pages we could find
21  that are titled, "Open Learning Courses,
22  Taft-Hartley funds," and take a look at the
23  document.  I think you'll find that it's the -- the
24  portion of Exhibit 15 that says, "Taft-Hartley
25  Funds Basics, 2 of 10 Pages," which corresponds to,

551

1  in the way we printed this out, I think the second,
2  third, fourth, and fifth pages that correspond in
3  terms of the URL at the bottom, with the URL that's
4  cited in Footnote 10 of your report.
5  A.  Yes.
6  Q.  But if you'd just take a look at that,
7  that would be good.
8  A.  Okay.  Can I just take a look at the full
9  document?
10  Q.  Yeah, please.
11  A.  (Witness reviews document.)  I think
12  there's something wrong with the numbering of my
13  document, 'cause it looks like there are multiple
14  pages that are the same, but --
15  Q.  Okay.  I think the part of it that we're
16  focused on, though --
17  A.  Uh-huh.
18  Q.  -- unless I'm mistaken, is -- is the pages
19  that I just described, the -- the portion that, you
20  know, the first two -- I'm sorry.  Withdrawn.  That
21  we're focused on the second, third, fourth, and
22  fifth pages of this document.
23  A.  It's just that I have multiple, so it's
24  hard to -- I think the document isn't -- it doesn't
25  just contain the 10 pages that you listed, but it

552

1  contains more.
2  Q.  Yeah, I understood.  I think there's
3  probably some amount of difficulty in trying to
4  just print a Web page.  Some pagination and other
5  things may be lost in translation.
6  A.  Okay.
7  Q.  Am I right, though, that -- that the pages
8  that I just described represent the Web page that
9  you cite for support for your assertion in your
10  declaration that, "Taft-Hartley funds, of which
11  there are approximately 2,500 nationally, are
12  smaller than commercial plans, but average roughly
13  3,600 members per year"?
14  A.  Right.
15  Q.  Okay.  Do you know who prepared this Web
16  page?
17  A.  No, I do not know.
18  Q.  Okay.  Do you know what NLC is?
19  A.  I'm sorry, not off the top of my head, no.
20  Q.  Okay.  Do you know anything about the
21  methodology?
22  A.  Oh.  Uh-huh.
23  Q.  You just said, "oh."
24  A.  I mean, I can -- yeah, I can read that
25  it's "Open Learning" or so -- no.

553

1  Q.  Okay.  Do you know anything about the
2  methodology that they would have used or how
3  accurate their numbers might be?
4  A.  No.
5  Q.  Where do you come up with the 3,600
6  average size?
7  A.  So that I'm trying to remember, and
8  honestly, I cannot remember off the top of my head.
9  When I was looking through this document, I was
10  trying to see if I could find that number and
11  couldn't find it off the top of my head, or kind of
12  going through a cursory look of this.  And I'm
13  wondering whether I kind of roughly, on average,
14  guesstimated that I was, you know, approximately
15  3,000 multi employers, divided -- you know, you know,
16  there are 9 million participants, and just took a
17  -- kind of an estimate based on that.
18  But I'm -- I don't -- I -- honestly I
19  don't recall, and I was surprised, honestly, when I
20  went through this I couldn't find the -- that 360
21  -- sorry, 3,600 member-per-year number.  But I
22  don't know.
23  Q.  Okay.  Okay.  In the next sentence you --
24  of Paragraph 56 --
25  A.  Uh-huh.

554

1  Q.  -- in your declaration, Exhibit 1, you
2  conclude that the majority of these TPPs -- the
3  Taft-Hartley funds --
4  A.  Uh-huh.
5  Q.  -- will exceed at least the 90 percent
6  threshold in Table 2 based on what you describe
7  here as, "reasonable assumptions about unique
8  covered lives over the proposed class periods"; is
9  that correct?
10  A.  Yes.
11  Q.  What are the assumptions that you have in
12  mind there?
13  A.  Oh.  So again, that the number of -- that
14  individuals taking Neurontin are going to be evenly
15  distributed across the population; that the
16  diagnoses that -- that are kind of related to
17  off-label indications are also evenly distributed
18  across the US population; that taking Neurontin
19  conditional on getting one of those -- those --
20  those diagnoses is going to be evenly distributed
21  across the population; and that, on average,
22  Taft-Hartley funds are going to cover -- are going
23  to cover those -- are going to kind of -- are going
24  to cover those members.
25  Q.  We can do this one by one, if you want, or

555

1  we can try to just do it all at once.  What are the
2  -- but the question I want to get at is what the
3  bases are for your assumptions there.
4      A.  Uh-huh.
5      Q.  Is it something that you can answer in the
6  aggregate, or do you want to do them one by one?
7      A.  So it's the same -- the bases of the
8  assumption is that I've already discussed in the --
9  that we've already gone through.  So it doesn't --
10  these assumptions don't change for Taft-Hartley
11  funds or for -- or for other commercial payers or
12  for the -- for the unique consumers.  It's the same
13  assumptions.
14      Q.  Okay.  And these are assumptions that you
15  had made in the absence of data that would tell you
16  otherwise?
17      A.  Right.  So again, there's no data that's
18  going to provide information for me on the -- the
19  distribution -- no information that I have
20  available to me in preparing this report that was
21  going to provide for me the account of or --
22  account of the number of individuals distributed
23  across the United States that have a diagnosis
24  that's linked to an off-label indication that have
25  -- or that take a Neurontin prescription

556

1  conditional on one of those diagnoses.
2          There's no information that I have about
3  -- there's no observation that I have on -- that
4  counts all the different third-party payers and
5  tells me something about how many of those -- or
6  what third-party payers pay for specific Neurontin
7  indications or Neurontin prescriptions by
8  indication.
9      Q.  Okay.
10      A.  So those assumptions seem reasonable, in
11  the absence of any information that would -- that
12  would be contrary to those assumptions.
13      Q.  Okay.  But there isn't any sort of
14  specific report for those assumptions that -- that
15  you can point to one way or the other.
16      A.  Again, these just seem like reasonable
17  assumptions in the absence of any data or any
18  empirical information that would provide -- you
19  know, provide differences in -- how can I --
20  differences in the estimated number of insurers and
21  -- that paid for prescriptions of Neurontin that
22  are linked to indications.
23          I don't have any of that data.  I don't
24  know of any data that exists.  It seemed like a
25  reasonable assumption that it would be evenly

557

1  distributed across the population in the absence of
2  that.
3      Q.  Okay.  Let's look at Paragraph 57, which
4  relates to self-insured employer third-party
5  payers.
6      A.  Uh-huh.
7      Q.  As I understand it here, you combined
8  survey data with census information to determine
9  percentages of self-insured businesses that fall
10  into different size categories.
11      A.  Right.  That's correct.
12      Q.  Okay.  For example, you concluded that 4
13  percent of self-insured businesses have more than
14  500 employees.
15          MR. RONA:  Objection.
16      A.  Right.  So in -- what I describe here is
17  that I need -- so there are a lot of -- I need a
18  count of the number of self-insured employers out
19  there, and I also need an estimate of how big they
20  are.
21          So to do that, I have to combine two
22  different datasets.  The first is, you know, a size
23  distribution that's contained in the Marquis and
24  Long article that gives a recent trends in
25  self-insured employer plans and tells me

558

1  approximately how many employees or how many -- the
2  distribution of employers and their employee
3  counts.
4          And the second gives me a sense of how --
5  of the census information on the number of
6  businesses in each of these size categories.  And
7  that's how I come up with the number that
8  approximately 4 percent of them have more than 500
9  members.
10      Q.  Okay.  Is -- is there any backup that you
11  have showing how you arrived at that estimate?
12          MR. RONA:  Objection.
13      A.  I'm sorry.  What --
14      Q.  Is there --
15      A.  -- do you mean by "backup"?
16      Q.  Do you have any sort of actual
17  calculations, written or electronic, that are
18  available to show how you got there?
19          MR. RONA:  Objection.
20      A.  I don't have any of that information
21  readily available right here -- here at this time,
22  and I don't honestly recall where -- you know,
23  when, exactly, I made these calculations or where I
24  did them.  I don't remember.  I'm sorry.
25      Q.  Are these ones calculations that you would

559

1    have done, or that staff folks at GMA would have
2    done?
3        A.   Yeah, I think -- to be honest, I think
4    that this is information that -- that staff
5    calculated at my -- sorry -- Mike and Forrest
6    calculated at my instruction, but there was some
7    discussion about how we would calculate -- about
8    how we would do the calculation.
9        Q.   So can you describe for us now
10   mathematically how you got to the 4 percent number
11   for, you know, in this last sentence of Paragraph
12   57.
13       A.   Are you asking me to do math on the board?
14   So it -- you know, honestly, I would really prefer
15   not to have to do math on the board right at this
16   moment in time.  I'm a little tired.  But I'm
17   happy -- happy, if you give me a little bit of
18   time, I'm happy to, you know -- I can, you know, I
19   could describe in you in more detail how these
20   numbers were calculated.
21       Q.   Okay.  Maybe -- do you want to do that
22   now, or do you want to circle back to it after the
23   next break?
24       A.   Okay.  So --
25       Q.   The only reason I ask is it's not

560

1    something that's clear to me or those of us who
2    have looked at it how you ended up with this
3    percentage?
4        A.   Uh-huh.
5        Q.   And it's something that we would want to
6    know the answer to.
7            MR. RONA:  Objection.
8        A.   Okay.  So I didn't personally do these
9    calculations.  I discussed with my staff doing
10   them.  And you know, I can kind of give you a rough
11   description of how they were calculated, but I
12   didn't calculate them personally.
13           So I can walk you through kind of the
14   general methodology for doing it, if you'd like.
15       Q.   Why don't we -- why don't we give it a
16   try.
17       A.   Okay.  So again, I don't have any data on
18   the number of self-insured employer -- employers --
19   and sorry, again, I just want to read the paragraph
20   so I provide the most specific information to you
21   possible.
22           (Witness reviews document.)  Okay.  So
23   census information gives me the number of
24   businesses overall in the self-insured employer
25   category, and gives me a distribution of each of

561

1    those -- of self-insured businesses in each of
2    these size categories.  Okay.
3            So less than 100 employees, 100 to 499
4    employees, and more than 5,000 employees.  Okay.
5    So -- oh, wait.  Hold on.  Let me think about this
6    for a second.
7            So again, I'm -- I'm sorry.  I'm really
8    tired.  It's hard, and I hate doing math on the
9    board and on the spot like this.  It's not fair.
10   So let me just take a few more minutes --
11       Q.   Sure.
12       A.   If you don't mind.
13       Q.   Please.
14       A.   (Witness reviews document.)  Okay.  Okay.
15   As I recall -- and again, please don't 100 percent
16   quote me on this, because this was a long time ago
17   that we did this calculation.  What I remember,
18   from the discussion that I had with my staff, was
19   that what the census information provides me is a
20   distribution of employers.  Okay.  And so it gives
21   me the number of businesses with -- by employee
22   count.  Okay.
23           So 100 employee -- no, what percentage of
24   -- 100 employees, what percentage have more than
25   100 to 499 employees, and what percentage have 500

562

1    or more employees.
2        Q.   Okay.  And I also -- and from the survey
3    data, I know the percentage of employers with fewer
4    than 100 employees that were self insured.
5            So combining that information, I can
6    estimate the percentage of businesses with fewer
7    than 100 employees that are self insured, and
8    that's what the 82 percent is.
9            Similarly, I can estimate the number of
10   employers that have -- that have more than 500
11   employees that are self insured, which is,
12   according to the survey data, 56 percent.
13       Q.   Okay.  So --
14       A.   Okay.
15       Q.   -- if I understand it right, the census
16   information -- which I don't think we ever received
17   this backup one way or the other -- would give you
18   a total number of employers with 500 or more
19   employees?
20       A.   (Witness nods.)
21       Q.   And then you would --
22       A.   That's right.
23       Q.   -- take 56 percent of that number -- or is
24   that -- maybe I'm confusing myself.  But you'd
25   essentially marry the two --

