# EXHIBIT 19

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

BLUE CROSS AND BLUE SHIELD OF )
ALABAMA; MUNICIPAL WORKERS )
COMPENSATION FUND, INC., )
                               )
       Plaintiffs, )
                               )
vs. )           CIVIL ACTION NO._____
                               )
PFIZER, INC., WARNER-LAMBERT )
COMPANY LLC; )
WARNER-LAMBER COMPANY; )
PARKE-DAVIS, A DIVISION OF )       COMPLAINT
WARNER-LAMBERT COMPANY and )
WARNER-LAMBER COMPANY LLC; )
DAVID LONGMIRE; and )
FICTITIOUS DEFENDANTS, the )
identities of which are unknown to )
Plaintiffs, and through the exercise of )
due diligence, cannot be known to )
Plaintiffs at this time, but who will be )
added as defendants by amendment as )
necessary, upon Plaintiffs' identifying )
them, A, B and C, intending to refer to )
those persons or entities that are the )
predecessors or successors in interest to )
the named Defendants; D-Z, intending to )
refer to those persons or entities that )
committed any of the acts and/or )
omissions of which the named )
Defendants are alleged herein to have )
committed; AA-ZZ, intending to refer to )
those persons or entities that conspired )
with one or more of the named )
Defendants, or with any other person or )
entity to commit the acts and/or )
omissions alleged herein; AAA-ZZZ, )
intending to refer to those persons or )
entities that have committed any acts or )
omissions that have proximately )
caused injury and damage to Plaintiffs )
alleged herein, )
                               )
       Defendants. )
                               )

## COMPLAINT

COME NOW Plaintiffs, by and through their counsel, and make the following allegations against Defendants, including Fictitious Defendants identified in the style of this Complaint, which style is adopted and incorporated by reference as if fully set forth herein.

### I.    INTRODUCTION

#### A.    General Information

1.    This action is brought by Plaintiffs Blue Cross and Blue Shield of Alabama ("Blue Cross") and Municipal Workers Compensation Fund, Inc. ("MWCF") (collectively hereafter referred to as "Plaintiffs") to recover monies paid by Plaintiffs as a result of Defendants' wrongful scheme to market and sell the drug Neurontin® ("Neurontin") for a variety of uses for which it is not approved, medically necessary or medically effective.    Defendant Pfizer, Inc. ("Pfizer") currently markets and sells Neurontin, a drug approved as adjunctive therapy in the treatment of partial seizures for patients with epilepsy.    Since May 2002, Neurontin has also been approved for the management of postherpetic neuralgia (pain resulting from shingles or herpes zoster) in adults.    Prior to Pfizer's acquisition of Defendant Warner-Lambert Company LLC, the successor to Warner-Lambert Company, (together referred to as "Warner-Lambert") in 2000, Neurontin was marketed and sold by Parke-Davis, a division of Warner-Lambert Company LLC, and previously a division of Warner-Lambert Company ("Parke-Davis").

2.    References to Pfizer, Warner-Lambert, or Parke-Davis in this Complaint include all three entities and/or the consolidated entity, and Fictitious Defendants A-ZZZ, unless otherwise specified.    References to Defendants or any Defendant include Fictitious

2

Defendants A-ZZZ. All allegations as to the acts or omissions of any Defendant include the acts or omissions of any agent, employee, representative, or co-conspirator of that Defendant, the acts or omissions of Fictitious Defendants A-ZZZ, and the acts or omissions of any agent, employee, representative, or co-conspirator of Fictitious Defendants A-ZZZ.

3.    This action arises out of the wrongful, negligent, fraudulent and unlawful marketing of Neurontin and Defendants' efforts to have doctors prescribe Neurontin for uses for which the drug was neither approved, medically necessary nor effective.

4.    Pharmaceutical companies must file a New Drug Application ("NDA") with the United States Food and Drug Administration ("FDA") for approval to sell a new drug, and are prohibited by the Federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C.A. §§ 331, *et seq.*, from promoting drugs for uses other than those approved by the FDA. Prescribing drugs for uses other than those approved by the FDA are commonly referred to as "off-label" uses.

5.    At all times material hereto, Defendants knew or should have known that Plaintiffs and other entities that pay for prescription drugs for their employees, members, and/or insureds will cover and pay for off-label uses of prescription drugs under certain circumstances. Therefore, to insure the success of their unlawful scheme, Defendants promoted the off-label use of Neurontin so that Plaintiffs would be defrauded or otherwise unlawfully influenced into treating prescriptions of Neurontin as medically necessary and effective, and therefore defrauded or otherwise unlawfully influenced into paying for Neurontin for off-label uses.

3

6.      Strict federal laws and regulations govern the promotion and marketing of drugs for off-label uses. Although Plaintiffs were justified in believing that Defendants would comply with such laws and regulations, Defendants did not comply with such laws and regulations, which are designed to insure that physicians receive accurate, scientifically valid information regarding the effectiveness of a drug for a particular use. From 1994 to the present, Defendants created and implemented a wrongful marketing and sales scheme that dramatically boosted sales of Neurontin and allowed Defendants to reap unlawful and unfair profits at the expense of the Plaintiffs. Using physicians and intermediary marketing entities and firms, Defendants aggressively marketed and sold Neurontin for off-label uses – which ranged from treatment for anxiety to treatment for alcoholism – in spite of a wealth of scientific evidence suggesting that the drug was not medically effective when so used. To carry out this scheme, Defendants employed various methods to make false, misleading and fraudulent representations and statements about Neurontin's effectiveness and medical necessity.

**B.      The Guilty Plea and Settlement**

7.      Dr. David Franklin initiated a qui tam action on behalf of the United States against the Parke-Davis division of Warner-Lambert in 1996. He alleged that the knowing promotion of Neurontin for off-label use caused false claims to be presented to the United States for prescription sales that were ineligible for Medicaid reimbursement and also caused the payment of kickbacks in violation of the Medicaid anti-kickback provisions, 31 U.S.C. § 3729.

8.      As a result of the filing of the Franklin qui tam lawsuit, the United States Attorney for the District of Massachusetts conducted an investigation and ultimately filed

4

a criminal case against Warner-Lambert. On May 13, 2004, the company pled guilty to violations of the FDCA. Warner-Lambert was fined $240 million and agreed to cease and desist its pattern of misconduct. The United States Attorney for the District of Massachusetts also opened a civil investigation regarding Defendants' marketing practices with regard to Neurontin.

