# EXHIBIT 34

*In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*

## EXPERT REPORT OF HENRY G. GRABOWSKI

### I.  Qualifications

1)      I am a Professor of Economics at Duke University. I received my B.S.

degree from Lehigh University in 1962. In 1967, I obtained a Ph.D. in Economics

from Princeton University. I have been Director of the Program in

Pharmaceuticals and Health Economics at Duke University since 1983. This

program performs academic research studies on the economics of the

pharmaceutical and biotechnology industries. I have also held visiting scholar

appointments at the International Institute of Management in Berlin, Germany, the

Health Care Financing Administration in Washington, D.C., the Office of Health

Economics in London, and the Centre for Medicines Research in London.

2)      My academic and research specialties are the pharmaceutical industry,

economics of innovation, government regulation of business, and industrial

organization. I have studied the economics of pharmaceuticals over most of my

career and have published numerous articles and books on this industry. Under a

series of grants from the National Science Foundation and other organizations, I

have investigated a number of economic and policy issues involving the

pharmaceutical industry. I teach a graduate course at Duke University called

"Economics and Management of the Pharmaceutical Industry."

3)      I have testified several times before Congressional committees and U.S.

regulatory bodies on pharmaceutical industry issues. For example, since 1994, I

have testified on issues involving effective patent life and generic competition in pharmaceuticals, the Clinton Administration's health reform legislation, the federal government's policy toward children's vaccines, and regulatory pathways for generic biologics. I have been an advisor and consultant to the National Academy of Sciences, the Institute of Medicine, the Federal Trade Commission, the General Accounting Office, and the Office of Technology Assessment.

4)    A copy of my current resume is attached as Appendix A. I have served as an expert witness in several prior cases involving issues in the pharmaceutical industry. A list of cases in which I have testified during the past four years is attached as Appendix B.

## II. Assignment

5)    I have been asked by counsel for the defendants in this matter (Pfizer, Inc. and Warner-Lambert Company, collectively "Pfizer") to undertake the following:

a.  Address the assertion made by Plaintiffs' counsel, but not their experts, that there would only have been a *de minimis* number of Neurontin off-label prescriptions, written by a *de minimis* number of physicians, absent the allegedly improper promotion.

b.  Analyze other factors that could have affected off-label prescribing of Neurontin.

    c.   Review the declaration of Dr. Rena Conti ("Conti Declaration")[1] and the extent to which her declaration addresses any causal impact of the challenged conduct on off-label prescribing for Neurontin.

    d.   Assess the validity of the methods used in the Conti Declaration to quantify the number of prescriptions of Neurontin for off-label uses, and the number of physicians prescribing Neurontin.

6)    In the course of my work on this case, I have reviewed a variety of materials including academic articles, legal pleadings, data and documents produced in this case, depositions, expert declarations, and other relevant materials. A complete list of the materials I have considered is attached as Appendix C. As this case is on-going, I reserve the right to revise my opinions as new documents, data, and testimony are made available to me. I am being compensated at my regular hourly rate of $700.

## III. Summary Of Opinions

7)    In the Memorandum Of Law In Support Of Plaintiffs' Renewed Motion For Class Certification filed on December 19, 2007 ("Plaintiffs' Memorandum of Law"), Plaintiffs' counsel assert without citing any supporting authority that the increases in Neurontin prescriptions for various off-label indications depicted in their charts are overwhelmingly attributable to the allegedly improper promotion. Setting aside any factual disputes regarding the accuracy of the events presented in Plaintiffs' Memorandum of Law, from an economist's perspective, this causal

---

[1] All references in this report to the Conti Declaration are to Dr. Conti's revised declaration dated February 21, 2008.

assertion is fatally flawed because Plaintiffs' counsel have failed to acknowledge and exclude any alternative potential causes of increases in off-label Neurontin prescriptions. This shortcoming in Plaintiffs' counsel's assertion of causation is all the more apparent because of the numerous factors other than allegedly fraudulent promotion that likely had a significant impact on off-label prescribing of Neurontin. These factors include, among others, physicians' positive experiences with Neurontin in the treatment of the various indications at issue in this case, physicians' positive experiences with other anti-epileptic drugs ("AEDs") in the treatment of those same indications, new scientific evidence of the effectiveness of Neurontin in the treatment of the various indications at issue in this case or related indications, approval of Neurontin by the Food and Drug Administration ("FDA") and governmental bodies in other countries for the treatment of the various indications at issue in this case or related indications, and the characteristics of Neurontin that make it particularly suitable for off-label prescribing.

8)  Because they do not consider other factors likely influencing the off-label prescribing of Neurontin, Plaintiffs' counsel provide no economically valid basis for concluding that there would have been a *de minimis* number of Neurontin prescriptions for off-label uses, written by a *de minimis* number of physicians, absent the allegedly improper promotion.

9)  Because of the wide range of factors other than the challenged conduct that may have caused off-label Neurontin prescriptions, individual inquiry would be required to determine which prescriptions resulted from the challenged conduct.

This is because the numerous factors that affect the prescription-writing behavior of physicians are inherently specific to each prescribing physician and patient.

10)      According to my review, and by her own admission, Dr. Conti has conducted no analysis—and is offering no opinion—regarding the causal relationship between the allegedly improper promotion and the off-label prescribing for Neurontin.

11)      Dr. Conti's calculations of the number of off-label prescriptions of Neurontin and the number of physicians within a specialty prescribing Neurontin are flawed for several reasons. In particular, her reliance on IMS National Disease and Therapeutic Index ("NDTI") data to allocate prescriptions to different indications is problematic because of the NDTI data's imprecision and the lack of correspondence between NDTI's measure of "uses" and actual prescriptions.

12)      Although neither Plaintiffs' counsel nor Dr. Conti refer in their papers to the declarations submitted by Prof. Rosenthal in support of Plaintiffs' prior motion for class certification ("Rosenthal Declaration" and "Rosenthal Reply"), I have reviewed those declarations and Prof. Rosenthal's testimony as part of my work in this matter. Those materials confirm that numerous factors other than allegedly improper promotion would have affected off-label prescriptions of Neurontin. In fact, Prof. Rosenthal acknowledges, as noted by the Court in its class certification decision, that because of the multiple factors affecting off-label prescriptions her model could not identify which Neurontin prescriptions were allegedly caused by the challenged conduct and which concededly were caused by other factors.

**IV. Plaintiffs' Counsel Have Not Offered An Economic Basis To Conclude That Only A *De Minimis* Number Of Off-Label Neurontin Prescriptions Would Have Been Written Absent The Challenged Conduct**

### A. Overview Of Plaintiffs' Claims

13)     Plaintiffs' counsel repeatedly assert in their Memorandum of Law that their charts of Neurontin use[2] over time illustrate the "impact" of allegedly fraudulent promotion on off-label Neurontin use, or the "causal relationship" between the two.[3]

14)     Plaintiffs' counsel point to, among other things, the publication and distribution of various journal supplements, seminars, meetings, CME programs and teleconferences for physicians as examples of improper promotion.[4]  They also highlight the publication of allegedly misleading articles and the omission of references to studies with negative results.[5]

15)     To support their assertion that such events caused the displayed trends in off-label use of Neurontin, Plaintiffs' counsel simply display the selected events on a series of charts showing Neurontin off-label use over time and conclude that the increases in off-label use were overwhelmingly caused by the challenged conduct.[6]  No attempt is made to account for other factors that were likely to have

---

[2] Plaintiffs' counsel define off-label use based on NDTI data from IMS health on the number of times Neurontin is involved in some way in a physician's visit.  Among other things, such "use" can involve a prescription, a free sample, a recommendation, or a discussion of Neurontin without it being issued in any way to the patient. (See IMS Health, National Disease and Therapeutic Index Drug Volume I, 1Q 2006, pp.5, 28, 32)   In this declaration, I refer to Neurontin "use" as Plaintiffs' counsel do, but note that the data they rely upon do not correspond to numbers of actual Neurontin prescriptions.  See further discussion in paragraph 46 below.
[3] See for example Plaintiffs' Memorandum of Law, pp. 23-24.
[4] See Plaintiffs' Memorandum of Law, pp. 18-19, 24-28, 31-32.
[5] See Plaintiffs' Memorandum of Law, pp. 24-28, 31-32.
[6] See for example Plaintiffs' Memorandum of Law, pp. 23-24.

influenced off-label Neurontin use over time.  Plaintiffs' counsel have simply

asserted causation based on the observation that there was a small amount of off-

label use prior to the alleged onset of off-label marketing followed by an increase

in use afterwards, i.e., based on their assertion of a "close correlation" between

off-label use and off-label marketing of Neurontin.

16)      However, even if correlation existed, it would not prove causation.  Simple

correlation between two variables does not provide a measure of how much one

variable affects the other if additional influencing factors are omitted from the

analysis.  Plaintiffs' causal assertion is contrary to standard economic practice that

attempts to measure the causal impact of one factor (in this case the allegedly

improper promotion) on an outcome variable (in this case Neurontin's off-label

usage) by isolating the effect of that one factor from the effect of other factors that

influence the outcome variable.  In order to prove that the allegedly improper

promotion caused the overwhelming majority of off-label Neurontin use,

Plaintiffs must establish that other factors had no significant effect on Neurontin's

off-label use.  Apart from the allegedly improper promotion, Plaintiffs' counsel

have not addressed any of the various factors that may have affected off-label use

of Neurontin.

