UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | |
| THIS DOCUMENT RELATES TO: | ) ) | MDL Docket No. 1629 Master File No. 04-10981 Judge Patti B. Saris |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) ) ) | Mag. Judge Leo T. Sorokin |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
RENEWED MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  DR. CONTI'S REPORT AND METHODOLOGY ARE SOUND ................................ 1

III.  THE ADDITIONAL CONSUMER SUBCLASS REPRESENTATIVES ARE
       TYPICAL AND ADEQUATE ..................................................................................... 6

IV.  THE PROPOSED SUBCLASS PERIODS ARE SUPPORTED BY THE
       EVIDENTIARY RECORD AMASSED IN DISCOVERY ............................................ 9

       A.  Bipolar.............................................................................................................. 11

       B.  Neuropathic Pain ............................................................................................. 14

       C.  Nociceptive Pain ............................................................................................. 16

       D.  Migraine ........................................................................................................... 17

       E.  Doses in Excess of 1800 mg per day .............................................................. 17

V.  DAMAGES TO THE TPPs ARE SUBJECT TO AGGREGATE PROOF.................... 18

VI.  TPP REIMBURSEMENT PRACTICES ARE IRRELEVANT..................................... 19

VII.  PLAINTIFFS' MOTION TO AMEND IS AUTHORIZED........................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Black v. Food Lion, Inc.*,
171 F.3d 308 (5th Cir. 1999) ........................................................................... 3

*Clark v. Pfizer, Pa. Court of Common Pleas*,
Philadelphia County, Civ. No. 1819
(Mar. 14, 2008) ........................................................................................... 11

*Cuevas v. E.I. DuPont de Nemours & Co.*,
956 F. Supp. 1306 (S.D. Miss. 1997) ................................................................ 3

*Desiano v. Warner-Lambert Co.*,
326 F.3d 339 (2d Cir. 2003) ............................................................................ 18

*Eisen v. Carlisle and Jacquelin*,
417 U.S. 156 (1974) ....................................................................................... 2

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ........................................................................... 6

*In re Bextra and Celebrex Marketing, Sales Practices and Prods. Liab. Litig.*,
2007 WL 2028408 (N.D. Cal. Jul. 10, 2007) ..................................................... 18

*In re Guidant Copr Implantable Defibrillators Prods. Liab. Litig.*,
484 F. Supp. 2d 973 (D. Minn. 2007) ............................................................... 19

*In re Lorazepan & Clorazepate Antitrust Litig.*,
295 F. Supp. 2d 30 (D.D.C. 2003) ................................................................... 18

*In re Neurontin Marketing and Sales Practices Litig.*,
244 F.R.D. 89 (D. Mass. 2007) .................................................................. passim

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
230 F.R.D. 61 (D. Mass. 2005) ........................................................................ 3

*Int'l Bhd. of Teamsters, Local 734 Health &
Welfare Trust Fund v. Philip Morris Inc.*,
196 F.3d 818 (7th Cir. 1999) ..................................................................... 18, 19

*Int'l Union of Operating Engineers Local No. 68
Welfare Fund v. Merck & Co., Inc.*,
192 N.J. 372, 929 A.2d 1076 (N.J. 2007) ........................................................ 20

*Long v. Trans World Airlines, Inc.*,
761 F. Supp. 1320 (N.D. Ill. 1991) ................................................................... 6

*M. Berenson Co., Inc. v. Faneuil Hall Marketplace*,
100 F.R.D. 468 (D. Mass. 1984) ....................................................................... 7

*McClain v. Metabolife Intern. Co., Inc.*,
401 F.3d 1233 ............................................................................................... 3

*Polaino v. Bayer Corp.*,
122 F. Supp. 2d 63 (D. Mass. 2000) .................................................................. 3

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*SEIU Health & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001) ................................................................................ 18

*United States ex rel Franklin*,
    2003 WL 22048255  (D.Mass. Aug. 22, 2003) ......................................................... 3

*United States ex rel. Franklin v. Parke-Davis*,
    147 F. Supp. 2d 39 (D. Mass. 2001) ........................................................................ 3

*Whiting v. Boston Edison Co.*,
    891 F. Supp. (D. Mass. 1995) ................................................................................... 3


**TREATISES**

D. Radley, S. Finkelstein, *et al.*, *Off-Label Prescribing Among Office-Based*
    *Physicians*, 166 Arch. Intern. Med. 1021 (May 8, 2006) ........................................ 3

Federal Judicial Center, *Manual for Complex Litigation*, *Fourth*
    § 2.22 (2004) ............................................................................................................. 8

## I.    <u>INTRODUCTION</u>

In its August 2007 opinion, the Court set Plaintiffs a limited set of tasks, the fulfillment of which would lead to class certification.  In their opening memorandum, Plaintiffs clearly laid out each of those tasks, in the Court's own words, without argument or evasion, and accomplished them, with mathematical precision.

Defendants chide the Plaintiffs for citing only four cases in their brief.  The Court requested a factual showing, not additional legal argument or authority.  Plaintiffs prepared their submission as ordered by the Court.

Defendants devote much of their brief to a re-presentation of arguments the Court has already declined to rule in their favor on, including (1) advancing alternative explanations for the meteoric rise in Neurontin sales for off-label conditions besides Defendants' misleading marketing efforts; (2) arguing the merits of whether Neurontin is effective to treat the various off-label conditions at issue; and (3) dissecting the reimbursement policies of Aetna and Kaiser, who have already excluded themselves from the proposed TPP Class.  Plaintiffs lack the time or space in this 20-page memorandum to reargue these points, and accordingly confine themselves to the matters requested by the Court.

