UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------------x
                                        :      MDL Docket No. 1629
In re:  NEURONTIN MARKETING,            :
        SALES PRACTICES AND             :      Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION   :
                                        :      Judge Patti B. Saris
------------------------------------------------------------x
                                        :      Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:               :
                                        :
ALL PRODUCTS LIABILITY CASES            :
                                        :
------------------------------------------------------------x
```

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM
OF LAW IN OPPOSITION TO DEFENDANTS PFIZER INC. AND
WARNER-LAMBERT COMPANY LLC'S MOTION TO EXCLUDE
THE TESTIMONY OF DOCTORS TRIMBLE, KRUSZEWSKI
AND BLUME ON THE ISSUE OF GENERAL CAUSATION**

*Members of Products Liability
Plaintiffs' Steering Committee*

Andrew G. Finkelstein, Esq.
FINKELSTEIN & PARTNERS, LLP
436 Robinson Avenue
Newburgh, NY 12550

Jack W. London, Esq.
LAW OFFICES OF JACK W. LONDON
   & ASSOCIATES
106 E. 6th Street, Suite 700
Austin, TX 78701

I.    **PRELIMINARY STATEMENT**

Products Liability Plaintiffs ("Plaintiffs") submit this memorandum in response to the motion to exclude testimony of Plaintiffs' experts, Prof. Michael Trimble, M.D., Stefan Kruszewski, M.D., and Cheryl Blume, Ph.D., brought by Defendants Pfizer Inc., and Warner-Lambert Company LLC.  (Pfizer, Warner-Lambert and Parke-Davis are hereinafter referred to collectively as Defendants or "Pfizer".)  Plaintiffs' experts have opined that Neurontin has the biological capacity to cause mood and behavioral changes that predictably result in suicidality (i.e., general causation).  Because the expert general causation opinions are relevant, reliable and satisfy Rule 702 and *Daubert* requirements, Defendants' motion should be denied in its entirety.

These lawsuits arise from Defendants' illegal promotion and sale of Neurontin for unapproved, off-label purposes, which caused unwitting patients to become suicidal due to the drug's psychoactive effect of reducing certain monoamine neurotransmitters in the brain, principally serotonin and norepinephrine.  All Plaintiffs who attempted suicide and Plaintiffs' decedents who committed suicide were prescribed Neurontin for off-label indications, i.e., conditions for which the FDA never approved Neurontin.  Neurontin is an antiepileptic drug.  It is not and has never been approved for any psychiatric or generalized pain indication. Defendants pled guilty on June 7, 2004, before the Honorable Richard Stearns, U.S.D.J., to two felony criminal counts related to Neurontin: Count 1 - Distribution of an unapproved drug by introducing Neurontin into interstate commerce for unapproved uses *without prior FDA approval*; and Count 2 – Distribution of a misbranded drug by selling Neurontin for unapproved

uses *without adequate directions* being provided to physicians and consumers for such uses.[1]
Defendants' actions to target such patients were not only illegal; they were unethical.[2]

Admissibility of expert testimony is set forth in *Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993), and its progeny, the Federal Rules of Evidence, together with the <u>Reference
Manual for Scientific Evidence, Second</u>.  In applying the standards of admissibility to opinions
involving psychiatry, a "soft" science, the courts have <u>broad discretion</u> to determine if the
opinions are based upon sufficient facts and data and were derived from reliable principles and
methods.  Further, the principles and methods must be applied reliably to the facts of the case.
Here, Plaintiffs' experts are experienced individuals with specialized training who arrived at
their conclusions by weighing all available scientific evidence in the same rigorous manner that
they use in their professional lives.

Plaintiffs' experts met and exceeded those standards in reaching their opinions on general
causation in this case.  Prof. Trimble's research on the effect of the entire class of antiepileptics
on mood and behavior, including Neurontin, began over 25 years *before* this litigation began.
Prof. Trimble is widely recognized as the world's foremost scientist regarding the effect of
antiepileptic drugs on mood and behavior.  His writings include the world's leading text on
neuropsychiatry and behavioral neurology, along with eight other medical, psychiatric, and
research texts and over 200 related research papers published in the peer-reviewed literature.[3]
Dr. Kruszewski, a Harvard-trained clinical psychiatrist and expert in psychopharmacology,
analyzed Neurontin's capacity to contribute to suicidality by using the available Bradford-Hill
factors.  Dr. Blume's professional career includes designing and overseeing clinical trials of the

---

[1]  Warner-Lambert transcript of guilty plea, attached as Exhibit 1 at pp. 9-14 to Declaration of Andrew G.
Finkelstein, Esq.  Further references below to Exhibits attached to the Finkelstein Declaration will hereinafter be
referred to as "Pls.' Ex.__"

[2]  Pls.' Ex. 2.

[3]  Pls.' Ex. 3.

kind used by the Defendants to assess the safety of Neurontin.  She has submitted over 30 new drug applications to the FDA on behalf of pharmaceutical companies, including evaluation of the information to be disclosed regarding a compound's safety parameters as disclosed by clinical trials and by post-marketing research.  Plaintiffs' experts have conducted, reviewed, analyzed, and relied upon an abundance of accepted scientific evidence in forming their opinions that *Neurontin has the biological capacity to cause mood and behavioral changes that predictably result in suicidality (i.e., general causation).*

Plaintiffs' experts' opinions on general causation is that Neurontin's capacity to cause suicidality is <u>biologically plausible</u> and that, knowing of its extensive off-label use with patients, Defendants failed to adequately warn of its risks, which greatly outweigh its benefits for such patients.[4]  As discussed in Section III, each step in the progress of events that occurs in the human brain from the point when Neurontin is ingested until it results in the emergence of suicidality has been <u>established</u> through laboratory testing by leading scientists, by objective brain scan testing, by Defendants' own well-controlled human clinical trial data, by peer-reviewed research literature published by leading scientists in authoritative medical journals and generally accepted in the medical community and by Defendants' own animal research reports and testing.  Plaintiffs' experts' causation opinions are supported by FDA-conducted epidemiology.

Plaintiffs' experts' methods generally were to review and incorporate the Defendants' own scientific research on Neurontin's mechanisms of action from *in vitro* laboratory tests,

---

[4]  In their Memorandum of Law in Support of Defendants' Motion for Summary Judgment, Defendants argue that Defendants' "had no duty to warn of information" regarding an association between Neurontin and suicidality.  *Id.* at 32.  Plaintiffs have opposed this argument as set forth in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.  In particular, Plaintiffs' expert Cheryl Blume, Ph.D., provides opinions in her expert report as to the "safety signals" regarding Neurontin's association with suicidality and how Defendants failed in their pharmacovigilance obligations to warn consumers and physicians.  *See* Pls.' Ex. 4. at p.1, ¶ 4; p.2, ¶¶ 10-12; pp. 8-9 ¶¶ 37-43; pp. 195-197, ¶¶ 324-328.

animal pre-clinical trials, adverse drug experiences observed during human clinical trials that were admitted by Defendants as associated with Neurontin, together with examining replicated objective brain scan imaging and evaluating the psychoactive effect Neurontin has on the human brain.    The materials considered included previously <u>undisclosed</u> research conducted by Defendants—brain scan imaging by two independent universities whose researchers have no connection to the litigation, and the peer reviewed reported clinical studies of independent researchers from the United States, Canada, and Europe.    The experts also relied on the 1992 FDA findings that:

> Less common but more serious events may limit (Neurontin's) widespread usefulness…    A third is that <u>depression</u>, while it may not be an infrequent occurrence in the epileptic population, <u>may become worse and require intervention, or lead to suicide,</u> as it has resulted in suicidal attempts.[5]    [Emphasis added.]

Plaintiffs' experts' methodologies were conducted with the same level of intellectual rigor that each expert applies in his or her professional research, teaching, and clinical practices. Plaintiffs' experts applied the same methodologies in the same manner that professionals in their field perform when they engage in research, teaching, clinical medical practices or preparation of FDA submissions.  Plaintiffs' experts' work paralleled the FDA's analysis of Neurontin clinical and epidemiological evidence that resulted in the January 2008 FDA Safety Alert, "Information for Healthcare Professionals Suicidality and Antiepileptic Drugs."  In the 2008 Alert, the FDA found that Neurontin and other antiepileptic drugs prescribed off label for pain and psychiatric conditions show a statistically significant increase in suicide and suicide attempts in such patients.

---

[5] Pls.' Ex. 5 at p. 117.

As will be more fully set forth below, those facts and their analyses are the bases of Plaintiffs' expert opinions that Neurontin can biologically lead to suicidality by changing the human brain chemistry, which predictably increases depression, hostility, impulsivity, and anxiety, known precursors to suicide. Consequently, Defendants' motion to exclude the testimony of Plaintiffs' experts should be denied in its entirety.

## II.   THE PROPER LEGAL STANDARDS

### A.   The *Daubert* Standard Is Flexible In the Context of a Psychiatric Case.

This Court is not the first court to determine whether expert testimony dealing with psychiatric issues is admissible pursuant to *Daubert* standards. *See Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d 308 (D. Vt. 2002); *Tobin v. Smithkline Beecham Pharms.,* 164 F. Supp. 2d 1278 (D. Wyo. 2001); *Cassidy v. Eli Lilly & Co.*, Civil Action No. 821, slip op. May 30, 2002 (W.D. Pa.), Pls.' Ex. 14; *Giles v. Wyeth Inc.*, 500 F. Supp. 2d 1048 (S.D. Ill. 2007); *Laisure-Radke v. Par Pharm., Inc.*, 2006 U.S.. Dist. LEXIS 22700 (W.D. Wash. 2006); *Miller v. Pfizer Inc.*, 2000 U.S. Dist. LEXIS 9816 (D. Kan. 2000), 196 F. Supp. 2d 1062 (2002), *aff'd*, 356 F.3d 1326 (10th Cir. 2004); *S.M. v. J.K.*, 262 F.3d 914 (9th Cir. 2001); *Hoult v. Hoult*, 373 F.3d 47 (1st Cir. 2004). As a preliminary observation, when making a *Daubert* ruling regarding psychiatric cases, courts distinguish between hard Newtonian sciences and soft social sciences. Hard sciences may encompass physics, chemistry and mathematics; soft sciences encompass social sciences including psychiatry, psychology and sociology. *See* Manual for Complex Litigation, Fourth § 23.1, at 469 (2004). When evaluating experts with specialized expertise in the social sciences or behavioral medicine (i.e., soft sciences), courts tend to rely, most understandably, on the expert's specialized training and experience when determining the admissibility of the opinion.

*Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d at 317; *Barefoot v. Estelle*, 463 U.S. 880, 896-906 (1983).

In *Blanchard,* a case Defendants failed to cite, the Court recognized that "[t]he reliability of expert opinion testimony based on psychiatric or psychological observation and analysis does not readily lend itself to evaluation using the specific *Daubert* factors." 207 F. Supp. 2d at 316.[6] The *Blanchard* Court, when ruling on the admissibility of a psychiatrist's opinion regarding the general capacity of a pharmacological agent, Prozac, to lead to homicide and suicide, found: "[T]he Court does not find the four *Daubert* factors particularly helpful in determining the reliability" of the psychiatrist's opinion. *Id.* at 317. *Blanchard* emphasized the "liberal thrust" of the Federal Rules of Evidence favoring admissibility of expert opinion testimony. *Id.* at 316, *citing Daubert*, 509 U.S. at 588. While "[s]trict adherence to traditional tests of reliability of 'hard science' would probably preclude" the psychiatrist's general causation testimony, 207 F. Supp. 2d at 317, the *Blanchard* Court employed the "fit" test envisioned by *General Elec. Co. v. Joiner*, 522 U.S. 136 (1977): "The Court's task however is not to apply a rigid checklist to proposed opinion testimony, <u>but to determine if it is based upon sufficient facts or data and is the product of reliable principles and methods, and if the principles and methods have been applied reliably to the facts of the case.</u> Fed. R. Evid. 702."[7] 207 F. Supp. 2d at 317 (emphasis added).

---

[6] *See also Jenson v. Eveleth Taconite Co.,* 130 F.3d 1287, 1297-98 (8th Cir. 1997) (questioning the fit of the *Daubert* factors to psychological evidence but finding evidence admissible under *Daubert's* flexible approach.); *cf. Elcock v. Kmart Corp.,* 233 F.3d 734, 747 (3d Cir. 2000) (court reviewing social science evidence of vocational rehabilitation could only roughly analogize to *Daubert* factors); *see also* C. Robert Showalter, *Distinguishing Science from Pseudo-Science in Psychiatry: Expert Testimony in the Post-Daubert Era*, 2 Va. J. Soc. Pol'y & L. 211, 228 (1995) ("much scientific data, including data derived from behavioral science analyses of both aggregate data and individuals undergoing psychiatric or psychological evaluation, simply cannot be measured by *Daubert* standards"); Michael H. Gottsman, *Admissibility of Expert Testimony after Daubert*, 43 Emory L.J. 867, 875 (1994) (psychiatrist assessments of mental capacity are neither "testable" nor able to be examined for "error rate").

[7] In *Blanchard*, in contrast to the case at bar, the expert's <u>specific</u> causation opinion that Prozac caused the plaintiffs' decedent to shoot and kill her children and then commit suicide, was "simply 'too great an analytical gap between the data and the opinion proffered.'" 207 F. Supp. 2d at 320 (*citing General Elec. Co. v. Joiner*, 522 U.S. at 146).

The Supreme Court in *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999), made clear that the Court has broad <u>discretion</u> and latitude in deciding how to determine reliability as well as ultimately deciding whether the opinion is reliable. Specifically, the *Kumho* Court wrote that the "test of reliability is 'flexible' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts in every case." The Court went on to say that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. at 141-42.

While the Supreme Court rejected any litmus test for admissibility, it did note that the touchstone for admissibility was "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the **same level of intellectual rigor** that characterizes the practice of an expert in the relevant field." *Id.* at 152 (emphasis added). This sentiment was echoed in the Advisory Committee's notes to the December 2000 amendment to Rule 702 and its companion rules. As that commentary points out, the Court rejected the suggestion of codifying the *Daubert* factors and opted, instead, to add the following language to Rule 702:

> … if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

In the case at bar, suicide is a **multi-factorial** phenomenon with a synergistic increase of risk with the addition of each suicidal risk factor.[8] This is a critical distinction when applying the facts presented in *Daubert* to this case. In *Daubert*, the issue was whether Bendectin was the teratogen that caused limb defects in children or whether something else caused them—an

---

[8] Pls.' Ex. 6 at p. 124; Pls.' Ex. 7 at 3.

7

either/or situation.[9]  Here, one cannot juxtapose an either/or situation with a multi-factorial analysis of suicidality.  With suicidality there is *always* more than one cause of an event.[10] Defendants' own purported expert, Dr. Douglas Jacobs, readily concedes that suicide is a multi-factorial event.  Pls.' Ex. 13 at pp. 27-30.  When evaluating the effect of adding a suicidal risk factor with another, 1 + 1 is actually greater than 2: the combination of risk factors is synergistic in increasing the suicide risk.  *See Id.* at p. 34.

Thus, in applying the standards set forth in *Daubert, Kuhmo Tire* and *Joiner* to the case at bar regarding expert opinions on whether a drug has the general capacity to cause a psychiatric adverse event, the test for such soft science is "flexible" and must "fit the facts of the case." Here, because Neurontin affects mood and behavior, the Court is dealing with a soft science. Consequently, this Court should exercise flexibility when evaluating psychiatric expert opinions dealing in soft science.

Testimony which is simply not amenable to the scientific method should not be subjected to the strictures of *Daubert* and instead passes as "specialized knowledge":

---

[9] Pfizer relies upon *Lynch v. Merrell-National Labs.*, 830 F.2d 1190 (1st Cir. 1987), a case decided six years **before** *Daubert. Lynch* is identical on its facts to *Daubert,* wherein a parent sought compensation for the birth defects of a child allegedly caused by Benedictin. *Daubert* overruled *Lynch* for the precedent for which Pfizer cites the case.

