UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION, | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: | Magistrate Judge Leo T. Sorokin |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER, INC., and | **REDACTED VERSION ORIGINAL FILED UNDER SEAL** |
| AETNA, INC. v. PFIZER, INC. | |

## MEMORANDUM OF LAW IN SUPPORT OF THE COORDINATED PLAINTIFFS' MOTION TO COMPEL DEFENDANTS TO PRODUCE ALL BUSINESS AND OPERATING PLANS RELATING TO THIRD PARTY PAYORS AND TO PRODUCE AN ADEQUATELY PREPARED RULE 30(b)(6) WITNESS

### INTRODUCTION

The Coordinated Plaintiffs ("Plaintiffs"), by and through their attorneys, respectfully

submit this memorandum of law in support of their motion to compel defendants Pfizer, Inc. and

Warner Lambert Company (collectively, "Defendants") for the following relief:[1]

---

[1] On March 7, 2008, Plaintiffs filed a motion for the relief now requested. On March 10, Defendants requested an adjournment for additional time to prepare a response. In an subsequent meet & confer conference, Defendants asserted that they believed they would be able to procure a declaration from their prior 30(b)(6) witness that would resolve many of the issues raised in this motion, but that because the declarant was out of town, additional time was needed. The parties agreed that they would continue to meet and confer to attempt to eliminate the need for this Court's intervention. In reliance on this agreement, Plaintiffs withdrew their motion without prejudice, via a stipulation signed by both parties, that was filed with this Court on March 11:

> Pursuant to the request of the Defendants, and a subsequent meet-and-confer between the parties, the Coordinated Plaintiffs hereby withdraw the Motion to Compel without prejudice. The parties intend to continue to meet and confer regarding the issues raised in the Motion to Compel.

Nussbaum Decl., Ex. N. Despite the intention expressed in the stipulation entered by the parties, Defendants did not continue to meet & confer once they obtained the withdrawal of the motion, and Plaintiffs did not receive a substantive response to any of several calls and emails until March 26. Nussbaum Decl., Ex. O. At that time Defendants demanded a proposal from Plaintiffs for a limited deposition. *Id.* Defendants issued a belated and blanket rejection of that proposal on April 2, 2008. Nussbaum Decl., Ex. P. The promised declaration was never produced. Defendants in effect procured for themselves a one month extension to draft an opposition brief. That month came at Plaintiffs' expense. Plaintiffs should not be further prejudiced by such tactics, and now request this

*First,* Plaintiffs move to compel Defendants to produce all remaining "business plans" and "operating plans" related to the named Third Party Payors, or in the alternative, to confirm the dates and circumstances of their destruction. These documents were first requested from Defendants on March 11, 2005,[2] but Defendants repeatedly claimed that no relevant documents exist. This was not true, as became clear when a subset of these documents were finally produced on February 13, 2008. The 2004 Operating Plan for Kaiser (a named Coordinated Plaintiff) ███████████████████████████████████████████████ ████████████████████████████████████ Nussbaum Decl., Ex. J at 16. Plaintiffs were advised on April 2 that Defendants' have searched various employees' files and have not located any further responsive documents, (*see* Nussbaum Decl., Ex. P), however, it remains unclear why electronic copies of these key documents cannot be retrieved or why these documents were not subject to a litigation hold at the time the government investigation of Neurontin was launched.

*Second,* Plaintiffs move to compel Defendants to produce a witness adequately prepared witness to testify to Topics 1 and 2 of the Coordinated Plaintiffs' 30(b)(6) Notice. The Defendants' 30(b)(6) witness was inadequate for three reasons: (i) the witness conceded he was entirely unprepared to testify as to Topic 1, which, in pertinent part, calls for "the identification of, and all documents concerning, all individuals at . . . Warner-Lambert . . . who had contacts with Third Party Payors concerning Neurontin;" (ii) the witness was unprepared to testify fully as to communications between Defendants and named Third Party Payors because Defendants

---

Court order the relief requested be provided on an expedited basis. *See* Declaration of Linda P. Nussbaum, April 4, 2008 at ¶ 27 - 30.

