# EXHIBIT A

STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>IN RE NEURONTIN MARKETING AND )<br>SALES PRACTICES LITIGATION ）<br>) | MDL Docket No. 1629<br>Master File No. 04-10981<br>Judge Patti B. Saris<br>Magistrate Leo T. Sorokin |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

|  |  |
|---|---|
| IN RE: NEW YORK NEURONTIN<br>PRODUCTS LIABILITY LITIGATION | Case Management<br>Index No. 765,000/2006<br>Hon. Marcy S. Friedman |

-----------------------------------------------------------------x

## PLAINTIFFS' NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30(b)(6) of the Federal Rules of

Civil Procedure, Plaintiffs will take the deposition upon oral examination of defendant , by a

person or persons knowledgeable with respect to the subjects set forth hereafter.

**I.     DATE, TIME AND LOCATION OF DEPOSITION**

The deposition will take place at 10:00 a.m. on July 2, 2007 at the offices of Kaplan Fox

& Kilsheimer LLP, 805 Third Ave., 22nd Floor, New York, NY 10022.  The deposition will

continue from day to day until completed. You are invited to attend and to participate to the

extent permitted by the Federal Rules of Civil Procedure.

**II.    DEFINITIONS**

1.     The Definitions set forth in Local Rule 26.5(c) are hereby incorporated by

reference.

2.     The term "document" has the broadest meaning accorded it under Fed. R. Civ. P.

34(a), and Local Rule 26.5(c)(2), and its meaning includes any original, reproduction or copy of

MP3 20227986.1

any kind whether electronic, computerized, typed, recorded, graphic or printed, written or documentary materials, including, without limitation e-mail, correspondence, memoranda, interoffice communications, computerized record, book-keeping or accounting records, notes, diaries, appointment calendars or records, contracts, specifications, estimates, checks, invoices, records of sale, brochures, manuals, price schedules, and letters, of which the party or the party's attorneys have knowledge, whether or not such document is in the party's possession, custody or control.

3.      "Including" shall be construed to mean "without limitation."

4.      "Parke-Davis" refers to Parke-Davis and its predecessors, successors, subsidiaries (foreign or domestic) divisions, employees, agents (including, but not limited to, attorneys, accountants, consultants, investment advisors or bankers), all joint ventures, limited or general partnerships or other entities operated or controlled directly or indirectly by Parke-Davis.

5.      "Pfizer" or the "Company" refers to Pfizer, Inc. and its predecessors, successors, subsidiaries (foreign or domestic) divisions, employees, agents (including, but not limited to, attorneys, accountants, consultants, investment advisors or bankers), all joint ventures, limited or general partnerships or other entities operated or controlled directly or indirectly by Pfizer and all entities acquired by Pfizer during the Relevant Period, including but not limited to Warner-Lambert and its Parke-Davis division.

6.      "Third Party Payors" refers to the Guardian Life Insurance Company of America; Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; Aetna, Inc.; Time Insurance Company; John Alden Life Company; Union Security Insurance Company; American Medical Security Life Insurance Company; American Medical Security Group, Inc.; Blue Cross and Blue Shield of Florida, Inc.; Health Options, Inc.; Blue Cross Blue Shield of Massachusetts, Inc.; Blue

Cross Blue Shield of Michigan; Blue Care Network, Inc.; Blue Cross Blue Shield of Minnesota;

Comprehensive Care Services, Inc.; First Plan of Minnesota; Atrium Health Plan, Inc.; HMO

Minnesota; Carefirst, Inc.; Carefirst of Maryland, Inc.; Carefirst Bluecross Blueshield; Willse &

Associates, Inc., CFS Health Group, Inc.; Delmarva Health Plan, Inc.; Free State Health Plan,

Inc.; Patuxent Medical Group, Inc.; Group Hospitalization and Medical Services, Inc.; Capital

Care, Inc.; Capital Area Services, Inc.; BCBSD, Inc.; Empire Healthchoice Assurance, Inc.;

Empire Healthchoice HMO, Inc.; Empire Blue Cross HMO; Wellchoice Insurance of New

Jersey, Inc.; Empire Healthchoice Assurance, Inc.; Excellus Health Plan, Inc.; EBS Benefit

Solutions, Inc.; Federated Mutual Insurance Company; Health Care Service Corporation; Mutual

of Omaha Insurance Company; United of Omaha Life Insurance Company; United World Life

Insurance Company; Exclusive Healthcare, Inc.; Trustmark Insurance Company; Wisconsin

Education Association Council; and Wisconsin Education Association Insurance Corporation

including their predecessors, successors, subsidiaries (foreign or domestic) divisions, employees,

agents (including, but not limited to, attorneys, accountants, consultants, investment advisors or

bankers), or Pharmacy Benefit Managers, all joint ventures, limited or general partnerships or

other entities operated or controlled directly or indirectly by the Third Party Payors.

   7.  "Warner-Lambert" refers to Warner-Lambert Company, its predecessors,

successors, subsidiaries (foreign or domestic) divisions, employees, agents (including, but not

limited to, attorneys, accountants, consultants, investment advisors or bankers), all joint ventures,

limited or general partnerships or other entities operated or controlled directly or indirectly by

Warner-Lambert.

   8.  The terms "you" and "your" mean, unless otherwise specified, the Person which

is responding to this discovery request, its predecessors and successors in interest, its present and

former subsidiaries, divisions, and affiliates, its present and former officers, directors,

employees, agents, attorneys, representatives, and all other persons acting or authorized to act on

behalf of that person or entity.

### III.     TIME PERIOD

Unless otherwise expressly indicated, the time period covered is January 1, 1994 to

present ("Relevant Period").

### IV.     SUBJECT MATTERS OF DEPOSITION

Pursuant to Fed.R.Civ.P. 30(b)(6), defendant Pfizer shall designate one or more officers,

directors, managing agents, or other person(s) to testify concerning the following subject matters:

    (1)      The identification of, and all documents concerning, all individuals at Pfizer, Warner-Lambert and Parke-Davis who had contacts with Third Party Payors concerning Neurontin.

    (2)      Any information that you have regarding communications you had with Third Party Payors concerning Neurontin.

    (3)      Any information that you have regarding the promotion of Neurontin for any off-label uses, including but not limited to pain, diabetic peripheral neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-approved maximum.

    (4)      The identification of, and all documents concerning, employees from the Healthcare Management division, who had any contacts with, or otherwise interacted with Third Party Payors concerning Neurontin.

    (5)      Any analysis that you, your agents or representatives performed regarding whether Neurontin provides any medical benefit to patients who take it for any off-label uses, including but not limited to pain, diabetic peripheral

neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-approved maximum.

(6)     Any conclusions or views you, your agents or representatives held regarding whether Neurontin provides any medical benefit to patients who take it for any off-label uses, including but not limited to pain, diabetic peripheral neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-approved maximum.

(7)     Any information you have regarding whether Neurontin provides any medical benefit to patients who take it for any off-label uses, including but not limited to pain, diabetic peripheral neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-approved maximum.

(8)     Any information concerning each medical educational seminar in which:

    a.  Neurontin was discussed; and

    b.  At least one Pfizer, Warner-Lambert or Parke-Davis representative attended, organized, participated, or had any involvement.

(9)     Any information regarding each third party, who attended medical educational seminars, including but not limited to any physicians, marketing firms, and/or vendors, including but not limited to Healthcare Strategies, Inc., in which:

    a.  Neurontin was discussed; and

    b.  At least one Pfizer, Warner-Lambert or Parke-Davis representative attended, organized, participated, or had any involvement.

(10)    Any information concerning Pfizer's communications, marketing or

otherwise, to managed care plans concerning Neurontin, as well as Pfizer's

organizational structure used for such efforts, including but not limited to the

identification of individuals to describe such communications and all

documents concerning such communications.

