EXHIBIT 1

```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2
      * * * * * * * * * * * * * *
 3    UNITED STATES OF AMERICA     *
                                   *
 4              vs.                *      CRIMINAL ACTION
                                   *      No. 04-10150-RGS
 5    WARNER-LAMBERT COMPANY LLC   *
                                   *
 6    * * * * * * * * * * * * * *

 7          BEFORE THE HONORABLE RICHARD G. STEARNS
                 UNITED STATES DISTRICT JUDGE
 8       WAIVER, CHANGE OF PLEA AND SENTENCING HEARING

 9    A P P E A R A N C E S

10            OFFICE OF THE UNITED STATES ATTORNEY
              1 Courthouse Way, Suite 9200
11            Boston, Massachusetts 02210
              for the United States
12            By:  Thomas E. Kanwit, AUSA
                   Sara M. Bloom, AUSA
13                 Jill Furman, Trial Attorney

14


15            DAVIS POLK & WARDWELL
              450 Lexington Avenue
16            New York, New York 10017
              for the defendant
17            By:  Robert B. Fiske, Jr, Esq.
                   James P. Rouhandeh, Esq.
18                 Martine M. Beamon, Esq.

19

20                              Courtroom No. 21
21                              John J. Moakley Courthouse
                                1 Courthouse Way
22                              Boston, Massachusetts 02210
                                June 7, 2004
23                              2:30 p.m.

24

25
```

1    <u>APPEARANCES, CONTINUED</u>

2

3

4

5          HARE & CHAFFIN
           160 Federal Street, 23rd Floor
           Boston, Massachusetts 02110-1701
6          for the defendant
           By: David B. Chaffin, Esq.

7

8

9

10

11

12

13

14

15

16

17

18

19

20              CAROL LYNN SCOTT, CSR, RMR
                   Official Court Reporter
21           One Courthouse Way, Suite 7204
               Boston, Massachusetts 02210
22                  (617) 330-1377

23

24

25

```
1                    P R O C E E D I N G S
2              THE CLERK:  Court is open.  You may be seated.
3        This is United States of America versus
4   Warner-Lambert Company, Criminal No. 04-10150.
5              Would all counsel please identify themselves for
6   the record.
7              MR. KANWIT:  Good afternoon, Your Honor.
8   Thomas Kanwit for the United States.
9              MS. FURMAN:  Good afternoon, Your Honor.  Jill
10  Furman for the United States.
11             MS. BLOOM:  Sara Bloom on behalf of the United
12  States.
13             MR. CHAFFIN:  Good afternoon, Your Honor.
14  David Chaffin for the defendant Warner-Lambert Company LLC.
15             And Your Honor has admitted previously pro hac
16  vice, on my furthest right Robert Fiske from Davis Polk &
17  Wardwell.
18             MR. FISKE:  Good afternoon, Your Honor.
19             THE COURT:  Good afternoon.
20             MR. CHAFFIN:  Attorney Jim Rouhandeh, Davis
21  Polk & Wardwell.
22             MR. ROUHANDEH:  Good afternoon, Your Honor.
23             THE COURT:  Good afternoon.
24             MR. CHAFFIN:  This is Martine Beamon from
25  Davis Polk & Wardwell --
```

1              **MS. BEAMON:**  Good afternoon.

2              **MR. CHAFFIN:**  -- also admitted pro hac vice.

3         And this is Martin Teicher who is the vice

4    president of Warner-Lambert Company LLC.

5         Thank you, Your Honor.

6              **MR. TEICHER:**  Good afternoon, Your Honor.

7              **THE COURT:**  Mr. Rouhandeh, I understand you

8    are going to be the principal spokesperson for the defense?

9              **MR. ROUHANDEH:**  Yes, that's correct, Your

10   Honor.

11             **THE COURT:**  All right.

12        Just to inventory what's before me, I received a

13   copy of the plea agreement, a copy of the Information that

14   is proposed to be filed in this case, a copy of the

15   settlement agreement entered in the related qui tam action,

16   the Sentencing Memorandum supplied by the government and a

17   similar memorandum supplied on behalf of the defendant

18   Warner-Lambert, one letter from outside counsel objecting to

19   some of the terms of the plea agreement which I think is

20   alluded to in the government's sentencing memorandum.

21        And further I received today a proposed waiver of

22   indictment in the case and a secretary's certificate

23   certifying that the Board of Directors has designated

24   Mr. Teicher to represent the company as attorney in fact.

25        So why don't we begin by swearing in Mr. Teicher.

1          THE CLERK:  Mr. Teicher, would you stand and

2     raise your right hand, please.

3          Martin Teicher, on behalf of Warner-Lambert Company

4     do you solemnly swear that you will tell the truth, the

5     whole truth and nothing but the truth in the matter now in

6     hearing, so help you God?

7          MR. TEICHER:  I do.

8          THE CLERK:  Please take a seat right up there

9     (indicating), sir.

10         Mr. Rouhandeh, if you would just stand beside him,

11    please.

12         THE COURT:  Mr. Teicher, my name is Richard

13    Stearns.  I am a judge of the United States District Court.

14    I am going to be asking some questions as this proceeding

15    transpires.

16         I think most of these questions are going to be

17    very familiar to you, as I am sure your attorneys have very

18    carefully prepared for this presentation today.

19         But should anything I say seem confusing or any

20    question seem imprecise, either ask me to rephrase it or

21    feel free to consult with counsel before you answer.  All

22    right?

23         MR. TEICHER:  Thank you, Your Honor.

24         THE COURT:  Can you tell us your full name and

25    title for the record.

6

1          MR. TEICHER:  My name is Martin Teicher.  I am

2   a Vice President of Warner-Lambert Company LLC.

