EXHIBIT 2

# Pfizer's Ethical Obligations Regarding Its Drug Neurontin

Professor Dan W. Brock, PhD
Frances Glessner Lee Professor of Medical Ethics
Harvard Medical School
Boston, Massachusetts

This report addresses the ethical obligations of Pfizer, with regard to its drug Neurontin (Gabapentin). It is based on my long experience as a bioethicist, on the relevant ethical literature, and on widely accepted ethical standards applicable to the health care field. My qualifications are that I am since 2004 the Frances Glessner Lee Professor of Medical Ethics and the Director of the Division of Medical Ethics at Harvard Medical School, as well as Director of the Harvard University Program in Ethics and Health. In this capacity I am responsible for all ethics training and research programs at Harvard Medical School. From 2002-2004 I was Senior Scientist in the Department of Clinical Bioethics at the National Institutes of Health. Prior to that I was a faculty member at Brown University for over 30 years where I directed the Center for Biomedical Ethics in the Brown Medical School and was a member and former Chair of the Department of Philosophy. My BA was in Economics from Cornell University and my PhD in philosophy from Columbia University in 1970. I have worked, taught, researched, lectured, and published widely in the ethics of medicine and health care for over 30 years (details available on my CV). I am a Past President

1

of the American Association of Bioethics, a former Board member of the American Association of Bioethics and Humanities and of the Hastings Center (the leading independent bioethics research institute) and an elected member of the Institute of Medicine. In 1981-82 I was Staff Philosopher of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, in 1991-92 a Fellow in the Program in Ethics and the Professions at Harvard University, and in 1993 a member of the Ethics Working Group of the Clinton Task Force on National Health Reform.

**Evidence of Depression and Suicide Risk at Initial Approval and Pfizer's Ethical Obligation to Monitor It**

In 1992 the Food and Drug Administration (FDA) approved the application of Parke Davis Pharmaceutical (subsequently acquired by Warner Lambert and then by Pfizer—I will refer to Pfizer throughout for purposes of this report; I have reviewed documents from Parke Davis, Warner Lambert, and Pfizer in the preparation of this report ) for Neurontin for use as an add-on or adjuvant treatment in refractory epilepsy. (NDA #20-235 Clinical Review) The "Summary, Conclusions, and Recommendations" section of the FDA's "Review and Evaluation of Clinical Data" (Clinical Reviewer, Cynthia G. McCormick, M.D.) concluded that the application "is approvable with appropriate and prominent labeling for use in a specific population."(113) However, also in this

2

section the FDA report noted that "Less common but more serious events may limit the drug's widespread usefulness… depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts." (112) The report noted that "In its clinical database of 2048 patients, Gabapentin has a risk profile that is uncertain, with five groups of important adverse events that have not yet been fully characterized, specifically seizure exacerbation, carcinogenicity, clinically important depression, renal failure and teratogenicity. Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy."(112) The FDA report clearly and explicitly put Pfizer on notice about the FDA's concern about depression, suicidal behavior, and suicide as adverse events in the use of Neurontin. This in turn obligated Pfizer to carefully monitor subsequent use of Neurontin for this risk. The initial and primary ethical responsibility for that monitoring falls on the manufacturer and distributor of the drug since only it has initial access to the relevant data. Although adverse events are to be reported to the FDA, the FDA is not in the position to directly monitor the drug's use for this specific concern about depression, suicidal behavior, and suicide.

The FDA made a reasonable decision that because of the seriousness of the condition for which it gave limited approval—refractory epilepsy-- the risk of

