EXHIBIT 89

EXPERT REPORT OF SANDER GREENLAND, M.A., M.S., Dr.P.H.

Regarding the Epidemiology of Neurontin® (gabapentin) and Suicidal Behavior

October 19, 2007


## 1. Task and Summary

I have been asked by Andrew Finkelstein of Finkelstein and Partners LLP to review and comment on the epidemiologic evidence linking gabapentin (Neurontin®) to suicide. The epidemiologic evidence regarding the relation of gabapentin to suicidal behavior appears to be very limited, with only one report appearing as a primary study in a peer-reviewed journal.

The unpublished material I have reviewed comprises reports and communications from Pfizer to the FDA, including the following submissions:

1) "Response to FDA Regarding Suicide and Suicide Attempt in Neurontin® (gabapentin) Clinical Trials and Postmarketing Survelliance," dated 09 September 2004; signatory: Bruce Parsons, M.D., Ph.D. and hereafter referred to as the first Parsons report, which covers phase 2-4 trials.

2) "Response to FDA Regarding Suicide and Suicide Attempt in Neurontin® (gabapentin) Clinical Trials – Phase I Studies," dated 16 November 2004; signatory: Bruce Parsons, M.D., Ph.D. and hereafter referred to as the second Parsons report, which supplements the clinical-trials section of the first report with phase-I trials.

3) "Gabapentin and Suicide," dated 17 October 2005; signatory: Jeffrey D. Mohan, Pharm. D. and hereafter referred to as the Mohan report.

4) Letter to Russell G. Katz of the FDA from Mary Ann Colonel Evertsz, R. Ph., dated 22nd June 2006, and its enclosures.

The unpublished materials provide no evidence regarding the presence or absence of a relation of gabapentin to suicide. This is because the Parsons reports and the subsequent data in the Evertsz letter had no completed suicide and only one suicide attempt among controlled comparisons, while the data in the Mohan report could not and hence did not provide a valid suicide-rate calculation for gabapentin users, or a controlled comparison of users and nonusers.

The published report is the study by J.C. Collins and B.H. McFarland, "Divalproex, lithium and suicide among Medicaid patients with bipolar disorder" (*Journal of Affective Disorders*, in press 2007), hereafter referred to as Collins and McFarland (2007). This study is supportive of the hypothesis of an elevated suicide risk associated with gabapentin use compared to lithium use among patients with bipolar disorder, although its broader applicability is unclear. Therefore the overall epidemiologic evidence known to me at this time is inconclusive, especially with regard to nonpsychiatric patients, and must be supplemented by other scientific evidence to draw any inference about the relation of gabapentin to suicide. The limited status of the epidemiologic evidence is explained by the difficulty and expense of conducting a study of an outcome as rare as suicide.

Section 2 of the present report provides my qualifications to render these conclusions, while sections 3 and 4 provide the facts as I know them and the reasoning I used to form my conclusions. Overall conclusions are given in section 5. All conclusions are subject to change upon receipt of further evidence or information regarding this topic.

## 2. Qualifications

My qualifications for this evaluation are extensive, as follows:

a) I have written and published numerous peer-reviewed articles on the summarization, interpretation, and limitations of scientific literature (see my curriculum vitae).

b) The textbook I have co-authored with Kenneth J. Rothman, *Modern Epidemiology* (2nd ed. 1998; Lippincott, Philadelphia), has been selected as the advanced epidemiologic text in numerous schools of public health and medicine.  *Modern Epidemiology* also has been authoritatively cited in innumerable peer-reviewed journal articles and reviews including the Federal Judiciary Center's *Reference Manual on Scientific Evidence*.

c) I have been teaching epidemiology and statistics at the UCLA School of Public Health since 1979.  I currently am Professor of Epidemiology, UCLA School of Public Health, and Professor of Statistics, UCLA College of Letters and Science.

d) I also have been invited to give and have given over 180 presentations and workshops at such institutions as Oxford University, Stanford University School of Medicine, Harvard School of Public Health, Yale University School of Public Health, Johns Hopkins School of Public Health, Columbia University School of Public Health, Case Western School of Medicine, Emory School of Public Health, Tulane School of Public Health, the National Cancer Institute, the Food and Drug Administration, the  Centers for Disease Control, the Royal Statistical Society, and the Universities of Washington, Texas, North Carolina, Minnesota, Michigan, and California, as well as universities, research institutes, and conferences in England, Scotland, Germany, Denmark, Sweden,

