adverse events and product problems by health professionals and consumers to the FDA, either directly or via the manufacturer. Neither individual health professionals nor hospitals are required by federal law or regulation to submit AE reports on pharmaceuticals, although federal law does require hospitals and other "user facilities" to report deaths and serious injuries that occur with medical devices.[15]

Some organizations do, however, help facilitate reporting of AEs to the FDA. Adverse event monitoring by hospitals is linked to Joint Commission on the Accreditation of Healthcare Organizations (JCAHO) standards. In order to be accredited, JCAHO requires each hospital to monitor for adverse events involving pharmaceuticals and devices, with medication monitoring to be a continual collaborative function. JCAHO standards indicate that medical product AE reporting should be done per applicable law/regulation, including those of state/federal bodies.[16] The American Society of Health-System Pharmacists has also issued guidelines on ADR monitoring and reporting.[17]

Given the vital importance of postmarketing surveillance, MedWatch, the FDA Medical Products Reporting Program, was established in 1993.[18] While FDA's long-standing postmarketing surveillance program predates MedWatch, this educational/promotional initiative was designed to emphasize the responsibility of healthcare providers to identify and report adverse events and problems related to the use of medical products.[19]

The program has four general goals, with the first to increase awareness of drug, device, and other medical product induced disease and the importance of reporting. Health professionals are taught that no drug or other medical product is without risk and are encouraged to consider medical products as possible causes when assessing a clinical problem in a patient. This goal is accomplished through educational outreach, which includes professional presentations, publications, and an active continuing education program that provides free continuing education credit. The continuing education articles are accessible via the MedWatch homepage (http://www.fda.gov/medwatch).

The second goal of MedWatch is to clarify what should (and should not) be reported. Health professionals are asked to limit reporting to serious AEs. This is important both in improving the quality of individual reports and enabling the FDA and the manufacturer to focus on the most potentially significant events. Causality is not a prerequisite for reporting; suspicion that a medical product may be related to a serious event is sufficient reason for a health professional to notify the FDA and/or the manufacturer.

For those manufacturers participating in the FDA's "MedWatch to Manufacturer" (MMP) program, copies of serious reports submitted directly to the FDA are sent expeditiously to the manufacturer. More information on the MMP program can be found at http://www.fda.gov/medwatch/report/mmp.htm.

The third goal is to make it as easy as possible for a health professional to report directly to the agency. Only one form is necessary for reporting adverse events and product problems with any human use medical product regulated by the agency—drugs, biologics, medical devices, special nutritionals (e.g., dietary supplements, medical foods, infant formulas), and cosmetics. There are two versions of the form (Figures 10.2 and 10.3). The postage-paid FDA Form 3500 is used for voluntary reporting, while the FDA Form 3500A is used for mandatory reporting, as described earlier. These forms are available from the FDA via a toll-free number (1-800-FDA-1088) or can be printed off the MedWatch homepage or downloaded as a software package.

In addition to mailing in a voluntary form, reporters also have the options of reporting via an interactive form on the MedWatch website, faxing their reports (1-800-FDA-0178), or calling 1-800-FDA-1088 to give a report verbally to a MedWatch health professional.

Vaccines are the only FDA-regulated human use medical products that are not reported on the MedWatch reporting form. Reports concerning vaccines are sent to the vaccine adverse event reporting system (VAERS) on the VAERS-1 form, available by calling 1-800-822-7967 or from the VAERS website at www.fda.gov/cber/vaers/vaers.htm. VAERS is a joint FDA/Center for

158          PHARMACOEPIDEMIOLOGY

# MEDWATCH
### THE FDA MEDICAL PRODUCTS REPORTING PROGRAM

For VOLUNTARY reporting by health professionals of adverse events and product problems

Form Approved: OMB No. 0910-0291 Expires: 7/31/99
See OMB statement on reverse

FDA Use Only
Triage unit sequence #

Page ___ of ___

### A. Patient information
1. Patient identifier (In confidence)
2. Age at time of event: or Date of birth:
3. Sex: ☐ female ☐ male
4. Weight: ___ lbs or ___ kgs

### B. Adverse event or product problem
1. ☐ Adverse event and/or ☐ Product problem (e.g., defects/malfunctions)
2. Outcomes attributed to adverse event (check all that apply)
   - ☐ death (mo/day/yr)
   - ☐ life-threatening
   - ☐ hospitalization – initial or prolonged
   - ☐ disability
   - ☐ congenital anomaly
   - ☐ required intervention to prevent permanent impairment/damage
   - ☐ other:
3. Date of event (mo/day/yr)
4. Date of this report (mo/day/yr)
5. Describe event or problem
6. Relevant tests/laboratory data, including dates
7. Other relevant history, including preexisting medical conditions (e.g., allergies, race, pregnancy, smoking and alcohol use, hepatic/renal dysfunction, etc.)

PLEASE TYPE OR USE BLACK INK

### C. Suspect medication(s)
1. Name (give labeled strength & mfr/labeler, if known)
   #1
   #2
2. Dose, frequency & route used
   #1
   #2
3. Therapy dates (if unknown, give duration) from/to (or best estimate)
   #1
   #2
4. Diagnosis for use (indication)
   #1
   #2
5. Event abated after use stopped or dose reduced
   #1 ☐ yes ☐ no ☐ doesn't apply
   #2 ☐ yes ☐ no ☐ doesn't apply
6. Lot # (if known)
   #1
   #2
7. Exp. date (if known)
   #1
   #2
8. Event reappeared after reintroduction
   #1 ☐ yes ☐ no ☐ doesn't apply
   #2 ☐ yes ☐ no ☐ doesn't apply
9. NDC # (for product problems only)
10. Concomitant medical products and therapy dates (exclude treatment of event)

### D. Suspect medical device
1. Brand name
2. Type of device
3. Manufacturer name & address
4. Operator of device
   - ☐ health professional
   - ☐ lay user/patient
   - ☐ other:
5. Expiration date (mo/day/yr)
6. model #
   catalog #
   serial #
   lot #
   other #
7. If implanted, give date (mo/day/yr)
8. If explanted, give date (mo/day/yr)
9. Device available for evaluation? (Do not send to FDA)
   ☐ yes ☐ no ☐ returned to manufacturer on ___ (mo/day/yr)
10. Concomitant medical products and therapy dates (exclude treatment of event)

### E. Reporter (see confidentiality section on back)
1. Name & address / phone #
2. Health professional? ☐ yes ☐ no
3. Occupation
4. Also reported to
   - ☐ manufacturer
   - ☐ user facility
   - ☐ distributor
5. If you do NOT want your identity disclosed to the manufacturer, place an "X" in this box. ☐

**FDA** Mail to: MEDWATCH, 5600 Fishers Lane, Rockville, MD 20852-9787
or FAX to: 1-800-FDA-0178

FDA Form 3500

Submission of a report does not constitute an admission that medical personnel or the product caused or contributed to the event.

