national perspectives. *Drug Intell Clin Pharm* 1987; **21**: 994–1001.
46. Center for Drug Evaluation and Research, Food and Drug Administration. *Annual Adverse Drug Experience Report 1996*. Rockville, MD: CDER, 1996.
47. Rossi AC, Knapp DE. Discovery of new adverse drug reactions: a review of the Food and Drug Administration's Spontaneous Reporting System. *J Am Med Assoc* 1984; **252**: 1030–3.
48. Milstien JB, Faich Ga, Hsu JP, Knapp DE, Baum C, Dreis MW. Factors affecting physician reporting of adverse drug reactions. *Drug Info J* 1986; **20**: 157–64.
49. Sekul EA, Cupler EJ, Dalakas MC. Aseptic meningitis associated with high-dose intravenous immunoglobulin therapy frequency and risk factors. *Ann Intern Med* 1994; **121**: 259–62.
50. Scribner CL, Kapit RM, Phillips ET, Rickles NM. Aseptic meningitis and intravenous immunoglobulin therapy. *Ann Intern Med* 1994; **121**: 305–6.
51. Blum MD, Graham DJ, McCloskey CA. Temafloxacin syndrome review of 95 cases. *Clin Infect Dis* 1994; **18**: 946–50.
52. Hertzman, PA. L-tryptophan related eosinophilia–myalgia syndrome. In: *Drug and Device Induced Disease: Developing a Blueprint for the Future. Proceedings of a MedWatch Conference 1994, Washington, DC*. Rockville, MD: FDA, 1994; 20–2.
53. Love LA, Rader JI, Crofford LJ, Raybourne RB, Principato MA, Page SW, *et al.* Pathological and immunological effects of ingesting L-tryptophan and 1,1′-ethyidenebis (L-tryptophan) in Lewis rats. *J Clin Invest* 1993; **91**: 804–11.
54. Farinelli S, Mariani A, Grimaldi A, Mariani M, Iannessi A, De Rosa F. Eosinophilia–myalgia syndrome associated with 5-OH-tryptophan. Description of a case. *Recenti Prog Med* 1991; **82**: 381–4.
55. Lampert A, Joly P, Thomine E, Ortoli JC, Lauret P. Scleroderma-like syndrome with bullous morphea during treatment with 5-hydroxytryptophan, carbidopa and flunitrazepam. *Ann Dermatol Venereol* 1992; **119**: 209–11.
56. Flockhart DA, Clauw DJ, Sale EB, Hewett J, Woosley RL. Pharmacogenetic characteristics of eosinophilia–myalgia syndrome. *Clin Pharmacol Ther* 1994; **56**: 398–405.
57. Okada S, Sullivan EA, Kamb ML, Philen RM, Miller FW, Love LA. Human leukocyte antigen (HLA) DRB1 alleles define risk factors for the development of eosinophilia myalgia syndrome. *Arthritis Rheum* 1994: **37**: S274.

# 32

# Determining Causation from Case Reports

JUDITH K. JONES
The Degge Group, Ltd., and Adjunct Faculty, George Washington University, Georgetown University, Washington, DC, USA

## INTRODUCTION

A major component of the evaluation of reports of suspected adverse drug reactions, or events in a clinical trial, is a judgment about the degree to which any reported event is, in fact, causally associated with the suspected drug. In reality, a particular event either is associated or is not associated with a particular drug, but the current state of information almost never allows a definitive determination of this dichotomy. Accordingly, a number of approaches to the determination of the probability of a causal drug–event association have evolved over the past several years. This chapter will first discuss the historical development of these efforts, and several of the current approaches, uses, and evolving efforts will then be reviewed, including a brief consideration of the evaluation of single events in the clinical trial setting.

## CLINICAL PROBLEMS TO BE ADDRESSED BY PHARMACOEPIDEMIOLOGY RESEARCH

The basic clinical problem to be addressed is illustrated in Figure 32.1. A clinical event occurs within the milieu of a number of possible causal factors. That event either occurred independently or in some way its occurrence was partially or totally linked to one or more of the potential causative agents. The primary task is to determine the degree to which the occurrence of the event is linked to one particular suspected causal agent, in this case a drug.

This task of evaluating causality in case reports shares some similarities with the problem of evaluating causality in chronic disease epidemiology, as discussed below and in more detail in Chapter 2. However, both the nature of the exposure and sometimes the nature of the event make the determination of causality in case reports a major challenge. This set of circumstances presents a special challenge to anyone who evaluates cases of suspected adverse drug reactions, as the evaluator must make, at the very least, an implicit judgment of causality. It also presents a special challenge to those who desire a coherent, consistent, and reliable method of determining whether there is a causal relationship between these events. Specifically:

1. The usual focus of adverse reaction assessment is an individual clinical event suspected of being

*Pharmacoepidemiology*, Third Edition. Edited by B. L. Strom.
© 2000 John Wiley & Sons, Ltd.



Case 1:04-cv-10981-PBS Document 1197-111 Filed 04/04/2008 Page 3 of 15

Figure 32.1. Diagram depicting the dilemma for determining causation of an event in a clinical setting. In reality a drug either did or did not cause or contribute to an event. However, given the multiple factors associated with the event, the actual truth can seldom be ascertained. Instead, some expression of probability that the drug was associated with the event is made. The method by which this expression is determined is the primary concern of those in adverse reaction causality research.

associated with a drug. The reporting of this event will, therefore, typically be in the context of a suspicion that the event is drug induced, which will often bias the collection of data required to evaluate other possible causes.

