EXHIBIT 99

# Manual for Complex Litigation, Fourth

Federal Judicial Center 2004

# 23. Expert Scientific Evidence

.1 Introduction  469
.2 The Use of Scientific Evidence in Complex Litigation  472
   .21 The Federal Rules of Evidence  472
   .22 The *Daubert* Trilogy  474
   .23 The *Daubert* Criteria  476
   .24 Opinions and Conclusions Under *Daubert*  478
   .25 The *Daubert* "Fit" Test  480
   .26 The Scope of Appellate Review  482
   .27 Emerging Issues in the Use of Scientific Evidence  484
      .271 The Validity of Toxicological Evidence Versus Epidemiological Evidence  485
      .272 Aggregation of Scientific Evidence  485
      .273 Clinical Medical Judgment  487
      .274 Research as a Result of Litigation  489
.3 Case Management  491
   .31 Preliminary Considerations in Assessing Expert Testimony  491
   .32 The Initial Conference  494
   .33 Disclosures  499
   .34 Discovery Control and Management  503
      .341 Discovery of Testifying Experts  503
      .342 Discovery of Nontestifying Experts  504
      .343 Discovery of Nonretained Experts  504
      .344 Discovery of Court-Appointed Experts  505
      .345 Use of Videotaped Depositions  505
   .35 Motion Practice  506
      .351 Initiating a *Daubert* Inquiry  507
      .352 Timing of Challenges to Expert Testimony  508
      .353 Handling a Challenge to Expert Testimony  509
      .354 Summary Judgment  512
   .36 Final Pretrial Conference  513
   .37 Trial  514

## 23.1  Introduction

A significant issue in many complex cases—particularly in areas of law such as mass tort, antitrust, environmental, and intellectual property, but increasingly appearing in other areas as well—is the admission and use of expert scientific or technical testimony. "Scientific evidence encompasses so-called hard sciences (such as physics, chemistry, mathematics, and biology) as well as soft sciences (such as economics, psychology, and sociology), and it may be offered by persons with scientific, technical, or other specialized knowledge whose skill, experience, training, or education may assist the trier of

fact in understanding the evidence or determining a fact in issue."[1545] Expert scientific testimony can add additional layers of complexity to already complex cases, and scientific and technical evidence often plays a pivotal role in litigation. In toxic tort cases, for example, excluding scientific evidence can prevent the plaintiff from establishing the prima facie elements of his or her case, thereby entitling the defendant to summary disposition.[1546] Judicial findings on the relevance of toxicological studies and their weight in relation to epidemiological studies may also significantly affect the ability of mass or toxic tort plaintiffs to prevail.[1547] Superfund cases, usually brought many years after the release of hazardous contaminants, rely heavily on scientific and toxicological evidence to establish the liability of potentially responsible parties and to evaluate remedial actions and the imminent threat presented to human health and the environment.[1548] Statistical evidence is routinely introduced and

1545. William W Schwarzer & Joe S. Cecil, *Management of Expert Evidence* [hereinafter *Expert Evidence*], *in* Reference Manual on Scientific Evidence 39, 42 (Federal Judicial Center, 2d ed. 2000). In a survey of federal judges conducted by the Federal Judicial Center examining recent trials involving expert witnesses, tort cases represented the greatest percentage (45%) of cases reported. Carol Krafka, Meghan A. Dunn, Molly Treadway Johnson, Joe S. Cecil & Dean Miletich, *Judge and Attorney Experiences, Practices, and Concerns Regarding Expert Testimony in Federal Civil Trials*, 8 Psychol. Pub. Pol'y & L. 309, 318 (2002) [hereinafter *FJC Survey on Expert Testimony*]. This survey also provides, among other things, a breakdown of experts appearing in federal courts. *Id.* at 319–20 & tbl.2. For a breakdown of experts appearing in state courts, see Anthony Champagne et al., *Expert Witnesses in the Courts: An Empirical Examination*, 76 Judicature 5 (1992); Samuel R. Gross, *Expert Evidence*, 1991 Wis. L. Rev. 1113.

1546. *See, e.g.*, Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1314, 1321–22 (9th Cir. 1995) (affirming grant of summary judgment where plaintiff's expert testimony found inadmissible); Wheat v. Sofamor, S.N.C., 46 F. Supp. 2d 1351, 1360–61 (N.D. Ga. 1999) (with the exclusion of plaintiff's expert, insufficient evidence of defect existed to preclude entry of summary judgment for defendant).

1547. *See, e.g.*, Gen. Elec. Co. v. Joiner, 522 U.S. 136, 144–45 (1997) (animal studies relied on by expert "were so dissimilar to the facts presented in this litigation" that district court did not abuse its discretion in excluding them). The introduction of scientific evidence in toxic tort cases, however, encompasses more than testimony by medical experts. Expert witnesses can range from experts on sampling, Trail v. Civil Engineer Corps, 849 F. Supp. 766 (W.D. Wash. 1994), to atmospheric dispersion, *In re* Hanford Nuclear Reservation Litig. (Hanford II), No. CY-91-3015, 1998 WL 775340 (E.D. Wash. Aug. 21, 1998), to fisheries, *In re* Hanford Nuclear Reservation Litig. (Hanford I), 894 F. Supp. 1436 (E.D. Wash. 1995).

1548. *See generally supra* section 34. *See also* Freeport-McMoran Res. Partners Ltd. P'ship v. B-B Paint Corp., 56 F. Supp. 2d 823, 833–34 (E.D. Mich. 1999) (rejecting plaintiff's argument that *Daubert* requirements should be inapplicable to CERCLA cases and excluding expert testimony where none of the *Daubert* indicia of reliability are met). *See, e.g.*, Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc., 135 F.3d 526, 530–31 (7th Cir. 1998) (affirming exclusion of testimony of environmental consultant as failing to reliably link petroleum distillates on property with defendants' actions); Keum J. Park, Note, *Judicial Utilization of Scientific Evidence*

explained by experts in antitrust litigation, employment litigation, and other areas,[1549] and proof of damages suffered by plaintiffs in these cases also may rest heavily on expert testimony.[1550] The decision to admit or exclude scientific evidence and testimony thus strongly affects the ability of a party to prevail.

This section can assist judges in effectively managing expert evidence that involves scientific or technical subject matter. Part I discusses the current standards under which expert testimony is to be judged in light of *Daubert v. Merrill Dow Pharmaceuticals*[1551] and its progeny and the Federal Rules of Evidence. It examines some issues that can arise in the application of these standards and then addresses case-management issues specific to expert testimony. The discussion focuses principally on expert testimony that is scientific or technical in nature, but is equally applicable to expert testimony in Federal Rule of Evidence 702's "other specialized knowledge" category. The discussion does not address some of the issues that have frequently arisen in criminal cases, such as those surrounding DNA and fingerprint evidence.

*in Complex Environmental Torts: Redefining Litigation Driven Research*, 7 Fordham Envtl. L.J. 483, 492–93 (1996) (noting that the Oil Pollution Liability and Compensation Act of 1990 established "procedures for natural resource trustees to determine resource injuries").

1549.  *See, e.g.*, Munoz v. Orr, 200 F.3d 291, 300–02 (5th Cir. 2000) (affirming exclusion of statistical testimony of plaintiff's expert in Title VII disparate impact claim as unreliable); City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 564–67 (11th Cir. 1998) (expert testimony of statistician admissible in antitrust case); Bean v. S.W. Waste Mgmt. Corp., 482 F. Supp. 673, 677–80 (S.D. Tex. 1979) (statistical evidence showing disparate impact insufficient to prove intentional discrimination under Equal Protection Clause in environmental justice case), *aff'd without opinion*, 782 F.2d 1038 (5th Cir. 1986).

