EXHIBIT 102

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------------X
In re: NEURONTIN MARKETING, SALES PRACTICES : MDL Docket No. 1629
AND PRODUCTS LIABILITY LITIGATION         :
---------------------------------------------------------------------X
                                          : Master File No. 04-10981
THIS DOCUMENT RELATES TO:                 :
                                          :
ALL PRODUCT LIABILITY CASES               :   Hon. Patti B. Saris
---------------------------------------------------------------------X Magistrate Leo T. Sorokin

DECLARATION OF CHERYL BLUME, PH.D.

I, Cheryl Blume, Ph.D., declare and state as follows:

1. My name is Dr. Cheryl Blume.  I have a Ph.D. in pharmacology  and
   toxicology from the West Virginia University School of Medicine.  A true and
   correct copy of my resume – curriculum vitae is attached as Exhibit Blume-A.

2. I have been accepted as an expert witness in pharmaceutical litigation in the
   courts provided in my list of cases which is attached to my expert disclosure
   dated October 22, 2007.  Included are cases in which my expert opinion
   concerned the sufficiency of labels, warnings, and other communications to
   prescribers to disclose risks to their patients who take certain drugs.  These are
   among the tasks for which I was consulted as an expert witness in this case.

3. My professional life has been directed to the development of pharmaceutical
   projects for submission to the United States Food and Drug Administration on
   behalf of pharmaceutical manufacturers.  I employ several persons in my
   company whose responsibilities are to assist in the evaluation of information
   relating to pharmaceutical products.  These evaluations are made for the
   purpose of submitting New Drug Applications (NDAs), Investigational New
   Drug Applications (INDs), Supplemental New Drug Applications (SNDA's),
   and information regarding the risks and benefits observed in patients exposed
   to such products.  This includes the composition, drafting, and submission of
   proposed labels for FDA approval and the composition, drafting, and
   submission of warnings, amendments, and corrections to existing labels for
   drugs already approved.  I have performed this type work on more than 50
   drugs.

4. The suggestion that I am a "perennial plaintiffs' expert" is false and
   pejorative.  I spend the majority of my time on drug development and
   regulatory tasks including safety surveillance.  Unlike Pfizer expert witnesses
   in this case, I have direct personal contact with FDA employees weekly and
   often daily on drug development and regulatory projects.  In addition to being

occasionally consulted as an expert witness by individual plaintiffs in tort litigation I also am hired by pharmaceutical companies as an expert witness in commercial litigation issues.

5.  I have consulted in the present litigation performing several of the same type of assignments that I conduct on behalf of drug companies. Here I have evaluated data regarding Neurontin to observe its reported effects on patients exposed to it, to evaluate those effects with regard to various patient populations, and to evaluate whether the label or any other source of information regularly available to the prescribing physicians was adequate to disclose to them the risks which patients might have by taking Neurontin. In doing so I used the same methods which I use in performing a drug development for submission to the FDA. I approached my work on the Neurontin litigation with the same methodologies I would use on behalf of pharmaceutical companies if I were conducting a similar review.

6.  I reviewed the records of Warner-Lambert and Pfizer sponsored clinical trials of Neurontin, including blinded placebo trials and non-blinded trials. This includes the defendants' confidential records of patients who took Neurontin and placebos in clinical trials for the approved indications of refractory epilepsy in adults and for post-herpetic neuralgia and for the unapproved off-label indications of psychiatric conditions and pain conditions. These latter indications included patients who were previously diagnosed with bipolar depression, social phobia, psychosis, orthopedic pain, neuropathic pain, and surgical / post-surgical pain, among many others.

7.  I also reviewed the records of clinical trials conducted on the same populations of patients which were performed by sponsors other than Pfizer or Warner-Lambert.

8.  I also reviewed the actual patient experience records of patients who received Neurontin in non-clinical trial settings. These records include adverse event reports and case studies submitted by poison control centers and by physicians who inform the manufacturers and the FDA of patient difficulties which they attributed to taking Neurontin. These records also include reports of patients from whom Neurontin is removed, or dechallenged, and patients who are re-exposed, or rechallenged.

