EXHIBIT 103

# DAVIS POLK & WARDWELL

450 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
212 450 4000
FAX 212 450 3800

1300 I STREET, N.W.
WASHINGTON, D.C. 20005

1600 EL CAMINO REAL
MENLO PARK, CA 94025

99 GRESHAM STREET
LONDON EC2V 7NG

15, AVENUE MATIGNON
75008 PARIS

MESSETURM
60308 FRANKFURT AM MAIN

MARQUÉS DE LA ENSENADA, 2
28004 MADRID

1-6-1 ROPPONGI
MINATO-KU, TOKYO 106-6033

3A CHATER ROAD
HONG KONG

JAMES P. ROUHANDEH
212 450 4835
james.rouhandeh@dpw.com

February 8, 2005

Re:   *In re Neurontin*, 04 CV 6704 (JSR)

Hon. Jed S. Rakoff
United States District Judge
United States District Court for the
  Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1340
New York, New York 10007

Dear Judge Rakoff:

In accord with yesterday's telephone conference with your chambers, and in further support of defendants' letter brief dated February 3, 2005 in the above-captioned action, I am attaching the affidavit of Dr. Brian L. Strom. Dr. Strom's affidavit was prepared in response to the affidavit by Dr. Cheryl Blume that accompanied plaintiffs' letter brief dated January 27, 2005, which had cited Dr. Strom's textbook, Pharmacoepidemiology.

Respectfully yours,

James P. Rouhandeh

Attachment
cc w/ att: Kenneth B. Fromson, Esq.

By Facsimile & Mail

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X
                              :
In re:                        :
                              :
Neurontin                     :    Case No. 04 CV 6704
LITIGATION                    :
                              :
                              :
                              :
------------------------------X

BRIAN L. STROM, M.D., M.P.H., under penalty of perjury, declares and says:

1.   I submit this affidavit in response to an affidavit by Cheryl Blume, PhD, dated January 21, 2005.

**Qualifications**

2.   I received my M.D. in 1975 from the Johns Hopkins University School of Medicine and my Master of Public Health degree in Epidemiology in 1980 from the University of California, Berkeley. I am licensed to practice medicine in the states of California and Pennsylvania.

3.   I am the George S. Pepper Professor of Public Health and Preventive Medicine, Professor of Biostatistics and Epidemiology, Professor of Medicine, and Professor of Pharmacology at the University of Pennsylvania School of Medicine. I am also Chair of the Department of Biostatistics and Epidemiology and Director of the Center for Clinical Epidemiology and Biostatistics at the University of Pennsylvania. I am a member or fellow of numerous professional societies, including but not limited to, the

- 1 -

International Society for Pharmacoepidemiology, for which I served as President; the American College of Physicians, for which I served as a member of its Board of Regents; the American College of Epidemiology, for which I served as a member of the Board of Directors; etc. I have also been elected as a member of a number of honorific societies, including among others, the American Epidemiology Society, and the Institute of Medicine of the National Academy of Sciences.

4.    My career has been devoted to the development of the field of pharmacoepidemiology, which is the study of the use and effects of drugs in populations. Most pharmacoepidemiology studies are conducted after drug marketing, and involve studies of adverse drug effects.

5.    I am the editor of a book entitled *Pharmacoepidemiology*, which is now entering its fourth edition (in press), including multiple chapters on the use and interpretation of adverse drug reaction reports, and I have extensive expertise in the field of pharmacoepidemiology. At the Hospital of the University of Pennsylvania, I have run for many years the program responsible for collecting and interpreting adverse drug reaction reports, as well as conducting drug use evaluations.

6.    I served as a member of the Food and Drug Administration ("FDA") Drug Safety and Risk Management Advisory Committee, which was formed to advise the FDA on general policies relating to drug safety issues, as well as the proper management of drug safety problems. I serve as the Editor for the Americas of *Pharmacoepidemiology and Drug Safety*, and as a peer reviewer for many medical and scientific journals, including, but not limited to the *New England Journal of Medicine* and the *Journal of the*

*American Medical Association*. A copy of my current curriculum vitae, including a list of my publications, is attached to this affidavit as Exhibit A.

