# EXHIBIT 123

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Blume, Cheryl (FP Expert)**
**11/12/2007**

**Printed : 3/20/2008**

285
1  MR. FROMSON: Just one moment. Let me just
2  read back your question. Can you go up for me?
3  All right. Objection as to form to the extent
4  that it -- to -- to -- only to the extent that the
5  answer -- that a responsive answer would infringe
6  upon the agreement not to inquire of the witness
7  about drafting of her reports. She can answer.
8  MR. BARNES: I want to know her methods.
9  BY MR. BARNES:
10  Q. What did you do --
11  MR. FROMSON: That's a different question.
12  BY MR. BARNES:
13  Q. -- by step -- step by step, what did you do?
14  What were your methods, and step by step what did you do
15  to answer the question?
16  MR. FROMSON: Well, then that's a compound
17  question. I have no objection to the method.
18  BY MR. BARNES:
19  Q. Methods first. Tell me the methods you
20  employed to answer the question asked of you that
21  Neurontin contributes to mood or behavioral disturbances
22  including self-injurious actions and suicide?
23  A. Several assignments were undertaken to address
24  this issue. An independent review of both the
25  nonclinical and clinical literature was undertaken. And

286
1  the articles that were obtained by us in that review
2  were provided on your disk. Those articles were
3  obtained by PDG and were not provided to us by anyone
4  else.
5  We also accessed available regulatory
6  information relating to the product -- and that
7  information is also on the disk -- from the
8  United States and from those Western European countries
9  that will also provide that information.
10  After reviewing that information, we then
11  accessed various databases, most of which or all of them
12  are referenced in the report; the World Health
13  Organization database, Health Canada for the years that
14  it was available during the relevant time period, and
15  the others that are listed.
16  Following that, we -- or not following that,
17  but in concert with that, we were also reviewing the
18  information that was provided to us according to the
19  time periods that we've already discussed today.
20  First area of interest were the time -- were
21  the events leading up to the initial approval. And we
22  would look at the research reports that were generated
23  by your client during that timeframe, their internal
24  database, if it were available during that timeframe,
25  the nature of the FDA submissions, FDA regulatory

287
1  actions, FDA regulatory reviews, advisory committee
2  reviews. And pretty much exactly as I've laid it out in
3  the report is the -- are the materials that we reviewed.
4  And we took the first period to the time of
5  the -- of the first approval. Because the first
6  approval was for a limited indication and other studies
7  were ongoing at that timeframe, we amplified the first
8  section of the report to include other available
9  studies. So you will see comments in here relating to
10  monotherapy, relating to other disease states that
11  were -- were ongoing at the time. Okay?
12  Once the first -- once the product was
13  launched, we go into the second period, the 1994 to
14  1996. Becomes a little more complicated at that point,
15  because then we are dealing with -- we are dealing with
16  postmarketing adverse event databases as well as
17  internal databases, so you will see in the next section
18  where we begin to look at the SRS, the AERS system,
19  et cetera.
20  We also then are looking at the required
21  reports that the -- that your client had to provide to
22  FDA or to the European authorities. In all cases, be it
23  research reports or the tabular summaries or narrative
24  summaries given in the quarterly or annual reports, we
25  were looking at the actual research reports compared

288
1  with the information that was summarized by the clients.
2  So we were actually able to look at the adverse events
3  and compare designation of those events and the reports
4  that were provided to the authorities.
5  Once the product is approved, we can start
6  mining the database, if you will. And in each section,
7  we asked -- at this point, Mr. Altman was involved with
8  this and we were asking him to do the same sort of
9  assignments that we routinely do for pharmacovigilance;
10  that is, break the data up into quarters, access the top
11  25 events, look for events that change by a factor of
12  two or more.
13  For -- because we were interested in
14  self-injury events or potential self-injury events, we
15  were focusing on the system organ class that we
16  discussed earlier today and those psychobiological
17  events. But because your client had in their database
18  concerned with aggression, aggressivity, hostility, we
19  became aware of the interest in depersonalization. We
20  added those to our lists as well.
21  At each point in time --
22  (Counsel conferring off the record.)
23  THE WITNESS: At -- at --
24  MR. FROMSON: Go ahead. Finish your answer,
25  Doctor.

