EXHIBIT 124

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Blume, Cheryl (FP Expert)**
**11/12/2007**

**Printed : 3/20/2008**

Page 13

1  anything. That's something -- that's why I says it
2  could all be taken under advisement as to what you
3  want --
4       MR. BARNES: I understand.
5       MR. FROMSON: -- do with it.
6       MR. BARNES: Let's mark this as Exhibit 2.
7  We'll talk off the record.
8       MR. FROMSON: It would probably be cured by
9  simply --
10      THE REPORTER: Excuse me.
11      MR. FROMSON: I'm sorry.
12      (Deposition Exhibit No. 2 marked for
13 identification.)
14      MR. GUNTER: Is this the index that goes to
15 this hard drive?
16      MR. FROMSON: No, it's --
17      MR. GUNTER: Do you have an index for the hard
18 drive? And that will clear up anything.
19      MR. ALTMAN: No. One could be brought in.
20      MR. GUNTER: If we had an index for the hard
21 drive, I think we'd be in good shape.
22      MR. ALTMAN: It would be thousands of pages
23 and not practical.
24      MR. GUNTER: Not pages, but just documents.
25      MR. ALTMAN: No, no, the index would be

Page 14

1  thousands of pages. There are probably almost a
2  million documents, not pages.
3       MR. GUNTER: Okay. So the best thing to do
4  then, if we have to extract any documents on that,
5  we could -- you could confirm that this was on
6  the --
7       MR. BARNES: Original.
8       MR. GUNTER: -- hard drive that you gave, the
9  original?
10      MR. ALTMAN: One simple way to do it is that,
11 maybe on a break, we can run a directory of what's
12 on that hard drive, mark that itself as an exhibit
13 which would authenticate what was on the hard
14 drive. Then you can take it with you. Then we
15 have the copy --
16      MR. BARNES: And that will be Exhibit -- we'll
17 make that as Exhibit 2A to the deposition.
18      MR. ALTMAN: And that would probably solve
19 that.
20      MR. BARNES: Okay. That's excellent. Thank
21 you.
22      And then I'd like to mark this as Exhibit 3
23 and 3A, if I might, Madame Court Reporter.
24      Excuse me, Dr. Blume.
25      (Deposition Exhibit Nos. 3 and 3A marked for

Page 15

1  identification.)
2  BY MR. BARNES:
3       Q. Can you identify what's been marked as
4  Exhibit 3 and Exhibit 3A to the deposition?
5       A. Yes. Exhibit 3 is a disk that I asked to be
6  prepared that includes the following information. It
7  includes our complete bibliography relating to Neurontin
8  and gabapentin of scientific literature articles. It
9  also includes information that I have cited in my report
10 that I obtained independently. And it includes the --
11 as I -- yes, it includes the databases that were
12 provided to us relating to the various postmarketing
13 pharmacovigilance data.
14      Q. Who provided information to you on the
15 pharmacovigilance data?
16      A. Mr. Altman.
17      Q. Who is Mr. Altman?
18      A. Keith Altman is an employee of Finkelstein who
19 works with PDG on various projects relating to
20 postmarketing pharmacovigilance.
21      Q. On how many products does Mr. Altman work with
22 your company on pharmacovigilance products?
23      A. Oh, over the last three or four years,
24 probably 20.
25      Q. And can you describe the -- the ref- -- the

Page 16

1  work you've done with Mr. Altman over the -- in the 20
2  projects that you've identified?
3       A. They may be divided into two categories. One
4  relates to the product development work we do for
5  pharmaceutical clients with respect to their preparation
6  of submissions for the U.S. Food and Drug
7  Administration, and the other relates to work that we
8  have done with him on litigation-related matters.
9       Q. Okay. Is Mr. Altman an employee of your firm?
10      A. No, as I noted, he's an employee of
11 Finkelstein.
12      Q. How is he -- when he works on project
13 development work for your clients with regard to FDA
14 submissions, on what basis is he compensated?
15      A. He -- he provides a bill -- he provides an
16 invoice for his hours to us, and that invoice is then
17 included with the expenses that I provide to the client.
18      Q. What clients have you worked with Mr. Altman
19 on product development work?
20      MR. FROMSON: Just note my objection as to
21 form.
22      THE WITNESS: Yes. And I can tell you the
23 types of clients they are, but I'm not permitted to
24 identify our pharmaceutical clients.
25 BY MR. BARNES:

