UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x
                                                    :        MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                        :
          SALES PRACTICES AND                       :        Master File No. 04-10981
          PRODUCTS LIABILITY LITIGATION             :
                                                    :        Judge Patti B. Saris
-------------------------------------------------------------x
                                                    :        Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                           :
                                                    :
ALL PRODUCTS LIABILITY CASES                        :
IDENTIFIED ON EXHIBIT 1 TO THE                      :
DECLARATION OF SCOTT W.SAYLER, ESQ.                 :
                                                    :
-------------------------------------------------------------x

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS PFIZER INC. AND WARNER-LAMBERT
COMPANY LLC'S MOTION FOR SUMMARY JUDGMENT**

*Members of Products Liability
Plaintiffs' Steering Committee*

Andrew G. Finkelstein, Esq.
FINKELSTEIN & PARTNERS, LLP
436 Robinson Avenue
Newburgh, NY  12550

Jack W. London, Esq.
LAW OFFICES OF JACK W. LONDON
    & ASSOCIATES
106 E. 6th Street, Suite 700
Austin, TX  78701

## I.    INTRODUCTION

Defendants Pfizer Inc. and Warner-Lambert Company LLC (hereinafter "Defendants") have moved for summary judgment premised on three points.  First, Defendants seek immunity from tort liability via preemption claiming that the FDA has reviewed, considered, and concluded that the Neurontin label should not include a warning for suicidal behavior.  Second, Defendants claim they had no duty to warn of suicide-related events about which they did not know prior to FDA's 2008 Alert regarding suicidality and antiepileptic drugs.[1]  Third, Defendants posit that Plaintiffs have not raised a genuine issue of material fact demonstrating that Neurontin has the capacity to contribute to suicidality (i.e., general causation).

This Court should deny Defendants' motion in its entirety because (1) preemption does not apply to Plaintiffs' claims; (2) Defendants knew or should have known about suicide related events and thus had a duty to warn of such events; and (3) Plaintiffs have raised genuine issues of material fact demonstrating that Neurontin has the capacity to contribute to suicidality.

### A.    Plaintiffs' Claims Are Not Preempted.

As part of its guilty plea in May 2004, Defendants admitted that the Neurontin label provided inadequate directions for unapproved uses.  Pls.' Ex. 2.  Furthermore, the company failed to comply with its pharmacovigilance obligations under 21 C.F.R. § 314.80, 21 C.F.R. § 314.70, and 21 C.F.R. § 201.  As such, this Court should not even consider preemption to be an issue in this case.  If the Court does decide to consider preemption, the state of preemption law

---

[1] On January 31, 2008, the FDA issued a FDA Alert – *Information for Healthcare Professionals: Suicidality and Antiepileptic Drugs*, in which it stated that after analyzing reports of suicidality in 199 clinical studies of eleven drugs, including Neurontin, used to treat epilepsy that: [P]atients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation (.043%) compared to patients receiving placebo (.022%).  The increased risk of suicidal behavior and suicidal ideation was observed as early as one week after starting the antiepileptic drug and continued through 24 weeks.  Exhibit 1 to Declaration of Andrew G. Finkelstein.  Further references below to Exhibits attached to the Finkelstein Declaration will hereinafter be referred to as "Pls.' Ex. __".  The FDA further warned:  "All patients who are currently taking or starting on any antiepileptic drug should be closely monitored for notable changes in behavior that could indicate the emergence or worsening of suicidal thoughts or behavior or depression." *Id.*

would still lead to a finding that Plaintiffs' claims are not preempted. The basic analysis of the preemption argument in this case can be summarized as follows:

- There is a "basic presumption against pre-emption" because preemption upsets the balance of power between the federal government and the states as independent sovereigns. *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 439, 125 S. Ct. 1788 (2005). The analysis of preemption of prescription drug claims begins with the strong presumption against preemption. *Caraker v. Sandoz Pharm. Corp.*, 172 F. Supp. 2d 1018 (S.D. Ill. 2001).

- Congress knows how to express its intent to preempt state law claims – as it has done, *inter alia*, with respect to medical devices. *Id.* at 1035. Congress did not expressly preempt any aspect of state law with respect to prescription drugs, and in fact foreclosed preemption absent a "direct and positive conflict";[2]

- Conflict preemption rests on a finding either that (1) it would be impossible for a drug manufacturer to comply with both federal and state law, or (2) requiring compliance with state law would "stand [ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1031. There is no conflict in this case;

- Because federal regulations expressly give drug manufacturers not only the power but also the duty to "add or strengthen" warnings beyond the FDA-approved labeling without prior approval by the FDA, it is not impossible both to comply with federal labeling requirements and to give adequate warnings under state law. *Id.* at 1033-35; 21 C.F.R. § 314.70;[3] 21 C.F.R. § 201.80(e).[4] "Thus, it is possible for drug manufacturers to strengthen existing warnings or at least to petition for a strengthening of the warnings. The regulations contemplate this exact situation." *Id.* at 1034;

- Because federal regulations relating to safety surveillance and reporting of adverse drug information (*see* 21 C.F.R. § 314.80 (c)) do not require a drug manufacturer to provide to FDA all safety information relating to a drug that may actually be possessed by the drug manufacturer, common sense dictates that the

---

[2] Congress's only express statement on this issue actually forecloses preemption absent a "direct and positive conflict"; "Nothing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments unless there is a direct and positive conflict between such amendments and such provision of state law." Federal Food, Drug, and Cosmetic Act, 76 Stat. 779 (1962).

[3] Noteworthy, 21 C.F.R. § 314.70 was amended on April 8, 2004. Prior to that time, and at all times relevant to the issues in this lawsuit, a drug manufacturer could give an additional warning without notifying the FDA beforehand, but had to file a supplement with the FDA "at the time the applicant makes any kind of change." The current version of this section provides that the manufacturer must file its supplement 30 days prior to distributing a drug containing any such change. 69 Fed. Reg. 18728-01, 18764 (2004).

[4] This regulation was set forth in 21 C.F.R. § 201.57(e) until June 30, 2006, at which time it was recodified as 21 C.F.R. § 201.80(e). Most of the case law on preemption of prescription drug cases refers to 21 C.F.R. § 201.57(e).

FDA does not possess all the safety information that is enjoyed by the manufacturer. More importantly, the FDA does not dictate to drug manufacturers how to conduct safety surveillance and each manufacturer is left to determine the development and execution of its own safety surveillance procedures (*see* 21 C.F.R. § 314.80(b)). Consequently, a claim that Defendants failed to act upon pharmacovigilance obligations is not preempted.

- Likewise, it can hardly be "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" to hold a drug manufacturer liable under state law for not adding or strengthening a warning when appropriate to do so. *Id.* Federal regulation of prescription drugs is set up to function in exactly this manner, and "[t]he full purpose and objective of the regulations necessarily includes the notion that drug manufacturers must exercise their own judgment in deciding when to strengthen a warning prior to FDA approval." *Caraker*, 172 F. Supp. 2d at 1037

- The FDA's assertion, in its 2006 Preamble to the Final Rule entitled "Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products," 71 Fed. Reg. 3922, 3936 ("Preamble"), sets forth that "'FDA approval of labeling under the [federal Food, Drug and Cosmetic] act . . . preempts conflicting or contrary State law." *Id.* However, the Preamble is contrary to previous FDA policy statements and should not be accorded deference. In addition, the Preamble is predicated upon the FDA having actually considered and come to some conclusion of the question at hand.

- Where the FDA has not made a specific determination that a warning was unsupported by scientific evidence in conflict with a plaintiff's claims, there is no preemption. *In Re: Bextra and Celebrex Marketing Sales Practices and Prods. Liab. Litig.*, 2006 U.S. Dist. LEXIS 63493 (N.D. Cal. 2006).

Applying these principles to this case, Defendants' preemption arguments must fail. First, Defendants maintain that the FDA reviewed and concluded there is no increased risk of suicidal behavior associated with Neurontin. This is wrong as there is no credible evidence that the FDA considered and concluded there was no increased risk of suicide with the use of Neurontin. Even if this Court finds there was such a review, it was done only in the context of the approved indications and does not apply to off-label uses for which Plaintiffs ingested Neurontin.

Second, Plaintiffs' common law negligence and state statutory claims complement and

"parallel" rather than conflict with actions that may be taken by the FDA. In this regard, Defendants failed to act upon their common law and state statutory pharmacovigilance obligations; failed to comply with FDA regulations under 21 C.F.R. §§ 314.80, 314.70 and 201, and the certification signed by Defendants on FDA Form 356h accompanying all submissions to the FDA was inaccurate. There is simply no evidence of a "direct and positive conflict" between Plaintiffs' claims in this case and federal law with respect to the required labeling for Neurontin. Therefore, Defendants' motion for summary judgment should be denied.

> **B.  Defendants Failed to Warn Consumers and Medical Providers of a Serious Health Hazard; Defendants Knew or Should Have Known of Reasonable Evidence of an Association of Psychiatric Adverse Events, Iincluding Depression and Suicidality, With Neurontin Use.**

Defendants' labeling for Neurontin is inadequate. Defendants have already pled guilty to the "introduction into interstate commerce of a misbranded drug by reason of the drug being <u>inadequately</u> labeled for off-label uses and for introduction of an unapproved new drug into interstate commerce . . . ." *See* Warner-Lambert guilty plea, Pls.' Ex. 2. Defendants must shoulder responsibility for their unethical, illegal acts, and their failure to take appropriate action to inform patients and physicians about important safety information related to off-label uses for which Defendants admittedly intended physicians to prescribe and patients to ingest Neurontin.[5]

This Court should reject Defendants' argument that they had no duty to warn of suicide risks because they did not know of any such risk until the FDA 2008 Alert. Defendants have possessed evidence since even before their 1992 New Drug Application for Neurontin's epilepsy indication that Neurontin was associated with mood and behavioral disturbances, including

---

[5] The Court's attention is respectfully referenced to Plaintiffs' expert, Dan Brock, Ph.D., who has opined as to the unethical actions taken by Defendants by intentionally marketing and promoting a drug for off-label uses despite the risks of suicidality and lack of efficacy. Pls.' Ex. 3. Plaintiffs' expert, Charles King III, has opined that Defendants' off-label marketing of Neurontin, even in the absence of direct contact by a company sales representative, <u>indirectly</u> influenced all, or substantially, all physicians prescribing Neurontin. Pls.' Ex. 4, at pp. 52-53, ¶¶ 98-103.

depression and suicidality. As discussed below, Defendants knew or should have known of "safety signals" related to Neurontin that were reflected in their own pre-approval clinical trials and post-marketing adverse events data. Both sources included adverse drug experiences with Neurontin including mood and behavior disturbances and suicidality. Defendants were also aware that Neurontin's mechanism of action—reducing the release of neurotransmitters in the brain (e.g., serotonin, norepinephrine)—contributed to these psychiatric adverse events.

        **C.**     **Neurontin Has the Capacity to Contribute to Mood and Behavioral Disturbances, Including Suicidality (i.e., General Causation)**

As set forth in detail in Plaintiffs' Memorandum of Law in opposition to Defendants' Motion to Exclude the Testimony of Doctors Trimble, Kruszewski and Blume, Plaintiffs' experts' general causation opinions are relevant, reliable and satisfy Rule 702 and *Daubert* requirements. Plaintiffs have raised triable issues relating to general causation. The Court is respectfully referenced to Plaintiffs' Memorandum regarding Plaintiffs'' experts' qualifications and opinions that Neurontin contributes to suicidality. These expert opinions are based upon biological plausibility, epidemiology, Defendants' own pre-clinical pharmacology data, clinical trial adverse event data, post-marketing adverse event data, medical literature, and FDA and foreign regulatory actions and recommendations.

**II.**    **FEDERAL REGULATORY FRAMEWORK FOR PRESCRIPTION DRUGS AND APPROVAL OF PRESCRIPTION DRUG LABELING**

All prescription drugs marketed in this country must first be approved by the FDA. To obtain permission to market a new product, a drug company must first submit a "new drug application" ("NDA") for the FDA's review and approval. 21 U.S.C. § 355(a)(b). An NDA must include information about the clinical trials that demonstrate the safety and effectiveness of the product, proposed labeling, and other information. 21 U.S.C. § 355(b)(d). If

the FDA finds that the application would be approvable if certain changes were made or conditions were met, it will send the applicant an "approvable letter" describing the information the FDA requires or the conditions the applicant must meet to obtain approval.  21 C.F.R. § 314.110(a).[6]  The drug manufacturer drafts and submits a proposed initial label to the FDA for approval as part of the NDA process.  21 C.F.R. § 314.105.  FDA approval includes approval of the labeling, which must, *inter alia*, identify contraindications, warnings, precautions, and adverse reactions.  21 C.F.R. §§ 201.56, 201.57.  Subsequently, FDA approval is required before the manufacturer can make certain labeling changes, but it may make other labeling changes without prior approval.  21 C.F.R. § 314.70(b)(c).  Among the changes in the latter category are changes "[t]o add or strengthen a contra-indication, warning, precaution, or adverse reaction."  21 C.F.R. § 314.70(c)(2)(i).  Thus, the label is not fixed as of the date of FDA approval. Rather, a company's obligation to provide physicians and patients with up-to-date warnings and precautions continues as long as the product is on the market.[7]

Because the FDA has limited knowledge of a new drug's safety at the time of approval, the FDA has acknowledged that the label is not a static document, but a fluid one that evolves over time.  The FDA Commissioner has stated that "drug labeling does not always contain the most current information and opinion available to physicians about a drug because advances in medical knowledge and practice inevitably precede formal submission of proposed new labeling by the manufacturer and approval by the FDA."  44 Fed. Reg. 37434, 37435 (1979).  Likewise, when a drug is approved for a particular use, or indication, the FDA does not have adequate data about the drug when it is prescribed for other "off-label" uses.  A drug's label

---

[6]Before reaching a final decision on an NDA, the FDA may convene an advisory committee to consider the NDA and the FDA's analysis of it.  21 C.F.R. § 14.160.  If, after reviewing the application, the FDA finds the drug is safe and effective for its intended use, the FDA will send an approval letter to the applicant.  21 U.S.C. § 355(c)(1)(A).

[7]Even after approval of an NDA, the FDA may convene an advisory committee meeting to consider action with respect to the drug, such as appropriate action in light of a newly-discovered hazard.  21 C.F.R. § 14.171.

constantly changes as the manufacturer learns more about the drug once it is on the market.

The formal labeling of drugs lags behind the current state of knowledge. Because a manufacturer has the resources and knowledge about its drug products, federal regulations place an affirmative duty on a manufacturer to continuously assess the safety of its drugs and to warn of safety hazards as these harms come to light: "[T]he labeling s h a ll be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug: a causal relationship need not have been proved." 21 C.F.R. § 201.57(e). The FDA thought it so important to put safety first that it dispensed with the normal procedure requiring FDA approval prior to a label change. 50 Fed. Reg. at 7452-01, 7470. Instead, a company can "add or strengthen a contraindication, warning, precaution, or adverse reaction" for its drug at any time, without the agency's prior approval." 21 C.F.R. § 314.70(c)(6)(iii)(A).

Thus, despite any assertion by Defendants to the contrary, they cannot avoid their duties to ensure that the labeling of Neurontin not be false or misleading in any particular, and that the labeling contains adequate directions for the drug's intended uses, 21 U.S.C. § 352, and Defendants are required to revise the labeling to include a warning "as soon as there is reasonable evidence of an association of a serious hazard with a drug." 21 C.F.R. § 201.57(e).

## III.    NEURONTIN IS APPROVED BY FDA FOR LIMITED INDICATIONS

The regulatory history as to the limited indications for which Neurontin has been approved by the FDA is not disputed: Neurontin (gabapentin) was approved in the United States in December 1993 as an adjunctive therapy for the treatment of partial seizures in adults (NDA 20-235). Pls. Ex. 5, p. 8, ¶ 36. Clinical studies of gabapentin administered either as add-on therapy or monotherapy for the management of epilepsy have been conducted in the U.S. and internationally since 1984. Approval for the same use in pediatric epilepsy patients was granted

in October 2000.  *Id.*  Pfizer attempted to gain a monotherapy indication for Neurontin, but this submission was deemed not approvable by the FDA in 1997 due to insufficient demonstration of efficacy.  *Id.*  In May 2001, an attempt to gain Neurontin approval for use in generalized neuropathic pain conditions was also denied by FDA due to insufficient data.  Pls.' Ex. 6, Pls.' Ex. 5, p. 8, ¶ 36.  Pfizer secured approval for the restricted indication of pain associated with postherpetic neuralgia in adults in May 2002.  *Id.*

## IV.    ARGUMENT

### A.    PLAINTIFFS' CLAIMS ARE NOT PREEMPTED BY  FEDERAL LAW.

This Court should decide that Plaintiffs' claims are not preempted by federal law.  In their moving papers, Defendants ask this Court to take extreme measures:  sweep aside decades of case law, ignore Congress's intent, and deprive injured citizens of legal recourse against pharmaceutical wrongdoers—felons by their own admission.  Defendants' motion is legally unwarranted and should be denied.  Defendants are in essence asserting that they and other drug companies are immunized from tort liability common law claims for failure to warn under the Food and Drug Cosmetic Act, 21 U.S.C. § 321, *et seq.* (hereinafter "FDCA").  Defendants rely particularly on two recent developments:  (1) comments inserted by the FDA in the "Preamble" to unrelated labeling regulations published in the Federal Register in January 24, 2006, which purport to establish regulatory preemption of all state claims by redefining FDA regulations as both minimum and maximum standards, and (2) a recent decision by a judge in the U.S. District Court for the Eastern District of Pennsylvania, who deferred to the views of the FDA on preemption (as expressed both in the Preamble and also in an *amicus curiae* brief submitted in the case), and therefore dismissed a products liability suit involving a generic version of a very different drug, Paxil.  *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514 (E.D. Pa. 2006).

