EXHIBIT 6

Pre-NDA Meeting
FDA Division of Anesthetic, Critical Care, and Addiction Drug Products
Pfizer Global Research and Development and Pfizer Pharmaceuticals Group

Neurontin (gabapentin) for the Management of Neuropathic Pain
5600 Fishers Lane, Conference Room M
May 14, 2001

Summary

The Division of Anesthetic, Critical Care, and Addiction Drug Products (DACCADP) indicated that the indication "management of neuropathic pain" cannot be granted at this time, and an application with this indication would be refused to file. The feasibility of this indication is planned for discussion at an advisory committee meeting later this year.

Post-herpetic neuralgia (PHN) and painful diabetic peripheral neuropathy (DPN) are considered distinct conditions and not two combinable models of neuropathic pain; separate supplemental applications would be required for each.

The Division does not believe that a Neurontin DPN submission would be filcable at this time, as efficacy has not been replicated. An additional trial would be needed. Future trials in DPN should be accompanied by nerve conduction studies.

Although the PHN application would be fileable, the Division does not think there is yet enough data for approval because they do not see that the treatment effect has been replicated at any specific dose.

The Division recognized that Pfizer was very surprised to hear the above positions. Pfizer obtained prior agreements regarding the requirements for a neuropathic pain indication on another product when this area was the responsibility of the Division of Anti-inflammatory, Analgesic, and Ophthalmologic Drug Products (DAAODP). Given these prior agreements, DACCAP is willing to have further discussion on the issues if Pfizer will provide copies of the FDA minutes of the meetings in which these agreements were made.

Future studies (PHN or DPN) should include a 12-week fixed-dose period following titration. The Division is willing to review and provide input on protocols.

Agreement was reached on the content and format of the submission. Pfizer will determine if acceptable electronic patient profiles can be created; if not, paper copies of patient profiles will be submitted.

Pre-NDA Meeting Attendees

FDA Attendees

Suresh Doddapaneni, PhD, Biopharmaceutics Team Leader

Laura Governale, PharmD, Regulatory Project Manager, Division of Anesthetic, Critical Care and Addiction Drug Products (DACCADP)

Stella Grosser, PhD, Biostatistics

Sharon Hertz, MD, Medical Reviewer, DACCADP

John Jenkins, MD, Director, Office of Drug Evaluation II

Dale Koble, PhD, Chemistry Team Leader

Cynthia G. McCormick, MD; Director, DACCADP

Bob Rappaport, MD; Deputy Director, DACCADP

Pfizer Attendees

Howard Bockbrader, PhD - Section Director, Clinical Pharmacokinetics, Pfizer Global Research and Development (PGRD)

Elizabeth Garofalo, MD - Executive Director, CNS Clinical Development, PGRD

Andrea Garrity - Director, Regulatory Affairs, Pfizer Pharmaceuticals Group

Stephen Gracon, DVM - Sr. Director, Worldwide Regulatory Affairs, PGRD

Edwina Koto, RN, MS - Manager, Clinical Communications, PGRD

Lloyd Knapp, PharmD - Sr. Director, CNS Clinical Development, PGRD

Atul Pande, MD - Vice President, Global Project Management, PGRD

Robert M. Poole, MD - Executive Director, CNS Clinical Development, PGRD

Byron Scott - Executive Director, Worldwide Regulatory Affairs, PGRD

Drusilla Scott, PhD - Director, Worldwide Regulatory Affairs, PGRD

Leslie Tive, PhD - Medical Director, Team Leader, Pfizer Pharmaceuticals Group

Marie Ulrey - Team Leader, Development Operations, PGRD

Robin Walker, PhD - Associate Research Fellow, Drug Safety Evaluation, PGRD

David Wesche, MD, PhD - Director, Clinical Pharmacology, PGRD

Chongqing Yan, PhD - Statistical Project Manager, CNS Biometrics, PGRD

Minutes
---

(The pre-NDA information package submitted to IND 28,454 on April 12, 2001 [SN 421] was used as the basis for discussion.)

The Division does not consider "management of neuropathic pain" a viable indication at this time. This is the message they have given to sponsors since they became responsible for this area (approximately 10 months ago).

They are planning an advisory committee meeting later this year on the topic of neuropathic pain. This meeting will discuss the various conditions associated with neuropathic pain, and which, if any, of these conditions are sufficiently similar so that studies in the various conditions could be considered together to support a general "management of neuropathic pain" indication. Adequate data to show a common mechanism for the neuropathic pain in different conditions would be required for a broad claim. Clinical data would be the most compelling; preclinical data are supportive but would probably not be sufficient. Hypotheses alone would not be supportive.

Based on the above positions, Dr. McCormick indicated that an application for "management of neuropathic pain" would be refused to file at this time.

The Division considers PHN and DPN to be different conditions; PHN is a post-inflammatory process, while DPN is part of an ongoing process. Consequently, separate supplemental applications would be required for the management of neuropathic pain associated with each condition.

