EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH C. COLACICCO,<br>Individually and as Executor of the<br>Estate of Lois Ann Colacicco, deceased<br><br>Plaintiff,<br><br>v.<br><br>APOTEX INC.; APOTEX CORP.<br>as Subsidiary of Apotex Inc.; and<br>SMITHKLINE BEECHAM doing<br>Business as GlaxoSmithKline<br><br>Defendants. | Civil Action No. 05-5500 |

DECLARATION OF ARVIN P. SHROFF, PH.D.

I, ARVIN P. SHROFF, Ph.D., declare as follows:

## QUALIFICATIONS AND BACKGROUND

1. I spent 26 years with the Food and Drug Administration (FDA) employed in various capacities before my retirement on June 30, 2000. I retired as a Deputy Director in the Office of Enforcement. A true and correct copy of my C.V. is attached (Appendix I).

2. I began my career with the FDA in 1974 at the Center for Drug Evaluation and Research ("CDER") in the Office of New Drug Evaluation as a Review Chemist. My main responsibilities included reviewing Investigational New Drug Applications (INDs), New Drug Applications (NDAs), Drug Master Files (DMFs), as well as supplements and amendments associated with these applications. I also reviewed Abbreviated New Drug Applications (ANDAs) and Abbreviated Antibiotic Drug Applications (AADAs) on occasion. During my tenure in this position, I reviewed and evaluated numerous different types of drug products with different dosage forms. In addition to these responsibilities, I was a member of many FDA technical committees that prepared guidance documents for the regulated industry in various drug-related subject areas such as Stability, Packaging, Chemistry and Manufacturing Controls. I was

1

also one of FDA's liaisons with the United States Pharmacopoeia, a scientific standard-setting organization, recognized in the Food, Drug and Cosmetic Act (the "Act").

3. In 1976, I was promoted to Chief, Product Surveillance Branch, Division of Drug Product Quality, Office of Compliance, CDER. My primary responsibilities were to help determine the quality of imported and domestic drugs distributed in the United States. Samples of drug products were tested according to my directions, for conformance with quality specifications to ensure that the nation's drug supply was safe and effective and to provide rapid identification of emerging problems. Further, my responsibilities included identifying, evaluating and analyzing inspectional findings for trends in current Good Manufacturing Practice (CGMP) deficiencies. In that role, I was often exposed to various current Good Manufacturing Practice ("GMP") issues, regulatory problems and recall situations. In addition, I provided guidance to FDA investigators, compliance officers and recall coordinators as well as other coworkers. I served in that position from 1976-1981.

4. In 1981, I was promoted to Director, Division of Field Science, Office of Regulatory Affairs ("ORA"). ORA has district offices and regional offices throughout the country and is the regulatory and enforcement arm of the FDA. Organizationally it is located in the Office of the FDA Commissioner. In that role, I directed and managed the scientific efforts and methods development research for ORA laboratories (there were 19 laboratories and 7 Research Centers in ORA at that time) for all program areas (foods, drugs, devices, biologics and veterinary medicine).

5. In 1985, I became the Deputy Director, Office of Regional Operations, ORA. I supervised and coordinated FDA's regulatory activities, such as inspections, imports, surveillance and emergency operations, as well as recall activities dealing with district and regional offices. These activities involved all FDA program areas, including drugs and biologics. In addition, I dealt with the Office of Public Affairs when press releases and other public actions required ORA input.

6. In 1992, I became Deputy Director, Office of Enforcement, ORA. In that role I evaluated and coordinated proposed legal actions to ascertain compliance with regulatory policy and enforcement objectives, including GMP issues, recalls and other enforcement and compliance issues. The recall unit was transferred from Office of Regional Operations to the Office of Enforcement, where I oversaw hundreds of recalls each year in all program areas. I have been involved in the development of agency enforcement policies, compliance and regulatory activities, coordinating specific legal actions and managing agency-wide programs. In addition, I acted as liaison with other federal agencies, such as the Federal Trade Commission ("FTC"), the Securities and Exchange Commission ("SEC"), the Department of Defense ("DOD"), and the Veterans Administration ("VA") on compliance matters, procurement issues and other administrative and regulatory matters. I have been involved with all FDA program areas and have provided guidance and advice to Center personnel, FDA field employees, and various Offices of the Commissioner. I have worked with the Office of Chief Counsel,

Office of Public Affairs and various State agencies, as well as foreign governments. I served as Deputy Director until my retirement in 2000.

