EXHIBIT 33

McCormick, Cynthia (FDA Witness) 2/14/2008 9:04:00 AM

```
                                                              1
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF MASSACHUSETTS
 3    ------------------------------x
 4    In re: NEURONTIN MARKETING, SALES
 5    PRACTICES AND PRODUCTS LIABILITY
 6    LITIGATION
 7    ------------------------------x
 8    THIS DOCUMENT RELATES TO:      MDL Docket No. 1629
 9    PRODUCTS LIABILITY LITIGATION     NO. 04-10981
10    ------------------------------x
11    SUPREME COURT OF THE STATE OF NEW YORK
12    COUNTY OF NEW YORK
13    ------------------------------x
14    IN RE: NEW YORK NEURONTIN
15    PRODUCTS LIABILITY LITIGATION
16    ------------------------------x
17    THIS DOCUMENT APPLIES TO:
18    ALL CASES
19    ------------------------------x
20         The Videotaped deposition of CYNTHIA MCCORMICK,
21    M.D., was held on Thursday, February 14, 2008, commencing at
22    9:04 a.m., at the law offices of Shook, Hardy & Bacon, 600
23    Fourteenth Street, Northwest, Washington, D.C., before Karen
24    Geddes, CSR, and notary public.
25    REPORTED BY: Karen Geddes, CSR
```

**57**

1  A  I'm estimating around 15, but I'm, you
2  know -- I'm estimating about 15.
3  Q  This first review that y'all did was to
4  approve this drug for epilepsy victims, right?
5  A  Well, patients who had partial complex
6  seizures --
7  Q  All right.  Which is?
8  A  Epilepsy.
9  Q  Okay.  And that was a limited review right
10 out of the box here in the early '90s, true?
11 A  What do you mean by "limited"?
12 Q  You were reviewing it to be used for that
13 population, that group?
14 A  That's correct.
15 Q  That's what we call on-label usage, isn't
16 it?
17 A  On-label -- what is that referring to?
18 On-label use refers to use of a drug that's
19 described in the label.
20 Q  Right.  And the label, when this drug was
21 approved, stated that its usage was an antiseizure
22 medicine or antiepileptic drug, true?
23 A  Let's look at the label so we can be
24 precise about that.  Do you have a copy of it?
25 Q  Oh, I'm sure it's in your file.  Why don't

**58**

1  you grab it.
2     You don't recall whether or not the
3  approval was for this drug as an antiepileptic drug?
4  A  That's not what you said.
5  Q  Okay.  Well --
6  A  It was a very specific indication.
7  Q  The indication was adjunctive treatment
8  for refractory epileptics, true?
9  A  I think it actually may have said
10 refract -- patients with partial complex seizures.
11 Q  All right.  I'll go with that.  My point
12 is --
13 A  To paint it with a broadbrush, we're
14 talking about patients with epilepsy --
15 Q  That's fair.
16 A  -- in some population --
17 Q  And that can save us some time.
18 A  -- but yeah.
19 Q  This drug was examined, you reviewed this
20 drug -- well, let me take a step back and go at it
21 this way.  Drugs, hopefully, have benefits, true?
22 A  Or they are not approved.
23 Q  Right.
24 A  There are some drugs that aren't approved.
25 Q  That's why I say drugs, hopefully, have a

**59**

1  benefit, right?
2  A  If they have been approved.
3  Q  By the same token, drugs also can carry
4  certain risks, true?
5  A  Absolutely.
6  Q  So one of the key measures for the FDA
7  when they are trying to decide whether to approve a
8  drug is to balance the benefits that might be
9  achieved with the risks that might be found; is that
10 fair to say?
11 A  Yes.
12 Q  That's called "risk-benefit analysis,"
13 isn't it?
14 A  Uh-huh.
15 Q  With Neurontin, the FDA first examined
16 whether or not there was a benefit to a certain part
17 of the epilepsy population that might be derived
18 from this drug; is that fair to say?
19 A  Yes.
20 Q  And compared that potential benefit with
21 the potential risks that might come from using the
22 drug, right?
23 A  In that population, yes.
24 Q  All right.  You added a very important
25 phrase: "In that population," true?

**60**

1  A  True.
2  Q  When you did your initial medical review
3  for the FDA, you were never studying this drug to
4  see if it should be approved for back pain, were
5  you?
6  A  I don't believe at the time there were
7  patients in that database for back pain.  The
8  initial NDA did contain exposures in -- from studies
9  that were conducted under the IND which were in
10 other indications besides epilepsy and we looked at
11 the entire database.  So we looked at both epilepsy
12 exposures and non-epilepsy exposures.
13 Q  And then having looked at that database,
14 approved it for a certain group of epilepsy
15 exposures, true?
16 A  Because the application was for approval
17 in that population.
18 Q  And the risk-benefit ratio or analysis was
19 done for that population, wasn't it?
20 A  The data to probe the effectiveness of the
21 drug were only provided for epilepsy, so the only
22 analysis that could be done was in the population
23 for which the data were provided.
24 Q  So by definition, you could only do
25 risk-benefit analysis at that point in time for the

