persons using the drug for any purpose to engage in self-destructive behavior including attempting to commit suicide and by failing to adequately warn the public of such risks.

132.    Defendants have an ongoing duty of pharmacovigilance. As part of this duty, defendants are required to continually monitor, test, and analyze data regarding the safety, efficacy, and prescribing practices of their marketed drugs, including Neurontin. Defendants continually receive reports from their own clinical trials, practicing physicians, individual patients and regulatory authorities concerning adverse events that occur in patients taking Neurontin and defendants' other marketed drugs. Furthermore, defendants continue to conduct clinical trials for their marketed drugs long after the drug is approved for use. Defendants have a continuing duty to inform doctors, regulatory agencies, and the public of new safety and efficacy information they learn, or should have learned, about their marketed drugs once that information becomes available to defendants, whether through defendants' clinical trials, other outside sources or pharmacovigilance activities. Specifically, when defendants learn, or should have learned, of new safety information associated with their marketed drugs, they have a duty to promptly disseminate that data to the public. Defendants also have a continuing duty to monitor epidemiology and pharmacovigilance data regarding their marketed drugs and promptly report any safety concerns that arise through epidemiologic study or data.

133.    Defendants were further negligent and breached this continuing duty of pharmacovigilance with respect to plaintiff's decedent. Defendants, through clinical trials and other adverse event reports, learned that there was a serious problem of suicidality associated with Neurontin use and failed to inform doctors, regulatory agencies and the public of this risk. Defendants had the means and the resources to perform their pharmacovigilance duties for the entire time Neurontin has been on the market in the United States.

134. Defendants failed to comply with the FDA postmarketing reporting requirements under 21 C.F.R. § 314.80(c) by, inter alia, failing to report each adverse drug experience concerning Neurontin that is both serious and unexpected, whether foreign or domestic, as soon as possible but in no case later than 15 calendar days after initial receipt of the information by defendants, failing to promptly investigate all adverse drug experiences concerning Neurontin that are the subject of these postmarketing 15-day Alert reports, failing to submit follow-up reports within 15 calendar days of receipt of new information or as requested by FDA, and, if additional information was not obtainable, failing to maintain records of the unsuccessful steps taken to seek additional information.

135. Defendants' failure to perform adequate pharmacovigilance and failure to comply with the postmarketing requirements of FDA regulations is evidence of defendants' negligence and constitutes negligence per se.

136 The death of plaintiff's decedent was caused by or was contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including plaintiff's decedent, on the part of defendants in the design, manufacture, distribution, advertising, marketing and promoting of Neurontin as being safe and effective in the treatment of chronic pain and depression and by inducing the public, including plaintiff's decedent, to believe that Neurontin was effective in the treatment of the causes and symptoms of chronic pain and depression.

137 That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by defendants was a proximate cause of injuries sustained by plaintiff's decedent.

23

138    That at all times hereinafter mentioned, plaintiff's decedent did not contribute to plaintiff's decedent's injuries by reason of any negligence or culpable conduct on plaintiff's decedent's part.

139    That as a result of the aforesaid occurrence, the injuries sustained and the death of plaintiff's decedent resulting therefrom, as aforesaid, the Next of Kin of plaintiff's decedent suffered extensive monetary and pecuniary losses and other compensatory damages, and there was also incurred and paid out necessary medical, hospital, funeral and concomitant expenses.

140.    That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## SECOND CLAIM FOR RELIEF

### Breach of Warranty

141.    Plaintiff repeats and reiterates the allegations previously set forth herein.

142.    That at all times hereinafter mentioned, upon information and belief, defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the treatment of chronic pain and depression and by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of chronic pain and depression in reliance upon the representations of defendants, expressly warranted to all foreseeable users of this drug, including plaintiff's decedent, that Neurontin was safe and effective for the treatment of chronic pain and depression.

143. That defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including plaintiff's decedent, that Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by defendants, including for the treatment of chronic pain and depression, and that Neurontin was reasonably safe, proper, merchantable and fit for the intended purpose, including for the treatment of chronic pain and depression.

144. That at all times hereinafter mentioned, plaintiff's decedent relied upon the aforesaid express and implied warranties by defendants.

145. That at all times hereinafter mentioned, plaintiff's decedent's use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which defendants directly and indirectly advertised, marketed and promoted Neurontin, and plaintiff's decedent's use of Neurontin was reasonably contemplated, intended and foreseen by defendants at the time of the distribution and sale of Neurontin by defendants, and, therefore, plaintiff's decedent's use of Neurontin was within the scope of the above-described express and implied warranties.

146. Defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of chronic pain and depression and because plaintiff's decedent's use of Neurontin for the treatment of chronic pain and depression caused or contributed to the incident described herein.

147. Plaintiff's decedent gave appropriate notice to defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

148. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower

courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

### THIRD CLAIM FOR RELIEF

#### Strict Liability

149. Plaintiff repeats and reiterates the allegations previously set forth herein.

150. That at all times hereinafter mentioned, the drug Neurontin was not suited for the treatment of chronic pain and depression and was not safe and effective for the treatment of chronic pain and depression even though defendants directly and indirectly advertised, marketed and promoted Neurontin for such use.

151. That at all times hereinafter mentioned, the drug Neurontin was not safe and was not suited for the purposes for which defendants, directly and indirectly, advertised, marketed and promoted the drug at the time defendants designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

152. That at all times hereinafter mentioned, upon information and belief, defendants assumed a strict products liability to users and to persons using Neurontin, including plaintiff's decedent, who sustained injuries, harm and damages by reason of the use of Neurontin for purposes directly and indirectly advertised, marketed, and promoted by defendants, including for the treatment of chronic pain and depression.

153. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks

punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## FOURTH CLAIM FOR RELIEF

### Fraud

154. Plaintiff repeats and reiterates the allegations previously set forth herein.

155. Defendants materially misrepresented material facts concerning the safety and effectiveness of Neurontin in the treatment of chronic pain and depression.

156. Defendants' affirmative misrepresentations include but are not limited to the acts set forth in the following paragraphs.

157. In or about 1993, defendants submitted a new drug application (NDA) for approval of a drug called Neurontin (also known by the chemical name "Gabapentin"), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5). In that application, defendants sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. On or about December 30, 1993, the FDA approved Neurontin for that specific use only. Because defendants had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than that approved use.

158. Commencing in at least June of 1995 and continuing through at least the date of this incident, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome,

27

amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other uses.

159.   Defendants did not file a new NDA seeking FDA approval for any of these unapproved uses at any time prior to the date of this incident.

160.   Defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to: post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

161.   In or about the fall of 1995, defendants' Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including plans for conference calls on pain and a pain consultant meeting.

162.   Certain defendants' annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies and tactics for increasing sales of the unapproved uses of the drug. The marketing plans budgeted for and funded these tactics.

163.   Commencing in early 1995 and continuing at least through the date of this incident, defendants determined not to seek FDA approval for certain unapproved uses.

164.   In or about April and May of 1995, defendants performed a marketing assessment of proposed psychiatric indications for Neurontin. In that marketing assessment, defendants forecast potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios: with and without FDA approval. Defendants' Neurontin Development Team and

28

New Product Committee reviewed the potential uses and concluded that defendants would not seek approval to promote and sell the drug for these unapproved uses.

165.    In or about July of 1995, defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to defendants' Neurontin Development Team and to defendants' Vice President for marketing. That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to the FDA for approval.

166.    One of the principal factors defendants considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that defendants were developing. Defendants expected this new drug would be approved by the FDA not only for epilepsy but also for a variety of uses beyond Neurontin's approved use.

167.    Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin. Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in defendants' original NDA approval for Neurontin. If defendants sought and obtained approval for any of the unapproved uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those unapproved uses. Defendants were concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

168.    Commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail below, defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

29

169. In October 1995, a member of defendants' Epilepsy Disease Team circulated a memorandum to a group including other senior members of defendants' Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 of defendants' sales representatives for whom data was available in a two-month period, was for off-label use of Neurontin. Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

170. On or about July 10, 1996, defendants' sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

171. Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure. This same document, entitled "Neurontin Can Do/Can't Do," stated that sales representatives could present lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

172. Defendants employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasions, which are not all-inclusive, defendants' medical liaisons promoted Neurontin for unapproved uses:

(a) In or about June of 1996 defendants' sales representative requested that defendants' medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

30

(b) The sales representative and the medical liaison selected the topic for the presentation to the local medical society. After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c) Among the topics of the presentation was the use of Neurontin for unapproved uses.

(d) During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of unapproved uses.

(e) After the presentation, defendants' Medical Director praised the event as "another great example of use of the medical liaisons" and an area business manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

173. Defendants organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-21, 1996. Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to unapproved uses of Neurontin.

174. Defendants invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs. As part of this event, defendants paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.

175. Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances." During this presentation, Neurontin was promoted for use in the treatment of pain.

31

176. Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs." During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

177. On or about May 8, 1996, following the Jupiter Beach conference, defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

178. From August 1-5, 1996, defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics. Defendants expressly instructed several of the physician speakers to address some of the unapproved uses.

179. During that meeting, defendants hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies. Defendants already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on defendants' behalf at prior meetings.

180. Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

181. On or about March 1, 1996, defendants sponsored a teleconference moderated by defendants' employee with a pain specialist as a speaker on Neurontin. The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

182. In or about May 1996, defendants' Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

183. Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits. Such consultants' meetings included, but were not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, F | Mar. 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | Apr. 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | Apr. 20, 1996 |
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | Apr. 19-21, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, N | Apr. 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande, Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |

33

| | | |
|---|---|---|
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sep. 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

184. Defendants rewarded doctors for their advocacy of Neurontin by paying them honoraria for lending their names to scientific articles which were actually prepared and written by third parties retained by defendants. In 1996, defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that defendants could completely control the publications distributed pursuant to its "publications strategy." The content of these articles were actually written by non-physician technical writers retained by defendants and defendants had the right to control the content of all the articles. Defendants paid all expenses in connection with the creation of these publications.

185. Defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

186. Defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

Reflex sympathetic dystrophy (RSD)

Peripheral neuropathy

Diabetic neuropathy

Trigeminal neuralgia

Post-herpetic neuralgia

Essential tremor

Restless leg syndrome (RLS)

Attention deficit disorder (ADD)

Periodic limb movement disorder

Migraine

Bipolar disorder

Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

Drug or alcohol withdrawal seizures

187.  The following enumerated misrepresentations, which are not intended to be all-inclusive, relating to "off-label" usage of Neurontin, were routinely made to physicians with the knowledge and consent of marketing personnel of defendants:

    a.    Bipolar Disorder. Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed.

    b.    Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes. Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the

35

treatment of pain was being reported. No such body of evidence existed. Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective monotherapy.

   c. Reflex Sympathetic Dystrophy ("RSD"). Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value.

   d. Attention Deficit Disorder ("ADD"). Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim.

   e. Restless Leg Syndrome ("RLS"). RLS was another condition where defendants' medical liaisons were trained to refer to a growing body of date relating to the condition, when no scientific date existed.

   f. Trigeminal Neuralgia. Although medical liaisons represented that Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

   g. Post-Herpetic Neuralgia ("PHN"). Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.

   h. Essential Tremor Periodic Limb Movement Disorder ("ETPLMD"). Medical liaisons were trained to allege that Neurontin was effective in the treatment of these