EXHIBIT 52



U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., N.W., Rm: 7250
Washington, D.C. 20530

JCB:CFB:DNL:SSwingle

Sharon Swingle                                                                                          Tel: (202) 353-2689
Sharon.Swingle@usdoj.gov                                                                        Fax: (202) 514-8151

September 21, 2006

RECEIVED
SEP 2 2 2006
LARRY M. ROTH, P.A.

Hon. Stewart Dalzell
United States District Court
Eastern District of Pennsylvania
Office of the Clerk of the Court
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

      Re:    *Andrea Perry et al. v. Novartis Pharmaceuticals et al.,* Civ. No. 05-5350

Dear Judge Dalzell:

      Thank you for your letter of August 8, 2006, inviting the Food and Drug Administration (FDA) to participate in this litigation as amicus curiae. FDA welcomes the opportunity to present its views on the question whether the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, as implemented by FDA, preempts a state-law tort claim arising out of a pharmaceutical company's alleged failure to warn of the dangers associated with use of a prescription drug.

      As the Court noted in its letter, FDA recently filed a brief as amicus curiae in *Colacicco v. Apotex, Inc.*, Civ. No. 05-5500 (E.D. Pa. 2005). In that brief, FDA explained that the Supremacy Clause bars a state tort claim premised on the defendants' failure to provide a warning that FDA had specifically considered and rejected as scientifically unsubstantiated during the relevant period. Had the manufacturers provided the warning that the plaintiff sought, their drug products would have been deemed misbranded in violation of federal law. The state-law failure-to-warn claim was thus preempted, because the claim conflicted with the agency's determination pursuant to the FDCA and implementing regulations that the warning in question should not be provided. The district court in *Colacicco* appropriately gave deference to FDA's views on conflict preemption in dismissing the relevant claim. *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 526-529, 537-538 (E.D. Pa. 2006).

      As we next explain, the underlying principles of conflict preemption that must be applied in this case are the same. Congress in the FDCA has authorized FDA to apply its scientific and regulatory expertise to determine what warnings are appropriate for prescription drugs, and the

2

Supremacy Clause prohibits application of state tort law in a manner that would prevent or frustrate FDA's accomplishment of that objective. Thus, state tort law is preempted if it imposes liability for a company's failure to provide a warning that FDA has rejected, or would reject, as scientifically unsubstantiated, or for a company's conduct in providing a warning that FDA deems necessary for the safe and efficacious use of a prescription drug.

Application of these general principles to the failure-to-warn claim in this litigation requires an examination of agency action relating to Elidel, including FDA's specific determinations regarding what warnings were appropriate, as well as the content of the warning that the plaintiffs allege should have been given. This letter sets out the regulatory history for Elidel, including the statutory and regulatory framework in which the drug was approved and FDA's labeling decisions relating to the drug. As we explain in greater detail below, it is not possible at this stage of the litigation for FDA to determine whether the plaintiffs' failure-to-warn claim is preempted in its entirety, because the plaintiffs have not yet articulated with specificity the warning that they assert should have been provided. That said, FDA has concluded that certain types of failure-to-warn claims that could be advanced in this proceeding are preempted. A claim that the defendants should have warned that Elidel *causes* lymphoma would be barred under the doctrine of federal conflict preemption, because it conflicts with FDA's determination, as of January 2006, that causation has not yet been established. Similarly, a claim based on the defendants' failure to warn of risks that were not included on the approved label for Elidel would be preempted absent scientific evidence in support of such a claim.

1.    Background.

   A.    Statutory and regulatory framework.

FDA is the expert federal agency authorized by Congress in the FDCA to regulate the approval of prescription drugs.[1] In particular, FDA has been charged by Congress with, among other things, ensuring that prescription drugs sold in the United States are safe and effective, 21 U.S.C. § 355(d) and § 393(b)(2)(B), and that they are not misbranded, 21 U.S.C. §§ 331(a), (b), and (k), 352, and 321(n).

Under federal law, FDA's evaluation of a drug's safety and efficacy is inextricably intertwined with the drug's labeling. A prescription drug label must provide physicians and pharmacists with sufficient information, including indications for use and "any relevant hazards, contraindications, side-effects, and precautions," to allow those medical professionals to "use the drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.100(c)(1). If drug labeling is false or misleading, or does not provide adequate directions for use or warnings against

---

   [1] FDA is a component of the United States Department of Health and Human Services (HHS). The FDCA vests regulatory and enforcement authority in the Secretary of Health and Human Services. The Secretary has delegated this authority to the Commissioner of Food and Drugs. *See* 21 U.S.C. § 393(d); FDA Staff Manual Guides, Vol. II, § 1410.10 (available at www.fda.gov/smg/1410_10.html).

