EXHIBIT 53

Testimony
United States Senate Committee on the Judiciary
**Regulatory Preemption: Are Federal Agencies Usurping Congressional and State Authority**
September 12, 2007

**The Honorable Donna Stone**
,
___

The Honorable Donna D. Stone
State Representative, Delaware

President,
National Conference of State Legislatures

Testimony
Before the Committee on the Judiciary
United States Senate

September 12, 2007

Good morning. I would like to thank Chairman Leahy, Ranking Member Specter and the members of the Senate Judiciary Committee for inviting me here this morning to speak to you about the preemption crisis facing states today. My name is Donna Stone and I am a state representative from the state of Delaware and the current President of the National Conference of State Legislatures. NCSL is a bipartisan organization representing the legislatures from the 50 states and the U.S. Territories. I ask that my written testimony be accepted and incorporated into the record.

NCSL is troubled by the growing trend in both Congress and federal agencies to pass or promulgate legislation and rules that have a substantial detrimental impact on states because of their intrusively preemptive nature. NCSL has tracked these preemptions in our Preemption Monitor, a publication that we initiated to alert state legislators nationwide to the alarming number of federal legislative and regulatory preemptions. As a result of federal preemption, a large part of the policy jurisdiction of state legislatures and of city and county officials has been lost. States and localities cannot legislate in response to their citizens' needs when the federal government has preempted the policy field. What is lost is the capacity for regional and local self-government.

The cornerstone policy of NCSL is our Federalism policy. Set forth in this policy resolution are the building blocks for a sound and robust state-federal partnership. The NCSL Federalism policy makes several important observations about the role of the states and federal government in our federal system of which we should all take note. Specifically, our policy recognizes that individual liberties can be protected by dividing power between levels of government; in other words, division of power between federal and state governments also serves as a check on the power of each. As the Supreme Court properly stated in New York v. United States (1992): "When one level of government becomes deficient or engages in excesses, the other level of government serves as a channel for renewed expressions of self-government."

Our Federalism policy also recognizes the importance of state innovation and creativity. As Justice Brandeis wrote in his dissenting opinion in the case of New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932)(Brandeis, J., dissenting):
"It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest

of the country." NCSL believes that states are often in the best position to act quickly on a given issue and, in so acting, be more sensitive to the needs of the American people. NCSL believes that federalism allows for greater responsiveness and innovation though local self-government. State and local legislatures are accessible to every citizen. They work quickly to address problems identified by constituents.

Finally, NCSL is committed to the goal of restoring balance to our dual system of government by inviting Congress to reexamine some of its own recent preemptive actions, as well as to scrutinize some of the more recent federal agency actions that have frustrated this policy goal. We at NCSL hope that this hearing will serve as an important first step toward repairing the damage that has been done to states through ill-considered preemptive actions. However, before I address the solutions to this problem, I wish to highlight some of the lowlights of the last several years.

Agency Preemptions
In recent years federal agencies have developed a troubling trend – preemption of established bodies of state law in the absence of underlying statutory authority through the rulemaking process. Several recent agency actions serve to illustrate this disturbing development.

In August, 2005, the National Highway Traffic Safety Administration (NHTSA) published a Notice of Proposed Rulemaking (NPRM) in the Federal Register on Roof Crush Resistance. The NPRM contained a federalism assessment required by Executive Order 13132 which stated that the agency had reviewed and analyzed the proposed rule against the criteria contained in the Executive Order and had determined that the NPRM did not have "sufficient federal implications to warrant consultation with State and local officials or the preparation of a federalism summary impact statement." See Federal Register, Vol. 70, No. 162 at 49245 (Tuesday, August 23, 2005). The NPRM further stated that "the proposal would not have any substantial impact on the States, or on the current Federal-State relationship, or on the current distribution of power and responsibilities among the various officials." Id. The NPRM then went on to state that "if the proposal were adopted as a final rule, it would preempt all conflicting State common law requirements, including rules of tort law." Id. at 49246. Whether NHTSA recognized that a preemption of this nature would obviously impact states significantly, or whether NHTSA was being disingenuous is unknown. What is known is that there was no consultation conducted with NCSL, state attorneys general or any other state or local government entity, and the NPRM was allowed to pass through the Office of Management and Budget and be published in the Federal Register.

The fact that NHTSA did not consult with NCSL prior to this NPRM's publication in the Federal Register is the critical one. Had this language become part of a final rule, NTSHA, a federal agency comprised of unelected civil servants, would have succeeded in establishing state tort law and liability standards. The parameters of state tort law, and more specifically whether to allow lawsuits on certain types of claims, are clearly policy decisions most appropriately crafted by elected state legislators and judges, not by federal agencies. This NPRM most definitely had significant impact on the federal-state relationship and had very substantial impact on every state in the country that allows wrongful death lawsuits in the event of a vehicle rollover.

