EXHIBIT 81

# Opinion
# Missouri Court of Appeals
# Eastern District

**Case Style: Cortez Strong, Respondent/Cross-Appellant v. American Cyanamid Company, Appellant/Cross-Respondent, and Georgia Santos-Jawaid, M.D., Respondent.**

**Case Number: ED87045**

**Handdown Date: 08/28/2007**

**Appeal From: Circuit Court of the City of St. Louis, Hon. Michael B. Calvin**

**Counsel for Appellant: Thomas P. Germeroth**

**Counsel for Respondent: Michael D. O'Keefe, James W. Erwin and Dale R. Joerling**

**Opinion Summary:**

American Cyanamid Company appeals the judgment entered in favor of Cortez Strong. Strong sued the company for products liability and negligent manufacture because of injuries he sustained after receiving the company's oral polio vaccine, "Orimune." Strong cross-appeals the trial court decision to overrule his motion to amend the judgment against the company to include prejudgment interest. He also appeals the judgment entered upon the jury verdict in favor of Georgia Santos-Jawaid, M.D., on his claim of medical malpractice.

**AFFIRMED IN PART AND REVERSED IN PART.**

**Division Three holds:** The trial court erred in overruling Strong's motion to amend the award to include prejudgment interest. The judgment is otherwise affirmed. Strong presented sufficient evidence that the company violated federal oral polio vaccine regulations and that the company's drugs were the proximate cause of his contracting polio, which caused his paralysis, to submit his claims of products liability and negligence to the jury. The trial court properly allowed Strong to rely on the federal oral polio vaccine regulations to define the standard of care. It did not err when it declined to award the company a new trial based on the admission of Strong's allegedly prejudicial and irrelevant evidence. The trial court did not abuse its discretion in overruling the company's motion for remittitur and did not err in overruling Strong's request to present a rebuttal witness in response to Dr. Jawaid's evidence.

**Citation:**

**Opinion Author: Glenn A. Norton, Presiding Judge**

**Opinion Vote: AFFIRMED IN PART AND REVERSED IN PART. Mooney, J. concurs; Romines, J., dissents.**

**Opinion:**

American Cyanamid Company ("Company") appeals the judgment entered upon a jury verdict in favor of Cortez Strong ("Plaintiff") on Plaintiff's claims of products liability and negligent manufacture. Plaintiff cross-appeals the trial court's denial of his motion to amend the judgment against Company to include prejudgment interest. He also appeals the judgment entered upon the jury verdict in favor of Georgia Santos-Jawaid, M.D. ("Dr. Jawaid"), on his claim of medical malpractice. We affirm in part and reverse in part.


## I. BACKGROUND

For several decades, Lederle Laboratories, one of Company's divisions, manufactured Orimune, an oral polio vaccine. In June 1987, Plaintiff received a second dose of Orimune as part of his routine immunizations. In the next few days, Plaintiff experienced weakness in his arms. The weakness subsequently developed into permanent paralysis in his left arm and some weakness in both hands.

Alleging that he contracted vaccine-associated paralytic polio from the polio vaccine, Plaintiff commenced this action against Company, the manufacturer, and Dr. Jawaid, the pediatrician who administered the vaccine. As to Company, among other counts, Plaintiff claimed that Orimune was a defective product and that Company negligently manufactured the vaccine. Plaintiff claimed that Dr. Jawaid failed to warn him of the risks of contracting polio from the live polio vaccine and failed to inform him of the alternative inactivated polio vaccine, which did not carry a risk of causing vaccine-associated polio because it does not contain a live polio virus.

According to evidence presented at trial, trivalent oral polio vaccine is intended to prevent infection from three types of "poliovirus" - Type I, Type II and Type III. The virus strains are "attenuated," or weakened, so that the virus strains can still grow but are not able to cause disease the way a virulent or "wild" strain would. When the patient takes the vaccine, the attenuated virus strains cause a mild infection as the virus grows in the patient's esophagus. This growth stimulates the body to produce antibodies that protect against the disease. The patient should also produce antibodies in the digestive tract and the bloodstream.

To produce the vaccine, Company acquired strain material for the three types of virus, which it used to grow the vaccine for each particular strain. For instance, with Type I, Company obtained the original strain material, called "Sabin Original Merck" or "SOM" from Dr. Albert Sabin in the 1960s. The original material came from a type of monkey that can carry a virus called simian

virus 40 ("SV40"). Company neutralized the SOM with an antibody to ensure the next virus generation would not carry SV40. After completing the neutralization process, Company called the material 45B157. According to Company, it generally assigns a number for each step in the manufacturing process so they can trace the development of the material.

Company took 45B157 and harvested it in monkey kidney tissue to expand the amount of material. Upon completion of that step, Company designated the grown material as 701S. From the 701S preparation, Company created another harvest or "passage" to expand the material to create what they called "production seed 45B160." Company used 45B160 to produce additional Type I virus in many different monkeys. After harvesting the material in several monkey kidneys, they pooled the harvests together to create a Type I monopool. The Type I monopool then became the Type I vaccine component of the trivalent vaccine.

Company performed essentially the same steps for the Type II component of the vaccine. It began with original seed material from Dr. Sabin which it neutralized to create 45B158. Company grew out 45B158 to create 801S and used the 801S harvest to create production seed 45B162. Like 45B160, Company pooled several harvests of 45B162 together to create a monopool for the Type II vaccine.

Unlike the Type I and Type II components, Company's Type III component in the vaccine at issue in this case did not derive directly from Sabin original material. Instead, Company obtained the strain material from a company called Institut Merieux, which had itself obtained the material from Pfizer, a pharmaceutical company. Company describes the material as "Pfizer material" because Pfizer created it by performing a "cloning implant purification of the Sabin Original Merck." Company designated the material as 45B164. According to Company, it did not neutralize the 45B164 because it was not produced in monkeys. Instead, Company went directly to creating production seed 45B165. As with 45B160 and 45B162, Company used 45B165 to grow out more virus and then pooled several harvests together to create a monopool for the Type III component of the vaccine.

Once Company completed the three monopools, it combined the monopools together with a dilutant to lessen the strength of the vaccine. The large vessel of diluted trivalent vaccine was then divided into smaller vessels, which were used to fill the individual doses Company packaged as Orimune and sold for public use.

At trial, Plaintiff introduced evidence intending to show that in manufacturing Orimune, Company failed to comply with several regulations that specifically govern the manufacture of live oral polio vaccine. In addition to other testimony, Plaintiff offered Thomas Bozzo as an expert to testify about Company's compliance with the polio vaccine regulations.

Initially, Bozzo testified about his qualifications. Bozzo stated that he holds a bachelor's degree in pharmacy and a master's degree in public health from Johns Hopkins University. In order to obtain his master's degree, Bozzo took courses dealing with epidemiology – the causes of infectious diseases, how chronic diseases progress, and biostatistics relating to disease.

Bozzo also testified that he is currently a consultant to biologics pharmaceutical tissue industries, providing advice to such organizations about compliance with FDA requirements. Before becoming a consultant he spent over twenty-one years working for the FDA in the area of regulating biologic products. Before working with the FDA he worked four to five years for its predecessor, the Division of Biologic Standards.

While at the FDA, Bozzo worked as a branch chief or branch director in a variety of areas including those having to do with assuring that products are made according to good manufacturing practices. Bozzo was also a compliance officer. He would take information provided during inspections to analyze products and determine whether or not the information indicates a violation of the regulations or the law. During his last five to six years he was the director of the office of compliance in the center for biologics evaluation and research.

Bozzo did conduct inspections and review inspection reports with respect to Orimune, although he was not specifically involved in licensing Company to manufacture the vaccine or approving the seeds or monopools. However, Bozzo was required to be familiar with the process for licensing manufacturers and others to produce products like Orimune.

Bozzo testified that he supervised the people who drafted the polio vaccine regulations, although he was not personally involved with the regulatory changes that occurred in the nineties. Finally, Bozzo explained he had to be knowledgeable about the polio vaccine regulations, but did not specifically recall instances when he was asked to interpret or apply them with regard to the manufacturing or testing of Orimune. Based on the foregoing, the court accepted Bozzo as an expert over Company's objection.

Once accepted, Bozzo testified about the regulatory requirements governing the production of oral polio vaccine. Bozzo cited three areas where he believed Company failed to comply with the regulations. Specifically, he stated Company violated 21 C.F.R. Section 630.10(b)(4) and (5)(FN1) and 21 C.F.R. Section 630.16(b)(1) because it did not test the Sabin strains SOM Types I and II and the Pfizer material, as well as intermediate seeds 701S and 801S, for neurovirulence. He also testified that Company violated 21 C.F.R. Section 630.10(b)(3) because it did not test the Sabin strains for extraneous microbial agents. Finally, he testified that Company violated 21 C.F.R. Section 630.12(a)(2), which prohibits the use of monkeys that have been used previously for experimental or test purposes as a source of kidney tissue in the processing of vaccine. According to Bozzo, Company used tissue from monkeys given an experimental foamy virus vaccine to develop materials used to create the Type I seed that was later used in Plaintiff's vaccine.

In its defense, Company presented the testimony of Dr. Mary Ritchey, a microbiologist who worked for Company in the area of vaccine quality control. When asked about the regulations, Dr. Ritchey testified that she disagreed with Bozzo that the regulations required testing of original strain material or intermediate material. She stated that the government was aware that Company did not perform tests on this material but did not inform them that they should have done so.

Dr. Ritchey testified that she had no issues with the safety of the vaccine after reviewing Company's records, including release protocols sent to the government and neurovirulence test results. She believed that good test results on monopools of the vaccine meant that the intermediate materials used to make the monopools would also pass the tests. When discussing the specifics of neurovirulence testing, Dr. Ritchey noted that neurovirulence tests refer to the vaccine's risk of causing polio because the results indicate whether or not the vaccine has maintained its attenuated or weakened characteristics.

In addition to presenting evidence about the manufacture and testing of Orimune, Plaintiff also offered evidence to demonstrate that vaccine-associated paralytic polio caused his paralysis. First, Plaintiff called Dr. Garrett Charles Burris, a medical doctor specializing in pediatric neurology, to testify. Dr. Burris stated that he was asked to see Plaintiff for the first time in 1995. Dr. Burris examined Plaintiff and did some testing of his nervous system to determine what caused his paralysis. Based on his examination and the test results, Dr. Burris concluded that Plaintiff's injury was caused by an anterior horn cell disease rather than an injury to or disease of the brachial plexus, the diagnosis contained in the report of Plaintiff's treating physician.

When asked what type of anterior horn cell disease caused Plaintiff's paralysis, Dr. Burris first testified he found it significant that the paralysis occurred within four to five days of Plaintiff's second dose of Orimune. He stated that a person can contract polio from the oral polio vaccine. Dr. Burris then explained that polio is a virus that gets into the anterior horn cell and causes a rapid onset of paralysis. He described the paralysis as typically permanent, although it may improve. Dr. Burris finally stated that in his opinion, based on the information he reviewed and within a reasonable degree of medical certainty, Plaintiff had vaccine-associated paralytic poliomyelitis.

Plaintiff also offered documents provided by the Centers for Disease Control and Prevention ("CDC") to support his argument that he contracted polio. According to the CDC documents, the CDC classified Plaintiff's case as vaccine-associated paralytic poliomyelitis in which the virus was not actually cultured or characterized. After discussing the conclusion in the CDC documents, Plaintiff asked Dr. Burris whether he relied on the CDC documents as a basis for his determination. He responded that he looked at Plaintiff's case from a neurological point of view, so that the CDC documents were not the sole basis for his diagnosis. As a neurologist, Dr. Burris concluded that Plaintiff had an acute onset of paralysis following administration of an oral polio vaccine with no other indications in Plaintiff's chart of another cause for Plaintiff's paralysis.

Plaintiff finally asked Dr. Burris about whether Plaintiff's paralysis could have been caused by another type of anterior horn cell disease, a virus called Enterovirus 71 ("EV 71"). Dr. Burris explained that he believed Plaintiff had polio rather than EV 71 because of the timing of the onset of paralysis, because the titer, or measure, indicating the presence of EV 71 antibodies in Plaintiff's blood was reported nine months after he was given the polio vaccine and because the CDC's panel of experts reviewed Plaintiff's records and concluded Plaintiff had a case of vaccine-associated polio.

On cross-examination, Dr. Burris agreed with Company that Plaintiff did not have a typical case of polio for various reasons, including the short time period between administration of the

vaccine and Plaintiff's onset of symptoms and because doctors were unable to isolate polio in Plaintiff's stool sample. Dr. Burris also agreed that it is more rare for a person to contract polio following the second dose of polio vaccine than after the first dose.

