F&P File #201320-06

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-------------------------------------x
                                      : MDL Docket No. 1629
In re: NEURONTIN MARKETING,           :
       SALES PRACTICES AND            : Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION  :
                                      :  Judge Patti B. Saris
-------------------------------------x
                                      : Mag. Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:             :
                                      :
     McGEE v. PFIZER INC.             : Demand for Jury Trial
     1:05-cv-12593-PBS                :
                                      :
-------------------------------------x
```

## AMENDED COMPLAINT

Plaintiff, by attorneys, FINKELSTEIN & PARTNERS, LLP, as and for the Verified Complaint herein allege upon information and belief the following:

## STATEMENT OF THE CASE

1. This is an action to recover damages for personal injuries sustained by, and the wrongful death of, plaintiff's decedent as the direct and proximate result of defendants' wrongful conduct in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the prescription drug Neurontin, especially for such "off-label" use as the treatment of

fibromyalgia, a purpose for which Neurontin had not received FDA approval, and at dosages higher than had been approved by the FDA and had been properly tested on humans, even though the drug had not been tested and studied for that purpose and had not been found to be safe and effective at any dosage for the treatment of fibromyalgia.

<u>**PARTIES AND JURISDICTION**</u>

2.    Jurisdiction exists as against the defendants, PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), WARNER-LAMBERT COMPANY and WARNER-LAMBERT COMPANY LLC, pursuant to:

(a) 28 U.S.C. Section 1332, in that the plaintiff, OSCAR MCGEE, as Administrator of the Estate of plaintiff's decedent, PEARLIE FAYE MCGEE, is a citizen and resident of the State of Texas, at the time of her death, plaintiff's decedent, PEARLIE FAYE MCGEE, was a citizen and resident of the State of Texas, the defendant, PFIZER INC., is incorporated in business in the State of Delaware and maintains its principal place of business in the State of New York, the defendant, PARKE-DAVIS, is incorporated in the State of Michigan, and maintains its principal place of business in the State of New Jersey, the defendant, WARNER-LAMBERT COMPANY, is incorporated in the State of Delaware and maintains its principal place of business in the

2

State of New Jersey, the defendant, WARNER-LAMBERT COMPANY LLC, is a limited liability company organized under the laws of the State of Delaware, whose sole shareholder and member is the defendant, PFIZER INC., and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

(b) 28 U.S.C. Section 1391, in that jurisdiction is founded only on diversity of citizenship, and all defendants are subject to personal jurisdiction in the Judicial District of the Southern District of New York and may be deemed to reside in the Southern District of New York.

3.    By Order of the Superior Court of the County of Deaf Smith, State of Texas, the plaintiff, OSCAR MCGEE, was appointed Temporary Administrator of the Estate of the deceased, PEARLIE FAYE MCGEE, on the 30th day of September, 2005, and at all times hereinafter mentioned, duly qualified and entered upon his duties as such Administrator and is now acting in such capacity.

4.    That at the time of death on June 25, 2001, plaintiff's decedent was then of the age of 51 years and prior thereto, was generally in good health, industrious and possessed of all faculties.

5.    That at the time of plaintiff's decedent death, she was married and survived by her husband, the plaintiff, OSCAR MCGEE.

3

6.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a foreign corporation organized under the laws of the State of Delaware.

7.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a foreign corporation authorized to do business in the State of New York.

8.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a business entity actually doing business in the State of New York.

9.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), was and still is a foreign corporation organized under the laws of the State of Michigan.

10.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, was and still is a foreign corporation authorized to do business in the State of New York.

11.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, was and

4

still is a business entity actually doing business in the State of New York.

12.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY was and still is a foreign corporation organized under the laws of the State of Delaware.

13.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a foreign corporation authorized to do business in the State of New York.

14.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of New York.

15.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY.

16.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY.

17.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company organized under the laws of the State of Delaware.

18.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company authorized to do business in the State of New York.

19.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a business entity actually doing business in the State of New York.

20.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is the sole shareholder and member of the defendant, WARNER-LAMBERT COMPANY LLC.

21.  That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY LLC.

22.  That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY LLC.

23.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a division of the defendant, PFIZER INC.

24.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a subsidiary of the defendant, PFIZER INC.

25.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

26.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a division of the defendant, PFIZER INC.

27.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a subsidiary of the defendant, PFIZER INC.

28.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, PARKE-DAVIS.

29.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

30.  That on a date prior to June 25, 2001, the defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

31.  That on a date prior to June 25, 2001, the defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

32.  That on a date prior to June 25, 2001, the defendant, WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

33.  That on a date prior to June 25, 2001, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

34.  That on a date prior to June 25, 2001, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY, and the defendant, PARKE-DAVIS, became a part of the defendant, WARNER-LAMBERT COMPANY.

35.  That on a date prior to June 25, 2001, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

36.  That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

37.  That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

38.  That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

39.  That on or about December 31, 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

40.  That on or about December 31, 2002, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY

LLC, and the defendant, PARKE-DAVIS, became a part of the defendant, WARNER-LAMBERT COMPANY LLC.

41. That on or prior to December 31, 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

42. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, WARNER-LAMBERT COMPANY.

43. That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

44. That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

45. That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

46. That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

47. That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, merged with the defendant, WARNER-

LAMBERT COMPANY LLC, and the defendant, WARNER-LAMBERT COMPANY, became a part of the defendant, WARNER-LAMBERT COMPANY LLC.

48.  That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

49.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, PARKE-DAVIS.

50.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT COMPANY.

51.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT COMPANY LLC.

52.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, PARKE-DAVIS.

53.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

54.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

55.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

56.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

57.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

58.  That on or prior to December 31, 2002, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY LLC.

59.  That on or prior to December 31, 2002, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY LLC.

60.  That on or prior to December 31, 2002, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant WARNER-LAMBERT COMPANY LLC.

61.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, merged with each other.

62.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

63.  That on or before June 25, 2001, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

64.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, merged with each other and the defendant, PARKE-DAVIS, became a part of the defendant, PFIZER INC.

65.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, merged with each other and the defendant, WARNER-LAMBERT COMPANY, became a part of the defendant, PFIZER INC.

66.  That on or prior to December 31, 2002, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other and the defendant, WARNER-LAMBERT COMPANY LLC, became a part of the defendant, PFIZER INC.

67.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, consolidated with each other.

68.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

69.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., has its principal place of business in the State of New York.

12

70.  In the year 2000, the defendant, PFIZER INC., acquired the defendant, WARNER-LAMBERT COMPANY, and as the result of that acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, WARNER-LAMBERT COMPANY, which occurred prior to such acquisition.

71.  In the year 2000, the defendant, PFIZER INC., acquired the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, and as the result of that acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, PARKE-DAVIS, which occurred prior to such acquisition.

72.  On or prior to December 31, 2002, defendant, PFIZER INC., acquired the defendant, WARNER-LAMBERT COMPANY LLC, and pursuant to the terms of and conditions of that acquisition, the defendant, PFIZER INC., is responsible for all acts or omissions of the defendant, WARNER LAMBERT-COMPANY, LLC, occurring prior to such acquisition.

73.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., presently markets and sells the drug Neurontin.

74.  That on a date prior to June 25, 2001, the defendant, PFIZER INC., marketed and sold the drug Neurontin.

13

75.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

76.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act inside the State of New York, which caused injury to plaintiff's decedent inside the State of Texas.

77.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act outside the State of New York, which caused injury to plaintiff's decedent inside the State of Texas.

78.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

79.  That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the

State of New York, and derives substantial revenue from
interstate or international commerce.

80.  That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, presently
markets and sells the drug Neurontin.

81.  That on a date prior to June 25, 2001, the defendant,
PARKE-DAVIS, marketed and sold the drug Neurontin.

82.  That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, is engaged
in the business of designing, manufacturing, advertising,
marketing, and selling pharmaceutical drugs, including
Neurontin, and in pursuance of this business, transacts business
within the State of New York and contracts to provide goods and
services in the State of New York.

83.  That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, committed a
tortious act inside the State of New York, which caused injury
to plaintiff's decedent inside the State of Texas.

84.  That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, committed a
tortious act outside the State of New York, which caused injury
to plaintiff's decedent inside the State of Texas.

85.  That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, regularly

does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

86.  That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

87.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, presently markets and sells the drug Neurontin.

88.  That on a date prior to June 25, 2001, the defendant, WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

89.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

90.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, committed a tortious act inside the State of New York, which caused injury to plaintiff's decedent in the State of Texas.

16

91.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, committed a tortious act outside the State of New York, which caused injury to plaintiff's decedent inside the State of Texas.

92.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in State of New York.

93.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

94.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, presently markets and sells the drug Neurontin.

95.  That on a date prior to June 25, 2001, the defendant, WARNER-LAMBERT COMPANY LLC, marketed and sold the drug Neurontin.

96.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs,

17

including Neurontin, and in pursuance of this business,
transacts business within the State of New York.

97.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
LLC, committed a tortious act inside the State of New York,
which caused injury to plaintiff's decedent inside the State of
Texas.

98.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
LLC, committed a tortious act outside the State of New York,
which caused injury to plaintiff's decedent inside the State of
Texas.

99.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
LLC, regularly does and solicits business and engages in a
persistent course of conduct in the State of New York, deriving
substantial revenue from good and products consumed in the State
of New York.

100. That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
LLC, regularly does and solicits business and engages in a
persistent course of conduct in the State of New York, deriving
substantial revenue from interstate commerce.

18

## BACKGROUND

### STATEMENT OF THE CASE

101. Pursuant to the Food, Drug, and Cosmetic Act ("FDCA")
21 U.S.C. §§ 301 et seq., new pharmaceutical drugs cannot be
distributed in interstate commerce unless the sponsor of the
drug demonstrates to the satisfaction of the Food and Drug
Administration ("FDA") that the drug is safe and effective for
each of its intended uses.  21 U.S.C. § 355(a) and (d).

102. However, the FDCA does not prevent doctors from
prescribing a drug approved for a particular use for other uses
that are different than those approved by the FDA ("off-label"
usage).

103. Nonetheless, even though physicians may prescribe
drugs for "off-label" usage, the FDCA prohibits drug
manufacturers themselves from marketing and promoting a drug for
a use that the FDA has not approved.  21 U.S.C. § 331(d).

104. A manufacturer illegally "misbrands" a drug if the
drug's labeling includes information about unapproved uses or if
the manufacturer engages directly or indirectly in marketing or
promoting the drug for unapproved uses.

