F&P File #231407-06/rag

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------------x
                                          :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,              :
        SALES PRACTICES AND               :   Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION     :
                                          :   Judge Patti B. Saris
------------------------------------------------------------x
                                          :   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                 :
                                          :
        SMITH v. PFIZER INC.              :   Demand for Jury Trial
        1:05-cv-11515-PBS                 :
                                          :
------------------------------------------------------------x
```

## AMENDED COMPLAINT

Now into Court comes Plaintiff, Ruth Smith, Individually and as Widow For the Use and Benefit of Herself and the Next of Kin of RICHARD SMITH, Deceased, by and through counsel, and alleges the following on information and belief against Defendants, Pfizer Inc., Parke-Davis, a division of Warner-Lambert Company and Warner-Lambert Company LLC, Warner-Lambert Company, Warner-Lambert Company LLC and John Doe(s) 1-10.

## PARTIES

1.      That Plaintiff, RUTH SMITH, is the surviving spouse of Plaintiff's decedent, Richard Smith, and on and prior to the 13th day of May, 2004, Plaintiff and Plaintiff's decedent resided in Davidson County, Tennessee.

2.      That Plaintiff's decedent is also survived by four children, Sherri Hoskins, Gayle Lawson, Cindy Smith Charlton and Donna Carnahan.

3.      That at the time of death on May 13, 2004, Plaintiff's decedent was then the age of 80 years and prior thereto, was generally in good health, industrious and possessed all faculties.

4.      That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., was and still is a foreign corporation organized under the laws of the State of Delaware.

5.      That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., was and still is a foreign corporation authorized to do business in the State of Tennessee.

6.      That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., was and still is a business entity actually doing business in the State of Tennessee.

7.      That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), was and still is a foreign corporation organized under the laws of the State of Michigan.

8.      That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, was and still is a foreign corporation authorized to do business in the State of Tennessee.

9.      That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, was and still is a business entity actually doing business in the State of Tennessee.

10.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, was and still is a foreign corporation organized under the laws of the State of Delaware.

11.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, was and still is a foreign corporation duly authorized to do business in the State of Tennessee.

12.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of Tennessee.

13.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is a division of Defendant, WARNER-LAMBERT COMPANY.

14.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is a subsidiary of Defendant, WARNER-LAMBERT COMPANY.

15.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company organized under the laws of the State of Delaware.

16.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company authorized to do business in the State of Tennessee.

17.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, was and still is a business entity actually doing business in the State of Tennessee.

18.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is the sole shareholder and member of Defendant, WARNER-LAMBERT COMPANY LLC.

19.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is a division of Defendant, WARNER-LAMBERT COMPANY LLC.

20.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is a subsidiary of Defendant, WARNER-LAMBERT COMPANY LLC.

21.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is a division of Defendant, PFIZER INC.

22.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is a subsidiary of Defendant, PFIZER INC.

23.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is a successor in interest to Defendant, PARKE-DAVIS.

24.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is a division of Defendant, PFIZER INC.

25.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is a subsidiary of Defendant, PFIZER INC.

26.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to Defendant, PARKE-DAVIS.

27.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is a successor in interest to Defendant, PARKE-DAVIS.

4

28.     That on a date prior to May 13, 2004, Defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of Defendant, PARKE-DAVIS.

29.     That on a date prior to May 13, 2004, Defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

30.     That on a date prior to May 13, 2004, Defendant, WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

31.     That on a date prior to May 13, 2004, Defendant, PARKE-DAVIS, and Defendant, WARNER-LAMBERT COMPANY, merged with each other.

32.     That on a date prior to May 13, 2004, Defendant, PARKE-DAVIS, merged with Defendant, WARNER-LAMBERT COMPANY, and Defendant, PARKE-DAVIS, became a part of Defendant, WARNER-LAMBERT COMPANY.

33.     That on a date prior to May 13, 2004, Defendant, PARKE-DAVIS, and Defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

34.     That on or about December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of Defendant, PARKE-DAVIS.

35.     That on or about December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

36.     That on or about December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

37.     That on or about December 31, 2002, Defendant, PARKE-DAVIS, and Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

38.     That on or about December 31, 2002, Defendant, PARKE-DAVIS, merged with Defendant, WARNER-LAMBERT COMPANY LLC, and Defendant, PARKE-DAVIS, became a part of Defendant, WARNER-LAMBERT COMPANY LLC.

39.     That on or prior to December 31, 2002, Defendant, PARKE-DAVIS, and Defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

40.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to Defendant, WARNER-LAMBERT COMPANY.

41.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of Defendant, WARNER-LAMBERT COMPANY.

42.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY.

43.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY.

44.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY, and Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

45.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY, merged with Defendant, WARNER-LAMBERT COMPANY LLC, and Defendant, WARNER-LAMBERT COMPANY, became a part of Defendant, WARNER-LAMBERT COMPANY LLC.

46.    That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY, and Defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

47.    That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is a successor in interest to Defendant, PARKE-DAVIS.

48.    That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is a successor in interest to Defendant, WARNER-LAMBERT COMPANY.

49.    That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is a successor in interest to Defendant, WARNER-LAMBERT COMPANY LLC.

50.    That on a date prior to May 13, 2004, Defendant, PFIZER INC., assumed the assets and liabilities of Defendant, PARKE-DAVIS.

51.    That on a date prior to May 13, 2004, Defendant, PFIZER INC., assumed the assets and liabilities of Defendant, WARNER-LAMBERT COMPANY.

52.    That on a date prior to May 13, 2004, Defendant, PFIZER INC., expressly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

53.    That on a date prior to May 13, 2004, Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

54.    That on a date prior to May 13, 2004, Defendant, PFIZER INC., expressly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY.

55.    That on a date prior to May 13, 2004, Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY.

56.    That on or prior to December 31, 2002, Defendant, PFIZER INC., assumed the assets and liabilities of Defendant, WARNER-LAMBERT COMPANY LLC.

7

57.     That on or prior to December 31, 2002, Defendant, PFIZER INC., expressly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY LLC.

58.     That on or prior to December 31, 2002, Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of Defendant WARNER-LAMBERT COMPANY LLC.

59.     That on a date prior to May 13, 2004, Defendant, PFIZER INC., and Defendant, PARKE-DAVIS, merged with each other.

60.     That on a date prior to May 13, 2004, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY, merged with each other.

61.     That on or before May 13, 2004, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

62.     That on a date prior to May 13, 2004, Defendant, PFIZER INC., and Defendant, PARKE-DAVIS, merged with each other and Defendant, PARKE-DAVIS, became a part of defendant PFIZER INC.

63.     That on a date prior to May 13, 2004, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY, merged with each other and Defendant, WARNER-LAMBERT COMPANY, became a part of Defendant, PFIZER INC.

64.     That on or prior to December 31, 2002, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other and Defendant, WARNER-LAMBERT COMPANY LLC, became a part of Defendant, PFIZER INC.

65.     That on a date prior to May 13, 2004, Defendant, PFIZER INC., and Defendant, PARKE-DAVIS, consolidated with each other.

66.     That on a date prior to May 13, 2004, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

8

67.    In the year 2000, Defendant, PFIZER INC., acquired Defendant, WARNER-LAMBERT COMPANY, and as the result of that acquisition, Defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of Defendant, WARNER-LAMBERT COMPANY, which occurred prior to such acquisition.

68.    In the year 2000, Defendant, PFIZER INC., acquired Defendant, PARKE-DAVIS, a division of Warner-Lambert Company, and as the result of that acquisition, Defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of Defendant, PARKE-DAVIS, which occurred prior to such acquisition.

69.    On or prior to December 31, 2002, Defendant, PFIZER INC., acquired Defendant, WARNER-LAMBERT COMPANY LLC, and pursuant to the terms of and conditions of that acquisition, Defendant, PFIZER INC., is responsible for all acts or omissions of Defendant, WARNER LAMBERT-COMPANY LLC, occurring prior to such acquisition.

70.    That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., presently markets and sells the drug Neurontin.

71.    That on a date prior to May 13, 2004, Defendant, PFIZER INC., marketed and sold the drug Neurontin.

72.    That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Tennessee and contracts to provide goods, materials, things and services in the State of Tennessee.

73.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., committed a tortious act inside the State of Tennessee, which caused injury to Plaintiff's decedent inside the State of Tennessee.

74.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., committed a tortious act outside the State of Tennessee, which caused injury to Plaintiff's decedent inside the State of Tennessee.

75.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., regularly does and solicits business and engages in a persistent course of conduct in the State of Tennessee, deriving substantial revenue from goods used or consumed or services rendered in the State of Tennessee.

76.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the State of Tennessee, and derives substantial revenue from interstate or international commerce.

77.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, presently markets and sells the drug Neurontin.

78.     That on a date prior to May 13, 2004, Defendant, PARKE-DAVIS, marketed and sold the drug Neurontin.

79.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Tennessee and contracts to provide goods, materials, things and services in the State of Tennessee.

10

80.    That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, committed a tortious act inside the State of Tennessee, which caused injury to Plaintiff's decedent inside the State of Tennessee.

81.    That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, committed a tortious act outside the State of Tennessee, which caused injury to Plaintiff's decedent inside the State of Tennessee.

82.    That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, regularly does and solicits business and engages in a persistent course of conduct in the State of Tennessee, deriving substantial revenue from goods used or consumed or services rendered in the State of Tennessee.

83.    That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, expects or should reasonably expect its acts to have consequences in the State of Tennessee, and derives substantial revenue from interstate or international commerce.

84.    That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, presently markets and sells the drug Neurontin.

85.    That on a date prior to May 13, 2004, Defendant, WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

86.    That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Tennessee and contracts to provide goods, materials, things and services in the State of Tennessee.

87.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, committed a tortious act inside the State of Tennessee, which caused injury to Plaintiff's decedent inside the State of Tennessee.

88.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, committed a tortious act outside the State of Tennessee, which caused injury to Plaintiff's decedent inside the State of Tennessee.

89.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, regularly does and solicits business and engages in a persistent course of conduct in the State of Tennessee, deriving substantial revenue from goods used or consumed or services rendered in State of Tennessee.

90.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, expects or should reasonably expect its acts to have consequences in the State of Tennessee, and derives substantial revenue from interstate or international commerce.

91.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, presently markets and sells the drug Neurontin.

92.     That on a date prior to November 28, 2003, Defendant, WARNER-LAMBERT COMPANY LLC, marketed and sold the drug Neurontin.

93.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Tennessee and contracts to provide goods, materials, things and services in the State of Tennessee.

94.    That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, committed a tortious act inside the State of Tennessee, which caused injury to Plaintiff's decedent inside the State of Tennessee.

95.    That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, committed a tortious act outside the State of Tennessee, which caused injury to Plaintiff's decedent inside the State of Tennessee.

96.    That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of Tennessee, deriving substantial revenue from goods used or consumed or services rendered in the State of Tennessee.

97.    That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, expects or should reasonably expect its acts to have consequences in the State of Tennessee, and derives substantial revenue from interstate or international commerce.

98.    That at all times hereinafter mentioned, upon information and belief, Defendants, JOHN DOE(S) 1-10, are residents of the State of Tennessee.

99.    That at all times hereinafter mentioned, upon information and belief, Defendants, JOHN DOE(S) 1-10, are presently unidentifiable persons who will be added as defendants as more information becomes available.

100.    That at all times hereinafter mentioned, upon information and belief, Defendants, JOHN DOE(S) 1-10, were drug detailers, salespersons, representatives, agents, servants and/or employees of Defendants, PFIZER INC., PARKE-DAVIS, WARNER-LAMBERT COMPANY and WARNER-LAMBERT COMPANY LLC.

101.    That at all times hereinafter mentioned, upon information and belief, Defendants, JOHN DOE(S) 1-10, were acting within the scope of their employment by Defendants, PFIZER INC., PARKE-DAVIS, WARNER-LAMBERT COMPANY and WARNER-LAMBERT COMPANY LLC.

102.    That at all times hereinafter mentioned, upon information and belief, Defendants, JOHN DOE(S) 1-10, were personally involved in the promoting, distributing, marketing, and supplying of samples of Neurontin to physicians and the medical community in the State of Tennessee, including Plaintiff's decedent's physician, Dr. Paul R. McCombs, III, for off-label uses, including treatment of pain.

