F&P File #231407-06/rag

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
                                    :   MDL Docket No. 1629

In re:  NEURONTIN MARKETING,      :
       SALES PRACTICES AND        :   Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION  :

                                      :   Judge Patti B. Saris
---------------------------------------------------------------x
                                    :   Magistrate Judge Leo T. Sorokin

THIS DOCUMENT RELATES TO:      :
                                    :

      OWENS v. PFIZER INC.         :   <u>Demand for Jury Trial</u>
      1:05-cv-11017-PBS         :
                                    :
---------------------------------------------------------------x

## <u>AMENDED COMPLAINT</u>

1.      I, Plaintiff, Darlene Owens, brings this civil action on behalf of the Estate of Joseph Frank Owens (hereinafter "Mr. Owens"), who was prescribed and used the prescription medication NEURONTIN (Gabapentin).  As a direct and proximate result of taking this drug, Mr. Owens was caused to suffer physical injuries, including his suicide on November 9, 2002.

2.      Plaintiff, Darlene Owens, is an adult resident of Mobile County, Alabama and has petitioned the Probate Court to act as the Personal Representative of the Estate of Joseph Frank Owens by the State of Alabama.  The Claims on behalf of Mr. Owens' estate are brought pursuant to Alabama's wrongful death statute, **Ala. Code Ann Section 6-5-411, et seq.**

3.      Defendant, Warner-Lambert, is a Delaware corporation.  Defendant, Pfizer Inc. (hereinafter "Defendants") is the successor in interest by merger to Warner-Lambert.  At all times relevant hereto, Defendants were in the business of manufacturing, marketing, selling and

distributing the pharmaceutical product Neurontin (Gabapentin).  Defendants, Pfizer and Warner-Lambert my be served through its registered agent: Pfizer, Incorporated c/o The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109.

4.      Personal jurisdiction and subject matter jurisdiction are appropriate in this court as to all Defendants, as all Defendants have done business in Mobile County, Alabama, either directly or by agent, and have thus availed themselves of this jurisdiction.

5.      Neurontin is a pharmaceutical treatment for seizures associated with epilepsy, among other maladies.  Defendants did manufacture, design, package, market and distribute this drug.  Defendants encouraged the use of this drug in improper customers, misrepresented the safety and effectiveness of this drug and concealed or understated it dangerous side effects. Defendants aggressively marketed this drug to physicians for numerous off-label uses. Defendants did this to increase sales and profits.

6.      At all times relevant hereto, Defendants actually knew of the nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and sell their product so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by misuse this product.  Defendants' conduct exhibits such an entire want of care as to establish that its actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to Mr. Owens' individual rights, and hence punitive damages are appropriate.

## BACKGROUND

## STATEMENT OF THE CASE

7.      Pursuant to the Food, Drug, and Cosmetic Act ("FDCA") 21 U.S.C. §§ 301 et seq., new pharmaceutical drugs cannot be distributed in interstate commerce unless the sponsor

of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a) and (d).

8.      However, the FDCA does not prevent doctors from prescribing a drug approved for a particular use for other uses that are different than those approved by the FDA ("off-label" usage).

9.      Nonetheless, even though physicians may prescribe drugs for "off-label" usage, the FDCA prohibits drug manufacturers themselves from marketing and promoting a drug for a use that the FDA has not approved. 21 U.S.C. § 331(d).

10.     A manufacturer illegally "misbrands" a drug if the drug's labeling includes information about unapproved uses or if the manufacturer engages directly or indirectly in marketing or promoting the drug for unapproved uses.

11.     Instead, if a manufacturer desires to market and promote the drug for new use s in addition to those already approved, the materials on "off-label" usage must meet certain stringent requirements and the manufacturer must resubmit the drug to the FDA testing and approval process for the proposed new use.

12.     The above-described statutory and regulatory system and process is designed to protect the public, including Mr. Owens, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage, and to protect the public, including Mr. Owens herein, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

13.     PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

14.     At no time prior to Mr. Owens being prescribed Neurontin, did Defendants receive FDA approval for any other use of Neurontin except for the above-described treatment of epilepsy or for higher dosages for any purpose, and the FDA never approved the usage of Neurontin at any dosage for the treatment of pain.

15.     Commencing in 1995, Defendants, as the manufacturer of Neurontin, began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment for pain and at higher dosages than had been tested and approved, in violation of the above-described statutory and regulatory system and process, including the FDCA, which prohibits manufacturers from directly or indirectly advertising, marketing and promoting a drug for "off-label" usage, and instead requires that the manufacturer resubmit the drug to the FDA testing and approval process for the proposed new use and that the materials issued by the manufacturer relating to the proposed new use meet certain stringent requirements.

16.     Defendants, as the manufacturer of Neurontin, directly and indirectly advertised, marketed and promoted Neurontin for the treatment of pain and encouraged that higher dosages than those tested be prescribed, even though Defendants knew or should have known that there were not adequate tests and studies establishing and confirming that Neurontin was safe and effective for the treatment of pain, and even though Defendants knew or should have known that

there were no adequate studies showing that Neurontin was safe when prescribed at dosages higher than those approved by the FDA.

17.    At all times hereinafter mentioned, upon information and belief, Defendants marketed and promoted Neurontin for the treatment of pain even though Defendants knew or should have known that Neurontin caused many symptoms or related risk factors associated with suicidal behavior by persons suffering from pain.

18.    At all times hereinafter mentioned, upon information and belief, Defendants marketed and promoted Neurontin for the treatment of pain even though Defendants knew or should have known that Neurontin had no effect in relieving or correcting the symptoms or causes of pain.

19.    Defendants' conduct in promoting "off-label" uses of Neurontin for treatment of pain constituted a wanton, callous and reckless disregard of the safety of the public and, in particular of persons suffering from pain.

20.    In promoting "off-label" uses of Neurontin, and at higher dosages than approved by the FDA, including treatment of pain, Defendants acted without regard to the potential danger and harm to persons for whom the drug was prescribed for the treatment of pain.

21.    Defendants actively distributed, sold and placed Neurontin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of pain and in dosages higher than those approved by the FDA, even though the only approved use of Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

22.    Neurontin is not reasonably safe and effective for the treatment of persons suffering from pain, and is not reasonably safe when consumed in higher dosages than those

approved by the FDA, and Defendants' conduct of illegally advertising, marketing and promoting Neurontin for this "off-label" uses was unlawful, deceptive and misleading and was violative of the FDCA.

23.    By reason of Defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from pain, frequently at dosages higher than those approved by the FDA.

24.    Upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, was indicted in the United States District Court for the District of Massachusetts for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy of such criminal Information is annexed hereto as Exhibit "A" and incorporated into this complaint by reference.

25.    Upon information and belief, on or about the 7th day of June, 2004, the Defendant, WARNER-LAMBERT COMPANY LLC, formally pled guilty to all charges contained in the Information.

26.    On May 1, 2007, Dr. William Crotwell, III, Mr. Owens' prescriber, provided testimony under oath as follows:

Q.    Did you --- What significance, if any, would you have attached back then when you were prescribing Neurontin to Mr. Owens if the evidence in this case is that Neurontin, through its mechanism of action, can reduce the release of production of serotonin in the brain?

A.    Again, it would depend on his history, the psychiatric history.  If a person is --- If they're on medications like that, then I think I would have probably questions using it.  But again, I didn't have that. . . . .

Q.    Doctor, going back to the line of questioning about the reduction of neurotransmitter release, in general, would --- if it was given to you in understandable terms, would you want to know whether Neurontin had the capacity to reduce the release of excitatory neurotransmitters as part of

your risk/benefit approach in determining whether to prescribe Neurontin in the first place?

A.   In general, yes, it would be.

Q.   And knowing what you know about the effects of the reduction of the release of certain excitatory neurotransmitters, would that have been something as part of your risk/benefit approach to determine whether to prescribe the drug that you would have shared with Mr. Owens?

A.   Yes.

27.   The drug Neurontin was ineffective in the treatment of the causes and symptoms of Mr. Owens' condition of pain and Mr. Owens sustained injury and harm by reason of this reliance upon Neurontin to be effective in the treatment as prescribed by his physician of such pain condition.

28.   That at all times hereinafter mentioned, Mr. Owens was diagnosed by his physician as suffering from pain and was being treated by his physician for such condition.

29.   That at all times hereinafter mentioned, upon information and belief, in reliance upon Defendants' direct and indirect advertising, marketing and promoting of Neurontin as being safe and effective for the treatment of pain, Mr. Owens' physician prescribed Neurontin to treat Mr. Owens' pain.

30.   That at all times hereinafter mentioned, Mr. Owens purchased and consumed Neurontin, as recommended and prescribed by his physician and in the dosages prescribed, in an effort to control the effects of pain.

31.   The drug Neurontin was not safe and effective for the treatment of Mr. Owens' condition of pain, and Mr. Owens sustained injury and harm by reason of his consumption of Neurontin as prescribed by his physician in an effort to treat his pain.

32.   The drug Neurontin was ineffective in the treatment of the causes and symptoms of Mr. Owens' condition of pain and Mr. Owens sustained injury and harm by reason of this

reliance upon Neurontin to be effective in the treatment as prescribed by his physician for such pain.

33.    By reason of Mr. Owens' consumption of Neurontin in a manner and at a dosage prescribed by his physician in an effort to treat his pain, on November 9, 2002, Mr. Owens committed suicide.

34.    The injuries and death sustained by Mr. Owens were caused by or were contributed to by Mr. Owens' consumption of Neurontin at a dosage prescribed by his physician for the treatment of pain in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by Defendants.

## COUNT 1

35.    Plaintiff realleges all prior paragraphs of this complaint as if fully set out herein.

36.    The pharmaceutical Neurontin (Gabapentin) designed, manufactured, sold and/or supplied by Defendants, was placed into the stream of commerce for off-label uses that it for which it was not designed, taking into account the utility of the product and the risks involved in its use.

