UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                       ::
In re:   NEURONTIN MARKETING,                                          :
         SALES PRACTICES AND                                           :
         PRODUCTS LIABILITY LITIGATION                                 
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                       ::
THIS DOCUMENT RELATES TO:                                              ::
                                                                       ::
  ALL MARKETING AND SALES PRACTICES ACTIONS                            ::
                                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**DEFENDANTS' OPPOSITION TO THE COORDINATED PLAINTIFFS'
MOTION TO COMPEL DEFENDANTS TO PRODUCE ALL BUSINESS AND
OPERATING PLANS RELATING TO THIRD PARTY PAYORS AND TO PRODUCE
<u>AN ADEQUATELY PREPARED RULE 30(b)(6) WITNESS</u>**

While packaged as a motion that purportedly seeks to cure alleged discovery deficiencies, Plaintiffs' motion actually seeks to re-open discovery for new and additional 30(b)(6) depositions of the Defendants and to re-litigate issues previously decided by this Court. Plaintiffs previously moved the Court to compel the Defendants to produce documents and 30(b)(6) witnesses regarding third-party-payer communication issues. (Dkt. # 827). And during the September 20, 2007 hearing regarding this motion, Plaintiffs specifically sought documents and 30(b)(6) discovery regarding the Defendants' communications with third-party payers (TPPs), the TPPs' pharmaceutical benefit managers and the physicians that treated the TPPs' insureds.[1] Summing up what really lied at the heart of Plaintiffs' discovery request, Plaintiffs' Counsel argued: "So we wanted something very simple and straightforward, if you had communications

---

[1] Sept. 20, 2007 Hr'g Tr. at 64-66 (attached as Ex. 1 to the April 9, 2008 Declaration of Nicholas P. Mizell) All subsequent citations to exhibits refer to exhibits of the Mizell Declaration.

with third party payers about Neurontin give us the communications. … Give us the communications if you have them and give us someone who can talk generally about them."[2]

Granting in part and denying in part Plaintiffs' Motion, the Court rejected Plaintiffs' overly broad and unduly burdensome requests and limited the scope of 30(b)(6) discovery to: "The marketing or promotion of Neurontin directly to the named Third Party Payors," and "Pfizer's organizational structure used for communications with Third Party Payors including but not limited to the identification of individuals responsible for such communications, the types and categories of such communications, and to identify any databases that may exist containing the contents of such communications."[3] In addition, the Defendants were directed to "produce to Plaintiffs from the National Accounts department, documents relating to communications with named Third Party Payors regarding Neurontin."[4] In compliance with this Order, the Defendants produced responsive documents to Plaintiffs on November 17, 2007, and while Plaintiffs chose not to ask him a single question about these documents, the Defendants also prepared and produced Pfizer Vice President Jeff Henderson for two full days of deposition regarding the specific areas of inquiry set forth in Discovery Order 14.

Despite the fact that the Defendants fully discharged their discovery obligations under Discovery Order 14 and Rule 30(b)(6), and ignoring the Court's previous ruling that 30(b)(6) discovery regarding any communications with physicians that treated TPP insureds would be unduly burdensome, Plaintiffs in the instant motion nevertheless seek to burden the Defendants with new and additional 30(b)(6) discovery related to any communications with physicians that treated the named TPP plaintiffs' insureds. The Court should reject this misguided attempt to re-

---

[2] *Id*. at 64.
[3] Discovery Order 14 (Ex. 2) at pp. 3-4.
[4] *Id*. at 4.

2855244v1

open discovery and re-litigate these previously decided discovery issues and deny Plaintiffs'
Motion to Compel.

## BACKGROUND

Plaintiffs first noticed a 30(b)(6) deposition of the Defendants regarding third-party-payer communication issues on June 11, 2007. Though the parties were continuing to confer and correspond regarding an agreed-upon scope for this deposition, Plaintiffs insisted that the deposition go forward in mid-July. The Defendants, therefore, were forced to move the court for a protective order, and the Court directed the parties to continue to meet and confer.[5]

The parties continued to confer and correspond regarding the scope of this deposition, but unwilling to agree to Defendants' proposals, Plaintiffs filed a Motion to Compel Discovery re: Communication Between Defendants and Third Party Payors (Dkt. # 827). The parties argued the motion before the Court during the September 20, 2007 Motion Hearing, and, on September 27, 2007, the Court granted in part and denied in part Plaintiffs' motion to compel in Discovery Order 14.[6]

On December 4, 2007, and consistent with Discovery Order 14, Defendants identified Jeff Henderson as their 30(b)(6) designee and notified Plaintiffs of the subject matters for which he was designated to testify. Mr. Henderson is a 17-year employee and current Vice President of the business unit that serves as a liaison between Pfizer and TPPs. In this position, Mr. Henderson's responsibilities include communications with TPPs (otherwise known as managed market customers), as well as the development of Pfizer's TPP strategies. In previous positions with Pfizer, Mr. Henderson was Vice President of Managed Markets West from 2005 to 2007;

---

[5] Mizell Decl. at ¶ 3.
[6] *Id*. at ¶¶ 5-6.

