Exhibit 6

```
                                                                      1

 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
     IN RE NEURONTIN MARKETING      : MDL DOCKET NO. 1629
 4   AND SALES PRACTICES            : Master File No. 04-10981
     LITIGATION                     : Judge Patti B. Saris
 5                                  : Magistrate Leo T. Sorokin
                                    :
 6                                  :
     ------------------------------ X ------------------------
 7   SUPREME COURT OF THE STATE     : Case Management
     OF NEW YORK                    : Index No. 765,000/2006
 8   COUNTY OF NEW YORK             : Hon. Marcy S. Friedman
     ------------------------------ :
 9   IN RE: NEW YORK NEURONTIN      :
     PRODUCTS LIABILITY             : VIDEOTAPED DEPOSITION
10   LITIGATION                     : UPON ORAL EXAMINATION OF
                                    : 3(b)(6) DESIGNEE
11                                  : JEFFERSON STIERHEIN
                                    :   HENDERSON III
12                                  :
     ------------------------------        VOLUME 1
13                                  ----------------------

14

15            CONTAINS CONFIDENTIAL INFORMATION

16       TRANSCRIPT of testimony as taken by and before

17   MARK SCHAFFER, a Certified Shorthand Reporter and

18   Notary Public of the States of New Jersey and New

19   York, at the offices of Davis, Polk, 450 Lexington

20   Avenue, New York, New York 10022 on Wednesday,

21   December 5, 2007, commencing at 10:05 in the forenoon.

22

23

24

25
```

Page 134

1  is.
2    Q.  Have you ever heard of a Neurontin
3  situational analysis before?
4    A.  I have not.
5    Q.  In these four meetings you had with counsel,
6  three were in September, you said, and one was
7  yesterday?
8    A.  That is correct.
9    Q.  How long were the meetings in September?
10   A.  Two to three hours.
11   Q.  So that's a total of six to nine hours in
12 September?
13   A.  In September, that's correct.
14   Q.  And then yesterday's meeting?
15   A.  Yesterday's meeting was from eight until just
16 before noon, almost four hours.
17   Q.  So a total of ten to 13 hours?
18   A.  I think that would be fair to say.
19   Q.  And besides the deposition transcripts, did
20 you review any other documents?
21   A.  Yes.
22   Q.  Which ones?
23   A.  I received a packet of 28 documents that I
24 was asked to review.
25   Q.  And what was in that packet of 28 documents?

Page 135

1    A.  It -- Most of the communications in that
2  packet were around the existing Parke-Davis
3  Warner-Lambert contract -- multi-product contract that
4  existed between Parke-Davis and Aetna; and then
5  communications around how we were going to deal with
6  the pending expiration of the Pfizer contract; and --
7  and this contract that -- that in force with
8  Parke-Davis/Warner-Lambert.
9    Q.  Do you remember anything else in that packet
10 of 28 documents?
11   A.  That was the bulk of it.  There was one
12 other communication that I recall between a -- a
13 clinical education consultant and some -- someone --
14 some employee of Aetna responding to indications.
15 Indications and dosing, as I recall.
16   Q.  Regarding Neurontin?
17   A.  Regarding Neurontin.  Actually, I think the
18 message was titled "Neurontin and Relpax." I think
19 they had questions about Relpax, too, but I don't
20 recall.
21   Q.  Were you involved in the efforts of Pfizer
22 regarding the PHN launch for Neurontin?
23   A.  Yes.
24   Q.  And what was your involvement there?
25   A.  It was nothing more than to listen to the

