Exhibit 7

Case 1:04-cv-10981-PBS    Document 1216-8    Filed 04/09/2008    Page 1 of 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
MDL Docket No. 1629/Master File No. 04-10981

------------------------------X

IN RE: NEURONTIN MARKETING         MDL Docket No. 1629

SALES PRACTICES, AND PRODUCTS      Master File No.

LIABILITY LITIGATION               04-10981

------------------------------X

VIDEOTAPED DEPOSITION OF ALBERT L. CARVER

New York, New York

July 13, 2007

Reported by:
Amy A. Rivera, CSR, RPR

Page 291

```
 1              A. Carver
 2     Q.   Do you know whether Kaiser is alleging
 3   that false statements were made with regard to
 4   each of the off-label uses for which it's seeking
 5   damages from the defendants?
 6         MS. NUSSBAUM:  To the best of your
 7   knowledge.
 8     A.   I believe so, with reliance upon
 9   counsel for the preparation.
10         MS. NUSSBAUM:  Please don't testify as
11   to any discussions with counsel.
12     Q.   Is Kaiser aware of any false
13   statements regarding the use of Neurontin for no
14   susceptive pain?
15         MS. NUSSBAUM:  Are you referring to
16   any particular portion of the Complaint?
17         MR. JAMES:  Actually, let me -- I'll
18   withdraw that question.
19     Q.   Were any statements made by the
20   defendants to Kaiser itself regarding the use of
21   Neurontin?
22     A.   Of course.  I mean, over the -- over
23   the course of the last ten years, there have been
24   numerous interactions between representatives of
25   the defendants and Permanente physicians --
```

Page 292

```
 1              A. Carver
 2     Q.   Actually, I'm not asking about
 3   Permanente physicians, just the plaintiffs
 4   themselves.
 5         Physicians are technically not
 6   employed by the plaintiffs, is that right?
 7     A.   That's correct.
 8         MS. NUSSBAUM:  Well, I think the
 9   witness testified yesterday the Permanente
10   physicians write the prescriptions.
11         MR. JAMES:  Right, I understand that.
12     Q.   But have any statements been made by
13   the defendants to the plaintiffs themselves
14   regarding the use of Neurontin?
15         MS. NUSSBAUM:  You want to know
16   whether or not the defendants, Warner-Lambert and
17   Pfizer, either made -
18         MR. JAMES:  Actually, you know --
19         MS. NUSSBAUM:  -- statements to the
20   two plaintiffs in this case?
21         MR. JAMES:  -- the two plaintiffs in
22   this case or their employees.
23     A.   I believe that the defendants have
24   provided information to our Drug Information
25   Service who -- and certainly they are employed by
```

Page 293

```
 1              A. Carver
 2   the plaintiffs.
 3     Q.   Aside from information provided to the
 4   Drug Information Service, are you aware of any
 5   other statements made by the defendants to the
 6   plaintiffs regarding the use of Neurontin?
 7         MS. NUSSBAUM:  Over this ten-year
 8   period?
 9         MR. JAMES:  Yes.
10     A.   Not specific interactions or
11   information; no, of course not.
12     Q.   And with regard to information
13   provided by Pfizer regarding the use of Neurontin
14   to the Drug Information Service, which statements
15   are you aware that the defendants made?
16     A.   Specific statements, I cannot attest
17   to.
18         MS. NUSSBAUM:  Well, but can you in
19   general?
20         MR. JAMES:  That's fine.  Actually,
21   that was entirely responsive to my question.
22     Q.   Are you aware of any false statements
23   made by the defendants to the Drug Information
24   Service regarding the use of Neurontin?
25         MS. NUSSBAUM:  You want to know in
```

