Exhibit 9

```
                                                   1
     0001
 1             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
 4   IN RE:                     )
     NEURONTIN MARKETING, SALES PRACTICES  ) CA No. 04-10981-PE
 5   AND PRODUCTS LIABILITY LITIGATION    ) Pages 1 - 84
 6
 7
                   MOTION HEARING
 8
 9       BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE
10
11
12
13
                United States District Court
14              1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
15               September 27, 2006, 11:15 a.m.
16
17
18
19
20
21
22
                       LEE A. MARZILLI
23                CERTIFIED REALTIME REPORTER
                  United States District Court
24              1 Courthouse Way, Room 3205
                    Boston, MA  02210
25                    (617)345-6787
```

```
                                                   2
 1   APPEARANCES:
 2
     FOR THE PLAINTIFFS:
 3
         THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro, LLP,
 4   One Main Street, Fourth Floor, Cambridge, Massachusetts,
     02142.
 5
         THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
 6   Greene & Hoffman, P.C., 125 Summer Street, Suite 1410,
     Boston, Massachusetts, 02110.
 7
         BARRY R. HIMMELSTEIN, ESQ., Lieff, Cabraser, Heimann &
 8   Bernstein, LLP, Embarcadero Center West, 275 Battery Street,
     30th Floor, San Francisco, California, 94111-3339.
 9
         JAMES DUGAN, ESQ., Dugan & Browne,
10   650 Poydras Street, Suite 2150, New Orleans, Louisiana,
     70130.
11
         GERALD LAWRENCE, ESQ., Lowey Dannenberg Bemporad &
12   Selinger, P.C., Four Tower Bridge, 200 Barr Harbor Drive,
     Suite 400, West Conshohocken, Pennsylvania, 19428-2977.
13
         LINDA P. NUSSBAUM, ESQ., Cohen, Milstein, Hausfeld &
14   Toll, P.L.L.C., 150 East 52nd Street, Thirtieth Floor, New
     York, New York, 10022.
15
     FOR THE DEFENDANTS:
16
         DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
17   160 Federal Street, 23rd Floor, Boston, Massachusetts,
     02110-1701.
18
         JAMES P. ROUHANDEH, ESQ., CARTER BURWELL, ESQ., and
19   MATTHEW B. ROWLAND, ESQ., Davis, Polk & Wardwell,
     450 Lexington Avenue, New York, New York, 10017.
20
21
22
23
24
25
```

```
                                                   3
 1                   PROCEEDINGS
 2       THE CLERK: In Re: Neurontin Marketing, Sales
 3   Practices and Products Liability Litigation, Civil Action
 4   04-10981, will now be heard before this Court. Will counsel
 5   please identify themselves for the record.
 6       MR. SOBOL: Good morning, your Honor. Tom Sobol
 7   for the MDL plaintiffs.
 8       MR. RONA: Good morning, your Honor. Ilyas Rona
 9   from the firm Greene & Hoffman, also for the plaintiffs.
10       MR. HIMMELSTEIN: Good morning, your Honor. Barry
11   Himmelstein for the class plaintiffs.
12       MR. GREENE: Good morning, your Honor. Tom Greene
13   for the class plaintiffs.
14       MR. DUGAN: James Dugan on behalf of the class
15   plaintiffs.
16       MR. LAWRENCE: Good morning, your Honor. Gerald
17   Lawrence on behalf of the opt-out plaintiffs.
18       MS. NUSSBAUM: Good morning. Linda Nussbaum on
19   behalf of the coordinated plaintiffs.
20       THE COURT: So remind me, what's the difference
21   between the two of you?
22       MR. LAWRENCE: They're the same, your Honor.
23       MS. NUSSBAUM: They're the same.
24       THE COURT: The coordinated opt-outs?
25       (Laughter.)
```

```
                                                   4
 1       MR. ROUHANDEH: Your Honor, Jim Rouhandeh, and with
 2   me are Matt Rowland and Carter Burwell from Davis Polk for
 3   the defendants and David Chaffin from Hare & Chaffin.
 4       THE COURT: Okay, good. Now, the two things on my
 5   agenda, that I think are on my agenda, one is the discovery
 6   order, and one is the motion to dismiss the second amended
 7   complaint. Is that right? Do you have a particular -- I was
 8   going to turn to the plaintiffs first.
 9       MR. HIMMELSTEIN: Yes, your Honor, and that is what
10   we have on the agenda. Your Honor's order said that you were
11   taking up the motion for reconsideration on the discovery
12   order. We weren't sure if you were hearing argument on the
13   merits or our motion to supplement the record with the
14   additional declaration.
15       THE COURT: I actually called Judge Sorokin on one
16   piece of it, and I decided I wanted to hear -- there's a very
17   real issue about burdensomeness, which I think is more
18   appropriately handled by him because I think that he really
19   has his hands on that. But what I thought I would do first
20   is, there's an overarching legal question about what needs to
21   be proven, which really cannot be resolved in the discovery
22   context, and so whether or not you actually have to prove it
23   wasn't effective, or whether you have to prove, if there's a
24   fraudulent representation of effectiveness, how that affects
25   marketing.
```

