Exhibit 10

1          ROUGH DRAFT TRANSCRIPT

2    conventions for other than obviously the, you

3    know, individual persons, I would have to check

4    my notes to be specific.

5       Q.   Do you have any general understanding

6    of what types of documents were produced with a

7    Pfizer underscore MDL designation?

8         MR. ROUHANDEH:  Same objection.

9       A.   As I said I would have to check my

10   notes.  A lot of the specific determinations

11   were made based upon the documents at the time

12   with counsel.  We did not create the names, so I

13   would have to check the list.

14      Q.   Let's go back to the documents called

15   operating plans or marketing plans, situation

16   analysis for the Pfizer era.

17         Did Pfizer gather its operating plans,

18   situation analyses, marketing plans for

19   Neurontin?

20      A.   Those documents were in fact within

21   the scope of what was searched and in the Pfizer

22   era, typically reside in the custodial files of

23   the various members of the marketing team

24   because they are all electronic at this point,

25   unlike the Legacy era with central paper file

1       ROUGH DRAFT TRANSCRIPT

2    rooms.

3       Q.   So if we were looking for the final

4    marketing plans, for instance, we would go look

5    in the custodial files of the documents that had

6    been produced by Pfizer?

7       A.   Exactly.

8       Q.   And the same would be true for

9    operating plans, right?

10      A.   Exactly.

11      Q.   The same would be true for situation

12    analyses?

13      A.   Exactly.

14      Q.   Do you know what the H C exchange is?

15      A.   Yes.

16      Q.   What is it?

17      A.   It is a company supported database for

18    the managed markets group.

19      Q.   How long has that been in existence?

20      A.   I believe the first role out of the

21    initial module was in Q4 of 2003.

22      Q.   So Q4 meaning fourth quarter, 2003?

23      A.   Yes.

24      Q.   So that would be October 1 through

25    December 31, 2003?

1          ROUGH DRAFT TRANSCRIPT

2     A.   Yes.

3     Q.   When was the H C exchange searched to

4  determine whether there were documents there

5  responsive to the document request in this case?

6          MR. ROUHANDEH:  Objection to form,

7  beyond the scope.

8     A.   I don't recall exactly when we had the

9  inquiry but it was determined that the documents

10  that would be responsive to the claims and

11  defenses in this case were the business plans

12  that would be housed in H C exchange and that

13  module was not brought on line until late 2005

14  and not complete until January of 2006.  So it

15  was determined that during the relevant time

16  period business plans would in fact have been

17  located in the individual custodial files of

18  those managed markets representatives and not

19  within H C exchange.

20     Q.   Who are those individuals who would

21  have those custodial files?

22     A.   I can't -- I would have to check my

23  notes.  I don't know which ones of the

24  custodians are managed market representatives.

25     Q.   If the business plans weren't retained

1        ROUGH DRAFT TRANSCRIPT

2    in the custodial files of the individuals, would

3    they still be in existence?

4        MR. ROUHANDEH:  Objection to form --

5        A.    The business practice prior to their

6    maintenance inside H C exchange was for the

7    custodians to maintain them either in electronic

8    or, you know, paper form pursuant to the

9    retention policy.  So they would either exist in

10    their electronic custodial files or whether they

11    chose to send them to storage, but they would be

12    always within that custodian's purview of

13    documents to be retained.

14        Q.    Do you know whether that business

15    practice was adhered to?

16        A.    With respect to a specific custodian I

17    can only tell you that in fact those documents

18    would have been within the scope of the legal

19    hold that was issued to all company employees.

20        Q.    Do you know whether or not the

21    employees, the custodial employees we are

22    talking about here that you can't recall their

23    names, whether they followed that legal hold?

24        MR. ROUHANDEH:  Objection to the form.

25        A.    I don't know of any custodian as I sit

1        ROUGH DRAFT TRANSCRIPT

2    here today who did not follow the legal hold.

3    The legal hold was issued to all employees

4    instructing them to preserve documents related

5    to this and other litigations that would be a

6    question appropriate for each individual I would

7    assume.

8      Q.    So the only way we would know that the

9    answer to that question would be if we had asked

10   each employee at Pfizer is what you are saying?

11         MR. ROUHANDEH:  Objection to form.

12     A.    I can tell you as I I sit here today

13   that I collected everything the employee had in

14   their possession if they no longer had something

15   this their possession at the time I collected

16   it, I don't know the answer to that question.

17   You would have to ask the individual.

18     Q.    Plaintiffs received for the first time

19   in mid February some operating plans that had

20   not been previously produced.  Do you know why

21   those documents hadn't been produced before?

22         MR. ROUHANDEH:  Objection to form.

23     A.    I don't know anything about the

24   specific production, that's all handled by

25   counsel.

1          ROUGH DRAFT TRANSCRIPT

2      Q.   Do you recall a question that came up

3    during the 30(b)(6) deposition of Mr. Henderson

4    in December of 2007 regarding operating plans

5    for various third party payer plaintiffs in this

6    case?

7          MR. ROUHANDEH:  Objection to form,

8    lack of foundation.

