UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------- x
In re:  NEURONTIN MARKETING,
        SALES PRACTICES AND
        PRODUCTS LIABILITY LITIGATION
---------------------------------------------- x
THIS DOCUMENT RELATES TO:

        PRODUCTS LIABILITY ACTIONS


---------------------------------------------- x

: MDL Docket No. 1629
:
: Master File No. 04-10981
:
: Judge Patti B. Saris
:
: Magistrate Judge Leo T.
: Sorokin

### DEFENDANTS' MEMORANDUM IN SUPPORT OF
### MOTION FOR LEAVE TO NAME A REBUTTAL EXPERT

Defendants Pfizer Inc. and Warner-Lambert Company LLC ("defendants") respectfully submit this memorandum in support of their motion for leave of Court to name a rebuttal expert to address plaintiffs' experts' causation testimony based on the January 31, 2008 FDA Alert entitled "Suicidality and Antiepileptic Drugs" ("FDA Alert").  Plaintiffs' general causation experts, Drs. Trimble, Kruszewski and Blume, universally rely on the FDA Alert and have testified that it provides further support for their causation opinions.  Indeed, in plaintiffs' response to defendants' motion to exclude the testimony of three of their general causation experts, plaintiffs claim that their experts' opinions "are consistent with and supported by the FDA's weighty evaluation . . . ."[1]  Because the Alert raises new and unforeseen issues on which plaintiffs' experts rely for their general causation opinions, and defendants have not had the opportunity to address plaintiffs' experts' new reliance on the Alert through relevant expert

---

[1] Product Liability Plaintiffs' Memorandum of Law in Opposition to Defendants Pfizer Inc. and Warner-Lambert Company LLC's Motion to Exclude the Testimony of Doctors Trimble,

2893501v5

- 2 -

testimony, defendants should be permitted to identify a rebuttal expert to opine on the FDA Alert, the analysis set forth in it, plaintiffs' experts' reliance on it, and inferences plaintiffs attempt to draw on the basis of the Alert.

## I. INTRODUCTION

Plaintiffs' supplemental expert disclosure served on February 1, 2008, and the depositions that followed, clearly demonstrate that plaintiffs' experts rely on the FDA Alert as a new basis for their general causation opinions. Drs. Kruszewski, Blume and Trimble opined at their depositions that FDA's pooling of placebo-controlled trial data for eleven different antiepileptic drugs (AEDs)—with disparate mechanisms of action and pharmacologic properties—supports their opinions on general causation, i.e., that Neurontin causes suicide-related events (suicide, suicide attempt, suicide gesture, and suicide ideation). Plaintiffs' experts offered these opinions despite: (1) the plain language of the Alert disavowing any conclusions about causation; (2) their reports and prior testimony under oath that the Neurontin-specific placebo-controlled clinical trial data fail to show an association between Neurontin and suicide-related events; and (3) plaintiffs' own admission that the Neurontin-specific data do <u>not</u> show an increased risk of suicide. Products Liability Plaintiffs' Memorandum in Opposition to Defendants' Emergency Motion to Modify the November 9, 2007 Case Management Order, at 10 (Doc. 1134) ("Plaintiffs do not dispute that Defendants' Neurontin-specific data, based upon improperly designed and underpowered clinical trials, show no increased risk of suicide."). Because plaintiffs' experts now attempt to bolster their opinions by relying on the FDA Alert, defendants request leave to name an expert witness specifically to rebut the scientific reliability of the FDA Alert and plaintiffs' experts' reliance on it. If defendants' motion for leave is

---

Kruszewski and Blume on the Issue of General Causation (hereinafter "Plaintiffs' Opposition") (filed April 4, 2008) (Doc. 1191) at 24.

granted, defendants would designate Dr. Robert Gibbons, Ph.D., an eminently qualified psychometric biostatistician, on these issues, as well as the limitations of FDA's pooled data analysis and findings, to which plaintiffs' own experts alluded at their depositions.

