# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------X
In re: NEURONTIN MARKETING, SALES PRACTICES :  MDL Docket No. 1629
AND PRODUCTS LIABILITY LITIGATION           :
------------------------------------X
                                            ;  Master File No. 04-10981
THIS DOCUMENT RELATES TO:                   :
                                            :
ALL PRODUCT LIABILITY CASES                 :  Hon. Patti B. Saris
------------------------------------X          Magistrate Leo T. Sorokin

### DECLARATION OF STEFAN KRUSZEWSKI, M.D.

I, Stefan Kruszewski, MD, declare and state as follows:

1. My name is Dr. Stefan Kruszewski. I have an M.D. degree from Harvard Medical School (1977). A true copy of my resume – curriculum vitae is attached as Exhibit Kruszewski-A. The lists of education, experience, and achievements listed on my resume-curriculum vitae are true.

2. I have been accepted as an expert witness in pharmaceutical litigation in the courts listed in my list of cases which is attached to my previous expert disclosure.

3. I have 28 years of clinical practice (including internship and residency). I have treated several thousand patients with a wide variety of psychiatric and neuropsychiatric conditions to whom I have prescribed numerous drugs for psychiatric and neuropsychiatric indications. In that capacity I have witnessed the side effects of drugs that predispose an individual to neuropsychiatric complications.

4. I have specialized training and knowledge in psychopharmacology, including education in medical school, residency, post-graduate work and continuous reading and updating through Continuing Medical Education (CME) work.

5. I have been an educator regarding basic and applied psychiatric and neuropsychiatric psychopharmacology, including metabolic dysfunction, at several institutions, including Harvard Medical School (1974-77), specifically epidemiology of obesity), UMDNJ-Rutgers Medical School/Robert Wood Johnson as a member of the residency program and faculty (1980-83), and University of Pittsburgh School of Medicine, Western Psychiatric Institute and Clinic (1988-1991), Allegheny General Hospital and related Medical Schools, (1991-92), University of North Texas Medical School (1992-93) and, as a member of the Clinical Faculty of Penn State College of Medicine-Hershey Medical School (1999-2004). As part of those academic teaching appointments I lectured on epidemiology, psychiatry, neuropsychiatry and related fields, including factors that affect and illness of individuals and populations to identify risk factors for disease and to determine optimal treatment approaches to clinical practice.

6. Among my peer-reviewed publications as solo and primary author are research articles in my specialty in peer-reviewed journals, including the *BMJ* (previously titled, British Medical Journal), *American Journal of Psychiatry, Neurology, Journal of the American Medical Association, the New England Journal of Medicine, Annals of Clinical Psychiatry, Journal of Clinical Psychiatry* (as of Spring 2007) and others. Those publications have covered a wide spectrum of issues pertaining to drugs (including anti-psychotics), side-effects, conflicts of interest and the validity and consistency of research.

7. I am on the Board of Directors of the Alliance for Human Research Protection. In that capacity, I review and analyze information from national and international peer-reviewed and edited sources related to clinical research on issues pertaining to drugs and device side-effects. That work includes ongoing study of effects and side-effects of *anticonvulsants*, antidepressants, anti-psychotics, stimulants, sedatives, drugs of abuse and mood-stabilizing drugs.

8. In 2001-2003, I provided psychiatric expertise regarding behavioral access to care for a white paper designed for the NCQA (National Committee on Quality Assurance, Washington D.C.) and to be used as a guide for nationwide behavioral health programs.

9. I participated in the design and implementation of drug trials, among which is Zyprexa.

10. I was consulted in the present litigation to perform the same type of work I do in my professional employment, that is, to evaluate data regarding a drug, Neurontin, to observe its reported effects on patients exposed to it, to evaluate those effects with regard to patient populations, and to evaluate whether Neurontin may be causally related to suicide, attempted suicide, or suicide precursors in off-label populations, principally pain and psychiatric patients for whom the FDA has not approved Neurontin. In doing so, I used the same methods that I use in analyzing effects and side-effects of drugs on patients.

