MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

## Page 2

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
 4     IN RE:                            )
       NEURONTIN MARKETING, SALES PRACTICES ) CA No. 0
 5     AND PRODUCTS LIABILITY LITIGATION    ) Pages 1 - 78
       SALES PRACTICES LITIGATION         )
 6
 7
 8
 9                      MOTION HEARING
10           BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
11
12
13
14
                    United States District Court
15                1 Courthouse Way, Courtroom 19
                       Boston, Massachusetts
16                    May 4, 2007, 2:10 p.m.
17
18
19
20
21
22
                         LEE A. MARZILLI
23                   CERTIFIED REALTIME REPORTER
                    United States District Court
24                 1 Courthouse Way, Room 3205
                         Boston, MA  02210
25                       (617)345-6787
```

## Page 3

```
 1    A P P E A R A N C E S:
 2    FOR THE PLAINTIFFS:
 3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
      Greene & Hoffman, P.C., 125 Summer Street, Suite 1410,
 4    Boston, Massachusetts, 02110.
 5        THOMAS M. SOBOL, ESQ., Hagens, Berman, Sobol & S
      LLP, One Main Street, Cambridge, Massachusetts, 01923.
 6
          ELIZABETH CABRASER, ESQ. and BARRY R. HIMMELS
 7    Lieff, Cabraser, Heimann & Bernstein, LLP, Embarcadero Ce
      West, 275 Battery Street, 30th Floor, San Francisco,
 8    California, 94111-3339.
 9        JAMES. R. DUGAN, II, ESQ., Dugan & Browne,
      650 Poydras Street, Suite 2150, New Orleans, Louisiana,
10    70130.
11        DANIEL E. BECNEL, JR., ESQ, Becnel Law Firm, LLC,
      106 W. Seventh Street, P.O. Drawer H, Reserve, Louisiana,
12    70084.
13        GERALD LAWRENCE, ESQ., Lowey, Dannenberg, Bemp
      Selinger & Cohen, P.C., Four Tower Bridge, 200 Barr Habor
14    Drive, Suite 400, West Conshohocken, Pennsylvania,
      19428-2977.
15
      FOR THE DEFENDANTS:
16
          DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
17    160 Federal Street, 23rd Floor, Boston, Massachusetts,
      02110-1701.
18
          JAMES P. ROUHANDEH, ESQ. CARTER H. BURWELL,
19    NEAL A. POTISHMAN, ESQ., REID SKIBELL, ESQ., and
      RAJESH JAMES, ESQ., Davis, Polk & Wardwell,
20    450 Lexington Avenue, New York, New York, 10017.
21        JAMES P. MUEHLBERGER, ESQ., Shook, Hardy & Baco
      2555 Grand Boulevard, Kansas City, Missouri, 64108.
22
23
24
25
```

## Page 4

```
 1                    P R O C E E D I N G S
 2         THE CLERK:  In Re: Neurontin Marketing, Sales
 3    Practices and Product Liability Litigation, Civil Action
 4    No. 04-10981, will now be heard before this Court.  Will
 5    counsel please identify themselves for the record.
 6         MR. SOBOL:  Good afternoon, your Honor.  Thomas
 7    Sobol for the class plaintiffs.
 8         MS. CABRASER:  Good afternoon, your Honor.
 9    Elizabeth Cabraser, Lief, Cabraser, Heimann & Bernstein, for
10    the plaintiffs.
11         MR. GREENE:  Good afternoon, your Honor.  Thomas
12    Greene for the class plaintiffs.
13         THE COURT:  You know, are these mikes on?  Can you
14    hear, Lee?
15         MR. RONA:  Good afternoon, your Honor.  Ilyas Rona
16    for the class plaintiffs.
17         MR. DUGAN:  Hello, Judge.  James Dugan on behalf of
18    the class plaintiffs.
19         MR. HIMMELSTEIN:  Barry Himmelstein of Lieff,
20    Cabraser, Heimann & Bernstein for the class plaintiffs.
21         MR. BECNEL:  Good afternoon.  Daniel Becnel for the
22    class plaintiffs.
23         MR. ROUHANDEH:  Good afternoon, your Honor.  Jim
24    Rouhandeh of Davis Polk for the defendants.
25         MR. POTISCHMAN:  Good afternoon, your Honor.  Neil
```

## Page 5

```
 1    Potischman from Davis Polk on behalf of the defendant.
 2         MR. MUEHLBERGER:  Good afternoon, your Honor.  Jim
 3    Muehlberger, Shook, Hardy & Bacon, for the defendants.
 4         MR. CHAFFIN:  Good afternoon, your Honor.  David
 5    Chaffin for the defendants.
 6         MR. SKIBELL:  Good afternoon, your Honor.  Reid
 7    Skibell for the defendants.
 8         MR. JAMES:  Good afternoon, your Honor.  Rajesh
 9    James of Davis Polk for the defendants.
10         MR. BURWELL:  And Carter Burwell from Davis Polk.
11         THE COURT:  All right, anybody else want to be
12    introduced?
13         MR. SOBOL:  Should we bring the podium over, your
14    Honor?
15         THE COURT:  If you want to.  All right, who's going
16    to argue for plaintiffs?  Mr. Greene?
17         MR. GREENE:  Elizabeth Cabraser, your Honor,
18    primarily, and if you have any specific questions about
19    experts and causation, Mr. Sobol would respond to those
20    questions.
21         MS. CABRASER:  Thank you, your Honor.  We're here
22    today on the plaintiffs' motion for class certification --
23         THE COURT:  I think you're going to have to pick up
24    the sound a little bit here.
25         (Discussion off the record.)
```

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

```
                                                                6
 1        MS. CABRASER:  Can you hear me now, your Honor?
 2        THE COURT:  Yes.
 3        MS. CABRASER:  All right, we're here today on
 4   plaintiffs' motion for class certification of their civil
 5   RICO, unjust enrichment, consumer statutory fraud, and commo
 6   law fraud claims arising out of the Neurontin off-label
 7   marketing scheme.  We have submitted, I think on both sides,
 8   extensive briefs for your Honor.  I know the pleadings are
 9   voluminous, and I know that your Honor is more familiar and
10   more aware of the factual and legal issues that this
11   litigation implicates than probably anyone in this courtroom,
12   and so I'm here to talk about some of the legal questions.
13   Mr. Sobol and Mr. Greene are here to talk to you about some
14   of the expert and trial structural questions that you may
15   have, and, of course, Mr. Greene is the master of the facts.
16        Your Honor, we are guided in our motion for class
17   certification by the jurisdiction of the First Circuit,
18   guided in turn by the jurisdiction of the United States
19   Supreme Court in the context of cases like this one that
20   assert claims for economic damages and seek economic relief
21   in the consumer context, and we know that these are the type
22   of cases that are at the very core of Rule 23's purpose and
23   policy, because without the class procedure, without the
24   aggregation of common issues of law and fact, these claims
25   would go largely, if not entirely, unlitigated, with the
```

```
                                                                7
 1   result that a defendant who sought profits in the billions of
 2   dollars from a course of wrongful conduct would be allowed to
 3   keep them for lack of a cohesive group of claimants to come
 4   against it and obtain their due.
 5        We are told by defendants that, as a matter of due
 6   process, there is no methodology by which the class can prove
 7   its claims and recover damages other than a completely
 8   individualized series of thousands, indeed perhaps millions,
 9   of individual trials on liability and damages, because to do
10   otherwise would accord defendants less than their full
11   measure of due process.  Plaintiffs are owed due process as
12   well, and Rule 23 provides a mechanism that enables common
13   issues and claims to be treated in a common way through
14   common proof so that the litigation can advance in a
15   cost-effective way for the benefit of all.
16        Our suits would not and could not exist in an
17   individualized universe.  They don't need to.  This was a
18   common course of conduct.
19        THE COURT:  As you know, I know the case, so I
20   think we need to jump forward to the specifics.  So you want
21   a class of everybody who's purchased Neurontin, right?
22        MS. CABRASER:  We have a class defined as those who
23   have purchased or paid for Neurontin off-label.  It is
24   circumscribed in time.  It is comprised of two subclasses.
25        THE COURT:  So start there.  This is primarily a
```

```
                                                                8
 1   fraud case, right?
 2        MS. CABRASER:  It is primarily a fraud case.  It
 3   sounds both in civil RICO, the federal fraud statute, and
 4   statutory fraud, common law fraud.
 5        THE COURT:  So a bunch of people bought the stuff
 6   not based on fraud, right?
 7        MS. CABRASER:  Your Honor, this drug, as you know,
 8   went from a niche drug to a blockbuster, a number 10 drug,
 9   and it got there through a course of pervasive fraud, much of
10   which was hidden from the ultimate purchasers.  This is a
11   fraud that is simply invisible.
12        THE COURT:  Right, it's an unusual case.
13        MS. CABRASER:  Yes.
14        THE COURT:  I have to be candid, I read your brief
15   and agreed with it.  Then I read their brief and agreed with
16   it.  Then I read your reply and agreed with it, and read
17   their surreply and agreed with that too.  This is one of the
18   most difficult class cert cases I've seen, okay, because
19   it -- or at least I don't know of any case like it where
20   you're essentially claiming that the false and fraudulent
21   advertising was so pervasive as to create this bump-up in
22   sales.  And the concern I have is -- and so, I mean, I just
23   don't want the general stuff about Rule 23.
24        MS. CABRASER:  And you won't get any more of it
25   from me.
```

