UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION, | MDL Docket No. 1629<br><br>Master File No. 04-10981<br><br>Judge Patti B. Saris<br><br>Magistrate Judge Leo T. Sorokin |
| **THIS DOCUMENT RELATES TO:**<br><br>**THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER, INC., and**<br><br>**AETNA, INC. v. PFIZER, INC.** | **REDACTED VERSION** |

### REPLY MEMORANDUM OF LAW IN SUPPORT OF THE COORDINATED PLAINTIFFS' MOTION TO COMPEL DEFENDANTS TO PRODUCE ALL BUSINESS AND OPERATING PLANS RELATING TO THIRD PARTY PAYORS AND TO PRODUCE AN ADEQUATELY PREPARED RULE 30(b)(6) WITNESS

The Coordinated Plaintiffs submit this reply memorandum of law in support of their motion to compel Defendants to produce all business and operating plans relating to the named Third Party Payors and to produce an adequately prepared 30(b)(6) witness.

In their opposing brief, Defendants make three main assertions to justify their refusal to provide any of the relief requested. None of their assertions have merit.

First, Defendants argue that *all* the requested operating and business plans are irrelevant, regardless of whether or not those plans explicitly reference Neurontin. Therefore, Defendants' maintain that their February production of a sampling of such plans was more than sufficient and that no 30(b)(6) testimony on that production is required. Because all the produced plans are asserted to be irrelevant, Defendants do not explain the criteria used to determine which plans would be produced and which withheld. If the documents were withheld because Defendants have concluded that they are no longer reasonably accessible, Defendants do not explain how it was concluded that those plans were irrelevant.

Second, Defendants do not – and cannot – dispute that Mr. Henderson was entirely unprepared to testify as to Topic 1, which, in pertinent part, calls for "the identification of, and all documents concerning, all individuals at . . . Warner-Lambert . . . who had contacts with Third Party Payors concerning Neurontin[.]" Instead, Defendants argue that Plaintiffs should be required to accept a laundry list of "adopted testimony" that was sent more than two months after their designee's testimony from prior fact witnesses. *See* Declaration of Elana Katcher, dated April 14, 2008 (Katcher Decl.), Ex. A at 6. Plaintiffs are not required to accept bits and pieces of testimony culled by counsel after the fact as a substitute for a 30(b)(6) deposition.

Third, Defendants do not – and cannot – contest that any plan to market Neurontin to the named Third Party Payors through affiliated or prescribing physicians would be relevant to this action. Instead, Defendants assert that Plaintiffs are precluded from obtaining discovery on this topic by this Court's "Discovery Order No. 14" which allowed Plaintiffs to seek testimony regarding "[t]he marketing or promotion of Neurontin directly to the named Third Party Payors." However, two issues were before the Court at that time: (i) whether Plaintiffs were entitled to a witness knowledgeable about any programs to market Neurontin to third party payers for off label indications; and (ii) whether Plaintiffs' original request for a witness prepared to testify regarding marketing efforts to *all* third party payors was overbroad. *See* Katcher Decl., Ex. B at 64-65. No fair reading of the Court's resolution of those issues disobliges the Defendants from providing a 30(b)(6) witness who is knowledgeable and prepared to testify about all marketing strategies targeting the named Third Party Payors, including those that explicitly called for marketing Neurontin to their affiliated and prescribing physicians.

# ARGUMENT

## I. Defendants Have Not Confirmed That They Have Produced *All* Relevant Operating & Business Plans Pertaining to Third- Party Payors

Defendants' opposition largely ignores Plaintiffs' request that Defendants produce all "operating plans" and the "business plans" that pertain to all named Third Party Payors created during the relevant factual period or, if any such plan no longer exists, disclose the dates and circumstances of its destruction.

