UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: NEURONTIN MARKETING,
     SALES PRACTICES AND
     PRODUCTS LIABILITY LITIGATION,

THIS DOCUMENT RELATES TO:

THE GUARDIAN LIFE INSURANCE COMPANY
OF AMERICA v. PFIZER, INC., and

AETNA, INC. v. PFIZER, INC.

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T.
Sorokin

## DECLARATION OF ELANA KATCHER

Elana Katcher declares upon penalty of perjury in accordance with 28 U.S.C. § 1746 as
follows:

    1.    I am associated with the law firm Kaplan Fox & Kilsheimer, LLP, one of the
attorneys for the Coordinated Plaintiffs in this action.

    2.    I submit this declaration in further support of Coordinated Plaintiffs' Motion to
Compel Defendants to Produce All Busines and Operating Plans Relating to Third Party Payors
and to Produce an Adequately Prepared Rule 30(b)(6) Witness, filed on April 4, 2008 on behalf
of all Coordinated Plaintiffs.

    3.    Attached as Exhibit A is a true and correct copy of a letter by Nicholas P. Mizell
of Shook, Hardy & Bacon to Annamarie Daley of Robins, Kaplan, Miller & Ciresi, LLP, dated
February 12, 2008.

    4.    Attached as Exhibit B is a true and correct copy of selected pages from the
transcript of a hearing held before this Court on September 20, 2007.

5.      Attached as Exhibit C are selected pages of a true and correct copy of the transcript of the deposition of George Cavic as held on September 26, 2007.

6.      Attached as Exhibit D are selected pages of a true and correct copy of the transcript of the deposition of Christopher DeSimone as held on October 1, 2007.

7.      Attached as Exhibit E are selected pages of a true and correct copy of the transcript of the deposition of John Richter as held on October 9, 2007.

8.      Attached as Exhibit F are selected pages of a true and correct copy of the transcript of the deposition of Jefferson Stierhein Henderson III, as held on December 5-6, 2007.

9.      Attached as Exhibit G is a true and correct copy of this Court's Discovery Order No. 14, dated September 27, 2007.

10.     Attached as Exhibit H are selected pages of a true and correct copy of the rough transcript of the deposition of Laura Marie Kibbe as held on April 7, 2008.


DATED: April 44, 2008                    **KAPLAN FOX & KILSHEIMER LLP**


                                         By: _C. )tatt_____
                                                Elana Katcher

                                         KAPLAN FOX & KILSHEIMER LLP
                                         850 Third Avenue, 14th Floor
                                         New York, New York  10022

                                         *Attorneys for the Coordinated Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2008, I caused this document (except Exhibits C & E) to be served on the parties pursuant to Case Management Order #3 by causing it to be filed through the Court's ECF System. Exhibits C & E were served on all parties via electronic mail and U.S. mail.

ATTORNEY FOR THE COORDINATED PLAINTIFFS

/s/ Elana Katcher
ELANA KATCHER

# EXHIBIT A



www.shb.com

**Nicholas P. Mizell**

2555 Grand Blvd.
Kansas City
Missouri 64108-2613
816.474.6550
816.421.5547 Fax
nmizell@shb.com

February 12, 2008

Annamarie Daley
Robins, Kaplan, Miller & Ciresi, L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015

Dear Ms. Daley:

I am writing in response to both your letter of January 3, 2008, and the conversations we have had since that date regarding issues related to the 30(b)(6) deposition of Jeff Henderson.

At the outset, and to appropriately frame this discussion, it is necessary to note that Plaintiffs' Notice of Deposition did not define the scope of the 30(b)(6) designation for this deposition. Instead, in Discovery Order 14, the Court expressly limited the topics for which the Defendants were obligated to prepare and produce a designee. Notably, the Court rejected the imposition of a duty to designate witnesses to testify about *any information regarding the promotion* of Neurontin or *any communications with third-party payers* concerning Neurontin, and limited the area of inquiry to: "The *marketing or promotion* of Neurontin *directly to* the named Third Party Payors."[1]

Thus, with respect to Kaiser, the scope of the 30(b)(6) designation for this deposition included the marketing or promotion of Neurontin directly to Kaiser Foundation Health Plan. While Permanente Medical Group physicians provided health care services to Kaiser Foundation Health Plan members, Discovery Order 14 expressly excluded any communications between Pfizer and these physicians from the scope of this deposition.

In fact, in responses to both deposition and written discovery, Plaintiffs have consistently distinguished the health plan from the physician group with which it contracts for services. *See, e.g.,* Carver Dep. at 434:11-435:3 (MS. NUSSBAUM: "...the relationship between the entities is simply a contractual relationship and nothing more. We've taken that position in front of Justice [*sic*] Saris, we've taken that position in front of Judge Sorokin. That information is publicly available, if you go online, you can research the corporate structures yourself and that's the situation.").[2]

---

[1] As we discussed during the deposition, the scope of the designation was also set forth in the attached December 4, 2006 correspondence of James P. Rouhandeh to Ronald Aranoff.

[2] If Plaintiffs are now taking the position that communications with Permanente Medical Group physicians represent communications with Kaiser Foundation Health Plan,

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

2818763v1



www.shb.com

Henderson Deposition
February 12, 2008
Page 2

Consistent with this approach, Kaiser Foundation Health Plan's 30(b)(6) designees have not referred to any communications between the Defendants and Permanente Medical Group physicians (i.e., "Kaiser physicians") when asked to identify any Neurontin-related communications between the plaintiff health plan and the Defendants. Accordingly, and notwithstanding the assertions in your letter to the contrary, Defendants were under no obligation to prepare and produce a designee to testify about communications with "Kaiser physicians."

The email thread bates stamped Pfizer_SPiron_0015885 to 0015886 that you have referenced in our conferences since January 3, 2008, does not change this analysis. Of note, this document was produced to plaintiffs well before the deposition of Jeff Henderson, but no questions were asked of him about it.[3] Further, while we have requested that Kaiser produce documents containing Neurontin-related communications with the Defendants, neither the originating email of the thread contained in this document, nor any document like this was ever produced by Kaiser. This naturally leads to the conclusion that Kaiser has taken the position that this document does not relate to marketing or promotional communications between itself and the Defendants. Indeed, the document apparently refers to a display that would be presented to physicians.[4]

Discovery Order 14 also limited the scope of the designation for Jeff Henderson's 30(b)(6) deposition to: "Pfizer's organizational structure used for communications with Third Party Payors including but not limited to the identification of individuals responsible for such communication, the types and categories of such communications, and to identify any databases that may exist containing the contents of such communications." Notably, Jeff Henderson testified in detail about the many changes in the relevant organizational structure and personnel over a more than seven-year period, the identify of specific individuals and their respective and often changing areas of responsibility, the types of communications they had with third-party payers, and the

---

then Plaintiffs would need to acknowledge that their discovery responses have been woefully deficient from the outset of this case, and they would need to provide us with extensive documentary and testimonial discovery from Permanente Medical Group physicians.

[3] Henderson was questioned about another instance in which a proposal to contract with a third-party-payer for Neurontin originated from someone out in the field, but was never agreed to by Pfizer headquarters, and this document appears to relate to a similar event.

[4] Additional documents indicate that this email exchange occurred when Kaiser had a then-existing policy to promote the off-label use of TCA's as a first or second line agent for post-herpetic neuralgia, notwithstanding the FDA's approval of Neurontin for this indication (Pfizer_SDoft_0024028 – 0024031).

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

Henderson Deposition
February 12, 2008
Page 3

databases that contained related information. Thus, despite inferences to the contrary in your letter, it is neither fair nor reasonable to assert that Mr. Henderson – a 16-year employee and current Vice President of the business unit that serves as a liaison between Pfizer and third-party payors – was anything but a well-qualified and well-prepared designee who made a conscientious effort to obtain information from other employees and review documents and transcripts in preparation for the deposition. *See, e.g.,* Henderson Dep. at 9:20-13:9; 15:3-16:20; 109:22-110:17.[5]

As part of this preparation work, Jeff Henderson reviewed the deposition testimony of former Warner-Lambert employees George Cavic, John Richter, and Christopher DeSimone. These witnesses were responsible for and testified about the individuals at Warner-Lambert that communicated with third-party payors, the types of documents created or maintained by Warner-Lambert regarding third-party-payor communications, and the organizational structure involved with these communications. Based on this review, and to the extent their testimony relates to the topics for which he was designated, Mr. Henderson affirmatively adopted the deposition testimony of Cavic, Richter and DeSimone as his own in his capacity as a 30(b)(6) designee. *See* Henderson Dep. at 15:3-16:20; 109:22-110:17.

