UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------x
:   MDL Docket No. 1629
In re:   NEURONTIN MARKETING,   :
       SALES PRACTICES AND   :   Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION   :
:   Judge Patti B. Saris
---------------------------------------------------------x
:   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:   :
:
PRODUCTS LIABILITY ACTIONS   :
:
---------------------------------------------------------x

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION FOR
LEAVE TO SERVE A REBUTTAL EXPERT REPORT**

Products Liability Plaintiffs hereby oppose the motion by Defendants Pfizer Inc. and Warner-Lambert Company for leave to serve a rebuttal expert report.

**PRELIMINARY STATEMENT**

On March 16, 2005, Dr. Russell Katz of the FDA sent a letter to Defendants indicating that a concern had been raised that anti-epileptic drugs (AEDs), including Neurontin, may be associated with an increased risk for suicidality.  (**Pls.' Ex. A**.)  Dr. Katz provided a protocol for the review of clinical trial data to be used by Defendants and other manufacturers.  Defendants knew that their Neurontin clinical trial data was to be pooled with data from ten (10) other AEDs.  Subsequently, on January 31, 2008, the FDA issued an Alert to healthcare professionals advising that "in the FDA's analysis, patients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation  (0.43%) compared to patients receiving placebo (0.22%)." (**Pls.' Ex. B**.)  The FDA further stated  "[t]he results were generally consistent among the eleven drugs." (Pls.' Ex. B.)

After the Alert was disclosed to the national public, Plaintiffs promptly supplemented their expert disclosure concerning general causation experts Michael Trimble, M.D., Stefan Kruszewski, M.D., and Cheryl Blume Ph.D., and advised that each of these experts would rely on the substance of the FDA Alert in providing opinion testimony that is consistent and supportive of Plaintiffs' claim that Neurontin contributes to mood and behavioral disturbances, including depression and suicidality. (**Pls.' Ex. C**.) Thereafter, Defendants again deposed Plaintiffs' experts prior to March 1, 2008.

Defendants now seek leave to serve a rebuttal expert report, to revisit the substance of their initial expert disclosures, and delay this litigation even longer. Defendants' motion (ECF Doc. # 1217) and memorandum in support (ECF Doc. # 1218) were electronically filed and served on April 10, 2008. It was Plaintiffs' counsel's understanding that, pursuant to D. Mass. Local Rule 7.1(b), Plaintiffs' papers in opposition to Defendants' motion are not due until April 24, 2008. In the course of a telephone conference on April 17, 2008, with Magistrate Judge Sorokin, Plaintiffs' counsel, advised that Plaintiffs would be timely filing opposing papers by April 23 or 24, 2008. Nevertheless, without the benefit of Plaintiffs' opposition to the within motion, this Court granted Defendants' application and ordered that Defendants serve a rebuttal expert report within 30 days. (*See* Electronic Order entered on the Docket on April 17, 2008.) Plaintiffs immediately filed an emergency motion that same day for clarification of the Court's ruling. (ECF Doc. # 1231.) Plaintiffs have not yet received clarification and are hereby submitting this opposition on schedule pending a response from this Court.

Defendants gratuitously indicate their willingness to serve a report no later than May 20, 2008 (the Court's Order as to which Plaintiffs seek clarification requires the report be served within 30 days). However, Defendants fail to fully discuss the ramifications of injecting another

2

expert opinion into this litigation: *Daubert* briefing has already been submitted to the Court, and a hearing is already scheduled for June 19 and 20, 2008.  The untimely inclusion of a new expert and new expert opinion fails to give adequate consideration to Plaintiffs' need to review and evaluate the rebuttal expert opinion, schedule and take the expert's deposition, or serve their own rebuttal expert opinion if needed.  Defendants' application is no doubt a veiled attempt at getting the litigation delayed.

