EXHIBIT I

Qualifications Pertinent to Neurontin Litigation

My training and experience provides me with a composite of skills and capabilities that enable me to evaluate the issues and claims across the multiple disciplines and areas of expertise this matter requires for resolution, and enables me to provide an assessment that appropriately integrates and balances inputs from all the expert areas and scientific disciplines relevant to this case.

I am physician who is current in board certification in Internal Medicine and Rheumatology. I graduated from medical school as a member of the Alpha Omega Alpha Medical Honor Society and successfully completed postgraduate training and board certification in Internal Medicine and Rheumatology. Subsequently I accumulated over 16 years of clinical practice where I treated a spectrum of diseases and conditions in patients typical for an internal medicine practice and specialized in rheumatic disorders, most of which are chronic, incurable, progressive, and associated with both psychological and physical distress. Working with patients who had chronic debilitating and dire diseases for which treatments were sometimes very limited led me to appreciate the toll it took on patients and the need to explore any and all available therapeutic approaches especially when conventional treatments failed. The vast majority of my patients experienced significant depression as a result of their condition at least multiple times during the course of their condition. Some of these conditions I managed had epilepsy as part of their clinical spectrum of manifestations.

The majority of the therapeutic agents available to treat rheumatic diseases in the early part of my clinical practice experience were drugs borrowed from off label or "unapproved" uses. The robust sharing of empirical observations in off label uses among colleagues often enabled the "discovery" of a therapeutic "diamond in the rough" that often became a standard of care. Preliminary observations of the benefits of off label unapproved uses of various medications often led to investigational new drug applications and subsequent company sponsored randomized control trials that led to approval. Examples of drugs used in off label or unapproved uses after recognition of a favorable risk benefit ratio that either became formally approved or became part of the standard of care without approval included cortisone, aspirin, hydroxychloroquine, methotrexate, azathioprine, gold salts, and cyclophosphamide. I also frequently employed antidepressant medications, antiepileptic agents, including Neurontin, and sedatives with success in chronic pain management in my patients. These uses would be considered off label but nonetheless of therapeutic value with a favorable.

Similar stories of progression from off label use to formal approval and incorporation into the standard of care can be told of drugs used in other medical disciplines. Examples include aspirin in the management and secondary prevention of stroke and myocardial infarction and use of beta blockers in the management of heart failure.

As a rule I found that information already existing from a drugs approved uses in addition to safety information derived from its approved use was sufficient to understand and manage risk in the unapproved or off label use populations. Many of these new uses for old drugs would not have come to fruition without a scientific dialogue between practitioners and pharmaceutical companies. Off label practices by clinicians, nor interest demonstrated in those uses by therapeutics developers, are not equivalent to a lack of concern for safety, are not inconsistent with responsible safety and pharmacovigilance due diligence and do not automatically mean unsafe use or practice. Recognizing the

1

It is important to note that in making these requests for analyses from Pfizer, the FDA never suggested that these requests were being made because of acknowledgement of a previously missed or unknown "signal" or because of failure of Pfizer to perform its duties in post market pharmacovigilance or from any previous misrepresentation of data within regulatory submissions or adverse event case reporting.

Because of duties to the public health, neither the FDA nor Pfizer had the luxury afforded academicians of "sitting on the fence", nor the choice of hiding behind impractical abstract epidemiological theories about what conclusions the data might or might not allow. The FDA as well as Pfizer must make decisions on the public's behalf and must use the best available resources to do so and cannot equivocate when a question about safety is put forth. Being "non informative" on any issues because of theoretical abstractions about the data would make the FDA and the manufacturer derelict in their duties. As such it is presumed the FDA selected the data management and analytic approaches consistent with the need to make a decision using the best available data. These data have unparalleled scientific evidentiary strength, and relevance in the assessment of whether Neurontin causes suicide, and sets the standard for evidence with which to refute or overcome the conclusions reached by the FDA.

The FDA defined the adverse event codes to be used in the compilation of the data sets for further examination of the questions regarding suicidality and Neurontin use. FDA Contact Report (April 26, 2004) Pfizer_BParsons_0141815. Choice of these code sets defined the data set with the most precision for evaluation suicidality and Neurontin use. The FDA did not include coded terms which lacked specificity for suicide risk or whose pathophysiological relationship to suicidality was ambiguous. Data from clinical trials (both randomized and open label) was selected, providing the most strength for drawing scientific inferences and conclusions. Data from post market adverse event databases was also requested as were individual adverse event report listings and reports.

Pfizer submitted reports to FDA following the Finkelstein Law Firm's submission of the Citizen's Petition, on September 9, 2004, November 19, 2004, and June 22, 2006. Response to FDA: Neurontin (September 9, 2004) Pfizer_MPatel_0039110; Response to FDA Regarding Suicide and Suicide Attempt in Neurontin Clinical Trials – Phase 1 Studies (November 19, 2004) Pfizer_MPatel_0045143; Response to FDA Suicidality Request (June 22, 2006) Pfizer_MEvertsz_0079431. The Pfizer reports were fully compliant with the FDA's request and specifications.

