UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:   NEURONTIN MARKETING,
          SALES PRACTICES AND
          PRODUCTS LIABILITY LITIGATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

ALL PRODUCTS LIABILITY CASES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: MDL Docket No. 1629
:
: Master File No. 04-10981
:
: Judge Patti B. Saris
:
: Magistrate Judge Leo T. Sorokin

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO EXCLUDE THE TESTIMONY OF DOCTORS TRIMBLE, KRUSZEWSKI
AND BLUME ON THE ISSUE OF GENERAL CAUSATION**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000

SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550

-and-

HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
Tel: (617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company LLC*

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     ARGUMENT ............................................................................................ 1

        A.      *Daubert's* Non-Exhaustive Factors for Determining Reliability Apply ................ 1

        B.      Plaintiffs Concede That They Cannot Satisfy the *Daubert* Criteria ...................... 2

                1.      Plaintiffs Experts' Theories Are Not Generally Accepted. ........................ 2

                2.      Plaintiffs' Experts' Theory and Methodology Have Not Been Subjected to
                        Peer Review and Publication. ...................................................... 4

                3.      Plaintiffs' Experts Have Not Tested Their General Causation Theory, and
                        Thus Have Not Assessed Its Rate of Error. ................................... 4

        C.      The Generally Accepted and Reliable Methodology for Proving General
                Causation Requires Evidence of a Statistically Significant Association Before
                Determining Whether the Association Can Be Considered Causal ........................ 5

        D.      No Epidemiology Supports Plaintiffs' Experts' Biologic Plausibility Theory ....... 8

                1.      The Neurontin Clinical Trial Data Indisputably Fail To Establish an
                        Association Between Neurontin and Suicide-Related Events. .................. 8

                2.      The FDA Alert Is Not Reliable Evidence of General Causation. ............... 9

                3.      The McFarland Study Is Not Evidence of Causation. ........................ 11

        E.      The Court Must Scrutinize All Evidence On Which Plaintiffs' Experts Rely ..... 12

        F.      None of the Evidence On Which Plaintiffs' Experts Rely Satisfies Rule 702 ..... 13

                1.      Plaintiffs' Experts' Biologic Plausibility Theory Is Nothing More Than An
                        Unproven Hypothesis, Making It Unreliable For Purposes of General
                        Causation ................................................................................ 13

                2.      Plaintiffs' Experts Use Unreliable and Unscientific Anecdotal Evidence.16

                3.      Plaintiffs' Experts' Reliance on Cherry-Picked Adverse Events and
                        Supposed Rechallenge/Dechallenge Case Reports From Neurontin
                        Clinical Trials Is Improper and Unscientific. ................................ 17

                4.      Plaintiffs' Experts' Reliance on Non-Suicide Related Adverse Events
                        Should Be Summarily Rejected As Unscientific. ............................. 18

G.    Plaintiffs' Experts' Opinions Are Not "Intellectually Rigorous." ........................ 19

III.    CONCLUSION ............................................................................................................ 20

## I.    PRELIMINARY STATEMENT

After 60 pages of responsive pleading, more than 200 pages of new expert declarations (containing new opinions and additional analyses) and voluminous exhibits, plaintiffs' experts base the entirety of their general causation opinions on nothing more than a chain of hypotheses about how Neurontin <u>may</u> work in the human body to cause suicide-related events.   They admittedly have never sought to test their hypotheses, and the existing scientific literature does not support them.   Indeed, plaintiffs' experts have cited no peer-reviewed scientific study of any kind that concludes that Neurontin is associated with an increased risk of suicidal thoughts or behavior.   Nor has any scientific, medical or regulatory body accepted plaintiffs' experts' (1) hypothesis that Neurontin's mechanism of action in the human body causes suicide, or (2) conclusion that Neurontin is capable of causing suicide-related events.   Plaintiffs thus ask this Court to allow almost 150 cases to proceed to juries on the basis of nothing more than a chain of hunches.   *Daubert* and Rule 702 preclude that result.

## II.    ARGUMENT

### A.    *Daubert's* Non-Exhaustive Factors for Determining Reliability Apply.

The first sign that plaintiffs' experts' opinions do not constitute admissible scientific knowledge is their suggestion that none of the *Daubert* factors—peer-review, testing, rate of error, proper controls and general acceptance—should be applied.   Plaintiffs argue that a different standard governs when "soft science" is at issue, citing numerous cases involving the diagnosis or evaluation of a patient's psychiatric condition.[1]   But the diagnosis or evaluation of

---

[1] Plaintiffs principally rely on *Blanchard v. Eli Lilly & Co*., 207 F. Supp. 2d 308 (D. Vt. 2002), which noted that "the reliability of <u>psychiatric or psychological observation and analysis</u> does not readily lend itself to evaluation using the specific *Daubert* factors."  *Id.* at 316.  Moreover, the Blanchard Court did not even reach the general causation inquiry, instead finding that the plaintiff had failed her burden on <u>specific</u> <u>causation</u>.  *Id.* at 319. ("Whether or not [the expert's] general causation opinion is sufficiently reliable to be admissible, however, the Court is forced to conclude that his opinion is inadmissible under *Daubert* and Rule 702 because it does not 'fit' the facts of this case.").

psychiatric conditions is not at issue here.   The inquiry here is whether there is any epidemiologic evidence of a statistically significant association between Neurontin and suicide, and if so, whether that association is causal.  This inquiry does not involve "soft science," but instead epidemiology and neuropsychopharmacology.[2]  Courts have repeatedly applied *Daubert* to general causation determinations in cases involving prescription drugs and alleged psychiatric injuries, including suicide.[3]   The *Daubert* case itself was about the reliability of general causation opinions regarding ingestion of a prescription drug and an alleged "side effect;" the Supreme Court did not view the relevant science as "soft," nor has any court in any similar case since then.

### B.   Plaintiffs Concede That They Cannot Satisfy the *Daubert* Criteria

Instead of attempting to show how their experts' theories and methodologies meet the *Daubert* criteria, plaintiffs ignore one of them (general acceptance), make a piece-meal and misleading attempt to satisfy another (peer-review), and suggest that their experts' theories are simply not amenable to the application of yet others (testing and rate of error).

