# Exhibit D

# Reference Manual on Scientific Evidence

*Second Edition*

## Federal Judicial Center 2000

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

discretion had the district court admitted expert testimony based on a method-ology used in risk assessment, such as the weight-of-evidence methodology (on which the plaintiff's expert claimed to rely), which pools all available informa-tion from many different kinds of studies, taking the quality of the studies into account.[123] Combining studies across fields is even more controversial than pooling the results of epidemiological studies in a meta-analysis, a statistical technique that some find unreliable when used in connection with observational studies.[124] Of course, even if a court has no objection to the particular methodology's relevance in proving causation, it may disagree with how it was applied in the particular case. As the Supreme Court said in *Joiner*, "nothing . . . requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."[125]

However, not all would agree with Justice Stevens' assumption that what-ever is relied upon in assessing risk is automatically relevant in proving causation in a court of law. Proof of risk and proof of causation entail somewhat different questions because risk assessment frequently calls for a cost–benefit analysis. The agency assessing risk may decide to bar a substance or product if the potential benefits are outweighed by the possibility of risks that are largely unquantifiable because of presently unknown contingencies. Consequently, risk assessors may pay heed to any evidence that points to a need for caution, rather than assess the likelihood that a causal relationship in a specific case is more likely than not.

There are therefore those who maintain that high-dose animal studies have no scientific value outside the context of risk assessment.[126] These critics claim that although such studies may point to a need for more research or extra cau-tion, they are irrelevant and unreliable in proving causation because of the need to extrapolate from the animal species used in the study to humans, and from the high doses used in the study to the plaintiff's much lower exposure.

Both *Kumho*'s insistence on "the particular circumstances of the particular case at issue"[127] and *Joiner*'s discussion of animal studies suggest, however, that

---

for experienced professionals to arrive at a conclusion by weighing all available scientific evidence. . . . After all, as Joiner points out, the Environmental Protection Agency (EPA) uses the same methodology to assess risks, albeit using a somewhat different threshold than that required in a trial.") (footnote omitted) (citing Brief for Respondents at 40–41, General Elec. Co. v. Joiner, 522 U.S. 136 (1997) (No. 96-188) (quoting EPA, Guidelines for Carcinogen Risk Assessment, 51 Fed. Reg. 33992, 33996 (1986))).

123. For a discussion of the weight-of-evidence methodology and arguments supporting its use to prove causation in toxic tort cases, see Carl F. Cranor et al., *Judicial Boundary Drawing and the Need for Context-Sensitive Science in Toxic Torts after* Daubert v. Merrell Dow Pharmaceuticals, Inc., 16 Va. Envtl. L.J. 1, 67–75 (1996).

124. *See* Michael D. Green et al., Reference Guide on Epidemiology § VI, in this manual.

125. *Joiner*, 522 U.S. at 146. *See supra* text accompanying note 32.

126. *See, e.g.*, Phantom Risk: Scientific Inference and the Law 12 (Kenneth R. Foster et al. eds., 1993).

127. *See supra* note 53 and accompanying text.