# Exhibit G

```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2

 3   JACQUELYN GILES, INDIVIDUALLY )
     AND AS SPECIAL ADMINISTRATOR  )
 4   OF THE ESTATE OF JEFF L.      )
     GILES, DECEASED,              )
 5                                 )
                   Plaintiff,      )
 6                                 )
          vs.                      )  No. 04-04245-JPG
 7                                 )
     WYETH, INC., A DELAWARE       )
 8   CORPORATION AND ITS           )
     WHOLLY-OWNED SUBSIDIARY, WYETH)
 9   PHARMACEUTICALS, FORMERLY     )
     KNOWN AS AMERICAN HOME        )
10   PRODUCTS CORPORATION,         )
                                   )  July 9, 2007
11                 Defendant.      )

12
                  TRANSCRIPT OF PROCEEDINGS
13           STATUS CONFERENCE - SECTION 1 OF 3
             BEFORE THE HONORABLE J. PHIL GILBERT
14             UNITED STATES DISTRICT COURT JUDGE

15   APPEARANCES:

16   For the Plaintiff:       Arnold A. Vickery, Esq.
                              Paul Waldner, Esq.
17                            Rebecca L. Dumas, Esq.
                              Vickery, Waldner & Mallia, LLP
18                            One Riverway Dr., Suite 1150
                              Houston, TX  77056-1920
19                            (713) 526-1100

20   For the Defendant:       Terence M. Murphy, Esq.
                              Jones Day
21                            2727 N. Harwood St.
                              Dallas, TX  75201-1515
22                            (214) 220-3939

23   For the Defendant:       Mark Herrmann, Esq.
                              Jones Day
24                            901 Lakeside Avenue
                              Cleveland, OH  44114
25                            (216) 586-3939
```

```
                                                                    2

 1   For the Defendant:      David S. Rutkowski, Esq.
                             Jones Day
 2                           51 Louisiana Ave., N.W.
                             Washington, DC  20001-2113
 3                           (202) 879-3939

 4   For the Defendant:      Larry E. Hepler, Esq.
                             Hepler, Broom, MacDonald
 5                           103 West Vandalia St.
                             Edwardsville, IL  62025-0510
 6                           (618) 656-0184

 7
     Court Reporter:         Laura A. Blatz, CSR, RPR, CCR
 8                           U.S. District Court
                             750 Missouri Avenue
 9                           East St. Louis, IL  62201
                             (618) 482-9481
10

11

12

13       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
14

15

16

17

18

19

20

21

22

23

24

25
```

anything. You've seen it, you've heard it.

THE COURT: That's the first and last time I've seen that it's out. Your Motion in Limine's granted. And the Court's using 403 to jettison that.

MR. HERMANN: We have two to go.

THE COURT: That's why I told you to come back up, didn't I?

MR. HERMANN: The next one will be the motion to exclude Altman as not disclosed.

THE COURT: What number is that, K Jane? I got it. 157 -- no, 156. Well, that's --

MR. VICKERY: That was 152.

COURTROOM DEPUTY: 152.

THE COURT: Go ahead, Mr. Herrmann. I've read it.

MR. VICKERY: Altman is the guy who is disclosed for the very first time as a witness of any type in the case on May 22nd, two weeks before our then-scheduled June 10 or 11 trial date.

THE COURT: I thought Mr. Vickery may want to use him as a summary to summarize some of the voluminous data.

MR. HERMANN: The first disclosure in the case was May 22nd, as a fact witness, and the next disclosure in the case was July 3rd when we moved to exclude Altman as saying he's not a fact witness, he never worked at Wyeth and doesn't know anything from Wyeth's side of the case, and

