UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------- x
:
In re:  NEURONTIN MARKETING,                     :   MDL Docket No. 1629
        SALES PRACTICES AND                      :
        PRODUCTS LIABILITY LITIGATION            :   Master File No. 04-10981
------------------------------------------------- x
:   Judge Patti B. Saris
THIS DOCUMENT RELATES TO:                        :
                                                 :   Magistrate Judge Leo T.
ALL PRODUCTS LIABILITY CASES IDENTIFIED ON       :   Sorokin
EXHIBIT 1 TO THE DECLARATION OF SCOTT W.         :
SAYLER, ESQ. FILED WITH MEMORANDUM IN            :
SUPPORT OF MOTION FOR SUMMARY JUDGMENT           :
                                                 :
                                                 :
                                                 :
------------------------------------------------- x

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS PFIZER INC. AND
WARNER-LAMBERT COMPANY LLC'S MOTION FOR SUMMARY JUDGMENT**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000

SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550

-and-

HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
Tel: (617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company LLC*

# **TABLE OF CONTENTS**

I. Warner-Lambert's 2004 Plea Does Not Affect Preemption ..................................................2

II. Plaintiffs' Claims Are Preempted Because FDA Repeatedly and Affirmatively Chose Not to Include Suicide-Related Warnings in the Neurontin Labeling ........................3

III. Pfizer Could Not Have Added a Suicide-Related Warning to the Labeling Consistent with Federal Law ................................................................................................8

IV. Plaintiffs' Other Arguments as to Why the Court Should Not Find Preemption Fail to Withstand Scrutiny ..................................................................................9

    A. The "Presumption Against Preemption" Does Not Apply Here ................................9

    B. FDA's Views on Preemption Are Entitled to Deference ..........................................10

V. The Court Should Invite FDA to Submit an *Amicus* Brief on the Preemption Issue ................................................................................................................................14

VI. Pfizer Is Entitled to Summary Judgment on Plaintiffs' Failure-to-Warn Claims .................14

**PRELIMINARY STATEMENT**

Nowhere in plaintiffs' summary judgment opposition do they contest the fact that FDA was fully aware of suicidal behavior in Neurontin patients when it decided – on repeated occasions – to approve the Neurontin label without requiring that the label contain any warning that Neurontin is associated with or causes suicidal behavior. Plaintiffs may disagree with that conclusion but federal preemption does not allow them to dispute FDA's conclusion in a personal injury lawsuit brought under state law. The fact that FDA has recently issued an alert to doctors and others does not change this result. It is undisputed that the Neurontin data reviewed by FDA in connection with the Alert show no increased risk of suicide-related events. Rather, the FDA Alert is indisputably based on data submitted by other manufacturers relating to anti-epileptic medications other than Neurontin. As Pfizer has previously explained, a manufacturer cannot be held liable for the failure to warn of information that it did not know - and could not have known - through the exercise of reasonable care. For these reasons alone, Pfizer is entitled to summary judgment as a matter of law.

**LAW AND ARGUMENT**

In their 60-page opposition, plaintiffs raise essentially three arguments against preemption. First, plaintiffs argue that preemption does not apply here as a result of the Warner-Lambert guilty plea. This argument fails because the plea had nothing whatsoever to do with the safety of Neurontin, but instead related to specific instances of off-label promotion in 1995 and 1996. Second, plaintiffs contend that FDA never considered any suicide-related warnings for Neurontin. The undisputed facts, however, demonstrate that FDA reviewed and specifically focused on suicide-related events in the clinical trial data when it approved Neurontin in 1993 and 2002, and again when it looked at this specific issue in 2004 and 2005, concluding on all

three occasions that suicidal behavior need only be described in the Adverse Events section - and not in the Warnings section – of the label. Further, FDA did not add suicide warnings requested by a May 2004 Citizen's Petition when the agency revised the Neurontin label in late 2005.

Third, plaintiffs argue that FDA regulations permitted Pfizer to add suicide-related warnings to the Neurontin labeling without prior FDA approval. Plaintiffs' argument ignores, however, that such a warning not only requires the existence of reasonable evidence of an association (which plaintiffs concede the Neurontin clinical data fail to show), but also requires FDA approval and cannot be made unilaterally by a manufacturer. For the foregoing reasons and as set forth more fully below, each of plaintiffs' arguments fail and Pfizer is entitled to summary judgment.

