UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:  NEURONTIN MARKETING,                  :  MDL Docket No. 1629
        SALES PRACTICES AND                   :
        PRODUCTS LIABILITY LITIGATION         :  Master File No. 04-10981
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :  Judge Patti B. Saris
THIS DOCUMENT RELATES TO:                     :
                                              :  Magistrate Judge Leo T.
ALL PRODUCTS LIABILITY CASES IDENTIFIED ON    :  Sorokin
EXHIBIT 1 TO THE DECLARATION OF SCOTT W.      :
SAYLER, ESQ. FILED WITH MEMORANDUM IN         :
SUPPORT OF MOTION FOR SUMMARY JUDGMENT        :
                                              :
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS PFIZER INC. AND WARNER-LAMBERT COMPANY LLC'S
REPLY TO PLAINTIFFS' RESPONSE TO LOCAL RULE 56.1 STATEMENT OF
MATERIAL FACTS, AND ADDITIONAL STATEMENT OF MATERIAL FACTS**

        Defendants Pfizer Inc. ("Pfizer") and Warner-Lambert Company LLC ("Warner-
Lambert") (together, "Pfizer") submit the following reply to plaintiffs' response to the Local
Rule 56.1 Statement of Material Facts in support of the Motion for Summary Judgment, and
Additional Statement of Material Facts as to which Pfizer contends there is no genuine issue to
be tried.[1]

**I.    REPLY TO PLAINTIFFS' RESPONSE TO LOCAL RULE 56.1 STATEMENT OF
        MATERIAL FACTS**

        Set forth below is each material fact included in Pfizer's Local Rule 56.1
statement, along with plaintiffs' response to each, followed by Pfizer's reply:

---

[1] The facts asserted herein are admitted for purposes of Defendants' Motion for Summary Judgment only.

1.     Plaintiffs allege that they (or their decedents) attempted or committed suicide, made suicidal gestures, and/or experienced suicidal ideations (with or without physical injury) between the years 2000 and 2005 as a result of Pfizer's failure to warn of an increased risk of suicide-related events with Neurontin® (gabapentin) (hereinafter "Neurontin").  (Declaration of Scott W. Sayler, Esq. ("Sayler Decl."), at Ex. 1.)[2]

Plaintiffs' Response to No. 1:  Disputed.  Plaintiffs submit that the statement in paragraph 1 of Defendants' Purported Facts is incomplete.  Plaintiffs allege that in promoting and selling Neurontin for prescription to, and purchase and off-label use by Plaintiffs and their decedents, (1) Defendants negligently and, recklessly failed to exercise due care toward Plaintiffs and their decedents, failed to warn Plaintiffs and their decedents of the ineffectiveness of and adverse effects caused by using Neurontin and breached their continuing duty of pharmacovigilance with respect to Plaintiffs and their decedents, (2) breached express and implied warranties with respect to Plaintiffs and their decedents, (3) assumed a strict products liability to users and to persons using Neurontin, including Plaintiffs and their decedents, (4) fraudulently misrepresented material facts concerning the effectiveness and safety of Neurontin, and (5) employed deceptive acts and practices for the purpose of inducing medical providers to prescribe Neurontin to Plaintiffs and their decedents for unapproved off-label uses, thereby causing Plaintiffs and their decedents to purchase and use Neurontin for off-label uses, suffer suicidal ideations, make suicidal gestures and/or attempt or commit suicide and to sustain monetary damages.  Summons and Complaint, *Ronald J. Bulger, Sr., as Administrator of Estate of Susan Bulger, Deceases v. Pfizer, Inc, et. al.* (07 CA 11426) attached as Exhibit 42 to Declaration of Andrew G. Finkelstein, Esq.  Further references below to Exhibits attached to the Finkelstein Declaration will hereinafter be referred to as "Pls.' Ex.__."

Pfizer's Reply Regarding No. 1:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.

2.     On January 15, 1992, Warner-Lambert submitted to FDA an NDA seeking approval to market Neurontin for use as adjunctive therapy in the treatment of partial seizures in patients with epilepsy.  The initially-submitted NDA comprised 250 volumes of safety and efficacy data, including an Integrated Summary of Safety.  (Declaration of Mary Ann Coronel ("Coronel Decl."), at Ex. 1.)

Plaintiffs' Response to No. 2:  Undisputed.

---

[2] Defendants Pfizer Inc. and Warner-Lambert Company LLC's Motion for Summary Judgment is directed at the cases listed on Exhibit 1 to the Declaration of Scott W. Sayler, Esq., submitted with defendants' opening brief.

<u>Pfizer's Reply Regarding No. 2</u>:  N/A

3.     In December 1992, after a careful review of the Neurontin safety data, FDA summarized its clinical data review of the initial NDA submission and multiple safety updates in a comprehensive 113-page report in which FDA evaluated all adverse events from the clinical trials to identify potential safety risks, including the adverse events of depression and suicidality.

(Coronel Decl., at Ex. 3.)

<u>Plaintiffs' Response to No. 3</u>:  Disputed.  Plaintiffs submit that the statement made in paragraph 3 of Defendants' Purported Facts is incorrect. The cited exhibit is a draft report and is a summary wherein FDA reviewed only 3 of 4 randomized controlled trials submitted to support the proposed efficacy of Neurontin as adjunctive treatment for the limited population of patients with refractory seizures. The Division of Neuropharmacological Drug Products Combined Medical-Statistical Review is a 119 pages document. Pls.' Ex. 15.  It is undisputed that the FDA found that Neurontin use may cause depression to become worse and require intervention or lead to suicide as it has resulted in some suicidal attempts in the three clinical trials reviewed. Pls.' Ex. 15 at p. 117.  <u>No FDA document exists</u> that FDA changed or modified their opinion regarding Neurontin causing depression to become worse and requiring intervention or leading to suicide. The Peripheral and Central Nervous System Drugs Advisory Committee conducted a meeting on December 15, 1992 and voted unanimously that Neurontin was safe and effective **only** for the add-on treatment for intractable partial seizures in adults. Pls.' Ex. 34 at pp. 125-126.

<u>Pfizer's Reply Regarding No. 3</u>:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  The FDA reviewed four randomized, placebo controlled, double blind clinical trials in evaluating the efficacy of Neurontin in patients with refractory partial seizures.  The FDA also reviewed 46 pharmacology studies and 43 clinical studies, eight of which were placebo-controlled clinical trials, to support the safety of Neurontin. (Coronel Decl., Ex. 4 at 2, 7). Plaintiffs do not dispute that FDA carefully reviewed and evaluated the adverse events data from the clinical trials, including reports of depression and suicidality.  Plaintiffs mischaracterize the referenced statement from FDA's Combined Medical-Statistical Review.  Dr. McCormick never made any statements regarding causation, nor did she conclude that Neurontin increases the risk of depression or suicidal behavior.  Rather, she identified a potential concern with depression, which she later noted in her December 1993 clinical review was an event that occurs more frequently in epileptic patients compared to the general population.  FDA did not include any language in the labeling suggesting that Neurontin increases the risk of depression or suicide-related events.  Had FDA drawn the conclusions plaintiffs suggest, the agency would have had an obligation to include suicide-related warnings pursuant to 21 C.F.R. § 201.57.  (Coronel Decl., Ex. 5 at 8, Ex. 8; Sayler Opening Br. Decl., Ex. 2, at ¶ 14.)

4.    In the FDA report, Dr. Cynthia McCormick, the FDA Medical Review Officer who was primarily responsible for reviewing the Neurontin clinical safety data, specifically analyzed and discussed suicide-related events in Neurontin patients.  (Coronel Decl., at Ex. 3-4.)

Plaintiffs' Response to No. 4:  Disputed.  Plaintiffs submit that the statement made in paragraph 4 of Defendants' Purported Facts is incorrect.  No document exists that Dr. Cynthia McCormick "specifically analyzed" suicide-related events. Plaintiffs submit that Dr. Cynthia McCormick stated that Neurontin use may cause depression to become worse and require intervention or lead to suicide as it has resulted in some suicidal attempts in the three clinical trials reviewed. Pls.' Ex. 15 at p. 117.

