# EXHIBIT C

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                )
NEURONTIN MARKETING, SALES PRACTICES  ) CA No. 04-10981-PBS
AND PRODUCTS LIABILITY LITIGATION     ) Pages 1 - 51
SALES PRACTICES LITIGATION            )




                        MOTION HEARING

              BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE




                          United States District Court
                          1 Courthouse Way, Courtroom 19
                          Boston, Massachusetts
                          February 19, 2008, 3:35 p.m.




                       LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
                 United States District Court
                 1 Courthouse Way, Room 3205
                       Boston, MA  02210
```

Page 2

```
 1   A P P E A R A N C E S:
 2   FOR THE PLAINTIFFS:
 3      ANDREW G. FINKELSTEIN, ESQ. and KENNETH B. FROMSON, ESQ.,
     Finkelstein & Partners, LLP, 436 Robinson Avenue, Newburgh,
 4   New York, 12550.
 5      ANNAMARIE A. DALEY, ESQ., Robins Kaplan Miller & Ciresi,
     LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis,
 6   Minnesota, 55402-2015.
 7      THOMAS M. GREENE, ESQ., Greene & Hoffman, P.C.,
     125 Summer Street, Suite 1410, Boston, Massachusetts, 02110.
 8
        THOMAS M. SOBOL, ESQ., Hagens Berman Sobol & Shapiro,
 9   LLP, One Main Street, Cambridge, Massachusetts, 02142-1531.
10      DON BARRETT, ESQ., Barrett Law Office,
     404 Court Square North, P.O. Box 987, Lexington,
11   Mississippi, 39095.
12      GERALD LAWRENCE, ESQ., Lowey Dannenberg Cohen & Hart,
     P.C. Four Tower Bridge, 200 Barr Harbor Drive, Suite 400,
13   West Conshohoken, Pennsylvania, 19428-2977.
14
     FOR THE DEFENDANTS:
15
        DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
16   160 Federal Street, 23rd Floor, Boston, Massachusetts,
     02110-1701.
17
        JAMES P. ROUHANDEH, ESQ., Davis Polk & Wardwell,
18   450 Lexington Avenue, New York, New York, 10017.
19      LORI R. SCHULTZ, ESQ., Shook Hardy & Bacon, LLP,
     LLP, 2555 Grand Boulevard, Kansas City, Missouri, 64108.
20
21
22
23
24
25
```

Page 3

```
 1              P R O C E E D I N G S
 2      THE CLERK:  In Re:  Neurontin Marketing, Sales
 3   Practices and Products Liability Litigation, Civil Action
 4   No. 04-10981 and MDL 1629, will now be heard before this
 5   Court.  Will counsel please identify themselves for the
 6   record.
 7      MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol
 8   for the class plaintiffs in the sales and marketing matters.
 9      MR. GREENE:  Good afternoon, your Honor.  Thomas
10   Greene for the class plaintiffs, sales and marketing.
11      MR. FROMSON:  Good afternoon, Judge.  Kenneth
12   Fromson, Finkelstein & Partners, for the products liability
13   plaintiffs.
14      MR. FINKELSTEIN:  Andrew Finkelstein, Finkelstein &
15   Partners, products liability plaintiffs.
16      THE COURT:  Just so I get it, so Greene and Sobol
17   are for sales and marketing, and Fromson and Finkelstein are
18   products?
19      MR. FINKELSTEIN:  Yes.
20      THE COURT:  Because the products piece of this, I'm
21   going to be getting reacquainted with you.  So sales and
22   marketing, we've been seeing each other all along.
23      Okay, go ahead.
24      MR. LAWRENCE:  Gerald Lawrence on behalf of Aetna.
25      MS. DALEY:  Annamarie Daley, your Honor, on behalf
```

Page 4

```
 1   of the Assurant plaintiff.
 2      MR. BARRETT:  I'm Don Barrett, your Honor.  I'm
 3   with Mr. Sobol and Mr. Greene.
 4      THE COURT:  All right, so I'll draw a big arrow
 5   across my chart.
 6      Good to see you.  I haven't seen you in a while.
 7      MR. ROUHANDEH:  It has been a while.  Jim
 8   Rouhandeh, Davis Polk & Wardwell, for Pfizer and
 9   Warner-Lambert.
10      MS. SCHULTZ:  Lori Schultz, Shook Hardy & Bacon,
11   for Pfizer and Warner-Lambert.
12      MR. CHAFFIN:  Good afternoon, your Honor.  David
13   Chaffin, Hare & Chaffin, for the defendants.
14      THE COURT:  And for both cases?
15      MR. CHAFFIN:  Yes, correct, your Honor.
16      THE COURT:  All right, so Judge Sorokin called me
17   up and actually suggested that at this point I should
18   reengage a bit with your case because some of the issues
19   overlap dramatically, I think, but I don't feel as if I know
20   the case well enough to have done this on the papers.
21      As I understand it, we've got two different pending
22   motions.  One has to do with the timing of the expert
23   disclosure stemming from a new FDA alert, and the second one
24   was a joint motion to essentially extend out the summary
25   judgment, Daubert, and expert pending what I do on class
```

Page 5

```
 1   cert.  And all this goes in addition -- now, these are two
 2   separate -- I don't know if you are aware of each other's
 3   cases, maybe just a little bit.  So I want to know whether or
 4   not essentially the Daubert kinds of issues are going to be
 5   the same in both cases because I don't want to decide it in
 6   one case and not another case.  I think it should all be done
 7   in tandem, unless there are different issues, and I don't
 8   feel as if I know the cases well enough to make that
 9   assessment.
10      MR. GREENE:  May I address the Court, your Honor?
11      THE COURT:  Yes.
12      MR. GREENE:  Again, for the sales and marketing
13   plaintiffs.  We filed a joint motion with the defense to
14   extend the plaintiff disclosure in the sales and marketing
15   cases, and the motion was drawn up to ask for the Court to
16   allow disclosure 60 days after you rendered your decision on
17   the renewed class cert motion, which is scheduled for a
18   hearing in April.
19      THE COURT:  Well, let me just stop you.  I saw
20   that, and my first instinct was, when you agree, I agree.
21   But the reason I didn't just write "allowed" was because I am
22   going to be deciding soon Daubert issues in the context of
23   the other case, and if they're the same issues, you're not
24   going to want to be out of that loop.  I'm not going to wait
25   till the FDA -- I may allow some supplemental discovery into
```

Page 6

1  the expert opinions. I'm not waiting until you get data from
2  the FDA. We'll all be old and retired. That isn't to say
3  you can't supplement later on if the data comes in. But I'm
4  moving, I'm moving on the causation issues in the products
5  cases, and I think at least one piece of that is going to be
6  a significant overlap with yours. Is that wrong?
7       MR. FINKELSTEIN: Yes.
8       THE COURT: All right, so talk to me.
9       MR. FINKELSTEIN: On behalf of the product
10 liability plaintiffs, your Honor, the Daubert and general
11 causation, the thrust of our claim from the beginning has
12 been exclusively Neurontin's capacity to cause negative mood
13 and behavioral disturbances resulting in suicidality,
14 personal injury cases.
15      THE COURT: Right. And so it's the general
16 causation, not specific to each person.
17      MR. FINKELSTEIN: Yes.
18      THE COURT: But whether or not in fact --
19      MR. FINKELSTEIN: The drug has the capacity to do
20 what we allege that it does.
21      THE COURT: And that's primarily for people with
22 bipolar? Is that right?
23      MR. FINKELSTEIN: No, not at all. Across the
24 entire spectrum of those who have been prescribed it.
