# EXHIBIT A

# Declaration of Robert D. Gibbons Ph.D.

# Neurontin Litigation

## QUALIFICATIONS

My name is Robert D. Gibbons, and I am the Director of the Center for Health Statistics, and Professor of Biostatistics and Psychiatry at the University of Illinois at Chicago. I am a Fellow of the American Statistical Association and a two-time recipient of the American Statistical Association's Youden Award for statistical contributions to the field of Chemistry (2001 and 2006). I have received the Harvard Award for lifetime contributions to the field of Psychiatric Epidemiology and Biostatistics. I am a member of the Institute of Medicine (IOM) of the National Academy of Sciences (NAS), and served for six years on the IOM Board on Health Sciences Policy. I am the author of over 175 peer reviewed scientific papers, and four books. Two of these books are considered foundational in the area of environmental statistics (Statistical Methods for Groundwater Monitoring (1994); and Statistical Methods for Detection and Quantification of Environmental Contamination (2001) with David Coleman, both published by John Wiley and Sons), and the 2001 book received the distinction of being in the top 5 books for statisticians, from the American Statistical Association. My most recent book with Don Hedeker "Longitudinal Data Analysis," also published by John Wiley and Sons, presents a comprehensive overview of methods for the analysis of longitudinal data, with particular emphasis on analytic problems in mental health research. My first book, "Statistical and Methodological Advances in Psychiatric Research," was published in 1982.

I have served as a member on the Institute of Medicine Committee on the Prevention of Suicide, and developed the statistical Appendix of that report that provides a state of the art presentation of statistical methods for the analysis of suicide completion and attempts. I served on the FDA Scientific Advisory Committee on Suicide and Antidepressants in Children. My colleagues and I have recently published five peer reviewed papers on the relationship between antidepressants and suicide. These papers included U.S. county-level analyses of the relationship between antidepressants and suicide in (1) the general population (Archives of General Psychiatry, 2005) and (2) in children (American Journal of Psychiatry, 2006) in the United States, (3) a study of 226,000 depressed U.S. veterans, (4) a study of changes in antidepressant prescriptions and youth suicide rates in the U.S. and Europe before and after public health advisories in the U.S., U.K., and Europe, and black box warning in the U.S, and (5) a statistical paper that develops a new approach to the analysis of spontaneous report data, illustrated with an example of antidepressants and suicide from the FDA Adverse Event Reporting System (AERS) data. My CV is attached as an exhibit to this expert report.

My expert opinions in this case are based on my review of materials such as the complaint, the expert reports and declarations of Drs. Blume and Kruszewski, the

1

declarations of Mr. Altman and Drs. Glenmullen and Jacoby, the depositions of Drs. Trimble, Kruszewski and Blume regarding the FDA Alert, the scientific literature on the relationship between antidepressants and suicide, the randomized controlled clinical trial data for the drugs Neurontin and Lyrica transmitted to the FDA, the paper by Collins and McFarland, data from FDA's Adverse Event Reporting System (AERS), prescription frequency data from Verispan and IMS, and my experience in working in the area of statistical methods for the analysis of psychiatric data in general and in the area of suicide research in particular, over the past 25 years. I reserve the right to supplement or modify these opinions as further information becomes available and additional analyses are undertaken.

I have testified as an expert witness at trial within the last four years in the case of *Eli Lilly, et al. v. Zenith Goldline, et al.,* IP01-0443 C Y/S, in the United States District Court for the Southern District of Indiana, the case of *Forest Laboratories v. Ivax Pharmaceuticals*, Civil Action No. 03-891-JJF, in the United States District Court for the District of Delaware, in the Matter of the Appraisal between *Taunus Corporation, Plaintiff, and Allianz Insurance Company, Axa Corporate Solutions Insurance Company, and Axa Global Risks US Insurance Company*, the case of *Giles vs. Wyeth*, 04-CV-04245 in the United States District Court for the Southern District of Illinois, and a deposition in the matter of *B.F. Goodrich vs. Westlake Vinyls*.

