UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
---------------------------------------------------------------x
                                            :    MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                :
        SALES PRACTICES AND                 :    Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION       :
                                            :    Judge Patti B. Saris
---------------------------------------------------------------x
                                            :    Magistrate Judge Leo T. Sorokin
                                            :
THIS DOCUMENT RELATES TO:                   :
                                            :
ALL PRODUCTS LIABILITY CASES                :
                                            :
---------------------------------------------------------------x
```

**PRODUCTS LIABILITY PLAINTIFFS' SUR-REPLY MEMORANDUM
IN OPPOSITION TO DEFENDANTS PFIZER INC. AND
WARNER-LAMBERT COMPANY LLC'S MOTION TO EXCLUDE
THE TESTIMONY OF DOCTORS TRIMBLE, KRUSZEWSKI
AND BLUME ON THE ISSUE OF GENERAL CAUSATION**

*Members of Products Liability
Plaintiffs' Steering Committee*

Andrew G. Finkelstein, Esq.
FINKELSTEIN & PARTNERS, LLP
436 Robinson Avenue
Newburgh, NY  12550

Jack W. London, Esq.
LAW OFFICES OF JACK W. LONDON
    & ASSOCIATES
106 E. 6th Street, Suite 700
Austin, TX  78701

## I.    PRELIMINARY STATEMENT

Having recognized the inadequacy of their initial briefing in support of their motion to exclude Plaintiffs' experts, Defendants in their Reply Memorandum now materially change their arguments, manipulate and alter the facts, and submit testimony from a new expert, Robert D. Gibbons Ph.D., rather than rely upon any of their existing seven experts.  Defendants' new expert refers to material and data that Defendants have always possessed but have <u>never</u> provided to Plaintiffs during this litigation; thus, the expert should be precluded from the Court's consideration.[1]    Defendants' tactics are simply meant to further mislead this Court with inaccuracies and misstatements.  Further, after reading Plaintiffs' opposition papers, Defendants have apparently lost faith in their own defense and have resorted to seeking leave of this Court for guidance from an unnecessary independent panel.  (ECF Doc. # 1213, filed April 9, 2008.)

Defendants, for the first time in their reply papers, acknowledge their own Neurontin-specific data submitted to the FDA as part of the FDA's suicidality review can be interpreted as demonstrating a capacity to contribute towards mood and behavioral disturbances, including suicidality.    Although couched with clever phraseology, Defendants admit, with a 95% confidence interval, that Neurontin may be **"7 times less protective than placebo in terms of the probability of developing suicidal thoughts."**  Gibbons Decl., ECF Doc. # 1241, at p. 3

---

[1]  Defendants' newly appointed rebuttal expert, Dr. Gibbons, attacks the FDA's methodology in pooling 11 anticonvulsants, including Neurontin, and at page 4 of his declaration, he analyzes Pfizer's clinical trial data relating to Lyrica (Pregabalin): Neurontin's new generation drug.  *See* Gibbons Decl., ECF. # 1241, at p. 4.  This Lyrica (Pregabalin) clinical trial data has never before been disclosed to Plaintiffs during the pendency of this litigation. Defendants' untimely disclosure of such evidence violates the disclosure requirements of Rule 26 of the Federal Rules of Civil Procedure.  Plaintiffs are not on equal footing to test Dr. Gibbons's opinions and such data should be deemed inadmissible for the purposes of Defendants' instant motion.  Second, the Court's electronic order, posted to ECF on April 30, 2008, limited Defendants' rebuttal expert to the FDA Alert.  Specifically, the Court permitted "a rebuttal expert report involving only the FDA alert, which is a key finding in this case."  Defendants sought leave only to serve a rebuttal opinion about the FDA Alert, and consistent with the Order, the Court should strike and exclude all opinions and analyses from the Gibbons Declaration that do not involve the FDA Alert.  In this regard, the Court is referred to specific opinions by Gibbons that clearly stray from any semblance of involvement with the FDA Alert:  The statements, analyses and opinions set forth as Gibbons's "Opinion 3", "Opinion 5", and "Opinion 6" should be excluded.  *Id.* at pp. 6, 8 and 9.

(emphasis added). That a placebo may be protective is nonsensical in the context Dr. Gibbons suggests. Another way of saying the same thing is that Neurontin may be <u>7 times more likely than placebo</u> to cause suicidal thoughts.[2] Defendants cannot escape the fact that their own Neurontin-specific data should be interpreted just as FDA determined in its Alert on Suicidality. In its 2008 Alert, the FDA recognized that patients receiving anticonvulsants, including Neurontin, "had approximately twice the risk of suicidal behavior or ideation (0.43%) compared to patients receiving placebo (0.22%)." Pls.' Ex. 31.[3]

Plaintiffs' experts are qualified to provide opinions on general causation in this case; the experts' methodologies in reaching their opinions are reliable; and the evidence upon which the opinions are based is generally accepted as scientifically sound. Plaintiffs' experts, in reaching their opinions, have relied upon peer-reviewed research literature, objective brain scan testing from two independent laboratories, Defendants' own human clinical trial data and Defendants' own animal research reports and testing. Further, Plaintiffs' experts' general causation opinions are supported by FDA-conducted epidemiology.

