UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
                                                               :
In re:  NEURONTIN MARKETING,                                   :   MDL Docket No. 1629
        SALES PRACTICES AND                                    :
        PRODUCTS LIABILITY LITIGATION                          :   Master File No. 04-10981
                                                               :
                                                               :   Judge Patti B. Saris
---------------------------------------------------------------x
                                                               :   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                                      :
                                                               :
ALL PRODUCTS LIABILITY CASES                                   :
IDENTIFIED ON EXHIBIT 1 TO THE                                 :
DECLARATION OF SCOTT W. SAYLER, ESQ.                           :
                                                               :
---------------------------------------------------------------x

**PRODUCTS LIABILITY PLAINTIFFS' SUR-REPLY MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS PFIZER INC. AND WARNER-LAMBERT
<u>COMPANY LLC'S MOTION FOR SUMMARY JUDGMENT</u>**

*Members of Products Liability
Plaintiffs' Steering Committee*

Andrew G. Finkelstein, Esq.
FINKELSTEIN & PARTNERS, LLP
436 Robinson Avenue
Newburgh, NY  12550

Jack W. London, Esq.
LAW OFFICES OF JACK W. LONDON
  & ASSOCIATES
106 E. 6th Street, Suite 700
Austin, TX  78701

## I. PRELIMINARY STATEMENT

Defendants' reply memorandum provides merely form over substance as to their attempt at summary judgment.[1] First, there is a presumption against preemption, and the FDA's views on preemption are not entitled to deference. Plaintiffs' claims also are not preempted because they do not conflict with federal law; Plaintiffs' claims complement and "parallel" rather than conflict with any FDA actions, and Defendants' illegal marketing scheme to promote Neurontin for "off-label" uses, with admittedly inadequate directions for these "off-label" uses, goes directly to Plaintiffs' parallel state law claims. Moreover, Plaintiffs' claims are not preempted because there is no credible evidence that the FDA ever reviewed, considered, concluded or in any way rejected any warning in the Neurontin labeling regarding suicidality with Neurontin when used for the "off-label" uses that Plaintiffs and the decedents ingested Neurontin.

Second, Plaintiffs have raised genuine issues as to material facts in dispute that demonstrate Defendants failed to warn consumers of Neurontin's association with mood and behavioral disturbances, including suicidality. Defendants knew or should have known about suicide-related events and thus had a duty to warn of such events. Defendants, not the FDA, had the affirmative obligation to (a) conduct pharmacovigilance to detect new risks, (b) to inform the FDA when such risks are discovered, and (c) revise their Neurontin label appropriately. Despite Defendants' bald assertions to the contrary, Defendants could have—and should have—added a suicide-related warning to the Neurontin labeling.

---

[1] There is no provision under D. Mass. L.R. 56.1 for a "Reply" to a Response to a L.R. 56.1 Statement of Material Facts, or for an "Additional Statement of Facts", and it does not appear that such a Response or Additional Statement is contemplated by L.R. 56.1. Plaintiffs therefore request that the Court disregard or strike Defendants' "Reply" and "Additional Statement of Facts". ECF Doc. # 1244.

## II. ARGUMENT

### A. FDA Amicus Briefs Should Not Be Accorded Any Deference Because Contrary to Defendants' Assertions, the FDA Has Not Been Consistent in Its Policy Regarding Preemption.

Plaintiffs' contention that the FDA's views on preemption are not entitled to deference is consistent with the current case law. Defs.' Reply Mem. at 16. The Supreme Court in *Bates v. Dow Agrosciences, LLC,* held that an agency assertion of preemption that reverses prior longstanding agency policy is entitled to little or no weight by courts. 544 U.S. 431, 449 (2005). In 2005, in *Bates,* the Supreme Court found that the Federal Insecticide, Fungicide, and Rodenticide Act, a federal statute governing the safety of pesticides, did not preempt state common law tort claims. The Court dismissed arguments posited by the government in *amicus* briefs, and chastised the EPA for engaging in a flip-flopping in policy in regard to preemption:

> The notion that FIFRA contains a non-ambiguous command to pre-empt the types of tort claims that parallel FIFRA's misbranding requirements is particularly dubious given that just five years ago the United States advocated the interpretation that we adopt today. [*Id.*]

Defendants correctly conceded that the Supreme Court in *Bates* stated that "jury verdicts" are not state law requirements subject to preemption because it "merely motivates an optional decision". 544 U.S. at 443. The Court's subsequent statements regarding the fact that some of the plaintiffs' claims would "qualify as requirements" were made specifically within the context of the prohibitions regarding labeling that were contained in an express clause, § 136v(b) of FIFRA. *Id.* at 443-47.

