UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------------------x
: MDL Docket No. 1629
In re:  NEURONTIN MARKETING, :
       SALES PRACTICES AND : Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION :
: Judge Patti B. Saris
------------------------------------------------------------------------x
: Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO: :
:
*Bentley v. Pfizer Inc., et al.*, CA No. 05-11997-PBS :
*Bulger v. Pfizer Inc., et al.*, CA No. 07-11426-PBS :
*Dixon v. Pfizer Inc., et al.*, CA No. 05-11998-PBS :
*Dorsey v. Pfizer Inc., et al.*, CA No. 05-10639-PBS :
*McGee v. Pfizer Inc., et al.*, CA No. 05-12593-PBS :
*Owens v. Pfizer Inc., et al.*, CA No. 05-11017-PBS :
*Pursey v. Pfizer Inc., et al.*, CA No. 07-10106-PBS :
*Roberson v. Pfizer Inc., et al.*, CA No. 05-12001-PBS :
*Shearer v. Pfizer Inc., et al.*, CA No. 07-11428-PBS :
*Smith v. Pfizer Inc., et al.*, CA No. 05-11515-PBS :
*Valentine v. Pfizer Inc., et al.*, CA No. 07-11067-PBS :
*Vercillo v. Pfizer Inc., et al.*, CA No. 05-11019-PBS :
*Woolum v. Pfizer Inc., et al.*, CA No. 07-10853-PBS :
------------------------------------------------------------------------x

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PRODUCTS LIABILITY PLAINTIFFS' FRAUD CLAIMS
<u>BASED UPON ALLEGEDLY IMPROPER MARKETING</u>**

Products Liability Plaintiffs submit this memorandum in opposition to Defendants Pfizer

Inc. and Warner-Lambert Company LLC's motion to dismiss Plaintiffs' fraud claims based on

allegedly improper off-label promotion and improper marketing practices.  ECF Doc. # 1232.

**I.  PRELIMINARY STATEMENT**

By a Memorandum and Order dated February 23, 2007, this Court allowed Defendants'

motion to dismiss Plaintiffs' fraud claims without prejudice to replead the fraud allegations.  ECF

Doc. # 646, p. 5.  The Court provided Plaintiffs with the opportunity to conduct additional

discovery with respect to contacts between Defendants' sales team and the doctors who prescribed Neurontin, and to depose the doctors and evaluate relevant sales documentation from Defendants. *Id.* at p. 4. Thereafter, "in the interest of justice, the court [would] allow the plaintiffs to amend the complaint to allege fraud with particularity, including specific misrepresentations that the plaintiffs' doctors allegedly relied upon." *Id.* at pp. 4-5.

As discussed below, Plaintiffs' Amended Complaints adequately plead fraud with the particularity required under Rule 9(b) of the Federal Rules of Civil Procedure. Plaintiffs plead the fraud claims, including the causal connection between Defendants' false representations and omissions toward Plaintiffs' and their decedents' medical providers, and Plaintiffs' and their decedents' injuries, to the best of their ability and with particularity to the extent the specified information is within their knowledge and control, as revealed in the course of discovery in the Track One cases.

## II.   THE AMENDED COMPLAINTS

Pursuant to the schedule set forth by the Court, on April 7, 2008, Plaintiffs filed Amended Complaints in twelve of the fourteen Track One cases, namely, the twelve Track One cases in which Plaintiffs are represented by the law firm of Finkelstein & Partners, LLP.[1]

The additional allegations in the twelve Amended Complaints may be categorized as follows: (1) additional allegations set forth in all twelve Amended Complaints;[2] (2) additional

---

[1] Defendants' original motion to dismiss Plaintiffs' fraud claims based upon allegedly improper marketing practices was made in reference to the fraud claims set forth in the Complaint in *Cascio v. Pfizer Inc.*, which was filed by the Finkelstein firm. *See* Motion, ECF Doc. # 363; Memorandum in Support, ECF Doc. # 364. Amended Complaints have therefore been filed only in the twelve Track One cases where the Plaintiffs are represented by the Finkelstein firm. The Finkelstein firm does not represent the Plaintiff in the *Dorsey* Track One case, or the *Huberman* Track One case. Also, as noted in Defendants' Memorandum in Support, p. 1 n.2, ECF Doc. # 1233, Defendants did not make the new motion in the *Huberman* case because Plaintiff has not asserted a fraud claim in that case.
[2] *See Woolum* Am. Compl., ECF Doc. # 1201, ¶¶ 199-247, 254-267; *McGee* Am. Compl., ECF Doc. # 1202, ¶¶ 209-271; *Vercillo* Am. Compl., ECF Doc. # 1203, ¶¶ 196-258; *Pursey* Am. Compl., ECF Doc. # 1204, ¶¶ 213-275; *Valentine* Am. Compl., ECF Doc. # 1205, ¶¶ 209-257, 264-277; *Roberson* Am. Compl., ECF Doc. # 1206, ¶¶ 210-258, 264-277; *Bentley* Am. Compl., ECF Doc. # 1207, ¶¶ 200-262; *Shearer* Am. Compl., ECF Doc. # 1208, ¶¶ 222-

allegations concerning the statements made by Dr. Catherine Clarey on January 16, 2003, set forth in the five of the Amended Complaints involving a Plaintiff or Plaintiff's decedent who attempted or committed suicide after January 16, 2003;[3] and (3) case-specific allegations set forth in ten of the Amended Complaints.[4]

### A.    Additional Allegations in All Twelve Amended Complaints

The additional allegations in all twelve Amended Complaints allege that Defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiffs or their decedents that: (1) Neurontin may contribute to mood and behavioral disturbances, including depression and suicide; (2) Neurontin may worsen existing mood and behavioral disturbances, including depression and suicidal behavior; (3) Neurontin may worsen depression and may lead to suicide; (4) Neurontin use has been associated with depression; (5) Neurontin use has been associated with psychobiologic adverse events; and (6) Neurontin use has been associated with suicidality. *See, e.g., Smith* Am. Compl., ECF Doc. # 1209, ¶¶ 235-240.

Important information concerning Neurontin and depression and suicidality that Defendants are alleged to have suppressed, concealed and failed to disclose included findings and results from Defendants' Epilepsy Clinical Trials, Defendants Clinical Pharmacology Studies, and Defendants' Add-on Therapy Studies, all of which were performed as part of Defendants' New Drug Application for Neurontin. *See Smith* Am. Compl. ¶¶ 242-249.

---

284; *Smith* Am. Compl., ECF Doc. # 1209, ¶¶ 235-283, 290-303; *Dixon* Am. Compl., ECF Doc. # 1210, ¶¶ 200-262; *Bulger* Am. Compl., ECF Doc. # 1211, ¶¶ 221-269, 276-289; *Owens* Am. Compl., ECF Doc. # 1212, ¶¶ 118-153, 163-175.
[3] See *Woolum* Am. Compl., ECF Doc. # 1201, ¶¶ 248-253; *Valentine* Am. Compl., ECF Doc. # 1205, ¶¶ 258-263; *Roberson* Am. Compl., ECF Doc. # 1206, ¶¶ 259-264; *Smith* Am. Compl., ECF Doc. # 1209, ¶¶ 284-289; *Bulger* Am. Compl., ECF Doc. # 1211, ¶¶ 270-275.
[4] See *Woolum* Am. Compl., ECF Doc. # 1201, ¶¶ 199-247, 254-267; *McGee* Am. Compl., ECF Doc. # 1202, ¶ 120; *Vercillo* Am. Compl., ECF Doc. # 1203, ¶ 117; *Valentine* Am. Compl., ECF Doc. # 1205, ¶¶ 117-130; *Roberson* Am. Compl., ECF Doc. # 1206, ¶¶ 120-121; *Bentley* Am. Compl., ECF Doc. # 1207, ¶ 119; *Shearer* Am. Compl., ECF Doc. # 1208, ¶¶ 120-125; *Smith* Am. Compl., ECF Doc. # 1209, ¶¶ 128-143; *Bulger* Am. Compl., ECF Doc. # 1211, ¶¶ 120-124; *Owens* Am. Compl., ECF Doc. # 1212, ¶¶ 26, 154-162.

In addition, Defendants are alleged to have suppressed, concealed and failed to disclose important information concerning Neurontin and depression and suicidality revealed to Defendants at the time of the 1992 pre-approval, Combined Medical-Statistical Review. *See Smith* Am. Compl. ¶¶ 250-258. Defendants allegedly undertook a plan to disseminate false and misleading information about Neurontin by suppressing or otherwise intentionally failing to disclose to Plaintiffs or their decedents, or their prescribing physicians, information about Neurontin's capacity to contribute to psychobiologic adverse events, including depression and suicidality. *See Smith* Am. Compl. ¶¶ 259-261.

Defendants also allegedly performed marketing assessments of proposed off-label indications for Neurontin, including psychiatric indications, and for neuropathic pain, and promoted Neurontin for off-label uses while at the same time suppressing, concealing and failing to disclose Neurontin's association with psychobiologic adverse events, including depression and suicidality. *See Smith* Am. Compl. ¶¶ 262-265.

Plaintiffs further allege that, to increase sales of Neurontin, Defendants affirmatively applied strategies to compare Neurontin with other competing pharmaceutical drugs that had warnings or otherwise greater disclosure of suicide-related events, and trained its sales force to minimize Neurontin's association with psychobiologic adverse events, including depression and suicidality, while at the same time emphasizing that competing drugs had a "Suicide Warning"; and that Defendants' application of such comparison strategies directly or indirectly resulted in Plaintiffs' or their decedents' prescribing physicians prescribing Neurontin and Plaintiffs or their decedents ingesting Neurontin. *See Smith* Am. Compl. ¶¶ 266-270.

The Amended Complaints also reiterate the findings and opinions of Plaintiffs' marketing expert, Charles King III, Ph.D., explaining how Defendants' extensive marketing of Neurontin

4

for off-label uses influenced, induced and caused Plaintiffs' and their decedents' physicians to prescribe Neurontin to their patients for off-label uses. *See Smith* Am. Compl. ¶¶ 271-278; Marketing Neurontin, Expert Report of Charles King III, dated October 22, 2007, ¶¶ 80-87, attached hereto as Exhibit A. The pertinent findings and opinions were summarized as follows:

> Most doctors likely would never have heard of Neurontin but for the off-labeling marketing efforts of Warner-Lambert and allegedly Pfizer. The inability to prove that Warner-Lambert or Pfizer contacted a doctor directly does not mean that that doctor was not influenced by Warner-Lambert and Pfizer marketing efforts. Pfizer's off-label marketing of Neurontin indirectly influenced all, or substantially all, doctors prescribing Neurontin in one of two ways. First, a doctor who did not have direct contact with Pfizer most likely was influenced in his prescribing habits by one who did. Second, all, or substantially all, doctors were indirectly affected by Pfizer's suppression of negative or adverse information about Neurontin that would have affected their prescribing habits.

*Smith* Am. Compl. ¶ 271; King Expert Report ¶ 80.

Plaintiffs' Amended Complaints go on to allege that Defendants' suppression, concealment and lack of disclosure, to Plaintiffs' and their decedents' prescribing physicians, directly or indirectly resulted in the prescribing physicians prescribing Neurontin and for Plaintiffs and their decedents to ingest Neurontin. *See Smith* Am. Compl. ¶¶ 280-283.

The Amended Complaints further allege that Defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action, which also directly and indirectly resulted in preventing Plaintiffs' and their decedents' prescribing physicians from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiffs and their decedents, and from being able to fully monitor changes in Plaintiffs' and their decedents' mood and behavior caused by Neurontin. *See Smith* Am. Compl. ¶¶ 290-296.

All the Amended Complaints allege that Defendants intentionally suppressed, concealed or otherwise misrepresented the utility of Neurontin in uses outside of its approved indications in

5

failing to inform Plaintiffs' and their decedents' prescribers that it would be unethical to prescribe Neurontin to depressed individuals because there was no evidence whatsoever that Neurontin was likely to be antidepressant, and that this directly or indirectly resulted in preventing Plaintiffs' and their decedents' prescribing physicians from being able to fully monitor changes in their patients' mood and behavior caused by Neurontin, and from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to the their patients. *See Smith* Am. Compl. ¶¶ 297-300.

Lastly, the Amended Complaints allege that Defendants were aware that Plaintiffs' and their decedents' prescribing physicians would rely on this information, but nevertheless provided this information to induce such prescribing physicians to prescribe Neurontin to their patients for off-label uses, and that such prescribing physicians and their patients relied on this information provided by Defendants, to their detriment as Plaintiffs and their decedents sustained serious injury. *See Smith* Am. Compl. ¶¶ 301-303.

### B. Additional Allegations Concerning Dr. Catherine Clarey's Statements in Five of the Amended Complaints

Five of the Amended Complaints allege that on January 16, 2003, via National Public Radio, Defendants, through their Senior Medical Director Dr. Catherine Clarey, suppressed, fraudulently misrepresented, concealed and failed to disclose Defendants' knowledge that Neurontin use has been associated with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality, when Dr. Clarey stated, "[t]here is absolutely no evidence that Neurontin in --- in --- with all these prescriptions that it has been associated with suicidal behavior or that it can cause suicidal behavior," and that Plaintiffs' or their decedents' prescribing physicians heard directly or otherwise learned indirectly of these statements. *Smith* Am. Compl. ¶¶ 284-285.

6

The Amended Complaints further allege that Defendants' suppression, fraudulent misrepresentation, concealment and lack of disclosure as to Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality, via statements by Dr. Clarey, directly or indirectly resulted in (1) Plaintiffs' or their decedents' prescribing physicians prescribing Neurontin and in Plaintiffs and their decedents' ingesting Neurontin; (2) Plaintiffs' or their decedents' prescribing physicians not warning Plaintiffs or their decedents of the risks of depression and suicide caused by Neurontin; (3) Plaintiffs' or their decedents' prescribing physicians failing to adequately monitor changes in Plaintiffs' or their decedents' mood and behavior caused by Neurontin; and (4) preventing Plaintiffs' or their decedents' prescribing physicians from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiffs or their decedents.  *See Smith* Am. Compl. ¶¶ 286-289.

### C.  Additional Case-Specific Allegations in Ten of the Amended Complaints

In nine of the Amended Complaints, it is alleged that Plaintiffs' or their decedents' physicians and medical providers testified at depositions that they would have wanted to know about the important information allegedly suppressed, concealed or failed to disclose by Defendants before prescribing Neurontin for Plaintiffs or their decedents.[5]

Further additional specific allegations were also made in five of the Amended Complaints, particularly concerning the detailing and promotional efforts of Defendants' sales representatives and "Consultants" toward Plaintiffs' and their decedents' medical providers in connection with off-label uses of Neurontin.

---

[5] *See Woolum* Am. Compl., ECF Doc. # 1201, ¶¶ 119-120; *McGee* Am. Compl., ECF Doc. # 1202, ¶ 120; *Vercillo* Am. Compl., ECF Doc. # 1203, ¶ 117; *Valentine* Am. Compl., ECF Doc. # 1205, ¶ 130; *Roberson* Am. Compl., ECF Doc. # 1206, ¶¶ 120-121; *Bentley* Am. Compl., ECF Doc. # 1207, ¶ 119; *Smith* Am. Compl., ECF Doc. # 1209, ¶¶ 128-129; *Bulger* Am. Compl., ECF Doc. # 1211, ¶ 123; *Owens* Am. Compl., ECF Doc. # 1212, ¶ 36.

7

1.  **Additional Specific Allegations in *Valentine* Amended Complaint:**

(a) Prior to Plaintiff's suicide attempt, on at least four specifically dated occasions, Defendants' sales representative a/k/a Territory Manager, Richard Schlect, detailed and promoted Neurontin for off-label, unapproved uses, to Nurse Tiberia, or to Plaintiff's psychiatrist, Dr. Arias, *Valentine* Am. Compl., ECF Doc. # 1205, ¶¶ 119-120, and on other occasions detailed Nurse Tiberia and Dr. Arias with respect to Neurontin. *Id.* at ¶ 121.

(b) Prior to Plaintiff's suicide attempt, on at least four occasions each, Defendants' sales representative a/k/a Territory Manager promoted Neurontin for off-label, unapproved uses to Psychiatrist Dr. Mignone or Psychiatrist Dr. Romanowski, healthcare providers in the same office practice as Dr. Arias, and with whom Dr. Arias, had direct contact. *Id.* at ¶¶ 122-123.

(c) On at least six occasions, Defendants' sales representative a/k/a Territory Manager promoted to Dr. Arias and Nurse Tiberia, unapproved uses for Neurontin, because Dr. Arias and Nurse Tiberia were not epileptologists or neurologists with patients for whom they would prescribe Neurontin for approved uses, and that Dr. Arias and Nurse Tiberia were under the impression that Neurontin was effective for the unapproved uses for which they treated Ms. Valentine with Neurontin, based in part upon their interactions with each other and doctors in their medical community. *Id.* at ¶¶ 124-125.

(d) Prior to Plaintiff's suicide attempt, Dr. Arias was told by Defendants' sales representative a/k/a Territory Manager "hush-hush" and "off-the-record" that Neurontin was safe and effective for indications not approved by the FDA. *Id.* at ¶ 126.

2.  **Additional Specific Allegations in *Shearer* Amended Complaint**

(a) Defendants sponsored and provided funding to Dr. Edwards, one of Plaintiff's decedent's prescribers of Neurontin, and listed Dr. Edwards as an investigator for Defendants' research regarding the off-label use of Neurontin, and Defendants thereby directly influenced Dr. Edwards's Neurontin prescribing practice and in Dr. Edwards' not warning Plaintiff's decedent of the risks of adverse depression and suicide caused by ingesting Neurontin; prior to Plaintiff's decedent's suicide, Dr. Edwards treated, prescribed or directed dosage levels of Neurontin to Plaintiff's decedent for off-label indications; and prior to Plaintiff's decedent's suicide, on any of 40 specifically dated occasions, Defendants' sales representative a/k/a Territory Manager, detailed and promoted Neurontin for off-label, unapproved uses, to Dr. Edwards. *Shearer* Am. Compl., ECF Doc. # 1208, ¶¶ 120, 122, 125.

(b) Paresh Desai, a Sales Representative for Defendants who engaged in the off-label promotion of Neurontin by providing money to third parties on or

8

about two specified dates for the purpose of sponsoring purported educational seminars about the use of anticonvulsant medications, including Neurontin, for indications such as the treatment of headaches and migraines, and pain, "detailed" Plaintiff's decedent's prescribing physician, Dr. Sullivan, on a specified date, at which time he promoted Neurontin for uses not approved by FDA, and suppressed or otherwise purposely failed to inform Dr. Sullivan about Neurontin's negative mood and behavior adverse effects and Neurontin's association with suicidal behavior; and that prior to Plaintiff's decedent's suicide, Dr. Sullivan treated, prescribed or directed dosage levels of Neurontin to Plaintiff's decedent for off-label indications. *Id.* at ¶¶ 121, 123.

### 3.    Additional Specific Allegations in *Bulger* Amended Complaint

(a) Prior to Plaintiff's decedent's suicide, Dr. Goldman treated, prescribed or directed dosage levels of Neurontin to Plaintiff's decedent for off-label indications; and prior to Plaintiff's decedent's suicide, and on any of four specifically dated occasion, Defendants' sales representative a/k/a Territory Manager, detailed and promoted Neurontin for off-label uses to Dr. Goldman. *Bulger* Am. Compl., ECF Doc. # 1211, ¶¶ 120-121.

### 4.    Additional Specific Allegations in *Smith* Amended Complaint

(a) Prior to Plaintiff's decedent's death, Defendants' sales representative employee a/k/a Territory Manager detailed Plaintiff's decedent's prescriber, Dr. McCombs, a neurological surgeon who was a member of a large group practice where he interacted and talked to the members of his practice about available medicines, including the unapproved uses of Neurontin, on approximately three occasions with respect to Neurontin, and detailed Dr. McCombs or the doctors in his medical practice, on approximately 300 occasions with respect to unapproved uses of Neurontin, because Dr. McCombs and the members of his practice were not epileptologists or neurologists with patients for whom they would prescribe Neurontin for approved uses, and with respect to Dr. McCombs's treatment and prescription of Neurontin for Plaintiff's decedent, Dr. McCombs was under the impression that Neurontin was effective for the unapproved uses for which he prescribed Neurontin to Plaintiff's decedent, based in part upon his interactions with the doctors in his immediate medical practice, and Dr. McCombs was influenced directly or indirectly to prescribe Neurontin for "off-label uses" to patients, including Plaintiff's decedent, by Defendants' sales representative employee a/k/a Territory Manager. *Smith* Am. Compl., ECF Doc. # 1209, ¶¶ 130-135.

(b) Prior to Plaintiff's decedent's death, Defendants' sales representative employee a/k/a Territory Manager detailed Plaintiff's decedent's prescriber, Dr. Mackey, an orthopaedist who was a member of a large group practice where he interacted and talked to the members of his practice about available medicines, including the unapproved uses of Neurontin, or the doctors in his medical

9

practice, on approximately 69 occasions with respect to unapproved uses of Neurontin, because Dr. McCombs and the members of his practice were not epileptologists or neurologists with patients for whom they would prescribe Neurontin for approved uses, and with respect to Dr. McCombs's treatment and prescription of Neurontin for Plaintiff's decedent, Dr. McCombs was under the impression that Neurontin was effective for the unapproved uses for which he prescribed Neurontin to Plaintiff's decedent, based in part upon his interactions with the doctors in his immediate medical practice, and Dr. McCombs was influenced directly or indirectly to prescribe Neurontin for "off-label uses" to patients, including Plaintiff's decedent, by Defendants' sales representative employee a/k/a Territory Manager. *Smith* Am. Compl., ECF Doc. # 1209, ¶¶ 136-140.

(c) Prior to Plaintiff's decedent's death, Defendants' sales representative employee a/k/a Territory Manager detailed Plaintiff's decedent's prescriber, Nurse Krancer, on approximately 27 occasions with respect to unapproved uses of Neurontin, because Nurse Krancer and the physician-members of her practice were not epileptologists or neurologists with patients for whom they would prescribe Neurontin for approved uses, and Nurse Krancer was influenced directly or indirectly to prescribe Neurontin for "off-label uses" to patients, including Plaintiff's decedent, by Defendants' sales representative employee a/k/a Territory Manager. *Smith* Am. Compl., ECF Doc. # 1209, ¶¶ 141-143.

### 5. Additional Specific Allegations in *Owens* Amended Complaint

(a) On or about June 14-16, 1996, Defendants sponsored a "Consultants' Meeting" entitled "New Frontiers in the Management of Seizure Disorders", at the Island House Hotel in Orange Beach, Alabama, where Defendants retained "Consultants" to be present, including Dr. Fleet, who was provided a financial honorarium, as well as financial contribution towards travel, meals and hotel room expenses, and where present were Defendants' employees Jan Anderson and Andrea Shapiro, as well as Christine Kapple of Medical Education Systems, Inc., and during which "off-label" alternative indications for Neurontin were promoted as part of "Interactive Workshops" during the Meeting. *Owens* Am. Compl., ECF Doc. # 1212, ¶¶ 154-156.

(b) Plaintiff's decedent's prescriber, Dr. Crotwell, an orthopaedist, did not prescribe Plaintiff's decedent Neurontin for any use or indication for which Neurontin was approved by the FDA, but was directly influenced to prescribe Neurontin for "off-label" uses to patients, including Plaintiff's decedent, by Dr. Fleet, a paid Consultant of Defendants. *Id.* at ¶¶ 157-159.

(c) Defendants' sales representative employee a/k/a Territory Manager, John Sanson, detailed Dr. Crotwell on approximately 23 occasions with respect to Neurontin, at which time Mr. Sanson promoted to Dr. Crotwell unapproved uses for Neurontin, because Dr. Crotwell was not an epileptologist or neurologist with

patients for whom he would prescribe Neurontin for approved uses, and Dr. Crotwell was influenced to prescribe Neurontin for "off-label uses" to patients, including Plaintiff's decedent, by Mr. Sanson. *Id.* at ¶¶ 160-162.

### III.  ARGUMENT

In *In re Eli Lilly & Co., Prozac Prods. Liab. Litig.*, 789 F. Supp. 18 (S.D. Ind. 1992), the plaintiffs alleged that they, or their decedents, were harmed when they took the prescription anti-depressant drug Prozac. In at least one case, the plaintiff's decedent committed suicide, and the complaint claimed that Prozac caused the injuries and death of the decedent. Lilly sought dismissal of the plaintiffs' fraud claims on the ground that they fail to satisfy the particular-pleading requirement of Rule 9(b). In finding that the fraud claim in two of the complaints states all the elements required of a fraud claim, the Court explained:

> These allegations satisfy the requirements of FRCP 9(b) under the circumstances of the present cases. Whatever further detail might otherwise be demanded is not required in these cases, in which the reliance was incurred principally by third parties (the doctors), rather than by the plaintiffs themselves, and in which the representations are alleged to have occurred over a period of several years. Under these circumstances, the plaintiffs cannot be expected to provide all details concerning the time and place of the alleged misrepresentations. Moreover, we find that Count V in both cases is sufficiently specific to apprise Lilly fairly of the charge and permit it to defend against the charge, which are principal considerations underlying FRCP 9(b). [Id, at 1457.]

Similarly, in *Bhandari v. Bittner*, 2004 U.S. Dist. LEXIS 29356 (W.D.N.Y. 2004), the plaintiff alleged that as a result of taking the prescription drug Arava, his wife sustained grievous injuries which led to her death. The district court initially granted defendant's motion pursuant to Rules 9(b) and 12(b)(6) to dismiss the claims for fraudulent misrepresentation and fraudulent concealment without prejudice and granted plaintiff leave to file an amended complaint. The defendants moved again pursuant to Rules 9(b) and 12(b)(6) to dismiss the repleaded claims for fraudulent misrepresentation and fraudulent concealment in the amended complaint. The district court rejected defendants' contention that the plaintiff still had not identified which defendant, or

11

defendants, made the alleged misrepresentations, noting that "this is an instance where FRCvP 9(b) must be relaxed because plaintiff does not have access to all the facts necessary to identify which defendants are responsible for which misrepresentation." *Id.* at *9. In denying defendants' motion to dismiss the fraud claims, the Court stated:

> Therefore, plaintiff has met the requirements of FRCvP 9 to the best of his present ability and pled the fraud claims with particularity to the extent the specified information was within his control. Although plaintiff did not plead with particularity those facts that are exclusively within defendants' knowledge, he did so plead those facts that are within his control, which is all that FRCvP 9(b) can require of a plaintiff... [Id. at *13-14.]

Likewise, in *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir. 1987), the Court observed:

> Where there were multiple defendants and the plaintiff was not directly involved in the alleged transaction, the burden of the plaintiff to know exactly when the defendants called each other or corresponded with each other, and the contents thereof, is not realistic. Plaintiff here provided an outline of the general scheme to defraud and established an inference that the mail or wires was used to transact this scheme; requiring plaintiff to plead the time, place and contents of communications between the defendants, without allowing some discovery, in addition to interrogatories, seems unreasonable. [Citations omitted.]

This Court previously found that the Class and Coordinated Plaintiffs' claims in the instant litigation, based on statements in Verbatim Reports, have been pled with the requisite particularity under Fed. R. Civ. P. 9(b). *In re Neurontin Marketing, Sales Practices, and Prods. Liab. Litig.*, 2006 U.S. Dist. LEXIS 38485 (D. Mass. 2006); *see also United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass. 2001) (where this Court found that although Franklin did not identify specific prescriptions for Medicaid patients for off-label uses made by doctors in reliance on the fraudulent representations, he did not reasonably have pre-discovery access to that patient-specific information, and that when considered alongside the disclosure, the complaint amply detailed both a general framework of the purported Medicaid

12

fraud and provided more specific information on the individuals, locations, the precise statements alleged to be false and the time-frames involved, and therefore satisfied the requirements of Rule 9(b) with respect to the off-label sale of Neurontin for Medicaid reimbursement).

Similarly, the Philadelphia Court of Common Pleas recently denied Pfizer's motion for partial summary judgment as to the negligent and intentional misrepresentation claims in *Clark v. Pfizer Inc.*, 2008 Phila. Ct. Com. Pl. LEXIS 74 (Mar. 14, 2008), a class action lawsuit brought by plaintiffs seeking refunds for purchases of Neurontin, or its generic equivalent, gabapentin, for off-label uses not approved by the FDA. The court considered the report of plaintiffs' expert, an Assistant Professor of Health, Economics and Policy at the Harvard School of Public Health, who stated in part that, "if Defendant's off-label promotion of Neurontin is proven to be illegal, it is feasible to quantify the causal effect of specific promotional strategies on off-label prescribing." *Id.* at *18. The court found that, "if plaintiffs can demonstrate at trial a comprehensive marketing scheme to unlawfully promote the off-label use of an FDA approved medication, a class wide claim has been proven," and that the plaintiff class claims, "if ultimately proven at trial, consist of an unlawful manipulation of medical literature, medical opinion, and a <u>fraud upon the medical community of the country</u>." *Id.* at *17-18 (emphasis added).

Here, in addition to the new allegations in the Amended Complaints, reiterated from Dr. King's Expert Report, <u>Marketing Neurontin</u>, attached hereto as Exhibit A, Plaintiffs' expert has further concluded in his Report as follows:

IX. Conclusions

98.    The goal of pharmaceutical marketing is to influence the prescribing habits of physicians and increase drug sales. Marketing by pharmaceutical companies seeks to influence the prescribing patterns of doctors both directly and indirectly. To obtain information about drugs, physicians rely upon "opinion

13

leader" physicians and colleagues, medical and scientific journal articles, experiences of other medical professionals, medical liaisons, pharmaceutical sales representatives and continuing medical education.

99.     Pharmaceuticals firms interact directly with physicians primarily through their sales force representatives, who visit doctors in their offices and provide information about their drugs, often leaving free samples behind. Other channels of direct communication to physicians include direct mail and medical journal advertising.

100.    Drug companies also influence physicians indirectly through influencing those who influence physicians in their decisions about which drugs to prescribe. Indirect channels of influence include self-influence through research, peer influence, colleagues, key opinion leaders and continuing medical education. Continuing medical education consists of educational activities that serve to maintain, develop, or increase the knowledge, skills, and professional performance of physicians and often take place in conferences, meetings, and events funded by pharmaceutical companies.

101.    Many of marketing's effects are subtle and pervasive. Doctors are often unable to explain where they first learned about a drug. Although physicians frequently claim that they are immune to the marketing and the blandishments of pharmaceutical companies, studies have shown that doctors and their prescribing habits are influenced by pharmaceutical companies' marketing efforts.

102.    In the case of Neurontin, activities that should have been independent of promotional intent were used to promote Neurontin. These included the use of continuing medical education, medical research, payment for published articles, and medical liaisons as well as the suppression of unfavorable study results. By blurring the distinction between medical and scientific activities and commercial and promotional activities, Warner-Lambert and allegedly Pfizer subverted the integrity of the scientific process for determining the efficacy and appropriateness of Neurontin for treating certain diseases but succeeded in dramatically increasing off-label prescriptions of Neurontin.

103.    Based on my review of materials in this matter, I have reached the following conclusions:

a.      The marketing and promotional efforts of Warner-Lambert and Pfizer were significant contributing factors to the off-label sales of Neurontin.
b.      Off-label sales of Neurontin would have continued had Pfizer ceased off-label promotional activities for Neurontin.

c.      The suppression of information about serious adverse events enabled growth in off-label sales.

      d.     Pfizer's off-label marketing of Neurontin indirectly influenced all, or substantially, all physicians prescribing of Neurontin.

It is submitted that Plaintiffs have adequately pleaded common law fraud causes of action through the additional allegations in the Amended Complaints setting forth Defendants' suppression, concealment, and failure to disclose important information concerning Neurontin and depression and suicidality, and explaining how such conduct, and Defendants' extensive marketing of Neurontin, directly and indirectly, influenced, induced and caused Plaintiffs' and their decedents' physicians to prescribe Neurontin off-label to their patients, as to whom Defendants were aware may already have been at higher risk of suicidality, without additionally monitoring for indications of suicidality; in conjunction with the specific allegations in the Amended Complaints that Plaintiffs' or their decedents' physicians and medical providers testified at depositions that they would have wanted to know about the important information allegedly suppressed, concealed or failed to disclose by Defendants, before prescribing Neurontin for Plaintiffs or their decedents, *see Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992) (applying Mississippi law, Court noted that: "<u>To satisfy the burden of establishing warning causation, a plaintiff may introduce</u> either objective evidence of how a reasonable physician would have responded to an adequate warning, [footnote omitted] or <u>subjective evidence of how the treating physician would have responded</u>" (emphasis added));

Furthermore, as discussed above, additional specific allegations also were set forth in five of the Amended Complaints, particularizing the detailing and off-label promotional efforts of Defendants' sales representatives and "Consultants" toward Plaintiffs' and their decedents' medical providers.

With respect to the seven Amended Complaints that do not have additional specific allegations concerning detailing of Plaintiffs' and their decedents' prescribing physicians,

15

Plaintiffs have sufficiently alleged that the inability to prove that Defendants contacted a doctor directly does not mean that that doctor was not influenced by Defendants' marketing efforts, and that Defendants' off-label marketing of Neurontin indirectly influenced all, or substantially all, doctors prescribing Neurontin, by such a doctor being influenced in his prescribing habits by one who did, and by Defendants' suppression of negative or adverse information about Neurontin that would have affected their prescribing habits.

In short, Plaintiffs have set forth in the Amended Complaints substantial specific allegations that Defendants caused false representations and omissions concerning the safety and effectiveness of Neurontin to be communicated to third-party medical providers rather than to Plaintiffs and their decedents themselves, for the purpose of influencing, inducing and causing such medical providers to prescribe Neurontin off-label to their patients, and a high probability and reasonable inference that Plaintiffs' physicians were exposed to, and relied upon such false representations and omissions, which are alleged to have occurred over a period of several years. The fact that Plaintiffs can set forth additional specific allegations in five of the twelve Amended Complaints, particularizing the detailing and off-label promotional efforts of Defendants' sales representatives and "Consultants" toward Plaintiffs' and their decedents' medical providers, after individualized discovery in these Track One cases, including depositions of Plaintiffs' and their decedents' physicians, who are understandably reluctant to assume the onus of additional duties to monitor their patients for suicidality, certainly precludes wholesale dismissal of the fraud claims in all Amended Complaints, or denying Plaintiffs leave to file Amended Complaints in all other individual actions, following individualized discovery in those actions.

Plaintiffs have therefore pleaded the fraud claims, including the causal connection between Defendants' false representations and omissions toward Plaintiffs' and their decedents'

medical providers, and plaintiffs' injuries, to the best of their ability and with particularity to the extent the specified information is within their knowledge and control, as revealed in the course of discovery in the Track One cases.  That is all that Rule 9(b) can expect of the Plaintiffs.

## IV.   CONCLUSION

Plaintiffs have adequately pleaded fraud claims with particularity in the Amended Complaints.  It is therefore respectfully requested that this Court deny in its entirety, Defendants' motion to dismiss Plaintiffs' fraud claims based on allegedly improper off-label promotion and improper marketing practices as set forth in Plaintiffs' Amended Complaints.

Dated:  May 5, 2008                                             Respectfully submitted,

*Members of Products Liability
Plaintiffs' Steering Committee*

By:    **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, NY  12550

By:    **/s/ Jack W. London**
Jack W. London, Esquire
Law Offices of Jack W. London
   & Associates
106 E. 6th Street, Suite 700
Austin, TX  78701

### CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on May 5, 2008.

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire