EXHIBIT B

Case 1:04-cv-10981-PBS    Document 1264-3    Filed 05/07/2008    Page 1 of 4

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                     )
NEURONTIN MARKETING, SALES PRACTICES        ) CA No. 04-10981-PBS
AND PRODUCTS LIABILITY LITIGATION           ) Pages 1 - 59
SALES PRACTICES LITIGATION                  )




              BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
                          -and-
                 JUSTICE HELEN E. FREEDMAN
                NEW YORK SUPREME COURT JUSTICE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        December 11, 2006, 3:10 p.m.




                    LEE A. MARZILLI
                CERTIFIED REALTIME REPORTER
                 United States District Court
                 1 Courthouse Way, Room 3205
                       Boston, MA  02210
                        (617)345-6787
```

Page 46

1  for our client, so we did that just to protect and preserve
2  the rights of the client. The doctor was eventually dropped
3  from the case, but, no, we didn't speak to the doctor because
4  he was represented by counsel, and that never took place, so
5  that has been impossible to happen. But on that case, we
6  know who the doctor was that prescribed it.
7      In some of the other cases, your Honor, there is
8  more than one doctor that prescribed the medication. I can
9  tell you that in the Biernacki case, which is the
10 representative one that they chose in the New York
11 litigation, I believe there's four or five different doctors
12 that prescribed Neurontin to my client. So the difficulty is
13 when you have a -- it's not just that the defendants
14 possess -- well, is the easiest way to get the information
15 necessary to make the connection, to make the detailed
16 connection. The easiest way to get that is from the
17 defendants. It's also that the marketing scheme was so
18 pervasive and all-encompassing, that that also relaxes the
19 standard of exactly which statement you have to point to
20 because they did it in so many different ways.
21     THE COURT: Do you agree with this, you take a few
22 test cases?
23     MR. KEENAN: I think that's a good idea.
24     THE COURT: Do you agree with that, by the way,
25 sir?

Page 47

1      MR. SCHWARTZ: Yes, your Honor. That's the way
2  we – it's usually ten, twenty, up to forty. We've tried --
3  one lasted four months, but we tried it with forty
4  representatives out of a much larger class than this.
5      THE COURT: Which is the Massachusetts cases? Are
6  there any?
7      MR. LONDON: There is a case. It's not here today
8  before you, your Honor.
9      THE COURT: Which is what?
10     MR. FINKELSTEIN: I know we do not have a specific
11 Massachusetts case, so I'm not certain.
12     THE COURT: So this just came here because of the
13 sales and marketing side which has a Massachusetts component?
14     MR. FINKELSTEIN: Yes.
15     THE COURT: But there aren't separate product
16 liability cases coming in through Massachusetts that I could
17 personally try as a test case, is that right?
18     MR. FINKELSTEIN: We could consent to you trying
19 it, which I would.
20     THE COURT: I'm blanking on the name of the case,
21 and I should know it by heart, the one that says I ship it
22 back to the transferor court at the time everything is
23 complete, so there would have to be a waiver of that.
24     MR. FINKELSTEIN: Right, I do believe the parties
25 can waive that.

Page 48

1      THE COURT: The one possibility would be to do a
2  couple of pilot cases, like one here, one in the New York
3  case, and see where that went.
4      MR. KEENAN: Thank you.
5      MR. SCHWARTZ: Your Honor, for the record, that was
6  Judge Bernstein, as in Leonard Bernstein, not Finkelstein, in
7  Philadelphia that tried the case.
8      THE COURT: I was going to say, what a coincidence.
9      MR. SCHWARTZ: No relation, I hope.
10     THE COURT: Do you all want to respond in any way?
11     MR. ROUHANDEH: Yes. There were a number of
12 points. First, Mr. Finkelstein said that this is a
13 nationwide conduct because there were fifty AGs. Well, you
14 don't have AGs that are party to a federal plea. What he's
15 talking about is a settlement, not a plea, no admission of
16 liability. Some of those states, when the defendants were
17 offered the opportunity to settle and eliminate all claims
18 from an entire state for $25,000, you're going to see a
19 settlement of that state's claim. It doesn't suggest in any
20 way that is a nationwide complaint because the company
21 decided to settle with all of those states.
22     There was a repeated suggestion that the defendants
23 have not given information over to the plaintiffs. Well, the
24 magistrate set out a very clear procedure, which was, first,
25 the plaintiffs have to go through their medical records, they

Page 49

1  have to identify who the doctor is, and they have to say when
2  the prescriptions were given. They tried at that point and I
3  think to some extent are still simply dumping a bunch of
4  medical records on us and not telling us who the prescriber
5  is. That, of course, was necessary so that we could identify
6  in the sales call database who are the physicians so we could
7  see if they were called on.
8      THE COURT: So you're saying you don't know who the
9  doctor is per plaintiff?
10     MR. ROUHANDEH: In many cases, no, they still have
11 not. The only way we would know is by sifting through their
12 medical records.
13     THE COURT: Just send out an interrogatory for each
14 of the 500 plaintiffs, who was the doctor, phone number and
15 address?
16     MR. ROUHANDEH: Well, in fact we had template
17 discovery, and they're supposed to do that. But the problem
18 is and the reason they still don't have the sales call
19 database is, they weren't happy with just getting the sales
20 call database for the doctors who wrote the prescriptions.
21 They wanted it for everybody. That expanded tremendously
22 what the defendants had to do because under federal law,
23 under HPPA, we have to redact patient names. So now we have
24 to go through the entire sales database to see if there are
25 any patient names in there in any field or any descriptive

Page 50

1  information about a plaintiff to get rid of it. This all
2  would have happened a lot quicker and they would have had
3  that sales call database if they had given us the names as
4  they should have and were content with, at least as an
5  initial matter, getting the portion of the database that
6  related to their claims. So any delay we think is on their
7  head.
8      Second, they seem to continue to talk about
9  off-label promotion as if it's some substitute for fraud.
10 It's not. And the plea dealt with off-label promotion in the
11 section, I think it's about page, I don't know, 10 or
12 something. It talks about off-label promotion. It talks
13 about through sales reps and through medical liaisons. And
14 listed under there is not some nationwide scheme. It's on
15 such and such a date at such and such location, a sales rep
16 did X and Y. And that doesn't establish any of the elements
17 of their claims. What Mr. Keenan is suggesting he's plead
18 with specificity relates to alleged off-label promotion, not
19 fraud, and I don't think it's certainly specific.
20     With respect to the Karvelas case, there was a
21 suggestion that maybe that stood for some relaxation of the
22 standard. That's a RICO case. There are not RICO claims in
23 here. It deals with the unique situation where on mail and
24 wire fraud, you can't plead every time the defendant used the
25 mails or used the wires because you just don't know that

Page 51

1  information was solely within the hands of the defendants.
2  That has nothing to do with this --
3      THE COURT: In fairness, neither of you have
4  control. That's what I've been persuaded of. You don't have
5  control of the doctor but neither do they because the doctor
6  thinks it's going to be sued. So we're in an odd -- so why
7  should they take a deposition yet? They don't have your
8  data. So I do understand that dynamic. It's not so simple.
9      MR. ROUHANDEH: That's right. But with respect to
10 that issue, we look at that issue as well, and we see that
11 there are many, many circuits out there that have said, okay,
12 well, where that information is in the hands of a third
13 party, that's not a reason to relax the requirement that you
14 plead with particularity. So they should have to plead that.
15     JUSTICE FREEDMAN: Mr. Rouhandeh, excuse me. I
16 understand your position that the pleading requirements have
17 not been met under either the federal standard or the
18 New York state standard, but I want to just focus for a
19 minute on the burden issue, the burden of discovery issue.
20 You have agreed to a sampling of ten or more -- I can't
21 remember if you said fifteen or twenty plaintiffs. This was
22 at our last conference. How would the burden of discovery
23 differ in any way if these cases were dismissed at this
24 procedural juncture?
25     MR. ROUHANDEH: Well, it would differ in the sense

Page 52

1  that that is a procedure to essentially take a group of
2  cases, however selected, and to do some minimal level of
3  discovery with respect to those. But what that procedure
4  doesn't talk about, and I think your Honor has raised and
5  Magistrate Sorokin has raised, is, what do you do with the
6  rest of the cases? And so the parties are in conversations
7  about what happens to the rest of the cases. And I think, in
8  terms of all of the cases, they should have to plead the
9  cases where they think there is some alleged fraud. That
10 might be in fact an issue that would be important to
11 selection of cases, perhaps not, but -- so I think that
12 the --
13     JUSTICE FREEDMAN: It is your intention, though,
14 after the plaintiff-specific discovery to bring summary
15 judgment motions, and that would have the effect of providing
16 guidance for the remaining cases, wouldn't it?
17     MR. ROUHANDEH: Yes, but only with respect to the
18 product claims because the motion for summary judgment is in
19 effect one based on both preemption and general causation
20 that says, look, there isn't any medical/scientific basis to
21 assert that Neurontin causes suicide. And I guess our
22 concern is, we go through this ten-plaintiff process,
23 selection process, we go through the general causation
24 summary judgment motions, and we're still left with this mess
25 of these claims, and the plaintiffs still have claims on the

Page 53

1  books in effect in their complaints that haven't been dealt
2  with. And we think this is the easiest thing to pick off is
3  at the outset, there are claims that have to be pled with
4  particularity, and those --
5      THE COURT: And even on the negligence claims, you
6  would need to do specific claims, specific --
7      MR. ROUHANDEH: Well, with respect to (inaudible)
8  misrepresentation, I think there is an argument that they
9  have to plead it with 9(b) specificity. But even if they
10 don't, even if they don't, they haven't alleged anything in
11 terms of causation, nothing whatsoever. All these claims
12 require causation. The express warranty --
13     THE COURT: Well, they do allege causation. They
14 just do it in a conclusory fashion.
15     MR. ROUHANDEH: Yes, right, and what we would say
16 is, even under 8(a) they have to have some basis for that
17 factual allegation.
18     THE COURT: Why? I mean, 8(a) is pretty -- notice
19 pleading is pretty conclusory by definition.
20     MR. ROUHANDEH: Right, it's not necessarily the
21 who, what, when, where, why. But we think in a case where
22 they've actually admitted that they have no idea whether
23 there was any communication, let alone whether that
24 communication caused a prescription to be written, I'm not
25 sure they can even in good faith argue the causation point