# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| IN RE:  **NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCT LIABILITY LITIGATION** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

_____

**MDL Docket No. 1629**
**Master File No. 04-10981**

**Judge Patti B. Saris**
**Mag. Judge Leo T. Sorokin**

**THIS DOCUMENT RELATES TO:**

*Jessie Allen, et al v. Pfizer, Inc., Case No.  1:07-cv-11795-PBS*
*Mary Cooper, et al v. Pfizer, Inc., Case No. 1:05-cv-10834-PBS*
*Leroy Anderson, et al v. Pfizer, Inc., Case No.  1:05-cv-10835-PBS*

## AMENDED PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO MOTION TO DISMISS

The Plaintiffs submit their Amended Plaintiffs' Memorandum In Support of Their Opposition to Motion to Dismiss, as follows:

### A.  FACTS

1.In 1993, 1Defendants received FDA approval to market and sell Neurontin for the treatment of epilepsy in certain doses. Despite FDA's limited approval for the use of Neurontin the Defendants engaged in an illegal marketing scheme to push and promote "off-label" uses of the prescription drug Neurontin.  "Off-label" is the term describing uses for a drug that are not approved by the U.S. Food and Drug Administration ("FDA").  All uses of Neurontin for treatment of conditions other than epilepsy is "off-label".

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS'
MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

1

2. The United States Attorney for the District of Massachusetts ultimately brought criminal charges against Defendants for this conduct.  The attorneys general from the 50 states also commenced litigation against Defendants under the relevant consumer protection statutes of those states.  On May 13, 2004, Defendants agreed to plead guilty to federal criminal charges, and at the same time, entered into a settlement agreement with the attorneys general.

3. Defendants' scheme ultimately caused physicians to prescribe Neurontin for the off-label uses that Defendants promoted.

4. Each of the plaintiffs in these actions was prescribed Neurontin for an "off-label" use, i.e. none of the plaintiffs suffer from epilepsy and consequently was not prescribed Neurontin for epilepsy.  These plaintiffs were prescribed Neurontin for various medical conditions that Neurontin was not approved to treat such as pain, depression, headaches, alcoholism, restless leg syndrome and other conditions. The FDA had not granted approval for said "off-label" use and, moreover, there was little – if any – scientific evidence suggesting Neurontin was safe and effective when so used.

### B.  THE TWO THEORIES OF LIABILITY AND DAMAGES UNDER FACTS OF CASE

#### i.

#### PLAINTIFFS' INGESTION OF NEURONTIN CAUSED THEIR UNDERLYING MEDICAL CONDITION TO GO UNTREATED RESULTING IN ASSOCIATED PAIN AND SUFFERING, AND MENTAL AND EMOTIONAL DISTREESS, PRESCRIPTION COSTS/CO-PAY, AND PUNITIVE DAMAGES

5. As a consequence of ingesting Neurontin for an "off-label" purpose, plaintiffs suffered damages relating to their underlying medical condition being untreated while

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS' MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

2

taking Neurontin.  The Plaintiffs also continued to experience the pain and discomfort associated with their underlying medical condition during the time they were taking Neurontin for said condition. Any purported relief or benefit received by the plaintiffs was not the maximum relief or benefit that could have been received by plaintiffs if they had been prescribed the proper medication for their underlying medical conditions.  The purported benefit from "off-label" use of Neurontin can be otherwise explained by the placebo effect.  The FDA had not granted approval for "off-label" use and, moreover, there was little – if any – scientific evidence suggesting Neurontin was safe and effective when so used.

6. The Plaintiffs also experienced mental and emotional distress upon learning that the FDA had not approved the "off-label" use of Neurontin for their respective medical condition.  Evidence of a physical symptom is not required to recover for emotional and mental distress when the defendant's conduct evokes outrage or revulsion, is done intentionally, or the results are reasonably foreseeable if done unintentionally. *Morrison v. Means*, 680 So.2d 803, 806 (Miss. 1996) (citing *Sears, Roebuck & Co. v. Devers*, 405 So.2d 898, 902 (Miss.1981)). Also "malicious . . . willful, wanton, grossly careless, indifferent or reckless" conduct perpetrated by the defendant precludes an injury requirement for a claim of intentional infliction of emotional and mental distress to succeed. *Id.* (citing *Leaf River Forest Products, Inc. v. Ferguson*, 662 So.2d 648, 659 (Miss. 1995)).

7. The Plaintiffs also sustained losses relating to the prescription costs and/or co-pay related to the purchase of Neurontin, and for any medical or related expense incurred for their underlying medical condition while taking Neurontin.

8. The damages outlined in paragraphs 5 – 7 hereinabove are covered in the respective complaints, *Jessie Allen, et al v. Pfizer, Inc.*, *Case No. 1:07-cv-11795-PBS*, *Mary Cooper, et al v. Pfizer, Inc.*, *Case No. 1:05-cv-10834-PBS, Leroy Anderson, et al v. Pfizer, Inc., Case No. 1:05-cv-10835-PBS,* attached hereto as Exhibit A, B, and C, respectively.

9. The Complaints, in part, state "Plaintiffs request the following relief:

   i.   Compensatory damages against Defendants in an amount deemed appropriate by the trier of fact, including but not limited to, medical, incidental, hospital, and service expenses and loss of earnings and earning capacity, according to proof;

   ii.  Punitive or exemplary damages as allowed by law;

   iii. Prejudgment and post judgment interest on all damages as is allowed by law;

   iv.  Past and future mental and emotional distress, according to proof;

   v.   Restitution of all purchase costs Plaintiffs paid for Neurontin, disgorgement of Defendants' profits, and such other equitable relief

        as the Court deems just and proper;

   vi.  Costs, including but not limited to discretionary Court costs of this cause, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action;

   vii. Loss of enjoyment of life;

   viii. Past, present, and future pain and suffering;

ix.  Permanent disability, impairment, and limitation;

x.  Such other and further relief as the Court deems just and proper.

10. The Complaints further allege that "The conduct of the Defendants described above was the proximate cause of injuries to the Plaintiffs, ***including but not limited to*** the following:" [our emphasis]

a.  suicide/attempted suicide and/or suicidal thoughts;
b.  memory loss;
c.  liver failure;
d.  kidney failure;
e.  heart attack;
f.  strokes;
g.  high blood pressure;
h.  ***and other injuries;***        [our emphasis]

11. It is fair to say that the language ***"including, but not limited to"*** and ***"and other injuries"*** under the damage provision of the Complaints are broad enough to cover the damage theories of the Plaintiffs set forth herein, i.e., "Plaintiffs' underlying medical conditions being untreated while taking Neurontin, pain and suffering, the Plaintiffs experienced mental and emotional distress upon learning that the FDA had not approved the use of Neurontin for their respective medical condition.  Further the Plaintiffs incurred medical expenses for their purchases of Neurontin."

ii.

## IN ADDITION TO OTHER INJURIES, NEURONTIN CAUSED SOME PLAINTIFFS TO EXPERIENCE SUICIDAL THOUGHTS, AND ATTEMPTED SUICIDE

11. Under this theory of liability and damages, the Plaintiffs allege that their

ingestion of Neurontin caused them to experience suicide/attempted suicide

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS'
MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

5

and/or suicidal thoughts in addition to the other injuries of pain and suffering, mental and emotional distress, prescription cost/co-pay, non-treatment of underlying health condition, and punitive damages.

12. These Plaintiffs rely upon the opinions of the experts submitted by the Plaintiff Steering Committee that causally relate the ingestion of Neurontin caused them to experience suicide/attempted suicide and/or suicidal thoughts.

13. The Complaints particularly allege that "The conduct of the Defendants described above was the proximate cause of injuries to the Plaintiffs, ***including but not limited to*** the following:" [our emphasis]

      i.   suicide/attempted suicide and/or suicidal thoughts;
      j.   memory loss;
      k.  liver failure;
      l.   kidney failure;
      m.  heart attack;
      n.   strokes;
      o.  high blood pressure;
      p.  ***and other injuries;***     [our emphasis]

iii.

## PUNITIVE DAMAGES

14. Finally, contrary to Defendants' assertion, punitive damage is relevant in this litigation because plaintiffs who do not have suicidal thoughts/suicidal attempts injuries may nevertheless have a significant claim based upon mental and emotional distress, pain, and prescription/co-pay because of the

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS'
MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

6

availability of punitive damages in Mississippi.  These Plaintiffs would need only to establish that they were prescribed Neurontin for an "off-label" use, but they would not need records establishing injuries.

15. Mississippi is a punitive damage State for intentional conduct, fraudulent conduct, or even gross negligent conduct.  In Mississippi, punitive damages are allowable if the defendant acted with actual malice; acted with gross negligence which evidences a willful, wanton or reckless disregard for the safety of others; or committed actual fraud.  Miss. Code Ann. § 11-1-65(1)(a).

16.  Fraud requires (1) a representation; (2) its falsity; (3) its materiality; (4) a speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) his/her consequent and proximate injury. *Allen v. Mac Tools, Inc.*, 671 So. 2d 636, 642 (Miss. 1996).

17.  Punitive damages are awarded in a large enough amounts to punish a wrongdoer of its actions and also deter the wrongdoer from repeating such conduct in the future. A punitive damage award should also be large enough to serve as a warning to others and thank the injured party for bringing the suit which protects the public from future harmful acts. *Whittington v. Whittington*, 535 So. 2d 573 (Miss. 1988); *Snowden v. Osborne*; 269 So. 2d 858 (Miss. 1972).

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS'
MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

7

18.  Pfizer engaged in willful and wanton disregard for the safety of others when
it marketed Neurontin for an untested off-label use to increase sales of the
product. Pfizer knew or should have known that physicians to whom it
marketed Neurontin as a pain medicine would prescribe the drug to patients
not eligible to use the drug for the FDA approved use.

19.  The company knew that no tests had been performed validating that
Neurontin was safe to use as a pain medicine. It proceeded with the willful,
thought-out, and strategic marketing plan without proof of the drug's safety.
Physicians prescribing Neurontin reasonably relied on the representations
made by Pfizer and its sales force. Pfizer and its representatives knew or
should have known that doctors expect marketed prescription drugs to be
FDA approved for a particular use and accompanied by testing providing a
risk-benefit analysis or side effects analysis of the marketed drug.

20.  Failure to disclose absence of FDA approval for use of the drug as a pain
medicine and failure to disclose that no clinical tests were performed to assess
the safety of Neurontin as pain medicine are willful and wanton acts in
disregard for the safety of others. Since the drug was approved for other uses,
the defendant Pfizer committed actual fraud by not disclosing the absence of
approval for a newly marketed use as a pain killer because Pfizer knew or
should have known many doctors reasonably could have and would have
assumed FDA approval for the newly marketed use as a pain giant has enough
experience to know that many drugs can be very dangerous. That means
Pfizer has a responsibility to anyone who might use its drug for a use intended

and marketed by Pfizer itself. The federal government helps Pfizer and other pharmaceutical companies live up to its responsibility. By bypassing such regulatory safeguards and not conducting thorough research on a drug that affects brain chemistry using its own resources, Pfizer acted recklessly in its pursuit profit. The failure of the company and its representatives to warn physicians of the lack of testing and approval shows at the very least no respect for the well-being of those who were potentially and indeed affected by the drug.

21.  Pfizer's consciously indifferent and willful conduct towards those that are experiencing the least extreme side effects deserves to be punished. Through grossly unethical practices those patients came into contact with an unsafe drug. When the truth of Pfizer's tacit and explicit deceptions came to light, those prescribed the medication for pain were subjected to emotional and mental distress caused by Pfizer's betrayal of the public trust. Pfizer's act of fraud caused the innocent users due worry over what side effects they could succumb to resulting from their use of Neurontin. Furthermore, those patients were prescribed an inferior pain medicine and therefore deprived of a safer and more effective treatment. Pfizer is therefore liable for their continued pain as they could not benefit from an alternative, the expense of the drug, the emotional and mental distress caused directly by the ingestion of Neurontin, and emotional and mental distress caused by the revelation of Pfizer's fraud.

22. In sum, these actions are brought to recover actual and compensatory damages, i.e. untreated underlying medical conditions while taking Neurontin,

mental and emotional distress, prescription cost and related medicals, and
punitive damages against Defendants as a result of Defendants' illegal
marketing scheme designed to push and promote "off-label" uses of the
prescription drug Neurontin.

## C. RELEVANT MEDICAL RECORDS UNDER THE TWO THEORIES OF LIABILITY AND DAMAGES

23. Based upon the two theories of liability and damage in this case as described
above, the relevant medical records would include pharmacy prescription
records, prescribing physician records, and medical records relating to
injuries, if available. The pharmacy prescription records establish that the
Neurontin prescriptions were filled and the pills thereof presumably ingested
by the plaintiffs. The prescribing physician records establish that the
Neurontin was prescribed to the plaintiffs for an "off-label" use.

24. Physicians and patients were not warned by Pfizer that "off-label" use of
Neurontin could cause the patients to experience suicide/attempted suicide
and/or suicidal thoughts, and other injuries outlined herein. Accordingly
physicians did not generally make a recordation of any causual relationship
between the Plaintiffs' ingestion of Neurontin and their experience of suicide/
attempted suicide and/or suicidal thoughts, and other injuries. Therefore there
are not any medical records establishing that the ingestion of Neurontin
caused Plaintiffs to experience suicide/attempted suicide and/or suicidal
thoughts and/or other injuries because the treating/prescribing physicians were
not aware of the relationship of Neurontin and these conditions. It is a matter
of expert testimony connecting the ingestion of Neurontin with ingestion of

Neurontin actually caused them to experience suicide/attempted suicide and/or suicidal thoughts and/or other injuries. There may be medical records showing the relief, if any, received by the plaintiffs' "off-label" use of Neurontin.

25. Although the Plaintiffs may claim that numerous injuries were caused by their ingestion of Neurontin, as the Defendants have pointed out in its *Exhibit A to the Declaration of Pamela Macer* to the Motion to Dismiss. However it is the injuries that are outlined under the theory of liability and damages aforementioned that serve as the basis for their cases. These injuries are included in the body of the complaints as aforementioned. The Defendant has only referred to a spreadsheet that the Plaintiffs attached to their Complaint that listed their complaints in addition those injuries set forth in the Complaints.

## D.   PLAINTIFFS' WILL DISMISS 19 OF THE 26 PLAINTIFFS LISTED ON EXHIBIT B TO DECLARATION OF PAMELA MACER

26. The Defendants complain that Plaintiffs have not produced the medical records relating to 26 Plaintiffs listed on Exhibit B to the Declaration of Pamela Macer.

27. Plaintiffs' attorney will voluntarily dismiss the cases relating to each of the Plaintiffs except Inez Fincher, Junaker Pigron, Phillip Walker, Richard Whitehall, Monnie Turner, Tommie Mills and Elton Mason, all of whom pharmacy and/or medical records have been submitted. The Attorney Certification for Inez Fincher, Junaker Pigron, Phillip Walker, Richard Whitehall, Monnie Turner, Tommie Mills and Elton Mason were based upon

communication with the plaintiffs and the good faith belief that supporting records would be forthcoming.

### E. THE CASES OF THE REMAINING PLAINTIFFS ARE PROPERLY CERTIFIED

28.    The Defendants admit that the Plaintiffs have provided pharmacy and medical records for 133 Plaintiffs, listed on Exhibit D to Declaration of Pamela Macer. However the Defendant argues that 95 of the cases should be dismissed because the medical records, as alleged by Defendants contain "no referenced to alleged injuries", and that 33 of the cases should be dismissed because the medical records, as alleged by Defendants, contain "no reference to indication for which prescribed".

29. As explained above herein, the Plaintiffs' injuries include, (a) Plaintiffs' underlying medical conditions being untreated while taking Neurontin, (b) the Plaintiffs experienced mental and emotional distress upon learning that the FDA had not approved the use of Neurontin for their respective medical condition, (c) the Plaintiffs incurred medical expenses for their purchases of Neurontin, (d) the Plaintiffs experienced pain and suffering, and (e) the Plaintiffs experienced suicidal thoughts/suicidal attempts.  Under the damage theory of these cases no reference to the array of injuries claimed by Plaintiffs is necessary when the Plaintiffs may choose to pursue only the damages aforesaid.

30. No reference in the medical records of the injuries described in (a) – (e) herein is required as these injuries may be proven independent of the medical chart.

31. The Plaintiffs who suffered suicidal thoughts and/or attempted suicide rely upon the opinions of the experts submitted by the Plaintiff Steering Committee that causally relate the ingestion of Neurontin caused them to experience suicide/attempted suicide and/or suicidal thoughts.

32. Physicians and patients were not warned by Pfizer that "off-label" use of Neurontin could cause the patients to experience suicide/attempted suicide and/or suicidal thoughts, and other injuries outlined herein. Accordingly physicians did not generally make a recordation of any causual relationship between the Plaintiffs' ingestion of Neurontin and their experience of suicide/ attempted suicide and/or suicidal thoughts, and other injuries. Therefore there are not any medical records establishing that the ingestion of Neurontin caused Plaintiffs to experience suicide/attempted suicide and/or suicidal thoughts and/or other injuries because the treating/prescribing physicians were not aware of the relationship of Neurontin and these conditions. It is a matter of expert testimony connecting the ingestion of Neurontin with ingestion of Neurontin actually caused them to experience suicide/attempted suicide and/or suicidal thoughts and/or other injuries. There may be medical records showing the relief, if any, received by the plaintiffs' "off-label" use of Neurontin.

33. Next, the Defendants argue that the medical records of 33 Plaintiffs do not show the reason that Neurontin was prescribed. However, the medical records submitted by the Plaintiffs do indicate the reason for which it was prescribed and the records establish that Neurontin was prescribed to them for an "off-

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS'
MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

13

label" use.  The Defendants have either not read the records or have chosen to ignore the reference to the "off-label" use.  In addition to medical records, Plaintiffs' attorney also relied, in part, upon information contained on the spreadsheet attached to the Complaint filed in *Jesse Allen, et al vs. Pfizer, et al* regarding the reasons that Neurontin was prescribed to them.  (*See Exhibit A (1) Spreadsheet to Allen Complaint*) The body of the Complaints in *Leroy Anderson, et al vs. Pfizer, et al* and *Mary Cooper, et al vs. Pfizer, et al* contain the reasons that these Plaintiffs were prescribed Neurontin, said information was derived from interviews with these Plaintiffs.  (*See Exhibit A to the Complaint filed in Jessie Allen, et al vs. Pfizer, et al with attached spreadsheet*).

34. The medical records review and submitted to Defendant show "off-label" use for these Plaintiffs, as follows:

Jessie Allen was prescribed Neurontin for depression by B. H. Cook, M. D., *(See Exhibit "1");*

Villian Allen was prescribed Neurontin for major depressive disorder by. Namica Khanna-Arora, M.D., *(See Exhibit "2");*

Teresser Bass was prescribed Neurontin for pain by Donald H. Butts, MD, *(See Exhibit "4")*;

Carolyn Bowyer was prescribed Neurontin for pain by R. Deaver Collins, M.D., *(See Exhibit "5")*;

According to Lillie Cannon, Neurontin was prescribed for pain by Thomas Windham, M.D;

Jessie Brown was prescribed Neurontin for diabetic neuropathy by Charles W. Campbell, M.D., *(See Exhibit "6")*;

Thomas Brown was prescribed Neurontin after having a stroke by George Murphy, F.N.P., *(See Exhibit "7")*;

Bobby Bryon was prescribed Neurontin for back and chest pain by Delta Health Center, *(See Exhibit "8")*;

Ruby Crapps was prescribed Neurontin for degenerative arthritis by John M. Beall, *(See Exhibit "9")*;

Theodore Crystian was prescribed Neurontin for pain and major depressive disorder by V. A. Medical Center, *(See Exhibit "10")*;

Marshall Dillion was prescribed Neurontin for neuropathy by Kent A. Kirshner, M.D., *(See Exhibit "11")*;

Samuel Ellis, was prescribed Neurontin for pain and jumping in the legs, tremor by C. B. Daniel, *(See Exhibit "12")*;

Clara Epps was prescribed Neurontin for pain by Reginald Rigsby, M.D., *(See Exhibit "13")*;

Ethel Fleming was prescribed Neurontin for pain by Allen Hale Thompson, M.D., *(See Exhibit "14")*;

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS' MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

15

Glen Forbes was prescribed Neurontin for pain and depression by Walter M. Gorton, M.D., *(See Exhibit "15")*;

Faith Ford was prescribed Neurontin for major depression by Stanley C. Russell, M.D.; medical records, attached as exhibit 16, were supplemented with interrogatories, *(See Exhibit "16")*;

Based upon interview of Alice Garrett, deceased, Neurontin was prescribed for back and leg by Tellis B. Ellis, III, M.D. (*See Exhibit A (1), Spreadsheet*)

Annie Gatewood was prescribed Neurontin for chronic back pain by Itta Bena Clinic; medical records, attached as exhibit 17, were supplemented with interrogatories, *(See Exhibit "17")*;

Holly Hammarstrom was prescribed Neurontin for migraine headaches by Susan Ann Jenkins, R.N., *(See Exhibit "18")*;

Melvin Harris was prescribed Neurontin for pain by Walton Lynn Stringer; attached as exhibit 19, were supplemented with interrogatories, *(See Exhibit "19")*;

According to Shawand Hicks, Neurontin was prescribed for headaches by A.M. Chiem, M.D., and Rahul Vohra, M.D., (*See Exhibit A (1) Spreadsheet*)

According to Tony Hodges, Neurontin was prescribed for alcohol withdrawal by William Jones, M.D;

According to Elizabeth Knight, deceased, Neurontin was prescribed for arthritis by Darrell N. Blaylock, M.D;

Ellawise Lacy was prescribed Neurontin for pain by Pr. B. Carminati, CFNP, *(See Exhibit "22")*;

Robert Lawson was prescribed Neurontin for alcohol dependency by Khaled Abu-Hamdan, M.D., *(See Exhibit "23")*;

Cornelius Lewis, deceased, was prescribed Neurontin for pain by Jessie M. Spencer, M.D., *(See Exhibit "24")*;

Casey McCardle was prescribed Neurontin for pain, possible component of Sympathetic Dystrophy, sleep problems and anxiety by Jeffrey T. Summers, M.D., *(See Exhibit "25")*;

Franklin McConnell was prescribed Neurontin for Erythema and Ischemic changes by Steven G. Clark, M.D., *(See Exhibit "26")*;

Brandy Murphy was prescribed Neurontin for Peripheral Neuropathies by James E. Warrington, M.D., *(See Exhibit "27")*;

According to Betty Newson, Neurontin was prescribed for severe pain by Jeffrey T. Summers, M.D;

Essie Ford Patterson was prescribed Neurontin for pain by Delta Health Center, *(See Exhibit "28")*;

J.T. Pinkton was prescribed Neurontin for HIV associating Neuropathy by Chidi A. Nwizu, M.D., *(See Exhibit "29")*;

Tara Robinson was prescribed Neurontin for back pain in thoracic and lumbar region by Jean Barker, M.D., *(See Exhibit "31")*;

Jack Shoemaker was prescribed Neurontin for mild depression by Ellisville Clinic, *(See Exhibit "33")*;

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS'
MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

17

Frank Smith was prescribed Neurontin for pain relating to peripheral polyneuropathies by Keith Thompson, M.D., *(See Exhibit "34")*;

According to Thomas Charles Summers, Neurontin was prescribed for nerve damage by Patrick Eakes, M.D;

Jennifer Theodore was prescribed Neurontin for diabetic neuropathy by Wendell Helveston, M.D., *(See Exhibit "35")*;

Deborah Watson was prescribed Neurontin for pain, back and arm pain and chronic pain by Delta Health Center, *(See Exhibit "36")*;

Clifton White was prescribed Neurontin for pain by MRC Interdisciplinary Rehabilitation, *(See Exhibit "37")*;

Daisy Williams was prescribed Neurontin for left cervical pain by Delta Health Center, *(See Exhibit "38")*;

Helen Williams was prescribed Neurontin for arthritis pain, carpal pain, and cramps in her hands and legs by William B. Jones, M.D., *(See Exhibit "39")*;

Tommie Mill was prescribed Neurontin by Pat F. Bass, III, M.D., *(See Exhibit "40")*;

Monnie Turner was prescribed Neurontin for carpal tunnel and chronic back pain by Karen Plunkett, M.D., *(See Exhibit "41")*;

Richard Whitehall was prescribed Neurontin by A. Aziz, M.D., *(See Exhibit "42")*;

Minnie Campbell was prescribed Neurontin for headaches by Brenda P. Hines, M.D., *(See Exhibit "43")*;

Cecil Taylor was prescribed Neurontin for diabetic neuropathy of legs, back pain, joint pain, and low back pain by William A. Middleton, M.D., *(See Exhibit "44")*;

Tommy Hardy was prescribed Neurontin for neuropathy by The Greenville Clinic, *(See Exhibit "45")*;

Bridgette Shields was prescribed Neurontin for burning pain and nerve pain relating to injury by Rose Marie Sotolongo, M.D., *(See Exhibit "46")*;

Clarence Harris was prescribed Neurontin for chronic low back pain with radiation into the lower extremities and neck pain with radiation to both upper extremities together with paresthesias affecting both upper extremities by Howard Holaday, M.D., *(See Exhibit "47")*;

Narie Givens was prescribed Neurontin for neuropathy by Ravi Pande, M.D., *(See Exhibit "48")*;

Pamela Shields was prescribed Neurontin for pain in hands, knees, ankles and wrists by Joe A. Campbell, M.D., *(See Exhibit "49")*; and

Jackie Lewis was prescribed Neurontin for pain and nerve damage by Thomas E. Joiner, M.D., *(See Exhibit "50")*.

35. There are pending medical records requests for the remaining plaintiffs who have not submitted records indicating "off-label" use. The Plaintiffs are supplementing these records to the Defendants upon receipt of same.

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS'
MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

19

However, the undersigned attorney communicated with these plaintiffs and based thereon appropriately executed attorney certifications.

36.  Finally, there are 232 Plaintiffs who pharmacy records were reviewed and submitted to Defendants (See Exhibit C to Declaration of Pamela Macer). The review of the pharmacy records coupled with interviews and written communication to these plaintiffs provided sufficient basis for Plaintiffs' attorney to execute attorney certification pending receipt of their medical records that had been requested.

37. The Defendants argue that these 232 Plaintiffs' cases should be dismissed because they have submitted only pharmacy records and the presumably attorney certification can not be made on pharmacy records alone.  The Attorney Certifications are not based upon medical records alone.

38.  In many instances the pharmacy record is sufficient under the theory of liability and damages and in this case.  For example, Plaintiff Terry Banks is listed as a Plaintiff with only a pharmacy prescription, but on the face of the pharmacy prescription it indicated that the Neurontin was for pain which is an "off-label" use. *(See Exhibit "3")* Also Plaintiff Doris Johnson only has a pharmacy prescription, but the prescription on its face indicates that it was prescribed for migraine prevention.  *(See Exhibit "21")*

39.  Likewise there are Plaintiffs whom Defendants claim have only pharmacy records when in fact pharmacy and medical records were reviewed and provided to Defendant.  For example, Plaintiff Gregory Haslett's medical records indicating Neurontin being prescribed for peripheral neuropathy were

also submitted along with his pharmacy records. *(See Exhibit "20")* Plaintiff

Janice Primer's medical records were also reviewed and submitted to

Defendant.  These records indicate that Janice Primer was prescribed

Neurontin for back and hand pain.  *(See Exhibit "30")* Plaintiff Shirley

Sashfras' medical records indicating Neurontin was given for burning in her

legs, but Defendant apparently denies receipt of this record.  *(See Exhibit

"32")*

40.   There are pending medical records requests on behalf of the other remaining

plaintiffs.  Plaintiffs' attorney is receiving new medical records on a weekly

basis and these records are being timely supplemented to Defendants.  Further

Plaintiffs' attorney certifications are based upon communication with the

Plaintiffs whereupon they indicated the reason that they were prescribed

Neurontin.  The information relating to the "off-label" use contained on the

spreadsheet attached to the Complaint in the *Jessie Allen, et al vs. Pfizer, et al*

was compiled as a result of individual interviews with the respective Plaintiffs

listed thereon.  *(See Declaration of Levi Boone, III)*. Medical records for many

plaintiffs have difficult to retrieve due to a number of reasons including the

closure of medical facilities, death of physicians, relocation of medical clinics,

record retention policies of facilities and sometimes just plain unwillingness to

cooperate so as to provide the records.

### F.  THE ATTORNEY CERTIFICATIONS COMPLY
### WITH DISCOVERY ORDER NO. 19

41. Defendants argue that the Plaintiffs' Attorney Certification does not comply

with Discovery Order No. 19.

42. On December 18, 2007 the undersigned law firm filed Attorney Certifications for all of the plaintiffs represented by said firm in the above referenced lawsuits. The respective Attorney Certifications for each of the three referenced cases are attached hereto as Exhibit "1" for *Jessie Allen, et al v. Pfizer, Inc.*; Exhibit "2" *Mary Cooper, et al v. Pfizer, Inc.*; and Exhibit "3" to *Leroy Anderson, et al v. Pfizer, Inc.* The Complaint in each of the respective case involves numerous plaintiffs bearing the same case number. In filing the Attorney Certification for each case the single document incorporated an attached list of the all of the plaintiffs affected by the Attorney Certification. The list of plaintiffs that are incorporated on the respective Attorney Certifications are attached as Exhibit "A" to *Jessie Allen, et al v. Pfizer, Inc.*; Exhibit "A" *Mary Cooper, et al v. Pfizer, Inc.*; and Exhibit "A" to *Leroy Anderson, et al v. Pfizer, Inc.*

43. The Defendant's submission, docket 1155, incorrectly indicated that the undersigned law firm represents additional plaintiffs that Attorney Certifications were not filed. It looks like the Defendant incorrectly duplicated Boone Law Firm's plaintiffs on Defendant's identified-plaintiffs-list and on the not-identified-plaintiffs-list. The only difference in the list is that the plaintiffs' last name is indicated first on the not-identified-plaintiffs list. Alternatively, the Defendant did not appreciate that the Attorney Certification incorporated attached lists of plaintiffs as reflected in Exhibit "A" to *Jessie Allen, et al v. Pfizer, Inc.*; Exhibit "A" *Mary Cooper, et al v. Pfizer, Inc.*; and Exhibit "A" to *Leroy Anderson, et al v. Pfizer, Inc.* The

undersigned law firm is not aware of any plaintiffs that do not have an Attorney Certification.

44.  In further clarification of the Attorney Certifications, Plaintiffs in the respective cases have prepared individual Attorney Certifications for the plaintiffs in each of the case to be filed upon this Court permission of same.

45.  Pretrial Order No. 23 directed that the undersigned law firm by April 9, 2008 indicate by a single document that the plaintiffs included on its original submission constitutes all of its plaintiffs or to submit Motion to Dismiss or Attorney Certification for the additional plaintiffs.  The undersigned law firm did not become timely knowledgeable of PTO 23.  Further it was clear to the Plaintiffs that this Court required an individual Attorney Certification for each plaintiff notwithstanding that plaintiffs are listed on the same complaint.

46.  Further the undersigned law firm has been overwhelmed for the past 30 days in working other aspects of these cases, including submitting medical records relating to 57 plaintiffs in these cases, having previously submitted medical records on behalf of 200 plaintiffs. Also within the past 30 days, the undersigned law firm has also submitted interrogatory responses and responses to document requests on behalf of 239 plaintiffs in these cases.

47.  None of the undersigned law firm's plaintiffs have been selected for trial and there is no prejudice to the Defendant.

48.  On May 8, 2008, the Plaintiffs file a Motion for Leave to File a Single Page Document Indicating Plaintiffs and/or to file Individual Attorney Certifications

## G.  DISMISSAL OF ACTION IS NOT WARRANTED

49.  The Plaintiffs have not intentionally failed to comply with this Court's discovery order.  The Plaintiffs' counsel was not immediate aware of this Court's discovery order because Plaintiffs' firm is not registered with the ECF system in this case and therefore Plaintiff's firm were receiving this Court orders from the Plaintiff Steering Committee which has not been immediately and sometime untimely in light of pending obligations.  Plaintiffs' firm is getting registered with the ECF system for direct submission and receipt  of documents from the Court.  The Plaintiffs' firm has worked almost exclusively on these Neurontin cases for the past two months due to requests that Defendants' counsel have made on Plaintiffs.  Plaintiffs had to re-submitted 57 set of records to Defendants that Plaintiffs have a good faith basis to believe had been previously submitted.

50.  It is also obvious that the Defendants have painted a broad brush because there may be a few deficient records.

51.   In an effort to cure any deficiencies and to comply with this Court's Oder 23, the Plaintiff filed on May 8, 2008 (prior to Defendant's Motion to Dismiss also filed on May 8, 2008) a Motion for Leave to File a Single Page Document Indicating the Plaintiffs and/or to file Individual Attorney Certification for the Plaintiffs.

52.  The conduct of Plaintiffs is not extreme.  Dismissal of these actions is not warranted because such a punishment would be too harsh for the alleged misconduct when there are other broad universe of options available, if necessary, to the Court particularly under the mitigating circumstances of this case and moreover because the Defendants are flat wrong in most instances.  *Young v. Gordon, 330 F. 3d 76, 81 (I[st] Cir. 2003).*

53. Not any of the cases for the Plaintiffs herein are set for trial. The Plaintiffs are willing to correct any deficiencies within a reasonable time allowed by the Court. Necessarily, the Defendants will have go through the records submitted by the Plaintiffs and determine if there are really deficiencies versus Defendants' overlooking the content of the records.

54. The Plaintiffs and their attorney alike have had difficulties timely obtaining some records due to pharmacies closing, records not being kept for only a certain period of time, and general non-responsive and some lack of cooperation by some medical facilities or pharmacies.

WHEREFORE PREMISES CONSIDERED, Plaintiffs request that Defendants' Motion be denied and that Plaintiffs be given a reasonable time to cure any deficiencies.

RESPECTFULLY SUBMITTED, this the 9th day of June, 2008.

/s/ Levi Boone, III

Document: C:\Documents and Settings\paralegal15.BOONELAW\My Documents\AMENDED PLAINTIFFS' MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS - 1934.doc

25