FILED

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

2008 JUL -1  A 10: 17

```
-----------------------------------------------------------x
                                          :       MDL Docket No. 1629
In re:  NEURONTIN MARKETING,              :
        SALES PRACTICES AND               :       Master File No. 04-10981
        PRODUCT LIABILITY LITIGATION      :
-----------------------------------------------------------x       Judge Patti B. Saris
                                          :
THIS DOCUMENT RELATES TO:                 :       Magistrate Judge Leo T.
                                          :       Sorokin
ALL PRODUCTS LIABILITY CASES              :
                                          :
-----------------------------------------------------------x
```

### MEMORANDUM OF THE UNITED STATES
### FOOD AND DRUG ADMINISTRATION AS AMICUS CURIAE

The Court has requested United States Food and Drug Administration ("FDA")

participation, through expert testimony or an amicus brief (or both), in pending multi-district

products liability litigation involving the allegation that the use of the drug Neurontin for off-

label purposes has caused patients to become suicidal. Letter to David Krawetz, Office of

Regulatory Affairs, FDA from the Honorable Patti B. Saris (May 20, 2008). On January 31,

2008, FDA posted on the internet an "FDA Alert" regarding the results of a study on suicidality

(suicidal ideation and behavior) and antiepileptic drugs. FDA Alert: Suicidality and

Antiepileptic Drugs (Jan. 31, 2008) (available at http://www.fda.gov/cder/drug/infopage/

antiepileptics/default.htm) (the "Alert"). In its letter request, the Court explained that the issue of

a causal connection between Neurontin and suicidality is central to the multi-district litigation

over which the Court is presiding, and the validity of the Alert has become a matter of dispute

among the parties to the litigation.

We have carefully considered this request together with the additional explanation

provided by the Court's law clerk to the Office of Consumer Litigation, United States Department of Justice. We understand that the Court is asking FDA to explain the science behind the issuance of the Alert. As explained in greater detail below, however, FDA's consideration of the relationship between suicidality and antiepileptic drugs is ongoing, and we cannot provide a definite timetable for any resolution of that issue.

Below, we describe FDA's purpose and policy in deciding to issue the kinds of alerts under discussion in this matter. We also describe the Alert itself and the status of FDA's ongoing consideration of the relationship between suicidality and antiepileptic drugs. Finally, we describe why we believe it would be inappropriate for an FDA employee to provide expert testimony on the causation issue, particularly at this time. We hope that this information will be helpful in determining the weight to be given to FDA's statements in the Alert in the context of the products liability litigation.

## I.    **FDA's Purpose and Policy in Issuing Alerts**

An FDA guidance document describes FDA's practice and policy for disseminating information on important drug safety issues, including emerging information that has not been fully analyzed or confirmed by the agency. *See* Guidance: Drug Safety Information – FDA's Communication to the Public (March 2007) (available at

http://www.fda.gov/cder/guidance/7477fnl.pdf) (the "Guidance"). FDA explained that "FDA has begun taking a more comprehensive approach to making information on potential drug risks available to the public earlier, in some cases while the Agency still is evaluating whether any

regulatory action is warranted." Guidance at 1.[1] Making the information available earlier gives

patients, health care professionals, and others access to the most current information concerning

the potential risks and benefits of marketed drugs, thereby helping them to make more informed

decisions regarding individual treatment. *See id.*

The Guidance describes that FDA may issue an alert when it becomes aware of new or

emerging information on a potentially important drug safety issue, such as "[n]ewly observed,

serious adverse events that may be associated with use of a drug; [i]nformation about how such

serious adverse events might be prevented by appropriate patient selection, monitoring of

patients, or use or avoidance of the therapy; [i]nformation regarding a serious adverse event that

FDA believes may be associated with use of a drug in populations in whom the drug was not

previously studied." *Id.* at 9. An alert should contain "a statement that reflects the stage of the

analysis with respect to regulatory decision making or other potential limitations on the

interpretation of the safety information." *Id.* at 10. FDA's purpose in issuing an alert "is

to make emerging drug safety information available to the public in a balanced, impartial manner

so that healthcare professionals and patients can consider the information when making decisions

about medical treatment despite uncertainties in the data." *Id.* The Guidance further explains

that FDA "is committed to providing accurate, clear, reliable, and useful drug safety

information." *Id.*

---

[1] Regulatory action in the case of drug products could consist of, for example, revising
the product labeling, issuing a letter to health care practitioners, requesting a product recall, or
even initiating an administrative or judicial process to withdraw the approval of the product. *See*
Guidance at 4 (stating that further regulatory action might include a revision to product labeling
or a Risk Minimization Action Plan); *see also* Guidance for Industry – Development and Use of
Risk Minimization Action Plans (March 2005), Sec. IV (describing tools for achieving Risk
Minimization) (available at http://www.fda.gov/cder/guidance/6358fnl.htm).

## II.     FDA's Consideration of Suicidality and Antiepileptic Drugs

In March 2005, FDA began a meta-analysis (i.e., combined analysis of data from many sources) of the potential for elevated risk of suicidality from the use of 11 antiepileptic drugs, including Neurontin. *See* Statistical Review and Evaluation (available at http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4372b1-01-FDA.pdf) at 5 (the "Statistical Review"). In that study, FDA collected and analyzed controlled clinical trial data from the sponsors of those 11 antiepileptic drugs. After conducting that analysis, FDA issued the Alert in January 2008, which stated that the study results showed that patients receiving antiepileptic drugs had "approximately twice the risk of suicidal behavior or ideation" as patients in the control group. Alert at 1. The Alert further stated that the "results were generally consistent among the eleven drugs." *Id.* FDA also provided advice for physicians and other health care professionals who have prescribed antiepileptic drugs to monitor those patients for depression and suicidality, and to inform those patients, their family members, and caregivers regarding the potential risks of having suicidal thoughts or actions. *See* Information for Healthcare Professionals -- Suicidality and Antiepileptic Drugs (available at http://www.fda.gov/cder/drug/InfoSheets/HCP/antiepilepticsHCP.htm and through a link under the Alert). FDA also released the Statistical Review describing its methodology and analysis. FDA has not released all of the underlying data considered in the meta-analysis for all of the drugs, some of which are protected by law from disclosure.[2]

_____

[2] Some of the data, including the data on Neurontin, were released pursuant to orders of the court in *Bloomberg L.P. v. FDA*, 06 Civ. 6552 (S.D.N.Y.), a case brought under the Freedom of Information Act.

The Alert does not represent the final conclusion of FDA's consideration of the issue of

suicidality and antiepileptic drugs. This fact is reflected in the Alert itself, which contains the

following statement regarding the stage of the analysis at the time the Alert issued:

> This information reflects FDA's current analysis of available data concerning
> these drugs. Posting this information does not mean that FDA has concluded there
> is a causal relationship between the drug products and the emerging safety issue.
> Nor does it mean that FDA is advising health care professionals to discontinue
> prescribing these products. FDA intends to update this document when additional
> information or analyses become available.

FDA Alert at 1. Thus, the posting of this Alert (or, in fact, any kind of alert about a drug and an

adverse event) does not constitute a conclusion by FDA that the drugs subject to the Alert

actually cause the adverse event in any particular population or caused a specific adverse event in

a particular individual. On the other hand, the disclaimer should not be read to suggest that FDA

has concluded that the drugs are *not* causally linked to the adverse events at issue, or that FDA is

precluded from further analysis that might lead to a more definitive finding and administrative

action.

Indeed, FDA continues to actively consider the issue of suicidality and antiepileptic

drugs. FDA has scheduled a July 2008 advisory committee meeting to further consider this

issue. The purpose of an FDA advisory committee meeting is to "conduct public hearings on

matters of importance that come before FDA, to review the issues involved, and to provide

advice and recommendations to the Commissioner." 21 C.F.R. § 14.5(a). Specifically, FDA's

Peripheral and Central Nervous System Drugs Advisory Committee, the Psychopharmacologic

Drugs Advisory Committee, representatives from the Pediatric Advisory Committee, and the

Drug Safety and Risk Management Advisory Committee are scheduled to meet on July 10, 2008

to discuss this matter and solicit input from the public. *See* Notice, 73 Fed. Reg. 32588-32589 (June 9, 2008). The agenda for the meeting is to "consider the results of FDA's analysis of suicidality (both suicidal ideation and behavior) from placebo-controlled clinical studies of 11 drugs . . . [and] discuss . . . whether any additional actions are appropriate." *Id.* Background material for the meeting currently consists of the Statistical Review, but FDA may make additional material available to the public. *See id.*

In addition, Keith Altman of Finkelstein and Partners submitted a citizen petition to FDA under 21 C.F.R. § 10.25(a) requesting that FDA require additional labeling for Neurontin regarding an association between Neurontin and suicidality. *See* Citizen Petition 2004P-0235 (available at http://www.fda.gov/ohrms/dockets/dailys/04/may04/051804/04p-0235-cp00001-vol1.pdf). FDA continues to consider the petition and has not yet issued a final response. When FDA is considering similar issues in separate proceedings, FDA may coordinate its deliberations and the timing of its decisions to promote consistency and efficiency. Accordingly, because the agency's response to the pending citizen petition is likely to be influenced by the recommendations received from the advisory committees, as well as by the agency's deliberations after receiving those recommendations, it is unlikely that FDA will be prepared to issue a decision on that pending citizen petition before those deliberations have concluded.

Either (or both) of these proceedings could result in further action with respect to these products.

-6-

III.    Expert Testimony by an FDA Employee Would Be Inappropriate

We respectfully decline the Court's invitation to provide expert testimony by an FDA employee, for several reasons. First, because deliberations are ongoing, testimony by an individual employee may reflect only the personal, subjective opinions of that individual at a particular time in ongoing deliberations and will not reflect any institutional conclusion reached by the agency. FDA decisions are based on consultation among scientists with different areas of specialization (e.g., statistics, pharmacology, and neurology), and often the FDA decision-maker will be in a supervisory position overseeing the various specialists. For complex questions involving the analyses performed by scientists in different specialties, and for matters significant or noteworthy by reason of science, policy, law, or degree of public interest, consultation is likely to occur higher up the supervisory chain, sometimes including the Center Director and FDA Commissioner. Thus, the opinion of one individual is not necessarily representative of the views of the agency, particularly when, as here, deliberations are continuing.

Second, much of the agency's deliberations and some of the underlying data under consideration are confidential or privileged, and protected from disclosure. The deliberative process privilege protects materials and discussions that are part of the decision-making process of a governmental agency. Predecisional deliberations intended to assist in the ultimate agency decision-making should be protected from disclosure to prevent injury to the decision-making process. *Town of Norfolk v. United States Army Corps of Eng'rs*, 968 F.2d 1438, 1458 (1st Cir. 1992). The privilege extends to, among other things, "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dept. of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8

-7-

(2001)(quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). For example, it is possible that the deliberations regarding the antiepilepsy drugs may include a robust debate among scientists with differing viewpoints and recommendations. FDA is also restricted in its ability to disclose trade secrets and/or confidential research, development, or commercial information. 21 U.S.C. § 331(j); 18 U.S.C. § 1905; 21 C.F.R. § 20.61. These restrictions would likely limit the scope and usefulness of any testimony.

Finally, FDA strives to limit its testimony in private lawsuits for several reasons.[3] First, as a government agency, FDA attempts to remain neutral in private disputes that do not directly impact its mission or authority. *See Moore v. Armour Pharmaceutical Co.*, 927 F.2d 1194, 1196 (11th Cir. 1991) ("Other reasons cited by HHS for refusing to allow the depositions included the government's policy of remaining strictly neutral in private litigation and the government's concern that allowing its employees to get into the conflict of private litigation would harm frank, free, and full exchanges within the scientific community."). Although here the request was initiated by the Court, FDA's testimony still could be viewed as benefitting one or another party or as establishing the existence of an agency bias in ongoing administrative proceedings. A second and related point is that, in this case, the pending citizen petition requesting additional labeling on suicidality for Neurontin was submitted by counsel for plaintiffs in the MDL litigation. A petitioner would not normally be entitled to examine FDA regarding the subject matter of a petition before FDA issues a final decision in the administrative proceeding. *See* 21

---

[3] FDA has declined to provide testimony in numerous proceedings, including *Sykes v. Bayer Corp.*, Civ. Action No. 3:07 CV 660 (E.D. Va.); *Quinn v. Siemens Medical Solutions USA, Inc.*, Civ. Action No. 07-1591 (W.D. Pa); *In re Transkaryotic Therapies, Inc.*, Civ. Action No. 03-10165 (D. Mass.); *Miles v. Pfizer, Inc.*, Civ. Action No. 03-0691 (M.D. La.); *Cartwright v. Pfizer, Inc.*, Civ. Action No. 6:04-292 (E.D. Tex.).

C.F.R. § 10.45(b) (requiring that a party first use the citizen petition process to "request that the Commissioner take or refrain from taking any form of administrative action," and that request must "be the subject of a final administrative decision based on [the citizen petition] . . . before any legal action is filed in a court."). This peculiar posture could have an adverse affect on FDA's citizen petition proceeding, and perhaps plaintiffs' counsel would attempt to use FDA testimony here in a subsequent judicial challenge to FDA's decision on the citizen petition. Third, we receive a vast number of requests for FDA personnel to testify in litigation to which FDA is not a party, and complying with these requests would require agency scientists to take time away from their considerable duties. *See Moore*, 927 F.2d at 1197-98. The time required for preparation and testifying can be substantial, and, if FDA were to offer expert testimony in products liability cases as a regular matter, those diverted resources would hamper FDA's abilities to accomplish its many responsibilities, such as the review of drug applications and ongoing monitoring of approved drug products.

## Conclusion

We hope the information provided above will assist the Court's evaluation.

Of Counsel:

THOMAS R. BARKER
Acting General Counsel

GERALD F. MASOUDI
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

MICHAEL F. HERTZ
Deputy Assistant Attorney General

EUGENE M. THIROLF
Director

-9-

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857
(301) 827-1152

GERALD C. KELL
Senior Trial Counsel
Office of Consumer Litigation
U.S. Department of Justice
PO. Box 386
Washington, D.C. 20044
(202) 514-1586

-10-