# EXHIBIT B

# Expert Report of Robert D. Gibbons Ph.D.

# Neurontin Litigation

## QUALIFICATIONS

My name is Robert D. Gibbons, and I am the Director of the Center for Health Statistics, and Professor of Biostatistics and Psychiatry at the University of Illinois at Chicago. I am a Fellow of the American Statistical Association and a two-time recipient of the American Statistical Association's Youden Award for statistical contributions to the field of Chemistry (2001 and 2006). I have received the Harvard Award for lifetime contributions to the field of Psychiatric Epidemiology and Biostatistics. I am a member of the Institute of Medicine (IOM) of the National Academy of Sciences (NAS), and served for six years on the IOM Board on Health Sciences Policy. I am the author of over 175 peer reviewed scientific papers, and four books. Two of these books are considered foundational in the area of environmental statistics (Statistical Methods for Groundwater Monitoring (1994); and Statistical Methods for Detection and Quantification of Environmental Contamination (2001) with David Coleman, both published by John Wiley and Sons), and the 2001 book received the distinction of being in the top 5 books for statisticians, from the American Statistical Association. My most recent book with Don Hedeker "Longitudinal Data Analysis," also published by John Wiley and Sons, presents a comprehensive overview of methods for the analysis of longitudinal data, with particular emphasis on analytic problems in mental health research. My first book, "Statistical and Methodological Advances in Psychiatric Research," was published in 1982.

I have served as a member on the Institute of Medicine Committee on the Prevention of Suicide, and developed the statistical Appendix of that report that provides a state of the art presentation of statistical methods for the analysis of suicide completion and attempts. I also served on the Institute of Medicine Committee on U.S. Drug Safety, which recommended major changes in the way in which the FDA evaluates safety and post-marketing surveillance of pharmaceuticals. These recommendations have been adopted by Congress and are now being implemented at FDA. I also served on the FDA Scientific Advisory Committee on Suicide and Antidepressants in Children. My colleagues and I have recently published five peer reviewed papers on the relationship between antidepressants and suicide. These papers included U.S. county-level analyses of the relationship between antidepressants and suicide in (1) the general population (Archives of General Psychiatry, 2005) and (2) in children (American Journal of Psychiatry, 2006) in the United States, (3) a study of 226,000 depressed U.S. veterans, (4) a study of changes in antidepressant prescriptions and youth suicide rates in the U.S. and Europe before and after public health advisories in the U.S., U.K., and Europe, and black box warning in the U.S., and (5) a statistical paper that develops a new approach to the analysis of spontaneous report data, illustrated with an example of antidepressants and suicide from the FDA Adverse Event Reporting System (AERS) data. Funding for this

1

work comes from an R56 grant from the National Institute of Mental Health and from a Center for Education and Research on Therapeutics (CERT) from AHRQ, for which I direct the statistical core.   My CV is attached as an exhibit to this expert report.

My expert opinions in this case are based on my review of materials such as the complaint, the expert reports and declarations of Drs. Blume and  Kruszewski, the declarations of Mr. Altman and Drs. Glenmullen and Jacoby, the depositions of Drs. Trimble, Kruszewski and Blume regarding the FDA Alert, the scientific literature on the relationship between antidepressants and suicide, the randomized controlled clinical trial data for the drugs Neurontin and Lyrica transmitted to the FDA, the paper by Collins and McFarland, data from FDA's Adverse Event Reporting System (AERS), prescription frequency data from Verispan and IMS, and my experience in working in the area of statistical methods for the analysis of psychiatric data in general and in the area of suicide research in particular, over the past 25 years.  I reserve the right to supplement or modify these opinions as further information becomes available and additional analyses are undertaken.

I have testified as an expert witness at trial within the last four years in the case of *Eli Lilly, et al. v. Zenith Goldline, et al.,* IP01-0443 C Y/S, in the United States District Court for the Southern District of Indiana, the case of *Forest Laboratories v. Ivax Pharmaceuticals*, Civil Action No. 03-891-JJF, in the United States District Court for the District of Delaware, in the Matter of the Appraisal between *Taunus Corporation, Plaintiff, and Allianz Insurance Company, Axa Corporate Solutions Insurance Company, and Axa Global Risks US Insurance Company*, the case of *Giles vs. Wyeth,* 04-CV-04245 in the United States District Court for the Southern District of Illinois, and a deposition in the matter of *B.F. Goodrich vs. Westlake Vinyls.*

My customary rate and the rate at which I will be compensated for work on this case is $500 per hour.

2

2963255v1

**EXPERT OPINIONS**

**Opinion 1: Randomized Clinical Trial (RCT) data analyzed by FDA in connection with the FDA Alert do not show an increased risk of suicidality for gabapentin relative to placebo.**

In connection with the FDA Alert, the FDA has reported a preliminary meta-analysis of 199 placebo controlled trials including 43,892 patients (27,863 in drug treatment groups and 16,029 in placebo) for 11 antiepileptic drugs. They report results of an overall analysis indicating that 0.43% of the patients in drug treatment groups experienced suicidal behavior or ideation versus 0.22% of the patients in placebo groups, corresponding to an estimated 2.1 per 1000 (95% CI: 0.7, 4.2) more patients in the drug treatment groups who experienced suicidal behavior or ideation than in the placebo treatment groups. FDA is also planning to discuss these data at an upcoming advisory committee meeting. No details regarding the statistical methodology by which these data were analyzed have been presented. FDA indicates that the results were "generally consistent" among the drugs and were seen in all demographic subgroups. It is unclear what the basis is for this statement. While the raw data and details regarding the analysis have not been made available by FDA, data submitted to FDA for this analysis by Pfizer are informative. Pooling the data across studies, the overall odds ratio for suicidality for all 11 drugs is 1.729 (1.181-2.530), $p<0.005$, confirming the statistical significance of the results for the group as a whole. The incidence is 0.38% for treated and 0.22% for control patients. (The incidence of 0.38% is based upon the report of FDA's Evelyn Mentari, MD, MS, Medical Reviewer, Division of Neurology Products, presented at the March 2008 Pediatric Advisory Committee Meeting, in which she reports 105 total suicide events in the drug treatment group in FDA's AED analysis). However, for gabapentin the odds ratio is 1.033 (0.135-7.884), $p<0.999$ indicating that for the 7876 patients treated with gabapentin (5194 treated and 2682 controls) there is no evidence of an association. The incidence is 0.039% for treated and 0.037% for placebo patients.

Dr. Greenland is quoted as indicating that based on these data, the risk can be as much as 30 times as high for gabapentin relative to placebo. He also reports that the lower confidence limit on risk is 0.08 indicating that the risk can also be 12.5 times lower than for placebo. Since (a) the result is clearly not significant, (b) the number of events is small, (c) and the point estimate is essentially 1, attempting to interpret the upper confidence limit as an index of the risk associated with gabapentin is invalid. The 95% confidence interval for the estimated odds ratio of 1.033 is 0.135-7.884, which clearly includes the value 1.0 and is therefore not significant. In fact, the probability associated with the test of the null hypothesis of no difference between gabapentin and placebo is 0.9999. Dr. Greenland's analysis does not provide any support for the proposition that gabapentin is associated with an increased risk of suicidal thinking or behavior. Furthermore, I note that his description of an increased risk of "suicidal behavior" is inaccurate since there was no suicidal behavior observed for any patient in the gabapentin controlled clinical trials.

3

When we examine the 10 other drugs, excluding the gabapentin data, the odds ratio increases to 1.787 (1.215-2.629), p<0.003. For the other 10 drugs the incidence of suicidality is 0.45% for treated versus 0.26% for control patients.

Dr. Greenland contends that we can learn nothing from the separate analysis of the gabapentin data because the sample size is too small. This is incorrect. First, if the true probability of suicidality for patients treated with the other ten drugs is 0.0045, we can ask the question what the probability is of getting 2 cases of suicidality out of 5194 gabapentin treated patients, if gabapentin has the same risk as the other 10 drugs. The answer is that the probability is 0.000005 based on a normal approximation and 0.000001 based on the Poisson distribution. In other words, the probability that gabapentin has the same risk of suicidality as the other ten drugs combined is one in one million. Clearly the gabapentin data do not resemble the data for at least some of the other ten antiepileptic drugs.

Second, it is methodologically appropriate and reliable to look at gabapentin and pregabalin as a group since, unlike the other nine drugs in the FDA's pooled dataset, these two drugs are both alpha 2 delta ligands, and share a similar mechanism of action. The pregabalin data submitted to FDA include a total of 10,888 patients (7609 treated and 3279 controls). The odds ratio for pregabalin was 1.50 (0.356-6.390), p<0.733, also indicating an insignificant risk of treatment on suicidality, but also underpowered in and of itself to detect such a difference. The incidence was 0.092% for pregabalin versus 0.061% for placebo. Note that these two drugs (gabapentin and pregabalin) account for 43% of the entire FDA database, yet they appear to have a very different risk profile than the other nine drugs. Excluding the gabapentin and pregabalin data, the combined incidence for the other nine drugs is 0.64% for treated and 0.32% for control patients, yielding an odds ratio of 2.009 (1.349-2.992), p<0.001, which is substantially increased following removal of the two Pfizer products. The combined incidence of suicidality for gabapentin and pregabalin is 0.07% versus 0.05% on placebo. The odds ratio for the two Pfizer products is 1.397 (0.409-4.771), p<0.763 which also shows no statistical evidence of an association between suicidality and treatment with these two drugs. Further, the combined analysis provides adequate statistical power to detect a significant difference. Using an incidence of 0.64% for treated and 0.32% for control patients derived from the other nine drugs, power of 80% is achieved with sample sizes of 10,983 for treated and 5,492 for control conditions. The data for the two Pfizer products consist of 12,803 treated and 5,961 control patients, which indicate that we have more than 80% power to detect the difference observed in the other nine drugs for the two Pfizer products. Results of that analysis reveal no increased risk of suicidality (p<0.763) for gabapentin and pregabalin.

These findings indicate that there is clear heterogeneity among the trials that were pooled by FDA in their meta-analysis. These results do not support FDA's statement that the results were "generally consistent" across the drugs," at least not for gabapentin and pregabalin. The data for gabapentin and pregabalin do not show evidence of increased risk of suicidality, whereas the combination of the other nine drugs do. Furthermore, as

4

confirmed by FDA, none of their findings indicate causal associations between antiepileptic drugs and suicidality.

**Opinion 2: Randomized Clinical Trial (RCT) data analyzed by FDA in the FDA Alert do not provide evidence of a causal link between antiepileptic drugs and suicidality or suicide.**

FDA in the Alert was appropriately careful to point out that the analyses of the RCT data that they summarize in their Information for Health Care Professionals alert "does not mean that FDA has concluded there is a causal relationship between the drug products and the emerging safety issue." Plaintiff experts contend that this somehow represents FDA negotiations with pharmaceutical companies. This assertion is inaccurate for the following reasons. First, suicidality was not a prospectively measured endpoint in any of these trials, it was retrospectively harvested from the clinical study records. There are numerous ascertainment biases that could easily account for the small observed differences between treated and control conditions reported in the FDA Alert. First, patients treated with an active medication will have more side-effects than those treated with placebo, and as a result, they will have more contact with their study physicians and greater opportunity to report their suicidal thoughts (Posner et.al., (2007), American Journal of Psychiatry, 164, 1035-1043). Second, suicide attempts based on overdose of study medication will be biased against patients treated with active medications because overdose on an antiepileptic drug will generally result in a visit to the emergency room whereas no such visit will be required following overdose of placebo. The combination of these two ascertainment biases could easily result in the small differences in reports of suicidality observed in these studies among the 10 other drugs excluding gabapentin for which no such difference between placebo and active treatment was observed. In the presence of potential ascertainment biases of this type, post-hoc meta-analyses of RCTs do not provide causal evidence for a link between antiepileptic drugs and suicide. FDA was correct in clearly stating that a conclusion of a causal connection between antiepileptic drugs and suicidality should not be drawn from these data nor the analyses that FDA has reported.

From a statistical perspective, there is concern regarding the methodology that FDA uses in their meta-analyses of RCTs (Kaizar et.al. (2006) *Clinical Trials*, 3, 73-98). Specifically, their analyses of both child and adult antidepressant studies for suicidality used statistical methods that required them to eliminate any study with no events in both treatment arms (i.e., drug and placebo) and apply a continuity correction to any study that had zero events in one arm (i.e., add 0.5 to all cells). Both of these practices can lead to bias, and the practice of discarding studies with no events will lead to bias in the direction of increased risk in active treated patients because it discards studies in which there was no difference between treated and control arms (i.e., 0 in both arms). This is an even greater problem for antiepileptic drugs than antidepressant drugs because the rate of suicidality is from one to two orders of magnitude lower.

Taken together the potential sources of bias in both the design of these studies and FDA's meta-analysis severely limits the formation of any reliable conclusions that can be drawn

5

from them regarding causal inference. More information provided by FDA regarding the specifics of their analysis of these data will be helpful in better understanding the types of inferences that can be drawn from their analyses. In no case can the type of causal inference made by plaintiff experts here, be drawn from FDA's meta-analyses. Use of the Alert or the data contained in the Alert as a basis for opinions on suicide causation is not an accepted or reliable scientific methodology.

**Opinion 3: Although the plaintiff's experts claim that their data tabulations are supported by the FDA alert, there is no scientific basis for this.**

Plaintiff experts claim that the FDA alert supports their opinions and validates their own tabulations of "risk" of suicidality with gabapentin. In no case is this evidence credible. With the assistance of Mr. Altman, Dr. Blume has provided a series of such analyses in her expert report.

1. The majority of these "analyses" are based on the simple reporting of frequencies of certain adverse events (hostility, aggressiveness, depression, nervousness, etc.) in lieu of data on actual suicide-related events. These data do not support inferences regarding the proposed link between suicidal thinking, behavior, or completion and gabapentin. FDA did not analyze these endpoints in either their analysis of the antidepressant or antiepileptic data. To do so would be scientifically unreliable because these behaviors are confounded by indication.

2. None of the analyses of spontaneous adverse event reports adjust for the number of patients being treated nor the indication for their treatment. It is not appropriate to analyze the "counts" and not consider the population exposed. Plaintiff experts' analysis is not appropriate to evaluate whether the spontaneous adverse event reports demonstrate a signal for suicidality. As a concrete example, FDA's review of adult suicidality data from antidepressant RCTs clearly revealed a statistically significant protective effect of antidepressant treatment on suicidal ideation and behavior in people 65 years of age and older. Nevertheless, there were still adverse event reports for suicidal thoughts and behavior for patients treated with antidepressants in this age cohort. The mere presence of those suicidal thoughts and behaviors identified in these RCTs, clearly does not lead to the conclusion that antidepressants are associated with these events. In fact, the data indicate that antidepressants are protective. No such comparative analyses (e.g., statistical comparison of placebo versus gabapentin, gabapentin versus no treatment in an epidemiologic study) were undertaken by any of Plaintiff's experts, rather they simply tallied numbers of "psychobiological events" in patients treated with gabapentin. Certainly, the FDA did not rely on simple counts of spontaneously reported adverse events in any of their suicide risk assessments.

3. As a result, the FDA meta-analysis cannot be used to corroborate Plaintiff's experts causation arguments. Mr. Altman and Dr. Blume conclude that increases in serious AEs in the 4th quarter of 2004 were due to off-label use and is therefore

6

2963255v1

evidence of the connection between gabapentin and suicidality. First, the total number of prescriptions of gabapentin were also increasing during this period. Second, and most importantly, if an off-label use involves a population with increased risk of suicide such as bipolar illness, then we would expect the rate of suicidal thoughts and behaviors for the drug now used to treat those patients to increase simply due to confounding by indication. This has nothing to do with gabapentin producing these adverse events. At least in the FDA alert, there was a stratified analysis presented based on indication. Finally, Dr. Blume does acknowledge the effects of notoriety bias on rates of reporting, further limiting conclusions that can be derived from her review of these data.

4. Unlike in connection with the Alert, Mr. Altman and Dr. Blume combine placebo controlled and uncontrolled analyses in their presentation and Dr. Kruszewski contends that the distinction between controlled and uncontrolled studies is meaningless. The sample populations for controlled and open label studies are quite different. Open label or uncontrolled studies generally consist of more severely ill patients that are unwilling to risk being randomized to placebo. Analyses based on the pooling of controlled and uncontrolled studies can therefore be severely biased giving the appearance of increased risk of suicide when no such relationship exists. In support of this, FDA only analyzed placebo controlled studies in their meta-analyses of antidepressant and antiepileptic medications.

**Opinion 4: Plaintiff's assertion that the meta-analytic methodology used by the FDA in both their analyses of antidepressants and antiepileptics leads to causal evidence is not scientifically valid.**

The plaintiffs lawyers and experts take the position that the FDA Alert provides support of their conclusion that gabapentin causes suicide. I disagree with this position for the following reasons.

1. The FDA alert is based primarily on suicidal ideation, not completed suicide. The relationship between suicidal ideation and completion has not been established.

2. The results of my analyses based on the gabapentin data reveal that there is no increased risk of suicidality for gabapentin relative to placebo.

3. Meta-analysis of RCTs for multiple different drugs with differences in chemical structure, mechanism of action, pharmacologic properties, does not provide causal evidence of a link to suicide for either the individual drugs contained in the analysis, or the drugs as a heterogeneous group. Just as Dr. Greenland has contended that there is insufficient statistical power to detect a drug-specific effect, there is insufficient power to test the hypothesis that the effect is the same for all drugs. How then does FDA conclude that the effects "were generally consistent among all eleven drugs"? Simply stated, FDA's conclusion that the

7

2963255v1

effects are "generally consistent" among the drugs reviewed is not supported by the data.

As pointed out by Greenland in Chapter 32 (Meta-analysis), in the book entitled Modern Epidemiology by Rothman and Greenland, "As many authors have stressed, analysis of heterogeneity can be the most important function of meta-analysis, often more important than computing a fictional common or "average" effect. … There is ordinarily no basis for assuming that the relative risk or coefficient value being estimated is constant across study populations. In fact, there are many situations that imply heterogeneity instead; for example, simple variation in background rates can produce large variation in the rate ratio, …, To summarize, one should regard any homogeneity assumption as extremely unlikely to be satisfied, given the difference in covariates, bias, and exposure variables among studies." This is exactly the case for FDA's meta-analysis of AED studies, namely, the exposure variables, in this case drugs, are quite different among the studies analyzed. With respect to testing homogeneity, Dr. Greenland points out "A statistical test of homogeneity can serve as a warning light with high specificity but low sensitivity: Small P values indicate that the heterogeneity should not be ignored, but large P values do not indicate that it can be safely ignored." It is unclear if FDA even performed a test of homogeneity, prior to concluding that the effects "were generally consistent among all eleven drugs."

4. Historically, FDA's approach to meta-analysis discards all studies with no events, leading to potential bias. The problem is even greater with antiepileptic drugs relative to antidepressants because the incidence of suicidality is so much lower.

5. The FDA alert has not withstood the test of any external scientific review.

6. The plaintiffs' experts have no way of verifying the scientific validity of the results that have been reported by FDA in their alert.

7. In discussing the Alert, Dr. Glenmullen opines that "to a reasonable degree of medical and scientific certainty, that Dr. Trimble, Dr. Kruszewski, and Dr. Blume followed generally accepted scientific principles and methods in relying on the FDA's findings." It is unclear to me how he can make such a statement. First, none of them have seen FDA's complete report or any detailed description of the data relied upon or the statistical methodology relied upon so that they can adequately review this study. Second, the FDA scientific advisory committee has not yet met to review these findings. Third, Dr. Glenmullen has not published a single peer reviewed scientific article in this area, nor have Drs. Trimble, Kruszewski and Blume. None of these experts has done anything more than read the Alert – they have not analyzed the data in any way or considered the methodology used by FDA, as stated in their depositions. Beyond the fact that plaintiffs' experts have read the FDA Information for Health Care Professionals alert, it is unclear what Dr. Glenmullen is referring to with his "reasonable degree of scientific certainty." Merely reading the FDA Alert involves no methodology

8

at all that could be subject to "accepted scientific principles." My comments regarding statements made by Dr. Glenmullen apply equally to similar comments made by Dr. Jacoby.

8. In supporting his opinion related to the FDA Alert, Dr. Glenmullen suggests that FDA's analysis of the pediatric RCT data yielded a "causal" inference regarding the relationship between antidepressants and suicide, and that this language was retracted only after pressure from industry. This is clearly not the case. Even during the hearings, there were serious questions raised regarding the validity of the analyses presented by FDA. In particular, the findings for the prospectively measured suicidality outcomes showed no association with treatment. Only the retrospective chart review data supported this association, and the resulting black box warning did not indicate that there was sufficient scientific evidence to conclude that there was a causal relationship between antidepressants and suicidality. Since the time of the black box warning, there has been substantial evidence that no such causal relationship exists. For example, Bridge and colleagues (JAMA, 2007) analyzed a now expanded set of pediatric RCTs and found that the difference between antidepressant therapy and placebo in terms of suicidal ideation and behavior was no longer statistically significant.

**Opinion 5: Plaintiff's experts' reliance on the Collins and McFarland epidemiologic study as further support of the FDA alert is misguided.**

Plaintiffs' experts cite Collins and McFarland (2008) *J. of Affective Disorders*, 107, 23-28, as providing additional "epidemiologic evidence" that they say is consistent with the increased risk of suicidality found in the FDA Alert. The Collins and McFarland study does not verify their opinions or confirm the Alert. . The study compared suicide completion and attempt rates in a cohort of 12,662 Oregon Medicaid medical claims database between lithium, gabapentin, divalproex, and carbamazepine. There were 11 suicides and 79 attempts, making this a very small study. The authors found significant effects of treatment with divalproex relative to lithium on suicide attempts and significant effects of treatment with gabapentin relative to lithium on suicide completions. The authors conclude that lithium may have protective effects with regard to suicide attempts among Medicaid patients with bipolar disorder, however it remains unclear whether or not lithium protects these patients against suicide completion. They also note that the difference between lithium and gabapentin in suicide rates could be due to confounding by indication, where "completed suicide among gabapentin users may well be related to prescription of this medication for people with chronic pain (in addition to bipolar disorder) who could be at very high risk of suicide. In addition, the study did not control for previous suicide attempts or previous treatment with lithium. It may be the case that more severely ill patients who did not respond to lithium are then prescribed gabapentin and it is this lack of treatment response that is related to increased suicide incidence. Of course, the study is still only based on 11 suicides and these results have not been confirmed by replication in other studies. Dr. Greenland indicates that the study "could not separate causative effects of gabapentin from preventive effects of lithium." "Completed suicide and attempted suicide are major concerns for people with bipolar

9

disorder (Baldessarini et al., 2006; Baldessarini and Tondo, 2003; Goodwin, 1999; Muller-Oerlinghausen et al., 2002). In the absence of treatment, approximately one person per hundred individuals with bipolar disorder completes suicide annually and about four per hundred attempt suicide (Baldessarini et al., 2006). These risks are approximately one hundred-fold higher (completed suicide) and ten-fold greater (suicide attempts) than those for the general population (Baldessarini et al., 2006)." Collins and McFarland (2008) note that the rate of suicide was 0.78 per thousand years of exposure to lithium and 3.5 per thousand for gabapentin. While in their study the protective effects of lithium were even greater than for gabapentin, suicide rates for both treatments are substantially less than for no treatment. The current data do not support the conclusion that gabapentin is associated with increased suicidal risk.

**Opinion 6: Neither RCTs nor Spontaneous Reports submitted to FDA indicate a risk of suicide for gabapentin.**

FDA did not analyze spontaneously reported adverse event data in evaluating suicide risk as set out in the Alert. FDA has specifically said: "the agency does not believe that spontaneous post-marketing reports can be interpreted appropriately in this situation. Patients taking these drugs have a high background rate of suicidal thoughts/behaviors, and it is not possible to tell from AERS reports, whether the drug caused them. In the agency's view, the only way to establish whether or not the drugs are responsible for suicidality is to analyze controlled trial data." In fact, my analysis of the gabapentin RCT data, combined with the information supplied in the FDA alert, indicates that the 11 AEDs are not homogenous with respect to their association with suicidality. Despite plaintiffs' experts' reliance on AERS data as "confirmation of" the Alert, my evaluation of these data do not "support" or "confirm" the Alert as it relates to gabapentin. Since the RCT data for the other AEDs were not available to me, I examined the AERS database to study the differential relationship between AEDs and completed suicide for the other drugs to determine whether these data support plaintiffs' experts statements about the Alert confirming their opinions based on AERS. I used the methodology for statistical adverse event (AE) surveillance developed by Gibbons et.al. (*Statistics in Medicine*, 27, 1814-1833, 2008). This methodology examines a particular AE (in this case completed suicide) for each of the members of a class of drugs (in this case antiepileptic drugs) and determines for each of the members of the drug class whether or not the rate of the AE is elevated relative to the drug-class average rate (see Appendix for further explanation of methodology). For each drug, we estimate a rate multiplier which describes whether the rate for a particular drug is lower, higher or the same as the average for the entire class. A rate multiplier of 1 indicates that the drug has the same rate as the class of drugs as a whole. A rate multiplier of 0.5 indicates that the drug has one-half the rate of suicide as the average rate for the class as a whole and a rate multiplier of 2.0 indicates that the drug has twice the rate of suicide than the average for the class as a whole. Corresponding confidence intervals are also computed to determine if the difference from the class average (i.e., 1.0) is statistically significant or not.

Results of my analysis, displayed in Figure 1, reveal that gabapentin is the only drug identified in the Alert that has a significantly lower rate multiplier than the group average

10

(i.e., the upper confidence limit is less than 1.0), although results for oxcarbazepine and tiagabine hcl are borderline significant (i.e., their upper confidence limits are close to 1.0). While FDA has expressly said in connection with the Alert that these data cannot be used to determine a causal relationship, what is clear from Figure 1 is that any signal of an increased risk of suicide for this group of drugs is related to valproic acid, which has a statistically significant elevated rate multiplier of 6.09 (confidence interval 5.00-7.42) or six times larger than the average for the other antiepileptic drugs. By contrast, the rate multiplier for gabapentin is only 0.79 (confidence interval 0.67-0.93), indicating that it is significantly lower than the class average. This analysis of the drugs in the Alert reveals that relative to other antiepileptic drugs analyzed by FDA, the gabapentin spontaneously reported adverse events do not show evidence of a signal for suicide events, and that a clear signal emerges for valproic acid not gabapentin. In fact, of the ten AEDs in this analysis, gabapentin has the lowest rate of spontaneous reports of suicide. Even after the FDA alert, Blume and Altman in their analysis of the FDA AERS data, did not analyze the same antiepileptic drugs that formed the basis of the FDA alert, as shown in the Figure below. Furthermore, the analysis that I have performed (and illustrated in the *Statistics in Medicine* paper) looked exclusively at suicide completions, because they will have the least amount of reporting bias. Indeed, when we began working with the FDA AERS data, we rejected use of suicidal ideation and attempts, because they were less frequently reported relative to suicide completion.



10 Antiepileptic Drugs on the Market from 2000-2005
Empirical Bayes Rate Multipliers

11

**Opinion 7: FDA did not follow Dr. Blume's methodology because it is not scientifically valid or accepted.**

In reviewing the expert report of Dr. Blume, I can find no scientifically defensible arguments or data that support a causal link or even a statistically significant association between gabapentin and suicidality of any kind, despite her contention that the FDA alert supports her opinions.

1. In preparing the FDA alert, FDA did not analyze the psychobiological events that formed the basis of Dr. Blume's expert report and opinions. These psychobiological events include but are not limited to abnormal thinking, depersonalization, euphoria, confusion, nervousness, hyperkinesias, agitation, personality disorder, abnormal dreams, and emotional liability. In fact, the list changes across the different types of studies that she reviews. As evidence of this association between gabapentin and psychobiological events, Dr. Blume reviewed 9 clinical pharmacology studies (n=240), 7 of which were healthy volunteer studies. She notes that there were no reports of depression, hostility, or suicidal behaviors. Furthermore, there were no deaths, withdrawals or serious adverse events with gabapentin treatment in any of these studies. Dr. Blume notes that there were a total of 52 psychobiological events reported in these 9 studies. However, given that there is no comparison group (e.g., subjects receiving placebo) it is impossible to know if these 52 events represents a high or a low rate of psychobiological events. Furthermore, Dr. Blume infers that these psychobiological events are risk factors for suicide and would therefore be expected to lead to increased incidence of suicidal thoughts and/or behavior. In fact, out of 5194 subjects treated with gabapentin and 2683 subjects on placebo, who were enrolled in double-blind randomized clinical trials, there were a total of 3 patients with suicidal thoughts, 2 treated with gabapentin (0.039%) and 1 on placebo (0.037%). There were no suicidal behaviors or completions in either gabapentin or placebo patients. These results clearly indicate that even if gabapentin were associated with psychobiological events, these events are not leading to suicidal thoughts, suicidal behaviors, or suicidal completion. In fact, Dr. Blume does not present any scientific evidence that these psychobiological events are associated with gabapentin treatment.

2. One of the studies that was submitted to the FDA as part of Pfizer's 2006 submission, and was also cited by Dr. Blume was the study conducted by Rowbotham et.al. (1998) JAMA, 280, 1837-1842. This study specifically compared gabapentin and placebo in terms of the Profile of Mood States (POMS) in a sample of 113 Postherpetic neuralgia patients (i.e., neuropathic pain following shingles) treated with gabapentin versus 116 patients on placebo. This study prospectively examined the effect of gabapentin on psychobiological conditions in contrast to the spontaneously reported events that Dr. Blume's

report is based on. These investigators found significant reductions in total mood disturbance (p<0.001), depression-dejection (p<0.001), anger–hostility (p<0.001), and confusion-bewilderment (p<0.01) in gabapentin treated patients relative to placebo controls. These results clearly reveal that gabapentin significantly decreased the same psychobiological conditions that Dr. Blume contends are increased by treatment with gabapentin. The difference, of course, is that this study represents a placebo controlled prospective study which was designed to study the effect of gabapentin on these psychobiological conditions. By contrast, Dr. Blume has relied exclusively on spontaneous reports of adverse events, without the benefit of statistical comparisons and in general without the benefit of comparison to a relevant control group such as placebo. In no way can Dr. Blume's tallies of counts of "psychobiological events" replace the results of placebo controlled RCTs designed prospectively to examine the effects of gabapentin on these same psychobiological conditions.

3. The Rowbotham study is not the only study that has found statistically significant beneficial effects of gabapentin on the psychobiological conditions that Dr. Blume claims that it produces. Pande et.al. (1999) *J. of Clinical Psychopharmacology,* 19, 341-348, found significant decreases in social phobia in patients treated with gabapentin relative to placebo. Rice et.al. (2001) *Pain*, 94, 215-224, found significant improvement in mental health domains of the SF-36 Quality of Life scale relative to placebo. Backonja et.al. (1998) JAMA 280, 1831-1836, found significant improvement in mental health (SF-36), anger/hostility, and total mood (POMS) relative to placebo. Dodrill et.al. (1999) *Epilepsy Research*, 35, 109-121 found a significant reduction in mood disorder with gabapentin treatment relative to placebo controls. None of these studies identified a single psychobiologic condition that was made worse with gabapentin relative to placebo. Finally, Kalinin (2007) Drug Safety, 30, 123-142 concludes that "gabapentin seems to be a drug with certain positive psychotropic effects, as has been demonstrated in numerous studies on its efficacy in affective spectrum disorders and in patients with epilepsy. Obviously such a positive psychotropic profile of gabapentin may be useful in epilepsy patients with a high risk for suicidality, and affective and behavioral disturbances."

**Opinion 8: Dr. Sander Greenland concludes that the RCT data for gabapentin provides no evidence of any association between gabapentin and suicidality before or after the FDA alert.**

While Dr. Greenland attempts to criticize my analysis of the gabapentin data that were submitted to FDA by Pfizer, he clearly indicates that these data do not provide evidence of an association between gabapentin and suicidality either causal or otherwise.

1. Dr. Greenland reviewed the epidemiologic evidence linking gabapentin to suicide and concluded that there is no evidence that there is an association between gabapentin and suicide attempts or completions. This is consistent with my own findings that the FDA alert is not supported by the gabapentin-specific data. With

13

2963255v1

respect to the Collins-McFarland study he states that "the Collins-McFarland study examined only associations in relation to lithium, and thus could not separate causative effects of gabapentin from preventive effects of lithium." Dr. Greenland notes that due to the rare nature of the outcome, completed suicide and/or suicide attempts require much larger populations than are available, even combining all randomized clinical trials for gabapentin. As such, he concludes that the available data on suicide completion and attempts neither provide evidence for an increased risk of suicide with gabapentin, nor do they rule out an increased risk of suicide with gabapentin.

2. First, based on the FDA alert, out of 5194 gabapentin treated patients, Pfizer should have observed 5194*0.0043=22.33 or 22 cases of suicidal thoughts and/or behaviors. Instead, only 2 patients with suicidal thoughts were observed. As such, the data for gabapentin do not appear to be consistent with the rate of suicidal thoughts and behaviors cited in the FDA alert. As previously noted, the odds ratio for the comparison of gabapentin to placebo in terms of suicidal ideation is 1.033 (0.135-7.884) p=0.999, indicating that for the 7876 patients treated with gabapentin (5194 treated and 2682 controls) there is no evidence of an association. The incidence is 0.039% for treated and 0.037% for placebo patients. To say that "thus the table supports no conclusion regarding the relation of gabapentin to suicidal behavior or risk" is misleading. The gabapentin RCT data submitted to the FDA instead supports the conclusion that out of 5194 gabapentin treated patients, Pfizer should have observed 22 cases of suicidal thoughts and/or behaviors, when in fact they only observed 2.

3. Dr. Greenland has criticized my description of the confidence interval for the 1.033 odd ratio and the associated significance level of 0.999. In doing so, he suggests that if we take the numbers at face value and rounding them, the data do not exclude any possibility ranging from a 90% risk reduction to a 700% risk increase. I do not disagree with this statement, but it provides a potentially biased view to the non-statistical reader who might conclude from this statement that the risk reduction is less than 100% but the risk increase could be as large as 700%. This gives the incorrect impression that the risk is potentially 7 times larger than the benefit. In fact, my estimated confidence interval was 0.135-7.884, which implies a 1.00/0.135=7.41-fold decrease to a 7.88-fold increase in risk. Again, the data from 7876 patients from placebo controlled trials of gabapentin provide no evidence of an association between gabapentin and suicidality of any kind. The probability associated with the test of the null hypothesis that the true odds ratio is 1.0, further confirms this finding. Using Dr. Greenland's logic, all negative studies are equivocal, because they all have upper confidence limits that are greater than 1.0.

4. Dr. Greenland has criticized my description of the probability associated with the test of the null hypothesis that the true odds ratio is 1.0. I have computed this probability to be 0.999, indicating that the observed value of 1.033 is extremely

close to the null value of 1.0, and therefore we have no evidence of increased risk of suicidality with gabapentin.[1]

**Opinion 9:  The Bottom Line.**

None of the data that I have reviewed provide any evidence that gabapentin is associated with suicidal thoughts, behavior, indicating that the FDA alert should not, based upon the available evidence, apply to gabapentin.  FDA's AERS system does not provide a signal for gabapentin in terms of completed suicide.  In fact, out of all of the antiepileptic drugs in the FDA alert, gabapentin has the lowest rate of spontaneous reports of completed suicide (adjusted for number of prescriptions).   The RCT data for gabapentin are not consistent with the estimates of rates of suicidal thoughts and behaviors reported by FDA in their alert.  Based on their estimated rate of 0.43%, Pfizer should have observed 22 suicidality events for gabapentin, when in fact they only observed 2.  This difference is statistically significant.  Furthermore, when analyzed independently, there is no evidence that gabapentin is related to suicide, and the estimated odds ratio of 1.033 does not reveal a clinically significant effect.  While Dr. Greenland contends that we can learn nothing from the gabapentin data because the sample size is too small, the number of patients enrolled in RCTs for gabapentin is in fact more than twice the number of patients enrolled in the pediatric RCTs of antidepressants that led to FDA's black box warning.  Furthermore, combining the data for the two alpha 2 delta ligands (gabapentin and pregabalin) also reveals that there is no significant difference between these two drugs and placebo, a comparison that involves a sufficient number of patients to identify the observed difference between the remaining 9 drugs and placebo with power in excess of 80%.  With respect to "psychobiological events," none of the data presented by the plaintiff's experts show that these events are statistically associated with gabapentin.  In fact, prospective studies in which these events were examined showed significant decreases in psychobiological disturbance in patients treated with gabapentin relative to placebo.

While FDA has provided an alert on a possible relationship between antiepileptics and suicidality, (1) the basis for this alert has not been peer reviewed by any scientific advisory board, (2) plaintiff's experts have not reviewed the data nor statistical methods used by FDA in developing the alert, and (3) the data for placebo controlled RCTs for gabapentin are not consistent with the conclusions in the alert.  Finally, the single epidemiologic study (Collins and McFarland, 2007) plaintiffs' experts say confirms the alert does not allow one to differentiate potential harmful effects of gabapentin from potential beneficial effects of lithium.  None of plaintiff's experts have provided any evidence that gabapentin is even associated with suicidal thoughts, behaviors, or completion.  Their only argument is that such an association cannot be ruled out based on

---

[1] Dr. Greenland contends that I should have indicated that the probability of the observed difference or greater is 0.999 if there were no gabapentin effect.  While this is technically correct, it gives the impression to the non-statistical reviewer that the probability is 0.999 that the observed odds ratio is 1.033, or 10 or 50 or any number larger than 1.033.  This is simply not the case.  The reason that the probability is so large is that the observed value is so close to the null value.  If the observed value of the odds ratio were larger than the null, say 2.0 or 3.0, then the probability associated with the null hypothesis that the true odds ratio was 1.0, would be quite small.

2963255v1

the amount of available data.   Neither FDA nor Plaintiff's experts have provided any evidence that leads to the conclusion of a causal link between gabapentin and suicidality.

I declare under penalty of perjury under the laws of the United States of America that the opinions set forth in this document and Appendix are my opinions to a reasonable degree of medical and scientific certainty, and are true and correct.

Executed May 19, 2008.

Sincerely,

Robert D. Gibbons Ph.D.

**Appendix to report for Robert D. Gibbons regarding Opinion 6**

This methodology (Gibbons et.al. *Statistics in Medicine*, *27*, 1814-1833, 2008) examines a particular AE (in this case completed suicide) for each of the members of a class of drugs (in this case antiepileptic drugs) and determines for each of the members of the drug class whether or not the rate of the AE is elevated relative to the drug-class average rate. To adjust for changing rates of prescriptions between drugs and within drugs over time, I used IMS estimates of annual number of prescriptions for each drug and year. In this way, the population at risk is included as an offset in the computation and differences in numbers of events are adjusted for the overall frequency with which the drug was prescribed. The statistical methodology produces a rate multiplier for each drug, which is computed as the exponential of the empirical Bayes estimate of the random intercept of a random-effects Poisson regression model. Year (2000-2005) was scaled as -2.5, -1.5, -0.5, 0.5, 1.5, 2.5, so the intercept (i.e. year = 0) corresponds to January of 2003, which is most likely prior to major media attention and advertising for clients by law firms. The model included a random year effect as well, so increases in reporting rates over time are incorporated into the statistical model, and these temporal effects are allowed to vary across drugs. In this way all data from 2000 to 2005 could be used in the analysis. A rate multiplier of 1 indicates that the drug has the same rate as the class of drugs as a whole. A rate multiplier of 0.5 indicates that the drug has one-half the rate of suicide as the average rate for the class as a whole and a rate multiplier of 2.0 indicates that the drug has twice the rate of suicide than the average for the class as a whole. Corresponding confidence intervals for the rate multipliers are based on the estimated posterior variance for the empirical Bayes estimate of the intercept for each drug. Rate multipliers and 95% confidence intervals for each drug are presented in Figure 1.