IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
NEURONTIN MARKETING, SALES PRACTICES ) CA No. 04-10981-PBS
AND PRODUCTS LIABILITY LITIGATION    ) Pages 107 - 360



DAUBERT HEARING - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE
and
JUSTICE MARCY S. FRIEDMAN
NEW YORK SUPREME COURT




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
June 20, 2008, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1      A P P E A R A N C E S:

2      FOR THE PLAINTIFFS:

3          ANDREW G. FINKELSTEIN, ESQ. and KENNETH B. FROMSON, ESQ.,
       Finkelstein & Partners, LLP, 436 Robinson Avenue, Newburgh,
4      New York, 12550.

5          JACK W. LONDON, ESQ., Jack W. London & Associates, P.C.,
       3701 Bee Cave Road, Suite 200, Austin, Texas, 78746.
6
       FOR THE DEFENDANTS:
7
           DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
8      160 Federal Street, 23rd Floor, Boston, Massachusetts,
       02110-1701.
9
           JAMES P. ROUHANDEH, ESQ., Davis, Polk & Wardwell,
10     450 Lexington Avenue, New York, New York, 10017.

11         JAMES E. HOOPER, ESQ. and DIANE HELLWIG, ESQ.,
       Wheeler Trigg Kennedy, LLP, 1801 California Street,
12     Suite 3600, Denver, Colorado, 80202-2617.

13         SCOTT W. SAYLER, ESQ., LORI CONNORS McGRODER, ESQ.,
       and JENNIFER M. STEVENSON, ESQ., Shook, Hardy & Bacon, LLP,
14     2555 Grand Boulevard, Kansas City, Missouri, 64108-2613.

15         RICHARD M. BARNES, ESQ. and MICHAEL J. WASICKO, ESQ.,
       Goodell, DeVries, Leech & Dann, LLP, One South Street,
16     20th Floor, Baltimore, Maryland, 21202.

17         BETH L. KAUFMAN, ESQ., Shoeman Updike & Kaufman, LLP,
       60 East 42nd Street, New York, New York, 10165-0006.
18

19

20

21

22

23

24

25

1                              I N D E X

2    WITNESS                DIRECT       CROSS        REDIRECT

3    Cheryl Blume           113          140          197

4    Stefan P. Kruszewski   203          235          287

5    Robert Gibbons         296          334

6    Charles P. Taylor      339

7

8    EXHIBITS               DESCRIPTION                    PAGE

     Plaintiff

9

10   3           FDA manual – Guidance for Industry    117

11   4           IV(a) Psychobiological Adverse
                 Events in Pre–Approval Stage

12   Defendant

13

14   2           "Seizure frequency and CSF parameters,"
                 Ben–Menachem, E., et al

15   3           Exchange of correspondence between    162
                 Dr. Hauben and Dr. Strom

16

17   4           U.S. Department of Health and
                 Human Services – Statistical Review
                 and Evaluation

18

19   5           Affidavit of Cynthia McCormick

20

21

22

23

24

25

1            P R O C E E D I N G S

2        THE CLERK:  In Re:  Neurontin Marketing Sales

3    Practices and Product Liability Litigation, Civil Action

4    No. 04-10981, will now be heard before this Court.

5        MR. FINKELSTEIN:  Your Honor, before we get

6    started, two very fast issues.  One, I'd like to hand up --

7    I've already provided it to Mr. Rouhandeh -- the declaration

8    from Dr. Trimble related to simply the peer-review articles

9    that he had referenced.

10        Secondly, we did offer an element where we think we

11    can satisfy the time constraints we have.  We agreed and

12    suggested to defense counsel we limit 20 minutes to direct,

13    40 minutes to cross, and we could get everything in today,

14    and we're open to doing that.

15        MR. ROUHANDEH:  Your Honor, before that's handed

16    up, the defendants believe it's entirely inappropriate for

17    the witness to leave the stand, and then, before he gets on a

18    flight to go back to London, signs a declaration to hand up

19    to the Court when we don't have any opportunity to

20    cross-examine him.

21        JUDGE SARIS:  Overruled.  If they're just the

22    documents he referred to yesterday, I'm going to allow it.

23        MR. FINKELSTEIN:  That's all it is.

24        JUDGE SARIS:  It's very helpful.  Let me just say

25    this:  We're having problems here.  We both realized we read

1    something yesterday involving Dr. Taylor.  And I read this

2    single-spaced opaque report, and she got some really great

3    little summary in an affidavit.  So we're trying to figure

4    out whether we're, A, getting the same documents, and, B,

5    what we should be using to prepare for this hearing.

6         Did I get the affidavit?  Does anyone know?

7         MS. McGRODER:  Your Honor, Lori McGroder for the

8    Pfizer defendants.  The reason why you got affidavits in the

9    New York court proceeding was because of the local rule about

10   supporting our evidence with an evidentiary basis.  So the

11   experts provided affidavits setting forth what was in their

12   reports.  The substance is the same as in their actual

13   reports which you received, your Honor.

14        JUDGE SARIS:  But which is, like, ten times longer.

15        MS. McGRODER:  Well, we'd be happy to give you the

16   declarations also.

17        JUDGE SARIS:  And the same comes up with

18   Dr. Blume.  It was 193 pages single-spaced.  I didn't get

19   through it, confession.  I mean, you couldn't read it all,

20   and it didn't really have a decent executive summary.  So at

21   some point, our time is a little limited here, and we're

22   trying to move quickly to do catchup.  So I don't know that I

23   want 20 minutes.  I don't know what she said.  I mean, I

24   didn't -- with some of them, you can read it through from

25   beginning to end and just figure it out.  I mean, if they're

1    40 pages, you can handle that.  193 pages single-spaced is

2    too much.  So I'm willing to try and streamline it so you

3    don't have to come back, but at some point, I have to

4    understand it.

5              MR. ROUHANDEH:  Your Honor, and that's one of the

6    reasons why we opposed the idea that Mr. Finkelstein is

7    suggesting because we think the witnesses on the stand being

8    examined should be one of the most helpful ways to get the

9    information in condensed form and to get your Honor and

10   Justice Friedman's questions answered.  Therefore, we don't

11   think it makes sense to short-circuit the witnesses on the

12   stand.

13             JUDGE SARIS:  If anything, I came in here this

14   morning worrying whether half an hour was enough.  So let's

15   just do what we need to do to understand this.

16             JUSTICE FRIEDMAN:  May I just say that I would like

17   to see the questioning conducted with more of the view to

18   eliciting the scientific bases for the opinions than in a

19   manner that might be conducted before a jury.  I'll give you

20   an example.  I think all of the time that was spent yesterday

21   on Professor Trimble's medicolegal textbook was really wasted

22   and that this was not the kind of examination that would help

23   in the search for the understanding as to the underlying

24   medical principles.  Yes, you got him, he authored a textbook

25   for lawyers, but he is also a scientist, and let's see if

1    there's a scientific basis for the particular opinion that

2    he's given.  So I would like to see the questioning focused a

3    little differently.

4          And I'm not saying that the plaintiffs didn't also

5    do some of that same kind of questioning.  I think we have an

6    adversarial system in which both sides are very used to

7    practicing, and I'm certainly not asking that you abandon

8    that but that we focus on the science here.

9          MR. ROUHANDEH:  We understand your point, and we

10   will try and do better today.  The point in that was simply

11   to show that Professor Trimble is not using an accepted

12   scientific methodology when he refers to his textbook, not so

13   much for a jury.  But we get the point, and we will try and

14   do better.

15         JUSTICE FRIEDMAN:  Thank you.

16         MR. FROMSON:  May I begin, Judge?  Dr. Blume, would

17   you please take the stand.

18                         CHERYL BLUME

19   having been first duly sworn, was examined and testified as

20   follows:

21   DIRECT EXAMINATION BY MR. FROMSON:

22   Q.   Good morning, Dr. Blume.

23   A.   Good morning.

24   Q.   Obviously, we have time constraints, and we want to

25   establish the scientific basis for your opinions here during

1    this tight time, okay?

2    A.    Okay.

3    Q.    So very briefly, I'm simply going to ask you first,

4    would you agree with me that your opinion in this case is one

5    on general causation with respect to Neurontin?

6    A.    Yes.

7    Q.    And you've rendered an opinion that Neurontin has the

8    capacity to cause suicidality?

9    A.    Yes.

10   Q.    Okay.  And did you give that opinion to a reasonable

11   degree of certainty?

12   A.    Yes.

13   Q.    All right, now, can you tell the Judges in summary

14   fashion what it is that you do for a living.

15   A.    Yes.  I direct a pharmaceutical and development

16   consulting company that helps drug companies get new drugs

17   approved by the FDA.

18   Q.    And you work with pharmaceutical companies, correct?

19   A.    Yes, yes.

20   Q.    And for how many years have you been doing that?

21   A.    Well, I've had this company for nine years, but I was in

22   the pharmaceutical industry for twenty-five years.

23   Q.    You have experience in evaluating the safety of drugs?

24   A.    Yes.

25   Q.    You do that for pharmaceutical companies?

1   A.   Yes.

2   Q.   And you do that with certain scientific bases, right?

3   A.   Yes, before approval and after approval.

4   Q.   Very briefly, what is your educational background?

5   A.   Very briefly, I have a Ph.D. in pharmacology and

6   toxicology.

7   Q.   What has your experience with neurotransmitters been?

8   A.   Worked with neurotransmitter products, both in industry,

9   with new drug applications, new drugs that impact

10  neurotransmitters; and in our private company, we also assist

11  clients who have drugs that impact neurotransmitters.

12  Q.   Okay.  And two more issues very quickly with respect to

13  your qualifications:  Do you hold any patents that are

14  applicable to this issue in this case?

15  A.   Yes.  I have approximately 30 pharmaceutical patents,

16  and about half of those deal with chemicals that impact

17  neurotransmitters or are intended for use in diseases that

18  may be impacted by neurotransmitters.

19  Q.   And are you an educator?

20  A.   Yes.  I have an adjunct faculty position at the Medical

21  Center at the University of South Florida.

22  Q.   How would you describe the manner of your contact with

23  FDA?  Daily basis, weekly basis, or something else?

24  A.   Oh, at least weekly, sometimes daily, and if we're close

25  to an approval or close to an FDA action, it can be multiple

1    times in a day.

2    Q.   And with respect to the scientific basis that

3    Justice Friedman had referenced this morning, did you apply a

4    scientific basis or a method to giving an opinion in this

5    case regarding the general causation of Neurontin and

6    suicidality?

7    A.   Yes.

8    Q.   And what was the basis?  In other words, I've put on the

9    screen here today "Guidance for Industry" published by the

10   FDA in March of '05.

11   A.   Yes.

12   Q.   It's just a cover page.  Can you tell the Judges what

13   this is?

14   A.   Well, this is the FDA's overview of instructions/

15   suggestions on how to conduct safety surveillance for drug

16   products; and it includes a method, and that is the method

17   that I used in the report.

18   Q.   All right.  And, generally speaking, summarize for the

19   Judges what it is that you do in terms of looking for

20   causation.

21               JUDGE SARIS:  So you authored that report, or you

22   just followed it?

23               THE WITNESS:  The FDA authored it.

24   Q.   Let me make sure I'm clear on it so there's no

25   confusion.  Who recommends the issues that are set forth in

1   the "Guidance for Industry"?

2   A.   Yes, as it notes here, the FDA publishes this as an

3   instruction guide, a manual for industry to follow.

4   Q.   All right, so is it generally accepted by the

5   pharmaceutical industry?

6   A.   Oh, yes.  FDA put it out.  It's accepted.

7   Q.   Do you consider it to be peer-reviewed?

8   A.   Yes.  It discusses the procedures by which the guidance

9   was put together, the input that it received from industry

10  and persons outside of the agency.

11          MR. FROMSON:  And for the Courts' benefit, if I can

12  mark one original, two for the Judges -- thank you very

13  much -- one for defense counsel, I'd ask that it be moved

14  into evidence for purposes of the hearing, your Honors.

15          (Plaintiff Exhibit 3 received in evidence.)

16  Q.   There's essentially six items that are first listed in

17  the "Guidance for Industry" at Page 17, and I want to first

18  establish that you followed those.  Is that correct?

19  A.   I did.

20  Q.   And it explains how to evaluate a safety signal,

21  correct?

22  A.   Yes, yes.

23  Q.   And explain to the Judges, what is a safety signal?

24  A.   Well, a safety signal is defined as an observation that

25  makes you think differently about the drug or suggests that

1    there might be something happening with the drug that had not

2    been observed before, either a new event or a change in the

3    magnitude or frequency of a previously observed event.

4    Q.   And in this case, with respect to Neurontin, or any

5    other drug actually, upon receiving signals, does the FDA

6    recommend or provide any basis for which you can use signals

7    to assess the degree of causality between a drug and a

8    product?

9    A.   Yes.  That slide that you had on earlier --

10   Q.   Actually, I'm sorry, let me rephrase that.  The FDA

11   allows you to make a causality assessment between a drug and

12   an adverse event in this "Guidance for Industry"

13   recommendation, right?

14   A.   Oh, yes, of course.

15   Q.   That's the purpose of the slide?

16   A.   Yes.

17   Q.   It states, "It may be possible to assess the degree of

18   causality between the use of a product and an adverse

19   event."  Did I read that correctly?

20   A.   Yes.

21          MR. BARNES:  What page, Counsel?

22          MR. FROMSON:  I believe that's Page 17.

23   Q.   And so is that a generally accepted statement in your

24   mind?

25   A.   Yes.  This is from the FDA, yes.

0301a09c-a750-4035-b5b0-dce99c568610

1    Q.   Is that generally accepted by the pharmaceutical

2    industry?

3    A.   Oh, yes.

4    Q.   All right, so in this particular case with respect to

5    Neurontin, did you consider safety signals?

6    A.   Yes.  The report was constructed to go through each of

7    those criteria outlined by FDA at various points in the

8    lifetime of Neurontin.  And because I addressed each of those

9    points, as you noted, the report is very lengthy, but that is

10   the pattern that I followed.

11   Q.   With that in mind, given that your report is lengthy,

12   can you give an executive summary of your opinions, as

13   referenced by Judge Saris?

14   A.   Yes.  There is a summary statement in the front of each

15   of the chronological sections; but basically, after reviewing

16   clinical trial data, literature, a multitude of adverse event

17   databases, both in the United States, Pfizer's internal

18   database, international databases, I concluded that at each

19   interval over the lifetime that I had reviewed the drug, that

20   there were indeed safety signals related to suicide and

21   suicide events, and events FDA considers as precursors to

22   suicide events.  And I outlined that in each section of the

23   report according to the six different criteria FDA requires.

24   Q.   And as a result of evaluating those safety signals, what

25   conclusion did you come to?  As far as providing an executive

1   summary of your opinion, please do so.

2   A.   That over time, the safety signals, there's a common

3   pattern of repeating of those signals; that there is an

4   agreement among various databases as to those signals that

5   suicide can cause -- causes suicide-related events, suicide

6   and precursor behavior to suicide.

7            JUDGE SARIS:   So could you just take me to one

8   section and show me how I can read your report in an

9   effective way.

10           THE WITNESS:   Yes, I'd love to.   Thank you.

11           Your Honors, the report is divided into four time

12  sections, and those four sections are the periods preceding

13  Neurontin approval in the early '90s.   The second section

14  which begins about on Page 18 -- and just to go back a

15  second, the first section goes through the -- very briefly,

16  it's only, I guess, about 15 pages long -- goes through the

17  data generated prior to approval that should have put Pfizer

18  on notice, including FDA's comments prior to approval that

19  they had picked up the incidences of depression in those

20  trials -- and those were just epilepsy trials -- and that FDA

21  noted that might be a concern with relating to suicide

22  events.   So that was sort of the first signal.

23           The next time period begins on Page 18, and this is

24  the post-marketing period between 1994 and 1996, and I

25  outline the reasons that I pick that period.   And if you go

1    step by step, it's following the FDA's pattern.  And the

2    first thing that I did was look at new data in clinical

3    trials, randomized clinical trials that Pfizer conducted.

4    And I start with the first type of phase one trials, which

5    are clinical pharmacology, and that's on Page 18.

6         And I note on the next page, did they see any

7    suicide-related events or precursor events in the various

8    trials, clinical pharmacology controlled trials, that

9    occurred during 1994 to 1996?  And that goes on for several

10   pages, and I outline them.  And I use the same pattern that I

11   use when I'm preparing a report for FDA.  So I pretended that

12   I was inside Pfizer summarizing their data for this time

13   point.

14        Then I moved, after I finished the pharmacology

15   trials, which are often done in healthy volunteers, as you

16   heard yesterday, if you move to Page 22, I started going into

17   clinical trials.  And during that time period, Pfizer was

18   interested in expanding Neurontin to an additional type of

19   use in epilepsy as sole therapy.  They were not successful in

20   obtaining that approval from FDA, but nonetheless the safety

21   data were important, and those are summarized in the pages

22   following the preface page on Page 22.  And, again, there is

23   a pattern within this, and I'm looking only at the

24   psychobiological events or the suicide-related terms.

25        And at the end of this section, all of these

1   individual tables are summarized together.  But if you move

2   to Page 27 --

3            JUDGE SARIS:  Wait.  So where's the summary?  I

4   like summaries.

5            THE WITNESS:  Yes.  Okay, let's see.  Let's go to

6   Page 46.  At this point I have gone through all of the

7   clinical healthy volunteer trials and clinical trials;

8   monotherapy, additional epilepsy, and also some efforts that

9   they had initiated in children and in various psychiatric

10  conditions; but 96 is sort of the pooled-together point that

11  I went through all of those trials and tried to summarize how

12  many patients had to discontinue the trials because -- they

13  had to be dropped from the trials because they experienced a

14  serious psychological, psychobiological-related event.

15  Q.   On that point, can you summarize what the amount of

16  discontinuance was for those people who withdrew because of a

17  serious adverse event.

18  A.   Right.  During all the trials that I've talked about for

19  the previous 40 pages, it's 26 percent versus 14 percent.

20  Twice as many people receiving the gabapentin had to be

21  dropped from these clinical trials because they experienced a

22  serious psychobiological-related adverse event compared to

23  placebos.

24  Q.   Let me stop you there on that point.  What paragraph of

25  your report is that that you're reading?

1   A.   Sorry, 96.   Paragraph 96 is on Page 46.

2   Q.   Are there additional points that you would include in

3   executive summary that you can bring to the Judges'

4   attention?

5   A.   Right, and the end points that I picked in Paragraph 96

6   are not at all unique.   These are the end points we have to

7   do when we're summarizing safety data for FDA.   You have to

8   amalgam your data and then pull out certain things.   Deaths

9   are one thing they want to know.   They want to know serious

10  adverse events that patients had to be removed from the

11  trials.

12          Another thing that they're interested in is the

13  tabular count of how many patients just experienced a serious

14  psychobiological event but may not have had to have been

15  withdrawn from the trial, and that's the number that I have

16  at the end of Paragraph 96, 17.3 percent versus

17  13.8 percent.

18          JUSTICE FRIEDMAN:   Excuse me.   There's a

19  difference, isn't there, between summarizing safety data and

20  subjecting it to the kind of scientific scrutiny that would

21  be required in order to draw conclusions as to causation?   Is

22  there not?

23          THE WITNESS:   Well, yes.   This represents the

24  summaries that are required for industry in order to assess

25  safety.   But it's important to remember that despite what was

1    said yesterday here, randomized clinical trials are not in

2    the picture for Neurontin when assessing suicide.  We are not

3    permitted to design clinical trials where the end point is

4    for a patient to hurt themselves.  We're not allowed to do

5    it.  The FDA doesn't permit it.  Institutional review boards

6    don't permit it.  So we can't design a trial that way.

7            Now, can we design a placebo-controlled trial with

8    epilepsy patients and look to see how many taking Neurontin

9    versus placebo commit suicide?  We could try to design it,

10   but the reality of it is, the government says the background

11   rate of suicide in Americans is one in 10,000.  If you do the

12   calculations of how big that epilepsy trial would have to be,

13   the Pfizer documents suggest it would have to be anywhere

14   from 50,000 and 300,000 patients in an epilepsy trial that

15   would allow you to find a significant difference in suicide.

16   Q.   May I stop you for a moment, all right?  There's been

17   testimony at your deposition and inquiry by defense counsel

18   that in the past, in other cases you have testified, in sum

19   and substance, that the gold standard for determining

20   causation is a randomized placebo-controlled trial.  Now,

21   here you've just told the Court they don't have that for

22   Neurontin, and you're basically saying it's because it would

23   be unethical to do it, and you would need too many people to

24   even try.  Am I right?

25   A.   Randomized clinical trial, if you can design a trial to

1  look for a benefit and detect an adverse event in a clinical

2  trial, that's a gold standard.  But with Neurontin, you can't

3  conduct such a trial.

4  Q.  For continuity then, take a look at the screen.  All

5  right, in the absence of a randomized placebo-controlled

6  trial for suicide, which is the case here, what can you do to

7  assess causation, and does the FDA say that this is a

8  generally accepted method?

9  A.  Right, just because one can't do a randomized trial to

10  look for an event doesn't mean you quit or that you ignore

11  everything else.  FDA gives you other instructions, other

12  ways of looking for a safety signal.

13  Q.  So biological plausibility was addressed by Dr. Trimble

14  yesterday, right?

15  A.  Yes.

16  Q.  And do you accept his opinion in this case on the

17  biological plausibility?

18  A.  I do, and it's also outlined in my report.

19  Q.  And as far as the next issue, a dechallenge/rechallenge,

20  explain very briefly what a dechallenge/rechallenge is,

21  particularly in the confines of a clinical trial.

22  A.  Yes, FDA as well as independent publications have

23  written about this phenomenon of dechallenge/rechallenge, and

24  it seems very simple, but it's powerful and reliable because

25  the person is its own control, your own control.  And what it

1   means is, if a person in a trial is given a drug, and you

2   observe an adverse event, and you take the drug away -- in

3   other words, you dechallenge that patient-- and the bad

4   event, the adverse event disappears or gets much less, that's

5   called a positive dechallenge.

6          If you follow that by readministering the drug to

7   the patient -- in other words, you rechallenge them -- and

8   that effect comes back again, then that is called the

9   positive rechallenge; powerful reliable data because the

10  person is its own control.

11  Q.   Let me stop you there.  So biological plausibility,

12  dechallenge/rechallenge.  The third one is epidemiology.

13  A.   Yes.

14  Q.   Meta-analysis.  Would that be another way, in the

15  absence of a randomized placebo-controlled trial with an end

16  point of suicide, to address causation in this case?

17  A.   Of course.  One of the few ways you could do it.

18  Q.   And obviously the FDA did that and came out with the

19  alert in 2008.  Would you agree that the FDA alert and the

20  statistical review promulgated by the FDA is generally

21  accepted?

22  A.   Of course.

23          JUDGE SARIS:  Wait, wait.  Generally accepted by

24  whom?

25          THE WITNESS:  By the pharmaceutical industry.

1          JUDGE SARIS:  Well, I mean, they've got to, but, I

2     mean --

3          THE WITNESS:  Exactly.

4          JUDGE SARIS:  -- is it considered good science?

5          MR. BARNES:  Objection, your Honor, for a moment.

6     She's speaking on behalf of the pharmaceutical industry, and

7     she's not --

8          JUDGE SARIS:  I agree.  I'm just saying, would it

9     be accepted by the scientific community as a valid

10    epidemiological study?

11         THE WITNESS:  Yes.

12    Q.   And, lastly, are post-marketing case reports also

13    helpful in corroborating causation for general causation

14    purposes?

15    A.   Absolutely.

16    Q.   Okay.  And is that also considered part of the "Guidance

17    for Industry" that we looked at earlier?

18    A.   Absolutely, required.

19         JUDGE SARIS:  Let me ask you this:  On the FDA

20    alert -- you know so much about the FDA -- is that a final

21    alert, or is there an appeal process?

22         THE WITNESS:  I'm not aware of any appeal process

23    for that.

24         JUDGE SARIS:  So if Pfizer, for example, disagreed

25    with it, is there any way of having a hearing or challenging

1    the findings?

2              THE WITNESS:  My understanding is, that's already

3    occurred.  Pfizer has met with the FDA between the first

4    announcement and the final announcement and presented their

5    own independent data.

6              JUDGE SARIS:  When was the final announcement?

7              THE WITNESS:  Well, the review of the statistical

8    plan that came out.  Pfizer met with the FDA after the

9    initial alert, shared with FDA their concerns with the data,

10   reanalyzed the data; and when FDA published their final

11   statistical findings, FDA had already incorporated and

12   addressed the concerns raised by Pfizer.

13             JUDGE SARIS:  So as far as you understand their

14   procedure, this is the final alert?

15             THE WITNESS:  Unless they've had private

16   correspondence with Pfizer, that is my understanding, is that

17   FDA is now going to promulgate new labeling requirements for

18   the antiepileptic drugs addressing suicide.

19             JUDGE SARIS:  And the other question that I had is,

20   there's a distinction between statistically significant

21   association, but they say, "But we're not opining on general

22   causation."  Is that rooted in regulations?

23             THE WITNESS:  Your Honors, in 30 years, the only

24   time I've ever heard FDA say causation for an adverse event

25   was in the case of Accutane and birth defects because all of

1    the young ladies who became pregnant had babies with birth

2    defects.  That's the only time I've ever seen it.  And the

3    regulations specifically say causation is not required for

4    adverse events.  It is specific that you don't have to have

5    it to have the adverse events in the labeling.

6    Q.   Dr. Blume, I'll take you right back to the FDA

7    analysis.  I want to confirm.  You observed and you evaluated

8    the dechallenge and rechallenge for suicidal ideation and

9    depression in this case?

10   A.   Yes.  There was a positive rechallenge in pharma-

11   clinical trial, absolutely.

12   Q.   And it was in the clinical trial, and that was

13   corroborative of your opinion in this case?

14   A.   Yes.

15   Q.   You are aware that Health Canada, a governmental

16   regulatory authority, also communicated to Pfizer that that

17   suicidality case report was also causally related by that

18   governmental authority?

19   A.   That's true, we have it from controlled clinical trial

20   and from the post-marketing data.

21   Q.   Does that corroborate your opinion?

22   A.   Yes.

23   Q.   Is it generally accepted in the scientific community to

24   rely in part and accept a governmental authority such as

25   Health Canada, even though it's foreign?

1   A.   Not only that, and it's in the scientific literature,

2   the value of the rechallenge results.

3   Q.   Okay.  Now, with respect to the recent FDA analysis --

4   and I've gone about twenty minutes, I'd like to stop within

5   the next two or three minutes and reserve some time for my

6   redirect-- with respect to the FDA analysis, why was it

7   appropriate to basically take Neurontin and pool it with ten

8   other drugs in the same class?

9   A.   Okay, as I mentioned a few moments ago, individual

10  trials would be so huge, they're not manageable, and we

11  couldn't design a trial specifically to look for suicide.

12  FDA states, if the event occurs less than one in 2,000, then

13  randomized clinical trials are not going to be available.  So

14  we have to go to other ways of looking at the data.  What FDA

15  did is, recognizing that these trials individually are not

16  going to be big enough, they pooled data across class.

17  That's in the Code of Federal Regulations to do that; it is

18  FDA's suggestions that you do that.

19  Q.   And is that a generally accepted method in the

20  scientific community?

21  A.   Yes.

22  Q.   To pool drugs in what's known as a meta-analysis?

23  A.   Right, when they're used for a common purpose or

24  according to a common chemical family.

25  Q.   And in this particular case, with respect to the

1    GABAergic drugs that the FDA analyzed, and which are on

2    Page 32 of the statistical review, do you see the relative

3    risk or basically the increased risk that was analyzed for

4    GABA drugs and which is highlighted on the screen as a 1.68?

5    A.   Yes, the GABA drugs are the four drugs from the eleven

6    that FDA put into a category called GABA, and two of them are

7    essentially gabapentin because the other one is the precursor

8    to gabapentin.

9    Q.   And the confidence interval is 1.02 through 2.88,

10   correct?

11   A.   That's correct.

12   Q.   Explain to the Judge what it means that the confidence

13   interval does not include 1, meaning it's never above 1.

14   A.   Right, if the left side of the confidence interval, if

15   it doesn't include 1, then it is considered to be

16   statistically significant.

17   Q.   And of what significance is this to you in determining

18   and corroborating your opinion that Neurontin has the general

19   capacity to contribute or cause suicidality?

20   A.   Well, I think FDA's opinion corroborates what is in my

21   report.  I mean, I looked at different drugs in this report,

22   compared them with Neurontin, and I think that FDA's opinion

23   is that across the GABA class and across all the

24   antiepileptics, there is an increased risk that's especially

25   evident in the GABA category.

Page 132

1          MR. FROMSON:  Thank you very much.

2          JUDGE SARIS:  Let me ask you this:  It turns out

3     that -- well, at least Pfizer's position is that all these

4     GABAs work in different ways.  Is that right?

5          THE WITNESS:  That's my understanding.

6          JUDGE SARIS:  Do you agree that the GABAs do work

7     in different ways?

8          THE WITNESS:  I think there are some differences

9     between them, but FDA categorizes them together because they

10    all chemically elevate the brain GABA levels.

11         JUDGE SARIS:  I was actually trying to learn the

12    biochemistry of this, and I got hopelessly lost, but some of

13    them go into some kinds of -- go into different locations,

14    they target different parts of the synapse, right?  Calcium

15    blockers do?

16         THE WITNESS:  Well, calcium blockers, right.  Some

17    of them also, GABA included, can impact -- they can impact

18    transmitters by acting on the calcium -- they can bind to a

19    site that acts on the alpha(2)delta calcium subunit, but it

20    also impacts transmitters.

21         JUDGE SARIS:  So in different ways?

22         THE WITNESS:  Yes, in multiple ways, it leads to

23    increases in GABA levels.  But the point is, it increases

24    GABA levels.

25         JUDGE SARIS:  All right, and so their point is,

1    though, that's not fair because at least one of their experts

2    says, aha, that's the difference as to whether or not it's

3    going to have an effect on serotonin.  Do you agree with

4    that?

5            THE WITNESS:  Well, I agree that all of them

6    increase GABA and all of them decrease serotonin.  And

7    perhaps there are fine differences in the way in which they

8    get to those points, but I don't know of any evidence that

9    supports their view that because there are these small

10   differences, that is evidence of causation or lack of

11   causation.

12           JUDGE SARIS:  And when you say that they all

13   decrease serotonin, what are you relying on?

14           THE WITNESS:  Well, I have cited several articles

15   in my report.

16           JUDGE SARIS:  Page, because this is a mega report?

17           THE WITNESS:  Okay.  Well, let me see.  I do it in

18   several places.  And I would also rely on the information

19   that Dr. Trimble provided yesterday.

20           Of course, Page 84 summarizes very briefly

21   Neurontin preclinical studies, but I'm looking specifically

22   for a section that does the biochemical mechanisms.

23           MR. FROMSON:  Your Honor, I would also respectfully

24   bring your attention to Page 184 which pertains specifically

25   to defendants' "mechanisms of action" language and statements

1   from the internal records regarding defendants' --

2         JUDGE SARIS:  No, no, I'm asking her.  I mean, this

3   is the heart of their dispute, that it was not appropriate to

4   pool because there's a different mechanism of action.

5   Everyone agrees, as I'm understanding it, that the amount of

6   GABA goes up.  Everyone agrees that a decrease in serotonin

7   causes depression.  But they're claiming that their drug is

8   not -- there's no good evidence, leads to the decrease in

9   serotonin because it acts differently from some of the

10  others, and it was inappropriate to pool, if I'm

11  understanding the heart of where the dispute is.  And so I

12  just want to know what you're relying on to say that it

13  doesn't matter what site it hits as to whether or not it

14  involves a decrease in serotonin.

15         (Witness examining document.)

16         JUDGE SARIS:  This may not have been your task.  If

17  that's so, just tell me.

18         (Witness examining document.)

19         THE WITNESS:  I mention some studies that look at

20  brain areas, but I don't think I -- in fact, I really hadn't

21  specifically heard that defense until I heard Pfizer say it.

22         JUDGE SARIS:  Do I have that basically right?

23         MR. SAYLER:  Your Honor, our position is, with

24  regard to GABA, the Petroff article that was cited

25  demonstrated that Neurontin caused an increase in whole-brain

1    GABA; that there's no evidence that Neurontin increases the

2    amount of active GABA in the human brain, and Dr. Taylor will

3    address this more in detail.

4           As to the serotonin issue, there is no reliable

5    data that Neurontin causes abnormal decreases in serotonin

6    levels.  Only when serotonin levels are hyperexcited does

7    Neurontin normalize serotonin levels.  That's our position.

8    And Dr. Taylor will describe --

9           JUDGE SARIS:  So, anyway, Dr. Trimble disagrees,

10   and the question is, do you disagree, and if so, is there

11   peer-reviewed literature that would support your position?

12          THE WITNESS:  I didn't specifically address the

13   different brain areas.  I did note that the Pfizer product,

14   the precursor product to this, which is when you take it,

15   when you take their precursor product, it converts itself to

16   gabapentin; and the insert for that product does discuss the

17   gabapentin and serotonin changes and says that Neurontin and

18   their other product works essentially the same, are

19   essentially the same products.

20          JUDGE SARIS:  Say that again?  What other product?

21   This is the new one we heard of for the first time with

22   Gibbons?  Is that what you're referring to?

23          THE WITNESS:  No.  There are two products that

24   Pfizer manufactures for epilepsy.  One is gabapentin.  Let me

25   see where the other one is on here.  Pregabalin is the other

1   one, and pregabalin is converted in the body to gabapentin.

2   It's a precursor product to gabapentin.  And if you look at

3   the labeling, it's a newer product, much newer product, and

4   it discusses in the labeling similarities between the product

5   and any influences on GABA and on serotonin.

6          JUDGE SARIS:  As I understand, your primary task

7   here was to go through the mounds of data, which you did in

8   this voluminous report, and do the signal points at different

9   points in time.

10          THE WITNESS:  They asked me to assume that I would

11  have had all these data available to me, and as an inside

12  pharmacovigilance tracking safety, when did these signals

13  occur, did they occur, and was there a consistency across

14  time and across databases?  And it's critical for a drug such

15  as Neurontin because there is no randomized controlled data

16  going to be helping us.  We have to rely on these others

17  because that's all we'll have.  And that's what I did, I

18  relied on the other aspects.

19          JUDGE SARIS:  All right, thanks.  So your job was

20  not to do the mechanism of the drug?

21          THE WITNESS:  I I discuss the mechanisms because I

22  have to have a biological plausibility to be able to place

23  value on rechallenged data or on the safety databases that

24  Pfizer maintains or the government maintains, World Health

25  Organization maintains.  So I did address that there's a

1   biologic plausibility to be worried about potential adverse

2   events and if those psychobiological adverse events can

3   progress to suicide-related events.  I don't believe that's

4   in dispute.  The issue of gabapentin being able to cause

5   depression and that being a potential precursor was written

6   by the FDA in their very first review.

7           JUDGE SARIS:  I've hijacked this a little bit, but

8   did you want to ask anything else before we go to cross?

9           MR. FROMSON:  She raised an issue with the FDA

10  review in 1992.

11  Q.   And they said what?  I can read it.  Did you have this

12  as a signal when you reviewed the issues in this case, that

13  the FDA said "Less common but more serious events may limit

14  the drug's widespread usefulness.  Depression may become

15  worse and require intervention or lead to suicide, as it has

16  resulted in some suicide attempts"?  Did you have this?

17  A.   Yes.  I quote this.

18  Q.   Doesn't that corroborate your opinion?

19  A.   Yes.  It's the signal at the very beginning.

20  Q.   And the FDA wrote that?

21  A.   That's an FDA document.

22  Q.   And you included gabapentin in the GABAergic drugs the

23  same way the FDA has done so, correct?

24  A.   Yes.

25  Q.   And you concluded that Neurontin contributed to

1    suicidality just as FDA included it in its analysis to say

2    that there's an increased risk of suicidality, right?

3    A.   Yes.  I concluded that before the FDA release came out,

4    but certainly the FDA release is corroborative.

5    Q.   If anything, you got it right?  The FDA says you got --

6              JUDGE SARIS:  No, no, no.  So I want a set of your

7    slides, okay?  One for each of us and one for the court

8    records?

9              MR. FROMSON:  Yes, your Honor.  Unfortunately, I

10   finished it this morning in the courtroom, so I'll have to

11   get you a fresh copy.

12             JUDGE SARIS:  So you had a good night's sleep?

13             MR. FROMSON:  No, I did not.

14             JUDGE SARIS:  All right, but you'll get us a copy?

15             MR. FROMSON:  Yes.

16             JUDGE SARIS:  All right, thank you.

17             MR. BARNES:  Is counsel done?

18             MR. FROMSON:  Yes.

19             MR. BARNES:  Thank you.  Your Honor.

20             JUDGE SARIS:  And you're Mr. Sayler?

21             MR. BARNES:  Rick Barnes.

22             JUDGE SARIS:  Oh, Barnes.  We've got an old list

23   here.  All right.

24             MR. BARNES:  Just real quickly, I just want to

25   correct for the record, the position of our client is that

1    the alert is not a final determination, that there will be --

2              JUDGE SARIS:  That what is?

3              MR. BARNES:  That the safety alert is not a final

4    determination of the agency.  There's going to be a hearing

5    in July.  There will be proposed labeling.  I don't want to

6    spend a lot of time on it, but I don't think it was

7    accurately summarized by the witness.

8              JUDGE SARIS:  Well, maybe she didn't know.

9              MR. BARNES:  I know.  I mean, I'm not trying to say

10   that.  Just that's our client's position.

11             THE WITNESS:  Okay, but the FDA's position is that

12   the purpose of the hearing is to discuss the new labeling

13   changes relating to suicide.  I do not believe the purpose of

14   the hearing is to readdress whether there is an increased

15   risk of suicide, but rather how to best convey that to

16   physicians so that they may then convey it to their patients.

17             JUDGE SARIS:  Okay, I understand it, and I have not

18   yet -- FDA knows about us.  As we're speaking, they're trying

19   to figure out what to do about us.  So I don't actually know

20   whether they're going to come into the hearing, as I've

21   invited them to do, so maybe we'll hear from them

22   eventually.  I hope so actually.

23             All right, go ahead.

24             MR. BARNES:  Thank you.

25             JUSTICE FRIEDMAN:  Before you do, Mr. Barnes, is

1   there any disagreement with Dr. Blume's statement just now

2   that the purpose of this hearing in July is just going to be

3   to discuss the labeling and not to reevaluate or to

4   scrutinize the scientific findings?

5            MR. BARNES:  I will answer that.  I want to be very

6   precise when I answer that.  On break I will formulate a

7   response, okay?

8            JUSTICE FRIEDMAN:  Okay.

9   CROSS-EXAMINATION BY MR. BARNES:

10  Q.   Good morning, Dr. Blume.

11  A.   Good morning.

12  Q.   We've spent some time together at a deposition in

13  November.

14  A.   Two days, yes.

15  Q.   Yes, ma'am.  I want to direct you to, and I'll go to the

16  Elmo here, but the next defense exhibit I'd like to mark, an

17  article you cite in your report by Dr. Ben-Menachem which was

18  referred to yesterday.  If I can pass up two copies for the

19  Court.

20           THE CLERK:  One original and two copies.

21           MR. BARNES:  Okay, I think this does it.

22  Q.   And specifically, Dr. Blume. . .

23  A.   Mr. Barnes, do you have a page where I cite this?

24  Q.   Yes.  You cite this article on Page 129 of your report.

25           MR. BARNES:  And if I could give this to the

1    witness and maybe it would help her out to. . .

2    Q.   I've marked a piece of the abstract for you.  Dr. Blume,

3    you cited it at Paragraph 129 of your report, correct?  I

4    just want to show you -- I don't want to spend a lot of time

5    on it, but --

6              JUDGE SARIS:  You know, I'm at Page 129.  I'm

7    trying to find the citation to it.

8              MR. BARNES:  Paragraph 129.

9              JUDGE SARIS:  Oh, Paragraph 129.

10             MR. BARNES:  Yes.  I'm sorry, your Honor.

11   Q.   Now, you were in the courtroom yesterday when

12   Dr. Trimble discussed this article, correct?

13   A.   I believe so.

14   Q.   Yes, and I want you to just -- I want to read something

15   to you, if I can get this better focused for you.  It says

16   that "The results of this study indicate that there were no

17   changes in selected amino acids HVA or 5-HIAA after

18   gabapentin treatment," correct?

19   A.   Yes.

20   Q.   You cite this in your report, correct?

21   A.   Well, I think if you look at what I say, I say that

22   rather "Relevant adverse events:  None mentioned."  So I

23   agree.

24   Q.   Okay, you agree.  And so the findings of this report

25   actually demonstrated that the critical metabolite of

1   serotonin, 5-HIAA, did not change after gabapentin treatment

2   for up to three months.  That's what this article represents

3   in your report?

4   A.   Mr. Barnes, I'm not arguing.  I presented all of the

5   literature --

6   Q.   You have to speak up because I'm across the room.  Go

7   ahead.

8   A.   I'm not arguing.  My goal on this section, as you note

9   on Paragraph 129, was to present all the preclinical studies

10  that occurred during the time frame that I showed, and

11  there's literature in here that goes both ways because I

12  reported it all, and I included in this one and specifically

13  noted that no specific events were noted.

14  Q.   No specific events were noted, and no change in

15  serotonin was noted either, correct?

16  A.   Based on the discussion I heard yesterday, I believe so,

17  yes.

18            JUDGE SARIS:  Well, how do you explain this?

19            THE WITNESS:  Well, because in this I describe the

20  articles that show an increase in serotonin and those that

21  don't.  And from my understanding of the discussion

22  yesterday, that there are multiple reasons why some studies

23  may not show a change in serotonin, including the time and

24  duration at which the patient or subject was given the drug

25  because there is an immediate burst of serotonin and then a

1  waning as additional drug is taken.  I understand that.  And

2  I understand it's also dependent on the number of

3  observations and the ability to detect a difference based on

4  the number of observations.

5           JUDGE SARIS:  So which one of these articles do you

6  cite would say something else, that would show that there was

7  a decrease in serotonin metabolites?  Are there any in

8  there?

9           THE WITNESS:  That show an increase -- well, let me

10  go back --

11           JUDGE SARIS:  That show a decrease in serotonin

12  from the gabapentin.

13           MR. BARNES:  Can I tighten your question up a

14  little bit?

15           JUDGE SARIS:  Feel free.

16           MR. BARNES:  No, it's a good question.

17  Q.   Isn't it true, Dr. Blume, that there are no human

18  studies that measure a --

19           JUDGE SARIS:  Wait, wait, wait.  I just want to

20  know, what do you cite for your support?  And then I'll let

21  you ask your question to distinguish between animal and

22  human.

23           THE WITNESS:  In Paragraph 292, I note that

24  Neurontin reduces the release of monamine transmitters and

25  action that's implicated in pathophysiology.  Footnote 136 --

1            JUDGE SARIS:  Wait.  I'm not, obviously, as

2       familiar with this as you, so let me get to 292.

3            THE WITNESS:  Which is on Page 184.

4            JUDGE SARIS:  Yes.  So what's --

5            THE WITNESS:  And I cite in the bottom of the page

6       136, a Pfizer document that I think was discussed yesterday

7       regarding the whole-brain spectroscopy, and also the report

8       comments of Dr. Taylor.  And if you go --

9            JUDGE SARIS:  Wait.  Where does it say anything

10      about serotonin in there?

11           THE WITNESS:  Well, I'm talking about the

12      transmitters.  If you go to Paragraph 292, I talk about

13      "reduces the release of monoamines," and I specify that I'm

14      discussing serotonin and norepinephrine.

15           JUDGE SARIS:  Yes, but where's the study that says

16      that?

17           THE WITNESS:  Well, I cite two documents at the

18      bottom.  I cite one of the studies that was discussed

19      yesterday, the whole-brain study, and then I discuss the

20      report of Dr. Taylor.

21           MR. BARNES:  We'll have Dr. Taylor here to discuss

22      that directly.  Let me make sure we -- can I ask?  I don't

23      want to interrupt you.

24           JUDGE SARIS:  All right, now you can ask your

25      question.

1    Q.    Dr. Blume, isn't it true that in the Ben-Menachem study,

2    they actually look for the metabolite of serotonin in the

3    cerebrospinal fluid to see if there were any changes,

4    correct, direct measurement?

5    A.    Yes.   That is my understanding.

6    Q.    And there is no human study that you cite in your report

7    that demonstrates a decrease in serotonin following the

8    administration of gabapentin; isn't that correct?

9                (Witness examining document.)

10   A.    I believe that's correct, in these two articles.

11   Q.    Okay, that is correct, okay.   And in fact isn't it true

12   that no study in animal or humans shows that Neurontin has

13   any effect on monoamine transmitters, such as serotonin,

14   other than to normalize it from a hyperexcited abnormality

15   with high serotonin levels?   Isn't that when the Neurontin

16   molecule kicks in, when there's a hyperexcited state, and

17   normalizes serotonin?   Isn't that true?

18   A.    Well, I would think that would be the case with

19   epilepsy, but I'm not -- I don't agree with you.   In fact,

20   when your client did the depression studies, they did not say

21   that.   They were attempting to look at Neurontin in an effort

22   in various depression models as well.

23   Q.    Okay, so your opinion is that at least as to epilepsy,

24   what I said is true, and you have some data as to other

25   conditions?   I just want to summarize so we can move on.

Page 146

1   A.   I believe -- and, again, this is not my field, this is

2   not my area of study, and I certainly never purported it to

3   be -- but my understanding is that the hyperexcitability

4   component may be a factor in epilepsy.  But it does not

5   underlie the additional studies that your company

6   attempted, additional indications your company attempted.

7   Q.   That wasn't my question.  I move to strike it.

8        Now, I want to move on to talk about you a little

9   bit, Dr. Blume.  You've made a general causation statement

10  here and you're offering yourself as an expert witness on

11  general causation, so I want to talk to you a little bit

12  about your background, if I might, for a minute.  Dr. Blume,

13  you're not a medical doctor, correct?

14  A.   My Ph.D. is in pharmacology and toxicology.

15  Q.   So you would agree with me?

16  A.   Yes, I would agree that I'm not a physician.

17  Q.   So you're not a clinician of any sort, correct?

18  A.   No.  As I told you in my deposition repeatedly, I am not

19  a physician.

20       JUDGE SARIS:  You know what, I know you told him,

21  but --

22       THE WITNESS:  I am not a physician.

23       JUDGE SARIS:  -- this is a way of teaching us.

24       THE WITNESS:  Okay.

25  A.   Yes, I'm a Ph.D.  I'm not a physician.

1    Q.    Thank you.  And you're not an epidemiologist, correct?

2    A.    No.  My Ph.D. is in pharmacology.

3    Q.    And you've never done an epidemiological study, have

4    you?

5    A.    You mean actually conducted an epidemiology study?

6    Q.    The question is, have you ever done an epidemiological

7    study?

8    A.    I use epidemiology, of course, all the time in my work,

9    but I have not functioned as an epidemiologist and conducted

10   an epidemiology study.

11   Q.    So the answer to my question is "yes," you have never

12   done or conducted an epidemiological study as I've asked,

13   correct?

14   A.    Yes, because I'm not an epidemiologist.

15   Q.    I understand that.  And you're not even qualified to do

16   an epidemiological study, are you, ma'am?

17   A.    Oh, I don't know.  I'm not sure what the qualifications

18   are to do a study, but I have never done one yet.

19   Q.    Are you qualified to do an epidemiological study?  Would

20   you hold yourself out as having the requisite qualifications

21   to do an epidemiological study?

22   A.    Well, I've never been asked that.

23   Q.    Okay.

24   A.    I don't know.  I've never been asked by a client to do

25   an epidemiology study.

1   Q.   You've been asked that question before by attorneys,

2   have you not?

3   A.   Well, I've been asked if I'm qualified alone, but I've

4   never been asked by a client to be part of a team to do an

5   epidemiology study.  And I think, as I've told you, you

6   require a biostatistican, and I'm also not a biostatistician.

7          MR. BARNES:  Just to make the record, I will read

8   this just for impeachment, your Honor, just to move it

9   along.

10  Q.   "Question:  And you've never done an epidemiological

11  study, I take it?  Answer:  Well, only those that are

12  required for FDA procedures.  Question:  But you've never

13  done an epidemiological study yourself, have you?

14  Answer:  No.  Question:  You're not qualified to do an

15  epidemiological study, are you?  Answer:  No.  I do not work

16  for -- no, I do not do epidemiological survey work.

17  Question:  And not only do you not do it, my question was,

18  you're not qualified to do that?  Answer:  No, I'm not an

19  epidemiologist.  Question:  So I think -- I think we're

20  honing in on the answer.  You are not qualified to do an

21  epidemiological study, are you ma'am?  Answer:  No."

22          That was in the Halton case in 2003.  Do you

23  remember those questions being asked and giving those

24  answers?

25  A.   Well, I do, and I'm not an epidemiologist in 2008

Page 149

1    either.

2    Q.   Thank you.  So that's still true today.  What you said

3    in 2003 to Mr. Philbeck is still true today, correct?

4    A.   I am not an epidemiologist.

5    Q.   Now, ma'am, moving along, you're not a biostatistician,

6    are you?

7    A.   No.  I just indicated I was not a biostatistician.

8    Q.   Okay.  You mentioned the word "meta-analysis."  You're

9    not an expert in meta-analysis, are you?

10   A.   I'm not a biostatistician, so I would not hold myself

11   out to be a biostatistician reviewing a meta-analysis.

12   Q.   And you've never conducted one, correct?

13   A.   No, I have never conducted statistical analyses.

14   Q.   So as to critiquing the FDA meta-analysis or its design

15   or how it tests for heterogeneity or any of these other

16   aspects of these very complicated statistical measures, that

17   is not your field of expertise, nor would you offer that in

18   this courtroom, would you?

19   A.   No.  I would rely on the FDA's review.

20   Q.   And you would not critique it.  You could not qualify

21   it.  You just would read the review and say that's what it

22   says?

23   A.   No, I would not rely on the FDA's review process for

24   biostatistics.

25   Q.   You would not rely?

1   A.   I would not comment on it.  I would rely on their

2   review.

3   Q.   Well, in your report -- well, just one other point.

4   You've not published anything in the pier-reviewed scientific

5   literature since 1990, correct?

6   A.   No, not since I've -- no.

7   Q.   You would agree with me?

8   A.   Yes, I would agree.

9   Q.   Thank you, thank you.  And in your report -- will you

10  put up Slide 39, please -- one of the things you say in your

11  report at Page 194 -- ma'am, do you recognize -- you have it

12  on your screen.  You recognize this plot, correct?

13  A.   Yes.

14  Q.   That was prepared and put into your report, correct?

15  A.   Yes.

16  Q.   And this is what you call a "Proportional Reporting

17  Ratio," correct?

18  A.   Yes, the title is, yes.

19  Q.   It's a measure of disproportional reporting of adverse

20  events, correct?  That's what "proportional reporting ratio"

21  means?  It looks at disproportional reporting, correct?

22  A.   Well, it can look at disproportional.  It can look at

23  proportional rating as well.

24  Q.   Okay, well, this is something that I want to talk to you

25  about briefly about your qualifications.  You did not prepare

1    this slide, this analysis, did you?

2    A.   No.  Mr. Altman did.

3    Q.   As a matter of fact, this analysis was done in its

4    entirety by Mr. Altman, correct?

5    A.   Correct.

6    Q.   And you just put what Mr. Altman prepared and put it

7    into your report, and it's on Page 194, correct?

8    A.   Yes.  Mr. Altman prepared this slide.

9    Q.   Now, Mr. Altman is seated at counsel table next to

10   Mr. Rouhandeh, correct?

11   A.   Well, I don't know Mr. Rouhandeh, but Mr. Altman is

12   sitting at the table.

13   Q.   And Mr. Altman is an employee of the Finkelstein law

14   firm, correct?

15   A.   That's my understanding.

16   Q.   Now, you are using this plot as evidence of causation to

17   support -- as supporting your opinion of general causation,

18   as I understand your testimony and your declarations,

19   correct?

20   A.   Yes.  FDA requires us to look at and compare drugs in a

21   class, similar to what they did in their meta-analysis  --

22   Q.   Just "yes" or "no" would be fine.  I'm just trying to

23   lay a foundation.

24   A.   I was just trying to explain.

25   Q.   Well, you're not --

1  A.   Well, they were asking to be educated.

2  Q.   Well, I will direct the questions, and you may answer my

3  questions "yes" or "no," okay?  If you have to explain, if

4  you really need to explain, the Court will interrupt me.

5        Now, I want to ask you about Mr. Altman's

6  participation.  You understand that Mr. Altman has been in

7  active participation in this litigation in behalf of

8  plaintiffs, correct?

9  A.   Yes.

10 Q.   And knowing that, wouldn't you agree that Mr. Altman and

11 his employees have a financial interest in the outcome of

12 this litigation?

13       JUDGE SARIS:  You know, this isn't a jury.

14       MR. BARNES:  Well, no, I understand, but, your

15 Honor, it goes to her autonomy as an expert witness and

16 having a law firm prepare a general causation report

17 wholesale.  May I make a proffer?

18       MR. FINKELSTEIN:  This is ridiculous, Judge.  It's

19 absolutely --

20       JUDGE SARIS:  I mean, if you want to use your hour

21 this way.  I'd much prefer to get to the science.  We keep

22 harping on that.

23       So let me just understand this chart.  A PRR is a

24 proportional reporting ratio?  What does that mean?

25       THE WITNESS:  If I want to compare two drugs and

Page 153

1    see if one drug is different than another one in causing a

2    bad effect, one way I can do it is to say, okay, for Drug A

3    I'm going to divide its bad effects by the total number of

4    effects that that drug has; and then I'm going to compare

5    drug B, how many bad effects does it cause divided by its

6    total number of adverse events?  So if one causes 10

7    headaches out of 100, it would be 10 over 100.  If the other

8    one causes 7 headaches and they have 100, it would be 10 over

9    100 versus 7 over 100.  And by doing that, you can say, in a

10   common family of drugs, is there a difference in the

11   percentage of headaches reported with one drug compared to

12   the other?  It's a simple way of comparing across families.

13   And if you divide the one ratio by the other ratio, it's

14   called a PR ratio.

15          JUDGE SARIS:  And all these numbers on the bottom

16   on the X axis, what do those denote?

17          THE WITNESS:  Those represent different points in

18   time of adverse events collected.  So one of the things that

19   I tried to do --

20          JUDGE SARIS:  Oh, so it says 1998, 19 -- so those

21   are dates?

22          THE WITNESS:  Yes.  They're reporting periods for

23   these data, yes.

24          JUDGE SARIS:  And I guess what you're being

25   criticized for is that you yourself didn't go through to make

1  sure, to use your analogy, that there was a headache?

2  Mr. Altman did that?

3          MR. BARNES:  I'm sorry, your Honor, I didn't hear

4  your question.

5          JUDGE SARIS:  You yourself didn't go through each

6  adverse report and determine whether there was a headache, to

7  use your metaphor?

8          THE WITNESS:  Mr. Altman filtered the FDA database

9  to generate these data.  And the reason I used him is, he

10  does the same work for me when I'm submitting applications to

11  the FDA.  FDA has reviewed his work in this manner, has

12  approved new drugs based on his work.  So because FDA has

13  found his material acceptable, I also use it for this work.

14          JUDGE SARIS:  So how much of it is subjective in

15  this kind of analysis?  In other words, if someone says they

16  have a headache, is that used as a proxy for depression?

17          THE WITNESS:  No, it's not subjective because we

18  use the terms exactly as they appear in the FDA's database.

19          JUDGE SARIS:  So the FDA database will say

20  "depression" or "suicide"?  What did you use to generate

21  these numbers?  What adverse -- what did you call them,

22  substitute end points?

23          THE WITNESS:  I did not use those in this database,

24  your Honor.  If you look at the top of the table, these

25  represent the high-level terms in the database of suicidal

1    and self-injurious behavior.

2            JUDGE SARIS:  And suicidal is suicidal attempts,

3    completions?

4            THE WITNESS:  Yes.

5            JUDGE SARIS:  And suicidal ideation?

6            THE WITNESS:  Yes.

7            JUDGE SARIS:  And self-injurious means, would that

8    be like cutting?

9            THE WITNESS:  Yes.  FDA defines a series of

10   self-injurious behaviors.  It would include that as well,

11   yes.

12           JUDGE SARIS:  So you've taken whatever the FDA has

13   said?

14           THE WITNESS:  How FDA has coded the database.

15           JUDGE SARIS:  So assuming for a minute --

16           MR. BARNES:  A couple of points.  I'll just proffer

17   what my concern is.  Dr. Blume is using a method, as she has

18   described it up here, where Mr. Altman has been -- this

19   method, this approach has been specifically excluded in a

20   prior case as being unreliable on issues of --

21           JUDGE SARIS:  No offense to him.  Isn't it like

22   asking my secretary, "Take everything from the reports that

23   says suicide or self-injury, and, like, type it in"?  I mean,

24   no offense to him, but, I mean, isn't that what we're talking

25   about?

1           MR. BARNES:  Not at all.  Not at all.  Not at all.

2     And let me tell you -- let me just --

3           MR. FINKELSTEIN:  We submitted this, your Honor.

4           JUDGE SARIS:  Well, let me ask you.  Is that your

5     understanding of what it is?

6           THE WITNESS:  The FDA adverse event database is a

7     huge database that requires filtering across its various

8     hierarchy terms.  My understanding is that Mr. Altman has

9     developed a method, has a method to filter those, and that's

10    what he does.  There is no subjective interpretation.  We use

11    the terms as FDA defines them.

12          MR. BARNES:  Your Honor, I'll make a proffer here.

13    Even under the method -- and I'll show you in the

14    pharmacovigilance document -- all this -- assume this is in

15    fact what they are purporting it to be.  All it is is

16    evidence of a signal.  It is explicitly prohibited to be

17    considered on issues of causation by the very document they

18    cite, the pharmacovigilance document in 2005, and I can show

19    it to you.

20          JUDGE SARIS:  Maybe.  I just wanted to understand

21    your point about Altman.

22          MR. BARNES:  The point about Mr. Altman is that --

23          JUDGE SARIS:  I got the whole thing now, okay.

24          MR. BARNES:  I will give you a cite on this point

25    that I think is important.  It's In Re:  Meridia Products

Page 157

1    Liability Litigation, 328 F. Supp. 791, and the Court held

2    after a similar hearing, "Even readers with only a casual

3    understanding of statistics can recognize that this evidence

4    does not speak to the issue of causation, and therefore

5    cannot create a genuine issue of causation --"

6            JUDGE SARIS:  Excuse me.  That's a legal argument.

7    We'll get to that.  I just want factually I understand the

8    dispute, so why don't we just move on.

9            MR. BARNES:  Okay.

10           JUSTICE FRIEDMAN:  I would like to ask Dr. Blume a

11   question.  Are you currently involved in obtaining approvals

12   for pharmaceutical products from the FDA?

13           THE WITNESS:  Absolutely.  Our last approval was in

14   February of this year.

15           JUSTICE FRIEDMAN:  And this was not for -- it had

16   nothing to do with any litigation?

17           THE WITNESS:  No.  Eighty percent of our practice

18   is devoted to working with pharmaceutical companies with FDA.

19           JUSTICE FRIEDMAN:  And when you submit these

20   approvals, you are working with FDA directives or regulations

21   that tell you what you have to submit, correct?

22           THE WITNESS:  Yes.

23           JUSTICE FRIEDMAN:  But you are not making findings

24   of causation, are you?

25           THE WITNESS:  As I noted earlier, our Code of

1   Federal Regulations specifically notes that causation isn't

2   required.  In fact, causation is not required for product

3   effectiveness, so it's certainly not required for product

4   safety.

5            JUSTICE FRIEDMAN:  No, I understand that, and I

6   recall that testimony, but it is not part of what you do in

7   your regular course of business outside of litigation to make

8   assessments of causation, is it?

9            THE WITNESS:  If we have a study, a randomized

10  clinical trial study, that shows the drug has a significant

11  improvement in whatever we're looking at over placebo, we

12  will say that it appears that this drug is associated with a

13  clinical improvement.  If it's statistically significant, you

14  can argue that it caused that improvement, the drug was

15  responsible for that improvement.

16           JUSTICE FRIEDMAN:  But you're not making the

17  determination as to whether the individual studies are

18  statistically significant, are you?

19           THE WITNESS:  Well, we have a biostatistician who

20  does that.

21           JUSTICE FRIEDMAN:  You're calling them to the

22  attention of the FDA, but somebody else is determining their

23  statistical significance?  Is that correct?  You just said

24  there's a biostatistician?

25           THE WITNESS:  Yes, we have a biostatistician who

1   runs the statistics.  And then our disks, our tapes,

2   statistical tapes, are submitted to FDA along with our

3   applications; and FDA statisticians use our tapes to either

4   confirm, or if they have a question, to ask us a question.

5            JUSTICE FRIEDMAN:  Thank you.

6   Q.   One other point.  Approvals in your line of work are

7   based upon randomized controlled clinical trials, correct?

8   A.   Well, if it's possible to do them, yes, they are.

9   Q.   And every one of your new drug applications has been

10  supported by randomized controlled clinical trial to get

11  approval?

12  A.   While I was still at Mylan, we did an orphan drug where

13  it was not permitted to allow patients to have a placebo, so

14  that NDA, of course, could not be based upon a

15  placebo-controlled trial.  But other than cancer trials, AIDS

16  types of trials, orphan drugs, most of them are

17  placebo-controlled.

18  Q.   Randomized controlled trials, right?

19  A.   Well, yes, if it's possible to do it, it is the gold

20  standard for effectiveness.

21            JUDGE SARIS:  Do you have any explanation about why

22  Neurontin jumps up so dramatically?

23            MR. BARNES:  Well, that's what I want to talk

24  about, okay?

25            JUDGE SARIS:  If you can just go back one second.

1          (Discussion off the record.)

2          JUDGE SARIS:  So do you have any idea what happened

3     in 1999 that made that shoot up so dramatically off of a

4     zero, almost of a zero base?  Is that when it started getting

5     marketed in a different way?

6          MR. BARNES:  Let me direct some examination.  I

7     think I can teach you through this.  Let me make a proffer.

8     This is not even -- this is an incident.  This is a

9     percentage.  It's not a proportion.  What this represents is

10    a percentage of this higher-level term as the percentage of

11    the entire adverse event database.  And so it's graphed over

12    time, and it's based upon spontaneous adverse event reports,

13    and it's used to generate to see if there is a signal, and

14    there are lots of -- I want to talk about the method and its

15    criticisms.

16         JUDGE SARIS:  Yes, but I'm just asking.  I mean,

17    it's dramatic, actually.  I just focused on it.  Why does it

18    suddenly shoot up for Neurontin?  Do you know?  I mean, if

19    you don't know, you don't know.  I'm not asking you.  I'm

20    just asking Dr. Blume.  Do you know?

21         THE WITNESS:  Oh, I'm sorry.  I thought you were

22    talking to him.  Several things happened.  There was new

23    terminology put into the database, and also there was a

24    publication.

25         JUDGE SARIS:  A new terminology, all right, so they

1   were capturing more data?

2           THE WITNESS:  Right, they were capturing more, and

3   there was a publication regarding Neurontin-related

4   intentional overdoses.

5           MR. BARNES:  There was a Poison Center Control

6   Report that at this time basically dumped in about 22

7   reports.  It's a literature report, and it just came in at

8   one time.

9           JUDGE SARIS:  All right, okay, so that explains

10  that, and then it sort of slowly creeps up and then jumps

11  again.  What happened there at around -- now that I'm seeing

12  the dating that you used, in around March 31, 2002, maybe a

13  little later, it jumps, starts going a steep incline again.

14  Do you know why?

15          THE WITNESS:  I'm turning to that section right

16  now.

17          MR. BARNES:  Your Honor, what statement are you

18  concerned with?

19          JUDGE SARIS:  You can see it right there.  It looks

20  like Mount Everest at the tail end there.

21          MR. BARNES:  Right here?

22          JUDGE SARIS:  Yes.

23          MR. BARNES:  There's a dispute about publicity bias

24  and when it was created.  There was widespread advertising

25  that began in 2003 and publicity.

1            JUDGE SARIS:  So that's your view.  Anyway, let me

2    just say, Dr. Blume, I don't want to take his time.  Do you

3    have a ready explanation for that?

4            THE WITNESS:  I'm looking to see it now, and I

5    don't think the publicity was until the second half of 2003.

6    I think those are the dates in which there was actually an

7    impact of publicity.  Just one second.  I'm looking right now

8    to see if I have specifically cited. . .

9            JUDGE SARIS:  Anyway, if you see it later on, let

10   us know.  Maybe you can find it for redirect.  I don't want

11   to take his time to do it.

12           MR. BARNES:  Thank you, your Honor.  I've just

13   offered another exhibit into evidence.  I guess it's Defense

14   Exhibit No. 3.

15           (Defendant Exhibit 3 received in evidence.)

16           MR. BARNES:  Now, your Honors, I want to direct

17   your attention to the first paragraph.  This is an exchange

18   of correspondence between Dr. Hauben of Pfizer and Dr. Brian

19   Strom.

20   Q.   I think we can agree, Dr. Blume, that Dr. Brian Strom is

21   a recognized authority in pharmacovigilance in the United

22   States, correct?

23   A.   I do cite his book.

24   Q.   So you would agree, and --

25   A.   I don't know if he's ever been designated as an

1    authority in court, but I do cite his book.

2    Q.   Okay.  And in fact the plaintiffs at Page 35 of their

3    briefing agree that Dr. Strom's textbook is authoritative.

4    Let me show you what Dr. Strom says to Dr. Hauben about the

5    use of proportional reporting ratios and measures of

6    disproportionality such as the one that the Court was

7    inquiring about.  Here's what Dr. Strom says:  "I strongly

8    agree with Drs. Hauben and Dr. van Puijenbroek --"

9            JUDGE SARIS:  Could you just fix that a little bit

10   on the screen there.

11           MR. BARNES:  Is that better?

12           JUDGE SARIS:  And the "In reply" is --

13           MR. BARNES:  It is a reply to Dr. Hauben, who's

14   actually of Pfizer.

15   Q.   And basically what Dr. Strom, an authority on

16   pharmacovigilance who you cite says, "I strongly agree with

17   Dr. Hauben and Dr. Puijenbroek that true signals should

18   emerge from clinical judgment, and that statistical

19   algorithms such as PRRs should be used as supplements to

20   clinical and epidemiological judgment, not replacements.  I

21   also agree that the value of statistical algorithms, even in

22   that role, remains unproven.  Unfortunately, however,

23   statistical algorithms are too often used alone, in

24   publications and in the courtroom, as if they represent

25   analyses useful for hypothesis testing, which is

1    inappropriate."

2            Do you agree with Dr. Strom, Dr. Blume?

3    A.   Well, let me answer that step by step.  I don't know to

4    whom he's writing or the essence of this, but I will note

5    that FDA in its Guidance instructs us to do PRRs -- just a

6    second -- so we are instructed to do that.  FDA says that you

7    may examine PRRs for evidence of causation and in signal

8    detection.  And I agree that clinical and epidemiologic

9    judgments would be wonderful to have, but in this case we

10   can't have randomized clinical trials.  And prior to the

11   FDA's meta-analysis, I could find no epidemiology data

12   associated -- found anywhere in your databases, so all we had

13   were these type of data.  But now we have the FDA

14   epidemiologic review, and it confirms the PRR issues.

15           JUDGE SARIS:  Well, do you agree that standing

16   alone, these PRRs cannot establish general causation?

17           THE WITNESS:  I agree that the PRRs are a tool in

18   examining products across a series.  That's the way I use

19   them, or looking at differences within particular vulnerable

20   subgroups.

21           JUDGE SARIS:  Well, sure, but just as we just were

22   doing going through that graph, it could be a difference in

23   publicity, it could be a difference in reporting techniques.

24           THE WITNESS:  Exactly, I agree.

25           JUDGE SARIS:  I mean, the jumps look horrific when

 1   you first look at them, but then there are explanations,

 2   right?

 3           THE WITNESS:  Right, I agree that they are a tool,

 4   but I would also agree that, your Honor, if you recall

 5   several years ago -- in fact they mentioned it -- the Bacol

 6   removal from the United States marketplace was predicated

 7   upon FDA's use of PRR ratios comparing Bacol and Lipitor.  So

 8   that formed the basis of the product's removal.

 9           JUDGE SARIS:  It's a red flag.

10           THE WITNESS:  It is a flag, yes, it's a flag.

11           JUDGE SARIS:  And we all agree it's a useful red

12   flag, but standing alone, you can't use it.

13           THE WITNESS:  I would agree that we can't use it

14   for statistical; but in a case such as when the end point is

15   death and we can't have a randomized clinical trial, it's an

16   end point that we have to look at.

17           JUDGE SARIS:  Fair enough.

18   Q.   Is it your testimony that -- what Judge Saris asked you

19   was dead on.  All these techniques do, if you accept them, is

20   to say -- and there is some controversy as to whether or not

21   they're even legitimate, as Dr. Strom points out -- you would

22   agree that FDA does not believe and has never recommended in

23   its Guidance document that these can be used as evidence of

24   general causation?

25   A.   Yes, I would agree with that, but I would also agree --

1          MR. FINKELSTEIN:  Can she answer the question?

2    A.   I mean, I would agree with that, but I would also point

3    out in Dr. Strom's textbook, if you wanted to be complete,

4    that Dr. Strom's textbook in fact is saying that even one --

5    he supports in his FDA chapter the use of such data and the

6    use of post-marketing data when there's biologic plausibility

7    to support causation.  So he doesn't out of hand reject

8    this.  In fact he gives examples where post-marketing data,

9    even limited post-marketing data, can be evidence of

10   causation.

11   Q.   Let's take it step by step.  Dr. Strom is saying that

12   the use of your technique for any purpose such as general

13   causation is completely inappropriate.  He even says it

14   shouldn't even be used in a courtroom, correct?  That's what

15   he says?

16   A.   You have read it correctly.

17   Q.   Thank you.

18   A.   I do not know the basis of this, but I know the extent

19   of what he addresses in his book.

20          JUDGE SARIS:  Now, who's this guy Strom again?

21          MR. BARNES:  Dr. Strom is a --

22          JUDGE SARIS:  You know, actually -- so who's

23   Strom?

24          THE WITNESS:  Dr. Strom is a well-recognized

25   epidemiologist, and he publishes a textbook or a reference

1   book related to pharmacovigilance.

2          JUDGE SARIS:  He's the guru in epidemiology?

3          THE WITNESS:  He is, and what he does in his book

4   is, he has FDA chapters, World Health Organization chapters,

5   and he gets regulators as well as leaders in the field to

6   talk on various topics.  In the last two books, he has

7   discussed the issue of causation, PRRs,

8   dechallenge/rechallenge data.  And I would submit that he

9   finds great use for post-marketing data when we don't have

10  anything else, especially when it's been confirmed by

11  rechallenge data.

12  Q.   Let me just finish one more question on this, just what

13  Dr. Strom says.  I want to finish reading what he says about

14  your method, proportional reporting.  Page 2, the same

15  letter.  This is Dr. Strom writing:  "My central points

16  remain.  Case reports are primarily useful for hypothesis

17  generation."

18          Now, Dr. Blume, that whole database that you were

19  looking at was made up of MedWatch reports, which are

20  essentially reports from doctors or patients about an

21  experience with a drug, correct?

22  A.   Well, they can be submitted by several people, but, yes.

23  Q.   Yes, as an example.  And here's what Dr. Strom says:

24  "And I still concur with the observation of Hennessey that

25  anecdotal case reports and disproportionality measures of

0301a09c-a750-4035-b5b0-dce99c568610

1  them are of the same essence and distinct from controlled

2  epidemiologic studies.  Disproportionality measures are

3  formal statistical analyses of poor, incomplete, and biased

4  data (i.e., spontaneous reporting data).  No matter how

5  sophisticated, formal analyses of such data can easily be

6  misleading.  They cannot correct for imperfections in the

7  data source.  Proper interpretation also requires clinical

8  judgment before one even considers there to be a signal."

9           Is that what Dr. Strom wrote to the Journal of the

10 American Medical Association in 2005?

11 A.   Yes, I don't know where this has been written.  I can't

12 see the bottom.

13 Q.   Well, I'll represent to you that it's the Journal of the

14 American Medical Association.

15 A.   And may I comment?

16 Q.   Let me ask you just one more question.  So assuming this

17 was a signal, assuming, Dr. Strom is saying that to actually

18 make any sense of it, it requires clinical judgment, that of

19 a physician, that of an epidemiologist, someone that actually

20 has the training to make sense of what is concededly poor

21 information to even see if it rises to a signal.  Wouldn't

22 you agree with that?

23 A.   Uhm --

24           JUDGE SARIS:  It says what it says.

25           MR. BARNES:  But she's not a clinician.

1   Q.   Are you?  So you can throw it up there, but do you have

2   the clinical judgment and epidemiological training and

3   biostatistical training to make any sense of that plot you

4   put at Page 194?

5   A.   Well, I think, based on 30 years of experience, I do,

6   but in this case it's really not necessary because the FDA

7   clinicians and epidemiologists and biostatisticians have

8   verified my opinion and corroborated my opinion.

9            JUDGE SARIS:  So let me just understand.  You're

10  required usually as part of a drug application to do these

11  PRRs?

12           THE WITNESS:  We usually do the PRRs after approval

13  when we are tracking the safety of the product.

14           JUDGE SARIS:  But it's required by FDA regulation?

15           THE WITNESS:  It is.  It's included in their

16  Guidance.

17           JUDGE SARIS:  Is that commonly accepted in the

18  field as at least a red flag?

19           THE WITNESS:  Well, yes, but I gave you an example

20  of when it was the basis of a product removal for safety

21  concerns.  So it is a red flag, and if one can couple it with

22  additional data, it's wonderful.  If there's controlled

23  clinical trial data to corroborate a post-marketing signal,

24  it's wonderful.  We don't have it here.  If there's

25  epidemiology data, Pfizer didn't do epidemiology studies, so

1    we don't have epidemiology data.  It's one of the few things

2    that we had.  The first time we see epidemiology data is with

3    the FDA meta-analysis.  And if I had had more, I would have

4    included it, but that's what we had.

5    Q.   We'll get to the meta-analysis in a minute, okay, but

6    you recognize this book by Dr. Strom?

7    A.   Yes.  I showed it to you in my office.

8    Q.   Yes, you did.

9              MR. BARNES:  Slide 33, please.

10             JUDGE SARIS:  So then you went out and sported and

11   bought it for yourself?

12             MR. BARNES:  He owes me dinner.  Actually, a lot of

13   lawyers probably have this book.

14             JUDGE SARIS:  What's it called?

15             MR. BARNES:  Pharmacoepidemiology, Editor, Brian L.

16   Strom.  He's a professor at the University of Pennsylvania.

17             (Discussion off the record.)

18             JUDGE SARIS:  Let me ask you this:  Does he have a

19   chapter on these -- since you both seem to agree that he's

20   the man, does he have a chapter on the PRRs, do you know?

21             THE WITNESS:  If you hand me the book, I can read

22   what he says.

23             MR. BARNES:  Actually, he's not authored a chapter

24   on PRRs.

25             THE WITNESS:  No, but I can read what he says.

Page 171

1          JUDGE SARIS:  Well, he you put it in.  I mean,

2     that's like the blessing from on high, right?

3          MR. BARNES:  Sure, in his book, he reads the whole

4     thing.

5          JUDGE SARIS:  So maybe that would be something that

6     would be useful for both of us to have.

7          MR. BARNES:  I will have copies of the relevant

8     chapters.

9          JUDGE SARIS:  Of the chapters.  It probably meets

10     the fair use doctrine, huh?

11          MR. BARNES:  It does, and we'll ask Dr. Strom.

12     He'll be fine with it.

13          Would you put up Slide 33 just so we can put an

14     exclamation point on where Dr. Strom's view is.

15          MR. FINKELSTEIN:  The witness asked for the book to

16     show you right where the PRR language is.

17          JUDGE SARIS:  You know what, just because we can't

18     read it now, we'll just get chapters.

19          MR. BARNES:  I will provide the chapters.

20     Q.   Okay, this is at Page 171.  This is what Dr. Strom's

21     book says:  "The result of a PRR provides a signal; it does

22     not prove causation."  Do you agree with what Dr. Strom says?

23     A.   Yes.

24     Q.   Thank you.  And let's see what the FDA says.  Can we

25     turn up on Slide 34.  This is from the Guidance document that

1    you claim supports your method, and here's what they say

2    about data mining, which this is what you're really asking

3    Mr. Altman to do:  "Data mining is not a tool for

4    establishing causal attributions between products and adverse

5    events."  That's right in the pharmacovigilance document,

6    correct?  You've seen that before?

7    A.   Yes.  And data mining, they refer to statistical

8    manipulations, statistical comparisons.  I think if you go to

9    Page 17, you'll see what they say about causal assessments.

10   Q.   I'm talking about, don't you -- do you agree that PRR is

11   a form of data mining?

12   A.   FDA recognizes it as a form of data mining, but I did

13   not do statistical comparisons across that.

14   Q.   As a matter of fact, you did no statistics anywhere in

15   your report, did you?

16   A.   I think, when statistics were available, I did do them,

17   and I did summarization stats.

18   Q.   We'll get to that in a moment.  So as far as FDA is

19   concerned and Dr. Strom is concerned, there is a consensus

20   that your graph on Page 194 is a signal and not used for

21   causal attribution, correct?

22   A.   Yes, and that's what I used it for.

23   Q.   A signal.

24   A.   Of course.  Yes, as a signal.

25   Q.   Now, Dr. Blume, I'm going to ask you something not to

1    impeach you or be unkind, but I want to just put something in

2    context here.  We have agreed -- and I think we can get

3    through this quickly, I hope -- that there's no randomized

4    controlled clinical trial data that demonstrates that

5    Neurontin is associated with an increased excess risk of

6    suicidality.  We can agree with that, right?

7               (Witness pausing.)

8    A.   Did you say "associated"?

9    Q.   Yes.

10   A.   I think so.

11   Q.   We can agree with that.  And we also agree that there's

12   no observational study, epidemiological literature in the

13   worldwide literature that demonstrates that Neurontin is

14   associated with an increased risk of suicidality when

15   compared to placebo?

16   A.   Yeah, I thought I said this, but there are no randomized

17   trials that can be done to show this, given the number and

18   that we can't kill people, and that no epidemiology studies

19   have been conducted.  So, yes, the absence of data --

20   Q.   Well --

21             JUDGE SARIS:  Hold it.  Hold on.

22   A.   But the absence of data or the absence of evidence is

23   not evidence of safety absence.  It's that we don't have the

24   information because the data were not generated by your

25   client.

1      MR. BARNES:  Move to strike that as unresponsive.

2  Q.   But let me just turn this around.  The absence of

3  evidence is what you're saying is not evidence of absence?

4  Is that your point?

5  A.   Yes, the --

6  Q.   Just "yes" or "no," that's what you're saying?

7  A.   Yes, the absence of evidence does not mean there is no

8  evidence.

9  Q.   But in science, it's the burden of -- you set up a

10  hypothesis, and then you seek to reject it by experimental

11  data, correct?

12  A.   Oh, and I wish that we had it in this instance, but we

13  don't.  And that's why the FDA Guidance says, "Here is the

14  way you analyze data."

15      JUDGE SARIS:  When you say there's no

16  epidemiological studies --

17      THE WITNESS:  Until the FDA survey came out, until

18  the FDA's came out.

19      JUDGE SARIS:  Do you consider the FDA survey

20  epidemiologic --

21      THE WITNESS:  Yes, I do, because it's a statistical

22  meta-analysis of a preselected group of studies and patient

23  criteria, yes.

24  Q.   Okay, so let's talk about what could have been done.  As

25  a proponent of the notion that Neurontin is associated with

1    increased risk of suicidal behavior, and recognizing that for

2    whatever reason -- we can talk about it in a liability

3    trial -- that there's no satisfactory evidence that you see

4    in the standard measures of association, that being

5    randomized controlled trials and published epidemiological

6    data, my question is, Dr. Blume, did you and your

7    organization conduct any epidemiological survey of the

8    databases or other available sources to actually measure

9    whether there's excess risk to be seen?  An epidemiological

10   study, did you do one?

11   A.    You're asking me if I did the epidemiology study?

12   Q.    Did you or anyone in your organization?

13   A.    No, we did not do -- no, I did not go to Blue Cross or

14   Blue Shield or other databases that are -- no, I did not do

15   that.  And I signed a protective order, so I'm not really

16   sure I could have done that anyway, but, no, I did not do the

17   database surveys that could have been done years earlier by

18   your client, no.

19   Q.    Okay, thank you.

20           MR. BARNES:  I move to strike that one part as

21   unresponsive.

22   Q.    But moving on, and in fact, Dr. Blume, you've been

23   paid -- I'm saying this for a matter of context -- you've

24   been paid $650,000 for your work in this case by plaintiffs'

25   counsel, correct, or more?

1   A.   Well, we began in 2003, and I believe that number is

2   correct through, yes, to this point.  And it was not paid to

3   me; it was paid to our company.

4   Q.   Well, you're the president of your company?

5   A.   Yes, but we had multiple people who worked on this.

6   But, yes, your number is correct, yes, we have.

7   Q.   So the plaintiffs retained you and spent over $650,000

8   in your reviewing the summaries and eyeballing evidence and

9   making assessments, but in fact they could have gone out to

10  any health care database, and they'd have a guy like

11  Dr. Trimble and a guy like Dr. McFarland, who's a

12  psychiatrist, and a guy like Dr. Greenland, with all the

13  expertise that they needed to actually run one in your

14  organization, and yet they did not commission a case control

15  study or some sort of retrospective analysis, did they?

16          MR. FINKELSTEIN:  Judge, we're not a pharmaceutical

17  company, and the burden isn't on us to do that which a

18  pharmaceutical company can do.

19          JUDGE SARIS:  You know what, I strike that

20  comment.  Let's just finish.  How much longer do you have?

21          MR. BARNES:  I have a lot more, actually.

22          JUDGE SARIS:  You'd better get going.

23          MR. BARNES:  I'm told I have twelve minutes, but

24  that's a generous twelve minutes, I hope.  I'll move along.

25  Q.   Okay, but the point is, you didn't do it, Dr. Greenland

1    didn't do it, and they didn't commission it from anyone else

2    in this litigation that you know of, correct?

3    A.   I didn't do it, and, to the best of my knowledge, the

4    only one who has done it has been the FDA.

5    Q.   And it certainly could have been done, just like

6    Dr. McFarland did with bipolar patients; isn't that true?

7    A.   I think that an epidemiologic study could have been

8    conducted.

9    Q.   Okay.  Now, I think we need to move on to for my last

10   twelve minutes, let's go to the safety alert.  How's that?

11   We'll spend some time on the safety alert, okay?

12   A.   Yes.  May I have a copy?  I don't have one.

13   Q.   I'll have someone pass it up to you.  I'm going to begin

14   by saying again, you're certainly not qualified to critique

15   it, but you've read it, and you say it supports your

16   opinion.  I want to review some of the details about it, if I

17   can.  I want to go to, if we can, Slide 24, and let's put

18   that up there, if we might, okay?

19          MR. BARNES:  And, your Honors, I'd like to give you

20   a copy.  This is the statistical review and evaluation,

21   self-help here.

22   Q.   Have you had a chance to look at that?  You've seen that

23   before, haven't you?

24   A.   Yes.

25   Q.   Okay, now, if we can put up the --

1       MR. FINKELSTEIN:  Do you have a copy for us?

2       MR. BARNES:  Sure.  Sorry.

3  Q.   Okay, now, if we can look.  We've talked about

4  confidence intervals, but let's just go back.  We agree that

5  if this -- this is at what's called a -- this is the analysis

6  FDA did of -- this is at Page 24 for everyone -- this is the

7  analysis that FDA did on the eleven drugs in the pooled

8  analysis, but what they did, instead of pooling the data,

9  they disaggregated the data, they separated it by each drug

10 in the study, correct?

11 A.   Yes.

12 Q.   And they talk about statistical significance, and it's

13 defined that "The odds ratio greater than 1 and confidence

14 interval did not contain the value of 1."  So, for example,

15 topiramate, which is at the bottom of the Figure 2, is a

16 finding that is statistically significant.  Let's just keep

17 it right here.  Correct?

18 A.   Yes.

19 Q.   So you can say with some confidence that the drug

20 topiramate is statistically significantly associated with

21 suicidality, as defined in the FDA document, correct?

22 A.   I believe so, yes.

23 Q.   And if you look at gabapentin, you would agree with me

24 that when the FDA broke out gabapentin separately from the

25 other drugs, there is no statistically significant increase

1    with gabapentin and suicidal behavior and thoughts, correct?

2    A.    The confidence interval includes -- we don't know either

3    way.  There's a right-side shift.  It goes up to 50 on the

4    right side, so it could be up to 50 times more, but we don't

5    know because there were not enough data.  The studies were so

6    small after the FDA filtered the data that we can't say

7    either way.

8    Q.   This is not a statistically significant finding, and

9    what FDA says is, if we have a confidence interval, it's the

10   range of values calculated and results of the study in which

11   the true value is likely to fall.  So they can't say where it

12   is.  It's uncertain.

13   A.    Exactly.

14   Q.   So there's no statistical significance, and no inference

15   of causality as to gabapentin can be drawn on the basis of a

16   statistically insignificant result, correct?

17   A.    Well, what it says is, the most likely number is 1.57.

18   Q.    That's a point estimate based upon this study --

19            JUDGE SARIS:  Wait, wait, wait.  You know, I need

20   to understand it too.  Okay, so what is the 1.57?

21            THE WITNESS:  That is the most likely number for

22   the odds ratio, comparing the patients who received Neurontin

23   versus the patients who received placebo.  The most likely

24   number is the odds ratio of 1.57, 1.57 percent higher, but

25   the confidence interval about it has the big spread.

1        JUDGE SARIS:  So standing alone, you couldn't say

2   one way or another about this drug, is that right?

3        THE WITNESS:  What it says is that the most likely

4   number would be 1.57, but the range about that number is a

5   big range, from .12 to almost 50.  So we don't have

6   statistical significance on that number because the range is

7   so high.

8        JUDGE SARIS:  So if all you had was gabapentin

9   standing alone, the FDA would not have drawn the conclusion?

10       THE WITNESS:  Oh, I don't know because FDA says the

11  conclusion applies to all the drugs in the database, and all

12  the drugs will have the same labeling warnings.

13       JUDGE SARIS:  No, I understand.  They say

14  consistent across the drugs.

15       THE WITNESS:  Exactly.

16       JUDGE SARIS:  Because they view it -- I mean, I

17  don't know exactly, but they view it as appropriate to pool.

18       THE WITNESS:  Right.

19       JUDGE SARIS:  But standing alone, you couldn't have

20  confidence in the 1.57?

21       THE WITNESS:  The studies for gabapentin are

22  extremely small and would not -- obviously, were not designed

23  to see this difference.  So given the few patients that

24  Neurontin is in this database, it would be impossible to see

25  it.

1    Q.   Well, let's be very clear.   There are almost 3,000

2    patients in the gabapentin cohort, more than many of the

3    other AEDs in the study, correct?

4    A.   Correct, but we need 50,000 to have a properly designed

5    study.

6    Q.   But the point is that as to gabapentin, all you can say

7    is that the results of this study did not reach statistical

8    significance, correct, as to suicidal behavior and suicidal

9    thoughts?

10   A.   Well, what I would say is that if you look at the

11   individuals, some of them are clearly to the left of the

12   centerline.   Others are to the right of the centerline,

13   suggesting that there is an effect.   In the case of

14   gabapentin, it's 1.57; but because the data contributing to

15   it are not very voluminous, you cannot draw a statistical

16   inference.

17   Q.   Well, they looked at it a different way.   Let's go to

18   the next slide, please, on Page 26.   And what we have here is

19   something called a "risk difference," correct?

20   A.   Yes.

21   Q.   And FDA again is looking at the risk of Neurontin

22   again --

23             JUDGE SARIS:   Excuse me, what page?

24             MR. BARNES:   This is Page 26, your Honor.

25   Q.   Now, the risk difference is basically the difference in

0301a09c-a750-4035-b5b0-dce99c568610

1   the incidents of suicidal behavior and ideation of the people

2   taking Neurontin compared against the incidents of suicidal

3   behavior and ideation in the placebo group, correct?

4   A.   Yes.

5   Q.   And just as a matter of absolute clarity, people in the

6   placebo group are also, who are very similar to the group

7   that's being exposed to Neurontin, are having all sorts of

8   psychobiologic adverse events during this time, aren't they?

9   And you're comparing like and like, with the only difference

10  being an exposure to Neurontin, correct?

11  A.   Well, yes, many different types of patients are in this

12  database.

13  Q.   But they compared like to like, right, with one

14  difference, as best they can; they exposed one group to

15  Neurontin, and the other people, they get a sugar pill,

16  right?

17  A.   A placebo, yes.

18  Q.   Okay.  Now, let's look at the odds difference, okay, the

19  risk difference.  Again you see some very interesting things

20  here.  You have topiramate, and topiramate is a statistically

21  significant result as to association with suicidal behavior

22  and thoughts, correct?

23  A.   Topiramate, .98?

24  Q.   Topiramate, on the bar, the confidence intervals do not

25  intersect zero, correct?  Zero is the -- in this chart, zero

1   is the measure against which statistical significance is

2   compared, correct?

3   A.   Yes, yes.

4   Q.   So topiramate is a statistically significant result and

5   is associated with suicidal behavior, correct?

6   A.   Yes.

7   Q.   Now, when you look at gabapentin, gabapentin again

8   is .28 and is nowhere near statistical significance in this

9   measure of risk, is it, as its confidence interval

10   intersects 1?

11   A.   Well, wait a minute.

12   Q.   Zero.

13   A.   Wait a minute.

14   Q.   Zero, zero.

15   A.   It is not significantly different, yes.

16   Q.   So the same thing.  They've looked at it two different

17   ways by two different measures of how much risk does

18   gabapentin have, and on each one of these techniques,

19   gabapentin falls out as a statistically insignificant

20   measure, correct?

21   A.   Yes, because the database was so small.

22   Q.   Okay.  Well, it's good enough for FDA, right?

23   A.   No, it wasn't good enough for FDA.  That's why FDA had

24   to pool the data, because these trials were too small to look

25   at the data individually.

1    Q.   Well, I'm going to challenge you.  You keep saying that,

2    but I think we have to look at this.  Look at topiramate

3    here.

4    A.   Well, topiramate did much bigger trials.  Now, let's

5    look at the numbers here.

6    Q.   Well, yeah, and they have 7,742 patients, and they

7    reached statistical significance.

8    A.   Okay.

9    Q.   Not 50,000.

10   A.   But for gabapentin, your calculations in the Pfizer

11   database would be that you would need up to 50,000 patients.

12   Q.   Well, I don't have all day to cross-examine you on that

13   document.  We're looking at this document with 7,000 patients

14   reaching statistical significance, correct?

15           JUDGE SARIS:  Where's 7,000?

16   A.   Where are you getting 7,000?  I see 12,000 or 13,000,

17   and this is the filtered database.

18   Q.   7,742, 7,742 exposed.

19   A.   And 7,800 and 4,000 is 13,000, and I believe this is the

20   filtered database, so there's 12,000, yes.

21   Q.   No.  The exposed group, 40 over 7,742.  There's 7,742

22   patients exposed to Neurontin -- to topiramate, right?

23   A.   But when I give the numbers, I give the full study

24   population.

25   Q.   Well, the calculation here, they obtained statistical

1   significance with 7,700 patients, correct?  And you can look

2   at lamotrigine, Dr. Blume.  It's the same thing.  It's 2,865

3   patients, and look at that.  Lamotrigine is statistically

4   significant too.

5   A.   Yes.

6   Q.   Okay?  So you don't need 50,000.  In FDA's analysis, you

7   needed 2,865 patients.

8   A.   Using the FDA's analysis with all the data, that's what

9   you need.  Using your calculations in an epilepsy population,

10  you would need a much bigger population.  And the absence of

11  the significance for gabapentin in no way suggests that

12  gabapentin does not have suicide behavior.  It means not

13  enough patients have been studied.

14  Q.   Well, all we're dealing with, Dr. Blume --

15          MR. FINKELSTEIN:  Judge, can Mr. Barnes just let

16  her answer and not cut her off?

17          JUDGE SARIS:  She finished.  So what's the next

18  question?

19          MR. BARNES:  The next question, just to go back,

20  I'm going to talk about --

21          JUSTICE FRIEDMAN:  Excuse me just one second.

22  Where is the 50,000 figure coming from, what document?

23          THE WITNESS:  The 300,000 number comes from the

24  Wardel publication that is cited in my report, that you would

25  need 300,000 patients.  That's his calculation to detect a

Page 186

1   statistically significant number, but we'll get to 50,000.

2           MR. BARNES:  The idea, your Honor, is that when you

3   look at these data, they are making very important judgments

4   based upon less than 3,000 patients in epileptics, and

5   epileptics have all sorts of background rates of psychiatric

6   and also of comorbidities, so --

7   Q.   And FDA now, they're making very important judgments on

8   the basis of a fraction of 50,000; isn't that right,

9   Dr. Blume?

10          JUDGE SARIS:  Now, where did you get the 50,000?

11          MR. BARNES:  That's her statement, not mine.  I

12  think that's, frankly, not relevant to this.  She throws out

13  a document out of context.  Here we have a document where we

14  have the numbers laid out actually explicitly, and you see

15  absolutely what goes into it and how the FDA does their

16  calculations to achieve statistical significance.  I'm

17  running -- do you see that?  I don't want to rush you on

18  this.  It's important.

19          JUDGE SARIS:  So your basic position, both of you

20  seem to agree that these are not big enough numbers.

21          MR. BARNES:  We don't agree with that at all.

22          THE WITNESS:  Oh, come on.

23          JUDGE SARIS:  You think there are big enough

24  numbers?

25          MR. BARNES:  Absolutely.

1        JUDGE SARIS:  So where do you get your number as to

2   what's big enough?

3        MR. BARNES:  The FDA announcement itself, you

4   Honor, demonstrates that on a count of 7,742, they were able

5   to find a statistically significant finding with topiramate

6   on 7,742 patients; and with lamotrigine, they did it with

7   2,865 patients.  I'm just working with the data, and we'll

8   have Dr. Gibbons here who's a biostatistician, and maybe he

9   can answer these.  I've exhausted the limits of my statistics

10  by pointing that out, but we can go into it in much more

11  detail.

12       JUDGE SARIS:  Anyway, your position is, it's not

13  enough data?

14       THE WITNESS:  Of course.  In order to see a

15  statistic -- I mean, the rule of thumb is tenfold.  So if you

16  see -- if the background rate has one in 10,000, you would

17  need to see a significant difference, nine or ten of them in

18  the active group.  So that would be nine plus one is ten that

19  you would need, and the rule of thumb is ten times that, so

20  obviously we're nowhere near close to those numbers for

21  Neurontin.

22       MR. BARNES:  Two more questions and I'm done, your

23  Honor, and Dr. Gibbons is far more able to drill down on this

24  issue than I am or Dr. Blume.  He is a biostatistician.

25  Q.   But I want to ask you a couple of questions.  We've

1    talked about randomized controlled clinical trials, and

2    you've done your line listings and you've done your

3    summarizing, but actually, when you talk about the data in

4    the clinical trials, it's pretty clear that you take the body

5    system's psychobiologic --

6            MR. BARNES:  And, by the way, your Honor, we can

7    provide you this document.  I don't have a copy of it with me

8    up here, but this is the first safety update to the clinical

9    trial for the epilepsy trial from 1992, and it's where they

10   summarize all the safety information for FDA which was

11   reviewed.

12   Q.   And specifically, Dr. Blume, you would agree that in the

13   randomized controlled clinical trials, when FDA looked at it,

14   they discovered that your psychobiologic function when

15   compared to the exposed gabapentin group, that there were a

16   higher percentage of placebo patients with psychobiologic

17   function complaints than patients taking Neurontin; isn't

18   that true?

19   A.   Yes, when you compare the nonserious and the serious.

20   But what I did in my report is to look at those that were

21   serious psychobiologic events and those requiring removal

22   from the study.  You can't simply look at all reports.  You

23   have to hone in, as we're instructed, to look at those

24   reports which were considered serious, those reports which

25   were considered removal from the study, or that the patient

Page 189

1   suffered a serious risk.

2   Q.   I understand that's your explanation.

3   A.   No, it's not my explanation.  It's the way the data are

4   run.

5   Q.   Well, I'll --

6   A.   And this is also, to go into yours, these are not

7   statistically significant numbers.  So all we can really say,

8   Mr. Barnes, is that in the first level of data, there was no

9   difference observed.  However, if you start drilling down,

10  you begin to see the difference, and these numbers were not

11  statistically --

12  Q.   Let me teach around this for a minute, okay?   I'm not

13  suggesting -- I didn't ask you about statistical

14  significance.  I said the percentage of it was higher for

15  psychobiologic function with placebo than with gabapentin.

16  That's true.

17  A.   And I was just trying to tie it into your earlier --

18  Q.   I understand.  Let's go to the next line --

19            JUDGE SARIS:  Wait, wait.  If you think we just

20  followed that --

21            MR. BARNES:  I know.  How much time do I have?  I

22  know I've got one more -- I want to drill this down, and then

23  we'll be over.

24            THE CLERK:  Way over.

25            JUDGE SARIS:  Way over.

1          MR. FINKELSTEIN:  Way over.

2          MR. BARNES:  This -- I'll make a proffer.

3          JUDGE SARIS:  Go into it with somebody else.

4          MR. BARNES:  Just one more slide, and that's it.

5          MR. FINKELSTEIN:  Judge, we still have redirect.  I

6    mean --

7          JUDGE SARIS:  You need to finish up.

8          MR. BARNES:  Okay, one more question.

9    Q.   In 2002 they looked at depression, correct?  The FDA

10   itself, Dr. Hertz, looked at depression in both the epilepsy

11   trials and the pain trials, correct?

12   A.   Yes.

13   Q.   She compared them, and let's review what they had.  In

14   the neuropathy trials, which are all neuropathy patients,

15   placebo had a higher percentage of depression than

16   gabapentin, 2.2 to 1.3 percent, correct?

17   A.   Yes.

18   Q.   Let's look at epilepsy.  Epilepsy was 1.8 percent to 1.1

19   percent, correct?

20   A.   Yes.

21   Q.   And that wasn't a statistically significant finding for

22   epilepsy, was it?

23   A.   No.

24   Q.   And the placebo and neuropathy comparison was not

25   statistically significant, was it?

1    A.    Right.

2    Q.    But the point is, when you actually compared them, there

3    was no disproportionate high percentage of patients on

4    Neurontin in the clinical trials that had depression compared

5    to placebo?

6    A.    Absolutely not.  Let me quote for you.  This is the

7    FDA's review of this data:  "The common but serious events

8    limit this drug's widespread usefulness.  Depression in the

9    epileptic population became worse, required intervention,

10   could lead to suicide, and it resulted in some suicide

11   attempts."  So when you take this data and drill it into the

12   serious events, as I did and FDA did, it led to this black-

13   bolded information within the FDA's medical summary.

14   Q.    Well, that's not true at all, is it?

15              JUSTICE FRIEDMAN:  Excuse me.  Where is that --

16              MR. FINKELSTEIN:  Judge, how much longer are we

17   going to go?

18              JUDGE SARIS:  This is over.  The exam is over.  Can

19   we have the document?  Do you have it?

20              THE WITNESS:  I have it right here.

21              MR. BARNES:  Which one are you looking for?

22              THE WITNESS:  The FDA document concerned about

23   serious cases of depression.

24              MR. BARNES:  We'll offer in the affidavit of the

25   author of that document, who explains exactly what she found

1    in that document, which is in evidence at deposition, so --

2          THE WITNESS:  I'm sorry, this is an FDA document I

3    quoted, not a Pfizer document.

4          JUDGE SARIS:  Hold on.  If your side wants to offer

5    it, they can.  He can offer his document.

6          MR. BARNES:  This is the affidavit of Dr. McCormick

7    on the very subject of how she examined depression cases in

8    the epilepsy trial that she just read from, that very point.

9          MR. FINKELSTEIN:  Is that the one she testified the

10   lawyers wrote?

11         MR. BARNES:  Yeah, right.  Thank you, Dr. Blume.

12         MR. FROMSON:  Your Honor, I have reserved time for

13   redirect.  I did not go over my 30 minutes.

14         JUDGE SARIS:  How much time do you need?

15         MR. FROMSON:  I'll be five minutes.

16         JUDGE SARIS:  Five minutes sounds good.

17         MR. FROMSON:  Are there any particular questions

18   that you have?

19         JUDGE SARIS:  Believe me, I've not been shy.

20         MR. FROMSON:  I'd like to mark into evidence the

21   Page 10 of her report which she just referenced in which the

22   FDA had made the quote regarding depression and suicide.

23         JUSTICE FRIEDMAN:  Excuse me.  I would like to know

24   what that document is and where it is in the record.

25         MR. BARNES:  Is it the one she read from at the

1   very end?

2           JUSTICE FRIEDMAN:  The slide, what's on the screen

3   now.

4           MR. BARNES:  We'll give that to you.  This is the

5   clinical review from Dr. Hertz in 2002.  We will get that

6   over lunchtime.

7           JUSTICE FRIEDMAN:  All right, thank you, but I'm

8   not interested in seeing a table out of context from the rest

9   of the document.  This is not something that has already been

10  attached as an exhibit to the papers?

11          MS. McGRODER:  Yes, Judge Friedman, the data that

12  are summarized there are in the expert report of Tony

13  Rothchild which you have.  It's Exhibit 13.

14          MR. BARNES:  We'll make a copy at lunch.

15          JUDGE SARIS:  Let me just ask you, who's Cynthia

16  McCormick?  Why do I have this?

17          THE WITNESS:  That's the FDA's review of this

18  data.  Cynthia McCormick was the medical reviewer at the time

19  the product was first approved.

20          JUDGE SARIS:  Why do I have this?  Is this

21  brand-new?

22          MR. FROMSON:  No.  Cynthia McCormick was the

23  clinical reviewer prior to the drug's approval, and she made

24  the statement that there were adverse events of depression

25  and the drug could lead to suicide.

1          JUDGE SARIS:  So you both agree we should have it?

2          MR. FINKELSTEIN:  No, absolutely not, your Honor.

3          JUDGE SARIS:  You just handed us an affidavit.  Why

4     is it relevant to what I just saw on the screen?

5          MR. SAYLER:  I'll explain, and Magistrate Sorokin

6     has actually dealt with this and allowed the deposition of

7     Dr. McCormick to go forward.  Dr. McCormick --

8          JUDGE SARIS:  Why don't we strike this at this

9     point.  This is way beyond what's on the screen, and if it

10    comes up at a later point as new evidence, what do you think?

11         JUSTICE FRIEDMAN:  Good idea.

12         MR. SAYLER:  The witness referred to a statement by

13    Dr. McCormick about a potential risk of depression and

14    suicidality.  The plaintiffs are using that statement to make

15    the argument of general causation.  Dr. McCormick in this

16    affidavit specifically states that "I never reached a

17    conclusion that this drug causes depression, suicide, or any

18    other relative psychiatric event.

19         JUDGE SARIS:  But has this been part of the

20    voluminous record already submitted to us?

21         MR. SAYLER:  Absolutely.  Yes, Absolutely, as well

22    as her deposition testimony --

23         JUDGE SARIS:  So it's already in here.

24         MR. SAYLER:  It is a part of the overall record.

25    This is a courtesy copy.

1          JUDGE SARIS:  Listen, the overall record looks like

2   something out of Raiders of The Lost Ark, I mean, like those

3   warehouses in the basement.  Is this part of what was

4   submitted to us in the Daubert hearing?

5          MS. McGRODER:  Your Honor, yes.  It's attached to

6   the Daubert brief and the Frye brief as well, and we'll get

7   you the exhibit numbers as soon as we can look them up.

8          JUDGE SARIS:  Fine, fine.

9          MR. SAYLER:  This is a courtesy copy.

10          JUSTICE FRIEDMAN:  This seems to be a good time to

11   address the issue of the state of the papers.  It appears

12   that Judge Saris and I do have some different papers, and I

13   thought I had confirmed at the outset that everything was the

14   same.  But, in any event, everything should be the same, and

15   I think we're going to need a list of all of the documents in

16   order that have been submitted as part of the records, part

17   of the paper records, and anything also that was submitted at

18   this hearing.  And if Judge Saris has received anything that

19   I haven't, I would like to have what she's received, and I

20   would like the list to show that this was something that was

21   initially submitted to her.

22          (Discussion between Judges.)

23          JUSTICE FRIEDMAN:  So I'm not speaking for

24   Judge Saris, I've just confirmed with her that she would like

25   anything that you have submitted to me that has not

Page 196

1    previously been submitted to her.

2        MR. SAYLER:  And to clarify, your Honor, would you

3    like the briefing that has been filed in Federal Court and

4    state court?

5        JUSTICE FRIEDMAN:  Well, I requested courtesy

6    copies of the Daubert briefs, and I think I have them now.  I

7    probably should have courtesy copies of the -- well, maybe

8    we'll talk about that later -- the motion papers.  I don't

9    know.  This might just turn out to be too voluminous a

10   matter, but let me think about that.

11       MR. FINKELSTEIN:  Just for clarification -- I just

12   wasn't clear -- are you asking for a list for that which

13   we've provided during this hearing or that which has been

14   provided in total?

15       JUSTICE FRIEDMAN:  In total and including this

16   hearing.

17       MR. FINKELSTEIN:  Including this hearing.

18       JUDGE SARIS:  Okay, so we're going to do a

19   five-minute or so redirect, and then we're going to take our

20   break.

21       Lee, is that okay, or would you rather do it now?

22   I see the look.  We'll do it now, and we'll do the five

23   minutes when we get back.

24       (A recess was taken, 11:00 a.m.)

25       (Resumed, 11:38 a.m.)

1          JUDGE SARIS:  Robert, do we need to switch the

2   computer?

3          THE CLERK:  No.  We're all set.

4          JUDGE SARIS:  There we go.

5          MR. FROMSON:  All right, great.

6   REDIRECT EXAMINATION BY MR. FROMSON:

7   Q.   Dr. Blume, the Judges today have used the word "red

8   flag" and --

9          JUDGE SARIS:  You didn't change this over the

10  break, did you, to be red flags?

11         MR. FROMSON:  That's why I can't really print

12  anything out for you till the end of the day.

13         MR. BARNES:  That's not fair.  That's pretty good.

14  Go ahead.

15  Q.   So these red flags are safety signals, right, Dr. Blume?

16  A.   Yes.

17  Q.   And they're like pieces of a puzzle, right?

18  A.   Yes.

19  Q.   And FDA Guidance, which has been marked for the Judges

20  today, that basically says you have to synthesize all the

21  safety signals, right?

22  A.   Right.

23  Q.   In fact, FDA Guidance uses the word "synthesize"?

24  A.   Yes, it does.

25  Q.   And so isn't this the method that you employed in this

1   case here?  You synthesized these red flags and came to a

2   conclusion?

3   A.   Correct.

4   Q.   And even where any one of the individual red flags may

5   not prove causation on its own, each one of those red

6   flags --

7          JUDGE SARIS:  Are you looking at me or asking her a

8   question?

9          (Laughter.)

10  Q.   -- each one of those red flags is still important to

11  your analysis, right, Dr. Blume?

12  A.   Yes.  They are integrated into the opinion.

13  Q.   And if you do decide, as you consider one of these red

14  flags, that it's not in and of itself proof of causation,

15  what do you do with it?  How do you handle such a situation?

16  A.   If one of the signals doesn't rise to the level of

17  causation?  All the signals are taught to integrate the

18  signals together; and based on the overview of this

19  information, then we can make decisions regarding the

20  existence of adverse events, signals relating to them,

21  causation assessments, et cetera.

22  Q.   And you in your everyday practice consulting with

23  pharmaceutical companies on drug safety and drug efficacy,

24  don't you do this yourself?

25  A.   Yes, prior to approval and then after approval.

1   Q.   And aren't you the person in your company --

2        JUDGE SARIS:  Excuse me.  Is this what you're using

3   your five minutes for?

4        MR. FROMSON:  I am, Judge, because it goes to the

5   methodology, and she's qualified, and she used appropriate

6   methodology to reach her conclusion.

7        JUDGE SARIS:  If you want to use your five minutes

8   this way, go ahead.

9   Q.   Let's look at dechallenge/rechallenge, all right?  There

10  was talk of Dr. Strom, right?

11  A.   Yes.

12  Q.   And what is your understanding of what Strom says

13  regarding the use of dechallenge and rechallenge in

14  determining causation?

15  A.   Well, the authors in that chapter in the Strom textbook

16  as well as the FDA says that even one well-documented case

17  report form reporting a rechallenge episode in the face of

18  biologic plausibility can be evidence of causation.

19        MR. FROMSON:  And, your Honors, that's Exhibit 93

20  in our opposition papers to defendants' motion.

21  Q.   And as to PRR analogy, right, to what extent can you use

22  PRR analogy to -- analogy is one of the Bradford Hill

23  criteria, right?

24  A.   Yes.

25  Q.   And PRR is what the FDA has used in the past for other

Page 200

1   drugs, right?

2   A.   Yes.  Yes, with post-marketing events, FDA has used PRR

3   comparisons between two drugs in a family as the bases in

4   fact for labeling and also for product removals.

5   Q.   In the 1992 FDA clinical review, the slide in the middle

6   in which the FDA had indicated this drug had adverse events

7   of depression and could lead to suicide, that's a red flag

8   you'd consider?

9   A.   Yes.

10  Q.   And you make the decisions every day, and the FDA

11  corroborated your opinion, right?

12  A.   Yes.

13  Q.   And did you use the same rigor here as you do in your

14  everyday considerations as you represent pharmaceutical

15  companies and make decisions on drug safety and causation?

16  A.   Yes.  What the report did was integration of all

17  available data, and then at the end there's a conclusion.

18  And we do that for efficacy data, and we do that for safety

19  data, and based on that, I make a decision of whether the

20  product's benefits outweigh the risk.

21          MR. FROMSON:  Thank you very much.  Less than five

22  minutes, I think.

23          JUDGE SARIS:  All right, thank you.

24          (Witness excused.)

25          MR. BARNES:  I did not go into the rechallenge case

1    on --

2              MR. FINKELSTEIN:  Judge --

3              MR. BARNES:  Okay.

4              JUDGE SARIS:  There's so much briefing and there's

5    so many expert reports, it's probably in the record

6    somewhere.

7              MR. BARNES:  It is, your Honor.  We have a section

8    on it.

9              MR. ROUHANDEH:  Your Honor, while they're setting

10   up with the next witness, could I answer the question that

11   you asked Mr. Barnes about Pfizer's submitting information to

12   the FDA?  You had asked about the status of the FDA alert,

13   whether or not Pfizer has had the opportunity to present

14   information; and the answer to that is, although the company

15   is cooperating with the FDA, we have not had an opportunity

16   to sit down and meet with them to present all the information

17   that you're going to be hearing here today.  And in fact we

18   may never have the opportunity to do so because what the FDA

19   is doing is very different than what the issue here is

20   because they're not assessing general causation.  They're

21   looking at a risk assessment issue, and so therefore they're

22   not going to be answering questions that your Honors have to

23   answer, which is, is there scientifically reliable evidence

24   of general causation?

25             MR. FINKELSTEIN:  Judge, with respect to that --

1    JUSTICE FRIEDMAN:  I'm sorry.  Was the answer to

2    the question that there is not going to be a hearing on the

3    scientific evidence?  That sounded like legal argument to me,

4    and it wasn't surprising.  I think we know that that's your

5    position on what the FDA has done, but is there going to be

6    any hearing on the science?

7        MR. ROUHANDEH:  There is going to be an Advisory

8    Committee meeting, but the point is, they're not going to be

9    addressing the issues of general causation at that meeting.

10       MR. FINKELSTEIN:  And if I may be heard, your

11   Honor, I don't have a direct hot line to the FDA as Pfizer

12   does, and I get my information from Wall Street Journal and

13   the New York Times that reported that Pfizer did in fact sit

14   down in a private meeting with FDA three weeks ago, I

15   believe, and made out their case that they are not, and we do

16   have the presentation that they provided there, and FDA then

17   reported they -- the claim was there, made efforts that

18   Neurontin should not be included in the class effect, and

19   that FDA evaluated, and as of that, rejected it.

20       JUSTICE FRIEDMAN:  Excuse me.  I don't think that

21   this is the time or place for that really.  I mean, if this

22   is an issue, then there needs to be competent evidence of it,

23   not the argument of attorneys in the middle of the hearing.

24       MR. FINKELSTEIN:  I'm simply responding to Pfizer's

25   sitting down with FDA.  From what I understand, it's

1   happening.

2          MR. ROUHANDEH:  That's just factually incorrect,

3   but I --

4          JUSTICE FRIEDMAN:  Well, you have a factual dispute

5   which can only be resolved, if relevant, by competent

6   evidence.

7          MR. LONDON:  Doctor, while you're taking the stand,

8   I want to preliminarily state that you're going to get

9   bored.  I'm Mr. London, and you can tell I'm the old-school

10  guy.  I have no idea how to run all these things.  The most

11  sexy presentation you're going to get might be on the Elmo,

12  if we can figure out how to do the Elmo, and it's just going

13  to be kind of old-fashioned, slow, and low-tech.  I'm sorry.

14                  STEFAN P. KRUSZEWSKI, M.D.

15  having been first duly sworn, was examined and testified as

16  follows:

17  DIRECT EXAMINATION BY MR. LONDON:

18  Q.   State your name, please.

19  A.   Stefan Philip Kruszewski, M.D.

20  Q.   M.D.  We learned yesterday that --

21          JUDGE SARIS:  Well, just to make sure, why don't

22  you spell your last name.

23          THE WITNESS:  Yes.  It's K-r-u-s-z-e-w-s-k-i.

24          MR. LONDON:  We were joking yesterday that I was

25  the only one who can say your name because I went to trial

Page 204

1  once with a lawyer named Majieski in Judge Borowick's court,

2  so I had to learn that.

3          JUDGE SARIS:  Where are you from?

4          MR. LONDON:  I'm from Texas, and these guys were

5  all in Federal Court in Arizona.  And it was just hilarious

6  because I would just make a fool of myself, and finally I

7  would call him Dr. K and Judge B, and they thought it was

8  hilarious.

9          JUSTICE FRIEDMAN:  Excuse me.  Mr. London, I

10 haven't met you in New York.  Who are you representing?

11         MR. LONDON:  Well, I'm on the Plaintiffs' Products

12 Steering Committee in the MDL, and I haven't actually been

13 asked to help in the New York cases, but it's sort of

14 inevitable that I'm either going to help or hurt them, but

15 I'm going to try to limit the damage, if I can.

16         JUSTICE FRIEDMAN:  Thank you.

17 Q.   Dr. Kruszewski, what we learned yesterday is that no one

18 has yet had a chance to learn what any of the witnesses are

19 about.  Would you just take a minute and tell Judge Saris and

20 tell Judge Friedman what kind of doctor you are, where you

21 were trained, what kind of post-medical schoolwork you've

22 been doing.  Would you do that, please.

23 A.   Yes, I'd be happy to.  I'm a board-certified

24 psychiatrist.  I went to Princeton University and graduated

25 in 1973.  I graduated in Harvard Medical School following

0301a09c-a750-4035-b5b0-dce99c568610

1    that in November of 1977.  I did subsequent training in

2    internal medicine at the Deaconess Beth Israel here in

3    Boston.  I subsequently went to UMDNJ-Rutgers and Robert Wood

4    Johnson Foundation and completed my residency training in

5    psychiatry.

6              I'm board-certified for a lifetime in general

7    psychiatry.  I'm board-certified in geriatric psychiatry

8    until the year 2010.  I have been boarded in adolescent

9    psychiatry by the American Society of Adolescent Psychiatry.

10   I'm currently boarded for a lifetime in addiction medicine,

11   and I was boarded, but it just lapsed, in addiction

12   psychiatry.

13   Q.   Has a portion of your career involved management of

14   psychiatric patients in the state of Pennsylvania?

15   A.   Yes, it has.

16   Q.   Maybe I should say the hospitals.  Would you just

17   briefly tell the Court and the Court --

18             MR. LONDON:  Would you all like me to call you the

19   Courts or her Honors?  I'm not sure.  The Courts.

20   Q.   Would you please tell the Courts about that period of

21   your professional life.

22   A.   Yes.  I currently practice in Harrisburg, Pennsylvania,

23   and am head of an organization called Kruszewski &

24   associates, but I think what you're referring to, Mr. London,

25   is, I was employed by the Pennsylvania Department of Public

1    Welfare from approximately September or October of 2001 and

2    until July 11 of 2003.  In that 22 months, I was responsible

3    for evaluating multiple medical records of individuals and

4    had responsibility for the oversight of all 200 psychiatric

5    facilities in Pennsylvania that accepted Medicaid patients,

6    and as well was responsible for the oversight and the death

7    investigations of children from Pennsylvania who died either

8    in Pennsylvania or in facilities outside of Pennsylvania.

9    Those were primarily Virginia, Texas, Oklahoma, Colorado, and

10   Florida.

11   Q.   Did you also have some faculty position?

12   A.   Yes.  I'm currently on the faculty at Eastern

13   University.  My last major academic appointment was at Penn

14   State from 1999 to 2004 as professor of clinical psychiatry.

15   Q.   Did you hear Judge Friedman ask Dr. Blume to give an

16   executive summary?  Perhaps it was Judge Saris.  I'd better

17   stop that.  I'll say the wrong judge and screw up.  Did you

18   hear the Judges ask Dr. Blume for an executive summary of her

19   report?

20   A.   Yes, I did.

21   Q.   Would you give the Judges an executive summary of yours?

22   A.   I'd be happy to.

23   Q.   Please.

24   A.   Right now?

25   Q.   Yes.

1   A.   Just the report or just what I did in order to --

2   Q.   Both.  They let me talk.  You teach.

3   A.   Okay.  Let me just very briefly describe my report and

4   then answer questions about how I went about it.  I was asked

5   in 2004 to see if there was any relationship between

6   suicidality and Neurontin, otherwise known as gabapentin.

7   That meeting was with Mr. Finkelstein, and he gave me a sort

8   of carte blanche to evaluate the entire medical literature as

9   I was able to do.  So that consisted of multiple citations

10  that I include as references for my report.  It includes a

11  PubMed search of different terms associated with adverse

12  events and gabapentin, or Neurontin.  It also included all

13  the Pfizer internal documents, not initially but ultimately,

14  that were given to me in a disk format from Mr. Finkelstein's

15  office.

16          In that whole process -- and I think this is very

17  important -- I hold myself out as a general psychiatrist and

18  addictionologist, so one question that I would ask if I were

19  you, your Honor, is, what am I doing here?  I had to learn a

20  lot of information that was not completely known to me or

21  remembered by me during this whole process, and in doing so,

22  I had to read books on statistics and epidemiology and

23  biostatistics and plausibility on Daubert principles and Frye

24  principles, and Bradford Hill principles as well, to be able

25  to come up with what I've included in my report, which is a

1   very brief 19-page summary of my findings.

2           And those findings are as follows:  I believe that

3   there's a cascade effects here that explain for me as a

4   clinical psychiatrist and psychopharmacologist, at least as I

5   was teaching previously at UMDNJ-Rutgers, that Neurontin is a

6   GABAergic drug; and that GABAergic effect, as you've already

7   heard from Professor Trimble and others, causes a decrease in

8   circulating and functionality of serotonin.  That end result

9   of decreasing levels of serotonin plausibly give you a result

10  of suicidal ideation, suicidal events, and completed suicide

11  acts.

12          I did that all in the time period before there was

13  any January 31st FDA alert about a link between gabapentin

14  and the ten other drugs that were evaluated in the 199 mostly

15  placebo-controlled studies and that the huge population that

16  they looked at of about 26,000, 27,000 individuals.

17          So in doing so, at the beginning of my quest to try

18  to understand this, I was literally looking for anything that

19  made sense to me empirically.  And I know Professor Trimble

20  used that word yesterday, but in effect that was to start

21  with something like the Physician Desk Reference and look at

22  the side effects that would give me a possible signal of

23  events, and then to follow that up with Neurontin and adverse

24  events and gabapentin and adverse events, and any GABAergic

25  drugs like depakote or Topamax, topiramate that we were

1    talking about, and their adverse events for analogous

2    situations, and then compile this report.  That's a very

3    brief summary.

4    Q.   I'd like to ask you whether as a part of your study you

5    tried to determine whether there was evidence or investigate

6    whether there was evidence that gabapentin reduced serotonin

7    levels?

8    A.   I'm sorry, could you repeat that, please?

9    Q.   Yes.  As a part of your study, did you try to determine

10   whether there was evidence that gabapentin makes serotonin go

11   down?

12   A.   Absolutely.  That was critical to my discussion.  And in

13   fact, since we were talking about it yesterday and it

14   appeared to me to be somewhat the missing link in the

15   discussion, I did bring some information that I think is

16   relevant and that --

17            MR. LONDON:  Well, let me just stop for a second

18   and ask if I might have the Elmo.

19            THE CLERK:  You're all set.

20            MR. LONDON:  That doesn't mean I can actually use

21   it right.

22            JUDGE SARIS:  Just put the piece of paper on the

23   screen.

24            MR. LONDON:  That's my hand, your Honor.

25            JUDGE SARIS:  The other way.

Page 210

1      MR. LONDON:  I promised you.

2  Q.   Exhibit 28 in the Court's material is your report.  Do

3  you see that?  All right, that's the source --

4      JUDGE SARIS:  Wait, wait.  That was too fast.

5      MR. LONDON:  Sorry, I told you.  Let's try it

6  again.

7  Q.   Exhibit 28 in the Court's records is your report,

8  Dr. Kruszewski?

9  A.   Yes.

10     JUDGE SARIS:  That's your report, all right.

11     MR. LONDON:  I'm just referring to the report so

12  we'll have kind of a locator.

13  Q.   Now, I want to go to Page 5 of the report and put this

14  information up.  Are you ready?

15  A.   Yes.

16  Q.   He's going to try and raise it a little.  Reading the

17  highlighted section, Dr. --

18  A.   I've brought my report with me, so I'm going to ask to

19  read it from my report.

20  Q.   And you should have it on your screen right there in

21  front of you.  Did you in your report, as I put on the screen

22  here, state, "In 2002 Perugi, et al reported that gabapentin

23  inhibits dopamine, norepinephrine, and serotonin release,

24  repeating the findings of Taylor, et al, and Kelly"?

25  A.   That's correct.

1    JUSTICE FRIEDMAN:  Can we have the page?  I have it

2    as 5.

3    MR. LONDON:  It's 5, that's correct, your Honor.

4    Q.   And would you explain to the Court what that means,

5    "Gabapentin inhibits dopamine, norepinephrine, and serotonin

6    release," just that part.

7    A.   Yes.  I believe that one of the critical points and why

8    we're here today to evaluate whether we have enough

9    scientific information to develop my conclusions, and

10   everybody else's, is whether gabapentin -- i.e., Neurontin --

11   adversely affects the release of the excitatory monoamines

12   norepinephrine, dopamine, and serotonin.  It is my opinion

13   that that information is relatively scarce but is absolutely

14   available and is compelling.

15   Q.   If we look at the next phrase, "repeating the findings

16   of Taylor, et al and Kelly," and you give footnotes that are

17   in the back of your report, true, 35, 36, 37?

18   A.   Are you asking me to turn to that page?

19   Q.   I'm going to share this with you.  We learn that there

20   are these three studies that you're referring to, Perugi in

21   the article published in the Journal of Clinical

22   Psychopharmacology.  Do you see that?  That was your Perugi?

23   A.   Yes, that's correct.

24   Q.   All right.  And the third one, Kelly, "Gabapentin" in

25   the Journal of Neuropsychobiology, do you see that?

Page 212

1   A.   I do, October, 1998.

2   Q.   And their studies and their tests were your source for

3   that statement in your report that gabapentin reduces

4   serotonin?

5   A.   They were, yes.

6   Q.   And were those peer-reviewed studies?

7   A.   Yes.  All of them were.

8           JUDGE SARIS:  Were they human or animal studies?

9           THE WITNESS:  I'm sorry?

10          JUDGE SARIS:  Are they human or animal studies?

11          THE WITNESS:  All of those are animal studies.

12  Q.   Now, let's go to the middle one.  That's Taylor, C.P.

13  Do you see that?  That was your middle citation published in

14  Epilepsy Research?

15  A.   I'm sorry, where are you?

16  Q.   Do you see where I'm pointing on the screen to you,

17  Footnote No. 36, Taylor, C.P.?

18  A.   Yes.

19  Q.   Do you see that?

20  A.   Yes.

21  Q.   Taylor, C.P. is the gentleman sitting two rows back over

22  there, Dr. Charles Taylor, who works for the defendants?

23  A.   Yes, that's correct.

24  Q.   And he published in the Journal of Epilepsy Research

25  that information that you published that serotonin levels go

0301a09c-a750-4035-b5b0-dce99c568610

1   down with gabapentin?

2   A.   That is correct.

3   Q.   Can we just have a moment to talk about how --

4          JUDGE SARIS:  So those were the brain slices that

5   we heard about from rats?

6          THE WITNESS:  Yes.

7          JUDGE SARIS:  Okay, so one of the arguments that

8   Taylor had made in his report was that there was no brain

9   stem to control things, and you can't necessarily

10  extrapolate --  I'm sure I'm butchering exactly how he said

11  it -- but extrapolate from the animal studies to a real human

12  where the actual serotonin is made.  Do you agree with that?

13         THE WITNESS:  If I can take your question in two

14  component parts.

15         JUDGE SARIS:  Sure.  I'm sure you can parse it

16  better than I.

17         THE WITNESS:  The easiest one for me to answer,

18  since I'm not a rat scientist and I'm not a, you know, a lot

19  of things.  There are other people here who do better than

20  me.  Animal studies are used and utilized to develop and

21  understand mechanisms of action.  And so as much as that

22  information was developed from the rat neocortical slices and

23  what not and whether or not there was a raphe nucleus

24  associated with that, to me, the point remains the same:

25  that in animal studies, in this case rat studies that were

1   rat or mice studies that were particularly done by

2   Dr. Taylor, it showed that gabapentin's effect decreased the

3   release of -- it decreased the amount of excitatory

4   neurotransmitters; in this case, norepinephrine, dopamine,

5   and serotonin.

6            MR. LONDON:  Did that help the Court?

7            JUDGE SARIS:  Well, to your knowledge, have there

8   been any human studies?

9            THE WITNESS:  I do not believe that there have been

10  any human studies.  I believe that they should be done.  They

11  have not been done to date, so the only thing that I can rely

12  on are the animal studies.

13           JUDGE SARIS:  There was one Graph 5 that kept

14  flashing up.  Were you here when that was flashed up on the

15  screen by Ben-Menachem -- is that the study? -- where there

16  was a N of 3, I think.

17           THE WITNESS:  That might be one of the population

18  of the total population of eleven?

19           JUDGE SARIS:  Yes, where at least I couldn't really

20  read the graph because the photocopy is so poor, but what do

21  you understand that that graph signifies?

22           THE WITNESS:  You know, your Honor, I'm not sure

23  what that graph signifies, and that's the best answer I can

24  give.  It's still a curious study in a minimal amount of

25  individuals that has not been replicated, I believe, outside

Page 215

1    of Elinor Ben-Menachem's laboratory.

2              JUDGE SARIS:  So you think that's sui generis?

3              THE WITNESS:  I'm sorry?

4              JUDGE SARIS:  That's the only one that exists?

5              THE WITNESS:  Yes.

6    Q.   That was the study in which about 20 percent of the

7    subjects had an adverse effect resolved?

8    A.   That is correct.

9    Q.   In clinical psychiatry, is a 20 percent adverse event

10   ratio high, low, medium in response to a drug?

11   A.   It's high.  It's high.

12   Q.   And is the difficulty with having human serotonin

13   measurements done in the same way that Dr. Taylor might do

14   animal studies is that in the animal studies, you give

15   gabapentin to the rat, you let the rat absorb it, you kill

16   the rat, and you cut the rat up?

17   A.   That's correct.

18   Q.   And it's inappropriate to take that very far with

19   humans?

20             JUDGE SARIS:  I think we can take judicial notice.

21   A.   It is.  I mean, what we ideally want to do in the study

22   that hasn't been done yet is to give human volunteers under

23   very controlled conditions doses of gabapentin, and then

24   measure their levels of cerebrospinal fluid for the

25   metabolites of serotonin like 5-HIAA.

Page 216

1          JUDGE SARIS:  So essentially do what she did but on

2     a much larger level?

3          THE WITNESS:  That is correct.

4     Q.   Were there other pieces of evidence for you on the

5     question whether gabapentin reduces serotonin levels in

6     people?  Did you have other pieces of evidence, other

7     articles, other studies, other investigations, in regard to

8     your question, does gabapentin reduce serotonin?

9     A.   I'm sorry, I'm not following the question exactly.

10    Q.   All right.  You brought with you some of the articles

11    that you had read and relied on?

12    A.   Yes, the animal studies, yes.

13    Q.   And were there other studies besides just those three

14    that we referred to a moment ago?

15    A.   Yes.  There are other comments from different places.

16    I'd actually like to very briefly review that.

17    Q.   I think it would go better if you would tell the Court

18    the science and the review rather than me Q and A you, me

19    asking you questions and you responding.  Refer to those

20    studies and those documents that you have, and we'll identify

21    them for the Court and counsel as you go through them.  All

22    right, what's the first one?

23    A.   Okay, the first one in your packet is a study from May,

24    1984, done by Goteki and Reimann.  And that one was

25    important -- it's a rat study -- again, because the rat

Page 217

1    cortex was preincubated with tritiated noradrenaline -- i.e.,

2    norepinephrine -- and tritiated serotonin and tritiated

3    choline.

4              The important part of this conclusion is in the

5    last paragraph.  It states that "Thus, gabapentin --"

6              JUDGE SARIS:  Excuse me.  Where is this document?

7    Where is this?

8              MR. LONDON:  Keith, can you pull those documents

9    out.  We need to give copies to the Court.  These are

10   courtesy copies that are in exhibits, and if you would give

11   two to the Court and let me have one for the defense counsel.

12             THE WITNESS:  If I could just ask one favor of the

13   Court, for everyone to speak up who's going to be asking me

14   questions.  I do have a hearing aid, but --

15             JUDGE SARIS:  Well, just let us know.

16             MR. LONDON:  I'll do the best I can with what I've

17   got, okay?

18   Q.  You had just pointed out the Document 1, and that's

19   the -- I hope I say this right -- Goteki study?

20   A.  I'm not sure how to pronounce that.  I'm sure Dr. Taylor

21   will pronounce that later.

22   Q.  At the bottom of the first page, what would you say?

23   A.  The last paragraph is the one I want to comment on.  It

24   says, "Gabapentin impaired the release of biogenic amines --"

25   in this case, we're talking about noradrenaline and

1   serotonin -- "in a similar manner as has been reported for

2   GABA and baclofen.  However, the site of action seems to be

3   different from that of baclofen.  The inhibitory action of

4   gabapentin is not effected by the generalized depression of

5   neuronal excitability, since the release of acetylcholine was

6   not affected."

7           And the only other point I want to make about that

8   is, they gave these rats before they dosed them tritiated

9   choline to see if the ^ choline was going to be decreased or

10  increased at the same time that they gave gabapentin.  What

11  this showed then is that you have a selective decrease in the

12  release of excitatory catecholamines -- in this case,

13  serotonin and norepinephrine and noradrenaline -- when you

14  don't have the same phenomenon occurring with

15  acetylcholine ^.

16  Q.   Document 2 is a document that Mr. Finkelstein alluded to

17  yesterday in his opening presentation.  It's a confidential

18  Pfizer document that covers a 20-year period from 1981 to the

19  year 2001.  Do you have that before you?

20  A.   Yes, I do.

21  Q.   And was that another of Dr. Taylor's investigations in

22  animals?

23  A.   That is correct.

24  Q.   That did include studies of reduction of serotonin?

25  A.   That is correct.

1   Q.   And would you point out to the Courts what portions of

2   that study are germane.

3   A.   I ask you to turn to Page 39 of 68 pages, again, of this

4   report reviewed by Dr. Taylor available July 19 of 2001, and

5   on the first line here, this is -- I'll just read it:

6   "Gabapentin was examined for effects on the release of

7   radiolabeled monoamine neurotransmitters from rat neocortical

8   or striatal tissue slices in vitro.  If neocortical slices

9   were superfused with gabapentin for 15 minutes prior to

10  application of elevated potassium ions for 120 seconds, the

11  release of norepinephrine in tritiated form was reduced up to

12  40 percent."

13  Q.   What does that mean?

14  A.   Basically that the animal was given gabapentin.  It

15  was -- I think the other side might say it was hyperexcited,

16  but, nonetheless, the amount of norepinephrine that was

17  available subsequently in the assay was reduced by

18  40 percent.  That means something was going on with the

19  animal after the gabapentin was given that reduced the amount

20  of norepinephrine.

21       It's very important when we talk and you talk about

22  reserpine and the analogous situation of reserpine's

23  reduction in norepinephrine and serotonin.

24       THE REPORTER:  I'm sorry.  I'd like you to repeat.

25       THE WITNESS:  Oh, I'm sorry.

Page 220

1          THE REPORTER:  "It's very important. . ."

2          THE WITNESS:  I think it's a very important point

3    because --

4          JUDGE SARIS:  She didn't get what the word was.

5    Reserpine?

6          MR. LONDON:  Reserpine.

7          JUDGE SARIS:  How do you spell that?

8          THE WITNESS:  We're talking about reserpine

9    analogously because reserpine has been for clinical

10   psychiatry the key element that has determined that a

11   decrease in circulating norepinephrine and dopamine in

12   particular gives rise to depression and suicide in animal

13   studies.

14   Q.   Are there other key points in this document --

15          JUDGE SARIS:  Well, excuse me.  How do you respond

16   to Pfizer's criticism that this is only when an animal is

17   hyperexcited, if that's the right word?

18          THE WITNESS:  Yeah.

19   Q.   How do you respond?

20   A.   How do I define it?  I'm sorry.

21          JUDGE SARIS:  No, no, no.  They say what occurs,

22   but this is an unnatural state.  The neocortical slices have

23   been hyperexcited, and so therefore this doesn't track what

24   happens in real people.

25          THE WITNESS:  Right.  There are different things

1    that have to be done to change the state sometimes to get

2    enough of a molecule out from slices.  I think I probably

3    could say that better.  But I would agree with what was said

4    earlier today by Dr. Blume, that there are a number of ways

5    that you can have excited states.  And the determination is

6    still the same ultimately; that even with an excited state,

7    it's the best evidence that we have, at least in this

8    particular study, that preapplication of gabapentin decreases

9    the amount of monoamines that are released.

10            JUDGE SARIS:  And is this a reliable scientific

11   methodology to use these excited states?  Is that commonly

12   used in the field?

13            THE WITNESS:  Excited states?

14            JUDGE SARIS:  Yes.

15            THE WITNESS:  Yes, absolutely.

16   Q.   Are there other key parts of Dr. Taylor's report that

17   are important to your study that we need to hear about in our

18   limited time?

19   A.    Yes.  On Page 40, rather than even rereading that, it

20   basically states that electrical stimulation of the brain

21   slices that were premedicated with gabapentin or pregabalin,

22   which is for me a gabapentin look-alike drug, also causes

23   decreased release in norepinephrine and also dopamine.

24            Again, the importance of that is that we in

25   clinical psychiatry more often than not are talking about

Page 222

1   several specific excitatory neurotransmitters that are

2   responsible for mood-altering states, and those include

3   norepinephrine, dopamine, and serotonin.

4   Q.   May I ask you a question and relate that to the

5   hyperexcited state.  Do you have an opinion in your

6   experience whether psychiatric patients, nonneuropathic pain

7   patients, chronic pain patients, such as the off-label

8   plaintiffs in this case, are in normal excited states or in

9   hyperexcited states when they're suffering from --

10  A.   It's a great question, and I can't give you a reference

11  right now, but I can submit it at a later time.  I believe

12  that all --

13  Q.   It's very important that you answer.

14  A.   Yes, all of those states represent hyperexcitable

15  states.  So if you have somebody in severe pain, somebody who

16  has significant mood alteration from bipolar disorder,

17  somebody who's suffering from severe depression, somebody

18  who's suffering from severe anxiety or post-traumatic stress,

19  all of those would be under the consideration of

20  hyperexcitable states.

21  Q.   If you're giving Neurontin to those people, you're

22  giving Neurontin to people who already are hyperexcited?  Is

23  that what you're saying?

24  A.   Yes, that's correct.

25  Q.   All right.  I'm going to try to conserve what time we

1   have and ask you to move to Document 3.  Would you do that

2   for me, please.  Do you see Document 3 in your package, 3?

3   A.   3, okay.

4   Q.   Sorry.

5   A.   I want to turn your attention to 3.  This was from the

6   NDA for gabapentin, and this is about the original labeling.

7   And if you see under "Proposed Revisions," these were

8   revisions that were initially put forth to the FDA, and, for

9   reasons not known to me, were then taken away.  Those

10  previous revisions -- and I believe this goes back to 1992,

11  '93 -- say the following, and that's in yellow there:

12  "Gabapentin administration to increase the total brain

13  content --"

14  Q.   Okay, just for quick reference, NDA means?

15  A.   "Gabapentin reduces --" thank you -- "the stimulated

16  release of noradrenaline, dopamine, and glutamate under

17  certain laboratory conditions."  The important point here is

18  that Parke-Davis, Pfizer, thought enough about this piece of

19  information that they wanted it included in their original

20  mechanism of action on their product label.

21  Q.   Now, this was product for epilepsy?

22  A.   That is correct.

23  Q.   And NDA means new drug application?

24  A.   New drug application for epilepsy.  Neurontin only has

25  two approvals, I believe, two approved indications by the

1  FDA, postherpetic neuralgia and forms of epilepsy, yes.

2  Q.   If it had been intended by the FDA that this drug was

3  approved for bipolar patients, non-neuropathic pain patients,

4  psychiatric patients, would that information that Pfizer sent

5  the FDA, that it reduces the stimulated release of those

6  monoamines, would that be important to a psychiatrist

7  treating a patient with those conditions?

8  A.   You know, it's critically important.

9  Q.   Why?

10      JUDGE SARIS:  So now you're talking as a

11  clinician?

12      THE WITNESS:  I'm talking as a clinician as I'm

13  talking about a practitioner, someone who prescribes

14  psychiatric drugs every day because I still have a

15  significant clinical practice.  We judge value, for better or

16  worse, of antidepressants, for example, for the SSRI group,

17  about how much serotonin functionality increases because of

18  the whole SSRI group.  We judge value of drugs like Cymbalta

19  and Effexor, another name for it, in how much they increase

20  the amount of circulating or functionality of norepinephrine

21  and of serotonin.

22      In this case, if you have a drug that is decreasing

23  the amount of circulating monoamines, decreasing the

24  distribution or decreasing the functionality of those

25  monoamines, and in particular norepinephrine again and

1  serotonin, you have a red flag that tells you this is a

2  depressant agent, because the whole basic premise of the

3  antidepressant market is that we give drugs in the

4  antidepressant market that increase serotonin or increase

5  norepinephrine, or in the case of Welbutrin, increases

6  dopamine and norepinephrine.

7          So here I would want to know this.  I didn't know

8  this, by the way, until I became involved in this thing, but

9  this is a critically important piece.  I would be very

10 careful about prescribing this to any of my patients for any

11 reason with that piece of information, so that having it

12 excluded is significant.

13          JUDGE SARIS:  Have you ever prescribed Neurontin

14 for any of your psychiatric patients?

15          THE WITNESS:  Have I read?

16          JUDGE SARIS:  Have you ever prescribed Neurontin,

17 or gabapentin, for any of your patients?

18          THE WITNESS:  I have in the distant past.  I don't

19 believe that I've prescribed it for any patients subsequent

20 to about the year 2000.  And that's because of just clinical

21 experience on my part.  The patients were not doing well on

22 it.  And it's been bolstered by other clinical information.

23          JUDGE SARIS:  Did you have marketing people coming

24 out to market it to you, or did you just hear it word of

25 mouth?

1    THE WITNESS:  I was closely marketed for it.  I was

2    a spokesperson for Pfizer.  We didn't talk about that, but I

3    was a paid spokesperson for Pfizer on behalf of Zoloft.  So

4    from that point -- and that was basically in 1993 -- 1993,

5    1994, 1994, 1995, and '96, I was repeatedly being detailed

6    that Neurontin basically has no side effects, and you can use

7    it comfortably to treat bipolar disorder, borderline

8    personality disorder, posttraumatic stress disorder, alcohol

9    detoxification, and anxiety disorders.  And it wasn't until I

10   started seeing very significantly bad effects from that that

11   I completely stopped.

12         JUDGE SARIS:  So when you would get this

13   information, did they mention in their marketing details

14   about this decrease in monamines?

15         THE WITNESS:  I'm sorry?

16         JUDGE SARIS:  I'm sorry.  I have a cold, so between

17   my cold and this big courtroom.  So did you in any way get

18   any information about the effects on monamines of these

19   gabapentins when you got the marketing?

20         THE WITNESS:  That was never provided to me.

21   Q.   It was not on the label, was it?

22   A.   It was not on the label.

23   Q.   Because it had not been approved for those uses?

24   A.   I actually looked at the 1995 label yesterday, and it's

25   not on that label.  I wanted to make sure.  I mean, there's

Page 227

1    been so many papers that I reviewed in this litigation and

2    the work for the last four years, that there's a lot I can't

3    remember, but --

4    Q.   I know it's going to be hard to prove this to the

5    Judges, but you've probably had to read more than we've given

6    them.  They're sympathetic to your problem.

7            I want to make a quick detour and ask you to look

8    at the next document, which I believe is No. 4.  It's clearly

9    not a peer-reviewed document.  It's just a chart.  Do you see

10   that?

11   A.   Yes.

12   Q.   And it may be that the key to this is down in the

13   corner.  I'm going to try to zoom in on this.  I'm only

14   showing that that is a Pfizer document.  Do you see that?

15   A.   That is correct.

16   Q.   All right.  And what was important about a Pfizer

17   document that is really just a chart that addresses

18   mechanisms of action in the enhancement of GABAergic

19   neurotransmission?  What was important about that to you?

20   A.   Under the enhancement of GABAergic neurotransmission,

21   since that is an argument that's going to be repeated that

22   there's not enough information to call it GABAergic, Pfizer

23   already knew that it was GABAergic when they compiled this

24   chart.

25   Q.   Do you find it interesting that they pooled gabapentin

1    with barbiturates, benzodiazepine, valproate, vigabatrin, if

2    I'm saying that correctly --

3    A.    Vigabatrin.

4    Q.    -- gabapentin as a pool of GABAergic drugs that inhibit

5    the neurotransmitters?

6    A.    I find it perfectly consistent, and if I can use one of

7    the broad Bradford Hill principles right now, it helped me --

8    and I did this in my expert report -- explain the analogous

9    situations that to me are absolutely understandable because

10   of the physiological basis of mechanism of action of

11   gabapentin.  And very simply, that is, most GABAergic drugs

12   have a very similar side effect profile.  So when I saw

13   enough in the literature to absolutely convince me that this

14   drug was primarily GABAergic, although it had other effects

15   on other neurotransmitter pre- and postsynaptic sites, that

16   just like barbiturates and benzodiazepines and depakote and

17   vigabatrin, it had serious depressive consequences.

18   Q.    Did you gasp when you read the FDA's statistical review

19   that included gabapentin pooled with other GABAergic drugs?

20   A.    I'll say what Dr. Trimble said.  I felt vindicated that

21   this is what one would anticipate, I do believe, doing

22   rigorous science and review and applying scientific

23   principles because -- and I want to say one thing about

24   Bradford Hill again.  I know it's going to come up.  Bradford

25   Hill, in my opinion, never proves causality; but the

1    principles established and articulated in 1965 by Bradford

2    Hill, including analogies and experimentation and biologic

3    plausibility and biologic gradient, and coherence and the

4    other factors, are all met and have been met in my report,

5    even though they're not specifically articulated.  And you

6    can draw the same basic conclusions from GABAergic look-alike

7    drugs for that particular reason.

8    Q.   I want to skip the next document and just conserve the

9    time.  The Court has been very generous with us.  I want to

10   go to the last document in your group, which I believe is

11   Document 6.

12          JUSTICE FRIEDMAN:  Mr. London, before you do that,

13   let's see if there's any agreement as to the date of the last

14   document.

15          MR. LONDON:  I don't believe that I can date that

16   document.  I'll have to rely on others in this group to do

17   that for me, your Honor.

18          MR. FINKELSTEIN:  We can get that date for you, and

19   I'm sure we can come to an agreement.

20          MR. HOOPER:  Your Honor, I'd like to note an

21   objection to the use of this document and submission in the

22   record.  There is no foundation for it.  Under Rule 26, this

23   gentleman was required to submit an expert report --

24          JUSTICE FRIEDMAN:  All right, I'll reserve decision

25   on that objection.

Page 230

1          MR. HOOPER:  We have no idea where it is, what it

2     is.

3          MR. LONDON:  This is a "Dear Doctor" letter.

4          JUSTICE FRIEDMAN:  Let's move on.

5          MR. HOOPER:  The chart, yes.

6          MR. LONDON:  I can only say that we got it from you

7     in discovery.

8          JUSTICE FRIEDMAN:  Let's move on.  We'll deal with

9     it at a later time when we're not taking testimony.

10    Q.   I want to go to the last document in your group that

11    we've given the Courts and we have given defense counsel.

12    It's on the screen.  Do you see that?

13    A.   Yes.  My screen is blurry.

14    Q.   Well, so is your lawyer's.  Let me see if I can help a

15    little.  Whoops, wrong direction.  Would it help if I took my

16    glasses off?

17    A.   If you go to the -- I think it's the last paragraph,

18    this is a document from Pfizer.  Let me explain the context,

19    my understanding of this document, although I don't believe

20    that I have a date, is that any physician, any prescribing

21    person, or probably any person at all, can ask for more

22    information about any drug from the manufacturer.  If you

23    want to know more, in this case, about the mechanism of

24    action and other issues associated with gabapentin, this is a

25    document that you would receive.

1        What I want to draw your attention to, your Honor,

2   is the very last paragraph which says, "Gabapentin has also

3   been shown to limit the rate of firing of sodium-dependent

4   action potentials, although not through direct blockage as

5   seen with phenytoin --" that's Dilantin -- "and

6   carbamazepine," and that's Tegretol.  "Additional work has

7   suggested that gabapentin may interact functionally in a

8   subtle manner with calcium channels, including a modest

9   reduction in the release of monoamine neurotransmitters

10  in vitro."

11        The important point of that, and included on that

12  document, is that we're talking primarily about the GABAergic

13  effects of gabapentin.  Whether you talk about GABAergic

14  effects, the antiglutaminergic effects, or the effects on

15  the alpha2-delta subunit of the voltage-sensitive calcium

16  channels, the end result is the same, is that you get a

17  reduction in the release of monoamine neurotransmitters.  And

18  that is absolutely crucial, and it's in a Pfizer document.

19  Q.   The Court has been very generous with us on the time.  I

20  want to quickly ask two last points so that I may pass you as

21  a witness.  This point, as I understand one of the points

22  Pfizer raised in its Daubert motion --

23        MR. LONDON:  May I say, someone was curious about

24  his name, and they called Mr. Daubert and asked him how to

25  pronounce it, and he said it was "Daubert."  I always thought

1    it was "Daubere."  West of the Mississippi, we call it

2    "Daubert."  I'm sorry, your Honor.

3            JUDGE SARIS:  That's fine.

4    Q.   One of the points Pfizer made in it's Daubert/Frye

5    motion was that you in some way had been involved in a

6    lawsuit which you --

7            JUDGE SARIS:  Now you'll pronounce it that way, now

8    that I know that Mr. Daubert --

9            MR. LONDON:  I don't know what's right.  I was just

10   passing on a great story.

11   Q.   But its Frye, its Frye motion, that you were a plaintiff

12   in a lawsuit in which Pfizer was a defendant, and that in

13   some way, as I interpret it, would make you not very good as

14   a witness in this kind of a case.  What's the background of

15   that?

16   A.   The background of the lawsuit?

17   Q.   Yes, sir.

18   A.   I did, I filed a lawsuit against Pfizer in Federal Court

19   in the Middle District of Pennsylvania on July 1, I believe,

20   2004.

21   Q.   Well, what's the background of it?

22   A.   And the background is, through my work in the Department

23   of Public Welfare and the records I reviewed, and in light of

24   the -- it was the psychiatric news for the official

25   publication of the American Psychiatric Association that had

Page 233

1    talked about the Neurontin settlement in April of that year,

2    I believe.  I'd have to check back, but that is close.  The

3    whole point of what I'm getting at is that I saw Neurontin

4    massively being prescribed, in my opinion, overprescribed.

5    Never once did I see it prescribed in a child or adolescent

6    for any approved indication.

7    Q.   Slow down just a heartbeat.  Slow down just a heartbeat.

8    A.   Okay.

9    Q.   In whom did you see it being prescribed?  What patients

10   are you talking about?

11   A.   Just psychiatric patients, substance abuse patients, but

12   primarily psychiatric, psychiatric adolescents, psychiatric

13   children, and --

14   Q.   And this is in that state hospital program that you were

15   supervising?

16   A.   Yes.  Actually, the only hospitals I had no jurisdiction

17   over was the state hospitals.  So absent the ten state

18   hospitals in Pennsylvania, the 200 freestanding or other

19   psychiatric hospitals and all of the residential treatment

20   facilities accepted children and adolescents that were

21   underwritten -- whose care was paid for by Pennsylvania

22   Medicaid was the population, so they were all psychiatric

23   clients.

24   Q.   And is that the population for whom you saw gabapentin,

25   Neurontin, being prescribed?

0301a09c-a750-4035-b5b0-dce99c568610

Page 234

1   A.   I saw the ill effects.  And I bring this up as a signal.

2   Two of the four deaths of the children -- and this was all

3   highly publicized in the British Medical Journal and

4   elsewhere -- had been taking Neurontin.  I made no causal

5   assessment at that point.  It just was on my radar that, you

6   know, we had two kids who were not psychologically healthy

7   when they were treated in an inpatient unit but ended up

8   dead, and that was just a red flag for me.

9   Q.   By the way, was Pfizer dismissed as a defendant?  You

10  didn't sue or sue them in the end?

11  A.   Yes.

12          JUDGE SARIS:  You know, this is taking too much

13  time.

14          MR. LONDON:  I apologize.

15  Q.   The last question:  Have you before been accepted as an

16  expert witness in federal and state court on the issue of

17  whether a drug causes the adverse effect in question in those

18  cases?

19  A.   I have, yes, in Zyprexa and the metabolic disturbances

20  associated with Zyprexa, and also in OxyContin litigation,

21  yes.

22          MR. LONDON:  And that should do it, your Honor.

23  I'll be happy to pass the witness at this point.  I'll

24  reserve all the rest of my time for redirect.

25          MR. ROUHANDEH:  There's nothing left to reserve.

1          MR. LONDON:  I used the Barnes principle of

2     30 minutes.

3          MR. HOOPER:  Proceed, your Honor?

4          JUDGE SARIS:  Yes.

5          MR. HOOPER:  Judge Friedman, Judge Saris, based on

6     what you all said this morning about wanting to focus on the

7     basis of the science in the case, would it be helpful to you

8     for me to spend some of the time that I might have otherwise

9     planned on other things to walk through the method for

10    assessing general causation in the reference manual?

11         JUDGE SARIS:  No.

12         MR. HOOPER:  No, that would not be good?

13         JUDGE SARIS:  I want to understand the science.  I

14    mean, that's such a good use of my time here when you

15    highlight things that point out the weaknesses and --

16         MR. HOOPER:  The literature and so forth?  Very

17    good.  We'll do it.

18         MR. LONDON:  It doesn't help us when he highlights

19    the weaknesses.

20         JUDGE SARIS:  No, no.  You highlight the strengths,

21    he highlights the weaknesses, but not lawyer argument.  We

22    can do that in closings.

23    CROSS-EXAMINATION BY MR. HOOPER:

24    Q.   Is that the Perugi study that Mr. London asked you about

25    that was cited in your report?

Page 236

1    A.   Let me just check.

2         (Witness examining document.)

3    A.   Yes, I believe it is, yes.

4    Q.   It's not in animals, is it?

5    A.   I'm sorry?

6    Q.   It's not in animals, is it?

7         (Witness examining document.)

8    A.   No.

9    Q.   It's a clinical trial of gabapentin, gabapentin safety

10   and effectiveness in patients with treatment-resistant

11   bipolar disorder, isn't it?

12   A.   Yes, that is correct.

13   Q.   Forty-three subjects, correct?

14   A.   Yes.

15   Q.   And their conclusion highlighted in the abstract for you

16   there refer in part, "Adjunctive treatment with gabapentin

17   was well tolerated by almost all the subjects.  Only three

18   patients had to interrupt treatment before Week 8, two

19   because of efficacy and one because of the appearance of side

20   effects (ataxia and irritability).  In other patients, the

21   most frequent side effects were sedation, irritability,

22   tremor, ataxia, or motor instability and nausea," correct?

23        JUSTICE FRIEDMAN:  Could I have the page, please.

24        MR. HOOPER:  It's on the front page, your Honor,

25   "Abstract," left column.

Page 237

1   A.   Yes, that's correct.

2   Q.   They say in the next sentence, 18, "41.9 percent of

3   43 patients were considered responders," correct?

4   A.   Yes.

5   Q.   And they say that "The mean total HAM-D score showed a

6   significant reduction during the eight weeks of treatment

7   with gabapentin," correct?

8   A.   That is correct.

9   Q.   And the HAM-D score refers to the Hamilton Rating Scale

10  for Depression, which is commonly used to evaluate treatment

11  response in depression trials, correct?

12  A.   That is correct.

13  Q.   And if you draw your attention, Dr. Kruszewski, to the

14  right column, they say that the results of the Perugi study

15  that you just cited earlier for the proposition that

16  gabapentin decreases serotonin levels, the actual results of

17  this study are that it replicates prior studies indicating

18  that gabapentin is an effective and well-tolerated treatment

19  in a large proportion of bipolar patients who are resistant

20  to traditional mood stabilizers, correct?

21  A.   Yes, that's correct.

22  Q.   And the very next sentence says, "More specifically,

23  this drug appears to have antidepressant properties," doesn't

24  it, Dr. Kruszewski?

25  A.   Yes, it does.

0301a09c-a750-4035-b5b0-dce99c568610

Page 238

1   Q.   That is just flat the opposite of your theory in this

2   case, isn't it?

3   A.   That is one study whose conclusions do not support what

4   I just said.

5            JUDGE SARIS:   Well, what did you cite it for?   For

6   what proposition?

7            THE WITNESS:   I didn't cite that particular part

8   that Mr. Hooper is citing to.

9            JUDGE SARIS:   Well, what part did you cite?

10            MR. LONDON:   May he have the whole article so that

11   he may review it, your Honor?

12            JUDGE SARIS:   He has it.

13            MR. LONDON:   Oh, Mr. Hooper wouldn't give me one,

14   so I didn't know he had given the witness one.

15            (Witness examining document.)

16   A.   I can't find it as I sit here.

17   Q.   Have you still got the documents Mr. London brought

18   today, the colored ones, 1 through 6?

19   A.   I'm sorry, is that a question for me?

20   Q.   Uh-huh.  Do you still have the documents with the

21   colored tabs?

22   A.   Yes.

23   Q.   Let's look at Tab 1, first page, please.

24   A.   Number one, yes.

25   Q.   You said this shows gabapentin reduces serotonin; is

0301a09c-a750-4035-b5b0-dce99c568610

1   that right?

2   A.   No.   I believe that's not correct.

3   Q.   Well, tell us again.   How does this document constitute

4   a scientific basis for your opinion?

5   A.   I'm sorry.   As it says in the second paragraph here,

6   "Slices of rats' cerebral cortex were preincubated with

7   either noradrenaline or serotonin and slices of rabbit

8   caudate nucleus with choline."   The outflow response of

9   monoamines was decreased after that pretreatment.

10   Q.   This is a study in animal tissue, correct?

11   A.   That is correct.

12   Q.   It's not in a live animal, is it?

13   A.   The animal was live before they killed it.

14   Q.   When they tested it -- I don't care what happened before

15   the test -- when they tested it and they measure the level --

16   A.   Yes, to make the measurement, they have to kill the

17   animal and, you know, crunch up the brain, yes.

18   Q.   And, by the way, for those laughing, it is possible to

19   study brain tissue in live animals, isn't it, with

20   microdialysis, isn't it, Dr. Kruszewski?

21   A.   Yes.

22   Q.   But in this case it's not, and what it says here is that

23   the tissue was electrically stimulated twice, correct?

24   A.   That is correct.

25   Q.   They shocked the tissue to make every single neuron dump

1   all the serotonin at once, correct?

2   A.   Well, I don't think I'd put it that way, but they

3   certainly were shocking the tissues to probably enhance the

4   response.

5   Q.   It's a state that never happens in living human beings,

6   correct?

7   A.   You can't extrapolate the fact that this finding is a

8   positive finding to one that may or may not happen in human

9   beings.

10   Q.   Turn to Tab 2, please, and turn to Page 39.  This too is

11   a study in rat brain slices, tissues removed from albeit rat

12   brains, correct?

13   A.   That is correct.

14   Q.   And the measurement is taken after application of

15   elevated potassium ions for 120 seconds, correct?

16   A.   Yes.

17   Q.   After that application of potassium ions for 120

18   seconds, that's when the norepinephrine tissue had a

19   40 percent lower rate, right?

20   A.   That is correct.

21   Q.   And applying potassium -- well, let me strike that.

22   What's an ion?

23   A.   A charged atom.

24   Q.   When you apply a potassium solution full of ions, that's

25   another way of electrically stimulating the tissue so that it

1   all, every vesicle dumps all the serotonin at once, right, or

2   norepinephrine at once, right?

3   A.   Yes.  You can do it chemically.  You can do it

4   electrically.  You can do it as Dr. Trimble talked about with

5   ECT.

6   Q.   It's a state that never exists in normal living human

7   beings, correct?

8   A.   I think you'd have difficulty, I'm going to suggest,

9   finding evidence to support that statement.  In other words,

10  I don't believe that to be true.  There may be the lack of

11  evidence, but we don't know the normal resting states and

12  excitatory states of people, for example, with psychiatric

13  disturbances.  As I spoke about it earlier, there is a strong

14  supposition that's already been written in the psychiatric

15  literature that those excitatory states occur, particularly

16  in people who are manic or hypomanic or psychotic or

17  depressed or have anxiety states, et cetera.

18  Q.   Let me ask you something, Dr. Kruszewski.  When people

19  talk about an excitatory or inhibitory neurotransmitter, do

20  the adjectives "excitatory" or "inhibitory" refer to the mood

21  or behavior of a physiological organism?  Or do they instead

22  refer to the electrochemical nature of the reaction between

23  the neurotransmitter and the cell?

24  A.   That's a good question.  I think the answer is both.

25  You know, typically, and if I were a neurologist, and I'm

1    not, we would be talking about action potentials and the

2    excitatory effect of increasing amount of action potential in

3    a specific assay that we're studying, or an inhibitory

4    response, just the opposite.  However, excitatory in the way

5    you just phrased the question is used also behaviorally in

6    the way I've been using it today, which is the excitatory

7    neurotransmitters associated with mood that include dopamine,

8    norepinephrine, and serotonin.

9    Q.    True or false:  Plaintiffs' expert, Dr. Robert Roth, a

10   renowned psychopharmacologist at Yale University, has written

11   in his textbook that excitable or inhibition with reference

12   to neurotransmitters refers to whether or not that

13   neurotransmitter does or does not polarize the membrane that

14   it wants to signal?

15   A.    I don't know because even though I've read Dr. Roth's

16   book and rely upon it and I consider him an eminent expert,

17   he is referring to the excitatory states that I referred to

18   earlier, and that's the neurological states.  And if I can

19   explain to your Honor, if I need to, excitatory states, if

20   you have an inhibition like a GABAergic response, you

21   increase the polarization, decrease the ability of the neuron

22   to fire; and excitatory things do just the opposite.

23   Q.    On the slide is the draft labeling that you have at

24   Tab 3 of the documents Mr. London showed you, correct?

25   A.    Yes, that is correct.

1   Q.   And it says there, I've highlighted for you, gabapentin

2   reduces not release, the stimulated release, correct?

3   A.   Yes, that's correct.

4   Q.   And it doesn't say that it does that in human beings, or

5   generally, or all the time, or however one might like.  It

6   says it does it under certain laboratory conditions, doesn't

7   it?

8   A.   The work was done, and one of the experts who did that

9   work is here who was able to understand it better than me.

10  But it's been done in animal work, and it says just what it

11  means; that it's been done in stimulated states, electrically

12  or chemically, as we've already defined.

13  Q.   Well, you know Dr. Charles Taylor who's in the

14  courtroom, correct?

15  A.   We shook hands yesterday.

16  Q.   You did.  And you know that he is a Ph.D. neuroscientist

17  who's worked on Neurontin for the better part of his career,

18  correct?

19  A.   Yes.

20  Q.   The second portion that you pointed to in this document,

21  the underlying language says that "Gabapentin administration

22  increases the total brain content of GABA after a single

23  dose.  However, the relevance of these findings to clinical

24  use is not yet clear," correct?

25  A.   That is correct.  It's also -- if I can add something

1  for the Court because I think this question will continue to

2  arise.  The studies that were addressed by Professor Trimble

3  yesterday and the studies that I also relied upon are

4  primarily the Petroff studies and the Kuzniecky studies from

5  the University of Alabama, and those studies both do the same

6  thing:  They basically give individuals gabapentin, and they

7  show an increase in whole-brain GABA.  That ultimate effect

8  of how that interacts with monoamine neurotransmitters, that

9  work has not yet been done.  And the effect of -- let me try

10  to make this really simple.  The issue, I believe, that will

11  continue to come up, I think, from the defense -- and if I'm

12  wrong, I'm sure you'll tell me -- is that this is most of --

13  I've lost my train of thought.

14          JUDGE SARIS:  It's been a long morning.

15          THE WITNESS:  Yeah, yeah.

16  A.   Oh, most of the whole-brain GABA stays intercellularly.

17  That's what I wanted to say.  So scientists would say 70 to

18  90 percent plus of brain GABA, CNS GABA, stays

19  intercellularly.  Whether it's 70 percent or 90 percent, it

20  doesn't mean that the 10 percent that is left over, or the

21  30 percent or the 40 percent that's left over, doesn't have a

22  significant functional effect on circulating monoamines.

23  Q.   Any basis to dispute that this draft annotated language

24  you saw in the slide -- well, first, you know that that is

25  not in the drug label?  That was never put into the drug

1    label, correct?

2    A.   Yes.   That's what I said earlier.

3    Q.   Are you aware that FDA disallowed inclusion of that

4    language?

5    A.   I don't know the process, but I'm aware that it's not in

6    the label.

7    Q.   Look at the sixth tabbed document, which does look --

8    it's got "Pfizer McLaussen" down in the lower right, sixth

9    in, blue tab.  At the fourth page in --

10   A.   I'm sorry, I don't have that in front of me.

11   Q.   You read and quoted that language to Judge Friedman and

12   Judge Saris, correct?

13   A.   Yes, I did.

14   Q.   And the footnotes there are 38, 39, 40, and 41, right?

15   A.   Yes.

16   Q.   And the second sentence there says, "Additional work has

17   suggested that gabapentin may interact functionally --"

18   functionally -- "in a subtle manner with calcium 2 channels,

19   including a modest reduction in the release of monoamine

20   neurotransmitters in vitro," correct?

21   A.   That is correct.

22   Q.   Where's the site on the calcium 2 channel that

23   gabapentin binds?

24   A.   The alpha2-delta subunit, the presumption is that

25   there's a binding on a presynaptic neuron, GABA.

1          JUDGE SARIS:  I have no idea what you both just

2     said.

3          MR. HOOPER:  We're going with this sentence, your

4     Honor.

5          JUDGE SARIS:  No, no, but I don't understand it.  I

6     mean, what are you asking about?  Why is it significant?

7          MR. HOOPER:  Well, I want to -- I'll tie it up for

8     your Honor.  I just want to get to how the drug works and how

9     it fits the scientific basis of his opinion.

10    Q.   Your opinion is all about the pharmacology of the

11    compound, correct?

12    A.   No.  That's incorrect.

13         JUDGE SARIS:  So this is out of the Pfizer

14    document, this language, isn't it?

15         MR. HOOPER:  Right, and he read it to you in his

16    direct, your Honor.

17         JUDGE SARIS:  Right.  Are you disagreeing with

18    what's in this document?

19         MR. HOOPER:  No.  I just want to ask him what he

20    thinks it means, as opposed to just reading a quote with a

21    lot of elliptical scientific terms.

22         JUDGE SARIS:  So say, what does it mean?

23    Q.   When it says that gabapentin interacts functionally with

24    the calcium 2 channel, where does it interact with the

25    calcium 2 channel?

Page 247

1        JUDGE SARIS:  I don't know what a calcium 2 channel

2   is.

3   Q.   What is a calcium 2 channel?

4   A.   There are multiple ionic channels in presynaptic and

5   postsynaptic --

6        JUDGE SARIS:  Draw it.

7        THE WITNESS:  Can I draw it for you?  That's great.

8        JUDGE SARIS:  Is this an important enough point to

9   take up this time?

10       MR. HOOPER:  No.  I'll move on.

11       JUDGE SARIS:  Okay, done.  If he doesn't care, move

12  on.

13       THE WITNESS:  I'll be happy to.

14       JUDGE SARIS:  I know, but it's his time and. . .

15       MR. LONDON:  Once again, may I ask for a copy of

16  what's being given out?

17       JUDGE SARIS:  What happens when it gets taller than

18  me?

19       MR. LONDON:  Thank you.

20  Q.   Dr. Kruszewski, please look at the binder that's been

21  handed to you, Tab A therein.  Would you concur that that's a

22  copy of your report in this case?

23  A.   Yes, that looks to be.

24  Q.   The opinion you set out in that report, Dr. Kruszewski,

25  is essentially the same as Professor Trimble's was yesterday;

1  namely, that ingestion leads to GABA elevation, leading to a

2  serotonin decrease, leading to depression and suicide.

3  That's in essence the five steps, correct?

4  A.   That is correct.

5  Q.   So the second step is GABA elevation, correct?

6  A.   Yes.

7  Q.   And you told Judge Friedman and Judge Saris on direct

8  that gabapentin is GABAergic, in your view?

9  A.   Yes.

10  Q.   And I want to be clear.  You don't contend that it only

11  affects levels?  You contend it has clinically significant

12  effects on the function of the GABA neurotransmitter system,

13  correct?

14  A.   I do, yes.

15  Q.   And you recall yesterday that Mr. Finkelstein introduced

16  Professor Trimble as the man who wrote the book, remember?

17  A.   Yes.

18  Q.   Let's see what he said in that book about GABA.  I want

19  to direct your attention to --

20          JUDGE SARIS:  What tab is this?  Is this Tab B?

21          MR. HOOPER:  Your Honor, this one is --

22          MR. SAYLER:  Mr. Alba, we want to go to the slides.

23          MR. HOOPER:  -- the very last tab in the binder.

24          JUDGE SARIS:  All right, L.

25  Q.   Tell me if I read Dr. Trimble's drug correctly:

1    "Gabapentin has a novel mechanism of action, not influencing

2    directly the GABA system, and having its own CNS binding

3    site."  Did I read that correctly?

4    A.    You did.

5    Q.    Do you agree with that statement?

6    A.    Let me see it again.

7              (Witness examining document.)

8    A.    Yes and no, and here's why:  The mechanism of action, of

9    course, of gabapentin is critical to this litigation and why

10   we're here today.  Gabapentin has been described, including

11   in Pfizer internal documents, as being GABAergic.  It's also

12   been described as being antiglutaminergic.  It's also been

13   described as an alpha2-delta ligand by Pfizer internal

14   documents actually supplied to the FDA in 2006 when they

15   requested more information about placebo-controlled trials.

16             What is all of that saying?  That's saying that

17   from the multiple experiments done to date -- and I did, by

18   the way, put this in my final report because it's in my final

19   summary -- that I believe, and there's good evidence to

20   suggest, that gabapentin has multiple post- and presynaptic

21   membrane functions, and those include the ones I just

22   mentioned.

23             So in terms of whether it has a novel mechanism of

24   action, that, you know, it's put under the categories of

25   GABAergic or not, depending on what we've already presented

Page 250

1    here and yesterday, the fact that he says it doesn't

2    influence the GABA system, in 1994 he may have believed that;

3    but that was then, and I don't think he believes that today.

4    Q.   You conducted no experimental research yourself of any

5    kind in connection with your work in this case, correct?

6    A.   I conducted no experimental research, no.

7    Q.   You've read literature and thought about it and written

8    a report, correct?

9    A.   That's essentially correct.

10   Q.   You conducted, just to be clear, very quickly, you've

11   conducted no scientific test of any kind in connection with

12   this case?

13   A.   That's essentially correct too.

14   Q.   You've made no attempt to calculate any relative risks

15   or odd ratios yourself in this case, correct?

16   A.   The only ones that I've seen are in the Collins/

17   McFarland report of Medicaid data of the 12,600 patients that

18   they looked at from 1998 to 2003, and, of course, the new FDA

19   data.

20   Q.   You rely on the Collins and McFarland study, don't you,

21   in your report?

22   A.   I do, yes.

23   Q.   Uh-huh.  It doesn't have a relative risk calculation in

24   it, does it?

25   A.   It has a -- it may not have a relative risk.  I may

Page 251

1   apologize.  For completed suicides, it mentions that it's a

2   statistically significant increase, a more than doubling of

3   effect from gabapentin compared to the other anticonvulsants.

4   Q.   Compared to all the other anticonvulsants?  Really?  Do

5   you know that study?

6   A.   Well, I don't want to -- you know, I may be misquoting

7   it.  I don't believe I am, but if we can --

8   Q.   We'll get to it.  I promise we'll get to it.

9   A.   -- bring it up, that would be great.

10  Q.   In your deposition, you said you made some calculations

11  in connection with your review of materials from the New Drug

12  Application files, correct?

13  A.   Yes.

14  Q.   Those consisted of going through the written material

15  and counting, arithmetically counting adverse events, and

16  comparing them to what you saw in studies, correct?

17  A.   Yeah, pretty much, yes.

18  Q.   And you took those calculations and you threw them in

19  the garbage before your deposition, didn't you?

20  A.   No.

21  Q.   Turn in your deposition --

22  A.   There was a piece of paper where I wrote down what I

23  always write down, and I wrote it down again today, about

24  being quiet and trying to answer the question and try to

25  remain calm; but in terms of writing down calculations and

0301a09c-a750-4035-b5b0-dce99c568610

Page 252

1   what you just represented, I believe that's a

2   misrepresentation.

3   Q.   Look at your deposition.  It's in the Tab K in your

4   binder there.

5        JUDGE SARIS:  Well, this will be the last line of

6   inquiry, and we'll break for lunch.

7   Q.   Turn to Page 99.  Page 99, Line 7, tell me if I read

8   correctly Dr. Kruszewski: "Question:  You mention earlier

9   Dr. Kruszewski that you had made some calculations in

10  connection with -- I believe you said looking at the NDA in

11  this case?"  Your answer:  "Correct."

12       12, "Where are those calculations located today?"

13  14, "Probably in the garbage somewhere."

14  A.   Yes.

15  Q.   Is that what you said?

16  A.   It is what I said.  Let me correct it for the record,

17  however.  There was a concern about a piece of paper where I

18  had put some doodles on that I threw out in the garbage

19  during the deposition, I think during the first seven hours

20  that you deposed me.  I thought you were referring to that,

21  not specifically the numbers of the cases, including the

22  challenge/dechallenge/rechallenge case.  So I just want to

23  make sure that that's in context.

24  Q.   Dr. Kruszewski, I really wasn't that interested in the

25  doodles.  I was really getting at the calculations you made

Page 253

1    in connection with developing your report in the case.  Those

2    are the ones you threw in the garbage, correct?

3    A.   Those are the ones I didn't have and why I said I

4    probably had them in the garbage, because you can count the

5    number of cases that I reviewed and from the NDA data,

6    including the 36-year-old man who had the very important case

7    of the challenge/dechallenge/rechallenge.  These are not

8    rocket science calculations.  They're just almost qualified

9    as doodles, but. . .

10             JUDGE SARIS:  Do you want to break?  Mr. Alba says

11   you have about another half an hour left.  So maybe another

12   five or ten minutes, that's about the best you're going to

13   do.

14             MR. LONDON:  So far, I've only got one question

15   coming out of me.

16             JUDGE SARIS:  All right.  And then our next witness

17   will be -- we start with yours, right?

18             MR. HOOPER:  Correct, Judge.

19             JUDGE SARIS:  And it's quite clear that at best

20   we're going to get through two witnesses, at best, this

21   afternoon, so you all need to be talking about what -- who's

22   your third witness?

23             MS. McGRODER:  Dr. Rothchild, your Honor, is our

24   third witness.

25             JUDGE SARIS:  Can I ask this:  Is there anyone here

Page 254

1    from another country for your witnesses?

2            MS. McGRODER:  No, no, no.

3            JUDGE SARIS:  And are there other people with

4    scheduling problems?

5            MS. McGRODER:  It depends on if you're

6    contemplating when to reschedule the third day of the

7    hearing.

8            JUDGE SARIS:  Well, the two of us need to talk

9    also, but --

10           MS. McGRODER:  Scheduling problems in terms of

11   today?

12           JUDGE SARIS:  Well, people have flown here, people

13   have changed their schedule.  I'm assuming people don't want

14   to be here the week of July 4.  Maybe some true diehards want

15   to be here.

16           MR. LONDON:  What do they do at the Constitution

17   out in the harbor the week of July 4?

18           JUDGE SARIS:  Yes, we can do it out there on the

19   Constitution, but my point is only, we might want to talk

20   about schedule, order of witnesses, et cetera, depending on

21   what people's plans are.

22           MS. McGRODER:  Right, and Dr. Rothchild will be our

23   last witness, and he's actually from UMass, so he's local.

24   So if we reschedule and he's the only witness left, it

25   probably isn't an inconvenience to him.

Page 255

1          JUDGE SARIS:  All right, so just think about that

2      over lunch.

3          MR. ROUHANDEH:  And perhaps if the Courts could

4      give some convenient dates at some point, one or more, rather

5      than us proposing dates.

6          JUDGE SARIS:  Well, we're going to talk at lunch

7      about what to do, but I think that we're lucky if we get

8      through two this afternoon.

9          MR. LONDON:  That was the question.  Do we try to

10     get through these two witnesses today?

11         JUDGE SARIS:  I'd love to try.  We may not.

12         MS. McGRODER:  How long do you want to break for

13     lunch, your Honor?

14         JUDGE SARIS:  I don't know, an hour?

15         MS. McGRODER:  We can do it in less.

16         JUDGE SARIS:  Oh, my gosh.

17         MR. ROUHANDEH:  We'll be back whenever you say.

18         JUDGE SARIS:  We'll see you at 2:00.

19         MR. ROUHANDEH:  2:00.  Thank you.

20         JUDGE SARIS:  And where are you from?

21         MS. McGRODER:  I'm from Kansas City.

22         JUDGE SARIS:  Enjoy Boston.

23         MS. McGRODER:  I wish I had more time to enjoy

24     Boston.

25         JUDGE SARIS:  Take a walk along the harbor.

Page 256

1        (The luncheon recess was taken, 1:03 p.m.)

2        JUDGE SARIS:  I understand that you had a nice long

3    lunch?

4        (Laughter.)

5        JUDGE SARIS:  What I should do is have a list of

6    who serves quickly in the courthouse area.  All right, we

7    weren't going to finish today anyway, so. . .

8        MR. HOOPER:  May it please the Court?

9    BY MR. HOOPER:

10   Q.   Dr. Kruszewski, if you'd please look at your report,

11   Tab A in your notebook.

12   A.   Yes.

13   Q.   At the bottom of Page 2, the article that you cite there

14   as reference to is a study published by a researcher named

15   Lloyd and others in 1983, correct, Page 2, Reference 2?

16   Page 2, bottom of Page 2?  Right here on Page 2.

17   A.   Yes, got it.

18   Q.   That's Lloyd, 1983?

19   A.   Yes, sir.

20   Q.   And the title of that study was "The potential use of

21   GABA agonists in psychiatric disorders:  Evidence from

22   studies with progabide in animal models and clinical trials,"

23   correct?

24   A.   That is correct.

25   Q.   And a GABA agonist is a drug that elevates the function

1    of the GABA system, correct?

2    A.    Yes.

3    Q.    An agonist promotes, correct?

4    A.    Yes.

5    Q.    And an antagonist would inhibit or slow it down?

6    A.    That is correct.

7    Q.    And your and Dr. Trimble's theory is that gabapentin is

8    a GABA agonist, correct?

9    A.    Yes.

10   Q.    Now, you cited the Lloyd paper in your report for the

11   proposition that gabapentin has structural similarity to

12   GABA, correct?

13   A.    That is correct.

14   Q.    In fact the Lloyd paper doesn't mention gabapentin,

15   Neurontin, at all, does it?

16   A.    I'd have to look at the paper again.

17   Q.    Slide 3.  It's at Tab B in your binder, the second

18   document in.

19   A.    Yes, do you have a hard copy of that?

20   Q.    It's at Tab B in your binder.  Did you realize when you

21   cited that, Dr. Kruszewski, that in 1983, gabapentin was

22   still a proprietary, nonpublic compound that wouldn't have

23   been available for this team in Paris to study?

24   A.    The evolution of gabapentin started in 1975,

25   approximately.

Page 258

1    Q.   And the Lloyd study doesn't mention gabapentin anywhere

2    in the study, does it?

3    A.   I'd have to read it again.

4          JUDGE SARIS:  Do you remember why you cited that

5    study, other than for the sentence that it's footnoted to?

6          THE WITNESS:  As I sit here today, I do not.

7          JUDGE SARIS:  Did you ever find that cite from that

8    other study over the lunch break?

9          THE WITNESS:  Yes, we did.

10         JUDGE SARIS:  All right, so we'll come back to

11   that.

12         MR. FINKELSTEIN:  That's essentially our redirect.

13   Q.   They did study, the Lloyd group that we're talking

14   about, did study a drug called progabide, correct?

15   A.   Correct.

16   Q.   And progabide is a GABA agonist, correct?

17   A.   That is correct.

18   Q.   It's a drug that elevates GABA function,

19   neurotransmission, correct?

20   A.   That is correct.

21   Q.   And that's the same thing you say gabapentin does,

22   correct?

23   A.   Yes.

24   Q.   Slide 4, please.  Let's look at the abstract of the

25   Lloyd paper shown here, the last two sentences of the

1    abstract and what it says about GABA and this GABA agonist,

2    progabide, the drug that you say behaves like Neurontin

3    does:  "In these various clinical trials, a definite

4    improvement of affect and mood was noted in these patients

5    receiving progabide," the GABA agonist, correct?

6    A.   Yes, that's correct.

7    Q.   "In clinical trials of depressed patients, progabide

8    produces a significant reduction in depressive symptoms,"

9    correct?

10   A.   That is correct.

11   Q.   And then it goes on to say immediately below that that

12   it had actions similar to that of imipramine on the Hamilton

13   Rating Scale for Depression, right?

14   A.   Correct.

15   Q.   Imipramine is a tricyclic antidepressant, otherwise

16   known as Elavil?

17   A.   Tofranil.

18   Q.   So they're comparing it in clinical trials, plural, to

19   antidepressants, correct?

20   A.   That is correct.

21          JUDGE SARIS:  So doesn't that support the

22   defendants' theory?

23          THE WITNESS:  As I sit here, I apologize, I can't

24   remember the reason.  I'd have to go back and read the paper

25   to find out why.  I was making a point, clearly, that

Page 260

1   gabapentin was introduced to the market as a GABA analog.

2          JUDGE SARIS:  So as you're sitting here right now,

3   would that statement support the defendants' position?

4          THE WITNESS:  I'm sorry?  The -- I didn't hear your

5   question.

6          JUDGE SARIS:  "In clinical trials in depressed

7   patients, progabide produces a significant reduction in

8   depressive symptoms," would that support the defendant's

9   position?

10          THE WITNESS:  Yes, it would.

11  Q.   Could we look at Slide 5, please.  Please look at Page 2

12  of your report, Dr. Kruszewski, and the very next reference

13  after 2 is No. 3; and there you cite to a study by a

14  researcher named -- and I hope I'm pronouncing it

15  correctly -- Ng, second author Bertram, 2001, correct?

16  A.   That is correct.

17  Q.   And the title of that is "Gamma aminobutyric acid," or

18  GABA.  GABA Type B receptors are targets of gabapentin

19  action, correct?

20  A.   That's correct.

21  Q.   And a GABA-B receptor is one of two types of sockets, if

22  you will, that GABA plugs into on the nerve to send a signal,

23  correct?

24  A.   That is correct.

25  Q.   And you cited this for the proposition that gabapentin's

Page 261

1   effects are GABAergic, correct?

2   A.   Yes.

3   Q.   And that's because if it were a GABA-B receptor agonist

4   in fact, that would enhance the transmission of the GABA

5   system, at the GABA-B receptor?

6   A.   Generally, yes.

7   Q.   You recall earlier today you were talking about the

8   Ben-Menachem 1995 paper --

9        JUDGE SARIS:  You know, if you want me to

10  understand that, you have to go through that again.

11       MR. HOOPER:  Okay.  I absolutely want you to

12  understand it.

13  Q.   The paper that you cited --

14       JUDGE SARIS:  What page are we on now, his report

15  page?

16       MR. HOOPER:  Your Honor, Page 2, and the reference

17  is No. 3, Footnote 3, to a paper with the first author Ng,

18  N-g.

19       JUDGE SARIS:  Page 2, Footnote 3?

20       MR. HOOPER:  Right.  And it's cited both there, and

21  the easy place to find it, your Honor, the very top line of

22  Page 3 of his report at Tab A where it says "Presumed act to

23  be an enhancement of GABAergic transmission --"

24       JUDGE SARIS:  All right, it's on Page 3.

25       MR. HOOPER:  "And result is that gabapentin's

Page 262

1    effects are GABAergic," Footnote 3.

2           JUDGE SARIS:  So your question again is?

3    Q.   Sure.  The study that he is citing there is Footnote 3.

4    The Ng study concluded that gabapentin was an agonist or

5    increased the action of a certain type of GABA receptor

6    called a GABA-B receptor, correct?

7    A.   That is correct.

8    Q.   And you cited it for the proposition that gabapentin is

9    GABAergic for that reason?

10   A.   Yes.

11   Q.   That's why you cited it.

12          JUDGE SARIS:  But what is the molecule we're

13   talking about?

14          MR. HOOPER:  Gabapentin --

15          JUDGE SARIS:  Gabapentin.

16          MR. HOOPER:  -- acting --

17          JUDGE SARIS:  On the Receptor B.

18          MR. HOOPER:  At a GABA-B receptor.  There's a

19   GABA-A receptor and a GABA-B.

20          JUDGE SARIS:  No one's gone through the actual

21   receptors or channels with us, so this isn't meaningful.  So

22   if it's significant, you need to spend time on it.  If not,

23   move on.

24          MR. HOOPER:  Let me try, your Honor, and see if

25   this is helpful.

Page 263

1    Q.    What is a GABA receptor, Dr. Kruszewski?

2    A.    A GABA receptor is any molecule that is at the pre- or

3    postsynaptic membrane sites for which gabapentin can

4    interact, and it tends to be specific for GABAergic drugs.

5    There are, for example, in early studies of GABAergic

6    function, a lot of the studies were done on GABA-A receptor

7    sites.  So when you're transmitting a GABA molecule through

8    the synapse, that it has a place to interact and change a

9    molecular configuration or change a -- changing the membrane

10   to allow for movement of ions, for example, and that triggers

11   a response in the postsynaptic cell.  That triggers another

12   electrical response.  And that can be specific.  Some drugs

13   are specific for GABA-A; some drugs are specific for

14   GABA-B.  There are drugs that are non-GABA A, non-GABA B.

15          In fact, it's probably relevant here that

16   gabapentin, in the mechanism of action described in the

17   Physician Desk Reference and elsewhere, is described as it

18   doesn't have GABA-A or GABA-B specific receptor sites or

19   places of action.

20          JUDGE SARIS:  So what is the significance of that

21   conclusion, that it doesn't target a particular --

22          THE WITNESS:  The significance for me, it was very

23   significant for me.  When I read about the mechanism of

24   action, and I read it and I read it probably a thousand

25   times, and it said all of the things that gabapentin does not

1    interact with.  It doesn't interact with these substances,

2    with these receptor sites.  But there was no positive for

3    what it did react to.  So the current label that was approved

4    by the FDA says the mechanism of action is unknown.  We also

5    know that the proposed label --

6         JUDGE SARIS:  Would you agree with that, it's an

7    unknown?  I'm asking you.

8         THE WITNESS:  Yes, yes.  I'm sorry.

9         JUDGE SARIS:  He's a lawyer, and you're a doctor.

10        THE WITNESS:  Yes.

11        JUDGE SARIS:  So you agree that the current state

12   of medical literature is, the exact mechanism of action is

13   unknown?

14        THE WITNESS:  I think there's still more to be

15   found.  I absolutely agree with the conclusion and with the

16   evidence I've already provided that gabapentin has

17   significant GABAergic effects.

18        JUDGE SARIS:  By which you mean what?

19        THE WITNESS:  That it acts as an inhibitory

20   transmitter, and that either through -- well, it may be best

21   that I draw it, but if you imagine this is GABA-A and GABA-B

22   and it's in a cell here, there are other ways that the GABA

23   molecule can interact with that postsynaptic membrane.  It

24   can massage what happens to these.  It can change their

25   configuration.  It can alter things from extra --

1           JUDGE SARIS:  But you're guessing.  The current

2    state of literature, I think it's actually agreed upon, is

3    that it's neither A nor B.  It's unknown?

4           THE WITNESS:  Yes.

5           JUDGE SARIS:  And is that the debate between you

6    and Mr. Taylor as to whether or not it's GABAergic or not?

7           THE WITNESS:  I'm sorry?

8           JUDGE SARIS:  Have you read Taylor's report?

9           THE WITNESS:  Yes.

10          JUDGE SARIS:  So he says it's not GABAergic.

11          THE WITNESS:  Yes, and I disagree with that.

12          JUDGE SARIS:  Because you might have different

13   definitions as I was reading his.  So your definition of

14   GABAergic is what?

15          THE WITNESS:  Yes, we also disagree on definition

16   about GABAergic.  But you don't have to interact with a

17   GABA-A or GABA-B receptor site to be GABAergic.  You can be

18   changing the turnover inside the synapse.  So we absolutely

19   agree on that part of the science.

20          In terms of GABAergic, one of the things that I

21   believe has been previously identified in the literature

22   extensively is that it's not GABA-A, it's not GABA-B.  It

23   does a lot of these other things.  It's not dopaminergic.

24   It's not serotonergic.  It doesn't act with all these other

25   kinds of receptor sites.

Page 266

1          So the question is left, what does it do?  Can it

2    still be GABAergic and not interact with those two

3    postsynaptic GABA receptors?  And the answer to that is

4    absolutely "yes."

5    Q.   So to sum all that up, when something is a GABA-B

6    receptor agonist, in your view of things, that means it's

7    GABAergic, in your view, correct?

8    A.   Yes.

9    Q.   And you cited the Ng study which says that it is a

10   GABA-B agonist?

11   A.   Yes.

12   Q.   Yes.

13          JUDGE SARIS:  What is a GABA-B?

14          MR. HOOPER:  A GABA-B is the --

15          JUDGE SARIS:  No, no, no.  What --

16          MR. HOOPER:  Gabapentin is, the drug we're here

17   about, yes, ma'am, yes.

18          THE WITNESS:  Can I ask you to repeat that

19   question, your Honor?  I'm not --

20          MR. HOOPER:  What is a GABA-B agonist?  Gabapentin.

21          THE WITNESS:  Oh, oh.

22          MR. HOOPER:  It's hard here because they wrote it

23   out "Gamma aminobutyric acid Type B receptors," and then you

24   have to go right to the end of the cite to see that it's

25   gabapentin that they're talking about.

1          JUDGE SARIS:  Truthfully, I know I got a very

2     excellent answer, but all I was asking was what that meant,

3     the aminobutyric acid.  It's the same as gabapentin.

4          MR. HOOPER:  No.  That's GABA.

5          MS. McGRODER:  Gamma aminobutyric acid is the long

6     form of GABA.

7          JUDGE SARIS:  Thank you.

8     Q.   Would you look at Tab C in your binder.  Immediately

9     after the study that you just cited that said it's a GABA-B

10    agonist and GABAergic, in your view, a different research

11    term lead by Lanneau tried to replicate the Ng study's

12    experiment?

13    A.   You're on C?

14    Q.   Yes, C.

15    A.   Yes.

16    Q.   And they concluded, trying to replicate the experiment,

17    as the title says, "Gabapentin is not --" emphasis on

18    "not" -- "a GABA-B receptor agonist," correct?

19    A.   That is correct.

20    Q.   And you didn't cite this anywhere in your report, did

21    you?

22    A.   I don't believe that I did.

23    Q.   Would you look at -- let me ask you, is there --

24          JUDGE SARIS:  Have you given us all these

25    documents?

1          MR. HOOPER:  They're in the binder, yes, your

2     Honor.  That one is C.

3     Q.   Would you please look at --

4     A.   I wonder if I could clarify my answer to that very, very

5     briefly, and that is, there's lots and lots of literature

6     that I did not cite in my report.  I was certainly, after a

7     thousand or two hours of reading and sort of cognitive time

8     spent on all of this, I wanted to quote things that I thought

9     particularly articulated the story of the GABAergic function

10    of gabapentin.

11          So it's not, as I've said here already today, it's

12    not specifically GABAergic.  It's predominantly GABAergic,

13    and we've identified sources, including Pfizer's own sources,

14    that say it's GABAergic.  It also has antiglutaminergic

15    function, and that very simply means, just for the Court,

16    that it's inhibitory of excitation.  So if it's not

17    excitatory, if you stimulate glutaminergic receptors, it's

18    just the opposite of stimulating GABAergic receptors, because

19    those are excitatory, and the GABAergic ones are inhibitory,

20    so --

21          MR. HOOPER:  He brought up glutaminergic.  Would

22    you put up Slide 38, please.

23    Q.   You admitted at your deposition that you couldn't cite a

24    single scientific study that stated any conclusion about a

25    relationship between glutaminergic effects of gabapentin that

1   you just told Justice Friedman and Judge Saris about and

2   suicide, correct?

3   A.   I don't believe that is correct.

4   Q.   Is that the transcript of your deposition, sir?

5   A.   Let me just read that again.

6        (Witness examining transcript.)

7   A.   Oh, that is -- what I said was correct, and what is here

8   is also accurate.  There is no study of which I'm aware that

9   cites a causal relationship between the glutaminergic effects

10  of gabapentin and suicide.  There is also no clinical trial

11  in the same regard that supports the GABAergic effects of

12  gabapentin and suicide.

13       The manner in which I identified the biological

14  plausibility that the GABAergic effects of gabapentin invoke

15  the kinds of problems that we're talking about today is

16  totally consistent with the fact that this clinical report

17  has never been done, this research has never been done.

18  Q.   Let's go back to the GABA-B thing just very briefly.

19  You were also shown a study at your deposition, a second

20  study by a second research group, Jensen, and they also said

21  gabapentin does not act through GABA Type B receptors,

22  correct?

23  A.   That is correct.

24  Q.   And they also tried to replicate the experiment that the

25  Ng group that you did cite had performed, didn't they?

1    A.    That is correct.

2    Q.    And they could not replicate it, correct?

3    A.    Not to my knowledge.  And you just remind me -- I'm

4    thankful that you did -- when I was investigating and reading

5    about the GABA-B receptor sites, I made a call to Bernhard

6    Luscher, who's a GABA-A receptor Ph.D. physiologist at Penn

7    State.  And he knows nothing about this litigation or what I

8    was doing.  The basic response from him about the controversy

9    is that "We don't know yet.  You know, we believe that the

10   drug is GABAergic.  I don't believe it's a GABA-A drug.  It

11   looks like a GABA-B drug to me."  And with that opinion, I

12   cited the reports about the possible GABA-B response in my

13   report.

14   Q.    Do you know the name of the scientist who discovered the

15   GABA-B receptor?

16   A.    I do not.

17   Q.    Bowery, does that ring a bell?

18   A.    Yes.

19   Q.    Do you know that Dr. Bowery also tried to do the same

20   experiment, and he too concluded the opposite of what your

21   report says, that it's not a GABA-B agonist?

22   A.    I take your word for it.

23   Q.    Do you know that there are multiple additional groups

24   who have also concluded the opposite of what your report

25   says?

Page 271

1    A.    There are.  I mean, that's certainly consistent with

2    scientific method that different groups at different times

3    have come up with different conclusions.

4           JUDGE SARIS:  What's different, that it's GABAergic

5    or that it's a GABA-B receptor site?

6           MR. HOOPER:  That it's a GABA-B agonist and thereby

7    GABAergic, your Honor.  That's what's different.

8           JUDGE SARIS:  So it's the mechanism of the

9    GABAergy?

10          MR. HOOPER:  The point, your Honor, is, one early

11   study -- and we'll discuss it later -- said they thought they

12   had found that, that's a way to be GABAergic.  He cited it.

13   There are five studies that tried to replicate it and could

14   not.

15          JUDGE SARIS:  But it's a narrow point, in that it's

16   now not GABA-B GABAergic, right?

17          MR. HOOPER:  His report says it is.

18          JUDGE SARIS:  Where?  No, it doesn't.

19          THE WITNESS:  My summary does not say that, and I'm

20   offended, actually, that the issue is being brought up.

21          JUDGE SARIS:  Wait, wait.  Don't be offended.

22          THE WITNESS:  All right.

23          (Laughter).

24          JUSTICE FRIEDMAN:  Is your view that gabapentin is

25   predominantly GABAergic in any way dependent on a finding

Page 272

1   that it is a GABA-B drug?

2           THE WITNESS:  No, it's not.

3           JUSTICE FRIEDMAN:  Can you explain why that that is

4   not an important finding?

5           THE WITNESS:  There's conflicting evidence of how

6   it's GABAergic, which receptors or no receptors that it

7   interacts with.  Why I didn't put that in, I don't know.  I

8   don't consider that a relevant point, but. . .

9   Q.   Do you believe it?

10  A.   I'm sorry?

11  Q.   Do you believe it acts at GABA-A receptors, if not B?

12  A.   No, I think I've already answered that, and I don't

13  believe it acts with GABA-A or GABA-B receptors.  And the

14  information that I was able to deduce is that it's GABAergic,

15  but the GABAergic function is separate from those very

16  specific receptor sites.

17          MR. HOOPER:  Slide 39, please.

18          JUSTICE FRIEDMAN:  And one more question.  A few

19  minutes ago -- I don't know if you'll be able to get it at

20  this point -- you said that research has not been done yet.

21  Can you clarify what research you're saying has not been

22  done?

23          THE WITNESS:  Yes, absolutely.  There has been no

24  research or clinical trial experiment that demonstrates

25  unequivocally, or really otherwise, that giving someone

1   gabapentin increases their risk of suicide.  There's no -- a

2   number of different ways.  No one would design a clinical

3   trial, for example, with that as an end point.

4            JUSTICE FRIEDMAN:  So you're referring to clinical

5   trials?

6            THE WITNESS:  Clinical trials are an experiment.

7   You wouldn't design an experiment that would look for an end

8   point that had suicide as a result, so that has just not been

9   studied.

10           JUSTICE FRIEDMAN:  Thank you.  Counsel, please

11  continue.

12  Q.   And there's no observational epidemiological study such

13  as a cohort case control or ecological study that concludes

14  gabapentin causes suicide either, is there?

15  A.    In fact I did not conclude that.  I said that it

16  increases the risk of suicide, which is a very important

17  difference.  The biological plausibility of causality exists,

18  but all the work has not been done, and some of the work, as

19  I've already stated, cannot be done, ethically or otherwise.

20  So we're still waiting on that, but --

21  Q.   Just for clarity, you are distinguishing a finding that

22  something increases a risk from a finding of general

23  causation?

24  A.   Yes, because we have studies from the FDA.  There are

25  199 studies which demonstrates a relative risk greater than

0301a09c-a750-4035-b5b0-dce99c568610

1   one, for example.

2   Q.   An odds ratio actually, right?

3   A.   Yes.

4   Q.   And you are distinguishing that from general causation,

5   correct?

6   A.   Yes.

7   Q.   And you are opining that the first step is biologically

8   plausible; is that right?

9   A.   Yes.

10  Q.   And you are not opining that the second step has been

11  scientifically proven?

12  A.   I'm opining that there is excellent evidence, as

13  presented by Professor Trimble and myself and Dr. Blume,

14  that -- I've lost my train of thought -- I'll think of it in

15  a minute -- that the science behind the relationship between

16  gabapentin and suicide exists.  What does not exist is the

17  experiment or trial that it's a cause-and-effect

18  relationship.

19        We also have the evidence, as in the FDA report, as

20  in the Collins/McFarland meta -- case-controlled -- well,

21  it's not case-controlled -- case study that the risk is

22  increased with gabapentin, depending on the different

23  circumstances, but it's increased.

24  Q.   Slide 39, please.  At Page 18 of your report, you cite

25  the Collins and McFarland study, correct?

1   A.   Yes.

2   Q.   It's a paper published earlier this year, correct?

3   A.   In 2007, yes.

4   Q.   A copy is at Tab J in your binder.

5        MR. HOOPER: And your binders, your Honors.

6   Q.   And what you see at Tab J of your binder is a copy of

7   the Collins/McFarland study, correct?

8   A.   Yes, that is correct.

9   Q.   41, please.  Let's walk through this.  This is first a

10  study of suicide and suicide attempts, by the way, in four

11  groups of patients, correct?

12  A.   That is correct.

13  Q.   They're patients that were treated with four different

14  drugs, correct?

15  A.   That is correct.

16  Q.   There is no placebo-controlled group in this study,

17  correct?

18  A.   That is correct.

19  Q.   And there is no direct comparison of any of these four

20  treated groups to any unexposed control group?

21  A.   Yes, that is correct.

22  Q.   And the background of the study, the authors say, is

23  that suicide completion and attempted suicide are major

24  concerns for people with bipolar disorder, correct?

25  A.   Yes, that is correct.

1    Q.   And they go on to say that studies have suggested that

2    lithium, one of those four treatments, may be superior to

3    this divalproex, a different job, with regard to minimizing

4    suicidal behavior, correct?

5    A.   That is correct.  Our opinion is that it has a possibly

6    protective effect against suicide.

7    Q.   Next slide.  They examined in this study the medical

8    records of 12,662 Oregon Medicaid patients who had bipolar

9    disorder.  That's the condition that Judge Saris was asking

10   about yesterday, right?

11   A.   Yes.

12   Q.   And when you say that there was an elevated risk, what

13   you mean is that the rate of events, suicide or attempts, on

14   gabapentin was higher than the rate that was observed on that

15   protective drug lithium, correct?

16   A.   That is correct.

17   Q.   As it says here, the rates they use were what's called

18   "adjusted hazard ratios."  That's the measure of the

19   relative risk between one drug group and another?

20   A.   Yes.

21   Q.   And they measured it versus lithium users, correct?

22   A.   They did, yes.

23   Q.   There's no calculation anywhere in this study about the

24   risk on gabapentin versus no gabapentin?

25   A.   No, but there's a clear signal in the last sentence

1   under "Results" section of this paper which states for

2   suicide deaths, the adjusted hazard ratios were 1.5 for

3   Divalproex users, not significant, but 2.6 for gabapentin

4   users, which was statistically significant, and otherwise the

5   information was not available for Tegretol users or

6   carbamazepine.

7            Why that's very important, and I want to just take

8   a moment here, if I can, your Honor, is that if you have a

9   bipolar population, and if you're giving some of them lithium

10  and some of them gabapentin, you're making a very bad

11  decision potentially, or according to this report, if you're

12  giving them gabapentin because you're increasing their risk

13  of suicide deaths 2.5.

14            JUDGE SARIS:  But what if you gave them nothing?

15            THE WITNESS:  There would still be a background

16  risk.

17            JUDGE SARIS:  So are you better off with a placebo,

18  or are you better off with gabapentin?

19            THE WITNESS:  That's -- let me think about that.

20            JUDGE SARIS:  What's the percentage of -- what's

21  the suicide rate among bipolars?  What do you call it, the --

22  the baseline rate or whatever?

23            THE WITNESS:  The baseline rate is somewhere

24  between one in a hundred bipolar patients to 1 in 250.

25            JUDGE SARIS:  So would this be a better or -- so

1   can you tell -- it's hard to compare apples and apples.  Do

2   you have it up there?

3          MR. HOOPER:  Your Honor, I have it on the board.

4   The author answered precisely your question in the very first

5   paragraph, and that's why what Dr. Kruszewski just said is so

6   terribly misleading.  You hit the nail square on the head.

7   They said, underlined in red, "In the absence of treatment,

8   one person per hundred individuals with bipolar completes

9   suicide annually," and that's very important, "and 4 per 100

10  attempt."

11         In the very next paragraph, next slide --

12         JUDGE SARIS:  Where are you so we can find it?

13  What page?

14         MR. HOOPER:  On the first page of the

15  Collins/McFarland study, which is Tab J in your binder, and

16  it's in the lower right-hand corner, your Honor, where it

17  says "Introduction."

18         JUDGE SARIS:  All right.

19         MR. HOOPER:  So those rates are in untreated

20  bipolar one per one hundred per annum for suicide, four per

21  one hundred per annum for attempts.

22         JUDGE SARIS:  So wait, wait, before we do this, to

23  compare apples with apples, if you took the Neurontin, what

24  would your deaths be out of a hundred?  Can you tell?

25         THE WITNESS:  I didn't do that calculation, so I

1  don't know.

2       MR. HOOPER:  Your Honor, I'm going to walk exactly

3  through this.  I can lay it out.  We're on the same page.

4  Q.   The second paragraph of the article, the first full

5  paragraph on Page 2 explains that lithium reduces the risk of

6  suicide attempts in completed suicides, and it says down here

7  that it reduces it roughly ninefold, correct?

8  A.   That is correct.

9  Q.   And they reduce it to one death per thousand per

10 patient-years?

11 A.   Yes.

12 Q.   Correct?  Next slide.

13 A.   The issue is --

14 Q.   Here's the math, your Honor.

15 A.   This is a very important issue, and I'd like to comment

16 on it again.  One of the results here is that you still have

17 a bigger risk giving gabapentin than you have with other

18 drugs for completed suicides.  So regardless of the

19 background rate, the risk is increased.  My concern here is

20 that, among other things, gabapentin was given to a lot of

21 people who didn't even have bipolar disorder.

22       JUDGE SARIS:  In the what, in the clinical trials

23 or in this study?

24       THE WITNESS:  Just in general, your Honor.  I'll

25 just cite, and I don't have the reference with me, but the

1   Archives of Internal Medicine, I believe approximately three

2   years ago, quoted that Neurontin is the most often prescribed

3   off-label drug that was looked at in that analysis.

4          MR. HOOPER:  Your Honor, the point is really

5   simple:  To get to one in a thousand, you're going to see

6   when they calculate the gabapentin rates, they do it in one

7   per thousand.  When you want to go take the background rate

8   of one in a hundred and equate that to a thousand

9   patient-years instead of a hundred patient-years, you

10  multiply both sides of the fraction by ten.  One in a

11  hundred, ten in a thousand, same thing.  That's why the

12  paragraph we just read about the protective effect of lithium

13  being reduced by ninefold by these authors makes any sense.

14  They say it reduces it to one per thousand, and that's a

15  ninefold reduction.  Well, one in a thousand is a ninefold

16  reduction from ten in a thousand.  So if you want to go a

17  hundred patient-years to a thousand patient-years, you

18  multiply both the top and the bottom by ten.

19          Next slide please.

20  Q.  Here are the results, correct, Dr. Kruszewski?

21  A.  Is this in the same Table 2?

22  Q.  This is Table 2 on Page 3 at the very bottom.

23  A.  That is correct.

24  Q.  And the numbers on a per thousand person-years of

25  exposure basis for suicides are in this row.  Suicide

Page 281

1    attempts per thousand years are in the bottom row, correct?

2    A.   That is correct.

3              JUDGE SARIS:  So --

4              MR. HOOPER:  And we were looking at a background

5    rate, your Honor, again of ten per thousand in untreated.

6              JUDGE SARIS:  That doesn't help at all.

7              MR. HOOPER:  Gabapentin reduces it by 65 percent.

8    The rate here for suicide for gabapentin is 3.5 against a

9    background rate of ten per thousand.

10             JUDGE SARIS:  What about suicide attempts?

11             MR. HOOPER:  9.49 against a background rate of

12   forty per thousand.

13             JUDGE SARIS:  Oh, I see, so it's a different

14   background rate.

15             MR. HOOPER:  Right.

16             MR. FINKELSTEIN:  Your Honor, Dr. McFarland was

17   deposed in this case, and we'll give you his transcript

18   because he explained all of these.

19             JUDGE SARIS:  I'm not sure I understand it if you

20   add them all together, so --

21             MR. FINKELSTEIN:  It's not exactly. . .

22             MR. HOOPER:  Let me show your Honor.  Let me see if

23   I can do it this way.

24             JUDGE SARIS:  If it's not important or you can do

25   it with someone else --

1          MR. HOOPER:  It is important.  It's very important,

2     your Honor.

3     Q.   Taking those numbers, Dr. Kruszewski, that we just got

4     from the table, yellow is the rate of attempts from that

5     table for each drug, lithium, Divalproex, gabapentin,

6     carbamazepine.  The black bars are the rate per thousand

7     patient-years of suicide in each of the four treatments for

8     bipolar, correct?  Those are the same numbers?

9     A.   Yes, that's correct.

10          MR. FINKELSTEIN:  Your Honor, just where is this

11     from?  Was this published?  I don't know where this is from.

12          JUDGE SARIS:  Where is it from?

13          MR. HOOPER:  It's from Table 2 we just looked at in

14     the study.

15          JUDGE SARIS:  Oh, I see.

16          THE WITNESS:  That's your own graph, though.

17          MR. FINKELSTEIN:  Oh, you created the graph.

18          MR. HOOPER:  Yes, I created the graph, sure.

19     Q.   Here are the numbers:  .78, .9, 3.5, 0.

20          .78, .9, 3.5, 10, or zero.  The same numbers we

21     just looked at.  Those are the numbers from Table 2, correct?

22     A.   Yes.

23          MR. HOOPER:  And, your Honor, on a

24     per-thousand-patient-year basis, what we plotted in those

25     numbers you looked at, in the very first paragraph of the

1    article, the background rate of suicides and attempts per

2    year in untreated bipolar patients, the very ones you asked

3    about, one per hundred, or ten per thousand, four per 100 or

4    forty per thousand.  Now hit the button.

5            Here's the significance and why neither of these

6    articles even purports to say that the study shows any of

7    these treatments causes suicide --

8            MR. LONDON:  May I interpose --

9            MR. HOOPER:  -- because it's so blaringly --

10           MR. LONDON:  May I propose that he's testifying.  I

11   don't mind him asking questions, but I'm a little concerned.

12           JUDGE SARIS:  Yes, you've got to ask questions.  We

13   can put you on the stand.

14   Q.   True or false:  On a per-thousand-patient-year basis,

15   the suicide and the suicide attempt rates in each of these

16   four treatments was lower than the stated annual background

17   rate in untreated bipolar that appears in the first paragraph

18   of the study?

19   A.   That is true, but I also believe that's a misleading

20   conclusion and misrepresents the findings of the underpowered

21   study.

22   Q.   Nowhere in that study do Collins or McFarland say that

23   this study shows that gabapentin or any of the other four

24   treatments causes suicide, do they?

25   A.   The risk of the anticonvulsants that they looked at here

1   was statistically significantly higher by a factor of 2.5 for

2   completed suicides for people who took gabapentin.  So for me

3   as a clinician, if I've got a bipolar patient, here's as

4   simple as I can state the issue:  I can give them Tegretol, I

5   can give them lithium, I can give them oxcarbazepine; but I

6   would not give them gabapentin because I would be increasing

7   their risk of suicide greater than all other treatments.  And

8   that is something I believe you cannot refute.

9           JUSTICE FRIEDMAN:  You're saying that the risk is

10  2.5 higher than the risk for patients who took lithium, not

11  2.5 percent higher than the background rate?

12          THE WITNESS:  The risk was 2.5 times higher.

13          JUSTICE FRIEDMAN:  Than what?

14          THE WITNESS:  Than the lithium protective effect.

15          JUSTICE FRIEDMAN:  The lithium.

16          MR. HOOPER:  Slide 50.

17  Q.   In fact, Dr. Kruszewski, on Page 4 of the article, in

18  the "Discussion" section, the authors, Collins and McFarland,

19  explicitly address the explanation for why there would be

20  that 3.5 on gabapentin in those groups of patients versus

21  the .78 in lithium, don't they?

22  A.   I don't recall that.

23  Q.   Well, let's read it together.  They say, "The data

24  suggest that lithium was associated with a reduced risk of

25  attempted suicide among Medicaid patients with bipolar

1   disorder," correct?

2   A.   Yes.

3   Q.   And they say, "It remains unclear whether or not lithium

4   is associated with a reduced risk of completed suicide,"

5   correct?

6   A.   That is correct.

7   Q.   And then they say right there, "The elevated rate of

8   completed suicide among gabapentin users --" relative to

9   lithium, correct? -- "may well be related to the prescription

10  of this medication for people with chronic pain in addition

11  to bipolar disorder who could be at very high risk for

12  suicide."  That's what the authors said about it, correct?

13  A.   Yes.  What was your question about that?

14  Q.   Is that what the authors said?

15  A.   That's what that says, yes.

16  Q.   Slide 52.

17  A.   I mean, I'm not sure that doesn't disagree with any of

18  the opinions I've already given here.  People who have

19  bipolar disorder are at higher risk for suicide.  People who

20  have chronic pain are at higher risk for suicide, so I'm

21  not -- I'm just not following, if I'm missing something where

22  you're going.

23  Q.   Well, Dr. Kruszewski, when you say that the rate of

24  suicide in the gabapentin group was higher relative to the

25  lithium group, that could be because they're both protective,

Page 286

1   couldn't it?

2   A.   Repeat that.

3           JUDGE SARIS:  You know what, he's made

4   his rhetorical point.  You're out of time, so how much more

5   do you have?

6           MR. HOOPER:  One question.

7           JUDGE SARIS:  One more question, all right, go

8   ahead.

9   Q.   Collins' and McFarland's stated conclusion from that

10  study was, "Overall, then, it remains unclear whether or not

11  there is a differential impact on suicide deaths among the

12  mood stabilizing agents, correct?

13  A.   They did.  The important point again here is, since,

14  your Honor, that we cannot do an outcome study with suicide

15  as the outcome, we can look, however, at ancillary

16  information of adverse events that come as a result of doing

17  other studies for benefit, like in efficacy studies.  And

18  this study continues to show that gabapentin risk was 2.5

19  times higher, which is statistically significant.

20  Q.   Than lithium, correct?

21  A.   Yes.

22  Q.   And not for attempts, correct?

23  A.   For completed suicides, yes.

24          MR. HOOPER:  No further questions.

25          MR. LONDON:  I'm going to be really focused and

Page 287

1    quick, your Honor, and I appreciate you giving me just a

2    moment.

3           JUDGE SARIS:  So you are limited to five minutes.

4    You went way over last time, so five minutes because we've

5    got to get to the next witness.

6    REDIRECT EXAMINATION BY MR. LONDON:

7           MR. LONDON:  The first question you asked the

8    witness after the break was whether he had found the article

9    during the lunch break.

10          JUDGE SARIS:  Yes.

11          MR. LONDON:  And in the article, just to bring us

12   to the point --

13          JUDGE SARIS:  This is -- wait a minute -- Perugi?

14          MR. LONDON:  It was his footnote regarding the

15   Perugi article, which was in 22-6 in the Journal of Clinical

16   Psychopharmacology.  And as I recall, the question to the

17   witness was, "That doesn't stand for the proposition that you

18   cited.  Can you find any article where it stands for what you

19   cited?"

20          THE WITNESS:  Yes, thank you for finding it.  I

21   have trouble reading on the stand.  It's hard to concentrate

22   sometimes.  On Page 585 of that article by Perugi, et al, in

23   the second paragraph, let me just read that paragraph because

24   that's what I was alluding to about the effect of gabapentin

25   on the release of the monoamines:  "Gabapentin has been

1   hypothesized to improve synthesis and release of GABA

2   by increasing the activity of glutamic acid and

3   decarboxylase.  It also protects neurons from damage by

4   inhibiting the glutamate."  We've already talked about that

5   today.  "This neuro-protective activity, although

6   controversial, might be explained either by activation of the

7   glutamate-metabolizing enzyme --" I'll not give you that

8   word -- "or by the competitive inhibition of the glutamic

9   aminotransferase chain.  GABA, and the final point here is

10  gabapentin, also inhibits voltage-dependent sodium and

11  calcium channels, as well as the release of dopamine,

12  norepinephrine, and serotonin."

13              JUDGE SARIS:  So you relied on that last line?

14              THE WITNESS:  I'm sorry?

15              JUDGE SARIS:  The last line is what you're relying

16  on?

17              THE WITNESS:  Yes, yes.  And that quotes the work,

18  by the way, of Kelly and Dr. Taylor.

19  Q.   There seems to be some controversy about the GABAergic

20  business.  I thought that was settled yesterday, but I want

21  to show you the FDA's statistical review that was just

22  released May the 23rd.  And on Page 13 of the FDA's

23  statistical review, the FDA has put gabapentin in with four

24  other products, divalproex, pregabalin, tiagabine, and

25  topiramate?

0301a09c-a750-4035-b5b0-dce99c568610

1   A.    That is correct.

2   Q.    And under what heading has the FDA classified that group

3   or that pool of five products?

4   A.    And just to reiterate, this is the May 23, 2008 report

5   that I've only glanced at so far since I received my copy,

6   but under Section 4.3.2, "Drug Groups," and Subsection 2

7   under that, under "GABAergic drugs" and "GABAmimetic drugs"

8   are included both gabapentin and pregabalin.  And important,

9   because I have looked at this particular page previously,

10  they didn't put them in any other categories.  In other

11  words, topiramate is in the sodium channel-blocking drug

12  category, actually all three of these categories.  They've

13  only identified one single category for mechanism of action

14  for gabapentin and for gabalin.

15  Q.    Do you believe you were being unreasonable, in that the

16  FDA and you agree that gabapentin is GABAergic?

17  A.    It's not unreasonable.  That's their conclusion, yes.

18  Q.    Is that the sort of reasonable thing -- is that the sort

19  of thing a reasonable scientist would rely upon; that is, the

20  FDA's classification of a drug with other drugs of the same

21  class?

22  A.    Yes.

23  Q.    A question was made about where the chart came from that

24  we showed earlier on in which it said that enhancement of

25  GABAergic neurotransmitters was one of the properties of

Page 290

1    gabapentin, and it had the arrow drawing that for the

2    neuronal inhibition.  Do you see that on your monitor?

3    A.    Yes.

4    Q.    And this is almost me testifying, but that chart came

5    from a peer-reviewed article the parties exchanged by

6    Soderpalm, "Anticonvulsants:  Aspects of their mechanisms of

7    action"?

8    A.    That is correct.

9                   JUDGE SARIS:  Do you have that article?

10                  MR. LONDON:  We'll have to print it for your

11   Honor.  We did not anticipate that being a disputed issue,

12   but I'll be more than happy to provide that for your Honor.

13   Q.    Then last but not least, you were quizzed pretty hard at

14   the moment about Dr. McFarland and his study and Dr. Collins'

15   study, and this is the study in which they found that

16   gabapentin was 2.6 higher than lithium insofar as bipolar

17   patients committing suicide.  I hope I've said that kind of

18   correctly.

19   A.    Close enough.

20   Q.    I've got the numbers.  I may not have the -- okay.  This

21   is the deposition of Dr. McFarland, and here's what

22   Dr. McFarland had to say about that:  "My opinion is that

23   there may well be individuals with bipolar disorder who are

24   better served by taking lithium versus gabapentin."

25                  Did you read that deposition?

Page 291

1    A.   I did not.  I did not.  And that's the point I was

2    making, that as clinicians, we have choices that we must make

3    of chemicals we use to treat psychiatric conditions.  The

4    Collins and McFarland paper clearly suggest that one should

5    not use gabapentin and one should use the other drugs that

6    are available.

7    Q.   We know that gabapentin has never been approved for

8    treatment of bipolar disorder, at least within the United

9    States.

10   A.   It has not.

11   Q.   Has lithium?

12             JUDGE SARIS:  Has it ever been approved anywhere?

13             THE WITNESS:  I do not believe so.

14             MR. LONDON:  To our knowledge, the answer is "no,"

15   your Honor.

16   Q.   Is lithium an approved drug?

17   A.   Yes.

18             MR. LONDON:  That is all.  I hope I haven't

19   overtaxed my time.  Thank you, your Honor.

20             JUDGE SARIS:  Thank you very much.

21             (Witness excused.)

22             JUDGE SARIS:  Do you rest?

23             MR. LONDON:  I believe at this point we do, your

24   Honor.

25             MS. McGRODER:  Your Honor, we are prepared to put

1    on at this time, your Honors, Dr. Robert Gibbons, who's a

2    biostatistician and conducts meta-analyses much like the FDA

3    meta-analyses.  And that was our plan, but we want to do what

4    you want to do, and so we also have here today Dr. Charles

5    Taylor, who obviously, as has been mentioned by the

6    plaintiffs' experts, spent his lifetime working on the

7    mechanism of action of gabapentin, so --

8              JUDGE SARIS:  Where's Dr. Gibbons from?

9              MS. McGRODER:  Dr. Gibbons is from Chicago, the

10   University of Chicago Illinois.

11             JUDGE SARIS:  And where's Dr. Taylor from?

12             MS. McGRODER:  Dr. Taylor is from Michigan.

13             JUDGE SARIS:  Well, let's try and get the two of

14   them if it's possible.

15             MS. McGRODER:  I don't think it's possible to do

16   both.  I would be very surprised if we got through both

17   today, so we can start with wherever you want to start.

18             JUDGE SARIS:  Whatever, but with Dr. Gibbons, I

19   gave permission for his report only with respect to the FDA

20   alert.  The motion to strike the other portions was

21   well-taken.

22             MS. McGRODER:  He's going to talk about the FDA

23   alert.

24             JUDGE SARIS:  I didn't allow a general report, so

25   the only opinion he's going to be allowed to give is with

Page 293

1    respect to the FDA alert.

2            MS. McGRODER:  And that's what he's prepared to

3    talk about today.

4            JUDGE SARIS:  And at some point, I'm confused as

5    well.  I don't even think that judge Friedman got them both.

6    I got two reports.  I read the first one, and then I refused

7    to read the second one.

8            MS. McGRODER:  Let me explain that briefly.  You

9    had not ruled yet that we could submit a report.  We moved

10   for leave to submit a report for Dr. Gibbons, and you hadn't

11   ruled yet.  So at the time that we filed our Daubert motion,

12   we submitted a declaration from him.  Subsequently you ruled

13   that he would be allowed to submit a report and that we

14   should submit the report to you.  So following the Daubert

15   briefing, we submitted his report to you.  So one is a

16   declaration, and the other is his full report.

17           MR. FROMSON:  I disagree.  It's legal argument, not

18   proper for today, unless you want to entertain oral argument.

19           JUDGE SARIS:  Right now I don't want to take the

20   time, but one thing I'm crystal clear on, at least -- I only

21   read the first one for the second time.  One was, of course,

22   three times as long, but at least with respect to the first

23   one, there were at least three opinions in there which were

24   not related to the FDA alert, and the motion to strike is

25   allowed.  Only the FDA alert.  Let's go.

1          MR. LONDON:  May I ask a mildly tangential

2     question?  I'm not quite sure what Judge Friedman's position

3     is on that same difficulty.

4          JUSTICE FRIEDMAN:  I don't think that that issue

5     has ever been directly brought to my attention, and I agree

6     with Judge Saris that we should not take the time now.  I

7     will abide by her ruling.

8          MR. LONDON:  Assuming, hypothetically, the defense

9     may want to make some record of it, may we have it that we're

10    going to operate under Judge Saris' ruling, both in --

11         JUDGE SARIS:  She hasn't even seen it.  I think

12    nobody filed all this in front of her, so that's not --

13         MR. LONDON:  But to the extent that Dr. Gibbons is

14    doing anything, it's limited, both in your court and in

15    Judge Friedman's court --

16         JUSTICE FRIEDMAN:  Well, I'll hear argument on that

17    at a later time, but now, as I started to say, I will abide

18    my Judge Saris' ruling.

19         JUDGE SARIS:  And let me ask you, there's one other

20    question.  There's another objection that I didn't know how

21    to rule on, that he's relying on data that were not provided

22    to the plaintiffs.  Is that true?

23         MS. McGRODER:  No.  I mean, if it is, I don't know

24    what you're talking about.  What he's going to rely on here

25    today is the FDA alert and the subsequent statistical review,

1   which the plaintiffs' experts have relied on all day long.

2           JUDGE SARIS:  No, but there was some data you said

3   you never saw.  What was it?

4           MR. FROMSON:  Your Honor, what we were given were

5   essentially the summaries upon which the doctor made his

6   opinions.  All the underlying data that ultimately culminated

7   in the summaries we have not been provided that deals with

8   Lyrica, pregabalin, the sister drug to gabapentin.  And

9   without being provided --

10          JUDGE SARIS:  But you've been provided with the

11  summaries, right?

12          MR. FROMSON:  I would agree in sum and substance

13  that what he put in his report was a summary, but we don't

14  have the underlying data to basically even review that.

15          MS. McGRODER:  Well, your Honor, we can have an

16  full argument on the motion if you'd like, but we've given

17  them everything that he relied on.

18          JUDGE SARIS:  But if he relied on the underlying

19  data and he says that, then you have to give it to them.

20          MS. McGRODER:  Absolutely, and we would.  We've

21  given them everything that he has relied on.

22          JUDGE SARIS:  I know, but it's a little unfair to

23  make them come into a hearing where they haven't seen the

24  same data he's relied on.

25          MS. McGRODER:  That's not the case.

Page 296

1          JUDGE SARIS:  Let's not -- let's go, let's go.

2                    ROBERT GIBBONS

3     having been first duly sworn, was examined and testified as

4     follows:

5          THE CLERK:  Would you please state your name and

6     spell it for the record.

7          THE WITNESS:  Robert Gibbons, G-i-b-b-o-n-s.

8     DIRECT EXAMINATION BY MS. McGRODER:

9     Q.   Dr. Gibbons, could you please tell the Court briefly

10    about your experience, training, education in the field of

11    biostatistics, and in particular in the field of

12    biostatistics and suicide.

13    A.   I am a professor of biostatistics, a professor of

14    psychiatry, and the director for the Center for Health

15    Statistics at the University of Illinois at Chicago.  I

16    received my training at the University of Chicago and just

17    went across town for the only job I've had the rest of my

18    life.

19          I am a member of the Institute of Medicine of the

20    National Academy of Sciences.  I spent six years on Health

21    Sciences Policy Board, helping to direct the Institute of

22    Medicine of what projects would be appropriate to undertake.

23    I have been a participant in many projects for the Institute

24    of Medicine, including a project on prevention of suicide, of

25    which I wrote the statistical chapters, both the statistical

1   appendix and the chapter on the design and analysis of

2   studies looking at suicide.

3          I also as part of the Institute of Medicine

4   developed the method that is now used for the allocation of

5   organs for transplantation; and most recently was a member of

6   the U.S. Drug Safety Study, which led to new laws about how

7   the FDA looks at surveillance and post-marketing safety data.

8          Locally, I received the Harvard Award for lifetime

9   contributions to the area of psychiatric epidemiology and

10  biostatistics.  I think I'm the only living member who has

11  that award.  Maybe that's not a good thing.  Hopefully it's

12  not predictive.

13         I was a member of the FDA Scientific Advisory Board

14  on antidepressants and pediatric suicide.  I have been

15  working in the area related to statistical analysis and

16  design of suicide research for the last twenty-seven years.

17  I've published fifteen peer-reviewed papers and the Institute

18  of Medicine report as a part of that.  Last week I was in

19  Washington as a member of the VA Expert Panel looking at the

20  issues of VA suicides, particularly in the veterans coming

21  back from Iraq.

22         I also last week got a $3.5 million grant from the

23  National Institute of Mental Health to develop new methods

24  for the analysis of suicide data and drug surveillance in

25  general and to further study the relationship between

0301a09c-a750-4035-b5b0-dce99c568610

1   antidepressants and suicide.  And there are a few other sorts

2   of related things.

3            I'm a fellow of the American Statistical

4   Association.  That accounts for one-third of one percent of

5   the membership of the American Statistical Association, which

6   is quizzically the same rate as suicidal thinking in patients

7   enrolled in antiepileptic drug trials.

8            JUDGE SARIS:  Is there a challenge to

9   qualifications?

10           MR. LONDON:  There is not.

11   Q.   So you have actually conducted meta-analyses?

12   A.   Yes.  I've written papers on the statistical methods

13   that are used and developed new methods for doing

14   meta-analysis for studies in which the same subject is

15   treated under both conditions, so I've followed the

16   meta-analytic literature to some degree, yes.

17   Q.   And so you know what meta-analyses can be used for and

18   what their limitations are?  Is that fair?

19   A.   Yes.

20   Q.   Can a meta-analysis, as that conducted by the FDA in the

21   alert and using the statistical review they supplied, can

22   that meta-analysis be used for the basis, as a basis for an

23   opinion about whether a drug can cause an event?

24   A.   Meta-analyses are very useful methods for research

25   synthesis, for taking a lot of information and pulling it

1  into one general statement that may say something about the

2  overall effects.  They are not useful for deriving causal

3  inferences.

4         JUDGE SARIS:  Would you call that an

5  epidemiological study?

6         THE WITNESS:  Well, that's -- I personally

7  wouldn't.  You know, I think of epidemiologic studies,

8  particularly in this area, pharmacoepidemiologic studies, as

9  large-scale studies that look at large medical claims,

10  medical records databases.  So, for example, when we wanted

11  to study the relationship between antidepressants and

12  suicide, we conducted a pharmacoepidemiologic study by

13  looking at 226,000 depressed veterans, and comparing the

14  rates of serious suicide attempts between those who had

15  received treatment with an antidepressant versus those that

16  didn't, and looking at among those who took an

17  antidepressant, what was the rate of suicide attempts before

18  they ever started to take it?

19         JUDGE SARIS:  So the difference would be, I think,

20  something like 29,000 patients.  So you're just saying it's

21  not an epidemiological study because it's not -- some use the

22  words powered, sufficiently powered?

23         THE WITNESS:  No, I wouldn't -- I mean

24  epidemiologic studies are great in the sense that they can

25  look at very large populations, and randomized clinical

1  trials can look at smaller populations.  Meta-analysis is a

2  way of combining the evidence from many randomized clinical

3  trials, and as such, it is a tool for data review.  It's a

4  tool for research synthesis of what are randomized clinical

5  trials.  They're not epidemiologic studies.  To me as a

6  statistician, the difference between an epidemiologic study

7  and a randomized clinical trial is that an epidemiologic

8  study is an observational or naturalistic study, and it's a

9  study in the general population.  It has great

10 generalizability because it talks about all kinds of people

11 in the population, not just those people who find themselves

12 enrolled in randomized clinical trials.  So there are

13 strengths and weaknesses to epidemiologic studies and

14 randomized clinical trials.

15        Now, some people would refer to a meta-analysis as

16 an epidemiologic study because the studies that get into the

17 meta-analysis are not necessarily representative of the total

18 population.  I find that not a convincing argument.  So

19 meta-analysis, to me, just sort of floats around someplace in

20 the middle.  Its basic component parts are randomized

21 clinical trials, which have nothing to do with epidemiologic

22 studies, and it is a tool for synthesizing the information

23 from many of those kinds of studies.

24        JUDGE SARIS:  And so accepted in the field as a

25 reliable tool?

0301a09c-a750-4035-b5b0-dce99c568610

1          THE WITNESS:  It's a reliable tool for research

2    synthesis, but it has a very important caveat, and the

3    important caveat is the issue of heterogeneity.  Even if one

4    is studying, say, a single drug for a single indication,

5    there is a lot of variability that are observed in

6    meta-analyses from study to study to study.

7               In the present context with lots of drugs and lots

8    of different indications, that kind of heterogeneity is

9    implicit.  Tools for meta-analysis assume that there is a

10   common effect, that all of the members, all the different

11   drugs, all the different drug classes, all the different

12   indications, all have the same effect; in this case, the

13   effect being the difference between treated and

14   placebo-controlled arms of these studies.

15              So that is a very serious limitation of

16   meta-analyses to the degree -- because what happens is, you

17   can find in many meta-analyses that one or two substudies or

18   one or two drugs tend to drive the whole thing.  So you come

19   up with a conclusion that says, well, there's an

20   association.  But when you go back and dissect it and figure

21   out what's really going on, you see that it was really being

22   driven by a small subset of the study.  So that's something

23   that you have to be very careful about in interpreting the

24   results of meta-analysis.

25   Q.   Dr. Gibbons, is that why -- is heterogeneity or the

1    differences among the studies and among the drugs and the

2    variation, you know, as a result of these eleven drugs all

3    being for different indications and used differently and

4    studied differently and with different chemical structures,

5    different pharmacologic properties, is that why the FDA says

6    you can't base a causation conclusion on these data?

7          MR. LONDON:  I'm sorry, I have to object to her

8    asking him why the FDA said something.

9          JUDGE SARIS:  Yes.  I'll sustain.

10          MR. LONDON:  I'm sorry, your Honor.

11          MS. McGRODER:  That's okay.  Can you put up

12    Slide 17.  In this notebook, your Honors, is the statistical

13    review from the FDA, which I believe the plaintiffs' counsel

14    has already given you.  You may want to work off the copy you

15    already have.

16          MR. LONDON:  Can we have one?

17    Q.   Dr. Gibbons, in the FDA alert, has the FDA commented on

18    what its analysis can and cannot be used for?

19    A.   Yes, they have.

20    Q.   And what has the FDA said?

21    A.   The FDA has indicated that the meta-analyses of these

22    alerts do not indicate a causal link between these drugs and

23    suicidality.  And this is also very consistent with the

24    statements made by the FDA for the antidepressant trials and

25    the issues related to suicidality for antidepressant

Page 303

1   medications.

2          MS. McGRODER:  Slide 3, please.  Your Honors, we

3   have slides of these.  Is it easier for you to see slides or

4   the board?  What do you prefer?  Do you care?  Can you see it

5   well enough?

6          JUSTICE FRIEDMAN:  If you use the slides, will you

7   just tell me what page you're referring to or what part of

8   the page?

9          MS. McGRODER:  Absolutely.  This slide comes from

10  Page 24 of the statistical review.  You've already seen this

11  slide today, and I just want to spend a minute having

12  Dr. Gibbons explain this slide to you, and in particular the

13  results for gabapentin.

14  A.   The results for gabapentin in this slide indicate that

15  the confidence interval for the odds ratio includes the

16  value 1.  Therefore, the conclusion is that there is no

17  statistically significant association between gabapentin and

18  suicidality.

19  Q.   And what is an odds ratio, in the most simplest terms

20  that even I could understand it?

21  A.   The odds ratio is the ratio essentially in this context,

22  the ratio of risks.  So an odds ratio of 2 indicates that the

23  risk on drug is double the risk on placebo.  An odds ratio of

24  1 would indicate that the risk for placebo and active drug

25  are identical, and an odds ratio .5 would mean that the drug

Page 304

1   is twice as protective relative to placebo.

2   Q.   And so for gabapentin, we heard this morning that

3   there's an odds ratio of 1.57, and then there is a confidence

4   interval.

5            JUDGE SARIS:   So 1.57 means about 50 percent

6   greater risk than a placebo?

7            THE WITNESS:   Right.   It would indicate that there

8   is a 57 percent increased risk relative to placebo on this

9   slide.   That's our point estimate on the basis of the primary

10  analysis conducted by the FDA.

11  Q.   And you can't look at the point estimate alone, can you?

12  A.   No.   Of course you need to look at the confidence

13  interval.   And you also have to know how this meta-analysis

14  was conducted, and this is a very important point.   Namely,

15  the method that FDA used in their primary meta-analysis

16  excluded all studies that had zero events in both arms, drug

17  and placebo.   Of the 49 studies that were submitted to FDA by

18  Pfizer regarding gabapentin, there were only three suicidal-

19  thinking events, and those were in three different studies.

20  So of the 49 studies, only three of them made it into FDA's

21  primary analysis.   And when you discard all of those studies

22  that had zero events, what it does is two things:   One, it

23  biases in favor of increased risk for the drug, and it also

24  creates enormously large confidence intervals.

25  Q.   So let's stop just for one second.   We can see this

1    confidence interval to be enormously large.  It's .12 and

2    then up to 47.66, or Dr. Blume referred to it as 50.  What

3    does that tell you?  What does that mean?

4    A.   Well, it means that we're looking at a very small number

5    of studies, so we have a tremendous amount of uncertainty

6    regarding this point estimate.  It means that certainly the

7    confidence interval includes the value 1.  This is not a

8    statistically significant association.  Our best estimate of

9    it, based on just the three studies for which there were

10   events, is that it's 1.57; but it could be anywhere from 8

11   times more protective or 47.66 times larger than -- it's just

12   an extremely large interval.  You wouldn't rely on that

13   interval.

14          JUDGE SARIS:  So you're saying the FDA did not act

15   appropriately by excluding the zero event?

16          THE WITNESS:  No, I'm not.  My opinion is, I don't

17   like that kind of analysis.  There are better analyses.  But

18   as a part of their sensitivity analyses, FDA did an analysis

19   that did not require them to exclude the events.  And that

20   analysis is reported here as well, and that's a much more

21   reasonable one.

22          JUDGE SARIS:  I don't know what you just said.  So

23   why are you criticizing the FDA for excluding the zeros?

24          THE WITNESS:  Well, think about it this way.  Let's

25   look at gabapentin.  There are forty-nine studies.  Forty-six

1   of them showed no difference.  They both were zeros.  There

2   were no events.  That's forty-six studies that show

3   equivalent risk; there is no difference between placebo and

4   drug.  To throw away the majority of data --

5           JUDGE SARIS:  So I'm just cutting through.  Do you

6   think they made a mistake?

7           THE WITNESS:  I think they made a mistake in

8   choosing that as --

9           JUDGE SARIS:  You say the FDA made a mistake?

10          THE WITNESS:  I think that the FDA's primary

11  analysis, they used the wrong method.  But they went back in

12  a sensitivity analysis, in a second analysis and used the

13  right method.  So I think FDA ultimately did the right thing,

14  and I think it's very informative to this case about what

15  they found.

16          JUDGE SARIS:  Is it in here?

17          THE WITNESS:  Yes, it is.

18          JUDGE SARIS:  Where?

19          MS. McGRODER:  Go to Slide 8, please.

20  Q.  When you say the FDA did a different analysis using what

21  you consider the right method, what is that analysis?

22          JUDGE SARIS:  What page are we at?

23          MS. McGRODER:  This is at Page 26 of the review.

24          THE LAW CLERK:  Is it on the slides?

25          MS. McGRODER:  Oh, it's No. 8.

1   A.   Figure 4 at the bottom, at the top it says "Risk

2   difference for Neurontin."

3   Q.   Now, let me ask you something before you get started on

4   this, doctor, and we touched on this a little bit this

5   morning with Dr. Blume.  Odds ratio, your middle line, the

6   line that tells you whether you're different or not from

7   placebo, is 1, right?

8   A.   That is correct.

9   Q.   Risk difference, the middle line, or the line that tells

10  you whether you're different from placebo or not, is zero?

11  A.   That is correct.

12  Q.   I don't know if that has any basis, and I don't even

13  know if we care to hear it, but let's just not get confused

14  about the numbers and what shows a difference.  So you can go

15  ahead and explain this, please.

16  A.   What's important about this slide is, it includes all of

17  the data that were submitted and that FDA used in their

18  analysis.  There was no exclusion of any studies simply

19  because they had zero events.

20       When you look at this analysis, again you come up

21  with the conclusion that there is no statistically

22  significant association between gabapentin and suicidality.

23  And in this case --

24       JUDGE SARIS:  But here there's a 28 percent odds

25  ratio, right?

1        THE WITNESS:  No, this is not an odds ratio.  This

2   is the difference in risk, and it says .28.  And what that

3   means is, for every thousand patients treated, one quarter of

4   one patient would report a suicidal thought.  It essentially

5   means no difference whatsoever between gabapentin and

6   placebo.  A quarter of one patient, a quarter of one report

7   for every thousand subjects.

8        What this analysis is telling you is that the value

9   is essentially zero.  The difference in risk between

10  gabapentin and placebo is essentially zero, which is very

11  consistent with the data:  two events for gabapentin, one

12  event for placebo.

13       JUDGE SARIS:  And if you were to pool together the

14  different GABAs, the GABAergic drugs, what does this tell

15  you?

16       THE WITNESS:  The FDA did not do that analysis, but

17  I think there's a -- that's a very important point, and let

18  me go back one step to -- if you could show me Slide No. 4 so

19  I can answer your question.  One of the things in reviewing

20  the meta-analysis that we can finally now review critically

21  from a scientific perspective, now that we have the

22  statistical report released by FDA only a week or so ago, is,

23  we can look at what is the composition of the different drugs

24  in terms of the events, because when I first started to look

25  at the data, nothing made sense to me.  I had access to the

1   actual data for gabapentin from Pfizer but not to any of the

2   other data, and I saw that the gabapentin data seemed very

3   inconsistent with the FDA alert.

4           If you look at this slide, what you see is that the

5   majority of the suicidality events --

6           JUDGE SARIS:  So what's that slide?  That's

7   depicting Figure 2, is that it?

8           MS. McGRODER:  That slide, your Honor, is a slide

9   taken from Table 13 in the statistical review, and it's the

10  table at Page -- what page is this?  32, is that right?  And

11  what this -- 23.  And what this --

12          JUDGE SARIS:  Page 23?  Hold it.  Let me just get

13  there.

14          MS. McGRODER:  Sure, sure.

15          JUDGE SARIS:  Page 23?

16          MS. McGRODER:  Page 23, right?  Are you there?

17          JUSTICE FRIEDMAN:  Before we continue, can you

18  explain generally the difference between odds ratio and risk

19  ratio and why they are used, what each is attempting to show.

20          THE WITNESS:  Of course, and I'll keep it directed

21  to where we're at here.  When you're dealing with a rare

22  event like suicide in these cases, the relative risk and the

23  odds ratio are virtually identical.  So as the event becomes

24  rare, the odds ratio and the relative risk become very

25  similar.

1          The odds ratio is essentially a ratio of ratios.

2   It tells you, if something is three to one in one case and

3   one to three in another case, the odds ratio is nine.  It's a

4   way of expressing differences in these probabilities.

5          By contrast, the relative risk, which is more

6   intuitively appealing --

7          MS. McGRODER:  Dr. Gibbons, let me stop you just

8   for a second.  I think they are talking about risk

9   difference.

10          THE WITNESS:  Risk difference or risk ratio?

11          JUSTICE FRIEDMAN:  Well, we have two analyses here.

12          THE WITNESS:  Oh, I'm sorry.

13          JUSTICE FRIEDMAN:  Maybe I haven't asked the

14   question properly --

15          MS. McGRODER:  No, no, you did.

16          JUSTICE FRIEDMAN:  -- but we've been looking at

17   what we call the "tree" on Page 26 and the chart on Page 28,

18   and my understanding was that one of them was odds ratio, and

19   the other was assessing a risk ratio.

20          THE WITNESS:  I now understand your question.

21          JUSTICE FRIEDMAN:  I'm glad someone does.

22          THE WITNESS:  Okay, so the odds ratio is sort of

23   the ratio of the risks, and the risk difference is the

24   absolute difference in the risks.  So one is using division,

25   and the other is using subtraction.  The advantage in this

Page 311

1    case of using subtraction is that you're never dividing by

2    zero.  And because you're not dividing by zero, you can use

3    the studies that have zero events in them.  So it allows you

4    to use all of the data, not just the data from which there

5    was an event, not just the studies for which there was an

6    event.

7           When the event is as rare as it is here, throwing

8    out so many of the studies leads to getting odds ratios that

9    are too big and confidence intervals that are too big.  Using

10   all of the data gives you a more representative look.  One of

11   the ways of using all of the data is to look at risk

12   difference as opposed to an odds ratio.

13          Does that answer your question?

14          MS. McGRODER:  I see one more issue.

15   Q.   Risk difference is the figure on Page 26, correct?  That

16   includes all studies that met the FDA criteria.  It doesn't

17   exclude studies where no events occurred; is that right?

18   A.   That is correct.  That's the major advantage of using

19   risk difference here and why FDA used it as a sensitivity

20   analysis.

21   Q.   And then we've also discussed the odds ratio analysis

22   the FDA did where they did throw out studies with no events,

23   and that's on Page 24, Figure 2.

24          MS. McGRODER:  But, Judge Friedman, you raised a

25   question about rate ratio on Page 28, so I want to make sure

1    that gets answered.  Rate ratio is a person-time analysis.

2            JUDGE SARIS:  So you're testifying.

3            JUSTICE FRIEDMAN:  I didn't think that I had asked

4    that.  I thought I asked that odds ratio and risk ratio.

5            MS. McGRODER:  Do you want to talk about what's on

6    Page 28?

7            JUSTICE FRIEDMAN:  I don't know.

8            MS. McGRODER:  Okay, I don't think you need to.  I

9    mean, I think we can go on.

10   Q.   What I'd like you to do really briefly, Dr. Gibbons, is

11   go back to this chart, but really quickly, can you explain to

12   the Court, on these what aren't really called tree plots --

13   what are they called?

14   A.   They're called forest plots.

15   Q.   Yes, on these forest plots, how do you read this?

16   Because I think this is really helpful.  Can you see this?

17           JUDGE SARIS:  What chart are you holding up?

18           MS. McGRODER:  This is the odds ratio chart which

19   is on Page 24, just so you have a sense of how to read this

20   graph.

21   A.   The centerline is the value 1, which indicates no

22   difference between placebo and active treatment.  The

23   horizontal lines reflect the confidence intervals.  If the

24   confidence interval includes the value 1, it is not

25   statistically significant.  If you take a look at this chart

1   and then the little squares, the filled-in squares, those are

2   the point estimates of what the odds ratio is.  If you look

3   at this chart, you see that there are two drugs that are

4   statistically significantly associated with suicidality.

5   They are lamotrigine and topiramate.

6   Q.   And how can you tell?  How can you tell by looking at

7   that?

8   A.   Because the entire confidence interval is greater than

9   1.  It doesn't include 1.  So the hypothesis of no difference

10  is the value of an odds ratio of 1.  And if the lower

11  confidence limit is larger than 1, it means that there is

12  statistically significant risk associated with that drug

13  relative to placebo.

14  Q.   So drugs that are on this side of the 1 and their

15  confidence interval doesn't cross back over the 1, those are

16  statistically significant, and you can tell it by reading the

17  confidence interval; is that right?

18  A.   That's correct.  And you can see that for all of the

19  other drugs, the confidence intervals include 1.

20  Q.   Now, let's go back to this bar graph based on Table 13

21  in the report.

22  A.   What this graph shows you is that the majority of the

23  events of suicidality, suicidal thinking and suicide

24  behavior, occurred for two drugs, those same two drugs that

25  were the only two drugs that showed a significant effect,

1   lamotrigine and topiramate.

2           JUDGE SARIS:  Are either of those GABAergic drugs?

3           THE WITNESS:  Topiramate is considered GABAergic.

4   It's also considered to be a member of every one of the other

5   classes, so topiramate was in every single one of those

6   subclass analyses.

7           MS. McGRODER:  Jennifer, can you put up Slide 22.

8   A.   As you can see, under "Sodium channel-blocking drugs"

9   topiramate is a member.  Under "GABAergic drugs," topiramate

10  is a member.  Under "carbonic and hydrase inhibitors,"

11  topiramate is a member.  Topiramate and lamotrigine are

12  completely driving FDA's analysis.

13          JUDGE SARIS:  If you were to exclude topiramate,

14  have you done the analysis about if you took the other

15  GABAergic drugs and you combined them?

16          THE WITNESS:  Yes, I have.  Slide 10 shows that

17  topiramate when viewed by itself has a statistically

18  significant odds ratio, indicating increased risk over

19  placebo of two and a half times.

20          MR. LONDON:  May I interrupt.  Please excuse me.

21          JUDGE SARIS:  This is what you haven't seen before.

22          MR. FINKELSTEIN:  This is the first time we've seen

23  this.  We have no idea how he calculated it.

24          MR. LONDON:  I want to be respectful, your Honor.

25          JUDGE SARIS:  No, no, no, no, that's fair.  That's

Page 315

1   fair.  Take it off, take it off.  It's not fair.

2         MR. LONDON:  Not one thing he said today was in his

3   report.

4         MS. McGRODER:  Well, your Honor --

5         MR. LONDON:  Excuse me.  May I finish?  I know you

6   like to -- everything he has said today he has come in and

7   told you for the first time after reading the statistical

8   review.  Nothing that was in the report you authorized him to

9   write has been said by him today.  He has come in and given

10  his spin to the FDA's numbers, and we're hearing it for the

11  first time.

12        JUDGE SARIS:  Is that correct?

13        MS. McGRODER:  Well, your Honor, yes, it is

14  correct.  They submitted the FDA statistical review to you as

15  soon as it came out last week, and every single one of their

16  experts who has been in here for the last day and a half has

17  used that FDA statistical review, including these very odds

18  ratio charts to support their opinions about causation in

19  this case.  And so Dr. Gibbons got the review last week and

20  conducted his analysis on it.  As I said, we'd be happy to

21  submit a supplemental report, but we thought your Honors

22  wanted to hear from the witness today what this meta-analysis

23  is about.

24        JUDGE SARIS:  It's a little unfair.  I can't expect

25  them to cross-examine him.  They can't do it.  That's unfair.

1        MR. SAYLER:  Your Honor, it hasn't been in any one

2   of the plaintiffs' experts' reports either.

3        JUDGE SARIS:  You know, I don't know.  I haven't

4   had an objection.  I have an objection now.  He says he's

5   never seen the data.

6        MS. McGRODER:  The data he's got --

7        JUDGE SARIS:  Excuse me, all right?  It's not in a

8   supplemental report.  I have an objection.  I don't know how

9   Judge Friedman would feel about this.  We can handle this in

10  two ways.  I care enormously about the FDA report.  When the

11  FDA says something, I listen, but I'd like to know the

12  limitations of it.  I want to hear it as long as there's no

13  data that's brand-new that he generated himself, so let me

14  ask that question:  Is this from the data in the FDA report

15  or your own data?

16       THE WITNESS:  Every piece of data that I have

17  presented here is from the FDA report.  I have used no other

18  source.

19       MR. LONDON:  Now, here's the difficulty with his

20  statement, your Honor.  What I just saw them trying to put up

21  was a new piece of calculations, if you will, in which they

22  took topiramate out of the five GABA drugs and recalculated

23  those, gave us a separate one for topiramate and a separate

24  one for the other four.

25       Now, if it will please the Court, I can't even run

1  the Elmo.  I assure you I can't figure out how to

2  cross-examine that kind of newly spun document.

3          JUDGE SARIS:  Well --

4          MS. McGRODER:  Can I try and answer that, your

5  Honor?

6          JUDGE SARIS:  No.  So we have a way of handling it

7  in two ways.  We need to know this information.  The

8  statistical report from the FDA came out last week, and so I

9  need to understand it and the limitations of it.  And this

10 criticism was something that he did put in his report, which

11 is that there was one thing or two things driving it.  But I

12 don't want to be unfair to you.  So we need to do another day

13 of hearing anyway.  We're just never going to finish with it.

14 It's Friday afternoon and all that.  So one way of handling

15 it is, we can either let you respond to it with your experts,

16 either through an affidavit or live at the next hearing, or

17 Dr. Gibbons can come back.

18         MR. LONDON:  May I make a middle proposition, and

19 it's somewhat along these line.  He is halfway through -- I

20 don't know how the clock works anymore -- with his

21 presentation.  I would be okay if he laid his entire

22 presentation out, and then we had an opportunity to receive

23 the transcript, have their exhibits, and have any

24 supplemental report of material he wants; and then they can

25 give us a chance to analyze it and complete it at the next

Page 318

1    resumption of this hearing.

2              JUDGE SARIS:  I think that's a fair proposal.

3              MR. LONDON:  I mean, it seems reasonable to me.

4              JUDGE SARIS:  Does that seem reasonable to you?

5              MS. McGRODER:  You know, it seems mostly

6    reasonable, but I have to say, we've stayed up night and day

7    for the past week since we got the statistical review.  They

8    have experts who could have done the same thing.  They could

9    have done this very same analysis.

10             JUDGE SARIS:  Excuse me.  I accept your proposal.

11   I mean, he's obviously so learned.  Let him do his thing.

12   But I couldn't ask some guy who's basically a lawyer to get

13   up and deal with, you know --

14             MR. LONDON:  I don't know if "basically" is --

15             JUDGE SARIS:  Like Trimble is with the mechanism of

16   action, he is with statistics.  So that seems perfectly fair.

17             JUSTICE FRIEDMAN:  I agree with that.

18             MR. LONDON:  May I ask the Court this question

19   please?  What is "basically"?  I mean, I thought I was doing

20   kind of okay.

21             JUDGE SARIS:  You were doing fine.  I'm just

22   saying --

23             MR. LONDON:  I'm just trying to make it fair for

24   everyone.

25             MS. McGRODER:  So let me make sure I understand.

1   We'll complete the direct examination, we'll submit a

2   supplemental report, and then when we reschedule the hearing,

3   they'll do the cross.

4            JUDGE SARIS:  I don't think we need a supplemental

5   report.  He's given you a supplemental report.

6            MR. LONDON:  Well, it's not quite as easy for me to

7   extract the numbers out of the transcript as it would be to

8   have the documents or the slides, the material that would

9   find its way into such a report.

10           MR. FINKELSTEIN:  Right, we need the data, the

11  underlying data.

12           JUDGE SARIS:  Okay, okay, fair.

13           MS. McGRODER:  I think it's right under Rule 26

14  that he should submit a supplemental report.

15           JUDGE SARIS:  Fair enough, but I've now read so

16  many reports, so it's only going to be on the FDA alert.  No

17  more, like, sneaking in opinion number whatever.

18           MS. McGRODER:  We obviously didn't mean to sneak in

19  anything, but it will be about the FDA statistical review.

20           JUDGE SARIS:  Okay, all right, go ahead.

21  Q.   All right, I believe we were on Slide 10, and,

22  Dr. Gibbons, Judge Saris, I believe, asked you what happens

23  when you pull topiramate out of the analysis for what the FDA

24  has termed the GABAergic drugs?

25  A.   What you see is that topiramate has a statistically

Page 320

1    significant odds ratio, indicating two and a half times

2    greater risk relative to placebo.  This is a group effect.

3    Its confidence interval, as you can also see, does not

4    include the value 1.  It is a statistically significant

5    association.

6              If you look at the remaining drugs that are a part

7    of the GABA group, which includes Neurontin -- that is,

8    gabapentin -- the odds ratio is 1.01.  That means it is

9    virtually identical to 1, indicating absolutely no increased

10   risk of suicidality for the remaining GABA drugs, of which

11   Neurontin is a member.

12             The probability associated with that is .999.  The

13   typical probability associated with statistical significance

14   is .05.

15             JUDGE SARIS:  But let me ask you this:  So you're a

16   statistician.  How does one deal with this where you have

17   topiramate, which I'm going to take from the FDA's

18   classification is GABAergic, and at least the FDA believes

19   that it's sufficiently GABAergic to pool it with the others,

20   but it's statistically significantly greater risk than the

21   others combined?  You've got to give some effect to the

22   topiramate.  So I'm just trying to understand statistically

23   what you would have done.

24             THE WITNESS:  My postmortem on the FDA alert is

25   that the entire analysis was driven by lamotrigine and

1    topiramate.  If those two drugs were not a part of FDA's

2    analysis, there would be no FDA alert on anticonvulsants.

3    There would be no Scientific Advisory Board.  There would be

4    nothing.

5        JUDGE SARIS:  No, but hear my question:  If the

6    FDA, which is entrusted with thinking about these things,

7    thinks that topiramate should have been pooled with the other

8    GABAergic drugs, would there have been a different way of

9    thinking about the statistical impact of topiramate versus

10   the other ones; in other words, a way of reducing the impact

11   that it had in driving its decision?

12       THE WITNESS:  The only way to reduce the impact of

13   topiramate is to remove topiramate.

14       JUDGE SARIS:  So what if the FDA concludes it has

15   the same GABAergic effects?

16       THE WITNESS:  That comes down to the very first

17   question that you asked me about the limitations of

18   meta-analysis.  This is an example where you have an

19   extremely heterogeneous group of studies from different drugs

20   within the GABA group.  Now, FDA never even tested for

21   heterogeneity for just the elements of the GABA group, but

22   these drugs that are a part of this, these five drugs, are

23   showing very different results.  Topiramate is going one way,

24   and all of the other drugs are going the other way.

25       JUDGE SARIS:  So, to you, the critical scientific

1    question would be whether it was reasonable scientifically to

2    pool topiramate with the others?

3             THE WITNESS:  I think that from an empirical basis,

4    based solely on the numbers, there's no reason, it's

5    inappropriate to apply a statistical method that assumes that

6    all five of these drugs have a common risk to a group of

7    drugs which includes one drug that has two and a half times

8    the risk and four drugs that have no risk whatsoever.  The

9    conclusion from that is apples and oranges.  You cannot come

10   up with a reliable conclusion about the pooled risk when you

11   have that level of heterogeneity.

12            JUDGE SARIS:  Would you want to know anything about

13   how topiramate works vis-a-vis gabapentin?

14            THE WITNESS:  I would suspect, on the basis of

15   these data, that topiramate is working in a very different

16   way relative to gabapentin; and I would encourage my

17   colleagues who are basic scientists in this area to look for

18   differences in the mechanism because clearly both the

19   incidence of suicidality and the difference between placebo

20   and topiramate are very, very different than what we're

21   seeing for gabapentin.

22            JUDGE SARIS:  As you sit here today, though, you

23   don't have the expertise to distinguish between the ways in

24   which these drugs are GABAergic?

25            THE WITNESS:  No, not at all.  I'm not an expert in

Page 323

1    that.

2    Q.   Just briefly, the FDA when they did these drug groups

3    put topiramate in the sodium channel-blocking group, the

4    GABAergic and GABAmimetic group, and the carbonic and hydrase

5    inhibitor group.  I take it you don't know why.

6    A.   That is correct.

7    Q.   Okay.  What happens if you look -- let's see.  Jennifer,

8    go to Slide 11.  In the FDA's chart telling us about the odds

9    ratios for the various drug groups -- and we know topiramate

10   is in each of these -- they also give us information about

11   the nongroup.  So we know -- well, let's start here.  Is

12   there any group among these that does not have a

13   statistically significant odds ratio?

14   A.   Yes.  The nonsodium channel-blocking group.  And it's

15   also the only group that doesn't have topiramate in it.

16   Again, the significant results associated with the FDA alert

17   are being driven completely by lamotrigine and topiramate.

18   Q.   And we know this group is not statistically significant

19   because the confidence interval encompasses 1; is that right?

20   A.   That's correct.  I can make the point even more clearly

21   if you were to put up Slide No. 7, I believe.  This is an

22   example --

23            MR. LONDON:  Can I just ask for one kind of aid,

24   since we don't have these slides and they're not being quite

25   identified in the record?

Page 324

1          JUDGE SARIS:  Yes, have you given them the slides?

2          MR. LONDON:  No, we don't have the slides.

3          MR. FINKELSTEIN:  We don't have anything.

4          JUDGE SARIS:  Why haven't you given them the

5     slides?

6          MS. McGRODER:  I apologize.  I thought they were

7     among the materials.

8          MR. LONDON:  We have none of the slides, and even

9     if we did, the record wouldn't say what they were.  So if our

10    ability to treat this as an examination is her transcript,

11    they need to identify in the transcript so we can read what

12    it is.

13         JUDGE SARIS:  We haven't got the slides either.

14         MS. McGRODER:  You do have the slides.  They're in

15    the front of your notebook.

16         JUDGE SARIS:  They are?

17         MS. McGRODER:  Yes.

18         MR. FINKELSTEIN:  They gave us a notebook and

19    conveniently left out the slides.

20         MS. McGRODER:  I apologize for that.  It was

21    inadvertent.

22         MR. ROUHANDEH:  Yesterday you didn't give us copies

23    of virtually any of the things you marked, and we didn't

24    complain about that.  We should get through the rest of this

25    examination.

1        MR. LONDON:  I'm only asking if they would please

2    identify for the Court Reporter what we're looking at so when

3    we have the transcript --

4        MS. McGRODER:  You know what, Jack, I would be

5    happy to sit down with you after and go over it.

6        JUDGE SARIS:  No, no, no.  Just describe the

7    headings on it.  He's exactly right.  I mean, I'm hoping

8    other people will read this transcript and understand it.  So

9    you now have a chart up there called the "Comparison of Odds

10   Ratios," right?  So is that what you're looking at?

11       THE WITNESS:  Yes, it is, Judge.

12       JUDGE SARIS:  That's fair enough.  He's got a good

13   point.  And then you'll mark these all afterwards.  All

14   right, thank you.

15       THE WITNESS:  This is the odds ratio and its

16   associated confidence interval for the two drugs that I claim

17   are driving the FDA analysis, and what you can see is the

18   overall risk is ratio -- the odds ratio is 2.0.  It is

19   statistically significant because the lower confidence limit

20   does not include 1.  And by contrast, the remaining nine

21   other antiepileptic drugs that were the subject of FDA's

22   meta-analysis have an odds ratio of 1.1, again, essentially

23   1, indicating no difference between placebo and any of the

24   treatments among these other nine drugs.

25       Again, the presence of these two drugs is what is

1   leading to the conclusion by FDA that there is a signal

2   associated with antiepileptic drugs.  If these two drugs were

3   not a part of this analysis, there would be no signal

4   whatsoever.  It is neither statistically significant, nor is

5   it clinically meaningful.  There has never been an FDA alert

6   regarding an odds ratio of 1.1, never even close.

7   Q.   Let me ask you, Dr. Gibbons, because there is a

8   statistically significant association for lamotrigine and

9   topiramate in this FDA statistical review, would it be

10  scientifically reliable or generally accepted for me to come

11  into this courtroom and say, "It's my opinion that

12  lamotrigine and topiramate cause suicide"?

13          MR. FINKELSTEIN:  Objection.  Objection.  He's a

14  statistician.

15          MS. McGRODER:  It's the use of the meta-analysis.

16  It's what it can be used for.

17          JUDGE SARIS:  I'll allow that.

18  A.   The answer is "no."  You cannot use meta-analyses to

19  draw a causal inference of -- there are several reasons, but

20  among them, there are a variety of potential biases that

21  could provide an alternative explanation of why lamotrigine

22  and topiramate are significantly riskier than placebo that

23  could describe these effects.  It doesn't mean -- just

24  because they're statistically significant does not infer that

25  it's a causal inference.  This is not one large

1   well-controlled, randomized-controlled trial.

2           JUSTICE FRIEDMAN:  Dr. Gibbons, are there occasions

3   when FDA does not do both odds ratio analyses and risk

4   difference analyses as part of their meta-analysis process?

5           THE WITNESS:  Yes.

6           JUSTICE FRIEDMAN:  Have they promulgated criteria

7   for when to do odds ratio and/or risk difference analyses?

8           THE WITNESS:  The evolution of this in the -- as I

9   said before, I was on the Scientific Advisory Board for FDA

10  for the pediatric trials of antidepressants and suicide.  In

11  that analysis, they did not do the risk difference.  They

12  only did the odds ratios.  And as a function of that, they

13  were criticized, initially by me as a member of the

14  committee, for using a methodology that threw out so much of

15  the data.

16          It's much worse here for the antiepileptic drugs

17  because the incidence of suicidality is an order of magnitude

18  lower than it was in the pediatric antidepressant trials, so

19  they didn't have to throw out as many studies.  But the point

20  was made to FDA:  You really need to use better methods that

21  don't require throwing out all of the zero arm cells in these

22  kind of meta-analyses.  And I'm heartened to see that they

23  took the advice, and at least for a sensitivity analysis,

24  included an analysis that did not require them to throw out

25  the zero cell studies from the antiepileptic analysis.

0301a09c-a750-4035-b5b0-dce99c568610

Page 328

1        JUSTICE FRIEDMAN:  Are there written criteria that

2    they have promulgated for when to do the various kinds of

3    analyses?

4        THE WITNESS:  No.  The only descriptions of their

5    methodologies are in their final reports where they talk

6    about their statistical analysis plan, where they lay out the

7    various methods and the motivation for those methods that

8    they used.

9    Q.   Doctor, we heard from Dr. Trimble yesterday that he

10   expected that the reason why we haven't seen more suicides in

11   the gabapentin data are twofold:  one, because the data are

12   undersized, and also because they didn't include enough

13   psychiatric patients.  Did the FDA's statistical review

14   address psychiatric patients as a group?

15   A.   Yes, it did.

16   Q.   And what does it tell us?  And we're now looking at a

17   slide called "FDA Odds Ratios by Indication" found on Page 33

18   of the report.  Go ahead.

19   A.   This is a slide out of the FDA's statistical report, and

20   what this actually indicates is that in those patients, in

21   those studies for psychiatric indications, the result was

22   actually not statistically significant.  It came close, but

23   it wasn't statistically significant; and if anything, it was

24   much smaller of a difference between the active treated and

25   placebo-controlled subjects than was seen in the epilepsy

1  trial.  So Dr. Trimble's assertion that the effects would be

2  larger in those patients who had a psychiatric vulnerability

3  is not supported by the FDA meta-analysis.

4  Q.   And did you calculate what percentage of the patients

5  among those included in the analysis fell into this

6  psychiatric category?

7  A.   It's over a quarter of the patients.  It's over

8  25 percent, so there are plenty of patients to do this kind

9  of analysis.

10  Q.   Now, with respect to Dr. Trimble and Dr. Blume and

11  Dr. Kruszewski's comments that the gabapentin data are

12  undersized, and so they're not big enough for us to be able

13  to find the risk, have you looked at that issue?

14  A.   Yes, I have.

15  Q.   And what's your opinion about that?

16  A.   My opinion is that in order to detect an effect of the

17  magnitude that we're seeing for lamotrigine and topiramate,

18  there are more than enough gabapentin subjects in these

19  trials.  Remember, there are more gabapentin subjects in

20  these trials than there were in all of the pediatric

21  randomized clinical trials in the antidepressant and suicide

22  studies.  There were only 25 trials with a total of about

23  3,000 subjects.  There are more subjects here than there were

24  for those trials, and those trials actually led to regulatory

25  action, a "black box" warning for antidepressants in

Page 330

1   pediatric depression.

2            JUDGE SARIS:  Do you know what the background rate

3   is for the psychiatric pool of suicide incidence as opposed

4   to the epilepsy rate?

5            THE WITNESS:  I don't have those figures at my

6   fingertips, particularly for -- well, could we go back to

7   that --

8            JUDGE SARIS:  Maybe my thinking is flawed, but I'm

9   thinking out loud that if it's a higher rate for psychiatric

10  patients anyway, if you're dealing it on odds comparing

11  placebos, that might explain why in fact it actually has a

12  harsher effect in epilepsy rates if they have a lower rate of

13  suicide.  In other words, you're dealing with odds, you know,

14  division rather than -- does that make sense to you?

15           THE WITNESS:  It's an interesting point, but the

16  ratio should be preserved even if the incidence is going up

17  and down.  So that if there is a bigger effect in those

18  people who have a psychiatric vulnerability, even though the

19  absolute number of events would go up, the ratio, the

20  difference between placebo and treated arms should be

21  maintained or made larger if that was really the

22  explanation.  What's actually happening is, the difference is

23  getting smaller between the placebo and the active treatment

24  arms.  If there are more events, we should have an easier

25  time of seeing it.  So I don't think that's the explanation,

1  but I don't know the answer to your question exactly of what

2  the rates are.

3          But it raises an interesting point that was made

4  earlier today about, you know, these studies not being -- you

5  can't draw inferences from these studies.  Remember, FDA's

6  analysis is looking at surrogates.  They're looking at

7  suicidal thinking and behavior.  The rate of suicidal

8  thinking and behavior is much, much, much larger than

9  completed suicide.  The figure that Dr. Blume indicated of

10  one in ten thousand is ten per hundred thousand, which is the

11  completed suicide rate in the entire United States of

12  America; not in psychiatric patients, not in patients treated

13  for pain, not in epilepsy patients.

14          To see an effect in a randomized clinical trial for

15  completed suicide in the normal U.S. population would require

16  an enormous sample size, but in the IOM report I created a

17  table for --

18          JUDGE SARIS:  IOM?

19          THE WITNESS:  Institute of Medicine.  My opinion

20  is, there are sufficient data here to be able to pick up an

21  effect of the magnitude that we're seeing.

22  Q.   And, Doctor, you mentioned the IOM, Institute of

23  Medicine.  Were you part of an IOM committee to examine the

24  risk of suicide?

25  A.   Yes, I was.

1  Q.   And do you recall, is this book the result of that

2  committee work?

3  A.   Yes, it is.

4  Q.   And are you an author of this book?

5  A.   Yes, I am.

6  Q.   And the book is called "Reducing Suicide:  A National

7  Imperative" published by the Institute of Medicine?

8  A.   That is correct.

9  Q.   And in this book at Page 404, did you actually

10 calculate -- well, let me back up.  In order to calculate the

11 sample size that's necessary to detect a risk of suicide, you

12 have to know what incidents you're looking at, right?

13 A.   That is correct.

14 Q.   So we know in the FDA alert, they reported an incidents

15 on drug of .43 percent?

16 A.   That is correct.

17 Q.   And .43 percent is about a half a percent?

18 A.   That is correct.

19 Q.   And your table in that book, does it address how many

20 patients you would need to have in a study to detect a risk

21 of a half a percent of suicide and suicide attempt?

22 A.   Yes, it does.

23 Q.   And how many do you need to have?

24 A.   Approximately 3,000, which is approximately the number

25 of gabapentin-treated subjects in the randomized controlled

1   trials used by FDA in their meta-analysis.

2   Q.   Well, when Dr. Blume says you need somewhere between

3   50,000 and 300,000 patients, first of all, do you know where

4   that comes from?

5   A.   I have no idea.

6   Q.   Have you ever heard that?

7   A.   I know that if your -- based on her incidents rate, she

8   was talking about completed suicide in the general U.S.

9   population.  You would need a lot of subjects.  I do that

10  computation in this book as well and computed it to be about

11  a hundred thousand patients.  But that certainly doesn't

12  apply to looking at suicidality.

13  Q.   Do you know how many total patients the FDA looked at

14  for this analysis?

15  A.   It was approximately 43,000, 44,000.

16          JUDGE SARIS:  You're at about a half an hour.

17          MS. McGRODER:  Yes, this is my last question.

18  Q.   43,892 is the number.  If you applied Dr. Blume's theory

19  or if you just used her testimony to suggest that you need

20  50,000 patients to detect a risk of suicide, would the FDA

21  alert be able to detect that risk?

22  A.   No.

23          MS. McGRODER:  Thank you, Doctor, and then I'll

24  reserve any remaining time I have for your cross-examination

25  when we set a new date.

1      MR. FINKELSTEIN:  Judge, I don't want to talk about

2  any numbers, but I literally have just two minutes on -- it's

3  topical with what he just said.  I think it's appropriate, if

4  I may.

5      JUDGE SARIS:  I don't understand why.  I thought

6  you were going to wait.

7      MR. FINKELSTEIN:  I do, but it's only really one

8  issue that is not related to the numbers that we didn't get

9  that I think it's appropriate for the Court to hear at this

10  time, if I may.

11      JUDGE SARIS:  All right.

12  CROSS-EXAMINATION BY MR. FINKELSTEIN:

13  Q.   Dr. Gibbons, earlier today, I don't know if you were in

14  the courtroom, but I shared with the Court that Pfizer

15  actually met with FDA a few weeks ago.  Do you remember?

16  Were you sitting here when I said that?

17  A.   Yes, I was.

18  Q.   And Mr. Rouhandeh stood up and said it didn't happen?

19  Did you hear that?

20  A.   I don't recall that.

21      MR. ROUHANDEH:  He's now trying to disagree with --

22  make a factual record on this, which is incorrect.

23      MR. FINKELSTEIN:  I'm not making a factual record.

24      MR. ROUHANDEH:  I would like to go back to the

25  transcript.

1        JUDGE SARIS:  No, no.  Sit down.  Let him ask.  Let

2   me just hear what the question is.

3        MR. FINKELSTEIN:  That's all.

4        JUDGE SARIS:  What's the question?

5   Q.   The question is, there's a letter that we received

6   notice that a hearing occurred and asked to be presented

7   documents that were presented to the FDA at a hearing, I

8   don't know the exact date, within the last -- I think the

9   beginning of June.  The questions I have, A, were you at the

10  meeting?

11  A.   No.

12  Q.   Do you know if the meeting occurred?

13  A.   No.

14  Q.   B, do you know what documents that Pfizer gave to FDA at

15  that meeting?

16  A.   I don't know.  I wasn't there.

17        JUDGE SARIS:  Did you prepare any documents for the

18  FDA?

19        THE WITNESS:  No, I did not.

20  Q.   And the theories that you're propounding here today that

21  you're telling this Court that the FDA is wrong, did you call

22  up anybody any of your buddies at the FDA and tell them that

23  they were wrong?

24  A.   First of all, I don't think I've said that the FDA is

25  wrong.  I'm explaining the data.

1  Q.   Were their methods not accurate?

2  A.   Oh, I've shared with the FDA that the idea and their

3  principal analysis that excludes the zero cells is definitely

4  problematic.  I said it when I was a member of the Scientific

5  Advisory Board, and I've said it in print, and I've said it

6  in a variety of ways, sure.

7  Q.   I want to know about your analysis --

8            JUDGE SARIS:  You know, this isn't helpful.

9            MR. FINKELSTEIN:  Okay, I just want to know, one,

10  was he at the meeting, and then one other question.  This

11  document that we asked defense counsel to give us as to what

12  was presented, I just want to know if he's had that.

13            JUDGE SARIS:  Have you seen what they presented?

14            THE WITNESS:  I don't know -- I'm not sure --

15  Q.   Well, it's important for us just to know, have you had

16  an opportunity to look at that, and did you incorporate

17  whatever's in that in your presentation so far?

18  A.   I'm not -- this isn't looking familiar to me at this

19  point.

20            MR. FINKELSTEIN:  Okay.

21            MR. ROUHANDEH:  I do think a misleading impression

22  has been left on the record.  Mr. Finkelstein said that the

23  company had gone to the FDA and asked for a private meeting

24  with them.  They in fact did ask for a meeting with the FDA,

25  and the FDA said "no."  What he's referring to, what these

1  documents are referring to is a public meeting at NYU or

2  Columbia where FDA happened to be there, and a bunch of

3  different people were all there.  This was not some meeting

4  that was set up so that Pfizer could present its issues to

5  the FDA.

6          JUDGE SARIS:  Well, let me ask you.  This

7  interesting issue with the topiramate, have you presented

8  that argument to the FDA?

9          MS. McGRODER:  Has Pfizer?

10          JUDGE SARIS:  Yes.

11          MR. ROUHANDEH:  No.  I think we just got the FDA's

12  data, which I believe the plaintiffs submitted to the Court.

13          JUDGE SARIS:  So the answer is "no," you didn't

14  present it?

15          MR. ROUHANDEH:  No, I don't believe so.

16          JUDGE SARIS:  All right, thank you.

17          (Witness excused.)

18          JUDGE SARIS:  So who's up next?  I think we're

19  going to take a quick break and then --

20          MR. ROUHANDEH:  I was going to ask what the

21  schedule was going to be.

22          JUDGE SARIS:  -- maybe we could do the direct of

23  Taylor.  You know, that's, I think, all we'll finish, and

24  then we can talk about next steps.

25          MR. ROUHANDEH:  I guess one question is, should we

Page 338

1    do that?  Should we do the direct and, you know, put on two

2    directs and, you know, then come back and do the crosses, or

3    whether we should save Taylor until --

4           JUDGE SARIS:  I don't want to lose the time, so if

5    we have half an hour, that's all, we can finish at least the

6    direct.

7           MR. ROUHANDEH:  That's fine.

8           JUDGE SARIS:  And then you need to come up with

9    alternative dates.

10          JUSTICE FRIEDMAN:  And if you get us the

11   transcripts before the cross-examination, we can review them.

12          MR. ROUHANDEH:  That's fine.

13          MR. LONDON:  When you said "When you get us the

14   transcript --"

15          JUDGE SARIS:  Go off the record, Lee.

16          (Discussion off the record.)

17          (A recess was taken, 4:10 p.m.)

18          (Resumed, 4:30 p.m.)

19          MR. HOOPER:  Your Honor, if it might please the

20   Court, Pfizer would like to call Dr. Charles P. Taylor to the

21   stand.

22                    CHARLES P. TAYLOR

23   having been first duly sworn, was examined and testified as

24   follows:

25          THE CLERK:  Will you please state your name and

1  spell it for the record.

2       THE WITNESS:  Sure.  My name is Charles Taylor,

3  T-a-y-l-o-r.

4  DIRECT EXAMINATION BY MR. HOOPER:

5  Q.   Dr. Taylor, would you please tell the Court about your

6  education and training.

7  A.   Sure.  I got a bachelor's degree at the University of

8  Texas, Ph.D. from University of California Berkeley in neuro-

9  biology, and then a post-doc, National Institutes of Health

10  post-doc at Tulane Med School where I studied brain slices,

11  little chunks of rat brain in-vitro.  After that, I got a job

12  with Parke-Davis in 1982, and I was with Parke-Davis until

13  they were acquired by Pfizer in 2001.

14  Q.   Can you describe the positions you've held and your

15  professional career.

16  A.   Sure.  I started out as an associate research scientist,

17  became a research fellow, which is a higher rank in the

18  science side of the company, in, I believe, 1985, and I have

19  had various jobs within that rank of research fellow since

20  then.  After Parke-Davis was bought by Pfizer in 2001, I was

21  also a research fellow there, and I retired from Pfizer last

22  August.

23  Q.   Dr. Taylor, could you please briefly describe for

24  Judge Saris and Judge Friedman your scientific publications,

25  how many and the subjects.

1   A.    Sure.  I have about 100 peer-reviewed articles in

2   journals and books.  About 32 of them concern directly the

3   drugs gabapentin and pregabalin or other drugs that are

4   directly related to them pharmacologically.  So I've been

5   studying gabapentin on and off since about 1983.

6   Q.   In addition to your peer-reviewed publications on the

7   alpha2-delta drugs, gabapentin and pregabalin, do you have

8   other peer-reviewed --

9            JUDGE SARIS:  You know, you need to speak up.  It's

10  a big courtroom, and you don't get the benefit of those

11  mikes.

12  Q.   Dr. Taylor, in addition to your 32 peer-reviewed papers

13  on the pharmacology of gabapentin, do you have other

14  peer-reviewed scientific papers published that deal with

15  other aspects of pharmacology?

16  A.    Yes, I do.

17  Q.   How many, sir?

18  A.    Well, a total of around 100, so there would be about 67

19  or so that are on other topics.

20           JUDGE SARIS:  So you spent twenty years on

21  gabapentin?

22           THE WITNESS:  Yeah.  Actually, as somebody already

23  mentioned, gabapentin was first thought of in 1977, and it's

24  been in clinical development ever since about 1982.  It

25  started out in Germany, and I have been involved more or less

Page 341

1  directly since at least 1985.

2  Q.   And have you made various scientific presentations to

3  your professional colleagues about the pharmacology of

4  gabapentin?

5  A.   Yes.  That's more or less what I do when I go to

6  scientific meetings.  I've given talks on other topics, but

7  I've given a lot on gabapentin and pregabalin.

8  Q.   Dr. Taylor, you have heard Dr. Trimble and

9  Dr. Kruszewski's theory of how Neurontin ingestion supposedly

10  leads to suicide, correct?

11  A.   Yes, I have.

12  Q.   And you have read their reports?

13  A.   Yes, I have.

14  Q.   You've read all the literature cited in their reports as

15  well?

16  A.   I am familiar with all the literature, and I think I

17  read the ones that I felt were relevant.

18  Q.   How many peer-reviewed published papers deal with

19  gabapentin, if you know?

20  A.   I actually did a MedSearch just the other day on the

21  term "gabapentin" and came up with over 2,600 peer-reviewed

22  journal articles.  So that includes, of course, articles that

23  included other topics in addition to gabapentin, but it's a

24  large literature.

25  Q.   Have you ever seen in the literature or heard anyone at

1   any scientific forum say that gabapentin causes suicide until

2   you heard about it in this litigation?

3   A.   No, I have not, and in fact I was surprised and puzzled

4   by that assertion.

5   Q.   Are there any peer-reviewed scientific papers that

6   discuss or endorse plaintiffs' five-step theory of causation?

7   A.   The only step that I think is supported in the

8   literature is that gabapentin causes a GABA elevation, but I

9   think that that is far from the theory that we heard from

10  Dr. Trimble yesterday being supported.  And, frankly, I think

11  if he presented that whole theory to a group of colleagues,

12  that it would not meet the "red face" test.

13          JUDGE SARIS:  Well, you agree that if you had a

14  reduction in the 5-HD (Sic), it could lead to depression?

15          THE WITNESS:  I think that that is a good question,

16  but I think that that probably would only be clinically

17  relevant if it was a very large reduction, and even then, I

18  think there's --

19          JUDGE SARIS:  All right, so you're not disagreeing.

20  I mean, it may be the magnitude.  But you're disagreeing with

21  the second step there, that gabapentin --

22          THE WITNESS:  I'm disagreeing -- well, to be

23  specific, GABA elevation does not mean an increase in GABA

24  function.  It also does not mean that a drug is GABAergic.

25  Secondary to that, not all GABAergic drugs reduce serotonin

1    function.  You would have to have essentially a GABA-A

2    agonist applied directly to the --

3              JUDGE SARIS:  You know what, you --

4              THE WITNESS:  -- raphe -- okay, back up.

5              JUDGE SARIS:  Can I be blunt with you?

6              THE WITNESS:  Absolutely.

7              JUDGE SARIS:  Your report took me hours to read.

8    It was written for another post-doc, not for two judges who

9    don't work in this field.  It was very difficult to follow.

10             THE WITNESS:  I apologize for that --

11             JUDGE SARIS:  -- to someone else earlier today,

12   because it was so lengthy, I just stopped.  Yours wasn't

13   lengthy, it was the appropriate length, but it was -- it's

14   got to be written -- you've got to teach us.

15             THE WITNESS:  I would be happy to do that.  I would

16   be happy to do that.  In order to understand both the

17   plaintiffs' argument and the reason that I think that it's

18   unsound, I will be forced to use some jargon.  I will try to

19   explain that jargon whenever I can.

20             JUDGE SARIS:  Believe it or not, I do patent cases.

21   I do very difficult cases.

22             THE WITNESS:  Oh, I believe it.

23             JUDGE SARIS:  Very difficult.  You just have to try

24   to teach, and we'll get it.  Okay.

25             MR. HOOPER:  Next slide, 4.  Prior slide.

1   Q.   Judge Saris asked a question yesterday, she said, are

2   there any peer-reviewed studies on the absence of a causal

3   relationship?  Do you recall hearing that question?

4   A.   Yes, I do.

5   Q.   Dr. Taylor, would you please answer the question that

6   Judge Saris asked yesterday.

7   A.   Sure.  The question was, are there any peer-reviewed

8   journal articles that talk about gabapentin not having a risk

9   for suicide?  And this paper, which is widely available in

10  the scientific literature, does discuss that point.

11  Q.   And what does it say about that?

12  A.   It says, "Controlled studies --" that would mean

13  controlled double-blind clinical trials -- "of gabapentin

14  have not suggested significant negative effects on mood."

15          MR. HOOPER:  The next slide, please.  This is the

16  same document, your Honor, still at Tab A.

17          JUDGE SARIS:  So that's in when, 2007?

18          THE WITNESS:  Yes.  And I would point out that this

19  is a journal article that is a review paper of multiple other

20  published studies, and this review paper was written by

21  clinical neurologists in the UK and Europe.

22  Q.   And, Dr. Taylor, this slide shows the chart that appears

23  on Page 561 of that same paper, that same review article,

24  correct?

25  A.   Correct.

1  Q.   And is there peer-reviewed science that specifically

2  addresses and distinguishes the mechanism of gabapentin from

3  other AEDs, from other antiepileptic drugs?

4  A.   From other antiepileptic drugs, yes, that is the case.

5  Q.   Is this such a paper?

6  A.   This paper is a review article, but indirectly it refers

7  to the published peer-reviewed literature on these different

8  drugs and how they act.

9  Q.   Does it put it all in one place in this chart?

10  A.   And this chart is a summary of really a rather large

11  body of literature.

12  Q.   And this second column, Dr. Taylor, that says

13  "Enhancement of GABA neurotransmission," can you explain to

14  Judge Saris and Judge Friedman what enhancement of GABA

15  neurotransmission means?

16  A.   Yes, I'd be happy to.  You've heard a lot about GABA,

17  and I think we'll get to the reason for that in a moment.

18  Enhancement of GABA transmission means that one neuron, one

19  nerve cell, talks to a second nerve cell using a chemical

20  messenger called GABA.  And the receptors on the other end of

21  the message are called GABA receptors, and you've already

22  heard talk about GABA receptors today.

23          So in order to enhance the function of GABA, there

24  are a number of different ways that drugs can do that, and

25  there are a number of different ways to measure that.  Once

1  you have done it and enough people agree on it, then you're

2  entitled, although there's no formal method for doing this,

3  to make a drug class called GABAergic drugs that the compound

4  that affects GABA signaling becomes a member of.

5          Now, there are --

6          JUDGE SARIS:  Is this you talking, or is this from

7  some dictionary or treatise or something?

8          THE WITNESS:  This is me talking from my

9  twenty-five years experience in pharmacology.  Unfortunately,

10  there is no written guideline for how to classify drugs into

11  drug classes.  I'm sure both of you are aware of SSRIs as a

12  drug class.  Those drugs all stick to one very distinct type

13  of protein in the brain.  They do not stick to other types of

14  proteins in the brain.  That's why they're called a drug

15  class.

16          Unfortunately, this category of GABAergic drugs is

17  a kind of an artificial one.  There are at least four

18  different proteins that a drug can stick to, and people can

19  talk about it loosely or informally as GABAergic.  This is

20  very important for this particular issue because of certain

21  drugs that are in this, quote, "GABAergic" drug class that

22  are known to be associated with psychiatric difficulties.

23  That's why everyone has been talking about GABA-A, GABA-B,

24  GABA, GABA, GABA.

25          JUDGE SARIS:  Is there a definition that's

1   generally accepted in the scientific community about what

2   "GABAergic" means?

3          THE WITNESS:  I can only give you --

4          JUDGE SARIS:  Or is there just a range of views?

5          THE WITNESS:  I can only give you my personal

6   judgment on that.  I think that if you ask ten different

7   people, you might get at least three different answers.

8          THE WITNESS:  All right, so you would say there's

9   no generally accepted definition?

10         THE WITNESS:  That is correct.  I'd be happy to

11  give you my definition.

12         JUDGE SARIS:  I'm happy to take it.  I'm just

13  saying this -- why don't you ask the next question.

14  Q.   Dr. Taylor, what does the peer-reviewed literature with

15  respect to this chart say about gabapentin and enhancement of

16  GABA neurotransmission?

17  A.   Okay, enhancement of neurotransmission is different than

18  an increase of GABA levels.  You've heard Dr. Trimble and

19  others talk about Dr. Petroff's studies that measure GABA

20  levels in the brain using NMR spectroscopy.  That is not an

21  increase of GABA neurotransmission.  That is an increase in

22  GABA concentration in the brain.  Concentration is not equal

23  to function, and you, I think, heard Dr. Kruszewski say today

24  he had not acknowledged that fact.

25         JUDGE SARIS:  All right, so why isn't an increase

1   in GABA similar to an enhancement of GABA neurotransmission?

2           THE WITNESS:  Because you heard yesterday that in

3   addition to gabapentin and topiramate and lamotrigine, that

4   yoga exercise, antidepressant SSRI drugs, and other

5   treatments such as electroconvulsive therapy, all elevate

6   GABA concentrations in the brain; and most of those

7   treatments are not what we would call GABAergic drugs.

8   Obviously, ECT therapy is not a GABAergic drug.

9           JUDGE SARIS:  You said -- what is GABA

10  neurotransmission?

11          THE WITNESS:  Well, let me, if I may, draw a

12  diagram?

13          JUDGE SARIS:  Terrific.

14          THE WITNESS:  Okay.  So neuroscientists like to

15  draw schematic diagrams of synapses.  A synapse is the

16  connection between Nerve Cell A and Nerve Cell B.  And it's

17  been known for a long time through hundreds of experiments

18  that the way synapses work is an action potential.  A kind of

19  a digital click signal comes down here in Cell A, and the end

20  result of that is, a bunch of little chemical packages that

21  are called synaptic vesicles in Cell A get released.  Those

22  chemical packages are otherwise known as neurotransmitter

23  compounds that are endogenous to the brain.  One of those

24  compounds is GABA.

25          So when Dr. Petroff has done his NMR spectroscopy

1   studies, most, probably over 95 percent, of the GABA that he

2   measures is within these presynaptic terminals.  That's where

3   most of the GABA in the brain resides, and there is

4   literature to show that.

5          Now, the GABA that sends a message from one nerve

6   cell to the other is different.  We call it a different pool

7   of GABA.  There's a very small amount of GABA that's released

8   virtually in an instant from one action potential, and it

9   gets emptied into this very tiny space between two nerve

10  cells.  And the individual GABA molecules, which are too

11  small to even be seen in my hand-drawn diagram here, stick to

12  and remain stuck to proteins on the second cell that we call

13  drug receptors or neurotransmitter receptors.  And for GABA,

14  there are at least three different kinds of GABA receptors

15  that are present on these postsynaptic cells.

16         Now, by my definition of a GABAergic drug, the

17  GABAergic drug would have to stick to these same GABA

18  receptors and modify the way that they operate.  And that is

19  true of drugs like the barbiturates that are sedatives.  It's

20  also true of the benzodiazepines such as Valium that are used

21  as anxiolytic drugs.  They stick to GABA-A receptors and

22  alter the way that these proteins work and the way they relay

23  the GABA signal within nerve cells.  That literature is based

24  on hundreds of papers that have been produced over the last

25  forty or fifty years.

Page 350

1          In addition to GABA-A receptors, there are GABA-B

2      receptors, and there are actually at least two or three

3      subclasses of these GABA-A receptors.  So it's quite a

4      complicated system, and I totally sympathize with you being

5      overwhelmed by the jargon.  It's complicated.

6          JUDGE SARIS:  No, it just needs to be explained.

7      That's an explanation.  So but when you say that gabapentin

8      does not enhance GABA neurotransmission -- is that what

9      you're saying?

10          THE WITNESS:  Yes.

11          JUDGE SARIS:  Why?

12          THE WITNESS:  Well, I'm not quite done with the

13      story.

14          JUDGE SARIS:  All right, fine.

15          THE WITNESS:  Okay, so there are other ways that

16      drugs can influence GABA transmission.  The drugs that act

17      here are GABA agonists, GABA antagonists, and GABA allosteric

18      modulators.  That's a lot of terms, but they all work at

19      these GABA receptors.  Those drugs, most everyone who does

20      pharmacology would agree, could be called GABAergic drugs, so

21      that includes the barbiturates and Valium.

22          On the other hand, there is one antiepileptic drug

23      that has a metabolic enzyme target.  There's an enzyme here

24      that converts glutamate into GABA.  That's called G-A-D.  And

25      there's another one, another enzyme called GABA

1   transaminase -- we'll call it GABA-T -- that degrades GABA.

2          These enzymes both have drugs that bind to them.

3   In the very early days of studying gabapentin, there are

4   scientists who thought that it worked by binding to and

5   activating this enzyme.  Since then, we found out that that

6   doesn't happen at concentrations that are relevant

7   medically.  It only happens in the laboratory.  We don't

8   think it happens in animals or in people.

9          There is a drug called vigabatrin that you may have

10  heard that inhibits the breakdown of GABA by binding to this

11  enzyme GABA-T.  Vigabatrin has some serious problems in terms

12  of psychiatric side effects, and one of the things that

13  Dr. Trimble has done in his report is, he has tried to make

14  the case that gabapentin is like vigabatrin, which acts right

15  here at this molecule.

16         JUDGE SARIS:  We only have limited time.  I'm just

17  trying to get to why do you say that gabapentin doesn't

18  enhance neurotransmission?

19         THE WITNESS:  Because in experiments where you

20  record electrically from Cell B, and you measure on an

21  oscilloscope right as it's happening this GABA message going

22  across from Cell A to Cell B, and you do the same experiment

23  with the addition of gabapentin, this GABA signal that you

24  measure in Cell B gets smaller.  It does not get larger.

25         JUDGE SARIS:  All right, so all you're saying is,

Page 352

1    it does not work by enhancing the GABA-B receptor?

2              THE WITNESS:  No, that's not correct, I'm sorry,

3    but --

4              JUDGE SARIS:  Tell me what it means.

5              THE WITNESS:  It also means it doesn't act here

6    because vigabatrin does increase that signal.  And it also

7    means that it doesn't work in a fourth place that I haven't

8    talked about, which is another protein that takes GABA up

9    into the intracellular space from the extracellular space.

10   That is a GABA transporter protein that in some ways is

11   similar to the serotonin transporter that is the drug target

12   for the SSRI drugs, except this transporter is specific for

13   GABA.

14              This protein is the target for tiagabine, which is

15   also an antiepileptic drug.  And so I would not argue with

16   the idea that tiagabine, vigabatrin, diazepam, the

17   benzodiazepines and the barbiturates are all GABAergic drugs;

18   but I have a big problem with the idea that gabapentin is a

19   GABAergic drug.  It does not bind to or interact with any of

20   these sites.

21              JUDGE SARIS:  Well, do you have any evidence that

22   it does not enhance neurotransmission?

23              THE WITNESS:  Yes.

24              JUDGE SARIS:  So you're saying, the only way it can

25   enhance neurotransmission is by binding to one of those

Page 353

1    sites?

2           THE WITNESS:  No, I'm not saying that's the only

3    way, but I'm saying those are the only well-described ways

4    that would allow you to call a drug a GABAergic drug.

5           JUDGE SARIS:  So all you're saying is -- would you

6    agree with what everyone said here, that no one really

7    understands the exact mechanism of action of gabapentin?

8           THE WITNESS:  No, I would disagree with that

9    statement.

10          JUDGE SARIS:  All right, so how does it work?

11   I mean, you've made this broad statement that it's not

12   GABAergic, where everybody else in the world calls it

13   GABAergic.  So, I mean, I had a hard time from Line 1 in your

14   report, so I'm trying to understand why.

15          THE WITNESS:  I think you've heard a very selective

16   group of people.

17          JUDGE SARIS:  The FDA calls it GABAergic.  You're

18   disagreeing with the category.  You yourself have called it

19   GABAergic in the earlier documents.  So you've changed your

20   mind?

21          THE WITNESS:  That's correct.

22          JUDGE SARIS:  All right, so I want to understand

23   why.

24          THE WITNESS:  Could I address that question first?

25          MR. HOOPER:  Why did you change your mind?

1          THE WITNESS:  The reason that I changed my mind,

2     your Honor, is that in the early days, all we had to go on,

3     really, with gabapentin was the chemical structure of the

4     compound.  There is part of the chemical structure of

5     gabapentin that is identical to the molecule GABA.  That's

6     how it was initially conceived by a synthetic chemist in

7     Germany in 1977, was as an analog or a thing that would work

8     like GABA.  It turns out that chemist was wrong, and we have

9     found over the intervening forty years, which is a pretty

10    long time, that gabapentin does not interact with GABA

11    receptors, and in fact it interacts very specifically with

12    another different protein that I would call the gabapentin

13    receptor that you may have heard already called the

14    alpha2-delta protein.  That science --

15          JUDGE SARIS:  You wrote about that in your report.

16    Alpha --

17          THE WITNESS:  Alpha2-delta, and there's a long

18    history behind the name.  Calcium channels have subunits,

19    alpha, beta, gamma.  At first it was thought there was one

20    alpha.  Then there were two proteins.

21          JUDGE SARIS:  All right, never mind, never mind.

22    So it does interact with the receptor?

23          THE WITNESS:  Yes.  And we've also found that with

24    both gabapentin and Lyrica, the pharmacology of those drugs

25    requires, requires and it is sufficient if the drugs bind to

1  the alpha-2-delta protein.  If the alpha-2-delta protein is

2  changed in a mouse brain so that it no longer binds these

3  drugs, the drugs lose their pharmacology.  They no longer act

4  as anticonvulsant drugs, as analgesic drugs, or as

5  anxiolytic-like drugs in mouse models in the laboratory if

6  you muck around with this binding to that one specific

7  protein and leave all the other proteins in the mouse brain

8  the same.

9          JUDGE SARIS:  Well, if it does attach to a

10  receptor, why isn't it GABAergic?

11          THE WITNESS:  The reason that it's not GABAergic

12  is, it doesn't attach to any of the GABAergic receptors.  The

13  alpha-2-delta protein is a presynaptic protein that's

14  found -- okay, I'll slow down.

15          The reason it's not a GABA receptor is that this

16  protein is not found only in GABA neurons.  As a matter of

17  fact, predominantly it is found in the brain at nerve

18  terminals that contain glutamate, which is the major

19  excitatory transmitter in the brain.  And there's a whole

20  other class of drugs that bind to different glutamate

21  receptors.  We know --

22          JUDGE SARIS:  Excuse me.  So this ligand is a

23  glutamate receptor?

24          THE WITNESS:  No.  Unfortunately, that's still not

25  it.  These receptors here are postsynaptic.  They can be

1    glutamate receptors at a glutamate synapse.  They can be GABA

2    receptors at a GABA synapse.  But gabapentin and pregabalin

3    do not act on those postsynaptic receptors.  They act on a

4    presynaptic receptor.  That is a protein that is only found

5    on Cell A of my diagram and not on Cell B.

6              So this class of drugs --

7              JUDGE SARIS:  Is that GABA-A or another A?

8              THE WITNESS:  No, it's not GABA-A.  This is just

9    generic A, B.  It could be 1 or 2.

10             JUDGE SARIS:  You know, maybe this is late on a

11   Friday, but why don't you -- so the distinction being, unless

12   they're on something that's postsynaptic, you don't consider

13   it as GABAergic?

14             THE WITNESS:  That's not quite correct because --

15   let me explain that just a little bit.  The postsynaptic

16   receptors are GABA-A receptors and GABA-B receptors.  There

17   are presynaptic GABAergic receptors that are the GABA

18   transporter, and also the GABA transaminase enzyme.  And we

19   think that alpha2-delta, which is the gabapentin receptor, is

20   also found on presynaptic GABA terminals.  But that's not the

21   only place it's found.  It's found all over the place, and

22   glutamate terminals are very rich in alpha2-delta proteins.

23             And so most all of the GABAergic drugs that we've

24   talked about are drugs that enhance GABA function.  Each of

25   these binding sites enhance the action of GABA in the brain.

1   Gabapentin does not do that.  I don't think anyone, or at

2   least I don't know of anyone who would say that it enhances

3   GABA function in the brain.  That's why I was careful to

4   distinguish between GABA function and what I call GABAergic

5   drugs and GABA levels in a person's whole head, which is what

6   Dr. Trimble and Dr. Kruszewski have been speaking about.  To

7   my mind, that's a very poor way of determining whether a drug

8   is GABAergic or not because, as we've seen, things like

9   exercise, electroconvulsive therapy, and SSRIs all do that,

10  and we don't call them GABAergic.

11  Q.   Dr. Trimble, could you articulate for the Judges an

12  analogy to a real-world experience that would convey the

13  problem with looking at GABA levels and inferring GABA

14  function from GABA levels?

15  A.   Absolutely.  A really simple analogy -- and keep in mind

16  it's an analogy, so it's not exact -- is that you want to

17  know how fast a car is going, so there are different things

18  that you could look at.  But looking with whole-brain MRS is

19  like looking at how full the gas tank is.  It doesn't tell

20  you how fast the car is going.  All it tells you is how much

21  gas you have.  And there are different ways that that can

22  change.  Not all of them have to do with how fast the car is

23  going.

24               MR. HOOPER:  Slide 12, please.

25               JUDGE SARIS:  Let me ask.  I know it's very

Page 358

1  complex.  How much longer do you have?

2          MR. HOOPER:  Five minutes.

3          JUDGE SARIS:  Five minutes, and then we're done.

4          MR. HOOPER:  Or I could do two if you'd like,

5  Judge.

6  Q.   Dr. Taylor, you've seen the groupings in the statistical

7  analysis report that was released last week by the FDA?

8  A.   Correct.

9  Q.   The GABAergic drugs and GABAmimetic drugs section?

10 A.   Yes.

11 Q.   How does divalproex work?

12 A.   Divalproex is, unfortunately, a pretty big mystery.  It

13 has several things that have been described, and there's not

14 much agreement what's crucial or important for how it acts

15 clinically.

16 Q.   Gabapentin and pregabalin work the way you've described?

17 A.   Correct.

18 Q.   Tiagabine, how does that work?

19 A.   Tiagabine works in a GABAergic synapse that I've drawn

20 over here by binding to the GABA transporter.

21 Q.   And how does topiramate, the drug that's in all three

22 groups, work?

23 A.   Topiramate also has multiple binding sites, so it does

24 affect sodium channels.  It affects GABA-A receptors, which

25 I've drawn over here, and gabapentin does not bind there or

0301a09c-a750-4035-b5b0-dce99c568610

1   affect GABA-A receptors.  And topiramate also has an effect

2   on glutamate receptors, one subclass of glutamate receptors,

3   which I personally think may be the main way that it

4   operates.

5   Q.   Three different ways?

6   A.   Yes.

7           MR. HOOPER:  Your Honor, subject to any questions

8   you have, we'll stop here.

9           MR. FINKELSTEIN:  Just for completeness of the

10  record, your Honor, we just had thirty minutes of direct.

11  It's my expectation that when we do reconvene, we start with

12  cross-examination, and they've exhausted their time because

13  it's only equitable.  That's what happened with

14  Professor Trimble and every other witness here.

15          MR. ROUHANDEH:  They clearly went over their thirty

16  minutes --

17          JUDGE SARIS:  Excuse me.  You know what, I was

18  pretty gracious, so if they have a few more questions, I'm

19  going to let him ask it, okay?  Unlike the situation with

20  Dr. Gibbons where it was new stuff, I mean, this is the heart

21  of it.

22          MR. LONDON:  The only thing that's new here is,

23  we've never heard Dr. Taylor say that the FDA got it wrong by

24  including -- that slide is Dr. Taylor's new thought on the

25  FDA's --

0301a09c-a750-4035-b5b0-dce99c568610

Page 360

1          JUDGE SARIS:  I know, but, you know, you submitted

2     that -- the FDA is essential to this.

3          MR. ROUHANDEH:  And, your Honor, they keep raising

4     that, and I just want to put on the record --

5          JUDGE SARIS:  No, no.  Enough.  Off the record

6     now.

7               (Discussion off the record.)

8               (Adjourned, 5:00 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0301a09c-a750-4035-b5b0-dce99c568610

1                 C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7

8           I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 107 through 360 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 04-10981-PBS, In Re:  Neurontin Marketing and

13  Sales Practices Litigation, and thereafter by me reduced to

14  typewriting and is a true and accurate record of the

15  proceedings.

16          In witness whereof I have hereunto set my hand this

17  10th day of July, 2008.

18

19

20

21

22          /s/ Lee A. Marzilli
            _____
23          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
24

25