EXHIBIT G

Joint Meeting of the
Peripheral and Central Nervous System Drugs Advisory Committee
and the Psychopharmacologic Drugs Advisory Committee


July 10, 2008



Sheraton Washington North Hotel Beltsville, Maryland

FDALive.com
11800 Nebel Street
Rockville, MD 20852
(301) 984 - 0001

Meeting Roster PERIPHERAL AND CENTRAL NERVOUS SYSTEM DRUGS ADVISORY
COMMITTEE MEMBERS
(Voting)

Britt Anderson, M.D., Ph.D.
Associate Professor
Department of Psychology
University of Waterloo
Waterloo, ON Canada
Larry B. Goldstein, M.D. (Acting Chair)
Professor of Medicine
Duke University Medical Center
Bryan Research Building
Durham, NC
Lily K.F. Jung, M.D., M.M.M.
(Consumer Representative)
Medical Director, Neurology Clinic
Swedish Neuroscience Institute
Medical Center, Neurology Clinic
Seattle, WA
Ying Lu, Ph.D.
Professor in Residence
Department of Radiology
University of California, San Francisco
San Francisco, CA
Matthew Rizzo, M.D.
Director, Division of Neuroergonomics
Department of Neurology
University of Iowa
Iowa City, IA
Stacy Ann Rudnicki, M.D.
Associate Professor
Department of Neurology
University of Arkansas for Medical Sciences
Little Rock, AR

PERIPHERAL AND CENTRAL NERVOUS SYSTEM DRUGS ADVISORY COMMITTEE MEMBERS

(Non-Voting)
Roy E. Twyman, M.D.
Johnson & Johnson Pharmaceutical
Research and Development, LLC
Titusville, NJ Joint Meeting of the Peripheral and Central Nervous System Drugs Advisory Committee and the Psychopharmacologic Drugs Advisory Committee July 10, 2008 Sheraton Washington North Hotel Beltsville, Maryland Meeting Roster
PSYCOPHARMACOLOGIC DRUGS ADVISORY COMMITTEE MEMBERS
(Voting)

Jorge Armenteros, M.D.
Associate Professor of Clinical Psychiatry
Department of Psychiatry
University of Miami School of Medicine
Coral Gables, FL
Rochelle Caplan, M.D.
Professor Department of Psychiatry and Bio-behavioral Sciences
UCLA
Los Angeles, CA
Gail Griffith, M.D.
(Consumer Representative)
Washington, DC
Robert F. Woolson, Ph.D.
Professor, Department of Biostatistics, Bioinformatics and Epidemiology
Medical University of South Carolina
Charleston, SC

PSYCOPHARMACOLOGIC DRUGS ADVISORY COMMITTEE MEMBERS
(Non-Voting)
William Z. Potter, M.D, Ph.D.
Vice President, Translational Neuroscience
Merck & Co., Inc.
North Wales, PA

TEMPORARY VOTING MEMBERS

Ruth S. Day, Ph.D.
Director, Medical Cognition Laboratory
Duke University
Durham, NC
Sid Gilman, M.D., FRCP
Director, Michigan Alzheimer's Disease Research Center
Department of Neurology
University of Michigan
300 N. Ingalls 3D15
Ann Arbor, MI 48109-0489
Wayne Goodman, M.D.
Division of Adult Translational Research
and Treatment Development
National Institute of Mental Health
National Institutes of Health

Bethesda, MD
Andrew Leon, Ph.D
Professor of Biostatistics in Psychiatry
Weill Medical College of Cornell University
New York, NY Joint Meeting of the Peripheral and Central Nervous System Drugs Advisory Committee and the Psychopharmacologic Drugs Advisory Committee July 10, 2008 Sheraton Washington North Hotel Beltsville, Maryland Meeting Roster
TEMPORARY VOTING MEMBERS
Richard Malone, M.D.
Professor of Psychiatry
Drexel University College of Medicine
Philadelphia, PA
Daniel S. Pine, M.D.
Chief of Child and Adolescent Research
National Institutes of Health
National Institute of Mental Health
Mood and Anxiety Disorders Program
Bethesda, MD
Delbert G. Robinson, M.D.
Associate Professor of Psychiatry
Research Department
The Zucker Hillside Hospital
Glen Oaks, NY
Barbara G. Wells, Pharm.D., FCCP, BCPP
Dean and Professor Executive Director of the Research Institute of Pharmaceutical Sciences The Univ. of Mississippi School of Pharmacy
University, MS
Andrew Winokur, M.D., Ph.D.
Director of Psychopharmacology
Professor and Dr. Manfred J. Sakel
Distinguished Chair in Psychiatry
Farmington, CT

DRUG SAFETY AND RISK MANAGEMENT VOTING MEMBERS

Sean Hennessy, Ph.D
Assistant Professor of Epidemiology
University of Pennsylvania School of Medicine
Philadelphia, PA

PEDIATRIC ADVISORY COMMITTEE VOTING MEMBERS

Melissa Hudsons, M.D.
Member, Department of Oncology Director, After Completion of Therapy Clinic St. Jude Children's
Research Hospital 332 North Lauderdale, Mail Stop 735 Memphis, TN 38105 Joint Meeting of the
Peripheral and Central Nervous System Drugs Advisory Committee and the Psychopharmacologic Drugs
Advisory Committee July 10, 2008 Sheraton Washington North Hotel Beltsville, Maryland Meeting Roster
FDA CENTER FOR DRUG EVALUATION AND RESEARCH PARTICIPANTS
(Non-Voting) Joint Meeting of the Peripheral and Central Nervous System Drugs Advisory Committee and
the Psychopharmacologic Drugs Advisory Committee July 10, 2008 Sheraton Washington North Hotel
Beltsville, Maryland Meeting Roster
Robert Temple, M.D.
Director,
Office of Drug Evaluation I, CDER, FDA
Russell Katz, M.D.
Director,
Division of Neurology Products, CDER, FDA
Tom Laughren, M.D.
Director,
Division of Psychiatry Products, CDER, FDA
Alice Hughes, M.D.
Associate Director for Safety
Division of Neurology Products, CDER, FDA
Evelyn Mentari, M.D., M.S.,
Clinical Safety Reviewer
Division of Neurology Products, CDER, FDA
Mark Levenson, Ph.D.
Statistical Safety Reviewer
Quantitative Safety & Pharmacoepidemiology Group
Division of Biometrics 6, CDER, FDA

Operator:  Good morning.  Will everyone please take their seats, we are about to start.  I would first like to remind everyone present to please silence your cell phones, blackberry and other devices of you have not done so.

I would also like to identify the FDA press contact, Ms. Sandy Wash.  If you are here please stand.

Larry Goldstein:  Good morning.  My name is Larry Goldstein and I am the acting chair for this joint meeting.  It should be a very interesting discussion and again I just to start for those who have not been at these things before.

The purpose is really for the FDA to hear the committees views and to hear the discussion on the voting that will take place based on questions that they ask is important to give an overall sense to the FDA but really the main purpose is for them to hear the discussion of our views about the questions and issues that they'd asked us here for.

To begin with, we have to read into the record of the conflict of interest statements.

Female:  The third in drug administration FDA is convening today's meeting of the peripheral and central nervous system advisory committee.  These cycle pharmacologic drugs advisor committee and representatives from the pediatric advisor committee and the drug safety and risk management advisor committee of the center for drug evaluation research under the authority of federal advisor committee act of 1972.

Centre for Drug Evaluation research under the authority of Federal ((inaudible)) committee act of 1972.  With the exception of the industry's representative all members and temporary voting members of the committee are special government employees (SGE'S)or regular federal employees from other agencies and are subject to federal conflict of interest laws and regulation.  The following information on the status of this committee's compliance with federal ethics and conflict at interest laws covered by, are not limited to those bound at 18 US C Section 208 and Section 712 of the Federal Food Drug and Cosmetic Act are being provided to participate into these meetings and to the public.

FDA have determined that all members and temporary voting members of these committee's are in compliance with Federal Ethics and Conflict of Interest laws.  Under 18 USC Section 208- Congress has authorized FDA to grant labors to special government employees who have potential financial conflicts, when it is determined that the agencies need for particular individual; services outweighs his or her potential financial conflict of interest.

Under Section 712 of FDFC Act- Congress have authorized FDA to grant labors to special government employees and then recommend employers with potential financial conflicts when necessary to afford the committee essential expertise.  The (related) to discussion to today's meeting, the members and temporary voting members of these committees have been screened for potential financial conflicts of interest of their own as  well as those appealing to them between those of their spouses or minor children and  for purposes of 18 USC Section 28 their employers.

These interests may include investments, consultant, expert witness testimony, contract, grants, (CIADA'S) teaching, speaking, writing, patents, and royalties and primary employment.  For today's agenda the committees will discuss and make recommendations regarding the results of FDA analysis of (Suicidality) of suicidal (adiation) and behavior but for (seba) control clinic trials F11 drug.  (Cabo mezinine) (Cabo trial) (Tacotrial) (Tacotrial exile) (Fabolay) (Babotine) (Babopentine) which is no altern (fibonitrogen) ((inaudible)) which is ((babocoat)) ((inaudible)) celestamine sonovan.  This was a particular matter of general (upperscilicy).

Based on the agenda in all financial interests reported by the committee members and temporary voting members it has been determined that all interest in ((inaudible)) by the centre for Drug Evaluation and Research and that there is no potential for a conflict of interest. Additionally we would like to disclose that Dr. Roy Twyman and Dr. William Potter assuming as non-voting industry representatives acting on behalf of all regulated industry that Twimine is an employee of Johnson and Johnson and that Potter is an employee of (Munk).

We would like to remind members and temporary voting members that if there is specials involved in any other products or firms not conveyed on the agenda for which an FDA participant has a personal or a (peutic) financial interest the participants need to exclude themselves from such involvement and their exclusion will be noted for the record. FDA encourages all other participants to advise the committees of any financial relationships that they may have with any firms at issue.

Thank you.

Male:  Thank you; I would like the people sitting around the table, members of the committee and the FDA staff to introduce themselves. I think we'll start with Bob Temple and work our way around.

Robert Temple:  I am Bob Temple I am the Director of the Office of Drug Evaluation One.

Tom Laughren:  I'm in the Director of the Psychiatrist products division.

Alice Hughes:  I'm Deputy Director for safety and Division for neurology.

Evelyn Mentari:  Clinical safety reviewer and Division of neurology.

Mark Levenson:  Statistical Ct reviewer office of Bio-statistics.

Ruth Day:  Director of the Medical Cognition Laboratory at Duke University.

(Quade Mamperez):  Child (Moderation) Psychologist.

(Nicole Chaplain):  Pediatrics Neuro-Psychiatrist at UCLA.

Gail Griffith:  I'm the consumer representative to the cycle for(McLeod) co-committee and I'm a writer on mental health issues.

Sean Hennessy:  Good morning my name is Sean Hennessy at the drug safety research at the University of Pennsylvania.

Ross Carl Starr:  Director Division of Neurology products FDA.

Susan Susan Schultz:  Geriatric Psychiatrist at the University of Iowa.

(Surger Mann):  Clinical neurologist University of Virginia medical Center.

(Stacy Rick Nicky):  Top Neurologist University of Arkansas.

(Wayne Goodman):  Psychiatrist at the National Institute of Mental Health.

Larry Goldstein:  I'm Larry Goldstein from Duke University.

Delbert Robinson:  Delbert Robinson, I'm psychiatrist at the Albert Einstein college of medicine in New York.

(Jenny Pines):  Psychiatrists from the National Sentimental Growth, in the Neuro research program.

(Lauren John):  From the Swedish Medicine Institute of the consumer advocate.

(Robert Reese):  A bio statistician Medical University South Carolina, Charleston.

Andrew Leon:  Bio statistician at Cornell Medical College New York.

Andrew Winokur:  Director of University o Psycho-morphology of Connecticut Health Center.

Matthew Rizzo:  University of Iowa, Neurologist Member of PNSCNS committee.

Richard Malone:  Child psychiatrist from Drakes University College of Medicine.

Male:  From the University of California, San Francisco.

Melissa Hudsons:  (Saint Richards) research hospital, a member to the Pediatric Advisory Committee.

Britt Anderson:  I'm neurologist I'm currently with the University of Waterloo in Ontario Canada.

Roy Twyman:  I'm with Johnson and Johnson I'm an Industry rep.

William Potter:  I'm with Mark research Labs, I'm an Industry rep.

Larry Goldstein:  Thank you we are now going to proceed to our first presentation from the FDA I'd like to reminder the public (preservers), that while this meeting is open for public observation, Public attendees may not participate except at specific request of the panel.  I think our first presentation; the introduction will be by Dr. Katz.

Russell Katz:  Thank you Dr. Goldstein and I'd like to welcome members of the PCNS psycho-pharmacologic chart advisor committee.  In particular I'd like welcome the pediatrics drugs the drug safety and risk management advisory committee so I agree to comment on the legal expertise to today's deliberations.

So basically – as you know we've basically convened a meeting, to discuss the agency's analysis of suicidality defined as episodes of suicidal behavior, or suicidal thinking and control trials of 11 anti-epileptic drugs or AED's and as you know in the packages you've received. We've sent you agencies reviews of the issue that explained in the set of detailed how we got to this point why we did this analysis as well as of course the result of the analysis have been sent.  And we have also outlined plans to ask sponsors of all markets and J.E.Ds that are given chronically to add a box warning describing the risks on the product labeling as well as produce some medication guide which is a sheet describing  the risks to be given to the patient each time they refill their prescriptions.

So of course we are here today to ask for your advice and guidance with regard to analysis and interpretation of the results and the plans to communicate what we believe to be an increased risk of suicidality in these drugs.  So again I know you have received the detailed reviews of our work but I just want a very brief recount of how we got here and the results of our work.

We got here because a number of years ago a single sponsor came to us with the results of the analysis that they did at their control trials with their particular AED which suggested to them that that particular drug had a signal for suicidiality.

So at that point we decided it was prudent to ask sponsors essential of all AEDs that had appropriate control of trials to systematically examine those trials for any indications not just for epilepsy for those drugs that met same criteria and you don't feel about what that criteria was that we applied to find the studies of interest. To look at these studies to the events that could possibly be considered to represent suicidal behavior or suicidal thinking.

We have concluded that there are really only 11 drugs currently approved as AEDs, that actually had control trials that we thought we appropriate to analyze so we contacted those sponsors. There were not exactly 11 of them, and asked them to submit appropriate data for us to analyze. And in particular we asked these sponsors to prepare analytives of all relevant events to be reviewed blindly and then to classify these events as representing the suicidal behavior or suicidal thinking according to a standardized scale created by the experts of Colombia University and these analyses are essentially identical and analogous to those performed over the past several years for the anti depressant drug products and of course you know those analyses have been presented to the psycho-pharmacologic drugs advisor committees on numerous occasions and those have resulted in significant changes to labeling for those products.

So as far as the results you know our analysis included almost 200 trials over 40,000 patients and we found an overall odds ratio of 1.8 which to us ((inaudible)) statistically increase in episodes of suicidality for the drugs taken as a whole compared to placebo.

Eight of the eleven drugs had an odds ratio greater than one and of the three that didn't, two had the fewest patients overall eleven. And they were multiple sensitivity analysis that were performed, various groupings of the data that the results are non hence robust to all of those maneuvers. So based on these results, the agency issued a public health advisory in January and decided to bring the issue before these combines committees.

So these analyses have brought us to several conclusions but of course we are here to seek your advice and guidance on what you think about those conclusions. First, we've concluded that the results should be considered to a apply to all eleven of the drugs analyzed and not actually just to those eleven but to all AEDs to be given chronically including those that were not included in the analyses and we recognized that this conclusion is arguable I suppose for at least two reasons.

First of all, not every drug that we've been analyzed will seem to have this signal and two perhaps more interestingly there is no obvious reason why there should be a similar signal for this event for drugs with such at least presumed district pharmacologic activities. Regarding the first point about the announced results having a signal as I noted earlier of the three that didn't have a signal two of them called (amedphin and phybanol) had very few patients in fact they had the those of the two smallest cohorts of the 11 that we looked at, so cause that suggests that the estimates in those particular cases might not be as reliable as precise as for the other drugs.

The third drug which did not have a signal (viberal proex) did seem to a have a reasonable number of patients in drugs versus placebo, over a 1000 patients in each of the treating groups.

So if you consider that in fact, there aren't necessarily 11 drugs that were capable of generating a signal but nine that actually had sufficient numbers of patients, it won't be terribly surprising to see one of those in the state of (Viberal proex) vary in its estimate of overall analysis, even if the truth was that the drugs do cause (suicidality). And I just point out one other point, that the two of the three drugs that didn't have a signal. The confidence of the signal estimates around the odds ratio in those cases did include the overall estimate of one point eight which was in itself statistically significant as I pointed out.

The third drug that did not have a signal ((inaudible)) had no events at all so you couldn't calculate the odds ratio. Regarding the second point about the district pharmacologic mechanism we have to recognize that we don't have any clear mechanist understanding with the signal, which of course raises questions about the

appropriateness of considering these drugs as a class to which results gained from several ((inaudible)) to apply to all other members.

Although to some other points we do consider the AED to constitute the therapeutic class, we will talk a little bit about that in a minute, and we do think that is of importance from a regulatory point of view, in fact as one could argue that the widely different presumed mechanisms of actions of these drugs make any generalizeable conclusion more or less implausible.

On the other hand, one could argue that the finding of the signal in eight of 11 drugs studied or in fact perhaps eight out of nine that had sufficient patients by itself establishes that the signal if one considers it real is independent to mechanism and should apply to all AED's studied and all AED's not studied.

And here the fact that the AED's do constitute a therapeutic class its important to consider, because differential labeling of drugs approve for the same and similar indications of course on a profound effect on prescribing behavior.

And in those cases we of cause have to be mindful of whether or not the data are sufficiently strong to support different conclusions for different drugs in that class to and it will be very important that we avoid inappropriately shifting prescribing to members of the class that in fact have the same signal.

It's also possible that one can consider that the drugs are closer in pharmacologic action than you think because whatever else they do they do decrease seizures, at least of patients with seizures.  And in that regard I think it has to be acknowledged, that we really don't understand how these drugs work, even though we have some information about some of the pharmacologic mechanisms that they display.

In any event regardless of the mechanistic arguments and lack of understanding at that level, we don't really believe that there are very good reasons to ignore to us what appears to be a fairly clear and (perical) finding.

And I would just point out that historically this is a situation is more or less similar to what was seen with the the anti-depressant, where the net analyses were showing signals of increased (suicidality), but there were a couple of members of that class that actually themselves did not have a signal.  And of course in that case as you know – later in changes were applied and the conclusions were considered to apply to all members of that class.

Now it's possible of course one could argue labeling changes will be applied in the conclusions with the facility reply to all members of that class.  Now its possible of cause one could argue that there is more common mechanisms within the epic differences than in the separate class within these AEDs but that's I think a point of discussion of cause where are you going to get when you think of that.  And as you can also see, we are proposing that the product labels be changed to include the box warning and then the medication guide be given to patients as I mentioned before.

But in particular we are proposing that the language in product labeling be uniform across all drugs that is to say we are not proposing that their be drug specific data included in labeling for specific products and that's because even though we believe that this is a real signal used for these drugs, we don't really believe that we are capable of providing such precise estimates to know that there is actually a differential risk among the drugs.

So of course we are very interested to hear your views about whether or not our plans for labeling the medication guide are appropriate or whether or not you have different views on that matter.  And finally before I just read the questions into the record, I should point out that you will hear from – in the open public, hearing from the formal agenda that there are folks who disagree with us, there's at least one company that will present its reasons for concluding that this signal does not apply to their drug, other folks I think have different views about our plans to require box warning.

So you will hear all about that there's a record of one company that is going to suggest that their own analyses lead to the conclusion that their drug is – should not be implicated.   The agency will give a response to that particular presentation.  So really here, We just want to end by reading the questions that we would like you to formally vote on, and formally discuss into the record and as Larry Goldstein pointed it out, we are very much of course interested in the discussion part of the proceedings across the formal vote is very important to us but we really do want to hear what you think.

So let me just read out the questions into the record that we would like you to vote on.  And the first question is, does the committee agree with the agency over all finding of increase in suicidality for the 11 AED's analyzed?

The second question is, does the committee agree with the agency's conclusion to the finding of increased suicidality should apply to all drugs including the analyses, despite the observation of the estimated of the odds ratio for three of the drugs in below one?  And if not, so which drugs do you think the conclusion should apply?

Third question, – does the committee agree with the agency's conclusion that the finding should apply to all chronically administered AED's including those not part of the analysis?  And finally does the committee agree with the agency's plan to acquire labeling changes for all AED's, including a box warning and the issuance or the medication guide?  And if not, do you want to offer guidance and other approaches to communicating this information?

So again of course and I said the formal questions that I would like you to vote on and discuss but of course if there s any other issue that's relevant, that you would like to bring up, we would certainly be very eager to hear your views on those.  So with that, I'll just close, I would say thank you again for coming, for the work you've done in preparation for the meeting and for the work you are about to do, and with that I'll turn it back without closing.

Male:  Thank you Dr. Katz, before we proceed I'd like to recognize Dr. Laughren for a brief presentation.

Tom Laughren:  Thank you, in recent years we've established a practice here of recognizing members of advisory committees when they finish their tours of duty and I think is a good practice let me just say that as (Rochelle) was telling you we rely heavily on the advice that we get from our advisory committees particularly on issues like the one we are dealing with today. And we really appreciate the hard work that you do you know we need outside comment from the academic and the (chronicle) community and your work is very important to us and we know that you do it in the interest of the public service and not for the very small stipend that you get from the FDA. So without any further ado let me mention two members from the Psychopharma advisor committee who has recently completed their tours of duty and they are back here today as consultants and those members are (Danny pine) and (Delbert Robinson) so the let me give them a clap.

Male:  Very well, so the questions are before us and I think it's really interesting process that we go through we have data, its interpretations of the data and I had a quick add to the framework to hopefully guide the FDA and hopefully do some public good.  So, the next order of business is a series of presentations by the FDA. The first presentation is by Dr. Mentari.

Evelyn Mentari:  Good morning my name is Evelyn Mentari and I am the clinical safety reviewer in the division of Neurology at FDA. I thank you for this opportunity to discuss our analysis with you this morning.  At the (onset) of this presentation I would like to start by defining the term suicidality as one that encompasses both suicidal behavior and suicidal thinking.

On the (anti-epileptic drug sponsor) approached (FDA) it concerns the suicidality signal and control clinical trial database, in response FDA initiated the study of suicidality in events in controlled clinical trials across (anit-epileptic drugs).  Patients with epilepsy and other illnesses for which inter rep have prescribed are

reported to have increased the risk of suicidal behavior or (ideation) but we are testing it very widely.  And if I compare it with (placebo treated) subjects the background of suicidality events and the risk of suicidality attributable to drugs are unclear.

(ISO) standardized approach based on previous FDA analyses of suicidality in children, adolescents and adults treated with anti-depressants.  In this analyses pediatrics and young adults patients treated with anti-depressants were found to have an increased risk of suicidality compared to those treated with (placebo).  We included trials that were randomized (trial arms) and placebo controlled, had at least 20 subjects in each treatment (arm) had subjects at least five years old, had a duration of at least seven days, and trials without a randomized withdrawal study design.

FDA specified a format for subjects' level data sets and information on suicidality event was part of subject level data.  Sponsors searched adverse.  An information about the suicide of all the events was part of the subject project data.  Sponsors search adverse event reports for events related to (suicidality) are possibly related to suicidality and such terms and procedures were specified by (FDA).

In our specified search strategy we use verbatim terms which were taken directly from adverse of that reports and also on preferred terms which I on rarely (terms) are translated into using the coding dictionary.

I specified such included terms with the (text rings) attempt cut, bath (hang, jump, mutilate, overdose, self damage, self harm, self inflict, self injure, slash, sues poison, asphyxiation, suffocation and fire arm.  An event screen for false positives, the specified search also use preferred terms with (text rings) (suice) overdose including all of them is quoted as accidental injury.

I guess another serious adverse event and all other adverse quoted as accidental injury.  After then (ISO) identified using the structured search strategy structured ((inaudible)) is well prepared and this time is not those event classified they responded to treatment.  On this side we have the suicidality of event categories, they include no event, completed suicide, suicide attempt, prepatory acts towards iminent suicidal behavior, suicidal ideation, self injuries behavior intent unknown (not enough information fatal) and not enough information, non fatal.

We requested the data for drugs known to have clinical trials which met our inclusion criteria and on this side we have the list of the entire epileptic drugs analyzed.  Many of these drugs have approved non epilepsy treatment  indications, ((inaudible)) is approved for (trigeminal neuralga) ((inaudible)) proxy sodium is proved for mania and migraines (gather pantisium) is approved (prostic trigeminal triojor nitrogenous) is proved for bipolar disorder (prigana) is approved for neuropathic pain from diabetic peripheral neuropathy (profonality) ((inaudible)) and ((inaudible)) is approved for migraine.

Just as there are a wide variety of the approved treatment medication for this drugs, there were wide variety of trial indication for this trials analyzed.  We categorized the trial medications to the three categories; epilepsy, (psychiatric) indications and other indications. Among the psychiatric trial indications; bipolar disorder and anxiety, post-traumatic stress disorder, depression, panic disorders (Schizophrenia) social phobia and (Binge eating) disorder.

Among the other trial indications; (neuropathy), migraine, obesity, chronic pain, agitations, and (peptagnisation).  Insomnia, (strategy) (fibromyllgia) (strastecity) and trauma.  To evaluate underlying mechanisms of suicidal risks drugs were categorized by main mechanism of action.  Some drugs have multiple main mechanism of action and for some drugs main mechanisms of action are not universally agreed upon.  Specifically we would like to acknowledge the disagreement with drugs of groups voice and sponsor of (pregablin and gabentaine).

The sub groups used we based on drugs prescribing information prescribed published the nature and medical reviewer consensus. At this time, this concludes the background information and next Dr. Mark Levenson

will discuss the statistical evaluation.  At this time this concludes the background information and next   Dr. Mark Levenson will discuss the statistical evaluation.

Male:  Before Dr. Levenson presents I just want the committee just to have just couple of minutes if there are any clarifying questions about each presentation we'll have more time  to discuss them all together in detail at the end.

Mark Levenson:  .When you listen to psychiatric indications for the ((inaudible)) the indication that the trials have tried to address that was not comprehensive. Is that correct?  You said among, so there were other, I mean in particular I was confused that I did, I thought that there were trials of superimid (ph) for alcohol abuse and I was confused that, that was not listed.

Female:  .You know there were several trial allocations and trial allocations with very few trials were not listed on that slide, its true. There is complete table within the briefing package, thank you.

Male:  Dr. Gilman

Sid Gilman:  I have a question for Dr. Katz and one for Dr. Mentari if I may.  For Dr. Katz can you inform us about how these recommendations if we were to agree with all points that you've made would pertain to anti-epileptic drugs going into the future, in other words if a company would develop a new drug and were to show no suicidal (adiation setra) in a very large ((inaudible)) will this necessarily apply to drugs in the future.

Male :  Maybe we can hold those types of questions till the  general discussion, I just wanted to make sure that there weren't anything specific clarifying the points that were made from these presentation there will be plenty of time for this  discussions we'll talk to Dr. Gilman first  then we do that.

Male:  OK, Yes,

Male:  Yes, I have  questions about those trials, because some of  the drugs listed as the agentive therapy as the mode of therapy.  For those trials when you have placebo groups at the active control for the other drug that is not tested or just purely placebo groups?

Female:  You know the data that we collected did not include concomodate medication because as you can imagine, there will be an enorment amount of combinations possible, you know we in some ways relied (placebo) controlled randomization and we somehow relied on randomization to supply a situation where things were relatively equal in both groups.

Male:  So in other words it's true that (liquitherone) may be common in ((inaudible)) medicine right?

Female:  That's right; the trials included trials for, adjunctive therapy (ph) and mono (therapy) yes.

Male:  Very good, Dr. Levenson welcome.

Male:  Just one comment, for the epilepsy trials they must be add on studies, so your right the Placebo group was getting some backgroung therapy, in the psychiatric kinds of things that probably mostly the placebo.

Mark Levenson:  Good morning, my name is Mark Levenson I am a statistical safety reviewer in Cedar (ph). I will presently represent the statistical review of anti-epileptic drug and suicidality.  Dr Montero has already presented the background of the data and after me we will discuss the conclusions of the statistical review in a medical context.

My presentations consists of four parts first I will briefly state the objectives of the statistical review, I will then discuss the analysis using the review, this includes the end points, populations and subgroups and the

statistical method, then I will present the results from the review, including trials, patients summaries the results of the primary, secondary, sensitivity analyses and the results from the subgroup analysis.

Male:  ((inaudible)) Trial and patient summaries the results of the primary and secondary sensitivity analyses and the results of the sub-group analysis.  Finally I will provide concluding summaries of the review.

The objectives of the statistical review were to examine whether eleven anti-epileptic drugs as a group are associated with increased risk of suicidality relative to placebo in randomized placebo controlled trials.  And to examine whether the risk of suicidality varies by individual drug, drug groups, studied indication and demographics.

Now I will discuss the analysis plan.  The analysis plan was specified prior to the review of the data.  It was developed with consensus by the medical and statistical members of the review team.  The primary endpoint was called suicidal behavior ideation.  A patient had the (end) point if the patient experienced any of the four events:  completed suicides, suicide attempts, prepatory acts, or suicidal ideation.

There were two secondary endpoints; suicidal behavior and suicidal ideation.  Suicidal behavior consisted of the first three events.  Suicidal ideation consisted of suicidal ideation only.  Only the most critical events for each patient was used for the definition of the endpoint.  Therefore a patient with both a suicide attempt event and suicide ideation event would only meet the suicidal behavior endpoint.

The primary analysis population was defined by the following trial and patient inclusion criteria.  Trials are randomized parallel placebo controls, which ((inaudible)) designs were (excluded).  Open ((inaudible)) extensions periods were excluded; the trial durations were at least seven days.  The trials had at least twenty patients per ((inaudible)).  The first period of crossover trials were included if they otherwise met the inclusion criteria. Patients had to be at least five years of age.

Now I will present the subgroups and special populations considered.  For the subgroup analysis each of the eleven drugs was considered individually.  Three drugs were -three drug groups were considered.  As ((inaudible)) said the groups were based on a consensus of the medical review team.  It is recognized that the drug classifications are not unambiguous and recent discussion has highlighted other classifications.

Note that the drug groups are overlapping, so (peremude) is in all three groups.  Each drug group was primarily compared to its compliment.  That is the group of sodium channel blocking drugs was compared the group of drugs that are not sodium channel blocking drugs.

The three indication groups discussed by Dr. Mentari were considered.  Note that these were studied indications and not necessarily improved indications or indications that were later approved.  Sub-groups based on demographics were considered including age, gender, race, setting – that is, did the treatment have an in-patient component, or was it out-patient only and the location of the patient's clinical center.

The primary analysis method was the exact method for a common odds ratio.  The method allows trials to have different ((inaudible)) rates of events which is an important feature in (Med analysis).  The method allows low event counts, which we refer to as sparse data.  The method does not make use of trials with no events, so called zero event trials.  The method assumes a common odds ratio for the trials.  The unit of analysis was the patient and the primary display was the odds ratio and is 95 percent ((inaudible)).  In order to examine the robustness of the primary method, we conducted several sensitivity analyses.  To examine the consequences of the even trials we used a ((inaudible)) difference method.  This method uses trials with no events.  To examine the consequences of heterogeneity of the odds ratio across trials, we used a generalized linear mixed model with a random trial effect.  We also looked at the effect the trials that had large influence on the estimates.  During the analysis data, a small but significant difference in treatment duration between the treatment groups was observed.  We used an exact method based on patient years to examine the consequence of this difference.  For exploratory analysis we examined the ((inaudible)) pattern of events

over time with (capped and moderate) incident curves and life table estimates. Now I will present the results, first the trial and patient summaries. The primary analysis group consisted of 199 trials.

There were 43,892 total patients, 27,863 in the drug treated group and 16,029 in the placebo group. Note that more patients were randomized the drug treatment than placebo treatment. This table gives the numbers of trials and patients for each of the eleven drugs. (Taperamine and Pergabilen) contributed to most patients. (Gabapentine, Lemotragine and Levarterothratine)were the next biggest contributors. (Carbanothapine) and ((inaudible)) each contribute relatively very few patients. The trial numbers reflect the patient numbers. The mean nominal trial duration was 14.2 weeks. The median was 12 weeks. The durations range from one to 112 weeks. 90 percent of the trials were between three and 39 weeks, 50 percent of the trials were between 8 and 16 weeks. This table compares the indication with the typo therapy, mono therapy, adjunctive therapy or other therapy for the 199 trials. The vast majority of the epilepsy trials 92 percent involved in juncture therapy whereas the majority of the psychiatric and other therapy trials involved mono therapy, 86 percent and 75 percent. Overall 57 percent of the trials involve mono therapy.

This graph is a bar chart the of the number of patients by drug and indication, in the interest of space over the first two letters of each drug is given. For example, PA is for (carbonasapine). For the epilepsy indications many drugs contributed comparable numbers of patients. For the psychiatric indication fewer drugs contributed comparable numbers of patients. For the other drugs, sever drugs (Taperamine, Pergailen and Gabapentine) dominate the group. This disparity in the other indication group is somewhat reflected in the totals for the patients. I will now turn to the patient ((inaudible)) demographics. Five percent of the patients were between five and 17. Eight percent were between eight and 24, 10 percent were between 25 and 30. The majority, 64 percent of the patients were between 31 and 64. 13 percent were 65 or over. The mean and the median age were 44. The ages range from five to 100. The majority, 79 percent of the patients were white Caucasian, six percent African American, three percent were Hispanic, three percent were Asain, two percent were other. Because of the small numbers in the subgroups other than White Caucasian, these groups were combined in the analysis. Fifty-five percent of the patients were female, eight percent of the patients had an in-patient component of treatment. Sixty-one percent of the patients were from North American centers. There were no notable differences between drug and placebo patients (when based on) demographics.

Drug patients are assured to treatment durations and a greater discontinuation rate from placebo patients. But these ((inaudible)) mean duration for drug patients were 73 days verses 77 days for a placebo patients. This discontinuation rate for drug patients was 36 percent versus 31 percent for placebo patients. The patient time and sensitivity analysis was conducted to evaluate the effect of these differences.

Now we will turn to the result of the primary, secondary and the sensitivity analyses. For the primary end point suicidal behavioral ideation 38 of 16,029 Placebo patients had an (event) which represents an unadjusted rate of .24 percent. One hundred four of 27,863 drug patients had an event which represent the unadjusted rate of .37 percent. Sixty-six of the 199 trials of 33 percent had at least one event. This table breaks down the primary endpoint into the four component event. If a patient had multiple events, only the most critical is included. The most common event was suicidal ideation with 96 events. The second most common was suicide attempt with 38 events. There were four completed suicides in the drug group and none in the placebo group. For all ((inaudible)) types, the drug group had higher percentages of events.

This graph is a ((inaudible)) of the results of the primary analysis. It shows the odds ratio and confidence intervals of suicidal behavior or ideation for the 11 drugs and overall. An odds ratio (of) greater than one, the area to the right of the dash line indicates that the drug was associated with suicidal behavior or ideation relative to placebo. The overall odds ratio was 1.8 with the confidence interval of 1.24 to 2.66. The interval did not contain the value of one.

Therefore, overall, there was a statistically significant association between the drugs and suicidal behavior or ideation relative to placebo in these trials. Eight of eleven drugs had odds ratio is greater than one. The confidence interval for individual drugs generally contained the value of one.

This graph is the ((inaudible)) of the secondary endpoints, the endpoint suicidal behavior and the endpoint suicidal ideation. For both endpoints, the odds ratio estimates were greater than one. Suicidal behavior had the larger odds ratio estimate and the associated confidence interval did not contain the value of one.

This graph shows that (capillary-my insulin curves) for the endpoint suicidal behavior or ideation up to 60 weeks. There were no more events beyond 60 weeks. The graph suggests an increased hazard for drug patients over a range of time. Analysis based on life table methods supports that the increased hazards at least into 24 weeks at which point data were insufficient for analysis.

This graph is a forest plot showing the results of the mental (health) or risk difference analysis. This analysis examined the consequences of the zero-event trials, rather than an odds ratio of the graph shows risks differences. A risk difference greater than zero, the area to the right of the dash line, indicates that the drug was associated with suicidal behavior or ideation relative to placebo. Overall the patterns for the overall result of the individual drugs were very similar to the primary analysis based on the odds ratio. The overall risk difference was statistically significant, the estimate for each of the eleven drugs sat on the same side of the line of no effect.

Let me present for the results for the mental (health) risk difference now. However, based on all the sensitivity analysis, we conclude that the results were above to inclusion of trials with no events, the possibility of trial heterogeneity and the differences in treatment durations between the treatment groups.

I will now present the results for the subgroups. This graph shows the forest plot plot for the predefined drug groups. For example, the first entry is for sodium-channel blocking drug and the second entry is the complement of this group. Based on these two drug groups, they did not appear to be a notable difference among the drug groups and their complements.

This graph compares to three indication groups: Epilepsy, psychiatric and other. Epilepsy had a notably high odds ratio than the other two groups. The high odds ratio for epilepsy compared to psychiatric group was related to the low placebo background rate for the epilepsy group. This table gives you estimated odds ratio, the placebo and drug patient event rates and the risk differences for the three groups. The psychiatric group had a notably high placebo event rate. The risk difference for epilepsy and the psychiatric groups were more comparable, 2.4 and 2.9.

This graph shows the forest plot for pre-defining age subgroups. Based on these results they did not appear to be of effect of age.

This graph shows the forest plot for post hoc final partition of age. The 31 to 64 age group was further divided. Again, based on these results, they did not appear to be an age effect.

This graph shows the forest plot for gender; there was no clear effect of gender. This graph shows the forest plot for race; there was no clear effect of race. This graph shows the forest plot for care setting, inpatient component versus outpatient; there was no clear effect on setting. This graph shows the forest plot for location; the non-North American subgroup had a notably high odds ratio; this was not fully related to a slow of background rate.

I conclude with the summary of the findings. The eleven anti-epileptic drugs as a group has a statistically significant effect that suicidal behavior or ideation. The odds ratio was 1.8 with the confidence interval from 1.24 to 2.66. Eight of the eleven drugs had estimated odds ratios greater than one.

In terms of the attributable risks, there were 1.9 per 1000 additional patients with suicidal behavior or ideation events from the drug groups compared to placebo. The higher drug hazard was seen over an extended period of time, although this was not statistically evaluated.

Epilepsy had the highest estimated odds ratio; however, epilepsy and psychiatric indications had comparable risk differences. Non-North American had a notably high odds ratio. Other subgroups, age, gender, race, setting, drug class, did not have notable effects.

Finally, the results were ((inaudible)) to the analysis method. Thank you.

Male: Thanks, Dr. Levenson. Again any – just any clarifying questions. We'll get to meat of it in the general discussion. Yes, Dr. …

Male: What was the reason for always including suicidal ideation plus behavior together as an outcome?

Mark Levenson: Well, we did do – as secondary endpoints, we did consider them separately for the primary analysis separate and combined and now as a medical judgment and what with the most appropriate outcome for this analysis be.

Male: Yes.

Male: In the comparison of the North-American and non-North American were most of the trials combined American and North American or did it turn out that most of the North American trials were just North American trials, so, do you see what I'm saying? In an effort were these combined in one trial over these totally distinct trials?

Mark Levenson: I can only answer part that maybe Evelyn will know more. That the forest – the analysis based on location was at the patient level. So it depended on the patient center where they were, whether they were North America or non-North America. I don't know if they were international trials or not.

Evelyn, are you aware – for the trials were there many international trials or are they generally…

Evelyn Mentari: You know in our discussions with sponsors as they submitted data, it wasn't pointed out to us if they were trials than combined – that were both North American and non-North American. We had it coded as North American versus non-North American.

There was extensive dialogue between sponsors and our group at FDA and if a categorization wasn't – did not really accurately meet an appropriate description, usually was pointed out. That was not pointed out to me. That's the best of I can do. It was coded as distinctly North American versus non-North American trials.

Female: I'd like a brief clarification on slide 19 where you have indication group by therapy. It indicates that most of the epilepsy patients were not on monotherapy and 86 percent of the psychiatric patients, it was monotherapy. In terms of defining that, I'm assuming that's anticonvulsant monotherapy, meaning you know the psychiatric patients, were on one anti-convulsant whereas the epilepsy were on run multiple

However, it wouldn't be psychiatric monotherapy overall in the sense that they were probably covered with other psychotropics for their psychiatric indication. Is that correct? So it wasn't global psychiatric monotherapy because it would be unusual per psychiatric patient received only carbamazepine for it.

Mark Levenson: Yes. I can address that completely, that was based on question – an individual patient level question, whether therapy was – actually, I'm sorry, it was a trial level question whether therapy was monotherapy or adjunctive therapy. So I guess it was left to the sponsors to interpret that.

Male: Dr. Hennessy.

Sean Hennessy: Thank you, (Didi). Calculate the risk difference and the associated 95 percent confidence interval for completed suicide.

Mark Levenson: No, I mean there were only four event total – I don't think I could go with – it had a very light confidence interval. Obviously, the point estimate, they've been greater than one with an extremely wide confidence interval.

Male: Mr. Goodman.

Wayne Goodman: Really, my question is along the same line as previous one. You'd note quite clearly that the suicidality signal's higher among the epilepsy compared to the psychiatric. I'm still trying to tease out how much that contribution is due to presence or lack of concomitant medications? Did you an analysis of that effect? In terms of the…

Mark Levenson: In terms of the concomitant meds?

Wayne Goodman: Yes, in terms of the concomitant medications or lack thereof.

Mark Levenson: The monotherapy versus adjunctive therapy is the only information we have on that.

Male: A 92 percent of the epilepsy trials were concomitant, so the results of the analyses of the concomitant versus non-conc would be the same for the epilepsy trials, presumably.

Male: I'm wondering if you could talk a little bit more about the fact that 66 or 67 percent of the trials contributed no events at all. And so with, at least, your primarily analysis stand point, you're facing a conclusions on only a third of the available data. I mean, obviously, based on your presentation, you gave a lot of thought to that. Could you maybe you know speak to some of the issues the you considered in the analysis and how they draw conclusions for all the drugs all together in light of the fact the two-thirds of the data you have basically generate no information.

Mark Levenson: Yes. When we were developing the statistic analysis plan, of course we haven't seen the data yet but we're truly expecting for level sparse sets in the data, as we seen the antidepressant analysis. And that's the reason that the sensitivity analysis of the (mental handel) risk difference plays a big role.

Male: Well, before you go on, I think in some ways it similar to the antidepressant data, in other ways it's very different in that most, if not all the trials, would have at least one event. Here, 67 percent of the trials have no events which is very, very different from the antidepressant data. So I guess that's really…

Mark Levenson: OK. Yes, it is more extreme. For the adult antidepressant data, I don't – I think you're probably talking about the 60 or 70 percent trials with event. I don't have the exact figure.

Well, again going back the (mental enhancement) risk difference method that, as ((inaudible)) said, does make use of the trials rather whether they have events or not. And we're used that you know it's a very important sensitivity analysis, it's almost like a co-primary analysis. And when you compare the forest plots between the individual estimates, between the odds ratio and risks differences, you see the results line up very well.

Male: Dr Lu.

Ying Lu: Yes. Just to follow up that question about the concomitant treatment, so for the treatment group, if they – whether you have more than one drugs that ((inaudible)) eleven drugs and so, did you separate this in the medicine or did you just put them as one endpoint in the study. And the other questions ((inaudible)) for the drug group study that you have at least one drug that appear in all three groups. Did the sensitivity that if that one is not there, what kind of impact would that be?

Mark Levenson: OK. The first question has to do with how we group the drugs. Maybe you can explain more what you mean but I do mean did we just – did we put all…

Ying Lu:  Or you can stand two both of them – two drugs in the treatment group.  How did you evaluate individual drug effect?

Mark Levenson:  So, if the treatment group had two drugs relative to a placebo – compared to a placebo arm, will that account as adjunctive therapy that would have included in the primary cast drug, the sponsor has submitted…

Ying Lu:  OK.  Primary one, yes.

Mark Levenson:  And…

Male:  Wait, before you finish that, in these studies the treatment and drug group – the treatment group and the placebo group have the same background therapy.

Ying Lu:  OK.

Male:  That's part of the background.  They're randomized to the added anti-epileptic

Male:  …or whatever versus…

Male:  …the placebo.  So, they should be the same in that respect.

Male:  All right.

Male:  We're not looking at two anticonvulsants versus non.

Male:  OK.  That was ((inaudible)) versus the same background.

Mark Levenson:  Could you repeat the second question please?

Ying Lu:  Oh, yes.  Just what drug groups because there was one drug…

Mark Levenson:  No, we do not – give a sensitivity analysis were remove the overlapping but what's the point were each drug group is compared to us complement, so that the complements are obviously not overlapping.  So, it wasn't so much a comparison between among the three drug groups that the comparison between each drug group and its complement.

Female:  Along the same lines of what Dr. Pine asked about, what is the significance of just identifying a new significant suicidal attempt within each study?

Mark Levenson:  What are the significance of the using just the most significant event as opposed to like all the events that might have occurred.  Well, in this anti-epileptic data request, we did request for all events to be submitted which was different from how was with the antidepressant analysis.  So, we received, out of the 43,000 patients, 9 patients that had multiple events.  Part of that is actually ascertaining the events.  Patients may have had multiple events but we don't know about them.

So, in terms of what we know about multiple events, there's not – I've a backup slide listing them all.  But generally, patient – the multi-event patients have multiple episodes of ideation.  One had two suicide attempts and one had one ideation and one suicide attempt.  So I think the answer to your question is, we don't really know a lot about multiple events but the little we see is still dominated by ideation.

Male:  Dr. Temple, sorry.

Robert Temple:  Mark, the two striking differences that you had were epilepsy versus other and North America versus non-North America.  Did you do an analysis looking at those groups together, for example, epilepsy versus other in North America and the other regions?

Mark Levenson:  No.  I did not.

Male:  Dr. Day.

Ruth Day:  Going back to the original classification of events, using the Columbia algorithm, can you remind the number of raters used to sort event into the categories and what the inter-data reliabilities were in general and whether they differed as a function of the different levels within the algorithm?

Mark Levenson:  OK.  I can't answer the question about the number of raters.  The sponsors were responsible for actually having – conducting that either through their own experts or contracting it out.  And I do not know that parameter; the number of raters was fixed among sponsors.

Ruth Day:  Was that reported?  I mean, could it be found and could there be differences across different drugs and companies on this?

Mark Levenson:  I do not believe we have that information at the moment.  It could be requested as...

Evelyn Mentari:  Just a note, in our instructions to sponsors we specified that there should be at least two rater for each evaluation ((inaudible)).

Ruth Day:  Well, I'm asking this because in the regional studies for the antidepressants when the companies and the agencies did – before they started using the algorithm, they were very different outcomes and number of events identified and so forth.  And so I think it would be useful information to know the number of raters and the inter-rater reliabilities for the different drugs.

Male:  Dr. (Zip)

(Zip):  Yes.  When you evaluated those strings of words to determine whether there were events, you mentioned that there was a false-positive rate; I wonder that that false-positive rate was?  Was it 10 percent or 50 percent, so how did you account for it?

Mark Levenson:  OK.  By false-positive, what's meant there is there is – that the (text string) search and let you (open) parts of words.  I (think) of an example on the spot but that part of word false and then completely unrelated word, so it's a clear false-positive, nothing do a suicidal.  I'm not going to be able to (sneak) as an example, but you… I don't have an example.

Evelyn Mentari:  Well, say, hang there.  Hang now has been identified by searching for hang or gastric identified by searching for gas.  Obviously seen those are going to suicide-related events.  So that's what we mean about false-positive.

Male:  Yes.  And so were…

Female:  Do we have information about the numbers of those?

Mark Levenson:  I know we were…

Female:  Yes.

Mark Levenson:  I imagine no one really has some information because it's a very early stage of the process.  Those are thrown out before narrative – blinding narratives are created.

Male:  So it's not merely that you sample some of the records to see if there were false-positives to determine the number but everybody who screens positive is evaluated and then you make a judgment about whether they should be included or not.

Mark Levenson:  Well, at that point once a narrative is created, they're classified into the seven so events from completed suicides to not enough information, or no event.  They could be classified at that point.  But everybody at that point would get…

Male:  Right. The screening is done on those text strings.  But I just want to say you.  All of this work,, this preliminary categorization and dividing of narratives and the categorizing narratives into one of these categories was done by companies.  Blinded, it was done blinded.  But it was done by the companies just so you do understand that.  We did the analyses of the results of their categorizations.

Male:  Thanks for that clarifications.  One other question is information on false-negatives.

Mark Levenson:  False negatives?  No more, no.

Male:  Thank you.

Male:  Dr. (Lear).

(Lear):  Yes.  I've a question about slide 20, if you can clarify.  This was supposed to include every patients not including risk studies of zero events, right?  So, if you look for zero events, will that be very different from the plot that you have?  So, this is the page for patient's drug and indication and the number of patients contribute in the analysis.

Mark Levenson:  That's correct.  And what was your question?

(Lear):  The question is that – yes, sorry.  If you exclude the events – the trials with no events…

Mark Levenson:  What would it look like?

(Lear):  What would it look like?  Yes.

Mark Levenson:  I would not know exactly what it'd look like, what I can to say is the psychiatric indication groups tend to have higher event rates.  So they would lose less trials than the epilepsy and other indications.  So, if you're going to see a decrease from throwing out patients who were in trials without events, you would see that mostly in the epilepsy and the other indications.  But that's all I can say about that.

Male:  OK.  We're certainly to get a little off from the clarifying questions but that's OK,  we still have time. Dr. (Lear).

Male:  All these numbers are based on the numerators here, are based on spontaneous adverse event report correct, is that correct?  Particularly in the psychiatric trials, I would imagine there were also prospectively gathered information on suicidality, was any of that with it?

Mark Levenson:  I'm not really in the position to answer.  I don't know the answer to that.  Anyone at the table know more about that, I mean.  So of these were psychiatric indications perhaps there were perspective instruments used in them, but I don't know.

Evelyn Mentari:  We didn't analyze that information for this analysis.  We didn't request it.

Male: We do know one thing from the depression trials which is that the suicidality item or the suicidal item on the hand, don't show them. Even while the rest of the data, spontaneous reports did. So I don't know what that means maybe you do.

Male: Dr. Winokur.

Andrew Winokur: You put it up that two of the anti-epileptic the drugs ((inaudible)) and pregabalin contributed quite high percentage of studies in patients. Can you say more about particularly how that was taken into consideration, make sure that did not overly influence the finding across the large number of the anti-epileptic drugs.

Mark Levenson: OK. Can I get the slides up again? Perhaps at the – should be 28. OK, so the question is that two drugs pregabaline and topiramate contributed a large number of patients to the overall analysis. Well, that was – there were no adjustment for that in the primary analysis. We do see that the other drugs, those two drugs form a pattern with the other A-drugs that have odds ratios greater than one. So, when we look at the drugs individually, the eight of the eleven drugs seem to have a very similar pattern.

We did look at the sensitivity analysis where we removed the trials – we looked at the large trial that contributed individual trials no matter what drugs they may appear, whether they have a large influence on the overall estimates. It turned out only one trial had any significant in itself influence on the overall estimate and when we removed that trial, the overall estimates were similar slightly ((inaudible)) but similar.

Male: Mr. Potter.

William Potter: I'm just trying to get of the same issue about the fraction of patients in the total size that contributed to counts, OK? So you talked about a lot of trials but if you just ask the question, how many patients of the total come from trials that contributed to your data analysis?

Mark Levenson: I believe that I have that number.

Male: So in other words, the findings, the results of multiple things from the smaller trials or all the findings coming from the big trials and they're already small trials with no events. Just to put in sort of common sense terms.

Mark Levenson: Again, when I looked at the influence of the individual trials, there're very few trials really dominating. One trial has an effect of 120 for the overall estimate and other than that no significant fraction of influence to the overall estimate. So, I'm not sure that answers your question.

Male: Let me try one more time. I mean, you have 40,000 you know – let's say you've 40,000 people you're reporting in your totals. But you're saying a lot of the people, and I'm saying how many of those 40,000 people were in those two-thirds of the trials that do not – had no events.

Mark Levenson: I don't have the answer to that question.

Male: OK. It should be – it might be interesting and what is the geographic distribution of that because there are some very peculiar things that ((inaudible)) in the data.

Male: We're separating on this concomitant medication issue. As I understand that there were some trials that involved monotherapy and it seems that more of those would be represented in the psychiatric than in the epileptic trials. Did you have enough of those monotherapy trials to conduct the separate analysis of suicidality risk, again, just looking at monotherapy?

Mark Levenson: We probably have enough but we did not. As you can see, 86 percent of psychiatric are monotherapy, so in a sense, almost none of the epilepsy are monotherapy and 86 percent or 75 percent for

the other indication categories of monotherapy. So since therapy is very confounded with indication and if you look at the results by indications, you're getting most of that information out.

Female: It's fine.

Male: In the statistical background, there's a comment about ascertainment bias apparently did not play a factor here. Could you elaborate further on that conclusion?

Mark Levenson: Evelyn, was that in your section or discussion about ascertain bias

Evelyn Mentari: That something I'll discuss in my presentation, that's next. Thank you.

Male: Since the epilepsy patients were adjunctive, there were probably many patients on many different numbers of AEDs. Was any effort made to look to see if the risks were stratified with the number of AEDs or some other estimate exposure to AED?

Mark Levenson: It's an interesting question but you know we did not collect that data and we could not analyze it that way.

Female: Recognizing that the agencies question is related to all clinically administered the AEDs and recognizing that this analysis was done only one drugs that have minimize placebo controlled studies. Where do you put (any claim) in all this, it's a very commonly prescribe drug. I know I don't have the data but how do you, if you going to try to classify the whole group, what are you going to do with this?

Male: Again, obviously this is larger question that we wanted the committee to discuss but I think the priority view would be included, just as the other drugs that we didn't study but don't have adequately controlled trials data.

Male: Very good. Let's go on. I think the next presentation is by Dr. Mentari again.

Evelyn Mentari: Next thing I will discuss some issues really don't ((inaudible)) to do with the end method. First I'll will discuss our use of placebo control clinical trial data which is a strength of our analysis, since placebo controls are necessary to understand about primarily suicidality. Patients with epilepsy and other illnesses for which anti-epileptic drugs are prescribed are reported to have increased risk of suicidal behavior or ideation but risk estimates very widely and without comparison to placebo treated subjects. But that summary and the risk of suicidality attributable to drug are unclear.

Next, I'll comment metanalysis. Individual clinical trials typically have few suicidality events; however, this stands in sharp contrast to the fact that over the lifetime of individuals in the population, suicidal behavior and ideation are frequent occurrences that amount to a major public health burden.

In 2004, suicidal is the eighth most common cause of death in the United States general population. However, in the limited timeframe of clinical trials, large numbers of subjects are necessary to evaluate risks. And this metanalysis provided the largest number of subjects used to evaluate this question to date.

Next, I'd like to discuss some limitations of our analysis. Analysis used data that was collected retrospectively since the majority of clinical trials data for currently marketed anti-epileptic drugs was generated prior to the recognition of this possible suicidality signal. As we've discussed large numbers of subjects are necessary to evaluate the risk of suicidality using clinical trial data. However, while the data was collected retrospectively, the analysis was prospectively defined.

The trials included in this metanalysis were not specifically designed to evaluate risk of suicidal behavior or ideation and differences between clinical trials analyzed for individual drugs limits not the possibility of making reliable comparisons between individual drugs.

Next slide, I'd like to discuss some issues regarding our findings.  Sponsors perform searches of their clinical trial adverse event data bases and with these methods, non-random differences and subject to assessment ascertain a bias may occur.  Drug-treated subjects may have a higher rate of adverse events in general and this may lead to additional contact to clinical staff.  Placebo-treated subjects may have increased contact with clinical staff due to lack of treatment efficacy.

With additional contact with clinical staff, subjects may be more likely to generate a suicidality adverse event report.  Prospective methods of assessment suicidality in randomized trials are not subject to ascertain a bias and maybe used along future studies.

Ascertain a bias likely to have less influence on reporting a suicidal behavior than on reporting a suicidal ideation.  Compared to placebo-treated subjects, drug-treated subjects had higher incidents rates for all categories of suicidal behavior or ideation events.

Also, the odds ratio estimates for suicidal behavior alone which encompass events of completed suicide, suicide attempts and preparatory acts towards eminent suicidal behavior which statistically significant with an odds ratio estimate of 2.92 and a 95 percent confidence interval of 1.44 to 6.47.

On review of the suicidal behavior narratives, the majority of suicidal behavior events prompted notification of study investigator by an outside party.  For example, notification during hospitalization, notification of death, or notification by a family member, or the event prompted the subject's discontinuation from the trial.  In these circumstances, reporting of suicidal behavior events is unlikely to have driven by a generally increased risk rate of adverse events or by additional of clinical staff.

Next, I'd like to discuss the risk of suicidality with individual anti-epileptic drugs.  Anti-epileptic drugs are the class where associated with the statistically significantly increased risk of suicidal behavior or ideation compared to placebo.  Estimate odds ratios were greater one for eight of the eleven individual drugs with data analyzed.  Two of the eleven drugs was data analyzed had a statistically significantly increased risk.  None of the eleven drugs with data analyzed had odds ratio estimates that were not statistically significant.

Reliable comparisons between individual drugs are limited by non-statistically significant odds ratio and the majority individual drugs and by differences between clinical trials for individual drugs.

Next, I'll discuss our subgroup analyses and the consistency of results.  Consistency of results in subgroups of the data analyzed is important confirming that overall metanalysis conclusions are valid.  There's no clear pattern of drug effects seen among subgroups according to age, gender, race or setting.  And there is no clear pattern of drug effects seen among drug groups pre-specified according to main mechanism of action.

An increased risk of suicidal behavior or ideation was observed in all categories of trial indications evaluated.  The majority of epilepsy trials involved, adjunct of therapy, raised the majority of trials for psychiatric indications or other indications involve monotherapy.  Because increased risk was seen in all trial indication categories, it may be expected that the increase risk exists whether the anti-epileptic drug is used as monotherapy or adjunct of therapy.

There was an increased risk of suicidal behavior or ideation seen in both trial location subgroups.  The estimate odds ratio for the non-North American subgroup was 4.53 with a 95 percent confidence interval) of 1.86 to 13.18m and that it was larger than that for the North American subgroup, with an estimate of (1.28) and a 95 percent confidence of 0.90 to 2.13.  A much lower event rate in placebo-treated non-North American subjects leads to the elevated odds ratio in this difference in the non-North American subgroup.

Based on these data, we had concluded that there is a signal for increased suicidality for the class of the anti-epileptic drugs.  On January 31st, 2008, FDA issued a press release and information for healthcare professionals.

FDA plans for action which are (for) discussion today include to propose product labeling for all anti-epileptic drugs used chronically to propose its sponsors include a description of these findings in a box warning, as well as in the warnings and precautions sections, and to propose a medication guide describing this risk for distribution each time an anti-epileptic drug prescription is filled.

At this time, several areas for future investigation remain. Research use in prospectively collected data is necessary to more systematically evaluate the risk of anti-epileptic drugs and the suicidal behavior or ideation. Further development and validation of methods to assess suicidality including suicidality rating scales are necessary.

Characterizing potential underlying mechanisms of increased risk of suicidal behavior or ideation with anti-epileptic drugs is an area for future research, as well as research on whether certain patient subgroups are at particular risk.

That concludes my discussion, thank you.

Male:  Thank you, Dr. Mentari.  I think that sets up the discussions that we should be having over the next half hour.  And as I started to say earlier, this part should be more general in discussion.  But again, we can certainly direct questions at the staff.  I want to start off now with Dr. Gilman who was going to ask a question earlier that I think sat very well as well.

Sid Gilman:  Thank you.  My question was directed at Russell Katz and it has to do with these four recommendations that you want us to consider, assuming that we are in the affirmative as a committee for them.  How does this pertain to drugs to be evaluated as anti-epileptics in the future?  Would this pertain to them automatically?  If so, is there anyway that the sponsor could demonstrate they do not have a suicidal risk.

Russell Katz:  I don't know what we've fully decided what that would do – what we would do in that case. There're a couple of things.  I think if the drug were to be approved tomorrow or in the near future, I think, yes, if we decided that this was going to be a general labeling change and applied to all drugs in the class that are currently approved.  Yes, it would apply to the ones that are approved in the near future.  Again, the proposal is to apply it to drugs that are approved now as anti-convulsants but they haven't been studied.  So I would say now we we'll just wait, we would do it for the future.

But we are interested in the question of how best to get better data perhaps in the future.  And perhaps in the future, if we systematically collect this data prospectively, and those are analyzed and it turns out when you do it that way, there really is a class that's nothing going on, that would affect our decision.  So, that's my answer to the question at the moment.

The other thing is I think maybe we shouldn't really have the definitive discussion about these issues until we hear the rest of the presentations because obviously there are some dissenting views out there.  So, I wouldn't you know have the entire discussion.  But that's how I will answer that question.

Sid Gilman:  Can I just mention that for another setting where we got some experience, namely anti-depressants, we have been applying the labeling changes to new drugs, not for – I mean, of a larger discussion is how do you every make something like that go away.  If somebody had a bunch of trial I mean how would you know about the assay sensitivity of that person's method.  Could it pick these up?  It's a very challenging problem.

Male:  One question that I just had we're calling this a class, the question really is how do you define the class.  Here we're saying anti-epileptic drugs but let's switch it.  Let's say it was antibiotics.  Do you use sulfonamides the same as betalactams, the same as cephalosporins?  How do you – they're all antibiotics.

Russell Katz:  Yes, that's an obviously critical question and very complicated question.  I'd say that perhaps the distinction between these antibiotics is that these, at least, all do the same thing ultimately.  They decrease seizures.  Now again, obviously, a lot of these patients didn't have seizures, so that's an issue.

I would say, though, the idea of a therapeutic class is something that's worth discussing as well because, again as I said in my opening remarks, if there's a group of drugs, let's not use the word class.  If there's a group of drugs all approved for the same indication, you want to be pretty sure that the results either do with – apply to all or just a few because you will shift prescribing behavior.

So, you do need to think of them at least as a therapeutic class.  Whether they are pharmacologic class is a very thorny question.  That needs a lot of discussion.

Male:  Again, by that analogy, the point of that antibiotics holds, they all kill bacteria.

Russell Katz:  Well, they all kill different bacteria, perhaps.  So I mean, again, that's case by case.  So, we can have that discussion.

Male:  OK.  Dr. Rudnicki?

Stacy Ann Rudnicki:  There's a question about an analysis.  Was analysis done looking at people who were in studies for depression grouped with people who had a history of depression independent of why they were in a study, say, they were seizure patient but had a history of depression.  So, what will a history of depression played on relative risk?

Russell Katz:  There was no subgroup based on the history of depression.  It was purely by the studied indication of the trial.

Male:  Dr. Day.

Ruth Day:  I have three questions for Dr. Mentari's presentation.  The first one was about the possibility of ascertainment bias and the comment that you made on slide 10 that the majority of events were (prompted notification) study investigator by outside parties.  Did you do that analysis and analysis only relying on those events and what did that show?

Evelyn Mentari:  That statement was based on review of the suicidal behavior, that narrative.

Ruth Day:  Right.  Did you do that analysis?

Evelyn Mentari:  I did that, yes.

Ruth Day:  Did you repeat the analysis only treating those events as positive?  Given that you reviewed all narratives and that you classified them as either narratives where an outside individual noted the behavior or not, it seems to me that you have the data where you could repeat the analysis only considering trials where an outside individual decides the patient noted the event.  And I would agree with you that if that were to show an association with the anti-epileptic drugs, then you would be right.  I would agree that you've ruled out ascertainment.

Just noting that a majority of the events characterized by that is kind of only the first step in ruling out that possibility, unless you repeated the analysis only considering those events a positive, you haven't ruled out that possibility.

Evelyn Mentari:  OK.  I'll confirm that we took that initial step where we didn't repeat the analysis with only those events with those characteristics.

Ruth Day:  So if you haven't, then I don't think you've ruled out the issue of ascertainment, if you haven't done that analysis.

Evelyn Mentari:  Sure.  We were trying to touch on it but I see your point.

Ruth Day:  All right.  The second question has to do with slide 11, where you said two of the 11 drugs were data analyzed, have statistically significant increased risks.  I thought I saw that some later material came in for one of the two.  And when that additional material came in, the confidence ((inaudible)) then included one.  Could you clarify that?

Evelyn Mentari:  Are you referring to the post-talk analysis with additional trials from the motrigine?

Ruth Day:  Yes.

Evelyn Mentari:  OK.  That side refers to our primary analysis which did not include that data.  If you'd like to discuss our rational for not including that data in our primary analysis, I'd be happy to do that.

Ruth Day:  But you still think that's the right thing to do, to not include those additional data.

Evelyn Mentari:  Sure.  Well, you know to bring the rest of the group up to speed about what we're discussing in both the statistical review and in my review.  We discussed that there were data from three additional with the motrigine trial that were submitted, basically vary weight in the analysis.  And our decision was that to allow a single sponsor to electively submit data from the primary analysis despite existing instructions for a specific cut-off date wouldn't be a risk for introducing bias to our analysis.  And that's why we didn't use it in our primary analysis.

Ruth Day:  Can I just say also, right, I think the cut-off date is an issue.  We could do this serially (whatever).  But for individual drugs, statistical significance really is not that critical for us.  It's just that the estimates are all, more or less, go on the same direction.  I think when you include those three other studies, statistical significance is lost for that drug but it it's still a signal that's consistent with the overall signal.

Male:  But you can't have it both ways.  You can't point out that two of them were statistically significant in your conclusions.  And I say that…

Ruth Day:  I think that's just as an observation.  I don't think we intend to make anything of that.  In fact, the proposal as you see have uniform language in labeling that isn't drug-specific.  So, we wouldn't intend to make any regulatory (hay) out of that.

Male:  But then, one last question on slide 13.  The last one on slide 13 was because the increased risk we see in all indication categories, it maybe expected the increased risk exists.  So, my ((inaudible)) of one of this in the psychiatric versus non-psychiatric (tray) shows that it was statistically significant in the non-psychiatric, not specifically significant in the psychiatric or other.  And you're concluding, presumably based on statistics, that that's just (transpiration), that there was in fact no indication by drug interaction.  Is that correct or not?

Evelyn Mentari:  You know in discussing differences between trial indication categories, I think we run into a same situation where the trials have differences, where it is difficult to directly compare them.  I mean I think it can be said that in comparing the epilepsy trials and the psychiatric trials, due to the higher background rate in psychiatric trials, the odds ratio for epilepsy was higher but the attributable risks was actually quite comparable.

I'm not sure if that entirely get to your question.  It's an observation and I was basically (summing) out why it's not identical.  And I don't know if…

Male:  Well, based from a statistical standpoint.  Do you think the difference between the odds ratio in the non-psychiatric and the epilepsy in the other two categories; is that a statistically meaningful difference?

Evelyn Mentari:  I wouldn't necessarily say that person – and that's my personal interpretation.

Male:  That goes to the heart of all of this analysis.  You get your best shot by throwing it all together.  But nobody's going to sit here and argue that throwing it all together is the most logical thing to do, makes the most sense.  It could be regional difference, it could be disease difference; it could be, for goodness sakes, it could be drug difference.  And that's really the problem representing to you.

Male:  But one of the first ones you would think about if you're thinking about a psychiatric outcome would be is the association different in the psychiatric patients or not.

Male:  And it goes in an illogical way.  I'd expect the people with psychiatric problems to have the bigger effect.  But that's not how it works.  If that makes sense to you, that's why you're the advisory committee, but you know that's at the heart of the problem with all of this.  What do you do when you're basic data is mass data and you're not very good at picking out the perfectly interesting sensible differences within the data.

Female:  I've a question of clarification for Dr. Mentari.  On your slide 18, you say that in the future, we need additional development of methods to identify suicidality events.  And it was also in the briefing material as well.  Can you comment what types of shortcomings might be present in the methods currently used?  For example use of text strings, I noticed in your previous presentation there were approximately 19 text strings identified as being associated with  possibly suicidal events.  And I've been able to sit here and generate quite a few others.

So, is it – are there any aspects of the current methods on the identification of events that you think needs attention in the future?

Male:  We face the same problem with the antidepressant data.  The information that we had on suicidality in those trials that were not designed specifically to look for suicidality was very sparse.  And we tried to put together narratives that included all the relevant information.  But obviously in the conduct of those trials, the investigators had not asked all the relevant questions they might have asked to try and define this as precisely as possible what those events entailed.  And that made it difficult to classify them into categories before we could do an analysis.

And so going forward, the hope is that we will develop better instruments for collecting information on suicidality in the (combat) of trial.  So that when we come around to delivering that analysis, we'll have all the information we need to categorize those events into the bins before we do an analysis.  And there are some instruments that are being developed to do that.

Female:  So it's the initial collection of the data during the clinical trials as opposed to the use of the algorithm after the fact that you're particularly concerned with.

Male:  They're completely separate things, but related.

Female:  That's very helpful, thank you.

Male:  Dr. Leon?

Male:  Well, the attributable risk that was presented at one point that's worth paying attention to, and I calculated the number needed to harm, which is (a bias) of about 800 subjects were treated with active med and 800 subjects were treated with placebo.  There would be one more event on active, but just based on the numbers here.  So to put that into context, we have an understanding of what's the impact on the public

health. And maybe I missed it in the book and I didn't see it in the presentation, what's the epidemiology of these – or even more important, how many patients take anti-epileptic drugs in this country. I have no idea of that number. And I know – I'm pretty sure at the antidepressant range, we saw numbers like that, maybe just the early months.

Male: Certainly, millions. I mean we probably have a lot of people in the room…

Evelyn Mentari: I'm sorry.

Male: Go ahead.

Evelyn Mentari: We actually have a slide on drug utilization that covers the (amount) on drugs in the analysis, not all anti-epileptic drugs but it's a start. And I guess we could that up with that if that's appropriate, yes.

I think it's the second to the last.

Female: Background slide.

Evelyn Mentari: Extra slide. I brought it in case. It's that one slide with all of them together.

So, this slide contains information from the various (band that when – patient tracker) and it has information on unique outpatients who receive prescriptions in U.S. retail pharmacies. And this covers – not all anti-epileptic drugs but the 11 drugs that were in the analysis. And we had another side that has a total of these which we can switch to whenever people are ready.

And one thing that I tried to include in my second presentation is that, in my mind, it's important to note that our methods involved clinical trial patients for various reasons. But that's a very small snapshot of triumph for these patients and that's what makes this analysis so difficult. But when we look at the potential for how many patients are affected over time, it may be a very different issue.

Male: Now that I see the number of 10 or 11 million maybe, Dr. Levenson, can you put in context that attributable risk? What do we multiply that by, like, 10,000 or something? That would be to get us up to 10 million.

You get attributable risk for, I think it was 1.9 per thousand so we multiply this by 10,000 and – to get up to 10 million.

Male: ((inaudible)) by 10,000, yes, to get to 10 million.

Evelyn Mentari: I guess one caveat I would include is that our data did not have much information on treatment beyond 24 weeks. So, I don't know if it's directly – it can be directly transferred into an interpretation with that graph.

Male: Right. And I guess that also, at 24 weeks, I think it's an important thing for us to keep in mind because the way the labeling or the regulation is proposed, this is chronically administered anti-convulsants. And we have data for a relatively short period of time presuming that that will hold over longer periods of time.

Male: Well, what we meant by including that language or those other drugs, chronically administered, we meant to exclude drugs that are given for very brief periods of time, injectable drugs that are given for a couple of days or perhaps rectally administered drugs that are given for acute events. So, we wanted – it wasn't so much to get at the question you all bring up, it was to exclude drugs that are given very briefly,

very intermittently. We didn't think that the risk would necessarily generalize to that sort of treatment. That's why we said chronically administered (AVs).

Male: But continuing the fact of how many events could be attributed to these drugs. We saw throughout the durations of the trials we had the increased hazard. So, there's no indication that we had that hazard would go away at as longer time period. It may or may not; we don't know. But periods of potential that you will see would be attributable risk beyond durations of the trials we'd seen.

Male: Thank you. Just (opinion) is what I'm doing is I'm going through an order. And what I'm doing is looking at who's asked the most questions. I'm trying to get people who haven't asked questions (that can't say for us). But we'll get to everybody, I promise.

Dr. (Chaplain).

(Nicole Chaplain): Yes. I wondered if ((inaudible)) mentioned and also Dr. Rudnicki. The issue of the psychiatric indications and ((inaudible)) do know is that the three categories of patients in these studies all had very high rates of depression. So there are very high rates of depression in patients of epilepsy; there are very high rates of depression in the patients who were treated with the neuropathy, the migraine, et cetera, et cetera; and of course with psychiatric patients.

So, this is a commonality. And the question raised here, are we talking about a therapeutic category in terms of drugs or are we talking about a common psychiatric diagnosis that is associated with high rates of suicidal ideation? So I think we really need to ((inaudible)) it's rather interesting that a third of the trials with the ones with events, and what we do know that this populations, in particular the epilepsy and the chronically medical illness patients, is that about a third of the patients have high rates of depression. So, I think we really need to give thought to that.

Male: Dr. Mentari.

Evelyn Mentari: I was wondering if the agency's going to show to us some, what's mentioned before, epidemiology data on suicidalities, particularly in patients with epilepsy, so that the whole statistical discussion falls into some real clinical perspective.

Evelyn Mentari: I didn't prepare a slide for that this discussion but I did review the data. And I can't say that my – I know there're estimates and literature. And in my review, the estimates vary widely and the rates are obviously defined in many different ways in many different populations, ranged from three to 25 percent. I mean it was wide enough that you – it was very difficult to use. And that's just to comment on my look at the literature.

Evelyn Mentari: Thank you.

Female: Well, on the same lines of what Dr. (Chaplain) and Dr. Armenteros mentioned, in your slide 13, again the comment that the majority of trials for psychiatric indications and other indications involve monotherapy. Again, talking about the other indications which are primarily pain syndromes, which have a very high rate of depression, the other part of that is that you can't pull apart – you can't assume that those indications had monotherapy because there may be other drugs involved that might change the statistics that were brought out on Dr. Levenson slide number 20.

Like for example, (pre-gavilan) had a very high bump under other indications. And the question is that are those patients pain patients that are using other medications that might change for better or worse your statistics. I think that's the part that we can't – it's not clear to me, at least.

Evelyn Mentari:  But those other medications should be the same in the drug-treated group and the placebo-treated group.  I mean we didn't collect information on concomitant medication, so can't we sure but that's what we expect.

Male:  You might expect that unless these drugs ((inaudible)) doing something.  And then, the open-label, adjunctive medicines might differ with the drugs that have been had the desired effect.

Evelyn Mentari:  Sure.  Or if there're some type of interaction, that's true.

Male:  Dr. (Campbell).

(Campbell):  As Alice says, this should not introduce bias and cannot explain the finding, but remains possible that the people wherein the observation occurs is conceivably the subset of people with the history of depression or people who are on the other drugs.  And I don't know of the extend we could look at that, but it's something that one could consider certainly.

Male:  Dr. Gilman.

Sid Gilman:  Question for Dr. Mentari.  You've really nicely classified the other indications by diagnosis and also the psychiatric indications by diagnosis.  But for the epilepsy, you just have epilepsy, if of course nothing (except) epilepsy defined anatomically by (signology), by presentation, age, et cetera, et cetera.

So I want to show you a better indication of the cause of epilepsy that were under consideration.  I suspect many of them were complex partial because that is the most frequent type and the most recent class have been in that area.  And I'm wondering whether most of your data can change a complex partial epilepsy or simple partial epilepsy and are – is there any to mirror that particular category down based upon the kinds of trials that were examined.

Female:  Yes, thank you for your question.  We did – we did ask about seizure type and as you suspect, I don't have the exact figure in front of me but my recollection is about 80 to 86 percent of the trials that were an indication for complex partial seizures.  So, you know with that type of a number, we really weren't able to make differentiations between different types of epilepsies.

Male:  Well then, my follow-up question, if I may, is do you have a sub-analysis of just those cases?  In other words, does it come out more as the same as the entire anti-epileptic group?

Female:  We did not – we did not perform an analysis of just the complex partial seizure trials.  No, we didn't.

Male:  Once more, these are very – these are people with common depression.

Male:  But again, as with the adjunct versus (monitored) that you expect the 85 percent of the trials were complex partials.  The 70 is consistent with our experience.  You would expect that the estimates of the odds ratio would be certainly in the (forefront).

Male:  I entirely agree, but we're discussing today not just a medication effect on a biological entity.  We're discussion a medication on a patient with a previous position.

Male:  Dr. Goodman.

Wayne Goodman:  I don't know if you were planning to, but I'd be interested in seeing data on other adverse behavioral facts or say adverse events in general, comparing the drug and placebo group with particular emphasis on adverse behavioral and cognitive effects.  Obviously that when you do a drug versus placebo trial, in general you expect to see more adverse events in your drug group, so that shouldn't be surprising as

well.  Well, surprising when we encountered this with antidepressants and depression is we were seeing an increase of suicide, which we consider to be one of the symptoms that should be getting better during the course of treatment.

So obvious – I'm still struggling in trying to conceptualize what's going on here.  But one thing I just wanted to explore is the possibility that in a subset of patients with epilepsy or other disorders that have been treated particularly with combined adjunctive anticonvulsants, it's increasing the general side effect burden and maybe as part of that picture, maybe there are other things that we could see like the cognitive disturbances, dystonia, and maybe even this even smaller subset, we're seeing suicidal ideation.  So I would really want to see what other adverse behavior on cognitive effects were showing up in the dataset.

Male:  Dr Winokur.

Andrew Winokur:  OK.  I have a follow-up question related to the epilepsy subset.  We've recognized that virtually this whole group was in the add-on therapy, and Dr. Goodman has raised a number of questions that which I shared questions.  As not a neurologist, I've an impression that patients who would be studied in that kind of study would almost by definition be treating refractory, that the only way they would get to such a study is having failed to respond to their current anti-epileptic.

And you know I know what theory I'm more familiar with, there're some considerable differences between a general major depression study and a study for treatment refractory.  So, you know I'm curious about the idea that this is a special subcategory of patients.  And I understand there was a different signal in those randomized placebo, but I just wanted to bring up for discussion both in terms of what further analyses the FDA has thought about and comments from the neurology colleagues about that kind of interaction of clinical focus challenging subgroup and perhaps greater sensitivity to medication effects could impact on the findings.

Male:  I would just confirm that the trials, the adjunctive trials for anticonvulsants in patients with epilepsy, those patients all meet some criterion of refractoriness for seizures per monitoring this sort of baseline kind of thing where by history – so they are at least by some operational definition considered not doing terribly well on their current regimen.

Male:  But that's in some ways why it's interesting that the psychiatric diagnoses where they're not all adjunctive, although some might be, show the same direction.

Male:  Dr. (Moran).

(Moran):  You know, as a follow-up on what Dr. Goodman said, I think in the panel on antidepressants, there is a lot of discussion about activation syndrome and agitation as kind of a mechanism that may have led to increased suicidality.  I mean so I think that data is interesting to look at side effects to see whether it was the presence of (activation) syndrome or irritability.  You know in my mind, I'm trying to figure out some mechanism, some behavioral mechanism that would relate to suicidality.

Male:  You know, that's a very interesting question, but it is something that would have to be looked at going forward.  There's no way when you do a meta-analysis like this you're going to have access to all that information.  I mean this involved almost 40,000 patients.  We had to go back to the companies to ask them for a very limited dataset.  Obviously we don't have you know all the kinds of information that you would like to have in trying to understand the phenomenology even of these events.

The same was true of the antidepressants.  You'd really have to form hypotheses and then go forward to try and understand the phenomenology of the events.

Male:  Dr. Anderson.

Britt Anderson:  Yes, I had a question to ask the FDA to clarify a little bit again on this issue of the therapeutic group.  It would seem that the therapeutic group doesn't define by regulatory approval, so how are you going to treat all or how would you – are you considering treatment all the medicines for which there's reasonable evidence of anti-epileptic effect but which are not approved for that, such as many of the antiarrhythmics (and today's) ((inaudible)) a number of others for which there's pretty well-established anti-seizure effects should they all also carry the same black box warning if that's recommended.

Male:  Well, at the moment we are considering basically just considering those drugs which were approved for the treatment of epilepsy.  I'm not aware of the anti-seizure effects of the antiarrhythmics or how well-documented that is, but (benzodiazepine) some of what – some are approved for epilepsy chronically.  So those were the least by proposal being included.

But it's a fair question I think in the antidepressant world.  There might be drugs that are considered to have antidepressant activity which are approved for something else besides depression.  I think those might have been included.  So it's a – it's a fair question, but we were at the moment anyway proposing that only those drugs which are approved for epilepsy be included.  Some, again – and that does include some of the benzos, not the anti-epileptics.

Male:  That's of course till we do our anxiolytic meta-analysis, then we'll see.

Male:  Exactly.

Male:  Let's see.  Next is Dr. Hennessy.

Sean Hennessy:  Thank you.  Suicide is of course a very serious ((inaudible)) event.  The risk difference that I calculated from the data presented is 5.8 per 10,000 treated patients.  To me it would help to put it in perspective to know whether other categories of death differed.

In other words, was there an attempt to look at all caused death between the two groups in the meta-analysis.  In some senses, we would – if the only difference was suicide, that would probably be washed out by other causes of death.  On the other hand, if the drugs cause beneficial effects that reduce the risk of death through other mechanisms, that would be important to know.  And I would like to hear data on that if we have it.

Male:  We do not collect any data on all caused death, so we do not have that data.

Male:  We're just a couple of minutes after the top of the hour.  We allowed about five-minute ((inaudible)) so we could take a couple more questions before we – before we move on.  Next is Dr. (Fleming).

(Fleming):  Yes, I have a question around the data that went into the generalization that this is a class effect.  I think someone who has pointed out that there were a lot of other compounds used in the United States that actually are not in this list per se.  And the data are obviously from more recently studied compounds and development programs.

So my question is that you know what potentially is the impact of the missing data?  That is the data from compounds in common use in the United States that are really not in this data set.  And as there been an attempt to look at weaker data sets, say the post marketing ((inaudible)) database to see whether or not there is some trending signals there because obviously, we can't get at recent study data for these other compounds.

Male:  We have looked in at least one case for one drug for that post marketing for other purposes and didn't convince ourselves that there was a ((inaudible)).  But I think we have long ago decided that post marketing data not the right data to look at or they don't believe that for this (set of things) where there is a high background rate of suicidality so defined in these populations, it's I think we have concluded that post marketing (very design interpretable).

And that's why we went to placebo control trials. It's impossible to know what the impact of other non-studied drugs would be on this. Again obviously your proposal will say, we studied 11, nine which actually had enough patients to say something about eight of which all went in the same direction. That's suggestive to us of a so-called class effect that really we have to discuss that more. But so we don't know what will happen with the – with other drugs not studied, but we do think that we do have pretty much all the relevant control trials done with these drugs in this analysis.

Male: And Dr. (Lazard).

(Lazard): Did anyone do a forensic analysis to try to determine if the four people who committed suicide actually did it because of anticonvulsants or not?

Male: Well, I don't think we did a forensic analysis. I'm not presently sure that is. I think you – I think it's very difficult to tell from the individual case reports whether or not of the narratives of those four cases, whether or not the suicide was related to the treatment. I think that's why we're analyzing control trials.

(Lazard): What I mean is call up the authors and ask them about the suicide and try to determine what happened and if necessary get medical records. That's what I mean by forensic analysis.

Male: No – yes, I – we – I don't believe we did that. I think again the companies gave us presumably all the relevant data that they had, whether they made efforts in those particular cases to follow up. I hope they did, but I certainly couldn't testify that they did that in those cases. Is that a fair statement?

(Lazard): Yes.

Male: But again, looking at the individual narratives to try and figure out causality is more or less problematic. Again, that's why we're looking at the control drug ((inaudible)) …

Male: It's what the FDA does. It's what NASA does. It's what the (Fire) system does. It's a very common process.

Male: Well again, in any individual case depending on what the event is, it might be fairly easy to do from a narrative. In some cases it's undoubtedly more ambiguous. But again, we haven't done that in this case so it's ((inaudible)).

Male: But you can look at it and reach a conclusion. But I don't know if you remember the antidepressants situation. Beginning in 1991, there were these very interesting horrible cases of people becoming suicidal.

When this was taken to an advisory committee, they said, "Well, I don't know if that's the underlying disease or the drug." The only way we eventually became comfortable in sorting that out in both children and adults was to look at suicidality, not suicides, in control trials because these conditions are all associated with an increased risk of suicidal behavior.

So if somebody commits the – has suicidal behavior or commits it, how do you know whether the drug did it or not. That's what (the rest of you are saying). The control group helps you. The individual case is a formidable task in interpreting (and knowing).

Male: But if there are only four cases, it becomes much less formidable. And what I'm just suggesting is to test the validity of the conclusions by trying to get extra data.

Male: Pretty good. Well …

Male: I think this was an excellent discussion. I think if we can get a good feeling for the issues that are being wrestled with here, and I think we'll be discussing these in a lot more detail as the day and the afternoon roll on. We're going to take a 10-minute biology and Blackberry break. We'll be back at 10:15. Please remember, members of the panel, no discussions about anything related to the topic at hand. Thank you.

Male: Hello. Test one. Check. Test one.

Female: We are about to continue. Can everyone please take their seats?

Male: One minute warning ((inaudible)).

Female: ((inaudible)). We are about to start. Well everyone please take their seats.

Female: (Yes, but lets continue to get to) …

Male: Yes, it's right here.

Female: (Do you have your manual set?)

Male: I sure do. I always worry about those ((inaudible)).

Male: I'm not sharing this ((inaudible)).

Female: Here, I turned in your manuals.

Male: OK, we're only five minutes off. I can live with that.

Female: ((inaudible)).

Male: OK, ((inaudible)).

Female: Can I have your ((inaudible))?

Male: All right. Here we go.

Female: OK, thank you.

Male: Do I call this to order or do you?

Female: Yes.

Male: OK, the committee will come back to order. We are beginning now with – to proceed with our guest presentations. The audience, please – keep it at out there. I'd like to remind the public observers at the meeting that while this meeting is open for public observation, public attendees may not participate again except at the specific request of the panel.

So we now begin with the public – with the first set of comments. And it will be by Dr. (Walberg) from Global Medical Team Lyrica and Head of Therapeutic (Lead) and Pain from Pfizer.

(Walberg): Thank you and good morning. I'd first like to thank the chair, the committee …

Male: There you go.

(Walberg): I would first like to thank the chair, the committee and the FDA for allowing me to speak on behalf of Pfizer regarding this very difficult issue. And what I would intend to do over the next 20 minutes is present some of our ideas regarding primarily our data for pregabalin and gabapentin. These are the representatives within the sponsor section. I won't go through them individually, but they're for the record.

What we have heard this morning is really a difficult topic. These are rare events. We're talking about events that are approximately 20-fold less frequent than the antidepressant issue. And there are some basic assumptions that have been made that we would like to consider a little bit further.

The first of those is that these drugs belong to a class, and the second is that the studies from these drugs are (poolable), and then the third is that the effects seen are consistent across the drugs. And finally, the overarching issue here is one of uncertainty. One cannot prove the heterogeneity where there's a lack of power and one cannot say that the drugs are necessarily different where the power doesn't exist to say that.

But we believe that primarily from an analysis of our products which we tend to look at very closely, that number one, pregabalin and gabapentin represent a distinct class of compounds with a unique mechanism of action and should be evaluated separately from other anti-epileptic drugs. The second is that Pfizer believes that the benefit-risk profile for pregabalin and gabapentin are properly represented in the current product labeling. Third is if the available data do not support a box warning or suicidality for either product, such a product warning would misrepresent the available evidence for pregabalin and gabapentin, remembering that the warning applies to all indications, not just epilepsy, and that overwarning actually has a potential to negatively impact patient care.

Based on the totality of data, there is no evidence of an elevated risk of potentially suicide-related adverse events with either pregabalin and gabapentin regardless of the method that we accept to assess this risk using updated data for Pfizer's products for studies completed through January 1st, 2008. We find a reduction in risk estimates using both the FDA's methodology, as well as our own.

Based on this updated information, we have approximately 2,000 more pregabalin-treated patients, about 800 more placebo-treated patients. And within that, using the FDA's methodology of an odds ratio (mental hands or) exact methods stratified by study, the updated odds ratio is 0.94. Furthermore, there's also a reduction in the risk difference, which was low to begin with from the 2006 data but has decreased from 0.52 per thousand patients to 0.13 per thousand patients for pregabalin. And finally, we believe that the inclusion of all data from all available trials, including those without events, demonstrates no elevated risk of potentially suicide-related adverse events.

So let me touch on the first assumption. Is this a class? And there are many ways of looking at class. One can be a therapeutic class, the other can be a pharmalogic class. And I'll take them separately.

So does the fact that a common threat of effect in epilepsy mean that the drugs share all common principles? And I think not. There are different adverse event profiles across drugs. There're different molecular structures that would inherently lead to different adverse event profiles, and that these products, in addition to having that common threat of epilepsy efficacy have different efficacy in different indications and are used in a broad array of indications.

The example of antibiotics was brought up this morning and it's interesting because we had tried to think of examples and came up with the antibiotic example of how antibiotics in different groups and different mechanisms may share common indications, but using the recent example of fluoroquinolones with a box warning for tendonitis and tendon rupture, although they share common indications with other antibiotics, that box warning was specific to the fluoroquinolones.

So what about a pharmacologic class? It's clear from the table here that the class of medication differs considerably by product. There're many different mechanism of action proposed, and while we won't speak

through the remainder of these, we do know that for our two products pregabalin and gabapentin, extensive work has been done to categorize the mechanism of action of these drugs.

And we're fairly clear that these drugs exert their effects through binding to the alpha(2)-delta binding site on voltage-gated calcium channels. We refer to them as alph(2)-delta ligands. This commonality is not shared by any of the other products, and therefore based not only on this common mechanism of action, but also what you heard before is a considerable contribution to the FDA's meta-analysis dataset. We feel that these drugs can actually be considered separately.

Our two drugs contribute about 35 percent of the patient data to the FDA's meta-analysis dataset, but contributed only about 8.4 percent of the adverse events. In contrast, if you look at two other drugs which contribute about the same amount of information, they contributed in composite over 60 percent of the adverse events. Shown graphically, in blue you can see the patient representation for pregabalin and gabapentin, which then combined, totals about 35 percent, but a disproportionately low representation of adverse events.

In contrast, these other two drugs, topiramate and lamotrigine, seem to have a disproportionately high representation of adverse events. And what does that suggest? Well, if you remove topiramate and lamotrigine and look at them separately, the incidence of adverse events is about twice what it is for placebo. But looking at the other nine anti-epileptic drugs, the incidence of adverse events potentially suicide-related adverse events is essentially symmetric. And if it were not for this, we might not be here today.

So in summary about class, we don't believe that there is a therapeutic or treatment class to speak of, and that a common threat of effect on epilepsy does not comply equivalent risk profile across products. There're certainly differential efficacy ((inaudible)) indications. We believe that there's strong evidence that there is different mechanism of action to suggest that there is no pharmacologic class, and there appears to be unequal representation of events.

So turning now to our data and in response to the FDA's request for information in 2005 for their meta-analysis, we provided information, categorized using the Columbia system for pregabalin shown on this slide, in which there were a total of seven events category one through five versus three events for placebo in categories one through five, but remembering that in terms of the number of patients, there is slightly greater than two-to-one representation.

So as a percentage, we have 0.092 percent of patients with an adverse event in the active group, versus 0.091 percent for the placebo group, about one in a thousand patients. And it's symmetric. It's equal in terms of exposure, the number of events per patient year is similarly low and similarly symmetric between treatment groups.

Looking at the data for gabapentin, the totality of clinical trials potentially suicide-related events is three. They're all suicidal ideation. There are no completed suicides and suicide attempts were preparatory acts within our clinical trials database. Again there is an unequal randomization here so that in terms of incidence of event reporting, they're relatively similar.

We've updated our database to include clinical trials data for those trials completed through January 1st, 2008. And based on that information, which included about 2000 more pregabalin-treated patients, there were no new Neurontin trials that we could look at. About 800 more placebo-treated patients within that additional information, 27 percent more patient data for the active group, there was only one more event.

And that was a completed suicide in a placebo group. So we now have a total for the alpha(2)-deltas nine events versus three in 2006. It's now nine events versus four in the 2008 database with a slightly greater than a two-to-one randomization ratio.

Furthermore, if we look at the specific patient in the pregabalin group that did commit suicide, that particular patient, as was brought up this morning – very interesting discussion – this patient had a history of major depressive disorder, was being treated with (tamoxifen) and the event occurred approximately six months after the initiation of drug treatment within the trial.  So from the descriptive statistics, we have very few events.  It is clear that these are rare within the pregabalin and gabapentin trials.  They're equally distributed between treatment groups, and the updated analysis shows greater symmetry in events between the treatment groups.

If we turn to some of the statistical issues, this is really to raise awareness and to consider these points.  The first is that there's rarity of events.  These are not common.  They are indeed very rare events, and that they could potentially lead to unstable point estimates.

Furthermore, different ratio-based methods – I'll show you in a second – and the presence of these rare events will give you different point estimates highlighting the instability.  The majority of studies do not have an event in either treatment group – that's been brought up before – about 66 percent of the studies in the Pfizer dataset don't have an event in either treatment group.  And that constitutes in our data about 80 percent of the patients, so that within our dataset, when you analyze using methods that exclude zero variance studies, you're only looking at 20 percent of the data.

These are four different methods for calculating odds ratios.  These are all valid methods.  These are methods used by the FDA in their analysis of suicidality associated with antidepressants in 2006.  Depending on the method that's used, the odds ratio varies by a factor of two, between 0.882 and 1.792, so half of the calculation give you an odds ratio less than one.  The other half give you an odds ratio point estimate greater than one.

But again, you're using 20 percent of the data, and none of these are statistically significant.  I should mention that this is for our data, the alpha(2)-deltas combined, and it is highlighting the instability of these point estimate calculations in the setting of rare events.  If you look at the primary analysis by the FDA, some of that instability can be seen in these confidence intervals.  For example, gabapentin has a confidence interval ranging from 0.12 to 48.  And clearly the point estimate can vary considerably in those circumstances.

Pregabalin's odds ratio calculation from the 2006 dataset was 1.88 in the FDA meta-analysis.  In our analysis using the updated data through 2008, the odds ratio with just that one additional patient in the placebo group has decreased by 50 percent and is now 0.94.  Again, turning back to whether the signals are consistent, the odds ratio calculated in an unstratified method – we don't have the steady level data to do this by study – is 2.0 for lamotrigine and topiramate, which is statistically significant, does not include one, whereas the other nine anti-epileptic drugs, the odds ratio is 1.1 with relative symmetry of the confidence interval around one.

Furthermore, pregabalin and gabapentin have been classified earlier as GABA-mimetic drugs.  We don't believe that that's true.  We have no evidence that there is any effect on the GABA complex, but unfortunately, our generic names are derived from the fact that we have a GABA backbone.  However that may be, if you look at the odds ratio within the GABA-mimetic category and exclude topiramate – topiramate has an odds ratio within that grouping, unstratified, of 2.57 compared to 1.01 for Neurontin, Lyrica, valproate and tiagabine.

The next grouping that I'll look at are some other points about ratio versus different spaced estimates of risk.  Ratio-based methods that don't account for the majority of data, those data with zero variance, may actually inflate the risk estimate.  We got our methods that exist that allow the use of all available data, and we can look at some of the variability in those point estimates when we exclude or include the zero variance data.

The non-ratio-based risk estimate or risk difference may provide the most accurate point estimate of risk because it does allow inclusion of our data.  So one method – not better, not worse, just a different method –

is the Bayesian method. And while the Mantel-Haenszel or exact method does not allow zero variance data to be included, the risk difference Mantel-Haenszel though does allow to be included but give you zero variance, zero difference in that analysis.

The Bayesian method does allow you to look at all of the available data and does not assume zero variance for those studies with no events. So that there are some advantages, there are clearly some disadvantages to this method, but when we use it, we can look both at risk by exposure in terms of treatment base, and risk by event by event counts. And so here we have a median ratio of events.

We're looking with a Bayesian analysis of this range of event likelihood. And the median is 0.95 for all pregabalin studies. But if we exclude the studies that were excluded using the Mantel-Haenszel or exact method, that estimate goes up to 1.37. Furthermore, the confidence interval becomes somewhat wider.

If we look at the odds ratio of calculation, the odds ratio calculated using the Bayes method is 1.07 for all studies and 1.52 when we exclude the zero variance data. With again a broadening of the confidence interval, we think that this shows that inclusion of all data provides a more accurate estimate as well as a more precise estimate.

The FDA did a sensitivity analysis looking at risk difference, and we believe that that risk difference data does show a lack of effect for both gabapentin and pregabalin. It's shown as a risk difference per thousand patients and the results for gabapentin are 0.28 patients per thousand versus 0.52 patients per thousand per pregabalin, with relative symmetry of the confidence intervals around zero.

Again we can replicate that analysis, the FDA's meta-analysis, and come up with the same risk difference but while we not normally do this, what you can do is you can exclude the zero variance data and see what impact that has on the risk difference. And so by doing that, you inflate that point estimate by five fold and significantly broaden the confidence interval around the point estimate.

Furthermore, in updating our data to 2008 studies, the risk estimate for all data has decreased by about 75 percent down to 0.13 patients per thousand compared to when we exclude data still have a five-fold increase in risk estimate. But even with the exclusion of that data, less than one per thousand, this was really the take-home message that updating our database, we have a decreased estimated risk using either the FDA methodology or our own.

Finally, the Mantel-Haenszel estimates of common odds ratio assume that the data estimates among the defined groups were consistent and (poolable). As the agency noted in the briefing document, there's insufficient statistical power to test for the (poolability) with rare events. While they did do a ((inaudible)) test and they did a sensitivity test using general linear mixed model, there's not enough power to really know what's going on. And there's a degree of uncertainty associated with that.

So in summary, analysis of rare events (pooling) across these drugs may not be appropriate and therefore Mantel-Haenszel based odds ratios may not be conclusive. The difference space risk estimates may provide more accurate and stable estimates, and when all available data is utilized for our products, both of 2006 and 2008 analyses show no evidence of risk with pregabalin or gabapentin within clinical trial and again using either the FDA's methodologies or our own.

So what about indications? There are many different ways that these products are used. The primary usage of pregabalin and gabapentin is not in epilepsy. It actually is in neuropathic pain. We have approvals in the United States as was shown earlier for DPN, PHN and fibromyalgia and pain conditions, as well as adjunctive treatment of epilepsy.

When we look at these risk differences by indication, they're all small, but there are also different directionally, so that for the pain conditions there is a negative risk difference relative to placebo where the

majority of usage occurs. In psychiatry, there's a very small positive risk difference, but it should be noted that within our GAD program, there were no events in either treatment group.

And for adjunctive epilepsy, there's a very small positive risk difference, though the instability can again be highlighted by the fact that with these two events driving this risk difference, if you have one event in the placebo group, the sign changes here to a negative. Similar patterns are seen for gabapentin. In pain, there is a negative risk difference compared to a small positive risk difference in epilepsy. And overall you have a risk difference of about one per 10,000 for pregabalin, three per 10,000 for gabapentin.

So therefore, it brings up the question, "Is class labeling appropriate?" We don't believe it is, and there are several questions that go into that. "Do these drugs belong to a class?" Pregabalin and gabapentin as alpha(2)-delta ligands, as I showed you before, are distinct pharmacologically.

One common effect does not suggest common risk profile. And inconsistency of event reporting suggests that product-specific labeling may be more appropriate. It is a risk uniform for all drugs. Again, it's difficult to know that answer by statistics, but signal seen here maybe primarily driven by two products. We do have updated information on the FDA's briefing document regarding lamotrigine, but there is no evidence of risk for pregabalin or gabapentin.

And then finally, "Is a box warning appropriate?" There's no evidence of risk using all clinical trials data. The greatest (usaging) is in conditions for which the risk difference is numerically lower than placebo. Our updated analysis using FDA's meta-analysis techniques or our own show diminished risk patterns, and the current data does not change the risk-benefit profile for either product.

So with that, I'd like to conclude with the same thought they're a unique class, there's no evidence of increased risk of potentially suicide-related adverse events for either product. Pfizer believes that the benefit risk of pregabalin and gabapentin are properly represented currently, and the available data do not support a box warning for suicidality for either product. Such a warning would misrepresent the available evidence relevant to pregabalin and gabapentin, and a little warning does have the potential to negatively impact patient care.

Thank you for your attention.

Male: The applause is appreciated, but please hold it. Here's Dr. (Modell) from GlaxoSmithKline.

Male: OK. What are the controls? You have the controls? Yes.

Male: We're having some minor technical difficulties here, so we'll be back with you in just a moment. OK, while we're trading water, let's ((inaudible)) again clarifying questions at least for the last presentation, maybe we can get some of those done. ((inaudible))?

Male: Yes, the last couple of slides referred to risk-benefit ratio, and I'm wondering if they quantify the risk-benefit ratio either with the old data or the new data. I mean I only saw risk data.

Male: If you're speaking specifically to how we would quantify a benefit, I'm not sure how we would be able to do that. In terms of usage, I think that we do have indications where patients do benefit significantly from treatment as we've heard conditions such as neuropathic pain, fibromyalgia, epilepsy. They all have increased background rates of suicide and come over psychiatric conditions. And so we are able to provide some relief of their underlying symptoms.

In Europe, we do have an approval for generalized anxiety disorder as well, and as I said, there were no events in either treatment group for that. How we would quantify benefit risk, I'm not quite sure how you would do that, but in terms of the risk itself, we feel that in this particular instance, there is no signal.

Male:  So but on your slides, you referred to risk-benefit so would you just be aware to change those last two slides so you're only talking about risk?

Male:  Yes, I think ((inaudible)) …

Male:  OK.  ((inaudible)) …

Male:  … in the absence of risk, it's difficult to say that there is a change in risk-benefit.  So but if that's an issue then yes, we don't believe that there's risk and therefore that may stand on its own.

Male:  Dr. Lu?

Ying Lu:  I just want to clarify about the endpoints here because I noticed that you have listed the one four – one, two, four and that's come up five.  And (eventually) it was FDA there is number four was not – I think was not in the FDA's list but in your list and was in ((inaudible)) the placebo group that you mentioned.  So I just want to get clarified.

Male:  Yes, thank you.  That's a very good point.  And in the original request for information in 2005, categories four and five were actually flipped so that category five was suicidal ideation, category four was preparatory act self-injurious behavior intent unknown.  What we've done because of presentations earlier listed category four as suicidal ideation and we're presented that we represented it that way for consistency.  But what we have analyzed are completed suicides, suicide attempts, preparatory acts and suicidal ideation.

Male:  Thank you.  I think the technical issues have been resolved.  Dr. Modell.

Jack Modell:  OK, thank you very much.  I'm Jack Modell, Vice President for Clinical Neurosciences at GlaxoSmithKline.  And I want to thank you folks up here for the help with the technical difficulties.  My apologies for that.

And also to thank the FDA and the advisory committee for having us here today, and also for looking into what we consider to be this very important issue for patients.  I, like most of the psychiatrists, most of the physicians that GlaxoSmithKline and probably throughout industry, practiced for many years before coming to industry.

And we've seen the devastation that these illnesses – epilepsy, bipolar disorder for example – untreated can bring to patients and their families and in many cases they don't have a choice but to take the medications to control these serious illnesses.  So we think it's very important that any potential safety signal be evaluated very carefully so that we can get the most appropriate information to patients and prescribers to make the best decisions around the of these medications for these illnesses.

I believe it was Dr. Pine who was asking earlier about the updated lamotrigine analysis, the additional data that were submitted later in 2007.  By way of history, just to give you the background on this, when the request came to have the initial dataset submitted to the FDA, which it was in June of 2007, we still had three ongoing trials with lamotrigine.  And then I'll show you more details of those trials in just a second.

But there were three fairly large trials that we knew we'd be finishing within the next several months.  So we thought it was most important especially with a signal that's relatively infrequent to have as much data as possible and as complete a dataset as possible.  So we did certainly submit the initial dataset as you can see, with 15 psychiatry, 16 neurology and one healthy volunteer trials to the FDA in 2007, and notified them that there would be additional three trials soon to complete.

And again, in the interest of having as much data as possible, we would submit those as soon as possible after the databases were frozen and analyzed.  So as slated, there were three additional trials, two in acute bipolar depression and one in epilepsy.  Additionally, we also searched the previously non-database text

fields from all of the studies to be sure – for example the case report forms – if something was noted in the margins or something out of place where you might not expect an adverse event to be reported that we would be able to pick up any signals or any possible data from those as well.

So in total, the full updated dataset for Lamictal then included 35 placebo control clinical trials involving almost 6,500 patients. The division there is about 3,000 in neurology indications and about 3,500 for psychiatric indications and also 52 healthy volunteers. So the additional data in the full updated dataset submitted in November contained 706 new patients, 354 on Lamictal and 352 on placebo.

There were 13 new classified events of suicidal ideation, none for behavior alone. None of these events of the majority came from the acute bipolar depression trials, one on Lamictal, eight on placebo. Four events came from the previously non-database text fields of the initial dataset with three on Lamictal and one on placebo.

So just going over what I'll show you here are the differences between the initial dataset in this darker blue and the full dataset in the brighter blue colors. And you see for neurological indications overall so this was now a combination of epilepsy trials plus neuropathic pain trials, essentially the odds ratios didn't change, approximately from 1.1 to 1.2 neither statistically significant.

Looking at epilepsy alone, the odds ratios again not much change here, 1.8 to 2.0, again that showing statistical significance. But I think it's important as has been already pointed out this morning, that the important thing to look at here are perhaps point estimates across all of the drugs. And basically if you look at what those are rather than perhaps to argue over whether something falls at a P value of 0.04, 0.05, 0.06 and that sort of things.

Looking at the psychiatric indications, these numbers change a little bit more because as noted, the majority of patients from these additional analyses came from the psychiatric trials, and here the odds ratio was initially 2.29. And with the additional data from the three trial the two bipolar trials, that odds ratio is now 1.49 and thus contain one. And here's an example of the P value again going to the other side of 0.05.

But the important thing still to note is we do have an overall odds ratio that's not really inconsistent with what we've seen across the aggregate data for all of the anticonvulsants. Looking specifically at (bipolar) disorders and stats where these trials were from, the odds ratio change with the additional patients from approximately 2.3 to 1.3 and the corresponding ranges and P values. For all indications overall, the additional data changes the odds ratio again, not a lot but from approximately 2 to 1.5 and associated P values.

Now if we then look at this number of ((inaudible)) with definitive suicidal behavior by treatment group and indication, I can go through these quickly because as noted already, there were no additional behaviors, so really nothing changes here. The odds ratio stay the same for the neurologic indications.

The denominators changed a little bit but not the numerators. So for epilepsy, the odds ratio is not really calculable because we have no events in the placebo group and only two in the Lamictal group. Psychiatric indications again doesn't change, neither did bipolar disorder, neither with the overall odds ratios.

In terms of GSK presenting these results publicly, within a couple of weeks of when we had the final full dataset analyzed, GSK posted to its public Web site for study results these results under the heading "(Inter-tidal) Analysis of Suicidal Ideation and Behavior in Lamotrigine Clinical Trials." Additionally these results had been presented at international meetings. You see the title of the presentations here, both at the American Psychiatric Association in May of this year, and also at NCD.

This was just an excerpt from the current Lamictal U.S. package insert actually around bipolar disorder. I realize that's not the focus of today's presentation. But just to say that it has been noted for bipolar disorder

that there may be worsening of depressive symptoms and suicidal ideation and behaviors, whether or not patients are taking medications.

But I think more importantly is the point that I as a clinician and I think all clinicians know, the patients with serious illnesses especially if associated with adverse consequences, suicidal ideation or behavior whether caused by drug or associated with drug or not need to be closely monitored for clinical worsening, including suicidality. And you know for that reason, we're actually grateful that the signal has been picked up so that we can advise patients and prescribers appropriately to watch for possible emergence of these symptoms.

So in summary, I think it probably goes without saying that bipolar disorder epilepsy, most of the indications we've been talking about, are serious chronic illnesses that untreated carry significant morbidity and mortality. So, we need to be able to treat these patients. Definitive interpretation of these analyses is difficult as discussed already because of the small incidence in absolute number of events, the actual rates are very low.

The retrospective nature of the analyses and therefore they're subject to confounding that we may not be able to sort out for years to come and potential confounding because of the events of interest from these symptoms of bipolar disorder or epilepsy.

Now, some of definitive interpretation is difficult is not to say that the results are unimportant, meaningless, inconclusive. They remain nonetheless an important signal that requires further investigation even if we don't fully understand what's giving rise to the signal.

The results from the meta-analysis, both the analysis submitted to the FDA and the final analysis submitted in November with the full data set. These results are consistent with the overall FDA anti-convulsive findings.

And we do believe that the results of the FDA's analysis across all of these medications should be incorporated into the labeling for anti-convulsants in the interest of giving patients and physicians the most information possible to making foreign decisions about risks versus benefits of treatment.

But also, GSK strongly supports additional prospective research for more complete understanding of the observed associations in clinical trials going forward to really understand what this signal means, perhaps how to best look for it, whether there are particular patient groups or situations where the risk is heightened.

So again, I thank you for allowing us to present and I thank you for your interest in this very important issue. Thank you very much.

Male: Thank you. Before we go on to the general discussion, I plead Dr. Levenson has some rebuttal.

Mark Levenson: OK. Good morning again. I will now present some preliminary statistical comments in Pfizer's background package for this meeting. The sponsor made three major points.

The first is the gabapentin and pregabalin have unique ((inaudible)) prescribing patterns. The second is that additional for gathering data are now available since the original submission to FDA, and finally, the final point is that FDA's analysis of rare events may lead to bias conclusions.

As a statistician, I will now address the first point. I will briefly address the second point, meanwhile then focus on the third point. On April 30th, 2008, the sponsor submitted additional for gathering data on trials that were available after January 1st, 2008. According to the sponsor, no additional gathered pending data were available. Again, according to the sponsor, the original submission had 10,429 patients, the update submission had 13,314 patients which amounts to a difference of 2,885 patients. There is one additional event of a feeble suicide.

The FDA has not reviewed these additional data. They have not reviewed whether the trials need our inclusion criteria, when indications are represented in the trials, and the duration of the trials. The knowledge of these factors is key to understanding the data and is placed in the overall analysis.

Now I will discuss the sponsor's analysis of real events which we will refer to as sparse data. The sponsor considered three classes of methods: four classical odds ratio methods, two Bayesian models, and a risk difference method.

The four classical odds ratio methods where Mantel-Haenszel, logistic regression, Mantel-Haenszel with continuity correction, and ((inaudible)) lead with continuity correction. In our 2006 statistical briefing document and review for the adult antidepressant analysis, we made our problems with all these methods except for Mantel-Haenszel in the sparse data setting.

In particular, the continuity correction, it has proportionately more events than the placebo because of unequal randomization. The effect is to reduce the estimated odds ratio.

Here are the results of the various methods applied to the pregabalin data. The results for the FDA – to the ((inaudible)) that there was from a – there was from a sponsor for Mantel-Haenszel and logistic regression. The two methods that make use of continuity correction showed expected reduction in the odds ratio estimate.

I will now discuss the Bayesian models. First, I will discuss Bayesian models in general. Bayesian models have two components, prior information on parameters and the model of the data given the parameters.

Bayesian models have some desirable features. They produce probability statements rather than confidence into this which simplify interpretation on youth. A stabilized de-estimation in the present case, this allows for the inclusion of zero event trials and the amount to use a prior information on the parameters if such information exists.

Hearing some important caveat to that Bayesian models, there are more choices to be made. Different prior information or different models can give different results. Because of this, sensitivity analyses with varying priors of models are important. In addition, the estimation for Bayesian models is typically more complex than for classical procedures because its diagnostics are important to judge the performance of the estimation algorithm.

Now I will discuss the sponsor's Bayesian models. No justification is given for the particular ((inaudible)) model and prior out of many possibilities. But in that clue that the model is appropriate for meta-analysis, the model uses zero event trials.

However, it does not demonstrate that the model improves, it worsens estimates. Reference to animated facilitation studies demonstrating appropriateness and benefit to the model were valuable in evaluating the model. Finally, diagnostics and results of the sensitivity analyses are not provided.

I now return to the first slide to explain the FDA's primary result that I showed earlier. In this first slide, the estimates for gabapentin and pregabalin are greater than one and are similar to other drugs which together give the overall statistically significant result.

It is possible to define a drug group with an odds ratio of less than one. However, our primary ((inaudible)) – then look at the 11 drugs as a group. FDA used the Mantel-Haenszel risk difference to evaluate the effect of zero event trials.

The risk difference is not directly comparable to the odds ratio. However, the method provides an alternative method for testing the drug effect and uses its zero event trials. As stated in my first presentation, the

estimate for each of the amount in drugs form the same side of the no-effect mind for the risk difference analysis as in the primary analysis.

However, I note here that the effects for gabapentin and pregabalin appears smaller in terms of risk differences than odds ratios relative to the other drugs. In conclusion, the sponsor's analysis do not support that the FDA's primary and sensitivity analyses make the bias conclusions. FDA's conclusions for gabapentin and pregabalin where based on overall pattern in finding of the 11 drugs. Thank you.

Male: Thank you, Dr. Levenson. We now have time for our general questions for the speakers and some general discussion. Before we get started on that, you know there's probably nothing more dangerous than an amateur statistician of which I consider myself a kind of example.

But we do have three full time bonafide statisticians on the panel and I was wondering whether they – I want you to give them a chance to really talk about this for a minute to begin with. I also know that there is a – you can draw a line among statisticians between Bayesians and non-Bayesians and get a war between the states as a result. So I think putting this in a little bit of context I think may be helpful for the discussions that we have going on.

Male: You know I do want to make a couple of comments as a non-Bayesian side of the ((inaudible)) in line. Two comments based on the discussion this morning. And one, although we heard it from the people from FDA many times, I still believe there's misunderstanding among the group that when we read about that there's confounding by indication that were word of expected suicidality because of this diagnostic groups. But that's the beauty of having placebo in these trials.

And all the comments, it was – I have, you know a lot of comments this morning were concerned both about adjunctive therapy and about – and the hurting rates of suicide that are already in pain and epilepsy and psychiatric disorders. Placebo takes care of that for the most part.

With placebo, that's why I'm not using an observational data, OK. So that – and there's a lot of concern about that. So I hope you just infer to that, that we used placebo as our base rate and if there's an analyzation because they have the same problems, the same adjunctive therapy, the same diagnoses within a clinical trial as the act of medication group does.

And if we see our elevation in the character of relative to placebo with any trial and we can't attribute it to inclusion or exclusion criteria that are constant across the two groups within a trial. And that was one – the other is I also have concern about knocking out two-thirds of the trials because it's zero event.

And I paid a lot more attention to the risk difference, the risk difference analyses which – when you look and because that included all the data. And the risk difference been if we had a one percent rate in one group and a three percent rate in the other group, the risk difference is two percent.

And we saw that – when we look at the plot of risk differences in Dr. Levenson's presentation, maybe it's found in page 28 or 26 or something and compare that pattern to the odds ratios that he presented two or three pages earlier, the pattern is almost identical.

And then they're really – the sensitivity analyses were really extensive and at that – well I can feel it was the most important of the sensitivity analysis. So most of my interpretation of this is based on looking at that risk difference plot because we're using all the data and it's also – I know the comment about number needed to harm, that the risk difference is the denominator and the amount that needed to harm.

It's a one only in the risk difference and how I forget – it was – I think it was 0.37 percent minus 0.24 percent. That's why I got rid of what I said 800. It's 769 if you had to do the math, but meaning again, what we see in analyzation and that's using all of the data, not just one-third of the data.

Male:  Dr. ((inaudible))?

Male:  Yes.  Excuse me.  I want to comment a couple – maybe more technical side and for the Pfizer's analysis.  Would be about Bayesian analysis I find puzzled about.  In the Bayesian analysis, you have set of things kind of prior distribution that you're assuming that, you know that in the line this fall a certain distributions and then you have observed the data and comment on weighted average of the two in material sense so that you are coursed through with data but just what your assumption as well as you observed the data.

Now, one thing that I don't understand about is the social ((inaudible)) model.  I mean, they give the reason that the prior distribution was assuming, you know some kind of – well it's more technical, but assuming for the certain distribution is – and they justify one of the parameter which is the meaning of the odds ratio or the new incidence, but they did not justify why they chose the precision variable which I think it's very narrow which basically narrow down to the zero for those who observed the data.

And then when you do the Bayesian, I would still vision a low flexibility between fewer and control groups so that the prior were less important for the placebo arm on fewer arms allow you to move.

Now in the ((inaudible)) model, it seems that they're only using ((inaudible)) similar for both (arms).  So basically, if 80 percent of the data they said as zero observations, so you kind of like put a lot of weight on the tier which I'd assume are the same.

So that's why I'm kind of puzzled about the odds ratio whether it's valid or not.  And I hope you did the ((inaudible)) analysis as if ((inaudible)) odds because in that way, we can see really the impact of those assumptions.

In terms of that certain risk difference which means, you know Dr. Leon articulated earlier and of course by including non-zero events, the overall risk reduced by four which I think clinically very important.

But on the other hand, if you look for the confidence work, and the confidence was also (shrinked) by the same proportion or even under the more, so that may not affect the statistic significance of the conclusions, but even though clinically, it's important because you want to distinguish the absolute risk known to you.

Now in terms of whether you want to look for individual studies or individual product versus all the class, I said that the product was developed prospectively and for those weight events, perhaps a meta-analysis still to be the best approach, more evidence based on – we look for individual studies.

The reason why you have to go through meta-analysis is that there would be no hope for this great event that one trial can derive conclusion of the, you know the (direct) conclusion thus therefore, you have to combine the study.

So when you have a prospective protocol to list all the drugs that – and then afterwards, you say, "OK.  This was different from the other.  Therefore, I won't take it out."  You really need very strong justification in order to do that.

Otherwise, there're always ((inaudible)) variations and you know that even in a trial you don't see all people responded and somebody ((inaudible)) specimen may not.  So you can't say, "OK.  My study is different for us is because I have a single observation that is different from the others" because its whole protocol, that's how the analysis was conducted.  That's my comment.

Male:  Thank you.  Dr., well one of the things that you said that was asked for is whether you have the details of how the Bayesian statistical analysis was done that you could maybe give to the statisticians so that they could take a look at it.

Male:  The Bayesian models were developed in conjunction with three external statisticians, Dr. ((inaudible)) at Harvard, Dr. ((inaudible)) in Columbia, and Dr. ((inaudible)) for three specific model features, I only have one of my statisticians ((inaudible)) Dr. (Wailing).

Male:  The  model is – the models are (out-mind) are on pages 30 and 31 of our patient document and the same time on page 31.  You'll see a short paragraph describing some sensitivity analysis that we did.  These included adopting the availability to an order of magnitude greater than what was in the base model and also, adopting the effect sizes in order of magnitude in each direction in our prior assumptions.

Male:  Right.  That's on the disk and one of us have our laptops here, so.

Male:  OK.

Male:  …there are a couple of us who may have…

Male:  It's in the book.  It's page 30.  You didn't listen to Dr. ((inaudible)).  So, I try to ((inaudible)) when you do the ((inaudible)) analysis.  You still apply the same prior to both treatment in placebo ((inaudible)), right?

Male:  Yes.

Male:  Dr. ((inaudible))?

Male:  Sure I would agree largely of what's been said, either Dr. Leon indicated specifically, a strong case could be made for using risk difference in a setting like this and that went to the brief and broken materials sent at a time and that what you made available on the Web site.

I was somewhat puzzled why wasn't the (A) priority analysis that was planned.  They've sort of expecting that their race would be low for something like this and I think I was not that surprised to see such a high fraction having zero events.

And the danger obviously and planning for something like a ration analysis where there's relative risk odds ratio is that you're going to be having things weighted essentially by the number of events rather than by the – by the denominators, the numbers of patients that odds ratio estimates do to you so I was somewhat surprised.

Many have find it heartening that the results did agree, I think that was important to me.  I'm looking for the materials that were sent to us by the sponsor for the – for cure of their drugs from Pfizer and I compared the Bayesian analysis to the Mantel-Haenszel risk difference analysis.

I think that again, there was similarity in their results for those analyses within their two drugs and I thought for me, the overall question was whether one could justify either putting those two drugs in the group of 11 as a single group or whether they could justify having and pool that as a separate group, and I thought that was the larger question in hand.

And final thing, I guess I wanted to say is that so much of our discussion here has been about the zero events and a number of statistical things that may be of interest to statisticians that might not be of interest to live other humans, but it seemed to me that as in most epidemiologic studies that you have the important thing we'll be thinking that is, what is the appropriate effect measure that we got to be dealing with?

I mean, some settings that really is the relative risk in a prospective epidemiologic study and in case control studies, we get odds ratios because it approximates it.  But I think that that to me is the important thing in choosing one of these.  Which was the most appropriate measure of effect in the setting?

And I think in this case, that you could make a case either for odds ratio or for risk difference and I might have chosen that risk difference before hand and when looking at something like suicide or something with relative involvement given the work that's been done in studying those estimates into bias.

Male:  Dr. ((inaudible))?

Male:  So I had two questions and points of clarification to that so many things that were said.  So Dr. Leon, a couple of times, you've brought up, you know the risk benefit or the harm to benefit ratio, and you said a few words about the number needed to harm and gave the number of about 800.

So the first question is, I wondered if you might just say again for the less statistically inclined, a number needed to harm of 800, how you view that from an effect size standpoint and how you think about that statistically public health wise when trying to evaluate the magnitude of the risk of an agent?

Andrew Leon:  That's good question.  And so that again, at 800, it was really 769 to be exact.  So I used a lot of my explanation and that is if 769 patients where treated with an active medication and 769 other patients were treated with placebo, would expect one additional suicidality event in those treated with the active.

And then the reason I asked that question about the sales figures, numbers of patients, if we put that 769, it needs 769 to see one difference and then extrapolate to the 11 million people getting it.  Then we see a pretty large – I mean, there's a lot – a big public health impact.

Male:  You know I guess my question was more to the point – when we look at the number needed to harm with other agents in terms of their risk, I mean a number of 800 is generally small, right?

And I thought it was important – some people would hear out numbers think that's really big, but you interpret that in an inverse way, so a smaller number would be worse and usually, you know the closer a number is below 10 with a ((inaudible)).  So, 769, that's a pretty big number, meaning, a relatively rare event.  Am I interpreting that correctly?

Andrew Leon:  And if we were looking at efficacy instead of safety, we would want – it depended on the prevalence of the disorder.  We'd want number needed to treat not number needed to harm, but number needed to treat closer to two or three or as you said, below ten for the most meant.

Male:  And then the second question was, you know you're making the point about randomization and which I agree.  I think that was a really good point.  I guess one of the other questions that the FDA put to us was, you know how general this effect is across a whole bunch of different ways of carving the data and we did talk about – that at least to my eye looked like there was an interaction in that – the effect looked like you're only applied in the patients with epilepsy.

And again, from a statistical standpoint, I wonder if you might comment on that specific – I mean I have this slide.  It's slide number 35 from Dr. Levenson's presentation where he shows the odds ratio.  So, again…

Andrew Leon:  So, you know if you go to page of Dr. Levenson's page number 34, I think this – I think this one addresses it pretty well.  So it's page 34 on section two.  The more we see the risk differences and not just the odds ratios which I was or a couple of us have advocated using – and now you see the risk difference actually is bigger for the psychiatric disorders than for epilepsy which make – so it's – it made these all alarming ((inaudible)).  But we don't see that the odds ratio…

Male:  So you're not reassured in other words?

Andrew Leon:  No.  I mean initially, when you were making the comment, I had to look from this slide again and in this page again.

Male:  OK.

Andrew Leon:  So again, I'd focus on the risk difference.

Male:  Dr. (Joan)?

(Joan):  I think we all put this in the patient's perspective just for a moment just to set our interest in and one additional case of suicidal ideation or behavior although ((inaudible)) it seems like a small number.

Nevertheless, I'm not talking about withdrawing a drug from the market, instead talking about alerting patients and consumers to a danger here.  I think that's really different kind of statement, you know and not all of the different inner context of the statistics.

Male:  Dr.?

Female:  I appreciate what Dr. Gilman said that it was ((inaudible)) after the anti-depressant black box labeling was a significant follow up in description writing and also a real scare factor once the physician black box occurred.  So that's in my mind as a consumer, that's what ((inaudible)).

Male:  Dr. ((inaudible))?

Male:  Thank you.  I think the risk difference and number needed to treat discussions were very good.  And also depends on which event you're talking about.  For completed suicide, I calculated that the number needed to harm was about 7,000, but the suicide attempt, it was about 1700 ((inaudible)) number that I do before of the difference of 10,000 people have 5.8 that was for attempt, not for completed suicide.

Overall, I think that the risks are modest in magnitude and uncertain and then difficult to put into the context of the potential benefits of the drug.  And to me, that says that there ought to be a warning.  But given what we know about, we've got some black box warnings or in prescribing, I'm not sure that it rises to the level of a black box.

Male:  Dr. ((inaudible))?

Male:  I want to direct this question to the FDA and to the pharmaceutical companies.  If there's any way of recovering information on those response relationship to the outcome between the drugs and the suicidality measures?

Male:  Many of the trials I presume at least in epilepsy probably had fixed those designs.  I don't think we looked at that in this amount.  We didn't ask for that information.  I suppose it's possible to get that and we haven't done that.  You could – again, it's as these very few events in total so I'm not really sure.  Once you start splitting them out by those, you're going to get probably useful numbers.  I guess we didn't expect that.

Male:  OK.

Male:  That is allowing or that the methodology in terms of assessing consider suicide event is an idea because these trials won't have the time specific satisfied measures, et cetera.  So, one of the questions is always how much of potential events where not capturing using the current methods as I like – in the SmithKline presentation, there was an attention that when you look at your data again, you had a far more advanced – I bet you find it highly coordinated initial sort of report and I like potentially for people from SmithKline to tell, you know what they found and that was – you know to give us a better idea about what they were finding that the, you know that the standard – their early ((inaudible)) and methodology wasn't finding, to give us some idea about potential – how much the people may be missing, you know in your earlier methods.

Male:  Sort of a technically difficult.  Thank you ((inaudible)) that a second.  Got some important question and I'll have to get back to you with exactly what those four events where then I think that's worth working at.

Female:  You know the correspondents still obviously think as kindergarten days additional ((inaudible)).  My understanding was that on the quest to have the comment sections of the adverse event for point searched was inadvertently admitted.  So the additional events that were provided were actually and inadvertently admitted prior to advice in requested search.

Male:  Mostly for GlaxoSmithKline and Pfizer, one of the things I think that ((inaudible)) is that is in terms of incumbent medicines or in some ways, if anti-convulsant as a ((inaudible)) have a ((inaudible)) to increase suicidal behavior, you know which we find if you're having a trial with multiple concomitant meds more of it.

And obviously, for the FDA, you couldn't do that as much because of what you've asked the companies that when the companies were doing this detailed analysis, did they find any effect in terms of monotherapy versus concomitant meds because obviously you guys have your own greater sets and you've been looking at that very closely?

Male:  Well, specifically for epilepsy as I said during the presentation, we had two events in the epilepsy studies.  One was a concluded suicide patient who had a history in major depression and was taken them effects and the other patient was a suicide attempt with a history of major depression taking fluoxetine.

So when we have seven versus three events, it's hard to know whether there's an interaction, but there are cases of concomitant medical histories or past histories, psychiatric conditions as we'd expect from the disorders that were studied.

Male:  And I would say, I'll have to get you those data.  We looked through a relatively small numbers of concomitant meds, but I don't recall that we saw any interaction with concomitant medications.

Male:  What the estimates that we had the numbers needed to harm and that's based upon the total number of events across all these trials.  I was wondering how that might change if you do it on a per year, annual basis?

In other words, how many people would you need to – how many people treated for one year would be expected to have either the actual suicide event or this more global measure than, you know I'm acting as a physician thinking about it.  That's sort of the thing that people keep in their mind when we – you set side of the length of treatment, it sort of makes it a little harder to understand.

Male:  I don't know if we had a number of person to years for each group.  I may be – I might assume that in one of these – that we'd need a number of person to years from each group to have a good deal with that.  You know I...

Male:  We do actually do have it somewhere out there in the slide, but we did look at that and I think we're going to talk about that.  But as ((inaudible)) pointed out, we don't have any data beyond 24 weeks.

And so, anything would say, we do know that within the durations of the studies that we looked at the risks into at least to be stable by increasing over time, we have now in clinical evidence from these trials beyond ((inaudible)) but we say, ((inaudible)) that we that.

I think the mean trial there has brought in weeks.  So, we would really be extrapolating beyond anything we had if we saw technically that risk of use.  I think that's not a concern we have is that we saw in short term trials what were happening in long term trials.  That's it.  But I think that's a complete unknown.

Male:  I just want to follow the question that you asked earlier this morning to Dr. Levenson and I think Pfizer presentation also raised the issue about the indication costs.  As if you look for the contribution of the drugs to each indication, the largest ((inaudible)) ratio is in the earlier class.

And we know that one of the drug that has a large contribution to all these particular – to the other section is the drug called – I just write down a pyramid if I'm ((inaudible)).  But anyway, this drug has average of two or something.  It's always through all of these relative compares to three indications.

So I just want – I ask you this morning by sensitivity if you exclude that, what happen?  So..

Male:  Well, I don't have much more to add than like I said earlier today when you look at the (various plots) of the 11 individual drugs to ((inaudible)) and outliers, that's how a lot of patients compares with odds ratio that was kind of rise above among the drugs.

Male:  Dr. ((inaudible))?

Male:  I just want to make sure that I understand one point.  Is there any evidence one way or another if the increased risk of suicidality after stopping the medication persists or stops?  In other words, is it possible that a person would be having increased suicidality for weeks or years after taking the drug and could you say anything one way or another?

Male:  Well, we excluded trials or events that occurred any time later than one day after the trial ended.  So, we have no information that will happens over time after drug is discontinued.  We just didn't look for that.  We didn't ask for that data.  We didn't look at it.

Male:  I was wondering.  Where the trials excluding patients enhanced suicidality in baseline?  And if so, that's good.  If not, is the data available to compare not only the incidence of these events, but where there's a difference between baseline data and then the appearance?  In other words, if you have some events, you know as we said active thinking baseline, is there a way of measuring, in other words disappearance of such during the trial?

Female:  Regarding your question on whether suicidality, suicidal thoughts existed at baseline, it's contained in my move yet.  I don't have the data in front of me, but I can say that the exclusion criteria relative to baseline psychiatric ((inaudible)) and suicidal that's related from ((inaudible)) to drug.  But it is ((inaudible)) may be brief ((inaudible)) as you all know is sort of that.

Male:  I want to conduct an issue that Ms. Griffith and Dr. Hennessy raised which I thought did nicely summarize some of the issues about black boxes and the potential unintended consequences and maybe ask the FDA to talk a little bit more about the points that were raised by both people in terms of what have you learned from the black box experience with the anti-depressants in terms of intended or unintended consequences that we should consider and think about when we evaluate what the most appropriate action would be in the current situation?

Male:  As an addendum to that, could there be ((inaudible)) approach just rather than a black box or just a warning or a lurk of a possible concern rather than a black box?

Male:  Let me just answer the second part because that's easier.  Yes, of course, there could be – we're coming to you, asking your advice on whether you think of black box as ((inaudible)) then if it is, what shall we say and if it's not, where should we put it and what shall we say?

((inaudible)) view about putting something on labeling even if the something is a bad thing like suicidality and serious thing is you have to be pretty sure we think the drug did it before we put in labeling.  Then we could figure out where to put it in labeling.  So, and that's the first ((inaudible)) question, but certainly, how we say it, where we put it, it's up for discussions.

Male:  Visually, time tells us ((inaudible)) explains is this is one other thing to think about and that is, how much to say about the data?  in the depression one, we give the conclusions, but we'll give a lot of – for our first thought, when we think about that, one possibility here that the previous conversation has made me think about is that we might sort of have a section that describes the data with its infirmities and it would be a big step to do ((inaudible)).

"Well, doesn't look like this one did."  But it's still – there're still things you could say about it in caveats and even explaining the difference between risk ratio and actual numbers needed to harm or actual risk.

Those things seem like matters that the committee was quite interested in.  those things were all on the table from our point of view.  We don't have the rigid.  It is our inclination of it if some thing is important, you'll just notice better if you put a box around it.

And if it's – it doesn't mean – it doesn't mean in times we're going to emphasize this, I know it doesn't mean don't use this drug.  It means pay attention.  Think about it.  Person gets funny note that it might be the drug doing it.  But you're right.  That can be on kind of consequences, but either you have to tell them on that.

Male:  Yes.  And clearly, when you were thinking about what to do with the anti-depressants, we read a lot about unintended consequences that committees on both occasions are worried about that.

In terms of what the impact has been, we have some early results, but it's probably something we're not going to learn for some time and actually in the ((inaudible)) my set of ((inaudible)) without this referred to that regular ((inaudible)) is sort of a public health experiment.

I think what we have learned is that prescribing in pediatric patients with anti-depressants has declined somewhat since the introduction of the black box.  But the other part of that, you know what has happened with suicides is less clear.

There's a lot of concern at the time that we have the advisory committee in December 2006 about a possible increase in adolescent suicides because the preliminary data from CDC had just come out.  But now, the numbers, that was for 2004.  the 2005 numbers are down somewhat.

They're not down to where they were in 2003, but they are down from where they were in 2004.  and you know actually, the change in anti-depressant prescribing didn't occur until 2005.  so, I think the only thing we can say at this point, it's not clear.

It's not clear whether or not the black box has had any impact on any that you care most about which is suicides.  You do know that prescribing is down some what.  But that could be a good thing, that could be a bad thing.

Well I guess on that point, that's from an – again, an FDA perspective in particular and again, going back to where we were when the black box first came out, you know were you surprised by that?  did you expect that downturn?

If yes or if no, how does that influence about what we will think about now, given that, you know it happened once, you know should we be thinking that if we put a black box here, maybe there's going to be a similar down tick in prescriptions in anti-epileptics and maybe that should be part of the equation that what we discussed here.

First, let me go back to what's actually in the box.  As (Bob Temple) pointed out, it doesn't tell clinicians not to use the drug, but it says that if you're going to use it, do basically a risk benefit analysis, consider the risks, consider the benefits.

In terms of – you know we didn't know really what to expect in terms of prescribing. It's always hard to predict what the impact is going to be. It's something you worry about, but it's hard to know what has happened. I think everyone is in agreement that there's been a slight decline in prescribing in adolescents.

There has not been an epidemic of suicides, but it's too early to tell. You know we'll know over the next three to four to five years I suppose. You want to make ((inaudible)) comment on most anything more about this.

I mean obviously, from my line of question are the certain point of view and you know to be explicit, I voted against the black box both times and I think that there was real concern at that time that there was going to be a decrease in prescribing.

And I think a lot of people weren't that surprised about what happened. I realized that you guys say that it doesn't so much prescribe in the black box and that you really do not – you want only people who knew the medicine to get prescribed the medicine want physicians who think very carefully about that.

But given what happened in the past, I think it at least ((inaudible)) on the table is the possibility that the actions here will influence the likelihood with which medications will be prescribed.

Male: Yes, we have to acknowledge that even though we don't say, don't use them, you put a box warning on, it could affect people's prescribing. Well, it's likely to run away. So but again, it depends upon what the indication is.

I think we would assume and this obviously something for the committee to discuss, but I think we would assume for example on epilepsy, if every drug approved to treat epilepsy has this language, it's very unlikely that people going to stop treating people who have epilepsy. There's no alternative to turn to that's approve that doesn't have that in its label as well. Well if it is some of this ((inaudible)).

So, I don't think we would expect, but again, there's lots of both label use, there's other things that are approved for that they're half as not as serious as epilepsy. So as (Tom) points out the decrease in prescriptions for anti-depressants might be a good thing, it might be a bad thing.

It may be that people who shouldn't have gotten them in the first place aren't getting them anymore. Where people who – physicians who don't really know how to wisely prescribe them aren't prescribing them anymore.

So, it's hard – it is hard to predict. But yes, we strongly acknowledge that just because we don't say don't use them, we know the box sizing effect or expected one.

Male: The other thing of course is you can emphasize something at the expense of other things. The box for anti-depressants now says that the major reason for committing suicide is being depressed. You know so it says that. that was an addition.

And of course one of the things that was – it was somewhat distressing to me about the whole anti-depressant thing was that we were looking at studies of acute depression which is where this merged.

And if you think about what the likely benefit of an anti-depressant is, it's preventing occurrence over the long term. At least that's my impression here. I'm not – I'm not the (shrink) here. And of course there were no studies of that at all.

So we're very conscious in trying to present the balance to our picture and call for your help in doing that. but I think that ((inaudible)) says is surely right. I'm just going to stop treating epilepsy. It's hard to imagine.

FDALive.com
11800 Nebel Street
Rockville, MD 20852
(301) 984 - 0001

Male:  Dr. Potter?

Male:  Yes.  I actually want to follow up on something that Dr. Leon was saying and perhaps ask him or the committee about some implications.  I think he drew very clearly the number needed to harm and if you run the numbers over large numbers of people, you know you clearly – you have to probably tell the problem potentially of which you won't commit from their people.

At the same time, given the statistical arguments, the conclusion ((inaudible)) decisions as you can see no difference between drugs that this is more than a mind game, but if you really believe that multiply ((inaudible)), there's a significant health problem in the relative risk of a suicidal behavior.

And I could presume it would be very important to know if there are true differences between drugs and if the relative risk that ((inaudible)) shown in the FDA analysis 5.4 to minus 4.16 uncover ((inaudible)) of the inches to take two numbers.

If there's only reality in that, is that important to know?  And are you losing that information or how does one follow up in that potential information?  so it's – it'll be interesting.  I mean I understand from the risk point of view, you emphasized relative risk.

But in the other room here is another question, are there real differences between drugs?  And seems very difficult to address that issue where you can talk about what one might do to address that issue.  I mean it's a point then obviously from society and the drug development point of view that's extremely important for us to know how to go about this.

But frankly, and ((inaudible)) one's concerns is that the standards or say, that drugs are different and you want drugs that together with data like this are so – are so difficult to sieve in the likelihood that leads the society will invest what you need to do show that one drug is different another.  It's something we all need to deal.  That's all I can just say.

Male:  Dr. ((inaudible))?

Male:  OK.  Can I just comment on it?  Those identified what we – I think sort of at the beginning or (Rusty) say at the beginning is one of the major fundamental problems here.  Our initial conclusion as you hold is that the sort of differences that we've seen are expected with relatively small numbers so they don't prove to somebody's satisfaction in a way that there was a difference, but it is – it's a profoundly good question.

And one of issues I think is how much one should say in any – in any box or other warning that you give about the variability and how much you should dismiss it and how much you should emphasize it and all kinds of things like that.

And you write making it ((inaudible)) making it ((inaudible)) once you have a core class effect, the kind of evidence you'd need to make it go away is daunting that you can think about.

Male:  Dr. (Chaplain)?

(Nicole Chaplain):  Yes, I'd like to address the issue of the unanticipated effects of putting a black box on.  Parents of children with epilepsy are really very concerned about adverse cognitive and behavior effects on their kids and the neurologist might continue the prescription patterns, but the parents ((inaudible)) the decision of the children are going to get the medication or not.

And we really don't want parents to withhold medication from that kid because of their concerns of these adverse effect and serious suicidal ideation.  I'm sure like most parents are very concerned.  And the issue

about withholding these meds from the kids, we also know that withholding would have significant adverse cognitive, linguistic, epidemic, and other effect. So this really is a serious issue.

The other thing is in terms of adolescents and young adults. The driver's license is a very important thing and one can easily see that patients might not tell the truth about suicidal ideation because they want to get this meds because they need their seizures controlled so that they can have their driver's licenses. So we really have to think about the different aspects of this.

Male: Dr. ((inaudible))?

Male: Well I want to air to what Dr. ((inaudible))'s comment, I think also a few with Dr. (Chaplain). I was to ((inaudible)) on those ((inaudible)) actually voted for the black box.

I share the concerns of unintended consequences decreased prescriptions being written, but that was offset in my mind in part by wanting to alert the clinician and the consumer to the possibility that during the course of anti-depressant treatment, it surmounts ((inaudible)) deterioration in mood or the emergence of suicidality that you would think of that could actually be an iatrogenic effect.

But you won't automatically assume it was just the underlying illness not responding to treatment because I was concerned that the reflex action might otherwise ((inaudible)) increase the anti-depressant and in which case, one would seek more deleterious results.

Well much throughout and I would interested in hearing from our neurologist colleagues are on the table whether there is an analogous situation here and maybe there isn't. maybe mild reason in part for voting for the black box in depression does not tame here in the treatment of epilepsy and that should may not be as concerned about changes during the course of treatment where you want to back off.

Male: Dr. ((inaudible)), I think you had a question?

Male: When Dr. ((inaudible)) was talking, I wondered if there's at least one device that was approved for – I know this is drug evaluation, the Center for Drug Evaluation but there's at least one device approved for epilepsy, did you look at the data, suicide data there from their trials? No?

Male: Yes, we can ask ((inaudible)).

Male: Dr. ((inaudible))?

Male: ((inaudible)) my comment has been in the ((inaudible)). Thank you.

Male: Well I'll just sort of follow up on (Wayne)'s comments. Somebody also visit the anti-depressant ((inaudible)). I think one of the other things that you have to keep in mind is when we have the public testing on ((inaudible)) and I don't know if our public testimony is going to do that.

there were family after family that got up and had said, "nobody had told us that this was something that could happen" and then the worst thing happened which is, you know their child died. And it was very hard to make the argument that these people shouldn't have known about a potentially fatal side effect even if it's a very rare side effect.

And the other issue which I think also came up in light in a public testimony was a lot of the families that were telling their stories, their medications were not being really prescribed by a psychiatrist. They've been prescribed by general practitioner, et cetera.

And we all question is, you know (LGPA), they were asking the patients about their level of suicidal ideation, that sort of thing. And that's one of the ((inaudible)) I think we need to think about with these

drugs when they're not being used in a non-psychiatric setting. How much of the time was the person prescribing ((inaudible)) asking about suicidal ideation and doing sort of follow up about that?

Male: Dr. Leon?

Andrew Leon: This is also current about the black box for the anti-depressant side. I did vote for it. I think, one of the – probably one of the big differences is that ((inaudible)) meeting, we also have efficacy data, and one of the concerns was that there was not a lot of data to show that the drugs worked.

But there was, you know this – there wasn't a lot of data because data that showed that it may do harm and cause suicidality. So, I would think of the different situation. Here, I think that we have data that the drugs – I'm not a ((inaudible)) that the data shows that they treat epilepsy.

Male: ((inaudible))

Male: …talking in the child meeting. And I think I can make a big difference in your weighing of the significance of the side effect.

Male: Again, yes, as a neurologist, the situation is not analogous. As mentioned before, we had a disease where the outcome that you are treating is also – was considered possibly be one of the side effects of the drug.

So separating those two as ((inaudible)) difficult. Here, we've got drugs if we're just talking about the ((inaudible)) epileptic agents that are treating a condition, and there may be these set of some potential side effect and that tell us whether they wanted things that we have to come to closure on that we haven't do, we think that there is a risk signaled here or not.

Male: Dr. Griffith?

Gail Griffith: Although it's Miss.

Male: Sorry.

Gail Griffith: It's OK.

Male: They don't shy me.

Gail Griffith: To Dr. ((inaudible)) comment, when we had the first sort of hearings in '04, '05, and ((inaudible)) wasn't there. By the time we met in December of '06 to look at extending the black box labeling to a group 18 to 24 which was considered pediatric by some extension.

We did have better efficacy data. I voted against the black box label extension at that point because I had seen the precipitous drop off in it. It really woes me and to Dr. (Chaplain)'s point, those extensive meetings protect pediatric patients.

You have to protect the children. Obviously, we're not doing the risk benefit analysis and it depends who frighten them up and then get the drugs. But one other things that bothered me and bothers me about this discussion too is I just don't want to see us rush headline into a black box blank.

One of the reasons we did impose the black box ((inaudible)) Dr. (Temple) when we were talking about this before was the motion that we wanted assumptive – a consistency. When we put a black box on a labeling for pediatric patients, it would tend to be a consistent judgment that we extend it to aged 24.

I don't think that was a judicious move on our part and I'm afraid that we'll, you know just more go into look at all these drugs and rush to the black box because it's expedient.

Male:  Thanks.  And again, in the new launch signal this is certainly on the table as we discuss this this afternoon.  We have about five minutes more then a few folks that have questions or points to make, I'd like you to try to run through them, but try to keep them pointed if you could.  Dr. (Chaplain)?

(Nicole Chaplain):  I'd like to address Dr. Goodman's comments and the issue about the iatrogenic effects.  So what happens in – what depends on kids with epilepsy gold rush to them everything under medication.  And in fact, we have a very, very high rate of undiagnosed ((inaudible)) kids.  Because the parents say that everything's due to the medication.  So then, putting the black box here really won't go ahead the opposite effect.

Male:  Dr. ((inaudible))?

Male:  Since some of these is notably a numbers game with the risk quarter of just 300,000 patients, ((inaudible)) required might be different.  So there were some magnitude effect and there is pretty good data on death rates and epilepsy and also from some large cohorts of the surgical treated patients in respond and that respond increased death rates in the patients who have that unsuccessfully treated epilepsy compared to a cohort that have severe epilepsy that underwent the same surgery.

So, I think from your anti-depressant data, you might be able to make some general assessment of death prescribed and decreased by this amount given these risks of inadequate treatment.

How does that weight against what our confidence is for the patients to harm to at least give some sort of sense of what might be the downside to placing the severe with or placing the black box one label versus what we believe is the downside to what's the current state of practice, where it's sort of being done in advance?

It might help to provide some sense of what's the appropriate response in terms of the magnitude of harm of labeling as opposed to not doing anything.

Male:  We haven't thought about this.  it's a fair question.  I just think that there's so many assumptions you'd have to make and some of the unknowns about whether or not the prescribing habits that follow the change in anti-depressant label is that it will be the same or is there an anti-convulsant role of whether indicated for very different things.

Male:  Again, it's a fair question.  We haven't entertained it internally, but it seems like it could be some of the assumptions that you have to make that you'd be, I think hard press to believe what you ended up with but somehow…

Male:  The assumption idea that ((inaudible)) kind of assumptions, but at least somewhat numerically based than pulling a room full of people based on their idiosyncratic opinions based on their practice.

I mean they should give us while we know that this numerically happened for anti-depressants, we know that this one medically happens in untreated epilepsy.  So, you know it does provide some context for interpreting our expert clinical advice.

Male:  Dr,. ((inaudible))?

Male:  I just want to make to point in that people who are with epilepsy as a nominal statement, perhaps 50 to 75 percent of them are not well controlled or on medications.  Those who are not controlled are usually given an additional medication and that continues.

Moreover, there's good evidence now that epilepsy with seizure can be do damage into the brain because it grew to make sort of toxicity. So we don't want people to have epileptic events. People with epilepsy do continue on the heavier seizures and they continued to have medical care and these are people often very disturbed and maybe depressed because of their seizure disorders especially in adolescents.

So, that has been taken into account when you think about a black box earlier kind of warning. On the other hand, it's so important that the parents and the patient with epilepsy be aware of this danger. So I exercise the latter in my odds here. We made people aware of the present danger here.

Male: Then one of the things that could be done explicitly is say that this is an issue, but that it is not within the reason to stop treatment with an anti-convulsant. It's just a warning to be aware that this may occur, but not an indication for stopping. OK. Dr. Lu?

Male: Yes, I think I heard a lot of discussion of epilepsy that this, you know box labeling or not perhaps stopped treatment. But we ((inaudible)) is that the black box won't claim not just epilepsy but also ((inaudible)) as an indication including ((inaudible)). So, it's in that condition so any discussion on the ((inaudible)) of this day?

Male: Two more. Dr. ((inaudible))?

Male: If you don't mind Dr. ((inaudible)). I'll wait until this afternoon.

Male: OK. That would be fine. And Dr. ((inaudible))?

Male: Yes. I have a question for the statisticians. To assume that the effect is generalizable to the class of (EAD)s, but if you look at the compounds individually, one draw at the conclusion individually that compounds have the risk or do you need the entire data set of all (EAD)s put together in order to draw the conclusion that (AED)s have a signal?

Male: I would say, we would need the entire data set in this phase.

Male: Very good. Well, it's out of time. We're going to take a lunch break. First, let me reiterate you the members of the committee. It's fine to talk about good basketball, it's not fine to talk about anything of substance or anything related to our discussions.

Sorry. We're going to reconvene in one hour, 1:00. Please take any personal belongings you may want with you at this time. This room is going to be secured by the FDA staff. You won't be allowed back in…

(BREAK)

Male: This is the open public hearing portion of our deliberations. Both the Food and Drug Administration and the public believe in a transparent process for information gathering and decision-making. To ensure such transparency at the open public hearing session and the advisory committee meeting, the FDA believes that it's important to understand the context of an individual's presentation. For this reason, FDA encourages you, the open public hearing speaker at the beginning of your written or oral statement to advise the committee of any financial relationship that you may with a sponsor, its product, and if known it's direct competitors.

For example, this financial information may include the sponsor's payment of your travel, lodging or expenses in connection with your attendance at the meeting. Likewise, FDA encourages you at the beginning of your statement t advise the committee if you do not have any such financial relationships. If you choose to not to address this issue of financial relationships at the beginning of your statement, we will not preclude you from speaking.

The FDA and this committee place great importance in the open public hearing process. The insights and comments provided can help the agency in this community and the consideration of the issues before them. That said in many instances and for many topics, there were will be a variety of opinions. One of our goals today is with this open public hearing to be conducted in a fair and open way where every participant is listed – listened to carefully and treated with dignity, courtesy, and respect. Therefore, please speak only when recognized the chair and thank you for your corporation.

As just a procedural thing each speaker has been given four minutes to talk. At three minutes an orange light goes on on the podium. At four minutes, the microphone is turned off and the next person will be allowed to speak. The – and we'll go in order and I'll recognize the people just by number, if you'll excuse that and you can introduce yourself. So first the first speaker, number one. You're on.

Joyce Cramer: OK. I'm Joyce Cramer, President of the Epilepsy Therapy Project, a non-profit organization devoted to advancing development of new therapies for epilepsy and my slides do not seem to be working. Let's see. Do we have my slides? There are. As I say, I represent a non-profit organization.

In my role as president of this organization, I'm here to represent researchers and patients with epilepsy. We do not support the findings of the FDA. I'm missing a slide in here that suggests that the (suicidality) risk is related to anti-epileptic drugs as a class. We offered data from the Department of Veteran's Affairs database to demonstrate that (suicidality) in epilepsy is related to co-morbid psychiatric diagnosis and not the medications.

These demonstrate – these data demonstrate that the FDA are not replicable in population based studies. And as you see in this slide, we have done a thorough analysis of a clean data set from the VA. We know from history and from the literature that there are factors associated with an increased risk of (suicidality) among adults. Our cohort looked at newly treated people on monotherapy with all diagnosis ((inaudible)) primary outcome of (suicidality) including completed events.

Top line results, if you look at the bottom center of this slide, you see six cases of 0.08 percent among those with epilepsy, 0.06 percent among those without epilepsy and with other diagnoses but using AEDs in monotherapy newly treated, not statistically significant difference.

Top line results. The primary predictor of (suicidality) is a previous diagnosis of a psychiatric disorder usually depression resulting in odds ratio of 4.42 after initiation of an anti-epileptic drug. No significant differences among the AEDs or among any indications. Note, again, that this was newly treated monotherapy.

What to change, if anything, in future control clinical trials? The problem, obviously, may be co-morbidity. We had the advantage of being able to look back over four years and know what our patients were doing before they were treated with an anti-epileptic drug. We all ready have patient reported outcome screening tools that can observe effects on mood as well ((inaudible)) spontaneous report data collection. Let me give you an example of an ongoing recently completed clinical trial of eslicarbazepine that included a quality-of-life instrument within which was the NHI-5 series of mood items a well-known screener for depression. Also included the Montgomery Asberg rating scale in which the 10th item asked specifically about (suicidality). And in this study, there was no signal of (suicidality) in this population. That should be adequate information that this is – we have tools that work and these are not class effect.

Another example is looking at some older data from (nebateracity) and looking at the old co-start data terms, we find that the difference in suicidal behavior that were reported were between treatment responders, and treatment non-responders as opposed to by class or versus placebo. We have these screening tools. I'm not in favor of developing new ones. As an academic instrument developer, I know, I'm very familiar with the FDA guidance on instruments and I'm very concerned about these issues.

I want to remind you that depression in epilepsy screening is a practice guidelines. The risk of (suicidality) is probably not related to the epilepsy but to pre-existing …

Male: Thank you. Number two.

(Darrel Rediu): Good afternoon. I'm (Darrel Rediu). I am the Director of Research for the American Psychiatric Association. And I'm representing a professional medical association of approximately 38,000 psychiatrists.

Our concerns include the following, the adequacy of the statistical findings on which the recommendations for the black box warning is based. Secondly, the potential impact on clinical practice of reducing the use of new stabilizers. Third, the public health impact on – of a black box on population mortality rates on suicide. And fourth, an interesting concern is how you would communicate the proposed medication risk to our psychiatric colleagues as part of our recently developed partnership with the FDA and the AMA in this joint communication effort.

Certainly, these medications are not only for anti-seizure purposes, but they are clearly used as mood stabilizers. And they are not all equal as mood stabilizers. Some of the medications being discussed are truly life-saving for the majority of patients who take them through stabilization of severe mood disorders and a subsequent reduction in the associated high risk of suicide.

Numerous studies have documented that the highest risk of the suicide attempt in patients with bipolar disorder occurs when the patient's systems persist or when the patient relapses and certainly the data of the FA study does not seem to suggest that the risk of suicidal thoughts and behaviors outweighs the potential harm for medication changes or discontinuations that could result from a black box warning.

Now, in the fall of 2004 the FDA began this natural experiment of using the black box warning for antidepressant medications. There was a rather precipitous drop in the prescription rates as Dr. (Logan) has mentioned. And, in fact, there was an increase, around that time, in the rate of child and adolescent suicide, an up tick that has not decreased significantly since that time.

So with no clear understanding of the true public health impact of black box warnings, ((inaudible)) agency first do no harm, and one possible harm is the dilution of the impact of the black box warnings when they are applied on the basis of such (normal) evidence. An increase of recorded adverse events, of spontaneous recording of suicide ideation from 0.22 percent to 0.37 percent for all of the active medications is a – needs to be contrasted with the epidemiological rates where we find that instead of less than one percent in this clinical population having suicide ideation or behavior up to 20 percent is found where there is systematic assessment. And putting it in this epidemiological concept – context makes you really concerned about the ascertain bias that exists with the current focus on adverse events that are spontaneously recorded.

So we are certainly concerned, also, in the memorandum that Dr. Katz provided that the memorandum does not include as occurred in the SSRI memorandum a statement about the benefits of taking antidepressant medications to treat serious life-threatening depressive illness. A similar balancing of benefits and risks for the treatment of knee disorders and seizures would be considered – should be considered for this class of medications if, in fact, you decide to add a black box warning.

So finally, we want to reiterate the concern that there is a need for prospective systematic assessment of (suicidality) as the FDA is moving towards as oppose to relying on these retrospective spontaneous report of events that are not the purpose of the original clinical trials. Thank you.

Male: Thank you. Number three.

(Dave Even): I'm (Dave Even) and I'm a physician at Brown and also a (clinical) consultant for the folks on the Citizen's Petition. Whoops, I went to the wrong way. And I had a slide show but, I guess, we'll skip it.

I want to start by talking – start by taking off on Pfizer's argument, because I think it's a relevant argument. Pfizer comes here like the kid who kills his parents and pleads for mercy because he's an orphan. In other words, they say, well our drug is not used for epilepsy, of course, that's because they fixed it so that people would be using it for no indications that had any benefit whatsoever. And contrary to what the representative here said, neuropathic pain is not the majority use. Epilepsy is two percent of the use of (Neurotan) by example.

If you look at the drugs, and if I can get to the seventh slide, we'll get to – this is the Pfizer slide. I urge you to look at that slide. That right hand column is the percent non epileptic use. Ninety-eight percent of (Neurotan) is non-epileptic. You've got to get two-thirds of the way down the chart and the big drug prescription numbers are at the top of the chart. (Neurotan) is the big drug here in terms of number of scripts, 12 million. You're way down in the hundreds of thousands when you get to the bottom of the chart.

So we're talking about not epilepsy. We're talking about back pain eight percent, migraine four percent, bipolar 15 percent, there's some suicidal risk (by) adding to with bipolar disease, other psychiatric 23 percent. So when we're talking about warning what you're doing is warning physicians who are mostly GPs who are using these drugs for diseases for which there is no benefit. No proven benefit and that's Pfizer's number, OK. And don't think that the other which is post-herpetic neuralgia which is an approved use for (Neurotan) is fewer than 100,000 treatable cases there for a year and trust me they're all not getting (Neurotan) as hard as they try to market it.

So the impact of the warning will not be on epilepsy treatment. It will be used – it will be on all of these other diseases for which here should be none of these drugs subscribed in the first place.

A couple of comments on warning. There's been some talk about whether the word chronic should go on. Well, I think, that's going to be – I look at that from a different perspective, you've got data that goes to 14 weeks you've got a separation of capital that might occur really immediately but certainly after a week. Three months of use which is your average data is not chronic in terms of epilepsy. So if you put chronic people are thinking years when you really have data for weeks and months. So it's really not chronic. It's really short-term use has been associated because short term for epilepsy is three months.

And now, in terms of just data it seems like there's a lack of data here. We're debating – or you're debating you know how many angles can fit on the head of a pin. And not only that, you want to know if they're fat angles, skinny angles, how many of the angles were saints? The data is not there for that. If you want some – but there's some data that you're not considering. You're not doing – you're not ordering them to do case control studies with large data sets, observational data. And you haven't presented the challenge, re-challenge data. Somebody asked about what data – what evidence is there when you go off the drug whether the risk goes away. You know, Pfizer data said there are at least two (Neurotan) cases, maybe more, where the person on the drug suicidal, off the drug not suicidal, re-challenge suicidal. That is powerful, powerful evidence. And that evidence exists for some of the other drugs, I don't know why it hasn't been presented here.

And the last is the mechanism. You've heard a lot about why the mechanism isn't there. Well, the mechanism – that's evidence under his considerations. You know, increase (SCABA), decreased serotonin. Decrease serotonin, increase depression, increased depression, increased suicide. Antidepressant drugs are used to increase …

Male: Thank you. Number four.

Andrew Finkelstein: Thank you. I'm Andrew Finkelstein. I'm an attorney in New York and Chairman of the (Neurotan) federal multi district litigation in Boston. And lead council in the (Neurotan) coordinated litigation in New York State corp.

My firm represents over 250 families of victims of suicide and over 500 people who attempted suicide while taking (Neurotan). During the course of the litigation we have discovered documents which illustrate both Pfizer's then (Warren Lambert) and the FDA have known since 1992 that (Neurotan) is associated with (suicidality).

At that time FDAs clinical review voiced concern over (Neurotan's) capacity to lead to suicides given the limited population which approval was sought which was adjunctive treatment for refractory seizures, the clinical reviewer, and the advisory committee recommended approval for use in a specific population.

However, Pfizer's illegal marketing of (Neurotan) off-label was in direct violation of FDAs limited approval. When they did, Pfizer failed to disclose their knowledge of the increased risk of (suicidality) caused by (Neurotan). Their action resulted in direct harm to thousands of American families across the nation. Now, the FDA has recognized that the data from its meta analysis, in fact, shows the increased risk, something that has been known for 16 years by Pfizer.

When someone has a sudden mood change emergence of or worsening depression or suicidal thoughts, the proposed warning will inform that it might be drug induced. As a result, the patient will be more willing to speak up to tell a loved one or a physician. Family members and physicians will be on the lookout for these mood changes whereas, up to now, they are not. Without such warnings thousands of people will continue to be left thinking their changes must solely be them without any consideration that their new or worsening thoughts may be related to the prescriptions.

One must not overlook the (search terms) FDA left out when they told pharmaceutical companies here to collect the suicidal events for their analysis. The companies did not include adverse event reports of increased depression, anxiety, hostility, (echiphasea), mania, or hypomania. As the 2008 FDA alert states, symptoms of anxiety, agitation, hostility, mania and hypomania may be precursors to emerging (suicidality). Yet, those events were not even collected or analyzed as part of the FDA work here.

As a result, the analysis did not consider many events relevant to (suicidality). FDA does not know and did not include as part of this analysis how many people in the submitted clinical trials dropped out because of increased depression or increased anxiety. In (Neurotan), for example, the pre approval clinical trials had 5.3 percent of the total exposed ((inaudible)) report depression as an adverse event, which amounted to 78 people out of the clinical database of 2,048. Importantly of the 78 people who reported depression 19 had no history of depression at all nine of them had to withdraw because of the severity of their drug induced depression.

Yet, FDA did not ask pharmaceutical companies to collect the treatment emerging depression. I know the FDA can't have all of the documents we get in this litigation. They don't see the manipulation by the drug companies when they minimize the adverse events and coding self-inflicted stab wounds to the chest as psychosis with chest wound rather than what it really was a suicide attempt. I strongly recommend you ask the companies for the case report forms related to depression, hostility and anxiety and you will surely find many more qualifying events.

The FDA is not asking for a recall here, nor are we. We are asking solely to …

Male: Thank you. Number five.

(Keith Altman): My name is (Keith Altman). I'm the Director of Adverse Events analysis for Finkelstein and Partners a law firm in Newburgh, New York.

By way of disclosure, my firm represents individuals and families that have been harmed by adverse effects associated with (Neurotan). In March of 2004 my firm contacted the FDA because of the large number of calls we received reporting suicidal behavior and (Neurotan). The vast majority of these calls were for off-label uses. And about half of those were for uses other than psychiatric conditions. At that time, the FDA

urged us to obtain experts to review the data. We have done so and brought copies of these reports for the FDA and the committee.

May of 2004 FDA detected the increased reporting of suicidal events for (Neurotan). I submitted a citizen's petition for the (Neurotan) label to enhanced to one of suicidal events. The petition was based upon data that existed before my firm became involved in September 2003. In March of 2005 I submitted 258 med watch reports with completed suicides after which the FDA stated its review of (suicidality) in part because of the submissions by my firm.

Aside from the review of the placebo controlled trials, we'd like to point out to the committee that there was much additional information. The export reports I provided are comprehensive analysis of one of the drugs, (Neurotan). These reports were prepared using the same methodologies used by industry reviewing the safety of the drug. A few of all of the available data on (Neurotan) shows that in the original 1992 MDA clinical review there were concerns that the drug could lead to (suicidality). The FDA medical review has stated that (Neurotan) may lead to worsening depression and suicide as there were suicidal attempts in the clinical trials. The clinical trials also showed several suicidal de-challenge events and there was one very well-documented de-challenge, re-challenge event with tight time association.

A review of post marketing safety information is also instructive. There are numerous reports of the very behaviors that the FDA suggests should be included in the med guide for AEDs. As the current slide shows, the percentage of serious (Neurotan) ADEs associated with (suicidality) compared to that of the background shows there was a strong signal by the middle of 1999.

In the past, the FDA has required labeling changes and requested products be withdrawn based upon similar post marketing data. It is also important to consider the extensive off-label use of many of the anti-epileptic drugs. I make not comment on whether or not this practice is appropriate.

This slide shows the approximate breakdowns in about 2003 of several of the AEDs. Since we're focused on (Neurotan) ((inaudible)) seven percent for epilepsy and a small portion of the neuropathic pain use with on-label indications. This means that on the order of 85 percent of individuals using (Neurotan) were without any clear guidance on safety and efficacy. Furthermore, Pfizer was well-aware that many of the trials in off-label populations failed to demonstrate efficacy.

A review of the ((inaudible)) clinical trials show that for the off-label indications there has been little if any testing. For example, psychiatric conditions representing 38 percent of the use of (Neurotan) were tested using 144 people and 21.49 patients years of exposure. With a background rate of about one and 250 patient years it is unlikely to see suicidal events in this population. Other indications are no different. In many of the studies individuals with serious psychiatric conditions were excluded.

Looking at Pfizer's internal adverse event database for suicidal events by indication, one sees that there is very strong signal associated with psychiatric uses. Although this chart is not, by itself, that the drug is responsible for any of these events, the totality of the data is strongly suggestive of an increased risk.

Therefore, in conclusion, it is crucial for the committee to consider that the placebo controlled trials are the tip of the iceberg and that a more detailed review of one of the individual drugs, (Neurotan) shows that the entire experience is consistent with an increased risk of (suicidality).

Furthermore, the committee should take the off-label use and lack of adequate testing into account when recommending what action should be taken and provide meaningful warnings in that context. Lastly, contrary to Pfizer's conclusion, that the lack of statistical significance in (Neurotan) is evidenced that there is no increased. The totality of the information says otherwise. Thank you.

Male: Sorry. Thank you. I'm told there's no number six so on to number seven.

(Andrew Briggs): Thank you. My name is (Andrew Briggs) and next to me is my mom, (Robin Briggs). I must first disclose that she has a pending law suit in which Finkelstein and Partners represents her for the death of my father due to (Neurotan) use.

I've come to speak to you on behalf of those effected by the (suicidality) caused by the epilepsy drugs that we are discussing today. My father Dr. (Douglass Briggs) was a well-known and very well liked family physician in a suburb outside of Charlotte, North Carolina. After attending medical school he built a successful practice by caring. By caring – excuse me – by caring for his patients while being and doing everything he was trained to do to help with their maladies.

However, anyone who really knew him knew his devotion to his wife and my brother and me is what gave him true purpose. Whenever my dad was not working he was with mom, my brother and me. Sorry. My dad never suffered from epilepsy. He had a back problem for which he had three back surgeries. Following the third surgery he took longer than expected to recover. A colleague of his ((inaudible)) the off-label use of (Neurotan) for his pain and gave him the boxes of samples, as well as a prescription.

At no time was he warned about an increased risk of suicide and my family was never told to pay close attention to the day-to-day changes and mood behavior and his actions. Shortly after beginning the treatment my dad became more dower and sullen. Suddenly and completely uncharacteristically he began to worry about his job, and whether he even wanted to continue practicing medicine. He began withdrawing from friends and even family. He quickly – excuse me – he quickly transitioned from having a great interest in my academic career with frequent phone calls, long discussions, to minimum contact. I knew there was something wrong and didn't even think that the sudden mood change could be related to the new drug he was taking.

When I came home from school for Christmas break in 2004 my father was not himself. On December 23, we were all watching TV together and out of nowhere my father asked us if we had a choice for a method of dying what would that be. I will never forget how strange that question seemed and my father's sudden preoccupation with death. We all dismissed the question as another one of my father's questions trying to engage us in spirited discussion. That seemed ((inaudible)) conversation end.

A few days later on Christmas Day during our traditional Christmas rituals it was clear that my father was withdrawn and unengaged. Excuse me. That afternoon he suggested that my mother, brother, and I go to the movies and when my father refused he insisted and spoke in a forceful manner of which I've never seen or heard before. Right after ((inaudible)) we all went, and upon returning we opened the front door and we found that my father had hung himself in the foyer of our house.

During the last few months when my father was on (Neurotan) he was not the same man that I grew up with, that raised me and took a remarkable pride in my and my family and most importantly in his love for his work. In hindsight, there were so many signs we could have seen. It seemed so easy ((inaudible)) pinpoint every incidence where my father said something or had done something that would have raised red flags and alarm bells. However, we didn't know what to look for. We didn't know what the signs were. And after listening to this morning's discussions, presentations and reading the January 2008 FDA report I wish that he was told of the increased risk of (suicidality) related to (Neurotan). Whether my dad would have decided to take the drug or not after being told the risk I have no way of knowing. However, I have no doubt that if we his family were told what to look out for we would have contacted his doctors shortly after he started using (Neurotan) and we certainly never would have left him alone that night.

Please don't let another family suffer the way my family has suffered by not providing any of these warnings on these drugs. Thank you for your time.

Male: Thank you. Again, I'm told there's no number eight, so on to number nine.

(Jackie French):  Hi.  My name is (Jackie French) and I am neurologist and epileptologist.  And I am here to kind of represent the view from epileptologists.  I am speaking today on behalf of the American Epilepsy Society as well as the American Academy of Neurology.

What I want to tell you is that (suicidality) in epilepsy is very multi-factorial.  We know that there is a bidirectional relationship between (suicidality) and epilepsy.  Probably a lot of you don't know that people who have a history of depression and suicide attempts, et cetera have a higher risk of developing epilepsy.  There's a biological relationship.  And one thing that I'm very concerned about even after listening to the last few speakers is there's such a high prevalence of depression within epilepsy not only because of the social problems with epilepsy but, also, just the biological pre disposition that when people do have suicidal thoughts which many of them do and many of them will, they're going to get very confused when they see that black box warning and they're going to make presumptions and say I need to switch my medicine.  I need to come off my medicine.

And just to a return a point from the FDA in terms of everybody with epilepsy knows they have to be on anti-epileptic drugs.  That makes sense in one way but when you think that a lot of people who are on anti-epileptic drugs, they're actually working, that was another question that came up, and they're seizure free.  So in their mind, and I see this in clinic, all of the time, they might not realize that they have to maintain their anti-epileptic drug in order to maintain seizure freedom.  And when they get concerned because they're depressed and they have suicidal thoughts which they will and they do, they may respond to that by coming off of anti-epileptic drug.

The other thing I wanted to point out is that changes – (suicidality) may occur in the context of epilepsy both when you go on to drugs also when you come off of drugs and I wanted to point to a study where – a placebo controlled study of anti-epileptic drug withdrawal 38 percent of patients developed moderate to severe psychopathology on withdrawal of antiepileptic drugs.

We also know that other therapies related to changes in seizure frequency also changed mood and increased (suicidality).  So if you do epilepsy surgery which is not a drug you also increase the risk, even when people become seizure free, with epilepsy surgery, there is a period of time when they have an increased risk of depression and suicide.  So it's changes.  It's perturbation that leads to changes in mood and perhaps (suicidality).  It's not a one-to-one correlation with drug necessarily.

We do have some issues with the analysis.  A lot of them have been discussed before, so I'm not going to go into them in detail.  Another thing I want to absolutely point out is the consequences of anti-epileptic drug non-compliance.  If people stop taking their drugs because of a black box warning, a recent study of anti-epileptic drug non-compliance using a Medicaid database showed a three-fold increase in death with apparent non compliance as well as increase in emergency visits, hospitalizations, automobile accidents and injuries.  And I looked back at that study while I was sitting here.  And if you want to know the number needed to harm people who didn't take their anti-epileptic drugs the number needed to harm was one in 30 that they would die from having seizures and from epilepsy.  So keep that in mind.

And finally, my conclusions are that changes in medicine regimen should, absolutely, be a time of closer observation for changes in mood.  We all know that.  That is a message we want to get out.  But the label should, at least, I mean first of all why put a black box warning on when you're not really sure yet about the cause-effect relationship.  And is this drugs or is this a change, a perturbation in therapy of any kind.

So the label should, at least, emphasize …

Male:  Thank you.  Number 10.

(Frank Gillum):  Thank you.  I'm (Frank Gillum).  I'm a neurologist and professor of neurology at Columbia University.  I'm here representing the Epilepsy Foundation.  The Epilepsy Foundation is a non-profit organization that represents more than three million people in the United States with epilepsy.

The Epilepsy Foundation is very concerned about the possibility of a black box warning related to the association of AED's with (suicidality). This is based on two major reasons. First, as has all ready been emphasized but the Epilepsy Foundation would like to echo this strongly, the danger of patients stopping anti-epileptic drugs or not beginning appropriate new therapies to better control their epilepsy due to concern about (suicidality), that concern by the Epilepsy Foundation is based on as they describe an overwhelming onslaught of telephone calls and e-mail – electronic communications after the FDA alert is made public regarding the (suicidality) issue.

The second concern is based on the mis-assignment or the inappropriate emphasis of the risk of the association of AEDs with (suicidality) compared to the background problem of depression and anxiety as co-morbid problems in epilepsy that can cause (suicidality) and I'd like to discuss that in some detail for the next couple of minutes.

The prevalence of depression in epilepsy is 20 to 55 percent depending on where these patients are selected in refractory epilepsy. But multiple studies including a large population based study in the U.K. found that depression was five to nine percent in seizure free patients although those patients were all taking anti-epileptic drugs suggesting that the major influence of depression is not due to the drug.

It's another community based study with a valid and reliable instrument used to identify depression was published a couple of years ago. And in this study about one-third of patients with epilepsy and, again, this is community based, endorsed significant symptoms of depression. This was increased over asthma. That's been replicated in other studies showing increased depression compared to other chronic illnesses such as diabetes. So this issue of depression as a co-morbid problem in epilepsy is very large and is a major concern and effort related to the Epilepsy Foundation. And this is data from 17 prior studies of suicide in epilepsy. And these studies summarized 11.5 percent of all deaths were from suicide in the epilepsy samples compared to about one percent in the general population.

These studies were all completed before the approval of newer anti-epileptic drugs suggesting that the new drugs may not be the major factor in suicide and epilepsy. ((inaudible)) a multi decade study from Denmark recently published found that as opposed to patients with epilepsy and no co-morbid disorder the increased risk of suicide rates were 2.4 times greater in patients only with epilepsy. And if you added epilepsy and (affective) disorder it was 32 times increased over the general population again emphasizing the magnitude of the problem of co-morbid psychiatric pathology in epilepsy as a primary factor in (suicidality).

Another study looking at (suicidality) from a structured psychiatric interview and five outpatient centers in the United States found that 12 percent had suicidal ideation within the past two weeks, compared to the –

Male: And number 11.

Larry Greenhill: Good afternoon. I am Larry Greenhill, President-Elect of the American Academy of Child and Adolescent Psychiatry, a medical membership association of over 8,000 child and adolescent psychiatrists dedicated to treating and improving the quality of life for an estimated seven to 12 million American youth under 18 years of age were effected by emotional, behavioral, developmental, and mental disorders. We are acutely concerned about the safety of medications that may be used in the treatment of these children and adolescents and appreciate the FDA's committee concern and attention to the (suicidality) from the AED medication trials.

And adverse psychiatric events that appear during treatment of children and adolescents with mental disorders have not been reported in conjunction with the use of various medications. It's challenging, at best, to try and reevaluate data from multiple clinical trials, few of which were ever designed to assess such parameters. In the case of children and adolescents often individuals with suicidal tendencies are excluded from those trials. And that makes the analysis even more difficult. Analysis based primarily in a retrospective review of reports, not systematically designed to assess causality of suicidal thoughts or

behaviors cannot provide us with adequate information to fully understand the relationship between medication treatments and these adverse events.

However, the data as presented today can raise questions that can help inform needed future research. They data reviewed today strongly indicates the need for a large scale prospective studies which evaluate the incidents of serious side effects including suicidal ideation and behavior in a systematic prospective manner utilizing consistent assessment tools and techniques.

The American Academy of Child and Adolescent's Psychiatry is concerned about possible ramifications and impacts of the FDA recommendations for patient care using these medications and based on these data reports. As we have learned from previous experience the FDA's decisions regarding use of black box warnings significantly influence physician's prescribing practice and ultimately impact patient care. We ask the committee to carefully consider their message to the public regarding these medications. These medications are helpful and even life saving for many people with neurological disorders. But patients currently on those medications could face life-threatening effects if they chose to suddenly discontinue their medication without the advice and guidance of the physicians.

The American Academy of Child and Adolescent's Psychiatry is supportive of the FDA's practice of approving safe and effective treatments for our patients. We strongly urge the FDA peripheral and CNS drugs advisory committee of the psychopharmacological drugs advisory committee to consider all data available on the relationship of anti-epileptic medications and suicide when determining decisions about labeling and ramifications of action based on currently available data. By protecting and information the public, we urge the agency to very carefully weigh the impact of black box warnings on current practice and have demonstrated effectiveness of these medications to treat our child and adolescent patients and to consider the most beneficial manner with which the recommendations were released to physicians and the general public. Thank you.

Male: Thank you. That's the last registered speaker that I have. So the open public hearing portion of the meeting has now been concluded. We'll no longer be taking comments from the audience. The committee will not turn its attention to address the task at hand, the careful consideration of the data before the committee as well as the public's comments.

We have specific questions that the committee was given that we'll be addressing later. I think this portion would be worthwhile having a more general discussion. And basically, you know, just to summarize again, the sort of question that we're generically trying to address is is there a signal at all? If there is a signal, is this a signal of concern? If there is, is – do we believe that is a class effect or – and if so what is the class? Should there be a warning if that's the case? If there is, then what form should it take? A lot of the discussion has focused on the black box and the unintended consequences that that might have.

So as before we begin the general discussion, again, we've heard some other information from the public, particularly, some statistical and other analytic information. I'd like to, again, ask the statisticians amongst us if they have any comments about that or anything that they'd like from just a purely technical standpoint to discuss before we move on.

Dr. Lu.

Ying Lu: Yes, I'll just add a comment that we don't have time to really review their analysis before, so it's hard to weigh. And I observed that most of them are based on observation of studies and just remind us that these meta-analysis was based on a randomized control which, at the current standards is the best way to control the confining factors.

Male: Dr. Leon, anything?

Andrew Leon:  Let me just emphasize the point I think that, you know, there's a big difference between observational clinical trial data.  And, I think, I would want to be sure that – I wouldn't want to be in a position to have observational data trump clinical trial data in an strong way.

And, I think, the other issue I would want to point out is if there's been somewhat of a call for large scale prospective studies.  And from the standpoint of a design of study, when you have something that's a very, very rare event, prospective cohort studies is not usually the optimal way to design that study.  One usually thinks of case control types of investigations simply because it would take millions and millions of individuals in order to really do those kinds of comparisons.

Male:  Thank you.  I'm opening up now for a general discussion.  Dr. Day.

Ruth Day:  Just a brief comment to the last speaker, last week there was an FDA advisory committee on potential signals for serious heart events while taking drugs for diabetes.  And the topic of that meeting was how would you design studies to do all of this.  So a lot was brought forward and some things were figured out.  And should this group think that that would be a way to go, the transcript and materials from that meeting would be helpful.

Male:  (Jan).

(Jan):  Just a quick question for the FDA staff what is the criteria for setting out a black box warning versus other warnings that are set up?

Male:  There's no formal criteria.  There are no formal criteria.  We choose to typically put a black box or a box warning when we think it's a serious event and we think people ought to know about it or might be able to prevent it.  And it's really a judgment.  There are no rules that I know of that say this is – you know, if it's different sometimes you do it, if it's the only drug in the class that has a particular serious event.  So it has to be serious.  And it has to be something we think people really ought to know about.  And as (Bob) was saying earlier if it's the kind of thing that you really think people ought to pay attention to, that's sort of a seat of the pants sort of rule because it is the most prominent way we can describe it.

Male:  It might help to look at what we've said about when we think there should be what's called a med guide, a patient directed labeling because some of the considerations are similar.  The two main reasons for having a med guide are when the thing in question, the adverse effect in question is something you really want patients to know about before they decide whether to use the drug so they can participate in the risk benefit decision.  That's one.

And the other is where there's something you can do to prevent a problem, for example, knowing that it might be a problem, knowing that the drug can do this.  And, I think, box warnings come in something like the same category.  It has to be a severe problem or you wouldn't do it.  You have to reasonably convinced of a causal relationship although whoever's absolutely convinced.  And then there needs to be something that you can do about it, whether it's the physician deciding whether to use the drug or the patient deciding whether to use the drug or taking appropriate warning steps.  I mean for antidepressants, for example, the main thing we've told people is watch out, not use it.

(Jan):  Well, the reason why I ask is coming from the consumer advocate standpoint, the use of the anti-epileptics in general neurology, I think, is not just for epilepsy.  And so as the other indications were pointed out a lot of that is for pain management.  And the alternatives for pain management are not good.  So, you know, it's interesting.  I got an e-mail during lunch from one of my patients asking – trying to get off this anti-epileptic which was used for neuropathic pain.  And the alternatives that were allowed by the FAA for which this patient was asking are anti-inflammatory which have risks associated with kidney failure and GI disorders.

And we run into that issue as well as the chronic pain patient whom we're trying to get off narcotics. And so at what point do you say that one alternative is better than the other? And certainly certified as a very significant adverse effect. But the risk associated with losing your job or being unable to work because of pain or dependency issues are also significant. And so those are the things that – so the reason why I ask about the black box warning is that it's not clear to me that there's a set criteria for it. And so are we jumping to establish some type of ruling that may cause the clinicians to have difficulty in terms of convincing their patients to switch therapies.

Male:  Dr. Rizzo I think you had a comment before lunch that you were going to hold over.

Matthew Rizzo:  Yes. I guess. I hope I can say this the right way so I wasn't in on the discussions with the psychiatrists about (suicidality) and antidepressants and they understand far better than we neurologists do what (suicidality) is. And this is one of the things that confuses me. One of the issue is the construction of validity of (suicidality). What does it mean? Is it  disease like dementia? Is it a condition that predicts something?

And, in a way, it seems to it's a concept that links together apples and oranges. If you think of a triangle with a wide base at the bottom where you have idea and at the top you have actions, and at the very tip you have very infrequent actions which are actions that lead to suicide. There's a relationship between the different levels of the triangle. So there's a relationship between ideas and there's a relationship between actions. But what of those relationships? And is it fair to lump them all together.

I was trying to think about how the concept of (suicidality) would relate to some sort of mechanism. And so you can imagine that a change in medications would lead to a change in moods which would lead to a change in ideas or the willingness to report ideas which would lead to a change in behavior and actions which might lead to suicidal attempts or suicide that was successful.

But how that mechanism which I would put out as a plausible mechanism or chain of causality would relate to this concept of (suicidality) I don't really understand. And it seems to me that throughout the discussions, people have been talking about suicide. They have been talking about suicidal actions. They've been talking about suicidal ideation and depression and all of these ideas have been interchanged and I'm not sure that we're all clear on the distinctions that we're making about ideas and actions and what we're really worried about.

It seems to me what we're really worried about is suicide or near suicide events and I don't think that comes out very clearly in the discussions today. So I would ask our psychiatric colleagues to explain better the concept of (suicidality).

Male:  So I actually was going to say something else but let me speak to that since a few of us as we've kind of have – kind of watched the development of this issue over the last five or six years. And, I think, maybe a few of us can comment on it.

And, I think, you raise a lot of points that have really occupied a lot of time and a lot of thought and there's been some progress and I'll try to describe it to you briefly and quickly.

So the first thing to say is that when this issue first came up with antidepressants many of the concerns that you raised occupied a lot of time including the fact that the term as it is currently defined and as it was used in the analysis that were presented lumps together a lot of things that maybe shouldn't be lumped. And there was a fair amount of thought about that.

The other thing is that it doesn't conform to the usual way we think about medications as being applied to, at least, disorders or syndromes that hang together, but ideally, things where we have some understanding of etiology.

And there was a fair amount of time spent classifying and reclassifying events. And I do think speaking as an individual and as a psychiatrist that my sense is that after a few years the FDA did about as good a job as one could do given the inherent problems in that. Problems that you rightfully point out and that, I think, are not going to be easily solved.

I also think you raised a very important issue that what we really care about is not (suicidality) as its defined currently in the measure that we're using but ultimate completed suicide. And the problem is that, thank goodness, ultimately, completed suicide is a very rare event. But on the other hand, the best predictors that we have of completed suicide is a history of a suicide attempt.

So when looking at an income that can be about the best proxy for the potential risk for completed suicide some consolation of suicidal ideations, suicidal behavior is about as good as we can do. And as the statistical analysis from the FDA made clear when that signal is clear for behaviors because the link between suicidal behavior and future suicidal completion is stronger than the length between suicidal ideation and ultimately completed suicide. When you see a stronger association or at least a strong association with behavior from a medication it raises a lot of concern.

I think the last thing to say is that because in thinking about behavior disorders more generally but mental disorders, in particular, is a major emergency for us as psychiatrists and something that really makes all of us think very, very carefully. The response has been over the last few years in thinking about this that we should have a very low threshold for alerting the public and for raising concern. And for not getting too bogged down in imperfections in the definitions of (suicidality). Because no matter what the imperfections are, I think, we all ultimately agree number one that it's about as good as we're going to get as far as coming up with a decision when there's a specific question about medications before us, number one. And then number two the way it is currently described is a reasonable predictor of risk for completed suicide.

So given all of that, I think, the way in which the current measure of (suicidality) which is the exact same measure that was used in the three hearings about the antidepressants is thought about, I think, among the committee there has been a reasonable committee that includes a lot of psychiatrists. There has been reasonable comfort in basing decisions about risk and risk benefit ratio with the definition that we're currently working with given all of the flaws in the definition. And then maybe you can ask me questions. I'll be interested to hear other comments from other people who are psychiatrists.

(Rob Hausen): (Rob Hausen). I think there's a few sort of methodologic things that maybe those of us who have been through the antidepressant sort of trials it's sort of second nature that this is the first time you've started thinking about it. It might be worth bringing up. One is that we talked about that randomized control clinical trial data has lots of advantages. But it has some disadvantages in the sense that, for example, these are patients, and I don't know about epilepsy but in psychiatry it's very routine for there to be an exclusive – there be criteria for suicidal patients when they go into the trials.

So one of the things is a lot of the psychiatry patients may have been systematically filtered out the patients at most risk because you can't get in the study because of an exclusion criteria for human subjects protection. The other thing is that if people are in a trial and they develop ideation usually their participation in the trial is truncated because if you're treating somebody especially, you know, in a trial and they start to have suicidal ideations, you know, they're often taken out of the trial and we do some other interventions because you don't want to go on to full suicide.

So that's one of the reasons why the suicidal ideation is really important in these sorts of trials because nobody wants to progress to the next level which are attempts, et cetera.

Male: Can you tell us anything about the tools that measure suicidal ideation, what's the test, retest, reliability, what's the inter-related reliability. Is it s thermometer that reaches 30 degrees in one second and 50 degrees the next second?

Well, I think, the main difficulty, I mean, basically I remember the methodology is they're using spontaneous adverse event reporting. Then those reports are then classified using the Columbia System. And is Dr. Pine was talking about there are limitations to the Columbia System of classification but it's as good as anybody can come up with. I think the main difficulty is that we're dealing with spontaneous – you know, reports of a spontaneous and a case report form. So I think it's like getting the data is the problem.

Now, there are scales that actually do measure suicidal ideation. In fact, in psychiatry there is at least one drug that specifically got an indication which is (plozipine) for patients with schizophrenia who are suicidal as a specific indication for that. And in that study there was wonderful measures of (suicidality) but that was a study that's totally designed for that purpose. And, obviously, in these epilepsy trials people weren't wanting to do specific suicide scales. Maybe in the future they might, but we don't have that sort of thing now. And so, I think, that's our biggest limitation is the data that we're basing all of this on is spontaneous reports and a case report form. And so obviously in that method you're probably missing stuff.

Male: So if you were doing a prospective study what tool would you use?

(Rob Hausen): Well, as I said, I mean there is at least one instrument that has been used successfully for an indication. So, there are scales, but they – you know it's like everything. It's a specific scale. It takes time, et cetera, et cetera. In a global trial while you're looking at many other ((inaudible)) if you're in an epilepsy trial, you're probably interested in lots of other measures and it's always the balance about what you put in versus what you – you know you measure. But you can do it. It's possible.

Male: One thing related to that, and Dr. Temple mentioned this, but it might have been lost people who are not – who are not psychiatrists or who were not at the other hearings, that for the antidepressant hearings, there were a subset of the trials that had acquired data prospectively on a group of patients specifically asking about suicidal ideation or behavior with reasonable reliability. And one of the vexing questions of those data was that you could see the signal, the association with suicidal ideation and behavior, in the spontaneous event reporting data, but when you looked at the prospective systematic measurement of suicidal ideation and behavior on the trials that had those data, there was no association with antidepressant use. So, it really raised a lot of questions, as Dr. Robinson was just mentioning, about exactly what we are picking up with these events.

So, but the thing to remember is despite that, the feeling around the room at the time, even though there was this discrepancy between the spontaneous event reports which showed pretty much uniformly acknowledged by both committees a clear signal with suicidal ideation or behavior, an association, I would add, that was no stronger than the association that we're seeing in the data today. So, despite that contradiction between the prospectively collected data and the – and the event reports, both committees felt that the data were conclusive enough to say that there was a causal relationship between antidepressants and suicidal ideation and events.

So, even if we had those prospective data here, if this committee viewed the data the same way the other two committees did, one would be forced to conclude that that still would not contradict the fact that the spontaneous event reports have shown what at least I look to see a fairly clear association from a statistical standpoint. So you know having the better scales would not really help us right now because if they showed something, maybe we'd feel a little more comfortable in concluding there was an association, but if they showed nothing, that would basically be exactly what we had with the antidepressant data which was not reassuring enough to a group of people who spent a lot of time thinking about suicidal ideation and behavior. Thanks.

Male: Thank you. Dr. Hudsons.

Melissa Hudsons: My question was addressed because I wanted to know where were the quality of life (for) mental health data that could anticipate a high-risk profile patient who is – who might suicide, were those ((inaudible)) any of these randomized control trials that were included in the meta analysis. Even if it's not

going to make a difference in our deliberations today, I'm curious are those types of outcomes collected in these studies and were those – was that data evaluated.

Male: We don't – we don't have good instruments for predicting suicidality, but we do have better instruments now for prospectively collecting in formation on suicidality when it merges, and that's really what has been missing from these trials. We have relied on spontaneous reports. The frustrating thing is that these reports have been very sparse and very difficult to classify prior to doing an analysis. Columbia has an instrument that they've developed, the Suicide Severity Rating Scale, that prospectively collects detailed information on suicidality that hopefully in the future will allow us to do a better job of looking for suicidality in future meta analyses and future analyses of clinical trials data, and there are some other instruments that are being developed. But it's something for the future. It doesn't help us right now with what we're dealing with today.

Male: But just to answer your specific question about quality of life scales and those sorts of things, we didn't ask for those data. Some trials I'm sure had that, I'm sure many trials didn't, I would assume, anyway, depending on the indication. So, we can't answer that definitively.

Male: Dr. Temple.

Robert Temple: Just one thing's worth remembering – we don't quite know what the phenomenon we're looking at is. For example, in the depression trials, the people on treatment were on the whole less depressed. So, you might ask, "Well, why are they more likely to be suicidal?" The suicidality is a relatively rare event compared to their underlying depression. They're all depressed, after all. So, we don't really know what the characteristics here. It looks like it behaved like something that was sort of an odd thing that happened to a small fraction of people. So, you don't really know whether your scales are going to pick it up.

I must say, in line with Dr. Rizzo's question, that's more persuasive for a suicidal act than it is for suicidal thinking which you might think happens more commonly. But a lot of what we pay attention to is the suicidal acts. According to the analysis that the Columbia (approach is), you have to reach a conclusion that it was a serious attempt to do yourself harm. Obviously a judgment call. But that doesn't happen that often, but it does happen more often in the people on treatment or at least it seems to.

I can't help adding one other thing. We've always wondered whether this was a greater likelihood to report events that were already there in equal numbers. That seems more of a worry with suicidality to me – you guys have to think about it – than it does with suicidal acts, you know putting a rope around your neck and stuff. But you know we don't really know the answer to those things yet.

Male: Dr. Gilman?

Sid Gilman: Throughout this discussion, I've been wondering about the basic question of whether there is a signal here and is it an important signal. So, I'd just like to spend a minute or two about those thoughts.

First, as I review the data, we have epilepsy, we have psychiatric disorders, and then we have other indications that are in the mix of data that we evaluated. You heard the (Forest blots) that are to me very convincing. They cut across eight of the eleven medications that you looked at, all antiepileptic drugs so-called, but used in a variety of indications. And I'm struck again that those patients who were in these trials are people who have illnesses that frequently come with depression. They include diabetic neuropathy and other kinds of pain that are often depressing that often happen to people who have pain and therefore are depressed. They happen in psychiatric disorders where depression is common. And people with epilepsy, if you heard from Dr. (French) and as I commented earlier, who are often depressed people.

And so I for one, as I think – thinking through this, see a biological substrate, a group of patients who commonly are depressed because of their illnesses or for other reasons the two go together, the pain and the

depression go together.  Another question is whether there is a common mechanism, and at least from the pharmacological point of view, there appears not to be.  But we have, as Dr. Katz put it, an empirical piece of data here showing that there is some sort of relationship, that is these are all (antiopulictic) drugs used for different purposes and yet we have this commonality here.

So, I'm at least leaning towards the conclusion here that we have an important signal.  It may pertain to a small percentage of the total cases evaluated, but we have at least a reporting phenomenon, that is these were people in clinical trials that were placebo-matched.  This is as good as one can get in a clinical pharmacological evaluation.  So, I'm concluding myself that there is a signal here, that it's an important signal even though it pertains to a small percentage of people.  I think what the FDA has come up with is important and to me it's real.  That's all I wanted to say.

Male:  Dr. Goodman.

Wayne Goodman:  OK.  Going back to Dr. (Rizzo's) question, I don't know – I don't know if it's been completely answered yet, but I – my own conceptualization of what's going on here or with the antidepressants is that there isn't a switch in the brain – a suicide switch that one day it's off and the next day you take an antidepressant or an antiepileptic drug and all of a sudden it's on.  I've always imagined that there was some sort of intervening state change.  In the case with antidepressants and their use in pediatric depression or other pediatric conditions, we all had our hypotheses and discussed them.

Those hypotheses included a state shift.  We all know that if you – with an antidepressant there's a risk in susceptible individuals you may induce a shift into bipolar (intomania) and that account for some of the emotional liability and irritability and other manifestations that could then lead to suicidality.  That's generally seemed to fit with the data and also clinical experience. There's a thing called activation syndrome which is not very well characterized but includes features like irritability, dysphoria, dysinhibition that you can see if you have been treating enough kids with antidepressants and you could imagine in that was an unrecognized state over a period of time that that could lead to suicidal behavior.

So, at least on my part and I think probably on some of the other psychiatrists who have examined this issue, thought about this issue, that we don't think that – we think that there's some sort of intervening antecedent process that occurs.  It's not going to be depression.  I mean we didn't think that we were making patients more depressed with the antidepressants.  We conceptualized it as a behavioral – sort of behavioral toxicity that occurred in a subset of individuals who are susceptible And if unrecognized, if the dose wasn't changed or the medication wasn't decreased, or in fact you increased the dose ((inaudible)) are useful for depression.

I don't hear anything that suggests activation syndrome, although we haven't really discussed that.  So, the only thing I can think of that might be an intervening behavioral change is some sort of side effect burden, and certainly we know with some of these drugs in some patients they can experience dysphoria, they have cognitive dysfunction, they may be feeling (loggy).  There's words I can think of that I don't want to use in public that may cause overtime for them to feel that life is not worth living.  But my guess is as good as anybody's.  I don't now really what's going on, but I don't have a neat fit with a construct here.

But I – in answer to your – a simple answer to your question, I don't think that you're flipping into suicide.  There's something going on in between.  I just don't know what that is.

Male:  Dr. (Vissen) or Dr. Leon.  I can't remember who – yes, (Peckles), I'm sorry.

(Peckles):  I have two points I want to make.  One is following up on something Dr. Pine said.  Although the strength of the association between medication and suicidality is the same in the – in these data, the antiepileptic data as we saw in the antidepressant data, the rates of suicidality in the antidepressant was about – was about six times what we are seeing in the data today.  OK, so, that's one clarification there.

And I do want to make a – and the other comment is regarding the – we saw some new data today that were presented but weren't included in the meta analyses. And I think it's important that you know when we're looking at efficacy data or safety data, we use the (opruway) goal, the (opruway) analysis, and the (opruway) primary outcome that's been defined in advance before the studies began. And to start piling on new data that may or may not agree with the data that we agreed to look at to make a decision, that muddies the waters. I really – although it doesn't seem to agree – the data that we saw today doesn't seem to agree with the bulk of the data, I'd dismiss it at this point. I don't know, there might have been some other trials conducted by other companies that we didn't get those data, but the ground rules were set whenever these data – before the data came in, the agreement was we'd make a decision based on these 199 trials, not 202 or whatever the additional number is. That's it.

Male: Thank you. Dr. Katz.

Russell Katz: Yes, just something fast for people to think about or discuss it. A number of comments have been made today about how the signal is much smaller than it was for the antidepressants. But at least if you look at the odds ratio, it's basically two, which is what it was for the antidepressants if I remember correctly. It was four percent to two percent, versus here you know whatever it is, which is absolutely the (rates are). So, of course, that's a function of who was in the trial and what the placebo rates were. When you – when you get into the – if you believe – if you believe it's twice on drug what it is on placebo, you could translate that into and (folks) have (cited) from the audience whether – it's dwarfed by the background rate of depression or perhaps suicidality in the population at large – up to 20 percent depression rates this sort of thing and epilepsy.

But if its twice what it is on placebo, then maybe our rates are 40 percent on drug out there. So, who knows? So, I just – I wonder whether or not the fact that it's absolute – that the absolute incidence is much smaller than it was with the antidepressants really can be generalized to say while it's less worrisome in some sense. Just wonder what people thought.

Male: Dr. Rudnicki (first).

Stacy Ann Rudnicki: Given that some of the (benzodaisfans) are chronically used to treat epilepsy particularly (clonasopan) , how is that going to fit if there's a warning that comes out?

Male: As proposed, we would – our proposal was to include any drug that's approved to treat epilepsy approved to be used chronically. And again, I think there is some vast misunderstanding. I talked about it earlier today about why the word chronically. The whole point of that, and you could pick another word, the whole point of that was to exclude drugs that are used only very acutely, very intermittently where we thought the signal might not necessarily apply. So, whether chronically is three months or five years is a matter for discussion, but that was why we threw the word chronically in there.

But anyway, to answer your question specifically, those would be included by our proposal.

Male: Dr. Hennessy.

Male: If they have a claim, which some do.

Male: Thanks. One of the points that was recently discussed was should an equivalent relative risk in one setting to another mean that the risk benefit balance is the same in the two? And it doesn't. The risk that you get from a drug has to do with the risk difference. You know if you – if you double a very small risk, it's a lot different than doubling a big risk.

The other point I would put forward that just because an event happens to be fatal, doesn't necessary mean that it needs to result in a black box warning. There are plenty of adverse events I think – and somebody can

correct me if I'm wrong – that can be fatal, but don't occur with enough frequency or aren't well enough documented to result in a box warning.

Male:  Dr. Pine.

Daniel Pine:  So, two things.  First, just to respond to Dr. Katz and to make it explicit, my view of the data here, and I hope I'm consistent in saying this throughout the day, are that the strength of the – I view the strength of the association very similarly and I base it on you know whichever metric the statistics – the statisticians would tell us is the most correct one, but whether it's the relative risk or the odds ratio, that the data appear to me reasonably compelling.

And I would agree with the summary about 10 minutes ago from this side of the table that it seems fairly clear to me that there is an association here, that it is important, and that seems to me by far the easiest of the three main questions before us.  In other words, whether or not there is an association and it is important, I would say absolutely.  Does it apply equally to every group and every medication?  That's a tough one.  And what to do about it – that's a tough one.

But you know I'm not sure if it was the Dr. (Leona My) discussion, but I heard a fairly consistent opinion around the table.  I haven't heard anybody say that this doesn't look like a real association yet, and I think maybe if somebody felt that way, it would be good to hear why because I don't' feel that way.  I feel it looks like a real association that I believe.

Male:  Dr. Potter.

William Potter:  Perhaps Dr. (Piners) or someone else can remind us, people continue to say, "Well, this looks pretty much like except for the absolute numbers, but the relative risk and the patterns seen for the antidepressants and just sort of point of information since I should know this, but I don't recall.  Among the SSOIs if you looked at the relative risk for the odds ratios, were the patterns distributed essentially the way we saw here across a range of plus five when you take the European studies ((inaudible)) ratio down the minus 2.5, did the SSRIs really distribute across that same range?

Male:  I would say if anything the data more consistent here probably just because the numbers are so much bigger.  At least in the initial analysis, there were only 4,000 patients – right?  So that's you know ten-fold fewer patients now …

William Potter:  That's not the question.  What I'm asking is if you look at the plots that were used, and remember, here in this particular analysis, what I'm just trying to get at is by chance, is the distribution of odds ratios by chance because you have multiple drug classes and with the SSOIs you had the advantage of looking at one true biochemical class of drugs where we have a much better sense of what they do.  And did we get the same distribution of risk (and odd) ratios across studies?  That's what ((inaudible)) …

Male:  Ask Dr. (Lochran) to – I mean to …

William Potter:  Did they go down and above or did they cover that big a range?

Male:  Yes, if (Mark Stone) is here, he could probably respond with more precision, but my recollection is that there were at least – at least two antidepressants that did have an ((inaudible)) ratio less than one.  And perhaps he can help.

(Mark Stone):  First of all, we have to be clear about whether we're talking about the initial analysis pediatric trials or the second analysis where we looked at all ages.  Now, in the second analysis with all ages, it was shown to be age-dependent.   And there was an increased risk in the 18-to-24 age group, no increased risk in 25-to-64, and a reduced rate in under age 65.

The – looking at the 25-and-under, and you can pretty much say the same thing whether you include the pediatric or just the young adults, you see a pretty consistent effect across classes. We're talking SSRIs, SNRIs, tricyclates, drugs that don't fit in like (euproprian) and what have you. The numbers certainly vary from drug to drug in terms of their point estimate and the odds ratios.

What's interesting and it's not – wasn't published is that in some additional analysis, the slope of change with age was very similar in all drugs regardless of whether the overall risk was higher, well, which kind of says that for this particular drug, there was a therapeutic effect that lowered the overall risk, but you still saw the age dependency, which was the effect that we're associating with suicidality and that ((inaudible)) a higher basic risk because you were dealing with patients that were you know – the refractory to the – to the drug or the drug was just less effective in terms of treating depression and suicide associated from depression rather than the drug.

But I think there was an extremely impressive consistency in the age dependence of the effect, that you were always seeing more suicidality for drug relative to placebo in younger patients than in older patients.

Male: But Mark, in answer to the actual thing that's worrying Bill, there were drugs that were below the one line and there were drugs that were further above the one line than some of the others. And it made no pharmacologic sense. It just reflected the variability of the data. But, again, this was a – this was pooled analysis with 4,000 people in it. That's ((inaudible)). Well, the adult, one to 70,000. But on the – on the pediatric, it had 4,000. But there was a similar kind of scatter, which is a small numbers issue probably. I mean who knows, but ((inaudible)) …

Male: And again, if you look at all adults where the point estimate was, like, .86 for all adults you know which – and class by class, they were all, like, between .83 and .90 class by class. Drug by drug, a lot more variance.

Male: Yes, ((inaudible)) that's very helpful because what I was trying to understand and to get at was the class versus the individual and what is one's confidence or not that this data does or does not suggest that there are – might be differences between drugs. And it's so hard to figure out. I mean this is a big dilemma.

Male: But it's worth emphasizing again that in the – in the antidepressant situation, there were different pharmacologic classes, as well. You know we've been talking about will antidepressants there vary. They all have a common mechanism, but in fact the signal seemed to occur across pharmacologic class to the extent we ((inaudible)).

Male: That's why I ask among the ((inaudible)), however you classified it, were the spreads observed just within that subclass because there you have five or six. And if it did, then that just tells you it's just – you know it's just the numbers.

Male: Yes, for example, again in ((inaudible)) analysis, (certraline) was pretty low, (floxene) was fairly low, (satalipam) and (esatalipam) were on the high side. And that's just all within the (SSRI) group.

Male: The results varied by study. I don't know if you remember this, but the first three studies we had of Prozac were all sort of below the line, and then along comes the NIMH study and that brings it way above the line. Nobody can make sense out of this. And you are looking at very small numbers, which is why we put the data in a pooled way because the individual cases don't have enough.

Male: Dr. (Chaplain).

(Nicole Chaplain): Yes, I'd like to address the point that Dr. ((inaudible)) made about the association of the two antiepileptic drugs and suicide. So, I don't want to sound simplistic, but yes, there is evidence for association, but that really doesn't mean cause – just association. And I'd like to bring up again the issue that epilepsy colleagues here have very clearly shown prospective data on patients with epilepsy with high

rates of depression, suicidal ideation, and that were unrelated to antiepileptic drugs. And I'd think that that is prospective data, whereas the current data that we're reviewing is retrospective data.

The other point I want to make is which at least in terms of what Dr. Goodman was talking about, trying to under the mechanism. The situation here is very different from the situation with the antiepilepsy – or antidepressant drugs, you've got very different classes of drugs here. They act by very different mechanisms and it's very difficult to use these different mechanisms as the explanation for an increase in suicidal ideation in a very, very small substate of the sample. And again, what I'd like to suggest is that the – at least in terms of patients with epilepsy, the biological aspects with the increase in depression and suicide need to be looked at prospectively. And given that the other two populations, the psychiatric patients and the patients with pain, et cetera, all have high rates of depression. I really would hate to have a confounding variable here that we're not considering despite placebo (fix).

Just want to add something about the placebo – the placebo. At least in terms of the patients with epilepsy, if you're looking at monotherapy versus polytherapy, we do know that polytherapy can increase adverse cognitive and behavioral side effects. The patients who are on placebo weren't exposed to that, so it's not the exact same trial.

Male: The difference – if you're addressing that comment to me, I'm assuming, the difference, though, is – the only difference between the two groups, I mean, maybe both groups got polytherapy, but one of them also got an additional antiepileptic and another also got placebo. So, the only difference between the groups would have been adding on one antiepileptic versus one placebo. And I think with that, we can look at causality. And I'd look – I'd rather look at retrospective clinical trial data, randomized control clinical trial data, than prospective observational data. I mean there's a big advantage to prospective designs now as we can build them better assessment tools, but I really would like to have randomization.

Male: Dr. Sean Hennessy: Can I just say one thing, though? But I do think that these prospective studies did have very good tools, so I think that's an important issue. In other words, it wasn't just subject reporting, but these questions, specifically suicide, depression, et cetera, were very specifically addressed.

Male: Thank you. So, arguing for causation is randomization, which gets rid of confounding on average. And the fact that across the different measures, there's consistency. On the other hand, we have small numbers. For completed suicides, we have zero versus four and the group in which the four occurred was larger than the group where zero occurred. And we have one meta analysis of randomized trials that weren't designed to look at this. So, there's reason to have cause in jumping to a causal conclusion even though they are randomized data. The data ((inaudible)) early at this point. I suspect that additional data will be forthcoming and I wouldn't want to jump to a black box warning before the data are convincing and before we have enough data to make that assessment.

Male: Yes, we're going back and reviewing the trial experience which is I guess the only experience of this sort that we have had. I think we should be a little bit careful in doing so. Number one, it's an entirely different group of patients, starting with a different condition all together. Now, just to go forward there a little bit, the fact that even the risks are similar in the suicidality between that type of data and this data in entirely different groups of patients and entirely groups of medications, ((inaudible)) makes the whole situation more complex. ((inaudible)) exactly what is it that we are identifying whether the actual methodology employed is confusing to what we are observing. So, I think I should – we should be a little bit careful in continuing to make these comparisons.

Male: Dr. Gilman.

Sid Gilman: I was going to say something similar to that, but it's a little different so I'll go ahead. I don't think it's very helpful to go back to compare a previous trial or a previous set of data with respect to antidepressants and suicide risk. And also one never has the perfect trial. We have what we have before us. And I think what we have is a very interesting data set; that is, we have the advantage of a large placebo

population and a large population of people who were treated in a randomized controlled study. And that has given us a signal. That's true.

It's not perfect because not all of these individual studies were done with the same number of patients, nor were they done with the same drug. They were done with different drugs that have different mechanisms, but they were aimed at more or less the same indication, that is epilepsy or a psychiatric disorder or another indication. And that has given us a signal. It's a very clear signal to me. It varies in power between the individual studies, but nevertheless it has the tremendous advantage that there is a placebo controlled group along with the active group. And I think that is to me the most important aspect of this data set.

Male: Dr. Leon.

Andrew Leon: I agree with Dr. Gilman. I do want to make a comment on what Dr. Hennessy said. I think it would be years, maybe a decade or more, before we had another 43,000 subjects enrolled in clinical trials to add to this body of data. So, although it would be nice to have three – four times as much data here, this is a big – a big data set which we will probably never see anything like this again to address this question. So, I wouldn't – I wouldn't want to wait for a couple more trials to come in.

Male: Dr. Temple.

Robert Temple: Just a couple of things that have come up. We are accustomed to concluding when you have a result from a control trial that any effect you see is causal. We are constantly encouraged by people (of) the label to use the words "associated with," but not for control trials. That – the whole point of them is to reach a causal conclusion within the limits of the data.

The other thing I just would like to mention is that one of the things I worry about with meta analyses is that you frequently know what the result's going to be before you do it because you've seen the large trials that you're putting into it. That is one potential bias that this analysis did not have. We went looking here without knowing what the result was going to be. So, there weren't 25 hypotheses or anything like that that we went scattering about. This was the one thing that was being looked for and that's not a common feature of all meta analyses. So, I just wanted to mention that there's one bias that this didn't have.

Male: Other point to this – yes, Dr. Lu.

Ying Lu: Yes, for me the ((inaudible)) data really different from the people who take our – who take care of patients. I've heard a lot of comments from professional associations this afternoon. So, I'd like to hear also from clinical side about a clinician so FDA about practical implication. And also what our concept ((inaudible)) if later on ((inaudible)) a call for research for this topic, if you could define that biological mechanism that takes place partially the reason who often will FDA go back to revisit black box ((inaudible)) or I mean is that will be your last ((inaudible)) or I mean what did other consequences here that we're talking about.

Male: I didn't hear the last part about the – can – was the last part of the question can …

Male: How ((inaudible)) updates was the new knowledge?

Male: Oh, updates, yes. Well, again, as I mentioned earlier, we all know how to do it. And as Bob has said on several occasions, it's difficult to get a labeling statement removed in particular a box warning. Things look better in the future. We – one could argue, well, the box is working. So, it can almost be circular. So, but, I guess one view is you continue to get data – maybe better data. We've been talking about how to prospectively or contemporaneously during trials get better data. And I suppose it's possible if we got a large enough cohort of data that we really thought was you know prospectively collected and then analyzed again and there's absolutely no signal, I supposed it's possible we could look back and say, "Well, we did the best we could at the time, but the data capture was so poor and variable that that's what gave rise to what we

now think would be a sperios result.  So, it's possible there are – there are ways to amend labeling, but it would be difficult and it would probably take a while as Dr. (Lan) said.  It took a while to get this sort of a data set.

Male:  We did amend the antidepressant box. , both adding the adult data, which depending on how you feel about it, softens it or strengthens it.  But also took note that suicide and suicidality are consequent of the underlying disease reminding everybody that there's something to treat.  That was at least in part to the same kinds of worries that people have expressed today.

Male:  Right, and ((inaudible)) amend language and that we do – we certainly do amend language when it comes to our attention, for example, that there is an unintended consequence that we think we could prevent with amending the language.  But the fundamental finding is – and it's description is hard to – it's hard to reverse.

Male:  Dr. Schultz.

Susan Susan Schultz:  Well, we've been talking a great deal about a neurobiologic mechanism but I'm sitting here thinking of the complexity of suicide and how we know clinically it's driven by social, environmental, cultural factors, access to alcohol, et cetera.

So I'm curious as to other's insights on the compelling finding that this–that the data were driven by the non-North American studies.  And I don't know from an epilepsy management standpoint if there might be cultural differences that might be adding to this finding.

It's a major finding that we really haven't brought into the discussion.  And again, how that might even effect the labeling and communicating this information, that's a strong finding that we might want to communicate.

Male:  Comments about that?  No?  Dr. Malone?

Richard Malone:  I don't have a comment about that but it was really about labeling and changes.  I mean if you think about the label for anti-depressants, it already had a warning about suicide in it before the black box was added.  It was an old warning.

So you know in a sense, you took that warning and stepped it up.  Here there is–I don't think there is any warning in most of the anti-epileptics about suicidality.  So any statement would be you know a stepping up or a changing of the warning, which was not true for anti-depressants.

Male:  Dr. Leon, I think, did you have a hand up?

Andrew Leon:  I'm going to follow up on, I forget whether it was Dr. Temple or Katz, just said.  I think it's–have you considered including, it was Dr. (Katz), including something to the effect that untreated epilepsy pain, mood disorders themselves are risk factors for suicidality in the black box?

Russell Katz:  I don't know if we've had that language in the box that we proposed in the package.  We probably didn't.  But certainly, it's something we would consider for sure.  ((inaudible)) was in the anti-depression.

Male:  I think we've had a great discussion.  I think what I'd like to do now is, let's take a 15 minute break, we'll come back at five to three.  And when we come back, what we'll start doing is really trying to attack each question separately and in turn.  I remind again the committee, no discussions about anything related to what we're talking about.  Thank you.

(BREAK)

Female:  We are about to continue.

Male:  This is your one-minute warning.  OK let's go ahead and reconvene.  Dr. Schultz had raised a question when we left, and – about the comparison of North America versus the rest of the universe data. The FDA does have some additional analysis that they can show us about that before we go on.

Female:  As I discussed in my discussion slides and as also was brought up by Dr. Schultz, there is (little bit of) difference in the said groups according to location.

I mentioned in my discussion that that was something that could be attributed to a lower event rate in the (profuberil tree) of non-North American subjects.

Here we have the exact numbers as was shown during the discussion presentation.  The non-North American subgroup had an estimated odds ratio of 4.53 with a 95 percent confidence in a (role) of 1.86 to 13.18.  And the North American subgroup had – and as we share estimates that was (1.38) with a (continents) and ((inaudible)) 0.90 to 2.13.

On this slide we have a table that shows events according to treatment arm and location and placebo controlled trials.  And as you can see, the comparisons between drug and placebo in both the North American and non-North American subgroups are qualitatively similar for the suicidal behavior events mainly completed suicides, suicide attempt and preparatory acts.

However, you can see that they are – the results are different for the suicidal (ideation) events.  In the North American subgroup, suicidal (ideation) in drug versus placebo was nearly identical.

However, in the non-North American subgroup, the number of suicidal (ideation) events was very different. And it is important to note that the rate of events was much lower in both groups, but is notably lower in the placebo group.

And that was the main category that was driving the difference in estimate (odds ratio) between the two subgroups.

This table breaks down suicidal behavior or (ideation) event rates and risk differences by treatment on a (markation).  And it doesn't differentiate in this table between suicidal behavior or suicidal (ideation).  But as you can see as a group, placebo patients with events had a much lower event rate as compared to the other subgroups.

Other characteristics were similar in North American and non-North American trials.  They included trial indication groups.  The proportion of trial indication groups, age, gender, race, and treatment setting.

Of primary concern I think is the question of whether given these differences between the North American and non-North American subgroups, whether our methods can ((inaudible)) and reproduce, recapture suicidal (ideation) between the two different locations.  However, in comparison, suicidal behavior events were much more consistent.

In addition, you know the ((inaudible)) just was so very general overview of other differences between North American and non-North American locations that may be contributing to these differences.

We can open up the ((inaudible)) discussion or I can stay here and take questions, either one.

Male:  Yes.

Male:  Maybe I missed it and I missed your first slide or two.  But did you show the indications by North America, non-North America?  I mean could that – maybe where they are …

Female:  Well the proportions of trial indication groups were similar when I looked at North America.

Male:  OK so there wasn't more …

Female:  No there was not …

Male:  (Bipolar disorder) …

Female:  No.  There wasn't really any ((inaudible)) difference.  And just …

Male:  But it would be of interest to look at those rates in the two subgroups.  Because they were so – I mean rates are so different in the epilepsy and other group, it would be interesting to have a four-part table that showed epilepsy other, North America other.  Just …

Female:  Sure.  And just to allow the community to know where to find that data in the briefing package, it's in the clinical review on pages 44 to 46, and then also on page 52.

Male:  For a non-North American trial, who translates, or is there translation of recorded adverse event into the text streams that you search for, and how is that done?

Male:  I don't know if (we) know – we didn't do the – this was all done by – this was all done by the sponsors.  I said before, the primary work of identifying the cases, categorizing them by the Columbia Scale, the translation if necessary.  It's all done sort of opaque to us.  It is all done by the sponsors.

And that would seem a possible systematic difference, right?

Female:  Yes.

Male:  If whoever is performing the translation chooses terminology that is different or distinct from that which is spontaneously recorded by North Americans, then it doesn't show up when you look for (ideation).  But …

Female:  No, we didn't give specific instructions about translation – about – doing it – yes.

Male:  Very good.

So, what I think we'd like to do now, is to turn to the specific questions that we were asked to discuss.  We really talked a lot about many of the issues, if not, all of the issues, that these questions address.

As we go through them, though, I'd like to sort of take each one, in turn, the – each question in turn and just sort of conditional on the one before – what the answer to the one before doesn't dictate the answer to the one that follows.  So, the – can we have the – can you have the questions up there or not?

OK, let's put question one up.

So, the first question is, "Does the committee agree with the agency's overall finding of an increase in suicidality for the 11 (AED's) analyzed?"  And, the real crux I – crux of the question is, do we think that there is a signal here?  Is there a signal?  Again you know don't think about where this is taking us on later questions, because we could answer "yes" now, and have something else later on.  So, don't jump to "yes" here and question four, therefore we're not you know – so – each one is conditional, but the answer to one doesn't dictate the answer to the next.

So, firstly, do we think that there is a signal? And, again, before we have a just general discussion, I'd like, again, the statisticians to just make sure we have them online about this – are there issues related to the analyses that were conducted, or the other information we heard public comments on that would alter that in any way – anything technical with the way the analyses were done that you have – that you have issues with?

Male: I think I'm OK with all – with – after the discussion, I think – I concur with the analyses. I put more weight on the – on the risk difference kinds of analyses and I think we've heard issues with regard to separating out the suicidal categories into behavior versus ideation. And I – and I put a fair amount of weight on the – on the behavioral aspects.

Male: Dr. (Ewen).

(Ewen): Yes, I don't have anything more to add. I agree with the way it was done and I focus more on the risk differences.

Male: Dr. Lu.

Ying Lu: Yes, I don't have anything to add. I think the analyses won't chance.

Male: OK.

Dr. Katz, I just want clarification.

What we're trying to get at here is whether or not you think there is an overall signal. It says for 11 AED's. There's a subsequent question which asks, if you think there is a signal, to which drug do you think the signal applies.

So, I don't want you to be distracted by that 11. This is, is there an overall signal? Is –

Male: So again, the question is, given the information that we have based on the analyses that we're presented, personally, are they valid? Are there technical issues with the way it was done that the statistical members of the committee have an issue with? And, the answer to that, from what I'm hearing is "no."

So, given what we have, then the next question is, do we think that there is a signal? Again, forget about the 11 AED's analyzed, part of this. Do we think with the information that we have here that there is a signal?

Comments.

Dr. (Yelman).

(Yelman): I've made two previous comments, and my answer is yes, there's a signal here, given the rationale previously. So I won't repeat it.

Male: Dr. (Chaplain).

(Nicole Chaplain): Yes, I'm going to repeat what I said before, but maybe a little better.

I still am concerned that with (apnea), what the rate of (depuration) was in treatment on and amongst the patients who received placebo. We have problems coming to the conclusion that AED's are, in fact, the cause and effect of suicide or ideation.

Male: Comments about Dr. Caplin's point.

Male: Yes., if she's going to repeat, then I will repeat.

We had placebo controlled groups to compare with patients who were seen as having active suicidal ideation. Therefore, I think that we do have very good data – a very good data set here.

((inaudible)).

(Nicole Chaplain): I agree that the data is good, but I think that the conclusion that the causality of AED's is problematic if we have a high rate – much higher rate of depression amongst the treatment (arm) versus the placebo (arm).

Male: Can I make a comment here? I mean, there's no –

Male: Let's go – let's go –

Male: As I understand it, there were no baseline differences on depression or any of the other – or suicidality. I don't know if we have a measure but, there is no reason to believe that there's any difference between the two treatment arms with respect to baseline measures of suicidality or any other psychiatric phenomenon that could be related to it.

(Nicole Chaplain): Earlier this morning, I heard on the news that Christians are often (left) with no data available for baseline.

Male: No, we do not have data directly on baseline depression. But, everything we do have data on shows that the randomization in the trial seemed to work, that there were balanced treatment groups in everything we did measure.

So there's no reason to believe there would be a poor randomization for this attribute.

Male: Dr. Leon.

Andrew Leon: Yes.

Male: Particularly with 43,000 subjects being randomized, if we had 43 subjects being randomized, we might expect some imbalance. But with 43,000, it's randomized in 199 trials. I wouldn't expect imbalance on an unmeasured variable. It wasn't unmeasured, but one unavailable to us.

Male: Yes.

Dr. Winokur.

Andrew Winokur: I'm going to jump in an agree and reinforce the comments that several people have made.

I think imbalance – this is a significant data set because of the really large number of studies in population and the placebo-controlled design. There clearly are some potentially confounding factors, but I think the fact that we're strictly looking at randomized placebo control trials results in our seeing a signal that I think is an important one, with a field to deal with.

Male: Very good.

(You're) of an analyst.

Any other committee members have any other points or – yes, sorry, Dr. Henderson.

Dr. Henderson: Thank you.

So, as the question is worded, I would say yes. But suicidality actually isn't found in the dictionary in (form) one that I just looked at.

It's not in the dictionary. Thank you. So, if you ask the question, "Is the rate of suicide different, it's not statistically different. It's four versus zero and the sizes of the denominators are different. I agree that suicidality and suicidal ideation points to a potential problem. But the thing that we're really worried about, suicide, which is the fatal event, has a suggestion for an increased risk, but it's not statistically elevated.

Male: And I think that gets back to the issues that were discussed with the depression – with the depression drugs. I think this is an empiric definition of how they're – what they're calling suicidality. And it's operationally defined.

Yes, Dr. Schultz.

Susan Susan Schultz: Just briefly to clarify the question, you're asking for a concern about in increase in suicidality based only on these up to 24 week – roughly – trials which you know as was alluded to earlier, represents sort of an acute (perturbation) of the system. Are you asking simply about that? Or, whether we think that is relevant to all anti-(epileptic) treatment, overall, which we know is chronic therapy over years of time.

Male: That's a later question.

OK? So, again you know we're going to do each one of these separately. And again the answer you know, if we say – if the committee votes – we think that there's no signal, the rest of the questions become moot. If we think that there is a signal here, then the next one is to start addressing some of the – some of the other issues that you so appropriately bring up.

Susan Susan Schultz: OK, so the signal question is only about the acute trials, period.

Male: Each one separately.

The next is conditional on it, but it doesn't dictate the answer on the next.

OK, so, having – I'm sorry – any other discussion?

Yes, Dr. Armenteros?

Jorge Armenteros: One point.

We're not implying – or maybe we are – causality? Clearly implying causality. Is that correct?

Male: The – I think that the first question is, is there a signal in this group? How one interprets it is a causality, is a related, but not the same question.

Jorge Armenteros: But I heard the FDA to say maybe they'll restate it, is, if an association's observed in a randomized controlled trial, by definition, they view that as a causal association. Or causality. But maybe you want to restate that?

Male: No, I think that's right. I think in control trials, you see a signal, it's physically significantly different from placebo. That's operationally defined as causality.

Jorge Armenteros: But once you rule out bias error and other inconveniences.

Male:  And you know the difference between, I think, and answer, for a prospective randomized trial and what we're looking at here is that these trials were not prospectively randomized to test this question.  So this is an observational analysis that nested in a series of randomized controlled trials that we're analyzing.  Now, whether one concludes that this is causal or not, I think, is open to debate.  That the bottom line is, this is the data we got.  These are the results.  Do we believe the signal?

Female:  but that has got to be two separate question.

Male:  Yes, can I – we're interested in whether or not you think when we use the word, signal, whether or not you think there is a statistically significant increase in episodes of suicidality, which, to us, we interpret that as causality.  We should be very clear that the trials were prospective trials.  They were randomized trial.  Data were collected contemporaneously prospectively.  The trials were not designed to specifically solicit information or elicit information about suicidality, necessarily.  Some probably were, depending on the indication.  But they weren't globally, specifically set up to capture that information.

So, but the information that was captured, was captured the way that information is captured in clinical trials, contemporaneously and you can think of that as prospectively.

What was done retrospectively was the manipulations after that, which were searching the database and categorizing them into these categories.  And the analysis has been – the (med) analysis has been (said) before – was prospective.

We set up a hypothesis.  We set up a primary outcome variable.  And we set up a method of analysis before we had looked at the data.  So, much of this, in a sense, is quite prospective.  They just weren't set up to capture the data, perhaps, in the best possible way.

Male:  Yes.

Female:  You know as I understand the discussion that we're having you know we're dealing with the question whether there is causality. And we do have a statistically significantly increased result for the class of anti-epileptic drugs.  And, as I understand it, most people consider that causality.

But there's a separate question of generalizability.  There's several issues with these trials that may make one question about how generalizable they are, namely, that several of them have exclusion criteria, which – including history of suicide attempts, suicide risks, substance abuse, personality disorders – which makes us how generalizable we are, and how we might use the data.  And that (stuff) a very relevant question.

You know also the issue that has been brought up several times was the short (turn) of the data is also something that we need to look at to assess how generalizable it is.

But, to me, I think that is a slightly different question from whether it represents a causal association.

Male:  Dr. (Chaplain)?

(Nicole Chaplain):  If I could get a decent explanation – so – really the outcome measure, which, in this case, is suicidal ((inaudible)) behavior ideation, was – as you – as you indicated, with collected – it was actually collected retrospectively, but looked at prospectively.  So the study wasn't a study that was designed to look at suicidality as an outcome measure.  And I think we really need to clarify that.

Male:  I think that that's, hopefully, clear.  That, again, this is a retrospective (talk) clearing of data that was tried to be done in as reasonable way as is possible for these types of analyses.  But the studies weren't prospectively designed to test this hypothesis.

Male:  But, before we leave that, the meta-analysis and the – was planned to study only that.  There wasn't a scatter shot look through any conceivable association.  It was directed at a particular thing, which means it was prospective.  Although, the studies were designed for something else.

Male:  Dr. Gilman?

Sid Gilman:  Actually, this question has been raised.

I think we should direct our attention to the group page eight, table one.  It's suicidality events in (code).  And some question about what suicidality means.  You I think it's very clear here, from the coding.  It goes from seven, not enough behavior.  Not enough information, six.  Not enough information to think of.  Self-injurious behavior is number five.  Suicidal ideation.  Number three, preparatory acts towards imminent suicidal behavior.  Two, suicide attempt.  Three, completed suicide.  I think that essentially defines suicidality as indicated here in this data sat.  and I think the idea is that there is a sequence of events leading to actual suicide.  And that suicidal ideation is a serious event, as is suicidal behavior.

Male:  Dr. Henderson.

Henderson:  I just want to spend a minute or two on causation or non and randomized versus non.

Except for mathematicians who prove things by theorems, the rest of us work by inference.  And, while I'll agree that, in generally, you can make stronger inferences from randomized studies than from nonrandomized studies, that it's not an all or nothing thing.

Randomized trials do not prove causality.  Nor is it the case that you can never draw causal inferences from nonrandomized trials.  So we're always making inferences.  So I don't think it's as simple to say, because it was randomized, and there's this statistically significant association.  Therefore, we approve in causality.

Male:  Dr. Jung?

Lily Jung:  I think, along the same lines, I'd like to hear from our statistician colleagues, whether or not – having that signal point is the same thing as causality.  Because I'm still struggling with that.

Male:  I can offer my view.  I think, anytime you look at a study, you – and you see an outcome – and it's a positive outcome – there are really four explanations.  And only four, for the difference that we see.  The difference could be the way we handle the patients over time.  Could be the way we made the assessments.  Those are two reasons.  It could be a real difference.  And that's what we're looking for.  And at the end of the day, what we do as statisticians – it could still be chance.  So, chance is always on the table.  And that's the five percent – the less than point 0 five kind of thing.  So that's always there.

So, I think what we've done with a study like this – if we take care of the first two reasons, which randomization and objective assessment and so forth really help us with, then we're really down to a really difference versus chance.  And then, right now, we're saying the chance of this being a chance outcome is so small that it's very, very unlikely.  So, I think you know that's still is not perfect cause.  It's not 100 percent, but you're never 100 percent, unless we go to infinity with sample sizes for things.

I guess – I want to make one or two other comments, if I could, just about randomization.  Even though we don't have some of the factors measured we'd like to have reported here, any other measured.  But, the nice thing about randomization, when done well – and Dr. (Ludison) has told us that it was done well in these 199 studies – is that you will get balance on the measured factors as well as the unmeasured factors, on average.  And that really is the beauty of randomization.  And, if in fact, you did pick a particular variable based on (random) and do a comparison.  And if I found there was a statistical difference, I don' think you can make too much of it, because the reason for the difference – it's chance.  That is the explanation because I assigned individuals at random to receive these treatments.

So I think that the randomization and you know on average aspect, as Dr. (Leona) would say – when you have 47,000 individuals, it really gives us a lot of comfort for some of the issues.  And I think they're legitimate issues to have on the table.  But I think there's a method of logic strengths here that really help us enormously.

Male:  Dr. Lu?

Ying Lu:  Yes, just trying to clarify, technically, when you say cause or effect, if it's conditionally on treatment minus conditionally on entry, given everything else is cause.  So, randomization is the only (meta) reason that can wash out everything else equal.

And, it doesn't mean the case control studies or the prospective studies cannot prove the relationship.  But, it's hard to argue about cause or relationship that a clinical trial can.

And, so for this one, I think there are potentially the condition within each treatment, which basically, the difference may come from the treated and (untreated).  Now there may be bias.  A similar study may contribute more than the others because of the weight, also, and the difference of the risk factor.  But also the variation of the study.  Or, in another way, when we put zero there, it's real weighted on the randomization size.

So, in that case, the (serious) study may control more than the other.  But if you believe there is a common – there is no way to distinguish among studies, and there's a common factor, then the way that (destiny) should be advised in the sense that the (coach) told the truth.  You know, that's to the limit of the data that we have.

Male:  Thank you.

And, Dr. Day?

Ruth Day:  Two things to say.

First of all, I think the question is very simple:  Is there a signal?  There are two groups.  Things were done with the data.  Data was collected.  They were analyzed.  Is there a signal?  Is it statistically reliable.  And I think the answer is yes.

So, this whole discussion of causality, of course, is really important.  But I don't think it needs to be addressed in this first question.  It certainly will be later.

And I'd like to – my second point is, the concept of causality causes lots of causes, lots of problems in a lot of settings.  And, it's – partly because it sounds so all or none.  It does, or does not.  And so, we use terms like relative with or associated with or is consistent with.  It downplays it.  In many settings, in everyday life, people don't want to step up and say causes.  And I would just point out that, even within the FDA documents presented to us of things we might take action on later, in the proposed medication guide, which we're not discussing now, but it does say, "This medication may cause suicidal thoughts, et cetera, et cetera." So that's one way of saying it.  Yet, in the public health or the information for healthcare professionals, it's already been posted.  It says what it says.  And then there's the boiler plate language at the bottom, "Posting this information does not mean that FDA has concluded that there is a causal relationship between the drug product and the emerging safety issue."  So, it's partly a linguistic problem.  And I don't think that's part of question number one.

Female:  I just wanted to mention that the reason for that disclaimer was because we issued that back in January when we had just finished the analysis and we were still – we were still sort of – we were still reviewing it and it was still considered preliminary at that time.

And so, that wasn't you know I think there are probably lots of examples of inconsistent language in our proposals in terms of causality.  But, that specific disclaimer is because it was preliminary, rather than because we –

Ruth Day:  So you're more comfortable with saying causality now?

And I withdraw the question.

Female:  I am.

Male:  We're unequivocally comfortable with using the word, the "C" word with saying that this establishes causality.  Again, we've talked about this a fair amount.  We – this is how we determine causality.  This is how we base our findings of effectiveness.  With drugs, we do randomized trials.  We analyze them in a – prospectively.  We have an outcome measure, and if it's statistically significant and different from placebo, we say the drug caused it.  You hear there are you know once you rule out chance and fraud and bias and that sort of thing, which we think we've done here.

So, yes, we're quite comfortable with saying there is causality.  And you mentioned the med guide where we said this drug may cause.  That's – that was, of course, predicated on the view that we had concluded that the drugs caused this.  That's a – that's a document given to lay people.  And, we said may cause because, even though we've established causality doesn't mean it causes it in everybody.

So, we say, well, it might cause it, or it may cause it, in a particular person.  And that was the implication.  But it wasn't meant as, step away from the conclusion that the drug was responsible, in most cases, where it happens.

Male:  Probably here to say can't, by the way.

OK, I think we've had ample discussion about the point.  I think we know the question that's before us, based upon the data that we have available.  Do we think that there is a signal?  OK?

So, having – the question, itself, though, is written up there, exactly in the text that we're voting on.  But that's the – that's the aim of what the question is trying to get at.

Now, for those of you who are on the panel, we've had – there's a new way of voting.

We used to go around the table and everybody voted yay or nay.  We still need to do that.

But, what we're going to do first is have – is have voting, without knowing what your neighbor thinks.  So, there's this little button on your gizmo, here.  It says, "Yes," "No," and it's flashing all sorts of colors now.  So, what you do is, you press "yes" or "no."  and then, once that's done – or abstain – sorry – and remember, some of the people on the panel are nonvoters.  So, do they press "abstain" or not vote?  Don't touch a button?

Don't touch a button.

Do something really bad.

OK, so, for the voting committee members, please place your votes now, and they will show up on the screen.  And then we will go around because we still have to do it the old way, as well.

Female:  Will it stop flashing?

All right.  I don't know what it does.  Does it stop flashing?

((inaudible)).

Male:  How do we know – how do we know when it's done?

Male:  OK, and when are you going to tell us when to stop pressing?

Male:  OK.

There we go.

OK.

I think what you have to do is, even though that's what – the way it shows up, is that we then need to go around and have everybody vote orally to affirm that that's what their vote was, just in case there's a short circuit here. Or that – seen people that are doing the voting in Florida run this thing.

Female:  I need to read the results in for the record.  On question one, there were 20 yes, one abstain and zero, no.

Male:  Dr. Schultz, let's just go around.

And just say your name and how you voted.

Susan Schultz:  Susan Schultz, yes.

Anderson:  Anderson, yes.

(Patson):  (Patson), yes.

Ying Lu:  Lu, yes.

Richard Malone:  Malone, yes.

Matthew Rizzo:  Rizzo, confess.

I'm the guy who abstained, and it's because I still don't understand the question.  And, I would vote yes if the question were worded – that there's a statistically significant association – or a statistically significant increase in suicidality.

But I cannot vote yes if the issue is causality.

Male:  Very good.

Andrew Winokur:  Winokur, yes.

Andrew Leon:  Leon, yes.

Robert Woolson:  Woolson, yes.

(Ian):  (Ian), yes.

Delbert Robinson:  Robinson, yes.

Larry Goldstein:  Goldstein, yes.

Goldman:  Goldman, yes.

Andrew Winokur:  Winokur, yes.

(Kilerman):  (Kilerman), yes.

Sean Hennessy:  Hennessy, yes.

(Grayforts):  (Grayforts), yes.

(Partmencuris):  (Partmencuris), yes.

(Jayne):  (Jayne), yes.

Male:  Very good.

So, on to question two.

Question two – to read it, and then I'll hopefully translate is – Does the committee agree with the agency's conclusion that the finding of increased suicidality should apply to all drugs included in the analyses, despite the observation that the estimate of the odds ratio for three of the drugs was below one.

If not, to which drugs should the conclusion apply?

So, this is getting at the issue of generalizability.  And we've also discussed, in some of the give and take that we've had, about drugs that have these properties of being anti-epileptic drugs that aren't in the analysis at all.  Or, drugs that may be developed in the future.  Trying to prove a negative in very rare events is virtually impossible.  So, what they're looking for here is that guidance.

Should this be a generalizable conclusion applied to all anti-epileptic drugs, or that drugs that have anti-epileptic properties.  The only other proviso is that word, "chronic."  And, what does "chronic" mean?

Dr. Leon.

Andrew Leon:  you know, I – as a point of clarification, there are only two – there are only below odds ratios below one.  One of them was undefined, and the other – what ever is left, eight – were above one.  So we could either – we should either say, all but three were above one.  Or, two were below one.

That should be correct.

Female:  Excuse me, Mr. Chair.

I disagree with your interpretation of the question.

Male:  OK.

Female:  You were talking about this extending more generally.  I think this is still restricted to the 11 drugs in the study, and that the misleading word in here is "all."  And so, if we take, in line two, and make "all" "each."  So, does the conclusion – define an increased suicidality should apply to each of the drugs included in the analyses.  And I think it's then, in questions three when it's applying to other ones that were not studied.

Male:  That's perfectly fine.

Female:  Thank you.

Male:  Not a problem.

Dr. Gilman?

Sid Gilman:  Mr. Chairman, I have another question to what you said, but not what is written here.

You said, "apply to drugs in the future."  I don't think that should be part of this question.  It's not written here.

Male:  We can do that in question three.  That's sort of what they're trying to get at, there.

Male:  this isn't (trying) to address just the 11.

Male:  Just the analysis that we have before us.

Male:  Just the drugs that were included in the analysis.

Male:  It's about what to do with the diversity of responses in a situation like this.

Male:  So everybody clear?

OK.

Dr. Henderson.

Henderson:  Yes, I'd like to make the point that when you say that the results apply, we're really talking about an assumption.  So there are a couple different things you can assume, either in the absence of data, you can assume that any particular drug hasn't been shown to be dangerous, is not.  Or, you – or, on the other side, you could assume that all the drugs are the same, unless proven different.

For a safety concern, the conservative thing to do is to assume that all drugs in a particular class and what – that the (pharmacological) class, that their in class – share the same risk, unless proven otherwise.  That's a reasonable assumption to make in a safety context.  But I think we should be clear that we're making an assumption and that we're not able to use scientific reasoning to make the inference that each one of those individual agents is – has an increased risk.

So, we're making an assumption from a public policy perspective.  But what we'll do from the label, but the data aren't – I would say that the data aren't there for the individual drugs.

Male:  Thank you.

Dr. Pine?

Daniel Pine:  I – so two things.  One thing, just to second what Dr. Hennessy said.  From the safety perspective, I think we have to look for the presence of data to suggest that we should do something unusual with one or another medicine, that we single it out as particularly good, or particularly not good.  And in the absence of statistical evidence from a safety standpoint, I think it behooves us to not single something out unless the evidence is there.

The second thing is, I want to come to the point that Dr. Temple made – that I think it is a good trend in recent communications from the FDA – that there is an emphasis on data.  And, particularly, alerting the field to the (posity) of data.  So really thinking very carefully about how exactly limited the data are in terms of saying anything specific about any of the 11 medications, would be really important.  You know to get across, again, in data, the scatter that you see.

Male:  Dr. Rizzo, you have your light on?  Did you need –

OK.  Cool.

Other comments.

OK, is everybody – if everybody is OK, then I think we can move that one to a vote.

So, again, the question is – does the committee agree with the agency's conclusion that finding of increased suicidality should apply to all, or each, of the drugs included in the analysis, despite the observation that the estimated odds ratio for two of the drugs was below one.  And, if not, which should the conclusion apply.

So, I think we do it in two steps.  The first step is – the first question mark.  And then we can do the second question mark, and just one, the first.

((inaudible)).

I think everybody pressed your buttons, that's supposed to?

Female:  For the record, 18, yes, 3, no and zero abstain for question two.

Male:  Very good.

And, let's start this way this time.

Ruth Day:  Day, yes.

Jorge Armenteros:  Armenteros, yes.

(Nicole Chaplain):  (Chaplain), no.

(Grebbit):  (Grebbit), yes.

Sean Hennessy:  Hennessy, yes.

(Goldman):  (Goldman), yes.

Andrew Winokur:  Winokur, yes.

Goodman:  Goodman, yes.

Larry Goldstein:  Goldstein, yes.

Delbert Robinson:  Robinson, yes.

(Bryan):  (Bryan), yes.

(Jan):  (Jan), no.

Wilson:  Wilson, yes.

Andrew Leon:  Leon, yes.

Andrew Winokur:  Winokur, yes.

Matthew Rizzo:  Rizzo, no.

Richard Malone:  Malone, yes.

Ying Lu:  Lu, yes.

Melissa Hudsons:  Hudsons, yes.

Anderson:  Anderson, yes.

Susan Schultz:  Schultz, yes.

Male:  Very good.

Did the numbers tally?  (They) up?  OK, good.

OK, well, I guess the second question of the question, then, is moot.

So, we can go on to question three:  Does the committee agree with the agency's conclusion that the findings should apply to all chronically administered AED's, including those that were not part of the analyses.  And, I guess this is the question I tried to – that I semi muddled with the – with the – with the last one.  But we're addressing it separately, now.

So, this gets to the generalizability issue.

Comments.

Dr. Anderson?

Britt Anderson:  Well, I've – I will have trouble voting on this as phrased because I'm not sure that I understand the sufficient specificity with the FDA's definition of an AED class is.

So, for example, if I work for Pfizer and I have another you know alpha two delta agent and I make sure that I never test that agent in anti-epileptic efficacy, but I only test it in (pain), is that going to have to carry whatever warning?  Is that going to be defined as an AED?  Are you going to – you are going to get (clanezopam), but no other (benzodaze) unless it's regulatory approved.

And so, without knowing more specificity about the definition of the class, it's hard for me to feel that I could say yes or no on this question.

Male:  A couple things.

I don't know that we have a definitive answer.  It's an excellent question.  They are – I think, examples, as I said before with the anti-depressants for – with drugs that are considered for work, the same as other anti-depressants, but are not approved for depression.  I think they have the box warning.  So, there is some sort of mechanistic carry over, if you will, even if they don't have the indication.

You can make this, I suppose, simpler, if you just want to consider the question of – to apply to only those drugs that currently are approved for an indication of epilepsy. Then, at least for the moment, we don't have to worry about being – interested in hearing comments about the future. But, really, here, we're mostly trying to get at the other drugs that are currently approved for epilepsy and, but were not included in the analyses. That's a simpler question which we would very much you know it's – they're almost equivalent question, although I agree, they're not exactly

And I – and one issue, also, that just been mention to me, is, we mentioned earlier, most of the studies that we included were for complex partial seizures for epilepsy. There are some drugs approved for seizure types that are – that don't include partial seizures. I think, maybe, there are a couple, I think, maybe, just for the proof of just some sort of generalized (abson) seizures. I don't think carry a claim for partial seizures. So, that – if you'd like to discuss that – but, our proposal was to include all drugs that are approved for any kind of seizure type.

And so, we couldn't just limit this to the ones currently approved. That would at least make it easier, I think.

Male: Can I ask a question?

So, we're changing the question, then to – because I do think that it's an easier question to think about – based on what Dr. Katz just said.

Is that right?

Male: So the – just – Dr. Katz, just to – just to clarify – so, it would then read, "Does the committee agree with the agency's conclusion that the findings should apply to all currently approved chronically administered AED's? Is that what you're proposing?

Male: We can certainly do that, at least as a first step. Because, again – and I think that's mostly what we were getting at. We'll, of course, have to deal with the fact that, tomorrow, there may be an anti-convulsive approved and we'll have to deal with that, if you don't want to vote on that question, we will deal with it and we're likely to apply the – just to clarify the thinking that why you asked the question, I think you said it this morning, and I think I understand it. But maybe to just make it explicit, you're concerned that if we limited the warning just to the 11 medications that we've already discussed or limited conclusion, that there will be a movement away from these medicines to other medicines. Is that what motivates the question?

Male: That's the generic concern. Whether that's a real concern in this setting, given what those other drugs are, I don't know. But yes, that's the overarching concern, that we can shift prescribing to other drugs that might very well have the same signal. They just weren't included. Yes, that's the general idea.

Male: Very good.

Other – Dr. (Yelman)?

(Yelman): I'd just like to make sure that we're now talking about current medications. And we're not projecting into the future. I'd be happy to discuss that. I mean I think maybe we should discuss what we do about future AED's. but right now, it would be easier if we just voted for this as it is stated.

Male: Yes, I think that they actually amended the question with somewhat different wording, taking into account the clarifications that were just mentioned. So that now, we use currently approved chronically administered AED's.

Male: Yes, Dr. Henderson.

Henderson:  Yes, I'd like to make a similar comment to last time that, in my view, this is more of a policy question.  When does one – what does one assume, in the absence of data, rather than a scientific question.  What do we know about the effects of drugs that weren't studied?

Obviously, we don't know about the effects of drugs that aren't studied.  The question is, from a public policy perspective, what do we do about that?  And, to me, the question becomes much easier when I think about it in those terms.

Male:  Very good.

And, Dr. (Kes) Temple, is that –

Male:  Yes.  No, I think – right – largely that.  Take into consideration what you think you should take into consideration, but certainly, it is, in our view, largely a policy question.  Or, in part, anyway.

Male:  But it's presumably informed by what the perceived consistency across the drugs studied so far, is, I mean, you'll be informed by that, but it is ultimately a policy question.

Male:  Right.

Very good.

Female:  Sorry, I –

Male:  Sorry, Dr. (Chaplain)?

(Nicole Chaplain):  Yes, can you just clarify to me – I'm sorry, but if this is a policy issue and we're lacking more data, I mean, what are the implications for treatment with patients?  So all patients, for example – and I'm particularly talking about patients with epilepsy – are going to be warned that the medication might cause suicidality?  That's what we're voting on?

Male:  Right now, I think you're voting on the product – what – should we apply the conclusion that we've come to, to all of those other drugs.  And, the operational definition of it is – of apply the conclusion is, to change the labeling in a similar way.

(Nicole Chaplain):  Right, but the impact for this – of this, for example, on the epilepsy community, is going to be tremendous.  Basically, it's going to be saying to all patients that any medication that they take might make them suicidal.

Right?

Male:  Yes.

(Nicole Chaplain):  That's what we're voting on.

Male:  Yes, we're voting on changing – in effect – changing the labeling to include some description of these results in that labeling.

(Nicole Chaplain):  Despite the absence of data.

Male:  Well, that's what we're asking you.

We're saying, we didn't study these additional drugs.  Should we – should we take the same action, specific action., yet to be determined, by the way.  That's question number four.  But should we take the same action

we're going to take with these 11 – with these other additional drugs. That's the question we're asking and there's no data for those drugs. But, as Bob says, looking at the consistency of the data so far, that should inform your decision.

Male: Dr. Day?

Ruth Day: If we vote yes on this, it does not say what the language might be. So, there could be intermediate language in different cases. So there could be some language that goes for everyone in the class that this class of drugs has been associated with or cause – whatever you want to say – and then, there can be another sentence or statement – however, there's not sufficient evidence for this particular drug. I mean, that would weaken it. It's in between a little bit. But the point is, in voting on this, it doesn't say what the language would be because that comes up in the fourth question.

Male: And, that's again – that's exactly right. We're taking each one of these in turn and we'll deal with that (next).

Dr. Armenteros?

Jorge Armenteros: Yes, I think that the concern I had with generalizing this to older drugs for which we have – for which data has not been presented, is a little (wise) we're making extraordinary you know comment or statement without an extraordinary set of data to back that up.

So, that's just a little – my concern.

Male: Again, I think that might go in – more in how this is worded and phrased. I guess you guys went through the exact same issue with the – with the anti-depressants. And, we can go to that – discuss that a little bit more in a bit.

Dr. Griffith.

Gail Griffith: Yes, we have the exact same issue with the anti-depressants. There was a great concern that if we put the box on the current generation of anti-depressants, clinicians would be driven back to using the older anti-depressants, in particular, the (trycyclics) that are inherently more toxic. And nobody wanted that outcome. And so I think – I think that, in part, is what was driving that.

But you have to think of the same issue here from a – from a policy standpoint. What would clinicians do if you only have the box on the current generation of anti-epileptics. Would they – would they be inclined to use older drugs that were developed years ago and for which we may not have as much safety data.

Male: Dr. (Clemen)?

(Clemen): Yes, Dr. Katz, I just want to clarify the definition of the AED's and that, as a class, these compounds that are – that have been analyzed, have in common that, indeed, they've all been approved, except for one, for the adjunct of their treatment of ((inaudible)) seizures. I think Dr. (Al) (Parks) has a broader claim for treatment of epilepsy.

And so, are you meaning to apply this to AED's, as you pointed out, that are used for treatment of – principally, for generalized seizures. And also, the data (this year) basically included the ages from five and above. And, at least one of the medications that's approved for generalized seizures is often used for patients much younger than that.

And so, could you clarify, what is class definition?

Male:  Again, first of all, about the pediatrics, I don't think there are any drugs approved only in pediatrics. There are drugs approved for pediatric patients, some down to very young.  But they're also all approved for adults, I think.

Yes, it's a very simple operational definition – anything that is – has an indication for epilepsy.  Any kind of seizure type.  That's the proposal.  You can discuss whether or not you want to cross out the few that don't have a partial seizure claim, but the proposal is, any seizure type in approved indication.

Male:  ((inaudible)) issue.  I mean, for the generalized seizure population, there's absolutely no data, particularly for the compounds that are specific to generalized seizures.  And there's been no data here presented for that.

Male:  Got (another one).  Dr. Gilman?

Sid Gilman:  We don't have the language before us that is going to be written.  What we're asked to do is say yes or no, we agree with the conclusion that this should apply to all currently approved anti-epileptic drugs, without saying to the patient, "you're going to get – you're going to become suicidal if you take this drug." There's going to be some sort of language that indicates there's a risk involved with this drug, period.  And, if we had the specific language it would be easier for us to vote.  But I don't think we're telling people you're going to become suicidal if you take this drug at all.  So I think this is an appropriate "yes" vote, personally.

Male:  Dr. Leon?

Andrew Leon:  Can – from the FDA – can you give me some rough idea of how many other anti-epileptic drugs there are, other than these 11?  Or, are three more or 100 more?

Female:  There are about 20.

Andrew Leon:  Total?

Twenty more, or …

Female:  Roughly, if you're just talking generic, there are roughly 20.

Andrew Leon:  Include …

Male:  31, or 20 total?

Andrew Leon:  Are there …

Female:  Counting the 11 on the list …

Andrew Leon:  Yes.

Female:  We are working with about (42).

Andrew Leon:  For which there are no data.

((inaudible)).

Male:  Dr. Lu.

I'm sorry.

Female:  Would you like me to answer it in the mike?  Sorry.

(Jackie Ware):  I'm a product manager in division of (neurology) products.

The current working list – it's not a finalized list – is about 43 drugs.  They are not all inclusive for dosage forms, but that includes just generic names.  Different generic names.

I can list part of them if that's OK.  I don't – like I said – it's not a complete list.

Female:  So the point of this that for those of us who train you know 20 years ago, I mean we all remember the anti-epileptics that didn't' work very well, that we've moved away from.  And I think you know part of the concern here is that, again, we're applying a black – we're recommending that we apply a black box label to drugs.

Male:  No, no we're not.

That's later.

Female:  Well, OK.

But let me back up.  I mean, the – I think that, if you look at the – in the clinical study – a patient or of a parent of a patient is going to here that there's a black box warning for a suicidal risk, and they're not going to differentiate the difference between, this is going to cause you to become suicidal versus there is this risk.  And that's the concern I have.

I mean you know we tell our patients that drug X can make them gain weight and they all refuse to take it.  So –

Male:  But the question being made here is, should it be cover (Dylane)?  Should it cover (Fenetoid)?  Should it cover (aphenobarbotal)?  Should it cover (mephenitoid)?

Female:  Yes.

You all remember how well or not well those drugs worked.

Male:  But that is the – that is the question being raised in this one.

Should it apply to drugs other than the 11 – whatever they are, Jackie will tell us – that weren't in the study?

Female:  That's a circular argument, right?  We're trying to cover these drugs, even though we don't have data for it?

Male:  That's exactly what the question is.

That's exactly what the question is.  And the reason is the one Tom – the – Tom gave before.  We didn't have any data for any depressants on (tricyclics).  So, what do you do?  Leave them out?  And, after all, if all the classes of any depressants that were studied have this effect, why wouldn't another one?

Female:  Well, if we vote – if we vote yes to this question, that means that we're making an assumption that we're going to try to change the behavior of the – of the prescribing clinicians – that they should not be – that they should not be worried whether they're going to use an older drug versus a new drug.

Male:  I think the worry is that you would drive people toward older drugs inappropriately if you only identified the 11 drugs.  That's where this concern comes from.

Male:  I do think we're missing the discussion of a very important point – that, for the anti-depressants, there was a very specific realistic concern that not only were there another class of medication where there were not – where there was not data – there were considerable data to suggest that that class of anti-depressant was dangerous.  And so that there was a great deal of concern in the committee about discouraging use of one group and driving people to the only other option that was known to be dangerous.  And it was that specific fear that influenced that policy or that vote.  So as a psychiatrist, I would like to hear from the neurologists.  Is there anything remotely like that for the anti-epileptics?  I mean I'm starting to hear that maybe there is.  But you know the degree to which it's a legitimate concern that people are going to drive – parents or patients are going to want to take medications that the neurologists in the room are not going to want to use – then, this is a relevant –

Female:  Well, that's exactly what we're doing by answering question number one.

Male:  Well, we're trying to prevent –

Male:  No -

Male:  If we don't want that to happen and we don't say anything, it could happen.

Male:  I just want to add something, quickly, to what Danny Pine just said, going back to the rationale for expanding the list to include the (trycyclics).  In addition to safety concerns we had about the (trycyclics), some of the earliest descriptions of an association between suicidality and administration of anti-depressants, was in the context of the administration of the (trycyclic) anti-depressant.

And so, going back to the early sixties, there was the description of the energizing phenomenon, to – it urged the clinician to be cautious in the early days to weeks to prescribing a (trycyclic) anti-depressant that the (personality) of mobilized, and that could add to their suicidality.

So there are other reasons, too, to implicate the (trycyclics).  And I'm not clear that those obtained here for the drugs like (phenol-barbotol).

Male:  Dr. Temple.

Robert Temple:  It is worth remembering that your answer to question two, I guess you know you may need to tell me this is wrong – seem to be that, yes, we have no idea why this should be a common effect in all of the anti-epileptic drugs because we don't know of a mechanistic explanation for this.  But, we think the conclusions should apply to all 11 of them, even though some of them didn't actually lean that way.

Following similar reasoning, might lead you to conclude the same thing here.

That's the question.

Male:  Where you have no data at all.

Male:  But, you didn't have any data on two to three of those drugs, either.

Male:  Exactly.

Dr. Lu?

Ying Lu:  Yes, I think that I'll comment on Dr. Temple's comment.

There's one thing that's different from question two is here is that in question two, it actually ((inaudible)) data and competency which covers the estimate (points). And here, really, we are extrapolating something that – I mean, personally, I don't have any idea about.

Male: Dr. Hennessy?

Dr. Hennessy: Dr. Temple made my point. So, if – and I'm usually not one to be slavish to do the same thing as I did earlier. But earlier, we assumed that the results should apply even to the drugs for which there wasn't a point estimate greater than one.

So it seems easier, to back away to areas where we don't have data, to areas where we have data that seem to suggest safety.

Male: OK.

Dr. Anderson.

OK, Dr. Potter.

William Potter: Just a quick follow-up on the statistical question of confidence limits.

I mean, for those drugs for which you don't have data, though, given the infrequence – the sparseness of the events in question – wouldn't you need huge sample sizes? You know if you did have data, wouldn't it be extraordinarily unlikely that the confidence limits there would be far enough to the good side to say they don't have a – I mean – I mean, what would it have to be? I mean, it's a – any statistical data in the world that you could convince yourself, if they're old drugs, that they don't share this.

I don't think there's a measure – that this group would have set, from what I've heard.

Male: And, the other point of the question was, is there you know is there concern about driving people to prescribe the older drugs. The older drugs aren't used anywhere as near as frequently for a whole variety of reasons. Among them are the adverse effects – side effect profile and the inability, and for many of them, to control – to control seizures.

So, I – again, the law of unintended consequences. And it think everybody is quite aware of them. You – based on this signal that appears to be – that we said was real and we're concerned about – does that mean that you want to drive people from the seizure medicines that there are now, that may be adequately controlling their seizures. We've heard about the terrible downside that that would have – increased mortality, loss of jobs. Whole bunches of bad stuff happens. So that's not where we're going here.

And – but again, by analogy, from what I understand – I wasn't that part of that with the – with the anti-depressants. It's not a dissimilar – you know as scientists, we like to have the data. We want it with tight confidence intervals. We want to make clear decisions. This is way past that.

Male: Dr. Katz.

Russell Katz: Yes, just that – to get an answer to question of how many additional AED's are we talking about? Our count – as best we can figure out – is that there are 14 additional different AED's approved, in addition to the 11. So, 25 different chemicals. So an additional 14.

Male: Are they in the same group? Like, you have classification of three (mechanisms).

Male: We haven't looked at them.

I'm sure there's some overlap, but a lot of them are old.  I don't know what we know about their mechanisms, but we haven't looked at them.

Male:  What includes (Bensodaz).  (Benz) includes, ((inaudible)), includes (Benetel) and –

Male:  Dr. Gilman?

Sid Gilman:  Does that include bromides?

That wasn't an entirely serious comment.  I just wondered how far back it went.

I find it to be a (difficult) question because (Phenetrol) is actually a very effective drug and I use it myself when patients frequently – especially (fast) ones, currently active and very good drug.  Is there any evidence – and will we ever have evidence that it is – has suicidal risks associated with it?  I think the answer to that is no, we will never have evidence for it.

And so, I go back to our original conversation, and the original data that we have here, which is that, we have a number of medications that have different bio-chemical mechanisms of action, and yet, are anti-epileptic drugs.  Therefore, by analogy, it might stand to reason that the earlier drugs may have a similar mechanism of action – may have a similar effect, even though they a different mechanism of action.

Consequently, I think it's perfectly reasonable that they should be included first, just for the purely logical perspective.

Second, it is – these newer agents have done a great deal for patients, even though we were once hoping for modern therapy, one drug for a seizure patient.  That seems to allude us.  And now we're back to treating with two or three or even four different medications to keep people seizure-free.  Epilepsy can be very difficult to control, of course.

So, I find myself torn.  But on balance, I think this is – I think my vote is going to be "yes."  And the reason it is going to be "yes" is because there are just a few drugs that, really, we're talking about here.  It may be 14 on the list.  But, in fact, it's not going to be 40.  We're not going to go back to bromides.  We never will do that.  I'm not old enough to have experienced what they were like.  They were probably a terrible things, by the way.

And, (phenol-barbatol) is a very poor drug for chronic use.  So really, we're really dealing with (Phentoid) as the practical one.  And I still think it's a good idea to drive the clinicians or the patients and the clinicians back into a single agent that was very effective.  It was actually a miraculous drug at the time.  But we have so much better drugs now that, on balance, even though there are no data and we have not acquired data, I at least have – at least, supporting this idea – logic and the fact that there are other medications that have different biochemical mechanism action that lead to the same kind of (adverse) (event), liability.  So my vote is going to be yes.

Male:  Sorry.

Sorry about that.

Dr. Rizzo, and just to remind the committee members, I should have said this more explicitly before – as we're discussing these things, please don't say how you would vote, just raise your points.

Matthew Rizzo:  Along the lines of guilt by association and driving practice patterns, have we considered that possibility that by extending this warning to all anti-epileptics, we might be driving patients to surgery?  Or to (vegal) move stimulation.

What are you thoughts on that?

Male:  Well, actually, we'd like to hear your thoughts on it.

This is what – this is the reason we're asking and it's one of the reasons it's a tough – it's a tough question. I'd be very, very interested to hear what you think.  If you think that by doing this (role) of drugs, we are going to drive people to surgery, inappropriately, perhaps.  Or, (vegal) nerve.  We don't know.

Male:  I think that there are some data, as was mentioned by one of the public speakers about surgery, and there's an – apparently an increased risk in suicidality after surgical procedures, as well.  So, I don't see you know if one understands the data correctly, then I don't see why that should be operative.

Male:  Dr. Schultz, did you have your hand up?

Susan Schultz:  I am struggling a little bit with – I understand the concern about, you never want to drive practice you know back to (Phenetoin).  But there's also a lot of discussion from the neurologists, earlier, about patients often are noncompliant and blame everything on the medicines.  Are we going to drive stable patients off their (Phenetoin) by virtue of a warning if people are equivocally you know compliant anyway.  Are we going to do them more harm by driving stable patients off their older anti-convulsions?

Male:  I guess part of that would be the way that this is worded, among other things, which we'll deal with next.

Dr. Twyman?

Roy Twyman:  Yes, I'm just a little concerned about the (lay) for the future for all drugs to use the (cheat).  So, I just want one more stat that the – the classification.

So, there's at least one compound and it's very specifically targets (half zon) epilepsy, for example.  And it has absolutely no activity in partial onset seizures.

And so, perhaps the science of future may evolve that we have more specific therapies that target very specific subtypes of these seizures and cannot be you know reasonably classified as an agent that works with partial seizures and in fact, may not work in partial seizures.

So, I'm just trying to make you know some distinction that this drug class, as a whole, appears to be – there are at least the data that supports this – appears to be for those drugs effective in partial onset seizures.  And the data is absolutely absent on conditions, say, like (apson) seizures and drugs that are used specifically to treat those and have no activity in partial seizures.

Male:  Dr. Katz?

Russell Katz:  Well, that's a fair point and you should take that in – that's why I raised it for you.  You should take that into consideration when you vote on this.  The proposal on the table is to include all drugs with an indication for any kind of seizure type.  If you think that that should – that (absence) drugs only and only that are approved for (absence) should be excluded from this, then we need to know that.  But, that's the proposal.  We have no – it's been said many, many times, there's – there are a lot of questions that we're asking you that we don't really have specific data to answer.  But you – (like) we need an answer.

Male:  Sorry.

Dr. Hennessy first.

Sean Hennessy:  My point was made already.  I'll pass.  Thanks.

Male:  Dr. (Chaplain)?

(Nicole Chaplain):  Yes, I like up to (shoot), I want to bring up the point that I'm really very uncomfortable with this because, the question is, are we doing this in the best interest of the patient?  And, if you know as mentioned by the speakers before ((inaudible)) epilepsy, irrespective of the type of treatment, be that surgery, be that ((inaudible)), be that medication, patients with epilepsy have much higher rates of depression and suicidal ideation.  So that again, I'm bringing us back to the question, if we had good drugs, and if we had drugs that are working, we need to be very careful about scaring the patients into not taking these drugs, and I really think we need to give a lot of thought to that.

Male:  Again, I think that is (wrote) – you know how this going to be presented.  That's – I think you're absolutely right and that's going to be an important thing for us to really discuss in great detail again.

Female:  I'd like to point out (some) ((inaudible)) what Dr. (Rizel) says that in ((inaudible)) way if we're going to drive people away from anticonvulsants towards surgery the question is are we going to drive them away from medication – off medical therapy altogether.  And those of us who treat patients with seizures know that there's a huge amount of denial out there.  We spend a lot of our time fighting to get patients onto therapy in the first place and I think we're going to scare them off.  And if you think about the risk of sudden death associated with untreated epilepsy, or treat epilepsy, for that matter, I think we really need to think that through.

Male:  Dr. Anderson.

Britt Anderson:  Hi.  I'm not sure if it directly affects the voting of this question, but I guess I just still want to emphasize my concern for the non-epilepsy non-psychiatric population – that other category.  While I have sensitivity to the concern that we drive patients to (phenytoin), who have epilepsy, if we label these drugs and not (phenytoin), I'm concerned about the interpretation and application of a label to the class of AEDs for new agents and that there should be ((inaudible)) there is supposed to be some perspective determination, again, for new agents that come along that would easily have been fit into this group of 11 if we hadn't labeled the – hadn't given the AEDs some sort of specific suicidal warning action, whatever that is determined to be, and now for new applications for post-herpetic neuralgia, or pain, or something else, there's a specific avoidance of studying those medicines for epilepsy, where they be effective, in order not to be able to be (tarred) with the AED label.

And, so I think the action that's taken against the class of AEDs that currently exist there is a need for some mechanism or sensitivity to making sure that future approvals sort of don't necessarily just go with the seize indication as much as they do – some sensitivity to similarity in class or action.

Male:  Dr. Hudsons.

Melissa Hudsons:  I guess I'm not having a much ((inaudible)) considering ((inaudible)) medications I use in my practice are potentially life threatening.  So, you're used to having a dialogue with the family and the patient and how they're tolerating it and weighing the risks and benefits.  So, I think this offers the opportunity, even if we extend it to all AEDs, for dialogue with the physician and the patient and the family for enhanced awareness of the need to monitor and continued follow up and that, at the very least, is probably worthwhile, so people can be aware you know.  So the label, or whatever we state in the – you know in question four – that's going to be the meat of the matter, in my view.

Male:  Dr. (Kline).

(Kline):  Related to Dr. Anderson's comment, I just want to clarify, based on the question of Dr. Katz, my understanding is we've taken future agents off the table and we're not even considering them.  I would share the concerns that Dr. Anderson raised.

One thing I would suggest, though – and, again, I know this came up with the antidepressant data – one of the problems with the data, not just the small number of events, but you know there's a lot of problems with the outcome measure.  So, I think one of the thoughts, going forward, for future medicines is some systematic effort on behalf of the FDA.  And, again, I don't think we need to talk about this today, but if some of the problems in the data, in terms of what was measured and how it was collected were fixed in future studies it might be feasible to say something with more confidence about new agents that come along, if these concerns – and there's a whole host of other things that you might measure, related to mechanism.  If data were produced that would answer more definitively is there an association of do we understand it in this medicine or not.

But, the bottom line is let's keep the future off the table because I think it's a very sticky wicket.

Male:  Dr. ((inaudible)).

(Kline):  Right, I think we have taken that off the table.  Although, as I said before, and I agree, in the future we should be collecting better data.  It's just that it's going to take, I think, probably a long time to figure out whether there's a ((inaudible)) with better collection devices, so we will have to deal with the question of the anticonvulsant that's approved next week, or next month, or next year.  We're going to have to deal with that and we will.  And, I don't know how we will, but I have a guess, so that just needs to be taken into ((inaudible)) but for purposes of this question, I think we've decided to talk about those that are currently approved.

Male:  Very good.  Any other points of clarification – questions?

OK, ((inaudible)) we're getting ready, so the question on the table is does the Committee agree with the Agency's conclusion that the finding should apply to all currently approved (clinically) administrated AEDs, including those not part of the analyses?

Female:  ((inaudible)) for question number three, yes, this ((inaudible)) no five, abstained one.

Male:  Very good.  So, I think you're getting the feel that our unease is similar to your unease.  Let's see, I think we start this way this time.

Susan Susan Schultz:  Schultz, no.

Britt Anderson:  Anderson, yes.

Melissa Hudsons:  Hudsons, yes.

Male:  ((inaudible)) yes.

Male:  ((inaudible)) yes.

Matthew Rizzo:  Rizzo, no.

Andrew Winokur:  Winokur, yes.

Male:  ((inaudible)) yes.

Robert Woolson:  Woolson, yes.

Lily Jung:  Jung no.

Daniel Pine:  Pine yes.

Delbert Robinson:  Robinson yes.

Larry Goldstein:  Goldstein yes.

Wayne Goodman:  Goodman yes.

Female:  ((inaudible)) yes.

Male:  ((inaudible)) yes.

Sean Hennessy:  Hennessy yes.

Female:  ((inaudible)) abstain.  I felt as though we were in a (trick) box and we'd walked ourselves into this very similarly to the antidepressant situation.  I mean we're dammed if we do, we're dammed if we don't if we truly don't want to discourage patients from taking their medication.  At the same time, if they are forced to take medications that are older we don't know the consequences of that and I don't feel like I have enough information.

(Nicole Chaplain):  (Chaplain) no.

Male:  ((inaudible)) no.

Ruth Day:  Day yes, but close to abstain.

Male:  Very good.  Does anybody who voted no just want to amplify anything else, because, again, part of this whole exercise here is to make sure that the Agency has heard a full discussion and opinions?  I think we've had a good discussion, but I just want to make sure that everybody's had their chance.

OK, so let's go on now to the last questions, and there are actually two questions, and I think I'd like to deal with the first one first and then we can go on to the second, depending upon the first.  So, the first – can you hit the button?  Thanks.  There we go.

So, the first question is "does the Committee agree with the Agency's plan to require labeling changes for all AEDs, including a boxed warning and medication guide?  And then if not, does the Committee want to offer guidance on other approaches to communicating this information?"  I guess the discussion would cover both, but I'd like to hold the votes separately if we could.  ((inaudible)) first ((inaudible)).

Male:  I'm not sure what the order of warnings are, but I guess black boxes at the top.  I'm not sure how it goes then down.

Male:  The new labeling format combines what used to be warnings and precautions.  Well, it used to be separate warnings and precautions sections in the old label, so now there's a section for warnings and precautions.  It's one section and we place those which we think are most important first and then we just go down, so that's the next most severe – you know that's the next most prominent place in labeling that you would put ((inaudible)) and you can bold – you can actually you know – I think you can still do that – bold the print you know.  So, for those warnings which we really think people ought to pay attention to, so that's – well, we mentioned box ((inaudible)).

Male:  ((inaudible)) another question is can you get a medication guide only if you have a black box, or is that a separate issue?

Male:  Yes.  No that's separate.  It's separate.

Male:  And there are rules about what can lead to a medication (guide).  You can have a patient package insert that isn't called a medication guide.  You do that for a lot of reasons.

But, medication guides are put there for three reasons, one of which is that if you really think the patient ought to participate in the (risk) ((inaudible)) the medication guide goes to the patient  ((inaudible)) ...

Male:  Yes.

Male:  … or to participate in the decision to use the drug – that's one.  Two, the can do something really important to avoid a problem, and then there's a third that isn't relevant to this, but that's what gets you a medication guide, something that they really need to think about – two, they can really help avoid a problem.  That's not different from the basis for putting things in a box.

Male:  Dr. Matthew Rizzo:

Matthew Rizzo:  A question – if you put a black-box warning on a drug, when there's not really any clear implication or clear evidence that there's a big problem, does that detract from other warnings for a drug, which are more likely – in other words, suppose you have this black-box warning for Tegetrol or carbamazepine, but  suppose there are other side effects of carbamazepine that are much more like to cause harm, how does the black-box warning for (suicidality) interact with those other warnings that may be of more importance to get out for a drug?

Male:  Well, I guess if we felt that there were other warnings for a drug that were more important than the warning we put in a box warning we'd put those is a box – we'd put those in a box ((inaudible)) …

Matthew Rizzo:  You can put more than one warning in a box?

Male:  … ((inaudible)) and you can put more than one warning about more than one adverse event in a box, so that – and we have done that ((inaudible)) …

Matthew Rizzo:  So it's not a special box just for suicidality?  It's a box that includes all of the (stuff) ((inaudible)) …

Male:  Yes …

Matthew Rizzo:  … go wrong?

Male:  … ((inaudible)) already a box warning, if that's what you're talking about, for a drug, and now we wanted to add language about suicidality it would be in the same box.  And, again, we'd have to decide which one was a bigger issue and we would order them accordingly.  But, there are numerous examples of drugs that have box warnings with multiple different types of adverse events described in that same box.

Male:  I was just trying to think outside the box.

Male:  You're out of here.  ((inaudible)) going to push your abstain button ((inaudible)).

Male:  ((inaudible)) just trying to clarify the question here.  So, are we in yes means we want ((inaudible)) the box for the suicidal or we want to ((inaudible)) so if you want  the other warnings – it seems to me that discontinuation of treatment will be worse than just suicidal warnings.  The wording here, I'm not quite

sure, because we're asked to say if we agree with Agency's plan to require label changes, but what are the changes? If we say yes – I mean ((inaudible)) a condition of yes and no ((inaudible)).

Male: I'm not sure exactly what you're asking. If you're asking if you vote yes does that mean you're committed to the language that we have proposed in the boxed warning, so …

Male: ((inaudible)).

Male: … no, I would say no. I would just say – do you think maybe can take this sort of piecemeal. For example, do you think there should be a boxed warning? Forget about for the moment what we proposed as language to be included, because we can obviously change the language. We really, as a first step, want to know whether or not you think there should be a box warning – does this rise to the level, given all the considerations about unintended consequences, the actual numbers involved? Do you think there should be a box warning? And, we'll ((inaudible)) the language …

Male: And, as I understand it, the alternative is to have language as part of the labeling, but it's not part of the boxed – you know that black-boxed thing that – you know, again, physicians look at this black box and this is a big deal. I mean this is a big deal, so when you put something in a black box that's put there to bring attention to it and it carries a lot of baggage along with it and we've heard some of that.

So, an alternative, given again all the discussions, and hemming and hawing and iffing that we had is – should there be a – could there be a warning there, but it's not separated as one of these black-box warnings, so that's the part B here.

So, the part A of the question is should this be a separated black-box warning with all that implies, or can it be – have warning language, or language but it's not in that black – not as part of that black box.

Female: ((inaudible)).

Male: For all AEDs, right. That's what we've said already. Yes, Dr. ((inaudible)) I'm sorry ((inaudible)).

Male: ((inaudible)) just have three things. You now (following) psychiatric drugs now seems a lot of them have black-box warnings and you start wondering about the effect of a black box if that keeps happening.

But, the second question is if they're ((inaudible)) precautions does that get some sort of publicity? I guess if you get a black box there's a lot of publicity. Is there anything like that if you just go (into) warnings and precautions?

Male: There's no official connection between how a change in labeling is announced by the Agency and where it is in labeling. Typically the higher up in – you know the more prominent that it is in labeling these are all related. The more important we think it is and the more likely we are to make some sort of public announcement about it, but you can certainly put language in the warnings and precautions section, not in a box warning, and still have some public announcement about it and publicity about it, whatever we think is appropriate, so you certainly can mix and match that way.

Male: And just to make sure we're clear and ((inaudible)) part of a medication guide and not part of the black-box warning?

Male: Well, certainly you can have a medication guide to discuss a particular adverse event that is not described in a boxed warning.

Male: ((inaudible)).

Male: It would typically be somewhere in labeling, relatively permanently.

Male:  ((inaudible)).

Male:  And, by the way, I think, again, we ought to sort of take this question piecemeal and first get your views about whether there should be a boxed warning …

Male:  Right.

Male:  … ((inaudible)) medication guide into a separate question.

Male:  I think that's exactly what I'd like to do and maybe we can do that.  ((inaudible)).

Female:  Well, you know judging from the public outcry, the last time we did this, I can ((inaudible)) (again) if ((inaudible)) have some hysterical reaction if we indeed vote for a black box.

But, one of the questions that came up the last time around – I'm sorry to keep alluding to the antidepressant debate, but Dr. ((inaudible)) conversations on informed consent and it seemed to me that that accomplished a lot of the goals.  You had a conversation about the risks and benefits amongst the physicians and doctors.  At that time you thought it would be too cumbersome and I'm wondering now, knowing what we went through, wouldn't it be more advisable than you know jumping to the black box?

Male:  Can I ask about that – mean should – instead of a box should we ask for informed consent ?  Is that what you're saying?

Yes, it's unusual to ask to informed consent.  I believe the medication guide comes moderately close to that.  It gives the document to the patient that lists all this stuff and the patient, obviously, has a choice of asking the physician, "hey, what are you doing to me" and so on, and there is a sort of implicit consent because they are, after all, taking the drug.

We haven't actually made people sign a consent form, even when the drug has a limited distribution.  They may sign something saying they've been given this piece of paper and have read it, which is not quite the same thing.  But that is – enforcing that is very burdensome.  I mean it has to – you have to have limited distribution and you have to be sure the person gets it.  That's a very restrictive thing to do.

Male:  Dr. (Chaplain) and Dr. Hennessy.

(Nicole Chaplain):  Yes, I'd like to ask the Committee if they would consider either, in terms of – if we're talking about a medication guide or informed consent, putting in language there of depression, so that if the (commissions) would be considering –  or the patients, or whatever, had depression and suicidal ideation, because in that way I think we would really be doing a great service to this population of patients, be (that) the psychiatric, or the epilepsy patients and other patients, who have a very high rates of depression, because then that could be one step towards getting them help.

Male:  Dr. Hennessy.

Sean Hennessy:  Thanks.  I think that requiring informed consent would be much more draconian, even than a black-box warning or a medication guide.  I mean there are much more dangerous drugs that we have on the market that don't require that.

So, both for med guides and for black-box warnings, I'd be concerned, one, about unnecessarily scaring patients who need the drug who are on the fence about whether or not to take it and then, two, devaluing the currency.  If we keep issuing med guides and black-box warnings for risks that are moderate, and I'll still say unproven for this one, then it's tough to know what to believe in the black box.  And, I won't say how I'm going to vote, but in my view this doesn't erase a clear level of either a black-box warning or a med guide.

Male:  Dr. ((inaudible)).

Male:  Thank you for not telling us that.

Male:  I'm not even going to mention the word vote.  But, let me say that I am very concerned, as in the antidepressant story, about the risk of unintended consequences and influencing practice which would discourage patients from taking their medications, number one.

Number two, I think there are two other very significant things to ((inaudible)) with these medications, when we think about a black box.  The decision on a black box, as I've thought about it, is a balancing of data of efficacy and data on harm.  And people struggled a lot in the discussions about antidepressants that it was not only that the data on harm were there and everybody agreed with it, much as we did today, but, as Dr. Malone suggested, the data on efficacy were very weak.  That is clearly not the case here.  The data on efficacy are unequivocal and that further influences me.

The last thing to say is that if we just think about the randomized controlled trial, I am very influenced by the fact that two thirds of the trials had no events in them whatsoever , and while different trials have different patient numbers, we can safely say for the people who were studied and the data that we're basing our conclusions on at least half of them this warning would be irrelevant to, so I'm very concerned about unintended consequences, and it feels like taking a canon you know to an issue where we don't really have a clear definitive idea about what's the most appropriate action to take.

Male:  Dr. Leon.

Male:  I have a couple of other (comments) ((inaudible)) follow up ((inaudible)).

Andrew Leon:  Yes, the follow up on what Dr. (Polence) said, I'd ((inaudible)) that definitely two thirds of the trials had no events reported.  We don't know that if within those …

Male:  ((inaudible)).

Andrew Leon:  … right.  Yes, yes, yes.

Male:  ((inaudible)).

Andrew Leon:  Yes.  So, I had a couple of other comments, though.  You said, Dr. Goldstein, that the black box carries – you as a clinician, said the black box carries a lot of baggage.  Could you elaborate ((inaudible))?

Larry Goldstein:  I think when there's a black-box warning I think it really might drive physicians to really question whether they need the drug to begin with, or might effect on alternative choices, as was mentioned before.  It really does carry a very negative connotation, especially when it's something like ((inaudible)).

Male:  ((inaudible)) I think – I'm not basing this on data, but I think with antidepressants there was a belief that there were at least some people who were getting antidepressants who didn't need them.  That's a fair statement, whether ((inaudible)) quantify that.  Could you say the same thing about anti epileptics?

Male:  Well, I think, again, this is a long complicated story, as to when one considers we're (drawing) anti-epileptic drugs in particular circumstances in trials of patients off of drugs.  But, in general, I think that patients who have epilepsy, which is by definition a chronic condition, require chronic treatment.

Male: And my last – I want to bring it up again. I asked earlier, but is there some way we can at least regress that the black box, as with antidepressants, refers to the risk of untreated epilepsy, untreated pain, untreated bipolar (disorder)?

Male: Certainly.

Male: And the same could be done for a warning.

Male: Absolutely.

Male: Yes.

Male: ((inaudible)).

Male: Well you know this was – I hate to bring back the antidepressant meetings, but you know we – in the bottom line it's like if you have a potentially fatal side effect how frequently does that have to happen that you feel like it needs to be prominently warned? Because you know ultimately suicide – complete suicide is a fatal you know adverse event. And that was one of the things that you know we sort of struggled with. I was more on the side of letting people know in the sense ((inaudible)) you can have a dialogue. It happens in – you know in psychiatry ((inaudible)) as Dr. Malone brought up, a lot of drugs now have these black boxes and so it's not that you can't get patients to take them, it's just that you have to have a dialogue with them, and I think that's the thing I think that's ((inaudible)) you know how we can get the best of ((inaudible)) that physicians have a dialogue with their patients.

And, I think one of the struggles is – actually the FDA is not the best mechanism for that. It's actually the professional societies who really should be educating the clinicians about how do you present this, what is the data, how do you talk with the patients, and I've always found it very interesting that a lot of these FDA meetings about suicide we have the presidents of very prominent professional organizations. Afterwards it doesn't seem that they're doing a lot of the follow up about the education of their members and that sort of thing and I think that's the difficulty. In some ways we're here to sort of identify are there risks and how those can be presented in a label, but actually we're not a practice organization.

Male: ((inaudible)). Yes, Dr. ((inaudible)).

Male: I'm sorry.

Male: Yes, just to briefly – trying to reconstruct my rationale for voting for the black box during pediatric use of antidepressants, comparing it to a current issue before us. I'll do it very quickly.

I already mentioned we have a weak efficacy. In the current condition we have good evidence for efficacy. We were concerned about the paradox of misinterpreting emergence of suicidality as deterioration of the underlying condition, as opposed to identifying ((inaudible)) (genic) effect, where I think we may be more concerned in this case about over attribution to the drugs of emergence of effective symptoms of suicidality and the risk of discontinuation.

Another thing that hasn't been mentioned, I don't think yet today, was that was had non-pharmacological alternatives, not just the devices, but in some of the psychiatric indications a proven psychosocial intervention, such as cognitive behavioral therapy, you may want to make sure that patients were aware of those options as an alternative to drugs. I don't think we have that situation here. I'm not aware of ((inaudible)) interventions. And, we also ((inaudible)) we had a theory. In fact we had more than one theory for explaining the mechanisms that could explain this phenomenon. Moreover, it fit with some of the clinical observations. I haven't heard any really plausible explanation, other than some non-specific ones today.

So, on balance, I don't find the way – what drove me to make that decision, in the face of the concern about unintended consequences, is a different weighting than I – today – than I have in facing this issue before.

Male:  Dr. (Dean).

(Dean):  I know we're just considering yes or no, whether there should be the black-box warning, and then the medication guide, but I think a lot of people having trouble deciding on t his because they have a certain set of language in mind.

We've done comprehension studies on a couple of medication guides, in my lab, as to how people then understand this information and one thing that I can tell you is that if you say something in a medication guide – and we can talk about implications for the box – if you say it doubles the risk the way people interpret that is more draconian than you say that there was an increased risk approximately say two in a thousand, or 10,000, or one and so on, so the way you say something makes a difference and if you say to lay persons it's going to double your risk they don't understand you know the numerator or the denominator at all, and I would then vote no for.

So, we can't do the wordsmithing of what's going to go into either of these if we vote for them, but I think as we discuss each one we can be recommending you know what to say and what not to say.  And, I've heard from a lot of the clinical people that it has to be balanced with the risk of not treating, and so if those were somehow linkable in the same place then I think that people would be more likely to vote yes for this.

Male:  ((inaudible)).

Male:  Yes, let's also not forget that on ((inaudible)) consequences may include, of course, the psychiatric population where the signal didn't seem to be as strong as you know epileptic population, so the warning may impact all kind of practices, for which some, at least in the psychiatric world, the data wasn't that phenomenal that we saw ((inaudible)).

Male:  Dr. Temple, and then I think we'll try to bring this around.

Robert Temple:  It hasn't been discussed, but while think about this, I wondered if people could comment on whether they're influenced at all by the significantly larger effect in the European trials than in the domestic trials?  I think that's worth telling us whether that influenced you or not.

Male:  Has that influenced anyone?  Would anybody like to respond to Dr. Temple?  It doesn't sound like it made much difference.

Let's see, I think there was one more comment – Dr. Gilman.

Sid Gilman:  ((inaudible)) it's difficult because we don't know what the wording is going to say.  If this were very well balanced there's a danger of not taking drugs for epilepsy and taking drugs for epilepsy carries a small percentage risk of suicidal thoughts, so you need to be on the alert for that.  That would be find, but if it – it all depends on the language.  So, we're being asked yes, no, black box, not black box without know what will go in there.  So, we trust the FDA to be judicious in saying the right thing – do the right thing, in which case I'd be a little more comfortable with that.  But just voting yes or no is difficult right now.

Male:  Given that, I think we – given that concern, I think we can probably at least vote on the black-box separation and t hen talk the remainder of the time about the – about what language might be recommended – black box or non black box, and then, I guess secondarily, the issue of the medication guide, which I think is not quite as big an issue, although it may be.

So, if there are any other burning things that haven't been discussed ((inaudible)) so let's vote on number four.  Should there be a black-box warning, and remember that doesn't mean that there isn't a warning, just

that separate black-box warning as opposed to a different type of warning. Should there be a black-box warning – yes or no?

Male: Nothing is flashing here.

Male: What is ((inaudible)). Please standby, wait until something flashes. It's like "Jeopardy."

Right, take a nap. System breakdown?

Male: No.

Male: OK, there we go.

Interesting.

Female: ((inaudible)) there's four yes, 14 no, three abstain for question number four.

Male: OK, let's head her this way this time – Dr. Day is first.

Ruth Day: Day abstain.

Male: ((inaudible)) no.

Female: ((inaudible)) no.

Gail Griffith: Griffith no.

Sean Hennessy: Hennessy no.

Sid Gilman: Gilman yes, based upon our future discussion, which is a risk.

Female: ((inaudible)) no.

Wayne Goodman: Goodman no, and I'm not recanting any previous yes.

Larry Goldstein: Goldstein no.

Delbert Robinson: Robinson I abstain because I didn't think I could evaluate without seeing the language.

(Kline): (Kline), no.

Lily Jung: Jung, no.

Robert Woolson: Woolson, yes.

Andrew Leon: Leon, yes.

Winokur: Winokur no.

Matthew Rizzo: Rizzo, no.

Richard Malone: Malone no.

Male: ((inaudible)) abstain.

Melissa Hudsons:  Hudsons, yes.

Britt Anderson:  Anderson, no.

Susan Susan Schultz:  Schultz, no.

Male:  Interesting, so the statisticians voted one way and the clinicians voted a different way.  Very interesting.

OK, so I think you've got the view.  OK.  So, given that, let's go to the last thing – or next – which is if not's, since it was not.  Does the Committee want to offer guidance on other approaches to communicating this information?  I will come back to that because I think you know the – I think it's (subsumed) by that question.

Dr. ((inaudible)).

Male:  Well, I just wanted to echo the suggestion that was made, actually in some of our material, as well as by Dr. Day, which is that I found the increase of two per thousand, or 786 patients to harm, a more meaningful and attributable event for me than doubling the risk, since I don't know what the denominator is either, probably when I sitting there in the clinic with an individual, so that sort of language is more helpful for me and also to engage the patient in a discussion as to sort of the magnitude of what we're talking about.

Male:  Dr. Hennessy.

Sean Hennessy:  I agree with that and I think that the degree of uncertainty around the information that we think we know ought to be present, as well.

Male:  And, I think that would include the generalizations, or the problems we have – we were struggling with, with the generalizations that we don't gave data for many of these drugs and there is this concern, but there's also a lack of data for a lot of this.

Dr. Pine.

Daniel Pine:  I do think – while I felt comfortable voting no for a black box, I do think there is a serious need to communicate this knowledge, because I think all of us would probably say that we were surprised to see the finding and it sounds like you guys were surprised, as well, and I think that reflects the fact that it's not an association that is frequently thought about.

Given that and given the potential concern, I do think that you need to think of creative ways, short of a black box ((inaudible)) and a med guide I do think would be one to make sure that clinicians and patients are aware of the possibility, so that should it arise clinicians and patients know what to do with it.

Male:  Dr. Rizzo.

Matthew Rizzo:  Would we envision a medication guide that just had general information about warning for suicidality in the whole class of anti-epileptic drugs or would have that plus maybe some specific information about the individual drug related to suicidality, whether there was no clear indication that this particular drug caused extra harm?

Male:  As with our proposed labeling approach, I think, at least at the moment, we would probably or are likely to have sort of generic non-drug specific language in a medication guide.

Matthew Rizzo:  So, I think what the general gist is that the wording of this obviously needs to be very, very carefully considered – that there's a concern and we talked about the drugs for partial complex seizures, as opposed to all antiepileptic drugs, as well as the extrapolation to drugs for which we have no data, and all of those issues need to be carefully (included), because that is the discussion that physicians are going to have – what do we know and what do we not know about this whole area?

And ((inaudible)) also said, all of these conditions are associated with depression and potentially increased suicidality, so having that patient population aware of this alone, regardless of whether it's drug related or not, is an important thing to do.

Male:  Yes, Dr. Gilman.

Gilman:  Well, I would urge that this be prominent in language ((inaudible)) medication guide.  In other words, calling attention to this as a problem would be the important thing to do ((inaudible)) black box, as the majority wishes, and at least putting it in prominent ((inaudible)) kind of letters at the top of the medication guide would be helpful.

Male:  Dr. Day.

Ruth Day:  I think there's a little bit of a confusion here – if you don't do a black box you jump down to medication guide – that's not it at all.  There's two separate (tracks).  One is for the professionals.  If you don't do black-box warning you still – we might discuss or decide – we still want to have something in the professional labeling, but it would go in another section, so that would be in the warnings-and-precautions section, something of the sort.  And, I think that's what Dr. Goldstein was just addressing.

So, it isn't – and I would like clarification from the FDA about – I used to know all of the drugs with medication guides and they've gotten so many now that I don't.  But, I've read examples where there's a medication guide, which is issued for something specific, say is Accutane and warnings about pregnancy and fetal harm – OK.  Are there cases where there's a medication guide on an issue which does not also have a black-box warning in the professional label?

Male:  ((inaudible)).

Male:  Give your example.

Male:  Yes, the ADHD drugs all have a medication guide regarding cardiovascular risk, but do not have a black box for that.

Ruth Day:  And those are generally exceptions.  Most of them have both – is that correct?  I mean most that have – most medication guides also have that issue addressed in a black-box warning except for a few?

Male:  Well, a lot of older boxes do not have medication guides.  More recently they tend to.

Ruth Day:  ((inaudible)) (condition) (wise) the other way.  (Giving) medication guide, most of those medication guides also have that issue addressed in the box?

Male:  (Concerning) our examples where we are currently working with sponsors to develop medication guides without a box warning in their label, so those aren't finalized, but they certainly are examples that we're working on.

Male:  Yes, Dr. Pine.

Daniel Pine:  So, I seem to recall you know, whatever, three or four years ago, when we first talked about medication guides, you guys had a very different tone, in terms of talking about them, in that they were seen

as not a very valuable thing. I remember Dr. (Temple), in particular, talking about how the fact that you know your experiences that pharmacists usually don't hand them out, patients usually don't read them, and I think today's discussion it sounds like you're looking at medication guides differently, as an important way to communicate to patients, which is refreshing, but maybe you might comment on that.

Male: (Well), it's still getting them distributed is certainly still a problem that has not been solved. Our attempts to solve it in the past have been to try to get the sponsor to make ((inaudible)) packaging, at which point you get the med guide, but we haven't that uniformly. It remains to be seen, I have to tell you, whether on new authorities under (Fadal) will make it more possible to get this done and I think that's entirely possible, but it's not a fully-solved problem.

In some cases with the non-steroidal anti-inflammatory drugs, we resorted to a common med guide for you know 10 or 15 drugs – that helped. It was more manageable for the pharmacy. But, no, I don't think that problem is fully solved. But, the idea that the patient gets it and participates is still very attractive, we just can't quite figure out how to get them distributed all the time.

Male: Dr. Day.

Ruth Day: One piece of evidence – there was a study conducted at Duke in two laboratories and in the Duke Clinical Research Institute they (tracked) where the patients got the medication guide or not. As you know, there's supposed to be with the prescription every time it's dispensed, not just the first time, and I don't remember the exact data, but I think my colleagues found up in the 90s, 90percent distribution and the two drugs were Accutane and Premarin. We did the comprehension part of it and we found that – you know good things about it and that patients paid attention and understood a lot of it and so on. So, I think they are taken seriously and there's pretty good distribution, and very good in some cases, so I'm not aware of other subsequent studies.

Male: You know, for example, all contraceptives are almost always administered ((inaudible)) packaging, so the thing can be attached to that and I think that's largely true of Accutane. So, when you have that then it goes out, no problem.

Male: Dr. Gilman.

Sid Gilman: Well, the message about the low risk, but nevertheless risk for suicide, should go not only to professionals but also to patients. That's true for what pharmacists hand out, but also on the Web. There are lots and lots of information about drugs on the Web that should contain this information in the proper language to patients.

Male: So, I think you've heard a lot about all of our concerns and issues and hemming and hawing on the language on – obviously that's something you're going to need to really think a lot and very carefully about.

The question that was for the secondary vote was should there be a medication guide? That is something given to patients that describes this in the appropriate language. So, I think we're up for a vote for that. ((inaudible)) I'm sorry.

Male: I just want to follow up on Dr. Day's comment.

Male: Yes.

Male: In your study, what percentage of people would voluntarily read the medication guide? I understood from the way you said that among those who read it people comprehended, but what …

Ruth Day: Let me clarify. The patients in – these were people on the drug and, first of all, they were contacted by somebody else about – by phone as to whether they had read it and whether they had gotten it

and so on. In our study, in my Lab, people actually showed up and they were there and we made them sit there and read it and then we tested comprehension. But, we did also ask them about how much they would have – you know what percentages they would have read in everyday life and so on, so forth, and it's all pretty good. Medication guides are supposedly written in patient-friendly language. The structure is different. Every little section has a question – what should I know before taking this drug, et cetera, so there are some patient-friendly things, not as high as I would like, but people do pay attention to them.

Male: Dr. Anderson.

Britt Anderson: So, this is a question for people to answer to help me decide on my vote. We were reticent with the black box because of, I think in some of our cases, the concern for adverse consequences, because we would be scared as physicians by the black box. But, sending suicidality in a patient guide that's going to be inserted (with) (what) they get with their medicine at the pharmacist that's OK.

So, I guess I would like to know whether people really – whether people feel that there isn't the same risk of adverse consequence by sending a mailer, basically, that the patient gets separated from his encounter with – that uses the word "suicidality," whatever the language is that specifies the risk.

Male: Dr. (Kline).

(Kline): Speaking as a physician, my hope would be that whatever we decide the purpose ((inaudible)) encourage a discussion between the physician and the patient – that that's really what one wants to do. And getting a med guide in a way that facilitates that discussion about the risk for suicide would be a good thing. Whether or not there is a med guide, I would hope that the FDA communicates our discussions it would become standard practice for all physicians to discuss the risk of suicidal ideation or suicidal behavior when somebody starts an anticonvulsant, given that that is at least my desire. Anything that is going to make it more likely that that discussion were to happen then that's a good thing and my sense is that the med guide would have that affect, while at the same time not discouraging – it would encourage the physician to discuss the issue without scaring them away from using the treatment.

Male: Dr. ((inaudible)) and then ((inaudible))

Male: Yes, I just want to follow up a little bit on Dr. (Temple's) question about the (X) North American dataset. Since what we're talking about is basically influencing and helping better manage the risk benefit discussion in the U.S. labeled and the U.S. population, is the use of the global dataset appropriate here, or is it better to use the North American dataset?

And, I presume the antidepressant data analysis did not show a distinction between regional differences. And in the (X) North American dataset appears to be driven principally by the events (and) suicidal ideation, which could be ((inaudible)) or other sort of cultural differences. And, so since the discussions principally around the U.S. label and U.S. practice is it appropriate to use global data or is it more appropriate to use U.S. data?

Male: Well, we might look more closely at some analyses of the non-North American data, but I think that's certainly contributing to our conclusions about the data overall. We're not aware of any obvious reason why, for example, there should be a differential ascertainment bias between placebo and drug in other countries. We often rely on – and not to say it's not a real question, but we often rely on data – non-U.S. data to make regulatory decisions. It's not uncommon to have international trials for effectiveness that show you know a stronger (signal) outside the U.S. and certainly sponsors don't object to that. So, at the moment, absent some other results of some other analyses we might do, I think we are likely to describe the overall data.

Male: But, we're also – I mean I want to see a two-by-two analysis that looks at both the epilepsy and other data by region. And, even though you all didn't care much about it, I do, so we're going to look at it more.

OK, we have to come to a vote on this last issue within the next minutes and a half ((inaudible)) both of our patient representatives would like to get one more word in, so I'm going to get that and then we'll vote – Ms. Griffith.

Griffith:  Yes, I would suggest that if we've learned anything from the experience with the antidepressant drugs that that is that the black box – and this is to address Dr. (Anderson's) question – the black box became a term that was larger than life.  Patients knew what that meant.  It caused tremendous alarm, as opposed to a med guide, which was ((inaudible)) I have to say that that never caused anyone any distress, so I'm very comfortable with separating those two out.

Male:  Dr. ((inaudible)).

Female:  Well, I'd like to point out, for those of us who are still stuck on the idea of extrapolating the data that we had to all the anticonvulsants, it seems to me that when I'm sitting in a room with my patient I am going to struggle if there isn't any clarify here, whether – if I'm using a drug that's an anticonvulsant  for non epilepsy am I going to be held to the same responsibility of having that discussion, since I'm still not sure I buy it.

And, moving forward, if I use (phenetoyan) on my patient for epilepsy or for trigeminal neuralgia you know I really am stuck here.  I understand that there's this need to have this discussion with a patient, but I'm very uncomfortable with the extrapolation of the data that we do have, the data that we don't have, and I realize that not all of my colleagues agree with me, but I have to put that out there.

Male:  And, again, that exact distinction could be part of the language here.

OK, I think we need to come to a vote now.  So, the question is should there be a medication guide – yes or no?

OK, I think we start ((inaudible)) …

Female:  ((inaudible)) for question number five, there's 17 yes, four no ((inaudible)) abstain.

Male:  And, last time around.

Susan Susan Schultz:  Schultz yes.

Britt Anderson:  Anderson yes.

Female:  ((inaudible)) yes.

Male:  ((inaudible)) yes.

Male:  ((inaudible)).

Matthew Rizzo:  Rizzo, yes.

Andrew Winokur:  Winokur, yes.

Andrew Leon:  Leon, yes.

Robert Woolson:  Woolson, yes.

Lily Jung:  Jung, no.

Daniel Pine:  Pine, yes.

Delbert Robinson:  Robinson, yes.

Larry Goldstein:  Goldstein, yes.

Wayne Goodman:  Goodman, no.

Female:  ((inaudible)) yes.

Sid Gilman:  Gilman, yes.

Sean Hennessy:  Hennessy, no.

Gail Griffith:  Griffith, yes.

Male:  ((inaudible)) no.

Ruth Day:  Day, yes.

Male:  Very good.  I hope that the FDA has gotten what they wished out of this exercise.  It was certainly an interesting and difficult discussion.  My sweet secondhand has come across five and we are adjourned.  Thank you.

Male:  Thank you.

Male:  Thank you.

END