# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------ x
In re:   NEURONTIN MARKETING,
         SALES PRACTICES AND
         PRODUCTS LIABILITY LITIGATION
------------------------------------------------ x

THIS DOCUMENT RELATES TO:

ALL PRODUCTS LIABILITY CASES

------------------------------------------------ x

: MDL Docket No. 1629
:
: Master File No. 04-10981
:
: Judge Patti B. Saris
:
: Magistrate Judge Leo T. Sorokin

**RESPONSE TO PRODUCT LIABILITY PLAINTIFFS' NOTICE
OF SUPPLEMENTAL AUTHORITY IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE TESTIMONY OF DOCTORS TRIMBLE,
KRUSZEWSKI AND BLUME ON THE ISSUE OF GENERAL CAUSATION**

Plaintiffs' Supplemental Authority is not only in direct contravention of this Court's Order that no additional briefing or authority be filed, but mischaracterizes the FDA Advisory Committee's (the "Committee") and Dr. Katz's conclusions about Neurontin in no less than five ways.[1]

First, plaintiffs selectively quote Dr. Katz to suggest FDA concluded that Neurontin causes suicide. But neither Dr. Katz nor FDA has made a causality finding as to Neurontin. Rather, when specifically asked whether he could conclude that any individual drug has an increased risk of suicidality, Dr. Katz responded that he could not:

> Roy Twyman (Advisory Committee Member): Let's assume that the effect is generalizable to the class of AEDs, but if you look at the compounds individually could one draw the conclusion individually that compounds have a risk. Or do

---

[1] Defendants are mindful of the Court's admonition regarding additional filings—which plaintiffs completely ignored—and thus have filed a motion for leave seeking the Court's permission to file this reply.

>you need the entire data set of all the AEDs put together in order to draw the conclusion that AEDs have a signal?
>
>Russell Katz: I would say we need the entire data set in this case.

Hearing Transcript at 63, attached as Ex. A. Even in the excerpt quoted by plaintiffs, Dr. Katz states, "if it's statistically significantly different from placebo we say *the drug* caused it." *Id*. at 99 (emphasis added). FDA's own analysis of the drug at issue here—Neurontin—demonstrates that there is no statistically significant association between Neurontin and suicidal thinking or behavior. FDA Statistical Analysis and Review at 24, Figure 2 (May 23, 2008), attached as Ex. B.

Second, plaintiffs misrepresent the actions of the Committee, stating that it "voted 20-0 (with 1 abstention) in favor of FDA's overall finding of an increase in suicidality for the 11 drugs analyzed." Plaintiffs' Supplemental Authority at 2. Plaintiffs omit that the Committee chair, Larry Goldstein, reiterated again and again that the question before the Committee was whether there was "a signal" and that a signal is <u>not</u> the same as causation.[2] That the Committee agreed that FDA's analysis shows "a signal"—i.e., a hypothesis requiring further study—is quite distinct from a determination of causation.[3]

Third, plaintiffs misleadingly state that "the Advisory Committee then voted 18-3 in favor of the position that the FDA's causation analysis was applicable to each of the 11 drugs at

---

[2] Ex. A at 93 ("So the first question is does the committee agree with the agency's overall finding of an increase in suicidality for the 11 AEDs analyzed? And the real crux of the question is do we think there's a signal here? Is there a signal."); *Id* at 95 ("I think that the first question is, is there a signal in this group?" How one interprets it is it causality is a related but not the same question."); *Id* at 96 "Now whether one concludes that this is causal or not, I think is open to debate but the bottom line is that this is the data we got; these are the results. So we believe the signal?").

[3] Indeed, Dr. Katz noted that there was no clear mechanistic understanding of the signal: "First of all, not every drug that we analyzed was seen to have a signal. And two and perhaps more interestingly, there is no obvious reason why there should be a similar signal for this event for drugs with such, at least presumed disparate pharmacologic activities." Ex. A. at 5.

issue." Plaintiffs' Supplemental Authority at 2. The vote on question number two was whether the Committee could *exclude* any drugs analyzed—including those for which there was no statistically significant association—from FDA's finding of an increased risk. At no point did the Committee conclude that each or any of the eleven drugs could cause anything. Several Committee members made the precise point prior to the vote on question number two that this was a policy-based class-wide risk assessment, not a drug-specific causation assessment:

> Sean Hennessy: Yes, I'd like to make the point that when you say the results apply, we're really talking about an assumption so there are a couple of different things you can assume either in the absence of data you can assume that any particular drug that hasn't been shown to be dangerous is not.
>
> Or on the other side you could assume that all of the drugs are the same unless proven different. For a safety concern the conservative thing to do is to assume that all drugs in a particular class, and whether that be pharmacologic class or therapeutic class, share the same risk unless proven otherwise.
>
> That's a reasonable assumption to make in a safety context. <u>But I think we should be clear that we are making an assumption and that we are not able to use scientific reasoning to make the inference that each one of those individual agents is—has an increased risk.</u>
>
> So we make an assumption from a public policy perspective of what we will do from the label. <u>But the data aren't—I would say the data aren't there for the individual drugs.</u>
>
> \*\*\*
>
> Daniel Pine: So two things. One thing, just to second what Dr. Hennessy said. From a safety perspective I think that we have to look for the presence of data to suggest that we should do something unusual with one or another medicine.
>
> Do we single it out as particularly good or particularly not good? And <u>in the absence of statistical evidence, from a safety standpoint I think it behooves us to not single something out unless the evidence is there.</u>"

Ex. A at 102 (emphasis added). Thus, contrary to plaintiffs' suggestion to this Court, the Committee made no causality assessment whatsoever because "the data aren't there" to support a causality finding for the individual drugs.

3

3039954v1

Fourth, plaintiffs' Supplemental Authority fails to mention the Committee's vote on question three. After determining that it could not exclude the possibility that a potential risk existed for any of the drugs in the meta-analysis, the Committee went one step further. The Committee concluded that FDA's finding of an increased risk should apply to all medications indicated for epilepsy, even those drugs not part of FDA's analysis. In other words, the Committee extended FDA's finding to drugs for which no data and no statistically significant association exists. This decision is no more a conclusion that the unstudied drugs cause suicidal thinking or behavior than was the Committee's vote on question number two. Rather, it too demonstrates that the Committee's focus was a public policy risk assessment, not a drug-specific causation analysis. Ex. A at 106 ("Obviously we don't know about the effects of drugs that aren't studied. The question is, from a public policy perspective, what do we do about that?") (testimony of Dr. Sean Hennessy).

Fifth, also noticeably absent from plaintiff's brief is the Committee's vote on question four. The Committee voted 14-4 against the addition of a black box to the labeling of AEDs discussing FDA' analysis. If—as plaintiffs suggest—the Committee believed that each of the drugs studied could cause suicide, the Committee undoubtedly would have voted to include a black box warning. Yet, it did not.

Pfizer's position going into the Advisory Committee hearing—supported by FDA's own analysis—was that the Neurontin data do not demonstrate a statistically significant increased risk of suicidal behavior or thinking. Hence, the Neurontin-specific data do not support the conclusion that Neurontin can cause suicide. Neither FDA nor any Advisory Committee member disagreed with that conclusion.

4

Dated: July 21, 2008

Respectfully submitted,

DAVIS POLK & WARDWELL

By: /s/James P. Rouhandeh
     James P. Rouhandeh

450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000

-and-

SHOOK, HARDY & BACON L.L.P.

By: /s/Scott W. Sayler
     Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550

-and-

HARE & CHAFFIN

By: /s/David B. Chaffin
     David B. Chaffin

160 Federal Street
Boston, MA 02110
Tel: (617) 330-5000

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

# Exhibit A

FDAAC
7/10/2008 - 8:00 AM ET
Speaker ID FDA
Page 1

# Peripheral and Central Nervous System Drugs and the Psychopharmacologic Drugs Advisory Committee
## July 10, 2008
## 8:00 AM ET

| | |
|---|---|
| Yvette Waples: | Good morning. Will everyone please take their seats? We are about to start. |
| | I would first like to remind everyone present to please silence your cell phones, Blackberry and other devices if you have not done so. I would also like to identify the FDA press contact, Miss Sandy Walsh. If you are here, please stand. |
| Larry Goldstein: | Good morning. My name is Larry Goldstein, and I am the acting Chair for this joint meeting. It should be a very interesting discussion. And again I -- just to start, for those of you who have not been at these things before, the purpose is really for the FDA to hear the Committee's views and to hear the discussion. |
| | The voting that will take place based on based on the questions that they ask is important to give an overall sense to the FDA. But really the main purpose is for them to hear the discussion of our views about the questions and issues that they have asked us here for. |
| | To begin with, we have to read into the record the Conflict of Interest Statements. |
| Yvette Waples: | The Food and Drug Administration, FDA is convening today's meeting of the Peripheral and Central Nervous System Advisory Committee, the Psychopharmacologic Drugs Advisory Committee and representatives from the Pediatric Advisory Committee and the Drug Safety and Risk Management Advisory Committee of the Center for Drug Evaluation and Research under the authority of Federal Advisory Committee Act of 1972. |
| | With the exception of the industry representatives, all members and temporary voting members of the Committee are special government employees, SGE's or regular federal employees from other agencies and are subject to Federal Conflict of Interest Laws and Regulations. |
| | The following information on the status of these Committees' compliance with Federal Ethics and Conflict of Interest Laws covered by but not limited to those found at 18USC Section 208 and Section 712 of the Federal Food, Drug and Cosmetic Act are being provided to participants in today's meeting and to the public. |
| | FDA has determined that all members and temporary voting members of these Committees are in compliance with Federal Ethics and Conflict of Interest laws. Under 18USC Section 208, Congress has authorized FDA to grant waivers to special government employees who have potential financial conflicts when it is determined that the Agency's need for particular individual services outweighs his or her potential financial conflict of interest. |
| | Under Section 712 of the FD&C Act, Congress has authorized FDA to grant waivers to special government employees and regular government employees with a potential financial conflict when necessary to afford the Committee essential expertise. |

behavior or suicidal thinking according to a standardized scale created by the experts at Columbia University.

And these analyses were essentially identical and analogous to those performed over the past several years for the antidepressant drug products. And of course, you know those analyses have been presented to the Psychopharmacologic Drugs Advisory Committees on numerous occasions. And those have resulted in significant changes to labeling for those products.

So as far as the results, you know our analyses included almost 200 trials, over 40,000 patients. And we found an overall odds ratio of 1.8, which to us was a statistically significant increase in episodes of suicidality for the drugs taken as a whole compared to placebo.

Eight of the 11 drugs had an odds ratio greater than 1. And of the three that didn't, two had the fewest patients of all 11. And though there were multiple sensitivity analyses that were performed, various groupings of the data, the results in our hands were robust to all of those, all of those maneuvers.

So, based on these results, the Agency issued a Public Health Advisory in January and decided to bring the issue before these combined Committees.

So these analyses have led us to several conclusions. But of course we are here to seek your advice and guidance on what you think about, about those conclusions.

First, we have concluded that the results should be considered to apply to all 11 of the drugs analyzed and not actually just to those 11, but to all AEDs to be given chronically, including those that were not included in the analyses. And we recognize that this conclusion is arguable I suppose for at least two reasons.

First of all, not every drug that we analyzed was seen to have a signal. And two and perhaps more interestingly, there is no obvious reason why there should be a similar signal for this event for drugs with such, at least presumed disparate pharmacologic activities.

Regarding the first point about not all drugs having a signal, as I noted earlier, of the three that didn't have a signal, two of them, Carbamazepine and FELBATOL had very few patients. In fact, they had the, those are the two smallest cohorts of the 11 that we looked at.

So of course that suggests that the estimates in those particular cases might not be as reliable, as precise as for the other drugs.

The third drug, which did not have a signal, Divalproex, did seem to have a reasonable number of patients in drug versus placebo, over 1,000 patients in each of the treatment groups.

So if you consider that in fact, there aren't necessarily 11 drugs that were capable of generating a signal, but nine that actually had sufficient numbers of patients, it wouldn't be terribly surprising to see one of those, in this case Divalproex vary in its estimate from the overall meta-analysis, even if the truth was that the drugs do cause suicidality.

| | |
|---|---|
| Sid Gilman: | I just wanted to make the point again that people with epilepsy, as an ominous statement perhaps 50% to 75% of them are not well controlled on their medications. Those who are not controlled are usually given an additional medication and that continues. |
| | Moreover, there is good evidence now that epilepsy, each seizure can be damaging to the brain because of glutamate cytotoxicity. So we don't want people to have epileptic events. |
| | People with epilepsy do continue on to have their seizures and they continue to have medical care. And these are people often very disturbed, who may be depressed because of their seizure disorder, especially in adolescents. So that has to be taken into account when we think about a black box or any other kind of warning. |
| | On the other hand it's very important that both the parents and the patient with the epilepsy be aware of this danger so I emphasize the latter in my thoughts here. We need to make people aware that there is a danger here. |
| Larry Goldstein: | And again, one of the things that could be done explicitly is say that this is an issue, but that it is not a reason to stop treatment with an anticonvulsant. It's just the warning could be aware that this may occur but not an indication for stopping. |
| | Okay. Dr. Lu. |
| Ying Lu: | I think I heard a lot of discussion about epilepsy that this box labeling or not, perhaps stop the treatment. But we, my understanding is that the black box will apply not just to epilepsy but also psychiatry and other indications including neuropathy and so, because I'm not a clinician so any discussion on the other side of the story? |
| Larry Goldstein: | Two more -- Dr. Rizzo. |
| Matthew Rizzo: | If you don't mind Dr. Goldstein I'll wait until this afternoon. |
| Larry Goldstein: | Oh. Okay, that would be fine. And Dr. Twyman. |
| Roy Twyman: | Yes, I have a question for the statisticians. Let's assume that the effect is generalizable to the class of AEDs, but if you look at the compounds individually could one draw the conclusion individually that compounds have a risk. Or do you need the entire data set of all the AEDs put together in order to draw the conclusion that AEDs have a signal? |
| Russell Katz: | I would say we need the entire data set in this case. |
| Larry Goldstein: | Very good. Well, it's at that time. We are going to take a lunch break. First let me reiterate to the members of the Committee, it's fine to talk about Duke basketball. It's not fine to talk about anything of substance or anything related to our discussions. |
| | Sorry. We are going to reconvene in one hour at one o'clock. Please take any personal belongings you may want with you at this time. This room is going to be secured by the FDA staff. You won't be allowed back in until we reconvene. |
| [BREAK] | |
| Larry Goldstein: | Everybody please take your seats and come to order. |

| | |
|---|---|
| Brett Anderson: | And that would seem a possible systematic difference, right, if whoever is performing the translation chooses terminology that's different or distinct from that which is spontaneously reported by North Americans, then it doesn't show up when you look for ideation. |
| Alice Hughes: | We didn't give specific instructions about translation. |
| Larry Goldstein: | Very good. So what I think we'd like to do now is to turn to the specific questions that we were asked to discuss. We really talked a lot about many of the issues if not all the issues that these questions address. As we go through them, though, I'd like to sort of take each one in turn. Each question in turn is sort of conditional on the one before it, but the answer to the one before doesn't dictate the answer to the one that follows. So, can we have the questions up there or not? |
| | Okay, let's put question one up. So the first question is does the committee agree with the agency's overall finding of an increase in suicidality for the 11 AEDs analyzed? And the real crux of the question is do we think that there's a signal here? Is there a signal? Again, don't think about where this is taking us on later questions because we can answer yes now and have something else later on, so don't jump to yes here and question therefore we're not, so each one is conditional but the answer to one doesn't dictate the answer to the next. |
| | So firstly, do we think that there's a signal? And again, before we have a just general discussion, I'd like again the statisticians just to make sure we have them online about this, are there issues related to the analyses that were conducted or the other information that we heard at the public comment time that would alter than in any way? Anything technical with the way the analyses were done that you had issues with? |
| Robert Woolson: | I think I'm okay with all after the discussion. I think I concur with the analyses. I put more weight on the risk difference kind of analyses and I think we've heard issues with regard to separating out the suicidal categories into behavior versus ideation and I put a fair amount of weight on the behavioral aspects. |
| Larry Goldstein: | Dr. Leon. |
| Andrew Leon: | I don't have anything new to add. I agree with the way it was done and I focus more on the risk differences. |
| Larry Goldstein: | Dr. Lu? |
| Ying Lu: | Yes, I don't have anything to add. I think the analysis won't change. |
| Larry Goldstein: | Okay. Dr. Katz. |
| Russell Katz: | Just one clarification, what we're trying to get at here is whether you think there's an overall signal. It says for the 11 AEDs. There's a subsequent question which asks if you think there's a signal, to which drugs do you think this signal applies? So I don't want you to be distracted by that 11. This is, is there an overall signal is --. |
| Larry Goldstein: | So again, the question is, given the information that we have based on the analyses that were presented, firstly are they valid? Are there technical issues with the way that the statistical members of the committee have an issue with and the answer to that from what |

| | |
|---|---|
| | trials, I wouldn't expect imbalance on an unmeasured variable. And it wasn't unmeasured but one unavailable to us. |
| Larry Goldstein: | Yes, Dr. Winokur. |
| Andrew Winokur: | So I'm going to jump in and agree and reinforce comments that several people have made. I think in balance this is a significant data set because of the really large number of studies in population and the placebo-controlled design. There clearly are some potentially confounding factors, but I think that the fact that we're strictly looking at randomized placebo-control trials results in our seeing a signal that I think is an important one for the field to be aware of. |
| Larry Goldstein: | Very good. Any others -- nobody on the list. The other committee members have any other points or--yes, sorry, Dr. Hennessy. |
| Sean Hennessy: | Thank you. So as the question is worded I would say yes, but suicidality actually isn't found in the dictionary online that I just looked at. It's not in the dictionary. Thank you. So if you ask the question is the rate of suicide different it's not statistically different; it's four versus zero and the sizes of the denominators are different. I agree that suicidality and suicidal ideation points to a potential problem, but the thing we're really worried about, suicide, which is the fatal event, has a suggestion for an increased risk but it's not statistically elevated. |
| Larry Goldstein: | And I think that gets back to the issues that were discussed with the depression drugs. I think this is an empiric definition of what they're calling suicidality and it's operationally defined. |
| | Yes, Dr. Schultz? |
| Susan Schultz: | Just very briefly to clarify the question, you're asking for a concern about an increase in suicidality but based on these only up to 24 week roughly trials which, as was alluded to earlier sort of represents an acute perturbation of the system. Are you asking simply about that or whether we think that's relevant to all antiepileptic treatment overall which we know is chronic therapy over years of time? |
| Larry Goldstein: | I think that's a later question, okay? So again, we're going to do each one of these separately and again, the answer, you know, if we say -- if the committee votes we think that there's no signal, the rest of the questions become moot. If we think that there is a signal here then the next one is to start address some of the other issues that you so appropriately bring up. |
| Susan Schultz: | Okay. So the signal question is only the acute trials period. |
| Larry Goldstein: | Each one separately. The next one is conditional on it but it doesn't dictate the answer to the next. Okay. So having, I'm sorry, any other discussion? Yes, Dr. Armenteros? |
| Jorge Armenteros: | One point. We are not implying or maybe we are, causality? Clearly implying causality, is that correct? |
| Larry Goldstein: | I think that the first question is, is there a signal in this group? How one interprets it is it causality is a related but not the same question. |

| Speaker | |
|---|---|
| Daniel Pine: | What I heard the FDA just say and maybe they'll restate it is, if an association is observed in a randomized control trial, by definition they view that as a causal association or causality. But maybe you want to restate that? |
| Russell Katz: | No. I think that's right. I think in the controlled trials you see a signal, it's statistically different from placebo, that's operationally defined as causality. |
| Robert Temple: | Once you rule out bias error and other inconveniences. |
| Larry Goldstein: | Right. And the differences between I think an answer for a prospective randomized trial and what we're looking at here is that these trials were not prospectively randomized to test this question. So this is an observational analysis that's nested in a series of randomized controlled trials that we're analyzing. Now whether one concludes that this is causal or not, I think is open to debate but the bottom line is this is the data we got; these are the results. So we believe the signal? |
| Female: | But that has got to be two separate questions. |
| Russell Katz: | Yes. We're interested in whether or not you think--when we use the words signal we mean whether or not you think there's a statistically significant increase in episodes of suicidality which to us we interpret that as causality. We should be very clear that the trials were prospective trials. They were randomized trials. Data were collected contemporaneously prospectively. The trials were not designed to specifically solicit information or elicit information about suicidality necessarily. Some probably were depending upon the indication, but they weren't globally specifically set up to capture that information.<br><br>So, but the information that was captured, was captured the way information is captured in clinical trials; contemporaneously and then think of that as prospectively. What was done retrospectively was the manipulations after that which were searching the database and categorizing them into these categories. And the analysis has been -- the meta-analysis, as has been said before--was prospective. We set up a hypothesis. We set up a primary outcome variable and we set up a method of analysis before we had looked at the data. So much of this in a sense is quite prospective. They just weren't set up to capture the data perhaps in the best possible way. |
| Evelyn Mentari: | As I understand the discussion that we're having, we're dealing with the question of whether there's causality. And we do have a statistically significantly increase result for the class of antiepileptic drugs. And as I understand that most people consider that causality. There's a separate question of generalizability. I mean, there's several issues with these trials that may make on e question about how generalizable they are, namely that several of them have exclusion criteria which including history of suicide attempts, suicide risk, substance abuse, personality disorders, which may affect how generalizable they are and how we might use the data. And that's a very relevant question. You know, also the issue that has been brought up several times of the short-term nature of the data is also something that we need to look at to assess how generalizable it is. But to me I think that is a slightly different question from whether it represents a causal association. |
| Larry Goldstein: | Dr. Caplan? |
| Rochelle Caplan: | If I could get additional explanation, so really the outcome measure which in this case is suicidal attempts, behavior, ideation, was as you indicated, was actually collected |

downplays it in many settings in every day life. People don't want to step up and say causes.

And I will just point out that even within the FDA documents presented to us of things we might take action on later in the proposed medication, which we're not discussing now, but it does say this medication may cause suicidal thoughts et cetera, so that's one way of saying it. Yet in the public health or the information or the information for healthcare professionals that's already been posted it says what it says and then there's the boilerplate language at the bottom, "Posting this information does not mean that FDA has concluded that there is a causal relationship between the drug product and the emerging safety issues." So it's partly a linguistic problem and I don't think that's part of question number one.

Evelyn Mentari: I just wanted to mention that the reason for that disclaimer was because we issued that back in January when we had just finished the analysis and we are still, we were still sort of reviewing it and it was still considered preliminary at that time. So that wasn't -- I think there are probably lots of examples of inconsistent language in our proposal in terms of causality, but that specific disclaimer was because it was preliminary rather than because we--

Ruth Day: Oh, so you're more comfortable with the same causality now?

Evelyn Mentari: Well--

Ruth Day: And I withdraw the question.

Evelyn Mentari: I am.

Russell Katz: We're unequivocally comfortable with using the word, the C word, with saying this establishes causality because again, we've talked about this a fair amount. This is how we determine causality. This is how we base our findings of effectiveness. The drugs, we do randomized trials. We analyze them prospectively. We have an outcome measure and if it's statistically significantly different from placebo we say the drug caused it. You've heard there are, you know, once you rule out chance and fraud and bias and that sort of thing, which we think we've done here.

So yes, we're quite comfortable with saying there's causality and you mentioned the med guide where we said this drug may cause, that was of course predicated on the view that we had concluded that the drugs caused this. That's a document to be given to lay people and we said may cause because even though we've established causality it doesn't mean it causes it in everybody. So we said, well, it might cause it or it may cause it in a particular person and that was the implication. But it wasn't meant to step away from the conclusion that the drug is responsible in those cases where it happens.

Mark Levenson: It's probably better to say can.

Larry Goldstein: Okay. I think we've had ample discussion about the point. I think we know the question that's before us based on the data that we have available, do we think that there's a signal, okay? So having the question itself though is written up there exactly in the text that we're voting on, but that's the aim of what the question is trying to get at.

Now for those of you on the panel we've had--there's a new way of voting. We used to go around the table and everybody voted yea or nay. We still need to do that, but what

| | |
|---|---|
| Larry Goldstein: | Not a problem. Dr. Gilman? |
| Sid Gilman: | Mr. Chairman, I have another correction to what you said but not what is written here. You said apply to drugs in the future. I don't think that should be part of this question; it's not written here. |
| Larry Goldstein: | We can do that in question three, in a sense of what they're trying to get at there. |
| Russell Katz: | This is the time to address just the 11 drugs in the study. |
| Larry Goldstein: | Just the analysis that we have before us. Fair enough. |
| Russell Katz: | Just the drugs that were included in the analysis. |
| Robert Temple: | It's about what to do with the diversity of responses in a sort of situation like this. |
| Larry Goldstein: | Got it. So everybody clear? Okay. Dr. Hennessy. |
| Sean Hennessy: | Yes, I'd like to make the point that when you say that the results apply, we're really talking about an assumption so there are a couple of different things you can assume either in the absence of data you can assume that any particular drug that hasn't been shown to be dangerous is not.

Or on the other side you could assume that all the drugs are the same unless proven different. For a safety concern the conservative thing to do is to assume that all drugs in a particular class, and whether that be pharmacologic class or therapeutic class, share the same risk unless proven otherwise.

That's a reasonable assumption to make in a safety context. But I think we should be clear that we are making an assumption and that we are not able to use scientific reasoning to make the inference that each one of those individual agents is -- has an increased risk.

So we make an assumption from a public policy perspective of what we will do from the label. But the data aren't -- I would say that the data aren't there for the individual drugs. |
| Larry Goldstein: | Thank you. Dr. Pine? |
| Daniel Pine: | So two things. One thing, just to second what Dr. Hennessy said. From a safety perspective I think that we have to look for the presence of data to suggest that we should do something unusual with one or another medicine.

Do we single it out as particularly good or particularly not good? And in the absence of statistical evidence, from a safety standpoint I think it behooves us to not single something out unless the evidence is there.

The second thing is I want to come back to the point that Dr. Temple made that I think it is a good trend in recent communications from the FDA that there is an emphasis on data and particularly alerting the field to the paucity of data. So really thinking very carefully about how exactly limited the data are in terms of saying anything specific about any of |

FDAAC
7/10/2008 - 8:00 AM ET
Speaker ID FDA
Page 106

| | |
|---|---|
| Larry Goldstein: | Yeah, I think that they've actually amended the question with somewhat different wording, taking into account the clarifications that were just mentioned. So it now reads, "currently approved, chronically administered AEDs". |
| | Yes, Dr. Hennessy. |
| Sean Hennessy: | Thanks. I'd like to make a similar comment. The last time that -- in my view, this is more of a policy question. What does one assume in the absence of data? Rather than a scientific question -- what do we know about the effects of drugs that weren't studied? |
| | Obviously we don't know about the effects of drugs that aren't studied. The question is, from a public policy perspective, what do we do about that? And to me the question becomes much easier when I think about it in those terms. |
| Larry Goldstein: | Very good. And Dr. Katz, Dr. Temple, is that --? |
| Russell Katz: | Yeah. No, I think -- right. It's largely that you take into consideration what you think you should take into consideration. But certainly it is, in our view largely a policy question, or in part anyway. |
| Robert Temple: | But it is presumably informed by what the perceived consistency across the drugs studied so far is. I mean, it will be informed by that. But it is ultimately a policy question, right. |
| Larry Goldstein: | Very good. |
| Rochelle Caplan: | Sorry. |
| Larry Goldstein: | Sorry, Dr. Caplan. |
| Rochelle Caplan: | Yeah, can you just clarify to me -- I'm sorry -- but if this is a policy issue and we are lacking all data -- I mean, again, what are the implications for treatment with patients? |
| | Are all patients, for example, and I am particularly talking about patients with epilepsy, going to be warned that their medication might cause suicidality? That is what we are voting on? |
| Russell Katz: | Right now, I think you are voting on the product -- should we apply the conclusion that we have come to, to all those other drugs. And the operational definition of "apply the conclusion" is to change the labeling in a similar way. |
| Rochelle Caplan: | Right. But the impact of this for example, on the epileptic community is going to be tremendous. Basically it's going to be saying to all patients that any medication that they take might make them suicidal. Right? |
| Russell Katz: | Yeah. |
| Rochelle Caplan: | That's what we are voting on. |
| Russell Katz: | Yeah. We are voting on changing, in effect changing the labeling to include some description of these results in that labeling. |
| Rochelle Caplan: | Despite the absence of data. |

# Exhibit B



U.S. Department of Health and Human Services
Food and Drug Administration
Center for Drug Evaluation and Research
Office of Translational Sciences
Office of Biostatistics

# STATISTICAL REVIEW AND EVALUATION

## ANTIEPILEPTIC DRUGS AND SUICIDALITY

| | |
|---|---|
| **Drug Class:** | Antiepileptic drugs |
| **Drug Names (NDA Numbers):** | Carbamazepine (21-710) |
| | Divalproex (18-723, 19-680, 21-168) |
| | Felbamate (20-189) |
| | Gabapentin (20-235, 20-882, 21-129, 21-216) |
| | Lamotrigine (20-241, 20-764) |
| | Levetiracetam (21-035, 21-505, 21-872) |
| | Oxcarbazepine (21-014, 21-285) |
| | Pregabalin (21-446) |
| | Tiagabine (20-646) |
| | Topiramate (20-505, 20-844) |
| | Zonisamide (20-789) |
| **Indication(s):** | Epilepsy, psychiatric disorders, other |
| **Date:** | 23 May 2008 |
| **Biometrics Division:** | Division of Biometrics 6 |
| **Statistical Reviewer:** | Mark Levenson, Ph.D. |
| **Statistical Team Leader:** | C. George Rochester, Ph.D., RAC |
| **Medical Division:** | Division of Neurology Products |
| **Clinical Team:** | Evelyn Mentari, MD |
| | Alice Hughes, MD |
| | John Feeney III, MD |
| | Marc Stone, MD |
| **Project Manager:** | Jacqueline Ware, Pharm.D., RAC |

**Keywords:** Epilepsy, psychiatric, bipolar, suicide, suicidality, meta-analysis

Figure 2 gives a forest plot of the estimated odds ratios and 95% confidence intervals for Suicidal Behavior or Ideation by drug and overall. The estimated overall odds ratio was 1.80 (95% CI: 1.24, 2.66). The odds ratio was greater than 1 and the confidence interval did not contain the value of 1. Therefore, the drugs were associated with statistically significant increased risk of Suicidal Behavior or Ideation events relative to placebo.

Based on the overall odds ratio estimate and the observed rate of 0.24% for Suicidal Behavior or Ideation events among placebo patients, there was an estimated 1.9 per 1000 (95% CI: 0.6, 3.9) more antiepileptic drug patients than placebo patients who experienced Suicidal Behavior or Ideation in placebo-controlled trials. In terms of adjusted risk estimates for the treatment groups, 0.43% of the drug patients experienced Suicidal Behavior or Ideation compared to the 0.24% of placebo patients.

Among the 10 drugs with any events, the estimated odds ratios for 8 drugs were greater than 1. For 2 of these 8 drugs, the confidence interval did not contain the value of 1.



*[Treat. Events/Treat. n  Plac. Events/Placebo n]

Figure 2: Suicidal Behavior or Ideation Odds Ratio Estimates, Placebo-Controlled Trials.

24