# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------------------x

In re: NEURONTIN MARKETING, SALES PRACTICES   :   MDL Docket no. 1629

    AND PRODUCT LIABILITY LITIGATION   :   Master File no 04-10981

---------------------------------------------------------------------------x

THIS DOCUMENT RELATES TO:   :   Judge Patti B. Saris

ALL PRODUCT LIABILITY CASES   :   Magistrate Leo T. Sorokin

---------------------------------------------------------------------------x

**DECLARATION OF SANDER GREENLAND, M.A., M.S., Dr.P.H., C. Stat.**

**July 22, 2008**

I, **Sander Greenland**, declare and state as follows:

**1. Tasks and Qualifications**

I have been asked by Kenneth Fromson of Finkelstein and Partners LLP to comment on the supplemental expert report by Dr. Robert D. Gibbons executed 11 July 2008 regarding the FDA Statistical Review and Evaluation of Antiepileptic Drugs and Suicidality dated 23 May 2008 (hereafter called the FDA Review). My qualifications for these tasks are extensive, and were presented in detail in my Expert Report in this matter dated 19 October 2007. Among my qualifications I should mention that I am a member of the Drug Safety and Risk Management (DSaRM) Advisory Committee of the FDA and so have some acquaintance with the operation of those committees.

## 2. Summary

I have determined that the supplemental expert report provided by Dr. Gibbons makes several serious statistical errors regarding the FDA analysis and the data at issue. All of the errors spuriously make the FDA analysis look questionable and gabapentin appear safe; hence the errors are biased (lacking in equipoise) toward masking a gabapentin effect. It is especially disturbing that every error, bias, and omission is in favor of the expert's client, and most are technical enough to make their detection by lay readers difficult.

In reality, the FDA analysis was in all respects conducted properly and followed the current best standards of practice. This is evidenced by the fact that the FDA Advisory Committee (composed of a large number of impartial experts screened to exclude anyone with conflicts of interest, including several biostatisticians) raised no criticism of the statistical analysis. I concur with the FDA analysis, which showed that any conclusion regarding gabapentin must be based on a physiologic judgment of whether gabapentin effects resemble those of other drugs in its class (a judgment that the FDA determined should be affirmative).

In the following sections I document the errors in Dr. Gibbons' supplemental report.

**3. Dr. Gibbons Bases Analyses on Incorrect and Biased Criteria for Inconsistency and Exclusion**

Statistical analyses based on excluding certain patients or subgroups after their outcomes are known have unlimited potential to distort statistical results. Concern about such bias is the reason that the FDA requires any primary analysis to state *in advance of seeing the outcomes* what will be included and excluded. In particular, if groups are excluded because they are significantly positive, the remaining data will give a result that is biased in favor of finding no positive effect.

Starting in section 3 of his supplemental report, Dr. Gibbons analyses are biased in just this fashion. He incorrectly focuses on seeing what happens when the largest groups providing positive evidence (lamotrigine and topirimate trials) are excluded. Exclusions made after seeing the outcomes, as Dr. Gibbons makes for lamotrigine and topirimate, need to be based either on clear physiologic evidence that the drugs in question act differently, or else on clear statistical evidence that the drugs in question have significantly different effects from the other drugs. Dr. Gibbons presents no evidence whatsoever that the effects of the drugs differ. Instead, he incorrectly bases his selection on which odds ratios were significantly different from 1 (rather than on which were significantly different from the other odds ratios, as he should have).

In reality, the FDA analyses of heterogeneity showed that the lamotrigine and topirimate results do *not* differ significantly from the results for the remaining drugs according to any acceptable statistical criterion or method. As can be seen from Figure 2 of the FDA

Review, the odds ratios for lamotrigine and topirimate are quite similar to the odds ratios for most of the remaining drugs. The only exceptional odds ratios are those for carbamazepine and divalproex, which are below 1 (meaning in the protective direction). In contrast, the odds ratios for lamotrigine (2.08) and topirimate (2.65) are not even the largest observed, with levetiracetam (2.75) instead being the largest.

Rules against excluding data after outcomes have been seen are designed to safeguard against selective removal ("cherry picking") of data in order to leave a remainder that favor the analyst's personal bias. In some instances it may be seen as acceptable to exclude extreme trials equally from *both* sides of the spectrum of results, but only if there is a clear statistical difference of those trials from the remainder. There is no such evidence here at all. In fact, as just mentioned, neither lamotrigine nor topirimate represent extreme results, which is one reason the FDA did not exclude these drugs.

Dr. Gibbons makes a severe statistical error in arguing otherwise. He mistakenly looks for differences among the drugs by comparing each to the null (no effect) odds ratio of 1. As explained in many textbooks (e.g., Chapter 32 of Rothman and Greenland, 1998) the correct comparison to make in a meta-analysis is to compare each group to the mean of all the groups. This is what the FDA did as part of their heterogeneity analysis, and they detected no differences. Dr. Gibbons simply erred in comparing all odds ratios to the null value of 1 and then excluding lamotrigine and topirimate from the data based on the significance of this difference from 1. This type of error is bound to obscure any true effects in the remaining data.

**4. Dr. Gibbons Makes Erroneous Claims Regarding Widths of Confidence Intervals**

In sec. 5 of his report regarding the FDA analysis of the gabapentin odds ratio, Dr. Gibbons claims that "the width of the confidence interval is due to the fact that in the FDA's primary analysis, they excluded all but 3 of the trials for which there was at least one event of suicidality, in this case suicidal thoughts (2 for gabapentin, 1 for placebo)." First, the wording of the claim is misleading. The FDA excluded only trials in which no case of suicidality was reported, but included all 3 trials for which at least one suicidality event was reported. Second, the claim that the exclusion led to wider confidence intervals is mathematically erroneous.

The technical error committed by Dr. Gibbons in his arguments can be deduced from standard formulas for constructing confidence intervals for ratios, as can be found in Chapter 14 and 15 of the textbook by Rothman and Greenland, 1998. These formulas show that, when dealing with an uncommon outcome such as suicidality, the width of the confidence interval for an odds ratio or risk ratio ("relative risk") depends only on the number of cases observed, not on the total numbers observed. Adding back the trials with no event does not and cannot change the width of the confidence interval for the odds ratio or risk ratio in any meaningful way. To claim that the exclusion of zero-event trials is responsible for the wide ratio confidence intervals in the FDA Review is simply false. The reason for the width of the ratio intervals is that the number of suicidality cases is only 2 for gabapentin and 1 for placebo. It is not because the FDA excluded the zero-event trials.

**5. Dr. Gibbons Provides Biased Interpretations and Presentation of the FDA Results**

For risk differences, exclusion of zero-event trials would widen the confidence interval, but the FDA included the zero-event trials in their analysis of risk differences and so committed no error. Instead, as just explained, the error is in Dr. Gibbons' conflation of the two separate analyses done by the FDA: The primary FDA analysis, which concerned only ratios and for which exclusion of zero-event trials could not affect the width of the intervals; and the secondary FDA analysis, which included zero-event trials when analyzing differences (as opposed to ratios).

Nonetheless, in section 5 of his supplementary report, Dr. Gibbons gives a biased description of the FDA results for risk differences. Dr. Gibbons there said of the FDA risk-difference analysis:

> "The confidence interval [for the gabapentin risk difference] was from -1.37 to 1.92, indicating that (a) the CI includes zero, so there is no evidence of suicidality risk for patients treated with gabapentin…By contrast, the estimated risk difference for lamotrigine was 5.40 per 1000 patients treated and for topirimate the risk difference was 3.05 per 1000 patients treated (see Figure below)."

Note the asymmetric way Dr. Gibbons describes these results: he claims there is no evidence of suicidality risk for gabapentin because its confidence interval includes zero. He then fails to mention that (as can be seen in the FDA figure) both the lamotrigine and topirimate confidence intervals include the gabapentin risk difference of 0.28. This means that, by the same criterion Dr. Gibbons used in his quote, there is no evidence of a

difference between the gabapentin effect and the lamotrigine and topirimate effects. Thus an unbiased analysis would note that the gabapentin risk difference of 0.28 is not significantly different from zero but is also not significantly different from the lamotrigine and topirimate risk differences.

The bias in Dr. Gibbons supplemental report continues in his figures in section 5. Those figures omit the results for all drugs but gabapentin, lamotrigine, and topirimate. He excludes the other 8 drugs shown in the actual FDA Figure 4 which he cites as his source. When the other 8 groups are included (as in the orginal FDA Figure 4) we see that in fact gabapentin most closely resembles the majority (8 of 11) of the drugs, in that it falls on the side of a positive association with suicidality. In his second figure Dr. Gibbons also fails to show the confidence intervals for the 3 drugs he picked; those intervals would show that the differences among the drugs fail to reach Dr. Gibbons' own criterion for significance.

In sum, an unbiased assessment of the statistical evidence shows that the totality of data (including the zero-event trials) cannot determine where gabapentin falls (on the spectrum ranging from no harm to harm comparable to topirimate and lamotrigine). It thus explains why the FDA and the FDA Advisory Committee properly chose to rely on pharmacologic evidence rather than statistics in deciding whether to include gabapentin (as well as other products) in the FDA alert.

**6. Dr. Gibbons Makes Erroneous Claims about the Statistical Power of the FDA Data and What Those Data Show**

The arguments in section 8 of Dr. Gibbons' report are based entirely on erroneous power comparisons. Note well that Dr. Gibbons never presents the power of the gabapentin trials. To provide it would reveal that indeed the gabapentin trials were underpowered to detect a doubling or even tripling of suicidality risk.

The number of suicidality events expected in the placebo group is a key factor contributing to statistical power (not the total number of patients as Dr. Gibbons insinuates). Unlike the gabapentin trials, the lamotrigine and topirimate trials involved patients at very high risk of suicide. It is thus no surprise that the latter trials observed a large number of suicidality events in those trials (19 among placebo patients) and hence did detect elevated risks.

In contrast, the gabapentin trials used patients at much lower risk and so observed only 1 event among the placebo patients. Thus the total power of the gabapentin trials is much lower than that of the lamotrigine and topirimate trials. Dr. Gibbons does not present the power of the gabapentin analysis, but that power is under 10% to detect a risk ratio of 2 (a doubling of risk). This power is far below the 80% power at a risk ratio of 2 generally required to test the safety of a drug. It means that there is over a 90% chance that a doubling of risk by gabapentin would go *undetected* by the gabapentin trials. It is thus all the more remarkable that the gabapentin trials were able to see as much of a risk increase they did (a risk ratio of 1.49 in Figure 5 of the FDA Review).

## 7. Dr. Gibbons Makes Erroneous Claims about the Inconsistency of the Results

In section 9 of his supplemental report, Dr. Gibbons erroneously interprets the FDA data to claim that "There are several other features of the FDA statistical report that give rise to serious concerns regarding the consistency of these data." The odds ratios cited by Dr. Gibbons are in fact remarkably consistent: 1.38, 1.51, 1.42, and 1.39. Every one of these analyses show about a 40-50% increased risk for the treated groups. Furthermore, every confidence interval overlaps every point estimate of every group, showing that the minor fluctuations across these odds ratios are completely consistent with only chance variation. Thus, and in direct contradiction to Dr. Gibbons claim, these results are perfectly consistent with the FDA conclusion that the data show a consistent picture of increased risk of suicidality for antiepileptic drugs.

## 8. Gibbons Misrepresents the FDA Position on Meta-Analysis and Causal Inference

In sec. 7 of his report Dr. Gibbons states

> "Here I agree completely with FDA that the observational nature of meta-analysis does not permit causal inference. The FDA has repeated this statement in its Amicus brief to the court."

I could find no place in any document where the FDA made any statement about meta-analysis and causal inference as general and restrictive as that claimed by Dr. Gibbons. The FDA simply noted that its findings regarding anti-epileptics and suicidality up to certain points in time (in particular, the time of their alert) were preliminary and therefore not yet conclusive. And no matter what was said about meta-analysis, the FDA has made

abundantly clear that they rely not just on meta-analysis or other statistical machinery, but also rely on expert considerations of physiology, pharmacokinetics, and all other relevant scientific input.

In particular, and contrary to Dr. Gibbons' claims, the FDA specifically allowed for subsequent causal inferences. For example, the FDA Amicus Curare Memorandum filed 01 July 2008 states at page 5 that its specific disclaimers do *not* preclude the FDA from further analysis that might lead to a more definitive finding. Subsequently, the FDA has reached a much more definitive and causal conclusion in this matter, as documented on page 90 of the transcripts of Joint Meeting of the Peripheral and Central Nervous System Drugs Advisory Committee and the Psychopharmacologic Drugs Advisory Committee of July 10, 2008. There, in reference to the current matter, the FDA representative states "We're unequivocally comfortable with using the word, the 'C' word with saying that this establishes causality." Any careful reading of the FDA documents will thus show that the FDA relies on the full spectrum of evidence in reaching its conclusions (not just statistical issues) and can reach causal conclusions.

Because Dr. Gibbons' is, like me, a statistical expert, it is natural and indeed expected that he focus on the statistical aspects of the FDA analysis, which are described by the agency in their Statistical Review of 23 May 2008. It should be remembered however that this FDA Statistical Review is one input into a broader scientific analysis used by the FDA, and that the broad analysis involves elements beyond the qualifications of both Dr. Gibbons and myself.

**9. Conclusions**

I have documented above some of the more egregious errors and misleading statements in Dr. Gibbons' supplemental report. As I said in my declarations of March 5, 2008, Dr. Gibbons' analysis of the FDA data is filled with technical errors, statistical fallacies, and distortive descriptions that consistently mask the possibility of gabapentin effects, and his supplementary report continues this pattern.

Contrary to Dr. Gibbons' claims, the FDA Statistical Review and the data reported therein provide no basis for claiming inconsistency between effects of gabapentin and the other drugs considered, including lamotrigine and topirimate. The statistical evidence in the gabapentin data alone are compatible with gabapentin having an effect similar to lamotrigine or topirimate, and are also compatible with gabapentin having no effect and gabapentin having a larger effect than the other drugs. Hence the FDA relied on physiologic arguments as well as meta-analysis to determine that the effects of gabapentin, lamotrigine, topirimate, and the other drugs examined are probably similar. The FDA examined 11 drugs and determined that 8, including gabapentin, exhibited positive relations to suicidality in placebo-controlled trials. They also found an overall relation of the drugs to suicidality that was significant by all usual standards. I thus concur with the July 10 vote of the FDA DSaRM Advisory Committee, agreeing with the FDA finding of increase in suicidality for the drugs examined.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of July, 2008, in Topanga, California.

Sander Greenland, M.A., M.S., Dr.P.H., C.Stat.

## 10. Reference

Rothman, K. J. and Greenland, S., and Lash, T.L. (1998). *Modern Epidemiology*, 2nd ed. Philadelphia: Lippincott-Williams-Wilkins.