1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3      _____

4   IN RE:  NEURONTIN MARKETING,
    SALES PRACTICES AND PRODUCTS
5   LIABILITY LITIGATION,          Civil Action
                                   No. 04-10981-PBS
6
                                   July 23, 2008, 9:22a.m.
7      _____

8

9

10           TRANSCRIPT OF DAUBERT HEARING DAY 3

11         BEFORE THE HONORABLE PATTI B. SARIS

12            UNITED STATES DISTRICT JUDGE

13                      and

14         HONORABLE MARCY S. FRIEDMAN

15            NEW YORK SUPREME COURT

16        JOHN J. MOAKLEY U.S. COURTHOUSE

17             1 COURTHOUSE WAY

18            BOSTON, MA  02210

19

20
              DEBRA M. JOYCE, RMR, CRR
21            Official Court Reporter
          John J. Moakley U.S. Courthouse
22          1 Courthouse Way, Room 5204
                Boston, MA  02210
23              617-737-4410

24

25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:

 3   ANDREW G. FINKELSTEIN, ESQ.
     KENNETH B. FROMSON, ESQ.
 4   Finkelstein & Partners, LLP.
     436 Robinson Avenue
 5   Newburgh, New York  12550

 6   JACK W. LONDON, ESQ.
     Jack W. London & Associates, P.C.
 7   3710 Bee Cave Road, Suite 200
     Austin, TX  78746
 8
     W. MARK LANIER, ESQ
 9   Lanier Law Office
     6810 FM 1960 Road W
10   Houston, TX 77069
     713-659-5200
11
     FOR THE DEFENDANTS:
12

13   JAMES P. ROUHANDEH, ESQ.
     Davis, Polk & Wardwell
14   450 Lexington Avenue
     New York, NY  10017
15
     JAMES E. HOOPER, ESQ.
16   Wheeler Trigg Kennedy, LLP
     1801 California Street, Suite 3600
17   Denver, Colorado 80202-2617

18   SCOTT W. SAYLER, ESQ.
     LORI CONNORS McGRODER, ESQ.
19   JENNIFER M. STEVENSON, ESQ.
     Shook, Hardy & Bacon, LLP
20   2555 Grand Boulevard
     Kansas City, MO  64108-2613
21
     RICHARD M. BARNES, ESQ.
22   Goodell, DeVries, Leech & Dann, LLP
     One South Street, 20th Floor
23   Baltimore, MD  21202

24

25
```

<pre>
1                              INDEX

2

3   WITNESS                    Direct  Cross   Redirect  Recross

4   ROBERT GIBBONS

5       By Mr. Lanier                    368
        BY Ms. McGroder                           420, 530
6
    CHARLES P. TAYLOR
7
        By Mr. Hooper         436
8

9   ANTHONY ROTHSCHILD

10      By Ms. McGroder       450              526
        By Mr. Finkelstein            475
11

12
    CLOSING ARGUMENTS
13
        By Mr. Sayler         535
14      By Mr. Finkelstein    556

15

16                          E X H I B I T S

17

18

    Exhibit No.   Description                    Received
19
       6          Transcript of FDA hearing         525
20

21

22

23

24

25
</pre>

```
 1              P R O C E E D I N G S

 2              (The following proceedings were held in open

 3    court before the Honorable Patti B. Saris, United States

 4    District Judge, and Honorable Marcy S. Friedman, New

 5    York Supreme Court, United States District Court,

 6    District of Massachusetts, at the John J. Moakley United

 7    States Courthouse, 1 Courthouse Way, Boston,

 8    Massachusetts, on July 23, 2008.)

 9              THE CLERK:  In Re:  Neuron Marketing, Sales

10    Practices and Products Liability Litigation, 04-10981

11    will now be heard before this Court.

12              Will counsel now identify themselves for the

13    record.

14              MR. FINKELSTEIN:  Andrew Finkelstein,

15    Finkelstein & Partners on behalf of the product

16    liability plaintiffs.

17              JUDGE SARIS:  Is your mic on?

18              MR. FINKELSTEIN:  Yes.

19              JUDGE SARIS:  Pull it in closer, because we'll

20    all need to catch your words.

21              Okay.

22              MR. LANIER:  Mark Lanier, your Honor, making an

23    appearance for the first time this morning, though I am

24    on the pleadings, I'm here from The Lanier Law Firm for

25    the product liability plaintiffs also.
```

```
 1              MR. FROMSON:  Good morning, your Honor.  Kenneth
 2      Fromson, Finkelstein & Partners for the product
 3      liability plaintiffs.
 4              MR. LONDON:  Jack London, no microphone, Product
 5      Liability Steering Committee.
 6              MR. ROUHANDEH:  Good morning, your Honor.  Jim
 7      Rouhandeh, Davis, Polk & Wardwell for Defendants.
 8              MR. SAYLER:  Good morning.  Scott Sayler, Shook
 9      Hardy & Bacon for the defendants.  My partner, Lori
10      McGroder, had to run to the restroom, she'll be right
11      back momentarily.  She's also with Shook Hardy & Bacon
12      for the defendants.
13              MR. HOOPER:  Jim Hooper for the defendants, your
14      Honor.
15              JUDGE SARIS:  All right.
16              MS. STEVENSON:  Jennifer Stevenson, Shook Hardy
17      & Bacon, defendants.
18              MR. BARNES:  Richard Barnes, Goodell, DeVries,
19      Leech & Dann from Maryland for the defendants.
20              JUDGE SARIS:  Okay.  So where were we?
21              MR. ROUHANDEH:  Well, we have Dr. Taylor, who we
22      need to complete the direct examination of and then
23      cross and redirect, but I think before that we're going
24      to do Dr. Gibbons, who is up for cross-examination and
25      redirect.  And then we have Dr. Tony Rothschild, who has
```

PDF created with pdfFactory trial version www.pdffactory.com

1    not testified yet, do direct, cross, and redirect,

2    followed by oral argument, closing argument.

3         JUDGE SARIS:  We had thought this was going to

4    be a cleanup morning.  I have a couple of criminal

5    matters on starting at 3:30, and it needs to finish by

6    then.  So I was a little worried when I saw the script,

7    as Mr. Alba gave it to me, that that was not going to be

8    feasible.

9         MR. ROUHANDEH:  Well, I'm not sure.  It might be

10   feasible, depending how quickly this moves along.  We

11   are almost done with Dr. Taylor; Dr. Gibbons is up for

12   cross-examination first.

13        JUDGE SARIS:  We'll see.  I'm simply saying,

14   Judge Friedman has come up all the way from New York,

15   she's going back tonight, it has to finish today.

16        MR. ROUHANDEH:  I think all the parties are

17   hoping, expecting that will occur.

18        JUDGE SARIS:  Okay.  Let's go.

19        MR. ROUHANDEH:  I did want to make one point for

20   the record.  Mr. Lanier mentioned he's on the papers in

21   New York, I don't believe he's filed a notice of

22   appearance and paid the filing fee in this case, in the

23   MDL.

24        JUDGE SARIS:  You know what, let's not take the

25   time to do this.

1          MR. ROUHANDEH:  No, no, I just want to note for

2     the record -- obviously, we're not in a position to

3     object.  For the record, I don't believe he's filed a

4     notice of appearance.

5          MR. LANIER:  For the record, Judges, I do

6     believe I am on the pleadings, I will make sure I --

7          JUDGE SARIS:  Let's not take time now.  Let's

8     go.

9          You are still under oath.  It's Dr. Gibbons,

10    right?

11         THE WITNESS:  Yes.

12         ROBERT GIBBONS, having been previously duly

13    sworn by the Clerk, was further examined and testified

14    as follows:

15         MR. LONDON:  May it please the Court, Mark

16    Lanier.

17                    CROSS-EXAMINATION

18    BY MR. LANIER:

19    Q.   Dr. Gibbons, I met you out in the hall, but you I

20    and have not met before; is that true?

21    A.   That's true.

22    Q.   I want to be sure you've got a copy of the bench

23    book we're using.  If I can give one to you and your

24    Honors, I believe, may I approach the bench?

25              Your Honor, Dr. Gibbons, I'm going to especially

1    be directing your attention to tab number 2 and tab

2    number 9.  If I could start out, though, with the Power

3    Point, that would be helpful.

4        In an effort to reduce the time we need with

5    you, sir, and your Honors, I'll represent I will be done

6    within one hour with this cross.  What I want to do is

7    focus on one Daubert/Frye issue with you.

8        MR. ROUHANDEH:  Your Honor, I don't believe the

9    cross for any of the witnesses has been one hour.

10        MR. SAYLER:  Thirty minutes.

11        MR. LONDON:  Cross is one hour.

12        MR. FROMSON:  Direct is 30, cross is one hour.

13        MR. LANIER:  I'm going to go so fast it's going

14    to seem like 30 minutes.

15        JUDGE SARIS:  So fast it's going to fly right

16    over hour heads.

17        MR. LANIER:  Fast and clear.

18    BY MR. LANIER:

19    Q.  Sir, what I want to do is, first of all, I want to

20    make sure we're all in focus on the objective I want to

21    ask you about and what I believe you're here to testify

22    about, and that is, whether or not the FDA meta-analysis

23    enjoys general scientific acceptance.  Are you with me?

24    Do you understand what that means?

25    A.  Yes, I do.

```
 1    Q.   And to make sure that we're clear on terms,
 2    meta-analysis, you know what that is, you're a
 3    statistician, right?
 4            JUDGE SARIS:  Do you know the answer to that
 5    question?
 6            THE WITNESS:  Yes.
 7            JUDGE SARIS:  What's your answer?
 8            THE WITNESS:  The answer to this question?
 9    (Indicating.)
10            JUDGE SARIS:  Yes.
11            THE WITNESS:  There are aspects of it that do
12    not enjoy general scientific or statistical acceptance.
13    BY MR. LANIER:
14    Q.   Let's go through it.  First of all, the FDA did an
15    actual statistical analysis plan before they conducted
16    their meta-analysis, right?
17    A.   That doesn't change the fact that it's a secondary
18    analysis.
19    Q.   That wasn't the question, sir.  They had a
20    statistical analysis plan, didn't they?
21    A.   Yes.
22    Q.   And we can see that on pages 5 and 7, if we care to
23    look, but you're not fussing that point, they had one,
24    didn't they?
25    A.   That's correct.
```

1  Q.   And by statistical analysis plan, what we mean is

2  the FDA did a road map and said here's how we're going

3  to conduct this study, here's what we're going to do,

4  correct?

5  A.   They defined the statistical methods that they were

6  going to use in advance.

7  Q.   We can see on page 5 --

8          JUDGE SARIS:  Wait.  Page 5 of what?

9          MR. LANIER:  Of tab 2, your Honor, the

10  statistical review and evaluation.

11          Mr. Alba, could I have the Elmo, please?

12          Thank you, sir.

13  BY MR. LANIER:

14  Q.   If you will look at page 5, we can see in the very

15  first paragraph -- actually, go to the third paragraph.

16  Third paragraph.  "Prior to the analysis of the data" --

17  you see where I am, sir?

18  A.   Yes, I do.

19  Q.   " -- medical reviewers in the division of neurology

20  and statistical reviewers in the quantitative safety and

21  pharmacoepidemiology group agreed upon the definition of

22  the research objectives, end points, study population,

23  and subgroups, and upon the specification of the

24  statistical methods."

25          Did I read that correctly?

```
 1   A.    I believe you did.
 2   Q.    "These elements were incorporated into a statistical
 3   analysis plan prior to the review."  Right?
 4   A.    That's what it says.
 5   Q.    And those are important words to a statistician,
 6   aren't they?
 7   A.    Well, these are important words for the purpose of
 8   new drug applications to FDA where FDA has the ability
 9   to review those statistical analysis plans and determine
10   whether or not they're appropriate.  I don't see any
11   such review here, except within the hands of the FDA.
12   Q.    That wasn't my question, sir.
13         I said these are important words also when
14   you're doing a meta-analysis; isn't that true?  You
15   understand the difference between post-hoc analysis and
16   a statistical analysis plan that's written up prior to
17   the review, don't you?
18   A.    No, I don't.
19   Q.    Do you not understand the difference between saying
20   here is how we're going to study a matter, here is our
21   plan that we're planning on using, versus afterwards
22   going back and saying let's cherry-pick the results we
23   like and do a post-hoc or an after-the-fact analysis?
24   A.    The analysis that was conducted, the meta-analysis
25   that was conducted by FDA was post hoc after the
```

1    original analyses of those data were conducted.  I don't

2    think that FDA cherry-picked the analytic methods to

3    give them the answer that they want, if that's your

4    question.

5    Q.   No, sir, that wasn't.

6         My point is, the FDA actually did a statistical

7    analysis plan and followed that plan, didn't they?

8    A.   Yes, but it's a post-hoc analysis.

9    Q.   Sir, post-hoc analysis is referencing the idea that

10   you go back and you change the way you analyze the data

11   from the original plan.  That's what post-hoc analysis

12   is, right?

13   A.   Maybe that's what post-hoc analysis is to a lawyer,

14   but not a statistician.

15   Q.   Well, then let's go through it and look.

16        MR. LANIER:  If I could go back, please,

17   Mr. Alba, to the Elmo.

18        THE CLERK:  You're on it.

19        MR. LANIER:   I mean to the computer.

20   BY MR. LANIER:

21   Q.   The FDA, when they set this study up, used a primary

22   method to analyze the data, right?

23   A.   Correct.

24   Q.   And then they checked the results of that primary

25   method with three sensitivity methods, true?

```
 1   A.   No, that's not true.
 2          MR. LANIER:   Okay.   If I could go back to the
 3   Elmo.
 4          Your Honors, tab 2.   Dr. Gibbons, tab 2.   If
 5   you'll look on pages 14 and 15.
 6   Q.   Sir, do you see on page 14 under the statistical
 7   methods that first we have listed a primary method?
 8   A.   I see that.
 9   Q.   And do you see that the FDA said the primary
10   analysis method was the exact method for a stratified
11   odds ratio and associated 95 percent confidence
12   interval?  Do you see that?
13   A.   Yes, I do.
14   Q.   And then they add sensitivity methods, don't they?
15   A.   Yes, they did.
16   Q.   Specifically, three sensitivity analyses were
17   employed to examine the robustness of the primary
18   method, right?
19   A.   That's what it says.
20   Q.   So these were three sensitivity analyses to examine
21   the robustness or to understand the impact of the
22   primary method, true?
23   A.   This only pertains to the analysis of the primary
24   analysis.   None of the other analyses were subjected to
25   the sensitivity analyses.
```

375

```
 1   Q.   That wasn't my question, sir.
 2        My question is:  Isn't it true these three
 3   sensitivity analyses were employed to examine the
 4   robustness of the primary method?
 5   A.   Primary method was applied in many different ways.
 6   The sensitivity analysis was only applied to one of
 7   those analyses.
 8        MR. LANIER:  Okay.  If we could go back to the
 9   computer, please, sir.
10   Q.   In other words, the FDA used a primary method and
11   checked the results or the robustness of it with three
12   sensitivity methods.  Would you now agree with that?
13   A.   Only for their primary overall analysis that looked
14   at all of the drugs for all of the indications, not for
15   any of the subset analyses.
16   Q.   Fair enough.
17        Now, in that regard, if we look at the three
18   sensitivity examinations, if we continue the
19   cross-examination, the first was using zero event
20   trials, right?
21   A.   The first excluded -- are you talking about the
22   primary method or the --
23   Q.   The three sensitivity methods, the first one was
24   zero event trials, true?
25   A.   The first sensitivity analysis looked at risk
```

1   differences which included zero event trials.

2          MR. LANIER:  Sir, if we could go back, please,

3   to the computer.

4   Q.  I'm taking the language straight from the FDA on

5   page 14, if you'd like to follow it, please, sir.

6          MR. LANIER:  I'm sorry, go back to the Elmo.

7   Thank you, Mr. Alba.

8          (Discussion off the record.)

9   Q.  "Three sensitivity analyses were employed, the very

10  first one they called zero event trials.  The first

11  sensitivity analysis examined the consequences of the

12  fact that a large number of the trials were expected to

13  have no events."

14          True?

15  A.  That's correct.

16  Q.  So the first sensitivity analysis examined the no

17  event trials, right, zero event trials?

18  A.  It included those.

19  Q.  Okay.  The second sensitivity test dealt with trial

20  heterogeneity, true?

21  A.  That's correct.

22  Q.  And then the third one dealt with the duration

23  differences, also true?

24  A.  That's true.

25  Q.  All right.

```
 1          MR. LANIER:  If we could go back to the
 2  computer, please, sir.
 3  Q.   Now, to make sure that we're communicating on what
 4  these terms are, meta-analysis is an analysis of a
 5  number of different studies put together, fair?
 6  A.   Fair.
 7  Q.   So if I wanted to study how many times when I roll
 8  this white dice it turns up one and I roll it twice,
 9  I'll have two results for that one dice, right?
10  A.   That's correct.
11  Q.   We could call that one study.  Then I have a green
12  dice.  I want to do the same thing, and maybe I roll it
13  twice, and I have two more results, right?
14  A.   That's true.
15  Q.   I've got one more I'll use, a black die, same thing,
16  roll it twice, get two more results, right?
17  A.   That's correct.
18  Q.   Now, if I want to know how many times these dice
19  turn up six when I roll them and I only have two studies
20  with this green dice, I don't really have enough what
21  you call power to make a determination, fair?  If I only
22  roll it twice, I'm not going to get a good test result
23  of how many times six turns up, right?
24  A.   That's true.
25  Q.   So when you have smaller studies and you're looking
```

1  for something that needs a larger study to give an

2  indication, what statisticians sometimes do is employ

3  meta-analysis where they combine a number of the studies

4  together and look at the results of all of them.  That's

5  what a meta-analysis is, right?

6  A.   That would be an example of one, yes.

7  Q.   All right.  And what this FDA did, is they combined

8  those results and they combined them for 11 different

9  drugs, right?

10 A.   That's true.

11 Q.   And so the 11 different drugs, you have got to make

12 sure that you can even combine the studies, make sure

13 that it's okay to take the results of a green dice with

14 a black dice, right?

15 A.   That's true.

16 Q.   Those are issues of heterogeneity, aren't they?

17 A.   Yes.

18 Q.   All right.  So if we could go -- oh, we are here.

19 Thank you.

20        So the zero event trials, the heterogeneity

21 analysis, is it fair to put these groups together, these

22 studies together, and then the duration differences,

23 those were the sensitivity methods that were used,

24 right?

25 A.   That's correct.

```
 1   Q.   Now, the FDA conclusion after doing this
 2   meta-analysis and combining all of those different
 3   studies together, as we read on page 44, was,
 4   "Antiepileptic drugs are associated with increased risk
 5   of suicidality, relative to placebo in randomized
 6   placebo-controlled trials.  The effect appears
 7   consistent among the group of 11 drugs."   Right?
 8   A.   That's what it says.
 9   Q.   You disagree with that conclusion, don't you?
10   A.   Yes.
11   Q.   And so, as I frame your cross-examination from
12   reading your direct, it looks to me like you took issue
13   basically with three things:  Number one, you challenge
14   the heterogeneity.  You said you shouldn't include the
15   topiramate and lamotrigine studies.
16   A.   I said the data for topiramate and lamotrigine
17   appears to be quite different from the different drugs.
18   Q.   Right.  So you wanted to exclude those from the
19   meta-analysis.  You think they should not be in there,
20   true?
21   A.   I think that's correct.
22   Q.   So, for example, if I'm having to put together the
23   study of how many times those dice turn up six and the
24   red dice -- I mean, the white dice turns up six two out
25   of three times, the black one hardly -- doesn't turn up
```

1    a six at all, the green doesn't turn up a six at all.
2    You say since we got the results in the white, take it
3    out because it seems to be different from the black and
4    the green.  That's what you're arguing?
5    A.   No.  I'm arguing that the assumption of homogeneity
6    that's implicit in any meta-analysis for it to make
7    sense is violated clearly by the data to which it was
8    applied.
9    Q.   Let's break apart the words you've used.  The
10   assumption of homogeneity.  What you're saying is we're
11   assuming it's okay to put all these dice together,
12   homogeneity, we're assuming they all work together,
13   right?
14   A.   That's correct.
15   Q.   And your challenge is:  I don't think that's true, I
16   think the white dice may be loaded in coming up six too
17   often and that shouldn't be included with the rest of
18   them, in essence.  You think topiramate and lamotrigine
19   should not be included with the other nine AEDs, right?
20   A.   I think that the results here for the topiramate and
21   the lamotrigine drove the results of the meta-analysis.
22   I think that one of the serious problems with
23   meta-analysis is that subset of the studies, perhaps a
24   subset of the drugs, can drive the overall results,
25   making it appear as if there's an overall effect that's

1    consistent.

2    Q.   But that's not a new concept.   That's not a novelty

3    you've discovered in the realm of statistics, correct?

4    A.   That's correct.   I think it's a very commonly held

5    view by statisticians.

6    Q.   And that's why statisticians have developed tests to

7    see if that actually happens, haven't they?

8    A.   The tests that have been developed for testing the

9    homogeneity assumption, Zelen's test, homogeneity tests

10   in general, are of very limited power, and it's widely

11   acknowledged in the statistical literature that they

12   should not be relied upon.

13   Q.   That wasn't my question, sir.

14        I said, your area of expertise, the

15   statisticians have come up with tests to try and measure

16   whether or not it's appropriate to include those, in

17   this case topiramate and lamotrigine, tests with the

18   others, right?

19   A.   Those tests would work fine if you're dice.   They

20   certainly don't work for suicide, suicidality, because

21   those tests become powerless once the event in question

22   is rare.   It's a widely acknowledged view.   In fact, FDA

23   cites that view in their own report.

24   Q.   All right.   We're going to fuss homogeneity in a

25   moment.   Suffice that is one of the main issues you have

```
 1   with the FDA's conclusions?
 2   A.    It's certainly one of the main issues I have.
 3   Q.    The second one, you took issue with the fact in the
 4   primary method, at least, that there was an exclusion of
 5   zero event studies, right?
 6   A.    That's right.
 7   Q.    And the third one I read on your testimony seems to
 8   mean you don't find any basis for causation, at least as
 9   far as the drug gabapentin is concerned, true?
10   A.    That's correct.
11   Q.    Now, if we could, then, dissect your problems in the
12   time I have remaining.  First the homogeneity, do all of
13   the dice go together?  Can we put all these studies
14   together?  Do you have the issue I want to look at?
15   A.    So far.
16   Q.    If you look at tab 2, page 26 to 27, you're going to
17   find the FDA talking about it.  Do you see down at the
18   bottom -- if I could go, please, to the Elmo, Mr. Alba.
19          Do you see down at the bottom where it says,
20   "trial heterogeneity"?
21   A.    Yes, I do.
22   Q.    It talks about the primary analysis method was a
23   fixed-effect method.  It explains the fixed-effect
24   method assumes all the trials had a common treatment
25   effect, the P value based on the Zelen's test for the
```

1    null hypothesis that all trials had a common odds ratio

2    test was, and gives it.  This value does not provide

3    evidence for the trial heterogeneity in the odds ratio,

4    but the lack of evidence does not imply there was no

5    trial heterogeneity.

6              Are you with me so far?

7              JUDGE SARIS:  I'm not.

8              MR. LANIER:  And I will explain it in just a

9    minute, your Honor, or the witness will.

10   BY MR. LANIER:

11   Q.   You see in context what we're looking at, right?

12   A.   Yes, I do.

13   Q.   And what we're saying here is they have done

14   heterogeneity analysis according to Zelen's test, and

15   the Zelen's test does not show that one of these dice

16   doesn't belong, but it doesn't necessarily mean it does

17   belong.  It doesn't give us an answer, does it?

18   A.   I know Marvin Zelen very well.  I'm sure he'd be

19   horrified to see his test being used in this context.

20   Q.   That wasn't my question, sir.

21             I'm asking you what the statement here from the

22   FDA means.

23   A.   It means they conducted the test.  It means the

24   probability of the test was .735, it was not

25   statistically significant, but they point out that the

PDF created with pdfFactory trial version www.pdffactory.com

1    lack of evidence in support of heterogeneity does not

2    assume that there was no trial of heterogeneity.

3    Q.   Sir, this sentence right here.   "This value does not

4    provide evidence for trial heterogeneity."  Do you see

5    that?

6    A.   I do.

7    Q.   What they mean by that is, that's not proof that the

8    black dice is wrongly included with the green ones, we

9    don't know if it's wrongly included, but we also don't

10   know if it's okay to include it, we don't have evidence

11   either way based upon Zelen's test, right?

12   A.   Based solely upon Zelen's test, that's correct.

13   Q.   Now, they then used a general linear mixed model

14   that allows for trial heterogeneity, and it produced an

15   overall odds ratio estimate of 1.86.  See that?

16   A.   Yes.

17   Q.   What this means is, under the general linear mixed

18   model, there is no problem keeping in those two studies

19   of the drugs.  The dice can all go together, all 11

20   drugs, the studies work together.  That's what that

21   means, doesn't it?

22   A.   Well, sir, I invented that method.

23   Q.   That wasn't my question, sir.

24          That is what it means, doesn't it?

25   A.   You can't use that method for showing that.  First

1    of all, it doesn't say there's trial, it's just telling

2    you what the overall odds ratio estimate is.

3    Q.   Actually, sir, if you'll continue, sir, it says,

4    "both the estimate and the confidence interval were very

5    similar to those from the primary analysis method.  The

6    similarity implies trial heterogeneity was not a major

7    concern."  Did I read that correctly?

8    A.   You read it correctly.

9    Q.   And if trial heterogeneity is not a major concern,

10   what that means, in the FDA's language, is it's okay to

11   include all of these studies together, doesn't it?

12   A.   Well, first of all, it's very unclear from this

13   whether or not that analysis included the zero effect

14   studies.

15   Q.   Sir, that wasn't my question.

16        I'm asking you to focus on what this sentence

17   means, what this conclusion means from the FDA.

18        "Heterogeneity was not a major concern, the

19   similarity implies trial heterogeneity was not a major

20   concern."  That sentence means the FDA, based upon its

21   examination of whether or not all of the studies can be

22   grouped, said it's okay to group them.  That was the

23   FDA's conclusion, wasn't it?

24   A.   It was FDA's conclusion; I disagree with that

25   conclusion.

```
 1    Q.    Okay.   Now, by the same token, if you look back at

 2    page 24, they're talking about the effects of these 11

 3    drugs -- it's not on page 24.

 4          All right.  In the interest of time, I'll move

 5    on anyway.

 6          Sir, the bottom line is, the FDA specifically

 7    said the principle -- the effect appears consistent

 8    among the entire group of 11 drugs, true?

 9    A.    That's what they said.

10    Q.    That's on page 6, I believe, if you want to see the

11    language exactly.

12          "The effect" -- under the conclusions --

13    "appears consistent among the group of 11 drugs."  That

14    includes GABA, doesn't it, Neurontin?

15    A.    Neurontin is one of the 11 drugs.

16    Q.    So the FDA says that the effect they have seen is

17    consistent among all 11 drugs, including Neurontin,

18    true?

19    A.    That's what they said.

20    Q.    They found these drugs to be associated with a

21    statistically significant increase of suicidal behavior

22    or ideation, true?

23    A.    Overall that's what they said.

24    Q.    And that's the page 24 reference I wasn't putting my

25    hand on before.  The drugs, plural, all of them, right?
```

1    A.   That's not what the data indicate.

2    Q.   Sir, that's what the words say?

3    A.   Well, I can read it as well as you can, but it's

4    very clear from the data that as soon as you remove

5    those two drugs, there is no evidence of the

6    statistically significant association of the remaining

7    drugs and suicidality.  How could that possibly be true?

8    Q.   Sir, if I roll this dice and I get a six -- I get a

9    five on that one, I get a three on this one, I get a

10   four on that one, I get a two on that one, I finally get

11   a six on the black, and then I get a six on the white,

12   so on the black, I get a six one out of two times, on

13   the white, I get a six one out of four times.  Okay.

14   You with me?

15   A.   I'm totally with you.

16   Q.   All right.  Now, you can't say, oh, well, I'm going

17   to take out the black ones because that's a 50 percent

18   result, it must be high, and now that I look at the

19   white ones, the results are so slim that it's

20   statistically insignificant?

21   A.   I can certainly do that if I have tens of thousands

22   of your dice.

23   Q.   Tens of thousands?

24   A.   I have tens of thousands of subjects who have been

25   treated with these drugs.  I see that two of the drugs

1    account for the majority of all of the events.

2    Certainly any sensible statistician will go through and

3    determine whether or not those two drugs are driving the

4    meta-analysis.

5    Q.   Sir, there were four -- no, there were three

6    full-time bona fide, sensible statisticians in an

7    independent blue ribbon advisory panel that looked at

8    this FDA analysis and didn't have any problem with these

9    statistics, right?

10   A.   I would suggest they didn't look carefully enough.

11   Q.   Sir, they spent all day in a blue ribbon panel

12   reported investigation with audience, with a reporter --

13            JUDGE SARIS:   Excuse me.   Are you referring to

14   the event last week?

15            MR. LANIER:   Yes, ma'am.

16   BY MR. LANIER:

17   Q.   And they were specifically asked:   Do you have any

18   problems with the way these statistics were done?   And

19   they said no, didn't they?

20   A.   Well, I was a member of the last, quote, blue ribbon

21   panel, and I had serious questions about the way the

22   statistics were handled.

23   Q.   Sir, that wasn't my question.   Can you answer my

24   question?

25   A.   Could you repeat your question?

1    Q.   Yes, sir.   The blue ribbon panel didn't have any

2    problem with the way these statistics were done, did

3    they?

4    A.   I don't know if they did or did not have problems.

5    They said that they had problems with the primary

6    analysis being zero events.   They had problems with the

7    idea that the sensitivity analysis was done based on

8    risk differences and the primary analysis was done based

9    on risk ratios.   There were several issues raised by the

10   committee questioning the validity of the statistical

11   results.

12   Q.   Well, sir, if we look at that committee -- and if we

13   could go back, please, to the Power Point, thank you,

14   Mr. Alba -- it was a joint meeting of the advisory

15   committees.   It's an independent blue ribbon panel.

16   These are top-notch scientists and doctors, true?

17   A.   They're generally well-respected people.

18   Q.   You're not throwing rocks at any of them, are you?

19   A.   I was a member of that advisory panel.   I wouldn't

20   throw rocks at myself.

21   Q.   You were actually on this advisory committee panel

22   at this time?

23   A.   No, I was a member of this same advisory panel when

24   they put the black box warning on antidepressants and

25   suicide.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   So you weren't on this advisory committee panel.

2   The FDA did not invite you to attend this personally?

3   A.   I was invited to be on this advisory panel but not

4   to this event.

5   Q.   So you were not at the event as a participant or an

6   observer -- did you go watch?

7   A.   I did not go watch.

8   Q.   At this -- there was a gentleman from Pfizer there,

9   wasn't there?

10   A.   I believe so.

11   Q.   You know Mr. Walberg from Pfizer made the same

12   arguments to that blue ribbon panel that you have made

13   to this Court, true?

14   A.   I'm not sure he made the same arguments, but you'll

15   have to tell me.

16   Q.   Your Honors, and Dr. Gibbons, on tab 9 in your book

17   is the meeting transcript, sir.  If you will look on

18   page 37, you will see a Mr. Walberg, very first words on

19   it -- if I could go to the Elmo, please, Mr. Alba --

20   very first words, this fellow named Walberg --

21           JUDGE SARIS:   37 of --

22           MR. LANIER:    Page 37 of tab 9, your Honor.

23           (Discussion off the record.)

24           MR. LANIER:   Is this the same page you have?  It

25   shows page 37 on the copy that I was given.  Are you

1   telling me it should be 36?

2          MR. FROMSON:  It's 36.

3   BY MR. LANIER:

4   Q.   Okay.  "Mr. Walberg:  I would first like to thank

5   the chair, the committee, and the FDA for allowing me to

6   speak on behalf of Pfizer."  Do you see that, sir?

7   A.   Yes, I do.

8   Q.   So this gentleman, Walberg, speaks on behalf of

9   Pfizer, and he makes the very same arguments criticizing

10  the FDA that you have made to her Honors in this

11  courtroom, right?

12  A.   Well, I haven't read this whole transcript to know

13  if he made the very same arguments in the same way and

14  what the supporting data he used were.  I can't answer

15  that question.

16  Q.   All right.  Let's look at it together briefly.  On

17  the very next page, the fourth paragraph down, it's my

18  page 38 but it may be 37 in the book based on what I'm

19  being told.  He specifically -- he, being Walberg,

20  specifically says, "In contrast" -- talking about the

21  meta-analysis -- "these other two drugs, topiramate and

22  lamotrigine, seem to have a disproportionately high

23  representation of adverse events.  What does that

24  suggest?  Well, if you remove topiramate and lamotrigine

25  and look at them separately, the incidence of adverse

1   events is about twice what it is for placebo.  But

2   looking at the other nine antiepileptic drugs, the

3   incidence of adverse events, potentially suicide-related

4   adverse events is essentially symmetric.  Were it not

5   for this" -- meaning those two drugs, I guess -- "we

6   would not be here today."  Those two drugs, in other

7   words, are driving the results.  That's what they're

8   arguing, isn't it?

9   A.   Yes.

10  Q.   That's the same argument you're making to the

11  Honorable Court, isn't it?

12  A.   Yes, that's one of the arguments.

13  Q.   The other argument you're making is on page 38 of

14  the pagination, in the fourth paragraph down, a

15  paragraph that begins "furthermore."  Do you see that?

16  A.   I see it.

17  Q.   In this paragraph it says, "The majority of studies

18  do not have an event in either treatment group" --

19  that's been brought up before -- "about 66 percent of

20  the studies in the Pfizer dataset don't have an event in

21  either treatment group.  And that constitutes in our

22  data about 80 percent of the patients, so that within

23  our dataset, when you analyze using methods that exclude

24  zero variance studies, you're only looking at 20 percent

25  of the data."   Right?

1    A.   That's what it says.

2    Q.   Same argument you're making to the Court, isn't it?

3    A.   Well, the argument I'm making is it's inappropriate

4    to exclude a zero event study in any case.

5    Q.   But, sir, if you will turn to page 84 -- and this is

6    the crux of what I'm driving at with you --

7              JUDGE SARIS:   Page?

8              MR. LANIER:    83, your Honor, 83.

9    MR. LANIER:

10   Q.   The statisticians were specifically asked whether or

11   not they agree with the way this was done, true?  Look

12   at the language.  The male here is the gentleman, I

13   believe, of the FDA who says, "So again, the question

14   is, given the information that we have, based on the

15   analyses that we're presented personally, are they

16   valid?  Are there technical issues with the way it was

17   done that the statistical members of the committee have

18   an issue with?  And the answer to that, from what I'm

19   hearing is 'no,' right?"

20   A.   First of all, I don't exactly know who "male" is;

21   and secondly, I'm not sure that this makes it clear that

22   the members -- the statistical members had no questions

23   about the way this was done.

24   Q.   Well, sir, if you will look at the pages that

25   precede this, it will put it into a little better

PDF created with pdfFactory trial version www.pdffactory.com

1    context for you.

2           You can start with page 83 -- I mean 81, where

3    they start talking about the main category that was

4    driving the difference in estimate between the two

5    subgroups, the table breaks down.  You see all of this

6    type of information there on 81?

7    A.   Yes.  Would you like me to read it?

8    Q.   Well, I'm going to try to get the flow of it for

9    you.

10          I'll tell you what, we have an audio of it,

11   perhaps that will help your Honor if we boot up the

12   audio.  Audio and video.

13          MR. LANIER:  Okay.  Can we switch?

14          (Discussion off the record.)

15   Q.   Okay.  Sir, what I'm going to play for you is the

16   actual committee itself, the videotape with some of the

17   language where the statisticians are asked these

18   questions.  It's the framework that puts the answer into

19   perspective.  So I'd ask you to listen carefully and see

20   what you think.

21          (From videotape)  Again, before we have just a

22   general discussion, I'd like to give the

23   statisticians -- make sure we have them online about

24   this.  Are there issues related to the analyses that

25   were conducted or the other information that we heard at

```
 1   the public comment time that would alter that in any
 2   way, anything technical with the way the analyses were
 3   done that you have issues with?
 4        (New speaker) I think I'm okay after the
 5   discussion.  I think I concur with the analyses.  I put
 6   more weight on the risk difference kinds of analyses.  I
 7   think we've heard issues with regard to separating out
 8   the suicidal categories into behavior versus ideation,
 9   and I put a fair amount of weight on the behavioral
10   aspects.
11        (New speaker) Dr. Lu?
12        (New speaker) I don't have anything new to add.
13   I agree with the way it was done, and I focus more on
14   the risk differences.
15        (New speaker)  Dr. Leon?
16        (New speaker)  I agree with the analyses
17   wouldn't change.
18   MR. LANIER:
19   Q.  Were you aware of the testimony by the three
20   full-time bona fide statisticians, as the FDA called
21   them?
22   A.  Yes.
23        MR. LANIER:  Can we go back to the Elmo?
24        JUDGE SARIS:  Since you know these people,
25   having just looked at them, who are they?
```

1           THE WITNESS:  Well, Andy Leon is a professor of

2     psychiatry.

3           JUDGE SARIS:  Is he the first one that spoke?

4           THE WITNESS:  He's the last one who spoke.  He's

5     a professor of psychiatry at Cornell.  And has done some

6     work in psychiatric statistics.  I don't think he's ever

7     done anything in meta-analysis.

8           Skip Wilson, his name is Robert Wilson, I've

9     known him for a long time.  He's a clinical trial

10    specialist, good in analysis of data.  Doesn't have any

11    specialization in the area of meta-analysis.

12          The third person is a statistician who works in

13    the department of radiology.  I don't know him.

14          I don't think any of these people are experts in

15    meta-analysis.  I know that in my own experience working

16    on this committee we are given very little time to

17    review any of the data.  You know, I personally just

18    disagree with their conclusions based on the time that

19    I've had to look at the data.  I think there are some

20    problems.  I agree with their conclusion about the risk

21    differences being the primary method that should have

22    been used because it uses all of the data.  Again, in

23    the context of this case, that analysis shows very

24    clearly that there is no even signal for Neurontin.

25          MR. LANIER:  Okay.  Sir, could we go back to the

PDF created with pdfFactory trial version www.pdffactory.com

1  Elmo, please?

2  BY MR. LANIER:

3  Q.   So you take issue with -- by the way, are you sure

4  about the identity of those people?

5  A.   You mean Andy Leon and Skip Wilson and the other

6  person whose name I didn't remember who was in the

7  department of radiology?  I'm pretty sure.

8  Q.   Okay.

9        That's what preceded the FDA moderator saying,

10 "Again, the question is, given the information we have,

11 based on the analyses that we're presented personally,

12 are they valid?  Are there technical issues with the way

13 it was done that the statistical members of the

14 committee have an issue with?  And the answer to that

15 from what I'm hearing is 'no.'"

16        Your response to that now is, yes, but the

17 committee probably didn't have enough expertise to

18 properly answer the question or enough time to look at

19 the materials.  Is that what I'm hearing?

20 A.   What I'm saying is, the statisticians -- I think the

21 committee -- I think it was a sad day for statisticians

22 when the non-statistical members of the committee made

23 more on-target statistical comments about these data.

24 There were several --

25        JUDGE SARIS:  So who was the male asking the

```
 1    question?  Do you know?  Is that a member of the

 2    committee?

 3             I don't get this whole transcript.

 4             MR. LANIER:  It's the chairman of the committee.

 5             JUDGE SARIS:  The male is the chairman of the

 6    committee?

 7             MR. LANIER:  Dr. Katz from the FDA.

 8             MR. FINKELSTEIN:  No, no, no, that was

 9    Dr. Goldstein.

10             THE WITNESS:  He's a neurologist.

11             The point that you made -- and maybe I can

12    answer this -- there was this gentleman from Pfizer who

13    said, look, it looks like two of these drugs are driving

14    the meta-analysis.  The committee was very clear about

15    this.  Dr. Pine made it clear that, you know, if we put

16    a warning on these drugs, we are actually putting a

17    warning that really won't even apply to 50 percent or

18    more of the people who participated in these trials

19    because there wasn't even a signal for those drugs.

20    BY MR. LANIER:

21    Q.   Time out, sir.  You've just jumped to a whole

22    different part of this.  That's talking about the vote

23    on the black box warning and whether it should be a

24    black box warning versus another kind of warning.  You

25    left out two other questions that were voted on before
```

1   that, didn't you?

2   A.   I was not referring to something that was about a

3   black box warning.  I was referring to the

4   interpretation of the consistency of the data across the

5   drugs.

6   Q.   Well, let's look at what happened between the time

7   of the vote on that black box warning and the language

8   that you're talking about and what was already done, and

9   this -- in other words, there's a big gap, you just

10  leaped over before you got to that.  Those two -- you

11  don't connect what you just said with what we're talking

12  about here, do you?

13  A.   I'm connecting what you asked me about the Pfizer

14  person saying that -- pointing out something that was

15  consistent with my prior testimony here about the -- two

16  of these drugs, if you take those two drugs away, it all

17  goes -- there's nothing else there, having no effect on

18  the committee.  And I think it did have an effect on the

19  committee.

20        JUDGE FRIEDMAN:  Excuse me, Doctor.  Is it

21  correct that the primary analysis was an odds ratio

22  analysis rather than a risk difference analysis?

23        THE WITNESS:  That's correct.

24        JUDGE FRIEDMAN:  Can you explain very briefly

25  from your point of view what the significance is of

1    that?

2          THE WITNESS:  There are two issues.  I take no

3    exception to odds ratio as being a problem.  An odds

4    ratio is certainly a valid way of looking at differences

5    and risks.

6          The primary analysis excluded all of the zero

7    event studies.  In other words, to look at the effect of

8    excluding, throwing out all of these studies, the

9    majority of studies had no events.  This is a very rare

10   event in this population.

11         JUDGE FRIEDMAN:  And the risk difference would

12   have taken into account the zero event studies?

13         THE WITNESS:  That's correct.

14         JUDGE FRIEDMAN:  And how many zero event studies

15   were there in the Pfizer data for gabapentin?

16         THE WITNESS:  Of the 46 studies that were

17   submitted to the FDA, 43 of them were zero event

18   studies.

19         So in the primary analysis, only three of the

20   studies made it into FDA's analysis.  When they looked

21   at the risk difference analysis in which all of the data

22   made it in, they saw absolutely nothing.

23         JUDGE FRIEDMAN:  Thank you, Doctor, for

24   respecting my request that you be brief.

25   BY MR. LANIER:

```
 1    Q.   But in that regard, just because some of the times I

 2    roll this dice it doesn't show up a six doesn't mean you

 3    reject that study just because it didn't have a six,

 4    does it?

 5    A.   I'm sorry, I don't understand your question.

 6    Q.   Okay.  Let me do it this way.  The FDA actually did

 7    a sensitivity analysis to try and determine whether or

 8    not the estimated risk differences in the odds ratio

 9    analysis makes an ultimate difference in their

10    conclusion.  They weren't blind to this, they looked at

11    it, didn't they?

12    A.   They looked at it, but they looked at it using

13    ineffective means.

14         JUDGE FRIEDMAN:  You're not claiming that they

15    were reckless, though, are you?

16         THE WITNESS:  Not at all.

17         JUDGE FRIEDMAN:  You're saying you have a

18    genuine difference of opinion, but not that this

19    exceeded the bounds of an appropriate scientific inquiry

20    or --

21         THE WITNESS:  I don't think the FDA did anything

22    to try to stack the deck or try to come up with a

23    predetermined answer.  I think the methodology that they

24    used to test whether or not the effects they were seeing

25    applied to all of the drugs they were looking at were
```

1    really bad methods.  They weren't good methods for doing

2    that, and it's very evident they weren't doing that

3    because you can see the heterogeneity.

4         JUDGE FRIEDMAN:  But you have a difference of

5    opinion with them about the propriety of the methods

6    they used; is that correct?

7         THE WITNESS:  I think I really don't have that

8    big of a difference of a opinion.

9         We went through this before when I participated

10   on a scientific advisory board and suggested that they

11   use methods that didn't throw out the zero event

12   studies.  And in this, they used a sensitivity analysis

13   that included them, which was a good step forward.

14        JUDGE FRIEDMAN:  Thank you.

15        JUDGE SARIS:  But still, nonetheless, they ended

16   up sticking with their conclusion, even when they took

17   into account the sensitivity studies, right?

18        THE WITNESS:  Only for the overall effect.

19        JUDGE SARIS:  Right.

20        THE WITNESS:  So the overall effect, throwing

21   all of these drugs and all of these indications

22   together, they came up with a statistically significant

23   association, but as soon as you start breaking it down

24   at all, you see that it all goes away.  You don't see

25   any of it in the North American studies.  All of these

PDF created with pdfFactory trial version www.pdffactory.com

1    things -- it's like a house of cards.  It just goes away

2    in that analysis.

3    MR. LANIER:

4    Q.   But what Judge Saris and what Judge Friedman said is

5    exactly on with what the FDA reported.  The FDA said

6    when looking at this, odds ratio analysis, unlike the

7    odds ratio analysis, the risk difference analysis makes

8    use of trials without any events.  Right?  And then they

9    draw this conclusion?

10          JUDGE SARIS:  What page are you on, now?

11          MR. LANIER:   Your Honors, I'm on page 26, this

12   is back in tab 2, the very top of the page now.  And it

13   started on page 25 down at the bottom.

14   Q.   They say that the overall risk difference was 1.79.

15   The confidence interval does span 1.  The risk

16   difference was greater than zero, and the confidence

17   interval did not contain the value of zero, as was the

18   case for the odds ratio analysis.  This result supports

19   the finding that the drugs were associated with

20   statistically significant increased risk of suicidal

21   behavior.  That's what they said, isn't it?

22   A.   And this is really the problem with these kinds of

23   meta-analyses.  It's that if there is a subset of the

24   drugs that actually do show an effect, you can include

25   lots of other drugs that don't and the overall result

1    will show a statistically significant finding.  And the

2    statistical literature in what is called an omnibus

3    method.  And the problem with it is it can trigger, it

4    can become statistically significant even if there's a

5    subset of the studies, or a subset in this case of the

6    drugs that are showing the effect.  And there is no

7    reason to believe that that effect is shared by the

8    other drugs.

9    Q.   And this point was discussed in the minutes -- in

10   the meeting as well on July 10th, wasn't it?

11   A.   You'll have to bring my attention to it.

12   Q.   Okay.  It's on page 45 of tab -- at this point we're

13   back to tab 9, and this is down toward the bottom.  The

14   sensitivity analyses -- and I apologize to the Court for

15   the poor copy of this -- the sensitivity analyses were

16   really extensive and at that -- well, I can feel it was

17   the most important of the sensitivity analysis.  So most

18   of my interpretation of this is based on looking at that

19   risk difference plot because we're using all the data

20   and it's also -- I know the comment about number needed

21   to harm, that the risk difference is the denominator and

22   the amount needed to harm.  It's a one only in the risk

23   difference, and how I forget -- it was -- I think it was

24   0.37 versus minus .24 percent.  That's why I got rid of

25   what I said, 800, 769 if you had to do the math, but

```
1   meaning again -- what we see -- and here's the
2   conclusion -- what we see in analyzation, and that's
3   using all of the data, not just one-third of the data.
4         They dealt with this very point.  They discussed
5   this, didn't they?
6         JUDGE SARIS:  Where did you just read from?
7         MR. LANIER:   Your Honors, this is tab 9.  I
8   believe it's page 45 down at the bottom.
9         (Discussion off the record.)
10        MR. LANIER:   Down at the bottom, right
11  underneath where it says, "When we look at the plot of
12  risk differences in Dr. Levenson's presentation" -- page
13  28 or 26 or something, what you're looking at for the
14  Court -- "and compare that pattern to the odds ratios
15  that he presented two or three pages earlier, the
16  pattern is almost identical."
17        In other words, they looked at this very issue,
18  didn't they?
19  A.  Well, what you've read to me seems unintelligible.
20  I don't know what that's all about.  And the issue, as
21  I've said before, of their sensitivity analyses on
22  heterogeneity is unconvincing to me as a statistician.
23  I think the data show very clearly there is tremendous
24  variability in this effect, and that the only effect is
25  seen for those two drugs, lamotrigine and topiramate.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   And in the exclusion of those two drugs you don't see

 2   anything, and if it were true that there was no

 3   heterogeneity, that couldn't possibly be the case.  You

 4   would have to see at least a consistent signal, at least

 5   a consistent point estimate for the risk difference or

 6   for the odds ratio across the studies.  It isn't going

 7   to go from two or two and a half down to 1.01.  It can't

 8   happen if it's really homogenous.  You couldn't make it

 9   happen to your dice.

10   Q.   Not in the time I have for cross, which is fast

11   growing to a close, so let me do it this way.

12          JUDGE SARIS:  To be precise, you have ten

13   minutes.

14          MR. LANIER:    Thank you.

15   BY MR. LANIER:

16   Q.   So the bottom line is, I guess what I want the Court

17   to understand, the complaints that you have are

18   complaints that were made, they were made by Pfizer,

19   they were made to an independent blue ribbon panel that

20   included statisticians, as they were called full-time

21   bona fide statisticians by the FDA, all of those were

22   weighed over the day 's proceedings.  There was

23   interaction.  There was discussion not only with the

24   blue ribbon panel but with the FDA present, and when the

25   end of the day was held, they had a vote on these
```

1    issues, including whether or not all 11 drugs are

2    associated with or cause suicidal events, true?

3    A.    False.   There was no vote of whether or not these

4    drugs cause suicidal events.

5         JUDGE SARIS:   Where exactly is the wording of

6    the vote in here?

7         MR. LANIER:    The wording of the vote, your

8    Honor?

9         JUDGE SARIS:   The exact words of what the blue

10   panel took from these statistical analyses.

11        MR. LANIER:    The question number one is on page

12   83, I believe, the way yours is paginated.   It's 84 on

13   mine.

14        (Discussion off the record.)

15        MR. LANIER:    82 on the big banner at the top,

16   Judges.   This is what it looks like on my sheet, it's on

17   my page 84.   It's down at the bottom.   The male

18   moderator is the fellow talking.   Oh, that's the wrong

19   one.

20        It's 81 on yours, according to them.

21        Are we able to find --

22        (Discussion off the record.)

23   BY MR. LANIER:

24   Q.   Here's the question, the first question:   Does the

25   committee agree with the agency's overall finding of an

1   increase in suicidality for the 11 AEDs analyzed?  That
2   was the first question, wasn't it?
3   A.   You haven't read the entire question.  The real
4   crux, the crux of the question is:  Do we think there's
5   a signal here?  Is there a signal?  A signal has nothing
6   whatsoever to do with causation, and a signal has
7   nothing to do with the inference of is there an
8   association with every one of the individual measure --
9        JUDGE SARIS:  Let me ask you this.  Is there a
10  definition of the word "signal" in the scientific
11  literature?
12       THE WITNESS:  A signal would be a statistically
13  significant association.
14       JUDGE SARIS:  Where does that come from?
15       THE WITNESS:  It's the common use of that term
16  in pharmacoepidemiology.
17       JUDGE SARIS:  Essentially, what they voted was
18  that there was a statistically significant association.
19       THE WITNESS:  Based on the overall analysis.
20       JUDGE SARIS:  On the overall analysis.  So a
21  signal means not the same as causation, or the "C" word,
22  as they refer to it, but a statistically significant
23  association.
24       THE WITNESS:  That's correct.  If there was
25  causation, if the committee believed there was

PDF created with pdfFactory trial version www.pdffactory.com

1    causation, they would have put a black box on this.

2         JUDGE SARIS:  So now help me with this.  The

3    black box -- is there a regulation that says when a

4    black box goes on as opposed to another kind of warning?

5         THE WITNESS:  Black box is if not the most, one

6    of the most punitive warnings --

7         JUDGE SARIS:  Is there a definition of when the

8    black box goes on versus another kind of label?

9         THE WITNESS:  I don't know of a particular

10   definition.  I know how we were instructed to view it

11   when we voted on the black box warning for children,

12   antidepressants, and suicide, that there be a causal

13   association and that there be no evidence that there

14   was -- that the risk benefit -- the risks greatly

15   outweighed the benefit.

16        JUDGE SARIS:  So you get a black box, in your

17   view, if there's a finding of causation but not a black

18   box if there's a finding of statistical significant

19   association.

20        THE WITNESS:  Absolutely.

21        JUDGE SARIS:  So that's where you think that the

22   blue ribbon panel drew the line.

23        THE WITNESS:  That is exactly where I believe

24   they drew the line.

25   BY MR. LANIER:

```
 1   Q.   There's no basis for that; you're climbing into
 2   their brain.  There's not a regulation that says here's
 3   when you use a black box warning.
 4   A.   Sir, I'm the only person sitting in this room who's
 5   actually been on a scientific advisory board for the FDA
 6   and the only one here who has been asked to deliberate
 7   and vote on whether or not to put a black box warning on
 8   suicide.
 9   Q.   That's fine.  And I'm not arguing that point.
10        Sir, I'm not arguing that point.  I'm saying
11   there's not a regulation that says it.
12   A.   I've already said I don't know of any such
13   regulation.
14   Q.   And as a matter of fact, it's a deliberated process
15   within the FDA itself on determining whether a black box
16   warning goes on.  All the advisory committee does is
17   give advice, right?
18   A.   The advisory committee is asked to vote on that, and
19   as before we voted, we were given guidelines on whether,
20   you know, what would be the basis for --
21        JUDGE SARIS:  Can I stop you there?  Are there
22   written guidelines we could have?
23        THE WITNESS:  They're probably a part of the
24   record, public record of the antidepressant pediatric
25   suicide trials.
```

1          JUDGE SARIS:  So at least in this record, as far

2     as you know, we don't have the demarcation.

3          THE WITNESS:  Not in this record.

4          JUDGE SARIS:  So this -- can I just -- one last

5     thing.

6          MR. LANIER:   Sure.

7          JUDGE SARIS:  I'm not as familiar.  These

8     advisory committees advised FDA, will there be another

9     vote of the FDA?  Is that the way it goes?

10          THE WITNESS:  The way it has worked in the past,

11     the FDA has convened its advisory board, historically

12     it's just the psychopharm advisory board.  The vote is

13     taken, and then FDA takes action on the basis of the

14     vote.

15          It's my understanding that the FDA may or may

16     not follow the advice of the advisory board, but in my

17     experience, they have not done that.

18          JUDGE SARIS:  So there's no separate hearing, as

19     far as you know, they'll look at this and make a vote as

20     to whether to accept it, that's your experience.

21          THE WITNESS:  That's correct.  The scientific

22     advisory board has voted not to put a black box

23     advisory.  I think it would be hard to get future

24     advisory boards if they ignored their advice and put

25     their black box warning.

1           JUDGE SARIS:  On the other hand, they're likely
2    just to follow along with their statistically
3    significant association on that.
4           THE WITNESS:  Remember that --
5           JUDGE SARIS:  I'm just trying to understand it.
6    There's no separate hearing, there's no separate, like,
7    administrative procedure.  What happened last week is
8    what happens in terms of the hearing --
9           THE WITNESS:  That's it.
10          JUDGE SARIS:  -- is that right?  Now the FDA
11   will look at it and make a decision whether or not to
12   adopt the recommendations.
13          THE WITNESS:  Correct.
14          JUDGE SARIS:  No more hearings, no more
15   fact-findings, no more records.  This is it.
16          THE WITNESS:  This is a public policy issue.
17          JUDGE SARIS:  I just want to understand.
18          THE WITNESS:  Exactly, it's a done deal.
19   BY MR. LANIER:
20   Q.   In the representation to the Court, I want to take
21   issue with a couple of things you said.
22          First of all, Dr. Katz talked about specifically
23   what he meant by signal and what he meant by cause.  Did
24   you remember him saying that from the FDA, on page 85,
25   where he said we're interested in whether or not you

1    think when we use the word "signal," whether or not you

2    think there is a statistical significant increase in

3    episodes of suicidality, which, to us, we interpret that

4    as causality?

5        Were you aware that the FDA made that statement,

6    sir?

7    A.   I remember --

8        MS. McGRODER:   I'm sorry, where are you in the

9    transcript?

10       JUDGE SARIS:   Page 85.

11       MS. McGRODER:   Thank you.

12       JUDGE SARIS:   Is it the big 85 or the little 85?

13   To the risk of being simplistic, we'll refer to the

14   little 85s, the interior ones, then we'll be the same

15   with you.

16       MR. LANIER:   I'm sorry, Judge.

17       JUDGE SARIS:   So where are we?

18       MR. LANIER:   Little 85.  If you look at the

19   third entry, it starts out with "Male," and this is

20   Dr. Katz from the FDA, "Yes, can I."

21       JUDGE SARIS:   Okay.  Is everyone in the same

22   place?

23       Good.

24   BY MR. LANIER:

25   Q.   We're interested in whether or not you think when we

```
 1   use the word "signal," whether or not you think there is

 2   a statistical significant increase in episodes of

 3   suicidality, which, to us, we interpret that as

 4   causality?

 5          Sir, signal, to the FDA, they're interpreting

 6   here as causality, aren't they?

 7   A.   Well, this is what Dr. Katz is saying.

 8          JUDGE SARIS:  Katz is who, again?

 9          THE WITNESS:  Katz is the -- from neurology at

10   the FDA.

11          JUDGE SARIS:  So he's a representative of the

12   Food and Drug Administration.

13          MR. FINKELSTEIN:  He's the director.

14          JUDGE SARIS:  Director of FDA?

15          MR. FINKELSTEIN:  Of the neurology products.

16          JUDGE SARIS:  Was he the chairman of this

17   hearing?

18          MR. FINKELSTEIN:  The head of the FDA, not

19   Chairman Dr. Goldstein.

20          JUDGE SARIS:  Chairman of the --

21          MR. FINKELSTEIN:  Dr. Goldstein was the chairman

22   of the hearing, on behalf of the FDA contingent, he was

23   the chairperson.

24          JUDGE SARIS:  Okay.

25          MR. LANIER:   And, your Honors --
```

```
 1              MR. FINKELSTEIN:  He and Dr. Temple.
 2    BY MR. LANIER:
 3    Q.   If we could then turn to little 88 to finish this
 4    issue.
 5              And on little 88, Ruth Day specifically asked
 6    the question:  "You're more comfortable with saying
 7    causality now?"  She withdrew the question, but the
 8    female, who the record will reflect was the FDA Alice
 9    Hughes, said, "I am."
10              Then we have Dr. Katz again coming in saying,
11    "We're unequivocally comfortable with using the word,
12    the 'C' word with saying that this establishes
13    causality.  Again, we've talked about this a fair
14    amount.  We -- this is how we determine causality."
15              The FDA is using the word, aren't they?
16    A.   Well, if you read the --
17    Q.   Answer my question, please, sir.  The FDA is using
18    the word, aren't they?
19    A.   With respect to randomized trial -- this is a
20    meta-analysis.  This is not a randomized trial, this is
21    a meta-analysis.
22              (Discussion off the record.)
23    Q.   And, then, if we go to little page 89.  There's a
24    vote where they punch buttons to vote, remember?  There
25    were 20 people that voted yes, and one that abstained on
```

the question of whether the committee agrees with the
agency's overall finding of an increase in suicidality
for the 11 analyzed.  Twenty yes, zero no, one
abstention, right?

A.   As to whether or not there was a signal.

Q.   And the one abstention abstained because he wasn't
certain about causation, right?

A.   No, no, the --

Q.   Look on page 88, please, sir.

A.   The vote was about signalling.

Q.   Little 89.

     As they're going through reading the results in
for the record on question one, 20 yes, one abstain, and
zero no.

     Dr. Schultz -- let's go around say your name,
how you voted.

     Susan Schultz, yes; Anderson, yes; Patson, yes;
Ying Lu, yes; Malone, yes; Matthew Rizzo -- "Rizzo:
Confess."  Then he continues.  "I'm the guy who
abstained, and it's because I still don't understand the
question.  I would vote yes if the question were worded
that there's a statistically significant association or
a statistically significant association in increase in
suicidality but I cannot vote yes if the issue is
causality."  Do you see that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   I do.

2         JUDGE FRIEDMAN:   Excuse me.   Mr. Lanier, can you

3    give me the page with the question?   It is given a

4    number of times, and I'm a little confused what the

5    final question is.

6         MR. LANIER:   Yes, your Honor.   Tab 6, the last

7    page is the question in your book.

8         JUDGE FRIEDMAN:   But where is it in the

9    transcript?

10        MR. LANIER:   In the transcript, your Honor, he

11   reads it in a couple of different places.

12        JUDGE FRIEDMAN:   In a couple of different ways.

13        MR. LANIER:   Little 81 at the bottom, I

14   believe.

15        JUDGE FRIEDMAN:   He's asking about an increase

16   in -- he's asking about a signal.   Is there another

17   formulation of the question?

18        MR. LANIER:   No, your Honor.   Ultimately the

19   questions were actually printed out as well, and he

20   would read the questions, but he always reads it this

21   way.   Sometimes he fills in with extra information or

22   discussion, and it's hard to tell when he quits.   But

23   these are the questions as they were posed to the

24   committee that the committee actually had to vote on.

25        JUDGE FRIEDMAN:   So that's why we're looking at

```
 1   tab 6.
 2          MR. LANIER:   Yes, your Honor, which is the
 3   actual reproduction of the actual questions that were
 4   presented there to the panel.
 5          And the first one was:  Does the committee agree
 6   with the agency's overall finding of an increase in
 7   suicidality?
 8          JUDGE FRIEDMAN:  Thank you.
 9          MR. LANIER:   Yes, your Honor.
10   MR. LANIER:
11   Q.   In that regard, sir, if we go back to the vote,
12   Rizzo is the one who confesses and says, Okay, I was
13   the -- I confess, I was the abstention, and I abstained
14   on causality.  I cannot vote yes if the issue is
15   causality, right?
16   A.   That doesn't presume that the other 20 people felt
17   they were voting on causality.  It's just Rizzo didn't
18   get it.
19   Q.   Well, after Rizzo said that, the moderator said,
20   "Very good, and let his vote stand."  And then Winokur,
21   after Rizzo says that, says yes; Leon says yes; Wilson
22   says yes; Egan says yes; Robinson says yes; Goldstein,
23   yes; Goldman, yes, Winokur, yes; Kilerman, yes;
24   Hennessey, yes; Grayforts, yes.
25          It sure seems that they seem to understand.  And
```

1  then they moved on to question, two, right?

2  A.   Sir, you missed the point of the little buttons.

3  The little buttons were put in place so that previous

4  votes don't affect later votes.  They had already voted.

5  The fact that Rizzo made this comment did not in any way

6  influence or enlighten anyone's vote.  The vote had

7  already been made by the little button.  We didn't have

8  the little buttons in the antidepressant trials.  I like

9  the little buttons, because as people moved around the

10  room, it looked as if they were changing their votes

11  based on prior votes.

12  Q.   But, sir, the point of the matter is, no one else

13  felt it -- evidently, no one else took the opportunity

14  to say I voted yes but I voted yes because I don't think

15  causality is an issue.  Nobody says anything.  After one

16  man says I abstained because of causality, everyone else

17  says --

18        JUDGE SARIS:  You know what, you're beyond the

19  time.

20        MR. LANIER:   I'm out.

21        JUDGE SARIS:  Thank you.

22        MR. LANIER:   Pass the witness.

23        JUDGE SARIS:  So now it's 25 of, so you have,

24  what, half an hour?  Is that how we work it?

25        MR. FROMSON:  No, no.

```
 1          MR. LONDON:  She used her half hour.

 2          JUDGE SARIS:  So what are we doing now?

 3          MS. McGRODER:  I'm doing a short redirect on two

 4    points.

 5          JUDGE SARIS:  Have we provided for this?

 6          MR. LONDON:  Was I talking?  I'm sorry.  The

 7    deal was the Court gave each side 30 minutes with the

 8    witness, you've used it.  You gave an hour of cross,

 9    we've used it.  As I understood it --

10          JUDGE SARIS:  Here's the issue:  You got an

11    extra five minutes, you have five minutes.

12          MR. LONDON:  That's certainly --

13          MR. ROUHANDEH:  They certainly had more than

14    their fair share.

15          JUDGE SARIS:  We have to finish today.

16          MR. ROUHANDEH:  This is an extremely important

17    point.

18          JUDGE SARIS:  You can have five minutes.

19          MS. McGRODER:  I only have a few questions.

20          (Discussion off the record.)

21          JUDGE SARIS:  The largess from New York, ten

22    minutes.

23                      REDIRECT EXAMINATION

24    BY MS. McGRODER:

25    Q.   Judge Friedman asked you if you have a difference of
```

 1    opinion with the FDA's method.  Now, I understand you do

 2    have some difference of opinion with their methodology

 3    and whether the FDA was able to rule out or set aside

 4    the issue of heterogeneity.  But where's your real

 5    difference of opinion with the purpose for this FDA

 6    meta-analysis and the advisory committee meeting and

 7    what we're doing here?

 8    A.   These are really apples and oranges.  This is -- FDA

 9    has a responsibility that if there is a signal, if there

10    is even a sign of an association with a serious event,

11    like suicidality, associated with one of the drugs that

12    they've approved, they have to alert the public, they

13    have to alert doctors.  It is a totally different issue

14    than the issue of whether or not these drugs are

15    causally linked to suicide and whether or not one of

16    those drugs in this amass of 11 drugs is related in any

17    way to suicide.  These are very, very different issues.

18           And as Dr. Pine pointed out, as we have over

19    here, you know, the last thing to say is that if we just

20    think about randomized controlled trial, I am influenced

21    by the fact that two-thirds of the trial had no events

22    whatsoever.

23           This is the same person who was the head of the

24    psychopharmacology advisory board that put the black box

25    warning on antidepressants and pediatric suicides.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Were there members of the advisory committee, as you

2    observed, who took issue with the notion of, one, using

3    the meta-analysis in terms of causality; and two,

4    applying the results of the meta-analysis to the

5    individual drugs in the analysis?

6    A.   Here I think Dr. Hennessey, a

7    pharmacoepidemiologist, was very articulate about this

8    point.  And he said with respect to the issue of

9    homogeneity, "I think we should be clear that we're

10   making an assumption and we were not able to use

11   scientific reasoning to make the inference that each one

12   of those individual agents has an increased risk.  So we

13   make an assumption from a public policy perspective of

14   what we will do from the label.  But the data aren't --

15   I would say that the data aren't there for the

16   individual drugs."

17          The same thing was true for antidepressants.  As

18   you may or may not remember, the black box warning is

19   for all antidepressants, including the old tricyclic

20   antidepressants, for which there were no data reviewed

21   by FDA.  And the reason for this is they didn't want to

22   not put the black box warning on the tricyclics because

23   they were frightened that it would drive prescribers

24   away from the SSRIs back to the tricyclics, which were

25   not as effective and also which were lethal upon

```
 1    overdose.
 2           JUDGE SARIS:  I'm having enough trouble
 3    understanding Neurontin, so if we --
 4           Who are these people who are saying these
 5    things?  Are these people who were in the minority vote
 6    or majority vote?  It's too fast for me to find it in
 7    here.
 8           MS. McGRODER:  This quote from Dr. Hennessey,
 9    who is an epidemiologist, came right before the second
10    vote.
11           JUDGE SARIS:  So is it page -- little page --
12           MS. McGRODER:  Our transcript, unfortunately, is
13    different from theirs, but I believe it's on page 91.
14           MR. SAYLER:  To further confuse things, our
15    transcript has a different pagination.  We submitted our
16    transcript as Exhibit A to the response to the product
17    liability plaintiffs' notice of supplemental authority
18    that they filed last week.  So a separate transcript
19    with separate pagination has been filed with the brief
20    we filed last week, which spells out the fact that
21    neither the FDA nor the advisory committee made any
22    drug-specific causation conclusions.  And the testimony
23    or the discussion at the advisory committee hearing --
24           JUDGE SARIS:  You're taking up her time --
25           MR. SAYLER:  -- is contained in that brief.
```

1          JUDGE SARIS:  I've got this big book here, my

2    little stickies are going on.  I just found it, it's on

3    page 91.  That's Henderson; is that right?

4          MS. McGRODER:  No, that's not it.

5          MR. SAYLER:  Could we supply that on a break?

6          MS. McGRODER:  Yes, before the committee voted

7    to on whether to apply the findings to all drugs --

8          JUDGE SARIS:  I don't want another transcript.

9          MS. McGRODER:  We'll have to find it in their

10   version.

11         JUDGE SARIS:  You'll tell me.

12         MS. McGRODER:  The point is, before the second

13   vote on whether to apply the findings to all of the

14   drugs in the mix, this was a comment by Dr. Hennessey,

15   an epidemiologist.  So it's unclear who incorporates --

16   when you watch this --

17         JUDGE SARIS:  Did Hennessey vote yes or no?

18         MR. FINKELSTEIN:  Yes.

19         MR. FROMSON:  He voted yes.

20         MS. McGRODER:  He voted yes on the question with

21   the assumption that they're doing this from a public

22   policy perspective and you can't apply the findings to

23   the individual drugs.

24         JUDGE SARIS:  Okay.  So Hennessey --

25         MS. McGRODER:  That was the question.

```
 1              JUDGE SARIS:  So Hennessey thinks that.

 2          What's your next question?

 3   BY MS. McGRODER:

 4   Q.   Well, my next question is:  Is a public policy

 5   determination on a class-wide risk assessment for

 6   purposes of public safety, is that the same thing as

 7   finding in this courtroom that Neurontin is capable of

 8   causing suicide?

 9   A.   Completely different.

10          MR. FINKELSTEIN:  Objection.

11          JUDGE SARIS:  Is there an objection?

12          MR. FINKELSTEIN:  Objection.

13          JUDGE SARIS:  Sustained.  You've got a guy who's

14   a leading -- ask him.

15          MS. McGRODER:  I just asked him.

16          JUDGE SARIS:  I know but it was so leading.

17   BY MS. McGRODER:

18   Q.   I'm sorry.  Is this process here, is this classified

19   risk assessment, the same thing that is going on in this

20   courtroom in terms of this hearing?

21          MR. FINKELSTEIN:  Objection.

22          JUDGE SARIS:  Overruled.

23   A.   Absolutely not.

24   Q.   Explain that.

25   A.   Well, this is -- this is surveillance work, this is
```

1    drug safety work.  This is meta-analysis.  It's looking

2    for signals.  It's looking for signals that may or may

3    not be real but that are important.  And these are

4    important for public policy.  This is a very different

5    issue than saying that Neurontin causes suicide.  There

6    are no data here that indicates Neurontin causes

7    suicide.  There are no data that FDA considered that

8    showed that Neurontin causes suicide. We're talking

9    about 46 studies that were submitted to FDA and three

10   people with suicidal thought, two of which were treated

11   with Neurontin and one on placebo.  The data do not

12   indicate any kind of effect for Neurontin.  And the idea

13   that you can have some of these drugs not showing any

14   effect but overall meta-analysis showing an overall

15   effect is very inconsistent with the statistical

16   methodology.

17   Q.   And what did the FDA say -- well, in response to

18   whether the advisory committee questioned about applying

19   the findings to individual drugs, what did the FDA say?

20   If you could look at slide 38.

21   A.   Well, it was very clear that when Dr. Katz was

22   asked, Dr. Katz, the head for FDA for these types of

23   drugs, can we make an inference about an individual

24   drug?  He said, no, we really need to have all of the

25   data together.  We can only make this overall class-wise

1  indication.

2           MS. McGRODER:   Slide 30, please.

3           JUDGE SARIS:   Two minutes.

4           MS. McGRODER:   Sure.

5  BY MS. McGRODER:

6  Q.   And on the issue of heterogeneity, you know,

7  Mr. Lanier had some green dice, white dice, black dice,

8  can you take that green dice that he was holding up and

9  make that a white dice?  Can you fix it so that the

10  green dice, the black dice, and the white dice are all

11  the same color?

12  A.   No.

13  Q.   Well, if you can't do that, are they homogenous?

14  A.   Of course not.  One of the things I think came

15  across most clearly to me in watching this process and

16  being in this courtroom a month ago was that all of this

17  is about mechanism.  This is about, if I recall it

18  correctly, GABA leading to serotonin leading to

19  depression leading to suicidal thoughts leading to

20  suicidal behavior leading to suicide completion.  What

21  was remarkable is that both from FDA's perspective and

22  from a scientific advisory board, they were completely

23  devoid of any mechanism by which these effects could be

24  obtained.  There was never a discussion of

25  neurotransmitters, like GABA, in any of these

PDF created with pdfFactory trial version www.pdffactory.com

1    deliberations.

2    Q.   And if the mechanisms of the different drugs are

3    different and the pharmacologic effect of drugs are

4    different and the drugs themselves are different and the

5    data are different, are the data homogeneous?

6    A.   Of course not.  And even if we were looking at one

7    drug for one indication from multiple studies, it's

8    still extremely difficult on the basis of a

9    meta-analysis to draw any kind of causal inference, even

10   for a single drug in a more homogenous environment.

11         JUDGE SARIS:   Thank you.

12         MS. McGRODER:   That's all I have.   Thank you.

13         JUDGE SARIS:   Thank you very much, Doctor.

14         JUDGE FRIEDMAN:   Thank you, Doctor.

15         MR. LANIER:   Your Honors, may it please the

16   Court, I did my job, maybe not too good, but I did it,

17   may I be excused to step back from counsel table?

18         JUDGE SARIS:   You want to leave?

19         MR. LANIER:    In other words, can I leave from

20   here?

21         JUDGE SARIS:   Sure.

22         MR. LANIER:    Thank you, Judges.

23         MR. LONDON:    By way of explanation, he and I

24   are both from Texas, and he and I both have hurricanes

25   heading our way.

```
 1            JUDGE SARIS:  So stay here.
 2            MR. LANIER:   That's what I told my wife and
 3     five kids, and it did not fly.
 4            MR. LONDON:   He can't; I might.  Can I keep him
 5     posted throughout the day with what's going on?
 6            JUDGE SARIS:  Of course.
 7            MR. LONDON:   Thank you, your Honor.
 8            MR. FINKELSTEIN:  While they're getting
 9     together, Dr. Taylor has already provided direct
10     testimony, I think they were just having a few follow-up
11     here; he already testified for a half hour.
12            JUDGE SARIS:  Dr. Taylor.
13            MR. FINKELSTEIN:  Dr. Taylor.
14            MR. ROUHANDEH:  I don't think he used up all his
15     time.
16            MR. FROMSON:  Your Honor, we had requested 30
17     minutes --
18            MR. SAYLER:  We can do it in ten minutes.
19            JUDGE SARIS:  Sounds reasonable to me.
20            Mr. Alba said you were thinking of not doing a
21     cross.
22            MR. LONDON:   We're going to make that decision
23     as soon as we hear their last question.
24            JUDGE SARIS:  Ten minutes will do the trick?
25            All right.
```

430

1              (Discussion off the record.)

2              MR. LONDON:   We will say one good thing about

3     Dr. Taylor, he did go to the University of Texas, but

4     then he forgot everything when he went to Tulane.

5              MR. SAYLER:  One question for the Courts.  We

6     filed a brief last week that spells out the testimony

7     and the statements at the advisory committee hearing

8     demonstrating neither the FDA nor the advisory committee

9     ever considered or decided that Neurontin specifically

10    can cause suicidality.

11             We attached to that brief a transcript of the

12    advisory committee hearing, so it is a part of both the

13    Court's records as we sit here today, but it's

14    differently paginated than the transcript that was made

15    a part of this briefing book here.  My question is,

16    would the Court like us to separately file that

17    transcript in any way or would that just add to the

18    mountains of paper?

19             JUDGE SARIS:  No, but it would be useful because

20    I've got this one big book, and I've been just -- not

21    that you're bound by it, but when I learn, I underline

22    and put yellow tabs.  I'd rather not go back and forth.

23    If you just gave us the pages, I could make everything

24    consistent.

25             MR. ROUHANDEH:  We could do that for the last

1    three quotes.

2            JUDGE SARIS:  That be would fabulous.

3            MR. SAYLER:  All the citations they cite to in

4    this brief as well as our Power Point slides.

5            JUDGE SARIS:  Just on the Power Point, just so

6    we could --

7            MR. LONDON:  As long as we're housekeeping on

8    that same issue, you'll recall at our very last

9    discussion, we had this question about what to do with

10   Dr. Gibbons having come up with essentially a new report

11   during his testimony.  And since then, he did file a new

12   report, and your Honors invited us to file a reply, and

13   we got one late last night from our expert.  We'd like

14   to file our reply to Dr. Gibbons' new reply.

15           MR. ROUHANDEH:  Your Honor, I think the

16   expectation was they were going to give it in time for

17   us to react to it.  Now they --

18           JUDGE SARIS:  When did they file this?

19           MR. LONDON:  We received it the 16th.

20           JUDGE SARIS:  I'm going to let them do it,

21   that's unfair.

22           MR. SAYLER:  This is total sandbagging.

23           JUDGE SARIS:  If he gave the 16th and this the

24   23rd, that's not unreasonable, seven days.

25           MR. SAYLER:  Your Honor, we provided

1    Dr. Gibbons' supplemental report to plaintiffs' counsel

2    on the Monday of the advisory committee hearing.

3         JUDGE SARIS:  Excuse me.  At least for my part

4    I'm going to allow it.

5         MR. SAYLER:  They have --

6         JUDGE SARIS:  I have been very generous with

7    allowing Dr. Gibbons, who obviously has a lot of

8    expertise in this field, to file what he wants.  I think

9    what's happened in the FDA is absolutely essential for

10   my understanding of it, okay, and I understand all of

11   this is late and it's not as perfectly scripted and

12   there may be some unfairness to it.  There was some

13   unfairness with letting Dr. Gibbons file something a

14   week ago, there's some unfairness about allowing this.

15   I'm going to allow it.

16        Now, if there's some just horrifically off-point

17   thing and Dr. Gibbons feels the need to respond, file a

18   motion to respond, but I'm not going to prevent the

19   plaintiffs to respond to Dr. Gibbons.

20        MR. ROUHANDEH:  That's fine.  Our point was

21   simply we haven't seen it yet so we have no idea what it

22   says, so we might want to respond to it, we might not.

23        JUDGE SARIS:  Fair enough, fair game.

24        JUDGE FRIEDMAN:  All right.  I have a slightly

25   different position on that.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          The Gibbons supplemental report you're referring

 2     to is the one dated July 11; is that correct?

 3          MS. McGRODER:  That's correct.

 4          MR. SAYLER:  That's correct.

 5          JUDGE FRIEDMAN:  And the defendants are

 6     representing today that they have not seen the

 7     plaintiffs' response to that?

 8          MR. ROUHANDEH:  That's correct.

 9          JUDGE FRIEDMAN:  Is it a lengthy document?

10          MR. LONDON:   I think it's 11, 12 pages, your

11     Honor.

12          JUDGE FRIEDMAN:  I agree with Judge Saris that

13     it should be accepted.  In terms of authorizing a

14     written motion, I have a different position.  So I'm

15     going to ask you look at it during the break.  If we can

16     deal with it today, any applications to respond, we

17     will; if we can't, I'll take an oral application in New

18     York for a response rather than a written.

19          JUDGE SARIS:  Let me ask you this.  Why didn't

20     you give it to them this morning?

21          MR. ROUHANDEH:  I asked for it every day.

22          MR. FROMSON:  We haven't spoken every day.

23          JUDGE SARIS:  Excuse me.  Why didn't you show it

24     to them this morning?  In general I'm going to allow

25     them to respond, you were all sitting here for 20
```

PDF created with pdfFactory trial version www.pdffactory.com

1    minutes while -- Judge Friedman came into town, we were

2    15 minutes late coming out on the bench.  Why didn't you

3    show it to them?

4         MR. FROMSON:  For a number of reasons, one of

5    which is, why would I give the witness my

6    cross-examination so he can raise --

7         JUDGE SARIS:  No.

8         MR. FROMSON:  And for rebuttal --

9         JUDGE SARIS:  No.  That was unfair game.  That

10   having been said, I'm trying to reach the truth of the

11   thing.

12        MR. FROMSON:  There's other reasons.

13        JUDGE SARIS:  You can't have something that you

14   want him to look at that's a written memo in response

15   that you haven't let them see.

16        MR. FROMSON:  -- provide it until after the

17   doctor was done with his rebuttal.

18        MR. LONDON:  Let me be candid.  I think there's

19   some gamesmanship, I for one would like to see the

20   gamesmanship stop.  I can only reply for me, it's been

21   both ways, and I think it's enough.

22        JUDGE SARIS:  I don't know what Dr. Gibbons is

23   doing this morning, if he has to be on a plane or

24   something.  Why don't you read it during the break --

25             (Discussion off the record.)

1            JUDGE SARIS:  Why don't we take it right now and
2      see if there's anything that's just so out of the
3      ballpark --
4            MR. LONDON:  I think there is not.
5            MS. McGRODER:  I'm a little unclear on the
6      process here.  You want us to look at and read it and
7      respond to it hear?
8            JUDGE SARIS:  I don't know.  It may not be
9      necessary.
10           (Discussion off the record.)
11           JUDGE SARIS:  Is Dr. Greenland going to be
12     testifying?
13           MR. FINKELSTEIN:  We don't have time allotted
14     for him.  No.
15           JUDGE SARIS:  I have some problems with
16     Dr. Greenland's testimony in the sense that I didn't
17     understand it.
18           MR. LONDON:   Dr. Greenland or Dr. Gibbons?
19           THE COURT:  Greenland.
20           MS. McGRODER:  Your Honor, this was signed
21     yesterday by Dr. Greenland.
22           MR. FINKELSTEIN:  We got it at 10:00 last night.
23           MS. McGRODER:  I have a Blackberry.
24           JUDGE SARIS:  Enough.  We're taking a recess
25     right now.  One of my issues with Greenland -- I am sure

1    he's a world-renowned statistician -- I haven't taken

2    statistics since college, I couldn't understand it.

3            MR. FINKELSTEIN:  We hope that this will clear

4    it up.

5            (Discussion off the record.).

6            JUDGE SARIS:  11:15.

7            Mr. Taylor, is that who we're doing?

8            MR. ROUHANDEH:  Your Honor, just on the issue of

9    the Greenland declaration.  What we would like to do, is

10   Dr. Gibbons is looking at it now, perhaps after lunch we

11   can put him back on the stand.

12           JUDGE SARIS:  I don't know.

13           MR. ROUHANDEH:  If we can.

14           JUDGE SARIS:  We've got to finish this.

15           MR. ROUHANDEH:  We'll go ahead with Taylor and

16   Rothschild, and if time permits -- we'll see where we

17   are.

18           JUDGE SARIS:  Time has never permitted.

19           All right, let's go.

20           CHARLES P. TAYLOR, having been duly sworn by the

21   Clerk, was examined and testified as follows:

22                   CONTINUED DIRECT EXAMINATION

23   BY MR. HOOPER:

24   Q.   Dr. Taylor, could you please summarize for the Court

25   the basic reasons why you believe the plaintiffs'

 1   biological plausibility theory is scientifically

 2   unsound?

 3   A.   Sure, I'd be glad to.

 4        First of all, the first main point is that the

 5   plaintiffs appeared to have the direction of GABA

 6   changes that are associated with depression and

 7   suicidality reversed.  The scientific literature, and in

 8   fact, psychology texts that are widely recognized

 9   indicate that it's an increase in brain GABA that's

10   indicated with depression and suicidality.

11   Q.   The opposite of plaintiffs' theory?

12   A.   Exactly.

13   Q.   What is point two, Dr. Taylor?

14   A.   Point number two is that Dr. Trimble's theory relies

15   heavily on the fact, in his words, that gabapentin is

16   GABAergic, and we've heard a lot of terms around the

17   evidence GABAergic in prior testimony, but this

18   conclusion that Dr. Trimble has reached is not

19   scientific.  In fact, Neurontin has no GABA activity, it

20   doesn't have a target, pharmacologic target that exists

21   inside of GABAergic neurons, and there's no GABA

22   pharmacology, there's no pharmacology that's shared with

23   other GABAergic drugs.  In fact, I looked carefully at

24   Dr. Trimble's report, and he completely omitted citing

25   22 peer-reviewed journal original research articles that

1  provide evidence that gabapentin is not GABAergic.

2  Those articles were completely neglected in his review.

3  Q.   And what is your third point, Dr. Taylor?

4  A.   The third point is that this theory requires that

5  Neurontin reduces monoamine release, specifically

6  serotonin, but there are both animal and human studies

7  that show this is not the case.

8        MR. HOOPER:  Next slide.

9  Q.   What does the Textbook of Psychopharmacology, the

10  leading textbook in the United States --

11  A.   Yes --

12  Q.   -- say about the actual relationship between GABA

13  and depression?

14        JUDGE SARIS:  Do we have this textbook?

15        MR. HOOPER:  I have excerpts, your Honor.

16        JUDGE SARIS:  Have you shared that with them?

17        MR. HOOPER:  It's a deposition exhibit, it was

18  used in his deposition.

19        JUDGE FRIEDMAN:  These slides were not the

20  slides that were used on the direct examination on the

21  last day, are they?

22        MR. HOOPER:  This one is reordered, your Honor.

23        JUDGE SARIS:  Where are they?

24        MR. HOOPER:  Not the same set of slides, no,

25  your Honor.

```
 1              JUDGE SARIS:  Are we getting new slides?
 2              We will for both sides?
 3              MR. HOOPER:  Yes.
 4              JUDGE SARIS:  Okay.
 5    BY MR. HOOPER:
 6    Q.   Dr. Taylor, what does the Textbook of
 7    Psychopharmacology say about what the scientists found
 8    in the relationship between GABA and depression?
 9    A.   It says that brain GABA concentrations are lower in
10    suicidal patients than normal patients and that GABA
11    concentrations are conversely correlated with the
12    severity of depression.
13              JUDGE SARIS:  Can I get this?  Where is this?
14              MR. HOOPER:  Would you like a hard copy?
15              JUDGE SARIS:  If I don't have it --
16              MR. HOOPER:  Third piece of paper in.
17              JUDGE SARIS:  So what piece of paper are we
18    talking about?
19              MR. HOOPER:  The third piece of paper in, your
20    Honor, page number 736.
21    BY MR. HOOPER:
22    Q.   The relationship is the lower GABA levels and
23    inverse correlation; is that right, Dr. Taylor?
24    A.   That's correct.
25    Q.   Is that the same as or different from Professor
```

```
 1   Trimble and Kruszewski's theory?
 2   A.   It's the opposite of Dr. Trimble and
 3   Dr. Kruszewski's theories.
 4          MR. HOOPER:  Next slide.
 5   Q.   Dr. Taylor, let me ask you to look at the June 2007
 6   version of the Neurontin --
 7          JUDGE SARIS:  If you want me to get this, I have
 8   to actually sit and read it.  That's -- I understand you
 9   have time limits, but -- so what do you want me to focus
10   on now that I have this?
11          MR. HOOPER:  Prior slide, your Honor.  This one.
12          (Pause.)
13          JUDGE SARIS:  All right.
14          MR. HOOPER:  And the point we want to focus are
15   the words "lower inverse correlation" to contrast the
16   plaintiffs' theory.
17          MR. HOOPER:  Slide 3, please.
18   BY MR. HOOPER:
19   Q.   Dr. Taylor, let me ask you to call your attention to
20   the June 2007 version of the Neurontin label.
21          MR. HOOPER:  Your Honors, it's page 2, and I've
22   highlighted in yellow the language that's relevant.
23   It's the same language that's pulled up on this slide.
24   Q.   Dr. Taylor, what does the -- first, the labelling
25   for the drug is the same thing as the package insert,
```

PDF created with pdfFactory trial version www.pdffactory.com

1  correct?

2  A.   That's correct.  And actually, I composed these

3  words.

4  Q.   And was this label approved, as required to be

5  approved, by the Food and Drug Administration?

6  A.   That is correct.  The Food and Drug Administration

7  can recommend changes or not approve wording that comes

8  from the sponsored drug company.

9  Q.   What does the FDA say about the relationship between

10  gabapentin or Neurontin and GABA?

11  A.   The words are gabapentin is structurally related to

12  the neurotransmitter GABA, that means that the chemical

13  structure of the compound is similar to GABA, but in

14  spite of that, it does not modify GABA-A or GABA-B radio

15  ligand binding, that's a way of looking at GABA

16  receptors.  It's not converted metabolically into GABA-R

17  or a GABA agonist, and it's not an inhibitor of GABA

18  uptake or GABA degradation.

19       Those are always how the other drugs that are

20  widely accepted to be GABAergic operate, and gabapentin

21  does not have any of those effects.

22       JUDGE SARIS:  Is it true that the FDA still

23  refers to it as GABAergic?

24       THE WITNESS:  I believe that you're referring to

25  the suicidality hearing; is that correct?

1          JUDGE SARIS:  I don't know what I'm referring

2     to, except they classify gabapentin in a class of

3     GABAergic drugs.  So is that still the FDA

4     classification?

5          THE WITNESS:  That is not an FDA classification.

6     This is the approved labelling.  If there was an

7     approved classification, this is where that

8     classification would appear.

9          JUDGE SARIS:  I'm referring to the hearing that

10    took place last week.

11         THE WITNESS:  Yes.

12         JUDGE SARIS:  They refer to it as being in the

13    class -- they, I'm being imprecise -- the blue ribbon

14    panels and the FDA representatives seem to refer to

15    gabapentin as being in the class of GABAergic drugs.

16         THE WITNESS:  That designation was done only for

17    the purpose of looking at statistical subgroups of the

18    data.  And it was stated in that document from FDA that

19    those groups were chosen by the FDA medical officer with

20    no justification of how they were chosen.  So my --

21         JUDGE FRIEDMAN:  Excuse me, Doctor.  It's in the

22    statistical review and evaluation that came out in

23    connection with the FDA alert; is that correct?

24         THE WITNESS:  Yes, that's correct, that's the

25    document I'm referring to also.

1            In that document, there is no explanation for

2     the mechanistic groups that the FDA chose, and I would

3     not agree with that classification, and I think most

4     scientists would not agree with that classification.

5            JUDGE FRIEDMAN:  You disagree with it, but it

6     was the classification that was made in connection with

7     the study that resulted in the January 2008 alert; is

8     that correct?

9            THE WITNESS:  Oh, yes, that's absolutely true.

10           JUDGE FRIEDMAN:  So the FDA is still referring

11    to the drug as GABAergic.

12           THE WITNESS:  I would take exception to that.

13           JUDGE FRIEDMAN:  The question is:  Are they

14    still referring to it, at least for purposes of this

15    study, as GABAergic?

16           THE WITNESS:  I think for the purposes of this

17    one advisory committee meeting and the preparatory

18    document, yes, it was put in that class.

19           JUDGE FRIEDMAN:  All right, fair enough, Doctor.

20           THE WITNESS:  For the public, it's not the case.

21           JUDGE FRIEDMAN:  Fair enough, you've answered my

22    question.

23           I just have one further question.  This last

24    document that was handed up, this is the actual

25    labelling for Neurontin?

1          THE WITNESS:  Yes, that's correct, that's the

2     current labelling.

3          JUDGE FRIEDMAN:  Thank you.

4     BY MR. HOOPER:

5     Q.   Dr. Taylor, do you recall the FDA making that

6     classification, termed it GABAergic and GABAmimetic?

7     A.   Yes.

8     Q.   What does "GABAmimetic" mean?

9     A.   It probably means different things to different

10    people.  To a pharmacologist, GABAmimetic means that the

11    drug itself mimics the GABA at GABA receptors or in the

12    brain.  And that's clearly not the case with gabapentin.

13    To someone not only looking at the structure of GABA and

14    gabapentin, you might call gabapentin a GABAmimetic or a

15    GABA analog or a GABA derivative, those latter terms

16    would better to use in describing the chemistry.

17    Q.   If gabapentin is GABAmimetic, therefore, in that

18    class, for the reason that it is structurally related to

19    GABA, does that necessarily mean that gabapentin is

20    GABAergic?

21    A.   Absolutely not.  There are lots of compounds that

22    are found in the scientific literature whose function

23    does not bear an obvious resemblance to its chemical

24    structure.

25          MR. HOOPER:  Next slide.

1           Your Honor, I'm going to hand up hard copies of

2    the study that this slide is drawn from, as well, we're

3    going to look at page 10, 89, figure 2, which is in up

4    upper left-hand corner.

5    Q.    Dr. Taylor, could you please explain what the

6    science shows about Neurontin's action with respect to

7    the monoamine system?

8    A.    Sure.  This is one representative figure from a

9    number of papers that could have been chosen that all

10   show that gabapentin reduces the induced or stimulated

11   release of monoamine neurotransmitters such as

12   noradrenaline, dopamine, and serotonin.  The effect

13   seems to be similar across those studies.  This one,

14   however, shows the data in detail.

15   Q.    Could you explain the three blocks that you've

16   broken the graph into?

17   A.    Sure.

18   Q.    The blue, the green, and the black.

19   A.    First of all, there are two time course graphs

20   superimposed, the one with circles is the control group

21   that has no drug present, the other is a drug-treated

22   group that has gabapentin present throughout.  And what

23   you will notice is that before the stimulation, the

24   amount of noradrenaline in this assay is the same.

25   Q.    Where does the stimulation occur, Dr. Taylor?

```
 1    A.   The stimulation occurs in the time period between

 2    the blue box and the black box, during the period where

 3    the green is shown.

 4    Q.   And by stimulation, do you mean application of an

 5    external agent to cause all this tissue to dump

 6    neurotransmitters immediately?

 7    A.   That's correct.

 8         MR. FINKELSTEIN:  Objection.

 9         JUDGE SARIS:  Sustained, leading.

10         So ask it differently.

11    BY MR. HOOPER:

12    Q.   What does "stimulation" mean?

13    A.   Stimulation means that an external massive stimulus,

14    such as electrical shocking of the tissue in the dish or

15    applying potassium, which depolarizes, essentially

16    activates all the cells in the tissue at the same time,

17    is applied.

18         JUDGE FRIEDMAN:  Doctor, is your point with

19    respect to this study that it didn't make sense for

20    Dr. Trimble to rely on it because of the stimulation and

21    other circumstances under which the study was conducted?

22         THE WITNESS:  Yes, that's correct.  This

23    particular finding is relevant for the release of

24    monoamine neurotransmitters in vitro that is produced by

25    a massive stimulation.  It is irrelevant, really, for
```

1    the effects of the drug in a human or in a whole animal;

2    and in fact, there are other studies, at least with

3    noradrenaline and the spinal cord, that do not support

4    this effect in whole animals or people.  There is human

5    data.

6         JUDGE FRIEDMAN:  Are you referring to the

7    Ben-Menachem study?

8         THE WITNESS:  In part I'm referring to the

9    Ben-Menachem study.  There are also more recent studies

10   of noradrenaline and the cerebrospinal fluid in patients

11   treated with gabapentin or placebo.  And in that

12   situation, noradrenaline is actually increased to a

13   significant extent rather than decreased.

14        JUDGE FRIEDMAN:  And what are those other

15   studies?  Are they referenced in your declaration or

16   your affidavits?

17        THE WITNESS:  You know, that particular study,

18   the one that I just mentioned, is not cited in my expert

19   report because it only -- it only was published toward

20   the end of last year.  But we do have a copy of that

21   today, and I'd be glad to provide it.

22        JUDGE FRIEDMAN:  And Dr. Trimble is saying that

23   the Ben-Menachem study is worthless because it involved

24   three patients, and I'm sure there were more

25   sophisticated reasons that he thought that that was not

PDF created with pdfFactory trial version www.pdffactory.com

1    a useful study.  Can you address that very briefly?

2    A.   Certainly.  First of all, I don't think there were

3    good reasons for rejecting that study.  There were, in

4    fact, six patients in -- or six treated individuals in

5    the group that received gabapentin.  In a very similar

6    study done by the same lab, same investigator,

7    Dr. Ben-Menachem, with the drug bigabatrin, which is

8    widely recognized to be GABAergic, clearly showed an

9    increase in GABA in the cerebrospinal fluid.  So the

10   methods were the same, a difference was easily

11   observable in that study.  There is no reason that a

12   similar effect would not be observable with gabapentin.

13            JUDGE FRIEDMAN:  We have is bit of a squaring

14   match here, don't we, between the plaintiffs' experts

15   and the defendants' experts as to which of these studies

16   furnish a reliable scientific basis for the drawing of

17   the conclusions that are being drawn here?

18            THE WITNESS:  You might say that.  On the other

19   hand, I would submit that Dr. Trimble has completely

20   omitted any mention of these 22 peer-reviewed articles

21   that I have found that provide evidence that gabapentin

22   is not a GABAergic drug.  He simply left out mention of

23   those studies, which are easy to find in the literature.

24            JUDGE FRIEDMAN:  Is the significance of whether

25   gabapentin is GABAergic, that that is another way of

1    getting to the point as to whether the drug effects the

2    functioning of the neurotransmitters?

3              THE WITNESS:  Yes.  I think there are two

4    points, two reasons, that Dr. Trimble chose to emphasize

5    the, in quotes, GABAergic nature, end quotes, of

6    gabapentin.  The first is that that provides a

7    theoretical framework for his theory.  His theory would

8    fail without gabapentin being a GABAergic drug.  And

9    secondly, he draws analogies throughout his expert

10   report between gabapentin, which is not a GABAergic

11   drug, and the known GABAergic drug bigabatrin, which

12   blocks the penetration of GABA in the brain.  Gabapentin

13   does not share that pharmacologic action, but

14   Dr. Trimble posits that all bad things that happen with

15   bigabatrin also happen with gabapentin, in fact, in the

16   absence of evidence.

17   BY MR. HOOPER:

18   Q.   Dr. Taylor, just a couple of last questions.

19            Is there scientific significance to the fact

20   that the two lines are one in the same in the blue box

21   on the left side of the graph and in the black box on

22   the right side of the box?

23   A.   Yes, that's correct.  And what that means is the

24   noradrenaline release, both before and after the

25   stimulation, was identical whether or not gabapentin was

1    present.

2    Q.   There was no general lowering as a result of

3    noradrenaline?

4    A.   That's correct.

5            MR. HOOPER:  No further questions, your Honor.

6            MR. FINKELSTEIN:  Your Honor, we'll waive our

7    cross-examination.

8            MS. McGRODER:  We're calling Dr. Anthony

9    Rothschild at this time, your Honor.

10           ANTHONY ROTHSCHILD, having been duly sworn by

11   the Clerk, was examined and testified as follows:

12           THE CLERK:  Thank you.  You may be seated.  And

13   would you please state your name and spell it for the

14   record.

15           THE WITNESS:  Anthony Rothschild, Rothschild,

16   R-o-t-h-s-c-h-i-l-d.

17                     DIRECT EXAMINATION

18   BY MS. McGRODER:

19   Q.   Can you briefly describe for the Court,

20   Dr. Rothschild, your education and experience in

21   psychiatry and neuropsychopharmacology?

22   A.    I did my undergraduate degree at Princeton

23   University, majored in chemistry at Princeton

24   University, then did my medical degree at University of

25   Pennsylvania School of Medicine, then came up to Boston

1    and did my psychiatry residence at Harvard Medical

2    School, McLean Hospital, finished that in 1983.  Then I

3    stayed at Harvard Medical School working my way up from

4    instructor to assistant professor to associate

5    professor, this is all at McLean Hospital and at Harvard

6    Medical School.  At the same time, I was director of the

7    depression treatment unit at McLean Hospital, where we

8    took care of seriously depressed patients, including all

9    admissions for suicide to McLean.  I was also doing

10   clinical research at the time, randomized control of

11   clinical trials.

12         In 1996, I left Harvard and McLean Hospital to

13   go to the University of Massachusetts Medical School in

14   Worcester, where I have an endowed chair in psychiatry,

15   and I've continued to do similar things.  I do clinical

16   research, I am also just a plain old psychiatrist

17   treating patients.  I do a lot of teaching of medical

18   students and psychiatry residents and do some

19   administrative work.

20   Q.   And what is your current position at University of

21   Massachusetts Medical School?

22   A.   I'm the Brudnick professor of psychiatry, and I'm

23   also the director of the Center For

24   Psychopharmacological Research and Treatment.

25   Q.   So you treat patients with mood disorders such as

PDF created with pdfFactory trial version www.pdffactory.com

1   bipolar disorder?

2   A.   Yes.

3   Q.   Can you just briefly, very briefly describe your

4   clinical practice?  What kinds of patients, how many do

5   you see in a week or a month or whatever makes sense?

6   A.   Well, my clinical practice is primarily in mood

7   disorders, and particularly within that severe mood

8   disorders, that would include bipolar disorder.  My

9   actual clinical practice, you know, being just a

10  psychiatrist not involved in research would probably be

11  about a day, day and a half a week.  But the research,

12  the clinical research involving patients who suffer from

13  these disorders, and that would be another 50 percent of

14  my time.

15  Q.   And have you, yourself, prescribed Neurontin in your

16  practice in treating patients with mood disorders?

17  A.   Yes.

18  Q.   And in what context have you prescribed Neurontin to

19  your patients?

20  A.   Well, I prescribed it primarily for anxiety, for

21  patients who suffer from, say, mood disorders would be

22  the most common who also have anxiety symptoms, and I'm

23  using Neurontin to treat some of their anxiety symptoms.

24  I also have another group of patients in my practice who

25  are on Neurontin, although other doctors are prescribing

1    Neurontin, most commonly for pain.

2    Q.   And why would you prescribe Neurontin to patients

3    for an indication for which there's no FDA approval,

4    such as anxiety disorder?

5           MR. FINKELSTEIN:  Objection.

6           JUDGE SARIS:  Overruled.

7    A.   Well, for me, the reason would be is that there is a

8    scientific literature that indicates that Neurontin may

9    be effective for the treatment of anxiety.  But I must

10   tell you that in the practice of psychiatry today, what

11   you call "off-label use" is the norm.  Okay?  So that

12   most of the medicines that psychiatrists are using to

13   treat patients are off label in the sense that there's

14   not an FDA indication for that.

15   Q.   Now, have you ever had a patient to whom you

16   prescribed Neurontin commit suicide or have suicidal

17   thoughts or engage in suicidal behavior that you

18   attributed to the drug?

19   A.   No.

20   Q.   Now, you said, Dr Rothschild, that you were involved

21   in conducting clinical studies.  Can you just briefly

22   describe what kinds of studies those are and what your

23   role is?

24   A.   Well, my role would be --

25          JUDGE SARIS:  You only have half an hour here.

1          THE WITNESS:  I'll try and keep it short.

2          MS. McGRODER:  It's important, your Honor,

3     because --

4          JUDGE SARIS:  You use the time however you want,

5     but that's all you get.

6          MS. McGRODER:  I'm with you.

7     A.   My role would be as principal investigator.  These

8     are studies sometimes funded by the National Institute

9     of Mental Health, sometimes by pharmaceutical companies,

10    but they're blinded studies so neither I nor the

11    patients participating know which drug they're on,

12    whether they're getting the sugar pill or the drug

13    that's being studied and they involve very frequent

14    assessments of the patient, usually on a weekly basis

15    where you do a number of rating instruments both for

16    measuring efficacy, say improvement in depression, and

17    also side effects.  I've been doing that for -- since I

18    finished my residency in 1983.  So I did it both at

19    Harvard, and I continue to do it at UMass.  I've been

20    doing it for about 25 years.

21    Q.   Let's get to the point, Dr. Rothschild.  If a

22    hypothesis is raised that a drug, like Neurontin, can

23    cause an adverse effect, like suicidal thinking and

24    behavior, is there a generally accepted and reliable

25    scientific method to examine that hypothesis?

1   A.   Yes.   The gold standard would be the randomized

2   controlled blinded, double-blinded clinical trial.

3   Q.   And those are the kind of clinical trials you've

4   been involved in conducting, correct?

5   A.   Yes.

6   Q.   What do the randomized controlled clinical trials

7   show with respect to the question does or can Neurontin

8   cause suicide?

9   A.   Well, if you look at the randomized controlled

10  clinical trials of Neurontin, you see no difference

11  between Neurontin and the sugar pill placebo on death

12  from suicide, suicide attempts, or even this concept of

13  suicidality, if you look at Neurontin versus placebo.

14        MS. McGRODER:   Slide 3, please.

15  Q.   Why is it important to look at randomized controlled

16  trial data when you're trying to determine whether a

17  drug can cause an adverse effect?

18  A.   Well, because there's this background rate of --

19  say, for example, suicide, in the populations that

20  you're studying.   So, for example, in depression or

21  bipolar disorder, as this slide shows, you have a rate

22  of 40 per 10,000 persons rate of suicide.   Anxiety also

23  has a rate of suicide, epilepsy has, pain has.   So the

24  way to control for that is you randomly assign the group

25  of patients you're studying to get the sugar pill, to

1  get the placebo.

2  Q.   Have you reviewed the expert -- the reports of

3  plaintiffs' expert witnesses who have testified at this

4  hearing and listened to their testimony?

5  A.   Yes.  I actually was here in June, and I listened to

6  their testimony.

7       MS. McGRODER:   Slide 4, please.

8  Q.   What have the plaintiffs' experts said about

9  randomized control trial data for Neurontin?  Let's

10 start with Dr. Blume.  Did Dr. Blume analyze randomized

11 controlled trial data or the gold standard for

12 Neurontin?

13 A.   Well, she said they were not in the picture, and she

14 seemed to not think it was important to look at them.

15      MS. McGRODER:   Slide 5.

16 Q.   What about Dr. Trimble?  Did he analyze the

17 randomized controlled trial data for Neurontin?

18 A.   I think this actually comes from his deposition,

19 which I did read, where he also said that he didn't feel

20 it was relevant.  I think he used the word it wasn't

21 relevant to look at the randomized control trial.

22      MS. McGRODER:   Slide 6.

23      And, Dr. Kruszewski, what did he do, if

24 anything, with the randomized control trial data for

25 Neurontin?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   In his deposition, Dr. Kruszewski said he didn't

2   even look at it.

3   Q.   In your opinion, is a methodology that ignores the

4   existing and available randomized control trial data for

5   gabapentin or Neurontin consistent with the generally

6   accepted and scientifically reliable method for deriving

7   conclusions about causation?

8   A.   Well, if you're interested in causation, the first

9   step is to look at the accepted scientific methodology,

10  as a first step would be to look at the randomized

11  controlled double-blind clinical trials to see if there

12  is a statistical association.  That is the accepted

13  methodology.

14  Q.   And was that done here?

15  A.   It wasn't done by the plaintiffs' experts, no.

16       MS. McGREGOR:   Slide 7, please.

17  Q.   What is the FDA's view regarding why it's important

18  to look at randomized controlled trial data in

19  evaluating suicide risk?

20  A.   Well, the FDA does the same thing as the accepted

21  methodology -- not the same thing as what the

22  plaintiffs' experts did here -- but the FDA's

23  Dr. Mentari actually at the hearing a couple of weeks

24  ago saying that you needed to compare the finding to the

25  placebo-treated subjects to control for the background

```
 1    rate of suicidality that occurs in these populations.
 2            MS. McGREGOR:   Slide 8, please.
 3    Q.   Drs. Trimble and Kruszewski told Judges Saris and
 4    Friedman at the last hearing that the reason why, or one
 5    reason why that the randomized control data for
 6    Neurontin aren't useful to look at is because they
 7    excluded patients at risk.  Do you remember that
 8    testimony?
 9    A.   Yes.
10    Q.   Did the Neurontin randomized control trials exclude
11    patients at risk for suicidal thinking and behavior?
12    A.   Well, they excluded one study out of 28.  So this
13    slide is from the FDA's clinical review that they put
14    out June 12th of 2008.  You can see here that --
15            MR. FINKELSTEIN:   I'm sorry --
16            JUDGE SARIS:   You'll just have to hold it when
17    he objects.
18            MR. FINKELSTEIN:   I'm objecting solely on the
19    basis we've never received any supplemental report
20    regarding what Dr. Rothschild's opinion post January
21    2008 FDA alert up until today.  He has never provided
22    any supplemental report, we've never had an opportunity
23    for any deposition.  So this is going into a field -- we
24    have provided supplemental reports --
25            JUDGE SARIS:   Is this something that was in his
```

459

1    report?

2            MS. McGRODER:   Actually, your Honor, that is a

3    misstatement.

4            JUDGE SARIS:   Is this in his report?

5            MS. McGRODER:   This is not in his original

6    report because the --

7            JUDGE SARIS:   Excuse me.   You're pulling the

8    same thing they did this morning.

9            MS. McGRODER:   No.   We did not receive a

10   supplemental report from Dr. Trimble, Dr. Kruszewski.

11           JUDGE SARIS:   Have they ever seen this before?

12           MS. McGRODER:   They -- this is the FDA

13   statistical review, they've seen it all day long.

14           JUDGE SARIS:   Listen, don't get up on a high

15   horse.   The question is:   Have you ever produced to the

16   plaintiffs his opinion on this subject?

17           MS. McGRODER:   Well, the randomized control

18   trial data for Neurontin exclude patients at risk?   Yes,

19   that issue is addressed in his report.

20           MR. FINKELSTEIN:   Not with respect to the recent

21   FDA analysis.

22           MS. McGRODER:   But, of course, the FDA analysis

23   wasn't available at the time of his original report,

24   just like it wasn't available to Dr. Blume or Kruszewski

25   or Trimble, who also testified about it.

```
 1            JUDGE SARIS:  We're going to allow it in a tit
 2    for tat.  If it happens again, everything is going to be
 3    struck.
 4            JUDGE FRIEDMAN:  Before we continue, Doctor, can
 5    you call my attention to the specific randomized
 6    clinical trials that exist that you are saying
 7    Drs. Trimble and Kruszewski either ignored or said were
 8    irrelevant?
 9            THE WITNESS:  Sure.  I'm basing it on two
10    sources.  One I know you have, which is the data that
11    Pfizer submitted on Neurontin to the FDA, and if you'd
12    look at the FDA's analysis of --
13            JUDGE FRIEDMAN:  Without analyzing it, I just
14    want to make sure that I know what the trials are.
15            THE WITNESS:  The second one is the review of
16    all the Neurontin clinical trials of Pfizer that they've
17    submitted to the FDA for this -- for this FDA analysis.
18            JUDGE FRIEDMAN:  These four trials performed by
19    Pfizer that were submitted to the FDA, is that the sum
20    total of the clinical trials?
21            THE WITNESS:  Yes.
22            JUDGE FRIEDMAN:  Okay.  And at some point,
23    counsel, if you can show me where they are in the
24    record, we don't have to do that right now if you're not
25    referring specifically.
```

1          MS. McGRODER:  Sure, we can do that.

2          JUDGE FRIEDMAN:  Thank you.

3    BY MS. McGRODER:

4    Q.   Back to this table in the FDA statistical review.

5    What does the table tell you about whether patients at

6    suicide risk were excluded, whether or not they were

7    excluded from the randomized controlled trials for

8    gabapentin?

9    A.   I was sitting in this trial when I heard Dr. Trimble

10   criticize Pfizer for excluding patients, quote, at risk,

11   unquote, who had psychiatric disturbances or who might

12   be at risk for suicide.  And this table 10 shows you

13   that, you know, in the FDA analysis, only one of the 28

14   trials were excluded because patients were -- were at

15   current suicide risk.  The other 27, they were not

16   excluded.

17   Q.   Okay.  Do the randomized controlled trials for

18   gabapentin support plaintiffs' theory that Neurontin is

19   capable of causing suicide?

20   A.    They do not because the Neurontin clinical trials

21   don't find a statistical association between taking

22   Neurontin and suicide.  In other words, there's no

23   difference between Neurontin and the sugar pill.

24   Q.   Okay.  Now, can you tell us what this board is for,

25   Dr. Rothschild?

```
 1   A.   Well, these are the -- well, this could be -- I
 2   guess, the best way to summarize this, this would be the
 3   accepted scientific methodology, if you have a
 4   hypothesis that Neurontin causes suicide, you would need
 5   to go through these various things.  So there's -- in my
 6   review, there's no controlled clinical trial data, we
 7   just talked about that, there's no human epidemiologic
 8   studies that go through that --
 9   Q.   Let me stop you there.  Let's talk about the
10   epidemiologic evidence or studies.  Do the plaintiffs'
11   experts rely on any epidemiologic studies that
12   demonstrates there's statistically significant
13   association between Neurontin and suicidal thinking and
14   behavior?
15   A.   No, they have not.  They did not present any study
16   that -- any epidemiologic study that came to the
17   conclusion that Neurontin causes suicide.
18   Q.   Now, Dr. Kruszewski testified at the hearing in this
19   courtroom in late June that there's no observational
20   epidemiologic study and you can't do that -- in sum or
21   substance -- because it wouldn't be ethical.  Do you
22   agree with that?
23   A.   No.
24   Q.   What's wrong with that statement by Dr. Kruszewski?
25   A.   Well, I don't know why he has ethical problems with
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   it.  In fact, these studies happen -- I heard testimony

 2   about the McFarland study in the Oregon Medicaid

 3   database.

 4         So these are -- these epidemiologic studies look

 5   at databases.

 6         JUDGE SARIS:  But that wasn't against a placebo,

 7   was it?

 8         THE WITNESS:  No.

 9         JUDGE SARIS:  That was lithium -- so why

10   wouldn't it be unethical to give a group of people who

11   are potentially suicidal a placebo?

12         THE WITNESS:  You mean in a randomized

13   controlled clinical trial?  There might be ethical

14   problems with giving an acutely suicidal person --

15         JUDGE SARIS:  Not acutely, let's just say these

16   are the kind of people who are depressed, people who are

17   at risk.

18         THE WITNESS:  Well, there are issues of safety

19   in those kind of studies; you can do them, I've done

20   them.  There's two issues -- a little off the topic --

21   the issue of safety, so you would have to do it on a

22   person under watch in the hospital, and then there's an

23   informed consent issue, where the person has to know

24   what they're getting into.  But the safety would be a

25   big one.  I've done studies in suicidal patients, they
```

1    have to be in the hospital, under 24 hour nursing, it

2    can be done.

3           This is different.  What Dr. Kruszewski is

4    saying, he says it's unethical to do an epidemiological

5    study.  An epidemiological study is I call up Blue

6    Cross/Blue Shield of Massachusetts and say I have a

7    hypothesis, can I look at your data?  Can I look at your

8    database that Neurontin causes this or that?  It's after

9    the fact, the doctors in Massachusetts have already

10   given the drug to the people.  Epidemiologic study is

11   after the fact.  So there's no ethics problem with that.

12   And it has been done.  In fact, the McFarland study,

13   which I heard testimony about in the Oregon Medicaid

14   case, is an example of that.

15   Q.   We'll get there, we don't have much time.

16          What did Dr. Blume say about whether you can

17   conduct a pharmacoepidemiologic study, a retrospective

18   study looking at a database?

19   A.   She, I think, agrees with me; it can and could have

20   been conducted.

21   Q.   Has any one of plaintiffs' experts conducted such a

22   study?

23   A.   Not that I'm aware of.

24   Q.   Okay.  And so on this board, is there any

25   epidemiologic study that supports plaintiffs' theory in

1   this case?

2   A.   No.

3          JUDGE SARIS:   What do you consider the FDA

4   meta-analysis?

5          THE WITNESS:   That's not an epidemiological

6   study.   That's a meta-analysis of randomized control of

7   clinical trials.   It's kind of a post-hoc analysis of

8   data that was collected in randomized data.   It's not an

9   epidemiologic study.   An epidemiological study is you

10  have a large database of, you know, Blue Cross, Medicaid

11  or Medicare or the Veterans Administration, you go in

12  there and I say I want to look at all your 50,000 or

13  100,000 patients treated with drug X; that would be an

14  epidemiological study.   It's in the hierarchy of

15  things -- the randomized controlled clinical trial is

16  the gold standard.   On scale of 1 to 100, that's a 100.

17  The epidemiologic study is somewhere around 30 to 60,

18  depending on the controls, but it never approaches the

19  randomized controlled clinical trial.   Of course, the

20  case report, which I've heard testimony about, would be

21  like a two on a scale of one to 100; that's just a

22  single observation.

23  Q.   On the McFarland study -- again, we don't have a lot

24  of time -- does the McFarland study support plaintiffs'

25  theory that Neurontin is capable of causing suicide?

1    A.    No, it does not.

2    Q.    What's your opinion about the conclusions from the

3    McFarland study?

4    A.    Dr. McFarland did not conclude anywhere in the

5    paper, I've read it several times, that -- anywhere that

6    Neurontin causes suicide.  I think he did conclude that,

7    you know, lithium was more protective than Neurontin

8    for -- I think it was suicide attempts.  But, you know,

9    there was no control for -- well, it was an

10   epidemiologic study, so you can't draw any conclusions

11   about Neurontin.  I think Dr. McFarland testified at his

12   deposition that he didn't say that Neurontin can cause

13   suicide or suicide attempts.

14         MS. McGRODER:    Slide 15, please.

15   Q.   Last month at this hearing, Judge Saris asked

16   Dr. Kruszewski on the basis of a discussion about the

17   McFarland study, you know, are you better off giving a

18   patient nothing?  Are they better off taking a placebo

19   or gabapentin?  And Dr. Kruszewski did not have an

20   answer for the Court.  Can you answer that question?

21   A.    Yes.  Well, I think the short answer is you're

22   better off taking gabapentin.  In terms of harms or risk

23   or do no harm, there's no difference between Neurontin

24   and the sugar pill.  So there's no greater harm in

25   taking Neurontin than taking a sugar pill.

```
 1              However, there are benefits to taking --
 2              JUDGE SARIS:  What do you mean there's no
 3     difference between Neurontin and the sugar pill?
 4              THE WITNESS:  In terms of causing suicide or
 5     causing suicide attempts.
 6     BY MS. McGREGOR:
 7     Q.   And can you say that on the basis of a statistical
 8     analysis?  I think that's what the Court is getting at.
 9     How do you know there's no difference between Neurontin
10     and a placebo on the issue of causality?
11     A.   Are we talking about the McFarland study
12     specifically?
13     Q.   I was talking generally.
14     A.   Well, I'm talking about the McFarland study.
15              Generally -- I'll do both.  The controlled
16     studies showed no difference between Neurontin and the
17     sugar pill; and the McFarland study, where it's a
18     Medicaid database analysis, if you look at the
19     background rates and the population of bipolar of
20     suicide and suicide attempts, they're much higher than
21     the rates he found on gabapentin.
22              So the answer to your question that you put to
23     Dr. Kruszewski is:  People are better off in taking
24     gabapentin because there are actually benefits to taking
25     gabapentin that you don't get with taking a sugar pill.
```

1    Q.   Now, you heard Dr. Taylor testify in June at this

2    hearing that there are, based on his MedSearch, about

3    2,600 articles on gabapentin in the published

4    peer-reviewed literature.  Do you remember that?

5    A.   Yes.

6    Q.   Have you yourself reviewed the literature on

7    gabapentin?

8    A.   Yes.

9    Q.   Are there any studies in the peer-reviewed

10   literature -- slide 17, please -- that support the

11   plaintiffs' causation theory in this case?

12   A.   I haven't seen any.

13   Q.   Does Dr. Trimble agree with you?

14   A.   He agreed with the question that there is not one

15   scientific study in the peer-reviewed literature that

16   demonstrated that Neurontin caused suicide.

17   Q.   Same question with a case report.  Tell us, really

18   quickly, what is a case report?

19   A.   Case report is I'm in my office in Worcester,

20   patient is on a medication, they get, you know,

21   diarrhea, and I write it up or I call the FDA or I do a

22   MedWatch and say patient was on drug X and they have

23   diarrhea.  That's a case report.  It's a single,

24   uncontrolled observation.

25   Q.   And are there any case reports in the literature in

1   which an author suggests or concludes that Neurontin

2   causes suicide?

3   A.   I haven't seen any.

4          JUDGE SARIS:  Is there any literature that says

5   to the contrary?

6          THE WITNESS:  I'm not sure I understand the

7   question.

8          JUDGE SARIS:  Is there any peer-reviewed

9   scientific literature that shows that Neurontin does not

10  cause suicide or suicidal events?

11         MS. McGRODER:  And that's a question I was going

12  to ask you myself.

13  BY MS. McGRODER:

14  Q.   You know, Dr. Trimble told the Court that there

15  aren't any articles that say Neurontin doesn't cause

16  suicide.  Is that reliable scientific methodology --

17         JUDGE SARIS:  No.  Actually, I would like my

18  answer first.  Are there any that say to the contrary?

19         THE WITNESS:  I'll do my best.

20         It sounds a bit like you're asking the

21  scientific literature or the scientist to prove a

22  negative.  However, if you have a hypothesis or a

23  question that Neurontin causes suicide, you do studies

24  comparing Neurontin to the sugar pill.  That's been

25  done, and to date nothing has been found, no difference

PDF created with pdfFactory trial version www.pdffactory.com

1    between Neurontin --

2         JUDGE SARIS:  Is that peer-reviewed?

3         THE WITNESS:  Yes, yes.

4         JUDGE SARIS:  Where?

5         THE WITNESS:  In the studies that I've reviewed

6    in the literature, the studies have not shown a

7    difference between Neurontin and suicide.

8         JUDGE SARIS:  Where?  Name me a study.  I'm just

9    trying to understand this.  You're saying there's

10   nothing that proves it up, that proves up a connection.

11   Is there one that shows there is no connection?

12        THE WITNESS:  There's a number of studies

13   published in Epilepsy and in Pain, some studies in

14   Psychiatry in using Neurontin to treat bipolar disorder

15   that show no -- or anxiety that have shown no increase

16   rate in suicide on Neurontin versus placebo.

17        JUDGE SARIS:  Fine, fine, I'm just asking.

18   BY MS. McGRODER:

19   Q.  Dr. Rothschild, have you reviewed the Callanan

20   study, the 2007 --

21        JUDGE SARIS:  I'm not asking you to testify --

22        THE WITNESS:  You want the specific papers.

23        JUDGE SARIS:  Are they in your report?

24        MS. McGRODER:  I doubt they are, your Honor.

25        JUDGE SARIS:  Excuse me, I'm not asking you.

1           Thank you.

2           Are they in your report?

3           THE WITNESS:  In my report, I don't think the

4    studies I was about to give you are in my report,

5    because I based my report on my analysis on the total

6    data of Neurontin, some of which has been published,

7    some of which has not been published, but the total

8    data -- it's the same database the FDA looked at is what

9    I based on.

10          But to answer your question, there is this

11   Callanan study in a journal called Drug Safety in 2007,

12   I think the title was something like, Does Neurontin

13   cause suicide?  Or Does Neurontin cause suicidality?

14          JUDGE SARIS:  Is that peer-reviewed?

15          THE WITNESS:  Yes, Drug Safety, I've reviewed

16   papers for them.

17          JUDGE SARIS:  And the conclusion was that it

18   didn't?

19          THE WITNESS:  Correct, correct.

20          JUDGE SARIS:  So why didn't you cite it?

21          THE WITNESS:  I may have written my report

22   before that paper came out.  I'm pretty sure I was not

23   aware of it at the time.  It was 2007, I think I wrote

24   my report before it came out.

25          JUDGE SARIS:  And you didn't supplement.

```
 1              THE WITNESS:  No, I didn't
 2              MS. McGRODER:  May I address that question, your
 3    Honor?  I think that's listed on his reliance list.  I
 4    think that article is on his supplemental reliance list,
 5    but we can go back and check.
 6              Slide 18, please.
 7              JUDGE SARIS:  If it's listed, I would like a
 8    copy of it.
 9              MS. McGRODER:  Okay.
10              JUDGE SARIS:  If it's not listed, it's too late.
11              MS. McGRODER:  Understand completely.
12    BY MS. McGRODER:
13    Q.  Is there any support in the peer-reviewed published
14    literature for the mechanism of action theory proposed
15    here?  Are there any studies that say that gabapentin
16    can lead to suicide on the basis of the mechanistic
17    theory proposed here by plaintiffs' experts?
18    A.  No, I haven't seen any.
19    Q.  And has Dr. Kruszewski admitted the same?
20    A.  He did.
21    Q.  Doctor, the next item on the list is, is there any
22    conclusion from any scientific medical or regulatory
23    authority that says Neurontin can cause suicide?  Is
24    there?
25    A.  There is not.  And as a member of the American
```

```
 1    Psychiatric Association or the American College of

 2    Neuropsychopharmacology, or any organization, no

 3    organization has come to that conclusion.

 4          I might add, no organization has even raised the

 5    question.  The only time I've heard about does Neurontin

 6    cause suicide or have -- is when I've heard the

 7    testimony here, and then in the FDA hearing.  That's the

 8    only places.

 9    Q.  Well, I want to ask you, because it's plaintiffs'

10    position, as I understand it, that the FDA analysis

11    finds that Neurontin causes suicide.  Is that correct?

12    A.  No.

13          MS. McGRODER:  Slide 21, please.

14    Q.  What has the FDA said about whether the

15    meta-analysis can be used to support a causation

16    finding?

17          MR. FINKELSTEIN:  I object, and I'm only

18    objecting because I wasn't clear on what your last

19    ruling was, was it for his entire testimony that he can

20    testify about the FDA hearing?  Because this is beyond

21    the scope.

22          JUDGE SARIS:  Right now he's got a minute.

23          MR. FINKELSTEIN:  Okay.

24    BY MS. McGRODER:

25    Q.  Is this the amicus brief submitted by the FDA that
```

1   you've reviewed?

2   A.   Yes.

3   Q.   And what does the FDA say about causation in --

4   A.   They're saying what they've been saying for years,

5   which is, that the alert does not constitute a

6   conclusion that the FDA -- the that drugs in this case,

7   Neurontin, cause suicide.

8   Q.   Does the fact that there's pooled data that arguably

9   shows high odds ratio for an overall set of drugs, does

10  that change the Neurontin randomized control trial data?

11  A.   No.  I mean, if you have a question about Neurontin,

12  if you have a hypothesis about Neurontin, you look at

13  the Neurontin data.  I mean, the FDA is a regulatory

14  body, they do different things.  But as a scientist, if

15  you're looking at causation, you look at the drug you're

16  studying, in this case, Neurontin.

17  Q.   All right.  Let's talk about association really

18  quickly.

19          JUDGE SARIS:  No, done.  Done.

20          MS. McGRODER:  Your Honor, one more question.

21          JUDGE SARIS:  One question.

22  BY MS. McGRODER:

23  Q.   In the FDA alert, when the finding is that there's a

24  statistically significant risk with lamotrigine and

25  topiramate, does that mean we can say lamotrigine and

1    topiramate can cause suicide?

2    A.   No.   The statistical association of a finding of

3    lamotrigine and topiramate is the first step.   By the

4    way, with Neurontin, you don't find the association, so

5    it's over, end of story.   With the case of topiramate

6    and lamotrigine, you then go to what's called the

7    Bradford Hill criteria, which is on this slide, you have

8    a number of things you have to show to prove causation.

9         MS. McGRODER:   Thank you.   That's all the time

10    we have.

11         JUDGE SARIS:   Thank you.

12         See if you can finish by 1:00.   In any event,

13    it's ten past one.

14         MR. FINKELSTEIN:   I'll try, your Honor.

15         JUDGE SARIS:   See what you can do.

16                   CROSS-EXAMINATION

17    BY MR. FINKELSTEIN:

18    Q.   Doctor, I took your deposition.   Do you recall?   And

19    you were under oath at that time?

20    A.   Yes.

21    Q.   And you never participated in the design or the

22    administration of a clinical trial related to Neurontin,

23    have you?

24    A.   That's correct.

25    Q.   And you've never participated in any study where

1    Neurontin was, in fact, the studied medication, right?

2    A.    Correct.

3    Q.    You've never published any articles on the effects

4    of Neurontin and mood and behavior?

5    A.    Correct.

6    Q.    And you've never published any articles that relate

7    to the effect of GABA or the GABA systems and mood and

8    behavior at all, have you?

9    A.    That's correct.

10    Q.    And you've never published any peer-reviewed paper

11    related to any psychiatric event caused by antiepileptic

12    drugs, have you?

13    A.    That's correct.

14    Q.    You've never written any books regarding

15    antiepileptic drugs, right?

16    A.    Correct.

17    Q.    Never written or edited any chapters in any books

18    related to antiepileptic drugs, right?

19    A.    Correct.

20    Q.    Your specialty is SSRIs, a totally different class

21    of drugs, right?

22    A.    Wrong.

23    Q.    You have experience with SSRIs, you don't have the

24    same experience with antiepileptic drugs, right?

25    A.    I would not agree with that.  In my practice, I

1    prescribe antiepileptic drugs very frequently, as I do

2    SSRIs.

3    Q.   Let's talk about your prescription habits.  You said

4    on direct you prescribed Neurontin and have, correct?

5    A.   Correct.

6    Q.   And in your entire career, your entire career, the

7    total number of patients that you've proscribed

8    Neurontin to is approximately 100 to 140, right?

9    A.   That's possible, yes.

10   Q.   And with what frequency would you expect to see

11   suicidality in a population of a thousand patients?

12   A.   With what?

13   Q.   With -- without drugs.

14   A.   Are we talking about the general population or major

15   depression?

16   Q.   Right, the general population.

17   A.   With no psychiatric disorder.

18   Q.   The general population.

19   A.   In a thousand people?

20   Q.   Right.

21   A.   Probably none.

22   Q.   And in your population of 100 to 140, when you

23   provided Neurontin, you wouldn't expect to see an

24   adverse event related to suicidality either, would you?

25   That's not a large enough sample size, right?

```
 1   A.   If you came and saw my practice, it would be a large

 2   enough sample size.

 3   Q.   Oh, so you're telling this Court that a large enough

 4   sample size to determine causation for Neurontin is 100

 5   to 140 patients?

 6   A.   No, that is not what I said.  You were talking about

 7   my practice and my prescription habits for prescribing

 8   Neurontin.  I'm not making any conclusions about

 9   causation based on my prescription of Neurontin.

10   Q.   Okay.  And you can't, that's all I want --

11   A.   I make my conclusions about causation based on the

12   scientific literature.

13   Q.   Okay.

14   A.   But in my practice of 100 to 140 people, these are

15   severely ill patients with severe bipolar disorders,

16   severe major depression, and there wouldn't be any--

17   just in terms of suicidal thinking, probably 50 to 60

18   percent of them have suicidal thinking frequently.

19   Q.   You're not a member of the American Biological

20   Psychiatry Association, are you?

21   A.   No.

22   Q.   You're not a professor of behavioral neurology?

23   A.   No.

24   Q.   And you've never been asked prior to this litigation

25   to do any examination at all related to Neurontin,
```

1   right, by Pfizer?

2   A.   That's correct.

3   Q.   Your entire experience in your examination regarding

4   suicidality in Neurontin is from this litigation,

5   correct?

6   A.   Well, as I think I may have said at my deposition,

7   prior to this litigation, I had never heard anyone

8   suggest anything about Neurontin causing suicide.  So my

9   experience would not be unique.

10   Q.   My question was, Doctor, before this litigation, did

11   Pfizer ever ask you to examine gabapentin and its

12   association with suicidality or any adverse event?

13   A.   No.

14   Q.   Did you know in 1995 and in 1996 Pfizer asked

15   Dr. Trimble to examine Neurontin and its effect on mood

16   and behavior?

17   A.   I think I do know that, yes.

18   Q.   Did you read those reports?

19   A.   That I don't recall if I have.

20   Q.   Do you know that in 1995 Dr. Trimble told Pfizer

21   that the greatest side effect of Neurontin is its

22   causation of depression?

23         MS. McGRODER:   Objection, your Honor.  That is

24   not what that document says, nothing even close, it

25   doesn't even have the word "cause" in it.  That's a

1   misuse of that evidence.

2          Do you want to show him the document,

3   Mr. Finkelstein?

4          JUDGE SARIS:  You know what, just object.

5          I'll sustain the objection unless you want to

6   show him the document.

7   BY MR. FINKELSTEIN:

8   Q.   Did you read the report?  You don't have a memory of

9   it, do you?

10  A.   I may have read it, but I don't recall for sure.

11  Q.   Did you read the 1996 report regarding the release

12  of hostility in Neurontin?

13  A.   Who authored that report?

14  Q.   Dr. Trimble?

15  A.   I'm not sure I have.

16  Q.   You don't dispute the fact that Neurontin is

17  GABAergic, do you?

18  A.   Well, you asked me this at my deposition.  I think

19  you also asked me what's the mechanism of Neurontin, and

20  I said it wasn't --

21  Q.   Doctor, I just want to know, do you dispute whether

22  it's GABAergic or not?  I'm on a limited time frame.

23  A.   I'll try to make it quick.  There are studies that

24  show that total brain GABA is increased after Neurontin

25  administration.  You asked me in my deposition is it

PDF created with pdfFactory trial version www.pdffactory.com

1    GABAergic, I was thinking of those studies.

2             JUDGE SARIS:  So did you say yes in the

3    deposition?

4             THE WITNESS:  Yes.

5    BY MR. FINKELSTEIN:

6    Q.   I asked you a simple question at your deposition,

7    and I said, is it your opinion that Neurontin is

8    GABAergic?  And you said yes, correct?

9    A.   Yes.

10   Q.   You had plenty of time to qualify your answer in any

11   way, right?

12   A.   I qualified it before that question by saying the

13   mechanism wasn't really known.

14   Q.   Well, were you retained here to study the mechanism

15   of action?

16   A.   No.

17   Q.   You didn't even study the mechanism of action.

18   That's not what you were charged with, that

19   responsibility, right?

20   A.   Correct.

21   Q.   Okay.  And you agree it's not a novel position for a

22   physician to take the position that Neurontin is

23   GABAergic, right?

24   A.   Well, I think the mechanism of Neurontin is not

25   clear.  I mean, it doesn't work in the synapse, it

1   doesn't increase GABA transmission, so -- I mean, I

2   guess it would be a hypothesis.  I don't know what you

3   mean by a position.

4          JUDGE SARIS:  Are there studies that say that

5   Neurontin increases GABA?

6          THE WITNESS:  In the total brain, yes.

7          MR. FINKELSTEIN:  I'm sorry, let me hand up a

8   bench book.

9          JUDGE SARIS:  So that's what you mean by

10  GABAergic?

11         THE WITNESS:  Yes.

12  BY MR. FINKELSTEIN:

13  Q.   Do you see your deposition?  It's tab 3.

14  A.   Yes.

15         MR. FINKELSTEIN:  Can you put the Elmo on,

16  please, Mr. Alba?

17  Q.   I want to you turn to page 80, line 21.

18         JUDGE SARIS:  Where are we now?

19         MR. FINKELSTEIN:  Page 80 on -- it's Exhibit --

20  tab 3.  Just to avoid confusion, your Honors, when I'm

21  referring to page 80, it's page 80 of the actual

22  deposition.

23  BY MR. FINKELSTEIN:

24  Q.   Are we there?  Line 21.

25         I asked you this question:  "Do you agree it's

PDF created with pdfFactory trial version www.pdffactory.com

1    not novel -- it is not a novel position for the

2    physician to take the position that Neurontin changes

3    the brain chemistry through the GABA systems?"

4          Your answer on the next page:  "That would not

5    be novel.

6          "Do you agree Neurontin increases GABA

7    synthesis?

8          "A.  I don't know.

9          "Do you know if it's a novel position for a

10   physician to take the position that GABA synthesis is

11   increased with Neurontin?"

12         Your answer:  "Well, I don't know the answer to

13   your first question, so I don't know the answer to that

14   question either."

15         Is that accurate?  You don't know the effect of

16   Neurontin on the GABA systems, yet, you agree it's

17   GABAergic?

18   A.  Well, if you look at the question and answers on 80

19   that occurs before that, I think I testified that I

20   didn't think that it was conclusive that Neurontin was

21   GABAergic, but it did have effects on the GABA system.

22   Q.  Well, let me ask you, specifically on page 80, I ask

23   you on line 11:  "Well, a pharmacological agent that

24   affects the GABA system, do you define that as

25   GABAergic?

484

```
1              "I would.
2              "So if I ask, is it your opinion that Neurontin
3      is GABAergic, your answer would be?
4              "Yes."
5      A.   Yes.
6      Q.   You don't dispute today that Neurontin is GABAergic,
7      do you?
8      A.   No.
9      Q.   Did you consider the peer-reviewed articles of
10     Dr. Petroff at Yale regarding the spectroscopies on the
11     effect of Neurontin on the human brain?
12     A.   Yes.
13     Q.   You did?  Did you put them in your materials
14     considered?
15     A.   I don't think I discussed it in my report, but did I
16     look at them, yes.
17     Q.   It's your testimony that they are contained in your
18     materials considered, the Petroff spectroscopy studies?
19     A.   I know I've looked at the Petroff studies.  Whether
20     I listed them as materials I relied on, I can't recall.
21     Q.   You agree, Doctor, that based on what's known in
22     biological psychiatry, it's not novel for a physician to
23     take the position that changing brain chemistry can
24     affect mood negatively?
25     A.   That would not be novel.
```

1  Q.   And you agree it's not novel and many knowledgeable

2  scientists and physicians agree that altering the

3  neurotransmitter system can affect mood and behavior

4  negatively?

5  A.   Well, in theory that would be true.  But again, you

6  would have to find an example.  But I would -- I would

7  not disagree that that's novel.

8  Q.   Okay.  And you'd agree, based on what's known in

9  psychiatry, many knowledgeable scientists and physicians

10  accept a working hypothesis that altering

11  neurotransmitter systems can, in fact, affect mood

12  negatively, right?

13  A.   I don't know what you mean by a working hypothesis.

14  Q.   Well, have you ever heard of the monoamine

15  hypothesis?

16  A.   Yes.

17  Q.   That in 1965, that serotonin is associated with

18  depression and altering serotonin and increasing

19  serotonin in the brain, in fact, improves mood and

20  behavior?  You're familiar with that hypothesis, right?

21  A.   You don't have it quite right.  The 1965 paper by

22  Joe Schildkraut here at Harvard, dopamine and

23  norepinephrine does affect mood.  They had a passing

24  comment by serotonin as well.  Since there were no

25  serotonin medicines at the time for professor

1    Schildkraut to rely on, it was mainly focused on

2    dopamine and norepinephrine.

3    Q.   Did you get it wrong at your testimony -- let me

4    refer you to page 14, Doctor, page 14, line 14, where

5    you said, "Well, there is one hypoth -- there is a

6    hypothesis called a monoamine hypothesis for depression

7    which involves serotonin, norepinephrine, dopamine, and

8    the hypothesis is that some decrease, if not -- it's not

9    dysfunction but it's decreased function of those

10   monoamines is related to depression."  Included

11   serotonin in that hypothesis from 1965, correct?

12        You go on to say, "However, you know that

13   hypothesis is, I think most -- as you would put it,

14   knowledgeable physicians and experts all add to that

15   would all agree that the hypothesis can't explain what

16   causes depression.  The hypothesis is old, it came out

17   in 1965.  There are now hypotheses and new treatments

18   for depression that don't involve monoamine

19   prescriptions, but, for example, the serotonin reuptake

20   inhibitors, which is a class of antidepressants, work on

21   serotonin, so it gives some credence to the fact that

22   serotonin is involved but it's too simplistic to explain

23   the way you phrase the question."

24        Now, Doctor, you agree that serotonin can impact

25   the serotonergic system, affects mood and behavior

PDF created with pdfFactory trial version www.pdffactory.com

1   negatively potentially, right?

2   A.   That's not what I said.  I said that the monoamine

3   hypothesis in 1965 said that dopamine and norepinephrine

4   play a role, and possibly also serotonin, even though

5   there were no SSRIs in 1965.  When the SSRIs were

6   developed, it was consistent with this monoamine

7   hypothesis, but the hypothesis is if you give

8   medications that enhance -- let's talk about

9   serotonin -- serotonin transmission, it affects mood in

10  a positive way.  I don't recall anything in the

11  hypothesis about affecting mood in a negative way.

12  Q.   Well, you agree, and you've testified that a drug

13  can cause depression by depleting or decreasing the

14  brain of monoamines, specifically norepinephrine and

15  dopamine transmission, right?

16  A.   Yes.

17  Q.   Reserpine does that?

18  A.   Yes.

19  Q.   And those are the same monoamines of the hypothesis

20  that you're describing now?

21  A.   Yes.

22  Q.   So if you deplete the brain of reserpine and nor --

23  I'm sorry, dopamine and norepinephrine, it causes

24  depression?

25  A.   Yes.

1    Q.   And you've testified under oath that inhibiting the

2    release of serotonin may have a negative impact on mood,

3    correct?

4    A.   That's a theory.   There's never been shown a drug to

5    cause this, you know, decrease in serotonin.

6            MR. FINKELSTEIN:   Do you have that slide?   31.

7    Q.   I want to see if this accurately reflects what you

8    testified to.

9            (From videotape.)

10           Q. Do you agree that the inhibition of the

11   release of norepinephrine may have a negative effect on

12   mood?

13           A.   Well, that's a -- I guess it's possible.

14           Q.   And do you agree that the inhibition of the

15   release of serotonin may have a negative effect on mood?

16           A.   Possible.

17           (End of videotape.)

18   BY MR. FINKELSTEIN:

19   Q.   And you don't disagree with that today, do you?

20   A.   Possible.

21   Q.   You've testified that it's your position that it's

22   novel for a physician to take the position that a drug

23   can cause suicidality, right?

24   A.   I may have missed one of the words in your question.

25   Q.   Do you think a drug can cause suicidality?

1  A.   I'm not aware of any studies that have proven that a

2  drug can cause someone to become -- to feel suicidal.

3  Q.   Do you disagree with the hypothesis that a drug can

4  cause someone to become suicidal?

5  A.   A hypothesis is a question.  You can't disagree with

6  a question.  The purpose of a hypothesis is to test it.

7  So I'm all in favor of testing hypotheses, that's what I

8  do for a living.  But you can't disagree with somebody's

9  hypothesis, it's just a hypothesis.

10         JUDGE SARIS:  Can a drug cause depression?

11         THE WITNESS:  Well, there is this example of

12  this drug reserpine, it's an old blood pressure

13  medication, it did cause depression in some people, yes.

14         JUDGE SARIS:  So just as a psychiatrist, can

15  increase in depression be said to increase the risk in

16  suicide?

17         THE WITNESS:  No, because the vast majority of

18  people who suffer from depression don't commit suicide,

19  it's actually a very small fraction.

20         JUDGE SARIS:  I understand.  But does increasing

21  depression increase the risk of suicide?

22         THE WITNESS:  Depression is one of many risk

23  factors for suicide.

24  BY MR. FINKELSTEIN:

25  Q.   And there are other risk factors for suicide, too,

PDF created with pdfFactory trial version www.pdffactory.com

490

```
 1   right?
 2   A.   Yes, there are many.
 3   Q.   Like hostility is a risk factor for suicide?
 4   A.   I'm not sure I would agree with that one.
 5   Q.   You didn't testify to that?  You didn't say increase
 6   in hostility, in fact, increases a risk of suicidality?
 7   A.   I don't recall.
 8   Q.   I'll find it.
 9        But there are other things, increase in
10   depression, increase in anxiety increases the increase
11   in suicidality?
12   A.   This has been looked at.
13   Q.   I'm just asking the question.
14        JUDGE SARIS:  I'd like to hear his answer.
15        MR. FINKELSTEIN:  I'm sorry.
16   A.   The two biggest risk factors for suicide --
17   actually, three -- are suffering from a mood disorder,
18   one; two, substance abuse; and three, access to lethal
19   means can explain 90 to 95 percent of suicides.  This
20   has been published in the peer-reviewed literature.
21   Q.   How many suicides a year in the United States?
22   A.   I think it's something like one per 100,000 in the
23   population.
24   Q.   What's the total number?
25   A.   I'd have to do a calculation.
```

1    Q.   Isn't it about 33,000 per year?

2    A.   Probably about right.

3    Q.   About 33,000.  And you just said 90 percent are

4    explained by those three illustrations.  What about the

5    10 percent, the 3,300 that aren't?

6    A.   Well, there are other risk factors that we can talk

7    about besides mood disorder, substance abuse, and access

8    to a lethal means.

9    Q.   But it's also a drug can cause suicidality, right?

10   A.   Well, again, I have to go by what evidence in the

11   medical and scientific literature there is.  I'm not

12   aware of anyone saying that a drug can cause

13   suicidality.

14          And by the way, you know, you made this example

15   of reserpine and reserpine causing depression.  That

16   happened widespread in people who got reserpine.  It

17   wasn't one in a thousand -- the vast majority of people

18   who took reserpine got depressed, it wasn't a subtle

19   thing.

20   Q.   You keep saying you're not aware of anyone.  Are you

21   aware of the FDA?  What is the FDA?  What do you

22   consider the FDA to be?

23   A.   It stands for the Food and Drug Administration.

24   They're a -- I think there's legislation that gives them

25   authority to regulate what -- in the case of drugs, what

```
 1    requires a prescription, what doesn't require a
 2    prescription, the labelling and approval and so forth.
 3    Q.   Do you agree they're an expert agency?
 4    A.   I don't know what you mean by expert agency.  They
 5    are a regulatory body.  They have a public health and
 6    public policy function.  I mean, for example, they don't
 7    practice medicine.
 8    Q.   But don't they consist of doctors?
 9    A.   They consist of all kinds of people, including
10    doctors.
11    Q.   And do you think when the FDA publishes a position,
12    that that's novel?
13    A.   Well, it might be.  I think we've heard a little bit
14    about this.  The FDA's threshold for issuing public
15    health alerts is very low.  They will err on the
16    conservative side, alerting doctors and other health
17    care professionals about something that they want them
18    to be aware of and look out for.  They don't make
19    pronouncements, they don't tell -- they don't tell
20    physicians, you know, do this or don't do that or -- you
21    know, they'll be the first to tell you they don't
22    practice medicine.
23    Q.   Well, were you at the FDA hearing when Dr. Katz
24    described what the position and his position was related
25    to causation and random controlled trials related to
```

1   placebos and their analysis?  Were you there?

2   A.   I was not there.

3   Q.   Well, let me play for you what he said.

4        (From videotape.)  We are unequivocally

5   comfortable with using the word -- the "C" word with

6   saying that this establishes causality.  Again, we've

7   talked about this a fair amount.  This is how we

8   determine causality.  This is how we base our findings

9   of effectiveness for drugs, we do randomized trials, we

10  analyze them prospectively, we have an outcome measure,

11  if it's statistically different from placebo, we say the

12  drug caused it, once you ruled out chance and fraud and

13  bias and that sort of thing, which we think we've done

14  here.  So, yes, we're quite comfortable with saying

15  there's causality.

16       (End of videotape.)

17  BY MR. FINKELSTEIN:

18  Q.   Do you disagree with the director, the division

19  leader for the neurology products of the FDA?

20  A.   Yes, I do.  As a matter of fact, I think he's just

21  expressing his opinion.

22       The FDA for decades has never said this, and,

23  you know, believe me, if the advisory committee thought

24  that Neurontin or any of these other drugs caused

25  suicide, they would have put a black box warning on

```
 1    them.  And I think this is just his position, and it's
 2    what -- I think what he says is when he says we use this
 3    as causality, I mean, he's -- he's using this as what
 4    the FDA does.  That is not the same thing as a scientist
 5    or a peer-reviewed literature would say about causality.
 6            You can't make conclusions about causality by
 7    lumping a whole bunch of drugs together and saying, oh,
 8    this applies to all.  You could put lollipops in there
 9    and it would have said lollipops cause suicide.  You put
10    anything in there, because, as Dr. Gibbons testified, it
11    was driven by topiramate and lamotrigine, anything could
12    have been put in there and come that that conclusion,
13    but I would not agree that it is causality.
14    Q.   You're not an epidemiologist, are you?
15    A.   No.
16    Q.   You're not a statistician?
17    A.   No.
18    Q.   And you haven't conducted any epidemiological
19    analyses yourself?
20    A.   Right.
21    Q.   Do you rely upon the FDA when they say a drug is
22    effective for a particular indication?
23    A.   It's important information, but I certainly do not
24    rely upon the FDA for telling me how to practice
25    psychiatry.  If I did, I'd be 10, 15 years behind the
```

1    curve.

2    Q.   Do you rely on the FDA when the FDA says a drug is

3    effective for an indication?  That's what my question

4    was.

5    A.   Yes, I rely upon them, but I also, you know, look at

6    the studies myself.

7    Q.   And you're choosing not to rely upon the FDA in this

8    situation when they say that the drug is causation for

9    suicidality, right?

10   A.   It's not just me.  I mean, I actually watched this

11   hearing.  I was talking to colleagues at work.  I'm

12   telling you what they -- the average practicing

13   psychiatrist and neurologist can't believe this.  I

14   mean -- and you saw some of that in the committee

15   members speaking, if you watched the whole hearing,

16   which I --

17   Q.   I was there, I saw it.

18   A.   Well, I watched it on -- there was just a lot of

19   concern that the FDA was going too far in their -- in

20   their concerns.  And I just, you know, not scientific,

21   but was back at UMass and telling people about the

22   hearing, I couldn't believe this.  They're going to do

23   what?

24        But, fine, that is their job, that is their job

25   as public policy.  I need to listen to them, we all need

1    to listen to them, but we incorporate it into the grand

2    scheme of the big picture when we treat patients.

3    Q.   So Dr. Katz is a little out there is what you're

4    saying, a little beyond -- beyond the realm of -- he's

5    not novel in his thought of that, is that what you're

6    saying?

7    A.   My reading of Dr. Katz was he was advocating a

8    position which he believes in.

9    Q.   Okay.

10   A.   But the committee didn't go along with it.

11   Q.   We'll get to that in a minute.

12        Now, Dr. Katz' boss, Dr. Temple, do you know who

13   that is?

14   A.   I know who he is, yes.

15   Q.   Did you hear what he had to say with respect -- why

16   don't we play -- with respect to causation?

17        (From videotape.)  Just a couple of things that

18   have come up.  We are accustomed to concluding when you

19   have a result from a control trial that any effect you

20   see is causal.  We are constantly encouraged by

21   people -- of the label to use the word associated with,

22   but not for control trials.  The whole point of them is

23   to reach a causal conclusion within the limits of the

24   data.  The other thing I just would like to mention is

25   that one of the things that I worry about with

```
 1    meta-analyses is that you frequently know what the
 2    result's going to be before you do it because you've
 3    seen the large trials that you're putting into it.  That
 4    is one potential bias that this analysis did not have.
 5    We went looking here without knowing what the result was
 6    going to be.  So there weren't 25 hypotheses or anything
 7    like that that we went scattering about.  This was the
 8    one thing that was being looked for, and that's not a
 9    common feature of all meta-analyses.  So I just wanted
10    to mention that there's one bias that this didn't have.
11              (End of videotape.)
12    BY MR. FINKELSTEIN:
13    Q.   And they only considered random controlled placebo
14    trials, correct?
15    A.   Correct.
16    Q.   And you disagree with Dr. Temple, too?
17    A.   Right, because they included all these drugs
18    together as a group and they come to conclusions of
19    causality.  In fact, they want to come to conclusions
20    about drugs they didn't even include in the analysis.
21    Q.   Did you disagree with Dr. Temple?
22              MS. McGRODER:  I object, your Honor.  I'm not
23    sure Dr. Rothschild finished his answer.
24              JUDGE SARIS:  Were you done?
25              THE WITNESS:   Yes, I was done.
```

1  BY MR. FINKELSTEIN:

2  Q.  Do you disagree with Dr. Temple with his opinion on

3  causality and the individual drugs?

4  A.  He's not using the same definition of causality that

5  I would use as a scientist, that a specific drug, say in

6  this case, Neurontin, causes something, say suicide.  He

7  is talking about a whole group of drugs that they lumped

8  together in an analysis, and I guess he's using the word

9  "causality" for that.  But I would not agree that you

10  can extract from his statement that Neurontin causes

11  suicide.

12       And the FDA has never said that in any of their

13  written documents.  We'll have to wait and see what they

14  do.  I've never -- even with the SSRIs, I've never seen

15  them say that.

16  Q.  Well, with the FDA alert they issued in 2008, you

17  say they even included some disclaimer language on that,

18  right?

19  A.  I think there was disclaimer language.

20  Q.  Do you know what the FDA's current position is with

21  respect to that disclaimer language?

22  A.  Well, I -- there was a recent FDA amicus brief filed

23  by the FDA in this case, and it said, quite clearly --

24  I'm not an attorney -- but it looked to me like they

25  were saying it does not cause -- these alerts are not to

1    be interpreted that it causes a suicide or suicidality.

2    Q.   Well, let me play for you what the FDA's position is

3    on it.

4          (Pause.)

5          (From videotape)  I just wanted to mention the

6    reason there was that disclaimer was because we issued

7    that back in January when we just finished analysis and

8    we were still -- we were still reviewing it and it was

9    still considered preliminary at that time.  So that

10   wasn't -- I think there are probably lots of examples of

11   inconsistent language in our proposals in terms of

12   causality, but that specific disclaimer was because it

13   was preliminary rather than because we --

14         (New speaker):  So you're more comfortable with

15   saying causality now?  I withdraw the question.

16         (New Speaker):  I am.

17         (End of videotape.)

18   BY MR. FINKELSTEIN:

19   Q.   They're more comfortable with causality now after

20   they've further reviewed the meta-analysis, and you

21   still disagree with the FDA --

22   A.   Well, this is Dr. Hughes speaking early in the

23   hearing.  You hear the nervous laughter in the

24   background when that question is being asked.  Let's see

25   what they ultimately decide.

1          JUDGE SARIS:  When you say that, what do you

2    mean?  What the FDA ultimately puts on the label, is

3    that you're referring to?

4          THE WITNESS:  Yes, because the FDA, in my

5    understanding, has made it very clear for a very long

6    time that these alerts, these statistical associations,

7    do not mean causality.  They've been very clear about

8    that.  They said it in that thing --

9          JUDGE SARIS:  I'm just -- I don't want -- I'm

10   just asking, when you keep saying we'll see what they

11   do, you mean how they word the label?  Is that what

12   you're referring to?

13         THE WITNESS:  Attorney Finkelstein is implying

14   that based on these clips that the FDA has concluded a

15   causality.  But this is a hearing, this is before the

16   committee voted, before they got feedback.  That's what

17   I mean.  Let's see what they ultimately decide, whether

18   they use that kind of language, causality.

19         JUDGE SARIS:  In what?

20         THE WITNESS:  In a label.

21         JUDGE SARIS:  In a label.

22         THE WITNESS:  In a label, in a dear doctor -- in

23   any kind of professional letter, in any kind of

24   communication.

25         JUDGE SARIS:  Sure, but when do we know what

1    they're going to put in a label, in a letter?  What's a

2    typical time frame?

3            THE WITNESS:  I wouldn't know.  I mean, months,

4    usually, but I wouldn't be in a position to predict what

5    they do.

6    BY MR. FINKELSTEIN:

7    Q.   Dr. Rothschild, you would agree that whatever goes

8    ultimately on the label doesn't affect the meta-analysis

9    that was performed by the FDA, correct?  It is what it

10   is?

11   A.   Yeah, it is what it is.

12   Q.   Right.  And you don't agree with it?

13   A.   I don't agree with what?

14   Q.   The outcome of the meta-analysis.  Do you?

15   A.   Well, I think I've tried to be clear.  The

16   meta-analysis is a grouping of all the drugs together.

17   I don't agree that you can make conclusions about

18   whether Neurontin causes suicide, which my understanding

19   is the issue in this case, from that meta-analysis.

20   Q.   Okay.  It's your opinion, Doctor, that you believe

21   that -- you deny that Neurontin reduces

22   neurotransmitters, don't you?

23   A.   I don't think there's evidence that Neurontin

24   reduces neurotransmitters.

25   Q.   Now, you did not consider as part of your opinion

PDF created with pdfFactory trial version www.pdffactory.com

1    that -- regarding evidence of Neurontin reducing

2    neurotransmitters, whether the Suarez article -- do you

3    have it?

4            (Pause.)

5    Q.    The European Journal of Neuroscience is a

6    peer-reviewed publication, isn't it?

7    A.    I believe it is, yes.

8    Q.    And your vast search of the Neurontin literature

9    just didn't happen to show this one, did it?

10   A.    As I think I've testified, I was not asked to

11   comment on mechanisms of action of gabapentin, although

12   you've asked me questions about it.   I was focused on

13   other issues.

14   Q.    So if the peer-reviewed literature supports the fact

15   that Neurontin, in fact, reduces neurotransmitters, you

16   never looked at that, and your opinion would be wrong,

17   right?

18   A.    No.   I mean, just to be clear about this, you can

19   have all kinds of hypotheses of the biological mechanism

20   of gabapentin, which, by the way, the FDA said they have

21   no idea of the biological mechanism -- but be that as it

22   may, you can have all kinds of hypotheses.   But at the

23   end of the day, the ultimate test is in people, in human

24   beings, where you do randomized control trials and you

25   give some of them Neurontin and you give some a placebo

PDF created with pdfFactory trial version   www.pdffactory.com

1    and you see if there's a difference.

2    Q.   So when Dr. Suarez writes in the very first line of

3    the article, gabapentin is a drug with anticonvulsant

4    and analgesic properties causing the reduction of

5    neurotransmitter release, you would disagree with that?

6    A.   Well, based on reading the reports of the various

7    experts, I would say it's not conclusive.  There are

8    studies that have suggested that, there are many more

9    studies that have suggested not.  So I wouldn't come to

10   that conclusion.

11         JUDGE SARIS:  My job is simply to understand

12   whether there are differences in opinion in the

13   scientific community, whether each side has a reasonable

14   position.  Would you just view this as a debate?

15         THE WITNESS:  In terms of the mechanism of

16   action, I would call it a debate.  But in the ultimate

17   hypothesis, does Neurontin cause suicide --

18         JUDGE SARIS:  No, I'm just talking now, sorry,

19   about the mechanism of action.  Do you have reasonable

20   scientists on both sides of the divide here?

21         THE WITNESS:  Well, you know, I don't know.  The

22   person who, to my knowledge, has done the most work on

23   Neurontin is Dr. Taylor.

24         JUDGE SARIS:  I think he dreams Neurontin.

25         THE WITNESS:  He does.

1            JUDGE SARIS:  I'm just saying, are there

2     reasonable scientists that disagree?

3            THE WITNESS:  I think the preponderance of -- my

4     reading of the preponderance of the studies do not say

5     that Neurontin decreases monoamines.

6            JUDGE SARIS:  But is there some peer-reviewed

7     literature out there that say -- that says the opposite?

8            THE WITNESS:  There are studies, you know, in

9     tissue cultures and in animals that have found that

10    decreases, but there are more studies that have found

11    that it doesn't do that.

12            JUDGE SARIS:  So there's a divide.

13            THE WITNESS:  Well, you know, I guess I go back

14    to something I said in my deposition, is that the

15    mechanism of action of gabapentin is not entirely clear.

16    But as a practicing psychiatrist and researcher, we can

17    have all the hypotheses in the world --

18            JUDGE SARIS:  Excuse me.  My job is actually

19    much narrower.  Is there a reasonable body of literature

20    on both sides of this issue?

21            THE WITNESS:  I don't think so.

22            JUDGE SARIS:  So would you say this scientific

23    article is an outlier.  Is it the only one out there?

24            THE WITNESS:  You have to take the hypothesis in

25    total.  The plaintiffs have a hypothesis that gabapentin

1  somehow lowers serotonin --

2       JUDGE SARIS:  Right.

3       THE WITNESS:  -- which I think is debatable.

4       JUDGE SARIS:  Excuse me.  You're not -- are

5  there other articles, or is this the only one out there?

6       THE WITNESS:  It's not the only one.

7       MR. FINKELSTEIN:  Why don't we hand up an

8  article written by Dr. Taylor, who --

9       MS. McGRODER:  Your Honor, I object.  He's

10  already testified he's not here to give an opinion about

11  mechanism of action.  He didn't give an opinion about

12  mechanism in his report.  He's not the expert on

13  mechanism here, and Dr. Taylor is but the plaintiffs

14  didn't want to cross-examine Dr. Taylor.

15       JUDGE SARIS:  Objection overruled.

16       JUDGE FRIEDMAN:  I agree with that.  This doctor

17  has given a lengthy opinion about what studies are

18  available.  This is fair cross-examination.

19       MR. FINKELSTEIN:  Thank you, your Honor.

20       I've handed up to your Honors an article

21  written -- the first named article was Charlie Taylor.

22  BY MR. FINKELSTEIN:

23  Q.  Do you see in the abstract, third line from the

24  bottom, gabapentin reduces the release of several

25  monoamine neurotransmitters in the peer-reviewed

1   epilepsy research?  Do you see that?

2   A.   Yes.

3   Q.   Do you disagree with Dr. Taylor?

4   A.   Well, you've got to read the whole thing.  He

5   says --

6   Q.   I'm asking with respect to --

7   A.   Well, monoamines could include a lot of different

8   things.  But he specifically references serotonin in the

9   last line of the abstract where he says gabapentin

10  increases serotonin concentrations in human whole blood

11  which may be relevant to its neurobehavioral actions.

12  Q.   Whole blood is different than what happens in the

13  brain, correct, if you measure serotonin in the whole

14  blood out of the arm versus what happens in the brain?

15  You don't disagree with that, do you?

16  A.   Right.  But this first article you handed me, rat

17  hippocampus brain slices, that's also different from the

18  human species by a long shot.  It's a different species.

19  If you want to hand me the rat hippocampal, I cite

20  Dr. Taylor's human study.  I think the human study is

21  more relevant.

22  Q.   Okay.  How about whether the company has ever taken

23  the position in advertisements whether Neurontin -- I'll

24  just draw your attention to it -- inhibits the release

25  of excitatory neurotransmitters?  Did you review that as

1    part of your work for Pfizer in this case, or did they

2    not give this to you?

3    A.    I have not seen this before.

4    Q.    Thank you.

5          And with respect to animal studies, did Pfizer

6    give you --

7          JUDGE FRIEDMAN:  Of course, there's a difference

8    between excitatory and inhibitory, and there's some

9    debate about that in this case, isn't there?

10         MR. FINKELSTEIN:  Well --

11   BY MR. FINKELSTEIN:

12   Q.    Is serotonin an excitatory neurotransmitter or an

13   inhibitory neurotransmitter?

14   A.    It's not usually referred to as either.  Serotonin

15   is a monoamine neurotransmitter in many areas of the

16   body but it's believed to be involved in the mood areas

17   of the brain.  It's neither excitatory nor inhibitory.

18   Q.    Is it your testimony today it would be a novel

19   position for a physician to say that serotonin is an

20   excitatory neurotransmitter?  Have you not heard that?

21   A.    Well, that may be in epilepsy, people talk about

22   excitatory/inhibitory in relation epilepsy.  Certainly

23   in my field we don't use those terms to describe

24   serotonin.

25   Q.    Now, what is Neurontin gabapentin approved for?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It has a pain indication.

2    Q.    What else?  What was it originally approved for?

3    A.    I think also epilepsy in children or in younger

4    people.

5    Q.    Do you know what Neurontin has been approved for?

6    What did the FDA specifically approve Neurontin for?

7    A.    My understanding is it originally came out as an

8    antiepileptic seizure drug, but it also has adjunctive

9    treatment.

10   Q.    What's adjunctive treatment?

11   A.    Add on.

12   Q.    Do you know if it's approved as adjunctive treatment

13   or monotherapy for epilepsy?

14   A.    Add on, I think.

15   Q.    You think so, but you're not sure?

16   A.    I don't treat epilepsy.

17   Q.    Okay.  Let's move on to -- I would like to know

18   whether or not Pfizer provided to you some early animal

19   studies they did when they examined gabapentin.  Have

20   you ever seen the 1984 investigation where gabapentin

21   attenuates the release of noradrenaline and serotonin

22   but not acetylcholine from brain slices in these animal

23   studies?

24   A.    As I think I've testified, I was asked to comment on

25   the human use of Neurontin in human beings and not on

1    animal studies.

2    Q.   So you wouldn't disagree that in this investigation,

3    it reduced the release of serotonin?

4    A.   I haven't looked at this or seen this before.

5    Q.   Well, let's talk about -- did you review the -- in

6    your literature search the mechanism of action of

7    gabapentin and pregabalin by Sills, which was published

8    in the Current Opinion and Pharmacology in 2006?

9    A.   Yes.

10   Q.   And I'll draw your attention to page 111, the last

11   page.

12        MR. FINKELSTEIN:  Can you switch to the Elmo so

13   we're all looking at the same --

14   Q.   Where inhibition of calcium currents via

15   high-voltage-activated channels containing the

16   alpha2-delta subunit, which is what the current thought

17   process regarding the mechanism of action for Neurontin,

18   correct?

19   A.   Correct.

20   Q.   So it could be the alpha2-delta unit or whether it's

21   GABAergic, it's leading, in turn, to reduced

22   neurotransmitter release and attenuation of postsynaptic

23   excitability.

24        It goes on to say, is a biological plausible

25   mechanism and one which is consistently observed at

1   therapeutic relevant concentrations in preclinical

2   studies of GBP, gabapentin, and PGB, pregabalin.  It's

3   on the last page, right above the references.  Right in

4   the middle of the paragraph.

5        Now, you wouldn't disagree with this

6   peer-reviewed article, would you, that -- whether it's

7   through the alpha2-delta unit or the GABAergic pathways,

8   that Neurontin reduces neurotransmitter release?

9   A.   This is a hypothesis.  I think we should read the

10  next sentence, you know, given the inherently

11  presynaptic nature of this effect, referring to the

12  effect you're talking about, it is reasonable to

13  speculate, speculate, that it accounts for the remaining

14  anecdotal and unconfirmed effects of the drugs.

15  Q.   Well, are you saying that the author of this is yet

16  another outlier or is this not novel?

17  A.   This author is writing an opinion piece and

18  promoting a hypothesis that needs to be tested.

19  Q.   You're not the only physician who believes Neurontin

20  is GABAergic, are you?

21       MR. FINKELSTEIN:  I actually will finish in ten

22  minutes.  I'm sorry.

23       (Discussion off the record.)

24  Q.   Now, you testified that the appropriate method, and

25  you put into your narrative report, which is Exhibit --

1    Exhibit 1, that the appropriate method after having a

2    signal is to conduct what you called a Bradford Hill

3    consideration, right?

4    A.   Well, no, not a signal.  I think I probably didn't

5    use that word.  A statistically significant association,

6    then you would go to the Bradford Hill.

7    Q.   Okay.  Well -- Mr. Alba -- thank you.

8          And you put into your report at page 18 --

9    actually, page 19, what you think are the Bradford Hill

10   considerations.  You typed this report, right, or had it

11   typed?

12   A.   I typed it.

13   Q.   You typed it.  You personally typed it?

14   A.   Yes.

15   Q.   Okay.  And do you have the exhibits from the prior

16   hearing?

17         I don't need them right now.  I have another

18   copy of the Hill -- Bradford Hill wrote this article

19   that said you have to consider these things to determine

20   whether or not an environmental agent or drug causes an

21   event, right?

22   A.   Generally.  Yeah, but you're leaving out an

23   important step.  Yeah, I agree he wrote about them.  But

24   on page 18 of my report, I say if no statistically

25   significant positive association is found, it cannot be

said that the exposure to the drug caused or associated

in any way with the outcome.  The analysis of the

potential causality is over, there is no causality, and

cited the Reference Manual on Scientific Evidence.  We

don't get to Bradford Hill.

Q.   I understand that's your opinion, we don't get to

Bradford Hill.  But then you went on to say, assuming

you do get to Bradford Hill, it still doesn't satisfy

Hill.

A.   Yes.

Q.   I want you to work with me simply on the

presumption --

          JUDGE SARIS:  Let me say just the FDA has

found -- maybe not the big "C" word, but a significantly

statistically association.

          THE WITNESS:  Not with Neurontin by itself, with

everything else --

          JUDGE SARIS:  I understand that.  But if I find

or if we find that that's enough to trigger Bradford

Hill, would that trigger this analysis?

          THE WITNESS:  You would go to the Bradford Hill

after you find a significantly significant association,

yes.

          JUDGE SARIS:  So -- all right.  So your view --

and is this with respect to each individual person or

1    just in general?

2         THE WITNESS:  In general for the body of the

3    literature and the studies and so forth.

4    BY MR. FINKELSTEIN:

5    Q.  Well, Bradford Hill wrote an article which is --

6    it's in evidence, and I have another copy, which I'll --

7    do you have it?

8         MR. FROMSON:  No.

9         MR. FINKELSTEIN:  We'll get that out.

10   BY MR. FINKELSTEIN:

11   Q.  So now you go on assuming --

12        JUDGE SARIS:  This is part of general causation.

13   We're still in general causation.

14   BY MR. FINKELSTEIN:

15   Q.  That's what my next question was.

16        The next question was:  After a statistically

17   significant increased risk, there's a further

18   evaluation, does the drug have the capacity -- that's

19   really what this is -- does it have the capacity to lead

20   to the event under consideration, correct?

21   A.  Yes.

22   Q.  And you would agree that every one of these Bradford

23   Hill considerations need not be met for there to be a

24   finding of an association or a causality, right?

25   A.  Most of them would need to be met, yes.

514

```
 1              JUDGE SARIS:  Say it again?
 2              THE WITNESS:  Most of them would need to be met.
 3   BY MR. FINKELSTEIN:
 4   Q.   Professor Hill didn't say they would all have to be
 5   met, did he?
 6   A.   No.
 7   Q.   And some, if some are found in a stronger scenario,
 8   can outweigh the other ones, correct?
 9   A.   Possibly.
10   Q.   In fact, like some of them are -- well, we'll get to
11   it.
12              So these are -- do you disagree that these are
13   the Bradford Hill considerations?
14   A.   I don't know for sure if that's a picture of Sir
15   Bradford Hill.
16   Q.   No, no, the considerations --
17   A.   Yes, they are.
18              JUDGE SARIS:  He's very dignified.
19              THE WITNESS:  He's Sir Bradford Hill.
20   BY MR. FINKELSTEIN:
21   Q.   Sir Bradford Hill.
22              Now, let's take a look at -- well, why don't you
23   take a look at your narrative report, 19.  And you list
24   here strength of association -- and I'm on page 19 --
25              JUDGE SARIS:  His report.
```

```
 1              MR. FINKELSTEIN:   -- of his report.
 2    BY MR. FINKELSTEIN:
 3    Q.   You list here strength of association, consistency
 4    of association, specificity of association, temporal
 5    relationship, dose relationship, which is biologic
 6    radiant, right?
 7    A.   Dose response.  In other words, the more drug you
 8    give, the more you see the effect.
 9    Q.   Biological plausibility, right?
10    A.   Yes.
11    Q.   And then you turn the page, coherence with existing
12    knowledge, it's coherence.
13    A.   Mm-hmm.
14    Q.   Eight, replication of findings, which in the Hill
15    article is called experiment, right?
16    A.   Yes.
17    Q.   And then in the Hill article, the next category is
18    analogy, analogy is other drugs.  You list nine and ten
19    here.  Are either one of those analogy?
20    A.   No.
21    Q.   Okay.  And consideration of alternative
22    explanations.  Did you invent that for this litigation?
23    Because it's not in the Hill article.
24    A.   It's in the Reference Manual on Scientific Evidence.
25    Q.   No, you list it here as the Hill considerations.  I
```

PDF created with pdfFactory trial version www.pdffactory.com

 1    want to know did you invent that?

 2    A.   I saw that in a publication.  No, I didn't invent

 3    it, I saw it in a publication.

 4    Q.   How about cessation of exposure, where did that come

 5    from?

 6    A.   Same place.

 7    Q.   Where?

 8    A.   I looked at both the Hill paper in 1965 and the

 9    Reference Manual on Scientific Evidence in 2005.

10    Q.   Why did you leave analogy out?

11    A.   I don't recall seeing analogy, although it might be

12    subsumed -- I don't know what you mean by analogy, but

13    it might be number seven, coherence with existing

14    scientific knowledge.

15    Q.   Oh, no -- do you have that article?

16         MR. FROMSON:  No.

17         MR. FINKELSTEIN:  We'll pull the article, and

18    the record will reflect whether or not there's a

19    separate analogy versus coherence.

20    BY MR. FINKELSTEIN:

21    Q.   You agree when you come to court you should be

22    thorough and you're going to tell this -- all right.

23         So you invented these two considerations.  Let's

24    take a look at what considerations -- move forward, can

25    you, please?

```
 1    A.    I already testified I didn't invent them.
 2    Q.    Okay.  Strength of association.  Strength of
 3    association, you agree is related to a rate ratio and
 4    evaluating the strength of that agent causing the event,
 5    right?
 6    A.    Well, let's talk about that one first.
 7    Q.    I'm sorry just to cut you off, because I have a time
 8    constraint here.
 9    A.    I think this is an important point to make.  I know
10    the Judges have been asking questions that make me think
11    they want to know this.
12           What I wrote in the report, I won't repeat.
13    There's the issue of what the FDA did with their
14    statistical association in their meta-analysis with
15    everything together.  It's not very strong.  You read
16    the transcript.  Many members of the committee said it's
17    not very strong.  And -- and you don't find it in North
18    Americans.  You only find it in non-North Americans.
19    How can you have a finding that strong that only
20    occurs --
21           JUDGE SARIS:  Say that again.  You found what in
22    North Americans?
23           THE WITNESS:  The FDA's analysis, this group
24    analysis, this meta-analysis.  Only when they separated
25    out the North American people from the non-North
```

```
 1   American people, it was only in the non-North American
 2   people that they find this increase risk of suicidality.
 3   In the United States and Canadian people, they don't
 4   find this, which, when you're talking about something
 5   that's suicidality -- this came up in the hearings -- it
 6   could be a cultural thing.
 7        My point is, it's not a very strong association,
 8   even when you lump it all together it's very, very weak
 9   and they pointed it out in the committee here.
10   BY MR. FINKELSTEIN:
11   Q.   And my point is, Dr. Rothschild, when Dr. Trimble
12   and Dr. Kruszewski relied upon the FDA analysis, they
13   considered the Hill consideration of strength of
14   association, right?   I'm not asking about the
15   conclusion, I'm only asking you, did they consider it?
16   And by evaluating, the FDA, they considered it, correct?
17   A.   I've already testified on the direct that both
18   Dr. Trimble and Dr. Kruszewski testified they did not
19   rely on the randomized controlled clinical trials.  So
20   how could they have relied on the basis of the
21   meta-analysis if they didn't rely on the randomized
22   clinical control, which is one of the bases of the
23   meta-analysis?  So I don't know how they did it.
24   Q.   You clearly haven't read their subsequent reports.
25   I just want to know, if they relied on that.  You agree
```

1    they've considered the Hill consideration of strength of

2    association.  That's all I want to know.

3    A.   I was sitting in the courtroom, I heard them testify

4    they didn't rely on it.

5         MR. FINKELSTEIN:  Let's have the next slide.

6    Q.   Consistency, that's where the study's reproducible

7    in different people, animals, and population.  When

8    Dr. Trimble wrote in his report, There have been a

9    number of studies of patients with epilepsy and the link

10   of prescription of antiepileptic drugs to depression.

11   That's across several series, and Dr. Kruszewski wrote

12   in additional to animal studies, human studies

13   demonstrate that gabapentin is GABAergic.

14        My question is simple:  Do you agree that they

15   considered the Hill consideration of consistency?

16   A.   They got it wrong, though.  The finding is not

17   consistent.

18   Q.   Whether they got it wrong or cite --

19        JUDGE SARIS:  Excuse me.  Let me understand it.

20        Assume for a minute there's some reliable

21   scientific evidence that GABA is GABAergic, we've seen

22   that here, there's some -- and there's some that says it

23   isn't, but let's just say if, in fact, it is GABAergic,

24   would you agree with Dr. Trimble that there's a

25   plausible biological mechanism for it leading to

1    depression?

2            THE WITNESS:  Well, what he says is there's a

3    link between the prescription of antiepileptics to

4    depression.  This is not.  If you look at the

5    database -- I'm going to talk about Neurontin.  If you

6    look at the studies of Neurontin versus placebo, there

7    is no increased risk of depression in the people taking

8    Neurontin in a number of studies.

9            JUDGE SARIS:  I'm drawing the distinction

10   between suicide and depression.

11           So Trimble was careful here and saying

12   depression.

13           THE WITNESS:  I'm talking about depression.

14           JUDGE SARIS:  So you're saying there's not even

15   a link between GABAergic drug and depression.

16           THE WITNESS:  I'm talking about Neurontin.

17   There is no link in prescribing of Neurontin and

18   depression.  That's been studied.  In many of trials

19   there were ratings of depression, I remember when

20   Dr. Trimble was testifying, there were questions about

21   did you study it in a psychiatric population?  And he

22   said it was studied in a psychiatric population, and

23   there's no increased depression from taking Neurontin in

24   a psychiatric population.

25           By the way, in all the drugs together in the

1    meta-analysis, they didn't find the increase in risk in

2    the psychiatric population.  So none of this holds

3    together, there is no consistency.  You only find it in

4    non-North Americans --

5             JUDGE SARIS:  No, we have to finish this.

6             THE WITNESS:  No increase in depression.

7             MR. FINKELSTEIN:  I'm trying to move right

8    along.

9             JUDGE SARIS:  How much time is left, since it's

10   already been ten minutes?

11            MR. FINKELSTEIN:  I've handed up to --

12            JUDGE SARIS:  How long?

13            MR. FINKELSTEIN:  Five minutes.

14            JUDGE SARIS:  Well --

15   BY MR. FINKELSTEIN:

16   Q.  I've handed up to an article in Department of

17   Neurology, page 31.  You see table 1, page 31, table 1?

18   If we could -- where the author in this peer-reviewed

19   article describes the mechanism of GABAergic drugs,

20   sedating analytic depressogenic.  Have you ever heard

21   that term, Dr. Rothschild, depressogenic?  Have you ever

22   heard of that, yes or no?

23   A.  Yes.

24   Q.  Thank you.  And that means it causes depression?

25   A.  Well --

Q. I'll withdraw the question. Let me move through this.

And the drugs that are listed under GABAergic depressogenic, you see the bottom one there that's gabapentin? Did you not look at this article either, and when you just told the Judges there's no article out there that says it's related to depression, weren't you wrong?

A. No, this is just one person's opinion. I have a slide I brought with me, I'd be happy to put it up now, showing the actual data.

JUDGE SARIS: No. Excuse me, you have three minutes.

THE WITNESS: This is not the actual --

JUDGE SARIS: Excuse me. We'll never get you out of here. We only have an hour and this is over.

BY MR. FINKELSTEIN:

Q. I'm going to move back to your report.

A. Sure.

Specificity. There's only a single effect. That really doesn't apply in this case, you'd agree with that, no drug causes one single effect, right?

Move on.

A. That's not what I said in my report.

Q. It may not be what you said in your report, but

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    we'll leave what the Hill consideration really is.
 2           Let's talk about temporality.  Did the exposure
 3    occur before or after the event?  A challenge,
 4    dechallenge, rechallenge is proof of temporality.  Agree
 5    or disagree?
 6    A.   If it's done blindly, yes.
 7    Q.   Okay.  Thank you.
 8           The biological gradient asks whether there's a
 9    dose response relationship or a biologic gradient
10    exists.
11           Dr. Trimble wrote, "Further, there was a
12    dose-response relationship such that those on higher
13    doses of gabapentin had the higher levels of GABA."
14           Dr. Kruszewski wrote what he wrote.
15           Simple question:  Don't you agree that
16    Dr. Kruszewski and Dr. Trimble considered the Hill
17    consideration of biological gradient?
18    A.   I thought this case was about whether Neurontin
19    causes suicide.
20    Q.   Can you answer my question?
21    A.   I'm trying.
22    Q.   Yes or no?
23    A.   The dose -- he did not.  Dose-response relationship
24    means the more drug you give, the more suicides should
25    occur.  That's what it means.  It's not about GABA, it's
```

524

1    about whether -- if your premise is that Neurontin

2    causes suicide, the higher the dose of the Neurontin,

3    the more the risk of suicide, that's what dose response

4    means.

5    Q.   Biologic plausibility.  You don't disagree that

6    Dr. Trimble and Dr. Kruszewski considered the Hill

7    consideration of biological plausibility, right?

8    A.   Many --

9    Q.   Or do you disagree with that, too?

10   A.   I disagree, because many people --

11        MR. FINKELSTEIN:  Next slide.

12   A.   -- including the FDA have said there's no

13   psychological --

14   Q.   So they didn't consider it at all.

15        Coherence.  It deals with the general and known

16   facts of the natural biology of disease.  Dr. Trimble

17   wrote it's accepted in the epilepsy community that

18   gabapentin is GABAergic.  Does that not satisfy the Hill

19   consideration, or he doesn't do that there either?

20   A.   No --

21        JUDGE SARIS:  At this point we're done.  Thank

22   you.  You can give us all the slides.  You're

23   essentially asking him to refute Trimble or Kruszewski.

24        We're done.

25        MS. McGRODER:  I take it, your Honor, you're not

1   allowing me to do any redirect?

2          JUDGE SARIS:  No.  We're finishing this today.

3   It's critical you have a chance to do closing arguments.

4          Is this the last witness?

5          MR. FINKELSTEIN:  Yes.

6          MS. McGRODER:  Yes.

7          JUDGE SARIS:  Thank you very much.

8          So this afternoon -- just go off the record.

9          (Discussion off the record.)

10         (Recess taken.)

11         MS. McGRODER:  Okay.  Your Honors, we'll start

12  briefly with very short redirect of Dr. Rothschild.

13         MR. ROUHANDEH:  While he's taking the stand,

14  this is a copy of the FDA amicus brief.  I don't know if

15  Judge Friedman ever received that.

16         JUDGE FRIEDMAN:  I don't think I did.

17         MS. McGRODER:  We'd like to mark a copy of the

18  transcript.  Apparently, the one the plaintiffs gave was

19  a rough.  At least this will be in the record, because

20  instead of saying "male," it will say who the speaker is

21  and give the correct name.

22         THE CLERK:  That will be Defendants' Exhibit 6.

23         MR. ROUHANDEH:  Thank you.

24         (Exhibit 6 received into evidence.)

25

```
 1                    REDIRECT EXAMINATION
 2   BY MS. McGRODER:
 3   Q.   Dr. Rothschild, did the FDA adopt plaintiffs'
 4   biologic mechanism theory?
 5   A.   No, they did not.
 6   Q.   What did the FDA say about plaintiffs' theory of
 7   biologic mechanism?
 8   A.   These are quotes from the hearing on July 10.
 9   Dr. Katz says, "We have to recognize we don't have any
10   clear mechanistic understanding of the signal."
11        Dr. Temple said, "We have no idea why this
12   should be a common effect given all the antiepileptic
13   drugs, because we don't know of a mechanistic
14   explanation for this."
15   Q.   What's the significance of the FDA's statement that
16   they don't know what the mechanistic explanation would
17   be?
18        JUDGE FRIEDMAN:  Counsel, can you give us a
19   page?
20        MS. McGRODER:  The page of the transcript is 6,
21   110.
22        JUDGE SARIS:  Of what?
23        MS. McGRODER:  Of the transcript we just
24   provided.
25        JUDGE FRIEDMAN:  That's from the Gibbons book,
```

```
 1    isn't it?  That's where we have it, in the Gibbons book?
 2              JUDGE SARIS:  No, they say that's a different
 3    one.
 4              MR. ROUHANDEH:  That's a rough transcript, a
 5    rough draft of it, so some of the language is going to
 6    be different and the speakers could be different.
 7              MR. SAYLER:  Our transcript is paginated
 8    differently and it indicates who is actually speaking,
 9    as opposed to just male or female.
10              JUDGE SARIS:  What page?
11              MS. McGRODER:  6 and 110, but the relevant part
12    is here on the slide, your Honors, if you want --
13              JUDGE SARIS:  I know, but I'll never remember
14    it.
15              MS. McGRODER:  Okay.
16    BY MS. McGRODER:
17    Q.   Okay.  Are you ready?  Dr. Rothschild, what is the
18    significance of the FDA's statement that they don't know
19    of a mechanistic explanation for their findings?
20    A.   So the FDA says there's no clear mechanistic
21    understanding or explanation.  So this does not, then,
22    satisfy the Bradford Hill criteria for biologic
23    plausibility, and that's my understanding, a major part
24    of the plaintiffs' experts' theories.  And the FDA can't
25    come up with a biological plausibility either.  So it
```

PDF created with pdfFactory trial version www.pdffactory.com

1    doesn't satisfy Bradford Hill.

2    Q.    Okay, thank you.

3          Plaintiffs' counsel handed you a number of

4    articles relating to the mechanism of action of

5    gabapentin.  Are all of those studies in humans?

6    A.    No, the only one that was in humans was Dr. Taylor's

7    study, which showed an increase in serotonin in blood of

8    humans.  The rest were animal studies or tissues slices.

9    Q.    Let's talk about human studies.  Were there any

10   human studies or articles in the peer-reviewed published

11   literature that set out the plaintiffs' mechanism of

12   action theory in this case in proving that Neurontin can

13   cause suicide?

14   A.    The answer to both is no, there's no articles that

15   Neurontin can cause suicide and there's no article in

16   peer-reviewed literature on the biological explanation

17   of why it might.

18   Q.    Isn't that the position that Dr. Kruszewski has

19   given in this case?

20   A.    He couldn't cite any theories about scientific

21   studies because there aren't any.

22   Q.    Really briefly.  Plaintiffs played for you testimony

23   from Dr. Katz and Temple from the FDA at the advisory

24   committee meeting.  As part of that testimony,

25   Drs. Temple and Katz suggested that you can use

1    randomized control trial data to make causation

2    determinations, and that's why they felt comfortable

3    using the "C" word, in quotes, with respect to the FDA

4    meta-analysis.  Do you remember that testimony?

5    A.   Yes, yes.

6    Q.   Is that accurate?

7    A.   Well, it's not correct.  Again, they're a regulatory

8    body, they can do what they want, but if they submitted

9    this, you know, to a peer-reviewed journal, such as the

10   American Journal of Psychiatry or Journal of Clinical

11   Psychiatry and said I draw the conclusion that Neurontin

12   causes suicide based to on this meta-analysis of all

13   these different drugs, the paper would never be

14   accepted.

15   Q.   And are the randomized controlled trials that

16   Drs. Temple and Katz are speaking of, are those

17   prospective randomized controlled studies that are used

18   to make -- well, are the randomized controlled trials

19   that they're talking about, is that what the

20   meta-analysis is?

21   A.   Well, the meta-analysis is sort of lumping all these

22   clinical trials together and trying to -- they're trying

23   to draw conclusions about specific drugs which you

24   cannot.  They can only sort of make global statements.

25   Q.   Okay, thank you.

1          No further questions.

2          JUDGE SARIS:  Thank you.

3          MS. McGRODER:  Dr. Gibbons.

4                    REDIRECT EXAMINATION

5     BY MS. McGRODER:

6     Q.   Now, Dr. Gibbons, recognizing that --

7          JUDGE SARIS:  He's just responding to this most

8     recent declaration, right?

9          MS. McGRODER:  Exactly.  And have your Honors

10    had a chance it review it?

11         JUDGE SARIS:  Not much.

12    BY MS. McGRODER:

13    Q.   So we're very briefly going to address the new

14    declaration that has been submitted by Dr. Greenland

15    today, which you've just had a short time review.

16         JUDGE SARIS:  This is in lieu of a declaration.

17         MS. McGRODER:  I sure hope so.  It depends on

18    how much you want to hear about it.

19         JUDGE SARIS:  I haven't read it.

20         MS. McGRODER:  I'm a little worried about that,

21    because it's sort of abstract, you not having a chance

22    to review it.

23         JUDGE FRIEDMAN:  I'm sorry, Counselor, if we

24    think we need something further after we've had a full

25    opportunity to review the Greenland submission, we'll

1    let you know.

2         MS. McGRODER:   Okay, great.

3    BY MS. McGRODER:

4    Q.   Dr. Gibbons, you've now read a report by

5    Dr. Greenland and three declarations by Dr. Greenland,

6    the most recent one provided today, correct?

7    A.   Correct.

8    Q.   In any of those reports and declarations, has

9    Dr. Greenland ever offered the opinion that there is a

10   statistically significant association between Neurontin

11   and suicidal thinking and behavior?

12   A.   Never.

13   Q.   Has Dr. Greenland ever offered the opinion in any

14   report or declaration that Neurontin is capable of

15   causing suicide?

16   A.   Never.

17   Q.   Now, Dr. Greenland has made a couple of criticisms

18   regarding your most recent supplemental report, we're

19   just going to take them one by one, okay?

20   A.   Sure.

21   Q.   If I misstate Dr. Greenland's declaration, I'm sure

22   you'll clear it, up.

23   A.   I live for the opportunity.

24   Q.   Dr. Greenland criticizes you for excluding

25   lamotrigine and topiramate in your analysis on the basis

PDF created with pdfFactory trial version www.pdffactory.com

1    of a statistically significant odds ratio.  Have I

2    stated that correctly?

3    A.    Close enough.

4    Q.    Can you explain that?

5    A.    Sure, let me explain.

6          What Dr. Greenland said that I did is I took a

7    look at lamotrigine, which confidence interval doesn't

8    include zero here, these are risk differences, this is

9    FDA figure 5, I believe, for their statistical report,

10   and also for topiramate and said, well, those two are

11   the only two statistical significant ones so I'm going

12   to throw those two out and I'm going to look at the rest

13   of them.  That's not what I did, and I testified in this

14   Court that's not what I did.

15         What I did was I noticed that lamotrigine and

16   topiramate contained the majority of events, both in the

17   placebo and in active treatment.  On the basis of that,

18   I said those two drugs, which account for about a third

19   of the data but they account for almost two-thirds of

20   all the events, seem to be acting differently.  I want

21   to take a look at the remaining drugs without those two

22   drugs in there.  It so happened that they're also

23   statistically significant, and when you removed them,

24   you don't see a signal, it just doesn't flow.  So that's

25   what I did, which is very different from what

1    Dr. Greenland has said that I did.

2         The second point -- do you want to ask a

3    question?

4    Q.   I do.  So big deal.  So Dr. Greenland said you

5    kicked out lamotrigine and topiramate because they did

6    have significant odds ratios.  What's wrong with that?

7    A.   Somebody could say I was doing this based on

8    cherry-picking, that somehow I have a collection of

9    studies, some of them are significant some of them

10   aren't significant and I threw away the significant ones

11   based on looking at the data already and then I looked

12   at everything else.  I mean, in part, that's still a

13   sort of valid sensitivity analysis, but I didn't do

14   that.

15        What I did do is I noticed that the overall

16   rates were much higher for those two drugs, and I

17   excluded them on the basis of that, not on the basis of

18   whether or not there was a significant difference

19   between them and placebo.

20   Q.   And now, Dr. Greenland did his own analysis and

21   compared, if I have this right -- compared gabapentin

22   statistically to the odds ratios for topiramate and

23   lamotrigine, and opined that statistically there's no

24   difference really between gabapentin and lamotrigine and

25   topiramate; is that fair?

1    A.    Yeah.  So what he said was, look, you got rid of

2    these two drugs and I'm assuming you got rid of them

3    because they were statistically significant, but the

4    confidence intervals for lamotrigine and topiramate for

5    these risk differences include the point estimate of the

6    gabapentin risk difference of .28.  So you don't have

7    any reason to say that gabapentin is statistically

8    significantly different from lamotrigine and topiramate,

9    so what are you really talking about?  He made a fatal

10   flaw here.  He looked at these figures, which are not

11   drawn all that well, but he didn't look at the number.

12   If you look at the lower confidence limit for

13   topiramate, it's .98.  If you look at the point estimate

14   for gabapentin, it's .28, it is not included in the

15   confidence interval for topiramate, for the risk

16   differences.  It is statistically significant.  And for

17   lamotrigine, it goes from .24, and this is .28, it's

18   borderline significant.  It's almost significant.

19          So his statement that .28 lies within the

20   confidence interval of .98, the 5.11 is just wrong.  I

21   don't know where he got that, but he didn't get it from

22   FDA and he didn't get it from the data and so any

23   comments on the basis of that just are completely

24   without force.

25   Q.    So just to summarize, if Dr. Greenland's opinion is

1  that you can't differentiate gabapentin from topiramate

2  and lamotrigine statistically significantly, that's

3  wrong?

4  A.   Topiramate is statistically different from

5  gabapentin, and lamotrigine approaches significance.

6          MS. McGRODER:  That's all I have.  Thank you,

7  Dr. Gibbons.

8          Unless you have any questions.

9          MR. FINKELSTEIN:  Just -- I offer to your

10 Honors -- this is not an epi offer, but if you want to

11 hear from Dr. Greenland, we're happy to bring him in.

12         JUDGE SARIS:  So is the evidence now closed?

13         MR. FINKELSTEIN:  Yes.

14         THE COURT:  The evidence is closed?

15         MS. McGRODER:  Yes, it is your Honor.

16         JUDGE SARIS:  You're the moving party on the

17 Daubert.

18         MR. SAYLER:  Thank you.

19         JUDGE SARIS:  I am going to hold you each to

20 half an hour, simply because I do need to leave at 3:30.

21         MR. SAYLER:  If I may, your Honor, here are the

22 slides that I prepared for the closing.  I can't promise

23 I'll get through each and every one, but I'll do my

24 best.

25         First, on behalf of all of us, a sincere thank

1    you to both Courts for all the time, energy, and

2    attention that you've devoted to this very important

3    matter.

4          Plaintiffs' experts are lacking in any

5    controlled clinical trial data or epidemiologic data

6    specific to Neurontin establishing a statistically

7    significant association between Neurontin and

8    suicidality.  Plaintiffs' experts, as we've heard over

9    the three days of hearing, attempt to overcome this

10   deficiency by relying very heavily on a theory of

11   biological plausibility.

12         I'd like to begin by explaining why plaintiffs'

13   biological plausibility theory fails as a matter of fact

14   or law to help them overcome their <u>Daubert</u> and <u>Frye</u>

15   hurdles.

16         Plaintiffs' experts' biological plausibility

17   theory is scientifically flawed for three dispositive

18   independent reasons.  We boil it down to these three

19   reasons and I'll address each of them very briefly with

20   evidence that the Court has seen already and we have on

21   all these Power Point slides attempted to identify

22   specifically where in the record all of the cited

23   materials are contained.

24         The first flaw in the plaintiffs 'theory is

25   their premise that elevated GABA activity leads to

1    depression and suicidality is contradicted by scientific

2    knowledge on the relationship between GABA activity and

3    those conditions.

4         You've seen this before.  The leading textbook

5    on psychopharmacology establishes that depression is

6    associated with reduced, not elevated, GABA activity in

7    humans.

8         Contradicting plaintiffs' experts' hypothesis is

9    the fact that agents and therapies that treat depression

10   are known to increase GABA levels directly in

11   contradiction of the plaintiffs' experts' opinion.

12        This is why, for example, on the paper on yoga

13   and the fact that it increases GABA, the authors of that

14   study have stated that this suggests that the practice

15   of yoga should be explored as a treatment for disorders

16   with low GABA levels, such as depression and anxiety

17   disorders.

18        The second point, even if plaintiffs' premise

19   were correct, plaintiffs' experts have presented no

20   scientific proof that Neurontin increases GABA activity,

21   and that's the key word, GABA activity, in humans.

22        Next, next.

23        We heard a lot about the Petroff and Kuzniecky

24   studies.  The Petroff and Kuzniecky studies did not

25   measure whether Neurontin increases extracellular GABA

1    activity.  All these studies did is measure whole brain

2    or total tissue GABA levels, both intra- and

3    extracellular, and, as with yoga and therapies and

4    treatments that treat depression, showed that there was

5    an increase in total tissue GABA levels.  But these

6    studies did not assess or measure whether Neurontin

7    increases extra cellular GABA activity.

8            Next, please.

9            This is why Dr. Kruszewski testified that these

10   studies basically give individuals gabapentin and they

11   show an increase in whole brain GABA.  The ultimate

12   effect of how that interacts with monoamine

13   neurotransmitters, that work is yet to be done.  That

14   was Dr. Kruszewski's testimony.

15           The fact of the matter is, that work is yet to

16   be done in a way that supports the plaintiffs' case.

17   There have been human studies measuring the effect of

18   active GABA levels of Neurontin on active GABA levels in

19   humans.

20           Next slide, please.

21           Those are the Ben-Menachem studies.  The

22   Ben-Menachem studies that both short-term and long-term

23   use of Neurontin has no effect on active GABA levels.

24   That is, by measuring CSF GABA levels or GABA levels in

25   the cerebrospinal fluid.  No effect on active GABA

 1   levels in direct contradiction of the plaintiffs'

 2   theory.  And this is not a debated issue.  This is not a

 3   debated issue.  This is the only human data that speaks

 4   to this issue, and what it establishes is that Neurontin

 5   has no effect on active GABA levels.

 6          Next slide, please.

 7          This is why Dr. Trimble in his textbook has

 8   written that gabapentin has a novel mechanism of action,

 9   not influencing directly the GABA system and having its

10   own CNS binding site.

11          Next slide, please.

12          This is why the FDA required labelling provides

13   that Neurontin is structurally similar to GABA, hence,

14   placing it in that GABAergic or GABAmimetic category in

15   the statistical review, but Neurontin is not GABAergic

16   as demonstrated by the statement that Neurontin does not

17   modify GABA-A or GABA-B.  It is not converted

18   metabolically into GABA or a GABA antagonist, and it is

19   not an inhibitor of GABA uptake or degradation.

20          Next slide, please.

21          The third fundamental and independent reason why

22   plaintiffs' theory is scientifically flawed is the fact

23   that plaintiffs have provided no reliable scientific

24   evidence that Neurontin reduces serotonin levels or

25   function in humans.  Human study data establishes it

 1   does not.

 2         Next, please.

 3         This is why, again, going back to the

 4   Ben-Menachem studies, the Ben-Menachem studies looked at

 5   CSF levels of five HIAA, which is the metabolite of

 6   serotonin, and HVA, which is the metabolite of another

 7   neurotransmitter, both short term and long term.  And

 8   what the Ben-Menachem studies establish in humans, the

 9   only data that exists, is that Neurontin had no effect

10   on serotonin levels in humans.  In fact, in the

11   short-term study, it actually raised serotonin levels at

12   24 and 72 hours, again, in direct contradiction of the

13   plaintiffs' expert hypothesis.

14         Next, please.

15         All of the data that has been presented, that

16   was not presented to Dr. Taylor, the expert on the

17   subject, but instead to Dr. Rothschild, is consistent

18   with the problems with the plaintiffs' experts' theory.

19   They have no human data that Neurontin lowers serotonin

20   levels in humans, and all the in vitro and animal data

21   is consistent with this study, which was discussed this

22   morning with Dr. Taylor, showing that Neurontin has no

23   effect on unartificially stimulated neurotransmitter

24   release.  Only when neurotransmitter release is

25   artificially stimulated does Neurontin in vitro in rat

1    brain slices have the effect of modulating or

2    normalizing neurotransmitter release.

3              And then once the artificial stimulation is

4    gone, again, back to no effect between Neurontin and

5    placebo.

6              Next slide, please.

7              Plaintiffs experts' biological plausibility

8    hypothesis was developed initially and solely for

9    purposes of this litigation.  It has not been

10   substantiated by any controlled clinical trial data or

11   epidemiologic data specific to Neurontin.  It has not

12   been submitted or subjected for peer review evaluation

13   and publication.  It enjoys no acceptance, let alone

14   general acceptance, in the scientific or medical

15   community.  As you have heard, out of the 2,600

16   published peer-reviewed articles that mention

17   gabapentin, not one expresses an opinion that Neurontin

18   can cause suicidality.  Even the FDA, which has

19   concluded that AEDs generally as a class increase the

20   risk of suicide, even the FDA agrees that the Neurontin

21   specific clinical trial data do not establish a

22   statistically significant increased risk between

23   Neurontin and suicidality, and as you've just heard, the

24   FDA believes there's no identified mechanism of action

25   that explains the pooled AED risk.

 1          Now, final point on plaintiffs' biological

 2    plausibility hypothesis is that it is just that, a

 3    hypothesis; and the law makes very, very clear that

 4    while a biological theory may be exactly right, at this

 5    point, it's merely plausible, not proven, and

 6    biologically possible, it's not proof of causation.

 7    When a theory hasn't been verified by testing, it

 8    obviously hasn't been peer-reviewed.  Without

 9    verification, the theory remains an educated guess.

10          Next slide, please.

11          Likewise, in the Bextra/Celebrex New York State

12    court decision, the Court there concluded that there's

13    insufficient statistical evidence to support any

14    conclusion Celebrex is capable of causing cardiovascular

15    problems at 200 milligrams a day, as in our case.  So at

16    least with respect to that category of cases, the

17    Fitzgerald hypothesis, a biological mechanism of injury

18    theory, is irrelevant.  Without proof of an association,

19    the hypothesis is inadmissible.  And I would submit that

20    that is our case.

21          So with reference to association, let me move to

22    the next topic, and that is the fact that the

23    plaintiffs' experts have presented no controlled

24    clinical or epidemiologic data specific to Neurontin

25    establishing a statistically significant increased risk.

1          Next slide, please.

2          The placebo controlled clinical trial data

3     specific to Neurontin reflect that out of over 5,000

4     cases of Neurontin users, there were no attempted or

5     completed suicides.  There were two people who thought

6     about suicide or had suicidal ideation, leading to an

7     incident of 0.0398 percent, that is compared with .037

8     percent in the placebo group.

9          It is conceded by everybody involved, the FDA's

10    own analysis reflects the fact -- next slide, please --

11    that the gabapentin data do not -- no matter how you

12    slice it, no matter whether you do odds ratios, risk

13    difference, include the zero event studies, take out the

14    zero event studies, any way you want to slice it, the

15    gabapentin specific data do not demonstrate a

16    statistically significant association between Neurontin

17    and suicidality.

18          Next, please.

19          Moreover, the fact of the matter is, topiramate

20    and lamotrigine are driving this train, driving every

21    bit of this data.  They're the only two drugs out of 11

22    that showed a statistically significant increased risk.

23    Lamotrigine and topiramate accounted for 67 out of the

24    104 cases.  Two-thirds of the cases came from two of the

25    drugs.

```
 1          So when you separate out those two drugs -- next
 2   slide, please -- what you have is those two drugs show a
 3   statistically significant increased risk.  The other
 4   nine show absolutely no increased risk.
 5          Next slide, please.
 6          And this is true whether you do the analysis
 7   with all 11 drugs or even if you take this category
 8   referred to as GABAergic and GABAmimetic drugs.  If you
 9   separate out topiramate and you look at the other four
10   on their own, you have absolutely no evidence of an
11   increased risk.
12          Next slide, please.
13          So the takeaway points, they remain exactly the
14   same.  The critical difference between the Neurontin
15   data and the AED pooled data is that the AED pooled data
16   the FDA has found do demonstrate a statistically
17   significant increased risk.  The Neurontin data, no
18   matter how you slice the data, do not.
19          Similarly, pooling the Neurontin data with data
20   from different AEDs, it doesn't change the Neurontin
21   data.  No matter what you combine it with, the Neurontin
22   data remain as they are.
23          Third, there was no causality finding.  There
24   has been no causality finding by the FDA specific to
25   Neurontin.  And you saw some pieces played today on
```

PDF created with pdfFactory trial version www.pdffactory.com

 1   causality, but the critical point to make there is that

 2   you heard individuals at the FDA, which, by the way, as

 3   the FDA states in its amicus brief, individuals do not

 4   speak for the FDA as a whole.  But even they are

 5   speaking, the causality discussion was as to an all-AED

 6   causality finding, that these drugs, plural, as a class,

 7   there may be a statistically significant increase risk

 8   which they equated with causality.  But Dr. Katz, he

 9   specifically stated that when you're looking at a

10   specific drug and asking does that drug cause whatever

11   the event at interest is, what you have to do is look at

12   that drug's data and ask is there a statistically

13   significant association?  That's at page 99 of the

14   transcript that we just provided you today.  And when

15   you apply that test, you cannot reach a causality

16   conclusion with respect to Neurontin specifically.

17            And then, finally, the FDA's statistical review

18   clarifies that the increased risk in the pooled data is

19   not attributable to Neurontin; it is attributable to

20   lamotrigine and topiramate.

21            The FDA relied on its pool of our class-wide

22   analysis to make a class-wide risk assessment, a very

23   different thing from a drug-specific causation

24   assessment.

25            Now, without debating one way or the other the

1    appropriateness of engaging in meta-analysis or pooling

2    the data for purposes of making a class-wide regulatory

3    risk assessment, it's clear, as a matter of science and

4    law, that the data from other AEDs cannot be used to

5    make a Neurontin-specific causality finding.

6           First, the drugs are very, very different.

7    There has been no dispute in this case, and the

8    plaintiffs' experts have conceded, that these 11 drugs

9    are very distinct.  They're distinct chemical compounds.

10   They have distinct mechanisms of action.  They have

11   distinct pharmacologic properties, and they have

12   distinct risk profiles.

13          As we know, their data also yield very, very

14   distinct results.

15          Here's what plaintiffs' expert, who they did not

16   bring into this Court to be questioned today, but here's

17   what plaintiffs' expert, Dr. Greenland, who has not

18   offered a causation opinion in this case, I would submit

19   for very good reason, here are some of the things he has

20   to say about the problems with using meta-analysis for

21   making specific causation conclusion.

22          A major problem is meta-analysis can give a

23   false impression of consistency across study results.

24          Next, please.

25          A common objection to meta-analysis summaries is

1    that they combine results from studies of disparate

2    quality.  Our situation here.

3         Next, please.

4         Meta-analyses that ignore heterogeneity should,

5    indeed, be banned from publication if only because they

6    violate sound statistical and scientific practice.

7         I would emphasize, you heard a lot about the FDA

8    statistical review today.  The FDA was unable to rule

9    out heterogeneity as confounding the meta-analytic

10   results and certainly was unable to rule it out to the

11   extent you could indict Neurontin with the data from

12   other drugs.

13        Continue, please.

14        Exclusion of studies from meta-analysis is a

15   controversial practice.  Just what was done here.

16        Next, please.

17        Any decision to exclude a study should not be

18   based on the study results.

19        Next, please.

20        The case law establishes a class-wide analysis

21   is unreliable proof of general causation.  Again, from

22   the Bextra/Celebrex state court decision that came down

23   this past January, the court was troubled by the

24   experts' testimony that the theory was premised on a

25   biological effect of the class as a whole instead of

1    identifying the effect of specific COX-2s, because he

2    specifically testified that the different COX-2s are

3    different drugs that are different biochemically.  The

4    court went on to explain, accordingly, any use of this

5    theory to establish causation would have to be tailored

6    to Celebrex specifically as opposed to different COX-2

7    or COX-2s in general.

8          We cite two other cases in our briefing that

9    stands for the same proposition that when you're doing

10   specific -- general causation analysis for a specific

11   drug, you look to the data pertaining to that specific

12   drug.

13         Let's be clear, the advisory committee made very

14   clear throughout the entire advisory committee hearing,

15   that they were relying on the pool of AED data for the

16   purposes of making a public policy based class-wide risk

17   assessment, not for purposes of making or reaching

18   drug-specific causation conclusions.

19         Before the committee voted on the first question

20   of whether it agreed with the FDA's overall finding of

21   an increase in suicidality for the 11 AEDs, the

22   committee chair specifically explained that the question

23   was not whether there was causality.  The question was

24   whether there was a signal, that's at page 95 of the

25   transcript we just submitted to you.

PDF created with pdfFactory trial version www.pdffactory.com

1          Before the committee voted on the second

2    question of whether to exclude any of the 11 AEDs, the

3    committee member -- next slide, please -- as you've seen

4    earlier today, one of the committee members, Sean

5    Hennessey, an epidemiologist at Penn, specifically

6    explained the difference between the company -- or the

7    committee's public policy safety analysis for purposes

8    of making a regulatory and labelling recommendation, the

9    distinction between that and individual drug general

10   causation analysis.  And as he said in the last

11   sentence, "I think it's appropriate to not exclude any

12   of the 11 AEDs from the initial recommendation, but as

13   to general causation, the data aren't -- the data aren't

14   there for the individual drugs."

15          The committee, I think, you know, confirmed that

16   it was not making drug causation -- drug-specific

17   causation findings when on the next question it was

18   asked whether to apply its findings to all of the other

19   AEDs out there, even though they were never studied as

20   part of this 11 drug AED analysis.  They said, yes,

21   let's apply it across the board to all AEDs.

22          And then in response to the FDA's fourth

23   question, as you've heard today, the committee voted

24   14-4 with three abstentions to not recommend a black box

25   warning for AEDs.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              The case law makes clear the regulatory risk
 2     assessments, exactly like the risk assessments being
 3     made by the FDA and the advisory committee, are not
 4     reliable evidence of general causation.  This Court has
 5     reflected that in the Sutera opinion granting a Daubert
 6     motion.  The Bextra/Celebrex state court decision is
 7     very instructive on this issue.  In the Bextra/Celebrex
 8     situation, an advisory committee made a specific
 9     recommendation for a class-wide black box warning.
10     Actually, it went a step further than what this
11     committee did last week, made a class-wide black box
12     warning recommendation.  Justice Kornreich recognized
13     that this recommendation, this public policy risk
14     assessment, was very different from the general
15     causation inquiry to be conducted in a Daubert or Frye
16     context and held that this evidence did not preclude her
17     from granting the Frye motion.
18              Next slide, please.
19              The plaintiffs have no epidemiologic evidence to
20     support their general causation theory.  The only
21     epidemiologic study cited by the plaintiffs' expert is
22     the Collins/McFarland article.  What this epidemiologic
23     study showed was that both Neurontin and lithium
24     dramatically reduced the attempted and completed suicide
25     rate in contrast to the background rates in the
```

 1   untreated bipolar population.

 2        You've heard testimony about how lithium is

 3   super protective, and also, the Neurontin patient

 4   population was not just a bipolar population, but also a

 5   pain population, which may explain the differences

 6   between lithium and Neurontin.  But the key take-away

 7   point is that this provides absolutely no support for

 8   the plaintiffs' case, and if anything, supports the

 9   hypothesis that Neurontin is protective against

10   suicidality.

11        Next slide, please.

12        The plaintiffs don't have the testing, and we

13   would submit they made a dispositive mistake by not

14   conducting the epidemiologic testing that needs to be

15   conducted to satisfy their Daubert and Frye burdens.

16        Dr. Blume, she recognized in her testimony that

17   absolutely an epidemiologic study can be conducted to

18   evaluate the issue of Neurontin and suicidality, ala the

19   Collins and McFarland study.  This study could have been

20   done for about one-sixth the price of what Dr. Blume has

21   already been paid in this case.

22        The case law -- next, please -- the case law

23   reflects that plaintiffs have the burden of proving

24   general causation.  Plaintiffs have the burden of

25   overcoming the Daubert hurdle, and where epidemiologic

PDF created with pdfFactory trial version www.pdffactory.com

1    testing is feasible, they need to do it.  They need to

2    do it.  They can't simply argue, well, it hasn't been

3    done so we're excused.  They need to do it.  It's

4    reflected in this Bextra/Celebrex federal court MDL

5    opinion, it's also reflected in the Cloud v. Pfizer case

6    out the District of Arizona.

7            Not one of plaintiffs' experts followed the

8    reliable and accepted methodology for assessing general

9    causation that's spelled out in the Federal Judicial

10   Center's Reference Manual For Scientific Evidence.  This

11   is because had they followed that methodology, they

12   couldn't get past step one.  There is no epidemiologic

13   proof of a statistically significant association between

14   Neurontin and suicidality.

15           Dr. Trimble's methodology, he states, is

16   contained in a chapter of his medical/legal book that

17   he's authored.  I urge the Courts to read that.  There's

18   not one bit of discussion about a reliable methodology

19   for assessing general causation.

20           Dr. Blume for her methodology cites to an FDA

21   guidance which is to be used for safety signal analysis

22   on post-market adverse event data.  Exactly the kind of

23   data that the FDA has said is uninterpretable and

24   unreliable for purposes of engaging in the suicidality

25   analysis that is before us.

1          And finally, Dr. Kruszewski, he really followed

2     no methodology at all.  What he did was went and

3     selected literature that he felt supported his case,

4     discarded other literature, did nothing else.

5          Plaintiffs' weight of the evidence or

6     throw-it-all-up-against-the-wall approach is exactly the

7     type of approach that we would submit has been rejected.

8     It's been rejected by the 1st Circuit -- next slide,

9     please -- in the Lynch v. Merrell National Laboratories

10    case, where there were no epi studies to support an

11    association.  The plaintiffs' expert offered the opinion

12    that Bendectin can cause the limb reduction based on

13    animal studies and the study of analogous chemicals.

14         What the court held was studies of this sort,

15    singularly or in combination, don't have the

16    capabilities of proving causation in human beings in the

17    absence of any confirmatory epidemiologic data.  Without

18    such a study affirming the epidemiologic evidence,

19    there's nothing on which expert opinion on Bendectin as

20    a cause may be based.  The plaintiffs offered no data.

21    Similarly, the Bextra/Celebrex state court opinion

22    likewise holds that without statistical epidemiologic

23    evidence, the plaintiffs' general causation opinions

24    were excluded, notwithstanding an advisory committee

25    recommendation that I discussed, a black box warning,

1    the claim of a class-wide increased risk, and biological

2    plausibility hypothesis.

3           Finally, Dr. Blume attempts to save her

4    testimony by relying upon individual case reports.  It's

5    almost universally recognized that individual case

6    reports cannot be used and are not reliable evidence of

7    general causation.  This is the FDA's opinion, it's the

8    opinion of the New York courts, I'd cite the Hexital

9    case as an example, and it's essentially the law

10   throughout the country.

11          Dr. Blume relies on these reports to engage in

12   what she calls a proportional reporting rate analysis

13   based on work that's been done by Mr. Altman of the

14   plaintiffs' law firm.

15          This work that's been done by Mr. Altman, this

16   so-called PRR analysis -- next, please -- has actually

17   been considered and rejected as unreliable using

18   virtually the identical methods used here.

19          The reason Dr. Blume's individual case report

20   analysis is meaningless is because we have high

21   background rates of depression and psychiatric adverse

22   events in the populations that use Neurontin.  It simply

23   is not proof of anything to go cherry-pick and find one

24   of those cases and say, aha, this proves my case.  And

25   that remains the case, also, with dechallenge and

1    rechallenge data, especially where the dechallenge and

2    rechallenge relates to a subjectively reported event,

3    such as depression or suicidal ideation as opposed to an

4    objectively measurable event, such as a rise in a

5    laboratory value, or something to that effect.

6          But most distorting thing about the reliance on

7    individual case reports of depression and other

8    psychiatric adverse events is that they're contradicted

9    by the controlled clinical trial data.

10         Next slide, please.

11         The controlled clinical trial data using

12   Neurontin show that the rates of depression reported as

13   an adverse event were lower in the Neurontin population

14   than they were in the sugar pill population.

15   Likewise -- next slide, please -- the rates of

16   psychobiologic adverse events, a constellation of

17   psychiatric adverse events, were lower in the Neurontin

18   population than they were in the placebo population.

19         Next slide, please.

20         So where --

21         JUDGE SARIS:  You need to wrap it up in about

22   two minutes.

23         MR. SAYLER:  You got it.

24         Where this takes us, your Honor, is back to the

25   tests that must be applied to the evidence in this case,

PDF created with pdfFactory trial version www.pdffactory.com

1   to the Daubert reliability factors.  When you go through

2   these factors, what you see is the plaintiffs haven't

3   done the testing, the rate of error is not measurable.

4   There is no general acceptance for their opinion.  They

5   haven't peer-reviewed and published their opinions.

6   Their opinions were developed solely and expressly for

7   this litigation.  It extrapolated from unreliable

8   biologic plausibility theories to a clinically

9   unsupported conclusion of causation, and there obviously

10  are alternative explanations for the suicidality that

11  occurs in the patients that are of the type that use

12  Neurontin.

13          So we would submit that the plaintiffs'

14  methodologies and their conclusions are unreliable.

15  There is no general acceptance for their methodologies

16  and their conclusions, and this -- these Courts should

17  grant the respective Daubert and Frye motions.

18          Thank you.

19          JUDGE FRIEDMAN:  Thank you.

20          MR. FINKELSTEIN:  Good afternoon, your Honor.

21  May it please the Court.  Judge Friedman, I want to

22  thank you, again, for taking that trip.  It saves us

23  from doing this two times.

24          The FDA convened a meeting of experts from all

25  over the country.  They're epidemiologists,

1    biostatisticians, neurologists, psychiatrists, a joint

2    meeting of the central nervous system drugs and

3    psychopharmacological drugs advisory committees.  They

4    convened last week, July 10th, and you have the entire

5    hearing, and it's hyperlinked to certain sections

6    wherever you'd like to go.

7         At that meeting, it was vigorously discussed by

8    everybody there the methods, the reliability, and the

9    conclusions of the FDA analysis.

10         During that time, there was robust scientific

11   debate, scientific debate that wouldn't -- there's a

12   pending motion for a 706 panel, the exact type of panel

13   one would like to form.  And at the end of that debate,

14   a question was presented:  Does the committee agree with

15   the agency's overall finding of an increase in

16   suicidality for the 11 antiepileptic drugs the FDA

17   analyzed?

18         FDA presented for 45 minutes, there was open

19   public hearing, and then there was a vote.  And the vote

20   was very clear:  Yes.  This case is about whether or not

21   gabapentin, Neurontin, has the capacity to lead to mood

22   and behavioral disturbances resulting in suicidality.

23   An independent scientific board says yes, the FDA says

24   yes, only Pfizer says no.

25         At that hearing -- and I'm going to just move

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    right through this -- this we heard already.  But
 2    Dr. Katz made it very clear.  The analysis -- and what
 3    I'd like to do -- and the reason why I skipped that and
 4    I've already played it today, your Honors, it's clear,
 5    interpretations can be made by both sides.  I sat at
 6    that hearing.  There is no dispute that every member of
 7    that panel knew exactly what they were voting on:
 8    Causation.  If you can't listen to the whole thing, just
 9    go to the 20 minutes leading up to that vote.  They go
10    around the table, and they say, well, what do you feel
11    about causation?  What do you feel about causation?
12    Dr. Katz says, we're completely comfortable with
13    causation.  Biostatistician, Dr. Leon, says, I totally
14    agree with causation.  I can play all these clips, I'm
15    going to move through it, because I trust your Honors
16    will look at this videotape.  When you look at it
17    without my opinion on it or Pfizer's opinion on it,
18    you'll see it is clear, and I leave it for you to make
19    that ultimate analysis, whether or not that vote
20    reflected causation or not, which at the end, I submit,
21    it will.
22            They clearly stated a signal exists.  And there
23    was no dispute a signal exists, the only question was
24    does that signal equal causation?  FDA said we believe
25    it is causation.
```

1          (From videotape)  We're interested in whether or

2     not you think when we use the word "signal," whether or

3     not you think there's is a statistically significant

4     increase in episodes of suicidality, which to us, we

5     interpret that as causality.  We should be very clear

6     that the trials were prospective trials.  They were

7     randomized trials.  Data were collected

8     contemporaneously prospectively.

9          (End of videotape.)

10         MR. FINKELSTEIN:  And he goes on to describe and

11    they analyze them, they took out all bias.  There's

12    no -- that was right before the vote.  This signal

13    equals causation.

14         FDA presented -- we heard a lot about the

15    interpretation, what does FDA mean by this, what does

16    FDA mean by that?  Well, Dr. Levenson, the FDA's

17    statistical safety reviewer in the quantitative safety

18    and pharmacoepidemiology group, said it very succinctly.

19         (From videotape)  An odds ratio greater than

20    one, the area to the right of the dashed line indicates

21    that the drug was associated with suicidal behavior

22    ideation over the placebo.  The overall odds ratio was

23    1.8 with a confidence interval of 1.24 to 2.66.  The

24    interval did not contain the value of 1.  Therefore,

25    overall, there was statistically significant association

PDF created with pdfFactory trial version www.pdffactory.com

1    between the drugs and suicide behavior ideation relative

2    to placebo in these trials.

3          (End of videotape.)

4          MR. FINKELSTEIN:  There was no dispute at that

5    hearing.  They represent a statistically significant

6    increase in suicidality.  The pattern is similar amongst

7    every drug in there.

8          Dr. Gibbons comes here and says FDA is wrong.

9    Pfizer had an opportunity to present everything they

10   presented here.  They went there, they presented for 20

11   minutes, which is on this DVD, and there's a hyperlink

12   right to everything that you heard here, but it went out

13   into the real world where real scientists knew what they

14   were talking about, rather than an effort --

15         JUDGE SARIS:  Better than judges.

16         MR. FINKELSTEIN:  With all due respect, I don't

17   understand it either, but you sit -- and if you listen

18   to the FDA presentation, and it was a complete

19   presentation, and then there was a rebuttal.  But this

20   is what they had to say.  And Dr. Levenson was asked

21   specifically about what about the topiramate?  Did it

22   drive the results?  The same questions were asked.

23   Dr. Levenson of the FDA, and I'm sorry, I don't have

24   this audio, said -- and I have to read this because it's

25   so important.

PDF created with pdfFactory trial version www.pdffactory.com

1          So the question is that two drugs, pregabalin

2     and topiramate, contributed a large number of patients

3     to the overall analysis.  Well, that was -- there was no

4     adjustment for that in the primary analysis.  We do see

5     that the other drugs, those two drugs form a pattern

6     with the other A drugs that have odds ratios greater

7     than one.  So when we look at the drugs individually,

8     the eight of the 11 drugs seem to have a very similar

9     pattern, of which gabapentin was one of them.

10          We did look at the sensitivity analysis where we

11     removed the trials -- we looked at the large trial that

12     contributed individual trials, no matter what drugs they

13     may appear, whether they have a large influence on the

14     overall estimates.  It turned out only one trial had any

15     significant influence on the overall estimate, and when

16     we removed that trial, the overall estimates were

17     similar, slightly larger, but similar.  Removing

18     topiramate had no effect on the outcome.

19          Dr. Gibbons is wrong.  I can't say it anymore

20     plainly.  The FDA looked at this, three biostatisticians

21     from -- I forget the universities, but they're in the

22     papers -- all said that they are wrong.

23          Not only that, FDA was so offended by Pfizer's

24     presentation, they took 20 minutes to rebut, step by

25     step what Pfizer presented.  And it was done by

1    Dr. Levenson, and Dr. Levenson -- and those slides are

2    submitted, they're part of our bench book -- said -- and

3    these were his conclusions:  Sponsors analyses, Pfizer's

4    analysis do not support that FDA primary and sensitivity

5    analyses led to a biased conclusions, FDA conclusions

6    for gabapentin and pregabalin based on overall patterns

7    and findings of the 11 drugs.

8         Then, and I -- right in there there's a

9    hyperlink.  Then the chairman said, Okay, we understand

10   that from Pfizer, but I want to hear from the three

11   biostatisticians on our panel.  Number one, Dr. Wolfson:

12   I agree with the FDA, Pfizer's wrong.  You'll hear it.

13   Dr. Leon:  I agree with the FDA.  Pfizer had no basis

14   for doing their analysis.  They were wrong.  They're

15   fundamentally wrong.  And then Dr. Lu said the exact --

16   all three agreed with FDA's analysis.

17        Then they took another vote.  And the vote --

18   the question was:  Does the committee agree with the

19   agency's conclusion that the finding of increase the

20   suicidality should apply to all drugs included in the

21   analyses, despite the observation that the estimate of

22   the odds ratio for three of the drugs was below one, of

23   which was not including Neurontin.  They were talking

24   about three other drugs.  And then they discussed it.

25   And what was the vote?  18 to 3 yes, it should apply to

1   all 11 drugs.

2          Now, Dr. Greenland, who this is in his report

3   that we submitted today, and respectfully, I appreciate

4   that you haven't had an opportunity to review it, simply

5   says this, and puts it in perspective:  What are we

6   talking about here?  It says Dr. Gibbons does not

7   present the power -- which we've been saying from day

8   one -- the power, the volume, the number of people in

9   the studies -- of the gabapentin analysis, but that

10  power is under 10 percent to detect a risk ratio of 2, a

11  doubling of the risk.  This power is far below the 80

12  percent power at a risk ratio of 2 generally required to

13  test the safety of a drug.  It means that there is over

14  a 90 percent chance that a doubling of the risk by

15  gabapentin would go undetected by the gabapentin trials.

16  It is, thus, all the more remarkable that gabapentin

17  trials were able to see as much of a risk increase that

18  they did, (a risk ratio of 1.49 in the FDA review.)  A

19  90 percent chance of not seeing the doubling of the risk

20  because the power wasn't large enough, that's why they

21  did the meta-analysis.  None of the individual studies

22  were large enough.  They did it, they put it together,

23  they considered heterogeneity, bias, everything, in

24  every analysis, the biostatisticians all agreed.

25          Then we talked about, well, the disclaimer

1    language, which I played earlier for you.  They said

2    that disclaimer language, that never would have been in

3    the initial alert.  Why did they send this initial alert

4    out right away?  Because they wanted -- I'm sorry --

5    they were worried about public health effects of

6    Pfizer's off-label promotion.  And the public health

7    effects of this drug being out without appropriate

8    labelling, and Dr. Leon said it best --

9           (From videotape)  And that is if 769 patients

10   were treated with an active medication and 769 other

11   patients were treated with placebo, we would expect one

12   additional suicidality event in those treated with the

13   active.  And then the reason I asked that question about

14   the sales figures, numbers of patients, if we take that

15   769, it needs 769 to see one difference and then

16   extrapolate to the 11 million people getting it.  Then

17   we see a pretty large -- I mean, there's a big public

18   health impact there.

19          (End of videotape.)

20          MR. FINKELSTEIN:  A big public health impact,

21   increased suicidality through these drugs.

22          Pfizer 's sales increasing to the millions.

23   What happens?  They targeted the psychiatric committee.

24   Dr. Rothschild uses it off label where it's untested,

25   unknown of the outcome until now.  And they take the

1    very population that is at greatest risk, the

2    psychiatric community, and look what happened to their

3    sales -- their sales skyrocketed.  Then they go after

4    the pain community, and they promoted this off label and

5    illegally; sales skyrocket.  Then what happens in the

6    headache community or some other unapproved -- where

7    they did not get random controlled trials, they have no

8    proof of efficacy.  What did they do?  The sales go up.

9    But in the epilepsy market, the sales go down.  And why

10   is this important?  What's the public health effect?

11   Because now, if you take a look at the reporting of

12   suicidality over that same period of time, you see this

13   significant increase.  It's going up like Mt. Everest.

14   It happens to match the sales of off-label promotion at

15   the same time.  That's the public health crisis we're

16   dealing with.

17          But this case isn't about the conclusion, this

18   case is about the methods.  What methods did the

19   plaintiffs' expert -- and they spent all their time, the

20   conclusion -- there's no peer-reviewed article on the

21   conclusion, it's on the conclusion -- this is about

22   methods.  Did the plaintiffs' experts do that which the

23   law requires in their analysis in forming their

24   opinions?

25          Well, what did they do?  The medical doctors

```
 1    conducted a -- they conducted the Hill analysis, and
 2    there's nothing novel about suicide, there's no novel
 3    syndrome here, no novel -- nothing about depression.
 4    They examined the animal data, the human data, the
 5    epidemiological data and all the case reports, and they
 6    said, well, let's evaluate this.  And they took it to
 7    the Hill considerations.  Dr. Trimble and Dr. Kruszewski
 8    analyzed each and every one of them.  And in each --
 9    that's what's required.  Did they consider these
10    important considerations?
11           Then with respect to Dr. Blume, she followed
12    exactly what the FDA tells her to follow, guidance for
13    industry.  It may be possible to assess the degree of
14    causality between use of a product and an adverse event.
15    FDA says to Pfizer, go look for a signal.  And this is
16    what you do to go look for a signal.  Look for case
17    reports, background rate, epidemiology.  And then if you
18    find a signal, give it to us, and we'll analyze it.  And
19    we analyze it, we look at things that are very similar
20    to the Hill consideration, strength of association,
21    temporal relationship, and we'll make an analysis:  Does
22    this, in fact, lead to an association, or does this drug
23    have the capacity to cause suicidality?  It's exactly
24    what Dr. Blume did.  Methodologically she's right on
25    point, as was Dr. Trimble and Dr. Kruszewski.
```

PDF created with pdfFactory trial version www.pdffactory.com

1            What's the basic position?  Gabapentin increases
2       GABA in the brain; increase of GABA, reduction of
3       serotonin, reduction of serotonin increases suicidality.
4       Well, let's see who agrees with that.  The Pfizer
5       litigation position is contrary to the FDA, journal
6       articles, and internal corporate document gabapentin is
7       GABAergic.  They stood here over and over again trying
8       to persuade this Court it's not GABAergic when article
9       after article, FDA, it's not novel, everybody says it's
10      GABAergic.  And we heard Dr. Trimble say the only place
11      I've heard it's not GABAergic is in this courtroom,
12      that's it.  It's a litigation position, because the
13      journal articles confirm it, Pfizer documents confirm
14      it, but the lawyers say no.  Gabapentin in reduction of
15      serotonin, FDA didn't analyze it, but journal articles
16      say that it's there.  The internal Pfizer documents
17      agree.  I don't know what the Pfizer lawyers' position
18      on that are, they haven't actually said that one, and
19      the serotonin, increase in suicidality, that journal
20      articles are clear, books are clear, there's no dispute
21      about that, even Dr. Rothschild agrees with that one,
22      the internal Pfizer documents -- I don't know what the
23      lawyers say about that.
24            But when we get to the ultimate conclusion in
25      this case, and this case is about methods, when we get

1    to the conclusion, gabapentin increases suicidality, the

2    FDA says yes, the FDA advisory committee says yes,

3    plaintiffs' experts say yes, and only Pfizer's lawyers

4    say no.

5         Why?  They do the same thing the corporation

6    does.  There are all these red flags around; let's not

7    look at them.  Let's ignore the dechallenge/rechallenge

8    which is right on point with temporality, let's just

9    dismiss the biological plausibility argument because we

10    have to.  Patients excluded from trials -- they stood --

11    it's in our motion paper, you'll see them.  The patients

12    that were excluded from the psychiatric trials or the

13    epilepsy trials were patients who had a history of

14    psychiatric events.  They didn't exclude, as they

15    suggested, giving it to the FDA, we're not suggesting

16    that.  What they excluded were the people going into the

17    trials, so you have a skewed result coming out.  How

18    about the case reports, the trial -- they ignore all of

19    this -- the warning was there to be seen.

20         Now, I'm just going to address the support for

21    each of these independent very quickly.  Gabapentin does

22    increase GABA.  There's the spectroscopy, internally,

23    the Pfizer e-mail that says Dr. Feltner, who is the

24    Pfizer psychiatrist in charge of research and

25    development, says, I suppose the question is:  What are

1    the consequences of the increase in GABA in human brain

2    caused by gabapentin?   It strikes me that they might

3    contribute to efficacy and adverse events in humans.

4    This is not novel, they know it inside, they talk about

5    it amongst themselves, but they send their lawyers in to

6    say no.

7            Dr. Trimble told them back in 1995.  He wrote it

8    has been known for a long time, 13 years ago,

9    anticonvulsant drugs influence the mental state, this

10   can be broken down into adverse and beneficial effects.

11   The main adverse effect of anticonvulsants is the link

12   between anticonvulsant drugs and depression.

13   Dr. Rothschild knows nothing about it because he doesn't

14   do anything with antiepileptics.  Dr. Trimble is one of

15   the foremost exports on antiepileptic drugs, that's why

16   they went to him to analyze it.  There's no dispute that

17   this drug increases depression.  It is GABAergic.  As

18   recently as 2006, Dr. Smith, which we submitted earlier,

19   classified it as depressogenic and GABAergic.

20           Another article in 2002, the neuronal

21   inhibition, it has no GABAergic inhibition pathways.

22           How about the increase of GABA reduces

23   serotonin?  Here, too, there's a tremendous amount of

24   peer-reviewed support for this.  This is a scientific

25   debate.  They just disagree.  It's simply a question of

PDF created with pdfFactory trial version www.pdffactory.com

1    fact of what's the effect of it, but certainly there is

2    no dispute that there is valid, reliable support for

3    these positions.

4         What did they look at?  Plaintiffs' experts

5    looked at the defendants' animal studies, journal

6    articles, corporate documents, and their own

7    advertisements.  Gabapentin in 1985 is GABAergic that

8    causes the decrease serotonin, and this is in our

9    responsive papers, Exhibit 42.

10        In 1984, we saw with Dr. Rothschild today,

11   gabapentin attenuates the release of noradrenaline and

12   serotonin.  This is while they're studying this drug to

13   bring it to make a product out of it.  Then they --

14   Dr. Taylor did a 20-year review back in 2001, what did

15   he find?  Inhibition of neurotransmitter release by

16   gabapentin, serotonin was also reduced, and gabapentin

17   inhibits the release of serotonin, all in their

18   corporate documents.

19        Before this litigation, nobody saw all of this.

20   It was well hidden.  Not until Dr. Trimble and

21   Dr. Kruszewski had an opportunity to look at their

22   internal corporate documents did they see what was

23   really going on.

24        Gabapentin reduces the release of monoamine

25   neurotransmitter.  That's in their product profile in

PDF created with pdfFactory trial version www.pdffactory.com

1    '92.

2         Gabapentin is a drug with anticonvulsant

3    analgesic properties causing a reduction in

4    neurotransmitter release, European Journal of

5    Neuroscience 2005.

6         Whether or not -- and they come here now and say

7    it's the alpha2-delta effect.  Here's a peer-reviewed

8    article that says it doesn't matter, call it GABAergic,

9    call it whatever you want.  The net effect is clear that

10   the -- leading to reduced neurotransmitter release and

11   attenuation of postsynaptic excitability is a biological

12   plausible mechanism.

13        In their own advertising they say it inhibits

14   the release of excitatory neurotransmitters.  And then

15   when a doctor calls up and says what does this drug do?

16   In their dear doctor letter they say it reduces

17   monoamine neurotransmitters.

18        The last element is the most generally

19   established -- and they don't even argue on this -- that

20   the reduction of serotonin does and is causally related

21   in increase in suicidality.  One of the experts they

22   didn't bring in wrote a book, Dr. Jacobs.  In that book

23   he evaluated 22 peer-reviewed studies of serotonin and

24   its relationship to suicidality.  Sixteen of them all

25   said serotonin is the neurotransmitter that is most

1    associated with violent, unpredictable suicides.  They

2    admit and they know that this drug -- serotonin at a

3    minimum causes suicidality.

4         The dechallenge/rechallenge.  Depression and

5    suicide ideation is related to gabapentin therapy.  Why

6    did they say this?  Because they know what the

7    mechanistic effect is on the human brain.  Their

8    internal documents causally relate it.

9         Back in 1990, in their original clinical trials,

10   there's an adverse event:  Acute severe depression

11   suicidal ideation.  What do they say?  I've been

12   informed of the follow-up information regarding the

13   above adverse event.  A summary of the adverse event is

14   enclosed.  The Pfizer rep said this is an expected

15   adverse event considered possibly associated with the

16   use of gabapentin, the investigational drug.  That is no

17   surprise.  FDA is not the only regulatory body who has

18   said causation.  Health Canada, in 2005, says one

19   suicide attempt was found to have a positive

20   dechallenge/rechallenge indicating that this event was

21   related to gabapentin.  Yet, they don't see that.  They

22   say nothing exists.  It's right here.  Health Canada.

23        1992, FDA, in their original clinical review,

24   when they sought approval, Pfizer sought approval, FDA

25   said to them, very clearly depression may become worse

1    and require intervention or lead to suicide as it has

2    resulted in some suicidal attempts.  Dr. Rothschild

3    didn't look at that because Pfizer didn't give it to

4    them.  This is an FDA document from 1992 to Pfizer not

5    in the public domain.  Nobody knew about this until

6    Dr. Kruszewski and Dr. Trimble saw it.

7         FDA's predictions have come true.  They said in

8    '92 this is going to lead to suicidality, increased

9    depression.  Thousands of families have had a family

10   member attempt suicide because there have been millions

11   of sales on this drug.  Hundreds, hundreds have had a

12   family member commit suicide.

13        The experts' methods, they satisfy <u>Daubert</u> and

14   <u>Frye</u>.  The experts applied generally accepted methods to

15   scientifically reliable evidence in a reliable way to

16   the facts of this case.

17        There's nothing novel about any syndromes here,

18   nothing novel about depression, nothing novel about a

19   suicide act, no newly minted technique.  And the

20   scientific evidence relied upon provides a proper

21   foundation for the opinion that gabapentin has the

22   general capacity to cause suicidality.  As a result, the

23   defendants' motion to exclude should be denied.

24        Thank you, your Honors.

25        JUDGE FRIEDMAN:  Thank you.

```
 1            JUDGE SARIS:  Do we have these slides?
 2            MR. FINKELSTEIN:  I just -- I will submit them,
 3    your Honor.  I'm sorry.  The answer is no, I just
 4    finished this last night.  I have about 70 slides, I
 5    didn't know which ones I was going to use, so I will
 6    submit them tomorrow.
 7            JUDGE SARIS:  Thank you.
 8            MR. FINKELSTEIN:  I didn't know if I was going
 9    to have an hour, half hour.
10            MS. McGRODER:  I have a few things to hand up
11    whenever you're ready.
12            THE COURT:  The what?
13            MS. McGRODER:  The things you asked for today.
14            Some of the slides and the study that
15    Dr. Rothschild talked about, Callanan study.
16            JUDGE SARIS:  All right.  That's the one -- but
17    it was cited.  Do you agree it was cited?
18            MS. McGRODER:  Yes, it's in his supplemental
19    reliance list produced in March of '08.  It was also
20    produced by Dr. Rothschild at his deposition.
21            MR. FROMSON:  If that's, in fact, the case, then
22    they should be able to provide it, but I can't confirm
23    or deny it.
24            THE COURT:  Why don't you hand it up now, and
25    you move to strike it in it's not in there.
```

```
 1          MR. FROMSON:  Thank you, Judge.

 2          JUDGE SARIS:  So you don't have to all come

 3     back.

 4          (Discussion off the record.)

 5          JUDGE SARIS:  If I could just see lead counsel

 6     off the record at sidebar before we take our one-minute

 7     recess.

 8          (Discussion off the record.)

 9          JUDGE SARIS:  So we just talked for a moment off

10     the record at sidebar.  So at this point, we don't want,

11     essentially, anything else from you.  I thank you,

12     excellent, really outstanding lawyering.  I wish one

13     side weren't as good as the other, but it just wasn't

14     true.

15          JUDGE FRIEDMAN:  I just wanted to have the

16     opportunity on the record to thank counsel on both sides

17     for a very well tried, very seriously tried case, but I

18     particularly want to thank Judge Saris for hosting this

19     joint hearing and for so very graciously welcoming me to

20     her courtroom.  This has by no means been a hardship to

21     be here in Boston.

22          JUDGE SARIS:  She's invited me down to New York

23     to schmooze after the fact.

24          All right.  Have a nice day.

25          (Court adjourned at 3:34 p.m.)
```

PDF created with pdfFactory trial version www.pdffactory.com

1                        - - - - - - - - - - - -

2                        CERTIFICATION

3          I certify that the foregoing is a correct

4     transcript of the record of proceedings in the

5     above-entitled matter to the best of my skill and

6     ability.

7

8

9

10    /s/Debra M. Joyce                    _____
      Debra M. Joyce, RMR, CRR            Date
11    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25