# EXHIBIT 3
# (PART I)

```
                                                        312
 1          UNITED STATES DISTRICT COURT

 2           DISTRICT OF MASSACHUSETTS

 3             MDL Docket No. 1629

 4           Master File No. 04-10981

 5

 6    * * * * * * * * * * * * *

 7    IN RE:  NEURONTIN MARKETING, SALES       *

 8    PRACTICES, AND PRODUCTS LIABILITY        *

 9    LITIGATION                               *

10    ----------------------------------       *

11    THIS DOCUMENT RELATES TO:                *

12    ALL MARKETING AND SALES PRACTICES        *

13    ACTIONS                                  *

14    * * * * * * * * * * * * *

15

16                 VOLUME II

17              PAGES 312 - 546

18

19

20     CONTINUED VIDEOTAPED DEPOSITION OF

21          MEREDITH B. ROSENTHAL, Ph.D.

22

23

24    DATE:  WEDNESDAY, OCTOBER 25, 2006

25    TIME:  9:03 A.M. TO 2:35 P.M.
```

M. ROSENTHAL

313

1    CONTINUED VIDEOTAPED DEPOSITION OF
2    MEREDITH B. ROSENTHAL, Ph.D., a witness
3    called on behalf of the Defendants,
4    pursuant to the Federal Rules of Civil
5    Procedure, before Jessica L. Williamson,
6    Registered Merit Reporter, Certified
7    Realtime Reporter and Notary Public in and
8    for the Commonwealth of Massachusetts, at
9    the Offices of Hare & Chaffin, 160 Federal
10   Street, Boston, Massachusetts, on
11   Wednesday, October 25, 2006, commencing at
12   9:03 a.m.
13
14   A P P E A R A N C E S
15
16   HAGENS BERMAN SOBOL SHAPIRO LLP
17     (By Edward Notargiacomo, Esq.)
18     One Main Street
19     Fourth Floor
20     Cambridge, Massachusetts  02142
21     (617) 482-3700
22     ed@hbsslaw.com
23     Counsel for the Plaintiffs
24
25

314

1    A P P E A R A N C E S, Continued
2
3    DAVIS POLK & WARDWELL
4      (By Edmund Polubinski III, Esq.
5      and Paul Mishkin, Esq.)
6      450 Lexington Avenue
7      New York, New York  10017
8      (212) 450-4429
9      edmund.polubinski@dpw.com
10     paul.mishkin@davispolk.com
11     Counsel for the Defendants
12
13   ALSO PRESENT:
14     Rahul Guha, Cornerstone Research
15
16
17
18
19
20
21
22
23
24
25

315

1                I N D E X
2    DEPONENT                           PAGE
3    MEREDITH B. ROSENTHAL, Ph.D.
4    Examination By Mr. Polubinski       315
5
6              E X H I B I T S
7    NO.                                PAGE
8    15  Document headed "ICD-9 Codes    391
         for Neurontin, From IMS File,
9        Ben Sommers, August 3, 2005"
10   16  Affidavit of C. Seth            410
         Landefeld, M.D. and Michael
11       Steiman, M.D.
12   17  Document headed "National       425
         Ambulatory Medical Care
13       Survey, 2006 Patient Record"
14
15
16
17
18
19
20   Note:  Original Exhibits 15 - 17 were
21   retained by the court reporter and
22   forwarded to Veritext New York for
23   distribution.
24
25

316

1           PROCEEDINGS          09:03:09
2         THE VIDEOGRAPHER:  Good morning.    09:03:09
3    We are recording and are now on the record.  09:03:18
4    Today's date is October 25th, 2006, and the  09:03:20
5    time is 9:03 a.m.  My name is George         09:03:23
6    Dobrentey.  I'm a legal videographer for     09:03:27
7    Veritext New York.  This is the deposition   09:03:31
8    of Meredith Rosenthal, In Re:  Neurontin     09:03:32
9    Marketing and Practices Litigation in the    09:03:35
10   U.S. District Court for the District of      09:03:37
11   Massachusetts, Master File No. 04-10981.     09:03:39
12        This deposition is being taken at       09:03:43
13   160 Federal Street in Boston,                09:03:46
14   Massachusetts.  The court reporter is        09:03:48
15   Jessica Williamson.  The counsel will state  09:03:49
16   their appearances, and the court reporter    09:03:51
17   will administer the oath.                    09:03:53
18        MR. POLUBINSKI:  Ted Polubinski         09:03:55
19   from Davis Polk representing the             09:03:57
20   defendants.                           09:03:59
21        MR. MISHKIN:  Paul Mishkin from         09:04:00
22   Davis Polk for the defendants.               09:04:01
23        MR. GUHA:  Rahul Guha from              09:04:05
24   Cornerstone Research.                        09:04:06
25        MR. NOTARGIACOMO:  Ed                   09:04:06

2 (Pages 313 to 316)

Page 317

1  Notargiacomo, Hagens Berman Sobol Shapiro,    09:04:08
2  for the plaintiffs.    09:04:09
3
4       MEREDITH B. ROSENTHAL, Ph.D.,
5  a witness called on behalf of the
6  Defendants, having first been duly sworn,
7  was deposed and testifies as follows:
8
9       DIRECT EXAMINATION
10
11  BY MR. POLUBINSKI:    09:04:17
12  Q. Good morning, Professor Rosenthal.    09:04:17
13  A. Good morning.    09:04:21
14  Q. You would agree that a range of factors may    09:04:22
15     influence individual doctors' individual    09:04:25
16     prescription decisions, correct?    09:04:29
17       MR. NOTARGIACOMO: Objection.    09:04:31
18  A. Yes, I would agree with that.    09:04:31
19  Q. And if a particular factor might influence    09:04:32
20     a particular describing decision, is it at    09:04:35
21     least possible that the same factor could    09:04:37
22     also influence doctors' prescription    09:04:40
23     decisions in the aggregate?    09:04:42
24       MR. NOTARGIACOMO: Objection.    09:04:44
25  A. I'm not sure if I understand, but if a    09:04:44

Page 318

1     factor influences an individual physician    09:04:49
2     and we're looking at the aggregate and that    09:04:51
3     physician's part of that aggregate, it    09:04:54
4     would certainly play out that way.    09:04:55
5  Q. Do you have a complete list of such factors    09:04:59
6     in mind now?    09:05:01
7  A. I have not created an exhaustive list of    09:05:02
8     such factors. I list examples in the    09:05:07
9     declaration. When I have more data    09:05:10
10    according to the data that we've requested,    09:05:15
11    I'll begin to develop a more exhaustive    09:05:17
12    list of factors.    09:05:19
13  Q. Okay. We would agree, though, that you    09:05:20
14    will need to at least consider all of the    09:05:24
15    various factors that might influence    09:05:26
16    prescribing behavior in developing your    09:05:28
17    model?    09:05:30
18  A. I will consider those factors, and as I    09:05:31
19    mentioned yesterday, in particular I'm    09:05:34
20    going to focus on factors, that is, the    09:05:36
21    primary factors that drive prescribing    09:05:38
22    choices, and those factors that might be    09:05:40
23    correlated with the variables of interest    09:05:42
24    here are the off-label, allegedly illegal    09:05:45
25    off-label promotional activities.    09:05:50

Page 319

1  Q. Before we keep going I can tell that your    09:05:52
2     voice is --    09:05:58
3  A. I'm sorry.    09:05:58
4  Q. -- that you're having trouble with your    09:05:59
5     voice, so please let me know if you need to    09:06:00
6     take breaks at any point or if we can get    09:06:02
7     water for you or anything else --    09:06:04
8  A. Thank you.    09:06:06
9  Q. -- just so you know.    09:06:06
10       What I would like to do now is go    09:06:07
11    through a list of factors, and what I would    09:06:11
12    like you to do is to tell me whether you    09:06:15
13    agree that it's possible that the following    09:06:16
14    factors could affect a doctor's decision to    09:06:19
15    prescribe Neurontin off-label in a    09:06:22
16    particular case.    09:06:24
17  A. Okay. I understand.    09:06:26
18       MR. NOTARGIACOMO: Just for    09:06:28
19    clarification, the question is whether it    09:06:28
20    would affect them -- whether it would    09:06:30
21    affect an individual doctor's prescribing    09:06:33
22    decision --    09:06:37
23       MR. POLUBINSKI: You know,    09:06:37
24    let's --    09:06:38
25       MR. NOTARGIACOMO: -- or are you    09:06:39

Page 320

1     asking that in the aggregate?    09:06:40
2       MR. POLUBINSKI: Well, that's a    09:06:42
3     good question.    09:06:42
4  BY MR. POLUBINSKI:    09:06:42
5  Q. I'd initially been thinking we would ask    09:06:43
6     about individual doctors, but maybe just to    09:06:45
7     cut through this a little bit why don't we    09:06:48
8     ask whether these factors could affect    09:06:49
9     doctors' prescribing decisions in the    09:06:51
10    aggregate.    09:06:52
11  A. We can agree that the aggregate is the sum    09:06:53
12    of the individuals, and --    09:06:55
13  Q. Exactly. And that the two are connected in    09:06:55
14    the same way that you've just testified,    09:06:58
15    correct?    09:07:00
16  A. I can agree with that, yes.    09:07:01
17  Q. All right. The first possible factor is a    09:07:04
18    new article in a peer-reviewed medical    09:07:07
19    publication on the use of Neurontin to    09:07:09
20    treat the applicable condition?    09:07:11
21  A. That may have an effect, yes.    09:07:14
22  Q. How about a new case report in a more    09:07:16
23    informal medical publication on the use of    09:07:18
24    Neurontin to treat the applicable    09:07:20
25    condition?    09:07:21

**321**

1  A. Potentially that can have an effect as well  09:07:21
2     if it were disseminated.  09:07:25
3  Q. How about a new article in a peer-reviewed  09:07:26
4     medical publication or any other medium  09:07:28
5     really on the use of a drug with a similar  09:07:30
6     mechanism of action to Neurontin to treat  09:07:32
7     the applicable condition?  09:07:35
8        MR. NOTARGIACOMO: Objection.  09:07:37
9  A. That may be possible.  09:07:37
10 Q. How about a new article in a peer-reviewed  09:07:40
11    medical publication or some other medium on  09:07:42
12    the inefficacy of a different drug that had  09:07:44
13    been used to treat the applicable  09:07:47
14    condition?  09:07:48
15       MR. NOTARGIACOMO: Objection.  09:07:49
16 A. It seems like we're getting further and  09:07:49
17    further away from a main effect here, but  09:07:52
18    it's certainly possible that that could  09:07:54
19    have some effect.  09:07:55
20 Q. Okay. How about a new article in a peer-  09:07:57
21    reviewed medical publication or any other  09:08:01
22    medium on the safety of Neurontin?  09:08:03
23 A. I can imagine that having an effect on its  09:08:05
24    use, yes.  09:08:10
25 Q. How about a new article in a peer-reviewed  09:08:10

**322**

1     medical publication or some other medium on  09:08:15
2     the safety of a different drug that has  09:08:17
3     been used to treat the applicable  09:08:18
4     condition?  09:08:20
5        MR. NOTARGIACOMO: Objection.  09:08:20
6        MR. POLUBINSKI: What's -- can I  09:08:22
7     ask what the grounds of the objection are?  09:08:23
8        MR. NOTARGIACOMO: I think "or any  09:08:25
9     other medium" is vague. It could just be  09:08:28
10    about anything, so that's my objection. I  09:08:31
11    think the questions are vague.  09:08:33
12       MR. POLUBINSKI: All right. Well,  09:08:34
13    let me just -- let me hone it. That's  09:08:35
14    fine.  09:08:37
15    BY MR. POLUBINSKI:  09:08:38
16 Q. A new article in any medical publication on  09:08:38
17    the safety of a different drug that had  09:08:43
18    been used to treat the applicable  09:08:45
19    condition?  09:08:47
20       MR. NOTARGIACOMO: Objection.  09:08:48
21 A. Yes, that could have an effect.  09:08:48
22 Q. How about an initiative by a manufacturer  09:08:50
23    to disseminate any of those publications?  09:08:55
24 A. Yes, that could certainly have an effect as  09:08:57
25    well.  09:09:01

**323**

1  Q. How about a continuing medical education  09:09:01
2     seminar addressing the use of Neurontin to  09:09:04
3     treat the applicable condition?  09:09:06
4  A. I'm sorry, so that's the main thing we're  09:09:07
5     talking about, right? So this is a  09:09:13
6     continuing education seminar on whatever  09:09:15
7     the indication, was the original subject  09:09:17
8     here that we're looking at.  09:09:20
9  Q. And the use of Neurontin to treat that  09:09:21
10    condition.  09:09:24
11 A. Yes, certainly.  09:09:24
12 Q. How about a more informal talk given by --  09:09:24
13    just a more informal talk maybe given by an  09:09:28
14    authority in the field that addresses the  09:09:31
15    use of Neurontin to treat the applicable  09:09:32
16    condition?  09:09:34
17 A. Potentially that could have an effect as  09:09:34
18    well.  09:09:38
19 Q. How about a continuing medical education  09:09:38
20    seminar that addresses the use of a drug  09:09:40
21    with a similar mechanism of action to  09:09:42
22    Neurontin to treat the applicable  09:09:44
23    condition?  09:09:46
24 A. Again, similarly it could have an effect.  09:09:46
25 Q. How about a continuing medical education  09:09:50

**324**

1     seminar on the inefficacy of a different  09:09:52
2     drug that had been used to treat the same  09:09:55
3     condition we've been talking about?  09:09:57
4  A. Yes, that could have an effect, too.  09:09:58
5  Q. How about an informal conversation among  09:10:01
6     doctors about the doctor's clinical  09:10:03
7     experience in the use of Neurontin to treat  09:10:06
8     the condition that we're talking about?  09:10:08
9  A. Yes, that could affect prescribing  09:10:09
10    patterns, too.  09:10:13
11 Q. How about an informal conversation among  09:10:15
12    doctors about their clinical experience on  09:10:17
13    the use of a drug with a similar mechanism  09:10:19
14    of action to Neurontin to treat the  09:10:21
15    applicable condition?  09:10:22
16 A. I'm losing score here, but I think if we  09:10:24
17    haven't already covered that one, I think  09:10:28
18    that, yes, that could have an effect.  09:10:29
19 Q. Okay. How about a change in formal  09:10:31
20    practice guidelines within an institution  09:10:33
21    or a professional group?  09:10:37
22 A. Can you explain what you mean by "formal  09:10:38
23    practice guidelines"?  09:10:42
24 Q. Do you have an understanding of what a  09:10:44
25    formal practice guideline might be with  09:10:47

Page 325

1  respect to a prescription drug?  09:10:49
2  A. Yes. My understanding is often guidelines  09:10:51
3  are not specific to drugs, so usually the  09:10:53
4  guidelines refer to class of drugs or to  09:10:56
5  the pharmaceutical treatment following  09:11:02
6  surgery, for example, but there may be  09:11:04
7  guidelines that are specific to a specific  09:11:07
8  drug in terms of whether to use it only  09:11:09
9  after a patient has failed on something  09:11:12
10 else, for example. So are those the kinds  09:11:14
11 of guidelines that you're talking about?  09:11:19
12 Q. Yeah. Let's focus on the latter that  09:11:20
13 you've just described --  09:11:22
14 A. Okay.  09:11:23
15 Q. -- that sort of deal with the use of a  09:11:23
16 particular prescription drug. Could a  09:11:25
17 change in those guidelines affect the  09:11:28
18 prescription of Neurontin for a particular  09:11:30
19 off-label condition?  09:11:31
20 A. Assuming such guidelines existed that were  09:11:33
21 specific to Neurontin, yes.  09:11:35
22 Q. And the same would be true for informal  09:11:36
23 practice guidelines, the same way they  09:11:39
24 would be for more formal ones?  09:11:41
25 A. Can you tell me what you mean by "informal  09:11:42

Page 326

1  practice guidelines"?  09:11:45
2  Q. Why don't -- why don't I withdraw the  09:11:48
3  question and just -- I'll withdraw the  09:11:51
4  question, that's fine.  09:11:53
5  A. Okay.  09:11:54
6  Q. How about a new development in the  09:11:54
7  underlying science in the particular field  09:11:56
8  that relates to the particular indication?  09:11:58
9  A. So you mean the basic science --  09:12:01
10 Q. Yes.  09:12:05
11 A. -- underpinnings?  09:12:05
12    I guess if -- I don't know how  09:12:07
13 those kinds of changes translate into  09:12:09
14 clinical practice. That information would  09:12:12
15 have to disseminate somehow.  09:12:13
16 Q. Should it have disseminated somehow, could  09:12:14
17 it have impacted doctors' prescribing  09:12:17
18 behavior with respect to Neurontin for that  09:12:19
19 indication?  09:12:21
20 A. I guess potentially, again, it seems second  09:12:23
21 order relative to clinical changes.  09:12:26
22 Q. How about a discussion of the use of  09:12:27
23 Neurontin in a medical school class to  09:12:30
24 treat the applicable condition?  09:12:33
25 A. What effect would it have on current  09:12:33

Page 327

1  practice? Because it seems tenuous to me,  09:12:37
2  but...  09:12:41
3  Q. What about an effect on practice at some  09:12:42
4  point in the future?  09:12:45
5  A. Perhaps at some point in the future it  09:12:46
6  could have an effect if those students took  09:12:48
7  that knowledge and used it in practice  09:12:51
8  subsequently.  09:12:54
9  Q. How about a change in the availability of  09:12:54
10 therapeutic substitutes for treating a  09:12:56
11 particular condition?  09:12:59
12 A. That would certainly have an effect.  09:12:59
13 Q. How about FDA approval of Neurontin for a  09:13:03
14 related use?  09:13:05
15 A. That can potentially have an effect as  09:13:05
16 well.  09:13:09
17 Q. How about FDA approval of a drug with a  09:13:09
18 similar mechanism of action to Neurontin  09:13:11
19 for the applicable use?  09:13:13
20 A. I'm sorry, could you repeat it? I'm again  09:13:14
21 losing all --  09:13:21
22 Q. Yeah, sure.  09:13:21
23 A. -- the questions.  09:13:22
24    MR. POLUBINSKI: Do you want to  09:13:22
25 read it back.  09:13:23

Page 328

1  A. Thank you.  09:13:23
2     (Record read.)  09:13:23
3  A. Yes, that could have an effect.  09:13:32
4  Q. How about FDA approval of a drug with a  09:13:33
5  similar mechanism of action to Neurontin  09:13:36
6  for a related use?  09:13:39
7  A. Potentially that could have an effect as  09:13:41
8  well. Again, it seems second order.  09:13:42
9  Q. How about approval of Neurontin for the  09:13:44
10 applicable use in another country?  09:13:46
11 A. I guess possibly it could have an effect.  09:13:47
12 I think it's an empirical question. I  09:13:52
13 don't actually know.  09:13:54
14 Q. Okay. And when you say "it's an empirical  09:13:55
15 question," what does that mean?  09:13:58
16 A. I mean, it's not clear to me that  09:13:59
17 physicians in this country would be  09:14:01
18 influenced by -- would know or be  09:14:03
19 influenced by what was proved in other  09:14:05
20 countries.  09:14:09
21 Q. But you couldn't rule out the possibility  09:14:09
22 without examining the data; is that  09:14:11
23 correct?  09:14:13
24 A. That's correct. If I were interested in  09:14:13
25 that question, I would need to look at the  09:14:15

### 329

1   data.                                               09:14:17
2   Q. How about approval of Neurontin for a            09:14:17
3      related use in another country?                  09:14:21
4   A. Yes, that could have an effect in the same       09:14:22
5      way.                                             09:14:26
6   Q. An approval of a drug with a similar             09:14:26
7      mechanism of action for the applicable use       09:14:29
8      in another country?                              09:14:31
9   A. Yes.                                             09:14:33
10  Q. How about a change in information on             09:14:35
11     Neurontin in the Physicians' Desk                09:14:37
12     Reference?                                       09:14:40
13  A. Yes. I guess depending on what kind of           09:14:42
14     information you're talking about, if it          09:14:44
15     were salient information of some kind. I'm       09:14:45
16     not sure what kind of information you're         09:14:48
17     talking about.                                   09:14:49
18  Q. Well, let's think of a couple of examples.       09:14:52
19  A. Okay.                                            09:14:54
20  Q. What about a change to the long list of          09:14:55
21     possible adverse events; could that have an      09:14:57
22     impact on prescribing behavior?                  09:15:01
23  A. Potentially.                                     09:15:02
24  Q. How about a warning on the label?                09:15:02
25  A. Potentially.                                     09:15:04

### 330

1   Q. Okay. How about a change in information in       09:15:05
2      the Physicians' Desk Reference on other          09:15:12
3      drugs with a similar mechanism of action?        09:15:14
4   A. That could potentially have an effect again      09:15:15
5      in substitution.                                 09:15:18
6   Q. Okay. How about information posted on a          09:15:19
7      bulletin board on the Internet about             09:15:20
8      Neurontin and treating the applicable            09:15:24
9      condition?                                       09:15:26
10  A. I suppose plausibly that someone could use       09:15:27
11     that information.                                09:15:31
12  Q. How about more specifically information          09:15:33
13     that's posted on a medical information site      09:15:34
14     on the Internet on treatment of the              09:15:37
15     applicable condition with Neurontin?             09:15:40
16  A. I guess that could also have an effect           09:15:42
17     potentially.                                     09:15:45
18  Q. How about detailing visits about Neurontin?      09:15:52
19  A. As we discussed yesterday, we'd certainly        09:15:55
20     expect detailing visits to affect all            09:15:58
21     prescribing.                                     09:16:01
22  Q. How about detailing visits about                 09:16:02
23     competitive drugs?                               09:16:05
24  A. Yes, those should have an effect as well.        09:16:06
25  Q. Provision of samples of Neurontin without        09:16:08

### 331

1      any other informational content?                 09:16:10
2   A. I'm --                                           09:16:13
3   Q. Does my question make sense?                     09:16:16
4   A. So you mean a detailer who comes, drops off      09:16:17
5      samples and runs away without discussing         09:16:20
6      the drug?                                        09:16:22
7   Q. Without actually getting in to speak with        09:16:22
8      the doctor.                                      09:16:25
9   A. We think free samples do have an effect          09:16:25
10     independently of the detailing visit,            09:16:28
11     although it's often difficult to tell.           09:16:29
12  Q. How about provision of samples of                09:16:31
13     competitor drugs without any other               09:16:34
14     informational content?                           09:16:35
15  A. Yes, that would have an effect.                  09:16:37
16  Q. How about dissemination of the                   09:16:38
17     manufacturer's own literature or brochures       09:16:39
18     or things like that?                             09:16:42
19  A. Potentially that would have an effect.           09:16:42
20  Q. What about the relative cost or price of         09:16:46
21     Neurontin relative to -- withdrawn.              09:16:50
22         How about the cost of Neurontin              09:16:53
23     relative to competitor drugs?                    09:16:55
24  A. Cost to whom?                                    09:16:57
25  Q. Good question. Let's take, for example,          09:16:58

### 332

1      the cost to a consumer who's paying for the      09:17:05
2      prescription him or herself.                     09:17:07
3   A. So you mean a change in the co-payment, for      09:17:08
4      example?                                         09:17:10
5   Q. Uh-huh. Or for somebody who's not insured        09:17:11
6      or for whom the prescription isn't insured.      09:17:14
7   A. That price in theory would have an effect.       09:17:17
8      As you know, these price effects are hard        09:17:20
9      to identify because of the fact that most        09:17:22
10     people don't pay those prices out of             09:17:24
11     pocket.                                          09:17:26
12  Q. Okay. How about a change in the relative         09:17:26
13     cost or price of a drug paid by third-party      09:17:30
14     payers, reimbursement for the drug?              09:17:35
15  A. Potentially there could be some kind of          09:17:36
16     effect there. It's not clear that it's a         09:17:38
17     linear effect, that there is an effect for       09:17:40
18     every increment that has to do with the --       09:17:44
19     at some level the relative price may             09:17:46
20     matter.                                          09:17:47
21  Q. How about insurance coverage guidelines for      09:17:49
22     Neurontin?                                       09:17:51
23  A. Can you explain what you mean by "insurance      09:17:52
24     coverage guidelines"? Just simply whether        09:17:56
25     it's covered or not?                             09:17:58

Page 333

1  Q. Yeah.
2  A. Certainly whether it's covered or not will
3     have an effect on its use.
4  Q. And will whether or not a competitor drug
5     is covered have an effect on Neurontin's
6     use for that condition -- for the
7     applicable condition?
8  A. Yes.
9  Q. Now, we've been talking about insurance
10    coverage guidelines. How about coverage
11    guidelines for PBMs? Do you know what I'm
12    talking about when I say PBM?
13 A. I do know what you're talking about when
14    you say PBM. And, again, do you mean just
15    whether or not it's covered?
16 Q. I do.
17 A. Okay. Then the same way, must ensure that
18    a PBM is acting essentially as the insurer
19    for pharmaceuticals, so...
20 Q. How about the use of a prior authorization
21    program by a third-party payer for
22    Neurontin?
23 A. If a third-party payer required prior
24    authorization, that would have an effect on
25    Neurontin prescribing.

Page 334

1  Q. Do you know what a disease management
2     program is?
3  A. I do. Do you?
4  Q. Why don't I ask you to tell me what it is,
5     at least as you understand it.
6  A. Disease management programs are usually
7     condition-specific, although sometimes
8     they're more complex efforts to coordinate
9     and improve the quality of care for people
10    with chronic diseases, clearly.
11 Q. Okay. Would the implementation of a
12    disease management program have an
13    impact -- an implementation of a disease
14    management program that offers guidelines
15    in the treatment of the applicable
16    condition have an impact on the use of
17    Neurontin to treat that condition?
18 A. Again, if that program had guidelines that
19    were specific to Neurontin therapy, then
20    that could have an effect.
21 Q. Are you familiar with the term "academic
22    detailing"?
23 A. I am.
24 Q. What does that mean?
25 A. Academic detailing is an effort to inform

Page 335

1     physicians about pharmaceutical therapies
2     generally, it could be on any topic, but
3     pharmaceutical therapies in the same way
4     that the industry does but using scientific
5     data instead of commercial promotional
6     information. So it's one-on-one. That's
7     the important piece of it, is that it's
8     peer-to-peer, one-on-one counseling.
9  Q. Would the implementation of an academic
10    detailing program on Neurontin have an
11    impact on prescription behavior with
12    respect to Neurontin?
13 A. If such a program were targeting Neurontin
14    use, then yes.
15 Q. All right. How about the availability of
16    Neurontin on a hospital or insurance
17    formulary?
18 A. Whether it's on the formulary would be
19    similar to whether it's covered, so yes,
20    the same way.
21 Q. And how about the availability of a
22    competitor drug on a formulary, an
23    insurance or hospital formulary?
24 A. Yes, same.
25 Q. How about a decision by a hospital to bar

Page 336

1     acceptance of samples by its professionals?
2  A. Yes, I would expect that to have some
3     effect.
4  Q. How about a newspaper article reflecting
5     concerns about improper promotion by
6     defendants for off-label uses?
7  A. I suppose that could have some effect as
8     well.
9  Q. And you're familiar with the Franklin case;
10    you testified about that yesterday?
11 A. Yes.
12 Q. How about a news broadcast on the Franklin
13    case; would that have an impact on doctors'
14    prescribing behavior of Neurontin?
15 A. Potentially.
16 Q. How about an advertisement by a law firm
17    seeking to recruit individuals who have
18    taken Neurontin to file personal injury
19    lawsuits against the defendants?
20 A. I guess I'm not sure how those would get
21    out to physicians, but if physicians saw
22    such advertisements, possibly.
23 Q. So am I correct that your model would need
24    to at least consider whether to take into
25    account each of the factors that we've just

### 337

1  discussed in determining the effects of
2  off-label promotional events and
3  expenditures on total aggregate
4  prescriptions of Neurontin?
5  A. So the model -- in setting up the model
6     I'll consider those factors that I deem to
7     be important determinants of quantity and
8     in particular where I would spend most of
9     my time worrying about those where the
10    timing is correlated with the off-label
11    promotions, the levels. The intensity of
12    these other factors could be correlated and
13    therefore confused with the off-label
14    promotions.
15         In addition, there are elements of
16    the model intended to capture some of these
17    other factors. For example, by using time
18    trends, linear quadratic time trends to
19    capture other secular trends in what's
20    happening in the market by including
21    variables on other drugs. So certainly
22    those factors would be considered and
23    incorporated either explicitly or captured
24    in the time trend, the secular trend.
25 Q. Okay. Just so I understand it, though, I

### 338

1     think you are saying that you would need to
2     at least consider the various factors that
3     we talked about?
4  A. Can we agree what "consider" means?
5  Q. Consider to the extent they need to be
6     reflected in your model.
7  A. Certainly I'll consider a wide range of
8     factors, including the types that we've
9     just discussed.
10 Q. Do you know how many in total there could
11    be?
12 A. No, I don't think it's possible to say.
13    And certainly the numbers depend on whether
14    you define them as finely as you have done
15    or if you, say, consider, you know,
16    promotional efforts of competitors, new
17    drug introduction, so there may be many
18    that we consider.
19 Q. There could be -- withdrawn.
20         How do you plan to consider these
21    different factors?
22 A. Well, I will start with the literature on
23    what -- the impact of promotion on drug
24    utilization and look at models that have
25    been done in the past and what factors

### 339

1     they've included, and certainly of course
2     those do include things like, as you've
3     mentioned, competitor new drug entry into
4     the class, competitors' promotional
5     efforts, other secular trends that may
6     affect prescribing.
7  Q. Aside from reviewing the literature to see
8     what past models have done, what else would
9     you need to do?
10 A. The first place I would start is the
11    literature for sure. I may consult some of
12    my clinical colleagues as well.
13    Particularly I may try to find experts in
14    the treatment -- in the areas of treatment
15    for the indications that ultimately I'm
16    asked to model the indications.
17 Q. Do you need, yourself, to actually look at
18    data with respect to some number or all of
19    these factors to figure out whether they
20    had a measurable impact on prescription
21    decisions?
22 A. Not necessarily. Modeling strategies
23    generally -- and economics you start with a
24    good theoretical model and include those
25    variables that should theoretically be

### 340

1     included. There is, of course, some point
2     when you're specifying the model itself
3     that you need to look at data. You can't
4     always include all variables because of
5     high degrees of correlation, for example.
6     Then at that point I would need to see
7     data, but the starting point is really to
8     develop a good theory.
9  Q. But at some point -- I guess would you rely
10    on your theory alone, then, to rule out
11    whether to consider individual factors in
12    running your model?
13 A. Not alone, but in some cases I might rely
14    alone on the theories. For example, there
15    are some things that I wouldn't include,
16    the ambient temperature based on the theory
17    that it has no affect on Neurontin
18    prescribing, and so I wouldn't consider
19    data on that.
20 Q. Fair enough. I think what we're talking
21    about are the factors that we've just
22    discussed. For purposes of those factors
23    do you anticipate relying on the literature
24    to exclude any of them from your analysis?
25 A. I would anticipate relying on the

## Page 341

1  literature and data where possible, but it  09:26:27
2  does seem possible to me that I won't have  09:26:29
3  data on every one of those factors, and  09:26:31
4  then I would rely on theory and the  09:26:33
5  literature as to whether it was an  09:26:35
6  important factor.  09:26:41
7  Q. Maybe just to get a little more precision  09:26:54
8  on this why don't we go back and look at a  09:26:57
9  few of these individual things --  09:27:00
10 A. Okay. The ones you mentioned?  09:27:00
11 Q. Yeah, a few of the factors that we  09:27:01
12 discussed --  09:27:03
13 A. Okay.  09:27:03
14 Q. -- that you said might impact physician  09:27:03
15 prescribing behavior. Let's start with the  09:27:05
16 first one, which is an article in a peer-  09:27:09
17 reviewed medical publication on the use of  09:27:12
18 Neurontin to treat the applicable  09:27:13
19 condition.  09:27:15
20 A. Okay.  09:27:15
21 Q. How do you anticipate that you would go  09:27:15
22 about finding out whether you would include  09:27:20
23 that particular publication -- whether you  09:27:22
24 would include publication of a particular  09:27:24
25 article in your model?  09:27:25

## Page 342

1  A. In that case of those articles, if there  09:27:28
2  were significant studies published, new  09:27:32
3  data published on Neurontin, in all  09:27:34
4  likelihood we would search PubMed and find  09:27:36
5  those articles and look to see about their  09:27:41
6  timing and see whether it made sense to  09:27:43
7  include them in the model.  09:27:46
8  Q. And so you would analyze each individual  09:27:50
9  article as to whether it fit that -- fit  09:27:52
10 those criteria?  09:27:54
11 A. In all likelihood the number of articles  09:27:55
12 providing new data on Neurontin is a  09:27:58
13 reasonable number that we can find in the  09:28:00
14 literature review and decide which of them  09:28:02
15 provides new data on either effects or side  09:28:05
16 effects of Neurontin.  09:28:09
17 Q. What would you believe the reasonable  09:28:10
18 number to be for purposes of your last  09:28:14
19 answer?  09:28:16
20 A. You mean whether it would be feasible?  09:28:16
21 Q. Yeah.  09:28:19
22 A. I don't know. Something less than a  09:28:19
23 thousand.  09:28:21
24 Q. Okay. But it's at least possible that some  09:28:21
25 number less than a thousand articles would  09:28:35

## Page 343

1  have had some impact on prescribing  09:28:38
2  behavior of Neurontin --  09:28:41
3          MR. NOTARGIACOMO: Objection.  09:28:42
4  Q. -- for off-label uses?  09:28:43
5  A. I believe I've already said it's at least  09:28:44
6  possible.  09:28:46
7  Q. Okay. We also talked about new articles in  09:28:46
8  peer-reviewed medical publications on the  09:28:55
9  use of drugs with similar mechanisms of  09:28:59
10 action to Neurontin to treat conditions.  09:29:01
11 How would you go about determining whether  09:29:04
12 that's a factor that you would include in  09:29:06
13 your model?  09:29:08
14 A. I think in that case I would need to  09:29:09
15 consult a clinical expert in those areas.  09:29:12
16 Clearly I couldn't make that judgment about  09:29:15
17 whether it was a similar mechanism.  09:29:18
18 Q. And once -- well, first question is, you  09:29:28
19 haven't consulted a clinical expert on that  09:29:30
20 now, I take it?  09:29:32
21 A. No, I have not.  09:29:32
22 Q. Okay. And then when you did, if you came  09:29:33
23 up with a list of drugs with a similar  09:29:37
24 mechanism of action, would you do the same  09:29:39
25 sort of search of PubMed that you described  09:29:42

## Page 344

1  before --  09:29:45
2  A. Poten --  09:29:45
3  Q. -- for articles?  09:29:46
4  A. Sorry. I'm still cutting you off.  09:29:47
5          Potentially in combination with  09:29:52
6  some input from said clinical expert, so it  09:29:54
7  would certainly make sense to use some  09:29:56
8  clinical expertise on what were the  09:30:02
9  important trends in treatment in this area.  09:30:04
10 Q. Okay. One of the other factors that we  09:30:06
11 discussed was a continuing medical  09:30:16
12 education seminar addressing the use of  09:30:18
13 Neurontin to treat an applicable condition.  09:30:20
14 How would you go about determining whether  09:30:22
15 a particular seminar would have had an  09:30:25
16 impact on prescribing behavior?  09:30:27
17 A. So in part we have seen data collected by  09:30:28
18 Parke-Davis, fill in Warner-Lambert there.  09:30:34
19 Q. We can say defendants, to make it easier.  09:30:39
20 A. Defendants. The defendants have some data  09:30:41
21 on CME, continuing medical education, for  09:30:42
22 Neurontin. They have documented events and  09:30:47
23 attendance, that sort of thing. So we do  09:30:50
24 have some data there. And so I would start  09:30:53
25 with that.  09:30:57

### Page 345

1  Q. Are there any other sources of data that                09:30:57
2      you would look to on this, or would that be            09:30:59
3      the principal source?                                  09:31:01
4  A. I think that would be the principal source.             09:31:02
5      There are also data collected by IMS Health            09:31:04
6      in the aggregate on meetings and events                09:31:08
7      associated with drugs, including Neurontin             09:31:11
8      and Neurontin's competitors.                           09:31:14
9  Q. Okay. In terms of the first category of                 09:31:16
10     data, the data from defendants, is it your             09:31:22
11     understanding that that data will include              09:31:29
12     information about events that the                      09:31:31
13     defendants didn't sponsor? When I say                  09:31:33
14     "events," I mean continuing medical                    09:31:36
15     education events.                                      09:31:38
16 A. I'm not altogether clear on whether they                09:31:39
17     only have data on events that they                     09:31:43
18     sponsored or events where they had                     09:31:44
19     sponsored a speaker, for example, so made a            09:31:46
20     payment for a physician to give a talk                 09:31:50
21     about research. So it may be that there                09:31:53
22     are some meetings and events that they                 09:31:56
23     don't have direct spending -- direct record            09:31:58
24     of.                                                    09:32:00
25 Q. Is it your view that meetings or events                 09:32:03

### Page 346

1      that weren't supported by the defendants               09:32:06
2      could have had an impact on prescribing                09:32:08
3      behavior of Neurontin for off-label uses?              09:32:10
4  A. Potentially.                                            09:32:12
5  Q. And how would you go about finding out                  09:32:15
6      whether those events had a measurable                  09:32:16
7      impact?                                                09:32:18
8  A. I think at this point I haven't tried to                09:32:18
9      get all the data on this, but I guess as a             09:32:23
10     starting place I would start with the                  09:32:25
11     relevant medical societies. So, again,                 09:32:27
12     condition by condition there would be                  09:32:32
13     different relevant medical societies.                  09:32:33
14 Q. When you say you would start with the                   09:32:38
15     relevant medical societies, what would you             09:32:40
16     do?                                                    09:32:43
17 A. So contact, excuse me, the medical                      09:32:43
18     education staff at the medical societies               09:32:45
19     for neurology, for psychiatry, yes, as was             09:32:48
20     relevant, see what kind of data they had.              09:32:53
21 Q. And what impact would it have on your                   09:32:57
22     analysis if they didn't have data                      09:33:00
23     stretching back to the beginning of the                09:33:02
24     class period, 1994?                                    09:33:03
25 A. Then I would have to consider other                     09:33:05

### Page 347

1      mechanisms for modeling that effect.                   09:33:09
2  Q. What other mechanisms would you consider?               09:33:17
3  A. So in part the time trend might pick up                 09:33:20
4      these kinds of events. The other variables             09:33:23
5      that we talked about, including publication            09:33:28
6      of new articles, might pick up the timing              09:33:30
7      of these events. If the publication of new             09:33:33
8      articles, you know, was -- as you may know,            09:33:35
9      the timing of publication of new releases              09:33:40
10     is often coordinated with national                     09:33:42
11     meetings.                                              09:33:45
12         So, for example, you always see                    09:33:45
13     the latest results of cardiovascular                   09:33:47
14     disease clinical trials come out at the                09:33:51
15     same time as the big CME events for                    09:33:53
16     cardiovascular specialists. And so I                   09:33:57
17     looked at those kinds of data.                         09:34:00
18 Q. When you say in your last answer "pick up               09:34:02
19     the timing of these events" --                         09:34:05
20 A. Yes.                                                    09:34:08
21 Q. -- can you tell me what that means?                     09:34:08
22 A. It would be because the events in the model             09:34:09
23     essentially would be capturing a point in              09:34:11
24     time. There are indicator variables as I               09:34:17
25     described, so if there was an event, there             09:34:19

### Page 348

1      would be a variable for the point in time              09:34:21
2      at which that happens, and then potentially            09:34:23
3      the time since the event, and therefore if             09:34:26
4      a meeting and an article come out at the               09:34:30
5      same time, they essentially are capturing              09:34:32
6      the same information as far as the model's             09:34:34
7      concerned.                                             09:34:37
8  Q. Assuming that the two are coordinated?                  09:34:38
9  A. Right.                                                  09:34:40
10 Q. How would you decide whether they're                    09:34:40
11     sufficiently coordinated that you would be             09:34:44
12     able to use that analysis?                             09:34:46
13 A. Well, I would have to review on a case-by-              09:34:47
14     case basis.                                            09:34:50
15 Q. When you say "a case-by-case basis," would              09:34:50
16     that be with respect to each individual                09:34:54
17     event?                                                 09:34:55
18 A. Again, I think in this area I would consult             09:34:56
19     someone who's an expert in the treatment of            09:35:00
20     this particular condition for a way to                 09:35:02
21     prioritize what are the important meetings,            09:35:05
22     for example, what were the important                   09:35:09
23     clinical findings from this era.                       09:35:11
24 Q. And, again, just going back to where you                09:35:18
25     would come up with a list of meetings,                 09:35:20

### Page 349

1   other than reaching out to the relevant          09:35:23
2   medical societies?                                09:35:25
3   A. And defendants' own data. Again, IMS          09:35:26
4   Health tracks these, tracks spending for         09:35:31
5   events, meetings and events, and I would         09:35:32
6   look to other data sources in the industry.      09:35:35
7   Q. Okay. Let's go on to one of the other         09:35:37
8   factors.                                          09:35:40
9   A. Okay.                                          09:35:40
10  Q. One of the other things that we agreed        09:35:41
11  might impact prescribing behavior in the         09:35:43
12  aggregate would be an informal conversation      09:35:45
13  among doctors -- or informal conversations       09:35:49
14  among doctors -- let's put it that way --        09:35:52
15  A. Yes.                                           09:35:54
16  Q. -- about the doctors' clinical experience    09:35:54
17  in the use of Neurontin to treat the             09:35:57
18  applicable condition. How would you decide       09:35:58
19  whether to incorporate that into your            09:36:00
20  model?                                            09:36:02
21  A. So clearly that would not be incorporated     09:36:02
22  into the model. That's -- as we talked           09:36:04
23  about yesterday, the model doesn't include       09:36:08
24  every factor. It's a simplification of           09:36:11
25  reality that focuses on major factors and        09:36:15

### Page 350

1   particularly those that might be correlated      09:36:19
2   with the variable of interest, again, the        09:36:21
3   allegedly illegal promotional activity.          09:36:24
4        And so in the case of                        09:36:27
5   conversations between doctors I have no          09:36:28
6   reason to believe that those, other than         09:36:32
7   those caused by the allegedly illegal            09:36:34
8   activities, would be correlated with the         09:36:36
9   allegedly illegal activities. And in             09:36:40
10  effect transmission of information among         09:36:43
11  physicians would be captured in that time        09:36:46
12  trend.                                            09:36:49
13  Q. How confident are you that conversations      09:36:49
14  among doctors couldn't be correlated with        09:36:55
15  off-label promotion in some way? So in           09:36:57
16  other words, you know, isn't it possible at      09:36:59
17  least that, you know, by virtue of, you          09:37:01
18  know, buzz in the medical community, for         09:37:07
19  lack of a better word, about a particular        09:37:09
20  off-label use that the defendants would          09:37:10
21  increase off-label promotion?                    09:37:11
22  A. Well, again, the model will took to the       09:37:12
23  specific timing of the promotional events,       09:37:16
24  and so if the buzz preceded the promotional      09:37:18
25  events or activities, then the buzz would        09:37:21

### Page 351

1   be captured as something other than caused       09:37:25
2   by the allegedly illegal activities.             09:37:29
3        And so because I'll be looking at           09:37:31
4   the specific time of these events and            09:37:34
5   separating out secular trends, which would       09:37:35
6   include the sort of natural diffusion of         09:37:38
7   information about Neurontin, I'm fairly          09:37:40
8   confident that those things can be               09:37:43
9   separated.                                        09:37:45
10  Q. If they couldn't be separated, your results   09:37:52
11  would be biased; is that correct?                09:37:57
12  A. If there was a correlation between them,      09:37:58
13  then there would be some bias, yes.              09:38:04
14  Q. And if they were correlated -- well, I'll    09:38:12
15  withdraw the question.                           09:38:17
16       All right. One of the other                 09:38:20
17  things that we discussed was changes in          09:38:23
18  practice guidelines within an institution        09:38:26
19  or professional group on the use of              09:38:29
20  Neurontin to treat a particular condition?       09:38:31
21  A. Yes.                                          09:38:34
22  Q. We agreed that that could potentially         09:38:34
23  impact prescribing behavior in the               09:38:36
24  aggregate, correct?                              09:38:37
25  A. Yes, we did.                                  09:38:38

### Page 352

1   Q. How would you go about determining whether   09:38:39
2   or not to include that factor in your            09:38:42
3   model?                                            09:38:43
4   A. I guess, again, in this case it would make   09:38:44
5   sense to consult a clinical expert for the       09:38:47
6   conditions considered.                           09:38:49
7   Q. What information would you get from the       09:38:50
8   clinical expert?                                  09:38:52
9   A. About standard practices in terms of          09:38:52
10  guidelines. Guidelines are variably used,        09:38:57
11  as you know, by condition, for cancer, for       09:39:02
12  example. Cancer treatment is almost purely       09:39:06
13  protocol-driven. That's well-known. Many         09:39:08
14  other kinds of conditions there are very         09:39:11
15  few protocols for treatment, particularly        09:39:15
16  specific protocols about drugs. So I would       09:39:17
17  talk to clinical experts to understand           09:39:20
18  better the patterns of treatment with            09:39:22
19  regard to these protocols.                       09:39:24
20  Q. Would you expect the clinical expert to be    09:39:28
21  able to provide you with information about       09:39:30
22  implementation of particular practice            09:39:34
23  guidelines at particular institutions?           09:39:36
24  A. It's not clear to me that that would be       09:39:37
25  relevant until I consulted with the              09:39:40

### Page 353

1  clinical expert to find out whether 09:39:42
2  guidelines such as these are used at all. 09:39:43
3  Q. Fair enough. But at this point you haven't 09:39:46
4  had that consultation? 09:39:48
5  A. At this point I have not had that 09:39:49
6  consultation. 09:39:51
7  Q. All right. One of the other factors that 09:39:52
8  we discussed was a new development in the 09:39:53
9  underlying science of the particular field? 09:39:55
10 A. Yes. 09:39:59
11 Q. Assuming that that were disseminated 09:39:59
12 somehow to the prescribing public, how 09:40:02
13 would your model seek to take that into 09:40:06
14 account? 09:40:08
15 A. Well, again, I think it would make sense to 09:40:08
16 look at large significant trends in basic 09:40:11
17 science as it relates to these particular 09:40:15
18 types of drugs and conditions, and that 09:40:17
19 would take some clinical expertise, some 09:40:19
20 scientific expertise. 09:40:21
21 Q. And so is that another category of issues 09:40:24
22 on which you would consult with a clinical 09:40:26
23 expert? 09:40:28
24 A. I think that probably would be -- 09:40:28
25 Q. And the consult -- go ahead. I'm sorry, I 09:40:31

### Page 354

1  didn't mean to cut you off. 09:40:34
2  A. -- would be in the category of 09:40:36
3  understanding better the clinical decisions 09:40:37
4  around each specific condition that I 09:40:40
5  model, and all of these factors, trends and 09:40:43
6  treatment, new drugs, new science, would be 09:40:45
7  part of that conversation. 09:40:48
8  Q. And what information would you seek to get 09:40:51
9  out of the conversation, at least with 09:40:57
10 respect to this particular issue, a new 09:40:58
11 development in the underlying science? 09:41:01
12 A. So, again, potentially it's not altogether 09:41:03
13 clear to me that this is relevant, so the 09:41:06
14 new development in the science may have a 09:41:08
15 similar effect, for example, on all drugs 09:41:12
16 in the therapeutic class, and therefore it 09:41:16
17 may not enter the model in the same way. 09:41:18
18 So I guess I would hope to understand in 09:41:21
19 talking with a clinical expert if there 09:41:23
20 were trends that were likely to change the 09:41:26
21 off-label uses, change the use of off-label 09:41:29
22 prescribing. 09:41:32
23       And so I think without a specific 09:41:33
24 example it's hard for me to tell you 09:41:37
25 exactly how that would enter the model, but 09:41:39

### Page 355

1  if there was information, for example, 09:41:41
2  suddenly that this -- the whole class of 09:41:44
3  drugs is -- becomes clear that it's less 09:41:47
4  useful for treating this condition, then I 09:41:50
5  would expect that to have an effect, not 09:41:53
6  only on Neurontin prescribing, but on 09:41:56
7  prescribing of competitor drugs for the 09:41:58
8  same off-label uses. 09:42:00
9  Q. Okay. Let's take that example that you 09:42:02
10 just gave. 09:42:04
11 A. Okay. 09:42:05
12 Q. If you learned -- if you learned that there 09:42:05
13 were trends of that kind, that it became 09:42:10
14 clear that, you know, at some point in time 09:42:13
15 that this whole class of drugs is less 09:42:17
16 useful in treating the applicable 09:42:19
17 condition, how would you seek to 09:42:21
18 incorporate that into your model? 09:42:22
19 A. Generally speaking, through another 09:42:24
20 variable about the dissemination, another 09:42:27
21 indicator variable about the dissemination 09:42:30
22 of that information, and it could be 09:42:32
23 modeled again as in the more detailed model 09:42:34
24 that I described in my declaration using a 09:42:36
25 comparison drug that should have the same 09:42:40

### Page 356

1  effect. 09:42:42
2  Q. How would you determine the timing of that 09:42:43
3  effect? 09:42:51
4  A. Based on publication of literature, in all 09:42:51
5  likelihood. 09:43:01
6  Q. All right. Here's another one: How about 09:43:04
7  FDA approval of a drug with a similar 09:43:06
8  mechanism of action for the applicable use? 09:43:08
9  We talked about how this might impact 09:43:11
10 prescribing behavior in the aggregate. How 09:43:13
11 would you go about -- how do you go about 09:43:16
12 determining how to incorporate that into 09:43:19
13 your model? 09:43:22
14 A. If there were a new entrant in the class, I 09:43:22
15 would in all likelihood include the entry 09:43:27
16 of that drug as part of the model. 09:43:28
17 Q. How would you identify which drug to 09:43:36
18 include? 09:43:38
19 A. Can you explain -- 09:43:38
20 Q. In other words, how would you identify 09:43:42
21 whether a particular drug other than 09:43:43
22 Neurontin is relevant in terms of an 09:43:44
23 additional approval by the FDA? 09:43:46
24 A. Sorry, I'm still not sure that -- so 09:43:48
25 whether a drug is a clinical substitute for 09:43:55

357

1  Neurontin for a particular indication, how                09:43:58
2  would I identify that?                                    09:44:00
3  Q. Let's just back up. I think we had agreed              09:44:01
4     that FDA approval of a drug with a similar             09:44:03
5     mechanism of action for the applicable use             09:44:07
6     might impact physicians' prescribing                   09:44:10
7     behavior in the aggregate; is that right?              09:44:13
8        MR. NOTARGIACOMO: Objection,                        09:44:14
9     asked and answered.                                    09:44:15
10 A. Yes. And I think I understood that to                  09:44:16
11    mean --                                                09:44:19
12 Q. Okay.                                                  09:44:19
13 A. -- a drug that was potentially                         09:44:19
14    substitutable for Neurontin --                         09:44:22
15 Q. Fair enough.                                           09:44:22
16 A. -- for the treatment.                                  09:44:24
17 Q. Okay. Fair enough. How would you come up               09:44:25
18    with a list of drugs that would potentially            09:44:27
19    be substitutable for Neurontin?                        09:44:29
20 A. Again, such a list would be developed in               09:44:30
21    consultation with a clinical expert in the             09:44:33
22    area.                                                  09:44:35
23 Q. Okay. And, again, you haven't had that                 09:44:35
24    consultation at this point?                            09:44:38
25 A. No, I have not.                                        09:44:40

358

1  Q. How about approval of a drug with a similar            09:44:41
2     mechanism of action for the applicable use             09:44:55
3     in another country? We agreed that that                09:44:57
4     might impact physician prescribing                     09:44:59
5     behavior. How would you go about                       09:45:02
6     determining whether to incorporate that                09:45:03
7     factor into your model?                                09:45:05
8        MR. NOTARGIACOMO: Objection.                        09:45:06
9  A. That factor, I would expect to have                    09:45:10
10    information on that from defendants. I'm               09:45:11
11    sorry, are we talking about Neurontin?                 09:45:14
12 Q. We're talking about a drug with a similar              09:45:15
13    mechanism of action.                                   09:45:17
14 A. I'm -- it's not clear to me that that's                09:45:18
15    going to be an important factor, and I                 09:45:21
16    haven't thought about how to incorporate               09:45:23
17    it. I believe that we're getting further               09:45:25
18    and further away from the central issue.               09:45:28
19 Q. How would you determine whether it's an                09:45:34
20    important factor or not? You said it's not             09:45:35
21    clear to you now whether or not it is.                 09:45:37
22 A. I guess, you know, I would review the data,            09:45:39
23    and to my knowledge, that kind of factor is            09:45:42
24    not generally included looking at use of               09:45:46
25    drugs, for example, in all the studies that            09:45:48

359

1  we've looked at before, so it's not clear                 09:45:50
2  to me that there's a very strong tie there.               09:45:53
3     So, you know, I would certainly                        09:45:55
4  consider that in reviewing the literature                 09:45:57
5  and sort of developing the theoretical                    09:46:00
6  model, but it seems like a second order                   09:46:04
7  issue to me at this point.                                09:46:06
8  Q. Without yet having reviewed the data or --             09:46:07
9  A. Without having seen the complete data yet.             09:46:10
10 Q. We'll only do this for a couple more.                  09:46:13
11    Information posted on a medical                        09:46:22
12 information site on the Internet related to               09:46:25
13 use of Neurontin for treatment of the                     09:46:27
14 applicable condition, we agreed that that                 09:46:29
15 might impact prescribing behavior in the                  09:46:32
16 aggregate, correct?                                       09:46:34
17       MR. NOTARGIACOMO: Objection.                        09:46:35
18 A. That's correct.                                        09:46:35
19 Q. How would you go about determining whether             09:46:37
20    or not to include that factor in your                  09:46:41
21    model?                                                 09:46:43
22 A. I think that would fall -- I mean, I would             09:46:44
23    certainly have to consider it, but I think             09:46:46
24    that falls in the category of factors that             09:46:48
25    are in the background. I have no                       09:46:50

360

1  theoretical reason to believe it's                        09:46:52
2  correlated with the off-label prescribing,                09:46:53
3  the illegally -- excuse me, the allegedly                 09:46:58
4  illegal off-label prescribing activities.                 09:47:01
5  Q. Okay. Let me ask you a couple things about             09:47:03
6  that. When you say you think it's                         09:47:05
7  something that's in the background, what                  09:47:06
8  does that mean?                                           09:47:08
9  A. There's a notion that there are many                   09:47:08
10 unmeasurable factors that may have small                  09:47:11
11 effects on the decision to prescribe a drug               09:47:14
12 or take a drug and that the model would not               09:47:19
13 capture every one of these factors, would                 09:47:23
14 capture the major ones and those that I                   09:47:25
15 believe have the greatest potential to be                 09:47:28
16 confounded with the variable of interest.                 09:47:31
17 Q. Okay. Do you have an understanding as to               09:47:32
18    the extent to which doctors might consult              09:47:34
19    medical information sites in making                    09:47:36
20    treatment decisions?                                   09:47:38
21 A. I don't have any -- you mean, do I have a              09:47:39
22    quantitative estimate of that?                         09:47:42
23 Q. (No verbal response.)                                  09:47:43
24 A. I do not.                                              09:47:44
25 Q. Do you have any sense for that, I mean,                09:47:45

Page 361

```
 1    whether it's something that doctors might
 2    do in deciding how to treat their patients?
 3  A. I don't have a sense that that is
 4    scientifically backed up, so I wouldn't
 5    want to give you my just general
 6    impression.
 7  Q. Yeah, I guess I'm just trying to
 8    understand, I think, what the -- you know,
 9    what -- at least at this point what the
10    basis is for your assumption that this
11    would be an issue that's in the background.
12  A. The basis for my assumption is that it's --
13    there's no reason to believe that suddenly
14    that would start happening independently.
15    Again, independently it's happening at just
16    the same time that defendants began
17    promoting their drug for an off-label use.
18  Q. You would agree that it's at least possible
19    that the defendants would be monitoring the
20    same medical information websites that
21    doctors might be, correct?
22  A. It is at least possible, but, again, since
23    I'm relying on timing for identification in
24    my model, if the website preceded the
25    defendants' allegedly illegal activities,
```

Page 362

```
 1    it would get picked up in the time trend
 2    and not picked up in those variables that
 3    represent the activities.
 4  Q. How would you go about determining when the
 5    postings on the website would have
 6    occurred?
 7  A. Again, I wouldn't -- that's not the way the
 8    model would work. I determine when the
 9    allegedly illegal activities occurred, and
10    these other activities that may change over
11    time that may diffuse over time would get
12    picked up in the time trend.
13  Q. Right. But I guess what we're talking
14    about, I guess -- well, withdrawn.
15        If you're relying on the timing to
16    separate out any possible correlation
17    between the two, isn't it important to know
18    the timing that the posting on the medical
19    information website -- the timing of the
20    posting on the particular medical
21    information website?
22  A. It's only important to separate out if it
23    is miraculously simultaneous to the timing
24    of the events that I'm modeling; that is,
25    it doesn't -- it's not that it's going on
```

Page 363

```
 1    at the same time but that it begins -- it
 2    has a similar pattern over time. And so
 3    that's -- and rather than test for any
 4    possible events that might have had that
 5    same timing, one has to consider whether
 6    it's possible for events to have the same
 7    idiosyncratic patterns as the events of
 8    interest here.
 9  Q. Let me ask it another way. Are you aware
10    of any way, as you sit here now, in which
11    you would be able to determine the timing
12    of postings on the Internet on medical
13    information websites on the use of
14    Neurontin to treat certain off-label --
15    certain off-label conditions?
16  A. It's not an issue I've looked into, no,
17    so...
18  Q. And assuming that the posting of
19    information on the use of Neurontin to
20    treat an applicable condition does have an
21    impact on prescribing behavior and assuming
22    that it's possible at least that it's
23    correlated with the defendants' promotion
24    for that off-label use, isn't it important
25    that you be able to tell which came first,
```

Page 364

```
 1    a posting on the medical information
 2    website or the promotion?
 3         MR. NOTARGIACOMO: Objection,
 4    asked and answered.
 5  A. I think, again, that's -- the way the model
 6    works is that if they're exactly -- if you
 7    want me to assume that they happen at
 8    exactly the same time, then they are
 9    perfectly correlated and by definition
10    can't be separated, but when you do an
11    event study such as this, we look at the
12    timing of the event of interest. We don't
13    then measure every other event, and in part
14    some of the identification comes from the
15    fact that we can compare, for example,
16    treatment -- treatment for the particular
17    indication by use of Neurontin with other
18    drugs in the same class at the same time to
19    get additional identification.
20        So if that information were
21    disseminated and were broadly about the
22    use, for example, of anticonvulsants for
23    bipolar disorder, then we could see it
24    being picked up in these other drugs and
25    separate out the activities there from what
```

14 (Pages 361 to 364)

365

| | | |
|---|---|---|
| 1 | was going on with Neurontin. So there are | 09:52:32 |
| 2 | ways of identifying that in part, but the | 09:52:34 |
| 3 | general strategy is not to look at the | 09:52:36 |
| 4 | timing of every possible confounding event | 09:52:38 |
| 5 | but to be as detailed as possible about the | 09:52:41 |
| 6 | events in question. | 09:52:44 |
| 7 | (Pause.) | 09:53:17 |
| 8 | Q. Okay. We discussed yesterday that in order | 09:53:18 |
| 9 | to conduct your analysis, you or somebody | 09:53:20 |
| 10 | would need to determine whether a given | 09:53:24 |
| 11 | factor or a given expenditure is subject to | 09:53:26 |
| 12 | the alleged violations; is that correct? | 09:53:28 |
| 13 | A. That I would be directed by counsel about | 09:53:30 |
| 14 | which particular activities were subject to | 09:53:34 |
| 15 | the action in question, yes. | 09:53:36 |
| 16 | Q. Maybe -- well, let's -- I think that's one | 09:53:40 |
| 17 | of the things that I would like to try to | 09:53:45 |
| 18 | unwind. | 09:53:47 |
| 19 | A. Okay. | 09:53:48 |
| 20 | Q. We did agree that it's important to | 09:53:48 |
| 21 | determine which factors fall within XJT and | 09:53:50 |
| 22 | which factors fall within XKT? | 09:53:55 |
| 23 | A. Yes, that's right. | 09:53:58 |
| 24 | Q. Okay. Is it correct that you are going to | 09:53:59 |
| 25 | be relying on counsel to identify whether | 09:54:04 |

366

| | | |
|---|---|---|
| 1 | each individual factor should fall within | 09:54:07 |
| 2 | XKT or XJT? | 09:54:09 |
| 3 | A. I'm not sure if I understand precisely, but | 09:54:11 |
| 4 | maybe I could give an example -- | 09:54:16 |
| 5 | Q. Sure. | 09:54:17 |
| 6 | A. -- of what I expect to learn. That, for | 09:54:18 |
| 7 | example, I expect the counsel to tell me | 09:54:20 |
| 8 | for which indications the promotional | 09:54:26 |
| 9 | activities appear to be illegal and for | 09:54:29 |
| 10 | which ones are being pursued, so for | 09:54:33 |
| 11 | example, maybe the commercial activities | 09:54:36 |
| 12 | with regard to some indications will be | 09:54:37 |
| 13 | considered allegedly illegal and some | 09:54:40 |
| 14 | won't. That will, of course, determine | 09:54:44 |
| 15 | which indications I model in general. | 09:54:45 |
| 16 | And then in particular it may be | 09:54:48 |
| 17 | deemed that certain kinds of activities, | 09:54:50 |
| 18 | meetings and events versus dinners, will be | 09:54:54 |
| 19 | considered to be the activities that | 09:54:57 |
| 20 | counsel's determined are part of the | 09:55:03 |
| 21 | allegations ultimately, and those are the | 09:55:05 |
| 22 | ones that I will be looking at the effects | 09:55:07 |
| 23 | of. But in part also it may be that some | 09:55:09 |
| 24 | things are not separable, as we talked | 09:55:19 |
| 25 | about yesterday. | 09:55:21 |

367

| | | |
|---|---|---|
| 1 | So, for example, detailing, if in | 09:55:21 |
| 2 | the data I can't determine whether the | 09:55:24 |
| 3 | detailing was for an indication using | 09:55:26 |
| 4 | information that was allegedly illegal in | 09:55:32 |
| 5 | the sense that it's going to be part of | 09:55:35 |
| 6 | this action, then those would have to be | 09:55:37 |
| 7 | left in the other side of promotion, the | 09:55:41 |
| 8 | routine -- what's considered to be routine | 09:55:47 |
| 9 | and legal promotional activities? | 09:55:49 |
| 10 | Q. In terms of the last determination that you | 09:55:51 |
| 11 | just discussed -- | 09:55:53 |
| 12 | A. Yeah. | 09:55:55 |
| 13 | Q. -- who's making that decision, you or | 09:55:55 |
| 14 | counsel or somebody else? | 09:55:57 |
| 15 | A. Well, in part it would have to do with the | 09:55:58 |
| 16 | data in consultation with counsel about | 09:56:01 |
| 17 | what the Court has indicated they can look | 09:56:05 |
| 18 | at in terms of -- so we -- you know, as we | 09:56:08 |
| 19 | discussed yesterday, I'm confused about the | 09:56:11 |
| 20 | difference between fraudulent and illegal, | 09:56:12 |
| 21 | but if there is some nuance there and | 09:56:14 |
| 22 | certain kinds of information is deemed to | 09:56:18 |
| 23 | be -- that we won't look at the impact of | 09:56:21 |
| 24 | that, then that would have some | 09:56:23 |
| 25 | determination of what goes in XJT versus | 09:56:25 |

368

| | | |
|---|---|---|
| 1 | XKT. | 09:56:28 |
| 2 | Q. Do you expect that you would make that | 09:56:28 |
| 3 | determination or that that determination | 09:56:31 |
| 4 | would be made by someone at least on an | 09:56:34 |
| 5 | activity-by-activity basis? | 09:56:35 |
| 6 | A. I would imagine it would be categories of | 09:56:37 |
| 7 | activities. | 09:56:41 |
| 8 | Q. So in other words, I guess, let's think | 09:56:42 |
| 9 | about -- let's think about meetings. | 09:56:44 |
| 10 | A. Okay. | 09:56:48 |
| 11 | Q. I'm assuming that individual meetings could | 09:56:49 |
| 12 | qualify as factors in either XJT or XKT in | 09:56:52 |
| 13 | your model, right? | 09:56:57 |
| 14 | A. Yes, that's correct. | 09:56:57 |
| 15 | Q. You need to determine with respect to each | 09:56:59 |
| 16 | individual meeting, correct, whether it | 09:57:03 |
| 17 | falls into XJT or XKT? | 09:57:04 |
| 18 | A. That's correct. | 09:57:07 |
| 19 | Q. Is the same true of specific continuing | 09:57:07 |
| 20 | medical education seminars? | 09:57:10 |
| 21 | A. Potentially, yes. | 09:57:12 |
| 22 | Q. Is the same true of detailing visits? | 09:57:13 |
| 23 | A. Detailing, I think we would have to make an | 09:57:16 |
| 24 | aggregate determination. I have seen some | 09:57:21 |
| 25 | detailed data on detailing reports that | 09:57:22 |

15 (Pages 365 to 368)

### Page 369

```
 1  show what was discussed during the              09:57:27
 2  detailing visit, but without seeing the         09:57:28
 3  data it's not clear to me how detailed          09:57:30
 4  we'll be able to be on each of these            09:57:34
 5  different promotional activities. So once       09:57:37
 6  I have all the data, it'll be a lot clearer     09:57:40
 7  whether there is an aggregate decision or a     09:57:44
 8  much more detailed analysis.                    09:57:46
 9  Q. In the case of expenditures, how do you      09:57:53
10  anticipate identifying which spending           09:57:57
11  should be characterized as O and which          09:57:58
12  spending should be categorized as M for         09:58:00
13  purposes of your model?                         09:58:03
14  A. Again, I don't have complete data yet, but   09:58:04
15  in the data -- some of the data that I've       09:58:06
16  seen in the discovery documents, as I           09:58:08
17  illustrate in my declaration a few              09:58:10
18  examples, it does seem like defendants          09:58:12
19  break out spending for specific                 09:58:15
20  indications, for example, as it relates to      09:58:17
21  bipolar disorder, as an example.                09:58:18
22  Q. Will you be relying entirely on defendants   09:58:23
23  breaking out the data as between improper       09:58:28
24  activity on the one hand and proper             09:58:35
25  activity on the other hand?                     09:58:39
```

### Page 370

```
 1  A. It's not clear to me that entirely is the    09:58:40
 2  right characterization of that. Again, I        09:58:44
 3  haven't pulled all the data together, but I     09:58:46
 4  do believe the defendants' own tracking of      09:58:49
 5  their promotional activities will be a          09:58:51
 6  prime source of information here. But as        09:58:53
 7  we discussed also, there may be other kinds     09:58:55
 8  of information such as publications that        09:58:58
 9  appear in the general literature.               09:59:00
10  Q. How would publications that appear in the    09:59:03
11  general literature inform your                  09:59:06
12  understanding of whether a particular           09:59:07
13  expenditure should be categorized as O or       09:59:09
14  M?                                              09:59:13
15  A. Sorry. I was back on X. So in terms of       09:59:16
16  spending, I believe it'll largely come from     09:59:23
17  defendants' data, but, again, I can't say       09:59:25
18  that will be exclusively true.                  09:59:27
19  Q. Can you think, as you sit here today, of     09:59:29
20  anything other than defendants' data that       09:59:31
21  would provide you any insight on the            09:59:33
22  determination of whether a particular           09:59:35
23  expenditure is O or M?                          09:59:37
24  A. I would look again to data sources such as   09:59:39
25  those that I've described before, IMS           09:59:42
```

### Page 371

```
 1  Health, Verispan, that do track promotional     09:59:46
 2  spending, and I don't know all the details      09:59:49
 3  of all their products, but they do track        09:59:50
 4  prescriptions by diagnosis. It's possible       09:59:53
 5  that they have more detailed data on            09:59:55
 6  promotional spending as well.                   09:59:58
 7  Q. But you haven't conducted that analysis yet  09:59:59
 8  or made those inquiries of IMS or Verispan      10:00:07
 9  yet?                                            10:00:10
10  A. With regard to the promotional data, not     10:00:10
11  yet, no.                                        10:00:12
12  Q. Why not?                                     10:00:13
13  A. I've not been asked to bring data together   10:00:14
14  for this. I found potential data sources        10:00:16
15  in the discovery documents and also by          10:00:19
16  talking to IMS Health and Verispan about        10:00:23
17  their prescribing data to satisfy me that       10:00:25
18  the data were available to estimate this        10:00:28
19  model.                                          10:00:31
20  Q. But this particular aspect of data you       10:00:33
21  didn't speak with them about; is that           10:00:35
22  right?                                          10:00:38
23  A. Not as supplementing defendants' data, but   10:00:38
24  I observed that defendants tracked their        10:00:41
25  spending in a fairly detailed way.              10:00:43
```

### Page 372

```
 1  Q. When do you expect the determination of      10:00:47
 2  whether a particular expenditure would fall     10:00:56
 3  into O on the one hand or M on the other        10:00:58
 4  hand would occur?                               10:01:00
 5  A. When do I suspect that would occur?          10:01:01
 6  Q. (No verbal response.)                        10:01:03
 7  A. I guess I'm not really clear what you mean.  10:01:06
 8  At the point at which I'm asked to proceed      10:01:09
 9  with estimating my model, which I have not      10:01:11
10  been asked to do yet, then I would begin to     10:01:16
11  gather the data and specify all the             10:01:19
12  variables, and at that point that would be      10:01:23
13  relevant, whenever that is.                     10:01:25
14  Q. Again, in the case of sampling you would     10:01:28
15  agree that some kinds of sampling are not       10:01:36
16  subject to the alleged violations; is that      10:01:39
17  correct?                                        10:01:40
18  A. Yes, I would agree with that.                10:01:40
19  Q. But you also understand that some kinds do   10:01:45
20  constitute allegedly improper promotion for     10:01:47
21  purposes of this case?                          10:01:50
22  A. I believe it was described in the            10:01:51
23  allegations, yes.                               10:01:53
24  Q. How do you intend to differentiate between   10:01:54
25  appropriate sampling and improper sampling      10:01:58
```

**Page 373**

1  for purposes of your analysis? 10:02:00
2  A. To the extent that it's possible to use 10:02:01
3  defendants' own tracking of those data. 10:02:04
4  Q. Is that something that you've done yet? 10:02:07
5  A. As we discussed yesterday, looking at the 10:02:10
6  strategic documents, they talk specifically 10:02:13
7  in those documents about use of samples. 10:02:14
8  Q. When you refer to "these documents," both 10:02:18
9  in this context and in your previous 10:02:20
10 answers, I'm assuming that the documents 10:02:23
11 you're referring to would be included 10:02:25
12 within the documents that you list as 10:02:26
13 having relied on in your declaration? 10:02:28
14 A. Yes, in particular that strategic grid we 10:02:30
15 looked at yesterday is the one I'm talking 10:02:34
16 about. 10:02:36
17 Q. And so it's those sorts of documents, the 10:02:36
18 strategic-grid-type documents, that you 10:02:41
19 anticipate relying on for purposes of doing 10:02:43
20 this analysis? 10:02:45
21 A. And we understand from other materials that 10:02:46
22 defendants have tracked the profitability, 10:02:50
23 return on investment related to their 10:02:52
24 promotional activities, and so we would 10:02:54
25 look for those kinds of documents as well. 10:02:56

**Page 374**

1  Q. Have you reviewed any of those documents to 10:03:01
2  date? 10:03:04
3  A. I've reviewed a large number of documents 10:03:06
4  at one point, but I don't recall seeing any 10:03:09
5  specific accounting documents on these 10:03:11
6  return on investment models. I know that 10:03:14
7  they are referenced, and I note some 10:03:16
8  references in my declaration. There's 10:03:19
9  promo track analyses. 10:03:22
10 Q. Anything else? 10:03:30
11 A. I believe there's a footnote in my 10:03:31
12 declaration that lists a couple of 10:03:32
13 examples, but I believe promo track was the 10:03:34
14 principal and -- promotional effectiveness 10:03:36
15 system that they have. 10:03:41
16      THE WITNESS: Maybe a short break? 10:03:50
17      MR. POLUBINSKI: Sure. Sure. 10:03:51
18 Let's take a break. That's fine. 10:03:52
19      THE VIDEOGRAPHER: The time is 10:03:54
20 10:04. This is the end of Tape 1, and we 10:03:56
21 are off the record. 10:03:58
22      (Recess taken.) 10:03:59
23      THE VIDEOGRAPHER: The time is 10:14:05
24 10:14. This is the beginning of Tape 2, 10:14:18
25 and we are back on the record. 10:14:19

**Page 375**

1  BY MR. POLUBINSKI: 10:14:21
2  Q. So, Professor Rosenthal, in the case of 10:14:21
3  detailing, whether or not a given detailing 10:14:33
4  visit is appropriate, will necessarily 10:14:35
5  depend on what's said in the course of that 10:14:38
6  visit; is that correct? 10:14:41
7  A. Whether or not the allegations apply to 10:14:41
8  that detailing visit, you mean? 10:14:44
9  Q. Yes. 10:14:46
10 A. Okay. That seems like that's the right way 10:14:46
11 to characterize it, what's said, what's 10:14:51
12 disseminated. 10:14:53
13 Q. Right. And that like sampling not all 10:14:54
14 detailing is subject to the alleged 10:15:00
15 violations? 10:15:02
16 A. I think that's right. 10:15:02
17 Q. With respect to detailing, how do you 10:15:03
18 intend to differentiate between appropriate 10:15:08
19 detailing and allegedly improper detailing? 10:15:11
20 A. With respect to detailing, I have two kinds 10:15:13
21 of information that I think will be 10:15:17
22 relevant, one -- and forgive me, I forget 10:15:18
23 the names of these reports, but one is 10:15:24
24 information on the detailing visits 10:15:27
25 themselves that the physicians who are 10:15:30

**Page 376**

1  detailed provide that describes what was 10:15:32
2  discussed during the visit, and, two, again 10:15:37
3  are the strategic and marketing documents 10:15:40
4  that I've seen that quantify detailing for 10:15:43
5  specific indications. 10:15:49
6  Q. With respect to the first, to what extent 10:15:56
7  do you expect -- well, withdrawn. 10:16:01
8      Would you expect to make an 10:16:03
9  individual determination as to each 10:16:06
10 specific detailing visit and whether that 10:16:08
11 detailing visit constituted improper or 10:16:10
12 proper behavior? 10:16:13
13 A. I would expect to make a determination in 10:16:14
14 the aggregate as to the proportion of 10:16:16
15 detailing that would fall into those 10:16:18
16 categories, so not -- I don't believe that 10:16:20
17 that's what you mean by "individual 10:16:24
18 determination" like visit per visit, but to 10:16:27
19 characterize overall. 10:16:30
20 Q. Fair enough. But you've used this data on 10:16:32
21 individual visits to inform your 10:16:36
22 conclusions about -- to inform your 10:16:37
23 aggregate conclusions? 10:16:39
24 A. At this time I think that data is to be one 10:16:40
25 of the things I use to try to break apart 10:16:44

Page 377

```
1   the detailing spending.                          10:16:46
2  Q. With respect to the information on those       10:16:52
3   individual detailing visits, how would you       10:16:54
4   intend to distinguish between fraudulent         10:16:56
5   detailing on the one hand and detailing          10:16:59
6   that was not fraudulent on the other hand?       10:17:01
7  A. Again, determination of what's fraudulent      10:17:03
8   or illegal in some other manner, I would         10:17:05
9   expect counsel to advise me on how to            10:17:07
10  categorize that.                                 10:17:12
11 Q. So will counsel be making the individual       10:17:13
12  determinations about whether a specific          10:17:15
13  detailing visit involved fraudulent              10:17:17
14  behavior or not?                                 10:17:20
15      MR. NOTARGIACOMO: Objection. I               10:17:21
16  think that mischaracterizes her testimony.       10:17:22
17      MR. POLUBINSKI: Well, I am asking            10:17:24
18  her the question.                                10:17:24
19      MR. NOTARGIACOMO: Fair enough.               10:17:25
20 A. I would expect to get input. I would           10:17:26
21  expect to be advised on what kinds of            10:17:29
22  things I should count in the allegedly           10:17:30
23  illegal bucket and what kinds of things I        10:17:35
24  shouldn't.                                       10:17:37
25 Q. And so you would get -- do you imagine you     10:17:37
```

Page 378

```
1   might get guidelines or some other sort of       10:17:38
2   instruction that would enable you to make        10:17:40
3   this determination yourself?                     10:17:42
4  A. That might be the case. Without knowing        10:17:43
5   exactly how this will play out, I can't          10:17:44
6   say.                                             10:17:48
7  Q. All right. Aside from the events that we       10:18:16
8   discussed earlier this morning that might        10:18:17
9   impact aggregate quantities of Neurontin         10:18:19
10  prescribed for off-label uses, I'm going to      10:18:22
11  give you a much, much shorter list now and       10:18:25
12  ask you whether the following would be           10:18:27
13  additional individual factors that might         10:18:30
14  play into an individual physician's              10:18:33
15  prescribing decision. And if we can go           10:18:35
16  through each one and if you can just tell        10:18:36
17  me whether or not they might or might not,       10:18:38
18  that would be great.                             10:18:40
19      The first one is an individual --            10:18:41
20  is an individual doctor's medical school         10:18:42
21  education.                                       10:18:44
22 A. Would affect prescribing patterns in           10:18:44
23  general.                                         10:18:49
24 Q. And a decision on whether or not to            10:18:49
25  prescribe Neurontin for an off-label use in      10:18:51
```

Page 379

```
1   a given case?                                    10:18:54
2  A. I suppose it might.                            10:18:54
3  Q. How about the doctor's fellowships that he     10:18:55
4   or she might have had after their medical        10:18:58
5   school?                                          10:19:02
6  A. It might. And may I just say that all of       10:19:03
7   these factors seem like second order to a        10:19:09
8   decision about off-label prescribing.            10:19:11
9  Q. How about the patient's specific systems?      10:19:13
10 A. Yes, that might affect prescribing.            10:19:15
11 Q. And that that wouldn't be a second order       10:19:19
12  impact in a particular individual                10:19:22
13  prescription decision?                           10:19:25
14 A. As to whether or not the prescription for      10:19:25
15  Neurontin were given versus some other           10:19:30
16  drug? I mean, certainly the symptoms would       10:19:32
17  be relevant.                                     10:19:34
18 Q. How about the patient's medical history?       10:19:35
19 A. Yes, that would be relevant.                   10:19:37
20 Q. How about other medications that the           10:19:39
21  patient might be taking at the time?             10:19:41
22 A. Yes.                                           10:19:42
23 Q. How about a specific request from a            10:19:42
24  specific patient?                                10:19:46
25 A. Possibly.                                      10:19:49
```

Page 380

```
1  Q. How about the doctor's individual              10:19:50
2   independent review of the scholarly              10:19:55
3   literature?                                      10:19:58
4  A. Yes, I believe we talked about that            10:19:58
5   yesterday.                                       10:20:01
6  Q. And how about the doctor's individual          10:20:01
7   consultation of medical information              10:20:06
8   websites on the Internet?                        10:20:08
9  A. Yes.                                           10:20:09
10 Q. Okay. We discussed yesterday the fact that     10:20:09
11  Neurontin was approved to treat PHN in           10:20:23
12  2002, correct?                                   10:20:26
13 A. Yes, correct.                                  10:20:27
14 Q. Have plaintiffs' counsel instructed you at     10:20:27
15  this point to make any particular                10:20:31
16  assumptions with respect to Neurontin's          10:20:33
17  efficacy in treating PHN?                        10:20:35
18 A. For the purposes of my work, I'm to            10:20:37
19  consider only the total quantity induced         10:20:43
20  without regard to efficacy.                      10:20:46
21 Q. Okay. Let me put it another way. Do you        10:20:47
22  know whether plaintiffs' counsel will ask        10:20:51
23  you to include prescriptions for PHN prior       10:20:53
24  to May 2002 in your analysis in the model?       10:20:56
25 A. I don't know at this point exactly which       10:20:58
```

18 (Pages 377 to 380)

M. ROSENTHAL

### Page 381

```
 1  indications will be included in the final       10:21:00
 2  analysis, no.                                   10:21:03
 3  Q. But those indications would have been        10:21:05
 4  off-label uses, correct, prescriptions of       10:21:07
 5  Neurontin for PHN prior to May 2002?            10:21:08
 6  A. That's certainly described in the            10:21:11
 7  allegations, so...                              10:21:14
 8  Q. On the other hand, because Neurontin was     10:21:15
 9  approved for treatment of PHN in May of         10:21:18
10  2002, I think we can be confident that you      10:21:20
11  would not seek to include prescriptions of      10:21:24
12  Neurontin for PHN after that date in your       10:21:28
13  model, correct?                                 10:21:31
14  A. I think I'm probably going to need a little  10:21:37
15  more direction on the legal issues here.        10:21:38
16  As you know, promotional activities have a      10:21:41
17  long-lived impact, and so there will be         10:21:45
18  some continued impact of promotional            10:21:48
19  activities that took place before the           10:21:51
20  approval, but I don't know where that           10:21:53
21  stands as a legal matter. As an economic        10:21:57
22  matter there are effects.                       10:21:59
23  Q. I guess here's my question:                  10:22:01
24  A. Okay.                                        10:22:04
25  Q. As set forth in your declaration the class   10:22:04
```

### Page 382

```
 1  includes, among others, "individuals who        10:22:12
 2  for purposes other than resale, purchased,      10:22:20
 3  reimbursed, and/or paid for Neurontin for       10:22:22
 4  indications not approved by the FDA."           10:22:25
 5  A. So from a legal perspective it sounds like   10:22:29
 6  those uses may be out, but you understand       10:22:31
 7  what I mean by the --                           10:22:36
 8  Q. I do. I understand --                        10:22:36
 9  A. -- effects might be --                       10:22:36
10  Q. -- precisely. I don't -- I'm not --          10:22:36
11  A. -- lasting?                                  10:22:37
12  Q. And I'm not taking issue with that. The      10:22:38
13  only thing I'm saying is that just by           10:22:42
14  reference to the definition of the class in     10:22:45
15  this case, you wouldn't expect to include       10:22:47
16  prescriptions for PHN after it was approved     10:22:53
17  by the FDA in your analysis of impact on        10:22:56
18  the class?                                      10:23:00
19  A. Not being a legal expert, I'm not sure -- I  10:23:01
20  wouldn't necessarily have read that that        10:23:04
21  way, but as you read it, perhaps that's the     10:23:07
22  right interpretation of the class               10:23:09
23  definition.                                     10:23:11
24  Q. If counsel instructs you to include          10:23:12
25  prescriptions for PHN prior to May 2002, I      10:23:15
```

### Page 383

```
 1  think you had said this before, but let me      10:23:21
 2  confirm, your model would assume that all       10:23:22
 3  such prescriptions for PHN are ineffective;     10:23:25
 4  is that right?                                  10:23:28
 5  A. Essentially the model does not account for   10:23:28
 6  any health benefits from the prescriptions.     10:23:30
 7  Q. And so you would include all PHN             10:23:32
 8  prescriptions from that time frame in the Q     10:23:37
 9  number that you provide to Dr. Hartman for      10:23:40
10  him to calculate damages; is that correct?      10:23:43
11  A. If so directed by counsel, that's what I     10:23:45
12  would do, yes.                                  10:23:47
13  Q. Are you aware of any reason why Neurontin    10:23:50
14  would have been less effective in treating      10:23:52
15  PHN prior to the FDA's supplemental             10:23:55
16  approval in 2002 than it was after?             10:23:58
17  A. I'm not aware of any reason, no.             10:24:00
18  Q. Do you have an understanding for why         10:24:04
19  defendants sought approval for Neurontin to     10:24:05
20  treat PHN when they did?                        10:24:07
21  A. I'm not sure what you mean by "why." Why     10:24:09
22  that timing and not another --                  10:24:19
23  Q. Sure.                                        10:24:20
24  A. -- or not at all?                            10:24:20
25  Q. Yeah, what the circumstances were that       10:24:21
```

### Page 384

```
 1  would have driven the defendants to seek        10:24:23
 2  approval for PHN at that time?                  10:24:26
 3  A. I don't think I do know the answer to that,  10:24:27
 4  no.                                             10:24:30
 5  Q. Okay. And you don't know, do you, whether    10:24:31
 6  defendants had information at the time that     10:24:34
 7  might have supported approval for another       10:24:36
 8  indication, do you?                             10:24:38
 9  A. Not as I sit here. I know there are          10:24:38
10  numerous discovery documents about              10:24:43
11  strategic planning for obtaining new            10:24:46
12  indications with the FDA on a variety of        10:24:49
13  these conditions, but as I sit here, I          10:24:52
14  can't tell you if there was anything else       10:24:54
15  in the works at the time.                       10:24:56
16  Q. And I guess the -- going back to what I      10:24:57
17  think my question was, which may not have       10:25:02
18  been perfectly phrased, do you know whether     10:25:04
19  defendants had information or data at the       10:25:06
20  time that would have actually supported an      10:25:09
21  application for approval of another             10:25:12
22  indication from the FDA?                        10:25:16
23  A. And so, again, I'm afraid my answer wasn't   10:25:18
24  clear, either. I know there are discovery       10:25:21
25  documents that talk about those kinds of        10:25:23
```