# EXHIBIT 3
# (PART II)

M. ROSENTHAL

385

```
1    data, but I don't know at that particular        10:25:27
2    time if there were -- if they had clinical       10:25:29
3    trial evidence, is I assume what you             10:25:33
4    mean --                                          10:25:34
5  Q. Yeah.                                           10:25:35
6  A. -- to support another application, no, I        10:25:35
7    don't. I believe it may be knowable, but I       10:25:38
8    don't know.                                      10:25:43
9  Q. We discussed yesterday that neuropathic         10:25:43
10   pain is one of the off-label indications at      10:25:45
11   issue in the case, correct?                      10:25:47
12 A. That's correct, neuropathic pain not           10:25:49
13   including HPN.                                    10:25:51
14 Q. PHN?                                            10:25:53
15 A. PHN.                                            10:25:54
16 Q. At least after May of 2002, right?             10:25:55
17 A. Yes.                                            10:25:57
18 Q. And why don't -- actually, for purposes of     10:25:57
19   this series of questions, why don't we           10:26:02
20   assume since it's such a mouthful to say         10:26:04
21   neuropathic pain other than PHN after May        10:26:07
22   of 2002 --                                       10:26:09
23 A. Just pain.                                      10:26:10
24 Q. -- can I just say pain?                         10:26:11
25 A. Pain.                                           10:26:12
```

386

```
1  Q. Great. Okay. Subject to further              10:26:13
2    instructions from your counsel, your model       10:26:15
3    would seek to measure the additional            10:26:17
4    incremental prescriptions for pain,             10:26:20
5    correct?                                         10:26:22
6  A. Again, assuming that -- I understand that       10:26:22
7    some of the legal issues are in flux, or at      10:26:28
8    least that's my understanding about which       10:26:30
9    indications, but if I were told that pain        10:26:32
10   was one of the indications that we were         10:26:33
11   looking at, that's what I would do.             10:26:35
12 Q. Okay. We discussed that Neurontin has been     10:26:36
13   approved for the treatment of neuropathic       10:26:42
14   pain throughout Europe and elsewhere           10:26:44
15   yesterday, correct?                             10:26:46
16 A. I believe we did discuss that, yes.           10:26:46
17 Q. Okay. Let's assume for a moment that a        10:26:48
18   class member would have received that           10:26:51
19   prescription in the United States for          10:26:52
20   Neurontin to treat neuropathic pain and the    10:26:56
21   prescription worked, the patient's pain        10:26:59
22   went away. Had that patient received that      10:27:00
23   prescription in the United States, your        10:27:04
24   model would conclude that class member         10:27:08
25   would have been impacted and would suffer      10:27:10
```

387

```
1    economic damages; is that correct?              10:27:12
2  A. As I've been directed by counsel to assume     10:27:14
3    that the relevant measure of economic          10:27:17
4    damages here is what was paid for those        10:27:20
5    units of Neurontin induced by the allegedly    10:27:21
6    illegal promotion, so, yes.                    10:27:26
7  Q. And if the patient received the very same     10:27:27
8    prescription from a doctor in Europe whose      10:27:30
9    regulatory authority tells her that            10:27:32
10   Neurontin is effective for treatment of         10:27:34
11   neuropathic pain, would that patient have       10:27:36
12   been impacted and suffer economic damages?     10:27:38
13 A. The question of the patient in Europe is      10:27:42
14   outside the realm of that which I've been       10:27:44
15   asked to consider. They're not in the          10:27:46
16   class here, so I don't know what you mean.      10:27:47
17   This is based on a legal theory about, you     10:27:50
18   know, what -- based on a legal theory about     10:27:54
19   what the illegal behavior was, and I'm          10:27:57
20   directed to look at the economic               10:27:59
21   consequences of that.                          10:28:02
22 Q. I guess what I'm asking is maybe just from    10:28:02
23   your perspective, are the economic             10:28:05
24   consequences of the prescription that's       10:28:07
25   written in Europe any different from the      10:28:09
```

388

```
1    economic consequences for the prescription      10:28:11
2    that's written in the States for the same       10:28:14
3    indication?                                      10:28:16
4  A. I'm not sure with what you mean by "the        10:28:16
5    economic consequences."                         10:28:18
6  Q. The economic consequences for the              10:28:19
7    individual patient.                              10:28:21
8  A. The consequences that I have --                10:28:22
9  Q. And/or -- I'm sorry. For the individual        10:28:23
10   patient and/or whatever entity is paying        10:28:26
11   for the individual patient's prescription?      10:28:28
12 A. If you want to ask whether the effects are     10:28:31
13   likely to differ on health status, whether      10:28:35
14   the effects are likely to differ in Europe      10:28:40
15   versus the U.S., I have no reason to            10:28:42
16   believe that the health effects differ, but     10:28:44
17   I've not been asked to consider those           10:28:46
18   health effects.                                 10:28:47
19 Q. Right. I'm asking about the economic           10:28:48
20   effects. You know, what you say in your         10:28:50
21   report that you do in the very first page       10:28:52
22   is that you analyze whether consumers or        10:28:55
23   third-party payers would have and continue      10:29:06
24   to be impacted and suffer economic damages,     10:29:08
25   and so I guess what I'm asking is whether       10:29:12
```

20 (Pages 385 to 388)

M. ROSENTHAL

389

```
1    those same individuals or entities would        10:29:14
2    have been any more impacted or suffer any        10:29:18
3    more economic damages in the United States       10:29:20
4    for the exact same prescription as they          10:29:22
5    would have had they been prescribed the          10:29:25
6    same drug in Europe.                     10:29:29
7  A. That's again -- excuse me. My conclusions       10:29:30
8    are based on being directed to assume that       10:29:33
9    there were no clinical benefits to be            10:29:35
10   counted against the spending, and so that        10:29:39
11   conclusion is relevant to that model where       10:29:41
12   those clinical benefits cannot be shown.         10:29:43
13   So you're asking me to assume a different        10:29:46
14   framework in which those clinical benefits       10:29:49
15   can be shown to exist, and so -- is that         10:29:50
16   what you would like me to assume?                10:29:54
17 Q. No, I don't think so. I'm just sort of         10:29:55
18   looking at what the practical reality of         10:30:04
19   the situation is and what the economic           10:30:06
20   impacts of it are. Is there any greater          10:30:09
21   economic impact on the patient than we           10:30:12
22   talked about in the United States than the       10:30:14
23   patient in Europe?                    10:30:15
24 A. I guess I need to -- again, I'm sorry, I        10:30:17
25   don't mean to be difficult, but I need to        10:30:21
```

390

```
1    make some assumption about the clinical          10:30:22
2    effectiveness of the drug, and if you want       10:30:24
3    me to assume that drug was clinically            10:30:27
4    effective for those patients who got it in       10:30:30
5    the U.S. in a similar way to those patients      10:30:32
6    who got it in Europe, then the difference        10:30:35
7    would be the total spending on the drug,         10:30:36
8    which, as you know, is much less in Europe.      10:30:38
9  Q. I guess here's my question: Is there any       10:30:40
10   reason that that assumption -- that you can      10:30:42
11   think of that that assumption should be any      10:30:44
12   different for a patient in the U.S. than a       10:30:45
13   patient in Europe?                    10:30:47
14 A. I don't know of any reason, but, again,        10:30:49
15   I've not been asked to consider this case.       10:30:51
16 Q. Okay. Your report says that you intend to     10:31:05
17   group diagnoses into five categories by          10:31:07
18   reference to ICD-9 codes, correct?              10:31:09
19 A. I did categorize -- excuse me, can I look       10:31:12
20   at that again in my report?                  10:31:16
21 Q. Sure. I think it's on Page 16, Footnote        10:31:18
22   64.                           10:31:51
23   (Discussion off the record.)                 10:31:51
24 A. I see there's a typo in there, too.           10:31:52
25 Q. What's the typo that you mentioned you        10:31:57
```

391

```
1    noticed?                          10:31:59
2  A. That says "IVD" in the very last             10:31:59
3    characterization of ICD-9. Yes, so this         10:32:02
4    was sort of a preliminary grouping of           10:32:10
5    indications, but as we talked about before,     10:32:11
6    when we look individually by indication,        10:32:15
7    there may be some change -- my               10:32:20
8    understanding is there may be some change       10:32:21
9    in which indications I'm asked to look at        10:32:23
10   specifically.                      10:32:25
11 Q. So these may not be the groups -- the         10:32:26
12   groupings that you ultimately use at the        10:32:29
13   end of the day; is that your --              10:32:30
14 A. Ultimately. This is sort of based on my       10:32:32
15   preliminary examination of those ICD-9           10:32:34
16   codes and what was in the original              10:32:36
17   complaint.                        10:32:39
18 Q. Okay.                          10:32:45
19     MR. POLUBINSKI: Let's mark the             10:32:48
20   next document.                     10:32:48
21     (Exhibit No. 15, Document headed          10:32:49
22   "ICD-9 Codes for Neurontin, From IMS File,      10:32:49
23   Ben Sommers, August 3, 2005," marked for        10:32:49
24   identification.)                    10:32:49
25 Q. All right. I'm handing you a document that     10:33:06
```

392

```
1    we've marked as Rosenthal Exhibit 15.           10:33:08
2  A. Thank you.                       10:33:12
3  Q. Can you take a look at the document and let    10:33:13
4    me know when you've had a chance to look        10:33:15
5    through it.                       10:33:18
6  A. Yeah.                          10:33:19
7  Q. Do you recognize this document?             10:33:19
8  A. In the way that I would recognize a          10:33:20
9    document that I looked at about a year ago,      10:33:22
10   but, yes, it does look familiar.              10:33:24
11 Q. Okay. This document was produced to the      10:33:26
12   defendants in January 2006 by plaintiffs'       10:33:28
13   counsel. Do you know why it would have         10:33:34
14   been produced to us?                 10:33:35
15 A. I don't know. Perhaps in relationship to a     10:33:36
16   data request.                     10:33:46
17 Q. Okay. Did you review this document in         10:33:47
18   connection with your work on this matter at     10:33:48
19   all?                          10:33:50
20 A. I certainly reviewed it. Not being an        10:33:50
21   expert in clinical coding myself, I            10:33:52
22   wouldn't say that I could have checked it        10:33:53
23   in any real sense. Is that what you're         10:33:56
24   asking? I'm familiar with it.              10:33:58
25 Q. Okay. Did you rely on the document in any     10:34:05
```

21 (Pages 389 to 392)

M. ROSENTHAL

**393**

1  way in your report, in your analysis?  10:34:07
2  A.  Not -- since there is no data analysis in  10:34:08
3  my report, the answer is no.  We wanted to  10:34:15
4  get a sense of the categories of data.  As  10:34:19
5  I mentioned -- as we discussed yesterday,  10:34:26
6  looking at the -- some data from the  10:34:28
7  Franklin case that had been produced from  10:34:30
8  the National Disease and Therapeutic Index,  10:34:32
9  they have data by ICD-9 code.  We're trying  10:34:36
10  to understand those data a little better.  10:34:39
11  So we wanted to take a preliminary grouping  10:34:41
12  of those ICD-9 codes to see how they mapped  10:34:45
13  to these categories.  10:34:48
14  Q.  Okay.  Can you tell me the circumstances in  10:34:52
15  which the document was prepared, so in  10:34:54
16  other words, who asked for it to be  10:34:59
17  prepared?  10:35:00
18  A.  I'm not sure who asked for it to be  10:35:01
19  prepared.  Again, when these data came to  10:35:06
20  light in the Franklin case, we wondered  10:35:08
21  what we would learn from them, how relevant  10:35:11
22  they were.  We didn't want to rely on the  10:35:13
23  groupings necessarily that had been done by  10:35:15
24  previous experts.  As we mentioned  10:35:21
25  yesterday, it was an attachment to their  10:35:24

**394**

1  report.  And so it was either myself or  10:35:26
2  potentially Ms. Rushnawitz that asked for  10:35:29
3  this categorization to be done.  10:35:31
4  Q.  Okay.  And would it have been something  10:35:34
5  that was commissioned on or about August  10:35:37
6  3rd of 2005, which is the date that appears  10:35:39
7  at the top of the document?  10:35:41
8  A.  I think it may have been updated around --  10:35:46
9  I honestly -- I'm sorry, I just don't know.  10:35:48
10  I assume that that's the correct date --  10:35:50
11  Q.  That's fine.  10:35:52
12  A.  -- because it's there.  10:35:52
13  Q.  Do you know who Ben Sommers is?  10:35:53
14  A.  I do.  10:35:55
15  Q.  Who's Ben Sommers?  10:35:56
16  A.  He's a medical student that occasionally  10:35:57
17  works with us.  10:35:59
18  Q.  When you say "us," what do you mean?  10:36:02
19  A.  With Greylock McKinnon.  10:36:03
20  Q.  Do you know if he's compensated for the  10:36:04
21  work that he does?  10:36:10
22  A.  I'm certain that he is.  10:36:10
23  Q.  Do you have any sense for why his name  10:36:11
24  wouldn't have appeared on any of the  10:36:13
25  invoices that we received?  10:36:14

**395**

1  A.  I honestly don't know.  10:36:16
2  Q.  Do you know what your instructions or Ms.  10:36:22
3  Rushnawitz's instructions were to Mr.  10:36:26
4  Sommers in preparing this document?  10:36:28
5  A.  I'm not 100 percent sure about the exact  10:36:32
6  instruction, but I believe it went  10:36:35
7  something like this:  Given that we have a  10:36:37
8  list of ICD-9 codes from that National  10:36:40
9  Disease and Therapeutic Index database, I  10:36:43
10  believe that these are all the ICD-9 codes  10:36:47
11  for which Neurontin was prescribed and that  10:36:49
12  he was then instructed to categorize them  10:36:54
13  into major groups, and I believe he was  10:36:56
14  given the categories as well.  10:37:00
15  Q.  Okay.  10:37:01
16  A.  Okay.  10:37:05
17  Q.  On the subject of the categories maybe if I  10:37:05
18  could just -- well, I'll withdraw that  10:37:12
19  question.  10:37:14
20    Do you know if he wrote the  10:37:14
21  commentary that appears on the document?  10:37:15
22  So, for example, under the first heading,  10:37:18
23  which is "Seizures & Epilepsy," there is an  10:37:20
24  italicized notation that says, "These are  10:37:24
25  all variants on seizure disorders."  10:37:27

**396**

1  A.  I believe those are his notes, yes.  10:37:28
2  Q.  Okay.  All right.  Now, I think we've  10:37:30
3  discussed before that you expect that  10:37:43
4  you'll receive data for your model that's  10:37:44
5  broken down by ICD-9 codes?  10:37:46
6  A.  Again, one of the major sources of data  10:37:48
7  that I talked about yesterday would be  10:37:50
8  these kinds of data from the National  10:37:51
9  Disease and Therapeutic Index, and those  10:37:54
10  are broken down by ICD-9 codes.  10:37:55
11  Q.  Is there any other data other than the NDTI  10:37:57
12  data that you imagine would be broken down  10:38:00
13  by ICD-9 codes?  10:38:02
14  A.  There's a similar database that I've  10:38:03
15  learned about subsequently that's produced  10:38:05
16  by Verispan.  I haven't worked with those  10:38:07
17  data myself, but I believe they are also  10:38:09
18  broken out by ICD-9 codes.  They're  10:38:11
19  referenced --  10:38:17
20  Q.  How about -- how about data from -- I'm  10:38:19
21  going to have to just give you the acronyms  10:38:20
22  since I don't know --  10:38:22
23  A.  That's okay.  10:38:22
24  Q.  -- what all the letters stand for, but  10:38:22
25  NAMCS?  10:38:26

22 (Pages 393 to 396)

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                              516-608-2400

M. ROSENTHAL

397

1  A. Yeah, I reference those as well in my            10:38:27
2     declaration. It's possible that I'll use         10:38:30
3     the NAMCS data, if that's okay, N-A-M-C-S.        10:38:33
4  Q. Do you know if they're broken down by ICD-9       10:38:38
5     codes as well?                                    10:38:41
6  A. They have condition codes. I believe             10:38:41
7     they're ICD-9 codes as well.                      10:38:42
8  Q. Okay. Now, setting aside the data that you        10:38:50
9     mentioned before that was produced in the         10:38:58
10    Franklin case, which we can talk about            10:38:59
11    later --                                           10:39:02
12 A. Okay.                                              10:39:02
13 Q. -- have you collected any of this data yet?       10:39:03
14 A. We have sent a request for data to the            10:39:05
15    defendants, but I do not yet have access to       10:39:08
16    these kinds of data aside from the Franklin       10:39:10
17    case, yeah.                                         10:39:13
18 Q. All right. You haven't sought to collect          10:39:14
19    the data from any of these sources,               10:39:16
20    directly from any of these sources,               10:39:19
21    correct?                                            10:39:21
22 A. No, I have not done so for a variety of           10:39:21
23    reasons. One, it's very expensive to              10:39:24
24    obtain data from IMS Health directly, and         10:39:27
25    two, they don't allow this data to be used        10:39:31

398

1     for litigation purposes.                           10:39:33
2  Q. You mentioned IMS. Is that also true of          10:39:34
3     NAMCS?                                             10:39:39
4  A. The NAMCS is available publicly. And I'm         10:39:40
5     sorry, I have looked in general at this            10:39:45
6     data to see the frequency with which              10:39:48
7     Neurontin shows up, for example.                   10:39:51
8  Q. Okay. Okay. Let's look at Rosenthal             10:39:52
9     Exhibit 15 a lot more closely.                     10:40:00
10 A. Okay.                                              10:40:01
11 Q. If you flip through it, you'll see that          10:40:02
12    there are four different bold headings that       10:40:09
13    appear in this document. The first one is        10:40:14
14    "Seizures & Epilepsy." The second one is         10:40:17
15    "Psychiatric Diagnoses/Mental Illness," the      10:40:23
16    third one is "Pain," and the last one is         10:40:26
17    "Migraine," correct?                               10:40:32
18 A. That's correct.                                    10:40:34
19 Q. Would you agree that these roughly               10:40:34
20    correspond, maybe even not so roughly             10:40:37
21    correspond, with the different groupings         10:40:40
22    that are referenced in Footnote 64 of your       10:40:44
23    declaration?                                       10:40:47
24 A. Yes, that's correct.                               10:40:47
25 Q. Who decided on this particular aggregation?      10:40:54

399

1  A. This aggregation, again, was provided to us      10:40:56
2     by Ben Sommers.                                   10:41:01
3  Q. Do you have an understanding for what            10:41:02
4     dictated which ICD-9 codes belonged in           10:41:07
5     which group?                                      10:41:10
6  A. His knowledge of the clinical issues            10:41:16
7     related to each of these conditions.             10:41:18
8  Q. But it was a determination he made based on      10:41:19
9     his own clinical knowledge?                       10:41:23
10 A. That's right.                                     10:41:24
11 Q. Did he have input from you or Ms.                10:41:25
12    Rushnawitz at all on the subject?                 10:41:28
13 A. Of how to categorize these? No, we were          10:41:29
14    seeking some understanding from him about        10:41:32
15    how these things generally played out.           10:41:34
16 Q. Okay. Your ability to accurately               10:41:35
17    disaggregate, in your mind, by indication        10:41:46
18    will depend on the correctness or accuracy       10:41:47
19    of the ICD-9 codes?                               10:41:50
20 A. My ultimate analyses, this analysis --          10:41:53
21 Q. Not necessarily this document. Let's set        10:41:57
22    this document to one side for purposes of        10:41:58
23    this question. But just the accuracy of --       10:42:01
24    well, depending on your ability to               10:42:03
25    accurately group indications by ICD-9 code,      10:42:05

400

1     correct?                                          10:42:09
2  A. In terms of those categories which I'm          10:42:09
3     ultimately directed by counsel are to be         10:42:13
4     the indications to be considered for             10:42:16
5     damages, yes.                                     10:42:17
6  Q. And in the same way your ability to             10:42:25
7     distinguish between on-label and off-label       10:42:27
8     prescriptions of Neurontin will depend on        10:42:28
9     your being able to accurately group              10:42:30
10    diagnoses using ICD-9 codes, correct?            10:42:35
11 A. That's correct.                                   10:42:38
12 Q. So to put it another way, without data from      10:42:43
13    whatever source it is, whether it's NDTI or      10:42:46
14    NAMCS, broken down by indication your model      10:42:49
15    would not be able to separate out on-label       10:42:52
16    from off-label prescriptions; is that            10:42:55
17    correct?                                          10:42:59
18 A. Though as we discussed yesterday there's a       10:42:59
19    simplified version of the model that            10:43:03
20    wouldn't distinguish them, that would look      10:43:04
21    at the effects of off-label prescribing on      10:43:06
22    total prescriptions, but as you noted           10:43:09
23    yesterday, it's not as good a model, it's       10:43:13
24    not as detailed a model as the model where      10:43:14
25    we break it out indication by indication.       10:43:17

23 (Pages 397 to 400)

M. ROSENTHAL

---

**401**

1    That is a model that can be run.                10:43:19
2  Q. Right. But I guess if we were interested       10:43:20
3     in separating out on-label prescriptions       10:43:22
4     from off-label prescriptions?                   10:43:24
5  A. Clearly we need to be able to identify         10:43:25
6     them.                                           10:43:28
7  Q. Right. And the way to identify them is         10:43:28
8     with ICD-9 codes, correct?                      10:43:29
9  A. That certainly seems to be the way that I      10:43:31
10    would think about going about it. Right         10:43:32
11    now I can't think of another way to do it,      10:43:33
12    but there may be other kinds of disease         10:43:36
13    groupings. ICD-9 is obviously the most          10:43:38
14    commonly used disease grouping.                 10:43:43
15 Q. And as you sit here today, that's the way      10:43:44
16    that you envision doing this? You can't         10:43:48
17    think of another way that you can do it?        10:43:49
18 A. As I sit here today, I would expect to use     10:43:49
19    diagnosis codes, yes.                           10:43:51
20 Q. Did you discuss the use of those groups        10:43:53
21    with anybody else other than Ms. Rushnawitz    10:43:56
22    and Mr. Sommers?                                10:43:58
23 A. I'm sorry, I don't know what you mean by       10:43:59
24    that question. Did I discuss --                 10:44:00
25 Q. The use of -- that's a slightly confused       10:44:02

---

**402**

1     question, I think.                              10:44:10
2  A. Okay.                                           10:44:10
3  Q. All right. We discussed yesterday how --       10:44:11
4     and to some degree today as well how            10:44:23
5     counsel would instruct you which                10:44:26
6     indications to run through your model,          10:44:27
7     correct?                                        10:44:28
8  A. That's correct.                                 10:44:29
9  Q. And it would be through their instructions     10:44:29
10    that you would seek to exclude any uses for     10:44:42
11    which there have been no -- there had been      10:44:44
12    no fraudulent promotion?                         10:44:45
13 A. That's correct.                                 10:44:48
14 Q. And you wouldn't be conducting any analysis    10:44:51
15    yourself as to whether defendants promoted     10:44:54
16    Neurontin for a given off-label use?            10:44:55
17 A. I wouldn't be conducting any analysis          10:44:57
18    myself to identify what falls into that        10:45:02
19    category, yes.                                   10:45:03
20 Q. Okay. At this point I'm assuming they         10:45:04
21    haven't yet identified any ICD-9 codes that    10:45:09
22    are listed on Rosenthal Exhibit 15 that you    10:45:12
23    would not include in your analysis --           10:45:15
24 A. No. I --                                        10:45:15
25 Q. -- is that correct?                             10:45:17

---

**403**

1  A. That's correct. I have not received           10:45:17
2     specific instructions from counsel. In my      10:45:20
3     reading of the complaint as -- even the        10:45:22
4     original complaint that these categories       10:45:27
5     are described in broader terms. I don't        10:45:29
6     recall that they used ICD-9 codes there.       10:45:32
7  Q. Would you agree with me that the document     10:45:35
8     that -- well, would you agree with me that     10:45:39
9     Rosenthal 15 contains an exceedingly broad,    10:45:43
10    maybe even wildly overinclusive list of        10:45:50
11    possible ICD-9 codes to include in your        10:45:54
12    analysis?                                        10:45:57
13 A. This document -- my understanding of what's   10:45:57
14    in this document is that it includes every     10:46:01
15    ICD-9 code for which Neurontin is              10:46:04
16    prescribed. I don't know if any were          10:46:05
17    excluded, so it's a complete list.             10:46:10
18 Q. Okay. Fair enough. I think just to sort       10:46:13
19    of follow up on that question, if you can      10:46:19
20    turn to the second-to-last page.              10:46:21
21 A. Okay.                                          10:46:23
22 Q. These pages aren't -- or maybe they are       10:46:23
23    numbered on yours.                              10:46:26
24 A. 97.                                             10:46:27
25 Q. Yeah, GMA97, thank you. At the very bottom    10:46:28

---

**404**

1     of the page there is an italicized notation    10:46:33
2     that reads, "The last page or so is filled     10:46:34
3     with non-neuropathic pain" -- oh, I'm          10:46:37
4     sorry.                                          10:46:37
5  A. Sorry. 96. I'm with you now.                  10:46:45
6  Q. Let me start again. So we're looking at       10:46:47
7     GMA96, and what I'm looking at is the          10:46:49
8     italicized notation at the very bottom of      10:46:52
9     the page which reads, "The last page or so    10:46:53
10    is filled with non-neuropathic pain -- i.e.    10:46:55
11    your nerves work fine, you've just got a       10:46:58
12    major injury -- so Neurontin really isn't      10:47:01
13    the recommended drug, but who knows what       10:47:03
14    doctors are giving."                            10:47:05
15       That would suggest to you -- that           10:47:07
16    would confirm your sense that this is an       10:47:08
17    inclusive list, correct?                        10:47:09
18 A. Right. Again, he was trying to categorize     10:47:11
19    everything in the list in some way and to      10:47:14
20    explain to us what these things really were    10:47:17
21    in laymen's terms.                              10:47:20
22 Q. Here's a question for you: Do you expect      10:47:30
23    that it would be you or plaintiffs' counsel    10:47:35
24    or somebody else who would seek to            10:47:39
25    translate the indications at issue in the      10:47:41

---

24 (Pages 401 to 404)

M. ROSENTHAL

---

**405**

1    case at whatever the appropriate time is          10:47:44
2    into the ICD-9 codes that are listed here         10:47:49
3    for purposes of deciding what to include in       10:47:51
4    your model?                                       10:47:54
5 A.  That's a good question. Having not reached        10:47:55
6    that juncture of the investigation, it            10:47:59
7    would certainly not be me. I think the            10:48:01
8    question is whether it would be a clinical        10:48:04
9    expert under their direction or a clinical        10:48:06
10   expert under my direction who incidentally        10:48:09
11   wouldn't be a medical student but a real          10:48:11
12   clinical expert in this area. I don't know        10:48:14
13   at this time. I guess, again, I don't             10:48:17
14   understand exactly the legal issues around        10:48:23
15   what's in and what's out.                         10:48:25
16 Q. Okay.                                             10:48:26
17 A.  But by no means would I as an economist          10:48:30
18   decide which ICD-9 codes map to which             10:48:33
19   indications.                                      10:48:40
20 Q. But in any event, the process hasn't yet          10:48:40
21   been done?                                        10:48:43
22 A.  No, that hasn't. This really is just a           10:48:43
23   grouping of all the existing data into some       10:48:46
24   categories that we could understand what          10:48:49
25   they meant.                                       10:48:51

---

**406**

1 Q. So you don't know yet if you would have           10:48:52
2    difficulty matching ICD-9 codes with the          10:48:55
3    indications that are still relevant to the        10:48:58
4    case, because you haven't had to conduct          10:49:00
5    that analysis yet?                                10:49:03
6 A.  I have not conducted that analysis yet.           10:49:04
7 Q. How do you propose to treat PHN for               10:49:08
8    purposes of your grouping?                        10:49:12
9 A.  Again, as we discussed before, I'm not            10:49:13
10   entirely clear as to how that's going to be       10:49:16
11   treated legally, whether PHN is going to be       10:49:18
12   included as an indication to be considered.       10:49:20
13   And if it were, again, I think the issue          10:49:24
14   would be the same, consulting the                 10:49:26
15   appropriate clinical expert as to which           10:49:29
16   ICD-9 codes would characterize PHN. I             10:49:31
17   don't know, sitting here, which those are.        10:49:34
18 Q. Okay. Would you agree at this point that          10:49:35
19   it would likely be important to be able to        10:49:42
20   isolate PHN prescriptions by ICD-9 codes          10:49:43
21   given that it's an on-label use for some          10:49:47
22   period of the class and it's an off-label         10:49:49
23   use for another period of the class?             10:49:51
24 A.  I'm sorry, I just -- I haven't fully             10:49:53
25   thought about how to do that because I           10:49:56

---

**407**

1    haven't considered --                             10:49:58
2 Q. I'm just -- all I'm asking is whether you          10:49:59
3    would agree that it's something that you          10:50:01
4    would need to do.                                 10:50:03
5 A.  It might be important if I need to exclude        10:50:04
6    them.                                             10:50:07
7 Q. Okay. Or if you need to decide how to             10:50:07
8    group them?                                       10:50:09
9 A.  You mean in the period after approval, for       10:50:10
10   example?                                          10:50:17
11 Q. Either one.                                       10:50:17
12 A.  Well, in the period before approval it           10:50:18
13   might be included with other neuropathic         10:50:22
14   pain, might it not?                               10:50:24
15 Q. Okay.                                             10:50:26
16 A.  In the period after it might be important        10:50:26
17   to decide how to identify it --                   10:50:29
18 Q. Fair enough.                                      10:50:29
19 A.  -- depending on, again --                        10:50:31
20 Q. Fair enough. Could you take a second and          10:50:32
21   look through Rosenthal Exhibit 15 and find        10:50:36
22   for me the code for postherpetic neuralgia?       10:50:38
23       MR. NOTARGIACOMO: Objection.                   10:50:44
24 A.  Can you just tell me the answer to that          10:50:47
25   question? I'm assuming that it's not here,       10:50:49

---

**408**

1    but...                                            10:50:51
2 Q. Your assumption, as far as I'm aware, is           10:50:52
3    correct, but I don't want to be the one to       10:50:54
4    represent that to you.                            10:50:56
5 A.  Okay. Well, then I'll need a few minutes.        10:50:56
6 Q. Take your time.                                    10:50:59
7       (Witness reviews document.)                     10:51:00
8 A.  To the best of my ability to understand          10:52:07
9    these clinical terms, I don't see               10:52:09
10   postherpetic neuralgia. I certainly don't        10:52:11
11   see those specific words.                         10:52:13
12 Q. Do you have any understanding for why it's        10:52:14
13   not on the list?                                  10:52:16
14 A.  No, I don't.                                     10:52:16
15 Q. There is no code for postherpetic               10:52:19
16   neuralgia, is there?                              10:52:21
17 A.  I have no knowledge of whether there is or       10:52:21
18   isn't.                                            10:52:24
19 Q. So as you sit here today, though, you're         10:52:24
20   not aware of a way to isolate prescriptions      10:52:28
21   of Neurontin for PHN; is that correct?           10:52:30
22 A.  I am not aware of a way to do that at this       10:52:32
23   point, no. I can imagine one could combine       10:52:36
24   codes for the -- as we talked about             10:52:38
25   yesterday, I'm not really clear whether         10:52:44

---

25 (Pages 405 to 408)

postherpetic neuralgia is related to herpes 10:52:46
or herpes zoster, but in any case there is 10:52:49
some underlying condition that I believe 10:52:52
it's related to. There may be some way to 10:52:53
identify postherpetic neuralgia by looking 10:52:55
at a combination of neuropathic pain and 10:52:56
the underlying condition codes for both of 10:52:59
those, but as I sit here today, I do not 10:53:01
know how I would implement that. 10:53:04
Q. Okay. Both yesterday and today you 10:53:05
testified that you reviewed some data that 10:53:11
you understood came from NDTI that was 10:53:15
produced by defendants in the Franklin 10:53:17
case? 10:53:19
A. Yes, that's right. 10:53:20
Q. And when I asked about that data, you 10:53:21
referred me to Footnote 72 of your 10:53:23
declaration, correct, which is Exhibit 1 to 10:53:26
your deposition? 10:53:30
A. And Footnote 73, yes. 10:53:35
Q. Okay. Footnote 72 reads, "Counsel has 10:53:40
already provided a roll out of these data 10:53:42
and conducted preliminary analysis with 10:53:44
them. The data that I have reviewed 10:53:45
clearly allow for identifying prescription 10:53:47

patterns by diagnosis." 10:53:49
Did I read that correctly? 10:53:52
A. Yes, you did. 10:53:53
Q. And you just referred me to Footnote 73 as 10:53:54
well -- 10:53:58
A. Yes. 10:53:58
Q. -- which refers to Pages 63 to 65 of 10:53:58
Exhibit B to the affidavit of C. Seth 10:54:04
Landefeld, M.D. and Michael Steiman, M.D. 10:54:08
and I take it that that document contains 10:54:17
the materials that you reference in 10:54:19
Footnote 72? 10:54:21
A. That's correct. 10:54:22
Q. And that therefore that's the information 10:54:25
that you've reviewed to clearly allow for 10:54:27
identifying prescription patterns by 10:54:31
diagnosis? 10:54:32
A. And, again, the list of ICD-9 codes that 10:54:32
goes along with that, yes. 10:54:36
MR. POLUBINSKI: Okay. Now let's 10:54:37
mark the next exhibit. 10:54:39
(Exhibit No. 16, Affidavit of C. 10:54:39
Seth Landefeld, M.D. and Michael Steiman, 10:54:39
M.D., marked for identification.) 10:54:56
Q. Okay. I'm handing you a document that's 10:54:57

been marked as Rosenthal Exhibit 16. Can 10:54:58
you turn to the specific pages that are 10:55:11
referenced in Footnote 73 of your 10:55:12
declaration -- 10:55:15
A. Okay. 10:55:15
Q. -- which is to say Pages 63 to 65 of 10:55:15
Exhibit B. 10:55:18
A. Okay. 10:55:31
Q. These three pages are the pages that you 10:55:31
had in mind, correct? 10:55:33
A. That's right, particularly the -- I'm 10:55:34
sorry, I can't see the page numbers, 63. 10:55:37
Q. Okay. And if you flip back to Page 62 -- 10:55:39
A. Okay. Yes. 10:55:44
Q. -- the top of 62 reads, "Appendix 1: Use 10:55:48
of gabapentin - national and Medicaid 10:55:54
program estimates." 10:55:57
A. Yeah. 10:56:01
Q. So the graphs that you referred to in 10:56:01
Footnote 73 are part of Appendix 1 to this 10:56:05
report; is that correct? 10:56:09
A. That's my understanding, yeah. 10:56:09
Q. Are you aware that the graphs on Pages 63 10:56:11
to 65 were created by the lawyers, Greene 10:56:23
and Hoffman? 10:56:26

A. I believe that that's right, that analysis 10:56:27
was done by the lawyers, yes, which is why 10:56:29
I don't -- didn't use it specifically. 10:56:31
Q. Okay. Did you review the underlying report 10:56:36
to which this document is attached as an 10:56:38
exhibit? 10:56:40
A. I may have. We certainly tried to learn 10:56:40
where the data came from, what assumptions 10:56:44
they made in plotting the data, yes. 10:56:48
Q. Okay. If we could look at Page 43 -- 10:56:54
A. Okay. 10:57:00
Q. -- of the report that is attached as 10:57:00
Exhibit B to this declaration. That report 10:57:05
is called "Expert Consultant's Report, 10:57:10
United States ex rel Franklin versus 10:57:14
Pfizer, Inc., et al., prepared by Michael 10:57:17
Steiman, M.D., C. Seth Landefeld, M.D., 10:57:20
Mary-Margaret Chren, M.D." 10:57:25
A. I'm sorry, you've lost me. At which page? 10:57:28
Q. It's Page 43 of the -- 10:57:31
A. Okay. 10:57:33
Q. -- of Exhibit B, the underlying report. 10:57:33
MR. NOTARGIACOMO: I'm sorry, I 10:57:38
don't see that language on Page 43. 10:57:39
A. (Indicating.) 10:57:43

M. ROSENTHAL

---

413

1  Q. That's Page 43.                              10:57:44
2  A. I'm in the right place?                      10:57:45
3  Q. Yes.                                         10:57:46
4  A. Okay. Sorry.                                 10:57:47
5       MR. NOTARGIACOMO: You've just              10:57:48
6  read something that -- I'm not sure where       10:57:49
7  it came from.                                   10:57:51
8       MR. POLUBINSKI: Yeah, what I just          10:57:54
9  read was the title of the report itself,        10:57:55
10  the title of what Exhibit B actually is.       10:57:56
11 A. Yes.                                         10:57:56
12      MR. POLUBINSKI: It's an expert             10:57:56
13 consultant's report.                            10:57:58
14 A. Okay.                                        10:57:58
15      MR. NOTARGIACOMO: Okay. Where              10:57:59
16 is -- I'm just asking where that language       10:57:59
17 is. What page?                                  10:58:01
18      MR. POLUBINSKI: Page 1 of Exhibit          10:58:01
19 B.                                              10:58:02
20 A. Yeah.                                        10:58:03
21      MR. POLUBINSKI: I was reading it           10:58:09
22 really just to give context of what Exhibit     10:58:10
23 B really is. I want focus on Page 43.           10:58:12
24 BY MR. POLUBINSKI:                              10:58:16
25 Q. If you could focus with me on the first two  10:58:17

---

414

1  sentences at the top of the page. They          10:58:23
2  read, "Documents provided by Pfizer/Parke-      10:58:27
3  Davis document massive growth in the use of     10:58:31
4  gabapentin for unapproved uses over the         10:58:34
5  mid- and late 1990s (RXD)" with a reference     10:58:38
6  to Footnote 10, "These are explained            10:58:44
7  graphically in Appendix 1."                     10:58:47
8       You would agree that these                 10:58:51
9  sentences refer to the graphs on Pages 63       10:58:51
10  to 65 that you cite --                         10:58:58
11 A. Yes.                                         10:58:59
12 Q. -- in your declaration, correct?            10:58:59
13 A. Yes.                                         10:59:00
14 Q. Can you take a look at Footnote 10, please,  10:59:01
15  of your report.                                10:59:03
16 A. Yeah.                                        10:59:04
17 Q. It's Footnote 10. That reads, "This data     10:59:04
18  was compiled by Green and Hoffman from         10:59:10
19  documents received by Pfizer/Parke-Davis.      10:59:13
20  The original source of this data is            10:59:15
21  unclear, and we do not have clear              10:59:17
22  confirmation of the units of measurement       10:59:19
23  (e.g. we cannot be sure if they represent      10:59:21
24  the number of unique prescriptions, the        10:59:24
25  number of one month supplies of medications    10:59:27

---

415

1  dispensed, et cetera). The classification       10:59:29
2  of individual diagnoses into categories and     10:59:33
3  disease was performed by Greene and Hoffman     10:59:36
4  and briefly reviewed by us."                    10:59:36
5  A. I see that.                                  10:59:39
6  Q. Have you been able to determine the          10:59:50
7  original source of the data or the units of     10:59:52
8  measurement that Drs. Landeman (sic),           10:59:55
9  Steiman and Chren were not able to?             10:59:59
10 A. We confirmed with the office of Mr. Chren.   11:00:03
11  I don't know Mr. Hoffman, or Ms. Hoffman.      11:00:07
12  I don't know. But with Mr. Chren that          11:00:09
13  these data -- the original source of the       11:00:11
14  data was the National Disease and              11:00:13
15  Therapeutic Index report from IMS. And so      11:00:17
16  we learned about that data set in              11:00:20
17  particular, and the data set records           11:00:22
18  prescribing by physicians at an office         11:00:26
19  visit.                                         11:00:29
20 Q. Have you actually reviewed the underlying    11:00:31
21  data set yourself?                             11:00:33
22 A. I have -- not the underlying data set, no.   11:00:34
23  I've seen the spreadsheets from which the      11:00:38
24  graphs were developed, but I did not use       11:00:40
25  the data myself because I didn't have the      11:00:46

---

416

1  original data set, so I couldn't confirm if     11:00:47
2  they were used appropriately.                   11:00:49
3  Q. Okay. When you say you saw the               11:00:51
4  spreadsheets that were prepared from the        11:00:55
5  underlying data --                              11:00:56
6  A. That list those diagnosis codes.            11:01:01
7  Q. Okay. Are those documents that are           11:01:02
8  referred to in the list of documents           11:01:06
9  considered in your report?                      11:01:07
10 A. Again, I don't -- I guess I don't know if    11:01:08
11  it's -- that's separate from this document     11:01:12
12  itself. I guess the spreadsheets I did         11:01:15
13  see, I don't know that they're not -- I        11:01:19
14  don't know that they're in my list, no.        11:01:21
15      MR. POLUBINSKI: We'd ask that you          11:01:25
16  or plaintiffs' counsel identify what the       11:01:26
17  spreadsheets are. Insofar as they're           11:01:28
18  documents that have actually been produced     11:01:30
19  by defendants, we would be grateful to know    11:01:31
20  what the Bates number of those documents       11:01:33
21  are. Insofar as they're documents that         11:01:35
22  were actually prepared for Dr. Rosenthal's     11:01:38
23  use, Professor Rosenthal's use in preparing    11:01:41
24  her declaration, we call for their             11:01:44
25  production.                                     11:01:46

27 (Pages 413 to 416)

M. ROSENTHAL

417

1  A. I believe they were part of the Franklin          11:01:46
2     production itself, but...                         11:01:49
3        MR. NOTARGIACOMO: I'll look into        11:01:50
4     it.                                               11:01:52
5        THE WITNESS: Okay.                             11:01:52
6  Q. All right. Aside from the spreadsheets      11:02:06
7     that we've just talked about that summarize  11:02:07
8     this data --                                      11:02:09
9  A. Yeah.                                             11:02:10
10 Q. -- have you reviewed any other NDTI data     11:02:10
11    for your work in this case?                       11:02:13
12 A. No, I have not.                                    11:02:14
13 Q. We can set that document to one side.         11:02:26
14 A. Okay. Thank you.                                  11:02:28
15 Q. So in your declarations you've proposed       11:02:49
16    using two different data sets to collect          11:02:52
17    data on actual Neurontin prescriptions by        11:02:54
18    diagnosis, correct?                               11:02:56
19 A. In my original declaration I believe I          11:02:57
20    named the NDTI, if it's okay to use that         11:02:59
21    abbreviation, and the NAMCS data as leading  11:03:02
22    candidates.                                       11:03:06
23 Q. Okay.                                             11:03:06
24 A. In my response to Argenbright I also note     11:03:06
25    the existence of this Verispan competitor.   11:03:09

418

1  Q. Okay. Have you ever used the data from the  11:03:11
2     Verispan competitor before?                      11:03:15
3  A. No, I have not.                                    11:03:16
4  Q. Have you made any inquiries at all as to      11:03:17
5     the categories of data that might be             11:03:19
6     available to you through that source?            11:03:21
7  A. The staff spoke, so that would have been      11:03:22
8     Mr. Augusteijn in all likelihood spoke to a  11:03:27
9     salesperson at Verispan to ask about what      11:03:29
10    the data contained and confirmed that it        11:03:31
11    was similar in structure to the NDTI.            11:03:34
12 Q. Are you aware of any differences between      11:03:36
13    the Verispan data and the NDTI data in         11:03:44
14    terms of the differences that would be          11:03:48
15    relevant to the work that you are doing --     11:03:53
16    that you would contemplate doing in this       11:03:54
17    case?                                             11:03:56
18 A. I believe they have different sample sizes.  11:03:57
19    I don't know the exact sample size for the    11:03:59
20    Verispan data set, but in the other            11:04:00
21    comparisons between NAMCS -- sorry, between  11:04:03
22    IMS Health and Verispan for their              11:04:06
23    promotional data, for example, they survey   11:04:09
24    a different set of physician offices.          11:04:11
25 Q. Is it your sense that one set of data would  11:04:14

419

1     be any more reliable than the other set?      11:04:16
2  A. I believe they're both large data sets that  11:04:19
3     are widely used, but I haven't evaluated       11:04:24
4     whether one is better than the other yet.      11:04:27
5  Q. How would you envision using these three      11:04:28
6     different data sets in your work?               11:04:40
7  A. Well, I guess, again, I would sort of         11:04:42
8     evaluate first which database offered the      11:04:45
9     largest samples, the most detailed breakout  11:04:50
10    by diagnosis, for example, assuming they're  11:04:54
11    not all identical, and then primarily we      11:04:57
12    would likely look at monthly units of          11:05:01
13    Neurontin by diagnosis, potentially by         11:05:06
14    dosing, by NDC code.                            11:05:10
15 Q. When you say "potentially by dosing," what   11:05:14
16    do you mean by "potentially"?                   11:05:18
17 A. Well, it's not clear to me at this point      11:05:18
18    whether we roll up dosages or break them      11:05:21
19    out separately and estimate separate models  11:05:24
20    for each of them.                               11:05:26
21 Q. When you say "roll up dosages," you mean?    11:05:30
22 A. Essentially add together extended units for  11:05:32
23    each dose.                                       11:05:35
24 Q. At this point do you envision that you       11:05:37
25    would need all three, or do you imagine       11:05:49

420

1     that they would be to some degree or          11:05:50
2     another redundant?                              11:05:54
3  A. I guess at this point I would imagine, in    11:05:55
4     all likelihood, using more than one, given   11:06:01
5     that they're available, perhaps confirming   11:06:04
6     results with one or another. I'm not          11:06:06
7     entirely sure, if one were to prove really   11:06:09
8     superior to the others, then I would likely  11:06:11
9     only use one. But if there were different    11:06:13
10    strengths and weaknesses, I might             11:06:16
11    triangulate results with two.                  11:06:18
12 Q. How would you determine whether one data     11:06:19
13    set's superior to another?                      11:06:22
14 A. Well, largely having to do with the sample  11:06:23
15    size and the ability to break out these      11:06:25
16    diagnoses.                                       11:06:32
17 Q. I take it that that's not work that you've   11:06:32
18    done yet, looking into the different sample  11:06:38
19    sizes for each of these three data sets?      11:06:40
20 A. There was a little bit of that in my         11:06:42
21    response to Dr. Argenbright, as you may       11:06:45
22    recall in that report.                          11:06:48
23 Q. Aside from what's set forth in your          11:06:55
24    declaration, have you done any analysis at   11:06:57
25    this point about the sample size through     11:06:59

28 (Pages 417 to 420)

M. ROSENTHAL

421

1    competing possibilities?                        11:07:01
2  A.  I have a general sense from having used        11:07:03
3    these data before that the NDTI has a           11:07:06
4    bigger sample size, for example, than the       11:07:10
5    NAMCS, but, again, I have not used the          11:07:12
6    Verispan data, so I don't know precisely        11:07:14
7    what their sample is.                           11:07:16
8  Q.  Have you done any work to date on the         11:07:20
9    relative strengths and weaknesses of the        11:07:24
10   different data sets in breaking                  11:07:27
11   prescriptions out by indication?                 11:07:30
12 A.  Today I have not, no.                          11:07:33
13 Q.  Why not?                                       11:07:34
14 A.  Because I -- what I viewed as my task with     11:07:34
15   regards to the data, this report was to         11:07:41
16   identify a number of data sets that would       11:07:45
17   provide plausible sources of information        11:07:46
18   for breaking out use by diagnosis, and it       11:07:48
19   appears that both the NDTI and the NAMCS        11:07:53
20   have those data, and at the time that I        11:07:57
21   must actually do the analysis decide which      11:08:00
22   of those is more appropriate.                    11:08:02
23 Q.  Do you have to decide based on what further   11:08:04
24   inquiry of NDTI or NAMCS?                        11:08:14
25 A.  And no doubt the literature as well.           11:08:17

422

1  Q.  But there's no reason why you couldn't have   11:08:19
2    conducted that analysis at this stage?          11:08:22
3  A.  And I made preliminary investigations into    11:08:23
4    the characteristics of these data sets that     11:08:27
5    I found sufficient to draw my conclusion        11:08:29
6    that the data would be available for the        11:08:30
7    analysis.                                        11:08:31
8  Q.  All of these data sets are derived from       11:08:35
9    samples, correct?                               11:08:37
10 A.  Yes, that's true.                              11:08:38
11 Q.  And so there will be some amount of           11:08:41
12   inaccuracy that will be built into the          11:08:44
13   data?                                            11:08:45
14 A.  There is what's termed sampling error in      11:08:46
15   every sample-based estimate.                     11:08:49
16 Q.  Here's another general question about the     11:08:52
17   data:  I'm assuming that the patient            11:08:56
18   information in each of these data sets is       11:08:59
19   ultimately confidential?                         11:09:00
20 A.  When you say "patient information," do you    11:09:03
21   mean Mrs. Jones, her insurance number, that     11:09:07
22   kind of patient information?                     11:09:09
23 Q.  I guess the ultimate question that I'm        11:09:10
24   getting at is, none of these data would         11:09:12
25   enable you to determine the diagnosis           11:09:15

423

1    associated with any given identifiable          11:09:20
2    patient's prescription; is that correct?        11:09:22
3  A.  Can I -- may I restate that --                 11:09:24
4  Q.  Sure.                                    11:09:28
5  A.  -- just to make sure I understand it? I        11:09:28
6    can't use these data to then link back to       11:09:30
7    an individual patient?                           11:09:32
8  Q.  Precisely.                              11:09:35
9  A.  Yes, that's true.                              11:09:36
10 Q.  And so that the data that you would           11:09:39
11   collect, of course, would be used only in       11:09:41
12   the aggregate analysis that we've been          11:09:43
13   talking about for the past day and a bit?       11:09:44
14 A.  That's correct.                               11:09:46
15 Q.  Okay.  And then it wouldn't be appropriate    11:09:46
16   for any sort of patient-by-patient             11:09:49
17   analysis?                                   11:09:50
18 A.  Again, when you say "patient-by-patient,"      11:09:51
19   you mean really a specific patient --           11:09:54
20 Q.  Sure.                                    11:09:57
21 A.  -- as opposed to you could do a patient       11:09:57
22   level analysis, but that's not identifying      11:09:59
23   a specific patient.                         11:10:00
24 Q.  What do you mean by "a patient level          11:10:02
25   analysis," what you just said?                  11:10:03

424

1  A.  For example, you could imagine running a      11:10:05
2    logistic regression, a model looking at the     11:10:09
3    probability that an individual receives a       11:10:12
4    prescription for Neurontin as a function of     11:10:14
5    the variables in the NAMCS, for example,        11:10:18
6    private insurance coverage, for example.        11:10:22
7    That would be a patient level analysis, but     11:10:26
8    you still don't identify Mrs. Jones.            11:10:28
9  Q.  Right.  Right.  Okay.  Let's talk about --    11:10:29
10   let me go back to your last answer.  Can        11:10:45
11   you do what you just described in your last     11:10:47
12   answer with the NDTI data set?                  11:10:48
13 A.  I am not certain at what level of detail --   11:10:50
14   again, since I don't have the raw data          11:10:55
15   themselves, I'm not certain what level of       11:10:57
16   detail is available in the NDTI, that NAMCS     11:10:59
17   is a patient level, it's a visit level        11:11:01
18   database.  I understand the NDTI is            11:11:06
19   structured and sampled in a similar way, so     11:11:08
20   it may be possible to.                          11:11:09
21 Q.  But you don't know, as we sit here today,     11:11:10
22   whether you could go back to individual        11:11:12
23   patient records in the NDTI database?           11:11:14
24 A.  I do not, as we sit here today.               11:11:16
25 Q.  Let's talk about the NAMCS database for a     11:11:21

29 (Pages 421 to 424)

M. ROSENTHAL

425

1   second.                                          11:11:23
2   A. Okay.                                         11:11:23
3   Q. You talked about sampling error?              11:11:23
4   A. Yes.                                          11:11:25
5   Q. With regard to NAMCS, in view of the          11:11:25
6     potential for built-in sampling error, have    11:11:32
7     you devised some method to calculate           11:11:35
8     standard errors for frequencies, percents      11:11:36
9     and rates?                                     11:11:39
10  A. Have I devised the method? In the NAMCS       11:11:42
11    they give you enough information to be able    11:11:45
12    to compute those confidence intervals,         11:11:48
13    standard errors. They have weights,            11:11:52
14    sampling weights.                              11:11:54
15  Q. Did NAMCS have standard weights that they     11:11:55
16    provide for purposes --                        11:11:59
17  A. They did, yes.                                11:12:00
18  Q. -- of your analysis?                          11:12:00
19  A. Yes.                                          11:12:00
20      (Discussion off the record.)                 11:12:12
21      MR. POLUBINSKI: Let's mark the               11:12:20
22  next exhibit.                                    11:12:20
23      (Exhibit No. 17, Document headed             11:12:21
24  "National Ambulatory Medical Care Survey,        11:12:21
25  2006 Patient Record," marked for                 11:12:21

426

1   identification.)                                 11:12:22
2   Q. Okay. We've just handed you a document        11:12:38
3     that's marked as Rosenthal Exhibit 17. Do      11:12:42
4     you recognize this?                            11:12:45
5   A. I believe it's the data collection            11:12:45
6     instrument for the NAMCS.                      11:12:47
7   Q. Which is to say that this is the document     11:12:48
8     that doctors would fill out to provide         11:12:53
9     information as part of the NAMCS survey?       11:12:56
10  A. That's my understanding, yes.                 11:12:58
11  Q. Have you ever reviewed this before?           11:13:01
12  A. I have seen it before, but I have certainly   11:13:02
13    not reviewed it in detail recently.            11:13:07
14  Q. Let's look at Section 5. It's about           11:13:09
15    halfway down the page.                         11:13:12
16  A. Okay.                                         11:13:13
17  Q. You'll see three spaces for three different   11:13:14
18    diagnoses in letter A -- under letter A,       11:13:18
19    correct?                                       11:13:22
20  A. Yes.                                          11:13:22
21  Q. And under letter B you'll see sort of 15 or   11:13:23
22    20 additional boxes that a doctor could        11:13:27
23    check as additional conditions a patient       11:13:30
24    might have?                                    11:13:32
25  A. Yes, I see that.                              11:13:32

427

1   Q. And then if we look down at Section 10,       11:13:35
2     which reads "Medications & Immunizations."     11:13:38
3   A. Yes, I see that.                              11:13:41
4   Q. You'll see that there are listed -- well,     11:13:43
5     there are eight spaces there under the         11:13:46
6     heading "Medications & Immunizations,          11:13:49
7     correct?                                       11:13:51
8   A. Yes.                                          11:13:51
9   Q. Is there any way that you can see to tie      11:13:52
10    individual medications prescribed back to      11:13:56
11    individual diagnoses on this record?           11:13:58
12  A. If there's more than one of either, then,    11:13:59
13    no, then you can't make that connection.       11:14:05
14    You're correct that one weakness of the        11:14:14
15    NAMCS is that the prescription is not          11:14:15
16    directly connected with the diagnosis code.    11:14:19
17  Q. Okay. So putting a little context on your     11:14:21
18    observation, in this case if a given record    11:14:28
19    contained a diagnosis for migraine,            11:14:33
20    assuming that migraine is one of the           11:14:35
21    indications that you run through your          11:14:37
22    model --                                       11:14:38
23  A. Okay.                                         11:14:39
24  Q. -- and also a diagnosis for epilepsy and it   11:14:39
25    contained a prescription for Neurontin as      11:14:42

428

1     well --                                        11:14:44
2   A. Yeah.                                         11:14:44
3   Q. -- you wouldn't have any way of knowing       11:14:44
4     whether that prescription was written for      11:14:46
5     an off-label use, correct?                     11:14:47
6   A. If that were the case, I think the            11:14:48
7     conservative assumption would have to be to    11:14:51
8     categorize that as an on-label use.            11:14:54
9   Q. Okay. And with respect to the NDTI data       11:14:56
10    set, generally speaking, what's your source    11:15:13
11    of the -- or what's your understanding         11:15:16
12    the source of the data that underlies that     11:15:18
13    data set?                                      11:15:21
14  A. The underlying data set, I believe, is        11:15:25
15    collected in a similar way to the NAMCS.       11:15:27
16    Again, doctors are asked to fill out data      11:15:29
17    collection forms similar to this, my           11:15:32
18    understanding, for the NDTI.                   11:15:35
19  Q. Have you ever seen a copy of the survey       11:15:37
20    form for NDTI?                                 11:15:39
21  A. I have not, no.                               11:15:39
22  Q. Are you aware of whether it differs from      11:15:43
23    the NAMCS data set?                            11:15:45
24  A. My understanding from having reviewed the     11:15:48
25    Argenbright report -- sorry, is that okay?     11:15:51

30 (Pages 425 to 428)

M. ROSENTHAL

429

```
 1 Q. You can go ahead and answer. That was not      11:15:55
 2    quite the question that I meant to ask, but     11:15:58
 3    why don't you go ahead and give the answer.     11:16:00
 4    Your understanding from the Argenbright --      11:16:00
 5 A. My understanding from reviewing the            11:16:01
 6    Argenbright report and the supporting          11:16:03
 7    documents that he provided is that with the    11:16:05
 8    NDTI there is a one-to-one link between        11:16:07
 9    diagnosis and prescription, but I've not       11:16:11
10    verified that myself.                          11:16:16
11 Q. Okay. Do you know whether you'll have          11:16:17
12    access to individual survey forms when you     11:16:24
13    request data from IMS, the NDTI data?          11:16:27
14 A. Do you mean the model or the actual one        11:16:29
15    that was filled out?                           11:16:32
16 Q. I mean ones that were actually filled out.     11:16:33
17 A. I would not expect so. I would not expect      11:16:35
18    that one could get those from NAMCS either,    11:16:38
19    although the database is structured exactly    11:16:42
20    in the same way.                               11:16:45
21 Q. Okay. We can set this one aside, too.          11:16:46
22 A. Okay.                                          11:16:51
23    MR. NOTARGIACOMO: Is it time for               11:16:53
24 another five-minute break?                        11:16:53
25    MR. POLUBINSKI: If you'd like,                 11:16:54
```

430

```
 1    that's fine with me.                           11:16:56
 2    THE WITNESS: Is that okay? Just                11:16:57
 3    five minutes.                                  11:16:58
 4    MR. POLUBINSKI: Of course, yeah.               11:16:59
 5    THE VIDEOGRAPHER: The time is                  11:17:01
 6 11:17. This is the end of Tape 2, and we          11:17:03
 7    are off the record.                            11:17:07
 8    (Recess taken.)                                11:17:08
 9    THE VIDEOGRAPHER: The time is                  11:28:45
10 11:28. This is beginning of Tape 3, and we        11:28:47
11 are back on the record.                           11:28:49
12 BY MR. POLUBINSKI:                                11:28:50
13 Q. Professor Rosenthal, just to go back for       11:28:50
14    one second to Rosenthal Exhibit 15, there's    11:28:54
15    one issue I just want to make sure is          11:28:58
16    clear.                                         11:29:02
17 A. Okay.                                          11:29:02
18 Q. I may not have it clearly on the record.       11:29:02
19    Your testimony was that Mr. Sommers would      11:29:06
20    have done the aggregation or the groupings     11:29:09
21    that appear on this list, correct?            11:29:11
22 A. That's correct.                                11:29:14
23 Q. Are you aware of whether somebody would        11:29:14
24    have instructed him about the different        11:29:18
25    categories into which to group the             11:29:20
```

431

```
 1    individual costs?                              11:29:22
 2 A. I believe -- as I stated, I believe that we    11:29:23
 3    gave him the categories.                       11:29:26
 4 Q. Okay.                                          11:29:28
 5 A. I'm not absolutely sure of that, but I         11:29:28
 6    believe that we did.                           11:29:31
 7 Q. Terrific. That's the point I wanted to         11:29:32
 8    clarify.                                       11:29:35
 9 A. Okay.                                          11:29:35
10 Q. Okay. In Exhibit 1, your report, Paragraph     11:29:36
11    37, you propose to "introduce a               11:29:44
12    contemporaneous comparator or control drug     11:29:50
13    that could serve as a yardstick" as a          11:29:54
14    further refinement of your equation; is        11:30:00
15    that correct?                                  11:30:02
16 A. That's correct.                                11:30:02
17 Q. Have you done that analysis yet?               11:30:02
18 A. As we've discussed, I don't have the data      11:30:05
19    to do these analyses yet, so I have not        11:30:08
20    done that analysis, either.                    11:30:10
21 Q. What data would you use to do that             11:30:11
22    analysis?                                      11:30:14
23 A. The data that I would use to do that           11:30:14
24    analysis would be very similar to the data     11:30:18
25    that we've discussed already on the            11:30:21
```

432

```
 1    quantity side, so perhaps the NDTI or the      11:30:25
 2    NAMCS or that other Verispan data set that     11:30:28
 3    we discussed.                                  11:30:32
 4 Q. And I assume that the data that you would      11:30:33
 5    use would both be Neurontin data and data      11:30:35
 6    for whatever the proposed comparator would     11:30:38
 7    be?                                            11:30:41
 8 A. That's correct.                                11:30:41
 9 Q. Do you definitely plan on doing this           11:30:45
10    analysis with a contemporary comparator in     11:30:47
11    your model?                                    11:30:51
12 A. I guess I'm not entirely sure yet whether      11:30:57
13    the circumstances will make that              11:30:59
14    appropriate, so depending on exactly what      11:31:00
15    kinds of promotional activities we're          11:31:02
16    talking about, which indications we're         11:31:04
17    talking about, then it may be appropriate      11:31:07
18    to do that, but I guess it definitely is a     11:31:08
19    word that I feel is maybe a little too         11:31:13
20    strong, but I think in all likelihood I'll     11:31:17
21    look to comparator drugs, at least examine     11:31:19
22    their trends.                                  11:31:22
23 Q. And why would you anticipate you would do      11:31:24
24    that, in all likelihood?                       11:31:26
25 A. That's simply a good way of getting a          11:31:27
```

31 (Pages 429 to 432)

M. ROSENTHAL

433

1    better approximation of the true effect.    11:31:33
2  Q. If you weren't able to do this analysis,    11:31:41
3    would you still be able to get a reliable    11:31:44
4    approximation of the true effect?    11:31:50
5  A. Well, I guess I'm not sure why I wouldn't    11:31:52
6    be able to do the analysis, but if I    11:31:58
7    weren't for some reason able to do the    11:32:01
8    analysis, then it would depend on the    11:32:03
9    underlying circumstances, so a comparator    11:32:06
10    drug allows for breaking out essentially    11:32:10
11    other secular trends. If those secular    11:32:13
12    trends were unimportant, then it wouldn't    11:32:16
13    matter.    11:32:18
14  Q. But at this point you don't know; is that    11:32:21
15    correct?    11:32:23
16  A. At this point I couldn't say for sure.    11:32:23
17  Q. Do you plan on -- withdrawn.    11:32:27
18    Would you plan on using one drug    11:32:29
19    or more than one in your comparator    11:32:31
20    analysis?    11:32:33
21  A. At this point I can't really say for sure.    11:32:34
22    I would need to review the data and again    11:32:36
23    the clinical issues related to these    11:32:41
24    comparison drugs.    11:32:46
25  Q. How will you decide whether you use one or    11:32:47

434

1    more than one?    11:32:49
2  A. Well, I guess it would depend again on for    11:32:54
3    a particular indication how many drugs were    11:32:57
4    substitutes for Neurontin for that    11:33:00
5    indication.    11:33:02
6  Q. Would it depend on other things or just    11:33:04
7    that?    11:33:05
8  A. It might depend on other things as well,    11:33:06
9    but I would say that's sort of the first    11:33:08
10    thing that I would consider.    11:33:10
11  Q. Okay. You suggest in Paragraph 37 that    11:33:10
12    Dilantin --    11:33:20
13  A. Yes.    11:33:20
14  Q. -- might be an appropriate comparator drug?    11:33:20
15  A. It was a hypothetical, yes. As you know,    11:33:23
16    Dilantin is used for some of the same    11:33:25
17    indications.    11:33:27
18  Q. How confident are you that Dilantin might    11:33:28
19    be an appropriate comparator drug?    11:33:31
20  A. I'm not sure what you mean by "how    11:33:35
21    confident." I think it makes for a good    11:33:38
22    example, but in the ultimate analysis I    11:33:40
23    would look to, again, clinical input or    11:33:42
24    which drugs were being used for the same    11:33:45
25    indications, as well as the data    11:33:48

435

1    themselves.    11:33:49
2  Q. All right. Let's just use Dilantin as an    11:33:59
3    example for how you would do this analysis.    11:34:02
4  A. Okay.    11:34:04
5  Q. Would you have to look into the relative    11:34:08
6    efficacy of Dilantin for both its FDA-    11:34:10
7    approved use and for its off-label uses?    11:34:16
8  A. I don't believe that would be factor in the    11:34:20
9    analysis. Again, I would rely on some    11:34:21
10    clinical expertise as to the extent to    11:34:24
11    which Dilantin makes for a good comparison    11:34:27
12    for the particular indication in question,    11:34:29
13    so perhaps if I provide a little more    11:34:32
14    detail, it'll help. Then we can talk about    11:34:34
15    that. So imagine the following scenario:    11:34:38
16        Both Dilantin and Neurontin are    11:34:40
17    used for some off-label indication, I'm not    11:34:42
18    even sure what the right indication to    11:34:47
19    choose is here, but let's say there is one.    11:34:49
20    We observe that they were used by    11:34:51
21    neurologists for the same off-label use.    11:34:53
22    Perhaps it's a form of pain. And then I    11:34:56
23    could look over time at these allegedly    11:35:00
24    illegal activities related to Neurontin and    11:35:05
25    see if my model suggested they were having    11:35:06

436

1    an effect on Dilantin use for the same    11:35:09
2    off-label use.    11:35:11
3        If there -- if those -- the model    11:35:12
4    suggested there was an effect on Dilantin,    11:35:15
5    I would interpret that as the model picking    11:35:17
6    up some secular trend, and I could break    11:35:19
7    that out of the ultimate estimate.    11:35:22
8  Q. Maybe I'm misunderstanding your report, but    11:35:25
9    I'm assuming that what you would be doing    11:35:30
10    with the comparator drug, among other    11:35:32
11    things, is comparing trends and off-label    11:35:34
12    prescribing of that comparative drug --    11:35:36
13    comparator drug to the trends and off-label    11:35:38
14    prescribing with Neurontin, correct?    11:35:41
15  A. In the context of a regression model, but,    11:35:41
16    yes, you're correct.    11:35:44
17  Q. Right.    11:35:45
18  A. It's what's called a difference-in-    11:35:45
19    difference estimate.    11:35:48
20  Q. Sure. Wouldn't you agree that one of the    11:35:50
21    things that could impact the trends and    11:35:52
22    off-label prescribing of the comparator    11:35:54
23    drug would be that drug's efficacy in    11:35:56
24    treating the particular off-label use at    11:35:58
25    issue?    11:36:00

32 (Pages 433 to 436)

M. ROSENTHAL

437

1  A. Yes, but you're assuming -- okay. I'm not    11:36:00
2     sure if -- let me try to be really clear    11:36:04
3     about what I'm trying to estimate. I'm    11:36:07
4     only trying to use Dilantin to pick up any    11:36:09
5     secular trends that may commonly affect    11:36:12
6     this class of drugs and their off-label    11:36:15
7     use. If indeed Dilantin is not viewed as    11:36:18
8     an effective substitute -- well, first of    11:36:22
9     all, then it wouldn't make a very good    11:36:24
10    comparator.    11:36:28
11 Q. That's my question.    11:36:28
12 A. Well, again, the choice of comparators will    11:36:29
13    be made on the basis of clinical    11:36:31
14    substitutability for the condition. So if    11:36:33
15    there's no off-label use for Dilantin for    11:36:35
16    this particular condition, for example,    11:36:37
17    because it's not believed to be    11:36:39
18    efficacious, it wouldn't be a very good    11:36:41
19    comparator.    11:36:44
20 Q. Fair enough. I guess my question is, how    11:36:44
21    do you anticipate making that    11:36:47
22    determination?    11:36:48
23 A. I expect to get clinical input as to which    11:36:48
24    drug's to be used but also to look at the    11:36:51
25    data that break out use by diagnosis,    11:36:53

438

1     and -- but nonetheless, I think it's    11:36:58
2     important to put in context your question.    11:37:00
3     So imagine the Dilantin is used sometimes    11:37:02
4     but that most physicians view it as    11:37:05
5     inferior.    11:37:07
6         Well, that's not really the    11:37:08
7     problem. I'm trying to look at breaking    11:37:11
8     out its trend. If indeed its trend is not    11:37:13
9     coinciding with these off-label events,    11:37:16
10    there will be no real effect there. There    11:37:18
11    will be nothing to break out. But if    11:37:20
12    Dilantin use seems to be going up at the    11:37:23
13    same time as Neurontin use, then that's a    11:37:25
14    measure of some other factor that I'm not    11:37:28
15    capturing, and that can be netted out of    11:37:30
16    the estimate, the quantity induced by the    11:37:32
17    off-label promotion. That's sort of the    11:37:34
18    purpose of a difference-in-difference    11:37:37
19    analysis is to prove your identification.    11:37:38
20 Q. Right. I guess let me try to ask the    11:37:46
21    question by reference --    11:37:47
22 A. Okay.    11:37:49
23 Q. -- to a different possibility. Would you    11:37:49
24    need to conduct analysis in deciding which    11:37:51
25    comparator drug to use and to what the side    11:37:57

439

1     effect profile is of that comparator drug,    11:37:58
2     so Dilantin in the example that we've been    11:38:01
3     talking about?    11:38:04
4  A. So let me be clear again. Only to the    11:38:05
5     extent that there are changes over time in    11:38:09
6     that side effect profile or the knowledge    11:38:11
7     about that side effect profile that    11:38:13
8     coincide with the off-label promotion. So    11:38:16
9     there's not -- I didn't write down a model    11:38:19
10    here so I can understand how it's not    11:38:21
11    entirely clear from the general way that    11:38:23
12    I've talked about it, but what's key here    11:38:25
13    is there -- we'd looked to see if the model    11:38:29
14    predicted an impact on Dilantin or some    11:38:31
15    other drug's use from the off-label    11:38:36
16    promotions related to Neurontin. And we    11:38:38
17    would assume, make a conservative    11:38:42
18    assumption that any effects we see are    11:38:44
19    really from something else in the    11:38:46
20    environment and that we should separate    11:38:49
21    those and not attribute those to the    11:38:51
22    allegedly illegal activities.    11:38:58
23        And so that would be the purpose    11:38:58
24    here, and so cross-sectional differences in    11:38:59
25    effectiveness or side effect profiles,    11:39:01

440

1     they're irrelevant to that piece of    11:39:04
2     information. They don't -- there's no --    11:39:05
3     doesn't confound that estimate.    11:39:07
4  Q. That's because you're looking at changes in    11:39:08
5     the trend as opposed to the trend itself?    11:39:10
6  A. I'm looking at changes in the trend    11:39:12
7     particularly as they relate to the    11:39:15
8     allegedly illegal promotional activities,    11:39:18
9     not just -- I'm not just comparing trends    11:39:20
10    side by side. This is all in the context    11:39:22
11    of this regression model, so an interaction    11:39:23
12    effect.    11:39:27
13 Q. Okay. I guess a more general question, how    11:39:33
14    confident are you that a sufficiently    11:39:44
15    similar comparator drug actually exists for    11:39:45
16    Neurontin?    11:39:48
17 A. I think this would vary by indication, and    11:39:48
18    I guess I don't feel comfortable making a    11:39:51
19    blanket statement.    11:39:55
20 Q. Okay. In Paragraph 38 of your report you    11:39:56
21    write that you might further refine your    11:40:06
22    model by seeking to make "contemporaneous    11:40:08
23    comparisons across geographical or clinical    11:40:13
24    submarkets"?    11:40:16
25 A. Yes. I see that.    11:40:26

33 (Pages 437 to 440)

M. ROSENTHAL

441

1  Q. Right. And I believe that you also write          11:40:27
2     that your analysis here will be "informed         11:40:33
3     by a detailed understanding of the                11:40:35
4     institutional context affecting prescribing       11:40:37
5     behavior" -- or "prescription behavior"?          11:40:40
6  A. Uh-huh.                                            11:40:42
7  Q. What does that mean?                               11:40:43
8  A. Let me just see in what sentence that              11:40:44
9     appears.                                           11:40:53
10 Q. Sure. That was --                                  11:40:53
11 A. Yeah.                                              11:40:54
12 Q. It appears in the second paragraph of             11:40:54
13    Paragraph 38.                                       11:40:56
14 A. Okay. Great. Let me just read it for a            11:40:57
15    sec to make --                                      11:41:01
16 Q. Sure.                                              11:41:03
17 A. -- so I don't --                                   11:41:03
18       (Witness reviews document.)                     11:41:04
19 A. I think the general notion that I was             11:41:12
20    thinking about there in particular, we're          11:41:14
21    talking about clinical submarkets, thinking        11:41:17
22    about, for example, by specialty, so where         11:41:20
23    some of the activities may be focused on           11:41:23
24    particular specialties, as we may have             11:41:26
25    discussed yesterday, the specialties differ        11:41:28

442

1     in terms of, excuse me, the extent to which       11:41:31
2     they may go to different meetings, they may        11:41:34
3     have different practice settings, and so if        11:41:38
4     there's an opportunity to get some                 11:41:40
5     identification there, particularly if some         11:41:41
6     of the defendants' documents suggest               11:41:45
7     marketing specific to certain geographic           11:41:48
8     areas, certain specialties, that may be            11:41:51
9     another way of doing the same kind of              11:41:54
10    difference-in-difference analysis.                 11:41:56
11 Q. So what you're saying, though, is that            11:41:58
12    prescribing behavior may well differ               11:42:00
13    depending on those different factors that          11:42:03
14    you've just outlined in your last answer?          11:42:05
15 A. Right. So cross-sectionally it may, and if        11:42:07
16    there's evidence of the promotional                11:42:10
17    activities targeting one of those areas,           11:42:12
18    geographic is obviously the easiest one to         11:42:14
19    describe. We have evidence of a big                11:42:17
20    meeting in Boston. We might seek to try to         11:42:18
21    identify its effect. We're looking at              11:42:21
22    Boston physicians prescribing versus               11:42:22
23    California physicians prescribing.                 11:42:25
24 Q. Uh-huh. Where do you anticipate your              11:42:27
25    information would come from to enable you          11:42:29

443

1     to do this analysis?                               11:42:31
2  A. Well, again, I would say this is -- as you        11:42:32
3     can tell the way the model moves along             11:42:34
4     through the paragraphs, this is the part           11:42:36
5     that -- I mean, it's not clear to me that          11:42:38
6     there are databases where one can look at          11:42:40
7     both geography and specialty and diagnosis.        11:42:42
8     IMS Health does have databases where one           11:42:47
9     can look at prescribing overall by                 11:42:50
10    geography and where one can look at                11:42:52
11    prescribing by specialty.                          11:42:54
12       I can certainly imagine the                     11:42:58
13    defendants track those kinds of data in            11:42:58
14    their own work. But I haven't seen                 11:43:02
15    detailed data that I'm certain would               11:43:05
16    support this kind of analysis. So it's the         11:43:07
17    kind of thing that I would like to explore         11:43:09
18    though, if possible.                               11:43:11
19 Q. Okay. But you haven't yet done that?              11:43:12
20 A. I have not done that.                              11:43:12
21 Q. And you're not aware of whether the data          11:43:13
22    would exist yet to enable you to do it?            11:43:16
23 A. There are certainly -- again, there are           11:43:18
24    data by geography and specialty, and there         11:43:19
25    are data by diagnosis. I'm not sure               11:43:22

444

1     whether the two things can be linked              11:43:23
2     effectively. I mean, certainly in the              11:43:25
3     NAMCS they can because it's a patient level        11:43:28
4     database. In the NAMCS one could look              11:43:30
5     certainly by specialty and then by                 11:43:32
6     diagnosis.                                          11:43:34
7  Q. You're familiar with the concept of               11:43:35
8     endogeneity in the context of regression           11:43:44
9     analysis?                                          11:43:46
10 A. I am.                                              11:43:46
11 Q. Is it correct to say that endogeneity             11:43:47
12    occurs when one or more independent                11:43:51
13    variables is correlated with the error             11:43:53
14    term?                                              11:43:55
15 A. Yes.                                               11:43:56
16 Q. And that a specific kind of endogeneity           11:43:57
17    might occur when dependent and independent         11:44:01
18    variables are jointly determined?                  11:44:04
19 A. Yes.                                               11:44:06
20 Q. Just to help me make sure I understand            11:44:06
21    this, what I'll do is give you a                    11:44:10
22    hypothetical, and I'll ask you if you can          11:44:13
23    tell me if it'll present an endogeneity            11:44:14
24    problem.                                            11:44:18
25 A. Okay.                                              11:44:18

34 (Pages 441 to 444)

VERITEXT/NEW YORK REPORTING COMPANY

M. ROSENTHAL

445

1  Q.  Imagine that your dependent variable is          11:44:19
2      violent behavior, your independent variable      11:44:23
3      is watching violent television shows.            11:44:26
4  A.  Okay.                                   11:44:29
5  Q.  You want to run a regression to test the         11:44:29
6      hypothesis that watching violent television      11:44:32
7      shows causes violent behavior.  You might        11:44:35
8      imagine further that some people have an         11:44:38
9      underlying propensity towards -- to engage       11:44:39
10     in violent behavior which might also cause       11:44:42
11     them to watch more violent television            11:44:45
12     shows.  Is my hypothetical clear?                11:44:48
13 A.  I understand perfectly.                      11:44:52
14 Q.  If the hypothetical model didn't account         11:44:53
15     for the underlying propensity to engage in       11:44:55
16     violent behavior, would there be an              11:44:57
17     endogeneity problem?                         11:45:01
18 A.  Yes.                                     11:45:03
19 Q.  And would it likely tend to overestimate         11:45:03
20     the degree to which watching violent             11:45:06
21     television shows causes violent behavior?        11:45:10
22 A.  Yes.                                     11:45:12
23 Q.  Why is that?                              11:45:12
24 A.  You mean in layman's terms?                  11:45:12
25 Q.  That would be great, since you're speaking       11:45:19

446

1      to lay people, yeah.                         11:45:20
2          MR. NOTARGIACOMO:  Or English.            11:45:21
3  A.  Essentially there's this omitted factor         11:45:23
4      that causes both things, causes the TV           11:45:26
5      watching and the violent behavior.  So it's      11:45:28
6      the kind of -- endogeneity, generally it         11:45:31
7      can be considered a form of omitted              11:45:33
8      variable bias, too.  There's this omitted        11:45:36
9      factor or third factor that causes both,         11:45:39
10     and now you've attributed the causal effect      11:45:42
11     of that factor to the factor that you have       11:45:44
12     included on the right-hand side.                 11:45:46
13 Q.  What are the consequences of leaving            11:45:48
14     possible endogeneity like the endogeneity        11:45:51
15     that we just talked about in a regression        11:45:53
16     model unaddressed?                          11:45:55
17 A.  Well, essentially it causes a bias either       11:45:55
18     up or down.                               11:46:00
19 Q.  Okay.  The results wouldn't be reliable,        11:46:02
20     correct?                                 11:46:04
21 A.  The term "reliable" has other statistical       11:46:04
22     meanings, so can we say that they would be       11:46:07
23     biased?                                  11:46:09
24 Q.  Sure.  Why don't you tell me what you think     11:46:10
25     biased means just so --                      11:46:13

447

1  A.  Either too large or too small.              11:46:14
2  Q.  Okay.  And I guess to, you know, maybe put      11:46:16
3      it in a slightly more technical way, it          11:46:23
4      would mean the coefficients that you're          11:46:26
5      trying to estimate would be overestimated        11:46:28
6      or underestimated, correct?                   11:46:30
7  A.  That's correct.                           11:46:31
8  Q.  Now, here's a question.  Failure to address     11:46:39
9      the endogeneity of one variable could           11:46:41
10     adversely affect the reliability of the          11:46:43
11     estimates for coefficients of other             11:46:45
12     variables even if those variables aren't         11:46:47
13     endogenous; is that correct?  Is my             11:46:51
14     question --                               11:46:52
15 A.  If they're correlated with the omitted          11:46:53
16     variable as well.                          11:46:55
17 Q.  Okay.  Now, as they're written in this          11:46:55
18     simple form in your declaration here,            11:46:59
19     neither equation one nor equation two            11:47:01
20     addresses on its face at least the               11:47:04
21     possibility that off-label promotion is          11:47:06
22     endogenous, correct?                         11:47:09
23 A.  Neither of the equations explicitly address     11:47:10
24     endogeneity.  Obviously the timing of these      11:47:16
25     interventions is intended to do so, and I        11:47:18

448

1      believe, but I would have to check, that         11:47:21
2      there's a footnote about exploration of IV       11:47:23
3      modeling, but --                           11:47:27
4  Q.  Why don't --                             11:47:27
5  A.  -- of the models themselves.                 11:47:28
6  Q.  Sure.  Why don't we -- why don't we check       11:47:30
7      the footnote that I've been able --              11:47:30
8  A.  Okay.                                   11:47:30
9  Q.  -- to find at least --                       11:47:33
10 A.  Okay.  That's good.                         11:47:33
11 Q.  -- which is Footnote 63 on Page 16.             11:47:34
12 A.  Excellent.                              11:47:37
13 Q.  Are you there?                            11:47:39
14 A.  Yes.                                    11:47:40
15 Q.  Okay.  You write that "I will further          11:47:40
16     explore and address through statistical          11:47:44
17     tests and alternative specifications the         11:47:47
18     possible endogeneity of off-label               11:47:49
19     promotion."                               11:47:53
20         Did I read that correctly?               11:47:53
21 A.  Yes, you did.                             11:47:54
22 Q.  So you would agree that off-label promotion     11:47:55
23     in your model is possibly endogenous,            11:47:58
24     correct?                                 11:48:02
25 A.  Possibly, yes.                            11:48:02

35 (Pages 445 to 448)

Q. Is it possible that on-label promotion could also be endogenous? 11:48:03 11:48:11
A. On-label promotion could be endogenous to off-label use? 11:48:13 11:48:16
Q. Yes. 11:48:17
A. I suppose -- I would need to think about it for a minute. So what's the omitted variable there? Well -- 11:48:17 11:48:21 11:48:24
Q. You're going to have to help me. 11:48:29
A. One could perhaps always construct a scenario in which there's an omitted variable, so on-label promotion, one of the ways to try to fully specify the effects of on-label use on off-label use is to put in that on-label promotion, because otherwise that would be an omitted variable, and also time to put in variables like time since the launch of the drug which captures the natural diffusion of on-label and off-label uses. 11:48:31 11:48:35 11:48:37 11:48:43 11:48:48 11:48:52 11:48:55 11:48:57 11:49:00 11:49:02 11:49:05
And so in a model you could always construct a scenario in which there was some omitted factor that was correlated and then therefore some endogeneity here. But I can't think of a mechanism. 11:49:06 11:49:09 11:49:11 11:49:14 11:49:17

Q. Okay. Let me ask -- describe, you know, a generic example here. 11:49:19 11:49:26
A. Okay. 11:49:28
Q. Endogeneity could well occur here because a drug company might adjust its level of promotional spending activities in response to the quantity of the drug sold; is that right? 11:49:29 11:49:31 11:49:33 11:49:36 11:49:40
A. It addresses -- I'm sorry, it adjusts the quantity of spending on on-label promotion due to the quantity of -- that it sells. 11:49:40 11:49:44 11:49:47
Q. Just for purposes of the example, let's not even worry about on-label versus off-label. We could talk about it -- why don't we talk about off-label promotion just to make it simple. Let me just spin out the question again. 11:49:50 11:49:52 11:49:55 11:49:57 11:49:59 11:50:05
A. Okay. 11:50:05
Q. That endogeneity might well occur because a manufacturer might adjust its level of promotional spending or other activities related to off-label uses in response to the quantity of the drug sold for those off-label uses? 11:50:05 11:50:09 11:50:11 11:50:13 11:50:15 11:50:18
A. Well, if we weren't distinguishing on-label 11:50:19

and off-label, then certainly there is an argument that promotional spending responds to the level of sales. 11:50:22 11:50:25 11:50:28
Q. And so endogeneity might well occur in a circumstance like that? 11:50:30 11:50:32
A. It might well, but I think we're just trying to distinguish here between on- and off-label. 11:50:33 11:50:37 11:50:40
Q. Okay. Fair enough. And I guess I'm happy at this point to leave the on-label/ off-label distinction. 11:50:40 11:50:44 11:50:47
A. Okay. 11:50:48
Q. Now, just referring again just to the off-label uses, failure to account for the sort of endogeneity that I described in my last question would likely produce too high an estimate of the impact of off-label promotion, correct, failure to account for that endogeneity? 11:50:48 11:50:50 11:50:53 11:50:55 11:51:00 11:51:02 11:51:06
A. If that endogeneity proves to be, you know, statistically shown, then, yes, that's right. 11:51:07 11:51:11 11:51:13
Q. Here's another general question: 11:51:13
A. Okay. 11:51:19
Q. Is it possible that your model could omit a 11:51:19

variable that affects both drug demand and drug promotion? 11:51:25 11:51:29
A. Certainly it's always possible. I will try to consider all the important variables that might affect certainly my left-hand-side variable. 11:51:30 11:51:34 11:51:36 11:51:40
Q. Okay. Would that be an endogeneity problem, just terminologically, or would it be something else? 11:51:41 11:51:43 11:51:45
A. Well, omitted variable bias to the extent that we worry about it, it's because it's causing -- it has a correlation with the variable that you care about, here the allegedly illegal activities, and with the left-hand side variables, so they're the same thing for our purposes here. 11:51:46 11:51:49 11:51:52 11:51:55 11:51:57 11:52:00 11:52:03
Q. Okay. 11:52:06
A. Unless we're -- I'm sorry, unless we're talking about the simultaneity that you mentioned before, but I think we were talking about a third variable, yes? 11:52:10 11:52:12 11:52:16 11:52:17
Q. I think that's right. Let's move on to -- 11:52:18
A. Okay. 11:52:22
Q. -- another part of -- or I guess another piece of this sentence in Footnote 63 -- 11:52:22 11:52:26

M. ROSENTHAL

453

1  A.  Okay.                                          11:52:30
2  Q.  -- in which you say that you "will further     11:52:31
3      explore and address through statistical        11:52:35
4      tests and alternative specifications           11:52:37
5      possible endogeneity."                         11:52:40
6          What statistical tests do you have         11:52:45
7      in mind?                                       11:52:47
8  A.  Well, there's the Hausman test for             11:52:47
9      endogeneity.  Excuse me.  That's the           11:52:49
10     principal test for endogeneity.                11:52:54
11 Q.  Can you tell me what the Hausman test is?      11:52:56
12 A.  Well, I can't tell you exactly what goes       11:52:57
13     into the test.  I'd have to say I would        11:52:59
14     have to look at the test itself, but it        11:53:01
15     essentially looks for that correlation you     11:53:02
16     talked about in the residuals and the          11:53:05
17     variable that -- of interest.  So if --        11:53:07
18     those error terms, they have to do with the    11:53:13
19     correlation of the residuals.  I actually      11:53:16
20     don't know the exact math on the test.  I      11:53:18
21     can look it up, but...                         11:53:21
22 Q.  Have you ever used it before?                  11:53:22
23 A.  Sure.                                          11:53:25
24 Q.  In what context?                               11:53:28
25 A.  Well, as an example, in my work on direct      11:53:29

454

1      consumer advertising.                          11:53:32
2  Q.  Any other context that you can think of?       11:53:34
3  A.  No, but it's a pretty common test.  I'm        11:53:37
4      sure I've used it in other contexts.           11:53:41
5  Q.  Okay.  Any other statistical tests other       11:53:45
6      than the Hausman test that you talked about    11:53:53
7      that you might run, or is that the one that    11:53:56
8      you would expect you would use?                11:53:58
9  A.  That's the main test, but of course this       11:54:00
10     will all be in the context of a larger set     11:54:02
11     of specification tests about -- excuse me.     11:54:04
12     You want to correctly specify the time         11:54:07
13     relationships, in particular in this model     11:54:11
14     with regard to lags, with regard to whether    11:54:14
15     it's a linear trend or a quadratic trend,      11:54:16
16     these specification issues are important       11:54:20
17     for getting good estimates as well.            11:54:21
18 Q.  Now, the specification issues that you         11:54:24
19     talked about, are those the alternative        11:54:26
20     specifications that you referred to in this    11:54:27
21     sentence, or is it something else?             11:54:30
22 A.  The alternative specifications that I          11:54:31
23     referred to in the sentence include            11:54:33
24     different ways of modeling time itself, as     11:54:35
25     well as potentially examining instrumental     11:54:38

455

1      variables analysis, which is a two-stage       11:54:41
2      model where one predicts the variable of       11:54:44
3      interest here, the allegedly illegal           11:54:49
4      promotions and uses that predicted value       11:54:52
5      instead of the number itself.                  11:54:54
6          So to address your earlier concern         11:54:55
7      about the simultaneity between promotional     11:54:58
8      spending and the quantity of the drug          11:55:02
9      prescribed, for example, you could use an      11:55:05
10     instrumental variables analysis there.         11:55:08
11     That may be appropriate depending on what      11:55:10
12     the data show.                                 11:55:12
13 Q.  Okay.  So in terms of the -- I just want to    11:55:12
14     make sure I have a complete sense of the       11:55:23
15     different approaches that you might use to      11:55:24
16     address endogeneity.  Is there anything        11:55:26
17     else other than what you've just described,    11:55:29
18     the Hausman test, the specification test       11:55:30
19     that you discussed an answer or two ago,       11:55:32
20     the work that you would do that you just       11:55:37
21     described as being -- falling within the       11:55:39
22     category of alternative specifications?        11:55:42
23 A.  I haven't considered all the possibilities,    11:55:45
24     but I would say those are probably among       11:55:48
25     the most important.  And clearly in this       11:55:50

456

1      context, understanding the timing of the       11:55:52
2      specific events and spending relative to       11:55:56
3      the use and modeling that timing              11:55:59
4      appropriately is really a critical part of    11:56:03
5      this question.                                 11:56:05
6          In your example of violent               11:56:09
7      behavior, part of the problem is we don't     11:56:12
8      know which came first.  And here in many      11:56:14
9      cases we know when the median was relative    11:56:16
10     to the use.                                    11:56:20
11 Q.  If you can't tell which came first, does      11:56:23
12     that make it impossible to unravel an         11:56:24
13     endogeneity problem?                          11:56:28
14 A.  It doesn't make it impossible.  Using         11:56:31
15     instrumental variables analysis for example  11:56:33
16     doesn't rely on timing.                       11:56:41
17 Q.  Are there any other ways other than          11:56:42
18     instrumental variable analysis that you      11:56:44
19     could -- that you don't rely on timing to     11:56:46
20     unwind an endogeneity problem?                11:56:49
21 A.  Instrumental variables would be sort of the  11:56:51
22     chief candidate.                              11:56:55
23 Q.  Okay.                                         11:56:57
24 A.  To the extent that the endogeneity problem   11:56:57
25     relates to observables one can also do some  11:57:00

37 (Pages 453 to 456)

M. ROSENTHAL

457

```
 1    kind of propensity score matching.          11:57:03
 2 Q. Some what?                                   11:57:05
 3 A. Some of kind of matching. If we had two      11:57:06
 4    groups again, a group of doctors that        11:57:08
 5    should be effected and a group that          11:57:11
 6    shouldn't, we could do some matching         11:57:12
 7    between those and look at the difference in  11:57:14
 8    the effects and estimate that as the         11:57:17
 9    impact.                                      11:57:20
10 Q. Doing the sort of matching that you just     11:57:21
11    described would require getting data from    11:57:23
12    individual doctors, though, I take it?       11:57:25
13 A. Or, again, if we looked at submarkets or     11:57:26
14    subgroups of specialties so not initially    11:57:31
15    individual doctors but groups.               11:57:36
16 Q. And you'd need to be able to -- well, I'll   11:57:39
17    withdraw the question.                       11:57:41
18 A. Okay.                                        11:57:42
19 Q. So one of the things that you've just been   11:57:42
20    discussing is instrumental variable          11:57:47
21    analysis?                                     11:57:49
22 A. Uh-huh.                                      11:57:51
23 Q. For clarity of the record and for my own    11:57:51
24    edification, could you tell me what an       11:57:56
25    instrumental variable is?                    11:57:58
```

458

```
 1 A. An instrumental variable is something        11:57:59
 2    that's correlated with the variable of       11:58:02
 3    interest, let's call it promotional          11:58:05
 4    spending for argument, but is not other      11:58:07
 5    than through the variable of interest        11:58:10
 6    correlated with your outcome of interest,    11:58:12
 7    use. So it predicts promotional spending     11:58:16
 8    but only to the extent that through          11:58:21
 9    promotional spending does it predict the     11:58:23
10    outcome itself. It doesn't have any          11:58:26
11    independent effect on the outcome.           11:58:28
12 Q. Is it correct to say that an instrumental    11:58:29
13    variable must be uncorrelated with the       11:58:34
14    error term?                                  11:58:35
15 A. Instrumental variable must be uncorrelated   11:58:36
16    with the error term in the primary           11:58:41
17    regression or in the logistic regression     11:58:45
18    that it's in.                                11:58:49
19 Q. Can you explain to me what that means in --  11:58:56
20 A. Well, the instrumental variable itself, if   11:58:58
21    we -- I mean, there are two ways of          11:59:01
22    thinking about instrumental variables,       11:59:03
23    whether it's going to -- you're talking      11:59:04
24    about a two-step regression or putting the   11:59:05
25    instrument directly into the regression,     11:59:08
```

459

```
 1    let's assume that there's this first model   11:59:10
 2    you develop that says there's some           11:59:12
 3    characteristics that you control for         11:59:16
 4    everything that predicts promotional         11:59:17
 5    spending, including for this instrumental    11:59:20
 6    variable which again has the                 11:59:22
 7    characteristics of not being correlated      11:59:23
 8    with the outcome of interest. It doesn't     11:59:25
 9    cause the outcome of interest, so it         11:59:28
10    shouldn't be correlated with the residuals,  11:59:30
11    either.                                      11:59:32
12          And so that's sort of a -- that's      11:59:32
13    how you choose your instrumental variable.   11:59:34
14    And then you take that model and you         11:59:37
15    predict something, and then the second       11:59:38
16    model you predict -- take that predicted     11:59:39
17    value plus all those other control           11:59:41
18    variables but not -- not now your            11:59:44
19    instrument. Your instrument is excluded      11:59:46
20    from the second stage.                       11:59:48
21          And so by selection the variable       11:59:50
22    that you choose to use in the first stage    11:59:53
23    and not the second stage, your instrument,   11:59:55
24    should not be correlated with the residuals  11:59:58
25    in the first -- in the second stage.         12:00:00
```

460

```
 1 Q. Okay. Is the equation that you do in the     12:00:08
 2    first stage the equation that will actually  12:00:15
 3    generate the results at the end of the day   12:00:17
 4    that you'll use in your model, or is it the  12:00:19
 5    second stage --                              12:00:21
 6 A. It's the second stage.                       12:00:21
 7 Q. Okay.                                        12:00:22
 8 A. You can think of the first stage as a way    12:00:26
 9    to try to remove the bias.                   12:00:27
10 Q. Okay. Putting it another way, setting        12:00:33
11    aside the questions, I think, about the      12:00:41
12    error term, you want a variable that is not  12:00:43
13    correlated with the dependent variable but   12:00:46
14    is as highly correlated as possible with     12:00:49
15    the endogenous or suspect variable?          12:00:52
16 A. Not correlated except age through. So        12:00:56
17    some variable that will predict promotion    12:00:59
18    will be correlated with the outcome of       12:01:01
19    interest, but only through promotion and     12:01:03
20    not through a different channel, okay?       12:01:06
21 Q. Okay. Insofar as you use instrumental        12:01:10
22    variables to try to identify or correct for  12:01:27
23    endogeneity, would you need an instrumental  12:01:29
24    variable for each component of the X         12:01:31
25    variable, you know, promotional activities,  12:01:34
```

38 (Pages 457 to 460)

M. ROSENTHAL

461

1  as well as an instrumental variable for                    12:01:36
2  each -- or for the O variable, the                         12:01:38
3  promotional spending?                                      12:01:40
4  A. Potentially they would be different                     12:01:41
5     variables, yes.                              12:01:47
6  Q. When you say "potentially," what do you        12:01:47
7     mean?                                  12:01:49
8  A. I guess if you show that there's                        12:01:49
9     endogeneity for each of those X variables,        12:01:51
10    then we would have to look for an                  12:01:54
11    instrumental variable for each of them, but        12:01:57
12    it's not necessarily clear that they have          12:02:03
13    to be different instrumental variables.            12:02:04
14    They may have some similar set of                  12:02:08
15    instruments and multiple instruments.             12:02:11
16 Q. What analysis, if any, have you already           12:02:14
17    undertaken at this point to determine            12:02:16
18    whether instrumental variables could be           12:02:18
19    used in your model to address endogeneity?       12:02:19
20 A. I haven't -- again, I don't have the data        12:02:23
21    to do this analysis yet, so I haven't              12:02:26
22    determined that instrumental variables is         12:02:28
23    needed, and I certainly haven't begun to          12:02:29
24    develop those models.                      12:02:34
25 Q. So I take it you haven't identified              12:02:35

462

1     possible instrumental variables yet?           12:02:39
2  A. No. There are some that have been used in        12:02:40
3     the literature, as you may know.            12:02:41
4  Q. What are the ones that you have in mind?           12:02:45
5  A. For detailing and sampling the literature        12:02:46
6     has used, I believe, variables having to do       12:02:53
7     with staffing in the pharmaceutical             12:02:59
8     companies for advertising, media prices.        12:03:01
9     Sort of the category of instruments that         12:03:08
10    people often look to, not the only               12:03:10
11    category, but a category of instruments          12:03:12
12    that people often look to are the supply         12:03:15
13    prices for whatever you're trying to get at       12:03:16
14    here, so this is essentially a demand            12:03:19
15    model.                              12:03:23
16       So you can put in what it costs to        12:03:23
17    do the advertising instead of the               12:03:25
18    advertising itself. Those are commonly           12:03:27
19    used, as well as other measures. We used         12:03:32
20    one having to do with the order of entry of       12:03:35
21    the drug in that case across all conditions       12:03:38
22    in a therapeutic class, but in this case it       12:03:41
23    would be for a particular condition.             12:03:43
24 Q. Were there any others that you can think         12:03:47
25    of?                              12:03:57

463

1  A. Those are some examples.                   12:03:58
2  Q. Okay. All right. Let's turn back to Page        12:03:59
3     16, Footnote 63.                        12:04:25
4  A. Okay.                               12:04:28
5  Q. And look at the second-to-last sentence         12:04:28
6     there. It reads, "Likewise, it is possible       12:04:29
7     that multicollinearity among independent         12:04:37
8     variables may be found, since promotional        12:04:40
9     effects" -- "since promotional efforts,"        12:04:43
10    excuse me, "are often intentionally             12:04:45
11    coordinated. While multicollinearity can         12:04:47
12    complicate estimation of the model and          12:04:50
13    produce large estimated standard errors,         12:04:52
14    alternative specifications can be              12:04:55
15    developed."                            12:04:57
16       You refer in these sentences to        12:05:00
17    multicollinearity, correct?                 12:05:01
18 A. Yes, that's right.                      12:05:03
19 Q. And by "multicollinearity," am I right that     12:05:05
20    you mean a situation in which two or more        12:05:08
21    of the independent variables are highly         12:05:11
22    correlated with one another?                 12:05:14
23 A. That's correct.                        12:05:15
24 Q. And you would agree that in your model it's     12:05:15
25    possible that multicollinearity among         12:05:22

464

1     independent variables may be found,           12:05:24
2     correct?                            12:05:25
3  A. That's correct.                        12:05:26
4  Q. Have you done any analysis to determine         12:05:26
5     whether such multicollinearity in fact         12:05:29
6     exists?                             12:05:31
7  A. No, I have not. Again, I do not have the       12:05:31
8     data yet to do these analyses.            12:05:34
9  Q. How would you determine when you have the       12:05:37
10    data whether variables in your model were       12:05:38
11    multicollinear?                       12:05:44
12 A. Essentially one can look at a first pass at     12:05:45
13    the correlation matrix across independent       12:05:50
14    variables, correlation of --              12:05:53
15 Q. Can you tell me what that means, please?       12:05:54
16 A. Well, the correlation is essentially the       12:05:57
17    extent to which these variables co-vary        12:06:01
18    over time, and so if there's a high degree      12:06:03
19    of correlation, for example, in two of the      12:06:07
20    right-hand side variables, this leads to,      12:06:12
21    again, this problem with the standard          12:06:16
22    errors.                             12:06:19
23       And generally sort of looking at        12:06:19
24    those covariates there's a matrix. Imagine      12:06:21
25    that, you know, there's a list of your         12:06:24

39 (Pages 461 to 464)