# EXHIBIT 3 (PART III)

M. ROSENTHAL

465

1  independent variables across the top and          12:06:25
2  across the bottom, and there's a              12:06:27
3  correlation coefficient that goes with each         12:06:29
4  one.  In that correlation coefficient,          12:06:31
5  usually people look for -- if there's a          12:06:33
6  correlation of .8 or above, then that's          12:06:34
7  deemed to be a problem.  That's sort of a          12:06:37
8  rule of thumb rather than a precise number,         12:06:40
9  but one can also look at linear          12:06:44
10  combinations of variables in the          12:06:46
11  correlations there.              12:06:47
12 Q.  When you say "a correlation of Point A or       12:06:48
13  above" --                12:06:51
14 A.  I'm sorry, .8.              12:06:51
15 Q.  Oh, I see.  Okay.              12:06:53
16 A.  I beg your pardon.              12:06:55
17 Q.  Not at all.  I'm sorry I misheard.  What        12:06:59
18  are the consequences of not addressing         12:07:02
19  multicollinearity in a regression model?         12:07:05
20 A.  Well, if it's extreme, many software pages       12:07:08
21  will simply drop the variables, they won't         12:07:12
22  be able to estimate the model at all.  And         12:07:15
23  otherwise, it can lead to, again, these         12:07:18
24  very large standard errors.  So it can make         12:07:22
25  the situation where it's impossible to pull         12:07:26

466

1  apart the effects of that -- of the two          12:07:28
2  highly correlated variables.  All of these         12:07:30
3  effects depend on the type of model as          12:07:38
4  well.                12:07:39
5 Q.  Now, it's correct that one reason that         12:08:00
6  multicollinearity may be found in your          12:08:02
7  model is that promotional efforts are often         12:08:04
8  intentionally coordinated; is that correct?        12:08:06
9 A.  I mean, that seems like a reasonable          12:08:10
10  assumption that they may be coordinated.         12:08:16
11 Q.  Right.  I think --              12:08:18
12 A.  When you say "often," I just don't have any       12:08:22
13  data, so often coordinated, but --          12:08:25
14 Q.  The reason I use the terminology --          12:08:26
15 A.  Did I say "often"?              12:08:29
16 Q.  -- that's what you say in the second-to-         12:08:31
17  last sentence of Footnote 63.            12:08:33
18 A.  I believe that they can certainly be          12:08:35
19  coordinated.                12:08:38
20 Q.  Would you disagree with what you wrote here       12:08:39
21  as to the possibility that -- or the fact         12:08:42
22  that promotional efforts are often          12:08:45
23  intentionally coordinated?            12:08:48
24 A.  No, I'm sorry, I don't disagree with that        12:08:49
25  statement.                12:08:51

467

1 Q.  Now, what that means is that there could be       12:08:56
2  multicollinearity between some of the          12:08:57
3  on-label promotional variables on the one         12:08:59
4  hand and some of the off-label promotional         12:09:02
5  variables on the other hand, correct?          12:09:05
6 A.  I believe it's possible.  I guess, I was         12:09:06
7  thinking more in terms of if you have an         12:09:09
8  event, then you follow up with free samples         12:09:11
9  or something.  The coordination of          12:09:14
10  off-label and on-label, I guess it would         12:09:17
11  sort of depend on what exactly we were         12:09:19
12  talking about, but it seems possible that         12:09:21
13  they could be coordinated.            12:09:23
14 Q.  Right.  And so that -- all right.  Well,         12:09:24
15  let's assume for purposes of these          12:09:30
16  questions that multicollinearity does exist        12:09:32
17  between --                12:09:34
18 A.  Okay.                12:09:35
19 Q.  -- on-label and off-label promotional          12:09:35
20  variables in your model.            12:09:37
21 A.  Yes.                12:09:38
22 Q.  How would you address that?            12:09:38
23 A.  Well, I do think, as I mentioned, it might        12:09:42
24  be necessary to selectively eliminate some         12:09:44
25  variables, and in this context I would do         12:09:46

468

1  so in the most conservative way.  So if          12:09:48
2  there were events closely timed, just as an         12:09:50
3  example, events closely timed for on- and         12:09:55
4  off-label promotion and I couldn't separate        12:09:58
5  them in the model, I would have to trade         12:10:00
6  that all to be on-label use.            12:10:03
7 Q.  Now, when you talk about selectively          12:10:06
8  eliminating some variables, that would be         12:10:09
9  simply dropping one of the two          12:10:10
10  multicollinear variables in order to          12:10:14
11  address the problem.  Is that a correct          12:10:16
12  understanding?                12:10:18
13 A.  Essentially, yes.              12:10:18
14 Q.  And that's typically sort of the easiest         12:10:20
15  way of addressing this problem?            12:10:23
16 A.  So either dropping variables or changing         12:10:25
17  specification in some way.  You can imagine        12:10:27
18  in some examples changing the way those         12:10:29
19  variables were specified would reduce the         12:10:31
20  collinearity.                12:10:33
21 Q.  Okay.  Now, if there was multicollinearity       12:10:35
22  between certain on-label promotional          12:10:40
23  activities on the one hand and off-label         12:10:42
24  promotional activities on the other hand --        12:10:46
25  well, why don't I withdraw the question --         12:10:49

M. ROSENTHAL

469

```
 1  A.  Okay.                              12:10:49
 2  Q.  -- and state it more precisely.    12:10:49
 3          If there is multicollinearity  12:10:53
 4      between certain on-label variables and   12:10:53
 5      on-label promotional variables and       12:10:56
 6      off-label promotional variables on the   12:10:57
 7      other hand, you wouldn't simply be able to  12:10:59
 8      drop one set of those variables from your   12:11:03
 9      equation; is that right?           12:11:06
10  A.  Essentially, in my view, in that situation  12:11:07
11      I would have to not attribute the effect   12:11:11
12      of -- those two variables I couldn't       12:11:14
13      separate them, right?  So they have -- they  12:11:16
14      appear to have some common effect, but if I  12:11:18
15      exclude one, there's bias.  Generally in    12:11:20
16      this model you do the best you can, but I   12:11:24
17      wouldn't -- so that is, you choose which    12:11:26
18      one to exclude for the purposes of the      12:11:29
19      model, but I wouldn't attribute -- then     12:11:31
20      attribute that effect to the allegedly      12:11:34
21      illegal activities because I couldn't fully  12:11:37
22      identify those.                     12:11:39
23  Q.  Right.  In other words, you wouldn't be    12:11:40
24      able to account for what the relative       12:11:42
25      effects were on Q?                  12:11:43
```

470

```
 1  A.  Right.  So I would have to assume -- to be  12:11:44
 2      conservative, I would have to assume that   12:11:46
 3      they were all coming from the illegal       12:11:48
 4      activities.                         12:11:49
 5  Q.  And in such a circumstance you would        12:11:49
 6      potentially -- well, I'll withdraw that     12:12:08
 7      question.                           12:12:13
 8  A.  Okay.                               12:12:13
 9  Q.  All right.  How many observations do you    12:12:13
10      think you'll have for purposes of           12:12:41
11      estimating the models that you propose?      12:12:42
12  A.  I can't say how many observations I'll have  12:12:43
13      at this point.  You mean the underlying      12:12:46
14      data from the NDTI or the --        12:12:51
15  Q.  Yeah.                               12:12:53
16  A.  I don't know at this point what will be the  12:12:53
17      basis for that.  The way this is described,  12:12:55
18      this time series model, essentially they'll  12:12:58
19      use an aggregated monthly data on the       12:13:02
20      left-hand side.  That will be based on a    12:13:04
21      different sample size depending on which    12:13:07
22      data source appears to be the most         12:13:09
23      appropriate.                        12:13:11
24  Q.  Okay.  But in terms of the number of        12:13:11
25      observations, what we would be talking      12:13:15
```

471

```
 1      about, I guess, would be one observation     12:13:16
 2      per month for the length of the class        12:13:19
 3      period?                             12:13:21
 4  A.  That's essentially what an aggregate model   12:13:21
 5      looks like, yes.                    12:13:23
 6  Q.  Right.  And so that's -- without actually    12:13:24
 7      sitting down and doing the math, would that  12:13:27
 8      be a reasonable way of coming up with the    12:13:29
 9      number of observations that you would       12:13:32
10      imagine using in your model?        12:13:35
11  A.  Right.  So there are -- there's as many      12:13:37
12      observations as there are months and        12:13:41
13      diagnose -- times diagnoses, right?  12:13:43
14  Q.  Okay.                               12:13:47
15  A.  And potentially dosages.  But essentially    12:13:51
16      you're right.                       12:13:56
17  Q.  Okay.  To what extent do the number of      12:13:56
18      observations limit the number of           12:14:01
19      independent variables that you can use in    12:14:03
20      your analysis?                      12:14:06
21  A.  There is a natural limit there in terms of   12:14:06
22      what's called degrees of freedom, so at      12:14:09
23      some --                             12:14:13
24  Q.  What is -- go ahead.                12:14:13
25  A.  Well, so degrees of freedom have to do with  12:14:14
```

472

```
 1      the number of observations and the number    12:14:19
 2      of -- sorry, observations and variables and  12:14:21
 3      you're right, the number of observations -- 12:14:28
 4      certainly the number of independent         12:14:30
 5      variables cannot exceed the number of       12:14:32
 6      observations.                       12:14:34
 7  Q.  So is that the natural limit that you        12:14:34
 8      described in your first answer?     12:14:40
 9  A.  That's the extreme limit, but clearly        12:14:42
10      sooner than that you would run out of power  12:14:46
11      to test anything within reasonable bounds.   12:14:49
12      And so it's a matter of how much power      12:14:52
13      you're looking for.                 12:14:55
14  Q.  When you say "sooner than that," you mean    12:14:56
15      when the number of independent variables     12:15:00
16      approaches but doesn't yet reach --  12:15:03
17  A.  That's right.                       12:15:05
18  Q.  -- the total number of observations?        12:15:06
19  A.  That's right.                       12:15:08
20  Q.  Okay.  And that the one-to-one ratio is an   12:15:08
21      extreme limit?                      12:15:12
22  A.  Very extreme.                       12:15:13
23  Q.  What's a less extreme limit?         12:15:15
24  A.  I think it's really going to depend here on  12:15:18
25      what kinds of power we're looking for in     12:15:23
```

41 (Pages 469 to 472)

M. ROSENTHAL

473

1  the analysis. Generally speaking, of            12:15:26
2  course, we're going to look for more            12:15:31
3  degrees of freedom than just one or two,        12:15:33
4  so, you know, I can't really say what's a       12:15:36
5  less extreme limit. There will be a             12:15:40
6  natural limit. As we continue to add            12:15:42
7  variables, the standard errors are going to     12:15:44
8  get larger and larger. And at some point        12:15:47
9  it'll be hard to find a significant effect      12:15:50
10 of any kind.                                     12:15:52
11 Q. Is that what you mean when you refer to the   12:15:57
12 power of the analysis that we're looking         12:15:59
13 for?                                             12:16:02
14 A. Yes. And so that's a function of the          12:16:02
15 number of variables you include but also of      12:16:04
16 the underlying variability in the dependent      12:16:06
17 variable, as well as the variability of the      12:16:09
18 independent variables.                           12:16:11
19 Q. Okay. How, if at all, would you account       12:16:11
20 for continuing effects of promotional            12:16:18
21 spending and activities beyond the month in      12:16:21
22 which they occur in your model?                  12:16:24
23 A. There are a couple possible ways. A simple    12:16:28
24 approach is to include what's called the         12:16:31
25 stock of promotional activities, and so          12:16:33

474

1  that's a discounted sum of, say,                 12:16:36
2  promotional spending over time. So imagine       12:16:39
3  you have in your model current spending          12:16:44
4  plus a discounted sum of all previous            12:16:46
5  spending.                                        12:16:49
6  Q. How would you arrive at the discount if you   12:16:50
7  are using a stock?                               12:16:53
8  A. It can be estimated, and there are            12:16:53
9  depreciation rates available in the              12:16:57
10 literature that have been fairly commonly        12:16:59
11 used. But it can be estimated in the model       12:17:01
12 itself.                                          12:17:07
13 Q. Is it the case that the effects of            12:17:07
14 off-label promotion would diminish over          12:17:14
15 time?                                            12:17:17
16 A. It's been found for other promotional         12:17:17
17 efforts that there is this pattern of            12:17:20
18 diminishing effects over time, so they           12:17:23
19 don't disappear between Month 1 and Month        12:17:28
20 2, but they depreciate. So I would expect        12:17:32
21 them to last over time at a diminishing          12:17:35
22 rate, yes.                                        12:17:39
23 Q. The literature that you referred to, does     12:17:42
24 it refer to a constant rate across               12:17:44
25 different prescription drugs, or does it         12:17:47

475

1  vary from drug to drug, from promotion to        12:17:48
2  promotion?                                       12:17:51
3  A. You know, I would have to double-check, but   12:17:52
4  my recollection of the literature is that        12:17:54
5  generally they estimate one depreciation         12:17:57
6  rate for the whole class of drugs that           12:17:59
7  they're looking at: So I'm thinking of           12:18:02
8  Professor Berndt's paper, which I believe        12:18:06
9  looks at proton pump inhibitors, a specific      12:18:09
10 class of drugs. I think they have one            12:18:12
11 depreciation rate for all the drugs.             12:18:13
12 Q. Okay. You had mentioned that one way of       12:18:17
13 doing this would be through stock analysis,      12:18:22
14 stock variable. Are there other ways that        12:18:28
15 you can think of through which you could do      12:18:32
16 this analysis?                                   12:18:33
17 A. You could actually put the lagged values on   12:18:34
18 the right-hand side.                             12:18:37
19 Q. What does that mean?                          12:18:39
20 A. It means not only putting this month's        12:18:40
21 spending but last month's spending,             12:18:42
22 spending from the month before and estimate      12:18:45
23 explicitly those coefficients for each one.      12:18:48
24 Q. So in other words, making them separate       12:18:51
25 independent variables?                           12:18:53

476

1  A. That's right.                                 12:18:53
2  Q. Each month's spending?                        12:18:54
3  A. That's right.                                 12:18:55
4  Q. And the same would be true of each month's    12:18:56
5  promotional activities, if that's the            12:18:59
6  way -- you know, if you ended up using           12:19:01
7  lagged values on the right-hand side?            12:19:04
8  A. If one chose to do that, yes.                 12:19:05
9  Q. Will you use a similar lag structure for      12:19:13
10 the M variable?                                  12:19:15
11 A. Potentially all of these variables, as you    12:19:16
12 know, are -- they vary over time, and it         12:19:21
13 may be appropriate to include either lags        12:19:24
14 or some estimate of the stock of prior           12:19:26
15 activities, so but possibly.                     12:19:30
16 Q. Would you use a similar lag structure for     12:19:40
17 the XJT variable as well?                        12:19:42
18 A. It would depend on the specific variable we   12:19:44
19 were talking about, but potentially, yes.        12:19:50
20 I don't know that -- I mean, we certainly        12:19:57
21 look for these kinds of effects over time        12:19:59
22 for each of the variables. I don't know          12:20:04
23 that there's data to suggest that they           12:20:05
24 exist for all types of promotion, but we         12:20:07
25 would investigate that.                          12:20:09

42 (Pages 473 to 476)

M. ROSENTHAL

477

1  Q. Can I direct your attention to Paragraph          12:20:15
2     34b) --                                    12:20:18
3  A. Okay.                                      12:20:19
4  Q. -- of your declaration.  It's on Page 15.       12:20:20
5  A. Yes.                                       12:20:28
6  Q. And I want to look specifically at the          12:20:28
7     first bullet point.                        12:20:31
8  A. Okay.                                      12:20:32
9  Q. If you read the tail end of the paragraph       12:20:33
10    before the bullet point, it reads, "It may       12:20:37
11    be necessary to --                         12:20:39
12 A. Uh-huh.                                    12:20:40
13 Q. -- "experiment with non-linear versions of      12:20:41
14    Equation 1."  What types of non-linear          12:20:43
15    versions of Equation 1 do you plan on            12:20:49
16    experimenting with?                        12:20:52
17 A. So, for example, it may be appropriate to       12:20:52
18    suggest that the underlying trend in             12:20:54
19    off-label use of Neurontin is not linear        12:20:57
20    but quadratic or CORDIC or something else.       12:21:01
21    As you can imagine, a diffusion curve for a      12:21:05
22    drug, a natural diffusion curve would --         12:21:08
23    might not be linear.                       12:21:10
24 Q. Maybe you could imagine that.                  12:21:11
25 A. So there --                                12:21:11

478

1  Q. I was an English major, so it's harder for      12:21:13
2     me to imagine that.                        12:21:16
3  A. There are early adopters, and then people       12:21:17
4     start learning about a specific drug, and        12:21:19
5     so it picks up in the rate.  And so that         12:21:21
6     might be more consistent with either a           12:21:23
7     quadratic, which would include a squared        12:21:26
8     term, or a cubic, which would include a          12:21:28
9     third degree term.  So you could put in          12:21:32
10    literally time and time squared.            12:21:36
11 Q. Sure.  Sure.  Is there any reason why you        12:21:38
12    wouldn't conduct the same experiments with       12:21:40
13    Equation 2 in addition to Equation 1?           12:21:42
14 A. In either one they both have an underlying      12:21:45
15    time trend.                                12:21:48
16 Q. Okay.  But there's no reason why the             12:21:49
17    statement that's in this first bullet point      12:21:54
18    wouldn't also apply with respect to             12:21:55
19    modifications that you might make to the         12:21:58
20    model in Equation 2?                        12:22:01
21 A. No.  Perhaps the text is unclear, but these     12:22:02
22    were intended to be broader issues that          12:22:04
23    would apply to all models.                 12:22:06
24 Q. That makes sense to me.                        12:22:07
25 A. Okay.                                       12:22:08

479

1  Q. I just wanted to be clear about it.            12:22:09
2        MR. POLUBINSKI:  Now, I'm at a            12:22:13
3     decent stopping point for a break now.  We       12:22:17
4     can either break for lunch, or I'm happy to      12:22:20
5     keep going for a little while, whatever          12:22:22
6     your preference is.                        12:22:24
7        THE WITNESS:  This is a good time         12:22:26
8     for me, I guess, as opposed to going            12:22:27
9     another hour, so...                        12:22:29
10       MR. POLUBINSKI:  Sure.  Okay.            12:22:29
11    Let's break then.                          12:22:30
12       THE WITNESS:  Okay.                      12:22:30
13       MR. POLUBINSKI:  Go off the              12:22:32
14    record.                                    12:22:33
15       THE VIDEOGRAPHER:  The time is            12:22:33
16    12:22, and we are off the record.           12:22:38
17    (Lunch recess taken.)                       12:22:45
18
19
20
21
22
23
24
25

480

1        AFTERNOON SESSION                       12:22:54
2        THE VIDEOGRAPHER:  The time is            13:12:27
3     1:12 p.m., and we are back on the record.       13:12:30
4                                                13:12:30
5     (MEREDITH B. ROSENTHAL, Ph.D., Resumed.)         13:12:30
6        DIRECT EXAMINATION, Continued             13:12:30
7                                                13:12:32
8  BY MR. POLUBINSKI:                             13:12:32
9  Q. So, Professor Rosenthal, I think you           13:12:33
10    testified that you have not actually           13:12:39
11    attempted to run a version of your model        13:12:41
12    yet, correct?                              13:12:42
13 A. That's correct.                             13:12:43
14 Q. And you haven't yet collected all of the        13:12:43
15    data that you would need to do so; is that       13:12:45
16    correct, too?                              13:12:48
17 A. That's correct.                             13:12:49
18 Q. So you don't yet know for certain precisely      13:12:49
19    what data you will be able to collect; is        13:12:53
20    that correct?                              13:12:55
21 A. That's correct beyond the examples that         13:12:55
22    I've shown you and mentioned in my             13:12:59
23    declaration of data sources that I've seen.      13:13:01
24 Q. Right.  But you do -- you would need to          13:13:03
25    collect additional data beyond what you've       13:13:07

43 (Pages 477 to 480)

M. ROSENTHAL

481

1     already seen in order to run your model,    13:13:09
2     correct?    13:13:11
3 A. I would say that's true.  I certainly need    13:13:11
4     additional data on the allegedly illegal    13:13:16
5     activities.    13:13:20
6 Q. Okay.  So therefore you don't know whether    13:13:21
7     there are any possible deficiencies or any    13:13:22
8     deficiencies in the data that you would    13:13:25
9     claim to collect?    13:13:27
10 A. I don't know what the deficiencies of the    13:13:28
11     data that I haven't seen yet are, no.    13:13:30
12 Q. Precisely.    13:13:32
13 A. Yes.    13:13:33
14 Q. And you also haven't identified yet all of    13:13:33
15     the possible variables that may impact    13:13:37
16     prescription behavior?    13:13:39
17 A. That's correct.    13:13:39
18 Q. And you don't yet know what endogeneity    13:13:40
19     problems you might encounter in the course    13:13:46
20     of your work?    13:13:49
21 A. Without the data I can't again run those    13:13:50
22     tests and examine the data, no, so I    13:13:53
23     don't -- I can't see that yet.    13:13:56
24 Q. Right.  So you don't know for sure whether    13:13:57
25     you'll be able to address or correct them?    13:14:00

482

1 A. I know that there are standard approaches    13:14:02
2     available for correcting those problems,    13:14:06
3     for addressing those problems.  I guess I'm    13:14:08
4     not sure what you mean.    13:14:10
5 Q. Right.  You don't yet know the extent to    13:14:11
6     which those standard methods will enable    13:14:14
7     you to create a sufficiently reliable model    13:14:17
8     because you haven't done it yet?    13:14:21
9 A. I guess that may be true.  Again, I've run    13:14:23
10     models like this before and overcome    13:14:26
11     similar problems, and of course the rest of    13:14:30
12     the published literature has as well, so I    13:14:32
13     guess I feel fairly confident that the    13:14:34
14     tools are out there that will be able to do    13:14:36
15     that.    13:14:39
16 Q. But you haven't actually done it yet?    13:14:39
17 A. But I have not done that.    13:14:41
18 Q. And you don't know precisely what    13:14:42
19     multicollinearity problems you may    13:14:43
20     encounter in the course of your work?    13:14:45
21 A. That's correct.    13:14:46
22 Q. And you don't know whether the estimates    13:14:48
23     that you ultimately reach based on the data    13:14:50
24     that you're able to collect will be    13:14:53
25     statistically significant, correct?    13:14:56

483

1 A. That's correct.    13:14:56
2 Q. Are you familiar with the concept of fit in    13:15:00
3     the context of a regression analysis?    13:15:01
4 A. Yes.    13:15:03
5 Q. What is fit?    13:15:05
6 A. Well, in very general terms it's how well    13:15:06
7     the model you've constructed actually    13:15:08
8     matches up with the data themselves, and    13:15:11
9     one measure of fit might be how well you    13:15:16
10     can predict the variables of interest.    13:15:18
11 Q. Okay.  And one way to describe it would be    13:15:21
12     to say the better the fit of a model is,    13:15:25
13     the better it describes reality?    13:15:27
14 A. That seems like a fair way to describe it,    13:15:28
15     yes.    13:15:31
16 Q. Okay.  And you don't know what the fit of    13:15:31
17     your model will be before you actually run    13:15:36
18     the regression, correct?    13:15:38
19 A. Certainly not.    13:15:38
20 Q. And it's certainly possible that after    13:15:41
21     running the model you could discover it has    13:15:42
22     a poor fit?    13:15:44
23 A. I guess it would depend on what you mean by    13:15:47
24     "a poor fit."  There will be a range.  If    13:15:49
25     we were, for example, looking at a measure    13:15:53

484

1     like the R squared, which is the percent of    13:15:54
2     the variation that you explain,    13:15:56
3     effectively, there are -- I can't predict    13:15:58
4     what that R squared is going to be right    13:16:01
5     now.    13:16:03
6 Q. Do you have an understanding now for what    13:16:04
7     an acceptable R squared would be?    13:16:07
8 A. It actually typically depends on the class    13:16:09
9     of model you're doing, right?  So --    13:16:14
10 Q. Sorry.    13:16:17
11 A. That's okay.    13:16:17
12     -- in certain models we expect to    13:16:19
13     a find better fit than others, time series    13:16:21
14     models.  Generally, we can explain the fair    13:16:27
15     amount of the variation, so it would really    13:16:30
16     depend.  In the published literature you'll    13:16:33
17     see R squareds varying from, you know,    13:16:36
18     below .1 to much, much higher.    13:16:40
19 Q. Is there a threshold beyond which -- a    13:16:42
20     threshold in terms of R squared beyond    13:16:53
21     which you would deem a model to be    13:16:55
22     insufficiently reliable for purposes of    13:16:58
23     your work in this case?    13:17:01
24 A. At this point I certainly have not    13:17:02
25     considered such a threshold.    13:17:05

44 (Pages 481 to 484)

M. ROSENTHAL

485

1  Q. All right. In Paragraph 41 of your        13:17:09
2     declaration, which is Exhibit 1 --        13:17:22
3  A. Okay.                                     13:17:24
4  Q. -- you write at the beginning of the      13:17:25
5     paragraph that "Sufficient data exists to 13:17:28
6     implement and estimate these models."     13:17:30
7  A. I see that.                               13:17:35
8  Q. Based on what you've just told me, are you 13:17:35
9     certain that that's true?                 13:17:43
10 A. Again, there are two sets of variables.   13:17:48
11    One relates to the utilization of         13:17:52
12    Neurontin, and not having looked at the   13:17:55
13    National Disease and Therapeutic Index    13:17:59
14    data, I'm aware of what's contained in the 13:18:02
15    National Ambulatory Medical Care survey, I 13:18:06
16    feel confident that these data are        13:18:08
17    available. On the promotional side I've   13:18:10
18    seen documents from defendants that show  13:18:12
19    representative data that I think would be  13:18:15
20    sufficient to estimate -- to model those  13:18:18
21    right-hand side variables, the on- and    13:18:22
22    off-label promotional meetings and events. 13:18:24
23       I have not seen a complete set of      13:18:28
24    them as relates to all the allegations that 13:18:31
25    I will ultimately be asked to estimate the 13:18:34

486

1     impact of, but what I've seen suggests that 13:18:35
2     those data exist.                          13:18:39
3  Q. At the time that you wrote the statement   13:18:40
4     you certainly hadn't collected obviously   13:18:47
5     all of the data that you would envision    13:18:50
6     using in your model, correct?              13:18:53
7  A. That's correct.                            13:18:55
8  Q. Why don't we see if we can, you know, try  13:18:55
9     as best we can to isolate the specific     13:19:22
10    kinds of data here --                      13:19:22
11 A. Okay.                                      13:19:22
12 Q. -- that we're talking about, and I think   13:19:22
13    what you write here is that in the third   13:19:22
14    sentence there are two key types of data   13:19:23
15    that are necessary for you to run your     13:19:28
16    analysis and that those two types of data  13:19:33
17    are "data on patterns of promotional       13:19:35
18    spending and data on use of Neurontin." Is 13:19:40
19    that correct?                              13:19:46
20 A. That's correct.                            13:19:46
21 Q. Let's look first at data on patterns of    13:19:46
22    promotional spending. Which data on        13:19:51
23    patterns of promotional spending would you 13:19:53
24    think are necessary for you to run your    13:19:56
25    model?                                     13:20:00

487

1  A. So the data on promotional spending would  13:20:02
2     vary depending on the model, but generally 13:20:06
3     speaking, promotion by the type of         13:20:08
4     activity, so, for example, if there was    13:20:13
5     spending on consumer advertising versus    13:20:15
6     detailing overall for Neurontin, and then  13:20:21
7     as it relates to these allegations.        13:20:26
8  Q. What do you mean by "as it relates to these 13:20:34
9     allegations"?                              13:20:37
10 A. So, again, if we determined that spending  13:20:37
11    that's related to supporting research      13:20:42
12    projects for physicians, that this was     13:20:45
13    subject to the allegations -- there's some 13:20:48
14    allegations to that effect in the          13:20:50
15    complaint, as I recall -- that funds were  13:20:52
16    given to physicians to do these trials with 13:20:54
17    a purpose that was other standard research 13:20:58
18    purposes. And so I would have the overall  13:21:02
19    promotional spending as well as spending on 13:21:07
20    those types of interpromotional activities, 13:21:10
21    if I can use that broad term, that are     13:21:13
22    allegedly illegal.                         13:21:14
23 Q. Would your data need to be broken down --  13:21:17
24    well, for the data on promotional spending 13:21:22
25    do you envision that it would be company   13:21:25

488

1     data or publicly available data?           13:21:27
2  A. I believe it was a combination of company  13:21:28
3     data and publicly available data. If we    13:21:30
4     called the IMS Health -- that publicly     13:21:32
5     available data, which, as you know, there  13:21:35
6     is some issue about using those without    13:21:37
7     subpoena.                                  13:21:39
8  Q. Right. Would you need -- would either one  13:21:41
9     by itself be sufficient, or would you need 13:21:48
10    both, both company data and third-party    13:21:50
11    data?                                      13:21:54
12 A. If I only had the publicly available --    13:21:55
13       MR. NOTARGIACOMO: Go ahead.             13:21:58
14       THE WITNESS: It's okay to go            13:22:00
15    ahead?                                     13:22:01
16       MR. NOTARGIACOMO: Yeah.                 13:22:01
17 A. If I only had the publicly available data, 13:22:01
18    then I would need some other data to allow 13:22:03
19    me to allocate spending to the alleged     13:22:07
20    illegal activities versus the standard     13:22:10
21    legal promotional activities.              13:22:15
22 Q. And that data would be company data, is    13:22:17
23    what you're envisioning?                   13:22:19
24 A. Perhaps company data. I'm not entirely     13:22:21
25    clear if it weren't company data where it  13:22:24

45 (Pages 485 to 488)

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                            516-608-2400

M. ROSENTHAL

489

1  would come from.  It seems possible it          13:22:28
2  could come from third parties, for example,     13:22:30
3  from those companies that ran meetings and       13:22:33
4  events for the defendants.                       13:22:35
5  Q. For the sort of data that we were just        13:22:36
6     talking about would you need -- would you      13:22:46
7     need that broken down reliably by             13:22:51
8     indication?                          13:22:54
9  A. I would need to be able to attach it to an     13:22:54
10    indication.  In some instances, as you        13:22:57
11    might imagine, there would be a natural       13:22:59
12    connection.  So, for example, if there were   13:23:01
13    funds provided to a psychiatrist to do a      13:23:04
14    small case series on the use of Neurontin     13:23:07
15    for bipolar disorder, then that would be      13:23:10
16    clearly linked to the indication for         13:23:13
17    bipolar disorder.  But in general, I would    13:23:15
18    need to be able to link it to the specific    13:23:17
19    indication or indications that were the       13:23:19
20    subject of the promotional activity.         13:23:21
21 Q. Would you also need this data on a monthly     13:23:23
22    basis?                          13:23:27
23 A. It would not necessarily be true that every   13:23:31
24    variable needs to be on a monthly basis.      13:23:33
25 Q. Why not?                          13:23:36

490

1  A. Well, for one thing, the spending might       13:23:36
2     just happen at a point in time, and I could    13:23:38
3     code it in for the month in which it          13:23:42
4     happened, right?  And for another, if there   13:23:44
5     were only annual spending available, I        13:23:48
6     could use annual data.                 13:23:50
7  Q. Now, if the data that you're describing      13:23:51
8     isn't available either in company documents   13:24:10
9     or in the sort of third-party documents      13:24:10
10    that you described for some point in time     13:24:10
11    during the class period, what impact would    13:24:11
12    that have on your ability to do your         13:24:13
13    analysis?                         13:24:14
14 A. It would sort of depend on exactly what        13:24:14
15    you're talking about.  If I were missing,     13:24:18
16    say, one month in the middle of a longer      13:24:20
17    period, it might be possible to             13:24:22
18    interpolate, so that is essentially to        13:24:24
19    assume a consistent trend between the point   13:24:27
20    before the data missing and the point        13:24:30
21    after.  It would depend.                 13:24:32
22 Q. Okay.  And if it were something more than     13:24:34
23    just a month in a larger period?            13:24:36
24 A. It might not be possible to do the analysis   13:24:38
25    for that period of time.                13:24:40

491

1  Q. Do you need data on each of the factors       13:24:41
2     that you hypothesize in XKT?             13:24:46
3  A. Each of the factors that I decide are         13:24:48
4     relevant to put into XKT I would need data   13:24:51
5     for.                             13:24:54
6  Q. What sorts of data would you envision        13:24:54
7     collecting?                        13:24:57
8  A. I guess, you know, those XKT events -- I       13:24:57
9     have to remember my own model.  The KT are    13:25:04
10    the off-label promotional events.           13:25:06
11 Q. You're welcome to --                   13:25:08
12 A. Yeah, thank you.                     13:25:08
13 Q. -- refer to it if you like.               13:25:09
14 A. Subscripts, they fade over time.            13:25:10
15 Q. I'm glad it's not just me.               13:25:14
16 A. Yeah, so those are -- the meetings, events    13:25:16
17    that are subject to the allegations.  And     13:25:22
18    so, again, having seen some documents and     13:25:24
19    some documents in Franklin that show that     13:25:29
20    these events are tracked by the defendants,   13:25:31
21    those are the kinds of data I would imagine   13:25:35
22    would go into XKT.                    13:25:37
23 Q. And I assume as we've discussed before that   13:25:39
24    the data for both promotional activities     13:25:49
25    and promotional spending will need to        13:25:51

492

1  distinguish between proper and improper        13:25:53
2  marketing?  And for purposes of that           13:25:59
3  question I think improper -- why don't we       13:26:03
4  just agree that "improper" means something      13:26:06
5  that would generate liability in this case?     13:26:09
6  A. Okay.  Thank you.  That's useful.  Yes, as    13:26:11
7     we've discussed, I would need to be able to    13:26:16
8     distinguish them, and if there were such an   13:26:19
9     occasion at which I could not distinguish     13:26:21
10    in a particular case, I would need to        13:26:24
11    attribute that to proper promotional         13:26:26
12    activities.                        13:26:30
13 Q. All right.  The other category of data that   13:26:30
14    you say you need to collect is data on the    13:26:39
15    use of Neurontin?                    13:26:42
16 A. Yes, that's right.                    13:26:44
17 Q. For that data were you envisioning that you   13:26:45
18    would need company data or third-party       13:26:49
19    data?                            13:26:55
20 A. The third-party data I had in mind for that   13:26:55
21    would be the, for example, the National      13:26:58
22    Disease and Therapeutic Index data or the     13:27:02
23    NAMCS.                           13:27:04
24 Q. Had you envisioned that you would also        13:27:04
25    collect company data, or would you rely      13:27:11

46 (Pages 489 to 492)

M. ROSENTHAL

493

```
1    exclusively on the third-party data that       13:27:13
2    you described?                                  13:27:15
3 A. The company data play a role, as you know,      13:27:15
4    in giving a total number of units sold, so      13:27:17
5    the company invoice data would be used to       13:27:20
6    get the universe by condition -- I mean,        13:27:24
7    sorry, not by condition, by dosage site.        13:27:29
8 Q. And the company data presumably would not       13:27:32
9    distinguish between off-label and on-label      13:27:38
10   prescriptions?                                  13:27:41
11 A. The company probably has data from IMS         13:27:41
12   again on those distinctions, but in their       13:27:45
13   own data systems I don't expect them to         13:27:49
14   track that, no, as opposed to data they         13:27:51
15   purchase.                                        13:27:54
16 Q. Okay.  At least as far as the third-party      13:27:54
17   data goes, we discussed the need for those      13:28:01
18   data to be broken down reliably by              13:28:02
19   indication, correct?                            13:28:05
20 A. That's correct.                                13:28:06
21 Q. And would you need monthly data for each of    13:28:06
22   those, for whichever data set you end up        13:28:08
23   using?                                          13:28:16
24 A. No, not necessarily.                           13:28:16
25 Q. Why not?                                       13:28:17
```

494

```
1 A. Well, monthly is just one way of               13:28:19
2    categorizing this.  If some of the data are     13:28:21
3    only available annually, we can only use        13:28:23
4    annual data and then interpolate across         13:28:26
5    months.                                          13:28:29
6 Q. If you needed to use annual data, wouldn't      13:28:29
7    that mean that you would have fewer             13:28:35
8    observations with which to conduct your         13:28:36
9    analysis?                                        13:28:39
10 A. If, for example, we're only using it for a     13:28:39
11   variable, what essentially you have is          13:28:42
12   you've reduced variation because you've         13:28:45
13   taken an annual variable and stretched it       13:28:47
14   across months.  So in effect you're right,      13:28:50
15   you have reduced power.                          13:28:51
16 Q. Okay.  And the consequences of reduced         13:28:52
17   power are?                                       13:28:56
18 A. Well, again, it may make the confidence        13:28:58
19   intervals basically around the estimates        13:29:01
20   larger, the harder to find a significant        13:29:04
21   event.                                          13:29:07
22 Q. All right.  Let's look at 41a) in              13:29:07
23   particular --                                    13:29:30
24 A. Okay.                                          13:29:31
25 Q. -- Paragraph 41a) of your declaration.         13:29:31
```

495

```
1 A. Okay.                                          13:29:36
2 Q. I'm sorry, Paragraph 41a) of your              13:29:36
3    declaration, Exhibit 1.                         13:29:39
4 A. Okay.  I'm with you now.                       13:29:40
5 Q. Great.  You write here that "As a matter of    13:29:41
6    good business practice, companies such as       13:29:46
7    the Defendants' document marketing              13:29:48
8    activities by product line and in extensive     13:29:50
9    detail"; is that correct?                       13:29:53
10 A. That's correct.                               13:29:55
11 Q. Now, has your preliminary review suggested    13:29:56
12   to you that defendants in this case            13:30:09
13   maintain this data?                             13:30:11
14 A. In my review I've seen documentation,         13:30:12
15   again, like the strategic grid that we         13:30:15
16   discussed yesterday that is Footnote 71        13:30:18
17   here.  And so information about this           13:30:22
18   promotional effectiveness system that's in    13:30:28
19   Footnote 70, that indicates the ability to    13:30:30
20   track some promotional activities and their   13:30:34
21   effects.                                        13:30:38
22 Q. Other than these two categories, can you      13:30:38
23   think of any other sorts of documents that    13:30:41
24   you've seen to date at least that was --       13:30:44
25 A. That than --                                  13:30:44
```

496

```
1 Q. -- in this category?                           13:30:46
2 A. Actually, I see the previous footnote as       13:30:47
3    well, but you're right, these categories       13:30:49
4    are promotional marketing strategy and        13:30:52
5    analyses of the effectiveness of marketing    13:30:57
6    as the major categories.  I understand that   13:31:01
7    product profits -- excuse me, product         13:31:04
8    profit and loss statements are often          13:31:07
9    constructed as well, and so brand by brand    13:31:10
10   there will be promotional and sales           13:31:13
11   spending.                                      13:31:15
12 Q. Have you seen those documents in this case?   13:31:15
13 A. I confess I can't remember.  I could check   13:31:18
14   my footnotes to see if I've noted one of     13:31:23
15   these here.                                    13:31:25
16 Q. You're welcome to take a look if you would    13:31:25
17   like.                                          13:31:28
18 A. Okay.  There doesn't seem to be a reference   13:31:28
19   in this section at least.  It's probably      13:31:39
20   profit and loss.  I may have seen them for    13:31:40
21   other drugs.                                    13:31:42
22 Q. But you don't recall having seen them for     13:31:46
23   Neurontin?                                      13:31:48
24 A. I'm not certain, yeah.  Footnote 68 talks     13:31:48
25   about documents that I can picture now        13:31:52
```

47 (Pages 493 to 496)

M. ROSENTHAL

497

1   where they look at promotional spending for      13:31:53
2   Neurontin across the customer business           13:31:56
3   units, which is not quite the same as the        13:31:58
4   product profit and loss.                         13:32:06
5  Q. Okay. How certain are you that there's a       13:32:08
6   complete set of documents containing all of      13:32:15
7   this data for all of the periods of time         13:32:19
8   that your model will cover?                      13:32:23
9  A. Can I take that in pieces?                      13:32:26
10 Q. Sure.                                          13:32:29
11 A. First, I know that sources like IMS Health     13:32:30
12   track promotional spending by category          13:32:36
13   routinely and that those data exist.            13:32:39
14   Second, I know, having looked at some of        13:32:44
15   these discovery documents, having consulted     13:32:46
16   with Professor King about whom we spoke         13:32:48
17   yesterday, Charles King, that companies do      13:32:51
18   track their marketing expenditures at the       13:32:55
19   very least and their effects generally as       13:32:58
20   routine matter of, as I say here, good          13:33:00
21   business practice.                              13:33:02
22       So I feel quite confident that              13:33:03
23   these documents existed at one time. I          13:33:06
24   guess I can't say for sure that the             13:33:08
25   defendants can still produce those              13:33:11

498

1   documents, whether they existed. And what        13:33:13
2   I've seen in discovery suggests that the         13:33:15
3   discovery materials may yield some of these      13:33:19
4   data.                                            13:33:21
5  Q. Okay. Let me take your answer in pieces.       13:33:22
6   The first piece relates to the IMS data,         13:33:26
7   correct?                                         13:33:29
8  A. Yes.                                           13:33:29
9  Q. I think we discussed before how the IMS        13:33:29
10   data on promotional activity at least           13:33:33
11   wouldn't distinguish from indication to         13:33:37
12   indication --                                   13:33:39
13 A. That's correct.                                13:33:40
14 Q. -- is that correct?                            13:33:40
15 A. Overall, yes.                                  13:33:41
16 Q. The second piece relates to your               13:33:42
17   conversations with Professor King, correct?     13:33:46
18 A. Yes.                                           13:33:49
19 Q. And that if I understand it correctly,         13:33:49
20   Professor King advised you that companies       13:33:53
21   as a general matter do track to track           13:33:56
22   promotional spending; is that correct?          13:34:00
23 A. Pharmaceutical companies in particular.        13:34:01
24 Q. Okay. Does your conversation with              13:34:10
25   Professor King suggest to you that the          13:34:11

499

1   defendants necessarily would have done this      13:34:18
2   tracking of Neurontin by indication for          13:34:21
3   every period of time that's covered by the       13:34:26
4   class period?                                    13:34:29
5  A. That's a very comprehensive statement, and     13:34:31
6   I would say my understanding, again, having      13:34:38
7   seen selected documents in Franklin,            13:34:42
8   documents that form the basis of the            13:34:45
9   complaint, is that these data were tracked      13:34:46
10   extensively, and I can think of no reason       13:34:49
11   why there would be any point in time that       13:34:52
12   the defendants would have stopped tracking      13:34:55
13   them. I can't think of any reason why           13:34:57
14   there would be a gap.                           13:34:59
15 Q. Could there be a point in time before which    13:35:00
16   they started tracking prescriptions by          13:35:03
17   indication --                                   13:35:06
18 A. Possibly.                                      13:35:06
19 Q. -- promotional expenditures by indication?    13:35:07
20 A. That's possible.                              13:35:10
21 Q. And you don't know whether the documents      13:35:10
22   would reflect that one way or the other?        13:35:12
23 A. I don't know whether I could establish that   13:35:15
24   with the documents I've reviewed yet. If        13:35:17
25   that were to be the case, then I guess          13:35:19

500

1   there would not be sufficient support for        13:35:23
2   analysis for those time periods.                 13:35:25
3       MR. POLUBINSKI: Okay. Why don't             13:35:30
4   we take just a quick break to change the         13:35:31
5   tape?                                            13:35:33
6       THE WITNESS: Okay. I'll take                13:35:34
7   advantage so we don't have to break again.       13:35:36
8       MR. POLUBINSKI: The time is 1:35.           13:35:38
9   This is the end of Tape 2 -- Tape 3, excuse      13:35:43
10   me, and we're off the record.                   13:35:45
11       (Recess taken.)                             13:35:48
12       THE VIDEOGRAPHER: The time is              13:38:53
13   1:39. This is the beginning of Tape 4, and      13:38:57
14   we're back on the record.                       13:39:01
15 BY MR. POLUBINSKI:                                13:39:02
16 Q. So, Professor Rosenthal, I'm going to ask      13:39:02
17   you to dig a document out of the stack of       13:39:05
18   exhibits that's sitting next to you.            13:39:07
19 A. Okay.                                          13:39:10
20 Q. If you could look for Rosenthal Exhibit 12,    13:39:10
21   that would be great. Can I help you find        13:39:14
22   it?                                             13:39:31
23 A. Okay. It's the promotional grid. Got it.      13:39:32
24   Thank you.                                      13:39:34
25 Q. The bottom of the stack, of course.           13:39:35

48 (Pages 497 to 500)

M. ROSENTHAL

501

1  A. Yes, of course. Okay. I have it.          13:39:37
2  Q. Rosenthal Exhibit 12 is the document that     13:39:42
3     we discussed yesterday that is cited in      13:39:44
4     Footnote 71, correct?              13:39:46
5  A. That is correct.                13:39:48
6  Q. It's the 1998 Strategic Plan and A&P        13:39:48
7     Allocation Grid, right?             13:39:52
8  A. Right.                     13:39:54
9  Q. And that this is the document that you       13:39:54
10    identify in 41a) that you write permits you    13:39:57
11    to track spending on off-label promotions     13:40:04
12    in the form of speaking engagements and      13:40:09
13    consultancies; am I getting that right?      13:40:11
14 A. I'm sorry, can I just see where you're       13:40:16
15    reading?                     13:40:20
16 Q. Yeah, of course. It's the language on the     13:40:20
17    carry-over sentence at the end of the page.    13:40:23
18 A. Okay.                      13:40:26
19 Q. I'll read the sentence for you. It's        13:40:29
20    "Finally, I have seen numerous agreements     13:40:29
21    such as Bates-stamped document V084073 to     13:40:31
22    078 that track spending on off-label        13:40:38
23    promotion in the form of speaking         13:40:41
24    engagements and consultancies."          13:40:42
25 A. Right. So, for example, you'll see rows      13:40:47

502

1     that say "Physician honoraria and travel,"    13:40:49
2     "Speakers Bureau"?                13:40:51
3  Q. Where are you looking?              13:40:53
4  A. Under "Local Tactics."              13:40:54
5  Q. This is on the first page of the document?     13:40:57
6  A. On the first page, yes, sorry.          13:40:58
7  Q. Okay. Just a general question about the      13:41:01
8     document. We did agree that this is a       13:41:05
9     prospective document, correct?          13:41:06
10 A. Right. You indicated that, and I agree.      13:41:07
11    It makes sense. It's a strategic plan,      13:41:10
12    so...                      13:41:14
13 Q. And just so that I'm square on this, can      13:41:20
14    you point to any documents that actually     13:41:23
15    demonstrate what defendants actually spent    13:41:25
16    on the promotion -- actually spent for      13:41:27
17    promotion of Neurontin?             13:41:29
18 A. This grid, if in fact it is only a plan,     13:41:30
19    doesn't show that. Again, as I mentioned     13:41:35
20    before in the promotional effectiveness     13:41:40
21    system, those kinds of activity -- tracking   13:41:42
22    mechanisms look at actual events, spending    13:41:45
23    and their effects.               13:41:49
24 Q. Those are the documents that you referred     13:41:54
25    to in Footnote 70?                13:41:56

503

1  A. That's right. Let me just verify that, but    13:41:57
2     I believe that's right. Yes.          13:42:04
3  Q. All right. Looking at this document and      13:42:07
4     again sort of just looking at the first      13:42:09
5     page, is there a way that you can discern     13:42:11
6     off-label promotional spending versus       13:42:18
7     on-label promotional spending just on the    13:42:20
8     basis of this document?             13:42:22
9  A. Well, if we're looking at the planned       13:42:24
10    spending and taking that as representative    13:42:32
11    of what actually happened, as you see, the    13:42:33
12    heading on the first page says "Expend      13:42:37
13    Neurontin use on epilepsy through the       13:42:40
14    introduction of monotherapy." So that's     13:42:43
15    for a particular off-label use, and then     13:42:45
16    there's spending associated with it.       13:42:48
17 Q. I guess, didn't we agree that the          13:42:49
18    physicians who would be targeted, for lack    13:42:56
19    of a better word, by the sorts of         13:42:59
20    activities described in Section 1 here of    13:43:05
21    on the first page would be epileptologists,   13:43:08
22    correct?                     13:43:12
23 A. That's correct.                 13:43:12
24 Q. And that some amount of this activity could   13:43:12
25    well be directed to on-label uses of       13:43:21

504

1     Neurontin as adjunctive therapy for        13:43:25
2     treatment of seizures?             13:43:27
3  A. Well, in my view, this grid shows         13:43:28
4     defendants' own estimate of the dollars to    13:43:33
5     be spent promoting monotherapy. Whether or    13:43:37
6     not it's for the same individuals, I'm not    13:43:39
7     sure that I understand your point.        13:43:43
8  Q. Let me -- let's -- let me ask you this: Is    13:43:44
9     the spending that's envisioned in this       13:43:50
10    document organized annually or by monthly    13:43:53
11    outlays?                     13:43:56
12 A. My understanding is that this is for the     13:43:57
13    entire year 1998.                13:44:00
14 Q. Would you be able to create a monthly       13:44:02
15    series of promotional expenditures using a    13:44:07
16    document like this?               13:44:09
17 A. Again, as I mentioned before, if some       13:44:10
18    variables are only available on an annual    13:44:13
19    basis, I would interpolate them, excuse me,   13:44:15
20    interpolate the monthly data and thereby     13:44:19
21    lose some power, but this is frequently      13:44:23
22    done in studies like this.            13:44:26
23 Q. Okay.                      13:44:28
24 A. Okay.                      13:44:28
25 Q. You can set this one, too, aside.         13:44:29

49 (Pages 501 to 504)

M. ROSENTHAL

505

1  A. Okay. I'll leave it on the top.            13:44:36
2  Q. All right. Let me direct your attention to  13:44:54
3     Paragraph 7d) on Page 5 of your            13:44:56
4     declaration, Exhibit 1 to your deposition.  13:44:59
5  A. I'm sorry?                                  13:45:05
6  Q. Paragraph 7d).                              13:45:06
7  A. 70?                                         13:45:07
8  Q. Uh-huh.                                     13:45:09
9  A. And then -- okay. I'm sorry. I'm sorry,     13:45:09
10    Paragraph 70 of my --                       13:45:17
11 Q. 7d).                                        13:45:18
12 A. 7d), oh, sorry. It would be -- thought I was losing it.  13:45:21
13 Q. We're going backwards.                      13:45:26
14 A. That's a shame.                             13:45:28
15 Q. Yeah, well, not for long.                   13:45:29
16 A. All right.                                  13:45:30
17 Q. Okay.                                       13:45:31
18 A. Okay.                                       13:45:35
19 Q. So in this paragraph you write that         13:45:36
20    "Parke-Davis made the explicit calculation  13:45:38
21    that seeking FDA approval would not be      13:45:40
22    worthwhile, given the short remaining       13:45:42
23    patent life for Neurontin," correct?        13:45:44
24 A. That's correct.                             13:45:47
25 Q. What's the basis for that statement?        13:45:47

506

1  A. That comes -- and you'll see there are      13:45:49
2     footnotes there in the documents, but       13:45:53
3     essentially it's a summary of my            13:45:55
4     understanding of what the complaint was     13:45:57
5     saying.                                     13:45:59
6  Q. What's the extent of your knowledge about   13:45:59
7     the process involved in a manufacturer      13:46:07
8     seeking approval from the FDA for           13:46:10
9     additional indications for an existing      13:46:12
10    drug?                                       13:46:15
11 A. My knowledge is fairly rudimentary on that  13:46:17
12    subject, and my understanding is that       13:46:21
13    additional clinical tests need to be done.  13:46:23
14 Q. Do you have any knowledge for how expensive 13:46:26
15    the process might be?                       13:46:27
16 A. I understand that undertaking clinical      13:46:28
17    trials, particularly randomized control     13:46:31
18    double-blind trials, is very expensive in   13:46:34
19    general, and so I mean, it's well-known     13:46:37
20    that under the process of drug development,  13:46:41
21    that is, getting approval from the FDA, is  13:46:46
22    expensive and is essentially a barrier to   13:46:48
23    entry for new drugs.                        13:46:51
24 Q. Do you have any knowledge of how long the   13:46:52
25    process can take of running the clinical    13:46:59

507

1     trials and then seeking the approval from   13:47:00
2     the agency?                                 13:47:02
3  A. Again, I've certainly seen discussions in   13:47:03
4     the policy literature about how long it     13:47:06
5     takes to get FDA approval. There have been  13:47:10
6     efforts, as you know, over the last decade  13:47:13
7     or two to try to shorten that length of     13:47:16
8     time, but so my understanding is that it's  13:47:18
9     a substantial consideration, that it takes  13:47:21
10    quite a while.                              13:47:24
11 Q. By "quite a while," are we talking years?   13:47:25
12 A. It would be -- that would be my -- again,   13:47:28
13    my not terribly expert opinion on this is   13:47:31
14    that it would take a couple of years, and   13:47:35
15    it would represent a significant sum of     13:47:36
16    money to undertake.                         13:47:39
17 Q. Would you agree with the assumption that    13:47:40
18    manufacturers of prescription drugs are by  13:47:45
19    and large rational economic actors?         13:47:47
20 A. And if you mean profit-maximizing firms, I  13:47:53
21    would agree with that assumption.           13:47:56
22 Q. And so based on that assumption, would you  13:48:05
23    say that it's also a reasonable assumption  13:48:08
24    that Parke-Davis, as you lay it out here    13:48:14
25    (indicating) in your declaration, that      13:48:17

508

1     Parke-Davis made the implicit calculation   13:48:18
2     that they wouldn't earn sufficient profit   13:48:20
3     to make seeking an additional use           13:48:24
4     worthwhile?                                 13:48:26
5  A. That is my understanding, that it was an    13:48:27
6     explicit (sic) calculation, yes.            13:48:30
7  Q. All right. Let me ask you a hypothetical    13:48:35
8     question on this. Assume the manufacturer   13:48:37
9     had a drug whose patent will run out in     13:48:42
10    three years --                              13:48:44
11 A. Okay.                                       13:48:45
12 Q. -- and discovers that this drug which has   13:48:45
13    already been approved by the FDA for one    13:48:57
14    condition is almost surely effective for an 13:48:59
15    additional unapproved condition. The        13:49:01
16    manufacturer estimates that it will cost    13:49:05
17    them $2 million and two years to complete   13:49:07
18    the studies they need to complete and to    13:49:11
19    end -- assuming that the results are        13:49:16
20    favorable in those studies, to secure the   13:49:17
21    FDA approval of that new use.               13:49:19
22       I have no sense for whether those        13:49:22
23    numbers -- they're probably low-balled in   13:49:24
24    a, you know, in a serious way, but for      13:49:27
25    purposes of this hypothetical let's use     13:49:29

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                      516-608-2400

M. ROSENTHAL

509

```
1   them.                          13:49:30
2        And then they estimate that the    13:49:31
3   potential profit for the drug over the one   13:49:33
4   year of its remaining patent life after the   13:49:35
5   two-year approval period is a million   13:49:37
6   dollars.  What would you imagine the   13:49:42
7   manufacturer would choose to do in that   13:49:43
8   circumstance?                    13:49:45
9  A.  I'm sorry, I think I lost some important   13:49:46
10   elements of the word problem.  I need a   13:49:49
11   pencil, but what was the cost of the   13:49:52
12   clinical trials?  It took two years to --   13:49:53
13 Q.  Two years and 2 million, just so we keep   13:49:56
14   the numerals simple.             13:49:58
15 A.  That's right.  Excellent.  We're good.   13:49:59
16   Right.  So, again, you know, I believe that   13:50:00
17   there's a math calculation.  It's a simple   13:50:02
18   one.  If the profits are a million dollars   13:50:04
19   and the cost is $2 million, no matter what   13:50:07
20   discount rate you use, you come to a   13:50:09
21   conclusion that it doesn't make sense to go   13:50:11
22   through the process.             13:50:14
23 Q.  Okay.  And you wouldn't suggest the   13:50:14
24   manufacturer has done anything wrong by not   13:50:17
25   going through the process?        13:50:19
```

510

```
1  A.  No.                          13:50:20
2  Q.  Does it matter for purposes of your answer   13:50:24
3   whether the drug is or isn't effective for   13:50:26
4   the supplemental use?            13:50:28
5  A.  For the calculation?            13:50:29
6  Q.  For the answer to your -- answer to the   13:50:32
7   last question, which is that they haven't   13:50:36
8   done anything wrong in not seeking approval   13:50:37
9   for the additional use.          13:50:40
10 A.  Well, we're getting --           13:50:41
11      MR. NOTARGIACOMO:  Economically,   13:50:46
12   morally, legally?  Where are we now?   13:50:46
13      MR. POLUBINSKI:  Professor   13:50:48
14   Rosenthal answered the question.   13:50:50
15 Q.  What were you thinking when you answered   13:50:50
16   it?                          13:50:56
17 A.  I believe I was trapped.  But in the first   13:50:57
18   example I was speculating on the cost/   13:51:01
19   benefit comparison, and in no way did the   13:51:03
20   rightness of launching the drug for that   13:51:05
21   indication enter into my calculation.  I   13:51:11
22   was merely comparing the $2 million to the   13:51:14
23   million dollars.  That was a profit-   13:51:16
24   maximizing decision.             13:51:17
25 Q.  Sure.                        13:51:18
```

511

```
1  A.  And if you want me to say something about   13:51:19
2   whether or not it's right if there's no   13:51:21
3   effectiveness, then I need to use some   13:51:23
4   other standard.  I don't know what the   13:51:25
5   right standard to use is there.   13:51:27
6  Q.  Okay.  Are you aware of any standard, I   13:51:29
7   guess, under which it would be wrong for   13:51:32
8   them not to go and seek additional approval   13:51:34
9   for that use?                   13:51:36
10      MR. NOTARGIACOMO:  Objection.   13:51:38
11 A.  I'm not aware of any standard to evaluate   13:51:39
12   that decision.                  13:51:43
13 Q.  Okay.  Now, let me ask you also to assume   13:51:44
14   just for purposes of this question that   13:51:54
15   Neurontin is 100 percent effective for a   13:51:57
16   given off-label use.  Could you imagine the   13:51:59
17   defendants making a rational economic   13:52:04
18   decision to not even pursue FDA approval   13:52:07
19   for that use based on the amount of time   13:52:09
20   left in the patent life of the drug?   13:52:11
21 A.  Again, my response to your original   13:52:14
22   question didn't assume anything about   13:52:17
23   effectiveness.  So the economic -- rational   13:52:19
24   economic decision was just one about costs   13:52:21
25   and benefits in terms of profitability --   13:52:23
```

512

```
1  Q.  And --                       13:52:27
2  A.  -- and therefore I would respond the same   13:52:27
3   way.                          13:52:30
4  Q.  Okay.  And that they could in fact make a   13:52:30
5   rational economic decision not to even   13:52:33
6   sponsor a single clinical trial?   13:52:35
7  A.  Yes, absolutely.  The rational economic   13:52:36
8   decision is based only on profits.   13:52:41
9  Q.  And their decision to do that or not to do   13:52:44
10   that wouldn't mean anything with regard to   13:52:52
11   whether Neurontin was or wasn't perfectly   13:52:57
12   effective for that use?          13:53:00
13 A.  Again, I believe that one can abstract that   13:53:01
14   decision in terms of purely profits and   13:53:08
15   it could be the same decision no   13:53:10
16   matter what the effectiveness is, and so I   13:53:12
17   think the answer is yes, but I believe I've   13:53:15
18   already answered it, unless I haven't been   13:53:17
19   clear.                        13:53:19
20 Q.  No, that's fine -- right.  I guess by   13:53:19
21   itself, then, the fact that Neurontin was   13:53:22
22   not approved by the FDA for a given use   13:53:24
23   doesn't mean that Neurontin wasn't   13:53:27
24   perfectly effective for that use?   13:53:28
25 A.  By itself that does not indicate anything   13:53:31
```

51 (Pages 509 to 512)

M. ROSENTHAL

**513**

1   about the true effectiveness of Neurontin,      13:53:34
2   no.                                              13:53:36
3 Q. Okay. All right. You've said in your           13:53:41
4   model that you proposed to quantify the          13:53:47
5   effect of wrongful conduct on a class-wide       13:53:49
6   level, correct?                                  13:53:53
7 A. Uh-huh.                                         13:53:53
8 Q. I take it you'll -- that you expect to be       13:53:53
9   able to quantify the extent of the impact        13:53:58
10  suffered by each of the subclasses. So in        13:54:01
11  other words, the consumer subclass as well       13:54:04
12  as the third-party payer subclass, correct?      13:54:07
13 A. That's correct.                                13:54:09
14 Q. Do you know how large the third-party payer    13:54:09
15  subclass is?                                      13:54:13
16 A. Can you tell me what you mean by "large"?      13:54:13
17  You mean number of members --                    13:54:17
18 Q. Yes.                                           13:54:17
19 A. -- or number of dollars?                       13:54:18
20 Q. Number of members.                             13:54:19
21 A. I don't know the number of members. If you     13:54:21
22  look at third-party payers, commercial           13:54:26
23  insurers generally, the number is in the         13:54:31
24  several hundred. If you add in the Taft-         13:54:34
25  Hartley plans, there are probably another        13:54:39

**514**

1   hundred or so. That's order of magnitude.        13:54:41
2 Q. Are there others that you would have to         13:54:45
3   include?                                         13:54:46
4 A. On the third-party payer side?                  13:54:47
5 Q. Yeah.                                           13:54:49
6 A. I believe the commercial plans -- the Taft-     13:54:49
7   Hartley funds and the commercial plans are       13:55:02
8   the principal members of the third-party         13:55:03
9   payer subclass. I could check the                13:55:05
10  complaint.                                        13:55:07
11 Q. And I guess just adding up the two             13:55:07
12  categories that you've just described, I         13:55:13
13  guess we would agree that the, to the best       13:55:16
14  of your knowledge now, the third-party           13:55:19
15  payer subclass would be at least several         13:55:21
16  hundred entities large, possibly over a          13:55:24
17  thousand?                                         13:55:27
18 A. Possibly.                                       13:55:27
19 Q. Okay. I assume that your model would seek      13:55:28
20  to determine aggregate impact on the third-      13:55:39
21  party payer subclass; is that correct?           13:55:41
22 A. I have been asked to develop a model to        13:55:43
23  estimate aggregate impact, yes.                  13:55:45
24 Q. And that your model wouldn't purport to        13:55:47
25  determine whether each member, each              13:55:50

**515**

1   individual member of the third-party payer       13:55:51
2   subclass suffered an injury as a result of       13:55:53
3   the conduct at issue?                            13:55:55
4 A. Well, as you know, in sort of the context       13:56:00
5   of a class like this you're looking at           13:56:03
6   aggregate impact that is common to all the       13:56:05
7   class members, so -- but I don't identify        13:56:08
8   if what you mean is to look specifically at      13:56:10
9   Blue Cross/Blue Shield of Kansas City and        13:56:13
10  their effects.                                    13:56:15
11 Q. Okay. We've discussed before in your           13:56:16
12  declaration how physicians -- let's              13:56:23
13  actually look at Paragraph 12.                    13:56:26
14 A. 12, thank you. Okay.                            13:56:29
15 Q. We've discussed before how in your             13:56:40
16  declaration how physicians "face numerous        13:56:43
17  constraints, including limited time and          13:56:45
18  cognitive ability to digest the continuous       13:56:48
19  flow of information about new treatments"?       13:56:50
20 A. Yes.                                           13:56:53
21 Q. Will that statement be true of at least        13:56:53
22  some of the third-party payers as well?          13:56:59
23 A. I'm not sure what you mean by that.            13:57:01
24 Q. Would you agree that third-party payers do     13:57:07
25  process to some degree information about         13:57:12

**516**

1   the different treatments for which they          13:57:15
2   reimburse?                                       13:57:17
3 A. I believe that third-party payers make          13:57:17
4   coverage decisions. For example, they make      13:57:21
5   coverage decisions -- I don't know the          13:57:25
6   extent to which -- I know that they             13:57:29
7   incorporate some of this information that I     13:57:31
8   believe was referenced yesterday through        13:57:33
9   the Drugdex which tracks studies on             13:57:35
10  particular uses of particular drugs, and so      13:57:39
11  if that's what you mean by they sort of          13:57:41
12  incorporate new information in their             13:57:44
13  policies -- is that the kind of thing that       13:57:46
14  you had in mind?                                  13:57:47
15 Q. Yeah. And do -- third-party payers, I'd        13:57:48
16  assume to some degree at least, make             13:57:51
17  coverage decisions about whether they'll         13:57:53
18  reimburse for particular drugs for               13:57:56
19  particular uses, correct?                        13:57:57
20 A. To some degree they make those policies.       13:57:58
21  As you know, they don't tend to apply those     13:58:02
22  policies patient by patient.                     13:58:05
23 Q. Sure. No, of course.                           13:58:08
24 A. So for example --                              13:58:10
25 Q. Of course.                                     13:58:12

52 (Pages 513 to 516)

M. ROSENTHAL

517

1  A.  Right.  Okay.                          13:58:12
2  Q.  But in the context of making decisions    13:58:13
3      about what to cover and what not to cover,   13:58:16
4      they do receive and process information    13:58:18
5      about various treatments?                13:58:21
6  A.  I imagine that there's a function in the  13:58:23
7      third-party payers where they do this -- I  13:58:25
8      guess what I'm having a little trouble with  13:58:28
9      is I can see how this happens for an      13:58:30
10     initial coverage decision.  I don't know   13:58:32
11     the extent to which third-party payers     13:58:34
12     revisit existing drugs with regard to new  13:58:35
13     indications.                              13:58:38
14 Q.  Could you imagine that the answer to that  13:58:39
15     question might vary from third-party payer  13:58:41
16     to third-party payer?                     13:58:43
17 A.  Perhaps.                                  13:58:44
18 Q.  That some of them might revisit this on   13:58:44
19     several occasions?                        13:58:48
20 A.  Again, since I'm not entirely sure the    13:58:51
21     extent to which this happens at all, I    13:58:53
22     could imagine that it would happen        13:58:57
23     differentially, so that's certainly in the  13:58:59
24     realm of possibility.                     13:59:00
25 Q.  All right.  Also in Paragraph 12 you write  13:59:01

518

1      the "Physicians are often not aware of the  13:59:14
2      latest scientific evidence on treatments   13:59:17
3      and rely heavily on commercial sources of  13:59:22
4      information, such as pharmaceutical company  13:59:24
5      promotional materials."                   13:59:26
6          In terms of awareness of the          13:59:32
7      latest scientific evidence, would your     13:59:34
8      statement as it's laid out here in your    13:59:39
9      declaration be true of third-party payers?  13:59:41
10 A.  Again, it's sort of a -- I'm having a      13:59:43
11     little trouble casting the third-party     13:59:48
12     payer as medical decision-makers because   13:59:50
13     they're so enormous, but could the medical  13:59:51
14     director of a third-party payer be aware of  13:59:54
15     the latest scientific evidence to some     13:59:57
16     degree?                                    14:00:00
17 Q.  Okay.                                      14:00:03
18 A.  I suppose.                                 14:00:03
19 Q.  And that degree would vary from third-party  14:00:04
20     payer to third-party payer?                14:00:06
21 A.  I suppose.                                 14:00:07
22 Q.  There might be some third-party payers that  14:00:08
23     may not even have a medical director as    14:00:10
24     such?                                      14:00:12
25 A.  That, I have trouble believing.            14:00:12

519

1  Q.  Okay.                                      14:00:15
2  A.  But I can believe that medical directors   14:00:15
3      vary.                                      14:00:18
4  Q.  Okay.  All right.  You state in Paragraph  14:00:18
5      33 of your declaration -- actually Footnote  14:00:25
6      49.                                        14:00:37
7  A.  Okay.  49?                                 14:00:37
8  Q.  Yeah.                                      14:00:39
9          -- that "price plays a relatively     14:00:42
10     minor role here because most patients      14:00:43
11     receiving Neurontin are covered by         14:00:47
12     insurance so they only pay" -- "they only  14:00:49
13     face the co-payment amount."               14:00:51
14         Does price play a similarly minor      14:00:55
15     role in decision-making on reimbursement by  14:00:57
16     third-party payers?                        14:01:00
17 A.  I think it would depend on the situation,  14:01:01
18     but clearly -- so can I be a little        14:01:03
19     specific here for a second?                14:01:06
20 Q.  Please.                                    14:01:08
21 A.  So the price we're talking about in the    14:01:08
22     Rizzo model and in general is --           14:01:10
23 Q.  In the which model?                        14:01:14
24 A.  I'm sorry, in the Rizzo model in Footnote  14:01:16
25     49, R-I-Z-Z-O, is something like that AWP  14:01:18

520

1      price.  In all likelihood it's the AWP, the  14:01:22
2      list price for the drug.  And most of these  14:01:25
3      models are about overall consumption of the  14:01:30
4      drug.  So sort of looking at total units    14:01:32
5      consumed as a function of this list price,  14:01:34
6      the relationship is not all that clear,    14:01:37
7      because, again, the individuals pay        14:01:41
8      something out of pocket.                    14:01:43
9          So now you're asking, I think,         14:01:44
10     does that same list price affect a third-  14:01:46
11     party payer's coverage decision?  I think  14:01:50
12     it would depend -- for the most part       14:01:53
13     third-party payers cover -- open           14:01:56
14     formularies are the most common form, so   14:01:59
15     they cover all drugs.  They may put        14:02:01
16     differential co-payments for certain       14:02:03
17     kinds of high cost drugs in cases where    14:02:05
18     they have lower cost substitutes in        14:02:09
19     general.  It'll depend on the class of     14:02:11
20     drugs, but you can imagine there's some    14:02:13
21     very high cross-biological drugs that don't  14:02:15
22     have high co-payments simply because there  14:02:18
23     aren't alternatives, and so using that kind  14:02:21
24     of co-payment mechanism doesn't make sense  14:02:23
25     for trying to get consumers to try a       14:02:24

53 (Pages 517 to 520)

M. ROSENTHAL

521

1    different drug.                           14:02:26
2  Q. All right. And different third-party      14:02:27
3    payers, I take it, could make different     14:02:28
4    decisions on this even with respect to the  14:02:29
5    same drug; is that correct?                 14:02:32
6  A. In the cross-section there may be          14:02:33
7    differences in co-payments. There           14:02:36
8    certainly are differences in co-payments.   14:02:38
9  Q. Okay. The third-party payers, generally    14:02:40
10   speaking, have a significant economic stake 14:02:42
11   in persuading or directing physicians not   14:02:45
12   to prescribe drugs for indications for      14:02:48
13   which they're known to be ineffective; is   14:02:51
14   that correct?                      14:02:54
15 A. Could you read that back? I just ---       14:02:54
16        MR. POLUBINSKI: If you could read    14:03:01
17   it, that would be great.            14:03:02
18        (Record read.)             14:03:18
19        MR. NOTARGIACOMO: Objection.     14:03:18
20 A. I guess the way you phrase that, it's      14:03:19
21   certainly true that third-party payers      14:03:29
22   generally do better when spending is less,  14:03:31
23   and given that they want to constrict       14:03:38
24   spending, eliminating ineffective use makes 14:03:42
25   more sense than effective use, but that     14:03:44

522

1    statement doesn't characterize very well    14:03:46
2    what we know about how the market works in  14:03:48
3    this area. There are lots of treatments     14:03:52
4    that are known to be ineffective, low       14:03:54
5    effectiveness that are covered.             14:03:58
6  Q. Do third-party payers have different ways  14:04:07
7    of affecting physician or patient decision- 14:04:09
8    making with respect to drugs that they      14:04:12
9    believe to be ineffective for treating      14:04:14
10   particular indications?                14:04:18
11        MR. NOTARGIACOMO: Objection.     14:04:19
12 A. The -- yes, there are financial incentives, 14:04:20
13   pre-authorization requirements, for         14:04:27
14   example, and, of course, coverage           14:04:30
15   decisions.                        14:04:35
16 Q. Okay. Let's talk about some of these. All  14:04:35
17   right. How about a prior authorization      14:04:47
18   program; could you describe just briefly    14:04:48
19   how such a program would work in this       14:04:53
20   context?                        14:04:55
21 A. A prior authorization program might, for    14:04:55
22   example, require that a physician supply    14:04:58
23   some clinical information about a patient    14:05:01
24   before the prescription drug would be       14:05:03
25   reimbursed.                      14:05:06

523

1  Q. I think we agreed in some of the early     14:05:09
2    questions that we did today that the        14:05:16
3    implementation of a prior authorization     14:05:18
4    program might impact prescription decisions 14:05:19
5    in the aggregate. Am I correct on that?     14:05:22
6  A. So it would depend on how the prior        14:05:24
7    authorization program -- well, let's say,   14:05:26
8    for example, it was for any patient getting 14:05:28
9    Neurontin there had to be a prior           14:05:30
10   authorization. That would certainly affect  14:05:31
11   overall prescribing of any kind. If the     14:05:34
12   prior authorization were specific to        14:05:36
13   off-label use, then it would have that more 14:05:38
14   specific effect.                   14:05:41
15 Q. Will your model take into consideration all 14:05:42
16   of the occasions in which third-party       14:05:44
17   payers implemented prior authorization      14:05:46
18   programs for Neurontin?                14:05:48
19 A. My model will again focus on the main       14:05:49
20   predictors of the use of Neurontin for      14:05:56
21   off-label uses, and in particular the       14:05:58
22   concern is with regard to those variables   14:06:02
23   that might occur with a pattern over time   14:06:04
24   identical to the allegedly illegal          14:06:09
25   activities. So to the extent that there --  14:06:12

524

1    that my research shows that there's a       14:06:16
2    concern, there's a simultaneous effect of   14:06:18
3    these kinds of formulary decisions or prior 14:06:23
4    authorization programs, then I'll try to    14:06:25
5    model it.                        14:06:29
6        In reality, though, as you know,      14:06:30
7    if, for example, you were to posit a story  14:06:32
8    such as is follows: Defendants increase     14:06:36
9    off-label promotions, third-party payers    14:06:38
10   make it harder and harder to get Neurontin  14:06:40
11   for off-label use, it'll just -- it'll bias 14:06:41
12   my estimate downwards if I don't model      14:06:46
13   those. It's really only -- if you can tell  14:06:49
14   a story, again, about they're being         14:06:51
15   correlated in time that it causes a         14:06:53
16   problem. And in this case that story would  14:06:55
17   really have to be one that would result in  14:06:56
18   a downward bias in the estimate of the      14:06:58
19   impact.                         14:07:00
20 Q. Okay. Let's talk about financial           14:07:00
21   incentives, too. That was another --        14:07:03
22 A. Okay.                          14:07:06
23 Q. -- category of ways in which third-party    14:07:06
24   payers might affect physician prescribing   14:07:08
25   decisions. What sorts of financial          14:07:11

54 (Pages 521 to 524)

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                              516-608-2400

M. ROSENTHAL

525

1    incentives would you have in mind when you    14:07:16
2    answer the question?    14:07:19
3  A. I think the chief ones in this realm would    14:07:19
4    be consumer co-payments.    14:07:21
5  Q. That the co-payments would differ from drug    14:07:26
6    to drug?    14:07:29
7  A. As you're probably aware, they don't    14:07:31
8    typically differ from drug to drug, but    14:07:34
9    there are categories of drugs. There are    14:07:37
10   preferred drugs, not preferred drugs,    14:07:39
11   generic drugs, which are typically all the    14:07:42
12   best category of drugs. And so the    14:07:44
13   co-payments vary across those categories.    14:07:47
14 Q. The best category of drugs from the    14:07:50
15   perspective of the third-party payers,    14:07:52
16   correct?    14:07:53
17 A. That's right. So where a generic exists    14:07:55
18   for a particular molecule --    14:07:57
19 Q. Right.    14:07:57
20 A. -- yeah.    14:07:59
21 Q. Is this the same thing as a situation in    14:07:59
22   which a TPP, or third-party payer, has a    14:08:01
23   different tier within its formulary?    14:08:03
24 A. That's right, those are exactly those kinds    14:08:05
25   of tiers.    14:08:07

526

1  Q. We talked also, I think, earlier today    14:08:12
2    about disease management programs?    14:08:13
3  A. We did.    14:08:14
4  Q. Is that a way that a third-party payer    14:08:17
5    might be able to affect prescribing    14:08:19
6    behavior with respect to Neurontin?    14:08:21
7  A. If there were a disease management program,    14:08:24
8    for example, for one of the off-label    14:08:27
9    indications, is that what you had in mind?    14:08:31
10 Q. Sure.    14:08:31
11 A. So let's say bipolar disorder.    14:08:34
12 Q. Or one that relates to one of the off-label    14:08:36
13   indications --    14:08:39
14 A. Okay.    14:08:39
15 Q. -- in some way.    14:08:39
16 A. It might -- I'm afraid my in-depth    14:08:40
17   knowledge of disease management programs is    14:08:41
18   not deep enough to tell you if they specify    14:08:44
19   certain drugs, but if you ask me to assume    14:08:48
20   that the disease management program had    14:08:51
21   recommendations with regards to drugs,    14:08:53
22   disease management programs generally work    14:08:56
23   around physicians and patients. They don't    14:08:59
24   tend to get involved in the physician/    14:09:01
25   patient decision-making.    14:09:03

527

1    So they are third-party payers'    14:09:04
2    efforts, I think, generally speaking, to    14:09:10
3    overcome the lack of coordination in the    14:09:12
4    health care system itself. So it seems    14:09:14
5    strange to me to think about a disease    14:09:18
6    management program trying to affect    14:09:19
7    physician decision-making. Usually instead    14:09:21
8    they contact patients directly and say,    14:09:23
9    "You should lose weight. You should be    14:09:25
10   taking your medications," but they don't --    14:09:26
11   they're not in a position actually treat    14:09:29
12   the patient. They advise the patient on    14:09:31
13   behavior.    14:09:33
14 Q. And through their advising the patient on    14:09:33
15   behavior, could you imagine that that's    14:09:36
16   something that could conceivably impact the    14:09:37
17   extent to which a physician was -- or a    14:09:39
18   patient, rather, received prescriptions for    14:09:43
19   Neurontin for an off-label use?    14:09:44
20 A. Possibly. Again, it's not very consistent    14:09:46
21   with my vision of the way these programs    14:09:50
22   work, but I think it could be possible,    14:09:53
23   yes.    14:09:55
24 Q. Do you know what a drug utilization review    14:09:59
25   program is?    14:10:01

528

1  A. Yes. So like standard utilization review,    14:10:02
2    drug utilization review is a way of    14:10:07
3    generally retrospectively looking at    14:10:13
4    patterns of drug use, and typically it's an    14:10:15
5    informational activity. So, for example,    14:10:18
6    you could do drug utilization review at the    14:10:23
7    individual physician level. We look at all    14:10:26
8    your prescribing patterns for your    14:10:28
9    epileptic patients, just to take an    14:10:31
10   example, and we compare those to your    14:10:33
11   peers'.    14:10:35
12     We give you that information and    14:10:36
13   say, "Look, Dr. Smith, you're an outlier.    14:10:37
14   You're using a lot more of this expensive    14:10:40
15   drug X and everyone else is using Y."    14:10:43
16   That's a typical drug review program.    14:10:45
17 Q. Okay. Can we take a look at Paragraph    14:10:47
18   27b).    14:11:03
19 A. Okay.    14:11:03
20 Q. 27d), I'm sorry.    14:11:03
21 A. Okay.    14:11:09
22 Q. In 27d) you refer to marketing literature    14:11:10
23   by -- you might have to help me with the    14:11:21
24   pronunciation, Manchanda, Chintagunta and    14:11:25
25   Gertzis --    14:11:29

55 (Pages 525 to 528)

M. ROSENTHAL

529

1  A.  That sounds right to me.                    14:11:32
2  Q.  Okay.                                       14:11:32
3       -- that report that "detailing has         14:11:43
4   a significant positive impact on the number    14:11:45
5   of prescriptions written for a drug by the     14:11:50
6   physician."                                    14:11:52
7  A.  Yes.                                         14:12:02
8  Q.  Do you have a view as to the qualifications  14:12:03
9   of Professors Manchanda, Chintagunta and       14:12:05
10  Gertzis to reach this conclusion?              14:12:09
11 A.  The qualifications?  My understanding of     14:12:11
12  the authors -- the first author in            14:12:15
13  particular, that he's a marketing professor   14:12:17
14  at the University of Chicago.  I'm afraid I    14:12:20
15  don't know the other authors.                 14:12:22
16 Q.  Okay.  With respect to the first author --  14:12:23
17 A.  Yeah.                                        14:12:26
18 Q.  -- do you know anything more about what he   14:12:27
19  does at the University of Chicago?             14:12:30
20 A.  I do not.  I just -- I believe he's a        14:12:31
21  marketing professor there.                    14:12:34
22 Q.  Okay.  On the subject of detailing, you had  14:12:35
23  mentioned academic detailing before?          14:12:41
24 A.  Yes.                                         14:12:43
25 Q.  Is that another means through which a        14:12:45

530

1   third-party payer could seek to affect         14:12:53
2   prescription writing decisions by             14:12:55
3   physicians?                                    14:12:57
4  A.  Theoretically.  I'm not actually aware of,   14:12:59
5   other than demonstration projects,           14:13:03
6   third-party payers having academic           14:13:05
7   detailing programs, but in theory it could.  14:13:07
8  Q.  Okay.  Would you agree that at some level    14:13:10
9   at least each third-party payer can and      14:13:33
10  generally did make its own decisions on      14:13:37
11  which uses of Neurontin it would reimburse   14:13:40
12  for?                                         14:13:42
13       MR. NOTARGIACOMO:  Objection.            14:13:42
14 A.  Well, I think that's a somewhat complicated  14:13:43
15  statement.  As you know, Neurontin is an     14:13:47
16  oral pharmaceutical that patients purchase   14:13:51
17  through a retail pharmacy, pick up at the    14:13:54
18  pharmacy and third-party payers reimburse    14:13:57
19  through pharmaceutical claims.  Those        14:14:00
20  claims, as you know, do not include          14:14:03
21  diagnosis codes.  So whether a third-party   14:14:06
22  payer could in practice require such         14:14:11
23  diagnostic information through, for          14:14:15
24  example, a pre-authorization program as we   14:14:18
25  described before, I would say it is          14:14:21

531

1   possible, at very high cost to do, of         14:14:22
2   course, for all Neurontin prescriptions.     14:14:26
3       They would have to consider the           14:14:28
4   problem with potentially preventing          14:14:29
5   appropriate Neurontin prescriptions,         14:14:32
6   consider the problem of making their         14:14:35
7   physicians in their network very angry       14:14:36
8   about the extra work.  But in theory they    14:14:39
9   could request that clinical information be   14:14:43
10  provided and therefore construct such a      14:14:45
11  detailed policy.                             14:14:49
12 Q.  Okay.  Would you agree that to the extent    14:14:53
13  that an individual third-party payer made a  14:15:14
14  conscious affirmative decision not to        14:15:16
15  implement a pre-authorization program along  14:15:18
16  the lines of what you've just described,     14:15:21
17  despite its belief that Neurontin was        14:15:24
18  ineffective for some number of off-label     14:15:26
19  uses, that by virtue of that conscious       14:15:34
20  decision the unlawful promotion             14:15:36
21  described -- allegedly unlawful promotion    14:15:38
22  described in the complaint was not a direct  14:15:40
23  cause of any loss to that third-party        14:15:42
24  payer?                                       14:15:46
25       MR. NOTARGIACOMO:  Objection,           14:15:46

532

1   calls for a legal conclusion.                 14:15:47
2  Q.  Well, I'm not -- let's clarify the           14:15:48
3   question.  I'm not asking for a legal        14:15:51
4   conclusion, I'm just asking for a -- your    14:15:52
5   own economic analysis as to causality.      14:15:54
6  A.  Could you perhaps --                         14:16:00
7       MR. NOTARGIACOMO:  I'm going to           14:16:01
8   still object on the same basis.             14:16:02
9  A.  Could you please restate it in some chunks?  14:16:04
10  Because I'm a little unclear.  So I assume   14:16:10
11  that the third-party payer knows Neurontin   14:16:13
12  to be ineffective.                           14:16:16
13 Q.  Sure.  For a given off-label indication or   14:16:16
14  any number of off-label indications --       14:16:20
15 A.  So --                                        14:16:22
16 Q.  -- or at least that it believes Neurontin    14:16:24
17  to be ineffective?                           14:16:26
18 A.  It knows or believes Neurontin to be         14:16:28
19  ineffective, and it knows -- I'm not sure    14:16:31
20  how -- that Neurontin's being used for       14:16:35
21  these off-label indications given that they  14:16:36
22  don't have a prior authorization program.    14:16:40
23  I guess that's the problem with -- if I      14:16:44
24  assume that they know Neurontin to be        14:16:47
25  ineffective and they know that it's being    14:16:49

56 (Pages 529 to 532)

M. ROSENTHAL

533

```
1     used for those off-label uses --        14:16:51
2  Q. Right.  And maybe they learned that it's   14:16:53
3     being used for the off-label uses by     14:16:55
4     watching Dateline or something like that  14:16:57
5     and seeing a piece about David Franklin,  14:16:59
6     his case?                        14:17:05
7  A. Okay.  Although I don't think that tells  14:17:06
8     them, you know, how it's being used --    14:17:08
9  Q. Fair enough.                  14:17:11
10 A. -- in their population necessarily.  Then  14:17:11
11    why is the cause of that off-label use not  14:17:15
12    still the allegedly illegal promotional   14:17:19
13    activities?                     14:17:24
14 Q. I guess my question goes to the extent that  14:17:28
15    the third-party payer knows that the      14:17:34
16    allegedly illegal activities are going on,  14:17:38
17    and it affirmatively decides not to       14:17:40
18    implement a program through which it would  14:17:42
19    not need to reimburse for those          14:17:43
20    indications, how can it be said that the   14:17:49
21    promotional activity resulted in the loss  14:17:51
22    to that third-party payer?               14:17:58
23         MR. NOTARGIACOMO:  Objection,     14:17:59
24    calls for a legal conclusion.             14:18:00
25 A. Well, in my view, that really does ask a   14:18:01
```

534

```
1     legal question, because then you could pose  14:18:04
2     a case where there's always some means by   14:18:08
3     which someone can avert fraud, but if it's  14:18:10
4     very, very high cost, I mean, how can you   14:18:12
5     say that that's the fault of the person who  14:18:15
6     was defrauded?  And that's a really poor   14:18:17
7     sort of coffee-table legal opinion, and    14:18:22
8     so -- but that's sort of where your        14:18:24
9     question leads me, so I'm afraid I can't   14:18:25
10    really respond.                 14:18:28
11 Q. Okay.  I won't ask you for the coffee-      14:18:29
12    table --                      14:18:31
13 A. Okay.                        14:18:31
14 Q. -- legal opinion.                14:18:32
15 A. Thank you.  I know it's offensive.        14:18:33
16 Q. No, not at all.                 14:18:35
17         All right.  Wouldn't you agree     14:18:36
18    though that the class does -- the third-   14:18:37
19    party payer subclass does contain a wide   14:18:39
20    range of third-party payers that range from  14:18:41
21    large multi-state insurance companies with  14:18:44
22    many employees to small local businesses   14:18:46
23    with just a few employees?             14:18:49
24 A. I would imagine that to be true, yes.     14:18:50
25 Q. And that you would agree that -- I assume,  14:18:53
```

535

```
1     that in view of this, the third-party      14:18:54
2     payers would have varying levels of        14:18:56
3     knowledge or sophistication as to efficacy  14:18:58
4     of various drugs for various indications?  14:18:59
5  A. Again, as I said before, I would agree that  14:19:01
6     there's probably variation along those     14:19:05
7     lines.                         14:19:07
8  Q. And you would also agree that your model   14:19:07
9     doesn't seek to account for those         14:19:09
10    differences from third-party payer to      14:19:11
11    third-party payer because it's an aggregate  14:19:13
12    model?                        14:19:16
13 A. That's correct.                 14:19:16
14 Q. What analysis, if any, have you done into   14:19:16
15    the amount and quality of the medical      14:19:24
16    claims data that are maintained by the     14:19:25
17    different third-party payers?            14:19:27
18 A. Specific to this case?               14:19:28
19 Q. Uh-huh.                       14:19:35
20 A. I have not planned to use claims data      14:19:36
21    specifically in the models that we've      14:19:38
22    discussed, so I have not looked into those  14:19:40
23    data.  I have extensive experience using   14:19:43
24    claims data both on the prescription drug  14:19:47
25    and in general, so I have a general sense   14:19:49
```

536

```
1     of those data.                  14:19:51
2  Q. Okay.  But you don't plan on using them in  14:19:52
3     your analysis in this case?             14:19:54
4  A. I believe there are places where they might  14:19:55
5     be informative, but in general, as we      14:19:59
6     talked about, I plan to use the National   14:20:02
7     Disease and Therapeutic Index data for the  14:20:04
8     quantities and then the promotional data   14:20:07
9     for promotional spending.              14:20:09
10 Q. Would you agree that individual third-party  14:20:22
11    payers may have delegated decision-making  14:20:24
12    authority regarding reimbursement for      14:20:26
13    prescription drugs to different entities   14:20:28
14    that I'll refer to by acronyms, and maybe  14:20:30
15    we can go through them one by one.  The    14:20:34
16    first is TPAs, the second are PBMs, and the  14:20:36
17    third are EBCs.                 14:20:39
18         MR. NOTARGIACOMO:  Objection.     14:20:41
19 Q. Are you familiar with any of those three   14:20:42
20    groups of acronyms?               14:20:44
21 A. Two, and I could guess what the third is,  14:20:45
22    but --                        14:20:46
23 Q. Well, let's work on just the two that      14:20:47
24    you --                        14:20:49
25 A. Excellent.                     14:20:49
```

57 (Pages 533 to 536)

M. ROSENTHAL

537

1 Q. Okay.                                            14:20:50
2 A. Third-party administrators, they               14:20:50
3    essentially process claims data for --         14:20:53
4    often for these plans like Taft-Hartley        14:20:59
5    funds. They have a third-party                 14:21:01
6    administrator. Third-party administrator       14:21:04
7    runs claims through a repricing system, so     14:21:07
8    they adjudicate claims, pay claims, that       14:21:11
9    kind of thing.                                 14:21:14
10       PBMs have a -- so the TPAs,                 14:21:15
11   they're -- maybe just to give a sense,         14:21:18
12   they're administrative entities. They --       14:21:21
13   most of what they do is about processing       14:21:26
14   the bills.                                     14:21:28
15       PBMs, pharmacy benefit managers,           14:21:29
16   in contrast do a lot more. They set            14:21:34
17   formularies in particular, as well as          14:21:38
18   process claims. They often have mail order     14:21:42
19   facilities of their own. And I don't know      14:21:44
20   what the last one is, but I can make it up.    14:21:52
21 Q. Don't make it up.                             14:21:55
22       Would you agree that the extent to         14:21:56
23   which and the manner in which individual       14:22:00
24   TPPs delegate decision-making authority to     14:22:02
25   either PBMs or TPAs will vary from third-      14:22:06

538

1    party payer to third-party payer?             14:22:09
2 A. I would assume that the specific functions    14:22:14
3    they ask the -- particularly the TPAs to      14:22:18
4    undertake could vary.                         14:22:21
5 Q. Okay. I think you also said -- and correct    14:22:25
6    me if I'm getting this wrong -- that          14:22:28
7    individual third-party payers may have        14:22:30
8    different policies regarding coverage of      14:22:31
9    prescription drugs for off-label uses?        14:22:34
10 A. I believe that's true.                        14:22:36
11 Q. Okay. Would you also agree that different     14:22:38
12   third-party payers even with the same         14:22:41
13   policies regarding coverage may have          14:22:43
14   different enforcement practices with          14:22:45
15   respect to those policies?                    14:22:48
16 A. That may be true as well.                     14:22:49
17 Q. Would you agree that differing policies of    14:22:52
18   TPPs or different enforcement practices of    14:23:00
19   TPPs could alter the effect of the            14:23:03
20   allegedly unlawful promotional activities     14:23:09
21   with respect to each individual TPP?          14:23:13
22 A. Let's be clear for a moment.                  14:23:15
23 Q. That would be good for a change, right?       14:23:18
24 A. The difference in policies as a general       14:23:21
25   term across third-party payers may affect     14:23:25

539

1    their sort of cross-sectional impact.         14:23:31
2    Those differences will not confound my        14:23:34
3    estimates of the aggregate impact because,    14:23:37
4    again, there's no reason to believe that      14:23:42
5    they're correlated over time precisely with   14:23:44
6    the allegedly illegal activities. So          14:23:46
7    they're not confounding the aggregate         14:23:49
8    estimate.                                      14:23:50
9        If you want me to say that a TPP           14:23:53
10   that requires prior authorization for         14:23:56
11   Neurontin will be differently affected than   14:23:58
12   when it doesn't -- is that your question?     14:24:01
13 Q. That had been the question, yeah.             14:24:03
14 A. Okay. I'm sorry. So it is true that there     14:24:05
15   will be a different quantum of effect         14:24:08
16   across TPPs depending on whether, for         14:24:11
17   example, they have prior authorization for    14:24:13
18   Neurontin.                                    14:24:15
19 Q. Now, just to make sure I understand your      14:24:20
20   answer, it is the case that changes in       14:24:24
21   policies regarding coverage of Neurontin      14:24:29
22   for off-label uses or changes in             14:24:31
23   enforcement practices of those policies       14:24:33
24   could affect prescription-writing behavior    14:24:36
25   in the aggregate, correct?                    14:24:39

540

1        MR. NOTARGIACOMO: Objection,              14:24:41
2    asked and answered.                           14:24:43
3 A. Yes. Those changes could affect               14:24:43
4    prescription-writing behavior, but, again,    14:24:47
5    they would not confound my estimates unless   14:24:50
6    they were correlated. And one would think     14:24:52
7    they would be negatively correlated, if       14:24:55
8    anything.                                     14:24:57
9 Q. Would you agree that different third-party     14:25:03
10   payers were responsible for ensuring          14:25:06
11   substantially different membership            14:25:09
12   demographics?                                 14:25:11
13 A. The third-party payers have different kinds   14:25:12
14   of patients that they cover, yes.            14:25:18
15 Q. Different kinds of beneficiaries, right?      14:25:19
16 A. That's right, yes.                            14:25:21
17 Q. And that the percentage of women versus the   14:25:23
18   percentage of men covered might vary from    14:25:28
19   TPP to TPP?                                   14:25:30
20 A. I would guess that this might happen for a    14:25:32
21   large population probably not so much, but    14:25:37
22   some of the smaller ones potentially.        14:25:39
23 Q. How about general age demographics again?     14:25:41
24 A. Potentially there might be some variation,    14:25:45
25   yes.                                          14:25:47

58 (Pages 537 to 540)

M. ROSENTHAL

**541**

```
1  Q. Region of the country?                    14:25:49
2  A. Surely.                                    14:25:50
3  Q. Occupations of the people who are covered?  14:25:50
4  A. By definition with the Taft-Hartley plans.  14:25:54
5  Q. In view of these differences, isn't it     14:25:57
6     necessarily the case that the effect of the 14:26:05
7     alleged promotional activity on individual  14:26:07
8     TPP class members could vary from TPP to     14:26:10
9     TPP?                                         14:26:12
10 A. Again, individual TPPs, the magnitude of    14:26:17
11    the effect, for example, because they have  14:26:22
12    many patients on Neurontin versus not many  14:26:24
13    patients on Neurontin, could certainly      14:26:27
14    vary.                                        14:26:29
15 Q. Okay.  Would you agree that the cost        14:26:29
16    containment programs that we described      14:26:38
17    earlier, prior authorization programs,      14:26:39
18    things like that, may very well have        14:26:41
19    changed over time with respect to even an   14:26:43
20    individual third-party payer?               14:26:46
21 A. That certainly may be true.  Again, I don't 14:26:47
22    see how it would confound the estimates I'm 14:26:53
23    concerned about, but they may have changed. 14:26:56
24        MR. POLUBINSKI:  Okay.  Why don't       14:27:00
25    we take a break.                            14:27:01
```

**542**

```
1         MR. NOTARGIACOMO:  Okay.              14:27:02
2         THE VIDEOGRAPHER:  The time is        14:27:03
3     2:27.  We are off the record.             14:27:04
4         (Recess taken.)                       14:27:05
5         THE VIDEOGRAPHER:  The time is        14:34:30
6     2:34, and we are back on the record.      14:34:35
7         MR. POLUBINSKI:  All right.  I        14:34:38
8     don't have any further questions at this  14:34:39
9     time, but I would like to say that the    14:34:41
10    defendants reserve the right to continue  14:34:43
11    the deposition in the event that Professor 14:34:45
12    Rosenthal offers new or revised opinions at 14:34:47
13    some point later in the case or in the    14:34:49
14    event that plaintiffs produce additional  14:34:51
15    documents that should have been produced  14:34:53
16    prior to this deposition.                  14:34:54
17        MR. NOTARGIACOMO:  I have no other    14:34:55
18    questions for the plaintiffs.  I believe we 14:34:59
19    should conclude the deposition, but if it  14:35:04
20    turns out that there's an issue, we can    14:35:05
21    fight about that later.                     14:35:07
22        MR. POLUBINSKI:  Exactly.  I think    14:35:08
23    we -- it's not ripe for fighting about at  14:35:09
24    this time --                                14:35:14
25        MR. NOTARGIACOMO:  Absolutely.        14:35:14
```

**543**

```
1         MR. POLUBINSKI:  -- as much as --     14:35:14
2         MR. NOTARGIACOMO:  As much as I'd     14:35:15
3     love to fight with you.                    14:35:17
4         MR. POLUBINSKI:  Yeah.  It's          14:35:18
5     always a pleasure.  We can go off the      14:35:19
6     record.                                    14:35:22
7         THE VIDEOGRAPHER:  The time is        14:35:22
8     2:35.  This is the end of Tape 4.  The     14:35:24
9     deposition is concluded, and we are off the 14:35:29
10    record.                                    14:35:32
11        (Whereupon the deposition was         14:35:32
12    adjourned at 2:35 p.m.)                     14:35:36
```

**544**

```
2  CASE:  IN RE:  NEURONTIN MARKETING, SALES
   PRACTICES, AND PRODUCTS LIABILITY
3  LITIGATION
4        ERRATA SHEET
5  INSTRUCTIONS:  After reading the transcript
   of your deposition, note any change or
6  correction to your testimony and the reason
   therefor on this sheet.  DO NOT make any
7  marks or notations on the transcript volume
   itself.  Sign and date this errata sheet
8  (before a Notary Public, if required).
   Refer to Page 546 of the transcript for
9  errata sheet distribution instructions.
10 PAGE  LINE
         CHANGE:
11       REASON:
         CHANGE:
12       REASON:
         CHANGE:
13       REASON:
         CHANGE:
14       REASON:
         CHANGE:
15       REASON:
         CHANGE:
16       REASON:
         CHANGE:
17       REASON:
         CHANGE:
18       REASON:
         CHANGE:
19       REASON:
         CHANGE:
20       REASON:
21
   I have read the foregoing transcript of my
22 deposition and except for any corrections
   or changes noted above, I hereby subscribe
23 to the transcript as an accurate record of
   the statements made by me.
24
25       _____
```

59 (Pages 541 to 544)

M. ROSENTHAL

545

```
1    United States District Court
2    District of Massachusetts
3        I, Jessica L. Williamson, Registered,
4    Merit Reporter, Certified Realtime Reporter
5    and Notary Public in and for the
6    Commonwealth of Massachusetts, do hereby
7    certify that MEREDITH B. ROSENTHAL, Ph.D.,
8    the witness whose deposition is
9    hereinbefore set forth, was duly sworn by
10   me and that such deposition is a true
11   record of the testimony given by the
12   witness.
13       I further certify that I am neither
14   related to or employed by any of the
15   parties in or counsel to this action, nor
16   am I financially interested in the outcome
17   of this action.
18       In witness whereof, I have hereunto set
19   my hand and seal this 30th day of October,
20   2006.
21
22
23       Jessica L. Williamson, RMR, RPR, CRR
24       Notary Public, CSR No. 138795
25       My commission expires: 12/18/2009
```

546

```
1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3
4        The original of the Errata Sheet has
5    been delivered to Edward Notargiacomo, Esq.
6        When the Errata Sheet has been
7    completed by the deponent and signed, a
8    copy thereof should be delivered to each
9    party of record and the ORIGINAL delivered
10   to Edmund Polubinski III, Esq. to whom the
11   original deposition transcript was
12   delivered.
13
14       INSTRUCTIONS TO DEPONENT
15
16       After reading this volume of your
     deposition, indicate any corrections or
     changes to your testimony and the reasons
17   therefor on the Errata Sheet supplied to
     you and sign it.  DO NOT make marks or
18   notations on the transcript volume itself.
19   REPLACE THIS PAGE OF THE TRANSCRIPT WITH
20   THE COMPLETED AND SIGNED ERRATA SHEET WHEN
21   RECEIVED.
22
23
24
25
```

60 (Pages 545 to 546)