563

1  A. That's correct.
2  Q. -- the percentages that you have from this
3  article in Health Affairs with the census data that
4  you got.
5  A. Right. So then the article in Health
6  Affairs is going to tell me the percentage that's
7  going -- it's going to be self insured in any given
8  category, and the census information is going to
9  give me the number of businesses in any -- the
10  distribution of businesses in -- by size.
11  Q. Got it.
12  A. You got it.
13  Q. Okay. Let's look at Paragraph 58. In
14  Paragraph 58 you describe, "The size of the
15  third-party payer groups relevant to these
16  matters."
17     What do you mean by "relevant to these
18  matters"?
19  A. Oh. Again, because what the -- what I've
20  been asked to do is provide a kind of a -- a best
21  estimate of the number of third-party payers who
22  paid for at least one Neurontin prescription off
23  label.
24  Q. Okay.
25  A. And so -- and so that's what I mean by

564

1  that. That's what I mean by "relative to these
2  matters."
3  Q. Okay.
4  A. Can I just -- can I just make one more
5  point about No. 57 -- about Paragraph 57?
6  Q. Sure.
7  A. Is that this -- we know this is going to
8  provide an underestimate of the number of -- of
9  employees, because employers not -- don't only
10  cover employees, but they also cover family members
11  and other dependents, like children.
12     And to the extent that they are also
13  members of the class or also could have taken
14  Neurontin off label, this is kind of a -- it's a
15  kind of conservative estimate of how many
16  self-insured employees could potentially pay for or
17  could potentially pay for an off-label indication
18  of Neurontin.
19  Q. Okay. Turning back to 58 --
20  A. Yeah, of course.
21  Q. -- and in particular, thinking about how
22  you considered the size of the third-party payer
23  groups relevant to these matters --
24  A. Of course.
25  Q. -- I assume you did that by reference to

565

1  Table 2 --
2  A. Yes.
3  Q. -- at least in part?
4  A. Uh-huh.
5  Q. Which percentage threshold on Table 2 did
6  you use --
7  A. Uh-huh.
8  Q. -- for purposes of 58?
9  A. Uh-huh. Okay. So -- so 58 -- so for all
10  health plans identified by AHIP -- so again, these
11  are the commercial health plans -- we consider that
12  -- I consider that the vast majority of commercial
13  insurers are going to exceed the membership
14  thresholds at the 99 percent level. So for these
15  purposes, I -- I counted them all in. So all
16  1,300. For the tap --
17  Q. And just -- just to be clear on that.
18  A. Uh-huh.
19  Q. You used the 99 percent probability for
20  purposes of that analysis with the commercial
21  insurers or --
22  A. I -- I took into account all
23  probabilities, but it was clear that, under very
24  reasonable assumptions, that -- that the vast
25  majority of commercial insurers were -- would

566

1  exceed the thresholds which -- which are -- for
2  each of the probability thresholds, are -- are
3  approximately a couple of thousand members. And on
4  average, these commercial plans have over 160,000
5  covered lives. So that seemed like a -- so that
6  seemed like a reasonable assumption to make.
7  Q. Okay. For the others, for Taft-Hartley --
8  A. Yeah.
9  Q. -- and for --
10  A. Uh-huh.
11  Q. -- self insureds?
12  A. So for Taft-Hartley, with an assumption of
13  -- that they average roughly 3,600 members per
14  year, that would -- that would -- I'm a little bit
15  out of order, but that would provide me with 90 --
16  that kind of -- that would hit the 90th percentile
17  of probability that -- that they would be -- that
18  they would have paid for at least one Neurontin
19  use.
20     Actually, just as I kind of -- as I'm
21  looking at it, they would even hit, on average, the
22  threshold for each of the classes as -- as hitting
23  the 95 percent probability for all but -- for all
24  but one, which is migraine.
25     So again, I considered all the probability

567

1   thresholds, and tried to kind of get a sense of
2   they would at least reach at least the 90th
3   percentile, and some would reach the 95th
4   percentile of probability.
5        So just to give the Court a very
6   conservative estimate of -- of the number of
7   Taft-Hartley funds, I just -- I took kind of I
8   think 75 percent of all Taft-Hartley funds -- so 75
9   percent of 2,500 nationally is -- is 1,875 -- and
10  gave the Court that as a kind of reasonable
11  approximation.
12      Q.  Let me ask you about that.
13      A.  Uh-huh.
14      Q.  Where did the 75 percent come from?
15      A.  Again, it was just that I didn't -- you
16  know, with 90 percent -- so with 99 percent
17  probability with AHIP, I felt comfortable saying,
18  okay, they're probably all in -- they all would hit
19  the ceiling.
20      But with -- with 3,600 members on average,
21  you know, some would be a little bit smaller, some
22  would be a little bit bigger.  Again, I -- and I
23  didn't want to kind of overestimate.  So I thought,
24  okay, 90 -- at least -- they would at least, on
25  average, hit the 90th percentile.  So kind of a

568

1   rough estimate would be that 75 percent of all of
2   them would hit that.
3       Q.  Is there any calculation that you or your
4   staff did to come up with 75 percent?
5       A.  No.  Again, it was just trying to kind of
6   -- no, it's probably going to be more than half,
7   less than all.
8       Q.  Okay.  It --
9       A.  So it was just, again, rough.
10      Q.  Okay.  And it's -- so it's a number that
11  you had essentially just picked.
12      A.  Again, I was just trying to be as
13  reasonable as possible.
14      MR. RONA:  Objection.
15      A.  And I know, again, based on what -- the
16  information that we have, it seemed reliable to
17  say, okay, it's not going to be all of them, but
18  it's not going to be half of them, and it's not
19  going to be zero of them either.
20      Q.  I assume it wasn't based on any analysis
21  of particular Taft-Hartley funds, correct?
22      A.  No, I don't have any data about that.
23      Q.  Do you have any data or other support for
24  the assumption that you use -- the 75 percent
25  assumption?

569

1       A.  No.
2       Q.  Are you aware of any peer-reviewed
3   economics literature that comes up with percentage
4   assumptions like this in the way you have?
5       A.  Are you asking me whether I prepared this
6   document to meet the threshold of peer review?
7       Q.  Well, sure.  I'll ask you that first.
8       A.  No.  I did not prepare this for
9   peer-reviewed publication.  I prepared this for
10  submission to the Court.
11      Q.  Did you use a lower standard than you
12  would have for a peer-reviewed publication?
13      MR. RONA:  Objection.
14      A.  I guess it would depend on what the
15  peer-reviewed publication would be.  But again,
16  this seems like -- again, this is a rough estimate,
17  given the data that I have, to provide the Court
18  with as best an estimate as is possible on the
19  number of -- of health plans.  I can't -- it's not
20  -- this is not a statistical analysis where I would
21  consider all advantages and disadvantages and try
22  to provide you an estimate of whether this is a
23  true overestimate or a true underestimate.  I
24  didn't do that exercise.  That's not what I was
25  asked to do.

570

1       Q.  So you wouldn't be comfortable, I take it,
2   submitting this particular piece of your analysis
3   for peer-reviewed publication, would you?
4       A.  To be honest, I wouldn't submit any of
5   this -- this at this stage.  It would have to be --
6   I mean, I have -- sorry.  I should be more precise.
7       I was not asked to provide a peer-reviewed
8   analysis for any of these purposes -- for the
9   purposes that I was asked to do.  I was asked to
10  try to provide the Court with a rough, best
11  estimate, given the information at hand, to address
12  the questions at hand.  That's all I was asked to
13  do.
14      Q.  Okay.
15      A.  I would not submit this as it is for a
16  peer-reviewed population.  I don't know what the
17  empirical question would be that I would be trying
18  to answer in that.
19      Q.  I think you had said peer-reviewed
20  population.  I think you mean peer-reviewed
21  publication?
22      A.  Publication.  That's correct.
23      Q.  Okay.  Let's keep going through the
24  sentence.
25      You then conclude that 4 percent of

571

1    self-insured employers would be relevant.
2      A.  Right.
3      Q.  Where does that number come from?
4      A.  Yeah.  So again, so 4 percent that we
5    estimate have more than 500 members.  500 members
6    meets the 90th percentage probability for -- for
7    thresholds for -- for neuropathic pain, and maybe,
8    roughly, for bipolar as well, but not -- you know,
9    not as enumerated in this chart.
10      So I just took as kind of, again, a really
11   rough estimate to give the Court an estimate of the
12   number of -- of self-insured employees that would
13   likely be in the class, considering that, again,
14   this is a -- it's an underestimate of the number of
15   all members of the self-insured employers would be
16   covering, that you know, this 500 would -- would
17   meet the 90th percentile probability and which
18   should be included in the class.
19     Q.  A couple of things to unpack --
20     A.  Uh-huh.
21     Q.  -- that -- did you use any sort of a
22   different analysis or methodology to come up with
23   the 4 percent than what you did to come up with the
24   75 percent, or is it essentially the same?
25     A.  It's essentially the same.

572

1     Q.  Okay.
2     A.  Again, just a rough estimate to give the
3   Court a sense of how many.
4     Q.  Okay.  And let's just look back at Table
5   2.  And -- just for the sake of precision, we'll
6   try to find, if we can, Exhibit 2, which is your
7   revision to your report.
8     Do you have that -- or it's up to you if
9   you want to use the -- the original version.
10   That's fine, too.
11     A.  So tell me what exhibit I should be
12   looking at.
13     Q.  Exhibit 2, which is the revision to your
14   report.
15     A.  Okay.  So give me a second to look at it.
16     Q.  Sure.
17     A.  I don't see it.  (Witness reviews
18   document.)  Okay.  So what page?
19     Q.  That's a good question.  It's -- I'm
20   looking at Table 2 revised, which I think is the
21   second-to-last page.  The pages aren't paginated.
22     A.  Okay.  I'm not sure -- okay.  I'm sorry.
23   What?
24     Q.  It's -- I think it's the second-to-last
25   page, which is Table 2 revised.

573

1     A.  Okay.  I'm not sure that I have --
2     Q.  From -- of Exhibit 2.
3     A.  Okay.  Hold on.  I'm really sorry, but I'm
4   not sure but I have the right thing.  So the
5   revised is the -- are these --
6     Q.  Let me see if I can help you.
7   (Indicating.)
8     A.  Okay.  That's great.
9     Q.  I think that it's the second-to-last page
10   there.
11     A.  So in the figures you mean.
12     Q.  Yes.  Yes.
13     A.  That's what kind of put me off.
14     Q.  Sorry about that.
15     A.  That's okay.  So what figure is it?
16     Q.  Table 2.
17     A.  Table 2.  Okay.  (Witness reviews
18   document.)  Okay.
19     Q.  Okay.  Looking at -- at Table 2, and just
20   thinking about the -- lost my place -- all right.
21   Let's -- let's do it this way:  Looking back at
22   Paragraph 57, which relates to self-employed --
23   self-insured, rather, third-party payers.
24     A.  And this is in Exhibit 1, in the original
25   document?

574

1     Q.  Yes, it is.  Sorry to go back and forth --
2     A.  Okay.
3     Q.  -- between the two of them.
4     A.  Okay.  So I'm sorry, what paragraph?
5     Q.  57.
6     A.  57.  Okay.
7     Q.  Here I read that your conclusion is that 4
8   percent of self-insured employers have more than
9   500 insureds -- is that -- is that correct?  Is
10   that a correct reading?
11     A.  Okay.  So 4 percent of self-insured --
12     Q.  You know, what --
13     A.  -- businesses have more than 500
14   employees.
15     Q.  You know what, you can probably do this
16   better than I can.  If -- if you can just explain
17   to me, looking at -- at Table 2, how --
18     A.  In the revised version?
19     Q.  Yeah, in the revised version --
20     A.  Okay.
21     Q.  -- or the original version, either one,
22   but how you end up coming up with the conclusion
23   that 4 percent of self-insured employers, you know,
24   fit -- fit these categories and are relevant to
25   these matters.

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

575

1    A.   Okay.
2         MR. RONA:  Objection.
3    A.   So again, we -- I estimate that
4    approximately 4 percent of self-insured businesses
5    have more than 500 employees.  We know that that
6    must be, on average, an underestimate of the number
7    of insured -- insureds.  And that's because
8    employees have dependents.  They have wives and
9    husbands and children.  Okay.
10        So taking 500 as the kind of best -- kind
11   of lowest bound --
12   Q.   Uh-huh.
13   A.   -- we then go to the table, Table 2 in
14   either version.  So let's just -- let's -- just to
15   be really simple -- look at Table 2 revised, okay.
16   Q.   Simple's good.
17   A.   So at the -- okay.  Good.  At the 90th
18   percentile, 500 meets the threshold at the 90th
19   percent line for neuropathic pain.
20        Do you see that?  So 500 is bigger --
21   Q.   Than the --
22   A.   -- than -- than 258.
23   Q.   Right, and also bigger than 336, correct?
24   A.   That's correct.
25   Q.   Okay.

577

1    Q.   Maybe this helps, too.  Let me --
2    A.   Uh-huh.
3    Q.   Let's look at the very last sentence of
4    Paragraph 58.
5    A.   Okay.
6    Q.   After giving the approximate total number
7    of TPPs at 13,070, your last sentence reads, "The
8    actual number would be somewhat lower for migraine
9    and higher for the more commonly-used off label
10   indications --"
11   A.   Uh-huh.
12   Q.   "-- i.e., the pain categories, as well as
13   bipolar."
14   A.   Uh-huh.
15   Q.   I guess the question is that the number
16   here -- the 13,070 number --
17   A.   Uh-huh.
18   Q.   -- is the number across all of these
19   different subclasses?
20   A.   That's correct.
21   Q.   And that that number will differ, to some
22   degree, depending on which subclass you are looking
23   at; that it might be slightly lower for migraine or
24   higher for one of the pain categories or bipolar.
25   A.   Right.  That -- that's exactly right.  And

576

1    A.   500 is also bigger than 336.
2    Q.   But not bigger than 517.
3    A.   Right, but -- that's correct.  In absolute
4    numbers, that's absolutely correct.  But now we
5    also assume -- so again, 400 -- 500 is all --
6    again, is going to be a lower bound on the number
7    of insureds that, on average, self-insured
8    employers are going to have because of dependents
9    and other -- of other people that we don't have any
10   information for, and I would love to have that
11   information, but I don't have that.  I didn't have
12   that in the preparation of this report.
13   Q.   Uh-huh.
14   A.   So just thinking there are going to be
15   more than 17 -- there will be at least 1,700
16   dependents, that would meet our threshold for
17   neuropathic pain, even at the 99th percentile.
18        500 -- so if we just move over to the
19   bipolar indication column -- one column over -- 500
20   is going to be more than the 90th percentile for
21   bipolar as well.
22        So it's also going to meet inclusion in
23   this -- at this threshold.
24   Q.   Okay.
25   A.   Okay.

578

1    that's because, again, the threshold, let's say,
2    for migraine, is much higher than the threshold,
3    let's say, for bipolar.
4    Q.   Okay.
5    A.   That's right.  You got it.
6    Q.   Okay.  Under your analysis, the
7    third-party payers included in or excluded from
8    your estimate of the class size for a particular
9    indication, is based solely on the number of
10   members it has; is that correct -- the number of
11   members we think it has.
12        MR. RONA:  Objection.
13   A.   So I think what you're asking me is, does
14   the calculation -- the calculation does depend -- I
15   think what you're asking me is, does the
16   calculation depend on the estimated size of this --
17   of the employer -- of the -- of the health plan.
18   Q.   Right.  Exactly.
19   A.   And yes, it does.  Absolutely.
20   Q.   Does it depend on anything else?
21   A.   Right.  So it also depends on the
22   assumptions that we've -- that we've discussed.  So
23   that -- again, the number of individuals taking
24   Neurontin over the time period or in a given time
25   period is going to be evenly distributed across the

579

1　population; that individuals who are taking
2　Neurontin for a specification are also going to be
3　evenly distributed across the population. And that
4　-- right. So -- and that -- in the absence of any
5　information that would provide us with specific --
6　specific distributions that would controvert that,
7　that seemed like a reasonable assumption to make.
8　　　Q. Okay. And we've talked about those
9　assumptions before, correct?
10　　A. We have.
11　　Q. Okay. As much as I'd love to talk about
12　them some more, maybe let's move on to Part 5.
13　　　THE WITNESS: Okay. May I take a
14　five-minute break while we're at this point?
15　　　MR. POLUBINSKI: Of course. That makes
16　good sense.
17　　　THE WITNESS: Okay. That would be great.
18　Thank you.
19　　　VIDEO OPERATOR: Off the record at 4:10.
20　　　(Recess was taken.)
21　　　VIDEO OPERATOR: On the record. 4:16.
22　　Q. Okay. We were just about to turn to Part
23　5 of your report when we took a break. Part 5 --
24　and you can follow along if you want to, but here
25　I'll read from Page 2 of your report. It's the

580

1　part of your report where you present your analysis
2　showing the "Likelihood that the named Plaintiff
3　TPPs paid for off-label indications of Neurontin."
4　　　Is that correct?
5　　A. That's correct. I should -- I should look
6　at my report.
7　　Q. Sure. You're welcome to, and actually,
8　I'm going to be flipping up ahead to Page 26 --
9　　A. Okay.
10　　Q. -- if you want to turn there.
11　　A. Okay. So just will you state that --
12　sorry -- so I can.
13　　Q. Yeah, sure.
14　　　MR. POLUBINSKI: Jodi, do you want to do
15　it.
16　　　(Question read back.)
17　　A. That's correct.
18　　Q. Okay. And then looking at Page 26,
19　Paragraph 60, what you're doing here is seeking to
20　determine "the probability that each TPP had at
21　least one member who received a prescription for
22　Neurontin for each of the off-label categories."
23　　　Is that correct?
24　　A. That's correct. Okay.
25　　Q. Now, none of the data maintained by these

581

1　TPPs --
2　　A. Uh-huh.
3　　Q. -- that you received, at least, purports
4　to report what indications they did or did not
5　reimburse for during the class period, correct?
6　　A. See, again, it's a missing data problem,
7　so I don't have data that links claims of
8　prescriptions for Neurontin to an indication --
9　again, this is an issue that we have with claims
10　data in general.
11　　Q. Okay. So to your knowledge, at least, the
12　data just doesn't exist.
13　　A. Right. I wasn't provided with the data,
14　and I didn't have the data.
15　　Q. Okay. And you didn't ask for it.
16　　A. No.
17　　Q. Okay. If you had had the data -- just so
18　I understand exactly what -- what we're doing in
19　Part 5 --
20　　A. Uh-huh.
21　　Q. -- if you had had the data, you wouldn't
22　have needed to do this analysis, correct?
23　　　MR. RONA: Objection.
24　　Q. So in other words, if you had data that
25　reflected by indication what each of these TPPs

582

1　prescribed for, you wouldn't have needed to -- to
2　do the calculations you do in Part 5.
3　　　MR. RONA: Objection.
4　　A. Right. So if I was able to observe each
5　TTP's -- the claims for each TPP, and it linked
6　indication for Neurontin, then I wouldn't have to
7　do the statistical -- I wouldn't have to follow --
8　I wouldn't have to come up with and follow up with
9　a statistical method for getting -- for determining
10　the likelihood -- likelihood that each TPP paid for
11　an off-label use of Neurontin. You've got it.
12　　Q. Okay. And so what -- what -- what you did
13　in its place is -- in Part 5 -- is to try to
14　determine, as a statistical matter, really --
15　　A. Uh-huh.
16　　Q. -- what the odds were or what the
17　likelihood was that these TPPs paid for Neurontin
18　for a particular off-label use?
19　　A. It's -- that's right.
20　　Q. Okay. And in doing so, what you tried to
21　do was to identify whether the third-party payers
22　likely reimbursed for any Neurontin prescriptions
23　for the indications at issue? So in other words,
24　the number didn't matter. Let me -- let me
25　rephrase it. Your analysis tries to identify only

583

1    whether the third-party payers likely reimbursed
2    for at least one Neurontin --
3        A. That's correct.
4        Q. -- prescription for the indications at
5    issue.
6        A. Right. That's correct.
7        Q. Okay. Let's take a look at Table 3, which
8    is on Page 27, but I think also is on -- no, I'm
9    wrong. Actually, I don't think there is a revised
10   version of Table 3.
11       A. Okay.
12       Q. And what I want to do is sort of walk
13   through the steps, as I understand them --
14       A. Uh-huh.
15       Q. -- that you would have done to come up
16   with Table 3, and you can, obviously, correct me
17   where I got it wrong. And what I thought it made
18   sense to do is to use Harden as an example.
19          So the first step would have been to look
20   at Claims data for Harden back in 2000, and then
21   determine the number of Harden's insureds between
22   2000 and the end of the class period who were
23   reimbursed for Neurontin; is that right?
24       A. Uhm.
25       Q. If it's not, then you can tell me what the

584

1    right first step was.
2        A. Right. So the first thing that I do is I
3    tally the total number of members appearing in the
4    claims data for the proposed class period. So all
5    unique members, okay. And then I determine the
6    total percentage of Neurontin use associated with
7    each of the off-label categories in the NDTI data.
8    And then I use the numbers, again, applying that --
9    the same simple probability calculation to
10   determine the likelihood that each of these TTPs,
11   given the size of the TTP for that -- the size of
12   the membership for that TTP had at least one member
13   who was prescribed an off-label use. So it's --
14   and -- and again, the off-label uses are enumerated
15   in the -- in the column -- in the first column.
16       Q. It's --
17          MR. RONA: Just for the sake of
18   clarification, I think you -- and I understand it's
19   the end of the day, you've been saying, "TTP."
20          THE WITNESS: I'm sorry. TPP. I
21   apologize.
22          MR. RONA: Just want to make sure we have
23   a clean record on that.
24          THE WITNESS: I apologize. Sorry. Tired,
25   very tired.

585

1        Q. Okay. Okay. Let me ask you about the
2    first step, which is -- I think you describe it
3    here -- as where you "Tally the total number of
4    unique members appearing in the claims data for the
5    proposed class periods."
6          How did you do that?
7        A. So when -- so I'm just -- I'm just -- I'm
8    just trying to estimate the number of unique
9    members -- so a unique member ID that appeared in
10   the claims data for -- of the -- of the -- of the
11   insurer for the proposed class period.
12          I personally did not calculate the number
13   of unique members, so I don't know the exact
14   procedure for going about doing that.
15       Q. Okay. Did you, yourself, review the
16   claims data, or is that something that's done?
17       A. I did not.
18       Q. So staff members of GMA would have done
19   that?
20       A. Staff members provided this. I did not
21   provide this number.
22       Q. Okay. Do you know how many such
23   individuals -- how many unique members -- there
24   were for Harden in particular?
25       A. Honestly, I don't know off the top of my

586

1    head.
2        Q. Okay. So the next step, I think, as you
3    said it, was that you applied the percentage of
4    Neurontin usage attributable to certain indications
5    that came from the NDTI data.
6        A. That's right.
7        Q. And the estimated percentages there are
8    the ones reflected in Footnote 13 on Page 26,
9    correct?
10       A. That's correct.
11       Q. Okay. So for example, you estimate that 4
12   percent of Neurontin uses were for migraine during
13   the migraine class period, right?
14       A. Right. That's right.
15       Q. Okay. And this is -- these percentages
16   are -- are an aggregate number over the duration of
17   the entire class period. Does that make sense --
18   my question?
19       A. Uh-huh. It does. And I -- I think so.
20   But again, yes, I think so that it's the average
21   number. But again, I don't remember off the top of
22   my head exactly.
23       Q. Okay. Let's -- let's stick with the
24   example of Harden and see if I understand correctly
25   the next step as it's reflected in Table 3.

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

587

1    A.  Okay.
2    Q.  So based on the number of Harden insureds
3  that took Neurontin, and assuming that 4 percent,
4  based on the number in this footnote, are using it
5  for migraine --
6    A.  Uh-huh.
7    Q.  -- you determined how likely it is that
8  one of these 15 people was taking Neurontin for
9  migraine; is that correct?
10    A.  One of these 15 people?  I'm sorry.  Where
11  do you get the 15 people from?
12    Q.  I'm sorry.  Good question.  It -- one of
13  the people -- however many it is.  My understanding
14  is that the number is 15, but I don't want to put
15  words in your mouth.  And I apologize for having
16  done that.  It's getting late in the day for me,
17  too.
18    A.  Okay.  Right.  So again, it's the
19  likelihood -- this is the percentage -- this is the
20  percent probability that -- that Harden would have
21  paid for one off-label -- for one prescription of
22  Neurontin for migraine.  Right.  So it's
23  approximately 45 percent.
24    Q.  Okay.  I guess in terms of the probability
25  calculation that you did that's set forth in more

588

1  detail in Attachment E, is it -- is that correct?
2    A.  Uh-huh.
3    Q.  Okay, which is a similar probability
4  calculation to the one that you've done in the
5  context of Table 2; is that correct?
6    A.  It -- it is is -- it's just -- it's the same
7  probability calculation for Table 2.  That's
8  correct.
9    Q.  Okay.
10    A.  Uhm.
11    Q.  So for example --
12    A.  It's actually the basis for Table 2.
13    Q.  Sorry.  Got it.  So for example, if it was
14  just one insured who was taking Neurontin --
15    A.  Uh-huh.
16    Q.  -- you'd say there was a 4 percent chance
17  that their Neurontin was for migraine.  Does that
18  make sense?
19    A.  No.
20    Q.  Okay.  If the number of -- of lives
21  covered by Harden was one --
22    A.  Uh-huh.
23    Q.  -- and you wanted to figure out what the
24  chances were that Harden had reimbursed for
25  migraine, the answer would be a simple one.  It

589

1  would be a 4 percent chance, based on the analysis
2  that you do in here, correct?
3    A.  I'm sorry.  Where is the 4 percent?  Oh.
4  Oh.  Oh.
5    Q.  The 4 percent comes from the NDTI
6  percentage.  We're just talking about -- trying to
7  break it down a little bit to make it simple for --
8    A.  Okay.  So again, no, this doesn't have to
9  do -- this is -- I mean, again, the calculation is
10  based on the size in order to get the threshold.
11    Q.  Right.
12    A.  So NDTI data is just giving me the
13  relative percentage of individuals taking Neurontin
14  for each indication, right.  So 4 percent of
15  individuals taking Neurontin are taking it for
16  migraine.  Right.
17    Q.  Okay.  Right.  So again, if we go back to
18  the simple example of just one insured --
19    A.  Uh-huh.
20    Q.  -- for a particular TPP, the answer that
21  would come out on Table 3 for that one insured
22  would be that they would have had a 4 percent
23  chance or that the one insurer, rather, would have
24  had a 4 percent chance of having been reimbursed
25  for migraine.

590

1    A.  Okay.  So what the table allows me to do
2  is calculate -- what the probability allows me to
3  do is say, what -- how big Harden has to be in
4  order for it -- for us to be confident that it
5  identified -- it paid for at least one prescription
6  of Neurontin for migraine.
7    Q.  Okay.
8    A.  Okay.  That's what it's allowing me to do.
9  So it allows me to back out -- given the -- given
10  the percentages, it allows me to back out -- or
11  given the incidence, it allows me -- and the
12  probability of -- again, all these assumptions
13  under the probability theory that underlies that
14  table -- that I'm allowed to -- that I can estimate
15  the -- I'm sorry.  I'm really tired.
16    So given the size of Harden, it will --
17  the probability allows me to estimate the
18  probability that Harden paid for at least one
19  migraine med -- at least one Neurontin prescription
20  for migraine.  Okay.
21    So I don't recall how big Harden is.  I
22  don't know -- and I can't tell you off the top of
23  my head, so I wouldn't be able to kind of do the --
24  again, do the exercise I think that you're asking
25  me to do.

591

1    Q.  Okay.  Okay.  You've mentioned a couple of
2  times in the context of your last answer so that
3  you're very tired.  Are you okay to keep going?
4    A.  Uh-huh.  Yeah.  I'm fine to keep going.
5  So I'm just tired.  So doing math at the board at
6  this stage is difficult.  I wouldn't want to ask
7  you to do the same thing.
8    Q.  I wouldn't want to have to do the same
9  thing.  Okay.  So I guess just looking at what you
10  actually found for Harden here, in the case of
11  Harden you conclude that there's a 45 percent
12  chance that they reimburse for at least 1
13  prescription for migraine during the class period.
14    A.  Right.
15        MR. RONA:  Objection.
16    Q.  Would you agree with me that -- that under
17  the analysis, as you've laid it out here --
18    A.  Uh-huh.
19    Q.  -- it's more likely than not that Harden
20  would not -- let me think of a way to do this.
21  There's no way to do it without a double negative,
22  so let me start it again, though, and bear with me.
23    A.  Okay.
24    Q.  This means that, under the analysis that
25  you've set forth here, it's more likely than not

592

1  that Harden did not reimburse for any Neurontin
2  prescription for migraine during the class period.
3        MR. RONA:  Objection.
4    A.  Are you asking me to interpret the 45
5  percent?
6    Q.  I think it's a pretty simple percentage
7  that -- would you agree with me that -- that the
8  likelihood is -- withdrawn.  Would you agree with
9  me that there's a 55 percent chance that Harden did
10  not reimburse for any migraine prescriptions during
11  the course of the class period based on Table 3?
12    A.  Right approx -- right.  So that's just the
13  negative --
14    Q.  Sure.
15    A.  -- of what we -- what we've presented in
16  the table.
17    Q.  Okay.
18    A.  Yes, I would agree with that.
19    Q.  So a better than even chance that they did
20  not reimburse for migraine during the class period.
21        MR. RONA:  Objection.
22    A.  Sure.
23    Q.  Okay.  And then you follow the same
24  methodology for the other indications, in addition
25  to migraine, in Table 3, correct?

593

1    A.  Uh-huh.
2    Q.  And so we end up with 78 percent chance
3  that Harden reimbursed for nociceptive pain, 78
4  percent chance that Harden reimbursed for doses
5  greater than 1,800 milligrams, 99 percent chance
6  that they reimbursed for neuropathic pain, and 88
7  percent chance they reimbursed for bipolar under
8  the analysis that you've set forth here; is that
9  correct?
10    A.  Right.  Greater that 99 percent for
11  neuropathic pain.
12    Q.  Okay.
13    A.  Right.
14    Q.  For bipolar, nociceptive pain, and doses
15  greater than 1,800 milligrams, would you agree with
16  me that the confidence level is below the 90
17  percent level that we were talking about before?
18    A.  I'm sorry.  What's the basis of that
19  statement?
20    Q.  Well, maybe let's go through it a little
21  bit more slowly, I guess.
22        Of the ones that we just walked through,
23  bipolar, there's an 88 percent chance, nociceptive
24  pain, a 78 percent chance and doses --
25    A.  Oh, wait.  We're referring to Harden

594

1  again.
2    Q.  Yeah, Harden in Table 3.
3    A.  Okay.  So Table 3, Harden, for bipolar,
4  for nociceptive, and for doses greater than 1,800
5  milligrams, correct?
6    Q.  Uh-huh.
7    A.  Okay.
8    Q.  And in each case, the -- the percentage
9  likelihood is less than 90 percent, correct?
10    A.  Yes, it is.
11    Q.  Okay.  Okay.  Let me ask you about the
12  final category, which is "Dosage."  This too, I
13  take it, is the percentage for all patients who
14  took Neurontin above 1,800 milligrams without
15  regard to indication?
16    A.  It's inclusive of -- of right.  So --
17  right.
18    Q.  Okay.  I think you've just said it better
19  than I did --
20    A.  Uh-huh.
21    Q.  -- which is that it is inclusive of all
22  indications, both on label and off label.
23    A.  It's defined, irrespective of indication.
24    Q.  Thank you.  That's --
25    A.  Right.  So it's just about dosage.  It's

595

1    just about dosage.
2        Q.  Okay.  I think we got there.
3        A.  Yeah.
4        Q.  And so it includes patients who are taking
5    Neurontin for epilepsy.
6        A.  Uh-huh.
7        Q.  And also patients who are taking Neurontin
8    for some of these other off-label indications, like
9    bipolar, neuropathic pain, nociceptive pain, and
10   migraine, correct?
11       A.  That's correct.  Who are taking it for
12   dosages over 1,800 milligrams.
13       Q.  Okay.  Let's -- let's take a look at
14   Attachment E, which I think is the very tail end of
15   Exhibit 1.
16           Have you got it?
17       A.  Uh-huh.
18       Q.  You know, and after having asked you to
19   flip here -- although you may already be at Page
20   26 -- just -- just to -- just to orient us, I want
21   to look quickly at Page 26, Paragraph 60.  The last
22   full sentence there reads, "For more detail on the
23   probability calculation, see Attachment E."
24           Does that -- does that sound right?
25       A.  Yes.

596

1        Q.  Okay.  Thanks.  And so what Attachment E
2    does is it explains your methodology, and then it
3    also attaches a table, Table E-1, on the second
4    page of the attachment.  And Table E-1 is, "Number
5    of Neurontin patients needed to determine that a
6    payer will have at least one patient prescribed the
7    drug for a specification, with probability equal to
8    90 percent, 95 percent, on 99 percent," correct?
9        A.  Yes.
10       Q.  Okay.  Let's look at the second paragraph
11   of the -- the two paragraphs of text in the
12   attachment.
13       A.  Okay.  I'm sorry.  Which paragraph?
14       Q.  The second paragraph.
15       A.  Okay.  In attachment E?
16       Q.  First sentence in Attachment E, yes.
17   Thanks.
18       A.  Great.
19       Q.  The first sentence reads, "These
20   calculations are made based on the assumption that
21   a health plan's patients on Neurontin are randomly
22   selected from all patients on Neurontin."
23       A.  Right.  Again -- that's correct.
24       Q.  Is -- is that one of the assumptions that
25   we talked about before, or is this a different --

597

1        A.  Right.  This is the same.  It's --
2        Q.  Okay.
3        A.  It's the same assumption, again, that --
4    that all patients -- that patients on Neurontin are
5    distributed evenly across the population and across
6    each health plan.
7        Q.  Okay.  And you make this assumption for
8    all TPPs, irrespective of size; is that correct?
9        A.  That's right for the calculations that we
10   present.  Absolutely.
11       Q.  Okay.  Let's look -- let's look at Table
12   4 --
13       A.  In what --
14       Q.  -- in Exhibit 1 --
15       A.  Okay.
16       Q.  -- or actually, I take that back.  Let's
17   look at Table 4 revised in Exhibit 2.  If you want
18   to also have Table 4 in Exhibit 1 out for
19   reference --
20       A.  Okay.  So.
21       Q.  -- that's fine too.  I think in Exhibit 1,
22   Table 4 appears on Page 27.
23       A.  Uhm.
24       Q.  In Exhibit 2, the revised version is the
25   last page.

598

1        A.  So just to be really clear, okay, so Table
2    4 in the revised version, correct?
3        Q.  Yeah.
4        A.  And then Table --
5        Q.  You can also --
6        A.  -- Table 4 in the -- in Exhibit 1.
7        Q.  Yeah.
8        A.  Okay.
9        Q.  Yeah.
10       A.  Okay.
11           MR. RONA:  Do we still need Attachment E?
12           MR. POLUBINSKI:  No, we don't.  We can set
13   it to one side.
14           MR. RONA:  What about Table E-1?
15           MR. POLUBINSKI:  Set that to one side,
16   too.
17           MR. RONA:  Okay.  Thank you.
18       Q.  Okay.  In Table 4 you're seeking to
19   estimate the total amount paid by each TPP for each
20   of the off-label categories.
21       A.  Uh-huh.
22       Q.  Were you asked to do this by counsel?
23       A.  To be honest, I'm not sure that I was
24   asked to do it by counsel.  I think this was
25   something that, again, my staff and I discussed

599

1    putting in the chart -- or putting in the -- the
2    declaration. But I don't remember a specific
3    conversation where we talked about this with
4    counsel.
5        Q. Okay. Do you remember specific
6    conversations where you talked about it among your
7    staff?
8        A. I can't tell you a day and a time, no.
9        Q. Okay. What's your -- well, just to start
10   -- I assume it was your decision to put Table 4 in
11   the declaration, correct?
12       A. Yes. That's right.
13       Q. Okay. Why did you decide to include Table
14   4 in your declaration -- in your declaration?
15       A. Uh-huh. So again, it was just to give a
16   kind of general sense to the Court of the total
17   amount -- just as, again, not only do we want to
18   provide a percent probability that each TPP class
19   representative paid for an off-label prescription,
20   but just to give a kind of general sense to the
21   Court of how much they would have paid for each
22   given indication.
23       Q. Okay. Was it -- was it based on any
24   understanding that you had about something that the
25   Court had asked for, or was it just additional

600

1    information you thought you'd provide?
2        A. It was additional information.
3        Q. Okay.
4        A. But it was, again, a kind of a rough sense
5    on kind of how big the bread basket is.
6        Q. Okay. Am I correct that you relied on
7    claims data for these three third-party payers to
8    calculate the amounts reflected in Table 4?
9        A. Right. That's correct.
10       Q. And then --
11       A. But that -- that's my understanding.
12   That's correct.
13       Q. Okay. When you say that's your
14   understanding --
15       A. Uh-huh.
16       Q. -- is that because these are calculations
17   that your staff did?
18       A. Right. Calculations my staff -- my staff
19   did. I did not do them directly.
20       Q. Okay. But your understanding is that your
21   staff had relied on the claims data to do it -- to
22   do them.
23       A. That's right.
24       Q. And then you would have allocated the
25   total amounts reimbursed for Neurontin by these

601

1    third-party payers by indication category?
2        A. That's right.
3        Q. Same way we discussed before?
4        A. Uh-huh.
5        Q. Okay. And you would have done that in
6    reliance on the percentages derived from NDTI that
7    are reflected, I think, in Footnote 13 on the
8    preceding page, Page 26 of Exhibit 1?
9        A. Right. That's right. Exactly. It's the
10   same calculation that allowed us to get to Table 3
11   as well. That same underlying information about
12   the percentage of use attributable to each
13   indication as a percentage of all use of Neurontin.
14       Q. Okay. Now, the -- the dollar amounts that
15   you report in Table 4 are quite specific. They're
16   not obviously down to the penny.
17       A. Uh-huh.
18       Q. But they are down to the dollar, correct?
19       A. Uh-huh.
20       Q. I think you'd said before that these are
21   meant to be rough estimates --
22       A. Uh-huh.
23       Q. -- is that correct? So that we shouldn't
24   take from the -- you know, the -- the apparent
25   precision of these numbers that they're meant to be

602

1    precise reflections of amounts that would have been
2    reimbursed for each of these indications, correct?
3        MR. RONA: Objection.
4        A. So again, these are provided for best
5    estimates, not -- these are provided for best
6    estimates for the Court. I don't consider -- I
7    don't consider any -- these numbers to be precisely
8    estimated in a kind of statistical sense.
9        Q. Okay. Do -- is there a way for you to
10   characterize the precision of these numbers, a
11   margin of error, a confidence interval at all that
12   you've got?
13       A. Honestly, I haven't really thought about
14   how I would go about doing that.
15       Q. Okay. Let's look at one of the numbers
16   here. For Harden, the number associated with
17   migraine in Table 4 is $313, correct?
18       A. Yes.
19       MR. RONA: I'm sorry. On what --
20       THE WITNESS: Oh. Yeah. Okay. On --
21   right.
22       MR. POLUBINSKI: Oh, no. I'm sorry.
23   Thank you. Yeah. $317. My apologies.
24       A. Actually, so are we talking about Table 4
25   for Exhibit 1 or for the revised?

603

1    Q.  Why don't we stick with the revised --
2    A.  Okay.
3    Q.  -- since that's the most up-to-date
4    version.  Am I right about that?
5    A.  That would be great.  Thank you.
6        MR. POLUBINSKI:  And thanks, Ilyas, for
7    getting us on the right page.
8    Q.  Okay.  So let me try -- try that one more
9    time.  The number on Table 4 revised for Harden for
10   migraine is $317, correct?
11   A.  That's correct.
12   Q.  Okay.  You would agree with me that the
13   actual amount is likely to be quite different from
14   that, correct?
15   A.  I have no --
16       MR. RONA:  Objection.
17   A.  -- way of knowing either -- I have no way
18   of knowing.
19   Q.  Okay.  Let's -- let's look quickly at
20   Table 3, just to give context to my question.
21   A.  Table 3 in --
22   Q.  In Exhibit 1.
23   A.  Exhibit 1, okay.
24   Q.  Yeah.  For migraine, at least, it appears
25   that the likelihood that Harden would have

604

1    reimbursed for a single Neurontin prescription is
2    45 percent, correct?
3    A.  That's correct.
4    Q.  And I think, as we discussed before,
5    there's a 55 percent likelihood that Harden did not
6    reimburse for any Neurontin prescriptions for
7    migraine, correct?
8    A.  It's not for any -- for at least one.
9    Q.  For at least one.
10   A.  Right.
11   Q.  Okay.  So is it wrong to say that there is
12   a 55 percent chance that they didn't reimburse for
13   any Neurontin prescriptions for migraine?
14   A.  I would say for at least one.  So there
15   may -- for at least one.  I guess any would make
16   sense as well.
17   Q.  Okay.  So I guess my point is that, if we
18   think that there's a 55 percent chance that Harden
19   didn't reimburse for any migraine prescriptions --
20   A.  Uh-huh.
21   Q.  -- that would seem to me that there would
22   be a 55 percent chance that the actual number paid
23   by Harden for migraine prescriptions for Neurontin
24   would be zero.
25       MR. RONA:  Objection.

605

1    A.  It could be zero if they didn't pay for
2    any.  But it -- it looks like from -- how about
3    this:  It's clear in the claims data that they --
4    or how about this:  It's clear in the claims data
5    that Harden paid for Neurontin prescriptions,
6    right.  And if they have a distribution of -- of
7    Neurontin use that looks similar to national
8    estimates of -- of Neurontin use by indication,
9    then it makes sense that they -- that they would
10   have paid something for -- for migraine medication,
11   but I can't tell you that for certain, because I
12   have no data that links -- I have no claims data
13   that links a paid Harden prescription -- the amount
14   that was paid to an indication.
15       So it could be zero, but it could be
16   something larger than that.  And it makes sense
17   that -- and it's possible that it could be
18   something larger than that --
19   Q.  Okay.
20   A.  For each -- for each indication, in
21   particular for migraine.
22   Q.  Okay.  I'm about to shift gears a little
23   bit, so if you want to take a break, this would be
24   a good time.  If you want, we can keep going.
25   A.  Why don't we keep on going.

606

1    Q.  Okay.  What I want to do is flip back in
2    Exhibit 1 a little bit to Paragraph 31.  This
3    brings us back into Part 3.  And in particular,
4    this relates to prescriptions of Neurontin by
5    physician specialty.
6    A.  What page?
7    Q.  15.  I'm sorry.  Page 15, Paragraph 31.
8    A.  15.
9    Q.  Okay.  So this is the portion of your
10   analysis --
11   A.  So let me just --
12   Q.  Yeah.
13   A.  -- make sure I orient myself, since we've
14   shifted gears quite a lot.
15   Q.  That's fine.  We have.
16   A.  Okay.  (Witness reviews document.)  Okay.
17   Q.  Okay.  So you write in Paragraph 31 --
18   well, let me -- let me, before I do that, just try
19   to orient us a little bit more.
20       This is -- is this portion of your
21   report where you address "Prescriptions of
22   Neurontin by physician specialty."  I just read the
23   point heading there; is that correct?
24   A.  That is correct.
25   Q.  You write in the second sentence here of

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

607

1 Paragraph 31 that, "To perform these analyses, I
2 have been instructed by counsel to group physicians
3 into several specialty categories:  Psychiatrists,
4 pain specialists, neurologists, and all other
5 specialists," correct?
6    A.  That's correct.
7    Q.  What's your understanding of the relevance
8 of these categories to this case?
9        MR. RONA:  Objection.
10    Q.  Or in other words, do you have any
11 understanding yourself as to why Plaintiffs'
12 counsel picked these four?
13        MR. RONA:  Objection.
14    A.  So I have been instructed by the Court --
15 I've been instructed or asked to provide a series
16 of analyses that are going to link the number of
17 physicians prescribing Neurontin to specifications.
18 But I can't do that with any of the available data.
19 There's no data available to me that would allow me
20 to link to provide the Court with a count of the
21 number of -- of physicians overall or by specialty
22 category by -- by indication for Neurontin uses.
23        So my understanding about this -- the
24 focus on specialty category -- is to provide the
25 Court with an estimate of the number of physicians

608

1 that are prescribing Neurontin -- number of
2 physicians by specialty categories -- that are
3 prescribing Neurontin that would likely be
4 prescribing them for on-label and off-label uses.
5    Q.  Okay.
6        THE WITNESS:  And I'm sorry, may I take --
7 may I actually take that break, if you don't mind?
8        MR. POLUBINSKI:  Yeah, I don't -- I don't
9 want to take that break.  We can take a break.
10 Sure.
11        THE WITNESS:  Okay.  Thank you.
12        VIDEO OPERATOR:  The time is 4:50.  This
13 is the end of Cassette 5.  We are off the record.
14        (Recess was taken.)
15        VIDEO OPERATOR:  The time is 5:02.  This
16 is the beginning of Cassette 6 in the deposition of
17 Doctor Conti.  We are on the record.
18    Q.  Are you ready?
19    A.  I am.
20    Q.  Okay.  All right.  So we were looking at
21 Paragraph 31 of Exhibit 1, and the very last
22 sentence of Paragraph 31 reads, "Attachment D
23 contains more information on the physician
24 specialty categorization," correct?
25    A.  That's correct.

609

1    Q.  Who prepared Attachment D?  And we can
2 look at Attachment D --
3    A.  Let's look at Attachment D, okay.
4 (Witness reviews document.)  Okay.  Okay.  So I did
5 not prepare Attachment D-1 or 2.
6    Q.  I think there's a third, too.
7    A.  Oh, okay.  1, 2 --
8    Q.  Just so we've got them all.
9    A.  -- right, or 3.
10    Q.  Okay.  Do you -- I didn't mean to cut you
11 off.
12    A.  Yes.  So my understanding is that this
13 physician specialty categorization was provided to
14 me by counsel.
15    Q.  Okay.  And your understanding that it was
16 provided by counsel comes from where?
17    A.  What do you mean?  So physician specialty
18 categorization, okay, you know, if -- it's
19 considered if -- certain physician specialty is
20 categorized as other pain, neuropathy, psychiatry,
21 that categorization was provided by counsel to
22 myself.
23    Q.  I see.  Okay.  When would it have been
24 provided to you -- the chart or the -- the
25 attachment?

610

1    A.  So honestly, when I started working on the
2 -- on the preparation of the analyses and also the
3 draft, I think my staff -- Mike and Forrest -- had
4 this information.
5    Q.  Okay.
6    A.  That that's my understanding.  But again,
7 I don't -- I don't know exactly.
8    Q.  When -- you know, approximately, in the --
9 in the course of your engagement, did you first see
10 a copy of Attachment D?
11    A.  So these were -- Attachment D was -- I
12 never saw a copy of Attachment D until the -- I
13 finalized the report.
14    Q.  Okay.  What's your understanding for who
15 prepared the chart?
16    A.  I don't know.
17    Q.  Did --
18    A.  You mean by -- you mean by that
19 "Attachment D-1," the actual charts that I see in
20 front of me, correct?
21    Q.  Yeah, Attachments D-1, D-2, and D-3.
22    A.  So I did not prepare those charts, and I
23 don't know who did.
24    Q.  Okay.  Did you ask or -- or one way or the
25 other?

611

1    A.  No, I did not.

2    Q.  Do you know anything one way or the other

3  about what methodology was used to put the charts

4  together?

5    A.  Do you mean by that -- the methodologies,

6  do you mean the categorization?

7    Q.  Yeah.

8    A.  No, I do not.

9    Q.  Okay.  You'd mentioned -- you pointed out

10  that -- that there are three attachments within

11  Attachment D, three separate lists.  The reason for

12  that, I assume, is that there are some difference

13  between the datasets -- well, let me back up.

14      Attachment D-1 appears to correspond to

15  "IMS NDTI Physician Specialties," correct?

16    A.  That's correct.

17    Q.  And D-2, appears to correspond to "Wolters

18  Kluwer Physician Specialties," right?

19    A.  That's correct.

20    Q.  And then D-3 corresponds to "IMS Xponent

21  Physician Specialties."

22    A.  That's correct.

23    Q.  Okay.  The reason I'm assuming that there

24  needed to be three separate charts is that there

25  are differences among the datasets in what the

613

1  pharmacy has a -- sorry, the -- the data that's

2  collected has -- I'm assuming -- a DEA number for

3  the physician, which is then being -- my kind of

4  rough understanding is that IMS is then linking

5  that to -- to physician categories based on AMA

6  data and other kind of very -- very kind of

7  commonly-used datasets for identifying physician

8  specialties.

9    Q.  And so is my understanding right that

10  you're thinking that IMS may not request a DEA

11  number for physicians who fill out their survey in

12  NDTI?

13    A.  I have no idea --

14      MR. RONA:  Objection.

15    A.  -- honestly.

16    Q.  Let's -- let's look at the figures that --

17  that relate to your analysis of physician -- or

18  prescriptions of Neurontin by physician specialty,

19  which I understand to be Figures 11 through 14 of

20  your declaration, which is Exhibit 1.

21      Let's look at Figure 11 first.

22    A.  So in my document, Figure 1's title is --

23  I'm sorry.  Figure 11 reads, "Number of Neurontin

24  New Prescriptions Per Month By Psychiatrists."

25    Q.  That's where I am.

612

1  different physician specialties are, correct?

2      MR. RONA:  Objection.

3    A.  My understanding is that there are

4  differences in -- in the datasets and how physician

5  specialty was recorded.

6    Q.  Okay.  Do you know why there would have

7  been a difference among the datasets?

8      MR. RONA:  Objection.

9    A.  Uhm.

10    Q.  So for example, two of the datasets are

11  both prepared by IMS.

12    A.  Uh-huh.

13    Q.  Do you have an understanding for why those

14  two wouldn't use the same physician specialty

15  characterizations?

16    A.  I don't, no.

17      MR. RONA:  Objection.

18    Q.  And if we --

19    A.  Other than -- I mean -- sorry.  Other than

20  to say there -- they are, again, prepared from

21  different universes and for different purposes.  So

22  IMS NDTI data is -- again, it's -- it's a sample of

23  physicians representative of the United States.

24  Whereas, IMS Xponent data is a -- is data drawn

25  from retail pharmacies where the -- the retail

614

1    A.  Is that correct?

2    Q.  That's where I am, too, yes.

3    A.  Okay.

4    Q.  Looking at Figure 11, we're -- we're now

5  back to just Wolters Kluwer and IMS XPonent data;

6  is that right?  In other words, there's no --

7  there's no NDTI data that's reflected in this

8  chart, is there?

9    A.  That's correct.

10    Q.  Why not?  I mean, I -- I gather from

11  Attachment D-1 that NDTI does identify physicians

12  by specialty, at least some -- to some degree.

13      MR. RONA:  Objection.

14    A.  So we want -- the task at hand is to

15  identify the number of Neurontin prescriptions per

16  month by specialty category, but the specialty

17  category provided by NDTI -- well, there are two

18  issues.

19      The first is, NDTI data cannot give us a

20  nationally-representative sample or a

21  nationally-representative estimate of a number of

22  Neurontin new prescriptions provided.  So it's not

23  the appropriate dataset for estimating the number

24  of Neurontin new prescriptions for -- over any --

25  over any physician category, but specifically for

615

1  -- for specific physician categories.
2      And secondly, the -- excuse me -- we were
3  interested in trying to provide the Court
4  information on the number of Neurontin
5  prescriptions by -- by physician -- by physician
6  category, and -- and wanted to provide the Court as
7  best estimate as possible by physician specialty,
8  and that information -- and the information
9  contained in NDTI doesn't have a fine grain enough
10  categorization of physician specialty.
11     Q.  Okay.  In Figure 11, the new prescription
12  data that's charted here is -- I'll -- withdrawn.
13     Let me ask you this:  Is the -- is the
14  forecasting -- well, withdrawn again.
15     Included with -- with -- along with the
16  actual IMS Xponent data and the actual Wolters
17  Kluwer data are lines here for "IMS Extrapolated"
18  and "IMS Backcast," correct?
19     A.  That's correct.
20     Q.  I am correct that the methodology that you
21  would have used to come up with the extrapolated
22  line is essentially the same as the methodology
23  that you would have used to come up with the
24  extrapolated lines that we looked at earlier today
25  in Figure -- Figures 2 and 3, I think.

616

1      A.  Let's go back and look at them to make
2  sure.
3      Q.  You could tell I was raising my eyebrows.
4      A.  Okay.  So -- so Figure -- (Witness reviews
5  document.)  So Figure 3 --
6      Q.  Okay.
7      A.  -- correct?
8      Q.  Figure 3 I'm looking at now appears to
9  have the backcasted data, correct, or the
10  backcasted line, correct?
11     A.  So Figure 3 has the number of physicians
12  writing new prescriptions for Neurontin over all
13  specialties combined, and contains both the
14  forecasted data based on the relationship between
15  IMS and Wolters Kluwer data, and also the backcast
16  forecast based on the observed data.
17     Q.  Okay.
18     A.  Correct.
19     Q.  Thanks.  And so would I be right then to
20  say that Figure 11 is -- is -- contains similar
21  information to that reflected in Figure 3, except
22  that it is limited to data on physicians who have
23  been identified as psychiatrists in the methodology
24  reflected in Attachment D?
25     MR. RONA:  Objection.

617

1      A.  I don't know what your definition of
2  "similar" is.  So let me -- so if you're asking me
3  whether Figure 11 reports the number of Neurontin
4  prescriptions per month by psychiatrists, both in
5  actually-observed data by IMS and Wolters Kluwer
6  and also using the forecast and backcasting
7  procedures that are similar to what we did to
8  construct Figure 3, then the answer is yes.
9      Q.  Okay.
10     A.  Okay.
11     Q.  Thanks.  And in the interest of cutting
12  through this, let's just -- if you can just take a
13  quick look at Figures 12 through 14, I've got some
14  just general questions to ask about them, too.
15     A.  Okay.  (Witness reviews document.)  Okay.
16     Q.  With apologies for use of the adjective
17  "similar" again, my basic question is whether
18  Figures 12 through 14 are derived in a similar way
19  to the way you derive Figure 11, except for they
20  focus on different specialty groups?
21     A.  Right.  So the methodology for the --
22  showing the IMS new prescriptions and Wolters
23  Kluwer data that's actually observed in the data is
24  the same for Figure 11, Figure 12, Figure 13, and
25  Figure 14.  That the extrapolation procedure for

618

1  each one of these figures, Figure 11, 12, 13, and
2  14, is the same.  "Same" by -- what I mean by that
3  is the same for what we do for predicting all
4  specialties across all types of physicians.
5      So again, that's an estimate -- that's
6  based on an estimated relationship between observed
7  IMS data and observed Wolters Kluwer data.
8      Q.  Which is to say the same forecasting and
9  same backcasting method, correct?
10     A.  No.
11     Q.  Okay.
12     A.  So I want -- I want to be really specific
13  about this.  So it's the same forecasting procedure
14  across all of these different figures, okay, in
15  terms of the method.
16     The -- the reason that I want to be really
17  specific about the backcast is that the backcast
18  relies on -- again, it -- it relies on the
19  diffusion literature about -- diffusion of new
20  technologies, and specifically the diffusion of new
21  prescriptions, and we need -- in order to make this
22  backcast, we need to make some assumptions about
23  functional form that underlie this estimation.
24     And so I think for each one of them, each
25  one of the figures presented, we tried to use the

619

1 functional form that best fit the observed data.
2 So for Figure 11 -- sorry -- for Figure 3, which is
3 "All Specialties," for Figure 11, "Psychiatrists,"
4 for Figure 12, "Pain Specialists," for Figure --
5 and for Figure -- "All Specialists Including
6 Unknown," that -- that functional form is a
7 logistic --
8      Q.   Okay.
9      A.   Which is, again, very, very commonly used
10 in -- in the economic literature for estimating
11 diffusion curves.
12          Now, again, we wanted to be as careful
13 with letting the observed data dictate the
14 functional form as possible to provide the Court
15 with the most conservative, reasonable standard
16 economic method for going about estimating the
17 number of Neurontin prescriptions where we don't
18 observe any data.
19          So for neurologists, we assumed an
20 exponential functional form, which fit the data
21 better.
22      Q.   Okay.
23      A.   Okay.
24      Q.   And I -- and just one other thing, just to
25 make sure we're on the same page on this --

620

1      A.   Uh-huh.
2      Q.   -- I'm assuming that no NDTI data was used
3 in Figures 12 through 14; is that right?
4      A.   No IMS NDTI data was -- was used for
5 Figures 12 -- in the construction of Figures 12
6 through 14, correct.
7      Q.   And then the -- the breakdown of the data
8 by specialty category in each of these figures, 12
9 through 14, was done pursuant to the -- the
10 breakdown that's reflected in Attachment D.
11          MR. RONA:  Objection.
12      A.   Uhm.
13      Q.   So in other words, Attachment D informed
14 your grouping of new prescription data into these
15 different specialist categories that are reflected
16 in these figures, correct?
17      A.   Right.  So we relied on the information in
18 Attachment D to -- to categorize all physicians
19 into physician specialties, right.
20      Q.   Okay.  Let's flip ahead to figures
21 -- for Figures 15 through 18.
22      A.   15 through 18?
23      Q.   Uh-huh.
24      A.   Okay.
25      Q.   And to start with, I'll ask some --

621

1 some general questions about these.  My
2 understanding is for Figures 15 through 18 that you
3 did essentially the same analysis, but instead of
4 seeking to measure the number of new
5 prescriptions --
6      A.   Uh-huh.
7      Q.   -- you were trying, instead, to measure
8 the number of unique doctors that were prescribing
9 Neurontin by specialty?
10      A.   Yes, that's correct, and let me just --
11 again, I should just be sure.
12      Q.   Sure.
13      A.   Figure 15, Figure 16, and Figure 17,
14 correct?
15      Q.   Okay.
16      A.   That's what you're referring to?
17      Q.   Yeah.  Those are the ones.
18      A.   Oh.  And Figure 18.  Is that correct that
19 you're referring to Figure 18 as well?
20      Q.   I think I am.
21      A.   Okay.
22      Q.   Let me just make sure.  (Reviews
23 documents.)  Yes, I am.
24      A.   Okay.  Right.  That's correct.
25      Q.   Okay.  Thanks.  And by counting unique

622

1 doctors, I -- I assume that your goal was to -- to
2 try to measure the absolute number of doctors by
3 month who were prescribing Neurontin by specialty
4 for that month.
5      A.   Okay.  So I -- I have no way of observing
6 in any dataset the absolute number of doctors
7 prescribing any medication per month or per year.
8 There's no dataset available to myself or anyone
9 else that I know of that's going to give you --
10 give me the absolute number of doctors doing that.
11          I can only -- again, the -- the exercise
12 was to provide the Court with a count of physicians
13 overall and by specialty who provide -- provided
14 new prescriptions of Neurontin to their patients
15 over the time period in the datasets that we had
16 available to us to do that.
17      Q.   Okay.  I guess my question was probably
18 more complicated than it needed to be.  I think the
19 -- what I was trying to get at was just whether --
20 the number here is not meant to be a cumulative
21 number.  It's meant to be a snapshot in time.  So
22 for -- for each individual data point for each
23 individual month in these figures.
24      A.   My -- a cumulative number --
25          MR. RONA:  I'm just going to object on

623

1  vagueness. I think I sort of understand what
2  you're saying, but it's confusing.
3      Q.  Okay.
4      A.  Okay.
5      Q.  Do you understand it any more than Ilyas
6  does? I'm not sure I necessarily do but --
7      A.  Okay.
8      Q.  -- but you're the expert.
9      A.  Okay. So are you asking me whether it's a
10  unique count of physicians --
11     Q.  No.
12     A.  -- over this time period, given the
13  dataset that I have?
14     Q.  The question is -- the question is
15  whether, you know, if you look at a particular data
16  point on this -- on this chart -- I'm looking now
17  at Figure 15, and say the number corresponds with
18  2000 in the Y axis, which is, "Number of Physicians
19  Writing New Prescriptions Each Month," what that
20  means is that, during that month, as -- as best the
21  data can tell us, there were 2,000 unique doctors
22  who that month wrote prescriptions for Neurontin --
23     A.  (Witness nods.)
24     Q.  -- not that there had been 2,000 doctors
25  starting then going back to the dawn of time in

624

1  total who had prescribed Neurontin for that
2  indication. Maybe that last part of the -- it
3  looks like I lost you on the last part.
4      A.  Yeah I don't know what the going back in
5  time --
6          MR. RONA:  Objection.
7      A.  -- to forever means, but --
8      Q.  Okay.
9          MR. RONA:  Objection.
10     Q.  I think you followed the first part,
11  though.  Does -- does that give you a sense for
12  what I'm asking for and -- and are you able to
13  answer?
14     A.  Let me -- yes, let me rephrase, okay, so
15  that I understand.  So in -- the data point in 1997
16  provides me an estimated number from both -- from
17  observed IMS data, the number of physicians that
18  are prescribing new prescriptions for Neurontin in
19  sorry -- the number of psychiatrists on Figure 15
20  the number of psychiatrists prescribing Neurontin
21  in that month.
22         So it's -- I don't know, something like
23  around a thousand, right?  It's not telling me --
24  it's telling me that approximately a thousand
25  psychiatrists prescribed Neurontin in 1997.  In

625

1  1998, IMS data is telling me that approximately
2  4,000 unique physicians prescribed -- a unique
3  psychiatrist prescribed a new prescription of
4  Neurontin in that month.
5      Q.  Okay.
6      A.  Okay.
7      Q.  Okay, that -- I think that --
8      A.  Okay.
9      Q.  -- that helps.  That answers it, I think.
10     A.  So that's the data point, okay.
11     Q.  All right.  Let's look at Figure 16
12  specifically.  In Figure 16 I take it you seek to
13  measure the number of physicians writing new
14  prescriptions for Neurontin each month for pain
15  specialists, correct?
16     A.  That's correct.
17     Q.  And the grey squares on this chart are the
18  Wolters Kluwer data --
19     A.  Uh-huh.
20     Q.  -- and the -- okay.
21     A.  That's correct.
22     Q.  And -- and the red line is the actual IMS
23  Xponent data that you acquired, correct?
24     A.  That's correct.
25     Q.  And then the green triangles are the IMS

626

1  Xponent data that's been extrapolated, correct?
2      A.  That's correct.
3      Q.  And the blue circles are the IMS
4  backcast --
5      A.  The blue circles below the IMS line --
6  below the observation of 1996 was the backcast,
7  that's correct.
8      Q.  Okay.  I guess the reason I say that --
9      A.  Uh-huh.
10     Q.  -- is I'm just reading from the -- from
11  the description of the lines at the bottom of the
12  chart.
13     A.  That's right.
14     Q.  And -- but that's a good point that you
15  make.  The backcast part of it is from 1996
16  backwards, right?
17     A.  It's -- the backcast is -- right, from
18  1994 through 1996, and then the -- the
19  extrapolation gives the blue line through -- gives
20  the kind of best estimate -- best -- based on that
21  -- on that diffusion curve estimated for the
22  backcast.
23     Q.  Okay.  On that note, it looks like your
24  IMS backcast line here builds in a good-sized leap
25  at the beginning of 1996; is that correct?

Conti, Rena (MDL) 2/13/2008 6:30:00 PM

627

1      MR. RONA: Objection.
2      A. "A good-sized leap." Okay. What do you
3  mean by that?
4      Q. Okay. So if you look at the -- if you
5  look at the IMS backcast line, it's going along
6  quite smoothly --
7      A. Uh-huh.
8      Q. -- with the little circles touching each
9  other --
10     A. Yeah.
11     Q. -- until you get to 1996, and then, as
12  soon as you get to 1996, all of a sudden the next
13  circle is, you know -- I can't tell, but several
14  hundred higher that's -- that the -- the line rises
15  very steeply in one data point --
16     A. Uh-huh.
17     Q. -- at the beginning of 1996?
18     A. Uh-huh.
19     Q. Does that make sense?
20     A. It does make sense to me, yes.
21     Q. Okay. And you'd agree that that's a
22  basically fair characterization of what -- of what
23  this IMS backcast line looks like.
24     A. There is -- there is definitely a pivot --
25     Q. Okay.

628

1      A. -- in that line.
2      Q. You're not -- you're not offering a
3  conclusion that there actually was a jump in this
4  magnitude in doctors writing prescriptions in the
5  beginning of 1996 for Neurontin, correct?
6      MR. RONA: Objection.
7      A. No, not at all. What I'm seeking to do in
8  this -- in this is, again, the backcast exercise is
9  to provide the Court with an estimate of the number
10  of prescriptions -- number of -- of pain specialist
11  physicians writing new prescriptions for Neurontin
12  each month in a period in which we observe no data.
13  We have no data to tell us between 1994 and 1996.
14  So that's what the little blue squares are before
15  19 -- little blue circles before 1996.
16     The pivot has to do with the fact that we
17  know that -- that the number of -- of pain
18  specialists writing enough prescriptions for
19  Neurontin each month in 1994 at entry could not be
20  negative.
21     And if you just follow the backcast line,
22  starting from the upper right-hand corner, those
23  blue circles, all the way down, through the
24  observed data in IMS, if you just follow the -- the
25  curve all the way back, without following the blue

629

1  line all the way back, that you would see that
2  there would be -- at 1994 there would be a negative
3  number of prescriptions being written by pain
4  specialists.
5      So the pivot is just used -- it's an
6  estimate to try to smooth out the line and say,
7  okay, there's probably -- you know, there's -- it's
8  not possible to have negative prescriptions of a
9  medication written, but it's possible to have a
10  zero -- a zero number of prescriptions written.
11     Q. Yeah, I guess maybe I don't follow. As I
12  follow the line, the blue circle line down, I think
13  if I were to follow it, it wouldn't hit below zero,
14  but instead would -- would end up somewhere above
15  zero at the time of Neurontin entry in February of
16  2004.
17     A. I don't see that. So maybe I should
18  explain again. So if you start from the upper
19  right and follow the blue line, which is our best
20  estimate based on all available data that we have
21  -- observed at that time through -- through IMS.
22  And from the upper right-hand corner all the way to
23  1994, and instead of following -- so starting at
24  the -- upper right and going all the way
25  through to 1996, and then, instead of following the

630

1  blue line at that moment at 1996 through to 1994 as
2  it's plotted, instead, I -- I just -- let me -- I
3  let my finger follow -- follow the line through --
4  kind of follow the curvature of the line through to
5  1994, it would be below the X axis, which would
6  indicate a -- a negative number of prescriptions
7  being written by pain specialists in Neurontin.
8      Q. Yeah, I guess I still don't see -- if
9  you're -- if you're starting from the top right, I
10  don't see how, by shifting the line downward, it
11  enables you somehow to avoid having it come out
12  below the X-axis. Maybe I'm just not following.
13     A. So.
14     Q. But listen it's --
15     A. The point of the pivot --
16     Q. Okay.
17     A. -- is just to make -- to smooth it out and
18  make sure there's not a negative -- there's not
19  negative new prescriptions being written by a
20  physician --
21     Q. Okay.
22     A. -- by this physician specialty.
23     Q. Okay. That's fine. We can -- we can
24  definitely keep moving.
25     If you look at Figure 17, we see the same

631

1   sort of phenomenon in this --
2       A. Uh-huh.
3       Q. -- in this line as well that the -- that
4   the jump here might be even a little bit bigger
5   than the one in Figure 16?
6       A. Right. So again, there's a pivot and --
7   around 1996, and that's, again, because starting in
8   1996, we observe no data from IMS, and here for
9   this estimation for the backcast we used an
10  exponential form for the backcast, not a logistic.
11  And that follows, again, the -- the observed
12  relationship between IMS and Wolters Kluwer data in
13  the overlap period, and also the -- just the raw
14  data of IMS and also of Wolters Kluwer.
15      So again, in 1996 there's a pivot, and the
16  pivot, again, is to -- to adjust for the fact that
17  for neurologists -- we actually have data between
18  1994 and 1996 that provides us an estimate of the
19  number of physicians -- of number of neurologists
20  writing new prescriptions for Neurontin each month.
21  And those are indicated in the black -- by the
22  black dots on the table or on the figure.
23      Q. Okay.
24      A. And so the -- the pivot is -- just to make
25  sure, is that the best estimate -- that the

632

1   backcast is in -- takes into account that actual
2   observed data that we -- that's provided to us in a
3   document that we -- that I received from -- from
4   counsel.
5       Q. Okay. So just so I'm clear on this, so if
6   someone reading this chart, you know, were looking
7   at the -- at the IMS backcast line and assumed that
8   there had been a -- a steep jump in prescriptions
9   as -- as -- or in doctors writing prescriptions at
10  the very beginning of 1996, as reflected by this
11  pivot --
12      A. Uh-huh.
13      Q. -- that they would be reaching the wrong
14  conclusion, correct?
15      MR. RONA: Objection.
16      A. Right. So are you -- so are you asking me
17  whether the -- the pivot is representational of --
18  of, you know, some actual jump in the number of
19  neurologists --
20      Q. Yes.
21      A. -- prescribing Neurontin? No, it's not.
22      Q. And it would be a mistake to assume that
23  it was, right?
24      A. That's right. That's correct.
25      Q. Okay. In your declaration, where does it

633

1   explain the reason for the pivot?
2       A. I -- so I'll have to go through --
3       Q. Take your time.
4       A. Okay. (Witness reviews document.) Okay.
5   So we should go to Attachment B. Okay. So
6   Attachment B provides a description of the
7   methodology used to estimate both the backcast and
8   the forecast for all physician specialties and also
9   for individual physician specialties. Okay.
10      (Witness reviews document.) So if you
11  don't mind, I'm just going to go through to see if
12  there's a specific notion of -- of this. (Witness
13  reviews document.) Uh-huh. Okay. So on Page 2 of
14  Attachment B, on Paragraph No. 2 -- so -- so the
15  report -- we describe how the back -- the
16  backcasted methodology was implemented, and I
17  mention that, for a few physician specialty
18  categories, the number of prescribing physicians,
19  prior to January 1996, may be independently
20  determined from documents produced by the
21  Defendant. And when such information -- I'm sorry.
22  So -- so we -- and then in the estimation procedure
23  on Page 7 of Attachment B -- this is paragraph
24  numbered 2 -- I write on the one, two, third
25  paragraph from the top, "For neurologists,

634

1   additional information in the number of
2   neurologists prescribing Neurontin is available
3   from documents produced by the Defendants. These
4   data were added to the data acquired from IMS and
5   Wolters Kluwer and the estimated results of the
6   parameters from equation one is shown in Table 2."
7       Same thing for psychiatrists, only one
8   additional data point was found in the Defendant
9   documents. This data point was not included in the
10  estimation of the logistic S curve, but the results
11  of the parameter are shown in -- in Table 3 and
12  also in the parameters.
13      So for looking at the pivot that we're
14  talking about in terms of neurologists, the -- the
15  Attachment B provides a description of us adding
16  additional information to -- to -- in order to get
17  the best estimate possible for the backcast.
18      Q. Okay. These don't actually discuss the
19  pivot as such, but more the underlying rationale to
20  the pivot?
21      A. So "pivot" is not a technical term, so I
22  -- no, it does not mention the term "pivot" in
23  here.
24      Q. Okay. And I assume that -- that there
25  isn't anything in the declaration at all about this

635

1   itself, as opposed to the attachment?
2       A.   What do you mean by "this"?
3       Q.   That I guess -- again, referring to the --
4   to the pivot or the leap, whatever you want to call
5   it, that there isn't any discussion in the body of
6   the declaration itself on the reason for the pivot
7   or leap on these figures.
8       A.   Okay.  So --
9       MR. RONA:  Objection.
10      A.   Again, "pivot" is not a technical term.  I
11  would never use the term "leap" to describe this,
12  because it's not a leap.  And I -- in the data that
13  I think -- I think in the -- in the calculation I
14  write that the specific methodology -- that what
15  the issue is, in terms of forecasting and
16  backcasting, and then describe that the methodology
17  is going to be described in more detail in
18  Attachment B.
19      So that's the only information that I
20  provide -- I think the only -- I think that's the
21  most specific information that I provide.
22      I think somewhere in the -- in the
23  declaration -- I'm happy to look for it explicitly
24  -- I talk about how, for some physician
25  specialties, we do have additional data points that

636

1   are actually observed data points in -- that are in
2   documents provided by the Defendants, and that we
3   include that information in our estimates when --
4   in constructing the figures and presenting those
5   figures.
6       Q.   Okay.  But aside from what you've just
7   described --
8       A.   Uh-huh.
9       Q.   -- there isn't any specific discussion of
10  the -- how the backcast curve -- I'm trying to
11  think of a way to put this, 'cause I know that you
12  don't like --
13      A.   Uh-huh.
14      Q.   -- "leap."  Maybe I'll say, "pivot,"
15  recognizing it's not a technical term.  But there
16  isn't anything in the declaration beyond what you
17  just described that explains this pivot.
18      A.   Right.  So nothing in the -- in the
19  documentation --
20      Q.   Yeah.
21      A.   -- except what we've just discussed,
22  right.
23      Q.   Okay.  With respect to Attachment B, why
24  did you decide to create an Attachment B, as
25  opposed to putting everything in one document?

637

1       A.   So the notion was, is that -- so in
2   Attachment B, if we can just go to Attachment B --
3       Q.   Sure.
4       A.   -- I think it would be easier for me to
5   talk about it.
6       Q.   Of course.  Please.
7       A.   Great.  Thank you.  Okay.  So Attachment B
8   contains a description of the forecasting and
9   backcasting extrapolation method that we use to
10  provide the Court with an estimate of the number of
11  physicians prescribing Neurontin over the time
12  period.
13      And in order -- as we've discussed, in
14  order to provide the Court with this information,
15  for -- I needed to both -- to do some statistical
16  manipulation of the data to fill in missing data.
17  Attachment B describes that filling in of missing
18  data for both aggregate physicians and also in
19  particular for -- for specific physician specialty
20  categories.
21      And some of the methodology is -- it
22  seemed like it -- it -- it would take up a lot of
23  space, No. 1, in the actual declaration, and also,
24  it contains formulas and a kind of more technical
25  description of -- you know, of the kind of

638

1   estimation procedures used.  So it seemed like an
2   appropriate place to put a -- that this description
3   seemed like an appropriate place to put it in an
4   attachment, as opposed to in the main body of the
5   document, which, I assume, is going to be read by a
6   whole bunch of different people who are not
7   technical specialists.
8       Q.   Did you have discussions about the
9   decision to create a separate Attachment B with
10  anybody else?
11      A.   So I certainly discussed that with my
12  staff.
13      Q.   Anybody else?
14      A.   And I think I may have also discussed that
15  with counsel.  But I'm not -- I'm not a hundred
16  percent sure about that.
17      Q.   If you had discussed it with counsel, I
18  assume that would have been in one of your phone
19  conversations with Mr. Notargiacomo, or would it --
20  would it have been a different discussion?
21      A.   So the only counsel member that I ever
22  spoke to before -- before Monday was -- was Ed.
23  But I mean, again, I can't be precisely sure of
24  whether or not I have talked about the specific
25  decision with Ed, but I certainly had a long

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

639

1   discussion with my staff about this, and relying on
2   their -- on -- on their experience in preparing
3   other expert testimony, it seemed like a reasonable
4   thing to do.
5       Q.  Okay.  I think you said that the thought
6   was that -- at least the body of your declaration
7   was going to be read by a whole bunch of different
8   people who are not technical specialists; is that
9   correct?
10      A.  Well --
11      Q.  I think -- I don't mean to --
12      A.  I should be more precise, so I will be.
13  So what I mean by that is that I'm assuming that my
14  document will be read by noneconomists and
15  nonstatisticians, noneconometricians as well.
16      Q.  Was the expectation that
17  noneconometricians or nonstatisticians would read
18  only the first part of your declaration or the body
19  of the declaration, but not read Attachment B?
20      A.  Not at all.  And in fact, I spent a lot of
21  time drafting and editing Attachment B to make sure
22  that, you know, kind of a general -- for -- for --
23  that it would be at least understandable to -- to
24  -- to a wide variety of people.
25      Q.  Okay.  Let's -- let's look back at Figure

640

1   16.
2       A.  Figure 16, Exhibit --
3       Q.  Exhibit 1.
4       A.  Okay.
5       Q.  You know what, actually, just --
6       THE WITNESS:  May I take a break, too.
7   May I just go to the bathroom quickly.
8       MR. POLUBINSKI:  Yeah.  Sure.
9       THE WITNESS:  Okay.  Great.  Thank you.
10      VIDEO OPERATOR:  Off the record.  5:49.
11      (Recess was taken.)
12      VIDEO OPERATOR:  On the record.  5:51.
13      MR. POLUBINSKI:  Okay.  While you were
14  away, Doctor Conti, I'm sure you'll be disappointed
15  to hear that I discussed with counsel that I think
16  -- I think we're ready to call it a day at this
17  point.
18      THE WITNESS:  Okay.
19      MR. POLUBINSKI:  Nearly 6 o'clock.  You
20  know, we reserve our rights to reopen the
21  deposition in the event that new material's
22  produced, but subject to that reservation of
23  rights, at this point the deposition is over from
24  our perspective.
25      THE WITNESS:  Okay.

641

1       MR. POLUBINSKI:  Should we go off the
2   record.
3       MR. RONA:  Yeah.
4       VIDEO OPERATOR:  The time is 5:51.  This
5   deposition is concluded.  This is the end of
6   Cassette 6.  We are off the record.
7       (Whereupon the deposition ended at 5:51
8       p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

642

1           DEPONENT'S ERRATA SHEET
2           AND SIGNATURE INSTRUCTIONS
3
4
5       The original of the Errata Sheet has
6   been delivered to Ilyas Rona, Esq.
7       When the Errata Sheet has been
8   completed by the deponent and signed, a copy
9   thereof should be delivered to each party of record
10  and the ORIGINAL delivered to Edmund Polubinski,
11  Esq. to whom the original deposition transcript was
12  delivered.
13
14
15      INSTRUCTIONS TO DEPONENT
16
17      After reading this volume of your
    deposition, indicate any corrections or changes to
18  your testimony and the reasons therefor on the
    Errata Sheet supplied to you and sign it.  DO NOT
19  make marks or notations on the transcript volume
    itself.
20
21
22
23
24  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
25  COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVE

Conti, Rena (MDL)  2/13/2008  6:30:00 PM

643

```
 1    Commonwealth of Massachusetts
 2    Middlesex, ss.
 3
 4
            I, P. Jodi Ohnemus, Notary Public
 5    in and for the Commonwealth of Massachusetts,
      do hereby certify that there came before me
 6    on the 13th day of February, 2008, the deponent
      herein, who was duly sworn by me; that the ensuing
 7    examination upon oath of the said deponent was
      reported stenographically by me and transcribed
 8    into typewriting under my direction and control;
      and that the within transcript is a true record of
 9    the questions asked and answers given at said
      deposition.
10
11          I FURTHER CERTIFY that I am neither
      attorney nor counsel for, nor related to or
12    employed by any of the parties to the action
      in which this deposition is taken; and, further,
13    that I am not a relative or employee of any
      attorney or financially interested in the outcome
14    of the action.
15
            IN WITNESS WHEREOF I have hereunto set my
16    hand and affixed my seal of office this
      15th day of February, 2008, at Waltham.
17
18    _____

19    _____
20          P. Jodi Ohnemus, RPR, RMR, CRR
            Notary Public,
21          Commonwealth
            of Massachusetts
22          My Commission Expires:
            3/28/2014
23
24
25
```

644

```
 1    ATTACH TO DEPOSITION OF:  RENA CONTI, Ph.D., DAY II
      CASE:  IN RE:  NEURONTIN MARKETING SALES LITIGATION
 2
 3                ERRATA SHEET
      INSTRUCTIONS:  After reading the transcript of your
 4    deposition, note any change or correction to your
      testimony and the reason therefor on this sheet.
 5    DO NOT make any marks or notations on the
      transcript volume itself.  Sign and date this
 6    errata sheet (before a Notary Public, if required).
      Refer to Page 642 of the transcript for errata
 7    sheet distribution instructions.
 8    PAGE LINE
            CHANGE: _____
 9    _____ REASON: _____
            CHANGE: _____
10    _____ REASON: _____
            CHANGE: _____
11    _____ REASON: _____
            CHANGE: _____
12    _____ REASON: _____
            CHANGE: _____
13    _____ REASON: _____
            CHANGE: _____
14    _____ REASON: _____
            CHANGE: _____
15    _____ REASON: _____
            CHANGE: _____
16    _____ REASON: _____
            CHANGE: _____
17    _____ REASON: _____
18          I have read the foregoing transcript of
      my deposition and except for any corrections or
19    changes noted above, I hereby subscribe to the
      transcript as an accurate record of the statements
20    made by me.
21    _____
22          Subscribed and sworn to before me
      this _____ day of _____, 2008.
23
      _____
24    Notary Public
      My Commission Expires:
25
```