9.      Various State Attorneys General also commenced investigations of off-label marketing practices concerning Neurontin. One group of State Attorneys General and the National Association of Medicaid Fraud Control Units opened civil and criminal investigations against Warner-Lambert for Medicaid fraud. A second group of Attorneys General investigated violations of state consumer protection laws that occurred when Warner-Lambert promoted Neurontin for various off-label uses.

10.     The qui tam federal civil investigation and State Attorneys General investigations settled at the same time. As part of an omnibus civil settlement, Warner-Lambert paid $190 million to resolve the civil claims and investigations pending against them.

11.     As part of the omnibus civil settlement, Warner-Lambert and the State Attorneys General entered into an Assurance of Voluntary Compliance. The Voluntary Compliance explicitly provided that claims brought by individual consumers and entities were excluded from the omnibus civil settlement.

12.     Plaintiffs were diligent in pursuing an investigation of the claims asserted in this Complaint. Through no fault of their own, they did not receive inquiry notice or learn of the factual basis for their claims in this Complaint against Defendants Pfizer, Warner-Lambert, Parke-Davis, and certain Fictitious Defendants A-ZZZ, or their injuries

5

suffered therefrom, until after Warner-Lambert's guilty plea and until the cases in which Plaintiffs are putative class members were filed. Plaintiffs did not learn of the factual basis for their claims in this Complaint against Defendant Longmire and certain Fictitious Defendants A-ZZZ, until less than a year preceding the filing of this Complaint. In any event, under the tolling principles applicable in class action cases of which Plaintiffs are putative class members, the statutes of limitation that apply to the claims asserted herein have been tolled such that these claims are timely asserted by Plaintiffs.

## II.    THE PARTIES

13.    Plaintiff Blue Cross is an Alabama nonprofit, nonstock health services corporation, organized and existing under Ala. Code § 10-4-100, et seq. (1975) with its headquarters in Birmingham, Alabama, which provides health care and prescription drug benefits to its members and insureds. Blue Cross has paid or reimbursed eligible beneficiaries' prescription drug benefits for Neurontin for off-label use and was injured by the conduct alleged herein.

13.    Plaintiff MWCF is an Alabama corporation headquartered in Montgomery, Alabama. MWCF is a self-funded corporation that provides workers' compensation benefits through its third-party beneficiary, Melenium Risk Managers ("MRM"). MWCF paid or reimbursed eligible fund participants' prescription drug benefits for Neurontin for off-label use and was injured by the conduct alleged herein.

14.    Defendant Pfizer is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States.

6

15.    Defendant Warner-Lambert Company LLC is the successor to Defendant Warner-Lambert Company (together "Warner-Lambert"), and was acquired in June 2000 by Pfizer. This acquisition included Defendant Parke-Davis. Prior to the acquisition, Warner-Lambert was a Delaware corporation that maintained its principal place of business at 201 Tabor Road, Morris Plains, New Jersey. In 1993, Warner-Lambert received FDA approval to market Neurontin in the United States, and did so through its Parke-Davis division. After the acquisition, the marketing of Neurontin continued to be managed at the consolidated companies' Morris Plains, New Jersey location.

16.    Defendant David Longmire ("Longmire") is an individual who is, and at all times relevant hereto, was a resident of Russellville, Alabama. As described in detail herein, Defendant Longmire wrongfully marketed, promoted and/or lectured regarding Neurontin and its uses. Longmire is sued herein only as an employee, agent, representative and/or independent contractor of Defendants Pfizer and Warner-Lambert, and is *not* sued for breach of any applicable standard of health care, or for any care provided to, or for the benefit of, any patient.

III.    **JURISDICTION AND VENUE**

17.    The amount sought herein exceeds the jurisdictional limits of this Court. This Court has jurisdiction pursuant to Ala. Code § 12-11-30(1) (1975).

18.    Venue is proper in this Court pursuant to Ala. Code § 6-3-7(a) & (c) in that (a) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred outside the State of Alabama, although said events and omissions were intended to and did influence persons within the State of Alabama, (b) the principal offices of Defendants Pfizer and Warner-Lambert are not in Alabama, (c) the principal office of

7

Plaintiff MWCF is, and at the time of the accrual of the causes of action alleged herein, was in Montgomery County, (d) Defendants Pfizer and Warner-Lambert do, and at the time of the accrual of the causes of action alleged herein, were doing business by agent in Montgomery County, (e) Plaintiffs assert rights to relief arising out of the same transactions or occurrences, (f) the existence of a substantial number of questions of law or material fact common to both Plaintiffs will arise in the action, (g) such questions will predominate over individualized questions pertaining to each Plaintiff, (h) the action can be maintained more efficiently and economically for all parties than if prosecuted separately, and (i) the interest of justice supports the joinder of the parties as plaintiffs in one action. Venue is also proper pursuant to Ala. R. Civ. P. 82(c).

19.    Jurisdiction is not proper in any federal court because there is not complete diversity of citizenship among the parties and no claim is made herein that arises under the Constitution, laws, or treaties of the United States. Although Warner-Lambert has pled guilty to violating the FDCA by committing acts alleged herein both directly and/or through its employees, agents and representatives, such as Defendant Longmire, no cause of action is brought herein under the FDCA. Any claims available to Plaintiffs under federal law are specifically disclaimed, although Plaintiffs reserve the right to add federal claims available to them in the event that this action is determined to be removable to a federal court at any time in the future.

IV.    FACTUAL ALLEGATIONS[1]

    A.    Neurontin

20.    Defendants Pfizer and Warner-Lambert, through Parke-Davis (collectively referred to as "Parke-Davis") are the manufacturers and distributors of Neurontin, a

---

[1] Such allegations are upon information or belief.

prescription drug. Neurontin is the brand name of gabapentin. Until 2004, Parke-Davis was the exclusive provider of Neurontin in the United States.

21.    In December 1993, the FDA approved Neurontin for "adjunctive therapy" in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. "Adjunctive therapy" means that the drug cannot be prescribed by itself for the treatment of epilepsy -- it is to be used in combination with another "front line" epilepsy drug.    The FDA did not find Neurontin to be safe and effective as a "monotherapy" -- a single drug treatment for epilepsy.  The FDA approved labeling of Neurontin states that the drug is only effective at doses ranging from 900 to 1800 mg/day. On May 24, 2002, the FDA also approved Neurontin for the management of postherpetic neuralgia, which is pain resulting from nerve damage caused by shingles.

### B.    Parke-Davis's Deliberate Decision to Avoid FDA Approval and Market Neurontin Off-Label

22.    The market potential for Neurontin for its approved use as adjunctive therapy for partial seizures was modest.  In May 1994, Parke-Davis estimated that Neurontin's ultimate sales potential was $500 million over the lifetime of the drug, based on Neurontin's narrow use for epilepsy adjunctive therapy.

23.    In the late 1980s and early 1990s, before the FDA approved Neurontin for epilepsy adjunctive therapy, Parke-Davis filed several patent applications for Neurontin as a treatment for depression, neurodegenerative disease, mania, bipolar disease and anxiety.  Notwithstanding the claims made in the patent applications, Parke-Davis did not seek FDA approval for these indications or start the internal process within Parke-Davis to obtain approval for these uses. Neurontin's short U.S. patent life was likely a major factor in this analysis. The patent was set to expire in a few years, leaving Parke-

9

Davis with only a small window of exclusivity for this drug during which it could reap monopolistic profits from its sale. After the expiration of the Neurontin patent, Parke-Davis would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing their profits and their ability to keep Neurontin's retail price high.

24.    In October 1994, the Parke-Davis Neurontin Development Team, a group of high-level officials who examined regulatory, clinical research, patents, marketing and manufacturing issues regarding Neurontin, began to consider whether Parke-Davis should attempt to extend Neurontin's use to psychiatric disorders. The principal reason for extending the use was because other anticonvulsants were used for (and FDA-approved for) psychiatric disorders, such as bipolar disorder, panic disorder, post-traumatic stress disorder and possibly personality disorders.

25.    Notwithstanding other anti-epileptic drugs being used for psychiatric disorders, Parke-Davis knew or should have known there was no scientific rationale for Neurontin being effective for bipolar disorder, acute mania, social phobia and panic disorder because Neurontin has a different mechanism of action than other anti-epileptics.

26.    In January 1995, Parke-Davis's Marketing and Planning department, presented a preliminary market analysis to the Neurontin Development Team regarding Neurontin's potential use for psychiatric indications. Without considering whether the drug was actually effective for such uses, or how Parke-Davis could prove the drug worked for these conditions, the report viewed the market as very favorable for Neurontin. At the same Neurontin Development Team meeting, the possibility of

10

expanding Neurontin's use for pain syndromes, another market substantially larger than epilepsy, was also discussed.

27.    In February 1995, the Parke-Davis New Product Committee ("NPC") informed the Neurontin Development Team that it supported the development of Neurontin for other indications and asked for a formal proposal.  John Boris was instructed to prepare market feasibility analyses of new potential indications, including bipolar disorder, generalized anxiety disorder and social phobia, neuropathic pain and migraine prophylaxis.

28.    In March 1995, a senior scientist in Parke-Davis's Research Department informed the Neurontin Development Team that it would not be a good use of Parke-Davis resources to obtain regulatory approval for using Neurontin to treat bipolar disorder because of the short patent exclusivity period remaining and because the clinical studies needed to prove that the drug actually worked for this indication would be hard to conduct and expensive.  The Development Team, however, was informed that a "publication study will be less expensive and focus on what management organization and clinician want to know." Members of Parke-Davis's Regulatory Department opposed the pursuit of a "publication strategy," stating that seeking FDA approval for bipolar disorder through appropriate clinical studies was the correct way to proceed.  That recommendation was not followed.

29.    On March 22, 1995, the Parke-Davis Marketing Council, meeting in Lyons, France, recommended that Parke-Davis pursue a "publication strategy" instead of formal regulatory approval with regard to psychiatric indications for Neurontin in the United States because "the patent situation would most likely not allow Parke-Davis to

11

optimize the investment required to obtain a full indication." Members of the Marketing Council included Tony Wild, the President of Parke-Davis, and senior management.

30.     The object of a "publication strategy" was to disseminate information as widely as possible through the world's medical literature. Parke-Davis recognized that publishing Neurontin's studies on off-label uses would increase sales. Parke-Davis estimated that performing clinical trials sufficient to obtain FDA approval would be at least three times the cost of pursuing a publication strategy.

31.     In May 1995, a formal Marketing Assessment recommended that Parke-Davis implement a "publication strategy" for various psychiatric indications. The report predicted that the revenues generated by sales for these indications would justify investment in the publication strategy. The report, however, specifically noted a lack of scientific rationale for Neurontin's use for bipolar disorder, since Neurontin has a different mechanism of action than other anti-epileptics. Other Parke-Davis reports had recognized that the scientific rationales for using Neurontin for acute mania, social phobia and panic disorder were essentially the same as the rationale for using Neurontin to treat bipolar disorder, i.e., lacking.

32.     In July 1995, the Parke-Davis Marketing and Planning department issued a final Marketing Assessment on Neuropathic Pain and Spasticity. That report recommended that Parke-Davis pursue a publication strategy in the areas of neuropathic pain associated with peripheral nerve damage due to diabetes mellitus, trigeminal neuralgia, postherpetic pain, neuropathic facial pain, and reflex sympathetic dystrophy, disseminating information about such uses through publication and key neurological and pain congresses. Parke-Davis management approved these marketing assessments and

12

adopted the recommendations regarding the publication strategy. In approving the publication strategy for Neurontin, however, Parke-Davis only intended to publish studies that generated positive results.

33.    The New Product Committee also approved the decision to conduct publication studies for Neurontin in migraine prophylaxis but restricted publication to only positive study results. In fact, the negative results of a clinical trial conducted in the 1980s relating to Neurontin and migraine were not published.

34.    Thus, by late 1995, senior management at Parke-Davis had committed the company to promoting Neurontin for off-label uses for which it had no intention of ever seeking FDA approval, including bipolar disorder, generalized anxiety disorder, social phobia, migraine, trigeminal neuralgia, postherpetic pain, neuropathic facial pain, and reflex sympathetic dystrophy. No clinical trial suggested that Neurontin was effective for any of these conditions and at least one clinical trial demonstrated that Neurontin was not effective for at least one of these conditions. Moreover, because FDA regulations prohibited Parke-Davis employees from promoting Neurontin for off-label uses, these marketing decisions required Parke-Davis to construct a marketing organization that appeared to be separate and independent from Parke-Davis's existing marketing and sales department, but which was, in fact, controlled by Parke-Davis.

**C.    Regulation of Marketing Practices and Restrictions on Promotion of Off-Label Uses for Prescription Drugs**

35.    The FDA closely regulates the marketing and promotion of prescription drugs. Under the FDCA and the regulations promulgated thereunder, all information provided by a drug company about its products, whether on or off-label, whether directed at consumers, physicians, or others, including Plaintiffs, must be fair and balanced. To

13

05-12-'06 16:07 FROM-                                T-003  P017/073 F-003

be fair and balanced, information about a drug company's products must accurately and fairly present all data relevant to any drug information provided. In practice, this means a drug company must present positive as well as negative information known to a drug company about its products. Drug companies may not present half-truths, omit material information or disclose select information favorable to their position. In order to meet their obligation of providing fair and balanced information, drug companies must make full disclosure.

36.    At all times relevant hereto, Parke-Davis's promotion of Neurontin for off-label uses was also closely regulated. The general rule was that drug companies could only promote their products for uses that had been approved by the FDA. Sales personnel could not discuss off-label uses with physicians during sales visits, and off-label uses were not supposed to be discussed in any promotional event sponsored by anyone, including those presented by physicians.

37.    The FDA did, however, issue guidelines that allowed drug companies to provide information concerning off-label uses in very limited circumstances. These included:

> * Drug companies could provide an unrestricted grant to an accredited independent sponsor of continuing medical education programs, provided the companies did not influence the content of the program. Thus, drug companies could not select the topics to be presented at such programs or approve the speakers or the content to be provided. Only programs that were truly independent of the drug companies were supposed to qualify for this exception.

> * Drug companies could provide off-label information to bona-fide medical consultants provided the actual purpose of the consultation was to have the persons retained provide information to the drug companies.

> * Drug companies were permitted to communicate off-label information to physicians in response to a bona fide, unsolicited request from a physician, provided such information was specifically responsive to the physician's request.

14

38.    Subsequent to the marketing assessments described above, Parke-Davis's marketing department budgeted millions of dollars to be paid to physicians for "studies" of off-label uses of Neurontin.    These "studies" ranged from paying physicians to describe their off-label Neurontin usage to technical writers who would then write case reports under the physicians' names, to substantial subsidies for plans to use Neurontin experimentally on patients.    Pursuant to the publication strategy described above, only favorable results would be published and physicians were made to understand that continued funding would only occur if there were favorable results.    Many of these studies were not double-blind and most of the studies had little scientific or research value.    This initiative, however, resulted in the creation of a wealth of off-label articles Parke-Davis could circulate.

39.    Regulation of off-label promotion also restricted the means by which Parke-Davis could publicize information about off-label usage. It could not use its sales force to inform doctors of Neurontin's alleged ability to treat pain or psychiatric conditions, as it normally would when publicizing a new approved pharmaceutical.    It had to create parallel marketing structures that appeared independent from Parke-Davis's ordinary promotion forces.    Thus, to institute the off-label marketing plan, Parke-Davis had to create a marketing organization that would publicize Neurontin for off-label purposes, but make it appear that Parke-Davis did not have control of the content of the messages being distributed.

40.    Parke-Davis's inability to use its usual sales force to promote unapproved uses of Neurontin presented one advantageous opportunity.    Parke-Davis was aware that physicians view promotional presentations by drug companies with caution, and are

15

generally skeptical of representations made by drug company salespersons. However, it also knew that recommendations by fellow practitioners were highly regarded by most physicians and were particularly effective in getting doctors to change prescription behavior. Consequently, Parke-Davis deliberately decided to market Neurontin off- label through "peer-selling."

41.    Doctors would be trained to sell Neurontin to other doctors in the guise of educational or professional programs. This marketing strategy, however, could only succeed if it appeared that the doctor-spokespersons were promoting off-label Neurontin because they had independently determined that such treatment was beneficial for their patients, not because they were actually the mouthpieces of a drug company marketing plan. Throughout the off-label promotion campaign Parke-Davis hid their involvement in the promotion of off-label information and misled physicians into believing that the physicians who promoted Neurontin were independent or not otherwise part of the scheme Parke-Davis created to market Neurontin off-label. Longmire was one such physician that promoted Neurontin for off-label purposes on behalf of Parke-Davis.

D.    The Off-Label Promotion Scheme

42.    Parke-Davis established the Off-Label Promotion Scheme to accomplish two goals that were instrumental to its scheme to market Neurontin for off-label indications. First, it had to create parallel marketing structures that appeared independent from Parke-Davis's ordinary promotion forces to avoid federal regulations concerning off-label promotion. Second, to execute the publication strategy, favorable articles had to be generated and published that appeared to emanate from independent physicians. These two goals were complementary and mutually reinforcing. The production of

16

favorable publications created a "buzz" regarding Neurontin, while the peer-to-peer marketing and promotion allowed aggressive sales pitches to continue with a veneer of legitimacy. To achieve these goals, at least two methods were used: the Peer Selling Scheme (described below) and the Publication Scheme (described below).

### 1.    The Peer Selling Scheme

43.    The Peer Selling Scheme centered on hosting numerous events where doctors trained and/or approved by Parke-Davis would provide favorable information on the off-label use of Neurontin, often under conditions where physicians would be compensated for attending the presentation. Parke-Davis funded hundreds of such events between at least 1996 and 2003. As noted above, Parke-Davis was prohibited from directly producing such events, so it created the Peer Selling Scheme whereby medical marketing firms (the "vendor participants") and several dozen physicians (the "physician participants"), including Longmire, routinely promoted Neurontin to other physicians in venues all across the country.

44.    Defendants maintained sufficient control over the events to select and approve the content of the programs and the physician participants that would deliver the off-label message. The physicians who attended these events were deceived into thinking that the events were educational in nature and independent from the control of Defendants.

45.    In order to hide the lack of scientific support for the off-label uses promoted by the scheme, and Defendants' direct involvement in Neurontin's off-label promotion, the Defendants employed improper and unlawful sales and marketing practices. These practices included, inter alia: (a) deliberately misrepresenting the safety

17

and medical efficacy of Neurontin for a variety of off-label uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical effectiveness or necessity of Neurontin for a variety of off-label uses; (c) deliberately concealing negative findings or the absence of positive findings relating to Neurontin's off-label uses; (d) misrepresenting the credentials and qualifications of certain of Parke-Davis's employees, agents or representatives as specialists, medical researchers, physicians and scientific experts in order to market and sell Neurontin for various off-label uses; (e) wrongfully and illegally compensating physicians for prescribing Neurontin for various off-label uses; (f) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and touting the medical effectiveness of Neurontin for off-label uses; (i) intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell Neurontin to off-label markets; and (j) intentionally misrepresenting and concealing the financial ties between the Defendants and other participants in the scheme.

46.    Defendants' scheme reaped them significant financial gain. From 1995 to 2003, Parke-Davis's revenues from the sale of Neurontin soared from $97.5 million to nearly $2.7 billion. By 2003 90% of all Neurontin prescriptions were for off-label uses. Sales of the drug grew at a rate of 50% per year, fueled primarily by prescriptions for off-label uses. Longmire also received payments from Parke-Davis for his participation in the scheme.

47.    All of the participants in the Peer Selling Scheme, including Longmire, aided Parke-Davis in marketing Neurontin for off-label uses and achieving "market

18

expansion" of these uses. Each of the participants received substantial revenue from Parke-Davis to promote Neurontin off-label. The more successful these marketing events were, the more events there would be in the future and the more fees each of the participants would receive for participating in the events. For these reasons, all of the participants, including Longmire, knowingly and willingly agreed to assist Parke-Davis in the off-label promotion of Neurontin, notwithstanding the fact that such a promotional campaign required the systematic repetition of false and misleading statements to thousands of physicians throughout the United States.

48.    Parke-Davis controlled the Peer Selling Scheme.    Parke-Davis compensated the other participants, including Longmire, for all of their efforts, and controlled the money flow to the participating vendors and physicians. As described below, on the rare occasions where participants in the Peer-Selling Scheme made statements that failed to support off-label use of Neurontin, Parke-Davis could and would cease the flow of funds to the offending participant. Parke-Davis closely monitored all events to insure the expected representations related to off-label Neurontin were made to physicians attending the events.

49.    The Parke-Davis Neurontin Extended Disease Team, a formal team created by the Parke-Davis marketing department that included members of the Parke-Davis marketing department and at least one outside vendor, Cline, Davis & Mann, oversaw the execution of the Peer Selling Scheme. As described herein, Parke-Davis has also controlled the content of the presentations, speeches, promotional events and articles that describe off-label usage of Neurontin.

19

50.    One of Parke-Davis's principal strategies for marketing Neurontin was to target key physicians, preferably within the major teaching hospitals, to serve as "Neurontin champions." These doctors would promote Neurontin to their peers through peer selling programs by (a) touting Neurontin's supposed off-label uses; (b) claiming that Neurontin was being widely used by other physicians for off-label uses; (c) suggesting mechanisms of action that could explain Neurontin's supposed effictivness in off-label areas, even though the mechanism of action in any area was not, and still is not, understood; and (d) claiming that they were privy to the latest clinical data that had not been released yet, but which would support off-label use.

51.    To lure physicians to participate in the Peer Selling Scheme, Defendants approached target doctors and informed them of Parke-Davis's interest in funding research opportunities and clinical trials at their institutions. Doctors who were willing to speak favorably about Neurontin could likely receive substantial funds in the form of research grants. Parke-Davis instructed its sales departments to select doctors at the major teaching hospitals to become "Neurontin experts" who would in turn deliver the Neurontin message to other physicians to grow Neurontin sales. This could be done formally to other physicians at marketing events or informally to colleagues within a hospital or medical practice.

52.    Having recruited these physicians, Defendants created an explosion in the off-label use of Neurontin by artificially creating the perception that physicians were clinically using Neurontin and investigating its efficacy in off-label uses on their own initiative, and not as a result of the illegal marketing activities. Defendants developed a stable of physicians to create this perception. Parke-Davis paid these physicians to induce

them to write journal articles and letters to the editor that favorably discussed the off-label use of Neurontin. Parke-Davis also paid these physicians (in addition to providing free travel to resorts, free lodging and free meals) to induce them to give talks at medical education seminars, advisory boards, consultants' meetings, speakers bureaus and similar events that favorably discussed the off-label use of Neurontin. The physicians, including Longmire, who accepted these benefits and agreed to promote Neurontin off-label to other doctors were physician participants in the Peer Selling Scheme. The individual physician participants received tens of thousands of dollars to promote Neurontin's off-label uses. Some individual physician participants received more than $100,000.

53.     Some physicians participated in the Peer Selling Scheme by publishing favorable journal articles and letters to the editor about off-label use of Neurontin. Parke-Davis paid large sums of money, often in the form of research grants, to the physician participants in order to publish such articles. In some cases, the physician was not required to perform any research or even write the article. Marketing firms were financed by Parke-Davis to ghostwrote articles under the physician participants' names. Physicians merely had to "lend" their names to the articles, in exchange for a payment.

54.     Physicians who participated in the Peer Selling Scheme, either as speakers or as authors, entered into a mutually advantageous relationship with Parke-Davis. The more favorable a physician's statements were, the more he or she could expect to receive in the form of speaker fees and research grants.

55.     The participating physicians knew that minimal, if any, scientific evidence supported the use of Neurontin for the off-label uses and that the type of clinical evidence that existed was insufficient, under the usual standards in the medical profession, to

21

represent that Neurontin worked for the unapproved indications. For example, on March

18, 2000, at a meeting in New York City of participating physicians who were planning

new "educational" programs regarding off-label Neurontin usage, one psychiatrist

admitted to his colleagues:

> (A)lmost everything I'm talking about [reports of successful off-label
> Neurontin usage] appears in the form of letters to the editor or open case
> series. The amount of controlled trials, the evidence base for this, is not
> very good. And there is a sense of feeling awkward -- Elizabeth, this is
> something we should address -- there's a sense of getting up there and
> talking about these things [off-label Neurontin usage] when, maybe, at
> best, there might be one or two controlled trials that support a given use.
> So, clinical use is running way ahead of what research is giving us. I
> mean, I can't remember, in psychiatry, anything like this, where there's
> such extensive use of drugs, without there necessarily being an indication
> or the data we would consider gold standard. So, one of the questions that
> I have for you to think about is, can we really say with any certainty that
> these drugs really work in the way that we're reporting? How confident
> are you, individually or as a group, that even without the clinical trials,
> that we can get up in front of clinicians and say, look, trust us that these
> things do work?

56.    These doubts, as well as the limitations of the evidence that supported

Neurontin's off-label use and the fact that the type of evidence assembled by Defendants

would in any other circumstance be insufficient to permit a recommendation for off-label

usage, were facts that had to be reported to the physicians attending events where the

participating physicians spoke, in order to avoid the other information they presented

from being misleading. However, despite acknowledgements that the limitations of

Defendants' evidence had to be addressed, these facts were never disclosed at the events

produced through the Peer Selling Scheme or the journal articles created.

22

2.    Publication Scheme

a.    Introduction

57.    In order to execute their publication strategy, Defendants also needed to generate favorable articles about Neurontin's off-label uses. However, Defendants' control of this strategy had to be kept secret. Articles had to appear as if they emanated from independent physicians who were investigating Neurontin independently. To perform these tasks Defendants established the Publication Scheme to create publications that appeared to be independent.

58.    Defendants created the Publication Scheme to hire non-physician technical writers to create the necessary articles and then paid actual specialists to be the articles' "authors." This practice is referred to as "ghostwriting."

59.    In order to monitor the status of publications, and in order to coordinate and execute the ghostwriting plan, marketing firms were necessary. The role played by such marketing firms in assisting the Defendants in creating publications was very similar to the role played by marketing firms in the coordination of peer-to-peer marketing events.

b.    Misrepresentations and Misleading Statements In Articles Created or Controlled Through the Publication Scheme

60.    Publications that Defendants distributed as part of their Publication Scheme intentionally misrepresented Defendants' role in the creation and sponsorship of the publications. Physicians who reviewed these publications were led to believe that the publications were the independent, unbiased research of the authors of the articles. They were not made aware of the fact that Defendants had in fact solicited these articles or that

23

they had paid significant sums of money in various forms to the physician authors to induce them to make favorable statements about Neurontin.

61.    For example, an article widely circulated by Defendants concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick had not and never would receive financial benefit from anyone with an interest in Neurontin. The Mellick brothers had in fact received tens of thousands of dollars for acting as speakers at Defendants' events. Moreover, Gary Mellick never disclosed that he was a consultant with Parke-Davis and was assisting the Company in developing the market for off-label uses of Neurontin.

62.    Even in cases where physician-authors drafted the articles themselves, they did so under the direction and control of Defendants. Physicians were promised grants and other gifts if they wrote favorable articles. If a physician attempted to write a negative article, Defendants would attempt to intervene and have a more favorable draft written. If this failed, Defendants would use their best efforts to suppress the article or restrict its dissemination.

63.    For example, in 1996, Parke-Davis funded a placebo-controlled clinical trial conducted by Dr. Kenneth Gorson, a doctor at St. Elizabeth's Hospital in Boston, Massachusetts. On August 23, 1997, Gorson submitted a draft of his study to Parke-Davis, accompanied by an abstract. The results of Gorson's study were negative. Gorson's abstract plainly stated that the study did not support Neurontin's use for diabetic peripheral neuropathy. Its conclusion stated that gabapentin "is probably no more effective than placebo in the treatment of painful diabetic neuropathy."

24

64.    Defendants attempted to revise the draft abstract to give it a more favorable conclusion. In January 1998, Parke-Davis circulated a different abstract of the Gorson article which contained the revised conclusion. The conclusion of the abstract circulated by Parke-Davis stated: "Gabapentin may be effective in the treatment of painful diabetic neuropathy. Our results suggest that further studies evaluating higher dosages of gabapentin are warranted." Dr. Gorson refused to adopt this revision.

65.    Despite Gorson's refusal to "sugarcoat" his manuscript, Parke-Davis still attempted to control the content of the article. Parke-Davis submitted to the Drugdex Drug Information System ("Drugdex"), a widely used computer database that contains drug information and article citations, a draft of the article which contained language consistent with the false abstract circulated by Parke-Davis but which was not contained in the actual article. Based on this false information, Drugdex published a citation for the Gorson article, which falsely stated: "the authors suggest that higher doses of gabapentin are needed." No such language is in the article. The Drugdex article omits the author's conclusion that gabapentin is "probably ineffective" for the treatment of painful diabetic neuropathy.

66.    Defendants took similar steps to misrepresent conclusions regarding Neurontin's effectiveness in the treatment of other unapproved uses.

### c.    Misrepresentations Through Trials

67.    Another method by which Defendants controlled the stream of published information was through its policy of publishing only favorable results of its own internal trials and suppressing results that were unfavorable. In the case of an early trial that failed to show Neurontin's efficacy for migraine, the results were never published. In the

25

case of a clinical trial that failed to show Neurontin's efficacy for bipolar disorder, the publication of results was delayed until the patent life was set to expire, and even then, Defendants never forwarded a copy of the article to Drugdex.

68.    Although Plaintiffs are aware of the policy of suppressing unfavorable studies because of the express terms of the corporate decisions implementing the Publication Strategy, all information regarding negative studies funded by Parke-Davis remains in the sole possession of Defendants and/or members of the Off-Label Promotion Scheme. Without access to records of the studies that were funded and the results of those studies, Plaintiffs cannot identify specific negative findings at this time.

E.    **Defendants' Use of the Entire Off-Label Promotion Scheme to Make False Statements to Physicians**

1.    **Introduction**

69.    When presenting off-label information about Neurontin to physicians in response to unsolicited requests for information on unapproved uses, Defendants were required to provide fair and balanced information. Defendants were also required to provide fair and balanced information whenever it engaged in promotional activities. Fair balance was not limited to written materials, but all presentations. Defendants knew that whenever they were required to provide fair and balanced information, federal law and industry standards required them to provide any negative information as well as positive information about their drug products.

70.    Within the medical community, in the context of describing properties of approved prescriptions drugs, the terms "effectiveness" and "efficacy" have specific and well understood meanings. Because the FDA will only find a drug product to be effective if the proposed use is supported by well designed, placebo-controlled clinical

26

trials that establish a causal relationship to a statistically significant degree, a statement that a drug is "effective," or "works," or "has been proven to . . ." is understood to mean that well controlled clinical studies support the use. To make such a statement without such clinical trial proof is misleading. Further, failure to inform physicians that no placebo-controlled clinical trials support a representation of drug efficacy is a violation of a pharmaceutical company's obligation to disclose.

71. Although Defendants have extensively promoted Neurontin for off-label purposes, few placebo-controlled, clinical studies have been conducted on off-label uses of Neurontin. Most of those that have been conducted were negative or inconclusive. For instance, placebo-controlled clinical trials for Neurontin's use for bipolar disorder, unipolar disorder, essential tremor, spasticity, controlled diabetic pain, and panic disorder have all failed to show that Neurontin is effective for those conditions.

72. Any presentation concerning Neurontin's use for indications other than those approved by the FDA that purports to rely on clinical or published evidence must also describe those clinical studies that have found that Neurontin is not effective for off-label uses. Where such information is not provided, any statements about Neurontin's effectiveness for off-label use is false, misleading, distorted, inaccurate, unfair, unbalanced, and omits material facts necessary to be disclosed.

73. Further, federal law and industry standards also prohibited Defendants from misrepresenting scientific evidence that supported (or failed to support) claims that a drug was effective for a specific condition. Thus, anecdotal evidence of a drug's usefulness for a given condition could not be presented as the equivalent of the findings

27

of a well-designed clinical trial. To fail to comply with these standards violated the Defendants' legal duty to provide accurate and non-misleading information.

74.    Defendants routinely and knowingly provided false, inaccurate, misleading, distorted, unfair and unbalanced information about Neurontin's use for unapproved indications. Without discovery, Plaintiffs cannot catalog each misrepresentation and/or misleading statement about Neurontin because Plaintiffs do not possess all transcripts of all meetings. The vast majority of these transcripts are in the possession of the Defendants and/or other members of the Off-Label Promotion Scheme. Plaintiffs have information, however, of misrepresentations, misleading statements and material omissions that were made in specific events as well as misrepresentations, misleading statements and material omissions that were likely made in numerous other events. A description of those false statements, misleading statements and material omissions follow.

### 2.    False and Misleading Statements About Pain

75.    At the presentations concerning Neurontin on pain, at least one of the presenters expressly stated or implied that Neurontin was effective for the treatment of pain. A representative statement was made by Longmire. Longmire was a participating physician, agent, employee, representative and/or independent contractor for Defendants at the time of the statement which was made at the Jupiter Beach consultants' meeting in April 1996. At that time, he stated that Neurontin was effective for the treatment of pain. Longmire repeated that statement at a May 1996 Consultants' Meeting at the Ritz Carlton in Boston. Another physician participant, Dr. Steven Schacter made a similar statement at the May 1996 meeting when he stated that "pain specialists are finding that low

28

dosages of Neurontin are effective." Plaintiffs are aware of comparable statements made by another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach Consultants' Meeting, in May 1996 at the Boston Ritz Carlton Consultants' Meeting and in June 1996 at a Philadelphia Consultants' Meeting. Similar statements were made at all events presented by Defendants that discussed Neurontin's use for pain indications.

76.    The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed. However, with the exception of Neurontin's use for postherpetic neuralgia, no clinical trial evidence exists that supports any claim that Neurontin is effective for the treatment of any other type of pain.

77.    In none of the presentations in which Neurontin's use for pain was promoted did the physician participant or any person connected to Defendants acknowledge that there was no clinical trial evidence to support a claim of efficacy. Defendants' failure to disclose this material information made any statement stating that Neurontin was effective for any pain syndrome other than postherpetic neuralgia false and misleading.

78.    At every presentation concerning Neurontin's use for pain, neither the participating physicians, nor the participating vendors, nor the Defendants informed the attendee physicians that Defendants had deliberately suppressed negative studies pursuant to the Publication Scheme. Negative studies did in fact exist that indicated or found that Neurontin was not effective for pain, and information regarding these studies was not disclosed.

79.    At every presentation concerning Neurontin's use for pain, anecdotal

evidence was presented to support Neurontin's use.  At none of the presentations,

however, was anecdotal evidence presented of Neurontin's failure to treat pain, even

though such evidence had been made known to Defendants.  Defendants' intentional

failure to provide a fair and balanced presentation of the anecdotal information

concerning Neurontin's treatment for pain made their presentation false and misleading.

80.    Although they were not supposed to discuss off-label indications with

physicians, Parke-Davis sales representatives regularly made false statements to doctors

about Neurontin's utility in treating pain.  The following are representative false

statements by the sales force.  Similar statements were regularly made by the Parke-Davis

sales forces from 1999 through 2004.

> * In October 1995, a Parke-Davis sales representative stated that Neurontin had
> received a "[n]ew indication for chronic pain."
>
> * In December 1995 a Parke-Davis sales representative stated that Neurontin was
> a "[g]ood anticonvulsant for chronic pain and restless leg syndrome."
>
> * In July 1996, a Parke-Davis sales representative stated that Neurontin was
> "[e]ffective for many types of chronic pain."
>
> * In December 1996, a Parke-Davis sales representative stated that Neurontin was
> "[g]ood for back pain; neuropathic pains."

### 3.    Statements Regarding Diabetic Peripheral Neuropathy

81.    Although Parke-Davis had no reasonable basis to claim or suggest that

Neurontin was effective or could be possibly effective to treat diabetic peripheral

neuropathy, at events produced by Parke-Davis, physician participants routinely stated

that Neurontin was effective for this condition.  A representative statement was made at

the Jupiter Beach Consultants Meeting in April 1996, when Dr. Nicholson stated that

30

diabetic neuropathy patients "will" have their burning sensations relieved. Similar statements were made at all events presented by Defendants that discussed Neurontin's use as a treatment for diabetic peripheral neuropathy.

82.    There was no clinical trial support for this assertion. In fact, in 1996 Defendants had requested the Dr. Gorson study discussed at ¶¶ 63-65, *supra*. Dr. Gorson concluded by 1997 that Neurontin was probably ineffective to treat diabetic peripheral neuropathy.

83.    Yet, Defendants continued to present numerous events at which Neurontin's use for diabetic peripheral neuropathy was promoted. The physician participants at these presentations failed to describe the results and conclusions of Dr. Gorson's study, and Defendants' representatives at these events also did not provide such information. Defendants' failure to describe negative studies as well as positive studies breached their obligation to provide fair and balanced information and made their representations regarding Neurontin's use for diabetic peripheral neuropathy false and misleading.

### 4.    Representations Regarding Restless Leg Syndrome ("RLS")

84.    At events produced by Defendants, physician participants routinely stated that Neurontin was effective for the treatment of Restless Leg Syndrome ("RLS").

85.    The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed. However, as discussed below, the clinical studies in existence do not find that Neurontin is effective for the treatment of RLS.

86.    In the presentations in which Neurontin's use for RLS was promoted, neither the physician participants nor any person connected to Defendants acknowledged the lack of any clinical trial evidence to support a claim of efficacy. Defendants' failure to disclose this material information made any statement stating that Neurontin was effective for these indications false and misleading.

87.    At every presentation concerning Neurontin's use for RLS, neither the participating physicians, the participating vendors, nor the Defendants informed the attendee physicians that Defendants had deliberately suppressed negative studies pursuant to the Publication Scheme. As described below, at least one negative study existed which found that Neurontin was not effective for RLS, and the results of this study were never disclosed when Neurontin's use for RLS was discussed.

88.    In 1996, Parke-Davis funded a study conducted by Dr. Bruce Ehrenberg of the New England Medical Center on whether Neurontin was effective for periodic limb movement, a sleep disorder closely related to RLS. Dr. Ehrenberg's study was negative. Less than half the participants who took the drug had improved sleep, and Neurontin had no effect on more than half. Moreover, the drug did not affect any of the participants' limb movements during sleep.

89.    Parke-Davis's medical liaisons (discussed in ¶¶ 142-144, *infra*) falsely told physicians that Dr. Ehrenberg's patients had a 90% response rate to Neurontin. In a June 1996 conference call taped by Dr. David Franklin (the qui tam relator), medical liaisons discussed making such assertions routinely. Neither medical liaisons nor physician participants amended their statements to physicians once the results of Dr. Ehrenberg's study were known.

32

90.     Former Parke-Davis officials have admitted that although the results were not favorable, the results of Ehrenberg's study should have been published and made known to clinicians. Indeed, Parke-Davis hired companies to organize this data and to develop a manuscript for him. After the results were received, however, Parke-Davis took no steps to publish an article based on Dr. Ehrenberg's results. Parke-Davis's actions were consistent with the publication strategy, which only intended to publish studies with favorable results. Parke-Davis's policy of only publishing and disclosing the results of favorable studies directly violates its obligation to disclose favorable and unfavorable results.

91.     Although they were not supposed to discuss off-label indications with physicians, Parke-Davis sales representatives regularly made false statements to doctors about Neurontin's utility in treating RLS. The following are representative false statements by the sales force. Similar statements were regularly made by the Defendants' sales forces from 1999 through 2004.

    * In August 1996, a Parke-Davis sales representative falsely stated that Neurontin was "Effective in controlling postherpetic pain; restless leg syndrome, peripheral neuropathy, migraine headache."

    * In December 1996, a Parke-Davis sales representative stated that Neurontin was "Good for restless leg syndrome."

### 5.     Representations Regarding Bipolar Disorder

92.     In May 1995, when Parke-Davis created its original marketing assessment for the use of Neurontin to treat bipolar disorder, which is commonly called manic depression, it knew that there was no scientific rationale for Neurontin being an effective agent for treatment. Nonetheless, it planned to promote, and intended the Off-Label Promotion Scheme to promote, Neurontin heavily for bipolar disorder.

33

93.    At events produced by Parke-Davis, physician participants routinely stated that Neurontin was effective for the treatment of bipolar disorder.

94.    The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed, but as discussed below, clinical studies that were conducted did not find that Neurontin is effective for the treatment of bipolar disorder.

95.    At every presentation sponsored by Parke-Davis on the use of Neurontin for bipolar disorder, physicians were not informed that there was no scientific basis for using Neurontin, and Parke-Davis failed to inform the physician attendees of material information that was required to be presented in order for its statements on the use of Neurontin to not be misleading and false and to satisfy its obligation to provide fair and balanced information.

96.    By the third quarter of 1997, Parke-Davis knew that the results of its own clinical trial of Neurontin showed that a placebo was more effective than Neurontin in treating bipolar disorder.

97.    Although Parke-Davis knew the results of its negative bipolar disorder clinical trial as early as 1997, it did not publish the results until 2000. Nor did it halt the sponsorship of events that promoted Neurontin as an effective treatment of bipolar disorder and other psychiatric conditions.

98.    Regardless of the clinical trial results, Parke-Davis continued to make presentations to physician attendees where Neurontin was promoted for use with bipolar disorder patients. In most of these presentations, the attendee physicians were not

34

informed of the negative clinical trial evidence. For example, Parke-Davis created and sponsored a series of dinner meetings for psychiatrists entitled "Closing the Psychiatry-Neurology Divide: Emerging Uses of Anticonvulsants." This program was presented dozens of times in 1998, including one in St. Petersburg, Florida at Patrick's Bayside Inn. As part of the program, psychiatrists were informed Neurontin was indicated for bipolar disorder, that early evidence suggested that it had anti-depressive and mood-stabilizing effects, and that "data are increasing but currently limited to favorable case reports and open trials." The program did not inform attendees of the unfavorable clinical trials that found that Neurontin was not effective for bipolar disorder and that it was less effective than a placebo.

99.     Although they were not supposed to discuss off-label indications with physicians, after placebo-controlled clinical results established that Neurontin was not effective for the treatment of bipolar disorder, Parke Davis's sales force nonetheless regularly made false statements about Neurontin's utility in treating bipolar disorder. Similar statements were regularly made by the Defendants' sales forces at least from 1999 through 2004. Representative statements made to physicians include:

* At a Parke-Davis marketing event in 1997, Parke-Davis falsely stated that Neurontin was "effective" for "bipolar."

* In December 1998, a Parke-Davis sales representative falsely stated to a physician that Neurontin was an "effective treatment of bipolar disorder."

* At a Parke-Davis marketing event in December 1998, Parke-Davis falsely stated that Neurontin was "Effective on bipolar."

* At a Parke-Davis marketing event at the airport Marriott in San Francisco in August 1998, Parke-Davis falsely stated that Neurontin was "Innovative and effective ...for bipolar II."