17)      Setting aside the fact that correlation does not prove causation, Plaintiffs'

counsel have also provided no basis for their assertion that there is a "close

correlation" between the allegedly fraudulent promotion and increases in

Neurontin off-label use.  For example, the NDTI data suggest that there were

increases in Neurontin's off-label usage even during periods in which no fraud is

alleged (e.g., in late 2002 for bipolar[7]; in 2002 for nociceptive pain[8]). Moreover, there were periods of decrease in off-label NDTI uses immediately following allegedly fraudulent events (e.g., the decrease in neuropathic pain uses in the fourth quarter of 1997 and first quarter of 1998 following the allegedly fraudulent September 1997 "Pain Weekend" and November 1997 "IM Supplement"[9]). More generally, Neurontin off-label NDTI uses continued to increase after the allegations regarding improper promotion of Neurontin started to become public in early 2000, and at no point through 2007 is there a decrease in Neurontin off-label usage to a *de minimis* level.[10] Furthermore, for dosages above 1800 mg, the level of epilepsy-related use *prior* to any alleged fraud is as high as it was in the final two years of the period in which the fraud was alleged to have occurred.[11]

**B. Numerous Factors Likely Influenced Off-Label Prescribing Of Neurontin**

18)     Many factors affect off-label prescribing of prescription medications. A review of the literature and expert reports in this case reveals uniform consensus that there are numerous factors unrelated to allegedly improper promotion that can affect off-label prescribing. This conclusion is unsurprising and is consistent with my years of experience as an economist specializing in healthcare issues. Moreover, the literature and expert reports in this case reveal that Neurontin in particular has characteristics making it especially suitable for off-label

---

[7] Plaintiffs' Memorandum of Law, Figure 7A, p. 23.
[8] Plaintiffs' Memorandum of Law, Figure 9A, p. 29.
[9] Plaintiffs' Memorandum of Law, p. 25; Figure 8A, p. 28.
[10] Conti Declaration, Figure 5. Dr. Conti's figures for Neurontin also overstate the decrease in Neurontin use since 2003 as they do not include prescriptions written for Neurontin's generic equivalent, gabapentin, after its introduction in August 2004.
[11] Plaintiffs' Memorandum of Law, Figure 23A, p. 38.

prescribing. Any economist seeking to explain the causes of Neurontin off-label prescribing would have to develop an understanding of all these general and Neurontin-specific factors likely affecting off-label prescribing of Neurontin and control for them in his or her analysis. Plaintiffs' counsel, however, have not addressed or even acknowledged any factor other than alleged improper promotion.

### i. Off-Label Prescribing in General

19)      As an initial matter, off-label prescribing (i.e., the use of an FDA-approved drug for an indication other than an indication approved by the FDA) is a common phenomenon and accepted clinical practice.[12] Physicians are the main decision makers in the prescribing of drugs such as Neurontin and aim to find the best available treatment option for their patients. In fulfilling those obligations, physicians will often conclude that an off-label treatment is best. Otherwise stated, lack of FDA approval for a particular indication does not mean that a drug should not be prescribed.

20)      Physicians choose to write off-label prescriptions for a variety of reasons. One reason is that the pace of medical and scientific discoveries is much faster than the FDA approval process.[13] Not only is medical research continuously performed and reported, but physicians also test out medications to see the results and discuss those results with colleagues. Indeed, the off-label use of a drug for a

---

[12] Plaintiffs' own expert, Prof. Meredith Rosenthal, agrees that off-label prescribing is a routine part of clinical practice. (Rosenthal deposition, 10/24/06, p. 212.)
[13] Tabarrok, A.T., "Assessing the FDA via the Anomaly of Off-Label Drug Prescribing," *Independent Review*, Volume 5(1), Summer 2000; Klein, D.B., and A.T. Tabarrok, "Who Certifies Off-Label?" *Regulation*, Summer 2004, pp. 60-63.

particular indication is frequently endorsed in medical reference guides long before the drug receives FDA approval.

21)     A second reason that off-label prescribing is common is that, for many indications, the available FDA-approved medications do not provide adequate treatment for a large number of patients. In such situations, physicians will innovate and try new drugs when theory suggests there may be a benefit to a patient.[14] This is especially true when on-label treatment options are limited, have many contraindications, and/or have poor side-effect profiles.[15] In contrast, when a drug is relatively safe (e.g., it has a good side-effect profile and few contraindications) it will represent a low-risk choice for the physician and the patient, and physicians will be more likely to prescribe it off-label.

22)     AEDs in particular have a high level of off-label prescribing. According to the same NDTI data source relied upon by Dr. Conti, AEDs other than Neurontin were already heavily used for the exact same off-label indications at issue in this case at the time Neurontin came on the market, and continued to be used for those same off-label indications with increasing frequency in the years that followed. (See Exhibit 1A.) At the start of 1994, NDTI reports nearly 700,000 total quarterly uses for all AEDs excluding Neurontin for the off-label indications at issue in this case, with increases in later years, peaking at approximately 1.5 million uses in the fourth quarter of 2002. Looking at all off-label uses of AEDs

---

[14] Tabarrok, A.T., "Assessing the FDA via the Anomaly of Off-Label Drug Prescribing," *Independent Review*, Volume 5(1), Summer 2000; Klein, D.B. and A.T. Tabarrok, "Who Certifies Off-Label?" *Regulation*, Summer 2004, pp. 60-63.
[15] See, for example, Expert Report of Dr. Shawn Bird, 11/29/06, p. 3; Expert Report of Alan M. Rapoport, 12/1/06, p. 3.

excluding Neurontin, NDTI reports approximately 1.3 million quarterly off-label uses at the start of 1994 with a peak of 2.7 million in the second quarter of 2003. (See Exhibit 1B.)

23)    Moreover, according to NDTI estimates, there are numerous examples of individual AEDs that exhibited sharp growth in off-label use following their introductions. (See Exhibit 2A-2G, showing NDTI uses of Depakote ER, Gabitril, Keppra, Lamictal, Topamax, Trileptal, and Zonegran, for the off-label indications at issue in this case).

24)    In sum, off-label prescribing is an extremely common phenomenon, particularly among AEDs. In addition, numerous AEDs have experienced sharp growth in off-label use after their introductions. Therefore, it cannot be presumed that high off-label usage levels or sharp increases in off-label use are the result of improper promotion. Particularly in the case of AEDs, such patterns are common and may be attributable to numerous factors, as discussed in the following sections.

### ii. Physicians Rely on a Wide Range of Sources in Making Their Prescribing Decisions

25)    Not unlike other decision-making situations, prescription decisions are based on a wide range of factors that are specific to each prescribing physician and patient. Such factors include, among other things, knowledge of the efficacy and side-effect profile of a drug, availability of alternative drugs to treat the patient's condition, knowledge of the benefits of using a drug in closely related indications, and knowledge of the use of similar drugs to treat the relevant indication.

Plaintiffs' experts Dr. Conti and Prof. Rosenthal agree that a wide range of factors affect drug prescriptions.[16]

26)    Physicians accumulate knowledge about a drug from a number of different sources including: physicians' experiences prescribing the drug and observing its efficacy and side effects, published research, medical reference guides, discussions with colleagues, lectures and conferences, and theories advanced by scientists and scientific bodies.[17]

27)    Developments over time will affect this pool of knowledge from which physicians draw in making their prescribing decisions.  Among many other things:  new articles may come out in academic publications, reference guides, and other sources, as clinical research is conducted; new FDA approvals may occur, suggesting additional potential uses for a particular medication or related medications; approvals in foreign countries may affect prescribing decisions; and the medical community's growing experience with a medication, or class of medications, may lead to new discussions, new prescription ideas, and new standards of care.[18]

28)    The role of experience in determining prescribing decisions is significant because prescription medications are experience goods.[19]  Physicians learn about

---

[16] Rosenthal deposition, 10/25/06, pp. 320-336; Conti deposition, 2/13/08, pp. 453-454.
[17] Klein, D.B. and A.T. Tabarrok, "Who Certifies Off-Label?" *Regulation*, Summer 2004, pp. 60-63.
[18] Klein, D.B. and A.T. Tabarrok, "Who Certifies Off-Label?" *Regulation*, Summer.2004, pp. 60-63.
[19] See, for example, Berndt, Ernst R., "The U.S. Pharmaceutical Industry: Why Major Growth In Times Of Cost Containment?" *Health Affairs*, Volume 20(2), 2001, pp. 100-114; Berndt, Ernst R. , "Pharmaceuticals in U.S. Health Care: Determinants of Quantity and Price," *The Journal of Economic Perspectives*, Fall 2002, pp. 45-66; Azoulay, Pierre, "Do Pharmaceutical Sales Respond to Scientific Evidence?," *Journal of Economics & Management Strategy*, Volume 11(4), Winter 2002, pp. 551-594; Coscelli, Andrea, and Matthew Shum, "An Empirical Model of Learning and Patient Spillovers in New Drug Entry," *Journal of*

the efficacy, side-effect profile, and contraindications of drugs over time. Plaintiffs' expert, Prof. Rosenthal, agrees that the accumulated learning about the characteristics of Neurontin by a physician would likely influence his or her off-label prescribing decisions.[20]  Medical experts who have filed reports in this case and doctors who have provided deposition testimony in this case uniformly confirm this point.[21]

### iii. Factors Influencing Off-Label Prescribing of Neurontin in Particular

29)     The above discussion applies with particular force to Neurontin.  It is likely that numerous factors would have led to significant off-label prescribing of Neurontin wholly apart from any alleged improper promotion, including: the prevalence of off-label prescribing in general; the characteristics of Neurontin that make it an obvious candidate for off-label prescribing; physicians' positive experiences with Neurontin and other AEDs in treating the relevant conditions; and the numerous developments over time pertaining to Neurontin that likely underscored Neurontin's utility in treating a variety of off-label conditions and contributed to such uses.

---

*Econometrics,* Volume 122(2), 2004, pp. 213–246; Ching, Andrew, and Masakazu Ishihara, "The Effects of Detailing on Prescribing Decisions under Quality Uncertainty," *Draft Paper,* August 2006.
[20] Rosenthal deposition, 10/24/06, p. 257.
[21] See, for example, Expert Report of Dr. Samuel Potolicchio, 12/8/06, p. 1.  See also paragraph 34 below.

*Benign side-effect profile and demonstrated off-label efficacy in areas with few treatment options*

30)    As confirmed by several medical experts who have submitted reports in this case, Neurontin is a good candidate for off-label use because of its benign side-effect profile, lack of contraindications, and demonstrated efficacy for off-label conditions with few alternative treatment options.

31)    Dr. Shawn Bird, a neurologist who treats neuropathic pain, explained in his expert report that before the introduction of Neurontin, the side-effect profile of the available treatment options (which were also off-label) often precluded their use.[22] He describes Neurontin as having "few limiting side-effects" and agrees that because it is not metabolized, Neurontin has "no drug-drug interactions."[23] The other medical experts who have filed reports for this case agree that Neurontin has a benign side-effect profile and that drug-drug interactions are rare.[24]

32)    These medical experts also make clear that the on-label treatment options for many of the indications at issue in this case were limited and sometimes non-existent. According to Dr. Bird, until August 2004, there were no drugs with FDA approval to treat neuropathic pain.[25] Dr. Alan M. Rapoport, a neurologist focusing on the treatment of headaches, discusses the four on-label treatment

---

[22] Expert report of Dr. Shawn J. Bird, 11/29/06, p. 3.
[23] Expert report of Dr. Shawn J. Bird, 11/29/06, pp. 3-4.
[24] Expert report of Dr. Samuel Potolicchio, 12/8/06, pp. 2-3; Expert report of Alan M. Rapoport, M.D., 12/1/06, pp. 3-4; Expert report of Andrew E. Slaby, M.D., PH.D., M.P.H., p. 13. Prescribing physicians who have been deposed in this case have also testified that Neurontin's safety profile was an important determinant of their decision to prescribe Neurontin off-label. Deposition of Kylene Huler, M.D., 11/1/06, p. 40; Deposition of Vithal Dhaduk, M.D., 11/12/06, pp. 33-34.
[25] Expert report of Dr. Shawn J. Bird, 11/29/06, p. 2.

options for migraine prevention in his expert report. He notes that two are beta

blockers with limited effectiveness and many adverse side effects and

contraindications and the other two are anticonvulsants both of which have more

serious side-effect profiles than Neurontin.[26]

33)　　Even when on-label treatment options can be used for most patients, they

may be inappropriate or ineffective for a subset of patients. Dr. Andrew Slaby, a

clinical psychiatrist, explained in his expert report that off-label medications are

prescribed for psychiatric disorders because often "available medications fail to

provide any relief or only partial relief of symptoms" and may be "precluded

because of other conditions" of the patient.[27] He notes that physicians "seek out

alternatives that have hope of providing symptomatic relief or cure with minimal

adverse effects."[28] Another medical expert, Dr. Samuel Potolicchio, notes that

when addiction to narcotics is a concern, anticonvulsants may be considered as a

potential alternative for the treatment of pain.[29]

34)　　The medical experts also specifically note the importance of past experience

with Neurontin as an influence on their current decisions to prescribe Neurontin

for off-label uses. For example, Dr. Bird notes that he has used Neurontin as a

first-line agent for patients with neuropathic pain for ten years because "it clearly

is as effective in my experience, if not more so, than any other drug available for

this use" and "it is the best tolerated drug for this use, with the least bothersome

---

[26] Expert report of Alan M. Rapoport, M.D., 12/1/06, p. 3.
[27] Expert report of Andrew E. Slaby, M.D., PH.D., M.P.H., pp. 3-4.
[28] Expert report of Andrew E. Slaby, M.D., PH.D., M.P.H., p. 4.
[29] Expert report of Dr. Samuel Potolicchio, 12/8/06, p. 1.

side-effects and no requirement for blood monitoring."[30] Dr. Rapoport states that he tried Neurontin because of its benign side-effect profile and found that it helped close to half the patients he put on it and never had serious side effects.[31] Dr. Slaby states in his report that, based on his own experience, Neurontin has "clearly brought many patients relief from painful psychological symptoms that other approved drugs failed to relieve or failed to completely relieve."[32, 33]

### Specific developments influencing the prescribing of Neurontin for various off-label conditions

35)    Numerous developments occurred during the class period that likely contributed to the increase in off-label prescribing of Neurontin and would have done so in the absence of any allegedly improper promotion. Neither Plaintiffs' counsel nor any of their experts have attempted to assess and quantify the effect of any of these developments or other factors on Neurontin's off-label usage.

36)    For example, during the class period, new information became available regarding the efficacy of Neurontin in the treatment of the indications at issue in this case. With regard to neuropathic pain, Dr. Bird cites as "particularly worthy of mention" six randomized clinical trials (RCTs) comparing Neurontin with a placebo and two RCTs comparing Neurontin with amitriptyline (an antidepressant

---

[30] Expert report of Dr. Shawn J. Bird, 11/29/06, pp. 5-6.
[31] Expert report of Alan M. Rapoport, M.D., 12/1/06, p. 3.
[32] Expert report of Andrew E. Slaby, M.D., PH.D., M.P.H., p. 13.
[33] The physicians deposed in this matter also confirm that direct experience with Neurontin has influenced their prescribing decisions. See, for example, deposition of Kylene Huler, M.D., 11/1/06, p. 40, deposition of Vithal Dhaduk, M.D., 11/12/06, p. 33., deposition of Rick Waldo, M.D., 2/1/08, pp. 27, 31, deposition of Robert Haynsworth, Jr., M.D., 2/1/08, pp. 21, 25-26.

previously shown to be effective in the treatment of neuropathic pain).[34]  These studies were published between 1998 and 2002 and all eight "demonstrated a beneficial effect" of Neurontin.  Dr. Bird further notes that the "extensive literature" supporting the use of Neurontin for other pain indications includes "a number of placebo-controlled clinical trials" that demonstrate the effectiveness of [Neurontin] in these disorders.[35]  These studies include the use of Neurontin for post-operative pain.[36]

37)    Similarly, Dr. Rapoport has reviewed "several published studies" on Neurontin uses for the treatment of migraine and specifically discusses two

---

[34] Expert report of Dr. Shawn J. Bird, 11/29/06, p. 4-5.  The six placebo-controlled trials are: Backonja, M., et al, "Gabapentin for the Symptomatic Treatment of Painful Neuropathy in Patients with Diabetes Mellitus," *JAMA*, Volume 280(21), 1998, pp. 1831-1836; Tamez-Perez, H.E., et al., "Use of Gabapentin on Neuropathic Pain," *Med. Interna Mex*, Volume 14, 1998, pp.145-155; Rowbotham, M., et al, "Gabapentin for the Treatment of Postherpetic Neuralgia: a Randomized Controlled Trial," *JAMA*,  Volume 280(21), 1998, pp. 1837-1842; Gorson, K.C., et al., "Gabapentin in the Treatment of Painful Diabetic Neuropathy: A Placebo Controlled, Double Blind, Crossover Trial," Journal of *Neurology. Neurosurgery and Psychiatry*, Volume 66(2), February 1999, pp. 251-252; Rice, A.S.C., S. Maton, "Gabapentin in Post-Herpetic Neuralgia: a Randomized, Double-Blind, Placebo Controlled Study," *Pain*, Volume 94(2), 2001, pp. 215-224; and Serpell, M.G., Neuropathic Pain Study Group, "Gabapentin in Neuropathic Pain Syndromes: a Randomized, Double-Blind, Placebo-Controlled Trial," *Pain*, Volume 99(3), 2002, pp. 557-566.  The two trials comparing Neurontin to amitriptyline are: Morello, C.M., et al., "Randomized Double-Blind Study Comparing the Efficacy of Gabapentin with Amitriptyline on Diabetic Peripheral Neuropathy Pain," *Archives of Internal Medicine*, Volume 159, September 1999, pp. 1931-1937; and Dollocchio, C., et al., "Gabapentin vs. Amitriptyline in Painful Diabetic Neuropathy," *Journal of Pain and Symptom Management*, Volume 20, 2000, pp. 280-285.
[35] Expert report of Dr. Shawn J. Bird, 11/29/06, p. 5.
[36] Expert report of Dr. Shawn J. Bird, 11/29/06, p. 5.  Dr. Bird cites the following studies as examining Neurontin in the treatment of post-operative pain: Turan, A., et al., "Analgesic Effects of Gabapentin After Spinal Surgery," *Anesthesiology*, Volume 100(4), 2004, pp. 935-938; Turan, A., et al., "The Analgesic Effects of Gabapentin After Total Abdominal Hysterectomy," *Anesthesia Analog*, Volume 98, 2004, pp. 1370-3; Pandey, C.K., et al., "Regional Anesthesia and Pain," *Canadian Journal of Anesthesia*, Volume 51(10), 2004, pp.986-989; Rorarius, M.G.F., et al., "Gabapentin for the Prevention of Postoperative Pain After Vaginal Hysterectomy," *Pain*, Volume 110, 2004, pp. 175-181; Tuncer, S, et al., "Effect of gabapentin in postoperative pain: a randomized, placebo-controlled clinical study," *The Pain Clinic*, Volume 17(1), 2005, pp. 95-99; Gilron I, et al., "A Placebo-Controlled Randomized Clinical Trial of Perioperative Administration of Gabapentin, Rofecoxib and Their combination for Spontaneous and Movement-Evoked Pain After Abdominal Hysterectomy", *Pain*, Volume 131, 2005, pp. 191-200; Menigaux C, et al., "Preoperative Gabapentin Decreases Anxiety and Improves Early Functional Recovery From Knee Surgery", *Anesth. Analg.*, Volume 100, 2005, pp. 1394-1399.  Of these, Roraius (2004), Pandey (2004), and Tuncer (2005) involve RCTs.

placebo-controlled studies of Neurontin's effectiveness as a treatment for migraines.[37]  Both studies showed Neurontin to be more effective than placebo.[38]

38)       In addition to the publication of studies, Neurontin received FDA approval for the treatment of post-herpetic neuralgia, a form of neuropathic pain, in 2002.[39] In Europe, Neurontin received broad approval for treatment of neuropathic pain in 2000, and by 2002 had been approved for treatment of neuropathic pain in over 60 markets.[40, 41]

39)       These and other developments likely would have contributed to significant levels of off-label prescribing in the absence of any allegedly improper promotion.

**C.  Plaintiffs' Own Expert, Prof. Rosenthal, Agrees That Numerous Factors—Such As Those Discussed Above—Can And Likely Did Affect Neurontin Prescriptions And That Their Effect Would Have To Be Distinguished From Any Effect Of The Allegedly Fraudulent Promotion**

40)       The casual empiricism employed by Plaintiffs' counsel in their annotated charts directly contradicts the methodology proposed by Plaintiffs' own expert, Prof. Meredith Rosenthal.  Her proposed regression analysis would seek explicitly to model factors other than off-label marketing as affecting Neurontin's off-label prescriptions.  In particular, the model would concede that on-label marketing and other events not related to the challenged conduct would influence Neurontin's

---

[37] Expert Report of Alan M. Rapoport, M.D., 12/1/06, p. 2.
[38] Expert Report of Alan M. Rapoport, M.D., 12/1/06, p. 2.  One of these studies was co-authored by Dr. Rapoport and published in 2001 (Mathew, N.T., A. Rapoport, et al., "Efficacy of Gabapentin in Migraine Prophylaxis," *Journal of Head and Face Pain*, Volume 41, February 2001, pp.119-128.)
[39] Pfizer 2002 Form 10-K, p. 3.
[40] Pfizer 2000 Annual Report, p. 24.
[41] Pfizer 2002 Form 10-K, p. 3.

off-label prescribing.[42]  In their depositions, both Prof. Rosenthal and Dr. Conti agreed that numerous factors other than marketing can influence physicians' prescribing decisions.[43]  For example, Prof. Rosenthal agreed that new evidence of efficacy published in peer-reviewed medical journals, approvals in other countries, and approvals for related medications could all have influenced the prescribing of Neurontin.[44]

41)      Professor Rosenthal has acknowledged that there are numerous likely alternative causes of off-label Neurontin prescriptions, and that such causes must be controlled for in any attempt to ascribe causal significance to the allegedly improper promotion.  Moreover, as noted by the Court in its class certification decision,[45] Prof. Rosenthal has acknowledged that her model could not identify which prescriptions were caused by factors having nothing to do with the challenged conduct,[46] and therefore individual inquiry would be required to determine whether a particular class member has been injured.  Similarly, Prof. Rosenthal concedes that her model could not separate out patients for whom Neurontin was an effective treatment.[47]

---

[42] Rosenthal Declaration, ¶35.
[43] Rosenthal deposition, 10/25/06, pp. 320-336; Conti deposition, 2/13/08, pp. 453-454.
[44] Rosenthal deposition, 10/25/06, pp. 320, 327-328.
[45] Memorandum and Order, In re Neurontin Marketing and Sales Practices Litigation, MDL Docket No. 1629, Civil Action No. 04-10981, August 29, 2007, pp. 111-112.
[46] Rosenthal Reply, ¶10; Rosenthal deposition, 10/24/06, pp. 132-136, 287-292.
[47] Rosenthal deposition, 10/24/06, pp. 267-269, 278-279.

**V. Dr. Conti Has Not Addressed Causation And Her Calculations Of Neurontin's Off-Label Use Are Flawed**

### A. Overview Of Dr. Conti's Declaration

42)  In her revised declaration dated February 21, 2008, Dr. Conti performs calculations to estimate trends in the number of Neurontin prescriptions between 1994 and 2004.  She subdivides trends in Neurontin use into five "indication groupings": bipolar and other mood disorders ("bipolar"), migraine, nociceptive pain, neuropathic pain, and dosage levels above 1800 mg per day.[48]  Dr. Conti also performs calculations to estimate trends in the number of physicians prescribing Neurontin overall and for three specialties: neurologists, psychiatrists, and pain specialists.

43)  Dr. Conti has performed no analysis of the causes of the trends she observes in her data.  She agreed in her deposition that her assignment was simply to examine "the use of Neurontin overall in the time period, and also by specification…" and to look "at unique counts of physicians by specialty over the time period.[49]  She is "not offering an opinion … on the cause or causes of any of the trends" in her charts.[50]

---

[48] These indication groupings are not mutually exclusive as a patient could be prescribed Neurontin for multiple indications at the same time.
[49] Conti deposition, 2/13/08, pp. 432-433.
[50] Conti deposition, 2/13/08, p. 432.

### B. Flaws In Dr. Conti's Calculations

44)     Dr. Conti relies on NDTI data on drug uses from a sample of physician visits to allocate prescriptions into different indication groupings.[51]  For a number of reasons, Dr. Conti's sole reliance on NDTI data for this analysis is misplaced. These reasons include the lack of correspondence between a drug use in the NDTI data and a prescription as well as the size and characteristics of the NDTI sample of physicians.  Below I describe some of the issues with Dr. Conti's use of the NDTI data in this case.

45)     First, NDTI data is based on a fairly small sample and therefore its estimates of drug uses may be imprecise.  For this reason, IMS provides precision tables with confidence intervals or margins of error applicable to NDTI data.  For example, the margin of error for an estimate of 100,000 annual uses is plus or minus 61 percent.  In other words, if the annual estimate of drug uses equals 100,000, the researcher can only be 95 percent certain the true number of drug uses is between 39,000 and 161,000 uses.[52]  Many of Dr. Conti's estimated uses are smaller than 100,000 and are therefore at levels for which IMS does not even provide confidence intervals; however, the confidence intervals would be *wider* (i.e., larger than 61%) in such cases.

---

[51] The IMS definition of drug "use" includes the following physician actions: stock dispensed, stock sold to patient, gave sample, signed/phoned prescription, recommended to patient, hospital order, and not issued this visit. A "use" is counted for every diagnosis the drug is associated with for a particular patient. See IMS Health, National Disease and Therapeutic Index Drug Volume I, 1Q 2006, pp.5, 28, 32
[52] IMS Health, National Disease and Therapeutic Index Drug Volume I, 1Q 2006, pp. 13-14.  This confidence interval is based on 2006 NDTI data for drug appearances.

46)    Second, as Dr. Conti concedes, a drug "use" in the NDTI data does not

necessarily correspond to a prescription because a use occurs in the data for a

variety of other reasons.[53]  These include the physician simply discussing the drug

with the patient, recommending the drug to the patient, or providing a free sample

of the drug to the patient.[54]  The proportion of "uses" corresponding to

prescriptions may differ substantially across Dr. Conti's indication groupings.

47)    Third, even when a prescription is written, it is not possible to determine

from the data whether the patient actually filled the prescription.  The probability

of filling a prescription is unlikely to be the same across Dr. Conti's different

indication groupings.  A patient suffering from epilepsy may be far more likely to

fill a Neurontin prescription than a patient suffering from bipolar disorder or

migraines.  To my knowledge there simply is no data that would allow Dr. Conti

to determine with any confidence what percentage of prescriptions are filled, and

whether the percentage varies by indication..

48)    Lastly, the sample of NDTI physicians is limited to physicians who work at

least part time in an office-based private-practice setting.  Physicians who work

exclusively in a hospital setting are not included in the NDTI sample.  Neurontin,

however, can be prescribed in a hospital setting and the proportion of

prescriptions prescribed in such settings could differ substantially across Dr.

Conti's indication groupings.

---

[53] See Conti Declaration, pp. 4-5 and Conti Deposition, 2/12/08, pp. 284-286.
[54] See IMS Health, National Disease and Therapeutic Index Drug Volume I, 1Q 2006, p. 6; Conti
Declaration, pp. 4-5 and Conti Deposition pp. 284-286.

## VI. Conclusion

49)     Plaintiffs' counsel have provided no economic basis to support their assertion that increases in off-label prescribing of Neurontin were overwhelmingly attributable to allegedly improper promotion, and that only a *de minimis* number of off-label prescriptions would have occurred in the absence of the challenged conduct.  Plaintiffs' counsel have not addressed or even acknowledged the numerous other factors that likely affected the off-label use of Neurontin.

50)     Dr. Conti does not provide any support for Plaintiffs' counsel's asserted causal relationship between off-label prescribing of Neurontin and the allegedly improper promotion.  Dr. Conti expressly states that she is not offering any opinion on the causes of the increases in Neurontin's off-label prescriptions.  Prof. Rosenthal expressly acknowledges that numerous factors would have affected off-label prescribing and would have to be controlled for in any attempt to measure the causal impact of the allegedly improper promotion.

51)     Putting aside the fact that the trends in Neurontin off-label use estimated by Dr. Conti do not provide any basis for inferring causation, Dr. Conti does not acknowledge the substantial imprecision of the NDTI data on which she relies to estimate those trends.  For example, she attempts to estimate Neurontin prescriptions by relying on the NDTI measure of Neurontin "uses," which is not the same as prescriptions.  Her estimates also have large margins of error, frequently in excess of 60 percent.

I declare under penalty of perjury that this Report is true and correct.

Signed on _____ March 13, 2008

_____
Henry G. Grabowski

**EXHIBIT 1A**

# NDTI Uses: Off-Label Uses At Issue in This Case [1]
# For AEDs Excluding Neurontin[2]

Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:

[1]  Off-label uses are limited to the uses at issue in this case that are not FDA approved for a particular AED.  Does not include uses at dosages above FDA-approved levels.

[2]  Contains branded AEDs and their generic equivalents from IMS therapeutic category "20200 SEIZURE DISORDERS" with average positive annual uses in excess of 150,000 for the period 1994 to 2004: Carbatrol, Depakote, Depakote ER, Dilantin, Gabitril, Keppra, Klonopin, Lamictal, Mysoline, Tegretol, Tegretol XR, Topamax, Trileptal, and Zonegran.

**EXHIBIT 1B**

# NDTI Uses: All Off-Label Uses[1]
# For AEDs Excluding Neurontin[2]

Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:

[1] Off-label uses are all uses that are not FDA approved for a particular AED.  Does not include uses at dosages above FDA-approved levels.

[2] Contains branded AEDs and their generic equivalents from IMS therapeutic category "20200 SEIZURE DISORDERS" with average positive annual uses in excess of 150,000 for the period 1994 to 2004: Carbatrol, Depakote, Depakote ER, Dilantin, Gabitril, Keppra, Klonopin, Lamictal, Mysoline, Tegretol, Tegretol XR, Topamax, Trileptal, and Zonegran.

# NDTI Uses: Off-Label Uses At Issue in This Case
# For Depakote ER

Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:  Off-label uses are limited to the uses at issue in this case that are not FDA approved.  Does not include uses at dosages above FDA-approved
      levels.

# NDTI Uses: Off-Label Uses At Issue in This Case
# For Gabitril

Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:  Off-label uses are limited to the uses at issue in this case that are not FDA approved.  Does not include uses at dosages above FDA-approved levels.

# NDTI Uses: Off-Label Uses At Issue in This Case
# For Keppra

Source: NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note: Off-label uses are limited to the uses at issue in this case that are not FDA approved. Does not include uses at dosages above FDA-approved levels.

# NDTI Uses: Off-Label Uses At Issue in This Case
# For Lamictal

Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:  Off-label uses are limited to the uses at issue in this case that are not FDA approved.  Does not include uses at dosages above FDA-approved
levels.

EXHIBIT 2E

# NDTI Uses: Off-Label Uses At Issue in This Case
# For Topamax

Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:  Off-label uses are limited to the uses at issue in this case that are not FDA approved.  Does not include uses at dosages above FDA-approved levels.

# NDTI Uses: Off-Label Uses At Issue in This Case
# For Trileptal

Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:  Off-label uses are limited to the uses at issue in this case that are not FDA approved.  Does not include uses at dosages above FDA-approved levels.

# NDTI Uses: Off-Label Uses At Issue in This Case
## For Zonegran

Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:  Off-label uses are limited to the uses at issue in this case that are not FDA approved.  Does not include uses at dosages above FDA-approved
      levels.

VITA

Henry George Grabowski

| | | | |
|---|---|---|---|
| Office: | Department of Economics | Home: | 800 Cedar Falls Road |
| | Duke University | | Chapel Hill, N.C.  27514 |
| | 305 Social Sciences | | |
| | Box 90097 | | |
| | Durham, N.C.  27708-0097 | | |

| | | | |
|---|---|---|---|
| Telephone: | (919) 660-1839 | Telephone: | (919) 929-7023 |
| Fax: | (919) 681-7984 | | |
| E-mail: | grabow@econ.duke.edu | | |

Born:     September 20, 1940 in Scranton, Pennsylvania
          Married, three children

Education:

      Lehigh University, B.S., Engineering Physics, 1962
      Princeton University, M.A., Economics, 1964
      Princeton University, Ph.D., Economics, 1967

Professional Career:

      Assistant Professor in Economics Department, Yale University, 1967-1971
      Research Associate, National Bureau of Economic Research, 1971-1972
      Associate Professor in Economics Department, Duke University, 1972-1976
      Professor in Economics Department, Duke University, 1976-
      Research Fellow, International Institute of Management, Berlin, Germany, 1976
      Visiting Scholar, Health Care Financing Administration, Office of Research,
        Washington, D.C. 1979-1980
      Director, Program in Pharmaceuticals and Health Economics, Duke
        University, 1983-

Professional Organizations and Board Memberships:

      Adjunct Scholar and Advisory Board Member for Health Policy Research,
        American Enterprise Institute for Public Policy Research
      Board of Scientific Advisors, American Council on Science and Health
      Associate Editor, The Quarterly Review of Economics and Finance
      Associate Editor, Journal of Research in Pharmaceutical Economics

1

Major Fields of Interest:

      Industrial Organization          Government Regulation of Business
      Economics of Innovation        Pharmaceutical Industry-Health
      Economics


Publications


Books and Monographs:

Drug Regulation and Innovation:  Empirical Evidence and Policy Options, (American Enterprise Institute for Public Policy Research:  Washington, D.C.), 1976.

The Impact of Regulation on Industrial Innovation (with John Vernon) (National Academy of Sciences:  Washington, D.C.), 1979.

The Regulation of Pharmaceuticals:  Balancing the Benefits and Risks (with John Vernon) (American Enterprise Institute for Public Policy Research:  Washington, D.C.), 1983.

Health Reform and Pharmaceutical Innovation (American Enterprise Institute for Public Policy Research:  Washington, D.C.), 1994.

The Search for New Vaccines:  The Effects of the Vaccines for Children Program, (American Enterprise Institute for Public Policy Research:  Washington, D.C.), 1997.

"Competition Between Generic and Branded Drugs," in Pharmaceutical Innovation: Incentives, Competition, and Cost-Benefit Analysis in International Perspective, Frank A. Sloan and Chee-Ruey Hsieh, eds, Cambridge University Press, 2007, pp. 153-173.


Articles:

"A Graph-Oriented Model for Research Management," (with Oscar Morgenstern and R. W. Shepherd), in M. C. Yovits, D. M. Gilford, E. Staveley, and H. D. Lerner, eds., Research Program Effectiveness, (Gordon and Breach:  New York), 1966, pp. 187-216.

"The Determinants and Effects of Industrial Research and Development Expenditures," Journal of Political Economy, Vol. 76, No. 2, March/April, 1968, pp. 292-306; reprinted in K. S. Palda, ed., Readings in Managerial Economics, (Prentice-Hall), 1973; also reprinted in  S. Yamey, ed., Economics of Industrial Structure:  Selected Readings, (Penguin Modern Economics Series), 1973.

"Industrial Organization:  The Role and Contribution of Econometrics," (with Dennis Mueller), <u>American Economic Review</u>, Vol. 60, No. 2, May 1970, pp. 100-104.

"Demand Shifting, Optimal Firm Growth, and Rule-of-Thumb Decision Making," <u>Quarterly Journal of Economics</u>, Vol. 84, May 1970, pp. 217-235.

"Non-Price Competition in the Cigarette Industry:  A Comment," (with Dennis Mueller), <u>Antitrust Bulletin</u>, Vol. 40, Winter 1970, pp. 257-292.

"Imitative Advertising in the Cigarette Industry," (with Dennis C. Mueller), <u>The Journal of American and Foreign Antitrust and Trade Regulation</u>, Vol. 16, No. 2, Summer 1971, pp. 257-292.

"Determinants and Distributional Aspects of Enrollment in U.S. Higher Education," (with A. Corazzini and D. Dugan), <u>Journal of Human Resources</u>, Winter 1972, pp. 39-59.

"Managerial and Stockholder Welfare Models of Firm Expenditures," (with Dennis Mueller), <u>Review of Economics and Statistics</u>, Vol. 54, February 1972, pp. 9-24.

"Rivalry in Research and Development:  An Empirical Study," (with Nevins D. Baxter), <u>Journal of Industrial Economics</u>, Vol. 21, No. 2, July 1973, pp. 209-235.

"Advertising and Resource Allocation:  A Critique," in Salvatore F. Davita, ed., <u>Advertising and the Public Interest</u>, (American Marketing Association), 1974.

"Life Cycle Effects on Corporate Returns on Retentions," (with C. Dennis Mueller), <u>Review of Economics and Statistics</u>, Vol. 57, November 1975, pp. 400-409.

"Structural Effects of Regulation on Innovation in the Ethical Drug Industry," (with John Vernon), Chapter 10, in Robert T. Masson and P. David Qualls, eds., <u>Essays on Industrial Organization in Honor of Joe S. Bain</u>, (Ballinger Publishing Company:  Cambridge), 1976, pp. 181-205.

"The Effects of Advertising on the Interindustry Distribution of Demand," in Occasional Papers of National Bureau of Economic Research, <u>Explorations in Economic Research</u>, Vol. 3, Winter 1976, pp. 21-75.

"The Effects of Regulatory Policy on the Incentives to Innovate:  An International Comparative Analysis," (with John Vernon and Lacy Glenn Thomas), in Emery A. Link and Samuel Mitchell, eds., <u>Impact of Public Policy on Drug Innovation and Pricing</u>, (American University:  Washington, D.C.), 1976, pp. 47-93.

"Consumer Protection Regulation in Ethical Drugs," (with John Vernon), <u>American Economic Review</u>, Vol. 67, February 1977, pp. 359-364.

"Estimating the Effects of Regulation on Innovation:  An International Comparative Analysis of the Pharmaceutical Industry," (with John M. Vernon and Lacy Glenn Thomas), Journal of Law and Economics, Vol. 21, No. 1, April 1978, pp. 133-163.

"The Effects of Advertising on IntraIndustry Shifts on Demand," in Occasional Papers of National Bureau of Economic Research, Explorations in Economic Research, Vol. 4, No. 5, Fall 1978, pp. 675-701.

"Consumer Product Safety Regulation," (with John M. Vernon), American Economic Review, Vol. 68, May 1978, pp. 284-289.

"Industrial Research and Development, Intangible Capital Stocks, and Firm Profit Rates," (with Dennis Mueller), Bell Journal of Economics, Vol. 9, No. 2, Fall 1978, pp. 328-343.

"New Studies on Market Definition, Concentration, Theory of Supply, Entry and Promotion," (with John M. Vernon), in Robert I. Chien, ed., Issues in Pharmaceutical Economics, (Lexington Books:  Lexington, Mass.), 1979, pp. 29-52.

"Regulation of the United States Pharmaceutical Industry:  Current Problems and Policy Developments," in George Teeling-Smith, ed., Medicines for the Year 2000, (Office of Health Economics:  London, England), 1979, pp. 57-74.

The Effects of Product Quality Regulation on Innovation in the U.S. Pharmaceutical Industry, Final Report for the National Science Foundation Grant PRA 75-19823 (National Technical Information Services, Washington, D.C.), 1979.

"The Impact of Regulation on Innovation," Food Drug Cosmetic Law Journal, Vol. 34, No. 10, October 1979, pp. 555-560.

"Substitution Laws and Innovation in the Pharmaceutical Industry," (with John Vernon), Law and Contemporary Problems, Winter/Spring Issue, 1979, pp. 43-66.

"Regulation and the International Diffusion of Pharmaceuticals," in Robert B. Helms, ed., The International Supply of Medicines, (American Enterprise Institute for Public Policy Research:  Washington, D.C.), 1980, pp. 5-36.

"The Determinants of R&D Expenditures," (with John Vernon), in Robert B. Helms, ed., Drugs and Health, (American Enterprise Institute for Public Policy Research:  Washington, D.C.), 1981, pp. 3-20.

"Regulation and Industrial Innovation," in Industrial Innovation and Public Policy Options: Background Papers for a Colloquium, (National Academy Press:  Washington, D.C.), 1981, pp. 65-81.

4

"Auto Safety Regulation:  An Analysis of Market Failure," (with Richard J. Arnould), <u>The Bell Journal of Economics</u>, Vol. 12, No. 1, Spring 1981, pp. 27-48.

"Public Policy and Innovation:  The Case of Pharmaceuticals," <u>Technovation</u>, Vol. 1, 1982, pp. 157-189.

"A Sensitivity Analysis of Expected Profitability of Pharmaceutical Research and Development," (with John Vernon), <u>Managerial and Decision Economics</u>, Vol. 3, No. 1, March 1982, pp. 36-40.

"Public Policy and Pharmaceutical Innovation," <u>Health Care Financing Review</u>, Vol. 4, No. 1, September 1982, pp. 75-87.

"An Evaluation of the Maximum Allowable Cost Program," (with Jean P. Gagnon), in <u>The Effectiveness of Medicines in Containing Health Care Costs</u>, Proceedings of a Symposium of the National Pharmaceutical Council, Washington, D.C., 1982, pp. 81-113.

"The Pharmaceutical Industry," (with John M. Vernon), in Richard R. Nelson, ed., <u>Government and Technical Progress - A Cross-Industry Analysis</u>, (Pergamon Press:  New York), 1982, pp. 283-360.

"Automobile Safety Regulation:  A Review of the Evidence," (with Richard J. Arnould), in Richard O. Zerbe, ed., <u>Research in Law and Economics</u>, Vol. 5, 1983, pp. 233-267.

"The Impact of Patent and Regulatory Policies on Drug Innovation," <u>Medical Marketing & Media</u>, Vol. 18, No. 10, October 1983, pp. 42-63.

"A Computer Simulation Model of Pharmaceutical Innovation," (with John Vernon), in Bjorn Lindgren, ed., <u>Pharmaceutical Economics</u>, (Swedish Institute for Health Economics and Liber Forlag:  Lund, Sweden), 1984, pp. 159-175.

Studies on Drug Substitution, <u>Patent Policy and Innovation in the Pharmaceutical Industry</u>, Final report to the National Science Foundation available from the National Technical Information Services, Number PB-85-109700, Washington, D.C., 1985.

"Organizational Capital and the Choice between Specialization and Diversification," (with Michael Gort and Robert McGuckin), <u>Managerial and Decision Economics</u>, Vol. 6, No. 1, March 1985, pp. 2-10.

"Economic Aspects of Vaccine Innovation and Manufacturing," (with Lawrence De Brock), Chapter 4, in <u>Vaccine Supply and Innovation</u>, (National Academy Press:  Washington, D.C.), 1985, pp. 45-64.

"Longer Patents for Lower Imitation Barriers:  The 1984 Drug Act," (with John Vernon), The American Economic Review, Vol. 76, May 1986, pp. 195-198.

"Health Care Cost Containment and Pharmaceutical Innovation," in Proceedings of the Conferences on Health Care and the Elderly, (Washington, D.C.), 1986, pp. 25-28.


"Pioneers, Imitators, and Generics--A Simulation Model of Schumpeterian Competition," (with John Vernon), The Quarterly Journal of Economics, August 1987, pp. 491-525.

"The Health/Economic Benefits of Drug Therapy:  Efficacy, Low Risk, Cost Effectiveness, Patient Information and Emancipation," Swiss Pharma, Vol. 9, No. 3a, 1987, pp. 29-31.

"Impact of Patent and Regulatory Policies on Drug Innovation,"  Proceedings of the Second Annual Shearson Lehman Hutton Conference on Legal and Regulatory Issues Affecting Biotechnology and Health Care, (Shearson Lehman Hutton, Inc.:  New York), October 1988, pp. 5-16.

"Medicaid Patients' Access to New Drugs," Health Affairs, Winter 1988, pp. 102-114.

"Price and Availability Tradeoffs of Automobile Insurance Regulation," (with W. Kip Viscusi and William N. Evans), Journal of Risk and Insurance, Vol. LVI, No. 2, June 1989, pp. 275-299.

"An Analysis of U.S. International Competitiveness in Pharmaceuticals," Managerial and Decision Economics, Special Issue, 1989, pp. 27-33.

"Economic Scales and Tests," (with Ronald W. Hansen), in B. Spilker, ed., Quality of Life Assessments in Clinical Trials, (Raven Press, Ltd.:  New York), 1990, pp. 61-69.

"Innovation and International Competitiveness in Pharmaceuticals," in Arnold Heertje and Mark Perlman, eds., Evolving Technology and Market Structure:  Studies in Schumpeterian Economics, (University of Michigan Press), 1990, pp. 167-185.

"A New Look at the Returns and Risks to Pharmaceutical R&D," (with John Vernon), Management Science, Vol. 36, No. 7, July 1990, pp. 804-821.

"The Changing Economics of Pharmaceutical Research and Development," in Annetine C. Gelijns and Ethan A. Halm, eds., The Changing Economics of Medical Technology, (National Academy Press:  Washington, D.C.), 1991, pp. 35-52.

"Product Liability in the Pharmaceuticals:  Comments on Chapters Eight and Nine," in Peter W. Huber and Robert E. Litan, eds., The Liability Maze:  The Impact of Liability Law on Safety and Innovation, (Brookings Institution:  Washington, D.C.), 1991, pp. 360-366.

"The Cost of Innovation in the Pharmaceutical Industry," (with Joseph DiMasi, Ronald Hansen and Louis Lasagna), Journal of Health Economics, Volume 10, 1991, pp. 107-142.

"Pharmaceutical Research and Development: Returns and Risk," Sixth Annual Centre for Medicines Research Lecture 1991, Centre for Medicines Research, Surrey, England, 1991.

"The Effect of Medicaid Formularies on the Availability of New Drugs," (with Stuart O. Schweitzer and S. Renee Shiota), PharmacoEconomics, Vol. 1 (Suppl. 1), 1992, pp. 32-40.

"The Costs and Returns to Pharmaceutical Research and Development," Rivista Internazionale di Scienze sociali, (International Social Studies Review), September 1992, pp. 347-358.

"Brand Loyalty, Entry and Price Competition in Pharmaceuticals After the 1984 Drug Act," (with John M. Vernon), Journal of Law and Economics, Vol. 35, No. 2, October 1992, pp. 331-350.

"Pharmaceuticals and Health Care Costs," Proceedings of the First International Health Care Forum, Health Care Policy and the Pharmaceutical Industry, Gotemba, Japan, 1993.

"Health Reform and Pharmaceutical Innovation," Seton Hall Law Review, Vol. 24, No. 3, 1994, pp. 1221-1259.

"Innovation and Structural Change in Pharmaceuticals and Biotechnology," (with John Vernon), Industrial and Corporate Change, Vol. 3, No. 2, 1994, pp. 435-449.

"Returns to R&D on New Drug Introductions in the 1980s," (with John Vernon), Journal of Health Economics, Vol. 13, 1994, pp. 383-406.

"Research and Development Costs for New Drugs by Therapeutic Category: A Study of the U.S. Pharmaceutical Industry," (with Joseph A. DiMasi, Ronald W. Hansen, and Louis Lasagna), PharmacoEconomics, Vol. 7, No. 2, 1995, pp. 152-169.

"Economic Evaluation of Drug Treatment for Psychiatric Disorders: The New Clinical Trial Protocol," (with Gary Zarkin, Josephine Mauskopf, Heather A. Bannerman, and Richard H. Weisler), Chapter 161, in Floyd E. Bloom and David J. Kupfer, eds., Psychopharmacology: The Fourth Generation of Progress, (Raven Press, Ltd.: NY), 1995, pp. 1897-1905.

"R&D Costs, Innovative Output and Firm Size in the Pharmaceutical Industry," (with Joseph A. DiMasi and John Vernon), International Journal of the Economics of Business, Vol. 2, No. 2, 1995, pp. 201-219, (special volume honoring Merton J. Peck of Yale University).

"Price and Profit Control, New Competitive Dynamics and the Economics of Innovation in the Pharmaceutical Industry," in Adrian Towse, ed., <u>Industrial Policy and the Pharmaceutical Industry</u>, (Office of Health Economics:  London), 1995, pp. 77-91.

"Increasing R&D incentives for neglected diseases: Lessons from the Orphan Drug Act" in KE Maskus and JH Reichman eds.  <u>International Public Goods and Transfer of Technology Under A Globalized Intellectual Property Regime</u>, Cambridge University press, 2005, pp. 457-480.

"Economic Scales and Tests," (with Ronald W. Hansen), in B. Spilker, ed., <u>Quality of Life and Pharmacoeconomics in Clinical Trials</u>, Second Edition, (Lippincott-Raven Press: Philadelphia), 1996, pp. 79-84.

"Returns to Pharmaceutical R&D:  Prospects Under Health Care Reform," (with John Vernon), in Robert Helms, ed., <u>Competitive Strategies in the Pharmaceutical Industry</u>, (AEI Press:  Washington, D.C.), 1996, pp. 194-207.

"Longer Patents for Increased Generic Competition:  The Waxman-Hatch Act After One Decade," <u>PharmacoEconomics</u>, Vol. 10, Suppl. 2, 1996, pp. 110-123.

"The Effect of Pharmacoeconomics on Company Research and Development Decisions," <u>Pharmacoeconomics</u> Vol. 11, No. 5, May 1997, pp. 389-397.

"The Impact of Cost-Effectiveness on Public and Private Policies in Health Care:  An International Perspective," (Edited Symposium Volume with Frank Sloan), in <u>Social Science & Medicine</u>, Vol. 45, No. 4, August 1997.

"Pharmacy Benefit Management, Cost-Effectiveness Analysis and Drug Formulary Decisions," (with C. Daniel Mullins), <u>Social Science & Medicine</u>, Vol. 45, No. 4, August 1997, pp. 535-544.

"Public Policy and Innovation in Pharmaceuticals and Biotechnology," in Demetri Kantarelis, editor, <u>Business and Economics for the 21st Century, Volume I</u>, Business and Economic Society International, Worcester, Mass., 1997, pp. 343-349.

"The Role of Cost-Effectiveness Analysis in Managed Care Decisions," <u>Pharmacoeconomics</u>, Vol. 14, suppl. 1, 1998, pp. 15-24.

"The Determinants of Pharmaceutical Research and Development Expenditures," (with John Vernon), <u>Journal of Evolutionary Economics</u>, Vol. 10, 2000, pp. 201-215.
"Effective Patent Life in Pharmaceuticals," (with John Vernon), <u>International Journal of Technology Management</u>, Vol. 19, Nos. 1/2, 2000, pp. 98-120.

"The Distribution of Sales from Pharmaceutical Innovation," (with John Vernon) <u>PharmacoEconomics</u>, Vol. 18, suppl. 1, 2000, pp. 21-32.

"Pressures from the Demand Side: Market Dynamics and Industrial Structures," (with John Vernon), in Hannah Kettler, ed., <u>Consolidation and Competition in the Pharmaceutical Industry</u>, Office of Health Economics, London, 2001, pp. 62-79.

"Returns on Research and Development for 1990s New Drug Introductions," (with John Vernon and Joe DiMasi). <u>PharmacoEconomics</u>, Vol. 20, Supplement 3, 2002.

"Patents, Innovation and Access to New Pharmaceuticals," <u>Journal of International Economics Law</u> Vol. 5, No. 4, December 2002, pp 849-860.

"Patents and New Product Development in the Pharmaceuticals and Biotechnology Industries," in John Duca, ed., Science and Cents: the Economics of Biotechnology, <u>Federal Reserve Bank of Dallas</u>, 2003.

"The Price of Innovation: New Estimates of Drug Development Costs," (with Joseph DiMasi and Ronald Hansen). <u>Journal of Health Economics</u>, Vol. 22, 2003, pp.141-185. "The Ripple Effects of a Restrictive Medicaid Formulary (editorial), <u>American Journal of Managed Care</u>, Vol. 9, No. 10, October 2003, pp. 648-649.

"Are the Economics of Pharmaceutical R&D Changing? Productivity, Patents and Political Pressures," <u>PharmcoEconomics</u>, Vol. 22, suppl. 2, 2004, pp. 15-24.

"R&D Costs and Returns by Therapeutic Category" (with Joseph DiMasi and John Vernon), <u>Drug Information Journal</u>,  Vol. 38, No. 3, 2004, pp. 211-223.

"Increasing R&D Incentives for Neglected Diseases: Lessons from the Orphan Drug Act," in Maskus KE and Reichman JH, eds., <u>International Public Goods, and Transfer of Technology Under a Globalized Intellectual Property Regime</u>, Cambridge University Press, 2005, pp. 457-480.

"Encouraging the Development of New Vaccines," <u>Health Affairs</u>, Vol. 24, No. 3, 2005, pp. 697-704.

"Extraordinary Claims Require Extraordinary Evidence," and "Setting the Record Straight on Setting the Record Straight: Response to Light and Warburton's Rejoinder," (with Joseph DiMasi and Ronald Hansen) <u>Journal of Health Economics</u>, 2005 Vol. 24, No.5, pp. 1034 and 1049.

"Developing Drugs for Developing Countries," (with David Ridley and Jeffrey Moe) <u>Health Affairs</u> March/April 2006 Vol. 25 No. 2, pp 313-324.

 "The Quantity and Quality of Worldwide New Drug Introductions 1982 – 2003" (with Richard Wang), <u>Health Affairs</u>,  March/April 2006, Vol. 25 No. 2, pp. 452-460.

"Generic Competition in the U.S. Pharmaceutical Industry" (with Atanu Saha, Howard

Birnbaum, Paul Greenberg, and Oded Bizan), <u>International Journal of the Economics of Business</u>, February 2006, Vol. 13, No. 1, pp. 15-38.

"How Did the 2003 Prescription Drug Re-Importation Bill Pass the House?" (with Omar Gokcekus, Mike Adams and Edward Tower), <u>Economics and Politics</u>, March 2006, Vol. 18, No. 1, pp. 27-46.

"Spending on Post-approval Drug Safety" (with David Ridley, Judith Kramer, Hugh Tilson, and Kevin Schulman), in <u>Health Affairs</u>, March/April, 2006, Vol 25 No. 2, pp. 429-436.

"The Market for Follow-On Biologics: How Will It Evolve?" (with Iain Cockburn and Genia Long) in Health Affairs, September/October 2006; Vol. 25, No. 5, pp. 1291-1300.

"Economic Return of Clinical Trials Performed Under the Pediatric Exclusivity Program" (with Jennifer Li, Eric Eisenstein, Elizabeth Reid, Barry Mangum, Kevin Schulman, John Goldsmith, M. Dianne Murphy, Robert Califf, and Daniel Benjamin, Jr.) Journal of the American Medical Association, February 2007, vol. 297 (5), pp. 480-488.

"The Economics of New Oncology Drug Development" (with Joseph DiMasi), <u>Journal of Clinical Oncology</u>, 2007, Vol. 25(2), pp. 209-216.

"Generic Competition and Market Exclusivity Periods in Pharmaceuticals" (with Margaret Kyle), <u>Managerial and Decision Economics</u>, 2007, Vol. 28, pp. 491-502.

"Entry and Competition in Generic Biologics" (with David Ridley and Kevin Schulman), <u>Managerial and Decision Economics</u>, 2007, Vol. 28, pp. 439-451.

"Should the Patent System for New Medicines Be Abolished?" (with Joseph DiMasi), <u>Clinical Pharmacology & Therapeutics</u>, 2007, Vol. 82 (5), pp. 488-491.

"Competition Between Generic and Branded Drugs," <u>Pharmaceutical Innovation: Incentives, Competition, and Cost-Benefit Analysis in International Perspective,</u> F. A. Sloan and C. R. Hsieh, eds. Cambridge University Press, 2007, pp. 153-173.

"Impact of Economic, Regulatory and Patent Policies on Innovation in Cancer Chemoprevention," (with Jeffrey L. Moe), Duke Department of Economics Working Papers (November, 2007), forthcoming in *Cancer Prevention Research*, 2008.

"Do Faster FDA Drug Reviews Adversely Affect Patient Safety? An Analysis of the 1992 Prescription Drug User Fee Act" (with Richard Wang), forthcoming in <u>Journal of Law and Economics</u>, 2008.

<u>Papers Presented at Major Professional Conferences</u>:
      <u>(Selected Presentations since 1990)</u>

"Brand Loyalty, Entry, and Price Competition after the 1984 Act," Applied Econometric Association Meetings, Ankara, Turkey, June, 1990; also, Second World Congress in Health Economics, Zurich, Switzerland, September 1990.

"First Mover Advantages, Price and Non-Price Competition in Pharmaceuticals," American Economic Association Meetings, December 1990.

"International Competition in Pharmaceutical R&D," National Science Board on Industrial Support for R&D, U.S. National Science Foundation, Washington, D.C., January 1991.

"Research and Development in an Era of Global Competition," Conference on American Pharmaceuticals in the Global Village, U.S. Department of State, Washington, D.C., June 1991.

"Pharmaceutical Research and Development:  Returns and Risk," Centre for Medicines Research Annual Lecture 1991, Royal College of Physicians, London, England, July 1991.

"The Effect of Medicaid Formularies on the Availability of New Drugs," Tufts University Conference, Cost Containment and Pharmaceuticals:  Issues for Future Research, Talloires, France, July 1991.

"Innovative Structure and Performance of the Pharmaceutical Industry," Second International Conference on the Economics of Innovation, University of Milan, Piacenza, Italy, June 1992.

"Pharmaceuticals and Health Care Costs," International Health Care Forum on Health Care Policy and the Pharmaceutical Industry, Gotemba, Japan, October 1992.

"Innovation and Structural Change in Pharmaceuticals and Biotechnology," American Economic Association Meetings, Anaheim, California, January 1993.

"Pharmaceutical R&D Costs, Prices and Profits," Conference on Pharmaceutical Industry Research, Innovation and Public Policy, Harvard University, John F. Kennedy School of Government, February 1993.

"Pharmaceutical R&D Returns:  Prospects Under Health Care Reform," American Enterprise Institute Conference on Competitive Strategies in the Pharmaceutical Industry, October 1993.

"Health Care Reform--Implications for Pharmaceutical Innovation," Drug Information Association Workshop on Health Economics, Lisbon, Portugal, November 1993.

"The Administration's Health Reform Plan--Implications for Pharmaceutical Innovation," testimony before Congressman Waxman's House Subcommittee on Health and the Environment, February 1994.

"Socially Optimal Reimbursement and Utilization Policies for Pharmaceuticals," Hungarian National Social Insurance Administration, Budapest, Hungary, April 1994.

"Pharmaceuticals and Quality of Life:  An Economist's Perspective," Forum Engelberg, Engelberg, Switzerland, April 1994.

"Price and Profit Control, New Competitive Dynamics and the Economics of Innovation in the Pharmaceutical Industry," Office of Health Economics Symposium on Industrial Policy, London, England, June 1994.

"Health Reform and Pharmaceutical Innovation," American Enterprise Institute, Washington, D.C., July 1994.

"R&D Costs, Innovational Output and Firm Size," Yale University Festschrift Honoring Merton J. Peck, New Haven, Connecticut, September 1994.

"The Effects of Increased Government Purchases on Vaccine R&D," testimony before the Subcommittee on Health and the Environment on the Vaccines for Children's Program, June 1995.

"PharmacoEconomics and Pharmaceutical Innovation," to IFPMA Conference on PharmacoEconomics in the year 2000, Geneva, Switzerland, February 1995.

"Development of New Pharmaceuticals," to the Third Princeton Conference on Drug Discovery and Development, Princeton, New Jersey, May 1995.

"Longer Patents for Increased Generic Competition:  The Waxman-Hatch Act After One Decade," Tufts University Conference on Cost Containment Health Care Reform and Pharmaceutical Innovation, Talloires, France, July 1995.

"The Roles of Government in the Drug Regulation Process:  Lessons from Other Nations," presented to Conference on Health Financing and Health Economics, Beijing, China, October 1995.

"The Use of Cost-Effectiveness Analysis by Pharmaceutical Benefit Management Companies," to Duke University Conference on Cost-Effectiveness Analysis in Decision Making," November 1995.

"The Effects of the Waxman Hatch Act on Drug Innovation and Generic Competition," Testimony before the U.S. Senate Judiciary Committee, March 1996.

"International Patent Policies and Pharmaceutical Innovation," to University of Vienna, May 1996.

"Public Policies and Pharmaceutical Innovation" to Jagellion University, Krakow, Poland,

May 1996.

"Financing Health Care in Pharmaceuticals and Biotechnology," to OECD Workshop, Paris, July 1996.

"Health Care and Innovation" to Seminar on Approaches to Cost Containment in Health Care, Kasteel de Willenburg, The Hague, October 1996.

"Pharmaceutical Innovation, Cost-Effectiveness Research and Emerging Regulatory Issues," American Enterprise Institute, Washington, D.C., November 1996.

"The Role of Cost-Effectiveness Analysis in Managed Care," Tufts University Center for the Study of Drug Development Conference, Talloires, France, July 1997.

"Public Policy and Innovation in Pharmaceuticals and Biotechnology," Business and Economics Society International Conference, Athens, Greece, July 1997.

"The Determinants of Pharmaceutical Research and Development Expenditures," Schumpeterian Society Meetings, Vienna, Austria, June 1998.

"Effective Patent Life in Pharmaceuticals," U.S. House of Representatives Colloquium for House Staff Members, June 1999.

"The Distribution of Sales from Pharmaceutical Innovation," Schumpeterian Society Meetings, Manchester England, June, 2000.

"New Research on the Returns to Pharmaceutical R&D," American Enterprise Institute, Washington, D.C., October 2000.

"Patent Policy Issues in Pharmaceuticals" Robert Wood Johnson Foundation Colloquium on the Pharmaceutical Industry, Washington, D.C., March 2001.

"Returns to Pharmaceutical R&D in the 1990s" Tufts University Conference, Center for the Study of Drug Development, Talloires, France, July, 2001.
"Patents, Innovation and Access to New Pharmaceuticals," American Association for the Advancement of Science, Annual Meetings, Boston, February 2002.

"Patents and the Development of New Pharmaceuticals in Pharmaceuticals and Biotechnology Industry," Federal Reserve Bank of Dallas, April 2002.

"Returns to Pharmaceutical R&D," American Economic Association Meetings, Washington, DC, January 2003.

"Increasing R&D Incentives for Neglected Diseases," Duke University Law School Conference, April 2003; St. Vincent's College, September 2003; Georgetown University, October 2003, Columbia University, December 2003.

"Are the Economics of Pharmaceutical R&D Changing?  Productivity, Patents, and Political Pressures," Tufts University Center for the Study of Drug Development Conference, Talloires, France, July 2003.

"Global Returns on R&D From New Drug Introductions," Keio University, Tokyo, Japan, September 2003.

"R&D Costs and Returns by Therapeutic Category," Southern Economic Association Meetings, San Antonio, Texas, November 2003.

"The Hatch-Waxman Act and Drug Innovation," Food and Drug Law Institute Conference, Washington, DC, December 2004.

"Developing Drugs for Developing Countries," American Economic Association Meetings, Philadelphia, PA, January 2005; also International Health Economics Congress, Barcelona, Spain, July 2005.

"The Development of New Vaccines," University of Chicago Conference on Vaccines, May 2005.

"Generic Competition in Pharmaceuticals," International Conference on Pharmaceutical Innovation, Taipei, Taiwan, May 2005.

"Impact of Generic Competition on Pharmaceutical Markets," International Health Economics Congress, Barcelona, Spain, July 2005.

"Worldwide Trends In New Drug Introductions: Economic and Policy Issues," Second European Meeting on Pharmaceutical Policy, Madrid, Spain, April 2006.

"Legacy of Hatch Waxman Act:  Patents Generics and Litigation," Cornerstone Research Conference, Nevis, West Indies, May 2006.

"Entry and Competition in Follow-On Biologics."  Congressional Budget Office, Washington, DC.  March 2007.

"R&D Costs for New Biopharmaceuticals," BIO International Meetings, Boston, MA, May 2007.

"Data Exclusivity for Follow-On Biologicals," American Enterprise Institute, Washington, DC, June 2007.

"Economic Issues for Follow-on Biologicals," National Academy of Sciences, Washington, DC, November 2007.

Research Grants and Government Projects:

Principal Investigator, National Science Foundation Grant to Yale University, "Collaborative Research on Determinants of Selected Firm Outlays," June 1969 - December 1970.    ($9,800.00)

Principal Investigator, National Science Foundation Grant to NBER for research on "The Returns to Firm Investment Outlays, Plant and Equipment and Advertising Outlays," 1972-1974.    ($47,900.00)

Principal Investigator, National Science Foundation Grant for Research on "The Effect of Product Quality Regulation on Innovation: The Case of the U.S. Ethical Pharmaceutical Industry," 1975-1978.    ($111,700.00)

Consultant, Federal Trade Commission project on "The Effects of Repealing Anti-Substitution Laws on Drug Innovation," 1977-1978.

Study Rapporteur, National Academy of Sciences Committee on Technology and International Economic and Trade Issues, "The Impact of Government Regulation on Innovation," 1978-1979.

Principal Investigator, National Science Foundation Grant to Duke University for "Studies on Drug Substitution, Patent Policy and Innovation," 1979-1982. ($125,979.00)

Advisory Panel Member, Office of Technology Assessment, The Patent System and Its Assessment on New Technological Enterprises, 1982-1983.

Principal Investigator, Environmental Protection Agency Grant to Investigate the Effects of Regulation on Innovation in Pesticides, (with Kip Viscusi of the Fuqua School of Business), 1983-1984.

Member, Committee on Public-Private Sector Relations in Vaccine Innovation," Institute of Medicine, National Academy of Sciences, 1983-1985.

Principal Investigator, General Accounting Office, Research Project on the Effects of Different State Regulations on Automobile Insurance Premiums and Availability, 1984-1985.

Principal Investigator, Duke University, Program in Pharmaceuticals and Health Economics, Project on Cost Containment and Pharmaceutical Innovation, 1985-1991.

Principal Investigator, Duke University, Program in Pharmaceuticals and Health Economics, Project on Returns to Pharmaceutical R&D, 1990-1994.

Principal Investigator, Program in Pharmaceuticals and Health Economics, "Public Policy and Innovation in the Vaccine Industry," 1995-1997.

Principal Investigator, Program in Pharmaceuticals and Health Economics, "New Research on the Costs and Returns to R&D" 1998-2002.

Principal Investigator, "Increasing R&D Incentives for Neglected Diseases" (with David Ridley and Jeff Moe) 2003–2006.

Principal Investigator, "Advancing Chemoprevention Agents Through the Definition of Legal Barriers and Solutions in Patent, Intellectual Property, Liability, and Tax Laws." C-Change grant, Washington, DC, 2007 (with Jeff Moe of Fuqua School of Business).

**Henry G. Grabowski**
**Testimony in the Past Four Years**

Deposition, *New River Pharm., Inc. v. DSM Pharm., Inc.,* U. S. District Court for the Eastern District of Tennessee, March 2004.

Deposition, *Sanofi-Synthelabo, et al. v. Apotex, Inc.,* U. S. District Court for the Southern District of New York, November 2004.

Deposition, *In re Bristol-Myers Squibb Securities Litigation,* Civil Action No. 00-1990 (SRC), U. S. District Court for the District of New Jersey, January 2005.

Deposition, *Wyeth Pharm. v. Teva Pharm. Indus. Ltd.,* Civil Action No. 03-1293 (KSH), U. S. District Court for the District of New Jersey, June 2005.

Deposition, *Xcel Pharm. v. Kali Lab.,* U. S. District Court for the District of New Jersey, May 2006.

Deposition, *Pfizer Inc. v. Teva Pharm. Indus. Ltd.,* Civil Action No. 04-754 (JCL), U.S. District Court for the District of New Jersey, August 2006.

Deposition, Arbitration Hearing, *Elan Pharm. v. King Pharm.,* New York, N.Y., August 2006.

Arbitration Testimony, *Elan Pharm. V. King Pharm.,* New York, N.Y., September 2006.

Trial testimony, *Pfizer Inc. v. Teva Pharm.,* Civil Action No. 04-754 (JCL), U.S. District Court for the District of New Jersey, December 2006.

Deposition, *UCB S.A. v. Mylan Laboratories, Inc.,* United States District Court for the Northern District of Georgia, Civil Action No: 1:04-CV-0683 (WSD), December 2006.

Deposition, *State of Colorado v. Warner Chilcott Holdings Company III, LTD.,* United States District Court for the District of Columbia, Civil Action No: 1:05CV02182 (CKK), January 2007.

Deposition, *Meijer, Inc. v. Warner Chilcott Holdings Company III, LTD.*, United States District Court for the District of Columbia, Civil Action No: 05-2195 (CKK), August 2007.

Deposition, *Roche Palo Alto LLC v. Ranbaxy Laboratories Limited*, United States District Court for the District of New Jersey, Civil Action No: 3:06-cv-2003-FLW-TJB, March 2008.

### Documents Considered for Expert Report of Henry G. Grabowski

**Academic Journals**

Azoulay, Pierre, "Do Pharmaceutical Sales Respond to Scientific Evidence?," *Journal of Economics & Management Strategy*, Winter 2002, Volume 11, Number 4, pp. 551-594.

Berndt, Ernst R., "Pharmaceuticals in U.S. Health Care: Determinants of Quantity and Price," *The Journal of Economic Perspectives*, Fall 2002, pp. 45-66.

Berndt, Ernst R., "The U.S. Pharmaceutical Industry: Why Major Growth In Times Of Cost Containment?" *Health Affairs*, 2001, Volume 20, Number 2, pp. 100-114.

Ching, Andrew, and Masakazu Ishihara, "The Effects of Detailing on Prescribing Decisions under Quality Uncertainty," *Draft Paper*, August 2006.

Coscelli, Andrea, and Matthew Shum, "An Empirical Model of Learning and Patient Spillovers in New Drug Entry," *Journal of Econometrics,* 2004, Volume 122, Number 2, pp. 213–246.

Klein, D.B., and A.T. Tabarrok, "Who Certifies Off-Label?" *Regulation*, Summer 2004, pp. 60-63.

Tabarrok, A.T., "Assessing the FDA via the Anomaly of Off-Label Drug Prescribing," *Independent Review*, Summer 2000, Volume 5, Number 1.

**Declarations and Expert Reports**

Dr. Shawn J. Bird, Expert Report, November 29, 2006.

Pradeep K. Chintagunta, Ph.D., Declaration, December 20, 2006.

Pradeep K. Chintagunta, Ph.D., Reply Declaration, April 23, 2007.

Rena M. Conti, Ph.D., Declaration, December 19, 2007.

Rena M. Conti, Ph.D., Revised Declaration, February 21, 2008.

Raymond S. Hartman, Ph.D., Declaration, August 8, 2005.

Raymond S. Hartman, Ph.D., Reply Declaration, February 21, 2007.

Michael C. Keeley, Ph.D. Declaration, December 21, 2006.

Michael C. Keeley, Ph.D. Rebuttal Declaration, April 23 2007.

Fiona Scott Morton, Ph.D., Declaration, December 21, 2006.

Fiona Scott Morton, Ph.D., Reply Declaration, April 23 2007.

Dr. Samuel Potolicchio, Expert Report, December 8, 2006.

Alan M. Rapoport, M.D., Expert Report, December 1, 2006.

Meredith B. Rosenthal, Ph.D., Declaration, August 8, 2005.

Meredith B. Rosenthal, Ph.D., Reply Declaration, February 21, 2007.

Andrew E. Slaby M.D., Ph.D., M.P.H., Expert Report.

**Depositions**

Deposition of John Arness, M.D., February 13, 2008.

Deposition of Douglas Barrett, M.D., December 7, 2004.

Deposition of Richard J. Brown, M.D., August 18, 2005.

Deposition of Rena M. Conti, Ph.D. February 12, 2008.

Deposition of Rena M. Conti, Ph.D. February 13, 2008.

Deposition of Vithal Dhaduk, M.D., November 12, 2006.

Deposition of Jerrold Gray, M.D., February 6, 2008.

Deposition of Robert F. Haynsworth, Jr., M.D., February 1, 2008.

Deposition of Kylene Huler, M.D., November 1, 2006.

Deposition of Michael E. Okin, M.D., August 30, 2005.

Deposition of Gregory Rogers, D.O., February 2, 2008.

Deposition of Meredith B. Rosenthal, Ph.D., October 24, 2006.

Deposition of Meredith B. Rosenthal, Ph.D., October 25, 2006.

Deposition of Meredith B. Rosenthal, Ph.D., March 6, 2007.

Deposition of Rick T. Waldo, M.D., February 1, 2008.


**Data**

National Disease and Therapeutic Index data 1994-2007.

Drugs@FDA: http://www.accessdata.fda.gov/scripts/cder/drugsatfda/.


**Miscellaneous**

IMS Health, National Disease and Therapeutic Index Drug Volume I, 1Q 2006.

Memorandum and Order, In re Neurontin Marketing and Sales Practices Litigation, MDL Docket No. 1629, Civil Action No. 04-10981, August 29, 2007.

Memorandum of Law in Support of Plaintiffs' Renewed Motion for Class Certification, In re Neurontin Marketing and Sales Practices Litigation, MDL Docket No. 1629, Master File No. 04-10981, December 19, 2007.

Plaintiffs' Renewed Motion for Class Certification, In re Neurontin Marketing and Sales Practices Litigation, MDL Docket No. 1629, Master File No. 04-10981, December 19, 2007.

Pfizer 2000 Annual Report.

Pfizer 2002 Form 10-K.