## II.    <u>DR. CONTI'S REPORT AND METHODOLOGY ARE SOUND</u>

Defendants complain that Dr. Conti does not opine on the question of whether all but a *de minimis* number of prescriptions were caused by Defendants' fraudulent promotional activities (Defs. Mem. Opp. Cl. Pltfs. Renewed Mo. for Cl. Cert. ("Opp.") at 6), but that was not the task set by the Court.  Instead, Dr. Conti was asked to calculate, using the best available datasets, the number of Neurontin prescribers and prescriptions over time for each off-label condition.  If the increase in sales following the onset of the corresponding marketing campaign was sufficiently dramatic, *the Court* would "consider statistical proof as sufficient to demonstrate that most

purchasers were injured." *In re Neurontin Marketing and Sales Practices Litig.*, 244 F.R.D. 89, 114 (D. Mass. 2007) (emphasis added).[1] *See also id.* at 111 (plaintiffs "proffered dramatic statistics that even a lay judge can understand without an econometric model").[2]

Dr. Conti's calculations, presented in Plaintiffs' opening brief, mirror *Defendants' own assessment* that absent a concerted marketing effort, Neurontin had, and would continue to have, a 0% share of the bipolar market, and that a negligible number of psychiatrists prescribed Neurontin for bipolar prior to the onset of Defendants' marketing campaign. Similar showings were made for each of the other off-label conditions.[3]

Defendants argue that selected antiepileptics other than Neurontin exhibited "similarly sharp" growth in off-label usage. However — as is typical of Defendants, who cannot seem to help themselves when it comes to manipulating data — when the "off-label" conditions for which several of these drugs were eventually approved[4] (establishing that they were indeed

---

[1] On no less than seven occasions, Defendants misstate the task set by the Court, purporting to require "'statistical proof' that defendants' alleged fraud *caused* all but a 'de minimis' number of prescriptions for each off-label use that remains at issue." Opp. at 1 (emphasis added). *See also* Opp. at 2, 5, 6, 16, 20, 28.

[2] Defendants complain that Plaintiffs overlaid marketing timelines on Dr. Conti's sales calculations. Opp at 6 n.4. There was nothing improper in this. The whole point of these calculations was to enable the Court to assess the impact of the respective marketing campaigns on sales for the corresponding indication. Accordingly, in their opening memorandum, Plaintiffs set forth, for each indication, the broad outlines of Defendants' marketing efforts. *See* Pl. Mem. at 18-40. When each campaign began and ended, and the corresponding chronology of publications and events, are matters of evidentiary fact, not expert opinion. Although it is necessary to settle on a subclass period for purposes of class notice, given the duration and scope of Defendants' multi-faceted marketing campaigns, the number of actors and "events," and the innumerable disputes between the parties over the misleading character and impact of each phase of the operation, the determination of the onset of the fraud is one that should be made by the trier of fact after a full presentation of the evidence, not on a procedural motion, however significant. If *anything* remains of the Supreme Court's statement in *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974) that courts have no authority "to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action," questions of liability and causation should be reserved for trial of this matter. At this juncture, it is appropriate to give the Class the "benefit of the doubt," if any, as to the commencement of the class period, so that the Court may exercise jurisdiction over (and not unfairly extinguish) the claims of all who may have them, consistent with whatever judgment is ultimately rendered.

[3] Even accepting Defendants' alternative start dates (which are factually unsupportable, as set forth below), the level of prescribing activity prior to the onset of each fraudulent marketing campaign remains "de minimis" in relation to the increase in sales immediately following its onset, as the Court observed in its prior opinion. *See* 244 F.R.D. at 111.

[4] *See* Grabowski Report (Defs. Exh. 34), Exhs. 2A (showing approval of Depakote for bipolar), 2D Lamictal (same),

effective in treating those conditions) are factored out, the comparison looks very different, with Neurontin clearly in "a class by itself" in terms of off-label usage, both in general and for the specific indications at issue in this case.[5]

Defendants level several criticisms at Dr. Conti's report, but none cast sufficient doubt on its accuracy to alter the outcome of this motion. *See* 244 F.R.D. at 110 ("On a motion for class certification, a court need not plunge into the weeds of an expert dispute about potential technical flaws in expert methodology.").[6] Into the weeds we go.

First, Defendants complain that Dr. Conti is not prepared to submit her declaration for publication "as it is" in a peer-reviewed journal. Opp. at 6. That is not the standard of admissibility articulated or applied by the Court. *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 90 (D. Mass. 2005) (court must conclude only that

---

2E (showing approval of Topamax for migraine).

[5] *See* NDTI Uses: Off-Label Uses At Issue in This Case, All Drugs In Grabowski Exhibit 2 vs Neurontin (Declaration of Ilyas Rona ("Rona Decl.") ¶ 15, Exh. M). *See also* D. Radley, S. Finkelstein, *et al*., *Off-Label Prescribing Among Office-Based Physicians*, 166 Arch. Intern. Med. 1021, 1023-25 (May 8, 2006) (using IMS data on the 500 most frequently prescribed drugs in 2001, authors determined that "Gabapentin [the generic name for Neurontin] had the highest proportion of off-label prescription (83%)," and that there was "little or no scientific support" for 80% of these prescriptions) (Rona Decl., Exh.L).

[6] The several *Daubert* cases cited by Defendants invoking the logical fallacy "*post hoc ergo propter hoc*" (Opp. at 16-17) were of a very different nature, involving claims that the plaintiff suffered personal injuries caused by exposure to a toxin or a fall. *See Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63 (D. Mass. 2000) (exposure to undiluted chemicals from x-ray machine); *Whiting v. Boston Edison Co.*, 891 F. Supp. (D. Mass. 1995) (radiation exposure); *McClain v. Metabolife Intern. Co., Inc.*, 401 F.3d 1233 (11th Cir. 2005) (appealing jury verdict finding diet drug caused injuries); *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999) (addressing whether fibromyalgia caused by fall); *Cuevas v. E.I. DuPont de Nemours & Co.*, 956 F. Supp. 1306, 1311 (S.D. Miss. 1997) (whether exposure to herbicide caused medical problems). Issues of causation in those cases went to whether the toxin or accident was the unintended cause of a physical injury; here, the growth in sales documented in Dr. Conti's declaration was the foreseeable and "intended consequence of the alleged scheme of fraud." *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 53 (D. Mass. 2001). As the Court held in addressing the causation issue on the motion to dismiss: "The same common law tort principles that Judge Saris described in *United States ex rel Franklin*, 2003 WL 22048255 at *11 (D.Mass. Aug. 22, 2003) are applicable to the instant matter. ' . . . The first question is whether there was in fact some causal relationship between the conduct and the outcome. The Restatement expresses this test as whether the defendant's conduct was a 'substantial factor' in producing the harm. . . .'" Report and Recommendation on Defendants' Motions to Dismiss (Dkt. No. 269) at 18-19 (Sorokin, J.). *See* 244 F.R.D. at 111 ("with such a large bump-up in off-label sales immediately following a promotional campaign, it seems more likely that the increase was not due to the diffusion of new knowledge about the 'basic science' of the brain. It stands to reason that Pfizer believes its promotional campaign has an impact because it spends so much time and money on marketing and evaluating its effect.").

the proffered expert methodology for calculating damages on an aggregate class-wide basis is "not so insubstantial as to preclude class certification").

Next, Defendants complain that Dr. Conti's estimates do not contain margins of error. Opp. at 7. In her reply declaration, Dr. Conti explains that "when examining prescription trends over time using NDTI data, it is standard practice in peer-reviewed literature not to provide margins of error because doing so will not affect the observed trends. Dr. Grabowski himself does not provide margins of error in the charts provided in his report which utilize the same NDTI data to show prescribing trends over time." Rebuttal Declaration of Rena Conti, Ph.D. ("Conti Reb. Dec.") at 1. *See also id*. at 5 (providing greater detail).

Defendants also complain that the NDTI data on which Dr. Conti's analysis is based does not show the number of prescriptions actually dispensed for each off-label indication, but rather the number of "uses," which, as measured by the NDTI survey, could also include "mere mentions of the drug where no prescription was ever written, free samples, and prescriptions that were never filled." Opp. at 7. As Dr. Conti explains:

> NDTI data are the academic, government and industry standard for the estimation of national prescription medication use linked to specific diagnoses and related to promotional activities.
>
> * * *
>
> Dr. Grabowski also suggests that there maybe variation in the correspondence between prescription writing and filling - particularly for the off-label indications associated with Neurontin. There is no evidence to support this claim in the peer reviewed literature and Dr. Grabowski provides no references for this assertion.
>
> Finally, the trend estimates of Neurontin use before and after the initiation of alleged fraudulent promotional activities are immune to this criticism. Even if there was a gap in the correspondence between Neurontin prescriptions and the filling of the prescription at the disease level at any point in time, there is every reason to believe that this gap is the same (or stable) over time within the particular indication.

Conti Reb. Dec. at 4.

Finally, Defendants argue that demographic variations among insured populations make the NDTI an unreliable basis for determining individual TPP damages. Dr. Conti testified at her deposition that in the absence of evidence to the contrary — and she could find none — it was "a very reasonable conservative assumption to make," that "individuals taking Neurontin for a particular indication would also be evenly distributed across the population," a point she confirmed with an expert in statistical theory at the Harvard Medical School. Rowland Decl., Exh. 17 at 530:14-534:12. Dr. Bell challenges this assumption, but offers only his speculation that "Neurontin use likely varies across industries," and points out that that there is regional variation in prescription drug use per capita for some classes of drugs, but provides no evidence of the existence or extent of variation with respect to Neurontin. Rowland Decl., Exh. 35 ¶¶ 76, 78.

As shown in Table 2 (at p. 11) of Plaintiffs' opening memorandum, a TPP with 3,248 members would have a 99% probability of having paid for Neurontin prescriptions for all five of the subclass specific conditions. A probability of 90% requires only half that number, 1,624. With average membership of 160,000 each, there can be little doubt that virtually all of the approximately 1,300 commercial insurance plans in the United States, and the vast majority of Taft-Hartley Funds, with an average of 3,600 members each, are members of all five indication subclasses at a 90%-99% confidence level, regardless of any occupational or regional variations in usage.

Defendants do not dispute that the NDTI percentages are valid when measured against the entire population of the privately insured. Thus, the consistent application of these percentages against the purchases made by the entire TPP Class will result in no excess or under

award of damages.  With a class wide damage award that neither over nor under compensates the

TPP Class, and with class membership established for each TPP, by indication, to a confidence

level of 90% or more, based on its relative size, the allocation of any recovery as between the

members of each TPP Subclass concerns only the class members *inter se*, not Defendants, as the

Court has already held.[7]

## III.    THE ADDITIONAL CONSUMER SUBCLASS REPRESENTATIVES ARE TYPICAL AND ADEQUATE

The proposed additional representatives for each Consumer Subclass are both typical and

adequate.[8]  Defendants repeatedly misstate and misapply the typicality standard, which the Court

succinctly set forth in its August 29, 2007 opinion: "a plaintiff's claim is typical if it arises from

the same event or practice or course of conduct that gives rise to the claims of the other class

members, and if his or her claims are based on the same legal theory."  *In re Neurontin*, 244

F.R.D. 89, 106  (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)).  The Court

added, "Typicality, as with commonality, does not require that all putative class members share

identical claims," and "should be determined with reference to the defendant's actions, not with

respect to particularized defenses it might have against certain class members."  *Id.* at 106

(internal citations and quotations omitted).  To defeat typicality, the defendant must show that

the "'proposed class representative is subject to a unique defense that has the likelihood of

becoming the main focus of the litigation...'"  *Id.* at 106 (citations omitted).  Applying this

---

[7] *See* 244 F.R.D. at 112  ("Under the 'fluid recovery' (or 'cy pres distribution') process, 'the jury determines the aggregate damage to the class without deciding how much each individual class member is to receive.  Allocation of the award is made later, administratively, upon the submission of claims, and often according to a formula.'" (citations omitted).  Damage awards in class actions "need not be 100 percent accurate."  *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1327 (N.D. Ill. 1991).

[8] Defendants erroneously group together the adequacy and typicality of the proposed class representatives, see Opp. at 34-35, but their arguments, focused on what they characterize as unique defenses, go only to typicality (with the exception of proposed representative Holloway, discussed separately below), as they make no attempt to show that there is a non-speculative, fundamental conflict between any class representative and absent class members that would raise adequacy concerns.  *See* 244 F.R.D. at 107-08.

standard does not involve an inquiry into the merits of each plaintiff's claim.  Instead, "[t]ypicality refers to the nature of the claim of the class representatives, and not to the specific facts from which the claim arose or relief is sought."  *M. Berenson Co., Inc. v. Faneuil Hall Marketplace*, 100 F.R.D. 468, 470 (D. Mass. 1984) (quotation omitted).

Defendants make a series of merits-based arguments about each class representative, contending that the class representative's physicians did not prescribe Neurontin as a result of defendants' fraud, and arguing, wrongly,[9] that Neurontin was effective in treating each plaintiff's condition.  In opposing plaintiffs' first motion for class certification, defendants made nearly identical arguments about the typicality of class representatives Kopa and Smith.[10]  The Court rejected these attempts to defeat typicality.  "Defendants have failed to show that the existence of these potential defenses is likely to play a significant role at trial or distract from issues common to the class."  244 F.R.D. at 107.

The issues are no different with the new proposed class representatives.  Even the so-called "unique defenses" put forth for each new class representative are not unique, as claims of Neurontin's effectiveness and physicians' exposure to the fraud have been central and consistent defenses.  Perhaps recognizing that each plaintiff is typical of the classes plaintiffs have actually proposed, defendants invent their own class, introducing a merits determination into the class definition to argue that each plaintiff was not prescribed Neurontin as a result of the fraud and is

---

[9] Each plaintiff testified that Neurontin was ineffective in treating the condition for which it was prescribed.  *See* Holloway Dep. (Rowland Decl., Exh. 9)  at 102-06 (back pain); Varnum Dep. (Rowland Decl., Exh. 15) at 28 ("completely ineffective" in treating bipolar disorder); Wityk Dep. (Rowland Decl., Exh. 13) at 181, 125-26 (testifying that "I do not recall getting better while I was on Neurontin at all," and that she continued with Neurontin in an effort to be "compliant"); Ramsey Dep. (Rowland Decl., Exh. 16) at 35-36 (ineffective in treating reflex sympathetic dystrophy and musculoskeletal pain).

[10] Defendants contended that that Neurontin was effective for Smith, and that he had recovered his payments for the drug, and characterized as a unique defense Kopa's testimony of being coerced into continuing with Neurontin.  *See* Defs.' Mem. Opp. to Pls.' Mot. Class Cert. (Dkt. No.585, filed under seal) at 43-45.  Defendants also cited to the testimony of these Plaintiffs' physicians, arguing that the doctors' testimony showed they had not been subject to the alleged fraud, and that they believed Neurontin was effective for their patients.  *See* Defs.' Sur-reply (Dkt. No. 738, filed under seal) at 35.

thus neither typical nor a class member. *See* Opp. at 10 (contending that Holloway is not a member of the class because "she did not receive Neurontin as a result of any alleged fraud and, therefore, has no claim."), 12 (arguing that Wityk "has no claim"). As Plaintiffs' class definitions do, "[t]he order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against)." Federal Judicial Center, *Manual for Complex Litigation*, *Fourth* § 2.22 (2004).

It is undisputed that each plaintiff purchased or paid for some or all of the purchase price of Neurontin, as the class definition for each consumer class provides. Their claims arise from the same events and course of conduct as of those of absent class members do. As such, they satisfy the typicality requirement.

Defendants claim that Ms. Holloway suffered from neuropathic rather than nociceptive pain, and thus is not an adequate class representative for the nociceptive pain class. The sole support for this claim is the self-serving testimony of Ms. Holloway's treating physician, Dr. Greg Rogers, given four years after he treated her for a supposed diagnosis of a "pinched nerve" due to spinal stenosis. There is a complete absence of any such diagnosis in Ms. Holloway's contemporaneous medical records, which are devoid of any reference to neuropathic, neurogenic or nerve related pain.[11] Defendants' exclusive reliance on Dr. Rogers's testimony is especially faulty because, as Dr. Rogers concedes, he has "trouble distinguishing between [neuropathic pain and nociceptive pain]." Rowland Decl., Exh. 12 at 124:1-2.[12]

---

[11] In fact, quite to the contrary, the record is clear that Ms. Holloway: (a) suffered chronic back pain resulting from a traumatic motor vehicle accident (Rona Decl., Exh. C), (b) that she suffered from inflammation which prompted the prescription for Bextra a COX-2 inhibitor used to treat nociceptive pain (*id.*), and (c) that she experienced "specific point tenderness in the lower back…" (Rona Decl., Exh. G). Each of these is consistent with a diagnosis and treatment for nociceptive pain.

[12] In fact, Dr. Rogers flunked the basic test of competency in the matter, failing to properly define nociceptive pain:

Pfizer also relies on Dr. Rogers' own subjective impressions to determine whether his Neurontin prescriptions were influenced by Pfizer. Unfortunately for Dr. Rogers, he is just as oblivious to the effect that marketing has on his prescribing patterns as Drs. Huler and Dhaduk.[13]

## IV.  THE PROPOSED SUBCLASS PERIODS ARE SUPPORTED BY THE EVIDENTIARY RECORD AMASSED IN DISCOVERY

Plaintiffs' original motion for class certification, filed nearly three years ago in August 2005 (Dkt. No. 204), sought certification of an overarching Class, and Consumer and TPP Subclasses, "from January 1, 1994, through the present." *Id*. at 1-2. Finding it necessary to impose some temporal limit on discovery by establishing a termination date, after extensive motion practice, the Court set the end of the class period at May 2004, but left the January 1, 1994 start date unaltered.[14] Indication-specific start dates were not called for by the Court, or proposed by Plaintiffs, prior to the Court's August 29, 2007 opinion and the instant motion. Thus, Defendants' argument that Plaintiffs are attempting to lengthen, rather than shorten, the

---

Q    Let me switch gears with you for a second. Have you ever heard of nociceptive pain?

A    Yes. Nociceptive.

Q    How would you define that?

A    That's pain that's not really generated by a specific location such as an arm, a leg, a knee, an ankle. But the nerve that connects the brain to that location is being affected and is generating the pain that the brain perceives. And it's not really -- it may seem like it's knee pain, but it's really something involving the nerve between the knee and the brain. So if something in the brain stem goes wrong, you won't perceive it properly. If something -- if there's a herniated disc in the lumbar spine, it can affect it and cause the sensation of knee pain without the knee actually being injured. So that -- that would be sort of my description of it.

Rowland Decl., Exh. 12 at 115:6-24.

[13] Dr. Rogers' prescribing data—produced by Pfizer in this litigation—shows *no* Neurontin prescriptions until November 2002, the *same month* that he was *first* detailed by a Pfizer sales representative! *See* Rona Decl. ¶¶ 11-12 and Exhs I, J. According to Pfizer's records, he was detailed three times after November 2002, and each month in which he was detailed saw an increase in four new prescriptions over the previous month. The records also show persistency in the lingering effect of a detail on Dr. Rogers. Dr. Rogers averaged 8.375 prescriptions per month for a period of six months after a detail, versus an average of only 3.25 scripts per month when it had been more than 6 months past his last detail. *Id*.

[14] *See* Electronic Order Dec. 12, 2006) ("'The motion to amend is allowed in part with respect to allegations through May, 2004."); Third Amended Class Action Complaint (Dkt. No. 580) ¶¶ 315-17. Plaintiffs apologize for overlooking this Order previously, and accordingly revise their proposed Class and Subclass periods to provide for termination dates of May 2004.

applicable subclass periods is made without reference to the pleadings and orders that actually

bear upon the issue.

Defendants argue that the subclass periods should not begin earlier than the specific

events listed in Class Plaintiffs' Post-Argument Submission in Support of Class Certification,

filed nearly a year ago (Dkt. No. 752). Opp. at 7-9. As stated in that submission, the Court had

requested "one page" summaries for each indication, for the purpose of identifying "uniform

messages that were provided to physicians by Defendants," not setting the temporal limits of

their dissemination.[15]

It should come as no surprise, to either Defendants or the Court, that discovery has

produced evidence of substantial off-label marketing efforts by Defendants unknown to Plaintiffs

at earlier phases of the case.[16] The chronologies of misleading marketing efforts for each

indication, set forth in Plaintiffs' opening memorandum (at 18-41) are well-supported by the

evidentiary record amassed in discovery, through considerable effort and expense. These efforts

should not be rendered pointless by holding Plaintiffs to interim, exemplary factual submissions

---

[15] *See id.* at 1 ("[t]he purpose of these summaries is to illustrate to the Court that common issues of law and fact regarding such marketing exist and that the Defendants pervasively disseminated, false and misleading marketing 'messages'"); 244 F.R.D. at 109 ("Plaintiffs have met their burden of demonstrating that the 'key messages' of efficacy and clinical evidentiary support disseminated by plaintiffs [sic], coupled with the suppression or misrepresentation of unfavorable data, are materially uniform per indication.") (citation omitted).

[16] As Plaintiffs noted in their post-argument submission:

> Although Plaintiffs served their requests for production of documents over two years ago, Defendants have produced most of the documents responsive to those requests in the last three months. Defendants have produced over 200,000 documents comprising more than 3 million pages, in the course of this litigation, but only 35% of them (72,540 out of 205,154 documents) were produced before February 15, 2007, and almost half of these were scientific studies which did not provide any detail on Defendants' multi-faceted marketing efforts. Despite the fact that the Class Plaintiffs have had more than a score of lawyers reviewing the document productions, they have simply not been able to digest in its entirety the massive amount of material that has been provided in the last several weeks. Moreover, many of the medical marketing firms, who have the best records regarding what was actually presented at the various events, have still not responded to the Class Plaintiffs' subpoenas.

*Id.* at 2 n.2.

provided for a different purpose.

Defendants further argue that the subclass period for each indication cannot begin until Defendants became aware of negative scientific studies, and must end with the publication of those studies. Opp. at 28. While the suppression of negative scientific studies is an important part of the case against Defendants, as the Court determined in ruling on the motion to dismiss, "Plaintiffs have stated a claim with respect to any theory based on Defendant's *misrepresentation of the results of scientific studies or* omission of existing negative studies." Memorandum and Order dated June 12, 2006 (Dkt. No. 356) at 21 (emphasis added). Nor did the fraud necessarily end with the publication of negative studies, as the articles themselves misrepresent the actual results of the studies, and often the researchers' conclusions.[17] Defendants also buried negative information in obscure journals with minimal readership (*id*.), in a deliberate — and successful — effort to ensure that science did not interfere with their marketing efforts. Defendants continued to make false and misleading statements after the publication of negative studies. Accordingly, the subclass periods do not end simply by virtue of publication.[18]

### A.    <u>Bipolar</u>

In the spring and summer of 1995, the first two of what would be four marketing assessments were approved, one in bipolar and the other in neuropathic pain, implementing a

---

[17] With respect to the potentially damaging effect the Reckless study would have on Defendants' successful efforts to market Neurontin for diabetic peripheral neuropathy, a key document states:

> I think that we can limit the potential downsides of the 224 study by delaying the publication for as long as possible and also from where it is published. More importantly it will be more important to how WE write up the study. We are using a medical agency to put the paper together which we will show to Dr Reckless. We are not allowing him to write it up himself.

Pfizer_LeslieTive_0020985 (attached as Exh. B to Revised Decl. of Ilyas Rona (Dkt. No. 645).

[18] Indeed, in the companion case already certified in Pennsylvania state court, the Court recently held that Pfizer could be held liable for sales of generic gabapentin, which did not even begin until Pfizer abandoned its marketing efforts. *See Clark v. Pfizer, Pa. Court of Common Pleas*, Philadelphia County, Civ. No. 1819 (Mar. 14, 2008) (Rona Decl., Exh.K).

two-pronged strategy designed to create the appearance of scientific support.  The first prong

called for scientific studies to be conducted and for selective publication strategies where the

publication and public dissemination of the results of these studies was only contemplated "if

positive."  *See* Bipolar Marketing Assessment WLC_FRANKLIN_0000170736; Neuropathic

Pain Marketing Assessment WLC_FRANKLIN_0000166608.  In the short term, however, the

company paid physicians such as David Marcotte, A.G. Finkel, J.D. Mann, and Hans Hansen to

claim that they had conducted retrospective studies and were providing "preliminary" or "hot of

the press" data that showed that their studies were positive.  These physicians held themselves

out as disinterested researchers, when in fact they were paid shills who earned hundreds of

thousands of dollars from Parke-Davis.  The data that was presented was held out as being

scientifically reliable data collected from an unbiased retrospective study, when in fact the data

was cherry-picked data collected with the intent to deceive physicians about efficacy.

As of May 1995, Parke-Davis knew that there was no scientific rationale for using

Neurontin as a treatment for bipolar.  *See* Bipolar Marketing Assessment

WLC_FRANKLIN_0000170736.  At that time, Parke-Davis also knew that Neurontin was

capturing 0% of the bipolar market.  At that time, Parke-Davis also knew that use of Neurontin

to treat bipolar "would not be obvious to a medical practitioner of ordinary skill."  *See* U.S.

Patent No. 5,510,381 (issued Apr. 23, 1996).

Nevertheless, starting on October 24, 1995, Parke-Davis began holding a series of

scripted teleconferences aimed at presenting misleading information about Neurontin's utility in

treating bipolar disorder.  *See* WLC_FRANKLIN_0000199997;

WLC_FRANKLIN_0000098315.  Parke-Davis employees prepared the outline for the calls, but

the calls were moderated by Dr. Marcotte, a physician who would "guide physicians on how to

use Neurontin effectively." *See* WLC_FRANKLIN_0000199997.    Dr. Marcotte presented

purportedly scientific data containing "[m]easures of success (end points)."  For this reason, Dr.

Marcotte was noted as being "a very valuable resource for the SECBU."  *Id.*  At no point did Dr.

Marcotte reveal that there was no scientific rationale for using Neurontin as a treatment for

bipolar.

      In the spring of 1996, when the teleconferences began receiving scrutiny from the FDA

for off-label marketing, Parke-Davis shifted its focus to consultants meetings as a way to

disseminate the bipolar marketing fraud.  At these meetings, Parke-Davis once again paid Dr.

Marcotte to support the claim that there was mounting scientific evidence to support the use of

Neurontin for bipolar.[19]

      In late spring 1996, Parke-Davis also began using medical liaisons to spread the

misleading message of mounting scientific data to an even broader audience.  This information

was represented as "cutting edge clinical information."  WLC_FRANKLIN_0000015602.  As

was revealed by former medical liaison and whistleblower David Franklin, the supposedly

"scientific" information was a sham.[20]

      Defendants contend that the bipolar class period ends with the publication of the Pande

study in September 2000 and the Frye study in December 2000.  This assertion is flawed for

several reasons.  First, Defendants make no mention of any publication of the Guille study,

---

[19] For example, at a consultants meeting in Marco Island, FL, Marcotte presented "hot off the press data" in the form of a "retrospective chart review" which claimed that "all patients experienced stabilized sleep, mood, and irritability," and that 78% achieved monotherapy with Neurontin, which was better than the 21% who had achieved monotherapy with other medication prior to the study.  *See* WLC_FRANKLIN_0000199743; WLC_FRANKLIN_0000073645.  This was intentionally misleading, as the figures ultimately reported by Marcotte were materially worse.  *See* WLC_FRANKLIN_0000109214, WLC_FRANKLIN_0000109215.

[20] For example, Franklin testified in his deposition in the underlying *qui tam* action that he and a sales colleague met with a physician near Boston and "told her that Neurontin was efficacious for bipolar and other psychiatric problems."  Transcript of Deposition of David Franklin, Vol. 1, 296:8-11.  The physician was also told "[t]hat a substantial body of data existed on the efficacious use of Neurontin in bipolar disease."  *Id.* at 301:22-302:1.

which was also negative.  Second, the negative Pande study was published in a journal that has only 450 subscribers.  Because Defendants did not distribute reprints of the study, as they did with purportedly favorable studies, their publication likely had little impact.  Third, the fraud continued for months after the publication of the articles in the form of detailing, CMEs, and misleading statements made in various journal publications.

### B.    Neuropathic Pain

On July 24, 1995, Parke-Davis issued a Marketing Assessment for Neurontin in neuropathic pain.  As with bipolar, the neuropathic pain Marketing Assessment included the recommendations of the NPC to conduct an exploratory study in neuropathic pain and to have the results of the study be published only "if positive."  *See* Neuropathic Pain Marketing Assessment WLC_FRANKLIN_0000166608.

The neuropathic pain Marketing Assessment explicitly endorsed the two-pronged strategy identified above.  Specifically, the Marketing Assessment called for Parke-Davis to "[p]ool the currently available open label data from the several centers [e.g. Carolina Pain Management Center (100 patients), Georgia Pain Management Center (100-200 patients)] and have the investigators present this data at neurology and pain conferences."  Id.

Pursuant to the Marketing Assessment, Parke-Davis presented an abstract by Drs. Finkel and Mann at the American Pain Society (APS) meeting in Los Angeles in November 1995 entitled "Gabapentin: a New Therapy for the Treatment of Chronic Pain."  *See* WLC_FRANKLIN_0000035723.  In the abstract, Finkel and Mann concluded that Neurontin was an "efficacious medication for the treatment of certain chronic pain conditions."  *Id*.  In March 1996, Finkel and Mann received a grant for $30,000.  *See* WLC_FRANKLIN_0000156836.

In April 1996, Parke-Davis delivered a CME "home study" course book, developed by its

joint venture partner Physicians World, to roughly 10,000 physicians. *See* WLC_FRANKLIN_0000015522. The goal of the course book—which purported to be continuing medical education— "[p]rovide medical rationale for using anticonvulsants in these appropriate clinical situations," and to "[d]isseminate existing clinical experience regarding use of anticonvulsants in the treatment of pain." *See* WLC_FRANKLIN_0000032920. This mailing was followed up with 25 of dinner meetings held in 16 large metropolitan areas in May and June 1996 attended by 4,000 physicians. Parke-Davis also held 50 audio-conferences containing the "highlights" of these meetings, which allowed for hundreds of physicians in less urban areas to participate. *See* WLC_FRANKLIN_0000015522; WLC_FRANKLIN_0000032920. The purpose of the home study course book and dinner meetings was to "disseminate information regarding the use of anticonvulsants in the treatment of chronic pain." *See* WLC_FRANKLIN_0000032920. At no point during the program was Physicians World's partnership with Parke-Davis disclosed. Moreover, it was clear that the educational nature of these events was merely a pretext for marketing. As Physicians World recognized, the goal of the program was to achieve "modification of health-care provider behavior"—i.e. increasing "target audience" prescriptions—by proving "important background information… in the effective use of anticonvulsants." *See* WLC_FRANKLIN_0000032920 (emphasis added).

In October 1996—not August 1997—Gorson's study was completed and the study manuscript was complete.

Defendants cite as support for their argument that the class period for neuropathic pain should end prior to 2004 that the results of various negative trials were published between 1999 and 2003. This argument fails for several reasons. First, Defendants fail to mention that there were other clinical results, such as the results of the negative POPP study, that have still not been

published to this day. Second, Defendants assume the unstated premise that the publications must be accurate and non-misleading enough that the negative results are properly conveyed. Class Plaintiffs dispute this premise and contend that at least two of the articles cited are themselves deceptive and thus their publication contributes to the fraud rather than relieving it. Third, Pfizer has continued to make false statements about Neurontin's "efficacy" to treat neuropathic pain well after publication of these articles. Finally, there is a fact issue as to whether the medical community would have detected the existence of Gorson and Reckless's negative data published in the format they were (a letter to the editor and a review article)— places where physicians rarely look for new clinical data.

### C.    Nociceptive Pain

Defendants do not dispute that the nociceptive pain class period should end in 2004. Rather, Defendants only claim that the nociceptive class period must begin in 2000. This ignores the plan to make false and misleading statements relating to nociceptive pain going as far back as 1995.[21] In late 1995, in a document entitled "SECBU, Right On the Mark with Neurontin and Pain," Parke-Davis identified the following pain strategies:

> Plan strategy utilizing our key researchers in the SECBU and rolling out data through Southern Clinical. Medical research assistance for compilation and analysis of retrospective data and written abstracts for publication and presentation at meetings… Funding of smaller studies (statistical analysis) in the SECBU with our key customers for investigation of Neurontin and pain. Use this to further conference calls and presentation of data to colleagues.

See WLC_CBU_038936. The document noted that Dr. Hansen of the Carolina Pain Consultants already had received $6,000 for "statistical analysis" and would receive another $3,000 more.[22]

---

[21] The complaint alleges that the sales representatives mirrored the effort to create the appearance of scientific support for Neurontin's use to treat nociceptive pain. For example, in December 1996, a Parke-Davis sales representative stated that Neurontin was "[g]ood for back pain." Third Amended Class Action Complaint ¶ 158.

[22] On April 26, 1996, Dr. Hansen a "proposal to look at Neurontin for various pain syndromes." The proposal requested $25,000 from Parke-Davis in order to help Dr. Hansen create studies addressing "acute and chronic pain."

### D.    Migraine

Defendants do not take issue with the beginning of the class period for migraine.  Rather,

Defendants only contend that "the class period for a migraine subclass must end no later than

2001, based on Plaintiffs' statement that "After 2001, Pfizer largely abandoned the fraudulent

migraine marketing campaign..."  Memorandum in Support of Plaintiffs' Renewed Motion for

Class Certification at 32.  The abandonment, however, was not complete.  Pfizer never published

either of the two negative clinical trials on migraine.   To this day, physicians continue to be

exposed to an inaccurate and materially incomplete record of the scientific evidence concerning

Neurontin's utility in preventing migraines.

### E.    Doses in Excess of 1800 mg per day

As with migraine, Defendants do not put up a fight on the proposed start date for the class

period.  Rather, they contend that because some—but not all—of the studies were published

prior to the start of the class period, the class must fail.  This assertion is absurd because the

articles themselves are misleading as published and suggest that they prove Neurontin's greater

efficacy at doses above 1800 mg per day.[23]  Pfizer's inaccurate publication of the information

---

The goal of these studies was explicit:  "I would like to propose we look at other straight forward uses of GBP in common practice…. GBP use should expand into the primary care and early secondary care community. Hopefully, this will keep GBP from being 'niched' to neurological and pain management settings….Ideally, GBP will replace habituating medication profiles [i.e. narcotics]."   As examples of the forms of acute and chronic pain that were being discussed, Hansen listed various non-neuropathic pain conditions, including "neck and back pain," "headache," and "interstitial cystitis."  See WLC_CBU_095100.  A grant of $15,000 was approved on May 12, 1996.  Later that year, Hansen prepared a monograph entitled "Controlling Acute and Chronic Pain with Non-Narcotic Medication Alternatives," which claimed that Neurontin was a useful adjunct to narcotics that was capable of "eliminating [the need for morphine] altogether."  See WLC_CBU_152217.  Hansen does not disclose that he received a grant from Parke-Davis or that he had contracted with the company to help the use of Neurontin to "expand into the primary care and early secondary care community."  See WLC_CBU_095100.

[23] In fact, Parke-Davis applied to the FDA to increase the Neurontin's approved dose range for epilepsy to 3600 mg/day based on those studies.  On August 26, 1997—well after those studies were published—the FDA denied the application because there was no evidence that Neurontin greater efficacy at such doses.  After the merger, Pfizer continued this pattern of misrepresentation, misleadingly published articles claiming that Neurontin needed to be titrated up to 3600 mg per day to achieve maximum efficacy, while suppressing the evidence to the contrary.  In

relating to excessive doses, coupled with its suppression of the Reckless study, perpetuated the fraudulent scheme through 2004.

## V.    DAMAGES TO THE TPPs ARE SUBJECT TO AGGREGATE PROOF

Defendants argue that "[t]o recover, each member of the TPP classes must prove how each of its insureds' physicians would have behaved absent the alleged fraud" (Opp. at 35), but the Court has already held otherwise, finding aggregate proof sufficient with respect to the TPP class. 244 F.R.D. at 114-15. The authority cited by Defendants actually *supports* the Court's well-considered view that "[s]tatistical methods could provide a decent answer—likely a more accurate answer than is possible when addressing the equivalent causation question in a single person's suit." *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 823 (7th Cir. 1999).[24]

Next, Defendants argue that TPPs cannot recover any damages unless they are calculating their premiums incorrectly, because if they are correctly calculated, they are maintaining their overall profit margin. This is a convenient theory for the pharmaceutical

---

2002, Pfizer sought FDA approval to market Neurontin for dosages above 1800 mg per day for PHN. Once again, the FDA refused to accept this portion of the application, finding that "additional benefits of using doses greater than 1800 mg/day were not demonstrated."

[24] Defendants cite two tobacco cases, *Teamsters* and *SEIU Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001), both of which arose on motions to dismiss, to argue that the need for individual proof of causation defeats certification of the proposed TPP classes. The *SEIU* court held that third-party payor claims were too speculative and remote, 249 F.3d 1073-75, while the *Teamsters* court held that consumers, as the targets of the fraud, were the proper plaintiffs. 195 F.3d at 823. The *SEIU* court cited to tobacco cases from five other circuits in stating the case's central issue and holding. *See* 249 F.3d 1071 n.2. These cases are distinguishable, and, indeed, have been distinguished by courts that had before them claims like those of Plaintiffs here. For example, in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), involving the diabetes drug Rezulin, the Second Circuit distinguished tobacco cases from those where third-party payors seek to recover the purchase price of a fraudulently marketed drug. Unlike the tobacco context, where third-party payor "plaintiff's damages were entirely derivative of the injuries to their insured... the damages – the excess money Plaintiffs paid Defendants for the Rezulin that they claim they would not have purchased 'but for' Defendants' fraud – were in no way derivative of damages to a third party." *Desiano*, 326 F.3d at 349 (internal quotation omitted); *see also In re Bextra and Celebrex Marketing, Sales Practices and Prods. Liab. Litig.*, 2007 WL 2028408 (N.D. Cal. Jul. 10, 2007) (holding that plaintiffs adequately alleged direct injury). As in *Desiano*, Plaintiffs here "allege an injury directly to themselves." 326 F.3d at 349. *See In re Lorazepan & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 39-40 (D.D.C. 2003) (adopting rationale of *Desiano* in the antitrust context, distinguishing third-party payor tobacco litigation).

industry, which would give them *carte blanche* to defraud private insurers.  (Presumably, if an insurer *did* calculate its premiums incorrectly, Defendants would seek to avoid liability on the grounds of failure to mitigate or contributory negligence.)   Defendants argue that consumers, who are paying the higher premiums, cannot remedy the situation.  Every incremental increase in the cost of private health insurance puts it out of reach of some number of Americans.  The burden of caring for those who cease to be able to afford it falls on society in general.  "Big pharma" wins, everyone else loses, and the law and the Courts are powerless to remedy the situation.  Fortunately, this is *not* the law.[25]  For example, The New Jersey Consumer Fraud Act contains a statutory refund remedy, providing,  in addition to damages, that any person violating the NJCFA "shall be liable for a refund of all monies acquired by means of any practice declared herein to be unlawful."  N.J.S.A. 56:8-2.12.

## VI.    TPP REIMBURSEMENT PRACTICES ARE IRRELEVANT

Defendants repeat at considerable length their argument, made in the prior briefing,[26] that variations in TPP formulary and reimbursement practices preclude certification.  The argument has no more traction the second time around.  Unlike the *Vioxx* case on which Defendants rely, Plaintiffs have never taken the position that:

> Central to plaintiff's class action assertions is its argument that defendant engaged in a fraudulent marketing campaign that induced, or was intended to induce, all third-party payors to accord Vioxx preferred status in their formularies. Plaintiff argues that if defendant had disclosed the adverse information about which it was aware concerning the safety and efficacy of the drug, plaintiff and the other class members either would not have authorized its inclusion in their formularies or would have placed it in a tier that would have discouraged consumers from

---

[25] The cases adopting this "pass on" defense, generally a creature of antitrust law, are distinguishable.  *See Teamsters*, 196 F.3d at 823 ("Multiple rules of antitrust law interdict plaintiffs' efforts to enlist the Sherman Act in their campaign."); *In re Guidant Copr Implantable Defibrillators Prods. Liab. Litig.*, 484 F. Supp. 2d 973, 983  (D. Minn. 2007) (finding that TPPs were not "purchasers" of defective defibrillators, distinguishing "drug cases in which a third-party payer has standing because it suffered direct injuries").

[26] *See* Defendants' Proposed Memorandum of Law in Opposition to the Class Plaintiffs' Motion for Class Certification (Dec. 22, 2006), at 27-28.

purchasing it, and, therefore, would have reduced the amounts that third-party payors authorized for reimbursement of the drug's cost to plan members.

*Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 929 A.2d 1076, 1081-82 (N.J. 2007).  *See also id*. at 390 ("defendant points out that the essence of the claims must be that each class member was injured individually when it decided, based on defendant's allegedly fraudulent conduct, to include Vioxx in its formulary"). Plaintiffs' claims are based on prescriptions for ineffective medications that would not have been written but for Defendants' fraud, not the impact on the market price or TPP Class members' reimbursement policies.[27]

## VII.   PLAINTIFFS' MOTION TO AMEND IS AUTHORIZED

Defendants argue that the Court's September 29, 2006 order foreclosed the possibility of amendments other than as to the timing of illegal acts.  The Court's August 29, 2007 order expressly directed that "the proposed consumer and TPP classes must be further divided into subclasses by use," and that "Plaintiffs will need to satisfy the prerequisites of Rule 23, both for consumers and the TPPs, for each indication."  244 F.R.D. at 105.   This constituted an implicit, if not express direction to Plaintiffs to name additional Consumer Class representatives for the indications for which they were lacking.[28]

---

[27] For the same reason, Defendants' argument that the reversal of *Vioxx* somehow impairs Plaintiffs' class certification argument is misguided.  Neither have Plaintiffs advanced the alternative theory of damages rejected in Vioxx:  "Plaintiff argues that it should be permitted to demonstrate class-wide damages through use of a single expert who would opine about the effect on pricing of the marketing campaign in which defendant engaged."  Id. at 1088.  The Court rejected this "fraud on the market theory as being inappropriate in any context other than federal securities fraud litigation."  *Id*.  Plaintiffs advance no such theory here.  Plaintiffs relied on the trial and intermediate appellate decisions in *Vioxx* primarily for their holding that New Jersey law should be applied to the claims of a national class.  The New Jersey Supreme Court expressly left this portion of the lower court opinions undisturbed. *See id*. at 1086 n.3 ("in light of our decision on predominance and superiority, we express no view on the Appellate Division's choice of law reasoning or the result it reached as to the applicability of our law to all members of a nationwide class").

[28] As Plaintiffs noted in their opening memorandum (at 1 n.1), a class action complaint need not be formally amended to add additional proposed class representatives as named plaintiffs, and Plaintiffs brought their motion to amend out of an abundance of caution, in case the Court deemed formal amendment of the plaintiffs was required.

Dated: March 31, 2008                          Respectfully Submitted,

By:     */s/ Barry Himmelstein*
        Barry Himmelstein, Esquire
        Lieff Cabraser Heimann &
        Bernstein, LLP
        Embarcadero Center West
        275 Battery Street, 30th Floor
        San Francisco, CA 94111-3339

By:     */s/ Thomas Greene*
        Thomas Greene, Esquire
        Greene & Hoffman
        125 Summer Street
        Boston, MA 02110

By:     */s/ Thomas M. Sobol*
        Hagens Berman Sobol Shapiro LLP
        One Main Street, 4th Floor
        Cambridge, MA  02142
        Boston, MA 02110

By:     */s/ Don Barrett*
        Don Barrett, Esquire
        Barrett Law Office
        404 Court Square North
        P.O. Box 987
        Lexington, MS 39095

By:     */s/ Daniel Becnel*
        Daniel Becnel, Jr., Esquire
        Law Offices of Daniel Becnel, Jr.
        106 W. Seventh Street
        P.O. Drawer H
        Reserve, LA 70084

By:     */s/ James Dugan*
        James Dugan, Esquire
        Dugan & Browne
        650 Poydras St., Suite 2150
        New Orleans, LA 70130

***Members of the Class Plaintiffs'
Steering Committee***

755845.1                          -21-