[10] When there is more than one cause of an event, Plaintiff must show Neurontin was *a* cause of the suicidality, i.e., that it was *a* "substantial factor" in bringing about the act. *See, e.g.,* PJI 2:70, Proximate Cause-Concurrent Causes, New York Pattern Jury Instruction, 3rd ed. (2008). When there are concurrent proximate causes of the suicidality and only one of which is the result of negligence, the negligent actor may be held liable. *See* PJI 2:71, Proximate Cause-Concurrent Causes, NY Pattern Jury Instruction, 3rd ed. (2008).  Proximate cause is almost invariably a factual question, and in this case the issues are so inextricably interwoven as to make it logically impossible to apply an either/or standard.  Pfizer summarily states because "the risk factor fully explains the suicide related events that plaintiffs seek to blame on Neurontin," the ingestion of Neurontin cannot be a proximate cause of the suicidality. Defs.' Mem., p. 8.  This simply is not the law.  *See Giles v. Wyeth Inc.*, 500 F. Supp. 2d 1063, 1068 (S.D. Ill. 2007) (whether an intervening cause relieves a defendant of its negligence "has been determined by asking whether the intervention of the later cause is a significant part of the risk involved in the defendant's conduct, or is so reasonably connected with it that responsibility should not be terminated."); W. Page Keeton et al., PROSSER AND KEETON ON TORTS § 44 at 302 (5th ed. 1984) (Student ed.). In other words, "the defendant is said to be liable if, but only if, the intervening cause is foreseeable."  *Id.*  "The courts are quite generally agreed that intervening causes which fall fairly in this category [i.e., foreseeable intervening causes] will not supercede the defendant's responsibility." *Id.* at 303-04; *see also Stevens v. Parke, Davis & Co.*, 507 P.2d 653, 663-64 (Cal. 1973) ("It is well settled that 'an actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct."); *Taylor v. Wyeth Labs., Inc.*, 362 N.W.2d 293 (Mich. Ct. App. 1985) (same).

Because there are areas of expertise, such as "social science in which the research, theories and opinions cannot have the exactness of hard sciences methodologies, trial judges are given broad discretion whether the *Daubert* specific factors are, or are not, reasonable measures of reliability in a particular case."[11]

*United States v. Simmons*, 470 F.3d 1115, 1123 (5ᵗʰ Cir. 2006).

As shown below in Section IV, Prof. Trimble, Dr. Kruszewski and Dr. Blume have specialized knowledge. They formulated their opinions with the same considerable "intellectual rigor" they apply in their own professional lives based on the best <u>available</u> facts or data. Their opinions are reliable and as such, Defendants' motion should be denied.

### B.    Plaintiffs' Experts Use Judicially-Endorsed Methods to Weigh all Available Reliable, Scientific Evidence.

Plaintiffs' experts have applied their methodologies in a reliable way to the facts of this case. As will be more fully explained in Section III below, each expert has taken into account all available scientific evidence which, when taken together, is a compelling basis for the expert's proffered opinion. Each element of the scientific evidence that Plaintiffs' experts rely upon is generally accepted, reliable, scientific evidence. Ultimately, the *weight of the evidence* as analyzed by Plaintiffs' experts leads to their opinions on general causation in this case. Justice Stevens, in a concurring and dissenting opinion in *Joiner*, commented that "[i]t is not intrinsically 'unscientific' for experienced professionals to arrive at a conclusion by weighing all available scientific evidence—this is not the sort of 'junk science' with which *Daubert* was concerned." 533 U.S at 153; *see also* <u>Manual for Complex Litigation, Fourth</u> § 23.272 at 487.

---

[11] *See also United States v. Hall*, 974 F. Supp. 1198, 1200 (C.D. Ill. 1997) (*citing* Jennifer Laser, *Inconsistent Gatekeeping in Federal Courts: Application of Daubert v. Merrell Dow Pharmaceuticals, Inc. to Nonscientific Expert Testimony*, 30 Loy. L.A. L. Rev. 1379 (1997); Teresa S. Renaker, *Evidentiary Legerdemain: Deciding When Daubert Should Apply to Social Science Evidence*, 84 Cal. L. Rev. 1657 (1996); Edward J. Imwinkelried, *The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony*, 15 Cardozo L. Rev. 2271 (1994)).

The *weight of the evidence* approach is particularly appropriate when dealing with experts who have specialized training and knowledge in the field of psychiatry. Many social scientists rely primarily on real-world experience rather than experimentation to arrive at their conclusions. This Court must look at Plaintiffs' experts' quantitative and qualitative experiences and how they apply to the methodologies they deployed. *United States v. Hall*, 974 F.2d 1198, 1200-01 (C.D. Ill. 1997).

When confronted with drugs associated with suicidality—selective serotonin reuptake inhibitors (SSRI) for example—other courts have applied the *weight of the evidence* standard and permitted testimony from psychiatrists. In *Giles v Wyeth Inc.*, 500 F. Supp. 2d 1048 (S.D. Ill. 2007), the Court permitted testimony from an expert psychiatrist, even when the proffered psychiatrist had never participated in a controlled trial; never designed or written a protocol for a controlled trial; never conducted a scientific study of any drug; never served as a principal investigator for any scientific study; never administered any psychiatric or psychological rating scales; never performed clinical or laboratory research regarding potential side effects with any SSRI antidepressants; never authored or published a paper, study or article in any scientific or medical journal on any subject; never served as a peer reviewer for any medical or scientific journal; and never belonged to any professional organization which focuses on the study of psychoactive drugs.

Other courts have applied the weight of the evidence approach when analyzing *Daubert* motions. *See, e.g.*, *Laisure-Radke v. Par Pharm., Inc.*, 2006 U.S. Dist. LEXIS 22700 (where because of plaintiff's expert psychiatrist's extensive clinical observational experience, he was permitted to testify that the SSRI in question, Prozac, caused the interim condition akathisia and that akathisia increased the risk of suicide); *Tobin v. Smithkline Beecham Pharms.*, Civil No. 00-

CV-0025-Bea, slip op., May 8, 2001 (D. Wyo.), Pls.' Ex. 15; (court permitted testimony that Zoloft caused decedent's suicide, from psychiatrist who relied upon publications regarding suicide assessment and who had published peer-reviewed journal articles regarding suicide assessment risk factors); *United States v. Hall*, 974 F. Supp. 1198 (court permitted social psychologist to testify about false confessions and factors that allowed them to occur); *Shahzade v. Gregory*, 923 F. Supp. 286 (D. Mass. 1996) (court permitted psychiatrist to testify regarding victim's repressed memory of sexual abuse which occurred 47 years before plaintiff filed her complaint); *Hoult v. Hoult*, 373 F.3d 47 (1st Cir. 2004) (court permitted testimony of psychiatrist regarding victim's repressed memory of sexual abuse by her father); *United States v. Simmons*, 470 F.3d 1115 (court permitted psychologist to render opinion testimony about sexual victimization syndrome even though psychologist had not conducted research on the topic); *A.B. v. Seminole County Sch. Bd.*, 2006 U.S. Dist. LEXIS 94083 (M.D. Fla. 2006) (court permitted testimony from both a psychologist and a psychiatrist, each based upon their experience, and they were permitted to render opinions that child enrolled as special education student was a victim of maltreatment based <u>solely</u> upon review of medical and school records, witness statements, and viewing a videotape of the student in school).

Here, Prof. Trimble, Dr. Kruszewski and Dr. Blume, as more fully described below, are sufficiently familiar with the issues herein, they possess specialized training and knowledge, and they weighed all available scientific evidence in forming their opinions. The sources of such scientific evidence include clinical trials, animal pre-clinical studies, post-marketing adverse event data (both spontaneously reported and from post-marketing clinical trials), medical literature, epidemiologic data, the FDA and foreign regulatory authorities.

Without reviewing the same generally accepted scientific evidence, Defendants' arguments regarding general causation are relegated to misguided legal attacks on Plaintiffs' experts, not scientific arguments.[12]  Ultimately, when the quality and quantity of the scientific evidence that Plaintiffs' experts reviewed is examined, only the conclusions are in dispute, not the methodological approach to reach them.  Consequently, this Court should recognize that Defendants' arguments are best left for cross-examination at trial.[13]  Defendants' motion should be denied in its entirety.

### C.    Plaintiffs' Scientific Evidence That Neurontin Causes Psychiatric Side Effects Resulting in Suicidality Is Demonstrated by a Preponderance of the Evidence.

The challenges to expert testimony raise a preliminary evidentiary question.  *Adel v. Greensprings of Vt., Inc.,* 363 F. Supp. 2d 283 (D. Vt. 2005).  The Court's inquiry is conducted pursuant to Fed. R. Evid. 104(a); *Daubert,* 509 U.S. at 592.  Under Rule 104(a), the Court is not bound by the rules of evidence in making its determination.  A party proffering expert testimony should establish the testimony's admissibility by a preponderance of proof.  *Daubert,* 509 U.S. at 593 n.10; *Plourde v. Gladstone,* 190 F. Supp. 2d 708, 718-19 (D. Vt. 2002) (emphasis added).

---

[12] In fact, it is Defendants' experts who failed to review, consider and appreciate the weight of the evidence in this case.  For example, Prof. Trimble reviewed and considered 125 published peer-reviewed articles, including those by Stanley and Mann, *Increased serotonin-2 binding sites in frontal cortex of suicide victims*, Lancet, 1983, 214-216, and Mann and Malone, *Cerebrospinal fluid amines and higher-lethality suicide attempts in depressed in-patients*. Pls.' Ex 8 at pp 45-53; Pls.' Ex 9.  Defendants' counterparts' resources were sparse in comparison, and they failed to review the majority of the sources Plaintiffs' experts even cited.  Dr. Sanacora read only 13 of the 125 sources read by Prof. Trimble (10% overlap); Dr. Jacobs 10 (8% overlap), and Dr. Rothschild only 5 (4% overlap).  Plaintiffs' expert Dr. Kruszewski's opinion incorporated the scientific data from 402 published articles. Pls.' Ex 10.  However, Defendants' expert Dr. Sanacora read only 20 of the sources cited by Dr. Kruszewski (5% overlap); Dr. Jacobs only 14 (3.5% overlap); and Dr. Rothschild only 6 (1.5% overlap).  Defendants' litigation scientists did not even review the Neurontin New Drug Application that was submitted to the FDA, or the entire safety surveillance data for Neurontin as did Plaintiffs' expert, Cheryl Blume, Ph.D.  Rather than consider the sound, reliable, scientific evidence relied upon by Plaintiffs' experts, and the weight carried with it, Defendants' litigation scientists chose to blindly recite the corporate mantra that "no scientific evidence exists that Neurontin causes suicide."

[13] "Vigorous **cross-examination**, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert v. Merrel Dow Pharms., Inc.,* 509 U.S. 579, 595-96 (1993) (emphasis added).  Plaintiffs do not intend to intimate that Plaintiffs' experts' opinions are "shaky" in any way.  Rather, to the extent Defendants posit the evidence is in dispute or is unreliable, they should make such arguments to a jury.

Here, Plaintiffs have demonstrated by far more than a preponderance that Neurontin has the capacity to cause psychiatric adverse events leading to suicidality.

Neurontin was designed to have a biological effect on the brain that reduces seizure activity by altering the brain chemistry. This very biological change in the brain chemistry causes one of the well-established suicide risk factors—lower cerebral serotonin.[14] While Defendants have never been able to determine how Neurontin exerts its anti-seizure or analgesic properties,[15] it is undisputed by both Defendants' employees and experts that Neurontin is a psychoactive, i.e., mind-altering, drug.[16] In fact, the psychoactive effects of Neurontin are not limited to its anti-seizure properties. One need only look at the Neurontin label, which contains the following highlighted warning for Neuropsychiatric Adverse Events:

> "**WARNINGS Neuropsychiatric Adverse Events– Pediatric Patients 3 – 12 years of age** Gabapentin use in pediatric patients with epilepsy 3 –12 years of age is associated with the occurrence of central nervous system related adverse events. The most significant of these can be classified into the following categories: 1) emotional lability (primarily behavioral problems), 2) hostility, including aggressive behaviors, 3) thought disorder, including concentration problems and change in school performance, and 4) hyperkinesias (primarily restlessness and hyperactivity). Among the gabapentin-treated patients, most of the events were mild to moderate in intensity. Pls.' Ex. 11 at p.. 10. *See* Pls.' Ex. 127; Pls.' Ex. 128.

A well-established fundamental principle of biological psychiatry, generally accepted in psychiatric medicine, is "that anticonvulsant drugs [Neurontin] influence(s) the mental state, and this can be broken down into adverse and beneficial effects. The main adverse effect of

---

[14] Neurontin reduces the release of excitatory neurotransmitters (e.g., serotonin and norepinephrine) in the brain—an action known to be a significant suicide risk factor. Pls.' Ex. 8 at p. 6; discussed *infra* at III.

[15] "The mechanism by which gabapentin exerts its analgesic action is unknown … The mechanism by which gabapentin exerts its anticonvulsant action is unknown". Pls.' Ex. 11 at p. 1. It cannot be overlooked that no one currently knows the molecular mechanism for Neurontin's efficacy. However, absence of this knowledge does not argue against the causal association between Neurontin and its antiseizure and analgesic effect.

[16] Pls.' Ex. 12 at 109; Pls.' Ex. 37; *see* Pls.'. Ex. 16. ("Investigator Report: gabapentin alone is psychoactive….").

anticonvulsants is the link between drugs [Neurontin] and depression."[17]    Neurontin has the capacity to contribute to the emergence or worsening of depression, hostility, impulsivity and anxiety.[18] Each is a risk factor that increases suicidality. Pls.' Ex. 19.

Increasing any of these risk factors due to Neurontin can be a substantial factor, the *sine qua non* of bringing about suicidality in any individual.  Such a determination can be made on a case-specific basis by a "psychological autopsy".[19]  Defendants cleverly argue that a cause—**one** cause—is necessary to establish general causation even though suicidality never has a single cause.  Nowhere in the *Daubert* line of cases is such an unrealistically high burden placed upon a Plaintiff when proving general causation, and it should not be imposed in this case.  Plaintiffs' expert opinions are established by a preponderance of the reliable scientific evidence and Defendants' motion should be denied.

---

[17] Pls.' Ex. 17 at p. 6; Pls.' Ex. 18 at p. 5; Pls.' Ex. 12 at p. 109.

[18] Pls.' Ex. 5 at 114; Pls.' Ex. 132 at p.17; Pls.' Ex. 133 at p. 8.

[19] Although case-specific causation is <u>not</u> before this Court, hence rendering Defendants' arguments as to specific-causation on the ten Track One cases moot, the report of Plaintiffs' case-specific expert, Dr. Ronald Maris, in the specific case of  *Smith v. Pfizer Inc.*, Individual Case No. 05-11515, is submitted as illustrative of the process a suicidologist undertakes to evaluate risk factors with emergent suicidality and Neurontin use. Pls.' Ex. 20.  *See also* Prof. Trimble report for specific case of *Smith v. Pfizer Inc.*, Individual Case No. 05-11515, Pls.' Ex. 130.

Pfizer's expert, Dr. Jacobs, refers to the ten Track One cases designated by the Court for purposes of discovery **without** considering the psychoactive effect of Neurontin.  Importantly, the ten Track One cases are in no way representative or reflective of all cases in the litigation.  The selection process for the cases was not done with any single common or uncommon factor characteristic to each case.  The cases were selected for the purpose of having at least some group of cases go through the discovery process so that there would be cases ready for trial when discovery and dispositive motion practice was completed.  The Track One process was separate and distinct from the scheduling of this summary judgment motion on general causation.  Plaintiffs will provide specific-causation expert disclosure as to these cases in accordance with the discovery rules; the issue of specific-causation is  not currently before this Court.  Moreover, Magistrate Judge Sorokin, in Discovery Order No. 8, dated January 17, 2007, distinguished the issue of general causation from specific causation when he stated that "[i]ndividual discovery in the Track One cases is not necessary for resolution of this issue.  It is, however, relevant to other issues, including whether in a particular case, Neurontin was in fact the cause of Plaintiff's harm . . . ." Pls.' Ex. 21 at p. 1.

III.  **PLAINTIFFS' EXPERTS' OPINIONS ARE BASED
      ON SCIENTIFICALLY RELIABLE FACTS AND DATA**

   A.  **Neurontin's Capacity to Cause
       Suicidality Is Biologically Plausible.**

Each of Plaintiffs' experts subject to Defendants' motion has opined in the expert's report and via deposition testimony that Neurontin's mechanism of action contributes to suicidality. Their opinions are relevant, reliable and satisfy Rule 702 and *Daubert* requirements.  The sources of information upon which they rely are set forth in their respective expert reports and are highlighted herein collectively.

It is undisputed that Neurontin's mechanism of action reduces the release of excitatory neurotransmitters (e.g., serotonin, norepinephrine) in the brain.[20]  The reduction of serotonin is a contributing factor in depression and suicidality.[21]  Prof. Trimble's opinion as to Neurontin's effect on mood and behavior was formed as early as 1995 and reiterated in 1996.[22]  In the Neurontin research reports Prof. Trimble wrote for Defendants, he stated, "The main adverse effect of anticonvulsants is the link between anticonvulsant drugs and depression."[23]  With a secure foundation of the biological psychiatric effect Neurontin has on human brain neurochemistry, Prof. Trimble undertook for this case an examination of the biological plausibility for Neurontin's negative effect on mood and behavioral resulting in suicidality.

Prof. Trimble provided his succinct opinion at the time of his deposition:

---

[20] *See* Pls.' Ex. 22 ("Neurontin treatment may shift the relative balance of neurotransmitters from excitatory to inhibitory); Pls.' Ex. 23 ("In addition to reducing neurotransmitter release, [Neurontin] . . . reduces calcium influx into synaptasomes in vitro"); *see* Pls.' Ex. 24 ("Inhibition of Neurotransmitter Release"); *see* Pls.' Ex. 25 (1993 Product Monograph states "Neurontin slightly reduces the release of monoamine neurotransmitters in vitro").

[21] Pls.'. Ex. 8 at pp. 12-13. Defendants' expert, Gerard Sanacora, M.D., Ph.D., at his deposition agreed "that it would be commonly accepted there is an association between abnormal serotonergic measures and the diagnosis of depression . . . . There are --- there is a fairly large literature base showing abnormal measures of serotonin associated with suicide, yes."  Pls.' Ex. 26 at pp 86-87.  Dr. Sanacora also admitted that from a biochemical basis, individuals who have low serotonergic turnover are at a higher risk of suicide.  *Id.* at 89-90.  Pls.' Ex. 125 at pp. 256-265

[22] Pls.' Ex. 17; Pls.' Ex. 18.

[23] Pls.' Ex. 17 at p. 6; Pls.' Ex. 18 at p. 5.

Q      Professor Trimble, would you succinctly state your opinion with a reasonable degree of scientific, psychiatric and medical certainty, how the ingestion of Neurontin may be a substantial factor in leading to suicide and attempted suicide?

A      It's my considered opinion, based upon scientific papers and my own reading of those papers, that the following apply:  If you take gabapentin, this leads to an increase in cerebral GABA, in brain GABA.  Increasing brain GABA, has been shown, in scientific, peer-reviewed papers, to lead to decrease of serotonin.  Serotonin is vital for the regulation of mood, and it has been shown in many published, scientific, peer-reviewed papers that decrease of turnover of serotonin in the human brain is associated with depression, suicide, and in particular, with violent suicides. Pls.' Ex. 27 at p. 328.

Similarly, Dr. Kruszewski succinctly sets forth in his expert report the following:  "It is my opinion, based upon a reasonable degree of medical certainty, that gabapentin produces GABAergic effects on neurotransmitters . . . that gabapentin's net effect on these neurotransmitter systems results in self-injurious behavior, including attempted and completed suicide, in a susceptible minority of consumers. Pls.' Ex. 28 at p. 1; Pls.' Ex. 129.

Plaintiffs' expert, Cheryl Blume, Ph.D., likewise provided her opinion as to biological plausibility:  "Multiple avenues of neuropharmacologic research have supported the biologic plausibility of Neurontin-precipitated self-injurious behavior for several years."  Pls.' Ex. 4 p. 2 at ¶ 7.  Dr. Blume recognized Neurontin's capacity to reduce the release of monoamine neurotransmitters in the brain (e.g., serotonin, norepinephrine) as an action that contributes to clinical depression and suicidal behavior.[24]  *Id.* at p. 9, ¶ 39; p. 184, ¶ 292.  Importantly, Defendants' argument that Dr. Blume's opinion on general causation is based only on anecdotal

---

[24] Similar to experts Prof. Trimble Dr. Kruszewski's analysis, Dr. Blume also reviewed and considered Defendants' own pre-clinical pharmacology data related to biological plausibility and Neurontin's capacity to reduce the release of neurotransmitters in the brain.  Pls.' Ex. 4 at pp. 184-299, ¶¶ 292-299.  Dr. Blume's opinion in this case is encompassed by her experience as a pharmacologist and her in depth analysis of causation, including a review and analysis of adverse event data, biological factors related to plausibility, positive dechallenge/rechallenge events, adverse event data recovered from both clinical trials and post-marketing reports.  *Id.* at p.179, ¶ 273.

evidence (i.e., adverse event reports) is simply wrong. Dr. Blume stated the following at her deposition as to the various sources that culminated in her opinion on general causation:

> So its biological plausibility, the clinical data, the clinical literature, the dechallenge events, the rechallenge events, and information relating to other products that have similar actions on neurotransmitters are all provided in my report. So based on the expansive information that's in this report, those are --- those are the information that I [am] using to predicate that there is a causal relationship between --- precipitating action between Neurontin and suicide behavior. [Pls.' Ex. 29 at p.4 18.]

From a biological plausibility perspective, each step in the sequence of events that occurs in the human brain from the moment when Neurontin is ingested through to the emergence of suicidality has been established in significant laboratory testing by leading scientists, by objective testing, by Defendants' own clinical testing and by peer-reviewed literature from authoritative medical journals written by leading scientists, all of which is generally accepted in the medical community. Pls.' Ex. 8; Pls.' Ex. 9; Pls.' Ex. 28. Without citing any scientific authority, Defendants argue it is improper to examine the intermediate steps between ingestion of Neurontin and suicidality. This argument is contrary to Defendants' own experts' testimony, Defendants' own internal company protocol, and to the FDA analysis of emerging suicidality with antiepileptic drugs.[25]

As discussed in greater detail in Section III B below, the 2008 FDA Alert on Antiepileptic Drugs and Suicidality confirms Plaintiffs' experts' opinions. The FDA states: "All patients taking or starting any antiepileptic drug should be closely monitored for **notable changes in behavior** that could indicate the emergence or worsening of suicidal thoughts or

---

[25] Defendants' expert, Gerard Sanacora, M.D., Ph.D., stated at his deposition, "I believe that altering neurotransmitter systems either directly or indirectly can be associated with several of the symptoms that we use in the diagnosis of major depression . . . ranging from changes in sleep, appetite, psychomotor behavior, interest, concentration. . . suicidal or obsessive – or not obsessive, suicidal or frequent thoughts of morbid preoccupations. Pls.' Ex. 30 at p.78. Intermediate steps, or precursors to suicidality, are also recognized by FDA in the 2008 Alert: "Symptoms such as anxiety, agitation, hostility, mania and hypomania may be precursors to emerging suicidality." Pls.' Ex. 31; *see*, Pls.' Ex. 32, not disclosed by Defendants until April 1, 2008, wherein Defendants developed in 2006 a protocol to evaluate potential suicide related events.

behavior or depression."[26]   (Emphasis added.)   Further, the Alert says, "Symptoms such as anxiety, agitation, hostility, mania and hypomania may be precursors to emerging suicidality."[27]

Defendants' own Senior Director, Global Clinical Leader for Neurontin, testified that pharmacological agents have the capacity to alter brain chemistry in a way that causes suicidality:

> Q      The hypothesis, just so we are clear, is that a pharmacological agent can transition from some -- an individual from being suicidal to not being imminently suicidal.
>
> A      That would be a reasonable hypothesis.
>
> Q      I want to know if this hypothesis you subscribe to:  Just as a chemical can relieve someone of imminent suicidality, can't the chemical create imminent suicidality by altering the brain chemistry?
>
> A      That, too, is a reasonable hypothesis.  Pls.' Ex. 36 at pp. 463-464.

It is undisputed that Neurontin increases whole brain GABA which results in a corresponding depletion of serotonin.[28]  Because low levels of serotonin are a strong risk factor for violent suicide, Neurontin's depletion of serotonin results in suicidality.[29]

The increase in whole brain GABA is supported by objective neuroimaging that was replicated at two independent spectroscopy facilities.[30]  Spectroscopy is an <u>objective</u> test that measures a pattern of spectra that reveal to the investigator the underlying brain chemistry.[31]

---

[26] Pls.' Ex. 31.

[27] On October 10, 2007, Andrew Finkelstein submitted both Prof. Trimble and Dr. Greenland's reports and CV's to the FDA for consideration. Pls.' Ex. 33.  On November 30, 2007, Mr. Finkelstein submitted Dr. Cheryl Blume's report to the FDA for consideration.  Pls.' Ex. 34  On November 28, 2007, the FDA confirmed receipt of Prof. Trimble and Dr. Greenland's materials and advised:  "We are reviewing these submission and plan to <u>incorporate our analysis of them</u> into our response to your Citizens Petition."  Pls.' Ex. 35.  (Emphasis added.)  The FDA Alert was the response to Finkelstein & Partners' previously filed Citizens Petition.

[28] Pls.' Ex. 8 at pp.11-12, 22-24; Pls.' Ex. 42 at p. 81; Pls.' Ex 43; Pls.' Ex 44; Pls.' Ex 45; Pls.' Ex 46; Pls.' Ex 47; Pls.' Ex. 48; Pls.' Ex. 60; Pls.' Ex. 129.

[29] Defendants' employee Dr. Alphs's PowerPoint slide indicates serotonin and norepinephrine dysfunction are associated with suicide.  Pls.' Ex. 73.

[30] Pls.' Ex. 38; Pls.' Ex 39; Pls.' Ex. 40; Pls.' Ex. 41.

Defendants are well aware that Neurontin's increasing of brain GABA likely leads to deleterious effects on mood. One of Defendants' clinical psychiatrists, Douglas Feltner, M.D.,[32] in an e-mail exchange discussing the psychoactive effect of Neurontin's increasing GABA in human brain, raised the paramount question in October 2003 when he wrote:

> In terms of the reality of the increase in GABA in human brain, I would point out that the Yale group's neuroimaging findings have been replicated by the group at Univ. Alabama. Also, the increases in GABA in human neocortical slices appear to use the same technique as the rat studies (PCA extracts).

> I suppose the question is: what are the consequences of the increases in GABA in human brain that are caused by gabapentin? It strikes me that they might contribute to efficacy *and adverse events in humans*. [33] [Emphasis added.]

No one replied to Dr. Feltner and the e-mail string ceases with this query. Certainly, if the same question had been posed to Prof. Trimble, he would have confirmed that which Defendants now deny—that Neurontin contributes to negative mood and behavioral alterations resulting in suicidality.

Plaintiffs' experts' opinions on Neurontin's mechanism of action related to GABA[34] are rooted in reliable, scientific evidence. Indeed, it has been shown since 1980 in numerous scientific, peer-reviewed papers that increasing brain GABA leads to decreases of serotonin. "It has been known, since at least the early 1980's, that there is a reciprocal link between GABA

---

[31] Pls.' Ex 49 at 333; Pls.' Ex. 50. Spectroscopy has been recognized as reliable and admissible evidence in courts around the country for ten years and is a generally accepted tool to measure brain function, and Defendants do not challenge its reliability. *Miller v. Consolidated Rail Corp.,* 1999 U.S. Dist. LEXIS 812 (E.D. Pa. 1999); *Friedrich v. Intel Corp.*, 181 F3d 1105 (9th Cir. 1999); *Berry v. CSX Transp., Inc.,* 709 So. 2d 552 (Fla. App. Dist. 1998).

[32] Douglas Feltner, M.D., is senior director and clinical exploratory head, CNS, for Pfizer Global Research and Development. He is responsible for Phase I through Phase IIa development of CNS drugs. Dr. Feltner has a medical degree from the University of Michigan Medical School and completed his residency in psychiatry at George Washington University and the National Institute of Mental Health. He also did a fellowship, sponsored by the Howard Hughes Medical Institute, in molecular genetics at the National Institute of Child Health and Human Development. He is co-editor of *The Handbook of Psychopharmacology Trials, An Overview of Scientific, Political and Ethical Concerns.* NYU Press, 1997. *See* http://www.ppdi.com/events_speakers/rating_scales.

[33] Pls.' Ex. 51.

[34] "Gamma-Aminobutyric Acid (GABA) is an inhibitory neurotransmitter that binds to two broad classes of receptors designated as GABA-A and GABA-B." Pls.' Ex. 131 at 397; Pls.' Ex. 52, Pls.' Ex. 57 at p. 69.

and serotonin in the brain … if you increase the level of GABA you decrease the output of serotonin."[35]  Raphe nuclei, part of the rhombencephalon, one of the deep structures of the brain, manufactures serotonin in humans.[36]  Experiments carried out in the 1980's show a direct effect of serotonin inhibition when GABA is placed in the nuclei of the brain.[37]

One of the most established findings in the whole of biological psychiatry is that decreasing the release and depletion of serotonin in the brain is deleterious to mood.[38]  The management of serotonin levels through SSRI drugs[39] in the treatment of a wide range of affective disorders is considered generally accepted medical practice both by primary care physicians and psychiatrists.[40]  It is also undisputed that low levels of serotonin turnover is associated with suicide, and in particular violent, aggressive, spontaneous suicides.  There have been at least 22 peer-reviewed studies of serotonin levels and suicidality.[41]  Overall, 16 of the 22

---

[35] Pls.' Ex. p 53; Pls.' Ex. 42 at p. 81; Pls.' Ex. 43; Pls.' Ex. 44; Pls.' Ex. 45; Pls.' Ex. 46; Pls.' Ex. 47; Pls.' Ex. 48. Defendants suggest that increasing GABA in human brain has anti-depressant effects.  This is not been established as generally accepted in medicine.  *See* Pls.' Ex. 54; Pls.' Ex. 55 pp. 98–104; Pls.' Ex. 110.

[36] Pls.' Ex.  56; Pls.' Ex. 58 at pp. 48-50; . Ex. 62 at pp.76-78.

[37] Pls.' Ex. 58 at p 50; Pls.' Ex. 42 at p. 81; Pls.' Ex. 43; Pls.' Ex. 44;  Pls.' Ex. 45; Pls.' Ex. 46; Pls.' Ex. 47; Pls.' Ex. 48; Pls.' Ex. 60; Pls.' Ex. 129 .

[38] Pls.' Ex. 59 at p. 299; Pls.' Ex. 61 at pp. 78-80; Pls.' Ex. 62 at pp. 76-78; Pls.' Ex. 63 at p. 29; Pls.' Ex. 64; Pls.' Ex. 36; Pfizer employee, Dr. Leslie Tive, who has a Ph.D. in biopsychology with a specialization in neuropharmacology (Medical Director, Team Leader for Neurontin), at her deposition, acknowledged low serotonin negatively effects mood:  Q. What happens when there's a reduction in the flow of monoamines such as dopamine, serotonin, and norepinephrine?  A. You're saying monoamines in general?  Q. Correct.  A. A reduction in monoamines has been associated with depression.  Pls.' Ex. 65 at p. 300.  Defendants' expert, Dr. Rothschild, admitted that it is generally accepted by knowledgeable scientists and physicians that serotonin Is related to mood and behavior in humans.  Pls.' Ex. 67 at p. 12.

[39] Selective Serotonin Reuptake Inhibitors are a class of drugs widely used as antidepressants.  The psychoactive effect of SSRI's is to "block the reuptake" of serotonin thereby increasing the amount of serotonin in human brain.  Their use has become generally accepted in medical practice in the treatment of depression. Pls.' Ex. 68 at p. 80

[40] Defendants argue such a statement is "overly simplistic" and "outdated", but a review of Pfizer's SSRI drug Zoloft's website, used to promote the sale of the drug, has similar statements.  "How Zoloft Works: …Because it is linked with so many functions in our body, serotonin has an effect on a wide range of conditions such as depression.  This *tie between depression and serotonin* led scientists to an interesting find.  Scientists believe people with depression could have an *imbalance of serotonin in their brain*.  That means the level of serotonin is 'off.'  So the nerve cells can't communicate, or send message to each other the right way.  This lack of contact between cells might cause depression.  Zoloft helps fix this."  Pls.' Ex. 69.  (Emphasis added.)
http://www.zoloft.com/zoloft/zoloft.portal?_nfpb=true&_pageLabel=how_zoloft_works

[41] Pls.' Ex. 70 at pp. 102-104.  Dr. Sanacora, admitted that there is an association between low measures of serotonin and suicide victims.  Pls.' Ex. 66 at p. 87. *See* Pls.' Ex. 71; Pls.' Ex. 72; Pls.' Ex. 73; Pls.' Ex. 80 at p. 29.

studies find a relationship between lower levels of serotonin and suicidality.[42] "The significance of this finding and that it is consistent with reports of reduced serotonin or 5-HIAA in the brainstem of suicide victims means that regardless of receptor changes, <u>at least part of the pathology related to suicidal behavior is reduced serotonin turnover or serotonergic neuron activity</u>."[43] (Emphasis added). Defendants have never undertaken to test the amount of serotonin that Neurontin depletes from human brain.[44]

Neurontin's capacity to reduce serotonin is further confirmed in peer-reviewed clinical journal articles. In a double-blind placebo-controlled study in which patients suffering from seizures were followed after Neurontin treatment, participants whose serotonin levels were measured demonstrated a 40% reduction of serotonin levels.[45]

The unrebutted scientific and psychiatric literature compels the conclusion that serotonin dysfunction is related to suicide. There is a robust body of scientific peer-reviewed literature demonstrating that low serotonin turnover, i.e., serotonin dysfunction, plays a central role in suicidality.[46] Prof. Trimble testified as follows:

> One of the most replicated findings in the whole of biological psychiatry, a finding that has been replicated repeatedly since at least the early 1980s is as follows: People with low levels of serotonin turnover behave or have the propensity to behave differently from people who have higher levels of serotonin turnover. And decreased serotonin turnover as measured directly from measurements related to the human brain, the decreased turnover is associated with impulsivity, aggressivity and in humans suicidal actions and completed

---

[42] Pls.' Ex. 70 at pp. 102-104.

[43] *Id.* at p. 102; Pls.' Ex. 74 at pp. 384-388; Ex. 134 at pp. 579-583.

[44] Pls.' Ex. 75 at pp. 52-53; Pls.' Ex. 76 at 321-322. Pls.' Ex. 77 at pp 519-520.

[45] Pls.' Ex. 78 at p. 233. (See Fig. 5 demonstrating reduced serotonin levels after 3 months of Neurontin treatment); *see* Pls.' Ex. 79 at pp. 78-89.

[46] Pls.' Ex. 80 at p. 29 ("…inadequacy of serotonin in parts of the limbic system and perhaps elsewhere can induce suicidal thoughts and behavior… In fact, Asberg and colleagues have found that impulsive, unpredictable, violent suicides and homicides are more related to decreased brain serotonin than to any specific diagnosis. Historically, suicidal thoughts and behaviors are aggregated with other symptoms to determine the diagnosis of depression. Impulsive suicide, however, occurs at times with little or no clinical evidence of depression."). Pls.' Ex. 70 at pp. 102-104. Dr. Sanacora, admitted that there is an association between low measures of serotonin and suicide victims. Pls.' Ex. 66 at p. 87; *see* Pls.' Ex. 71; Pls.' Ex. 72; Pls.' Ex. 73.

suicides; and the lower the turnovers, the more suicides are by very aggressive means. Pls.' Ex. 58 at p. 50.[47]

Defendants argue that Plaintiffs' experts' analysis regarding decreased serotonin levels is "overly simplistic" without citing any peer-reviewed references to support their criticism. Only Defendants' paid experts are on record as stating Plaintiffs' serotonin explanation is overly simplistic. However, Pfizer sells its blockbuster SSRI drug, Zoloft, based upon this very simple premise, and Pfizer depends on this mechanism theory for its corporate financial well being. To sell Zoloft as an antidepressant, Pfizer touts it as a drug that will increase serotonin levels and improve an individual's mood and behavior.[48]

Even Defendants concede that an imbalance of serotonin is related to depression, and that depression is a mood and behavioral disturbance associated with suicidality. There is no "oversimplification" of the issue. Finally, it is well accepted by physicians that reduction in serotonin levels is associated with behavioral disturbances, and this mechanism of action requires physicians to closely monitor their patients.[49]

---

[47] Dr. Robert Roth, another Plaintiffs' expert unchallenged by Defendants has stated in his textbook *The Biochemical Basis of Neuropharmacology*, the following: "Altered function of serotonergic systems has been reported in several psychopathological conditions… There is mounting evidence for impaired serotonergic function in major depressive illness and suicidal behavior. In this connection, several effective antidepressant drugs appear to act by *enhancing* serotonergic transmission." (Emphasis added.) Pls.' Ex. 63 at p. 291.

[48] http://www.zoloft.com/zoloft/zoloft.portal?_nfpb=true&_pageLabel=how_zoloft_works
Zoloft® (sertraline HCl) is a prescription medicine that treats depression and anxiety. It belongs to a class of drugs known as SSRIs (Selective Serotonin Reuptake Inhibitors). Zoloft works to correct a chemical imbalance in the brain that may be related to symptoms of depression or anxiety. It has been prescribed to millions of people for over 15 years.. . . .Studies show that serotonin plays a vital role in how our body works. It controls sleep, appetite, temperature, and blood vessel tone. It's also in charge of the release of certain hormones and how much pain we feel. Because it is linked with so many functions in our body, serotonin has an effect on a wide range of conditions such as depression. This tie between depression and serotonin led scientists to an interesting find. **Scientists believe people with depression could have an imbalance of serotonin in their brain. That means the level of serotonin is "off." So the nerve cells can't communicate, or send messages to each other the right way. This lack of contact between cells might cause depression. Zoloft helps fix this.** Zoloft helps the nerve cells send messages to each other the way they normally should. (Emphasis added). Pls.' Ex. 69.

[49] Plaintiffs deposed prescribing physicians in this litigation as part of the Track 1 discovery process. Prescribers universally testified that if a drug's action affected serotonin levels, it affects their prescribing practices and monitoring of patients. Pls.' Ex. 4 at p. 190, ¶ 307, n.159.

B.     **Plaintiffs' Experts' Opinions on General
       <u>Causation Are Supported by Epidemiology.</u>**

As more fully set forth below in Section III. B. 3., epidemiology is not required for Plaintiffs' experts to render a sound, reliable opinion on general causation.  However, the epidemiology that does exists supports Plaintiffs' experts' opinions.

1.     <u>**The 2008 FDA Alert on Suicidality and Antiepileptic Drugs**</u>

Perhaps nowhere in Defendants' submission have they been more disingenuous than in attacking the January 31, 2008 Safety Alert which the FDA published to warn physicians that Neurontin and ten other off-label antiepileptic drugs were proved to cause a statistically significant upswing in suicidality.  That FDA is the same FDA that Defendants insist used its expert skills to approve the Neurontin label so as to pre-empt the off-label victims from complaining that Defendants did not tell their doctors everything Defendants knew about the drug's risks.

On January 31, 2008, the FDA issued an alert to physicians entitled "Information for Healthcare Professionals - Suicidality and Antiepileptic Drugs".  The FDA made the following clear statements about antiepileptic drugs, including Neurontin:

- In the FDA's analysis, patients receiving antiepileptic drugs had approximately twice the risk of suicidality compared to patients receiving placebo.

- There was a statistically significant increased risk of suicidal behavior and suicidal ideation in the patients randomized to receive an antiepileptic drug compared to patients who received a placebo.

- The results were generally consistent among all eleven drugs.

- The increased risk of suicidality was observed as early as one week after starting the antiepileptic drug and continued through 24 weeks.  Because most

trials included in the analysis did not extend beyond 24 weeks, the risk of
suicidality beyond 24 weeks could not be reliably assessed.[50]

- All patients treated with antiepileptic drugs should be monitored for
  suicidality.

- Pay close attention to any day-to-day changes in mood, behavior and actions.
  Symptoms such as anxiety, agitation, hostility, mania and hypomania may be
  precursors to emerging suicidality.[51]

Given the plain language of the FDA's Alert relating to the epidemiological analysis
employed, this Court should deny Defendants' motion in its entirety. Indeed, Plaintiffs' experts
reviewed and considered the 2008 FDA Alert in this case,[52] and their opinions are consistent
with and supported by the FDA's weighty evaluation that took place over at least a 3-year
period. Nevertheless, because Defendants continue to deny the probative value of the FDA's
evaluation, Plaintiffs will address their spurious arguments.

Defendants incorrectly argue that Neurontin cannot be compared to other drugs of the
same class (i.e., antiepileptic drugs). First, the FDA, an expert regulatory agency, has pooled
anticonvulsants as a class. Based upon that analysis, FDA issued a warning to all healthcare
providers and patients. Defendants' apparent criticism of FDA methods is pure folly. Second,
the law is clear that drugs need not be identical in order for information relating to them to be
relevant. *See generally, Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1248 (10th Cir. 2000) ("The
substantial similarity rule does not require identical products; nor does it require us to compare
the products in their entirety"); *see also Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (1998)

---

[50] Temporal association is not, in and of itself, sufficient to establish causation. Nonetheless it is an important
consideration. In addition to the temporality established in the dozens of case reports set forth in Dr. Kruszewski
and Dr. Blume's reports, the FDA Alert addressed temporality by advising, "The increased risk of suicidality was
observed as early as one week after starting the antiepileptic drug and continued through 24 weeks." Importantly,
patients, family members and caregivers were warned to "pay close attention to any day-to-day changes in mood,
behavior and actions. These changes can happen very quickly…." Pls.' Ex. 31 at pp. 1-2.
[51] *Id.*
[52] On February 1, 2008, Plaintiffs provided supplemental expert disclosure related to the subject 2008 FDA Alert.
Pls.' Ex. 81.

(admitting expert testimony relying in part on evidence of similar drugs); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 678, n. 4 (W.D. Tex. 2002) (despite finding unqualified and ill-prepared expert did not survive *Daubert*, court recognized comparison of Vitamin A and Accutane and research on retinoids as "potentially relevant to the causation issue in this case").

Defendants also claim, repeatedly, that the specific Neurontin data reviewed by the FDA show no evidence of suicidality. To do so, Defendants attempt to mislead the Court by an inappropriate manipulation of the FDA data. For example, Defendants argue that their June 2006 correspondence to the FDA reflects that "the Neurontin specific data show no statistically significant different incidence of suicidal behavior and thinking between Neurontin (0.039%) and placebo (0.037%). Defs.' Mem. at p. 16. However, when Dr. Sander Greenland, Plaintiffs' **unchallenged** and eminently qualified epidemiologist, analyzed Defendants' specific data, he found that the same data can be said to show a 30-fold *increase* in suicidality.[53]

Additionally, the "internal" position Defendants' qualified employees take regarding their data is far different than what Defendants' lawyers argue in their brief. In an internal e-mail, Dr. Manfred Hauben, Defendants' own Medical Director of Risk Management Strategy, acknowledged the limitations of statements that can be made regarding Defendants' data. Dr. Hauben wrote: "We can data mine on gabapentin but I don't think that negative data mining findings would make a strong counterargument to a signal that have arisen from clinical observations."[54] Defendants' lawyers argue precisely what Dr. Hauben said is <u>not</u> a valid argument.

Defendants argue the plain language of the 2008 FDA Alert is somehow unclear as to whether Neurontin was associated with suicidality. This is laughable since the FDA stated

---

[53] Pls.' Ex. 82 at p. 5.
[54] Pls.' Ex. 83.

unequivocally that the "results were generally consistent among all eleven drugs."  Given that

Neurontin is named as one of the eleven drugs, the only reasonable interpretation that can be

made is that Neurontin increases the risk of suicidality.[55]

FDA's choice not to specifically render an opinion on "causation" is not probative of

whether Plaintiffs' experts pass muster for *Daubert* purposes.  This is because the FDA's

articulated standard for "unreasonable risk" does not allow the  FDA to wait to declare a health

warning until there is ***definite*** proof of causation.[56]  The FDA concept of definite proof is the

100% standard, not the "greater weight of the credible evidence" standard or the "more likely

than not standard" used in civil litigation.[57]  Defendants simply want to trick the Court into

adopting a 100% standard.  Despite Defendants' waltz with the rules, the FDA attributes the

increased risk of suicidality risk to Neurontin and its cohorts in the class of antiepileptic drugs.

It cannot be overlooked that the 2008 FDA Alert is based on precisely the same kind of

scientific evidence envisioned by *Daubert* and involves precisely the same kind of determination

of general causation with the same burden of proof.  In addition to the data review, the FDA

<u>reviewed, considered and incorporated</u> the reports of Prof. Trimble, Dr. Greenland and Dr.

---

[55] Defendants also downplay the importance of the FDA Alert because FDA includes language that FDA has not yet concluded there is a "causal relationship between the drug products and the emerging safety issue."  A 'causal relationship' for purposes of this Court's legal analysis is different than a causal relationship determined by the FDA, a phrase which Defendants seek to exploit and misapply to mislead the Court.  For example, within the FDA it is not unusual for an alert to say (as does this Alert) that:  "*Posting this information does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue.*"  FDA uses identical or similar language with the required SSRI label warnings:  "Although a causal link between the emergence of such symptoms and either the worsening of depression and/or the emergence of suicidal impulses has not been established, there is concern that such symptoms may represent precursors to emerging suicidality."  Pls.' Ex. 84 at p. 3.

[56] Pls.' Ex. 85.

[57] *Id.* at p. 27-28. The proof of this is that in 21 C.F.R. § 201.57(c)(6), the FDA articulates its standard for revising labels: "[T]he labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been ***definitely*** established."  *See also* 21 C.F.R. § 201.5 (c)(7) *Adverse reactions,* the FDA definition of an adverse reaction: "For purposes of prescription drug labeling, an adverse reaction is an undesirable effect, ***reasonably associated*** with the use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence." (Emphasis added.)

Blume.[58]  Plaintiffs can speculate in the same manner as Defendants that the FDA gave greater

weight to these expert reports than the data submitted by Defendants.  The FDA certainly did not

find that their opinions failed to meet any standard of scientific reliability.

In summary, the FDA based its explicit findings on precisely the kinds of scientific

evidence that Defendants claim is required by this Court:  controlled clinical trials.  The

materials the FDA relied upon satisfy all of the criteria of *Daubert*, 509 U.S. at 593-94.  Because

the FDA applied the same rigorous scientific standards in reaching its conclusion about the

ability of Neurontin to significantly increase the risk of suicidality, Plaintiffs' experts properly

may rely on the 2008 FDA Alert.

## 2.    Compared to Lithium, Neurontin doubles the risk of suicide.

Epidemiology demonstrating an association of Neurontin (gabapentin) with suicidality

was also addressed in a peer-reviewed 2007 article by Bentson H. McFarland, M.D. and Jon C.

Collins, M.D.  Plaintiffs' experts have each relied, in part, upon the study, and Dr. Blume

summarized her review in her report as follows:

> 283.      Despite Pfizer Defendants' failure to sponsor an appropriate
> controlled clinical or epidemiological study designed to assess whether
> there is a significant difference in suicide-related events in patients taking
> Neurontin, there does exist in the literature such information.  Authors Jon
> Collins and Bentson McFarland presented an article entitled, **Divalproex,
> lithium and suicide among Medicaid patients with bipolar disorder**, in
> the Journal of Affective Disorders (2007).  The authors recognized an
> increased risk of completed suicide in those patients exposed to
> gabapentin as compared to lithium.
>
> 284.      Collins and McFarland "examined relationships between suicidal
> behavior and medication use for Medicaid patients with diagnoses of
> bipolar disorder.  The objective was to compare rates of completed suicide
> and suicide attempts among those Medicaid patients using lithium,
> divalproex, and/or other anticonvulsant medications, with emphasis on the
> initial (or index) episode of medication use during the study period."

---

[58] Pls.' Ex. 33; Pls.' Ex. 34; Pls.' Ex. 35.

285.        Having identified subjects from Oregon's Medicaid and mental
health databases, the authors evaluated completed suicide and emergency
department visits related to suicide attempts.  Out of 12,662 subjects in
said databases, gabapentin subjects equaled 4,025 (31.8%) of the total
population.  There were observed two suicides among lithium users (3,200
subjects), two among divalproex users (4,142 subjects), **seven among
gabapentin users** (4,025 subjects), and none in the carbamazepine group
(420 subjects) . . . .

286.    Collins and McFarland provided hazard ratios for the divalproex,
gabapentin, and carbamazepine users, respectively, versus lithium users as
the reference group.  "The adjusted hazard ratio for completed suicide
among divalproex users was 1.5 but this elevated risk of suicide death was
not statistically significant.  **However, risk of suicide completion was
significantly (2.6 times) greater among gabapentin users versus
lithium users ($p$ less than 0.001)"** [Pls.' Ex. 4 at pp. 182-183.][59]

Despite Defendants' assertion that Neurontin is actually protective of suicide, Dr.

McFarland testified at his deposition in this case that his study could not be used for such a

premise:

Q.    From the report, can you tell whether any of these scenarios is true?  It's
kind of a multiple choice question. Scenario No. 1, that lithium and
Gabapentin are both protective for suicide as against a patient who is
taking no medicine whatsoever?

Q.    Can you tell that from this report?

A.    No.  [Pls.' Ex. 86 at p. 167.]

Not surprisingly, in light of Neurontin's statistical doubling of the risk of suicide, Dr.

McFarland testified at his deposition that it was his opinion that there are "individuals with

bipolar disorder who would be well advised to take lithium instead of Gabapentin."  Pls.' Ex. 87

at p. 204.

---

[59] Plaintiffs' experts Michael Trimble, M.D, and Stefan Kruszewski, M.D., each reviewed and considered the McFarland article in reaching their opinions on general causation.  Pls.' Ex. 8 at p. 19; Pls.' Ex. 28 at p. 18.

### 3.  Epidemiology is not required to demonstrate general causation.

Defendants attempt to preclude Plaintiffs' generic experts by the false contention that there is no sound epidemiology to support general causation.  Frankly, if it were up to Defendants, very few, if any, experts would ever be able to testify before a jury because their opinions would be universally excluded for failure to meet a standard of absolute certainty.  This fanciful view of admissibility of scientific evidence runs afoul of *Daubert's* intent, as well as the Federal Rules of Evidence and an impressive body of case law.[60]  Contrary to Defendants' argument, there is no mandate under *Daubert* that epidemiology must be a preliminary requirement for admissibility of an expert's opinion.[61]

However, as set out above, there is sound epidemiology.  The FDA found a statistically significant increase in the risk of suicidality in Neurontin and ten other antiepileptic drugs using Defendants' clinical studies.  Independent researchers in Oregon found that bipolar patients who take Neurontin are more than twice as likely to commit suicide as patients on approved psychiatric medications.

Even in cases that did not have the extent of reliable epidemiology that is currently before this Court, courts have routinely held epidemiological evidence is not required to prove

---

[60] Defendants insist that nothing short of at least one large statistically significant epidemiology study to determine whether Neurontin causes the injuries alleged can ever pass muster under *Daubert*; that the failure of Plaintiffs' experts to conduct or rely upon case/control studies specifically to determine whether Neurontin can cause suicidality renders their opinions inadmissible; that each piece of evidence in isolation must definitively establish causation in order to meet *Daubert's* standard for admissibility.  This rigid view of admissibility of scientific evidence runs afoul of *Daubert's* intent, as well as the Federal Rules of Evidence and an impressive body of case law.

[61] Defendants improperly cite the case of *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791 (N.D. Ohio 2004), in their attack on Keith Altman, who provided to Plaintiffs' expert, Cheryl Blume, Ph.D., charts of data in furtherance of her general causation opinions, i.e., that Neurontin has the capacity to contribute to suicidality and Defendants failed to warn consumers; this is addressed, *infra*, and in Keith Altman's affidavit.  Further, what Defendants completely fail to cite from the opinion is the *Meridia* court's unequivocal statement that epidemiology is not mandatory to demonstrate general causation:  "No requirement exists that a party *must* offer epidemiological evidence to establish causation."  *Id.*

causation. *See, e.g., Kennedy v. Collagen Corp.*, 161 F.3d at 1229 (expert's testimony was admissible based on reliable methodology without epidemiological or animal studies to link defendant's product to plaintiff's disease); *Ambrosini v. Labarraque*, 101 F.3d 129, 135-138 (D.C. Cir. 1996) (expert's testimony was admissible where it was based on multiple sources of non-epidemiological evidence, including published medical literature, biological plausibility and time sequence); *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995) (court found experts had properly relied on nonepidemiological data to support their conclusions); *Glaser v. Thompson Med. Co, Inc.*, 32 F.3d 969, 972 (6th Cir. 1994), *rehearing and rehearing en banc denied*, 1994 U.S. App. LEXIS 31316 (6th Cir. 1994) (expert's opinion was admissible where it was based on his own published studies, articles in other published peer-reviewed journals, published case reports and his own clinical experience); *Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998) (expert's testimony was admissible based on differential diagnosis, along with a variety of published and unpublished studies indicating that drug's affect on hormones could cause endothelial dysfunction and an imbalance of vasoconstrictor effects, resulting in primary pulmonary hypertension); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (experts' testimony was admissible based on various factors, including experts' extensive practical experience, training and education); *see also Becker v. National Health Prods., Inc.*, 896 F. Supp. 100, 103 (N.D.N.Y. 1995) (experts' opinions were found reliable and admissible where they based their opinions on a variety of factors, including medical history, scientific and medical treatises and articles, and their training and experience); *McElroy v. Albany Memorial Hosp.*, 332 F. Supp. 2d 502, 506 (N.D.N.Y. 2004) (lack of textual authority for expert's opinion did not render it inadmissible).

Additionally, the Fourth Circuit Court in *Benedi* stated the following instructive point related to epidemiology:

> [W]e do not read *Daubert* as restricting expert testimony to opinions that are based solely upon epidemiological data. *Daubert* merely requires that the expert testimony to be relevant and reliable … Under the *Daubert* standard, epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound.

66 F.3d at 1384.  The *Benedi* court found that the plaintiff's experts relied on multiple factors, including a study of the peer-reviewed literature and concluded, "We will not declare such methodologies invalid and unreliable in light of the medical community's daily use of the same methodologies in diagnosing patients." *Id.*

In *Globetti v. Sandoz Pharms. Corp.*, 111 F. Supp. 2d 1174 (N.D. Ala. 2000), the Court observed regarding the admissibility of evidence that in situations where no epidemiological studies had been—or feasibly could have been—conducted, "Science, like many other human endeavors, draws conclusions from circumstantial evidence when other, better forms of evidence is not available. *Id.* at 1180.

Disputes as to the significance of the data are questions of fact for the jury to consider. Defendants erroneously attempt to conflate the issues of admissibility of expert testimony and their weight.  Defendants' rejection of the impressive body of evidence, both epidemiological and non-epidemiological, is misguided.  Consequently, this Court should reject Defendants' argument that epidemiology is required for general causation, and Defendants' motion to preclude testimony of Plaintiffs' experts should be denied.

C.     **Plaintiffs' Experts' Opinions Are Supported by
Peer-Reviewed, Published Medical Literature.**

Prof. Trimble's conclusion that Neurontin's psychoactive effect in the human brain negatively affects mood and behavior resulting in suicidaility is based in part on his clinical experience in the field, review of at least 125 published articles, internal corporate documents, objective imaging evidence, and laboratory findings replicated at independent laboratories. Every step in Prof. Trimble's opinion is supported by several peer-reviewed medical journal articles.

Dr. Kruszewski concluded that Neurontin's psychoactive effect in human brain negatively effects mood and behavior resulting in suicidality after a review of at least 400 published articles, internal corporate documents, his clinical experience in this field, and objective evidence replicated at independent laboratories.  Pls.' Ex. 10.

In providing her opinion on general causation, Dr. Blume cites at least 122 references to published articles, learned treatises on pharmacoepidemiology, confidential Defendants' studies not publicly available, FDA Guidance for Industry, as well as FDA available adverse event data and the World Health Organization's adverse event data. Pls.' Ex. 4 at p. 198.

Plaintiffs' experts' conclusions take into consideration the kind of evidence scientists regularly rely on in forming opinions of causality. *In re: Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181 (S.D.N.Y. 2005); *see also Globetti v. Sandoz Pharms. Corp.*, 111 F. Supp. 2d at 1179 (expert testimony sufficiently reliable to be admitted despite absence of epidemiological studies because such studies were not practical); *Brasher v. Sandoz Pharms. Corp.*, 160 F. Supp. 2d 1291, 1297 (N.D. Alaska 2001).   "All scientific work is incomplete – whether it be observational or experimental.  All scientific work is liable to be upset or modified by advancing

knowledge.  That does not confer upon us a freedom to ignore the knowledge we already have, or to postpone the action that it appears to demand at a given time."[62]

### D.    Plaintiffs' Experts' Opinions Are Supported by Adverse Events Observed in Defendants' Own Rigorous Clinical Trials.

Plaintiffs' experts can state that Defendants' own Neurontin clinical trial data establishes that Neurontin triples the risk of suicidality with the same hubris with which Defendants state "The Neurontin clinical trial date unequivocally do not establish an association between Neurontin and suicide related events."  Defs.' Mem. at 14.  Plaintiffs' expert, Dr. Sander Greenland,[63] when discussing Defendants' data, states that the "results are compatible with the null hypothesis of no gabapentin effect and the hypothesis that gabapentin triples risk of completed suicide."[64]  Defendants elect to state the former, while Plaintiffs elect to state the latter:  each is as reliable and scientific as the other.  Defendants think, however, if they say it over and over again, they are more correct.  No matter how many times Defendants repeat their version to this Court, physicians, patients and the media,[65] the data still show that Neurontin increases the risk of suicidality.

Defendants' clinical trial data submitted to the FDA as long ago as Defendants' initial New Drug Application for Neurontin's epilepsy indication in 1992 provides evidence that supports general causation in this case.[66]  In 1992, the FDA analyzed safety and efficacy findings, for the sought-after indication for approval, in a series of clinical trials submitted by

---

[62] Sir Austin Bradford Hill, *The Environment and Diseases Association or Causation?*, Proceedings of the Royal Society of Medicine, Section of Occupational Medicine 300 (1965) (B-7).

[63] Prof of Epidemiology, UCLA School of Public Health and author of the authoritative textbook Rothman, K. J., Greenland, S., and Lash, T.L. (2007). *Modern Epidemiology*, 3rd ed. Philadelphia: Lippincott-Raven.  *See* Pls.' Ex. 88.

[64] Pls.' Ex. 89 at p. 7-8.

[65] Pls.' Ex. 90 at p. 3-5.

[66] Each of Plaintiffs' experts challenged by Defendants reviewed and considered Defendants' own clinical trial data and psychiatric adverse events, including depression and suicidality, associated with Neurontin.  Pls.' Ex. 8 at pp. 37-39; Pls.' Ex. 28 at pp. 13-15.

Defendants, both controlled and uncontrolled, and this analysis provides corroborative support for Plaintiffs' experts' opinions in this case with respect to the <u>safety</u> of Neurontin. This evidence is recognized by the FDA as corroborative of safety. 21 C.F.R. § 314.126(e) states;

> Uncontrolled studies or partially controlled studies are not acceptable as the **sole basis for approval** of claims of effectiveness. Such studies carefully conducted and documented may provide <u>corroborative support</u> of well controlled studies regarding efficacy and may yield valuable data regarding <u>drug safety</u> of the test drug. [Emphasis added.]

Thus, Plaintiffs' experts' reliance on uncontrolled studies regarding Neurontin's <u>safety</u> is specifically authorized by the FDA, particularly when their opinions are based on biological plausibility, epidemiology, pre-clinical animal models, and adverse event data from controlled clinical trials.

As of June 30, 1992, the total number of patients exposed to Neurontin in all studies, controlled and uncontrolled, was 2048. Pls.' Ex. 5 at p. 117    At that time, Dr. Cynthia McCormick, the FDA clinical reviewer, stated the following about Neurontin before its approval for the narrow epilepsy indication:

> Less common but more serious events may limit the drug's widespread usefulness. . . . **[D]epression**, while it may be not an infrequent occurrence in the epileptic population, **may become worse and require intervention or lead to suicide**, as it has resulted in some suicidal attempts. *Id.* [Emphasis added.]

A total of 78 adverse events in all initial trials were considered serious.[67] The relevant serious adverse events included 7 reports of depression, 6 drug overdoses, and 2 suicide attempts. *Id.* at 102. Defendants admitted that 5.3% (78 patients) of the exposed population reported depression as an adverse event. *Id.* at 114. The FDA found that of the 78 patients who reported depression as an adverse event, 19 had no prior history of depression, 22 of the 78 patients required pharmacologic treatment for their symptoms, and nine withdrew because of the

---

[67] The term 'serious' is used to describe an adverse event thought to be immediately life threatening, permanently disabling, or requiring hospitalization. Pls.' Ex. 5 at p. 102.

depression. *Id.* at 114. During these clinical trials, Defendants' own investigators determined that 6 serious psychiatric adverse events "possibly or probably" related to Neurontin.[68]

| Patient | Event |
|---|---|
| 945-13-14 | Depression with attempted suicide. |
| 945-15-11 | Depression, resolved with dose reduction |
| **915-15-01** | **Depression with suicide ideation, improved on tapering and discontinuance. Depression with suicide ideation recurred with rechallenge.** |
| 945-14-801 | Drug Overdose |
| 945-15-19 | Depression and attempted suicide |
| B77-219P-212 | Drug Overdose [Emphasis added.] |

Patient 915-15-01 represents an observation by Defendants' own investigators of a positive challenge, dechallenge and rechallenge event with Neurontin <u>during a clinical trial</u>.[69] Such an event represents sound, reliable evidence that Neurontin has the capacity to be causally associated with depression and suicidality.[70] It is undisputed that a well-documented challenge/dechallenge/ rechallenge adverse event report can make isolated reports conclusive as to causation of event by a drug. In the authoritative textbook *Pharmacoepidemiology*, it is stated that "…a temporal relationship between medical product and adverse event, coupled with positive dechallenge and rechallenge, can make isolated reports conclusive as to a product-event association." *See* Pls.' Ex. 93 at p. 166.

---

[68] "If an adverse event that develops following the initiation of drug therapy subsequently resolves following the discontinuation of the drug, this is referred to as a positive dechallenge. A positive rechallenge refers to the re-occurrence of the adverse event (following a positive dechallenge) subsequent to re-initiation of the drug. Pls.' Ex. 4 at p. 12, ¶ 53.

[69] Pls.' Ex. 91 at p.53-54; Pls.' Ex. 92; Pls.' Ex. 5 at p. 107.

[70] The observed adverse event was not simply a post-marketing case report. Rather, it was during a clinical trial that involved Defendants' own causal association assessment that ranged from Definite, Probable, Possible, or of Unknown Relationship. Pls.' Ex. 4 at p. 13, n.37. Defendants utilized Causality Assessments based on Karch, F.E. and Lasagna, L., JAMA 234, 1236-1241 (1975) as it pertained to such open-label studies of the safety and efficacy of gabapentin (Protocol 945-15), and not a Bradford-Hill assessment. The criteria for assessment of causality (using Karch and Lasagna's approach) included Definite, Probable, Possible, Remote, and Unclear. *Id.* Additionally, Defendants' own investigator rendered a causal association assessment during a clinical trial pertaining to diabetic peripheral neuropathy that a suicide attempt and intentional overdose were "definitely related" to Neurontin. Pls.' Ex. 94. Additionally, Pfizer's own internal correspondence confirm acute severe depression and suicidal ideation was an expected adverse event possibly related to Neurontin usage. Pls.' Ex. 95.

Defendants' lawyers suggest this Court should ignore such strong evidence merely because it is a psychiatric adverse event.  However, the Office of Postmarketing Drug Risk Assessment for the FDA, when discussing the issue of causation and methodology for assessing Accutane, an acne drug associated with suicidality, stated that "[n]onetheless, positive rechallenges are very important evidence in overall causality assessment of isotretinoin (Accutane) and <u>psychiatric</u> adverse events."[71]  (Emphasis added.)  Additionally, Health Canada, the Canadian Regulatory authority equivalent to the FDA, wrote to Defendants regarding dechallenge/rechallenge findings related specifically to Neurontin and psychiatric adverse events:  "One suicide attempt was found to have positive dechallenge/rechallenge, indicating that this event was related to gabapentin."  Pls.' Ex. 97 at p. 1.

The most unreliable aspect of Defendants' arguments is in the manner of overreaching to say more than the cases hold.  Defendants overstate the holdings in much of the case law they cite regarding the use of challenge/dechallenge/rechallenge as some evidence of causation.  No court has said that such evidence is without value *per se*.  Contrary to the suggestion in Defendants' brief, the court in *Rider v. Sandoz,* 295 F.3d 1194, 1199 (11th Cir. 2002), held that dechallenge and rechallenge data "which may be analogized to controlled studies with one subject, can be particularly useful in determining whether a causal relationship exists."  That court rejected the plaintiff's data because none of the cases involved the same injury as the plaintiff experienced, exactly the opposite use made by Plaintiffs expert of such data here.  In

---

[71] Pls.' Ex. 96 at p. 105.  At the FDA Advisory Committee Meeting regarding the causation and methodology for assessing causation of Accutane to suicide, the FDA safety evaluator testified:  "Some reasons to suspect a drug/adverse event relationship include the temporal, or the **time relationship between administering the drug and the development of symptoms**, a dose response, or a **mechanism of action or biological plausibility**, or a **class effect**, or the absence of alternatives, and **dechallenge**, or the abatement of symptoms when the drug is discontinued, and **rechallenge**, the recurrence of symptoms when the drug is reintroduced.  Again, dechallenge and rechallenge provide additional evidence of a relationship between a drug and adverse event. … In evaluating spontaneous adverse events, positive dechallenge/rechallenge cases provide *the best* evidence to support a relationship between a drug and an observed event."  (Emphasis added).  *Id.; see* Pls.' Ex. 98 at p. 2.

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996), the court did not exclude experts because of use of dechallenge/rechallenge data, but because they relied on mere abstracts of unpublished studies, not the actual case reports.  In *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 434, 545 (W.D. Pa. 1993), the court excluded an expert because he relied on causality assessments related to a different side effect than that experienced by the plaintiff.  One could never learn those case distinctions from Defendants' brief.

The Court should not lose sight of the fact that both the FDA and Health Canada have accepted the challenge/dechallenge/rechallenge episodes of Neurontin suicide/suicidal patients as evidence of the drug's relationship to suicidality.   The point is that like any other circumstantial evidence, challenge/dechallenge/rechallenge episodes are additional components of the weight of the evidence upon which experts may rely in evaluating whether a cause-effect relation exists between a compound and a patient's reaction to it (e.g., between Neurontin and suicidality).  That is the use Plaintiffs' experts make of such evidence, and properly so.

> 1.    **Evaluation of suicidality via controlled trials**
> **with the endpoint of suicide is unethical; thus, a**
> **rate of error and empirical testing is impossible.**

An assessment of how a drug affects mood and behavior resulting in suicidality, is a complex psychiatric evaluation involving biological psychiatry that cannot be tested empirically.[72]   Such evaluations require multiple scientific disciplines, including psychiatry, neurology, neuroanatomy and neuropharmacology.[73]

---

[72] In *S.M. v. J.K.*, 262 F.3d 914 (9th Cir. 2001), the Court cited Professor Christopher Slobogin's article, "*Doubts About Daubert: Psychiatric Anecdata as a Case Study*, 57 Wash. & Lee L. Rev.919, 922 (2002), in support of its decision supporting psychiatric testimony on debatable issues, especially in the absence of specific testing by the drug maker on point.  The reason is obvious.  When a drug manufacturer fails to test the relevant hypothesis, of necessity, courts focus on the "best available" scientific information.  Sometimes such information falls into Professor Slobogin's penumbral category of "anecdata".  *See also Mendes-Silva v. United States,* 980 F.2d 1482 (D.C. Cir. 1993).
[73] Pls.' Ex. 27 at p. 327.

Defendants argue that Plaintiffs have failed to initiate or conduct clinical trials to support Plaintiffs' burden of proof.  It is undisputed that it is unethical to design a test with the endpoint of suicide and one has never been carried out.  As such, a rate of error for suicidality based upon such a clinical trial is not calculable.  Any prospective experimental method to validate or disprove the hypotheses that Neurontin causes suicidality cannot be undertaken.  Many social scientists, as do Plaintiffs' experts in this case, appropriately rely in part on real-world experience rather than experimentation to arrive at their conclusions.  As more fully explained below, no one is more capable of providing helpful insight to a jury on such issues than Plaintiffs' experts, Prof. Michael Trimble, M.D., the author of the textbook, <u>Biological Psychiatry, 2d Edition</u>, a trained psychiatrist like Stefan Kruszewski, M.D., and a regulatory expert like Cheryl Blume, Ph.D., who has submitted volumes of New Drug Applications to the FDA.

> **E.      Plaintiffs' Experts' Opinions Are Supported by Adverse Events**
> **<u>Observed in Defendants' Own Post-Marketing Event Case Reports.</u>**

Case reports are among the lines of evidence relied upon in considering issues of causation.[74]  A temporal relationship between ingestion of drug and the side effect, as seen through case reports is a valid element of causation, albeit insufficient evidence standing alone to establish causation.  While case reports have limitations, they are recognized evidence "when considered in light of other information available."[75]  That is exactly the weight to which Plaintiffs' experts have given to case reports.

Defendants' own Medical Director of Risk Management, Dr. Manfred Hauben, with a co-author, published an article found in the British Medical Journal on May 22, 2007, *Drug Safety:*

---

[74] Pls.' Ex. 99 at p. 469.

[75] *Id.* at p. 475.

*Anecdotes that provide definitive evidence; When a criminal is caught in the act, other evidence is unnecessary. Should the same be true for adverse drug reactions?*, in which they proposed that some anecdotal adverse drug reports can be so convincing that a well-documented anecdotal report can provide <u>convincing evidence of a causal association and further verification is not needed.</u> Pls.' Ex. 100 at pp. 1267-1268 (emphasis added). One of the four types of spontaneously reported adverse events for which causal attribution to the drug is either irrefutable or demonstrable with a high level of confidence is when a "physiological dysfunction or direct tissue damage that can be proved by physicochemical testing." *Id.* Applying the principles Dr. Hauben describes in his article, Neurontin's increase of brain GABA is analogous to catching a culprit at a crime scene through "recreating the crime scene." *Id.*

Case reports may be useful support for causation opinions even if they represent the view of a significant minority of experts in the field. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226; *Tyler v. Sterling Drug, Inc.*, 19 F. Supp. 2d 1239, 1241 (N.D. Okla. 1998). Mood and behavioral disturbances after taking Neurontin have occurred at a point in time at which one would logically suspect the recently ingested drug to be a contributing factor. While case reports are generally thought not to be, in and of themselves, sufficient to establish causation, they do provide important corroborative evidence.[76] For instance, the Second Circuit allows expert testimony relying in part on published and unpublished case reports because such evidence provides

---

[76] Defendants attack Plaintiffs' expert, Cheryl Blume, Ph.D., for her use of a Proportional Reporting Ratio (PRR) calculation to evaluate a "safety signal" related to Neurontin case reports. Defs' Mem. at p. 38. Dr. Blume did not opine that her PRR analysis, standing alone, would equate to general causation, but rather that her PRR analysis was supportive of a "safety signal" and is supportive of general causation. Pls.' Ex. 101 at pp.108-109; Pls.' Ex. 4 at pp. 192-195, ¶ 313-323. Use of PRR analyses is a well recognized method of evaluating safety signals. Pls.' Ex. 4 pp. 192-195, ¶313-323. Dr. Blume appropriately analyzed a PRR by comparing Neurontin adverse event reports to other comparator drugs. Pls.' Ex. 103 at p. 6. Dr. Blume has opined that a safety signal via PRR analysis existed before 2002 – before any perceived notoriety bias due to lawyer advertising (which did not begin until 2003) related to Neurontin litigation. Importantly, the adverse event terms Dr. Blume utilized as part of her PRR analysis are consistent with the very terms Defendants now employ when they collect information on potential suicidal events. Pls.' Ex. 104 at p. 4.

additional support to meet plaintiff's burden of establishing causation. *See Zuchowicz v. United States*, 140 F.3d at 386; *McCullock v. H.B. Fuller Co.*, 61 F.3d at 1044; *Becker v. National Health Prods., Inc.*, 896 F. Supp. at 102.

Courts in other circuits also hold that expert testimony on causation may be admissible where the opinions were based in part on case reports. *See, e.g.*, *Kennedy v. Collagen Corp.*, 161 F.3d at 1228; *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124-25 (9th Cir. 1994); *Glaser v. Thompson Med. Co, Inc.*, 32 F.3d at 972; *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d at 1384; *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1242, 1246 (W.D. Wash. 2003); *Tyler v. Sterling Drug, Inc.*, 19 F. Supp. 2d at 1241; *Brasher v. Sandoz Pharms. Corp.*, 160 F. Supp. 2d at 1294; *Globetti v. Sandoz Pharms. Corp.*, 111 F. Supp. 2d at 1178. Such reports are not the sole evidence of causation; they are merely additional evidence. Because case reports are reasonably reliable evidence under *Daubert* to satisfy the threshold requirement for admissibility, it is a question for the jury to decide what weight to give the evidence, and whether plaintiffs have met their burden of proof. *Eve v. Sandoz Pharm. Corp.*, 2001 U.S. Dist. LEXIS 4531 at *64 (S.D. Ind. 2001) (citing *Tyler*). Moreover, case reports need not be accepted by a widespread majority of the scientific community as long as they represent the view of a significant minority. *Rogers v. Secretary of Health & Human Servs.*, 2000 U.S. Claims LEXIS 262, at *47 (Fed. Cl. 2000).

In much the same way Defendants overstate the holdings in the cited case law regarding the reliability of challenge/dechallenge proof, courts do not reject *per se* the use of case reports. The court in *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005), cited by Defendants, did not hold that case reports are 'no evidence'; it held that case reports could not redeem otherwise faulty proof relied on by the tendered expert. *Id.*

The use of case reports in medicine is longstanding and vital, as evidenced by the continued publication of such reports in peer-reviewed scientific journals. Defendants themselves consider such reports <u>important evidence</u> when executing their own pharmacovigilance protocol.[77]

Here, as additional bases of their opinions, Plaintiffs' experts' opinions that Neurontin can cause the injuries alleged are supported by case reports published in the peer-reviewed medical literature and by numerous adverse event reports discovered in Defendants' own adverse event safety surveillance system.[78]  It is not the role of the Court to remove tools from the expert's belt but only to observe whether the expert has made reliable use of the tools. Plaintiffs' experts have done so.

F.    <u>**Plaintiffs' Experts' Opinions Are Supported by Animal Models.**</u>

In addition to other studies, toxicology based on animal studies is helpful to assess toxicity in humans. Pls.' Ex. 99 at p. 485-487. Animal studies often provide useful information about pathological mechanisms. *Id.* Toxicological research (including both animal studies and chemical/structural correlations) provides much of the basis for scientific judgments relating toxic exposures to health effects. This is especially true in instances where it is impossible to conduct such studies in humans. *Id.* As detailed below, Plaintiffs' experts properly utilize such evidence in forming their opinions in this case.

Animal models have demonstrated that Neurontin causes significant changes in the brain.[79]  While it is undisputed that animal models may not accurately predict the effect a pharmacological agent will have in humans, animal models can demonstrate targets where

---

[77] Pls.' Ex. 105 at p. 4. "Tools for Evaluating Drug Safety Profile…Spontaneous reports."

[78] Pls.' Ex. 4 at p. 178-179 ¶¶ 271-275 .

[79] Pls.' Ex. 8 at pp. 27-28, 30; Pls.' Ex. 28 at pp. 6- 7; Pls.' Ex. 106 at pp.3-4; Pls.' Ex. 4 at pp. 185-186, ¶¶ 294-297.

actions will occur.  Preclinical pharmacology animal studies (i.e., *in vitro* studies) in this case are

particularly relevant because they were conducted by Defendants' own scientists.  One need only

examine the Neurontin label that states the following:

> *In vitro* studies with radiolabeled gabapentin have revealed a gabapentin binding
> site in areas of rat brain including neocortex and hippocampus.  A high-affinity
> binding protein in animal brain tissue has been identified as an auxiliary subunit
> of voltage-activated calcium channels.   However, functional correlates of
> gabapentin binding, if any, remain to be elucidated.  [Pls.' Ex. 11 at p. 2.]

Defendants' own preclinical pharmacology studies involving lab animals establish that

Neurontin reduces monoamine neurotransmitters (e.g.., serotonin, norepinephrine) in the brain:

> Gabapentin was examined for effects on the release of radiolabeled monoamine
> neurotransmitters from rat neocortical or striatal tissue slices in vitro . . . the
> release of [H]norepinephrine was reduced up to 40%  . . . .  These results suggests
> that inhibition of neurotransmitter release by gabapentin may occur by a reduction
> in depolarization-induced entry of calcium ions.  [Pls.' Ex. 4 at p. 185 ¶ 296.]

Next, Defendants' own preclinical pharmacology studies involving laboratory animals

acknowledge that Neurontin's action in reducing monoamine neurotransmitters can have effects

on mood and behavior.  Pls.' Ex. 4 at pp. 185-186 ¶¶ 294-297.  Defendants' scientist, Charlie

Taylor, Ph.D., who testified in this litigation about Neurontin's mechanism of action, applied the

pharmacological studies from animals to the clinical effects on mood and behavior . Pls.' Ex. 4 at

p. 186 ¶ 298; Pls.' Ex. 107 at pp. 86-87.  Defendants acknowledge that the "effects of gabapentin

on neurotransmitter release occur at drug concentrations that are relevant for the pharmacological

actions of gabapentin in animal models (i.e., approximately 10 µM or 1.5 µg/mL)."  Pls.' Ex. 4 at

p. 186 ¶ 299; Pls.' Ex. 107 at p. 327.  Third, in relation to clinical practice in humans, Dr. Taylor

testified, "And absolutely I think, its my opinion after writing all these papers, that

concentrations of gabapentin in the ten micromolar to 100 micromolar range are relevant for

clinical practice."  *Id.*

Additionally, Neurontin's effect on behavioral depression in mice was published in the *Indian Journal of Pharmacology* (2000). After setting forth the generally accepted opinion that serotonin and norepinephrine are associated with behavioral depression,[80] the author explained that the following: [Treating albino mice with Neurontin] increased the duration of immobility in [the] behavioural despair test." Pls.' Ex. 109. Importantly, even at doses <u>lower</u> than Neurontin's anticonvulsant dose, Gabapentin caused "a release of GABA which may act on $GABA_B$ receptors like sodium valproate in producing facilitation of depression directly or indirectly. *Id.* (emphasis added).[81]

Defendants claim that animal studies alone are never admissible because animals cannot be reliably compared to people. The contention is not germane since in this case the animal studies do not stand alone, and they show that Neurontin can cause serotonergic dysfunction.[82] Accordingly, the Neurontin animal studies provide additional confirming evidence that Neurontin is capable of causing the injuries at issue in this case.

Defendants misstate the law as to the value of animal models to support general causation. Defendants cite *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441 (D.V.I. 1994), to imply that animal studies are inadmissible *per se* and are never reliable. *Wade-Greaux* involved a completely different issue, teratology evidence to establish whether asthma medication could cause birth defects. The court found those particular animal studies inadmissible because they used fragile models, the doses were highly excessive, there was no dose/response effect, and the types of defects found were not the same ones found in the

---

[80] Noteworthy, the author compared Neurontin to drugs of another class: "Drugs which deplete brain monoamines like reserpine or which reduce the norepinephrine release like clonidine have reported to facilitate depression in behavioural despair test." *Id* at. p. 32.

[81] *See* Pls.' Ex. 108. The author recognized that the drug agent, baclofen, was associated with a similar mechanism of action and depression. Neurontin has been acknowledged by Pfizer to have similarities to baclofen. Pls.' Ex. 4 at pp. 185 ¶ 295.

[82] Pls.' Ex. 43; Pls.' Ex. 44.

plaintiff. As such, they were irrelevant because they could not be reliably extrapolated to humans. *Id.* at 1453-55. However, the court did note that animal studies, if appropriately conducted, could be helpful in determining human teratogenicity.

Plaintiffs' experts also rely on published, controlled animal studies, an additional line of evidence to support causation. Animal studies are conducted for the purpose of extrapolating results and generating a biologically plausible hypothesis to test in humans. Whether Plaintiffs' experts actually perform animal research is irrelevant. Plaintiffs' experts properly rely in part upon the results of animal studies to provide additional, consistent support for their opinions.

### G.    All Bradford Hill Criteria Is Not Required

Prof. Trimble and Dr. Kruszewski considered the factors consistent with the Bradford Hill methodology. Causation analysis using the Bradford Hill Factors does **not** require a finding that all factors exist for there to be causation.[83] In fact, on April 2, 2008, the U.S. District Court for the District of Minnesota specifically rejected Pfizer's argument that a failure to satisfy the Bradford Hill criteria provided independent grounds to exclude an expert's testimony. *In re Viagra Prods. Liab. Litig.*, Civil No. 06-md-1724, slip op., Apr. 2, 2008 at p. 12 (D. Minn.) (ECF Doc. # 432).[84]

As the Reference Manual on Scientific Evidence, Second declares: "Drawing casual inferences after finding an association and considering these factors **requires judgment and searching analysis**, **based on biology**, of why a factor or factors may be absent despite a causal relationship, and vice-versa. While the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using scientific methodology." (Emphasis

---

[83] Pfizer actually argues Plaintiff is unable to satisfy Bradford Hill requirements in the ten Track One cases regarding cessation of exposure. This argument is devoid of any practicality since the claim in seven of the ten cases is death from suicide; hence, the cessation of exposure is concomitant with the demise of the Plaintiff.

[84] The *Viagra* litigation involves an MDL wherein plaintiffs claim that Viagra, manufactured by Pfizer, causes a vision-loss disorder. *Id.* at 1.

added.)[85]  It is undisputed that suicide is a multi-factorial event with each individual case requiring evaluation of proximate cause.  When evaluating general causation with a multi-factorial event, analysis must focus on Neurontin's general capacity to cause mood and behavioral disturbances that increase the risk of suicidality.

Defendants argue there is a lack of epidemiology so no current scientific proof of an absolute causal link between Neurontin and suicidality can be made.  However, the law rejects the need for definitive epidemiological  proof.  Defendants' position in seeking only the highest levels of proof to the exclusion of all other proof is unfounded and rejected by the courts.  *See e.g., Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d at 316-17 ("Overall, the Supreme Court emphasized the 'liberal thrust' of the Federal Rules of Evidence, favoring admissibility of expert opinion testimony… The Court's task however is not to apply a rigid checklist to proposed opinion testimony, but to determine if it is based upon sufficient facts or data and is the product of reliable principles and methods, and if the principles and methods have been applied reliably to the facts of the case"); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d at 1198-99 ("It is well-settled that while epidemiological studies may be powerful evidence of causation, the lack thereof is not fatal to a plaintiff's case…  This Court has long held that epidemiology is not required to prove causation in a toxic tort case"); *Benedi v. McNeil-P.P.C.U. Inc.*, 66 F.3d at 1384 ("expert testimony need not be based upon identical case studies or epidemiological data).

Additionally, *Daubert* does not require that a party who proffers expert testimony establish that the expert's opinion is accurate.  *Ruiz-Troche v. Pepsi-Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).  Rather, *Daubert* only requires that an expert's scientific

---

[85] <u>Reference Manual on Scientific Evidence, Second</u> at 375 (2000).

testimony rest upon "good grounds, based on what is known." *Holtje v. Waterman*, 11 Mass. L.

Rep. 89 (Mass. Super. 1999). In a case Defendants fail to cite, the court states the following:

> *Daubert* does not require proof to a certainty or even proof convincing to the trial judge. The trial judge is not required to find that that proffered opinion is scientifically correct, but only that it is trustworthy because it is tied to good scientific grounds. What *Daubert* does require is that the expert's opinion be based on sound methodologies of the type used experts in the field in which the opinion is offered. There can be little question that scientists routinely use **animal studies, case reports, and pharmacological comparisons of similar classes of drugs to infer conclusions, which are expressed in peer-reviewed journals and textbooks.** Unquestionably, epidemiological studies provide the best proof of the general association of a particular substance with particular effects, but it is not the only scientific basis on which those effects can be predicted. In science, as in life, where there is smoke, fire can be inferred, subject to debate and further testing. [Emphasis added for all evidence relied upon by Plaintiff experts in this case.]

*Brasher v. Sandoz Pharms. Corp.,* 160 F. Supp. 2d 1291 (N.D. Ala., 2001). In fact, the *Brasher*

court ruled that even alternative explanations for the injury are <u>not</u> enough to exclude expert

testimony. <u>*Id.*</u> at 1299.[86]  Contrary to Defendants' plea to this Court, Plaintiffs do not have to

show that in the absence of Neurontin, suicide would not have occurred, but, rather, that

Neurontin substantially increased the risk of suicide.

Prof. Trimble, Dr. Kruszewski, and Dr. Blume are well qualified and their work satisfies

*Daubert* because it is based on good scientific grounds. Their opinions are supported by peer-

reviewed journals and textbooks, animal studies, case reports, epidemiology, the January 2008

FDA Alert and the consistency of pharmacology when compared to the drugs in the same class.

---

[86] Defendants argue their experts' suggestion of alternative explanation for the suicide in the ten Track One cases is enough to defeat *Daubert*. However, with a multifactorial event like suicidality, Defendants' argument that an alternative explanation alone defeats *Daubert* in both a general and specific causation evaluation is wrong.

IV.    **PLAINTIFFS' EXPERTS ARE EMINENTLY QUALIFIED AND INTELLECTUALLY RIGOROUS IN PROVIDING OPINIONS**

    A.    **Prof. Michael Trimble, M.D. Is the World's Most Qualified Expert to Testify on Neurontin's Capacity to Cause Negative Mood and Behavioral Changes Resulting in Suicidality.**

Prof. Trimble is the world's foremost expert with substantial clinical experience regarding antiepileptic drugs effects on mood and behavior.[87]  Common sense dictates that this is why Defendants retained Prof. Trimble in 1995 to evaluate Neurontin's association with mood and behavioral disturbances.  Prof. Trimble has **specialized training and clinical experience** regarding antiepileptic drugs effects on mood and behavior.  He has dedicated his long and distinguished medical and research career to brain-behavior relationships, with particular emphasis in the area of epilepsy and the effect antiepileptic drugs have on mood and behavior. Prof. Trimble is one of a very small number of people in the world who have a medical degree and expertise in neurology, psychiatry, neuropsychopharmacology, neuroimaging and neuroanatomy.[88]  The confluence of his specialized clinical training and research experience enables Prof. Trimble to have unique insight from a neurological, psychiatric, neuroanatomy, neurochemistry and psychopharmacological perspective as to how Neurontin's psychoactive effects in human brain negatively alter mood and behavior.

Prof. Trimble is a prolific writer having authored nine books, including Biological Psychiatry 2nd, and Concise Guide to Neuropsychiatry and Behavioral Neurology, also in its second edition.   He has edited 26 medical books.  Additionally, Prof. Trimble has edited chapters in 154 medical books, the majority of which deal with the effects of antiepileptic drugs on mood and behavior.  Prof. Trimble has published 206 peer-reviewed papers.  Many of these

---

[87] Pls.' Ex. 3; Pls.' Ex. 135 pp. 151-174.
[88] Pls.' Ex. 54 at 1.

articles are on topics directly dealing with the issues in this case—the effect antiepileptic drugs have on mood and behavior.

Prof. Trimble is a **Professor of Behavioral Neurology**. A neurologist deals with brains that are physically injured. A psychiatrist deals with functional disorders of cerebral and neurotransmitter function. A behavioral neurologist bridges the gap between straight neurology and psychiatry by bringing the two disciplines together.

Prof. Trimble was educated in the United Kingdom. His medical degrees include Membership of the Royal College of Physicians (**MRCP** – equivalent to Board Certified General Medicine); Membership of the Royal College of Psychiatrist (**MRCPsych** – equivalent to Board Certified Psychiatrist); Research Degree, first class honors, in Neuroanatomy; Master of Philosophy (**MPHIL**) where his post doctorate thesis was about the neuropharmacology of treating epilepsy using animal models to research seizure thresholds and drug effects on serotonin, dopamine, noradrenaline and GABA, (the same neurochemicals Neurontin affects and which lead to the negative effects on mood and behavior); Fellow of the Royal College of Psychiatrist (**FRC Psych** is the equivalent of Fellow of the American Psychiatric Association), Fellow of the Royal College of Physicians (**FRCP**); and Medical Doctor (**MD**) in neuroimaging where he conducted several studies using brain imaging techniques looking at changes in human brain structure and function of people who have psychiatric or behavioral problems.

Prof. Trimble is an Emeritus Professor in Behavioural Neurology and Consultant Physician to the department of psychological medicine, Institute of Neurology and the National Hospital for Neurology and Neurosurgery, Queen Square, London. He has been a University accredited teacher at the University of London where he is a recognized teacher in Behavioural Neurology. He has actively taught post graduate students neurology, neuroanatomy, the role of

48

brain anatomy and brain chemistry in regulating behavior as revealed through neurological and psychiatric diseases at the National Hospital and Institute for Neurology. Neuroimaging has played an important role in his teaching Unit, bringing the most modern neuroimaging techniques available to an understanding of psychopathology and brain behavior relationships. Prof. Trimble's professional emphasis has been evaluating the psychopharmacology of antiepileptic drugs effect on behavior and cerebral stimulation.

Prof. Trimble is a member or Fellow of twelve medical Societies or Associations. He has been, or currently is, a member of fifteen Editorial Boards. Of particular note, Prof. Trimble was a member of the Harvard Review of Psychiatry and the Journal of Forensic Psychiatry.

Prof. Trimble also is an international lecturer and advisor. He has spoken specifically about antiepileptic drugs' effects on mood and behavior before his peers throughout Europe, North America and Asia. While Defendants tacitly concede that Prof. Trimble is eminently qualified to render his opinion by choosing not to object to his qualifications, they do so with the hope this Court will overlook the cases that hold that the weight given to an expert's opinion must be balanced with his level of expertise. *In re TMI Litig.*, 193 F.3d at 665. "However, 'the level of expertise may affect the reliability of the expert's opinion.'" *Id.* at 664 (quoting *In re Paoli*, 35 F.3d 717, 741 (3d Cir. 1994)). It is clear that due deference to Prof. Trimble's opinion must be given considering the scope and breadth of his experience as a behavioral psychiatrist who has spent a career studying, writing and teaching about the behavioral effects of antiepileptic drugs on humans.

Prof. Trimble's opinion is based on far more than mere *ipse dixit*. He reviewed available animal research data, peer-reviewed scientific data, confidential internal corporate scientific research documents not available to the general scientific community, peer-reviewed medical

research articles, spectroscopy findings, anecdotal reports, all existing epidemiology, and the January 2008 FDA alert. These materials, combined with his extensive experience with antiepileptic drugs' effects on mood and behavior, form the bases of his opinion. When considering Prof. Trimble's extraordinary credentials and experience, together with the judicially accepted methodology he applied by weighing all the available evidence with the same scientific rigor he uses in his professional life, as set forth by Justice Stevens in *Joiner*, his opinion more than satisfies *Daubert* and should be admitted by this Court.

It cannot be overlooked that Defendants' experts who challenge Prof. Trimble's opinion are not professors of biological psychiatry, have never conducted research regarding antiepileptic drugs' effects on mood and behavior, have not authored a single peer-reviewed article regarding antiepileptic drugs effect on mood and behavior nor authored any books on biological psychiatry, and have not edited any chapters dealing with any topics associated with antiepileptic drugs effect on mood and behavior. Antiepileptic drugs have found minimal utility in Defendants' experts' private practices.[89] Not one of Defendants' experts has broad experience in prescribing Neurontin. Simply stated, Defendants' experts are not qualified to challenge Prof. Trimble's opinions in this case. Defendants were not able to find an expert with <u>comparable</u> credentials as Prof. Trimble who differed in his opinion that Neurontin's psychoactive effect of reducing serotonin predictably causes suicidality. Indeed, it was Prof. Trimble whom Defendants retained in 1995 and 1996 to evaluate psychotic disturbances associated with Neurontin.

On May 20, 1995, Prof. Trimble provided to Defendants a report "Psychosis with Gabapentin", relating to his opinion that Neurontin has the capacity to lead to negative mood and behavioral disturbances, including clinically important depression. Pls.' Ex. 17. In that report he

---

[89] Pls.' Ex. 111 at p. 56; Pls.' Ex. 112 at p. 169; Pls.' Ex. 113 at 65-66.

states, "A particular drug may influence one aspect of behavior positively and another negatively. **The main adverse effect of anticonvulsants is the link between drugs and depression.**" *Id.* at p. 6 (emphasis added).

In a report written in 1996, Prof. Trimble was again retained by Defendants to evaluate Neurontin. He re-confirmed his opinion that Neurontin has the capacity to cause adverse effects on mood on behavior. Pls.' Ex. 18 at p. 5. One might say Prof. Trimble simply got it right, notwithstanding that Defendants withheld from him the full extent of the information they possessed regarding the psychoactive effect of Neurontin. Indeed, he was provided with only limited information at that time. Prof. Trimble's opinions over a decade ago perspicaciously detected an association between Neurontin and depression and hostility which has been borne out as reliable and that has been confirmed by the recent FDA Safety Alert that Neurontin causes suicidality.

**B.    Dr. Stefan Kruszewski Is Qualified to Provide an Opinion on General Causation.**

As his curriculum vitae reflects, Dr. Kruszewski is a well-educated, credentialed, and experienced clinical psychiatrist with extensive specialized expertise in psychopharmacology.[90] He has been providing psychiatric care, including prescribing psychoactive drugs, for the past two decades.

Dr. Kruszewski maintains a private psychiatric practice and is the Psychiatric Medical Director at the psychiatric residential facility Mazzitti and Sullivan Counseling Services. Dr. Kruszewski currently is a faculty member at Eastern University after serving as a Clinical Professor of Psychiatry at Penn State College of Medicine. He has authored several peer-

---

[90] Pls.' Ex. 114; Declaration of Stefan Kruszewski, M.D., Pls.' Ex. 115.

51

reviewed publications relating to the utility of antiepileptic drugs in the treatment of affective disorders.

In an unrelated matter before the esteemed Judge Weinstein in *In re: Zyprexa Prods. Liab. Litig.*, Dr. Kruszewski's qualifications and opinions satisfied *Daubert* scrutiny. When discussing these qualifications, Judge Weinstein wrote:

> This distinguished expert's analysis of the relevant literature may be useful to the jury. Dr. Kruszewski's experience provides an adequate basis for his opinion and proposed testimony. His curriculum vitae includes the following: He has 28 years of clinical practice (including internship and residency) in which he treated several thousand patients with a wide variety of psychiatric and neuropsychiatric conditions to whom he prescribed numerous drugs for psychiatric and neuropsychiatric indications. He witnessed the side effects of drugs that predispose an individual to neuropsychiatric complications….
>
> Dr. Kruszewski has expertise in psychopharmacology, including education in medical school, residency, post-graduate work and continuous reading and updating through Continuing Medical Education (CME) work. He has been an educator regarding basic and applied psychiatric and neuropsychiatric psychopharmacology, including metabolic dysfunction,  at several institutions, including Harvard Medical School (1974-77), specifically epidemiology of obesity), UMDNJ-Rutgers Medical School/Robert Wood Johnson for several years as a member of their residency program and faculty (1980-83), and University of Pittsburgh School of Medicine, Western Psychiatric Institute and Clinic (1988-1991), Allegheny General Hospital and related Medical Schools, (1991-92), University of North Texas Medical School (1992-93) and, as a member of the Clinical Faculty of Penn State College of Medicine-Hershey Medical School (1999-2004). As part of those academic teaching appointments, he lectured on epidemiology, psychiatry, neuropsychiatry and related fields, including factors that affect and illness of individuals and populations to identify risk factors for disease and to determine optimal treatment approaches to clinical practice. His work has been published as solo and primary author in peer-reviewed journals, including the *BMJ* (previously titled, British Medical Journal), *American Journal of Psychiatry, Neurology, Journal of the American Medical Association, the New England Journal of Medicine, Annals of Clinical Psychiatry, Journal of Clinical Psychiatry* (as of Spring 2007) and others. Those publications have covered a wide spectrum of issues pertaining to drugs (including anti-psychotics), side-effects, conflicts of interest and the validity and consistency of research.
>
> This expert is on the Board of Directors of the Alliance for Human Research Protection. In that capacity, he reviews and analyzes information from

national and international peer-reviewed and edited sources related to clinical research on issues pertaining to drugs and device side-effects.  That work includes his ongoing study of effects and side-effect of ***anticonvulsants***, antidepressants, antipsychotics, stimulants, sedatives, drugs of abuse and mood-stabilizing drugs. In 2001-2003, he provided psychiatric expertise regarding behavioral access to care for a white paper designed for the NCQA (National Committee on Quality Assurance, Washington D.C.) and to be used as a guide for nationwide behavioral health programs.  He participated in the design and implementation of drug trials, including Zyprexa.  [*In re: Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 287-288 (E.D.NY 2007) (emphasis added).]

### C.  Dr. Cheryl Blume Is Qualified to Provide an Opinion on General Causation.

As reflected in her curriculum vitae, Dr. Blume is a well-educated, credentialed and experienced clinical pharmacologist with extensive, specialized expertise in the review and analysis of industry drug development for both neurological and psychiatric indications.[91]   Dr. Blume  provides a general causation opinion (as well as a failure-to-warn opinion)  in this case based upon sound, reliable scientific evidence.

During the past 25 years, Dr. Blume has participated in the development, submission and approval of more than 20 New Drug Applications to the FDA; the development, submission and approval of more than 100 Abbreviated New Drug Applications to the FDA; as well as the development and submission of at least 30 Investigational New Drug Applications.

Not only does Dr. Blume have a background in pharmacology so as to provide opinions on a drug's mechanism of action (i.e., biological plausibility), her experience also includes responsibility for neuropsychiatric animal studies as part of New Drug Applications that included transmitter studies and electrical stimulation studies.  Pls.' Ex. 117 at p. 240.  As Chief Operating Officer (COO) at Somerset Pharmaceuticals, Dr. Blume was "in charge" and responsible for the

---

[91] Pls.' Ex. 116; Pls.' Ex. 102.

design of studies that were conducted to measure the effect of drug compounds on neurotransmitters in the brain.  *Id.* at 242.

After working 21 years for two pharmaceutical companies, Dr. Blume founded a private pharmaceutical development firm where she provides independent consultation for international and national pharmaceutical companies regarding the development, submission and approval for new drugs to the FDA.  Dr. Blume has been awarded 27 patents for various pharmaceutical compounds.[92]  She has authored 13 articles, including peer-reviewed literature that have been published in several well-respected biopharmaceutical journals.  She has been an educator regarding basic and applied molecular pharmacology and physiology at the University of South Florida College of Medicine.

In this case, as reflected in Dr. Blume's expert report, Dr. Blume performed extensive research of peer-reviewed and non-peer-reviewed scientific literature, including a detailed and thorough review of the Neurontin New Drug Application (NDA) submitted to the FDA for both Defendants' epilepsy and post-herpetic neuralgia indications, corporate research documents regarding the molecular pharmacology of Neurontin, pre-clinical pharmacology studies, animal studies, and multiple confidential corporate documents including Integrated Summary of Safety filings. Pls.' Ex. 4.  Additionally, Dr. Blume reviewed adverse event reports from Neurontin clinical trials, Defendants' internal adverse event data base, and the World Health Organization' adverse event database.  Importantly, unlike Defendants' experts, who simply reviewed summaries of adverse events, Dr. Blume actually reviewed all of the research reports for the clinical and pre-clinical trials related to Neurontin.  Pls.' Ex. 4 at p.1 ¶ 5. Dr. Blume did not merely review summaries or charts depicting raw numbers of reports. Pls.' Ex. 102 at pp. 1-9.

---

[92] Defendants, in support of their own patent application in 1988 (07/204,437) cite Cheryl Blume, Ph.D., as a source of information for their own invention, "Drug in combination with flavor masking agent and method for making same." Pls.' Ex. 118 at p. 3.

## V.    PLAINTIFFS' EXPERTS APPLIED THE SAME SCIENTIFIC RIGORS IN REACHING OPINIONS AS THEY DO IN THEIR EVERYDAY PRACTICES

The "intellectual rigor" that Plaintiffs' experts utilize in their review as the bases of their opinions in this case is the same they use in their private consulting practices. Each expert, in their respective reports or via testimony under oath, applied their working knowledge to the issue at hand.

First, when conducting his research into Neurontin's effect on mood and behavior, Prof. Trimble applied the same standards and scientific rigors he applies to the books, chapters and articles he has written and submitted for peer review.[93]

> Q.    And is that -- that is an opinion that you posit is a scientific one; is that right?
>
> A.    The opinion has been derived through my knowledge of the literature and the application of scientific principles to the conclusion.[94]

Prof. Trimble employed the same methodology and intellectual rigor that he uses to evaluate the articles submitted for peer review on the Editorial Boards on which he is a member. Everything in Prof. Trimble's opinion is supported by generally accepted scientific principles that are found in numerous peer-reviewed scientific articles.[95]

Second, when conducting his research into Neurontin's effects on mood and behavior, Dr. Kruszewski applied the same standards and scientific rigor he applies in his medical practice and professional life. As set forth in his expert report: "I have used the same type of scientific

---

[93] Pls.' Ex. 119 at p. 337; Pls.' Ex. 54.

[94] *Id.* at p. 46.

[95] Defendants argue there are no peer-reviewed published articles stating the ultimate conclusion that Neurontin causes suicide. Not until Prof. Trimble, Dr. Kruszewski, and Dr. Blume has there been an opportunity for someone outside of Defendants' employ to review the internal, confidential corporate documents and the peer-reviewed literature. Since Defendants insisted upon anyone reviewing this case to sign a confidentiality agreement, Plaintiffs' experts have been prevented from submitting their findings for publication. Pls.' Ex. 54;, Pls.' Ex. 115. As discussed infra, the FDA agrees with Prof. Trimble, Dr. Kruszewski, and Dr. Blume.

analysis and reasoning herein that I use in my professional work."[96]  As stated above regarding his qualifications, Judge Weinstein, in the  *Zyprexa* litigation, recognized that Dr. Kruszewski's daily rigors of professional work with patients translated easily to Dr. Kruszewski's qualifications to render opinions in a litigation setting.  *See* 489 F. Supp. 2d at 287-88.

Here, Dr. Kruszewski undertook the same methodological, rigorous approach to render his opinions.  As reflected in his expert report disclosed in this case, he performed an extensive research of peer-reviewed and non-peer-reviewed scientific literature, including review of the Neurontin New Drug Application (NDA), research documents concerning Neurontin's mechanism of action, efficacy and safety features of Neurontin, and confidential corporate research documents of Defendants as the bases of his opinion.[97]  The "intellectual rigor" that Dr. Kruszewski utilized in this review as the bases of his opinion in this case is the same as that which he uses in his private practice.  As Judge Weinstein found, under *Kumho* and *Joiner*, this suffices.

Third,  Dr. Blume applied to this case the same standards and scientific rigor she applies in her daily work on drug development projects for private pharmaceutical companies in areas of pharmacology and toxicology, design and review of clinical trials, development of New Drug Applications and safety surveillance.[98]  Further, as explained below, Defendants' attack on Dr. Blume's rigor, methods, or her reliance, in part, on assignments performed by Mr. Keith Altman, are simply misplaced.

---

[96] Pls.' Ex. 28 at p. 1.
[97] Pls.' Ex. 115.
[98]  At her deposition, Dr. Blume testified that she is currently working with a pharmaceutical company on the development of an NDA for an antiepileptic medication:  "A. We are working on a project now with an antiepileptic product, a product development project of  an antiepileptic marketed in Europe.  Not marketed yet -- not marketed in the United States, but it's being developed in the United States for a different indication.  But mechanism of action work has been included in that NDA."  Pls.' Ex. 121 at p. 235.

In applying the same rigor here as she does with her consulting to pharmaceutical companies, Dr. Blume explained during deposition testimony her review and evaluation of Neurontin:

> "**to conduct the same sort of analyses that we conduct in our standard pharmacovigilance work for  --- for pharmaceutical companies.**  And what that means is accessing the different types of events at different periods of **time.** In this particular instance, the report is divided into four time periods.  And in each time period, we looked at all available databases, which included the U.S. pharmacovigilance databases referred to as either "SRS" or "SRS/AERS".  We accessed the World Health Organization database.  We looked at Health Canada at least during one period in which it was available.  I believe in this report we also looked at DAWN, the Drug Abuse Network Test, the Test Network, and the internal Pfizer pharmacovigilance database or adverse event database.  **And during that period of time – during those periods of time, we conducted the same sort of queries that we conduct as part of our NDA preparation efforts and as part of our post-NDA pharmacovigilance assignments for clients.**  And that includes – in this particular case, we were interested in psychobiological, neuropsychiatric terms, and we were also look --- interested in looking at the contribution of those terms relative to the entire database over time.  [Pls.' Ex. 122 at pp. 48-49 (emphasis added).][99]

Dr. Blume relies in part upon data collection by Keith Altman for purposes of private consulting to pharmaceutical companies related to postmarketing pharmacovigilance.[100]  Pls.' Ex. 124 at pp. 15-16.  Generally, Dr. Blume's opinions in this case derived, in part, from the same methods Mr. Altman applies to his private consulting with pharmaceutical clients:  "He does the same general types of searches in both litigation in the product development assignments."  Pls.' Ex. 124 at pp. 23-24.  In her daily practice consulting with private pharmaceutical companies, as well as in this litigation, Dr. Blume directs the activities and assignments Mr. Altman performs.  Pls.' Ex. 124 at p. 18.  In conjunction with private consulting for pharmaceutical companies and the New Drug Applications (NDAs) that Dr. Blume has

---

[99] *See* also Pls.' Ex. 123 at pp. 285-291.

[100] Dr. Blume testified further that Keith Altman has worked with her pharmaceutical clients; that "he has evaluated U.S. as well as international databases, both publicly available as end company-based databases, relating to adverse events for utilization in either IND or NDA submissions or in the establishment of pharmacovigilance assignments following an NDA approval."  Pls.' Ex. 124 at pp. 17-18.

pursued with the FDA on behalf of such clients, both Dr. Blume and Mr. Altman's work has

been approved by the FDA. Pls.' Ex. 124 at pp. 17-21. In reference to her work with Mr.

Altman, Dr. Blume explained that Mr. Altman's methods have been approved by the FDA:

> We have used his --- the method that he has developed has been provided to the
> FDA. FDA has queried him independently on the way in which he analyzes these
> data. FDA has – has approved our applications using these data. I understand
> that Mr. Altman communicates with the FDA on projects other than mine, as well,
> on these database assignments . . . . [Pls.' Ex. 124 at p. 56.]

Dr. Blume testified further at her deposition regarding the rigor with which Mr. Altman's

methods ensure accuracy:

> My understanding, when Mr. Altman approaches a database, is that he establishes
> the database so that we are fulfilling requirements for ensuring that we have
> access – that we have secured all the numbers that are available, that there has not
> been double counting, and that we have structured the database in such a way that
> allows us to get an accurate number of the events at each time period. I know that
> several procedures and controls are put into place to allow him to do that . . . .
> [Pls.' Ex. 124 at p. 71.][101]

As it pertains to epidemiologic reviews, Dr. Blume also applied to her methods in this

litigation the same rigor she applies when consulting with private pharmaceutical company

clients involving epidemiologic assignments. Pls.' Ex. 124 at p. 226. Similar to her reliance, in

part, on data collection by Mr. Altman,[102] she also retains independent biostatisticians to design

statistical components of her studies. Pls.' Ex. 124 at pp. 228. Indeed, it is axiomatic that

---

[101] As part of their attack on Mr. Altman, Defendants misapply the Court's opinion in *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791 (N.D. Ohio 2004), in their Memorandum of Law at page 39. First, the *Meridia* court did not preclude Mr. Altman from being an expert witness. Mr. Altman was never offered as an expert witness: "Plaintiffs concede that Mr. Altman is not an expert. Further, Mr. Altman does not present statistical evidence which requires an expert." *Id.* at 808 n.14. Similar to the situation in *Meridia*, Mr. Altman is not an expert here; his calculations involve the compilation of numbers and preparation of charts pursuant to Rule 1006 of the Federal Rules of Evidence.

[102] As explained in Mr. Altman's Affidavit, Pls.' Ex. 120, at the direction of Dr. Blume, Mr. Altman provided calculations of data in the form of charts based upon data disclosed by Defendants during the pendency of the litigation or from publicly available FDA databases. The charts represent summaries of voluminous materials permitted under Rule 1006 of the Federal Rules of Evidence.

58

experts in all professions—including the Defendants' own experts in this case—retain third parties for related assignments.[103]

## VI.  CONCLUSION

Every step in Prof. Trimble, Dr. Kruszewski and Dr. Blume's methodology and intellectual rigor meet and exceed the requirements of *Daubert* and its progeny and Rules 702 and 703 with respect to their opinions on general causation.  Consequently, this Court should deny Defendants' motion in its entirety.

Dated:  April 4, 2008                              Respectfully submitted,

                                                   *Members of Products Liability*
                                                   *Plaintiffs' Steering Committee*

                                   By:    /s/ Andrew G. Finkelstein
                                          Andrew G. Finkelstein, Esquire
                                          Finkelstein & Partners, LLP
                                          436 Robinson Avenue
                                          Newburgh, NY  12550

                                   By:    /s/ Jack W. London
                                          Jack W. London, Esquire
                                          Law Offices of Jack W. London
                                            & Associates
                                          106 E. 6th Street, Suite 700
                                          Austin, TX  78701

### CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on April 4, 2008.

                                          /s/ Andrew G. Finkelstein
                                          Andrew G. Finkelstein, Esquire

---

[103] Defendants' purported expert Smith-Weiss, PhD, acknowledged her own retention of a third party vendor, DrugLogic®, of Reston, VA, to collect the data for her own expert report in this case, just as Mr. Altman performed for Dr. Blume.  Pls.' Ex. 126 at p. 15.  Similar to the manner in which Mr. Altman "filters" data for Dr. Blume, Dr. Smith-Weiss's vendor, Drug Logic®, "took steps to clean the data" for Dr. Smith-Weiss.  *Id.*