[2] *See* "Class and Non-Class Plaintiffs' First Request for Production of Documents." *See* Nussbaum Decl, Ex.. D at ¶¶ 53-56 and 67-68.

inappropriately chose to exclude communications between Defendants and physicians affiliated with, or who prescribed medication to be reimbursed by, the named Third Party Payors from those Topics; and (iii) Defendants did not produce any Third-Party Payor business or operating plans until well after the deposition, and thus the Coordinated Plaintiffs were unfairly denied the opportunity to examine the Defendants on documents that are squarely responsive to Topic 2.

This Court has granted the Defendants similar relief in much less egregious circumstances. *See* Discovery Order 17 (Dkt # 963). Plaintiffs have been locked out of areas of inquiry now that are plainly within the scope of discovery that was requested long ago and plainly relevant and material to the core claims in this litigation, *i.e.* that Third Party Payors were misled into paying for Neurontin by Plaintiffs misrepresentations of its efficacy and safety for the uses prescribed.    *Id.*  The materiality of the documents requested is demonstrated by the contents of the 2004 Operating Plan for Kaiser.  The materiality of the additional testimony sought cannot fairly be challenged by the Defendants who previously moved this Court to compel the same type of communications from the Plaintiffs, and who have frequently questioned Plaintiffs' own witnesses about the same topic.

Plaintiffs are entitled to the relief requested, and have been prejudiced by their inability to gain discovery and prepare their case in accordance with the schedule laid out by this Court. We now ask that the Court grant the relief requested, and order the immediate production of the documents requested and the production of an adequately prepared witness within 30 days of the document production.

## I.     STATEMENT OF FACTS

### A.     The Business and Operating Plans

Over three years ago, Plaintiffs served their "First Request for Production of Documents." Nussbaum Decl. Ex. D. The operating and business plans that are the subject of this motion are responsive to no fewer than five of Plaintiffs original Requests. *Id.* at Requests Nos. 53-56, 67-68. For example, Request No. 68 calls for the production of "[a]ll documents relating to tactical plans created to implement marketing strategies for Neurontin (whether at the national, regional or CBU level)."

According to Defendants' 30(b)(6) witness, Pfizer maintained operating and business plans that would have included information relevant to communications with third-party payors, and those documents would have been housed in various locations and departments over the years. Nussbaum Decl. Ex C, 185:21-188:8. Operating plans were created for large, national third-party payors, while business plans were used for smaller third-party payers. *Id.* at 84:24-85:10. According to the witness, each operating plans "follows a similar format," including an executive summary, a situational analysis, and then individual product strategies and tactics. *Id.* at 76:23-77:6; 78:5-78:9. Pfizer would only include products in the plan that Pfizer was "actively promoting." *Id.* Business plans would have a less comprehensive situational analysis, specific goals and an "ongoing list of tactics that [had] been implemented to accomplish those goals." *Id.* at 85:11-85:18.

The witness testified that the operating plans between 2002 and 2004 did not contain references to Neurontin because Pfizer was "not promoting Neurontin to any of our third-party payers." *Id.* at 79:11-17. He did not know whether Warner Lambert had any operating plans.

*Id.* at 83:10-84:1.  Lastly, he testified that at least since 2001, each historic operating and business plan would have been overwritten each year within the database that housed them. 185:11-187:20.

Plaintiffs were prepared to file a motion to compel on this issue on January 10, 2008. However, Plaintiffs refrained from doing so when Defendants requested additional time to determine whether the missing operating plans could be found or otherwise reconstructed from Defendants' computer systems. Nussbaum Decl., Ex. F.  Defendants eventually reported that they had recovered some of the plans, which the Coordinated Plaintiffs received on February 14. Nussbaum Decl. Ex. I.  Defendants have produced one operating plan from 2004 for Kaiser Permanente and several copies of various plans for Aetna.  Nussbaum Decl. at 23.

The documents that were produced in February demonstrate why the relief now requested is critical to the Coordinated Plaintiffs. One of the documents that Defendants produced is a 2004 Operating Plan for Kaiser Permanente. Nussbaum Ex. J.  █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████  Nussbaum Decl., Ex. P at 2.  However, counsel's spin of a document is not evidence.  Plaintiffs clearly have the right to the production of these documents and to cross-examine Defendants on their contents.

The Coordinated Plaintiffs respectfully ask the Court to compel Defendants to either immediately produce the remainder of these documents or concede that they existed and have since been destroyed and to confirm the dates and circumstances of their destruction.

**B.    The Deposition Notice**

On June 11, 2007, Plaintiffs served Defendants with a Notice of Deposition, pursuant to Federal Rule of Civil Procedure 30(b)(6). This notice sought testimony regarding various topics, including:

❖ **Topic 1:**    "The identification of, and all documents concerning, all individuals at Pfizer, Warner-Lambert and Parke-Davis who had contacts with Third Party Payors concerning Neurontin;"

❖ **Topic 2:**    "Any information that you have regarding communications you had with Third Party Payors concerning Neurontin;" and

❖ **Topic 3:**    "Any information that you have regarding the promotion of Neurontin for any off-label uses, including but not limited to pain, diabetic peripheral neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-approved maximum."

*See* Nussbaum Declaration, Exh. A at 4.

On September 27, 2007, this Court ordered Defendants to produce a witness to testify regarding communications between Defendants and named Third Party Payors concerning Neurontin. Discovery Order No. 14 (Doc. # 890) at 3.[3] The Court also limited Topic 2 to "The marketing or promotion of Neurontin directly to the named Third Party Payors," and struck

---

[3] Discovery Order No. 14 defines "Named Third Party Payors" as "the Plaintiffs named in the Coordinated Complaint and the Third Party Payors named as Plaintiffs in the Class Complaint.

Topic 3 – which would have clearly included communications with doctors who prescribed medication to be reimbursed by the Named Third Party Plaintiffs – as "*duplicative of Topic 2.*" *Id.* at 3-4 (emphasis added). Plaintiffs served their amended Notice of Deposition on December 3, 2007. Nussbaum Decl., Ex. B.

### C.    The Inadequate Deposition

Defendants designated Jefferson S. Henderson III as its Rule 30(b)(6) witness and produced him for a deposition on Topics 1 and 2 on December 5 and 6, 2007.  Mr. Henderson's testimony at his deposition was inadequate for at least four reasons.

**First,** Defendants' designee conceded that he made no effort to determine whether any individuals from Warner Lambert promoted Neurontin the Third Party Payors, and thus he was unable to provide testimony responsive to Topic 1 or 2.

> Q.    Did you make any efforts to determine whether any of the Warner-Lambert individuals promoted Neurontin to Kaiser?
>
> A.    No, I did not.
>
> Q.    Did you make any effort to determine whether any of the Warner-Lambert individuals promoted Neurontin to Aetna?
>
> A.    No, I did not.
>
> Q.    Did you make any effort to determine whether any of the Warner-Lambert individuals promoted Neurontin to Guardian?
>
> A.    No, I did not.
>
> Q.    Did you make any effort to determine whether any of the Warner-Lambert individuals promoted Neurontin in communications with Harden Manufacturing?
>
> A.    With who?
>
> Q.    Harden Manufacturing.
>
> A.    No, I did not.

Q.    Did you make any effort to determine whether any of the Warner-Lambert individuals promoted Neurontin to Louisiana Health Service Indemnity Company doing business as Blue Cross/Blue Shield of Louisiana?

A.    No, I did not.

Q.    Did you make any effort to determine whether any of the Warner-Lambert individuals promoted Neurontin to the International Union of Operating Engineers, Local Number 68 Welfare Fund?

A.    No, I did not.

Q.    Did you make any effort to determine whether any of the Warner-Lambert individuals promoted Neurontin to ASE, AFSCME Local 52 Health Benefits Trust?

A.    No, I did not.

Q.    So if you didn't make any efforts, you wouldn't know the identification of any of those individuals responsible for such communications; right?

                              *        *        *

A.    That is -- that is correct.

Nussbaum Decl., Ex. C at 41:10-43:3. *See also Id.* at 39:19-39:23 (conceding that he did not "have the names of those individuals" who were responsible for communications with Kaiser prior to Pfizer's acquisition of Warner Lambert with respect to Neurontin).

   **Second,** Mr. Henderson also testified that he did not examine, or ask anyone else to examine the "HC database," a database which he testified is the "primary database" for communications between Pfizer and third-party payors:

Q.    Did you look at the HC Exchange database to determine whether there were any communications in there with Kaiser?

A.    No, I did not.

Q.    Did you ask anyone to look at that database to determine whether there were any communications with Kaiser?

A.    No, I did not.

Q.    Did you look at the HC Exchange to determine whether there were any communications with Aetna?

A.    No, I did not.

Q.    Did you ask anyone to look at the HC Exchange database to see if there were any communications with Aetna?

A.    No, I did not.

Q.    Did you look at the HC Exchange database to determine whether there were any communications with Guardian Life?

A.    No, I did not.

Q.    Did you ask anyone to look at the database to determine whether there were any communications in there with Guardian Life?

A.    No, I did not.

Q.    Did you look at the HC Exchange to determine whether there were any communications with Louisiana Health Service Indemnity Company doing business as Blue Cross/Blue Shield of Louisiana?

A.    No, I did not.

Q.    Did you ask anyone to do that?

A.    No, I did not.

Q.    Let's sort of cut to the chase. The same sets of questions with respect to Harden Manufacturing, the International Union of Operating Engineers, Local Number 68, and the AFSCME, Local 52 Health Benefits Trust?

MR. MIZELL:        I object to the form.

Q.    The questions -- These are the two questions. Did you look at HC Exchange database to see if there were any communications with any of those three entities?

A.    No, I did not.

Q.    Did you ask anyone to look at the HC Exchange database to see if it contained any communications with those three entities?

> A.    No, I did not.

*See Id.* at 59:1-61:5.

**Third,** Defendants' designee was not prepared to respond on behalf of Defendants to any question regarding contacts Pfizer sales representatives had with Kaiser physicians.  In response to a question regarding a memorandum from a Pfizer employee that noted that "[t]here are ten reps in his region actively selling Neurontin in Kaiser," Henderson testified that communications between a Kaiser physician and a Pfizer sales representative were not Third Party Payor communications:

> Q.    Do you have the names of those representatives selling Neurontin in Kaiser?
>
> A.    `I do not have the names of Mr. Partain's representatives, nor do I know that they were actively selling Neurontin in Kaiser.
>
> Q.    Would – if a representative was selling Neurontin in Kaiser, would that representative be communicating with Kaiser about Neurontin?
>
> A.    Again, I think it is very important to understand communicating to Kaiser, which is a third-party payer account, and communicating with Kaiser physicians.  What these representatives would be doing, if they were indeed calling on Kaiser doctors, they would be calling on Kaiser doctors, in the same way that sales representatives call on doctors throughout the United States.
>
> Q.    So you are saying that if a representative from Pfizer is calling on a Kaiser doctor, that that's not a third-party payer communication?
>
> A.    That is correct.
>
> Q.    Do you know what the types and categories of communications are that these representatives had regarding Neurontin in Kaiser?
>
> MR. MIZELL:        Object to form. Outside the scope of the designation.
>
> A.    Again, I don't know that these representatives were calling on Kaiser; and because they were receiving no sales credit, logic would dictate there is no reason for them to call on Kaiser doctors.

*See* Nussbaum Decl., Ex. C, 455:17-456:18.

In contrast to Henderson's testimony, ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████

Thus, contacts with physicians affiliated with Third-Party Payors was a core part of Defendants' marketing strategy, and Plaintiffs are entitled to testimony regarding these communications as responsive to Topic 2.

**Fourth,** Mr. Henderson testified that he did not review any operating plans for Kaiser prior to 2006, and claimed that plans created between 2002 and 2004 would not have contained *any references to Neurontin* "because we were not promoting Neurontin to any of our third-party

---

[4] "P&T" is shorthand for "Pharmacy and Therapeutics Committee." The decisions on which drugs to put on the formulary rests with the P&T committee at most managed care organizations.

[5] Drug Education Coordinators

payors." Nussbaum Decl., Ex C at 61:13-61:19; 78:20-79:17. This statement is flatly contradicted by the 2004 Kaiser operating plan that was produced after Mr. Henderson's deposition. Henderson also testified that he only reviewed Aetna operating plans that were created after Pfizer stopped promoting Neurontin. He did not ask whether any such plans were created prior to the time Pfizer stopped promoting Neurontin. *Id.* at 76:7-78:4. It is clear that Plaintiffs are entitled to depose an adequately prepared witness on all Third-Party Payor operating plans that were produced after the date of Henderson's deposition, if at all.

## II.    **LEGAL ARGUMENT**

As Defendants have previously argued, a corporation must adequately prepare its designee to answer questions at a Rule 30(b)(6) deposition.

> Rule 30(b)(6) requires corporate deponents to "make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by the party noticing the deposition and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed as to the relevant subject matters." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 432-33 (5th Cir. 2006); accord *Black Horse Lane Assocs., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 302-03 (3d Cir. 2000). The Rule "implicitly requires persons to review all matters known or reasonably available to [the corporation] in preparation for the 30(b)(6) deposition." *Heron Interact, Inc. v. Guidelines, Inc.*, Civil Action No. 05-30290-KPN, 2007 U.S. Dist. LEXIS 50191, at *3 (D. Mass. July 2, 2007) (internal quotation marks omitted).

> It is settled, both in this District and in other federal jurisdictions, that "[p]roducing an unprepared witness is tantamount to a failure to appear at a deposition." *Calzaturficio S.C.A.R.P.A., s.p.a. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 39 (D. Mass. 2001) (internal quotation marks omitted); *see, e.g.*, *Black Horse Lane*, 228 F.3d at 304 ("[I]f a Rule 30(b)(6) witness is unable to give useful information he is no more present for the deposition than would be a deponent who physically appears for the deposition but sleeps through it. . . . [T]he purpose behind Rule 30(b)(6) is undoubtedly frustrated in the situation in which a corporate party produces a witness who is unable and/or unwilling to provide the necessary

factual information on the entity's behalf.").

Defendants' Motion To Compel Kaiser To Produce An Adequately Prepared Rule 30(b)(6) Witness And For Attorneys' Fees And Costs Pursuant To Rule 37 (Doc. # 918) at 14-15.

Additionally, the lack of an employee with current knowledge does not relieve Defendants of their burden under the rule: "[t]hese problems do not relieve a corporation from preparing its Rule 30(b)(6) designee to the extent matters are reasonably available, whether from documents, past employees, or other sources," *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996).

### A.   Kaiser Physicians Fall Within The Scope of Topic 2 and Defendants Must Produce Witness to Testify to Such Communications.

Defendants argue that communications with Kaiser physicians fall outside of the scope of the deposition topics as described in Discovery Order No. 14, because it ordered Topic 2 to be limited to marketing and promotion directly to named Third Party Payors. Order at 3. But the Order also struck Topic 3 as "the relative testimony it seeks is duplicative of Topic 2." The scope of the original Topic 3 clearly contemplates communications between Defendants and individual physicians since the promotion of off-label uses would have been directed, in no small part, towards physicians by sales representatives. Because such testimony could hardly be considered *irrelevant*, the only reasonable interpretation of Order No. 14 is that Topic 2 was intended to be limited to testimony of named Third-Party Payors, but the term "named Third Party Payors" must include affiliated physicians.

Defendants conceded the close connection between the named Third-Party Payors and its physicians earlier in this litigation. *See* Defendants' Memorandum of Law in Support of Their Motion To Compel Discovery From Plaintiffs. (Doc. #262) In a section entitled "Coordinated

Plaintiff Kaiser Should Be Compelled To Produce Documents from Outside California and <u>from All of Its Physician Provider Employees</u>" (underlining in original), Defendants stated:

> Kaiser is an integrated health delivery system and, as such, owns and operated its own health care facilities and employs its own physicians and pharmacists. The members of Kaiser's health plans typically receive treatment from Kaiser physicians in Kaiser offices and hospitals, and have their prescriptions filled in Kaiser in-house pharmacies . . . documents about Neurontin from Kaiser's offices outside of California are just as relevant as the numerous documents about Neurontin that Kaiser will produce from California.

Page 13. Defendants also noticed and took the depositions of no fewer than five Kaiser physicians.[6] Defendants cannot fairly seek discovery regarding Kaiser physicians and now attempt to argue that such questioning is beyond the scope of discovery.

The Local Rules of this District also contemplate a meaning of "Plaintiff" which would include the Kaiser physicians at issue here. In Local Rule 26.5, entitled "Uniform Definitions in Discovery Requests," subsection (c)(5) provides the definition of "plaintiff" for discovery requests:

> (5)    *Parties*. The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

Kaiser physicians are "affiliates" under this definition. It is important to note that Local Rule 26.5(c)(5) became effective on October 1, 1992. The definition of affiliate from the sixth edition of Black's Law Dictionary (Abridged Sixth Ed.1990)[7] reads as follows: "Signifies a condition of being united; being in close connection, allied, associated, or attached as a member or branch."

---

[6] Dr. Robin Dea, Dr. Mitchell Danish, Dr. David Chandler, Dr. Bill Harold McCarberg and Dr. Morris Maizels.
[7] The most recently published edition at the time the local rule was enacted.

Kaiser physicians are affiliates because they all were under contract and precluded from working for any other HMO, Third Party Payor or managed care plan.

**B.    Defendants Must Produce a Witness Adequately Prepared to Testify to Topics 1 and 2 With Regard to Warner Lambert**

Defendants failed to adequately prepare their designee to testify to Topic 1 and 2 of the deposition notice. This is clear from the designee's admissions that he made no effort to investigate communications between Defendants and no fewer than seven named Third Party Payors during the Warner Lambert/Parke-Davis Era. This made it impossible to probe the Defendants' corporate knowledge on this topic to any significant depth. It is irrelevant that there may only be a few individuals who still are employed by Defendants. *See Taylor*, 166 F.R.D. at 361 supra. Defendants must produce an individual qualified to testify to these matters.

**C.    Defendants Must Produce Operating Plans or Concede They Have Been Destroyed**

Defendants should be compelled to immediately produce all "operating plans" and "business plans" pertaining to the named Plaintiffs, or to disclose the date and circumstances of their destruction. Defendants have been on notice of potential Neurontin litigation for some time and had a duty to preserve these plans. Defendants should not be able to delay production of critical and discoverable information. The information contained in the 2004 Kaiser Operating Plan discussed above demonstrates the potential importance of this testimony to the claims of the Coordinated Plaintiffs.

**D.    This Discovery is Critical To This Case**

The information that the Coordinated Plaintiffs seek through the filing of this motion is of critical importance to their case. In the Third Coordinated Amended Complaint (Doc. #583), Plaintiffs asserted that, among other claims, that Defendants engaged in the illegal promotion of

Neurontin directly to the named Third Party Payors by disseminating false and misleading statements regarding the drugs safety and efficacy. The named Third Party Payors paid the vast majority of the purchase price of Neurontin and suffered the largest direct economic injury from Defendants' wrongdoing.

The promotion of off-label uses was accomplished by hiring medical liaisons who would cold call physicians and promote unapproved doses and uses of Neurontin, *Id.* at ¶¶36-37, or via educational seminars where Defendants disseminated false and leading representations regarding Neurontin to physicians in attendance. *Id.* at ¶38. The promotion to Third Party Payors also came directly from the sales force of Defendants. Sales representatives would visit doctors employed by Third Party Payors and make false and misleading representations concerning Neurontin's effectiveness for a variety of unapproved uses, including restless leg syndrome (¶123); bipolar disorder (¶128); migraine (¶144); and monotherapy (¶150).

The type of testimony that a prepared witness would provide is illustrated by an e-mail sent by Curtis Reese, a Pfizer sales manager. Part of the text of that e-mail illustrates the types of promotion that Plaintiffs seek to prove.

> Over the past couple of months as I have met with Kaiser DEC's [Drug Education Coordinators] I have been asking if we can work with them in *promoting* Neurontin where they want the product to be used. They are currently counter detailing nortriptyline (a TCA anti-depressant) against Neurontin *for the treatment of pain* and not allowing us to display or discuss Neurontin even though it is a formulary product. We have proposed that if we can display and detail Neurontin we would be more than happy to have a sample of Kaiser's nortriptyline starter pak on our display table and Kaiser recommendations *for neuropathic pain* and work with them on helping their MD's understand when and where to use Neurontin.

Nussbaum Decl., Ex. N, Pfizer_SPrion_0015885 (emphasis added). Mr. Reese's e-mail clearly indicates promotion to Kaiser by Defendants. It is also noteworthy that Mr. Reese's e-mail is

preoccupied with unapproved uses of Neurontin. Reese wants to have recommendations for treating "neuropathic pain" conveniently placed on the Neurontin display table and is concerned about Kaiser counterdetailing "the treatment of pain." Mr. Reese would have no other reason to send out this e-mail unless Defendants were trying to promote Neurontin for unapproved uses.

Based on the testimony of Defendants' designee, it is clear that communications took place directly between Defendants and named Third Party Payors on a variety of levels. However, the designee was unprepared to identify the names of several of these individuals; denied that communications to physicians fell within the scope of the depositions; and stated that Defendants had not promoted to Neurontin to Kaiser when documents available to the witness clearly suggested otherwise. The operating and business plans pertaining to the named Third Party Payors were not produced to the Coordinated Plaintiffs until two months after the deposition, and even now Plaintiffs have not received all of the plans. However, their content plainly demonstrates why the Coordinated Plaintiffs would be prejudiced if denied an opportunity to question an adequately prepared witness on these topics. The information that the Coordinated Plaintiffs seek to obtain in this motion to compel would establish that Defendants actually engaged in active promotion of Neurontin to the named Third Party Payors and compel Defendants to adequately prepare a witness regarding these topics.

## CONCLUSION

For the foregoing reasons, the Coordinated Plaintiffs respectfully request that the Court grant their motion to compel Defendants to (i) produce an adequately prepared Rule 30(b)(6) witness and (ii) produce all "operating plans" and the "business plans" that pertain to the named Third Party Payors created during the relevant factual period and, if any such plan no longer exists, disclose the dates and circumstances of its destruction.

DATED:  April 4, 2008                    KAPLAN FOX & KILSHEIMER LLP


                                          /s/ Linda P. Nussbaum, Esq.

                                          Linda P. Nussbaum, Esq.
                                          850 Third Avenue, 14th Floor
                                          New York, NY 10022
                                          Tel:  (212) 687-1980
                                          Fax:  (212) 687-7714

                                          *Attorneys for the Coordinated Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2008, I caused the redacted version of this document to be served on all parties pursuant to Case Management Order #3 by causing it to be filed through the Court's ECF System. On the same date, an unredacted version of this document was served on all parties via electronic mail and first class mail.

ATTORNEY FOR THE COORDINATED PLAINTIFFS


/s/ Elana Katcher
ELANA KATCHER