Dated: June 11, 2007

COHEN & MALAD, LLP

By:

Irwin B. Levin
Richard E. Shevitz
Jeff S. Gibson
COHEN & MALAD, LLP
One Indiana Square, Ste. 1400
Indianapolis, IN 46204
Telephone:  (317) 636-6481
Facsimile:  (317) 636-2593
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
jgibson@cohenandmalad.com

Thomas M. Greene
Greene & Hoffman
125 Summer Street, Suite 1410
Boston, MA 02110
Telephone: 617-261-0040
Facsimile: 617-261-3558
tgreene@greenehoffman.com

Linda Nussbaum
Kaplan Fox & Kilsheimer, LLP
805 Third Avenue
22nd Floor
New York, New York 10022
Telephone: 800-290-1952
Facsimile: 212-687-7714
lnussbaum@kaplanfox.com

Annamarie A. Daley
Robins, Kaplan, Miller & Ciresi
2800 LaSalle Plaza
800 LaSalle Road
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181
aadaley@rkmc.com

MP3 20227986.1

6

| | |
|---|---|
| Richard Bemporad<br>Gerald Lawrence<br>Lowey Dannenberg Bemporad<br>& Selinger, P.C.<br>The Gateway - 11th Floor<br>One North Lexington Avenue<br>White Plains, NY 10601-1714<br>Telephone: 914-997-0500<br>Facsimile: 914-997-0035<br>rbemporad@lowey.com<br>glawrence@lowey.com | Kenneth B. Fromson<br>Finkelstein & Partners<br>436 Robinson Ave<br>Newburgh, NY 12550-3341<br>Telephone: 800-529-2676<br>Facsimile: 845-562-3492<br>kfromson@lawampm.com |
| Linda Nussbaum<br>Kaplan Fox & Kilsheimer, LLP<br>805 Third Avenue<br>22nd Floor<br>New York, New York 10022<br>Telephone: 800-290-1952<br>Facsimile: 212-687-7714<br>lnussbaum@kaplanfox.com | Annamarie A. Daley<br>Robins, Kaplan, Miller & Ciresi<br>2800 LaSalle Plaza<br>800 LaSalle Road<br>Minneapolis, MN 55402<br>Telephone: 612-349-8500<br>Facsimile: 612-339-4181<br>aadaley@rkmc.com |

Date: June 11, 2007

*Richard E. Shevitz / sn .*

Richard E. Shevitz

COHEN & MALAD, LLP
One Indiana Square, Ste. 1400
Indianapolis, IN 46204
Telephone:  (317) 636-6481
Facsimile:  (317) 636-2593

MP3 20227986.1

8

| Richard Bemporad | Kenneth B. Fromson |
|---|---|
| Gerald Lawrence | Finkelstein & Partners |
| Lowey Dannenberg Bemporad | 436 Robinson Ave |
| & Selinger, P.C. | Newburgh, NY 12550-3341 |
| The Gateway - 11th Floor | Telephone: 800-529-2676 |
| One North Lexington Avenue | Facsimile: 845-562-3492 |
| White Plains, NY 10601-1714 | kfromson@lawampm.com |
| Telephone: 914-997-0500 | |
| Facsimile: 914-997-0035 | |
| rbemporad@lowey.com | |
| glawrence@lowey.com | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of June, 2007, I caused to be served a true and correct copy of the foregoing Notice of Deposition by electronic mail and first class U.S. Mail, postage prepaid to:

| Debbie MacGregor | Vincent E. Gunter |
|---|---|
| Davis Polk & Wardwell | Shook, Hardy & Bacon LLP |
| 450 Lexington Avenue | 2555 Grand Blvd. |
| New York, NY 10017 | Kansas City, Missouri 64108 |
| Telephone: 212-450-4000 | Telephone: (816) 474-6550 |
| Facsimile: 212-450-3800 | Facsimile: (816) 421-5547 |
| deborah.macgregor@dpw.com | vgunter@shb.com |
| Ilyas Rona | Ronald J. Aranoff, Esq. |
| Greene & Hoffman | Bernstein Liebhard & Lifshitz, LLP |
| 125 Summer Street, Suite 1410 | 10 East 40th Street, 22nd Floor |
| Boston, MA 02110 | New York, NY 10016 |
| Telephone: 617-261-0040 | Telephone: 212-779-1414 |
| Facsimile: 617-261-3558 | Facsimile: 212-779-3218 |
| tgreene@greenehoffman.com | aranoff@bernlieb.com |
| David B. Chaffin | Edward Notargiacomo |
| Hare & Chaffin | Hagens Berman, LLP |
| 160 Federal Street, 23rd Floor | One Main Street, 4th Floor |
| Boston, MA 02110 | Cambridge, MA 02142 |
| Telephone: 617-330-5000 | Telephone: 617-482-3700 |
| Facsimile: 617-330-1996 | Facsimile: 617-482-3003 |
| dchaffin@hare-chaffin.com | ed@hbsslaw.com |

MP3 20227986.1

7

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALE PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.: 1629 |
| This Document Relates To: | Master File No.: 04-10981 |
| *THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC. et al.*, 04-CV-01739 (PBS) and | Judge: Patti B. Saris |
| | Magistrate: Judge Leo T. Sorokin |
| *AETNA, INC. v. PFIZER INC., et al*, 04-CV-10958 (PBS) | |

## PLAINTIFFS' NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition upon oral examination of defendant, by a person or persons knowledgeable with respect to the subjects set forth hereafter.

**I.    DATE, TIME AND LOCATION OF DEPOSITION**

The deposition will take place at 9:30 a.m. on December 5, 2007 at the offices of Davis, Polk & Wardwell, 450 Lexington Avenue, New York, NY 10017. The deposition will continue from day to day until completed. You are invited to attend and to participate to the extent permitted by the Federal Rules of Civil Procedure.

**II.    DEFINITIONS**

1.    The Definitions set forth in Local Rule 26.5(c) are hereby incorporated by reference.

2.    The term "document" has the broadest meaning accorded it under Fed. R. Civ. P. 34(a), and Local Rule 26.5(c)(2), and its meaning includes any original, reproduction or copy of any kind whether electronic, computerized, typed, recorded, graphic or printed, written or

documentary materials, including, without limitation e-mail, correspondence, memoranda, interoffice communications, computerized record, book-keeping or accounting records, notes, diaries, appointment calendars or records, contracts, specifications, estimates, checks, invoices, records of sale, brochures, manuals, price schedules, and letters, of which the party or the party's attorneys have knowledge, whether or not such document is in the party's possession, custody or control.

3.    "Including" shall be construed to mean "without limitation."

4.    "Parke-Davis" refers to Parke-Davis and its predecessors, successors, subsidiaries (foreign or domestic) divisions, employees, agents (including, but not limited to, attorneys, accountants, consultants, investment advisors or bankers), all joint ventures, limited or general partnerships or other entities operated or controlled directly or indirectly by Parke-Davis.

5.    "Pfizer" or the "Company" refers to Pfizer, Inc. and its predecessors, successors, subsidiaries (foreign or domestic) divisions, employees, agents (including, but not limited to, attorneys, accountants, consultants, investment advisors or bankers), all joint ventures, limited or general partnerships or other entities operated or controlled directly or indirectly by Pfizer and all entities acquired by Pfizer during the Relevant Period, including but not limited to Warner-Lambert and its Parke-Davis division.

6.    "Third Party Payors" refers to the Plaintiffs named in the Coordinated Complaint and Plaintiffs named in the Class Complaint.

7.    "Warner-Lambert" refers to Warner-Lambert Company, its predecessors, successors, subsidiaries (foreign or domestic) divisions, employees, agents (including, but not limited to, attorneys, accountants, consultants, investment advisors or bankers), all joint ventures,

2

limited or general partnerships or other entities operated or controlled directly or indirectly by Warner-Lambert.

        8.     The terms "you" and "your" mean, unless otherwise specified, the Person which is responding to this discovery request, its predecessors and successors in interest, its present and former subsidiaries, divisions, and affiliates, its present and former officers, directors, employees, agents, attorneys, representatives, and all other persons acting or authorized to act on behalf of that person or entity.

## III.    TIME PERIOD

Unless otherwise expressly indicated, the time period covered is January 1, 1994 to present ("Relevant Period").

## IV.    SUBJECT MATTERS OF DEPOSITION

Pursuant to Fed.R.Civ.P. 30(b)(6), defendant Pfizer shall designate one or more officers, directors, managing agents, or other person(s) to testify concerning the following subject matters:

      (1)    The identification of, and all documents concerning, all individuals at Pfizer, Warner-Lambert and Parke-Davis who had contacts with Third Party Payors concerning Neurontin.

      (2)    Any information that you have regarding communications you had concerning Neurontin with the Plaintiffs named in the Coordinated Complaint and the Third Party Payors named as Plaintiffs in the Class Complaint.

      (3)    The identification of, and all documents concerning, employees from the Healthcare Management division, who had any contacts with, or otherwise interacted with Third Party Payors concerning Neurontin.

      (4)    Any analysis that you, your agents or representatives performed regarding whether Neurontin provides any medical benefit to patients who take it for any off-label uses, including but not limited to pain, diabetic peripheral

3

neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-approved maximum.

(5)     Any conclusions or views you, your agents or representatives held regarding whether Neurontin provides any medical benefit to patients who take it for any off-label uses, including but not limited to pain, diabetic peripheral neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-approved maximum.

(6)     Any information you have regarding whether Neurontin provides any medical benefit to patients who take it for any off-label uses, including but not limited to pain, diabetic peripheral neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-approved maximum.

(7)     Any information concerning each medical educational seminar in which:

a.   Neurontin was discussed; and

b.   At least one Pfizer, Warner-Lambert or Parke-Davis representative attended, organized, participated, or had any involvement.

(8)     Any information regarding each third party, who attended medical educational seminars, including but not limited to any physicians, marketing firms, and/or vendors, including but not limited to Healthcare Strategies, Inc., in which:

a.   Neurontin was discussed; and

b.   At least one Pfizer, Warner-Lambert or Parke-Davis representative attended, organized, participated, or had any involvement.

(9)     Any information regarding Pfizer's organizational structure used for communications with Third Party Payors including but not limited to the

4

identification of individuals responsible for such communication, the types and categories of such communications, and to identify any databases that may exist containing the contents of such communications.

Dated: December 3, 2007                    KAPLAN FOX & KILSHEIMER LLP

                                           By: _____
                                               Linda Nussbaum

                                           850 Third Avenue, 14th Floor
                                           New York, NY 10022
                                           Tel: (212) 687-1980
                                           Fax: (212) 687-7714

5

## CERTIFICATE OF SERVICE

I, Elana Katcher, certify that on December 3, 2007, I caused to be served a true and

correct copy of the foregoing Plaintiffs' Notice of Deposition by First Class U.S. Mail, postage

prepaid, to:

| | |
|---|---|
| Andrew G. Finkelstein<br>FINKELSTEIN & PARTNERS<br>436 Robinson Avenue<br>Newburg, New York 12550<br>Telephone: 845-562-0203<br>Facsimile: 845-562-3492<br>Email: afinkelstein@lawampm.com | Jack W. London<br>LAW OFFICES OF JACK LONDON &<br>ASSOCIATES, P.C.<br>3701 Bee Cave Road, Suite 200<br>Austin, TX 78746<br>Telephone: 512-478-5858<br>Facsimile: 412-478-1120<br>Email: jlondon@texas.net |
| James P. Rouhandeh<br>Neal A. Potischman<br>Matthew B. Rowland<br>DAVIS POLK & WARDWELL<br>450 Lexington Avenue<br>New York, New York 10017<br>Telephone: 212-450-4000<br>Facsimile: 212-450-3800<br>Email: rouhandeh@dpw.com<br>　　　neal.potischman@dpw.com<br>　　　matthew.rowland@dpw.com | David B. Chaffin<br>HARE & CHAFFIN<br>160 Federal Street<br>Boston, Massachusetts 02110<br>Telephone: 617-330-5000<br>Facsimile: 617-330-1996<br>Email: dchaffin@hare-chaffin.com |
| Gerald Lawrence<br>LOWEY DANNENERG BEMPORAD<br>SELINGER & COHEN, P.C.<br>White Plains Plaza-5th Floor<br>One North Broadway<br>White Plains, New York 10601-2310<br>Telephone: 914-997-0500<br>Facsimile: 914-997-0035<br>Email: glawrence@lowey.com | Annamarie A. Daley<br>W. Scott Simmer<br>ROBINS, KAPLAN, MILLER<br>& CIRESI, LLP<br>2800 LaSalle Plaza<br>800 Lasalle Avenue<br>Minneapolis, Minnesota 55401-2015<br>Telephone: 612-347-8431<br>Facsimile: 612-339-4181<br>Email: aadaley@rkmc.com<br>　　　wssimmer@rkmc.com |
| Thomas M. Greene<br>GREENE & HOFFMAN, P.C.<br>125 Summer Street<br>Suite 1410 | Barry Himmelstein<br>LIEF CABRASER HEIMANN &<br>BERNSTEIN<br>Embarcadero center West |

| | |
|---|---|
| Boston, Massachusetts 02110<br>Telephone: 617-261-0040<br>Facsimile: 617-261-3558<br>Email: tgreene@greenehoffman.com | 275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339<br>Telephone: 415-956-1000<br>Facsimile: 415-956-1008<br>Email: bhimmelstein@lchb.com |
| Liza Doepken<br>COHEN & MALAD LLP<br>One Indiana Square<br>Suite 1400<br>Indianapolis, IN 46204<br>Telephone: 317-636-6481<br>Facsimile: 317-636-2593<br>Email: edoepken@cohenandmalad.com | Greg Egleston<br>BERNARD LIEBHARD<br>& LIFTSHITZ LLP<br>10 East 40th Street<br>New York, NY 10016<br>Telephone: 212-779-1414<br>Facsimile: 212-779-3218<br>Email: egleston@bernlieb.com |
| Mark S. Sandmann<br>RALWINGS & ASSOCIATES, P.L.L.C.<br>325 W. Main Street<br>Louisville, KY 40202<br>Telephone: 502-587-1279<br>Facsimile:<br>Email: mms@rawlingsandassociates.com | Don Barrett<br>BARRETT LAW OFFICE<br>404 Court Square North<br>P.O. Box 987<br>Lexington, MS 39095<br>Telephone: 662-834-2376<br>Facsimile: 662-834-2628<br>Email: cb@barrettandassociates.net |
| Daniel Becnel Jr.<br>LAW OFFICES OF DANILE BECNEL, JR.<br>106 W. Seventh Street<br>P.O. Drawer H<br>Reserve, LA 70084<br>Telephone: 985-536-1186<br>Facsimile: 985-536-6445<br>Email: dbecnel@ecnellaw.com | James Dugan<br>DUGAN & BROWNE<br>650 Poydras Street, Suite 2150<br>New Orleans, LA 70130<br>Telephone: 04-648-0180<br>Facsimile: 504-648-0181<br>Email: jdugan@duganbrowne.com |
| Thomas M. Sobol, Esq.<br>HAGENS BERMAN SOBOL SHAPIRO, LLP<br>One Main Street, 4th Floor<br>Cambridge, MA 02142<br>Telephone: 617-482-3700<br>Facsimile: 617-482-3003 | Paul F. Corcoran, Esq.<br>Neal H. Klausner, Esq.<br>Cheryl Plambeck<br>DAVIS & GILBERT LLP<br>1740 Broadway<br>New York, NY 10019<br>Telephone: 212-468-4800<br>Facsimile: 212-468-4888 |
| Scott A. Edelman, Esq.<br>Carolyn C. Wu, Esq.<br>MILBANK, TWEED, HADLEY<br>& MCCLOY LLP | Daniel J. Dwyer, Esq.<br>HANIFY & KING<br>One Beacon Street<br>Boston, MA 02108-3107 |

2

| | |
|---|---|
| One Chase Manhattan Plaza<br>New York, NY 10005-1413<br>Telephone: 212-530-5000<br>Facsimile: 212-530-5219 | Telephone: 617-423-0400<br>Facsimile: 617-423-0498 |
| Asa Groves, III, Esq.<br>GROVES AND VERONA PA<br>7385 SW 87th Avenue, Suite 400<br>Miami, FL 33173<br>Telephone: 305-273-7133<br>Facsimile: 305-273-7763 | Alice S. Johnston, Esq.<br>OBERMAYER, REBMANN, MAXWELL<br>& HIPPEL LLC<br>1617 John F. Kennedy Blvd.<br>One Pennsylvania Center, 19th Floor<br>Philadelphia, PA 19103-1895<br>Telephone: 215-665-3000<br>Facsimile: 215-665-3165 |
| U. Gwyn Williams, Esq.<br>GOODWIN PROCTER LLP<br>Exchange Place<br>Boston, MA 02109<br>Telephone: 617-570-1000<br>Facsimile: 617-523-1231 | Jonathan I. Price, Esq.<br>Goodwin Proctor LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>Telephone: 212-813-8800<br>Facsimile: 212-355-3333 |
| Benjamin M. Welch, Esq.<br>Paul W. Shaw, Esq.<br>BROWN RUDNICK BERLACK<br>ISRAELS LLP<br>One Financial Center, 18th Floor<br>Boston, MA 02111<br>Telephone: 617-856-8200<br>Facsimile: 617-856-8201 | Bruce F. Rogers, Esq.<br>Charles K. Hamilton, Esq.<br>BAINBRIDGE, MIMS, ROGERS<br>& SMITH<br>P.O. Box 530886<br>Birmingham, AL 35253<br>Telephone: 205-879-1100<br>Facsimile: 205-879-4300 |
| Robert A. Griffith, Esq.<br>GARGIULO/RUDNICK, LLP<br>66 Long Wharf<br>Boston, MA 02110<br>Telephone: 617-742-3833<br>Facsimile: 617-523-7834 | Steven A. Stadtmauer, Esq.<br>HARRIS BEACH PLLC<br>One Gateway Center, Suite 2500<br>Newark, NJ 07102<br>Telephone: 973-848-1244<br>Facsimile: 212-687-0659 |

| | |
|---|---|
| Debra V. Urbanowicz-Pandos, Esq.<br>DURAN & PANDOS<br>1044 Route 22 West, Suite 3<br>Mountainside, NJ 07092<br>Telephone:  908-518-5000<br>Facsimile:  908-518-0030 | Jan R. McLean Bernier, Esq.<br>HALLELAND, LEWIS, NILAN<br>& JOHNSON<br>220 South 6th Street, Suite 600<br>Minneapolis, MN 55402<br>Telephone:  612-338-1838<br>Facsimile:  612-338-7858 |
| Douglas L. Brown, Esq.<br>BRADY RADCLIFF & BROWN LLP<br>P.O. Box 1668<br>Mobile, AL 36633<br>Telephone:  251-405-0077<br>Facsimile:  251-405-0076 | Robert K. Dowd, Esq.<br>DOWD & BLOUNT<br>3141 Hood Street<br>Suite 650<br>Dallas, TX 75219<br>Telephone: 214-922-8884<br>Facsimile: 214-922-9372 |
| William E. Johnson, III, Esq.<br>THE LAW OFFICE OF WILLIAM E.<br>JOHNSON III, PC<br>3141 Hood Street<br>Suite 650<br>Dallas, TX 75219<br>Telephone: 214-922-8884<br>Facsimile: 214-922-8894 | |

_C. Katch_

Elana Katcher

4

# EXHIBIT C

Page 1

1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2
3                                    :
     IN RE NEURONTIN MARKETING       : MDL DOCKET NO. 1629
4    AND SALES PRACTICES             : Master File No. 04-10981
     LITIGATION                      : Judge Patti B. Saris
5                                    : Magistrate Leo T. Sorokin
                                     :
6                                    :
     --------------------------- X ------------------------
7    SUPREME COURT OF THE STATE   : Case Management
     OF NEW YORK                  : Index No. 765,000/2006
8    COUNTY OF NEW YORK           : Hon. Marcy S. Friedman
     ---------------------------  :
9    IN RE: NEW YORK NEURONTIN    :
     PRODUCTS LIABILITY           :    VIDEOTAPED DEPOSITION
10   LITIGATION                   : UPON ORAL EXAMINATION OF
                                  :    30(b)(6) DESIGNEE
11                                :    JEFFERSON STIERHEIN
                                  :      HENDERSON III
12                                :
     --------------------------- :       VOLUME 1
13                               X ------------------------
14
15           CONTAINS CONFIDENTIAL INFORMATION
16         TRANSCRIPT of testimony as taken by and before
17    MARK SCHAFFER, a Certified Shorthand Reporter and
18    Notary Public of the States of New Jersey and New
19    York, at the offices of Davis, Polk, 450 Lexington
20   Avenue, New York, New York 10022 on Wednesday,
21   December 5, 2007, commencing at 10:05 in the forenoon.
22
23
24
25

Page 38

1    promote Neurontin?
2        A.   Pfizer did not promote Neurontin in Kaiser.
3        Q.   I got that backwards.  Let me re-ask the
4    question.
5            So you discussed that Pfizer did not promote
6    Neurontin --
7        A.   Correct.
8        Q.   -- in its communications with Kaiser?
9        A.   Correct.
10       Q.   And how did Mr. Reese know that?
11       A.   He was the District Manager at the time of
12   the Warner-Lambert/Parke-Davis acquisition.
13       Q.   Was he a Pfizer employee or a Warner-Lambert
14   employee?
15       A.   Pfizer employee.
16       Q.   Who was the Warner-Lambert employee or
17   employees in charge of Kaiser at the time of the
18   Pfizer acquisition of Warner-Lambert?
19       A.   I don't recall.
20       Q.   Who are the individuals at Pfizer who are
21   responsible for communications with Kaiser?
22       A.   That would be Kirk Bachman, as well as the
23   two Sales District Managers and the 16 Sales
24   Representatives.
25       Q.   Okay.  So that's Kirk Bachman, Curtis Reese

Page 39

1    and John Dauser?
2        A.   Correct.
3        Q.   And then 16 other individuals?
4        A.   Sixteen sales representatives, yes.
5        Q.   And the identification of those sales
6    individuals is?  The names of those individuals?
7        A.   I don't have their names.
8        Q.   Did those individuals, those 16 individuals,
9    have communications with Kaiser?
10       A.   Yes.
11       Q.   Did those six individuals (sic) remain the
12   same -- excuse me -- have those 16 individuals
13   remained the same 16 individuals since Pfizer acquired
14   Warner-Lambert in 2000?
15       A.   No.
16       Q.   So there is more than 16 individuals out
17   there?
18       A.   I would assume, yes.
19       Q.   And then the names -- the identification of
20   the individuals responsible for communications with
21   Kaiser prior to Pfizer's acquisition of Warner-Lambert
22   with respect to Neurontin would be?
23       A.   I don't have the names of those individuals.
24       Q.   Did Pfizer hire any of the Warner-Lambert
25   individuals who had communications with Kaiser after

Page 40

1    the acquisition of Warner-Lambert?
2            MR. MIZELL: Object to the form.
3        A.   I'm not aware.
4        Q.   You said Kirk Bachman is the National Account
5    Manager?
6        A.   That's correct.
7        Q.   Is his only account Kaiser?
8        A.   No.  He also is responsible for MedImpact,
9    which is a PBM in southern California.
10       Q.   Any other third-party payers?
11       A.   Not that I'm aware of.
12       Q.   Do Curtis Reese or John Dauser call on any
13   third-party payers other than Kaiser?
14       A.   No.
15       Q.   Do the 16 individuals -- and I understand
16   their names have changed over time.  Did they -- that
17   report to Curtis Reese and John Dauser.  Did they call
18   on any third-party payers besides Kaiser?
19       A.   No.
20       Q.   Do you know whether Warner-Lambert
21   communicated with Kaiser about Neurontin prior to
22   Pfizer's acquisition?
23       A.   I'm only aware inasmuch as I have read in the
24   Cavic deposition.
25       Q.   What do you know from that deposition?

Page 41

1        A.   Very little.
2        Q.   So tell me what you know?
3        A.   It -- It appears that they had folks that
4    were calling on Kaiser.  Whether they were promoting
5    Neurontin, I don't recall reading that.
6        Q.   So based upon your review of Mr. Cavic's
7    deposition testimony, it appears that Warner-Lambert
8    had individuals who called on Kaiser; right?
9        A.   Yes.
10       Q.   But you, as you sit here today, do not know
11   whether in those communications with Kaiser,
12   Warner-Lambert was promoting Neurontin; correct?
13       A.   That is correct.
14       Q.   Did you make any efforts to determine whether
15   any of the Warner-Lambert individuals promoted
16   Neurontin to Kaiser?
17       A.   No, I did not.
18       Q.   Did you make any effort to determine whether
19   any of the Warner-Lambert individuals promoted
20   Neurontin to Aetna?
21       A.   No, I did not.
22       Q.   Did you make any effort to determine whether
23   any of the Warner-Lambert individuals promoted
24   Neurontin to Guardian?
25       A.   No, I did not.

11 (Pages 38 to 41)

Page 42

1    Q.  Did you make any effort to determine whether
2  any of the Warner-Lambert individuals promoted
3  Neurontin in communications with Harden Manufacturing?
4    A.  With who?
5    Q.  Harden Manufacturing.
6    A.  No, I did not.
7    Q.  Did you make any effort to determine whether
8  any of the Warner-Lambert individuals promoted
9  Neurontin to Louisiana Health Service Indemnity
10  Company doing business as Blue Cross/Blue Shield of
11  Louisiana?
12    A.  No, I did not.
13    Q.  Did you make any effort to determine whether
14  any of the Warner-Lambert individuals promoted
15  Neurontin to the International Union of Operating
16  Engineers, Local Number 68 Welfare Fund?
17    A.  No, I did not.
18    Q.  Did you make any effort to determine whether
19  any of the Warner-Lambert individuals promoted
20  Neurontin to ASE, AFSCME Local 52 Health Benefits
21  Trust?
22    A.  No, I did not.
23    Q.  So if you didn't make any efforts, you
24  wouldn't know the identification of any of those
25  individuals responsible for such communications;

Page 43

1  right?
2        MR. MIZELL: Object to the form.
3    A.  That is -- that is correct.
4    Q.  What are the types of categories of Pfizer's
5  communications to Kaiser?
6    A.  To Kaiser?
7    Q.  Uh-huh, or with Kaiser.
8    A.  Typically there are two types of
9  communications. There are promotional communications
10  and there are medical communications.
11    Q.  What's the difference between promotional
12  communications and medical communications?
13    A.  Promotional communications are -- are
14  communications that are made through approved
15  promotional materials that have been approved by our
16  Regulatory to ensure that we are in compliance with
17  FDA guidance.
18        Medical presentations can take two forms:
19  Either promotional, where we are giving a clinical
20  presentation that is promotional in nature; or it can
21  be in response to a unsolicited medical request.
22    Q.  How do you define "unsolicited medical
23  request"?
24    A.  A customer asked a question which is not
25  within scope of our label.

Page 44

1    Q.  When a customer asks a question that is not
2  within the scope of the label, is that also referred
3  to as "off-label"?
4    A.  It -- It could be interpreted as off-label.
5  It could also be an inquiry into something that a -- a
6  clinical reprint, for example, that has not been
7  approved by our Regulatory Affairs folks for
8  promotional use.
9    Q.  When you refer to your Regulatory --
10  Regulatory Affairs folks, who are you referring to?
11    A.  By name?
12    Q.  Right.
13    A.  I don't have names.
14    Q.  When you think of the Regulatory Affairs
15  folks, who do you think of?
16    A.  I typically think of lawyers. They're
17  employed by Pfizer.
18    Q.  So when you think of these reprints or
19  marketing materials approved by the Regulatory Affairs
20  folks, you are thinking of Pfizer lawyers?
21    A.  Yes.
22    Q.  You said a medical communication can be
23  promotional or in response to an unsolicited medical
24  request. How can a medical communication be
25  promotional?

Page 45

1        MR. MIZELL: Object to the form.
2    A.  For example, a formulary slide kit is a slide
3  kit that is designed to provide the customer on-label
4  information that they can use when making formulary
5  decisions.
6    Q.  So a formulary slide kit is considered to be
7  promotional?
8        MR. MIZELL: Object to the form.
9    A.  Yes.
10    Q.  Have you ever seen a formulary slide kit for
11  Neurontin?
12    A.  No, I have not.
13    Q.  Is a formulary slide kit a communication that
14  you would have with a third-party payer?
15    A.  Yes.
16    Q.  You said that you were told by either Curtis
17  Reese or Mr. Dauser that there was no promotion of
18  Pfizer to Kaiser of Neurontin; right?
19    A.  That is right.
20    Q.  Was there promotion by Pfizer to Kaiser about
21  Lyrica?
22        MR. MIZELL: Object to the form.  It is
23  outside the scope of the deposition.
24    A.  Yes.
25    Q.  And Lyrica is through the -- the next

12 (Pages 42 to 45)

Page 58

1    A.  I did not.
2    Q.  Who are the individuals at Pfizer responsible
3  for communication with Harden Manufacturing?
4    A.  To the best of my knowledge, no one's
5  responsible for calling on Harden Manufacturing.
6    Q.  Did you check?
7    A.  No, I did not.
8    Q.  Who at Pfizer is responsible for
9  communications with the International Union of
10  Operating Engineers, Local Number 68 Welfare fund?
11    A.  I am not aware of anyone that calls on -- on
12  that particular union.
13    Q.  Did you check?
14    A.  I did not.
15    Q.  Who at Pfizer is responsible for
16  communications with AFC, AFSCME, Local 52 Health
17  Benefits Trust?
18    A.  I am not aware of anyone who calls on that
19  account.
20    Q.  Did you check?
21    A.  I did not.
22    Q.  What did John Dauser tell you about his
23  communications with Kaiser?
24    A.  He told me there was no communication with
25  Kaiser around Neurontin.

Page 59

1    Q.  What are the databases that Pfizer has that
2  may contain the contents of communications they had
3  with any third-party payers?
4    A.  HC Exchange is the primary database.
5    Q.  Any others?
6    A.  It could also be contained in the operating
7  plans for the individual national accounts.
8    Q.  Any other databases?
9    A.  The only other database would be contained
10  within the Contracting Department.
11    Q.  Did you look at the HC Exchange database to
12  determine whether there were any communications in
13  there with Kaiser?
14    A.  No, I did not.
15    Q.  Did you ask anyone to look at that database
16  to determine whether there were any communications
17  with Kaiser?
18    A.  No, I did not.
19    Q.  Did you look at the HC Exchange to determine
20  whether there were any communications with Aetna?
21    A.  No, I did not.
22    Q.  Did you ask anyone to look at the HC Exchange
23  database to see if there were any communications with
24  Aetna?
25    A.  No, I did not.

Page 60

1    Q.  Did you look at the HC Exchange database to
2  determine whether there were any communications with
3  Guardian Life?
4    A.  No, I did not.
5    Q.  Did you ask anyone to look at the database to
6  determine whether there were any communications in
7  there with Guardian Life?
8    A.  No, I did not.
9    Q.  Did you look at the HC Exchange to determine
10  whether there were any communications with Louisiana
11  Health Service Indemnity Company doing business as
12  Blue Cross/Blue Shield of Louisiana?
13    A.  No, I did not.
14    Q.  Did you ask anyone to do that?
15    A.  No, I did not.
16    Q.  Let's sort of cut to the chase.
17      The same sets of questions with respect to
18  Harden Manufacturing, the International Union of
19  Operating Engineers, Local Number 68, and the AFSCME,
20  Local 52 Health Benefits Trust?
21      MR. MIZELL: I object to the form.
22    Q.  The questions -- These are the two questions.
23  Did you look at HC Exchange database to see if there
24  were any communications with any of those three
25  entities?

Page 61

1    A.  No, I did not.
2    Q.  Did you ask anyone to look at the HC Exchange
3  database to see if it contained any communications
4  with those three entities?
5    A.  No, I did not.
6    Q.  Okay.  You said there also is databases
7  operating plans for individual national accounts?
8    A.  Yes.
9    Q.  Is there an operating plan for Kaiser?
10    A.  Yes.
11    Q.  Did you look at that?
12    A.  Yes.
13    Q.  What were the dates of the operating plans
14  for Kaiser that you looked at?
15    A.  I looked at the most-recent 2006 operating
16  plan.
17    Q.  Were there operating plans before the 2006
18  plan?
19    A.  Yes.
20    Q.  For what years?
21    A.  I'm not aware.
22    Q.  You know there were plans, you just don't
23  know --
24    A.  That's correct.
25    Q.  -- what they were?

16 (Pages 58 to 61)

Page 74

1     Welpoint; Anthem, prior to Anthem purchasing Welpoint.
2        I believe I have them all. If I think of
3 another one, I'll let you know.
4        Then when I was the Vice President of Managed
5 Markets West, Kaiser, Regents, Blue Cross-Blue Shield
6 of Arizona, Health Net, both primarily regional
7 subsidiaries of Health Net, Iowa Medicaid. Health
8 Partners, Blue Cross-Blue Shield of Minnesota. Kaiser
9 Colorado, Blue Cross-Blue Shield of Texas.
10        I'm sure there are others, but that's all I
11 can recall at this time.
12    Q.  And in -- is it correct that in not one of
13 those communications you had with any of those
14 third-party payers, did you ever discuss Neurontin?
15    A.  That is correct. Pfizer did not -- or the
16 Managed Markets organization in its various forms did
17 not promote Neurontin.
18    Q.  Today are you still in some way responsible
19 for Managed Markets, the Managed Markets organization
20 for Pfizer?
21    A.  In my capacity today, I'm responsible for
22 communicating all the activities that take -- take
23 place with our managed markets customers, as well as
24 the development of our strategies with managed markets
25 to the business units.

Page 75

1    Q.  Does Pfizer promote any drug to the Managed
2 Markets organization -- to the managed markets?
3    A.  Yes.
4    Q.  Which ones?
5       MR. MIZELL: Object to the form.
6    A.  I'll start with Powers. The Powers Business
7 Unit promotes Aricept, Geodon, Lyrica, Rebif, and
8 Celebrex.
9       The Steere Business Unit promotes Detrol LA,
10 Viagra and Chantix. And they have been promoting
11 Zyrtec, but it's -- it's gone off patent.
12       The Pratt Business Unit promotes Lipitor and
13 Caduet.
14       The Specialty Business Unit and I'll try to
15 get all the products that they are responsible for
16 promoting, because many of these products are not
17 utilized by third-party payers or managed markets,
18 they're hospital-based markets. Eraxis, Vfend,
19 Genatropine, Sutent, Aromacin. We have a new HIV
20 product out. We have Viracept and there is one other
21 HIV product and I don't recall -- oh, Selzentry. Oh,
22 and Xalatan.
23    Q.  Any others?
24    A.  Not that I recall.
25    Q.  Going become to the database issues, you

Page 76

1 talked about the operating plan for Kaiser that you
2 reviewed in 2006. And you --
3       Did you determine whether there were any
4 operating plans for Aetna?
5    A.  Yes, there is.
6    Q.  Did you review those documents?
7    A.  I reviewed the 2006 Aetna operating plan.
8    Q.  Were there operating plans for Aetna before
9 2006?
10    A.  Yes.
11    Q.  Did you review those?
12    A.  They were -- they -- a number of them have
13 been presented to me. I did not review them in
14 preparation for this.
15    Q.  When you say a number of them have been
16 presented to you, does that mean you have copies of
17 them, you just didn't look at them?
18    A.  No, it means I sat in a meeting room in which
19 the presentation was made to me by the National
20 Account Manager responsible for Aetna.
21    Q.  And he went through the operating plans?
22    A.  That is correct.
23    Q.  What did he tell you about the operating
24 plans for Aetna?
25       MR. MIZELL: Object to form.

Page 77

1    A.  Essentially every operating plan is --
2 follows a similar format. And it has a -- an
3 executive summary, a situational analysis, and then
4 individual product strategies and tactics. The
5 products included in the operating plan are only
6 products that Pfizer is actively promoting.
7    Q.  Were the operating plans for Aetna -- did the
8 operating plans for Aetna before Pfizer quit promoting
9 Neurontin contain information about promotions for
10 Neurontin?
11       MR. MIZELL: Object to the form.
12    A.  None that I am aware of.
13    Q.  Did you look at them?
14    A.  I would have looked at -- Let's see. I would
15 have looked at them after Pfizer promoted Neurontin --
16 stopped promoting Neurontin.
17    Q.  So you didn't look at any of the operating
18 plans for Aetna before Pfizer stopped promoting
19 Neurontin?
20       MR. MIZELL: Objection.
21    A.  I'm not aware that there were operating plans
22 for Aetna prior to that time.
23    Q.  Did you ask if there were operating plans
24 prior to Pfizer's cessation, stopping of promoting
25 Neurontin?

20 (Pages 74 to 77)

Page 78

1    A. I did not.
2        MR. MIZELL: Object to the form. Object to the
3    form.
4    A. I did not.
5    Q. Would the operating plans for Kaiser have
6    followed the same general structure, with an executive
7    summary, situational analysis and then individual
8    product strategies and tactics?
9    A. Yes.
10    Q. Did you review any operating plans -- let's
11    just put a date in here. 2004 is when Pfizer stopped
12    promoting Neurontin?
13        MR. MIZELL: Object to the form.
14    Q. Correct?
15        MR. MIZELL: Same objection.
16    A. Kaiser stopped -- Pfizer stopped promoting
17    Neurontin when it went generic. I'm not sure
18    specifically when in 2004 that -- or if it even was
19    2004.
20    Q. I was just trying to shorten up the question.
21    That's what I was trying to do.
22        If it is correct that Pfizer ceased promoting
23    Neurontin in 2004 when it went generic, do you know --
24    well, did you review any of the operating plans before
25    that date?

Page 79

1    A. I am only aware of the operating plans that
2    existed when I assumed responsibility for the national
3    accounts. So the answer to your question is no, I did
4    not, because I don't know whether they exist.
5    Q. And you assumed that position in 2007; right?
6    A. No, I assumed that position in two thousand
7    -- let's see -- 2002.
8    Q. Okay. So you would know what was in
9    operating plans between 2002 and 2004?
10    A. Correct.
11    Q. And the operating plan for Kaiser -- in any
12    operating plan for Kaiser between 2002 and 2004, are
13    there any references to Neurontin?
14    A. No, because we were not promoting Neurontin.
15    Q. To Kaiser?
16    A. We were not promoting Neurontin to any of our
17    third-party payers.
18    Q. And you know that because of what Mr. Butera
19    told you?
20        MR. MIZELL: Object to the form.
21    A. No, I know that because of my position in
22    leadership and that that was the guidance that was
23    given.
24    Q. By who?
25    A. By our senior management, starting --

Page 80

1    starting as high as Karen Katen, who was the President
2    of Pfizer Pharmaceuticals.
3    Q. Did Ms. Katen tell you that directly?
4    A. She did not tell me directly. I, however,
5    have read a memorandum that she wrote.
6    Q. What memoranda are you talking about?
7    A. It was a memorandum that went to her direct
8    report -- or at least three people who reported
9    directly to her, outlining Pfizer's -- Pfizer's
10    position on promoting Neurontin.
11    Q. Is that the memo where she talked about
12    promoting Neurontin for off-label uses?
13        MR. MIZELL: Object to the form.
14    A. I'm not sure if that is the memo that you are
15    referring to.
16    Q. I'm trying to figure out which one you are
17    referring to, so...
18        Do you recall whether in this Katen memo that
19    you recall there was any reference to the off-label
20    promotion of Neurontin?
21    A. I do not recall whether that was mentioned in
22    the memo.
23    Q. What does it mean to off-label promote a
24    drug?
25        MR. MIZELL: Object to the form.

Page 81

1    A. Promoting a product off-label is promoting a
2    product for a non-FDA-approved indication.
3    Q. Do you know what the FDA approved indications
4    were for Neurontin?
5    A. Upon the acquisition of
6    Warner-Lambert/Parke-Davis, it was indicated, as I
7    recall, for epilepsy, the treatment of epilepsy.
8    Q. Anything else?
9    A. It eventually received an indication for
10    post-herpetic neuralgia.
11    Q. Anything else?
12    A. Not that I'm aware of.
13    Q. Do you know whether Neurontin was approved by
14    the FDA for only certain treatments of epilepsy?
15    A. I am not aware of that.
16    Q. When you were Area -- let's go back.
17        When you were Senior Director of National
18    Accounts Health Plans, what were your
19    responsibilities?
20    A. I was responsible for supervising the
21    National Account Managers, who called on 11 accounts,
22    the largest 11 health plans in the country, as well as
23    Medco and CMS, the centers for Medicaid and Medicare
24    Services.
25    Q. Who are these 11 accounts?

21 (Pages 78 to 81)

Page 82

1    A.  The 11 accounts were Aetna, CIGNA, Welpoint,
2  Health Net, Kaiser, Medco, CMS, United.
3       I'm running through them in my head.  There
4  are two more.  Humana and Anthem.
5    Q.  Let me give you a piece of paper and we'll go
6  through them.  I only have ten.  Would it help you?
7    A.  Health Net, CIGNA, Aetna, CMS, Medco, United,
8  Humana, Welpoint, Anthem, Kaiser.
9    Q.  So when you said there were 11 accounts --
10    A.  And CMS, did I say CMS?
11    Q.  You did say CMS.
12       You said there were 11 accounts, Medco and
13  CMS?  When you say 11, did that include Medco and CMS?
14    A.  Yes, that is correct.  It includes those.
15  So it was actually nine defined health plans, and then
16  Medco, because Medco is the PBM for United.
17    Q.  When you say United, you are talking about
18  United Health?
19    A.  Health Group.
20    Q.  What does a PBM do for a health benefit plan?
21    A.  PBMs, pharmacy benefit managers, offer a
22  variety of services for their client.  The services
23  can range from just straight claims adjudication that
24  takes place within the retail pharmacy, to disease
25  management, to mail order services, to actually

Page 83

1  managing an employer's entire pharmacy benefit that
2  they offer to their employees.
3    Q.  And the services that a particular PBM
4  provides to a health benefit plan will depend upon the
5  particular arrangement or contract between that PBM
6  and the plan; right?
7    A.  That is correct.
8    Q.  Does Pfizer have any operating plans -- well,
9  let's step back for a second.
10       Did Warner-Lambert have operating plans for
11  Kaiser?
12    A.  I -- I don't know.
13    Q.  Did you ask anyone?
14    A.  I did not.
15    Q.  Did Warner-Lambert have any operating plans
16  for Aetna?
17    A.  I don't know.
18    Q.  Do you know -- excuse me.  Did you ask
19  anyone?
20    A.  No, I did not.
21    Q.  Does Pfizer have an operating plan for
22  Guardian Life?
23    A.  No, we do not.
24    Q.  Do you know whether Warner-Lambert had an
25  operating plan for Guardian Life?

Page 84

1    A.  I do not know.
2    Q.  Does Pfizer have an operating plan for
3  Louisiana Health Service Indemnity Company, doing
4  business as Blue Cross-Blue Shield of Louisiana?
5    A.  No, we do not.
6    Q.  And how do you know that?
7    A.  Because for regional accounts, we have
8  business plans.  Operating plans are only done for
9  large, national accounts.
10    Q.  Does Pfizer have a business plan for Blue
11  Cross-Blue Shield of Louisiana?
12    A.  I don't know.
13    Q.  Did you ask anyone?
14    A.  I did not.
15    Q.  If Pfizer has a business plan for Blue
16  Cross-Blue Shield of Louisiana, might that plan have
17  information about communications with Blue Cross-Blue
18  Shield of Louisiana?
19       MR. MIZELL:  Object to form.
20    A.  That would be speculative, whether it's
21  there.
22    Q.  You don't know one way or the other?
23    A.  I do not know.
24    Q.  So let me understand:  From a structure
25  perspective, Pfizer has operating plans for the larger

Page 85

1  third-party payers and then -- correct?
2    A.  That is correct.
3    Q.  And then for the smaller third-party payers,
4  like Blue Cross-Blue Shield of Louisiana, you would
5  have business plans?
6    A.  We have business plans for assigned accounts.
7    Q.  And if Blue Cross-Blue Shield of Louisiana is
8  an assigned account, then there would be a business
9  plan?
10    A.  That is correct.
11    Q.  What type of information is in a business
12  plan?
13    A.  A business plan typically lists what types
14  of -- first they would have some type of situational
15  analysis, much less comprehensive than an operating
16  plan.  Then it would contain specific goals.  And then
17  there would be a list of -- an ongoing list of tactics
18  that have been implemented to accomplish those goals.
19    Q.  Who prepares the business plans for assigned
20  accounts?
21    A.  Account managers.
22    Q.  Who prepares the operating plans for the
23  larger accounts?
24    A.  The National Account Operator -- National
25  Account Managers, in conjunction with the Account

22 (Pages 82 to 85)

Page 182

1  the organization was known as NHO, National Healthcare
2  Operations.
3      Q.  Who was in charge of National Healthcare
4  Operations in the summer of 2000?
5      A.  In the summer of 2000?  Actually, let me step
6  back.  Actually -- actually, I believe we did have the
7  Healthcare Cluster in the summer of 2000, and that was
8  led by Bill Pelton.
9          And so the leader of National Healthcare
10  Operations -- well, it was some time in that time that
11  Bill Pelton, who had been in charge of National
12  Healthcare Operations, took over as the head of the
13  newly-created Healthcare Cluster, and Forest Harper
14  took over as the Vice President of National Healthcare
15  Operations.
16      Q.  So when did the NHO become the HCC?
17      A.  It was some time, as I recall, in 2001.
18          And the impetus behind the creation was that
19  we had -- National Healthcare Operations had increased
20  in size such that it warranted being part -- dividing
21  two of the entities -- making two of the entities
22  separate.
23          And then to reflect the rest of the cluster
24  structure that we had created, the Healthcare Cluster
25  was created within Sales.

Page 183

1      Q.  Okay.  So National Healthcare Operations was
2  split up into the Healthcare Cluster -- Healthcare
3  Cluster?
4      A.  The National Healthcare Operations was
5  divided into two organization.  One organization
6  remained named National Healthcare Operations.  And it
7  is -- it is definitely a misnomer, because then we
8  also spun off another entity called National Accounts.
9          So National Healthcare Operations and
10  National Accounts, which were each led by vice
11  presidents, reported in to the Senior Vice President
12  of the Healthcare Cluster.
13      Q.  So the NHO became the HCC?
14      A.  Became one -- one of the groups within the
15  HCC.
16      Q.  And Forest Tucker was in charge of what
17  group?  Forest Harper?
18      A.  Forest Harper was in charge of National
19  Healthcare Operations.
20      Q.  What customers did the new National
21  Healthcare Operations unit call on?
22          MR. MIZELL: Objection to form.
23      A.  They had -- They had responsibility for
24  regional accounts.
25      Q.  Can you give me an example?

Page 184

1      A.  Blue Cross-Blue Shield of Louisiana.
2      Q.  And the National Accounts then had
3  responsibility for the national accounts?
4      A.  National accounts, but also the government
5  accounts.
6      Q.  What's a non-government national account?
7  What is that?
8      A.  Medco.
9      Q.  Would Kaiser have been within the NHO?
10      A.  No, Kaiser was a national account.
11      Q.  The 11 that you mentioned before were all
12  national accounts?
13      A.  Yes, those 11, plus others.
14      Q.  Let me make sure I understand.
15          Forest Harper was in charge of the National
16  Healthcare Operations, and who was in charge of
17  National Accounts?
18      A.  Claire Kennedy was the Vice President in
19  charge of National Accounts.
20      Q.  And this occurred in 2001?
21      A.  As I recall.
22      Q.  What types of documents did the National
23  Healthcare Operations organization -- National
24  Healthcare Operations group maintain regarding its
25  communications with third-party payers prior to the

Page 185

1  split?
2      A.  Primarily formulary, we tracked formulary.
3          Some of the account managers within that
4  group maintained -- maintained business plans, but
5  there wasn't a single repository for the business
6  plans, which led to the creation of HC Exchange.
7      Q.  Was HC Exchange created as part of the
8  Healthcare Cluster?
9      A.  It was -- it -- yes, it was part of that
10  entire transformation.
11      Q.  How long has the HC Exchange existed?
12      A.  Since -- since -- I want to say 2001;
13  essentially the same time as the creation of the
14  Healthcare Cluster.
15      Q.  Do you know that for sure?
16      A.  I don't know exactly.  I just know that at the
17  time that it went live, because I had Government
18  Account Managers working for me, that is when their --
19  their business plans started getting housed in that --
20  in that application, as well as formulary access.
21      Q.  How far back are the business plans
22  maintained in the Healthcare Exchange?
23      A.  To the best of my knowledge, every year a
24  switch is flipped.  You basically can take
25  information from your previous year's business plan,

47 (Pages 182 to 185)

Page 186

1  but then you are starting live on your new business
2  plan. So I know of no archive function that exists.
3      Q.  So the old business plans get written over in
4  the Healthcare Exchange?  Is that what you are saying?
5      A.  Essentially.
6      Q.  So if I was looking for the business plan for
7  Blue Cross-Blue Shield of Louisiana, if it existed,
8  for 2004, there wouldn't be, because there is no
9  archive function?
10         MR. MIZELL: Object to form and outside the
11  scope.
12      A.  Yes.  I mean, if you went into HC Exchange,
13  you would see the 2007 business plan for that account.
14      Q.  With respect to the operating plans for the
15  national accounts, where are they housed again?
16      A.  MMWeb, Managed Markets Web.
17      Q.  And are the operating plans for the national
18  accounts archived on the MMWeb?
19      A.  They were not.  We would -- we would --
20  basically MMWeb was nothing more than a place where
21  you would -- you would put a -- give people access to
22  the national account operating plan.  And it typically
23  was a matter of policy, so that we wouldn't create
24  confusion, to remove old operating plans.
25      Q.  So if I was looking for the operating plan

Page 187

1  for 2003 for Kaiser, it wouldn't exist on the MMWeb.
2  Is that right?
3      A.  That's correct.
4         MR. MIZELL: Object to form.  Outside the
5  scope.
6      A.  That's correct.
7      Q.  Do you know whether the operating plan for
8  Kaiser for 2003 exists anywhere else?
9         MR. MIZELL: Object to form.
10      A.  I'm not aware.
11      Q.  If you were to go look for it, where would
12  you find it?
13         MR. MIZELL: Object to form.
14      Q.  Excuse me.  If you were to look for it, who
15  would you ask to see if they still had it?
16      A.  I would ask me.
17      Q.  And as far as you know, it doesn't exist,
18  so...
19      A.  That's correct.
20      Q.  Okay.
21      A.  And the reason I would ask is because in
22  2003, I was responsible for Kaiser.
23      Q.  Was there an operating plan in 2003 for
24  Kaiser?
25      A.  Yes.

Page 188

1      Q.  But you threw yours out?
2         MR. MIZELL: Object to form.
3      A.  I'm not even sure I had a paper copy of it,
4  but yes.
5      Q.  And the same would be true for any operating
6  plan you had for Kaiser for 2002?
7         MR. MIZELL: Object to form.
8      A.  Yes, that's correct.
9      Q.  The same would be true for any operating plan
10  you had for Kaiser for 2001?
11      A.  I wouldn't have had one in 2001.
12      Q.  You were still working for the government?
13      A.  Yes.
14      Q.  Okay.  How about 2004?  If you had an
15  operating plan for Kaiser in 2004, would that be gone?
16      A.  Yes.
17      Q.  Are those operating plans documents that
18  would be part of the National Accounts Department?
19      A.  When the National Accounts Group existed,
20  yes.
21      Q.  Would the business plans that you have been
22  talking about be part of the documents of the National
23  Accounts Department?
24      A.  No.  They would have been part of the NHO
25  organization, followed by the Managed Markets

Page 189

1  organization, followed by what exists today, the
2  Account Management Organization.
3      Q.  Lots of changes in organizational structure
4  over time?
5      A.  Yes.
6      Q.  And during that same time period, operating
7  plans for the national accounts would be located in
8  the National Accounts Department, and then it would
9  have changed to a different department?
10      A.  Yes.  Where it is today falls under the
11  Customer Strategy Group.
12         MS. DALEY: I want to take a five-minute break.
13         THE VIDEOGRAPHER: The time is approximately
14  3:57.  We are now going off the record.
15         (A recess is taken.)
16
17  CONTINUED DIRECT EXAMINATION BY MS. DALEY:
18         THE VIDEOGRAPHER: The time is approximately
19  4:06.  This begins Tape Number 5.  We are now on
20  the record.
21      Q.  Mr. Henderson, have you ever spoken with
22  Suzanne Doft?
23      A.  I believe so, casually.
24      Q.  So just social conversation --
25      A.  Yes.

48 (Pages 186 to 189)

454

1      Do you see that?
2      A.  Yes, I see that name.
3      Q.  And the bullet under that says, "Ellen to get
4   independent medical grant going for McCarver."
5      Do you know whether Mr. McCarver is a doctor
6   with Kaiser?
7      A.  I do not know whether Mr. McCarver a -- is a
8   doctor.
9      Q.  Does Pfizer provide independent medical
10  grants to non-doctors?
11     MR. MIZELL: Object to form.  Outside the
12     scope.
13     A.  So in the context of this memorandum, all of
14  the attendees here are part of Outcomes Research in
15  Medical.  They are the arm responsible for doing
16  research for Pfizer.
17     In this case, Outcomes Research is -- is what
18  it is to determine outcomes.  Kaiser actually does a
19  lot of clinical research through our clinical trials
20  drug program.  So products that are in Phase 2 and 3
21  getting ready to come to market, additionally they do
22  outcomes research.
23     The people within any given organization that
24  conduct research are not necessarily physicians.  They
25  could be PharmDs, PhDs, various disciplines.

455

1      Q.  Beneath that it says under Discussion
2   Comments, Roman Numeral One, or not Roman Numeral one,
3   excuse me.  Beneath that, under Discussion Comments
4   the first item says, "No slide kit, because it's
5   promotional."  Right?
6      A.  Yes.
7      Q.  I'm going to go back to Henderson Exhibit
8   Number 8.  This is Mr. Partain's memo.  He says in
9   this memo in the second page that "There are ten reps
10  in his region actively selling Neurontin in Kaiser."
11     Do you have the names of those
12  representatives selling Neurontin in Kaiser?
13     MR. MIZELL: Outside the scope.
14     A.  I do not have the names of Mr. Partain's
15  representatives, nor do I know that they were actively
16  selling Neurontin in Kaiser.
17     Q.  Would -- if a representative was selling
18  Neurontin in Kaiser, would that representative be
19  communicating with Kaiser about Neurontin?
20     MR. MIZELL: Object to form.  Outside the scope.
21     A.  Again, I think it is very important to
22  understand communicating to Kaiser, which is a
23  third-party payer account, and communicating with
24  Kaiser physicians.
25     What these representatives would be doing, if

456

1   they were indeed calling on Kaiser doctors, they would
2   be calling on Kaiser doctors, in the same way that
3   sales representatives call on doctors throughout the
4   United States.
5      Q.  So you are saying that if a representative
6   from Pfizer is calling on a Kaiser doctor, that that's
7   not a third-party payer communication?
8      A.  That is correct.
9      Q.  Do you know what the types and categories of
10  communications are that these representatives had
11  regarding Neurontin in Kaiser?
12     MR. MIZELL: Object to form.  Outside the
13     scope of the designation.
14     A.  Again, I don't know that these
15  representatives were calling on Kaiser; and because
16  they were receiving no sales credit, logic would
17  dictate there is no reason for them to call on Kaiser
18  doctors.
19     Q.  Do you know the -- whether there are any
20  databases that may exist that would contain the
21  contents of any communications that these sales
22  representatives had when they were selling Neurontin
23  in Kaiser?
24     MR. MIZELL: Object to form.  And outside the
25     scope.

457

1      A.  The -- The only database we typically
2   maintain for representatives that I'm aware of
3   resolves around starters.  And so when a
4   representative leaves starters with a physician, just
5   because of our obligations and requirements by the
6   FDA, those -- those types of things are tracked and
7   logged.
8      Q.  And where are they tracked and logged in?
9      MR. MIZELL: Object to form.  Outside the
10     scope.
11     A.  Again, I -- since I am not part of that
12  group, I -- I -- I believe it's part of the Sherlock
13  system, but I can't say for sure.
14     Q.  And are you prepared to answer questions
15  about the types of documents created or maintained at
16  the Warner-Lambert Healthcare Management Unit?
17     A.  Just as it relates to the -- to the
18  preparation that I did prior to this -- this
19  deposition.
20     Q.  Reviewing the three deposition transcripts?
21     A.  Correct.
22     Q.  That's all you know about the types of
23  documents created or maintained at the Warner-Lambert
24  Healthcare Management Unit?
25     A.  That is correct.

51 (Pages 454 to 457)