3          THE COURT:  All right.  Mr. Teicher, you are

4   familiar with what purports to be the minutes of the meeting

5   held by the managers of Warner-Lambert on May 11, 2004?

6          MR. TEICHER:  I am on the Board of Directors

7   of Warner-Lambert.

8          THE COURT:  And this resolution authorizes you

9   to, in fact, appear for Warner-Lambert as attorney in fact;

10  am I correct?

11         MR. TEICHER:  Yes.

12         THE COURT:  And the action of the Board of

13  Directors in enacting this resolution was in the authority

14  of the Board under the Articles of Incorporation?

15         MR. TEICHER:  I believe so, Your Honor.

16         THE COURT:  All right.  Have you discussed --

17  and, again, I am asking more by way of formality, but it is

18  an important question.

19         Have you discussed with counsel what it means for

20  the corporation to waive indictment in this case?

21         MR. TEICHER:  Yes.

22         THE COURT:  Do you understand that the crimes,

23  although they are treated as felonies because of a prior

24  conviction of the company, are nonetheless charged as

25  misdemeanors?  Ordinarily the prosecutor has no authority on

1    his or her own to bring in the form of an indictment a

2    felony or a charge with the consequence of a felony crime

3    without obtaining the prior permission of a citizen panel

4    called a grand jury to do so.

5              By waiving indictment in this case, Warner-Lambert

6    is permitting the government to proceed as if it, indeed,

7    had the consent of the grand jury to bring these charges.

8    Although this is captioned as an "Information," the crimes,

9    again, as I stated before are felonies.

10             Do you understand that Warner-Lambert by agreeing

11   to waive indictment is giving up its right to require the

12   government to present this case first to a grand jury to

13   obtain the acquiescence of a grand jury in the Information?

14             MR. TEICHER:  I do understand that, Your

15   Honor.

16             THE COURT:  Is it the advice of counsel that

17   it is in the best interests of the corporation to proceed by

18   waiver of indictment?

19             MR. TEICHER:  Yes, Your Honor.

20             THE COURT:  Does either counsel or Mr. Teicher

21   know of any untoward threats or inducements that were given

22   to Warner-Lambert to bring about the waiver of indictment in

23   this case?

24             MR. TEICHER:  No.

25             MR. ROUHANDEH:  No, Your Honor.

1        **THE COURT:** Mr. Teicher, it is also your

2  judgment that it is in the best interests of Warner-Lambert

3  to proceed by way of Information?

4        **MR. TEICHER:** Yes.

5        **THE COURT:** All right. I find that the

6  decision to proceed by waiver of indictment is a voluntary

7  one and one made in the best interests of the corporate

8  defendant. We will accept the waiver.

9        Mary, would you have Mr. Teicher sign the waiver.

10       **THE CLERK:** Yes.

11       (Pause in proceedings.)

12       **THE COURT:** All right. The waiver of

13 indictment having been executed by Mr. Teicher, I will so

14 witness the acceptance by signing and dating the waiver

15 provided.

16       Now, Mr. Teicher, before I proceed with the

17 Information, could you for the record -- because I think

18 this may help clarify the factual basis for the Information

19 to some degree -- could you explain the interrelationship

20 between Parke-Davis, Warner-Lambert and Pfizer Corporation?

21       **MR. TEICHER:** I believe that Parke-Davis was

22 an internal operating division of Warner-Lambert. And

23 Warner-Lambert is currently, since June of 2000, a

24 subsidiary of Pfizer Corporate.

25       **THE COURT:** Have you reviewed the Information

1  with counsel and has the Board of Directors reviewed the

2  Information?

3              MR. TEICHER:  Yes.

4              THE COURT:  All right.  Do you feel -- and,

5  again, I am asking now to speak not only on your own behalf

6  but on behalf of the Board of Directors.

7          Do you feel that you understand the two criminal

8  charges contained in the Information?

9              MR. TEICHER:  Yes.

10             THE COURT:  Has counsel explained to you and

11  to the Board of Directors the so-called, what a lawyer would

12  call elements of these crimes, that is, the distinctive

13  features of the crimes that the government would be required

14  to prove beyond a reasonable doubt to obtain a conviction on

15  both Counts 1 and 2?

16             MR. TEICHER:  Yes.

17             THE COURT:  All right.  Let me simply

18  summarize, and counsel can correct me if my summary is

19  wrong.

20          Count 1 -- again, while a misdemeanor, it appears

21  in the criminal code, because, as I said before, of the

22  prior conviction, it has a felony consequence -- charges

23  distribution of an unapproved drug.  As framed this count

24  would require proof of a prior conviction as I mentioned

25  under the same operative statutes.

1          The sale of the drug with the tradename Neurontin

2     was introduced in interstate commerce for unapproved uses

3     and without prior FDA approval.

4          This crime, like Count 2, is a direct liability

5     offense, that is, the government would not have to prove

6     scienter but would have to prove the four elements I just

7     described.

8          So too with Count 2 which alleges distribution of a

9     misbranded drug.  As framed this would require proof of a

10    prior conviction under the same operative statutes, the sale

11    of the drug under the tradename Neurontin in interstate

12    commerce, and unapproved uses without adequate directions

13    being provided to physicians and consumers for such uses.

14         These would be the elements that the government

15    would have to prove.

16         Do I have them correctly stated, Counsel?

17              MR. KANWIT:  Yes, you do, Your Honor.

18              MR. ROUHANDEH:  Yes, Your Honor.

19              THE COURT:  Do you understand that --

20              MR. TEICHER:  Yes.

21              THE COURT:  -- that is what would be involved?

22         All right.  Now, let me ask Mr. Kanwit to

23    explain -- and I realize that there is more art than perhaps

24    science in this -- but explain the maximum penalties to the

25    offense.

1            **MR. KANWIT:** Yes, Your Honor. The maximum

2 penalties under 21 U.S.C., Section 333(a)(2) would be three

3 years and a $10,000 fine. However, 18 U.S.C. provides for a

4 $500,000 fine. And 18 U.S.C., Section 357(1)(d) provides

5 for a fine of two times the pecuniary gain or loss. And the

6 appropriate fine is the maximum of those.

7            Therefore, it's the United States' position with

8 the agreement of the defendant that the maximum fine is two

9 times the pecuniary gain.

10            **THE COURT:** Mr. Teicher, do you understand, at

11 least as just as mortal human beings can calculate these

12 things in the Sentencing Guidelines, that these are the

13 maximum penalties of those offenses?

14            **MR. TEICHER:** Yes.

15            **THE COURT:** Now, I am going to ask the

16 prosecutor to recite for the record the material terms of

17 the plea agreement which was reached in this case.

18            And in doing this, Mr. Kanwit, you may also want to

19 outline the terms of the civil settlement which I understand

20 was a condition precedent to the government's recommendation

21 of the disposition of the criminal matters.

22            **MR. KANWIT:** Thank you, Your Honor.

23            The plea agreement entered into between

24 Warner-Lambert Company LLC and the United States provides

25 that it is submitted to the Court under Criminal Rule

1    11(c)(1)(c).

2          And it provides that the defendant Warner-Lambert

3    will plead guilty to two counts of violation of Title 21,

4    United States Code, Sections 331(a), 331(d), 333(a),

5    352(f)(1) and 355(a).

6          Warner-Lambert in connection with its plea has

7    agreed to waive any defenses, including statute of

8    limitations defenses it has in connection with those crimes.

9          Further, Warner-Lambert and the United States have

10   agreed that the United States Sentencing Guidelines will

11   apply.  And more specifically that pursuant to Section

12   8C2.4A2 and 18 U.S.C., Section 3571(d), the fine will be

13   based on a calculation of pecuniary gain to Warner-Lambert,

14   which pecuniary gain is one hundred fifty million dollars.

15         Further, the parties have agreed that the

16   appropriate multiplier pursuant to the Sentencing Guidelines

17   is 1.6.  Although, as the Court is aware, the parties get to

18   those -- get to that multiplier through somewhat different

19   means.  Nonetheless, the 1.6 is within the range that both

20   parties reach.  And the parties have agreed to the 1.6

21   multiplier under 8C2.6 of the Sentencing Guidelines.

22         And, therefore, the 1.6 multiplied by the pecuniary

23   gain of one hundred fifty million results in an agreed upon

24   criminal fine of two hundred and forty million.

25         There are additional provisions in the plea

1    agreement such as the mandatory special assessment of $800

2    to be paid to the Court by Warner-Lambert.  And in addition

3    the plea agreement contemplates the entry of Warner-Lambert

4    into a civil settlement agreement and a Corporate Integrity

5    Agreement.

6         The civil settlement agreement provides that

7    Warner-Lambert will pay to the United States on behalf of

8    False Claims Act and other damages pursuant to the Medicaid

9    program and to the state a combined total of one hundred

10   ninety million dollars and to state Consumer Protection

11   divisions the amount of thirty-eight million dollars.

12        It is also contemplated as part of the Corporate

13   Integrity Agreement that Warner-Lambert and its parent

14   Pfizer will, and they have, in fact, at this point indeed

15   entered into a Corporate Integrity Agreement which provides,

16   among other things, for training of Warner-Lambert and

17   Pfizer employees and auditing of those employees as regards

18   marketing practices and related activity of the company's

19   employees with regard to marketing, and very specifically

20   potential off-label marketing.

21        There are over provisions of the plea agreement

22   entered into by Warner-Lambert and the United States that

23   relate to a breach of the plea agreement, that relate to the

24   company's continued cooperation with the government, that

25   relate to withdrawal of the plea agreement; but those are

1    the essential elements of the plea agreement between the

2    United States.

3             THE COURT:  Mr. Teicher, do you understand --

4    and I know that the plea agreement has been read carefully

5    and acknowledged -- but do you understand that as this plea

6    is offered, it is really offered to the Court because of the

7    peculiar rule under which it was written as either a "take

8    it or leave it proposition"?  That is, either I approve the

9    terms as counsel have agreed or Warner-Lambert is permitted

10   to withdraw the plea, or the United States is also permitted

11   to withdraw its consent to the plea.

12          Do you understand that?

13            MR. TEICHER:  Yes, Your Honor.

14            THE COURT:  I have an interesting question for

15   counsel.

16          Is a corporation entitled to a jury trial in

17   criminal cases?

18            MR. KANWIT:  Your Honor, I actually don't know

19   the answer to that.  I always assumed that they are.

20            MR. ROUHANDEH:  That's my understanding as

21   well, Your Honor.

22            THE COURT:  I don't think the Supreme Court

23   has ever really answered the issue.  The closest case I can

24   find is Muniz vs. Hoffman where it seems to have been left

25   as an open issue.  A lot of academic writers take the

1    position that, in fact, because a corporation cannot be

2    sentenced to imprisonment that the jury right does not

3    apply, at least in a criminal context.

4            But let's be cautious.  Let's assume that it does.

5    And because we are being cautious, Mr. Teicher, do you

6    understand that when Warner-Lambert pleads guilty, it gives

7    up its right to have its case tried before a jury, or for

8    that matter before a judge sitting without a jury?

9            MR. TEICHER:  I do.

10           THE COURT:  Have you served as a juror?

11           MR. TEICHER:  No, I have never served as a

12   juror.

13           THE COURT:  All right.  Let me simply explain

14   that if the case were to go to trial in this court, a group

15   of citizens randomly chosen from the eastern half of

16   Massachusetts would be summoned to this courtroom.

17   Ultimately twelve of them would be seated to serve as the

18   jurors in the case.

19           During the course of this so-called impanelment

20   process, your company and its attorneys would be permitted

21   to object to any ten jurors for whatever reason it did not

22   want them seated to hear the case.  The government would

23   object to any six that it did not want seated for any

24   reason.

25           I would explain to the jury that they would have to

1    be unanimous as to whether Warner-Lambert, in fact, was

2    guilty or not guilty of each of these offenses.

3           When I say that the company give ups its right to a

4    jury trial, therefore, I mean not only does the company give

5    up the right to have a jury make the ultimate factual

6    determination as to whether the company is guilty or not

7    guilty but also the right to participate in the selection of

8    the very jury that would make that decision.

9           Do you understand that?

10          MR. TEICHER:  Yes.

11          THE COURT:  Do you understand that

12   Warner-Lambert would be entitled to the assistance of

13   counsel throughout the jury selection process and throughout

14   the trial of the case?

15          MR. TEICHER:  Yes, Your Honor.

16          THE COURT:  Do you understand that I would

17   instruct the jury that they must presume Warner-Lambert

18   innocent unless or until the government succeeded in proving

19   the company's guilt beyond a reasonable doubt?

20          MS. BEAMON:  Yes.

21          THE COURT:  Do you understand that I would

22   also instruct the jury that the burden of proof rests with

23   the government throughout the trial of the case, meaning

24   that Warner-Lambert would have no duty to prove its

25   innocence, to call witnesses, to produce evidence during the

1    trial?

2            Do you understand that?

3                    MR. TEICHER:  Yes.

4                    THE COURT:  Do you understand that the burden

5    of proof in a criminal trial is proof beyond a reasonable

6    doubt?  That is the highest standard of proof known in our

7    system of law.

8                    MR. TEICHER:  Yes.

9                    THE COURT:  Do you understand that

10   Warner-Lambert by pleading guilty gives up the right to

11   confront the witnesses against it?  That means to have its

12   lawyers ask questions of the government's witnesses.

13                   MR. TEICHER:  Yes, Your Honor.

14                   THE COURT:  And do you understand that the

15   company gives up its right, if it should choose to do so, to

16   present any defenses that its counsel thought were to its

17   benefit during the course of the trial?

18                   MR. TEICHER:  Yes.

19                   THE COURT:  Do you also understand that the

20   company, to the extent that it is a personality under the

21   law, is in effect giving up its right I suppose to remain

22   silent.  I assume the Fifth Amendment applies to

23   corporations?

24           Mr. Fiske, you would know the answer to that.

25                   MR. FISKE:  I am not sure, Your Honor.  I

1    believe it does.

2           THE COURT:  I think it would depend on the

3    circumstances and the type of --

4           MR. FISKE:  My colleague about thirty years

5    ago David Kreiger (ph.) argued when he was U.S. Attorney

6    that the Fifth Amendment did not apply to a corporation.

7    And he lost that argument.

8           THE COURT:  Well, that is good enough for me.

9    We will, again, we will err on the side of caution.

10    You understand that the company may be giving up

11    the right under the Fifth Amendment to refuse to produce any

12    information or make any acknowledgements whatsoever with

13    respect to these charges?

14           MR. TEICHER:  I understand that, Your Honor.

15           THE COURT:  All right.  I am going to ask the

16    prosecutor then to summarize the factual basis for the

17    agreement in this case.

18    When he finishes, I have to ask if the company

19    agrees with the material allegations that the government

20    outlines.

21           MR. KANWIT:  Thank you, Your Honor.

22    If this case were to go to trial, Your Honor, the

23    United States would prove the following and more.

24    First, Warner-Lambert Company LLC was a corporation

25    operating and existing under the laws of the State of

1    Delaware with its principal place of business in Morris

2    Plains, New Jersey.  Warner-Lambert's Parke-Davis Division

3    was engaged in the development, manufacture, promotion,

4    sale, and interstate distribution of prescription drugs

5    intended for human use in the United States.  Those drugs

6    were manufactured in Puerto Rico, from which they were

7    shipped interstate to all fifty states and the District of

8    Columbia.

9         The Federal Food, Drug and Cosmetic Act governs the

10    lawful interstate distribution of drugs for human use.  As

11    codified at Title 21, United States Code, Sections 331 et

12    seq., and specifically at 355(b), the Food, Drug and

13    Cosmetic Act and its implementing regulations require that

14    before a new drug may legally be distributed in interstate

15    commerce, a sponsor of that drug product must submit a New

16    Drug Application.

17         Further, the New Drug Application's sponsor must

18    submit proposed labeling for the proposed intended uses for

19    the drug which include, among other things, the conditions

20    for the specific therapeutic use to which the drug is to be

21    made.

22         The NDA, or the New Drug Application, must provide

23    to the satisfaction of FDA, data generated in randomized and

24    well-controlled clinical trials that demonstrates that the

25    drug will be safe and effective when used in accordance with

1    the proposed labeling.

2            The Food, Drug and Cosmetic Act at Section 355

3    further prohibits the introduction into interstate commerce

4    of any new drug, unless such an approval of a New Drug

5    Application is effective.  No marketing or promotion of a

6    drug may be made unless and until the application is

7    approved and such marketing and promotion must be limited to

8    the therapeutic use contained in the approval.

9            The Food, Drug and Cosmetic Act requires that

10    before a manufacturer may label or promote a drug for use

11    different than the conditions for use specified in the

12    approved labeling, the sponsor had to file a new NDA, or

13    amend the existing NDA.  Only upon approval of the new NDA

14    or the amendment can the sponsor promote the drug for the

15    new intended use.

16            Further, the Food, Drug and Cosmetic Act at all

17    times relevant to this investigation provided that a drug

18    was misbranded if the labeling did not contain adequate

19    directions for use.  Adequate directions for use cannot be

20    written for medical indications or uses for which the drug

21    could not be proven to be safe and effective.

22            The statute also prohibits distribution in

23    interstate commerce of an unapproved new drug or of a

24    misbranded drug.

25            Turning to the specific facts of the Neurontin and

1   the Warner-Lambert situation.   In or about 1993,

2   Warner-Lambert submitted a New Drug Application for approval

3   of a drug that was eventually called Neurontin, with the

4   chemical name gabapentin.

5           Warner-Lambert sought to demonstrate the drug's

6   safety and efficacy for, and sought approval for use only as

7   adjunctive therapy in the treatment of partial seizures with

8   and without secondary generalization in adults with

9   epilepsy.

10          On or about December 30, 1993, the FDA approved

11  Neurontin for that specific use only.  Neurontin was not

12  approved for any use or condition other than what we have

13  referred to in the Information as the approved use, this

14  adult epilepsy I just referred to.

15          From at least June of 1995 through at least

16  August 20, 1996, unapproved uses for Neurontin included

17  post-herpetic neuralgia, painful diabetic neuralgia, anxiety

18  disorder, social phobias, bipolar disorder, alcohol

19  withdrawal syndrome, amyotrophic lateral sclerosis or ALS,

20  spinal cord injury, essential tremor, restless leg syndrome,

21  reflex sympathetic dystrophy and migraine headaches, among

22  other uses.  We have referred to these collectively along

23  with other uses as "Unapproved Uses."

24          Warner-Lambert did not file a new New Drug

25  Application, or NDA, seeking FDA approval for any of these

1    unapproved uses during the time period addressed in the

2    government's information.

3         Regarding the marketing strategy for Warner -- by

4    Warner-Lambert for Neurontin, Warner-Lambert conducted

5    evaluations of the market potential at various times for

6    certain of the unapproved uses for Neurontin, including

7    post-herpetic neuralgia, painful diabetic neuralgia, anxiety

8    disorder, social phobias and bipolar disorder.

9         In or about the fall of 1995 one regional unit,

10   Warner-Lambert's Southeast Customer Business Unit, created a

11   planning document regarding Neurontin, which included a page

12   titled, "SECBU Right On The Mark with Neurontin and Pain"

13   over a picture of a target and listed "Neurontin for Pain

14   Strategies" including conference calls on pain and a pain

15   consultant meeting.

16        Further, certain of Warner-Lambert's annual

17   strategic plans and other marketing planning documents for

18   Neurontin included quarterly and annual goals, objectives,

19   strategies and tactics for increasing sales of the

20   unapproved uses of Neurontin.  The marketing plans also

21   budgeted for and funded these specific tactics.

22        From early 1995 on repeated occasions

23   Warner-Lambert determined not to seek FDA approval for

24   certain of the unapproved uses.

25        Specifically in or about April and May of 1995,

1    Warner-Lambert performed a marketing assessment of proposed

2    psychiatric indications for Neurontin.  In that marketing

3    assessment Warner-Lambert forecast potential revenue from

4    Neurontin for bipolar and anxiety treatment under two

5    scenarios:  With and without FDA approval.

6         The company concluded that it would not seek

7    approval to promote and sell Neurontin for those unapproved

8    uses.

9         Further, in or about July of 1995 Warner-Lambert

10   made an assessment of Neurontin's market potential for

11   neuropathic pain.  This was distributed within the company,

12   including to a Vice President for Marketing.  The assessment

13   stated, "There is no intention to fully develop the

14   indication at this point."  Full development would have

15   required the submission of a New Drug Application to FDA for

16   approval.

17        One of the principal factors Warner-Lambert

18   considered in determining whether to seek approval for

19   Neurontin for other uses was the short patent protection

20   available for Neurontin.  Another factor was the negative

21   impact such approval might generate on potential sales of

22   another drug that Warner-Lambert had been developing.

23        The company expected that this new drug would be

24   approved by FDA not only for epilepsy but also for a variety

25   of uses beyond Neurontin's approved use.

1          Once Neurontin's patent expired, other companies

2    could seek approval to distribute generic equivalents of

3    Neurontin.  Such approval, however, would be limited to the

4    approved therapeutic use for Neurontin set forth in

5    Warner-Lambert's original NDA approval.  If Warner-Lambert

6    sought and obtained approval for any of the unapproved uses,

7    then upon expiration of the patent, generic equivalents of

8    Neurontin could also be sold for those unapproved uses.

9    Warner-Lambert was concerned that under those circumstances

10   the generic equivalents would undermine sales of the new

11   drug that was under development.

12         Turning to the promotion of Neurontin for

13   unapproved uses and specific tactics employed by

14   Warner-Lambert.  The government would prove at trial from in

15   or about June of 1995 through in or about August 20, 1996,

16   Warner-Lambert promoted the sale and use of Neurontin for

17   certain conditions other than the approved use in

18   Massachusetts and elsewhere.

19         The tactics employed included circulating a

20   memorandum to a group including senior members of

21   Warner-Lambert's Epilepsy Disease Team noting that data

22   purchased from an outside vendor showed that the doctors had

23   reported that the main message of certain sales pitches,

24   known in the industry as "details" by sales representatives,

25   given by ten of fifty Warner-Lambert sales representatives

1    for whom data was available in a two-month period was for

2    off-label use of Neurontin.  Nine were for pain and one was

3    for reflex sympathetic dystrophy, a painful nerve damage

4    syndrome.

5              In addition, on about July 10, 1996 a

6    Warner-Lambert sales representative met with a doctor in

7    Monroe, Louisiana and detailed that doctor on Neurontin for

8    the treatment of pain.

9              Also in 1996 another sales representative created a

10   document that stated that sales representatives could ask

11   doctors during a Neurontin detail if they ever used other

12   anti-epileptic drugs for painful neuropathies and could

13   mention that approximately 35 percent of all Neurontin use

14   is non-seizure.  The same document entitled "Neurontin Can

15   Do/Can't Do," stated that sales representatives could do

16   lunch programs on Neurontin and pain.

17             Turning to the tactic of using medical liaisons.

18   Warner-Lambert employed persons called "medical liaisons"

19   who were presented to physicians as employees of the

20   company's Medical and Scientific Affairs Department.

21             On a specific occasion in or about June of 1996, a

22   Warner-Lambert sales representative requested that a medical

23   liaison with the company make a presentation at Longwood

24   Gardens in Kennett Square, Pennsylvania, to a group of

25   physicians who were members of a local medical society.

1      Prior to the meeting the sales representative and

2    the medical liaison selected the topic that would be

3    presented to the medical society.  Among the topics actually

4    presented were the use of Neurontin for unapproved uses.

5    And that was done in front of -- there were doctors and in

6    front of the sales representative.

7      After the presentation a Warner-Lambert medical

8    director who was aware of the event praised it as "another

9    great example of use of the medical liaisons" and an area

10   business manager who oversaw sales representatives called it

11   an "outstanding utilization of...one of the medical affairs

12   liaisons."

13      Further, in or about May of 1996 a Warner-Lambert

14   medical director who oversaw medical liaisons in the

15   Northeast Customer Business Unit, which was a regional sales

16   unit for the company, sent a voice mail message to the

17   Medical Liaisons in the Northeast CBU in which he stated,

18   "What we'd like you to do is, anytime you're called out just

19   make sure that your main focus out of what you're doing is

20   on Neurontin... When we get out there, we want to kick some

21   ass, we want to sell Neurontin on pain.  All right?  And

22   monotherapy and everything we can talk about, that's what we

23   want to do."

24      One or more Medical Liaisons in the Northeast CBU

25   interpreted this statement to mean that he or she should

1    promote Neurontin for unapproved uses and thereafter

2    promoted Neurontin for neuropathic pain, which is an

3    unapproved use.

4         Turning to the tactic of use of consultant

5    meetings and advisory Boards in promoting Neurontin.

6    Specifically Warner-Lambert organized a consultant meeting

7    at the Jupiter Beach Resort in Palm Beach, Florida held on

8    April 19 to 21, 1996.  Approximately 42 physicians attended

9    the meeting, including nine physicians who made

10   presentations relating to the unapproved uses of Neurontin.

11        Warner-Lambert invited certain doctors to this

12   meeting based upon their history of writing a large number

13   of prescriptions for Neurontin or similar drugs.  As part of

14   this event, Warner-Lambert paid for the accommodations and

15   meals for the invited doctors and their spouse or guest, and

16   paid an honorarium to each of the doctor attendees.  Doctors

17   who acted as faculty were paid between $1,500 and $2,000.

18        Among the presentations made to the physicians in

19   attendance was one relating to unapproved uses entitled,

20   "Reduction of Pain Symptoms During Treatment with

21   Gabapentin."

22        In the meeting's agenda, this presentation was

23   listed as "Anticonvulsant Advances."  During this

24   presentation, Neurontin was promoted for use in the

25   treatment of pain.

1          Additional presentations made at the Jupiter Beach

2    conference also addressed unapproved uses.

3          Following the Jupiter Beach conference

4    Warner-Lambert circulated to employees in the Northeast

5    region the agenda to the meeting, specifying the off-label

6    topics, the faculty list, the attendee list and presentation

7    abstracts discussing the off-label content of the

8    presentations.  The company told its employees that, "The

9    meeting was a great success and the participants were

10   delivered a hard-hitting message about Neurontin."

11          Warner-Lambert also distributed to these employees

12   a form entitled "Jupiter Beach Trending Worksheet" which was

13   intended to be used to gauge the effect of the meeting on

14   the prescribing by doctors who attended the Jupiter Beach

15   meeting.

16          In addition, from August 1st through the 5th, 1996,

17   Warner-Lambert organized and held an advisory board meeting

18   in Atlanta, Georgia in connection with the 1996 Summer

19   Olympics.  Warner-Lambert expressly instructed several of

20   the physician speakers to address some of the unapproved

21   uses of Neurontin at that meeting.

22          The meeting was hosted for the doctors at the

23   Chateau Elan Winery and Resort in Atlanta, Georgia, and all

24   expenses were paid for eighteen consultants and their

25   spouses to attend the Olympics, including tickets to the

1    closing ceremonies.  The company had already had numerous

2    opportunities to consult with these doctors and, in fact,

3    many of them had spoken on Warner-Lambert's behalf at prior

4    meetings.

5         In addition, certain of the physician speakers

6    promoted Neurontin for unapproved uses in their

7    presentations at this meeting.

8         Turning to the off-label promotion of Neurontin

9    through teleconferences.

10        Warner-Lambert organized teleconferences as part of

11   its effort to increase off-label sales of Neurontin.

12        Specifically in or about January of 1996 a

13   Warner-Lambert vice president of the Southeast Customer

14   Business Unit sent a memorandum to Warner-Lambert sales

15   representatives listing certain goals, including, "Utilize

16   the Medical Liaison Group to target the Neurontin, Pain &

17   Psychiatric Market.  Objective to conduct twice weekly Pain

18   Teleconferences moderated by key Neuro Consultants.  Goals

19   250 Physicians Participants quarterly."

20        On or about March 1st, 1996, Warner-Lambert

21   sponsored such a teleconference moderated by a

22   Warner-Lambert employee with a pain specialist as a speaker

23   on Neurontin.  Neurontin was promoted for the treatment of

24   pain to doctors participating in that teleconference.

25        Further, on or about March 28, 1996, a

1    Warner-Lambert Medical Director in the Northeast Customer --

2    I'm sorry -- the Northcentral Customer Business Unit sent a

3    memorandum to Warner-Lambert Medical Liaisons in that unit

4    instructing them to hold a series of teleconferences with

5    doctors to provide clinical updates on Neurontin, including

6    monotherapy and other non-epilepsy use data.  Monotherapy is

7    use of Neurontin alone rather than in conjunction with

8    another epilepsy medication and it was an off-label use.

9           In or about May 1996 a Warner-Lambert Medical

10    Director held such a teleconference in the Northcentral

11    Customer Business Unit entitled, "Neurontin, A Clinical

12    Update" which the Medical Director promoted off-label uses

13    of Neurontin to the doctors participating in the

14    teleconference.

15           Your Honor, those are the essential facts that if

16    the government went to trial it would expect to prove.  In

17    addition, there are facts contained in the Sentencing Memo

18    submitted by the government which the government believes

19    are relevant conduct.

20           Clearly the expectation of the United States is

21    that were we to go to trial, we would prove more than what

22    is in the Information.  But what is in the Information are

23    the essential facts that we would prove that would be

24    sufficient to sustain a conviction on Counts 1 and 2.

25           Count 1, as the Court has noted, being distribution

```
 1    of an unapproved new drug, and Count 2, the distribution of

 2    a misbranded drug by reason of inadequate directions for

 3    use.

 4                    THE COURT:  All right.

 5              Mr. Teicher, I think much of this would be

 6    unsurprising to you because it is contained in the

 7    Sentencing Memorandum the government filed, which I am sure

 8    that you have seen.

 9              And I do recognize that in its own Sentencing

10    Memorandum, the company does, without arguing the point of

11    guilt, nonetheless, it points to some mitigating factors.

12    For example, the fact that to the company's knowledge no

13    individual has been harmed by any of the activities that the

14    government has recited.

15              But I am going to focus now on what the prosecutor

16    related as the facts of the case as the government sees

17    them.

18              Does Warner-Lambert agree that that recitation is

19    factually accurate and the responsibilities that the

20    prosecutor pointed to which lead to the suggestion or

21    actually an inference of a felony nature of guilt in this

22    matter are accurately stated?

23                    MR. TEICHER:  Warner-Lambert acknowledges the

24    facts stated by the U.S. Attorney to the extent as set forth

25    in the Information, Your Honor.
```

```
 1                    THE COURT:  Is the company pleading guilty
 2     voluntarily and willingly?
 3                    MR. TEICHER:  Yes.
 4                    THE COURT:  Has any coercion of a physical
 5     nature, other than obviously the threat of prosecution, been
 6     brought to bear to induce the company to plead guilty?
 7                    MR. TEICHER:  No, Your Honor.
 8                    THE COURT:  Have any promises of a secret
 9     nature, that is, any promise other than those that have been
10     disclosed to the Court in the plea agreement and the release
11     been made to induce a plea agreement?
12                    MS. BEAMON:  No.
13                    THE COURT:  Again, apart from the threat of
14     prosecution, have any untoward threats been made to induce
15     the guilty plea?
16                    MR. TEICHER:  No.
17                    THE COURT:  Is Warner-Lambert satisfied with
18     the representation that its attorneys have provided and does
19     it feel that it has had sufficient time to elicit the advice
20     of its attorneys, discuss any possible defenses and the
21     consequences of entering a guilty plea in this case?
22                    MR. TEICHER:  Yes, Your Honor.
23                    THE COURT:  Is Warner-Lambert satisfied that
24     its attorneys have represented the corporate interests at
25     all times?
```

```
 1                    MR. TEICHER:  Yes.

 2                    THE COURT:  Do counsel for Warner-Lambert see

 3      any reason why the plea should not be accepted in this case?

 4                    MR. ROUHANDEH:  No, Your Honor.

 5                    THE COURT:  Do counsel have any other areas

 6      that you wish me to inquire into?

 7                    MR. KANWIT:  No, Your Honor.

 8                    THE COURT:  Okay.

 9                    MR. ROUHANDEH:  No, Your Honor.

10                    THE COURT:  None.

11           All right.  Mr. Teicher, your ordeal is almost

12      over.  If you would step back to counsel table.

13                    (Pause in proceedings.)

14                    THE COURT:  All right.  I find that the pleas

15      tendered on behalf of Warner-Lambert are voluntary.  They

16      have been tendered after a full discussion with counsel of

17      whatever legal rights that Warner-Lambert may have and is

18      waiving as a result of the pleas.

19           And after consideration by the corporate Board of

20      Directors, it is in the company's best interests in this

21      matter to find that there is a sufficient basis in the facts

22      submitted by the government, particularly those that are

23      outlined in the Information, the accuracy of which

24      Warner-Lambert acknowledges, to warrant a finding of guilt

25      on each of the offenses beyond a reasonable doubt.
```

1    I further find that given the magnitude of the fine

2   that is recommended, the associated civil settlement, the

3   fact that the plea agreement and the associated release do

4   not compromise any private right or any potential criminal

5   liability of individual defendants, or any other criminal

6   conduct, corporate or otherwise, that lies outside the scope

7   of the agreement, I find that the agreement and the proposed

8   disposition are in the public's interest.

9    I would, therefore, accept the pleas and direct the

10   clerk at this time to enter the pleas into the record.

11    **THE CLERK:**  Mr. Teicher, would you stand,

12   please.

13    Mr. Teicher, Count 1 of the Information filed by

14   the United States Attorney charges Warner-Lambert Company

15   with distribution of unapproved new drug, beginning as early

16   as in or about April of 1995, and continuing thereafter

17   until at least in or about August 20 of 1996, in the

18   District of Massachusetts, and elsewhere, all in violation

19   of Title 21, United States Code, Sections 331(d), 333(a)(2)

20   and 355(a).

21    How does Warner-Lambert Company plead to Count 1 of

22   this Information?

23    **MR. TEICHER:**  Warner-Lambert Company pleads

24   guilty.

25    **THE CLERK:**  And Count 2 of the Information

1    filed by the United States Attorney charges Warner-Lambert

2    Company with distribution of a misbranded drug, beginning as

3    early as April of 1995, and continuing thereafter until at

4    least in or about August 20 of 1996, in the District of

5    Massachusetts and elsewhere, all in violation of Title 21,

6    United States Code, Sections 331(a), 333(a)(2) and

7    352(f)(1).

8          How does Warner-Lambert Company plead to Count 2 of

9    the information?

10         MR. TEICHER:  Warner-Lambert Company pleads

11   guilty.

12         THE CLERK:  Thank you, sir.  Please be seated.

13         THE COURT:  I have a motion before the Court

14   filed by the United States asking that the Court waive the

15   Presentence Report and proceed immediately to sentencing in

16   this matter.

17         Is that the case, Mr. Kanwit?

18         MR. KANWIT:  That is, Your Honor, provided

19   that we, of course, want to be sure that the Court has had

20   an adequate opportunity to look into this matter and feels

21   comfortable with it.

22         THE COURT:  The reason I was hesitant when you

23   all came in two or three weeks ago and asked me to conduct

24   the hearing then is that I would not have felt comfortable

25   at that point.  I didn't realize that the interest was

1    running quite on the meter the way it was or I might have

2    hurried my own review.

3    But, nonetheless, I think it is in the interests of

4    the court and the interests of the public that the judge

5    feel informed and comfortable about the matter in this case.

6    And I am, as I said, particularly having read the

7    terms of the release associated with the plea agreement and

8    those provisions as I indicated of the agreement that did

9    not purport to compromise any rights except those

10   immediately at stake in this proceeding.

11   I am comfortable not only with the plea but with

12   the proposed disposition.

13   Mr. Teicher, I gather it is also the desire of

14   Warner-Lambert to proceed immediately to sentencing?

15   MR. TEICHER:  Yes, it is, Your Honor.

16   THE COURT:  You understand that the company

17   would ordinarily have the right to have a Presentence Report

18   prepared by the Probation Department for further advice and

19   information to the Court?

20   MR. TEICHER:  Yes, Your Honor.

21   THE COURT:  You are willing to waive that

22   right of the company?

23   MR. TEICHER:  Yes.

24   THE COURT:  Mr. Kanwit, what is the

25   government's recommendation?

1          I know what it is but for the record could you

2    state the government's recommendation.

3                    MR. KANWIT:   Your Honor, it's the United

4    State's recommendation that Warner-Lambert Company LLC have

5    imposed upon it a criminal fine of two hundred forty million

6    dollars; a special assessment of $800; that restitution be

7    waived in light of the civil settlement agreement; and no

8    period of probation be imposed in light of the Corporate

9    Integrity Agreement.

10                   THE COURT:   Mr. Rouhandeh, I gather

11   Warner-Lambert concurs in the recommended disposition?

12                   MR. ROUHANDEH:   Yes, Your Honor.

13                   THE COURT:   Mr. Teicher, if you would stand,

14   please.

15           Mr. Teicher, pursuant to the Sentencing Reform Act

16   of 1984 and the associated Sentencing Guidelines, it is the

17   judgment of the Court that the defendant Warner-Lambert

18   Company LLC be fined the sum of two hundred and forty

19   million dollars, the fine to be paid within fourteen days of

20   the date of this sentencing.

21           I further order that the company pay a special

22   assessment of $800 which should be due immediately.

23           In light of the civil agreement entered into

24   previously, the Court will waive any restitution in this

25   matter.

1          Any technical imperfection in the sentence as

2     dictated?

3               MR. KANWIT:  Not that the government is aware

4     of, Your Honor.  Could I have one moment?

5               THE COURT:  Yes.

6          (Pause in proceedings.)

7               MR. KANWIT:  Thank you, Your Honor.  Nothing

8     from the government.

9               MR. ROUHANDEH:  No, Your Honor.

10              THE COURT:  All right.  The sentence will then

11    be imposed as it was orally dictated by the Court.

12         Unless counsel have anything further, we will be

13    adjourned on this matter.

14              MR. ROUHANDEH:  Yes, Your Honor.  Just one

15    point just for the record.  And that is that Mr. Teicher had

16    no involvement whatsoever in any of the charged or

17    investigated conduct.

18         I wanted the record to be clear on that.

19              THE COURT:  I assumed that that is why he was

20    so chosen to be the representative today.

21         (Laughter.)

22              THE COURT:  Okay.

23         All right.  With that additional statement for the

24    record, we will be adjourned.

25

1

2              THE CLERK:  All rise.  Court is in recess.

3        (WHEREUPON, the proceedings were recessed at 3:30

4        p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE

I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377