3

depression, suicidal behavior, and suicide did not warrant rejection of the company's application. However, physicians, and so in turn patients should have been explicitly informed of this risk so that they, as well as patients' families, could take account of it in the treatment decision for each individual patient, and could monitor the patient for this risk and intervene appropriately when necessary to prevent these adverse events. While it may be reasonable for patients to assume this risk of depression, suicidal behavior, and even of suicide, as well as for physicians to recommend that they do so, in order to treat their serious condition of refractory epilepsy, they should each be informed of the risk so that they can monitor and attempt to prevent its occurrence. Pfizer failed in its ethical obligation to so inform physicians and patients of this risk, or to seriously monitor for its occurrence. Pfizer's material on Neurontin available to physicians and patients mentions only "suicide gestures" in premarketing clinical trials, but makes no reference to completed suicides nor does it advise physicians, patients, or families to monitor for depression or suicidal behavior. Despite the marked increase in completed suicides in most recent adverse event data, Pfizer's materials on Neurontin to this day make no mention of this risk, nor contain any warning to monitor for it. That represents a serious failure of Pfizer's ethical obligation to clearly and explicitly inform physicians and patients of this serious risk of their product.

4

**Pfizer's Illegal and Unethical Promotion of Neurontin for Off Label non-Approved Uses**

It is important that the FDA's approval of Pfizer's NDA in 1992 was only for Neurontin's use as an adjuvenant treatment for the limited population of patients with refractory epilepsy. In this very limited group of patients the benefit/risk ratio was reasonably judged to be sufficiently favorable for approval. However, in the mid 1990s Pfizer developed an explicit corporate strategy of promoting Neurontin for non-approved uses, a practice explicitly forbidden by law. By the end of that decade, the large majority of Neurontin use, perhaps approaching 90%, was for off label, non-approved uses. Pfizer internal documents clearly show that the company recognized shortly after Neurontin's approval by the FDA that its sales potential in the epilepsy market was limited, but that "off label use provides significant growth opportunity." (South Central CBU 1997 Situation Analysis, 5/31/96) These included bipolar disorder, neuropathic pain, diabetic neuropathy, complex regional pain syndrome, attention deficit disorder, restless leg syndrome, trigeminal neuralgia, periodic limb movement disorder of sleep, migraine, and drug and alcohol withdrawal seizures.(Mack 2003) Internal company documents now available through disclosure detail a multifaceted sustained effort to promote Neurontin for some of these non-approved uses. These efforts included meetings and teleconferences for

5

physicians at which such uses were discussed, publicizing these uses at medical congresses, commissioning speakers to promote such uses, preparing articles to be signed by academic physicians regarding such uses, and other activities.(Steinman, et al 2006; Silverman et al 2007) On repeated occasions the internal company documents clearly establish that the company explicitly chose to pursue this strategy rather than doing the clinical trials necessary to seek FDA approval for other indications and then seeking that approval; the latter course was rejected because the company judged it was too close to the patent expiration date to justify their time and cost. The result was that the limited studies that were done for some of these non approved uses were often open label and too small to provide adequate evidence of either efficacy or safety. As the result of an initial whistleblower suit, later joined by the United States Department of Justice, the company agreed to a settlement including fines of over $400 million for these activities.

These illegal and unethical activities are ethically important because they reinforce and increase Pfizer's ethical obligation to warn and monitor for these adverse events. For various reasons, current law permits physicians to prescribe an approved drug for any use beyond the specific approved uses. Whether or not this policy and practice are desirable is controversial, but not at issue here. But current law does not permit the manufacturer to promote a drug for non-approved

uses. And for good reason. Neither individual physicians nor their patients are at all well placed to independently evaluate either the safety or efficacy of a new drug, which can only be established by properly structured and conducted, randomized clinical trials. Consequently, the FDA has been assigned the legal and social responsibility to establish safety and efficacy before a new drug can be marketed; this role of the FDA is an important public good properly assigned to government. The company is only permitted to promote the drug for uses that have been approved on the basis of adequate evidence, again because of the difficulty of physicians or patients making an informed evaluation of its appropriateness for other uses.

By promoting a drug for non-approved uses for which adequate evidence of safety and efficacy has not been provided, the company harms patients in two ways. First, its very intent is to generate use for its own drug for uses for which safety and efficacy have not been established instead in many cases of other alternative drugs for the same indication for which safety and efficacy have been established. One researcher investigated each of the ten non-approved uses cited earlier and found that in the majority of cases Neurontin was not the optimal course of treatment as shown in the peer reviewed medical literature. Moreover, the study concluded "Gabapentin is not recommended in the clinical guidelines or established treatment algorithms (e.g., American Academy of Neurology or

AASM guidelines or TMAP algorithm) for any of the off-label indications. Considering the evidence, Gabapentin should be used almost exclusively for the FDA-approved indications—treatment of seizures and postherpetic neuralgia."(Mack, 2003, p. 565) Simply put then, Pfizer's intent was to lead physicians to recommend treatments that on the basis of available evidence could be expected to be worse for their patients than other available treatments. If a physician deliberately sought to have a patient follow a treatment that he believed to be worse than other available treatments, this would be clearly unethical, as well probably as malpractice. If he did it because his own financial interests were better served by the patient using the worse treatment, this would be a clearly unethical conflict of interest and wrong. Yet this was Pfizer's motivation in promoting its drug for non approved uses.

    If a physician found that he had inadvertently recommended a worse drug to a patient, he would rightly feel a special responsibility to correct his mistake because he was the cause of the patient using a worse drug. Likewise, if a drug company inadvertently provided false or misleading evidence to physicians and patients about its drug, portraying it as better than evidence now shows it to be, it would have a special ethical responsibility to correct the mistake and prevent further harm to the patient. It is a widely accepted ethical principle that we each have a special responsibility to correct or compensate for harms that we wrongly

cause that we do not have for harms caused by others or by "nature." In this case, however, the harm of leading the physician and patient to use a treatment that based on available evidence could be expected to be worse for the patient than other approved treatments for their condition was hardly inadvertent. That was precisely the company's intent in order to increase the market for, and its profits from, Neurontin. Rather than an inadvertent mistake, it was a deliberate harm and wrong. That clearly strengthens the company's obligation to prevent further harms from its wrongful actions, and to right the wrong. There may be disagreement about what steps should be required for it to do so, but at a minimum taking extra care to monitor for and try to prevent serious potential harms of which it was, or should have been, aware, such as depression, suicidal behavior, and suicide, should have been done. So in summary, in marketing Neurontin for unapproved uses, the company deliberately kept patients from using other drugs whose benefits for their condition had been better established and/or whose safety had been better established. Pfizer deliberately exposed patients to the risk of serious harms about which neither they nor their physicians had been adequately warned. That in my view is to harm and wrong all patients so affected, but of course especially those for whom risks about which they were not, but should have been, warned, in fact came to pass. Pfizer's failure ever to

9

attempt to correct for these effects of its illegal and unethical promotion is especially ethically egregious.

**The Role of the FDA**

It is my view as well that the FDA failed in its responsibility to adequately protect the public in this matter. Given that its own reviewer of Pfizer's NDA for Neurontin concluded in her report that depression "may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts," and so this may "limit the drug's widespread usefulness," the FDA should have required that this concern at the least be transmitted to physicians and patients making a decision whether to use the drug, and then using the drug.(NDA #20-235 Clinical Review) That would have put the company, as well as both physicians and patients, on notice carefully to monitor for signs of depression and suicide behavior. As it was, not having been so put on notice, neither physicians nor families of patients who attempted or completed suicide while using Neurontin would have had any reason to believe that this could have been caused by Neurontin; as a result, reported figures almost certainly seriously understate suicide attempts and completed suicides of patients using Neurontin.(Blume 2007) As I understand it, as of this date the FDA has still not taken action on the citizen's petition filed by the law firm of Finkelstein and Partners in May 2004 requesting a "black box" warning on the medication, as

well as a "Dear Doctor" letter, about this risk. While the FDA maintains that it is investigating the issues raised in the petition, its investigation seems unduly protracted and non public for a matter of this seriousness, particularly in light of the recent marked increase of completed suicides of patients taking Neurontin. While the mode of action of Neurontin in increasing the risk of depression and suicide was not known in 1992 when the drug was approved, it now appears to be well understood by scientists. The drug apparently has a GABAergic effect on neurotransmitters that suppresses serotonin and neuropinephrine transmission, and low levels of these neurotransmitters is an established risk factor for depression and suicide. These scientific matters are discussed in some detail in the report of Dr. Stefan P. Kruszewski, as well as in the scientific literature.(Kruszewski 2007) A small subset of patients is apparently vulnerable to this risk, but Dr. Kruszewski notes in his report that "it is not predictable as to which consumer will be adversely affected" by mood and behavioral disturbances, and that of course makes the need for careful monitoring for them in all patients all the more important. (In Pfizer's initial NDA approved in 1992, it noted that of the 78 patients in clinical trials who reported depression, 19 had no prior history of depression.( NDA #20-235 Clinical Review, p 109))) Dr. Kruszewski concludes that "Gabapentin's adverse effects upon mood and mood related behaviors have the capacity to cause, inter alia, dysphoria, sadness,

depression, abnormal thinking, depersonalization, irritability, agitation, aggression, suicidal behavior and completed suicides."(Kruszewski 2007, p 18) Given the much greater understanding that we now have than was available in 1992, the FDA's failure to act in this matter to protect patients is increasingly hard to understand or to justify.

It is important to be clear that the FDA's continued apparent failure to take appropriate action to protect the public in this matter does not in any way absolve Pfizer of its ethical responsibility to do so, nor justify Pfizer's failure to do so. Analogously, if police fail appropriately to protect an innocent victim from an act of violence, this in no way justifies or excuses the perpetrator of the wrongful act of violence; that the police also become partly responsible for the harm caused the victim does not at all reduce the responsibility of the perpetrator. It is FDA's responsibility to ensure that Pfizer appropriately monitored for this serious risk, but Pfizer's ethical responsibility to do so does not depend on the FDA having required it to do so.

**Conclusion**

It is my considered conclusion that Pfizer was duly put on notice by the FDA in its approval of Pfizer's NDA in 1992 of the FDA's serious concern about adverse effects of depression, suicidal behavior, and suicide from use of Neurontin. This placed Pfizer under an ethical obligation to carefully monitor for

these serious adverse events, and to clearly and explicitly inform physicians and patients of the risk of them. The evidence shows that Pfizer failed to fulfill these obligations.

There is also extensive and conclusive evidence that Pfizer engaged in the illegal and unethical promotion of Neurontin for non-approved uses. This typically and deliberately diverted patients from alternative treatments whose safety and efficacy had been established, and thereby led to their use of non optimal treatments with fewer expected benefits for their condition. Pfizer's illegal and unethical promotion of Neurontin for non-approved uses also needlessly exposed patients to unknown risks of the use of Neurontin in patients for whom its safety had not been established, without warning them or their physicians of the risks of depression, suicidal behavior, and completed suicides from that use. Its failure to ever attempt to correct for the effects of these illegal and unethical actions is especially ethically egregious.

Finally, the FDA appears also to have failed in its ethical responsibility to adequately protect patients from the serious risks of Neurontin, but this failure in no way excuses or justifies Pfizer's failures to meet its own ethical obligations.

*[signature]*

## References

Blume, Cheryl D, PhD, "Neurontin Expert Clinical Report," 2007

Kruszewski, Stefan P. M.D., "Gabapentin: Mechanism of Mood-altering Action." 2007.

Mack, Alicia, PharmD, "Examination of the Evidence for Off-Label Use of Gabapentin," Journal of Managed Care Pharmacy 9,6 (November/December 2003) 559-568.

NDA #20-235 Clinical Review, Food and Drug Administration, 1992.

Silverman, Michael A., Bero, Lisa A., Chen, Mary-Margaret, and Landenfeld, Seth, "Narrative Review: The Promotion of Gabapentin: An Analysis of Internal Industry Documents," Annals of Internal Medicine 145,4 (15 August 2006) 284-293.

Silverman, Michael A, Harper, G Michael, Chen, Mary-Margaret, Landenfeld, C Seth, and Bero, Lisa A, "Characteristics and Impact of Drug Detailing for Gabbapentin," PLoS Medicine 4(4): doI:10.1371/journal.pmed. 0040134. 2007

South Central CBU 1997 Situation Analysis, 5/31/96