Finland, Norway, The Netherlands, France, Switzerland, Spain, Italy, Japan, Australia, and New Zealand.

e) I received a Doctorate in Public Health (Dr.P.H. 1978) from the University of California, Los Angeles, where I majored in Epidemiology, minored in Mathematics, and received a Regents Fellowship in Epidemiology.  I also received a Master's degree in Mathematics from the University of California, Berkeley (1973), where I received highest honors and a Regents Fellowship in Mathematics.

f) I have received honors and professional certifications as a Fellow of the American Statistical Association and as a Fellow and a Chartered Statistician of the Royal Statistical Society.  I am a member of the Biometric Society and the Society for Epidemiologic Research, I have served as an elected member of the Executive Committee for the latter society, which is the largest society of epidemiologists in the world today, and as Chair of the Epidemiology Section of the American Statistical Association, which is the largest statistical society in the world today.

g) I have served as a consultant in epidemiology and statistics for numerous government agencies and private corporations, including the National Academy of Sciences, the National Institute of Environmental Health Sciences (NIEHS), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the Centers for Disease Control (CDC), the California State Attorney General's Office (regarding risk assessment), the California State Department of Health, the World Health Organization (WHO), The March of Dimes, General Electric, Southern California Edison, Boehringer-Ingelheim, Amgen, and Dow Corning.

h) I am the author of some 300 peer-reviewed articles, over 60 published letters, over 130 published abstracts, and over 30 other publications (including book chapters and encyclopedia entries).

i) I have served as an investigator on over 30 grants and contracts from numerous research agencies, including the Rockefeller Foundation, National Cancer Institute, National Institute of Child Health and Human Development, National Institute of Mental Health, National Institute of Environmental Health Science, National Institute of Allergy and Infectious Diseases, National Institute on Drug Abuse, National Center for Health Services Research, National Highway and Traffic Safety Administration, Public Health Institute, Electric Power Research Institute, and the State of California. I have also carried out research for private industry including the Battelle Corporation, Southern California Edison, Dow Corning Corporation, and General Electric Corporation.

j) I have served three terms as an Associate Editor of the *American Journal of Epidemiology* (1984-98) and the journal *Epidemiology* (1989-2006), and now serve as an Associate Editor of *Statistics in Medicine* (1985-present) and the *European Journal of Epidemiology* (2003-present). I also serve as a regular referee for American Journal of Epidemiology, Epidemiology, International Journal of Epidemiology, and Statistics in Medicine, have served as a referee for the American Journal of Public Health, the American Statistician, Annals of Epidemiology, Biometrics, Biometrika, Communications in Statistics, Computational Statistics and Data Analysis, Controlled Clinical Trials, International Statistical Review, Journal of the American Medical Association, Journal of the American Statistical Association, Journal of Clinical Epidemiology, The New England Journal of Medicine, and the Scandinavian Journal of

Work, Environment, and Health, and have served as a textbook reviewer for Oxford University Press, John Wiley & Sons, and other academic publishing houses.

## 2. Evaluation of the Unpublished Pfizer Materials

*Clinical Trials, Parsons Reports*

The clinical-trial portion of the first Parsons report was an unpublished review and pooling of 92 phase 2-4 studies conducted to asses effects of gabapentin. These studies were individually too small to detect any effect on suicide risk. The studies involved a total of about 9,000 gabapentin-treated patients and 4,500 patient-years of exposure to gabapentin, for an average of 9,000/4,500 = ½ year or 6 months exposure per exposed patient (figures from Executive Summary, p.2 of first Parsons report).

The second Parsons report supplements the first with data from phase-I studies, which are more selective, smaller, and much shorter than phase-II studies. The studies involved a total of about 900 gabapentin-treated patients but only 16.71 patient-years of exposure to gabapentin, for an average of 16.71/900 = 0.0186 years or less than 1 week exposure per exposed patient (figures from Conclusions, p. 15 of second Parsons report). *Completed suicides*. The Parsons reports are not informative for completed suicides because only two such events were reported among all the studies included. Both completed suicides were among the gabapentin-treated patients, but one of the suicides among the gabapentin-treated patients was 6 months after treatment discontinuance, and none were in the placebo-controlled studies.

To understand the noninformative nature of the report with respect to completed suicides in trials, consider first the small number of completed suicides expected in the totality of observations. According to the first Parsons report (Table 1, p.10), the

estimated one-year incidence rate of completed suicide in nonpsychiatric patient populations ranges from 0.02% to about 0.07%, or about 2 to 7 per 10,000 annually. The rate in psychiatric populations appears much higher, about 0.20-0.40%, or 20 to 40 per 10,000 annually. These figures are from populations that would include gabapentin users. Given that most of the patients in the first Parsons report were nonpsychiatric and there were only 4,500 patient-years of gabapentin exposure in the first report, we should expect only about 0.02%-0.07% times 4,500 = 1-3 completed suicides in the report. This expectation is borne out in that only one completed suicide was reported during exposure and just one more in the months following exposure. These expected and observed numbers of completed suicides are far too small to draw any statistically reliable conclusion.

Consider next the difference between the gabapentin and non-gabapentin experiences. Because there were no completed suicides in the placebo-controlled trials, the data are statistically compatible with any and every hypotheses about the gabapentin effect. In particular, the results are compatible with the null hypothesis of no gabapentin effect and the hypothesis that gabapentin triples risk of completed suicide. Thus, while it is correct to say that this portion of the report "did not indicate an increased risk of suicide with gabapentin treatment" (Executive Summary, p.2 of first Parsons report), it is just as correct to say that it also does not indicate there is no greatly increased risk of suicide with gabapentin treatment. A neutral summary would say that the data presented in both reports provide no statistical basis evaluating any hypothesis about gabapentin effects on completed suicide.

*Suicide attempt*. According the first Parsons report, there were 12 reported cases of

suicide attempt in gabapentin-treated subjects (Executive Summary, p.2 of report), which

translates to an annual rate of 12/4,500 = 0.27% or 27 per 10,000 patients per year.

Unlike the situation for completed suicide, however, there are no general-population

registry data for suicide attempts with which to compare the reported incidence of suicide

attempts. The ratio of suicide attempts to completed suicides among the gabapentin-

treated is however 12/2 = 6 or 12/1 = 12, statistically compatible with the 8-to-1 ratio

reported in Collins and McFarland (2007).

There was only 1 suicide attempt reported among those receiving gabapentin in

the placebo-controlled trials, and none among those receiving placebos. Thus, as with

completed suicides, the attempted-suicide data are compatible with any and every

plausible hypotheses about the gabapentin effect, including the null hypothesis of no

gabapentin effect and the hypotheses that gabapentin tripled risk of completed suicide.

Again, while it is correct to say that this portion of the first Parsons report "did not

indicate an increased risk of suicide with gabapentin treatment" (Executive Summary, p.2

of report), it is just as correct to say that it also does not rule out a greatly increased risk

of suicide attempts with gabapentin treatment. A neutral summary would say that the data

presented in both reports provide no statistical basis evaluating any reasonable hypothesis

about gabapentin effects on suicide attempts.


*Post-Marketing Surveillance, First Parsons Report*

According to the Executive Summary, the post-marketing surveillance portion of

the first Parsons report was an unpublished review of nearly 18,000 non-clinical study

adverse-event case reports to first Parsons's post-marketing surveillance database. The value of such case reports is very limited, not only because the observations are uncontrolled (lack a comparison group) but also because reporting rates (the proportion of cases that get reported to a database) are unknown, and because suicide and suicide attempts may be further under-identified due to insufficient information in death reports. Thus, such case-report databases at best can provide a sentinel alert for adverse events associated with a drug, but such surveillance has high risks of both false-positive findings (signaling an excess risk when none exists) and false-negative findings (signaling no excess risk when an excess exists).

Comparison of reporting rates to population rates is compromised by several broad sources of uncertainty. For example, there is considerable uncertainty about how many patient-years of exposure to the drug have occurred over a reporting period. Estimates of exposure based on sales or counting prescriptions overestimates exposure because many prescriptions may not be used or may be used incompletely. Because this estimate of exposure is divided into the number of case reports, overestimation of exposure results in underestimation of rates. Rates are further underestimated by incomplete reporting of cases.

A final and often large step in underestimation of effects occurs when cases are eliminated by the analyst based on judgments of "lack of causal relation" or other criteria. Such eliminative criteria are highly subjective, so much so that they are not applied to either general population rates or the rates computed from controlled studies. In fact, such elimination is a violation of standard protocols in randomized clinical trials, which proscribe exclusions following randomization (Greenland et al., 2008).

Another reason for not eliminating cases based on other factors in the case reports is that most if not all adverse events are caused by several factors. Thus, the presence of other causal factors in a case report does not in any way exonerate the exposure in question (here, gabapentin) from having played a causal role in the case. As an analogy in criminal conduct, finding that a murderer had a traumatic childhood does not eliminate the murder weapon as a cause of death. It is also possible if not likely that other factors may abet a causal role for the exposure. This fact may be clear if one considers the possibility (offered here as an illustrative hypothetical only) that gabapentin use might lead to suicide attempts only in the presence of certain factors such as underlying depression or suicidal ideation. Thus, judging cases as unrelated to gabapentin based on presence of risk factors for suicide is not a logically sound or accepted scientific basis for considering the case to be unrelated to gabapentin use. Elimination of cases in this fashion leads to underestimation of suicide rates in post-marketing surveillance and uncontrolled comparisons, which greatly increases the likelihood of false-negative results (failure to find a genuine excess).

The first Parsons report also relies on an uncontrolled suicide-percentage construction, taking the number of reported suicides and dividing by the total number of adverse-event reports. For example, on p. 56 of the first Parsons report, the 35 completed suicides reported is divided by the 17,768 case reports to obtain a figure of 0.2%. This percentage has no meaning without reference to what percentage of suicides one should expect among the case reports if gabapentin had no effect on suicide risk. No such expectation is provided, and it is doubtful that a convincing or credible calculation of such an expected percentage could be made from available data. The same criticism

applies to the uncontrolled attempted-suicide percentage: 73 reported attempts out of 17,768 case reports, for a percentage of 0.4%. Again, with no reference to what percentage we should expect if there is no effect of gabapentin, the percentage has no meaning.

There is a legitimate use of the numbers of suicides and suicide attempts to assess the validity of the data, by taking the ratio of attempted to completed suicides. In the postmarketing data of the first Parsons report this ratio is $73/35 = 2.1$, which is considerably less than the ratio of $12/2 = 6.0$ reported for the clinical-trial data or the ratio of $79/11 = 7.2$ reported by Collins and McFarland (2007). The latter ratio is likely an underestimate of the true ratio because Collins and McFarland could count only those suicide attempts that resulted in an emergency-room visit. Nonetheless, the two-sided Fisher-exact P-value (Rothman and Greenland, 1998) comparing the post-marketing data to the ratio in Collins and McFarland is 0.001, ruling out chance alone as an explanation for the difference. The unusually low ratio of attempted to completed suicides in the post-marketing data of the first Parsons report suggest problems with those data, for example, more under-reporting of attempted suicides than completed suicides.

Apparently in consequence of the uncontrolled percentage calculation, the first Parsons report claimed that "a review of the available postmarketing data on gabapentin cases reporting suicide or suicide attempt does not support a causal association between gabapentin and suicide or suicide attempt" (p. 56, final paragraph of the first Parsons report). As with the clinical-trial conclusions, this claim is true only by virtue of lack of support for any conclusion. It is equally true that the available postmarketing data on gabapentin cases reporting suicide or suicide attempt does not support absence of a causal

association between gabapentin and suicide or suicide attempt. Again, a neutral summary would say that the data presented provide no statistical basis for evaluating any reasonable hypothesis about gabapentin effects on completed suicide or suicide attempts.

*Mohan Report*

According to the Abstract (page 1), the Mohan report assessed two case series assembled from Pfizer post-marketing safety data: (1) clinical and solicited case reports of deaths, and (2) non-clinical case reports of death. These data sets are limited in the same manner as the post-marketing data in the first Parsons report. For example, the observations in the Mohan report are uncontrolled (lack a comparison group) and the reporting rates (the proportion of cases that get reported to the data source) are unknown. Completed suicide and (especially) suicide attempts may be under-identified due to non-reporting or insufficient information in death reports. These problems bring high risks of both false-positive findings (signaling an excess risk when none exists) and false-negative findings (signaling no excess risk when an excess exists). Some of the key limitations are listed and described in the Methodology section on page 3 of the Mohan report.

The methodology of the Mohan report involved review of narrative death reports to verify or identify suicides and suicide attempts, and then inference of noncausation based on factors listed in the records. As evidence of severe under-identification of suicide attempts, the ratio of attempted to completed suicides is only 7/3 = 2.3 in the clinical series, and only 192/111 = 1.7 in the non-clinical series. These ratios are far below the ratio of 12/2 = 6.0 reported for the clinical-trial data in the first Parsons report

or the ratio of 79/11 = 7.2 reported by Collins and McFarland (2007). The two-sided

Fisher-exact P-value (Rothman and Greenland, 1998) comparing the ratio from the non-

clinical data to the ratio in Collins and McFarland is less than 0.001, ruling out chance

alone as an explanation for the difference.

Much of the narrative in the Mohan report is based on eliminating cases from the

series based on judgments of "lack of causal relation." As mentioned earlier, such

eliminative would constitute a violation of standard protocols in randomized clinical

trials. These protocols recognize that eliminative criteria are highly subjective and

potentially controversial, and that their application may eliminate many cases that are in

fact caused by the drug in question because most if not all adverse events are caused by

several factors. Thus, the presence of other causal factors in a case does not in any way

exonerate gabapentin from playing a causal role, and may even abet that role, for

example if gabapentin use leads to suicide attempts only in the presence of certain factors

such as underlying depression or suicidal ideation. Consequently, identification of other

causes contributing to suicidal behavior does eliminate gabapentin as a potential

contributory cause.

Even if no elimination of cases had been made, the Mohan report would provide

no evidence regarding gabapentin and suicide due to the lack of a control group of reports

from untreated cases with which to compare the data from treated cases. Despite this

problem, the Mohan report concludes (at the end of page 15) that "A review of the

available postmarketing data on gabapentin cases reporting suicide or suicide attempt

does not suggest a causal association between gabapentin and suicide or suicide attempt."

As with the conclusions in the Parsons reports, this claim is true only by virtue of lack of

support for any conclusion. It is equally true that the available postmarketing data on the

gabapentin case reports does not support absence of a causal association between

gabapentin and suicide or suicide attempt. Again, a neutral summary would say that the

data presented provide no statistical basis for evaluating any reasonable hypothesis about

gabapentin effects on completed suicide or on suicide attempts.


*Evertsz Letter*

The Evertsz letter provides a summary of data from blinded controlled clinical

trials of gababpentin involving in total 5,194 gabapentin-treated patients and 3,635

controls (including 2,682 inert-placebo controls); see table at top of page 4 of letter. No

completed suicides or attempted suicides were reported in any group, rendering the data

uninformative for comparing suicide risk in the gabapentin-treated to the suicide risk in

the controls. The table also reports two cases of suicidal ideation among the gabapentin

treated as opposed to one case among the controls, numbers too small to support any

statistically reliable comparison.

The letter follows the table with the comment "Pfizer believes that the currently

submitted data provides further support for the conclusion that Neurontin neither causes

nor is associated with an increased risk of suicidal behavior and thinking, including

completed suicide, suicide attempt, suicide gesture, and suicide ideation." This comment

fails to recognize the paucity of information in the data regarding suicide outcomes. The

lack of completed and attempted suicides implies that the data presented provide no

statistical support for any reasonable hypothesis, including the hypothesis that gabapentin

does not cause suicide or suicide attempt (the null hypothesis), and the hypothesis that

gabapentin does cause suicide or suicide attempt (the causal hypothesis).


*Conclusions*

The Conclusions (section 16, p. 57) of the first Parsons report only repeats the one-sided

interpretation of the results mentioned above. It states the results "did not indicate and

increased risk for suicide with gabapentin treatment," but fails to note that the results also

do not indicate that there is no increased risk. The same problem afflicts the conclusions

of the Mohan report and the Evertsz letter. A neutral evaluation of the results would

acknowledge that the data presented in the unpublished Pfizer reports and

communications (including the Parsons reports, the Mohan report, and the Evertsz letter)

provide too little information regarding the relation of gabapentin to suicide risk to draw

any statistical or epidemiological conclusion based on those data.

The same problems and consequent inability to derive sound and reliable

conclusions would apply to any other data that have few suicides, or that lack a control

group, or that come from postmarketing surveillance systems.


**4. Evaluation of J.C. Collins  and B.H. McFarland, "Divalproex, lithium and suicide**

**among Medicaid patients with bipolar disorder," *Journal of Affective Disorders*,**

**2007.**

Collins and McFarland (2007) used the Oregon State Medicaid and mental health

databases to construct comparisons of suicide rates among patients prescribed one of 3

drugs (divalproex, gabapentin, and carbamazepine) to the rates among patients prescribed

lithium. To compare "pure" groups, patients prescribed combinations of these drugs were excluded.

*Study Results*

The Collins-McFarland study recorded a total of 2,002 patient-years of exposure to gabapentin and 2,558 patient-years exposure to lithium. Specific outcomes were completed suicides (including fatal poisonings), of which there were 7 in the gabapentin-treated group and 2 in the lithium-treated group; and attempted suicides resulting in emergency-room visits (including those for non-fatal poisonings), of which there were 19 in the gabapentin-treated group and 15 in the lithium-treated group.

The adjusted ratio for the rate of completed suicide in the gabapentin group versus the rate in the lithium group was 2.6. The P-value for this result is less than 0.001, with 95% confidence limits of 1.8 and 4.0, indicating that chance alone could not have produced a ratio this large in this study, and that the true ratio might be as high as 4 (a quadrupling of the completed-suicide rate in the gabapentin group compared to the lithium group).

The adjusted ratio for the rate of attempted suicide in the gabapentin group versus the rate in the lithium group was 1.6. The P-value for this result is 0.20, with 95% confidence limits of 0.8 and 3.3, indicating that chance alone could have easily produced a ratio this large, but also that the true ratio might exceed 3 (a tripling of the rate in the gabapentin group compared to the lithium group).

*Interpretation and Limitation of the Results*

The Collins-McFarland study supports the hypothesis that gabapentin is associated with increased suicide risk relative to lithium use among bipolar patients. Nonetheless, as acknowledged by the Collins and McFarland, among the limitations of the study is that it was not a randomized comparison, and thus there would be some confounding (mixing) of the effects of the drugs with effects of the indications for their prescription. This problem is partially mitigated by record-based adjustments made for several factors leading to prescription choices (age, gender, year of diagnosis, co-occurring medical and psychiatric conditions, and concomitant use of other psychotropic medication), but such adjustment may not have addressed all confounding problems. Thus the confidence limits cannot be regarded as capturing all the uncertainty about these problems (Greenland, 2005).

Another limitation (mentioned earlier) is that attempted suicide could only be detected through emergency-room visits. This limitation would result in an undercount of attempted suicides. Nonetheless, if the undercounting rate was the same in all groups it would not affect the estimated ratios of rates between groups. Furthermore, the ratio of attempted to completed suicides in the study was 79/11 or about 8 to 1, in line with those seen in earlier studies (including the pooling of clinical trials in the first Parsons report), which suggests the undercount was not severe.

Another limitation is that the degree of adherence (compliance) to the prescribed medication was not recorded. Analyses of the type in Collins and McFarland, based on prescription rather than actual usage, are known as "intent-to-treat" analyses. They are used as a reference analysis in the clinical-trial literature because they preserve significance levels for testing the null hypothesis (Senn, 1997). Nonetheless, ordinarily

they would be expected to lead to underestimation of the effects under study (Greenland et al., 2008). In the analysis of completed suicides, however, the underestimation resulting from nonadherence may have been counterbalanced by a technical problem in the statistical adjustment technique used in Collins and McFarland (Cox proportional-hazards regression). Specifically, their use of more adjustment covariates than completed suicides in the lithium group may have led to overestimation of the ratio comparing the rates of completed suicides in the gabapentin and lithium groups (Greenland et al., 2000). Neither nonadherence nor the technical problem would distort the P-value (statistical significance) of the result, however.

A limitation of the Collins and McFarland study with regard to the present question of gabapentin effects on suicide risk is that the study analysis focused on comparisons to lithium users. Lithium therapy is regarded by at least some researchers as an established preventive for suicidal behavior among bipolar patients (e.g., see Yerevanian et al., 2007). Therefore, any estimates from the analysis in Collins and McFarland may reflect preventive effects of lithium, at least in part. In other words, the study estimates mix preventive effects of lithium with causative effects of gabapentin. In clinical trials this mixing problem is avoided by use of placebo control groups, which was not available here.

Because the relation of the other drugs in the study to suicide risk is unknown, direct statistical comparisons of gabapentin to drugs other than lithium would not address the problem satisfactorily. The only other drug with frequent use in the study, divalproex, is itself hypothesized to increase suicide risk. Thus, a comparison to the divalproex group could mask increased risk from gabapentin use.

## 5. Conclusions

The unpublished Pfizer material (including the Parsons and Mohan reports and the Evertsz letter) provide essentially no evidence on regarding a possible effect of gabapentin on suicide risk. The published Collins-McFarland study is supportive of the hypothesis of an elevated suicide risk for gabapentin compared to lithium among patients with bipolar disorder, but must be considered in light of its limitations. Because the Collins-McFarland study focused on patients with bipolar disorder (who have higher suicide rates than most other patients prescribed gabapentin), the generalizability of the study estimates to other patients cannot be assessed from the study itself. Finally, the Collins-McFarland study examined only associations in relation to lithium, and thus could not separate causative effects of gabapentin from preventive effects of lithium. Their study is thus most supportive of the hypothesis that lithium is preferable to gabapentin for avoiding completed suicide among bipolar patients, which is a more narrowly focused hypothesis than the hypothesis that gabapentin use elevates suicide risk in general patient populations.

The absence of extensive epidemiologic evidence regarding the relation of gabapentin to suicide risk may be explained in large part to the nature of the outcomes being studied. Completed suicide is a rare event. For example, among patient populations for which gabapentin was prescribed, the first Parsons report counted only 1 suicide during the 4,500 patient-years of follow-up. Assuming a rate of only 1 per 4,500 patient-years among the exposed, I estimate that even a randomized placebo-controlled trial would need well over 400,000 patient-years total follow-up to have an 80% chance of

detecting a doubling of the rate due to gabapentin, using a 0.05 alpha-level statistical test; section 6 (Appendix) gives my calculations. Under the same assumptions, if attempted suicides occur at 8 times the rate of completed suicides, the number of patient-years required to detect a doubling of the attempted-suicide rate would be well over 50,000, and the study would face the additional difficulty of having to detect suicide attempts.

Studies of such enormous size would be infeasible under ordinary circumstances, and the size required explains why the current evidence from controlled clinical trials and epidemiologic studies is so limited.

## 6. Appendix

The Wald (approximate normal) test of the equality of two rates in groups with equal patient time can be reduced to a Wald test of that the probability of exposure among cases equals ½, or equivalently that the logit of that probability equals 0 (Rothman and Greenland, 1998, Ch. 14). For a doubling of the rate, the alternative is that probability of exposure among cases is 2/3, or equivalently that the logit of that probability equals ln(2), the natural logarithm of 2. From standard statistical tables (e.g., Dixon and Massey, 1969, p.515), we find that to obtain 80% power, the standardized difference between the alternative and the null must equal 2.802. Writing M for the number of cases required, the standardized logit difference is $\ln(2)/(4.5/M)^{\frac{1}{2}}$; setting this expression and solving yields 73.5. For a doubling of the rate, this result implies that the study will need roughly 49 cases expected among the exposed and 24.5 among the unexposed. With 1 case per 4,500 patient-years among the exposed, 49 cases will require about 220,000 exposed patient-years; the additional 220,000 unexposed patient years

brings the total required to about 440,000 patient-years. If attempted suicides occur at 8 times the rate of completed suicides and all attempts are detected, the total patient-years required to detect a doubling of the rate of attempted suicides would be 440,000/8 = 55,000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of October, 2007, at Topanga, California.

Sander Greenland, M.A., M.S., Dr.P.H., C.Stat.

## 7. References

Collins, J.C. and McFarland, B.H. (2007). Divalproex, lithium and suicide among Medicaid patients with bipolar disorder. *Journal of Affective Disorders*, in press.

Dixon, W.J. and Massey, F.J. (1969). *Introduction to Statistical Analysis*. New York: McGraw-Hill.

Greenland, S., Schwartzbaum, J.A. and Finkle, W.D. (2000). Problems from small samples and sparse data in conditional logistic regression analysis. *American Journal of Epidemiology*, **151**, 531-539.

Greenland, S. (2005). Multiple-bias modeling for analysis of observational data (with discussion). *Journal of the Royal Statistical Society*, Series A, **168**, 267-308.

Greenland, S., Lanes, S.F., and Jara, M. (2008). Estimating efficacy from randomized

trials with discontinuations: The need for intent-to-treat design and g-estimation.

*Clinical Trials*, in press.

Rothman, K. J., and Greenland, S. (1998). *Modern Epidemiology*, 2nd ed. Philadelphia:

Lippincott-Raven.

Senn, S.J. (1997). *Statistical Issues in Drug Development*. New York: Wiley.

Yerevanian, B.I., Ralph J. Koek, R.J., and Mintz, J. (2007). Bipolar pharmacotherapy and

suicidal behavior. Part I: Lithium, divalproex and carbamazepine. *Journal of

Affective Disorders*, **103**, 5-11.