SPONTANEOUS REPORTING IN THE UNITED STATES                                      159

# ADVICE ABOUT VOLUNTARY REPORTING

**Report experiences with:**
- medications (drugs or biologics)
- medical devices (including in-vitro diagnostics)
- special nutritional products (dietary supplements, medical foods, infant formulas)
- other products regulated by FDA

**Report SERIOUS adverse events.** An event is serious when the patient outcome is:
- death
- life-threatening (real risk of dying)
- hospitalization (initial or prolonged)
- disability (significant, persistent or permanent)
- congenital anomaly
- required intervention to prevent permanent impairment or damage

**Report even if:**
- you're not certain the product caused the event
- you don't have all the details

**Report product problems** – quality, performance or safety concerns such as:
- suspected contamination
- questionable stability
- defective components
- poor packaging or labeling
- therapeutic failures

**How to report:**
- just fill in the sections that apply to your report
- use section C for all products except medical devices
- attach additional blank pages if needed
- use a separate form for each patient
- report either to FDA or the manufacturer (or both)

**Important numbers:**
- 1-800-FDA-0178  to FAX report
- 1-800-FDA-7737  to report by modem
- 1-800-FDA-1088  to report by phone or for more information
- 1-800-822-7967  for a VAERS form for vaccines

**If your report involves a serious adverse event with a device** and it occurred in a facility outside a doctor's office, that facility may be legally required to report to FDA and/or the manufacturer. Please notify the person in that facility who would handle such reporting.

**Confidentiality:** The patient's identity is held in strict confidence by FDA and protected to the fullest extent of the law. The reporter's identity, including the identity of a self-reporter, may be shared with the manufacturer unless requested otherwise. However, FDA will not disclose the reporter's identity in response to a request from the public, pursuant to the Freedom of Information Act.

---

The public reporting burden for this collection of information has been estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

DHHS Reports Clearance Office
Paperwork Reduction Project (0910-0291)
Hubert H. Humphrey Building, Room 531-H
200 Independence Avenue, S.W.
Washington, DC 20201

"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number."

Please DO NOT RETURN this form to this address.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Public Health Service • Food and Drug Administration

FDA Form 3500-back    **Please Use Address Provided Below – Just Fold In Thirds, Tape and Mail**

**Department of Health and Human Services**
Public Health Service
Food and Drug Administration
Rockville, MD 20857

**Official Business**
Penalty for Private Use $300

**BUSINESS REPLY MAIL**
FIRST CLASS MAIL   PERMIT NO. 946   ROCKVILLE, MD
POSTAGE WILL BE PAID BY FOOD AND DRUG ADMINISTRATION

NO POSTAGE NECESSARY IF MAILED IN THE UNITED STATES OR APO/FPO

**MEDWATCH**
The FDA Medical Products Reporting Program
Food and Drug Administration
5600 Fishers Lane
Rockville, MD 20852-9787

Figure 10.2. MedWatch Voluntary Reporting Form (FDA Form 3500).

# MedWatch
### THE FDA MEDICAL PRODUCTS REPORTING PROGRAM

For use by user-facilities, distributors and manufacturers for **MANDATORY reporting**

Page ___ of ___

Form Approved: OMB No. 0910-0291 Expires: 7/31/99
See OMB statement on reverse

Mfr report #
UF/Dist report #

FDA Use Only

## A. Patient information
1. Patient identifier (In confidence)
2. Age at time of event: or Date of birth:
3. Sex: ☐ female ☐ male
4. Weight: ___ lbs or ___ kgs

## B. Adverse event or product problem
1. ☐ Adverse event and/or ☐ Product problem (e.g., defects/malfunctions)
2. Outcomes attributed to adverse event (check all that apply)
   - ☐ death ___ (mo/day/yr)
   - ☐ life-threatening
   - ☐ hospitalization – initial or prolonged
   - ☐ disability
   - ☐ congenital anomaly
   - ☐ required intervention to prevent permanent impairment/damage
   - ☐ other: ___
3. Date of event (mo/day/yr)
4. Date of this report (mo/day/yr)
5. Describe event or problem
6. Relevant tests/laboratory data, including dates
7. Other relevant history, including preexisting medical conditions (e.g., allergies, race, pregnancy, smoking and alcohol use, hepatic/renal dysfunction, etc.)

*PLEASE TYPE OR USE BLACK INK*

## C. Suspect medication(s)
1. Name (give labeled strength & mfr/labeler, if known)
   #1
   #2
2. Dose, frequency & route used
   #1
   #2
3. Therapy dates (if unknown, give duration) from/to (or best estimate)
   #1
   #2
4. Diagnosis for use (indication)
   #1
   #2
5. Event abated after use stopped or dose reduced
   #1 ☐ yes ☐ no ☐ doesn't apply
   #2 ☐ yes ☐ no ☐ doesn't apply
6. Lot # (if known)
   #1
   #2
7. Exp. date (if known)
   #1
   #2
8. Event reappeared after reintroduction
   #1 ☐ yes ☐ no ☐ doesn't apply
   #2 ☐ yes ☐ no ☐ doesn't apply
9. NDC # – for product problems only (if known)
10. Concomitant medical products and therapy dates (exclude treatment of event)

## D. Suspect medical device
1. Brand name
2. Type of device
3. Manufacturer name & address
4. Operator of device
   - ☐ health professional
   - ☐ lay user/patient
   - ☐ other:
5. Expiration date (mo/day/yr)
6. model # ___ catalog # ___ serial # ___ lot # ___ other # ___
7. If implanted, give date (mo/day/yr)
8. If explanted, give date (mo/day/yr)
9. Device available for evaluation? (Do not send to FDA)
   ☐ yes ☐ no ☐ returned to manufacturer on ___ (mo/day/yr)
10. Concomitant medical products and therapy dates (exclude treatment of event)

## E. Initial reporter
1. Name & address          phone #
2. Health professional? ☐ yes ☐ no
3. Occupation
4. Initial reporter also sent report to FDA ☐ yes ☐ no ☐ unk

**FDA**
FDA Form 3500A

Submission of a report does not constitute an admission that medical personnel, user facility, distributor, manufacturer or product caused or contributed to the event.

SPONTANEOUS REPORTING IN THE UNITED STATES    161

Figure 10.3. MedWatch Mandatory Reporting From (FDA Form 3500A).

Disease Control and Prevention program for mandatory reporting by physicians of vaccine related adverse events.[20]

The fourth goal of MedWatch is to provide feedback to health professionals about new safety issues involving medical products. As new information (e.g., "Dear Health Professional Letters," Public Health Advisories, Safety Alerts, etc.) becomes available, it is posted on the MedWatch Homepage and immediate email notification goes out to members of MedWatch's listservs. To join the general MedWatch listserv, send a subscription message to fdalists@archie.fda.gov. In the message body enter: subscribe medwatch YourEmailAddress@YourDomain (replace "YourEmailAddress@YourDomain" with your own email address). MedWatch also has a network of more than 140 health professional and industry organizations that have allied themselves with the FDA as MedWatch Partners. These partners are used to further disseminate safety notifications to their membership, thus acting as multiplier groups to expand notification.

These MedWatch partners encourage all healthcare providers (physicians, pharmacists, nurses, dentists, and others) to look upon adverse event reporting as part of their professional responsibility. The American Medical Association and American Dental Association advocate (respectively) physician and dentist participation in adverse event reporting systems as an obligation.[21,22] Further, since 1994, *The Journal of the American Medical Association* instructs its authors that adverse drug or device reactions should be reported to the appropriate government agency, in addition to submitting such information for publication.[23] The International Committee of Medical Journal Editors recently revised the "Uniform requirements for manuscripts submitted to biomedical journals" to also encourage timely reporting of urgent public health hazards.[24]

The FDA's interest in informing health professionals about new safety discoveries is not only to enable them to incorporate new safety information into daily practice, but also to demonstrate that voluntary reporting has a definite clinical impact.

The FDA acknowledges that health professionals have concerns regarding their confidentiality as reporters, and that of the patients whose cases they report. In order to encourage reporting of adverse events, FDA regulations offer substantial protection against disclosure of the identities of both reporters and patients. This was further strengthened on 3 July, 1995, when a regulation went into effect extending this protection against disclosure by preempting state discovery laws regarding voluntary reports held by pharmaceutical, biological, and medical device manufacturers.[25] To facilitate obtaining followup information, health professionals reporting directly to the FDA are asked to indicate whether they prefer that their identity not be disclosed through the MMP program to the manufacturer of the product involved in the case being reported. When such a preference is indicated, that information will not be shared.

## DATA MANIPULATION: THE ADVERSE EVENT MONITORING SYSTEM (AERS)

A new tool used by FDA is the computerized spontaneous adverse event reporting system or AERS, which replaces older technology. This client server, Oracle based system contains all AE reports on pharmaceuticals submitted to the Agency either directly or via the manufacturer.

AERS was designed and implemented with the following concepts in mind:

- Improve the operational efficiency, effectiveness, and quality control of the process for handling AEs.
- Improve the accessibility of AE information to all users.
- Implement and maintain compatibility with ICH standards.
- Build the capability to receive electronic submissions of AEs using ICH standards.
- Provide automated signal generation capabilities and improved tools for the analysis of potential AE signals.

Pharmaceutical manufacturers submit AE reports to the FDA central document room, where they are sorted and forwarded to the Office of Postmarketing Drug Risk Assessment (OPDRA)

in FDA's Center for Drug Evaluation and Research (CDER). Manufacturer reports are submitted in duplicate, with one copy forwarded to the reviewing division that is responsible for the marketing status of the drug being reported upon. Reports submitted by individuals are mailed, faxed, sent via the internet, or phoned into MedWatch, which in turn forwards the appropriate reports to OPDRA.

When received by OPDRA, these incoming 3500 and 3500A reports are assigned a single permanent report number, imaged and stored in an Excalibur imaging system; subsequently they are entered verbatim into the AERS database. Data entry has a number of sequential steps involving comparative entry, quality comparison of critical entry fields, and coding and quality control into standardized international medial terminology using MEDDRA. Direct and 15 day reports receive priority handling.

Automated quality control is performed to review reports for timeliness, completeness, and accuracy of coding. Statistical samples are also used to spot check manufacturer performance in providing accurate and timely reports, which can be used for compliance functions.

Although the bulk of the data entry into AERS is currently done through manual coding, AERS is designed for electronic submission of ICH standardized, MEDDRA precoded reports. This design concept incorporates the ICH standards for content, structure, and transmittal of individual case safety reports. To prepare for full scale implementation of electronic submissions, a step-by-step pilot program is in place. The pilot program is designed to develop and test the necessary processes, procedures, and technical architecture to implement electronic submissions. The process of transitioning to electronic reporting is a complex one that will take place over the next few years.

Copies of all reports in the AERS database are available to the public through the FDA Freedom of Information Office, with all confidential information redacted (e.g., patient, reporter, institutional identifiers). The AERS database, in non-cumulative quarterly updates, can be obtained from the National Technical Information Service.[26]

A variety of technology assisted features in AERS augment AE review by OPDRA's safety evaluators. Some of these features are in place and some will be implemented when the system is fully developed. Safety evaluators will have the following pharmacovigilance tools available for AE report screening to generate signals:

- *Primary Triage*. The program screens incoming reports and alerts safety evaluators to serious and unlabeled events, and designated medical events known to often be drug related (e.g., torsade de pointes, agranulocytosis, toxic epidermal necrolysis, etc.).
- *Secondary triage/surveillance*. Provides a tool for signal identification based on overall specific counts for each risk category associated with all ADR reports received for a given drug.
- *Graphic monitoring indicators*. Allow visualization of graphical displays to enable signal generation. Eventually this will include statistical tools for data-mining events within the entire database.
- *Periodic (canned) reports*. Enable periodic reviews of the AERS database, including all new actions in a time period.
- *Active (canned and/or ad hoc) query*. Represents active investigation of case series signals found from any of the above levels of screening.

When fully deployed, the AERS system will constitute a world-class system for maximizing the ability of the agency to identify and assess signals of importance in the spontaneous reporting system.

## FDA EVALUATION OF REPORTS OF ADVERSE EVENTS

The uncontrolled nature of spontaneously reported data places great importance on the complex, intensive process of individual evaluation of submitted AE reports. This is perhaps most accurately characterized as a method, applied on a case-by-case basis, that is based on experience, knowledge of the medical product, and awareness of the limitations of the data.

Given the large number of AE reports that the FDA receives, it is obviously not possible to review all reports individually. The reporting forms seek information on dechallenge and rechallenge (positive, negative, not applicable), and this information is included in the computerized database. However, the causal relationship between the drug exposure and the adverse event reported to the FDA is not individually evaluated for most of the AE reports. Elements such as the temporal relationship between the event and the exposure and possible confounding factors such as concomitant drugs and underlying disease are assessed only for reports of specific AEs that are being closely monitored.

All reports sent directly to the FDA (i.e., nonmanufacturer reports) and all 15 day reports (manufacturer reports involving serious unlabeled events) are reviewed on a case-by-case basis by a safety evaluator, usually a pharmacist or a physician, because they are the most likely to involve events with potential significant public health impact. If the safety evaluator determines that the reported AE is new (i.e., unlabeled) and potentially significant, (s)he will then query the AERS database for similar reports to develop a case series. Each case report is evaluated for the adequacy of the information on the report, the temporal association of the drug and the event, possible confounding factors such as patient disease or concomitant drug therapy, and dechallenge–rechallenge information. If necessary, followup information is requested from the reporter or manufacturer. Further steps such as literature searches, use of drug utilization databases, or conducting further epidemiologic investigations may be taken. If the case series meets certain specific criteria, the issue is brought to the attention of others within OPDRA. An important new event is referred to as a *MAR* (monitored adverse reaction). These MARs are given further evaluation and are brought to the attention of the medical review divisions at the FDA that are responsible for regulatory actions involving the drug's marketing status. The reviewing division may request manufacturer sponsored postmarketing studies to further evaluate the issue.

After a decision has been made regarding a safety issue, the FDA can initiate various actions, including labeling, name, or packaging change(s); a "Dear Health Professional" letter; restricting the use of the drug; or working with a manufacturer regarding possible withdrawal of a medical product from the US market.

To notify health professionals of important new safety information discovered after marketing, the FDA often requests that the manufacturer send a "Dear Health Professional" letter to warn providers of particular safety issues. This is done in combination with a labeling change, although only a small proportion of labeling changes result in such letters.

There were 34 drug or biologic letters/safety notifications posted in 1998, with another 19 added through the end of June 1999. In 1998, safety related labeling changes were approved by FDA for an average of 28 drug products each month (range = 18–41). (Note: "Dear Health Professional" letters and other safety notifications, and summaries of safety related labeling changes approved each month, can be found on the MedWatch homepage (www.fda.gov/medwatch/safety.htm).) Table 10.3 lists some examples of recent "Dear Health Professional" letters.

The FDA can restrict or limit the use of product if the adverse reaction associated with a drug product has severe consequences. For example, fetal abnormalities associated with the use of Accutane®, a drug to treat acne, resulted in a contraindication for use in women of childbearing age. If potential safety problems are an issue when a product is first approved, FDA may ask the company to conduct postmarketing studies (phase IV) or to continue phase III trials beyond their planned completion date. For example, results showed that patients taking flosequinan (Manoplax®) for congestive heart failure had initial improvement. However, the patients in the study continued to be followed after the product was approved in December 1992. It was ultimately shown that treated patients had an increased risk of death, as well as an increased hospitalization rate.[27] This information led to the withdrawal of the drug after just 7 months on the market.

Previously unsuspected safety issues discovered after marketing can also lead to the removal of a

Table 10.3. Recent "Dear Health Professional" letters

*June 1999: Cylert[R] (pemoline).* Updated recommendations for liver function monitoring and a patient information/consent form.

*June 1999: Rezulin[R] (troglitazone).* Based on further evidence of serious and sometimes fatal liver injury, significant new changes in the labeling and recommended uses.

*June 1999: Trovan[R] (trovafloxacin/alatrofloxacin).* Because of associated serious liver injury, use should be reserved for use *only* in the treatment of patients who meet all of certain specified treatment criteria.

*June 1999: Propulsid[R] (cisapride).* Two new contraindications (known family history of congenital long QT syndrome and clinically significant bradycardia) and a new drug interaction (coadministration of grapefruit juice increases the bioavailability of cisapride and concomitant use should be avoided).

*May 1999: Celebrex[R] (celecoxib).* In patients concurrently taking warfarin, infrequent reports of increases in prothrombin time, sometimes associated with bleeding events, predominantly in the elderly.

*May 1999: Enbrel[R] (etanercept).* Reports indicate that certain patients have developed serious infections, including sepsis, and that several of these patients have died from their infections.

*March 1999: Xeloda[R] (capecitabine).* Reports of altered coagulation parameters and/or bleeding in cancer patients who were taking coumarin derivatives concomitantly.

*January 1999: Cerebyx[R] (fosphenytoin).* Massive overdoses associated with serious adverse events, including death, have resulted from health care workers' mistaken interpretation of the current vial label (both 2 ml and 10 ml vials). Specifically, some health care workers withdrawing fosphenytoin from the vial have misinterpreted the vial label to mean that the amount of phenytoin equivalents per milliliter actually represents the total amount of phenytoin equivalents in the vial.

*January 1999: Trovan[R] (alatrofloxacin mesylate).* Potential incompatibility of alatrofloxacin mesylate injection with two commonly used diluents, 0.9% sodium chloride injection, USP (usually referred to as normal saline solution), and lactated Ringer's, USP.

*January 1999: Flovent[R] (fluticasone propionate).* Rare cases of patients on inhaled fluticasone propionate presenting with systemic eosinophilic conditions, some with clinical features of vasculitis consistent with Churg–Strauss syndrome.

drug from the market. Fortunately, such product withdrawals are very uncommon; there have been only 13 drugs taken off the US market since 1980; these are listed in Table 10.4.

In addition to the technology used in current AE reporting, including sophisticated relational databases and network connections for electronic transfer, new methods to evaluate and assess spontaneous reports are being explored to take advantage of the sheer volume of data. Aggregate analysis tools and data-mining techniques are currently being developed by OPDRA, the European Union, the World Health Organization (WHO), and others, to systematically screen large databases of spontaneous reports.

OPDRA is specifically testing and validating the feasibility of using data-mining techniques employing a Bayesian statistical basis[28] and commercial visualization computer tools to enhance surveillance efficiency. The strategy is to use the computer to identify potential signals in large databases that might be overlooked, for a variety of reasons, in a manual review on a case-by-case basis. Drug–AE signals are generated by comparing the frequency of reports with what would be expected if all drugs and AEs were assumed to follow certain patterns. The goal is to distinguish the more important or stronger signals to facilitate identification of combinations of drugs and events that warrant more in-depth followup.

## STRENGTHS

### LARGE-SCALE AND COST-EFFECTIVE

Two vital advantages of surveillance systems based on spontaneous reports are that they potentially

Table 10.4. Withdrawals from the market, 1980–1998

| Brand name (generic name) | Reason for withdrawal | Year of marketing | Year withdrawn |
|---|---|---|---|
| Selacryn[R] (ticrynafen) | liver necrosis | 1979 | 1980 |
| Oraflex[R] (benoxaprofen) | liver necrosis | 1982 | 1982 |
| Zomax[R] (zomepirac) | anaphylaxis | 1980 | 1983 |
| Merital[R] (nomifensine) | hemolytic anemia | 1985 | 1986 |
| Suprol[R] (suprofen) | flank pain syndrome | 1986 | 1987 |
| Enkaid[R] (encainide) | excessive mortality | 1987 | 1991 |
| Omniflox[R] (temafloxacin) | hemolytic anemia | 1992 | 1992 |
| Manoplax[R] (flosequinan) | excessive mortality | 1992 | 1993 |
| Redux[R] (dexfenfluramine) | cardiac valvular disease | 1996 | 1997 |
| Pondimin[R] (fenfluramine) | cardiac valvular disease | 1973 | 1997 |
| Seldane[R] (terfenadine) | drug interactions/fatal cardiac arrythmias | 1985 | 1998 |
| Posicor[R] (mibefradil) | multiple drug interactions | 1997 | 1998 |
| Duract[R] (bromfenac) | serious hepatotoxic effects | 1997 | 1998 |

maintain ongoing surveillance of all patients, and are relatively inexpensive.[29] In fact, they are probably the most cost-effective way to detect rare, serious adverse events not discovered during clinical trials.

## GENERATION OF HYPOTHESES AND SIGNALS

Making the best possible use of the data obtained through monitoring underlies postmarketing surveillance.[30] Toward that goal, the great utility of spontaneous reports lies in *hypothesis generation*,[31] with need to explore possible explanations for the adverse event in question. By fostering suspicions,[32] spontaneous report based surveillance programs perform an important function, which is to generate *signals* of potential problems that warrant further investigation.

Assessment of the medical product adverse event relationship for a particular report or series of reports can be quite difficult. Table 10.5 lists factors that are helpful in evaluating the strength of association between a drug and a reported adverse event.[33] (See also Chapter 32.)

The stronger the drug–event relationship in each case and the lower the incidence of the AE occurring spontaneously, the fewer case reports are needed to perceive causality.[34] It has been found that for rare events, coincidental drug–event associations are so unlikely that they merit little concern, with greater than three reports constituting a signal requiring further study.[35] In fact, it has been suggested that a temporal relationship between medical product and adverse event, coupled with positive dechallenge and rechallenge, can make isolated reports conclusive as to a product–event association.[36] Biological plausibility and reasonable strength of association aid in deeming any association as causal.[37]

However, achieving certain proof of causality through adverse event reporting is unusual. Attaining a prominent degree of suspicion is much more likely, and may be considered a sufficient basis for regulatory decisions.[34]

Table 10.5. Useful factors for assessing causal relationship between drug and reported adverse events

- Chronology of administration of agent, including beginning and ending of treatment and adverse event onset
- Course of adverse event when suspected agent stopped (*dechallenge*) or continued
- Etiologic roles of agents and diseases in regard to adverse event
- Response to readministration (*rechallenge*) of agent
- Laboratory test results
- Previously known toxicity of agent

## OPPORTUNITY FOR CLINICIAN CONTRIBUTIONS

The reliance of postmarketing surveillance systems on health professional reporting enables an individual to help improve public health. This is demonstrated by one study that found direct practitioner participation in the FDA spontaneous reporting system was the most effective source of new ADR reports that led to changes in labeling.[36] Ensuring that the information provided in the AE report is as complete and in depth as possible further enhances postmarketing surveillance. Thus, while possessing inherent limitations, postmarketing surveillance based on spontaneous report data is a powerful tool for detecting AE signals of direct clinical impact.

## WEAKNESSES

As with clinical trials, there are important limitations to consider when using spontaneously reported AE information. These limitations include difficulties with AE recognition, underreporting, biases, estimation of population exposure, and report quality.

## ADVERSE EVENT RECOGNITION

The recognition of AEs (or any other medical product associated adverse event) is quite subjective and imprecise.[38] While an attribution between the medical product and the observed event is assumed with all spontaneously reported events, every effort is made to rule out other explanations for the event in question. It is well known that placebos[39] and even no treatment[40] can be associated with adverse events. In addition, there is almost always an underlying background rate for any clinical event in a population, regardless of whether there was exposure to a medical product.

Reaching a firm conclusion about the relationship between exposure to a medical product and the occurrence of an adverse event can be difficult. In one study, clinical pharmacologists and treating physicians showed complete agreement less than half the time when determining whether medication, alcohol, or "recreational" drug use had caused hospitalization.[41]

Such considerations emphasize the crucial need for careful, thoughtful review of adverse event reports upon their receipt by FDA or the manufacturer. It is through this process that causality, or at least a high degree of suspicion for a product–AE association, is put to the test. Ultimately, formal pharmacoepidemiology studies are usually needed though, to be certain.

## UNDERREPORTING

Another major concern with any spontaneous reporting system is underreporting of adverse events.[20,31,37,42] It has been estimated that rarely more than 10% of serious ADRs, and 2–4% of non-serious reactions, are reported to the British spontaneous reporting program.[37] A similar estimate is that the FDA receives by direct report less than 1% of suspected serious ADRs.[42] This means that cases spontaneously reported to any surveillance program, which comprise the numerator, generally represent only a small portion of the number that have actually occurred. The impact of underreporting can be somewhat lessened if submitted reports, irrespective of number, are of high quality.

## BIASES

Unlike clinical trial data, which are obtained under strictly controlled conditions, spontaneously reported information is uncontrolled, and therefore subject to the possible influence of a number of biases that can affect reporting. These biases include the length of time a product has been on the market, country, reporting environment, detailing time, and quality of the data.[43] A striking illustration of the impact one such factor can have is the finding that the peak of spontaneous ADR reporting for a drug is at the end of the second year of marketing, with a subsequent precipitous decline in reporting,[44] despite a lack of apparent decline in usage or change in ADR incidence.[43,44] In addition to these biases, it is possible that reported cases might differ from nonreported cases in characteristics such as time to onset or severity.[35]

## ESTIMATION OF POPULATION EXPOSURE

Compounding these limitations is the lack of denominator data, such as user population and drug exposure patterns,[35] that would provide the exact number of patients exposed to the medical product, and thus at risk for the adverse event of interest. Numerator and denominator limitations make incidence rates computed from spontaneously reported data problematic,[35] if not completely baseless. However, even if the exposed patient population is not precisely known, estimation of the exposure can be attempted through the use of drug utilization data.[45]

This approach, whose basic methodologies are applicable to medical products in general, can be of great utility. Major sources of data on the use of drugs by a defined population include market surveys based on sales or prescription data, third-party payers or health maintenance organizations, institutional/ambulatory settings, or specific pharmacoepidemiology studies.[45] Cooperative agreements and contracts with outside researchers enable FDA to use such databases in its investigations. Device utilization studies employ the same sources of data, as well as Medicare derived information.

Care must be taken in interpreting results from studies using these databases. That drug prescribing does not necessarily equal drug usage,[45] and the applicability of results derived from a specific population (such as Medicaid recipients) to the population at large, need to be weighed carefully.

## REPORT QUALITY

The ability to assess, analyze, and act on safety issues based on spontaneous reporting is dependent on the quality of information submitted by health professionals in their reports. A complete AE report should include the following:

- product name (and information such as model and serial numbers in the case of medical devices)
- demographic data
- succinct clinical description of AE, including confirmatory/relevant test/laboratory results
- confounding factors (such as concomitant medical products and medical history)
- temporal information, including the date of event onset and start/stop dates for use of medical product
- dose/frequency of use (as applicable)
- biopsy/autopsy results (as applicable)
- dechallenge/rechallenge information (if available)
- outcome

## SUMMARY

In summary, the major limitations of the FDA's AE reporting system reflect the fact that the data are generated in an uncontrolled and incomplete manner. Although manufacturers are legally required to submit AE reports to the FDA and some of those reports are based on formal studies, the majority of AEs originate with practicing physicians who may or may not notify the manufacturer or the FDA when they observe an AE in one of their patients. It appears that they generally do not choose to report AEs, and the number of reports that the FDA receives is most underrepresentative of adverse events occurring in the United States. The number of reports in the system is also influenced by a variety of other factors, such as the extent and quality of the individual manufacturer's postmarketing surveillance activities, the nature of the event, the type of drug, the length of time it has been marketed, and publicity in the lay or professional press. Because of these limitations, AE reports are primarily useful for hypothesis generating, rather than hypothesis testing. Ironically, the scientifically uncontrolled nature of AE reporting creates its greatest advantage—the ability to detect and characterize AEs occurring across a broad range of medical practice—as well as its most serious limitations.

## PARTICULAR APPLICATIONS

### OVERALL

The FDA's Adverse Event Reporting System (AERS) contains almost 2 million reports, with the earliest dating back to 1969. While reporting

levels remained fairly constant during the 1970s—about 18 000 reports were entered into the database in 1970, and slightly over 14 000 reports were added in 1980—reporting increased dramatically after 1985, as can be seen in Figure 10.4. By 1990, the annual number of reports had risen to 83 000, and in 1998 it was over 230 000.

As noted earlier, the AERS contains reports from a variety of sources. Reports may be from the United States or other countries. The suspected AEs may have been observed in the usual practice of medicine or during formal studies; case reports from the literature are also included. Reports come to the FDA either directly from health professionals or consumers, or from pharmaceutical manufacturers. The vast majority of reports are sent by manufacturers (over 90% in 1998).

Historically, most AE reports have originated with health professionals. However, the proportion coming from consumers has been increasing. In 1993, the proportions from health professionals and consumers were 72 and 27% respectively (1% unknown). In 1996, the proportions were 58, 41, and 1%. Over the four year period from 1993 to 1996, reports from consumers increased in absolute numbers as well as proportionally. Over the same time, although the proportion from health professionals decreased, the absolute numbers went up.[46] The increase in reports from consumers may very well be related to the large numbers of former prescription products now available OTC, as OTC packaging will frequently contain the company's 800 number.

Although the majority of the FDA's adverse drug event reports are channeled through the manufacturer, a substantial number of reports are received directly from health care professionals (over 15 400 reports in 1998). Direct reports have been shown to be more useful than other types of reports for identifying previously unsuspected AEs,[47] resulting in the emphasis on such direct reporting via the MedWatch program. Direct reports tend to be more detailed, contain more specific information, and are more likely to have a suspected high likelihood of association between the event and the drug in question. Two-thirds of all direct drug reports involve serious AEs. Compared with all US physicians, physicians who report AEs to the FDA are likely to be younger, to practice in a primary care specialty, and to spend more time in teaching and research activities.[48]

Of reports sent directly to FDA, 73% involve drugs, 14% medical devices, 3% biologics, and 2% dietary supplements. Fifty-nine% are from pharmacists, 15% from physicians, 9% from nurses, and 6% from non-health professionals.

## SPECIFIC EXAMPLES

### Intravenous Immunoglobulin and Aseptic Meningitis Syndrome

In early 1994, FDA learned of a report from the National Institutes of Health (NIH), which described a high rate of aseptic meningitis syndrome



Figure 10.4. ADE reports by year and type 1985–1998 (1998 estimated)

occurring in patients being treated for neuromuscular diseases with high doses of intravenous immunoglobulin (IVIG). The patients had been receiving doses of 2 g/kg of IVIG, which is five to ten times higher than the normally recommended dosage. Six of 54 patients developed severe headache, meningismus, and fever within 24 hours of dosing. Cerebrospinal fluid (CSF) was consistent with aseptic meningitis syndrome in four of the six. Following this lead, 22 cases of IVIG associated aseptic meningitis syndrome that had been reported to the FDA were reviewed. Symptoms included fever and photophobia, and prominent painful headache. Twenty of the cases were associated with positive CSF findings, including leukocytosis (predominantly neutrophilic) and elevated protein.

Unexpectedly, 19 of the reports indicated that normal doses of IVIG had been administered (0.2–0.4 g/kg). The patients had been treated by withdrawal of the medication and administration of analgesics. Of particular note was the characteristic time course of IVIG associated aseptic meningitis syndrome. The illnesses all began between 12 and 24 hours after administration, and recovery ensued within several days following withdrawal of the medication.

As a result of this work, FDA and NIH workers published two articles on IVIG–aseptic meningitis syndrome simultaneously in the same journal.[49,50] The FDA also directed IVIG manufacturers to modify labeling to include a precaution statement about the occurrence of the syndrome.

### Temafloxacin and Hemolytic Anemia

Temafloxacin, a fluoroquinolone antibiotic, was first marketed in January 1992. By early April, FDA had received a few reports of hemolytic anemia occurring in patients treated with this drug. Over the next two months, many additional cases were reported, eventually totaling nearly 100. These provided a clear picture of what was subsequently called the "temafloxacin syndrome."

The typical patient was a young woman with no underlying medical conditions who was treated for urinary tract infection with temafloxacin. Within 7–10 days of starting treatment, dark colored urine was often noted, sometimes with accompanying flank pain and chills. There was typically a drop in hemoglobin of 3 grams or greater. Acute renal failure developed in nearly two-thirds, with hemodialysis usually required. Mild hepatobiliary changes were noted in half the patients, and coagulopathy in one-third.

A subset of patients experienced the syndrome after their first dose of temafloxacin. That these patients were more likely to have had prior exposure to a fluoroquinolone antibiotic provided support for an antibody-mediated basis for massive hemolysis.

Based on spontaneously reported cases, the manufacturer, in consultation with FDA, voluntarily withdrew temafloxacin from the market worldwide in June, barely six months after initial marketing. In 1994, FDA staff published a multicase review article describing the "temafloxacin syndrome."[51]

### L-tryptophan Related Eosinophilia–Myalgia Syndrome

In July 1989, a healthy 44-year-old woman in Santa Fe with a history of allergic rhinitis started taking L-tryptophan, an essential amino acid available as a dietary supplement, for insomnia. By early September, she was reporting onset of cough, shortness of breath, and weakness. When first seen by a physician in late September, she presented with a puffy, flushed face, abdominal pain, mucosal ulcers, myalgia, and weakness. Her white blood cell count was 11 900 cells/mm$^3$, with an eosinophil count of 42%. Her condition worsened through October, with her white blood cell rising to 18 200 and eosinophil count to 45%.

Her physician consulted with a rheumatologist, who, while not knowing what was wrong with this patient, did know of a second patient who had been hospitalized in Santa Fe with similar symptoms and eosinophil count. In mid-October, a third patient in New Mexico, who had an eosinophil count of 9000 and had also been taking L-tryptophan, was discovered. While one patient was unusual and two was suspicious, three made it a cluster of a very uncommon disease.

All three original patients were middle-aged women. Although the severity differed, all had the common features of myalgia, weakness, oral ulcers, abdominal pain, shortness of breath, and skin rash. While the doses of L-tryptophan they had used were similar, the duration of use before onset of illness varied from a few weeks to 2 years. Common laboratory features included striking leukocytosis, eosinophilia, elevated aldolase (with a normal creatine kinase), and abnormal liver function tests.

An article about the condition appeared in the 7 November *Albuquerque Journal News*. On 11 November, FDA issued a Public Advisory against the use of L-tryptophan, followed four days later by the establishment by the Centers for Disease Control and Prevention (CDC) of a system of national state based surveillance for the newly named eosinophilia–myalgia syndrome (EMS).[52]

On 17 November, FDA requested a nationwide recall of all OTC dietary supplements in capsule or tablet form providing 100 mg or more of L-tryptophan in a daily dose. On 23 March, 1990, because of the identification of one case of EMS associated with a dietary supplement containing less than 100 mg, and continued efforts by some firms to circumvent the recall, the agency requested an expansion of the recall to all marketed products containing added manufactured L-tryptophan. Excepted were those that were permitted to contain added L-tryptophan under existing food additive regulations. Additionally, on 22 March, the agency had imposed an import alert to detain all foreign shipments of manufactured L-tryptophan.

Because virtually all manufactured L-tryptophan is imported into the US, the practical effect of the recall and import alert was to effectively eliminate the availability of L-tryptophan containing dietary supplements. Eventually, more than 1500 cases of EMS, including 38 deaths, were reported to the CDC, although the true incidence of the disorder is thought to be much higher.

The recognition of a cluster of cases was the key to the detecting of EMS. Interactions among various specialists, including a family physician, hematologist, rheumatologist, clinical immunologist, and epidemiologists, were crucial to this process.

Of equal importance is ongoing basic and clinical research to explain the etiology and pathogenesis of this disorder. Although it is widely believed that contaminants or impurities in the L-tryptophan are responsible for EMS, continuing research indicates a role for "pure" tryptophan itself,[53–55] as well as for certain host factors in the etiology of the disorder.[56,57] These findings support suggestions that the L-tryptophan associated EMS was caused by several factors and is not necessarily related to a contaminant in a single source of L-tryptophan.

FDA concerns about the safety of L-tryptophan containing products and the possibility of potential new cases of L-tryptophan related EMS are underscored by recent information indicating the availability of L-tryptophan by American sources. Both EMS's clinical seriousness, and uncertainties surrounding its etiology, indicate the need for health professionals to remain vigilant regarding adverse events possibly associated with the use of L-tryptophan containing dietary supplements, and to report such events to MedWatch.

## THE FUTURE

Adverse event reporting in the United States has come a long way since its inception in the early 1950s. Yet, it should be remembered that spontaneous reporting, although invaluable, is only one tool used in managing medical product risk. The FDA is committed to evaluating and improving its role in the current risk management system. The May 1999 report to the FDA Commissioner "Managing the risks from medical product use: creating a risk management framework"[2] found that the postmarketing surveillance program currently in place performs well for the goal it was designed to achieve, namely the rapid detection of unexpected serious AEs that occur postmarketing. However, the report also stated that FDA's programs are not designed to evaluate the rate, or impact, of known AEs. The report proposed several options for improving risk management including expanding the use of automated systems for reporting, monitoring, and evaluating AEs, and increasing the agency's access to data sources

that would supplement and extend its spontaneous reporting system. This could include use of large scale medical databases from health maintenance organizations to reinforce, support, and enhance spontaneous signals and provide background rates and descriptive epidemiology.

In recognition of the increasing importance of postmarketing surveillance and risk assessment in the regulatory setting, a variety of initiatives are under way within FDA to expand these activities. In 1998, the Office of Postmarketing Drug Risk Assessment (OPDRA) was established within CDER to explore and confirm safety signals from spontaneous reporting; to plan, direct, and collaborate in the conduct of epidemiological activities; and to explore other drug surveillance strategies.

Many of the basic problems with spontaneous reporting are still with us today, such as under-reporting and poor quality of reporting. However, FDA, academia, and industry are making efforts to address these problems. These efforts can be summarized in the following areas: increasing the quality of incoming reports; establishing global reporting standards; promoting speed of reporting and assessment through electronic reporting; exploring new assessment and data visualizing methodologies; and, finally, exploring tools beyond spontaneous reporting. The last initiatives involve identification and assessment of linked databases and registries which can be accessed to expand surveillance, provide confirmatory evidence for signals, assess regulatory impact of labeling changes through studies, and, in general, build on the known strengths of spontaneous reporting—signal generation of potentially important events.

Studies to explore the barriers to reporting are being proposed by FDA with the goal of increasing the quality of reports and identifying areas in which effective reporting can be stimulated. Specific areas for consideration include the following.

- Identification of causes and factors contributing to product related injuries.
- Factors involved in identification and reporting of AEs.
- Identification of more effective risk communication methods to transmit information to heath care professionals and consumers.
- Identification of methods to focus more attention on medical products in the immediate postmarketing period.
- Existing barriers to reporting in areas such as managed care.

In summary, the spontaneous reporting of AEs provides an important cornerstone for pharmacovigilance in the United States. Regulators and manufacturers of medical products worldwide are moving forward with global harmonization for data standards and data transmission, improvements in relational database systems, the development of new risk assessment methodologies, and increased access to other data resources to improve our overall ability to manage risk from pharmaceuticals.

## REFERENCES

1. Food and Drug Administration, Center for Drug Evaluation and Research. *CDER 1998 Report to the Nation—Improving Public Health through Human Drugs.* Rockville, MD: CDER, 1999.
2. Report to the FDA Commissioner from the Task Force on Risk Management. *Managing the risks from medical product use.* Rockville, MD: Food and Drug Administration, 1999.
3. Bates DW, Leape LL, Petrycki S. Incidence and preventability of adverse drug events in hospitalized adults. *J Gen Intern Med* 1993; **8**: 289–94.
4. Young JH. *Pure food: securing the federal food and drugs act of 1906.* Princeton, NJ: Princeton University Press, 1989.
5. Jackson CO. *Food and drug legislation in the New Deal.* Princeton, NJ: Princeton University Press, 1970.
6. Erslev AJ, Wintrobe MM. Detection and prevention of drug-induced blood dyscrascias. *J Am Med Assoc* 1962; **181**: 114–9.
7. Maeder T. *Adverse reactions.* New York: Morrow, 1994.
8. Schardein JL, ed. *Chemically induced birth defects.* New York: Dekker, 1985; 215–59.
9. Adverse experience reporting requirements for licensed biological products; final rule. *Fed Regist* 1994; **59**: 54 034–44.
10. Expedited safety reporting requirements for human drug and biological products; final rule. *Fed Regist* 1997; **62**: 52 237–53.
11. Dietary Supplement Health and Education Act (DSHEA) of 1994.

12. Food and Drug Administration, Center for Drug Evaluation and Research. *Guideline for postmarketing reporting of adverse drug experiences*. Rockville, MD: CDER, 1992.
13. Food and Drug Administration, Center for Biologics Evaluation and Research. *Guideline for adverse experience reporting for licensed biological products*. Rockville, MD: CBER, 1993.
14. International Conference on Harmonization; Guideline on Clinical Safety Data Management; Definitions and Standards for Expedited Reporting; Availability—Notice. *Fed Reg.* 1995; **60**: 11 283–7.
15. Safe Medical Devices Act of 1990, Public Law 101–629, *Stat* 1990; **104**: 4511.
16. Joint Commission on Accreditation of Healthcare Organizations. Comprehensive Accreditation Manual for Hospitals—updated as of April 1999. Oakbrook Terrace, IL: Joint Commission on Accreditation of Healthcare Organizations, 1999.
17. ASHP guidelines on adverse drug reaction monitoring and reporting. *Am J Health Syst Pharm* 1995; **52**: 417–9.
18. Kessler DA. Introducing MedWatch: a new approach to reporting medication and device adverse effects and product problems. *J Am Med Assoc* 1993; **269**: 2765–8.
19. Goldman SA, Kennedy DL. MedWatch FDA's Medical Products Reporting Program. *Postgrad Med* 1998; **103**: 13, 16.
20. Chen RT, Rastogi SC, Mullen JR, Hayes SW, Cochi SL, Donlon JA, et al. The Vaccine Adverse Event Reporting System (VAERS). *Vaccine* 1994; **12**: 542–50.
21. American Medical Association. Reporting adverse drug and medical device events: report of the AMA's Council on Ethical and Judicial Affairs. *Food Drug Law* 1994; **49**: 359–66.
22. Advisory Opinion No. 1 to Section 4-A, Devices and Therapeutic Methods, of the American Dental Association Principles of Ethics and Code of Professional Conduct.
23. *The Journal of the American Medical Association*. JAMA instructions for authors. *J Am Med Assoc* 1998; **280**: 19–26.
24. Glass RM. Reporting of public health hazards or major advances—revision of uniform requirements. *J Am Med Assoc* 1998; **280**: 2035.
25. Protecting the identities of reporters of adverse events and patients; preemption of disclosure rules. *Fed Regist* 1995; **60**; 16 962–8.
26. National Technical Information Service (NTIS), 5285 Port Royal Road, Springfield, VA 22161, USA. Tel. (703) 487–4650.
27. Higher mortality risk with 100-mg dose of Manoplex. *FDA Med Bull* 1993; **23**: 3.
28. DuMouchel W. Bayesian data-mining in large frequency tables, with an application to the FDA Spontaneous Reporting System. *Am Statistician* 1999; **53**: 177–90.
29. Fletcher AP. Spontaneous adverse drug reaction reporting vs event monitoring: a comparison. *J R Soc Med* 1991; **84**: 341–4.
30. Finney DJ. The detection of adverse reactions to therapeutic drugs. *Stat Med* 1982; **1**: 153–61.
31. Strom BL, Tugwell P. Pharmacoepidemiology current status, prospects, and problems. *Ann Intern Med* 1990; **113**: 179–81.
32. Finney DJ. Statistical aspects of monitoring for dangers in drug therapy. *Methods Information Med* 1971; **10**: 1–8.
33. Standardization of definitions and criteria of causality assessment of adverse drug reactions: drug-induced liver disorders: report of an international consensus meeting. *Int J Clin Pharmacol Ther Toxicol* 1990; **28**: 317–22.
34. Auriche M, Loupi E. Does proof of causality ever exist in pharmacovigilance? *Drug Safety* 1993; **9**: 230–5.
35. Begaud B, Moride Y, Tubert-Bitter P, Chaslerie A, Haramburu F. False-positives in spontaneous reporting: should we worry about them? *Br J Clin Pharamcol* 1994; **38**: 401–4.
36. Temple RJ, Jones JK, Crout JR. Adverse effects of newly marketed drugs. *New Engl J Med* 1979; **300**: 1046–7.
37. Rawlins MD. Pharmacovigilance: paradise lost, regained or postponed? The William Withering Lecture 1994. *J R College Physicians Lond* 1995; **29**: 41–9.
38. Koch-Weser J, Sellers EM, Zacest R. The ambiguity of adverse drug reactions. *Eur J Clin Pharmacol* 1997; **11**: 75–8.
39. Green DM. Pre-existing conditions, placebo reactions, and "side effects". *Ann Intern Med* 1964; **60**: 255–65.
40. Reidenberg MM, Lowenthal DT. Adverse nondrug reactions. *New Engl J Med* 1968; **279**: 678–9.
41. Karch FE, Smith CL, Kerzner B, Mazzullo JM, Weintraub M, Lasagna L. Adverse drug reactions—a matter of opinion. *Clin Pharmacol Ther* 1976; **19**: 489–92.
42. Scott HD, Rosenbaum SE, Waters WJ, Colt AM, Andrews LG, Juergens JP, et al. Rhode Island physicians" recognition and reporting of adverse drug reactions. *R I Med J* 1987; **70**: 311–6.
43. Sachs RM, Bortnichak EA. An evaluation of spontaneous adverse drug reaction monitoring systems. *Am J Med* 1986; **81**: 49–55.
44. Weber JCP. *Epidemiology of adverse reactions to nonsteroidal antiinflammatory drugs*. In: Rainsford KD, Velo GP, eds., *Advances in Inflammation Research*, Vol. 6, New York: Raven Press. 1984; 1–7.
45. Serradell J, Bjornson DC, Harzema AG. Drug utilization study methodologies; national and inter-