2. The data available about a patient's drug exposure in the typical case report are incomplete, usually missing precise information on duration, actual dose ingested, and/or concomitant drugs administered. The one exception is the report that comes from a hospital, but this is less often a source of reports because of the excess of events and exposures that occur during a hospitalization, confounding most suspicions.
3. The data available on the event, including its onset, characteristics, and time course, are also typically incomplete, because the suspicion is usually retrospective and the desired data (e.g., baseline laboratory data) are often not available.
4. As a corollary to 3 above, since adverse reactions can be acute, subacute, or chronic, can be reversible or not (e.g., death and birth defects), can be rare or common, and can be unique pathologically or identical to known common diseases, it has been difficult to define general data elements and criteria which will apply to most types of adverse reaction. For example, for irreversible events, criteria that require dechallenge and rechallenge are irrelevant. More recently, as described below, this is changing.
5. Data on concomitant diseases and other confounding conditions, such as diet and habits, are typically not available, often because of factors discussed in 1 and 3 above.

Closely linked to the task of determining whether there is a causal relationship between a drug exposure and an event is the reason for that particular determination and the impact of that inference on any actions taken. If the determination is perceived to have little impact, it might logically be less rigorous. However, the evolution of recent interest in the entire subject of adverse drug reactions and the recognition of the broad use of alleged drug–event associations has supported a need for consistent and reliable methods of causality determination.[1]

Additionally, with the appearance of regulations for reporting in clinical trials of adverse events that are "reasonably" associated with a drug,[2] there is a growing need to describe the basis for defining an association within this setting. Although some of the above-listed uncertainties are likely to exist, there are similar difficulties with rare events, which will be considered below.

## HISTORICAL PERSPECTIVES

### Development of Concepts of Causality for Adverse Reactions

The development of thinking about the causality of adverse reactions has evolved in two disciplines: (i) in epidemiology, and (ii) in the study of individual case reports of adverse reactions. Consideration of both is important.

In the 1950s, epidemiologists grappled with the issue of causality, and Yerushalmy and Palmer, drawing upon the Bradford Hill epidemiology criteria as well as the Koch–Henle postulates for establishing causation for infectious diseases, developed a set of proposed criteria for causality. These evolved, after considerable deliberation with other epidemiologists, into five criteria for the causal nature of an association.[3] These included determinations of:

1. the consistency of the association;
2. the strength of the association;
3. the specificity of the association;
4. the temporal relationship of the association; and
5. the coherence, or biological plausibility, of the association.

These criteria continue to be generally used in chronic disease epidemiology, although they have also been actively discussed and criticized.[3] They are discussed in more detail in Chapter 2. Although seldom explicitly noted, the reasoning behind these criteria appeared at about the same time as did thinking about the causal assessment of individual reports of adverse reactions.

Prior to the last two decades in the adverse reactions field, the typical approach to case reports of suspected drug associated clinical events was to consider the events as possibly associated with the drug if there were a number of similar reports. Considerations of pharmacologic plausibility, dose–response, and timing factors were sometimes implicit, but seldom explicit. This approach continued until relatively recently, and in some cases is still used.

The more perplexing proposed drug–event associations were then typically referred to one or more experts, who generally approached the evaluation by what has been termed "global introspection." In this approach, the experts collect all the facts relevant to the problem at hand, compile them, and make unstructured judgements to decide the answer. In the causality assessment context, this answer has usually been expressed in terms of a qualitative probability scale, for example "definite" versus "probable" versus "possible" versus "doubtful" versus "unrelated."[4]

The subjective nature of global reasoning as an approach led a number of investigators to develop more structured methods of causality assessment. Irey, in examining the details of cases of suspected reactions at the US Armed Forces Institute of Pathology, clearly demonstrated the discrepancy between cases initially reported as drug associated and those found by careful detailed examination to be actually likely to be drug associated.[5,6] Shortly thereafter, the clinical pharmacologists Karch and Lasagna also recognized the inadequacy of expert "global" evaluations of adverse reactions and developed a decision table, or algorithm, to segment the evaluation of a case into several components.[7] These two groups of investigators identified very similar basic data elements that they felt were necessary for a more standardized assessment:

1. the timing of the event, relative to the drug exposure;
2. the presence or absence of other factors which might also cause the event;
3. the result of withdrawing the drug ("dechallenge");
4. the result of reintroducing the drug ("rechallenge"); and
5. other data supporting an association, e.g., previous cases.

Although the criteria shared some similarities with those in chronic disease epidemiology, the special characteristics of adverse drug reactions required considerations that differed somewhat. The usual setting for this latter causality assessment was a single case or group of cases from an ill defined exposed population. The criteria derived for chronic disease epidemiology were therefore inapplicable.

Following the introduction of these new methods for the assessment of suspected adverse drug reactions, a large number of other approaches were developed,[8–15] either as algorithms, decision tables, or, in at least one case, as a diagrammatic method.[13] These were reviewed and summarized in monographs from two con-

Table 32.1. A summary of the information categories in the method of Kramer *et al.* (8) for determining the causality of adverse reactions

| Axis[a] | Information category | Number of questions[b] | General content |
|---|---|---|---|
| I | Previous experience with drug | 4 | Literature or labeling information |
| II | Alternative etiologies | 9 | Character, frequency of event with disease versus drug |
| III | Timing of events | 4 | Timing consistent |
| IV | Drug levels, evidence of overdose | 6 | Blood levels, other dose related issues |
| V | Dechallenge | 23 | All aspects of timing, results |
| VI | Rechallenge | 10 | All aspects of response |

[a] Axis in the published algorithm. Although the visual format of the published algorithm appears complex, the axes correspond to the information considered in the majority of causality assessment methods. The authors then weight the answers to the questions to provide a score for each axis which, when summed, gives a numerical estimate of the probability of an association, ranging from 6 or 7 = definite to less than 0 = unlikely.
[b] Not all questions are asked for any one problem.

ferences held in the early 1980s on the causality of adverse reactions—one in Morges, Switzerland,[16] and another in Crystal City, VA.[17] The vast majority of these methods shared the basic elements originally suggested by Irey and by Karch and Lasagna, but many added many other details useful for the evaluation of special cases, such as injection site reactions or *in vitro* verification (e.g., 14). Some included extensive scoring systems linked to relatively extensive algorithms, such as the approach published by Kramer *et al.*[8] A summary of some of the major methods is presented in Table 32.1, and selected methods are discussed in detail in the next section of this chapter.

The 1981 Morges conference,[16] the 1983 Crystal City conference,[17] and a 1983 Paris meeting[18] were all intended to compare a number of these approaches and to consider whether a single method might be developed that could represent a consensus. An international study group, the Associated Permanent Workshop of Imputologists (APWI) ("imputology" being the French term for causality), was initiated at the Morges meeting and continued into the 1990s.[19,20] Although a consensus method was not established, the Crystal City conference had requested an outside observer (Dr. David Lane, a theoretical statistician) to provide a critique of the deliberations.[21] His critique and subsequent participation in the Paris conference and APWI resulted in the development of a new approach for assessing the causality of adverse reactions based on Bayes probability theorem.[22] This approach considered the probability of an event occurring in the presence of a drug relative to its probability of occurring in the absence of the drug, considering all details of the case.[23–26] Although in use elsewhere in medicine, this approach had not been applied to analyses of suspected adverse effects. This method will be discussed in more detail in the next section of this chapter.

## Potential Uses of Causality Assessment

Despite the proliferation of methods and the great interest in adverse effects of drugs, the actual use of these methods for decision making has been infrequent. However, causality assessment has been required in France for many years and has been formally considered in a European Community Directive[27,28] (see also Chapter 11). This has resulted in a general consensus on the causality terms used by the European Union member states.[29] In fact, there are a variety of settings where these approaches could be useful, from drug development and monitoring by the pharmaceutical manufacturer, to evaluation and monitoring by regulators, to the clinical setting, the courtroom, and even the newsroom.[1]

### *Pharmaceutical Manufacturers*

Manufacturers of pharmaceuticals must view causality assessment for events associated with their drugs from the standpoints of both regula-

tory requirements and product liability. Until recently, US pharmaceutical manufacturers have not had to consider assessment of causality for regulatory purposes. Regulations covering post-marketing event monitoring in the US required reporting of all events associated with the drug "whether or not thought to be associated with the drug" (earlier, US Code of Federal Regulations 21:310.300; now, 21:314.80) (see also Chapter 10), and causality assessment did not formally apply to events in clinical trials. However, recently US FDA regulations implicitly require causality assessment for determination of reporting certain types of clinical event in clinical trials in the Investigational New Drug (IND) regulations (CFR 21:312.22). This has come about by requiring the reporting of serious unexpected events associated with use of a drug where there is a reasonable possibility that the events may have been caused by the drug. A disclaimer is noted that such a safety report does not constitute an admission that the drug caused the events. These regulations do not provide criteria or a suggested method; however, they do imply that such methods might be useful.

Independently, manufacturers faced with a serious event in drug development have also been motivated to explore formal evaluation methods for serious events that could be used to signal the need for discontinuation of drug development if causality is established.

Outside of the US, the requirements for manufacturers to consider causality have varied from country to country. Many regulatory agencies have requested or implied some type of evaluation to minimize the number of nonspecific events reported.[30] Given this environment, particularly in a growing international milieu, manufacturers have been actively interested in this area. In fact, several of the specific methods for causality assessment have been published by investigators based in the pharmaceutical industry.[11,14,15,31–33]

Causality definitely is an issue for pharmaceutical manufacturers in the arena of product liability (see Chapter 9). Freilich has considered many aspects of this,[34] concluding that a company must have a rigorous process for the review of any adverse event reports and "make causality assessments on an ongoing basis" for product liability purposes. This is necessary to comply with the duty to warn, which he summarizes as follows: "Information must be given of any risks of death or serious harm, no matter how rare, as well as information concerning side effects where there is a substantial probability of their occurrence, no matter how mild." Others in the legal arena dealing in product liability have considered causality issues and the notion of the "substantial factor" test for contributing to causation.[35,36]

### *Drug Regulators*

The use by drug regulators of causality assessment of spontaneously reported postmarketing adverse reactions has varied considerably. Most countries' drug regulators have some method of approaching causality, but this method has been best defined in France, Australia, and certain other countries[30,37,38] (also see Chapter 11).

In France—owing in part to the considerable original work and interest in adverse reaction causality by a regulator, J. Dangoumou, and his colleagues—all reports of suspected reactions must be evaluated by the "French method." This method combines symptom and chronologic criteria to give a "global intrinsic score," and then adds bibliographic data from standardized sources to give an "extrinsic score."[10,39]

In the US (see also Chapter 10), although a data element for causality was incorporated into the initial file format for the computerized reports of suspected adverse reactions submitted to the FDA, no formal method for evaluating all reports was used until a simple algorithm was developed in the early 1980s, based on the Irey and the Karch and Lasagna work.[12,13] This method very specifically excluded the consideration of previous literature reports as a basis for considering the strength of the association. It was reasoned that, in many cases, the FDA would be in the position of receiving the first reports of an association, and such a criterion would suppress a signal of a possibly new drug associated event. The primary use of the assessment by the FDA was administrative, i.e., the causality assessment was a mechanism for identifying the best

documented cases—those with a "probable" or "highly probable" association. The causality judgment was specifically deleted from publicly available files, which consistently carry the caveat, "a cause and effect relationship has not been established." Although the FDA algorithm existed for the reviewers of the reports, the frequency of its actual use was not determined, and this causality data element was removed from the computer file in 1986. The FDA does not now use formal causality assessment on a routine basis (see Chapters 8 and 10).

### *Publishers of Reports of Adverse Reactions*

The medical literature containing case reports of suspected adverse reactions has largely avoided the issue of causality. The majority of single case reports, letters to the editor, or short publications do not provide an explicit judgement using any of the published algorithms. Further, many reports do not provide information on confounding drug therapy or medical conditions, data elements considered by most knowledgeable in adverse reaction assessment to be essential for considering causality. This issue was recognized as one of several problems relating to the publication of adverse reactions in the literature, and was discussed extensively during the conference in Morges, Switzerland in 1983. A number of editors of medical publications were present and discussed the quality of information in reported cases. They developed a list of the types of information that would be desirable for published reports, information that would permit the reader to assess independently the likelihood of the association.[40,41] More recently, Harambaru and her colleagues compared the value of 500 published reports with 500 spontaneous reports with respect to the availability of information needed in most standard causality assessments. Although analysis suggested the published reports contained significantly more information, the tabulation suggests very sparse data on both alternate causes/other diseases and other drugs in *both* types of report.[42]

## METHODOLOGIC PROBLEMS TO BE ADDRESSED BY PHARMACOEPIDEMIOLOGY RESEARCH

The problem to be solved in determining whether an event is caused by a drug is to find one or more methods that are reliable, consistent, accurate, and useful for determining the likelihood of association. This problem is compounded by the nature of drug associated adverse events. They vary in their frequency, their manifestations, their timing relative to exposure, and their mechanism, and mimic almost the entire range of human pathology, as well as adding unique new pathologies (e.g., kidney stones consisting of drug crystals and the oculomucocutaneous syndrome caused by practolol). In addition, since drugs are used to treat illnesses, drug associated events are always nested within other pathologies associated with the indication for the drug. Since drugs are used to produce a beneficial effect, known or expected adverse events are grudgingly accepted within the clinical risk/benefit equation. However, unknown or unexpected events are inconsistently recognized and described, and seldom are the desired baseline and other detailed measurements taken.

The nature of this task, and its context, has generated two divergent philosophies. One philosophy discounts the value or importance of causality assessment of individual reactions, deferring judgment to the results of formal epidemiological studies or clinical trials.[43] The alternate view contends that the information in single reports can be evaluated to determine at least some degree of association, and that this can be useful, and sometimes critical, when drug withdrawal is a consideration.[44] This latter view has spurred the evolution of causal evaluation from expert consensual opinion based on global introspection to structured algorithms, and to elaborate probabilistic approaches, as described previously. Further, because of the nature of drug associated effects, particularly those that are rare and serious, the question has been raised about whether epidemiologists need to consider using methods for causal evaluations of cases in their formal studies and in clinical trials, since the small

numbers available may not be amenable to standard statistical analysis.[45]

## CURRENTLY AVAILABLE SOLUTIONS

There are now a variety of methods for causality assessment of spontaneous reports. Four basic types will be described, chosen as illustrative examples and because they have been widely described in various publications.

### UNSTRUCTURED CLINICAL JUDGEMENT/GLOBAL INTROSPECTION

Probably the most common approach to causality assessment is unstructured clinical judgement. An expert is asked to review the clinical information available and to make a judgement as to the likelihood that the adverse event resulted from drug exposure. However, it has been amply demonstrated that global introspection does not work well, for several reasons.[4]

First, cognitive psychologists have shown that the ability of the human brain to make unaided assessments of uncertainty in complicated situations is poor, especially when assessing the probability of a cause given an effect, precisely the task of causality assessment.[46] This has been clearly demonstrated for the evaluation of suspected adverse reactions. Several studies have used "expert" clinical pharmacologists to review suspected reactions. Comparing their individual evaluations, these studies documented the extent of their disagreement and illustrated, thereby, how unreliable global introspection is as a causality assessment method.[11–13,47,48]

Second, global introspection is uncalibrated. One assessor's "possible" might mean the same thing as another assessor's "probable." This has been well demonstrated in a study of one pharmaceutical company's spontaneous report reviewers, who used both a verbal and numerical scale.[16] These and other shortcomings of global introspection as a causality assessment method for adverse reactions are discussed in detail by Lane, Hutchinson, and Kramer.[4,21,49]

### ALGORITHM/CRITERIAL METHOD WITH VERBAL JUDGMENTS

The subsequent attempts to address this problem have resulted in the proliferation of approaches (see references 16 and 17 for reviews and examples of these methods, the appendix in reference 20 for a complete bibliography, and a recent summary).[50] These methods range from simple flow charts posing ten or fewer questions to lengthy questionnaires containing up to 84 items. However, they share a common basic structure essentially based on the original Karch and Lasagna and Irey work—the timing of the adverse event in relation to administration of the drug, alternative etiological candidates, previous recognition of the event as a possible adverse reaction to the drug, the response when the drug is discontinued (dechallenge), and the response when the drug is subsequently readministered (rechallenge). Information relevant to each factor is elicited by a series of questions, the answers to which are restricted to "yes/no" (and, for some methods, "don't know").

These approaches have advantages when compared to global introspection,[49] since there is a great improvement in the consistency of ratings among reviewers. Since the consideration of each case is segmented into its components (e.g., timing, confounding diseases, etc.), this also allows for a better understanding of areas of disagreement. However, there is still considerable global introspection required to make judgments on the separate elements of the algorithms or decision tables. These judgments require, in some cases, "yes" or "no" answers where, in fact, a more quantitative estimate of uncertainty would be more appropriate. For example, the reviewer might have to consider whether the appearance of jaundice within one week represented a sufficient duration of drug exposure to be consistent with a drug–event association. Even adherents of some of the methods agree that their procedures for converting answers into probability ratings are arbitrary.

This type of approach, with various degrees of complexity, is used by some drug regulatory agencies, such as that of Australia.[37] The FDA algorithm, currently not in official use, was

Case 1:04-cv-10981-PBS Document 1197-111 Filed 04/04/2008 Page 9 of 15

another example of this approach, inquiring sequentially about temporal sequence, dechallenge, rechallenge, and concomitant diseases that might have caused the event. Based on the Irey and the Karch and Lasagna concepts, it was tailored to be amenable for rapid use by professionals with varied backgrounds for the administrative purpose of finding well documented cases for regulatory signal evaluation. It was also considered useful and easily remembered by clinicians in initial differential diagnosis of a clinical event. However, this very simple approach is less useful for irreversible drug effects, since they have neither dechallenge or rechallenge possibilities. To address this, an alternate algorithm for fatal outcome events was developed in the aftermath of the FDA algorithm (Dries, in 14).

## ALGORITHMS REQUIRING SCORING OF INDIVIDUAL JUDGMENTS

Many algorithms permit quantitative judgments by requiring the scoring of their criteria. The answers to the algorithms' questions are converted into a score for each factor, the factor scores are summed, and this overall score is converted into a value on a quantitative probability scale. These judgments range from the extensive, multiple question method of Venulet *et al.*,[14] which has now been translated for computer use, to the relatively simpler French method.[10] The method developed by Kramer *et al.*[8] received considerable review and is representative of the scored methods. Although it was presented in algorithm format with multiple steps, it can also be represented in tabular format, as shown here (Table 32.1). One of the more practical methods of this type was developed by Naranjo *et al.*[9] This has been adopted in a number of clinical settings (Naranjo, personal communication) and is shown in Figure 32.2.

These quantitative methods have found applications in a number of settings, ranging from evaluations of suspected adverse reactions by hospital committees (US hospitals are now required by the Joint Commission on Accreditation of Health Care Organizations (JCAHO) to have programs of adverse reaction surveillance) to use by some regulatory authorities, as in France. They are also used, although sometimes only in a research context, by some pharmaceutical manufacturers.[16,30] The specific manner in which they are used has not been well described in the literature.

## PROBABILISTIC METHODS

Recognition of the various problems inherent in the previously existing methods set the stage for the development of an alternative approach based on the Bayesian probability approach to

CAUSALITY ASSESSMENT
EXAMPLE: NARANJO SCORED ALGORITHM

| QUESTION | ANSWER Yes | No | Unk | | SCORE |
|---|---|---|---|---|---|
| Previous reports? | +1 | 0 | 0 | | – |
| Event after drug? | +2 | –1 | 0 | | – |
| Event abate on drug removal? | +1 | 0 | 0 | | – |
| + Rechallenge? | +2 | –1 | 0 | | – |
| Alternative causes? | –1 | +2 | 0 | | – |
| Reaction with placebo? | –1 | +1 | 0 | | – |
| Drug blood level toxic? | +1 | 0 | 0 | | – |
| Reaction dose-related? | +1 | 0 | 0 | | – |
| Past history of similar event? | +1 | 0 | 0 | | – |
| ADR confirmed objectively? | +1 | 0 | 0 | = | – |

Figure 32.2. A critical scored algorithm illustrated by the method of Naranjo *et al.*, in wide use.[9] This particular method uses some of the basic data elements as well as more details of the history and characteristics of the case, and an arbitrary score is designated for each response.

assessment of causality. This method has provided an opportunity for a fresh look at the issue of causality, and its initial apparent difficulty (due to its requirement for using all available information) raised some new issues about causality assessment of adverse reactions. It has also brought the area of adverse reactions evaluation into a larger discussion of the value of the Bayesian and probabilistic approaches to the analysis of medical and scientific data.[3]

First published as a method for adverse reaction assessment by Auriche,[33] who participated with Lane and others in a working group within the APWI organization, this method was first presented in extensive form in a workshop in 1985 (see Figure 32.3). Several examples were published in a monograph and subsequently in early papers.[25,26] The methods have been incorporated into automated versions by both Naranjo and Hutchinson, the latter developing a model using an expert system.[51,52] Naranjo and colleagues have implemented a practical spreadsheet/automated version called BARDI (Bayesian Adverse Reaction Diagnostic Instrument) and have now applied it to a number of practical adverse event problems.[44,53,54]

The Bayesian method determines the probability of an event occurring in the presence of a drug, relative to the probability of that event occurring in the absence of the drug, as illustrated in Figure 32.3. Estimation of this overall probability, the "posterior probability," is based on two components:

1. what is known prior to the event, the "prior probability," which is based on clinical trial and epidemiologic data, and
2. what the likelihoods are or are not for drug causation of the components of the specific case, including its history, timing, characteristics, dechallenge and its timing components, rechallenge, and any other factors, such as multiple rechallenges.

The full application of this method requires knowledge of the clinical event, its epidemiology, and relatively specific information about the event's characteristics and kinetics over time. Examples have been published for several types of event, including Stevens–Johnson Syndrome, renal toxicity, lithium dermatitis, and ampicillin associated colitis, agranulocytosis, and Guillain-Barré syndrome.[23,44,53] Thus far, this approach appears to be useful for the analysis of the perplexing first events in new drug clinical trials,

POSTERIOR ODDS = PRIOR ODDS X LIKELIHOOD RATIO
P (D → E) I B, C / P (D –/→ E) I B, C = P (D → E) I B / P (D –/→ E) I B X P C I (D → E) / P C I (D –/→ E)
Overall probability
Epidemiology and clinical trial data
Individual case data (history, timing, case character, dechallenge, etc.)
P Probability
D → E Drug caused event
D –/→ E Drug did not cause event
B Baseline information
C Case c event

Figure 32.3. The basic equations for the Bayesian analysis of suspected drug associated events. These provide a structured, yet flexible and explicit approach to estimating the probability that an event is associated with one, or more, drugs, as described in the text and extensive literature dating from Auriche,[23] Lane,[25] and others. Since the prior probability estimate is dependent on explicit data from clinical trials and epidemiologic studies, this approach can provide a framework for specific event-related questions in these studies.

serious spontaneous adverse reaction reports, and possibly rare events discovered in both case–control and cohort pharmacoepidemiology studies, when standard methods of statistical analysis will not provide sufficient clues as to causality because of inadequate sample size.

With the logistic problem of the length of time required for the actual calculations minimized by automation, the major impediment to more general application of the Bayesian method is the state of the information required for robust analyses of events. There is no abundance of data on the incidence of most events and their occurrence in the presence and absence of most drugs (the required information for the prior probability). There are even fewer data available on the historical risk factors, the time course, and specific characteristics of the drug associated conditions, as opposed to the naturally occurring conditions. Although this lack of information is a current limitation, it represents both an important challenge and a framework for structuring further understanding. Benichou and collaborators have delved further into a mapping process of reactions by type in an attempt to begin classifications of specific drug associated disease, using acute liver disease as one model that incorporates qualitative clinical definitions of the disease into the judgement.[58,59]

For this reason, there appear to be several advantages of using this method for the analysis of suspected drug-associated events:

1. All judgments must be explicit and quantified, which permits better explanations of the degree of uncertainty about each component of information. Further, this approach makes maximum use of the available information and follows the basic rule of not discarding information.
2. Since each component is analysed separately, a sensitivity analysis of each information component can estimate its overall contribution to the final posterior odds or probability estimate. This, in turn, can be used to determine which information is pivotal. For example, if a tenfold difference in the estimate of the timing does not materially modify the overall posterior odds estimate, further efforts to determine the "best" estimate would not be worthwhile.
3. Because of the multistep approach to a judgement, combined with a lack of the prejudged weighting present in most other methods, this approach resists the tendency to achieve a result expected on an *a priori* global judgement. This is quite important in evaluating events with multiple causes.
4. This approach can provide an extensive summary of the information needed and areas needing further research and data compilation. Thus, the Bayesian approach ultimately provides a "map" to define the information most critical for understanding drug induced disease and serves to help formulate the most critical questions to be researched. As disease natural histories and drug induced diseases are now being described in large population databases, it will be essential to link these two types of analysis. For example, the timing and risk factor data on antibiotic associated diarrhea in three state Medicaid populations (Jones *et al.* unpublished) will provide extensive population data which can be used in one of the Bayesian analyses of this entity in single cases.[25,51,52]

## COMPARISON AMONG THE DIFFERENT METHODS FOR CAUSALITY ASSESSMENT

Several efforts have been made to evaluate and compare these methods. The 1983 conference in Crystal City involved the application of several of the methods to a standardized case, illustrating a considerable lack of concordance for some methods.[18]

A much more elegant and detailed evaluation of six representative algorithmic methods has been carried out more recently by Pere *et al.*,[55] who identified standard evaluation criteria and carried out an evaluation of 1134 adverse reactions using the various methods. Significantly, they found only moderate agreement between all pairs, and considerable disagreements on weightings of three

of the major criteria—timing, dechallenge, and alternate etiologies.

Given the current state of affairs, where a number of published methods exists, the choice of a method for use in evaluating individual adverse effects will likely be determined by a number of practical factors. These include the following.

1. *How the evaluation will be used.* This refers to both its short term use (e.g., a higher rating may be needed to result in a "signal" or need to report an event in a clinical trial) and long term use (e.g., will a single highly probable case in a file, not otherwise acted upon, be a source of liability for the evaluator?)
2. *The importance of the accuracy of the judgement.* If this evaluation will determine either a specific clinical outcome or, for example, the continuation of a clinical trial or the continued marketing of a drug, the accuracy of the judgement may be critical. Conversely, if little hinges upon the judgement, cruder estimates and methods, recognized as such, may suffice.
3. *The number of causality evaluations to be made.* The above considerations must also be weighed against the time required to make judgments on large numbers of reports. This is particularly a dilemma for regulatory agencies and manufacturers, where the need for accurate judgements is pitted against the volume of evaluations to be considered. One approach to this problem is suggested by the FDA's approach to identifying high priority problems according to their newness and seriousness (1, and see Chapter 8).
4. *The accrued value of thorough evaluations.* In some circumstances, the careful, rigorous evaluation of certain categories of drug associated event will facilitate the more accurate evaluation of subsequent, related events. For example, consider a case where a drug under development is anticipated to cause hepatic events. Detailed evaluations of hepatic events induced by other drugs may allow more satisfactory causality evaluation of reports received on the new drug.[56] In some cases this results from data collection being focused to a much greater degree, as has been initiated in France by Benichou *et al.*; here special reporting forms based on disease-specific criteria for events are being developed.[56,57]
5. *Who will be carrying out the evaluation?* Although no specific studies have been carried out to evaluate the inter-rater differences among differently trained professionals, it is likely that the body of information held by each reviewer will have considerable impact on any of the methods used, including the Bayesian method.

## THE FUTURE

The field of adverse reaction causality assessment has many unresolved issues, both methodologic and practical, which have been described in the preceding sections. Although there was an original hope that there would be some basis for a consensus method,[18] the current state of the field would suggest that this is not likely to be the case, as again evidenced at the Third International APWI meeting in Paris (November 1992). Several reasons can be suggested. First, a number of individuals and institutions have adopted one or sometimes a few methods and have committed to their use, often through their choice of data collecting systems or software.[14] Second, the practical aspects of the use of these methods have appeared to play a very real role. Although discussed with excitement as the possible "gold standard" for adverse reaction causality, the Bayesian method was not rapidly embraced, in part because of the difficulty of its use without automation. Now that this barrier has been lifted, and with further use for practical applications, its potential may be realized. It is likely that the complex appearance of the algorithm of Kramer *et al.*[8] likewise discourages its use in some sectors, although this has not been documented. Again, this is diminished with automation. Third, concern about the misuse of judgment terms or scores within the legal arena (see Chapter 9) has generated concern (34), particularly given the fact that there is no gold standard method.

All of these factors suggest the need for considerable further work. This work would appear to fall into at least three areas:

1. Further definition of the *applications* of causality assessment, that is the "output" of the process, so as to better define the desired rigor, accuracy, and usability of the methods. It would appear that there will probably always be needs for simpler and rougher methods, as well as more complete and rigorous methods, when the determination has considerable impact.
2. Further definition of the *critical elements needed* for the evaluation of causality for different types of adverse reaction. This has long been recognized[10,18,55] and is being implemented in some centers (e.g., France, University of Toronto). Further work in this area can have a major impact on:
   (a) the collection of better information, using data collection instruments tailored to the event of interest, and
   (b) the better definition of the dynamics and, ultimately, the mechanisms of certain types of drug induced condition.
3. Gathering of data on these *critical elements* in the course of both clinical trials and epidemiologic studies. Risk factor, history, timing, characteristics, and resolution patterns of adverse events should be described in these studies and incorporated into general data resources on the characteristics of medical events and diseases.
4. Further work on *automation* of the causality evaluation process. Global introspection is still widely used because of the cumbersome nature of many of the more complete methods. Fortunately, several methods are now being automated, including the French method,[55] the Venulet method (J. Venulet, personal communication), and the Bayesian BARDI method.[54] Convenient access to the proper questions, arrayed in logical order, as well as background data on the state of information to date, has the potential for radically changing the state of adverse reaction causality evaluation.

## REFERENCES

1. Jones JK. Uses of drug–event assessment. *Drug Inf J* 1984; **18**: 233–40.
2. US Code of Federal Regulations 1987; **21**: 312.22 on Investigational New Drug procedures.
3. Feinstein AR. Clinical biostatistics. XLVII. Scientific standards vs. statistical associations and biologic logic in the analysis of causation. *Clin Pharmacol Ther* 1979; **25**: 481–92.
4. Hutchinson, TA, Lane DA. Assessing methods for causality assessment. *J Clin Epidemiol* 1989; **42**: 5–16.
5. Irey NS. Diagnostic problems in drug-induced diseases. In: Meyler L, Peck HM, eds, *Drug-Induced Diseases*, Vol. IV. Amsterdam: Elsevier, 1972; 1–24.
6. Irey NS. Adverse drug reactions and death: a review of 827 cases. *J Am Med Assoc* 1976; **236**: 575–8.
7. Karch FE, Lasagna L. Toward the operational identification of adverse drug reactions. *Clin Pharmacol Ther* 1977; **21**: 247–54.
8. Kramer MS, Leventhal JM, Hutchinson TA *et al.* An algorithm for the operational assessment of adverse drug reactions. I. Background, description, and instructions for use. *J Am Med Assoc* 1979; **242**: 623–32.
9. Naranjo CA, Busto U, Sellers EM, *et al.* A method for estimating the probability of adverse drug reactions. *Clin Pharmacol Ther* 1981; **30**: 239–45.
10. Begaud B, Evreux JC, Jouglard J *et al.* Unexpected or toxic drug reaction assessment (imputation). Actualization of the method used in France. *Therapie* 1985; **40**: 111–8.
11. Emanueli A, Sacchetti G. An algorithm for the classification of untoward events in large scale clinical trials. *Agents Actions* 1980; **7**: 318–22.
12. Jones JK. Adverse reactions in the community health setting: Approaches to recognizing, counseling, and reporting. *Family Community Health* 1985; **5**: 58–67.
13. Turner WM. The Food and Drug Administration algorithm. *Drug Inf J* 1984; **18**: 259–66.
14. Venulet J, Ciucci AG, Berneker GC. Updating of a method for causality assessment of adverse drug reactions. Int J Clin Pharmacol Ther Toxicol 1986; **24**: 559–68.
15. Castle WM. Assessment of causality in industrial settings. *Drug Inf J* 1984; **18**: 297–302.
16. Venulet J, Berneker GC, Ciucci AG, eds. *Assessing Causes of Adverse Drug Reactions*, London: Academic, 1982.
17. Herman RL, ed. *Drug–Event Associations: Perspectives, Methods, and Users*, proceedings of Drug Information Association Workshop, Arlington, VA, 1983.
18. Jones JK. Drug–event associations: a view of the current status. Epilogue. *Drug Inf J* 1984; **18**: 233–40.

19. Jones JK, Herman RL. Assessing adverse drug experiences [letter]. *Ann Intern Med* 1988; **108**: 160.
20. Venulet, J. APWI: past and present. *Drug Inf J* 1991; **25**: 229–33.
21. Lane DA. A probabilist's view of causality assessment. *Drug Inf J* 1984; **18**: 323–30.
22. de Finetti B. *Theory of Probability.* New York: Wiley, 1974.
23. Jones JK, Herman RL (guest eds). *Introduction, The Future of Adverse Drug Reaction Diagnosis: Computers, Clinical Judgement and the Logic of Uncertainty,* proceedings of the Drug Information Association Workshop, Arlington, VA, 1986. *Drug Inf J* 1986; **20**: 383.
24. Lane D. Causality assessment for adverse drug reactions: a probabilistic approach. In: Berry D, ed., *Statistical Methodology in the Pharmaceutical Sciences*. New York: Dekker, 1990; 475–507.
25. Lane DA, Kramer MS, Hutchinson TA *et al.* The causality assessment of adverse drug reactions using a Bayesian approach. *Pharm Med* 1987; **2**: 265–83.
26. Jones JK. A Bayesian approach to causality assessment. *Psychopharm Bull* 1987; **23**: 395–9.
27. CPMP Working Party on Pharmacovigilance. *Procedure for Causality Classification in Pharmacovigilance in the European Community*, EC Document III/3445/91-EN, final, 1991.
28. Jones JK. Causality assessment of suspected adverse drug reactions: a transatlantic view. *Pharmacoepidemiol Drug Safety* 1992; **1**: 251–60.
29. Miremont G, Haramburu F, Begaud B, Pere JC, Dangoumou J. Adverse drug reactions: physicians' opinions versus a causality assessment method. *Eur J Clin Pharmacol* 1994; **46**: 285–9.
30. Castle W, Baker A. Communication of ADR information: the viewpoint of a British company. *Drug Inf J* 1985; **19**: 375–80.
31. Stephens M. Assessment of causality in industrial settings. *Drug Inf J* 1984; **18**: 307–14.
32. Stephens M. *The Detection of New Adverse Drug Reactions*. London: Plenum, 1985.
33. Auriche M. Approache bayesienne de l'imputabilite des phenomenes indesirables aux medicaments. *Therapie* 1985; **40**: 301–6.
34. Freilich WB. Legal perspectives in causality assessment. *Drug Inf J* 1984; **18**: 211–7.
35. Margulies, JB. Epidemiologic causation in the courtroom: square pegs in round holes? *Drug Inf J* 1991; **25**: 217–27.
36. Henderson TW. Legal aspects of disease clusters. Toxic tort litigation: medical and scientific principles in causation. *Am J Epidemiol* 1990; **132**: S69–78.
37. Mashford ML. The Australian method of drug–event assessment. *Drug Inf J* 1984; **18**: 271–3.
38. Wiholm BE. The Swedish drug–event assessment methods. *Drug Inf J* 1984; **18**: 267–9.
39. Dangoumau J, Begaud B, Boisseau A, *et al.* Les effets indésirables des médicaments. *Presse Med* 1980; **9**: 1607–9.
40. Editorial. Improving reports of adverse drug reactions. *Br Med J* 1984; **289**: 898–9.
41. Venulet J. Incomplete information as a limiting factor in causality assessment of adverse drug reactions and its practical consequences. *Drug Inf J* 1986; **20**: 423–31.
42. Haramburu F, Begaud, B, Pere JC. Comparison of 500 spontaneous and 500 published reports of adverse reactions. *Eur J Clin Pharmacol* 1990; **39**: 287–8.
43. Louik C, Lacouture PG, Mitchell AA *et al.* A study of adverse reaction algorithms in a drug surveillance program. *Clin Pharmacol Ther* 1985; **38**: 183–7.
44. Naranjo, CA, Lanctot, KL, Lane DA. The Bayesian differential diagnosis of neutropenia and antiarrhythmic agents. *J Clin Pharmacol* 1990; **30**: 1120–7.
45. Jones JK. Epidemiologic perspective on causality assessment for drug associated events. *Drug Inf J* 1986; **20**: 413–22.
46. Kahneman D, Slovic P, Tversky A. *Judgement Under Uncertainty: Heuristics and Biases*. Cambridge: Cambridge University Press, 1982.
47. Koch-Weser J, Sellers EM, Zacest R. The ambiguity of adverse drug reactions. *Eur J Clin Pharmacol* 1977; **11**: 75–8.
48. Karch FE, Smith CL, Kernzer B *et al.* Adverse drug reactions—a matter of opinion. *Clin Pharmacol Ther* 1976; **19**: 489–92.
49. Kramer MS. Assessing causality of adverse reactions: global introspection and its limitations. *Drug Inf J* 1986; **20**: 433–7.
50. Herman RL, Fourrier A. *List of References: Third International APWI Meeting*. Paris, 1992.
51. Hutchinson TA, Dawid AP, Spiegelhalter DJ Cowell RG, Roden, S. Computerized aids for probabilistic assessment of drug safety I: a spreadsheet program. *Drug Inf J* 1991; **25**: 29–39.
52. Hutchinson TA, Dawid AP, Spiegelhalter DJ Cowell RG, Roden, S. Computerized aids for praobabilistic assessment of drug safety I: an expert system. *Drug Inf J* 1991; **25**: 41–8.
53. Lanctot KL, Naranjo, CA. Using microcomputers to simplify the Bayesian causality assessment of adverse drug reactions. *Pharm Med* 1990; **4**: 185–95.
54. Naranjo CA, Lanctot, KL. Microcomputer assisted Bayesian differential diagnosis of severe adverse drug reactions to new drugs: a 4-year experience. *Drug Inf J* 1991; **25**: 243–50.
55. Pere JC, Begaud B, Harambaru F, *et al.* Computerized comparison of six adverse drug reaction assessment procedures. *Clin Pharmacol Ther* 1986; **40**: 451–61.
56. Benichou C. *Guide Practique de Pharmacovigilance.* Paris: Pradel, 1992.

Case 1:04-cv-10981-PBS Document 1197-111 Filed 04/04/2008 Page 15 of 15

57. Benichou C, Danon G. Experts' opinion in causality assessment: results of consensus meetings. *Drug Inf J* 1991; **25**: 251–5.
58. Benichou C, Danan G, Flahault A. Causality assessment of adverse reactions to drugs—I. A novel method based on the conclusions of international consensus meetings: application to drug-induced liver injuries. *J Clin Epidemiol* 1993; **46**: 1323–30.
59. Benichou C, Danan G, Flahault A. Causality assessment of adverse reactions to drugs—II. An original model for validation of drug causality assessment methods: case reports with positive rechallenge. *J Clin Epidemiol* 1993; **46**: 1331–6.