1550.  For example, in employment cases, forensic psychiatrists may be called to testify on the relationship between a plaintiff's emotional harm and his or her work environment, and psychological testimony has been found probative on the question of damages and causation. *See, e.g.*, Blakey v. Cont'l Airlines, Inc., 992 F. Supp. 731, 735–39 (D.N.J. 1998). *See* EFCO Corp. v. Symons Corp., 219 F.3d 734, 739 (8th Cir. 2000) (expert testimony admissible on damages); Hurley v. Atl. City Police Dept., 933 F. Supp. 396, 408–09, 424 (D.N.J. 1996) (expert testimony on mental harm to employee resulting from sexual harassment); Bottomly v. Leucadia Nat'l Corp., 163 F.R.D. 617, 619–20 (D. Utah 1995) (expert testimony admissible on issue of damages and causation). Expert testimony relating to the amount of damages occurred in almost half of the reported trials examined in a recent Federal Judicial Center survey. *See FJC Survey on Expert Testimony, supra* note 1545, at 321.

1551.  509 U.S. 579 (1993).

## 23.2   The Use of Scientific Evidence in Complex Litigation

.21 The Federal Rules of Evidence  472
.22 The *Daubert* Trilogy  474
.23 The *Daubert* Criteria  476
.24 Opinions and Conclusions Under *Daubert*  478
.25 The *Daubert* "Fit" Test  480
.26 The Scope of Appellate Review  482
.27 Emerging Issues in the Use of Scientific Evidence  484
    .271 The Validity of Toxicological Evidence Versus Epidemiological Evidence  485
    .272 Aggregation of Scientific Evidence   485
    .273 Clinical Medical Judgment  487
    .274 Research as a Result of Litigation  489

### 23.21  The Federal Rules of Evidence

*Daubert v. Merrell Dow Pharmaceuticals, Inc., General Electric Co. v. Joiner*,[1552] and *Kumho Tire Co. v. Carmichael*,[1553] the "*Daubert* trilogy," have made management of expert evidence an integral part of proper case management.[1554] Those decisions make the district judge the gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702.

Rule 702, amended in 2000 with the italicized language, takes account of the trilogy:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is*

---

1552.  522 U.S. 136 (1997).

1553.  526 U.S. 137 (1999).

1554.  The judge's performance of the gatekeeper function will be intertwined with his or her implementation of Federal Rule of Civil Procedure 16. *See Joiner*, 522 U.S. at 149 (Breyer, J., concurring):

> [J]udges have increasingly found in the Rules of Evidence and Civil Procedure ways to help them overcome the inherent difficulty of making determinations about complicated scientific or otherwise technical evidence. Among these techniques are an increased use of Rule 16's pretrial conference authority to narrow the scientific issues in dispute, pretrial hearings where potential experts are subject to examination by the court, and the appointment of special masters and specially trained law clerks.

> *the product of reliable principles and methods, and (3) the witness has ap-*
> *plied the principles and methods reliably to the facts of the case.*[1555]

An extensive committee note provides guidance to courts in assessing the admissibility of expert evidence. It emphasizes the breadth of the standards set forth in the rule and reiterates that its purpose is to ensure the reliability of the proffered testimony. For example, "The amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case."[1556] Federal Rules of Evidence 701 and 703 also were amended in conjunction with the amendments to Rule 702. Rule 701 seeks to ensure that the gatekeeping requirements of Rule 702 not be circumvented through "proffering an expert in lay witness clothing,"[1557] stating that opinions and inferences of lay witnesses may not be based on "scientific, technical or other specialized knowledge within the scope of Rule 702."[1558] Rule 703 clarifies the circumstances under which inadmissible evidence relied on by an expert witness in forming his or her opinion can be disclosed to a jury.[1559]

---

1555. Fed. R. Evid. 702 (emphasis added). *See also* Hon. Lee H. Rosenthal, *Strategies for Handling Expert Challenges in Federal Court*, App. Law., at 1, 8 (Houston Bar Ass'n Spring 1999) ("Counsel should . . . familiarize themselves with the recent proposed amendments to Rule 702 [which] largely codify the two major holdings of the Supreme Court's *Kumho Tire* decision.").

1556. Fed. R. Evid. 702 committee note. *See* Zic v. Italian Gov't Travel Office, 130 F. Supp. 2d 991, 999 (N.D. Ill. 2001) (amendments to Rule 702 added "three new 'reliability' requirements: reliable data, reliable methodology, and reliable application of the methodology").

1557. Fed. R. Evid. 701 committee note. Rule 701 provides the following:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue . . . .

1558. Fed. R. Evid. 701 committee note.

1559. Rule 703 directs the court to apply a balancing test when deciding whether to let the jury hear otherwise inadmissible information to assist the jury in evaluating the expert's opinion by weighing the probative value of the evidence against its prejudicial effect. Unless the probative value substantially outweighs its prejudicial effect, the evidence should not be disclosed to the jury. Unlike the balancing test in Rule 403, the test established in Rule 703 places the presumption against admission, and the committee note to Rule 703 further emphasizes that, to the extent the information is disclosed, it is not admissible for substantive purposes, and a limiting instruction should be given to the jury to that effect.

## 23.22  The *Daubert* Trilogy[1560]

Expert scientific evidence in the courtroom has grown in tandem with the increasing reliance on technological and scientific advances in virtually every facet of American life.[1561] This convergence of science and law has inevitably placed judges in the position of assessing the admissibility of such evidence using standards that many charged were too ill-defined to realistically separate valid scientific endeavors from science lacking any real empirical support.[1562] Prior to *Daubert*,[1563] scientific evidence was often judged according to the standard set forth in *Frye v. United States*.[1564] *Frye* set forth a test for the admission of expert testimony as one of "general acceptance," with admissibility premised on whether the scientific principle or discovery from which the testimony derived was generally accepted in the pertinent scientific community.[1565] Despite criticisms of the *Frye* test, the general acceptance criterion

1560.  For an excellent discussion of the *Daubert* trilogy, see Margaret A. Berger, *The Supreme Court's Trilogy on the Admissibility of Expert Testimony* [hereinafter *Supreme Court's Trilogy*], *in* Reference Manual on Scientific Evidence 9 (Federal Judicial Center, 2d ed. 2000).

1561.  *See* David L. Faigman et al., *Check Your Crystal Ball at the Courthouse Door, Please: Exploring the Past, Understanding the Present, and Worrying About the Future of Scientific Evidence*, 15 Cardozo L. Rev. 1799, 1802 n.6 (1994) (citing William L. Foster, *Expert Testimony,—Prevalent Complaints and Proposed Remedies*, 11 Harv. L. Rev. 169, 176 (1897–98) (quoting unattributed comments that "the scientific expert is a product of an advanced and rapidly advancing civilization . . . [and has acquired] a far greater frequency of employment by the recent marvelous advances in the applications of science,—applications which have increased the sphere of things to be litigated about")); Joseph Sanders, *Scientifically Complex Cases, Trial by Jury, and the Erosion of Adversarial Processes*, 48 DePaul L. Rev. 355, 357–58 (1998) (citing statistics from several studies reflecting growth in number of cases in which experts testify as well as the number of testifying experts).

1562.  *See, e.g.*, 1 David L. Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony § 1-2.4, at 9–10 (2d ed. 2002).

1563.  509 U.S. 579 (1993). *See also* Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1314 & n.2 (9th Cir. 1995) (noting that prior standard for admissibility in Ninth Circuit was *Frye* test of general acceptance); Christopherson v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir. 1991) (overruled by *Daubert*).

1564.  293 F. 1013 (D.C. Cir. 1923). The *Frye* test initially was applied almost exclusively in criminal cases and was not relied on in federal civil litigation until 1984. Paul C. Giannelli, *Daubert: Interpreting the Federal Rules of Evidence*, 15 Cardozo L. Rev. 1999, 2008 (1994).

1565.  293 F. at 1014. *Frye* has been described as simply a relocation of the marketplace test, where expertise is judged by the success of the expert in his or her profession. "In effect, the marketplace determined whether valid knowledge existed by endowing it with commercial value." 1 Faigman et al., *supra* note 1562, § 1-2.1, at 4. However, *Frye* is also argued to have recognized a distinction between the expert and the expertise, and to have placed the assessment of the value of the expertise offered in the hands of "the people who produced the knowledge and offered it, and themselves, to the courts." *Id.* § 1-2.2, at 7.

became the most common standard for assessing the admissibility of expert testimony,[1566] even after the advent of the Federal Rules of Evidence in 1975, and in particular Rule 702.

*Daubert, Joiner,* and *Kumho Tire,* however, changed the way in which courts assess the admissibility of scientific evidence.[1567] *Daubert* explicitly rejected the *Frye* test, holding that the admissibility of expert testimony was governed by Rule 702, and that nothing in the language of the rule reflected an intent to incorporate "general acceptance" as a precondition to admission.[1568] "The drafting history makes no mention of *Frye,* and a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'"[1569] Rather, *Daubert* established that Rule 702 mandates federal courts to serve as gatekeepers, ensuring (1) that the subject of the expert testimony is scientific "knowledge" grounded "in the methods and procedures of science"[1570] and (2) that the testimony is relevant, i.e., it will assist the trier of fact in understanding the evidence or determining an issue in the case.[1571] According to *Daubert,* "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue."[1572]

---

1566.  1 Faigman et al., *supra* note 1562, § 1-2.4, at 10. Among these criticisms were that the general acceptance standard precluded the admission of reliable evidence, it left to the scientific community the determination of validity, and it rested on the invalid assumption that jurors were unable to handle scientific evidence. 1 Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence § 1-5(G), at 28–29 (3d ed. 1999). Other criticisms included that the general acceptance standard was vague and easily manipulated, was overly conservative, provided no clear demarcation or other guideline as to the point at which a proposition became "generally acceptable," lacked standards for defining the "particular field," and, more importantly, left "the law at the mercy of the practitioners of the respective fields" who may differ in degree of rigorousness. 1 Faigman et al., *supra* note 1562, § 1-2.4, at 8–9, 10.

1567.  *But see* United States v. Downing, 753 F.2d 1224, 1232 (3d Cir. 1985) (foreshadowing *Daubert* by concluding that "the status of the *Frye* test under Rule 702 is somewhat uncertain").

1568.  *Daubert,* 509 U.S. at 588–89. The Court noted that the rules occupied the field, and that the inability to find any reference to the common-law doctrine in Rule 702 or its drafting history clearly indicated that Rule 702 superceded *Frye.* "Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention 'general acceptance,' the assertion that the Rules somehow assimilated *Frye* is unconvincing." *Id.* at 589.

1569.  *Id.* at 588 (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988)).

1570.  *Id.* at 589–90.

1571.  *Id.* at 591.

1572.  *Id.* at 592–93. *See* Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1295 (N.D. Ala. 2001) ("The point of the gatekeeping role is to separate opinion evidence based on 'good grounds' from simple subjective speculation masquerading as scientific knowledge.").

## 23.23  The *Daubert* Criteria

Central to any determination of admissibility is the finding, as a threshold matter, that the witness is qualified to testify as an expert under Rule 702. The courts generally have interpreted this requirement liberally.[1573] In many fields of expertise, for example, neither formal education nor training may be necessary. It is the inquiry into the scientific validity of the underlying reasoning or methodology that presents the greatest challenge to judges. Rule 702 establishes the general standards against which expert testimony is to be judged, relying on criteria delineated in *Daubert*, as well as others that might be appropriate. It is for the trial judge to then determine whether those standards have been met.

*Daubert* identifies several considerations that might bear on the trial court's determination whether given testimony is scientifically valid and therefore "trustworthy": (1) whether the theory or technique had been tested; (2) whether the theory or technique can be or has been peer reviewed or published; (3) the known or potential error rate; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) the general acceptance by the relevant scientific community and the testimony's degree of acceptance therein.[1574] These considerations, however, are neither a checklist nor exhaustive, and the trial court's inquiry should be a "flexible

---

1573. *See, e.g.*, Alvarado v. Weinberger, 511 F.2d 1046, 1048–49 (1st Cir. 1975). Some cases decided since the *Daubert* trilogy seem to reflect a tightening of the standard against which expert qualifications are judged, a trend that may become more prominent in light of the amendments to Rule 702. *See, e.g.*, Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156 (1999) ("The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" (quoting 4 Joseph McLaughlin, Weinstein's Federal Evidence ¶ 702.05[1] (2d ed. 1998))); Smelser v. Norfolk S. Ry., 105 F.3d 299, 303 (6th Cir. 1997) (court to examine "'not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question'" (quoting Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994))). Professor Edward Imwinkelried has suggested that the former liberality of the courts in qualifying experts as only needing to have knowledge or skill beyond the average layperson is disappearing in favor of a standard that requires a showing "that the witness has expertise highly relevant to the precise issue before the court." Edward J. Imwinkelried, *An Unheralded Change*, Nat'l L.J., Feb. 5, 2001, at A10. Professor Imwinkelried argues that recent decisions reflect a trend away from qualifying experts who are not specialists in the area relevant to the subject matter of the testimony. *Id. See, e.g.*, Berry v. Crown Equip. Corp., 108 F. Supp. 2d 743, 752–53 (E.D. Mich. 2000) (excluding testimony of plaintiff's expert witness because he was not qualified to render an opinion on defective forklift design).

1574. *Daubert*, 509 U.S. at 593–94 (1993).

one," consistent with the "permissive backdrop" of the Federal Rules.[1575] The committee note similarly states that there may be circumstances in which the *Daubert* factors are inapplicable and other criteria more probative; however, in each case the court is to use criteria to achieve the standards set forth in the rule.[1576] Once the judge determines that proposed scientific testimony is valid (i.e., trustworthy or reliable), the inquiry turns to whether the evidence is relevant to the facts of the case, or its "fit."[1577]

 *Daubert* dealt specifically with scientific expert testimony. In response to the conflict among the lower courts as to *Daubert*'s reach, *Kumho Tire* clarified that the gatekeeping obligation of Rule 702 applied not just to expert scientific testimony but to all expert testimony: "This language makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge . . . Hence, as a matter of language, the Rule applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope."[1578] The Court further held that it was proper, where appropriate, to apply the *Daubert* factors to nonscientific evidence, recognizing, however, that other factors might be of greater assistance in light of the "many different kinds of experts, and many different kinds of expertise."[1579] The Court expressly declined to establish a definitive list of factors that would apply to all cases.[1580] Instead, it remains for the district court to apply those factors it deems appropriate in order to ensure that the expert "employs in the court-

---

 1575. *Id.* at 593. "[Rule 702's] overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of principles that underlie a proposed submission." *Id.* at 594–95. *See also* Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999) ("[N]ot only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.").

 1576. Fed. R. Evid. 702 committee note.

 1577. *See, e.g.*, Clark v. Takata Corp., 192 F.3d 750, 757 (7th Cir. 1999) (noting that "an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question he was called upon to resolve)").

 1578. *Kumho Tire*, 526 U.S. at 147.

 1579. *Id.* at 150. The Court cited to the amicus brief filed by the United States referencing a wide variety of cases in which nonscientific expert testimony had been offered, from handwriting analysis, to agricultural practice, to attorney fee valuation. *See also* Elcock v. Kmart Corp., 233 F.3d 734, 747 (3d Cir. 2000) (analogizing two of the *Daubert* factors in reviewing testimony of vocational rehabilitation expert, noting "[v]ocational rehabilitation is a social science that does not exactly mirror the fundamental precepts of the so-called harder sciences"); Ohio *ex rel.* Montgomery v. Louis Trauth Dairy, Inc., 925 F. Supp. 1247, 1252 (S.D. Ohio 1996) (noting reasoning and general framework of *Daubert* applied to economic and statistical evidence).

 1580. *Kumho Tire*, 526 U.S. at 150–51.

room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[1581]

## 23.24  Opinions and Conclusions Under *Daubert*

One issue that has caused debate is the appropriate degree of inquiry into the conclusions of an expert. In making the *Daubert* inquiry, some courts have examined not only the appropriateness and reliability of the methodology used by the expert,[1582] but whether the expert's conclusions are supported by the methodology used.[1583] The *Daubert* Court cautioned that the focus of the inquiry under Rule 702 is not on the conclusions reached by the expert but on the principles adduced and methodologies used.[1584] *Joiner*, decided several years later, blurred *Daubert*'s distinction between methodology and conclusion, stating that "conclusions and methodology are not entirely distinct from one another."[1585] Indeed, *Joiner* implies that to find an expert's proffered testimony reliable, the district court must not only conclude the expert followed proper methodology for the science, but also that the conclusion reached was supported by the methodology used. The *Joiner* Court noted that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district

---

1581.  *Id.* at 151–53.

1582.  Allen v. Pa. Eng'g Corp., 102 F.3d 194 (5th Cir. 1996).

1583.  Jahn v. Equine Servs., PSC, 233 F.3d 382, 393 (6th Cir. 2000) (expert methodology can be reliable even where matter might be in debate because of other testimony); Smith v. Ford Motor Co., 215 F.3d 713, 720–21 (7th Cir. 2000) (district court abused discretion in relying on single, potentially irrelevant criterion in finding expert conclusions were based on unreliable methodologies, did not consider other factors, and failed to explain connection between factor selected by court and reliability under the circumstances); McCulloch v. H.B. Fuller Co., 61 F.3d 1038, 1043–44 (2d Cir. 1995); United States v. Martinez, 3 F.3d 1191, 1197–98 (8th Cir. 1993); Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co., 128 F. Supp. 2d 1148, 1150 (N.D. Ill. 2001) (court's gatekeeping function focuses on methodology, leaving the correctness of expert's conclusion or soundness of facts on which conclusion is based to fact-finder).

1584.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993). *See* NutraSweet Co. v. X-L Eng'g Co., 227 F.3d 776, 788–89 (7th Cir. 2000) ("The district court did not abuse its discretion in concluding that the common and official acceptance of photographic analysis made it sufficiently reliable."); Clark v. Takata Corp., 192 F.3d 750, 758–59 (7th Cir. 1999) (expert opinion properly excluded where based only on experience or training with no scientific data or supporting research material or other rigorous methodology).

1585.  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Justice Stevens, concurring in part and dissenting in part in *Joiner*, questioned "When qualified experts have reached relevant conclusions on the basis of an acceptable methodology, why are their opinions inadmissible?" *Id.* at 154.

court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."[1586]

The amendment to Rule 702, which became effective after *Daubert*, *Joiner*, and *Kumho Tire*, provides some guidance. The rule contemplates, among other things, that in making a reliability determination, the court will "scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case."[1587] In light of *Joiner* and Rule 702, *Daubert*'s caution against inquiring into the expert's conclusion appears to have lost some of its authority, although the degree to which the conclusion must be supported by the methodology and supporting reasoning remains unclear.[1588] Where the expert's conclusion is drawn from a reliable methodology, however, the correctness of that conclusion is still an issue for the finder of fact. The original intent of Rule 702 in 1975 was to liberalize, not restrict, the admission of expert evidence.[1589] Accordingly, a judge must be cognizant of the constraints imposed by the Seventh Amendment and not preclude the jury from hearing an opinion that, although in the minority, is nonetheless responsibly grounded in the science and reliable even if the judge does not believe the conclusion to be "correct."[1590] Presumably, cross-examination and presentation of contrary evidence by the opposing party, as suggested in *Daubert*, would identify for the jury the shakiness of the foundation on which the conclusion is based.

1586. *Id.* at 146.

1587. Fed. R. Evid. 702 committee note. *See, e.g.*, Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) (excluding testimony where, among other things, experts failed to timely conduct replicable experiments); Moore v. Ashland Chem., Inc., 151 F.3d 269, 279 (5th Cir. 1998) (where wide analytical gap existed between expert opinion and scientific knowledge, opinion would be excluded as unreliable).

1588. Ruiz-Troche v. Pepsi Cola of P.R., 161 F.3d 77, 81 (1st Cir. 1998) ("[W]hile methodology remains the central focus of a *Daubert* inquiry, this focus need not completely pretermit judicial consideration of an expert's conclusions.").

1589. *See* Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (courts should be mindful of the intent to liberalize the introduction of expert testimony while also recognizing the potential of expert witnesses to "'be both powerful and quite misleading'" (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993))).

1590. *See, e.g.*, Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) (evidence should be admitted where there are good grounds for the expert's conclusions, even though the judge may believe there are better grounds for alternative conclusions); Jahn v. Equine Servs., PSC, 233 F.3d 382, 391 (6th Cir. 2000) (district court improperly weighed testimony of expert against pathologist testimony in finding expert's opinion suspect).

## 23.25  The *Daubert* "Fit" Test

Rule 702 has always required that expert testimony "assist the trier of fact" to understand evidence or resolve issues in the case, and the second prong of the *Daubert* test reiterates the necessity of such a determination. The *Daubert* Court discussed this inquiry as one of relevance, noting that if "it is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."[1591] Since *Daubert*, however, courts have differed on their interpretation of "fit" in assessing expert scientific evidence. This disagreement has turned in part on whether the inquiry under Rule 702 looks only at the admissibility of the expert evidence (whether it is reliable and relevant) separate from any inquiry into its sufficiency.[1592] In some cases the courts have excluded expert testimony as lacking relevance where it was insufficient to prove the matter for which the party sought its introduction.[1593] Other courts have held that the evidence need only meet a low threshold of "relevance" to be admissible.[1594] These decisions limit the trial court, once the methodology underlying expert testimony is found to be appropriate or reliable, to determining whether the testimony is pertinent to an issue in the case in order to be admissible.[1595] Courts adhering to this latter view have

---

1591. *Daubert*, 509 U.S. at 591. *See also* Amorgianos v. Nat'l R.R. Passenger Corp., 137 F. Supp. 2d 147 (E.D.N.Y. 2001).

1592. *See, e.g.*, *In re* Joint E. & S. Dists. Asbestos Litig., 52 F.3d 1124, 1132 (2d Cir. 1995) (stating that admissibility is a threshold inquiry as to whether a certain piece of evidence ought to be admitted at trial, whereas a "sufficiency inquiry, which asks whether the collective weight of a litigant's evidence is adequate to present a jury question, lies further down the litigational road").

1593. *See, e.g.*, Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319–20 (7th Cir. 1996) (expert opinion excluded where it failed to establish how nicotine overdose can precipitate a heart attack in person with heart disease). *See also* Blevins v. New Holland N. Am., Inc., 128 F. Supp. 2d 952, 957–59 (W.D. Va. 2001) (seemingly conflating both admissibility and sufficiency inquiries). For example, in some toxic tort cases, if the expert's evidence, considered by itself, did not meet the legal standard of causation, it would be inadmissible as lacking relevance. *See, e.g.*, Wheat v. Sofamor S.N.C., 46 F. Supp. 2d 1351, 1357–58 (N.D. Ga. 1999) (where expert could not state to reasonable degree of medical certainty as to either a general or specific causal relationship between product and harm, testimony "is unhelpful and irrelevant").

1594. *See, e.g.*, Adams v. Ameritech Servs., Inc., 231 F.3d 414, 425 (7th Cir. 2000) ("First, the question before us is not whether the reports proffered by the plaintiffs prove the entire case; it is whether they were prepared in a reliable and statistically sound way, such that they contained relevant evidence that a trier of fact would have been entitled to consider."); Md. Cas. Co. v. Therm-O-Disc, Inc., 137 F.3d 780, 783 (4th Cir. 1998) ("prescribing fluid and general standards for the admission of scientific testimony"); Ambrosini v. Labarraque, 101 F.3d 129, 135–36 (D.C. Cir. 1996).

1595. Smith v. Ford Motor Co., 215 F.3d 713, 719 (7th Cir. 2000).

maintained that litigants need only "demonstrate by a preponderance of the evidence that their opinions are reliable,"[1596] and they are not required to "prove their case twice . . . ."[1597] Under this view of the fit test, an expert's testimony, even though insufficient to prove causation when viewed alone, would be admissible for consideration by the jury collectively with all the other evidence in the case.[1598]

In addition to the conflict in the circuits on the proper interpretation of *Daubert*'s second prong, the fit test has also been used to exclude evidence based on the nature of the science at issue or the degree to which the science sought to be introduced differs from the facts at issue in the case.[1599] In some instances, the very unreliability of the expert testimony has supported the conclusion that the evidence therefore did not fit the case.[1600] *Daubert* articulated the relevant inquiry as whether the testimony offered is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute,"[1601]

---

1596. *See* City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562–63 (11th Cir. 1998).

1597. *In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994); *see, e.g.*, *In re* TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999) (quoting *In re Paoli*, 35 F.3d at 744). The *TMI* court noted that there was a distinction between the evidentiary requirement of reliability and the higher standard of whether the expert's conclusions were correct on the merits, commenting, "The distinction is indeed significant as it preserves the fact finding role of the jury." *In re TMI Litig.*, at 665 n.90.

1598. *See, e.g.*, Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) ("[N]either Rule 702 nor *Daubert* requires that an expert opinion resolve an ultimate issue of fact to a scientific absolute in order to be admissible."); *City of Tuscaloosa*, 158 F.3d at 565 ("As circumstantial evidence, McClave's data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury.").

1599. *See, e.g.*, Savage v. Union Pac. R.R. Co., 67 F. Supp. 2d 1021, 1035–39 (E.D. Ark. 1999) (excluding expert testimony where no scientific evidence was introduced as to whether the chemicals to which plaintiff was exposed were implicated in the type of cancer suffered by plaintiff). One issue of significance is the threshold necessary to maintain a science-based claim. This conflict is probably most prominent in mass and toxic tort cases, where the ability to prove causation typically relies on inferences and hypotheses about an unknown causal mechanism, but arises in other areas as well. *See* Michael D. Green et al., *Reference Guide on Epidemiology* [hereinafter *Epidemiology*], *in* Reference Manual on Scientific Evidence 333–400 (Federal Judicial Center, 2d ed. 2000).

1600. *See, e.g.*, Bourne v. E.I. DuPont De Nemours & Co., 189 F. Supp. 2d 482, 499 (S.D. W. Va. 2002) (finding methodologies used by experts in extrapolating from animal studies to humans was unsound and therefore "a poor 'fit' for the facts of the case").

1601. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993) (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). *But see* Mattis v. Carlon Elec. Prods., 114 F. Supp. 2d 888, 895 (D.S.D. 2000) (examining whether testimony demonstrates level of exposure hazardous to humans and plaintiff's actual level of exposure in terms of "fit" under *Daubert*).

with the determination as to what constitutes a "sufficient" relationship clearly left to judicial discretion.[1602]

## 23.26  The Scope of Appellate Review

*Joiner* addressed the scope of the district court's discretion in applying Rule 702. The Court held that the standard of review of evidentiary rulings by the district court, including rulings pursuant to Rule 702, is abuse of discretion.[1603] *Kumho Tire* clarified the extent of the trial court's discretion, holding that the abuse-of-discretion standard applied not just to the ultimate conclusion on admissibility, but to all of the findings on admissibility. Thus the district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[1604] This includes determinations on the best way to proceed as well as what factors are reasonable measures of reliability of the particular expert testimony proffered.[1605] *Kumho Tire* rejected any suggestion that specific criteria must be

---

1602.  *See, e.g.*, Textron, Inc. *ex rel.* Homelite Div. v. Barber-Colman Co. (Textron I), 903 F. Supp. 1546, 1558 (W.D.N.C. 1995) (The court rejected expert testimony that relied on studies of household solid waste, concluding that such substances were hazardous where the expert was unable to demonstrate that the "studies relied upon [were] sufficiently similar to the households connected to Burlington's wastewater system to merit comparison."). *See also* Mitchell v. Gencorp., Inc., 165 F.3d 778, 782 (10th Cir. 1999) (affirming exclusion of expert testimony as unreliable: "[W]ithout scientific data supporting their conclusions that chemicals similar to benzene caused the same problems as benzene, the analytical gap in the expert's testimony is simply too wide . . . ."); Bradley v. Armstrong Rubber Co., 130 F.3d 168, 176–78 (5th Cir. 1997) (court considering admissibility under Rule 703 found expert opinion could be properly excluded as irrelevant where facts on which opinion was based were wrong); Textron, Inc. *ex rel.* Homelite Div. Co. v. Barber-Colman Co. (Textron II), 903 F. Supp. 1558, 1568–69 (W.D.N.C. 1995).

1603.  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997). A *de novo* standard of review applies, however, to the initial inquiry into whether the district court properly followed *Daubert*'s framework. *See* Walker v. Soo Line R.R. Co., 208 F.3d 581, 590 (7th Cir. 2000) ("We review de novo 'whether the district court properly followed the framework set forth in *Daubert.*'" (quoting United States v. Hall, 165 F.3d 1095, 1101 (7th Cir. 1999))); United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997).

1604.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

1605.  *Id.* at 152–53. *See also* Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333 (11th Cir. 2003) (holding that (1) witness qualified as an expert by virtue of extensive education, training, and experience; (2) expert's methods and results were discernible and rooted in real science, and therefore were empirically testable; and (3) expert's testimony was relevant and would assist the jury); Bourelle v. Crown Equip. Corp., 220 F.3d 532, 537–38 (7th Cir. 2000) (district court did not abuse its discretion in excluding testimony of expert who failed to test or observe vehicle, conduct computer analysis, or otherwise satisfy *Daubert*); Clay v. Ford Motor Co., 215 F.3d 663, 668 (6th Cir. 2000) ("The District Court, in its discretion, could have

applied to certain types of expert testimony;[1606] however, Justice Scalia empha-sized in a concurring opinion that although the *Daubert* factors "are not holy writ, in a particular case the failure to apply one or another of them may be unreasonable, and hence an abuse of discretion."[1607]

In addition, the Supreme Court in *Weisgram v. Marley Co.*[1608] resolved any uncertainty surrounding the scope of appellate courts' authority to enter judgment as a matter of law under Federal Rule of Civil Procedure 50 where expert testimony has been improperly admitted. The Court held that an appellate court, upon concluding that the district court abused its discretion in admitting expert testimony at trial, has the authority to overturn a jury verdict and enter judgment as a matter of law where the exclusion of the evidence renders the proof legally insufficient.[1609] The Court commented that "[s]ince *Daubert*, parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet. It is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail."[1610]

---

decided that [the expert's] failure to test his theories went to the weight of his testimony regarding defects in the *Bronco II*, not to its admissibility.").

1606.  "[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue." 526 U.S. at 150. The Court also rejected any interpretation of Rule 702 that would "[map] certain kinds of questions to certain kinds of experts." *Id.* at 151.

1607.  *Id.* at 159 (Scalia, J., concurring). *See* Black v. Food Lion, Inc., 171 F.3d 308, 311–12 (5th Cir. 1999) (stating "[I]n the vast majority of cases, the district court first should decide whether the [*Daubert* factors] are appropriate . . . . [It] then can consider whether other factors . . . are relevant to the case at hand," and suggesting failure to apply *Daubert* factors may be an abuse of discretion). The danger of establishing criteria that must be applied is that the validity of the science turns on being shoehorned into the correlative criteria, regardless of whether the science involved was amenable to such a qualification, rather than being measured against scientific work outside the courtroom.

1608.  528 U.S. 440 (2000).

1609.  *Id.*

1610.  *Id.* at 455 (citations and footnote omitted). Although the Court's decision in *Weisgram* and its earlier decision in *Neely v. Martin K. Elby Construction Co.* recognized that the authority to enter judgment on appeal was afforded by Rule 50, the Court did caution that in exercising its discretion, the court of appeals should take into consideration the rights of the verdict winner as well as the trial judge's firsthand knowledge of the case. "'Part of the Court's concern has been to protect the rights of the party whose jury verdict has been set aside on appeal and who may have valid grounds for a new trial, some or all of which should be passed upon by the district court, rather than the court of appeals, because of the trial judge's first-hand knowledge of witnesses, testimony, and issues—because of his 'feel' for the overall case.'" *Weisgram*, 528 U.S. at 451 (quoting Neely v. Martin K. Elby Construction Co., 386 U.S. 317, 325 (1967)).

Subsequent circuit court decisions, following the rationale in *Weisgram*, have entered judgment under Rule 50 where expert testimony was admitted in error.[1611] Accordingly, the *Daubert* trilogy, together with *Weisgram*, clearly indicates not only the significance of the gatekeeping inquiry, but the potential prejudice to a party should that inquiry be superficial or inadequate and expert testimony subsequently deemed unreliable and therefore inadmissible on appeal. At the same time, parties are placed on notice that borderline expert testimony may be excised on appeal to their detriment. One possible effect of *Weisgram* is that parties might attempt to identify extra experts to minimize the negative impact on their case should an appellate court find the testimony of one expert was erroneously admitted—with extra experts, the subsequent excision of one would not be fatal to the verdict. Such an approach would result in increased time and costs, both to the parties as well as the trial court, and the court should discourage multiple expert identification.

## 23.27  Emerging Issues in the Use of Scientific Evidence

.271 The Validity of Toxicological Evidence Versus Epidemiological Evidence  485
.272 Aggregation of Scientific Evidence   485
.273 Clinical Medical Judgment  487
.274 Research as a Result of Litigation  489

As amended, Federal Rule of Evidence 702 establishes general standards for the judge to use in determining the reliability of expert testimony. Rule 702 not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case. The rule contemplates judicial analysis of various factors, including but not limited to those set forth in *Daubert*, to assess whether the proposed testimony meets these standards. However, the court should avoid interpreting these factors (and others deemed appropriate) so rigidly that valid science is excluded because it does not neatly fit within the confines of the criteria selected by the court as indicia of reliability.

There are several issues that have emerged as the district courts have wrestled with their role as gatekeeper, including the issues discussed below.

---

1611. *See, e.g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000) ("It cannot be said that the verdict would have been the same without the expert testimony, and its admission affected Brunswick's substantial rights.").

### 23.271 The Validity of Toxicological Evidence Versus Epidemiological Evidence

The courts have had little difficulty admitting expert testimony based on epidemiological studies.[1612] In order for toxicological studies to be admissible to prove causation in humans, however, a number of courts have required that sufficient grounds exist to support the extrapolation from animals to humans, "just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves."[1613] As a result, and particularly in cases where either no epidemiological evidence is offered by the proposing party or epidemiological evidence is unavailable, some courts have been inclined to exclude toxicological evidence based on lack of "fit."[1614]

### 23.272 Aggregation of Scientific Evidence

Another concern is whether the aggregation of scientific evidence undermines the reliability of expert testimony based on such evidence. For example, epidemiological studies are often small and lack sufficient independent

---

1612.  Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1115 (5th Cir. 1991) ("[O]nly when . . . critically inaccurate or incomplete, as determined by what other experts would or would not be willing to base opinions upon, would the facts and data lack the necessary requisites of Rule 703."); DeLuca *ex rel.* Deluca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 953 (3d Cir. 1990), *aff'd*, 8 F.3d 778 (3d Cir. 1993); *In re* Agent Orange Prod. Liab. Litig., 611 F. Supp. 1223, 1240 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987); Cook v. United States, 545 F. Supp. 306, 307–16 (N.D. Cal. 1982) (whether swine flue vaccine led to Guillain-Barre disease). *See also* Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 593 (D.N.J. 2002) ("[A]nimal bioassays are of limited use in determining whether a particular chemical causes a particular disease, or type of cancer, in humans."); Bourne v. E.I. DuPont De Nemours, 189 F. Supp. 2d 482, 496 (S.D. W. Va. 2002) (noting jurisdictions where extrapolating human teratogenicity from in vivo animal studies and in vivo test found unreliable). *But see* Villari v. Terminix Int'l, Inc., 692 F. Supp. 568, 570–71 (E.D. Pa. 1988) (finding substantial portion of scientific community relied on animal studies of the type offered by plaintiff to assess human health risks). *See also* Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 313 (5th Cir.) ("This circuit has previously realized the very limited usefulness of animal studies when confronted with questions of toxicity."), *modified*, 884 F.2d 166, 167 (5th Cir. 1989) (court changing its holding that the plaintiffs' case was undermined by "the lack of conclusive epidemiological proof" to a "failure to present statistically significant epidemiological proof").

1613.  *In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994).

1614.  *See, e.g.,* Allen v. Pa. Eng'g Corp., 102 F.3d 194, 197 (5th Cir. 1996) ("In the absence of scientifically valid reasoning, methodology and evidence supporting these experts' opinions, the district court properly excluded them."); Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1360–61 (6th Cir. 1992).

statistical significance to support definitive conclusions.[1615] Furthermore, several studies may differ or disagree in whether or not an association is found or in the magnitude of the association.[1616] As a result, a formal technique ("meta-analysis") was developed to aggregate these studies, which would derive a single figure to represent the totality of the studies reviewed.[1617] At issue is whether this technique renders the conclusion "unreliable" for purposes of *Daubert* if the individual studies alone would not satisfy a *Daubert* inquiry. There are valid concerns with the aggregation of empirical studies under these circumstances.[1618] At the same time, the mere fact that the studies have been aggregated to make an assessment should not automatically disqualify the conclusion or serve as the basis for excluding epidemiological evidence.[1619]

Questions regarding the reliability of aggregated evidence can arise in more informal contexts as well, such as where the expert considers several studies, none of which would support the expert's conclusions by itself, but when taken together form the basis for the proffered opinion.[1620] This "weight of the evidence" methodology was rejected as unreliable by the district court in *Joiner*, at least as presented by the proffered experts, but the court of appeals

1615. *See, e.g.*, Moore v. Ashland Chem., 151 F.3d 269, 281 (5th Cir. 1998) (en banc) (Dennis J., dissenting) (noting that "[t]he quantity of persons who sustain this type of exposure was simply too small for a plaintiff to be able to provide epidemiological, animal testing or other hard scientific evidence linking the particular chemical compound to reactive airways disease").

1616. *Epidemiology*, *supra* note 1599, at 380. The criteria used to determine whether an observed association is causal are known as the Hill criteria, after their author Sir Austin Bradford Hill. For a list of these criteria, see, e.g., *Magistrini*, 180 F. Supp. 2d at 592–93 (D.N.J. 2002).

1617. "In meta-analysis, studies are given different weights in proportion to the sizes of their study populations and other characteristics." *Epidemiology*, *supra* note 1599, at 380.

1618. *Id.* In many instances, the "differences among the individual studies included in the meta-analysis and the reasons for the differences are important in themselves and need to be understood." *Id.* at 381. And, as meta-analysis generates a single estimate of risk, it could "lead to a false sense of security regarding the certainty of the estimate." *Id.* at 381 (citing John C. Bailar III, *Assessing Assessments*, 277 Science 528, 529 (1997)).

1619. *See id.* at 381 (discussing criteria that may be more appropriate in assessing the reliability of meta-analysis).

1620. *See* Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1296 (N.D. Ala. 2001) (noting that although evidence of animal studies, medical texts, and a limited number of case reports do not "establish conclusively that Parlodel can cause [injury], taken together they present a compelling picture, one which can support a scientific inference"). A variation of this approach would occur where information from different kinds of studies across different fields is considered in reaching the expert's conclusion. *Supreme Court's Trilogy*, *supra* note 1560, at 33.

found the approach scientifically acceptable.[1621] Justice Stevens, in a concurring and dissenting opinion in *Joiner*, commented that "[i]t is not intrinsically 'unscientific' for experienced professionals to arrive at a conclusion by weighing all available scientific evidence—this is not the sort of 'junk science' with which *Daubert* was concerned."[1622] Some courts, however, have required experts to use a "weight of the evidence" methodology to demonstrate how each study or piece of evidence was valued by the expert and the methodological basis upon which the expert may have discounted some pieces of evidence while relying more heavily on others in reaching his or her conclusion.[1623] The uncertainty surrounding the reliability of aggregated studies or evidence is inextricably tied to the debate on the distinction between methodology and conclusion,[1624] as well as the disagreement among the courts on the admissibility versus the sufficiency of expert evidence under the second prong of *Daubert*.[1625]

## 23.273 Clinical Medical Judgment

Many tort cases involve the introduction of expert evidence through the use of clinical treating physicians, relying on a methodology referred to as

---

1621.  Joiner v. Gen. Elec. Co., 864 F. Supp. 1310, 1320–26 (N.D. Ga. 1994), *rev'd*, 78 F.3d 524, 532 (11th Cir. 1996) (according to the Eleventh Circuit, "opinions of any kind are derived from individual pieces of evidence, each of which by itself might not be conclusive, but when viewed in their entirety are the building blocks of a perfectly reasonable conclusion, one reliable enough to be submitted to a jury along with the tests and criticisms cross-examination and contrary evidence would supply"). *See also* Gen. Elec. Co. v. Joiner, 522 U.S. 136, 153–54 (1997) (Stevens, J., concurring in part and dissenting in part) (noting approvingly the court of appeal's acceptance of the "'weight of the evidence' methodology"). Where the data permit a reasonable scientist to make a probabilistic statement with regard to effect, even though lacking statistical significance, these judgments should not be automatically discarded as legally insufficient simply because of epistemological or proof problems as long as they can be expressed with a level of confidence that meets or exceeds the demands of Federal Rule of Evidence 104(a). The court should allow consideration of all methodically sound studies with the focus on whether the studies reliably permit the inference sought to be drawn.

1622.  522 U.S. at 153. In *Joiner*, the district court had examined various animal studies offered by the plaintiff and found that none of them supported the experts' conclusions that the plaintiff's cancer was caused by PCB exposure. The majority opinion did not specifically address whether the experts properly could have aggregated these studies to reach their conclusion that there was a causal relationship between the plaintiff's cancer and PCB exposure. Rather, the Court pointed to *Joiner*'s failure to explain "how and why the experts could have extrapolated their opinions from these seemingly far-removed animal studies . . . ." *Id.* at 144.

1623.  *See, e.g.*, Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 602 (D.N.J. 2002).

1624.  *See supra* section 23.24.

1625.  *See id.*

"differential diagnosis" to establish a causal relationship between the plaintiff's harm and an allegedly injurious substance.[1626] Differential diagnosis seeks to establish specific causation by ruling out other causative factors, leaving the exposure to the harmful agent as the likely explanation for plaintiff's harm. Although a number of judges have permitted expert testimony based on differential diagnosis, others have held such testimony to be inadmissible where the expert was unable to show general causation or otherwise rule out alternative causes that might also explain all of the plaintiff's symptoms.[1627] This has hampered the ability of plaintiffs to prove causation through clinical physicians in cases where, for example, the relevant science has not clearly established a known etiology for the disease in question.[1628] The apparent split in approach is based in part on a disagreement regarding the degree to which the expert must rely on more than the traditional methodology of clinical medical reasoning to support his or her opinion, and the extent of the court's inquiry into the evidence forming the basis for the clinical medical judg-

1626. For a discussion of medical testimony and differential diagnosis, see Mary Sue Henifin et al., *Reference Guide on Medical Testimony* [hereinafter *Medical Testimony*], *in* Reference Manual on Scientific Evidence 441–84 (Federal Judicial Center, 2d ed. 2000).

1627. *Compare* Glastetter v. Novartis Pharms. Corp., 252 F.3d 986 (8th Cir. 2001) (finding differential diagnosis presumptively admissible and only those diagnoses that are scientifically invalid should be excluded), *and* Heller v. Shaw Indus., Inc., 167 F.3d 146, 154–57 (3d Cir. 1999) (discussing the different components to differential analysis and stating, where properly done, that it will support expert medical opinion on causation), *and* McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) (differential analysis requires "listing possible causes, then eliminating all causes but one"), *with* Raynor v. Merrell Pharms., Inc., 104 F.3d 1371, 1374–76 (D.C. Cir. 1997) (where contradictory epidemiological evidence was "overwhelming" relating to Bendectin, and expert opinion on causation based in part on differential diagnosis was inadmissible). *See also* Mattis v. Carlon Elec. Prods., 114 F. Supp. 2d 888, 893 (D.S.D. 2000) (noting that a number of cases have accepted differential diagnosis as reliable, but that "[d]ifferential diagnosis of RADS . . . have not fared so well in the federal courts"); Gary Sloboda, *Differential Diagnosis or Distortion?*, 35 U.S.F. L. Rev. 301 (2001) (discussing differential diagnosis and issues of causation).

1628. *See, e.g.*, Mitchell v. Gencorp, Inc., 165 F.3d 778, 781 (10th Cir. 1999); Black v. Food Lion, Inc., 171 F.3d 308, 314 (5th Cir. 1999); Allen v. Pa. Eng'g Corp., 102 F.3d 194, 199 (5th Cir. 1996); Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1106 (8th Cir. 1996) (plaintiffs have burden of proving "the levels of exposure that are hazardous to human beings generally as well as plaintiff's actual level of exposure"); Siharth v. Sandoz Pharm. Corp., 131 F. Supp. 2d 1347 (N.D. Ga. 2001). *But see* Meister v. Med. Eng'g Corp., 267 F.3d 1123 (D.C. Cir. 2001) (overwhelming epidemiological evidence finding no causal relationship between breast implants and scleroderma overcame plaintiff's evidence to the contrary based on asserted differential diagnosis). *See also Supreme Court's Trilogy*, *supra* note 1560, at 26; Joseph Sanders & Julie Machal-Fulks, *The Admissibility of Differential Diagnosis Testimony to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law*, 64 Law & Contemp. Probs. 107 (2001); *Sloboda*, *supra* note 1627.

ment.[1629] A lack of epidemiological or other studies demonstrating an objective, scientifically established association between the disease and the causative agent has led some circuits to reject some clinical medical testimony as unreliable.[1630] However, all methodologically sound studies should be considered, with the focus on whether the studies reasonably permit the inference or conclusion sought to be drawn. "While an epidemiological study may be the best or ideal evidence, *Daubert* requires only that reliable evidence be presented . . . ."[1631] It is unclear whether *Kumho Tire*'s admonition that no specified set of factors will apply to every case, and that each case must be considered in light of the circumstances, will affect how the circuits consider clinical medical evidence.[1632]

## 23.274  Research as a Result of Litigation

Another area of concern is whether an inordinate focus on independent research and peer review as indicia of reliability may lead to the exclusion of research conducted as a result of litigation, even though the science is valid. The committee note to Rule 702 offers as a possible relevant factor whether the

---

1629.  Westberry v. Gislaved Gummi AB, 178 F.3d 257, 264 (4th Cir. 1999) (evidence of exposure and temporal proximity to plaintiff's injury was sufficient to "rule in" talc as a causal agent, even though physician had no scientific literature upon which to rely); Ruiz-Troche v. Pepsi Cola of P.R., 161 F.3d 77, 86 (1st Cir. 1998) (finding district court had improperly imposed requirement that expert be able to "declare that a precise quantity of cocaine in the bloodstream produces an equally precise degree of impairment"); Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291 (N.D. Ala. 2001) (finding that "animal studies, the medical literature reviews, the ADRs reported to the FDA, and the 'general acceptance' of the association between stroke and Parlodel, reflected in several neurology and toxicology textbooks and treatises" constituted reliable evidence on which a conclusion could be drawn); Hollander v. Sandoz Pharms. Corp., 95 F. Supp. 2d 1230 (W.D. Okla. 2000) (lack of controlled epidemiological studies reflecting association between stroke and Parlodel, reliance on anecdotal case reports, and the dissimilarity of the animal studies and the experts' methodologies failed to establish reliability of methods used by plaintiffs' experts); Savage v. Union Pac. R.R. Co., 67 F. Supp. 2d 1021, 1033–34 (E.D. Ark. 1999) (expert testimony excluded where plaintiff introduced no evidence of the nature of creosote exposure necessary to lead to basal cell carcinoma, the level of exposure needed, or the level of his own exposure with any degree of scientific certainty). *Compare* Heller v. Shaw Indus., Inc., 167 F.3d 146 (3d Cir. 1999), *with* Black v. Food Lion, Inc., 171 F.3d 308 (5th Cir. 1999), *and* Moore v. Ashland Chems., Inc., 151 F.3d 269 (5th Cir. 1998).

1630.  *See, e.g.*, Hollander v. Sandoz Pharms. Corp., 95 F. Supp. 2d 1230 (W.D. Okla. 2000); *Black*, 171 F.3d at 313–14. *But see* Nat'l Bank of Commerce v. Associated Milk Producers, Inc., 191 F.3d 858, 864 (8th Cir. 1999) (affirming exclusion of expert testimony based on differential diagnosis in absence of scientific studies correlating aflatoxin M-1 with laryngeal cancer).

1631.  *Brasher*, 160 F. Supp. 2d at 1298.

1632.  For an example of an opinion issued after *Kumho Tire*, see *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999).

expert is proposing to testify about matters growing naturally and directly out of research independent of litigation, and the Ninth Circuit on remand in *Daubert* stated "If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'"[1633] The Supreme Court in *Daubert* said that a corollary indicator of reliability could be whether the research had been subject to peer review or published.[1634] Although in some instances a failure to satisfy these two criteria may justifiably call into question the reliability of the science, in other cases there may be a dearth of scientific evidence as to the existence of a causal relationship between exposure to a chemical, product, or contaminant and adverse health effects, because the relationship has not been sufficiently tested or because the substance is new.[1635] The Court noted in *Kumho Tire* that the "particular application at issue may never previously have interested any scientist,"[1636] or the issue may not have been one to generate any interest among editors of scientific publications. In such cases there are no established studies on which experts can rely, and often it is the harm which gave rise to the litigation that spurred whatever research exists.[1637] Such research may be both credible and reliable, even though it has neither grown "naturally and directly out of research independent of litigation,"[1638] nor yet been published. Rigid application of these criteria might preclude a party's ability to prove causation simply because the question as to whether there was a causal relationship had never arisen before.

---

1633.  Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317–18 (9th Cir. 1995).

1634.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593–94 (1993); *Ruiz-Troche*, 161 F.3d at 84 ("The publication of these pieces and their exposure to peer review serve as independent indicia of the reliability of the . . . technique . . . [and] also demonstrate a measure of acceptance of the methodology within the scientific community.").

1635.  *See* Wendy E. Wagner, *The Science Charade in Toxic Risk Regulation*, 95 Colum. L. Rev. 1613 (1995).

1636.  526 U.S. at 151. *See, e.g.*, Lauzon v. Senco Prods. Inc., 270 F.3d 681, 691 (8th Cir. 2001) (lack of peer reviewed information on dangers associated with pneumatic nailers a result of the fact that only recently had there been an increase in popularity of pneumatic-fire nailers and concomitant increase in injuries).

1637.  The Bendectin litigation seems to provide an example of research spurred by litigation. *See* Joseph Sanders, *The Bendectin Litigation: A Case Study in the Life Cycle of Mass Torts*, 43 Hastings L.J. 301 (1992). *See also* Bourne v. E.I. DuPont De Nemours, 189 F. Supp. 2d 482, 484 n.2 (S.D. W. Va. 2002) (parties engaged in studies of benomyl and its relationship to plaintiff's birth defects during pendency of case).

1638.  *Daubert*, 43 F.3d at 1317.