9.  These records as outlined above are the type of records the FDA routinely reviews in its evaluation of a pharmaceutical product to evaluate risks and benefits and to evaluate safety and efficacy. I used the records the same way the FDA uses them, to compare the number, type, frequency, and severity of any adverse events in patient populations, to evaluate whether the risk or safety limitations of a drug in any particular patient population taking the drug are different than with other patient populations and, if so, to evaluate whether

the risk or safety can be mitigated by providing information in the label or in other communications to prescribers to prevent or reduce patient deaths and injuries from taking a drug.

10. It is routine practice among drug development professionals, including those with primary NDA drafting responsibility to rely upon the computational work of others. I have worked with Keith Altman on several drug development projects. When I do so he is responsible for the execution of the data analysis projects I request. In that capacity Mr. Altman has authored the adverse event section of one New Drug Application (NDA) and has performed the safety analysis for two others as well as numerous Investigational New Drug Applications (INDs). Mr. Altman's work has been specifically reviewed by the FDA in its approval of the NDA's that Mr. Altman worked on. The FDA has approved two of the NDA's and the third is in the final stages of approval. The FDA has not in my lengthy experience rejected either my or Mr. Altman's submissions for errors, omissions, inaccuracies, or methods in his computation analyses.

11. Based on my past experience with Mr. Altman, I rely upon his data compilations in the routine course of my business , both in litigation projects and drug development projects. To date, no one has demonstrated any substantive errors in any analysis he has performed at my request. I am confident that he has accurately prepared data summaries and tables which I requested.

12. Mr. Altman's technical skill in working with the data exceeds my own; I personally could not replicate the work he performed. Nevertheless, I know that since all of the data compilations he has performed are objective in nature, they can be replicated by anyone who uses the same data he used.

13. In this case I asked Mr. Altman to prepare computational analyses of adverse event data. Mr. Altman was instructed to perform the work I delegated to him in an objective manner and to not exercise subjective judgment as to the interpretation of the data. He and I had several conversations concerning possible data summaries. I decided which analyses were the most appropriate for my evaluation of Neurontin.

14. I have reviewed Mr. Altman's affidavit prepared on April 2, 2008 in response to the Defendants' motions in this case. I adopt his observations of the number, kind, character, and dates of increases in the reports of suicide and suicide attempts by patients who took Neurontin.

15. The methodology which I employed in this case is similar to those I employed in my drug development and safety surveillance projects submitted to the FDA over the last 25 years. It also is the same methodology Pfizer used in

NDA's in this case and generated the same kinds of report charts I presented in my expert report.

16. For example, in Exhibit Blume-B to this affidavit, a portion of the Pfizer Integrated Summary of Safety for the Post Herpetic Neuralgia NDA, Pfizer calculated the percentages of post-marketing adverse event reports for various events between 'Neuropathic Pain' indications and 'all other indications' for Neurontin. Pfizer did not perform end-product statistical calculations. It did use the results of the post-marketing adverse event reports to make representations to the FDA concerning the safety of the drug. This is but one of hundreds of examples of a confluence of the methods I used in my study in this case and the methods used by Pfizer in its NDA's.

17. Among the risks I evaluated with Neurontin are the risks of off-label populations who take Neurontin who commit or attempt suicide. The off-label populations include psychiatric patients and pain patients. It is known that a component of those populations have a range of patients who may commit or attempt suicide notwithstanding medication. This is generally referred to as the background risk.

18. I considered the background rates of the Neurontin patient populations. It is normal methodology to do so because it is necessary to evaluate whether any particular clinical trial was large enough to uncover a risk that is different than the background rate. That is known as assessing the power of clinical trials to detect risks above the background rate. I employed that methodology in this study to determine if the clinical trials which Pfizer, Warner-Lambert, or third parties were sufficiently powered to uncover an increased risk of suicidal behavior in patients who took Neurontin.

19. It is not universally necessary to employ the various methods of epidemiology to establish whether there is an association between a drug and a risk. For example, the FDA in 21 C.F.R. 201.57(e) states as such that epidemiology is not indispensable to providing even a black box warning. In addition, to use background rates to compare to adverse event reporting rates is not an appropriate method, nor did I do so. The suggestion by the defendants in the motion to exclude my testimony, page 22 of their brief, that I did not consider background rates, is false. As stated in my expert report, such comparisons are contrary to good pharmacvigilance practices.

20. It is my opinion, and was stated as such in my report, that the clinical trials of Neurontin were not sufficiently powered to definitively provide an epidemiologic answer, standing alone, as to whether or not there is a causal relationship between Neurontin and suicidality. I do not now and did not in my report or deposition state that the epidemiologic evidence from the clinical trials does *not* support evidence of a causal relationship; the absence of evidence is not evidence of absence.

21. There is no epidemiologic evidence that a causal relationship does not exist between Neurontin and suicidality. I considered the defendants' clinical trial data; none of the data enrolled enough patients to uncover a risk of suicidality above the background risk. For example, in the company's only bipolar clinical trial there were less than 20 patient years of study when, in order to detect an association between Neurontin and suicidality in bipolar patients the minimum number of patients Pfizer / Warner – Lambert needed to have enrolled is 750 patient years. The same inadequacy exists in the company's trials for other psychiatric patients and for all categories of pain patients other than post-herpetic neuralgia. The Defendant's clinical trial data does not answer any questions concerning the risk of suicide associated with the use of Neurontin.

22. I also took into account Dr. Collins' and McFarland's epidemiology study of bipolar patients in Oregon. That study, standing alone, would not in my opinion be a definitive epidemiology study to find a causal relation between Neurontin and suicidality. However, it is a well-powered epidemiology study that demonstrates that bipolar patients who take Neurontin are at greater risk to commit suicide than similar patients who take approved medicine for bipolar conditions.

23. It is my opinion that anecdotal case reports are not by themselves sufficient to establish a causal relationship but it is also my opinion that such reports support the existence of a causal link between patients who take Neurontin and suicidality. The collection of case report information is a recognized method to evaluate whether there is a reasonable inference that a drug can cause an adverse event in a particular individual. This is consistent with the practices of defendant as shown in exhibit Blume-C. There, on page 4 Pfizer states that "[d]ata from all sources are necessary to evaluate a drug's safety profile."

24. If, as a biologic fact, an agent does cause an event, the anecdotal evidence should be supportive of this proposition. For example, with respect to Neurontin, if the mechanism of action is suggestive of a relationship between Neurontin and negative mood and behavioral disturbances but there was no anecdotal evidence that such events are ever observed, one should seriously question whether there is in fact a relationship.

25. That example was not the experience with Neurontin patient case reports. My evaluation of such reports is that they do suggest a relationship between Neurontin and negative mood and behavioral disturbances.

26. Just as there are different levels of weight that might be given to epidemiologic studies, there is different weight to be afforded to anecdotal information. In the Defendants' motion to exclude my testimony it is

suggested that dechallenge/rechallenge reports of subjective events are of no value and should be discarded.

27. The Defendants brief in that regard is incomplete and misleading. First, the brief refers to a letter to the editor from three FDA scientists regarding Accutane in which the authors state that such events do not *prove* causality. However, Pfizer counsel omitted the second half of the clause quoted and the very next sentence which states: "*Nonetheless, positive rechallenges are very important evidence in overall causality assessment of isotretinoin and psychiatric adverse events.*" The evidence of dechallenge/rechallenge such as that observed in this case may not, standing alone, establish causation but is an important part of the overall evaluation of whether Neurontin causes suicidality. With respect to the key dechallenge/rechallenge report discussed in my opinion, the investigator, after carefully documenting the patient, concluded that the event was probably related to the drug. Therefore, I gave appropriate weight to such reports in my overall evaluation.

28. Defendants' criticism of my opinions is misplaced. In addition to my evaluation of epidemiologic evidence, clinical trials outcomes, and case studies, and because there is a biological basis and a theory of mechanism of action, I used the Neurontin adverse event information and clinical and preclinical information to see if the events predicted by the theories occur in the real world.

29. Defendants incorrectly criticize the method I used to evaluate uncontrolled studies. The FDA uses such studies for evaluation of safety in performing a safety/efficacy study on a new drug. I reviewed and relied upon the deposition testimony of Janeth Turner, Pfizer's FDA regulatory affairs employee who was also the Defendants' primary regulatory affairs contact for the original Neurontin NDA. She testified that the FDA requires double-blind placebo control studies for efficacy but that for evaluation of safety the FDA considers both controlled and uncontrolled studies. An uncontrolled study means only that the patient is aware s/he is taking the drug; there is no epidemiologic comparison to a control group. With respect to adverse events, uncontrolled and controlled studies employ similar mechanisms for the data collection and review.

30. Adverse events in the uncontrolled studies are considered by the FDA to be important in assessing the overall safety of a drug. It is consistent with industry practice to evaluate such events when assessing a causal relationship between a drug and an adverse event.

31. It is well known that there are many adverse effects associated with suicide and suicidal behavior. In the routine course of my drug development and regulatory practice, I am asked to evaluate the safety of a drug for certain

areas of interest.  In doing so, I am required to develop a collection of terms that are representative of the areas of concern.

32. For my Neurontin evaluation, I did precisely the same thing.  The medical adverse event dictionary in use by the FDA and by most companies has standard collections of adverse event terms.  In generating my analyses I used either collections created by the company or used the standard dictionary collections.  Because these are standard definitions, an individual may not always know all of the terms that make up the collection.  Such information is readily available to anyone concerned.

33. On page 49 of the brief of the motion to exclude my testimony the Defendants criticize my opinions because I did not state statistical calculations on my graphs and charts. In the routine practice of discussing adverse events in the context of drug development work, results are typically given in raw counts and percentages.  Statistical computations generally are not done.

34. My charts and graphs are similar to those used by the company within its NDA's for Neurontin.  For example, defendants criticized me for calculating percentages of adverse events over time without calculating statistical significance.  Pfizer in its sNDA for post herpetic neuralgia did the same kinds of computations and did not always provide statistical significance.  See Exhibit Blume-B attached.  I used the same method; for every chart or graph that I used in my report there is a corresponding chart done in a nearly identical way in Pfizer's submissions to the FDA or by the FDA themselves.

35. I reviewed more than 100 clinical and pre-clinical trial reports and did not rely upon the summaries exclusively.  The limitation of the defense review is that the FDA clinical review from the Post Herpetic Neuralgia NDA only compared the data from the Neuropathic Pain trials and the data from the original Neurontin NDA . Exhibit Blume-D.

36. Although the defendants' brief states that there were no reports of hostility in the Neurontin data, it omits several reports of hostility, aggression, emotional lability, and depression from trials other than the initial clinical trials and the pain studies.  Furthermore, there was a withdrawal within the neuropathic pain studies for hostility that defendants did not note in their brief, which while blinded, may have been as the result of study medication and would contradict their statement that there were no hostility reports.  Blume-E, Blume-F. Absent from the Defendant's summary is any discussion of the pediatric epilepsy data where an association with psychiatric adverse events was found and labeled.

37. As part of her expert report on page 21, Defendants' expert Dr. Weiss-Smith, utilizes a chart, based upon publicly available FDA data, suggesting that there was no signal for either suicide or suicide attempt until after 2004.  Exhibit

Altman-C to Altman Declaration. Her chart begins at the time period 1994; however, before November 1997, there was no term in the FDA database for completed suicide. By starting her chart in 1994 when there were no suicides in the database, she biased the chart by moving any signals of a potential problem later into time.

38. On April 1, 2008, I first had the opportunity to review a document known as the "Gabapentin Data Capture Aid" attached as exhibit Blume-G. From the e-mail to which the document was attached, the document was created some time in early 2006. This document is important because first it shows that the company created a specialized protocol to capture information about suicidal events potentially associated with the use of Neurontin. There is no technical reason that such a protocol could not have been implemented in 1994 based upon the signals already existing with respect to Neurontin and suicidal behavior. It is my opinion that such a protocol should have been implemented long before 2006 and likely at the time of initial approval, consistent with the company's obligations under 21 C.F.R. 314.80(b).

39. Second, the defendants have criticized my methodology for using the MedDRA dictionary term "suicidal and self injurious behaviour" or combing various adverse event terms, as used throughout my expert disclosure. However, on page three of the protocol in Blume-G, the company does the very same thing and lists the terms that are to be considered when capturing events of suicidal behavior. This list comes from the MedDRA dictionary and includes all of the terms for "suicidal and self injurious behavior" plus a few additional terms. Therefore, in effect, the company has validated my use of "suicidal and self injurious behavior" in my analyses and opinions.

40. Third, the "Gabapentin Data Capture Aid" confirms the company's inadequate pharmacovigilance practices. By example, on July 12, 2002, Christopher Pacella sent the document attached as Blume-H to several Pfizer employees, which was a review of the adverse events in the company's internal adverse event database through March 31, 2002. The document states that events greater than 1% are highlighted as a possible safety signal. Instead of using collections of terms as stated in the Gabapentin Data Capture Aid, the company view terms individually. This practice obscured signals of possible safety concern by enabling Pfizer to list suicide attempt as only 0.24%, falling below the arbitrary threshold set by Mr. Pacella. That methodlogy was incorrect.

41. At my direction, Mr. Altman recomputed the data from Blume-H and the company's internal adverse event database. He did so in a manner consistent with the collection of terms in the Gabapentin Data Capture Aid. Attached as exhibit Blume-I is the chart which shows that suicidal and self injurious behavior is 1.86% along with overdoses at 7.23%, depressive disorders at 3.22%, and behavior and socialization disturbances at 1.98%. There were

several other events relevant to mood and behavioral disturbances. As I have stated in my expert disclosure, these represent signals of safety concern that were not observed by the company. Furthermore, since these results predate any possible notoriety bias by at least 15 months, these data were not influenced. In sum, had the defendants used sound pharmacovigilance practices, they would have observed the same signals demonstrated above.

42. The confidential nature of my work on this case precluded my ability to prepare any peer reviewed papers based upon my work. If Pfizer releases me from my confidentiality agreement, I am confident that I can submit a number of publishable papers for peer review. It is a false criticism to block peers from reviewing a question, then criticize the absence of peer-reviewed studies. Pfizer has done so in this instance.

43. I incorporate herein my report and also incorporate herein my review of the FDA Safety Alert dated January 31, 2008. They are true and correct. The opinions in my report and as stated herein are my opinions. They were reached only after I reviewed the material recited therein and after I evaluated each of them as set out above and as stated in my report. My evaluations were conducted based on the methods described herein and on methods adopted by the defendants, by the FDA, and by my peers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of April, 2008, in Tampa, Florida.

*Cheryl Blume*

Cheryl Blume, Ph.D.

# Blume April 3, 2008 Declaration

# Exhibit Blume-A

# EXHIBIT 1

# CHERYL D. BLUME, Ph.D.

▪ 13902 North Dale Mabry Avenue, Suite 122 ▪ Tampa, Florida 33618 ▪ Phone: 813-963-3062 ▪ Fax: 813-963-0972
▪ E-mail: cblume@PharmDevGroup.com

> * Generic, OTC, Rx and Biotech pharmaceutical industry knowledge * Executive and consultant
> experience in private/publicly held pharmaceutical companies * Drug discovery/device/
> pharmaceutical product development * NDA/ANDA/IND/BLA compilation/submission * Product
> launch strategies * Europe and United States government registrations/regulatory affairs * FDA
> interactions * Expert witness in clinical pharmacology, toxicology and in pharmaceutical related
> litigation * U.S. Patent/trademark submission/approval procedures * Pre-clinical and clinical
> development * Analytical/Bioanalytical laboratory development/management * Design, planning,
> and implementation of pivotal pre-clinical and clinical trials * Quality assurance management
> * Establishment and implementation of Good Laboratory and Good Manufacturing Practices
> * Regulatory oversight of sales and marketing programs

## SUMMARY

Generic and ethical pharmaceutical development and registration strategist with more than 25 years experience including independent consultant to national and international pharmaceutical firms, expert witness in national pharmaceutical litigation, as well as executive positions in generic and ethical pharmaceutical companies. Accomplishments in complete NDA, ANDA, IND and BLA development, submission, approval, market launch and post-approval programs with extraordinary results. Successful in the development, implementation and direction of Regulatory Affairs, Pre-Clinical and Clinical Development, Pharmacokinetics, Statistics, Quality Assurance, Analytical and Bioanalytical Laboratories, Document Control, Marketing Oversight and Professional Services.

## HIGHLIGHTS/ACCOMPLISHMENTS

➢ As an independent consultant, formulate international and national pharmaceutical development programs, evaluate clinical and preclinical data and direct the elaboration and prosecution of government registration dossiers. Expert witness in national pharmaceutical litigation relating to product launches, product related liabilities, pharmaceutical adverse medical events, market definitions, product labeling and registration activities. Assist counsel in developing strategies relating to regulatory and marketing elements associated with litigation. Serve as clinical pharmacology, regulatory affairs and toxicology expert witness.

➢ Spearheaded research and development, submission and approval programs for three complete New Drug Applications (NDA) with accumulated United States sales exceeding $2 billion. FDA approved two of these NDAs within one year of submission. Accountable for several additional new product launches in the United States.

➢ Directed new product development, submission and approval of more than 100 Abbreviated New Drug Applications (ANDA) with the majority being the first generic approval granted by FDA.

➢ Accountable for the submission of at least 30 Investigational New Drug Applications (IND) that permitted initiation of clinical trials in the United States in the following areas: Cardiology, Neurology, Psychiatry, Pediatrics, Gastroenterology, Infectious Disease, Oncology, Dermatology, and Topical Analgesia.

➢ Inventor of record for 30 United States and foreign cardiovascular, neurologic and psychiatric product and method of use patents, as well as several pending applications.

➢ Ultimate responsibility for the design, development, implementation, finalization and submission of Phase I-IV clinical and all phases of toxicology trials to FDA and other regulatory scientific review bodies.

➢ Experienced in the design of development programs for oral, topical, transdermal and parenteral dosage forms.

➢ Successful in interacting with contract research organizations and all subsidiary and external manufacturers (bulk and finished product), formulators, packagers, and other suppliers of goods and services.

➢ Appeared before the United States House of Representatives, Wall Street, Financial Analysts meetings, national Pharmaceutical Association Meetings and on local and national television.

➢ Expert pharmaceutical witness in multiple national and international judicial proceedings.

➢ Author of multiple peer reviewed pharmaceutical and medical related articles.

➢ Responsible for the regulatory oversight of the sales and marketing development and implementation programs for generic, OTC and prescription drug products.

## PROFESSIONAL EXPERIENCE

Pharmaceutical Development Group, Inc.                                                    1999 to Present
**President**                                                                                       Tampa, Florida

University of South Florida College of Medicine                                          2007 to 2009
**Affiliate Associate Professor to the Voluntary Faculty of the Department**     Tampa, Florida
**of Molecular Pharmacology & Physiology**

University of South Florida College of Medicine                                          2004 to 2007
**Affiliate (Research Scientist) Associate Professor to the Voluntary**            Tampa, Florida
**Faculty of the Department of Pharmacology**

Somerset Pharmaceuticals, Inc.                                                             1993 to 1998
**Executive Vice President/Chief Operations Officer**                                Tampa, Florida
**Board of Directors**
**Vice President**

Mylan Laboratories, Inc.                                                                      1977 to 1995
**Vice President**                                              Morgantown, West Virginia/Tampa, Florida
**Technical Director**
**Director of Pharmacology/Assistant Director of Regulatory Affairs**

## EDUCATION

West Virginia University – **Bachelor of Arts Degree in Biology**
West Virginia University School of Medicine – **Doctorate Degree in Medical Pharmacology**
- Phi Beta Kappa (National Scholastic Honorary)
- Recipient NIH Pre-Doctoral Fellowship

## AWARDS/ORGANIZATIONS

- West Virginia University Alumni Association
- Active member of Phi Beta Kappa Alumni Association
- American Association of Pharmaceutical Scientists (AAPS)
- American Pharmacists Association
- Academy of Pharmaceutical Sciences
- Elected in 1997 to the Board of Fellows at the University of Tampa
- Affiliate (Research Scientist) Associate Professor to the Voluntary Faculty of the Department of
  Molecular Pharmacology & Physiology – University of South Florida.
- Regulatory Affairs Professionals Society (RAPS)
- International Society for Pharmacoepidemiology (ISPE)
- Drug Information Association (DIA)
- Generic Pharmaceutical Association (GPhA)

# CHERYL D. BLUME, Ph.D.

▪ 13902 North Dale Mabry Avenue, Suite 122 ▪ Tampa, Florida 33618 ▪ Phone: 813-963-3062 ▪ Fax: 813-963-0972
▪ E-mail: cblume@pharmdevgroup.com

## AWARDED PATENTS

- Patent No. US4,444,769 - Antihypertensive diuretic combination composition and associated method
- Patent No. US4,526,777 - Pharmaceutical combination composition and associated method
- Patent No. US4,547,498 - Pharmaceutical combination composition and associated method
- Patent No. PH21520-Antihypertensive diuretic combination and associated method
- Patent No CA1220423-Pharmaceutical combination composition and associated method
- Patent No. EP0207405-Method for making pharmaceutical combination composition in granularity heterogenous solid unit dosage form with enhanced bioavailability.
- Patent No.AT51147T-Verfahren zur herstellung einer kombinierten pharmazeutischen zusammensetzung in einer granulaeren heterogenen dosisform mit erhoehter bioverfuegbarkeit
- Patent No. AT29663T-Kombinierte pharmazeutische zusammensetzung und zugehoeriges verfahren
- Patent No. US6,299,901 - Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. US6,348,208 - Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. US6,419,948 - R(-)desmethylselegiline and its use in transdermal delivery compositions
- Patent No. US6,528,082 - Methods and pharmaceutical compositions employing desmethylselegiline to treat neoplastic diseases or conditions
- Patent No. US6,562,364 – Desmethylselegiline enantiomers and their use to treat drug withdrawal symptoms
- Patent No. US6,562,365 - Methods employing R(-)-desmethylselegiline
- Patent No. US6,699,495 - Methods for treating multiple sclerosis employing desmethylselegiline
- Patent No. WO03075906-Methods for preventing and treating peripheral neuropathy by administering desmethylselegiline.
- Patent No. WO0219964-Methods and pharmaceutical compositions employing desmethylselegiline to treat neoplastic diseases or conditions
- Patent No. AU9235898– Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. AU719447B- Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. NO973261- Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. WO9622068- Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. AU695359B- Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. CA2,209,892– Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. CN96192486.1– Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. JP3036847– Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. FI972988– Methods and pharmaceutical compositions employing desmethylselegiline
- Patent No. AU709447–Methods and pharmaceutical compositions employing desmethylselegiline

# **PUBLICATIONS**

- Absorption and disposition of a low-dose combination formulation of hydrochlorothiazide and triamterene.  Biopharm Drug Dispos. 1990 Apr;11(3):233-43. Williams RL, Lin ET, Liang-Gee W, Blume CD, Benet LZ.
- Effects of formulation and food on the absorption of hydrochlorothiazide and triamterene or amiloride from combination diuretic products. Pharm Res. 1987 Aug;4(4):348-52.  Williams RL, Mordenti J, Upton RA, Lin ET, Gee WL, Blume CD, Benet LZ.
- Absorption and disposition of two combination formulations of hydrochlorothiazide and triamterene: influence of age and renal function. Clin Pharmacol Ther. 1986 Aug;40(2):226-32. Williams RL, Thornhill MD, Upton RA, Blume C, Clark TS, Lin E, Benet LZ.
- Absence of a significant pharmacokinetic interaction between hydrochlorothiazide and triamterene when coadministered.J Pharmacokinet Biopharm. 1984 Dec;12(6):575-86. Upton RA, Williams RL, Lin ET, Gee WL, Blume CD, Benet LZ.
- Pharmacokinetic-pharmacodynamic analysis of unbound disopyramide directly measured in serial plasma samples in man. J Pharmacokinet Biopharm. 1984 Dec;12(6):559-73. Thibonnier M, Holford NH, Upton RA, Blume CD, Williams RL.
- Bioequivalence study of a tablet formulation of triamterene and hydrochlorothiazide. Am J Med. 1984 Nov 5;77(5A):59-61. Blume CD, Williams RL, Upton RA, Lin ET, Benet LZ.
- Clinical experience with a combination formulation of triamterene and hydrochlorothiazide (Maxzide) in patients with mild to moderate hypertension.Am J Med. 1984 Nov 5;77(5A):62-6. Williams RL, Clark T, Blume CD.
- A antihypertensive agent: Maxzide (75 mg triamterene/50 mg hydrochlorothiazide). Am J Med. 1984 Nov 5;77(5A):52-8. Blume CD, Williams RL.
- Relative bioavailability of chlorthalidone in humans: adverse influence of polyethylene glycol. J Pharm Sci. 1982 May;71(5):533-5. Williams RL, Blume CD, Lin ET, Holford NH, Benet LZ.
- Comparative effects and mechanisms of castration, estrogen anti-androgen, and anti-estrogen-induced regression of accessory sex organ epithelium and muscle. Invest Urol. 1981 Jan.;18(4):229-34. Neubauer B, Blume C, Cricco R, Greiner J, Mawhinney M.
- Estrophilic molecules in the male guinea pig. J Steroid Biochem. 1978 Jun;9(6):515-25. No abstract available. Blume CD, Mawhinney MG.
- Androphilic and estrophilic molecules in canine prostate glands. Invest Urol. 1978 Mar.;15(5):425-31. No abstract available. Robinette CL, Blume CD, Mawhinney MG.
- Androgen and estrogen binding in male guinea pig accessory sex organs. Endocrinology. 1977 Sep;101(3):726-40. No abstract available. Belis JA, Blume CD, Mawhinney MG.

# Blume April 3, 2008 Declaration

# Exhibit Blume-B

# C O N F I D E N T I A L

## PFIZER GLOBAL RESEARCH & DEVELOPMENT
## ANN ARBOR LABORATORIES
## ANN ARBOR, MICHIGAN

**RESEARCH REPORT NO.: RR-REG** 720-30135

**PGRD AUTHOR(S):**
Holley HP Jr, Purcell TJ, Robbins JL, Wesche D

**DATE ISSUED:** December 13, 2001

**INVESTIGATOR(S):**

**PERIODS COVERED:** 07/02/96 to 12/31/00

**ANALYST(S):**

**DEPARTMENT:** Clinical Research

**COMPOUND NUMBERS (PD,WL,GOE,CI):**
CI-0945, PD 0087842-0000, GOE 3450

**LOT NUMBER(S):**

**PHASE:**

**PROTOCOL NUMBER:**

**NOTEBOOK (OR OTHER REFS):**

**SUGGESTED KEY WORDS:**
Gabapentin, Neurontin, Neuropathic Pain, Diabetic Peripheral Neuropathy, Postherpetic Neuralgia, Safety, Adverse Events

| | |
|---|---|
| **TITLE**: | Integrated Summary of Safety for Gabapentin (CI-945, Neurontin) for the Management of Neuropathic Pain Associated With Postherpetic Neuralgia |

Appendix C.55

**SAFETY ANALYSIS OF POST-MARKETING SAFETY DATABASE FOR GABAPENTIN**

**Overview**

Pfizer's pharmacovigilance databases for gabapentin contain cases of adverse events reported spontaneously to Pfizer (formerly Warner Lambert/Parke-Davis) Worldwide Safety Surveillance by both health care professionals and consumers, cases from adverse event registries, cases of adverse events published in the medical literature, and cases of serious adverse events reported from post-marketing (Phase IV) clinical studies regardless of causality. The databases were reviewed through 31 December 2000 for cases where gabapentin was a primary suspect medication.[a] A total of 7655 cases (one case represents one patient; however, a given patient may be in more than one case) reporting 20076 adverse events were identified in the safety databases.

Of these 7655 cases, 5717 originated from the United States, 885 from the United Kingdom, 337 from France, 140 from Canada, 127 from Germany, and 103 from Sweden representing 95% of the total. The remaining 346 cases were distributed among 27 other countries. There were 2565 males, 4125 females, 791 cases where gender was data entered as "unknown" and 174 cases where gender was not designated. Patient ages ranged from newborn to 97 years. There were 412 (5.4%) patients 16 years of age or less, 4051 (52.9%) patients between the ages of 17 and 64, and 1060 (13.8%) patients over 64 years of age. Patient age was data entered as "unknown" in 1674 (21.9%) cases and not designated in 458 (6.0%) cases.

The distribution by outcome (at event level) was as follows: recovered (5089), not yet recovered (5521), recovered with sequelae (99), still under treatment/persisting (81), death (342), data entered as "unknown" (5593), not applicable (3333), and not designated (18) for a total of 20076 event outcomes.

The COSTART body systems containing the reported COSTART preferred adverse event terms are listed in descending order of events/body system in Table 1.

Table 1.

| COSTART Body System | Number of Events/Body System | Percentage of Total Number of Events |
|---|---|---|
| Nervous System | 5792 | 28.9% |
| Body as a Whole | 3316 | 16.5% |
| Drug, Usage | 3084 | 15.4% |
| Digestive System | 1777 | 8.8% |
| Metabolism & Nutrition | 1103 | 5.5% |
| Skin and Appendages | 1090 | 5.4% |
| Special Senses | 923 | 4.6% |
| Cardiovascular System | 763 | 3.8% |
| Urogenital System | 715 | 3.6% |
| Respiratory System | 530 | 2.6% |
| Hemic & Lymphatic System | 484 | 2.4% |
| Musculoskeletal System | 424 | 2.1% |
| Endocrine System | 73 | 0.4% |
| Drug, Character | 1 | <0.1% |
| Fetal and Neonatal Disorders | 1 | <0.1% |
| **Total** | **20076** | **100.0%** |

---

[a] This review did not include approximately 130 cases where gabapentin was listed as a secondary suspect medication in accordance with the assessment of the reporter and/or based on data entry conventions.