7. I was asked to comment on the affidavit of Cheryl Blume, PhD, with particular attention to its paragraphs 5 to 10.

## Description of Adverse Event Reporting System

8. The identification of possible adverse drug reactions (ADRs) after marketing relies upon spontaneous voluntary reporting to industry or regulators of reactions observed in clinical practice. The FDA receives well over 300,000 such reports annually, consolidating them into a large database. Few (<10%) are submitted directly to the FDA by healthcare providers and consumers. Rather, manufacturers receive >90% of reports and must then process, analyze, and report to the FDA all ADRs reported to them after use of their products.

9. A major advantage of the spontaneous reporting system (SRS) is that it incorporates all drugs, prescribers, dispensers, and patients, casting the broadest possible net to capture events. However, this system is subject to under-ascertainment (not recognizing an event is due to a drug) and over-ascertainment (erroneously ascribing an adverse event to a drug). Further, it is subject to vast underreporting, with published reporting rates ranging from 0.1 to 50%, and variations depending on event severity and acuteness, for example. Reporting is somewhat more complete for newer or more recently marketed drugs than older drugs. External events (e.g., letters to the editor in a medical

journal or lay newspaper, increased suspicion about a drug's risk, or "Dear Doctor" letters) can easily modify ascertainment or reporting rates.

10. To calculate true ADR rates, one needs an accurate number of events in the exposed population (numerator) and an accurate number of exposed individuals (denominator). The SRS has neither. There is no true numerator because it is unclear how many ADRs actually occurred in a specific population. Accurate denominators likewise are unavailable; sponsors and the FDA know the sales of a given drug, but often lack the number of individuals exposed over time. Further, they do not know the number of people who used the drug and whose ADRs would have been reported had they suffered such an event, which would be the correct denominator for a numerator consisting of only reported cases.

**Proportional Reporting Ratios**

11. To quote FDA in a statement in my book: "Because of these limitations, AE [ADR] reports are primarily useful for hypothesis generating, rather than hypothesis testing." Indeed, the SRS generates numerous hypotheses, many of which are neither investigated further nor confirmed.

12. The proportional reporting ratio (PRR) is the relative frequency of reports of a specific event compared with all events reported for a specific drug, divided by the corresponding quantity for other drugs. Such "disproportionality measures" were developed to help identify signals to be explored in subsequent controlled studies, and have recently been reviewed in detail in our journal.

13. Pharmacoepidemiologists hope that using PRRs will allow for earlier hypothesis generation, although this goal still remains to be evaluated rigorously. With rare exceptions, when such a "signal" is identified, the appropriate response is for a manufacturer to investigate further by launching a formal study, which is often epidemiological in design. Many "signals" suggesting potential associations, after further investigation with an epidemiological study, do not confirm the potential association.

14. Once a "signal" is already present, e.g., someone suggests a drug may cause an adverse effect, there is no need to calculate PRRs.

15. The calculation of PRRs requires a count of numbers of adverse reactions of a given type for a drug, and the total numbers of adverse reactions for that drug. Such calculations do not require access to the details of each report. Such calculations do not even require identifying the types of adverse reactions, except for the type of adverse reaction of interest.

16. The calculation of PRRs requires equivalent data on more than one drug, since one is comparing the proportion of ADRs of a particular type which are due to one drug, and whether that proportion is more than one would expect, based on the other drug.

Dated: February 8, 2005

BRIAN L. STROM, M.D., M.P.H.

Sworn to and subscribed before me this
8 day of February, 2005.

Print CHRISTOPHER B. ANGELUCCI
Notary Public, Pennsylvania Commission No. 1200571
Commission expires 1-8-2008
Personally known YES

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Christopher B. Angelucci, Notary
City of Philadelphia, Phila. County
My Commission Expires January 8, 2008

-5-