**289**

1  THE WITNESS: At each point in time, we were
2  updating for you any new nonclinical literature or
3  medical literature that may have occurred during
4  the relevant time period. Okay?
5     After approval, we were also accessing
6  regulatory events where their efforts to obtain
7  additional approvals, were their letters with
8  DD Mac, were there other letters sent to the FDA
9  from the FDA, any meetings or communications
10 between the Pfizer defendants and the FDA. So
11 pretty much creating little quarterly and annual
12 reports using all available databases.
13    If you look at the next section, which is the
14 longest section, where we go from '96 to 2002, we
15 repeated all the same assignments that I've already
16 outlined for you, but this time we stepped back and
17 did the same sort of assignments we did in the
18 first quarter, the first quarter of the report,
19 which is to look at the basis of the data that
20 formed the basis of the second approval, which is
21 the subset of the postherpetic neuralgia.
22    So in addition to looking at all the
23 postmarketing information, the literature, the
24 non -- the animal literature, the human literature,
25 pharmacokinetic literature, quarterly reports,

**290**

1  annual reports, PSURs, and all the postmarketing
2  databases, we were also accessing information
3  relating to, first, the general neuropathic pain
4  proposed indication and in the subset actually
5  approved for postherpetic neuralgia. And that, by
6  far, is the longest period of time.
7     And then the last quarter, there hasn't been
8  any additional approvals of the last one-fourth of
9  the report, so what we did is we took it from the
10 time of the postherpetic and went forward in time
11 and again compared the various postmarketing
12 databases and any new data that were in your
13 client's research reports or in their reports, and
14 paid particular attention to the reanalysis of the
15 controlled clinical trial phases one through four
16 dating the postmarketing data that the Pfizer
17 defendants submitted in response to the various FDA
18 requests.
19    And as we do with -- with all of our work, we
20 look at other -- look at those areas of insert
21 where we think that additional information should
22 have been provided. And we look to see if there
23 were examples of where other companies may have
24 provided information that would have been helpful
25 to the prescriber, either for the approved

**291**

1  indication or perhaps directed towards the
2  off-label indications. And that's finalizes the
3  report. We waited until the end, the last section,
4  to do that.
5  BY MR. BARNES:
6  Q. Okay. Move to strike portions of your answer
7  as unresponsive, and I'll ask you this question.
8     MR. FROMSON: I mean, are you -- are you -- do
9  you want to let her finish, because I think her
10 answer was responsive.
11    MR. BARNES: But -- I thought you were done.
12    MR. FROMSON: Are you done, Dr. Blume, or no?
13    THE WITNESS: Yeah, I was done.
14    MR. FROMSON: Okay. Thank you. I apologize.
15    MR. BARNES: Move to strike her answer as
16 nonresponsive, and -- and I'll ask this question.
17 BY MR. BARNES:
18 Q. To the extent that's the methodology you
19 employed for assessing the question of whether Neurontin
20 causes suicide, can you cite one scientific reference in
21 a peer-reviewed journal which uses that method to
22 establish that a medicine causes suicide or any adverse
23 event?
24    MR. FROMSON: Let me object to the form of
25 that question to the extent it's even

**292**

1  comprehensible.
2  BY MR. BARNES:
3  Q. Do you understand my question? Where --
4  where -- where -- what -- that you describe the method
5  by which you assess the question that Neurontin causes
6  suicide, correct? That was my question.
7  A. And you want me to --
8  Q. Well, and I'm --
9  A. -- give you examples of where that method is
10 used to -- to change labeling.
11 Q. No, the question had to deal with causation.
12 My question was not about labeling. It's causation.
13    Now, where -- where in the worldwide medical
14 and scientific literature is that method published --
15    MR. FROMSON: Just note my objection.
16 BY MR. BARNES:
17 Q. -- as we've just described?
18    MR. FROMSON: Note my objection to the form of
19 your question.
20    THE WITNESS: Well, insofar as I was looking
21 at this from a regulatory perspective, if you pick
22 up the books that I gave you and the references I
23 gave you earlier, both Brian Strom and the FDA will
24 talk about various situations in which one can
25 examine causality with -- with adverse events.