Blume, Cheryl (F&P Expert)  11/12/2007  9:25:00 AM

## Page 17

1  Q. On what basis do you -- you can't identify
2  your pharmaceutical clients?
3     MR. FROMSON: Just note my objection to the
4  extent that it may be privileged information or
5  subject to confidentiality agreements that she has
6  with both pharmaceutical companies.
7     THE WITNESS: That is correct. And I have
8  questioned them in the past regarding these types
9  of issues and they have forbidden me to identify
10 them.
11 BY MR. BARNES:
12 Q. How many clients has Mr. Altman worked with
13 you on product development matters?
14 A. Probably four or five.
15 Q. And when did that begin?
16 A. In 2004.
17 Q. Describe the nature of the work that
18 Mr. Altman does for you for your pharmaceutical clients.
19 A. He has evaluated U.S. as well as international
20 databases, both publicly available as end company-based
21 databases, relating to adverse events for utilization in
22 either IND or NDA submissions or in the establishment of
23 pharmacovigilance assignments following an NDA approval.
24 Q. Are these U.S.-based companies that you're
25 working with?

## Page 18

1  A. Both U.S. and international.
2  Q. Are the -- involves the products that are --
3  are they generic or are they ethical pharmaceuticals,
4  branded pharmaceuticals?
5  A. They are both.
6  Q. Do you direct his activities when he works
7  with you on your -- your pharmacovigilance work for
8  private clients outside of litigation?
9  A. Yes.
10 Q. And so he -- you basically ask him to run the
11 queries of the database and you will run the queries?
12 A. Yes.
13 Q. Does he ever design the queries himself?
14 A. I did -- I request the type of information
15 that I need extracted. He -- he designs the assignments
16 that he conducts in order to assess the database,
17 electronically access the database and check the
18 database.
19 Q. So I understand, you will say, "Mr. Altman, I
20 would like for you to query the database to extract this
21 information, run these analyses," and he would use his
22 system to pull the information out and return the
23 information to you for your professional evaluation? Is
24 that fair?
25 A. Yes. And his -- and his analyses procedures

## Page 19

1  are included with the information that is provided to
2  both the client and to the Food and Drug Administration.
3  Q. Let me know, how does that work? When he
4  provides you with the analyses and procedures, what
5  are -- what documentation does he provide you with in
6  response to your request for information?
7     MR. FROMSON: Just note my objection as to
8  form.
9     THE WITNESS: Well, it takes -- it takes --
10 takes different approaches depending on the type of
11 search and depending on the client. Generally he
12 is involved with the design, the information that
13 is needed in the goals for -- for the IND or for
14 the NDA. And so he is aware of what we are -- what
15 we are working on.
16    And I will ask him specific queries, either at
17 a meet -- either at a face-to-face meeting or
18 telephonically or electronically, and he will run
19 that information. There is generally telephonic
20 contact back and forth as that information is
21 generated. And the information is provided to us
22 electronically or he brings us to us when we meet.
23 BY MR. BARNES:
24 Q. Your prior answer talked about that he would
25 provide you with design and documentation back to you in

## Page 20

1  terms of the request.
2     Does he provide you with the protocol for a
3  search or how does he set up the search or does he --
4  you just let him run the search as he sees fit?
5  A. Well, we've done it several times, and he
6  provides to me an overview of how he has -- how he plans
7  on conducting the search. That protocol and the -- and
8  his execution of that protocol has been previously found
9  acceptable by the Food and Drug Administration.
10 Generally, that same general type of search is conducted
11 for all of our searches.
12 Q. And when -- when was it found acceptable by
13 the Food and Drug Administration?
14 A. I think our first NDA with that was approved
15 in 2004.
16 Q. And what -- what protocol did he run that was
17 found acceptable by the Food and Drug Administration?
18 Describe it, the protocol and what the output was.
19    MR. FROMSON: Just note my objection as to
20 form.
21    THE WITNESS: Within the confines of our
22 confidentiality agreement with that client, the
23 search was designed to compare a variety of
24 adverse-related events over a family of drug
25 products. And we were interested in specific

**Page 21**

1  events within a drug product and across the family
2  of drugs. And we were also interested in the
3  standard pharmacovigilance tools of accessing the
4  top 25 events at each reporting period, any changes
5  in the top 25 events, any events that represent a
6  signal from one reporting period to the next, any
7  new events that have popped up on the database from
8  the previous period.
9  BY MR. BARNES:
10  Q. And do you have a -- was that information
11  submitted to the Food and Drug Administration?
12  A. Yes.
13  Q. And was this NDA approved?
14  A. Yes.
15  Q. Is it, work that Mr. Altman did, publicly
16  available from the Food and Drug Administration?
17  A. I don't know if that is specifically noted in
18  the summary basis of approval. I don't know.
19  Q. The infor- -- you provide information to the
20  government that was prepared by Mr. Altman, correct?
21  A. Yes.
22  Q. Is there any -- any -- any known reason -- any
23  basis for confidentiality that you can identify with
24  regard to the information that your company submitted to
25  the Food and Drug Administration that was presented by

**Page 22**

1  Mr. -- prepared by Mr. Altman in connection with that
2  NDA?
3  A. The only thing that is publicly available from
4  a new drug application is the information that the FDA
5  provides relating to that new drug application. And I
6  don't know if the FDA's release of the clinical data
7  section includes an overview of the postmarketing
8  pharmacovigilance. I don't know.
9  Q. And what's the name of that drug?
10  A. I just can't share this with you.
11  Q. Well, just so I understand, you did work on
12  behalf of a pharmaceutical company in regard to a new
13  drug application, correct?
14  A. Yes.
15  Q. And that your -- your client submitted that
16  information to the Food and Drug Administration in
17  connection with seeking FDA approval for a drug?
18  A. Yes.
19  Q. And now is it your testimony that the drug was
20  subsequently approved by the Food and Drug
21  Administration?
22  A. Yes.
23  Q. And you're claiming that the work that you
24  submitted to the United States Government is somehow
25  confidential in connection with that approval of -- of a

**Page 23**

1  drug for marketing to the United States?
2  A. Yes.
3  Q. I'm asking you -- so you're just refusing to
4  provide me with the name of the drug?
5  A. All the work that I provide goes to the client
6  and is embedded within their new drug application.
7  Q. What's confidential with the name of the drug?
8  MR. FROMSON: Just note my objection as to
9  form.
10  THE WITNESS: I am not permitted to talk about
11  the clients nor their drug products.
12  BY MR. BARNES:
13  Q. By whom?
14  A. By the client.
15  Q. Are you relying on any of your experience
16  working with these pharmaceutical clients in forming
17  your opinions in this case?
18  MR. FROMSON: Note my objection as to form.
19  THE WITNESS: My opinions in this case are --
20  are predicated upon my 25 years in the
21  pharmaceutical industry as well as the work that I
22  have continued over the last six years.
23  BY MR. BARNES:
24  Q. Are you relying on any of the work you've done
25  with the Food and Drug Administration in connection with

**Page 24**

1  pharmaceutical clients in expressing any of your
2  opinions in this case, including the methods that
3  Mr. Altman employed on your behalf in making these
4  submissions?
5  A. No. Not specifically, no.
6  Q. Not specifically. How about generally?
7  A. He does the same general types of searches in
8  both litigation and as well as in the product
9  development assignments.
10  Q. It's not my question.
11  MR. BARNES: Would you read back that last
12  question, please.
13  (The reporter read the portion requested.)
14  THE WITNESS: It is the same methods that he
15  uses for both our litigation work as well as
16  pharmaceutical development work. So I'm relying on
17  the experience I have gained with him in the
18  litigation for my work in this case.
19  BY MR. BARNES:
20  Q. Please list every drug pharmaceutical client
21  that Mr. Altman has assisted you with --
22  (Brief interruption.)
23  MR. FROMSON: Did you finish the question?
24  MR. BARNES: I did not. Thank you.
25  MR. FROMSON: Okay.

**Page 53**

1  Q. You don't know who prepared this. Who
2  provided the terms?
3  A. We provided the terms.
4  Q. You directed the terms and he went -- he or
5  you -- on this, on page 76 -- went into the database to
6  extract it?
7  A. Yes, it's a little different with the World
8  Health Organization. When you receive the database from
9  them, they send you the entire database, so it's a
10 matter of going through and extracting from a whole --
11 you don't -- you don't have the opportunity to do it by
12 body systems. They send you everything.
13 Q. Do you have -- okay.
14    Do you have the database that was provided to
15 you from World Health Organization in your possession;
16 that was used to create this table on page 76?
17 A. Yes, and I have put that on this disk as well.
18 Q. And that would be referring to Exhibit No. 3?
19 A. Yes.
20 Q. Thank you very much.
21    All right. Why don't you continue to review
22 the report just as to what you -- so -- what you
23 prepared.
24    Right now, we have Mr. Altman preparing 69,
25 70, 71, 72, 73, 74, 75, and 76, correct?

**Page 54**

1  MR. FROMSON: Just note my objection as to the
2  form in terms of the use of the word "prepare."
3  MR. BARNES: "Filtered" was her room -- word.
4  "Filtered." I'll --
5  THE WITNESS: Yes. And just to clarify, I
6  would have to check if we -- if we did the World
7  Health Organization or if he did it.
8  BY MR. BARNES:
9  Q. You'll check on that for me?
10 A. Yes, I will.
11 Q. Okay. Now, when you -- Mr. Fromson noted an
12 objection. What do you mean by Mr. -- by using the
13 phrase Mr. Altman filtered the information for you, what
14 does that mean?
15 A. Well, my understanding of the FDA and some of
16 these other databases is they are huge databases. The
17 word "filter" is simply my way of asking him to apply
18 the rules and the conditions that he has established in
19 evaluating the database and calculating the number of
20 specific events at -- at this designated time periods.
21 Q. What are the rules that Mr. Altman established
22 in querying the databases to get the number of events?
23 A. Well, we out -- we outline these. When we
24 submit, for example, to the Food and Drug
25 Administration, we give a complete list of what he does.

**Page 55**

1  But my understanding is that care is taken to
2  take into consideration when there is an initial report
3  versus a follow-up report so it is not counted twice.
4  We filter -- I believe he filters the database so that
5  we are getting all of the information. We take the last
6  reports so that it includes all the cumulative
7  information. He checks for duplicates. He is able to
8  filter them for us by suspect status, nonsuspect status.
9  If we ask, he can filter it by various demographics.
10 For example, if the patient were on other meds, were not
11 on other meds.
12    If we're given information generally, whatever
13 fields -- it is my understanding, whatever fields are in
14 the intake form, he would be able to filter by those
15 forms -- fields. Excuse me.
16 Q. Are you -- is it your testimony that that's
17 what he did in this case?
18 A. Well, what I asked for -- and there are
19 certain -- there are certain precautions that he
20 undertakes for all tables. For example, he is very
21 careful that we don't double count. He is very careful
22 that we put the event when the event was -- when the
23 event occurred, not necessarily when reported.
24 Q. How do you know he was careful? What did you
25 do to -- did you do anything to audit his work in this

**Page 56**

1  case to verify that he was exercising care?
2  A. We have used his -- the method that he has
3  developed has been provided to the FDA. FDA has queried
4  him independently on the way in which he analyzes these
5  data. FDA has -- has approved our applications using
6  these data. I understand that Mr. Altman communicates
7  with the FDA on projects other than mine, as well, on
8  these database assignments, so --
9  Q. My question is, what did you do in this
10 particular case to verify that Mr. Altman exercised care
11 in preparing these tables and filtered it in an accurate
12 and reliable way --
13 A. Well, I under --
14 Q. -- in this case?
15 A. Yes. I understood he used the same system
16 that has been previously found to be acceptable. I
17 cannot tell you over the last four years of whether I
18 did any other independent checking or not. I just don't
19 recall.
20 Q. In this case, did you do any independent
21 checking of Mr. Altman?
22 A. That's what I'm saying. In the last four
23 years, I just don't recall if I did or not.
24 Q. Well, when were you retained in this matter?
25 A. 2003. 2003, I think.

**69**

1  I'm not capable of validating his work.
2  BY MR. BARNES:
3  Q. So it is your testimony that you have never
4  specifically done anything to validate his data in 2007
5  on his work in Neurontin?
6      MR. FROMSON: Same objection, to the extent
7  that it hasn't already been asked and answered.
8      THE WITNESS: Yes, I have not -- I am not
9  capable of independently validating his extraction
10 of data from -- from these databases.
11 BY MR. BARNES:
12 Q. At any time in this litigation, correct?
13     MR. FROMSON: Same objection to the extent
14 that it has not already been asked and answered.
15     THE WITNESS: Yes.
16 BY MR. BARNES:
17 Q. Okay. Now, let's -- let's finish going
18 through your report and identify other tables that
19 Mr. Altman --
20 A. Okay.
21 Q. -- filtered for you.
22 A. Okay. And, again, I don't -- I don't mean
23 to -- to limit what he does as filtering. That's simply
24 my shorthand way of referring to it.
25     The Pfizer database --

**70**

1  Q. Well, they --
2      MR. BARNES: Would you read that back, that
3  last answer. I apologize. Read back her last
4  answer. And identify the pages, but read back that
5  last answer.
6      (The requested portion was read by the
7  reporter.)
8  BY MR. BARNES:
9  Q. Well, would you give me the long-handed way of
10 referring to filtering as to describing in detail what
11 Mr. Altman's work entails for you when he runs these
12 tables and analysis for you, because I don't want to --
13 you've said "shorthand." I don't want the short. I
14 want the complete answer.
15     MR. FROMSON: Just note -- are you finished?
16     MR. BARNES: Yeah.
17     MR. FROMSON: Just note my objection as to
18 form to the extent that it has not already been
19 asked and answered. On the record, you will see
20 that she -- you asked about rules, conditions, and
21 evaluating queries, so that my objection is to the
22 extent it's already been asked and answered. Go
23 ahead.
24     THE WITNESS: Okay. My understanding, when --
25 again, you certainly have to ask him these

**71**

1  questions.
2      My understanding, when Mr. Altman approaches a
3  database, is that he establishes the database so
4  that we are fulfilling requirements for ensuring
5  that we have access -- that we have secured all the
6  numbers that are available, that there has not been
7  double counting, and that we have structured the
8  database in such a way that allows us to get an
9  accurate number of the events at each time period.
10     I know that several procedures and controls
11 are put into place to allow him to do that. What
12 the specific natures are, specific natures of those
13 controls, I just don't know.
14 BY MR. BARNES:
15 Q. That's fair. Thank you.
16     MR. BARNES: All right. Let's take a very
17 short break, about five minutes pushing.
18     MR. FROMSON: Okay.
19     THE VIDEOGRAPHER: Off the record at 10:42.
20     (Recess taken.)
21     THE VIDEOGRAPHER: On the record 10:51.
22 BY MR. BARNES:
23 Q. Okay. I think, Dr. Blume, we were at page 76
24 and you were talking about -- we were addressing the
25 work that Mr. Altman had done on your -- with you on

**72**

1  your report. And let's continue after page 75 and 76.
2  You're not sure about 76. You'll tell me. Let's
3  continue.
4      When -- what's -- what other pages did he
5  provide you the work product for?
6  A. Well, if I didn't already say it, when I was
7  talking about the internal database, these are captioned
8  as serious events. So another thing that we do when
9  we're looking at databases is, in addition to canvassing
10 the entire database, we also look at variety of subsets.
11 And one of those subsets are those events that have been
12 declared serious. And FDA defines a serious, a
13 criteria for an event to be serious.
14 Q. And who did that canvassing of the database to
15 identify serious adverse events? Is that something you
16 did personally?
17 A. If you -- if you look at an FDA MedWatch form,
18 it defines the criteria which makes it serious, so it's
19 a computer filtering of it. If a patient is
20 hospitalized, there is certain things that you check to
21 make it serious or nonserious.
22 Q. I asked a poor question and I apologize. But
23 my question is in terms of your analysis when you
24 generated reports on serious adverse events.
25     Did -- who did the query to generate the

**Page 221**

1  (The requested portion was read by the
2  reporter.)
3  MR. FROMSON: It's not that question.
4  MR. BARNES: It's not the question.
5  THE REPORTER: Okay. I'm Sorry.
6  MR. BARNES: That's all right. I'll restate
7  it. You can do it that way.
8  BY MR. BARNES:
9  Q. Do you believe a physician would continuously
10 prescribe a medication to their patients if their
11 clinical experience showed that the medication was not
12 working?
13 MR. FROMSON: Note my objection as to the form
14 of the question.
15 THE WITNESS: Well, I think that there might
16 be an effort if the drug were not working to
17 continue to increase the dose to see if it might
18 work with the higher dose. I think there might be
19 an opportunity for a physician to continue using a
20 product in the face of an inadequate response and
21 add an additional drug on top of it, especially in
22 psychiatric conditions.
23 So, yeah, I think a physician could use --
24 continue to use a drug, even if they weren't happy
25 with the response, by modifying the dose or adding

**Page 222**

1  additional drugs. I think it could happen, yes.
2  BY MR. BARNES:
3  Q. And it could also -- it could -- it's also
4  possible that a physician could find that a particular
5  off-label use for a drug was actually effective in
6  treating their patients, even though it was not labeled
7  for that indication, correct?
8  MR. FROMSON: Objection as to form, lack of
9  foundation, improperly-stated hypothetical.
10 THE WITNESS: Are you asking me if it's
11 conceivable that a product could be successfully
12 used off-label?
13 BY MR. BARNES:
14 Q. Sure.
15 A. For a patient? Yeah, I think a product -- a
16 hypothetical product could be used in a hypothetical
17 patient successfully for hypothetical off-label use,
18 yes.
19 Q. Do you understand that -- did you inquiry as
20 to whether or not Neurontin was found to be effective
21 for off-label indications by clinicians in the
22 United States? Did you do any research into that?
23 A. Well, I reviewed quite a few of the off-label
24 indications in my report.
25 Q. Did -- did you do any inquiry as to whether or

**Page 223**

1  not there was that clinicians found certain off-label
2  indications to be effective?
3  A. Are you asking if I interviewed --
4  Q. Any --
5  A. -- independent physicians?
6  Q. Any -- any effort to understand the effica- --
7  the off-label use issue with regard to physicians
8  finding applications for those uses?
9  A. No, I --
10 MR. FROMSON: Let me object. Let me object to
11 the form of that last question.
12 MR. BARNES: Thank you.
13 MR. FROMSON: Go ahead.
14 THE WITNESS: No, I did not interview any
15 independent physicians regarding their off-label
16 use of Neurontin.
17 BY MR. BARNES:
18 Q. Do you understand how many patients have used
19 Neurontin since it came on the market in early 1994?
20 A. No, I -- I -- it's in the annual reports. I
21 know it was around two billion dollars before it was
22 multi-sourced, but I -- I haven't done the calculations
23 backwards for the number of patients.
24 Q. Can you give me a rough estimate of your
25 understanding of the number of patients who have used

**Page 224**

1  Neurontin --
2  A. No, I would have to --
3  Q. -- since 1984?
4  A. It's in the annual reports. I would have to
5  stop at a break and look it up or calculate it back
6  based on your price.
7  Q. Did you -- is it more than a million patients?
8  A. Well, let's see. If it's two billion dollars
9  a year --
10 Q. Let's do it that way. Strike that last
11 question.
12 Did you read the -- the September '04 report
13 submitted?
14 A. Yeah, that's in my report. Yes. And I have a
15 copy of that here, so I guess we could backtrack into
16 that.
17 Q. Are you aware that it stated in there that
18 there was an excess of 12 million patients who had taken
19 Neurontin since 1994?
20 A. I didn't specifically remember that number,
21 no, but I have the report.
22 So 12 million, 90 percent of it's off-label,
23 so that would be 1.2 million people have received it for
24 either an epilepsy or a postherpetic neuralgia.
25 Q. Strike that.