Courts should be extremely reluctant to imply "clear evidence" of an intent to immunize an entire industry from liability, even where the industry is a highly regulated. *Ohler v. Purdue Pharma, L.P.*, 2002 U.S. Dist. LEXIS 2368 at *54 (E.D. La. 2002). Such intent can be ascribed only under the most compelling circumstances. *English v. General Elec. Co.*, 496 U.S. 72, 87-90 (1990). Because the displacement of the state law protecting the health and safety of its citizens is not favored, a party seeking preemption of state law bears a heavy burden of proof. Defendants have not met their burden here. For the reasons detailed in Plaintiffs' Introduction, *supra*, and as set forth below, Defendants' motion should be denied.[8]

### 1.    There Is a Strong Presumption Against Preemption.

The Supreme Court has identified three types of preemption: express preemption, field (or implied) preemption, and conflict preemption. *English v. General Elec. Co.,* 496 U.S. 72, 78-79 (1990) Express preemption exists when Congress clearly states its intent to preempt state law. *Id.* at 78 Field preemption arises where Congress has intended the federal government to occupy an entire field of regulation exclusively, leaving no room for states to supplement federal law. *Id.* at 79. To find field preemption, the Supreme Court "has looked for a specific [legislative] statement of pre-emptive intent where it is claimed that the mere 'volume and complexity' of agency regulations demonstrate an implicit intent to displace all state law in a particular area." *Geier v. American Honda Motor Co.* 529 U.S. 861, 884 (2000). Conflict

---

[8]When considering a motion for summary judgment or dismissal, this Court must accept the allegations in the complaint as true and construe all reasonable inferences in the light most favorable to the Plaintiffs. *U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir. 2002). The Court may not dismiss a complaint for failure to state a claim unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Doe v. Delie,* 257 F.3d 309, 313 (3d Cir. 2001).

preemption may exist where "[1] it is impossible for a private party to comply with both state and federal requirements, or [2] where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002) (internal quotations and citations omitted). As Defendants basically concede in their moving papers, express and field preemption do not apply here because Congress did not explicitly intend for the FDCA to displace state tort law; nor has Congress expressed any intent for the FDCA to govern drug safety exclusively. Therefore, conflict preemption is Defendants' sole basis for alleging preemption in these cases. Defs.' Mem. at pp. 1, 4.

There is a "basic presumption against pre-emption" because preemption upsets the balance of power between the federal government and the states as independent sovereigns. *Bates v. Dow Agrosciences LLC,* 544 U.S. at 439. The Supreme Court has emphasized: "[I]n areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest." *Id.* (citations omitted). An analysis of preemption begins with the purpose of Congress and "starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981). When a claim of preemption is asserted, the claim must overcome this presumption. *Rice v. Santa Fe Elev. Corp.,* 331 U.S. 218 (1947). It must be assumed that Congress did not intend to preempt state law addressing traditional areas of state concern, such as public health and safety. *Id.* at 230. Implied preemption rarely applies, and then, only when state law is in direct conflict with or frustrates the purposes of federal law. *Missouri Bd. of Examiners v. Hearing Help Express, Inc.*, 447 F.3d 1033, 1035 (8ᵗʰ Cir. 2006).[9]

---

[9] In *Missouri Board of Examiners,* the court held that regulations promulgated under state law were preempted by FDA regulations pursuant to the Medical Devices Act ("MDA"). Congress explicitly included preemptive language in the MDA with regard to medical devices. However, Congress has taken no similar action with regard to prescription drugs under the FDCA. *See also McNellis v. Pfizer, Inc.*, 2006 U.S. Dist. LEXIS 70844 at *30 (D.N.J.

The presumption against preemption is especially strong if preemption would effectively deny plaintiff a remedy.  The Supreme Court has stressed that a preemptive federal regulatory scheme that would leave injured citizens without any federal or state recourse runs counter to the fundamental principles of justice.  *Sprietsma v. Mercury Marine,* 537 U.S. 51, 64 (2002) (noting that it would be irrational for Congress to preempt common law claims that provide an important remedy for compensating accident victims); *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 251 (1984).  As the Supreme Court recently noted:

> The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against preemption.  If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly.

*Bates v. Dow Agrosciences, LLC*, 554 U.S. at 449.  Because displacement of state law protecting the health and safety of their citizens is not favored, a party seeking preemption of state law bears a heavy burden of proof.  In denying preemption in *In re Zyprexa Products Liability Litigation*, Judge Weinstein stated that where there is any ambiguity whether preemption should apply "a federal court should take the law's default position, honoring the traditional state control of tort law."  489 F. Supp. 2d 230, 240 (E.D. N.Y. 2007) (referring to John C.P. Goldberg & Benjamin C. Zipursky, *Accidents of the Great Society,* 64 Md. L. Rev. 364 (2005)).

Furthermore, "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there [is] between them.'"  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166-67 (1989)

---

2006); *Caraker v. Sandoz,* 172 F. Supp. 2d at 1041-42 (distinguishing express intent of Congress to preempt state law in medical device cases from lack of congressional intent for FDCA to preempt state law with regard to prescription drugs).

(quoting *Silkwood*, 464 U.S. at 256).[10]   In the context of FDA preemption, one court noted,

"Congress knows how to enact FDA legislation that contains a preemption clause.  Thus, the

absence of any such clause with respect to prescription drugs demonstrates an implied intent not

to preempt cases, such as this." *Cartwright v. Pfizer, Inc.*, 369 F. Supp. 2d 876, 885 (E.D. Tex.

2005).  Similarly, in the *Zyprexa* litigation, Judge Weinstein aptly noted:

> Congress has not spoken on the issue of preemption as related to prescription
> drugs, and this silence is telling.  While a direct statement of legislative intent is
> not essential for preemption, it would be odd for Congress to include express
> preemption provisions in amendments to the FDCA regarding state law claims in
> certain contexts (i.e., for medical devices) if it intended all FDCA claims to be
> preempted.  [489 F. Supp. 2d at 276.]

Recently, the Supreme Court emphasized in their decision in *Riegel v. Medtronic, Inc.*,

that unlike the express preemption provision enacted by Congress concerning medical devices,

there is no similar provision in regard to prescription drugs. 552 U.S. ___, 128 S. Ct. 999 (2008).

Judge Scalia commented upon this sharp distinction in addressing Judge Ginsberg's dissent:

> If, as the dissent believes, the preemption clause permits tort lawsuits for medical
> devices just as they are (by hypothesis) permitted for drugs and additives; and if,
> as the dissent believes, Congress wanted the two regimes to be alike; Congress
> could have applied the pre-emption clause to the entire FDCA. It did not do so,
> but instead wrote a pre-emption clause that applies only to medical devices.  [128
> S. Ct. at 1009 at 1009.]

Shortly after the *Riegel* decision, the Supreme Court, by a four to four decision   in

*Warner-Lambert Co., LLC v. Kent*, 552 U.S. ___,128 S. Ct. 1168 (2008), affirmed the Second

Circuit Court of Appeals' decision in *Desiano v. Warner-Lambert & Co.*, 2007 U.S. App. LEXIS

32377 (2d Cir. 2006) (as amended January 18, 2007), which had denied Pfizer's motion for

---

[10] State tort actions against pharmaceutical manufacturers have existed for more than a century.  *See, e.g., Thomas v. Winchester*, 6 N.Y. 397 (N.Y. 1852).  Congress was well aware of these suits when it enacted the federal Food, Drug and Cosmetic Act in 1934.  In fact, Congress decided not to include a private right of action for damages in the FDCA on the grounds that it was "unnecessary," because a "common-law right of action exists."  Adler & Mann, *Preemption and Medical Devices: The Courts Run Amok*, 59 Mo. L. Rev. 895, 924 & n.130 (1995) (quoting Hearings on S. 1944 Before a Subcomm. of the Comm. on Commerce, U.S. Senate, 73rd Cong., 2d Sess. 400, 403 (1934)).  Pls. Ex. 7.

preemption of Rezulin cases.  The Second Circuit had found an exception in the Michigan immunity statute applied where plaintiffs alleged that defendants committed fraud on the FDA because plaintiffs also had asserted traditional tort law claims.  Aside from considering the level of deference that should be accorded to the FDA Preamble regarding preemption, the Second Circuit noted that "arguably an agency cannot supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption." *Id.* at *34 (citing to *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

Defendants contend that the FDA's Preamble to new labeling rules effectively immunizes the entire pharmaceutical industry of liability in cases arising from state tort law, regardless of what Congress intended.  This view would essentially deprive Plaintiffs in this litigation (in fact, all pharmaceutical litigation as a whole) of all legal recourse, since the FDCA does not provide remedies for damages to injured parties.  *E.g.*, *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 544 (3rd Cir.), *cert. denied*, 513 U.S. 965 (1994) ("violations of the FDCA do not create private rights of action").[11]  This Court should deny Defendants' motion, because there is no evidence that Congress intended such a drastic result.  Defendants cannot and do not overcome this strong presumption against preemption.

## 2. The FDCA Expressly Prohibits Preemption Except in Cases of "Direct and Positive Conflict."

Congress has expressly limited the extent of implied conflict preemption under the FDCA.  When Congress amended the FDCA in 1962, it adopted language that severely restricted the potential preemptive effect of federal law:

---

[11] *See also Bates v. Dow Agrosciences LLC,* 544 U.S. at 449 ("The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against pre-emption.  If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly.").  Further, as U.S. Supreme Court Justice Scalia aptly stated, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself."  *Alexander v. Sandoval,* 532 U.S. 275, 291(2001).

> Nothing in the Amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments unless there is a *direct and positive conflict* between such amendments and such provision of State law.[12]

The FDA, in its 2006 Preamble, acknowledges the relevance of this statutory provision, but attempts to minimize its significance by arguing that "[t]he existence of a legislative provision addressing preemption does not bar the operation of ordinary principles of implied preemption." 71 Fed. Reg. at 3935 n.8. Plaintiffs disagree and submit that the quoted statutory language plainly limits implied conflict preemption to cases of "direct and positive conflict" between state and federal law. No such conflict exists in the instant case before this Court.

### 3.     There Is No "Direct and Positive Conflict" Between Plaintiffs' Claims and the FDA's Labeling Regulations.

#### i.     The FDA's Regulations Permit Manufacturers to Strengthen Label Warnings Without Prior Approval.

State failure-to-warn tort lawsuits, such as Plaintiffs' claims against Defendants, do not interfere—let alone pose a "direct and positive conflict"—with the federal regulatory scheme for prescription drugs. Rather, such suits provide a complementary system of protections for consumers of drugs that inevitably further federal objectives. Most importantly, the FDCA does not prevent pharmaceutical manufacturers from strengthening warnings on their products. FDA regulations expressly permit manufacturers to make certain labeling changes to increase safety without prior approval, simply by notifying the agency of the changes. 21 C.F.R. § 314.70(c). Specifically, manufacturers may use this Changes Being Effected ("CBE") supplement process:

> (A) To add or strengthen a contraindication, warning, precaution, or adverse reaction;
> (B) To add or strengthen a statement about drug abuse, dependence, psychological effect, or overdosage;
> (C) To add or strengthen an instruction about dosage and administration

---

[12] Pub. L. 87-781, Title II, section 202, 76 Stat. 793 (Oct. 10, 1962) (emphasis added). This provision was not codified in the U.S. Code, but rather set out as a note under 21 U.S.C. §321, the definitional provision of the FDCA.

that is intended to increase the safe use of the drug product; [and]
(D) To delete false, misleading, or unsupported indications for use or claims of effectiveness . . . .[21 C.F.R. § 314.70(c)(6)(iii)(A)-(D).][13]

Numerous courts have cited this CBE procedure for strengthening warnings as a basis for concluding that failure-to-warn claims are not preempted. [14] Indeed, as one court has observed:

> [t]o argue that, once the FDA approves a package insert, the defendant has no further duty to give an adequate warning creates an incentive for pharmaceutical companies to oppose all efforts by the FDA to secure clearer package inserts. If that were the case, drug manufacturers could avoid liability simply by resting on the formerly approved package insert (regardless of how long ago the approval occurred and how much information about the drug had changed) and resist all efforts to change it. [*Globetti v. Sandoz Pharms. Corp.*, 2001 U.S. Dist. LEXIS 2391 at *29 (N.D. Ala. 2001).]

The FDA itself has recognized repeatedly that "drug labeling does not always contain the most current information and opinion available to physicians about a drug because advances in medical knowledge and practice inevitably precede formal submission of proposed new labeling by the manufacturer and approval by the FDA." 44 Fed. Reg. 37434, 37435 (June 26, 1979). Therefore, FDA regulations place the burden on drug manufacturers to strengthen label warnings as soon as possible: "[T]he labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been approved." 21 C.F.R. § 201.57(e).[15]

---

[13] This CBE supplement process remains in full effect following the effective date (June 30, 2006) of the new final labeling regulations issued in January. The only change to this provision effected by the new rule is to exclude the new "Highlights" section of drug labels from amendment through the CBE process. 71Fed. Reg. at 3932, 3997.

[14] *See also Eve v. Sandoz Pharm. Corp.*, 2002 U.S. Dist. LEXIS 23965 (S.D.Ind. 2002); *Ohler v. Purdue Pharma, L.P.*, 2002 U.S. Dist. LEXIS 2368; *Motus v. Pfizer, Inc.*, 127 F. Supp. 2d 1085 (C.D. Cal. 2000); *Bansemer v. Smith Labs., Inc.*, 1988 U.S. Dist. LEXIS 16208 (E.D. Wis. 1988); *McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522 (Or. 1974); *Witczak v. Pfizer, Inc.*, 377 F. Supp. 2d 726, 732 (D. Minn. 2005) ("This particular regulation was promulgated precisely to allow drug-makers to quickly strengthen label warnings when evidence of new side effects are discovered.") (citing 30 Fed. Reg. 993 (Jan. 30, 1965)); *Osburn v. Anchor Labs.*, 825 F.2d 908 (5th Cir.1987) ("FDA regulations [] did not prevent [the manufacturer] from adding to its warning labels").

[15] The January rulemaking redesignated this section as 21 C.F.R. § 201.80(e), effective June 30, 2006, and preserves it for drugs labeled under the old labeling regulation, such as Neurontin. 71 Fed. Reg. at 3988, 3996. New section 201.57(c)(6) applies a virtually identical requirement to drugs labeled under the new regulations: "In accordance with §§ 314.70 and 601.12 of this chapter, the labeling must be revised to include a warning about a clinically

Defendants cite to a new proposal to amend 21 C.F.R. § 314.70(c), 73 Fed. Reg. at 2849. The proposal has not been approved, and members from both the Senate and the House of Representative have written letters to Andrew C. von Eschenbach, Commissioner of the FDA, voicing concern over the proposed rule which House letter stated "seeks to substantively amend current regulations".[16] Pls.' Ex. 8.

Moreover, even before a label can be revised, manufacturers are free to use other means to warn of potential health risks:[17]

> These labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drugs, or the issuance of letters directed to health care professionals [i.e., "Dear Doctor" letters containing such information] is not prohibited by these regulations. [44 Fed. Reg. at 37447.][18]

Due to the fact that knowledge about the risk posed by particular drugs will change over time, and because drug manufacturers are allowed to add warnings concerning newly discovered

---

significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." 71 Fed. Reg. at 3990.

[16] The House of Representatives' letter noted their intention that state law claims remain viable: "We included language in the FDAA to preserve the status quo, allowing the FDA and state remedies to remain complementary and necessary safeguards to protect American families. However, we believe the FDA's proposed rule directly contradicts this language by reversing a drug manufacturer's obligation to warn of new risks and hazards and, instead, allowing these companies to claim immunity from liability because they had no duty to warn. This is contrary to congressional intent and to the FDA's mission to protect the public health." Pls. Ex. 8. The Senate letter questioned the motivation: "[The] proposal has no purpose other than to shore up the industry's legal arguments for avoiding liability. Indeed, the proposal fails to identify a single problem associated with these regulations that would warrant a modification must less a public health threat of such magnitude as to put issuing the proposal at the top of the FDA's priority list. We note however, that the proposal was immediately cited by the Solicitor General in a letter the U.S. Supreme Court in support of the industry's argument that FDA approval preempts individual liability cases. [citing letter to Honorable William K. Souter in reference to the *Wyeth v. Levine* appeal]. Pls.' Ex. 8.

[17] Defendants suggest that preemption applies to "Dear Doctor" letters in the same way that preemption applies to the label. The cases cited incorrectly read the law which specifically states that a label must be provided at the same time as the product. A communication separate and apart from the product is not considered a label under the Act. 21 U.S.C. § 321(k)-(m). Therefore, a "Dear Doctor" sent directly to the doctors is not a label. As such, Defendants were free to use this tool to communicate risks of Neurontin in off label populations but failed to do so. On the other hand, when it came to promoting a "new and emerging use" of Neurontin for Social Phobia, Defendants did not feel constrained and sent such a letter out on letterhead from the <u>marketing</u> department. Pls.' Ex. 9.

[18] In this same regulatory preamble, the FDA disclaimed any intent to preempt state tort law: "It is not the intent of the FDA to influence the civil tort liability of the manufacturer." 44 Fed. Reg. at 37437.

hazards without prior FDA approval, the vast majority of courts to consider the issue have concluded that most FDA labeling requirements establish only minimum safety standards that lack the power to preempt state tort claims.[19]

The FDA argues in the Preamble that it interprets the FDCA "to establish both a 'floor' and a 'ceiling,'" and thereby preempts state laws imposing greater safety requirements. 71 Fed. Reg. at 3935. The agency reaches this conclusion on the grounds that "additional disclosures of risk information can expose a manufacturer to liability under the act." *Id.* But, as the agency is forced to concede, such liability will only attach "if the additional statement is unsubstantiated or otherwise false or misleading." *Id.* In other words, not only does the Act not impose a "ceiling" on truthful, substantiated risk information, precisely the type of warnings sought by Plaintiffs in the instant action, but in fact requires such information to be provided.

The FDA itself has acknowledged that its regulations establish only minimum standards that lack the power to preempt state tort claims. In 1998, the FDA issued regulations concerning medication guides for prescription drugs to be given to consumers at the point of sale. 63 Fed. Reg. 66378 (1998). The FDA rejected a suggestion by drug manufacturers that it preempt "State regulation with respect to civil tort liability claims and other labeling requirements," and instead

---

[19] *See, e.g., Tobin v. Astra Pharm.,* 993 F.2d 528 (6th Cir. 1993); *Hill v. Searle Labs.,* 884 F.2d 1064, 1068 (8th Cir. 1989) ("FDA regulations are generally minimum standards"); *Wells v. Ortho Pharm. Corp.,* 788 F.2d 741, 746 (11th Cir. 1986) ("An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes but still not be sufficient for state tort law purposes"); *Brochu v. Ortho Pharm. Corp.,* 642 F.2d 652 (1st Cir. 1981); *Salmon v. Parke Davis & Co.,* 520 F.2d 1359 (4th Cir. 1975); *McNellis v. Pfizer, Inc.,* 2006 U.S. Dist. LEXIS 70844 at *15 ("[T]he FDCA and the FDA's regulations do not conflict with New Jersey's failure to warn law because those federal regulations merely set minimum standards with which manufacturer's must comply"); *Cartwright v. Pfizer, Inc.,* 369 F. Supp. 2d 876, 882 (E.D. Tex. 2005) ("Numerous courts over the years have recognized that the FDCA and its associated regulations set out minimum requirements that drug manufacturers must follow which may be supplemented by state tort laws which are stronger"); *Witczak v. Pfizer, Inc.,* 377 F. Supp. 2d at 732 ("Federal labeling laws are minimum standards; they do not necessarily shield manufacturers from state law liability"); *Ohler,* 2002 U.S. Dist. LEXIS at *38 ("FDA regulations appear to be minimum standards except in cases of express preemption"); *Kociemba v. Searle & Co.,* 680 F. Supp. 1293, 1299 (D. Minn. 1988) ("FDA regulation of prescription drugs establishes minimum standards, both as to design and warning") (citing *Graham v. Wyeth Labs.,* 666 F. Supp. 1483 (D. Kan. 1987); *Caraker v. Sandoz Pharm. Corp.,* 172 F. Supp. 2d 1018; *Mazur v. Merck & Co., Inc.,* 742 F. Supp. 239 (E.D. Pa. 1990)**;** *In re Tetracycline Cases,* 747 F. Supp. 543 (W.D. Mo. 1989).

expressly acknowledged that state law, including state tort law, is not in conflict with the FDCA.[20]

Plaintiffs find additional support for the contention that their claims do not conflict with the FDA in *Bates v. Dow Agrosciences.* 544 U.S. 431, where the Supreme Court held that common-law design defect, manufacturing defect, negligent testing, and breach-of-express-warranty claims are entirely exempt from federal preemption under the Federal Insecticide, Fungicide and Rodenticide Act.  In *Bates*, a pesticide manufacturer argued, *inter alia,* that such claims are preempted because they would induce a manufacturer to change its federally-approved labels, thereby running afoul of a statutory prohibition against state law "requirements" that differ from federal law.  In rejecting this argument, the Supreme Court held that a common-law claim would not force a manufacturer to make any changes with respect to its product labels; to the contrary, the Court emphasized that "a jury verdict . . . merely motivates an *optional decision* . . . ." *Id.* at 1799 (emphasis added); *see also id.* at 443 ("An occurrence that merely motivates an optional decision does not qualify as a requirement").[21]

Similarly in the case at bar, it cannot be said that common-law claims would run afoul of the FDA's labeling requirements in any respect.  At the most, such a claim would merely "motivate an optional decision" to change a drug label.  It is impossible to understand how such

---

[20] "FDA does not believe that the evolution of state tort law will cause the development of standards that would be at odds with the agency's regulations. FDA's regulations establish the minimal standards necessary, but were not intended to preclude the states from imposing additional labeling requirements. States may authorize additional labeling but they cannot reduce, alter, or eliminate FDA-required labeling." *Id.* at 66384.

[21] *Bates* is squarely in keeping with numerous prior decisions holding that common law claims do not conflict with federal law because they merely exert incidental regulatory pressure on manufacturers to change their conduct. *See, e.g., English v. General Elec. Co.,* 496 U.S. 72, 85-86 (1990) (upholding employee whistleblower's state law claim for intentional infliction of emotional distress against nuclear industry employer because effect of damage awards was not direct or substantial enough to warrant preemption); *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 186 (1988) (upholding nuclear worker's state workers compensation claim based on violation of state safety regulation on the ground that compensation award imposes only acceptable incidental regulatory pressure, not unacceptable "direct regulatory authority"); *see also Ferebee v. Chevron Chem. Co.,* 726 F.2d 1529, 1543 (D.C. Cir. 1984) ("Compliance with both federal and state law cannot be said to be impossible. Chevron can continue to use the EPA-approved label and can at the same time pay damages to successful tort plaintiffs such as Mr. Ferebee").

a decision could possibly run afoul of the FDA's purposes, given that the agency's entire regulatory scheme is specifically designed to allow manufacturers to add additional warnings to their labels without prior agency approval. Therefore, there is no "direct and positive conflict" between Plaintiffs' failure-to-warn claims and FDA labeling regulations.

ii.    State Failure-to-Warn Claims Complement and
       Advance the Purposes of the FDCA.

There is a growing body of case law that is entirely consistent with the view expressed by the Supreme Court in *Bates*, namely that products liability suits brought under the state law serve an important role in complementing federal regulation of prescription drug. 544 U.S. at 451 (noting that because FIFRA contemplates that pesticide labels "evolve over time," tort suits "serve as a catalyst in this process."); *see also Laisure-Radke v. Par Pharm., Inc.*, 2006 U.S. Dist. LEXIS 78804 at *18 (W.D. Wash. 2006) ("Providing new or additional warnings can hardly be an obstacle to the accomplishment of the full objectives of Congress when federal regulations specifically allow manufacturers to do so, and when Congress has left product liability matters to state law as long as they do not directly conflict with federal law in that area); *Zikis v. Pfizer, Inc.,* 2007 U.S. Dist. LEXIS 69802 at *19-20 (N.D. Ill. 2005) (FDA's mission to protect consumers from dangerous products is clearly served by provisions allowing a manufacturer to add warnings unilaterally); *Cartwright,* 369 F. Supp. 2d at 886-87 (defendant's arguments regarding supposed thwarting of FDA objectives are misguided; state law's duty regarding warnings are directly parallel with FDA's requirements that manufacturers provide safety warnings as soon as reasonably possible); *McNellis,* 2005 U.S. Dist. LEXIS 37505 at *31 ("This Court is unwilling to find … that Congress intended to obviate the very state laws that provide remedies to consumers harmed by dangerous products and deceptive marketing in the absence of a clear and compelling Congressional statement.").

19

Indeed, state tort claims, such as those alleged by individual Plaintiffs in their respective complaints, further the purposes of the FDCA. The Supreme Court has recognized that Congress passed the FDCA to protect consumers from dangerous products. *See United States v. Dotterweich,* 320 U.S. 277, 280, 282 (1943) (House and Senate committee reports indicate that "[t]he purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection"); *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States,* 340 U.S. 593, 596 (1951) (stating that Congress intended the FDCA to protect consumers who are unable to protect themselves); *United States v. Sullivan,* 332 U.S. 689, 696 (1948). In enacting the 1962 Drug Amendments, which significantly expanded the FDA's authority over drug labeling, Congress's intent was to promote safety and efficacy during the thalidomide crisis. *See* S. Rep. No. 1744, 87th Cong., 2d Sess., p.1 (1962) ("The purpose of the proposed legislation . . . is to strengthen and broaden existing laws in the drug field so as to bring about better, safer, medicine and to establish a more effective system of enforcement of the drug laws."). State tort lawsuits complement and are wholly consistent with this legislative purpose. Such actions protect consumers directly, by providing a remedy to persons injured by unsafe drugs, and also indirectly, by creating financial incentives for pharmaceutical companies to make their products safer and to provide reasonable warnings concerning the dangers posed by the drugs they manufacture. Former Chief Counsel of the FDA, Margaret Jane Porter, wrote, "FDA product approval and state tort liability usually operate independently, each providing a significant, yet distinct, layer of consumer protection." Margaret J. Porter, *The Lohr Decision: FDA Perspective and Position,* 52 Food & Drug. L.J. 7, 11 (1997). Pls.' Ex. 10.

The FDA Preamble is virtually silent about the legislative purpose behind our nation's

food and drug laws, but subtly seeks to redefine that mission. At several points, the Preamble suggests that the threat posed by state tort litigation may result in "overwarning," "thereby potentially discouraging safe and effective use of approved products" and "underutilization of beneficial treatments," which can have a "negative effect on patient safety and public health." 71 Fed. Reg. at 3934-35. But, apart from ensuring that only safe and effective drugs are approved for use, the FDA has no legitimate statutory role in trying to promote the use of particular drugs. Moreover, additional warnings can have a negative effect only if they inaccurately represent the dangers posed by a drug; accurate warnings will promote proper use.[22]

Instead, it is Defendants' position in favor of preemption that would undermine the legislative aim of the FDCA. Another court has rejected a similar preemption argument:

> FDA's and [defendant]'s position [in favor of preemption] vitiates, rather than advances, the FDCA's purpose of protecting the public. That is, FDA and [defendant] invite the Court to find that in enacting the FDCA for the purposes of protecting public health, Congress not only declined to provide for a private cause of action but also eliminated the availability of common law state claims. This position contravenes common sense . . . . [In *Re Paxil Litig.*, 2002 U.S. Dist. LEXIS 24621 at *3-4 (C.D. Cal. 2002).]

In *Laisure-Radke v. Par Pharm., Inc.*, for example, the court rejected a motion for summary judgment based on preemption filed by a generic manufacturer of Prozac. 2006 U.S. Dist. LEXIS 57158 (W.D. Wash. 2006). The *Laisure-Radke* Court was "not persuaded that allowing plaintiff's claims to move forward would be a frustration of Congressional purpose."[23]

Similarly, in *Coutu v. Tracy*, 2006 R.I. Super. LEXIS 55 (R.I. Super. Ct. 2006), the Court

---

[22] FDA's argument also ignores the fact that drug labels are not drafted by the FDA, but by the manufacturer, which has an economic incentive to present as little negative information about the product as possible. The FDA can suggest stronger warning language, but the decision ultimately rests with the company, subject only to the FDA's authority to deny approval for the product or to bring a misbranding action against the manufacturer. *See* Declaration of Arvin P. Schroff, *Colacicco v. Apotex, Inc.*, ¶¶ 11-16. Pls.' Ex. 11.

[23] "Providing new or additional warnings can hardly be an obstacle to the accomplishment of the full objectives of Congress when federal regulations specifically allow manufacturers to do so, and when Congress has left product liability matters to state law, as long as they do not directly conflict with federal law in that area." *Id.*

denied a motion for summary judgment by AstraZeneca Pharmaceuticals, the maker of the drug

Propofol, and stated the following:

> After considering the arguments of both parties, this Court finds that AstraZeneca has failed to meet its heavy burden to establish preemption and, therefore, the defendants' motion for summary judgment is denied. A substantial number of courts have previously declined to find that state law failure to warn claims are preempted by the FDA approval process. Furthermore, there does not appear to be any congressional intent to preempt state law under such circumstances. Finally, the Supreme Court has discouraged federal agencies from changing positions regarding issues that have been previously decided by courts. Ultimately, given these factors, this Court refuses to find that the plaintiffs' claim is preempted. This Court is not convinced that state laws, encouraging more stringent warning standards, frustrate the purpose of the FDA. Courts have consistently held that FDA regulations regarding labels and warnings for drugs do not preempt state law. [*Id.* at *10-11.*]

The Superior Court of New Jersey prohibited Merck from introducing the FDA Preamble

as evidence in a pending Vioxx trial, in which the court stated:

> The preamble, as I see it, is a political statement by the FDA. The primary purpose of it is to . . . set forth the FDA's position that they believe there should be federal preemption of all tort actions. That is basically what the preamble is saying. What the preamble is saying is the FDA should be the final word. It has nothing to do with science. It has nothing to do with what happened back in 2000, 2001, 2002, when these issues were being decided. It is contrary to the U.S. Supreme Court's decisions. It is contrary to all the law on preemption. And I am not going to allow you to use it. [*Doherty v. Merck & Co.,* No. ATL-L-0638-05MT (Tr. 585: 25-25; 586: 1-10) (June 9, 2006) Pls.' Ex. 12.]

In *Kelly v. Wyeth,* the Superior Court of Massachusetts, when confronted with the issue

of whether the FDA Preamble and the *amicus* brief filed in *Colacicco* should be accorded

deference in the context of a motion for preemption concerning a generic drug, determined that

the Preamble and brief "were not entitled to the heightened deference afforded to an agency's

rules." 2007 LEXIS 13622 (Mass Super. Ct. 2007). The court noted the FDA had made a

reversal in its interpretation of the labeling standards" in its *amicus* brief filed in *Perry v.*

*Novartis,* and that due to the FDA's inconsistency that the preamble was an advisory opinion

which was not persuasive.  *Id.* at *12-13.  The Court found that because the manufacturer had never presented the labeling change to the FDA, the FDA did not have the opportunity to accept or reject the change and therefore, preemption did not apply.  *Id.* at *16.

Recently in *Collins v. Smithkline Beecham*, the Philadelphia Court of Common Pleas, Pennsylvania, denied preemption and found there was no ambiguity in the statute or regulations and did not have to rely on the interpretation of the FDA in amicus briefs or preamble.  Civ. No. 0763 February 2007 Term, March 11, 2008. Pls.' Ex. 13, p. 10.  The court noted that defendants' reading of § 201.57(e) was incorrect and mandated the manufacturer action as soon as there was a "reasonable evidence of an association of a serious hazard with a drug".  *Id.* at 11.  Plaintiffs submit that this Court should similarly find that the FDA *amicus* briefs referenced in Defendants' memorandum pertain to factual situations dissimilar and not relevant to the case at hand, and that the statutes and regulations at issue do not pose any ambiguity which would necessitate this Court having to resort to opinions of the FDA for interpretation.  Moreover, numerous courts have declined to give any weight to the FDA's amicus briefs in determining the preemption issue in pharmaceutical cases.[24]

In a most recent, March 2008 decision concerning a Neurontin Class action, *Clark v. Pfizer Inc.,* a Philadelphia Court of Common Pleas Judge held that a pharmaceutical company "which negligently or intentionally perpetuates a fraud upon the medical community" for its off label marketing of the brand named drug may be held legally liable for money paid for the generic gabapentin manufactured by third-party generic drug manufacturers.  Slip Op. Case No. 1819 (C.C.P. Pa. Mar. 2008). Pls.' Ex. 14.  In *Clark,* the court also denied preemption finding

---

[24] *See Zikis v. Pfizer, Inc.,* Case No. 04 C 8104, 2005 WL 1126909 (N.D. Ill. 2005) (*Motus Brief by government* "contains nothing more than legal argument by counsel"; *Zikis v. Pfizer, Inc.,* Case No. 04 C 8104, 2005 WL 3019409 (N.D. Ill. 2005) (*Kallas* Brief by government "insufficient to tip the balance in favor of" preemption); *Witczak v. Pfizer, Inc.*, 377 F. Supp. 2d 726 (D. Minn. 2005) ("The court ... declines to treat statements from a single FDA legal brief as declaration afforded the preemptive force of law").

that the *Colaccico* decision gave undue deference to the FDA's preamble and stating as follows: "As a Pennsylvania trial court, this court is obligated to enforce state law until such time as the Supreme Court having actual authority determines that state law has been preempted". The court, in distinguishing the Neurontin Class Action from *Colaccico* made clear that:

> [t]he case before the bar of the Court specifically seeks to enforce the exact citizen safety requirement of the FDCA and seeks recompense for the violation of that very Act. . .[i]n contradiction, it is plaintiff herein who supports the FDA in the proposition that in violation of Federal law, defendants unlawfully manipulated scientific "truth"" to convince by misrepresentation the entire medical community of the proposition that Gabapentin could be therapeutically used for indications never approved by the FDA" *Id*. at 15, 16.

> *O'Neal v. Smithkline Beecham Corp.,* cited by Defendants, is clearly distinguishable from the instant litigation.  2008 U.S. Dist. LEXIS 6804 (E.D. Cal. 2008).  In *O'Neal,* there was evidence that pre-NDA approval, the FDA <u>concluded</u> that in the clinical trials there was no signal for depression and/or an additional risk for suicide, suicide attempts or suicide ideation, and no emergence of suicidality with the drugs in question.  *Id.* at *45-46  Here, there is no evidence that the FDA ever made such a conclusion.[25]

The majority of courts that have decided the issue of preemption within the context of pharmaceutical claims subsequent to the issuance of the FDA's Preamble have consistently denied preemption of plaintiffs' state law claims.[26]

---

[25] Quite to the contrary, as discussed in detail below, Cynthia McCormick, the Clinical Reviewer for Neurontin, in the 1992 New Drug Application (NDA) for Neurontin, noted that "depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts."  Pls.' Ex. 15, p. 117.  Plaintiffs submit that at that juncture, Defendants were obligated at a minimum to present to the FDA a label with appropriate warnings including the monitoring of patients ingesting neurontin for adverse effects.  Unlike the factual scenerio in *O'Neal*, there is no evidence in the record before this Court that the FDA ever was presented with or rejected such a warning.  In the years subsequent to the approval of Neurontin's epilepsy indication, and in the wake of Defendants illegal off-label promotion, Defendants were obligated to warn consumers and physicians about suicidality.

[26] *See, e.g.,Jackson v. Pfizer, Inc.*, 432 F. Supp. 2d 964, 968 (D. Neb. 2006) (denying preemption motion by manufacturers of Zoloft and Effexor); *In re Prempro Prods. Liab. Litig*., MDL Nos. 03-CV-1507, 05-CV-00163 (E.D. Ark. June 15, 2006) (denying preemption motion by manufacturer of Prempro and adopting reasoning of *Jackson v. Pfizer*) *Perry v. Novartis Pharm. Corp.* 456 F. Supp. 2d 678, 683-84 (E.D. Pa. 2006) (denying preemption motion by manufacturer of Elidel finding that the Preamble is an advisory opinion and may not

Moreover, although Defendants cite to an *amicus curiae* brief filed by the FDA in *Wyeth v. Levine,* the U.S. Supreme Court has not yet heard the case or considered the FDA's assertions in the brief. That brief is therefore presently merely an opinion letter as to a particular case and has not been accorded with any deference under the law. Further, *Levine* is starkly dissimilar to the cases at hand. In *Levine,* the FDA had advised the manufacturer to "retain the current verbiage" thereby rejecting a change in the label proposed by the manufacturer and advocated by the plaintiff. *Levine v. Wyeth,* 2006 Vt. 107, 2006 Vt. LEXIS 306 at *21 (Vt. 2006). In this litigation, the FDA issued an Alert which provides a warning to Healthcare Professionals that is, in essence, one of the same warnings that Plaintiffs submit Defendants should have provided and thus failed in their duty to provide adequate warnings of Neurontin's risks.

---

retroactively absolve a manufacturer of a duty); *Weiss v. Fujisawa Pharm. Co.*, 464 F. Supp. 2d 666 (E.D. Ky. 2006) (denying preemption motion by manufacturer of Elidel); *Nelson v. Wyeth*, No. 040101670 (Phila. C.C.P. Sept. 6, 2006); *Deutsch v. Wyeth,* Superior Court of New Jersey HRT Mass Tort Case (Memorandum of Decision, Pls. Ex. 16) (Court considered Preamble and denied preemption adopting decision and findings of Judge Weinstein in *Zyprexa Products Liability Litigation,* and Superior Court Judge Higbee's reasoning and findings in *Cona/McDarby v. Merck*); *Dunson v. McNeil,* 2007 Phila. Ct. Comm. Pl., LEXIS 250 (Phila. C.P. Sept 12, 2007) (distinguishing case from *Colacicco* which "conflicts with a large body of federal law and has already been criticized by other District Courts in the same Circuit"); *Ferrari v. American Home Products,* 286 Ga. App. 305 (Ct of App, Ga. 2007) (denying preemption pursuant to decision in *Bates* and Court's duty "to accept the reading [of the Vaccine Act] that disfavors preemption"); *Sarli v. Mylan Bertek Pharms.*, 207 U.S. Dist. LEXIS 52522 (M.D. N.C. 2007) (denying preemption noting that no evidence warnings advocated were submitted to the FDA); *Peters v. Astrazeneca, LP,* 417 F. Supp. 2d 1051 (W.D. Wis. 2006) (denying preemption finding "[t]he mere fact that the FDA does not require a warning on a product label does not necessarily create a conflict"); *Barnhill v. Teva Pharms. USA, Inc., et al,* 2007 U.S. Dist. LEXIS 44718, (S.D. Ala. 2007) (denying preemption to generic manufacturer and rejecting the FDA's positions annunciated in the Preamble including that if would "nullify its own regulations which place an affirmative duty upon drug manufacturers to revise a drug's label to include a warning as soon as there is a reasonable evidence of an association of a serious hazard with a drug"); *Desiano v. Warner Lambert & Co.,* 467 F. 3d 85 (2d Cir. 2006) (as amended January 18, 2007), *cert granted,* 128 S. Ct. 31 (2007), *aff'd,* 552 U.S. ___ (2008); *Zyprexa Liab. Litig. v. Eli Lilly & Co.,* 489 F. Supp. 2d 230 (E.D.N.Y. 2007) (rejecting implied conflict preemption and the FDA Preamble in MDL); *Giles v. Wyeth, Inc.,* 500 F. Supp. 2d 1063 (S.D. Ill. 2007) (rejecting implied conflict preemption in an Effexor suicide case); *Levine v. Wyeth,* 2006 Vt. 107; 2006 Vt. LEXIS 306 (Vt. 2006) (finding in regard to the FDA Preamble that "Under either standard, the FDA's statement deserves no deference. . . Nothing in the FDA's new statement alters our conclusion that it would be possible for defendant to comply with both its federal obligations and the obligations of state common law."); *In re Vioxx Prods. Liab. Litig.,* 501 F. Supp. 2d 776 (E.D. La. 2007); *Kelly v. Wyeth,* 22 Mass. L. Rept. 384 (Mass. Super. Ct. 2007) (denying generic manufacturer's Teva's motion for preemption where co. never submitted a proposed warning to the FDA); *Strong v. American Cyanamid* (denying preemption on grounds company did not demonstrate either express or implied congressional intent to preempt state tort law claims in reference to vaccines) Pls.' Ex. 81; *Collins v. Smithkline Beecham Corp.,* Court of Common Pleas, Civ. No. 0763 February 2007 Term, March 11, 2008 (denying preemption and found that there was no ambiguity in the statute or regulations and did not have to rely on interpretation of FDA in amicus briefs or preamble, defendants' reading of § 201.57(e) was incorrect and mandated manufacturer action as soon as there was a "reasonable evidence of an association of a serious hazard with a drug). Pls.' Ex. 13.

To make certain that this Court is clear—contrary to Defendants' assertion in their moving papers—the FDA has not rejected a label revision claimed by Plaintiffs in this litigation. Defendants did not submit a label to the FDA that included the warnings Plaintiffs claim should have been sought. Plaintiffs' expert, Cheryl Blume, Ph.D., has opined that, "Defendants have failed to reasonably warn healthcare professionals about the association of Neurontin with psychobiologic adverse events, including suicidal behavior." Pls. Ex. 5, pp. 195-96, ¶ 324. Dr. Blume sets forth numerous proposed labeling changes never proposed by Defendants to FDA. Moreover, there is absolutely <u>no credible evidence</u> in the record before this Court that the FDA specifically reviewed, considered and analyzed each of the proposed warnings set forth by Plaintiffs' expert and rejected same for inclusion within a label.

As the foregoing demonstrates, there is no conflict whatsoever between Plaintiffs' failure-to-warn claims and either the FDA's regulations or its statutory purposes.

> ### iii.    Defendants Were Able But Failed to Provide Adequate Warnings Concerning the Risks of Neurontin, and There Is No Conflict Between Plaintiffs' Claims and the FDA's Actions With Respect to Neurontin.

There is absolutely no conflict, let alone a "direct and positive" conflict, between the Plaintiffs' failure to warn claims and the FDA's actions regarding Neurontin. There is no evidence that FDA reviewed, considered and concluded that there was not an association with Neurontin and suicidal behavior or that FDA chose to reject or otherwise not require corresponding label language.

In 1993, the FDA approved Neurontin for a narrow, limited indication: adjunctive therapy for the treatment of partial seizures in adults. Subsequently in 2002, the FDA approved Neurontin for the management of postherpetic neuralgia in adults. At all times, the FDA's

review and analysis was limited to the indications for which Defendants were seeking approval. There is no evidence to demonstrate that the FDA review of Neurontin included anything other than an analysis of the indications sought by Defendants for approval by FDA.[27]

Defendants refer to their initial 1992 New Drug Application (NDA) for Neurontin and state incorrectly that the FDA "found no evidence that Neurontin increases the risk of or causes depression or suicidal behavior." Defs.' Mem. at 10. In fact, there is no formal FDA document in which any conclusion by the FDA is made regarding an increased risk or the lack thereof. At most, all that can be said is that the FDA, in its review of the 1992 NDA (epilepsy indication) could not determine the issue (depression) one way or the other, and on December 28, 1993, the following was stated by the FDA: "One cannot determine based on the available data, largely uncontrolled, whether the reports here represent an increase in incidence or intensity of depression compared to that which is expected." Pls.' Ex. 17, at 0084687.

Nothing more or less can be said for the 2002 approval for post-herpetic neuralgia. Again, no conclusion whatsoever by the FDA exists in any formal FDA document prior to the 2008 FDA Alert on Suicidality with Antiepileptics.[28]

---

[27] At the time of the initial NDA application on January 15, 1992, Warner-Lambert did not disclose to the FDA (Pls.' Ex. 18) that it had received a patent (Pls.' Ex. 19) for the use of Neurontin in depression dated June 18, 1991. This clearly demonstrates Warner-Lambert's intent to promote the drug for psychiatric purposes through an additional NDA or for off-label use. Had the FDA known of the depression patent, the review of the NDA may have been different.

[28] Defendants, at pages 12-14 of their Memorandum of Law, assert that the FDA's clinical review of Neurontin associated with the 2002 approval for post herpetic neuralgia (PHN) stands for the proposition that the FDA reaffirmed the safety of the drug with respect to suicide. Nothing could be further from the truth. In said clinical review, Sharon Hertz did not review data from any clinical trials other than those for neuropathic pain. Pls.' Ex. 20 at 17. The only safety data from the epilepsy trials to which she referred came from a chart, supplied by Defendants, comparing adverse events from the original 1992 NDA and the PHN application pending at that time. *Id.* at 76. Notably absent from the review were pediatric clinical trials and the underpowered studies on psychiatric indications performed since the time of the initial epilepsy indication approval. In the pediatric trials, there was evidence of negative effects on mood and behavior disturbances which led to a prominent neuropsychiatric warning of such risks in children. Pls.' Ex. 21, Pls.' Ex. 22 at 10. In addition, even though Defendants knew of the extensive off-label use of Neurontin, they chose not to review the post marketing safety data for any indications other than the one for which they were seeking approval. Pls.' Ex. 23. Had they done so, they would have observed a very strong signal for suicidal behavior in those individuals using Neurontin for psychiatric indications. A summary of Defendants'

The FDA did not begin to review, consider and analyze the issue of suicidality with Neurontin until April 2004 when it began its evaluation of suicidality with Neurontin use. Common sense dictates that had the FDA previously reviewed, considered and analyzed the data for suicidality, the FDA would have issued an alert years ago; however, the evaluation did not begin until April 2004.[29]  Common sense also dictates that the FDA's inquiries to Defendants and other anti-epileptic manufacturers is prima facie evidence that the FDA could not have considered the results of such inquiry before the companies provided the analysis to the FDA.[30]

The FDA evaluation has thus far resulted in a 2008 FDA Alert acknowledging the increased risk of suicidality with anticonvulsants, including Neurontin.[31]  Pls.' Ex. 1. Importantly, Defendants' placebo-controlled data that had previously been provided to FDA both in 1992 (epilepsy indication) and again in 2002 (post herpetic neuralgia indication) formed the basis for the 2008 FDA Alert.  Defendants have stated that to date, even in light of the January 2008 Alert, the FDA has not requested a labeling change.  This is not surprising considering that the Alert was only issued some eight weeks ago and the FDA stated they were going to convene

---

data is provided as Pls.' Ex. 24 and Pls.' Ex. 25.  Therefore, the 2002 approval is at most a review of the data for the limited population of those with neuropathic pain and should not be considered by this court as a conclusion by the FDA that Neurontin is not associated with suicidal behavior.

[29] On April 26, 2004, the FDA and Defendants purportedly engaged in their first conference related to the FDA inquiry about Neurontin and suicide/suicide attempt.  Thereafter, the FDA and Defendants developed an analysis plan to evaluate suicidality with Neurontin.  See Pls.' Ex. 26.  In preparation for the conference, Defendants immediately went on the defensive, seeking to discredit the FDA's position.  See Pls.' Ex. 27.  Importantly, Defendants' employee on pharmacovigilance, Manfred Hauben, pointed out that highlighting negative data mining findings would not prove the lack of a safety signal regarding Neurontin's relationship to suicidality:  "We can data mine on gabapentin but I don't think that negative data mining findings would make a strong counterargument to a signal that may have arisen from clinical observations."  Id.

[30] In late 2006, FDA scientists participated in an FDA internal presentation where the question of suicidality was still being evaluated.  Pls.' Ex. 28.  Even as of November 2007, Dr. Katz wrote to Plaintiffs' counsel, Andrew Finkelstein, advising that the FDA was still reviewing the question of suicidality raised by Finkelstein & Partners' Citizens Petition from May 2004.  Pls.' Ex. 29.  Any suggestion by Defendants that the FDA had already reviewed and concluded that a warning concerning suicidal behavior is not appropriate and is without merit.

[31] Review by FDA and Canada's regulatory agency in 2005 further resulted in a labeling revision of "suicide-related adverse event terms under the subheading **Other Adverse Events Observed During All Clinical Trials.**" .Pls.' Ex. 30; Pls.' Ex. 31.

an advisory committee to consider the next steps – a label change.[32]

Demonstrative of the fact that the FDA's 1992 approval review-process for Neurontin has been <u>limited solely to the sought-after indications</u>, former FDA employee Dr. Cynthia McCormick, the FDA Medical Review Officer primarily responsible for reviewing the Neurontin clinical safety data, summarized her review of Neurontin clinical data for purposes of Defendants' sought-after indications:  "adjunctive medication in refractory partial epilepsy." Pls.' Ex. 17 at 0084359.  Dr. McCormick's overview of studies pertinent to efficacy were limited to an evaluation of Neurontin "as adjunctive therapy in patients with refractory epilepsy who were maintained on a base of 1-2 antiepileptic drugs."  *Id*. at 0084376.  Dr. McCormick's safety evaluation was similarly limited to an assessment of data related to "risks associated with the use of [Neurontin] administered in the manner suggested in the proposed labeling."[33]  *Id.* at 0084434. Of course, the labeling was limited to the refractory epilepsy indication and the epileptic population. Pls.' Ex. 33 at 162.

On December 14, 1992, an independent panel of experts, FDA's Peripheral and Central Nervous Systems Drugs Advisory Committee, also evaluated the data on Neurontin for purposes of the limited indication being sought for approval by Defendants.[34]   Pls.' Ex 34.   The Committee approved of the limited indications for which Defendants were seeking approval.  *Id.* From the transcript of the hearing, it is undisputed that the committee did not consider whether

---

[32] The 2008 Alert indicates a further labeling change in the future:  "FDA will be working with manufacturers of marketed antiepileptic drugs to include this new information in the labeling for these products."  Pls.' Ex. 1.

[33] As part of her safety review for the sought-after epilepsy indication, Dr. McCormick indicated that "depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts."  Pls.' Ex.15 at p.117.  Ultimately, Dr. McCormick indicated her approval of Neurontin for the sought-after epilepsy indication "with appropriate and prominent labeling for use" in the specific population of epileptics.  Pls.' Ex. 15 at 119; Pls.' Ex. 33 at 57-62.

[34] The Committee posed the following question for vote:  "Has the sponsor provided evidence from more than one adequate and well-controlled clinical investigation that supports the conclusion that gabapentin is effective for the treatment of epilepsy?  I will just modify that to say, so we can be consistent with yesterday's discussion, for the treatment as an add-on for intractable partial seizures in adults.  Is that fair to modify that?  Is that all right with everybody?  That is the question in front of us."  Pls.' Ex. 34.

the drug was safe in any other population. *Id.*

Importantly, Defendants in their memorandum of law, fail to reference a single document that demonstrates the FDA actually reviewed and considered specific safety data for off-label, unapproved uses; Defendants equally fail to refer to a single document that demonstrates the FDA actually reviewed and considered populations other than epileptics and individuals using Neurontin for post herpetic neuralgia (i.e., the expected populations for the FDA-approved uses). Instead, Defendants mislead the Court with references to unsubstantiated, inadmissible opinions from Dr. McCormick's 2007 affidavit prepared solely for litigation. Pls.' Ex. 35. Indeed, Defendants paid Dr. McCormick to "help" them with this lawsuit, over 15 years after her clinical review, and they compensated her to sign an affidavit prepared by defense counsel that included opinions never before stated in any formal FDA document.[35] Pls.' Ex. 33 at 82-83. Nowhere in the actual body of Defendants' memorandum do they reference the Court to the fact that this affidavit was signed in 2007; a reading of defense counsel's memorandum leads an unsuspecting reader to believe that Dr. McCormick's statements were actually made and documented back in 1993. This is simply not the case. Furthermore, Dr. McCormick did not write the affidavit. By her own admission, it was written for her by Pfizer counsel and then signed by her.[36] Moreover,

---

[35] For purposes of this Court's evaluation of Defendants' summary judgment motion, all inferences should be viewed in the light most favorable to Plaintiffs. Not only should this Court deem inadmissible McCormick's affidavit and testimony, but Plaintiffs question the veracity of her statements. For example, McCormick states gratuitously that Neurontin had never given rise to a safety signal involving any psychiatric adverse event. Pls.' Ex. 35 at ¶ 39. This is not true, particularly since the Neurontin labeling since at least 2000 has indicated a **warning** for neuropsychiatric events associated with Neurontin use in children. Pls.' Ex. 36 at p. 6.

[36] Although Defendants provided McCormick's affidavit as a fact witness to support their motion for summary judgment, the Affidavit and her subsequent testimony contain supposition and hearsay and incorporate matters of opinion that are subject of expert testimony. Pursuant to Fed. R. Civ. Proc. 56(e), "[a] supporting or opposition affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated." Hearsay is "inadmissible in support of, or in opposition to, a motion for summary judgment. *Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, (10th Cir. 2007); see also *Continental Casualty Co. v. Northside Marina at Sesuit Harbor*, 2005 U.S. Dist. LEXIS 17942 (D. Mass 2005) (citing to *Garside v. Osco Drug, Inc.*, 895 F. 2d 46, 50(1st Cir. 1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.")). Here, McCormick's comments in her affidavit concerning what others concluded, and the bases for the conclusions of others is nothing more than untrustworthy hearsay. The fact

Plaintiffs allege that Dr. McCormick's opinions in her affidavit are suspect due to the fact that, in addition to the other pharmaceutical entities of which she is involved, Dr. McCormick is listed as a Medical/Scientific advisor or Marinus Pharmaceuticals Inc., which is involved with a antiepileptic drug Ganaxolone which "modulates the GABA receptor system."  Pls.' Ex. 37 p. 2. Dr. McCormick's involvement with such a similar drug, and for which she has a personal interest, poses a direct conflict of interest with her affidavit.  It is not surprising that 15 years after the fact and being within the pharmaceutical industry as an insider, that Dr. McCormick, an ex-FDA employee, is now directly contradicting the statements which she provided in the Neurontin Clinical Review.  Her affidavit should be given absolutely no credence and stricken from consideration by this Court, or in the alternative, Plaintiffs respectfully request that this Court strike all speculative and hearsay statements contained in Dr. McCormick's affidavit.

Consistent with Plaintiffs' position is the fact that in her deposition on February 14, 2008, Dr. McCormick acknowledged that her 1992 clinical review was limited to the narrow indication for epilepsy treatment. Pls.' Ex. 33 at 57-62.  Indeed, there was no evidence in 1992, and there is no evidence now, that the FDA's 1992 review of Neurontin's safety and efficacy data pertained to anything other than the sought-after epilepsy indication and the population expected to use Neurontin for said approved indication.  *Id*.  The off-label indications for which Plaintiffs and their decedents ingested Neurontin and for which Defendants illegally promoted and intended Neurontin be prescribed across the United States were simply not reviewed and considered by FDA as part of the initial approval of Defendants' New Drug Application in 1992.

A decade later, in 2002, Defendants sought approval of Neurontin for the management of post herpetic neuralgia.  Once again, FDA limited its review and consideration solely to the

---

that the affidavit was not prepared by the affiant but rather by defense counsel further depletes its trustworthiness. Moreover, McCormick's statements as to what the FDA did or did not believe, or what the FDA's scientific judgment was, is clearly supposition and not demonstrated by FDA documents. Pls.' Ex. 35, Pls.' Ex. 33.

safety and efficacy of Neurontin for the limited indication being sought for approval. For example, Defendants did not include safety or efficacy data pertaining to off-label psychiatric uses from its limited clinical trials on such uses.[37] Pls.' Ex. 38 at 526. There is not one single formal FDA document or written communication between the FDA and Defendants that reflects that the FDA reviewed and considered a safety issue regarding any off-label indication as part of its approval of Neurontin for this additional limited indication for post herpetic neuralgia.

At no time in the regulatory process did the FDA ever conclude as inappropriate a warning about an association between Neurontin and depression and suicide or that certain monitoring or some type of assessment should be performed prior to, and during treatment with Neurontin. Defendants, not the FDA, had the affirmative obligation to (a) conduct pharmacovigilance to detect new risks, (b) to inform the FDA when such risks are discovered, and (c) revise their Neurontin label appropriately.[38]

At no time in the process did the FDA ever reject a stronger warning regarding monitoring; nor was such a warning proposed by Defendants.[39] During the entire approval

---

[37] *See* Pls. Ex. 39, in which FDA confirms its limited approval for the post-herpetic neuralgia application: "We have completed the review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the agreed upon enclosed labeling text." *See* Pls.' Ex. 40 p. 3, in which FDA states the following: "In summary, there has been adequate demonstration of safety and effectiveness of Neurontin in the treatment of postherpetic neuralgia to support approval."

[38] The FDA has recognized that "drug labeling does not always contain the most current information and opinion available to physicians about a drug because advances in medical knowledge and practice inevitable precede formal submission of proposed new labeling by the manufacturer and approval by the FDA." 44 Fed. Reg. 37434, 37435 (June 26, 1979). The regulations therefore mandate that manufacturers strengthen label warnings as soon as possible: "The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been approved." 21 C.F.R. § 201.57(e). The January rulemaking redesignated this section as 21 C.F.R. § 201.80 (e), effective June 30, 2006 and preserves it for drugs labeled under the old labeling regulation, such as Neurontin. 71 Fed. Reg. at 3988, 3996. New section 201.57 (c) (6) applies a virtually identical requirement to drugs labeled under the new regulations: "In accordance with §§ 314.70 and 601.12 of this chapter, the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." 71 Fed. Reg. at 3990.

[39] In fact, the January 31, 2008 FDA Alert provides precisely the same type of language that Plaintiffs have advocated, that 'all patients who are currently taking or starting on any antiepileptic drug should be closely monitored for notable changes in behavior that could indicate the emergence or worsening of suicidal thoughts or

process from the FDA approval up until the present, Defendants were free to "add or strengthen a … warning" without prior FDA approval. 21 C.F.R. § 314.70(c)(6)(iii)(A). Plaintiffs submit that Defendants were required to do so pursuant to 21 C.F.R. § 201.57(e) (requiring a drug label to be revised "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved").[40]

Courts have been heretofore generally unconvinced by Defendants' arguments that FDA regulations grant only *temporary* authority to strengthen the language in their warning labels without preapproval. Although FDA's regulations do give the agency the power to disapprove a label strengthened pursuant to 21 C.F.R. § 314.70(c), there is nothing that *requires* the agency to do so. If the FDA takes no action, the warning change remains in effect. *McNellis v. Pfizer, Inc.,* 2006 U.S. Dist. LEXIS 70844. Furthermore, FDA's authority to disapprove a unilateral label change does not make the company's pre-approved action a violation of federal law. If the FDA exercises its authority to disapprove the warning, the manufacturer simply removes the language at issue. *See id.; accord Witczak,* 377 F. Supp. 2d at 729. In general, the ability of drug companies to take additional measures beyond bare FDA compliance does not directly conflict with their duties under state common law.[41]

---

behavior or depression." Pls.' Ex. 1. Indeed, there is no credible evidence that FDA would have rejected such language if proposed by Defendants; FDA has embraced the language in its own Alert to the public – an alert that spans both on and off-label uses. *Id.* (FDA evaluated "the effectiveness of the drugs in epilepsy, psychiatric disorders (e.g., bipolar disorder, depression and anxiety and other conditions (e.g., migraine and neuropathic pain syndromes).")

[40] Even if this Court finds that Defendants were required to obtain prior approval from the FDA for the inclusion of such a monitor warning prior changing the label, Defendants were aware of the gabaergic properties of Neurontin and Dr. McCormick's comments in the Clinical Review of the NDA regarding ingestion of Neurontin and that depression "may become worse [and] lead to suicide" and failed in their duty to seek approval from the FDA for such a label change. Pls.' Ex. 15 at 117.

[41] Nor does the strengthening of drug labels automatically render them "false and misleading." The validity of state law does not depend on a company's "speculative hypotheticals" about what the FDA would have done had the company unilaterally changed its warnings. *See Witczak,* 377 F. Supp. 2d at 731; *McNellis,* 2006 U.S. Dist. LEXIS 70844; *Cartwright,* 369 F. Supp. 2d at 884; *Laisure-Radke v. Par Pharm., Inc.,* 2006 U.S. Dist. LEXIS 78804 at *18-19 (finding evidence speculative that labeling would be deemed false and misleading because there was no evidence that FDA would have taken formal legal action and prevailed against defendant for adding such labeling).

Moreover, as the Court in *Caraker v. Sandoz* noted, a pharmaceutical manufacturer may be found liable if it does not "at least request FDA approval of an additional warning" where appropriate:

> Until 1965, the FDA regulations applicable to drugs prohibited companies from adding warnings or other information without prior approval. These regulations were amended in 1965, allowing labeling changes related to safety to be "placed into effect at the earliest possible time," the goal of which was for drug manufacturers "to enable prompt adoption of such changes." 30 Fed. Reg. 993 (1965). Liability, irrespective of the Food, Drug, and Cosmetic Act ("FDCA"), may attach if drug manufacturers do not at least request FDA approval of an additional warning as soon as new hazards or elevated risk associations are discovered. These options for conveying additional risk information are not prohibited but encouraged. Because there is no indication that Congress and the FDA have attempted to impede what the FDA has referred to as the "sophisticat[ed] and complex [ ] private tort litigation in the United States," this Court is right to interpret the FDA standards as minimum ones and to find that drug manufacturers still have a duty to timely disclose new known risks to learned intermediaries, especially because any other interpretation would run contrary to what appears to be an intent to preserve these tort remedies. [*Caraker v. Sandoz,* 172 F. Supp. 2d 1018, 1034-35 (S.D. Ill. 2001).]

This case at bar seeks redress from Defendants who were well aware of "reasonable evidence of an association" between a serious hazard, depression and suicide, posed by the ingestion of Neurontin, yet they failed to provide adequate warnings of this risk. Plaintiffs' claims are consistent with, complement and promote the objectives of the FDA regulations and the intent of Congress in the enactment of this statutory scheme, namely, consumer protection through prompt and effective warnings to apprise the public of serious health risks.

### 4. Defendants' Illegal Promotion for Off-Label Use Constituted Misbranding, and State Law Causes of Action Will Complement And Not Conflict With FDA Regulations.

Defendants intentionally circumvented the FDA prohibitions of promoting Neurontin for off-label indications. Defendants pled guilty for the "introduction into interstate commerce of a misbranded drug by reason of the drug being <u>inadequately</u> labeled for Warner-Lambert's

<u>intended</u> uses and for its introduction of an unapproved new drug into interstate commerce…"[42] Pls.' Ex. 41 pp. 13-14; Pls.' Ex. 2.  Plaintiffs' common law negligence and state statutory claims complement and "parallel" rather than conflict with the federal government's actions that have already been, or may be further taken, with respect to Defendants' misbranding of Neurontin.

Under the FDCA, a drug is misbranded only if its labeling is "false or misleading in any particular" or, ironically, if the labeling "does not provide adequate warnings against any use dangerous to health."  21 U.S.C. § 352(a)(f)(j); 21 U.S.C. § 321(n).  Although the FDA can initiate a misbranding action, the ultimate determination whether the product is misbranded, as in plaintiffs' tort suit, must be made by a jury.  *See U. S. v. 47 Bottles, More or Less, Jenasol RJ Formula '60',* 320 F.2d 564, 571 (3d Cir. 1963) ("Whether or not labeling [of a drug] is false or misleading [within FDCA] is a question of fact for determination by the trial judge in the absence of a jury.");  *cf. Bates,* 544 U.S. at 452 (under FIFRA, issues of misbranding are ultimately decided by juries).  Despite the fact that Neurontin was specifically approved for a limited indication (and thus a limited population), Defendants were well aware that due to the

---

[42] This is not simply the case where physicians, due to either their own, or other physicians' clinical experiences have determined to use Neurontin off-label.  Quite the contrary, as the guilty plea evinces, this was a carefully orchestrated plan by Defendants to promote Neurontin specifically for these off-label uses. Plaintiffs claim that Defendants' illegal activities have continued into the Pfizer era as to the promotion of Neurontin.  In correspondence to Pfizer dated 6/29/01, the FDA identified a Neurontin advertising piece (a "slim jim") "that is misleading and in violation" of the FDCA and applicable regulations.  Pls.' Ex. 43.  Again, in 7/1/02, the FDA identified a Neurontin advertising piece that was in violation of the FDCA and applicable regulations "because it makes representations about Neurontin which are false and misleading."  Pls.' Ex. 44; *see* Pls.' Ex. 45 (in 2001, Defendants sponsored a confidential study with psychiatrists to explore off-label psychiatric uses with Neurontin, entitled "Psychiatrist Use of Anticonvulsants"); *see* Pls.' Ex. 46 (as part of "Neurontin Initiatives" for 2002, Defendants continued development of publication plan strategies for off-label uses, including psychiatry); Pls.' Ex. 47 ("Publication Plan Key Messages" for pain uses); *see* Pls.' Ex. 48 at 0009379 (Neurontin Publication Key Messages included associating Neurontin with psychiatric medicines; *id.* at 0009383, associated Neurontin with a class of drugs (anticonvulsants) with GABA effects beneficial to psychiatric conditions, and at *Id.* 0009384, Defendants developed key message that "Gabapentin is effective against a wide range of neurologic and psychiatric conditions."); *see* Pls.' Ex. 49 at 0006484 (in 2002, "psychiatry and pain are driving the increased use of Neurontin in the U.S.  Epilepsy use continues to decline."); *id.* at 0006486 (Defendants promoted Neurontin's off-label use through anectodal reports); *id.* at 6495 ("maximizing Neurontin" by "building synergies across therapeutic areas" where Neurontin was not FDA approved); *id.* at 0006497 ("Education" and "Promotion" for off-label uses including bipolar, diabetes, dementia, migraine, NePain, SPPain).

illegal marketing scheme, Neurontin was being prescribed for off-label uses.[43]

Defendants were well aware of the effects of Neurontin and that there was an association between ingestion of Neurontin and negative effects in mood behavior, depression and in some cases suicide since at least 1992 when FDA employee Cynthia McCormick, M.D., expressed her concerns, albeit in the context of the sought-after indication (epilepsy).  Defendants were mandated by 21 C.F.R. § 201.57 (e), but failed to submit for consideration by the FDA a label which provided the adequate warnings to physicians for prescribing the drug for indications other than those approved by the FDA.[44]

Moreover, Defendants have still failed to propose a new label or warning for consideration by the FDA, despite the 2008 FDA Alert, and even though they are well aware that due to their marketing campaigns, 90% of Neurontin sales were for off-label indications.  Pls.' Ex. 49 at 0006485.  Defendants have failed to supplement their NDA with labeling containing stronger and or adequate warnings concerning the association between the ingestion of Neurontin and suicide and depression.  Consequently, the FDA has not ever had the opportunity to either approve or reject a label that would have contained adequate warnings to protect this larger population.  The FDA Preamble is therefore not relevant to this case.

Indeed, it strains credulity that after Defendants pled guilty to introducing into interstate commerce a misbranded—inadequately labeled—drug that they would now try to use the FDA's

---

[43] Defendants also were well aware that Neurontin often failed to show any benefit compared with placebo or a comparator drug for certain off-label uses and that the FDA had denied their applications for Neurontin's use for other indications due to insufficient data.  However, Defendants were keenly aware of the nationwide extensive off-label use of Neurontin.  Defendants failed in their obligation to include a specific warning/ instructions for off-label use pursuant to 21 C.F.R § 201.57 (e):  "A specific **warning relating to a use not provided under the "Indications and Usage" section of the labeling** may be required by the FDA if the drug is commonly prescribed for a disease or condition, and there is lack of substantial evidence of effectiveness for that disease or condition, and such usage is associated with serious risk or hazard."  (Emphasis added.)

[44] The point is that the FDA denied approval for use of Neurontin as an epileptic monotherapy and, subsequent to the injuries alleged in this complaint, for neurological pain, which would have targeted a much larger population.  Pls.' Ex. 5, at p. 8, ¶ 36.  The FDA therefore, at no time had the opportunity to consider with any deliberation what warnings should have accompanied Neurontin for such widespread illegal marketing for off-label usage.

Preamble as a shield and claim that they are free from informing consumers and the public about serious health hazards involved with off-label usage of Neurontin. From a practical standpoint, such actions would not constitute "misbranding" inasmuch as such information would not be false or misleading. Second, in light of the 2008 FDA Alert that comments specifically upon both on and off-label uses, there is no credible evidence that the FDA would have rejected any similar proposed language by Defendants as "misbranding".[45] The fact is Plaintiffs' state law claims which seek to attach liability for Defendants' failure to provide adequate warnings will complement, not conflict with, any action taken in regard to Defendants' illegal actions.

5.    **Defendants' Illegal Promotion of Neurontin for Off-label Uses Rendered FDA Restriction That Drugs Be Restricted to Limited Population Meaningless, and Therefore State Action Requiring Additional Warnings Does Not Conflict With FDA Warnings**

Courts have recognized causes of action where a manufacturer overpromotes a product "which serves a useful purpose notwithstanding a medically recognizable risk, for over-promotion of the drug that encouraged physicians to ignore otherwise adequate warnings, effectively canceling out and rendering meaningless the printed words on the label." *Koruba v. American Honda Motor Co., Inc.* 935 A2d 737, (citing to *Baldino v. Castagna,* 505 Pa. 239, 478 A.2d 807, 810 (1984) (citing *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206, 220 (1971)); *see also Salmon v. Parke Davis & Co*., 520 F.2d 1359, 1363-64 (4th Cir. 1975)).

Defendants' illegal promotion of Neurontin for off-label uses necessarily encouraged

---

[45] The reality that Defendants fail to acknowledge is that the 2008 FDA Alert clearly provides evidence that demonstrates the agency, prior to its Alert, would not have rejected Defendants' inclusion of some type of warning either through a label change, application to the FDA for a label change, through Dear Doctor Letters or some other approved method of communication, that individuals ingesting Neurontin should be monitored for "notable changes in behavior" for "the emergence or worsening of suicidal thoughts or behavior or depression". There are two relevant examples of FDA actions: First, with respect to Gabitril, an antiepileptic drug similar to Neurontin with similar off-label usages, the FDA allowed a label actively <u>discouraging</u> the use of the drug in off label populations. Pls.' Ex. 50. Second, with respect to Avonex, a drug used to treat multiple sclerosis, the FDA included a warning for depression and suicide noting that these events were common with multiple sclerosis patients. Pls.' Ex. 51. This Court should reject Defendants' contentions otherwise.

physicians to ignore the fact that the FDA had approved the drug solely for use by a limited population. Defendants' illegal actions and over-promotion of Neurontin thus effectively cancelled out and ultimately rendered meaningless the FDA restriction of this drug to a limited population. In essence, through their illegal off-label promotion of Neurontin, Defendants failed to comply with the labeling mandates of the FDA. The state law tort claims alleging that Defendants failed to adequately warn Plaintiffs of the risks serve to complement and reinforce, and not conflict with, FDA regulations, and therefore, preemption should be denied.

The instant case is very similar to *Perry v. Novartis Pharmaceutical*, 456 F. Supp. 2d 678 (E.D. Pa. 2006). Both concern manufacturers who illegally promoted their drug for off-label indications. In *Perry*, following the FDA 2001 approval of Elidel, a prescription drug to treat atopic dermatitis for short-term or intermittent long-term use in non-immunocompromised patients at least two years of age, it was discovered that the drug was being aggressively promoted off-label by the manufacturer Novartis. *Id.* at 681. Perry had been diagnosed with lymphoma after he was prescribed and treated with the drug Elidel. *Id.* at 679, 680. At the time that Perry was prescribed Elidel, the FDA had "made no finding regarding a link between use of topical calcineurin inhibitors and increased cancer in children and no statute or regulation prevented Novartis from adding the warning." *Id.* at 687. The District Court denied preemption, finding that "state law may require a manufacturer to at least seek FDA approval for the addition of a new warning where there has been no determination by the agency whether there is a link between the adverse health effect to be warned against and the use of the drug."[46] *Id.* at 685.

---

[46] In their *amicus* brief, the FDA clearly stated that the "A failure-to-warn claim is not preempted merely because it imposes liability for a manufacturer's failure to provide a warning that has not yet been required by the FDA. Federal regulations explicitly recognize that manufacturers can, and in some limited instances must, modify their labels to add new warnings of hazards associated with the drug without awaiting prior FDA approval." Pls.' Ex. 52 at p.10. The FDA further indicated in footnote 10 of the brief that the "FDA does not mean to suggest that the preamble itself establishes a federal rule of decision that preempts inconsistent state law." *Id.* The FDA clarified their position in regard to the Preamble by stating "[t]o the extent, therefore, that the defendants argue that federal

Here, Defendants, like the manufacturers in *Perry,* failed in their duty to seek to strengthen the warning in Neurontin regarding negative mood and behavior changes and the monitoring of patients ingesting Neurontin.[47]   There is no evidence in the record that the FDA ever rejected a label with stronger warnings concerning the association between Neurontin and depression and suicide, or the monitoring of certain patients who may be more susceptible to these adverse events.[48]   The recent 2008 FDA Alert provides precisely such a warning that has been advocated by Plaintiffs.

> **6.     If This Court Determines That the FDA Preamble Applies, Plaintiffs Claims are Not Preempted.**

The Preamble states that "FDA approval of labeling under the act, whether it be in the old or new format, preempts conflicting State Law."  71 Fed. Reg. at 3934.  The Preamble thereafter identifies six specific claims that the agency believes would be preempted by the FDA's regulation of prescription drug labeling.  *Id.* at 3935-36.[49]   The only one of the six identified

---

preemption bars *any* failure-to-warn claim premised on a drug manufacturer's failure to provide a warning not contained in the drug's approved labeling, the defendants are incorrect."  *Id.* at 11.  In the footnote on page 12, the FDA also stated that, "FDA merely notes that federal preemption would bar a claim based on the defendants' alleged failure to provide additional warnings as of December, 2001 based solely on scientific information **known and considered** by FDA in approving the final labeling for Elidel."  *Id.* at 12 (emphasis added).  Clearly the FDA was stating that preemption should not apply if the information was not both known and considered.

[47] The record is crystal clear, that the FDA's clinical reviewer, Dr. McCormick, expressed a concern in the clinical review that there were adverse events that had not been "fully characterized" including clinically important depression, and that ingestion of Neurontin in the clinical studies had resulted in some suicide attempts.  Pls.' Ex. 15, p. 117.  Plaintiffs allege that Defendants failed to change their label to adequately warn of the potential for depression which may lead to suicide or submit such a label to the FDA for consideration.

[48] Plaintiffs' expert, Cheryl Blume, Ph.D., in her report has opined as to numerous warnings that should have been proposed by Defendants and which have never been rejected by FDA as part of an evaluation of psychiatric adverse events and suicidality.  Pls.' Ex. 5 , p. 195, ¶ 324.

[49] The six claims are: "(1) Claims that a drug sponsor breached an obligation to warn by failing to put in highlights or otherwise emphasize any information the substance of which appears anywhere in the labeling; (2) claims that a drug sponsor breached an obligation to warn by failing to include in an advertisement any information the substance of which appears anywhere in the labeling, in those cases where a drug's sponsor has used highlights consistently with FDA draft guidance regarding the 'brief summary' in direct-to-consumer advertising; (3) claims that a sponsor breached an obligation to warn by failing to include contraindications or warnings that are not supported by evidence that meets the standards set forth in this rule, including § 201.57(c)(5) (requiring that contraindications reflect '[k]nown hazards and not theoretical possibilities') and (c)(7); (4) claims that a drug sponsor breached an obligation to warn by failing to include a statement in labeling or advertising, the substance of which had been proposed to FDA for inclusion in labeling, if that statement was not required by FDA at the time plaintiff claims the

claims which even arguably applies would be the third claim: "that a sponsor breached an obligation to warn by failing to include contraindications or warnings that are not supported by evidence that meets the standards set forth in this rule." However, as noted throughout this brief, Defendants' obligation to adequately warn concerning risks ingestion of Neurontin and negative mood and behavior including depression and suicide is supported by evidence that "meets the standards" of the rule, that is, requiring a drug label to be revised as soon as there is "reasonable evidence of an association of a serious hazard with a drug". 21 C.F.R. § 201.57(e). Moreover, as previously stated, the FDA never rejected a label that proposed such warnings. Plaintiffs' claims would not be preempted if this Court would consider the FDA's views of preemption as enunciated in the Preamble, because said claims do not fall within the ambit of any of the six delineated categories.

### 7.    If This Court Determines That the FDA Preamble Applies, It Should Not Be Accorded Any Deference by This Court.

Even if this Court does find that the FDA Preamble applies, it should not be accorded deference. The FDA lacks authority under the Federal Food, Drug, & Cosmetic Act, 21 U.S.C. § 321 et seq., and the United States Constitution to alter Congress' intent not to supplant state law causes of action that protect consumer health and safety.

Furthermore, Defendants disregard the consensus of authority that FDA prescription drug regulations are minimum standards that do not preempt state law failure-to-warn or other state product liability claims. Courts have routinely rejected such arguments, holding that neither the FDCA nor the FDA's statements in *amicus* briefs preempt such common law claims.

---

sponsor had an obligation to warn (unless FDA has made a finding that the sponsor withheld material information relating to the proposed warning before plaintiff claims the sponsor had the obligation to warn); (5) claims that a drug sponsor breached an obligation to warn by failing to include in labeling or in advertising a statement the substance of which FDA has prohibited in labeling or advertising; and (6) claims that a drug's sponsor breached an obligation to plaintiff by making statements that FDA approved for inclusion in the drug's label (unless FDA has made a finding that the sponsor withheld material information relating to the statement)." *Id.* at 3936.

Defendants, and the FDA notably have ignored recent decisions by the United States Supreme Court, which hold that preemption under similar regulatory contexts is inappropriate.

Moreover, as illustrated in the *Perry* case, the FDA recently has appeared to have a change in heart concerning the Preamble:

> [t]hat the defendants argue that federal preemption bars *any* failure-to warn claim premised on a drug manufacturer's failure to provide a warning not contained in the drug's approved labeling, the defendants are incorrect. FDA has not attempted to "occupy the field" of prescription drug labeling, and state tort liability for failure to warn does not necessarily prevent FDA from carrying out its regulatory goals. [Pls.' Ex. 52, p. 11.]

  **i.  The FDA's Opinion Regarding Preemption Is Not Entitled to *Chevron* Deference Because It Does Not Possess the Force of Law.**

Certain agency actions are entitled to heightened deference from the courts under *Chevron*, 467 U.S. 837. Such deference, however, "is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the *agency interpretation claiming deference was promulgated in the exercise of that authority.*'" *Gonzales v. Oregon,* 546 U.S. 243, 255-56 (2006) (quoting *United States v. Mead Corp.,* 533 U.S. 218, 226-27 (2006)) (emphasis added). Although Congress has conferred rulemaking authority on the FDA, the Preamble was not "promulgated in the exercise of that authority," because it is merely the preamble to a rule and not part of the rule itself.

FDA regulations make it clear that a regulatory preamble is not itself part of the rule, and lacks the force of law. 21 C.F.R. § 10.85 expressly provides that "[a]ny portion of a Federal Register notice other than the text of a proposed or final regulation, *e.g.*, a notice to manufacturers or a *preamble to a proposed or final regulation*" constitutes only an advisory opinion. *Id.* (emphasis added). The regulations also state that such an advisory opinion may not

be used in court proceedings as "a legal requirement." 21 C.F.R. § 10.85(j).[50] Thus, the Preamble at issue here is *not* entitled to *Chevron* deference. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference").

> ii.    **The FDA's Position Regarding Preemption Is Not Entitled to This Court's Respect Under *Skidmore* and *Mead* Because It Lacks the "Power to Persuade."**

Where an agency interpretation is not entitled to *Chevron* deference, it is "'entitled to respect' only to the extent it has the 'power to persuade.'" *Gonzalez*, 126 S. Ct. at 915 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994)). As the Supreme Court makes clear, when an agency is acting within its scope of authority, determining what deference which might be accorded, if any, to an agency include consideration upon "'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give the power to persuade, if lacking power to control.'" *United States v. Mead*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 140). In applying these factors—thoroughness, consistency, and validity—the FDA Preamble lacks the power to persuade and is not entitled to any judicial deference.

> iii.    **Thoroughness of Consideration.**

The FDA preamble does not reflect a thorough agency consideration of both sides of the legal arguments for and against preemption. Thorough agency consideration of an issue, as in formal notice-and-comment rulemaking, compels an agency to solicit comments from and weigh

---

[50] *See* Jennifer Corbett Dooren, *UPDATE: FDA To Require Simpler Drug Labels*, Wall Street Journal Online, Jan. 18, 2006, *at* http://online.wsj.com/article_print/BT-CO-200600118-008819.htm ("Dr. Scott Gottlieb, the FDA's deputy commissioner for medical and scientific affairs, noted that the provision is in the rule's preamble, meaning it will not be codified into federal law. He said the courts could decide to ignore the FDA's opinions."). Pls.' Ex. 32.

the arguments of all interested parties. The FDA did not do that in the case of the Preamble. When the FDA first proposed its new labeling rules in 2000, it explicitly stated that the regulations would *not* have preemptive effect. *See* 65 Fed. Reg. 81082, 81103 (proposed Dec. 22, 2000). The FDA did not request comments on the appropriate preemptive effect of the proposed new labeling requirements, nor did FDA officials consult with state and local officials about the potential preemptive effect of the proposed regulation, or provide them with specific notice and an opportunity to comment, as required by Executive Order 13132. Exec. Ord. 13132, § 4(d) & (e) (1999).

By neglecting to follow the standard process, the agency reached its views on preemption expressed in the Preamble without due consideration of the arguments against preemption.[51] The State Representative of Delaware, Donna Stone, testified before the United States Senate Committee of the Judiciary on September 12, 2007, concerning the FDA's violation of the Executive Order in their inclusion of the Preamble:

> On December 30, 2006, NCSL learned that the FDA planned to finalize its rule and include a policy statement that the provisions of the prescription drug labeling rule would preempt state product liability laws. NCSL approached FDA officials and asked for three things: a consultation meeting pursuant to the Federalism Executive Order, a copy of the proposed language, and that the FDA re-open the comment period to allow NCSL to file formal comments on this very significant and preemptive change. The FDA ignored the first request. The second and third requests were denied. However, it is interesting to note that during this rule's 5-year dormancy period, the FDA had allowed certain large pharmaceutical companies to submit comments pertaining to preemption after the expiration of the comment period. States, however, were not given the same

---

[51] If the Preamble were a substantive rule possessing the force of law, the promulgation of the Preamble would have violated the notice-and-comment requirements for rulemaking under the Administrative Procedures Act. 5 U.S.C. §§ 553(b), (c); *see also Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 164 n.1 (2001) (stating that "the Corps issued the 'Migratory Bird Rule' without following the notice and comment procedures outlined in the Administrative Procedure Act"). Comments were not sought on preemption; rather, the Proposed Rule specifically disclaimed any preemptive effect. Because the Preamble is not a "logical outgrowth" of the Proposed Rule, it likely violates notice-and-comment rulemaking. *See, e.g., American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994) (holding that agency failed to provide adequate notice that it would adopt a novel definition of the term and thus vacating the rule).

deference, and the FDA finalized this rule in mid-January, 2006.  Once again, unelected federal bureaucrats had succeeded in forming state tort law policy over the objections of the states.  [Pls.' Ex. 53 at p. 3.]

### iv.    Consistency with Earlier Pronouncements.

Where an agency changes its mind and reverses position, its views are not entitled to deference.  For example, in *Bates,* the U.S. Supreme Court rejected the Environmental Protection Agency's argument, set forth in an *amicus* brief to the Court, that federal law preempts tort claims against a pesticide manufacturer alleging design defect and failure to warn.  The Court noted that the agency's pro-preemption argument was "particularly dubious given that just five years ago the United States advocated the [opposite] interpretation."  544 U.S. at 449 & n.24 (citations omitted); *see also Norfolk South. R.R. Co. v. Shanklin*, 529 U.S. 344, 356 (2000) (stating that an agency's construction of its own regulations is not entitled to deference when that construction "contradicts the agency's own prior construction").[52]

The FDA's recent pronouncement on preemption is equally "dubious," because of its inconsistency with earlier agency pronouncements.  As just discussed, when the FDA first proposed its labeling rules in 2000, it explicitly stated that "this proposed rule does not contain policies that have federalism implications or that preempt state law."  *See* 65 Fed. Reg. at 81103.  This position was consistent with prior FDA statements.  For example, the preamble to the FDA's 1979 labeling rule explained (in response to comments on liability):  "It is *not* the intent of FDA to influence the civil tort liability of the manufacturer."  44 Fed. Reg. 37434, 37437 (1979) (emphasis added).  Likewise, in a final labeling rule published in 1998, the FDA rejected

---

[52]  In contrast, in those recent cases where the Supreme Court has given deference to an agency's views on preemption, there was no evidence of any prior inconsistent positions on the agency's part.  *See, e.g., Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 863 (2000); *Lohr*, 518 U.S. at 496; *Sprietsma v. Mercury Marine Co.*, 537 U.S. 51, 68 (2002).  To the contrary, in all of those cases, the agency views accorded deference had been consistently stated over time, both in *amicus* briefs and in regulatory preambles.  Plainly, that is not this case.

manufacturers' calls to preempt state tort claims and stated unequivocally that "FDA's regulations establish the minimal standards necessary, *but were not intended to preclude the states from imposing additional labeling standards.*"   63 Fed. Reg. 66378, 66384 (1998) (emphasis added).  Because the FDA's current pro-preemption stance is plainly a reversal of its previous position, it is not entitled to the Court's respect. [53]

Ironically, the *Colacicco* court admitted that the FDA's 2006 Preamble is directly contrary to what the agency stated in the 2000 preamble to the proposed version of *those very same rules*, and noted that the FDA's *amicus* brief in *Colacicco* was "completely silent" on the issue, despite being requested to address this very point. 432 F. Supp. 2d at 531.

### v.  Validity of Reasoning.

Even if the FDA's new preemption position did not expressly contradict its prior statements on the matter, the Preamble still would not be entitled to this Court's respect because of the invalidity of its reasoning.  As Plaintiffs discussed at length above, the legal arguments against preemption are compelling.  In order to reach a contrary conclusion, the FDA's discussion of preemption in the Preamble, among other things, ignores the presumption against

---

[53]   In an attempt to create the impression that its position on preemption "is not new," the FDA in the Preamble cited four earlier occasions in which the FDA had asserted that "State law requirements relating to drugs" were preempted by federal regulations. *See* 71 Fed. Reg. 3935. But none of these regulations concerned the labeling of prescription pharmaceuticals, and each of these preemption claims appear to have been "directed at state positive laws that specifically regulated the particular matter at issue;" none "suggested that common-law claims would be preempted."  *See* Allison M. Zieve and Brian Wolfman, *The FDA's Argument for Eradicating State Tort Law: Why It Is Wrong and Warrants No Deference*, 34 Prod. Safety & Liab. Rep. (BNA) 12, 308-16 (Mar. 27, 2006), Pls.' Ex. 54.  Indeed, the preamble to one of these regulations expressly "recognize[d] that product liability plays an important role in consumer protection" and made clear that "the proposed preemption action is not intended to frustrate or impede tort litigation in this area."  59 Fed. Reg. 3944, 3948 (1994).  The Preamble also cites four *amicus* briefs that the FDA had filed in cases prior to the present administration.  *See* 71 Fed. Reg. 3935.  Three of those briefs, however, did not address preemption of damages claims at all and the fourth, *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), involved an unusual "fraud on the FDA" claim, which was held to be preempted because it intruded on a preeminent federal concern, the relationship between the federal government and the entities it regulates.  The FDA brief in *Buckman* carefully distinguished this claim from traditional products liability claims such as failure to warn, which the agency conceded "implicate core areas of traditional state concern" and carry a strong presumption against preemption.  Brief for the United States as *Amicus Curiae,* 2000 WL 1364441, at *17 (filed Sept. 13, 2000).

preemption, discounts adverse legislative language, describes the regulations that govern labeling in a misleading manner, disregards the legislative purpose of the FDCA, and overlooks or mischaracterizes prior agency statements on preemption.    Most importantly, to reach its conclusions, the Preamble wrongly presumes that virtually any warning not approved by the FDA must be false and misleading. It is a piece of advocacy, not of legal analysis, that does not withstand even the mildest form of scrutiny.    This Court should have no reservations about rejecting it outright.

> 8.    The *Colacicco* Court Erred by Treating the FDA's Views on Preemption as Dispositive.

The *Colacicco* court did not merely show deference to the FDA's position on preemption, but treated it as "dispositive." *Colacicco*, 432 F. Supp. 2d at 525.[54]    The court held that it was inappropriate "to substitute its judgment for the FDA's about these medical [*sic*] issues." *Id.* at 530.    This was clear error.    To reach this conclusion, the *Colacicco* court relied heavily on *Chevron*, 467 U.S. 837 (1984), and on language from *Hillsborough County v. Automated Medical Labs., Inc.,* 471 U.S. 707, 714 (1985), that applied *Chevron* and treated an FDA statement on preemption as "dispositive." 432 F. Supp. 2d at 525.    The *Colacicco* court simply ignored more recent Supreme Court precedent that places limits on *Chevron* and on judicial deference to administrative agencies.    One will search in vain through the *Colacicco* opinion for any reference to *Skidmore, Mead,* or *Gonzales* on this topic.    Those decisions provide a context for the Supreme Court's more recent discussions of the weight to be given an agency's views on preemption in cases such as *Bates, Geier*, and *Lohr.*[55]    Moreover, although the Supreme Court in

---

[54] While the FDA submitted an *amicus* brief in *Colacicco,* the court made clear that it was deferring to the Preamble as well as the brief. 432 F. Supp. 2d at 529-32.    This was striking because the FDA itself had emphasized in its brief that "the basis for federal preemption in this litigation is not the preamble itself."    Brief for the United States as *Amicus Curiae* Supporting Defendant, *Colacicco v. Apotex, Inc.,* at 2 (filed May 10, 2006); *see also id.* at 18.

[55] *Bates,* which affirmatively rejected a federal agency's views on preemption, is not even mentioned in *Colacicco*.

its recent decision in *Riegel* gave deference to the FDA interpretation in that case, the Court did so because the FDA regulation that plaintiff cited in that case did not "provide unambiguous support" for the plaintiffs' position.  552 U.S. ___, 128 S. Ct. at 1010 .  Moreover, *Riegel* concerned a medical device case where the statute has an express preemption provision, which is not the case with the pharmaceutical law.

It is understood that an agency can communicate its "intentions" about the preemptive effect of its regulations "through statements in 'regulations, preambles, interpretive statements, and responses to comments,'"  *Lohr,* 518 U.S. at 506 (Breyer, J., concurring in part and concurring in judgment) (*quoting Hillsborough,* 471 U.S. at 718), and those agency views may be entitled to "some weight."  *Geier,* 529 U.S. at 883.  But the weight those views receive from a court, under *Skidmore* and *Mead,* depends entirely on their "power to persuade."  *Mead*, 533 U.S. at 228 (quoting *Skidmore,* 323 U.S. at 140).  An agency has no "power to control" the court's judgment on preemption.  Thus, the *Colacicco* court erred by simply accepting the FDA's views on preemption and not conducting its own independent analysis.  *See Colacicco*, 432 F. Supp. 2d at 536 ("This Court has concluded . . . that it is improper for a federal district judge to engage in this analysis in the first place").[56]  Furthermore, this litigation is clearly distinguishable from *Colacicco,* in that this case does not concern a generic drug, and the FDA has not rejected

---

[56] *Horn v. Thoratec Corp.,* 376 F.3d 163 (3d Cir. 2004), the Third Circuit's recent discussion of FDA preemption cited in *Colacicco,* confirms this analysis.  *Horn* involved a claim of express preemption under § 360k(a) of the Medical Device Amendments (MDA) to the FDCA.  In *Lohr,* the Supreme Court had instructed that the FDA's views on preemption under the MDA were entitled to "substantial weight," because "Congress has given the FDA a unique role in determining the scope of § 360k's preemptive effect."  518 U.S. at 495-96.  Following *Lohr,* the Third Circuit in *Horn* treated the FDA's preemption determination, as expressed in an *amicus* brief, as "significant," but not "dispositive."  376 F.3d at 171.  Although the FDA's position had changed from prior cases, the Court of Appeals concluded that it was still entitled to respect under the *Mead* standard because the agency had justified its change of position with a "reasoned analysis."  *Id.* at 179 and n.25.  The court conducted its own analysis of the preemption issue informed by the FDA's views.  *See, e.g., id.* at 177 ("Our preemption conclusion is reinforced by the informed analysis found in the FDA's *amicus curiae* brief").

the warnings which Plaintiffs assert Defendants should have submitted to the FDA.[57]

In the *Zyprexa* litigation, Judge Weinstein found that the FDA Preamble would be accorded with limited deference: "If an agency interpretation lacks the "power to control"—because it was not promulgated in the exercise of congressionally-delegated authority under *Chevron,* or does not resolve an ambiguity in a previously issued regulation under *Auer*—it serves as guidance for litigants, but will only be respected by the court to the extent that it has the "power to persuade"'. *In re: Zyprexa Prods. Liab. Litig. v. Eli Lilly & Co.,* 489 F. Supp. 2d 230 (citing to *Auer v. Robbins,* 519 U.S. 452, 461 (1997); and *Christensen v. Harris County,* 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous.")). In these cases, as in *Zyprexa,* there is no ambiguity in the language of the FDA regulation, in contrast with *Rucker v. Lee Holding Co.,* where there was an ambiguity in the regulations governing eligibility for leave under the Family and Medical Leave Act. 471 F.3d 6 (1st Cir. 2006).

Defendants point to this Court's decision in *In re Pharmaceutical Industry Average Wholesale Price Litig.,* 321 F. Supp. 2d 187 (D. Mass. 2004), for the premise that the FDA views on the preemption in the context of pharmaceutical cases and the preamble and various *amicus* briefs should be accorded deference. As this Court is well aware, the *In re Pharmaceutical*

---

[57] There is a second significant factual difference between the present case and *Colacicco:* the drug involved. *Colacicco* involved generic Paxil, a member of the class of SSRIs. Unlike with Neurontin, there was a long history of FDA decisions affirmatively rejecting additional warnings on SSRIs. In this case, there was a citizen petition seeking stronger warnings for Neurontin which was in effect ratified by the FDA who has taken affirmative action by issuing the January 31, 2008 alert, *cited supra,* which demonstrates the determination by the agency that a warning of an association between use of Neurontin and depression and suicide is scientifically supported. The plain words of the McCormick Clinical Review in 1992 from the Neurontin NDA demonstrates that from the time of Defendants' initial application for approval, the FDA was concerned about an association with depression and the increased risk for suicide, albeit for the sought-after indication. The FDA placed restrictions on the product's use, for a small and definitive population consisting of individuals suffering from refractory epilepsy, insisted upon further post-approval studies, and eventually both issued an FDA Alert to Healthcare Professional regarding Suicidality and Antiepileptic Drugs.

*Industry Average Wholesale Price Litigation,* concerned a different Rebate Statute, was based in part on an *amicus* brief from the United States Department of Justice, on behalf of the Secretary of Health and Human Services at the request of the Court. Moreover, the Court found the brief was well reasoned and there was no indication that the Health and Human Services had provided viewpoints in the past which were inconsistent with their briefing.

Here, although Defendants point to several different *amicus* briefs in their moving papers, it is very telling that the FDA has not filed an *amicus* brief regarding Neurontin and instead, has issued an Alert which provides essentially one of the same warnings regarding suicide and depression which Plaintiffs advocate. Moreover, it is clear from the FDA *amicus* brief filed in *Perry*, that the FDA has changed or clarified its position and made clear that not all failure-to-warn claims are preempted within the context of pharmaceutical litigation—quite the contrary to what Defendants are alleging in their moving papers.

> **9.    Defendants Violated FDA Regulations, and Plaintiffs' Parallel Claims of Common Law Negligence or State Statute Violations are Not Preempted.**

Defendants violated FDA Regulations as fully set forth below. These violations of FDA regulations 'parallel' or supplement Plaintiffs' common law claims of negligence and/or state statutory law claims. Pls.' Ex. 42. Since these claims are parallel and do not impose different or additional requirements to FDA regulations, the claims pose no conflict, and would not affect the FDA's enforcement of federal law; thus, no preemption is warranted.[58] The Supreme Court has recognized even in the context of much stricter medical device litigation that a State can provide a "damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case "parallel," rather than add to, federal requirements. *Riegel v. Medtronic, Inc.*, 552 U.S. ___, 128 S. Ct. at 1011 (citing *Lohr,* 518 U. S., at 495; *see also id.* at 513 (O'Connor, J.,

---

[58] At least 46 states have statutes regarding the misbranding of drugs. Pls.' Ex. 55.

concurring in part and dissenting in part) (*Lohr* involved a private state law negligence action against a manufacturer based upon a defective medical device). The Supreme Court in *Riegel* was responding to Petitioners'-Plaintiffs' Brief which provided a detailed explanation of their assertion of a parallel claim:

> The Riegels' inadequate warning claim similarly seeks to enforce duties parallel to the MDA's general labeling rules. New York common law requires a manufacturer to provide "adequate warnings regarding use of its product." 86 N.Y. Jur. 2d, Products Liab. § 51 (2007). 'Liability may be premised upon the complete absence of warnings as to a particular hazard, or upon the inclusions of warnings [that] are insufficient.' *El Sheikh v. Chem-Tainer Indus., Inc.,* 2006 WL 623464, at *4 (N.Y. Sup. Ct. Mar. 13, 2006); see *Cooley v. Carter – Wallace Inc.,* 478 N.Y.S.2d 375, 377 (N.Y. App. Div. 1984) ("warnings must clearly alert the user to avoid certain (unsafe) uses of the product which would appear to be normal and reasonable," and "to be adequate, the warnings must be commensurate with the risk involved in the ordinary use of the product") [citations omitted]. A manufacturer may also incur liability for failing to warn of dangers that came to its attention after the product was manufactured or sold, through advancements in the state of the art or through reports of incidents involving dangers that warrant additional warnings. *See Cover v. Cohen,* 461 N.E.2d 864, 871 (N.Y. 1984). [Petitioners Brief at p. 41. Pls.' Ex. 56.]

As detailed below, Defendants have failed in their pharmacovigilance obligations to inform the public and medical providers of Neurontin's association with psychobiologic adverse events, including suicidality. Plaintiffs are not seeking to enforce the FDA regulations but instead they are asserting claims premised on state common law negligence and/or state statutory law. Defendants' failure of their common law duty runs parallel with their failure to comply with 21 C.F.R. §§ 314.80, 314.70(c) , and 201.57(e).[59]

### a.    Defendants' Violation of 21 CFR § 314.80 – Safety Surveillance

First, the Court's attention is brought to the issue of safety surveillance. Plaintiffs' expert on Regulatory Affairs, Cheryl Blume, Ph.D., states the following regarding safety surveillance:

---

[59] Compounding the issue is that Defendants submitted improper certifications to the FDA which had incorrectly asserted that Defendants had in fact been compliant with such FDA regulations. Specifically, Defendants submitted to the FDA at various times since Neurontin's initial approval by the FDA a Form 356h that was plainly wrong in light of the lack of pharmacovigilance exhibited by Defendants. Pls.' Ex. 57 at p. 2; Pls.' Ex. 58 at p. 2.

Surveillance is critically important for the development of a safety database for the drug product. Experience has taught that pre-marketing clinical trial data provide only initial and preliminary safety information for a new drug product. Frequently, critical safety concerns are not observed until after an approved product has been commercially launched. There are several reasons for the delayed appearance of adverse medical events. One reason is that a relatively small number of patients (usually only up to a few thousand) are actually exposed to a new drug before it is approved. As such, only the most frequently occurring adverse events will be observed. Following approval, a much larger population uses the drug and the less frequent adverse events will then be evidenced. [Pls.' Ex. 5 at p. 5.]

Dr. Blume's reasoning is consistent with 21 C.F.R. § 314.80 requirements regarding the review of adverse drug experiences. 21 C.F.R. § 314.80 states in part that pharmaceutical companies shall "**develop written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to FDA**." (Emphasis added.) Here, Defendants knew or should have known about postmarketing adverse drug experiences relating to psychobiologic adverse events, including suicidality, particularly those reported with off-label use of Neurontin. Defendants not only had the duty to develop written procedures for such adverse drug experiences, but they should have evaluated and taken action in response to such psychobiologic adverse drug experiences reported with Neurontin; indeed a "safety signal" existed and Defendants failed to take action.[60] Plaintiffs' expert Dr. Blume has opined that

---

[60] Defendants contend that any purported safety signal alleged by Plaintiffs as to a safety signal surfaced only after litigation began and "notoriety bias" skewed data relating to Neurontin adverse drug experience reporting. However, such argument is plainly wrong as it ignores all "notice" to Defendants prior to Plaintiffs' counsel advertisements in the media that only first began in the third quarter of 2003. Unfortunately, Defendants did not take appropriate action in the face of safety signals demonstrating an association between Neurontin and psychobiologic adverse events, including suicidality. Had the company complied with its obligations under 314.80(b), the company would have clearly seen that there was a substantial signal for suicidal and self-injurious behavior in the post marketing surveillance. Attached as Pls.' Ex. 59, Pls.' Ex. 24, and Pls.' Ex. 60 are charts generated from internal company data or publicly available FDA data. Pls.' Ex. 59 shows that unlike the analysis performed incorrectly by Defendants' expert Sheila Weiss-Smith, by her own admission, the chart shows a statistically significant signal for suicidal behavior against the background starting in 1999. Likewise, Pls.' Ex. 24 is an analysis of suicidal and self-injurious behavior from Defendants' own database that shows there was a substantial difference in the reporting rate for psychiatric indications versus other indications by mid 1999. Lastly Pls.' Ex. 60 shows that suicidal and self-injurious behavior represent 1.86% of the serious adverse event reports received by Defendants for Neurontin through March 31, 2002. According to the testimony of Defendants' witness, Christopher Pacella, events that occurred at greater than 1% should have warranted specific review. Pls. Ex. 61.

Defendants "failed to take appropriate action to recognize and respond to safety signals demonstrating an association between Neurontin use and psychobiologic adverse events, including depression and suicidal behavior. Pls.' Ex. 5 at p. 9, ¶ 42.[61] Defendants' Rule 30(b)(6) witness on safety surveillance, Manfred Hauben, acknowledged that Defendants did not engage in any such activity to evaluate psychiatric adverse events occurring across each indication for which Neurontin is prescribed, whether approved or unapproved (i.e., off-label) by the FDA; no special pharmacovigilance procedure had ever been enacted related to an evaluation of suicidality until FDA requested a review in 2004. Pls.' Ex. 62 at pp. 573-574.

It appears that, in part because of safety and efficacy concerns, about which Defendants knew or should have known via postmarketing surveillance, Defendants affirmatively decided not to fully explore and evaluate Neurontin in treating off-label psychiatric indications such as bipolar disorder in their own controlled clinical trials.[62] Instead, Defendants reaped the benefits of off-label prescriptions without a proven safety and efficacy record for Neurontin.[63]

Incredibly, on April 1, 2008, Defendants disclosed to Plaintiffs a document, entitled Gabapentin Data Capture Aid, apparently dating to 2006, that sets forth exactly the type of

---

[61] Dr. Blume applies a Proportional Reporting Rate (PRR) in part to demonstrate evidence of a safety signal relating to Neurontin. Specifically, at Pls.' Ex. 5 ¶¶ 313-323, Dr. Blume details how by at least 2001—years before any potential notoriety bias due to media coverage or litigation—serious adverse event reports for Neurontin related to terms "suicidal" and "self injurious" behavior were approximately twice as much as the percentage of reports for other anti-epileptic drugs used to treat similar conditions. Defendants' suggestions that her charts are not "true" PRR charts promote form over substance. As shown in her report, the FDA used the same methodology as Dr. Blume when reviewing safety data associated with Avandia. *Id.*

[62] *See* Expert Report of Cheryl Blume, Ph.D., Pls.' Ex. 5 at p.2 (citing Pfizer_LTive_0008792 at 0008800, (Defendants' CI-945 Clinical Development): "It is concluded that the methodology of add-on trials for this indication [bipolar disorder] requires further refinement and the inability to control potential confounding variables is a major limitation of this design. No further trials are planned with gabapentin in any psychiatric indications." Additionally, Defendants' researcher, Atul C. Pande, whose responsibilities included the oversight and technical support of drug development programs in psychiatry and the oversight of new drug development efforts in depressive, anxiety and psychotic disorders, stated the following on June 18, 1999 regarding Defendants' clinical trials related to bipolar disorder and exclusion of depressed patients from trials: "[W]e had absolutely no evidence whatsoever that Gabapentin was likely to be antidepressant and therefore we felt it ethically unjustified to include depressed patients." Defendants' Response to Plaintiffs' Request for Admissions, Set 3 (12/7/07), Pls.' Ex. 64 at p. 7.

[63] Pls.' Ex. 65 at pp. 2-3: As of 2003, sales were at $2.4 billion with "less than 10% use for epilepsy, and the largest off-label use for pain management" compared to other anticonvulsants.

pharmacovigilance protocol Defendants should have done over a decade ago.[64]  Pls.' Ex. 63. This protocol symbolizes the type of "written procedures for the surveillance, receipt, evaluation and reporting" of adverse drug experiences required under the 21 C.F.R. § 314.80. Unfortunately, Defendants failed in their obligations in this regard.

### b.    Defendants' Violation of 21 CFR 201.57(e) – Revising the Label

In light of the safety signal regarding Neurontin's association with suicidality, as detailed above in this memorandum, Defendants failed to comply with 21 C.F.R. § 201.57(e), which pertains to updating the Neurontin labeling and which states in part  the following:

> (e) Warnings. Under this section heading, the **labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them**, and steps that should be taken if they occur . **The labeling shall be revised to include a warning as soon  as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.**  A specific warning relating to a use not provided for under the ``Indications and Usage'' section of the labeling may be required by the Food and Drug Administration **if the drug is commonly prescribed for a disease or condition, and there is lack of substantial evidence of effectiveness for that disease or condition, and such usage is associated with serious risk or hazard**. [Emphasis added].

### c.    Defendants' Violation of 21 C.F.R. §314.70(c)(2)(i)

FDA approval is not required for certain labeling changes related to pharmaceuticals. Specifically, 21 C.F.R. § 314.70(c)(2)(i) allows for changes in labeling to be made prior to FDA approval under circumstances to "add or strengthen a contraindication, warning, precaution, or adverse reaction".

In this litigation, despite clinical trial psychobiologic adverse events and postmarketing safety surveillance data available to Defendants that demonstrated an association of Neurontin

---

[64]  "The purpose of the Gabapentin Data Capture Aid is to systematically collect and assemble all available information . . .involving adverse events of special interest." Pls.' Ex. 63 at p. 1.  The Gabapentin Data Capture Aid was specifically designed to determine "the etiology of potentially suicide/self-injury-related adverse events."  *Id*. at p. 2; *see* Pls.' Ex. 80 at ¶ 38 (April 3, 2008 Declaration of Cheryl Blume).

with psychobiologic adverse events including suicidality, Defendants did not inform the public or healthcare providers as to Neurontin's capacity to contribute to such serious health hazards in its Neurontin labeling or via any other appropriate method of communication (e.g., Dear Doctor letters). Defendants, knowing full well that the safety of the drug in the off-label populations representing the bulk of Neurontin's usage was unknown, failed to take any steps to investigate the safety in these populations. Defendants did not take appropriate and reasonable actions to update the labeling regarding Neurontin's capacity to reduce the release of excitatory neurotransmitters (i.e., serotonin):   an action known to be associated with depression and suicidality.[65]

### d.    Defendants' Provided False Certification on their FDA Form 356h

Initially, each New Drug Application requires the sponsor to submit FDA Form 356h. The form serves as a summary of the application:  the form provides a description of the product for which the application is being sought, it identifies the applicant, and it indicates the type of submission at issue (e.g., original application, annual report, labeling supplement, etc.). Importantly, the Form 356h requires the sponsor to provide a Certification as follows:

---

[65] While Defendants may contend that the FDA struck draft labeling that "Gabapentin reduces the stimulated release of noradrenaline, dopamine, and glutamate under certain laboratory conditions," Pls.' Ex. 66 at Bates 0067, this is not tantamount to an FDA rejection of any and all language pertaining to Neurontin's mechanism of action or its capacity to reduce the release of excitatory neurotransmitters (i.e., serotonin). Moreover, the FDA never rejected warnings Plaintiffs claim should have been implemented, because Defendants failed to ever submit to the FDA for consideration for inclusion in the Neurontin label the other warnings advocated by Plaintiffs including a warning that patients ingesting Neurontin should be "monitored for notable changes in behavior that could indicate the emergence or worsening of suicidal thoughts or behavior or depression", which is exactly the warning included in the 2008 FDA Alert for Antiepileptic drugs, including Neurontin. Indeed, the labeling reviewed by FDA was for a different intended population and indication (initially epilepsy and subsequently post herpetic neuralgia), and so little or no credence can be applied by the FDA striking such language since FDA's review was limited to the indications for which approval was being sought. *See* Pls.' Ex. 38, p. 526 (Defendants' Rule 30(b)(6) witness on labeling) ("Q. And if the pharmacology review regarding the Clinical Pharmacology Section:  Mechanism of Action portion of the label addressed the efficacy of gabapentin in relation to the proposed indication, you would have no reason to disagree that that, in fact, was discussed and then evaluated by the FDA?  A. Yes.  Q. Now, do you have any reason to believe that Pfizer provided any information regarding the efficacy of gabapentin **in relation to indications that were not proposed, in particular those that would pertain to psychiatric indications**, as part of its post-herpetic neuralgia submission?  **A. I do not believe that those data were included in that submission, that is correct.**"  (Emphasis added.)

> I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA.  If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications including, but not limited to the following:  . . . . 3. Labeling regulations in 21 CFR Parts 201  . . . . . 6. Regulations on Reports in 21 CFR 314.80 . . . .The data and information in this submission have been reviewed and, to the best of my knowledge are certified to be true and accurate. [Pls.' Ex. 57 at p. 2; Pls.' Ex. 58 at p. 2.]

Unfortunately, Defendants failed to meet their obligations.  Despite Defendants' submission of certifications that they had complied with FDA Regulations and provided updated information, such was patently untrue in light of the lack of pharmacovigilance exhibited by Defendants as detailed by the excerpts of Dr. Blume's report cited above.

### B. DEFENDANTS FAILED TO WARN CONSUMERS AND PHYSICIANS OF NEURONTIN'S ASSOCIATION WITH SUICIDALITY.

Defendants have possessed evidence since at least the time of the 1992 New Drug Application for Neurontin's epilepsy indication that Neurontin was associated with mood and behavioral disturbances, including depression and suicidality.  Importantly, as has been previously detailed above regarding Defendants' responsibilities for labeling revisions under 21 C.F.R. § 210.57(e), an epidemiological association or a causal association is NOT required for there to be an obligation to warn of a risk of a serious health hazard.  *See* 21 C.F.R. § 201.57(e); the standard is "reasonable evidence".  In fact, the FDA contemplates black box warnings in the absence of any clinical data which implies epidemiological evidence is not always needed.  *Id.*

Here, Defendants were aware of the multiple pre-approval clinical trial adverse events and post-FDA approval, post-marketing adverse events of mood and behavior disturbances which predictably lead to suicide as well as suicidal behavior itself, in association with Neurontin.  Defendants were also aware that Neurontin's mechanism of action contributed to

these adverse events.  Although clearly not exhaustive of all factual information possessed by Defendants reflecting reasonable evidence of an association of serious psychiatric adverse events with Neurontin use, below is a summary demonstrative of such evidence.[66]

- Defendants' own clinical trial data demonstrated an association with suicidality, as confirmed by FDA over a decade later.  In 2008, an FDA Alert indicated a doubling of the risk for suicidal behavior associated with the use of antiepileptic drugs, including Neurontin.  The FDA analyzed 11 drugs, including Neurontin, and specifically stated that the results were generally consistent across all drugs reviewed.[67]

- Incidences of positive dechallenge/rechallenge psychiatric events have been documented in Defendants' own <u>clinical trials</u> for Neurontin.[68]  As early as 1990, a positive dechallenge/rechallenge reaction of depression was observed by Defendants' own investigator who rendered a causal association assessment that the depression was <u>probably related</u> to Neurontin, and the patient was withdrawn from the clinical trial.[69] Pls.' Ex. 5, pp. 12-13, ¶¶ 52-58.

- Defendants' own clinical trials reflected that Acute Severe Depression and Suicidal Ideation were expected adverse events associated with Neurontin.  Pls.' Ex. 67. Clinical trials demonstrated associated psychiatric adverse drug experiences observed by Defendants' own investigators.  Pls.' Ex. 68. at pp. 13-15.

- Defendants' own clinical trials  reflected that approximately twice as many Neurontin patients (compared to placebo patients) withdrew as a result of clinically-related psychobiologic events.[70]  Pls.' Ex. 5, p. 9 ¶ 39.

---

[66] For a complete, substantive opinion regarding Defendants' failure to warn of suicidality, the Court is respectfully referred to the expert report of Plaintiffs' expert, Cheryl Blume, Ph.D., Pls.' Ex. 5.

[67] Also included in the FDA review was Lyrica, Pfizer's replacement for Neurontin and which is chemically and pharmacologically related to Neurontin.  In the Lyrica trials, one completed suicide and three suicide attempts were observed.  Pls.' Ex. 5 ¶ 240.

[68] "If an adverse event that develops following the initiation of drug therapy subsequently resolves following the discontinuation of the drug, this is referred to as a positive dechallenge.  A positive rechallenge refers to the re-occurrence of the adverse event (following a positive dechallenge) subsequent to re-initiation of the drug.  Pls.' Ex. 5 at p. 12, ¶ 53.

[69] Defendants' causal association assessment ranged from Definite, Probable, Possible, or of Unknown Relationship. Pls.' Ex. 5, p. 13, n.37.  Defendants utilized Causality Assessments based on Karch, F.E. and Lasagna, L., JAMA 234, 1236-1241 (1975) as it pertained to such open-label studies of the safety and efficacy of gabapentin (Protocol 945-15), and not a Bradford-Hill assessment.  The criteria for assessment of causality (using Karch and Lasagna's approach) included Definite, Probable, Possible, Remote, and Unclear.  *Id.*  Additionally, Defendants' own investigator rendered a causal association assessment during a clinical trial pertaining to diabetic peripheral neuropathy that a suicide attempt and intentional overdose were "definitely related" to Neurontin.  Pls.' Ex. 69, p. 59.  Additionally, Health Canada, the Canadian Regulatory authority equivalent to FDA, has stated the following to Pfizer regarding dechallenge/rechallenge findings related specifically to Neurontin and post-marketing psychiatric adverse events:  "One suicide attempt was found to have positive dechallenge/rechallenge, indicating that this event was related to gabapentin."  Pls.' Ex. 31.

[70] *See* Pls.' Ex. 70 at p. 87:  Q. "[W]hat is your understanding of the term "psychobiologic function" as it's used to describe a body system?  A. I would roughly equate that to mental function, so adverse events relating to functioning

56

- Defendants' knew since the 1992 NDA for Neurontin's epilepsy indication that Neurontin reduces the release of monoamine neurotransmitters in the brain (e.g., serotonin and norepinephrine).[71] This action contributes to the pathophysiology of clinical depression and suicidality.[72] *Id.*

- Defendants knew since at least 1992 that FDA's pre-approval clinical review stated that "[l]ess common but more serious events may limit [Neurontin's] widespread usefulness . . . . [D]epression, while it may [not be] an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts." Pls.' Ex. 15 at 117.

- In 1995, Defendants' retained consultant—and now Plaintiffs' expert in this case—Michael Trimble, M.D., and he provided Defendants a paper entitled, *Psychosis with Gabapentin*. Dr. Trimble advised that "anticonvulsant drugs influence the mental state, and this can be broken down into adverse and beneficial effects . . . . The main adverse effect of anticonvulsants is the link between anticonvulsant drugs and depression." Pls.' Ex. 77 at p. 6.

- Defendants possessed post-marketing adverse event reports through 2002, prior to any potential notoriety bias that Defendants relate to the publicity of this litigation, demonstrating an association of psychiatric adverse events, including depression and suicidality, with Neurontin use. A 'safety signal' clearly existed, particularly with off-

mentally. Q. Would mood be a subset of someone's mental function? A. It could well be, yes. Q. Would behavior be a subset of mental function. A. Yes."; *see* Pls.' Ex. 71 at 0001085 (Defendants indicate depression as a side effect associated with Neurontin use as observed in Defendants' own clinical trials).

[71] *See* Pls.' Ex. 72 at 0075642 ("Neurontin treatment may shift the relative balance of neurotransmitters from excitatory to inhibitory); Pls.' Ex. 73 at Bates 0010853 ("In addition to reducing neurotransmitter release, [Neurontin] . . . reduces calcium influx into synaptasomes in vitro"); *see* Pls.' Ex. 74 at Bates 0005343 ("Inhibition of Neurotransmitter Release"); *see* Pls. Ex. 75 at 115776 (1993 Product Monograph states "Neurontin slightly reduces the release of monoamine neurotransmitters in vitro").

[72] *See* Pls.' Ex. 76 at pp. 13, 294-298, 300 (Deposition of Defendants' witness Leslie Tive, Medical Director, Team Leader for Neurontin (7/19/06)): "Q. Do you have any degrees? A. I do. Q. And what are your degrees? A. I have a Ph.D. in biopsychology with a specialization in neuropharmacology. Q. Okay. Would you agree that there are drugs sold by Pfizer that are utilized by patients to affect neurotransmitters in the brain? A. Yes. Q. And these drugs can be antidepressants. Correct? A. Yes. Q. And these drugs can be for – for reduction of pain. Correct? A. Uh-hum. Q. Yes? A. Reduction of pain, yes. Q. And these drugs can be for anticonvulsant purposes, correct? A. Yes. Q. In fact, Pfizer sells drugs for anticonvulsant purposes, right? A. Yes. Q. Pfizer sells drugs for antidepressant purposes, right? A. Yes, they do. Q. And all these drugs affect neurotransmitters? A. Yes. Q. And as a neuropharmacologist, you understand what dopamine is, right? A. Yes. Q. You understand what serotonin is, right? A. Yes, I do. Q. And you understand what norepinephrine is, right? A. Yes. . . . Q. Explain to me the part of the brain --  all right? -- in which dopamine is involved and for which an antidepressant drug would have an effect. A. The antidepressant drug that Pfizer has works on serotonin, not dopamine. Q. Are you referring to Zoloft? A. Yes, I am. Q. And when you reference serotonin, what is serotonin? A. It's another neurotransmitter. Q. Miss Tive, do you have an understanding as to whether an increased amount of serotonin or a decreased amount of serotonin in the brain can be associated with depression? A. An increase or decrease of serotonin in the brain can be associated with depression. . . . . Q. Let's talk about clinical depression. All right. What happens when there's a reduction in the flow of monoamines such as dopamine, serotonin, and norepinephrine? A. You're saying monoamines in general? Q. Correct. A. A reduction in monoamines has been associated with depression."

label uses.  Pls.' Ex. 5 , pp. 175-182, ¶¶ 263-282; pp 192-195, ¶¶ 313-323.

- Defendants possessed their own internal post-marketing data demonstrating that suicide ideation and/or intentional overdoses were consistently in the top 10 reported serious psychiatric events and in the top 25 all reported adverse events.  The FDA Spontaneous Reporting System provided safety signals of increased numbers of deaths, suicide attempts, overdoses, and psychotic disorders reported with the use of Neurontin.  Pls.' Ex. 5, p. 54 ¶ 101.

- Published peer reviewed medical literature providing evidence of mood and behavioral disturbances with Neurontin use has existed for decades.[73]

The above points of fact clearly demonstrate a genuine material issue in dispute as to whether Defendants knew (or should have known) of Neurontin's association with suicidality that would have triggered an obligation to warn consumers and healthcare providers.  To the extent that Defendants did not know—they should have known of the association via an exercise of pharmacovigilance years before the FDA's 2008 Alert regarding suicidality with antiepileptic drugs.  The liability for any such lack of knowledge by Defendants falls squarely on Defendants' shoulders for not properly developing and executing safety surveillance activities consistent with 21 C.F.R. § 314.80.  Additionally, despite illegally promoting and selling Neurontin for off-label, unapproved uses, Defendants failed to exercise safety surveillance activities in terms of reviewing and considering psychiatric adverse events reported with the very intended "off-label" uses for which Defendants knew Neurontin was being used in the marketplace, and for which Defendants' Neurontin labeling was admittedly inadequate.[74]

### C.    NEURONTIN HAS THE CAPACITY TO CONTRIBUTE TO MOOD AND BEHAVIORAL DISTURBANCES, INCLUDING SUICIDALITY.

This Court should deny Defendants' motion for summary judgment.  Plaintiffs have

---

[73] Pls.' Ex. 5, p.80, ¶ 129; p. 153, ¶ 216; pp. 172-173, ¶ 256; pp. 198-206; Pls.' Ex. 68 pp. 9-12.

[74] In June 2004, Defendant Pfizer, on behalf of Defendant Warner-Lambert Company, LLC, entered a plea of guilty to violations of Title 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355.  In this regard, Defendants admitted to "inadequately labeling Neurontin and to introducing Neurontin into interstate commerce for unapproved purposes, which by virtue of its prior violation of the Food, Drug & Cosmetic Act, constitute felony violations of the Food, Drug & Cosmetic Act. . . ."  Pls.' Ex. 78 at p. 4; Pls. Ex. 41.

raised genuine issues of material fact as to the issue of general causation (i.e., whether Neurontin has the capacity to contribute to suicidality). As set forth in detail in Plaintiffs' Memorandum in opposition to Defendants' motion to exclude the testimony of Doctors Trimble, Kruszewski and Blume, Plaintiffs' experts' general causation opinions are relevant, reliable and pass Rule 702 and *Daubert's* requirements. Although not exhaustive of the arguments and expert opinions discussed in the Memorandum and exhibits submitted therewith, incorporated by reference as if fully set forth herein is the crux of Plaintiffs' position on general causation:

- <u>Biological Plausibility</u>: Neurontin reduces the release of excitatory monoamine neurotransmitters in the brain (e.g., serotonin, dopamine, norepeniphrine) and it is well established via peer-reviewed medical literature that reductions in such neurotransmitters are associated with behavioral disturbances, including suicidality. Thus, Neurontin has the capacity to contribute to mood and behavioral disturbances, including depression and suicidality.[75]

- <u>Epidemiology</u>: On January 31, 2008, after an analysis of placebo-controlled clinical studies of eleven drugs, including Neurontin, FDA determined via epidemiology that patients receiving antiepileptic drugs, including Neurontin, had approximately twice the risk of suicidal behavior or ideation compared to patients receiving placebo; FDA considered the risk to be statistically significant. Furthermore, FDA stated that these results were generally consistent across all drugs reviewed clearly demonstrating that Neurontin was specifically implicated. Pls.' Ex. 1.

- Defendants' own <u>clinical trial</u> adverse event data, and post-marketing adverse event reports demonstrate evidence that is supportive of a determination that Neurontin contributes to suicidality. This information includes observations of dechalleng/rechallenge events of depression and suicidality supportive of causality of adverse events with Neurontin.[76]

Reviewing the facts and evidence in the light most favorable to the non-moving party, the Plaintiffs herein, this Court should recognize the above evidence on general causation raises triable issues of fact and deny Defendants' motion for summary judgment.

---

[75] Pls.' Ex. 5, Pls. Ex. 68, Pls. Ex. 79.
[76] Pls.' Ex. 5, Pls. Ex, 68, Pls. Ex. 79.

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiffs urge this Court to deny Defendants' Motion to Dismiss Plaintiffs' Claims in its entirety.  Plaintiffs hereby request oral argument on this motion.

Dated:  April 4, 2008                                    Respectfully submitted,

                                                         ***Members of Products Liability***
                                                         ***Plaintiffs' Steering Committee***

                                         By:     **/s/ Andrew G. Finkelstein**
                                                 Andrew G. Finkelstein, Esquire
                                                 Finkelstein & Partners, LLP
                                                 436 Robinson Avenue
                                                 Newburgh, NY  12550

                                         By:     **/s/ Jack W. London**
                                                 Jack W. London, Esquire
                                                 Law Offices of Jack W. London
                                                   & Associates
                                                 106 E. 6th Street, Suite 700
                                                 Austin, TX  78701

### CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on April 4, 2008.

                                                 **/s/ Andrew G. Finkelstein**
                                                 Andrew G. Finkelstein, Esquire