Dr. McCormick recognized that Pfizer was completely taken aback by the Division's position on the proposed indication. Dr. Poole described prior agreements that had been reached in meetings with the Division of Anti-inflammatory, Analgesic, and Ophthalmologic Drug Products (DAAODP) when that Division was responsible for neuropathic pain. These meetings were held to discuss Pfizer's other product, but the agreements were about specific requirements for a neuropathic pain indication. DAAODP had indicated that replication in one model of neuropathic pain (PHN and DPN were the models discussed) with corroborative evidence in another model would be sufficient for a neuropathic pain indication. DACCADP would like to see a copy of the FDA minutes of these meetings; Pfizer will provide available documents. Dr. McCormick agreed to Mr. Scott's suggestion that a teleconference be held to discuss the prior agreements once DACCADP has had the opportunity to review the minutes of the meetings in DAAODP.

Dr. McCormick also indicated that she expected that the first few NDAs submitted for some type of neuropathic pain indication would go to an advisory committee.

For a DPN claim, the Division will require that evidence of efficacy be replicated in a second DPN study. Dr. Hertz indicated that the study must include electrophysiologic

measurements (nerve conduction velocity and amplitude) to ensure that efficacy is not a result of disease progression or neurotoxicity of the drug. Based on their clinical experience and discussion with consultants, Drs. McCormick, Rappaport, and Hertz do not agree with Drs. Garofalo and Poole that a neurological exam serves as an adequate surrogate for nerve function testing in the clinical trial setting (because of the variability and non-quantitative nature of the exam).

While there are two positive studies in PHN, and the case for approvability is stronger than for DPN, efficacy does not appear to have been replicated at any specific dose and the Division believes an additional study is needed. Based on their review of the background package, they do not think there are quite enough data for approval. Dr. Knapp of Pfizer indicated that the weekly mean pain analysis provided some replication of the 1800 and 2400 mg doses during titration (prospective secondary endpoint). When informed that there were 300-400 patients with PHN in the sNDA database, FDA indicated that this was probably an adequate number for safety. Dr. McCormick noted several times that, while the decision to submit was the sponsor's, Pfizer could lose a year in the review process if the PHN sNDA is found non-approvable.

The duration of the studies is a concern to the Division. Any additional studies should have a 12-week fixed-dose period.

Dr. Hertz requested patient profiles along with the proposed domain profiles, as it is difficult to review all information on an individual patient with only the domain profiles. Pfizer agreed to look further into whether acceptable electronic patient profiles from the pivotal studies can be created; the Pfizer Information Technology (IT) group can discuss this separately with FDA's IT group. Paper patient profiles can be provided as a last measure.

For the non-pivotal studies (combination studies in non-neuropathic pain, clinical pharmacology studies, and ongoing neuropathic pain studies) Pfizer had proposed including case report forms (CRFs) and narratives in the NDA for only those patients who died. Dr. Hertz asked that CRFs and narratives for patients with serious adverse events and patients who withdrew due to an adverse event in these studies also be included. (The Division understood that while the sponsor receives information on deaths and serious adverse events in an expedited manner, CRFs for patients who withdraw due to a non-serious adverse event are not always available until the end of a study.) Pfizer will provide the additional requested CRFs and narratives that are currently available with the initial submission; those that become available later can be included in the safety updates. Ms. Koto confirmed for Dr. Hertz that there would not be a large number of additional patients in the safety updates. The submission should include a list that clearly identifies patients (study/center/patient number) who died, experienced a serious adverse event, or withdrew due to an adverse event so that the reviewer can easily identify the CRF of interest. These patients will also be identified in the table of contents for the electronic CRFs.

The plans for the pediatric assessment and partial waiver request seem reasonable for a broad neuropathic pain claim. For specific PHN or DPN indications, the lower age limit could be raised, or a full waiver might be acceptable. The Division will accept a waiver request fewer than 60 days prior to the sNDA submission, and it can even be included in the application if necessary.

All other aspects of the administrative review processes and content/format for the sNDA were agreeable as proposed by the sponsor. These included the following:

One-half of the full NDA user fee applies to each application, even if a new NDA number is assigned

Copies of the submission/amendments do not need to be submitted in parallel to DNDP; DACCADP will contact DNDP as needed throughout the review, and will work with them to determine how labeling supplements should be managed near the end of the review period

Copies of summaries and reports from the approved NDAs will not be included unless specifically needed for the neuropathic pain submission

The updated environmental assessment can be cross-referenced to the existing approved NDAs in DNDP; information on the study formulations (marketed capsule formulation enclosed in gray/gray shell for study blinding) will be provided

The proposed plan for financial disclosure is acceptable

The pediatric assessment can be placed where the sponsor thinks most appropriate in the submission, as long as its location is clear (sponsor plans to include it in Item 8)

Copies of the Item 8 sections on marketing experience and foreign regulatory actions, obligations transferred to contract research organizations, and audit/review of original subject records will not be included in the paper review copy of Item 10

It is acceptable to provide domain datasets as SAS transport files

Note: Until an IND or NDA is submitted to DACCADP, correspondence should be submitted to IND 28,454 in DNDP with desk copies provided to Dr. Governale in DACCADP.