7. In July 2000, I founded ARVIN SHROFF ASSOCIATES, LLC and have been its president ever since. We specialize in FDA regulatory, enforcement and compliance issues including submissions of various types of applications and documents to FDA. The firm provides advice to pharmaceutical manufacturers, biotechnology companies, medical device firms, biological industry, and food firms (including dietary supplement companies). ARVIN SHROFF ASSOCIATES, LLC also provides consultation to various law groups in connection with FDA-related issues.

8. Prior to working at the FDA, I was employed as a Group Leader and Senior Research Chemist at Ortho Pharmaceutical Corporation, a subsidiary of Johnson & Johnson, where I was involved in both synthetic organic chemistry and analytical chemistry.

9. I received my Ph.D. in Pharmaceutical Chemistry from the School of Pharmacy, University of Maryland in 1962.

## PRE-MARKET EVALUATION OF DRUG LABELING BY FDA

10. New drugs are approved on the basis of relatively short treatment studies in a limited number of patients. The agency generally only weighs the risks and benefits of a drug in the disease and patient group for which it was being considered for approval. For this reason, a drug's rare adverse effects may not turn up until well after it has reached the market and large numbers of people have been exposed to it including children. For example, the drug Tysabri[1] was approved in November 2004 for the treatment of Multiple Sclerosis and suspended in early 2005 by the manufacturer when two patients were diagnosed with serious brain disease called Progressive Multifocal Leukoencephalopathy (PML), a rare and frequently fatal demyelinating disease of the central nervous system that was not observed during clinical trials and thus not included in the labeling.

11. FDA now normally negotiates with the company for labeling when the drug is first approved. In fact drug companies write the package inserts of all drugs, carefully including the information they choose and omitting information they want to avoid.[2] The approved labeling only represents FDA's current thinking on the labeling contents at the time of drug approval based on limited clinical trial experience. FDA approves drugs based on small clinical trials in which the participants are carefully screened. At the time of approval, the drug label contains only the information that could be definitively established by the small trials. These trials cannot produce reliable

---

[1] FDA Issues Public Health Advisory on Tysabri, a New Drug for MS. [http://www.fda.gov/bbs/topics/news/2005/NEW01158.html]
[2] Cohen, JS. Over Dose: The Case Against The Drug Companies. Prescription Drugs, Side Effects, and Your Health. Tarcher/Putnam, New York: October 2001.

3

evidence about low-frequency side effects, nor do they always provide adequate information about the benefits and risks of using the drug in a much broader population.[3]

## FDA'S POST-MARKETING LABELING REGULATIONS

12. As a result, the FDA places a great deal of emphasis on postmarketing study commitments to gather additional information about a product's safety, efficacy, or optimal use. Postmarketing study commitments, also called Phase 4 commitments, are studies required of or agreed to by pharmaceutical companies that are conducted after the FDA has approved a product for marketing. FDA has acknowledged that "sometimes there are risks that only come to light after a product gets on the market and is used in larger numbers of patients who differ from those studied before approval".[4]

13. The negotiating process with the company continues every time FDA seeks a labeling change due to safety related data. The companies appear to have an upper hand as to what goes on the labeling. At a recent Congressional hearing on Vioxx[5], Sandra Kweder of FDA used the recent Vioxx withdrawal as an example of how FDA struggles to get important information on labels after a drug is approved. She said that after a clinical trial in 2000 demonstrated a cardiovascular risk with Vioxx, negotiations with Merck continued for about a year before the labeling was revised, and the warning was not as prominent as FDA had envisioned. Paxil's labeling seems to indicate that GlaxoSmithKline was successful in keeping the bad news (suicidality) from the "Black Box" warning section of the labeling that would draw the most attention of a prescribing physician.

14. Based on my understanding of FDA procedures, practices, and policies as well as FDA law and regulations, I am not aware of any restrictions where a company would be prevented from alerting the consumer and the prescribing physician about a serious and life threatening adverse reaction such as suicidality associated with Paxil. FDA is a public health agency whose mission is to protect consumer's health and safety. For example, in promulgating the regulation on drug labeling in 1979, the agency said: "drug labeling does not always contain the most current information and opinion available to physicians about a drug because advances in medical knowledge inevitably precede formal submission of proposed new labeling by the manufacturer and approval by FDA," that "[c]ommunication of significant medical information should be encouraged, not restricted," and that "the addition to labeling and advertising of additional warnings is not prohibited by [FDA's] regulations"[6]. The notice cited with approval a state court case holding that a company may have a common law duty to

---

[3] FDA, Managing the Risks from Medical Product Use, at pp. 7-8 (1999), accessed online at http://www.fda.gov/oc/tfrm/riskmanagement.pdf.
[4] MedWatch: Managing Risk At The FDA [http://www.fda.gov/fdac/special/testtubetopatient/medwatch.html]
[5] Senate Committee on Health, Education, Labor, and Pensions, Testimony of Sandra Kweder, FDA, FDA's Drug Approval Process: Up to the Challenge?, 109th Congress (March 1, 2005).
[6] FDA, *Specflc Requirements on Content and Format of Labeling for Human Prescription Drugs*, 44 Fed. Reg. 37,434, 37,435 et seq. (June 26, 1979).

4

revise its warnings earlier than obtaining FDA approval.

15. FDA labeling regulations at, 21 CFR 201.57 (e) clearly provides under "Warning" that "The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a casual relationship need not have been proved." The regulations do not prevent a company such as GlaxoSmithKline from alerting consumers and prescribing physicians about the proposed revision in the product labeling.

16. Further, FDA regulations at 21 CFR 314.70 (c)(6)(iii)(A) permits companies such as GlaxoSmithKline to alert consumers and the prescribing physicians of a labeling change it proposed to the FDA. This regulation allows for "Change being affected" in order for companies like GlaxoSmithKline "To add or strengthen a contraindication, warning, precaution, or adverse reaction." As usual FDA has the authority to accept, reject or modify the proposed changes. However, based on my experience at the FDA, I am not aware of any situation where FDA has rejected a proposed warning that would alert consumers and the medical community to a serious and/or life threatening adverse reaction to a drug.

17. In addition, under regulation 21 CFR 99 a manufacturer may disseminate written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling for an approved drug. In my opinion GlaxoSmithKline could have distributed scientific and medical journal articles to the prescribing physicians to alert them to the fact that Paxil might precipitate suicidality in unsuspecting patients.

18. It is my opinion that FDA law or regulations did not bar GlaxoSmithKline from exercising its public health responsibilities. GlaxoSmithKline had the opportunity to be proactive and warn the consumers and the medical profession based on its knowledge of hundreds of adverse drug reaction reports including suicidality and its knowledge and analysis of hundreds of scientific and medical journal articles dealing with suicidality. Unfortunately GlaxoSmithKline failed to warn.

19. Other pharmaceutical companies have voluntarily provided warnings to consumers and the medical community before the warning was actually requested by the FDA. For example on August 22, 2003, WYETH issued a warning about hostility and suicidality in children and adolescents treated with its drug Effexor, an antidepressant drug similar to Paxil. In what is known as a "Dear Doctor" letter, WYETH told health professionals that clinical studies of the long-acting version, Effexor XR, found a higher incidence in children of "hostility and suicide-related adverse events, such as suicidal ideation and self-harm." No children in the tests committed suicide. "You should be alert to signs of suicidal ideation in children and adolescent patients prescribed Effexor or Effexor XR (and) reassess the benefit-risk balance," the WYETH letter stated. WYETH issued this important information a year before the FDA required it. Wyeth spokesman Douglas Petkus said[7] the company decided to notify healthcare professionals as a

---

[7] http://www.icspp.org/index.php?option=com_content&task=view&id=52&Itemid=69

5

precaution. "Companies typically don't release data that is sent to the FDA, but in this case we felt it was important for physicians to be aware of the studies because we know it is being prescribed to children," Petkus said. He also noted that Wyeth is still conducting clinical trials on adolescents.

20. In my opinion FDA regulations explicitly permits a company to unilaterally strengthen its warning label at any time without regulatory preapproval[8]. 21 C.F.R. § 314.70(c)(6)(iii)(A).[9] Further it is my opinion that this particular regulation was promulgated precisely to allow drug-makers to quickly strengthen label warnings when evidence of new side effects are discovered.[10] Thus, as the FDA has noted, the regulation "permits the addition to the drug's labeling or advertising of information about a hazard without advance approval" by the FDA.[11][12]

21. The regulations do grant FDA the power to later disapprove a label strengthened pursuant to § 314.70. 21 C.F.R. § 314.70(c)(7). But the regulation "does not require that FDA take any action when a manufacturer" makes a change pursuant to § 314(c); if the FDA does nothing, the change remains in effect.[13] Further, even if FDA exercised, the power to disapprove, it does not retroactively make the manufacturer's strengthened label a violation of any law. Rather, if the FDA exercises its power to disapprove, the manufacturer simply stops distributing the new label. 21 C.F.R. § 314.70(c)(7).

## FDA HAS VERY LIMITED EXPRESS PREEMPTION AUTHORITY UNDER THE ACT

22. Based on my experience at the FDA and my understanding of the Food, Drug, and Cosmetic Act (FDCA), it is my belief that the Congress has never acted to preempt state product liability cases involving drug labeling or advertising. To the contrary, when Congress passed the landmark 1962 Drug Amendments to the FDCA, it said, in section 202, that "[n]othing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments unless there is a direct and positive conflict between such amendments and such provision of State law." Thus, nothing in the FDCA, in my opinion, preempts requirements that are "different or in addition to" those required by federal law, unless they are in "direct and positive conflict" with federal law. Further it is my opinion that express preemption exists only when Congress states (and not FDA regulation) a clear intent to preempt State law. Congress has not done so in FDCA with regard to drug labeling or advertising.

---

[8] See Witczak v. Pfizer, Inc. 377 F.Supp.2d 726 (D. Minn. 2005)
[9] The regulation was originally codified at 21 C.F.R. §130.9(d); it then became 21 C.F.R. § 314.8(d), before finally becoming 21 C.F.R. § 314.70(c). See 56 Fed. Reg. 59288, 59290 (Nov. 25, 1991).
[10] See 30 Fed. Reg. 993 (Jan. 30, 1965)
[11][12] 44 Fed. Reg. 37447 (June 26,1979).
  Judge Carol Higbee told the jury in the Vioxx case that FDA regulations would have permitted the company to add a warning label at any point. Lisa Brennan, New Jersey Law Journal 03-16-2006 [http://www.law.com/jsp/article.jsp?id=1142429894927]

[13] See 56 Fed. Reg. 59290 (Nov. 25, 1991).

6

23. Executive Order 13132[14] dated August 4, 1999 states in section 4(a) that agencies must "construe …..a Federal <u>statute</u> to preempt State law only where the statute contains an <u>express preemption provision</u> or there is some other clear evidence that the congress intended preemption of State law or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal <u>statute</u>" (emphasis added). In my opinion the FDCA does not expressly permit FDA to preempt state law in the area of prescription drugs except in a very narrow area (see paragraph 22 above).

24. The Notice of Proposed Rulemaking (NPRM) for the "Requirements on Content and Format of Labeling for Human Prescription Drugs and Biologics; Requirements for Prescription Drug Product Labels" (Labeling Rule) was first issued on December 22, 2000 (precursor to the Jan. 24, 2006 Final Regulation). In the original NPRM, FDA conducted an analysis of the Labeling Rule and determined that the Labeling Rule did not have federalism implications as defined by Executive Order 13132 and stated: "FDA is publishing this proposed rule to revise its regulations governing the format and content of labeling for human prescription drug products…Because enforcement of these labeling provisions is a Federal responsibility, there should be little, if any, impact from this rule, if finalized, on the States, or on the distribution of power and responsibilities among the various levels of Government. **In addition, this proposed rule does not preempt State law.** Accordingly, FDA has determined that this proposed rule does not contain policies that have federalism implications or that preempt State law." [15] (emphasis added)

25. Further, FDA's Chief Counsel, Margaret Porter publicly state in 1996 that FDA had a "longstanding presumption against preemption" and that "FDA's view is that FDA product approval and state tort liability usually operate independently, each providing a significant, yet distinct, layer of consumer protection."[16]

26. Finally, in my opinion, FDA's recent[17] preemption claim is designed to reverses a long-standing FDA policy of permitting complementary state activities intended to protect consumers from unsafe drugs. Further, I believe, the principle purpose of FDA's announcement (through regulation) at this time appears to be to preempt State court product liability actions after two recent court rulings,[18][19] in which FDA had provided amicus curiae briefs (on behalf of the defendants), rejected FDA's preemption claims. FDA added the preemption language to the December 22, 2000 NPRM and proceeded to finalize the regulations without providing any opportunity for further public comments. I believe FDA is attempting to expressly preempt such claims through regulations that it was not able to achieve through judicial means and Congressional intent.

---

[14] Executive Order 13132 of 4 August 1999; Federalism, 64 Fed. Reg. 43,255, 43257 (Aug. 10, 1999)
[15] NPRM, 65 Fed. Reg. No. 247, p. 81103 (Dec. 22, 2000)
[16] Margaret Jane Porter, The Lohr Decision: FDA Perspective and Position, 52 FOOD & DRUG L.J. 7, (1997).
[17] 71 Fed.Reg. 3934 (Jan. 24, 2006)
[18] Motus v Pfizer 358 F. 3d 659 (9th Cir. 2004)
[19] Witczak v Pfizer 04-cv-2819 (JMR/FLN) 377 F.Supp.2d 726 (D. Minn. 2005)

7

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Executed this 17th day of May, 2006 in Clarksburg, Maryland.

*[signature]*
Arvin P. Shroff, Ph.D.

# APPENDIX I

## CURRICULUM VITAE

ARVIN P. SHROFF, Ph.D.
President
Arvin Shroff Associates, LLC
23417 Clarksridge Road
Clarksburg, MD 20871
Tele: (301) 916-0733
Fax: (301) 916-0734
Email:
arvinshroff@comcast.net

## Area of Expertise

Arvin Shroff Associates specializes in FDA [Food and Drug Administration] regulatory, enforcement and compliance issues. Dr.Shroff serves as an advisor to pharmaceutical manufacturers, biotechnology companies, medical device firms, food firms, biological industry and law firms in the following areas:

- FDA Procedures, Practices and Regulations
- Review of IND, NDA, ANDA, DMF, 510(k), PMA submissions, Food Additive Petitions as well as annual, semiannual and other reports submitted to FDA.
- Review Standard Operating Procedures, failure investigation reports and third-party audit reports.
- Assist in formulating a response to FDA pertaining to FD-483, Warning Letter, Application Integrity Policy Letter, Recalls and other similar communications from the agency.
- Assist in drafting Corrective Action Plan, monitoring progress and accomplishment for upper management.
- Provide guidance and advice during acquisition of new companies or products, outsourcing manufacturing or other activities.
- Provide proactive enforcement guidance as well as post-enforcement recommendations (seizure, injunction and consent decree negotiations)
- Training and
- Provide expert witness testimony, Deposition reviews and Consultation ( including Trial Judges and Court consultations) during litigation

Dr.Shroff has 26 years of FDA experience and 11 years of private industry experience.

1

## PROFESSIONAL EXPERIENCE

1974 to 2000 Food and Drug Administration (FDA)

1992 to 2000 Deputy Director, Office of Enforcement
Helped direct and coordinate the enforcement activities of the agency, including developing enforcement policies, compliances and regulatory activities, coordinating specific legal actions and managing program issues. Worked closely with the Office of Chief Counsel, FDA center Compliance Offices, and District Offices including the Compliance Branches.

1985 to 1992 Deputy Director, Office of Regional Operations
Helped direct the field inspectional and compliance activities including import activities and foreign inspection efforts. Worked with all FDA centers in the development of compliance programs, implementation policies and research efforts. Was highly involved during the Tylenol tragedy, Cyanide in Chilean grapes episode and the generic drug scandal investigations.

1981 to 1985 Director, Division of Field Science
Directed and managed the field's regulatory science efforts and methods development research. Worked with all FDA centers in assessing the science needs in various program areas and in seeking uniformity across all FDA field laboratories in their scientific approach to regulatory problems.

1976 to 1981 Chief, Product Surveillance Branch, Drug Product Quality Division, Center for Drug Evaluation and Research (CDER)
Oversaw product surveillance activities for CDER. Dealt with various offices within CDER, district offices and organizations such as USP and others.

1974 to 1976 Review Chemist in CDER's Office of New Drug Evaluation
Performed reviews of IND's, NDA's, amendments and supplements. Was involved in various committees that developed guidelines for industry submissions.

1963 to 1974 Ortho Pharmaceutical Corporation (subsid. of Johnson & Johnson)
Group Leader and Senior Research Chemist
Developed ORTHO CYCLENE, a female contraceptive product which currently has a sale of over $400 million. In 1972 was presented with Philip B. Hoffman award, the highest scientific award at Ortho.

1961 to 1963 University College, University of Maryland
Instructor in Chemistry

## EDUCATION
Ph.D., Pharmaceutical Chemistry, University of Maryland, 1962
MS, Pharmaceutical Chemistry, Duquesne University, 1958
BS, Chemistry, University of Baroda, India. 1954
Post-doctoral Fellow, University of Maryland, Baltimore, 1962-63

## PUBLICATIONS
Authored a significant number of scientific and technical papers.

## PATENTS
Authored more than 30 US and foreign patents.

## PROFESSIONAL AFFILIATIONS & AWARDS
On the Board of Directors, Regulatory Affairs Professional Society (RAPS)(retired in December, 2002)
On the Editorial Advisory Board of Pharmaceutical Technology Journal (retired in September, 2000)
On the Editorial Advisory Board of the FDA Enforcement Manual, a commercial publication
Philip B. Hoffman Award
FDA Awards:
Commissioner's Special Citation
Award of Merit
Commendable Service Award
Group Awards for special accomplishments

3