McCormick, Cynthia (FDA Witness)  2/14/2008  9:04:00 AM

```
                                                              61
 1    portion of the epilepsy population that this drug
 2    was being ultimately labeled for?
 3      A    That is correct.
 4      Q    So you weren't doing risk-benefit analysis
 5    back then for back pain, were you?
 6      A    No, we were not.
 7      Q    The FDA analysis ultimately expanded
 8    beyond this portion of the epilepsy population for
 9    this drug, true?
10      A    When the data were submitted.
11      Q    So ultimately, the drug got approval also
12    for post-herpetic neuropathy?
13      A    Neuralgia.
14      Q    -- neuralgia; basically, shingles pain --
15           MR. SAYLER:  Objection.
16      Q    -- right?
17           THE WITNESS:  Well, not exactly, but
18    you're getting the right idea.
19    BY MR. LANIER:
20      Q    "Post" is --
21      A    Post --
22      Q    -- after?
23      A    Yes.
24      Q    "Herpetic" is the reference to herpes,
25    which is shingles?
```

```
                                                              62
 1      A    Uh-huh.  This is actually a syndrome that
 2    follows shingles.
 3      Q    Yeah.
 4      A    But yeah, you've got the -- you've got the
 5    right idea.
 6      Q    So the FDA --
 7      A    Chronic neuropathic pain following
 8    shingles.
 9      Q    All right.  Now, the advisory committee
10    that met that we were discussing on this drug back
11    in '92 --
12      A    Yes.
13      Q    -- met only to consider the risk-benefit
14    for this portion of the epilepsy population, right?
15      A    That's correct.
16      Q    The approval that was ultimately given,
17    the initial approval, was only for this subgroup
18    within the epilepsy population, right?
19      A    In the adults with epilepsy, yes.  And in
20    fact, specifically there is the indication -- it is
21    indicated as adjunctive therapy in the treatment of
22    partial seizures with and without secondary
23    generalization in adults with epilepsy.
24      Q    Were you in on the label negotiations with
25    the drug company?
```

82

1  something that probably -- I understand why, because
2  you have a law case -- a lawsuit to win, but I think
3  that you really are taking it out of context.
4       MR. LANIER: Objection, nonresponsive.
5  BY MR. LANIER:
6    Q    You haven't met or seen the video of the
7  Widow Smith, have you --
8    A    I don't know who that is.
9    Q    -- or her three daughters?
10   A    No. I don't know who that is.
11   Q    You don't know the story behind her
12 husband's suicide?
13   A    No.
14   Q    Okay. They are my clients and I do take
15 that very seriously.
16   A    I'm sure you do.
17   Q    Before you gave your affidavit and started
18 offering your opinions in this case, you moved from
19 the FDA and started being paid $500 an hour by the
20 drug company, right?
21   A    I'm sorry. I -- would you please --
22   Q    Before you started writing affidavits and
23 testifying in this case, one of the changes that
24 happened is lawyers stepped in and started paying
25 you $500 an hour on behalf of the drug company,

83

1  right?
2    A    This is the only affidavit that I'm aware
3  of that I have ever written.
4    Q    But you have drafts of it? You didn't
5  write it first draft, did you?
6    A    No.
7    Q    Did you even write the first draft, or did
8  you consult with lawyers and have them prepare it?
9    A    We talked at length and they wrote -- they
10 took notes and they prepared the first draft.
11   Q    So you didn't even prepare the first draft
12 of the affidavit as far as dictating it or sitting
13 down and typing it, you just had a conversation and
14 the lawyers prepared it; is that fair to say?
15   A    That is correct.
16   Q    If I wanted to see the computer that had
17 the first draft on it, I would have to go to the law
18 firm; I wouldn't go to your office, right?
19   A    That's correct.
20   Q    And it's the lawyers that's -- in essence,
21 gave you the documents they wanted you to review
22 before you had those meetings, didn't they?
23   A    Well, I have to say that I started the
24 process.
25   Q    That's fair. That's fair. But when you

McCormick, Cynthia (FDA Witness)  2/14/2008  9:04:00 AM

```
                                                                    162
 1    also among the adverse events.
 2         It's also -- you know, frankly, it's
 3    something that is characteristic of this population
 4    and I guess I worried at the time whether or not we
 5    were seeing a signal that this might be worse with
 6    the drug.
 7      Q   I want to ask you about the patient
 8    population that was being studied in this trial --
 9    in these trials. There are documents describing the
10    patient population as being refractory epilepsy
11    patients; are you familiar with those?
12      A   Yes.
13      Q   And can you explain what is meant by a
14    refractory epilepsy patient?
15      A   Yeah. Refractory patients, unfortunately,
16    make up most of these -- these epilepsy trials and
17    they are patients who generally have complex partial
18    seizures, although may have a mixture of seizure
19    types, and have -- continue to have seizures that
20    are not controlled despite numerous attempts to give
21    maximum doses of medication, and these patients go
22    through multiple changes in their medications and
23    continue to have seizures and are just very
24    difficult to control, and they make up the -- they
25    make up the databases that are under study here.
```