3

any use dangerous to health, the drug is unlawfully misbranded. *See* 21 U.S.C. § 331(a), (b), and (k); *id.* § 352(a), (f), (j); *id.* § 321(n).

FDA seeks to ensure that prescription drug labels warn of all known risks based on reliable scientific evidence, while avoiding inadequately substantiated risks, the mention of which could improperly deter use of the drug.[2]  Labels are required to describe all "clinically significant adverse reactions" and "other potential safety hazards" associated with use of the drug.  21 C.F.R. §§ 201.57(c)(6)(i).  Before a particular hazard can be listed on the labeling, there must be "reasonable evidence of a causal association" with use of the drug. *See* 21 C.F.R. § 201.57(c)(6)(i).

In order for a prescription drug manufacturer to obtain FDA approval for a new drug, the manufacturer must provide full reports of investigations establishing that the drug is safe and effective for use under "the conditions prescribed, recommended, or suggested in the proposed labeling thereof."  21 U.S.C. § 355(d)(1).  When FDA approves a new drug application, it also approves the precise final version of the drug labeling. *See* 21 C.F.R. § 314.50(e)(2)(ii).

A manufacturer may not deviate from FDA-approved product labeling except in limited circumstances.  If the manufacturer of a non-generic prescription drug wishes to add or strengthen a warning, the manufacturer may provide FDA with a supplemental submission regarding the proposed labeling change, providing a full explanation of the basis for the proposed change. *See* 21 C.F.R. § 314.70(c)(1), (3), (6)(iii)(A).  If FDA has not rejected the supplement within 30 days after its submission, the manufacturer may distribute the drug with the new proposed labeling. *See* 21 C.F.R. § 314.70(c)(7).  Even after the drug has been distributed, FDA may choose to reject the proposed labeling change and may order the drug manufacturer to cease distributing drugs with the new label. *See* 21 C.F.R. § 314.70(c)(5).[3]

If a drug manufacturer has "reasonable evidence of a causal association" between the use of a drug and a "clinically significant hazard," the manufacturer has an obligation to seek FDA approval for a labeling change, in order to add a warning of the new potential hazard. *See* 21 C.F.R. § 201.57(c)(6)(i); *see also* 21 C.F.R. § 201.56(a)(2) (requiring manufacturer to seek FDA approval to update labeling "when new information becomes available that causes the labeling to become inaccurate, false, or misleading").  Drug manufacturers are also subject to continuing obligations to

---

[2] FDA undertakes a comprehensive scientific evaluation of a drug's risks and benefits when determining whether a prescription drug product is safe and effective.  The approved labeling for a product "reflects thorough FDA review of the pertinent scientific evidence and communicates * * * the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively."  71 Fed. Reg. 3922, 3934 (2006).  Disclosing additional risks that FDA did not require can erode the careful representation of benefits and risks in the approved labeling in a number of ways, including discouraging appropriate use of the drug if a risk is exaggerated and causing meaningful risk information to lose its significance. *See id.* at 3934-3935.

[3] A generic drug manufacturer is not permitted to modify the labeling for its drug without prior FDA approval. *See* 21 C.F.R. § 314.150(b)(10); 57 Fed. Reg. 17,950, 17,961 (1992).

4

report adverse events that occur in patients treated with a particular drug, whether or not considered drug-related, and to investigate any "serious and unexpected" adverse events associated with the use of a drug in humans. *See* 21 C.F.R. §§ 314.80(a), (c), 314.98(a).

      B.    <u>Regulatory history.</u>[4]

      Elidel is a topical skin cream approved by FDA as a "second-line" treatment for atopic dermatitis in non-immunocompromised patients over the age of 2. *See* FDA, Center for Drug Evaluation and Research, Application No. 21-302, Approval Letter for Elidel (Exh. A), at 2. Atopic dermatitis is a chronic inflammatory disease of the skin that commonly presents in early childhood, and affects between 10-20% of all children and 1-3% of adults. *See* Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee, Open Meeting, Oct. 29-30, 2003, Overview (Exh. B), at 1. On December 13, 2001, FDA approved the application of Novartis Pharmaceuticals Corp. to market Elidel as a short-term or intermittent long-term treatment for atopic dermatitis in patients who cannot use conventional therapies because of potential risks, or for whom conventional therapies have been unsuccessful or poorly tolerated. *See* FDA Elidel Approval Letter (Exh. A), at 1.

      The active ingredient of Elidel, pimecrolimus, works by suppressing the immune system response. *See* 2003 Pediatric Advisory Subcommittee Overview (Exh. B), at 1-2. Pimecrolimus and a similar drug also approved for marketing as a topical immunosuppressant, tacrolimus (sold under the brand name Protopic), make up the class of drugs known as calcineurin inhibitors. Prior to FDA approval of a topical form of tacrolimus, the drug was approved in an oral form for use as a systemic immunosuppressant for organ transplant recipients. *See id.* at 2. Oral treatment with tacrolimus as a systemic immunosuppressant (which results in systemic levels of tacrolimus that are approximately 30-fold higher than the levels observed with topical use, *see* Protopic 2000 Label (Exh. C), at 2) is known to increase the risk of skin cancer and lymphoma. *See* 2003 Pediatric Advisory Subcommittee Overview (Exh. B), at 2.

      Clinical studies involving the use of topical pimecrolimus in humans found no increase in lymphoma or other cancers. *See* Elidel 2001 Label (Exh. D), at 10. Animal studies of pimecrolimus, in which high doses of the drug (47 and 179-217 times the maximum recommended human doses) were administered topically to mice and rats, showed an increase in lymphoproliferative changes, including lymphoma, as well as a shortened latency period for lymphoma formation and for skin tumor formation upon exposure to UV radiation. *See* Elidel 2001 Label (Exh. D), at 11. In addition, animal studies involving oral use of high levels of pimecrolimus confirmed what was already known to FDA about the immunosuppressive use of tacrolimus, *i.e.,*, that pimecrolimus increased the risk

---

    [4] This history of FDA's actions relating to Elidel is drawn from public documents available at FDA's web site at www.fda.gov/ohrms/dockets/ac/cder03.html#Anti-Infective, www.fda.gov/ohrms/dockets/ac/oc05.html, www.fda.gov/cder/drug/infopage/elidel/default.htm, and www.fda.gov/cder/drug/infopage/protopic/default.htm. We have also attached copies of the relevant documents in a separately bound addendum to this letter, for the convenience of the Court and the parties.

5

of lymphoma; an increase in the risk of follicular cell thyroid adenoma was also found. *See* FDA Elidel Approval Letter (Exh. A), at 2.

While the label approved by FDA for Elidel in 2001 thoroughly described the results of these studies and cautioned that patients using the drug should minimize or avoid exposure to sunlight, it did not contain any warning of an association between pimecrolimus and lymphoma. *See* Elidel 2001 label (Exh. D), at 10-11. Novartis did, however, make a commitment to FDA in its new drug application to conduct further studies to determine whether long-term intermittent use of Elidel in pediatric patients increased the risk of developing malignancies, and whether long-term intermittent use of Elidel in sun-exposed adult patients increased the risk of skin cancer. *See* FDA Elidel Approval Letter (Exh. A), at 2.[5]

In October 2003, FDA's Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee met to discuss monitoring of cancer rates in pediatric patients treated with calcineurin inhibitors for atopic dermatitis. *See* 2003 Pediatric Advisory Subcommittee Overview (Exh. B), at 1.[6] FDA scientists recognized at the meeting that lymphoma is associated with systemic exposure to a calcineurin inhibitor through oral treatment with the drug. *See* Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee, Open Meeting, Oct. 29-30, 2003, Slides: Questions (Exh. F), at 2. Because calcineurin inhibitors are absorbed through the skin, topical use of the drugs may cause low-level systemic exposure. *See id.* The amount of systemic exposure might be higher in children, who have a higher ratio of body surface to total body mass. *See id.* Any malignancy, however, might be discernible only through long-term exposure, especially if total systemic exposure is modest. *See id.* at 2-3. The question, therefore, was how to assess the clinical risk of malignancy, if any, resulting from the topical use of this class of drugs. *See id.*

Several FDA scientists presented information at the October 2003 meeting about animal studies and clinical trials of Elidel and Protopic conducted prior to those drugs' approval (information that, as noted above, was also summarized in the approved label for those drugs). One FDA scientist interpreted the animal studies to suggest that "systemic exposure from topical

---

[5] The manufacturer of Protopic Ointment, another topical immunosuppressant approved by FDA on December 18, 2000, for marketing as a treatment for atopic dermatitis, also made a commitment to conduct a study of the risk of malignancies in pediatric patients treated with Protopic on a long-term, intermittent basis, and to do an additional study to evaluate whether very young patients (ages 2-5) using Protopic had measurable blood levels of tacrolimus. *See* FDA, Center for Drug Evaluation and Research, Application No. 50-777, Approval Letter for Protopic (Exh. E), at 2.

[6] FDA utilizes advisory committees "to conduct public hearings on matters of importance that come before FDA, to review the issues involved, and to provide advice and recommendations to the Commissioner." 21 C.F.R. § 14.5(a). The role of the committees is purely advisory, and the Commissioner of Food and Drugs "has sole discretion concerning action to be taken and policy to be expressed on any matter considered by an advisory committee." *Id.* § 14.5(b); *see also* 5 U.S.C. Apx. 2 § 2(6).

calcineurin inhibitors over a course of time leading to a cumulative dose effect may lead to melanomas, non-melanoma skin cancers, Hodgkin's and Non-Hodgkin's lymphomas." Pediatric Advisory Subcommittee of the Anti-Infective Drugs Advisory Committee, Oct. 30, 2003, Transcript (Exh. G), at 21-22. Another FDA scientist similarly noted that "lymphome signals" had been found in dermal and oral mouse carcinogenicity studies conducted with tacrolimus, an oral mouse carcinogenicity study conducted with pimecrolimus, and a dermal mouse study conducted with an extremely high dose of pimecrolimus. 2003 Pediatric Advisory Subcommittee Transcript (Exh. G), at 32-33; Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee, Open Meeting, Oct. 29-30, 2003, Slides: Topical Immunosuppressants (Calcineurin Inhibitors) – Animal Toxicology (Exh. H), at 18.[7]

FDA scientists also presented post-marketing information about calcineurin inhibitors, *i.e.*, information obtained following FDA approval of the topical forms of the drugs. A pharmacist and safety evaluator reported that more than 3.2 million prescriptions for topical pimecrolimus and 2 million prescriptions for topical tacrolimus had been dispensed as of August 2003. 2003 Pediatric Advisory Subcommittee Transcript (Exh. G), at 35, 55-56. For patients treated with topical pimecrolimus, 79 adverse events had been reported to FDA, most of which involved side effects warned of in the labeling for the drug and 90% of which were skin-related. *Id.* at 36. As of that time, there were 2 reported instances of nonmalignant tumors and 7 cases of infection, as well as 4 hospitalizations, all involving pediatric patients. *Id.* at 37. Post-marketing reports for topical tacrolimus showed 183 adverse event reports, 95% of which were found in the product labeling and 50% of which involved a skin reaction. *Id.* at 38, 55-56. Among patients treated with topical tacrolimus, there were three reported cases of death, five malignancies in adults, and ten cases of pediatric infection, one of which ended in death. *Id.* at 39-41. Post-marketing data for both calcineurin inhibitors showed substantial "off-label" use in children under the age of 2, who represented 17% of the prescriptions written for pimecrolimus, and 22% of the adverse event reports for that drug. *Id.* at 41.[8]

The Pediatric Advisory Subcommittee did not make any recommendations to FDA about the specific topic of the October 2003 meeting — the monitoring of cancer rates in pediatric patients treated with calcineurin inhibitors. Individual committee members recognized that the long latency period for malignancies; the low incidence of those diseases, particularly in children; and the lack

---

[7] Also described were photo-toxicity studies involving tacrolimus and pimecrolimus, which sought to determine whether use of the drugs reduced the time to skin tumor formation in animals as a result of UV exposure. For tacrolimus, the study showed that the vehicle ointment itself had a photo-carcinogenic effect, and that tacrolimus had an additional small effect. For pimecrolimus, the study showed that the vehicle cream enhanced UV photo-carcinogenesis, but that pimecrolimus had no additional effect. 2003 Pediatric Advisory Subcommittee Slides: Topical Immunosuppressants (Exh. H), at 9-10.

[8] "Off-label" use of a drug product is the use of that product by a medical professional for a purpose other than the purpose for which it has been approved by FDA. *See Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001).

7

of any centralized registry or reporting system for many forms of malignancies, all contributed to the difficulty in determining whether topical use of calcineurin inhibitors increases the risk for cancer. Numerous individual participants recommended the adoption of particular strategies to manage the potential risk for malignancies, with some committee members suggesting that the labels for calcineurin inhibitors should be modified to warn against use of the drugs in children under the age of 2. However, the Subcommittee did not make any formal decision or recommendation on the issue of labeling, which was not the topic on which the meeting had been convened.

On February 15, 2005, FDA's Pediatric Advisory Committee met again to discuss the potential cancer risk in children from use of topical immunosuppressants and methods of risk management. *See* 70 Fed. Reg. 1721 (2005); Pediatric Advisory Committee, FDA, 2/15/05 Draft Agenda (Exh. I). In calling the committee meeting, FDA was particularly concerned about off-label use of the drugs in infants. The Briefing Memorandum for the meeting explained that, although neither Elidel nor Protopic was approved or recommended for use in children under 2, approximately 500,000 prescriptions for the drugs had been dispensed for children in that age range between June 2003 and May 2004. FDA Feb. 7, 2005, Briefing Memo (Exh. J), at 2. Prior animal studies had raised a concern that "chronic, intermittent exposure * * * could lead to an increased incidence of Hodgkin and Non-Hodgkin lymphoma as well as melanoma and non-melanoma skin cancers," and the FDA had learned of a new study involving oral use of pimecrolimus in monkeys (albeit at a dose 30 times the maximum recommended human dose), which found that viral-associated lymphomas occurred in a dose-response manner. *Id.* at 2-3; FDA, Division of Pediatric Drug Development Recommendation (Exh. K), at 2. FDA had also received additional malignancy and other adverse event reports for Elidel and Protopic. FDA Briefing Memo (Exh. J), at 3-4.

FDA's Office of Pediatric Therapies and Division of Pediatric Drug Development both recommended to the Pediatric Advisory Committee that the labels for Elidel and Protopic be modified to reflect a potential risk of cancer, particular in young children treated with the drugs. *See* Briefing Memo (Exh. J), at 4, 5; Pediatric Drug Recommendation Memo (Exh. K), at 1. Although members of the Committee recognized that there was substantial scientific uncertainty about any association between the use of calcineurin inhibitors and the development of lymphoma or other malignancies, they also recognized that calcineurin inhibitors were commonly perceived as being far safer than alternative treatments, and agreed that there was a need to communicate more clearly the scientific uncertainty about potential risks of topical use of the drugs. *See* Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 264-265, 273-274; *see also id.* at 280-294 (summarizing views).

The Pediatric Advisory Committee voted on February 15, 2005, to recommend a change in the labeling for the drugs to alert medical professionals of a potential association between calcineurin inhibitors and lymphoma and other malignancies. *See* Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 298-299, 302. Specifically, the Committee recommended a boxed warning on the labels for Elidel and Protopic recognizing the "potential increased risk of cancer in humans, based on animal studies," while noting that "there is inadequate human data at this time to ascertain the cancer risk from the topical use of calcineurin inhibitors." Pediatric Advisory Committee, 2/15/05 Slides:  Questions to Committee About Potential Cancer Risk with Use of Topical

8

Immunosuppressants (Exh. M), at 1; Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 302, 318-321, 324, 328, 331-333. The Committee also recommended that the labels for Elidel and Protopic, which already noted that the drugs were not approved for use as a first-line therapy or in children under the age of 2, be modified to further emphasize these limitations. Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 302, 318-321, 323-324. Finally, the Committee recommended a letter to health care providers containing this information. Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 355-356.

On March 10, 2005, FDA issued a public health advisory "to inform healthcare providers and patients about a potential cancer risk from use" of Elidel and Protopic. FDA Public Health Advisory (Exh. N), at 1. The public health advisory explained that the concern was "based on information from animal studies, case reports in a small number of patients, and knowledge of how the drugs work," and further explained that human studies might take ten years or more "to determine if use of Elidel or Protopic is linked to cancer." *Id.* FDA recommended that providers, patients, and caregivers consider (i) using calcineurin inhibitors only as second-line agents to treat atopic dermatitis; (ii) avoiding use of the drugs in children under the age of 2, for whom the effects of the drug on developing immune systems is not known and in whom clinical studies have shown a higher rate of upper respiratory infections; (iii) using the drugs only for short periods rather than continuously; (iv) avoiding use of the drugs in patients with a weakened or compromised immune system; and (v) using the minimum amount of the drugs necessary to control symptoms. *See id.* FDA also indicated that, based on the advice of its Pediatric Advisory Committee, FDA would require labeling changes for the drugs, "including the placement of a boxed warning about the potential cancer risk," and would also work with the drugs' manufacturers to develop a medication guide to be given to patients or their caregivers by pharmacists filling each prescription. *Id.*

On January 19, 2006, FDA approved revised labeling for Elidel containing the following boxed warning:

---

**WARNING**

**Long-term Safety of Topical Calcineurin Inhibitors Has Not Been Established**

Although a causal relationship has not been established, rare cases of malignancy (e.g., skin and lymphoma) have been reported in patients treated with topical calcineurin inhibitors, including Elidel Cream.

Therefore:

- Continuous long-term use of topical calcineurin inhibitors, including Elidel Cream, in any age group should be avoided, and application limited to areas of involvement with atopic dermatitis.

- Elidel Cream is not indicated for use in children less than 2 years of age.

---

9

Elidel 2006 Label (Exh. O), at 8. The revised labeling explained that prolonged systemic use of calcineurin inhibitors in organ transplant patients and use of the drugs in animal studies had been associated with an increased risk of infections, lymphomas, and skin malignancies, and that those risks were tied to the intensity and duration of immunosuppression. *Id.* "Based on this information and the mechanism of action, there is a concern about a potential risk with the use of topical calcineurin inhibitors, including ELIDEL Cream." *Id.* Although the label explicitly stated that "a causal relationship has *not* been established," *id.* (emphasis added), it noted that rare cases of skin malignancy and lymphoma had been reported in patients treated with the drugs, *id.* The label accordingly warned against the use of Elidel in immunocompromised patients, and noted that the safety of Elidel has not been established beyond one year of non-continuous use. *Id.*

    C.    <u>Factual and procedural background.</u>

Andreas Perry is a minor child whose physician allegedly provided his mother with Elidel in late April 2003 to treat her son's eczema. Second Amended Complaint, ¶¶ 76-78.[9] Andreas was subsequently diagnosed with lymphoblastic lymphoma. *Id.* ¶ 79. Andreas and his parents allege that they were not given adequate warnings about the potential risks of Elidel, and that the defendants failed to give adequate warnings to their treating physician of the drug's potential risks, instead engaging in intentional misrepresentations about its safety and efficacy. The plaintiffs assert that this misconduct was the proximate cause of their infant son's treatment with Elidel, which is alleged to have caused his lymphoma. *Id.* ¶¶ 99, 112. The plaintiffs have brought claims against Novartis Pharmaceuticals Corporation, several Novartis affiliates, and two individual sales representatives for the company, for deceit, fraud, infliction of emotional distress, breach of warranty, and failure to warn.

The defendants moved to dismiss on federal preemption grounds the plaintiffs' failure-to-warn claim. On August 8, 2006, this Court invited FDA to submit a letter or a brief as amicus curiae setting out the agency's views on federal preemption and the application of that doctrine in this litigation.

2.    <u>Discussion.</u>

    A.    <u>Principles of federal preemption.</u>

Under the Supremacy Clause (U.S. Const. art. VI, cl. 2), a state may not cause a drug manufacturer to choose between compliance with federal law and state tort liability. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000). State law is also preempted if it would "prevent or frustrate the accomplishment of a federal objective." *Id.*; *see also Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).

---

    [9] As the Court is required to do at this stage of the pleadings, FDA assumes the truth of the allegations of the Second Amended Complaint for purposes of this letter.

In the context of drug labeling, Congress in the FDCA has authorized FDA to apply its scientific expertise to determine what warnings are appropriate and necessary for a particular drug. *See Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996); *Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21, 28 (D.C. Cir. 1984). Where FDA has exercised its authority to determine that a particular warning is not adequately supported by the evidence, it would stymie the regulatory scheme established by Congress to impose liability under state tort law for the failure to provide such a warning. Conversely, where FDA has determined that a particular warning is necessary to ensure the safe and efficacious use of a drug, it would undermine federal regulatory objectives for a manufacturer to be found liable under state law for providing that warning. As FDA explained recently in the preamble to its prescription drug labeling regulation adopted under the FDCA, state tort law is preempted if it purports "to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated," or to "preclude a firm from including in labeling or advertising a statement that is included in prescription drug labeling." 71 Fed. Reg. 3922, 3935 (2006).[10] Even if compliance with both state and federal law in these circumstances would not be impossible, state tort liability would pose a sufficient threat to federal regulatory objectives to be preempted under the Supremacy Clause. *See, e.g., Geier*, 529 U.S. at 884-885; *Jones*, 430 U.S. at 543.

B.    <u>Application of federal preemption principles to plaintiffs' failure-to-warn claim.</u>

Although the general principles of federal preemption applicable in this litigation are the same as in *Colacicco v. Apotex, Inc.*, C.A. No. 05-5500 (E.D. Pa. 2005), FDA's analysis in that litigation and the district court's legally correct dismissal of failure-to-warn claims involving paroxetene hydrochloride do not resolve the question presented here: whether federal preemption bars the plaintiffs' failure-to-warn claim relating to Elidel. A failure-to-warn claim is not preempted merely because it imposes liability for a manufacturer's failure to provide a warning that has not yet been required by FDA. Federal regulations explicitly recognize that manufacturers can, and in some limited instances must, modify their labels to add new warnings of hazards associated with the drug, without awaiting prior FDA approval. *See* 21 C.F.R. § 314.70(c)(7); 21 C.F.R. § 201.56. Where, in light of new scientific evidence or other changed circumstances, a drug label no longer ensures safe and effective use, FDA encourages drug manufacturers to work quickly and collaboratively with the agency to make necessary labeling changes. Of course, even in these instances, FDA retains ultimate responsibility to determine whether the proposed change is appropriate, and may reject a

---

[10] In referencing the preamble to the 2006 final regulations, FDA does not mean to suggest that the preamble itself establishes a federal rule of decision that preempts inconsistent state tort law. The basis for preemption in cases such as this one and *Colacicco v. Apotex, Inc.*, No. 05-CV-5500 (E.D. Pa.), is federal law requiring drug manufacturers to provide adequate directions for use, forbidding "misbranding" of a drug product, and requiring drug manufacturers to use the approved label for their product or, in limited circumstances, to seek FDA approval to change the label to warn of a potential hazard for which there is reasonable evidence of a causal association. Nevertheless, the 2006 preamble sets out FDA's understanding of the relevant preemption principles to be applied in a case such as this one, and is thus entitled to deferential consideration by this Court. *See, e.g., Geier*, 529 U.S. at 883; *Horn v. Thoratec Corp.*, 376 F.3d 163, 171, 176-177 & n.22 (3d Cir. 2004).

11

labeling change and order the drug manufacturer to cease distributing the product with the new label. *See* 21 C.F.R. § 314.70(c)(5).

To the extent, therefore, that the defendants argue that federal preemption bars *any* failure-to-warn claim premised on a drug manufacturer's failure to provide a warning not contained in the drug's approved labeling, the defendants are incorrect. FDA has not attempted to "occupy the field" of prescription drug labeling, and state tort liability for failure to warn does not necessarily prevent FDA from carrying out its regulatory goals. Federal regulations explicitly provide for labeling changes to be made to warn of new hazards or cautions relating to a drug without prior FDA approval. Under this regulatory scheme, preemptive conflict does not exist in every instance in which state tort law seeks to impose liability for the failure to provide a warning not affirmatively mandated by FDA.

That said, in some circumstances the imposition of state tort liability on a drug manufacturer for failure to warn would conflict with FDA's regulatory authority or interfere with the accomplishment of federal objectives. Because FDA has not occupied the field, such determinations require an analysis of the agency's actions and the actions that are alleged to give rise to liability. A court must ask whether the warning sought by the plaintiff would have rendered the drug misbranded in the agency's judgment at the relevant time, or if any new warnings proposed to be added to the warning label would have been rejected by the agency as unsubstantiated.

Application of those principles is difficult in this case, in large part because of the lack of specificity in plaintiffs' complaint about the factual basis on which they assert liability for failure to warn. Plaintiffs allege that defendants should have warned of "the risks of developing malignancies from the use and application of pimecrolimus" and also should have warned that those risks were "more severe" than the risks of other, more traditional treatments for eczema. Second Amended Complaint, ¶ 137. Plaintiffs do not clarify, however, what an appropriate warning would have said; what causal relationship, if any, should have been asserted for the development of malignancies; and what comparative claims of safety should have been made, and as to which drugs. Plaintiffs also do not explain *when* these warnings should have been given, which is a crucial factor in determining whether state tort liability would conflict with FDA labeling decisions. Even if FDA ultimately determines that a specific warning should be added to a label, a state-law failure-to-warn claim would still be preempted if it sought to impose liability for failure to provide the same warning at an earlier time when existing scientific evidence would not have supported it. Given these uncertainties, it is not possible to decide as a matter of law whether liability on the plaintiffs' failure-to-warn claim would prevent the accomplishment of federal regulatory objectives.

FDA can, however, provide some guidance about the types of failure-to-warn claims that would be preempted by federal law, in the hope that this analysis might assist the Court as the litigation progresses.

First, federal preemption bars any claim that defendants should have warned of a causal link between Elidel and lymphoma or other malignancies. Following approval of Elidel in 2001, FDA became aware of, and concerned about, widespread off-label use of the drug in patients under the

12

age of 2, as a first-line treatment for atopic dermatitis, and for long-term treatment of dermatitis. FDA was concerned that physicians and patients were using the drug without adequate information about the potential risks, and the scientific uncertainty about the effects, of long-term use of the drug or use of the drug in young children. FDA also became aware of adverse event reports involving the drug, which supported the theory that chronic exposure to the drug might increase the risk of developing malignancies. Even as of January 2006, however, FDA's determination was that available scientific evidence has not established the existence of a causal relationship between Elidel and the development of malignancies. See 2006 Elidel label, at 8; FDA Press Release, 1/19/06. at 1. The "black box" warning required by FDA specifically states that "a causal relationship has not been established" between Elidel and lymphoma and other malignancies. Elidel 2006 Label, at 8. Necessarily, therefore, no causal relationship had been established before that time and, had defendants attempted to claim such a relationship in their labeling, the drug would have been deemed misbranded by FDA.

Second, any claim premised on the defendants' failure to provide additional warnings about Elidel as of the drug's approval in 2001, premised on scientific information known to and considered by FDA as part of the approval process, would also be preempted. In December 2001, FDA determined, based on its evaluation of the scientific evidence regarding potential risks and side effects of pimecrolimus, that the label for Elidel should warn that the drug was not recommended for use in children younger than 2 and should also warn of side effects in children in that age group as well as the fact that "the "effects of Elidel Cream on the developing immune system in infants are unknown." 2001 Label, at 13. FDA also determined that the label should describe animal studies involving pimecrolimus, which showed a potential association between use of the drug in animals and an increase in lymphoma and other cancers, and should warn that patients using Elidel should minimize sunlight exposure in light of this potential risk. 2001 Label, at 11, 10. Federal preemption would bar state tort liability based on the defendants' provision of these warnings as of December 2001 in the form and substance approved by FDA.[11]

In conclusion, any warning added after Elidel's approval would need to have been supported by reasonable evidence of a causal association with the drug. See 21 C.F.R. § 201.57(c)(6)(i). As explained earlier, once FDA has approved a new drug application, an applicant generally may not deviate from the approved label without submitting a supplement to the application providing a full explanation of the basis for the change. See 21 C.F.R. § 314.70. The applicant must provide supporting information for the proposed change or advise FDA of where such information may be found. This evidence may include company-conducted or independent studies, published reports,

---

[11] FDA does not intend to suggest, however, that post-approval data about the use of Elidel or adverse event reports for the drug are irrelevant to the question whether the labeling was adequate to ensure safe and effective use. As noted above, FDA issued a public health advisory about calcineurin inhibitors in 2005, and approved new labeling for Elidel in 2006, to better communicate the scientific uncertainty about whether topical use of calcineurin inhibitors is associated with a risk of malignancies. FDA merely notes that federal preemption would bar a claim based on the defendants' alleged failure to provide additional warnings as of December 2001, based solely on scientific information known to and considered by FDA in approving the final labeling for Elidel.

13

and compilations of adverse events. After evaluating this evidence, FDA determines whether the labeling change is appropriate based on such factors as the frequency of the risk of a side effect or adverse outcome, the severity of the potential risk, and the potential benefits and risks associated with the proposed warning. The scientific evidence FDA was aware of in 2003 regarding use of Elidel and the potential risk of lymphoma or other cancers is the data submitted as part of the approval process for Elidel, Protopic, and the oral form of tacrolimus, and a small number of adverse event reports for Protopic involving malignancies.

\* \* \* \* \*

On behalf of FDA, we thank the Court for the opportunity to present FDA's views on the question of federal preemption in this litigation.

Of Counsel:
    DANIEL MERON
      General Counsel
      Department of Health and
        Human Services

    SHELDON T. BRADSHAW
      Chief Counsel
    ERIC M. BLUMBERG
      Deputy Chief Counsel
    SUSAN L. WILLIAMS
      Associate Chief Counsel
      Food and Drug Division
      Department of Health and
        Human Services
      Office of General Counsel

PETER D. KEISLER
    Assistant Attorney General

C. FREDERICK BECKNER III
    Deputy Assistant Attorney General

PATRICK L. MEEHAN
    United States Attorney

VIRGINIA A. GIBSON
    Assistant United States Attorney
    Chief, Civil Division

DOUGLAS N. LETTER
    (202) 514-3602
SHARON SWINGLE
    (202) 353-2689
    Attorneys, Appellate Staff
    Department of Justice
    Civil Division
    950 Pennsylvania Ave., N.W.
    Washington, DC  20530-0001

cc:    Hon. Stewart Dalzell
United States District Court
Eastern District of Pennsylvania
10613 United States Courthouse
601 Market Street
Philadelphia, PA  19106-1705    (w/ enclosure)

Scott J. Liotta
Law Offices of Larry M. Roth, P.A.
P.O. Box 547637
Orlando, FL  32854-7637    (w/ enclosure)

Madeline M. Sherry
Gibbons, Del Deo, Dolan,
Griffinger & Vecchione, P.C.
1700 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103-2769    (w/ enclosure)

Brian P. McCafferty
Provost Umphrey Law Firm LLP
1617 John Fitzgerald Kennedy Blvd.
Suite 640
Philadelphia, PA  19103    (w/out enclosure)

Erin K. Corley
Fibich, Hampton & Leebron, LLP
Five Houston Center
1401 McKinney, Suite 1800
Houston, TX  77010    (w/out enclosure)

Francine A. Hochberg
Louis M. Bograd
Center for Constitutional Litigation, P.C.
1050 31st Street, N.W.
Washington, DC  20007    (w/out enclosure)

Leslie Brueckner
Trial Lawyers for Public Justice PC
1717 Massachusetts Ave., N.W.
Suite 800
Washington, DC  20036-20001    (w/out enclosure)

15

Joe G. Hollingsworth
Kirby T. Griffis
Spriggs & Hollingsworth
1350 I Street NW
Washington, DC  20005          (w/out enclosure)

Shanin Specter
Kline & Specter, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA  19102          (w/out enclosure)