Spurred by concern about this proposed rule, NCSL went one step further. We contracted with the Pacific Institute for Research and Analysis to conduct an analysis of how much a federal preemption of this nature would cost states. The ensuing report found that the financial burden placed on State governments as a result of the preemption provision contained in the NHTSA rule would be between $49 and $71 million per year, primarily as a result of increased state-paid medical and disability costs. Had NHTSA been required to consult with states by something more binding than an Executive

Order, this impact would have been known in advance of the NPRM's publication, and efforts to minimize the preemption could have been undertaken.

Another important facet of this particular rulemaking that I alluded to earlier is that there was absolutely no statutory authority for the NHTSA preemption contained in the NPRM's underlying statute, which was Section 7251 of the Safe, Accountable, Flexible and Efficient Transportation Equity Act of 2005. Instead, NHTSA placed its authority to act in the holding of a 2000 Supreme Court case called Geier v. Honda, Inc., 529 U.S. 861 (2000), which actually upheld the rights of citizens to file common law tort cases in vehicle airbag cases. Conversely, the NHTSA language in the NPRM expressly stated that common law tort lawsuits would be prohibited. I want to thank Senators Leahy and Specter for sending their letter of concern to NHTSA, which echoed the concerns of NCSL on this NPRM.

Close on the heels of the NHTSA NPRM came another, even more disturbing proposed rule, this time by the Food and Drug Administration. In December, 2005, the FDA determined that it was time to finalize a rule on prescription drug labeling which had lain dormant for five years. NCSL was aware of this rule, but did not submit comments because the original language of this NPRM expressly stated that there would be no federalism implications because the proposed rule would not preempt state law. See, Federal Register, Vol. 65, No. 247, p. 81103, December 22, 2000. Because of the express statement of non-preemption, the consultation requirements of Executive Order 13132 were not triggered.

On December 30, 2006, NCSL learned that the FDA planned to finalize its rule and include a policy statement that the provisions of the prescription drug labeling rule would preempt state product liability laws. NCSL approached FDA officials and asked for three things: a consultation meeting pursuant to the Federalism Executive Order, a copy of the proposed language, and that the FDA re-open the comment period to allow NCSL to file formal comments on this very significant and preemptive change. The FDA ignored the first request. The second and third requests were denied. However, it is interesting to note that during this rule's 5-year dormancy period, the FDA had allowed certain large pharmaceutical companies to submit comments pertaining to preemption after the expiration of the comment period. States, however, were not given the same deference, and the FDA finalized this rule in mid-January, 2006. Once again, unelected federal bureaucrats had succeeded in forming state tort law policy over the objections of the states.

Most recently, in early 2007, the IRS issued a revenue ruling concerning Section 162(h) of the Tax Code. Section 162(h) provides for the per diem deduction to any day that the legislature is in session. This section specifies that a legislative day, " shall be any day during such year on which – (A) the legislature was in session (including any day in which the legislature was not in session for a period of 4 consecutive days or less)". Section 162(h)(2)(A). Congress provided no more specificity or limitations in the definition of legislative session.

Pursuant to this revenue ruling, the IRS told state legislators that they could not take per diem deductions for days that the legislature was in session, but during which no substantial business was conducted. This interpretation was not based on any statute or existing rule of law, yet it sought to essentially define what would constitute a "legislative day." The unelected IRS officials unilaterally, and without any consultation with states as to the state impact, decided to craft state policy in a manner that preempted many state statutes or constitutions, or both, which specifically define what constitutes a "legislative day."

All of these circumstances surrounding the regulatory actions of the NHTSA, the FDA, and the IRS

made it abundantly clear to NCSL that something more than an Executive Order on Federalism would be needed to keep agency action in check. We think we know how to bring our federal-state system back into balance.

Additionally, the following examples illustrate what happens when there is a lack of agency/state consultations. In the FY 2008 budget, the Administration proposed to make a number of "administrative" changes that would fundamentally alter and substantially reduce federal support for the Medicaid program. Many of these proposals were at one time submitted as legislative proposals and rejected by Congress. In some cases Congress has enacted moratoria on the proposed regulatory actions. In 2007, Center for Medicare and Medicaid Services (CMS) has promulgated the following rules that would significantly amend the Medicaid statute without guidance or consideration by Congress and without meaningful consultation with state and local governments or their national associations:
• January 18, 2007 –NPRM– Cost Limit for Providers Operated by Units of Local Government and Provisions to Ensure the Integrity of the Federal-State Financial Partnership. This NPRM proposed to alter the definition of "unit of local government" in the Medicaid statute for purposes of limiting local governments in the amount they can assist states in providing the "state share" of Medicaid funding. A Final Rule was published May 29, 2007 in the Federal Register. Congress imposed a one-year moratorium on the Final Rule in P.L. 110-28.
• March 23, 2007 – Notice of Proposed Rulemaking (NPRM) - Health Care-Related Taxes. In addition to establishing guidelines regarding the provision in the Tax Relief and Health Care Act of 2006, this NPRM reduces the allowable amount that can be collected by a state from a health care-related tax from 6 percent to 5.5 percent of net patient revenues and substantially changes the hold harmless test which was not addressed in the Act.
• May 23, 2007 – Notice of Proposed Rulemaking (NPRM) – Graduate Medical Education. Proposed to change current law to no longer permit costs and payments associated with Graduate Medical Education (GME) to be reimbursed under Medicaid. Congress imposed a one-year moratorium on the NPRM in P.L. 110-28.
• August 13, 2007 – Notice of Proposed Rulemaking (NPRM) – Coverage for Rehabilitative Services. Amends the definition of rehabilitative services in the Medicaid statute. These changes are not required by any federal law or other Act of Congress.
• August 17, 2007 – Dear State Health Official Letter – Changes the income eligibility requirements in the State Children's Health Insurance Program (SCHIP). These changes became effective immediately, despite that Congress is in the midst of reauthorizing this critically important health care program for children.
• September 7, 2007 – Notice of Proposed Rulemaking (NPRM) – Elimination of Reimbursement Under Medicaid for School Administration Expenditures and Costs Related to Transportation of School-Age Children Between Home and School. This NPRM proposes to change Medicaid reimbursement policy related to school-based health care services. These changes are not required by any federal law or other act of Congress.

NCSL believes the key to the successful implementation of Medicaid and SCHIP is stability in funding and rules of engagement. If the Department of Health and Human Services was required by law to consult with state and local government officials or their national associations, the adverse impact of these agency actions could have been minimized and perhaps avoided.

Legislative Preemptions
Over the last two and one-half years, NCSL has tracked over one hundred and fifty proposed legislative preemptions of state law. The legislation has spanned the range of issue areas from homeland security, to health, to election reform, and are all reported in NCSL's Preemption Monitor

which can be found on our website at www.ncsl.org. I will highlight a few of the more notorious preemptions today.

Real ID ACT of 2005
The Real ID Act of 2005 requires states to adopt new federal standards for the issuance of driver licenses (DL) and identification cards (ID) by May 11, 2008 or their DL/ID cards will not be recognized for federal purposes, for example, boarding federally regulated commercial aircraft, accessing federal facilities, entering nuclear power plants, and any other purposes that the secretary determines.

The process whereby the Real ID Act was enacted, as well as the proposed DL/ID standards themselves, ignores the basic principles of federalism that respect diversity without causing division and that foster unity without enshrining uniformity. The Real ID Act of 2005 was added to a must-pass supplemental spending bill for the war on terrorism and tsunami relief. With its enactment, the Real ID Act repealed an existing negotiated rulemaking process for establishing DL/ID standards, in which NCSL participated, and instead put into statute prescriptive mandates. The negotiated rulemaking process would have made the development of standards a partnership instead of a preemption of existing state practices. The process ignored the fact that DL/ID cards have been issued by states for over 90 years under the constitutional authority of the 10th Amendment, and failed to provide state legislators with any notice of congressional intent or opportunity for formal or informal comment prior to the law's enactment.

Mr. Chairman and committee members, creative solutions to public problems can be achieved more readily when states are accorded due respect. Uniformity for uniformity's sake does not justify preemption. As you know, at least six states—Maine, Montana, New Hampshire, Oklahoma, South Carolina and Washington—have enacted legislation stating their refusal to comply with the provisions with the Real ID Act.

Vaccine liability exemption – H.R. 2863, defense appropriations rider
This provision was added as a rider to the Conference Committee report of H.R. 2863, the FY2006 Defense Appropriations bill. It prohibits any lawsuit, under federal law or any applicable state law, from being filed against a vaccine manufacturer, distributor or administrator for any claim arising or resulting from the use of the vaccine or drug in question. Any petitioner making a claim of willful misconduct by a drug manufacturer may only file a complaint with the Secretary of Health and Human Services, thus being further barred from the state and/or federal court system. Courts are restricted to the review of the Secretary's action, and may not ever consider the nature of the willful misconduct complaint. The bill was signed by President Bush on December 30, 2005, and became Public Law 109-148.
S. 1082, The Prescription Drug User Free Act of 2007 (PDUFA) as part of The Food and

Drug Administration Revitalization Act.
Language was stripped from all 10 House drafts of the PDUFA legislation which, if included, would have provided a safeguard against FDA preemption of state laws and would have undone the FDA Prescription Drug Labeling Rule preamble preemption which I discussed above.

Election Reform – H.R. 811
H.R. 811 is poised for House floor action any day. If passed, H.R. 811 will require states to have voting systems that provide a paper receipt or "trail" of a voter's ballot choices. While most states agree with the concept of H.R. 811-- that there ought to be some sort of paper trail, concurrence with the requirements of H.R. 811 ends there. Direct recording-electronic voting machines, or "DREs",

which are the only voting machines in existence that permit the disabled voter to cast a secret ballot, are not considered to be compliant with the provisions of H.R. 811. These machines will need to be either scrapped or retrofitted with a paper printer. Both options are expensive. In the most recent iteration of the bill, it appears that AutoMark machines are not compliant either. Even more troubling is the requirement for a one-size-fits-all audit scheme that is not based on any state's current practices and would, therefore, preempt laws in all 50 states. The audit process contemplated by H.R. 811 would also be very expensive. Several states recently rejected audit provisions similar to those in H.R. 811 because they were cost prohibitive; Indiana and Virginia are two such states. Regrettably, state and local policy and elections officials were not given a seat at the table when this bill was drafted and, thus, the full scope of the preemptive impact and the resultant cost implications for states were never discussed.

If members of Congress are better informed about the preemptive impact of legislative proposals, then we believe, based on our experience with the Unfunded Mandates Reform Act, that fewer provisions preempting state law will be proposed. Even when Congress decides that preemption is necessary, we believe that preemptive language will be more carefully targeted and more narrowly crafted. We think that greater clarity in bill drafting will allow states, courts and the general public to know more precisely when Congress intends to preempt and where the limits are on the scope of the preemption.

Proposed Solutions to Excessive Preemptions
In 1999, NCSL and other state and local government national associations worked closely with the Clinton Administration to revise and refine the Federalism Executive Order, Executive Order 13132. Although the Federalism Executive Order is a noble first step in increasing agency awareness and accountability for preemptive regulations, as my testimony has shown, it does not go far enough for one main reason: an executive order is a guidance document that does not carry the weight of statute and, therefore, cannot be enforced. There are no consequences for its violation. There is no incentive for agencies to adhere to the Federalism Executive Order's requirements in any meaningful way. NCSL has found that in the years following the effective date of the Federalism Executive Order, overall agency adherence to its provisions has been spotty at best. As I have illustrated, agencies like the FDA and NHTSA have, at times, chosen to ignore its requirements altogether. Other agencies, like the Department of Homeland Security, choose to circumvent it by issuing interim rules so that the Federalism Executive Order cannot be applied; and a handful of agencies, like the Consumer Product Safety Commission, are expressly exempted from its requirements.

NCSL believes that the Federalism Executive Order should be codified into statute to protect elected state policymakers from the uninformed actions of unelected federal agency bureaucrats. Additionally, we believe that the provisions of this new law should be extended to legislative actions undertaken by Congress. Specifically, NCSL would like to see a new piece of congressional legislation that contains the following principles:

1. Partnership and enhanced consultation. NCSL would support provisions to provide for consultation with state and local elected officials or their representative national associations prior to the consideration of any legislation or federal regulations that would interfere with or intrude upon historic and traditional state and local rights and responsibilities.

2. Rule of Construction. NCSL would support provisions to ensure that, absent any explicit statement of intent to preempt or absent any irreconcilable conflicts with state law, any ambiguities would be construed in favor of state law.

3. Enforcement. NCSL supports provisions to ensure congressional and agency accountability and

enforcement. The point of order in the Unfunded Mandates Reform Act (UMRA) has made members of Congress increasingly aware of potential impacts of federal laws and regulations on state and local taxpayers. We believe that a mechanism to ensure this recognition regarding preemption in both the legislative and the regulatory arenas is critical.

4. Legislative Report. NCSL supports efforts to include a federalism assessment in every committee and conference report. This will help members appreciate the potential impact on our levels of government, our taxpayers, and our programs.

5. Agency Impact Statement. Early in the rulemaking process, it is essential to codify the provisions of the Federalism Executive Order to ensure that every federal agency engages in a meaningful consultation process with elected state and local officials or their national associations, as well as with other impacted stakeholders. This will help to determine the potential impact of final administrative rules on our partnership.

NCSL believes that these recommendations, taken in the cumulative, will benefit everyone – state and local governments, the federal government and the general public -- because they foster greater transparency, greater cooperation between governmental units and more information sharing all around. NCSL is prepared to work with you, Chairman Leahy, Ranking Member Specter and members of the Senate Judiciary Committee, to make these policy considerations a legislative reality. I believe that this type of legislation will serve to strengthen and fortify the intergovernmental partnership. My hope is that with your leadership, legislation to address the states' concerns on preemption will be introduced soon so that it can successfully make its way through the legislative process during this session. Thank you for your time today.