Company then questioned the validity of Dr. Burris's diagnosis based on the presence of EV 71 antibodies in Plaintiff's blood when he was tested in March of 1988. First, Dr. Burris agreed that EV 71 has been reported to cause paralysis similar to that caused by polio and that it is difficult to diagnose. He then agreed that the lower titer of EV 71 antibodies in Plaintiff's blood indicated previous exposure so that it was possible Plaintiff's EV 71 caused Plaintiff's paralysis. However, he stated that in the absence of objective evidence demonstrating Plaintiff's paralysis was caused by EV 71 rather than polio, he found that the temporal association between administration of the vaccine and Plaintiff's paralysis was a significant factor in determining that Plaintiff had polio. According to Dr. Burris, this conclusion was supported by the CDC case definition for polio. Finally, Dr. Burris opined that the onset of paralysis after administration of oral polio vaccine is such a rare occurrence that it is not coincidental.

On the issue of economic damages, Plaintiff offered the testimony of James England, a vocational expert. Mr. England is a rehabilitation counselor whose job is to evaluate and assist people who have impairments or disabilities that interfere with their ability to work. After evaluating Plaintiff, Mr. England concluded that Plaintiff was precluded from many occupations available without much formal education beyond high school because of his physical limitations. Plaintiff also could not join the military or work in a job requiring rapid accurate production such as at a car plant. He could not work in skilled trades that pay well, such as brick-laying or carpentry. Thus, absent formal academic development, Plaintiff is limited to entry-level, unskilled employment with an earning capacity of six to eight dollars per hour.

As to Plaintiff's likelihood of getting accepted into college, Mr. England testified that Plaintiff's academic record was "[n]ot very good." Although Plaintiff recently earned good grades at an alternative high school, Mr. England felt they were incongruous compared to his scores on national tests and did not think the high school was as rigorous academically. Mr. England concluded that it was unlikely Plaintiff would receive an academic scholarship and that it would be difficult to get into many colleges. However, Mr. England agreed that Plaintiff may very well finish college and that, if he did, he could earn at the same level as a person without his disability.

In addition to testifying about his difficulty performing his current job at Shop-N-Save because of the physical demands, Plaintiff testified about the non-economic impact of his injury. Plaintiff explained that his classmates have taunted him and picked on him for most of his life. He notices people staring at him and feels that it is hard to fit in. Although he was a good student during elementary school, he became more interested in fitting in than in school work. Because his grades dropped significantly, he was sent to an alternative school with "wannabe gangsters" and kids with attitude problems. Plaintiff is not sure whether he can get into college.

Plaintiff's evidence against Dr. Jawaid primarily consisted of the testimony of Dr. Alan Shanske. Dr. Shanske testified about what warnings a physician should give before administering the oral polio vaccine. He discussed the recommendations contained in the "Red Book," a book

distributed by the American Academy of Pediatrics. According to Dr. Shanske, it would be below the standard of care for a physician to not mention the alternative inactivated polio vaccine, which does not carry a risk of causing polio.

In her defense, Dr. Jawaid testified about her encounters with Plaintiff's mother at the time she administered Orimune to Plaintiff. Dr. Jawaid testified that she did not recall whether she discussed inactivated polio vaccine as an alternative with Plaintiff's mother, but believed she might have. She further stated she definitely would have told Plaintiff's mother about inactivated polio vaccine if Plaintiff's mother refused oral polio vaccine or certain risk factors were present dictating the use of inactivated polio vaccine. Dr. Jawaid explained that she used the Red Book as a resource to obtain information about vaccines and infectious diseases and used it as a guide for what to do when giving a vaccine to a patient.

After Dr. Jawaid testified, Plaintiff requested that the trial court allow him to enter the testimony of Elizabeth Diehl, M.D., an expert endorsed by both Plaintiff and Dr. Jawaid, as rebuttal evidence. Plaintiff believed that Dr. Diehl's testimony contradicted Dr. Jawaid's testimony that the Red Book guidelines did not require her to discuss alternatives to oral polio vaccine under all circumstances. The trial court did not permit Plaintiff to offer Dr. Diehl's testimony.

At the conclusion of trial, the jury returned a verdict in favor of Plaintiff on his claims against Company. The jury awarded Plaintiff $1.5 million for past economic damages, $2 million for future economic damages, and $5 million for future non-economic damages. As to Plaintiff's claims against Dr. Jawaid, the jury returned a verdict in favor of Dr. Jawaid. This appeal follows.

## II. DISCUSSION

### A. Company's Appeal

### 1. Sufficiency of Proof of Proximate Cause

In its first point, Company argues that the trial court erred in denying its motion for judgment notwithstanding the verdict because Plaintiff failed to present a submissible case for either products liability or negligence. In particular, Company contends that Plaintiff failed to prove the element of causation under either theory because he did not offer any expert testimony tending to show that the alleged defects or Company's negligence affected the safety of the vaccine.

To make a submissible case, the plaintiff must present substantial evidence to support each element of his claim. *Benoit v. Missouri Highway and Transportation Commission*, 33 S.W.3d 663, 667 (Mo. App. S.D. 2000). In determining whether Plaintiff made a submissible case, we consider the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiff, disregarding all contrary inferences. *Cline v. William H. Friedman & Associates, Inc.*, 882 S.W.2d 754, 758 (Mo. App. E.D. 1994). We may not withdraw a case from the jury unless there is no room for reasonable minds to differ. *Washington by Washington v. Barnes Hospital*, 897 S.W.2d 611, 615 (Mo. banc 1995). Also, only the jury may judge the credibility of witnesses

and the weight and value of their testimony. *Benoit*, 33 S.W.3d at 667. However, whether evidence in a case is substantial and whether the inferences drawn are reasonable are questions of law that we review *de novo*. *Savory v. Hensick*, 143 S.W.3d 712, 716 (Mo. App. E.D. 2004).

To make a submissible case for products liability, Plaintiff had to prove the following elements, taken from Restatement (Second) of Torts, section 402A: (1) the defendant sold a product in the course of its business; (2) the product was then in a defective condition, unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold. *Lay v. P & G Health Care, Inc.*, 37 S.W.3d 310, 325 (Mo. App. W.D. 2000) (citing *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 364 (Mo. 1969)). To submit a case for negligence, Plaintiff had to show that the defendant had a duty to protect him from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused his injury. *Sill v. Burlington Northern Railroad*, 87 S.W.3d 386, 391 (Mo. App. S.D. 2002).

In contending that Plaintiff failed to make a submissible case on either claim, Company focuses primarily on whether Plaintiff proved causation, and more specifically, whether Plaintiff proved that Company's actions were the proximate cause of his injuries. As is apparent from the elements set forth above, products liability actions and negligence actions require a causal connection between the conduct of the defendant and the resulting injury to the plaintiff. *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 381 (Mo. banc 1986) (stating that proving proximate cause in a strict tort liability case is a fundamental burden that must be met); *Jones v. Trittler*, 983 S.W.2d 165, 167 (Mo. App. E.D. 1998) (stating that a negligence action requires a causal connection).

To establish causation, Plaintiff must show that Company's conduct was both the cause in fact and the proximate or legal cause of his injury. *Wright v. Barr*, 62 S.W.3d 509, 524 (Mo. App. W.D. 2001). "The cause in fact is determined by asking whether the plaintiff's injury would not have occurred but for the defendant's conduct, and a defendant's conduct is also the proximate cause of the plaintiff's injury if the injury complained of was the natural and probable consequence of the defendant's conduct." *Id.* (internal citations omitted). Normally, the trier of fact will decide causation, especially where reasonable minds could differ. *Id.*

Relying on prior cases involving Orimune, Company argues that, even assuming it violated the polio vaccine regulations, Plaintiff failed to prove its actions were the proximate cause of Plaintiff's paralysis because he did not present evidence that Company's conduct made Orimune more unsafe that it would have been had Company complied. Although we agree with most of the reasoning in the cited cases, because we find that Plaintiff presented sufficient evidence of proximate cause, we disagree that the cases support reversal here.

In *United States v. St. Louis University*, after paying a sixteen million dollar Missouri state-court judgment to the family of a boy paralyzed after receiving Orimune, St. Louis University ("SLU") brought a contribution action against the United States government and Company. 336 F.3d 294, 296 (4th Cir. 2003). The district court granted Company's motion for summary judgment, but found the government liable in contribution to SLU because it was negligent in approving

vaccine that did not satisfy the neurovirulence standards contained in the regulations. *Id.* at 299. Relying on its analysis in a previous case called *In re Sabin Oral Polio Vaccine Products Liability Litigation* ("*Sabin III*"), the district court concluded that the government proximately caused the plaintiff's injuries because, had the government properly refused to approve the questionable seeds, vaccine made from those seeds never would have been produced, released, and administered to the plaintiff. *Saint Louis University*, 336 F.3d at 299; *Sabin III*, 774 F. Supp. 952, 958 (D. Md. 1991). (FN2)

On appeal, the Fourth Circuit declined to apply the district court's causation determinations in *Sabin III* because *Saint Louis University* involved Missouri law rather than Maryland or Florida law. *Saint Louis University*, 336 F.3d at 300-01. The Fourth Circuit noted that under Missouri law, a plaintiff must prove both cause-in-fact and proximate cause. *Id.* at 302. Because all oral polio vaccine, including oral polio vaccine that satisfied all regulatory requirements, carries the risk that the recipient will contract polio, the Fourth Circuit held that SLU was required to establish that the plaintiff likely would not have contracted polio from a vaccine that satisfied the government's neurovirulence requirements. *Id.* at 303. According to the Fourth Circuit, "[a]ny lesser standard would result in the government being held strictly liable for its regulatory violations, which would be inconsistent with Missouri law." *Id.* As the court explained, to support a negligence *per se* claim, a Missouri plaintiff must still prove that the statutory violation was the proximate cause of the injury. *Id.* After reviewing the facts, the Fourth Circuit found that SLU failed to meet the standard because it presented no evidence tending to show that the vaccine was more unsafe. *Id.* at 303-04. Thus, SLU did not sufficiently demonstrate that the government's regulatory violations proximately caused the plaintiff's injuries. (FN3) *Id.* at 304. *See also American Cyanamid Company v. St. Louis University*, 336 F.3d 307, 310-11 (4th Cir. 2003) (applying the same reasoning to find that SLU did not meet its burden of proving proximate cause with regard to Company's liability).

Company also cites *Graham v. American Cyanamid Company* to support its argument that Plaintiff failed to establish proximate cause. 350 F.3d 496 (6th Cir. 2003). In *Graham*, the Sixth Circuit considered whether the plaintiffs presented sufficient evidence to support their claim that Company's misrepresentation of Orimune's regulatory compliance proximately caused their injuries. *Id.* at 507. Noting the case's similarity to the claims in *Saint Louis University*, the court concluded that the plaintiffs failed to show that Company's alleged regulatory noncompliance increased the risk that the Orimune vaccine would cause polio beyond the inherent risk long known to be associated with oral polio vaccine. *Id.* at 508. In reaching its conclusion, the Sixth Circuit determined that the plaintiffs' experts established no connection between the alleged regulatory violations and an increased risk of vaccine-associated polio either through testimony, studies or other data. *Id.* at 508-10.

Significantly, the *Graham* court also recognized that the regulations Company allegedly violated, one requiring that the vaccine be no more than five tissue culture passages from the Sabin original strain, 21 C.F.R. Section 630.13(a), and the other requiring each monovalent pool to be one of a series of five consecutive pools that meet the monkey neurovirulence criteria, 21 C.F.R. Section 630.17(b), were both repealed in 1991. *Id.* at 509-11. The court emphasized that in repealing the five tissue culture passage regulation, the Food and Drug Administration ("FDA") expressly recognized the absence of a correlation between observed monkey neurovirulence and

the risk of vaccine-associated polio. *Id*. at 509-10. As to the consistency of manufacture regulation, the court pointed to the following statement in the preamble to the FDA's amended regulations:

[N]o criteria were provided to link the history of performance of monovalent virus pools with the continued qualification of the seed virus. Long experience has shown that the failure of a monovalent virus pool, produced from an acceptable seed virus, is usually unrelated to deficiencies in the manufacturing process, but is usually due instead to test variability.

*Id*. at 510-11 (quoting 56 Fed. Reg. 21430-31 (May 8, 1991)). Again, the FDA's comments supported a conclusion that a failure to comply with the repealed regulation would not increase the risk of vaccine-associated polio. The court summarized its reasoning, stating:

All vaccines produced from live viruses, as this one is, carry the paradoxical risk of inducing the very disease that the vaccine strives to prevent. In the absence of expert testimony showing that these alleged regulatory violations made Orimune more unsafe than it otherwise would have been, a rational trier of fact could rule for plaintiffs only on the basis of conjecture, not a legitimate set of inferences drawn from admissible evidence. On this record, it remains unknowable whether plaintiffs' injuries stemmed from an avoidable defect in the product or unavoidable bad luck. That the 1984 regulations upon which these claims rest have since been repealed and that the FDA has concluded that compliance with these regulations did not decrease the incidence of vaccine-associated paralytic polio cement this conclusion.

*Id*. at 512.

Although Company acknowledges that Plaintiff offered some testimony as to regulatory violations through Bozzo, Company contends his testimony did not sufficiently link the regulatory violations to Plaintiff's injuries as required by *Saint Louis University* and *Graham*. In particular, Company states that Bozzo admitted no connection between polio and two of the violations to which he testified. First, Bozzo agreed that opining whether or not adventitious agents or extraneous microbial agents are present in oral polio vaccine can result in paralytic polio was not within his expertise. Second, during Bozzo's deposition, which was read into the record, Company asked Bozzo whether he was going to offer any expert opinion that using monkey tissue involved in a foamy virus study to produce seed 45B160 had any effect on the possibility that vaccine made from the seed could cause vaccine-associated polio. Bozzo replied that he had not focused on that issue because he was only asked to look at various documents to see if Company deviated from the regulations.

While we agree with Company that Bozzo did not specifically connect a violation of the extraneous agent regulation or the experimental monkey regulation to increased risk of polio, we disagree with its assessment of Bozzo's testimony regarding Company's third regulatory violation. At trial, Bozzo testified that Company did not test the SOM material or the intermediate seeds 701S or 801S for neurovirulence in violation of 21 C.F.R. Sections 630.10(b)(4) and (5) and 630.16(b)(1). The following exchange occurred with regard to the effect of Company's failure to perform these tests on the safety of the product:

Q [By Plaintiff's Counsel]: . . . The safety testing that was required by the regulations by Lederle's own license, why was it being done?

A [By Bozzo]: Why should safety testing be done?

Q Yeah.

A Safety testing should be done to assure that the product is safe, pure and potent.

Q What happens if you don't do the test?

A Well, if you omit safety tests, then you raise the possibility of a product being unsafe.

Q When you say you raise the possibility of a product being unsafe, what do you mean in regard to the general public who is going to receive that vaccine?

A Well, the general public is then exposed to product that is at higher risk or higher danger for an untoward effect. And if you're talking about a neurovirulence test, it's virulent polio virus being given to them.

Plaintiff also presented the following testimony taken during Bozzo's deposition to the jury:

Q [By Company's Counsel]: Do you have an understanding of why some people get vaccine-associated polio from oral polio vaccine?

A [By Bozzo]: Yes, I do.

Q What's your understanding?

A My understanding is that there is reversion of the attenuated virus to a more virulent form on occasion.

Q Do you have an understanding of what causes that?

A Not from a virological standpoint, no.

Q Do you have an understanding from some other standpoint?

A Well, if the product was inadequately tested for neurovirulence, then it's possible that the product simply contained particles of neurovirulent virus, and therefore when administered, it may in fact cause polio. . . .

Q Whether or not the product is tested doesn't have any effect on the inherent neurovirulence of the product, correct?

A No, the testing itself does not have an effect. The testing hopefully, if adequately performed, will indicate whether or not it has the -- whether or not it has the virulent form.

Finally, on cross examination, when Company asked, "[a]nd isn't it the case, sir, that you can't say that anything that you've testified about before this jury today, anything had any effect on the possibility that the vaccine administered to [Plaintiff] could cause vaccine-associated polio," Bozzo responded "You are absolutely wrong."

Initially, we note that the presence of Bozzo's testimony distinguishes this case from *Saint Louis University* and *Graham*. In *Saint Louis University*, the plaintiff offered *no* evidence to link the regulatory violations to an increased risk of polio. In *Graham*, although the plaintiffs offered some expert testimony, the experts specifically did not opine that any regulatory violations resulted in an increased risk. Here, Bozzo explained to the jury that inadequately tested vaccine will expose the public to a higher risk of receiving virulent polio virus.

Also, unlike in *Graham*, the regulations at issue in this case are intended to measure the actual virulence of the vaccine by assessing the severity of polio lesions in test monkeys. *See* 21 C.F.R. Sections 630.10(b)(4) and (5) and 630.16(b)(1). Because these regulations directly measure the safety of the vaccine, it is reasonable to infer that a failure to perform the tests could result in the release of vaccine containing a more virulent virus than intended.

Although we recognize that, as in *Graham*, the FDA addressed one aspect of the regulations Plaintiff alleges Company violated in its comments to the 1991 amendments, contrary to *Graham*, the comments at issue here did not establish that a violation of the pre-amendment regulations had no effect on the safety of the vaccine. First, as to seeds 701S and 801S, the FDA did not remove any regulations requiring neurovirulence testing in the 1991 amendments and made no comments regarding seeds at that level of production. As to the strain material, the FDA's comments to its amended regulations did call into question Plaintiff's interpretation of the former regulations as requiring neurovirulence testing of strain material such as SOM:

The agency continues to believe that the early use of strain material to produce vaccine lots directly did not thereby mean that the strain material had to be qualified as seed material. As previously stated, the agency believes that SO (produced by Dr. Sabin), SOM (produced by Merck, Sharp and Dohme), and SOR (produced by Pfizer, Ltd.) all constitute original Sabin strain material. Therefore, production of lots directly from any of these strain materials should not require that SO, SOM, or SOR be tested in accordance with the criteria for qualification of the seed virus in [Section] 630.10(c).

56 Fed. Reg. 21,422 (May 8, 1991). However, while we acknowledge that the FDA amended the regulations to remove any ambiguity about whether SOM should be tested for neurovirulence, *see* 21 C.F.R. Section 630.10(b)(4) (1991) (stating that the strain material is not required to be tested), we find that the FDA's comments about the former regulations do not require a finding that Plaintiff failed to causally connect his injury with Company's actions.

In *Graham*, as discussed above, the court weighed the plaintiffs' almost complete lack of evidence linking the regulatory violations with a less safe vaccine against the FDA's specific

comments that the regulations in question had been shown over history to have no effect on safety. Here, however, Plaintiff presented evidence that a failure to test the strain material would have an effect on safety. In addition, unlike in *Graham*, Plaintiff's expert addressed the FDA comments, stating that he did not agree that the people responsible for drafting the original regulations intended that strain material be exempt from neurovirulence testing. Even assuming Company did not actually violate the former regulations by not testing the strain material, Plaintiff's evidence allows a reasonable inference that failure to do so could cause the product to be in a defective condition or that Company was negligent in not performing the tests.

Thus, viewing the evidence and inferences in the light most favorable to Plaintiff, reasonable minds could differ about whether Company's failure to test the strain material resulted in a vaccine that imposed a greater risk of vaccine-associated polio.

In addition to our determination that Bozzo's testimony distinguishes this case from *Saint Louis University* and *Graham*, we agree with Plaintiff's argument that the jury could also infer that Company's actions made Orimune more unsafe through circumstantial evidence. Generally, "[t]he fact that only circumstantial evidence is presented on a material issue is no bar to recovery." *Sanders v. Hartville Milling Co*., 14 S.W.3d 188, 200 (Mo. App. S.D. 2000). In addition, the doctrine of strict liability does not require impossible standards of proof. *Williams v. Deere and Co*., 598 S.W.2d 609, 612 (Mo. App. S.D. 1980). The proof must be realistically tailored to the circumstances and the existence of a defect may be inferred from circumstantial evidence with or without the aid of expert evidence. *Id*.(FN4)

Here, Plaintiff presented testimony from an FDA regulatory compliance officer to assist the jury in determining whether the Orimune administered to Plaintiff was more unsafe than it would have been if tested appropriately. The jury could, however, have also based its conclusion on circumstantial evidence. *See Sanders*, 14 S.W.3d at 201-02 (finding that circumstantial evidence was sufficient for jury to infer that contaminated feed caused cattle to experience symptoms of aflatoxin resulting in injury to cattle and plaintiffs' dairy farm). As Plaintiff notes in his brief, not only did Bozzo testify about the significance of neurovirulence testing to assure Orimune was as safe as possible, Dr. Ritchey also testified about the importance of the testing. At trial, she stated that each passage of the manufacturing process risked loss of attenuation, or weakened state of the polio virus. She testified that the characteristics could potentially change slightly when they went from passage to passage. Thus, according to Dr. Ritchey, Company performed neurovirulence tests to insure that they maintained the attenuated characteristics of the Sabin original seed. Taking this testimony into account along with Plaintiff's other evidence, a jury could infer that a failure to test Orimune during all stages of the manufacturing process could result in a more virulent vaccine.

Citing *Hills v. Ozark Border Electric Cooperative*, Company argues that Bozzo's testimony merely raises the possibility that inadequately tested vaccine will cause a greater risk of polio, which is not sufficient to establish causation. 710 S.W.2d 338, 341 (Mo. App. S.D. 1986) (stating that expert evidence that damage "could" have been caused by certain things is not, by itself, sufficient to establish causation in fact). In doing so, Company refers to additional testimony where Bozzo stated he had not reviewed enough documents to respond to Company's question of whether any live oral polio vaccine made anywhere in the world ever had a lower

13

risk of vaccine-associated polio than the vaccine given to Plaintiff in 1987. Company also focuses on Bozzo's statements that he took no issue with the neurovirulence test results performed on seeds and lots that were submitted to the government and that he took no issue with the FDA's decision to release certain seeds and monopools for use in making Plaintiff's vaccine.

We disagree with Company's characterization of Bozzo's testimony as only raising the possibility that inadequately tested vaccine will more likely cause polio. Further, as stated above, our conclusion that Plaintiff presented sufficient evidence on the element of causation to make a submissible case is not based solely on Bozzo's testimony. Taking the evidence in Plaintiff's favor and all reasonable inferences therefrom into account and disregarding all contrary evidence and inferences, we cannot say that the trial court erred in allowing the jury to decide whether Company was liable.

Company's first point is denied.

### 2. Proof of Regulatory Violations

Company argues in its second point that the trial court erred in denying its motion for judgment notwithstanding the verdict because Plaintiff failed to prove that Company violated any of the polio vaccine regulations. Specifically, it claims that Bozzo was not competent to testify on this issue, that any testimony interpreting the meaning of the regulations was impermissible, that Bozzo testified about facts as to which he had no knowledge, and that the FDA's position on the regulations is contrary to Bozzo's.

### a. Admissibility of Bozzo's Testimony

Although this sub-argument is presented in the context of whether Plaintiff made a submissible case, Company's first claim under point II is that the trial court erred in accepting Bozzo as an expert witness and admitting his opinions. Whether Plaintiff has sufficiently established a witness's qualifications to state an opinion rests largely in the discretion of the trial court and its ruling in that regard will not be disturbed on appeal unless there is a clear showing of abuse. *Donjon v. Black & Decker (U.S.), Inc*. 825 S.W.2d 31, 32 (Mo. App. E.D. 1992). Also, the admission or exclusion of expert testimony is a matter within the discretion of the trial court. *Id*. We will not interfere with the trial court's decision to admit or exclude testimony unless it plainly appears that the trial court abused its discretion. *Id*.

Company first attacks Bozzo's qualifications to testify as an expert with respect to the interpretation or application of the FDA's polio vaccine regulations. Specifically, Company argues that Bozzo did not have any relevant training or experience on the subject because he had no involvement in the FDA's approval of seeds or monopools, was never involved in drafting the polio vaccine regulations, and could not identify any relevant experience he had in interpreting regulations governing the oral polio vaccine. Thus, Company contends that the trial court abused its discretion in accepting Bozzo as an expert witness.

For a witness to be qualified as an expert, it must be shown that by reason of specialized experience or education the witness possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or reaching correct conclusions. *Whitnell v. State*, 129 S.W.3d 409, 413 (Mo. App. E.D. 2004). "If the witness has some qualifications, the testimony may be permitted." *Donjon*, 825 S.W.2d at 32-33. Significantly, the extent of an expert's training or experience goes to the weight of his testimony and does not render the testimony incompetent. *Id*. at 33.

As explained above, the court considered Company's challenge to Bozzo's qualifications at trial. It allowed Company to conduct voir dire to help it better determine whether Bozzo could be accepted as an expert witness. Based on Bozzo's testimony regarding his qualifications, we find that the trial court did not abuse its discretion in allowing Bozzo to testify as an expert witness. This is especially true since Company's challenges to Bozzo's qualifications go to the weight of his testimony rather than its admissibility.

Citing *Wulfing v. Kansas City Southern Industries, Inc*., Company next argues that, even assuming Bozzo was qualified to testify generally regarding the regulation of oral polio vaccine, he was not permitted to testify about the meaning of the regulations since this was a question of law for the court. 842 S.W.2d 133, 153 (Mo. App. W.D. 1992) (stating that the opinion of an expert on issues of law is not admissible). In responding to this argument, we find that *Glidewell v. S.C. Management, Inc*., 923 S.W.2d 940 (Mo. App. S.D. 1996) is instructive.

In *Glidewell*, the defendant hospital argued that the trial court erred in allowing the plaintiff to elicit expert testimony as to whether a physician was negligent. *Id*. at 948. The court of appeals held that the testimony was admissible even though "defining the '*concept of negligence*' is, indeed, a question of law." *Id*. (emphasis in original). The court found no error, reasoning that:

[The expert testimony statute, section 490.065.2] clearly allows an expert to testify as to his opinion concerning an ultimate issue, such as whether a party was negligent. The term "negligence" should be defined in the questioning so that it can be ascertained whether or not the standard for determining "negligence" which is used by the expert is the same standard to be applied by the jury under the instructions of the court. When the legal term "negligence" is defined in accordance with the applicable jury instruction, the legal issue of negligence becomes an ultimate fact issue for the trier of fact . . . . Under section 490.065, testimony on ultimate fact issues is admissible for the guidance of the jury in their fact finding mission.

923 S.W.2d at 949 (internal citations omitted).

Plaintiff's products liability claims and negligence claims were primarily based on Company's violation of the polio vaccine regulations. As in *Glidewell*, Bozzo's explanation of the regulatory requirements became a definition of negligence for purposes of this case. Indeed, his testimony describing Company's failure to test SOM materials and intermediate seeds was contained in Plaintiff's instruction on its negligent manufacture count as the standard by which the jury would determine whether Company was negligent:

On [P]laintiff's claim based on negligent manufacture, your verdict must be for [P]laintiff against [Company], if you believe:

First, [Company] manufactured the Orimune oral polio vaccine administered to [P]laintiff, and

Second, the Orimune oral polio vaccine *was not tested for neurovirulence in Orimune oral polio vaccine seeds SOM Type 1, SOM Type 2, SOM Type 3, 45B157, 45B158, 45B164, 701S, or 801S*, and

Third, [Company] failed to use ordinary care to manufacture the Orimune oral polio vaccine administered to [P]laintiff to be reasonably safe, and

Fourth, as a direct result of such failure, [P]laintiff sustained damage.

Plaintiff's Instruction Number 9 (emphasis ours). We find that the trial court did not err in allowing Bozzo's testimony on this ultimate fact issue.(FN5)

Company's last argument under this subpoint is that Bozzo's testimony improperly provided the only factual evidence on the issue of whether Company used experimental monkeys to produce certain components in the Type 1 lineage of Plaintiff's vaccine because Plaintiff did not offer the documentation into evidence. Whether or not it was error for the court to allow "factual testimony" is irrelevant, however, because a jury verdict must be upheld on appeal unless there is a complete lack of probative facts to support it. *Whaley v. LS & E, Inc.*, 859 S.W.2d 180, 181 (Mo. App. E.D. 1993). Here, the jury could have found Company liable based solely on its failure to perform neurovirulence tests. Company's argument has no merit.

### b. Sufficiency of Bozzo's Testimony

Company's final argument under this point is that even with Bozzo's testimony, Plaintiff still lacks sufficient evidence that any regulatory violation took place. In particular, Company argues that it cannot be liable based on an interpretation of the term "seed" that is contrary to the governing agency's interpretations and that Bozzo's testimony about experimental monkeys was unsupported by any evidence.

Company first contends that the meaning of the word "seed" in the regulations was a question of law for the court. Based on the reasoning set forth above, the court properly allowed Bozzo to testify about the meaning of the regulations given their technical and scientific nature. Company then argues that, even assuming the testimony was admissible, the FDA's interpretation of the term should have been controlling. Company cites *State ex rel. Webster v. Missouri Resource Recovery, Inc.*, 825 S.W.2d 916 (Mo. App. S.D. 1992), and *Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994), to support this argument. We find that Company's reliance is misplaced.

Both *Missouri Resource Recovery* and *Thomas Jefferson University* involved actions brought by or against a regulatory agency to determine the defendant's compliance with that agency's

16

regulations. *See Missouri Resource Recovery*, 825 S.W.2d at 920; *Thomas Jefferson University*, 512 U.S. at 511. In such cases, where an agency interpretation is directly in dispute, courts give the agency interpretation considerable deference. *Missouri Resource Recovery*, 825 S.W.2d at 931; *Thomas Jefferson University*, 512 U.S. at 512.

Because the FDA is not a party to this case, neither *Missouri Resource Recovery* nor *Thomas Jefferson University* is directly on point. We may agree that the FDA's interpretation of its regulations should be given weight, but the standard of giving considerable deference to the agency interpretation does not apply where, as here, the only evidence of the FDA's interpretation of the polio vaccine regulations submitted to the jury occurred when Company read a portion of the preamble to the 1991 amendments during its cross-examination of Bozzo.(FN6) As Plaintiff notes in his brief, he presented the testimony of Bozzo, a former FDA compliance officer, to interpret the regulations. Company presented no witnesses from the agency. Moreover, other than reading from the preamble, Company's only evidence of how the regulations should be interpreted came from Ritchey, an employee of Company who has no connection with the FDA. The trial court did not err in allowing the jury to determine the meaning of the regulations from the evidence as a whole, including Bozzo's testimony.

Company's second point is denied.

### 3. Reliance on Federal Regulations to Establish the Standard of Care

In its third point, Company argues that the trial court erred in denying its motion for judgment notwithstanding the verdict because Missouri law does not permit plaintiffs to use the polio vaccine regulations to establish the standard of care. According to Company, violation of the regulations was the sole basis for Plaintiff's claims of products liability and negligence. Thus, by allowing his claims to proceed, the court improperly permitted Plaintiff to submit a negligence *per se* claim to the jury in violation of Missouri law. Because Company's contention is based on an issue of law, our review is *de novo*. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996).

To support its argument, Company cites several cases setting forth the standard for determining whether a negligence *per se* claim exists in connection with various statutes.(FN7) Company further asserts that because it is clear no private right of action exists under the Food, Drug and Cosmetic Act ("FDCA") or the corresponding regulations (such as the polio vaccine regulations), an alleged breach of either cannot give rise to civil liability in tort.(FN8) While Company correctly states the law, by construing Plaintiff's claims as negligence *per se*, it mischaracterizes the facts of this case.

"Negligence *per se* arises when the legislature pronounces in a statute what the conduct of a reasonable person must be, whether or not the common law would require similar conduct, and the court then adopts the statutory standard of care to define the standard of conduct of [a] reasonable person." *Burns v. Frontier II Properties Limited Partnership*, 106 S.W.3d 1, 3 (Mo. App. E.D. 2003) (internal citations omitted). If a claim is submitted on negligence *per se*, the plaintiff can recover if the jury merely finds that the defendant violated the statute. *Vintila v.*

*Drassen*, 52 S.W.3d 28, 37 (Mo. App. S.D. 2001). This lower burden omits the threshold inquiry of whether the evidence showed that the defendant was negligent in violating the statute before determining if such negligence was the proximate cause of the plaintiff's injuries. *Id*.

Reviewing the record, including Plaintiff's petition and jury instructions, we agree with his assertion that he did not submit a claim for negligence *per se*. Plaintiff's negligent manufacture instruction does not omit the requirement that the jury independently find that Company's conduct in violating the polio vaccine regulations constituted negligence. In particular, the instruction specifically states that, *in addition to* finding that Company did not test certain vaccine seeds for neurovirulence, the jury can only find for Plaintiff if it believes Company failed to use ordinary care to manufacture reasonably safe polio vaccine. As to Plaintiff's products liability instruction, there is no specific mention of any regulatory requirements.(FN9) Instead, the jury was to generally decide whether the vaccine was in a defective condition. Company fails to show how either instruction supports its contention that Plaintiff submitted a claim for negligence *per se*.

To the extent that Company argues Plaintiff cannot use regulatory requirements to establish the standard of care for general negligence or to assist the jury in determining whether a product is defective under a products liability claim, Company is incorrect. Missouri courts do not prohibit plaintiffs from defining the standard of care in terms of what a statute or regulation requires. *See Giddens v. Kansas City Southern Railway Co*., 29 S.W.3d 813, 821 (Mo. banc 2000) (stating that Occupational Safety and Health Act regulations offered as evidence of the standard of care owed by a party are competent evidence relevant to the question of negligence); *Vintila*, 52 S.W.3d at 37 (recognizing that Missouri courts have often held that regulations may establish the appropriate standard of care in a negligence case).

In the context of products liability, Company cites no case, and our research discloses none, precluding a plaintiff from using the violation of safety regulations as evidence of a product's defectiveness. The Restatement (Third) of Torts: Products Liability (1998) Section 4(a) specifically states that a product's noncompliance with an applicable product safety statute or administrative regulation renders the product defective with respect to the risks sought to be reduced by the statute or regulation. Thus, tort law clearly anticipates the use of regulations, such as those at issue in this case, to prove that a product is defective. The only possible prohibition against products liability claims relying on statutes or regulations that we have encountered is where they are preempted by such laws. However, Company has failed to show congressional intent, express or implied, to preempt Plaintiff's state tort law claims based on the FDA vaccine regulations at issue. *See Pollard v. Ashby*, 793 S.W.2d 394, 403 (Mo. App. E.D. en banc 1990) (citing *Abbot v. American Cyanamid Co*., 844 F.2d 1108, 1112-14 (4th Cir. 1988) to support holding that the FDA does not preempt state common law claims with regard to vaccines).

Company's third point is denied.

### 4. Sufficiency of Evidence That Polio Caused Plaintiff's Paralysis

Company argues in its fourth point that Plaintiff's evidence was insufficient to prove his

paralysis was caused by polio. In particular, Company contends that the trial court erroneously admitted the only evidence Plaintiff offered in support of his claim that he had polio: Dr. Burris's testimony and the CDC documents. Also, Company argues that even if the testimony and documents were admissible, any conclusion that Plaintiff contracted vaccine-associated polio was against the weight of the evidence.

### a. Admissibility of Dr. Burris's Testimony

Company first argues that Dr. Burris's testimony was inadmissible because it did not satisfy the requirements of section 490.065 RSMo 2000,(FN10) which governs the admissibility of expert testimony. Specifically, Company claims Dr. Burris's opinion or inferences are only admissible if based on facts or data of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable. It also argues that Dr. Burris was required to identify the relevant scientific community or field in which the data and facts he relied upon are accepted.

In response, Plaintiff notes, and Company does not dispute, that Company did not object to Dr. Burris's opinion testimony at trial. Because Company failed to object to Dr. Burris's testimony, we may review only for plain error. Rule 84.13.(FN11) Under the plain error standard, we may, in our discretion, review plain errors affecting substantial rights where we find that manifest injustice or a miscarriage or justice has resulted therefrom. *Id*. If we grant plain error review, we first examine whether the claim of plain error is one that, on its face, establishes substantial grounds for believing that manifest injustice or miscarriage of justice has occurred. *Eagan v. Duello*, 173 S.W.3d 341, 348 (Mo. App. W.D. 2005). If plain error is facially established, we then review the claim to determine whether manifest injustice or a miscarriage of justice actually occurred. *Id*.

Notwithstanding that Company fails to request plain error review, we will examine the record to determine if plain error is facially established. Reviewing Dr. Burris's testimony, we fail to see how admission of his opinions established substantial grounds for believing that manifest injustice or a miscarriage of justice occurred. Plaintiff adequately demonstrated Dr. Burris's qualifications to testify regarding the cause of his paralysis. Dr. Burris also sufficiently explained the reasoning behind his opinion that Plaintiff had vaccine-associated paralytic polio. While Company may disagree with Dr. Burris's conclusions, any weakness in the factual underpinnings of Dr. Burris's opinion regarding the cause of Plaintiff's paralysis went to the weight the testimony should be given and not its admissibility. *See Alcorn v. Union Pacific Railroad Co*., 50 S.W.3d 226, 246 (Mo. banc 2001). The trial court did not commit plain error in admitting Dr. Burris's testimony.

### b. Admissibility of CDC Documents

Company also claims that the trial court erred in admitting the CDC documents because they constitute inadmissible hearsay and do not fall within any exception to the hearsay rule. In particular, Company argues that the CDC documents do not qualify for the business records exception because in introducing them, Plaintiff did not satisfy the requirements of sections

490.680 and 490.692. Company further contends that the CDC documents do not qualify for the public records exception because "it is obvious" that the documents are not official records of the CDC. *See* section 490.220.

Generally, the admissibility of evidence lies within the sound discretion of the trial court. *C & W Asset Acquisition, LLC v. Somogyi*, 136 S.W.3d 134, 137 (Mo. App. S.D. 2004). We will find no error absent a showing that the court abused its discretion. *Id*. Upon review, we presume that the trial court's ruling is correct and reverse only when the ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable it shocks the sense of justice and indicates a lack of careful consideration. *Id*. If reasonable minds can differ about the propriety of the trial court's action, it cannot be said that the trial court abused its discretion. *Id*.

Section 490.680 permits the admission of business records that would otherwise constitute hearsay if the custodian or another qualified person testifies (1) as to the identity and mode of preparation of the records; (2) that the records were kept in the regular course of business; and (3) that they were made at or near the time of the event. *Id*. Under section 490.692, business records are also admissible without the testimony of a custodian or other qualified person if the party offering the records presents an affidavit explaining that the records were kept as required by section 490.680. Section 490.692.2 further states that "[n]o party shall be permitted to offer such business records into evidence pursuant to this section unless all other parties to the action have been served with copies of such records and such affidavit at least seven days prior to the day upon which trial of the cause commences."

Citing *State v. Caldwell*, Company first argues that the CDC documents cannot qualify as business records. 904 S.W.2d 81 (Mo. App. W.D. 1995). Based on the court's holding in *Caldwell* that "[t]he provisions of section 490.692.2 cannot be disregarded" because "[e]very word, clause, sentence, and section of a statute should be given meaning" *id*. at 82, Company argues that the CDC documents are inadmissible because Plaintiff did not offer any testimony to lay a foundation, did not obtain an affidavit in substantial compliance with the form set forth in section 490.692, and did not furnish the affidavit at least seven days before trial commenced.

Unlike the business records exception, the public records exception codified in section 490.220 states that "[a]ll records and exemplifications of office books, kept in any public office of the United States . . . shall be evidence in this state, if attested by the keeper of said record or books, and the seal of his office, if there be a seal." Thus, testimony or an affidavit in compliance with section 490.692 is unnecessary. With regard to this exception, Company argues that Judge White's dissenting opinion in *Rodriguez v. Suzuki Motor Corporation* confirms that section 490.220 does not apply to every document in the file of a government office. 996 S.W.2d 47, 70 (Mo. banc 1999). According to Company, the CDC documents are not within the public records exception because the only document bearing a seal was handwritten and another document which does not bear a seal is marked "draft."

Plaintiff responds to both of Company's arguments by asserting that the trial court properly admitted the CDC documents in their entirety under the public records exception. Plaintiff notes that the majority of the Court in *Rodriguez* explained that so long as the requirements of the statute are met and the records are relevant, they are admissible. *Id*. at 55. He also cites *Eltiste v.*

*Ford Motor Corporation*, which observes that "[t]he language of section 490.220 is unambiguous, unqualified, and open-ended." 167 S.W.3d 742, 748 (Mo. App. E.D. 2005). Plaintiff notes that the CDC records were presented with the affidavit of the CDC's custodian swearing that the documents were the official record and bearing the stamp and seal of the CDC.

When the parties discussed the admissibility of the documents at trial, the trial court expressed concern about Plaintiff's strict compliance with the statutes because "every page of the materials received . . . [is] not stamped" and that Plaintiff did not turn over a photocopy of the materials with the stamp before trial. In addition, the trial court noted that one of the documents has the word "draft" in the corner and seems to be only the fifth page of a five page document. However, the trial court determined that because both parties were in possession of the documents for years and Plaintiff assured the court that the records received from the CDC were whole and complete, the documents would be received into evidence.

Although the trial court did not specify whether it admitted the CDC documents under the business records exception or the public records exception, we may affirm the court's ruling even if the documents did not meet one of the exceptions so long as the court could base admission on an alternative choice that would not yield a result contrary to the law. *Aliff v. Cody*, 26 S.W.3d 309, 315 (Mo. App. W.D. 2000). Thus, it is irrelevant whether the documents were inadmissible because of failure to comply with the business records statutes if the CDC documents met the criteria of section 490.220. Based on the reasoning in *Rodriguez* and *Eltiste*, we see no reason why the CDC records did not satisfy the requirements of section 490.220. Company's argument to the contrary is without merit.

Company's fourth point is denied.

## 5. Admission of Prejudicial and Irrelevant Evidence

In its fifth point, Company argues that it is entitled to a new trial because the trial court improperly admitted highly prejudicial evidence about Company's conduct that was either irrelevant or foundationless. We review the trial court's denial of a motion for new trial for abuse of discretion. *Kehr v. Knapp*, 136 S.W.3d 118, 122 (Mo. App. E.D. 2004). We will not reverse unless there is a substantial or glaring injustice. *Id*. Further, if reasonable minds could differ about the propriety of the trial court's action, it cannot be said that the court abused its discretion. *Id*. at 122-23.

In its argument, Company contends that the trial court erroneously permitted Plaintiff to elicit testimony on several irrelevant subjects, including whether any of Company's vaccine contained a contaminant called "Simian Virus 40," a monkey virus that has been alleged in other lawsuits to cause cancer, whether Company's laminar flow hood used to clean the air in the production area of the vaccine was working properly, and whether Company was concerned more about profit than safety. Company argues that under *Hawley v. Merritt*, 452 S.W.2d 604 (Mo. App. 1970), admission of this and other irrelevant prejudicial evidence constitutes reversible error requiring a new trial. We disagree.

In *Hawley*, the plaintiff brought an action against the defendant for tortious interference with contract rights. *Id*. at 606. Because the trial court determined that it allowed irrelevant and prejudicial evidence and permitted the plaintiff's counsel to ask several argumentative questions that assumed facts not in evidence, the trial court granted the defendants a new trial. *Id*. On appeal, the plaintiff argued that the trial court abused its discretion in granting a new trial, but the appellate court upheld the trial court's ruling. *Id*. at 612. Significantly, the appellate court explained that trial courts have broad discretionary authority to grant a new trial for error involving questions of fact and matters affecting the determination of fact issues. *Id*. at 608-09. The court also stated the following:

Because the trial court is obviously in a better position to judge the prejudicial effect of the error, we defer to and are liberal in upholding a trial court's action in granting a new trial, even though we may feel, on the cold record, that as a trial court we might have ruled otherwise.

*Id*. at 609 (internal citations omitted).

Contrary to Company's assertion, *Hawley* does not mandate reversal in this case. Unlike in *Hawley*, we are not reviewing a decision to *grant* a new trial. Even assuming some of the testimony of which Company complains was inadmissible, Company fails to show that admission of such evidence was sufficiently prejudicial to require a new trial. As the court in *Hawley* deferred to the trial court's determination as to the prejudicial effect of the evidence, we defer to the trial court's assessment of any prejudice here. The trial court did not abuse its discretion in declining to grant a new trial.

Company's fifth point is denied.


### 6. Excessiveness of the Verdict

In its sixth and final point, Company argues that the trial court erred in denying its motion for remittitur or new trial because the jury's $8.5 million verdict was excessive. Company further claims the verdict was unsupported by the evidence, was out of line with other awards, and can only be explained by the trial court's erroneous introduction of irrelevant and prejudicial evidence.

The determination of damages is primarily for the jury. *Fust v. Francois*, 913 S.W.2d 38, 49 (Mo. App. E.D. 1995). However, the trial court may enter a remittitur order if it finds that the jury's verdict is excessive because the amount exceeds fair and reasonable compensation for the plaintiff's injuries and damages. Section 537.068. "The trial court has broad discretion in ordering remittitur and its decision whether or not to reduce damages will not be disturbed on appeal absent an abuse of discretion so grossly excessive that it shocks the conscience and convinces this [C]ourt that both the trial judge and the jury have abused their discretion." *King v. Unidynamics Corp.*, 943 S.W.2d 262, 268 (Mo. App. E.D. 1997). We should exercise our power to interfere with the judgment of the jury and the trial court with hesitation and only when the verdict is manifestly unjust. *Alcorn*, 50 S.W.3d at 249-50.

To determine whether a verdict is manifestly unjust, we review the evidence in the light most favorable to the verdict. *Id*. at 250. We also examine the following factors: (1) loss of income, both present and future; (2) medical expenses; (3) Plaintiff's age; (4) the nature and extent of Plaintiff's injuries; (5) economic considerations; (6) awards given and approved in comparable cases; and (7) the superior opportunity for the jury and the trial court to evaluate Plaintiff's injuries and other damages. *Emery v. Wal-Mart Stores, Inc*., 976 S.W.2d 439, 448 (Mo. banc 1998). Further, a judgment may also "be based in part on certain intangibles that do not lend themselves to precise calculation, such as past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss." *Alcorn*, 50 S.W.3d at 250 (internal citations omitted).

In light of the deference we give to the judge and jury on the issue of damages, we disagree with Company that the verdict amount was manifestly unjust. Plaintiff presented ample evidence of the limitations his injury places on him in the job market creating a future loss of income. His evidence also supports an award for non-economic damages based on the impact his injuries have on his self-esteem. While Company cites cases upholding smaller verdicts in other personal injury cases, Company cites to no case in which the appellate court ordered remittitur under facts similar to those before us.

Because we find that the verdict is not excessive, we also find that Company is not entitled to a new trial. A new trial is only warranted where the jury's bias and prejudice result in a verdict that is grossly excessive. *Ince v. Money's Building & Development, Inc*., 135 S.W.3d 475, 478 (Mo. App. E.D. 2004). Considering our analysis above, the jury's verdict does not indicate bias or prejudice and is not grossly excessive.

Company's sixth point is denied.

## B. Plaintiff's Cross-Appeal

### 1. Prejudgment Interest

On cross-appeal, Plaintiff argues in his first point that the trial court erred in denying his motion to amend the judgment to add prejudgment interest under section 408.040.2. Because the issue involves the interpretation of section 408.040 and its application, it is a question of law. *McKinney v. State Farm Mutual Insurance*, 123 S.W.3d 242, 245 (Mo. App. W.D. 2003). Therefore, our review is *de novo* and we give no deference to the trial court's judgment. *Id*.

Section 408.040.2 permits a party to obtain prejudgment interest on a jury verdict if certain conditions are met. Section 408.040 states the following:

1. Interest shall be allowed *on all money due* upon any judgment or order of any court from the day of rendering the same until satisfaction be made by payment, accord or sale of property; all such judgments and orders for money upon contracts bearing more than nine percent interest

shall bear the same interest borne by such contracts, and all other judgments and orders for money shall bear nine percent per annum until satisfaction made as aforesaid.

2. In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and the amount of the judgment or order exceeds the demand for payment or offer of settlement, prejudgment interest, at the rate specified in subsection 1 of this section, shall be calculated from a date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier. Any such demand or offer shall be made in writing and sent by certified mail and shall be left open for sixty days unless rejected earlier. Nothing contained herein shall limit the right of a claimant, in actions other than tort actions, to recover prejudgment interest as otherwise provided by law or contract.

Section 408.040 (emphasis ours).(FN12)

Plaintiff argues, and Company does not dispute, that he sent a demand letter in compliance with section 408.040.2 on July 7, 2001, offering to settle for $1.4 million, an amount less than the verdict he received. The offer was left open for sixty days as required by the statute. Although "[t]he plain language of section 408.040.2 does not allow the trial court discretion to deny prejudgment interest once the statutory conditions are met," *McCormack v. Capital Electric Construction Co., Inc.*, 159 S.W.3d 387, 402 (Mo. App. W.D. 2004), the trial court denied Plaintiff's motion to amend the judgment to include prejudgment interest.

Company argues that we should uphold the trial court's denial of prejudgment interest for several reasons. First, it argues that the statute does not apply because Plaintiff made additional settlement offers after the July 2001 demand letter that did not invoke section 408.040 and thus did not trigger the statute. Relying on *Wilson v. Wal-Mart Stores*, 72 Cal. App. 4th 382 (Cal. App. 1999), Company contends that these subsequent offers revoked the original demand so that there was no reason for it to deal with any portion of the prior offer.

While Company is correct that a settlement made pursuant to section 408.040 is analogous to a contract, *see Brown v. Donham*, 900 S.W.2d 630, 633 (Mo. banc 1995), even if we apply the contract principles discussed in *Wilson*, we disagree that Plaintiff abandoned his right to prejudgment interest by failing to comply with section 408.040 in his subsequent offers. In *Wilson*, the plaintiff argued that she was entitled to prejudgment interest under a statute similar to section 408.040 because she made a valid offer for settlement at an amount less than the jury's verdict. 72 Cal. App. at 388 -89. Because her second offer, also invoking the prejudgment statute, was higher than the verdict she received, the court of appeals had to decide whether she could still collect prejudgment interest. *Id*. at 389. The court explained that it would apply contract principles to the extent they "neither conflict[ed] with the statute nor defeat[ed] its purpose" of encouraging pretrial settlements. *Id*. It then held that the most recently rejected statutory offer would control for purposes of applying the prejudgment interest statute because of the contract principle that a new offer communicated prior to a valid acceptance of a previous offer will extinguish and replace the prior one. *Id*. at 389-91.

Importantly, in making its determination, the *Wilson* court compared the plaintiff's argument to one raised in *Wickware v. Tanner*, 53 Cal. App. 4th 570 (Cal. App. 1997). In *Wickware*, the court of appeals looked to the plaintiff's initial settlement offer to determine whether the amount was less than her verdict because the second offer did not comply with the prejudgment interest statute. *Id*. at 575-76. Thus, even though a second offer existed, which would typically extinguish and replace the prior one, the second offer was considered invalid and inconsequential in determining the plaintiff's entitlement to prejudgment interest. *Id*. at 576-77. The *Wilson* court distinguished *Wickware* specifically because, unlike the second offer in that case, the *Wilson* plaintiff's subsequent offer did comply with the statute and was therefore a valid replacement of the original offer. *Wilson*, 72 Cal. App. 4th at 392.

Based on the above, it is clear that *Wilson* did not address the issue we face in this case: whether Plaintiff's subsequent offers not only revoked the *amount* of the original settlement offer, but also revoked Plaintiff's right to prejudgment interest. Indeed, the reasoning in *Wickware*, which *Wilson* did not criticize, seems to suggest that an invalid subsequent offer is of no consequence in determining whether a party is entitled to prejudgment interest. Considering that the Missouri Supreme Court considers subsequent offers (without specifying whether they are or are not in compliance with section 408.040) to be "immaterial" for purposes of calculating from which date prejudgment interest should run, *see Lester v. Sayles*, 850 S.W.2d 858, 874 (Mo. banc 1993), we decline to accept Company's argument. Because our prejudgment interest statute is intended to serve the policy of promoting settlement and deterring unfair benefit from the delay of litigation, *see McCormack*, 159 S.W.3d at 402, we do not consider Plaintiff's failure to invoke section 408.040 in its subsequent offers to be a revocation of his right to prejudgment interest.

Company next argues that the statutory language does not support an award of prejudgment interest on future damages. In doing so, it recites the two policies the statute serves: (1) to compensate claimants for the true cost of money damages they have incurred due to the delay of litigation; and (2) to promote settlement and deter unfair benefit from the delay of litigation. *McCormack*, 159 S.W.3d at 402. According to Company, there can be no loss to a claimant and hence no benefit to a losing party based on the delay of an award for future damages because the jury awards such damages based upon the value of the injury at the time it renders its verdict. Company asserts that applying prejudgment interest to the entire award would overly compensate Plaintiff.

The Missouri Supreme Court addressed an argument almost identical to Company's in *Lester*. The Court concluded that, based on the statutory language, "it is clear that prejudgment interest shall be based on all money due upon any judgment or order." 850 S.W.2d at 874 (quoting section 408.040.1). Company complains that the Court's reasoning is faulty because it relied on section 408.040.1 as the source of the "all money due upon any judgment or order" language even though section 408.040.1 only applies to post-judgment interest. *See id*. at 872. We disagree.

The text of the statute does not support a construction requiring a court to subtract future damages from the verdict before calculating prejudgment interest. Interpreting section 408.040 by its plain and ordinary meaning, *see McKinney*, 123 S.W.3d at 246, we acknowledge that the statute initially deals with post-judgment interest when it states that "interest shall be allowed on

all money due upon any judgment or order." Section 408.040.1. Later, when the statute discusses prejudgment interest, it merely states that "prejudgment interest shall be . . . calculated" (assuming the statutory conditions are met) but does not state that the court should set aside the portion of the judgment that represents future damages. Section 408.040.2.

"When statutory language is clear, we must give effect to its language as written." *McCormack*, 159 S.W.3d at 402. Moreover, we may not add words or requirements by implication to a statute that is not ambiguous. *Id*. By not identifying a specific part of the judgment as being subject to prejudgment interest, the prejudgment portion of section 408.040.2 instead refers back to the original statement that interest, including prejudgment interest, shall be allowed on "all money due." Section 408.040.1. The statute clearly awards prejudgment interest on the entire judgment regardless of what a particular amount represents. We will not imply a different requirement.

Finally, Company argues that it should at least be entitled to a hearing to determine whether Plaintiff was at fault for the delay in litigation. Company contends that since section 408.040 is intended to promote settlement by preventing a party from benefiting from its delay, awarding Plaintiff prejudgment interest would reward him for his delay in lengthening the life of the litigation, contrary to the purpose of the statute. Company also argues that if this Court determines that the statute does not allow for a hearing, we should declare the statute unconstitutional because it denies Company its due process rights under the Missouri and United States constitutions.

By its terms, the statute does not provide for a hearing to contest delays caused by the plaintiff. However, turning to Company's argument that section 408.040 is therefore unconstitutional, we find that the constitutionality of the statute is not properly before this Court. To properly raise a constitutional issue, the party must (1) raise the question at the first available opportunity; (2) specifically designate the constitutional provision alleged to have been violated, such as by explicit reference to the article and section, or by quotation from the particular provision; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review. *Missouri Highway and Transportation Commission v. Merritt*, 204 S.W.3d 278, 284 (Mo. App. E.D. 2006). In addition, to preserve the issue for our review, Company must not only have presented the issue of constitutional validity of the statue to the trial court, but the trial court must have ruled thereon. *Id*. "The reason for this requirement is to prevent surprise to the opposing party and to permit the trial court an opportunity to fairly identify and rule on the issues." *Id*. (internal citations omitted).

Company's constitutional argument fails to meet these requirements. First, Company's response does not adequately identify the constitutional provisions that the statute allegedly violates. Company merely states that "if the Court determines that [Company] is not entitled to a hearing on this issue, the statute should be deemed unconstitutional as it denies [Company] its due process rights, as provided under the Constitutions of both the state of Missouri and United States." There is no explicit reference to the article and section or quotation from a particular provision.

Second, the trial court did not rule on the issue of section 408.040's constitutionality. It merely stated that it was denying Plaintiff's motion to amend the judgment without explanation.

Finally, Company did not mention the validity of section 408.040 until it responded to Plaintiff's post-trial motion to amend the judgment to add prejudgment interest. "An attack on the constitutionality of a statute is of such dignity and importance that the record touching such issues should be fully developed and not raised as an afterthought in a post-trial motion or on appeal." *Land Clearance for Redevelopment Authority of Kansas City, Missouri v. Kansas University Endowment Association*, 805 S.W.2d 173, 176 (Mo. banc 1991). Company was aware that Plaintiff intended to invoke the prejudgment interest statute from the time it received Plaintiff's section 408.040 settlement demand letter four years before trial. Thus, by waiting to present its constitutional argument to the trial court until it responded to Plaintiff's post-trial motion, Company did not raise the issue at its earliest opportunity. *See id*. at 175-76 (noting that the plaintiff could not claim surprise with respect to the trial court's application of a prejudgment interest statute where plaintiff provided no explanation why it could not have given some notice that it considered the interest rate provided by the statute to be unconstitutional prior to its post-trial motion). Because this constitutional question is not properly before the Court, we need not consider it.

Considering the analysis above, we revisit *McCormack*'s conclusion that "[t]he plain language of [s]ection 408.040.2 does not allow the trial court discretion to deny prejudgment interest once the statutory conditions are met." 159 S.W.2d at 402. Plaintiff met the statutory conditions. The trial court erred in denying his motion to amend the judgment to add prejudgment interest.

Plaintiff's first point is granted.


## 2. Exclusion of Rebuttal Testimony

In his second and final point on cross-appeal, Plaintiff argues that the trial court erred in excluding the testimony of Dr. Diehl as rebuttal evidence. He contends that Dr. Jawaid first testified that she followed the Red Book as the standard of care on direct examination and moved the book into evidence. Thus, Plaintiff contends that he was entitled to present Dr. Diehl's contrary testimony regarding the standard of care in rebuttal.

"Admission of rebuttal evidence is a matter largely within the discretion of the trial court." *Gassen v. Woy*, 785 S.W.2d 601, 604-05 (Mo. App. W.D. 1990). A party is generally entitled to introduce evidence to rebut the evidence of his adversary. *Bray v. Bi-State Development Corp*., 949 S.W.2d 93, 101 (Mo. App. E.D. 1997). For this purpose, any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible. *Id*. But a party cannot, as a matter of right, offer in rebuttal evidence which was appropriate or should have been presented in the case in chief, even if it tends to contradict or rebut the adverse party's evidence. *Id*. While the court may in its discretion admit such evidence, it generally should decline to do so. *Gassen*, 785 S.W.2d at 605. Also, evidence that is merely cumulative to that offered in a party's case in chief is not generally admissible in rebuttal. *Edley v. O'Brien*, 918 S.W.2d 898, 907 (Mo. App. S.D. 1996).

Plaintiff's argument on this point has no merit. In order for Plaintiff to prove his case against Dr. Jawaid, he had to demonstrate that her "act or omission failed to meet the requisite standard of

care." *Ploch v. Hamai*, 213 S.W.3d 135, 140 (Mo. App. E.D. 2006) (reciting the three elements of a *prima facie* case of medical negligence). Moreover, Plaintiff's jury instruction for his claim against Dr. Jawaid asked the jury to enter a verdict in his favor if the jury found that Dr. Jawaid was negligent in failing to advise Plaintiff's mother of the risk of contracting polio associated with the oral polio vaccine or in failing to advise Plaintiff's mother of alternatives to the oral polio vaccine. It was therefore Plaintiff's responsibility in his case in chief to establish that Dr. Jawaid's failure to advise was below the appropriate standard of care.

When Plaintiff requested that the court allow him to offer Dr. Diehl's testimony in rebuttal, the court observed that Plaintiff already argued in his case in chief that his mother should have been advised about both IPV and OPV. For instance, when Dr. Shanske testified, he specifically referred to the Red Book as the "bible of pediatric practice" and then discussed the recommendations included in the Red Book for informed consent with respect to the oral polio vaccine. Considering that Plaintiff carried the burden of presenting a *prima facie* case of negligence, his argument that the trial court abused its discretion in not allowing his rebuttal witness fails. Plaintiff only states that "the mere fact that an item of evidence could have been offered in the case in chief did not destroy the utility of that evidence for impeachment purposes." It does not follow that a trial court's refusal to allow such evidence constitutes an abuse of discretion. Plaintiff's second point is denied.

## C. Points Raised in the Dissenting Opinion

### 1. Allocation of Damages on Verdict Forms

The dissent asserts that Plaintiff failed to make a submissible case on his products liability claim but properly submitted his negligent manufacture claim. It then argues that we should reverse and remand because we cannot tell whether the damages awarded were allocated with respect to Plaintiff's products liability claim or his negligent manufacture claim. In doing so, it cites *Stacy v. Truman Medical Center*, 836 S.W.2d 911 (Mo. banc 1992) and *Knox v. Simmons*, 838 S.W.2d 21 (Mo. App. E.D. 1992). In both *Stacy* and *Knox*, the reviewing courts considered whether the plaintiffs introduced evidence sufficient to support all theories of liability in a disjunctive instruction for a single negligence claim. *Stacy*, 836 S.W.2d at 925; *Knox*, 838 S.W.2d at 24-25. While we agree with their holdings that each element of a disjunctive negligence instruction must be supported by substantial evidence for the instruction to be properly submitted, we disagree that either case requires remand here.

Unlike in *Stacy* or *Knox*, we are not considering whether Plaintiff submitted sufficient evidence on each element of one particular claim, but whether Plaintiff made a submissible case as to the elements of two separate claims. The verdict form shows that the jury found for Plaintiff separately on his products liability claim and on his negligent manufacture claim. Thus, even if we agreed with the dissent that Plaintiff failed to make a submissible case on his products liability claim, so long as Plaintiff made a submissible case on his negligent manufacture claim, Plaintiff is entitled to damages.

28

It appears that the dissent believes that the general rule regarding disjunctive instructions should be applied where, as here, a plaintiff submits two completely separate theories of liability. Under such reasoning, had Plaintiff chosen to submit only his negligent manufacture claim, the damages award would be upheld. But because Plaintiff also submitted an additional claim based on the same injury, unless Plaintiff proved *both* claims, Plaintiff cannot recover damages unless the verdict form specifically links the damages award with a particular claim. Nowhere does *Stacy* or *Knox* suggest a requirement that a court must remand merely because one of the *separate* claims upon which he bases liability is found to be insufficient. While there are cases involving separate claims that lead to separate damages, such as a claim for property damage and a claim for personal injury, we disagree that damages must be allocated to a particular claim in this case. Plaintiff's injury and the damages arising therefrom remain the same whether Company's liability is premised on products liability or negligent manufacture.

### 2. Distinction Between Products Liability and Negligent Manufacture Claims

We also disagree with the dissent's explanation of what Plaintiff must prove in order to submit a claim for products liability claims versus a claim for negligent manufacture. According to the dissent, proof of negligent manufacture does not require a showing that the product is defective. We disagree. While the language describing the elements of each claim is different, as stated in *Patterson v. Foster Forbes Glass Co.*,

"if [a dangerous defective condition] is a strong circumstance in a negligence case it is an even stronger circumstance in a products liability case which rests solely upon the presence of a defect whether that defect is negligently created or not. *In both cases a dangerous defective condition is required*; in negligence that condition must *additionally* be the product of human error." 674 S.W.2d 599, 603 (Mo. App. E.D. 1984) (emphasis added).

The dissent's distinction is not supported by the law. Plaintiff was required to prove that Orimune was defective, whether under the specific language of the products liability instruction requiring a finding that Orimune was "in a defective condition unreasonably dangerous," or under the less specific language of the negligent manufacture instruction requiring a finding that Company failed to properly test Orimune for neurovirulence so that the vaccine was not manufactured to be reasonably safe. As stated above, Plaintiff met his burden of submitting sufficient evidence to support his claim that Orimune was in a defective condition under both theories of liability.

### III. CONCLUSION

Plaintiff's point requesting prejudgment interest on the jury's verdict against Company is granted. The judgment is otherwise affirmed.

**Footnotes:**

**FN1.** Unless otherwise indicated, all references to the oral polio vaccine regulations are to 21 C.F.R. Sections 600.3(z) and 630.10 et seq. (1987).

**FN2.** *Sabin III* was part of a series of cases in which the district court held that the government was liable under the Federal Tort Claims Act for injuries caused by vaccine-associated polio. *See In re Sabin Oral Polio Vaccine Products Liability Litigation*, 743 F. Supp. 410 (D. Md. 1990) ("*Sabin I*"); *In re Sabin Oral Polio Vaccine Products Liability Litigation*, 763 F. Supp. 811 (D. Md. 1991) ("*Sabin II*"). The district court held that the government was negligent in using testing methods that did not meet the neurovirulence criteria set forth in 21 C.F.R. Section 630.15(b)(1)(iii) (1974) to approve the Type III vaccine Company included in its Orimune up until 1983. *Sabin II*, 763 F. Supp. at 821-23. It also held that the government was negligent in approving the new Type III vaccine acquired after 1983 because the vaccine lots manufactured from the new seed, 45B165, violated 21 C.F.R. 630.13(a) (1974), since the lots were more than five tissue culture passages from the original Sabin material. *Id*. at 823-25.

**FN3.** As is discussed more fully below, the courts in *Saint Louis University* and *Graham v. American Cyanamid Company*, 350 F.3d 496 (6th Cir. 2003), both stated that this evidence must be in the form of expert testimony. *Saint Louis University*, 336 F.3d at 303; *Graham*, 350 F.3d at 507.

**FN4.** We are aware that the Fourth Circuit appeared to require that a plaintiff's proof that any regulatory violations were the proximate cause of his injury in a polio vaccine case "of course, must be in the form of expert testimony." *Saint Louis University*, 336 F.3d at 303. The court cited *Wright v. Barr*, 62 S.W.3d 509, 524 (Mo. App. W.D. 2001) to support its ruling. *Wright* does not necessarily require expert testimony to establish causation in this case. While *Wright* does state that where "there is a sophisticated injury, one that requires surgical intervention or other highly scientific techniques for diagnosis, expert medical testimony is required to prove causation," *id*. at 524, the court was discussing the necessity of expert testimony to explain the reason for a patient's injury in the context of medical malpractice. *See id*. Here, as discussed more fully below, Plaintiff did present expert testimony to show his paralysis was caused by the polio vaccine rather than some other virus or condition. Proof that Company's vaccine carried a greater risk of causing polio fits more into the context of proving a defective condition. Thus, to the extent *Saint Louis University* appears to require that only expert testimony will satisfy Plaintiff's burden of proving the vaccine was more unsafe than one in compliance with the regulations, we decline to adopt such a rule. Instead, we will follow Missouri precedent which clearly permits the use of circumstantial evidence to show that a product is defective, *see e.g. Sanders*, 14 S.W.3d at 202, and consider both Plaintiff's expert testimony and circumstantial evidence to determine whether Plaintiff met his burden of proof.

**FN5.** We further note that, although the case is not controlling, *McNeil Pharmaceutical v. Hawkins*, 686 A.2d 567 (D.C. Ct. App. 1996), cited by Plaintiff, directly supports our conclusion. In particular, we agree with the determination in *McNeil* that the plaintiff should present expert testimony concerning the interpretation of highly technical statutes and regulations so that the jury may be guided in its application of those sources to the conduct at issue in the case and to help them apply the appropriate standard of care. *Id*. 584-85. Had the trial court refused to allow Bozzo's testimony in this case, the jury would have been required to interpret highly technical neurovirulence regulations without any guidance.

**FN6.** The FDA interpretation to which Company refers is set forth in our discussion of Point I, above. Company argues that the text of the preamble discussing the 1991 amendments' specific exemption of Sabin original materials from neurovirulence testing illustrates Bozzo's erroneous interpretation of the former regulations as requiring the testing of the Sabin original material. Through Company's reading of this language to the jury, the jury had the opportunity to consider the "FDA interpretation" Company argues is controlling. Without more evidence of how the FDA interpreted the original regulations, however, the preamble by itself does not necessarily preclude an interpretation of the former regulations as requiring testing of the Sabin original materials. As noted above, the preamble states that "[t]he agency continues to believe that the early use of stain material to produce vaccine lots directly did not thereby mean that the strain material had to be qualified as seed material." 56 Fed. Reg. 21,422 (May 8, 1991). However, while this language suggests that the Sabin original materials did not need to be tested even under the former regulations, there is no evidence indicating that the former regulations actually exempted the Sabin original materials from testing. In fact, Bozzo questioned whether the 1991 preamble accurately reflected the viewpoint of the FDA at the time it drafted the former regulations. Without more, we cannot say the trial court erred in allowing the jury to interpret the word "seed" as including the Sabin original materials.

**FN7.** *See, e.g., Bradley v. Ray*, 904 S.W.2d 302, 314 (Mo. App. W.D. 1995) (holding that alleged breach of child abuse reporting act did not amount to negligence *per se* because analysis of statute indicated no private cause of action could be implied under the act); *Imperial Premium Finance, Inc. v. Northland Insurance Co.*, 861 S.W.2d 596, 599 (Mo. App. W.D. 1993) (explaining that in order for the violation of a statute to constitute actionable negligence, not only must the injured party be within the class of persons intended to be protected thereby, but the injury must be of such character as the statute was designed to prevent).

**FN8.** *See In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 788 (3rd Cir. 1999) (stating it is well settled that the FDCA creates no private right of action); *Cali v. Danek Medical, Inc.*, 24 F. Supp. 2d 941, 954 (W.D. Wis. 1998) (stating that "[f]ar from containing an expression that FDA regulations are intended to form the basis for civil liability, the law expresses the opposite intention").

**FN9.** Plaintiff's products liability instruction, Instruction Number 7, states the following:

On [P]laintiff's claim based on product defect, your verdict must be for [P]laintiff against [Company], if you believe:

First, [Company ] sold the Orimune oral polio vaccine in the course of [Company's] business,

Second, the Orimune oral polio vaccine administered to [P]laintiff was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the Orimune oral polio vaccine was used in a manner reasonably anticipated, and

Fourth, [P]laintiff was damaged as a direct result of such defective condition as it existed when the Orimune oral polio vaccine was sold.

**FN10.** Unless otherwise indicated, all statutory references are to RSMo 2000.

**FN11.** All references to Rules are to Missouri Supreme Court Rules (2007).

**FN12.** Section 408.040 was amended in 2006. The statute we quote is the former version in effect at the time the trial court entered its order denying prejudgment interest.

**Separate Opinion:**

**Dissenting opinion by Kenneth M. Romines, Judge:**

I dissent.(FN1) This is a product liability case involving the live oral polio vaccine Orimune. The case was submitted to the jury on three separate theories: product liability (Count I) and negligent manufacture (Count II) as to Cyanamid; and medical negligence (Count VI) as to Dr. Jawaid. Because the plaintiff did not prove causation and thus failed to make a submissible case on one of its offered theories, and because the trial court erred when it excluded relevant evidence, I would reverse and remand for a new trial.

## FACTS

Cortez Strong (Cortez) was born 7 February 1987. When he was two months old, Dr. Georgia Santos-Jawaid (Dr. Jawaid) gave Cortez his first dose of oral polio vaccine (OPV). The OPV given to Cortez was manufactured by American Cyanamid Co. (Cyanamid), and known as Orimune. The history of the development of OPV and the drug's evolution are discussed thoroughly in the following cases: Graham v. American Cyanamid Co., 350 F.3d 496 (6th Cir. 2003); United States v. St. Louis University, 336 F.3d 294 (4th Cir. 2003); and In re Sabin Oral Polio Vaccine Prods. Liab. Litig., 743 F.Supp. 410 (D.Md. 1990).

Because OPV is made from live polio virus, it will cause polio, even if it is properly manufactured and tested. During the 1980s, when Cortez received Orimune, less than twenty-five doses of OPV caused paralytic polio yearly; by the 1990s, the occurrence of vaccine associated paralytic polio dropped to approximately ten per year, or one out of every 2.6 million doses. Graham v. American Cyanamid Co., 350 F.3d 496, 501 (6th Cir. 2003). Cortez received his second Orimune dose on 5 June 1987. Three or four days later, he developed partial paralysis in his arms, which is permanent.

In 1999, Cortez brought suit against Dr. Jawaid and Cyanamid, and alleged that his second Orimune dose was defective and gave him paralytic polio. In particular, Cortez asserted that Cyanamid failed to test Orimune in accordance with FDA regulations. After a trial in the Circuit Court for the City of St. Louis, Hon. Michael B. Calvin presiding, a jury found for Cortez and against Cyanamid on theories of product defect and negligent manufacture, and awarded Cortez $8.5 million ($1.5 million past non-economic damages; $2 million future economic damages; and $5 million future non-economic damages). The verdict did not specify which portion of the damages was awarded for the two separate theories submitted. The jury found for Dr. Jawaid on

Cortez's personal injury claim. Cyanamid responded with a Motion for Judgment Notwithstanding the Verdict, which was denied.

## DISCUSSION

Cyanamid argues, *inter alia*, that the Court erred when it denied its Motion for Judgment Notwithstanding the Verdict. Cyanamid claims there was insufficient evidence of causation to support Cortez's claims of product defect and negligent manufacture. In his cross-appeal, Cortez argues that 1) the Court erred when it denied his motion to amend the judgment to add prejudgment interest under Section 408.040 RSMo (2000); and 2) the Court erred when it excluded the rebuttal testimony of Dr. Elizabeth Diehl.

When reviewing the denial of a motion for judgment notwithstanding the verdict, we review to determine if every fact essential to liability is predicated on legal and sufficient evidence. Uxa ex rel. Uxa v. Marconi, 128 S.W.3d 121, 128 (Mo. App. E.D. 2003). We view the evidence and inferences therefrom in the light most favorable to the verdict, and disregard evidence and inferences therefrom that conflict with the verdict. Id. We leave witness credibility to the jury's determination, and will only reverse the jury's verdict for insufficient evidence if there is a complete absence of probative fact to support it. Id.

Because I find that the Court erred when it submitted the product defect case to the jury, and when it refused to allow Dr. Diehl's testimony, I would reverse and remand for a new trial.

### Product Defect: Instruction No. 7

Instruction Number 7, based on MAI 25.04, was submitted to the jury on plaintiff Cortez's product defect claim against Cyanamid. It stated:

On plaintiff's claim based on product defect, your verdict must be for plaintiff against defendant American Cyanamid Company, if you believe:

First, defendant American Cyanamid Company sold the Orimune polio vaccine in the course of defendant's business, and

Second, the Orimune oral polio vaccine administered to plaintiff was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the Orimune polio vaccine was used in a manner reasonably anticipated, and

Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the Orimune polio vaccine was sold.

As indicated in the fourth paragraph of this instruction, a strict product liability case may not be submitted to the jury unless the plaintiff proves causation. Grover v. Grover, 972 S.W.2d 568,

573 (Mo. App. E.D. 1998). Missouri requires both proximate and "but for" causation. <u>Callahan v. Cardinal Glennon Hosp.</u>, 863 S.W.2d 852, 860-61 (Mo. banc 1993). "But for" causation is satisfied if the plaintiff's injury would not have occurred "but for" the defendant's conduct. <u>Id.</u> In other words, Cortez was required to prove that, but for some action by Cyanamid, he would not have contracted polio. In addition to "but for" causation, a plaintiff must prove that an injury is a reasonable and probable consequence of the defendant's act or omission. <u>Id.</u> at 865.

In <u>United States v. St. Louis University</u>, *infra,* St. Louis University brought a contribution action to recover damages from the United States in an Orimune case. In the judgment below, a jury had found for the plaintiff in a suit to recover for paralysis caused by Orimune administered by St. Louis University Hospital. <u>United States v. St. Louis University</u>, 336 F.3d 294, 295 (4th Cir. 2003). The Fourth Circuit sets out what must be shown to establish proximate cause in a strict liability case against Cyanamid:

As to proximate cause, we note that all OPV, including OPV that satisfied all regulatory requirements, carried the risk that the recipient would actually contract polio. Therefore, to show that [plaintiff's] polio was caused by the government's regulatory violations, we conclude that SLU was required to establish that [plaintiff] likely would not have contacted [sic] polio (or would have contracted a less severe case of polio) from a vaccine that satisfied the government's neurovirulence requirements.

<u>Id.</u> at 304. Shortly thereafter, the Sixth Circuit confirmed <u>St. Louis University</u>'s holding regarding causation in another oral polio vaccine case:

All vaccines produced from live viruses, as this one is, carry the paradoxical risk of inducing the very disease that the vaccine strives to prevent. In the absence of expert testimony showing that these alleged regulatory violations made Orimune more unsafe than it otherwise would have been, a rational trier of fact could rule for plaintiffs only on the basis of conjecture, not a legitimate set of inferences drawn from admissible evidence. On this record, it remains unknowable whether plaintiffs' injuries stemmed from an avoidable defect in the product or unavoidable bad luck.

<u>Graham v. American Cyanamid Co.</u>, 350 F.3d 496, 512 (6th Cir. 2003). I conclude that the analysis set out by the Fourth Circuit and Sixth Circuit is correct as to the proof necessary for the submission of Instruction No. 7, under the Missouri cases cited *supra.*

Cortez, however, did present expert testimony, discussed in detail later in this opinion, which indicated that the Orimune given to Cortez had not been properly tested and was therefore more likely to cause polio. However, that is not what Instruction No. 7 required. Rather, Instruction No. 7 required the jury to find that Orimune was "in a defective condition unreasonably dangerous," and that this defective condition caused Cortez's polio.

Orimune, a live polio vaccine, is inherently dangerous. <u>St. Louis University</u> at 296. Without further proof that the improperly tested Orimune carried a defect and was therefore additionally "in a defective condition unreasonably dangerous," there was insufficient evidence from which a jury could determine that Orimune caused Cortez's polio. On the evidence submitted, it is just as

likely that Cortez's condition was caused by the callously described "unavoidable bad luck." Graham at 512. As such, Instruction No. 7 was not supported by the evidence and should not have been submitted to the jury.

## Negligent Manufacture: Instruction No. 9

The difference between the jury instructions for Cortez's product defect and negligent manufacture claims is subtle—but it is a difference that demands disparate results. Instruction Number 9, based on MAI 25.09, was submitted to the jury on Cortez's negligent manufacture claim against Cyanamid. The instruction stated:

On plaintiff's claim based on negligent manufacture, your verdict must be for plaintiff against defendant American Cyanamid Company, if you believe:

First, defendant American Cyanamid Company manufactured the Orimune oral polio vaccine administered to plaintiff, and

Second, the Orimune oral polio vaccine was not tested for neurovirulence in Orimune oral polio vaccine seeds SOM Type 1, SOM Type 2, SOM Type 3, 45B157, 45B158, 45B164, 701S, or 801S, and

Third, defendant American Cyanamid failed to use ordinary care to manufacture the Orimune oral polio vaccine administered to plaintiff to be reasonably safe, and

Fourth, as a direct result of such failure, plaintiff sustained damage.

Unlike the verdict director for Cortez's product claim, Instruction No. 9 did not require the jury to find that the Orimune administered to Cortez was defective. Rather, the jury was only required to find that Cyanamid failed to test Orimune for neurovirulence, and that this failure caused Cortez's injuries.

At trial, Dr. Burris, a pediatric neurologist, testified that Cortez contracted polio from the Orimune vaccine administered. Cortez also provided the testimony of Thomas Bozzo, a former FDA compliance officer with degrees in pharmacy and public health. Mr. Bozzo testified that, while there were records indicating that Cyanamid tested Orimune in accordance with FDA regulations, these records were "conclusionary" and did not include actual test records. Tr. 744. Mr. Bozzo also testified that a failure to properly test Orimune increased the risk that Orimune was unsafe:

A. Safety testing should be done to assure that the product is safe, safe, pure, and potent.

Q. What happens if you don't do the test?

A. Well, if you omit safety tests, then you raise the possibility of a product being unsafe.

Q. When you say you raise the possibility of a product being unsafe, what do you mean in regard to the general public, who is going to receive that vaccine?

A. Well, the general public is then exposed to product that is at higher risk or higher danger for an untoward effect. And if you're talking about a neurovirulence test, it's virulent polio virus being given to them.

Tr. 686.

In Graham, *supra*, the Sixth Circuit established what evidence a plaintiff must produce in order to show that Cyanamid's regulatory noncompliance caused polio. Graham, 350 F.3d at 508. The plaintiffs in Graham, individuals who contracted polio after receiving Orimune or coming in contact with someone who received Orimune, sued Cyanamid on theories of product liability and negligence, *et al*. Graham at 503-05. The plaintiffs alleged that Cyanamid failed to comply with the FDA's "tissue culture passage" and "consistency of manufacture" neurovirulence regulations. Id. The Court affirmed the lower court's grant of summary judgment to Cyanamid, finding that the plaintiffs "did not show…that American Cyanamid's alleged regulatory noncompliance increased the risk that the Orimune vaccine would cause polio in recipients or those in close contact with recipients beyond the inherent risk long known to be associated with OPV." Id. at 508.

As stated earlier in Graham, the Court went on to say: "[i]n the absence of expert testimony showing that these alleged regulatory violations made Orimune more unsafe than it otherwise would have been, a rational trier of fact could rule for plaintiffs only on the basis of conjecture, not a legitimate set of inferences drawn from admissible evidence." Id. at 512. Unlike the plaintiffs in Graham, Cortez presented expert testimony that Cyanamid's failure to test Orimune as required by FDA regulations, and failure to exercise ordinary care to ensure Orimune is reasonably safe, increased the risk that Orimune would cause polio, thereby making it more unsafe. Mr. Bozzo testified that, as a result of Cyanamid's failure to test, "the general public is then exposed to product that is at higher risk or higher danger" of causing polio. Tr. 686. Mr. Bozzo's testimony was sufficient to establish causation and make a submissible case on Cortez's negligent manufacture claim.

### Verdict Form

However, because of the way the case was submitted to the jury, I am not confident that this jury rendered this verdict without confusing the instructions on the two claims. On the verdict form, the jury awarded Cortez $8.5 million. The verdict form submitted directed the jury to award a single damages award, and this the jury did. As such, we cannot tell whether the damages were allocated with respect to Instruction No. 7 or Instruction 9, and thus a new trial is required.(FN2)

### Rebuttal Testimony

Additionally, as to Cyanamid's rebuttal expert, Dr. Diehl, I would hold that it was an abuse of discretion not to allow Dr. Diehl's testimony or deposition into evidence.

Because the admission or exclusion of evidence, especially expert testimony, is within the trial court's discretion, we review for an abuse of discretion. <u>Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co.</u>, 168 S.W.3d 488, 504 (Mo. App. E.D. 2005).

At trial, Dr. Jawaid was questioned about her routine when discussing Orimune's risks and benefits with patients. Dr. Jawaid testified that <u>she did not recall advising</u> Cortez's mother about the risks of oral polio vaccine, but she followed her usual routine, which is based on the "Red Book," a pediatrics reference book:

Q. With regard to the routine you had in discussing OPV and other vaccines with patients, did you derive that routine...from the Red Book...?

A. Yes, I did.

Q. Do you have any reason to believe as you sit here today that on June 5, 1987, you didn't follow your regular routine in discussing the risks and complications of polio?

A. No, I followed the Red Book.

Q. And you do that regularly?

A. Yes, because I was trained to follow the Red Book as my guideline.

Tr. 1987.

...

Q. So if there is a--if you will, a standard of care by this Red Book, you think you've complied with that standard of care?

A. I followed their guidelines, so I guess I did it.

Tr. 1995.

…

Q. … "it's your interpretation of the Red Book that you don't need to also advise them of the availability of the IPV,(FN3) is that correct?

A. You're right.

Tr. 1996.

…

37

Q. ...With regard to how you determine to do things, like giving advice to patients or getting their consent...you are relying on the Red Book as the standard of how you do that, correct?

A. That is correct.

Q. Okay. And it is your understanding that that is the standard for physicians to do that, correct, pediatricians?

A. Yeah, that's the guideline.

Tr. 2013-14.

Dr. Jawaid testified that the Red Book is the "standard" or "guideline" for pediatricians, and that it did not require her to discuss the availability of IPV with Cortez's mother. Cortez then attempted to call Dr. Elizabeth Diehl, *one of Dr. Jawaid's named experts*, to offer rebuttal testimony regarding the standard of care for physicians administering polio vaccine. Dr. Diehl was prepared to testify that the standard of care required a pediatrician to advise potential Orimune recipients of the availability of IPV in addition to OPV. L.F. 4107-09. However, the Court prohibited Cortez from calling Dr. Diehl.

Dr. Jawaid argues that the testimony of Dr. Diehl should have been offered in the plaintiff's case-in-chief. "[R]ebuttal testimony is not necessarily inadmissible simply because…it would have been better procedure to offer it as part of the state's evidence-in-chief instead of rebuttal." Aliff at 316; quoting State v. Petty, 967 S.W.2d 127, 141 (Mo. App. E.D. 1998).

In Cortez's case-in-chief, he offered the testimony of Cortez's mother, Alesia Allen, who testified that Dr. Jawaid did not inform her of the risks associated with OPV. Tr. 484-85. One cannot read this transcript and but conclude that Dr. Jawaid did not inform Ms. Allen of the availability of IPV, and that Ms. Allen would have chosen IPV if she had known it was an option. Tr. 485-86. Simply, Cortez was not allowed to present evidence as to the standard of care applicable to doctors administering OPV. While it is true that the trial court has considerable discretion when deciding whether to admit rebuttal evidence, this discretion is not limitless.

When Ms. Allen took Cortez to Dr. Jawaid in 1987, she did not possess medical knowledge of the available polio vaccines and their risks. Consequently, she was in a position of total reliance on Dr. Jawaid, and trusted Dr. Jawaid with her infant son's safety. Given the disparity in the parties' knowledge, the severity of the resulting injury, and the availability of rebuttal testimony from a designated defense witness—thus no surprise, I find that Dr. Jawaid's testimony should not have gone un-countered. The Court's decision to exclude Dr. Diehl's rebuttal testimony was arbitrary and unreasonable and thus constituted an abuse of discretion.(FN4)

**Prejudgment Interest**

In his cross-appeal, Cortez also argues that the Court erred when it denied his motion to amend

the judgment to add prejudgment interest under Section 408.040 RSMo (2000). I agree that Cortez complied with Section 408.040 RSMo (2000).

I would reverse and remand for a new trial.

**Footnotes:**

**FN1.** I believe the Court misreads Sanders v. Hartville Mill Co., 14 S.W.3d 188 (Mo. App. S.D. 2002). Causation in a products case must be established by expert testimony. Hagen v. Celotex, 816 S.W.2d 667 (Mo. banc 1991), and Harashe v. Flintkote Co., 848 S.W.2d 506 (Mo. App. E.D. 1993). Likewise, the Court applies not at all Thomas Jefferson University v. Shalala, 512 U.S. 504 (U.S. 1994) in regard to agency deference.

**FN2.** As we would remand for a disjunctive instruction, a portion of which is without factual basis. Stacy v. Truman Medical Center, 836 S.W.2d 911, 925 (Mo. banc 1992); Knox v. Simmons, 838 S.W.2d 21, 24 (Mo. App. E.D. 1992).

**FN3.** IPV, or Inactivated Polio Virus, is an alternative to OPV that does not carry the risk of causing vaccine associated polio.

**FN4.** Dr. Jawaid also argues that the "standard of care" was not raised in her testimony and, as such, rebuttal testimony was inappropriate. I find no merit in this argument. "Standard of care" is defined as "…the degree of care that a reasonable person should exercise." Black's Law Dictionary (8th ed. 2004). While Dr. Jawaid did not use the precise term "standard of care" in her testimony, she testified that the Red Book is the "standard" or "guideline" used by pediatricians. This language constitutes testimony regarding the "standard of care," as does the question of Dr. Jawaid's counsel.


*This slip opinion is subject to revision and may not reflect the final opinion adopted by the Court.*