105. Instead, if a manufacturer desires to market and
promote the drug for new use s in addition to those already
approved, the materials on "off-label" usage must meet certain
stringent requirements and the manufacturer must resubmit the

19

drug to the FDA testing and approval process for the proposed new use.

106. The above-described statutory and regulatory system and process is designed to protect the public, including plaintiff's decedent, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage, and to protect the public, including plaintiff's decedent herein, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

107. PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

108. Defendants did not receive FDA approval for any other use of Neurontin except for the above-described treatment of

epilepsy or for higher dosages for any purpose, and the FDA
never approved the usage of Neurontin at any dosage for the
treatment of fibromyalgia.

109. Commencing in 1995, defendants, as the manufacturer of
Neurontin, began to directly and indirectly advertise, market
and promote Neurontin for additional "off-label" uses for which
FDA approval had not been obtained, including treatment for
fibromyalgia and at higher dosages than had been tested and
approved, in violation of the above-described statutory and
regulatory system and process, including the FDCA, which
prohibits manufacturers from directly or indirectly advertising,
marketing and promoting a drug for "off-label" usage, and
instead requires that the manufacturer resubmit the drug to the
FDA testing and approval process for the proposed new use and
that the materials issued by the manufacturer relating to the
proposed new use meet certain stringent requirements.

110. Defendants, as the manufacturer of Neurontin, directly
and indirectly advertised, marketed and promoted Neurontin for
the treatment of fibromyalgia and encouraged that higher dosages
than those tested be prescribed, even though defendants knew or
should have known that there were not adequate tests and studies
establishing and confirming that Neurontin was safe and
effective for the treatment of fibromyalgia, and even though
defendants knew or should have known that there were no adequate

21

studies showing that Neurontin was safe when prescribed at
dosages higher than those approved by the FDA.

111. At all times hereinafter mentioned, upon information
and belief, defendants marketed and promoted Neurontin for the
treatment of fibromyalgia even though defendants knew or should
have known that Neurontin caused many symptoms or related risk
factors associated with suicidal behavior by persons suffering
from fibromyalgia.

112. At all times hereinafter mentioned, upon information
and belief, defendants marketed and promoted Neurontin for the
treatment of fibromyalgia even though defendants knew or should
have known that Neurontin had no effect in relieving or
correcting the symptoms or causes of fibromyalgia.

113. Defendants' conduct in promoting "off-label" uses of
Neurontin for treatment of fibromyalgia constituted a wanton,
callous and reckless disregard of the safety of the public and,
in particular of persons suffering from fibromyalgia.

114. In promoting "off-label" uses of Neurontin, and at
higher dosages than approved by the FDA, including treatment of
fibromyalgia, defendants acted without regard to the potential
danger and harm to persons for whom the drug was prescribed for
the treatment of fibromyalgia.

115. Defendants actively distributed, sold and placed
Neurontin into the stream of commerce and directly and

22

indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of fibromyalgia and in dosages higher than those approved by the FDA, even though the only approved use of Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

116. Neurontin is not reasonably safe and effective for the treatment of persons suffering from fibromyalgia, and is not reasonably safe when consumed in higher dosages than those approved by the FDA, and defendants' conduct of illegally advertising, marketing and promoting Neurontin for this "off-label" use was unlawful, deceptive and misleading and was violative of the FDCA.

117. By reason of defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of fibromyalgia in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from fibromyalgia, frequently at dosages higher than those approved by the FDA.

118. Upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was indicted in the United States District Court for the District of Massachusetts for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy

of such criminal Information is annexed hereto as Exhibit "A"
and incorporated into this complaint by reference.

119. Upon information and belief, on or about the 7th day of
June, 2004, the defendant, WARNER-LAMBERT COMPANY LLC, formally
pled guilty to all charges contained in the Information.

120. On June 6, 2007, Dr. Constantine Saadeh, Plaintiff's
prescriber, testified under oath as follows:

> Q.   Would you ordinarily want to prescribe a drug to
>      somebody who had depression or was depressed if
>      you knew that the drug would further reduce
>      serotonin and norepinephrine?
>
> A.   If I have that knowledge, maybe I would tell the
>      patient that it is possibility, so, you know, be
>      careful, but at the same time, its not going to
>      say --- its not going to make me not to prescribe
>      it; its just going to make me mention it to the
>      patient, that this is a possibility and we have
>      to watch for that." . . . .
>
> Q.   Up to this moment, as we sit here now, had you
>      ever been told, either through Pfizer, Parke-
>      Davis or Warner Lambert, that Neurontin decreases
>      the flow of serotonin or norepinephrine?
>
> A.   No, no.
>
> Q.   Okay. If you knew that, you would at least want
>      to investigate further to see what it was doing
>      to the particular patients in the studies?
>
> A.   I would like to know the clinical data, yes.

121. The drug Neurontin was ineffective in the treatment of
the causes and symptoms of plaintiff's decedent's condition of
fibromyalgia and plaintiff's decedent sustained injury and harm
by reason of this reliance upon Neurontin to be effective in the

24

treatment as prescribed by her physicians of such fibromyalgia condition.

122. That at all times hereinafter mentioned, plaintiff's decedent was diagnosed by her physician as suffering from fibromyalgia and was being treated by her physician for such condition.

123. That at all times hereinafter mentioned, upon information and belief, in reliance upon defendants' direct and indirect advertising, marketing and promoting of Neurontin as being safe and effective for the treatment of fibromyalgia, plaintiff's decedent's physician prescribed Neurontin to treat plaintiff's decedent's fibromyalgia.

124. That at all times hereinafter mentioned, plaintiff's decedent purchased and consumed Neurontin, as recommended and prescribed by her physician and in the dosages prescribed, in an effort to control the effects of fibromyalgia.

125. The drug Neurontin was not safe and effective for the treatment of plaintiff's decedent's condition of fibromyalgia, and plaintiff's decedent sustained injury and harm by reason of her consumption of Neurontin as prescribed by her physician in an effort to treat her fibromyalgia.

126. The drug Neurontin was ineffective in the treatment of the causes and symptoms of plaintiff's decedent's condition of fibromyalgia and plaintiff's decedent sustained injury and harm

25

by reason of this reliance upon Neurontin to be effective in the treatment as prescribed by her physician of such fibromyalgia.

127. By reason of plaintiff's decedent's consumption of Neurontin in a manner and at a dosage prescribed by her physician in an effort to treat her fibromyalgia, on June 25, 2001, plaintiff's decedent committed suicide.

128. The injuries and death sustained by plaintiff's decedent were caused by or were contributed to by plaintiff's decedent's consumption of Neurontin at a dosage prescribed by her physician for the treatment of fibromyalgia, in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by defendants.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST THE DEFENDANTS

129. Plaintiff repeats and reiterates the allegations previously set forth herein.

130. That at all times hereinafter mentioned, defendants were under a duty to exercise reasonable care in the design and development of Neurontin and, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of conditions such as fibromyalgia for which it was not effective and to ensure that Neurontin was not used in a

26

manner or to treat conditions where defendants knew or should
have known that the user could sustain injuries and harm from
the drug.

131. That defendants negligently, recklessly, grossly
negligently, wantonly and willfully displayed a morally culpable
and conscious disregard of the rights of others in that they
failed to exercise reasonable care and failed to fulfill the
above-stated duty by the manner that defendants, directly and
indirectly, advertised, marketed and promoted Neurontin for the
treatment of fibromyalgia, even though Neurontin had not been
scientifically determined to be safe for the treatment of such
condition and even though Neurontin was, in fact, not reasonably
safe for the treatment of such condition and furthermore,
defendant failed to adequately warn of the risk of suicide or
aggressive, self-destructive behavior of which defendants knew
or should have known about.

132. That defendants were further negligent, reckless,
grossly negligent, wanton and willfully displayed a morally
culpable and conscious disregard of the rights of others by
manufacturing, distributing, selling, advertising, marketing and
promoting Neurontin even though such drug was not safe or
effective for any purpose because it caused or influenced
persons using the drug for any purpose to engage in self-

27

destructive behavior including attempting to commit suicide and by failing to adequately warn the public of such risks.

133. The death of plaintiff's decedent was caused by or was contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including plaintiff's decedent, on the part of defendants in the design, manufacture, distribution, advertising, marketing and promoting of Neurontin as being safe and effective in the treatment of fibromyalgia and by inducing the public, including plaintiff's decedent, to believe that Neurontin was effective in the treatment of the causes and symptoms of fibromyalgia.

134. That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by defendants was a direct and proximate cause of the death of plaintiff's decedent.  In addition, plaintiff's decedent was deprived of a chance for effective and/or successful treatment that would have prevented her suicide.

135. That at all times hereinafter mentioned, plaintiff's decedent did not contribute to her death by reason of any negligence or culpable conduct on her part.

136. That as a result of the aforesaid occurrence, the injuries sustained by and the death of plaintiff's decedent resulting therefrom, the beneficiaries entitled to recover under

28

Tex. Civ. Prac. & Rem. Code § 71.004 suffered extensive monetary and pecuniary losses and other compensatory damages, as recoverable under Tex. Civ. Prac. & Rem. Code § 71.010.

137. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST THE DEFENDANTS

138. Plaintiff repeats and reiterates the allegations previously set forth herein.

139. That at all times hereinafter mentioned, upon information and belief, defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the treatment of fibromyalgia and by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of fibromyalgia in reliance upon the representations of defendants, expressly warranted to all foreseeable users of this drug, including plaintiff's decedent, that Neurontin was safe and effective for the treatment of fibromyalgia.

29

140. That defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including plaintiff's decedent, that Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by defendants, including for the treatment of fibromyalgia, and that Neurontin was reasonably safe, proper, merchantable and fit for the intended purposes, including for the treatment of fibromyalgia.

141. That at all times hereinafter mentioned, plaintiff's decedent relied upon the aforesaid express and implied warranties by defendants.

142. That at all times hereinafter mentioned, plaintiff's decedent's use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which defendants directly and indirectly advertised, marketed and promoted Neurontin, and plaintiff's decedent's use of Neurontin was reasonably contemplated, intended and foreseen by defendants at the time of the distribution and sale of Neurontin by defendants, and, therefore, plaintiff's decedent's use of Neurontin was within the scope of the above-described express and implied warranties.

143. Defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the

treatment of fibromyalgia and because plaintiff's decedent's use of Neurontin for the treatment of fibromyalgia caused or contributed to the incident described herein.

144. Plaintiff's decedent gave appropriate notice to defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

145. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE DEFENDANTS

146. Plaintiff repeats and reiterates the allegations previously set forth herein.

147. That at all times hereinafter mentioned, the drug Neurontin was not suited for the treatment of fibromyalgia and was not safe and effective for the treatment of fibromyalgia even though defendants directly and indirectly advertised, marketed and promoted Neurontin for that purpose.

148. That at all times hereinafter mentioned, the drug Neurontin was not safe and was not suited for the purposes for

31

which defendants, directly and indirectly, advertised, marketed and promoted the drug at the time defendants designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

149. That at all times hereinafter mentioned, upon information and belief, defendants assumed a strict products liability to users and to persons using Neurontin, including plaintiff's decedent, who sustained injuries, harm and damages by reason of the use of Neurontin for purposes directly and indirectly advertised, marketed, and promoted by defendants, including for the treatment of fibromyalgia.

150. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST THE DEFENDANTS

151. Plaintiff repeats and reiterates the allegations previously set forth herein.

152. Defendants materially misrepresented material facts concerning the safety and effectiveness of Neurontin in the treatment of fibromyalgia.

153. Defendants' affirmative misrepresentations include but are not limited to the acts set forth in the following paragraphs.

154. In or about 1993, defendants submitted a new drug application (NDA) for approval of a drug called Neurontin (also known by the chemical name "Gabapentin"), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5).  In that application, defendants sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.  On or about December 30, 1993, the FDA approved Neurontin for that specific use only.  Because defendants had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than that approved use.

155. Commencing in at least June of 1995 and continuing through at least the date of this incident, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder,

alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other uses.

156. Defendants did not file a new NDA seeking FDA approval for any of these unapproved uses at any time prior to the date of this incident.

157. Defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to:  post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

158. In or about the fall of 1995, defendants' Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled:  "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including plans for conference calls on pain and a pain consultant meeting.

159. Certain defendants' annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies and tactics for increasing sales of the unapproved uses of the drug.  The marketing plans budgeted for and funded these tactics.

34

160. Commencing in early 1995 and continuing at least through the date of this incident, defendants determined not to seek FDA approval for certain unapproved uses.

161. In or about April and May of 1995, defendants performed a marketing assessment of proposed psychiatric indications for Neurontin. In that marketing assessment, defendants forecast potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios: with and without FDA approval. Defendants' Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that the defendants would not seek approval to promote and sell the drug for these unapproved uses.

162. In or about July of 1995, defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to defendants' Neurontin Development Team and to defendants' Vice President for marketing. That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to the FDA for approval.

163. One of the principal factors defendants considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that defendants were

developing.  Defendants expected this new drug would be approved
by the FDA not only for epilepsy but also for a variety of uses
beyond Neurontin's approved use.

164. Once Neurontin's patent expired, other companies could
seek approval to distribute generic equivalents of Neurontin.
Such approval, however, would be limited to the approved
therapeutic use for Neurontin set forth in defendants' original
NDA approval for Neurontin.  If defendants sought and obtained
approval for any of the unapproved uses, then upon expiration of
the patent, generic equivalents of Neurontin could also be sold
for those unapproved uses.  Defendants were concerned that under
those circumstances the generic equivalents would undermine
sales of the new drug that was under development.

165. Commencing about June of 1995 until at least the date
of this incident, by certain conduct described in greater detail
below, defendants promoted the sale and use of Neurontin for
certain conditions other than the approved use.

166. In October 1995, a member of defendants' Epilepsy
Disease Team circulated a memorandum to a group including other
senior members of defendants' Epilepsy Disease Team noting that
data purchased from an outside vendor showed that doctors had
reported that the main message of certain sales pitches (known
as "details"), given by 10 of 50 of defendants' sales
representatives for whom data was available in a two-month

36

period, was for off-label use of Neurontin.  Nine were for pain

and one was for reflex sympathetic dystrophy, a painful nerve

damage syndrome.

167. On or about July 10, 1996, defendants' sales

representative met with a doctor in Monroe, Louisiana, and

detailed a doctor on Neurontin for the treatment of pain.

168. Also in 1996, a sales representative created a

document that stated that sales representatives could ask

doctors during a Neurontin detail if they ever used other anti-

epileptic drugs for painful neuropathies and could mention that

approximately 35% of all Neurontin use is non-seizure.  This

same document, entitled "Neurontin Can Do/Can't Do," stated that

sales representatives could present lunch programs on Neurontin

and pain.  The document indicated that it was to be forwarded to

the Northcentral Customer Business Unit.

169. Defendants employed "medical liaisons" who were

presented to physicians as employees of the company's Medical

and Scientific Affairs Department.  On the following occasions,

which are not all-inclusive, defendants' medical liaisons

promoted Neurontin for unapproved uses:

(a)  In or about June of 1996 defendants' sales

representative requested that defendants' medical liaison make a

presentation at Longwood Gardens in Kennett Square,

Pennsylvania, to a group of physicians who were members of a local medical society.

(b)  The sales representative and the medical liaison selected the topic for the presentation to the local medical society.  After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c)  Among the topics of the presentation was the use of Neurontin for unapproved uses.

(d)  During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of unapproved uses.

(e)  After the presentation, defendants' Medical Director praised the event as "another great example of use of the medical liaisons" and an area business manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

170. Defendants organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-21, 1996.  Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to unapproved uses of Neurontin.

171. Defendants invited certain doctors to this meeting based upon their history of writing a large number of

prescriptions for Neurontin or similar drugs.  As part of this event, defendants paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.

172. Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances."  During this presentation, Neurontin was promoted for use in the treatment of pain.

173. Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances:  Nonepileptic Uses of Anti Epileptic Drugs."  During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

174. On or about May 8, 1996, following the Jupiter Beach conference, defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

175. From August 1-5, 1996, defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics.  Defendants expressly instructed

39

several of the physician speakers to address some of the
unapproved uses.

176. During that meeting, defendants hosted doctors at the
Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid
all the expenses for eighteen "consultants" and their spouses to
attend the Olympics, including tickets to the closing
ceremonies.  Defendants already had numerous opportunities to
consult with the doctors and, in fact, many of them had spoken
on defendants' behalf at prior meetings.

177. Certain of the physician speakers promoted Neurontin
for unapproved uses in their presentations.

178. On or about March 1, 1996, defendants sponsored a
teleconference moderated by defendants' employee with a pain
specialist as a speaker on Neurontin.  The speaker promoted
Neurontin for the treatment of pain to doctors participating in
the teleconference.

179. In or about May, 1996, defendants' Medical Director
held such a teleconference entitled "Neurontin, A Clinical
Update" in which the Medical Director promoted off-label uses of
Neurontin to the doctors participating in the teleconference.

180. Defendants hosted dozens of "consultants" meetings
between late 1995 and 1997 in which the "consultants" received
payments and gratuities as well as presentations on "off-label"
Neurontin use designed to change the physicians' prescription

writing habits.  Such consultants' meetings included, but were
not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Mar. 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | Apr. 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | Apr. 20, 1996 |
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | Apr. 19-21, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | Apr. 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |

| | | |
|---|---|---|
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sep. 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

181. Defendants rewarded doctors for their advocacy of Neurontin by paying them honoraria for lending their names to scientific articles which were actually prepared and written by third parties retained by defendants. In 1996, defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that defendants could completely control the publications distributed pursuant to its "publications strategy." The content of these articles were actually written by non-physician technical writers retained by defendants and defendants had the right to control the content of all the articles. Defendants paid all expenses in connection with the creation of these publications.

42

182. Defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

183. Defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

Reflex sympathetic dystrophy (RSD)

Peripheral neuropathy

Diabetic neuropathy

Trigeminal neuralgia

Post-herpetic neuralgia

Essential tremor

Restless leg syndrome (RLS)

Attention deficit disorder (ADD)

Periodic limb movement disorder

Migraine

Bipolar disorder

Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

Drug or alcohol withdrawal seizures

184. The following enumerated misrepresentations, which are not intended to be all-inclusive, relating to "off-label" usage

43

of Neurontin were routinely made to physicians with the knowledge and consent of marketing personnel of defendants:

a. *Bipolar Disorder*. Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed.

b. *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes*. Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective monotherapy.

c. *Reflex Sympathetic Dystrophy ("RSD")*. Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value.

44

d.  *Attention Deficit Disorder ("ADD")*.  Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.

e.  *Restless Leg Syndrome ("RLS")*.  RLS was another condition where defendants' medical liaisons were trained to refer to a growing body of date relating to the condition, when no scientific date existed.

f.  *Trigeminal Neuralgia*.  Although medical liaisons represented that Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports.  No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

g.  *Post-Herpetic Neuralgia ("PHN")*.  Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin.  Once again, no clinical trial data supported such a claim.

h.  *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*.  Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions.  No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

45

i.   *Migraine*.   Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials.  Although pilot studies had been such suggested and undertaken, no early results of clinical trials existed to support these claims.  Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value.  Most of the case reports were either created or sponsored by defendants.

j.   *Drug and Alcohol Withdrawal Seizures*.   Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

185. Defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Bipolar Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though defendants were fully aware of these results from the tests which they sponsored, defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin.

186. At each of the presentations known to the plaintiff concerning Neurontin on pain, at least one of the presenters expressly stated or implied that Neurontin was effective for the treatment of pain.  A representative statement was made by Dr. David Longmire, a participating physician, at the Jupiter Beach Consultants Meeting in April 1996 when he stated that Neurontin was effective for the treatment of pain.  Dr. Longmire repeated that statement at a May 1996 Consultants Meeting at the Ritz Carlton in Boston.  Another physician participant, Dr. Steven Schacter, made a similar statement at the May 1996 meeting when he stated that "pain specialists are finding that low dosages of Neurontin are effective."  Comparable statements were made by another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach Consultants Meeting, in May 1996 at the Boston Ritz Carlton Consultants Meeting, and in June 1996 at a Philadelphia Consultants Meeting.  Upon information and belief, similar statements were made at all events presented by defendants that discussed Neurontin's use for pain indications. These events include, but are not limited to the following events:

| Topic | Date | Location |
| --- | --- | --- |
| Neurontin Consultants Meeting | Apr. 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |

| | | |
|---|---|---|
| Neurontin Consultants Meeting | May 10-11, 1996 | Boston, MA |
| Advisory Board Meeting | Apr. 14-16, 2000 | Grand Wailea Resort Hotel & Spa, Maui, HI |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants | Apr. 2000 | Four Seasons Irving, TX |
| Advisory Board Meeting | May 26, 2000 | Disney Yacht Club Orlando, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 24, 2001 | Plaza Hotel New York, NY |
| New Directions in the Understanding and Treatment of Pain | Mar. 2-3, 2001 | Hilton Novi Detroit, MI |
| New Directions in the Understanding and Treatment of Pain | May 4-5, 2001 | Westin Galleria Houston, TX |
| New Directions in the Understanding and Treatment of Pain | Feb. 9-10, 2001 | Harbor Court Hotel Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain | Mar. 9-10, 2001 | Fairmont Kansas City Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain | May 11-12, 2001 | Peabody Memphis Memphis, TN |

| | | |
|---|---|---|
| New Directions in the Understanding and Treatment of Pain | Mar. 16-17, 2001 | Fairmont SanFrancisco San Francisco, CA |
| Advisory Board Meeting | June 16-18, 2000 | Westin Resort Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Sheraton Universal City, Universal City, CA |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Miami Biltmore Miami, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Ritz Carlton New Orleans, New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Sheraton Music City Nashville, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 30-31, 2001 | Ritz Carlton St. Louis, St. Louis, MO |
| New Directions in the Treatment of Neuropathic Pain | Oct. 9-11, 1998 | Madeira, Portugal |

187. At events produced by defendants, physician participants routinely stated that Neurontin was effective for the treatment of restless leg syndrome or RSD.  Events presented by defendants that discussed Neurontin's use as a treatment for restless leg syndrome or RSD include, but are not limited to, the following event:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

188. At events produced by defendants, physician participants routinely stated that Neurontin was effective for the treatment of bipolar disorder.  Events presented by defendants that discussed Neurontin's use as a treatment for bipolar disorder include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess, Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro, St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

189. At events produced by defendants, physician participants routinely stated that Neurontin was effective for the treatment of social phobia. Events presented by defendants that discussed Neurontin's use as a treatment for social phobia include, but are not limited to, the following events:

51

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess, Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro, St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

190. Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder. Nonetheless, at events produced by defendants, physician participants routinely stated that Neurontin was effective for the treatment of panic disorder. Events presented by defendants that discussed Neurontin's use as a treatment for panic disorder include, but are not limited to, the following events:

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess, Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro, St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

191. On September 13, 1996, Parke-Davis submitted a supplemental NDA to approve Neurontin as monotherapy for partial seizures. The FDA determined the application to be non-approvable on August 26, 1997, because of insufficiency of evidence of Neurontin's effectiveness. The FDA noted that Clinical Study 945-82 failed to yield evidence of effectiveness. Parke-Davis did not make public that its application for monotherapy had been denied. Representative events at which defendants continued to make presentations that Neurontin was effective for monotherapy without disclosing that the FDA had denied its application for a monotherapy indication include, but are not limited to, the following events:

55

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Monotherapy Speakers Bureau Meeting | September 1997 | La Quinta Resort Palm Springs, CA |

192. Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis and defendants, defendants regularly presented programs in which physician participants touted Neurontin as being effective for the treatment of migraine. Events where such presentations were made include, but are not limited to, the following events:

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Gabapentin in the Management of Migraine | May 25, 1996 | Short Hills, NJ |

193. Notwithstanding the FDA's refusal to increase the maximum approved dosage of Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages greater than 1800 mg per day, defendants presented numerous programs where physician participants asserted that Neurontin was effective and safe at dosages above 1800 mg. All such representations were false and misleading. Additionally, at these presentations the physician participants did not disclose the clinical trial evidence that demonstrated that there was no dose response above 1800 mg per day. Defendants' failure to

56

provide this information was a violation of defendants' duties to provide fair and balanced information, and made any prior representations about use of Neurontin at dosages greater than 1800 mg per day false and misleading.  In addition to the events identified above, other events where these false and misleading statements were made include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting on Neurontin | Feb. 4-6, 2000 | Royal Sonesta New Orleans, LA |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

194. On or about June 29, 2001, the FDA Division of Drug Marketing, Advertising and Communications (DDMAC) advised defendants that through routine monitoring and surveillance, the DDMAC has identified a slim jim (ID #NSJ5095A1) for Neurontin that is misleading and in violation of the FDCA and applicable regulations, in that this slim jim misleadingly claims improvement in quality of life (QOL) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study, that among other QOL parameters, the misleading presentation includes improvement in social limitations, memory

difficulties, energy level, and work limitations, and that the
NEON study is not considered to be substantial evidence for
claims of QOL improvements because it is not a controlled study.

195. On or about July 1, 2002, the DDMAC advised defendants
that through routine monitoring and surveillance, the DDMAC has
identified a model (#NE 102254) for Neurontin (gabapentin) that
is in violation of the FDCA and applicable regulations because
it makes representations about Neurontin which are false or
misleading, in that this suggestion of proof of the mechanism of
action is false and contrary to the language in the approved
product labeling that states "[t]he mechanism by which
gabapentin [Neurontin] exerts its anticonvulsant action is
unknown," and that, furthermore, the full presentation of the
areas of the human brain accompanied by purported "Mechanism of
Action" and the prominent display of the name "Neurontin" is
misleading because it suggests that Neurontin is useful for a
broader range of central nervous system conditions than has been
demonstrated by substantial evidence.

196. From July 1995 through at least August 5, 2002,
defendants engaged in a marketing program to promote the use of
Neurontin, and to induce physicians to prescribe Neurontin, for
medical conditions for which the FDA had not approved Neurontin
to be used (i.e., "unapproved" or "off-label" uses).  That
program included:  (a) illegally promoting the sale and use of

58

Neurontin for a variety of conditions other than the one
condition for which its use was approved by the FDA and for
which defendants had not performed the required FDA testing or
established safety and efficacy, in violation of the Federal
Food Drug and Cosmetic Act, 21 U.S.C. § 331, et seq.; (b)
offering and paying illegal remuneration to doctors, either
directly or through third parties, to induce them to promote and
prescribe Neurontin for off-label uses, in violation of the
federal Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b); and (c)
making and/or disseminating false statements in presentations
and marketing literature sales personnel provided to doctors
concerning, among other things, the uses for which the FDA had
approved Neurontin, the conditions for which the use of
Neurontin was otherwise medically accepted and/or the existence
of adequate evidence of the safety and efficacy for such use.

197. This "off-label" promotion scheme remained hidden
until a complaint by a former medical liaison, Dr. David
Franklin, was fully unsealed by the United States District Court
for the District of Massachusetts in May 2002.

198. On information and belief, defendants' "off-label"
promotion scheme continued after the filing of Dr. Franklin's
whistleblower complaint and still continues.  For example,
through the third quarter of 2002, there were no published
scientific studies to support Neurontin's use for a wide variety

of diseases that it is being prescribed for including anxiety disorder, attention deficit disorder, bipolar disorder, cluster headache, depression, dosages in excess of 1800 mg per day and many other disorders that physicians are now prescribing Neurontin for that are "off-label." Despite this lack of scientific evidence, Neurontin sales for these and other "off-label" uses have steadily increased, to the point that, according to an article published in the December 1, 2003 issue of Medical Marketing & Media, 90% of Neurontin sales are for "off-label" use. No other drug in the United States has such a high percentage of "off-label" use. The same article estimates that $1.8 billion worth of Neurontin has been sold for "off-label" uses. This increase in sales, and the repeated and increased prescription of Neurontin for "off-label" uses, without any supporting scientific studies that would be prompting such use, cannot be a random event and could not occur without continuing "off-label" promotion by defendants' sales force.

199. As a result of the activities described above, many of which continue to occur after Dr. Franklin filed his whistleblower suit, physicians were inundated with false information about Neurontin. As a result, they continue to prescribe Neurontin for "off-label" uses for which there is no reliable scientific support.

200. On information and belief, Pfizer has a company-wide practice of marketing "off-label" indications.  "Off-label" marketing plans exist for Cox 2 inhibitors and, on information and belief, also exist for Neurontin.

201. This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for "off-label" uses.  Because there are no valid scientific studies supporting such use, a reasonable inference is that the use results from past and continuing promotional efforts by defendants.  This clear and unavoidable conclusion follows from observations regarding the ongoing extent of prescriptions written for "off-label" Neurontin use.

202. First, from the perspective of overall Neurontin sales, "off-label" usage of Neurontin has actually increased during the years since 1999; in recent years, "off-label" prescriptions for Neurontin have exceeded 90% of all sales and, in some months, it appears that approved indication usage is negligible.

203. Second, although Neurontin is prescribed for scores of "off-label" indications, since 1999 the types of "off-label" usage continue to be weighted in the precise areas where defendants focused their illegal marketing efforts:  bipolar disorder, peripheral neuropathy, migraine, etc.

204. Third, these focus treatment areas of continuing unapproved usage are subject to very intense competition between therapeutic substitutes (other drugs or treatments).  Indeed, because manufacturers' incremental cost for drugs in these areas is very small (e.g., only pennies to manufacture an additional pill), manufacturers compete aggressively for market share by spending huge amounts of money for marketing, promotional and sales activities.  If any company was to simply pack its tent and discontinue programmatic promotional effort in any therapeutic arena, significant loss of overall sales within that diagnosis regime would certainly occur.  For Neurontin, no such dip in overall sales, let alone any significant drop, has occurred.

205. Fourth, Pfizer, like most branded drug companies, monitors the relationship of its sales to its promotional efforts in very short timeframe; Pfizer would be concerned about a drop in sales within a certain therapeutic regime not after a year look-back, or even a quarterly look-back, but over just weeks.  The persistent maintenance of high Neurontin sales within multiple, targeted areas for "off-label" promotion over a period of years defies the conclusion that any significant backing away on the marketing, sales or promotion of Neurontin to each of those approved therapeutic areas.

206. For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction.  This increase is a direct result of defendants' sales representatives recommending to doctors its use for this purpose and their distribution of unapproved promotional materials.  These promotional efforts did not stop in 1999, but continued thereafter.  There are no valid scientific studies that support Neurontin's use for bipolar disorders.  Dr. C. Seth Landefeld has submitted an expert opinion in the Franklin litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for . . . bipolar disorder."  As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness has been established, were given and are being given Neurontin.  These prescriptions for this purpose are still being written and as a direct result of defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

207. Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, depression and dosages in excess of 1800 mg per day, are also increasing without any scientific evidence supporting use of Neurontin for such indications.  Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific studies to support

63

Neurontin's use for" any of these indications or in an increased dose.

208. Overall, "off-label" sales of Neurontin have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales. Actual sales for approved uses has declined. Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by defendants to promote "off-label" use.

209. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may contribute to mood and behavioral disturbances, including depression and suicidality.

210. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may worsen existing mood and behavioral disturbances, including depression and suicidal behavior.

211. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may worsen depression and may lead to suicide.

212. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with depression.

213. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with psychobiologic adverse events.

214. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with suicidality (i.e., ideation, attempted and completed suicide).

215. Refractory epilepsy is a condition in which patients with epilepsy cannot control their seizures with existing anti-seizure medication. Refractory Epilepsy is a serious medical condition. Parke-Davis submitted on January 15, 1992, the New Drug Application (NDA 20-235, Gabapentin with a trade name of Neurontin), seeking approval for treatment as adjunctive treatment for refractory epilepsy. FDA risk benefit analysis for Neurontin was limited to refractory epileptic patients. FDA conducted no safety analysis prior to approval of Neurontin in people suffering from a psychiatric disorder or pain disorder.

216. Epilepsy clinical trials performed as part of Defendants' New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin. Of the 2048 people, 19.7% discontinued treatment due to adverse reactions. Depression and Suicidal Ideation was the ninth most common adverse reaction resulting in discontinuation of Neurontin.

65

217. Epilepsy clinical trials performed as part of
Defendants' New Drug Application for Neurontin reflected safety
information on 2048 people who received Neurontin.  In the total
exposed population of said New Drug Application, 78 patients
reported depression as an adverse event (i.e., 5.3% of the
population of patients).  There were seven reports of depression
as serious adverse events, and nine patients who withdrew from
studies because of depression.

218. During Epilepsy clinical trials, performed as part of
Defendants' New Drug Application for Neurontin, there was
observed at least seven cases of "Depression" adverse events
considered possibly or probably related to Neurontin by
Defendants' Investigator; there was observed at least two cases
of "Drug Overdose" adverse events considered possibly or
probably related to Neurontin by Defendants' Investigator.

219. During Defendants' Clinical Pharmacology Studies,
performed as part of Defendants' New Drug Application for
Neurontin, there were mood and behavioral disturbances or
"psychobiologic" adverse events, including the following:
Abnormal Thinking (16), Depersonalization (11), Euphoria (6),
Confusion (5), Nervousness (4), Hyperkinesia (3), Agitation (2),
Personality Disorder (2), Abnormal Dreams (2), Emotional
Lability (1).

220. During Defendants' Clinical Epilepsy Studies, performed as part of Defendants' New Drug Application for Neurontin, there were the following mood and behavioral disturbances or "psychobiologic" adverse events: Nervousness (58), Thinking Abnormal (37), Confusion (29), Depression (27), Emotional Lability (26), Anxiety (24), Agitation (8), Hostility (7), Doped Feeling (6), Euphoria (5), Hallucinations (4), Psychosis (4), Suicide Attempt (2), Personality Disorder (2), Apathy (1), Depersonalization (1), Overdose (1), Abnormal Dreams (1), Feeling High (1), Feeling Abnormal (1), Frustration (1), Hypomania (1), Paranoia (1), Psychiatric Disorder (1), Schizophrenic (1), Suicidal (1), Withdrawal Syndrome (1).

221. During Defendants' Add-on Therapy Studies, performed as part of Defendants' New Drug Application for Neurontin, there were the following mood and behavioral disturbances or "psychobiologic" adverse events: Confusion (57), Nervousness (56), Depression (38), Thinking Abnormal (32), Emotional Lability (20), Anxiety (18), Hostility (12), Overdose (12), Personality Disorder (12), Agitation (10), Euphoria (10), Forgetfulness (8), Depersonalization (7), Hallucinations (5), Psychosis (3), Suicide Attempt (3), Delirium (2), Neurosis (2), Paranoia (2), Aggression (1), Apathy (2), Manic Reaction (1), Mood Swings (1), Suicidal (1), Suicide Attempt (1), Suicide (1).

222. During the Epilepsy Clinical Trials, performed as part of Defendants' New Drug Application for Neurontin, Defendants' medical investigators assessed the following Serious Adverse Events to be possibly or probably related to Neurontin:

a.  Depression with attempted suicide by a seventeen year old male on 1,200 mg of Neurontin;

b.  Depression with suicide ideation of a thirty six year old male on 1,200 mg of Neurontin. Suicide ideation improved on tapering and discontinuance.

c.  Depression with suicide ideation recurred when Neurontin was reintroduced at 1,500 mg of Neuorntin;

d.  Depression and attempted suicide by a seventeen year old female on 2,000 mg of Neurontin;

e.  Depression which resolved with dose reduction of a twenty three year old female on 1,200 mg of Neurontin;

f.  Drug overdose by a thirty one year old female on 1,800 mg of Neurontin;

g.  Drug overdose by an eighteen year old male on 1,800 mg of Neurontin.

223. Epilepsy clinical trials performed as part of Defendants' New Drug Application for Neurontin reflected safety information including the presence of positive dechallenge/rechallenge adverse events. Dechallenge events included suicidal ideation, depression and hostility. A positive rechallenge was documented in one patient for the adverse event of depression with suicide ideation, and

Defendants' Investigator acknowledged the adverse event to be possibly or probably related to Neurontin.

224. The FDA, in its 1992 pre-approval, Combined Medical-Statistical Review (hereinafter, "1992 FDA Review"), which was done to evaluate the limited sought-after indication of Adjunctive Medication in Refractory Partial Epilepsy, observed at least 369 treatment emergent "psychobiologic" adverse drug events in the total population of 2048 participants given Neurontin.  These adverse events, when considered individually and classified using a modified COSTART-preferred terminology, occurred at a frequency of at least 1% or more among gabapentin treated patients who participated in placebo controlled studies. These individual mood and behavioral disturbances or "psychobiologic" adverse events are as follows: Thinking Abnormal 96/2048 (4.69%), Nervousness 92/2048 (4.49%), Depression 82/2048 (4.0%), Emotional Lability 38/2048 (1.86%), Anxiety 36/2048 (1.76%), Hostility 25/2048 (1.22%).

225. Although FDA's 1992 Review was done to evaluate the limited sought-after indication of Adjunctive Medication in Refractory Partial Epilepsy, FDA medical reviewer, Cynthia McCormick, M.D., raised important concerns about the relationship between Neurontin and adverse events of depression and suicide.  Specifically, the FDA 1992 Review sets forth the following:

Less common but more serious events may limit the drugs [Neurontin's] widespread usefulness…[D]epression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts.

*   *   *

In its clinical database of 2048 patients, gabapentin has a risk profile that is uncertain, with five groups of important adverse events that have not been fully characterized, [including] clinically important depression …. Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy.

*   *   *

In conclusion, NDA 20-235 is approvable with appropriate and prominent labeling *for use in a specific population*." [Emphasis added.]

226. On or about December 15, 1992, the Peripheral and Central Nervous System Drugs Advisory Committee to the Department of Health and Human Services, Food and Drug Administration, had a public hearing and voted to recommend Neurontin for a very specific use in a very limited population (e.g., adjunctive treatment for refractory epilepsy). The Advisory Committee did not consider the safety of Neurontin's use in any patient group other than sufferers of refractory epilepsy. Defendant employees Dr. Spivey, Ms. Turner, Dr. Pierce, Dr. Fletcher, Mr. Parker, Ms. LaMoreaux and Dr. Charles Taylor were in attendance at said hearing where the following

70

question and answer was posed regarding the limited expected use

and indication for Neurontin:

> Has the sponsor provided evidence that gabapentin
> is safe when used in the treatment of epilepsy?
> And again I would modify it to be used as an add-
> on in adult patients with intractable partial
> seizures.

*   *   *

We have a 10-to-0 vote in favor of that question.

227. The FDA has consistently reaffirmed its findings from

the FDA 1992 Review that its concern that depression while it

may not be an infrequent occurrence in the epileptic population,

may become worse and require intervention or lead to suicide.

In a subsequent review dated May 12, 1992, and signed by FDA

clinical reviewer on September 27, 1993, the FDA stated "there

is no new data in Safety Update #3 which alter the safety

profile of this drug as presented the initial NDA and Safety

Update #1 and 2."  In another subsequent safety update dated

December 15, 1993, the FDA again stated "there are no new data

in Safety Update #4 which alter the safety profile of this drug

as presented in the initial NDA and Safety updates #1, 2, and

3."

228. Parke Davis and Warner Lambert had specific knowledge

on or about December 7, 1992, via FDA's 1992 Review, that

Neurontin's widespread usefulness was limited because of the

occurrence of depression and suicide attempts during clinical

71

trials; Parke Davis and Warner Lambert had knowledge of Neurontin's capacity to contribute to mood and behavioral disturbances, including depression and suicidality. Dr. Richard Spivey, then Senior Director of Regulatory Affairs at Parke Davis, obtained the FDA 1992 Review from the FDA. On or about December 7, 1992, Dr. Spivey provided the January 31, 1992 Review to the Neurontin Director of Regulatory Affairs at Parke Davis: Janeth Turner. On December 7, 1992, Ms. Turner provided the FDA 1992 Review to Dr. Mark Pierce, Parke Davis Vice President of Clinical Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of Drug Development. Between December 7, 1992 and December 9, 1992, Dr. Spivey, Ms. Turner, Dr. Pierce and Mr. Fletcher read and became aware of the 1992 FDA Review, including the following FDA findings regarding Neurontin:

> Less common but more serious events may limit the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts.
>
> *   *   *
>
> In its clinical database of 2048 patients, gabapentin has a risk profile that is uncertain, with five groups of important adverse events that have not been fully characterized, [including] clinically important depression …. Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy.

72

\*   \*   \*

In conclusion, NDA 20-235 is approvable with appropriate and prominent labeling for use in a specific population."

229. On or about December 9, 1992, Dr. Spivey, Ms. Turner, Dr. Pierce, and Mr. Fletcher had a discussion via telephone with Dr. Russell Katz, the FDA Supervising Medical Officer, regarding the Neurontin New Drug Application, and with Ms. Nancy Chamberlain, the FDA Consumer Safety Officer regarding the Neurontin New Drug Application.  Said discussion included the substance of the aforementioned FDA 1992 Review.  As a consequence of this discussion, on or about December 9, 1992, upon information and belief,  Dr. Spivey, Ms. Turner, Dr. Pierce and Mr. Fletcher, learned that the widespread usefulness of Neurontin was limited because it was shown to be associated with depression and may lead to suicide, as it had led to several suicide attempts during clinical trials.

230. On December 15, 1992, the Peripheral and Central nervous System Drugs Advisory Committee to the Department of Health and Human Services, Food and Drug Administration, conducted a public hearing that was attended by, *inter alia,* several employees of Parke Davis, including Dr. Spivey, Ms. Turner, Dr. Pierce, Mr. Fletcher, Mr. James Parker, Ms. Linda LaMoreaux, and Dr. Charles Taylor.  At said hearing, FDA presented the following information:

73

In the total exposed population of the NDA, 78, or 5.3
percent of patients, reported depression as an adverse
event.  This included one subject in Phase I study.
There were seven reports of depression as serious
adverse events and nine patients who withdrew from
studies because of depression, some with suicidal
ideation.

*   *   *

There may be some underrepresentation of certain
categories; for example, in some cases, depression was
reported as a serious adverse event, particularly if
it resulted in hospitalization or was associated with
suicidal ideation…  The actual incidence of treatment-
emergent depression in which pharmacological
intervention was begun and maintained throughout the
course of the study is not known.  The firm has
provided the FDA with a breakdown of patients who
reported depression as an adverse event, and it's
found that…of 78 patients who reported depression as
an adverse event, 19 had no prior history and 22
patients required treatment for their symptoms.

231. Defendants' employees Ms. Turner, Mr. James Parker,
Ms. LaMoreaux and Dr. Taylor were members of the Drug
Development Team and New Product Committee whose stated purpose
was to explore new uses for Neurontin beyond the epileptic
population.

232. At no time did Defendants' employees Ms. Turner, Mr.
Parker, Ms. Lamoreaux or Dr. Taylor communicate to any other
member of Defendants' Development Team, or New Product
Committee, the FDA's concern that "[l]ess common but more
serious events may limit the drugs [Neurontin's] widespread
usefulness…depression, while it may not be an infrequent
occurrence in the epileptic population, may become worse and

require intervention or lead to suicide, as it has resulted in some suicidal attempts."

233. Defendants undertook a plan to disseminate false and misleading information about Neurontin by suppressing or otherwise intentionally failing to disclose to Plaintiff's decedent's prescribing physician(s) and Plaintiff's decedent information about Neurontin's capacity to contribute to mood and behavioral disturbances or "psychobiologic" adverse events, including depression and suicidality.

234. Defendants suppressed, concealed and failed to disclose to Plaintiff's decedent and Plaintiff's decedent's prescribing physician(s) the FDA's concerns regarding Neurontin's association with depression, suicidality, psychobiologic adverse events, including FDA's statement that "[l]ess common but more serious events may limit the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts." Suppressing, concealing and failing to disclose the FDA's concern that Neurontin may worsen depression and may lead to suicide contributed to Plaintiff's decedent's physician(s) prescribing Neurontin to Plaintiff's decedent for off-label uses.

235. Defendants' actions in suppressing, concealing or otherwise failing to disclose Neurontin's association with suicidality, depression, and psychobiologic events were done with a strategic purpose to increase sales of Neurontin, including sales related to off-label uses.  Defendants knew that disclosure of such an association with Neurontin would decrease sales; Defendants knew there was a financial, strategic advantage in not disclosing Neurontin's association with suicidality, depression, and psychobiologic adverse events.

236. In or about April and May of 1995, Defendants performed a marketing assessment of proposed psychiatric indications for Neurontin.  In that marketing assessment, Defendants forecasted potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios: with and without FDA approval.  Defendants' Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that Defendants would not seek approval to promote and sell the drug for these unapproved uses.

237. In or about July of 1995, Defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to Defendants' Neurontin Development Team and to Defendants' Vice President for marketing.  That assessment stated that "there is no intention to fully develop the

indication at this point." Full development would have required submission of an NDA to the FDA for approval.

238. As previously set forth above and incorporated by reference herein, commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail above, Defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

239. Upon information and belief, at all times during promotion of the sale and use of Neurontin for conditions other than the approved use (e.g., "off-label" uses), Defendants always suppressed, concealed, and failed to disclose Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality.

240. To increase sales of Neurontin, Defendants affirmatively applied strategies to compare Neurontin with other competing pharmaceutical drugs that had warnings or otherwise greater disclosure of suicide related events.

241. To increase sales of Neurontin, Defendants trained its sales force to minimize Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality.

242 To increase sales of Neurontin, Defendants applied strategies to compare Neurontin with other competing

pharmaceutical drugs, such as Keppra, which already had a
specific warning related to suicide:  "Neurontin Backgrounder",
"Competitive Information", and "Compare and Win" strategies were
implemented.  Neurontin was portrayed as "Safe and Easy"
compared to Keppra that had a "Suicide Warning".

243. Defendants' comparison strategy wherein they
suppressed, concealed and failed to disclose Neurontin's
association with mood and behavior disturbances or
psychobiologic adverse events, including depression and
suicidality, while at the same time emphasizing competing drugs
that had a "Suicide Warning", increased sales of Neurontin,
including sales for off-label uses.

244. Defendants' application of such comparison strategies
directly or indirectly resulted in Plaintiff's decedent's
prescribing physician(s) prescribing Neurontin and Plaintiff's
decedent ingesting Neurontin.

245. Most doctors likely would never have heard of
Neurontin but for the off-labeling marketing efforts of Warner-
Lambert and allegedly Pfizer.  The inability to prove that
Warner-Lambert or Pfizer contacted a doctor directly does not
mean that that doctor was not influenced by Warner-Lambert and
Pfizer marketing efforts.  Pfizer's off-label marketing of
Neurontin indirectly influenced all, or substantially all,
doctors prescribing Neurontin in one of two ways.  First, a

doctor who did not have direct contact with Pfizer most likely was influenced in his prescribing habits by one who did. Second, all, or substantially all, doctors were indirectly affected by Pfizer's suppression of negative or adverse information about Neurontin that would have affected their prescribing habits.

246. It seems unlikely that a responsible doctor who has never heard of Neurontin would prescribe Neurontin for an off-label use without first consulting the medical and scientific literature, a colleague, or a medical reference work.  To do so would be part of the doctor's professional and ethical responsibility.

247. Doctors work in an environment where informal communications among fellow doctors, or "word-of-mouth," play an important role in the dissemination of information about drugs and treatments.  Colleagues are generally perceived as credible, independent, and reliable sources of information.  Studies have shown that doctors learn extensively from and draw upon their colleagues' clinical experience.  Indeed, academic research has found that the source most influential and encouraging first prescribing a new drug is colleagues.

248. The academic literature has shown that social interactions among doctors can influence their prescribing behavior.  For example, brand-level network effects affect the

rate at which a drug diffuses into the market.  Widespread use
of a drug implicitly conveys important information about its
safety and efficacy, which increases word-of-mouth
communications and accelerates the rate at which others become
aware of and adopt the drug.

249. Even doctors who did not receive visits from Neurontin
sales representatives were more likely to prescribe Neurontin
off-label because of indirect influences of Neurontin's
extensive promotional efforts.  The reason is that Neurontin
promotional plans targeted the two areas physicians rely on most
for a physician to not have heard about the product.  The makers
of Neurontin were well aware of these social networks  and hoped
to exploit them through their marketing efforts.

250. The widespread use of Neurontin  would further
encourage doctors who may not have had direct contact with the
drug company to prescribe the drug, because widespread use of a
drug may convey information about its safety and efficacy, and,
for physicians, may imply "accepted practice" and hence greater
immunity to malpractice lawsuits.  This could lead to the
dominance of one drug - not necessarily the most efficacious or
safest - despite the availability of close substitutes.  This
idea of high prescription volume signaling safety may have been
especially relevant for Neurontin.  More important, as Neurontin
sales increased year-over-year, the indirect influences would

have become stronger, encouraging physicians to prescribe Neurontin, regardless of whether or not they had direct contact with the company or received sales calls from Neurontin sales representatives.

251. Given the high levels of detailing proposed by Pfizer in 2002, it is unlikely that a doctor would be completely unaware of Neurontin, especially in the specialties where Pfizer most heavily promoted Neurontin.  Pfizer's Neurontin sales representatives visited the majority of primary care physicians, neurologists, rheumatologists, and orthopedists.  Since doctors share information  and rely on each other for new information, any doctor who did not receive a personal visit would likely learn about Neurontin through a colleague who was visited.

252. Because it was perceived as "safe and efficacious", Neurontin was listed on nearly all formularies.  Neurontin's formulary status would have also created indirect influences encouraging prescriptions.  If a doctor had a patient in need of treatment for one of the numerous off-label conditions for which Warner-Lambert and Pfizer promoted Neurontin, the physician may have prescribed Neurontin simply because it was on formulary, without ever having been personally contacted by the company or its sales representatives promoting Neurontin.

253. Defendants unlawfully manipulated scientific "truth"" to convince by misrepresentation the entire medical community of

81

the proposition that Neurontin could be therapeutically used for indications never approved by the FDA.

254. Defendants' suppression, concealment and lack of disclosure, to Plaintiff's decedent and Plaintiff's decedent's prescribing physician(s), directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) to prescribe Neurontin and for Plaintiff's decedent to ingest Neurontin.

255. Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) not warning of the risks of depression and suicide associated with Neurontin.

256. Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) failing to adequately monitor changes in mood and behavior caused by Neurontin.

257. Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality directly or indirectly prevented

Plaintiff's decedent's prescribing physician(s) from being able
to fully assess the risk-benefit analysis for the underlying
condition Neurontin was prescribed to Plaintiff's decedent.

258. Defendants suppressed, concealed, misrepresented or
otherwise failed to disclose Neurontin's mechanism of action to
Plaintiff's decedent and Plaintiff's decedent's prescribing
physician(s) in failing to inform the prescriber(s) that
Neurontin increases Gaba and thereby reduces the release of
neurotransmitters in the human brain, including serotonin and
norepinephrine.

259. Defendants suppressed, concealed, misrepresented or
otherwise failed to disclose Neurontin's mechanism of action to
Plaintiff's decedent and Plaintiff's decedent's prescriber in
failing to inform Plaintiff's decedent and the prescriber(s)
that Neurontin's mechanism of action, in particular Neurontin's
effects on monoamine neurotransmitter release, may contribute to
mood and behavior disturbances or psychobiologic adverse events,
including depression and suicidality.

260. Defendants suppressed, concealed, misrepresented or
otherwise failed to disclose Neurontin's mechanism of action to
Plaintiff's decedent and Plaintiff's decedent's prescriber(s) in
failing to inform the prescriber(s) that Neurontin increases
Gaba and thereby reduces the release of neurotransmitters in the
human brain, including serotonin and norepinephrine, and that

the reduction of such neurotransmitters was associated with mood
and behavioral disturbances or psychobiologic adverse events,
including depression and suicidality.

261. Defendants knew or should have known that there is a
need to define Neurontin's mechanism of action so that a proper
warning regarding monitoring patients for these mood and
behavioral disturbances or psychobiologic adverse events would
be presented in product labeling in a form that is
understandable for prescribing physicians.

262. Defendants knew or should have known that Neurontin
would be used for off-label indications, such as those for which
Plaintiff's decedent herein was prescribed Neurontin, and with
such knowledge Defendants should have taken action to inform
prescribers and Plaintiff's decedent that careful monitoring of
patients ingesting Neurontin was required due to Neurontin's
capacity to increase Gaba and thereby reduce the release of
monoamine neurotransmitters and consequently Neurontin's
capacity to contribute to mood and behavioral disturbances or
psychobiologic adverse events, including depression and
suicidality.

263. Defendants' intentional suppression,
misrepresentation, concealment and lack of disclosure as to
Neurontin's  mechanism of action directly or indirectly resulted
in preventing Plaintiff's decedent's prescribing physician, from

being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

264. Defendants' intentional suppression, misrepresentation, concealment and lack of disclosure as to Neurontin's mechanism of action directly or indirectly resulted in preventing Plaintiff's decedent's prescribing physician from being able to fully monitor changes in Plaintiff's decedent's mood and behavior caused by Neurontin.

265. Defendants intentionally suppressed, concealed or otherwise misrepresented the utility of Neurontin in uses outside of its approved indications in failing to inform Plaintiff's decedent and Plaintiff's decedent's prescriber(s) that it would be unethical to prescribe Neurontin to depressed individuals.

266. On or about June 18, 1999, Defendants' employed Atul C. Pande, M.D., F.R.C.P.C. as a Senior Director, Psychiatrist, and Dr. Pande stated the following, on June 18, 1999, at the Third Annual Conference on Bipolar Disorder, regarding the exclusion of purely depressed patients from clinical trials wherein patients would be ingesting Neurontin:  "[W]e had absolutely no evidence whatsoever that [Neurontin] was likely to be antidepressant and therefore, we felt it ethically unjustified to include depressed patients."

267. Defendants' intentional suppression, misrepresentation, concealment and lack of disclosure that Defendants had no evidence that Neurontin was likely to be antidepressant directly or indirectly resulted in preventing Plaintiff's decedent's prescribing physician(s) from being able to fully monitor changes in Plaintiff's decedent's mood and behavior caused by Neurontin.

268. Defendants' intentional suppression, misrepresentation, concealment and lack of disclosure that Defendants had no evidence that Neurontin was likely to be antidepressant directly or indirectly resulted in the prevention of Plaintiff's decedent's prescriber(s) from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

269. Defendants were well aware that Plaintiff's decedent's prescribing physician(s) and Plaintiff's decedent would rely on the information concerning Neurontin (which suppressed, omitted, concealed and otherwise misrepresented the safety and efficacy of Neurontin), that Defendants provided to the Plaintiff's decedent's prescribing physicians and Plaintiff's decedent.

270. Defendants provided this information which suppressed, omitted, concealed and otherwise misrepresented the safety and efficacy of Neurontin to induce Plaintiff's decedent's prescribing physician(s) to induce the physicians to prescribe

Neurontin to their patients, including Plaintiff's decedent for either refractory epilepsy or off-label uses.

271. Plaintiff's decedent's prescribing physician(s) and Plaintiff's decedent relied on the information provided by Defendants, which suppressed, omitted, concealed and other wise misrepresented the safety and efficacy of Neurontin, and to their detriment as Plaintiff's decedent sustained serious injury.

272. Defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, which are not detailed herein but will be determined in discovery.

273. Defendants affirmatively and fraudulently misrepresented that Neurontin was safe and effective in the treatment of fibromyalgia when, in actuality, Neurontin was ineffective in treating such condition and instead influenced users to engage in self-destructive behavior.

274. Defendants affirmatively and fraudulently misrepresented that Neurontin was safe for human consumption in general, when in actuality, Neurontin influenced users to engage in self-destructive behavior.

275. Defendants knew that Neurontin was not safe and effective in the treatment of fibromyalgia and that Neurontin

was not safe for human consumption in general because such drug influenced users to engage in self-destructive behavior.

276. Defendants knew that physicians, health care providers, and mental health care providers would justifiably rely upon defendants' misrepresentations in prescribing Neurontin in the treatment of fibromyalgia and in prescribing Neurontin for human consumption in general for the treatment of illnesses and medical and mental conditions and that the public, including persons such as plaintiff's decedent, would justifiably rely upon defendants' misrepresentations in using Neurontin as prescribed by physicians, health care providers and mental health care providers in the treatment of fibromyalgia and for other prescribed uses.

277. Plaintiff justifiably relied upon defendants' misrepresentations and, accordingly, consumed Neurontin as prescribed by her physician in the treatment of fibromyalgia.

278. By reason of plaintiff's decedent's consumption of Neurontin in justifiable reliance upon defendants' fraudulent misrepresentations, plaintiff's decedent sustained injuries and was caused to commit suicide.

279. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition

thereto, plaintiff seeks punitive and exemplary damages against
defendants in an amount to be determined upon the trial of this
matter.

## AS AND FOR A FIFTH CAUSE OF
## ACTION AGAINST THE DEFENDANTS

280. Plaintiff repeats and reiterates the allegations
previously set forth herein.

281. Defendants knowingly, willfully and intentionally
engaged in unlawful, unfair, unconscionable, false, misleading,
deceptive and fraudulent acts and practices injurious to the
public interest, in violation of Tex. Bus. & Com. Code § 17.41 et
seq., including representing that Neurontin has uses and benefits
which the drug does not have, and failing to disclose information
concerning Neurontin which was known at the time of the
transaction, which failure was ultimately intended to induce the
patient/consumer into a transaction into which the
patient/consumer would not have entered had the information been
disclosed, for the purpose of influencing and inducing physicians
and medical providers to prescribe Neurontin, at excessively high
dosages, for unapproved "off-label" uses, including treatment for
fibromyalgia, to patients/consumers such as plaintiff's decedent,
and taking advantage of the lack of knowledge, ability,
experience or capacity of such patients/consumers to a grossly
unfair degree, and causing such patients/consumers to purchase,

89

acquire and use Neurontin, at high dosages, for unapproved "off-label" uses, including treatment for fibromyalgia, as prescribed by their physicians and medical providers.

282. By reason of defendants' unlawful, unfair, unconscionable, false, misleading, deceptive and fraudulent acts and practices, reasonable patients/consumers acting reasonably, such as plaintiff's decedent, were caused to attempt to commit suicide and to sustain economic damages and to suffer extreme mental anguish.

283. By reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries were damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdictional limits of this matter, which sum is equal to three times the amount of damages for mental anguish and economic damages.

**AS AND FOR A SIXTH CAUSE OF**
**ACTION AGAINST THE DEFENDANTS**

284. Plaintiff repeats and reiterates the allegations previously set forth herein.

285. That at the time of the incident and during plaintiff's decedent's consumption of Neurontin prior to and until the time of her death, plaintiff's decedent suffered suicidal ideations and apprehension of death during a period of time leading up to the actual commission of suicide.

286. That for a period of time leading up to and at the time of the aforesaid suicide, plaintiff's decedent lived and was suffering excruciating mental anguish, severe pain and suffering.

287. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

WHEREFORE, plaintiff demands judgment against the defendants as follows:

(1)  The sum of $100,000,000.00 on the First Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

(2)  The sum of $100,000,000.00 on the Second Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

(3)  The sum of $100,000,000.00 on the Third Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

(4)  The sum of $100,000,000.00 on the Fourth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action; and

(5)  A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Fifth Cause of Action, which sum is equal to three times the amount of damages for mental anguish and economic damages, together with court costs and reasonable and necessary attorneys' fees; and

(6)  The sum of $100,000,000.00 on the Sixth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon trial of this Action, together with interest, costs and disbursements of this Action.

Dated:  April 7, 2008          Respectfully submitted,

                               FINKELSTEIN & PARTNERS, LLP
                               Attorneys for Plaintiff


                                 **/s/ Andrew G. Finkelstein**
                               Andrew G. Finkelstein, Esquire
                               436 Robinson Avenue
                               Newburgh, NY  12550
                               (800) 634-1212
                               (845) 562-3492 (fax)
                               email:  afinkelstein@lawampm.com

## CERTIFICATE OF SERVICE

    I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on April 7, 2008.

Dated:  April 7, 2008

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein

EXHIBIT A

FindLaw
WWW.FINDLAW.COM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>)<br><br>)<br><br>)<br>Plaintiff, )<br><br>)<br>v. )<br><br>)<br><br>)<br>WARNER-LAMBERT COMPANY LLC )<br><br>)<br>Defendant. )<br><br>) | Crim. No.<br><br>Violations:<br>Title 21, United States<br>Code Sections 331(a),<br>331(d), 352(f)(1),<br>and 355(a) |

**INFORMATION**

THE UNITED STATES ATTORNEY FOR THE DISTRICT OF MASSACHUSETTS
CHARGES THAT:

## GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise alleged:

### BACKGROUND

1.      WARNER-LAMBERT COMPANY LLC (hereinafter "WARNER-LAMBERT"),
was a corporation operating and existing under the laws of the State of Delaware. Its principal
place of business was Morris Plains, New Jersey. WARNER-LAMBERT's Parke-Davis Division
was engaged in, among other things, the development, manufacture, promotion, sale, and
interstate distribution of prescription drugs intended for human use in the United States.
WARNER-LAMBERT's pharmaceutical manufacturing facilities were located in Puerto Rico,
from which it shipped products to all fifty states and the District of Columbia.

2.      The Federal Food, Drug and Cosmetic Act ("FDCA"), among other things
governs the lawful interstate distribution of drugs for human use. As codified at Title 21, United
States Code, Sections 331 et seq., and specifically at § 355(b), the FDCA, and its implementing
regulations, require that before a new drug may legally be distributed in interstate commerce, a
sponsor of a new drug product must submit a New Drug Application ("NDA").

3.      The FDCA required, at 21 U.S.C. § 355, that the NDA sponsor submit to the
United States Food and Drug Administration ("FDA"), as part of an NDA, proposed labeling for
the proposed intended uses for the drug which included, among other things, the conditions for
therapeutic use. The NDA must also provide, to the satisfaction of FDA, data generated in

2

randomized and well-controlled clinical trials that demonstrates that the drug will be safe and effective when used in accordance with the proposed labeling.

4.      The FDCA, at 21 U.S.C. § 355, prohibited the introduction into interstate commerce of any new drug, unless an approval of an NDA is effective. Only after the NDA, including the proposed labeling, was reviewed and approved by FDA, was the sponsor permitted by law to promote and market the drug, and only for the medical conditions of use specified in the approved labeling, for which use FDA had found sufficient evidence of safety and effectiveness. Uses unapproved by FDA, not included in the drug's approved labeling, are known as "unapproved uses" or "off-label uses."

5.      The FDCA, and the regulations promulgated thereunder, required that in order to label or promote a drug for a use different than the conditions for use specified in the approved labeling, the sponsor had to file a new NDA, or amend the existing NDA, by, among other requirements, submitting the newly proposed indications for use and evidence, in the form of randomized and well-controlled clinical studies, sufficient to demonstrate that the drug would be safe and effective for the newly proposed therapeutic use or uses. Only upon approval of the new NDA could the sponsor promote the drug for the new intended use.

6.      The FDCA, at 21 U.S.C. § 352(f)(1), provided that a drug was misbranded if, among other things, the labeling did not contain adequate directions for use. As the phrase is used in the FDCA, adequate directions for use cannot be written for medical indications or uses for which the drug had not been proven to be safe and effective through well-controlled clinical studies because that would be misleading under Section 352(a).

3

7.    The FDCA, 21, U.S.C. §§ 331(a)(d), 333(a), and 355, prohibits the distribution in interstate commerce of an unapproved new drug or of a misbranded drug.

8.    In or about 1993, WARNER-LAMBERT submitted an NDA for approval of a drug called Neurontin (also known by the chemical name gabapentin), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3 (h)(4) and (5) . In that application, WARNER-LAMBERT sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.  On or about December 30, 1993, FDA approved Neurontin for that specific use only.   This approved use for Neurontin will be referred to throughout this Information as the "Approved Use."  Because WARNER-LAMBERT had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than the Approved Use.  Further, Neurontin was not, pursuant to 21 U.S.C. § 355(i), exempt from the prohibition of introducing into interstate commerce a new drug for medical indications beyond the conditions prescribed, recommended, or suggested in the approved labeling thereof.

9.    As described in this Information, from at least June of 1995 through at least August 20, 1996, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD); and migraine headaches, among other uses.

4

These and other unapproved uses for Neurontin will be collectively referred to in this Information as the "Unapproved Uses."

10.    WARNER-LAMBERT did not file a new NDA seeking FDA approval for any of these Unapproved Uses during the time period addressed in this Information. Of these Unapproved Uses, only post-herpetic neuralgia has ever received FDA approval, and that approval was applied for and received after the events described in this Information.

<u>WARNER-LAMBERT'S STRATEGY FOR NEURONTIN</u>

11.    WARNER-LAMBERT conducted evaluations of the market potential for certain of the Unapproved Uses for Neurontin, including but not limited to: post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

12.    In or about the fall of 1995, WARNER-LAMBERT's Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including conference calls on pain and a pain consultant meeting.

13.    Certain of WARNER-LAMBERT's annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies, and tactics for increasing sales of the Unapproved Uses of the drug. The marketing plans budgeted for and funded these tactics.

14.    From early 1995, on repeated occasions, WARNER-LAMBERT determined not to seek FDA approval for certain Unapproved Uses.

5

15.    In or about April and May of 1995, WARNER-LAMBERT performed a
Marketing Assessment of proposed psychiatric indications for Neurontin. In that Marketing
Assessment, WARNER-LAMBERT forecast potential revenue from Neurontin for bipolar and
anxiety treatment under two scenarios: with and without FDA approval. WARNER-
LAMBERT's Neurontin Development Team and New Product Committee reviewed the potential
psychiatric uses and concluded that the company would not seek approval to promote and sell the
drug for these Unapproved Uses.

16.    In or about July of 1995 WARNER-LAMBERT's assessment of Neurontin's
market potential for neuropathic pain was distributed to its Neurontin Development Team and to
a WARNER-LAMBERT Vice President for Marketing. That assessment stated that "there is no
intention to fully develop the indication at this point." Full development would have required
submission of an NDA to FDA for approval.

17.    One of the principal factors WARNER-LAMBERT considered in determining
whether to seek approval for Neurontin for other uses was the short patent protection available
for Neurontin. Another factor was the negative impact such approval might generate on potential
sales of another drug that WARNER-LAMBERT had been developing. The company expected
this new drug would be approved by FDA not only for epilepsy but also for a variety of uses
beyond Neurontin's Approved Use.

18.    Once Neurontin's patent expired, other companies could seek approval to
distribute generic equivalents of Neurontin. Such approval, however, would be limited to the
approved therapeutic use for Neurontin set forth in WARNER-LAMBERT's original NDA
approval for Neurontin. If WARNER-LAMBERT sought and obtained approval for any of the

Unapproved Uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those Unapproved Uses. WARNER-LAMBERT was concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

### WARNER-LAMBERT'S PROMOTION OF NEURONTIN FOR UNAPPROVED USES

19.    From in or about June of 1995 through in or about August 20, 1996, by certain of the conduct described in greater detail below, WARNER-LAMBERT promoted the sale and use of Neurontin for certain conditions other than the Approved Use in Massachusetts and elsewhere:

### OFF-LABEL PROMOTION THROUGH SALES REPRESENTATIVES

20.    In October 1995, a member of WARNER-LAMBERT's Epilepsy Disease Team circulated a memorandum to a group including other senior members of WARNER-LAMBERT's Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 WARNER-LAMBERT sales representatives for whom data was available in a two month period, was for off-label use of Neurontin.  Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

21.    On or about July 10, 1996, a WARNER-LAMBERT sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

22.    Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure.  This same document, entitled "Neurontin Can Do/Can't Do," stated that sales

7

representatives could do lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

<u>OFF-LABEL PROMOTION THROUGH MEDICAL LIAISONS</u>

23.    WARNER-LAMBERT employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasion, a WARNER-LAMBERT medical liaison promoted Neurontin for Unapproved Uses:

(a) In or about June of 1996, a WARNER-LAMBERT sales representative requested that a WARNER-LAMBERT medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

(b) The sales representative and the medical liaison selected the topic for the presentation to the local medical society. After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c) Among the topics of the presentation was the use of Neurontin for Unapproved Uses.

(d) During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of Unapproved Uses.

8

(e) After the presentation, a WARNER-LAMBERT Medical Director praised the event as "another great example of use of the medical liaisons" and an Area Business Manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

24.    In or about May 1996, a WARNER-LAMBERT Medical Director based in the Northeast CBU sent a voicemail message to the Medical Liaisons in the Northeast CBU in which he stated:

> What we'd like you to do is, any time you're called out just make sure that your main focus out of what you're doing is on Neurontin . . . When we get out there, we want to kick some ass, we want to sell Neurontin on pain. All right? And monotherapy and everything that we can talk about, that's what we want to do.

One or more Medical Liaisons in the Northeast CBU interpreted this statement to mean that he or she should promote Neurontin for Unapproved Uses and thereafter, in or about May and June 1996, promoted Neurontin for neuropathic pain, an unapproved use.

## OFF-LABEL PROMOTION THROUGH CONSULTANTS' MEETINGS
### AND ADVISORY BOARDS

25.    WARNER-LAMBERT organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida on April 19-21, 1996. Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to Unapproved Uses of Neurontin.

26.    WARNER-LAMBERT invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs. As part of this event, WARNER-LAMBERT paid for accommodations and meals for the invited doctors and

9

their spouse or guest, and paid an honorarium to each of the doctor attendees. Doctors who acted as faculty were paid between $1,500 and $2,000.

27.     Among the presentations made to the physicians in attendance was one relating to Unapproved Uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances." During this presentation, Neurontin was promoted for use in the treatment of pain.

28.     Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs." During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol, and pain.

29.     On or about May 8, 1996, following the Jupiter Beach conference, WARNER-LAMBERT circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations. WARNER-LAMBERT told its employees that: "[t]he meeting was a great success and the participants were delivered a hard-hitting message about Neurontin." WARNER-LAMBERT distributed to these employees a form entitled "Jupiter Beach Trending Worksheet" which was intended to be used to gauge the effect of the meeting on the prescribing by doctors who attended the Jupiter Beach meeting.

30.     From August 1-5, 1996, WARNER-LAMBERT organized an "advisory board meeting," in Atlanta, Georgia in conjunction with the 1996 Summer Olympics. WARNER-LAMBERT expressly instructed several of the physician speakers to address some of the Unapproved Uses.

31.     During that meeting, WARNER-LAMBERT hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies. The company had already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on WARNER-LAMBERT's behalf at prior meetings.

32.     Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

<u>OFF-LABEL PROMOTION THROUGH TELECONFERENCES</u>

33.     In or about January, 1996, a WARNER-LAMBERT Vice President of the Southeast Customer Business Unit sent a memorandum to WARNER-LAMBERT sales representatives listing certain goals, including: "Utilize the Medical Liaison Group to target the Neurontin, Pain & Psychiatric market. Objective to conduct twice weekly Pain Teleconferences moderated by key Neuro Consultants. Goals 250 Physicians Participants quarterly."

34.     On or about March 1, 1996, WARNER-LAMBERT sponsored such a teleconference moderated by a WARNER-LAMBERT employee with a pain specialist as a speaker on Neurontin. The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

35.     On or about March 28, 1996, a WARNER-LAMBERT Medical Director in the Northcentral Customer Business Unit sent a memorandum to WARNER-LAMBERT Medical Liaisons in that unit instructing them to hold a series of teleconferences with doctors to provide clinical updates on Neurontin, including monotherapy epilepsy data and non-epilepsy use data entitled "Neurontin, A Clinical Update."

11

36.     In or about May, 1996, a WARNER-LAMBERT Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

12

## COUNT ONE: 21 U.S.C. §§ 331(d), 333(a)(2) & 355(a)

### (Distribution of an Unapproved New Drug)

37. The allegations contained in paragraphs 1 through 36 are realleged and incorporated herein as if set forth in full.

38. Beginning as early as in or about April 1995, and continuing thereafter until at least in or about August 20, 1996, in the District of Massachusetts, and elsewhere,

### WARNER-LAMBERT,

after previously having been convicted of violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331 and 333, did introduce and cause the introduction into interstate commerce from Puerto Rico and elsewhere, directly and indirectly, into Massachusetts and elsewhere, quantities of Neurontin, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p), which drug was intended for use for the treatment of neuropathic pain, bipolar disorder, as monotherapy for epilepsy, and other Unapproved Uses. No approval, pursuant to 21 U.S.C. § 355, was in effect with respect to Neurontin for use in these conditions.

All in violation of 21 U.S.C. §§ 331(d), 333(a)(2), and 355(a).

13

## COUNT TWO: 21 U.S.C. §§ 331(a), 333(a)(2) & 352(f)(1)

### (Distribution of a Misbranded Drug:  Inadequate Directions for Use)

39.    The allegations contained in paragraphs 1 through 36  are realleged and incorporated herein as if set forth in full.

40.    Beginning as early as April 1995, and continuing thereafter until at least in or about August 20, 1996, in the District of Massachusetts and elsewhere,

### WARNER-LAMBERT,

after previously having been convicted of violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331 and 333, did introduce and cause the introduction into interstate commerce from Puerto Rico and elsewhere, directly and indirectly, into Massachusetts and elsewhere, quantities of Neurontin, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p), which drug was intended for use for the treatment of neuropathic pain, bipolar disorder, as monotherapy for epilepsy, and other Unapproved Uses, and which was misbranded within the meaning of 21 U.S.C. § 352(a), in that Neurontin's labeling lacked adequate directions for such uses.

All in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 352(f)(1).

14

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

THOMAS E. KANWIT
ASSISTANT U.S. ATTORNEY

May 13, 2004

15