103.    That at all times hereinafter mentioned, upon information and belief, Defendants, JOHN DOE(S) 1-10, solicited business from physicians and the medical community in the State of Tennessee, including Plaintiff's decedent's physician, Dr. Paul R. McCombs, III, concerning off-label uses of Neurontin, including treatment of pain, thereby causing Neurontin sales to skyrocket in the State of Tennessee.

104.    That at all times hereinafter mentioned, upon information and belief, Defendants, JOHN DOE(S) 1-10, provided samples of Neurontin for off-label uses, including treatment of pain, to physicians and the medical community, including Plaintiff's decedent's physician, Dr. Paul R. McCombs, III., who then prescribed Neurontin to the general public and Plaintiff's decedent, and/or provided Neurontin samples to the general public and Plaintiff's decedent, for off-label uses, including treatment of pain.

105.    That at all times hereinafter mentioned, upon information and belief, Defendants, JOHN DOE(S) 1-10, directly and personally participated in (1) the unlawful, fraudulent and negligent promotion, distribution, marketing and supplying of Neurontin samples to physicians

14

and the medical community without regard to the safety and health of the general public and Plaintiff's decedent, (2) the failure to warn physicians and the medical community, and the general public, including Plaintiff's decedent, of the risks to which users of Neurontin were being exposed, and (3) the fraudulent and/or negligent misrepresentation and concealment of facts that would have put physicians and the medical community, and the general public and Plaintiff's decedent, on notice of the ongoing health threat resulting from said unlawful, fraudulent and negligent promotion, distribution, marketing and supplying of Neurontin samples.

106.    That Defendants, JOHN DOE(S) 1-10, are sued individually and as joint-tortfeasors who are jointly and severally liable for Plaintiff's decedent's injuries and damages. The liability of these defendants arises from the fact that they, directly and/or through their predecessors in interest, alter-egos, agents, employees, and/or representatives, engaged in all or part of the acts, events, schemes, fraud, negligence and/or transactions described herein substantially participated or assisted in the conduct complained of herein and had knowledge of the secret activities alleged herein or recklessly disregarded the conduct.

### JURISDICTION AND VENUE

107.    Plaintiff, RUTH SMITH, as the surviving spouse of Plaintiff's decedent, Richard Smith, brings this action under the laws of the State of Tennessee, Tenn. Code Ann. §§ 20-5-106, 20-5-107, 20-5-110 and 20-5-113, to recover damages for personal injury to and the wrongful death of Plaintiff's decedent and the expenses of the decedent had he lived, sustained as the direct and proximate result of Defendants' wrongful conduct in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the prescription drug Neurontin, especially for such "off-label" uses as the treatment of pain, a purpose for which Neurontin had not received FDA approval, and at dosages higher than had

been approved by the FDA and had been properly tested on humans, even though the drug had

not been tested and studied for that purpose and had not been found to be safe and effective at

any dosage for the treatment of pain.

108.    This Court has jurisdiction over this matter because the damages sought exceed

the jurisdictional minimums of this Court and the claims of Plaintiff's decedent, Richard Smith,

arise in substantial part from events occurring in Tennessee.  All Defendants are subject to the

jurisdiction of this Court.

## FACTS

109.    Pursuant to the Food, Drug, and Cosmetic Act ("FDCA") 21 U.S.C. §§ 301 et

seq., new pharmaceutical drugs cannot be distributed in interstate commerce unless the sponsor

of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that

the drug is safe and effective for each of its intended uses.  21 U.S.C. § 355(a) and (d).

110.    However, the FDCA does not prevent doctors from prescribing a drug approved

for a particular use for other uses that are different than those approved by the FDA ("off-label"

usage).

111.    Nonetheless, even though physicians may prescribe drugs for "off-label" usage,

the FDCA prohibits drug manufacturers themselves from marketing and promoting a drug for a

use that the FDA has not approved.  21 U.S.C. § 331(d).

112.    A manufacturer illegally "misbrands" a drug if the drug's labeling includes

information about unapproved uses or if the manufacturer engages directly or indirectly in

marketing or promoting the drug for unapproved uses.

113.    Instead, if a manufacturer desires to market and promote the drug for new uses in

addition to those already approved, the materials on "off-label" usage must meet certain stringent

requirements and the manufacturer must resubmit the drug to the FDA testing and approval process for the proposed new use.

114.    The above-described statutory and regulatory system and process is designed to protect the public, including  Plaintiff's decedent, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage, and to protect the public, including Plaintiff's decedent, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

115.    PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

116.    At no time prior to Plaintiff's decedent being prescribed Neurontin, did Defendants receive FDA approval for any other use of Neurontin except for the above-described treatment of epilepsy or for higher dosages for any purpose, and the FDA never approved the usage of Neurontin at any dosage for the treatment of pain.

117.    Commencing in 1995, Defendants, as the manufacturer of Neurontin, began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment of pain and at higher dosages than had been tested and approved, in violation of the above-described statutory and

regulatory system and process, including the FDCA, which prohibits manufacturers from directly or indirectly advertising, marketing and promoting a drug for "off-label" usage, and instead requires that the manufacturer resubmit the drug to the FDA testing and approval process for the proposed new use and that the materials issued by the manufacturer relating to the proposed new use meet certain stringent requirements.

118.    Defendants, as the manufacturer of Neurontin, directly and indirectly advertised, marketed and promoted Neurontin for the treatment of pain and encouraged that higher dosages than those tested be prescribed, even though Defendants knew or should have known that there were not adequate tests and studies establishing and confirming that Neurontin was safe and effective for the treatment of pain and even though Defendants knew or should have known that there were no adequate studies showing that Neurontin was safe when prescribed at dosages higher than those approved by the FDA.

119.    At all times hereinafter mentioned, upon information and belief, Defendants marketed and promoted Neurontin for treatment of pain even though Defendants knew or should have known that Neurontin caused many symptoms or related risk factors associated with suicidal behavior.

120.    At all times hereinafter mentioned, upon information and belief, Defendants marketed and promoted Neurontin for the treatment of pain even though Defendants knew or should have known that Neurontin had no effect in relieving or correcting the symptoms or causes of pain.

121.    Defendants' conduct in promoting "off-label" uses of Neurontin for treatment of pain constituted a wanton, callous and reckless disregard of the safety of the public and, in particular of persons suffering from pain.

122.    In promoting "off-label" uses of Neurontin, and at higher dosages than approved by the FDA, including treatment of pain, Defendants acted without regard to the potential danger and harm to persons for whom the drug was prescribed for the treatment of pain.

123.    Defendants actively distributed, sold and placed Neurontin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of pain and in dosages higher than those approved by the FDA, even though the only approved use of Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

124.    Neurontin is not reasonably safe and effective for the treatment of persons suffering from pain and is not reasonably safe when consumed in higher dosages than those approved by the FDA, and Defendants' conduct of illegally advertising, marketing and promoting Neurontin for these "off-label" uses was unlawful, deceptive and misleading and was violative of the FDCA.

125.    By reason of Defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from pain, frequently at dosages higher than those approved by the FDA.

126.    Upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, was indicted in the United States District Court for the District of Massachusetts for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy of such criminal Information is annexed hereto as Exhibit "A" and incorporated into this Complaint by reference.

127.    Upon information and belief, on or about the 7th day of June, 2004, Defendant,

WARNER-LAMBERT COMPANY LLC, formally pled guilty to all charges contained in the

Information.

128.    Dr. Paul R. McCombs, III, Plaintiff's decedent's prescriber, testified on June 8,

2007, as follows:

> Q.    Did you know that Neurontin was a drug where there was concern within the -- the – the drug company and the FDA about whether it increased depression?
>
> A.    No.
>
> Q.    Is that the kind of information you'd like to know?
>
> A.    If it is considered a significant risk, then, yes, I do.
>
> Q.    Okay.  If you -- when -- when Richard Smith presented to you, at any time that he came in, did he -- did he ever present, either himself or through phone calls with his daughters, as someone who was depressed and -- and down?
>
> A.    Yes, sir.
>
> Q.    Is that something that's rare with people who have a lot of back pain that need your help, or is that
>
> A.    Chronic -- chronic pain syndromes are frequently associated with depression and treated with medication for depression.
>
> Q.    Okay.  Is that the kind of fellow you would ever want to give a drug to that -- if you had a choice in the matter -- that -- if that drug was going to be one that increased depression or caused a loss of impulse control or suicide or things like that?
>
> A.    It's something that would have to be weighed.  If the patient's depression was caused by significant pain and the Neurontin helped the pain, that would maybe help the depression, but it could do -- it could go either way.
>
> Q.    All right.  Is that why it's important for you as a doctor to know if suicide or depression is a -- considered a prominent side effect of the drug?
>
> A.    Yes.

Q.      If you had been told by the detail reps who were -- were -- in talking to you about the drug Neurontin, that this drug was one that is associated with a loss of impulse control,  associated with a loss of cognitive awareness of things, or -- or increase in depression, would it have changed your prescription habits as far as Mr. Smith?

A.      Perhaps.

Q.      And by perhaps, would you have considered trying other drugs first?

A.      I would go over his medication list and try to pick the best possible choice to alleviate his pain.  If I had known it was associated with depression, knowing him, I would be very careful with it --

Q.      Yeah.  If --

A.      -- if I decided to use it.

Q.      So if you decided to use it, would you at least have given him some significant warnings and  his family and made sure everybody was tuned in to the fact that if his depression seemed to be getting worse, that he needs to contact someone?

A.      I would.

129.    On June 8, 2007, Pamela Krancer, APN, testified under oath as follows:

Q.      Did you actually write prescriptions yourself for Richard Smith?

A.      Yes, I did.

Q.      And you wrote prescriptions for Neurontin?

A.      Yes . . . I prescribed it for him.

Q.      Okay, If you had known about the side effects that I've discussed, if it had been brought to your attention that this drug is associated with increases in depression and suicide, would you have taken into account that information before you prescribed this drug?

A.      …I probably would have thought about it a little harder.

Q.      Might have at least thought about giving some warnings or some information about, hey, if you think this is causing you to be more depressed or something, you would you please contact someone, some medical help?  Is that fair to say?

21

A.    I probably would have added it to my [patient] education, yes, sir.

130.    Prior to Plaintiff's decedent's death, Defendants' sales representative employee a/k/a Territory Manager detailed Plaintiff's decedent's prescriber, Paul McCombs, III, M.D., a neurological surgeon, on approximately three occasions with respect to Neurontin.

131.    Prior to Plaintiff's decedent's death, Defendants' sales representative employee a/k/a Territory Manager detailed Plaintiff's decedent's prescriber, Paul McCombs, or the doctors in his medical practice on approximately 300 occasions with respect to Neurontin.

132.    Upon information and belief, as of the time period that Dr. Mackey treated and prescribed Neurontin to Plaintiff's decedent, Dr. McCombs was a member of a large group practice where he interacted and talked to the members of his practice about available medicines, including the unapproved uses of Neurontin.

133.    Upon information and belief, during the abovementioned approximately 300 occasions, Defendants' sales representative a/k/a Territory Manager promoted to Dr. McCombs and the other doctors in Dr. McCombs's medical practice unapproved uses for Neurontin, because Dr. McCombs and the members of his practice were not epileptologists or neurologists with patients for whom they would prescribe Neurontin for approved uses.

134.    Upon information and belief, with respect to Dr. McCombs's treatment and prescription of Neurontin for Plaintiff's decedent, Dr. McCombs was under the impression that Neurontin was effective for the unapproved uses for which he prescribed Neurontin to Plaintiff's decedent, based in part upon his interactions with the doctors in his immediate medical practice.

135.    Upon information and belief, Plaintiff's decedent's prescriber, Dr. Mackey, was influenced directly or indirectly to prescribe Neurontin for "off-label uses" to patients, including Plaintiff's decedent, by Defendants' sales representative employee a/k/a Territory Manager.

136.    Prior to Plaintiff's decedent's death, Defendants' sales representative employee a/k/a Territory Manager detailed Plaintiff's decedent's prescriber, Edward Mackey, M.D., an orthopaedist, or the doctors in his medical practice on approximately 69 occasions with respect to Neurontin.

137.    Upon information and belief, as of the time period that Dr. Mackey treated and prescribed Neurontin to Plaintiff's decedent, Dr. Mackey was a member of a large group practice where he interacted and talked to the members of his practice about available medicines, including the unapproved uses of Neurontin.

138.    Upon information and belief, on during the abovementioned approximately 69 occasions, Defendants' sales representative a/k/a Territory Manager promoted to Dr. Mackey and the other doctors in Dr. Mackey's medical practice unapproved uses for Neurontin, because Dr. Mackey and the members of his practice were not epileptologists or neurologists with patients for whom they would prescribe Neurontin for approved uses.

139.    Upon information and belief, with respect to Dr. Mackey's treatment and prescription of Neurontin for Plaintiff's decedent, Dr. Mackey was under the impression that Neurontin was effective for pain relief, an unapproved use, based in part upon his interactions with the doctors in his immediate medical practice.

140.    Upon information and belief, Plaintiff's decedent's prescriber, Dr. Mackey, was influenced directly or indirectly to prescribe Neurontin for "off-label uses" to patients, including Plaintiff's decedent, by Defendants' sales representative employee a/k/a Territory Manager.

141.    Prior to Plaintiff's decedent's death, Defendants' sales representative employee a/k/a Territory Manager detailed Plaintiff's decedent's prescriber, Pamela Krancer, an Advanced Practice Nurse, on approximately 27 occasions with respect to Neurontin.

142.    Upon information and belief, during the abovementioned approximately 27 occasions, Defendants' sales representative a/k/a Territory Manager promoted to Pamela Krancer, APN, unapproved uses for Neurontin, because Pamela Krancer, APN and the physician-members of her practice were not epileptologists or neurologists with patients for whom they would prescribe Neurontin for approved uses.

143.    Upon information and belief, Plaintiff's decedent's prescriber, Pamela Krancer, APN, was influenced directly or indirectly to prescribe Neurontin for "off-label uses" to patients, including Plaintiff's decedent, by Defendants' sales representative employee a/k/a Territory Manager.

144.    That at all times hereinafter mentioned, Plaintiff's decedent was diagnosed by his physician as suffering from pain and was being treated by his physician for such condition.

145.    That at all times hereinafter mentioned, upon information and belief, in reliance upon defendants' direct and indirect advertising, marketing and promoting of Neurontin as being safe and effective for the treatment of pain, Plaintiff's decedent's physician prescribed Neurontin to treat Plaintiff's decedent's pain.

146.    That at all times hereinafter mentioned, Plaintiff's decedent purchased and consumed Neurontin, as recommended and prescribed by his physician and in the dosages prescribed, in an effort to control the effects of pain.

147.    The drug Neurontin was not safe and effective for the treatment of Plaintiff's decedent's condition of pain, and Plaintiff's decedent sustained injury and harm by reason of his consumption of Neurontin as prescribed by his physician in an effort to treat his pain.

148.    The drug Neurontin was ineffective in the treatment of the causes and symptoms of Plaintiff's decedent's condition of pain and Plaintiff's decedent sustained injury and harm by

reason of this reliance upon Neurontin to be effective in the treatment as prescribed by his physician of such pain.

149.    By reason of Plaintiff's decedent's consumption of Neurontin in a manner and at a dosage prescribed by his physician in an effort to treat his pain, on May 13, 2004, Plaintiff's decedent committed suicide thereby sustaining severe personal injuries, including death.

150.    The injuries and death sustained by Plaintiff's decedent were caused by or were contributed to by Plaintiff's decedent's consumption of Neurontin at a dosage prescribed by his physician for the treatment of pain in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by Defendants.

## COUNT ONE

### NEGLIGENCE

151.    Plaintiff repeats and reiterates the allegations previously set forth herein.

152.    That at all times hereinafter mentioned, Defendants were under a duty to exercise reasonable care in the design and development of Neurontin and, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of conditions such as pain for which it was not effective and to ensure that Neurontin was not used in a manner or to treat conditions where Defendants knew or should have known that the user could sustain injuries and harm from the drug.

153.    That Defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that Defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the treatment of pain, even though Neurontin had not been scientifically determined to be safe and

25

effective for the treatment of such condition and even though Neurontin was, in fact, not reasonably safe for the treatment of such condition and furthermore, Defendants failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which Defendants knew or should have known about.

154.    That Defendants were further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting Neurontin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self- destructive behavior including committing suicide and by failing to adequately warn the public of such risks.

155.    The aforesaid incident and the injuries and death sustained by Plaintiff's decedent were caused by or were contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including Plaintiff's decedent, on the part of Defendants in the design, manufacture, distribution, advertising, marketing and promoting of Neurontin as being safe and effective treatment and by inducing the public, including Plaintiff's decedent, to believe that Neurontin was effective in the treatment.

156.    That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by Defendants was a direct and proximate cause of the death of Plaintiff's decedent.

157.    That at all times hereinafter mentioned, Plaintiff's decedent did not contribute to his injuries by reason of any negligence or culpable conduct on his part.

158.    That as a result of the aforesaid occurrence, and the death of Plaintiff's decedent resulting therefrom, as aforesaid, Plaintiff and Plaintiff's decedent's next of kin suffered extensive monetary and pecuniary damages including damages for non-economic loss and injury.

159.    As a direct and proximate result of Defendants' negligence, Plaintiff and the next of kin of Plaintiff's decedent sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter.

## COUNT TWO

## BREACH OF WARRANTY

160.    Plaintiff repeats and reiterates the allegations previously set forth herein.

161.    That at all times hereinafter mentioned, upon information and belief, Defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain and by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of pain in reliance upon the representations of Defendants, expressly warranted to all foreseeable users of this drug, including Plaintiff's decedent, that Neurontin was safe and effective for the treatment of pain and in addition was safe for human consumption in general.

162.    That Defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including Plaintiff's decedent, that Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by Defendants, including for the treatment of pain, and that Neurontin was reasonably safe, proper, merchantable and fit for the intended purpose, including for the treatment of pain and in addition was safe for human consumption in general.

163.    That at all times hereinafter mentioned, Plaintiff's decedent relied upon the aforesaid express and implied warranties by Defendants.

164.    That at all times hereinafter mentioned, Plaintiff's decedent's use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which Defendants directly and indirectly advertised, marketed and promoted Neurontin, and Plaintiff's decedent's use of Neurontin was reasonably contemplated, intended and foreseen by Defendants at the time of the distribution and sale of Neurontin by Defendants, and, therefore, Plaintiff's decedent's use of Neurontin was within the scope of the above-described express and implied warranties.

165.    Defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of pain, because Plaintiff's decedent's use of Neurontin for the treatment of pain caused or contributed to the incident described herein and because Neurontin was not safe for human consumption in general.

166.    Plaintiff's decedent gave appropriate notice to Defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

167.    As a direct and proximate result of Defendants' negligence, Plaintiff and the next of kin of Plaintiff's decedent sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter.

## COUNT THREE

## STRICT LIABILITY

168.    Plaintiff repeats and reiterates the allegations previously set forth herein.

169.    That at all times hereinafter mentioned, the drug Neurontin was not safe for human consumption in general and was not suited for the treatment of pain and was not safe and

28

effective for the treatment of pain, even though Defendants directly and indirectly advertised, marketed and promoted Neurontin for that purpose.

170.    That at all times hereinafter mentioned, the drug Neurontin was not safe and was not suited for the purposes for which Defendants, directly and indirectly, advertised, marketed and promoted the drug at the time Defendants designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

171.    That at all times hereinafter mentioned, upon information and belief, Defendants assumed a strict products liability to users and to persons using Neurontin, including Plaintiff's decedent, who sustained injuries, harm and damages by reason of the use of Neurontin for purposes directly and indirectly advertised, marketed, and promoted by Defendants, including for the treatment of pain.

172.    As a direct and proximate result of Defendants' negligence, Plaintiff and the next of kin of Plaintiff's decedent sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter.

## COUNT FOUR

### FRAUD

173.    Plaintiff repeats and reiterates the allegations previously set forth herein.

174.    Defendants materially misrepresented material facts concerning the safety and effectiveness of Neurontin in the treatment of depression.

175.    Defendants' affirmative misrepresentations include but are not limited to the acts set forth in the following paragraphs.

176.    In or about 1993, Defendants submitted a new drug application (NDA) for approval of a drug called Neurontin (also known by the chemical name "Gabapentin"), which

was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5). In that application, Defendants sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. On or about December 30, 1993, the FDA approved Neurontin for that specific use only. Because Defendants had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than that approved use.

177.    Commencing in at least June of 1995 and continuing through at least the date of this incident, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other uses.

178.    Defendants did not file a new NDA seeking FDA approval for any of these unapproved uses at any time prior to the date of this incident.

179.    Defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to:  post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

180.    In or about the fall of 1995, Defendants' Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including plans for conference calls on pain and a pain consultant meeting.

30

181.    Certain Defendants' annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies and tactics for increasing sales of the unapproved uses of the drug.  The marketing plans budgeted for and funded these tactics.

182.    Commencing in early 1995 and continuing at least through the date of this incident, Defendants determined not to seek FDA approval for certain unapproved uses.

183.    In or about April and May of 1995, Defendants performed a marketing assessment of proposed psychiatric indications for Neurontin.  In that marketing assessment, Defendants forecast potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios:  with and without FDA approval.  Defendants' Neurontin Development Team and New Product Committee reviewed the potential uses and concluded that Defendants would not seek approval to promote and sell the drug for these unapproved uses.

184.    In or about July of 1995, Defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to Defendants' Neurontin Development Team and to Defendants' Vice President for marketing.  That assessment stated that "there is no intention to fully develop the indication at this point."  Full development would have required submission of an NDA to the FDA for approval.

185.    One of the principal factors Defendants considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin.  Another factor was the negative impact such approval might generate on potential sales of another drug that Defendants were developing.  Defendants expected this new drug would be approved by the FDA not only for epilepsy but also for a variety of uses beyond Neurontin's approved use.

186.    Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin.  Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in Defendants' original NDA approval for Neurontin.  If Defendants sought and obtained approval for any of the unapproved uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those unapproved uses.  Defendants were concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

187.    Commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail below, Defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

188.    In October 1995, a member of Defendants' Epilepsy Disease Team circulated a memorandum to a group including other senior members of Defendants' Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 of Defendants' sales representatives for whom data was available in a two-month period, was for off-label use of Neurontin.  Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

189.    On or about July 10, 1996, Defendants' sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

190.    Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure.  This same document, entitled "Neurontin Can Do/Can't Do," stated that sales

representatives could present lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

191.    Defendants employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasions, which are not all-inclusive, Defendants' medical liaisons promoted Neurontin for unapproved uses:

(a)    In or about June of 1996 Defendants' sales representative requested that Defendants' medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

(b)    The sales representative and the medical liaison selected the topic for the presentation to the local medical society. After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c)    Among the topics of the presentation was the use of Neurontin for unapproved uses.

(d)    During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of unapproved uses.

(e)    After the presentation, Defendants' Medical Director praised the event as "another great example of use of the medical liaisons" and an area business manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

192.    Defendants organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-21, 1996. Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to unapproved uses of Neurontin.

193.    Defendants invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs.  As part of this event, Defendants paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.

194.    Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin."  In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances."  During this presentation, Neurontin was promoted for use in the treatment of pain.

195.    Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances:  Nonepileptic Uses of Anti Epileptic Drugs."  During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

196.    On or about May 8, 1996, following the Jupiter Beach conference, Defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

197.    From August 1-5, 1996, Defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics.  Defendants expressly instructed several of the physician speakers to address some of the unapproved uses.

198.    During that meeting, Defendants hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies.  Defendants already

had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on Defendants' behalf at prior meetings.

199.    Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

200.    On or about March 1, 1996, Defendants sponsored a teleconference moderated by Defendants' employee with a pain specialist as a speaker on Neurontin. The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

201.    In or about May 1996, Defendants' Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

202.    Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits. Such consultants' meetings included, but were not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Mar. 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen CO | Apr. 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | Apr. 20, 1996 |

| | | |
|---|---|---|
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | Apr. 19-21, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | Apr. 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande, Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sep. 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

203.    Defendants rewarded doctors for their advocacy of Neurontin by paying them honoraria for lending their names to scientific articles which were actually prepared and written by third parties retained by Defendants. In 1996, Defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that Defendants could completely control the publications distributed pursuant to its "publications strategy." The content of these articles were actually written by non-physician technical writers retained by Defendants and Defendants had the right

to control the content of all the articles.  Defendants paid all expenses in connection with the creation of these publications.

204.    Defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

205.    Defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

Reflex sympathetic dystrophy (RSD)

Peripheral neuropathy

Diabetic neuropathy

Trigeminal neuralgia

Post-herpetic neuralgia

Essential tremor

Restless leg syndrome (RLS)

Attention deficit disorder (ADD)

Periodic limb movement disorder

Migraine

Bipolar disorder

Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

Drug or alcohol withdrawal seizures

206.    The following enumerated misrepresentations, which are not intended to be all-inclusive, relating to "off-label" usage of Neurontin, were routinely made to physicians with the knowledge and consent of marketing personnel of Defendants:

a.    *Bipolar Disorder*.  Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed.

b.    *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes*. Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported.  No such body of evidence existed.  Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.  Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective monotherapy.

c.    *Reflex Sympathetic Dystrophy ("RSD")*.  Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD.  The only such evidence that existed was anecdotal reports of nominal scientific value.

d.    *Attention Deficit Disorder ("ADD")*.  Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.

e.    *Restless Leg Syndrome ("RLS")*.  RLS was another condition where Defendants' medical liaisons were trained to refer to a growing body of date relating to the condition, when no scientific date existed.

       f.     *Trigeminal Neuralgia*.  Although medical liaisons represented that Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports.  No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

       g.     *Post-Herpetic Neuralgia ("PHN")*.  Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin.  Once again, no clinical trial data supported such a claim.

       h.     *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*.  Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions.  No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

       i.     *Migraine*.  Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials.  Although pilot studies had been such suggested and undertaken, no early results of clinical trials existed to support these claims.  Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value.  Most of the case reports were either created or sponsored by Defendants.

       j.     *Drug and Alcohol Withdrawal Seizures*.  Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

    207.    Defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though Defendants were fully aware of these results from the

tests which they sponsored, Defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin.

208.    At each of the presentations known to the Plaintiff concerning Neurontin on pain, at least one of the presenters expressly stated or implied that Neurontin was effective for the treatment of pain.  A representative statement was made by Dr. David Longmire, a participating physician, at the Jupiter Beach Consultants Meeting in April 1996 when he stated that Neurontin was effective for the treatment of pain.  Dr. Longmire repeated that statement at a May 1996 Consultants Meeting at the Ritz Carlton in Boston.  Another physician participant, Dr. Steven Schacter, made a similar statement at the May 1996 meeting when he stated that "pain specialists are finding that low dosages of Neurontin are effective."  Comparable statements were made by another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach Consultants Meeting, in May 1996 at the Boston Ritz Carlton Consultants Meeting, and in June 1996 at a Philadelphia Consultants Meeting.  Upon information and belief, similar statements were made at all events presented by Defendants that discussed Neurontin's use for pain indications.  These events include, but are not limited to the following events:

| Topic | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | Apr. 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11, 1996 | Boston, MA |
| Advisory Board Meeting | Apr. 14-16, 2000 | Grand Wailea Resort Hotel & Spa, Maui, HI |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |

40

| | | |
|---|---|---|
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants | Apr. 2000 | Four Seasons Irving, TX |
| Advisory Board Meeting | May 26, 2000 | Disney Yacht Club Orlando, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 24, 2001 | Plaza Hotel New York, NY |
| New Directions in the Understanding and Treatment of Pain | Mar. 2-3, 2001 | Hilton Novi Detroit, MI |
| New Directions in the Understanding and Treatment of Pain | May 4-5, 2001 | Westin Galleria Houston, TX |
| New Directions in the Understanding and Treatment of Pain | Feb. 9-10, 2001 | Harbor Court Hotel Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain | Mar. 9-10, 2001 | Fairmont Kansas City Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain | May 11-12, 2001 | Peabody Memphis Memphis, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 16-17, 2001 | Fairmont San Francisco San Francisco, CA |
| Advisory Board Meeting | June 16-18, 2000 | Westin Resort Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Sheraton Universal City Universal City, CA |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Miami Biltmore Miami, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Ritz Carlton New Orleans New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Sheraton Music City Nashville, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 30-31, 2001 | Ritz Carlton St. Louis St. Louis, MO |

New Directions in the Treatment of          Oct. 9-11, 1998          Madeira, Portugal
Neuropathic Pain

209.    At events produced by Defendants, physician participants routinely stated that

Neurontin was effective for the treatment of restless leg syndrome or RSD.  Events presented by

Defendants that discussed Neurontin's use as a treatment for restless leg syndrome or RSD

include, but are not limited to, the following event:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

210.    At events produced by Defendants, physician participants routinely stated that

Neurontin was effective for the treatment of bipolar disorder.  Events presented by Defendants

that discussed Neurontin's use as a treatment for bipolar disorder include, but are not limited to,

the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire, Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place,New Orleans,LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill<br>Nashville, TN |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe<br>Seattle, WA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro<br>St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel<br>Portland, OR |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club<br>Philadelphia, PA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago<br>Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel<br>San Francisco, CA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant<br>Baltimore, MD |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia<br>New York, NY |
| The Use of Anticonvulsants<br>in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

211.    At events produced by Defendants, physician participants routinely stated that

Neurontin was effective for the treatment of social phobia.  Events presented by Defendants that

discussed Neurontin's use as a treatment for social phobia include, but are not limited to, the

following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel<br>San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess<br>Scottsdale, AZ |

| | | |
|---|---|---|
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire, Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

212.     Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder.  Nonetheless, at events produced by Defendants, physician participants routinely stated that Neurontin was effective for the treatment of panic disorder.  Events presented by Defendants that discussed Neurontin's use as a treatment for panic disorder include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire, Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place,New Orleans,LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club<br>Philadelphia, PA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago<br>Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel<br>San Francisco, CA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant<br>Baltimore, MD |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia<br>New York, NY |
| The Use of Anticonvulsants<br>in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

213.    On September 13, 1996, Parke-Davis submitted a supplemental NDA to approve Neurontin as monotherapy for partial seizures.  The FDA determined the application to be non-approvable on August 26, 1997, because of insufficiency of evidence of Neurontin's effectiveness.  The FDA noted that Clinical Study 945-82 failed to yield evidence of effectiveness.  Parke-Davis did not make public that its application for monotherapy had been denied.  Representative events at which Defendants continued to make presentations that Neurontin was effective for monotherapy without disclosing that the FDA had denied its application for a monotherapy indication include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel<br>San Antonio, TX |
| Monotherapy Speakers Bureau Meeting | September 1997 | La Quinta Resort<br>Palm Springs, CA |

214.    Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis and Defendants, Defendants regularly presented programs in which physician participants touted

Neurontin as being effective for the treatment of migraine. Events where such presentations were made include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Gabapentin in the Management of Migraine | May 25, 1996 | Short Hills, NJ |

215.    Notwithstanding the FDA's refusal to increase the maximum approved dosage of Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages greater than 1800 mg per day, Defendants presented numerous programs where physician participants asserted that Neurontin was effective and safe at dosages above 1800 mg. All such representations were false and misleading. Additionally, at these presentations the physician participants did not disclose the clinical trial evidence that demonstrated that there was no dose response above 1800 mg per day. Defendants' failure to provide this information was a violation of Defendants' duties to provide fair and balanced information, and made any prior representations about use of Neurontin at dosages greater than 1800 mg per day false and misleading. In addition to the events identified above, other events where these false and misleading statements were made include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting on Neurontin | Feb. 4-6, 2000 | Royal Sonesta New Orleans, LA |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire, Beverly Hills, CA |
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

216.    On or about June 29, 2001, the FDA Division of Drug Marketing, Advertising and Communications (DDMAC) advised Defendants that through routine monitoring and surveillance, the DDMAC has identified a slim jim (ID #NSJ5095A1) for Neurontin that is misleading and in violation of the FDCA and applicable regulations, in that this slim jim misleadingly claims improvement in quality of life (QOL) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study, that among other QOL parameters, the misleading presentation includes improvement in social limitations, memory difficulties, energy level, and work limitations, and that the NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study. difficulties, energy level, and work limitations, and that the NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

217.    On or about July 1, 2002, the DDMAC advised Defendants that through routine monitoring and surveillance, the DDMAC has identified a model (#NE 102254) for Neurontin (gabapentin) that is in violation of the FDCA and applicable regulations because it makes representations about Neurontin which are false or misleading, in that this suggestion of proof of the mechanism of action is false and contrary to the language in the approved product labeling that states "[t]he mechanism by which gabapentin [Neurontin] exerts its anticonvulsant action is unknown," and that, furthermore, the full presentation of the areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is misleading because it suggests that Neurontin is useful for a broader range of central nervous system conditions than has been demonstrated by substantial evidence.

218.    From July 1995 through at least August 5, 2002, Defendants engaged in a marketing program to promote the use of Neurontin, and to induce physicians to prescribe

Neurontin, for medical conditions for which the FDA had not approved Neurontin to be used (i.e., "unapproved" or "off-label" uses). That program included: (a) illegally promoting the sale and use of Neurontin for a variety of conditions other than the one condition for which its use was approved by the FDA and for which Defendants had not performed the required FDA testing or established safety and efficacy, in violation of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 331, et seq.; (b) offering and paying illegal remuneration to doctors, either directly or through third parties, to induce them to promote and prescribe Neurontin for off-label uses, in violation of the federal Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b); and (c) making and/or disseminating false statements in presentations and marketing literature sales personnel provided to doctors concerning, among other things, the uses for which the FDA had approved Neurontin, the conditions for which the use of Neurontin was otherwise medically accepted and/or the existence of adequate evidence of the safety and efficacy for such use.

219.    In order to avoid sanction and regulation by the FDA, Defendants' off-label marketing scheme depended on their concealment of their involvement in off-label promotion of Neurontin, and to make it appear to the public that Defendants did not have any hand in any discussions of off-label use. In addition, Defendants performed off-label promotion in the semblance of legitimate consultants' meetings, continuing education seminars, journal articles and medical education events. Also, Defendants' involvement was hidden because Defendants hid their financial connections between the participating physicians and used the vendor participants as payment intermediaries. These activities and others described herein concealed Defendants' off-label promotional activities, and Plaintiff's decedent could not have discovered the scheme alleged herein earlier in the exercise of reasonable diligence. Much of the scheme to this day remains concealed by Defendants.

220.    In May 2003, the details of Defendants' interactions with the other participants were disclosed through the filing by a former medical liaison, Dr. David Franklin, of previously sealed materials in opposition to Defendants' motion for summary judgment in the qui tam action.  This "off-label" promotion scheme remained hidden until, the United States District Court for the District of Massachusetts Court unsealed Dr. Franklin's Amended Complaint in the qui tam case in April or May 2002.

221.    In addition, Defendants fraudulently concealed information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts.

222.    Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiff's decedent and other members of the public who were prescribed and ingested Neurontin for off-label uses have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part, and could not reasonably have discovered the fraudulent nature of Defendants' conduct, and information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts. Accordingly, Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiff's claims.

223.    Similarly, due to Defendants' fraudulent concealment of the aforesaid documents and/or information, the scientific and/or medical community was not apprised of vital

information concerning safety and efficacy of the drug Neurontin. Furthermore, due to the aforesaid allegations, Plaintiff may rely on the discovery rule in pursuit of this claim.

224.    On information and belief, Defendants' "off-label" promotion scheme continued after the filing of Dr. Franklin's whistleblower complaint and still continues. For example, through the third quarter of 2002, there were no published scientific studies to support Neurontin's use for a wide variety of diseases that it is being prescribed for including anxiety disorder, attention deficit disorder, bipolar disorder, cluster headache, depression, dosages in excess of 1800 mg per day and many other disorders that physicians are now prescribing Neurontin for that are "off-label." Despite this lack of scientific evidence, Neurontin sales for these and other "off-label" uses have steadily increased, to the point that, according to an article published in the December 1, 2003 issue of Medical Marketing & Media, 90% of Neurontin sales are for "off-label" use. No other drug in the United States has such a high percentage of "off-label" use. The same article estimates that $1.8 billion worth of Neurontin has been sold for "off-label" uses. This increase in sales, and the repeated and increased prescription of Neurontin for "off-label" uses, without any supporting scientific studies that would be prompting such use, cannot be a random event and could not occur without continuing "off-label" promotion by Defendants' sales force.

225.    As a result of the activities described above, many of which continue to occur after Dr. Franklin filed his whistleblower suit, physicians were inundated with false information about Neurontin. As a result, they continue to prescribe Neurontin for "off-label" uses for which there is no reliable scientific support.

226.    On information and belief, Pfizer has a company-wide practice of marketing "off-label" indications.  "Off-label" marketing plans exist for Cox 2 inhibitors and, on information and belief, also exist for Neurontin.

227.    This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for "off-label" uses.  Because there are no valid scientific studies supporting such use, a reasonable inference is that the use results from past and continuing promotional efforts by Defendants.  This clear and unavoidable conclusion follows from observations regarding the ongoing extent of prescriptions written for "off-label" Neurontin use.

228.    First, from the perspective of overall Neurontin sales, "off-label" usage of Neurontin has actually increased during the years since 1999; in recent years, "off-label" prescriptions for Neurontin have exceeded 90% of all sales and, in some months, it appears that approved indication usage is negligible.

229.    Second, although Neurontin is prescribed for scores of "off-label" indications, since 1999 the types of "off-label" usage continue to be weighted in the precise areas where Defendants focused their illegal marketing efforts:  bipolar disorder, peripheral neuropathy, migraine, etc.

230.    Third, these focus treatment areas of continuing unapproved usage are subject to very intense competition between therapeutic substitutes (other drugs or treatments).  Indeed, because manufacturers' incremental cost for drugs in these areas is very small (e.g., only pennies to manufacture an additional pill), manufacturers compete aggressively for market share by spending huge amounts of money for marketing, promotional and sales activities.  If any company were to simply pack its tent and discontinue programmatic promotional effort in any

therapeutic arena, significant loss of overall sales within that diagnosis regime would certainly occur. For Neurontin, no such dip in overall sales, let alone any significant drop, has occurred.

231.    Fourth, Pfizer, like most branded drug companies, monitors the relationship of its sales to its promotional efforts in very short timeframe; Pfizer would be concerned about a drop in sales within a certain therapeutic regime not after a yearly look-back, or even a quarterly look-back, but over just weeks. The persistent maintenance of high Neurontin sales within multiple, targeted areas for "off-label" promotion over a period of years defies the conclusion that any significant backing away on the marketing, sales or promotion of Neurontin to each of those approved therapeutic areas.

232.    For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction. This increase is a direct result of Defendants' sales representatives recommending to doctors its use for this purpose and their distribution of unapproved promotional materials. These promotional efforts did not stop in 1999, but continued thereafter. There are no valid scientific studies that support Neurontin's use for bipolar disorder. Dr. C. Seth Landefeld has submitted an expert opinion in the Franklin litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for . . . bipolar disorder." As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness has been established, were given and are being given Neurontin. These prescriptions for this purpose are still being written and as a direct result of Defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

233.    Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, depression and dosages in excess of 1800 mg per day, are also increasing without any scientific evidence

supporting use of Neurontin for such indications.  Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific studies to support Neurontin's use for" any of these indications or in an increased dose.

234.    Overall, "off-label" sales of Neurontin have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales.  Actual sales for approved uses have declined.  Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by Defendants to promote "off-label" use.

235.    Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may contribute to mood and behavioral disturbances, including depression and suicidality.

236.    Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may worsen existing mood and behavioral disturbances, including depression and suicidal behavior.

237.    Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may worsen depression and may lead to suicide.

238.    Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with depression.

239.    Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with psychobiologic adverse events.

240.    Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with suicidality (i.e., ideation, attempted and completed suicide).

241.    Refractory epilepsy is a condition in which patients with epilepsy cannot control their seizures with existing anti-seizure medication.  Refractory Epilepsy is a serious medical condition.  Parke-Davis submitted on January 15, 1992, the New Drug Application (NDA 20-235, Gabapentin with a trade name of Neurontin), seeking approval for treatment as adjunctive treatment for refractory epilepsy.  FDA risk benefit analysis for Neurontin was limited to refractory epileptic patients.  FDA conducted no safety analysis prior to approval of Neurontin in people suffering from a psychiatric disorder or pain disorder.

242.    Epilepsy clinical trials performed as part of Defendants' New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin.  Of the 2048 people, 19.7% discontinued treatment due to adverse reactions.  Depression and Suicidal Ideation was the ninth most common adverse reaction resulting in discontinuation of Neurontin.

243.    Epilepsy clinical trials performed as part of Defendants' New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin.  In the total exposed population of said New Drug Application, 78 patients reported depression as an adverse event (i.e., 5.3% of the population of patients).  There were seven reports of depression as serious adverse events, and nine patients who withdrew from studies because of depression.

244.    During Epilepsy clinical trials, performed as part of Defendants' New Drug Application for Neurontin, there was observed at least seven cases of "Depression" adverse events considered possibly or probably related to Neurontin by Defendants' Investigator; there was observed at least two cases of "Drug Overdose" adverse events considered possibly or probably related to Neurontin by Defendants' Investigator.

245.    During Defendants' Clinical Pharmacology Studies, performed as part of Defendants' New Drug Application for Neurontin, there were mood and behavioral disturbances

or "psychobiologic" adverse events, including the following:  Abnormal Thinking (16), Depersonalization (11), Euphoria (6), Confusion (5), Nervousness (4), Hyperkinesia (3), Agitation (2), Personality Disorder (2), Abnormal Dreams (2), Emotional Lability (1).

246.    During Defendants' Clinical Epilepsy Studies, performed as part of Defendants' New Drug Application for Neurontin, there were the following mood and behavioral disturbances or "psychobiologic" adverse events:  Nervousness (58), Thinking Abnormal (37), Confusion (29), Depression (27), Emotional Lability (26), Anxiety (24), Agitation (8), Hostility (7), Doped Feeling (6), Euphoria (5), Hallucinations (4), Psychosis (4), Suicide Attempt (2), Personality Disorder (2), Apathy (1), Depersonalization (1), Overdose (1), Abnormal Dreams (1), Feeling High (1), Feeling Abnormal (1), Frustration (1), Hypomania (1), Paranoia (1), Psychiatric Disorder (1), Schizophrenic (1), Suicidal (1), Withdrawal Syndrome (1).

247.    During Defendants' Add-on Therapy Studies, performed as part of Defendants' New Drug Application for Neurontin, there were the following mood and behavioral disturbances or "psychobiologic" adverse events:  Confusion (57), Nervousness (56), Depression (38), Thinking Abnormal (32), Emotional Lability (20), Anxiety (18), Hostility (12), Overdose (12), Personality Disorder (12), Agitation (10), Euphoria (10), Forgetfulness (8), Depersonalization (7), Hallucinations (5), Psychosis (3), Suicide Attempt (3), Delirium (2), Neurosis (2), Paranoia (2), Aggression (1), Apathy (2), Manic Reaction (1), Mood Swings (1), Suicidal (1), Suicide Attempt (1), Suicide (1).

248.    During the Epilepsy Clinical Trials, performed as part of Defendants' New Drug Application for Neurontin, Defendants' medical investigators assessed the following Serious Adverse Events to be possibly or probably related to Neurontin:

a.    Depression with attempted suicide by a seventeen year old male on 1,200 mg of Neurontin;

b.  Depression with suicide ideation of a thirty six year old male on 1,200 mg of Neurontin. Suicide ideation improved on tapering and discontinuance.

c.  Depression with suicide ideation recurred when Neurontin was reintroduced at 1,500 mg of Neuorntin;

d.  Depression and attempted suicide by a seventeen year old female on 2,000 mg of Neurontin;

e.  Depression which resolved with dose reduction of a twenty three year old female on 1,200 mg of Neurontin;

f.  Drug overdose by a thirty one year old female on 1,800 mg of Neurontin;

g.  Drug overdose by an eighteen year old male on 1,800 mg of Neurontin.

249.  Epilepsy clinical trials performed as part of Defendants' New Drug Application for Neurontin reflected safety information including the presence of positive dechallenge/rechallenge adverse events. Dechallenge events included suicidal ideation, depression and hostility. A positive rechallenge was documented in one patient for the adverse event of depression with suicide ideation, and Defendants' Investigator acknowledged the adverse event to be possibly or probably related to Neurontin.

250.  The FDA, in its 1992 pre-approval, Combined Medical-Statistical Review (hereinafter, "1992 FDA Review"), which was done to evaluate the limited sought-after indication of Adjunctive Medication in Refractory Partial Epilepsy, observed at least 369 treatment emergent "psychobiologic" adverse drug events in the total population of 2048 participants given Neurontin. These adverse events, when considered individually and classified using a modified COSTART-preferred terminology, occurred at a frequency of at least 1% or more among gabapentin treated patients who participated in placebo controlled studies. These individual mood and behavioral disturbances or "psychobiologic" adverse events are as follows: Thinking Abnormal 96/2048 (4.69%), Nervousness 92/2048 (4.49%), Depression 82/2048

(4.0%), Emotional Lability 38/2048 (1.86%), Anxiety 36/2048 (1.76%), Hostility 25/2048

(1.22%).

251.    Although FDA's 1992 Review was done to evaluate the limited sought-after

indication of Adjunctive Medication in Refractory Partial Epilepsy, FDA medical reviewer,

Cynthia McCormick, M.D., raised important concerns about the relationship between Neurontin

and adverse events of depression and suicide.  Specifically, the FDA 1992 Review sets forth the

following:

> Less common but more serious events may limit the drugs [Neurontin's]
> widespread usefulness…[D]epression, while it may not be an infrequent
> occurrence in the epileptic population, may become worse and require
> intervention or lead to suicide, as it has resulted in some suicidal attempts.
>
> * * *
>
> In its clinical database of 2048 patients, gabapentin has a risk profile that is
> uncertain, with five groups of important adverse events that have not been
> fully characterized, [including] clinically important depression ….
> Accumulated long range safety data are limited by the excessive attrition
> due to apparent lack of sustained efficacy.
>
> * * *
>
> In conclusion, NDA 20-235 is approvable with appropriate and prominent
> labeling *for use in a specific population*."  [Emphasis added.]

252.    On or about December 15, 1992, the Peripheral and Central Nervous System

Drugs Advisory Committee to the Department of Health and Human Services, Food and Drug

Administration, had a public hearing and voted to recommend Neurontin for a very specific use

in a very limited population (e.g., adjunctive treatment for refractory epilepsy).  The Advisory

Committee did not consider the safety of Neurontin's use in any patient group other than

sufferers of refractory epilepsy.  Defendant employees Dr. Spivey, Ms. Turner, Dr. Pierce, Dr.

Fletcher, Mr. Parker, Ms. LaMoreaux and Dr. Charles Taylor were in attendance at said hearing

where the following question and answer was posed regarding the limited expected use and

indication for Neurontin:

> Has the sponsor provided evidence that gabapentin is safe when used in the
> treatment of epilepsy? And again I would modify it to be used as an add-on
> in adult patients with intractable partial seizures.

* * *

> We have a 10-to-0 vote in favor of that question.

253.    The FDA has consistently reaffirmed its findings from the FDA 1992 Review that

its concern that depression while it may not be an infrequent occurrence in the epileptic

population, may become worse and require intervention or lead to suicide.  In a subsequent

review dated May 12, 1992, and signed by FDA clinical reviewer on September 27, 1993, the

FDA stated "there is no new data in Safety Update #3 which alter the safety profile of this drug

as presented the initial NDA and Safety Update #1 and 2."  In another subsequent safety update

dated December 15, 1993, the FDA again stated "there are no new data in Safety Update #4

which alter the safety profile of this drug as presented in the initial NDA and Safety updates #1,

2, and 3."

254.    Parke Davis and Warner Lambert had specific knowledge on or about December

7, 1992, via FDA's 1992 Review, that Neurontin's widespread usefulness was limited because of

the occurrence of depression and suicide attempts during clinical trials; Parke Davis and Warner

Lambert had knowledge of Neurontin's capacity to contribute to mood and behavioral

disturbances, including depression and suicidality.  Dr. Richard Spivey, then Senior Director of

Regulatory Affairs at Parke Davis, obtained the FDA 1992 Review from the FDA.  On or about

December 7, 1992, Dr. Spivey provided the January 31, 1992 Review to the Neurontin Director

of Regulatory Affairs at Parke Davis: Janeth Turner.  On December 7, 1992, Ms. Turner

provided the FDA 1992 Review to Dr. Mark Pierce, Parke Davis Vice President of Clinical

Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of

Drug Development.  Between December 7, 1992 and December 9, 1992, Dr. Spivey, Ms. Turner,

Dr. Pierce and Mr. Fletcher read and became aware of the 1992 FDA Review, including the

following FDA findings regarding Neurontin:

> Less common but more serious events may limit the drugs [Neurontin's]
> widespread usefulness…depression, while it may not be an infrequent occurrence
> in the epileptic population, may become worse and require intervention or lead to
> suicide, as it has resulted in some suicidal attempts.

* * *

> In its clinical database of 2048 patients, gabapentin has a risk profile that is
> uncertain, with five groups of important adverse events that have not been fully
> characterized, [including] clinically important depression …. Accumulated long
> range safety data are limited by the excessive attrition due to apparent lack of
> sustained efficacy.

* * *

> In conclusion, NDA 20-235 is approvable with appropriate and prominent
> labeling for use in a specific population."

255.    On or about December 9, 1992, Dr. Spivey, Ms. Turner, Dr. Pierce, and Mr.

Fletcher had a discussion via telephone with Dr. Russell Katz, the FDA Supervising Medical

Officer, regarding the Neurontin New Drug Application, and with Ms. Nancy Chamberlain, the

FDA Consumer Safety Officer regarding the Neurontin New Drug Application.  Said discussion

included the substance of the aforementioned FDA 1992 Review.  As a consequence of this

discussion, on or about December 9, 1992, upon information and belief,  Dr. Spivey, Ms. Turner,

Dr. Pierce and Mr. Fletcher, learned that the widespread usefulness of Neurontin was limited

because it was shown to be associated with depression and may lead to suicide, as it had led to

several suicide attempts during clinical trials.

256.    On December 15, 1992, the Peripheral and Central nervous System Drugs

Advisory Committee to the Department of Health and Human Services, Food and Drug

Administration, conducted a public hearing that was attended by, *inter alia,* several employees of

Parke Davis, including Dr. Spivey, Ms. Turner, Dr. Pierce, Mr. Fletcher, Mr. James Parker, Ms.

Linda LaMoreaux, and Dr. Charles Taylor.  At said hearing, FDA presented the following

information:

> In the total exposed population of the NDA, 78, or 5.3 percent of patients,
> reported depression as an adverse event.  This included one subject in Phase I
> study.  There were seven reports of depression as serious adverse events and nine
> patients who withdrew from studies because of depression, some with suicidal
> ideation.
>
>                          \*   \*   \*
>
> There may be some underrepresentation of certain categories; for example, in
> some cases, depression was reported as a serious adverse event, particularly if it
> resulted in hospitalization or was associated with suicidal ideation…  The actual
> incidence of treatment-emergent depression in which pharmacological
> intervention was begun and maintained throughout the course of the study is not
> known.  The firm has provided the FDA with a breakdown of patients who
> reported depression as an adverse event, and it's found that…of 78 patients who
> reported depression as an adverse event, 19 had no prior history and 22 patients
> required treatment for their symptoms.

257.    Defendants' employees Ms. Turner, Mr. James Parker, Ms. LaMoreaux and Dr.

Taylor were members of the Drug Development Team and New Product Committee whose

stated purpose was to explore new uses for Neurontin beyond the epileptic population.

258.    At no time did Defendants' employees Ms. Turner, Mr. Parker, Ms. Lamoreaux or

Dr. Taylor communicate to any other member of Defendants' Development Team, or New

Product Committee, the FDA's concern that "[l]ess common but more serious events may limit

the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent

occurrence in the epileptic population, may become worse and require intervention or lead to

suicide, as it has resulted in some suicidal attempts."

259.    Defendants undertook a plan to disseminate false and misleading information about Neurontin by suppressing or otherwise intentionally failing to disclose to Plaintiff's decedent's prescribing physician(s) and Plaintiff's decedent information about Neurontin's capacity to contribute to mood and behavioral disturbances or "psychobiologic" adverse events, including depression and suicidality.

260.    Defendants suppressed, concealed and failed to disclose to Plaintiff's decedent and Plaintiff's decedent's prescribing physician(s) the FDA's concerns regarding Neurontin's association with depression, suicidality, psychobiologic adverse events, including FDA's statement that "[l]ess common but more serious events may limit the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts."  Suppressing, concealing and failing to disclose the FDA's concern that Neurontin may worsen depression and may lead to suicide contributed to Plaintiff's decedent's physician(s) prescribing Neurontin to Plaintiff's decedent for off-label uses.

261.    Defendants' actions in suppressing, concealing or otherwise failing to disclose Neurontin's association with suicidality, depression, and psychobiologic events were done with a strategic purpose to increase sales of Neurontin, including sales related to off-label uses. Defendants knew that disclosure of such an association with Neurontin would decrease sales; Defendants knew there was a financial, strategic advantage in not disclosing Neurontin's association with suicidality, depression, and psychobiologic adverse events.

262.    In or about April and May of 1995, Defendants performed a marketing assessment of proposed psychiatric indications for Neurontin.  In that marketing assessment, Defendants forecasted potential revenue from Neurontin for bipolar disorder and anxiety

treatment under two scenarios:  with and without FDA approval.  Defendants' Neurontin

Development Team and New Product Committee reviewed the potential psychiatric uses and

concluded that Defendants would not seek approval to promote and sell the drug for these

unapproved uses.

263.    In or about July of 1995, Defendants' assessment of Neurontin's market potential

for neuropathic pain was distributed to Defendants' Neurontin Development Team and to

Defendants' Vice President for marketing.  That assessment stated that "there is no intention to

fully develop the indication at this point."  Full development would have required submission of

an NDA to the FDA for approval.

264.    As previously set forth above and incorporated by reference herein, commencing

about June of 1995 until at least the date of this incident, by certain conduct described in greater

detail above, Defendants promoted the sale and use of Neurontin for certain conditions other

than the approved use.

265.    Upon information and belief, at all times during promotion of the sale and use of

Neurontin for conditions other than the approved use (e.g., "off-label" uses), Defendants always

suppressed, concealed, and failed to disclose Neurontin's association with mood and behavior

disturbances or psychobiologic adverse events, including depression and suicidality.

266.    To increase sales of Neurontin, Defendants affirmatively applied strategies to

compare Neurontin with other competing pharmaceutical drugs that had warnings or otherwise

greater disclosure of suicide related events.

267.    To increase sales of Neurontin, Defendants trained its sales force to minimize

Neurontin's association with mood and behavioral disturbances or psychobiologic adverse

events, including depression and suicidality.

268.    To increase sales of Neurontin, Defendants applied strategies to compare Neurontin with other competing pharmaceutical drugs, such as Keppra, which already had a specific warning related to suicide:  "Neurontin Backgrounder", "Competitive Information", and "Compare and Win" strategies were implemented.  Neurontin was portrayed as "Safe and Easy" compared to Keppra that had a "Suicide Warning".

269.    Defendants' comparison strategy wherein they suppressed, concealed and failed to disclose Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality, while at the same time emphasizing competing drugs that had a "Suicide Warning", increased sales of Neurontin, including sales for off-label uses.

270.    Defendants' application of such comparison strategies directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) prescribing Neurontin and Plaintiff's decedent ingesting Neurontin.

271.    Most doctors likely would never have heard of Neurontin but for the off-labeling marketing efforts of Warner-Lambert and allegedly Pfizer.  The inability to prove that Warner-Lambert or Pfizer contacted a doctor directly does not mean that that doctor was not influenced by Warner-Lambert and Pfizer marketing efforts.  Pfizer's off-label marketing of Neurontin indirectly influenced all, or substantially all, doctors prescribing Neurontin in one of two ways.  First, a doctor who did not have direct contact with Pfizer most likely was influenced in his prescribing habits by one who did.  Second, all, or substantially all, doctors were indirectly affected by Pfizer's suppression of negative or adverse information about Neurontin that would have affected their prescribing habits.

272.    It seems unlikely that a responsible doctor who has never heard of Neurontin would prescribe Neurontin for an off-label use without first consulting the medical and scientific literature, a colleague, or a medical reference work.  To do so would be part of the doctor's professional and ethical responsibility.

273.    Doctors work in an environment where informal communications among fellow doctors, or "word-of-mouth," play an important role in the dissemination of information about drugs and treatments.  Colleagues are generally perceived as credible, independent, and reliable sources of information.  Studies have shown that doctors learn extensively from and draw upon their colleagues' clinical experience.  Indeed, academic research has found that the source most influential and encouraging first prescribing a new drug is colleagues.

274.    The academic literature has shown that social interactions among doctors can influence their prescribing behavior.  For example, brand-level network effects affect the rate at which a drug diffuses into the market.  Widespread use of a drug implicitly conveys important information about its safety and efficacy, which increases word-of-mouth communications and accelerates the rate at which others become aware of and adopt the drug.

275.    Even doctors who did not receive visits from Neurontin sales representatives were more likely to prescribe Neurontin off-label because of indirect influences of Neurontin's extensive promotional efforts.  The reason is that Neurontin promotional plans targeted the two areas physicians rely on most for a physician to not have heard about the product.  The makers of Neurontin were well aware of these social networks  and hoped to exploit them through their marketing efforts.

276.    The widespread use of Neurontin  would further encourage doctors who may not have had direct contact with the drug company to prescribe the drug, because widespread use of

a drug may convey information about its safety and efficacy, and, for physicians, may imply "accepted practice" and hence greater immunity to malpractice lawsuits.  This could lead to the dominance of one drug - not necessarily the most efficacious or safest - despite the availability of close substitutes.  This idea of high prescription volume signaling safety may have been especially relevant for Neurontin.  More important, as Neurontin sales increased year-over-year, the indirect influences would have become stronger, encouraging physicians to prescribe Neurontin, regardless of whether or not they had direct contact with the company or received sales calls from Neurontin sales representatives.

277.    Given the high levels of detailing proposed by Pfizer in 2002, it is unlikely that a doctor would be completely unaware of Neurontin, especially in the specialties where Pfizer most heavily promoted Neurontin.  Pfizer's Neurontin sales representatives visited the majority of primary care physicians, neurologists, rheumatologists, and orthopedists.  Since doctors share information  and rely on each other for new information, any doctor who did not receive a personal visit would likely learn about Neurontin through a colleague who was visited.

278.    Because it was perceived as "safe and efficacious", Neurontin was listed on nearly all formularies.  Neurontin's formulary status would have also created indirect influences encouraging prescriptions.  If a doctor had a patient in need of treatment for one of the numerous off-label conditions for which Warner-Lambert and Pfizer promoted Neurontin, the physician may have prescribed Neurontin simply because it was on formulary, without ever having been personally contacted by the company or its sales representatives promoting Neurontin.

279.    Defendants unlawfully manipulated scientific "truth"" to convince by misrepresentation the entire medical community of the proposition that Neurontin could be therapeutically used for indications never approved by the FDA.

280.    Defendants' suppression, concealment and lack of disclosure, to Plaintiff's decedent and Plaintiff's decedent's prescribing physician(s), directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) to prescribe Neurontin and for Plaintiff's decedent to ingest Neurontin.

281.    Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) not warning of the risks of depression and suicide associated with Neurontin.

282.    Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) failing to adequately monitor changes in mood and behavior caused by Neurontin.

283.    Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality directly or indirectly prevented Plaintiff's decedent's prescribing physician(s) from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

284.    On January 16, 2003, via National Public Radio, Defendants, through their Senior Medical Director Dr. Catherine Clarey, suppressed, fraudulently misrepresented, concealed and failed to disclose Defendants' knowledge that Neurontin use has been associated with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality. Specifically, Dr. Clarey stated, "[t]here is absolutely no evidence that Neurontin in --- in --- with

all these prescriptions that it has been associated with suicidal behavior or that it can cause suicidal behavior."

285.    Upon information and belief, Plaintiff's decedent's prescriber of Neurontin heard directly or otherwise learned indirectly of the statements by Defendants' employee, Catherine Clarey, wherein she stated, "[t]here is absolutely no evidence that Neurontin in --- in --- with all these prescriptions that it has been associated with suicidal behavior or that it can cause suicidal behavior."

286.    Defendants' suppression, fraudulent misrepresentation, concealment and lack of disclosure as to Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality, via statements by Catherine Clarey, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) prescribing Neurontin and in Plaintiff's decedent ingesting Neurontin.

287.    Defendants' suppression, fraudulent misrepresentation, concealment and lack of disclosure as to Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality, via statements by Catherine Clarey, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) not warning Plaintiff's decedent of the risks of depression and suicide caused by Neurontin.

288.    Defendants' suppression, fraudulent misrepresentation, concealment and lack of disclosure as to Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality, via statements by Catherine Clarey, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) failing to adequately monitor changes in Plaintiff's decedent's mood and behavior caused by Neurontin.

289.    Defendants' suppression, fraudulent misrepresentation, concealment and lack of disclosure as to Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality, via statements by Catherine Clarey, directly or indirectly resulted in preventing Plaintiff's decedent's prescribing physician from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

290.    Defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action to Plaintiff's decedent and Plaintiff's decedent's prescribing physician(s) in failing to inform the prescriber(s) that Neurontin increases Gaba and thereby reduces the release of neurotransmitters in the human brain, including serotonin and norepinephrine.

291.    Defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action to Plaintiff's decedent and Plaintiff's decedent's prescriber in failing to inform Plaintiff's decedent and the prescriber(s) that Neurontin's mechanism of action, in particular Neurontin's effects on monoamine neurotransmitter release, may contribute to mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality.

292.    Defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action to Plaintiff's decedent and Plaintiff's decedent's prescriber(s) in failing to inform the prescriber(s) that Neurontin increases Gaba and thereby reduces the release of neurotransmitters in the human brain, including serotonin and norepinephrine, and that the reduction of such neurotransmitters was associated with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality.

293.    Defendants knew or should have known that there is a need to define Neurontin's mechanism of action so that a proper warning regarding monitoring patients for these mood and behavioral disturbances or psychobiologic adverse events would be presented in product labeling in a form that is understandable for prescribing physicians.

294.    Defendants knew or should have known that Neurontin would be used for off-label indications, such as those for which Plaintiff's decedent herein was prescribed Neurontin, and with such knowledge Defendants should have taken action to inform prescribers and Plaintiff's decedent that careful monitoring of patients ingesting Neurontin was required due to Neurontin's capacity to increase Gaba and thereby reduce the release of monoamine neurotransmitters and consequently Neurontin's capacity to contribute to mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality.

295.    Defendants' intentional suppression, misrepresentation, concealment and lack of disclosure as to Neurontin's  mechanism of action directly or indirectly resulted in preventing Plaintiff's decedent's prescribing physician, from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

296.    Defendants' intentional suppression, misrepresentation, concealment and lack of disclosure as to Neurontin's mechanism of action directly or indirectly resulted in preventing Plaintiff's decedent's prescribing physician from being able to fully monitor changes in Plaintiff's decedent's mood and behavior caused by Neurontin.

297.    Defendants intentionally suppressed, concealed or otherwise misrepresented the utility of Neurontin in uses outside of its approved indications in failing to inform Plaintiff's decedent and Plaintiff's decedent's prescriber(s) that it would be unethical to prescribe Neurontin to depressed individuals.

298.    On or about June 18, 1999, Defendants' employed Atul C. Pande, M.D.,

F.R.C.P.C. as a Senior Director, Psychiatrist, and Dr. Pande stated the following, on June 18,

1999, at the Third Annual Conference on Bipolar Disorder, regarding the exclusion of purely

depressed patients from clinical trials wherein patients would be ingesting Neurontin:  "[W]e had

absolutely no evidence whatsoever that [Neurontin] was likely to be antidepressant and

therefore, we felt it ethically unjustified to include depressed patients."

299.    Defendants' intentional suppression, misrepresentation, concealment and lack of

disclosure that Defendants had no evidence that Neurontin was likely to be antidepressant

directly or indirectly resulted in preventing Plaintiff's decedent's prescribing physician(s) from

being able to fully monitor changes in Plaintiff's decedent's mood and behavior caused by

Neurontin.

300.    Defendants' intentional suppression, misrepresentation, concealment and lack of

disclosure that Defendants had no evidence that Neurontin was likely to be antidepressant

directly or indirectly resulted in the prevention of Plaintiff's decedent's prescriber(s) from being

able to fully assess the risk-benefit analysis for the underlying condition Neurontin was

prescribed to Plaintiff's decedent.

301.    Defendants were well aware that Plaintiff's decedent's prescribing physician(s)

and Plaintiff's decedent would rely on the information concerning Neurontin (which suppressed,

omitted, concealed and otherwise misrepresented the safety and efficacy of Neurontin), that

Defendants provided to the Plaintiff's decedent's prescribing physicians and Plaintiff's decedent.

302.    Defendants provided this information which suppressed, omitted, concealed and

otherwise misrepresented the safety and efficacy of Neurontin to induce Plaintiff's decedent's

prescribing physician(s) to induce the physicians to prescribe Neurontin to their patients, including Plaintiff's decedent for either refractory epilepsy or off-label uses.

303.    Plaintiff's decedent's prescribing physician(s) and Plaintiff's decedent relied on the information provided by Defendants, which suppressed, omitted, concealed and other wise misrepresented the safety and efficacy of Neurontin, and to their detriment as Plaintiff's decedent sustained serious injury.

304.    Defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, which are not detailed herein but will be determined in discovery.

305.    Defendants affirmatively and fraudulently misrepresented that Neurontin was safe and effective in the treatment of depression when, in actuality, Neurontin was ineffective in treating depression and instead influenced users to engage in self-destructive behavior.

306.    Defendants affirmatively and fraudulently misrepresented that Neurontin was safe for human consumption in general, when, in actuality, Neurontin influenced users to engage in self-destructive behavior.

307.    Defendants knew that Neurontin was not safe and effective in the treatment of depression and that Neurontin was not safe for human consumption in general because such drug influenced users to engage in self-destructive behavior.

308.    Defendants knew that physicians, health care providers, and mental health care providers would justifiably rely upon Defendants' misrepresentations in prescribing Neurontin in the treatment of depression and in prescribing Neurontin for human consumption in general for the treatment of illnesses and medical and mental conditions and that the public, including persons such as Plaintiff's decedent, would justifiably rely upon Defendants' misrepresentations

in using Neurontin as prescribed by physicians, health care providers and mental health care providers in the treatment of depression and for other prescribed uses.

309.    Plaintiff's decedent justifiably relied upon Defendants' misrepresentations and, accordingly, consumed Neurontin as prescribed by Plaintiff's decedent's physician in the treatment of depression.

310.    By reason of Plaintiff's decedent's consumption of Neurontin in justifiable reliance upon Defendants' fraudulent misrepresentations, Plaintiff's decedent sustained injuries and was caused to commit suicide.

311.    That by reason of the facts and premises aforesaid, Plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, Plaintiff seeks punitive and exemplary damages against Defendants in an amount to be determined upon the trial of this matter.

<u>**COUNT FIVE**</u>

**CONSUMER PROTECTION**

312.    Plaintiff repeats and reiterates the allegations previously set forth herein.

313.    Defendants willfully and knowingly engaged in acts and practices which were unfair and deceptive to patients/consumers and their physicians and medical providers, and disseminated information that was deceptive, misleading and false in a material way, in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, et seq., for the purpose of influencing and inducing physicians and medical providers to prescribed Neurontin, at excessively high dosages, for unapproved "off-label" uses, including treatment for pain, to patients/consumers such as the Plaintiff's decedent, and causing such patients/consumers to

purchase, acquire and use Neurontin, at high dosages, for unapproved "off-label" uses, including treatment for pain, as prescribed by their physicians and medical providers.

314.    That by reason of Defendants' unfair, deceptive, misleading, false and fraudulent acts and practices, Plaintiff's decedent sustained injuries and was caused to commit suicide.

315.    As a direct and proximate result of Defendants' negligence, Plaintiff and the next of kin of Plaintiff's decedent sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter.

## COUNT SIX

### PUNITIVE DAMAGES

316.    Plaintiff repeats and reiterates the allegations previously set forth herein.

317.    Defendants are jointly and severally liable to Plaintiff for compensatory damages resulting from the death of Plaintiff's decedent, Richard Smith.  Pursuant to Tenn. Code Ann. § 20-5-113, Plaintiff seeks all damages of every kind to the Plaintiff's decedent, Richard Smith, and all damages of every kind to Plaintiff's decedent's survivors, including, but not limited to, damages for the loss of consortium, companionship, society and love of the Plaintiff's decedent, mental and emotional anguish, medical expenses, economic loss of the present value of the Plaintiff's decedent's work-life expectancy, funeral expenses, loss of earning capacity, and physical and mental pain and suffering.

318.    Defendants knew that Neurontin was ineffective for off-label uses, including treatment of pain, and caused persons who consumed Neurontin for off-label uses, including Plaintiff's decedent who consumed Neurontin for treatment of pain, to suffer from suicidal ideations and gestures and to attempt to commit suicide.

319.    Defendants' actions, as alleged herein, were intentional, fraudulent, willful, wanton, malicious, and/or reckless, and in total disregard for the rights of, and potential injuries to and death of, persons who consumed Neurontin for off-label uses, including Plaintiff's decedent who consumed Neurontin for treatment of pain, such that punitive damages should be awarded.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.      For an order finding Defendants liable under each of the causes of action pleaded above;

b.      For compensatory damages under each of the causes of action pleaded above, in an amount to be determined upon the trial of this action;

c.      For punitive damages and exemplary damages under each of the causes of action pleaded above, in an amount to be determined upon the trial in this action;

d.      For attorneys' fees and costs incurred in the pursuit of this action;

e.      For all damages available under the Tennessee Consumer Protection Act; and

e.      For an order awarding such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff respectfully demands a trial by jury.


Dated:  April 7, 2008                    Respectfully submitted,

                                         FINKELSTEIN & PARTNERS, LLP
                                         Attorneys for Plaintiff


                                           /s/ Andrew G. Finkelstein
                                         Andrew G. Finkelstein, Esquire
                                         436 Robinson Avenue
                                         Newburgh, NY  12550
                                         (800) 634-1212
                                         (845) 562-3492 (fax)
                                         email:  afinkelstein@lawampm.com

                                         Charles F. Barrett, Esq.
                                         BARRETT LAW OFFICE, P.A.
                                         Attorneys for Plaintiff
                                         One Burton Hills Blvd., Suite 380
                                         Nashville, TN  37215
                                         (615) 386-8391
                                         (615) 386-8392 (fax)
                                         email:  cb@barrettandassociates.net


**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on April 7, 2008.

Dated:  April 7, 2008


                                           /s/ Andrew G. Finkelstein
                                         Andrew G. Finkelstein

EXHIBIT A

FindLaw
WWW.FINDLAW.COM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Crim. No. |
| Plaintiff, ) | |
| ) | Violations: |
| v. ) | Title 21, United States |
| ) | Code Sections 331(a), |
| WARNER-LAMBERT COMPANY LLC ) | 331(d), 352(f)(1), |
| ) | and 355(a) |
| Defendant. ) | |

**INFORMATION**

THE UNITED STATES ATTORNEY FOR THE DISTRICT OF MASSACHUSETTS
CHARGES THAT:

## GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise alleged:

### BACKGROUND

1.      WARNER-LAMBERT COMPANY LLC (hereinafter "WARNER-LAMBERT"),
was a corporation operating and existing under the laws of the State of Delaware. Its principal
place of business was Morris Plains, New Jersey. WARNER-LAMBERT's Parke-Davis Division
was engaged in, among other things, the development, manufacture, promotion, sale, and
interstate distribution of prescription drugs intended for human use in the United States.
WARNER-LAMBERT's pharmaceutical manufacturing facilities were located in Puerto Rico,
from which it shipped products to all fifty states and the District of Columbia.

2.      The Federal Food, Drug and Cosmetic Act ("FDCA"), among other things
governs the lawful interstate distribution of drugs for human use. As codified at Title 21, United
States Code, Sections 331 et seq., and specifically at § 355(b), the FDCA, and its implementing
regulations, require that before a new drug may legally be distributed in interstate commerce, a
sponsor of a new drug product must submit a New Drug Application ("NDA").

3.      The FDCA required, at 21 U.S.C. § 355, that the NDA sponsor submit to the
United States Food and Drug Administration ("FDA"), as part of an NDA, proposed labeling for
the proposed intended uses for the drug which included, among other things, the conditions for
therapeutic use. The NDA must also provide, to the satisfaction of FDA, data generated in

2

randomized and well-controlled clinical trials that demonstrates that the drug will be safe and effective when used in accordance with the proposed labeling.

4.    The FDCA, at 21 U.S.C. § 355, prohibited the introduction into interstate commerce of any new drug, unless an approval of an NDA is effective. Only after the NDA, including the proposed labeling, was reviewed and approved by FDA, was the sponsor permitted by law to promote and market the drug, and only for the medical conditions of use specified in the approved labeling, for which use FDA had found sufficient evidence of safety and effectiveness. Uses unapproved by FDA, not included in the drug's approved labeling, are known as "unapproved uses" or "off-label uses."

5.    The FDCA, and the regulations promulgated thereunder, required that in order to label or promote a drug for a use different than the conditions for use specified in the approved labeling, the sponsor had to file a new NDA, or amend the existing NDA, by, among other requirements, submitting the newly proposed indications for use and evidence, in the form of randomized and well-controlled clinical studies, sufficient to demonstrate that the drug would be safe and effective for the newly proposed therapeutic use or uses. Only upon approval of the new NDA could the sponsor promote the drug for the new intended use.

6.    The FDCA, at 21 U.S.C. § 352(f)(1), provided that a drug was misbranded if, among other things, the labeling did not contain adequate directions for use. As the phrase is used in the FDCA, adequate directions for use cannot be written for medical indications or uses for which the drug had not been proven to be safe and effective through well-controlled clinical studies because that would be misleading under Section 352(a).

3

7.    The FDCA, 21, U.S.C. §§ 331(a)(d), 333(a), and 355, prohibits the distribution in interstate commerce of an unapproved new drug or of a misbranded drug.

8.    In or about 1993, WARNER-LAMBERT submitted an NDA for approval of a drug called Neurontin (also known by the chemical name gabapentin), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3 (h)(4) and (5) . In that application, WARNER-LAMBERT sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.  On or about December 30, 1993, FDA approved Neurontin for that specific use only.   This approved use for Neurontin will be referred to throughout this Information as the "Approved Use."  Because WARNER-LAMBERT had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than the Approved Use.  Further, Neurontin was not, pursuant to 21 U.S.C. § 355(i), exempt from the prohibition of introducing into interstate commerce a new drug for medical indications beyond the conditions prescribed, recommended, or suggested in the approved labeling thereof.

9.    As described in this Information, from at least June of 1995 through at least August 20, 1996, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD); and migraine headaches, among other uses.

4

These and other unapproved uses for Neurontin will be collectively referred to in this Information as the "Unapproved Uses."

10.     WARNER-LAMBERT did not file a new NDA seeking FDA approval for any of these Unapproved Uses during the time period addressed in this Information. Of these Unapproved Uses, only post-herpetic neuralgia has ever received FDA approval, and that approval was applied for and received after the events described in this Information.

<u>WARNER-LAMBERT'S STRATEGY FOR NEURONTIN</u>

11.     WARNER-LAMBERT conducted evaluations of the market potential for certain of the Unapproved Uses for Neurontin, including but not limited to: post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

12.     In or about the fall of 1995, WARNER-LAMBERT's Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including conference calls on pain and a pain consultant meeting.

13.     Certain of WARNER-LAMBERT's annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies, and tactics for increasing sales of the Unapproved Uses of the drug. The marketing plans budgeted for and funded these tactics.

14.     From early 1995, on repeated occasions, WARNER-LAMBERT determined not to seek FDA approval for certain Unapproved Uses.

5

15.    In or about April and May of 1995, WARNER-LAMBERT performed a Marketing Assessment of proposed psychiatric indications for Neurontin. In that Marketing Assessment, WARNER-LAMBERT forecast potential revenue from Neurontin for bipolar and anxiety treatment under two scenarios: with and without FDA approval. WARNER-LAMBERT's Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that the company would not seek approval to promote and sell the drug for these Unapproved Uses.

16.    In or about July of 1995 WARNER-LAMBERT's assessment of Neurontin's market potential for neuropathic pain was distributed to its Neurontin Development Team and to a WARNER-LAMBERT Vice President for Marketing. That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to FDA for approval.

17.    One of the principal factors WARNER-LAMBERT considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that WARNER-LAMBERT had been developing. The company expected this new drug would be approved by FDA not only for epilepsy but also for a variety of uses beyond Neurontin's Approved Use.

18.    Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin. Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in WARNER-LAMBERT's original NDA approval for Neurontin. If WARNER-LAMBERT sought and obtained approval for any of the

Unapproved Uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those Unapproved Uses. WARNER-LAMBERT was concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

### WARNER-LAMBERT'S PROMOTION OF NEURONTIN FOR UNAPPROVED USES

19.    From in or about June of 1995 through in or about August 20, 1996, by certain of the conduct described in greater detail below, WARNER-LAMBERT promoted the sale and use of Neurontin for certain conditions other than the Approved Use in Massachusetts and elsewhere:

### OFF-LABEL PROMOTION THROUGH SALES REPRESENTATIVES

20.    In October 1995, a member of WARNER-LAMBERT's Epilepsy Disease Team circulated a memorandum to a group including other senior members of WARNER-LAMBERT's Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 WARNER-LAMBERT sales representatives for whom data was available in a two month period, was for off-label use of Neurontin. Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

21.    On or about July 10, 1996, a WARNER-LAMBERT sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

22.    Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure. This same document, entitled "Neurontin Can Do/Can't Do," stated that sales

7

representatives could do lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

## OFF-LABEL PROMOTION THROUGH MEDICAL LIAISONS

23.      WARNER-LAMBERT employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasion, a WARNER-LAMBERT medical liaison promoted Neurontin for Unapproved Uses:

(a)  In or about June of 1996, a WARNER-LAMBERT sales representative requested that a WARNER-LAMBERT medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

(b)  The sales representative and the medical liaison selected the topic for the presentation to the local medical society. After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c)  Among the topics of the presentation was the use of Neurontin for Unapproved Uses.

(d)  During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of Unapproved Uses.

8

(e)  After the presentation, a WARNER-LAMBERT Medical Director praised the

event as "another great example of use of the medical liaisons" and an Area Business

Manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

24.    In or about May 1996, a WARNER-LAMBERT Medical Director based in the

Northeast CBU sent a voicemail message to the Medical Liaisons in the Northeast CBU in which

he stated:

> What we'd like you to do is, any time you're called out just make sure that your main
> focus out of what you're doing is on Neurontin . . . When we get out there, we want to
> kick some ass, we want to sell Neurontin on pain.  All right?  And monotherapy and
> everything that we can talk about, that's what we want to do.

One or more Medical Liaisons in the Northeast CBU interpreted this statement to mean that he or

she should promote Neurontin for Unapproved Uses and thereafter, in or about May and June

1996, promoted Neurontin for neuropathic pain, an unapproved use.

### OFF-LABEL PROMOTION THROUGH CONSULTANTS' MEETINGS
### AND ADVISORY BOARDS

25.    WARNER-LAMBERT organized a consultant meeting at the Jupiter Beach

Resort in Palm Beach, Florida on April 19-21, 1996.  Approximately 42 physicians attended the

meeting, including nine physicians who made presentations relating to Unapproved Uses of

Neurontin.

26.    WARNER-LAMBERT invited certain doctors to this meeting based upon their

history of writing a large number of prescriptions for Neurontin or similar drugs.  As part of this

event, WARNER-LAMBERT paid for accommodations and meals for the invited doctors and

9

their spouse or guest, and paid an honorarium to each of the doctor attendees. Doctors who acted as faculty were paid between $1,500 and $2,000.

27.     Among the presentations made to the physicians in attendance was one relating to Unapproved Uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances." During this presentation, Neurontin was promoted for use in the treatment of pain.

28.     Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs." During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol, and pain.

29.     On or about May 8, 1996, following the Jupiter Beach conference, WARNER-LAMBERT circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations. WARNER-LAMBERT told its employees that: "[t]he meeting was a great success and the participants were delivered a hard-hitting message about Neurontin." WARNER-LAMBERT distributed to these employees a form entitled "Jupiter Beach Trending Worksheet" which was intended to be used to gauge the effect of the meeting on the prescribing by doctors who attended the Jupiter Beach meeting.

30.     From August 1-5, 1996, WARNER-LAMBERT organized an "advisory board meeting," in Atlanta, Georgia in conjunction with the 1996 Summer Olympics. WARNER-LAMBERT expressly instructed several of the physician speakers to address some of the Unapproved Uses.

10

31.    During that meeting, WARNER-LAMBERT hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies. The company had already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on WARNER-LAMBERT's behalf at prior meetings.

32.    Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

<u>OFF-LABEL PROMOTION THROUGH TELECONFERENCES</u>

33.    In or about January, 1996, a WARNER-LAMBERT Vice President of the Southeast Customer Business Unit sent a memorandum to WARNER-LAMBERT sales representatives listing certain goals, including: "Utilize the Medical Liaison Group to target the Neurontin, Pain & Psychiatric market. Objective to conduct twice weekly Pain Teleconferences moderated by key Neuro Consultants. Goals 250 Physicians Participants quarterly."

34.    On or about March 1, 1996, WARNER-LAMBERT sponsored such a teleconference moderated by a WARNER-LAMBERT employee with a pain specialist as a speaker on Neurontin. The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

35.    On or about March 28, 1996, a WARNER-LAMBERT Medical Director in the Northcentral Customer Business Unit sent a memorandum to WARNER-LAMBERT Medical Liaisons in that unit instructing them to hold a series of teleconferences with doctors to provide clinical updates on Neurontin, including monotherapy epilepsy data and non-epilepsy use data entitled "Neurontin, A Clinical Update."

11

36.    In or about May, 1996, a WARNER-LAMBERT Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

12

## COUNT ONE: 21 U.S.C. §§ 331(d), 333(a)(2) & 355(a)

### (Distribution of an Unapproved New Drug)

37. The allegations contained in paragraphs 1 through 36 are realleged and incorporated herein as if set forth in full.

38. Beginning as early as in or about April 1995, and continuing thereafter until at least in or about August 20, 1996, in the District of Massachusetts, and elsewhere,

### WARNER-LAMBERT,

after previously having been convicted of violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331 and 333, did introduce and cause the introduction into interstate commerce from Puerto Rico and elsewhere, directly and indirectly, into Massachusetts and elsewhere, quantities of Neurontin, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p), which drug was intended for use for the treatment of neuropathic pain, bipolar disorder, as monotherapy for epilepsy, and other Unapproved Uses. No approval, pursuant to 21 U.S.C. § 355, was in effect with respect to Neurontin for use in these conditions.

All in violation of 21 U.S.C. §§ 331(d), 333(a)(2), and 355(a).

13

## COUNT TWO: 21 U.S.C. §§ 331(a), 333(a)(2) & 352(f)(1)

### (Distribution of a Misbranded Drug: Inadequate Directions for Use)

39.    The allegations contained in paragraphs 1 through 36 are realleged and incorporated herein as if set forth in full.

40.    Beginning as early as April 1995, and continuing thereafter until at least in or about August 20, 1996, in the District of Massachusetts and elsewhere,

### WARNER-LAMBERT,

after previously having been convicted of violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331 and 333, did introduce and cause the introduction into interstate commerce from Puerto Rico and elsewhere, directly and indirectly, into Massachusetts and elsewhere, quantities of Neurontin, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p), which drug was intended for use for the treatment of neuropathic pain, bipolar disorder, as monotherapy for epilepsy, and other Unapproved Uses, and which was misbranded within the meaning of 21 U.S.C. § 352(a), in that Neurontin's labeling lacked adequate directions for such uses.

All in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 352(f)(1).

14

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

THOMAS E. KANWIT
ASSISTANT U.S. ATTORNEY

May 13, 2004

15