37.    Further, the pharmaceutical Neurontin designed, manufactured, marketed, sold and/or supplied by Defendants was defective in its marketing due to inadequate warnings or instructions, both independently and when coupled with the aggressive marketing campaign that Defendants initiated in relation to this product to the physicians through drug sales representatives.

38.    Neurontin was defective for the off-label uses for which it was marketed.

39.    Additionally, Defendants failed to provide timely and adequate post-marketing warnings or instructions after they knew or learned of the risk of injury from Neurontin via post-

marketing data.  The reckless marketing of this product for off-label uses is a contributing cause of Mr. Owens' injuries, damages and death.

**WHEREFORE,** Plaintiff demands judgement against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus cost.

## COUNT II

40.     Plaintiff realleges all prior paragraphs of the Complaint as if set out herein.

41.     Defendants had a duty to exercise reasonable care in the design, manufacture, marketing, sale, testing and/or distribution of Neurontin in the stream of commerce.

42.     Defendants knew or should have known that Neurontin  created an unreasonable risk of bodily harm, including the risk of death if misused.

43.     Despite the fact that Defendants knew or should have known that Neurontin caused unreasonably, dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market, and continues to market to this day, Neurontin to the consuming public via the medical community, when there were and are adequate and proper alternative methods of treatment, or opportunities for more meaningful concerning misuse.

44.     Defendants knew or should have known that consumers such as Mr. Owens would foresee ably suffer injury or death as a result of its failure to exercise ordinary care as described above.  Defendants' negligence was a contributing cause of Mr. Owens' injuries.

**WHEREFORE,** Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus cost.

## COUNT III

45.     Plaintiff realleges all prior paragraphs of this complaint as if fully set out herein.

9

46.    Defendants made express representations to the medical community at large through their aggressive marketing and advertising campaigns relative to its product, Neurontin.

47.    Defendants through their detail sales representatives, made representations of the safety and efficacy if the product, Neurontin.

48.    Neurontin does not conform to the express representations made through Defendants' marketing efforts.

49.    Neurontin does not conform to the express representation made by Defendants' agents/sales representatives.

50.    Defendants' conduct in this matter was a contributing cause of injuries, damages and death suffered by Mr. Owens.

**WHEREFORE,** Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable**,** plus cost.

## COUNT IV

51.    Plaintiff realleges all prior paragraphs of the Complaint as if fully set out herein.

52.    At the time Defendants marketed, sold and distributed Neurontin for use by the general consuming public, including Mr. Owens, Defendants knew if the use for which Neurontin was intended and implicitly warranted the product to be of merchantable quality, and safe and fit for other uses.

53.    Mr. Owens reasonably relied upon the skill and judgment of Defendants as to whether Neurontin was of merchantable quality and safe and fit for the use it was prescribed.

54.    Contrary to such implied warranty, Neurontin was not of merchantable quality, or safe or fit for the many uses it was prescribed, because the product was and is unreasonably dangerous and unfit for the purposes for which it was intended and used as described above.

10

55.    Defendants' conduct in this regard was a contributing cause of Mr. Owens' injuries, damages and death.

**WHEREFORE,** Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus cost.

## COUNT V

56.    Plaintiff realleges all prior paragraphs of the Complaint as if fully set out herein.

57.    Defendants materially misrepresented material facts concerning the safety and effectiveness of Neurontin in the treatment of pain.

58.    Defendants' affirmative misrepresentations include but are not limited to the acts set forth in the following paragraphs.

59.    In or about 1993, Defendants submitted a new drug application (NDA) for approval of a drug called Neurontin (also known by the chemical name "Gabapentin"), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5). In that application, Defendants sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.  On or about December 30, 1993, the FDA approved Neurontin for that specific use only.  Because Defendants had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than that approved use.

60.    Commencing in at least June of 1995 and continuing through at least the date of this incident, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome,

amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other uses.

61.     Defendants did not file a new NDA seeking FDA approval for any of these unapproved uses at any time prior to the date of this incident.

62.     Defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to:  post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

63.     In or about the fall of 1995, Defendants' Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including plans for conference calls on pain and a pain consultant meeting.

64.     Certain Defendants' annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies and tactics for increasing sales of the unapproved uses of the drug.  The marketing plans budgeted for and funded these tactics.

65.     Commencing in early 1995 and continuing at least through the date of this incident, Defendants determined not to seek FDA approval for certain unapproved uses.

66.     In or about April and May of 1995, Defendants performed a marketing assessment of proposed psychiatric indications for Neurontin.  In that marketing assessment, Defendants forecast potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios:  with and without FDA approval.  Defendants' Neurontin Development Team and

New Product Committee reviewed the potential uses and concluded that Defendants would not seek approval to promote and sell the drug for these unapproved uses.

67.     In or about July of 1995, Defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to Defendants' Neurontin Development Team and to Defendants' Vice President for marketing. That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to the FDA for approval.

68.     One of the principal factors Defendants considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that Defendants were developing. Defendants expected this new drug would be approved by the FDA not only for epilepsy but also for a variety of uses beyond Neurontin's approved use.

69.     Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin. Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in Defendants' original NDA approval for Neurontin. If Defendants sought and obtained approval for any of the unapproved uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those unapproved uses. Defendants were concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

70.     Commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail below, Defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

71.     In October 1995, a member of Defendants' Epilepsy Disease Team circulated a memorandum to a group including other senior members of Defendants' Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 of Defendants' sales representatives for whom data was available in a two-month period, was for off-label use of Neurontin. Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

72.     On or about July 10, 1996, Defendants' sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

73.     Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure. This same document, entitled "Neurontin Can Do/Can't Do," stated that sales representatives could present lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

74.     Defendants employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasions, which are not all-inclusive, Defendants' medical liaisons promoted Neurontin for unapproved uses:

(a)     In or about June of 1996 Defendants' sales representative requested that Defendants' medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

(b)    The sales representative and the medical liaison selected the topic for the presentation to the local medical society.  After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c)    Among the topics of the presentation was the use of Neurontin for unapproved uses.

(d)    During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of unapproved uses.

(e)    After the presentation, Defendants' Medical Director praised the event as "another great example of use of the medical liaisons" and an area business manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

75.    Defendants organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-21, 1996.  Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to unapproved uses of Neurontin.

76.    Defendants invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs.  As part of this event, Defendants paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.

77.    Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin."  In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances."  During this presentation, Neurontin was promoted for use in the treatment of pain.

78.    Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances:  Nonepileptic Uses of Anti Epileptic Drugs."  During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

79.    On or about May 8, 1996, following the Jupiter Beach conference, Defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

80.    From August 1-5, 1996, Defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics.  Defendants expressly instructed several of the physician speakers to address some of the unapproved uses.

81.    During that meeting, Defendants hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies.  Defendants already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on Defendants' behalf at prior meetings.

82.    Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

83.    On or about March 1, 1996, Defendants sponsored a teleconference moderated by Defendants' employee with a pain specialist as a speaker on Neurontin.  The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

84.     In or about May 1996, Defendants' Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

85.     Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits.  Such consultants' meetings included, but were not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, F | Mar. 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | Apr. 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | Apr. 20, 1996 |
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | Apr. 19-21, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, N | Apr. 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande, Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |

| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sep. 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

86.     Defendants rewarded doctors for their advocacy of Neurontin by paying them honoraria for lending their names to scientific articles which were actually prepared and written by third parties retained by Defendants. In 1996, Defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that Defendants could completely control the publications distributed pursuant to its "publications strategy." The content of these articles were actually written by non-physician technical writers retained by Defendants and Defendants had the right to control the content of all the articles. Defendants paid all expenses in connection with the creation of these publications.

87.     Defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

88.     Defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

18

Reflex sympathetic dystrophy (RSD)

Peripheral neuropathy

Diabetic neuropathy

Trigeminal neuralgia

Post-herpetic neuralgia

Essential tremor

Restless leg syndrome (RLS)

Attention deficit disorder (ADD)

Periodic limb movement disorder

Migraine

Bipolar disorder

Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

Drug or alcohol withdrawal seizures

89.    The following enumerated misrepresentations, which are not intended to be all-inclusive, relating to "off-label" usage of Neurontin, were routinely made to physicians with the knowledge and consent of marketing personnel of Defendants:

a.    Bipolar Disorder.  Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed.

b.    Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes. Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the

treatment of pain was being reported.  No such body of evidence existed.  Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.  Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective monotherapy.

        c.        Reflex Sympathetic Dystrophy ("RSD").  Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD.  The only such evidence that existed was anecdotal reports of nominal scientific value.

        d.        Attention Deficit Disorder ("ADD").  Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.

        e.        Restless Leg Syndrome ("RLS").  RLS was another condition where Defendants' medical liaisons were trained to refer to a growing body of date relating to the condition, when no scientific date existed.

        f.        Trigeminal Neuralgia.  Although medical liaisons represented that Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports.  No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

        g.        Post-Herpetic Neuralgia ("PHN").  Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin.  Once again, no clinical trial data supported such a claim.

        h.        Essential Tremor Periodic Limb Movement Disorder ("ETPLMD"). Medical liaisons were trained to allege that Neurontin was effective in the treatment of these

conditions.  No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

        i.     Migraine.  Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials.  Although pilot studies had been such suggested and undertaken, no early results of clinical trials existed to support these claims.  Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value.  Most of the case reports were either created or sponsored by Defendants.

        j.     Drug and Alcohol Withdrawal Seizures.  Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

        90.     Defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though Defendants were fully aware of these results from the tests which they sponsored, Defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin.

        91.     At each of the presentations known to the Plaintiff concerning Neurontin on pain, at least one of the presenters expressly stated or implied that Neurontin was effective for the treatment of pain.  A representative statement was made by Dr. David Longmire, a participating physician, at the Jupiter Beach Consultants Meeting in April 1996 when he stated that Neurontin was effective for the treatment of pain.  Dr. Longmire repeated that statement at a May 1996 Consultants Meeting at the Ritz Carlton in Boston.  Another physician participant, Dr. Steven

Schacter, made a similar statement at the May 1996 meeting when he stated that "pain specialists are finding that low dosages of Neurontin are effective." Comparable statements were made by another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach Consultants Meeting, in May 1996 at the Boston Ritz Carlton Consultants Meeting, and in June 1996 at a Philadelphia Consultants Meeting. Upon information and belief, similar statements were made at all events presented by Defendants that discussed Neurontin's use for pain indications. These events include, but are not limited to the following events:

| Topic | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | Apr. 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11, 1996 | Boston, MA |
| Advisory Board Meeting | Apr. 14-16, 2000 | Grand Wailea Resort Hotel & Spa, Maui, HI |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants | Apr. 2000 | Four Seasons Irving, TX |
| Advisory Board Meeting | May 26, 2000 | Disney Yacht Club Orlando, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 24, 2001 | Plaza Hotel New York, NY |
| New Directions in the Understanding and Treatment of Pain | Mar. 2-3, 2001 | Hilton Novi Detroit, MI |
| New Directions in the Understanding and Treatment of Pain | May 4-5, 2001 | Westin Galleria Houston, TX |

| | | |
|---|---|---|
| New Directions in the Understanding and Treatment of Pain | Feb. 9-10, 2001 | Harbor Court Hotel Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain | Mar. 9-10, 2001 | Fairmont Kansas City Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain | May 11-12, 2001 | Peabody Memphis Memphis, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 16-17, 2001 | Fairmont San Francisco San Francisco, CA |
| Advisory Board Meeting | June 16-18, 2000 | Westin Resort Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Sheraton Universal City Universal City, CA |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Miami Biltmore Miami, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Ritz Carlton New Orleans New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Sheraton Music City Nashville, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 30-31, 2001 | Ritz Carlton St. Louis St. Louis, MO |
| New Directions in the Understanding and Treatment of Neuropathic Pain | Oct. 9-11, 1998 | Madeira, Portugal |

92.    At events produced by Defendants, physician participants routinely stated that Neurontin was effective for the treatment of restless leg syndrome or RSD. Events presented by Defendants that discussed Neurontin's use as a treatment for restless leg syndrome or RSD include, but are not limited to, the following event:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

23

93.     At events produced by Defendants, physician participants routinely stated that Neurontin was effective for the treatment of bipolar disorder.  Events presented by Defendants that discussed Neurontin's use as a treatment for bipolar disorder include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel<br>San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting<br>Princess, Scottsdale, AZ | Jan. 21-23, 2000 | Fairmont Scottsdale |
| Merritt-Putnam Speakers Bureau<br>Current Perspectives in the Understanding<br>of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent<br>Beverly Wilshire<br>Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at<br>Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training<br>Advanced Perspectives in the<br>Management of Neurological and<br>Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort<br>Sedona, AZ |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert<br>Boston, MA |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 16, 1998 | Sunset Grill<br>Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe<br>Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro<br>St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 17, 1998 | Heathman Hotel<br>Portland, OR |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 18, 1998 | Downtown Club<br>Philadelphia, PA |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

94.     At events produced by Defendants, physician participants routinely stated that Neurontin was effective for the treatment of social phobia.  Events presented by Defendants that discussed Neurontin's use as a treatment for social phobia include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess, Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Perspectives in the Current understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place,New Orleans,LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

95.     Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder. Nonetheless, at events produced by Defendants, physician participants routinely stated that Neurontin was effective for the treatment of panic disorder. Events presented by Defendants that discussed Neurontin's use as a treatment for panic disorder include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting Princess, Scottsdale, AZ | Jan. 21-23, 2000 | Fairmont Scottsdale |

26

| | | |
|---|---|---|
| Merritt-Putnam Speakers Bureau<br>Current Perspectives in the Understanding<br>of Neurobehavioral Disorder | Mar. 24-26, 2000 | Four Seasons Regent<br>Beverly Wilshire<br>Beverly Hills, |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans, at<br>Canal Place,New Orleans,LA |
| Merritt-Putnam Speakers Training<br>Perspectives in the Management of<br>Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort<br>Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 16, 1998 | Maison Robert<br>Boston, MA |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 16, 1998 | Sunset Grill<br>Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe<br>Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro<br>Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 17, 1998 | Heathman Hotel<br>Portland, OR |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 18, 1998 | Downtown Club<br>Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago<br>Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 18, 1998 | Huntington Hotel<br>San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 19, 1998 | Brass Elephant<br>Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting<br>and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia<br>New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

96.     On September 13, 1996, Parke-Davis submitted a supplemental NDA to approve

Neurontin as monotherapy for partial seizures.  The FDA determined the application to be non-

approvable on August 26, 1997, because of insufficiency of evidence of Neurontin's

effectiveness.  The FDA noted that Clinical Study 945-82 failed to yield evidence of

effectiveness.  Parke-Davis did not make public that its application for monotherapy had been

denied.  Representative events at which Defendants continued to make presentations that

Neurontin was effective for monotherapy without disclosing that the FDA had denied its

application for a monotherapy indication include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Monotherapy Speakers Bureau Meeting | September 1997 | La Quinta Resort Palm Springs, CA |

97.     Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis

and Defendants, Defendants regularly presented programs in which physician participants touted

Neurontin as being effective for the treatment of migraine.  Events where such presentations were

made include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Gabapentin in the Management of Migraine | May 25, 1996 | Short Hills, NJ |

98.     Notwithstanding the FDA's refusal to increase the maximum approved dosage of

Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages

greater than 1800 mg per day, Defendants presented numerous programs where physician

participants asserted that Neurontin was effective and safe at dosages above 1800 mg.  All such

representations were false and misleading.  Additionally, at these presentations the physician

participants did not disclose the clinical trial evidence that demonstrated that there was no dose

response above 1800 mg per day.  Defendants' failure to provide this information was a violation

of Defendants' duties to provide fair and balanced information, and made any prior

representations about use of Neurontin at dosages greater than 1800 mg per day false and

misleading.  In addition to the events identified above, other events where these false and

misleading statements were made include, but are not limited to, the following events:

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting on Neurontin New Orleans, LA | Feb. 4-6, 2000 | Royal Sonesta |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

99.     On or about June 29, 2001, the FDA Division of Drug Marketing, Advertising and

Communications (DDMAC) advised Defendants that through routine monitoring and

surveillance, the DDMAC has identified a slim jim (ID #NSJ5095A1) for Neurontin that is

misleading and in violation of the FDCA and applicable regulations, in that this slim jim

misleadingly claims improvement in quality of life (QOL) parameters based on the Neurontin

Evaluation of Outcomes in Neurological Practice (NEON) study, that among other QOL

parameters, the misleading presentation includes improvement in social limitations, memory

difficulties, energy level, and work limitations, and that the NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

100.    On or about July 1, 2002, the DDMAC advised Defendants that through routine monitoring and surveillance, the DDMAC has identified a model (#NE 102254) for Neurontin (gabapentin) that is in violation of the FDCA and applicable regulations because it makes representations about Neurontin which are false or misleading, in that this suggestion of proof of the mechanism of action is false and contrary to the language in the approved product labeling that states "[t]he mechanism by which gabapentin [Neurontin] exerts its anticonvulsant action is unknown," and that, furthermore, the full presentation of the areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is misleading because it suggests that Neurontin is useful for a broader range of central nervous system conditions than has been demonstrated by substantial evidence.

101.    From July 1995 through at least August 5, 2002, Defendants engaged in a marketing program to promote the use of Neurontin, and to induce physicians to prescribe Neurontin, for medical conditions for which the FDA had not approved Neurontin to be used (i.e., "unapproved" or "off-label" uses).  That program included:  (a) illegally promoting the sale and use of Neurontin for a variety of conditions other than the one condition for which its use was approved by the FDA and for which Defendants had not performed the required FDA testing or established safety and efficacy, in violation of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 331, et seq.; (b) offering and paying illegal remuneration to doctors, either directly or through third parties, to induce them to promote and prescribe Neurontin for off-label uses, in violation of the federal Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b); and (c) making and/or disseminating false statements in presentations and marketing literature sales personnel provided

to doctors concerning, among other things, the uses for which the FDA had approved Neurontin, the conditions for which the use of Neurontin was otherwise medically accepted and/or the existence of adequate evidence of the safety and efficacy for such use.

102.    In order to avoid sanction and regulation by the FDA, Defendants' off-label marketing scheme depended on their concealment of their involvement in off-label promotion of Neurontin, and to make it appear to the public that Defendants did not have any hand in any discussions of off-label use.  In addition, Defendants performed off-label promotion in the semblance of legitimate consultants' meetings, continuing education seminars, journal articles and medical education events.  Also, Defendants' involvement was hidden because Defendants hid their financial connections between the participating physicians and used the vendor participants as payment intermediaries.  These activities and others described herein concealed Defendants' off-label promotional activities, and Plaintiff could not have discovered the scheme alleged herein earlier in the exercise of reasonable diligence.  Much of the scheme to this day remains concealed by Defendants.

103.    In May 2003, the details of Defendants' interactions with the other participants were disclosed through the filing by a former medical liaison, Dr. David Franklin, of previously sealed materials in opposition to Defendants' motion for summary judgment in the qui tam action.  This "off-label" promotion scheme remained hidden until, the United States District Court for the District of Massachusetts Court unsealed Dr. Franklin's Amended Complaint in the qui tam case in April or May 2002.

104.    In addition, Defendants fraudulently concealed information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents

indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts.

105.    Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Mr. Owens and other members of the public who were prescribed and ingested Neurontin for off-label uses have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part, and could not reasonably have discovered the fraudulent nature of Defendants' conduct, and information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts. Accordingly, Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiff's claims.

106.    Similarly, due to Defendants' fraudulent concealment of the aforesaid documents and/or information, the scientific and/or medical community was not apprised of vital information concerning safety and efficacy of the drug Neurontin.  Furthermore, due to the aforesaid allegations, Plaintiff may rely on the discovery rule in pursuit of this claim.

107.    On information and belief, Defendants' "off-label" promotion scheme continued after the filing of Dr. Franklin's whistleblower complaint and still continues.  For example, through the third quarter of 2002, there were no published scientific studies to support Neurontin's use for a wide variety of diseases that it is being prescribed for including anxiety disorder, attention deficit disorder, bipolar disorder, cluster headache, depression, dosages in excess of 1800 mg per day and many other disorders that physicians are now prescribing Neurontin for that are "off-label."  Despite this lack of scientific evidence, Neurontin sales for

these and other "off-label" uses have steadily increased, to the point that, according to an article published in the December 1, 2003 issue of Medical Marketing & Media, 90% of Neurontin sales are for "off-label" use. No other drug in the United States has such a high percentage of "off-label" use. The same article estimates that $1.8 billion worth of Neurontin has been sold for "off-label" uses. This increase in sales, and the repeated and increased prescription of Neurontin for "off-label" uses, without any supporting scientific studies that would be prompting such use, cannot be a random event and could not occur without continuing "off-label" promotion by Defendants' sales force.

108.    As a result of the activities described above, many of which continue to occur after Dr. Franklin filed his whistleblower suit, physicians were inundated with false information about Neurontin. As a result, they continue to prescribe Neurontin for "off-label" uses for which there is no reliable scientific support.

109.    On information and belief, Defendants has a company-wide practice of marketing "off-label" indications. "Off-label" marketing plans exist for Cox 2 inhibitors and, on information and belief, also exist for Neurontin.

110.    This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for "off-label" uses. Because there are no valid scientific studies supporting such use, a reasonable inference is that the use results from past and continuing promotional efforts by Defendants. This clear and unavoidable conclusion follows from observations regarding the ongoing extent of prescriptions written for "off-label" Neurontin use.

111.    First, from the perspective of overall Neurontin sales, "off-label" usage of Neurontin has actually increased during the years since 1999; in recent years, "off-label"

33

prescriptions for Neurontin have exceeded 90% of all sales and, in some months, it appears that approved indication usage is negligible.

112.    Second, although Neurontin is prescribed for scores of "off-label" indications, since 1999 the types of "off-label" usage continue to be weighted in the precise areas where Defendants focused their illegal marketing efforts:  bipolar disorder, peripheral neuropathy, migraine, etc.

113.    Third, these focus treatment areas of continuing unapproved usage are subject to very intense competition between therapeutic substitutes (other drugs or treatments).  Indeed, because manufacturers' incremental cost for drugs in these areas is very small (e.g., only pennies to manufacture an additional pill), manufacturers compete aggressively for market share by spending huge amounts of money for marketing, promotional and sales activities.  If any company were to simply pack its tent and discontinue programmatic promotional effort in any therapeutic arena, significant loss of overall sales within that diagnosis regime would certainly occur.  For Neurontin, no such dip in overall sales, let alone any significant drop, has occurred.

114.    Fourth, Defendants, like most branded drug companies, monitors the relationship of its sales to its promotional efforts in very short timeframe; Defendants would be concerned about a drop in sales within a certain therapeutic regime not after a yearly look-back, or even a quarterly look-back, but over just weeks.  The persistent maintenance of high Neurontin sales within multiple, targeted areas for "off-label" promotion over a period of years defies the conclusion that any significant backing away on the marketing, sales or promotion of Neurontin to each of those approved therapeutic areas.

115.    For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction.  This increase is a direct result of Defendants' sales

representatives recommending to doctors its use for this purpose and their distribution of unapproved promotional materials. These promotional efforts did not stop in 1999, but continued thereafter. There are no valid scientific studies that support Neurontin's use for bipolar disorder. Dr. C. Seth Landefeld has submitted an expert opinion in the Franklin litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for . . . bipolar disorder." As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness has been established, were given and are being given Neurontin. These prescriptions for this purpose are still being written and as a direct result of Defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

116. Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, depression and dosages in excess of 1800 mg per day, are also increasing without any scientific evidence supporting use of Neurontin for such indications. Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific studies to support Neurontin's use for" any of these indications or in an increased dose.

117. Overall, "off-label" sales of Neurontin have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales. Actual sales for approved uses have declined. Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by Defendants to promote "off-label" use.

118. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Mr. Owens that Neurontin may contribute to mood and behavioral disturbances, including depression and suicidality.

119. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Mr. Owens that Neurontin may worsen existing mood and behavioral disturbances, including depression and suicidal behavior.

120. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Mr. Owens that Neurontin may worsen depression and may lead to suicide.

121. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Mr. Owens that Neurontin use has been associated with depression.

122. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Mr. Owens that Neurontin use has been associated with psychobiologic adverse events.

123. Defendants suppressed, concealed and failed to disclose to prescribing physicians and Mr. Owens that Neurontin use has been associated with suicidality (i.e., ideation, attempted and completed suicide).

124. Refractory epilepsy is a condition in which patients with epilepsy cannot control their seizures with existing anti-seizure medication. Refractory Epilepsy is a serious medical condition. Parke-Davis submitted on January 15, 1992, the New Drug Application (NDA 20-235, Gabapentin with a trade name of Neurontin), seeking approval for treatment as adjunctive treatment for refractory epilepsy. FDA risk benefit analysis for Neurontin was limited to refractory epileptic patients. FDA conducted no safety analysis prior to approval of Neurontin in people suffering from a psychiatric disorder or pain disorder.

125. Epilepsy clinical trials performed as part of Defendants' New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin. Of the 2048 people, 19.7% discontinued treatment due to adverse reactions. Depression and Suicidal Ideation was the ninth most common adverse reaction resulting in discontinuation of Neurontin.

126.    Epilepsy clinical trials performed as part of Defendants' New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin.  In the total exposed population of said New Drug Application, 78 patients reported depression as an adverse event (i.e., 5.3% of the population of patients).  There were seven reports of depression as serious adverse events, and nine patients who withdrew from studies because of depression.

127.    During Epilepsy clinical trials, performed as part of Defendants' New Drug Application for Neurontin, there was observed at least seven cases of "Depression" adverse events considered possibly or probably related to Neurontin by Defendants' Investigator; there was observed at least two cases of "Drug Overdose" adverse events considered possibly or probably related to Neurontin by Defendants' Investigator.

128.    During Defendants' Clinical Pharmacology Studies, performed as part of Defendants' New Drug Application for Neurontin, there were mood and behavioral disturbances or "psychobiologic" adverse events, including the following:  Abnormal Thinking (16), Depersonalization (11), Euphoria (6), Confusion (5), Nervousness (4), Hyperkinesia (3), Agitation (2), Personality Disorder (2), Abnormal Dreams (2), Emotional Lability (1).

129.    During Defendants' Clinical Epilepsy Studies, performed as part of Defendants' New Drug Application for Neurontin, there were the following mood and behavioral disturbances or "psychobiologic" adverse events:  Nervousness (58), Thinking Abnormal (37), Confusion (29), Depression (27), Emotional Lability (26), Anxiety (24), Agitation (8), Hostility (7), Doped Feeling (6), Euphoria (5), Hallucinations (4), Psychosis (4), Suicide Attempt (2), Personality Disorder (2), Apathy (1), Depersonalization (1), Overdose (1), Abnormal Dreams (1), Feeling High (1), Feeling Abnormal (1), Frustration (1), Hypomania (1), Paranoia (1), Psychiatric Disorder (1), Schizophrenic (1), Suicidal (1), Withdrawal Syndrome (1).

130.    During Defendants' Add-on Therapy Studies, performed as part of Defendants' New Drug Application for Neurontin, there were the following mood and behavioral disturbances or "psychobiologic" adverse events:  Confusion (57), Nervousness (56), Depression (38), Thinking Abnormal (32), Emotional Lability (20), Anxiety (18), Hostility (12), Overdose (12), Personality Disorder (12), Agitation (10), Euphoria (10), Forgetfulness (8), Depersonalization (7), Hallucinations (5), Psychosis (3), Suicide Attempt (3), Delirium (2), Neurosis (2), Paranoia (2), Aggression (1), Apathy (2), Manic Reaction (1), Mood Swings (1), Suicidal (1), Suicide Attempt (1), Suicide (1).

131.    During the Epilepsy Clinical Trials, performed as part of Defendants' New Drug Application for Neurontin, Defendants' medical investigators assessed the following Serious Adverse Events to be possibly or probably related to Neurontin:

    a.    Depression with attempted suicide by a seventeen year old male on 1,200 mg of Neurontin;

    b.    Depression with suicide ideation of a thirty six year old male on 1,200 mg of Neurontin.  Suicide ideation improved on tapering and discontinuance.

    c.    Depression with suicide ideation recurred when Neurontin was reintroduced at 1,500 mg of Neurontin;

    d.    Depression and attempted suicide by a seventeen year old female on 2,000 mg of Neurontin;

    e.    Depression which resolved with dose reduction of a twenty three year old female on 1,200 mg of Neurontin;

    f.    Drug overdose by a thirty one year old female on 1,800 mg of Neurontin;

    g.    Drug overdose by an eighteen year old male on 1,800 mg of Neurontin.

132.    Epilepsy clinical trials performed as part of Defendants' New Drug Application for Neurontin reflected safety information including the presence of positive dechallenge/rechallenge adverse events.  Dechallenge events included suicidal ideation,

depression and hostility. A positive rechallenge was documented in one patient for the adverse event of depression with suicide ideation, and Defendants' Investigator acknowledged the adverse event to be possibly or probably related to Neurontin.

133.    The FDA, in its 1992 pre-approval, Combined Medical-Statistical Review (hereinafter, "1992 FDA Review"), which was done to evaluate the limited sought-after indication of Adjunctive Medication in Refractory Partial Epilepsy, observed at least 369 treatment emergent "psychobiologic" adverse drug events in the total population of 2048 participants given Neurontin. These adverse events, when considered individually and classified using a modified COSTART-preferred terminology, occurred at a frequency of at least 1% or more among gabapentin treated patients who participated in placebo controlled studies. These individual mood and behavioral disturbances or "psychobiologic" adverse events are as follows: Thinking Abnormal 96/2048 (4.69%), Nervousness 92/2048 (4.49%), Depression 82/2048 (4.0%), Emotional Lability 38/2048 (1.86%), Anxiety 36/2048 (1.76%), Hostility 25/2048 (1.22%).

134.    Although FDA's 1992 Review was done to evaluate the limited sought-after indication of Adjunctive Medication in Refractory Partial Epilepsy, FDA medical reviewer, Cynthia McCormick, M.D., raised important concerns about the relationship between Neurontin and adverse events of depression and suicide. Specifically, the FDA 1992 Review sets forth the following:

> Less common but more serious events may limit the drugs [Neurontin's] widespread usefulness…[D]epression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts.

* * *

In its clinical database of 2048 patients, gabapentin has a risk profile that is uncertain, with five groups of important adverse events that have not been fully characterized, [including] clinically important depression …. Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy.

* * *

In conclusion, NDA 20-235 is approvable with appropriate and prominent labeling *for use in a specific population*."  [Emphasis added.]

135.    On or about December 15, 1992, the Peripheral and Central Nervous System Drugs Advisory Committee to the Department of Health and Human Services, Food and Drug Administration, had a public hearing and voted to recommend Neurontin for a very specific use in a very limited population (e.g., adjunctive treatment for refractory epilepsy).  The Advisory Committee did not consider the safety of Neurontin's use in any patient group other than sufferers of refractory epilepsy.  Defendant employees Dr. Spivey, Ms. Turner, Dr. Pierce, Dr. Fletcher, Mr. Parker, Ms. LaMoreaux and Dr. Charles Taylor were in attendance at said hearing where the following question and answer was posed regarding the limited expected use and indication for Neurontin:

Has the sponsor provided evidence that gabapentin is safe when used in the treatment of epilepsy? And again I would modify it to be used as an add-on in adult patients with intractable partial seizures.

* * *

We have a 10-to-0 vote in favor of that question.

136.    The FDA has consistently reaffirmed its findings from the FDA 1992 Review that its concern that depression while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide.  In a subsequent review dated May 12, 1992, and signed by FDA clinical reviewer on September 27, 1993, the FDA stated "there is no new data in Safety Update #3 which alter the safety profile of this drug as

presented the initial NDA and Safety Update #1 and 2." In another subsequent safety update dated December 15, 1993, the FDA again stated "there are no new data in Safety Update #4 which alter the safety profile of this drug as presented in the initial NDA and Safety updates #1, 2, and 3."

137.    Parke Davis and Warner Lambert had specific knowledge on or about December 7, 1992, via FDA's 1992 Review, that Neurontin's widespread usefulness was limited because of the occurrence of depression and suicide attempts during clinical trials; Parke Davis and Warner Lambert had knowledge of Neurontin's capacity to contribute to mood and behavioral disturbances, including depression and suicidality. Dr. Richard Spivey, then Senior Director of Regulatory Affairs at Parke Davis, obtained the FDA 1992 Review from the FDA. On or about December 7, 1992, Dr. Spivey provided the January 31, 1992 Review to the Neurontin Director of Regulatory Affairs at Parke Davis: Janeth Turner. On December 7, 1992, Ms. Turner provided the FDA 1992 Review to Dr. Mark Pierce, Parke Davis Vice President of Clinical Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of Drug Development. Between December 7, 1992 and December 9, 1992, Dr. Spivey, Ms. Turner, Dr. Pierce and Mr. Fletcher read and became aware of the 1992 FDA Review, including the following FDA findings regarding Neurontin:

> Less common but more serious events may limit the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts.

> \* \* \*

> In its clinical database of 2048 patients, gabapentin has a risk profile that is uncertain, with five groups of important adverse events that have not been fully characterized, [including] clinically important depression …. Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy.

* * *

In conclusion, NDA 20-235 is approvable with appropriate and prominent labeling for use in a specific population."

138.    On or about December 9, 1992, Dr. Spivey, Ms. Turner, Dr. Pierce, and Mr. Fletcher had a discussion via telephone with Dr. Russell Katz, the FDA Supervising Medical Officer, regarding the Neurontin New Drug Application, and with Ms. Nancy Chamberlain, the FDA Consumer Safety Officer regarding the Neurontin New Drug Application.  Said discussion included the substance of the aforementioned FDA 1992 Review.  As a consequence of this discussion, on or about December 9, 1992, upon information and belief,  Dr. Spivey, Ms. Turner, Dr. Pierce and Mr. Fletcher, learned that the widespread usefulness of Neurontin was limited because it was shown to be associated with depression and may lead to suicide, as it had led to several suicide attempts during clinical trials.

139.    On December 15, 1992, the Peripheral and Central nervous System Drugs Advisory Committee to the Department of Health and Human Services, Food and Drug Administration, conducted a public hearing that was attended by, *inter alia,* several employees of Parke Davis, including Dr. Spivey, Ms. Turner, Dr. Pierce, Mr. Fletcher, Mr. James Parker, Ms. Linda LaMoreaux, and Dr. Charles Taylor.  At said hearing, FDA presented the following information:

In the total exposed population of the NDA, 78, or 5.3 percent of patients, reported depression as an adverse event.  This included one subject in Phase I study.  There were seven reports of depression as serious adverse events and nine patients who withdrew from studies because of depression, some with suicidal ideation.

* * *

There may be some underrepresentation of certain categories; for example, in some cases, depression was reported as a serious adverse event, particularly if it resulted in hospitalization or was associated with suicidal ideation… The actual

incidence of treatment-emergent depression in which pharmacological
intervention was begun and maintained throughout the course of the study is not
known. The firm has provided the FDA with a breakdown of patients who
reported depression as an adverse event, and it's found that…of 78 patients who
reported depression as an adverse event, 19 had no prior history and 22 patients
required treatment for their symptoms.

140.    Defendants' employees Ms. Turner, Mr. James Parker, Ms. LaMoreaux and Dr.

Taylor were members of the Drug Development Team and New Product Committee whose stated

purpose was to explore new uses for Neurontin beyond the epileptic population.

141.    At no time did Defendants' employees Ms. Turner, Mr. Parker, Ms. LaMoreaux or

Dr. Taylor communicate to any other member of Defendants' Development Team, or New

Product Committee, the FDA's concern that "[l]ess common but more serious events may limit

the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent

occurrence in the epileptic population, may become worse and require intervention or lead to

suicide, as it has resulted in some suicidal attempts."

142.    Defendants undertook a plan to disseminate false and misleading information

about Neurontin by suppressing or otherwise intentionally failing to disclose to Mr. Owens'

prescribing physician(s) and Mr. Owens information about Neurontin's capacity to contribute to

mood and behavioral disturbances or "psychobiologic" adverse events, including depression and

suicidality.

143.    Defendants suppressed, concealed and failed to disclose to Mr. Owens and Mr.

Owens' prescribing physician(s) the FDA's concerns regarding Neurontin's association with

depression, suicidality, psychobiologic adverse events, including FDA's statement that "[l]ess

common but more serious events may limit the drugs [Neurontin's] widespread

usefulness…depression, while it may not be an infrequent occurrence in the epileptic population,

may become worse and require intervention or lead to suicide, as it has resulted in some suicidal

attempts." Suppressing, concealing and failing to disclose the FDA's concern that Neurontin may worsen depression and may lead to suicide contributed to Mr. Owens' physician(s) prescribing Neurontin to Mr. Owens for off-label uses.

144.   Defendants' actions in suppressing, concealing or otherwise failing to disclose Neurontin's association with suicidality, depression, and psychobiologic events were done with a strategic purpose to increase sales of Neurontin, including sales related to off-label uses. Defendants knew that disclosure of such an association with Neurontin would decrease sales; Defendants knew there was a financial, strategic advantage in not disclosing Neurontin's association with suicidality, depression, and psychobiologic adverse events.

145.   In or about April and May of 1995, Defendants performed a marketing assessment of proposed psychiatric indications for Neurontin.  In that marketing assessment, Defendants forecasted potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios:  with and without FDA approval.  Defendants' Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that Defendants would not seek approval to promote and sell the drug for these unapproved uses.

146.   In or about July of 1995, Defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to Defendants' Neurontin Development Team and to Defendants' Vice President for marketing.  That assessment stated that "there is no intention to fully develop the indication at this point."  Full development would have required submission of an NDA to the FDA for approval.

147.   As previously set forth above and incorporated by reference herein, commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater

detail above, Defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

148.    Upon information and belief, at all times during promotion of the sale and use of Neurontin for conditions other than the approved use (e.g., "off-label" uses), Defendants always suppressed, concealed, and failed to disclose Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality.

149.    To increase sales of Neurontin, Defendants affirmatively applied strategies to compare Neurontin with other competing pharmaceutical drugs that had warnings or otherwise greater disclosure of suicide related events.

150.    To increase sales of Neurontin, Defendants trained its sales force to minimize Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality.

151.    To increase sales of Neurontin, Defendants applied strategies to compare Neurontin with other competing pharmaceutical drugs, such as Keppra, which already had a specific warning related to suicide:  "Neurontin Backgrounder", "Competitive Information", and "Compare and Win" strategies were implemented.  Neurontin was portrayed as "Safe and Easy" compared to Keppra that had a "Suicide Warning".

152.    Defendants' comparison strategy wherein they suppressed, concealed and failed to disclose Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality, while at the same time emphasizing competing drugs that had a "Suicide Warning", increased sales of Neurontin, including sales for off-label uses.

153. Defendants' application of such comparison strategies directly or indirectly resulted in Mr. Owens' prescribing physician(s) prescribing Neurontin and Mr. Owens ingesting Neurontin.

154. On or about June 14-16, 1996, Defendants sponsored a "Consultants' Meeting" entitled  at the Island House Hotel in Orange Beach, Alabama where Defendants retained "Consultants", including William Shepherd Fleet, MD, of 3401 Medical Park Drive, Mobile, AL 36693, to be present. As a Consultant, Dr. Fleet was provided a financial honorarium, as well as financial contribution towards travel, meals and hotel room expenses.

155. At said "Consultants' Meeting" there was present Defendant Parke-Davis employees Jan Anderson and Andrea Shapiro, as well as Christine Kapple of Medical Education Systems, Inc.

156. Said "Consultants' Meeting" was entitled "New Frontiers in the Management of Seizure Disorders" and, upon information and belief, during said "Consultants' Meeting", "off-label" alternative indications for Neurontin were promoted as part of "Interactive Workshops" during said meeting.

157. Mr. Owens' prescriber, William Crotwell, M.D., was directly influenced to prescribe Neurontin for "off-label uses" to patients, including Mr. Owens, by William Shepherd Fleet, M.D., a paid Consultant of Defendants.

158. On May 1, 2007, Mr. Owens' prescriber, Dr. William Crotwell, provided testimony under oath related to the basis for his off-label prescribing habits of Neurontin, as follows:

    A.    Probably a lot of my off-label uses that I would have, I think, comes from a lot of word of mouth, from going to meetings to fellow doctors in town. Specifically with Neurontin, I've tried to rack my brain to think, and that's tough at my age. But thinking back, I remember two or three neurologists

> that was in town at that time when I started using it about nine, ten years
> ago that was using it a lot in very high dosage, and they got me, you know,
> I think, to using it…."

Q.    Who were the two or three neurologists that you referenced?

A.    I think one was Dr. Shep Fleet.  I think he was one of the major ones that
was using it.  He was using large doses.  That was the one I remembered in
the back of my head.  Some of the others then, I'm not sure.  I think it was
Perrien, but I'm sure of Dr. Fleet.

159.    Mr. Owens was prescribed Neurontin by his physician Dr. William Crotwell, an

orthopaedist.  As an orthopaedic physician, Dr. Crotwell did not prescribe Mr. Owens Neurontin

for any use or indication for which Neurontin was approved by FDA.

160.    Defendants' sales representative employee a/k/a Territory Manager, John Sansom,

detailed Mr. Owens' prescriber, Dr. William Crotwell, an orthopaedist, on approximately twenty-

three (23) occasions with respect to Neurontin.

161.    Upon information and belief, on said occasions, Defendants' sales representative

John Sansom promoted to Dr. William Crotwell unapproved uses for Neurontin, because Dr.

Crotwell was not an epileptologist or neurologist with patients for whom he would prescribe

Neurontin for approved uses.

162.    Upon information and belief, Mr. Owens' prescriber, Dr. William Crotwell, was

influenced to prescribe Neurontin for "off-label uses" to patients, including Mr. Owens, by

Defendants' sales representative employee a/k/a Territory Manager.

163.    Most doctors likely would never have heard of Neurontin but for the off-labeling

marketing efforts of Warner-Lambert and allegedly Defendants.  The inability to prove that

Warner-Lambert or Defendants contacted a doctor directly does not mean that that doctor was not

influenced by Warner-Lambert and Defendants marketing efforts.  Defendants' off-label

marketing of Neurontin indirectly influenced all, or substantially all, doctors prescribing

Neurontin in one of two ways.  First, a doctor who did not have direct contact with Defendants most likely was influenced in his prescribing habits by one who did.  Second, all, or substantially all, doctors were indirectly affected by Defendants' suppression of negative or adverse information about Neurontin that would have affected their prescribing habits.

164.    It seems unlikely that a responsible doctor who has never heard of Neurontin would prescribe Neurontin for an off-label use without first consulting the medical and scientific literature, a colleague, or a medical reference work.  To do so would be part of the doctor's professional and ethical responsibility.

165.    Doctors work in an environment where informal communications among fellow doctors, or "word-of-mouth," play an important role in the dissemination of information about drugs and treatments.  Colleagues are generally perceived as credible, independent, and reliable sources of information.  Studies have shown that doctors learn extensively from and draw upon their colleagues' clinical experience.  Indeed, academic research has found that the source most influential and encouraging first prescribing a new drug is colleagues.

166.    The academic literature has shown that social interactions among doctors can influence their prescribing behavior.  For example, brand-level network effects affect the rate at which a drug diffuses into the market.  Widespread use of a drug implicitly conveys important information about its safety and efficacy, which increases word-of-mouth communications and accelerates the rate at which others become aware of and adopt the drug.

167.    Even doctors who did not receive visits from Neurontin sales representatives were more likely to prescribe Neurontin off-label because of indirect influences of Neurontin's extensive promotional efforts.  The reason is that Neurontin promotional plans targeted the two areas physicians rely on most for a physician to not have heard about the product.  The makers of

Neurontin were well aware of these social networks and hoped to exploit them through their marketing efforts.

168.    The widespread use of Neurontin would further encourage doctors who may not have had direct contact with the drug company to prescribe the drug, because widespread use of a drug may convey information about its safety and efficacy, and, for physicians, may imply "accepted practice" and hence greater immunity to malpractice lawsuits. This could lead to the dominance of one drug - not necessarily the most efficacious or safest - despite the availability of close substitutes. This idea of high prescription volume signaling safety may have been especially relevant for Neurontin. More important, as Neurontin sales increased year-over-year, the indirect influences would have become stronger, encouraging physicians to prescribe Neurontin, regardless of whether or not they had direct contact with the company or received sales calls from Neurontin sales representatives.

169.    Given the high levels of detailing proposed by Defendants in 2002, it is unlikely that a doctor would be completely unaware of Neurontin, especially in the specialties where Defendants most heavily promoted Neurontin. Defendants' Neurontin sales representatives visited the majority of primary care physicians, neurologists, rheumatologists, and orthopedists. Since doctors share information and rely on each other for new information, any doctor who did not receive a personal visit would likely learn about Neurontin through a colleague who was visited.

170.    Because it was perceived as "safe and efficacious", Neurontin was listed on nearly all formularies. Neurontin's formulary status would have also created indirect influences encouraging prescriptions. If a doctor had a patient in need of treatment for one of the numerous off-label conditions for which Warner-Lambert and Defendants promoted Neurontin, the

physician may have prescribed Neurontin simply because it was on formulary, without ever having been personally contacted by the company or its sales representatives promoting Neurontin.

171.    Defendants unlawfully manipulated scientific "truth"" to convince by misrepresentation the entire medical community of the proposition that Neurontin could be therapeutically used for indications never approved by the FDA.

172.    Defendants' suppression, concealment and lack of disclosure, to Mr. Owens and Mr. Owens' prescribing physician(s), directly or indirectly resulted in Mr. Owens' prescribing physician(s) to prescribe Neurontin and for Mr. Owens to ingest Neurontin.

173.    Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality, directly or indirectly resulted in Mr. Owens' prescribing physician(s) not warning of the risks of depression and suicide associated with Neurontin.

174.    Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality directly or indirectly resulted in Mr. Owens' prescribing physician(s) failing to adequately monitor changes in mood and behavior caused by Neurontin.

175.    Defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality directly or indirectly prevented Mr. Owens' prescribing physician(s) from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Mr. Owens.

176.    Defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action to Mr. Owens and Mr. Owens' prescribing physician(s) in failing to inform the prescriber(s) that Neurontin increases Gaba and thereby reduces the release of neurotransmitters in the human brain, including serotonin and norepinephrine.

177.    Defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action to Mr. Owens and Mr. Owens' prescriber in failing to inform Mr. Owens and the prescriber(s) that Neurontin's mechanism of action, in particular Neurontin's effects on monoamine neurotransmitter release, may contribute to mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality.

178.    Defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action to Mr. Owens and Mr. Owens' prescriber(s) in failing to inform the prescriber(s) that Neurontin increases Gaba and thereby reduces the release of neurotransmitters in the human brain, including serotonin and norepinephrine, and that the reduction of such neurotransmitters was associated with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality.

179.    Defendants knew or should have known that there is a need to define Neurontin's mechanism of action so that a proper warning regarding monitoring patients for these mood and behavioral disturbances or psychobiologic adverse events would be presented in product labeling in a form that is understandable for prescribing physicians.

180.    Defendants knew or should have known that Neurontin would be used for off-label indications, such as those for which Mr. Owens herein was prescribed Neurontin, and with such knowledge Defendants should have taken action to inform prescribers and Mr. Owens that careful monitoring of patients ingesting Neurontin was required due to Neurontin's capacity to

increase Gaba and thereby reduce the release of monoamine neurotransmitters and consequently

Neurontin's capacity to contribute to mood and behavioral disturbances or psychobiologic

adverse events, including depression and suicidality.

181.    Defendants' intentional suppression, misrepresentation, concealment and lack of

disclosure as to Neurontin's  mechanism of action directly or indirectly resulted in preventing

Mr. Owens' prescribing physician, from being able to fully assess the risk-benefit analysis for the

underlying condition Neurontin was prescribed to Mr. Owens.

182.    Defendants' intentional suppression, misrepresentation, concealment and lack of

disclosure as to Neurontin's mechanism of action directly or indirectly resulted in preventing Mr.

Owens' prescribing physician from being able to fully monitor changes in Mr. Owens' mood and

behavior caused by Neurontin.

183.    Defendants intentionally suppressed, concealed or otherwise misrepresented the

utility of Neurontin in uses outside of its approved indications in failing to inform Mr. Owens

and Mr. Owens' prescriber(s) that it would be unethical to prescribe Neurontin to depressed

individuals.

184.    On or about June 18, 1999, Defendants' employed Atul C. Pande, M.D.,

F.R.C.P.C. as a Senior Director, Psychiatrist, and Dr. Pande stated the following, on June 18,

1999, at the Third Annual Conference on Bipolar Disorder, regarding the exclusion of purely

depressed patients from clinical trials wherein patients would be ingesting Neurontin:  "[W]e had

absolutely no evidence whatsoever that [Neurontin] was likely to be antidepressant and therefore,

we felt it ethically unjustified to include depressed patients."

185.    Defendants' intentional suppression, misrepresentation, concealment and lack of

disclosure that Defendants had no evidence that Neurontin was likely to be antidepressant

directly or indirectly resulted in preventing Mr. Owens' prescribing physician(s) from being able to fully monitor changes in Mr. Owens' mood and behavior caused by Neurontin.

186.    Defendants' intentional suppression, misrepresentation, concealment and lack of disclosure that Defendants had no evidence that Neurontin was likely to be antidepressant directly or indirectly resulted in the prevention of Mr. Owens' prescriber(s) from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Mr. Owens.

187.    Defendants were well aware that Mr. Owens' prescribing physician(s) and Mr. Owens would rely on the information concerning Neurontin (which suppressed, omitted, concealed and otherwise misrepresented the safety and efficacy of Neurontin), that Defendants provided to the Mr. Owens' prescribing physicians and Mr. Owens.

188.    Defendants provided this information which suppressed, omitted, concealed and otherwise misrepresented the safety and efficacy of Neurontin to induce Mr. Owens' prescribing physician(s) to induce the physicians to prescribe Neurontin to their patients, including Mr. Owens for either refractory epilepsy or off-label uses.

189.    Mr. Owens' prescribing physician(s) and Mr. Owens relied on the information provided by Defendants, which suppressed, omitted, concealed and other wise misrepresented the safety and efficacy of Neurontin, and to their detriment as Mr. Owens sustained serious injury.

190.    Defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, which are not detailed herein but will be determined in discovery.

191.    Defendants affirmatively and fraudulently misrepresented that Neurontin was safe and effective in the treatment of pain when, in actuality, Neurontin was ineffective in treating pain and instead influenced users to engage in self-destructive behavior.

192.    Defendants affirmatively and fraudulently misrepresented that Neurontin was safe for human consumption in general, when, in actuality, Neurontin influenced users to engage in self-destructive behavior.

193.    Defendants knew that Neurontin was not safe and effective in the treatment of pain and that Neurontin was not safe for human consumption in general because such drug influenced users to engage in self-destructive behavior.

194.    Defendants knew that physicians, health care providers, and mental health care providers would justifiably rely upon Defendants' misrepresentations in prescribing Neurontin in the treatment of pain and in prescribing Neurontin for human consumption in general for the treatment of illnesses and medical and mental conditions and that the public, including persons such as Mr. Owens, would justifiably rely upon Defendants' misrepresentations in using Neurontin as prescribed by physicians, health care providers and mental health care providers in the treatment of pain and for other prescribed uses.

195.    Mr. Owens justifiably relied upon Defendants' misrepresentations and, accordingly, consumed Neurontin as prescribed by Mr. Owens' physician in the treatment of pain.

196.    By reason of Mr. Owens' consumption of Neurontin in justifiable reliance upon Defendants' fraudulent misrepresentations, Mr. Owens sustained injuries and was caused to commit suicide.

197.    That by reason of the facts and premises aforesaid, Mr. Owens' beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, Plaintiff seeks punitive and exemplary damages against Defendants in an amount to be determined upon the trial of this matter.

198.    Defendants negligently, recklessly, intentionally and fraudulently made material misrepresentations that Neurontin was safe and effective.  Defendants represented Neurontin as safe so that the medical community, including Mr. Owens' physician, in particular, would rely upon said representations when prescribing said product.

199.    Prior to and following the introduction of Neurontin into the market as a prescribable pharmaceutical medication, Defendants set in motion a public relations and advertising/marketing campaign to market their product to the medical community by way of press releases and print advertisements in medical publications.  Defendants' representations made concerning Neurontin as a safe and effective drug were made so that Mr. Owens' physician and the general medical community would rely on said representations and write prescriptions for this drug.  In fact, Mr. Owens' physician did rely on Defendants' representations.

200.    At the time Defendants made these representations, it was aware that these representations were false and/or made these representations with a reckless disregard to their truth.  As a result of Defendants' fraud and misrepresentation, Mr. Owens suffered various injuries and damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus cost.

## DAMAGES

201.    Upon the trial of this case, it will be shown that Mr. Owens was caused to sustain injuries, damages and death as a direct and proximate result of Defendants' conduct and Plaintiff will respectfully request the Court and jury to determine the amount of damages Plaintiff has suffered and incurred.

202.    At all times relevant hereto, Defendants actually knew of the defective nature of their product as herein set forth and continued to design, manufacture, market, distribute and sell their product so as to maximize sales and profits at the expense of the public health and safety in conscious disregard of the foreseeable harm caused by this product.  Defendants' conduct exhibits such a entire want of care as to establish that its actions were a result of fraud, ill-will, recklessness, gross negligence, or willful or intentional disregard of the Plaintiff's individual rights.  The Plaintiff, therefore, is entitled to punitive damages from Defendants.

203.    Plaintiff hereby requests a trial by jury on all issues in this case.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that the Defendants be cited to appear and answer herein; that upon final trial herein, Plaintiff recovers damages as set forth above from Defendants, including cost of Court, pre-judgment and post-judgment interest at the legal rates, and that Plaintiff have such other and further relief, both general and special at law and in equity, to which she may be justly entitled under the facts and attending circumstances.

Dated:  April 7, 2008                                     Respectfully submitted,

                                                          FINKELSTEIN & PARTNERS, LLP
                                                          Attorneys for Plaintiff


                                                            /s/ **Andrew G. Finkelstein**
                                                          Andrew G. Finkelstein, Esquire
                                                          436 Robinson Avenue
                                                          Newburgh, NY  12550
                                                          (800) 634-1212
                                                          (845) 562-3492 (fax)
                                                          email:  afinkelstein@lawampm.com

Frank Woodson, Esquire
BEASLEY, ALLEN, CROW,METHVIN
 PORTIS & MILLS, P.C.
Attorneys for Plaintiff
Post Office Box 4160
Montgomery, AL  36103-4160
(334) 269-2343
(334) 954-7555 (fax)
email:  frank.woodson@beasleyallen.com

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on April 7, 2008.

Dated:  April 7, 2008

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein

EXHIBIT A

FindLaw
WWW.FINDLAW.COM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>Plaintiff, )<br><br>v. )<br><br>WARNER-LAMBERT COMPANY LLC )<br><br>Defendant. ) | Crim. No.<br><br>Violations:<br>Title 21, United States<br>Code Sections 331(a),<br>331(d), 352(f)(1),<br>and 355(a) |

**INFORMATION**

THE UNITED STATES ATTORNEY FOR THE DISTRICT OF MASSACHUSETTS
CHARGES THAT:

## GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise alleged:

### BACKGROUND

1.      WARNER-LAMBERT COMPANY LLC (hereinafter "WARNER-LAMBERT"),
was a corporation operating and existing under the laws of the State of Delaware. Its principal
place of business was Morris Plains, New Jersey. WARNER-LAMBERT's Parke-Davis Division
was engaged in, among other things, the development, manufacture, promotion, sale, and
interstate distribution of prescription drugs intended for human use in the United States.
WARNER-LAMBERT's pharmaceutical manufacturing facilities were located in Puerto Rico,
from which it shipped products to all fifty states and the District of Columbia.

2.      The Federal Food, Drug and Cosmetic Act ("FDCA"), among other things
governs the lawful interstate distribution of drugs for human use. As codified at Title 21, United
States Code, Sections 331 et seq., and specifically at § 355(b), the FDCA, and its implementing
regulations, require that before a new drug may legally be distributed in interstate commerce, a
sponsor of a new drug product must submit a New Drug Application ("NDA").

3.      The FDCA required, at 21 U.S.C. § 355, that the NDA sponsor submit to the
United States Food and Drug Administration ("FDA"), as part of an NDA, proposed labeling for
the proposed intended uses for the drug which included, among other things, the conditions for
therapeutic use. The NDA must also provide, to the satisfaction of FDA, data generated in

2

randomized and well-controlled clinical trials that demonstrates that the drug will be safe and effective when used in accordance with the proposed labeling.

4.     The FDCA, at 21 U.S.C. § 355, prohibited the introduction into interstate commerce of any new drug, unless an approval of an NDA is effective. Only after the NDA, including the proposed labeling, was reviewed and approved by FDA, was the sponsor permitted by law to promote and market the drug, and only for the medical conditions of use specified in the approved labeling, for which use FDA had found sufficient evidence of safety and effectiveness. Uses unapproved by FDA, not included in the drug's approved labeling, are known as "unapproved uses" or "off-label uses."

5.     The FDCA, and the regulations promulgated thereunder, required that in order to label or promote a drug for a use different than the conditions for use specified in the approved labeling, the sponsor had to file a new NDA, or amend the existing NDA, by, among other requirements, submitting the newly proposed indications for use and evidence, in the form of randomized and well-controlled clinical studies, sufficient to demonstrate that the drug would be safe and effective for the newly proposed therapeutic use or uses. Only upon approval of the new NDA could the sponsor promote the drug for the new intended use.

6.     The FDCA, at 21 U.S.C. § 352(f)(1), provided that a drug was misbranded if, among other things, the labeling did not contain adequate directions for use. As the phrase is used in the FDCA, adequate directions for use cannot be written for medical indications or uses for which the drug had not been proven to be safe and effective through well-controlled clinical studies because that would be misleading under Section 352(a).

7.      The FDCA, 21, U.S.C. §§ 331(a)(d), 333(a), and 355, prohibits the distribution in interstate commerce of an unapproved new drug or of a misbranded drug.

8.      In or about 1993, WARNER-LAMBERT submitted an NDA for approval of a drug called Neurontin (also known by the chemical name gabapentin), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R.§ 310.3 (h)(4) and (5) . In that application, WARNER-LAMBERT sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. On or about December 30, 1993, FDA approved Neurontin for that specific use only.   This approved use for Neurontin will be referred to throughout this Information as the "Approved Use." Because WARNER-LAMBERT had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than the Approved Use. Further, Neurontin was not, pursuant to 21 U.S.C. § 355(i), exempt from the prohibition of introducing into interstate commerce a new drug for medical indications beyond the conditions prescribed, recommended, or suggested in the approved labeling thereof.

9.      As described in this Information, from at least June of 1995 through at least August 20, 1996, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD); and migraine headaches, among other uses.

4

These and other unapproved uses for Neurontin will be collectively referred to in this Information as the "Unapproved Uses."

10.    WARNER-LAMBERT did not file a new NDA seeking FDA approval for any of these Unapproved Uses during the time period addressed in this Information. Of these Unapproved Uses, only post-herpetic neuralgia has ever received FDA approval, and that approval was applied for and received after the events described in this Information.

### WARNER-LAMBERT'S STRATEGY FOR NEURONTIN

11.    WARNER-LAMBERT conducted evaluations of the market potential for certain of the Unapproved Uses for Neurontin, including but not limited to: post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

12.    In or about the fall of 1995, WARNER-LAMBERT's Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including conference calls on pain and a pain consultant meeting.

13.    Certain of WARNER-LAMBERT's annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies, and tactics for increasing sales of the Unapproved Uses of the drug. The marketing plans budgeted for and funded these tactics.

14.    From early 1995, on repeated occasions, WARNER-LAMBERT determined not to seek FDA approval for certain Unapproved Uses.

5

15.     In or about April and May of 1995, WARNER-LAMBERT performed a Marketing Assessment of proposed psychiatric indications for Neurontin. In that Marketing Assessment, WARNER-LAMBERT forecast potential revenue from Neurontin for bipolar and anxiety treatment under two scenarios: with and without FDA approval. WARNER-LAMBERT's Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that the company would not seek approval to promote and sell the drug for these Unapproved Uses.

16.     In or about July of 1995 WARNER-LAMBERT's assessment of Neurontin's market potential for neuropathic pain was distributed to its Neurontin Development Team and to a WARNER-LAMBERT Vice President for Marketing. That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to FDA for approval.

17.     One of the principal factors WARNER-LAMBERT considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that WARNER-LAMBERT had been developing. The company expected this new drug would be approved by FDA not only for epilepsy but also for a variety of uses beyond Neurontin's Approved Use.

18.     Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin. Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in WARNER-LAMBERT's original NDA approval for Neurontin. If WARNER-LAMBERT sought and obtained approval for any of the

Unapproved Uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those Unapproved Uses. WARNER-LAMBERT was concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

### WARNER-LAMBERT'S PROMOTION OF NEURONTIN FOR UNAPPROVED USES

19.     From in or about June of 1995 through in or about August 20, 1996, by certain of the conduct described in greater detail below, WARNER-LAMBERT promoted the sale and use of Neurontin for certain conditions other than the Approved Use in Massachusetts and elsewhere:

### OFF-LABEL PROMOTION THROUGH SALES REPRESENTATIVES

20.     In October 1995, a member of WARNER-LAMBERT's Epilepsy Disease Team circulated a memorandum to a group including other senior members of WARNER-LAMBERT's Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 WARNER-LAMBERT sales representatives for whom data was available in a two month period, was for off-label use of Neurontin. Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

21.     On or about July 10, 1996, a WARNER-LAMBERT sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

22.     Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure. This same document, entitled "Neurontin Can Do/Can't Do," stated that sales

7

representatives could do lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

## OFF-LABEL PROMOTION THROUGH MEDICAL LIAISONS

23.     WARNER-LAMBERT employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasion, a WARNER-LAMBERT medical liaison promoted Neurontin for Unapproved Uses:

(a)  In or about June of 1996, a WARNER-LAMBERT sales representative requested that a WARNER-LAMBERT medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

(b)  The sales representative and the medical liaison selected the topic for the presentation to the local medical society. After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c)  Among the topics of the presentation was the use of Neurontin for Unapproved Uses.

(d)  During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of Unapproved Uses.

(e) After the presentation, a WARNER-LAMBERT Medical Director praised the event as "another great example of use of the medical liaisons" and an Area Business Manager called it an "outstanding utilization of . . . one of the medical affairs.liaisons."

24.    In or about May 1996, a WARNER-LAMBERT Medical Director based in the Northeast CBU sent a voicemail message to the Medical Liaisons in the Northeast CBU in which he stated:

> What we'd like you to do is, any time you're called out just make sure that your main focus out of what you're doing is on Neurontin . . . When we get out there, we want to kick some ass, we want to sell Neurontin on pain. All right? And monotherapy and everything that we can talk about, that's what we want to do.

One or more Medical Liaisons in the Northeast CBU interpreted this statement to mean that he or she should promote Neurontin for Unapproved Uses and thereafter, in or about May and June 1996, promoted Neurontin for neuropathic pain, an unapproved use.

## OFF-LABEL PROMOTION THROUGH CONSULTANTS' MEETINGS
## AND ADVISORY BOARDS

25.    WARNER-LAMBERT organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida on April 19-21, 1996. Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to Unapproved Uses of Neurontin.

26.    WARNER-LAMBERT invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs. As part of this event, WARNER-LAMBERT paid for accommodations and meals for the invited doctors and

their spouse or guest, and paid an honorarium to each of the doctor attendees. Doctors who acted as faculty were paid between $1,500 and $2,000.

27.     Among the presentations made to the physicians in attendance was one relating to Unapproved Uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances." During this presentation, Neurontin was promoted for use in the treatment of pain.

28.     Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs." During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol, and pain.

29.     On or about May 8, 1996, following the Jupiter Beach conference, WARNER-LAMBERT circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations. WARNER-LAMBERT told its employees that: "[t]he meeting was a great success and the participants were delivered a hard-hitting message about Neurontin." WARNER-LAMBERT distributed to these employees a form entitled "Jupiter Beach Trending Worksheet" which was intended to be used to gauge the effect of the meeting on the prescribing by doctors who attended the Jupiter Beach meeting.

30.     From August 1-5, 1996, WARNER-LAMBERT organized an "advisory board meeting," in Atlanta, Georgia in conjunction with the 1996 Summer Olympics. WARNER-LAMBERT expressly instructed several of the physician speakers to address some of the Unapproved Uses.

10

31.    During that meeting, WARNER-LAMBERT hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies.  The company had already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on WARNER-LAMBERT's behalf at prior meetings.

32.    Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

<u>OFF-LABEL PROMOTION THROUGH TELECONFERENCES</u>

33.    In or about January, 1996, a WARNER-LAMBERT Vice President of the Southeast Customer Business Unit sent a memorandum to WARNER-LAMBERT sales representatives listing certain goals, including: "Utilize the Medical Liaison Group to target the Neurontin, Pain & Psychiatric market.  Objective to conduct twice weekly Pain Teleconferences moderated by key Neuro Consultants.  Goals 250 Physicians Participants quarterly."

34.    On or about March 1, 1996, WARNER-LAMBERT sponsored such a teleconference moderated by a WARNER-LAMBERT employee with a pain specialist as a speaker on Neurontin.  The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

35.    On or about March 28, 1996, a WARNER-LAMBERT Medical Director in the Northcentral Customer Business Unit sent a memorandum to WARNER-LAMBERT Medical Liaisons in that unit instructing them to hold a series of teleconferences with doctors to provide clinical updates on Neurontin, including monotherapy epilepsy data and non-epilepsy use data entitled "Neurontin, A Clinical Update."

11

36.    In or about May, 1996, a WARNER-LAMBERT Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

12

## COUNT ONE: 21 U.S.C. §§ 331(d), 333(a)(2) & 355(a)

### (Distribution of an Unapproved New Drug)

37. The allegations contained in paragraphs 1 through 36 are realleged and incorporated herein as if set forth in full.

38. Beginning as early as in or about April 1995, and continuing thereafter until at least in or about August 20, 1996, in the District of Massachusetts, and elsewhere,

### WARNER-LAMBERT,

after previously having been convicted of violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331 and 333, did introduce and cause the introduction into interstate commerce from Puerto Rico and elsewhere, directly and indirectly, into Massachusetts and elsewhere, quantities of Neurontin, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p), which drug was intended for use for the treatment of neuropathic pain, bipolar disorder, as monotherapy for epilepsy, and other Unapproved Uses. No approval, pursuant to 21 U.S.C. § 355, was in effect with respect to Neurontin for use in these conditions.

All in violation of 21 U.S.C. §§ 331(d), 333(a)(2), and 355(a).

## COUNT TWO: 21 U.S.C. §§ 331(a), 333(a)(2) & 352(f)(1)

### (Distribution of a Misbranded Drug:  Inadequate Directions for Use)

39.     The allegations contained in paragraphs 1 through 36  are realleged and incorporated herein as if set forth in full.

40.     Beginning as early as April 1995, and continuing thereafter until at least in or about August 20, 1996, in the District of Massachusetts and elsewhere,

### WARNER-LAMBERT,

after previously having been convicted of violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331 and 333, did introduce and cause the introduction into interstate commerce from Puerto Rico and elsewhere, directly and indirectly, into Massachusetts and elsewhere, quantities of Neurontin, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p), which drug was intended for use for the treatment of neuropathic pain, bipolar disorder, as monotherapy for epilepsy, and other Unapproved Uses, and which was misbranded within the meaning of 21 U.S.C. § 352(a), in that Neurontin's labeling lacked adequate directions for such uses.

All in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 352(f)(1).

14

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS


THOMAS E. KANWIT
ASSISTANT U.S. ATTORNEY


May 13, 2004

15