2855244v1

Senior Director for National Accounts, Health Plans from 2002 to 2005; and a Regional Account Manager from 1996 to 2000. All of these positions involved communications with TPPs.

Plaintiffs deposed Mr. Henderson for two full days on December 5 and 6, 2007. Based on his first-hand knowledge, years of relevant experience and personal investigation and document review, Mr. Henderson provided detailed testimony about the many changes in the relevant organizational structure and personnel over a more than seven-year period, the identity of specific individuals and their respective and often changing areas of responsibility, the types of communications they had with TPPs, and the databases that contained related information.[7]

Following the Henderson Deposition, the parties have engaged in a meet and confer process in an attempt to resolve both related and unrelated discovery issues. Included among these issues was Plaintiffs' request that Pfizer produce any operating or business plans that pertained to the named third-party-payer plaintiffs. Though Mr. Henderson had testified that the plans would not contain any Neurontin-specific third-party-payer marketing strategies because Pfizer had decided – following its merger with Warner-Lambert – not to promote Neurontin to third-party payers, in a good-faith effort to resolve a discovery issue without motion practice the Defendants agreed to search for and produce any business or operating plans created during the relevant period and containing any references to Neurontin. On February 13, 2008, Defendants produced a CD to Plaintiffs containing numerous operating and business plans from within the operative discovery period in this case that related to Aetna and Kaiser and included references to Neurontin.[8]

On March 5, 2008, the parties met and conferred and Plaintiffs' counsel requested an additional four hours to continue Mr. Henderson's 30(b)(6) deposition without any limitations as

---

[7] *Id.* at ¶ 9.
[8] *Id.* at ¶ 12.

to the scope of the continued examination. And, notwithstanding the provisions of Discovery Order 14 expressly limiting the scope of this discovery to the "marketing or promotion of Neurontin directly to the named Third Party Payers," plaintiffs sought 30(b)(6) testimony about any Neurontin-related communications with physicians that treated the named TPP plaintiffs' insureds. In particular, plaintiffs seek new and additional 30(b)(6) discovery regarding:

1. Any information that defendants have regarding the marketing or promotion of Neurontin or gabapentin to physicians affiliated with, or who prescribed mediations to insureds of, named Third-Party payors during the class period;

2. All documents created or possessed by Defendants concerning the marketing or promotion of Neurontin or gabapentin to physicians affiliated with, or who prescribed medications to the insureds of, the Coordinated Plaintiffs or any other named Third-Party Payor; and

3. Any information that Defendants have regarding the creation and contents of business or operating plans pertaining to the Plaintiffs named in the Coordinated Complaint and the Third-Party Payors named as Plaintiffs in the Class Complaint, including physicians affiliated with any such plaintiff or who prescribed Neurontin or gabapentin to any insured of any such physician.

Because these topics are far afield from the Defendants' obligations to prepare and produce a designee regarding the marketing or promotion of Neurontin <u>directly to</u> the named TPP plaintiffs under Discovery Order 14, the Defendants declined Plaintiffs' request for new and additional 30(b)(6) discovery. Consequently, Plaintiffs filed the instant motion to compel. The Court, however, should deny Plaintiffs' motion and thereby reject Plaintiffs' attempts to overturn Discovery Order 14 and re-open discovery.

<u>**ARGUMENT**</u>

**I.     THE SCOPE OF DISCOVERY ORDER 14**

As they must, Plaintiffs acknowledge and concede that Discovery Order 14 limited their 30(b)(6) discovery concerning TPP communication issues to: "The marketing or promotion of Neurontin directly to the named Third Party Payors." *See* Nussbaum Decl. ¶ 6. And the Court

expressly defined "named Third Party Payors" to mean "the Plaintiffs named in the Coordinated Complaint and the Third Party Payors named as Plaintiffs in the Class Complaint."[9] Plaintiffs nevertheless urge the Court to abandon this plain-meaning and common-sense construction and suggest that the Court intended to include physicians "affiliated" with the named third-party-payor plaintiffs when it struck Plaintiffs' proposed Topic 3 as duplicative of the 30(b)(6) inquiry permitted by the Court. But Plaintiffs ignore the Court's reasoning that the "relevant" testimony sought in Plaintiffs' Topic 3 – i.e., the marketing and promotion of Neurontin directly to the named Third Party Payors – was duplicative, leading to the logical conclusion that the Court applied the same limits to Topic 3 as it did to the other Topics in Plaintiffs' deposition notice. Moreover, Plaintiffs' newfound theory regarding the meaning of the term "named Third-Party Payor" is belied by their December 3, 2007 amended Notice of 30(b)(6) deposition, in which they significantly narrowed the definition of "Third Party Payors" to mean "the Plaintiffs named in the Coordinated Complaint and the Plaintiffs named in the Class Complaint." *See* Mizell Decl. ¶ 7.

In fact, it has long been and should remain an uncontested issue between the parties that communications between the defendants and TPPs regarding TPP-related issues, such as formulary placement and contracting for rebates, are separate and distinct from any communications with the physicians who treated the TPP's insureds. Contrary to the assertion in the instant motion, Plaintiffs have acknowledged that Permanente Medical Group is not a named TPP plaintiff. In both depositions and written discovery – when they believe it is to their advantage – Plaintiffs have distinguished the TPP health plan (Kaiser) from the physician group

---

[9] Discovery Order 14 (Ex. 2) at 3 n.2.

2855244v1

(Permanente) with which it contracts for services.[10] For example, in a letter dated June 4, 2007, Plaintiffs advised that they could not provide Permanente Medical Group physicians for deposition because the physicians *were not employed by Kaiser and thus were not parties to the lawsuit*:

> Contrary to statements made in your letter, these three individuals are not employed by Kaiser . . . . Therefore, these three individuals are not parties to this litigation and we do not believe that the information sought in these depositions will lead to the discovery of admissible evidence.[11]

And Kaiser Foundation Health Plan's 30(b)(6) designees have not referred to any communications between the defendants and Permanente Medical Group physicians when asked to identify any Neurontin-related communications between the plaintiff health plan and the defendants.[12]

Kaiser's counsel has stood before the Court and stated: "Except the problem is that the physicians are not actually employees of Kaiser. Kaiser contracts with physician groups." *See* Sept. 27, 2006 Hr'g Tr. (Ex. 9) at 54:17-21. Thus, it contradicts not only their previously-stated positions, but also the real-world facts, for Plaintiffs to now aver that Permanente Medical Group physicians are named parties in the litigation such that communications with them constitutes communications with named plaintiff Kaiser.

## II.     DEFENDANTS PRODUCED AN ADEQUATELY PREPARED 30(B)(6) WITNESS TO TESTIFY TO TOPICS AS DESIGNATED IN DISCOVERY ORDER 14

A company need only make a reasonable effort to prepare a Rule 30(b)(6) designee and "absolute perfection in preparation" is not required.  *Wilson v. Lakner*, 228 F.R.D. 524, 528 (D.

---

[10]  *See, e.g.,* Carver Dep. (Ex. 7) at 434:11-435:3 (MS. NUSSBAUM: ". . . the relationship between the entities is simply a contractual relationship and nothing more.  We've taken that position in front of Justice [sic] Saris, we've taken that position in front of Judge Sorokin.  That information is publicly available, if you go online, you can research the corporate structures yourself and that's the situation.").

[11] *See* Ex. 8.
[12] *See* Carver Dep. (Ex. 7) at 292:12 -294:17.

Md. 2005). *See also United States v. Mass. Indus. Fin. Agency*, 162 F.R.D. 410, 412 (D. Mass. 1995) (denying motion to compel after the court found that the witness had been adequately prepared and any deficiencies were not "tantamount to a complete failure of the agency to appear" and the agency did not "act[] willfully or in bad faith to obstruct discovery").

Pfizer has met its obligations under Rule 30(b)(6) in all of the areas identified in Discovery Order 14. The Defendants produced documents as required by Discovery Order 14 to Plaintiffs on November 17, 2007, and Defendants prepared and produced Mr. Henderson for two full days of deposition regarding "The marketing or promotion of Neurontin directly to the named Third Party Payors," and "Pfizer's organizational structure used for communications with Third Party Payors including but not limited to the identification of individuals responsible for such communications, the types and categories of such communications, and to identify any databases that may exist containing the contents of such communications." *See* Discovery Order 14 (Ex. 2) at pp. 3-4. Mr. Henderson had years of supervisory experience in this area and first-hand knowledge and expertise regarding TPP communication issues. He reviewed deposition transcripts and devoted 10-13 hours meeting with counsel, interviewing employees and reviewing documents in preparation for his deposition. Henderson Dep. (Ex. 6) at 134:4-14. This amount of preparation, coupled with the fact that Mr. Henderson provided detailed deposition testimony demonstrates that he was adequately prepared to testify to all areas of inquiry for which he was designated.

Plaintiffs attempt to use two email threads to call into question the adequacy of Henderson's preparation to testify as a 30(b)(6) designee. Neither document, however, contradicts his testimony that Pfizer did not promote Neurontin to third-party-payer Kaiser. Plaintiffs first reference an email discussion that includes an email written by Alan Partain, a

Pfizer sales representative, discussing Pfizer potentially contracting with Kaiser for Neurontin. The document on its face reflects only a proposal to contract with Kaiser for Neurontin, and as Mr. Henderson explained at his deposition, the decision had already been made not to promote Neurontin to third-party payers and this policy did not change in light of this document.

Plaintiffs also refer to a document containing an email written by Pfizer employee Curtis Reese concerning a display that would be presented to physicians that treated Kaiser's insureds – a document produced to Plaintiffs well before the Mr. Henderson's deposition but about which they did not ask him any questions. On its face, this document relates to communications with physicians, and not TPP-related communications such as formulary placement or rebate contracting with Kaiser Foundation Health Plan.

Further, despite previous written discovery requests asking TPP Plaintiff Kaiser to produce documents containing Neurontin-related communications with the defendants, neither the originating email of the thread contained in this document, nor any document like it was ever produced by Kaiser. This naturally leads to the conclusion that Kaiser has taken the position that this document does not relate to marketing or promotional communications between itself and the defendants. And notwithstanding Plaintiffs' assertions to the contrary, this document does not focus on unapproved uses of Neurontin. Instead, it relates to Kaiser's then-existing policy of encouraging the off-label use of tricyclic antidepressants as a first or second line agent for post-herpetic neuralgia, despite the FDA's approval of Neurontin for this indication.[13]

A.    **No Further Testimony is Needed Regarding Operating and Business Plans Because They are Consistent with Mr. Henderson's Testimony that Pfizer did not Promote Neurontin to Third-Party Payers.**

Contrary to Plaintiffs' assertions, Pfizer's operating and business plans related to Aetna and Kaiser do not relate to the implementation of marketing strategies for TPPs concerning

---

[13] *See* Pfizer_SDoft_0024028-0024031 (Ex. 4).

Neurontin. As Mr. Henderson testified, Neurontin was not promoted to TPPs and therefore, there were no TPP marketing strategies for Neurontin.

Plaintiffs specifically reference a 2004 Operating Plan for Kaiser, but this document does not contain "several references to physicians and to Neurontin" as plaintiffs state. Rather, the plan contains a single reference to Neurontin and contains nothing related to communications with the named third-party-payer plaintiffs Kaiser Foundation Health Plan or Kaiser Foundation Health regarding Neurontin. Further, the use of the phrase "continue to support field detailing activities" in reference to Neurontin is boilerplate language used when managed market personnel are not promoting a particular drug to third-party payers. As Mr. Henderson explained during his deposition, this simply means that managed markets personnel will answer inquiries from the field sales force about formulary status and insurance coverage issues. Henderson Dep. (Ex. 6) at 297:9-299:1. Inquiries like this arise in situations such as where a doctor in Memphis may ask a sales representative whether Federal Express employees have access to certain pharmaceutical products in their health plans. Henderson Dep. (Ex. 6) at 298:3-299:1. In such a situation, managed markets personnel would "support field detailing activities" by providing this information to the sales representative. Other references to Neurontin in the plan simply state that the drug is on Kaiser's formulary. None of the other quotes from the plan referenced in Plaintiffs' motion have anything to do with Neurontin. To the contrary, Neurontin is never listed in the plan as a key or "contracted product."

Plaintiffs' argument that Mr. Henderson was not an adequately prepared designee because his preparation did not include a review of HCXchange for communications with the named TPP plaintiffs is likewise unfounded. As Mr. Henderson explained to Plaintiffs' counsel during his deposition, HCXchange is continually updated and does not contain any information

about products that have gone generic. Henderson Dep. (Ex. 6) at 286:23-288:13. Furthermore, Plaintiffs have since had the opportunity to depose Laura Kibbe, Defendants' 30(b)(6) designee regarding document retention and production issues, about issues related to the creation and maintenance of business and operating plans for TPPs and issues concerning how and when materials were posted on electronic resources like HCXchange and MMWeb. Notably, Ms. Kibbe clarified that HCXchange did not contain any TPP business plans until late 2005 or January 2006 – beyond the relevant time period for discovery in this case. *See* April 7, 2008 Deposition Tr. of Laura Kibbe (Ex. 10) at 128-129.

While the operating and business plans are not responsive to Plaintiffs' discovery requests, Defendants nevertheless produced numerous operating and business plans to Plaintiffs in a good-faith attempt to resolve this discovery issue without motion practice. Given that the Neurontin-related references within them are consistent with Mr. Henderson's testimony that Neurontin was not a promoted product within the managed markets area, there is no need for additional testimony about them.

### B.    Mr. Henderson Adequately Testified to Warner-Lambert's Third-Party Payer Communications by Expressly Adopting The Testimony of Former Warner-Lambert Employees

Plaintiffs contend that Mr. Henderson was not adequately prepared to respond to questions regarding communications between Warner-Lambert/Parke-Davis and TPPs. Mr. Henderson was never employed by Warner-Lambert. Despite a lack of first-hand knowledge, a company must undertake a reasonable effort to inform its 30(b)(6) designees "to the extent the matters are reasonably available, whether from documents, past employees, or other sources." *Berwind Prop. Group, Inc. v. Envtl. Mgmt. Group, Inc.*, 233 F.R.D. 62, 65 (1st Cir. 2005).

As the defendants' 30(b)(6) designee, Mr. Henderson reviewed and expressly adopted the deposition testimony of former Warner-Lambert employees George Cavic, Christopher Desimone, and John Richter to the extent their testimony related to the topics for which he was designated.[14]  Mr. Cavic, Mr. Desimone, and Mr. Richter worked in the Healthcare Management Group at Parke-Davis, and had direct responsibility for and testified concerning the communications with TPPs, the types of documents created or maintained by Warner-Lambert regarding TPP communications, and the organizational structure involved with these communications.

For example, George Cavic testified that as Vice President of the Healthcare Management Group, his group had communications with third-party payers about uses for which Neurontin was approved by the FDA, including communications with United Healthcare and Blue Cross Blue Shield.  Mr. Cavic repeatedly explained that his sales team had communications with third-party payers.  *See* Ex. 11 at 42:9-43:9; 45:25-48:25. And Plaintiffs should not be heard to complain about Mr. Henderson's inability to identify by name any other Warner-Lambert personnel that may have communicated with TPPs because Plaintiffs did not ask Cavic, Richter, or Desimone for this information.

In sum, the testimony of Cavic, Richter, and Desimone was based on their first-hand knowledge and related to events that occurred more than seven years ago with respect to a predecessor entity. Given these circumstances, Mr. Henderson's review and adoption of their testimony adequately discharged Defendants' 30(b)(6) obligation. Indeed, Defendants went

---

[14]     Each of these individuals sat for two-day depositions. Notably, Annamarie Daley conducted the examination of Mr. Henderson and also conducted the examination for each of these former Warner-Lambert employees.

beyond their obligation and provided Plaintiffs a page-and-line designation of the testimony expressly adopted by Mr. Henderson during his deposition.[15]

## <u>CONCLUSION</u>

Defendants respectfully submit that for all of the foregoing reasons the Court should reject Plaintiffs' attempt to re-litigate these previously decided discovery issues, preclude Plaintiffs from unduly burdening the Defendants with new and additional 30(b)(6) discovery obligations, and otherwise deny Plaintiffs' Motion to Compel.


Dated: April 9, 2008

                    Respectfully submitted,

                    DAVIS POLK & WARDWELL


By:   /s/ James P. Rouhandeh
         James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000


SHOOK, HARDY & BACON L.L.P.


By:   /s/ Scott W. Sayler
         Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

                - and -

---

[15] *See* Ex. 5.

HARE & CHAFFIN

By:   /s/ David B. Chaffin
      David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company LLC*

2855244v1

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on April 9, 2008.

/s/ David B. Chaffin

2855244v1