Page 136

1  information that was being -- being provided to the
2  PD2 sales representatives and managers that were going
3  to be responsible for launching PHN.
4    Q.  What were the PD2 representatives told about
5  launching Neurontin for PHN?
6       MR. MIZELL: Object to form.  Outside the
7    scope.
8    A.  Essentially they -- they -- as I recall this
9  launch meeting, it was done actually via a broadcast.
10 And I recall participating in it in the Reston,
11 Virginia office.
12       And the representatives were told -- and
13 representatives and their managers were told about the
14 disease state, and then Neurontin and how it was dosed
15 for this indication.  There was clinical information
16 provided as well, but I don't recall the exact
17 contents of all the materials that were used during
18 that launch.
19   Q.  Is your understanding that the Worldwide
20 Neurontin Team is part of the PD2?
21   A.  No, it is not my understanding.
22   Q.  So the Worldwide Neurontin Team would be
23 separate from the PD2 group?
24   A.  That is correct.
25   Q.  Do you know a John Marino?

Page 137

1    A.  No, I don't.
2    Q.  Who -- what customers would the PD2 -- or
3  what individuals would the PD2 group call on?
4    A.  PD2 -- and to clarify, that was the title of
5  one of our sales divisions.  So they fell under the
6  sales umbrella of the U.S. Pharmaceuticals Group.
7       PD2 representatives called on doctors or
8  healthcare providers.  And that would include
9  neurologists.
10   Q.  What's a PCP?
11   A.  Primary care provider.
12   Q.  Is a neurologist a PCP?
13   A.  Typically -- It -- It's possible, but
14 typically they are not.  They are classified as
15 specialists by health plans.  But that's a health plan
16 term.
17   Q.  The specialist reference?
18   A.  No.
19   Q.  Or the PCP?
20   A.  The PCP is a healthcare term.  It actually
21 was coined back when managed care first got started,
22 because PCPs were typically designated as your
23 gatekeeper.  And you had to go to your PCP before you
24 could be referred to a specialist.
25   Q.  So typically the neurologists are

257

```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                    :
     IN RE NEURONTIN MARKETING        : MDL DOCKET NO. 1629
 4   AND SALES PRACTICES              : Master File No. 04-10981
     LITIGATION                       : Judge Patti B. Saris
 5                                    : Magistrate Leo T. Sorokin
                                      :
 6                                    :
     ------------------------------ X ------------------------------
 7   SUPREME COURT OF THE STATE      : Case Management
     OF NEW YORK                     : Index No. 765,000/2006
 8   COUNTY OF NEW YORK              : Hon. Marcy S. Friedman
     ------------------------------   :
 9   IN RE: NEW YORK NEURONTIN       :
     PRODUCTS LIABILITY              : VIDEOTAPED DEPOSITION
10   LITIGATION                      : UPON ORAL EXAMINATION OF
                                     : 30(b)(6) DESIGNEE
11                                   : JEFFERSON STIERHEIN
                                     : HENDERSON III
12                                   :
     ------------------------------             VOLUME 2
13                                   ------------------------------

14

15
              TRANSCRIPT of testimony as taken by and before
16
     MARK SCHAEFER, a Certified Shorthand Reporter and
17
     Notary Public of the States of New Jersey and New
18
     York, at the offices of Davis, Polk, 450 Lexington
19
     Avenue, New York, New York 10022 on Thursday,
20
     December 6, 2007, commencing at 10:05 in the forenoon.
21

22

23           REPORTING SERVICES ARRANGED THROUGH:
            VERITEXT/NEW JERSEY REPORTING COMPANY
24              25B Vreeland Road, Suite 301
              Florham Park, New Jersey 07932
25       Phone:  (973) 410-4040   Fax:  (973) 410-1313
```

## Page 286

1  So what this is saying, that all products are
2  on formulary in second or third tier with no
3  restrictions.
4  Q. And if it's third tier, what does that mean?
5  A. It is -- it typically means that it is a
6  product that the patient pays a higher co-pay.
7  Q. Than second tier?
8  A. That's correct.
9  Q. Now, you notice that Neurontin is identified
10  in this list of all Pfizer products that have access;
11  right?
12  A. Yes, I see that.
13  Q. And beneath that in the lower left-hand
14  corner, it says, "Source, HC Exchange;" right?
15  A. That is correct.
16  Q. Is the HC Exchange reference here the same
17  database that you testified to yesterday as the HC
18  Exchange database?
19  A. That is correct.
20  Q. Does the HC Exchange database have a listing
21  of formularies for third-party payers?
22  A. Yes, it does.
23  Q. And so all you have to do at Pfizer then
24  would be to go to the HC Exchange database to
25  determine whether Neurontin is on a particular

## Page 287

1  third-party payer's formulary; right?
2      MR. MIZELL: Object to form.
3  A. You would not be able to do that today,
4  because Neurontin is not included in that database.
5  We only include products that Pfizer is actively
6  promoting.
7  Q. In 2004?
8      MR. MIZELL: Object to form.
9  A. In 2004 -- in 2004, it would have been
10  listed.
11  Q. Neurontin would have been listed on the HC
12  Exchange?
13  A. That is correct.
14      MR. MIZELL: Object to form.
15  Q. When was Neurontin taken off the HC Exchange?
16  A. I don't know the exact date when Neurontin
17  was pulled out of the HC Exchange database; however,
18  it is normally -- our normal practice is when a
19  product goes generic or if the product is moved to
20  Diversified or a product is removed from the market,
21  it is taken out of the database.
22  Q. When a product goes generic, is it -- is the
23  branded product removed from the database immediately,
24  or is there some time lag there?
25      MR. MIZELL: Object to form.

## Page 288

1  A. The HC Exchange database is managed by --
2  it's typically -- I couldn't give you the exact number
3  of weeks, but it occurs relatively quickly. Because
4  the database is so large and contains so much
5  information, we want to pull things that are no longer
6  relevant out as quickly as possible.
7  Q. Why would the fact that there was now a
8  generic available for Neurontin mean that whether
9  Neurontin was on formulary or that Neurontin was in a
10  HC Exchange database no longer relevant?
11      MR. MIZELL: Object to form.
12  A. Because we are no longer promoting the
13  product.
14  Q. So once the product goes generic, Pfizer no
15  longer promotes the branded product?
16  A. That is correct.
17  Q. Why is that?
18  A. Typically when a product goes generic,
19  it's -- and is made available via multi source generic
20  companies, pharmacists in pharmacies typically do a
21  therapeutic substitution. So they immediately start
22  dispensing the generic product.
23      So it doesn't matter whether a physician
24  writes a prescription for Neurontin or not. Unless
25  they have somehow mandated that it -- and I don't know

## Page 289

1  how they would do that, that it be a branded product,
2  the prescription is changed at the formula -- at the
3  pharmacy.
4      So it's not a best use of our time to deploy
5  our resources to try and sell a product that is
6  generic.
7  Q. Is that because the generic is cheaper than
8  the branded product?
9  A. Typically the generic is cheaper, yes. But
10  also retail pharmacies make more money dispensing
11  generic products.
12  Q. On the right-hand side of this page that's
13  part of Henderson Exhibit 6, Bates on the bottom, 194,
14  it's another table, it says, "Medco Formulary Design."
15      Do you see that?
16  A. Yes, I do.
17  Q. And it has I guess maybe kind of a bar graph
18  on the left-hand side there. It says, "50 percent."
19      Do you see that?
20  A. Yes, I do.
21  Q. And it says, "Two tier, equal co-pay, but
22  Medco proposal advantaged products."
23      Do you see that?
24  A. I do see that.
25  Q. What's an advantaged product?

Page 294

1  sales are adjudicated through Medco.
2  Q. How would Pfizer be able to know that number?
3     MR. MIZELL: Object to form. Outside the scope.
4  A. This, the source here is -- is NDC; and NDC
5  is one of those consulting companies that provide the
6  retail data. So my assumption is that we purchased it
7  from NDC.
8  Q. Can you turn to the page, last three digit
9  201. And you see the -- that portion of the bar --
10 A. I'm sorry?
11 Q. Yes. 201.
12 A. 201. Okay.
13 Q. It's a slide entitled "Impact of Medco
14 Cluster a Products, Southeast."
15    Do you see that?
16 A. I do.
17 Q. And, again, there is a portion of the bar
18 graph that is about Neurontin sales; right?
19 A. Yes.
20 Q. And what does that -- what information is
21 reflected in that portion of the bar graph regarding
22 Neurontin?
23    MR. MIZELL: Object to form. Outside the
24 scope.
25 A. This is showing that, of the U.S.

Page 295

1  pharmaceutical retail sales that have been mapped to
2  the Southeast Sales region, that of those sales
3  Medco's Neurontin sales -- retail sales represent 14
4  percent of that number.
5  Q. Turn to the next page. It's a page entitled
6  "TACU Impact of Medco."
7     Do you see that?
8  A. I do see that.
9  Q. What does T-A-C-U mean?
10 A. Targeted Account, Customer Unit, commonly
11 referred to as TACU.
12 Q. What makes a particular account a Targeted
13 Account, Customer Unit?
14 A. It's an acronym used to describe the local --
15 when I say local, it's a district group of individuals
16 that include the NHO Regional Account Manager, as well
17 as the Sales District Managers.
18 Q. So in this situation, it would have included
19 Patrick McElerney?
20    MR. MIZELL: Object to form.
21 A. No. Patrick McElerney would -- would
22 facilitate a larger -- a group of people that are the
23 people that supervise the people that participate in
24 the TAC -- TACU. So the entity that was above the
25 TACU was called the Regional Council. That was

Page 296

1  facilitated by the Area Manager and the regional --
2  Sales Regional Managers participated in that.
3     Then the Account Managers, Regional Account
4  Managers that reported to Patrick McElerney, would
5  convene a TACU, which would consist of the Regional
6  Account Manager who reported to Patrick McElerney, and
7  the Sales District Managers that reported to the Sales
8  Regional Managers.
9  Q. There is also another acronym in here, LAT;
10 what does that stand for?
11 A. L-A-T stands for LAT, Local Account Team.
12 Q. Is it above or below the account customer --
13 A. It is below and essentially mirrors the TACU.
14 So the LAT is the group of sales representatives.
15 Q. I'll have you turn to the page within
16 Henderson Exhibit 6 that's 202 in the lower right-hand
17 corner.
18 A. Yes.
19 Q. Do you see in the right-hand side -- or
20 left-hand side -- excuse me.
21    Well, first of all, this is a slide entitled
22 "Orlando TACU" T-A-C-U, dash, "Key Medco Clients;"
23 right?
24    Is that the title of the slide, Mr.
25 Henderson?

Page 297

1  A. Oh, yes.
2  Q. And on the left-hand corner, there is a
3  listing of top employers; right?
4  A. Yes.
5  Q. Listed, included within that list of top
6  employers is Guardian Life Insurance Company of
7  America; right?
8  A. Yes, it is on the list.
9  Q. How did Pfizer obtain the information about
10 Guardian Life Insurance Company as a top employer, key
11 Medco client?
12    MR. MIZELL: Object to form. Outside the scope.
13 A. Typically, as I said before, because we don't
14 call on these types of organizations, that -- that
15 information is provided to Pfizer by Medco.
16 Q. Why do you want that information?
17    MR. MIZELL: Object to form.
18 A. Well, pharmacy benefit managers are
19 interesting organizations because they provide
20 pharmacy services not only to health plans, but in
21 many cases they provide pharmacy services to
22 employers -- I mean, yes, to employers.
23    So when you are out -- a sales representative
24 is out, out talking to a physician, and the physician
25 says, "Is it Lipitor on formulary at -- with Verizon?"

11 (Pages 294 to 297)

298

1  You -- if you have that information, you can respond.
2       Because if a sales representative says,
3  "Doctor, Lipitor is on formulary with Medco," most
4  physicians don't know what Medco is. Medco is a
5  transparent entity to them, because they are only
6  providing claims adjudication for most of these
7  employers.
8     Q. But the doctors or the physicians are
9  interested in knowing about whether or not a
10 particular drug is on a formulary for a particular
11 employer?
12      MR. MIZELL: Object to form. Outside the scope.
13    A. It depends on the marketplace, but in certain
14 marketplaces where physicians practice, there are
15 typically -- there could be a single employer. For
16 example, in Memphis, doctors want to know if -- if
17 Federal Express employees have access to given
18 products because that large employer is -- is
19 typically the -- the biggest employer in town.
20    Q. So that's why Pfizer asks PBMs like Medco for
21 the information about whether -- or who the top
22 employers are that contract through that particular
23 PBM?
24      MR. MIZELL: Object to form.
25    A. That's certainly one reason we ask for that

299

1  information, yes.
2     Q. Is Guardian Life Insurance Company an
3  employer?
4     A. I would assume that Guardian Life employs
5  people, but I don't know.
6     Q. On the right-hand side, under "Top Health
7  Plans," there is a listing of three entities, BCBS
8  Association. Do you know what that is?
9     A. Yes, the Blue Cross-Blue Shield Association
10 is an association that consists of many of the Blue
11 Cross-Blue Shield health plans throughout the country.
12 They come together informally. They -- because of the
13 way Blue Cross-Blue Shield health plans are licensed
14 in the various states, they -- they aren't -- they are
15 not an entity that -- that is able to do anything
16 other than get together and discuss common issues that
17 they are dealing with.
18    Q. The second health plan that's listed under
19 "Top Health Plans" is United Health Group?
20    A. That's correct.
21    Q. Is that the same United Health Group that you
22 mentioned yesterday?
23    A. That is the same United Health Group that I
24 mentioned yesterday that's headquartered in Minnesota.
25    Q. And then the third is Health First Health

300

1  Plan?
2     A. Yes.
3     Q. Where are they located?
4     A. I don't recall where Health First is located.
5  I -- I -- I believe they have been purchased by
6  Conventry, but I don't recall. It's a -- it's a
7  regional account.
8     Q. The next slide is entitled "Product Strategy
9  Template to Develop Message."
10      Do you see that?
11    A. Yes, I do.
12    Q. Have you seen this slide or something like it
13 before?
14    A. Yes, I have.
15    Q. In what context?
16    A. I believe it was actually this -- this slide
17 that I saw. But it was -- it was -- the context was
18 it was designed to help representatives articulate
19 where we have formulary access.
20    Q. What do you mean by the "where," when you say
21 this slide or this template was designed to help
22 representatives articulate "where" we have formulary
23 access?
24    A. Well, as I explained in my previous answer,
25 pharmacy benefit management companies are very

301

1  difficult organizations for physicians to identify.
2  Physicians typically identify large health plans or
3  large employers in their -- in their market.
4       So rather than have a representative walk in
5  and say, when the physician says, "Is Lipitor on
6  formulary," rather than the physician (sic) say "Yes,
7  Doctor, it's on Medco's formulary," we have taught the
8  representatives how to identify who the prominent
9  health plans are that are clients of Medco's or
10 employers, and to be able to respond in terms that the
11 physician would understand.
12    Q. Would it be your expectation that Pfizer
13 sales representatives would be asked or could be asked
14 the question: "Is Neurontin on formulary"?
15      MR. MIZELL: Object to form. Outside the scope.
16    A. Again, because of the people that -- that are
17 on this list, Pfizer had 150 or so individuals that
18 were responsible for promoting Neurontin. They would
19 have been spread across the United States within the
20 eight sales regions.
21      One of the Sales Regional Managers here, my
22 assumption is, would have a select group of those
23 individuals that are responsible for promoting
24 Neurontin to neurologists; so it's highly likely that
25 a neurologist would -- would ask the question, "Is

12 (Pages 298 to 301)