Page 294

```
 1              A. Carver
 2   general, is he generally aware?
 3     Q.   If you understand the question, you
 4   can answer.
 5     A.   The specific statements, I'm not aware
 6   of.  I think that the information that would be
 7   provided to the Drug Information Service would be
 8   information provided by the defendants' marketing
 9   individuals, as well as through information that
10   was generally available through the literature, or
11   in some cases, perhaps studies that the defendants
12   may have written or had written on their behalf.
13         I'm not aware of specific instances to
14   which I could point.
15     Q.   Are you aware generally of any false
16   statements made to the Drug Information Service?
17     A.   Not specific false information, no.
18     Q.   I guess now setting aside the
19   plaintiffs, with regard to Permanente physicians,
20   are you specifically aware of any statements made
21   by the defendants or their agents to Permanente
22   physicians regarding the off-label uses of
23   Neurontin?
24     A.   And by "specific," are you asking me
25   to cite a specific interaction between a
```

22 (Pages 291 to 294)


Page 431

```
 1              A. Carver
 2    Q.  Yes.
 3    A.  It would not surprise me from the
 4 standpoint of, I believe, that southern California
 5 has been more energetic regarding attempting
 6 restrictions in other regions. There has been
 7 certainly fewer restrictions, even in northern
 8 California, related -- relative to southern
 9 California, and I think it's been more of just a
10 philosophy or a tradition.
11        And so, then it would not surprise me
12 that there could be variances in enthusiasm for
13 trying to implement restrictions in regions
14 outside of California.
15    Q.  Other than the larger number of
16 insureds in California and in other regions, is
17 there any other reason that California has been
18 more active with regard to attempting
19 restrictions?
20        MS. NUSSBAUM: If you know
21 specifically.
22    A.  I don't know specifically.
23    Q.  I think yesterday you mentioned
24 briefly that there is some communication between
25 the regional P&T committees for the various
```

Page 432

```
 1              A. Carver
 2 regions?
 3    A.  Correct.
 4    Q.  Do they share information regarding
 5 restriction on particular prescription drugs?
 6    A.  The information that is shared is
 7 generally the monograph that's developed regarding
 8 the use of all of drugs essentially, each other
 9 drug, whether it's Neurontin or not, and then --
10 then each of the P&T committees outside of
11 California deals with their decisions as they see
12 fit in their respective regions.
13    Q.  Is there a formal program for
14 exchanging those monographs, or is it kind of done
15 on an ad hoc basis?
16    A.  It's not an exchange as much as it's
17 an outflow from the Drug Information Service in
18 California.
19    Q.  Does Kaiser have drug information
20 services in other regions?
21    A.  Not formal drug information services.
22 Calls from other regions come into California's
23 Drug Information Service.
24    Q.  Am I correct to understand that Kaiser
25 has searched its e-mails in response to the
```

Page 433

```
 1              A. Carver
 2 defendant's document production requests?
 3    A.  I believe so.
 4    Q.  And does Kaiser, meaning the
 5 plaintiffs, have a separate e-mail system from
 6 Permanente Group?
 7    A.  There is one e-mail system, one big
 8 e-mail system that all the people within health
 9 plan, hospitals as well as the Permanente Medical
10 Groups utilize.
11    Q.  And were all responsive documents from
12 that sort of single e-mail group produced?
13    A.  I hope so.
14        MS. NUSSBAUM: The requests are for
15 the plaintiff's documents. All documents for the
16 plaintiffs were produced. To the extent that
17 there is a contractual relationship with others
18 and not access to individuals, you know, who are
19 not employees of the plaintiff's documents, they
20 are not being produced. So to the extent that
21 documents, you know, may have been created by
22 others who were not employees of the plaintiffs
23 here but were in the files of the plaintiffs as we
24 saw today and yesterday by things that are marked,
25 those things were produced.
```

Page 434

```
 1              A. Carver
 2        But third-party documents that are not
 3 in our possession and that are not under our
 4 control were clearly not produced.
 5    Q.  Are there any documents in Permanente
 6 Group's custody that are within the plaintiff's
 7 control?
 8        MS. NUSSBAUM: Can you explain what
 9 you mean by that?
10        THE WITNESS: Yeah.
11    Q.  Do you have the right to request any
12 documents from Permanente Group, you know, as a
13 matter of contractual right?
14        MS. NUSSBAUM: I think that that's
15 been asked and answered. The witness testified
16 that they employ physicians who they interview,
17 who they employ, who they train, that the
18 plaintiffs here have nothing to do with any of
19 that process, and that the relationship between
20 the entities is simply a contractual relationship
21 and nothing more.
22        We've taken that position in front of
23 Justice Saris, we've taken that position in front
24 of Judge Sorokin. That information is publicly
25 available, if you go online, you can research the
```

Page 435

```
 1              A. Carver
 2  corporate structures yourself and that's the
 3  situation.
 4       Q.  Do you know how long the contractual
 5  relationship between the Permanente Medical Group
 6  and the plaintiffs has been in place?
 7       A.  Since 1945.
 8       Q.  Were they founded at the same time?
 9           MS. NUSSBAUM: If you specifically
10  know.
11       A.  I do not specifically know region by
12  region. But the relationship dates back to
13  approximately 1945 and then as regions have grown
14  around the company, whatever those dates were.
15       Q.  Will you characterize it as an arm's
16  length contractual relationship?
17           MS. NUSSBAUM: The witness is not a
18  lawyer. I think that the relationship has been
19  characterized by him repeatedly throughout this
20  deposition and by the plaintiffs in this
21  litigation repeatedly to the courts. The
22  relationship is what it is and I'm not going to
23  have the witness give legal opinions because he's
24  not a lawyer.
25       Q.  We actually talked about this as a
```

Page 436

```
 1              A. Carver
 2  contractual relationship.
 3           Are there particular contracts in
 4  place between the plaintiffs and the Permanente
 5  Medical Group?
 6       A.  Yes, there are.
 7       Q.  Is there a single, like plaster
 8  contract or there are a large number of individual
 9  contracts?
10           MS. NUSSBAUM: If you know, and this
11  is beyond the scope of the 30(b)(6) deposition
12  here. He's not from the legal counsel's office,
13  and so we're happy, you know, to the extent that
14  he has specific knowledge, to testify as to that,
15  but you know, we don't want to have any
16  speculation here.
17       Q.  What do you know?
18       A.  There is a medical service agreement
19  in southern California. There's a separate
20  medical service agreement in northern California
21  with TPMG. I do not know the specifics of the
22  medical service agreements in the regions outside
23  of California.
24       Q.  Is that medical service agreement the
25  only contract of which you're aware of between the
```

Page 437

```
 1              A. Carver
 2  plaintiffs and Permanente Medical Group and
 3  northern and southern California?
 4       A.  To which I'm aware?
 5       Q.  Yes.
 6       A.  Yes.
 7       Q.  Well, what's the term of that contract
 8  or those two contracts?
 9           MS. NUSSBAUM: If you know.
10       A.  I do not know.
11       Q.  Do you have any familiarity with
12  whether those contracts are renegotiated
13  periodically?
14           MS. NUSSBAUM: Presumably all
15  contracts are negotiated periodically, but if you
16  don't have any specific understanding as to the
17  term of the contract, I would ask you not to
18  speculate.
19       A.  I can't speculate in terms of the
20  length of individual service agreements or the
21  frequency at which it's renegotiated.
22           MS. NUSSBAUM: You know, with all due
23  respect, Mr. James, we've talked ad nauseam with
24  your colleague Mr. Roland about the scope of the
25  various 30(b)(6) Notices here. This was not the
```

Page 438

```
 1              A. Carver
 2  terms of this particular contract and the lengths
 3  were not areas that he indicated to us you wanted
 4  a 30(b)(6) witness on.
 5           Nevertheless, what I would suggest is
 6  if you have a specific two, three, four questions
 7  such as the length of the, you know, present
 8  contract or whatever, let's just ask the question.
 9  We can leave a blank in the transcript and we will
10  endeavor to get the answer from the appropriate
11  person, but I don't want speculation, and I know
12  you don't either, the length of the contract and
13  whatever you have, another question or two,
14  whatever, just ask them.
15           Unless you have personal, you know,
16  knowledge, please don't testify, but we will
17  endeavor to get the answer from the appropriate
18  person.
19       Q.  I actually just have one more
20  question.
21           Just to your personal knowledge, are
22  you aware of any occasion on which the plaintiffs
23  and Permanente Medical Group have failed to reach
24  an agreement on a renewed contract at some point
25  from 1945 to the presence?
```