53

1  your burden, and it may be that with respect to all the
2  Kaiser people, it's too burdensome, and you have to do a
3  subset of the files. I don't know if you just press a button
4  like Medicare and Medicaid Services. You all thought it was
5  so burdensome. They press a button. It takes six months to
6  get in their pecking order, but they can do it. Kaiser may
7  come back and say, "We can't do it," and it may be that we
8  just rely on this industrywide data, which is what the class
9  is relying on, okay? It may be it's too burdensome for
10 Guardian and Aetna to do this, and maybe you also will say
11 you're relying on the industrywide data. And I'll just take
12 that data, and I'll see what work that is. What about the
13 industrywide data?
14     MR. ROUHANDEH: We don't think that it is valid.
15 It's not a statistical sample. And also you can't
16 extrapolate from that data, which is just a random sample of
17 2,000 doctors in one and 3,000 in the other, and if you
18 extrapolate from those -- and one scientist tried to do it --
19 you've got completely different results. What we'd like is
20 actual data, and we think --
21     THE COURT: I know you would.
22     MR. ROUHANDEH: But these big third-party payors,
23 all they have to do is do the same thing, do a sample of the
24 medical records and just say, "This is what it was prescribed
25 for."

54

1     THE COURT: Well, let me put it this way: If it's
2  reasonable to do it and it is not overly expensive. If it is
3  overly burdensome, do an affidavit to that effect. If you're
4  going to rely on the industrywide data, just understand that
5  if they attack it and you don't have anything to counter it
6  with, you may lose. I can understand using the industrywide
7  data for something like Guardian or Aetna which is -- you're
8  national, aren't you?
9     MR. LAWRENCE: Yes. Aetna has at the time during
10 the class period over 21 million people that they're
11 covering. I think, you know, they're a --
12    THE COURT: Kaiser it might be easier for because
13 it's a plan, and you've got neurology groups, and you've
14 got -- you know, you might just be able to figure out, did a
15 psychiatry unit ever use it or not? I mean, that's more of
16 an HMO kind of situation, right?
17    MS. NUSSBAUM: Except the problem is that the
18 physicians are not actually employees of Kaiser. Kaiser
19 contracts with physician groups. There are presently over
20 430 separate medical offices plus 30 medical centers spread
21 throughout many states.
22    THE COURT: Aren't we mostly talking about
23 neurologists and shrinks, right?
24    MS. NUSSBAUM: Each of these different, you know,
25 all together almost 500 different settings have different

55

1  physicians. And it's handwritten records. None of this is
2  computerized. Every patient record is --
3     THE COURT: I don't know.
4     MS. NUSSBAUM: I do because we put in the
5  affidavit, your Honor, from the Kaiser paralegal.
6     THE COURT: You know what, see how hard it is to
7  find out whether or not the psychiatrists prescribed for this
8  indication, you know, because it's different. It's one
9  practice group. It's one -- you know, you refer probably to
10 what, you probably have a cohort of psychiatrists? You know,
11 because if in fact you don't prescribe Neurontin for bipolar,
12 that's one theory of damages that's out the window for you,
13 and I don't think you should be able to rely on the
14 industrywide data. Whereas it might be fully appropriate for
15 the class if it's something like Aetna with 21 million
16 people. There's a culture, right? People in a medical group
17 may have uniform practices or not. I don't know.
18    MS. NUSSBAUM: Your Honor, we will make those
19 inquiries. We will then give you an affidavit. But other
20 than that, we did submit with the class plaintiffs the
21 Meredith Rosenthal affidavit that sets out in great detail
22 the various industry people that are out there that do
23 nothing but compile this kind of statistical evidence that's
24 relied on by Pfizer and every other pharmaceutical company in
25 the country.

56

1     THE COURT: That's very useful, and that may be
2  appropriate. But it's just in Kaiser, and I don't know if
3  there's another HMO opt-out that's like you, where it might
4  be more acceptable to have the data. So at this point, I
5  think we'll just rely on Kaiser. And you're going to check
6  and put an affidavit in as to what it would take to find out
7  whether there's a computer base that basically correlates --
8  this does not get into patient information -- just how many
9  prescriptions were for bipolar as opposed to for epilepsy.
10    MR. LAWRENCE: Your Honor, I could tell you we've
11 had those discussions with the appropriate people, and we
12 will submit an affidavit, but that is not in the computerized
13 records.
14    THE COURT: And also what it would take to do a
15 sampling. I mean, you're going to have that problem coming
16 up on the damage theory anyway if you don't want to rely just
17 on the industrywide data.
18    MR. LAWRENCE: I think, your Honor, we'd be happy
19 to rely on the industrywide data, and it will be typical of
20 our experience as well.
21    THE COURT: Are you going to be attacking it in a
22 Daubert kind of hearing?
23    MR. ROUHANDEH: Oh, absolutely we're going to
24 attack it, and we want a statistically valid sample from
25 their data. And what they're saying is, if we successfully