9      A.   I don't know anything about Mr.

10   Henderson's deposition other than I was told it

11   occurred.

12     Q.   After that deposition were you asked

13   to gather any additional -- strike that.

14          After Mr. Henderson's deposition were

15   you asked to determine whether there were any

16   operating plans available on the H C exchange

17   for the named third-party payer plaintiffs in

18   this case?

19     A.   I don't recall whether it was before

20   or after the deposition, but we were asked to

21   look for -- to confirm the date ranges of the

22   operating plans that were available on H C

23   exchange and that is when I informed counsel

24   that business plans were not maintained on that

25   system until late '05 and early '06.

1          ROUGH DRAFT TRANSCRIPT

2     Q.   And that to the extent any business

3   plans had been created before May 31, 2004, they

4   would have been retained only potentially in

5   various employee files?

6          MR. ROUHANDEH:  Objection to form.

7     A.   Yes, by the individual representatives

8   who would have created those plans.

9     Q.   What does it mean to say that a plan

10  has been manually created?

11         MR. ROUHANDEH:  Objection to form.

12    A.   I'm not familiar with the term.

13    Q.   Well, in connection with a letter that

14  we received from Mr. Mizell sell at Shook, Hardy

15  & Bacon, counsel for Pfizer on April 2, 2008

16  regarding this issue of the plans in the H C

17  exchange database we were advised that -- I'll

18  quote and I have a copy of the letter if you

19  want to read along -- as for any plans that were

20  created during the discovery period we

21  understand that they would have been manually

22  created and potentially retained in various

23  employees' files.  We have continued to search

24  for but had not identified any other responsive

25  documents.

1        ROUGH DRAFT TRANSCRIPT

2            Again, my question is what does it

3    mean to say that a plan was manually created?

4            MR. ROUHANDEH:  Objection to form,

5    lack of foundation.

6        A.    You would have to ask Mr. Mizell

7    specifically what he meant.  My assumption is he

8    means that created by the individual custodian

9    either in I assume paper is still a possible

10    format or a Word document or some other form as

11    opposed to being generated by a database system.

12        Q.    It is my understanding, Ms. Kibbe,

13    based upon testimony from some of the Warner

14    Lambert era employees that at the time they

15    terminated with Warner Lambert or Pfizer after

16    Pfizer acquired Warner Lambert, that they were

17    asked to box up their documents and their

18    computer and either left them at their offices

19    or sent them to Morris Plains.

20            Do you have any understanding of

21    whether that based upon your efforts to go and

22    search for documents that that process occurred?

23            MR. ROUHANDEH:  Objection.

24        Q.    In the summer of 2000?

25            MR. ROUHANDEH:  Objection to form,

1          ROUGH DRAFT TRANSCRIPT

2    record, the time is 1:31.  This is tape four.

3  BY MS. DALEY:

4      Q.   Ms. Kibbe do you know what the MM web

5  is?

6      A.   Yes.

7      Q.   What is that?

8      A.   Managed markets web.  It is a company

9  application.

10     Q.   Company application for what?

11     A.   It's a web portal for the managed

12  markets representative.

13     Q.   When was that in existence?

14     A.   Similar to H C exchange, its initial

15  role out was in late 2001 for the initial role

16  out and it is still in existence today.

17     Q.   Is the information that is put into

18  this web portal maintained?

19        MR. ROUHANDEH:  Objection to form?

20     A.   It would depend on the time period you

21  are talking about.  It was used in a variety of

22  different ways.  It is a portal application.

23  The business needs and uses have changed its its

24  inception.  It is treated like any other company

25  web portal, it is an active environment that can

1          ROUGH DRAFT TRANSCRIPT

2     be modified and changed as needed by the

3     business.  But it is currently maintained in our

4     data center as a company supported application.

5          Q.   What you say it is an active

6     environment does that mean that information gets

7     written over?

8          MR. ROUHANDEH:  Objection to the form.

9          A.   Not written over in the sense of like

10    a backup tape, but information can be moved and

11    modified so people can post documents and remove

12    documents and post new documents.

13         Q.   If a document is removed from the MM

14    web, is there a place or a location where that

15    document is still stored?

16         MR. ROUHANDEH:  Objection to form,

17    hypothetical.

18         A.   Well, again, the application is merely

19    a portal, it does not create any document, so

20    the documents that are loaded or removed are

21    created by the individuals doing that.

22         Q.   Focus first on the documents that are

23    removed.

24              Once a document is removed from the MM

25    web, is it still maintained in electronic format

143

1           ROUGH DRAFT TRANSCRIPT

2    somewhere at the company?

3           MR. ROUHANDEH:  Objection to the form.

4       A.   If an individual chooses to remove a

5    document, the document would then be maintained

6    or not at the individual's discretion, it would

7    be documents created by individuals, not by the

8    application itself.

9       Q.   If a document that's on the MM web is

10   modified in some way, is there a record of the

11   unmodified document maintained by the company in

12   some location?

13          MR. ROUHANDEH:  Same objection.

14      A.   Again, the document would be created

15   by an individual.  The application doesn't

16   create any document so it doesn't have the

17   equivalent of, say, a track changes.  The

18   application that created the document, Microsoft

19   Word, Excel, whatever, PowerPoint, whatever

20   document program created the document, would

21   have that information.

22      Q.   That wasn't my question.  My question

23   is, if a document was modified by an individual

24   is the original document maintained by the

25   company somewhere?

1      ROUGH DRAFT TRANSCRIPT

2          MR. ROUHANDEH:  Objection to form,

3   hypothetical, vague and ambiguous.

4      A.   And I think I did answer that

5   question, I said that would be up to the

6   individual to retain or not.  The application

7   itself doesn't retain anything.

8      Q.   What types of individuals would have

9   had access to the MM web portal?

10         MR. ROUHANDEH:  Objection to form,

11  beyond the scope.

12     A.   It would have varied from its

13  inception in 2001, but generally the individuals

14  who worked on the managed market accounts.

15     Q.   That would be individuals who worked

16  on the managed market accounts would be in the

17  sales and marketing group?

18         MR. ROUHANDEH:  Objection to form.

19     A.   They are technically under the

20  umbrella of sales and marketing, yes, but they

21  are their own group as opposed to the

22  representatives who call on doctors.

23     Q.   Do you know whether the MM web was

24  searched to determine whether there were any

25  documents in that application that were

1           ROUGH DRAFT TRANSCRIPT

2    responsive to plaintiffs' document request in

3    this case?

4           MR. ROUHANDEH:  Objection to form,

5    lack of foundation.

6      A.   It was identified as was H C exchange

7    as a potential source for information.  The

8    information that was currently maintained on the

9    site at the time it was looked at was beyond the

10   discovery period and that is when the

11   investigation -- we began the investigation to

12   understand how MM web worked and identified that

13   the documents were in fact created by the

14   individuals, not by the system, and we focused

15   our search then on the individuals who may or

16   may not have had documents.

17     Q.   To the extent that an individual sales

18   rep may have had business plans that referred to

19   any of the named third-party payers in this

20   litigation, how would you have gone about

21   searching those files to determine whether there

22   were any responsive documents?

23          MR. ROUHANDEH:  Objection to the form,

24   lack of foundation, beyond the scope.

25     A.   We would have followed the same

1          ROUGH DRAFT TRANSCRIPT

2     process once the individual representatives who

3     may have called on the plans at issue were

4     identified, we would have followed the exact

5     same collection and processing procedure as we

6     would have for any other custodian.  And

7     assuming that the operating plans or business

8     plans actually referenced the word Neurontin or

9     one of our other search terms they would have in

10    fact been pulled in as potentially relevant to

11    be reviewed by counsel.

12        Q.    So let's just say there is a sales rep

13    that has a business plan who calls on physicians

14    but doesn't call on third party payers but they

15    have a business plan that references Aetna for

16    instance would that have been a document you

17    would have gathered in connection with your

18    document collection efforts?

19        MR. ROUHANDEH:  Objection to the form,

20    lack of foundation, actually shows a complete

21    misunderstanding about the scope of the document

22    collection and production in this case, there

23    were numerous discussions about the scope of

24    what needed to be searched, what needed to be

25    reviewed in production.  Your questions show a

147

1        ROUGH DRAFT TRANSCRIPT

2    lack of familiarity with them.

3        MS. DALEY:  Mr. Rouhandeh your

4    objection is completely out of line and actually

5    indicates your lack of familiarity with the

6    documents that have been produced in this case.

7        Q.    Ms. Kibbe my question again, and

8    I'll -- did you understand it?

9        A.    I did.

10        MR. ROUHANDEH:  Same objections.  I

11    guess we can have that debate at some other time

12    as to who is correct.

13        A.    If a representative -- our collection

14    efforts as I said before is though collect

15    everything that individual has not restricted by

16    dates or search terms.  Once that is collected

17    and preserved and it is sent to processing, if

18    that business plan called on Aetna and also

19    had -- it would have to have one of the search

20    terms in it if it existed electronically, if it

21    was a paper document, it would have been sent

22    with the group of paper documents and it would

23    have gone into the review room as part of the

24    standard procedure.

25        So whether or not a particular

1    ROUGH DRAFT TRANSCRIPT

2    operating plan that had the word Aetna in it

3    would actually make it to the review room would

4    depend on what other words it had in it, and if

5    it hit on any of the search terms, or if it was

6    attached to an e-mail that hit on any of the

7    search terms.

8        Q.   But if it had Aetna and Neurontin in

9    it, it would be your understanding it would have

10   been sent to the review room, is that what you

11   are saying?

12       MR. ROUHANDEH:  Objection to form,

13   lack of foundation.

14       A.   Under the terms of our protocol, yes,

15   Neurontin was a serch term so it should.

16       MS. DALEY:  I have no further

17   questions at this time.

18   BY MR. ARANOFF:

19       Q.   Ms. Kibbe, my name is Ron Aranoff and

20   I represent the sales and marketing class

21   plaintiffs.  Good afternoon.  How are you?

22       A.   Hello.

23       Q.   Okay.  I just have some basic follow

24   up things from some of the questions that my

25   colleagues asked earlier today.  Just give me a