## II.   ARGUMENT

### A.   Plaintiffs' Experts' Reliance on the FDA Alert as a New Basis for Their Causation Opinions Raises New Issues That Warrant the Opportunity for Defendants to Name a Rebuttal Expert

After the close of expert discovery on the issue of general causation, on February 1, 2008, plaintiffs filed a supplemental expert disclosure stating that four of their experts (Drs. Kruszewski, Trimble, Blume and Greenland) would rely on the FDA Alert as an additional basis for their opinions.[2] The Alert reported on placebo-controlled trial data for eleven different AEDs, including Neurontin (the chemical name of which is gabapentin), without providing information regarding drug-specific analyses or data. FDA did not provide even a summary of any of the drug-specific data on which the Alert was based—and defendants are not in possession of any of these data for drugs manufactured by other companies—or any information regarding its methodology for the pooled analysis. Because the Neurontin-specific data do not show any increased risk of suicide-related events, it is reasonable to conclude—and plaintiffs'

---

[2] Defendants previously argued and still contend that plaintiffs' disclosure contains new, rather than supplemental opinions. Notably, before the issuance of the FDA Alert, plaintiffs' experts' took the position that the Neurontin randomized controlled clinical trial data do not establish an association between Neurontin and suicide-related events, and therefore, did not affect their general causation opinions. Drs. Greenland and Blume opined that the data were too small to draw any conclusions. Dr. Trimble testified that the data were "not relevant" to his general causation opinions. And Dr. Kruszewski admitted that he never even reviewed the placebo-controlled trial data. Kruszewski Dep. at 590:10-591:7, attached as **Exhibit A**. After the issuance of the FDA Alert, however, plaintiffs' experts' changed their tune. They now contend that the FDA Alert—based in relevant part on precisely the data plaintiffs' experts previously downplayed or ignored—supports their general causation opinions. Ex. A at 601:1-3; Blume Dep. at 16:6-14, attached as **Exhibit B**. Regardless of whether these opinions are "new," it is undisputed that plaintiffs' experts have interjected into this litigation a new issue that defendants could not have foreseen—whether an FDA Alert that had not even been issued when defendants identified their experts and provided their expert reports is appropriate support for a scientific opinion that Neurontin causes suicide-related events.

- 3 -

experts concede—that the drug-specific data for one or more of the <u>other</u> AEDs analyzed by FDA skewed the results for the entire group of medications reviewed—a subject that requires expert consideration, as even plaintiffs' experts agree.[3]

For that reason, shortly after receiving the Alert and plaintiffs' supplemental expert disclosure, defendants filed a motion to extend the *Daubert* briefing schedule. Defendants sought to extend the schedule only until they received the data FDA considered, so that they could have the opportunity to fully analyze FDA's methodology. At a minimum, defendants sought to depose plaintiffs' experts on their reliance on the Alert. The Court held a hearing on February 19, 2008 and ruled that it would not stay the expert proceedings to wait for FDA—given that it could take some time to receive the data—but that it would allow defendants to depose plaintiffs' experts on their opinions regarding the FDA Alert and allow a one week extension in the briefing schedule.

The Court recognized that "if the FDA finally spills forth, we may end up having to do something new . . . . I'm not precluding you from going forward with the FDA." Transcript of Feb. 19, 2008 Hearing at 7:5-8, attached as **Exhibit D**. Shortly thereafter, counsel for defendants deposed Drs. Kruszewski, Trimble, and Blume. During these depositions, plaintiffs' experts uniformly testified that the FDA Alert "supports" their general causation opinions, despite the express language in the Alert stating FDA has <u>not</u> determined that a causal relationship exists between any of the AEDs included in the analysis and suicidal thinking and behavior. FDA

---

[3] Trimble Dep. at 111:16-112:17 (noting he has not assessed FDA's methodology because "meta-analysis is a highly complex statistical analysis, which is very controversial and it's an area which is for statisticians and not for—I'm not a statistician, and basically, it is a statistical matter to discuss complexities of meta-analysis"), attached as **Exhibit C**; Ex. B at 31:9-19 (noting that she would need to provide the data underlying the Alert to a biostatistician to assess FDA's methodology); Ex. A at 631:19-632:10 (noting that the question of whether the heterogeneity of the data underlying the Alert would affect the reliability of generalizing the results across all studies in the Alert required expert statistical analysis, which was "probably" beyond his area of expertise).

- 4 -

Alert, "Suicidality and Antiepileptic Drugs," at 1, Jan. 31, 2008 ("Posting this information does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue."), attached as **Exhibit E**. Plaintiffs' experts admitted that they were unaware what methods FDA had used, and similarly unaware what the data for the ten AEDs other than Neurontin show. In addition, plaintiffs' experts testified that the dataset on which the FDA Alert is based comprises aggregated data from eleven AEDs with different pharmacologic properties, chemical structures, mechanisms of action and safety profiles.[4] They agreed that these differences could affect the scientific validity of FDA's pooled analysis, but were not able to state in what way because this was not their area of expertise. Plaintiffs' experts agreed, however, that data for as few as one or two of the ten AEDs *other than Neurontin* could account for the increased risk found by FDA, and that they have no basis on which to identify which of the AEDs in the mix drove the result. Ex. A at 601:22-602:9; Ex. C at 45:25-46:10; Ex. B at 8:22-9:10.

Notwithstanding this testimony, plaintiffs' experts made clear during their depositions that they endorse FDA's methodology and conclusions. Dr. Blume testified that FDA "spent years" reviewing the data underlying the FDA Alert, and that although she "did not know the specifics upon which they developed their analyses," she "defer[s] to the FDA . . . which employs phenomenal biostatisticians and epidemiologists." Ex. B at 19:20-20:15. Dr. Trimble likewise deferred to FDA, testifying that FDA, which has "expert statistical advice" would not

---

[4]  Ex. A at 615:22-616:5 (different risk profiles); 644:5-645:5 (different pharmacologic properties), 647:3-15 (different chemical structure), 649:17-23 (different mechanism of action), 652:25-653:5 (no published literature supports aggregating data for drugs with different mechanisms of action and different pharmacologic properties to determine scientific causation for one drug in the pool); Ex. C at 37:20-38:19 (different mechanism of action and different chemical compounds), 61:3-25 (different mechanism of action, diverse treatment effects, and different pharmacologic properties), 105:17-22 (different risk-benefit profile); Ex. B at 17:8-18:12 (different pharmacokinetic properties, different mechanisms of action).

have made the statements in the Alert without "considering them very carefully." He stated, "I accept the FDA's opinion. Who am I to argue with the FDA." Ex. C at 95:21-96:4. Dr. Kruszewski likewise accepted FDA's analysis and conclusions at face value, Ex. A at 639:10-640:4, testifying that he "assume[d]" that FDA's analysis was "carefully planned with a detailed protocol," but that he had not seen it. *Id.* at 618:3-14. This testimony unequivocally demonstrates plaintiffs' experts' blind reliance on the Alert—without even a complete understanding of FDA's methodology or the relevant expertise to evaluate it.[5]

Moreover, in plaintiffs' response to defendants' *Daubert* motion, plaintiffs trumpet the FDA Alert and the methodology upon which it is based—despite their experts' express concessions that they do not have any information about FDA's methodology and are not qualified to assess it, but merely rely on the Alert at "face value." For example, plaintiffs claim that FDA applied "rigorous scientific standards in reaching its conclusion about the ability of Neurontin to significantly increase the risk of suicidality." Plaintiffs' Opposition at 27. Setting aside that the FDA Alert says nothing about Neurontin specifically, and that FDA has not yet provided details of its methodology or "scientific standards," plaintiffs have attempted to do in their motion what their own experts could not do at deposition—that is, vouch for its reliability. And, when defendants demonstrated—through plaintiffs' experts' own admissions—the

---

[5] Plaintiffs' experts admit that they know nothing about FDA's methodology or analysis, and that they have not done anything to try to obtain more information regarding the basis for FDA's conclusions in the Alert. *See e.g.*, Ex. A at 608:14-19; 612:15-21, 616:6-620:12; Ex. B at 31:9-32:22; Ex. C at 112:6-113:19. Plaintiffs' experts' blind reliance alone is enough to preclude them from testifying that the Alert supports their general causation opinions—particularly where FDA has stated its express disagreement with the causation conclusions plaintiffs' experts' reach purportedly on the basis of the FDA Alert. Certainly plaintiffs have not established that their experts' opinions regarding the Alert are scientifically reliable as required by Rule 702 and *Daubert*, when plaintiffs' own experts are admittedly ignorant of the methodology and analysis underlying the Alert. At a minimum, plaintiffs' unquestioning reliance entitles defendants to a rebuttal expert to address the scientific reliability of such an approach.

numerous possible limitations of FDA's pooled data analysis for disparate drugs, plaintiffs responded that this "apparent criticism of FDA methods is pure folly." *Id*. at 24.

Plaintiffs went so far as to submit a new declaration from Dr. Kruszewski in response to defendants' *Daubert* motion, suggesting that the FDA Alert changed the available epidemiologic evidence as well as the *Daubert* inquiry. Dr. Kruszewski's declaration states that "before the January 31, 2008 FDA alert . . . there was no accessible or adequate epidemiologic data that answered the question one way or the other as to a relationship between Neurontin and suicide." Kruszewski Decl. at ¶ 20, attached as **Exhibit F**. Dr. Kruszewski—who, by the way, has no qualifications or relevant experience in epidemiology or the principles of meta-analysis—now apparently opines that the FDA Alert (based on data from *other* drugs that he admits all work differently in the body and have different risks and benefits) constitutes sufficient epidemiologic evidence to "answer" the general causation question here.[6] Plaintiffs and their experts have put the Alert and the methodology on which it is based under the "klieg lights." Allowing plaintiffs' experts' testimony regarding the FDA Alert to come before the Court and jury without the benefit of expert testimony putting it in proper scientific context would undermine the pretrial process and be unduly prejudicial to defendants.

---

[6] Plaintiffs' expert witness Dr. Greenland (who has never offered a general causation opinion in this case) has also submitted an entirely new Declaration with plaintiffs' opposition based almost exclusively on the Alert and his new statistical calculations of confidence intervals for the "risk difference" and "relative risk" reported in the Alert. While Dr. Greenland continues to opine that the Neurontin data do not establish an association between Neurontin and suicide, he now opines that the pooled data in the FDA Alert, based on his own calculations, are not due to chance. Thus, in addition to plaintiffs' supplemental designation, and the testimony of plaintiffs' experts at deposition, plaintiffs now proffer new Declarations of their experts on the FDA Alert – which can hardly be distinguished from attempting to back door in (outside the scope of Rule 26 and the expert discovery schedule set by the Court) new "reports." Moreover, plaintiffs use Dr. Greenland's new calculations as a platform for spinning new arguments and drawing new inferences in their opposition in a transparent attempt to resurrect their experts' opinions after defendants' *Daubert* challenge.

2893501v5

B.      **Defendants Should Be Allowed Leave To Name Dr. Robert Gibbons As a Rebuttal Witness**

Because plaintiffs' experts' reliance on the Alert interjects new and complex issues into the litigation—namely, the scientific reliability of FDA's pooled data analysis and findings, and the appropriate inferences regarding Neurontin and suicide that can be drawn from them, defendants should be permitted to name an expert witness with the specific qualifications and experience necessary to address FDA's analysis and plaintiffs' experts' reliance on it. Rule 26(2)(C)(ii) expressly permits rebuttal testimony within 30 days after the disclosure of an expert report (which plaintiffs never served here) or at the court's discretion. "The principal objective of rebuttal [testimony] is to permit a litigant to counter new, unforeseen facts brought out in the other side's case." *Faigin v. Kelly,* 184 F.3d 67, 85 (1st Cir. 1999). Courts routinely allow rebuttal expert testimony when opposing experts express opinions on issues not previously discussed in their expert reports, as plaintiffs' experts did here. *See, e.g., Diomed Inc. v. Angiodynamics, Inc.,* 450 F. Supp. 2d 130 (D. Mass. 2006) (ordering that expert who raised new issues in supplemental report be made available for deposition and that opposing party be permitted leave to designate a rebuttal expert and, if desired, produce a rebuttal report); *Cytyc Corp. v. Tripath Imaging, Inc.*, No. 03-11142, 2005 U.S. Lexis 12777 at *16-17 (D. Mass. Apr. 4, 2008) (ordering that party was "entitled" to submit a rebuttal report addressing the new issues raised in opposing party's report); *Estate of Vaughan v. Kia Motors Am., Inc.*, No. 05-CV-38BS, 2006 WL 1806454, at * 2 (S.D. Miss. June 29, 2006) (noting that there is a need for rebuttal designation when an opposing expert raises new issues in his report); *Hidalgo v. Cooley Godward Castro Huddleston & Tatum*, No. 302CV1709, 2004 WL 936859, at *2 (N.D. Tex.

2893501v5

April 1, 2004) (same).[7] And, at least one Court has held that "it is fundamentally unfair and unduly prejudicial" not to allow a party to designate rebuttal witnesses to address new issues. *Hidalgo*, No. 302CV1709, 2004 WL 936859, at *2 (N.D. Tex. April 1, 2004).

Importantly, defendants could not have foreseen the new issues raised by the FDA Alert when they designated general causation witnesses in response to plaintiffs' experts' opinions. Nor could defendants have anticipated these issues prior to the deadline for disclosure of expert reports. Defendants were not given any advance notice of the FDA Alert, which was issued on January 31, 2008, more than a month after defendants' deadline for service of expert reports. Defendants did not know, and could not have been expected to know, that the FDA would issue an alert as to some combination of drugs used to treat epilepsy. And defendants were in possession of only their own data, which, again, shows no increased risk of suicide-related events. Defendants' experts, therefore, could not have opined as to data for the other drugs addressed in the FDA Alert. Plaintiffs' experts' reliance on the Alert was likewise unanticipated, as it is based in relevant part on the same data that they previously testified was not considered by them and/or did not affect their general causation opinions. *See* note 2.[8] Moreover, while plaintiffs' experts previously criticized FDA's approval of and warnings regarding Neurontin, now plaintiffs' experts have testified they accept FDA's analysis and findings in the Alert—the details of which remain a mystery—at "face value."

Immediately following plaintiffs' experts' supplemental depositions, defendants began searching for a qualified expert to rebut the new issues raised by plaintiffs' experts' reliance on

---

[7]  *C.f.*, *Sprague v. United Air Lines, Inc.*, No. 97-12102, 200 U.S. Lexis 20889, at *2-3 (D. Mass. May 3, 2000) (request for designation of rebuttal expert denied where opposing expert did not raise issues that were "new" and "unforeseen").

[8]  Defendants likewise could not have anticipated Dr. Kruszewski's new opinions that the FDA Alert, analyzing data for ten AEDs other than Neurontin which he has never seen, somehow

- 9 -

the FDA Alert. Defendants are prepared to designate Dr. Robert Gibbons as a rebuttal expert. Dr. Gibbons is uniquely qualified to opine on plaintiffs' experts' reliance on the Alert, as well as FDA's analysis and methodology and their scientific reliability.[9] He has a Ph.D. in biostatics, has taught biostatics for the past twenty-seven years, and has authored numerous peer-reviewed publications in the field of biostatistics. Not only is he a learned biostatistician, but he is also an expert in psychometrics, or the quantification of behavioral and psychiatric characteristics, and has analyzed and quantified suicide events in the context of FDA's review of antidepressant medications for risk of suicide. Indeed, Dr. Gibbons served on the FDA Advisory Committee that considered suicide risk with antidepressant medications.

If defendants' motion for leave is granted, Dr. Gibbons will opine on the scientific validity of reliance on the FDA Alert for general causation opinions, limitations of pooled data analyses in general and specific to FDA's analysis, improper inferences plaintiffs make on the basis of the Alert, and analyze any data forthcoming from FDA in advance of the FDA Advisory Committee meeting. Based on past experience and his own peer-reviewed studies, Dr. Gibbons believes that additional information from FDA regarding drug specific data will allow analyses which may demonstrate that the increased risk reported in the Alert is not shared by all AEDs. Given the lateness of plaintiffs' experts' reliance on the FDA Alert, the complexity of the issues involved, and the great weight plaintiffs place on the Alert in their recent briefing, defendants believe that a cogent response from a well-credentialed expert will aid the Court's resolution of the *Daubert* motion.

---

[9] constitutes new epidemiologic data that answers the general causation question here—whether Neurontin (not some other unrelated drug) causes suicide.
Dr. Gibbons' curriculum vitae is attached as **Exhibit G**.

Defendants do not anticipate an extension of the schedule set forth by the Court for the joint *Daubert/Frye* hearing.  Based on the hearing date of June 19-20, 2008, there is sufficient time for Dr. Gibbons to prepare an expert report on the areas outlined above in advance of the hearing.  Defendants request that they be given 30 days following the receipt of FDA's summary report or no later than May 20, 2008 to serve a rebuttal expert report.  Following service of this report, defendants will make Dr. Gibbons available for deposition should plaintiffs desire to depose him.

### III.    CONCLUSION

As set forth above, plaintiffs' experts rely on new information in the FDA Alert as a new basis for their general causation opinions, consequently interjecting new and complex issues into the litigation that defendants have not yet had an opportunity to rebut through relevant expert testimony.  Defendants respectfully request that the Court grant their motion for leave to name a rebuttal expert on the issues outlined above.

Dated: April 10, 2008                    Respectfully submitted,

DAVIS POLK & WARDWELL

By:    /s/ James P. Rouhandeh
       James P. Rouhandeh

450 Lexington Avenue
New York, NY 10017
Tel:  (212) 450-4000

-and-

2893501v5

SHOOK, HARDY & BACON L.L.P.

By: /s/ Scott W. Sayler
     Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550

-and-

HARE & CHAFFIN

By: /s/ David B. Chaffin
     David B. Chaffin

160 Federal Street
Boston, MA 02110
Tel: (617) 330-5000

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on April 10, 2008.

           /s/ David B. Chaffin
           David B. Chaffin