11. I used patient source records provided in the form of confidential documents obtained in discovery from Pfizer / Warner-Lambert. These include reports of clinical trials conducted by Warner – Lambert director of psychiatric products, Dr. Atul Pande, on bipolar patients, clinical trial reports of patients enrolled in studies for pain, clinical trial reports of patients enrolled in studies for psychiatric indications in addition to bipolar patients, and clinical trial reports of patients enrolled in studies for patients who were enrolled in the original new drug application and the supplemental new drug application submitted to the FDA.

12. I reviewed the pre-clinical animal toxicity studies performed by Warner-Lambert which disclosed that Neurontin biologically reduces monoamines, including serotonin and norepinephrine.

13. I reviewed 402 research papers published in peer-reviewed literature which analyzed the effect of anti-epileptic drugs, including Neurontin, on pain and bipolar patients. This literature also included original research which demonstrates the well-accepted knowledge that a reduction in monoamines, particularly serotonin and norepinephrine, is a precursor to the psychological states that are associated with suicide.

14. I also reviewed the actual patient experience records of patients who were exposed to Neurontin in non-clinical trial settings. These records include adverse event reports and case studies submitted by poison control centers and by physicians who inform the manufacturers and the FDA of patient difficulties which they attribute to taking Neurontin. These records also include reports of patients from whom Neurontin is removed, or dechallenged, and patients who are re-exposed, or rechallenged.

15. I also reviewed neuroimaging information performed at two independent university medical facilities, Yale and the University of Alabama, by experts who have no connection to this litigation. The scans disclosed the alteration in brain GABA and serotonin levels in patients who take Neurontin.

16. This research is adequate to evaluate whether Neurontin's psychoactive effect in human brain negatively affects mood and behavior resulting in suicidality.

17. I reviewed the available epidemiology research on the relation between Neurontin and adverse events, including Dr. Collins and MacFarland's independent epidemiology study of bipolar patients in Oregon, a well-powered independent epidemiology study that demonstrates that bipolar patients who take Neurontin are at greater risk to commit suicide than similar patients who take approved medicine for bipolar conditions.

18. It is a false criticism to block peers from reviewing a question, then criticize the absence of peer-reviewed studies. Pfizer has done so in this instance. The confidential nature of my work on this case precluded my ability to prepare any peer reviewed papers based upon my work. If Pfizer releases me from my confidentiality agreement, I may do so.

19. On page 28 at footnote 31 of the defendants' memorandum to exclude my testimony, the defendants suggest, through a misleading reference to my deposition testimony, that I have opined in this litigation that individuals with a previous psychiatric history are at the highest risk of suicidality --- higher than any other patient group taking Neurontin. Further, the defendants argue at footnote 31 that I somehow abandoned this opinion in light of the 2008 FDA Alert indicating that the "relative risk of suicidal behavior and thinking was the lowest in the patients taking antiepileptic medications for a psychiatric indication." Let it be clear that I have never opined in this case that patients with a previous psychiatric history are at the highest risk of suicidality, as compared to any other patient group taking Neurontin. Consequently, there is no such opinion for me to "abandon" as claimed by the defendants. The FDA's statements regarding a relative risk of suicidality comparing patients taking Neurontin for epilepsy, pain or a psychiatric indication remains consistent and supportive of my opinion in this case: Neurontin contributes to mood and behavioral disturbances, including suicidality, in a susceptible minority of consumers. These consumers may include but are not defined solely as individuals with a previous psychiatric history of any kind.

20. The defendants have suggested on page 29 of their memorandum to exclude my testimony that I have failed to consider contradictory epidemiologic data. This is untrue; before the January 2008 FDA alert and before publication of the Collins-MacFarland epidemiology study of Oregon bipolar patients who took Neurontin, there was no accessible or adequate

epidemiologic data that answered the question one way or the other as to a relationship between Neurontin and suicide. Therefore, I did not ignore data such as the defendants have suggested. I did study and take into account both the 2008 FDA Alert and the Collins-McFarland study.

21. Prior to the January 2008 FDA alert, I did not rely upon epidemiologic information as stand-alone evidence in forming my opinions. Therefore, the concept of rates of error and proper controls are not relevant.

22. On page 32 of the defendants' memorandum, defendants repeatedly misstate my testimony on limited questions as standing for general propositions. For example, defendants cite to my deposition, (attached as Kruszewski-X at pages 379:13-18) where I was asked whether I knew of any study that supported that gabapentin could cause suicide after a single dose and I said I could not. That question is not relevant as to whether there is a lack of published literature that supports my opinion. As to the other references, they likewise omit the complete line of questioning and the defendants' use of those partial portions are quite misleading.

23. On page 35 of the defendants' memorandum it is suggested that I only reviewed documents provided to me by Finkelstein & Partners. This is not true and is insulting; I did extensive research on the questions of gabapentin and suicide. Finkelstein & Partners did provide me with a small portion of the documents I reviewed, but this was only a starting point and the entire document collection was made available to me as needed. Furthermore, as I have been subjected to *Daubert* challenges in the past, I had no doubt that *Daubert* factors would be used as the standard by which my work would be measured and I believed it was reasonable and appropriate for me to assure that my work would meet those standards. It was my standard in performing my study in this litigation to rely upon sound science and to employ commonly-accepted methods as I understand the Federal Rules of Evidence require.

24. As a psychiatrist, I am well acquainted with psychiatric symptoms associated with an increased risk of suicide. These include depression, anxiety, aggression, hostility and emotional lability. The suggestion by the defendants that none of these events are relevant to suicide is absurd.

25. On pp. 43-44 of the defendants' memorandum, a particular dechallenge/rechallenge adverse event report is discussed. The suggestion by the defendants that this is not a dechallenge/rechallenge report is baseless and false, the apparent product of their not having actually read the underlying source documents related to the particular patient. First, when the defendants state that suicidality was not reported on dechallenge, it is clear that the defendant witness or counsel who wrote that portion of the memorandum did not read the case report forms corresponding to the event in question; the case report forms show unequivocally that the suicidality did reoccur. Defendants also suggest that the patient became suicidal after being withdrawn from the drug. This is false. The patient was rechallenged and became depressed and suicidal within five days of being reintroduced to the drug. The patient still had not recovered twenty-one days after taking the last dose. That the adverse event did not resolve after the patient was taken off the drug does not take minimize the evidence of the dechallenge. I would also like to point out that the defendants intentionally deceived me at my deposition in only

showing me the last two pages of the case report forms which showed the event continuing after the last ingestion of the drug.

26. While it is true on page 13 of my expert report I erroneously identified all of the listed adverse event reports as coming from controlled clinical trials when some of them came from uncontrolled trials, this is a meaningless error. I was not using epidemiologic methods in reviewing these case reports as such methods are not a requirement when assessing a causal relationship between a drug and an adverse event. Uncontrolled studies simply mean that there is no placebo comparison group to compare statistics. They are performed with the same vigor as controlled studies and are an integral part in demonstrating the safety of the drug for a New Drug Application. Therefore, for the purposes I was using the case reports in question, the distinction between controlled and uncontrolled studies was meaningless.

27. Defendants have criticized me at page 45 of their memorandum that I did not list every possible piece of information in my report. My report contains information which after review and consideration, I concluded was significant to my opinion.

28. On many occasions in my deposition I was asked questions as to whether there was peer reviewed literature directly supporting my opinions. The absence of peer-reviewed literature on the specific issue is because Pfizer and Warner-Lambert did not release their confidential scientific research to the medical research community for review and analysis. Even so it is normal within the medical research community when, in the absence of peer reviewed literature directly on point for want of anyone having previously studied the particular questions, reasonable inferences can and are made using the existing scientific literature.

29. I incorporate herein my report and also incorporate herein my review of the FDA Safety Alert dated January 31, 2008. They are true and correct. The opinions in my report and as stated herein are my opinions. They were reached only after I reviewed the material recited therein and after I evaluated each of them as set out above and as stated in my report. My evaluations were conducted based on the methods described herein and on methods adopted by the FDA and by my peers. They are based on a reasonable medical and scientific probability.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of April, 2008, in Harrisburg, PA.

Stefan Kruszewski, M.D.

4/3/08