```
                                                                9
 1        THE COURT:  Okay, so let's just hone right in.
 2   Assume it's primarily a fraud case.  Whether it's unjust
 3   enrichment based on fraud or civil RICO or common law fraud
 4   or unfair and deceptive, it's primarily a fraud case.  So
 5   what you're trying to do is not just -- because you have no
 6   cause of action, would you agree, to collect just on
 7   off-label?
 8        MS. CABRASER:  Correct.
 9        THE COURT:  Right.  You know, I struggled with this
10   in another off-label case, I think involving Schering-Plough,
11   can you collect damages just on an off-label in a criminal
12   context?  Maybe yes, maybe no.  In that case, I couldn't
13   because it was a cancer brain tumor drug, and a lot of
14   third-party payors would have paid for it anyway because it
15   was people dying of cancer.  But if I had a straight
16   off-label case, your case would be much easier to me, the
17   bump-up, you know, to 92 percent off-label, you could do an
18   aggregate, whoever bought.  It would almost be closer to the
19   AWP.  But we've got primarily a fraud case, so how do I parse
20   out how much of the purchases -- let's assume you're right on
21   the fraud -- how much of the purchases are attributable to
22   the fraud?  That's what Meredith Rosenthal can't do for me,
23   right, how much is due to the fraud as opposed to what's due
24   to the off-label?
25        MS. CABRASER:  I think she can, your Honor.
```

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

### 10

1  MR. SOBOL: Yes.
2  THE COURT: All right, so this is what I need to
3  hear. Assume it's a fraud case, not an off-label case. We
4  all agree with that, right?
5  MS. CABRASER: It is a fraud case.
6  THE COURT: Okay. So how do I get from the
7  fraudulent statements, allegedly, in a mass marketing context
8  to actual purchases?
9  MS. CABRASER: Before we get there, and Mr. Sobol
10 has the answer to that, I think it's also important to
11 remember that this is indeed a fraud case, and as you
12 remarked, it is an unusual fraud case. Usually you think of
13 fraud as misrepresentation or omission. More rare is the
14 effective fraudulent concealment case where not only is
15 material information on the lack of efficacy in this case of
16 the drug for these off-label uses manipulated, distorted,
17 concealed, but you have fraudulent conduct going on behind
18 the scenes, certainly not visible to doctors. Even doctors
19 that are going to the marketing events, that are being
20 detailed, don't know that's what's happening.
21 THE COURT: Go to real basics for me. If you can
22 get the doctor either to meet with the sales team or to go to
23 a marketing event, you may have a cause of action. But for
24 most of the doctors, you have no nexus, right?
25 MS. CABRASER: We do have a nexus, your Honor.

### 11

1  THE COURT: You just have this, you know, like
2  throwing feathers in the air, and lots of feathers, and you
3  don't know who caught one and who didn't.
4  MS. CABRASER: Well, we know that the very, very
5  significant bump-up in the use of the drug, which is
6  unprecedented, it's unmatched, it's unique, so we know these
7  weren't just a few scattered feathers, and we know that an
8  individualized campaign of going to each doctor individually
9  would never have created the buzz, would never have created
10 the critical mass, would never have contaminated the flow of
11 information to such an extent. So the proof of the
12 pervasiveness of this fraud --
13 THE COURT: Well, could I just limit it to any
14 doctor who actually visited or showed up at one of these
15 trade shows?
16 MS. CABRASER: You could, your Honor, and that
17 would be --
18 THE COURT: Would you have that information to be
19 able to do that?
20 MS. CABRASER: It would be obtainable and you could
21 do that, but that would not account for the entirety of the
22 fraud or its effect, and that would deprive plaintiffs of the
23 opportunity to prove at trial through common means the
24 pervasiveness of the fraud. Again, that begins to fragment
25 in individualized fraud, and we know just as a matter of

### 12

1  marketing, your Honor, just as a matter of modern
2  communications that --
3  THE COURT: But do you know of any case in the
4  United States of America where, let's say, there's a
5  national -- we've got four different kinds of fraud, right,
6  or more? One is migraines, one is bipolar, one is general
7  mood, and pain, right? So four different, like, categories
8  of things, and to boot, some of them were through sales
9  teams, some of them were through the so-called boondoggles,
10 and some of it was just vaguer than that, publishing certain
11 articles but not other articles. You're essentially, and
12 maybe you're right, I mean, moving this into fraud on the
13 market.
14 MS. CABRASER: It's not fraud on the market, your
15 Honor. It may be close to it, but there's not fraud on the
16 market.
17 THE COURT: I mean, maybe that's perfectly
18 justifiable and somebody would be willing to move it that
19 way, but it's certainly a leap.
20 MS. CABRASER: You know, probably these days, when
21 you're dealing with consumer products, even consumer products
22 that are marketed in the first instance to a profession like
23 the medical profession, you're far closer to an efficient
24 market than even the stock market is today. But we don't
25 need to go there because even though that's true, the market

### 13

1  for consumer goods can be very efficient. The buzz you
2  create about a consumer good can be very efficient. We don't
3  need to go there because what we have is a campaign. It's a
4  multifaceted campaign, it's continuous, it's sophisticated.
5  The company knows its market, it knows the physicians, it
6  knows the medical communities. It knows how to hit them,
7  where to hit them to create a whole that is greater than the
8  sum of its parts. And what the defendants want you to do is
9  to ignore the whole, deprive us of the opportunity to prove
10 the whole at trial, because we either prove it or we don't,
11 and go back to the parts.
12       Now, you certainly could devise a trial structure
13 where you tried a particular off-label indication first;
14 for example, bipolar and mood. We know there are suppressed
15 studies in bipolar and mood, and you could try that first,
16 and you could try one or all four claims. You could also try
17 either subclass, and you could start from the particular and
18 move to the general. Because the scheme is the same overall
19 and the various off-label indications are branches of that
20 scheme, it is most efficient to bring in all of the evidence,
21 which is largely the same evidence, on the entire scheme.
22       Your Honor, we noticed in the surreply that
23 defendants claim we didn't identify, suppressed and concealed
24 Neurontin studies for the various off-label indications that
25 are at issue here, and we have prepared a chart of the

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

**14**

1   suppressed and concealed studies that we have obtained to
2   date in discovery, which is ongoing.  And we can certainly
3   hand that up to your Honor.  The defendants have that.  And
4   that shows you that with respect to every one of these
5   indications, the common course of conduct was indeed common
6        THE COURT:  But would you say it was different for
7   the different indications or not?
8        MS. CABRASER:  With respect to each indication that
9   is at issue here, and we have essentially seven of the
10  off-label -- actually eight off-label indications.  We have
11  bipolar and mood.  We have neuropathic pain.  We have
12  non-neuropathic pain.  We have the high doses, dosages above
13  1,800 milligrams per day.  We have migraine and headaches.
14  We've got the anxiety disorders, panic disorders, social
15  phobia, restless leg syndrome, and epilepsy monotherapy.  And
16  with respect to these off-label indications, the defendants
17  were not able to demonstrate to Daubert or FDA standards that
18  Neurontin was effective in treating these off-label
19  indications.  That is part of the fraud, your Honor.  The
20  impression was created that these were effective.
21       THE COURT:  There's no doubt there's a common
22  question as to whether there was a fraud or not.  The issue
23  is, how do you get it to the individual doctors?  Because
24  some are prescribing on-label or off-label on their own --
25  let's skip on-label -- off-label on their own.  In other

**15**

1   words, it's a very difficult -- do you know of any case where
2   there was no requirement of a nexus?
3        MS. CABRASER:  We have a nexus here, your Honor.
4        THE COURT:  What about the doctors who have never
5   heard the message?
6        MS. CABRASER:  Well, certainly the class
7   representatives' doctors heard the message loud and clear.
8        THE COURT:  Right, so I'm saying, why wouldn't you
9   just narrow this down to the people who heard the message?
10       MS. CABRASER:  It would be possible to do that,
11  your Honor.  It would not be necessary to do that because the
12  best evidence of who heard the message, directly or
13  indirectly, through publications, through direct contacts
14  with Neurontin or its representatives, is the increase in
15  sales, this tremendous increase in sales in the absence of
16  legitimate studies demonstrating efficacy and in the absence
17  of FDA approval for these off-label indications.  What you
18  have is a medical community that may not realize that it has
19  been influenced.  That's how influence works.  That's how
20  advertising messages work and ad campaigns.
21       THE COURT:  Is there any case that --
22       MS. CABRASER:  Your Honor, the Aspinall --
23       THE COURT:  Because that is fraud on the market,
24  essentially creating the buzz -- I like that word -- creating
25  the buzz in the market, "Hey, try Neurontin."

**16**

1        MS. CABRASER:  It's fraud on the market in terms of
2   the small market, the consumer market, absolutely, your
3   Honor, you are correct.  Fraud on the market in terms of a
4   small-end market was the subject matter of the Aspinall case,
5   the Massachusetts Supreme Court case that certified the light
6   cigarettes, the low-tar and nicotine cigarettes on precisely
7   that theory; that there had been a pervasive advertising
8   campaign, that smokers had obviously gotten the message that
9   these were healthier cigarettes, that people were buying them
10  for that reason, and that by buying them, they were being
11  damaged economically because they were buying a product that
12  did not work.  In that case, you know, the tobacco companies
13  went -- they got FTC approval for what they were doing, and
14  then they manipulated the product so that it did not deliver
15  lower tar and nicotine; it delivered higher tar and
16  nicotine.  The market was happy --
17       THE COURT:  So you want me to follow the Aspinall
18  model?
19       MS. CABRASER:  The Aspinall model works for this
20  case because in that case, the consumers were happy, they
21  thought they were getting low tar and nicotine, didn't
22  realize they were getting the opposite.  In this case, the
23  doctors didn't realize they were getting a false message, did
24  not realize, of course, that the studies they should have
25  seen were being concealed and suppressed, or that the studies

**17**

1   they needed had never been done or were abandoned.  They
2   believed the drug was effective for off-label uses because
3   that was the message, unmediated by true studies, unmediated
4   by complete information from the company.
5        THE COURT:  So I suppose the legal question is
6   whether you take fraud on the market from an unsophisticated
7   consumer to a learned intermediary, right?
8        MS. CABRASER:  If you have omission of material
9   fact from a learned intermediary --
10       THE COURT:  Right.
11       MS. CABRASER:  Of course, and you can do that
12  because here --
13       THE COURT:  How do you know?  In other words, this
14  is a real stretch.  I mean, it's tempting because there's
15  something upsetting about the fact that you can go out and do
16  a fraudulent advertising campaign, if it is -- I mean, you'd
17  have to prove that up -- and then somehow, because you can't
18  link it to each doctor, and just do it in the aggregate.  On
19  the other hand, that's what fraud statutes tend to require.
20       MS. CABRASER:  Well, your Honor, certainly in the
21  pharmaceutical arena, when you're talking about personal
22  jurisdiction type claims and you're talking about states, for
23  example, that do have the learned intermediary doctrine, one
24  way of getting past the learned intermediary doctrine is the
25  factually correct and logical way:  If the learned

Case 1:04-cv-10981-PBS   Document 1224-2   Filed 04/14/2008   Page 5 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

```
                                                18
 1   intermediary didn't have the information because the drug
 2   company misrepresented --
 3        THE COURT: Well, what if they never heard the
 4   misrepresentation? What if they've heard nothing?
 5        MS. CABRASER: If the learned intermediary hears
 6   nothing --
 7        THE COURT: Right, and they prescribe, you know,
 8   for legitimate reasons because they're permitted to; you
 9   know, they've used it on epilepsy patients. They said,
10   "Let's try it." Or the guy down the hall said, "Try
11   Neurontin for pain. It worked for my guy," you know, the
12   kinds of stuff they do. I mean, they're permitted to
13   prescribe off-label.
14        MS. CABRASER: But the drug company is not
15   permitted to suppress or conceal material information it has
16   from those learned intermediaries who are being trusted by
17   the patients to prescribe effective drugs. This gets back to
18   the bedrock notion of good old Restatement of Torts,
19   fraudulent concealment and fraud by nondisclosure.
20   Sections 50 and 51 of the Restatement universally
21   recognize --
22        THE COURT: I totally agree, if they heard it.
23        MS. CABRASER: No. This is the responsibility of
24   the drug company.
25        THE COURT: No, but if they heard the positive

                                                19
 1   message, then you need to also give the negative, the full
 2   mix. But don't you have to prove that the doctor -- I mean,
 3   I'm pushing you hard because you're pushing me into territory
 4   that's not existed. And yet I do understand the
 5   pharmaceutical industry, and Parke-Davis in particular,
 6   marketed on a national campaign and was successful on a
 7   national basis. So do I just take their marketing statistics
 8   and say there was causation? That's what you want me to do.
 9   It's sort of a fraud on the market. I mean, you sort of
10   candidly acknowledged that's what it is.
11        MS. CABRASER: You could essentially do that, your
12   Honor, and we'll get into the details of that in a minute to
13   explain how that model works. And, by the way, at the class
14   certification stage, if we have a model, that's what Smilow,
15   the First Circuit requires, and that's all the First Circuit
16   requires.
17        THE COURT: Sure, so a common question, and then
18   you get thrown out. I mean, the thing is, is that all that
19   it ends up being?
20        MS. CABRASER: Your Honor, no, because there is a
21   series of common questions here. Let's just look at the
22   fraudulent concealment, whether it's --
23        THE COURT: Because I could do that. I mean,
24   that's a really good point. I could certify a national class
25   based on the fraud-on-the-market theory, look at it, and then

                                                20
 1   if you lose on the fraud-on-the-market theory, you lose the
 2   whole thing. It's a common question of law. That's one way
 3   to do it. But if you're not willing to just rest all your
 4   eggs in that basket, it creates a harder thing for me because
 5   I don't know how you get the nexus to the individual doctors.
 6        MS. CABRASER: You know, this case is driven by the
 7   facts and the evidence, your Honor, and this case is, in our
 8   view, so strong on the facts and the evidence that we are
 9   ready, willing, and able to take this case to trial on that
10   type of a theory, because this isn't an, oh, maybe it was
11   negligent misrepresentation, or maybe it was --
12        THE COURT: But you wouldn't get that far. I mean,
13   the question is, assume -- play it out your way -- fraud on
14   the market one way or another, right? You don't have to get
15   into individual doctors because we're going on the fraud --
16   we're taking the Aspinall theory, and we want to go with it.
17   Well, that would be true, it would be a common question of
18   law, right? And then you'd have the common questions of
19   fact, which is whether there was a fraud, and then the
20   aggregate damages. That's how you would do it.
21        MS. CABRASER: That's right.
22        THE COURT: Are you willing to just rest on that?
23   Because if you were resting on a more traditional fraud or
24   RICO kind of thing, you have to show causation.
25        MS. CABRASER: Well, your Honor, on RICO, on RICO,

                                                21
 1   the type of causation that we have to show doesn't have to do
 2   with direct contact, and we know it doesn't have to do with
 3   reliance in the First Circuit. And the fact that the mail
 4   fraud and the wire fraud, which are the predicate acts of the
 5   civil RICO claim in this case, are going on within the
 6   medical community --
 7        THE COURT: But don't you still have to get the
 8   message to the doctor, even under a civil RICO? You still
 9   have got to get the misrepresentation into the ears of the
10   doctor.
11        MS. CABRASER: You have to make sure that the
12   message that you are intending the doctors to get is a true
13   and complete message. Now, fraudulent concealment, liability
14   for fraudulent concealment, good old common law fraudulent
15   concealment, can arise when, as you say, the company has
16   begun to speak. Once you've begun to speak, you've got to
17   say the rest of it, or -- or -- if the company has superior
18   knowledge, which was certainly the case here, about the lack
19   of efficacy of the drug for these off-label indications and
20   decide not to tell anybody about that. So you're giving some
21   people a positive message that's incomplete. You're trying
22   to get -- first of all, your intent is to get the message out
23   to everyone, and you pick your instrumentalities of doing it.
24        THE COURT: I understand your argument. Let me
25   move on to the next thing because we want to finish. It's
```

**22**

1  Friday afternoon.  So now we have -- I didn't even realize
2  you'd parsed off eight different indications.  I thought
3  there were only four or five.  Eight, so you want them all
4  tried together?
5      MS. CABRASER:  We could try them all together, your
6  Honor, or the leading --
7      THE COURT:  Common questions of law and fact are
8  going to be different for each indication.
9      MS. CABRASER:  You would use different experts for
10 each indication to demonstrate that the drug was not
11 effective for those.  That would add somewhat to the time of
12 the trial.
13     THE COURT:  For eight subclasses.
14     MS. CABRASER:  Not eight subclasses, your Honor,
15 but eight indications for which there was fraudulent
16 marketing and for which there are damages, but most of the
17 time at the trial goes to the common scheme.
18     The other way you could do it -- and there are
19 many, many ways to structure a trial or a sequence of trials,
20 bifurcated proceedings in this case -- would be to try the
21 marketing scheme, to try it with respect to specific
22 indications such as bipolar, indications that have caused the
23 greatest amount of sales activity, and to try those damages.
24 It's certainly possible on the damages distribution side.  If
25 it's possible on the liability side, it's possible on the

**23**

1  aggregate damages side per indication, and it's possible to
2  distribute the damages per indication.  You don't need
3  subclasses necessarily to do that.
4      THE COURT:  I think you would.
5      MS. CABRASER:  The TPP subclass would pay for all
6  of them.
7      THE COURT:  I don't think a jury could understand
8  all this.  This would be a mess.  It's hard enough for a
9  judge to understand, right?
10     MS. CABRASER:  It's a challenging situation, your
11 Honor, but it's far less challenging than trying to do this
12 on an individualized basis and --
13     THE COURT:  No, but you'd have to do at least eight
14 subclasses.
15     MS. CABRASER:  You would do one subclass for the
16 TPPs because they paid for all of these.
17     THE COURT:  No, you wouldn't.  You'd have to do the
18 bipolar, and then you'd do the pain, and then you'd do the
19 neuropathy.  Those aren't common questions of fact, right?
20     MS. CABRASER:  Pardon me, your Honor?
21     THE COURT:  I'm not sure that the common questions
22 would predominate over the uncommon ones if you looked at all
23 the different indications.
24     MS. CABRASER:  You could certainly structure a
25 trial to look at one indication.  All of the questions would

**24**

1  be common from the big scheme to specific concealment,
2  suppression, misrepresentations about that particular
3  indication.  You could create a subclass of payors, TPPs and
4  consumers, for that indication, and that would be
5  unquestionably a three-morning trial with all questions
6  common, all the way from liability, which is all that's
7  required, through damages.
8      THE COURT:  Let me ask you another question.  You
9  start off with New Jersey law.  Why do I even have to go
10 there if this is a civil RICO?
11     MS. CABRASER:  You don't.
12     THE COURT:  I can understand why everyone went off
13 on all of this.
14     MS. CABRASER:  Well, I think why everyone went off
15 on this, your Honor, is because one of the claims is the
16 state court counterpart of RICO.  But you're absolutely
17 right.
18     THE COURT:  This is a federal claim.  This is
19 different from the other case.
20     MS. CABRASER:  It is.
21     THE COURT:  So I don't know why I even have to get
22 into that.
23     MS. CABRASER:  You don't.  You have a unified
24 federal claim.  The law is the same.  We know what the
25 elements are, and the elements of civil RICO, in terms of

**25**

1  proving up liability, do not require any direct contact or
2  communication between the perpetrators of the scheme and the
3  victims of the scheme.  We do have direct communication with
4  the intermediaries, the doctors, but we don't need it with
5  respect to the victims.
6      THE COURT:  So suppose you certified a class on a
7  fraud-on-the-market basis and then you lose, I throw it out
8  on summary judgment, all right, is there anything left for
9  you?  Can you prove up a case based just on the doctors who
10 individually got the message?
11     MR. SOBOL:  No.
12     MS. CABRASER:  Go ahead, Tom, talk about the trial
13 structure.
14     THE COURT:  Why?  So you either win or lose on a
15 fraud-on-the-market theory.
16     MR. SOBOL:  Right, but understand, your Honor, how
17 that ties in with what the case itself is about.  So the case
18 is about fraud.  Take one example, bipolar.  We'll have to
19 prove that the statements or the omissions by Pfizer were
20 fraudulent as a whole, meaning basically it was not
21 effective, okay?
22     THE COURT:  Right, and it affected the market as a
23 whole.
24     MR. SOBOL:  By definition then, if we prevail on
25 the core issue of the fraud, which is that they lied about

Case 1:04-cv-10981-PBS    Document 1224-2    Filed 04/14/2008    Page 7 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

**Page 26**

1   the product, okay, then by definition we think we will have
2   achieved significantly the causation issue because
3   essentially, taking that as an example --
4       THE COURT: Well, that's all you've got, right?
5       MR. SOBOL: Well, I'm not sure what that question
6   is, but --
7       THE COURT: In other words, I came in here wanting
8   to know whether or not, if you lost on fraud on the market,
9   the Aspinall theory, you had the information to be able to
10  say, "We're only going to go with respect to those doctors
11  who got the sales teams sent out." You're saying "no."
12      MR. SOBOL: We're saying "no" and for the following
13  reasons.
14      THE COURT: All right, well, that's very useful.
15      MR. SOBOL: Right, for the following reasons:
16  First, we intend to prove for each indication that we go to
17  trial on that the fraud was a substantial contributing factor
18  for substantially all, the lion's share of all the
19  prescriptions. That's Aspinall, number one.
20      Number two, on causation, we will prove through
21  very well-accepted applied microeconomics, not only from
22  Dr. Rosenthal but drug companies do this all the time,
23  Dr. Berndt who you know has published numerous studies about
24  that, what they do is, they look at the before and after of
25  the marketing and its impact on sales. And that deals with

**Page 27**

1   all of the buzz features, so it gets rid of all of the noise;
2   in other words, whether or not it's word of mouth, whether or
3   not it was a direct --
4       THE COURT: But you've just answered my question.
5   I don't think we can go through all eight, or whatever.
6       MR. SOBOL: Right.
7       THE COURT: So you basically are willing to give
8   up --
9       MR. SOBOL: Proving the case up on a
10  doctor-by-doctor basis.
11      THE COURT: Who showed up, who got sales visits,
12  who showed at the trade conference.
13      MR. SOBOL: Proving it up only that way, that's
14  correct.
15      THE COURT: Who had a subscription to the Journal.
16  You're not going to -- you don't want to go -- you are
17  waiving that approach?
18      MR. SOBOL: Right, because, and also, by the way,
19  we pled this as if the marketing attack itself was intended
20  to create a buzz and do far more than just have mano-a-mano,
21  if you will, an effect, all right? And we also -- we've
22  already put in the record that health care economists don't
23  think that that kind of evidence is even reliable. The
24  physicians don't own up to being duped by a drug company.
25  You can't prove it up that way, even if you wanted to,

**Page 28**

1   because you'd have to cross-examine most of the treating
2   physicians.
3       THE COURT: So I could see a case where you would
4   say, well, every doctor who got a visit from the sales team
5   who was marketing Neurontin --
6       MR. SOBOL: Yes, but you'd have to have a physician
7   own up to it, or if the physician --
8       THE COURT: Why? You could just say --
9       MR. SOBOL: Maybe not. Maybe you could do it --
10      THE COURT: Maybe not. But, in any event, you
11  don't want to go that way.
12      MR. SOBOL: Right. So taking then causation at
13  trial, on a causation basis, we look at -- there are two
14  different issues in causation for each indication: First,
15  can we prove the effect as a whole by reason of tying in the
16  misconduct as a whole to increased sales? Our economists
17  have done that. Dr. Berndt has published literature on
18  that. We think we can do that overwhelmingly. And, again,
19  for each indication, as we define the case, we intend to
20  prove that substantially all prescriptions were caused by the
21  fraud.
22      Then the question is, you know, who, how much,
23  right, was the effect in terms of who within that?
24      THE COURT: How can you distinguish what was caused
25  by the fraud as opposed to just the illegal off-label

**Page 29**

1   marketing?
2       MR. SOBOL: How one goes about doing that is -- and
3   that's what we have in Professor Rosenthal's declaration and
4   the published literature from Dr. Berndt and what drug
5   companies do -- this is how they go about doing it: They
6   quantify marketing in various ways, how many detailing trips,
7   how much was spent on detailing. They quantify certain
8   pieces of behavior. They get what they call variables of
9   marketing. They look at another variable called the sales.
10  Then they look at a zillion other things that could have
11  influenced it; competitor marketing, the geographic range,
12  the time of the year, other potential influences on size of
13  sales, price, right?
14      And what economists do in typical regression
15  analysis is, they're able to say, when everything else is
16  equal, when all else is equal, "I can opine to a reasonable
17  degree of certainty in the area of applied microeconomics and
18  econometrics that this piece of marketing behavior,
19  caused --" and they use that word "caused" -- "caused this
20  amount of increased sales."
21      THE COURT: Are we talking about this August, 2005
22  report of Meredith Rosenthal?
23      MR. SOBOL: Correct, and her deposition and all the
24  literature that's cited in there. Dr. Berndt, who you know,
25  has published numerous articles quantifying the impact of

Case 1:04-cv-10981-PBS    Document 1224-2    Filed 04/14/2008    Page 8 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

**Page 30**

```
 1   drug marketing on sales.
 2        THE COURT:  I agree we can do that, absolutely.
 3   The issue is, you've got two kinds of illegal activity here,
 4   potentially:  off-label marketing, which is flat out illegal,
 5   but you don't have any cause of action for it, okay --
 6   unfortunately for you but you don't -- and then fraud, if you
 7   can prove it.  So what I didn't get from her declaration is
 8   how you distill out the fraud from just the off-label
 9   marketing.
10        MR. SOBOL:  Well, what we will have to prove as a
11   matter of fact is that certain campaigns were in essence
12   efforts to communicate the fraud; i.e., the efficacy or the
13   message of efficacy for certain indications.
14        THE COURT:  But you're going to say, if you prove
15   up your fraud, this is what you're going to argue to me, if
16   you get this far two years from now is, if you prove up your
17   fraud --
18        MR. SOBOL:  Next year.
19        THE COURT:  -- bingo, bingo, you're going to say,
20   "I get all of the off-label."  That's what you're going to
21   say to me.
22        MR. SOBOL:  No, no, no.  Well, if we prove that
23   that off-label indication is a fraud, yes, but we have to
24   prove that that off-label indication is a fraud.  Then we get
25   it.  That's your decision.
```

**Page 31**

```
 1        THE COURT:  That's what you're going to say.
 2   You're going to say they're tantamount to each other as
 3   opposed to --
 4        MR. SOBOL:  Yes, but we're not going after anything
 5   off-label just because it's off-label.  That's --
 6        THE COURT:  No, no, listen.  There's a fair amount,
 7   let's say just plain old pain, right?
 8        MR. SOBOL:  Oh, you're talking about the background
 9   off-label.  Meredith Rosenthal's analysis backs out what
10   would be the background possibility, the theoretical
11   possibility.
12        THE COURT:  The 14 percent or something like that?
13        MR. SOBOL:  Yes, that's right, and that's Aspinall
14   again.  In Aspinall the SJC said, "Look, in every single
15   consumer fraud case that we have in this country, you're
16   always going to find the bubble boy.  You're always going to
17   find somebody, the theoretical people who weren't in some way
18   affected by the overwhelming campaign.  Is that going to
19   therefore enable corporate America to defeat every
20   broad-based mass fraud?"  And Aspinall says, "Absolutely no.
21   If the plaintiffs can prove that virtually all or
22   substantially all, the overwhelming majority of sales were
23   substantially contributed to by the defendant's wrong, we're
24   not going to let the existence of the bubble boys be the tail
25   that wags this dog."
```

**Page 32**

```
 1        THE COURT:  All right, so your answer to me is that
 2   you're basically going to say you'll back out a standard
 3   off-label 13 percent, or whatever Dr. Rosenthal came out
 4   with, and you're going to say, "Everything else we can say by
 5   a preponderance of the evidence is caused by the fraud."
 6        MR. SOBOL:  Correct.
 7        THE COURT:  That's what you're going to do.
 8        All right, let me go to this side.  So, now, the
 9   question is, they've pretty much waived an individualized
10   approach to the doctors.  All your stuff about third-party
11   payors was not persuasive because it's a fraud case, not an
12   off-label case.  So it doesn't matter if somebody was willing
13   to pay off-label, not willing to pay off-label, or had a
14   prior authorization policy for off-label because this is a
15   fraud case.  They're willing to say, we're essentially
16   operating off a fraud-on-the-market theory, so there's your
17   common question of law, common questions of fact.  I'm only
18   talking class cert, not whether this is going to fly, right?
19   Why isn't that certifiable as a class if they're willing to
20   give up anything but the fraud-on-the-market legal theory?
21        MR. ROUHANDEH:  Well, I'm not sure that that's what
22   they said.  That's not what they said in their briefs, and I
23   don't think that's what they say that --
24        THE COURT:  I just heard them say it.
25        MR. ROUHANDEH:  I'm not sure that's what I heard
```

**Page 33**

```
 1   them say when you asked, "Are you going on a
 2   fraud-on-the-market theory?"  But even if they're changing
 3   their tune, in their reply brief they said --
 4        THE COURT:  Assume they were, okay?
 5        MR. ROUHANDEH:  Okay, assume they were, even thoug
 6   in the reply brief they repeatedly disclaimed going on a
 7   fraud-on-the-market theory.  The reason that they've
 8   disclaimed it before, and even if they like it now, is
 9   because it does not work in this industry with respect to
10   these types of products.  Fraud on the market is a very
11   specifically designed concept that only works in the
12   securities industry.  And the reason it works in the
13   securities industry is, before courts ever started looking at
14   it, there were years and years of research, and that research
15   said, the securities market is a fair and efficient market if
16   a whole bunch of things are true:  The security trades on an
17   exchange, there are analysts who cover the security and a
18   sufficient number of them.  It's not thinly traded.  There is
19   a lot of trading and a lot of volume in the securities.  It
20   changes, that security changes in response to -- the price
21   changes in response to new information entering the market.
22   That's why courts have repeatedly said the securities
23   industry is the only place that a fraud-on-the-market theory
24   has been adopted.
25        And many, many courts have said in the consumer
```

Case 1:04-cv-10981-PBS    Document 1224-2    Filed 04/14/2008    Page 9 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

34

1  context, it does not work in the consumer context. There is
2  no fraud-on-the-market theory. It doesn't even work every
3  time in the securities markets. Sometimes there are bonds
4  that are not traded on the market. Fraud on the market
5  doesn't work. The case is not certified. It usually only
6  works if an equity traded on a major exchange. It does not
7  work in a case like this because there is not a fair and
8  efficient market for all information. You can't assume that
9  when one piece of information, one statement is made
10  somewhere in the country, that that affects the price of the
11  product or that affects, more aptly here, that it affects a
12  doctor's decision to prescribe it somewhere else. So there
13  is no fraud-on-the-market theory.
14      THE COURT: Well, let me ask you this.
15  Pharmaceutical companies, as I've come to learn, do launch
16  national advertising and sales strategies, right? And they
17  do it based on aggregate data. So, like, if you have, let's
18  just even talk about truthful information for a minute, okay,
19  not even have a fraud, if you have a national advertising
20  campaign with truthful information, and before and after you
21  go up from 10 percent of the market to 30 percent of the
22  market, a marketing person is going to say, "Gee, I had a
23  successful marketing campaign," right?
24      MR. ROUHANDEH: Actually what they say is, they
25  say, "I marketed to these doctors in my area. I was out

35

1  there selling, and I made an impact on those doctors,"
2  because the pharmaceutical companies, that's why they have
3  all these sales reps; they realize it's an individual issue.
4  This is not a case, and I don't think it would be sufficient,
5  this is not a case where there was some national campaign
6  where there is direct-to-consumer advertising where the
7  message is uniform. This is a case where the conversations
8  occur on an individual-by-individual basis or in small
9  meetings.
10      Now, on this fraud-on-the-market theory, the other
11  problem with it is, under Polymedica and other First Circuit
12  law, they would have had to come in here with an expert who
13  says fraud on the market can apply in this context, and they
14  did not. In fact, they came with an expert who said the
15  opposite. Their expert, Meredith Rosenthal, it's not her
16  fault. She was asked the question, she was asked the wrong
17  question. They asked her, "Tell me the total overall impact
18  or the average impact of this off-label marketing." I'm not
19  sure they even asked her about the alleged fraudulent
20  marketing. They didn't ask her, "Can you tell me that
21  everybody in the class was damaged?"
22      THE COURT: I don't think she was asked about the
23  fraud. I think she was just asked to show the differential
24  from the off-label marketing.
25      MR. ROUHANDEH: I think that's correct.

36

1      THE COURT: And he's saying, no, that if you prove
2  that it was caused by a fraud, he can equate the two.
3      MR. ROUHANDEH: Well, but the problem with that is
4  that Rosenthal says, "I can't tell you that everybody in the
5  class was damaged." She can't tell you who in the class was
6  injured, who got it as a result or where there's causation,
7  who got it as a result of fraud and who got it as a result of
8  alleged off-label marketing, who got it because the doctors,
9  as your Honor pointed out, the doctors wrote it on their
10  own. She can't separate out any of those. So what they're
11  saying is, "We will show the difference. We'll show an
12  increase in prescriptions as a result of the alleged fraud.
13  We'll plug that into her model. We'll take that difference,
14  and we'll spread it across all class members." That one
15  cannot do consistent with the law. It's like taking a person
16  and saying, "This person has a claim for $100. This person
17  has a claim for zero. Let's give them both 50 bucks."
18      THE COURT: But it is truly a troubling thought
19  that you can have a national fraudulent advertising
20  campaign -- and I know you vigorously dispute that you did --
21  and you can see the difference in the marketing numbers
22  palpably, which you can here. I mean, it's overwhelming;
23  92 percent of your stuff was sold off-label. I mean, that's
24  just dramatic.
25      Assume for a minute that there were frauds that can

37

1  be proven, that you're essentially saying, tough, you need
2  another statute because you can't collect.
3      MR. ROUHANDEH: Well, I don't think one can make
4  the assumption, because there is a lot of off-label
5  prescribing, that it was the result of some fraud or some
6  improper conduct.
7      THE COURT: But suppose they can prove the fraud
8  and they can prove a national campaign based on the fraud.
9  Assume that for a minute, they can prove a fraud and they can
10  prove a national scheme to market the fraud, they just can't
11  get it into the ears of every doctor. So the question is,
12  you walk away scot-free under your theory.
13      MR. ROUHANDEH: No, that's not true, your Honor.
14      THE COURT: Why?
15      MR. ROUHANDEH: Because there are third-party
16  payors out here who have sued on their own, the Aetnas, the
17  Kaisers, the Guardian Life.
18      THE COURT: They still would have to prove it
19  doctor by doctor.
20      MR. ROUHANDEH: Let them prove it. Third-party
21  payors can come in here and sue, so if they think they've got
22  a claim --
23      THE COURT: All right, so take Aetna or one of the
24  Blues, Cigna, right? You would have the same defense under
25  your theory: "You can't prove a national fraudulent

Case 1:04-cv-10981-PBS   Document 1224-2   Filed 04/14/2008   Page 10 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

**38**
1  marketing campaign. Even if you can prove we lied, guys, you
2  have to put it in the ear of every doctor."
3    This is what makes this so hard.
4    MR. ROUHANDEH: Well, your Honor, it only makes it
5  hard if you assume that what the plaintiffs are saying is
6  true.
7    THE COURT: Well, I've got to.
8    MR. ROUHANDEH: Well, on a motion to dismiss,
9  that's correct. But on a motion for class certification, I
10 think the First Circuit and other circuits have said you've
11 got to look a little bit behind that and look at the merits.
12   THE COURT: I am not getting into -- this is what
13 you wanted me to do, and I can categorically tell you I'm not
14 getting into the merits here of whether there was a fraud or
15 not. I'm going to assume a fraud, but maybe eight different
16 kinds of frauds. I don't know. I'm going to assume
17 different kinds of frauds. I can't possibly back into this
18 every single Daubert issue and every single fraud. That
19 would make -- it collapses too much into it. I'm going to
20 assume a fraud, and I'm going to assume maybe eight different
21 kinds of indications or something like that. And I'm also
22 going to assume that they've waived any claims they had about
23 individual doctors and that they're thinking about how the
24 fraud impacted the market in the aggregate. You guys have
25 got to think about that because it is different from what I

**39**
1  saw in the briefs. I would agree with that. It's a fraud on
2  the market ala Aspinall.
3    MR. ROUHANDEH: They can waive for themselves the
4  issue of whether or not they want to approach this on an
5  individual basis. They can't waive it for the defendants
6  because we're entitled -- they cannot take money from us for
7  people who have no claim, who can't show that their
8  prescription was written as a result of the fraud. That's
9  what they asked Dr. Rosenthal to do, is to come up with an
10 estimate. It's not even causation, it's not even a legal
11 causation. What they're doing is, they're asking her to come
12 up with a correlation. They're saying, "Tell us the increase
13 in prescriptions that occurred after meetings where some
14 allegedly fraudulent statement was made." That's not even
15 legal causation. That's a correlation. And they can't get
16 there by fraud on the market, and they can't get there with
17 Aspinall. Aspinall is an entirely different case. It's
18 under 93A. There's no 93A case here. There are some
19 subsequent cases that I think draw that case into question,
20 but, most importantly, there the alleged problem --
21   THE COURT: There's no Unfair and Deceptive Trade
22 Act?
23   MR. ROUHANDEH: Under New Jersey law, there is, but
24 93A we believe is different than New Jersey Consumer Fraud
25 Act. And in that case, the allegation was that the product

**40**
1  itself had a uniform claim that light cigarettes were, you
2  know, more healthful, and also that the product itself was
3  deceptively manufactured. That's not what this case is.
4  This case is about statements, allegedly fraudulent
5  statements made by company people at meetings, specific
6  meetings designed to induce people to write prescriptions.
7  They have to prove that on an individual-by-individual
8  basis. They can't say, "We'll disclaim it. We don't care,
9  and we stand or lose," because -- and there's --
10   THE COURT: Well, because you say that there is no
11 fraud on the market. I mean, it rises and falls on that
12 legal question. You're saying they can't do that.
13   MR. ROUHANDEH: Well, certainly they can't, they
14 cannot prove it based on a fraud-on-the-market theory because
15 fraud-on-the-market theory does not apply. And what would
16 happen would be --
17   THE COURT: Let me stop you right there. Assume
18 you're right, but isn't that a common question? You're
19 saying, "They can't do that to us," they can't waive it for
20 the defendants, there is no viable fraud-on-the-market theory
21 under a civil RICO or a fraud. Is that a common question, if
22 they're willing to limit themselves to that?
23   MR. ROUHANDEH: Well, that's a question that should
24 be addressed on the motion for class certification, not saved
25 for some later point. It's an argument that they should have

**41**
1  made and briefed, that fraud on the market applies in this
2  context. And they should have gotten an expert, and they
3  don't have an expert, who will say that the prescription drug
4  market or the market for Neurontin was a fair and efficient
5  market. They can't get past those. To certify it at this
6  point would be a complete conditional certification which I
7  think --
8    THE COURT: But don't you win the hole hog, though,
9  if they make this argument, they don't prove up their theory
10 that it's fraud on the market, and I dismiss it as a class?
11   MR. ROUHANDEH: Well, your Honor, we would like you
12 to decide, in connection with this motion for class
13 certification, whether or not there's a fraud-on-the-market
14 theory. They haven't briefed it, and they haven't come
15 forward with an expert. They've had plenty of time to do
16 this, to approach this case from the perspective of fraud on
17 the market. They specifically disclaimed it.
18   THE COURT: What would you say they would --
19 Can I just jump to you for a minute. He claims
20 that you've disclaimed fraud on the market.
21   MS. CABRASER: We disclaim it in the sense that the
22 defendants mean. And I think this is a very important
23 conversation to have because we are proceeding on a
24 fraud-on-the-market theory as you articulated, your Honor.
25 We are not proceeding on -- there's a term of art, "fraud on

Case 1:04-cv-10981-PBS    Document 1224-2    Filed 04/14/2008    Page 11 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

                                                                         42

 1  the market," that does relate to securities cases where it
 2  has to be the stock market.  We're not talking about that.
 3  We're talking about the relevant market, which is the market
 4  of prescribing physicians; and we are talking about proving
 5  as a matter of common fact that a fraud was committed that
 6  was sufficiently pervasive through concealment, suppression,
 7  and the tip of the iceberg, but only the tip, affirmative
 8  misrepresentation that affected the behavior of that market.
 9  It affected the behavior --
10       THE COURT:  But without having to prove individual
11  causation.
12       MS. CABRASER:  Yes.  Yes, your Honor, and that does
13  not mean that you have to make a decision that the
14  affiliated, quote, "fraud-on-the-market theory" which comes
15  from securities law applies here.  The decision you have
16  to --
17       THE COURT:  Well, it would have to be some sort of
18  an efficient market.
19       MS. CABRASER:  Yes, it's an efficient market, and
20  we will prove as a matter of fact that it is a very efficient
21  market.  The drug companies have figured out how to
22  efficiently market --
23       THE COURT:  I don't want to steal his thunder,
24  but -- it's a very important discussion -- you're sort of
25  more looking at an Aspinall kind of --

                                                                         43

 1       MS. CABRASER:  That's right.
 2       THE COURT:  You're hooking your stars on Aspinall.
 3       MS. CABRASER:  We're hooking our stars on Aspinall,
 4  and what we're doing is, we are analogizing to the relevant
 5  market.
 6       THE COURT:  All right, let me get back to you.  I
 7  don't want to steal his thunder.
 8       MR. ROUHANDEH:  Aspinall was not a RICO case.  It
 9  doesn't apply to RICO.  They didn't brief it that way,
10  probably because they would agree that it doesn't dictate
11  what the law is on RICO.  In RICO you need proximate
12  causation.  They need "but for" causation.
13       THE COURT:  But can I stop you there on causation.
14  So this is what I found so difficult in this case.  Suppose
15  on day one you made a million dollars' worth of sales, and
16  then you commit a fraud for the next month.  Make up whatever
17  you did, you lied about something.  And then you go from a
18  million dollars to $20 million the next time you look after
19  the fraud.  Why couldn't an expert legitimately say that a
20  substantial contributing factor to that uptick was the fraud
21  on a preponderance standard?
22       MR. ROUHANDEH:  That's not what their expert has
23  said.  In fact what their expert says is, "I can't tell you
24  what prescriptions went up as a result of this fraud and
25  which did not."  In fact the expert says:  Look, what I'm

                                                                         44

 1  going to assume is, let's say you've got a day-long meeting.
 2  There's loads of information about Neurontin that's
 3  disseminated at that meeting, all true, eight, ten hours of
 4  it, tons of off-label information, all true except for one
 5  statement.  One point during the day somebody says something
 6  that they would say that's fraudulent because when the doctor
 7  said it or the person said it, they didn't refer to a study;
 8  there was some study that was out there.
 9       THE COURT:  Well, don't even -- let's just say
10  there were nine true things and one false.  That's your
11  thing.
12       MR. ROUHANDEH:  Right.  What Rosenthal says is, and
13  she admits that this is entirely overexclusive, is, "I'll
14  take all the increases following that meeting."  She's not
15  going to separate out the prescriptions that were caused as a
16  result of fraud from the prescriptions that were caused as a
17  result of off-label marketing, as a result of the doctor
18  deciding on their own to prescribe it.
19       And in fact that's the case here with the
20  individual class reps.  The evidence with respect to the
21  individual class reps is that the doctors were both
22  prescribing the medication, as your Honor said, for on-label
23  uses, saw in their own practice that it was effective for
24  some off-label uses, and continued to prescribe it.  Years
25  later they prescribe it for some off-label uses to the

                                                                         45

 1  individual class reps.  Those individual class reps, there's
 2  certainly no causation.  And you can't take the class cert
 3  rules and abridge our -- it's procedural.  You can't change
 4  the substantive rights of the parties.  They can't recover
 5  against us unless they prove the elements of their claim.
 6       THE COURT:  Well, this is where I disagree with
 7  you.  If you only had one statement and it was fraudulent,
 8  and you can show on day one, before the statement, it was
 9  $1 million of sales and after the statement it's $2 million,
10  I think that from common sense you could say that the
11  fraudulent statement caused the uptick.  What you're saying
12  is that there were other things out there, true statements
13  about off-label use, and so therefore it would be impossible
14  from an expert point of view to parse out what was
15  attributable to what.  Is that what --
16       MR. ROUHANDEH:  Well, yes, and their expert admits
17  it.  Their expert says --
18       THE COURT:  Expert, you keep saying that.  Who is
19  that, Rosenthal?
20       MR. ROUHANDEH:  Rosenthal.  She admits that she --
21       THE COURT:  Where are you quoting from?
22       MR. ROUHANDEH:  This is from her deposition at
23  Page 668.
24       THE COURT:  I have that, I assume, somewhere?
25       MR. ROUHANDEH:  Yes.  It's an exhibit to, I

Case 1:04-cv-10981-PBS    Document 1224-2    Filed 04/14/2008    Page 12 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

**Page 46**

1  believe, the Rowland declaration.
2      THE COURT: Can I ask you -- this is a good
3  question actually. Let me look at all of you. Why have I
4  got all -- I couldn't even find the stuff when I was
5  preparing for this. Why does this all have to be under seal?
6      MR. SOBOL: Ask them.
7      MR. CHAFFIN: Your Honor, the only items that we
8  have sealed are items that contain medical information
9  concerning some of the plaintiffs, items that they had
10 previously designated as --
11     THE COURT: As far as I'm concerned, we couldn't
12 even find the Rosenthal/Hartman thing, which must have been
13 filed years ago, because it was all under seal. I'm
14 unsealing everything right now except where it involves
15 private patient information.
16     MR. ROUHANDEH: Well, that's fine. On this motion,
17 we think all the information can be unsealed and filed, and
18 that's fine. But the Rosenthal deposition at 668, she admits
19 that her estimate, that the plaintiffs want to spread across
20 everybody, will include both legitimate activity and the
21 allegedly unlawful activity, which I'm not even sure is
22 fraud.
23     THE COURT: What if she says, yeah, but you can say
24 that historically the amount of normal off-label marketing is
25 found in the vicinity of 14, 15 percent in other drugs of

**Page 47**

1  similar kinds, like, what was it, depakote? I can't remember
2  what they were. Dilantin?
3      MR. ROUHANDEH: Dilantin, a drug that came on the
4  market before the FDA even existed, and it's been on the
5  market for years and years and years. I don't think she says
6  that's a comparable drug or has done any analysis to figure
7  out what drugs are comparable and what drugs are not. There
8  are many other drugs, antiepileptic drugs that are used
9  heavily off-label. The government didn't even say that. I
10 think the government --
11     THE COURT: What would you say would be heavily
12 off-label? Like what?
13     MR. ROUHANDEH: There's a whole bunch of other
14 antiepileptic drugs. Topamax is one of them.
15     THE COURT: Well, to what degree are they used
16 off-label?
17     MR. ROUHANDEH: Seventy, eighty percent, as I
18 recall. I'm reaching back in my memory to the Franklin
19 case. Very, very significant, kind of like cancer drugs,
20 like AIDS drugs, those are used very heavily off-label
21 because there aren't any drugs approved for some of the
22 conditions that are at issue in this case. No drug is
23 approved. What else are doctors going to give for
24 neuropathic pain? There are only a couple of individual
25 indications for neuropathic pain, so of course doctors are

**Page 48**

1  going to use them. What doctors were using before Neurontin
2  is, they were using antidepressants to treat neuropathic
3  pain. Now, since the early 1990s, they've been using a lot
4  of antiepileptic drugs, very high percentages.
5      The government never suggested that that was the
6  appropriate level. There is no appropriate level of
7  off-label that you would say incrementally there must have
8  been something improper that caused it. In fact this
9  prescription, the number of prescriptions has gone up year
10 after year because it's an effective drug.
11     THE COURT: Yes, but their main argument is that
12 you put out this ghost-written faux science, and you don't
13 publish the scientific articles that actually disprove
14 efficacy -- now, I understand this has got to go indication
15 by indication, and I haven't read their little chart yet --
16 and that by doing that, you create a buzz in the medical
17 community.
18     MR. ROUHANDEH: Actually, I think their theory is a
19 little different. They're not saying that the failure to
20 publish alone or failure to attribute research to funding by
21 the company is a fraud. I believe that was dismissed. What
22 they're saying is, the company suppressed certain studies --
23     THE COURT: Right.
24     MR. ROUHANDEH: -- while doctors went out paid by
25 the company to speak, you know, went out and said, "In my

**Page 49**

1  experience, it works well for this off-label use." That's
2  their theory.
3      THE COURT: You're saying the ghost-written piece
4  was dismissed? Did I do that?
5      MR. ROUHANDEH: Yes, yes. What Magistrate Sorokin
6  said, and I believe this Court accepted, was that if you say
7  that a doctor went out and should have said, "Hhm,
8  Parke-Davis gave me some funding for this," they haven't
9  established, and they nowhere tried to establish, that there
10 was some legal, regulatory, any duty for the doctor to say,
11 "Hey, I was funded by Parke-Davis in connection with this."
12 And then the Court said, "And even if you did, there's
13 nothing alleged to say that that failure to disclose is
14 attributable to any conduct of the defendants."
15     So what's left in this case are, you went out and
16 you actually lied about science. And they had two examples
17 where they alleged that, both of which we think, if we ever
18 get to the merits, are absolutely untrue. And then they say,
19 look, there's a whole bunch of times where people went out
20 and spoke about the product and related their anecdotal
21 experience; at the same the company suppressed the studies.
22     So we asked them, and we asked them back in
23 February, what are these suppressed studies? They took
24 extension after extension after extension to answer those
25 interrogatories. They answered them on Tuesday, May 1. They

**50**

1  told your Honor --
2      THE COURT: Is that true?
3      MR. ROUHANDEH: Yes. They told your Honor, "Oh,
4  the defendants have this." Mr. Sobol handed that to me two
5  minutes before your Honor took the bench.
6      Based on their interrogatories, here are the
7  suppressed studies. I have them in my hand. Here's the
8  study that they say is negative on panic disorder published
9  in Clinical Psychopharmacology.
10     THE COURT: This is the first time you told them
11 about it? You handed it to them when they walked in here?
12     MR. SOBOL: No. They've had the answers to
13 interrogatories. There was also things in the complaint.
14 And the reality is that because there's been a dump by Pfizer
15 of the documents only in the past several weeks, how are you
16 supposed to know which studies have been suppressed until
17 you're given them? So, you know, the plaintiffs have been
18 doing what we can in terms of providing the information, you
19 know, but -- but this is all spelled out in the complaint --
20     THE COURT: Does it make sense for me to wait to
21 see what the actual fraud is that you're alleging, if you say
22 you didn't have the documents before?
23     MR. SOBOL: Well, I think you have it in the
24 complaint, though.
25     THE COURT: I saw that complaint.

**51**

1      MR. SOBOL: The complaint was too long already.
2      THE COURT: No, but I need to know what it is. I
3  mean, what about his, if you'll excuse me for a minute, what
4  about his argument, yeah, maybe you can prove up a fraud, but
5  then there were nine truthful statements for every fraud, and
6  therefore how could you attribute all of the increase in
7  off-label to be caused by the one fraudulent statement?
8      MR. SOBOL: We will need to prove as a matter of
9  fact --
10     THE COURT: Just one fraud, you would say, accounts
11 for all of it?
12     MR. SOBOL: We will have to prove -- when all is
13 said and done, when you have all the omissions as well as all
14 the commissions, we will have to prove that the statements or
15 the failures to make statements were lies, period.
16     Now, we'll come forward with our evidence in terms
17 of prima facie. The defendant will come forward with their
18 evidence to say, you know what, we have some studies here,
19 you know, and indications. Frankly, many of the indications
20 are much, much stronger than, you know, a couple of the
21 others. It's going to be indication by indication. But when
22 all is said and done, the fact-finder will decide whether or
23 not what Pfizer and its predecessors did was a fraud.
24     In addition, they'll also have to determine --
25     THE COURT: Fraud on the market, not individual

**52**

1  doctor by --
2      MR. SOBOL: As a matter of fact, we will prove --
3  we will not be relying upon the securities presumption of
4  fraud, which is the, quote, "fraud on the market" principle
5  that's out there. We are not relying upon a legal
6  presumption. Instead, we have stated in our briefs, and we
7  are stating here, we're going to prove as a matter of fact
8  that in this industry doctors were influenced, that the
9  overwhelming majority, virtually all of the prescripts in an
10 indication were substantially caused by the fraud. We're
11 going to prove that as a matter of fact.
12     THE COURT: How?
13     MR. SOBOL: Through the testimony of Pfizer itself,
14 through their documents, through our expert witnesses who are
15 going to be able to provide testimony regarding how the
16 market works.
17     THE COURT: Rosenthal can't do that for you. She
18 didn't in the expert report. All she can tell you is
19 indication by indication what the amount was off-label.
20     MR. SOBOL: What Rosenthal did was, she showed that
21 she can use traditional techniques to attribute an amount of
22 increased sales that is the scope and the full due process
23 right of what Pfizer is entitled to. She can do that piece.
24 The other part of it --
25     THE COURT: She didn't attribute it to the

**53**

1  off-label marketing.
2      MR. SOBOL: Right, the other part -- to be sure.
3  The other part of it we will prove as a matter of fact
4  through the purposes that I told you before. And we'll also,
5  frankly, as we all do, educate, with all due respect, this
6  Court and the jury regarding how it is that information gets
7  disseminated in the marketplace to physicians, and what they
8  rely upon, and how buzz is created, and what marketing is all
9  about, and how you brand a product and how you try to have
10 one doctor be an influencer for a whole bunch of other
11 doctors. And when all is said and done, the jury will be
12 asked a question: Have the plaintiffs proven beyond a
13 reasonable -- by a preponderance --
14     THE COURT: I actually know how to -- you want
15 beyond a reasonable doubt?
16     MR. SOBOL: No, I don't. I don't even want clear
17 and convincing. But we will prove, I'll say this, by a
18 preponderance of the evidence for each indication that the
19 overwhelming majority of the prescriptions written in that
20 indication were substantially contributed to by the
21 defendant.
22     THE COURT: All right, I got it.
23     So this is your turn. I started off with
24 questions. Why don't you just give me your spiel.
25     MR. ROUHANDEH: Well, your Honor, I think one point

54

1  I wanted to make was, if your Honor was going to accept their
2  filing, which we just saw today, we would like your Honor to
3  have a copy of these published studies that were so-called
4  suppressed, including one from a gentleman who works in the
5  biological psychiatry branch of the National Institutes of
6  Mental Health. He's the lead author. I don't know how
7  they're going to say that Pfizer or Parke-Davis suppressed a
8  study by the National Institutes of Mental Health, but if
9  your Honor is going to accept their filing, we would like
10 your Honor to have this.
11     THE COURT: Could I even understand it?
12     MR. ROUHANDEH: Well, the point, it's a very simple
13 point, which is, if you go down this list -- and it may not
14 be every one because we just saw this today for the first
15 time -- many of the studies that they allege are suppressed
16 are out there in the public domain. That's the simple
17 point. We would just like that to be in the record if their
18 filing is going to be in the record. We can also supplement
19 it and put it on ECF.
20     THE COURT: I think I would supplement. I'm not
21 sure this even makes any sense to me.
22     MR. ROUHANDEH: That was our point, it doesn't make
23 sense to say studies are suppressed if they're published.
24     THE COURT: I mean, it's not much of a chart. It's
25 not self-explanatory, if you've seen it.

55

1      MR. ROUHANDEH: Well, we're happy with the Court
2  not accepting either, but our point was just, if the Court is
3  going to accept that and mark it as an exhibit to this, we'd
4  like these studies to be marked as an exhibit.
5      THE COURT: Yes, I can't take this without
6  briefing. It's not explanatory. I mean, I don't understand
7  it. It doesn't give me a --
8      MS. CABRASER: And we would be happy to file a very
9  short submission explaining the context of it and attaching
10 it so that it does make sense to you because it is shorthand
11 for a concept that probably does require some explanation,
12 and we would like the opportunity.
13     THE COURT: I don't know.
14     MR. ROUHANDEH: One final point on this issue of
15 fraud on the market. We put in an expert, a Dr. Chintagunta
16 from the University of Chicago, who says the market is not
17 efficient. We see no expert from them, so we think, based on
18 this record, both from a factual and legal point, they can't
19 make the new-found argument here today that there was fraud
20 on the market. Chintagunta says doctors respond differently
21 to marketing, some respond negatively, and that you can't
22 assume an average effect.
23     THE COURT: And yet you guys, not you personally
24 but Parke-Davis, Pfizer, obviously had a marketing campaign
25 here that was unbelievably successful. And so they thought

56

1  it was going to work; they thought it was successful to put
2  out this message.
3      Now, assume for a minute it was fraud, which I know
4  you don't. If your marketing people think it's effective,
5  why can't I?
6      MR. ROUHANDEH: Your Honor, because the
7  marketing -- there isn't a message that's standard that goes
8  to everybody out there. This is not like a
9  fraud-on-the-market case where there's a piece of
10 information. Either the statement is a uniform type of
11 statement, it's on the box, it's on the package, which is not
12 this case, which is more like the Aspinall case. Or where
13 you don't have that, say with selling a security, there's
14 nothing that goes along with that purchase, then you have to
15 say, well, if it's a different type of fraud, then you have
16 to say it's a fair and efficient market and that the
17 information put into the market affects every purchaser. And
18 that clearly is not true. Whether you accept their experts
19 or ours, they both agree that not every statement affected
20 every doctor, so you cannot have a fraud-on-the-market theory
21 in this context.
22     THE COURT: But your marketing people know this, so
23 they go out and they create a positive image for this drug:
24 "Hey, try it for pain." I mean, maybe not the specifics.
25 "Hey, try it for headaches. Hey, try it for jitters."

57

1  Isn't that what basically they did?
2      MR. ROUHANDEH: On an individual -- no, it's not
3  what they did. It's not what they say was done. But the
4  point is, it's done on an individual basis doctor by doctor.
5  It is not done -- I mean, the insurance cases are very good
6  on this. You have a whole bunch of -- for years and years
7  people have litigated whether in these, you know, insurance
8  cases you can certify a class. And if you look at it, the
9  cases pretty much break down right along a strict fault
10 line. They say, look, if you've got statements by sales reps
11 to individual people buying insurance, there's a whole bunch
12 of individual issues there: What was said, did it affect the
13 purchase? And those don't get certified. Where they do get
14 certified is where you have something in the insurance
15 contract itself that everybody got. That's not this case.
16     What the pharmaceutical companies recognize, if you
17 could just put one message out there, they wouldn't have
18 7,000 sales reps running around talking to individual
19 doctors. That's the point. Marketing, sales, is done on an
20 individual basis, and the facts are individual. Whether a
21 doctor wrote a prescription because, as they allege, and even
22 if you assume there was some fraud, as a result of that
23 fraud, whether the doctor wrote it because it was just a
24 simple off-label, it was off-label but it was truthful,
25 whether the doctor wrote it because, as in the case of the

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

**58**

1  individual class reps, they had been giving it to people who
2  had epilepsy and they said, "Oh, the person came in and
3  reported their migraines are gone," that might be why they
4  prescribed it, all sorts of legitimate individual issues; and
5  you can't separate those out, and the plaintiffs' expert
6  admits that you cannot do that.
7      THE COURT:  Is there one standard message that you
8  could say was replicated across the market, or can I only do
9  this indication by indication?
10     MS. CABRASER:  I think there are slight variations
11 indication by indication, but there is a pervasive message,
12 which is, "Our drug is effective to treat this problem.  It
13 is effective."  It wasn't a message that could be given
14 directly, as you know, from the company to either the doctors
15 or the public because this wasn't FDA approved.  They had to
16 go around that.  They had to create another strategy for
17 getting directly to the relevant market, which were
18 prescribing doctors.  And, by the way, your Honor --
19     THE COURT:  So can you prove -- let's take
20 bipolar -- that there is a standard message given to the
21 sales team to go out and say, "This is effective to treat
22 bipolar"?
23     MS. CABRASER:  Yes, we can prove that there is a
24 standard message, there is a cluster of ways and modalities
25 to do that.  And, by the way, your Honor, what the real

**59**

1  standard message is, or lack of message, which does come from
2  the top, which was nationwide, which is identical from
3  indication to indication to indication, was the basic
4  fraudulent conduct, and that was this:  The fraud on the
5  market, the relevant market, was that the message wasn't
6  coming from the company.  But it was.  Nobody could know
7  that, and nobody did know that.  This was a fraud on the
8  market by creating the impression that was a pervasive
9  impression that the effectiveness of this drug for all of
10 these indications was being discovered, discussed,
11 independently within the medical profession through
12 marketing, and that therefore the fact that it wasn't FDA
13 approved for these indications was fine because the
14 community, people were doing research, it was effective.
15 Nobody ever said, you know, "The company is telling you it's
16 effective.  You can believe it."  That's what they couldn't
17 do.  That's the illegal marketing of off-label use.  So they
18 not only had to find another way to do that, but they had to
19 suppress and conceal the fact that that's what they were
20 doing.
21     THE COURT:  Well, let me just -- I'm relatively
22 simplistic here.  Let's take bipolar.  Was there a
23 consistently fraudulent message being given out about
24 bipolar?
25     MS. CABRASER:  The simplest message, your Honor,

**60**

1  that it's effective for bipolar.  And if there were studies
2  that the company had and knew about that demonstrated it
3  wasn't --
4      THE COURT:  So it's just that simple, "It's
5  effective for bipolar," or was there some specific data that
6  was handed out?
7      MS. CABRASER:  Effective in treating bipolar --
8      THE COURT:  How do you know that, that that was
9  being given out?
10     MS. CABRASER:  We could talk about the facts of the
11 messages if you want.
12     THE COURT:  One of the things I'm having trouble
13 with -- you may be right that you need a standard message
14 that goes out, but suppose, take this example, there was a
15 standard message told to the sales team, "Go out and sell
16 bipolar and say scientific studies show it was effective for
17 bipolar," and it turns out not to be true.  Assume that they
18 can show that.
19     MR. ROUHANDEH:  Even if that was true, and they
20 have made no showing that they have common proof to prove
21 that, even if that were true, they can't show injury or
22 causation through common proof, and I think it's very clear
23 from Dr. Rosenthal that they cannot do that.  There's no
24 common proof that says it affected everyone.  She's admitted
25 that.  Their own expert has admitted that.

**61**

1      THE COURT:  I think you're holding it to too tight
2  a standard.  Suppose -- just take my example for a minute --
3  the sales team goes out to the hinterlands and starts telling
4  people, "There's scientific evidence that supports that this
5  is effective for bipolar," and that it's not true, there are
6  no scientific studies that show that.  Just take that.  And
7  then suddenly the sales bump up from $1 million to $2 million
8  overnight.  Why can't you on a civil standard show it's
9  probably true that they were caused by the fraudulent
10 message?
11     MR. ROUHANDEH:  For several reasons.  First, you
12 have to know whether a physician was exposed to that alleged
13 misstatement.  You'd have to know if the prescription written
14 by the physician even related to bipolar, related to that
15 use, because it may be for a different use.  You'd have to
16 know whether the prescription resulted from that piece of
17 information or some other piece of information.  Maybe they
18 read a study, maybe they had a patient, maybe they've already
19 been using it for that use.  You'd have to know whether the
20 physician would have written the prescription anyway for
21 bipolar, regardless of whether that information was
22 communicated; and you'd have to know whether the prescription
23 benefited the patient.  Those are all individual issues that
24 are necessary to liability.
25     THE COURT:  I don't agree with the last one.

**Page 62**

1  MR. ROUHANDEH: Well, and I do want to get to that
2  point.
3  THE COURT: And I'm not doing that here. I
4  guarantee you that's what I'm not doing here. I'm not doing
5  clinical studies through this lawsuit. You should have gone
6  through the FDA. I'm not going to do, in fact, was the
7  person injured? If you made a fraudulent statement about the
8  existence of scientific studies and there weren't any or
9  there weren't good ones, then you're going to rise or fall on
10  that. That's why we have the FDA.
11  MR. ROUHANDEH: Your Honor, on that point -- I
12  think it's a very important point -- we have demonstrated --
13  we think that injury -- and, first, let me just backtrack for
14  a second. What the plaintiffs in effect are saying is, just
15  going with the first point about this causation point, that
16  that might be enough, in effect what they're saying is, if
17  they can proceed with this model of Rosenthal where she
18  estimates some increase and they spread it among the class,
19  their other expert, Dr. Hartman, recovers because he takes
20  Neurontin. He takes it right now.
21  THE COURT: You know, I started counting how many
22  times you said that in the brief. I must admit, it must have
23  been a glory moment; I mean, one of those things that you go
24  home and say, "Hey, kids, guess what happened today in my
25  deposition."

**Page 63**

1  MR. ROUHANDEH: I wish I could say I took that
2  deposition, but I did not. But the point is that here's
3  Dr. Hartman -- and it goes to this injury point -- here's
4  Dr. Hartman, and he's a Ph.D. in economics --
5  THE COURT: You know, excuse me. I read it, and I
6  know Hartman.
7  MR. ROUHANDEH: I know your Honor does, but the
8  point --
9  THE COURT: I mean, not personally. He's been on
10  the stand for many days. I'm glad to know he's being
11  bolstered in his testimony with your drugs.
12  (Laughter.)
13  MR. ROUHANDEH: I guess what I'm saying is, he's
14  just an example. The example is that people who benefit from
15  the product who take it every day, who continue to take it,
16  get their money back for old prescriptions? That cannot be
17  the law.
18  And with respect to this injury issue, injury is an
19  element of liability. I'm not talking about the damages
20  issue. All the courts that have looked at this with
21  prescription drugs have said, "Look, you don't have a claim
22  if the product was effective." It's the plaintiffs' burden
23  to demonstrate that it was ineffective. So what their
24  allegation is, and it's solely an allegation, their
25  allegation is -- and it's really stunning that they say this

**Page 64**

1  with such ease, but they say, "Plaintiffs claim that
2  Neurontin was not effective in treating any class members for
3  those conditions." They say that in their reply at Page 23,
4  referring to all off-label uses. They say it didn't work for
5  any off-label use.
6  Now, they bear the burden of proving inefficacy.
7  They have to come in and demonstrate to this Court that
8  there's common proof to prove that. Your Honor, to be fair,
9  I think that they're misstating what our argument is. Our
10  argument is, they bear the burden of proving ineffectiveness.
11  THE COURT: No, they don't. No, I would disagree.
12  They have the burden of proving you made a fraudulent
13  representation.
14  MR. ROUHANDEH: Your Honor, with all due respect,
15  and I won't belabor the point --
16  THE COURT: It's fraud, the misrepresentation. If
17  you misrepresented that scientific studies supported
18  effectiveness, that's all they have to prove. If in fact, I
19  mean, that's not true, they lose. But I'm not -- this is one
20  of the things that you, not you but Parke-Davis, took a risk
21  on when they say, "We're going to bypass the FDA and sell
22  it." I am not going to allow this court to become a
23  substitute for a clinical trial.
24  MR. ROUHANDEH: Well, your Honor, we're not asking
25  the Court to. There's no battle between the experts here.

**Page 65**

1  They don't have any experts, they don't have anybody who
2  says, "We can establish the point that we've alleged through
3  common proof." That's the point of why we're here today.
4  They need to demonstrate that, true or false, this allegation
5  that everybody was injured -- and injury, remember, is an
6  element of liability -- that that can be proven through
7  common proof. They don't have a single expert. They don't
8  have a study. We have, and we would request the Court take a
9  look at this expert report that explains it cannot be done.
10  THE COURT: I'm not doing that in the class cert
11  context. You may win ultimately, but I'm not doing that
12  here. But I do have a big problem about the theory, which
13  I'm having a huge amount of problems with.
14  Let me ask this. This is late on a Friday
15  afternoon. What I'm increasingly realizing is, I don't
16  understand your theory of recovery indication by indication.
17  I read the complaint early on, but you know a lot more now.
18  That chart was meaningless to me. I just skimmed through it
19  just as you handed it up here. You say there are eight -- I
20  want to know what the alleged fraud is indication by
21  indication so that I can understand how you're going to prove
22  it up and whether or not you can prove it was transmitted
23  through your sales teams. I don't think just putting one
24  article out there in the marketplace and suppressing another
25  one is going to be enough. I think you need to have it be a

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

**66**

1  message that's being sent out through their marketing
2  strategy, at the very least, to win your market campaign.
3  It's got to be part of their marketing scheme to float
4  indication by indication through their sales team these
5  articles and this information through these marketing events
6  and these sales meetings. I think there's something to be
7  said, if you don't have a perfectly efficient market, that
8  you've got to at least show it's getting to the marketplace
9  in a standardized way.
10         MS. CABRASER: And we can do that, your Honor.
11         MR. GREENE: Can I address that, your Honor?
12         THE COURT: Yes.
13         MR. GREENE: To refresh your memory, this started
14  off with Parke-Davis, and it started off back in '95.
15  Remember, Neurontin was approved by the FDA in December o
16  '93. They began marketing it in the beginning of '94. In
17  '94 through part of '95, there were no uses, virtually no
18  uses for any of these off-label uses, some of the ones which
19  we're discussing here today. They came up with marketing
20  assessments. There were three marketing assessments. They
21  said, "We're going to publish only the favorable results,"
22  the publication strategy, the publication strategy conducting
23  these clinical trials; and then handing out for the off-label
24  uses, foregoing the FDA approval, they were only going to
25  hand out the favorable ones. So this started in the '95,

**67**

1  '96, '97, '98 time period. They hired these medical
2  marketing firms. There were national strategies.
3  Mr. Rouhandeh is talking about the sales force out there.
4  The sales force is executing the strategy that started at the
5  top level at Morris Plains, and then Pfizer started the same
6  thing.
7         THE COURT: You have to give that to me indication
8  by indication. His point was -- maybe it's in here
9  somewhere. It wasn't in the class cert papers indication by
10  indication what was the standard message, what is the proof
11  of the fraud, and --
12         MR. GREENE: We will submit that to you in a trial
13  plan, your Honor. But I do want to point out one thing.
14         THE COURT: No, but I don't understand the case
15  well enough. His point, would you disagree with him that
16  there's got to be some standardized fraud that went out into
17  the market?
18         MR. GREENE: There was. We did the Franklin case.
19  We saw it.
20         THE COURT: Excuse me. You know, first of all, it
21  was a gazillion years ago for me. I know you've been living
22  it, but I haven't. But, second of all, I didn't focus on
23  eight different indications. It was a whistleblower suit.
24  It was simply whether there was a misstatement to the federal
25  government, and so --

**68**

1         MR. GREENE: You're correct, we were not focusing
2  on false and misleading statements that were made about these
3  uses in Franklin. We are in this case. It's prevalent.
4  It's the publication strategy.
5         THE COURT: You need to prove it up. Why don't we
6  do an eight-page brief, one page per indication: What is the
7  fraud? What was the standard message? What was the -- you
8  know, something in that order -- what is it you say they
9  suppressed? Why is it that I can draw an inference that it
10  was a substantial contributing factor to the uptick in the
11  sales? I mean, if that's in here, maybe I missed it, but I
12  got so wrapped up in whether a third-party payor needs prior
13  authorization or not or should I apply New Jersey law?
14         The key issue is, does this fall into, as I'm
15  understanding it, an Aspinall kind of situation? Or is it,
16  as Mr. Rouhandeh says, a very different situation because
17  you're not dealing with a national marketing campaign to
18  consumers; you're dealing with learned intermediaries and
19  very different sales teams and very different indications?
20  That's the gist of what you're saying, right, Mr. Rouhandeh?
21  Don't superimpose Aspinall on this, this is a different
22  case? This has been a very helpful oral argument because I
23  realize I don't know enough about it to know whether I can
24  apply that model.
25         MR. GREENE: Well, I think we've laid out quite a

**69**

1  bit in our reply memo, your Honor, and I direct your
2  attention to Page 10 and the following pages, but we can set
3  this out in a trial plan. But there is one thing I want to
4  point out to you. You know, we filed our discovery requests
5  in this case back in March, 2005, and production began, and
6  then discovery was stayed. But I want to point this out to
7  you: Since February, 65 percent of the documents have been
8  dumped on us by Pfizer. We just got dumped with another
9  couple hundred thousand pages of documents this past week.
10  And I've had teams of lawyers, New York, Boston, trying to
11  digest this and review this material.
12         THE COURT: When can you give me -- that's a
13  coherent and cogent point -- when can you give me indication
14  by indication what the common questions of fact and law are
15  going to be by indication? And then I can make some
16  judgment.
17         MS. CABRASER: Based on the discovery that we have
18  today, which is all you'll have anyway to deal with class
19  certification, we can do that in a couple of weeks.
20         THE COURT: Fine. When?
21         MS. CABRASER: We can do that in -- a couple of
22  weeks is two weeks, your Honor, and --
23         THE COURT: Okay, May --
24         MS. CABRASER: I'm sorry.
25         MR. ROUHANDEH: May 25.

Case 1:04-cv-10981-PBS     Document 1224-2     Filed 04/14/2008     Page 18 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

### 70

1  THE COURT: May 25? Because his point is
2  well-taken: If you're going to prove fraud on the market,
3  you've got to prove a standard fraudulent message that goes
4  out and what the before and after were.
5  MS. CABRASER: That's correct, your Honor, and what
6  we would like to do -- and you're right, absolutely, these
7  briefs are very voluminous and nuanced. We need to get back
8  to basics. We will get back to basics for you with respect
9  to that theory. We will give you the specific information
10  you want on each of the indications.
11  THE COURT: What is the common evidence that you'd
12  have and how do you prove, on your theory, that this is an
13  Aspinall kind of situation?
14  MS. CABRASER: And we will do that, your Honor.
15  And one piece of that and a very important piece of it which
16  we'd like to give you at the same time, because it's
17  inextricably intertwined, is, there is the uniform message
18  that goes out about the effectiveness of the drug for the
19  off-label indication, and at the same time there is concealed
20  material information about that indication that is being
21  withheld from the market, and the fraud has got to be the
22  combination of those.
23  THE COURT: I don't know.
24  MS. CABRASER: We would like to demonstrate to
25  you --

### 71

1  THE COURT: I don't know. The farther away you get
2  from an explicit message, the harder it is for me because you
3  don't have a perfect market. Everyone seems to be conceding
4  this is not a direct analog to the securities world. I don't
5  know, okay?
6  You want probably two weeks after that to respond?
7  MR. ROUHANDEH: Yes, your Honor, that's fine.
8  THE COURT: Because, as you can tell, I am troubled
9  by this. On the one hand, I say, look, the pharmaceutical
10  companies rely on these marketing people. They assume
11  there's a cause and effect to the marketing, and so therefore
12  it's not so illogical that a court do it. On the other hand,
13  I'm taken with your argument that even if there were a fraud,
14  if so much of it was truthful, how do you separate the wheat
15  from the chaff? How do you figure out causative effect
16  unless there was a standardized message, and then you can do
17  something?
18  MR. ROUHANDEH: Well, your Honor, I think that is
19  our main point here, and we think it's fatal, that they admit
20  there are people in the class as defined who do not have a
21  claim, and they can't tell this Court or a jury who those
22  are, and that is a fundamental problem with respect to
23  causation.
24  THE COURT: But if your marketing people -- if you
25  bump it up through marketing 90 percent, even if there might

### 72

1  be some portion of that that's fair game, I don't know that I
2  would say that you can't prove causation, a substantial
3  contributing factor?
4  MR. ROUHANDEH: Well, it's what they say. It's
5  what they say. They say, we can't separate out the people
6  who would have written it anyway, the people who wrote it for
7  maybe some improper conduct but not fraudulent, from the
8  people who got it as a result of fraud. That's their
9  burden. They did not prove it.
10  And I just want one other point, which was, I think
11  you gave them three weeks. Can we have three weeks as well?
12  THE COURT: Sure. The only thing that's critical
13  is, I'm not giving you extensions because I need this to be
14  done before I let this law clerk out the door for his real
15  job. So he gets it as his summer task, and I can't go much
16  further than that without losing him. So we can get going on
17  it.
18  And I will say this, and it's been true through all
19  these pharmaceutical cases but maybe as much for this as
20  anything: I found the briefing fabulous. And it is in fact
21  true, I think this is an incredibly difficult issue. So I
22  don't know if I should thank you for the great briefing or
23  bemoan it.
24  MR. SOBOL: May I address a point, your Honor?
25  THE COURT: Yes. I think I've got the issues

### 73

1  vetted. I mean, I --
2  MR. SOBOL: May I address a point, sir?
3  THE COURT: Sure. Stop being so nice to each
4  other.
5  MR. SOBOL: What I'd like right now to do is sort
6  of turn the page. I'm not trying to address any of the
7  issues we've talked about so far. There is in addition in
8  the case an unjust enrichment count. So while we have
9  focused on the other critical counts in the case, RICO and
10  the state consumer protection cases, there is a different
11  additional way that this Court should, as we've asked, look
12  into whether there's a way to fashion a remedy for the class,
13  given some of the features that you've identified.
14  Unjust enrichment, as we pled, is common among the
15  states. The elements are one that will give the Court
16  greater flexibility to be able to fashion a remedy,
17  particularly if we can accomplish one critical thing, which
18  we think we can in both cases, both, all counts, which is
19  that the evidence that we will prove will determine and the
20  fact-finder will be able to determine how much the illegal
21  activity caused by way of an increase in sales. The
22  defendant will have a due process opportunity through its own
23  experts, through cross-examination of our experts, to define
24  the amount of the actual effect it had in the world,
25  regardless of the additional issue that counsel for the

Case 1:04-cv-10981-PBS    Document 1224-2    Filed 04/14/2008    Page 19 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

74

1  defendants appropriately raised, you know, that they want to
2  stick in, which is, "Yeah, even if you can figure out how
3  much harm we caused generally, you can't figure out which
4  ones." That's their argument, that you can't figure out who
5  got harmed how much.
6      THE COURT: But it's still a fraud claim, right?
7      MR. SOBOL: There's still a level of illegality.
8  We have to prove the illegality.
9      THE COURT: Well, which illegality?
10     MR. SOBOL: The fraud, we have to prove the fraud
11 still.
12     THE COURT: Right, not just the plain off-label?
13     MR. SOBOL: Not just the plain off-label. We'll
14 still have to prove a fraud, but we'll have to prove that
15 there was an unjust enrichment; you know, a benefit, right,
16 that was conferred, a detriment that the class to some extent
17 incurred, that it was unjust under the circumstances, right?
18 But we think that that substantive law provides you with
19 greater flexibility in terms of being able to certify the
20 class and provide a remedy.
21     I just don't want us -- because I think it's
22 appropriate when we have these big cases to sort of focus on
23 what the theories are and then move from there and going on,
24 I did not want to lose the fact that we are also pressing
25 that as a theory, particularly for consumers in a situation

75

1  like this. So --
2      MR. ROUHANDEH: Your Honor, my only response is
3  that the same causation issue, and we think the same injury
4  issue but certainly the same causation issue, is presented by
5  the unjust enrichment claim. They still have to show that
6  the unjust enrichment was by reason of an infringement of
7  their rights, and it is still a fraud claim. I don't think,
8  in terms of the principal issue that was addressed during
9  this oral argument, that really the issue is any different
10 from the unjust enrichment. We still need a level of
11 causation, and I think that's the first and foremost fatal
12 flaw in their motion.
13     THE COURT: What's happening on these other cases,
14 the personal injury suits?
15     MR. ROUHANDEH: Those cases are proceeding in
16 discovery. There are ten cases that have been selected for
17 additional specific discovery.
18     THE COURT: Are they all bipolars?
19     MR. ROUHANDEH: No, no. All sorts of different
20 uses, pain, bipolar, other uses.
21     THE COURT: I thought they were all people who
22 killed themselves, who are suing because it wasn't the right
23 drug to use for the mood disorder.
24     MR. ROUHANDEH: Some make that allegation, and
25 there are a number who allege that it's not effective and all

76

1  of that and they took it for bipolar, but there are many --
2  it runs the gamut of different uses.
3      THE COURT: But the ten sample questions, are those
4  all bipolar questions?
5      MR. ROUHANDEH: No, I don't believe they are.
6      THE COURT: Pretty soon, won't we be entering into
7  some sort of scientific back-and-forth on those?
8      MR. ROUHANDEH: Yes, and the way it's set up is,
9  both sides will complete a level of discovery in the ten
10 cases, and then in the fall there will be motions for summary
11 judgment and Daubert motions to be decided on at least the
12 general causation issue, which we think defeats all of those
13 cases, which is that the product doesn't cause suicide.
14     THE COURT: As a practical matter, let's say I
15 threw that out. Let's say they couldn't prove up the actual
16 fraud or the causation. That resolves the claim here too,
17 right, for that indication?
18     MR. SOBOL: No. It's a completely different issue,
19 your Honor. The question in the personal injury cases is
20 whether or not -- the causation level is two things: First,
21 did the drug as a general matter have a propensity to cause
22 the kind of injury that the person has suffered? And then,
23 second, whether or not that person's injury --
24     THE COURT: Right, but I think we're just doing the
25 first. Is that right?

77

1      MR. ROUHANDEH: Well, I think the record will be
2  supplemented by the facts in the ten cases. To the extent it
3  makes sense to address specific causation in those ten cases,
4  that may well be addressed. I think the idea was that it
5  would be helpful to the Court to have some specific facts
6  relating to those cases on this motion, but you're correct,
7  it's principally the general causation issue.
8      THE COURT: I just sort of assumed the general
9  causation was that the doctors prescribed it for bipolar
10 thinking it would have an effect on bipolar, and that would
11 come up in the ten cases we did in the fall.
12     MR. ROUHANDEH: Well, actually the fraud claim in
13 the personal injury cases your Honor dismissed for lack of
14 sufficient allegations.
15     THE COURT: No, I understand that, but even on a
16 negligence/product liability theory, it's the basic
17 effectiveness issue, right?
18     MR. ROUHANDEH: Well, I guess the issue in that
19 case is, as Mr. Sobol mentioned, a principal main issue there
20 and one that we think we should prevail on is that Neurontin
21 does not cause suicide, and that issue we think should be
22 resolved for all the cases in one fell swoop in a Daubert
23 hearing.
24     MR. SOBOL: The personal injury cases are regarding
25 the safety of the product, by and large the safety of the

Case 1:04-cv-10981-PBS   Document 1224-2   Filed 04/14/2008   Page 20 of 20

MDL Class Cert. Hearing  5/4/2007  1:01:00 PM

**78**

```
 1  product, not the efficacy of the product.
 2      THE COURT:  Well, obviously Judge Sorokin is closer
 3  to that case right now than I am, but I thought part of it
 4  was a claim, "My doctor prescribed Neurontin for bipolar, and
 5  in fact it wasn't effective in treating bipolar.  And in
 6  fact, if he had prescribed something that dealt with it, my
 7  kid wouldn't have killed himself."
 8      MR. GREENE:  That's not the claim, your Honor.
 9      THE COURT:  No?
10      MR. GREENE:  No, no.
11      THE COURT:  So what is it?
12      MR. GREENE:  It's a number of different
13  conditions.  They took Neurontin, and it caused them to
14  commit suicide.  It wasn't that they prescribed it for
15  bipolar and it was untreated.  It caused mania or it caused
16  depression.
17      THE COURT:  You mean, it affirmatively created
18  rather than if they had used the right medication, it would
19  have taken care of the problem?
20      MR. GREENE:  Correct.
21      THE COURT:  So you're all agreeing, which is the
22  only point here, this is true, that they should have no
23  impact on this case?
24      MR. GREENE:  Correct.
25      MS. CABRASER:  That's right.
```

**79**

```
 1      THE COURT:  That's interesting.
 2      MR. BECNEL:  Your Honor, Daniel Becnel.  A lot of
 3  what's going on in those cases, and there's new evidence in
 4  every day in the newspapers with the FDA on almost a weekly
 5  basis coming out with this whole class of types of warning
 6  labels now about suicides in young adults and what's
 7  happening with these types of drugs, so it's ongoing.
 8      THE COURT:  But the only thing that's of immediate
 9  interest to me here is, it has nothing to do with this
10  lawsuit?
11      MR. GREENE:  That's correct.
12      THE COURT:  It's not going to trigger an inquiry
13  into the effectiveness of this drug in treating bipolar?
14      MR. ROUHANDEH:  Yes, and what Mr. Becnel is
15  referring to has nothing to do with this category of drugs.
16      THE COURT:  Have a nice weekend.  I will look
17  forward to your materials.  I think it's really hard.  If I
18  were a betting person, I wouldn't bet.
19      MR. ROUHANDEH:  Thank you, your Honor.
20      MS. CABRASER:  Thank you.
21      MR. SOBOL:  Thank you, your Honor.
22      THE CLERK:  Court is in recess.
23      (Adjourned, 3:45 p.m.)
24
25
```

**80**

```
 1              C E R T I F I C A T E
 2
 3
    UNITED STATES DISTRICT COURT )
 4  DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
 5
 6
 7
 8      I, Lee A. Marzilli, Official Federal Court
 9  Reporter, do hereby certify that the foregoing transcript,
10  Pages 1 through 78 inclusive, was recorded by me
11  stenographically at the time and place aforesaid in Civil
12  Action No. 04-10981-PBS, In Re:  Neurontin Marketing and
13  Sales Practices Litigation, and thereafter by me reduced to
14  typewriting and is a true and accurate record of the
15  proceedings.
16      In witness whereof I have hereunto set my hand this
17  8th day of May, 2007.
18
19
20
21
22
23      _____
        LEE A. MARZILLI, CRR
24      OFFICIAL FEDERAL COURT REPORTER
25
```