Instead, Defendants respond only that "[o]n February 13, 2008, Defendants produced a CD to Plaintiffs containing numerous operating and business plans from within the operative discovery period in this case that related to Aetna and Kaiser[1] and included references to Neurontin." Def. Br. at 4. The operating and business plans produced by defendants on February 13 can be parsed as follows:

| *Bates Range* | *Description* | *Named Third Party Payor* | *Year* |
|---|---|---|---|
| MDL_SM_01614-43 | Pfizer 2004 Operating Plan | Kaiser | 2004 |
| MDL_SM_01614-73 | Pfizer 2004 Operating Plan | Kaiser | 2004 |
| MDL_SM_01714-19 | Pfizer 2004 Operating Plan | Aetna | 2004 |
| MDL_SM_02048-87 | Pfizer 2004 Operating Plan | Aetna | 2004 |
| MDL_SM_02088-93 | Pfizer 2004 Operating Plan | Aetna | 2004 |
| MDL_SM_01720-84 | Pfizer 2003 Operating Plan | Aetna | 2003 |
| MDL_SM_02094-187 | Pfizer 2003 Operating Plan | Aetna | 2003 |
| MDL_SM_02188-292 | Pfizer September 2003 Operating Plan | Aetna | 2003 |
| MDL_SM_02321-75 | Pfizer 2003 Business Plan | Aetna | 2003 |
| MDL_SM_01850-88 | Pfizer 2002 Business Plan | Aetna | 2002 |
| MDL_SM_01889-959 | Pfizer 2002 Business Plan | Aetna | 2002 |
| MDL_SM_01960-81 | Pfizer 2002 Business Plan | Aetna | 2002 |
| MDL_SM_01982-2014 | Pfizer 2002 Business Plan | Aetna | 2002 |

---

[1] Plaintiffs requested the operating and business plans related to all named Third-Party Payors. While Mr. Henderson's testimony indicated that such plans may not have been created for all named Third-Party Payors, he did not testify that such plans existed only for Kaiser and Aetna. To the extent any other relevant plans exist, Plaintiffs seek their production.

-3-

| MDL_SM_02015-47 | Pfizer 2002 Business Plan | Aetna | 2002 |
| MDL_SM_01806-49 | Pfizer 2001 Business Plan | Aetna | 2001 |

Defendants do not assert that all operating plans and business plan pertaining to any named Third Party Payor that "include references to Neurontin" have been produced. Nor do they assert that the remainder of the plans are no longer reasonably accessible, or explain why so many plans seem to have disappeared completely from Pfizer's possession.

Instead, in arguing that Plaintiffs' are not entitled to depose a witness on the handful of documents that were produced, Defendants aver that "Pfizer's operating and business plans related to Aetna and Kaiser do not relate to the implementation of marketing strategies for TPPs concerning Neurontin." Def. Opp. Br. at 9-10. In their opening brief, Plaintiffs presented language from the 2004 Kaiser Operating Plan that suggests the contrary. Pls. Opening Br. at 5, 11. Defendants' brief is argument not testimony, and the portions of Henderson's testimony that are cited by Defendants as supporting their interpretation are irrelevant and do not pertain to either (i) operating or business plans; or (ii) the language contained within the 2004 Kaiser Operating Plan.[2] Plaintiffs have not yet had a chance to present any business or operating plan to a 30(b)(6) witness. Nor have Plaintiffs had the opportunity to examine any Defendant witness about those plans which include a discussion of marketing efforts to Third Party Payors. The parties differing interpretations of the language contained in the plans demonstrate why Plaintiffs will be prejudiced if denied the opportunity to examine a 30(b)(6) witness on these documents.[3]

---

[2] Despite Defendants' representations that they would use the additional time gained by the withdrawal of Plaintiffs March 7 motion to compel to obtain a declaration from Mr. Henderson that would address the issues raised here, no such declaration ever materialized.

[3] The need to understand what happened to the operating and business plans has become particularly urgent due to facts just revealed to Plaintiffs via a 30(b)(6) deposition of Defendants' document retention witness, Laura Kibbe -- just taken last week -- about the destruction of computers at Pfizer. Mr. Cavic testified that when he left Pfizer, his computer was sent to Pfizer's home office in Morris Plains, New Jersey. See Katcher Decl, Ex. C (Cavic Tr. 53:6-54:10). Ms. Kibbe, as Pfizer's 30(b)(6) designee on document retention and collection issues testified, on April 7,

## II. Defendants Cannot Unilaterally Substitute Prior Fact Testimony in Place of An Adequately Prepared 30(b)(6) Witness

Plaintiffs served their first notice of deposition in June 2007, months before a witness was produced. The Defendant made their objections which were eventually brought before this Court twice.[4] Although the noticed topics were reviewed by the Court, Topic 1 remained intact. At no time between the issuance of Discovery Order No. 14 and the time the deposition was finally commenced on December 5 did Defendants alert Plaintiffs of their intention not to prepare their witness as to Topic 1. *See* Katcher Decl., Ex. A at 5 (email from James P. Rouhandeh to Ronald J. Aranoff, dated December 04. 2007). Thus, Plaintiffs devoted the time and resources to prepare for a deposition that was in effect unilaterally cancelled by Defendants 2008, as follows:

> Q. You said that you understood that the computers were recycled. Was any of the information to your knowledge taken off the computers and put on to the Pfizer systems?
>
> * * *
>
> A. As I testified earlier, my general understanding is that custodians' colleagues were instructed if they had documents that were required to be maintained in an official source that those were in fact loaded on to the official source and that anything left on the employee's computer would be deemed a convenience copy and therefore suitable of recycling and not subject to retention. *See* Kibbe Dep 136:6-136:20.
>
> * * *
>
> Q. Do you know whether every document that was a sales and marketing document regarding Neurontin was printed? Off of people's computers before these computers were recycled?
>
> * * *
>
> A. No.
>
> Q. Do you know whether there is any way to determine whether or not all the sales and marketing documents that were on these recycled computers were printed before they were recycled?
>
> A. No.

Katcher Decl., Ex. H at 140:7-140:20.

---

[4] *See* Discovery Order No. 13 (**Dkt No. 801**) and Katcher Decl., Ex. G.

without Plaintiffs' prior knowledge or consent. Such intentional disregard of Rule 30(b)(6) is in fact tantamount to a failure to appear. *See Calzaturficio S.C.A.R.P.A., s.p.a. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 39 (D.Mass. 2001). This behavior would be improper under any circumstances, but is particularly egregious here, where Defendants' conduct came after the near the close of fact discovery, and with full knowledge that Plaintiffs would not have the opportunity to issue additional notices to cure the deficiency. *See LendingTree, Inc. v. LowerMyBills, Inc.*, Civ. No. 3:05CV153-C, 2006 WL 2443685 at *3 (W.D.N.C. Aug. 22, 2006) (deposing party not required to accept earlier fact testimony as 30(b)(6) corporate testimony).

Defendants' desire to adopt previous testimony as their own neither relieves them from producing an adequately prepared witness nor gives its counsel license to limit questions by the surprise use of such adoptions. As noted in a similar context in the seminal case of *United States v. Taylor*, 166 F.R.D. 356, 361-362 (M.D.N.C. 1996):

> . . . if [a corporation] wishes to assert a position based on testimony from third parties, or their documents, the designee still must present an opinion as to why the corporation believes the facts should be so construed. The attorney for the corporation is not at liberty to manufacture the corporation's contentions. Rather, the corporation may designate a person to speak on its behalf and it is this position which the attorney must advocate.

*See also id.* at 363 (A corporation may not "review previous deposition testimony and documents previously produced in discovery after the deposition has concluded to then determine its corporate position").

In fact, the prior testimony is not sufficient. First, each of these witnesses was directed by counsel not to answer questions regarding their preparation, and thus there is no way for Plaintiffs to gain assurance that their preparation would have met the standards of an adequately prepared 30(b)(6) witness. *See* Katcher Decl, Ex. C-E (Cavic Tr. at 15:13-15:23; DeSimone Tr.

at 17:17-18:3; Richter Tr. at 63:9-65:13). Second, there is every reason to believe that these witnesses were not prepared to testify beyond their own personal knowledge, and they candidly professed the limits of that knowledge. For example, Mr. Richter served for some time as Warner-Lambert's Director of Managed Care for the Northeast but could not recall which third party payor accounts were called upon by employees in his particular department during the time he was in charge. Katcher Decl., Ex. E at 77:16-77:19. There thus would have been little point to expanding the line of inquiry to other departments or other time periods. Nor could Mr. Richter do more than "speculate" as to the department that prepared the "formulary packet" that was provided to managed care customers during Warner-Lambert's attempt to gain formulary access for Neurontin when the product first came onto the market. *Id.* at 50:14-51:23. He also professed ignorance as to the content of that packet. *Id.* Mr. DeSimone did not know the names of any employee that *ever* served on the advertising review committee that reviewed materials to be distributed to managed care accounts. Katcher Decl., Ex. D at 33:6-33:9. He could not explain the use of the term "Managed Care Influence" as it appeared in internal Warner-Lambert documents. *Id.* at 243:22-244:16. These examples are not intended to be exhaustive, and Plaintiffs reserve the right to a full examination of their choosing within the parameters of Topic 1, as related to Warner Lambert. Just as Defendants were found be found by this Court not to be obligated to accept Kaiser's offer of supplementary sworn interrogatories instead of an adequately prepared 30(b)(6) witness, *see* Discovery Order No.17, Dkt No. 963, parity and fairness – as well as the Federal Rules of Civil Procedure – demand that Plaintiffs not be obliged to forgo the opportunity to directly examine an adequately prepared 30(b)(6) witness on Topic 1.

Most egregiously of all, at his deposition Mr. Henderson (and Defendants' counsel) issued a blanket adoption of all testimony of the three witnesses at issue that fell within the scope

of Topic 1. *See* Katcher Decl, Ex. F at 110:3-110:17. However, the laundry list of "adopted" page and line references sent to Plaintiffs *two months later* indicates that Defendants' counsel selected only the testimony in a more strategic manner.[5] For example, Mr. Cavic's deposition included this line of testimony:



Katcher Decl., Ex. C at 139:11-139:20. Counsel's adopted testimony ends at "no."

Defendants do not – and cannot – cite any case that approves the sandbagging of an opponent in this matter. Instead Defendants cite to a district court case that stands only for the hornbook proposition that Defendants are obligated to prepare their 30(b)(6) witness to the extent "matters are reasonably available." *Berwind Prop. Group., Inc. v. Envtl. Mgmt. Group, Inc.*, 233 F.R.D. 62, 65 (D. Mass. 2005).[6] However, nothing in *Berwind* allows a party to belatedly and unilaterally pick and choose bits of testimony from prior witnesses and declare that their obligation to prepare and produce a 30(b)(6) witness should be thus satisfied.

---

[5] The list was sent by counsel and was not signed or certified by the deponent so it is unclear that the deponent had any role in selecting the testimony he had "adopted." Katcher Decl., Ex. A at 6.

[6] In their brief, Defendants inaccurately identified *Berwind* as a First Circuit decision. Defs. Br. at 11.

*During any subsequent 30(b)(6) deposition*, Defendants' witness may choose to cite to and adopt a particular answer of a prior witness in response to a particular question, if the prior witness's answer indeed reflects the full corporate knowledge of the Defendants. However, this procedure cannot limit in advance the questions to be asked. Defendants must produce a witness adequately prepared to testify to any question relevant to Topic 1, not just the questions previously posed to prior fact witnesses. Because Mr. Henderson acknowledged that he was not so prepared, the relief Plaintiffs request here must be granted.

### III.  Plaintiffs Are Entitled To 30(b)(6) Testimony Regarding All Strategies For Marketing Neurontin To The Named Third Party Plaintiffs, Including Those That Targeted Their Affiliated Or Prescribing Physicians.

Defendants accuse Plaintiffs of relitigating issues previously decided by this Court. Plaintiffs expect that the Court will indeed find some aspects of this dispute familiar. Once again, Plaintiffs are asking the Court to order Defendants to "give us someone who can tell us something about was there a program to market this to third party payers for off label indications." *See* Katcher Decl., Ex. B at 64. That discovery was in fact ordered by this Court on September 27, however the parties now dispute the intended scope of the Court's Order. Katcher Decl., Ex. G, at 3-4.

Defendants argue that they should not have to produce a witness knowledgeable about strategies Defendants employed to market Neurontin to the named Third-Party Payors through affiliated or prescribing physicians. However, documents produced by Defendants in February indicate that physician marketing was part of Defendants' written marketing strategy for the named Third-Party Payors.[7] *See* Pls. Opening Br. at 5. Thus, the *relevance* of the testimony

---

[7] Defendants devote much of their opposition to the argument that the physicians employed by Permanente Medical Group are not employees of Kaiser Health Plan, the named Third-Party Payor in this action. *See* Defs. Opp. Br. at 6-7. That is correct but irrelevant. The 2004 Kaiser Operating Plan discusses marketing strategies aimed at Kaiser

sought in this motion cannot reasonably be contested. The only issue is whether Discovery Order No. 14 can otherwise be construed to preclude questions regarding any strategy to market Neurontin to the named Third Party Payors through affiliated or prescribing physicians.

The only fair construction of the Order allows such questions. Plaintiffs' original deposition notice contained two topics that are relevant to the current motion. Topic 2 requested "[a]ny information that you have regarding communications you had with Third Party Payors concerning Neurontin." April 4 Nussbaum Decl., Ex. A. Topic 3 requested "Any information that you have regarding the promotion of Neurontin for any off-label uses[.]" *Id.* The September 20, 2007 argument concerned whether the original notice was overbroad because it reached communications with *all* third-party payors:

> **MR. HIMMELSTEIN:** . . . [Defendants] complained that we're asking them to educate a witness to testify about everything that was ever said to every third party payer about Neurontin. We're realistic. But give us someone who can tell us something about was there a program to market this to third party payers for off label indications."
>
> **THE COURT:** Why do you need this discovery beyond the named plaintiffs in the class and coordinated complaint and their pharmacy benefit managers?
>
> **MR. HIMMELSTEIN:** Well, they're moving – well we don't have, the pharmacy benefit managers are not plaintiffs and we don't have communications of them with the pharmacy benefit managers as far as we know.

*See* Katcher Decl, Ex. B, at 64-65. In its Order, the Court narrowed the scope of the original notice, holding that "Plaintiffs' proposed Topic 2 is too broad; it is limited to: The marketing or promotion of Neurontin directly to the named Third Party Payors. Topic 3 is stricken as the relevant testimony it seeks is duplicative of Topic 2." Katcher Decl., Ex. G at 3-4.

---

as a third-party payor, not as a medical group. *See* Declaration of Linda Nussbaum, dated April 4, 2008, Ex. J. ("April 4 Nussbaum Decl.") Mr. Henderson's testimony also confirmed that these plans were strategy documents to target third-party payors. *See* April 4 Nussbaum Decl., Ex. C. To the extent these document references physicians as a means of executing a marketing strategy directed at Kaiser as a third-party payor, those physicians should be considered proxies for Kaiser as a named Third-Party Payor.

Nothing in the Order, however, excused Defendants from providing a witness prepared to testify as to *all* marketing strategies that were intended to target the named Third-Party Payors. On the contrary, it is clear that the testimony sought here would have been clearly encompassed in Topic 3, which was stricken only on the grounds that the relevant testimony sought was encompassed in Topic 2.

## CONCLUSION

For the foregoing reasons, the Coordinated Plaintiffs respectfully request that the Court grant their motion to compel Defendants to (i) produce an adequately prepared Rule 30(b)(6) witness and (ii) produce all "operating plans" and the "business plans" that pertain to the named Third Party Payors created during the relevant factual period and, if any such plan no longer exists, disclose the dates and circumstances of its destruction.

DATED: April 14, 2008                KAPLAN FOX & KILSHEIMER LLP

/s/ Linda Nussbaum

Linda Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

*Attorneys for the Coordinated Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2008, I caused the redacted version of this document to be served on the parties pursuant to Case Management Order #3 by causing it to be filed through the Court's ECF System. The unredacted version was served on all parties via electronic mail and United States mail.

ATTORNEY FOR THE COORDINATED PLAINTIFFS


/s/ Elana Katcher
ELANA KATCHER