To avoid any confusion, and without waiving any of the objections made during the depositions, a page-and-line designation of the testimony adopted by Henderson is attached. Given the first-hand knowledge and experience that Cavic, Richter and DeSimone had with respect to these events that occurred more than seven years ago, and the fact that this relates to the institutional knowledge of a predecessor entity, Henderson's testimony adequately fulfills the Defendants' 30(b)(6) obligations.

As for your request for Pfizer's operating or business plans related to the named third-party-payor plaintiffs, our diligent search for and review of these documents remains ongoing. To clarify, while your letter referred to these plans being "overwritten in Pfizer's systems," we understand that only such plans created after late 2005 or early 2006, if any, were electronically posted to HCXchange. These documents are outside the discovery period as provided for by the Court. We understand that any such plans within the discovery period would have been manually created and retained in various employees' files. Subject to your agreement to accept the production of this category of documents under the Highly Confidential provisions of the December 16, 2005 Second

---

[5] The suggestion in your letter that Jeff Henderson was not an adequately prepared designee because his preparation did not include a review of HCXchange for communications with the named third-party-payor plaintiffs is unfounded. As Mr. Henderson explained, HCXchange does not contain any information regarding Neurontin-related marketing or promotion because Neurontin is not an actively promoted product. *See* Henderson dep. at 286-289.

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

Shook,
Hardy&
Bacon.L.L.P.
www.shb.com

Stipulated Protective Order (Dkt. # 257), we anticipate producing to you by the end of this week an initial production of plans related to Aetna and Kaiser.

Finally, with respect to the instruction to Mr. Henderson not to answer questions about Lyrica – a drug that is not at issue in this litigation – it is not reasonable for Plaintiffs to impose an obligation on the Defendants to prepare witnesses to testify about drugs other than Neurontin. Further, no harm can be shown from these instructions because the questions were outside the scope of the designation under Discovery Order 14 and Rule 30(b)(6) and they related to events outside the discovery period.

Please contact me at your earliest convenience with any questions.

Sincerely,

Nicholas P. Mizell

NMY:tmg

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

**From:** Rouhandeh, James P. [rouhandeh@dpw.com]

**Sent:** Tuesday, December 04, 2007 4:04 PM

**To:** Ronald J. Aranoff

**Cc:** Mizell, Nick P. (SHB)

Ron:

Pursuant to Discovery Order 14, Defendants designate and will produce Jeff Henderson for deposition at 9:00 a.m. on December 5 and 6, 2007, here in the New York offices of Davis Polk and Wardwell to testify regarding:

- the marketing or promotion of Neurontin directly to the named Third Party Payors, and
- Pfizer's organizational structure used for communications with Third Party Payors including but not limited to the identification of individuals responsible for such communication, the types and categories of such communications, and to identify any databases that may exist containing the contents of such communications.

Additionally, and in response to plaintiffs' June 11, 2007 Notice of Deposition regarding corporate structure issues, defendants further designate Jeff Henderson as their 30(b)(6) witness regarding:

- the types of documents created or maintained at the Warner-Lambert Health Care Management Unit, and
- Pfizer's due diligence related to alleged off-label marketing with respect to Neurontin during the acquisition by Pfizer of Warner-Lambert and its Parke-Davis division.

We previously provided deposition testimony and related exhibits regarding subject matters 1, 2 and 5 in the Notice of Deposition regarding corporate structure issues, and Pfizer's designee in response to plaintiffs' Notice of Deposition regarding document production issues will testify regarding the types of documents created or maintained at the Warner-Lambert Customer Business Units. Defendants otherwise object to the Notice of Deposition regarding corporate structure issues as overbroad and unduly burdensome.

| George Cavic | John Richter | Christopher DeSimone |
|---|---|---|
| 27:18-34:14 | 45:13-46:17 | 30:7-33:15 |
| 36:2-35:3 | 60:23-62:12 | 44:3-45:14 |
| 42:9-49:19 | 65:14-25 | 48:10-20 |
| 51:8-52:23 | 50:2-51:23 | 123:16-126:21 |
| 57:11-61:20 | 55:1-56:7 | 134:14-135:3 |
| 69:2-73:6 | 66:19-67:12 | 166:21-169:9 |
| 86:22-89:25 | 77:3-19 | 182:7-186:6 |
| 90:25-94:1 | 163:7-168:12 | 227:5-236:10 |
| 95:2-115:18 | 193:15-217:23 | 242:10-244:16 |
| 133:24-134:20 | 348:4-355:4 | 316:10-328:17 |
| 139:11-14 | | 361:10-25 |
| 176:25-179:24 | | 363:11-465:16 |
| 211:12-14 | | 475:1-479:20 |
| 224: 11-227:18 | | 481:11-489:6 |
| 305:10-17 | | 497:24-594:5 |
| 333:11-334:9 | | 598:11-607:19 |
| 353:13-359:12 | | 611:21-24 |
| 319:9-11 | | 613:1-11 |
| 397:16-472:17 | | |

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN RE NEURONTIN MARKETING,   .
SALES PRACTICES AND PRODUCTS.   MASTER FILE NO. 04-10981-PBS
LIABILITY LITIGATION         .   MDL DOCKET NO. 1629
. . . . . . . . . . . . . . .

                              BOSTON, MASSACHUSETTS
                              SEPTEMBER 20, 2007

                    TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE LEO T. SOROKIN
                UNITED STATES MAGISTRATE JUDGE

        APPEARANCES:

        Ronald Aranoff, Esquire, Berstein, Bernstein, Liebhard
        & Lifshitz, LLP, 10 East 40th Street, New York, NY
        07666, 212-779-1414, aranoff@bernlieb.com

        Thomas Sobol, Esquire, Hagens Berman Sobol Shapiro
        LLP, 26th Floor, One Main Street, 4th Floor,
        Cambridge, MA 02142, 617-482-3700, Tom@hbsslaw.com

        Gerald Lawrence, Esquire, Lowey Dannenberg & Cohen,
        P.C., 200 Barr Harbor Drive, Suite 400, West
        Conshohocken, PA 19428-2977, 610-941-2760,
        glawrence@lowey.com

        Barry Himmelstein, Esquire, Lieff Cabraser Heimann &
        Bernstein, Embarcadero Center West, 275 Battery
        Street, 30th Floor, San Francisco, CA 94111-3339, 415-
        956-1000, bhimmelstein@lchb.com

        Jim P. Rouhandeh, Esquire, Christopher Roche, Esquire,
        Davis Polk & Wardwell, 450 Lexington Avenue, New York,
        NY 10017, 212-450-4000, jim.rouhandeh@dpw.com

        Scott Sayler, Esquire, Shook Hardy & Bacon LLP, 2555
        Grand Boulevard, Kansas City, MO 64108-2613, 816-474-
        6550, ssayler@shb.com

David Chaffin, Esquire, Hare & Chaffin, 160 Federal
Street, 23rd Floor, Boston, MA 02110-1701, 617-330-
5000, dchaffin@hare-chaffin.com

Court Reporter:

Proceedings recorded by digital sound recording,
transcript produced by transcription service.

MARYANN V. YOUNG
Certified Court Transcriber
Wrentham, MA 02093
(508) 384-2003

62

1        THE COURT:  Yep.

2        MR. ROUHANDEH:  I just want to correct one thing that

3   Mr. Sobol said.  We don't have any intention of picking through

4   invoices.  I thought I was clear, maybe I wasn't.  We don't

5   want to go to the invoice level.  I think that's a massive

6   undertaking of going through invoices.  And, you know, and that

7   was not something that was in part of their motion.  So--

8        MR. SOBOL:  But we're not--

9        MR. ROUHANDEH:  --it's not like we want to pick

10  through the invoices.  And I think I heard Mr. Sobol say well

11  we don't know that it might not help the expert.  That's not

12  sufficient in the First Circuit.  In the First Circuit you have

13  to disclose the factual basis for the request.  And the only

14  one - we're trying to help them out here to think well where

15  could this possibly help them?  What is left?  And we say the

16  vendor is the only thing that I think they've got a decent

17  argument, got to give us a list of payments to the vendors, and

18  not to every vendor, only the ones that are relevant here.

19        THE COURT:  All right.

20        MR. ROUHANDEH:  That I'm confident can be done

21  without a huge burden.

22        THE COURT:  Okay.  Let me think about it.  What about

23  the communications with third party payers?

24        MR. HIMMELSTEIN:  I've got that one, Your Honor.

25        THE COURT:  Okay.

63

1        MR. HIMMELSTEIN:  It's fairly simple and

2   straightforward.  We have a case here where--

3        THE COURT:  Also, I'll tell all of you I would love

4   to be done by four o'clock.  So I want - how many more we got?

5   Three more, so let's try to keep it moving.  Go ahead.

6        MR. HIMMELSTEIN:  I'll be brief, Your Honor.  It's

7   very simple and straightforward.  We have a case where Pfizer,

8   Warner Lambert are accused of defrauding third party payers.

9   Yes, to date the information we have involves statements made

10  to physicians and therefore our allegations are primarily based

11  on the information that we have.

12       THE COURT:  But they say that in discovery each of

13  the third party payers with the exception, and you renew in

14  your reply, regarding Kaiser, said that there were no

15  communications with Pfizer and no fraudulent communications.

16  One, the other or both.

17       MR. HIMMELSTEIN:  Well, not surprising because all of

18  the, aside from Kaiser and perhaps Aetna, most of the third

19  party payers that are plaintiffs here are small third party

20  payers who don't manage their own formulas.  They use PBM's

21  like Caremark so there's no point marketing to my client ASEA.

22  It makes no decisions.  Those conversations would be with

23  Caremark.  But when they're trying to move market share

24  nationally they do go to the large third party payers directly,

25  like Kaiser, I would suspect Aetna, companies that do manage

64

1   their own formularies and have communications.

2           What we've discovered through these depositions that

3   we've been doing very intensely is this is a very highly

4   segmented business they have.  They've got a team for every

5   little thing.  They have a team for pain indications of

6   Neurontin.  They have a team for bipolar Neurontin.  They have

7   a team for marketing to third party payers.  They've got teams

8   and sub-teams for everything and here we are, we get one member

9   of this team and we try and flesh out the entire thing based on

10  him but he says, oh, no, that's this team over here.  So we

11  wanted something very simple and straightforward, if you had

12  communications with third party payers about Neurontin give us

13  the communications.  What they've offered to produced is a

14  witness who will tell us about employees who've have the

15  communications and tell us the names of the databases in which

16  those communications might exist.  That's not enough at this

17  stage.  Then we're back to, you know, trying to put the puzzle

18  together.  Give us the communications if you have them and give

19  us someone who can talk generally about them.  They complained

20  that we're asking them to educate a witness to testify about

21  everything that was ever said to every third party payer about

22  Neurontin.  We're realistic.  But give us someone who can tell

23  us something about was there a program to market this to third

24  party payers for off label indications.

25           THE COURT:  Why do you need this discovery beyond the

65

1  named plaintiffs in the class and coordinated complaint and

2  their pharmacy benefit managers?

3          MR. HIMMELSTEIN:  Well, they're moving - well we

4  don't have, the pharmacy benefit managers are not plaintiffs

5  and we don't have communications of them with the pharmacy

6  benefit managers as far as we know.

7          THE COURT:  Well, is that within your request in your

8  view?

9          MR. HIMMELSTEIN:  We consider it within the scope of

10  the request.  But it's certainly not surprising that Harden

11  which has, you know, a very small number of employees, was not

12  directly marketed to nor ASEA.  Blue Cross Blue Shield of

13  Louisiana is our largest third-party payer class representative

14  and they are - at Pfizer you have people who are dedicated to

15  selling this thing to third-party payers.

16          THE COURT:  But you're seeking more than

17  communications between Pfizer and the named plaintiffs in the

18  coordinated complaint, the named class plaintiffs third-party

19  payer class plaintiffs in the class and the third-party benefit

20  managers, the pharmacy benefit managers that those entities

21  worked with during the time period of discovery.

22          MR. HIMMELSTEIN:  Just as we are seeking and have

23  obtained information regarding their communication with

24  physicians beyond the named plaintiffs' physicians--

25          THE COURT:  So the answer is yes.

66

1          MR. HIMMELSTEIN:  --and the physicians - yes, Your

2     Honor.

3          THE COURT:  Okay.

4          MR. HIMMELSTEIN:  Yes.  To the extent they can, you

5     know, locate and produce this information we think we're

6     entitled to it.  We have not been able to crack that part of

7     this case.  We have primarily communications with physicians,

8     but we know they have teams devoted to marketing the third

9     party payers.  Give us what you got.  Let us look at it.  Give

10    us a witness who knows something about it.  Let us talk to

11    them.  If he doesn't know every little detail of every little

12    communication I won't be surprised.  I won't be asking for

13    sanctions based on that.  This is a reasonable request where

14    the third-party payers are, you know, the big financial losers

15    in the case, the targets of the fraud.  This shouldn't be that

16    controversial I don't think.

17         THE COURT:  All right.  Mr. Rouhandeh?

18         MR. ROUHANDEH:  Your Honor, what they want are they

19    want now a 30(b)(6) witness and they want all the documents

20    reflecting communications with any third party payer I assume

21    with any pharmacy benefit plan.  It's absolutely too late for

22    that request.  The request that they point to are two years

23    old.  And the - we objected to those.  We told them we were not

24    giving those documents to them.  They knew that two years

25    before the cutoff.  Every lawyer in this courtroom knows that

1  when a document discovery cutoff is coming and you know you're

2  not getting some documents, you'd better make a motion to

3  compel to get those documents before the cutoff of those, and

4  they didn't. So what did they do?

5      When Your Honor said oh well is there a date to make

6  a final motion to compel here? No. And then set one,

7  September 6th. Then they thought what can I go dredge out of

8  the 200, 300 item requests in the past that I can bring up here

9  now that I didn't bring up on a timely basis. And that's

10  frankly what they're doing. The document portion of this is

11  resurrecting a two-year old issue that they knew a long time

12  ago that they were not going to get. And just putting aside

13  that problem with their request for documents cause that's not

14  the same necessarily for the 30(b)(6). The 30(b)(6) is an

15  issue that came up later and was one they served a request, we

16  had to move for a protective order because they were insisting

17  that the deposition go forward by mid-July. We said we haven't

18  worked out what the scope of it is. We had to make the motion.

19  Your Honor said go meet and confer.

20      THE COURT: Right.

21      MR. ROUHANDEH: And so we met and conferred and we

22  tried and we haven't come to an agreement. And with respect to

23  that issue, the 30(b)(6) they have already got or they're

24  getting what they need. They - we've learned that the

25  communication, if it was a request from a third party payer for

68

1   medical information that would be reported in the Merlin

2   Phoenix databases which they got a long time ago.  So in terms

3   of communications with third-party payers regarding clinical

4   information, medical information, they already have that.

5            They're also taking three fact witness depositions

6   coming up of people who worked in either Warner Lambert or

7   Pfizer managed care area.  They're taking those depositions.

8   They're part of the 30 that they have asked for and we're

9   preparing and going to produce those witnesses to them.  I

10  think those depositions are scheduled.  They're not entitled to

11  anything more.  They haven't come up with a factual basis for

12  any additional discovery.  And the First Circuit is clear that

13  you have to disclose the factual basis for the discovery that's

14  sought.  Not only did they not do that in their motion we went

15  back and affirmatively showed there was no basis because we

16  took the testimony, it's 30(b)(6) testimony, it's not just, you

17  know, it's supposed to the corporate wide knowledge and said,

18  you know, tell us what false statements were made to you.  You

19  know, what's the factual basis - even if we give them the

20  benefit of the doubt and say well there's a vague allegation in

21  the complaint that says you made false statements to plaintiffs

22  and there are plaintiffs--

23           THE COURT:  Well, what about the fact they say, I

24  mean they point out that Kaiser had some factual basis for that

25  and they say look no reason think Harden or ASEA would have it.

69

1  It's really their pharmacy benefit managers.  What about that?

2        MR. ROUHANDEH:  They would have to disclose that.

3  That's just fishing.  They have no reason to believe that the

4  answers of the pharmacy benefit managers are any different than

5  the answers that the third-party payers gave.  If they had had

6  a factual basis to get this discovery they should get from the

7  pharmacy benefit managers some testimony that, yes, there were

8  misstatements made to them.

9        We point out these six 30(b)(6) depositions that we

10  took.  They've come back and their response is well one of

11  those, Carver, he said that there were some communications.

12  But if you look at the attachment to Mr. Himmelstein's

13  declaration what Carver says is he thinks, he believes that

14  there were communications to Kaiser's drug information services

15  but he's not aware of whether any false information was

16  provided.  What they need to do is to come and say we have

17  allegations and false information.  They have none.  It doesn't

18  matter if they've got a complaint, an allegation in the

19  complaint.  Even if you look at it most charitably and say well

20  look, you know, they said you made false statements to doctors

21  and others or you made false statements to the plaintiffs with

22  no specificity, even if you credit that, at this point this

23  late stage of this litigation with less than a month to go if

24  they think they've got a basis for false statements made to

25  those third party payers they need to come forward.  They need

1    to disclose it in order to get that discovery. If this were

2    an issue, if this were an issue this communication with third-

3    party payers, you know, it's really been sort of lost on me and

4    apparently on Judge Saris. If you look at the class cert

5    decision, if there's anything in there really about, it's all

6    about, you know, miscommunications and false statements or

7    alleged false statements to doctors. We all know that that's

8    what this case is about. And they're trying to expand it at

9    the eleventh hour and say look, we now want communications with

10   third-party payers. If they want to try that, first, they

11   should have done that before the cutoff and if they want to try

12   it now they had better come forward with a factual basis and

13   they haven't. And not only that, we've come forward and said

14   you don't have a--

15              THE COURT:  Okay.

16              MR. ROUHANDEH:  --factual basis cause we asked the

17   right questions.

18              THE COURT:  I get it. What about your motion,

19   Mr. Rouhandeh - we'll come back to the depositions - to compel

20   the interrogatories?

21              MR. HIMMELSTEIN:  Your Honor, if I could just provide

22   a--

23              THE COURT:  Oh, sure.

24              MR. HIMMELSTEIN:  --quick factual update--

25              THE COURT:  Yep.

98

| | |
|---|---|
| 1 | CERTIFICATION |
| 2 | I, Maryann V. Young, court approved transcriber, certify |
| 3 | that the foregoing is a correct transcript from the official |
| 4 | digital sound recording of the proceedings in the |
| 5 | above-entitled matter. |
| 6 | |
| 7 | /s/ Maryann V. Young                    January 21, 2008 |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

# EXHIBIT C
# (Filed Under Seal)

# EXHIBIT D

1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3
 4   In re:  NEURONTIN MARKETING     MDL Docket No.: 1629
     SALES PRACTICES AND PRODUCTS
 5   LIABILITY LITIGATION            Master File No.:
     _____/  04-10981
 6
     This Document Relates To:      Judge:
 7   THE GUARDIAN LIFE INSURANCE     Patti B. Saris
     COMPANY OF AMERICA v. PFIZER
 8   INC. et al., 04-CV-01739       Magistrate:
     (PBS) and                       Judge Leo T. Sorokin
 9
     AETNA, INC. v. PFIZER INC.,
10   et al., 04-CV-10958 (PBS)
     _____/
11
12
13        DEPOSITION OF CHRISTOPHER DeSIMONE
14                   VOLUME I
15                (Pages 1 - 298)
16                October 1, 2007
17
18
19
20   Reported by:
     Natalie Y. Botelho
21   CSR No. 9897
22
23
24
25
```

```
 8    Coventry Corporation, Blue -- IBC, Blue Cross of
 9    Pennsylvania, which is not to be confused with Blue
10    Cross of Western Pennsylvania, which is now
11    Highmark, which I think is now Excelsis, which I
12    don't know what they are now.  But at that time,
13    they could have been any of those names.  I don't --
14    but they're different.  Lifeguard Health Plan,
15    healthcare Plan of Buffalo.
16    Q.       Any others?
17    A.       Independence Health.  I'm sorry.
18    Independent Health of Buffalo.
19    Q.       Of Buffalo?
20    A.       I think they were Buffalo.  They were up
21    there on that -- was it Route 90?  Somewhere up
22    there.
23    Q.       Any others that you recall?
24    A.       Blue Cross of -- in Syracuse.  What was it
25    called?  Blue Cross of Central New York, I believe.
```

17

```
 1    Either BC or BS; I don't remember.
 2    Q.       Any others?
 3    A.       Blue Cross of Northeastern Pennsylvania.
 4    Q.       Any others?
 5    A.       Called on Thrift Drug, Express Pharmacy
 6    Services.
 7    Q.       Any others?
 8    A.       Community Mutual of Ohio, Blue Cross of
 9    Ohio, Blue Shield of Ohio, Group Health -- there's a
10    lot of Group Healths out there, but it was Group
11    Health Cincinnati, so I don't know if they were GHI,
12    GHIC, GHCI.  They could have been any of those.  I
13    don't -- Group Health Cincinnati.  There's only one
14    in Ohio, so....
15    Q.       Any others?
```

```
16   A.          I can't recall.
17   Q.          Did you review any documents to refresh
18   your recollection in preparation for today's
19   deposition?
20              MS. LOCKWOOD:  Object to form.
21              THE WITNESS:  I did review documents.
22              MS. DALEY:  Q.  What documents did you
23   review?
24              MS. LOCKWOOD:  Objection; attorney-client
25   privilege.  Instruct you not to answer.
```

18

```
1              MS. DALEY:  Q.  Are you going to follow
2   your counsel's instruction?
3   A.          Yes.
4   Q.          The two lawyers who are sitting next to
5   you today, they are from the Davis Polk law firm?
6   A.          Davis Polk Woodward (sic), right, Davis
7   Polk Woodward, I believe it is.
8   Q.          They're Pfizer's counsel, right?
9   A.          I believe so, yes.
10              MS. LOCKWOOD:  Object to form.
11              MS. DALEY:  Q.  And are you represented by
12   counsel here today?
13   A.          Yes.
14   Q.          And who is your counsel?
15   A.          Davis Polk Woodward.
16   Q.          And how -- are you being compensated for
17   your appearance here today?
18              MS. LOCKWOOD:  Object to form.
19              THE WITNESS:  No.
20              MS. DALEY:  Q.  When did you first find
21   out that your deposition was being sought in
22   connection with Neurontin, case pending in Boston,
23   Massachusetts?
```

```
16   A.        I don't remember.
17   Q.        Was that part of the portfolio management
18   group?
19             MS. LOCKWOOD:  Object to form.
20             THE WITNESS:  No.  I don't recall a
21   portfolio management group term.  I don't know that
22   term.
23             MS. DALEY:  Q.  Do you know Mr. Perlow?
24   A.        No.
25   Q.        Have you heard the name before?
```

---

33

```
1    A.        I know Dr. Perlow, Dr. Larry Perlow.
2    Q.        Okay.  Dr. Larry Perlow's group.  Do you
3    know whether the advertising review committee was
4    part of Dr. Perlow's group?
5    A.        I don't recall.
6    Q.        Do you know any of the names of anyone who
7    ever served on the advertising review committee?
8              MS. LOCKWOOD:  Object to form.
9              THE WITNESS:  No, no.
10             MS. DALEY:  Q.  How did you know that
11   there was an advertising review committee of
12   Parke-Davis?
13   A.        All information that we were able to use
14   that was available to be used with clients had to be
15   approved by the advertising review committee.
16   Q.        How do you know that information was
17   actually approved by the advertising review
18   committee?
19             MS. LOCKWOOD:  Object to form.
20             THE WITNESS:  When information would be
21   mailed, sent, just say sent to me, FedEx, whatever,
22   that would be stamped or otherwise designated
23   "approved for distribution by ARC."
```

```
 8     definitely been written from Pfizer, not from --
 9     because Warner-Lambert didn't exist at that time.
10     So to answer your question, I would have received at
11     least one check, maybe not paycheck, but one check
12     from Pfizer in that form of that severance
13     agreement.
14     Q.       At the time that you took that severance
15     check from Pfizer, did you have an office at the San
16     Mateo facility?
17     A.       Yes, in the time that they offered me
18     severance and I accepted -- I didn't take it.  I
19     mean, they offered me severance.  Yes, I did have an
20     office at 411 Borel Avenue.
21     Q.       And what happened to the papers and
22     computer that you had there?
23             MS. LOCKWOOD:  Object to form.
24             THE WITNESS:  I have no idea.
25             MS. DALEY:  Q.  What did you do with them?
```

207

```
 1     A.       I left as -- I left everything in my
 2     office, took nothing with me.  I left some pictures
 3     that were of friends that I probably should have
 4     taken.  I left a lot of things there.  I didn't take
 5     anything.  I left it.  I wanted nothing to do with
 6     it.  I left my computer there, any disk.  Anything
 7     that was Parke-Davis property was left at 411 Borel.
 8     Q.       Did you box your office up for shipment to
 9     Morris Plains?
10     A.       I can't remember if I boxed it up, what
11     the instructions were, whether to box it up, whether
12     I did box it up, or I just left it in my -- you
13     know, in my credenza and file cabinet.  I believe
14     what was in my office I did -- I believe I did -- I
15     believe I did box up.  I don't recall.  What was
```

16 external in my admin's area, I don't know what she
17 did with a lot of the materials that I would receive
18 on a regular basis.  I don't -- I don't recall
19 what --
20 Q.  When you moved from the northeast CBU out
21 to California to be -- to take on the promotion of
22 director of customer marketing, what happened to all
23 the files and documents that were in your home
24 office?
25   MS. LOCKWOOD:  Object to form.

208

1   THE WITNESS:  I never worked for the
2 northeast CBU.  I worked for the healthcare
3 management CBU.  When I --
4   MS. DALEY:  Q.  You were the northeast
5 geographic area?
6 A.  I just --
7 Q.  Okay.  I just want to make sure I
8 understand.  I thought you said something about
9 northeast, so....
10 A.  Right.  No, no, there is a northeast CBU,
11 but I still worked for the HCM in the northeast.  So
12 all those materials I would have transitioned.  I
13 was pretty anal about that.  I actually transitioned
14 those documents to the person or persons responsible
15 for those accounts.  And those materials that were
16 product specific -- I'm sorry -- physician -- not
17 product specific, not product specific --
18 physician -- specific to that role as senior
19 national account manager would have gone to the
20 person who replaced me, the people who replaced me.
21 Anything that was Warren Lambert or Parke-Davis
22 specific, Parke-Davis corporate, would have come
23 with me.  But anything that was about account or

24    account roles and responsibilities or contact info,
25    that would -- everything would have been provided to

---

209

1    the -- to that person who took over.
2    Q.       Do you know who that was?
3    A.       I believe -- I was so good, I think it was
4    two people.  I believe it was Kent Davis, Kent
5    Davis.
6    Q.       And the second person?
7    A.       I believe -- I believe I transitioned
8    everything to Kent, and then he might have
9    transitioned beyond that.  I don't recall, but
10   definitely Kent was the one who took the majority of
11   the geography.  So I would say Kent.
12   Q.       And there was another person who took some
13   of the work?  Do you know who that was?
14   A.       I don't recall.  I don't recall.  But I
15   would say Kent would have been the one.
16   Q.       At the time that you were -- during the
17   time period that you were director of customer
18   marketing, do you know whether the revenues from
19   sales of Neurontin went up or down?
20   A.       I mean, I guess they would have gone
21   either up or down.  My sense was --
22   Q.       Or they could have gone flat, too,
23   obviously.
24   A.       Yeah, but since I was there, during my
25   time, Neurontin was not an FDA approved product at

---

210

```
16              MS. DALEY:  Q.  Were they -- you know,
17    were they in one of these departments that are
18    listed on Cavic Exhibit Number 1, or were they
19    salespeople?
20    A.         I don't remember Gary Malmstrom.   Sorry.
21    Q.         Laura Johnson.
22    A.         She was with the northeast CBU.
23    Q.         Lisa Moore.
24    A.         She was with the north central -- NC,
25    north central CBU.
```

243

```
 1    Q.         Patrick Reichenberger.
 2    A.         Was with the west CBU.
 3    Q.         Jeff Warren.
 4    A.         He worked -- I forget.  In June of '97,
 5    Jeff Warren -- I don't know what he was doing.  I
 6    think he was in, like, external relations or
 7    association -- I don't remember what Jeff Warren
 8    did.
 9    Q.         Tim Windom.
10    A.         He was with the south.  So by process of
11    elimination -- he was with the south central CBU,
12    which means Malmstrom must have been with the
13    southeast CBU.  That was the only one we didn't get,
14    right?  You have north central.
15    Q.         North central was Lisa Moore.
16    A.         South central?
17    Q.         Tim Windom.
18    A.         Northeast was with Laura.  Southeast.
19    Yeah, it would have been southeast.
20    Q.         Was Gary Malmstrom?
21    A.         I think that's the way it is, yeah.
22    Q.         Going back to the section that you
23    referred to, which is Item Number 5 you said you
```

24    focused on, it says, "Managed Care Influence."  What
25    did you understand that to mean?

244

1    A.       I don't recall when I -- at the time I
2    received this document, what "Managed Care
3    Influence" would have mean -- would have -- what
4    they would have meant by that.  I would have
5    probably gone to, like, overall direction.  By
6    "overall direction," that means there -- is the
7    managed care influence or membership increasing or
8    decreasing, is it increasing the staff models or the
9    HMO's networks, is it increasing, you know, in -- at
10   that time, you know, where -- you know, how was it
11   increasing.  That's what I would have -- either
12   direction.  I would have responded more to that or
13   focused more on that, probably the major
14   initiatives.  But I don't recall what the originator
15   wanted, if there was to and fro or what they were
16   looking for.
17               (Whereupon Exhibit 8 was marked for
18               identification.)
19               MS. DALEY:  Q.  Handing you what has been
20   marked as DeSimone Exhibit 8.  It's a multi-page, so
21   if you want to take an opportunity to look at it,
22   please do so.
23   A.       Yes.
24               (Pause.)
25               THE WITNESS:  On Page 27, shows the

245

# EXHIBIT E
# (Filed Under Seal)

# EXHIBIT F

Page 1

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
 3                                      :
    IN RE NEURONTIN MARKETING      : MDL DOCKET NO. 1629
 4  AND SALES PRACTICES            : Master File No. 04-10981
    LITIGATION                     : Judge Patti B. Saris
 5                                 : Magistrate Leo T. Sorokin
                                   :
 6                                 :
    ---------------------------    X ----------------------
 7  SUPREME COURT OF THE STATE     : Case Management
    OF NEW YORK                    : Index No. 765,000/2006
 8  COUNTY OF NEW YORK             : Hon. Marcy S. Friedman
    ---------------------------    :
 9  IN RE: NEW YORK NEURONTIN      :
    PRODUCTS LIABILITY             :   VIDEOTAPED DEPOSITION
10  LITIGATION                     : UPON ORAL EXAMINATION OF
                                   :    30(b)(6) DESIGNEE
11                                 :    JEFFERSON STIERHEIN
                                   :       HENDERSON III
12                                 :
    ---------------------------    :      VOLUME 1
13                                 X ------------------------
14
15          CONTAINS CONFIDENTIAL INFORMATION
16        TRANSCRIPT of testimony as taken by and before
17   MARK SCHAFFER, a Certified Shorthand Reporter and
18   Notary Public of the States of New Jersey and New
19    York, at the offices of Davis, Polk, 450 Lexington
20   Avenue, New York, New York 10022 on Wednesday,
21   December 5, 2007, commencing at 10:05 in the forenoon.
22
23
24
25
```

Page 106

1  promoting Neurontin?
2      A.  No.
3      Q.  Did any of the people reporting to you
4  receive training on promoting Neurontin?
5      A.  No.
6      Q.  Did any of people above you, to your
7  knowledge, receive training on how to promote
8  Neurontin?
9      A.  No -- Oh, wait.  Let me clarify that.  Your
10 question was on how to promote Neurontin.
11     Q.  Right.
12     A.  That is very different than training on an
13 individual product.
14         The training on how to promote Neurontin was
15 quite simple:  You are not to promote Neurontin.  The
16 training on the individual disease state and the
17 product and its indications we did not receive.
18     Q.  Now, when you say you received the training
19 to not promote Neurontin, you are referencing back to
20 the Katen memo?
21     A.  I'm referencing --
22         MR. MIZELL: Object to form.
23         Go ahead.
24     A.  I'm actually referencing to the guidance that
25 we were given when we acquired

Page 107

1  Warner-Lambert/Parke-Davis.
2      Q.  And how was that guidance given to you?
3      A.  That guidance was cascaded out through Field
4  Sales.
5      Q.  What do you mean by "cascaded out"?
6      A.  I don't recall the exact mechanism, whether
7  it was electronic or voicemail or a letter to -- to
8  our homes.
9          However, we were -- it was communicated to us
10 that only one sales group within all of Sales would be
11 promoting Neurontin.  That would be the 150 designated
12 folks I guess in the PD2 sales force, and that no one
13 else would be communicating anything about Neurontin;
14 and if we received any requests about it, requests for
15 information, we were to refer whoever was requesting
16 the information to our Medical Inquiry.
17     Q.  Is that part of the 150 people in the PD2
18 sales force?
19     A.  I'm not sure I understand your question.
20     Q.  Well, you said that only 150 -- only 150
21 people in the PD2 sales force were to be promoting
22 Neurontin; right?
23     A.  That is correct.
24     Q.  But if you received an inquiry --
25     A.  Oh --

Page 108

1      Q.  -- you were to send it to the Medical Group?
2      A.  No.  If we received an inquiry, we would
3  refer them to our Medical Information Group, where
4  medical inquiries go.  That is not the 150 people.
5      Q.  Did anyone ever tell you why this guidance
6  was given?
7      A.  I was not directly told why this guidance was
8  given.
9      Q.  What was your understanding as to why you
10 were told that you were not to promote Neurontin?
11     A.  My understanding was that there were
12 questions about how Neurontin had been promoted by
13 Warner-Lambert, Parke-Davis.
14     Q.  What were the questions about how
15 Warner-Lambert had promoted Neurontin?
16     A.  That was -- I was not made aware of.
17     Q.  Do you have any understanding as to what
18 these concerns were about how Warner-Lambert had
19 promoted Neurontin?
20     A.  I had no understanding at the time.  I was
21 not made aware.  I was just informed of the decision.
22     Q.  Did you ever obtain an understanding at a
23 later point in time?
24         MR. MIZELL: Object to form.
25     A.  Actually, in doing my due diligence for this

Page 109

1  deposition.
2      Q.  What did you find out?
3      A.  I actually was made aware of the Karen Katen
4  memo and read the Karen Katen memo.
5      Q.  Had you read the Karen Katen memo before you
6  began preparation for this deposition?
7      A.  No.
8      Q.  Did you start your preparation for this
9  deposition in September, 2007?
10     A.  Yes.
11         MS. DALEY: Do you want to take a break?
12         THE REPORTER: I always want to take a break.
13         THE VIDEOGRAPHER: The time is approximately
14 12:49.  This ends Tape Number 2.  We are going off
15 the record.
16         (The luncheon recess is taken.)
17
18 CONTINUED DIRECT EXAMINATION BY MS. DALEY:
19         THE VIDEOGRAPHER: The time is approximately
20 1:40.  This begins Tape Number 3.  We are now on
21 the record.
22     Q.  Mr. Henderson, why did you decide to review
23 the Richter, Cavic and DeSimone deposition transcripts
24 prior to today's deposition?
25     A.  I did so at the recommendation of counsel to

28 (Pages 106 to 109)

Page 110

1  have a further understanding of how Warner-Lambert/
2  Parke-Davis operated with third party payers.
3      Q.  And what did you learn from your review of
4  those transcripts regarding how Warner-Lambert
5  operated with respect to third-party payers?
6      A.  I learned that, based on what I read in the
7  depositions, that it was -- their method of operation
8  is very consistent with -- with the way Pfizer
9  operates.  And I adopt and accept the things that were
10  stated in that deposition -- those three depositions.
11      Q.  As Pfizer's -- on behalf of Pfizer and as its
12  designee, you adopt everything that was said in the
13  Richter, DeSimone and Cavic depositions.
14          MR. MIZELL: I would clarify.  That would be
15      only with respect to the areas that he is
16      designated to testify about.
17      A.  Yes.
18      Q.  When you say Warner-Lambert's methods of
19  operation are very consistent with how Pfizer
20  operates, what do you mean?
21      A.  I mean just their organizational structure;
22  the way they called upon accounts and third-party
23  payers.
24      Q.  Okay.  What do you mean by "the way they
25  called on accounts and third-party payers"?

Page 111

1      A.  How they interacted with third-party payers,
2  having account managers as the designated individuals
3  that would go in and provide on-label promotion to
4  their products.
5      Q.  Did you review any Warner-Lambert documents
6  to prepare for today's deposition?
7      A.  The only Warner-Lambert document I reviewed
8  was the Cavic exhibit that illustrated -- that he
9  hand-illustrated their organization, their org chart.
10      Q.  Any other Warner-Lambert documents you looked
11  at?
12      A.  No.
13      Q.  And when you reference Warner-Lambert's
14  interaction with third-party payers, having account
15  managers as the designated rep to provide on-label
16  promotion of their products, you are relying upon what
17  was said in those depositions?
18      A.  That is correct.
19      Q.  Would the marketing of Neurontin for bipolar
20  indications have been an off-label promotion?
21          MR. MIZELL: Object to form.
22      A.  I'm not sure in what -- in what -- Are you
23  asking did Warner-Lambert and Parke-Davis -- I'm not
24  sure I follow you.
25      Q.  Would the marketing of Neurontin for use to

Page 112

1  treat bipolar disorder have been an off-label
2  promotion?
3          MR. MIZELL: Object to the form.
4      A.  Promotional -- and when I say promotional, I
5  think it's very important that I define the fact that
6  promotional is -- are materials that are approved by
7  Regulatory to promote.
8          Promoting products is on-label promotion.  So
9  when you say if you are talking about bipolar, that is
10  an off-label discussion, but that is certainly not
11  promotion.
12      Q.  Well, what do you mean by -- it seems to me
13  you are drawing a distinction between discussion and
14  promotion?
15          MR. MIZELL: Object to form.
16      Q.  Am I wrong in that assumption --
17  understanding?
18      A.  Yes, you are.
19      Q.  Okay.
20      A.  What I am getting at is:  Within the Sales
21  organization, you are only allowed to talk to
22  customers about approved -- RC-approved, on-label
23  promotional materials.  Outside of that, you don't
24  have discussions, you don't have any kind of
25  communications around non-promotional, meaning non

Page 113

1  approved, off-label diseases.
2      Q.  And is it your understanding that the way
3  that Warner-Lambert was set up, that they did not have
4  off-label promotions?
5          MR. MIZELL: Object to form.
6      A.  Based on what I read in the depositions, that
7  is my understanding.
8      Q.  In connection with your preparation for
9  today's deposition, were you given the guilty plea
10  that was entered into in connection with what's been
11  referred to as the Franklin lawsuit?
12          MR. MIZELL: Object to form.
13      A.  No.
14      Q.  Do you know anything about Warner-Lambert or
15  Pfizer admitting to off-label promotion?
16          MR. MIZELL: Object to form.
17      A.  No, other than the fact that I've heard the
18  name Franklin, but that's --
19      Q.  Do you know anything about Warner-Lambert or
20  Pfizer admitting to off-label promotion of Neurontin?
21          MR. MIZELL: Object to form.
22      A.  Not off-label promotion.
23      Q.  What do you mean by Franklin?
24      A.  The name.  And that there was some type of
25  settlement.  But that is as far as it goes.

29 (Pages 110 to 113)

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL Docket No. 1629 Master File No. 04-10981 |
| THIS ORDER RELATES TO: | ) ) ) | Judge Patti B. Saris Mag. Judge Leo T. Sorokin |
| ALL ACTIONS | ) ) | |

Discovery Order No. 14

September 27, 2007

SOROKIN, M.J.

The Court hereby makes the following rulings and orders on the matters before the Court

at the September 20, 2007 Motion Hearing.

1.    Sales and Marketing Plaintiffs' Motion to Compel Cline, Davis & Mann (#850)

A separate Order will issue with respect to this Motion.

2.    Defendants' Motion to Compel Plaintiff Aetna (#854)

Defendants' withdrew this Motion.  See Docket #863

3.    Plaintiffs' Motion to Compel Production of Neurontin Financial Data (#856)

In this Motion, Plaintiffs "seek an order requiring Defendants produce all occurrence

level financial information concerning expenditures related to Neurontin from 1994 to 2004."

Plaintiff's Memo at 2 (Dkt#856)(emphasis added).  According to the Plaintiffs, the data "is

necessary in order for Plaintiffs experts to properly perform their liability and damage analysis."

Id.  Both the Motion and Memorandum seek only documents pertaining to expenditures.  The

Reply filed on September 18, 2007 reiterates Plaintiffs' request for "data that tracks expenditures

related to Neurontin." Plaintiffs' Reply at 2 (Dkt # 882). Plaintiffs further explained that they

seek the expenditure data because it "would be utilized in the econometric model proposed by

Professor Rosenthal to estimate the number of units sold of Neurontin that resulted from

Defendants' fraudulent promotion of Neurontin for the various off-label uses at issue in this

case." Id. at 3. At no point in the Motion, Memorandum or Reply did Plaintiffs seek financial

data relating to sales, yet, at the hearing on the Motion, Plaintiffs requested that the Court order

Defendants to produce receipts for both every sale of Neurontin and every rebate pertaining to

every sale of Neurontin for the period from 1994 to 2004. This oral request made at the hearing

is simply not within the Motion and I decline to treat the Motion as encompassing these records.

The oral request for the records is DENIED.

Plaintiffs' Motion does seek transaction level expenditure financial data to assist their

expert's econometric analysis. Although the Motion, seeking a significant quantity of

documents, comes at the deadline for filing discovery motions on a request to which Defendants'

position has been clear since at least mid-April, the documents do appear to have substantial

significance to Plaintiffs' expert's analysis especially in light of the Court's recent decision on

the Motion for Class Certification. Accordingly, the Motion is ALLOWED IN PART and

DENIED IN PART as follows.

For the discovery period in this MDL (1994-2004), Defendants shall produce transaction

level records, in electronic format if maintained in that manner, showing defendants'

expenditures for the marketing or promotion of Neurontin: (i) directly to Third Party Payors, (ii)

through Continuing Medical Education conferences or seminars, Advisory Boards or

Consultants' meetings or to doctors; (iii) through the medical liaisons; (iv) through the

publication of case studies or articles including the expenditures for the funding the research; or

(v) to the Medical Marketing Firms.  In addition, Defendants shall report to the Court whether

they intend to argue (or reserve the right to argue) that any rebates defendants paid or issued

regarding sales of Neurontin should be treated as an offset or credit against any damages in this

case. Defendants shall so report to the Court by October 10, 2007.  In all other respects, the

Motion is DENIED.

4.      Sales and Marketing Plaintiffs' Motion to Compel Discovery re: Communications
        Between Defendants and Third Party Payors (#827)

        The parties dispute three topics for a Rule 30(b)(6) deposition sought by Plaintiffs[1] and

certain additional documents sought by Plaintiffs.  Both areas concern Defendants'

communications with Third Party Payors.

        Some of the additional discovery Plaintiffs seek regarding the marketing or promotion of

Neurontin to the Third Party Payors is warranted.  Defendants shall produce a Rule 30(b)(6)

deponent.  Plaintiffs' proposed Topic 2 is too broad; it is limited to: The marketing or promotion

of Neurontin directly to the named Third Party Payors.[2]  Topic 3 is stricken as the relevant

---

        [1]Topic 2 states: "Any information that you have regarding communications you had with
Third Party Payors concerning Neurontin." Topic 3 states: "Any information that you have
regarding the promotion of Neurontin for any off-label uses, including but not limited to pain,
diabetic peripheral neuropathy, restless leg syndrome, bipolar disorder, social phobia, panic
disorder, migraine, monotherapy for epilepsy, and dosages of Neurontin above the FDA-
approved maximum." Topic 10 states: "Any information concerning Pfizer's communications,
marketing or otherwise, to managed care plans concerning Neurontin, as well as Pfizer's
organizational structure used for such efforts, including but not limited to the identification of
individuals to describe such communications and all documents concerning such
communications."

        [2]Named Third Party Payors means the Plaintiffs named in the Coordinated Complaint and
the Third Party Payors named as Plaintiffs in the Class Complaint.

testimony it seeks is duplicative of Topic 2. Topic 10 is also too broad; it is limited to: Pfizer's organizational structure used for communications with Third Party Payors including but not limited to the identification of individuals responsible for such communication, the types and categories of such communications, and to identify any databases that may exist containing the contents of such communications.

In addition, Defendants shall produce to Plaintiffs, from the National Accounts department, documents relating to communications with named Third Party Payors regarding Neurontin.

5.    Sales and Marketing Plaintiffs' Motion for Leave to take Additional Depositions of Specified Current and Former Employees of Defendants (#846)

The Court authorized the Plaintiffs to take thirty (30) depositions of Pfizer employees. Neither Rule 30(b)(6) depositions nor depositions of non-parties count toward the thirty depositions allotted to Plaintiffs.  In addition, the depositions related to the individual Products Liability cases do not count toward the total of thirty. Plaintiffs' prior Motion for a general increase in the number of depositions by eight to twelve was denied without prejudice. Now, Plaintiffs seek twelve additional specific depositions with explanations for the basis for each deposition. CMO No. 5 (Dkt #736) requires a showing of "good cause" for additional depositions beyond the thirty limit. Plaintiffs have identified such cause with respect to some of the depositions they seek. The Motion is ALLOWED IN PART AND DENIED IN PART. In addition to the allotment of thirty, plaintiffs may take the depositions of Angela Crespo, John Knoop, Tim Windom and Drusilla Scott.

6.    Sales and Marketing Schedule

4

In light of the Court's rulings, the Sales and Marketing Schedule is modified. The parties shall have until November 15, 2007 to complete the additional discovery ordered herein. The remainder of the schedule is extended by two months. The revised deadlines are:

Completion of Additional Discovery Ordered Herein: 11/15/07
Provision of Plaintiffs' Expert Reports: 2/28/07
Provision of Defendants' Expert Reports: 03/30/08
Provision of Rebuttal Reports: 4/21/08
End of Expert Discovery 6/21/08
Filing of Motions for Summary Judgment: 7/21/08
Opposition: 8/21/08
Reply: 9/05/08

7.      Products Liability Cases

The schedule for experts on general causation and summary judgment briefing remains unchanged. The deposition of the Plaintiffs general causation expert will proceed, early, on the dates selected by the parties in October, provided Plaintiffs' disclose the expert's report to Defendants by October 1, 2007, unless the parties agree to another date within the existing schedule.

Defendants may select two new Track One cases to replace its original track one cases. It must designate its two cases by October 10, 2007. Discovery may proceed in those two individual cases. Pfizer must designate its Trial case from its two cases or the remaining cases randomly selected by the Court by November 9, 2007. Discovery in the case selected by Defendants will close on December 28, 2007. Expert discovery and summary judgment in the Smith case (Plaintiffs' designated Trial case) and the case designated by Defendants will proceed thereafter. Counsel for the Products Liability Plaintiffs and the Defendants shall confer and propose a new schedule for expert discovery and summary judgment in this two cases and file

5

such proposal no later than October 13, 2007.

At the Motion Hearing on September 20, 2007, the Defendants withdrew their requests for fees, costs and expenses and Plaintiffs withdrew their Motion to Compel Discovery and Extend Certain Deadlines (Dkt#843). The Court notes that the voluntary dismissal of the Strickland matter and the Motions to Withdraw by Counsel in the Mendoza and Fenelon matters significantly impeded the orderly management and adjudication of the Products Liability cases because they were three of the ten original Track One cases as well as both of the two cases designated by Defendants and their first Trial track case. A recurring pattern of such dismissals or Motions would also potentially raise Rule 11 or 28 U.S.C. § 1927 issues as well as interfering with the expeditious management and resolution of this MDL.

Counsel are invited to suggest to the Court how such dismissals or Motions in the remaining cases may be avoided and thereby prevent a disruption to the management and progress of this case. The Court will convene a hearing to discuss this matter with counsel on **October 17, 2007 at 2:00 p.m.**

Each of the following Motions are ALLOWED IN PART AND DENIED IN PART as described above: Defendants' Motion to Enforce and Modify Discovery Orders No. 7, 8, 11 and 13 (#824); Product Liability Plaintiffs' Motion to Compel Defendants to Conduct Deposition of Plaintiffs' General/Specific Causation Expert as Previously Agreed Upon (#834).

The Motion to Withdraw as Counsel for Plaintiff Fenelon (#836) and the Motion to Withdraw as Counsel for Plaintiff Mendoza (#838) remain under advisement. The Court will hold a hearing on these Motions on October 17, 2007 at 2:00 p.m. Plaintiffs' counsel shall notify these plaintiffs of their hearing. Each Plaintiff shall attend in person or by telephone. Counsel

6

may arrange a telephone appearance with the Clerk.

The Product Liability Plaintiffs' Motion to Compel Discovery and Extend Deadlines for Serving Notices to Admit (#843) was withdrawn at the hearing; the Clerk shall terminate the Motion.

The Motion to Dismiss With Prejudice the Strickland Action (#840) will be DENIED as MOOT. The parties shall jointly file a stipulation of dismissal with prejudice by the close of business on October 3, 2007.

SO ORDERED.

/s/ Leo T. Sorokin

_____

United States Magistrate Judge

7

# EXHIBIT H

2008-4-7.txt

```
       1

       1                   ROUGH DRAFT TRANSCRIPT

       2              UNITED STATES DISTRICT COURT

       3            FOR THE DISTRICT OF
MASSACHUSETTS

       4     ------------------------------x

       5  IN RE NEURONTIN MARKETING AND
          SALES PRACTICES LITIGATION
       6
          MDL Docket No. 1629
       7  Master File No., 04-10981
          Judge Patti B. Saris
       8  Magistrate Leo T. Sorokin
          ------------------------------x
       9

      10

      11          SUPREME COURT OF THE STATE OF NEW
YORK

      12                   COUNTY OF NEW YORK

      13
          ------------------------x
      14
          IN RE:  NEW YORK NEURONTIN
      15  PRODUCTS LIABILITY LITIGATION

      16  Case Management
          Index No. 765,000/2006
      17  Hon. Marcy S. Friedman
          ------------------------x
                      Page 1
```

2008-4-7.txt

         18

         19

         20              ROUGH DRAFT TRANSCRIPT

         21

         22
April 7, 2008

9:14 a.m.
         23

         24

         25


    □

          2

          1              ROUGH DRAFT TRANSCRIPT

          2

          3              Deposition of LAURA MARIE
KIBBE, taken

          4     by Class Plaintiffs, at the offices of
Davis,

          5     Polk & Wardwell, 450 Lexington Avenue,
New York,

          6     New York, before Brandon Rainoff, a
Federal

                        Page 2

2008-4-7.txt

7    Certified Realtime Reporter and Notary

Public of

8    the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2008-4-7.txt

⬜

    3

1               ROUGH DRAFT TRANSCRIPT

2    A P P E A R A N C E S:

3

4    FINKELSTEIN & PARTNERS

5    Attorneys for Product Liability
Plaintiffs

6           785 Broadway, 3rd Floor

7           Kingston, NY 12401

8           800.634.1212

9    BY:   KENNETH B. FROMSON, ESQ.

10          KEITH ALTMAN

11

12   BERNSTEIN LIEBHARD & LIFSHITZ, LLP

13   Attorneys for Class Plaintiffs

14          10 East 40th Street

15          New York, New York 10016

16          212.779.1414

17   BY:   RONALD J. ARANOFF, ESQ.

18
                    Page 4

2008-4-7.txt

19    ROBINS KAPLAN MILLER & CIRESI

20    Attorneys for Assurance Plaintiffs

21             2800 LaSalle Plaza

22             800 La Salle Avenue

23             Minneapolis, MN 55402-2015

24             612.349.8500

25    BY:    ANNAMARIE DALEY, ESQ.


□

4

1                    ROUGH DRAFT TRANSCRIPT

2.  A P P E A R A N C E S (Continued):

3

4    DAVIS POLK & WARDWELL

5.   Attorneys for Pfizer and Warner Lambert

6             450 Lexington Avenue

7             New York, NY 10017

8             212.450.4511

9    BY:    JAMES ROUHANDEH, ESQ.

10            CHRISTOPHER ROCHE, ESQ.
                     Page 5

2008-4-7.txt

```
         11
         12   SHOOK HARDY & BACON LLP
         13   Attorneys for Pfizer
         14           2555 Grand Blvd.
         15           Kansas City, Missouri
64108-2613
         16           816.474.6550
         17   BY:   JANEJ. BARTLEY, ESQ.
         18
         19
         20   ALSO PRESENT:
         21   Vijay Bondada, Esq., Legal Division,
Pfizer, Inc.
         22   Dan McClutchy, Videographer
         23
         24
         25


     D


         5
         1                  ROUGH DRAFT TRANSCRIPT
                        Page 6
```

2008-4-7.txt

         2              THE VIDEOGRAPHER:  Good morning, my

         3       name is Daniel McClutchy of Nationwide Video

         4       Productions.  The date today is April 7, 2008

         5       and the time is approximately 10:11 a.m.  This

         6       deposition is being held in the office of Davis

         7       Polk & Wardwell, located at 450 Lexington Avenue

         8       in New York, New York.

         9              The caption of this case is In Re

        10       Neurontin Marketing Sales Practices and Products

        11       Liability Litigation in the U.S. District Court,

        12       District of Massachusetts, MDL Docket No. 1629.

        13              The name of the witness is Laura

        14       Kibbe.  At this time the attorneys will identify

        15       themselves and the parties they represent, after

                              Page 7

2008-4-7.txt

16    which our court reporter, Brad Rainoff,
will

17    swear in the witness and we can
proceed.

18        MR. FROMSON:  On behalf of
the

19    products liability plaintiffs, my name
is

20    Kenneth Fromson from the law firm of
Finkelstein

21    & Partners.  Along with me this morning
is

22    nonattorney Keith Altman.

23        MR. ARANOFF:  Ronald Aranoff,

24    Bernstein Liebhard & Lifshitz on behalf
of the

25    class plaintiffs.

0

6

1            ROUGH DRAFT TRANSCRIPT

2            V.J. bandana from Pfizer
legal.

3        MS. BARTLEY:  Jane Bartley
        Page 8

2008-4-7.txt

with Shook,

4      Hardy & Bacon on behalf of Pfizer.

5              MR. ROCHE:  Chris Roche,
Davis Polk &

6      Wardwell, also on behalf of Pfizer and
the

7      witness.

8              MR. ROUHANDEH:  Jim
Rouhandeh, Davis

9      Polk & Wardwell on behalf of the
witness and on

10     behalf of Pfizer and Warner Lambert.

11             MR. ARANOFF:  Just note for
the record

12     that I think Annamarie Daley is also
here on

13     behalf of the coordinated plaintiffs.
She had

14     to step out for a moment.

15     LAURA MARIE KIBBE,

16             having been duly sworn, was
examined and

17             testified as follows:

18     EXAMINATION

19     BY MR. FROMSON:

              Page 9

4-7a

10          MR. ROUHANDEH: Objection,

11  argumentative.

12      A.    It was and I was trying to explain Mr.

13  Fromson asked me about my experience with

14  Rezulin, another litigation that I was working

15  on at the time. That was the process we

16  followed then in that litigation as well.

17          So you asked me if it would be common

18  to expect to find computers. It would not be

19  common to find computers from the Warner Lambert

20  era because at the time all of the lawyers doing

21  discovery would have asked individuals who had

22  information to be saved that was electronic to

23  print it and keep the paper.

24      Q.    My question had nothing to do with

25  Rezulin had nothing to do with what Mr. Fromson

🗆

140

1                  ROUGH DRAFT TRANSCRIPT

2  had asked. My question had to do with the

3  statement that you had made about the standard

4  being to print everything that was subject to a

5  legal hold. And again my question is focused

6  solely on what happened during the Warner

7  Lambert time period. Do you know whether every

8  document that was a sales and marketing document

9  regarding Neurontin was printed? Off of

10  people's computers before these computers were

11  recycled?

12          MR. ROUHANDEH: Objection to the form.

Page 124

4-7a
13    Argumentative.

14         A.    No.

15         Q.    Do you know whether there is any way

16    to determine whether or not all the sales and

17    marketing documents that were on these recycled

18    computers were printed before they were

19    recycled?

20         A.    No.

21               MS. DALEY:  Let's take a break.

22               THE VIDEOGRAPHER:  Going off the

23    record the time is 1:19.

24               (Recess).

25               THE VIDEOGRAPHER:  We are back on the

141

1                    ROUGH DRAFT TRANSCRIPT

2     record, the time is 1:31.  This is tape four.

3     BY MS. DALEY:

4          Q.    Ms. Kibbe do you know what the MM web

5     is?

6          A.    Yes.

7          Q.    What is that?

8          A.    Managed markets web.  It is a company

9     application.

10         Q.    Company application for what?

11         A.    It's a web portal for the managed

12    markets representative.

13         Q.    When was that in existence?

14         A.    Similar to H C exchange, its initial

15    role out was in late 2001 for the initial role

16    out and it is still in existence today.
                         Page 125