## ARGUMENT

### I. THE FDA USE OF POOLED DATA WAS NOT UNFORESEEN BY DEFENDANTS.

Plaintiffs have not interjected new and complex issues into the litigation warranting any rebuttal expert opinion by Defendants.  "The principal objective of rebuttal [testimony] is to permit a litigant to counter new, unforeseen facts brought out in the other side's case." *Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir. 1999); *Sprague v. United Air Lines, Inc.*, No. 97-12102, 2000 U.S. Dist. Lexis 20889, at *2-3 (D. Mass. May 3, 2000) (request for designation of rebuttal expert denied where opposing expert did not raise issues that were "new" and "unforeseen").  As demonstrated below, Defendants are not confronted with new, unforeseen issues.  After initial 2004 inquiries by the FDA to Defendants concerning the suicidality data associated with Neurontin, the FDA, in 2005, expanded the inquiry to include data from other manufacturers.  (Pls.' Ex. A.)  The March 2005 letter from the FDA was clear that the inquiry was not limited to Neurontin.  At that time, Defendants were on notice that the FDA would pool and combine data from different drugs.[1]

---

[1] Previously, Defendants' clinical trial data related to its antidepressant drug, Zoloft, was evaluated by FDA in a similar manner.  The FDA reviewed suicidality associated with anti-depressants and pooled data from various different drug trials.  (*See generally* **Pls.' Ex. D**.)

3

At no point prior to the issuance of the FDA Alert did Defendants contact the FDA and discuss any criticism about the pooling data or the combinability of data from different drugs. Specifically, Defendants accepted the methodology of pooling data from numerous anti-convulsant drugs, just as Defendants accepted FDA's methodology of pooling data from numerous anti-depressant drugs years earlier. Indeed, if Defendants believed that pooling data was not appropriate, they could have—and should have—included such opinions in their previous expert disclosures. Instead, Defendants embraced the methodology of pooling data, including their own Neurontin-specific data.

To calculate the Neurontin-specific data that Defendants submitted to the FDA for purposes of the suicidality review, Defendants themselves pooled data from several different trials in several different populations including patients suffering from epilepsy, neuropathic pain, and various psychiatric conditions. Some of the trials included children, others only adults; the trials differed in their inclusion and exclusion criteria, their length, number of participants, and doses ingested. Not one of Defendants' seven experts had any criticism of pooling data or the results of such pooled data across such different factual circumstances.

Furthermore, Defendants took a calculated risk by proclaiming the FDA as the ultimate authority on the issue and gambling that the FDA would not come out with a conclusion unfavorable to their defense. In her expert report submitted in December of 2007, Dr. Janet Arrowsmith-Lowe, Defendants' regulatory expert and an epidemiologist, stated the following:

> Since 2004, despite repeated efforts by plaintiffs' attorneys to compel specific labeling changes to the Neurontin label, FDA has not sought substantive changes regarding the risk of suicide or other psychiatric adverse events for the Neurontin label. FDA's consideration of both the clinical trial and postmarketing surveillance data has not resulted in any substantive action FDA to change the Neurontin label such as warnings, contraindications or precautions based on suicide adverse events. As of the date of this report, the only reasonable conclusion is that FDA, in the exercise of its statutory duty to protect the public

4

> health, has not found it necessary to change the Neurontin package insert, as suggested by Dr. Blume in her report.
>
> Further, it is my opinion that if FDA had found that the data submitted since 2004 supported a finding of an increased risk for suicidal behaviors associated with the use of Neurontin, FDA would have taken the necessary steps to promptly seek a labeling change. Neither the FDA nor any regulatory authority in the world of which I am aware has found that Neurontin causes suicide. FDA's position is consistent with my review of the available evidence. [**Pls.' Ex. E** at pp. 25-26.]

Defendants assumed that the FDA would not come out with a finding inconsistent with their defense. Nevertheless, Defendants were aware of the methodology being utilized by the FDA, and Defendants embraced the methodology because they assumed it was to their advantage. Defendants were clearly aware of the FDA review and what it could possibly show. If Defendants had any objection to the methodology of pooling data, Defendants had every opportunity to voice such criticism to the FDA as well as in their expert disclosures prepared in the context of this litigation. Such risk taking should not be rewarded by this Court granting the Defendants' request for a rebuttal expert.

**II.    DEFENDANTS' REQUEST FOR A REBUTTAL EXPERT HAS NO MERIT BECAUSE DEFENDANTS' EXPERTS HAVE ALREADY SUPPLEMENTED THEIR DISCLOSURE REGARDING THE FDA ALERT.**

Even assuming for the sake of argument that Defendants' motion is timely, Defendants' claim of entitlement to a rebuttal expert opinion is without merit. Defendants argue that such an expert opinion is necessary: (1) to opine on the FDA Alert; (2) to opine on the analysis set forth in the Alert; (3) to opine on Plaintiffs' experts' reliance on the Alert; and (4) to opine on the inferences Plaintiffs attempt to draw on the basis of the Alert. (Defs.' Mem. at 2.) As detailed below, Defendants' arguments should be rejected by this Court.

First, items (1) and (2) are not properly the subject of a rebuttal opinion; rather, if anything, they would be appropriate as a supplemental expert disclosure from an expert already

5

retained by Defendants and for whom the Defendants have already provided expert disclosure. In fact, on February 12, 2008, Defendants served Plaintiffs with a supplemental expert disclosure which specifically related to the 2008 FDA Alert, and which applied to all of their already retained experts: Arrowsmith-Lowe, Jacobs, Rothschild, Ruggieri, Sanacora, Taylor, and Smith-Weiss. (**Pls.' Ex. F**.) In the supplemental disclosure, Defendants indicated the following related to these already retained and previously disclosed experts:

> Each of the aforementioned experts has reviewed and considered the U.S. Food and Drug Administration (FDA) Alert relating to antiepileptic drugs . . . .Further, each of the aforementioned defense experts shall review and consider the data, analyses and other documents as they become available relating to FDA's analysis of drugs identified in the FDA Alert, which may supply additional bases for their opinions on general causation and /or may form the basis for additional opinions once considered . . . . [Pls.' Ex. F.]

As can readily be discerned from this already-served supplemental disclosure, Defendants' previously-disclosed experts have already reviewed and considered the 2008 FDA Alert. Further, pursuant to Rule 26(A)(2) of the Federal Rules of Civil Procedure, Defendants' experts have incorporated the substance of the 2008 FDA Alert into their already existing opinions on general causation. It is evident that these experts supplemented their disclosure because they are of the opinion that the FDA Alert and the analysis set forth in it (i.e., items (1) and (2) above) are consistent with the experts' previously disclosed general causation opinions. Defendants' disclosure of such a supplemental disclosure by their experts is certainly an acknowledgement of their experts' purported qualifications to opine upon the 2008 FDA Alert. Thus, there is no basis for Defendants' request to have a rebuttal expert "to opine on the FDA Alert," or to opine on "the analysis set forth in it" (i.e., items (1) and (2) above). (Defs.' Mem. at 2.) Defendants have essentially already done so through their previously disclosed experts.

6

Importantly, Defendants' own supplemental disclosure related to their experts' opinions on the 2008 FDA Alert also included specific language related to any reliance that Plaintiffs' experts place on the Alert: "Defendants' experts may have additional opinions regarding the FDA Alert and underlying data and analyses based on Plaintiffs' experts' reliance on the FDA Alert . . . ." (Pls.' Ex. F.) Defendants' depositions of Plaintiffs' experts related to the 2008 FDA Alert were completed by February 29, 2008. There were no unforeseen facts about which Defendants or their experts have been unaware. However, despite having already indicated on February 12, 2008, that their experts would have additional opinions based upon Plaintiffs' experts' reliance on the FDA Alert (i.e., items (3) and (4) above), Defendants have chosen not to have their purportedly qualified experts put forth any such additional opinion.

In fact, Defendants' expert, Dr. Ruggieri did communicate to the FDA his "additional opinion" on February 8, 2008. At that time, he did not disclose his bias in favor of Defendants or his financial relationship to Defendants. Instead he touted his expertise: "I am a physician, pharmaco-epidemiologist, medical scientist, informaticist and data management expert, and consultant in the area of drug safety." (**Pls.' Ex. G**.) He voiced his objections to the FDA's finding regarding suicidality, and he further expressed his opinions against the pooling of data as exercised by the FDA (the very issue about which Defendants believe they must now retain a separate expert). (Pls.' Ex. G.) Subsequently, the FDA responded to Dr. Ruggieri on April 1, 2008. (**Pls.' Ex. H**.) Thereafter, on April 4, 2008, Defendants again supplemented their expert disclosure regarding Dr. Ruggeri's opinions on general causation as it related to the FDA Alert. (Pls.' Ex. H.) Clearly, Defendants have not only had an opportunity to supplement their expert disclosures, indeed they already have done so. However, Defendants seek to inject a new

7

purported expert into this litigation via a guise of a rebuttal opinion. Defendants' application should be summarily denied.

### III.  DEFENDANTS' MOTION IS UNTIMELY.

Pursuant to Fed. R. Civ. P. Rule 26(a)(2)(C)(ii), expert reports that are "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)" are to be disclosed within 30 days after the other party's expert disclosure. In light of the fact that the *DaubertFrye* motions have already been filed, and a *Daubert/Frye* hearing is already scheduled for June 19 and 20, 2008, Defendants' application is untimely. The 2008 FDA Alert was issued on January 31, 2008. Plaintiffs' supplemental expert disclosure was promptly served on February 2, 2008. At the very least, Defendants were on notice of any "unforeseen" facts giving rise to a rebuttal expert opinion as of that time. Yet, prior to belatedly filing their motion on April 10, 2008, Defendants never sought leave for a rebuttal expert opinion. Defendants appeared before the this Court on February 19, 2008, and argued in support of their motion to compel the depositions of Plaintiffs' experts because of alleged "new" opinions, but never sought that a rebuttal expert opinion be included in the discovery schedule. Defendants failed to act—and they did so at their own peril.

### IV.  IF THE COURT ALLOWS A REBUTTAL EXPERT, DEFENDANTS' SHOULD BE LIMITED TO RECOVERING AN EXPERT OPINION FROM THEIR PREVIOUSLY DISCLOSED EXPERTS.

In this case, Defendants prepared and disclosed expert reports from seven individuals in response to Plaintiffs' expert disclosures. All seven experts retained by Defendants opined upon general causation and the FDA's query about suicidality: (1) that Defendants' review was adequately conducted in response to the FDA; and (2) that the review demonstrated no

8

relationship between Neurontin and suicide.[2] All of the experts opined that the rate of suicidality in Neurontin of 0.39% compared to 0.37% for placebo was not statistically significant and did not demonstrate an increased risk.

There is no reason that the existing assembly of defense experts do not possess among them the qualifications to render the opinion that Defendants are now requesting of their proposed rebuttal expert, Dr. Robert Gibbons. In fact, Dr. Gibbons is not qualified to render the opinion that Defendants seek. At its crux, Defendants seek to criticize the FDA for pooling data results from different drugs; however, Dr. Gibbons is not qualified to opine that FDA improperly evaluated drugs affecting the GABA neurotransmitter in the brain. Dr. Gibbons is a biostatistician and therefore is not qualified to comment on the combinability of such data. On the other hand, Defendants' expert Dr. Gerard Sanacora is a "neuropsychopharmacologist" and is presumably qualified to render an opinion on the pharmacologic combinability of the data from the different drugs. As previously indicated, Defendants' expert Dr. Ruggieri has already rendered an opinion to the FDA about his criticism of the pooled data as well.

By suggesting that Dr. Gibbons is uniquely qualified to render the opinions they now seek, Defendants are in effect alleging that their original experts were unqualified to render the opinions that form the basis of their motion to exclude Plaintiffs' experts. To accept Defendants' position that Dr. Gibbons is qualified means that their already retained epidemiologist is qualified. For example, Dr. Sheila Weiss-Smith, Defendants' pharmacoepidemiologist, is presumably qualified to render the rebuttal opinion Defendants now seek.

---

[2] *See* Pls.' Ex. E (Report of Defendants' expert, Dr. Janet Arrowsmith-Lowe, pp. 28-29); **Pls.' Ex. I** attached hereto , which includes pertinent sections of the expert reports of Defendants' experts: Dr. Alex Ruggieri, pp. 13-14; Dr. Sheila Weiss-Smith, pp. 8-10; Dr. Anthony Rothschild, pp. 27-28; Dr. Douglas Jacobs, pp. 10-12; Dr. Gerard Sanacora, p. 24; and Dr. Charles Taylor, p. 31.

[4] *See generally* Pls.' Ex. E (Report of Defendants' expert, Janet Arrowsmith-Lowe, pp. 3, 9-16, 23-26, 29-31).

9

## V. DEFENDANTS' PROPOSED TESTIMONY BY DR. GIBBONS IS SPECULATIVE AND CUMULATIVE OF DEFENDANTS' PREVIOUSLY DISCLOSED EXPERTS.

Defendants have stated that Dr. Gibbons would testify as to what the FDA may show if and when the FDA ultimately discloses the drug specific data from the other ten AEDs, and as to his belief that the data may show that the facts upon which the FDA Alert is based do not show an increased risk of suicide "shared by all AEDs." (Defs.' Mem. at 10.) This is complete speculation at this juncture. What is certain is that the FDA has included Neurontin—an AED—in a Safety Alert along with ten other similarly situated AEDs, and the FDA has informed the public of an increased risk of suicidality with these drugs, including Neurontin.

Furthermore, Dr. Gibbons' anticipated opinion as described by Defendants is cumulative and would contradict the testimony of Defendants' already disclosed experts. Each of Defendants' experts has already accepted the methodology of pooling of data as it pertained to Defendants' own Neurontin-specific trials. If it is inappropriate to conclude that the FDA's use of pooled data demonstrates an increased risk for suicide with the use of Neurontin, then all seven previously disclosed defense experts are equally wrong when they relied upon Defendants' own pooling of data to suggest that there is no increased risk. Since Defendants' experts all used the pooled data, they have provided the opinion that is scientifically sound to do so. Therefore, anything Dr. Gibbons would say on the topic has already been the subject of expert testimony by Defendants' previously disclosed experts.

Lastly, Dr. Gibbons opinion concerning the FDA alert is not necessary to assist the Court in its *Daubert* review. Plaintiffs' expert disclosures and depositions took place prior to the issuance of the FDA Alert. After the Alert, Plaintiffs supplemented their expert disclosures to include the Alert, and Plaintiffs' experts were again deposed before March 1, 2008. In the

absence of the Alert, Plaintiffs' experts' opinions on general causation are adequately supported by the experts' sound application of scientific principles as more fully set for in Plaintiffs' papers submitted in opposition to Defendants' *Daubert* motion. Certainly, Dr. Gibbons could not possibly render an opinion that the FDA Alert demonstrates that Neurontin is not associated with an increased risk of suicidal behavior. As such, nothing he could say would alter Plaintiffs' experts' or Defendants' experts' use of the Alert in support of their opinions. Defendants' existing experts are qualified to render opinions on the Alert and have already done so. If Dr. Gibbons is more qualified to render these opinions, then Defendants should have named him in the first place. Therefore, it is unclear how Dr. Gibbons' testimony would not be cumulative of the already existing opinions.

**VI.  DEFENDANTS' ATTACK ON THE SCIENTIFIC RELIABILITY OF THE FDA IS INCONSISTENT WITH DEFENDANTS' ALREADY PENDING MOTION FOR SUMMARY JUDGMENT ON PREEMPTION GROUNDS.**

Defendants seek to "rebut the scientific reliability of the FDA Alert". (Defs.' Mem. at 2.) The net opinion of Dr. Gibbons' proposed testimony is that the FDA was wrong in its methodology to pool data for its suicidality review and to issue the FDA Alert as written. Such a position is inconsistent with Defendants' claims in their pending motion that Plaintiffs' claims are federally preempted. Indeed, Defendants' motion for summary judgment on preemption grounds is based upon the FDA being the expert in the field of drug safety. Defendants' purported regulatory affairs expert, Janet Arrowsmith-Lowe, bases virtually her entire opinion on authoritative conclusions and statements made by the FDA.[4] Now, Defendants' argue that the FDA is unreliable: this is completely inconsistent with Defendants' contention that the FDA is the expert agency in the United States that already determines and approves of safety and efficacy for all prescription drugs. If anything, Defendants' instant motion shows that they do

11

not believe the FDA to be the expert professed in their concurrently pending motion for summary judgment. Thus, the Court should take into consideration Defendants' arguments in the instant motion in denying Defendants' motion for summary judgment on preemption grounds.

## CONCLUSION

In view of the above, Plaintiffs respectfully request that this Court deny in its entirety, Defendants' Motion for leave to serve an expert rebuttal report.

Dated:  April 24, 2008                                  Respectfully submitted,

*Members of Products Liability
Plaintiffs' Steering Committee*

By:     **/s/ Andrew G. Finkelstein**
           Andrew G. Finkelstein, Esquire
           Finkelstein & Partners, LLP
           436 Robinson Avenue
           Newburgh, NY  12550

By:     **/s/ Jack W. London**
           Jack W. London, Esquire
           Law Offices of Jack W. London
             & Associates
           106 E. 6th Street, Suite 700
           Austin, TX  78701

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on April 24, 2008.

          **/s/ Andrew G. Finkelstein**
          Andrew G. Finkelstein, Esquire