Dr. Parsons' September 2004 analysis employed the calculation of incidence rates (even occurrence rates) and Kaplan Meir as these statistical parameters provide the strongest level of evidence with respect to risk. The Kaplan Meir approach was consistent with recommendations for analyzing risk with changing denominators (populations exposed) as well as risk that may change over time with increased cumulative exposure as would occur in patients who stayed on Neurontin into open labeled clinical study extensions (Medical Uses of Statistics, 2nd Edition pg 282). This statistical approach was one with which the FDA concurred.

The Parsons November 2004 report employed clinical trials from phase 1 study. Similar statistical measures of risk were calculated (rate of event occurrence as well as description of individual case reports from those studies. Those reports and their conclusion of absence of a detectable risk in phase 1 studies of Neurontin for suicide, suicide attempt and intentional self harm were accepted by the FDA.

Subsequent to these reports, the FDA requested additional data that cast an even wider net than originally requested by the FDA with respect to cases that might be included in the analysis. Response to

13

this request was presented in a report dated June 22, 2006 ("June 2006 submission"). Response to FDA Suicidality Request (June 22, 2006) Pfizer_MEvertsz_0079431. Using the less stringent data inclusion criteria, risk estimates continued to indicate the absence of excess risk for suicide related to Neurontin use in this study population.

All of these three consecutive reports had their analytic approach and data selection criteria chosen and guided by the FDA. Pfizer was responsive to all additional requests and modifications for the analysis. The conclusions of all the reports received and accepted by the FDA were that there was no evidence to support excess risk related to Neurontin use for suicide related events.

In summary, well-designed rigorous randomized control clinical-trial data fail to support the assertion that Neurontin is causally associated with a risk of suicidality. In addition, additional pharmacoepidemiologic studies guided and endorsed by the FDA and other regulatory agencies fail to support the assertion of a causal relationship of Neurontin administration to suicide risk. To date, there has not been a risk-based reason for a new warning regarding suicide in the Neurontin package insert. The FDA has not requested that the package insert for Neurontin be modified to include a warning, precaution or contraindication related to suicide.

## Plaintiff Assertions

I have reviewed reports and affidavits making assertions on behalf of the plaintiffs claim. Specifically the Blume report, and the assertion by plaintiffs that a literature study (Collins JC, McFarland BH. Divalproex, lithium and suicide among Medicaid patients with bipolar disorder. J Affect Disord. 2007 Aug 15) provide evidence from which to conclude that there is a causative relationship between suicide risk or suicide related experiences and gabapentin sufficient to escalate warnings or advisements in product information material (product labels, package inserts)

I reject the basis for plaintiff's expert assertions on scientific grounds and scientific rules of evidence. The rationale for my rejection is summarized below.

## The Collins & McFarland Report

The Collins & McFarland report has been cited by several of plaintiffs' experts as a scientific epidemiological study supporting the assertion of a causative relationship of suicide to the therapeutic use of Neurontin in Bipolar Depression Disorders. Assertions that it was the intent of this study to evaluate the excess risk of suicide occurrence related to therapeutic Neurontin administration, or that evidence presented in this literature report supports this assertion are flawed. Testimony by the scientific author of the paper refutes the assertion that evidence for a relationship of Neurontin administration to suicide is presented or evident from data in the paper. Deposition of Bentson McFarland, M.D. at 106, 107-99, 199, 211-212.

The stated purpose of the paper was to evaluate the relative efficacy of three therapies used in the treatment of bipolar using a disease outcome measure of suicide. Suicide is an outcome for bipolar depression much the same way that cardiac arrest is an outcome measure for coronary artery disease. Much a study in cardiology may measure the relative effectiveness of therapies for coronary heart disease based on their ability to prevent cardiac arrest this study evaluates three acknowledged therapies for bipolar depression based on their ability to prevent suicide, a known and feared outcome

14

are submitted to FDA, they should be presented in the larger appropriate clinical epidemiological context".

The Blume report never actually performed a PRR analysis and even if they had been able to do so this would not provide sufficient perspective or information to constitute the action they assert Pfizer should have undertaken.

The Blume report never performs the required final analysis that provides "the larger appropriate clinical epidemiological context". However this larger epidemiological context was provided by Pfizer in the reports submitted to the FDA in September 2004 and June 2006.

_____
Alexander P. Ruggieri, M.D. M.H.S

12/20/2007
_____
Dated

30

Expert report
Sheila Weiss Smith, Ph.D., FISPE

My Background and qualifications:

I am currently an Associate Professor in the Department of Pharmaceutical Health Services Research, School of Pharmacy, with a secondary appointment in the Department of Epidemiology and Preventive Medicine, School of Medicine, University of Maryland, Baltimore, MD, and an affiliate appointment in the Gerontology doctoral program (University of Maryland Baltimore and University of Maryland Baltimore County). I am also a Visiting Associate Professor (each summer since 2005) at the Bloomberg School of Public Health, Johns Hopkins University, where I teach a course in Pharmacoepidemiology. I hold appointments at the U.S. Food and Drug Association (special government employee) and the U.S. Veterans Administration (research associate).

I earned a B.S. in Biology from the University of Maine in 1981, a M.S. in Exercise Sciences from Northeastern University (Boston, MA) in 1986 and a Ph.D. in Epidemiology from Johns Hopkins University in 1996. I completed a two-year postdoctoral fellowship in Pharmacoepidemiology & Regulatory Sciences at the U.S. Food and Drug Association and University of Maryland. I was inducted in the honor societies for both Education (Kappa Delta Pi) and Pharmacy (Rho Chi) and am a fellow of the International Society of Pharmacoepidemiology.

My research efforts and writings have focused on the area of pharmacoepidemiology, and I have written on the epidemiology of the risks associated with prescription medications with a special emphasis on methodology. I am currently principle investigator of a one-half million dollar grant "the value of data mining", which is an extensive look at the comparative validity of data mining algorithms in the FDA's adverse reporting database, industry practices in data mining, and factors which influence the results of data mining. Additionally, I have been Principal Investigator of two sequential NCI contracts to look at the strength of the scientific evidence for cancer prevention and cancer promotion among commonly used medicines and nutraceuticals, and to estimate the potential public health impact. I am on the executive committee of the University of Maryland's DeCIDE center, which is an AHRQ project (Bruce Staurt, PI), and an investigator on grants from NIDDK (Jeff Fink, PI) and Sanofi-Adventis (Daniel Mullins, PI). Past funding including grants and contracts from the FDA, NASA, the Pfieffer Foundation, Drug Information Association, Glaxo-Smith Klein, etc. are listed in my C.V. I have published more than 30 peer-reviewed papers (with in excess of 570 citations), a number of which in high impact journals including New England Journal of Medicine, British Medical Journal, and Pharmacoepidemiology and Drug Safety (PDS). One paper (Cluxton et al, 2005) was awarded the annual prize for best paper in PDS, for the year 2005. I am author or coauthor of more than 50 scientific presentations/posters and have given approximately 30 invited talks. I am an active member of the International Society of Pharmacoepidemiology; participating in annual meetings, chairing sessions, reviewing abstracts, and serving on a number of

1

The rates of suicide attempts are also elevated among patients with conditions that are commonly treated with gabapentin. For example, the annual rate of suicide attempts in the general US populations is 0.4%. Kessler, et al., Trends in Suicide Ideation, Plans, Gesturem and Attempts in the U.S. 1990 - 1992, to 2001 – 2003. *JAMA* 293:2487 – 2495 (2005) and the lifetime prevalence of suicide attempts is 4.6%. Kessler, et al, Prevalence of and risk factors for lifetime suicide attempts in the national comorbidity survey. *Arch. Gen. Psych.* 56:617 – 626 (1999). It has been established that there are 10 -25 suicide attempts for every suicide completion. Maris, Suicide. *Lancet* 360:319-26 (2002). Patients with epilepsy are at five times the risk of a suicide attempt. Hawton, et al., Suicide and attempted suicide in bipolar disorder: a systematic review of risk factors. *J. Clin. Psychiatry* 66:693 – 704 (2005), which is consistent with an estimated rate of suicide attempts of 2% per year. There have been a number of studies comparing suicide attempt rates among patients with chronic pain to controls without pain. While the lifetime prevalence of suicide attempts varied among across studies (range 5-13.7%), patients with pain were consistently were 2-3 times more likely have attempted suicide than those without pain. Tang and Crane, Suicidality in chronic pain: a review of the prevelance, risk factors and psychological links. *Psychol. Med.* 36:575 - 586 (2006).

A. Clinical Trial Analysis Pertaining to Suicide

i. Evertsz letter – June 2006
In March 2005, the FDA asked all AED manufacturers, including Pfizer to analyze its randomized controlled clinical trials to identify any possibly suicide-related events. The protocol for this analysis was determined by the FDA and modeled after the agency's analysis of SSRI medications. Correspondence from Russell G. Katz, M.D., Division Director, Division of Neurology Products, Center for Drug Evaluation and Research, FDA to Pfizer (March 16, 2005). Case identification included, among other things, an evaluation of all death reports to determine if the death could be attributed to suicide. To avoid bias, the medical reviewers were blinded to whether the person had received Neurontin or placebo. Using search strategies stipulated by FDA for "possibly suicide-related" adverse events that occurred in the double-blind phase of treatment or within one day of being taper, switching or stopping treatment. Response to FDA Suicidality Request (June 22, 2006), Pfizer_MEvertsz_0079431. Trained and qualified Pfizer psychiatrists reviewed and classified narratives, in a blinded fashion, using the approach from the Columbia University group (a well-accepted classification system for suicide analysis). *Id.;* Columbia Classification Algorithm of Suicide Assessment (C-CASA): Posner et al. *Am J Psychiatry.* 2007; 164: 1035-1043. Fifty-two randomized clinical studies were identified for inclusion in the analysis of suicide and suicide attempt with Neurontin. Of these, two were excluded because all of the patients were three years old or younger and one because it was not a placebo-controlled (or low dose comparator). Among the studies that met FDA inclusion criteria there were 8829 subjects (including patients and volunteers); 5194 treated with Neurontin, 2682 treated with placebo, 661 treated with an active control and 292 treated with "low-dose" placebo. *Id.* The results of the blinded reviews and classifications revealed that there were no cases of suicide or suicide attempts among the study participants. With respect to suicidal ideation, 0.039

percent of patients treated with Neurontin reported suicidal ideation compared to 0.037 of patients on placebo. *Id.*

Pfizer concluded that "the currently submitted data provides further support for the conclusion that Neurontin neither causes nor is associated with an increased risk of suicidal behavior and thinking, including completed suicide, suicide attempt, suicide gesture, and suicide ideation. While the population of patients who use gabapentin is known to have significantly higher rates of suicide relative to the general population, Pfizer believes that an analysis of gabapentin clinical trial data fully supports the conclusion that there is no increased risk of suicidal behavior and thinking as a result of treatment with gabapentin." *Id.*

This reevaluation of the randomized clinical trial data is important in that there were no reports of suicides or suicide attempts despite more than 5000 Neurontin exposed patients, who are at elevated risk of suicide compared to the general population. I concur with Pfizer's conclusions, as set forth above, that these data provide no indication of an elevated risk of suicide or suicide attempt and, rather, demonstrates an absence of increased risk.

ii. Parson's Report – September 9, 2004 Response to FDA Regarding Suicide and Suicide Attempt in Neurontin (gabapentin) Clinical Trials and Postmarketing Surveillance

In 2004, FDA requested Pfizer to conduct a comprehensive search of gabapentin clinical trials and postmarketing databases across all patient populations for cases of suicide and suicide attempt. Response to FDA: Neurontin (September 9, 2004) Pfizer_MPatel_0039110. This analysis was completed and provided to FDA in September, 2004, ("Parson's Report"). FDA and Pfizer established a protocol to identify and analyze all reports of suicide or suicide attempt accumulated in the clinical trial databases for Neurontin. The methods are similar to the methods described above under the Evertsz June 2006 correspondence. *Id.* Among the differences with the June 2006 submission is that the protocols for the 2004 analysis did not employ the Columbia Suicidality Classification Project protocols. *Id.* Accordingly, the FDA in 2004 only requested data on suicides and suicide attempts, as opposed to data on intentional self-injury and suicidal ideation. A second difference regarding the protocols was that in the 2004 analysis all intentional overdoses were automatically categorized as a suicide or suicide attempt, whichever event applied, without any additional analyses. *Id.* A third difference is that the 2004 analysis was not limited to placebo-controlled clinical trials. *Id.* The Parson's Report summarizes the number and rates of suicide and suicide attempt across 92 clinical trials, phases 2-4. In this report the clinical trials are separated into those in which Neurotontin was compared to placebo and those in which there is no comparison group (open label). *Id.*

The placebo-controlled clinical trials were conducted for a variety of clinical indications including psychiatric conditions, neurological conditions, epilepsy, pain, and neuropathic pain. There were 2 cases of completed suicide in gabapentin-treated subjects (none in

9

placebo-controlled studies, one in non-placebo-controlled studies, and one that occurred 6 months post-treatment) and none in the placebo-treated subjects. *Id.* There were 12 cases of suicide attempt in gabapentin-treated subjects (one in placebo-controlled and 11 in non-placebo-controlled studies), of which 11 subjects were participating in epilepsy studies and 1 case involved a subject in a neuropathic pain study. *Id.*

Pfizer concluded, "In summary, the combined results of a comprehensive search for cases of suicide and suicide attempt among gabapentin clinical trials and postmarketing data across all patient populations did not indicate an increased risk of suicide with gabapentin treatment. The results of this review are consistent with the published literature for suicide in comparable patient populations in which gabapentin has been studied or used. No changes in the current product labeling, which currently includes suicidal and suicidal gesture in the clinical trial adverse event section, are necessitated by these findings." *Id.* at p. 2).

I concur with the Pfizer conclusion that the data from the clinical trials show that, regardless of indication, that there was no association between Neurontin and suicide or suicide attempt. There were no suicides or suicide attempts in the placebo-controlled clinical trials. In the context of uncontrolled trial data, it is appropriate methodology to consider and contrast these results against background rates of suicidal behavior in similar populations that are obtained from the peer-reviewed published literature. I disagree with Plaintiffs' expert, Cheryl Blume, that FDA "prohibits" such comparisons. In fact, in assessing risk, such comparisons are commonly used and recommended by FDA . Guidance for Industry Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), and Center for Biologics Evaluation and Research (CBER) March 2005. http://www.fda.gov/cder/guidance/6359OCC.htm -p.11).

iii. <u>Patel Letter, November 19, 2004 Re: "Generalized information – Reponse to the FDA regarding Suicide and Suicide Attempt in Neurontin (gabapentin) Phase I studies in electronic format.</u>
This report was the second part of the analysis of all clinical studies and postmarketing data on Neurontin and suicide/suicide attempt. The Patel letter contained the analysis of the 55 Phase I studies that had been previously submitted or would be submitted for regulatory review (IND, NDA, sNDA). . Response to FDA Regarding Suicide and Suicide Attempt in Neurontin Clinical Trials – Phase 1 Studies (November 19, 2004) Pfizer_MPatel_0045143. The methods were the same as those described in the Parson's Report. The study subjects were predominantly health volunteers, though 10 studies were conduct in patients, including one long-term (>1 year) efficacy study of patients with epilepsy. There were no cases of suicide or suicide attempts in any of the placebo-controlled and non-placebo-controlled Phase I studies in healthy volunteers. Pfizer concluded that these data did not change the conclusions from the September 2004 Parson's Report.

10

IN RE: NEURONTIN

GENERAL CAUSATION REPORT

SUBMITTED BY ANTHONY J. ROTHSCHILD, M.D.
December 19, 2007

Anthony J. Rothschild, M.D.
Irving S. and Betty Brudnick Endowed Chair of Psychiatry
Professor of Psychiatry
Department of Psychiatry
Director, Senior Scholars Program
University of Massachusetts Medical School
Phone:      508-856-1027
Fax:        508-856-4854
E-mail: rothscha@ummhc.org

clinical trials are extremely useful to ascertain both the efficacy and side-effects of a medication and to look for a valid association between a drug and an event. It is the accepted methodology in the medical and scientific community and is also used by the FDA. The uncontrolled Neurontin clinical trial data is also useful as the rate of suicides and suicide attempts in the uncontrolled trials can be compared to the background rate of suicide and suicide attempts in that patient population. These data demonstrate that Plaintiff's do not have scientifically reliable evidence to support their proposed theory.

### Pfizer Response to FDA Suicidality Request – June 22, 2006

Notably, the FDA did not request data or analyses of adverse psychiatric events other than suicide and suicide attempts. This is the accepted methodology to analyze the question whether Neurontin causes suicide. In response to the request from the FDA for an evaluation of "possibly suicide-related" adverse events occurring in placebo-controlled trials for gabapentin, Pfizer conducted a search of the clinical trial registry of Neurontin studies meeting FDA's delineated criteria: unblinded; placebo-controlled; parallel arm and/or crossover design; at least 30 subjects; patient and volunteer studies; with no duration limit. The data set included 8829 subjects (5194 treated with Neurontin, 2682 treated with placebo, and 661 treated with another active control and 292 treated with Low-Dose Placebo) (Pfizer's Response to FDA suicidality request, June 22, 2006). There were no completed suicides, suicide attempts, or predatory acts towards imminent suicidal behavior in any of the groups: 1/5194 (0.019%) gabapentin treated subjects and 0/2682 placebo treated subjects exhibited self-injurious behavior, intent unknown; 2/5194 (0.039%) of gabapentin treated subjects and 1/2682 (0.037%) of placebo treated subjects exhibited suicidal ideation (Pfizer's Response to FDA suicidality request, June 22, 2006). These data provide further support that there is no reliable scientific evidence that Neurontin (gabapentin) causes or is associated with an increased risk of suicidality including completed

suicide, suicide attempt, or suicidal ideation.

### Epidemiologic Studies

Plaintiff's experts cite as "evidence" for their assertion that Neurontin causes suicide a paper by Collins and McFarland, an uncontrolled observational study of Oregon Medicaid patients. The authors matched the records of Oregon Medicaid patients with the diagnosis of bipolar disorder from 1998 -2003 using Oregon vital statistics data for suicides and emergency department visits for suicide attempts. The authors then compared the rates of suicides and suicide attempts in patients taking lithium, divalproex, carbamazepine, gabapentin (Neurontin), lamotrigine, oxcarbazepine, and combination treatment. They concluded that lithium had a protective effect with regard to suicide attempts. The authors also concluded that Neurontin was associated with a greater risk of suicide, but not suicide attempts, <u>compared to lithium</u>. In his deposition, Dr. McFarland concedes that lithium is protective against suicide and suicide attempts (McFarland Deposition Tr., pp.60-61) and that in his study lithium's protective effect may eclipse the protective effects of other drugs. Dr. McFarland concedes that his study is consistent with the conclusion that all of the study drugs were protective against suicide and suicide attempts, but that lithium was more protective (McFarland Deposition Tr., pp. 147-52). Dr. McFarland also conceded that it is not a valid conclusion to draw from his study that patients taking Neurontin are at increased risk of suicide compared to patients taking lithium (McFarland Deposition Tr., pp. 211-212 ). As the authors themselves point out in the article, the study had "numerous limitations" (pg. 4). These include the fact that subjects were not randomly assigned to the various medications, important clinical data such as history of suicide attempts, medication adherence, and age of first diagnosis of bipolar disorder were not available, diagnoses were obtained from electronic data systems and not from structured psychiatric

# PROFESSIONAL PSYCHIATRIC ASSOCIATES
ONE WASHINGTON STREET, SUITE 304
WELLESLEY HILLS, MASSACHUSETTS 02481-1706
TEL (781) 239-0071
FAX (781) 235-6390

Douglas G. Jacobs, M.D.
E-mail: drj@djacobsmd.com

December 20, 2007

Ms. Lori McGroder
Shook, Hardy & Bacon
2555 Grand Boulevard
Kansas City, Missouri  64108-2613

Re:   *Neurontin Litigation-General Causation Report*

Dear Ms. McGroder,

## I.   INTRODUCTION

You have asked me to provide an opinion regarding the issue of general causation in terms of whether reliable scientific and medical evidence establishes Neurontin causes suicidality *(i.e.,* suicide or suicide attempt). My opinion is based upon my education, training, and experience, a review of the materials in Attachment A, a review of relevant literature, and my work in the field of suicidology, including my work as editor of The Harvard Medical School Guide to Suicide Assessment and Intervention (1999) and as chairperson of the Work Group For The American Psychiatric Association Practice Guidelines for the Assessment and Treatment of Patients With Suicidal Behavior. A copy of my Curriculum Vitae is attached and is incorporated herein by reference. I reserve the right to supplement my opinions based on review of additional materials including the reports and testimony and materials considered by other designated experts.

- 1 -

illness." EMEA, Joint Response Assessment Report at 28 (January 12, 2006). I agree with the EMEA's conclusions and find it persuasive that no regulatory, scientific, or medical body has disagreed.

Determination of causation is a judgment that has to be based on sound scientific principles. I am familiar with the reliable and accepted principles used to determine general causation. These principles function as methodological guidelines for determination of causation in a variety of disciplines, including epidemiology, pharmacology, and medicine. (References 15, 16). It is generally accepted that in order to determine whether a drug such as Neurontin is capable of causing suicide, controlled epidemiologic and clinical studies must be analyzed for an association between the drug and the event – that is, whether the risk of suicide or suicide attempts is increased in Neurontin users compared to an unexposed similar population. If there is a statistically significant increased risk of these events in subjects taking Neurontin, it can be said that there is an association between Neurontin and suicide. I have reviewed the data from controlled and open label studies, as well as the only epidemiology study cited by plaintiffs' experts, and these data do not show an increased risk of suicide or suicide attempts with Neurontin. It is my opinion to a reasonable degree of medical and scientific certainty that there is no scientifically reliable evidence of an association between Neurontin and suicidality.

### *The controlled-clinical trial data fail to show an association or increased risk of suicidal thinking or behavior.*

Controlled clinical-trial data provide the most reliable scientific evidence for evaluating whether a prescription medication is capable of causing suicide. (References 17, 18). As the FDA has noted, an analysis of the controlled trial data is "crucial to deciding the obviously important question" regarding whether a medication increases the risk of suicidality.[4] (Reference 17).

---

[4] plaintiff advertisements and the filing of a Citizen's Petition increases the likelihood of reporting. It is significant that FDA's standard approach for evaluating drug-induced suicidality is to analyze placebo controlled clinical trial data. This was FDA's approach in its review of SSRIs, as well as AEDs. That FDA chose to evaluate suicide-related events reported in the placebo controlled

- 10 -

The placebo controlled trial data, summarized in Pfizer's June 2006 submission to the FDA, support my opinion that there is no reliable evidence that Neurontin is associated with an increased risk of completed suicides, suicide attempts, suicide gestures, or suicide ideation. Pfizer's June 2006 submission followed the FDA's protocol for assessing whether a medication increases the risk of suicidality. This protocol was developed by clinicians at Columbia University and is referred to as the Columbia Suicidality Classification Project. The protocol is FDA's standard approach for evaluating possible suicide-related events in clinical trials. (References 18, 19).

There were no cases of completed suicide or attempted suicide in any of the placebo-controlled studies, which involved 5,194 patients. There were no cases of "preparatory acts towards imminent suicidal behavior." And the incidence of suicidal ideation was nearly identical to that of placebo patients, specifically 0.039% of Gabapentin patients and 0.037% of placebo patients reported suicidal ideation. Only one of the 5,194 Gabapentin-treated patients exhibited self-injurious behavior, intent of which was unknown. In terms of the single most reliable scientific evidence – placebo controlled clinical trial data – Neurontin did not demonstrate any increased risk of suicide.

Any argument that these studies are meaningless because they are underpowered is flawed. The FDA has never concluded that the studies are meaningless because they are underpowered. This argument is also refuted by the fact that the postmarketing experience, which includes almost 14 million patient years, does not show an increase in suicide among Neurontin users. In fact, the number of suicide events in the postmarketing experience is <u>far below</u> what one would expect given the high risk population for whom Neurontin is prescribed (epileptics, chronic pain patients, and psychiatric patients).

---

studies is also significant. It is notable that one of plaintiffs' experts, Professor Michael Trimble, when asked if it was his opinion, "as a scientist, that the incident rates of completed suicide, suicide attempt and suicidal ideation from randomized double-blind placebo-controlled clinical trials are not relevant to a causal assessment of whether ... Gabapentin, has a causal association with either of those 3 outcomes," responded, "That is my opinion." Trimble Depo at 256. This statement is inconsistent with FDA's position and contrary to the generally accepted view of the scientific community for evaluating whether is associated with suicide.

- 11 -

***The combined clinical-trial data fail to show an association between Neurontin and suicide or suicide attempt.***

The results of Pfizer's June 2006 submission are consistent with an earlier analyses that Pfizer submitted to the FDA in September 2004. The September 2004 submission contained the results of a search for suicide-related events in 92 Phase 2-4 clinical studies included in Pfizer/Warner-Lambert's U.S. regulatory submissions. The analysis revealed only two completed suicides and 12 suicide attempts out of a population of over 9,000 patients and 4,495 patient-years of exposure. One of the suicides involved a patient who had stopped taking Neurontin six months before the suicide. One or two suicides in 4,495 patient years of exposure is consistent with or below the background rates of suicide in the epilepsy, psychiatric, and chronic pain populations prescribed Neurontin. Given the accepted best estimate of 10 to 25 attempted suicides for every completed suicide, a total of 12 attempted suicides in 4,495 patient years is well below the rate expected in these populations. Accordingly, these data do not support any association between Neurontin and suicide.

There were no suicide-related events reported by any patient in the studies of Neurontin in psychiatric populations. In three well-controlled randomized trials studying Neurontin in patients with psychiatric disorders -- panic disorder, bipolar disorder, and social phobia --there was also no increased risk of anxiety or depression with Neurontin. Using Hamilton Depression (or HAM-D) and Hamilton Anxiety (HAM-A) scales, these studies showed no significant differences from baseline reports of depression or anxiety at any time during the study period. These results indicate that, in these psychiatric populations, there was no worsening of depression or anxiety.

***There is no epidemiologic evidence to support the argument that Neurontin increases the risk of suicide in "susceptible" individuals***

Just as there is no evidence of an association between Neurontin and suicidality in the entire Neurontin population, there is no reliable clinical or epidemiologic evidence that Neurontin is associated with or increases the risk of suicidality in any "susceptible" sub-

- 12 -

Gerard Sanacora, M.D., Ph.D.
Associate Professor, Department of Psychiatry
Yale University, School of Medicine
34 Park St.
New Haven, CT 06519

**Expert Report on General Medical Causation:**
**Neuropsychopharmacological Evidence Regarding**
**Alleged Causal Relationship Between**
**Use of Neurontin (Gabapentin) and Suicidal Behavior**

I.   **Introduction**

My name is Gerard Sanacora, M.D., Ph.D. I am a psychiatrist and neuropsychopharmacologist at the Yale University School of Medicine. A copy of my current curriculum vitae is appended at Attachment A.

This report contains my opinions, expressed to a reasonable degree of scientific certainty, regarding current scientific understanding of the neurobiological bases of major depression and mood disorders and their symptomatology, including suicidality; the role of amino acid neurotransmitter systems such as γ-aminobutyric acid (GABA), glutamate, and monoamines in brain and central nervous system function; the pharmacology of gabapentin and other relevant compounds; and the clinical efficacy and safety profile of gabapentin when used to treat human psychiatric and neurological disorders.

Materials that I reviewed specifically in connection with preparation of this report are listed on Attachment B. My opinions are also based in part upon information gained through my medical and scientific education and training, my professional familiarity with the medical and scientific literature germane to the subject matter, and my discussions with colleagues, my research experience, and my clinical experience. It is not possible to list all of the manuscripts and documents that support or that I consider

medical and scientific literature, nor, to my knowledge, has any medical or scientific body or governmental pharmaceutical safety agency concluded that any such association exists. Moreover, the European Agency for Medicinal Products (EMEA) has concluded "the available data show no clear evidence for a causal association between gabapentin and suicide or suicide attempt and show no causal association for a risk of psychotic or mood disorders in patients with a positive history or psychotic illness." (Report (1/12-17/06)). With regard to the data from the approximately 50 randomized, blinded, placebo-controlled clinical trials of gabapentin compiled at the request of the Food and Drug Administration, of the more than 5,100 gabapentin-exposed subjects in placebo controlled studies, none committed suicide, none attempted suicide, and the same incidence of suicidal ideation was reported among placebo controls (0.037, n=2,682) as on gabapentin (0.039, n=5,194). (Pfizer Inc, Request for Information – Response to FDA Suicidality Request 4 (June 22, 2006). Simply put, there is no scientific evidence of any positive association – much less a strong association – between gabapentin and suicidal ideation or acts.

It should be noted that the sole epidemiological study cited by plaintiffs' experts (Collins and McFarland 2007)was a comparative study among three active treatments for bipolar disorder and did not purport to compare suicide-related risk between gabapentin and any comparable unexposed control group. Notably, however, although the Collins & McFarland study did not compare gabapentin patients with unexposed patients directly, they *did* calculate incidences of suicide and suicide attempt in gabapentin-treated bipolar patients evaluated in their study (3.5 and 9.49 per 1,000 person-years, respectively) that were much lower (approximately 65% and 75% lower, respectively) than the incidences

24

# Expert Report: Pharmacology of Gabapentin

Charles P. Taylor, PhD
CpTaylor Consulting
Chelsea, MI 48118, USA
December 21, 2007

*Charles Taylor*    Dec. 20, 2007
Signed            Date

## TABLE OF CONTENTS:

I.   Materials Relied Upon ............................................................................. 2
II.  Summary of Major Opinions ..................................................................... 4
III. Introduction to Gabapentin Pharmacology ................................................ 5
     A. Early published reviews of gabapentin mechanisms ......................... 5
     B. Current Reviews of Gabapentin's Mechanism of Action .................... 6
IV.  Effects of Gabapentin on GABA Neurotransmitter Systems in
     Brain and Spinal Cord ............................................................................. 8
     A. Definition of "GABAergic Drug" ......................................................... 8
     B. Effect of Gabapentin on $GABA_A$ and $GABA_B$ Receptors ............... 11
     C. Effects of Gabapentin on GABA Neurotransmission and
        GABA Responses Measured by Electrophysiology ......................... 11
     D. Effects of Gabapentin on Enzymes of GABA Synthesis &
        Degradation ..................................................................................... 12
     E. Effect of Gabapentin on GABA Transporters ................................... 13
     F. Effects of Gabapentin on Brain Tissue GABA
        Concentrations ................................................................................ 13
        1. Lack of gabapentin effects on brain tissue
           concentrations of GABA in animals ............................................ 14
        2. Gabapentin Effects on Brain Tissue
           Concentrations of GABA in Humans .......................................... 14
        3. Effect of Gabapentin on GABA Concentration in
           Extracellular Brain Fluids ............................................................ 15
        4. Effects of Other Kinds of Treatments on Brain
           Tissue GABA Concentrations ..................................................... 15
     G. Summary of GABA-Related Findings with Gabapentin ................... 16
V.   Effects of Gabapentin on Monoamine Neurotransmitter
     Release and Turnover In Vitro and In Vivo ............................................ 17
     A. Introduction to Monoamine Neurotransmitters ................................ 17
     B. Techniques Used to Study Monoamine Release In Vitro ................ 18
     C. Gabapentin Subtly Reduces Stimulated Release of
        Serotonin and Noradrenaline from Isolated Brain Nerve
        Endings In Vitro ............................................................................... 18
        1. In vitro systems for measuring monoamine
           release lack input and control from the brainstem .................... 19

causation with gabapentin, and yet he cited no data to support his assertion, because no data are available.
- Dr. Trimble lists a number of possible outcomes obtained by depleting serotonin turnover in humans and attributes these effects to gabapentin regardless of the human epidemiological data. In fact, the adult human epidemiological data show no association between gabapentin and increased psychological depression, aggression, irritability, and suicidal thoughts or actions in placebo-controlled studies with a large number of patients.
- Trimble ignores a large, well-controlled body of epidemiological data showing no association between gabapentin and depression or other psychobiologic adverse events. Instead, he asserts, with no scientific support or evidence, that certain "sensitive individuals" might have psychiatric symptoms induced in response to gabapentin treatment. In particular, he suggested that humans with a past history of psychiatric disease might be fundamentally different than otherwise healthy humans in terms of sensitivity to adverse psychiatric effects of gabapentin. He states that subjects with a past history of diagnosed psychiatric disease were excluded from placebo-controlled clinical trials. However, his reasoning is flawed and factually inaccurate, in that it neglects the widely-known fact that a majority of psychiatric diseases in the human population exist without proper diagnosis or treatment (for example, in the case of depression, approximately 50% of depressed individuals have never been properly diagnosed or treated (Kessler, 2007)). Therefore, regardless of the entrance or exclusionary criteria for any particular study design with gabapentin, any large clinical trial population (for example, the more than 5,000 patients administered gabapentin in placebo-controlled clinical studies) would necessarily be expected to include a large number of subjects with prior (undiagnosed or untreated) psychiatric diseases, including anxiety, depression, bipolar disorder, irritability and aggressiveness. Furthermore, regardless of their reported or known psychiatric states in a clinical drug study at baseline, subjects may develop depression or other psychiatric symptomatology during the course of the study for reasons completely unrelated to drug exposure. These reasons are an important part of why randomized, blinded, and prosepective placebo-controlled human studies are critical to an accurate assessment of drug effects. This characteristic of large clinical trial populations (or, for that matter, any large group of persons) is evident in the fact that a statistically similar or greater proportion of the subjects in gabapentin clinical trials who were administered *placebo* reported adverse events of depression and various other psychobiologic symptoms or signs as compared with gabapentin-treated subjects.
- Dr. Trimble's opinion that gabapentin, through the several pharmacological properties that he wrongly claims it has, causes depression and suicide, conflicts with the more-relevant and far more direct evidence from gabapentin exposure in well-controlled clinical studies. Therefore, in the absence of any of the commonly-used scientific principles of causal analysis, Dr. Trimble's analysis is entirely speculative and unscientific. In contrast to Dr. Trimble's assessment, no clinical researchers or governmental safety agencies who have examined valid or controlled scientific findings or experiences with gabapentin in a scientifically relevant and unbiased manner have ever concluded that gabapentin has any pharmacological properties or clinical causal relationship to depression or suicide.