### 1.   Plaintiffs Experts' Theories Are Not Generally Accepted.

Plaintiffs' Opposition completely ignores their experts' numerous concessions on the issue of general acceptance, including Dr. Kruszewski's testimony that, even after the FDA Alert, he still could not "identify any scientific body, medical authority, or regulatory authority

---

[2] Plaintiffs' suggestion that psychiatry, a "soft science," is involved here was previously rejected in a case on all fours with this one.  *See Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001) (rejecting argument that a relaxed standard applied to expert's testimony on the basis that he is a "psychiatric expert" because "[i]n seeking to testify that 'Zoloft causes suicide,' [the expert] is not seeking to testify as a behavioral scientist; rather, he seeks to testify regarding psychopharmacology and epidemiology.").

[3] *E.g., Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1072-1075 (considering *Daubert* factors in case alleging that drug caused suicide);  *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1316-17 (N.D. Ga. 2002) (considering *Daubert* factors in case alleging that drug caused panic disorder); *Newton v. Roche Labs., Inc.* 243 F. Supp. 2d 672, 681 (W.D. Tex. 2002) (considering *Daubert* factors in case alleging that drug causes schizophrenia).

which has concluded that Neurontin causes suicidal events."  Sayler Decl. to Opening Br., Ex. 9 at 691:7-22; Def. Br. at 23-24 (setting forth concessions).  Plaintiffs instead attempt to sidestep this issue by focusing on non-suicide related events, and then, providing a misleading recitation of the evidence:

> A well-established fundamental principle of biological psychiatry, generally accepted in psychiatric medicine, is "that anticonvulsant drugs [Neurontin] influence(s) the mental state, and this can be broken down into adverse and beneficial effects.  The main adverse effect of anticonvulsants is the link between drugs [Neurontin] and depression."

Pl. Opp. at 13-14 (citing Dr. Trimble's 1995 reports).  The source material cited not only fails to support these statements, but tends to <u>disprove</u> them.  Plaintiffs' quote is from two 1995 reports by Dr. Trimble in which he noted a link between phenobarbitone and vigabatrin—<u>not</u> Neurontin, but two *other* anticonvulsants—and depression.  Pl. Ex. 17 at 10; Pl. Ex. 18 at  5-6.  Dr. Trimble's reports concluded that he found <u>no evidence</u> that the case reports of depression and other adverse events he reviewed could "be directly attributable to gabapentin"—a notable distinction conspicuously absent from plaintiffs' brief and, indeed, misrepresented by plaintiffs' insertion of "[Neurontin]" in the 1995 Trimble quotation.[4]  Pl. Ex. 17 at 10; Pl. Ex. 18 at 13.  Still, after "years" of work on this matter, not one of plaintiffs' experts has produced a scrap of evidence that any recognized scientific organization or regulatory authority in the world has stated publicly in any peer review context that Neurontin causes suicide—or for that matter, that Neurontin causes "mood and behavioral disturbances that predictably result in suicide," as

---

[4] Plaintiffs' citation to Dr. Sanacora's deposition is likewise untrue.  Nowhere does he opine that Neurontin—as opposed to AEDs generally—can affect "mental state."  Sayler Decl., Ex. A at 109.  Plaintiffs' suggestions regarding "mental state" are similarly misleading as there is no evidence that because a drug can affect brain chemistry, it causes a "mental state" resulting in suicide. *Id.* at 95:1-10.  Dr. Sanacora went on to testify that patients on <u>vigabatrin</u> have higher rates of depressed mood, but that these patients are also epileptics, making it difficult to parse out background risk on the basis of co-morbidities. *Id.* at 110:4-22.  Dr. Sanacora never testified that Neurontin is linked with, associated with, or causes depression, nor does he agree with this theory.  In fact, he testified this theory is not held by well-informed scientists and is not generally accepted. *Id.* at 183:10-184:10, 187:19-189:11.

plaintiffs now attempt to frame the issue.[5]   Plaintiffs' failure to provide evidence that their experts' general causation opinions are generally accepted requires, at a minimum, that the Court view them "with skepticism."   *See Daubert v. Merrell Dow Pharms.,* 509 U.S. at 594 (noting that a theory that has been able to attract only minimal support within the community may properly be viewed with skepticism).

### 2.    Plaintiffs' Experts' Theory and Methodology Have Not Been Subjected to Peer Review and Publication.

Plaintiffs do not contend that the available peer reviewed literature supports their assertion that Neurontin is associated with or causes suicide – nor could they.  Instead, and in an utter *non sequitur*, plaintiffs suggest that their experts have reviewed more articles than have defendants' experts.  Pl. Opp. at 32-33.  Not <u>one</u> of the hundreds of publications plaintiffs' experts claim to have reviewed (a) endorses plaintiffs' experts' methodology, (b) mentions any biological action of Neurontin that would "predictably result in suicide," or (c) concludes that Neurontin is associated with or causes suicide.  That plaintiffs' experts could not find a single supporting authority in the peer-reviewed literature tends not only to disprove the theory, but vividly demonstrates the infirmity of it.[6]

### 3.    Plaintiffs' Experts Have Not Tested Their General Causation Theory, and Thus Have Not Assessed Its Rate of Error.

Plaintiffs concede that their experts have not tested their general causation theory (including its error rate), but claim that doing so is not feasible.  Pl. Opp. at 37-38.  These claims ignore: (1) that there are existing epidemiologic studies on Neurontin for which a rate of error

---

[5] In *General Electric. Co. v. Joiner*, 522 U.S. 136 (1997), the Supreme Court made clear that the *Daubert* inquiry includes both an expert's <u>methodology and conclusions</u>.  *Id.* at 146.

[6] Plaintiffs' experts' bald assertions that they have not published their theory or methodology in this case because there is a confidentiality order in place is absurd.  Nothing in the protective order governing this

can be calculated and that do <u>not</u> show an increased risk of suicide, a fact that plaintiffs' experts have chosen to ignore; and (2) that it is possible to design a retrospective study that compares Neurontin users to an unexposed control group to assess suicide, a study that plaintiffs' experts have not done.[7]  Plaintiffs' experts have no excuse for failing to take account of the available data and for failing to perform such a study.

Plaintiffs' argument that defendants failed to test the "relevant hypothesis" is a red herring.  Plaintiffs bear the burden of proving that Neurontin can cause suicide.[8]  *Daubert*, 509 U.S. at 593 n.10 (citing *Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987) (plaintiffs bear the burden of admissibility of expert testimony based on a preponderance of proof)).  Defendants do not carry the burden of disproving that hypothesis.    Moreover, plaintiffs cannot satisfy <u>their</u> burden of proof by complaining that the testing that has been done is insufficient to show an association they speculate exists.  *In re Bextra and Celebrex*, 524 F. Supp. 2d 1166, 1181 (N.D. Cal. 2008).[9]

### C.    The Generally Accepted and Reliable Methodology for Proving General Causation Requires Evidence of a Statistically Significant Association Before Determining Whether the Association Can Be Considered Causal

---

litigation prevents plaintiffs' experts from publishing scientific theories or methodologies.  Nor have plaintiffs' or their experts sought relief from the protective order.

[7]  Dr. Blume concedes as much, suggesting that either a retrospective epidemiologic study (like that conducted by Dr. McFarland) or a prospective epidemiologic study could be designed to evaluate the relationship between Neurontin and suicide.  Sayler Decl., Ex. B at 336:18-337:25.

[8]  Defendants have never suggested that plaintiffs must prove that Neurontin is the <u>sole</u> cause of the suicide-related events, but rather have consistently maintained that plaintiffs must prove that Neurontin <u>can cause</u> such events, which necessitates expert testimony based on reliable and relevant scientific evidence.  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 597 (trial judges must ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand").  Even under a "multiple cause" theory, plaintiffs fail to present the kind of reliable and relevant evidence that would satisfy *Daubert*.

[9]  *Cloud*, 198 F. Supp. 2d t 1134, n. 8 (rejects contention that plaintiff should not be required to produce epidemiologic studies since the defendant has not produced any studies as irrelevant because "it is plaintiff who bears the burden of proof"); *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1358 (N.D. Ga. 2001) (criticizing the available epidemiological studies "does not satisfy [plaintiffs'] burden of proof").

Plaintiffs agree both that the Reference Manual on Scientific Evidence is instructive (Pl. Opp. at 2), and that the Reference Manual requires evidence of a statistically significant association from clinical or epidemiologic studies prior to consideration of the Bradford-Hill criteria. Pl. Opp. at 44. This is the widely recognized and generally accepted and reliable methodology for proving general causation.[10] *See* Def. Br. at 6-10.

Plaintiffs nevertheless argue that epidemiologic evidence is not required in order to satisfy *Daubert's* reliability requirement. But where epidemiologic evidence exists and fails to support the expert's theory, and the expert cannot point to any evidence of general acceptance of his theory, the expert's testimony is plainly inadmissible. Plaintiffs cite no persuasive authority to the contrary. The cases plaintiffs do cite are from outside this Circuit and involve either outdated law,[11] fact that are not analogous,[12] or experts who in fact did rely on epidemiologic evidence.[13] Moreover, while defendants do not dispute that some courts outside of this Circuit have noted *in dicta* that epidemiologic evidence is not absolutely required in every case, most of

---

[10] Defendants have never contended as plaintiffs suggest that all of the Bradford-Hill criteria must be satisfied in order to draw a causal conclusion. Rather, defendants have argued, consistent with the Reference Manual, that all criteria should be considered before a conclusion is reached.

[11] For example, in *Ambrosini v. Labarraque,* 101 F.3d 129, 133-34 (2d Cir. 1996), and *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1228 (9th Cir. 1998), the courts believed that they could not examine the expert's conclusions for reliability. The Supreme Court subsequently ruled otherwise in *General Electric Co v. Joiner*, 522 U.S. at 146. All but three of the cases plaintiffs cite for the proposition that epidemiologic evidence is not required pre-date *Joiner*.

[12] In *Benedi v. McNeal-P.P.C., Inc.,* the inquiry appears to have been specific, not general, causation. 66 F.3d 1378 (4th Cir. 1995); *see also Norris v. Baxter Healthcare Corp.,* 397 F.3d 878, 882 (10th Cir. 2005) (distinguishing *Benedi* because "there [is] no epidemiology challenging causation available"). *Zuchowicz v. United States,* is likewise distinguishable. 140 F.3d 381, 385 (2d Cir. 1998) (no epidemiology available in an accidental overdose case because no formal studies of drug at such high dose had been conducted).

[13] *Glaser v. Thompson Med. Co.,* 32 F.3d 969, 973-75 (6th Cir. 1994) (expert's reliance on published, peer-reviewed studies on the subject, some of which were placebo-controlled, was sufficiently reliable); *Kennedy,* 161 F.3d at 1228 (expert's reliance on a peer-reviewed published study and clinical studies indicating that the active ingredient in the product (bovine collagen) can cause autoimmune disease was reliable proof that the product could cause lupus—an autoimmune disease).

these courts have gone on to hold that expert evidence is nonetheless not reliable <u>in the absence of epidemiologic or clinical data supporting the experts' opinions.</u>[14] This is precisely the holding of *Lynch v. Merrell-Nat'l Labs.*, 830 F.2d 1190 (1st Cir. 1987), which required "confirmatory" epidemiologic evidence in addition to animal and laboratory studies and "analogous" chemical studies to ensure a proper, scientific foundation for the expert's testimony on general causation. *Id.* at 1194.[15] As discussed below, plaintiffs here have failed to come forward with any such "confirmatory" evidence.

Further, plaintiffs cite no authority for the proposition that they can bypass what they concede is the first step in the reliable, "generally accepted methodology"—namely, a statistically significant association between Neurontin and suicide related events (*see* Pl. Opp. at 44)—and jump ahead to a single Bradford-Hill criterion (biologic plausibility) as the basis for admissibility of their experts' opinions. *See Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 679 (M.D.N.C. 2003) ("The first step in the causation analysis pursuant to Bradford Hill is an epidemiological study that has identified an association between two variables.") Plaintiffs' misuse of the Bradford-Hill criteria in the absence of epidemiologic evidence alone renders their experts' biologic plausibility theory, on which their general causation theory hinges, unreliable

---

[14] *E.g.*, *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198-1202 (11th Cir. 2002) (holding that case reports, dechallenge/rechallenge data, analogous chemical evidence, animal studies and FDA findings were not sufficiently reliable or relevant to support expert's general causation opinion where no epidemiologic evidence supported expert's opinion); *Glastetter v. Novartis Pharm. Corp.,* 252 F.3d 986, 991 (8th Cir. 2001) (same).

[15] Contrary to plaintiffs' assertion, the *Daubert* decision did not render *Lynch* inapposite. The *Lynch* holding regarding "confirmatory" epidemiologic evidence was not based on the *Frye* "general acceptance" test, but rather on the plaintiff's expert's failure to satisfy Rule 703 because the data were not of a type reasonably relied on by experts in that particular field. *Lynch v. Merrell-Nat'l Labs.*, 646 F. Supp. 856, 866-67 (D. Mass. 1986). The Third Circuit has held that the Court's pre-*Daubert* interpretation of Rule 703's "reasonable reliance" requirement is the equivalent of Rule 702's reliability requirement. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995). Moreover, numerous courts have cited *Lynch's* holding regarding confirmatory epidemiologic evidence post-*Daubert*. *E.g., Bourne v. E.I. Dupont de Nemours & Co.*, 189 F. Supp. 2d 482, 497 (S.D.W.Va. 2002); *Shirath*, 131 F. Supp. 2d at 1366; *In*

and inadmissible. *See id.* at 679-80, (excluding general causation opinion where expert relied on certain Bradford-Hill criteria in absence of epidemiologic evidence of an association).

**D.      No Epidemiology Supports Plaintiffs' Experts' Biologic Plausibility Theory**

No epidemiologic evidence supports plaintiffs' experts' theory of biologic plausibility. As plaintiffs concede, the controlled and uncontrolled clinical trial data for Neurontin do not demonstrate a statistically significant association between Neurontin and suicide-related events. The FDA Alert is based in relevant part on precisely the same Neurontin-specific clinical data and is therefore not "new epidemiologic evidence of causation." Gibbons Decl. at 7-8. Plaintiffs cannot hide from the fact that the FDA Alert itself expressly disclaims that any one of the drugs (or even all of them together) has been shown to be causally associated with suicide.

**1.      The Neurontin Clinical Trial Data Indisputably Fail To Establish an Association Between Neurontin and Suicide-Related Events.**

Plaintiffs concede that the Neurontin-specific controlled clinical data fail to establish a statistically significant association between Neurontin and suicide-related events.[16] Despite this concession, plaintiffs now claim that defendants "attempt to mislead this Court" by "claiming, repeatedly, that the Neurontin specific data . . . show no evidence of suicidality." Pl. Opp. at 25. But it is plaintiffs who attempt to mislead by their disingenuous reference to Dr. Greenland's new declaration.[17]      Plaintiffs state that Dr. Greenland found that the Neurontin-specific

---

*re Breast Implant Litig.*, 11 F. Supp. 2d at 1224-25; *Raynor v. Merrell Pharms. Inc.*, 104 F.3d 1371, 1376 (D.D.C. 1997).

[16] Products Liability Plaintiffs' Memorandum in Opposition to Defendants' Emergency Motion to Modify the November 9, 2007 Case Management Order, at 10 (Doc. 1134) ("Plaintiffs do not dispute that Defendants' Neurontin-specific data, based upon improperly designed and underpowered clinical trials, show no increased risk of suicide.").

[17] Drs. Blume, Greenland, and Kruszewski, along with Keith Altman, a non-expert employee of Finkelstein & Partners—submitted new declarations containing new opinions and analyses that they apparently only thought to express after reading defendants' *Daubert* motion. These new declarations are nothing more than a

controlled data "can be said to show a 30-fold increase in suicidality." *Id.* In fact, Dr. Greenland actually opined that "the data presented . . . cannot reasonably <u>exclude the possibility</u> that gabapentin multiples the risk of suicidal ideation by 30-fold <u>or divides the risk by 12-fold</u>." Pl. Ex. 82 at 5. Dr. Greenland's opinion that the controlled clinical trial data cannot exclude certain possibilities is not only compatible with both parties' view that these data do not show a statistically significant association, but more fundamentally, does not satisfy plaintiffs' burden of proving that Neurontin is capable of causing suicide. Gibbons Decl. at 3-4

### 2.    The FDA Alert Is Not Reliable Evidence of General Causation.

Plaintiffs have grossly mischaracterized both the FDA Alert and the events leading up to FDA's publication of it. First, the FDA Alert is not new "epidemiologic analysis" that satisfies plaintiffs' burden of coming forward with affirmative evidence of a statistically significant association between Neurontin and suicide-related events. Dr. Trimble has stated as much, testifying that the FDA Alert told him nothing about Neurontin <u>specifically</u> that he did not already know. Sayler Decl., Ex. C at 35:15-19.

The FDA Alert is a pooled risk analysis of eleven AEDs and did not purport to address the question at issue here: whether reliable scientific evidence establishes a causal association between Neurontin and suicide-related events.[18] Gibbons Decl. at 5-6. Nor does the Alert provide evidence that Neurontin and ten other AEDs "were proved to cause a statistically

---

transparent effort by Plaintiffs to backfill holes exposed by defendants' brief, often without citing any supporting scientific or other evidence.

[18] Citing only a regulation governing changes to prescription drug labels, plaintiffs claim that FDA's "concept of definite proof is the 100% standard," not the "greater weight of the credible evidence" standard or "more likely than not standards," and then argue that, because FDA's standard of proof is higher, the Alert is reliable evidence of general causation. The regulation at issue says nothing about a "100% standard," and numerous courts have reached precisely the opposite conclusion. *See Glastetter,* 252 F.3d at 991 ("The FDA will remove drugs from the marketplace upon a lesser showing of harm to the public than the preponderance-of-the-evidence or the more-likely-than-not standard used to assess tort liability."); *Rider,* 295 F.3d at 1201 (FDA's "risk-utility analysis involves a much lower standard than that which is demanded by a court of law").

significant upswing in suicidality." Pl. Opp. at 23. Indeed, FDA expressly disavowed a finding that any one of the drugs analyzed (or even all of them together) causes suicidal thinking or behavior.[19] Plaintiffs' statement that FDA has used similar language regarding causation elsewhere is neither relevant nor surprising, given that FDA utilizes a risk-benefit approach and often acts out of an abundance of caution in the absence of a showing of causation. *Rider*, 295 F.3d at 1201 (noting that risk-benefit standard of FDA differs from assessment of general causation); Sayler Decl., Ex. D at 33 (noting that FDA uses a risk-benefit analysis). Gibbons Decl. at 5-6. As such, numerous courts have held that FDA statements and findings are not reliable evidence of general causation. *See, e.g., Rider*, 295 F.3d at 1201; *Glastetter,* 252 F.3d at 991.

Not only is the analysis underlying the Alert not a general causation analysis, but plaintiffs have not refuted—nor could they—that pooling data for different drugs, with disparate mechanisms, chemical and pharmacologic properties, and from different and heterogeneous drug trials is not a reliable method for deriving general causation conclusions about particular compounds within the group. Gibbons Decl. at. 7. Plaintiffs further fail to provide any persuasive support for the suggestion that a pooled data analysis can reliably demonstrate causation for any specific drug in the pool.[20] Indeed, plaintiffs' expert Dr. Greenland has stated precisely the opposite: "meta-analyses that ignore heterogeneity should indeed be banned from

---

[19] *See* Sayler Decl. to Opening Br., Ex. 1 at 1 ("Posting this information does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue.").

[20] *See* Sayler Decl. to Opening Br., Ex. 9 at 652:25-653:5 (no published literature supports aggregating data for drugs with different mechanisms of action and different pharmacologic properties to determine scientific causation for one drug in the pool). In fact, one of the cases plaintiffs cite found expert testimony based on disparate drugs irrelevant to a general causation inquiry because, as here, there were important differences between the drugs studied. *Newton*, 243 F. Supp. at 680 The other cases cited by plaintiff are inapposite. *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1248 (10th Cir. 2000), involved a design defect in a milling machine and the "substantial similarity rule" applicable to "other accident" evidence. *Kennedy*, 161 F.3d at 1228, involved placebo-controlled studies of the identical active compound of the product at issue.

publication, if only because they violate sound statistical and scientific practice." Sayler Decl.,
Ex. E at 785.

Finally, plaintiffs' claim that the FDA Alert—though it makes no mention of plaintiffs'
expert reports and purports to rely exclusively on controlled clinical trial data—is nonetheless
based on plaintiffs' expert reports, is preposterous. Such a claim is particularly disingenuous
given that plaintiffs' experts ignore the very data (randomized controlled clinical trials) that FDA
relied upon <u>exclusively</u> for purposes of the pooled analysis.[21] *See* Ruggieri Aff., Ex. A at 1-2
(noting that FDA reviewed controlled trial data because such data is "the only way to establish
whether or not the drugs are responsible for suicidality").

### 3.    The McFarland Study Is Not Evidence of Causation.

In an apparent effort to adduce some epidemiologic evidence supportive of their claims,
plaintiffs suggest that the McFarland study, which compared Neurontin to lithium (known to be
protective against suicide), is "epidemiology demonstrating an association of Neurontin
(gabapentin) with suicidality." Pl. Br. at 27. This argument misleads: the McFarland study did
not compare suicide risk in Neurontin patients to unexposed controls. Gibbons Decl. at 8. Not
only did Dr. McFarland never conclude that Neurontin is associated with or causes suicide, s*ee*
Sayler Decl., Ex. F at 198:8-199:6; 204:16-206:1, but the data from this epidemiologic study
demonstrate that Neurontin is likely <u>protective</u> of suicide, although less so than lithium. Gibbons
Decl. at 8.[22] Most telling is the fact that the Neurontin completed and attempted suicide rates in

---

[21] Plaintiffs provide no evidence at all for this claim. Although they attach a letter from Russell Katz at FDA stating that FDA is reviewing the reports and planned to incorporate its analysis of them into its response to the Citizen Petition, there has, in fact, been no response to the Citizen Petition by FDA, nor is there any evidence—other than plaintiffs' lawyers' own self-interested speculation—that the FDA Alert is FDA's answer to the Citizen Petition.

[22] The McFarland study article specifically explains that the differences between lithium and Neurontin suicide rates can be explained by two factors: (1) lithium is protective against suicide; and (2) the Neurontin patient population had a higher background risk of suicide because it included patients with chronic pain.

the McFarland study were dramatically <u>lower</u> than the baseline or background rates in untreated patients. *Id.*

Plaintiffs' experts cannot use Dr. McFarland's study as evidence of general causation when he is unwilling to do so. *See In re Accutane Prod. Liab.*, 511 F. Supp. 2d 1288, 1291 (M.D. Fla. 2007) (noting that it is impermissible for an expert to "overreach" and to draw conclusions about a study beyond limitations identified by the author).[23]

### E.    The Court Must Scrutinize All Evidence On Which Plaintiffs' Experts Rely

Because plaintiffs' experts' theories and methods do not meet the test of *Daubert*, and because *Daubert* clearly applies, plaintiffs contrive—without any legal or other support—a new standard comprised of "specialized knowledge" and "weight of the evidence." Pl. Opp. at 8-9. Plaintiffs do not cite a single case which articulates this standard,[24] or that even suggests such a substitute for *Daubert*. Instead, plaintiffs cite the <u>dissenting</u> portion of Justice Stevens' opinion in *General Electric v. Joiner*, in which he criticized the majority's analysis of <u>each</u> animal study on which plaintiffs' expert relied before concluding that each study failed *Daubert's* requirements. While Justice Stevens may have noted that "[i]t is not intrinsically unscientific for experienced professionals to arrive at a conclusion by weighing all available evidence," his

---

[23] Despite Dr. McFarland's testimony that his study could <u>not</u> be used as evidence that Neurontin causes suicide, Drs. Trimble, Kruszewski, and Blume rely on the McFarland study as epidemiologic evidence to support their general causation opinions in this case. Sayler Decl. to Opening Br., Ex. 6 at 8:2-16, Ex. 23 at 18 and Ex. 24 at 182-183.

[24] Plaintiffs suggest that this standard requires that court examine experts' "quantitative and qualitative experiences and how they apply to the methodologies they deployed" in cases involving psychiatry, citing *United States v. Hall*, 974 F. Supp. 1198 (C.D. Ill. 1997). *Hall* does not mention a "weight of the evidence" standard and clearly involved a social science issue—false confessions. Plaintiffs proceed to cite numerous cases involving social sciences (<u>not</u> whether there was epidemiologic evidence of a statistically significant relationship) in which courts declined to analyze the experts' opinions according to the enumerated *Daubert* criteria. Plaintiffs' reliance on these cases is a misplaced and transparent attempt to escape *Daubert* scrutiny because their experts fail to meet its admissibility standard.

dissent did not create a new judicially-endorsed "weight of the evidence" standard to avoid the requirements of *Daubert*.

### F.     None of the Evidence On Which Plaintiffs' Experts Rely Satisfies Rule 702

Plaintiffs' experts rely on an amalgam of biologic plausibility, anecdotal evidence, and cherry-picked suicide and non-suicide related adverse events from Neurontin clinical trials. None of the evidence, standing alone or in combination, is sufficient to satisfy plaintiffs' burden of proving general causation by reliable and relevant expert testimony.[25]     At most it raises a hypothesis—neither tested nor proven—regarding a potential relationship between Neurontin and suicide-related events, which the epidemiologic evidence fails to support.  As Judge Stearns has explained in rejecting the plaintiff's experts' reliance on an unproven hypothesis:

> Anyone who has been trained in the scientific method realizes that a hypothesis is a scientist's educated speculation.  It is important to underscore again that a court of law is not a scientific experiment.  When a court of law determines responsibility for human suffering and awards damages, it must do so based upon reasonable evidence, not just speculation or hypothesis.

*Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 25 n. 56 (D. Mass. 1995).  There is no question but that plaintiffs' experts' theories in this case regarding the capacity of Neurontin to cause suicide amount to nothing more than unproven hypotheses.

### 1.     Plaintiffs' Experts' Biologic Plausibility Theory Is Nothing More Than An Unproven Hypothesis, Making It Unreliable For Purposes of General Causation.

Plaintiffs' experts theorize that it is biologically plausible that Neurontin causes suicide by  (1) increasing GABA, which (2) decreases serotonin, which (3) causes an increase in depression and anxiety, which (4) leads to suicide.  Plaintiffs' experts' mechanism of action

---

[25] Plaintiffs repeatedly claim that the evidence on which their experts rely is sufficient because they are not relying on it "standing alone."  While some courts have allowed an expert to refer to unreliable evidence where the expert also relies on epidemiologic evidence, *see Giles v. Wyeth, Inc*., 500 F. Supp. 2d 1048, 1060 (S.D. Ill. 2007) (noting that an expert's may well have failed under *Daubert* if the expert had not relied on

theory is a strung-together series of hypotheses unsupported by reliable scientific evidence for each step in the chain. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 745 ("*Daubert's* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that <u>any</u> step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.") (emphasis in original).

Despite their claims to have reviewed hundreds of scientific and medical journals in preparation for this case, plaintiffs' experts were unable to identify any reliable evidence that treatment with Neurontin is associated with suicide-related events. Def. Br. at 28-30. Likewise, plaintiffs cite no reliable evidence that Neurontin is associated with depression. Plaintiffs attempt to disguise this glaring absence of scientific evidence for the third and fourth steps of their theory by citing several studies <u>not</u> <u>involving</u> <u>Neurontin</u> that found an association between low serotonin and depression.

Such studies are irrelevant. Not only do they have nothing to do with Neurontin, but plaintiffs' experts do not cite any reliable scientific support for the first and second steps of their theory—that Neurontin elevates GABA in humans under conditions that would result in decreased serotonin.[26] Plaintiffs' experts rely exclusively on animal studies to establish this critical link in the chain. Yet plaintiffs and their experts concede it is "undisputed that animal models may not accurately predict the effect a pharmacological agent will have in humans" and that the purpose of animal studies is to "generate a biologically plausible hypothesis to test in

---

epidemiologic studies), plaintiffs cite no case holding that reliance on multiple forms of unreliable evidence—but no epidemiologic evidence—satisfies *Daubert.*

[26] Dr. Roth—plaintiffs' neuropharmacology expert from Yale University—testified that the literature does not contain "a lot of information that shows that Neurontin has much [of] an effect on serotonin [in the human brain]." Sayler Decl. to Opening Br., Ex. 11 at 69:10-16. Dr. Roth did not offer the opinion that Neurontin can cause suicidal behavior.

humans."[27] Pl. Opp. at 44, 41. Plaintiffs misrepresent to the Court that: "Neurontin's capacity to reduce serotonin is further confirmed in peer-reviewed clinical journal articles. In a double-blind placebo-controlled study . . . participants whose serotonin levels were measured demonstrated a 40% reduction of serotonin levels." *Id.* at 21. In fact, the sole article cited as support for this claim expressly rejects it, concluding that chronic use of Neurontin had <u>no effect</u> on serotonin. Pl. Ex. 78 at 234. Plaintiffs' own expert, Dr. Trimble, testified that this same article was "not one that contains any statistical relevance . . . and no conclusions can be reached from it." Pl. Ex. 79 at 82:1-8. The only other study of Neurontin's effects on monoamine levels (such as serotonin) in human cerebral spinal fluid found that an acute dose of Neurontin <u>increases</u> serotonin, not decreases it, as plaintiffs' theory postulates. *See* Sayler Decl. to Opening Brief, Ex. 54 at 45.

In the absence of any direct evidence that Neurontin decreases serotonin in human, plaintiffs' experts argue that we should presume Neurontin depletes serotonin and adversely effects mood and behavior because Neurontin is purportedly "GABAergic" and some GABAergic drugs reduce serotonin. Plaintiffs' experts ignore *in vitro*, live animal, and human studies that found Neurontin was <u>not</u> GABAergic. *See* Def. Br. at 52. They also ignore neuroimaging (brain scan) studies finding comparable increases in whole-tissue GABA are obtained with positive interventions such as yoga, antidepressant medications that increase serotonin and help treat depression, and ECT (electroconvulsive therapy), the most effective treatment for resistant major depression. *Id.* Selective reliance on certain limited data but

---

[27] Dr. Roth in fact testified that he "couldn't find any" animal model that would predict suicide in humans and that as a result "studies have to be carried out in human subjects" in order to prove causation for suicide events. Sayler Decl. to Opening Br., Ex. 11 at 77:15-24 and Ex. 39 at V4.

rejection of all other studies that contradict their theories is exactly the kind of unreliable methodology that fails scientific and *Daubert* scrutiny.

Because multiple steps in plaintiffs' experts theories are unsupported by any scientific knowledge, their theories are nothing more than scientific-sounding speculation, and are therefore inadmissible.

### 2. Plaintiffs' Experts Use Unreliable and Unscientific Anecdotal Evidence.

Plaintiffs concede that postmarketing adverse event reports (AERs) and published case reports are insufficient on their own to establish causation, and are used only to generate safety signals (themselves hypotheses). Pl. Opp. at 38-39.[28] Moreover, FDA has expressly stated—in the context of Neurontin specifically—that it is <u>not</u> possible to determine causation from postmarketing AERs due to the high background rate in the Neurontin population:

> [T]he agency does not believe that spontaneous post-marketing reports can be interpreted appropriately in this situation. Patients taking these drugs have a high background rate of suicidal thoughts/behaviors, and it is not possible to tell from AERS reports, whether the drugs caused them. In the agency's view, the only way to establish whether or not the drugs are responsible for suicidality is to analyze controlled trial data.

Ruggieri Aff, Ex. A at 1-2. Indeed, plaintiffs do not cite a single case stating that anecdotal evidence is reliable evidence of general causation when, as here, epidemiologic evidence exists and fails to support a statistically significant association between the drug and an adverse event.[29]

---

[28] *See also In re Breast Implant Litig*., 11 F. Supp. 2d at 1227-28 ("anecdotal reports noting various symptoms only suggest a potential, untested hypothesis that the produce may be their cause. . . . An untested hypothesis cannot be a scientifically reliable basis for opinion on causation."); *Grimes v. Hoffmann-LaRoche, Inc.*, 907 F. Supp. 33, 36 n. 2 (D. Mass. 1995) (reliance on anecdotal evidence not reliable when no epidemiologic studies had established any relationship between drugs and alleged injury).

[29] It is worth noting that none of plaintiffs' experts cite to a single published case report involving a suicide, let alone one where the authors conclude or even suggest that Neurontin causes suicide. *See Miller*, 196 F. Supp. at 1080 (case reports involving injuries other than the outcome of interest are irrelevant).

Dr. Blume's methodology is principally based on analyses of AERs—conducted primarily by Keith Altman, an employee of the plaintiffs' law firm— whose calculations, she concedes, she can neither understand nor repeat. *See* Def. Br. at 35-36. Notably, Mr. Altman's analyses have been previously excluded by a federal court as not being probative of general causation. *See In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 808 (N.D. Ohio 2004) (Keith Altman's analysis "conceals too much to speak directly to the issue of causation").[30]

### 3. Plaintiffs' Experts' Reliance on Cherry-Picked Adverse Events and Supposed Rechallenge/Dechallenge Case Reports From Neurontin Clinical Trials Is Improper and Unscientific.

Perhaps nowhere is plaintiffs' experts' unscientific methodology on display more than in their discussion of certain adverse events from Neurontin clinical trials. After attacking Neurontin controlled clinical trials as "underpowered" to detect suicide, and therefore "not relevant," plaintiffs' experts pluck isolated suicide-related adverse events from these very same trials and trumpet them as evidence of general causation. Plaintiffs cite no support for this methodology, which has been previously rejected as unreliable. *Caraker v. Sandoz Pharms. Corp.*, 172 F. Supp. 2d 1046, 1049 (S.D. Ill. 2001).[31] Moreover, plaintiffs fail to cite legal

---

[30] Plaintiffs do not and cannot dispute that Mr. Altman's analysis, based on the same methodology he used here, was excluded by the court in *In re Meridia*. Plaintiffs make much of the fact that Mr. Altman was not disclosed as an expert witness in *In re Meridia*; rather, plaintiffs in that case submitted Mr. Altman's analysis as evidence of general causation but failed to disclose him as an expert witness. This is a distinction without a difference. Plaintiffs repeat the same tactic here. Indeed, more than one court has excluded Mr. Altman's analyses and opinions when plaintiffs tried to backdoor them in at the eleventh hour. *See Giles v. Wyeth, Inc..*, No. 04-4245 (S.D. Ill. July 9, 2007) (attached at Sayler Decl., Ex. G at 37). This Court should do the same.

[31] Dr. Kruszewski mischaracterizes the alleged suicide-related adverse events on which he relies. *See* Def. Br. at 42-43. Plaintiffs ignore this mischaracterization and, instead, merely reiterate six of the adverse events discussed by Kruszewski. In fact, plaintiffs do not even identify a true dechallenge/rechallenge suicide-related adverse event.

support that a single anecdotal report of a rechallenge is sufficient to show general causation.[32]
Numerous courts have held otherwise. *E.g.*, *Miller*, 196 F. Supp. 2d at 1077; *Dunn*, 275 F. Supp.
2d at 683.

> **4.     Plaintiffs' Experts' Reliance on Non-Suicide Related Adverse Events Should Be Summarily Rejected As Unscientific.**

Realizing that the clinical trial data fail to show a statistically significant relationship
between Neurontin and suicide-related events, plaintiffs' experts—most notably Cheryl Blume—
turn to so-called "psychobiologic" or non-suicide-related adverse events from Neurontin clinical
trials. Plaintiffs do not provide any support for the use of non-suicide-related adverse events as
surrogates for the outcome of interest (suicide-related events) alleged in the nearly 150 cases at
issue, nor can these non-suicide events support causal inferences.[33]     Gibbons Decl. at 6.
Reliance on intermediate or surrogate endpoints has been excluded under *Daubert* in cases
involving suicide and prescription drugs. *Miller*, 196 F. Supp. 2d at 1080 (D. Kan. 2002);
Gibbons Decl. at 6.

More importantly, plaintiffs do not dispute that the clinical trial data—which they have
never suggested is "underpowered" to detect the psychobiologic events to which Dr. Blume
defaults—fail to support a statistically significant association between Neurontin and any of
these non-suicide adverse events, such as depression. In fact, depression occurred more often in
patients on placebo than Neurontin in the clinical trials. Def. Br. at 46. Likewise,
psychobiologic adverse events occurred more frequently in placebo patients than Neurontin
patients. *Id.* Ignoring this fact, plaintiffs' experts continue to rely on a <u>potential</u> risk raised in

---

[32] Dr. Kruszewski testified that this patient's suicidal ideation did not reoccur until twenty-two days <u>after</u> Neurontin had been discontinued, making it neither a rechallenge nor a reliable basis for general causation testimony. Sayler Decl. to Opening Br., Ex. 9 at 388:14-395:14.

Dr. Cynthia McCormick's 1993 Medical Statistical Review, which she has since testified never came to fruition.[34]  *See* Def. Br. at 51-52.

### G.    Plaintiffs' Experts' Opinions Are Not "Intellectually Rigorous."

Plaintiffs spend a significant portion of their brief arguing their experts' opinions are "intellectually rigorous," but offer no support for their claim that their experts "employed in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."   Instead, plaintiffs ask this Court to accept their naked assurances that the opinions are well-founded.   An expert's assurance that he or she has utilized the proper methodology is, however, insufficient: "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected only to existing data by the *ipse dixit* of the expert."   *Joiner*, 522 U.S. at 147; *see also* Fed. R. Evid. 702 Advisory Committee's Note (2000). ("The trial court's gatekeeping function requires more than simply taking the expert's word for it.").   That plaintiffs' experts offer litigation-driven opinions[35] directly contradicts plaintiffs claim that their opinions are "intellectually rigorous."[36]

---

[33] In fact, plaintiffs' specific causation expert, Dr. Maris, has stated that reliance on such events to predict suicide leads to many "false positive predictions."  Sayler Decl. to Opening Br., Ex. 37 at 320.

[34] Plaintiffs cite to the Neurontin label, which contains a warning for certain neuropsychiatric adverse events in the <u>pediatric</u> population.  Not only do the overwhelming majority of case filed here involve adults, but Trimble has previously explained that behavior problems and aggression are common among children taking <u>any</u> antiepileptic medications, due a well-documented scientific phenomenon.  Pl. Ex. 17 at 4-6.  Moreover, FDA often requires warnings in the absence of a causal relationship, and the warning on which plaintiffs rely says nothing about a <u>causal</u> association between Neurontin and the neuropsychiatric adverse events in the pediatric population.

[35] Plaintiffs do not dispute that Dr. Blume relies heavily on Keith Altman, an employee of plaintiffs' law firm with a pecuniary interest in this lawsuit, nor that all of their experts' opinions were prepared in the course of litigation.  Indeed, Dr. Trimble's opinions about Neurontin—before he was retained in this litigation—are wholly inconsistent with the opinions he offers here.  *See* Def. Br. at 30-33.

[36] Moreover, plaintiffs ignore concessions from Drs. Kruszewski and Blume that they have no expertise in neuropsychopharmacology, *see* Def. Br. at 55-57, making them unqualified to opine about Neurontin's mechanism of action or general causation, despite their purported literature reviews.  *See* Sayler Decl. to Opening Br., Ex. 6 at 326:21-327:24 (expertise in neurology, psychopharmacology, and psychiatry is essential

## III.    CONCLUSION

Defendants thus respectfully request that this Court grant their motion to exclude the testimony of Drs. Trimble, Kruszewski and Blume.

Dated: April 25, 2008                                    DAVIS POLK & WARDWELL

                                                        By:    /s/ James P Rouhandeh
                                                               James P. Rouhandeh
                                                        450 Lexington Avenue
                                                        New York, NY 10017
                                                        Tel:  (212) 450-4000

                                                               -and-

                                                        SHOOK, HARDY & BACON L.L.P.

                                                        By:    /s/ Scott W. Sayler
                                                               Scott W. Sayler
                                                        2555 Grand Blvd.
                                                        Kansas City, MO 64108-2613
                                                        Tel:  (816) 474-6550

                                                               -and-

                                                        HARE & CHAFFIN

                                                        By:    /s/ David B. Chaffin
                                                               David B. Chaffin
                                                        160 Federal Street
                                                        Boston, MA 02110
                                                        Tel:  (617) 330-5000

                                                        *Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on April 25, 2008.

                                                        /s/ David B. Chaffin

---

to understanding Neurontin's mechanism of action); *Smith v. Pfizer Inc.*, No. 98-4156, 2001 U.S. Dist. Lexis 12983 at *23 (D. Kan. Aug. 23, 2001) (non-psychopharmacologist not qualified to opine on causal relationship between Zoloft and emerging suicidality); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1476 (D. V.I. 1994) (expert's literature review did not qualify him where he was otherwise unqualified).