1  he's not a fact witness because he doesn't know the Gileses,
2  was never on their side of the case, not a precipient
3  witness to anything.  So this guy is not a fact witness.
4  Maybe he's an expert witness.  He feels like an expert
5  witness because what he does is being paid by plaintiff's
6  counsel:  Sit at a computer and analyze databases to pull
7  out adverse event reports.
8         THE COURT:  Is he going to be giving an opinion or
9  just compiling data?
10        MR. HERMANN:  Well, of course, on May 22nd the
11 first time we heard him, all we saw was Keith Altman, fact
12 witness, so we had no clue what he was going to do.  If he's
13 a fact witness he should have been disclosed on the initial
14 disclosures or in a supplement and he should have been
15 disclosed while discovery was open so we could have deposed
16 him.  You don't disclose fact witnesses for the first time
17 two weeks before trial.  And if he's an expert witness, as
18 Your Honor just noted, of course, it's even worse.  It's
19 equally bad anyway because we get him disclosed as an expert
20 and we get a expert report and get a chance to depose him
21 and designate and work with a counter-expert, and then
22 *Daubert* practice and the whole usual smear.  So since he's
23 not a fact witness, or he's a late disclosed fact witness or
24 a late disclosed expert witness, he should be excluded.
25        So we hear last week on July 3rd for the first

1   time, a-ha, he is merely a summary witness. Maybe I'm
2   old-fashioned, but in my view of the world there's two kinds
3   of witnesses in the case: There's fact witnesses and
4   there's expert witnesses. And you can have a summary
5   witness who is summarizing factual material -- I think
6   that's typically what happens -- or a summary witness who is
7   giving opinions of different kinds to create a summary who's
8   an expert, but there is no third category of witness. Ten
9   minutes to trial, having disclosed my experts and my fact
10  witnesses, now I can tell you I got a new guy, a summary
11  witness, we don't have to disclose them at all. A summary
12  witness, we're just going to tell you about the last minute.
13  You never depose him and you don't know what he's going to
14  say. Since he's a summary witness, he didn't have to be
15  disclosed. He is either fact or expert. Either way, he had
16  to be disclosed. He was not disclosed. And both Rule 26
17  and the Seventh Circuit in the *Musser* case that we cite in
18  the brief said -- the Seventh Circuit in the *Musser* case
19  that we cited says, quote, "Exclusion of non-disclosed
20  evidence is automatic and mandatory under Rule 37(c)(1)
21  unless nondisclosure was justified or harmless."
22          It wasn't justified here because Mr. Altman had
23  been working with Mr. Vickery for at least months before
24  this, and it's not harmless because we never took his
25  deposition, we never arranged for either fact or expert

```
 1  testimony to counter it.  We never heard about the guy until
 2  May 22nd and never heard until he was a summary witness --
 3  if we had tried this case in June, the case would have been
 4  over -- until last week was the first peek, that he was
 5  going to be a summary witness.  It's late.
 6          THE COURT:  When did you first hear of this
 7  Keith Altman?
 8          MR. HERMANN:  There was another case, Ackerman,
 9  against Wyeth with Mr. --
10          THE COURT:  I mean in this case when did you first
11  hear --
12          MR. HERMANN:  In this case there was a mention in a
13  document that there would be evidence of a whole collection
14  of different things.  There aren't going to be any
15  surprises.  We may use some of the database along the
16  lines --
17          THE COURT:  You're going to have to slow down.
18          MR. HERMANN:  You're right, of course I do.  The
19  first time his name was disclosed as a witness who would
20  speak at trial was May 22nd.  The first time he was
21  disclosed as a witness who would speak at trial is May 22nd.
22  His name had percolated up once earlier in the background
23  as, Of course you guys are aware of the sort of testimony
24  that Altman gave at a hearing in the Ackerman case in Texas.
25  And it was true, we were aware of that, and Altman appeared
```

to be a non-testifying consultant in that case. He didn't show up on any witness list. First time we heard he was going to be a witness was May 22, and the first time we heard he was going to be a summary witness was July 3rd. Discovery had closed and there's no chance to respond.

THE COURT: Mr. Vickery?

MR. VICKERY: A lot of the discovery -- you know, we've had two or three cases going with Wyeth, and we try not to duplicate everything. In every case we try not to duplicate the document discovery, the depositions of their people, and so they don't have to put them up but once. We had a fight, really the only discovery fight I think I've ever had with these gentlemen was in the *Ackerman* case over their adverse event database. Since 2000, I think it's called S-cube, and that's where they keep their adverse event data. Before then it was a different database. So we had a hearing last year in the *Ackerman* case and they brought their technical people and I brought Mr. Altman, and Mr. Altman testified. He was examined by Mr. Rutkowski.

THE COURT: Did he testify in a court?

MR. VICKERY: Yes, sir, he did. He testified before the magistrate judge in this discovery hearing about the nature of databases and why we need the data.

THE COURT: He didn't testify at the trial?

MR. VICKERY: No, sir. There was no trial. Mr.--

1  so that's how -- that's when Keith Altman first was
2  introduced to these folks as someone helping us with regard
3  to their data. After that hearing, at the magistrate
4  judge's instruction -- he even had some direct
5  communications with their data guy, so we got the lawyers
6  out of it and let data guy talk to data guy. The problem we
7  have, Judge, is that they have two different databases with
8  their adverse event data, and so if I want to ask the
9  question, *Well, how many suicides occurred before Jeff Giles*
10 *got this drug that you had in your adverse event database?*
11 *How many were reported, how many attempted suicides, how*
12 *many cases of akathisia,* that it takes someone that has
13 technical expertise to extract from the voluminous data that
14 data and show it, and Mr. Altman can do it lickedy-split.
15         Now, I realize, of course, that Keith Altman
16 probably could qualify as well as an expert witness and
17 offer opinion testimony, but I don't want or need him to do
18 that. Might want to, but I don't need him to do that.
19         THE COURT: Too late for him.
20         MR. VICKERY: Too late for him to do that. I
21 hadn't designated him. If I wanted opinion testimony I
22 would have gotten a report and designated him, and they
23 could have done the usual smear, but I didn't do that.
24 Keith Altman was the guy sitting at the deposition with me
25 with Rich Gural that had that tape. He was at

1  Maureen Caulfield's deposition when I needed to look at -- I
2  believe it was Maureen Caulfield's, where I said, *Let's see*
3  *what their data shows.*  So you know, the notion that
4  Keith Altman is some guy -- Judge, some guy we never heard
5  of, and all of a sudden he's going to come in here and offer
6  opinion testimony, it just ain't so.  I'm not going to ask
7  him an opinion.
8         THE COURT:  What are you going to ask him?
9         MR. VICKERY:  I'm going to ask him:
10            *Do you have the Wyeth database?*
11            Yes.
12            *Is it one database or two?*
13            Well, it's two.
14            They had this one to here and this one to here.
15            *Can you show us, Mr. Altman, on the Court's*
16     *screen here, how many suicide reports there were*
17     *through the year end before 2002?*
18            Yes.  I can show you for a four-year period
19     beforehand.
20            *And can you extract that data from their*
21     *database?*
22            Yes, I can.
23            Boom.  Show us.  That's why I thought I could have
24  cured it with a stipulation.  I had Keith prepare the
25  stipulation with those --

1    THE COURT: Where is the stipulation?
2    MR. VICKERY: Sir?
3    THE COURT: Where is it?
4    MR. VICKERY: I sent it to Mr. Rutkowski, and, you
5    know, they won't enter into it. You want to see it?
6    THE COURT: Yeah.
7    MR. VICKERY: Okay.
8    THE COURT: If this is just on paper, just
9    compilation of data, why did you need anybody just to
10   testify about something? I don't understand.
11   MR. VICKERY: To authenticate it. I can't -- I've
12   got to extract the summary from the data. I mean their
13   whole database, the S-cube database and the one that
14   preceded it is a database, so you've got to extract that
15   data and show the summary, how many of these reports were
16   there. Boom.
17   THE COURT: Mr. Rutkowski, what was your objection
18   to the stipulation?
19   MR. RUTKOWSKI: A couple things wrong with the
20   stipulation, Your Honor. First of all, to extract this
21   data -- and I understand what Mr. Vickery's saying: *It's*
22   *just a summary. It's just a compilation.* This is a
23   tremendously complex database. There are -- I don't know if
24   I'd call it an entire department, but a large number of
25   people within Wyeth whose sole job it is to extract

1  information from this database and to pull it out in the
2  correct way so it can be analyzed and interpreted the
3  correct way.
4      Mr. Altman I believe was present at a deposition of
5  someone within that department so he could try to understand
6  what that person's expertise was and information about the
7  database so that he could try to pull information out. Very
8  complex, pulling information out of here. I don't think
9  it's simply like -- to use an example, it's not going
10 through the phone book and pulling out all the people named
11 Smith.
12     THE COURT: You guys have this information
13 compiled?
14     MR. RUTKOWSKI: The problem is it depends on what
15 assumptions you make as to how you define the data you're
16 trying to pull out. And Mr. Vickery -- I called him. I
17 said, *How do you get to these numbers?* So he sent me a list
18 of his -- they have case ID's. Each case in there has a
19 unique case ID. He sent me a list of those case ID's. We
20 looked within there to try to figure out, is this number
21 they sent us the right number?
22     As we look at the information pertaining to the
23 cases that they sent us, turns out that several of them,
24 when you look into it and you analyze the data, it shows
25 that they are, in fact, cancelled cases that were duplicates

1  of other cases that were already in the database. As you
2  look into the information about the people who are being
3  reflected, the patients whose information's reflected on
4  those cases, many of them it turns out aren't even taking
5  our drug. Part of the stipulation was that all these people
6  were taking our drug when they committed suicide, for
7  instance. You read the information as you pull it out and
8  that's not the case. When Mr. Vickery -- and I don't want
9  to get into the details of the order in the *Ackerman* case.
10 There was a lot of back and forth in terms of --
11           THE COURT: We got it right up there, don't we?
12           MR. RUTKOWSKI: If you'd like to look at this
13 first, I can continue in a second.
14           THE COURT: I'll tell you, go ahead and continue.
15 I'm so old-fashioned, I've got to have this stuff in front
16 of me. Even a screen that big I have a hard time looking
17 at. Go ahead.
18           MR. RUTKOWSKI: In the *Ackerman* case, we're dealing
19 with this massive database. There are tens and tens of
20 thousands of patients in here. There's multiple versions.
21 As each piece of information comes in, there's a new version
22 created. This is a massive piece of information. To try to
23 get some information out to Mr. Vickery that could
24 potentially be relevant to the *Ackerman* case, what the judge
25 did there was ordered us to send Mr. Vickery a list of

what's called preferred terms. And at the risk of going a little too deep into how this database works, when an adverse event comes in there are individuals within Wyeth that look at all the information that's provided and give it a term from this massive dictionary called the metra-dictionary, which contains I think about 16,000 different potential terms that you could code a particular event to. And so what we did is we gave Mr. Vickery a list of all the preferred terms we've ever used for cases relating to Effexor, and the judge said, *Mr. Vickery, you go through that list and identify the ones that you think are relevant for this case and you send it to the defendants, and they will extract the information for you pertaining to those events.*

This is all along lead-up, Your Honor, they didn't ask us for suicidal ideation, they didn't ask us for suicide attempt, and those are some of the numbers that they're trying to present here. And as we talked about before, when we looked into completed suicide we found out that their methodology was flawed in some way because the number they provided and the explanation for what it represented was not accurate. So they don't even have the information to analyze the other numbers, the suicidal ideation, suicide attempt, to determine whether their number's even accurate or not. It takes tremendous expertise to get into the data

1   to interpret it correctly. It does involve expert testimony
2   to put this information on correctly in a way that has the
3   proper context for the jurors. That's why we didn't enter
4   into a stipulation. It's wrong. And it's expert testimony.
5           THE COURT: Let me read this over. I'm just
6   reading this and questions are popping into my head. Is
7   there an S-3 which is just limited to Effexor?
8           MR. RUTKOWSKI: If I may, I think we'd say the same
9   thing. S-3 contains all of Wyeth's data for all of its
10  products. The Effexor information --
11          THE COURT: But includes other drugs too.
12          MR. RUTKOWSKI: Includes all of Wyeth's drugs.
13          THE COURT: Do you agree with that?
14          MR. VICKERY: It does, but what we were given is
15  the Effexor portion, so the data -- we've been given a
16  subset of the database that's the Effexor portion. I mean
17  if you're concerned about him looking at some other drug or
18  testifying about some other drug, no. We were given that
19  portion of the database that pertains to Effexor.
20          THE COURT: Here's a sentence that says, "For the
21  four-year period of time there were 98 reported suicide
22  attempts, 43 completed suicides, and 62 instances of
23  suicidal ideation or thinking by people taking Effexor."
24          So is there data that these 98, 43, and 62 all were
25  limited to people taking Effexor?

1    MR. HERMANN: Those are Effexor. Those purport to
2  be talking about Effexor cases, and it would be
3  theoretically possible to extract that data as to Effexor.
4  The difficulty is -- I mean, as Mr. Vickery said, it takes
5  technical expertise. Mr. Altman has the technical
6  expertise, his words, to extract this, and if he had given
7  us an expert report back months ago we would have had these
8  numbers and then we would have somebody go in and say, of
9  the however many suicides they reported, two of them are
10 duplicative cases, three of them the person wasn't on the
11 drug at all, and we would have an expert or probably an
12 internal database expert of our own who we would designate
13 and say those are his numbers and here are the answers.
14 Instead, we have the stipulation three days before trial.
15 We're supposed to run through this database in order to try
16 to come up -- it looks very innocent. It's not as easy as
17 it looks, Your Honor.
18    THE COURT: Mr. Vickery, last word.
19    MR. VICKERY: This would be Keith Altman's
20 testimony. It's obvious there are at least two lawyers at
21 this table prepared to cross-examine him on it.
22    THE COURT: That's not the point.
23    MR. VICKERY: But it is, Your Honor. We're given a
24 database. Someone that has the ability to summarize and
25 extract the data from the database extracts it and is

prepared to testify to it. These lawyers are prepared to cross-examine him on it. I mean it's important for this jury to know, particularly with regard to the issue of notice, you know, what kind of reports they were getting of suicides or suicidal ideation on Effexor.

THE COURT: Can't you get that from other witnesses that will be testifying?

MR. VICKERY: No, sir, not from their database I can't. I mean this is data; it's not expert opinion testimony.

THE COURT: Well, I realize it's data, but it has to be reliable data. It has to be data that is relevant to the issues in this case. I mean there's -- you know, there's an old saying, there's statistics -- and you know how the saying goes. I mean these 98 reported suicide attempts, where did he get that?

MR. VICKERY: From their data. Mr. Herrmann just told you, yes, Judge, you know, if you look at our data and pull it out, that we see how someone could get this.

THE COURT: Then he just said there could be duplications, could be people that weren't on Effexor.

MR. VICKERY: We don't control their data; they control their data, they put it in. And if they want to cross him on, *Well, how about this, let me show you there's a duplication*, that's fine. If they want to bring some of

1   the data people down here and put them on the stand, I don't
2   object to that. The only data I've got is what they give
3   me, so when they give me this data and somebody that's got
4   the ability to pull it out says, *Here's what their data*
5   *shows*, and then they go, *Wait a minute, our data isn't*
6   *really that good because here's this problem with our data,*
7   I mean that's their problem. All I can do is deal with the
8   cards they've dealt me.
9        MR. HERMANN: Your Honor, in April that would have
10  been no problem. Today that's a problem. I mean if this
11  was an expert who was going to go through and give us these
12  numbers and give us a report and let us know, and we can
13  figure this out, we can work with this, he's right. We can
14  answer the question whether last week this is a problem, and
15  this is a big problem last week, Your Honor.
16       *THE COURT:* Here's the problem: I don't see how
17  Mr. Altman can testify without being an expert in this case
18  if he's going to be -- Court's going to bar his testimony.
19  That's it. All right. Next, Mr. Herrmann.
20       MR. HERMANN: Next, and on the in limine -- I think
21  last, Your Honor, and this is the motion to exclude the
22  untitled letters from the FDA. And you're going to ask me
23  the document number.
24       *THE COURT:* Well, and letters two and three, if I
25  recall from my readings, relate to whether or not my ruling

54

## REPORTER'S CERTIFICATE

    I, Laura A. Blatz, RPR, Official Court Reporter for the U.S. District Court, Southern District of Illinois, do hereby certify that I reported in shorthand the proceedings contained in the foregoing 53 pages, and that the same is a full, true, correct, and complete transcript from the record of proceedings in the above-entitled matter.

    Dated this 9th day of July, 2007.


_____
LAURA A. BLATZ, RPR