Pfizer is also entitled to summary judgment on plaintiffs' failure-to-warn claims on independent grounds. Because FDA has unequivocally stated that it does not consider post-marketing reports of suicide a sufficient basis to include a warning in the Neurontin label and because the Neurontin clinical trial data indisputably show no increased risk of suicide, Pfizer had no information on which to base a warning prior to plaintiffs' use of Neurontin in the years 2000 to 2005.

I.     **Warner-Lambert's 2004 Plea Does Not Affect Preemption**

Warner-Lambert's 2004 guilty plea is wholly unrelated to the question of whether plaintiffs' failure-to-warn claims are preempted and plaintiffs' argument to the contrary is misleading. Plaintiffs mischaracterize the nature of the government's allegations and the company's plea in an effort to leave the Court with the mistaken impression that the government's investigation involved issues concerning the safety of Neurontin. This is absolutely incorrect and plaintiffs know better. Simply stated, Warner-Lambert pleaded guilty

to "Distribution of a Misbranded Drug: Inadequate Directions for Use" on the basis of labeling that "lacked adequate directions for use," in violation of 21 U.S.C. § 352(f)(1). (Sayler Reply Decl., Ex. 1 at 14). At no time did the government allege, nor did Warner-Lambert plead, that the labeling for Neurontin *failed to warn of certain health risks.* The government's investigation of Warner-Lambert was based on specific incidents of off-label promotion – it never involved questions about the *safety* of Neurontin. Thus, any claim by plaintiffs that the guilty plea saves their failure-to-warn claims from preemption should be rejected.

**II.    Plaintiffs' Claims Are Preempted Because FDA Repeatedly and Affirmatively Chose Not to Include Suicide-Related Warnings in the Neurontin Labeling**

Plaintiffs argue that there is no conflict between state and federal law because there is no evidence that FDA considered and rejected a proposed warning for Neurontin regarding suicide-related events. In fact, one of the key documents that plaintiffs attempt to base their case on – the FDA medical review of Neurontin prepared by Dr. McCormick – specifically discusses suicide-related events prior to initial approval of the product in 1993. Despite having previously described the medical review as evidence of a suicide safety issue, plaintiffs are now attempting to make believe that the medical review contained no conclusion regarding suicide-related events. (Pls.' Opp. at 28). The fact that FDA was aware of suicide-related events and decided not to include any warning related to suicide in the label is evidenced not only by the medical review and the label itself, but by the unrebutted testimony of Dr. McCormick. Plaintiffs do not and cannot dispute the contents of those documents or Dr. McCormick's testimony. Accordingly, the undisputed facts entitle Pfizer to summary judgment.

Plaintiffs' argument (unsupported by any document or testimony) that the FDA never considered whether a warning regarding Neurontin should be added to the label is further belied by FDA's decision not to add a warning after a Citizen's Petition was filed in May 2004

seeking suicide warnings for Neurontin. The Petition was based solely on postmarketing reports of suicide-related events – which, notably, FDA chose not to analyze for purposes of its risk assessment. At FDA's request, Pfizer submitted Neurontin clinical trial and postmarketing data regarding cases of suicide and suicide attempt in September and November 2004. In October 2005, one year after Pfizer's submission of the suicide data requested by FDA, the agency asked Pfizer to make what it deemed "minor changes" to the terminology in the Adverse Reactions section of the Neurontin labeling regarding suicide-related events.[1] Significantly, however, **FDA did <u>not</u> include *any* warning regarding suicide-related events**. And as with its prior approval letters, FDA instructed Pfizer to follow the approved revised labeling *verbatim*.[2]

FDA's scientific approach for determining whether there is an association between a drug and suicide-related events requires an analysis of placebo-controlled **clinical trial data**. FDA does not consider postmarketing adverse event reports to be sufficiently reliable when considering the risks of suicide-related events.[3] Just recently, in discussing the FDA Alert,

---

[1] FDA asked Pfizer to modify the "Other Adverse Events Observed During All Clinical Trials: Clinical Trials in Adults and Adolescents with Epilepsy" section by changing the terms "suicidal" and "suicide gesture" to "suicide attempt" and "suicide," as infrequent and rare events, respectively. Similarly, in the subsection entitled "Clinical Trials in Adults With Neuropathic Pain of Various Etiologies," FDA added "suicide attempts" as an infrequent event. Finally, FDA asked that the information in the label reflecting the number of patients exposed to Neurontin in the epilepsy add-on trials be updated to reflect the numbers Pfizer provided with its suicidality analyses in 2004. Following additional coordination, on November 22, 2005, FDA directed Pfizer to "proceed with the minor labeling changes pertaining to suicide-related events." (Coronel Opening Br. Decl., Ex. 21-24).

[2] *See* Coronel Opening Brief Decl., Ex. 26 at 1.

[3] In its 2005 *amicus* brief submitted in *Kallas v. Pfizer*, a case involving an antidepressant, FDA explained why postmarketing adverse event reports are unreliable when analyzing a possible association between a drug and suicidality:

> *[I]n order to ensure that "warning" statements in the labeling of drugs are accurate and informative and not misleading, the FDA attempts to distinguish between events that are the effects of the drug from those that result from the underlying disease. Making this distinction is most difficult where the adverse event in question (here, suicide or suicidality) is known to be a consequence of the disease being treated (here, depression).* <u>See, e.g.</u>, Transcript of February 2, 2004 Advisory Committee Meeting at 221.

FDA made crystal clear why adverse event data cannot be used to determine whether a medication is associated with or causes suicidal behavior:

> *. . . the agency does not believe that spontaneous post-marketing reports can be interpreted appropriately in this situation. Patients taking these drugs have a high background rate of suicidal thoughts/behaviors, and it is not possible to tell from AERS reports, whether the drug caused them. In the agency's view, the only way to establish whether or not the drugs are responsible for suicidality is to analyze controlled trial data.*

(Sayler Reply Decl., Ex. 3). Plaintiffs also argue, without any factual basis, that FDA never had an opportunity to consider a suicide-related warning regarding patients using Neurontin for off-label purposes. In fact, following the Citizen Petition's request for a suicide warning regarding certain off-label populations, FDA in 2005 did not add such a warning.

FDA was aware of the off-label use of Neurontin as early as July 1996. In fact, FDA worked closely with the Department of Justice in pursuing claims based on allegations of off-label promotion. Further, postmarketing data submitted by Pfizer in 2001 as part of its postherpetic neuralgia application clearly reflected significant off-label use of Neurontin.[4] Plaintiffs do not dispute that FDA reviewed this data. Plaintiffs also do not dispute that the clinical trial and post-marketing data submitted by Pfizer in 2004, included patients with psychiatric disorders, patients with neuropathic pain, and patients with other neurology disorders.

FDA never expressed a concern over the safety of Neurontin in off-label populations here and never concluded there was a basis for any suicide-related warnings related

---

(Sayler Opening Br. Decl., Ex. 9 at 7-8) (emphasis added); *id.* at 7 ("Adding spurious associations, or unsupported ones, would fill labeling with misinformation, a disservice to people who might benefit from the drug.").

[4] In her report, Dr. Sharon Hertz, the FDA clinical reviewer with responsibility for the PHN application, discussed postmarketing adverse events reported in patients using the drug for off-label uses. Specifically, Dr. Hertz noted that "[o]f 7655 cases reporting 20,076 [adverse] events, 75% originated in the US, and neuropathic pain was identified as the indication in 1294 cases [i.e., patients]." (Coronel Opening Br. Decl., Ex. 9 at 14). Dr. Hertz's report further shows that patients using Neurontin for all off-label indications (including neuropathic pain) comprised 3,084 of the 7,655 cases reporting adverse events, or 40%. (*Id.* at 15.)

to these populations.[5] Accordingly, for Pfizer to have included the proposed warnings would have been in direct conflict with federal labeling regulations. Therefore, plaintiffs' claims are preempted. *See Colacicco v. Apotex Inc.*, --- F.3d ----, 2008 WL 927848 (3d Cir. Apr. 8, 2008) ("*Colacicco II*") (affirming the finding of conflict preemption in *Colacicco v. Apotex, Inc.*, a case criticized by plaintiffs, and reversing a "no preemption" finding in *McNellis v. Pfizer*, a case relied upon by plaintiffs).[6]

Plaintiffs incorrectly cite *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) for the proposition that "jury verdicts" are not state-law "requirements" preempted by federal law because they do not themselves force manufacturers to do anything. *Bates* did make that observation, but then went on to hold that failure-to-warn claims nevertheless *do* "qualify as requirements," because they "set a standard for a product's labeling." *Id.* at 446 (quotation omitted). Likewise, plaintiffs' claims here rest on an asserted state-law labeling standard that

---

[5] Even the FDA Alert, on which plaintiffs mistakenly place so much reliance, states that "there did not appear to be a specific demographic subgroup of patients to which the increased risk could be attributed." (Sayler Opening Br. Decl., Ex. 4).

[6] Plaintiffs' purported attempt to avoid preemption through "parallel" claims for violations of FDA labeling and postmarketing surveillance regulations also fails for several reasons. First, plaintiffs have not pleaded any state law that "provid[es] a damages remedy for claims premised on a violation of FDA regulations," as discussed in *Riegel*. Second, even after reviewing Pfizer's Neurontin data, FDA has never suggested that Pfizer failed to comply with its labeling or postmarketing surveillance regulations. Because plaintiffs construe these FDA regulations differently from FDA, their claims are not "parallel" to any FDA recognized standard and thus are preempted. *See, e.g.*, *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 230 (6th Cir. 2000). Third, the FDCA gives exclusive enforcement authority to the federal government. *See* 21 U.S.C. § 337(a) ("[A]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States."); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4, 352 (2001) (Section 337(a) "leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions" and is "clear evidence that Congress intended that the [statute] be enforced exclusively by the Federal Government"). Since Congress plainly did not intend anyone other than the government to be able to bring FDCA violation claims, then under state law, an essential prerequisite for negligence *per se* is not met. Further, any claim that Pfizer failed to provide FDA relevant data is preempted by *Buckman*. *See* 531 U.S. at 348 (holding that plaintiffs' state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly preempted by federal law); *id.* at 351 (fraud-on-the-FDA claims would cause manufacturers to fear that their disclosures to the FDA, although deemed appropriate by [FDA], will later be judged insufficient in state court); *Dusek v. Pfizer Inc.*, No. Civ. A. H-02-3559, 2004 WL 2191804, at *7 (S.D. Tex. Feb. 20, 2004) (stating that plaintiffs' claim that the FDA did not have all the relevant scientific information when it determined that a particular warning was not warranted amounts to a "fraud-on-the-agency" claim preempted by *Buckman*).

would conflict with the federal standard adopted by FDA.  *See also San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) (State "regulation can be as effectively exerted through an award of damages as through some form of preventive relief.  The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (imposition of damages through a state tort law rule that would have imposed a duty on auto manufacturers to install airbags rather than other passive restraint systems was preempted); *Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers*, 981 F.2d 1177, 1179 (10th Cir.) (citation omitted), *cert. denied*, 510 U.S. 813 (1993) (A "common law duty to warn is subjected to the same federal preemptive constraints as a state statute.").

Plaintiffs also incorrectly assert that Pfizer could have provided warnings regarding suicide-related events through "Dear Doctor" letters even before revising the labeling.  As the court aptly noted in *O'Neal v. SmithKline Beecham Corp.*:

> All promotional material must be consistent with a drug's labeling.  *See* 21 C.F.R. § 202.1.  If the warning is prohibited in the labeling (the prescribing information), the warning is not permitted in the promotional material.  The FDA has comprehensive statutory authority over all aspects of safety, efficacy, labeling, marketing, advertising, and promotion of prescription drugs.  The FDCA and the FDA's regulations define "labeling" to include all hard-copy promotional material "upon" or "accompanying" the drug, which includes the package insert for the drug, and everything from booklets to calendars, if the material is textually related to the drug.  21 U.S.C. § 321(m); 21 C.F.R. § 202.1(1)(2).  FDA's regulation of prescription drug labeling would be meaningless if [the manufacturer] were free to undermine and contradict FDA-mandated warnings through other publication means.

2008 WL 275782, at *13 (E.D. Cal. Jan. 30, 2008).  *See also Walls v. Armour Pharm. Co.*, 832 F. Supp. 1467, 1482-83 (M.D. Fla. 1993) ("Dear Doctor letter is a form of labeling"); *Dowhal v. SmithKline Beecham Consumer Healthcare*, 88 P.3d 1, 11 (Cal. 2004) ("Warnings through point-

of-sale posters or public advertising could have the same effect of frustrating the purpose of the federal policy.").

### III. Pfizer Could Not Have Added a Suicide-Related Warning to the Labeling Consistent with Federal Law

Plaintiffs assert that there is no conflict between federal labeling requirements and their state-law tort claims because 21 C.F.R. § 314.70(c) permitted Pfizer to add warnings to the Neurontin labeling without prior FDA approval by filing a Changes Being Effected ("CBE") supplement. Plaintiffs do not dispute, however, that changes made to add warnings by CBE supplement, "like all warnings, remain subject to Section 201.57(c)(6)(I) and may only be added when there is reasonable evidence of an association of a serious hazard with the drug." *O'Neal*, 2008 WL 275782, at *3 . Nor do they dispute that the decision as to whether the new warning is based on reliable scientific evidence, and thus whether the CBE should be approved, is reserved solely for FDA.[7]

As discussed above, FDA's scientific approach to determining whether there is an association between a drug and suicide-related events requires an analysis of placebo-controlled clinical trial data; the agency has made clear that postmarketing adverse event reports are unreliable in these circumstances. It is undisputed that the placebo-controlled clinical trial data for Neurontin showed no increased risk of suicide-related events. Absent reasonable evidence of a risk of suicide-related events, Pfizer "had no basis to petition FDA and simply did not have the

---

[7] "[T]he determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the [FDCA]. 71 Fed Reg. 3922, 3934 (Jan. 24, 2006).

option under federal law to include or secure a lawful warning for that risk in the drug's labeling." *O'Neal*, 2008 WL 275782, at *13.[8]

Plaintiffs further state that the Court cannot find conflict preemption here because Pfizer did not submit, and thus FDA did not explicitly reject, a CBE supplement with the contested warnings. But this very argument was rejected by the Third Circuit earlier this month in *Colacicco II*:

> We agree that a court could more easily determine the preemption issue if the FDA had formally rejected such a CBE supplement, but ***we cannot compel the defendant companies to suggest a CBE supplement that they believe is unnecessary. Nor do we favor encouraging regulated parties to submit CBE supplements for the sole purpose of insulating themselves from potential liability.*** Cf. 44 Fed. Reg. 37,434, 37,435 (June 26, 1979) (cautioning, in the context of medical malpractice liability, that "it would be inappropriate to require statements in drug labeling that do not contribute to the safe and effective use of the drug, but instead are intended solely to influence civil litigation in which the agency has no part"). Thus, we reject the notion that, in order to rise to the level of a conflict in this situation, the FDA's rejection of a warning must be imbued with the formality proposed by plaintiffs.

*Colacicco II*, 2008 WL 927848, at *15.

### IV. Plaintiffs' Other Arguments as to Why the Court Should Not Find Preemption Fail to Withstand Scrutiny

Plaintiffs also assert that the Court should find against preemption here because of a presumption against preemption, and because FDA's Preamble to its final labeling rule and its *amicus* briefs are not entitled to deference. Both arguments are without merit.[9]

---

[8] Had FDA concluded that the data submitted by Pfizer in 2004 constituted "reasonable evidence of an association" between Neurontin and suicide-related events, the agency would have had a regulatory obligation to direct Pfizer to include a warning.

[9] As an initial matter, plaintiffs wrongly claim that Pfizer's position is that pharmaceutical manufacturers are "immunized" against all state-law failure-to-warn claims under the FDCA. Neither Pfizer, nor FDA has taken that position. As plaintiffs themselves note, FDA expressly recognized in the 2006 Preamble to the Final Rule that its "regulation of drug labeling will not preempt all State law actions." 71 Fed. Reg. at 3936. Pfizer states that preemption is appropriate where, as here, there was no reasonable evidence of an association between the drug and suicide-related events, and FDA repeatedly considered the issue of suicidality and, consistent with the lack of

### A.     The "Presumption Against Preemption" Does Not Apply Here

Plaintiffs read the "presumption against preemption" too broadly and their reliance on it in these circumstances is misplaced. Foremost, the presumption against preemption does not apply in cases involving implied conflict preemption. Indeed, black-letter constitutional law holds that the Supremacy Clause preempts any state law that conflicts with the exercise of federal power. *See, e.g.*, *Fidelity Fed. Sav. & Loan. Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("state law is nullified to the extent that it actually conflicts with federal law"). This is consistent with the lack of any discussion of such a presumption in many of the Supreme Court's landmark conflict preemption decisions. *See de la Cuesta*; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987); *Chicago & Northwestern Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311 (1981); *City of New York v. FCC*, 486 U.S. 57 (1988); *Florida Lime & Avocado Growers, Inc.*, v. *Paul*, 373 U.S. 132 (1963). Indeed, none of the Supreme Court cases plaintiffs rely upon applies the presumption against preemption in a situation involving a conflict between state and federal law.[10,11]

### B.     FDA's Views on Preemption Are Entitled to Deference

Plaintiffs incorrectly argue that the Court should ignore FDA's views on preemption because the Preamble itself does not carry the force of law, and it lacks

---

reliable scientific evidence, chose not to include a warning, and in fact, rejected proposed warnings based on then-available information.

[10] The Third Circuit reached the same conclusion in its recent drug preemption ruling. *See Colacicco II*, 2008 WL 927848, at *8 ("Pfizer's argument that the presumption against preemption is inapplicable in the context of implied conflict preemption has more force.").

[11] Plaintiffs also wrongly suggest that Congress limited the extent of implied conflict preemption under the 1962 amendments to the FDCA when it stated that no state-law provision would be invalidated by the amendments absent a "direct and positive conflict" with state law. This is incorrect. Because "direct and positive" conflict was the precise phrase the Supreme Court used to summarize the test for conflict preemption, *Sinnot v. Davenport*, 63 U.S. (22 How.) 227, 243 (1859), Congress's use of that phrase makes clear its intent that ordinary conflict-preemption principles – nothing more, nothing less – continue to apply to the FDCA and FDA's implementing regulations. *See Colacicco II*, 2008 WL 927848, at *26 n.8 ("direct and positive conflict" language in the 1962 amendments "merely states that conflict preemption applies").

persuasiveness. Pfizer does not dispute that the Preamble statement does not carry the force of law and thus is not entitled to the highest deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). However, deference is appropriate under *Auer v. Robbins*, 519 U.S. 452 (1997) under which FDA's interpretation of its own regulations is controlling unless "plainly erroneous or inconsistent with the regulation." *Id.* at 461. Plaintiffs suggest that *Auer* deference does not apply because FDA regulations are not ambiguous. Not so.

FDA's clear expression of its preemptive intent is important because FDA regulations do not themselves answer the question whether they impose a "floor" or a "ceiling" for the content of approved labels. FDA has interpreted the regulations as establishing a "ceiling" that displace state laws that – in the agency's expert judgment – undermine consumer health and safety by requiring warnings the agency has found unnecessary and improper. Accordingly, the Court should defer to FDA's interpretation pursuant to *Auer*.[12]

Even if the Court does not find *Auer* deference appropriate, it should nonetheless give deference to FDA's preemption views pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).[13] Plaintiffs' argue that even under *Skidmore* the Preamble lacks the "power to persuade" and thus should be given no weight because it did not satisfy procedural notice-and-comment requirements, is poorly reasoned, and is inconsistent with prior FDA statements. Plaintiffs are wrong on each count.

First, neither the Administrative Procedure Act nor Executive Order 13,132 requires FDA to provide notice of and an opportunity to comment on responses to public

---

[12] The entire point of *Auer* deference is that unless the regulations permit only one conclusion, the agency itself must be allowed to decide how its own regulations should be construed so as to best advance the policy objectives underlying them.

[13] An agency's "rulings, interpretations and opinions . . . constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 140. Plaintiffs concede that an agency may communicate its intentions regarding the preemptive effect of its regulations through preambles and other means (citing *Lohr*) and that those views may be entitled to "some weight" (citing *Geier*).

comments about a proposed rule, which sets forth the agency's view of principles of implied conflict preemption in a preamble that is not part of the codified final rule.[14]  *See Sykes v. GlaxoSmithKline*, 484 F. Supp. 2d 289, 316 n.27 (E.D. Pa. 2007) (citing FDA's *Colacicco I amicus* brief).  Notwithstanding the above, when adopting the final rule in 2006, FDA did consult with numerous organizations representing the interests of state and local governments about the potential interaction between FDA drug labeling requirements and state law.  *See id.*; 71 Fed. Reg. at 3969.[15]

Second, plaintiffs' argument that the FDA's preemption position is based on invalid reasoning similarly misses the mark.  "[T]he government has provided a reasoned analysis in the Preemption Preamble as to why certain state law tort claims are now preempted." *Sykes*, 484 F. Supp. 2d at 315.  In particular,

> FDA analyzed many cases that found state law was not preempted and explained how those holdings conflicted with the objectives of its comprehensive labeling scheme and therefore, in such circumstances, preemption was warranted.  The FDA responded to the development of caselaw and this view of the preemptive effect of its regulations is not "plainly erroneous or inconsistent with the regulation[s]." [citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)].

*Id.*; *see also Colacicco II*, 2008 WL 927848, at *17 (giving deference to FDA's preemption views); *Bextra*, 2006 WL 2374742, at *8 (FDA's preemption view is "reasonable").  As the Supreme Court has held, FDA is "uniquely qualified to determine whether a particular form of state law 'stands as an obstacle to the accomplishment and execution of the full purposes and

---

[14]  APA's formal notice-and-comment procedures and Executive Order 13132's notice requirements apply only to legislative rules, not interpretive rules such as the Preamble's preemption statements.

[15]  *See also In re Bextra & Celebrex Marketing Sales Practices & Prod. Liab. Litig.*, No. CV-05-1699CRB, 2006 WL 2374742, at *8 (N.D. Cal. Aug. 16, 2006) ("*Bextra*") (stating that any administrative failure to consult with the states "does not mean that this Court cannot consider the FDA's view of how certain state laws stand as an obstacle to the accomplishment of the objectives of Federal law").

objectives of Congress,' and, therefore, whether it should be pre-empted." *Medtronic v. Lohr*, 518 U.S. 470, 496 (1996) (citations omitted).[16]

Third, plaintiffs' assertion that FDA's views on preemption are not entitled to deference because they have purportedly changed over time is also contrary to the law. A change in agency position does not mean that the agency's views may be ignored. "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863-64.[17] FDA has explained its reasoning and basis for its approach in both the FDA Preamble and *amicus* briefs. *See* 71 Fed. Reg. at 3933-36.

Moreover, plaintiffs have not identified any changes in FDA's most critical views. The FDA's supposed "inconsistency" arises from statements generally recognizing that, within the federal prescription drug regulatory scheme, state tort law still plays an important role. But as the Third Circuit found in *Colacicco II*, there is "no inconsistency between the FDA's preamble to the 2006 amendments and its long-held position that it has the responsibility to determine whether a warning is required." *Colacicco II*, 2008 WL 927848, at *18 (finding it unnecessary to determine whether FDA's preemption position was inconsistent with prior

---

[16] Like the Preamble, the FDA *amicus* briefs submitted with Pfizer's opening brief reflect the agency's informed judgment as to the types of state-law tort claims that conflict with federal objectives and, accordingly, the Court should consider them. *See Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007) (citing *Auer*, 519 U.S. at 462) ("Where . . . an agency's course of action indicates that the interpretation of its own regulation reflects its considered views," the Supreme Court has "accepted that interpretation as the agency's own, even if the agency set those views forth in a legal brief."). *See also Geier*, 529 U.S. at 883 (giving weight to agency's preemption views set forth in *amicus* brief); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 67-68 (2002) (same). Moreover, the cases cited by plaintiffs as not giving any weight to FDA's *amicus* briefs were all decided prior to the issuance of the FDA Preamble in 2006.

[17] *See also* Antonin Scalia, *Judicial Deference to Administrative Interpretations*, 1989 Duke L.J. 511, 518 (1989) (*Chevron* embraces concept that merely because agency interpretation is "new" or "changing," it is not somehow suspect); *Bextra*, 2006 WL 2374742, at *8 ("The Supreme Court has recognized that an agency's view of the preemptive effect of its regulations may change over time as the agency gains more experience with the interrelationship between its regulations and state laws.").

agency statements).[18]  In short, FDA has not taken the view that state tort law may compel manufacturers to add drug warnings where FDA has already considered the issue and found insufficient evidence to support the warning.  Further, plaintiffs do not dispute that FDA's approach to preemption has been "very consistent" since 2000.  *Colacicco I*, 432 F. Supp. 2d at 531.

V.      **The Court Should Invite FDA to Submit an *Amicus* Brief on the Preemption Issue**

Pfizer respectfully suggests that the Court and the parties would benefit from FDA's input on the preemption issue and, accordingly, asks the Court to invite FDA to submit an *amicus* brief stating whether its views on the issue of preemption in this case mirror those expressed in its prior *amicus* briefs.  For the same reasons Your Honor discussed in *In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d 187 (D. Mass. 2004) as the basis for requesting an *amicus* brief in that case, the Court should request one here.  *See* Defs.' Opening Br. at 31.  FDA's discussion of its regulatory actions regarding Neurontin and its views on preemption in the context of this litigation clearly would inform the Court's analysis of this important question.

VI.     **Pfizer Is Entitled to Summary Judgment on Plaintiffs' Failure-to-Warn Claims**

As set forth above, it is undisputed that the Neurontin clinical trial data show no increased risk of suicide-related events in patients taking Neurontin.  Plaintiffs and their experts have repeatedly conceded this point.  It is also undisputed that FDA does not base warnings on postmarketing reports of adverse events in a situation like this one where the adverse event is

---

[18] The prior statements of FDA cited by plaintiffs do not justify discounting FDA's views. As the court noted in *Colacicco I*, "the 1998 and 2000 statements in the Federal Register referred more generally to the regulations and not to the specific circumstances here-where Plaintiff's proposed warning would have misbranded the drug." *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 532 (E.D. Pa. 2006), *aff'd*, --- F.3d ----, 2008 WL 927848 (3d Cir. Apr. 8, 2008) ; *see also Dusek*, 2004 WL 2191804, at *6 (same).

found in the population of people who are treated with the medication. FDA has repeatedly and unequivocally made this clear as recently as three weeks ago. (Sayler Reply Decl., Ex. 3.) Accordingly, Pfizer had no scientific information upon which to warn patients and doctors regarding the risks of suicide-related events.

Moreover, the recent FDA Alert does not save plaintiffs' failure-to-warn claims because the FDA Alert is based on information that Pfizer did not have in its possession and could not have obtained through the exercise of reasonable care. That information – clinical trial data relating to medications not manufactured by Pfizer – is still not available to Pfizer. And, because the conclusion reached by FDA after analyzing this data did not become available until January 2008, it could not have been supplied to plaintiffs before they took Neurontin because the cases at issue here are based on the alleged ingestion of Neurontin in the years 2000 through 2005. For these reasons and as set forth in Pfizer's opening brief, Pfizer is entitled to summary judgment on plaintiffs' claims. *See* Defs.' Opening Br. at 32.

## CONCLUSION

For all the foregoing reasons and the reasons set forth in their opening brief, defendants respectfully request that the Court grant their Motion for Summary Judgment.

Dated: April 25, 2008                    Respectfully submitted,

                                                         DAVIS POLK & WARDWELL

                                                         By:  /s/ James P. Rouhandeh
                                                               James P. Rouhandeh

                                                       450 Lexington Avenue
                                                       New York, New York 10017
                                                       (212) 450-4000

                                                              - and -

        SHOOK, HARDY & BACON L.L.P.

By:   /s/ Scott W. Sayler
      Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

    - and -

HARE & CHAFFIN

By:   /s/ David B. Chaffin
      David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on April 25, 2008.

        /s/ David B. Chaffin