Pfizer's Reply Regarding No. 4:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiffs do not dispute that Dr. McCormick's clinical review included her analysis of suicide-related events in Neurontin patients.  Plaintiffs mischaracterize the referenced statement from FDA's Combined Medical-Statistical Review.  Dr. McCormick never made any statements regarding causation, nor did she conclude that Neurontin increases the risk of depression or suicidal behavior.  Rather, she identified a potential concern with depression, which she later noted in her December 1993 clinical review was an event that occurs more frequently in epileptic patients compared to the general population.  FDA did not include any language in the labeling suggesting that Neurontin increases the risk of depression or suicide-related events.  Had FDA drawn the conclusions plaintiffs suggest, the agency would have had an obligation to include suicide-related warnings pursuant to 21 C.F.R. § 201.57.  (Coronel Decl., Ex. 5 at 8, Ex. 8; Sayler Opening Br. Decl., Ex. 2, at ¶ 14.)

5.    Dr. McCormick found no evidence that Neurontin increases the risk of or causes depression or suicidal behavior.  (Sayler Decl., Ex. 2 at ¶¶ 11-21; Coronel Decl., Ex. 5 at 8.) Had she concluded there was an increased risk of these events with Neurontin, Dr. McCormick said, she would have recommended that the drug not be approved or, at a minimum, required that the issue be "prominently noted in a warning in the final approved labeling."  (*Id*. at ¶ 14.)

Plaintiffs' Response to No. 5:  Disputed.  Plaintiffs submit that the statement made in paragraph 5 of Defendants' Purported Facts is incorrect.  Plaintiffs submit that the cited document is hearsay, supposition and require intervention and not in admissible form.  Dr. McCormick found that Neurontin use may cause depression to become worse and require intervention or lead to suicide as it has resulted in some suicidal attempts in the three clinical trials reviewed. Pls.' Ex. 15 at p. 117.  On September 27, 1993, Dr. McCormick did not retract her opinion that Neurontin would cause depression to become worse and require intervention or lead to suicide in her 19 page safety update report. Pls.' Ex. 17 at 0084498.  On December 15, 1993, Dr. McCormick did not retract her opinion that Neurontin would cause depression to become worse and require intervention or lead to suicide in an 8 page safety update report.  Pls.' Ex. 17 at 00084687. <u>No</u>

FDA document exists that FDA changed or modified their opinion that Neurontin causes depression to become worse and will lead to suicide.

Pfizer's Reply Regarding No. 5: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. The referenced statements from Dr. McCormick's affidavit address her own involvement in the review of the Neurontin clinical trial data and are based on personal knowledge. The foundation for Dr. McCormick's sworn affidavit was further laid at her deposition. (Sayler Reply Decl., Ex. 4 at 143.) Plaintiffs mischaracterize the referenced statement from FDA's Combined Medical-Statistical Review. Dr. McCormick never made any statements regarding causation, nor did she conclude that Neurontin increases the risk of depression or suicidal behavior. Rather, she identified a potential concern with depression, which she later noted in her December 1993 clinical review was an event that occurs more frequently in epileptic patients compared to the general population. FDA did not include any language in the labeling suggesting that Neurontin increases the risk of depression or suicide-related events. Had FDA drawn the conclusions plaintiffs suggest, the agency would have had an obligation to include suicide-related warnings pursuant to 21 C.F.R. § 201.57. (Coronel Decl., Ex. 5 at 8, Ex. 8; Sayler Opening Br. Decl., Ex. 2, at ¶ 14.)

6.      Dr. Russell Katz, Deputy Director of FDA's Division of Neuropharmacological Drug Products, prepared a report as part of his review of the NDA, dated October 11, 1993, in which he noted that one patient committed suicide "after having been off drug for a considerable time" and ten patients [out of 2,048] discontinued the trial due to depression or suicidal ideation. (Coronel Decl., Ex. 6 at 13-14.)

Plaintiffs' Response to No. 6: Undisputed. Plaintiffs do not contest that ten patients discontinued treatment in the adjunctive treatment for refractory seizure trials, an additional seven discontinued due to thinking abnormal, four discontinued due to anxiety, four discontinued due to agitation, four discontinued due to nervousness. Pls.' Ex. 15 at p. 84.

Pfizer's Reply Regarding No. 6: Plaintiffs do not dispute this fact. Plaintiffs' additional statement is immaterial but nonetheless refers to information reviewed by FDA and, as plaintiffs note, is referenced in FDA's Combined Medical-Statistical Review.

7.      Dr. Katz further observed that seven of 78 adverse events reported as "serious" involved depression, of which four events were considered either "possibly" or "probably" related to Neurontin. (Coronel Decl., Ex. 6 at 15.)

Plaintiffs' Response to No. 7: Undisputed. Plaintiffs do not contest that seven of 78 adverse events reported as "serious" involved depression, *additionally* there were six of 78 adverse events reported as "serious" involved overdose, of which two were considered possibly or probably related to Neurontin, and there were two of 78 adverse events reported as "serious"

involved suicide attempts and both were considered "possibly" or "probably" related to Neurontin.  Pls.' Ex. 15 at p. 102 and 107.

Pfizer's Reply Regarding No. 7:  Plaintiffs do not dispute this fact.  Plaintiffs' additional statement also refers to information reviewed by FDA and, as plaintiffs note, is referenced in FDA's Combined Medical-Statistical Review.

8.      Dr. Paul Leber, Director of FDA's Neuropharmacological Division, also prepared a report of the safety and effectiveness of Neurontin, entitled, "Approval Action Memorandum," dated December 13, 1993.  Dr. Leber's findings were consistent with those of Dr. Katz and Dr. McCormick.  (Coronel Decl., at Ex. 7.)

Plaintiffs' Response to No. 8:  Disputed.  Plaintiffs submit that the statement made in paragraph 8 of Defendants' Purported Facts is incorrect. Plaintiffs submit the Purported Facts in paragraph 8 is speculative and not in admissible form. Plaintiffs do not dispute that Dr. Paul Leber, Director of FDA's Neuropharmacological Division, found Neurontin 'safe for use' *only* when administered under the conditions described by the Divisions proposed draft labeling. Pls.' Ex. 82 at p. 4.  It is further undisputed that Dr. Paul Leber explicitly stated that the Division's conclusions that Neurontin is 'safe for use' is not a warrant that the use of Neurontin is without risk. *Id.* The FDA conclusion reflects a judgment by the FDA review team that the risks attributed to the use of Neurontin are reasonably acceptable in light of the benefits that the use of Neurontin is expected to provided when it is administered to the intended population under the condition of use recommended in its approved product labeling. *Id.*  No document exists wherein the FDA found Neurontin 'safe for use' beyond the labeled population or indication.

Pfizer's Reply Regarding No. 8:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiffs' additional statements are immaterial.  Further, Dr. Leber did not identify depression or suicidality as "risks" with Neurontin in the referenced statements.  (Coronel Decl., Ex. 7 at 3-6).

9.      An independent panel of outside experts, FDA's Peripheral and Central Nervous System Drugs Advisory Committee, also evaluated the data on Neurontin.  Dr. McCormick's clinical review was provided to the Committee and she discussed with the Committee the various adverse events reported in the clinical trials, including the suicide-related events, during its December 15, 1992 meeting.  None of the experts at the panel meeting concluded that Neurontin causes or increases the risk of these events and the panel voted unanimously in favor of FDA approval.  (Sayler Decl., Ex. 2 at ¶ 20; Coronel Decl., Ex. 13 at 43, 55, 58-59, 125-26.)

Plaintiffs' Response to No. 9:  Disputed.  The FDA Peripheral and Central Nervous System Drugs Advisory Committee did <u>not</u> separately evaluate Neurontin's effect on suicidality and the unanimous vote was limited only to whether the sponsor provided evidence in more than one adequate and well-controlled clinical investigation that Neurontin is safe and effective for the treatment as an add-on for intractable partial seizures in adults.  Pls.' Ex. 34 at pp. 125-126.

Pfizer's Reply Regarding No. 9:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiffs do not dispute that the data on suicide-related events from FDA's clinical review was submitted to the Central Nervous System Drugs Advisory Committee in advance of the meeting and presented orally to the Committee on December 15, 1992, and that the Committee members raised no concerns regarding these events.

10.    On December 30, 1993, after two years of review, FDA concluded that Neurontin was safe and effective for its intended use and issued an approval letter.  FDA approved Neurontin on the condition that the final printed labeling be identical to the draft labeling FDA had reviewed, edited, and approved or the company would be in violation of federal law.  (Coronel Decl., at Ex. 8; Sayler Decl., Ex. 2 at ¶ 27.)  The letter stated in pertinent part:

> The final printed labeling (FPL) must be identical to the draft labeling/PPI enclosed as Attachment 1 with this letter.  Marketing the product with FPL that is not identical to the draft labeling may render the product misbranded and an unapproved new drug.

(Coronel Decl., at Ex. 8.)

Plaintiffs' Response to No. 10:  Undisputed.

Pfizer's Reply Regarding No. 10:  N/A

11.    As of the time of approval in December 1993, FDA found that there was no scientific evidence supporting an increased risk of suicidal behavior and thinking with Neurontin and the agency did not include any such warning in the labeling.  (Sayler Decl., Ex. 2 at ¶¶ 28-29, Coronel Decl., at Ex. 8.)

Plaintiffs' Response to No. 11:  Disputed.  Plaintiffs submit that the statement made in paragraph 11 of Defendants' Purported Facts is incorrect. Plaintiffs submit the FDA found that Neurontin use may cause depression to become worse and require intervention or lead to suicide as it has resulted in some suicidal attempts in the three clinical trials reviewed.  Pls.' Ex. 15 at p.

117.  No FDA document exists that FDA changed or modified their opinion regarding Neurontin causing depression to become worse and requiring intervention or leading to suicide.

Pfizer's Reply Regarding No. 11:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiffs mischaracterize Dr. McCormick's statements regarding depression.  Dr. McCormick never made any statements regarding causation, nor did she conclude that Neurontin increases the risk of depression or suicidal behavior.  Rather, she identified a potential concern with depression, which she later noted in her December 1993 clinical review was an event that occurs more frequently in epileptic patients compared to the general population.  FDA did not include any language in the labeling suggesting that Neurontin increases the risk of depression or suicide-related events.  Had FDA drawn the conclusions plaintiffs suggest, the agency would have had an obligation to include suicide-related warnings pursuant to 21 C.F.R. § 201.57.  (Coronel Decl., Ex. 5 at 8, Ex. 8; Sayler Opening Br. Decl., Ex. 2, at ¶ 14.)

12.    Dr. McCormick, FDA's principal clinical reviewer for Neurontin has stated:

> Given the relatively low frequency of suicidal adverse events reported in the clinical trials and the high background rate of suicidal behavior in patients with epilepsy, the FDA did not believe it would have been appropriate to address suicidal behavior in the warnings, precautions, or contraindications sections.  Accordingly, *the FDA's scientific judgment in December 1993 was that there was no reasonable evidence of an association with Neurontin and suicidal behavior or any psychiatric adverse event.  To include a warning or other prominent listing of suicide-related events would have been inconsistent with the clinical trial data and a mischaracterization of the risks associated with Neurontin.*  In addition, such a warning would have had significant potential to impact public health adversely; both by diluting scientifically supported information in the labeling and by improperly discouraging the use of Neurontin.

(Sayler Decl., Ex. 2 at ¶ 29.) (emphasis added).

Plaintiffs' Response to No. 12:  Disputed.  Plaintiffs submit that the statement made in paragraph 12 of Defendants' Purported Facts is incorrect. Plaintiffs object to the cited document as hearsay, supposition and not in admissible form. Plaintiffs submit that Dr. McCormick found the epilepsy clinical trial data demonstrated Neurontin use may cause depression to become worse and require intervention or lead to suicide as it has resulted in some suicidal attempts in the three clinical trials reviewed.  Pls.' Ex. 15 at p. 117.  On September 27, 1993, Dr. McCormick did not retract her opinion that Neurontin would cause depression to become worse and require intervention or lead to suicide in her 19 page safety update report. Pls.' Ex. 17 at 0084498.  On December 15, 1993, Dr. McCormick did not retract her opinion that Neurontin would cause depression to become worse and require intervention or lead to suicide in a 8 page safety update report.  Pls.' Ex. 17 at 0084687.  No FDA document exists that FDA changed or modified their opinion regarding Neurontin causing depression to become worse and requiring intervention or leading to suicide.

Pfizer's Reply Regarding No. 12:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  The referenced statements from Dr. McCormick's affidavit address her own involvement in the review of the Neurontin clinical trial data and are based on personal knowledge.  The foundation for Dr. McCormick's sworn affidavit was further laid at her deposition.  (Sayler Reply Decl., Ex. 4 at 143.)  Plaintiffs mischaracterize Dr. McCormick's statements regarding depression.  Dr. McCormick never made any statements regarding causation, nor did she conclude that Neurontin increases the risk of depression or suicidal behavior.  Rather, she identified a potential concern with depression, which she later noted in her December 1993 clinical review was an event that occurs more frequently in epileptic patients compared to the general population.  FDA did not include any language in the labeling suggesting that Neurontin increases the risk of depression or suicide-related events.  Had FDA drawn the conclusions plaintiffs suggest, the agency would have had an obligation to include suicide-related warnings pursuant to 21 C.F.R. § 201.57.  (Coronel Decl., Ex. 5 at 8, Ex. 8; Sayler Opening Br. Decl., Ex. 2, at ¶ 14.)

13.    During its 1993 review of the draft labeling, FDA removed Warner-Lambert's proposed language from the Mechanism of Action section discussing the effect of Neurontin on certain neurotransmitters in the brain.  Specifically, FDA removed the statement: "Gabapentin slightly reduces the release of monoamine neurotransmitters in vitro."  (Coronel Decl., Ex. 1 at Pfizer_LCastro_0039688, Ex. 14, Ex. 15 at WLC_CBU_119984, Ex. 16 at WLC_JTurner _000827.)

Plaintiffs' Response to No. 13:  Undisputed.

Pfizer's Reply Regarding No. 13:  N/A

14.    In August 2001, Pfizer filed a supplemental new drug application for Neurontin ("sNDA") seeking an indication for the management of neuropathic pain.  (Coronel Decl., at Ex. 17.)

Plaintiffs' Response to No. 14:  Undisputed.

Pfizer's Reply Regarding No. 14:  N/A

15.    Though Pfizer ultimately sought approval only for use in treating one type of neuropathic pain, postherpetic neuralgia ("PHN"), the results of the clinical trials also included "confirmatory safety findings in other neuropathic pain conditions."  (Coronel Decl., Ex. 9 at 3.)

Plaintiffs' Response to No. 15: Disputed. Plaintiffs submit that the statement made in paragraph 15 of Defendants' Purported Facts is incorrect. PL Plaintiffs submit the safety was evaluated by review of the August 6, 2001 Defendants' Integrated Summary of Safety which included five original completed neuropathic pain studies and the December 20, 2001 Integrated Summary of Safety which included only PHN subjects. Pls.' Ex. 83 at 17. PL Plaintiffs submit that no other clinical trials were reviewed by FDA when evaluating safety for PHN patients as no document exists FDA reviewed any other clinical trial related to FDA's PHN review. PL Plaintiffs submit FDA did not review the epilepsy pediatric trials that resulted in prominent warning for neuropsychiatric events in the label. Pls.' Ex. 22 at 10.

Pfizer's Reply Regarding No. 15: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. Plaintiffs are incorrect. In addition to the five completed neuropathic pain studies, FDA's review of the PHN application included safety data on patients from four ongoing studies in diabetic neuropathy and mixed etiology neuropathic pain, as well as combination studies with naproxen and hydrocodone in non-neuropathic pain. Further, FDA had reviewed and approved the pediatric epilepsy supplemental application less than a year before Pfizer filed the neuropathic pain application (October 2000). (Coronel Decl., Ex. 9 at 3, 52-54, 62, 67-68, 71-72).

16.    Pfizer submitted an Integrated Summary of Safety in August 2001 and a safety update in December 2001. (Coronel Decl., Ex. 9 at 52-53.)

Plaintiffs' Response to No. 16: Undisputed.

Pfizer's Reply Regarding No. 16: N/A

17.    The FDA clinical reviewer with responsibility for the PHN application, Dr. Sharon Hertz, prepared a report, dated May 24, 2002, detailing her analysis of the clinical data. (Coronel Decl., at Ex. 9.)

Plaintiffs' Response to No. 17: Undisputed.

Pfizer's Reply Regarding No. 17: N/A

18.    Dr. Hertz analyzed all of the adverse events data, including the reports of depression and suicide-related events from the clinical trials in neuropathic pain disorders. Dr. Hertz found that the incidence of treatment-emergent depression in the neuropathy studies was higher in patients on *placebo* than patients taking Neurontin (2.2% vs. 1.3%). (Coronel Decl., Ex. 9 at 77.)

Plaintiffs' Response to No. 18: Disputed. PL Plaintiffs submit that the statement made in paragraph 18 of Defendants' Purported Facts is incorrect. PL Plaintiffs submit Dr. Hertz did not independently review and make a finding related to the incidence of treatment emergent depression. PL Plaintiffs do not contest the reported incidence of treatment-emergent depression in the studies examined as described by Defendants. Plaintiffs submit there were two suicide attempts while on Neurontin treatment requiring discontinuation and zero during placebo treatment. Pls.' Ex. 83 at 71. While on Neurontin treatment there were no (0.0%) adverse events of treatment emergent depression at 600 mg, there was one (1.2%) treatment emergent depression at 1,200 mg, there were no (0.0%) adverse events of depression at 1800 mg, there were seven (2.0%) treatment emergent depression at 2,400 mg, there were three (1.5%) treatment emergent depression at 3,600 mg. Pls.' Ex. 83 at 73. PL Plaintiffs submit no document exists indicating that either Dr. Hertz or Dr. McCormick reviewed or considered any of the Defendants clinical trials related to pediatric epilepsy, bipolar, social phobia, anxiety or any other clinical trial conducted unrelated to pain or PHN between the time of the original epilepsy approval and the PHN submission.

Pfizer's Reply Regarding No. 18: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. Plaintiffs do not dispute that Dr. Hertz reviewed the reports of depression and suicide-related events from the clinical trials in neuropathic pain disorders, nor do they dispute that the incidence of treatment-emergent depression in the neuropathy studies was higher in placebo patients. Data from the bipolar disorder, panic disorder, and social phobia studies were submitted to FDA in response to the agency's 2004 request for suicide-related data; it is undisputed that there were no reports of suicide or suicide attempt in these studies. FDA had reviewed and approved the pediatric epilepsy supplemental application less than a year before Pfizer filed the neuropathic pain application (October 2000). Plaintiffs' additional statements are immaterial. (Coronel Decl., Ex. 19 at 27).

19.     Dr. Hertz noted one incident of intentional overdose, which Pfizer had reported as a suicide attempt. The patient developed somnolence after taking a higher dose of medication, but only the somnolence was attributed to Neurontin, not the overdose. (Coronel Decl., Ex. 9 at 66.)

Plaintiffs' Response to No. 19: Disputed. Plaintiffs submit that the statement made in paragraph 19 of Defendants' Purported Facts is incorrect. The reported patient, a 36 year old Hispanic woman, intentionally overdosed in a suicide attempt and developed somnolence, requiring hospitalization, after taking 4500 mg of Neurontin. An attempt to empty her stomach failed. She received hydration only. Neurontin therapy was discontinued from the study on Day 28. Defendants' investigator determined the adverse events of suicide attempt and intentional overdose were definitely related to Neurontin. Pls.' Ex. 84.

Pfizer's Reply Regarding No. 19: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. Further, FDA noted only that the somnolence was attributed to Neurontin. (Coronel Decl., Ex. 9 at 66.)

20.    Dr. Hertz's analysis of the safety data included a review of the postmarketing experience with Neurontin, in which Dr. Hertz discussed adverse events reported in patients using the drug for off-label uses.  Specifically, Dr. Hertz noted that "[o]f 7655 cases reporting 20,076 [adverse] events, 75% originated in the US, and neuropathic pain was identified as the indication in 1294 cases [i.e., patients]."  (Coronel Decl., Ex. 9 at 14)  Dr. Hertz's report further shows that patients using Neurontin for all off-label indications (including neuropathic pain) comprised 3,084 of the 7,655 cases reporting adverse events, or 40%.  (*Id*. at 15.)

Plaintiffs' Response to No. 20:  Undisputed.  Plaintiffs do not contest Dr. Hertz reviewed the data submitted by Defendants.  Plaintiffs do contest whether any safety analysis was performed by FDA as no document exists describing FDA analysis of off-label usage of Neurontin.  Plaintiffs submit Dr. Hertz found the postmarketing data limited due to them being mostly voluntary; no accurate denominator was available to determine how these frequencies compare to controlled trials.  Pls.' Ex. 83 at 14.  Plaintiffs submit that prior to December 7, 1999, "off-label use of drug" adverse event reports were ***not*** uniformly [sic] by the Defendants.  *Id.* at 15.

Pfizer's Reply Regarding No. 20:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiffs do not dispute that Dr. Hertz reviewed and evaluated data showing that 40% of the cases reporting adverse events were patients using Neurontin for off-label indications.

21.    Based on her review of the safety and efficacy data, Dr. Hertz recommended approval of Neurontin for the management of PHN.  (Coronel Decl., Ex. 9 at last page.)

Plaintiffs' Response to No. 21:  Undisputed.  Plaintiffs submit Dr. Hertz recommended approval of Neurontin of dosing to 1,800/mg with little additional benefit from higher dosage for the limited population of adult sufferers of Post Herpetic Neuralgia.  Pls.' Ex. 83 at 80.

Pfizer's Reply Regarding No. 21:  N/A

22.    Dr. Robert Rappaport, the Deputy Director of FDA's Division of Anesthetic, Critical Care, and Addiction Drug Products ("DACCADP"), concurred with Dr. Hertz's conclusions and also recommended approval.  (Coronel Decl., Ex. 9 at last page.)

Plaintiffs' Response to No. 22:  Undisputed.

Pfizer's Reply Regarding No. 22:  N/A

23.     Dr. McCormick, who reviewed the original Neurontin NDA and, by this time was the Director of the DACCADP, prepared a report, dated May 22, 2002, "Review and Basis for Approval Action," in which she stated that there had been an adequate demonstration of safety and effectiveness of Neurontin in the treatment of PHN to support approval.  (Coronel Decl., Ex. 10 at 3.)

Plaintiffs' Response to No. 23:  Undisputed.

Pfizer's Reply Regarding No. 23:  N/A

24.     Dr. McCormick did not discuss suicidality in her report because, among other things, "Neurontin had in 2002 been in use throughout the world for nearly a decade and had not given rise to a safety signal involving any psychiatric adverse event or suicidality."  (Coronel Decl., Ex. 10 at 3; Sayler Decl., Ex. 2 at ¶¶ 38-39.)

Plaintiffs' Response to No. 24:  Disputed.  Plaintiff submit [sic] that the statement made in paragraph 24 of Defendants' Purported Facts is incorrect.  Plaintiffs object to the cited document as it is hearsay, supposition and not in admissible form. The cited statement was written by Defendants' lawyers in 2007 Pls.' Ex. 33 at pp. 82-83.  PL Plaintiffs submit no document exists indicated that either Dr. Hertz or Dr. McCormick reviewed or considered any of the Defendants clinical trials related to pediatric epilepsy, bipolar, social phobia, anxiety or any other clinical trial conducted unrelated to pain or PHN between the original epilepsy approval and the PHN submission. Pls.' Ex. 83 at 17.  PL Plaintiffs submit the pediatric epilepsy trials demonstrated a clear association between Neurontin and both psychiatric adverse events and suicidal adverse events.  Pls.' Ex. 22 at 10.

Pfizer's Reply Regarding No. 24: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  The referenced statements from Dr. McCormick's affidavit address her own involvement in the review of the Neurontin clinical trial data and reflect her own views and recollection of events.  (Sayler Decl., Ex. 2 at ¶¶ 11-46) The foundation for Dr. McCormick's sworn affidavit was further laid at her deposition.  (Sayler Reply Decl., Ex. 4 at 143.)  Data from the bipolar disorder, panic disorder, and social phobia studies were submitted to FDA in response to the agency's 2004 request for suicide-related data; it is undisputed that there were no reports of suicide or suicide attempt in these studies.  (Coronel Decl., Ex. 19 at 27).  FDA had reviewed and approved the pediatric epilepsy supplemental application less than a year before Pfizer filed the neuropathic pain application (October 2000).  Plaintiffs mischaracterize the referenced labeling regarding pediatric patients; it does not refer to suicidal adverse events.  (Coronel Opening Br. Decl., Ex. 12 at 13-14.)

25.    As it did in 1993, FDA again removed certain proposed language from the Mechanism of Action section when determining the final PHN labeling.   In particular, FDA deleted the following language:

> Gabapentin reduces the stimulated release of noradrenaline, dopamine, and glutamate under certain laboratory conditions.   Gabapentin administration to humans increases the total brain content of GABA after a single dose.   However, the relevance of these findings to clinical use is not yet clear.

(Sayler Decl., Ex. 2 at ¶¶ 40-41; Coronel Decl., Ex. 11 at 3.)

Plaintiffs' Response to No. 25:  Undisputed.

Pfizer's Reply Regarding No. 25:  N/A

26.    FDA's decision to remove this language from the prescribing information for physicians reflects the agency's belief that this information was not clinically significant. (Sayler Decl., Ex. 2 at ¶ 41.)

Plaintiffs' Response to No. 26:  Disputed.  Plaintiffs submit that the statement made in paragraph 26 of Defendants' Purported Facts is incorrect. Defendants fail to support their incorrect statement with admissible evidence. Plaintiffs submit the statement is nothing more than question of fact.

Pfizer's Reply Regarding No. 26:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.

27.    On May 24, 2002, FDA issued an approval letter for the treatment of PHN. FDA conditioned approval on the ***verbatim*** use of the FDA-approved labeling and warnings, stating that marketing the product with final printed labeling that is not identical to the approved labeling could render the drug misbranded.  (Coronel Decl., at Ex. 12.)

Plaintiffs' Response to No. 27:  Undisputed.

Pfizer's Reply Regarding No. 27:  N/A

28.    FDA did not require warnings that Neurontin causes or increases the risk of suicide-related events in the May 2002 approved Neurontin labeling.  (Coronel Decl., at Ex. 12.)

Plaintiffs' Response to No. 28: Undisputed.

Pfizer's Reply Regarding No. 28: N/A

29.    The references to suicide-related events from the epilepsy add-on trials contained in the Adverse Reactions section remained unchanged from the initial labeling approved in December 1993. (Coronel Decl., Ex. 12 at 27-28.)

Plaintiffs' Response to No. 29: Disputed. Plaintiffs submit that the statement made in paragraph 29 of Defendants' Purported Facts is incorrect. Plaintiffs submit the cited document is a 2002 label containing only the terms "suicidal" and "suicide gesture". Plaintiffs submit in 2006, the Neurontin label was revised and the term "suicide attempt" and "suicide" was added. Pls.' Ex. 22 at 21. Plaintiffs do not contest that the other suicide related precursor events from the epilepsy add-on trials, including "anxiety", "hostility", and "agitation" remained unchanged from the initial labeling approved in December 1993.

Pfizer's Reply Regarding No. 29: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. Material Fact No. 29 refers only to the 2002 labeling and thus remains undisputed. Plaintiffs' reference to the 2006 labeling is thus inapplicable and the reference to other non-suicide adverse events is immaterial.

30.    On April 26, 2004, FDA asked Pfizer to perform a comprehensive search, pursuant to specific FDA-mandated protocols, of the Neurontin clinical trial and postmarketing data for cases of suicide and suicide attempt. (Coronel Decl., at Ex. 18.)

Plaintiffs' Response to No. 30: Disputed. Plaintiffs submit that the statement made in paragraph 30 of Defendants' Purported Facts is incorrect. Plaintiffs submit the supporting document is hearsay and not in admissible form. On April 26, 2004, FDA did not set-forth specific mandated protocols. Pls.' Ex. 85.

Pfizer's Reply Regarding No. 30: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. The referenced FDA Contact Report has been authenticated and a proper foundation laid to satisfy the business records exception to the hearsay rule. *See O'Neal v. SmithKline Beecham Corp.*, No. CIV S-06-1063 FCD/DAD, 2008 WL 275782, at *3 n.7 (E.D. Cal. Jan. 30, 2008).

31.    Pfizer responded to FDA's request by filing two submissions, in September and November 2004, respectively. (Coronel Decl., at Ex. 19-20.)

Plaintiffs' Response to No. 31: Undisputed.

Pfizer's Reply Regarding No. 31: N/A

32.    The September 2004 submission included the results of the search for cases of suicide and suicide attempts in 92 Phase 2-4 placebo-controlled, non-placebo controlled, and open-label (uncontrolled) Neurontin studies included in the investigational new drug applications ("INDs"), NDAs, and sNDAs, as well as the analysis of postmarketing data.  (Coronel Decl., Ex. 19 at 2.)

Plaintiffs' Response to No. 32:  Disputed.  Plaintiffs submit that the statement made in paragraph 32 of Defendants' Purported Facts is incorrect.  Plaintiffs do not dispute that Defendants did search for all reports containing the characters "suic" or "overdos" and reviewed those reports along with all reports involving a death.  Pls.' Ex. 86 at pp. 12-13.  Plaintiffs submit that any non-death report that did not contain the text "suic" or "overdos" was not reviewed even though such reports may have used alternate phrases to describe suicidal event; Plaintiffs submit that Defendants acknowledged that relevant reports could exist that would not contain "suic" or "overdose".  Id. at p. 13.

Pfizer's Reply Regarding No. 32:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiffs do not dispute that Pfizer submitted suicide-related data to FDA in the manner requested by the agency.  Further, plaintiffs' description of the search Pfizer conducted is incomplete and misleading.  The search also included all reports that coded to the terms "accidental injury" and "intentional injury" and all reports involving death because these might include suicide-related events that were not captured by the terms "suic" or "overdos."  (Coronel Decl.,  Ex. 19 at 13.)

33.    These studies included patients with psychiatric disorders such as bipolar disorder, panic disorder, and social phobia.  There were no reports of suicide or suicide attempt in these studies.  (Coronel Decl., Ex. 19 at 27.)

Plaintiffs' Response to No. 33:  Disputed.  Plaintiffs submit that the statement made in paragraph 33 of Defendants' Purported Facts is incorrect. Plaintiffs submit there were 2 cases of completed suicide in Neurontin treated epileptic subjects and no completed suicides in the placebo treated patients. There were 12 cases of suicide attempt in Neurontin treated subjects of which 11 were subjects in the Epilepsy trials and 1 case involved a subject in the neuropathic pain study.  There were no cases of suicide attempt in placebo treated patients.  Pls.' Ex. 86 at p. 2.  There were 14 reports of overdose in the Epilepsy trials and STEPS trials. Pfs.' Ex. 5 at pp. 10 and 34, ¶44 and 76.

Pfizer's Reply Regarding No. 33:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Material Fact No. 33 refers only to the psychiatric studies and thus remains undisputed.  Plaintiffs' reference to the other studies is thus inapplicable.  Plaintiffs do not identify whether the 14 incidents of overdose were

intentional or accidental. Further, of the 12 reports of suicide attempt, all but one were from uncontrolled clinical studies.

34. The November 2004 submission included 55 Phase I Neurontin clinical trials in healthy volunteers and patients. There were no cases of suicide or suicide attempt in any placebo-controlled or non-placebo controlled studies in healthy volunteers or patients. (Coronel Decl., Ex. 20 at 2.)

Plaintiffs' Response to No. 34: Disputed. Plaintiffs submit that the statement made in paragraph 34 of Defendants' Purported Facts is incorrect. Plaintiffs do not dispute that Defendants did search for all reports containing the characters "suic" or "overdos" and reviewed those reports along with all reports involving a death. Pls.' Ex. 87 at pp. 4-5. Plaintiffs submit that any non-death report that did not contain the text "suic" or "overdos" was not reviewed even though such reports may have used alternate phrases to describe suicidal event; Plaintiffs submit that Defendants acknowledged that relevant reports could exist that would not contain "suic" or "overdose". Id. at p. 5.

Pfizer's Reply Regarding No. 34: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. Plaintiffs do not dispute that Pfizer submitted suicide-related data to FDA in the manner requested by the agency. Further, plaintiffs' description of the search Pfizer conducted is incomplete and misleading. The search also included all reports that coded to the terms "accidental injury" and "intentional injury" and all reports involving death because these might include suicide-related events that were not captured by the terms "suic" or "overdos." (Coronel Decl., Ex. 20 at 5.)

35. On October 20, 2005, after a review of the September and November 2004 submissions, the agency asked Pfizer to make "minor labeling changes" to the terminology in the Adverse Reactions section of the Neurontin label regarding suicide-related events. (Coronel Decl., at Ex. 21-24.)

Plaintiffs' Response to No. 35: Disputed. Plaintiffs submit that the statement made in paragraph 35 of Defendants' Purported Facts is incorrect. Plaintiffs submit no evidence exists supporting the Purported Fact that the request for the changes was based upon a review of Defendants' September and November 2004 submissions. Plaintiffs dispute "minor labeling changes" as inferring something beyond the statutory definition for "minor labeling change" as set-forth at 21. C.F.R. Ch. I (4-1-06 Edition) §314.70 (d). Pls.' Ex. 88 at p. 114.

Pfizer's Reply Regarding No. 35: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. Pfizer is not stating the September and November 2004 submissions prompted FDA to request the minor labeling change, only that this request followed Pfizer's submission and FDA's review of this data. It is

evident from FDA's October 20, 2005 correspondence requesting the labeling change that the agency had reviewed this data. Specifically, FDA noted that the number of patients using Neurontin should be updated to be consistent with the number reported in the September 2004 submission. (Coronel Decl., Ex. 21). Plaintiffs do not dispute this. (Pls.' Resp. to No. 37). Moreover, any assertion that FDA had not reviewed <u>suicide-related</u> data that was submitted <u>one year</u> earlier – and at the agency's request – is simply not credible. Pfizer's use of the phrase "minor labeling changes" is a direct quote from FDA's November 22, 2005 correspondence, which speaks for itself. (Coronel Decl., Ex. 24).

36.    FDA did <u>not</u> find that Neurontin increased the risk of suicide-related events and,

accordingly, did not ask Pfizer to add any warning to the label. (Coronel Decl., at Ex. 21.)

<u>Plaintiffs' Response to No. 36</u>: Disputed. Plaintiffs submit that the statement made in paragraph 36 of Defendants' Purported Facts is incorrect. Plaintiffs submit the FDA analysis found patients receiving Neurontin had approximately twice the risk of suicidal behavior or ideation compared to patients receiving placebo. Pls.' Ex. 1 at p. 1. FDA expects to apply broad labeling changes to Neurontin. *Id.* p. 4.

<u>Pfizer's Reply Regarding No. 36</u>: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. Material Fact No. 26 refers to FDA's review of the 2004 submission and the labeling changes it requested in October 2005. It is undisputed that FDA did not ask Pfizer to add any suicide-related warnings to the labeling in 2005. Plaintiffs' statement refers to the FDA's meta-analysis of eleven different antiepileptic drugs, which resulted in the January 2008 FDA Alert – and does so incorrectly. FDA never concluded that *Neurontin* has approximately twice the risk of suicidal behavior or ideation compared to patients receiving placebo; rather, the agency's conclusion was based on pooled data from *all eleven drugs*. FDA did not state any conclusions regarding Neurontin specifically. (Sayler Opening Br. Decl., Ex. 4 at 1.) It is undisputed that the Neurontin-specific suicide-related data submitted to FDA for inclusion in the meta-analysis show no increased risk of suicide-related events. (Coronel Decl., Ex. 28 at 4; Material Fact No. 42). It is further undisputed that FDA reached its conclusion regarding antiepileptic drugs several years *after* plaintiffs' alleged Neurontin use and injuries and on the basis of data not available to Pfizer – or to FDA during the relevant time period.

37.    FDA asked Pfizer to modify the "Other Adverse Events Observed During All

Clinical Trials: Clinical Trials in Adults and Adolescents with Epilepsy" section by changing the

terms "suicidal" and "suicide gesture" to "suicide attempt" and "suicide," as infrequent and rare

events, respectively. Similarly, in the subsection entitled "Clinical Trials in Adults With

Neuropathic Pain of Various Etiologies," FDA added "suicide attempts" as an infrequent event.

Finally, FDA asked that the information in the label reflecting the number of patients exposed to

Neurontin in the epilepsy add-on trials be updated to reflect the numbers Pfizer provided with its suicidality analyses in 2004. (Coronel Decl., at Ex. 21).

Plaintiffs' Response to No. 37: Undisputed.

Pfizer's Reply Regarding No. 37: N/A

38.    On November 22, 2005, following additional coordination, FDA directed Pfizer to "proceed with the minor labeling changes pertaining to suicide-related events." (Coronel Decl., at Ex. 22-24.)

Plaintiffs' Response to No. 38: Undisputed. Plaintiffs contest Defendants' use of "minor labeling changes" as inferring something beyond the statutory definition for "minor labeling change" as set-forth at 21. C.F.R. Ch. I (4-1-06 Edition) § 314.70 (d). Pls.' Ex. 88 at p. 114.

Pfizer's Reply Regarding No. 38: Plaintiffs' do not dispute this fact and their additional statement does not give rise to a genuine issue of material fact that would preclude summary judgment. Pfizer's use of the phrase "minor labeling changes" is a direct quote from FDA's November 22, 2005 correspondence, which speaks for itself. (Coronel Decl., Ex. 24).

39.    On December 21, 2005, Pfizer submitted the minor labeling changes to FDA. (Coronel Decl., at Ex. 25.)  On May 3, 2006, FDA issued an approval letter, which stated in relevant part:

> We have completed our review of these applications.  These applications are approved, effective on the date of this letter, for use as recommended in the agreed-upon labeling text.
>
> The final printed labeling (FPL) ***must be identical*** to the submitted labeling (package insert submitted December 21, 2005).

(Coronel Decl., at Ex. 26.) (emphasis added).

Plaintiffs' Response to No. 39: Undisputed. Plaintiffs contest Defendants' use of "minor labeling changes" as inferring something beyond the statutory definition for "minor labeling change" as set-forth at 21. C.F.R. Ch. I (4-1-06 Edition) § 314.70 (d). Pls.' Ex. 88 at p. 114.

Pfizer's Reply Regarding No. 39: Plaintiffs' do not dispute this fact and their additional statement does not give rise to a genuine issue of material fact that would preclude summary judgment. Pfizer's use of the phrase "minor labeling changes" is a direct quote from FDA's November 22, 2005 correspondence, which speaks for itself. (Coronel Decl., Ex. 24).

40.    Having considered clinical and postmarketing data relating to suicide-related

events from *all* patient populations – including those patients taking the product for epilepsy,

neuropathic pain, bipolar and other psychiatric indications – FDA once again determined that

Neurontin's label should not include any suicide warning.  (Coronel Decl., at Ex. 19-26.)

Plaintiffs' Response to No. 40:  Disputed.  Plaintiffs submit that the statement made in
paragraph 40 of Defendants' Purported Facts is incorrect.  Plaintiffs dispute that the FDA
considered all clinical data or any postmarketing data regarding suicide related events.  No FDA
document exists supporting the statement or describing what the FDA considered.

Pfizer's Reply Regarding No. 40:  Plaintiffs' response does not give rise to a genuine
issue of material fact that would preclude summary judgment.  It is undisputed that Pfizer's 2004
submissions to FDA included suicide-related events from clinical trials and postmarketing data,
as requested by FDA, and included data on patients using Neurontin for psychiatric disorders,
neuropathic and other pain, epilepsy, and other neurology disorders.  It is evident from FDA's
October 20, 2005 correspondence requesting the labeling change that the agency had reviewed
this data.   Specifically, FDA noted that the number of patients using Neurontin should be
updated to be consistent with number reported in the September 2004 submission.  (Coronel
Decl., Ex. 21).  Plaintiffs do not dispute this.  (Pls.' Resp. to No. 37).  Moreover, any assertion
that FDA had not reviewed suicide-related data that was submitted one year earlier – and at the
agency's request – is simply not credible.

41.    After FDA was contacted by the manufacturer of an antiepileptic drug ("AED")

other than Neurontin, FDA asked the manufacturers of eleven AEDs (including Neurontin) to

analyze "possibly suicide-related adverse events" occurring in randomized double-blind,

placebo-controlled trials.  (Sayler Decl., Ex. 3 at 1; Coronel Decl., at Ex. 27.)

Plaintiffs' Response to No. 41:  Disputed.  Plaintiffs submit that the statement made in
paragraph 41 of Defendants' Purported Facts is incorrect.  Plaintiffs submit FDA observation of
suicidality as drug-induced adverse effect in pediatric antidepressant trials formed FDA interest
in examining data from placebo-controlled trials of antiepileptic drugs to assess similar effects.
Pls.' Ex. 89 at p. 1.

Pfizer's Reply Regarding No. 41:  Plaintiffs' response does not give rise to a genuine
issue of material fact that would preclude summary judgment.

42.    Using criteria established by FDA, in June 2006 Pfizer submitted data to FDA on

49 clinical trials relating to Neurontin.  The data showed no suicidal behavior (i.e., completed

suicides, suicide attempts, or preparatory acts) in the Neurontin-treated group, and the tiny

numerical difference in the incidence of suicide ideation between the Neurontin and placebo groups (0.039% vs. 0.037%) was not statistically significant. (Coronel Decl., Ex. 28 at 4.)

Plaintiffs' Response to No. 42:  Disputed.  Plaintiffs submit that the statement made in paragraph 42 of Defendants' Purported Facts is incorrect.  Plaintiffs contest Defendants' statement drawn from the suicidal behavior data as there is either no event to report or insufficient information to classify the event, and thus no information in the table to make any comparison.  For suicidal ideation there are 2 events out of 5,194 total (0.039%) among the gabapentin treated versus 1 event out of 2,682 total (0.037%) among the placebo treated.  The estimated risk ratio is thus .039/.037 = 1.05.  Using statistical methods for categorical data with small counts of a rare event (Greenland and Rothman, 2008), the 95% confidence interval for the risk ratio ranges from 0.08 to 30.  Plaintiffs submit the data presented in the table cannot reasonably exclude the possibility that gabapentin multiplies the risk of suicidal ideation by 30-fold.  Pls.' Ex. 90 at pp. 4-5.

Pfizer's Reply Regarding No. 42:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  It is undisputed that the data Pfizer submitted in June 2006 does not show an increased risk of suicidal thinking or behavior.  Further, Dr. Greenland stated (in the same sentence cited by plaintiffs) that the data could not reasonably exclude the possibility of a 12-fold <u>decrease</u> in the risk of suicidal ideation.  (Pls.' Ex. 90 at 5.)  That certain possibilities cannot be excluded does not satisfy plaintiffs' burden of proof, nor does it create a genuine issue of fact.

43.    In January 2008, after analyzing aggregate, pooled data from placebo-controlled trials involving <u>all eleven AEDs</u>, FDA stated that the patients receiving one or more of these eleven AEDs in clinical trials had shown an increased risk of suicidal behavior or thinking. (Sayler Decl., at Ex. 4.)

Plaintiffs' Response to No. 43:  Undisputed.  Plaintiffs submit the FDA 2008 alert stated patients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation compared to patients receiving placebo.  Pls.' Ex. 1.

Pfizer's Reply Regarding No. 43:  Plaintiffs' additional statement does not give rise to a genuine issue of material fact that would preclude summary judgment.  FDA did not state any conclusions regarding Neurontin specifically and made no causation determination.  (Sayler Opening Br. Decl., Ex. 4 at 1.)  It is undisputed that the Neurontin-specific suicide-related data submitted to FDA for inclusion in the meta-analysis show no increased risk of suicide-related events.  (Coronel Decl., Ex. 28 at 4; Material Fact No. 42.)

44.    FDA reported that all AED patients combined had approximately twice the risk of suicidal behavior or thinking compared to placebo-treated patients (0.43% vs. 0.22%).  The

agency's determination reportedly was based on an analysis of 27,863 drug-treated patients and 16,029 placebo-treated patients in 199 placebo-controlled clinical trials covering the eleven different AEDs. (Sayler Decl., at Ex. 4.)

Plaintiffs' Response to No. 44: Disputed. Plaintiffs submit that the statement made in paragraph 44 of Defendants' Purported Facts is incorrect. Plaintiffs contest Defendants' statement of patients "combined". Plaintiffs submit the FDA 2008 Alert stated patients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation compared to patients receiving placebo. Pls.' Ex. 1.

Pfizer's Reply Regarding No. 44: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. FDA did not state any conclusions regarding Neurontin – or any drug – individually. (Sayler Opening Br. Decl., Ex. 4 at 1.) It is undisputed that FDA's meta-analysis was based on a review of data from eleven antiepileptic drugs. (*Id.*) It is further undisputed that the Neurontin-specific suicide-related data submitted to FDA for inclusion in the meta-analysis show no increased risk of suicide-related events. (Coronel Decl., Ex. 28 at 4; Material Fact No. 42).

45.    FDA issued an alert advising that patients using AEDs should be closely monitored for suicidality and other unusual changes in behavior. FDA further stated that it would be working with AED manufacturers to include this "new" information in the labeling for these products, and that FDA will discuss these data at an upcoming advisory committee hearing. (Sayler Decl., at Ex. 4.)

Plaintiffs' Response to No. 45: Undisputed. Plaintiffs submit FDA alert stated symptoms such as anxiety, agitation, hostility, mania and hypomania may be precursors to emerging suicidality. Plaintiffs submit FDA advised patients, family members and caregivers taking Neurontin to pay close attention to any day-to-day changes in mood, behavior and actions. Plaintiffs submit suicidality changes can happen very quickly so it is important to be mindful of any sudden differences in behavior. Pls.' Ex. 1.

Pfizer's Reply Regarding No. 45: Plaintiffs' additional statement does not give rise to a genuine issue of material fact that would preclude summary judgment.

46.    FDA did not conclude that there was a causal relationship between any of the antiepileptic drugs and suicide. In the FDA Alert, the agency stated: "Posting this information

does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue." (Sayler Decl., at Ex. 4.)

Plaintiffs' Response to No. 46: Disputed. Plaintiffs submit that the statement made in paragraph 46 of Defendants' Purported Facts is incorrect. Plaintiffs do not contest what the FDA Alert language sets-forth as quoted in the statement. Plaintiffs contest the FDA Alert is not based upon legal causation standard. Pls.' Ex. 91 at 27-28.

Pfizer's Reply Regarding No. 46: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. Pfizer agrees that the FDA Alert is not based upon a legal causation standard. The Alert is not even a general causation analysis. (Gibbons Daubert Reply Decl. at 5-6). Further, FDA utilizes a lower standard in conducting risk analysis than the preponderance-of-the-evidence or more-likely-than-not standard used to assess tort liability. *Glastetter v. Novartis Pharm. Corp.,* 252 F.3d 986, 991 (8th Cir. 2001); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002). As a result, FDA often acts out of an abundance of caution in the absence of a showing of causation. *Rider*, 295 F.3d at 1201.

47. No clinical or epidemiological evidence establishes an association between Neurontin and suicide-related events. (Prods. Liab. Plaintiffs' Mem. in Opposition to Defs.' Emergency Mot. to Modify the November 9, 2007 Case Management Order, at 10 (Doc. 1134); Declaration of Scott W. Sayler, Esq. in support of Defs.' Mot. to Exclude the Testimony of Doctors Trimble, Kruszewski and Blume on the Issue of General Causation ("Sayler Daubert Decl."), Ex. 5 at 377:1-381:25, 384:18-385:2; Ex. 6 at 31:23-33:25; Ex. 10 at 2, 8-9, 14-15, 18-19; Ex. 7 at 205:16-206:1.)

Plaintiffs' Response to No. 47: Disputed. Plaintiffs submits that the statement made in paragraph 47 of Defendants' Purported Facts is incorrect. Plaintiffs submit that the expert reports provided by Prof. Trimble, Dr. Kruszewski, and Dr. Blume all contain clinical evidence establishing an association between Neurontin and suicide-related events. Pls.' Ex. 5; Pls.' Ex. 77; Pls.' Ex. 68; Pls.' Ex. 92 at p. 50; Pls.' Ex. 93 at p. 81; Pls.' Ex 94; Pls.' Ex 95; Pls.' Ex 96; Pls.' Ex 97; Pls.' Ex 98; Pls.' Ex. 99; Pls.' Ex. 100; Plaintiffs contest all references Defendants cite in support of "Statement of Fact 47" as all pre-date the FDA epidemiological analysis contained in the 2008 FDA alert. The FDA alert, with 95% confidence interval, establishes that Neurontin doubles the risk of suicidality as it does not include the risk-ratio null value of one. Pls.' Ex. 1; Pls.' Ex. 90 at p. 4.

Pfizer's Reply Regarding No. 47: Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment. The FDA Alert is not evidence that "Neurontin doubles the risk of suicidality." Rather, the FDA Alert was a pooled risk analysis of eleven different antiepileptic drugs, including Neurontin, which found that 0.43% of

the patients in drug treatment groups experienced suicidal behavior or ideation versus 0.22% of the patients in placebo groups. (Gibbons Daubert Reply Decl. at 3.) FDA made no specific conclusions about Neurontin, and the Neurontin-specific data fail to support an association between Neurontin and suicide-related events. (*Id.* at 4.) Moreover, meta-analysis of randomized controlled trials for multiple different drugs with differences in chemical structure, mechanism of action, and pharmacologic properties does not provide causal evidence of a link to suicide for either the individual drugs contained in the analysis, or the drugs as a heterogeneous group. (*Id.* at 3).

48.     Neither plaintiffs nor their experts have initiated or conducted any epidemiological testing required to establish an association between Neurontin and suicide-related events. (Sayler Daubert Decl., Ex. 9 at 35:11-18; Ex. 6 at 121:14-24; Ex. 5 at 97:18-98:2; 67:20-25; 87:10-15; 92:1-12.)

Plaintiffs' Response to No. 48: Disputed. Plaintiffs submit that the statement made in paragraph 48 of Defendants' Purported Facts is incorrect. Plaintiffs contest that an epidemiological test is required to establish an association between Neurontin and suicidality. Defendants fail to cite document in admissible form requiring Plaintiffs' to initiate or conduct an epidemiological study.

Pfizer's Reply Regarding No. 48: Plaintiffs do not dispute this fact. Plaintiffs' additional statements do not give rise to a genuine issue of material fact that would preclude summary judgment. Plaintiffs agree both that the Reference Manual on Scientific Evidence is instructive (Pls.' Daubert Opp. at 2), and that the Reference Manual requires evidence of a statistically significant association from clinical or epidemiologic studies prior to consideration of the Bradford-Hill criteria. (Pls.' Daubert Opp. at 44.) Moreover, plaintiffs bear the burden of proving general causation, which necessitates that their experts rely on "confirmatory" epidemiologic evidence. *See Lynch v. Merrell-Dow Labs.*, 830 F.2d 1190 (1st Cir. 1987).

49.     Other than plaintiffs' hired experts in this litigation, no scientist, scientific or medical organization, or regulatory authority has ever opined or concluded that Neurontin can cause suicide-related events. (Sayler Daubert Decl., Ex. 9 at 691:7-21.)

Plaintiffs' Response to No. 49: Disputed. Plaintiffs submit that the statement made in paragraph 49 of Defendants' Purported Facts is incorrect. Plaintiffs submit FDA has stated patients receiving Neurontin had approximately twice the risk of suicidal behavior or ideation compared to patients receiving placebo. Pls.' Ex. 1. Plaintiffs submit Defendants' own scientists recognized suicide-related events associated with Neurontin. Pls.' Ex. 67; Pls.' Ex. 15 at 107; Pls.' Ex. 101 at p. 53; Pls.' Ex. 69; Plaintiffs submit the regulatory authorities including FDA and Health Canada recognized suicide-related events associated with Neurontin. Pls.' Ex. 1; Pls.' Ex. 31. Plaintiffs submit FDA recognized patients receiving Neurontin had approximately twice the risk of suicidal behavior or ideation compared to patients receiving placebo. Pls.' Ex. 1.

<u>Pfizer's Reply Regarding No. 49</u>:  Plaintiffs' response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiff's own expert, Dr. Kruszewski, admitted that no scientist, scientific or medical organization, or regulatory authority has ever opined or concluded that Neurontin can cause suicide-related events, even after FDA issued the Alert.  (Sayler Daubert Decl., Ex. 9 at 691:7-21.)  Moreover, the Alert is not evidence of general causation, did not contain any conclusions regarding Neurontin, and is inconsistent with the Neurontin data, which fail to support an association between Neurontin and suicide-related events.  (Gibbons Daubert Reply Decl. at 3-4.)  Plaintiffs' reliance on exhibits showing that certain adverse events occurred during clinical trials and were deemed "possibly related" to Neurontin by clinical trial investigators does not support plaintiffs' claim that defendants' own scientists "recognized suicide-related events associated with Neurontin."

## II.    PFIZER'S ADDITIONAL STATEMENT OF MATERIAL FACTS

50.    The federal government's investigation of Warner-Lambert involved allegations of off-label promotion.  At no time did the government allege, nor did Warner-Lambert plead, that the labeling for Neurontin failed to warn of certain health risks, in violation of 21 U.S.C. § 352(f)(2).  (Sayler Reply Decl., Ex. 1 at 14.)

51.    In May 2004, a Citizen Petition was filed seeking suicide warnings for Neurontin.  The Petition was based solely on postmarketing reports of suicide-related adverse events.  (Sayler Reply Decl., Ex. 2.)

52.    The Citizen Petition raised concerns about a possible suicide risk in certain off-label populations.  (Sayler Reply Decl., Ex. 2 at 2-3, 11.)

53.    Despite the Citizen Petition's request for suicide-related warnings in May 2004, including warnings regarding certain off-label populations, FDA did not add any such warnings when it revised the Neurontin label in 2005.  (Coronel Opening Br. Decl., Ex. 25-26.)

54.    FDA's scientific approach for determining whether there is an association between a medication and suicide-related events is based on an analysis of placebo-controlled clinical trial data.  (Sayler Opening Br. Decl., Ex. 9 at 7-8; Sayler Reply Decl., Ex. 3.)

55.    FDA did not analyze postmarketing reports of suicide-related events when determining whether there is an association between antiepileptic drugs and suicide.  (Sayler Opening Br. Decl., Ex. 4.)

56.    On April 1, 2008, FDA made the following statement regarding why postmarketing adverse events cannot be used to determine whether a medication is associated with or causes suicidal thinking or behavior:

> . . . the agency does not believe that spontaneous post-marketing reports can be interpreted appropriately in this situation.  Patients taking these drugs have a high background rate of suicidal thoughts/behaviors, and it is not possible to tell from AERS reports, whether the drug caused them.  In the agency's view, the only way to establish whether or not the drugs are responsible for suicidality is to analyze controlled trial data.

(Sayler Reply Decl., Ex. 3) (emphasis added).

Dated: April 25, 2008                     Respectfully submitted,

                                          DAVIS POLK & WARDWELL

                                          By:   /s/ James P. Rouhandeh
                                                James P. Rouhandeh

                                          450 Lexington Avenue
                                          New York, New York 10017
                                          (212) 450-4000

                                          SHOOK, HARDY & BACON L.L.P.

                                          By:   /s/ Scott W. Sayler
                                                Scott W. Sayler

                                          2555 Grand Boulevard
                                          Kansas City, Missouri 64108
                                          (816) 474-6550

                                                - and -

HARE & CHAFFIN

By:    /s/ David B. Chaffin
         David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and*
*Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on April 25, 2008.

/s/ David B. Chaffin

-27-