25      THE COURT: Now, so what do you anticipate? Assume

Page 7

1  for a minute I allow some supplemental discovery, whether
2  it's requiring you to do a more elaborate expert report or a
3  quick follow-up deposition on the supplemental disclosure,
4  but that can go on parallel with briefing. I'm not going to
5  wait for the FDA. But if the FDA finally spills forth, we
6  may end up having to do something new. I mean, so that's
7  basically -- I'm not precluding you from going forward with
8  the FDA. It's just I've been through that with the SEC, the
9  FDA, with all these agencies. Good luck.
10      But assume for a minute that I allow, you know,
11 just two hours apiece follow-on for each of the four experts,
12 probably do it in a day, two days, as far as you're
13 concerned, what is the issue? Whether or not it's a
14 substantial factor, Neurontin/gabapentin is a substantial
15 factor in causing suicide? Is that the sole issue?
16      MR. FINKELSTEIN: Whether it has the capacity to
17 lead to suicide, mood and behavioral disturbances that result
18 in suicidality, correct.
19      THE COURT: Causation.
20      MR. FINKELSTEIN: Causation.
21      THE COURT: A substantial factor in causing
22 possible, possibly but for, depending on how you parse it,
23 causation-wise.
24      MR. FINKELSTEIN: Right.
25      THE COURT: So that's the only issue. All right,

Page 8

1  now I'm going to turn to you. When we're dealing with the --
2  as I read your class cert decision, part of it is mood
3  disorders and bipolar and essentially fraudulently stating
4  what it is that the drug could do. Does that not have an
5  overlap with what he just described?
6       MR. SOBOL: By and large, it does not. There's a
7  small element of it that it will, which I'll address in a
8  second, but by and large, our issues that deal with bipolar
9  is for prescribing it for that condition rather than the
10 consequences that it has, and whether or not it was
11 efficacious or not or whether there were comparatively
12 equally effective, less-expensive alternative products that
13 were available.
14      THE COURT: So suppose I were to rule --
15      MR. SOBOL: But there's a little piece --
16      THE COURT: Yes.
17      MR. SOBOL: -- that it may end up being that
18 there's a small part of where our experts, in dealing with
19 the efficacy issue, get into the question of comparative
20 safety. If our experts were to at all overlap -- and this is
21 a very small ultimate part of our case -- from our point of
22 view, from the class plaintiffs' point of view, we would have
23 no problem with the products liability folks moving forward
24 with their case. And if there was something else that we
25 thought we needed to chime in on, we would file, you know,

Page 9

1  some supplemental brief, you know, appropriately timed, just
2  to make sure that our part of it was heard. But that's not
3  going to be in any way the main thrust of what our position
4  is, so --
5       THE COURT: So do you have the same experts talking
6  on the same thing?
7       MR. SOBOL: No.
8       MR. FINKELSTEIN: No, not at all.
9       THE COURT: They're completely nonoverlapping.
10      Now, what about from your point of view?
11      MR. ROUHANDEH: Well, I think it's correct that
12 there's probably very little to no overlap on these motions,
13 and that's because the motions now in the product liability
14 personal injury cases are really confined to two issues:
15 general causation and preemption. And it's not covering
16 every issue in the case, and when expert gets to every issue
17 in both cases, I think we'll probably see more of an
18 overlap. But at this juncture, what's to be decided is
19 whether or not there's any evidence and whether or not they
20 have any experts who can survive Daubert on the general
21 causation issue and also the preemption issue, so --
22      THE COURT: Suppose I were to say that there is
23 enough to support under a but-for, or probably not, a
24 substantial contributing factor maybe, a tendency towards
25 suicide, and part of their, the sales and marketing case is a

Page 10

1  failure to disclose it. I was trying to think it through in
2  my mind, not knowing both cases. Does the overlap go that
3  way? Or the reverse of that? So therefore if I said, no, it
4  doesn't have any tendency to create suicide, so therefore
5  there couldn't be any fraudulent marketing in terms of
6  overstating, you know, suppressing -- isn't that the word? --
7  suppressing information about suicide. I don't know the
8  cases well enough. Are you both content to disentangle
9  this?
10     MR. ROUHANDEH: No, the way they are set up is,
11 they are two very different issues, and the sales and
12 marketing cases are economic damages only that don't have to
13 do with the safety issue. In fact, what Mr. Sobol said here
14 today is the first time I'm hearing about that issue, and we
15 haven't obviously talked about it. So I don't think there's
16 overlap on that issue at all.
17     THE COURT: So there's no claim of suppressing
18 information that it is not a safe product?
19     MR. ROUHANDEH: Right. Their allegation is
20 suppressing information that it was not effective for certain
21 off-label uses while simultaneously claiming that it was
22 effective. That's their allegation. That's their theory of
23 fraud. It really is a very narrow theory because it's
24 basically saying, "You had some studies in your back pocket,
25 and we claim that while you had those studies, you should --"

Page 11

1     THE COURT: When you say "they," I just want to
2  make sure I understand.
3     MR. ROUHANDEH: The sales and marketing plaintiffs
4  are alleging this suppression theory, and it has to do with
5  efficacy, not with safety.
6     THE COURT: So efficacy in curing depression or
7  bipolar?
8     MR. ROUHANDEH: Bipolar, pain, a couple of other
9  things, migraine headaches. That's their theory.
10    THE COURT: And none of those studies that they're
11 referring to refer to any kind of increased risk of suicide?
12    MR. ROUHANDEH: No, no. So that, I don't think
13 that there is any overlap, but --
14    THE COURT: All right, so you're all agreeing, so
15 that's good. Then I don't need to worry about -- I'm not
16 sure I want one --
17    Let me -- I neglected our plaintiffs back here. Do
18 you have any view that there's any overlap? Does anyone in
19 this room think there's an overlap?
20    MR. BARRETT: No, ma'am, we don't think there is.
21    THE COURT: All right, good.
22    MR. FINKELSTEIN: If it would assist the Court, the
23 bright line between us is efficacy, safety. And they really,
24 although they sound similar, they just don't overlap.
25 Efficacy is, is it safer than alternative drugs? Ours, it

Page 12

1  may be efficacious or not efficacious for the indication it
2  was prescribed, but from a safety standpoint, it caused the
3  harm. It's a product liability case, like a -- I'm just
4  trying to assist the Court. If I'm confusing the Court, I'll
5  sit down.
6     THE COURT: That just confused me actually.
7     MR. FINKELSTEIN: All right, I'm sorry. Then I'll
8  sit down.
9     MR. ROUHANDEH: If I could address the FDA alert
10 issue --
11    THE COURT: So can I just -- we'll get there in a
12 minute. I understand. Let me just say this. So from your
13 all point of view, here's the issue: So you all want me to
14 issue -- I was very discouraged to see that I'd allowed so
15 much time for the opposition to come in and the reply and the
16 surreply, so I don't see you all till April on the class
17 cert. And given the bang-up job you always do, it will take
18 me at least through the summer, I mean, realistically to
19 write something. So the issue really is that you are then
20 pushing Daubert and motions for summary judgment, if I allow
21 motions for summary judgment -- I'm assuming I'm going to
22 learn a lot more about the case and whether I think one will
23 be viable -- into 2009. You understand that?
24    MR. GREENE: We do. We were hoping we may be able
25 to get a trial date this fall.

Page 13

1     THE COURT: How could that be possible? I mean,
2  you can't -- if you have -- you are each -- this is what
3  fries me sometimes. You all take months and months and
4  months to brief the things. You give me crate loads full to
5  look at. You get the months, and then you expect me to turn
6  it around. You have, like, rooms full of lawyers, and I --
7  they're sitting here trembling -- have like a law clerk for
8  each one of your mega cases.
9     So I couldn't possibly -- if you argued this in
10 April, the soonest that you would have a class cert decision,
11 okay, would be early summer. And then I have to do Daubert,
12 and then I have to do motions for summary judgment, if I
13 permit them, because by then, sometimes, as I learned in the
14 big MDL, I know enough about the case to know what the big
15 issues are and what I need to address.
16    MR. GREENE: That's what we thought. We thought we
17 might have disclosures, plaintiff disclosures by the end of
18 June, defendants' experts by the end of July, depose one
19 another's experts, have a trial date set for fall. You might
20 handle summary judgment at trial, as I understand you have in
21 some other cases.
22    THE COURT: Well, that's not what you proposed.
23    MR. GREENE: Well, I was hoping we might be able to
24 talk about that today.
25    THE COURT: The joint motion was, I forget how it's

Page 14

1  worded, but essentially you anchor everything to my ruling in
2  90-day increments. It pushes us way into 2009, as I read it.
3       MR. ROUHANDEH: Yes, I think it does, and I thought
4  we were in agreement on that, and I think we are still in
5  agreement on that point. Everyone recognizes that. I don't
6  think we were anticipating that your Honor would necessarily
7  decide the motion within a couple of weeks, and it might take
8  some time. Yes, that would push it into 2009. But, frankly,
9  the plaintiffs are the ones who approached us about this
10 possible extension, and I'm sure they don't want to go to a
11 whole bunch of expense and time and --
12      THE COURT: It's your call to some extent. I mean,
13 the reality is, I skimmed plaintiffs' side. I haven't seen
14 an opposition yet, right?
15      MR. ROUHANDEH: Right.
16      THE COURT: So you've done to some extent what I
17 wanted. You dropped three of the indications. I'm assuming
18 you're taking some of your best cases. I'm sure you'll do a
19 fabulous job at lobbing cannonballs through it, and then I'll
20 have to decide what's left. But that won't take just a few
21 weeks. What's left, about six indications?
22      MR. GREENE: Five, five indications.
23      THE COURT: Five indications?
24      MR. ROUHANDEH: We're prepared, and we understand
25 that and think that that's the way this should go.

Page 15

1       MR. SOBOL: May I say something on this topic, your
2  Honor?
3       THE COURT: Yes.
4       MR. SOBOL: Because it appears in all likelihood
5  that we won't be having the trial until your next group of
6  law clerks would come in in the fall of '08, my only hope
7  would be that what we're trying to do is we're trying to
8  target a trial date that's early enough in '09 -- and I don't
9  even know whether or not we're going to have a jury-waived
10 trial or a jury trial yet -- but sometime that's early enough
11 in '09 that we can get it in while you have those --
12      THE COURT: Let's do a jury trial.
13      MR. SOBOL: Yes, you want a jury trial?
14      THE COURT: Let's do a jury trial.
15      MR. SOBOL: So you don't have to write a decision,
16 your Honor?
17      THE COURT: Exactly.
18      (Laughter.)
19      THE COURT: In any event, whatever you choose, it's
20 your right, but --
21      MR. SOBOL: Well, just something else in terms of
22 judicial economy and looking at this too, and it's just a
23 thought, but when you address your class certification
24 decision, knowing that this case has been around now for
25 about four years, you know, you might decide that you're only

Page 16

1  going to address class certification on some aspects of the
2  case and not on other aspects of the case so that you can
3  expedite things along.
4       THE COURT: Right, but it will take me a while to
5  get there.
6       MR. SOBOL: Okay. Again, I'm just putting that out
7  there because, as you've done in other situations, you deal
8  with the class certification. And then we've teed up before
9  can make a ruling on it; you've waited on other things so we
10 could --
11      THE COURT: But here's the big difference between
12 this and the other cases: Let's assume that I thought there
13 was enough there to certify a class on three of the five
14 indications. Let's just guess, okay? That only is step one,
15 as I'm hearing what you're saying, but that just means
16 there's a common issue; and even if you took a more rigorous
17 analysis of the expert reports, you know, that are
18 relatively -- it's going to be very -- it's not even getting
19 into the science of whether or not there's a fraud.
20      MR. SOBOL: Correct.
21      THE COURT: So I need to -- unlike many of my other
22 things, I'm actually going to have to get into the weeds of
23 the suppressed reports and whether or not not disclosing them
24 is fraudulent. So that's a whole different set of issues
25 than whether the statistics of Professor Rosenthal hold up.

Page 17

1       MR. SOBOL: What you're saying is basically, in
2  other situations you can bypass, arguably, summary judgment
3  or Daubert. Here you may not be able to.
4       THE COURT: Because class cert almost overlaps with
5  them, and that's not here. One is, I'm assuming they're
6  going to try and lob holes in Professor Rosenthal's
7  statistical analysis with respect to when the fraudulent
8  marketing campaign allegedly began and whether it shot up.
9       Assuming you win this just for a minute, that
10 doesn't even overlap with the Daubert issues about whether
11 there's anything fraudulent or incorrect about suppressing
12 these studies. It's possible that the Daubert ruling will
13 preclude a motion for summary judgment, but I can't skip one
14 or the other of those steps, and that's just another major
15 step, as opposed to in class cert when we were dealing with
16 the massive MDL, basically it collapsed into essentially the
17 same issue. So am I understanding this correctly?
18      MR. ROUHANDEH: Yes, that's correct. I mean, we
19 don't think anything should be certified, but if something is
20 certified, all those issues and more issues will present
21 themselves.
22      THE COURT: Let me ask you this: Assume for a
23 minute you lose on some of the indications for class cert,
24 and I think that there's at least a battle of reliable
25 experts on whether or not something should have been

Page 18

1  disclosed, what are the other issues that would come up for
2  summary judgment? Or does a ruling on Daubert just
3  essentially knock out summary judgment?
4       MR. ROUHANDEH: Well, you know, that's an
5  interesting question, but I think there are going to be a
6  number of other issues, including the efficacy, because it's
7  their burden to prove that this product doesn't work for the
8  uses that they say. That's fundamental to their theory.
9       THE COURT: But assume Daubert just sort of takes
10 care of that.
11      MR. ROUHANDEH: Takes care of that then? And it
12 may, and it may be done in Daubert or may be done in
13 conjunction with summary judgment, or it may be done --
14      THE COURT: You've done it here sequentially, and I
15 didn't understand the issues well enough to understand
16 whether it should be sequential.
17      MR. ROUHANDEH: Well, I think actually in this, in
18 this proposed extension, there's not a reference to Daubert.
19 It's simply expert discovery followed by filing of summary
20 judgment motions. But those are interesting questions that
21 we probably should discuss and the parties would confer,
22 but --
23      THE COURT: Although it does make some sense.
24 Basically that would answer the question, which is that you
25 view them as essentially the Daubert issue may resolve any

Page 19

1  summary judgment, that there's unlikely to be -- by which I
2  mean a statute of limitations point or --
3       MR. ROUHANDEH: Right, right.
4       THE COURT: What other kind of thing like that?
5       MR. ROUHANDEH: Yes, there are even RICO points in
6  terms of establishing the existence of an enterprise and all
7  sorts of things. But the Court is correct that some of these
8  issues will overlap with Daubert, if we get to that stage,
9  and it may make sense to do those in conjunction or seriatim,
10 I'm not sure. But I think all parties understood when we
11 proposed this joint motion that we weren't expecting your
12 Honor to decide class cert, you know, overnight. And in fact
13 last time I think it was argued in April or May, and the
14 Court's decision was rendered at the end of August, and so I
15 don't think anybody was expecting that the decision was going
16 to be any faster than that. So I think everyone knew that
17 this would mean that the trial, if we ever get to there,
18 would be in 2009, if they survive all of these other steps.
19 So --
20      THE COURT: Let me ask you this: How many experts
21 are we talking about for expert discovery on the suppression,
22 the allegedly suppressed information?
23      MR. ROUHANDEH: Well, there are going to be a lot
24 of experts in this case, I think, if it survives the class
25 cert motion. And remember that even if it doesn't survive

Page 20

1  class cert, there are some plaintiffs represented by counsel
2  in the back here who are proceeding independently of any
3  class. So those will all go forward, and I'm sure that they
4  will have experts with respect to efficacy. They'll have
5  economic experts. There will be a host of experts. And I
6  think one of the things that, at least in my conversations
7  with plaintiff's counsel who's actually not here today, was
8  that what happens on class cert is obviously going to
9  dramatically affect what happens in terms of expert
10 discovery.
11      THE COURT: But as you just pointed out, not
12 necessarily. Let me ask the third-party payors
13 individually. I mean, one way to do this is to have you go
14 forward with the experts, you bear the expense and
15 responsibility and -- because I just remembered, as you
16 pointed out, that you'd be going forward in any event, and
17 just have it run in tandem, and just let plaintiffs at this
18 point individually carry the burden and have the class
19 plaintiffs off to a side, assuming that you're all excellent
20 lawyers, and if there's anything that needs to be filled in,
21 it would just take a month rather than a huge amount of time.
22      MR. LAWRENCE: Your Honor, we have throughout this
23 case proceeded forward with the class plaintiffs for a
24 variety of reasons; one, for the judicial economy of the
25 issues that come before the Court; secondly, for the economy

Page 21

1  of what we've undertaken to do, in that the underlying
2  fundamental allegations that we make are substantially
3  similar, if not the same, as the allegations made by the
4  class plaintiffs on the sales and marketing side.
5       THE COURT: It's just Aetna and Assurant are
6  certainly well-heeled third-party payors. So I understand
7  why the class may not want to spend the money if in fact I
8  don't certify anything, or would only want to spend on what I
9  certified, but are you pressing forward with all those
10 claims? What claims are you pressing forward with?
11      MR. LAWRENCE: We have the same five claims that
12 the --
13      THE COURT: Do you have your experts already lined
14 up?
15      MR. LAWRENCE: We have the same experts as the
16 class, your Honor.
17      THE COURT: So why don't you take this fall because
18 I'm going to have to go to trial on you anyway, right?
19      MR. LAWRENCE: Well, your Honor, obviously we have
20 to speak with our clients, but there's a --
21      THE COURT: Let's say I deny cert on everything.
22 Are you going forward on your own?
23      MR. LAWRENCE: I don't know, your Honor.
24      THE COURT: How about you, Assurant? You're Aetna,
25 right, and then there's Assurant? Yes, so --

Page 22

1    MR. LAWRENCE: Your Honor's rulings on the first
2  round of the class briefing has certainly been very
3  instructive to us about how we're going to present and
4  advance our case, and I think that whatever your Honor's
5  rulings are --
6    THE COURT: But understand, whatever I rule on
7  Professor Rosenthal, it's a pretty interesting, actually
8  fascinating -- they should teach it in law school -- what to
9  do with these situations. It's just a great issue which
10 should go up on appeal. This is a case that should go to the
11 Supreme Court. I mean, I'll probably eat those words, but,
12 anyway, it's a great issue, it's a really fabulous issue, the
13 kind of issue you go to law school to think about.
14    But that's not your issue. Your issue is far more
15 straightforward. And so the question is, why should I waste
16 all this time with respect to your claims, which really have
17 nothing to do with statistically if you can show a big
18 bump-up after an allegedly fraudulent campaign is asserted,
19 whether that's enough. You're going forward anyway. Why
20 don't you go forward?
21    MR. LAWRENCE: Well, your Honor, I think the
22 liability issues are, as I said, if not identical, certainly
23 substantially similar.
24    THE COURT: But not the class cert issues.
25    MR. LAWRENCE: I agree, your Honor, certainly not

Page 23

1  the class cert issues. But I think that your Honor's rulings
2  on the class cert are --
3    THE COURT: The class cert will be irrelevant to
4  you.
5    MR. LAWRENCE: I don't know that that's true, your
6  Honor, because, you know, your Honor's ruling on the first
7  round of the class cert motion was certainly very instructive
8  to us and caused us to narrow some of our claims, just the
9  same as the class has narrowed their claims. And to the
10 extent --
11    THE COURT: The class has dropped three of its
12 claims. Are you going forward with those?
13    MR. LAWRENCE: No, your Honor, we are not. And I
14 think that whatever your Honor's ruling is on the motions to
15 be argued in April, it's likely to be similarly instructive
16 to our clients.
17    THE COURT: What do you all think? I mean, it's --
18    MR. ROUHANDEH: Our only concern with the
19 coordinated plaintiffs going forward is that we'll have to do
20 it twice.
21    THE COURT: No, you won't.
22    MR. ROUHANDEH: I know your Honor could correct
23 that and make it so it's not so, but I would not want
24 Mr. Sobol to come back and say, "Well, I've got different
25 experts or new experts. I want to go through expert

Page 24

1  discovery." It seems to me they have to participate in
2  that --
3    THE COURT: Why don't we have some modification of
4  what you propose, which is, while we're doing class cert, at
5  least an exchange of the written reports, and we can defer
6  depositions until you see what I've done.
7    MR. SOBOL: Written reports as to liability, your
8  Honor?
9    THE COURT: Yes. You are starting so far behind.
10 You know you'll all ask for continuances. You always do.
11 And at least I can -- it's going to take six months to work
12 through the class cert, and who knows, somebody might even
13 appeal, right, either side, right? So at least have the
14 expert piece of this progressing.
15    MR. SOBOL: Sure. Here's what the practical
16 consequences of that would be from the class point of view:
17 If there's some piece of the case that's going to go forward,
18 that may or may not impact us because we don't know which
19 indications will be certified. Then we're put to having to
20 work with the coordinated plaintiffs because they'll be
21 using, by and large, our own experts, and to incur expense
22 and time and energy in working on those experts' reports
23 which may be irrelevant from our point of view. But, and
24 just so you also understand, a part of that also is the
25 underlying economic modeling for the damages, because at

Page 25

1  least as I understand it, most of the large third-party
2  payors who are litigating this case as an opt-out basis will
3  approach damages in the same way that the class plaintiffs
4  do, only will be seeking their ratable portion, if you will,
5  of the damages for their client. They won't be proving up
6  damages in some way that would be generic only to, for
7  instance, Aetna. Now --
8    THE COURT: But couldn't the reverse be true, that
9  once you are forced to put pen to paper and come up with
10 expert reports, that you'll drop some of the indications
11 because you can't prove they're fraudulent?
12    MR. SOBOL: Well, certainly ultimately we'll have
13 to prove -- you know, that will ultimately be, you know, the
14 rubber to the pavement, your Honor, as to --
15    THE COURT: So, in other words, if we ran in
16 tandem, by the time we hit class cert, one possibility is
17 you'd say, "I can't prove up one of the indications in terms
18 of --"
19    MR. SOBOL: That's right. In addition --
20    THE COURT: You know, fraud is a pretty steep
21 burden.
22    MR. SOBOL: Sure. There's also something else,
23 which is, and you might think about, and, frankly, my
24 suggestion was going to be, you put a question to
25 Mr. Lawrence and to the coordinated plaintiffs that at least

Page 26

1  from my perspective as a class lawyer I would want to have a
2  chance to think about with them before we gave you a specific
3  suggestion following up on your insight here, because there
4  might be a way to identify one or two indications which we
5  think quite clearly we're going to go forward on, where we
6  know that we're more prepared than we are on other matters,
7  and that those matters might be able to go forward on a
8  shorter time period --
9       THE COURT:  Well, why don't you confer and get
10 something to me by the end of the week, but are there other
11 opt-out third-party payors?
12      MR. SOBOL:  This is the two groups.  The
13 coordinated plaintiffs are the Assurant and Aetna.
14      MR. LAWRENCE:  There are other third-party payor
15 opt-outs.
16      THE COURT:  Who?
17      MR. LAWRENCE:  Kaiser and Guardian.
18      MR. SOBOL:  And we worked with them all.
19      THE COURT:  Yes, but let me just play devil's
20 advocate for a minute.  You're all going forward.  You're all
21 very wealthy, big third-party payors who can take care of
22 yourselves, as opposed to the little Taft-Hartley plans,
23 okay?  So you're going forward anyway.  Certainly Davis Polk,
24 Pfizer, they can take care of themselves.  It's the battle of
25 the giants.  It may be that the class wins on some and loses

Page 27

1  on some.  I haven't even read it closely enough to know what
2  I think.  It's just a great set of legal issues, but that's
3  another issue.  I just have a sense that you need not to
4  piggyback on the class, and you need to put, all of you, pool
5  some money and get it going.
6       MR. LAWRENCE:  Your Honor, I'd say two things:
7  One, I don't know if we're so much piggybacking on the class
8  as we're working together in tandem with the class.  But the
9  second thing, your Honor, you are correct that we are, to use
10 your words, I think you said, you know, big boys, and --
11      THE COURT:  And girls too.
12      MR. LAWRENCE:  And girls, and we obviously can
13 stand on our own.  But if your Honor were to say for whatever
14 reason that Claim X, Y, Z is not a viable claim, is not a
15 sustainable claim with respect to the class, I think that
16 that's going to be instructive to my clients as well, and
17 they may not go forward.
18      THE COURT:  I'm thinking out loud, and I won't
19 resolve it until you've had a chance to confer with one
20 another and maybe get me something by Friday, but as I'm
21 thinking it through, unless you categorically guarantee to me
22 that you're not going forward -- well, actually, I'm not even
23 sure then, but it would be helpful to find out.  For example,
24 if I say no class cert on bipolar -- I'm making up one --
25 that you're not going to go forward with bipolar.  But if you

Page 28

1  say you're going to go forward anyway on the indications,
2  then I'm going to run everything in tandem.  If you're not
3  going to go forward, you need to consult with Guardian and
4  Kaiser too, I suppose, would be the other ones.  I'm likely
5  to run the expert discovery in tandem.  There's nothing I'd
6  gain from that.  And I do think we should wait on summary
7  judgment in terms of -- at least the way I'm thinking right
8  now, but I'm even thinking about that with respect to the big
9  ones.
10      Do you have views on it one way or another?
11      MR. ROUHANDEH:  Well, our principal concern is not
12 to be doing it at the same time we're doing the class cert,
13 and then also not to be doing it twice, and I'm just very --
14      THE COURT:  It's such a good opportunity for all
15 these summer associates coming in right around that time.
16 They'll be so excited.  They'll come up here.  It leaves me
17 in a position otherwise that I'm having these two rounds of
18 things happening, and it's going to bring us into late 2009,
19 and this is getting to be an old case.
20      MR. ROUHANDEH:  Right, and I'm just very wary of
21 this group here that they will decide that they need to do
22 some additional expert discovery and that we'll be left
23 having to do it twice.  If they can guarantee that they're
24 not going to, then --
25      THE COURT:  That's why I thought perhaps not doing

Page 29

1  the depositions until I resolve it.  But let me think about
2  that.  You confer and see what you can come up with that way
3  because, as a practical matter, if I don't issue an opinion
4  until, let's say, August, this puts us into mid-2009 to have
5  a trial on this, if anything survives.  So let me just --
6       MR. ROUHANDEH:  Perhaps if they confer among
7  themselves and then we could confer perhaps and come up with
8  something that's a joint proposal.
9       THE COURT:  Now, the second issue is -- I think
10 we've pretty much taken care of the sales and marketing for a
11 second, and now let me move back to the products cases.  The
12 FDA, I sort of jumped the gun.  Of course, I read everything
13 before I came in here.  Have you received the data from the
14 FDA?
15      MR. ROUHANDEH:  No, we have not.  We've requested
16 it and haven't received it.  And I understand your Honor's
17 concern that there's no guarantee of when we would get that
18 data.  Where we are is --
19      THE COURT:  You have to go through the D.C.
20 Circuit, right, and then you have to file those little
21 certificates.  What do they call the little rules?  You and I
22 have been through this before.
23      MR. ROUHANDEH:  Yes, it does take some time.
24      THE COURT:  Years.
25      MR. ROUHANDEH:  Yes, it could take a while to do

Page 30

 1  that. I mean, we don't have an answer yet as to, you know,
 2  when and where. We were hoping we would be able to come here
 3  today and say this is when we're going to get it and put some
 4  finite dates around this issue. So I understand completely
 5  your Honor's concern.
 6       From our perspective, we have the plaintiffs now
 7  previously having said that the Neurontin clinical trial data
 8  is meaningless and irrelevant; and now a day after this alert
 9  comes out, suddenly it's supportive of their opinion. So at
10  a minimum, as your Honor mentioned, we would want the
11  opportunity to depose their experts about why it is now
12  suddenly that this same data that before was irrelevant is --
13       THE COURT: Where are they all? Just take two-hour
14  telephone depositions. Like, this shouldn't even be that
15  expensive, just what's the basis for that? Or if you want --
16  I don't even know how many -- how many people are we talking
17  about?
18       MR. ROUHANDEH: Three or four, I think. And it
19  would be their availability. I think we would like to do
20  them in person, but I would agree that they're not -- it's
21  not like they're two-day depositions or something. They
22  could be done pretty --
23       THE COURT: So, fine, so make a date for a day or
24  two and just do two hours apiece, just have them supplement,
25  "What are you relying on?" If we're going to do this

Page 31

 1  deposition again, I don't know where all these people are,
 2  could they all fly to a central location?
 3       MR. ROUHANDEH: It would be helpful if they could
 4  come to New York and we could do it in New York where they're
 5  located and where we're located, and we could do the
 6  depositions. I think the reason we asked to do this after
 7  the data is simply, when the data comes down, one side or
 8  another, as your Honor --
 9       THE COURT: I'm not waiting. I've been through
10  this route. It takes forever. They will refuse. They'll
11  say take more. You'll go to the D.C. Circuit, and then it's
12  just going to be one major hassle, and I'm not waiting.
13       MR. ROUHANDEH: No, I understand that, your Honor.
14  Your Honor made that clear even at the outset of this. What
15  I'm saying, I think, is, you also made clear that what's
16  going to happen is, there's going to be another round of
17  something, as long as the Court is prepared for that. And
18  once the data comes down, there might be another round of
19  briefing, and there could be some additional expert
20  discovery.
21       THE COURT: Maybe, but --
22       MR. ROUHANDEH: Maybe, maybe not, but at a minimum,
23  I think we would want the depositions of their experts to
24  answer the question of why they're now relying on this data
25  that was irrelevant, you know, two months before.

Page 32

 1       THE COURT: You know, an hour or two hours each
 2  person, on the phone.
 3       MR. FINKELSTEIN: If I may, your Honor,
 4  Mr. Rouhandeh's statement is categorically wrong. Our
 5  experts never said it was irrelevant, never said --
 6       THE COURT: I saw the debate. All I'm saying is
 7  that they've supplemented on a key point. Obviously, from my
 8  point of view, if the FDA says it's increasing the risk of
 9  suicide, the FDA is an expert agency. That means a lot to
10  me. They have a right, though, to show why it shouldn't,
11  right? Why the data doesn't, that at least is being
12  disclosed that the experts were relying on, doesn't do that.
13  And certainly if I am impressed with the FDA, knowing its
14  flaws, a jury would be really impressed. So they have a
15  right to probe why your experts are taking the position that
16  it supports their point of view, regardless of whether there
17  are inconsistencies or not.
18       I allow the motion for a two-hour per expert
19  telephone deposition. The alternative is, if for some
20  reason -- I don't know enough about this, whether there are a
21  lot of papers involved? Maybe you could do it through a
22  video deposition so everyone -- you know, I think we now have
23  the technology that not everyone has to get on a plane and go
24  somewhere. They could maybe go to someone's office with a
25  video camera so you could actually see what they're pointing

Page 33

 1  to. Sometimes that's helpful. But we don't need a whole big
 2  expensive new round. Two hours apiece, excluding bathroom
 3  breaks, and you can probably do it in one eight-hour swing.
 4       MR. FINKELSTEIN: And just so we're clear, your
 5  Honor, when you say two hours apiece, only given the history
 6  of our litigation --
 7       THE COURT: It's two hours for them. If you want
 8  to redirect --
 9       MR. FINKELSTEIN: That's great, two hours per
10  expert. They're entitled to ask questions. Then we have an
11  opportunity.
12       THE COURT: Two hours for them. Whatever you want
13  to take, you can take.
14       MR. FINKELSTEIN: Fine.
15       THE COURT: You know, within reason, but basically,
16  you know, sort of a rebuttal to clean anything up.
17       MR. FINKELSTEIN: Fine.
18       THE COURT: Okay? So I guess you're right, it
19  really realistically would span into two days. Okay? So why
20  don't we do this: Not to exceed two hours. Just spin it up
21  so there would be a recross and redirect. And I know how
22  these things work, so let's say you were to do an hour and a
23  half, and whatever you take, maybe a ten-minute redirect and
24  a ten-minute recross. Just work out some rules so that the
25  whole thing isn't taking much longer than a two-hour span.

Page 34

1    MR. FINELSTEIN: We'll have no problem with that,
2 your Honor, and per expert witness?
3    THE COURT: Just work it out. I don't have any
4 strong views on exactly what it is. It would be on the phone
5 through video cameras so that people can actually see if
6 someone's pointing to a document or a graph or a picture or
7 whatever. Do you want me to script it now any better than
8 that?
9    MR. ROUHANDEH: No, your Honor. I think we do need
10 two hours with the witnesses. I don't know whether they need
11 more than two hours, but if they want to put that on their
12 witnesses, fine. But I think in the span of two days, we can
13 line them up and knock them out in two days. I have a
14 feeling, to do this logistically, each one is going to take
15 sort of -- one's going to be a morning and then an afternoon
16 and then a morning and an afternoon.
17    THE COURT: You work that out.
18    MR. ROUHANDEH: And that could be done in two days,
19 and it will fine.
20    THE COURT: They could be skiing this week, so
21 whatever their schedules work, it works.
22    Now, on the FDA, I think you need to start -- have
23 you already started that process?
24    MR. ROUHANDEH: I believe it has been started, at
25 least with direct communication with the FDA.

Page 35

1    THE COURT: Let me ask you this, something I didn't
2 understand from the motions: Are there clinical data that
3 have not already been disclosed by the FDA? Is this new
4 data?
5    MR. ROUHANDEH: Well, we've submitted data to the
6 FDA for Neurontin, and it doesn't show any increased risk of
7 suicide. In fact, there were more events of suicide among
8 placebo than there were in the drug treatment group. So we
9 don't understand how the plaintiffs could take that and say
10 there's an increased risk with Neurontin.
11    THE COURT: Were they referring -- it shows my
12 ignorance. Gabapentin is the generic, right?
13    MR. ROUHANDEH: Yes, Neurontin.
14    THE COURT: Were they referring to the generics
15 across the board? Could that be the difference, those
16 manufactured by other people?
17    MR. ROUHANDEH: No, no. I think it's quite clear
18 that in fact there was some language in the FDA alert that
19 says this was generally found among most drugs. We don't
20 think that this increased risk was found with respect to
21 Neurontin, and --
22    THE COURT: When you say Neurontin, do you mean to
23 all gabapentin?
24    MR. ROUHANDEH: Neurontin, gabapentin, yes. That's
25 just the --

Page 36

1    THE COURT: So even if -- who else manufactured
2 it?
3    MR. ROUHANDEH: Some other generic companies, but,
4 yes, whether gabapentin or Neurontin, the same thing. The
5 trials were with Neurontin, and they looked at the clinical
6 trials. And we've looked at them, and we've submitted the
7 data. And the plaintiffs have the data, and it doesn't show
8 any increased risk, and we need to now ask the plaintiffs'
9 experts about this. But there's a practical issue, which is
10 it's now February 19. Our briefs are due February 28. And I
11 don't know when this two-day event is going to occur. I
12 don't think we'd be looking at an open-ended or a lengthy
13 extension, but a couple more weeks might be helpful. If the
14 plaintiffs' experts could be, you know --
15    THE COURT: But this is going to be quick.
16    MR. ROUHANDEH: Yes, very quick.
17    THE COURT: You could do it in the next week, and
18 then give everybody an extra week on the briefing.
19    MR. ROUHANDEH: Right. Well, I was going to
20 suggest do it by the end of February, have the expert
21 depositions by the end of February; and then by March 14,
22 which is the same day that our class cert opposition is due,
23 we would put in the summary judgment motions. That's two
24 weeks, two weeks from -- or it would give me two weeks from
25 the 28th, whatever the date that is, the 13th, I believe.

Page 37

1    THE COURT: Well --
2    MR. FINKELSTEIN: I just have no idea of my
3 experts' -- I will reach out to every one of them. I just
4 have no idea what their schedule is. I have one who is in
5 London who travels. Last time they brought an application we
6 did a phone conference deposition with him in Paris. He will
7 make himself available. I just can't commit to -- we'll do
8 it as soon as practicable. I want to do it yesterday, Judge,
9 so it won't be an issue on our end.
10    THE COURT: Well, but he's asking for a
11 continuance. Let me put it this way. This is what I think
12 needs to happen: You need to do it as soon as possible.
13 There shouldn't be a continuance, and to the extent that you
14 need to work in the new information, put it into the reply.
15 And I won't hold you to the normal rules. You know, to the
16 extent that you need a little bit more room in your reply
17 bringing in new information, that probably makes the most
18 sense, because most of what you're going to do is not going
19 to be about this. I'm assuming what they're going to say is
20 pretty boilerplate in terms of, "Oh, the FDA says, so we say
21 too." And maybe I'm simplifying it, but --
22    MR. ROUHANDEH: We actually think that there's
23 going to be affirmatively helpful things that we're going to
24 get from these depositions. Otherwise we wouldn't take them.
25 If we put it off a week, I don't know that it really affects

Page 38

1  things very much, but --
2        THE COURT: Do I care if you put it off a week?
3  No, if you can get all the experts on board. What I'm not
4  willing to do, because you just got me worried, if some guy
5  is in Paris for three weeks, I'm not willing to wait that.
6  So whatever you can do within the week, fabulous. Otherwise,
7  I'm not going to prejudice you. Throw it into your reply.
8        MR. ROUHANDEH: Yes, I think we would like to
9  present it all up front.
10       THE COURT: I'm sure you would, but I'm not willing
11 to wait until the guy gets back from Paris or someone at the
12 FDA. Do we have a hearing date on these?
13       MR. FINKELSTEIN: No. That's an open issue we were
14 hoping to address today with you.
15       THE COURT: So when is the briefing schedule as
16 provided complete?
17       MR. ROUHANDEH: I don't know. I'm not sure that I
18 have it in front of me. Just the history of this issue in
19 the past in not being able to agree on simple things like
20 this, I would request if your Honor would actually order that
21 they produce their experts by the end of February. If the
22 one in Paris can't do it, you know, I don't see why he
23 couldn't do it the following week, but produce their experts
24 by February 28. And we'll put our brief in by March 7, and
25 then there's certainty to it.

Page 39

1        THE COURT: Can you live with that?
2        MR. FINKELSTEIN: I don't know why your Honor's
3  suggestion, which I think is perfect, is it goes in the reply
4  papers. We will make the phone calls as soon as we walk out
5  of here.
6        THE COURT: All right, I order you to produce
7  anyone who's humanly producible by February 28. I'm not
8  going to ruin someone's vacation with their kids. It's a
9  school vacation week, at least if you have your kids in
10 public school, and then I assume it will morph into the
11 private school week. So I'm not going to destroy someone's
12 vacation, and I'm not going to delay it longer than a week.
13 Whatever you can get in this week, get in, and otherwise --
14 and I'll give you the one week.
15       MR. ROUHANDEH: Thank you, your Honor.
16       THE COURT: But then I'm not going to increase --
17 but still file your papers one week later, and then whatever
18 you can't fold in you'll have to put in your reply.
19       MR. ROUHANDEH: That's fine.
20       MR. FINKELSTEIN: And, your Honor, they've already
21 had two days of depositions with these experts. I trust that
22 their examination is limited to the FDA?
23       THE COURT: Only limited to the FDA.
24       MR. ROUHANDEH: Yes, that's fine, your Honor.
25       MR. FINKELSTEIN: And the surreply is April 25.

Page 40

1        THE COURT: Okay, so the first week in May in the
2  afternoon.
3        MR. FINKELSTEIN: And we'd like to bring our
4  experts in for a hearing.
5        THE COURT: I don't know.
6        MR. ROUHANDEH: And we haven't discussed that.
7  That issue was raised with the Magistrate, and I thought the
8  parties were going to talk about that.
9        THE COURT: I'm actually quite sympathetic to that
10 because it's a way for me to learn. And one way to discuss
11 this is to have -- I've done this before where you put in the
12 direct exam through your affidavits and reports, do a little
13 brief sum-up so I can ask questions, and then spend most of
14 the time on cross.
15       MR. FINKELSTEIN: This is a very complex scientific
16 issue, your Honor, that we certainly can tackle on the
17 papers, but we believe you will be enlightened by asking our
18 expert any questions you may have.
19       THE COURT: One thought I have is the week of
20 April. . . I will just be getting back from somewhere, and it
21 would be better for us to have a bench trial, so I could give
22 each side up to, you know, a day, a morning apiece to do the
23 highlights of their case, and the rest would be on paper.
24 Would you want to do that?
25       MR. ROUHANDEH: I think we would need to talk to

Page 41

1  our client to discuss it. We haven't discussed the format of
2  any of this with the plaintiffs. I would propose that we try
3  to come up with a joint proposal as to what a hearing would
4  look like and --
5        THE COURT: Sometime during the week of April 28,
6  April 27.
7        THE CLERK: The 28th.
8        THE COURT: So let's say starting sometime that
9  week is what I'm thinking about. So we're going to pencil
10 that in, like a day apiece, by which I mean five trial hours,
11 something along those lines, four trial hours. So why don't
12 you talk about if that's doable for all of you, which should
13 be after everybody's vacation and after all the briefing is
14 due, and we can try and work it in. If not, I'll come up
15 with another date, but it is useful to me -- what are the big
16 issues?
17       MR. FINKELSTEIN: Does the drug have the capacity
18 to do what we claim that it does, which is alter the brain
19 chemistry, leading to mood and behavioral disturbances?
20       THE COURT: Who are your experts?
21       MR. FINKELSTEIN: Professor Trimble, who is a
22 professor of psychiatry and neurosurgeon out of the London
23 Institute of Neurosurgery; Dr. Frushefski (Phonetic), who's a
24 psychiatrist in Pennsylvania; Dr. Bloom, who's a regulatory
25 expert in Florida; Dr. Sander Greenland, who's an

Page 42

1  epidemiologist at UCLA.
2       THE COURT: Who are your experts?
3       MR. ROUHANDEH: We have a number of experts dealing
4  with the same sort of issues in terms of looking at the --
5       THE COURT: Who?
6       MR. ROUHANDEH: By name? What are some of the
7  names?
8       THE COURT: Truthfully, I just want to make sure I
9  don't know any of them because that could create an issue.
10      MR. ROUHANDEH: Well, we'll submit a list. We have
11 like four or five.
12      THE COURT: Are any of them from Boston?
13      MR. FINKELSTEIN: Dr. Sanacora from Yale,
14 Dr. Jacobs, Dr. Rothschild, Dr. Arrowsmith-Lowe.
15      MR. ROUHANDEH: A couple of them are from Boston.
16 Dr. Jacobs is from Boston.
17      THE COURT: I don't think I know him.
18      MR. FINKELSTEIN: Dr. Ruggieri.
19      THE COURT: I don't know him. Anybody else?
20      MR. ROUHANDEH: Rothschild is also from Boston.
21      THE COURT: I don't think I know any of them. I'll
22 be embarrassed to show up and they go "Hi." They're at least
23 not good friends. If they're the parents of any of my kids,
24 I don't know. So that's good because I do know some fair
25 number of doctors. So that's good. I just want to make sure

Page 43

1  I didn't show up at the hearing and have a major problem.
2       MR. ROUHANDEH: Well, in advance of this, we would
3  submit names and all of that.
4       In terms of that week, the last week of April, I
5  think we have a conflict on May 1 and 2, but is the Court
6  wedded to that week as opposed to the following week?
7       THE COURT: How about a couple of days before
8  that?
9       MR. ROUHANDEH: That might be possible, April 28,
10 29. Or the 29th and 30th?
11      (Discussion off the record between the Court and
12 Clerk.)
13      THE COURT: Yes, the 29th and 30th why don't you
14 block off. That seems to work with everybody's schedule, and
15 it's a week that's choppy for me too because I'm in and out,
16 so it will work for me. Ideally speaking, whatever we adjust
17 for all this briefing, those days should be held intact, even
18 if the sureply comes in the day before.
19      MR. FINKELSTEIN: And we'll reach out to our
20 experts immediately to confirm those dates, barring any
21 conflicts.
22      THE COURT: And the theory would be: You get one
23 day, you get another. You put in an affidavit that basically
24 puts in your case, maybe a half an hour, an hour that
25 basically explains your position, and then an hour on cross.

Page 44

1  And I think if we did that, we'd pretty much -- maybe I'm --
2  or I may have to give you another day if you think there are
3  four. Maybe you don't have to put all of them on.
4       MR. FINELSTEIN: I don't think we would have to put
5  them all on.
6       THE COURT: So you can just talk about scripting
7  that, if that makes any sense, and I'll protect you on the --
8  maybe we'd even give you in the afternoons if it -- we'll try
9  and keep those light.
10      So, now, let me just ask you this. I've been
11 talking with Judge Sorokin all along, and one of the things
12 that's frustrated me is that each time we take a case that's
13 going to be our bellwether trial, the plaintiff drops by the
14 wayside.
15      MR. FINKELSTEIN: No, that's all resolved, your
16 Honor. We have cases trial-ready.
17      THE COURT: I want to make sure that you're making
18 that commitment to me that it's all --
19      MR. FINKELSTEIN: Absolutely. We're ready, we have
20 cases trial-ready.
21      THE COURT: How many are left of your cases?
22      MR. FINKELSTEIN: Seventy-five, right in that
23 neighborhood.
24      THE COURT: All right, and how many of those are
25 mine; in other words, that I wouldn't be sending back to some

Page 45

1  jurisdiction?
2       MR. FINKELSTEIN: Two.
3       THE COURT: Two. I think Judge Sorokin was going
4  to pick at least one of them as a bellwether trial?
5       MR. FINKELSTEIN: Well, we are in the process of
6  conducting discovery on those right now.
7       THE COURT: Because when all is said and done,
8  unless everyone agrees, I'm not even sure even if you all
9  agree I have jurisdiction, right?
10      MR. ROUHANDEH: Right.
11      THE COURT: I'm not even sure you can even waive
12 this.
13      MR. ROUHANDEH: I think it can be waived, but --
14      THE COURT: I don't know. It's something you may
15 want to look at. But let's assume -- what I ideally would
16 like to do is try maybe one. Or ideally I'd like to try some
17 from one camp and some from another, but I don't know where
18 the Boston cases play out, whether they support -- you know,
19 whether they'd be one of yours or one of yours. I'm not sure
20 I have jurisdiction.
21      MR. FINKELSTEIN: Well, if your Honor is so
22 inclined, and there is some precedence for this, to take a
23 trip to Tennessee and hear a trial there, this case is
24 trial-ready.
25      THE COURT: Judges have done that?

Page 46

1     MR. FINKELSTEIN: And it's ready to go. Judges
2 have done that. Actually, there's a trial going on right now
3 in Mississippi that was originally venued in Ohio, and the
4 presiding judge who --
5     THE COURT: Which judge did that?
6     MR. FINKELSTEIN: Judge O'Malley.
7     THE COURT: Did she?
8     MR. BARRETT: She's in Mississippi right now.
9 She's the MDL judge in the Welding Fume litigation, and I'm
10 lead counsel in that for the plaintiffs. And she decided and
11 made the offer that "I know more about this case than anybody
12 else. I'm doing the Daubert," you know --
13     THE COURT: Well, I'll think about that one.
14     MR. ROUHANDEH: The expression "The eagle doesn't
15 fly" comes to mind, that we usually go to the judge as
16 opposed to the judge coming to the cases. I don't know if
17 the clerks -- well, they won't be around perhaps, so maybe
18 they wouldn't mind --
19     THE COURT: I've never even been to Tennessee,
20 but --
21     MR. ROUHANDEH: But I think the big issue here is,
22 there are only four cases, only four cases that are District
23 of Massachusetts cases. Two happen to be cases brought by
24 the Finkelstein law firm, and there are two others. So there
25 are four cases, and I believe Magistrate Sorokin has now

Page 47

1 selected all four of those to get bumped up to have some
2 level of discovery going forward in those now. So those four
3 are going.
4     THE COURT: What I'd love to do is, let's assume in
5 your case I have the Daubert in May, I have the hearing.
6 That does seem as if it would probably overlap with summary
7 judgment, unless there's a statute of limitations or other
8 kind of problem that I don't know about, and hold at least
9 one of those trials in the fall. That I would like to do.
10 And if it made sense, to be fair, a back-to-back trial, so
11 that one is sort of more plaintiff, one you think is the
12 stronger case and one you think is stronger. And then you
13 can decide whether or not settlement is even -- you'd get a
14 number. And so let me ask you my -- but I'll set that date
15 when we do the Daubert hearing and I'll get a better sense of
16 it. And you'll maybe give me a little brief if there's any
17 other kind of summary judgment type issue like statute of
18 limitations that would be dispositive.
19     MR. ROUHANDEH: Right, because these summary
20 judgment motions are limited to these threshold issues.
21 There will probably be another round.
22     THE COURT: There could be that individual
23 causation is my thought of what's most likely to be another
24 issue once. Will discovery be complete for the individuals
25 by then?

Page 48

1     MR. FINKELSTEIN: I believe so.
2     MR. ROUHANDEH: Not with respect to all of the
3 Track One cases, is what they're referred to, which now is up
4 to, I believe, fourteen cases.
5     THE COURT: But what if we just took two of the
6 Massachusetts cases --
7     MR. FINKELSTEIN: We could spearhead those.
8     THE COURT: -- and spearhead those. Maybe you
9 could talk about that and come up with a -- so that I can,
10 theoretically anyway, get the individual causation issues
11 revved up, you're right, and then get the thing tried
12 sometime, I think more realistically, in late 2008.
13     MR. FINKELSTEIN: It's only two cases, your Honor.
14 If we hold in abeyance discovery on the other matters, which
15 takes our time, and then we just focused on these two, I'm
16 sure we'd be able to get it done.
17     MR. ROUHANDEH: Well, there are two cases that the
18 Finkelstein law firm have brought. There are four
19 Massachusetts cases.
20     THE COURT: It could be four, and I'll just try
21 and -- now, let me just ask you all this. It's premature.
22 I'm just learning the products side of the cases. Is
23 settlement a possibility at all?
24     MR. ROUHANDEH: I think it's highly unlikely. I
25 mean, we obviously have a huge difference of opinion here.

Page 49

1 We think there's absolutely no evidence that Neurontin causes
2 suicide. And in fact whatever the FDA said about other
3 antiepileptic drugs, it can't be said about Neurontin. So I
4 think that issue needs to be resolved, and even if that issue
5 is resolved, I don't think -- you know, when we've gotten
6 into these cases and dug into these cases, they've dropped by
7 the wayside. Over a hundred cases have fallen out as a
8 result of that certification process, by our count. Not all
9 of them were Mr. Finkelstein's cases, but many, many cases
10 have dropped out, and we think many, many more cases will
11 drop out.
12     THE COURT: And on the sales and marketing side, I
13 haven't even pressed you, on the theory that I need to get
14 through class cert before any discussion is realistic with
15 the class. But let me ask, is that wrong? Have you been
16 having any kinds of discussions?
17     MR. SOBOL: We've had no discussions. We're
18 waiting for -- as a result of Pfizer's position, so we're
19 waiting for class to be certified so we can address it.
20     THE COURT: Let me go off the record just for one
21 minute.
22     (Discussion off the record.)
23     THE COURT: Anyway, good, have fun.
24     MR. ROUHANDEH: Your Honor, I would be remiss if I
25 didn't raise the page extension issue.

Page 50

1    THE COURT: Yes, you can have it. Bingo. You want
2 60 pages? However, the thing that persuaded me is, there are
3 no appendices. You said the reason to do this -- because,
4 see, now what plaintiffs are doing -- see, he's getting very
5 tricky here. What he does is, he keeps to the page limit,
6 and then there are 18 appendices that have all the -- I just
7 did this with this other case, the national class cert.
8 He'll stay on the page, and then he'll have Appendix A,
9 Appendix B, Appendix C, which he doesn't include in the
10 pagination but nonetheless triples the size of the 20. And
11 I've seen this. So what persuaded me is, you said, then you
12 won't have to include lengthy attachments. So it's 60 with
13 everything you have to say in it.
14    MR. FROMSON: Including exhibits, Judge?
15    THE COURT: I'm not taking separate affidavits.
16 There was Appendix A on which states are reliance and which
17 aren't, Appendix C, Appendix D. Uh-uh, okay? So, okay, you
18 get 60, but I'm not going to take all the arguments in
19 appendix form.
20    MR. ROUHANDEH: That's fine, your Honor. We would
21 never do such a thing.
22    MR. SOBOL: You would if I had.
23    THE COURT: That's why I've done it. Now, the
24 replies should -- what did you agree on?
25    MR. ROUHANDEH: We didn't agree. He said seven

Page 51

1 pages, and I know that your Honor believes that replies and
2 surreplies, some of the issues are really crystallized there.
3    THE COURT: Why don't you do 20 pages a side.
4    MR. ROUHANDEH: Okay, that's fine.
5    MR. FINKELSTEIN: And the opposition is 60 as well,
6 obviously.
7    THE COURT: Yes, yes. No, no, you guys get -- but,
8 remember, no -- I'm not saying -- obviously, you need to put
9 some of this in terms of affidavit because otherwise, for
10 summary judgment, you don't have something under oath. But
11 I'm simply saying you can't do all your legal argumentation
12 through -- and they have to be normal formatting, no tiny
13 little formats, you know. I want you to count every page.
14 You can't skip the introduction pages. I mean, this is like
15 real --
16    MR. ROUHANDEH: We can't number every other page.
17    THE COURT: Yes, yes. Not two sides of a page,
18 okay? So that none of these games are played. It's, like, a
19 real 60 pages. And you don't have to give me the boilerplate
20 on Daubert or the standard for summary judgment and all that
21 kind of stuff, okay?
22    MR. ROUHANDEH: Thank you, your Honor.
23    THE COURT: Okay.
24    THE CLERK: Court is in recess.
25    (Adjourned, 4:40 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )

    I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 51 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 04-10981-PBS, In Re: Neurontin Marketing and Sales Practices Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.
    In witness whereof I have hereunto set my hand this 22nd day of February, 2008.


    /s/ Lee A. Marzilli
    _____
    LEE A. MARZILLI, CRR
    OFFICIAL FEDERAL COURT REPORTER