My customary rate and the rate at which I will be compensated for work on this case is $500 per hour.

**EXPERT OPINIONS**

**Opinion 1: Randomized Clinical Trial (RCT) data analyzed by FDA do not show an increased risk of suicidality for gabapentin relative to placebo.**

FDA has reported a preliminary meta-analysis of 199 placebo controlled trials including 43,892 patients (27,863 in drug treatment groups and 16,029 in placebo) for 11 antiepileptic drugs. They report results of an overall analysis indicating that 0.43% of the patients in drug treatment groups experienced suicidal behavior or ideation versus 0.22% of the patients in placebo groups, corresponding to an estimated 2.1 per 1000 (95% CI: 0.7, 4.2) more patients in the drug treatment groups who experienced suicidal behavior or ideation than in the placebo treatment groups. FDA is also planning to discuss these data at an upcoming advisory committee meeting. No details regarding the statistical methodology by which these data were analyzed have been presented. FDA indicates that the results were "generally consistent" among the drugs and were seen in all demographic subgroups. It is unclear what the basis is for this statement. While the raw data and details regarding the analysis have not been made available by FDA, data submitted to FDA for this analysis by Pfizer are informative. Pooling the data across studies, the overall odds ratio for suicidality for all 11 drugs is 1.729 (1.181-2.530), $p<0.005$, confirming the statistical significance of the results for the group as a whole. The incidence is 0.38% for treated and 0.22% for control patients. (The incidence of 0.38% is based upon the report of FDA's Evelyn Mentari, MD, MS, Medical Reviewer, Division of Neurology Products, presented at the March 2008 Pediatric Advisory Committee Meeting, in which she reports 105 total suicide events in the drug treatment group in FDA's AED analysis.) However, for gabapentin the odds ratio is 1.033 (0.135-7.884), $p<0.999$ indicating that for the 7876 patients treated with gabapentin (5194 treated and 2682 controls) there is no evidence of an association. The incidence is 0.039% for treated and 0.037% for placebo patients. Dr. Greenland is quoted as indicating that based on these data, the risk can be as much as 30 times as high for gabapentin relative to placebo. This analysis reveals that the true 95% confidence interval for the odds ratio indicates that the difference can range from gabapentin being approximately 7 times more protective than placebo to 7 times less protective than placebo in terms of the probability of developing suicidal thoughts. In any event, Dr. Greenland's analysis does not provide any support for the proposition that gabapentin is associated with an increased risk of suicidal thinking or behavior. Furthermore, I note that his description of an increased risk of "suicidal behavior" is inaccurate since there was no suicidal behavior observed for any patient in the gabapentin controlled clinical trials.

Our best estimate of the ratio of the probability of suicidality for patients treated with gabapentin to those treated with placebo is a ratio of 1.033 indicating no increased risk of suicidality with gabapentin at a confidence level in excess of 99.9%. This means that the probability of the observed difference between gabapentin and placebo is 99.9% likely due to chance alone. When we examine the 10 other drugs, excluding the gabapentin

3

data, the odds ratio increases to 1.787 (1.215-2.629), p<0.003. For the other 10 drugs the incidence of suicidality is 0.45% for treated versus 0.26% for control patients.

Dr. Greenland contends that we can learn nothing from the separate analysis of the gabapentin data because the sample size is too small. This is incorrect. First, if the true probability of suicidality for patients treated with the other ten drugs is 0.0045, we can ask the question what the probability is of getting 2 cases of suicidality out of 5194 gabapentin treated patients, if gabapentin has the same risk as the other 10 drugs. The answer is that the probability is 0.000005 based on a normal approximation and 0.000001 based on the Poisson distribution. In other words, the probability that gabapentin has the same risk of suicidality as the other ten drugs combined is one in one million. Clearly the gabapentin data do not resemble the data for at least some of the other ten antiepileptic drugs.

Second, it is methodologically appropriate and reliable to look at gabapentin and pregabalin as a group since, unlike the other nine drugs in the FDA's pooled dataset, these two drugs are both alpha 2 delta ligands, and share a similar mechanism of action. The pregabalin data submitted to FDA include a total of 10,888 patients (7609 treated and 3279 controls). The odds ratio for pregabalin was 1.50 (0.356-6.390), p<0.733, also indicating an insignificant risk of treatment on suicidality, but also underpowered in and of itself to detect such a difference. The incidence was 0.092% for pregabalin versus 0.061% for placebo. Note that these two drugs (gabapentin and pregabalin) account for 43% of the entire FDA database, yet they appear to have a very different risk profile than the other nine drugs. Excluding the gabapentin and pregabalin data, the combined incidence for the other nine drugs is 0.64% for treated and 0.32% for control patients, yielding an odds ratio of 2.009 (1.349-2.992), p<0.001, which is substantially increased following removal of the two Pfizer products. The combined incidence of suicidality for gabapentin and pregabalin is 0.07% versus 0.05% on placebo. The odds ratio for the two Pfizer products is 1.397 (0.409-4.771), p<0.763 which also shows no statistical evidence of an association between suicidality and treatment with these two drugs. Further, the combined analysis provides adequate statistical power to detect a significant difference. Using a incidence of 0.64% for treated and 0.32% for control patients derived from the other nine drugs, power of 80% is achieved with sample sizes of 10,983 for treated and 5,492 for control conditions. The data for the two Pfizer products consist of 12,803 treated and 5,961 control patients, which indicate that we have more than 80% power to detect the difference observed in the other nine drugs for the two Pfizer products. Results of that analysis reveal no increased risk of suicidality (p<0.763) for gabapentin and pregabalin.

These findings indicate that there is clear heterogeneity among the trials that were pooled by FDA in their meta-analysis. These results do not support FDA's statement that the results were "generally consistent" across the drugs," at least not for gabapentin and pregabalin. The data for gabapentin and pregabalin do not show evidence of increased risk of suicidality, whereas the combination of the other nine drugs do. None of these positive findings indicate causal associations between antiepileptic drugs and suicidality as will be addressed in the following opinions.

**Opinion 2: Randomized Clinical Trial (RCT) data analyzed by FDA do not provide evidence of a causal link between antiepileptic drugs and suicidality or suicide.**

FDA was appropriately careful to point out that the analyses of the RCT data that they summarize in their Information for Health Care Professionals alert "does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue." Plaintiff experts contend that this somehow represents FDA negotiations with pharmaceutical companies. This assertion is inaccurate for the following reasons. First, suicidality was not a prospectively measured endpoint in any of these trials, it was retrospectively harvested from the clinical study records. There are numerous ascertainment biases that could easily account for the small observed differences between treated and control conditions reported in the FDA Alert. First, patients treated with an active medication will have more side-effects than those treated with placebo, and as a result, they will have more contact with their study physicians and greater opportunity to report their suicidal thoughts (Posner et.al., (2007), American Journal of Psychiatry, 164, 1035-1043). Second, suicide attempts based on overdose of study medication will be biased against patients treated with active medications because overdose on an antiepileptic drug will generally result in a visit to the emergency room whereas no such visit will be required following overdose of placebo. The combination of these two ascertainment biases could easily result in the small differences in reports of suicidality observed in these studies. In the presence of potential ascertainment biases of this type, post-hoc meta-analyses of RCTs do not provide causal evidence for a link between antiepileptic drugs and suicide. FDA was correct in clearly stating that a conclusion of a causal connection between antiepileptic drugs and suicidality should not be drawn from these data nor the analyses that FDA has reported.

From a statistical perspective, there is concern regarding the methodology that FDA uses in their meta-analyses of RCTs (Kaizar et.al. (2006) *Clinical Trials*, 3, 73-98). Specifically, their analyses of both child and adult antidepressant studies for suicidality used statistical methods that required them to eliminate any study with no events in both treatment arms (i.e., drug and placebo) and apply a continuity correction to any study that had zero events in one arm (i.e., add 0.5 to all cells). Both of these practices can lead to bias, and the practice of discarding studies with no events will lead to bias in the direction of increased risk in active treated patients because it discards studies in which there was no difference between treated and control arms (i.e., 0 in both arms). This is an even greater problem for antiepileptic drugs than antidepressant drugs because the rate of suicidality is from one to two orders of magnitude lower.

Taken together the potential sources of bias in both the design of these studies and their analysis severely limits the formation of any reliable conclusions that can be drawn from them regarding causal inference. More information provided by FDA regarding the specifics of their analysis of these data will be helpful in better understanding the types of inferences that can be drawn from their analyses. In no case can the type of causal inference made by plaintiff experts here, be drawn from FDA's meta-analyses. Use of

the Alert or the data contained in the Alert as a basis for opinions on suicide causation is not an accepted or reliable scientific methodology.

**Opinion 3: None of the statistical information provided by the plaintiff experts advances our understanding of the relationship between antiepileptics and suicidality.**

In an attempt to demonstrate an association between gabapentin and suicidality, plaintiff experts have provided data that they feel supports the existence of such an association. In no case is this evidence credible. With the assistance of Mr. Altman, Dr. Blume has provided a series of such analyses in her expert report.

1. The majority of these "analyses" are based on the simple reporting of frequencies of surrogate endpoint data (hostility, aggressiveness, depression, nervousness, etc.) in lieu of data on actual suicide-related events. These data do not support inferences regarding the proposed link between suicidal thinking, behavior, or completion and gabapentin. FDA did not analyze these surrogate endpoints in either their analysis of the antidepressant or antiepileptic data. To do so would be scientifically unreliable because these behaviors are confounded by indication.

2. None of the analyses of spontaneous adverse event reports adjust for the number of patients being treated nor the indication for their treatment. It is not appropriate to analyze the "counts" and not consider the population exposed. Plaintiff experts' analysis is not appropriate to evaluate whether the spontaneous adverse event reports demonstrate a signal for suicidality.

3. Mr. Altman and Dr. Blume conclude that increases in serious AEs in the 4th quarter of 2004 were due to off-label use and is therefore evidence of the connection between gabapentin and suicidality. First, the total number of prescriptions of gabapentin were also increasing during this period. Second, and most importantly, if an off-label use involves a population with increased risk of suicide such as bipolar illness, then we would expect the rate of suicidal thoughts and behaviors for the drug now used to treat those patients to increase simply due to confounding by indication. This has nothing to do with gabapentin producing these adverse events.

4. Mr. Altman and Dr. Blume combine placebo controlled and uncontrolled analyses in their presentation and Dr. Kruszewski contends that the distinction between controlled and uncontrolled studies is meaningless. The sample populations for controlled and open label studies are quite different. Open label or uncontrolled studies generally consist of more severely ill patients that are unwilling to risk being randomized to placebo. Analyses based on the pooling of controlled and uncontrolled studies can therefore be severely biased giving the appearance of increased risk of suicide when no such relationship exists. In support of this, FDA only analyzed placebo controlled studies in their meta-analyses of antidepressant and antiepileptic medications.

6

5. Dr. Glenmullen opines that "to a reasonable degree of medical and scientific certainty, that Dr. Trimble, Dr. Kruszewski, and Dr. Blume followed generally accepted scientific principles and methods in relying on the FDA's findings." It is unclear to me how he can make such a statement. First, none of them have seen FDA's complete report or any detailed description of the data relied upon or the statistical methodology relied upon so that they can adequately review this study. Second, the FDA scientific advisory committee has not yet met to review these findings. Third, Dr. Glenmullen has not published a single peer reviewed scientific article in this area, nor have Drs. Trimble, Kruszewski and Blume. None of these experts has done anything more than read the Alert – they have not analyzed the data in any way or considered the methodology used by FDA, as stated in their depositions. Beyond the fact that plaintiffs' experts have read the FDA Information for Health Care Professionals alert, it is unclear what Dr. Glenmullen is referring to with his "reasonable degree of scientific certainty." Merely reading the FDA Alert involves no methodology at all that could be subject to "accepted scientific principles." My comments regarding statements made by Dr. Glenmullen apply equally to similar comments made by Dr. Jacoby.

**Opinion 4: I disagree with the premise stated in the plaintiffs' Daubert brief that plaintiffs' experts' reliance on the FDA Alert provides the necessary "epidemiology" to support their opinions that gabapentin causes suicide.**

The plaintiffs lawyers and experts take the position that the FDA Alert provides support of their conclusion that gabapentin causes suicide. I disagree with this position for the following reasons.

1. The FDA alert is based primarily on suicidal ideation, not completed suicide. The relationship between suicidal ideation and completion has not been established.

2. The results of my analyses based on the gabapentin and pregabalin data reveal that there is no increased risk of suicidality for these two drugs relative to placebo and that there is an adequate number of patients available to determine if the relationship observed for the other nine drugs is present for gabapentin and pregabalin.

3. Meta-analysis of RCTs for multiple different drugs with differences in chemical structure, mechanism of action, pharmacologic properties, does not provide causal evidence of a link to suicide for either the individual drugs contained in the analysis, or the drugs as a heterogeneous group. Just as Dr. Greenland has contended that there is insufficient statistical power to detect a drug-specific effect, there is insufficient power to test the hypothesis that the effect is the same for all drugs. How then does FDA conclude that the effects "were generally consistent among all eleven drugs." Simply stated, FDA's conclusion that the effects are "generally consistent" among the drugs reviewed is not supported by the data.

7

4. Historically, FDA's approach to meta-analysis discards all studies with no events, leading to potential bias. The problem is even greater with antiepileptic drugs relative to antidepressants because the incidence of suicidality is so much lower.

5. The FDA alert has not withstood the test of any external scientific review.

6. The plaintiffs' experts have no way of verifying the scientific validity of the results that have been reported by FDA in their alert.

**Opinion 5: There is no epidemiologic evidence that gabapentin is associated with suicide.**

The single epidemiologic study of the relationship between antiepileptic drugs and suicide was conducted by Collins and McFarland (2008) *J. of Affective Disorders*, 107, 23-28. The study compared suicide completion and attempt rates in a cohort of 12,662 Oregon Medicaid medical claims database between lithium, gabapentin, divalproex, and carbamazepine. There were 11 suicides and 79 attempts making this a very small study. The authors found significant effects of treatment with divalproex relative to lithium on suicide attempts and significant effects of treatment with gabapentin relative to lithium on suicide completions. The authors conclude that lithium may have protective effects with regard to suicide attempts among Medicaid patients with bipolar disorder, however it remains unclear whether or not lithium protects these patients against suicide completion. They also note that the difference between lithium and gabapentin in suicide rates could be due to confounding by indication, where "completed suicide among gabapentin users may well be related to prescription of this medication for people with chronic pain (in addition to bipolar disorder) who could be at very high risk of suicide. In addition, the study did not control for previous suicide attempts or previous treatment with lithium. It may be the case that more severely ill patients who did not respond to lithium are then prescribed gabapentin and it is this lack of treatment response that is related to increased suicide incidence. Of course, the study is still only based on 11 suicides and these results have not been confirmed by replication in other studies.

Baldessarini et.al. (2006), *CNS Spectr.* 11, 465-471, note that the annual rate of suicide in untreated individuals with bipolar disorder is 13 per thousand. Collins and McFarland (2008) note that the rate of suicide was 0.78 per thousand years of exposure to lithium and 3.5 per thousand for gabapentin. These incidence rates reveal protective effects of gabapentin relative to no treatment. While in their study the protective effects of lithium were even greater than for gabapentin, suicide rates for both treatments are substantially less than for no treatment. These data indicate that gabapentin is reducing suicide risk, not increasing it.

**Opinion 6: Spontaneous Reports submitted to FDA do not represent a signal for increased risk of completed suicide for gabapentin.**

To examine the risk of spontaneous reports of suicide for patients taking gabapentin relative to other members of the class of antiepileptic drugs in the FDA's AERS database, I used the methodology for statistical adverse event (AE) surveillance developed by Gibbons et.al. (*Statistics in Medicine*, 27, 1814-1833, 2008). This methodology – published in a leading peer reviewed statistical journal -- examines a particular AE (in this case completed suicide) for each of the members of a class of drugs (in this case antiepileptic drugs) and determines for each of the members of the drug class whether or not the rate of the AE is elevated relative to the drug-class average rate. To adjust for changing rates of prescriptions between drugs and within drugs over time, I used IMS estimates of annual number of prescriptions for each drug and year. In this way, the population at risk is included as an offset in the computation and differences in numbers of events are adjusted for the overall frequency with which the drug was prescribed. The statistical methodology produces a rate multiplier for each drug, which is computed as the exponential of the empirical Bayes estimate of the random intercept of a random-effects Poisson regression model. Year (2000-2005) was scaled as -2.5, -1.5, -0.5, 0.5, 1.5, 2.5, so the intercept (i.e. year = 0) corresponds to January of 2003, which is most likely prior to major media attention and advertising for clients by law firms. The model included a random year effect as well, so increases in reporting rates over time are incorporated into the statistical model, and these temporal effects are allowed to vary across drugs. In this way all data from 2000 to 2005 could be used in the analysis. A rate multiplier of 1 indicates that the drug has the same rate as the class of drugs as a whole. A rate multiplier of 0.5 indicates that the drug has one-half the rate of suicide as the average rate for the class as a whole and a rate multiplier of 2.0 indicates that the drug has twice the rate of suicide than the average for the class as a whole. Corresponding confidence intervals for the rate multipliers are based on the estimated posterior variance for the empirical Bayes estimate of the intercept for each drug. Rate multipliers and 95% confidence intervals for each drug are presented in Figure 1.

The entire confidence interval for gabapentin is below the value of 1.0 indicating that it has a significantly lower suicide rate than the average rate for antiepileptic drugs as a group. (Pregabalin was not included in this analysis because it was not approved until 2005 and therefore spontaneous adverse event reports for pregabalin were not available.) In fact, gabapentin is the only drug that has a significantly lower rate multiplier than the group average (i.e., the upper confidence limit is less than 1.0), although results for oxcarbazepine and tiagapine hcl are borderline significant (i.e., their upper confidence limits are close to 1.0). While these data cannot be used to determine a causal relationship, what is clear from Figure 1 is that any signal of an increased risk of suicide for this group of drugs is related to valproic acid, which has a statistically significant elevated rate multiplier of 6.09 (5.00-7.42) or six times larger than the average for the other antiepileptic drugs. By contrast, the rate multiplier for gabapentin is only 0.79 (0.67-0.93). This analysis reveals that relative to other antiepileptic drugs analyzed, the gabapentin spontaneously reported adverse events do not show evidence of a signal for suicide events, and that a clear signal emerges for valproic acid not gabapentin. In fact,

9

of the ten AEDs in this analysis, gabapentin has the lowest rate of spontaneous reports of suicide.



I declare under penalty of perjury under the laws of the United States of America that the opinions set forth in this document are my opinions to a reasonable degree of medical and scientific certainty, and are true and correct.

Executed April 23, 2008.

Sincerely,

Robert D. Gibbons Ph.D.

10