## II.    ARGUMENT

### A.    PLAINTIFFS' EXPERTS' OPINIONS ON GENERAL CAUSATION SATISFY FED. R. EVID. 702 AND *DAUBERT*.

Plaintiffs' experts have opined that (i) Neurontin increases brain GABA, which (ii) decreases the release of excitatory neurotransmitters in the brain (e.g., serotonin, norepinephrine), and which (iii) causes mood and behavioral disturbances including depression

---

[2] Sur-Reply Ex. 14 at p.3. "The only common-sense, statistically correct, and unprejudiced meaning to assign Dr. Gibbons's upper confidence limit of 7.884 is that it allows for up to a nearly 8-fold potential increase in suicidality risk from gabapentin relative to placebo." *Id.* "Sur-Reply Ex. __" refers to exhibits attached to the Declaration of Andrew G. Finkelstein, submitted herewith.

[3] "Pls.' Ex. __" refers to exhibits previously attached to the Declaration of Andrew G. Finkelstein in opposition to Defendants' motion. ECF Doc. # 1197.

2

and suicidality. Plaintiffs' experts' opinions on general causation satisfy Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

### 1.    Plaintiffs' Experts' Opinions and Methodology Are Relevant and Reliable, and Are Generally Accepted.

Each step of the experts' opinions is proven and supported by peer review literature and objective tests, and corroborated by epidemiology (although not legally required). In assessing the reliability of scientific expert testimony, under *Daubert*, district courts may consider a number of different factors; however, this list is non-exclusive and district courts applying *Daubert* have broad discretion to consider a variety of other factors. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145 (1999). Defendants, contrary to *Daubert* and its progeny, posit that Plaintiffs must definitively demonstrate all of *Daubert's* factors with peer review support, replicated testing with a calculable rate of error, proper controls and general acceptance. Defendants simply are wrong as the caselaw clearly establishes that the *Daubert* factors are mere "guidelines [ ] not to be construed as a "definitive checklist." *In re: Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) (quoting *Daubert*, 509 U.S. at 593).

As previously detailed in Plaintiffs' opposing memorandum, Plaintiffs' experts' opinions and methodology regarding biologic plausibility are reliable and scientific. In fact, the reliability and proof of Plaintiffs' experts' opinions on biologic plausibility are rooted in the admissions found in Defendants' own internal documents disclosed during this litigation and which have never been made publicly available.

### a.    Neurontin (Gabapentin) Increases Brain GABA.

The Court is referred to the following admissions by Defendants regarding Neurontin and its capacity to increase brain GABA, either directly or indirectly:

- Defendants admit that Neurontin (gabapentin) "enhance[s] GABAergic neurotransmission" and that such enhancement results in "neuronal inhibition" (e.g., reduction of neurotransmitters such as serotonin and norepinephrine). Sur-Reply Ex. 1.

- Defendants in proposed labeling revisions state, "Gabapentin administration [ ] increases the total brain content of GABA after a single dose." Sur-Reply Ex. 2.

- Defendants' employee Douglas Feltner indicated the reality of the increases in GABA in human brain, and stated, "I suppose the question is: what are the consequences of the increases in GABA in human brain that are caused by gabapentin?" Pls.' Ex. 51.

- Defendants state in their own 2001 research report summarizing pharmacological studies with gabapentin that in the human studies, confirmed by NMR spectroscopy, "gabapentin significantly increased the brain tissue concentration of GABA in each of 6 patients given a single dose of 1200 mg gabapentin." Sur-Reply Ex. 3.

- Defendants' *Draft* Neurontin advertisement for post-herpetic neuralgia admits multiple mechanisms of action, including: "Increases synthesis of GABA", "Promotes release of GABA"; and that Neurontin "binds to alpha-2-delta subunit. Sur-Reply Ex. 4.

While Defendants' lawyers argue the contrary, Defendants' internal documents and scientists leave no room for dispute—Neurontin increases brain GABA.

### b.  Neurontin Reduces the Release of Excitatory Neurotransmitters in the Brain (e.g., Serotonin, Norepinephrine).

Plaintiffs' experts' opinions that Neurontin's mechanism of action includes reducing the release of neurotransmitters in the brain are again rooted and confirmed by Defendants' own documents.[4] Notwithstanding these damning internal documents, Defendants continue to argue these opinions are mere hypotheses. Certainly not exhaustive, but directly on point, Defendants' documents state the following:

---

[4] Whether through direct or indirect actions on brain GABA, or via binding to the alpha-2-delta protein in the brain, Neurontin reduces the release of mood regulating monoamines. Pls. Ex. 8 at p.10.

- Defendants' 1993 Product Monograph states "**Neurontin slightly reduces the release of monoamine neurotransmitters** in vitro." Pls.' Ex. 25 (emphasis added).

- Defendants' *Draft* Neurontin advertisement for post-herpetic neuralgia admits that Neurontin "**Inhibits release of excitatory neurotransmitters**." Sur-Reply Ex. 4 (emphasis added).

- Defendants' 2001 Project Operating Plan to pursue still unapproved indications of Anxiety and Sleep Induction, states a "major area of investigation involves effects of gabapentin and related compounds on neurotransmitter release. **Gabapentin has been known to reduce monoamine neurotransmitter release for many years**." Sur-Reply Ex. 5 (emphasis added).

- Defendants' 1999 Summary of Clinical Studies on Neuropathic pain states, "Neurontin treatment may shift the relative balance of neurotransmitters from **excitatory to inhibitory**." Pls.' Mem. at 15, citing Pls.' Ex. 22 (emphasis added).

- Defendants' former employee (and now purported expert), Charles Taylor, Ph.D., states in a presentation entitled, "Clinical Development in the slipstream of Gabapentin," that, "**In addition to reducing neurotransmitter release**, [Neurontin] . . . reduces calcium influx into synaptasomes in vitro." *Id.*, citing Pls.' Ex. 23 (emphasis added).

- Defendants' Written Summary of Pharmacology devotes a section to "**Inhibition of Neurotransmitter Release**" and states that Gabapentin "reduced norepinephrine, dopamine, glutamate and aspartate . . ." *Id.*, citing Pls. Ex. 24 (emphasis added).

<strong>c.    A Reduction in Neurotransmitter Release Causes Mood and Behavior Disturbances Including Suicidality.</strong>

In addition to Plaintiffs' experts' opinions and methodologies being based upon peer-reviewed published literature, Defendants' own expert admissions and references in internal documents again corroborate Plaintiffs' experts' opinion that a reduction in neurotransmitter release (e.g., serotonin, norepinephrine) contributes to mood and behavioral disturbances including suicidality. There is no doubt that Plaintiffs' experts' opinions are generally accepted on this point.

- Defendants' expert, Gerard Sanacora, M.D., Ph.D., at his deposition agreed "that it would be commonly accepted there is an association between abnormal

5

serotonergic measures and the diagnosis of depression . . . . There are --- there is a fairly large literature base showing abnormal measures of serotonin associated with suicide, yes." Pls.' Ex. 26 at pp. 86-87. Dr. Sanacora also admitted that from a biochemical basis, individuals who have low serotonergic turnover are at a higher risk of suicide. *Id.* at pp. 89-90.

- Defendants' expert, Gerard Sanacora, M.D., Ph.D., stated at his deposition, "I believe that altering neurotransmitter systems either directly or indirectly can be associated with several of the symptoms that we use in the diagnosis of major depression . . . ranging from changes in sleep, appetite, psychomotor behavior, interest, concentration . . . suicidal or obsessive – or not obsessive, suicidal or frequent thoughts of morbid preoccupations. Pls.' Ex. 30 at p.78.

- Pfizer employee, Dr. Leslie Tive, who has a Ph.D. in biopsychology with a specialization in neuropharmacology (Medical Director, Team Leader for Neurontin), at her deposition, acknowledged that low serotonin negatively affects mood: Q. What happens when there's a reduction in the flow of monoamines such as dopamine, serotonin, and norepinephrine? A. You're saying monoamines in general? Q. Correct. A. A reduction in monoamines has been associated with depression. Pls.' Ex. 65 at p. 300.

Plaintiffs' experts' opinion that a reduction in neurotransmitter release contributes to mood and behavioral disturbances is accepted in the medical community. During this litigation, Neurontin prescribers and healthcare providers were deposed and provided unequivocal testimony that a decrease in serotonin in the brain will increase symptoms of depression. Further, had the prescribing physicians known of Neurontin's capacity to act in such manner, their prescribing practices would have been different. Pls.' Ex. 4 at ¶ 307, n.139; Sur-Reply Ex. 6 at pp. 144-145. Illustrative of this general acceptance is the following testimony from a Board Certified Psychiatrist, Sylvain Nakkab, in the pending action, *Young v. Pfizer Inc.*:

Q. At the time that you prescribed Neurontin to Bill Young, did you have any understanding as to whether Neurontin decreased the release of neurotransmitters in the brain, such as dopamine, noradrenaline or serotonin?

A. No, I did not know how it affected those other neurochemicals.

Q. What significance, if any, do you attach to the decrease of those chemicals, the decrease of the release of those chemicals in the brain?

A.  Okay, the decrease of dopamine would lower the pleasure sensors of the brain.  Decrease of the serotonin could cause depression.  And the decrease of -- what's the last one, norepinephrine?

Q.   I said noradrenaline. Are the two interchangable?

A.  Same thing.  And norepinephrine could cause increased anxiety if it's decreased relatively.

Q.  Would you have prescribed Neurontin to Mr. Young if, in fact, you knew back then, when you were first prescribing it, that Neurontin would decrease the release of those neurotransmitters?

A.  Depending on what symptoms he was presenting with, I may have used it and watched for potential side effects.

Q.  And hypothetically, if the evidence in this case was, in fact, that Neurontin did decrease the release of those neurotransmitters, in particular dopamine, noradrenaline or serotonin; is that information you would have wanted to have back then in determining the risk factors for the use of Neurontin?

A.  Yes, I would have wanted that information.  [*Id.*]

Defendants posit that Plaintiffs must cite to a "scientific body, medical authority, or regulatory authority" to demonstrate general acceptance. Defs.' Reply Mem. at 2. However, notably absent from their memoranda is any testimony from the very body of prescribers—such as Dr. Nakkab—who represent the medical community; who provided testimony in this litigation; who are Neurontin prescribers; and who stated clearly their concerns over Neurontin's capacity to reduce excitatory neurotransmitters in the brain.

Defendants' own general acceptance that a reduction in neurotransmitter release is associated with depression is further reflected in Defendants' statements made when promoting their antidepressant, Zoloft.  Defendants state the following: "Scientists believe people with depression could have an *imbalance of serotonin in their brain*.  That means the level of serotonin is 'off.'  So the nerve cells can't communicate, or send message to each other the right

way.  This lack of contact between cells might cause depression.  Zoloft helps fix this."  Pls.' Ex. 69 (emphasis added).

Finally, general acceptance regarding Plaintiffs' experts' opinions on neurotransmitters is further reflected in caselaw.  For example, in *Blanchard v. Eli Lilly Co.*, 207 F. Supp. 2d 308, 311 (D. Vt. 2002), the court in its review of Prozac (an antidepressant), stated the following: "There is medical and scientific evidence that SSRIs including <u>Prozac</u> are effective in treating <u>major depressive disorders</u>.  This is because depression is associated with serotonin **<u>depletion</u>** in many people, and SSRIs are thought to **<u>increase</u>** the activity of the neurotransmitter serotonin in the brain."  *Id.* (emphasis added).  Here, consistent with such generally accepted medical and scientific evidence, Plaintiffs' experts have opined that Neurontin **decreases (depletes)** the release of neurotransmitters leading to depression and suicidality.

It simply cannot be disputed that Plaintiffs' experts' opinions on general causation meet Rule 702 and *Daubert* standards.  Each step of the process from ingestion of Neurontin to the observance of behavioral disturbances, including suicidality, is based upon reliable, relevant evidence applying generally accepted methodologies.

### 2.    The *Daubert* Standard Is Flexible in the Context of a Psychiatric Case.

The extent to which Defendants will twist the facts knows no bounds.  In an effort to have this Court apply a strict *Daubert* approach, ignoring the voluminous cases cited by Plaintiffs, Defendants outrageously argue that "the diagnoses or evaluation of psychiatric conditions is not at issue here."  Defs.' Reply Mem. at pp. 1-2.  The very essence of this case is whether Neurontin causes psychiatric side effects that result in suicidality.  To now argue this case is not about the evaluation of psychiatric conditions borders on lunacy.  If this was not a psychiatric case, why did Defendants retain three psychiatrists—Dr. Jacobs, Dr. Sanacora, and

Dr. Rothschild—to argue Neurontin does not lead to suicidality? If suicidality is not in the psychiatric field, what field is it in?

In fact, Defendants' own internal documents reflect that suicide is considered a "psychobiologic" side effect. Specifically, in their determination of coding an adverse side effect with Neurontin, Defendants utilized a dictionary of terms. This dictionary included terms such as "suicide gesture" and "suicide ideation", which are encompassed by a higher level term: "psychobiologic function". Sur-Reply Ex. 7.

Rather than distinguish *Blanchard*, *Barefoot v. Estelle*, 463 U.S. 880 (1983), and the other cases previously cited by Plaintiffs, Defendants cite *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118 (D. Ariz. 2001), as authority that a relaxed standard regarding psychiatric cases has been rejected. Defs.' Reply Mem. at 2. *Blanchard* was decided after *Cloud*; the *Blanchard* court cited *Cloud*, and yet the *Blanchard* court opted wisely to apply a flexible standard in the context of a psychiatric case and general causation. *Blanchard* and *Barefoot* are persuasive authority on point to the issues in this case.

### 3. Epidemiology is Not Required to Demonstrate General Causation; Existing Epidemiology is Supportive of Plaintiffs' Experts' Opinions.

Epidemiologic evidence exists that supports Plaintiffs' experts' opinions on general causation. However, such evidence is not required for Plaintiffs' experts to opine on general causation. Defendants continue with their incorrect assertion that Plaintiffs must come forward with epidemiologic evidence for Plaintiffs' experts' opinions to survive *Daubert* scrutiny.

"The Supreme Court of the United States held in *Kumho* that the trial court's gatekeeping function is a flexible and commonsense undertaking in which the trial judge is granted 'broad latitude' in deciding both how to determine the reliability as well as in the ultimate decision of whether the testimony is reliable." *Tobin v. Smithkline Beecham Pharms.*, 164 F. Supp. 2d 1278,

1283 (D. Wy. 2001) (upholding verdict where jury determined that Paxil caused suicide) (citing *Kumho,* 526 U.S. at 141-42; *In re: Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230.

### a.     Epidemiology Is Not Required to Demonstrate General Causation.

Ideally, this Court will recognize as persuasive Plaintiffs' experts' scientific methodology and technique as set forth in Plaintiffs' initial opposing memorandum.  Plaintiffs have detailed an abundance of caselaw demonstrating that epidemiology is not required to demonstrate general causation.  *See* Pls.' Mem. at 29-31.  In the context of pharmaceutical litigation there is likewise no requirement.  *See, e.g., Giles v. Wyeth, Inc.,* 500 F. Supp.2d 1048, 1053 (S.D. Ill 2007) (in this Effexor/suicide case, the court stated:   "[T]his Court and others do not impose an absolute epidemiology requirement, 'or any other requirement, except reliability and relevance'" (quoting *Caraker v. Sandoz Pharm. Corp.*  188 F. Supp. 2d 1026, 1033 (S.D. Ill. 2001)); *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181 (S.D.N.Y. 2005) ("Any rule that would automatically exclude causation testimony unless it is based on [epidemiological studies] . . .'would be at odds with the liberal admissibility standards of the federal rules and the express teachings of *Daubert* about the need for flexibility in the district court's gate-keeping role'") (quoting *Amorgianos v. AMTRACK*, 303 F.3d 256, 267 (2d Cir. 2002)); *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791 (N.D. Ohio 2004) ("No requirement exists that a party *must* offer epidemiological evidence to establish causation").   Nevertheless, Plaintiffs have put forward evidence of epidemiology that is supportive of Plaintiffs' experts' opinions that Neurontin has the general capacity to cause negative mood and behavioral disturbances resulting in suicidality.

### b.     Existing Epidemiology Supports Plaintiffs' Experts' Opinions on General Causation.

Defendants resort to a claim that existing epidemiology, if any, shows no increased risk of suicide with Neurontin.[5]  Defs.' Reply Mem. at 6.  This argument is flawed because the existing epidemiology does in fact support Plaintiffs' experts' opinions that Neurontin contributes to mood and behavioral disturbances, including suicidality.  The Court need only look to the FDA's 2008 FDA Alert, which specifically includes Neurontin in its epidemiological analysis.[6]  The 2008 FDA Alert on Suicidality and Antiepileptic Drugs states in no uncertain terms that "patients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation . . . compared to patients receiving placebo." Pls.' Ex. 31.  Neurontin was included in the drugs analyzed and FDA indicated that the "results were generally consistent among the drugs and were seen in all demographic subgroups."  *Id.*  The FDA's analysis has a calculable rate of error and it is undisputed that the analyses demonstrated a statistically significant association between the drugs at issue (including Neurontin) and the emergence of suicidality when compared to placebo.

Defendants, via their own purported rebuttal expert, Dr. Gibbons, cannot deny the corroborative evidence the 2008 FDA Alert provides to Plaintiffs' case:  Dr. Gibbons states that the data upon which FDA relied can be interpreted to show that Neurontin may be "7 times less protective than placebo in terms of the probability of developing suicidal thoughts."  Gibbons Decl., ECF Doc. # 1241 at p. 3.

Plaintiffs' experts have also put forward Dr. McFarland and his study which compared suicide victims taking Neurontin (gabapentin) and lithium.  The study found the "risk of suicide

---

[5] Defendants state without citation that "where epidemiologic evidence exists and fails to support the expert's theory, and the expert cannot point to any evidence of general acceptance of his theory, the expert's testimony is plainly inadmissible." Defs.' Reply Mem. at 6.

[6] Defendants' efforts to invalidate the findings of the very agency upon which they rely as central to their preemption motion is comical.  Essentially, Defendants use the FDA approval process as a sword while at the same time they criticize the FDA's recent analysis regarding Neurontin's safety and seek to be shielded from its findings. Such argument renders their preemption motion to be without merit.

completion was significantly (2.6 times) greater among gabapentin users versus lithium users (*p* less than 0.001)." *See* Pls.' Mem. at p. 28. This retrospective study is persuasive authority that is supportive of Plaintiffs' case on general causation.

Further support for Plaintiffs' experts' opinions is found in Defendants' own Neurontin package insert/labeling. The Neurontin package insert indicates the controlled trials with pediatric patients demonstrated a significant incidence of psychiatric adverse events: "emotional lability 6% (gabapentin-treated patients) vs 1.3% (placebo-treated patients); hostility 5.2% vs. 1.3% . . . and thought disorder 1.7% v. 0%." Pls.' Ex. 11. The Neurontin label further states the incidence of treatment emergent depression suffered in adults taking Neurontin was materially higher than those taking placebo during Defendants' own clinical trials: Depression 1.8% (Neurontin) vs. 1.1% (placebo). *Id.*

> **4.    Prospective Empirical Testing of Suicidality With Any Rate of Error Is Unethical; Retrospective Studies Are Defendants' Responsibility.**

Defendants again misstate Plaintiffs' burden to conduct testing to prove Neurontin has the general capacity to cause suicidality. Defendants argue Plaintiffs' experts have no excuse for failing to perform clinical trials comparing Neurontin users to placebo to assess suicidality. Defs.' Reply Mem. at p. 5. It is undisputed that it would be unethical to solicit patients to participate in a prospective study with suicidality as an endpoint. As it pertains to a retrospective study, performing such a study is not the Plaintiffs' obligation to prove general causation. Defendants' own failure to test its product appropriately in the face of safety signals of psychiatric adverse events cannot now be used as a defense.

In *Ephedra*, 393 F. Supp. 2d 181, the court rejected the defendants' argument that the plaintiffs should have incurred the expense of a retrospective study. The plaintiffs alleged that the defendants' Ephedra caused strokes, heart attacks, and heat stroke. *Id.* at 186. The court

summarized that manufacturers of phenylpropanolamine (PPA) joined with FDA in a study that began with its design in 1992 and culminated with its publication in 2000, "more than eight years between the undertaking and the published article." *Id.* at 190. The defendants criticized the epidemiological study—as do Defendants criticize the FDA epidemiology herein—and argued that Plaintiffs should have designed an even larger study than had been done by FDA and the manufacturers. *Id.* at 192. The *Ephedra* court was not persuaded.[7]

Similarly, Defendants' argument that Plaintiffs should undertake such a study on suicidality ignores both the caselaw and the practicality of undertaking such a study. Regarding the size and expense of such a study, Plaintiffs' expert Sander Greenland, Ph.D., has stated that "[s]tudies of such enormous size would be infeasible under ordinary circumstances and the size required explains why the current evidence from controlled clinical and epidemiologic studies is so limited."[8] Pls. Ex. 89 at pp. 19-20.

Here, both the FDA in collaboration with numerous pharmaceutical companies, and the sponsors of the McFarland Study (one of whom was the pharmaceutical company, Abbot Laboratories) presumably incurred substantial expense in performing their retrospective studies; the FDA's analysis resulted in its 2008 FDA Alert, and McFarland's analysis resulted in his publication in the *Journal of Affective Disorders*. Plaintiffs herein are not required to, nor can be

---

[7] The Hon. Jed Rakoff explained: "In other words, [Defendants] essentially argues that plaintiffs should be required to expend at least five times the effort spent by a group of PPA manufacturers prodded by the FDA's regulation of drug safety and labeling . . . Meanwhile, in an answer to a question from the bench about how much a statistically significant study of ephedra and hemorrhagic stroke might cost, Dr. Ebi gave an off-the-cuff estimate of 'a couple of million dollars.' . . . .As for the cost of studying not only hemorrhagic stroke but also other risks of taking ephedra, an estimate reported by the FDA is that such a study would 'require 4 to 8 years to complete and cost $ 2 million to $ 4 million per year.'" *Id.*

[8] "Completed suicide is a rare event . . . Assuming a rate of only 1 per 4,500 patient years among the exposed, I estimate that even a randomized placebo-controlled trial would need well over 400,000 patient-years total follow-up to have an 80% chance of detecting a doubling of the rate due to gabapentin, using a 0.05 alpha-level statistical test…. Under the same assumptions, if attempted suicides occur at 8 times the rate of completed suicides, the number of patient-years required to detect a doubling of the attempted-suicide rate would be well over 50,000 and the study would face the additional difficulty of having to detect suicide attempts." *Id.*

expected to shoulder the burdensome expense of conducting such studies. "To hold the opinions of scientists inadmissible unless backed by . . . results from . . . very expensive experiments would set a separate, higher standard for scientists than for other witnesses with specialized knowledge." *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d at 189.

### 5. Peer Review of Plaintiffs' Experts' Opinions; Plaintiffs' Experts Are Prepared to Seek Publication of Their Opinions.

Plaintiffs have submitted the Affidavit of Dr. Joseph Glenmullen, related to the New York State motion practice, where Defendants have made a *Frye* challenge to Plaintiffs' experts. Defendants argue in New York that Plaintiffs' experts' opinions are novel and not generally accepted.[9] Dr. Glenmullen has previously been deemed qualified to render opinions in federal court related to the antidepressant drug Effexor's capacity to cause suicidality.[10] *Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1048 (S.D. Ill. 2007). Dr. Glenmullen, a graduate of Harvard Medical School and a Clinical Instructor in Psychiatry at Harvard Medical School has averred that Dr. Trimble, Dr. Kruszewski, and Dr. Blume used generally accepted scientific methodologies and techniques in evaluating the materials relied upon to reach their conclusions. Sur-Reply Ex. 8.

Defendants criticize Plaintiffs' experts for not having published their general causation theory, despite the presence of a protective order in this case. Defendants further argue that the lack of a specific publication opining that "Neurontin is associated with or causes suicide" renders Plaintiffs' experts' opinions unreliable. Defs.' Reply Mem. at 4. Plaintiffs have requested Defendants release Plaintiffs' experts from the protective order in this case that they

---

[9] Dr. Glenmullen's Affidavit was commented upon by Defendants' new purported rebuttal expert, Gibbons, Ph.D., dated April 23, 2008 (ECF Doc. # 1241), and Defendants included Dr. Gibbons's Declaration as an exhibit to their recently served Reply Memorandum in support of their motion to exclude Plaintiffs' experts. Consequently, Plaintiffs are compelled to provide Dr. Glenmullen's Affidavit here for this Court's consideration.

[10] Dr. Glenmullen's qualified opinion in *Giles* "on general causation—whether Effexor can cause suicidality as a general matter—is based on an amalgamation of different sources, including his experience in treating patients with "this side effect," Food and Drug Administration (FDA) warnings on the risk of suicide, and academic journal articles." *Id.* at 1050.

insisted upon in the first place.  Sur-Reply Ex. 9.  Additionally, the fact that an expert witness
has not yet published a peer reviewed journal article on the general causation issue at hand is not
determinative of a *Daubert* challenge.  Indeed, "[i]t might not be surprising in a particular case
. . . that a claim made by a scientific witness has never been the subject of peer review, for the
particular application at issue may never previously have interested any scientist."  *In re:
Zyprexa*, 489 F. Supp. 2d. at 284 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. at 151.

> **B**.    **THE COURT SHOULD EXCLUDE AS INADMISSIBLE ALL
> NON-REBUTTAL OPINIONS OF DEFENDANTS' NEW EXPERT,
> ROBERT GIBBONS, PH.D., AND AN E-MAIL FROM FDA TO
> DEFENDANTS' EXPERT, DR. RUGGIERI**.

Defendants seek to inject into their *Daubert* motion new expert opinions that are
untimely disclosed, violate the provisions of Fed. R. Civ. P. 26 disclosure requirements, and are
based upon materials never provided to Plaintiffs.  Consequently, this Court should disregard
such information presented by Defendants.

> **1.    Defendants' Purported Rebuttal Expert Propounds Both New
> Opinions and Old Opinions Previously Disclosed by Defendants'
> Experts, Neither of Which Is a Rebuttal Opinion.**

This Court, in its Electronic Order posted to ECF on April 30, 2008, granted Defendants
leave to submit a rebuttal report limited to the FDA 2008 Alert.  However, Defendants' rebuttal
expert, Dr. Gibbons, goes far beyond the Alert, and Plaintiffs are therefore compelled to address
some of the issues set forth therein.  First, Defendants' sole basis for their claimed entitlement to
a rebuttal expert was premised upon the "new" information in the 2008 FDA Alert.  ECF Doc.
# 1218.  Many of Dr. Gibbons's opinions are either completely new opinions unrelated to the
2008 FDA Alert or are duplicative opinions of already disclosed defense experts also having
absolutely nothing to do with the 2008 FDA Alert.  Even a cursory reading of his itemized

opinions (Opinion 3, Opinion 5, and Opinion 6) reflect that these opinions are not based upon the

2008 FDA Alert and should clearly be excluded by this Court.[11]

### 2.    Dr. Gibbons Relies Upon Data Never Disclosed by Defendants to Plaintiffs.

As to that portion of his rebuttal opinion that is limited to the FDA Alert, Dr. Gibbons

discusses data that has **<u>never been disclosed</u>** by Defendants.  Defendants' newly appointed

rebuttal expert attacks the FDA's methodology of pooling 11 anticonvulsants.[12]  Central to Dr.

Gibbons's critique is his analysis of Pfizer's clinical trial data relating to Lyrica (Pregabalin)—

Pfizer's next generation drug of Neurontin.  The Lyrica (Pregabalin) clinical trial data has never

before been disclosed to Plaintiffs.  As a result, Plaintiffs are not on equal footing to test Dr.

Gibbons's opinions, and such rebuttal opinion and data should be deemed inadmissible and

excluded.  Defendants' untimely disclosure of such evidence is violates Fed. R. Civ. P. 26

disclosure requirements.  Plaintiffs are not on equal footing to test Dr. Gibbons's opinions and

such data should be deemed inadmissible for purposes of Defendants' current motion.

It is clear that Defendants chose to rely upon the purported safety of pregabalin as

demonstrative of the safety of Neurontin without providing the pregabalin data to Plaintiffs.

Accordingly, Plaintiffs are clearly entitled to the very same discovery of pregabalin safety

information as was provided to Plaintiffs with respect to Neurontin.  Over the span of the past

---

[11] Plaintiff's intend to file a formal application to strike those portions of Dr. Gibbons's opinions that are not rebuttal opinions as ordered by the Court's electronic Order entered April 30, 2008.

[12] Dr. Gibbons's analyses is technically deficient. Sur-Reply Ex. 14. "The randomized clinical trial data presented by the FDA do not exclude an enormously increased risk of suicidality from gabapentin (Neurontin) versus placebo, and Dr. Gibbons analysis of the FDA data is filled with technical errors and distortive descriptions that consistently mask the possibility of large gabapentin effects." *Id.*  Dr. Gibbons's criticism of the FDA's methodology of pooling Neurontin with other anticonvulsants is also misplaced.  Neurontin affects GABA, either directly or indirectly.  Sur-Reply Ex. 1, 2, 3, 4, 5, *supra*, and is therefore properly included in the FDA's review of other GABAergic anticonvulsants.  Grouping together drugs of the same class has been previously done numerous times by the FDA.  Additionally, extrapolating data from drugs of the same class has been found to be reliable in caselaw.  Most notably, in the evaluation of suicidality with antidepressants, the FDA pooled data from numerous SSRIs (including Defendants' Zoloft).  Such pooling has been deemed appropriate by courts of competent jurisdiction.  *See Tobin v. Smithkline Beecham Pharms.*, 164 F. Supp. 2d 1278, 1284 (D. Wy. 2001) ("There are sufficient similarities between the various SSRIs which warrants discussion regarding the drugs on a class wide basis").

four years, Plaintiffs and their experts have reviewed and analyzed hundreds of thousands of pages pertaining to Neurontin clinical trial data.  Sur-Reply Ex. 10.  Plaintiffs' experts have opined upon the safety issues reflected in Defendants' clinical trials.  Not only have Defendants not provided such discovery pertaining to pregabalin (e.g, New Drug Application, Research Reports, Adverse Event data, Safety Reviews, Medical Information, Safety Surveillance Documents, etc.) during this litigation, but Defendants have not provided the very specific limited pregabalin clinical trial data submitted to the FDA for its suicidality review.  Now, it simply violates Rule 26 disclosure requirements for Defendants to rely upon such evidence never before disclosed in the litigation.

3.    **Defendants' Rely Upon Inadmissible Email From FDA That Should Be Excluded from Consideration**.

Defendants improperly offer a solicited e-mail from the FDA.  Defs.' Reply Mem. at 11. Through one of their paid experts, Dr. Ruggieri, Defendants contacted the FDA.  As is the practice of these Defendants, the expert failed to fully disclose his financial relationship to Defendants or that he had any bias or potential conflict of interest.

Defendants' paid expert e-mailed the FDA his critical opinions of their 2008 Alert.  While he did not disclose his significant financial consulting relationship to Defendants, he did not hesitate to voice objections to the FDA's finding regarding suicidality.  Further, he voiced his opinions against the pooling of data as performed by the FDA (the very issue about which Defendants believe they had to now retain a new expert).  Sur-Reply Ex. 11.  Subsequently, on April 1, 2008, Dr. Ruggieri apparently received an e-mail from an FDA employee, and now Defendants seek to utilize this email as supportive of their defense.[13]    Defendants now

---

[13] Noteworthy, on April 3, 2008, Defendants again supplemented their expert disclosure regarding Dr. Ruggieri's opinions on general causation as it related to the FDA Alert but have refused Plaintiffs' requests to depose Dr. Ruggieri.

17

knowingly submit <u>inadmissible hearsay</u> documents surreptitiously obtained in an effort to improperly persuade this Court. All mention of this e-mail should be rejected.

### C.   PLAINTIFFS' EXPERTS' RELIANCE, IN PART, UPON SUMMARIES OF VOLUMINOUS DATA PREPARED BY KEITH ALTMAN, IS APPROPRIATE UNDER FED. R. EVID. 1006.

Defendants desperately try to discredit the opinions of Plaintiffs' expert, Cheryl Blume, Ph.D., because she relied, in part, upon the compilation and summaries of voluminous data by Keith Altman.[14]  Their argument is without merit.  Mr. Altman has appropriately presented to Plaintiffs' experts charts, summaries and calculations of voluminous writings and data consistent with Fed. R. Civ. P. 1006.  The Rule states that "voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculations . . ." *Moore's Federal Rules* (LEXIS 2008).[15]  It is axiomatic that Plaintiffs' experts would review and consider this evidence in the form that would later be submitted as evidence at the trial of this action.

In particular, Defendants attack Plaintiffs' experts' use of Proportional Reporting Ratio (PRR) data prepared by Mr. Altman.  Defendants ignore the FDA's use of Proportional Reporting Ratio (PRR) analyses, and instead tout the decision in *Meridia* for the proposition that Dr. Blume's reliance on Mr. Altman's summary of PRR data is not probative of general causation.  Defs.' Reply Mem. at 17 (citing *In re Meridia Prods. Liab. Litg.*, 328 F. Supp. 2d at

---

[14] Defendants accuse Plaintiffs' experts and Plaintiffs' counsel's employee, Keith Altman, of submitting "new declarations containing new opinions and analyses that they apparently only thought to express after reading defendants' *Daubert* motion."  Defs.' Reply Mem. at 8, n.17.  Plaintiffs were compelled to provide such declarations in order to address Defendants' misrepresentations of both the facts and Plaintiffs' experts' deposition testimony. The declarations do not put forth new opinions, but merely serve to provide accurate representations of the facts and evidence.

[15] The underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.  *United States v. Jamieson,* 427 F.3d 394, 409 (6th Cir. 2005) (citations omitted).

791). Plaintiffs have never disputed that the *Meridia* court determined that a PRR analysis, standing alone, could not prove general causation.[16] Plaintiffs' expert, Dr. Blume, does not opine to the contrary. She utilized a PRR analysis as evidence supportive of general causation and for purposes of the "signal detection" in the context of Defendants' obligation to warn consumers (this goes to Plaintiffs' failure-to-warn claim and does not require a definitive finding of general causation).[17]

Finally, Defendants baldly assert that Plaintiffs have tried to "backdoor" Mr. Altman's analyses "at the eleventh hour." Defs.' Reply Mem. at 17, n.30. Nothing could be further from the truth. Not only did Mr. Altman provide his data summaries to Defendants prior to Dr. Blume's deposition, Mr. Altman personally conferred with defense counsel at Dr. Blume's deposition, and Mr. Altman has been made available for deposition. Sur-Reply Ex. 10; Sur-Reply Ex. 13. Importantly, notably absent from Defendants' criticism is any indication that Mr. Altman has incorrectly compiled any numbers or data at issue. *See Meridia,* 328 F. Supp. 2d at 808 ("[T]he data at issue involves the mere compilation of numbers. . . .").

## III. CONCLUSION

As previously set forth in Plaintiffs' initial opposition papers, and as further set forth above herein, this Court should deny Defendants' motion in its entirety. Plaintiffs' Experts' methodologies and opinions meet and exceed the requirements of *Daubert* and its progeny, and Rules 702 and 703 with respect to their opinions on general causation.

---

[16] Dr. Blume applies a Proportional Reporting Rate (PRR) in part to demonstrate evidence of a safety signal relating to Neurontin. Specifically, in her report, Pls.' Ex. 4 ¶¶ 313-323, Dr. Blume details how by at least 2001—years before any potential notoriety bias due to media coverage or litigation—serious adverse event reports for Neurontin related to terms "suicidal" and "self injurious" behavior were approximately twice as much as the percentage of reports for other anti-epileptic drugs used to treat similar conditions. Defendants' suggestions that her charts are not "true" PRR charts promote form over substance. As shown in her report, the FDA used the same methodology as Dr. Blume when reviewing safety data associated with Avandia. *Id.*

[17] In fact, Defendants' own retained expert, Brian L. Strom, M.D., opined in this litigation that PRR analysis is useful for signal detection so that drug companies can "investigate further by launching a formal study, which is often epidemiological in design." Pls.' Ex. 12.

Dated:  May 2, 2008                    Respectfully submitted,

                                       ***Members of Products Liability
                                       Plaintiffs' Steering Committee***

                              By:    **/s/ Andrew G. Finkelstein**
                                       Andrew G. Finkelstein, Esquire
                                       Finkelstein & Partners, LLP
                                       436 Robinson Avenue
                                       Newburgh, NY  12550

                              By:    **/s/ Jack W. London**
                                       Jack W. London, Esquire
                                       Law Offices of Jack W. London
                                         & Associates
                                       106 E. 6th Street, Suite 700
                                       Austin, TX  78701

## CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on May 2, 2008.

                                       **/s/ Andrew G. Finkelstein**
                                       Andrew G. Finkelstein