Here, there is no such express clause or prohibition in the statutory law at issue, FDCA. Moreover, even with the express prohibitions in the FIFRA, the Supreme Court found that other common state law claims would not be preempted, including state common law claims that parallel FIFRA's misbranding requirements. *Id.* 449-452. Further, the Supreme Court made

2

clear that common law claims for negligent testing, as we have here, would not be preempted even under the express prohibitions of FIFRA. *Id.* at 444.

Regarding Defendants' assertion that the regulations should be accorded *Auer* deference, Judge Weinstein, in *In re: Zyprexa Prods. Liab. Litig. v. Eli Lilly & Co.*, did not find any ambiguity in the same FDA regulations, and found that the FDA Preamble should be accorded limited deference and is unpersuasive. 489 F. Supp. 2d 230, 273 (E.D.N.Y. 2007). It is a Court, not the FDA, which has the power or authority to determine whether FDA regulations are minimum standards. The plain language of the regulations are not ambiguous and speak for themselves. In fact, the regulations at issue specifically require a manufacturer to provide stronger warnings whenever there is reasonable evidence of an association between a drug and a serious hazard; causation is not required. 21 C.F.R. § 201.80(e).

Plaintiffs refer this Court to their opposition papers which are replete with references to the FDA's inconsistency on the issue of preemption, including the FDA's most recent reversal of its position enunciated in the Preamble, which was contained in the *amicus* brief submitted by the FDA in *Perry v. Novartis*, and decisions of other courts which have refused to accord the FDA *amicus* briefs and/or the FDA Preamble with any, or limited deference. *See* Pls.' Mem. in Opp. at 23.

Moreover, contrary to Defendants' assertions, the Supreme Court has found a presumption against preemption where implied preemption is alleged: "Appellee must thus present a showing of implicit pre-emption of the whole field, or of a conflict between a particular local provision and the federal scheme, that is strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation." *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 715-16 (1985);

3

*see also In re* : *Zyprexa*, 489 F. Supp. 2d at 273. ("To overcome the presumption, the party urging preemption must show that either (1) Congress or an agency with delegated authority has expressly stated that preemption is intended ('express preemption'), (2) Congress intended to occupy the field ('field preemption'), or (3) state causes of action conflict with federal objectives to such a large degree that harmony between the two becomes impossible ('conflict preemption')"(citations omitted)).

>    **B.    Plaintiffs' Claims Are Not Preempted, Because Defendants' Obligations to Provide a Sufficient Warning Regarding Psychiatric Adverse Events, Including Suicidality, Would Not Have Posed A Conflict With FDA Regulations.**

Defendants admit that only "reasonable evidence of an association" (not causation) is necessary for a label revision regarding side effects with a drug.[2] Defs.' Reply Mem. at 2. Thus, Defendants were obligated to provide appropriate warnings about psychiatric adverse events including depression and suicidality. Defendants knew or should have known of psychiatric adverse events and suicide "safety signals" related to Neurontin that were reflected in their own pre-approval clinical trials and post-marketing adverse events data. For Defendants to have propounded warnings concerning suicidality, or for physicians to have monitored for such risks, would have posed no conflict with FDA regulations. Indeed, the FDA has never rejected any warning regarding suicidality and Neurontin.

Although Defendants cite to the Third Circuit's recent decision in the *Colacicco* and *McNellis* cases for support, the facts of those two cases were extremely different from those in this litigation. The *Colacicco* decision is distinguishable because the FDA has never rejected a

---

[2] 21 C.F.R. § 201.57(e) states that "…The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved."

4

Neurontin warning on suicidality.[3] On appeal, the central issue decided concerned "whether actions taken by the [FDA] pursuant to its authority under the [FDCA], 21 U.S.C. §§ 301-397, and the corresponding regulatory scheme preempt the plaintiffs' state-law failure-to-warn claims." *Colacicco v. Apotex, Inc.*, 2008 U.S. App. LEXIS 7463, at *4 (3d Cir. 2008). The Court of Appeals made it quite clear that "[p]reemption is not a doctrine that lends itself to a black-letter rule. One size does not fit all. The decision must be based on the circumstances presented in the particular situation. *Id.* at *3. The Third Circuit reiterated that its decision was solely based on the facts of the specific case:

> The FDA clearly and publicly stated its position prior to the prescriptions and deaths at issue here. Therefore, we need not decide whether preemption would be appropriate under different facts--**such as where the FDA had not rejected the substance of the warning sought or where the FDA only stated its position after a lawsuit had been initiated--or under the broader theories of preemption argued by the parties.** Thus, we do not decide whether the FDA's mere approval of drug labeling is sufficient to preempt state-law claims alleging that the labeling failed to warn of a given danger, whether FDA approval of drug labeling constitutes minimum standards in the absence of the FDA's express rejection of a specific warning, or whether actions against generic drug manufacturers are preempted on the basis of their obligations under the Hatch-Waxman Amendments. **Our holding is limited to circumstances in ...which the FDA has publicly rejected the need for a warning that plaintiffs argue state law requires.** [*Id.* at *50, *51 (footnote omitted) (emphasis added).]

Here, Defendants never approached the FDA to inform the agency of the significant adverse events with "off-label" uses of Neurontin. Defendants never informed the FDA of the safety "signal" for psychiatric adverse events, including suicidality. Since Defendants failed in their obligations, the FDA did not review and consider the issue until after Plaintiffs' Citizen Petition. There is no evidence that the FDA found insufficient evidence to support a finding that

---

[3] Although only reviewed in the context of the sought after indication for epilepsy, the FDA expressly approved Neurontin to treat epilepsy despite a concern that "depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts." Pls.' Ex. 5 at p. 117. Plaintiffs and their decedents in this litigation ingested Neurontin for "off-label" uses illegally promoted by Defendants. "Pls.' Ex. ___" refers to exhibits previously attached to the Declaration of Andrew G. Finkelstein in opposition to Defendants' motion. ECF Doc # 1198.

Neurontin is associated with a risk of suicidality or adverse mood or behavior changes which may lead or contribute to suicidality.

Defendants' suggestion that the FDA "repeatedly and affirmatively chose not to include suicide-related warning in the Neurontin labeling" is a blatant falsehood as it is not supported by a single FDA document. Defs.' Reply Mem. at 3. Defendants' statement is nothing more than wishful thinking. Defendants have failed to reference or produce any support that the FDA reviewed or even considered suicidality with any patients ingesting Neurontin <u>for off-label use</u>. Importantly, all Plaintiffs' actions for personal injuries related to ingestion of Neurontin are for off-label uses—uses which were illegally promoted by Defendants in violation of federal law, state common law, and state statutory violations. If the FDA had ever performed such a review or rendered a conclusion, surely Defendants would have disclosed it. Defendants have failed to produce any evidence that the FDA considered suicidality in the off-label population of Neurontin users because it does not exist.

Instead, Defendants' lawyers resort to writing an affidavit for signing by a former FDA employee whom Defendants retained as a consultant on this case. The affidavit sets forth facts and conclusions that are not found in any FDA or Defendants' thousands of produced documents covering decades of communications between Defendants and the FDA. Importantly, this former employee (Cynthia McCormick, M.D.) readily admits that any <u>safety review by the FDA was limited</u> to the indications for which Defendants had sought approval (e.g., epilepsy and post-herpetic neuralgia). Pls.' Ex. 33 at pp. 57-62; Pls.' Mem. in Opp. at pp. 30-32. Prior to January, 2008, the FDA never conducted a safety review examining the increase risk of suicidality caused by Neurontin in the off-label populations.

6

Moreover, at no time in the regulatory process did the FDA ever conclude as inappropriate a warning about an association between Neurontin and depression and suicide or that certain monitoring or some type of assessment should be performed prior to, and during treatment with Neurontin. Defendants never proposed any such label language.

Defendants also point to the Third Circuit's rejection of the plaintiffs' argument that there was no conflict because the defendants had not submitted a label change through the CBE process. Defs.' Reply Mem. at 9. Again, the Third Circuit's decision was based upon the facts of those particular cases in which the FDA had informally rejected such a label change and the plaintiffs were requesting the court to "overlook the FDA's various public statements rejecting the existence of an association between SSRIs and adult suicidality because they were not made in the context of the FDA's formal rejection of a CBE supplement submitted by one of the defendant pharmaceutical companies." *Colacicco v. Apotex, Inc.*, 2008 U.S. App. LEXIS 7463, at *53.

*Colacicco* simply is distinguishable from the case at bar. Unlike *Colacicco,* there is no evidence in the record before this Court that the FDA rejected warnings[4], either informally or formally through the CBE process. In fact, the monitoring warning that the FDA included in the January 31, 2008 Alert, support Plaintiffs' claims that Defendants should have included such language in their Neurontin labeling.[5]

Further, no evidence exists that Defendants sought to disseminate "Dear Doctor" letters or that FDA rejected any such attempt by Defendants. Defendants incorrectly assert they were

---

[4] Defendants state in a footnote that "FDA repeatedly considered the issue of suicidality . . . and in fact, rejected proposed warnings based on then-available information." Notably absent is any citation to a single document.
[5] Plaintiffs have claimed that Defendants' Neurontin labeling should have provided warnings or instructions to monitor patients for suicidality, and the 2008 FDA Alert supports Plaintiffs inasmuch as it states: "All patients who are currently taking or starting any antiepileptic drug should be closely monitored for notable changes in behavior that could indicate the emergence or worsening of suicidal thoughts or behavior or depression." Pls.' Ex. 1.

7

prevented from providing the required warnings in regard to adverse mood and behavioral changes, suicide-related events by means of "Dear Doctor" letters. Defs.' Reply Mem. at 7. Plaintiffs refer the Court to Plaintiffs' Memorandum in Opposition at p. 16 n.17, and accompanying exhibit, which expands upon the fact that under the FDA regulatory scheme, a communication separate and apart from the product is not considered a label under the Act. 21 U.S.C. § 321(k)-(m). Thus, "Dear Doctor" letters would not have violated FDA regulations. Defendants were free to use this tool to communicate risks of Neurontin in off label populations but failed to do so.[6]

### C. Plaintiffs' Parallel State Law Violation Claims Are Not Preempted.

This litigation concerns a situation where Defendants promoted Neurontin, in violation of FDA regulations, in an elaborate scheme for off-label uses. Plaintiffs have claimed that Defendants' failure of their common law duty runs parallel with their failure to comply with FDA regulations; thus, there is no conflict exists. Defendant Warner-Lambert's illegal sales and marketing scheme resulting in the Defendants' Guilty Plea directly pertains to Plaintiffs' parallel state law violation claims regarding both safety issues and preemption. Defendants' illegal off-label promotion of Neurontin effectively cancelled out and rendered meaningless the FDA restriction of Neurontin's use for only approved indications for a limited population (e.g., epileptics).

---

[6] Defendants incorrectly represent that they could not have submitted a "Dear Doctor" letter concerning the relationship between Neurontin and suicidal behavior. Defs.' Reply Mem. at p.7. Attached as Sur-Reply Ex. 1 is MAPP 6020.10 from the Manual of Policies and Procedures from the Center for Drug Evaluation and Research of the FDA. "Sur-Reply Ex.___" refers to exhibits attached to the Declaration of Andrew G. Finkelstein, submitted herewith. This document establishes that one of the purposes of a "Dear Doctor" letter is to communicate information about a "significant hazard to health." *Id.* at p. 2. The policy clearly discusses that "Dear Doctor" letters can be sent without prior FDA approval, but are subject to FDA review after the fact. Defendants are correct that a dear doctor letter is considered promotional labeling, but are wrong to suggest that such letters can not contain information that is not in the current package insert.

8

Curiously, Defendants have relegated Plaintiffs' parallel state law violation claims argument to merely a footnote in their reply brief. Defs.' Reply Mem. at 6. These claims are fatal to Defendants preemption claims because they are based upon Defendants' affirmative illegal actions and failure to comply with the labeling mandates of the FDA. Plaintiffs' parallel common law negligence claims and failure to warn claims would not conflict, or in any manner hinder, the FDA regulatory process and should not be preempted.

In *Medtronic, Inc. v. Lohr,* a pacemaker medical device case, the Supreme Court held that the plaintiff's common law remedies premised on violations of the federal FDA requirements were not preempted:

> Nothing in §360K denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements, or that they created an unreasonable hazard for users of the product . . . The presence of a damages remedy does not amount to the additional or different "requirement" that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical "requirements" under federal law. [518 U.S. 470, 495 (1996).]

The Supreme Court noted that "although the precise contours of their theory of recovery have not yet been defined (the pre-emption issue was decided on the basis of pleadings), it is clear that the Lohrs' allegations may include claims that Medtronic has, to the extent that they exist, violated FDA regulations". *Id.*

In *Leipart v. Guardian Indus., Inc.,* the Ninth Circuit reversed the District Court's preemption of the plaintiffs' parallel state common law claim premised on a violation of the Consumer Product Safety Act. 234 F.3d 1063 (9th Cir. 2000). The court held that the plaintiffs' common-law claim of strict liability for failure to warn of the risks associated with the use of a glass shower door would not conflict with the Consumer Product Safety Act and therefore would not be preempted. *Id.* at 1070, 1071.

9

In *Farm Raised Salmon Cases*, the Supreme Court of California has similarly considered the issue of parallel state law claims in the context of the FDCA and the California Sherman Food, Drug, and Cosmetic Law (Health & Saf. Code, § 109875), in reference to the regulation of color additives to food, and held that such claims are not preempted. 2008 Cal. LEXIS 1413 (2008). The California Supreme Court reversed the Court of Appeals' holding that the federal regulation involved did not preempt the sate law action because plaintiffs did not "seek to 'enforce[], or to restrain violations' of the FDCA . . . Rather, plaintiffs' claims for deceptive marketing of food products are predicated on state laws establishing independent state disclosure requirements 'identical to' the disclosure requirements imposed by the FDCA . . ." *Id.* at *4. The Supreme Court noted that, "If Congress intended to permit states to enact identical laws on the one hand, but precludes states from providing private remedies for violations on those laws on the other hand, 'its failure even to hint at it is spectacularly off.'" *Id.* at * 23 (citing to *Lohr*, 518 U.S. at 491).

Here, Plaintiffs' complaint details Defendants illegal off-label marketing scheme which violated FDA regulations. Pls.' Ex. 42. Plaintiffs' complaint includes a copy of the Information from the *qui tam* action, which details Defendants' violation and illegal acts as an exhibit. *Id.* It is undisputed that Defendants promoted Neurontin for off-label uses and ultimately pled guilty to putting into commerce a label with inadequate directions for those very off-label uses Defendants intentionally promoted.[7] Plaintiffs' experts have opined that Defendants' off-label

---

[7] It is laughable that Defendants cry out that their 2004 guilty plea is wholly unrelated to the question of whether Plaintiffs' failure-to-warn claims are preempted. Defs.' Reply Mem. at 2. Defendants seek to shield themselves by the FDA's inaction during the criminal investigation (i.e., the criminal action "never involved questions about the *safety* of Neurontin), Defs.' Reply Mem. at 3, but try to use as a sword an apparent claim that "FDA worked closely with the Department of Justice" as if to mean that the FDA was evaluating safety issues inherent with off-label promotion. Defs.' Reply Mem. at 5. While the FDA may have known about the off-label promotion of Neurontin as early as 1996, there is no evidence that they knew the extent of the off label *use* of the drug. Periodic reports concerning Neurontin submitted to the FDA simply provide the total number of pills for a period of time without reference to off label use. Sur-Reply Ex. 2. There is no evidence that the FDA ever considered the risk of suicide in

10

marketing of Neurontin, even in the absence of direct contact by a company sales representative, indirectly or directly influenced all or substantially all physicians prescribing Neurontin. Pls.' Ex. 4, at pp. 52-53. Plaintiffs' complaint includes allegations concerning Defendants' violation of state common law negligence:

> 129. That at all times hereinafter mentioned, defendants were under a duty to exercise reasonable care in the design and development of Neurontin and, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of conditions such as chronic pain and depression for which it was not effective and to ensure that Neurontin was not used in a manner or to treat conditions where defendants knew or should have known that the user could sustain injuries and harm from the drug.
>
> 130. That defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the treatment of chronic pain and depression, even though Neurontin had not been scientifically determined to be safe for the treatment of chronic pain and depression and even though Neurontin was, in fact, not reasonably safe for the treatment of chronic pain and depression and furthermore, defendants failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which defendants knew or should have known about.
>
> 131. That defendants were further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting Neurontin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self-destructive behavior including attempting to commit suicide and by failing to adequately warn the public of such risks. [Pls. Ex. 42.]

Further, Plaintiffs' complaint includes similar allegations in regard to strict liability. The negligence and strict liability actions may be construed to include violation of state law

---

off-label populations. Defendants cite to Dr.Hertz's recognition of the overall number of off-label reports in the 2001 Neurontin clinical review, Defs.' Reply Mem. at 5, but fail to point out that Dr. Hertz's review was based solely upon the analyses provided by Defendants as part of its NDA submission and that at no point did Defendants ever analyze the data for any populations other than those that were either approved or for which approval was sought. Pls.' Mem. in Opp. at 27.

11

misbranding statutes. Plaintiffs' complaint also, under the state law negligence cause of action, asserts specific pharmacovigilance allegations which details the FDA regulations which Defendants violated. *Id.* at ¶¶ 132-136. Plaintiffs' claims based upon state common law claims and/or misbranding statutes would not conflict with the regulatory process which Defendants violated with impunity. Courts routinely determine whether parties have violated statutory or regulatory law, and there is not need for a finding by the FDA, as suggested by Defendants, for this Court to so hold Defendants in violation of either the regulation or state common law or statutory law.

Furthermore, Plaintiffs believe that their complaints sufficiently place Defendants on notice that Plaintiffs are alleging parallel state law causes of action in accordance with the more liberal notice pleading requirements of Fed. R. Civ. P. 8. If, however, the Court would require additional allegations be included in the complaints to assert these causes of action, Plaintiffs would seek leave of this Court for permission to amend the complaints accordingly.

Although Defendants point to the Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal.,* 531 U.S. 341, 349 n.4, 352 (2001), and that FDCA gives "exclusive enforcement authority to the Federal Government", Plaintiffs' claims are not based upon enforcement of the FDA regulations at issue. That Defendants violated the FDA regulations serves to demonstrate that Plaintiffs' claims under parallel state law do not conflict with the FDA regulations and do not impede the regulatory process.

In *Warner-Lambert Co., LLC v. Kent,* 552 U.S. ___, 128 S. Ct. 1168 (March 3, 2008), the Supreme Court, by a four to four decision , affirmed the Second Circuit U.S. Court of Appeals decision in *Desiano v. Warner-Lambert & Co.,* 2006 U.S. App. LEXIS 32377 (2d Cir. 2006) (as amended January 18, 2007) that had denied Pfizer's motion for preemption of Rezulin cases.

12

The Second Circuit found that an exception in the Michigan immunity statute applied where plaintiffs had alleged that defendants had committed fraud on the FDA because plaintiffs also had asserted traditional tort law claims. In finding that preemption did not apply, the Second Circuit noted:

> Significantly, all of the claims advanced by Appellants in this case are premised on traditional duties between a product manufacturer and Michigan consumers. None of them derives from, or is based on, a newly-concocted duty between a manufacturer and a federal agency. As a result, were we to conclude that Appellants' claims were preempted, we would be holding that Congress, without any explicit expression of intent, should nonetheless be taken to have modified (and, in effect, gutted) traditional state law duties between pharmaceutical companies and their consumers. We see no reason, nor can we identify any precedent, to justify such a result. [*Desiano*, 200 U.S. App. LEXIS 32377 at *26-27.]

Further, this Court has previously ruled on claims based on violations of parallel state law violations similar to Plaintiffs claims herein. In *In re Pharm. Industry Average Wholesale Price Litig.,* this Court held that Plaintiffs' claims based upon state law Consumer Protection Statutes did not conflict with the Medicare statute and thus were not preempted under *Buckman,* stating:

> [S]tate courts frequently construe terms in federal laws in order to adjudicate causes of action based in state law, and the Supreme Court has pointed out that it is the ultimate decision-maker on federal questions arising out of state court. (citing to See *Merrell Dow Pharms., Inc. v. Thompson,* 478 U.S. 804, 810, 106 S. Ct. 3229, 3233, 92 L. Ed. 2d 650 (1986) (recognizing that state court will be required to construe federal law to determine viability of state negligence claim, and that uniformity might be compromised, but holding that remand was nonetheless required because of lack of jurisdiction); see also *J.A. Jones Constr. Co. v. City of New York,* 753 F. Supp. 497, 505 (S.D.N.Y. 1990) ("A state court will have to determine the scope of the EPA Procurement Regulations in order to decide this [contract] case, but there is no doubt that that court will fulfill its 'constitutional obligation . . . to uphold federal law.'"). [263 F. Supp. 2d 172, 188, 189 (D. Mass. 2003).]

Further, this Court allowed the state law claims to go forward, based in part, because it would not interfere with the judgment of the FDA, and that the "decision of the pharmaceutical companies, not an agency action, is alleged to cause plaintiffs' harm" *Id*. at 189. Here, unlike

13

the plaintiffs' in *Buckman,* Plaintiffs have not alleged fraud upon the FDA, but that Defendants violated parallel state laws. Similar to the plaintiffs in *In re Pharm. Industry Average Wholesale Price Litig.,* it is the actions of Defendants, not the FDA, which caused Plaintiffs' harm.

> **D.  Defendants Failed to Warn Consumers and Medical Providers of a Serious Health Hazard; Defendants Knew or Should Have Known of Reasonable Evidence of an Association of Psychiatric Adverse Events, Including Depression and Suicidality, With Neurontin Use.**

Defendants have already pled guilty to placing Neurontin into the market with <u>inadequate</u> labeling for the very "off-label" uses they promoted doctors to prescribe Neurontin. Importantly, all Plaintiffs' actions for personal injury related to ingestion of Neurontin are premised upon these "off-label" uses. Additionally, for over a decade before the 2008 FDA Alert on Suicidality, Defendants possessed evidence that Neurontin was associated with mood and behavioral disturbances, including suicidality: Defendants were aware of the multiple pre-approval clinical trial adverse events and post-marketing adverse events of mood and behavior disturbances which predictably lead to suicide.

> **1.  FDA Seriously Considers Post-Marketing Data to Evaluate Drug Safety and Labeling**

Defendants assert the FDA does not consider postmarketing adverse event reports to be reliable when considering the risks of suicide-related events. Defs.' Reply Mem. at 4. However, the facts do not support their assertions. The FDA requested Defendants submit their own "postmarketing data regarding cases of suicide and suicide attempt in September and November 2004" as part of FDA's suidicality review.[8] Defs.' Reply Mem. at 4. Their own statement belies Defendants' argument.

---

[8] Defendants mislead the Court with reference to clinical trial data relating to "psychiatric disorders" being included in their data submitted to FDA in 2004, as if to mean that the data was powered to be reliable to demonstrate the lack of an increased risk of suicidality with Neurontin. Defs.' Reply Mem. at 5. In fact, there were less than 200 patients among 3 trials in areas of bipolar disorder, social phobia and panic disorder. Pls. Ex. 5 at p.40. Defendants'

14

In fact, post-marketing data <u>can</u> and is used to evaluate drug safety as the FDA does not require <u>causation</u> to approve a labeling revision. Defendants agree the law requires only "reasonable evidence of an association." Defs.' Reply Mem. at 2. Not only does the applicable federal regulation (21 C.F.R. § 201.57(e)) not require a causal relationship to be proved, it contemplates warnings in the absence of epidemiologic data. Defendants assert that "FDA's scientific approach for determining whether there is an association between a drug and suicide-related events requires an analysis of placebo-controlled clinical trial data". Defs.' Reply Mem. at 4. Here, too, Defendants ignore that the FDA has approved numerous drug warnings based on postmarketing data, including suicidality. Consider the following examples:

- Accutane, a drug used to treat acne, was the subject of a 2005 FDA Alert on suicidality. Sur-Reply Ex. 3. The FDA issued an Alert concerning suicidality associated with the use of Accutane based upon post-marketing data. In the Alert, no clinical data concerning psychiatric adeverse events was used and the Alert was based upon precisely the same information upon which Plaintiffs' experts herein base their opinions: animal data, imaging data, and post marketing adverse event data. To date, there has been no clinical trial with Accutane to determine whether Accutane cause suicidal behavior. This clearly demonstrates that the FDA does not require epidemiologic data to determine whether there is an association between suicides and a drug even where there is an increased risk of suicide in the intended population.[9]

- Gabitril, an epilepsy drug, was the subject of a 2005 FDA Alert in which FDA stated: "The off-label use of Gabitril is strongly discouraged. . . .There have been more than 30 postmarketing reports of new onset seizures and status epilepticus in patients without epilepsy in association with Gabitril use. In most of these cases, Gabitril was used as an off-label treatment for a psychiatric illness." Pls.' Ex. 50.

---

research scientist, Dr. Atul Pande, testified that the psychiatric studies were not safety studies; that 1500 patients were "generally what FDA guidelines state for a new application.; and that Defendants never did the studies required for FDA approval of these psychiatric indications. Sur-Reply Ex. 4. It is nonsensical that Defendants now stand before the Court and suggest that these very same studies are adequate to demonstrate the safety of the drug in a psychiatric population.

[9] Moreover, the 2005 Accutane Alert specifically refutes Defendants' practice of comparing adverse event reporting rates to the expected rates from the "background" population. Similarly, this refutes Defendants' rebuttal expert, Dr. Gibbons's statement that the Mcfarland Study demonstrates that Neurontin is protective of suicide by comparing adverse event rates to the "background".

15

- Avonex, a drug used to treat multiple sclerosis, includes a specific "Depression and Suicide" Warning: "Additionally, there have been post-marketing reports of depression, suicidal ideation and/or development of new or worsening of pre-existing other psychiatric disorders, including psychosis. Some of these patients improved upon cessation of AVONEX dosing." Pls.' Ex. 51.

- Bextra, an NSAID (non-steroidal anti-inflammatory drug), was removed from the market because of spontaneous postmarketing reports of serious skin reactions. Aside from the increased risk of cardiovascular adverse events shown from long term clinical trials of NSAIDS, Bextra had an increased *reporting rate* of serious spontaneous skin reactions. Sur-Reply Ex. 5. Previously, the FDA required a black box warning to be added to the label for these skin reactions solely based upon spontaneous postmarketing reports. *Id*.

The above examples illustrate Defendants' misrepresentations about FDA's use of postmarketing adverse event data. While such data, standing alone, may not prove causation, when the data is supportive of an association of drug side effects, the FDA seriously considers such data in evaluating drug safety and labeling. FDA relies upon spontaneous adverse event reports to form the basis for monitoring the safety of drugs.

### 2. Defendants Knew or Should Have Known of Neurontin's Association with Suicidality Before 2000.

Defendants have known for at least a decade, via their own clinical trial data and post-approval postmarketing data, that there were safety signals and evidence of an association between Neurontin and suicidality. As fully set forth in Plaintiffs' expert disclosures and included as exhibits to Plaintiffs' Memorandum in Opposition, Pls.' Ex. 5., Defendants cannot state with credibility that the 2008 FDA Alert is their first notice of an association between Neurontin and suicidality. Defs.' Reply Mem. at 15.

### 3. Defendants' Rebuttal Expert Has Admitted that Neurontin Is Associated With Suicidality.

Defendants have retained a rebuttal expert, Robert Gibbons, Ph.D.[10] In his report, Dr.

---

[10] Defendants have retained Doctors Ruggieri and Gibbons as experts, and each defense expert attacks the FDA's methodology set forth in the 2008 FDA Alert on Suicidality. Defendants' efforts to invalidate the findings of the

16

Gibbons acknowledges that the limited Neurontin-specific data submitted to the FDA as part of the FDA's suicidality review can be interpreted as demonstrating a capacity to contribute towards mood and behavioral disturbances, including suicidality. Although couched with clever phraseology, Defendants admit, with a 95% confidence interval, that Neurontin may be **"7 times less protective than placebo in terms of the probability of developing suicidal thoughts."** Gibbons Decl., ECF Doc. # 1241, at p. 3 (emphasis added). That a placebo may be protective is nonsensical in the context Dr. Gibbons suggests. Another way of saying the same thing is that Neurontin may be <u>7 times more likely than placebo</u> to cause suicidal thoughts. Defendants cannot escape the fact that their own Neurontin-specific data should be interpreted just as FDA determined in its Alert on Suicidality. In its 2008 Alert, the FDA recognized that patients receiving anticonvulsants, including Neurontin, "had approximately twice the risk of suicidal behavior or ideation (0.43%) compared to patients receiving placebo (0.22%)." Pls.' Ex. 1.

E. **Plaintiffs Object to Defendants' Untimely Request to Invite the FDA to Submit an Amicus Brief at This Late Date, Subsequent to the Full Briefing of the Issue That Would Taint the Amicus, Make This Process Procedurally Defective and Prejudice Plaintiffs.**

Plaintiffs object to this Court extending an invitation to the FDA to provide an *amicus* brief in this litigation. It appears that Defendants are not satisfied with the briefing they have submitted in this litigation. Defendants have had their "one bite of the apple" in this case and should not be provided with another at Plaintiffs' expense. Defendants had every opportunity to request that this Court extend such an invitation early in the process but made a choice not to so request. Plaintiffs have opposed Defendants' motion for summary judgment in good faith.

---

very agency upon which they rely as being central to their preemption motion is comical. Essentially, Defendants use the FDA approval process as a sword while at the same time they criticize the FDA's recent analysis regarding Neurontin's safety and seek to be shielded from its findings. Such argument renders their preemption motion meritless.

17

Plaintiffs submit that an invitation at this late date, after the parties have completed their briefing, would be "unfair surprise" and extremely prejudicial to Plaintiffs. Plaintiffs submit that it would make the process in this case procedurally flawed to their detriment.

Plaintiffs had a right to know whether or not the FDA would be submitting a brief, and an opportunity to review the FDA assertions prior to completing their briefing in this case. Furthermore, the FDA *amicus* brief would be tainted and biased due to the fact that they would have the benefit of having read all of the briefs submitted in this case, including that Plaintiffs are requesting this Court not to accord their prior *amicus* briefs with any deference. Moreover, with the opportunity to view the briefing in advance would enable the FDA to tailor make its brief. The FDA is quite aware of this litigation and, from past experience, would have requested permission to file an *amicus* brief if the agency so desired to comment and participate in these proceedings.

## III.    CONCLUSION

As previously set forth in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, and as further set forth above herein, this Court should deny Defendants' motion in its entirety.

Dated:  May 2, 2008                                                                 Respectfully submitted,

*Members of Products Liability*
*Plaintiffs' Steering Committee*

By:     **/s/ Andrew G. Finkelstein**
        Andrew G. Finkelstein, Esquire
        Finkelstein & Partners, LLP
        436 Robinson Avenue
        Newburgh, NY  12550

18

By:   **/s/ Jack W. London**
Jack W. London, Esquire
Law Offices of Jack W. London
  & Associates
106 E. 6th Street, Suite 700
Austin, TX  78701

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on May 2, 2008.

 **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein