# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
IN RE NEURONTIN MARKETING, SALES                    )
PRACTICES, AND PRODUCTS LIABILITY                   )
LITIGATION                                          )
_____ )
THIS DOCUMENT RELATES TO:                           )    MDL Docket No. 1629
                                                    )    Master File No. 04-10981
                                                    )    Judge Patti B. Saris
ALL MARKETING AND                                   )    Mag. Judge Leo T. Sorokin
SALES PRACTICES ACTIONS                             )
                                                    )
_____ )


**DECLARATION OF GREGORY K. BELL, PH.D.**
**IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS**
**CERTIFICATION**

## I.     INTRODUCTION

1.     I am an Executive Vice President at CRA International, an economics and management consulting firm.  My education includes a master of business administration and a doctorate in business economics, both from Harvard University.  Details of my professional experience, publications, and past testimony are described in my curriculum vitae, a copy of which is attached as Exhibit A.  CRA receives compensation for my time at a rate of $750 per hour.  Neither CRA nor I has any financial interest in the outcome of this litigation.

2.     For the past thirteen years, I have directed the Life Sciences practice within the Business Consulting platform at CRA.  In this capacity, I have led many projects concerning the economics of business strategy in the pharmaceutical industry.  Most of my work has focused on strategy issues throughout the pharmaceutical product lifecycle, from opportunity assessment to product launch to therapeutic competition and then generic competition.  Many of these projects have dealt with the influences on physician prescribing behavior, patient and provider purchasing behavior, and payor reimbursement and formulary decisions.  In addition, I have submitted numerous expert reports and given testimony in a wide range of cases involving patent disputes, licensing, antitrust, and other issues in the pharmaceutical industry.

3.     I understand that Plaintiffs have moved to certify a class of third-party payors ("TPPs") who paid or reimbursed for Neurontin prescribed from 1995 through 2004 to treat certain conditions that were not indicated on the product label ("off-label uses").  Plaintiffs allege that Defendants engaged in false or misleading marketing and promotion of Neurontin for each of these specific off-label uses.  Plaintiffs claim that this alleged fraud caused damages to the putative TPP Class members by causing them to pay for prescriptions of Neurontin for specific off-label uses that, but for the fraud, would not have occurred.

4.     I have been asked by counsel for Pfizer to describe how third-party payors operate generally, the differences among third-party payors, and the ways in which third-party

payors can and do influence physician prescribing behavior for pharmaceuticals, including Neurontin.  I have also been asked to address the impact of these differences on Plaintiffs' ability to prove their allegations by means of common proof on a class-wide basis, and, in particular, whether each payor's use of the techniques to influence prescribing behavior and to manage its costs for specific off-label uses of Neurontin would require individualized inquiry, physician-by-physician, patient-by-patient, retailer-by-retailer, or plan-by-plan, to assess impact or injury for each and every member of the proposed class.

5.      In preparing this report, I have reviewed the materials listed in Exhibit B and cited throughout this report.  I will update my analysis if additional information becomes available through discovery.  Further, I reserve the right to supplement or modify my opinions, if warranted, and to prepare additional supporting materials, such as summaries, graphical exhibits, or charts.

6.      My report is organized as follows. Following this introduction, the second section presents a summary of my opinion.  The third section provides information on Neurontin and the putative TPP class definition.  Section four presents a discussion of who are TPPs and how they could influence prescribing behavior for Neurontin.  Section five presents a summary of specific examples of how TPPs use formularies and other mechanisms to influence prescribing behavior, including specific examples of their influence on the prescribing of Neurontin.  Section six concludes.

## II.    SUMMARY OF OPINION

7.      First, health insurance companies are generally large sophisticated entities that have developed internal pharmaceutical benefit management capabilities or have arranged those services through independent pharmacy benefit managers ("PBMs").  Throughout the putative class period, all self-funded employers and union health and welfare funds had access to pharmaceutical benefit management services offered by insurance companies, independent PBMs, and third-party administrators ("TPAs").  Many TPPs chose to use these sophisticated services to manage pharmaceutical utilization and costs, including the utilization of Neurontin for specific off-label conditions and the

2

management of those costs.  Pharmaceutical benefit management services often included claims data reports that would readily identify highly utilized medications such as Neurontin and other opportunities for utilization management and cost control.

8.    Second, there was variation in how TPPs chose to restrict—or encourage (even after this litigation was filed)—the prescribing of Neurontin for specific off-label uses. Accordingly, it is my opinion that only individualized inquiry would allow an appropriate determination of the alleged impact and injury.  TPPs commonly control pharmaceutical utilization by establishing a list of covered drugs along with certain restrictions on prescribing behavior.  These "formularies" were developed by pharmacy and therapeutics ("P&T") committees of physicians and pharmacists who reviewed clinical information regarding the safety, efficacy, and appropriate use of medications.  Formulary decisions also considered the cost-effectiveness of various medications and different out-of-pocket amounts patients would be required to pay for different drugs (which differed across TPPs and time) to encourage or discourage the use of specific drugs.  Virtually all TPPs had access to formularies; many may have addressed the prescribing of Neurontin for specific off-label uses.  TPPs also had access to a variety of non-formulary controls on drug utilization and costs, such as drug utilization review ("DUR") and academic "detailing" by pharmacists and physicians.

9.    Third, TPPs used a variety of different tactics to manage prescribing for specific off-label uses of Neurontin and incurred different net costs for Neurontin reimbursement over time.  Insurance companies also varied in their ability to pass on cost increases to plan sponsors.  As such, it is my opinion that broad estimates of impact and/or injury could inappropriately mask significant individual differences among TPPs with respect to the actual utilization of Neurontin for specific off-label conditions, the management of Neurontin prescribing for those conditions, and the net reimbursement cost of Neurontin for those conditions.  This is readily illustrated by the fact that at least Aetna, CIGNA, and Kaiser Foundation Health Plan ("Kaiser"), among the largest health insurance companies at the end of the putative class period and with a significant share of all covered lives, still actively encourage off-label use of Neurontin; Plaintiffs' expert, however, concludes that the vast majority of insurance companies were injured.

10.     Fourth, utilization of prescription drugs, such as the utilization of Neurontin for specific conditions on an off-label basis, differs across TPPs due to differences in covered individuals' demographic characteristics (e.g., age, gender, health status) ), differences in exposure of covered individuals to health hazards associated with different industries, and due to regional differences in the practice of medicine.  These circumstances may have contributed to substantial differences in the use of Neurontin for specific off-label conditions, and thus individualized inquiry would be necessary to assess appropriately the alleged impact and injury.

## III.     BACKGROUND

## A.     Neurontin

11.     Neurontin® (gabapentin) was launched in 1994 by Parke-Davis, a division of Warner-Lambert, as an antiepileptic drug.[1]  On December 30, 1993, the Food and Drug Administration ("FDA") approved Neurontin for adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.[2]  In October 2000, the FDA also approved Neurontin as adjunctive therapy in the treatment of partial seizures in pediatric patients, age 3 years and above.[3]  On May 24, 2002, the FDA approved Neurontin for the management of postherpetic neuralgia in adults, which is pain that persists for three or more months after healing of the herpes zoster skin rash, also known as shingles.[4]  Neurontin is also used off-label to treat other conditions including bipolar/mood disorder, migraines, and neuropathic and nociceptive pain.[5]

---

[1]     "Neurontin cleared for marketing; uncontrolled epilepsy patients to benefit," *Business Wire*, January 3, 1994 ("Neurontin Launch").

[2]     US Food and Drug Administration, Center for Drug Evaluation and Research: Drugs@FDA,FDA Approved Drug Products Search Engine, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/, accessed on March 13, 2008 ("Drugs@FDA"); Neurontin Product Label, Revised January 2007; Neurontin Launch.

[3]     Neurontin Product Label; October 12, 2000 Letter from Russell Katz, M.D. at the Office of Drug Evaluation, Center for Drug Evaluation and Research to Janeth L. Turner at Parke-Davis, http://www.pfizer.com/products/rx/rx_product_neurontin.jsp, accessed on March 13, 2008; Drugs@FDA: Neurontin Capsule Approval History, Letters, Reviews, and Related Documents).

[4]     Drugs@FDA: Neurontin; "Pfizer Receives FDA Approval to Market Neurontin® for Post-Herpetic Neuralgia," *PRNewswire*, May 28, 2002.

[5]     Bipolar disorders are characterized by mania and depression, which usually alternate. (The Merck Manual, http://www.merck.com/mmpe/sec15/ch200/ch200b.html#sec15-ch200-ch200b-511, accessed on March 13, 2008). A migraine headache is throbbing, moderate to severe pain, usually on one side of the head, that is

4

12.    There are a variety of pharmaceuticals used to treat epilepsy and treatment tends to be highly individualized.[6]  Antiepileptics, also known as anticonvulsants, include Lyrica, Topamax, the Depakote franchise of products, Lamictal, Trileptal and Keppra.[7]  Some of these antiepileptics are approved to treat other conditions, and, as is commonly the case for drugs in the same therapeutic class, other antiepileptics are used "off-label" to treat those same conditions.  For instance, Topamax are Trileptal are used off-label for bipolar disorder; the Depakote products and Lamictal are indicated for bipolar disorder.[8]  Trileptal and Lamictal are used off-label for neuropathic pain; Lyrica is indicated for neuropathic pain.[9]  Topamax and the Depakote products are also indicated for migraine treatment.[10]

13.    Neurontin is available in capsule (100 mg, 300 mg, and 400 mg) and tablet form (600 mg and 800 mg) and as an oral solution (250 mg/5 ml).[11]  The initial approval in 1993 was for the 100, 300, and 400 mg capsules; the 600 and 800 mg tablets were approved in

---

worsened by physical activity, light, sounds, or smells and that is associated with nausea and vomiting. (http://www.merck.com/mmhe/sec06/ch079/ch079c.html, accessed on March 13, 2008.)  Neuropathic pain is caused by damage to or dysfunction of the nerves, spinal cord, or brain; Nociceptive pain is caused by an injury to body tissues. (http://www.merck.com/mmhe/sec06/ch078/ch078b.html, accessed on March 13, 2008.)

[6]    Steven C. Schachter and Patricia O. Shafer, *Seizure Medicines,* November 7, 2007, http://www.epilepsy.com/epilepsy/seizure_medicines, accessed on March 10, 2008.

[7]    Cowen and Company, *Therapeutic Categories Outlook: 2007*, October 2007 ("Therapeutic Categories Outlook"), pp. 399–403; and http://www.epilepsyfoundation.org/answerplace/Medical/treatment/medications/typesmedicine/, accessed on March 13, 2008.

[8]    http://www.merck.com/mmhe/sec07/ch101/ch101d.html (Topamax); http://www.merck.com/mmpe/sec15/ch200/ch200c.html (Lamictal).  Depakote/Depakote ER, Depacon, and Depakene combined product labels, October 2006, available at Drugs@FDA: Lamictal Product Label, September 2006, available at Drugs@FDA.  Antipsychotics indicated for bipolar disorder include Zyprexa, Seroquel, Geodon, Abilify and Risperdal. (http://www.merck.com/mmpe/sec19/ch300/ch300d.html, accessed on March 13, 2008, at Table 2.)

[9]    Therapeutic Categories Outlook, pp. 401–402; Lyrica Product Label, June 2007, available at Drugs@FDA: Lyrica Capsule Approval History, Letters, Reviews, and Related Documents.  "Classes of drugs not typically thought of as analgesics are often effective in treating neuropathic pain, including tricyclic antidepressants, anticonvulsants, and serotonin/norepinephrine reuptake inhibitors (SNRIs);" see Therapeutic Categories Outlook, p. 891.  See, also, http://www.merck.com/mmpe/sec19/ch300/ch300d.html, accessed on March 13, 2008.

[10]   Topamax Product Label June 2005, available at Drugs@FDA: Depakote Product Label, October 2006, available at Drugs@FDA.  The triptans are a group of products also indicated for migraine treatment; these include Imitrex, Maxalt and Zomig.

[11]   Drugs@FDA: Neurontin.

1998 and the oral solution in 2000.[12]  For adult epileptics, Neurontin is typically dosed at 900 to 1800 mg per day, given three times a day.  In the treatment of adults with postherpetic neuralgia, Neurontin therapy is typically dosed up to 1800 mg per day, given three times daily; it has also been shown to be well-tolerated in dosages of up to 3600 mg per day.[13]

14.    On August 18, 2004, the first generic gabapentin product (a non-AB-rated product) was launched by Ivax in the form of 100, 300, and 400 mg tablets;[14] those doses of Neurontin were sold only in capsule form.  On October 8, 2004, Teva and Purepac (then a subsidiary of Alpharma), both launched the first AB-rated 100, 300, and 400 mg gabapentin capsules.[15]

**B.    Putative Third-Party Payor Class Definition**

15.    I understand that named Plaintiffs Louisiana Health Service Indemnity Company dba BlueCross/BlueShield of Louisiana ("BCBS-LA"), ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA"), and Harden Manufacturing Corporation ("Harden"), collectively the Class Representatives, have moved for an order certifying a "TPP Class," composed of separate Subclasses for different indications.  The TPP Class is proposed to be defined as all private, non-governmental entities in the United States and its territories that paid or reimbursed all or part of the cost of Neurontin prescribed, provided, or administered to natural persons covered by any contract, policy or plan, for any of the following indications during the following periods of time:[16]

---

[12]    Drugs@FDA: Neurontin Capsule Approval History, Letters, Reviews, and Related Documents; Neurontin Tablet Approval History, Letters, Reviews, and Related Documents; Neurontin Oral Solution Approval History, Letters, Reviews, and Related Documents.

[13]    Neurontin Product Label, p. 24.

[14]    Deposition of Barry Davis (COO for the Health Group, Medco Health Solutions), October 26, 2007 ("Davis Deposition"), pp. 127–30; and NEUR 0001 (Davis Deposition Exhibit 22).

[15]    "FDA Grants Alpharma Final Approval and First-To-File Status for Gabapentin Tablets," *PR Newswire US*, October 22, 2004; and "Teva Announces Approval and Launch of Gabapentin Tables," *Business Wire, December 15, 2005*.

[16]    Plaintiffs Renewed Motion for Class Certification, December 19, 2007.

| TPP Subclass | Subclass Period |
|---|---|
| Bipolar/Mood Disorders | 11/95 - 12/04 |
| Neuropathic Pain | 7/95 - 12/04 |
| Migraine/Headache | 9/95 - 12/04 |
| Nociceptive Pain | 9/95 - 12/04 |
| Doses > 1800 mg/day | 3/95 - 12/04 |

16.    According to Plaintiffs, such entities in the TPP Class would include "insurance companies, union health and welfare benefit plans, entities with self-funded plans that contract with a health insurance company or other entity to serve as a third-party claims administrator to administer their prescription drug benefits, private entities paid by any governmental entity (including a state Medicaid program), and other organizations."[17] My understanding is that the putative TPP Class does not include pharmacy benefit managers ("PBMs") or third-party administrators ("TPAs") that do not sell their own insurance products.  Nonetheless, I note that Plaintiffs have not explained how they would determine class membership for a TPP (e.g., an insurance company) that also provides TPA services to another TPP (e.g., a self-funded employer), nor have they explained how they would resolve double-counting in claims data and other information that do not maintain this distinction.

17.    I understand that a number of TPPs are proceeding separately.  For the purposes of this report, however, I use examples to indicate how TPPs operate, whether or not the examples involve TPPs that would still be members of the putative class.  I have no reason to believe that these examples are not descriptive of the remaining putative class members.

## IV.    WHO ARE THIRD-PARTY PAYORS AND HOW DO THEY INFLUENCE NEURONTIN PRESCRIBING?

18.    Fundamentally, TPPs pay for medical services and/or prescription pharmaceuticals for individuals covered under their benefit plans.  Third-party payors are distinct from the first-party, the individual patient, and the second party, the provider of health care products or services (e.g., a pharmacist).

---

[17]    Plaintiffs Renewed Motion for Class Certification, December 19, 2007.

## A.    Types of TPPs

19.    There are a number of different types of non-governmental TPPs, including:  (1) self-funded employers, (2) union health and welfare benefits funds, and (3) health insurance companies.  In 1997, 47.9 million individuals (39 percent of the non-elderly population covered by the private sector) were in private-sector "self-funded" plans, and 74.9 million individuals (61 percent of the total) were in private sector "fully-insured" plans; in 2004, 54 percent of covered workers were in self-funded plans.[18]  The predominant form of pharmaceutical benefits coverage during the putative class period was fully-insured managed care (i.e., non-indemnity) plans provided by health insurance companies.

20.    Pharmaceutical benefit management services are designed to influence pharmaceutical prescribing and utilization behavior, and to control net reimbursement costs for the TPP. Throughout the putative class period, all self-funded employers and union health and welfare benefits funds had access to the pharmaceutical benefit management services offered by health insurance companies, independent PBMs, and TPAs.  Many of the self-funded employers and union health and welfare benefits funds chose to avail themselves of the sophisticated pharmaceutical benefit management services offered by these organizations.  As such, pharmaceutical benefit management services were available to and used by TPPs to help manage the prescribing of Neurontin for specific off-label uses and to control the net reimbursement costs driven by those uses.

21.    It is also important to note that TPP status changes over time.  For instance, Harden, a class representative, was self-funded until 1994, when it switched to a fully-insured plan offered by Blue Cross and Blue Shield of Alabama ("BCBS-AL"), then switched back to self-funded status in July 1999.[19]  Further, a single employer may establish several health benefits plans, some of which are self-funded and others of which are fully-insured.  For

---

[18]    Employee Benefit Research Institute, Employment-Based Health Care Benefits and Self-Funded Employment-Based Plans: An Overview, April 2000 ("EBRI, 2000"), p. 5 (1997 figures).  Kaiser Family Foundation and Health Research and Educational Trust, *2006 Employer Health Benefits Survey* ("Kaiser Family Foundation, 2006"), "Exhibit 10.1 – Percentage of Covered Workers in Partially or Completely Self-Funded Plans, by Firm Size, 1999–2006," p. 127.

[19]    Defendant's Exhibit 4, marked at the Deposition of Lee Dorrill (Marketing Representative for the Harden Manufacturing account, BCBS-AL), January 26, 2006 ("Dorrill Deposition"); Defendant's Exhibit 8, marked at the Dorrill Deposition.

example, Mitre Corporation has used a self-funded plan to serve 1,500 of its active employees for over 20 years, but in 2006 also began considering offering a fully-insured plan for 1,300 employees.[20]  As a result, it is my opinion that answers to questions regarding the oversight and management of prescription benefits, including the actual cost of a prescription to a TPP, would need to be addressed through individualized inquiry.

### i.    Self-funded employers

22.    An individual self-funded employer may establish a medical and/or pharmaceutical benefit plan for its employees.  The self-funded employer assumes the risk for health care costs and pays for its participants' health care claims directly out of its own income or assets.  As with other TPPs, the self-funded employer may require employees to contribute to part of the plan's cost through a periodic contribution, e.g., a monthly or yearly premium, and/or through a payment based on services provided, e.g., a flat amount as a co-payment or a percentage amount as coinsurance.  Many self-funded employers also purchase stop-loss insurance coverage to protect the plan from unusually large claims; stop-loss coverage will reimburse the plan if expenditures exceed certain dollar limits, on a per-person basis, on an aggregate basis, or both.[21]

23.    Self-funded employers range from those with only a few workers to highly sophisticated organizations employing thousands of people.  Over the period 1996 to 2004, self-funding was least prevalent among small firms (decreasing from 24 percent to 10 percent of covered workers in firms with 3 to 199 workers), more prevalent among medium-sized firms (decreasing from 58 percent to 50 percent of covered workers for firms with 200 to 999 workers), and the most prevalent among large firms (increasing from 66 percent (67 percent) to 78 percent (80 percent) of covered workers for firms with 1,000 to 4,999 (5,000 or more) covered workers).[22]  Among the self-funded employers during the

---

[20]    Nancy Hatch Woodward, "Is Self-Funded Health a Path for Small Firms," *HR Magazine*, Vol. 51, No.8, August 2006.

[21]    EBRI, 2000, p. 5.

[22]    See Kaiser Family Foundation and Health Research and Educational Trust, *Employer Health Benefits 2004 Annual Survey (Kaiser Family Foundation, 2004),* "Exhibit 10.1 – Percentage of Covered Workers in Partially or Completely Self-Funded Plans, by Firm Size, 1996–2004," p. 123.

putative class period are business entities such as Chevron Corporation, Ford Motor Company, Westinghouse Electric Corporation, Eastman Kodak and Xerox.[23]

24.   Self-funded employers generally make use of benefits consultants, PBMs and TPAs to establish and manage their pharmaceutical benefits package.[24]   The self-funded employer typically contracts with a TPA to process its claims and, if the benefit package restricts covered individuals to use a specific panel of pharmacies, the employer may also contract with the TPA for access to that TPA's network.   For pharmacy benefits, the TPA may be a pharmacy benefits manager such as Medco or Express Scripts.   If the TPA is an insurance company, such as Aetna or CIGNA, the arrangement with the employer is generally called an administrative services only ("ASO") agreement.   Self-funded employers, such as Harden, generally compensate TPAs for their services by paying them a percentage of the dollar value of the claims processed by the TPA.[25]   Thus, determining how much a self-funded employer paid for Neurontin prescriptions would require individualized inquiry into the employer-TPA arrangement (as well as any patient cost-sharing arrangements such as co-payments or coinsurance).

### ii.   Union health benefits funds

25.   Union health benefits funds (or health and welfare benefits funds) are established under collective bargaining agreements.   These funds may be formed by a single employer, although they are more commonly set up by multiple employers.   Multi-employer funds are usually established under Section 302(c)(5) of the Taft-Hartley Act, and participating members who switch employers covered under the same collective bargaining agreement may continue to receive health care benefits coverage.

26.   Union health benefits funds may cover prescription pharmaceutical costs through self-funding or through fully-insured plans offered by insurance companies, such as

---

[23]   See Jeannie Mandelker, "Controlling the cost of branded drugs - use of formularies," *Business and Health*, November 1993 ("Business and Health"); and Sharon Baker, "Self-Funded HMOs on the Rise," *Managed Care*, May 2002, pp. 46D, 46F, 46H, at 46F.

[24]   M. Susan Marquis and Stephen H. Long, "Who Helps Employers Design Their Health Insurance Benefits?" *Health Affairs*, January/February 2000, pp. 133–138 ("Benefit Consultants"), at 136.

[25]   Matthews Deposition, pp. 175–176.

Aetna or CIGNA.[26]  Some union health benefits funds individually arrange to provide health benefits, while others participate in health care purchasing coalitions that make arrangements to provide health benefits.[27]

27.    Like self-funded employers, union health benefits funds have access to benefits consultants, PBMs and TPAs to establish and manage their pharmaceutical benefits package.[28]  If the fund self-funded, it would typically contract with a TPA to process its claims and, possibly, to provide access to the TPA's pharmacy network.  As with the self-funded employer, the TPA may be a pharmacy benefits manager such as Medco or Express Scripts, or an insurance company, such as Aetna or CIGNA, operating under an ASO agreement.  Alternatively, of course, as with employers, the union benefits fund could choose to contract with an insurance company for the provision of pharmaceutical benefits on a fully-insured basis.

28.    The decisions of a union health benefits fund, whether to self-fund or not, who to contract with, and the terms of that contract as they relate to the management and oversight of the prescription benefit and the cost to the fund of individual prescriptions, will vary across funds and over time.  Accordingly, it is my opinion that the appropriate investigation of such issues with respect to the determination of impact and injury related to union health benefits funds would need to be the subject of individualized inquiry.

---

[26]    The named Plaintiff ASEA is a self-funded union benefit plan for employees of the Governmental Unit of the State of Alaska.  The Trust began administering the health plan in July 2001.  (Deposition of Fred Grant Brown (Chairman and Hearing officer for the Workers' Compensation division, ASEA/AFSCME Local 52 Health Benefits Trust), October 19–20, 2005, ("Brown Deposition"), p. 30.)  ASI was the third-party administrator for health care services from the beginning  (Deposition of Valera M. Kingsley (Claims Supervisor, ASI), January 12, 2006 ("Kingsley Deposition"), p. 38), however Caremark processed all of ASEA's pharmacy claims (Kingsley Deposition, pp. 69, 96).

[27]    See International Foundation of Employee Benefit Plans, *2005 Directory of Multiemployer & Public Health Care Purchasing Coalitions*.

[28]    See Health Policy Alternatives, Inc., *Pharmacy Benefit Managers: Tools for Managing Drug Benefit Costs, Quality, and Safety*, PCMA, August 2003, p. iii; and Mark Reynolds , "Third party administrators: their unique and specific role - California Consumer Alert: AB 1672," *Los Angeles Business Journal*, April 12, 1993.

### iii.    Health insurance companies

29.    Health insurance companies ("insurance companies" or "insurers") sell health insurance or other prepaid healthcare products that may utilize specific networks of health care providers who provide medical and/or pharmacy benefits under specific health care benefit packages.  Health insurance products include traditional unmanaged indemnity plans (which allow the patient to visit any provider and do not have cost controls), managed indemnity plans, preferred provider organization ("PPO") plans (which tend to offer somewhat restricted access to healthcare providers in return for cost savings) and health maintenance organization ("HMO") plans (which tend to offer the most restrictive networks of healthcare providers in return for the greatest potential cost savings).  The most restrictive HMOs tend to be staff-model HMOs in which offer integrated healthcare delivery systems—the pharmacies and hospitals are owned by the plan and the physicians are salaried employees of the plan.[29]

30.    Indemnity and managed care are the two primary types of commercial insurance offered during the putative class period.  Over time, the number of insured individuals under indemnity plans has declined, and the number covered under managed care plans has increased.[30]  Indemnity plans typically required the beneficiary to pay for the medical service provided (e.g., a prescription from a retail pharmacy, a physician visit, or a hospital stay) and then submit a claim to the insurer for proportionate reimbursement. Individualized inquiry would be required to determine to what extent indemnity insurers reimbursed for Neurontin prescribed for specific off-label uses under the conditions defined by the Plaintiffs.

31.    Managed care, however, is a fundamentally different way of offering healthcare insurance—acquire membership scale and then manage and restrict access to healthcare providers, including physicians, pharmacies, and hospitals, in order to drive cost savings. The insurance companies have a variety of tools at their disposal to manage prescription

---

[29]    Faith Lyman Ham, "An HMO primer - structural classification of health maintenance organizations," *Business and Health*, June 1989.

[30]    The percentage of covered workers under indemnity plans has fallen from 27 percent in 1995 to 5 percent in 2004.  (Harris Meyer, "Indemnity insurance; down but not out - indemnity health insurance," Business and Health, May 1996; Kaiser Family Foundation, *2004*, p. 6.)

benefits and there exists considerable variability in the net reimbursement cost of prescriptions for specific products, such as Neurontin, across TPPs and over time.

32.    A nexus of contracts lies at the heart of managed care: contracts between the insurer and the employer or group that defines the member's benefits, contracts between the insurer and providers that define reimbursement rates and contracts with the pharmaceutical companies that define net reimbursement costs. These contracts and insurer operations with respect to the management of pharmaceutical benefits are the result of competition in the marketplace and individual negotiations between the parties to each contract. The result is considerable variability in the management of pharmaceutical benefits with respect to Neurontin and considerable variability in the net cost of Neurontin reimbursement by plan and over time.

33.    Employers, union health and welfare benefits funds, and other entities that purchase managed care products ("sponsors"), typically issue a Request for Proposals ("RFP") to solicit bids from competing insurers. The requirements set forth in these RFPs reflect the objectives and interests of the sponsor and are often developed with the assistance of professional benefits consultants. These benefits consultants, including major firms such as Segal Company, Towers Perrin and Mercer, also assist the sponsor in the evaluation of the competing proposals.[31] Insurers often submit multiple responses to an RFP, providing the sponsor with a range of plan options for the sponsor. Plan sponsors may, in turn may offer several different plans to their employees or members. As a consequence, the same TPP may have used different tactics to manage the prescribing of Neurontin for specific off-label uses, and may have incurred different net reimbursement costs of Neurontin over time and across the different plans that it manages. It is, therefore, my opinion that broad estimates of impact and/or injury could inappropriately mask significant individual differences.

34.    Through this RFP process, insurers offer plan sponsors a variety of different services and payment options. The fundamental components of a managed care pharmaceutical

---

[31]    For instance, in 1997, 54 percent of all employers nationwide reported using some type of external consultant to assist in making health care benefit decisions. (Benefit Consultants, pp. 135–136.)

benefit include:  (1) access to a provider network, (2) a formulary, and (3) claims processing.

34.1  <u>Access to a provider network</u>.  The promise of managed care is lower insurance costs in return for reduced choice regarding which physicians people can see, which hospitals they can use, and which pharmacies they can frequent to fill their prescriptions.  Insurance companies use the bargaining power that member volume provides to negotiate reduced rates from the physicians, hospitals, and pharmacies that form the network of healthcare providers for use by their members.  By purchasing managed care products from an insurer, a sponsor gains access to the insurer's network of providers without having to negotiate contracts with each provider.  Provider networks generally differ across insurers and a single insurer may develop multiple networks to support different plans that it offers.  For example, an insurer may offer a "premier" medical benefits product that includes higher-cost specialty hospitals that are excluded from the networks associated with other products, or an insurer may contract with some, but not all, pharmacies to be in one of its networks.

34.2  <u>Formulary</u>.  A formulary is a listing of pharmaceutical products, sometimes called a "preferred drug list," that indicates which products are reimbursed by the health plan, what is the cost-sharing contribution required from the plan member is, and whether there are any constraints on prescribing behavior.  Formularies typically group products into therapeutic categories and competing pharmaceutical manufacturers may be forced to provide rebates and/or discounts to the health plan in order to be among the preferred products in a category.  The preferred products generally require a lower cost-sharing contribution from the member and may have fewer, if any, prescribing restrictions.  Common prescribing restrictions include prior authorization from the health plan before the product is reimbursed; step-therapy, i.e., failure on one product before access is granted to another; requirements that the prescription be written by specific types of doctors (e.g., neurologists) or for only certain conditions; and quantity limits.  A formulary's

restrictions may differ by drug and specific indications, whether for on- or off-label uses.

34.3   Formulary structure is the purview of the health plan's Pharmacy and Therapeutics ("P&T") Committee.  This committee decides which products are appropriate for the plan to reimburse and which types of prescribing restrictions may be appropriate.  These decisions are based upon the results of a clinical review of the products in the category.  To the extent that certain products are considered to be somewhat interchangeable, formulary position may be determined, in part, by the rebate/discount offers solicited from the competing manufacturers.

34.4   Claims processing.  This is the standard administrative service that insurers provide whether under an ASO agreement for a self-funded employer or union health benefits fund or as part of the administration of its own health insurance product on behalf of a sponsor.  If a prescription for Neurontin were dispensed to a member of a self-funded plan for which the insurer was providing administrative services or if the prescription were dispensed to a member of one of the insurer's own managed care plans, then the retail pharmacy would collect the required co-pay or coinsurance from the member and submit the claim to the insurer for adjudication and reimbursement.  The insurer would pay the claim according to the contract, if any, between the retailer and the insurer and would for claims incurred by members of self-funded plans, may pass the cost through to the employer or union benefits fund according to the terms of the contract between the insurer and the plan sponsor.  Finally, the insurer might collect a rebate from the manufacturer based on the terms of the contract between the insurer and the manufacturer for a preferred formulary position for the product and part of that rebate might also be passed through to the plan sponsor based on the terms of the contract between the insurer and the sponsor.

35.   Some insurers choose to perform some or all of the pharmaceutical benefit management services themselves, while others delegate and use PBMs to perform some or all of the

pharmaceutical benefit management services that they require.[32]  As a result, there is a continuum of TPPs' relationships with PBMs regarding the level of service provided, payments for those services, and how the services provided and payments evolved over time.[33]  The large independent PBMs during the putative class period included Medco, Express Scripts and Caremark.  Some insurers (e.g., CIGNA and PacifiCare) have their own resident PBM that provided services to the insurer's health plans and perhaps to others.  In other cases (e.g., Humana, HealthNet and UnitedHealthcare), insurers have tried using an internal PBM and now contract with others for PBM services.  Still other insurers may have been with one PBM throughout the class period, although it is likely that several contracts would have governed the relationship and established different pay rates over that time.[34]

36.    The contracts between the insurer and the PBM determine which services the PBM will supply and at what price.[35]  Services that might be delegated to PBMs include: claims processing, pharmacy network formation, formulary creation and maintenance, negotiation of manufacturer rebates, disease management, the creation and implementation of additional programs to control drug costs (such as those touting generic substitution or mail-order dispensing), and the assumption of reimbursement risk. Typically, these services are not priced independently but in the context of the negotiation of all terms of the contract.  For example, some health plan sponsors may want to maximize generic substitution, others may want to receive all the rebates from manufacturers, and still others may emphasize deep discounts off list prices and accept

---

[32]    In 2002, approximately 44 percent of the U.S. population was covered by fully-insured prescription drug plans administered by PBMs.  ("Calculating PBM Market Share Using Different Business Volume Indicators," *Drug Cost Management Report*, June 2002.)

[33]    Klaus A. Hieber, "Pharmacy Benefit Administration Options," *Journal of Managed Care Pharmacy*, Vol. 2, No. 3, May/June 1996, pp. 272–278 ("Pharmacy Benefit Administration Options"), at 273.  For an illustration of the continuum of services for ten TPPs (BCBS-MA, BCBS-MN, CIGNA, Health Net, Humana, Kaiser, PacifiCare, Premera BC, The Regence Group, and Wellpoint) near the end of the putative class period, see "Health Plan Strategies for Pharmacy Benefit Management," *Managed Care Week*, May 2, 2005.

[34]    See "Aetna takes mail-order in-house; ends contract with Express Scripts," *Drug Cost Management Report*, November 2002; and "Health Plan Strategies for Pharmacy Benefit Management," *Managed Care Week*, January 13, 2003.

[35]    As noted above, some self-insured employers and union benerfits funds may choose to contract directly with a PBM for the management of their pharmaceutical benefits.

lower rebate pass-through as a trade-off.[36]  It is my opinion that due to this heterogeneity, answers to questions regarding the oversight and management of prescription benefits for TPPs, including the prescribing of Neurontin for specific off-label uses and the net reimbursement cost for those uses, would need to be addressed through individualized inquiry.

## B.    TPPs are Heterogeneous

37.    Employers and union benefits funds structure their healthcare plans in a wide variety of ways.[37]  Meaningful and relevant variation occurs along a number of dimensions, including whether the plan is self-funded or fully-insured, the nature of the benefits offered, the extent to which access is managed, the comprehensiveness and generosity of the benefit package, the claims risk retained by the TPP, the distribution of pharmaceutical manufacturer rebates and discounts, the nature and level of the employer (and employee) contribution to plan costs, and the locus of responsibility for the management of pharmaceutical benefits.

### i.    Different TPPs assume different responsibilities and risks and are compensated differently

38.    Insurance companies perform a variety of services as third-party payors, oftentimes performing different services for different sponsors at the same time.  In some cases, the insurer will offer a full range of medical and pharmaceutical benefits for an employer, covering physician visits, hospital stays and prescription drugs.  In other cases, the insurer may offer only the pharmaceutical benefits, or it may outsource the management of those benefits to a stand-alone PBM.[38]  The insurer may choose the full slate of services offered by the PBM, using the PBM to process claims, maintain a network of

---

[36]    Thomas Boudreau (Senior Vice President, General Counsel, and Corporate Secretary, Express Scripts, Healthcare Hearings, p. 65; and Anthony Barrueta, (Senior Counsel, Primary Legislative and Policy Analyst, Kaiser Foundation Health Plan, Inc.), HealthCare Hearings, p. 105; in *The Federal Trade Commission-Department of Justice Hearings on Health Care and Competitive Law and Policy, and Panel Discussion:  Pharmaceutical Benefits Managers* ("FTC-DOJ Hearings"), June 26, 2003.

[37]    Phyllis C. Borzi, *ERISA Health Plans: Key Structural Variations and Their Effect on Liability*, Center for Health Services Research and Policy, George Washington University, School of Public Health and Health Services, September 2002, accessed at http://www.hcfo.net/pdf/borzi.pdf on March 5, 2008 ("Variations in ERISA Plans"), p. 6.

[38]    Mari Edlin, "Plans Ponder Their Pharmacy Role: Do It Themselves or Farm It Out to a PBM?," *Managed Healthcare Executive*, November 2002.

pharmacies to dispense prescriptions, manage the formulary, negotiate with manufacturers, etc. Alternatively, the insurer may just use the PBM to process claims as a TPA and to gain access to the PBM's network of pharmacies but maintain the formulary, manage the P&T Committee, and negotiate with manufacturers on its own.

39. How insurers are compensated for their services also varies significantly. How much a plan member must pay as a co-payment or coinsurance for access to a drug on a given formulary tier will be subject to the agreement between the insurer and the plan sponsor. How much the sponsor and the plan members pay as a premium to the insurer will also be the subject of negotiation. How much the insurer or the PBM receives as rebates or discounts from a pharmaceutical manufacturer for a preferred position on a formulary is the result of negotiation between the insurer or the PBM and the manufacturer. Whether the insurer or the PBM keeps the rebates and discounts it negotiates or passes them through to the plan sponsor is subject to the contract between the insurer and the plan sponsor. How much the insurer or PBM reimburses a retail pharmacy for dispensing a prescription is subject to the contract between the retail pharmacy and the insurer. Thus, how much the insurer actually pays for a particular prescription for Neurontin varies depending upon its contract with the employer, its contract with the pharmacy, and its contract with the manufacturer, and the terms of all of these contracts vary over time. Since insurers will have different contracts with different employers at the same time, they may pay different amounts for the same quantity of Neurontin dispensed at the same time and by the same pharmacy, but to members of two different plans.

40. TPPs also vary in their clients and the economic conditions that they face. They compete amongst themselves for access to employees or the members of a union benerfits fund. As a result, they vary in their ability to pass on cost increases in the form of higher premiums or co-payments. For instance, if the costs of all TPPs were to increase, some portion of that cost increase would be passed through to plan sponsors. Even how payments to the TPP are structured can be an element of the competition; for instance, higher premiums may be traded for lower member cost-share requirements. Thus, to determine how much of the costs of off-label use of Neurontin was borne by a TPP would require individualized inquiry.

**ii.      TPPs vary in sophistication but all had access to sophisticated pharmaceutical benefit management services**

41.     Large TPPs are complex business entities.  Many utilize state-of-the-art claims processing systems, although there is variation in the access to information in medical records.[39]  Many track drug utilization of their own plans, and all have access to third-party research on prescribing patterns (e.g., government reports on Medicaid and Medicare).

42.     Smaller TPPs, in particular smaller self-funded employers and union health benerfits funds, may claim that they do not have the scale to support such diverse and sophisticated operations.  Throughout the putative class period, however, the smaller self-funded TPPs could access sophisticated pharmaceutical benefit management operations by contracting with one of the large PBMs or an insurance company acting as a TPA.  For instance, class representative BCBS-LA was traditionally focused on the small group and individual markets; as it began to seek business in the large group market, it recognized that it needed to develop the additional resources expected by the clients.[40]  BCBS-LA began using Medco as a PBM in 1999 and switched to Express Scripts in April 2004.[41]  Class representative ASEA began using AdvancePCS (which was later acquired by Caremark) as a PBM in July 2004.[42]  AdvancePCS provided a wide range of services to ASEA, which contributed in millions of dollars of savings to ASEA.[43]  BCBS-AL served putative class representative Harden as an insurer from 1994 to 1999, and has served as

---

[39]    For example, Horizon BCBS-NJ's pharmacy claims do not contain the information needed to identify off-label prescriptions for Neurontin; see Deposition of Saira Jan (Jan (Pharm.D., Co-chair of P&T Committee, Horizon BCBS-NJ), November 2, 2006), ("Jan Deposition"), p. 31.  Claims data provided by TTP Class Plaintiffs does not contain the information needed to identify what caused a particular physician to write a particular prescription; see Deposition of Rena Conti, February 12–13, 2008 ("Conti Deposition,") pp. 438–439.

[40]    Deposition of Milam W. Ford (Pharmacy Director, BCBS-LA), January 19-20, 2006, ("Ford Deposition"), p. 123.

[41]    Deposition of James G.  Gengelbach (Member of the Private Practice, BCBS-LA ), October 10, 2007, ("Gengelbach Deposition"), pp. 22–23, 83; and Ford Deposition, p. 237.

[42]    Kingsley Deposition, pp. 69, 210.

[43]    Brown Deposition Exhibit 23 at pp. 2–3 (of the first document contained in the exhibit).

its TPA and PBM for a self-funded plan since 1999.[44]  As other examples of union funds and smaller employers accessing sophisticated PBM services, consider the following:

42.1    Northwest Pharmacy Services of Puyallup, Washington (1.1 million covered lives) provided PBM services to Les Schwab Tire Company, Washington Teamster Welfare Trust and Western Teamster Trust, among others;

42.2    Pharmacy Services Group of Ft. Lauderdale, Florida (11 million covered lives) provided PBM services to the International Brotherhood of Electrical Workers, among others;

42.3    Prescription Solutions of Costa Mesa, California (5.2 million covered lives), the PBM owned by the insurer PacifiCare, also provided PBM services to General Employees Trust Fund; and

42.4    ScripSolutions of Elmsford, New York (9 million covered lives) provided PBM services to the Rhode Island Pharmaceutical Association for the Elderly, among others.[45]

43.    Further, as noted above, RFP processes to purchase pharmaceutical benefits or the administrative services related to pharmaceutical benefits were well-established and benefits consultants were available to help smaller TPPs contract for those services in an effective and efficient manner.  For instance, Colleen Savoie, an employee of Willis of Alaska (and formerly with Mercer), provided benefits consulting services to ASEA.[46]

44.    One of the services that PBMs may provide or that TPPs may investigate for themselves is claims data analysis.  For example, AdvancePCS provided a broad range of drug utilization reports to ASEA, including one that placed Neurontin among the top 20

---

[44]    Dorrill Deposition, pp. 46, 95–97.

[45]    "Clients, Covered Lives for Selected Pharmacy Benefit Management Firms," *Managed Healthcare Executive*, December 2003.

[46]    Deposition of Colleen Savoie (Vice President and Consultant, Willis of Alaska), January 16, 2006 ("Savoie Deposition"), pp. 32–33.

drugs.[47]  Also, while serving as its PBM, Medco provided BCBS-LA with individual

claims data on a biweekly basis.  This included member information, prescription number

and NDC, as well as ingredient cost, dispensing fee, co-payment, prior authorization

information, etc.[48]  Medco also performed quarterly and annual reviews on BCBS-LA's

utilization specific to their different lines of business and classes of medications; these

reports included the top 100 drugs with respect to cost and number of prescriptions.[49]  In

addition, BCBS-LA had access to an online query system.  This information allowed

BCBS-LA to determine, for example, how much Neurontin its was paying for.[50]  Because

most TPPs have access to detailed pharmacy claims utilization data—either through their

own operations or through an outside PBM—it is relatively easy to identify high

utilization products, particularly utilization of Neurontin given the known incidence of

epilepsy of plan members.

### iii.    TPPs use formularies in different ways to influence prescribing patterns

45.    The formulary is one of the most important tools that TPPs use to control drug utilization

and costs.[51]  There is substantial diversity, however, regarding how TPPs use formularies

to influence physicians' prescribing behavior and how that may have affected the

prescribing of Neurontin.  Accordingly, it is my opinion that individualized inquiry

would be required in order to assess how different TPPs managed the prescribing of

Neurontin for specific uses over time.

46.    TPPs differed from one another in their use of formularies and with respect to the

structure of their formularies.  This variation created differences in how TPPs managed

---

[47]    Brown Deposition Exhibit 21 (ASEA/AFSCME Local 52 Health Benefit Trusts, Formulary Drug
Utilization, 4th Quarter 2003, AdvancePCS); Brown Deposition Exhibit 23 (containing various documents).

[48]    Deposition of Susan Hoomaian (Senior Account Manager, Medco), November 15, 2007, ("Hoomaian
Deposition"), pp. 55 (biweekly claims data), 58–60 (information in claims data).

[49]    Hoomaian Deposition, pp. 60, 114.

[50]    Hoomaian Deposition, pp. 121–122.

[51]    For an overview of health plans' formulary and non-formulary approaches to controlling prescription drug
use and expenditures, see Jack Hoadley, *Cost Containment Strategies for Prescription Drugs: Assessing the
Evidence in the Literature*, Kaiser Family Foundation, March 2005 ("Kaiser Family Foundation, 2005").
This report presents the results of a wide-ranging review of the literature on over 30 specific cost control
strategies broadly classified as utilization strategies, pricing strategies, and regulatory strategies; see pp. 1,
118–119.

utilization of Neurontin for specific off-label conditions and how reimbursement for Neurontin prescriptions affected overall costs for the TPP. During the putative class period, most, but not all, TPPs used formularies. Many large, self-funded employers, including Chevron, Chrysler and Owens-Corning, began using formularies in late 1993 or early 1994.[52] A study of health plans and PBMs in 2000 found that 89 percent of covered lives were in health plans with some type of formulary.[53]

47.    Insurance companies typically offer multiple products with different benefit designs and different formularies.[54] For example, Horizon BCBS-NJ has offered more than five different formularies at the same time.[55] While it currently manages only one benefit design for the International Union of Operating Engineers, Local 68 Welfare Fund, Horizon may have at one time managed as many as three different benefit designs for the Fund.[56] BCBS-LA offered several products with varying benefit designs; its self-funded clients often chose products with three-tiered formularies, while its fully-insured clients chose a variety of products such as those with five-tiered formularies or high deductibles[57] (and perhaps an HSA-style high deductible combined plan for medical and pharmacy benefits[58]). Aetna offered a variety of benefit plans, some with open formularies and other with closed formularies; customers had the option of customizing

---

[52]    Business and Health.

[53]    Common Practices in Formulary Management Systems: A Report Prepared by the Academy of Managed Care Pharmacy, June 2000 ("Formulary Management Systems"), pp. 2–3. This report presents the results of a study of six PBMs and two health plans that administered pharmacy benefits for approximately 176 million individuals. For each organization they studied the P&T committee composition, types of formulary structure used, cost containment measures employed, categories and classes of drugs excluded from coverage, and appeals processes.

[54]    C. Daniel Mullins, Francis B. Palumbo, and Mojdeh Saba, "Formulary Tier Placement for Commonly Prescribed Branded Drugs: Benchmarking and Creation of a Preferred Placement Index," *The American Journal of Managed Care*, Vol. 13, No. 6, Part 2 , June 2007, p. 379.

[55]    Deposition of Saira Jan (Pharm.D., Co-chair of P&T Committee, Horizon BCBS-NJ), November 2, 2006 ("Jan Deposition"), pp. 34–35.

[56]    Deposition of Jared Ferguson (Director of Labor, Sales, and Services, Horizon BCBS-NJ), January 30, 2006 ("Ferguson Deposition"), p. 36.

[57]    Deposition of Imelda Concepcion Coleman (Pharm.D., Manager of the Commercial Pharmacy Department, BCBS-LA), September 19, 2007 ("Coleman Deposition"), p. 76.

[58]    See Deposition of Milam W. Ford (Pharmacy Director, BCBS-LA, January 19–20, 2006 ("Ford Deposition"), p. 23.

their formularies.[59]  Guardian used two-tier and three-tier open formularies, two-tier and three-tier hybrid plans (with flat dollar co-payments for generic drugs and percentage coinsurance for brand drugs), and a purely coinsurance based plan.[60]

48.    It is thus apparent that formulary design varies among TPPs and their clients.  As a result, Neurontin's position on those formularies can be expected to be different and certainly the amounts reimbursed for Neurontin would be expected to be different.  As such, it is my opinion that assessments of impact and injury with respect to prescribing of Neurontin for specific off-label uses would need to be the subject of individualized inquiry.

49.    TPPs also vary in their processes for developing formularies.  In virtually all circumstances, however, clinical issues regarding the formulary are exclusively the purview of the P&T Committee.  P&T Committees are generally composed of independent physicians who represent every area of therapeutic expertise, a practicing clinical pharmacist, the medical director, and a representative of the quality assurance department.[61]  These committees review a variety of types of information in evaluating a drug, including the FDA-approved label, clinical trials, randomized control studies, uncontrolled studies, other clinical literature, and the TPP's own experience with how patients respond to a drug in the real world (for example, through utilization management programs).[62]

50.    Consider, for instance, BCBS-LA which has its own P&T Committee, but also uses the input from the P&T Committee of its PBM, Express Scripts.[63]  BCBS-LA's P&T Committee reviews clinical information including summaries from the PBM on cost,

---

[59]    Deposition of Susan M. Scheid (National Contract Manager, Aetna), July 24, 2007, pp. 56, 69, 93–94, see, also, Scheid Exhibit 4 at Aetna000570–571.

[60]    Deposition of Ariel Fernando (Associate Actuary, Guardian), July 18, 2007 ("Fernando Deposition »), pp. 64–65, 89.

[61]    Jan Deposition, p. 37.

[62]    Jan Deposition, pp. 11–18.

[63]    Deposition of Elizabeth Boudreaux (Clinical Program Manager, Express Scripts), November 8, 2006 ("Boudreaux Deposition"), p. 39.

generic utilization, top drugs, top therapeutic classes and member profiles.[64]  To gauge the effectiveness of a drug, the P&T Committee often contacts physicians and asks them about their experience with the drug.[65]  In addition, BCBS-LA (although not necessarily its P&T Committee) looks at top drugs and drug classes on a monthly basis.[66]  The off-label use of drugs is discussed at these meetings.[67]

51.  The Express Scripts process is more complex, involving three different committees:  the Therapeutics Assessment Committee ("TAC"), the Value Assessment Committee ("VAC"), and the National Pharmacy & Therapeutics Committee ("NPTC").  The TAC performs clinical reviews of products and makes recommendations to the VAC and NPTC regarding inclusion on the formulary and any restrictions on use (e.g., use limits, prior authorization).  The VAC reviews products that the TAC designated as "optional" or "conditional," taking into consideration cost factors, and makes recommendations to the NPTC.  The NPTC makes the final determination regarding inclusion on the formulary and any restrictions, or refers products back to the TAC for further consideration.[68]

52.  For large TPPs, the outcome of the P&T process is often a "standard" or "national" formulary, which may then be customized for specific clients.  In negotiations with specific clients, the TPP may offer several formulary configurations for consideration.  For example, the client may consider additional restrictions to the formulary—beyond what the P&T Committee considered to be clinically necessary—in order to achieve cost savings.  To facilitate the client's decision making process, the TPP may provide the client with analyses of the potential impact of various formulary alternatives on prescription drug utilization and expenditures.  It would not be uncommon for TPPs to provide information on prescription drugs that are associated with relatively high (or

---

[64]    Coleman Deposition, pp. 26–27, 71–72.

[65]    Coleman Deposition, p. 31.

[66]    Coleman Deposition, p. 72.

[67]    Hoomaian Deposition, p. 134.

[68]    Express Scripts, *White Paper: Formulary Development at Express Scripts*, , June 2006, http://express-scripts.com/industryresearch/formulary/development/formularyDevelopment.pdf, accessed on February 29, 2008.

rapidly changing) utilization levels or costs, as these may be likely targets for cost reduction efforts.[69]  Accordingly, one would expect high utilization products, such as Neurontin, to be identified[70] and questions to be raised regarding appropriate use, particularly with respect to the incidence of epilepsy.  It is thus my opinion that questions regarding TPP management of Neurontin utilization would need to be addressed on an individual basis.

53.    There is also diversity among formulary characteristics for a product,[71] such as Neurontin.  Insurance companies and the independent PBMs and TPAs that manage formularies may have a substantial influence on physicians' prescribing behavior and patients' use of a drug by altering the formulary characteristics for the drug.  Broadly speaking, the formulary characteristics may fall into five categories:  (1) which drugs are covered; (2) guidelines and restrictions on prescribing and use; (3) the number of tiers in the formulary; (4) the placement of particular drugs in preferred or nonpreferred positions on the formulary; and (5) patient cost-sharing provisions.  Accordingly, there could be substantial variation in the position of Neurontin for specific uses on different formularies across TPPs, across plans for a single TPP, and across time as formularies are updated annually and therapeutic categories are reviewed on a periodic basis.[72]

54.    Regarding prescribing and use, a formulary could, for example, require prior authorization before the drug is dispensed; require that the drug only be dispensed for a particular indication ("use limits"); require that the drug only be dispensed by certain

---

[69]    For example, AdvancePCS identified high utilization drugs, such as Neurontin, for ASEA. (Brown Deposition Exhibit 21, "Top 20 Drugs, Ranked by Amount Paid, 4th Quarter 2003," p. 2, and "Drug Distribution By Class, 4th Quarter 2003," p. 7.)

[70]    See, for example, Brown Deposition Exhibits 21 (p. 2) and Exhibit 23 (p. 13).

[71]    A study of two managed care organizations and six PBMs serving 176 million covered lives (with comparisons to the VA national formulary) found "multiple and highly variable" private-sector formularies. See *Description and Analysis of the VA National Formulary*, Institute of Medicine, 2000 ("Institute of Medicine"), pp. 5 and 150.

[72]    "Institute of Medicine" p. 152; Sally Trude, Jon B. Christianson, et al, "Employer-Sponsored Health Insurance: Pressing Problems, Incremental Changes," *Health Affairs*, Vol. 21, No. 1, January/February 2002, pp. 66–75 ("Trude and Christianson Study"), at 71–72; Richard Chung, Deborah Taira, and Charles Noh, "Alternate Financial Incentives in Multi-tiered Formulary Systems to Improve Accountability for Outcomes," *Journal of Managed Care Pharmacy*, Vol. 9, No. 4, July/August 2003, pp. 360–365, at 361; and Ford Deposition, p. 80.

medical specialties ("specialty limits"); require that the drug only be prescribed after other specific therapeutic alternatives have been tried and found to be unsatisfactory ("step therapy"); or it could limit the allowable dose, quantity per day, or the number of refills ("quantity limits").  Note that even when the formulary does not explicitly limit a drug's use for specific on-label or off-label indications, it may affect prescribing by including a drug in a broader or narrower category of medications or therapeutic uses ("granularity").[73]  Each of these types of restrictions could be used by a TPP to control prescribing behavior, including off-label prescribing for Neurontin, and the use of these restrictions could change over time.  Given the variety of options at the TPP's disposal to control the appropriate use of medications, it is my opinion that assessments of impact and injury with respect to the prescribing of Neurontin for specific off-label uses would need to be the subject of individualized inquiry.

55. Regarding the degree to which different types of formulary restrictions have been implemented, consider the following.

    55.1   By 2000, more than half of covered lives were in plans that used prior authorization. and, separately, plans had implemented varying provisions to limit the quantity prescribed (71 percent), the number of refills (46 percent), the number of prescriptions (23 percent), and duration of use (21 percent).[74]

---

[73]    For example, Neurontin has been included with other medications in any one or more of the following categories: anticonvulsants, postherpetic neuralgia, central nervous system agents, neuropathic pain, etc. See Keystone Mercy Health Plan, "Formulary Update," *Script Notes*, First Quarter 2003, pp. 1–4, at p. 3, http://www.keystonemercy.com/pdfs/pharmacy/scriptnotes/notes_1Q_2003.pdf, accessed on March 1, 2008, (anticonvulsants) , Express Scripts, *2005 Express Scripts National Preferred Alpha Formulary List*, December 31, 2004, pp. 1–17, at 16, http://eracpeople.enterprise.com/pdf/us/en/drug_US_en_ESIFormularyDetailed2005.pdf, accessed on February 29, 2008, (postherpetic neuralgia), Prime Therapeutics, "Formulary Updates" (Additions to the BCBS Formulary), *Prime Perspective,* Issue No.8, September 2001 (central nervous system agents), University Health System, Memorandum, *Subject: Formulary & Subsidy Actions*, March 19, 2001, https://labs-sec.uhs-sa.com/clinical_int/RefDocs/MAR01MEM.PDF, accessed on March 3, 2008 ("University Health System") (neuropathic pain).

[74]    Academy of Managed Care, 2000, p. 6.

55.2    By 2000, approximately 71 percent of covered lives were in plans that restricted coverage or reimbursement of specific drugs or classes of drugs for specific prescribers, clinical settings, or disease conditions.[75]

55.3    Step therapy was used by 22 percent of employers in 2000, and 28 percent of employers by 2003.[76]  Step therapy has been used to manage the use of Neurontin, for instance requiring the use of tricyclic antidepressants ("TCAs") prior to the use of Neurontin for neuropathic pain.[77]

56.    "Drugs are usually prescribed off-label when doctors discover new uses for a drug. There's nothing inherently wrong with this.  Doctors may discover that a device or drug can be beneficial in more instances than just those the FDA evaluated when it was first developed…."[78]  Accordingly, it is not uncommon for physicians to prescribe medications for off-label uses, and for such off-label prescribing practices to persist over time.  Drug effectiveness is highly variable; drugs may work differently for different patients.[79]  The efficacy of generally accepted first-line on-label therapies varies; different patients respond differently, which may lead physicians to prescribe several different medications in succession, some of which may not be approved for that indication.[80]  Because a particular drug may be commonly used as a first-line therapy for some indications but as a second- or third-line therapy for different indications,

---

[75]    Academy of Managed Care, 2000, p. 5.

[76]    Kaiser Family Foundation, March 2005, p. 21.

[77]    University Health System, p. 2

[78]    Mayo Clinic, *Off-label Drugs and Medical Devices: Get the Facts*, October 1, 2007, http://www.mayoclinic.com/health/off-label/DI00088, accessed on March 9, 2008.

[79]    Jan Deposition, pp. 10–11.  For instance, CIGNA recommends the use of Neurontin and other anticonvulsants for chronic low back pain while acknowledging the variability in their effectiveness: "Anticonvulsant medicine effectively treats chronic pain for some people but not others. One type of anticonvulsant may work better for you than another. This type of medicine is not well-studied as a chronic pain treatment but is considered a reasonable treatment option;" see CIGNA, *Anticonvulsants for chronic low back pain*, http://www.cigna.com/healthinfo/tn9237.html, accessed on February 12, 2008.

[80]    For example, it is difficult to predict the degree to which a particular nonsteroidal anti-inflammatory drug will be effective in a particular patient for an FDA-approved indication, so a physician may ultimately resort to another drug that is not approved for the indication.  (Ford Deposition, pp. 47–48.)  This is also true of pain medications as a whole.  (Jan Deposition, pp. 13–14.)

physicians have many potential products with which to treat a particular patient. Dosing may also vary among different uses,[81] whether on- or off-label.

57.    Different TPPs deal differently with off-label use. By 2000, approximately 30 percent of covered lives were under plans that excluded coverage for off-label prescriptions.[82] On the other hand, in instances where a TPP's P&T Committee concludes that a particular off-label use is justified, there would be no need to implement formulary restrictions or other controls on that particular use of the drug. Consequently, if a P&T Committee were to have concluded that there was no reason to restrict prescribing of Neurontin for specific off-label uses, one might conclude that that TPP would not have been subject to impact and injury as claimed by the Plaintiffs.

58.    Examples of TPPs that placed restrictions on or encouraged Neurontin prescribing for off-label uses were obtained from class discovery and publicly available materials; however, these materials were limited. Extensive discovery regarding TPPs' formularies and other mechanisms used to manage Neurontin prescribing, during the putative class period, is required in order to assess impact and injury with respect to off-label prescribing. In my opinion, broad estimates will not suffice, especially given the potential for significant variation by TPP, by plan and over time.

59.    I note that the following examples of Neurontin formulary position were the result of the P&T Committees' careful review of information, generally including the opinions of leading physicians in their fields. Further, some of the explicit approvals for off-label Neurontin use have continued to be in effect and others have been instituted even after this litigation was filed.

59.1    Aetna included Neurontin on its two-tiered open formulary at least as early as 1997.[83] In its national P&T Committee review of antiepileptic drugs in 2003, Aetna noted that "[g]abapentin is used for many mood-stabilizing disorders," that

---

[81]    Jan Deposition, pp. 33–34.

[82]    Academy of Managed Care, 2000, p. 1.

[83]    AET019306–317 (Member Guide, Aetna US HealthCare Preferred Medication Program, 1997) at AET019309.

"[i]t is the only antiepileptic to have an unlabeled indication for diabetic peripheral neuropathy," that it is "[t]herapeutically similar to other available products but with more clinical advantages (clinical efficacy, adverse effects, drug interactions, etc) to others in the category," and includes among its "unlabeled indications" diabetic peripheral neuropathy, panic disorder, and social phobia [84] In 2004, Aetna began to use more extensively various cost controls, including precertification, age edits, step edits, and quantity limits.[85]  Under some Aetna open and closed formularies in 2004, Neurontin was subject to precertification or step therapy.[86]  Aetna placed a number of restrictions—quantity limits, step therapy, precertification, and prior authorization—on Neurontin use across several formularies at least as early as 2005.[87]  In 2006, Aetna approved Neurontin use in doses of up to 3600 mg per day.[88]

59.2    AdvancePCS recommended to ASEA that limits be placed on anticonvulsant prescribing in 2003.[89]

59.3    CIGNA recommended Neurontin for mood-cycling and as an adjunctive agent for bipolar disorder in 2000;[90] for the treatment of cancer pain (including neuropathic

---

[84]    Deposition of Michael Brodeur (Aetna, Head of Formulary Development and Clinical Policies), July 26–27, 2007 ("Brodeur Deposition"), pp. 192–197; AETNA 001882–913 (Brodeur Deposition Exhibit 15) at AETNA 001882–890.

[85]    Scheid Deposition, pp. 85, 88.

[86]    AETNA 001939–941 (Brodeur Deposition Exhibit 18), at AETNA 001939.

[87]    Aetna, *Preferred Drug (Formulary) Guide*, January 2005, http://www.familyhealthofdelaware.com/files/preferred.pdf, accessed on March 11, 2008; Aetna, *Pharmacy Clinical Policy Bulletins (Anticonvulsants)*, January 1, 2006, http://www.aetna.com/products/rx/data/anticonvulsantscpb.html, accessed on December 20, 2008; Aetna, *Pharmacy Clinical Policy Bulletin*, October 15, 2007, http://www.aetna.com/products/rxnonmedicare/data/CNS/anticonvulsants_2007.html, accessed on March 12, 2008; Aetna, *Preferred Drug Guide (3-Tier/Open Formulary Plan)*, 2008, http://www.ithaca.edu/hr/pdf/benefits/aetna/aetna-rx-3tier-2008.pdf, accessed on March 11, 2008.

[88]    See, for example, Aetna, *Pharmacy Clinical Policy Bulletins, Subject: Anticonvulsants*, January 1, 2006.

[89]    Brown Deposition Exhibit 23, p. 13.

[90]    CIGNA, *The CBH Provider Connection*, 3rd Quarter 2002, Volume III, p. 13 ("Expert Consensus Guideline Bipolar 2000").

pain) in 2005;[91] for the treatment of chronic low back pain,[92] MS-related muscle stiffness (spasticity) and tremors,[93] and hot flashes, chronic pain, migraine headache, panic disorder, and social phobia in 2006;[94] and for the treatment of restless leg syndrome in 2007.[95]

59.4    Caremark explained that "[g]abapentin is also used to help relieve certain types of nerve pain, and may be prescribed for other nervous system disorders" in February 2008.[96]

59.5    Express Scripts reported that anticonvulsants may help to control neuropathic pain in December 2007.[97]  In February 2008, Express Scripts reported that gabapentin has been shown to prevent migraines.[98]

---

[91]    CIGNA, *Anticonvulsants for cancer pain,* November 4, 2005, http://www.cigna.com/healthinfo/tv7394.html, accessed on February 12, 2008.

[92]    CIGNA, *Anticonvulsants for chronic low back pain*, February 15, 2006, http://www.cigna.com/healthinfo/tn9237.html, accessed on February 12, 2008.

[93]    CIGNA, *Multiple Sclerosis (MS)*, March 23, 2006, http://www.cigna.com/healthinfo/hw190814.html, accessed on February 12, 2008.  This occurred two years after the National Multiple Sclerosis Society recognized the usefulness of Neurontin in treating MS symptoms,  "To treat the symptoms, your doctor can prescribe medications, such as Baclofen (Lioresal) for spasticity, Clonazepam (Klonopin) for tremors, or Gabapentin (Neurontin) for pain. You will know if these treatments are working because your symptoms will decrease or disappear and you may feel better."  See Ellen Kelley, "What Do My Medicines Do For Me?," *MS Connections*, National MS Society, Winter 2004, http://kyw.nationalmssociety.org/site/DocServer/ msconnections_winter2004.pdf?docID=7870, accessed on March 10, 2008.

[94]    CIGNA, *Gabapentin for hot flashes*, May 26, 2006, http://www.cigna.com/healthinfo/tn9903.html, accessed on February 12, 2008.

[95]    CIGNA, *Anticonvulsants for restless legs syndrome*, April 4, 2007, http://www.cigna.com/healthinfo/ue4969.html, accessed on February 12, 2008.

[96]    Caremark, *Patient Education: Gabapentin capsules or tablets*, February 2, 2008, https://www.caremark.com/wps/portal/!ut/p/kcxml/04_Sj9SPykssy0xPLMnMz0vM0Y_QjzKLN4j38wbJg FjGpvqRqCKO6AJmgYFwIV-P_NxUoESkOZBvaOGjH6IfpO-tH6BfkBsaGlFunA4Ay71AtQ!!/delta/base64xml/L0lDVE83b0pKN3VhQ1NZS0NsRUtDbEVBIS9vUG9n QUVJUWhDRU1ZaENHSVFJU0ZHVVp6Q0FJQlFVaFM0SSEvNEIxaWNvblFWd0d4T1VUb0s3OVlR N0RtRzRSMkhLTnhpQSEhLzdfMF8xOEwvNS9zcGZfQWN0aW9uTmFtZS9zcGZfQWN0aW9uW9uTGlzdG VuZXIxc3BmX3N0cnV0c0FjdGlvbi8h8hMmZodG1sITJmdmlldUyEyZkRydWdJbmZvQWN0aW9uW9uLmRvIT NmY29tbWFuZD1nZXRvYnJhLmLmFzcCEyNmNwbnVtPTI3MQ!!#7_0_18L, accessed on March 11, 2008.

[97]    Express Scripts, *Pain; How is it treated?*, December 2007, http://www.drugdigest.org/DD/HC/Treatment/0,4047,20,00.html, accessed on March 11, 2008.

[98]    Express Scripts, *Epilepsy Drug Doesn't Prevent Migraines*, February 11, 2008, http://www.drugdigest.org/DD/HC/Treatment/0,4047,20,00.html,

59.6   Horizon BCBS-NJ has established that Neurontin could be effective in treating neuropathic pain.[99]

59.7   Humana had Neurontin on tier two of its four-tier formulary at least as early as 2004.  They moved it to tier three in January 2005 and imposed quantity limits in 2006.[100]

59.8   In September 1997, Kaiser Foundation Health Plans ("Kaiser") Southern California relaxed restrictions on gabapentin to allow prescribing by pain clinic physicians for reflex sympathetic dystrophy.  In June 1999, it relaxed restrictions to allow prescribing by psychiatrists for bipolar affective disorder.  In September 1999, Kaiser's Southern California Regional Internal Medicine Committee recommended to the P&T Committee that restrictions on gabapentin prescribing be loosened to allow prescribing by primary care physicians (with guidelines) for diabetic neuralgia.  Kaiser has acknowledged that there is documented evidence establishing the efficacy of Neurontin in treating diabetic peripheral neuropathy.[101]

59.9   Lovelace Health Plan of Albuquerque, New Mexico had Neurontin on tier two of its three-tier formulary at least as early as 2005, imposed step therapy in its

---

http://www.drugdigest.org/DD/Articles/News/0,10141,612538,00.html, accessed on March 11, 2008.  The title of the article refers to Trileptal, not Neurontin.

[99]   Jan Deposition, pp. 12–13.

[100]   Humana, *RX4 Drug List (Drug List of most commonly prescribed)*, July 1, 2004, http://www.legendserv.com/humana%20group/Humana%20Drug%20List.pdf, accessed on March 11, 2008; Humana, *Humana Changes Drug List and Dispensing Limits, 1st Quarter 2005*, http://www.humana.com/providers/NewsLetters/HumanaWeb1stQ05/articles/changes_drug_list.html, accessed on March 1, 2008; Humana, *Prescription Drug Guide - Humana Formulary (List of Covered Drugs)*, 2006, http://www.humana-medicare.com/misc/druglist2006.pdf, accessed on March 11, 2008.

[101]   Deposition of Albert L. Carver (Kaiser Foundation Health Plan, Vice-President of Pharmacy Strategy and Operations), July 12–13, 2007 ("Carver Deposition"), p. 89; KAIS-004629–637 (Carver Exhibit 7) at KAIS-004627; see also Deposition of Mirta Millares (Kaiser Foundation Hospitals, Manager of Drug Information Services and Pharmacy Outcomes Research), October 2, 2007, ("Millares Deposition"), pp. 79–80 (primary physicians granted the authority to prescribe gabapentin with guidelines).

FEHBP HMO product in 2007 and moved Neurontin to non-preferred status on its commercial formulary in 2007.[102]

59.10    Maricopa Health Plan of Phoenix, Arizona had Neurontin on prior authorization and imposed step therapy after TCAs for neuropathic pain at least as early as 2006.[103]

59.11    As early as 1997, an employee of Medco was requesting information regarding various off-label uses of Neurontin.[104]  In June 2003, Medco reported that several sources of pain associated with multiple sclerosis "can usually be treated successfully with medications such as gabapentin (Neurontin®)…"[105]  On October 13, 2004, Medco issued a clinical alert to all its members stating that Neurontin was a blockbuster drug often prescribed for off-label uses.[106]  In January 2008, Medco reported that Neurontin may be used to reduce the stabbing pains associated with sensorimotor polyneuropathy, nerve damage that may be caused by peripheral neuropathy such as diabetic neuropathy.[107]

---

[102]    Lovelace Health Plan, *Three Tier Formulary Drug List, Member: 2005*, http://www.lovelacehealthplan.com/pdf/LHP%20three%20tier.pdf, accessed on March 1, 2008; Lovelace Health Plan, *Two Tier Formulary Drug List, Member: 2005*, http://www.lovelacehealthplan.com/pdf/LHP%20two%20tier.pdf, accessed on March 1, 2008; Lovelace Health Plan, *Lovelace Health Plan for the Federal Employees Health Benefits Program, 2007*, p. 39, http://www.opm.gov/insure/07/brochures/pdf/73-079.pdf, accessed 3/1/2008, Lovelace Health Plan, *Two-Tier Formulary Drug List, Member: 2007,* http://www.lovelacehealthplan.com/pdf/LHP%20TWO-TIER%20FORMULARY%20FINAL.pdf, accessed on March 1, 2008.

[103]    Maricopa Health Plan and UPH, *Drug Formulary*, December 1, 2006, pp. 5 and 26, http://www.uniteddrugs.com/PBM/Documents/MaricopaHealthPlan.pdf, accessed on February 15, 2008 ("Maricopa Health Plan").

[104]    Hoomaian Deposition, pp. 72–78, 88.

[105]    Medco, *Pain – The basic facts*, Source: National Multiple Sclerosis Society, June 4, 2003, http://www.medcohealth.com/medco/consumer/ehealth/ehsarticle.jsp?BV_SessionID=@@@@183437339 9.1205278900-mm824393751477@@@@&BV_EngineID=ccdiadedifkhkfgcfklcgffdghfdfgk.0 &articleID=NMSS%3acomp%3apain_the+basic+facts, accessed on March 11, 2008.

[106]    Hooaian Deposition, pp. 128–129, 132.

[107]    Medco, *Sensimotor polyneuropathy*, Source: A.D.A.M., Inc., January 2008, http://www.medcohealth.com/ medco/consumer/ehealth/ehsarticle.jsp?BV_SessionID=@@@@1834373399.1205278900-mm824393751477@@@@&BV_EngineID=ccdiadedifkhkfgcfklcgffdghfdfgk.0&articleID=000750adam, accessed on March 11, 2008.

59.12   Mercy Health Plans of Chesterfield, Missouri placed Neurontin on step therapy after first-line use of TCAs (after a history of seizures) at least as early as 2004. They continued step therapy in 2006.[108]  In 2007, Mercy imposed quantity limits for Neurontin oral solution of up to 3600 mg per day for 25 days.[109]

59.13   Passport Health Plan's Kentucky Medicaid formulary approved Neurontin for use in neuropathic pain in 2006.[110]

59.14   The St. John's Premier*Plus* HMO and Premier*Plus* Options PPO plans imposed quantity limits on Neurontin oral solution of 3600 mg/day for 25 days at least as early as 2006.[111]

59.15   The University Health System ("UHS") of San Antonio, Texas denied the Psychiatry department's request in December 2000 to approve Neurontin for use in bipolar disorder due to "insufficient or inconclusive clinical evidence," but approved Neurontin for neuropathic pain after step therapy with TCAs in March 2001.[112]

---

[108]   Mercy Health Plans, *Provider Update*, Summer 2004 ("Mercy Provider Update"), p. 4, http://premierhealthplansmo.com/provider/newsletter/Provider%20Update_Summer%202004.pdf, accessed on February 15, 2008; Mercy Health Plans, *2006 Preferred Drug Formulary*, http://www.mercyhealthplans.com/ers/2007/Formulary.pdf, accessed on March 3, 2008.

[109]   Mercy Health Plans, *PremierPlus Options 2007 Formulary*, June 1, 2007 http://www.mercyhealthplans.com/about/products/joplin/ options/SPJOPFormulary.pdf, accessed on March 3, 2008, p. 4.

[110]   Passport Health Plan, *Provider Bulletin*, Vol. 6, Issue 2, 2006, p. 2, http://www.passporthealthplan.com/pdf/providercenter/providercom/bulletin/2006/vol6iss2.pdf, accessed on March 1, 2008.

[111]   St. John's Health Plan, *St. John's PremierPlus - HMO and PremierPlus Options – PPO Standard Drug Plan Formulary*, November 9, 2005, p. 9.

[112]   University Health System, Memorandum, *Subject: Formulary & Subsidy Actions*, March 19, 2001, http://www.universityhealthsystem.com/carelink/docs/2004-04-CareLink-Update.pdf, accessed on March 3, 2008 ("University Health System")

59.16   The University of Michigan formulary listed Neurontin as on tier three with quantity limits at least as early as 2008 but also approved dosages of up to 3600 mg per day.[113]

60.   As indicated by the above examples, several TPPs, both large and small, have evaluated specific off-label uses for Neurontin and consequently instituted different formulary positions.  Thus, it is my opinion that aggregate statistics on Neurontin use cannot support a class-wide assessment of impact or injury; individualized inquiry would be required.  The fallacy in drawing conclusions regarding impact and injury from aggregate statistics on off-label prescribing of Neurontin is illustrated by the following example.  CIGNA, the third largest health insurance company in the United States in 2004,[114] decided to actively encourage the off-label use of Neurontin after this litigation was filed, and thus could not have been injured.  Plaintiffs, however, ignore this circumstance and the examples of other TPPs; instead, Plaintiffs use aggregate statistics on Neurontin off-label use and various extrapolations to conclude that "the vast majority of commercial insurers will exceed the membership thresholds" that they estimate would qualify for class membership.[115]

61.   Further, I note that an individual prescribing physician typically has patients who are covered by a number of different TPPs.  For some patients, their formulary (and, by extension, an informed P&T Committee) may support specific off-label prescribing of Neurontin.  The physician may use that knowledge and possibly experience with Neurontin in such situations to make prescribing decisions for patients subject to other formularies.  This spillover effect of drug formularies on physician prescribing behavior is not uncommon and has been demonstrated by a study of proton pump inhibitors.[116]

---

[113]   University of Michigan, *The University of Michigan Formulary*, February 1, 2008, p. 99, http://www.umich.edu/~benefits/forms/drugname.pdf, accessed on February 15, 2008.

[114]   Fortune 500, 1995-2006, 2004 Full List, http://robots.cnnfn.com/magazines/fortune/fortune500_archive/full/2004/1.html and http://robots.cnnfn.com/magazines/fortune/fortune500_archive/full/2004/101.html, accessed on March 11, 2008.

[115]   Declaration of Rena Conti, December 19, 2007, ¶55; Deposition of Rena Conti, pp. 537–545.

[116]   Y. Richard Wang and Mark V. Pauly, "Spillover Effects of Restrictive Drug Formularies on Physician Prescribing Behavior: Evidence from Medicaid," *Journal of Economics & Management Strategy*, Vol. 14, No. 3, Fall 2005, pp. 755–773, at 771.

62.   Formulary restrictions and their actual impact on specific uses also varies from one TPP to another and would need to be the subject of individualized inquiry. For instance, BCBS-LA noted that even when their formulary specified that a drug only be prescribed for FDA-approved uses, the restriction was not necessarily enforced for all drugs.[117] ASEA did not find it practical to track off-label usage.[118]

### iv.   TPPs vary in net reimbursement cost for Neurontin

63.   Formularies also vary widely—across TPPs and across products for the same TPP—in the extent to which drugs are categorized into tiers, which drugs are placed in preferred or nonpreferred positions,[119] patient cost sharing provisions (co-payments and coinsurance) by tier and rebates from the pharmaceutical manufacturers for preferred position on the formulary. These differences will plague any attempt to estimate the net cost of reimbursement for Neurontin and assess alleged injury on a class-wide basis.

64.   The structure of the formulary affects how much the TPP pays for drugs, since patient cost-sharing reduces the TPP's reimbursement cost and formulary position affects the level of rebates from drug manufacturers. Formulary structure also affects drug utilization by influencing the physician's choice of therapies and the patient's decision of whether to fill the prescription in consideration of out-of-pocket payments.[120]

65.   Within a TPP, the formulary tier structures may significantly change over time. For example, BCBS-LA did not implement a tiered formulary structure until 1999,[121] when it

---

[117]   For example, a January 2005 BCBS-LA group contract excluded all drugs that were used for other than FDA-approved indications unless the drugs were identified as covered in the schedule of benefits. See Ford Deposition, pp. 348–351.

[118]   Savoie Deposition, p. 71.

[119]   C. Daniel Mullins, Francis B. Palumbo, and Mojdeh Saba, "Formulary Tier Placement for Commonly Prescribed Branded Drugs: Benchmarking and Creation of a Preferred Placement Index," *American Journal of Managed Care*, Vol. 13, No. 6, June 2007, pp. 347–384 ("Mullins"), at 380–382. This study examined 67 patented brand-name drugs within the top 200 medications dispensed in 2004 as reported by NDC Health, as well as formularies for 12 insurance companies.

[120]   See, for example, the study of two employers who contracted with the same health plan, in Bonnie Austin, "Pharmaceutical Formularies: The Right Formulary for Cost and Utilization," Academy Health, *Changes in Health Care Financing and Organization Findings Brief*, Vol. 7, No. 5, August 2004.

[121]   Deposition of Robert Dwight Brower (Medical Director of Health and Quality Management, BCBS-LA), September 20, 2007 ("Brower Deposition"), p. 25.

customized Medco's formulary into a three-tier formulary of its own.[122]  More broadly, TPPs have reduced their use of single-tier formularies with a single co-payment amount,[123] and shifted to more complex tiered formulary structures over time, as shown in Figure 1.[124]

**Figure 1.  Percentage of Workers Covered by Different Types of Tiered Formularies**

66.    Each tier of a formulary may be associated with a different patient cost-sharing amount, with cost-sharing generally rising from the first tier to the higher tiers.  There is variation in the types of cost sharing—co-payments as fixed dollar amounts per prescription or coinsurance as a stated percentage of the price of the prescription—with or without a total dollar limit per prescription, or per member per year or per member for life.[125]  Aside from variation across TPPs, there is significant variation in the average co-payment (Figure 2) and coinsurance (Figure 3) for drugs in different formulary positions over time.[126]

---

[122]    Gengelbach Deposition, pp. 37–38.

[123]    Ford Deposition, p. 22.

[124]    Kaiser Family Foundation, 2006, p. 119.

[125]    Brower Deposition, pp. 28–29; Pharmacy Benefit Administration Options, p. 273; and Kaiser Family Foundation, 2004,"Exhibit 8.5 – Distribution of Covered Workers with Maximum Lifetime Benefit, by Plan Type and Firm Size, 2004," p. 109.

[126]    Kaiser Family Foundation, 2006, pp. 121–122.



Figure 2. Average Co-payment by Formulary Position of Drug



Figure 3. Average Coinsurance by Formulary Position of Drug

67.     Even among TPPs that have formularies with similar structures, there is variation in the patient cost-sharing provisions for Neurontin.

67.1    First, there is variation across TPPs in co-payment levels.  For instance, in 2004, patients enrolled in Aetna's Pennsylvania Cost Sharing HMO Plan Two paid $10 for tier one drugs, $20 for tier two and $35 for tier three.[127]  In the same year, however, those enrolled in Farmers Agents' Group's Aetna Managed Choice POS Plan paid $10, $15 and $30 for tiers one to three respectively.[128]

---

[127]   Aetna Pennsylvania, *Small Business Solutions*, October 2004, http://www.einsurancecare.com/pdfs/pa_sbs.pdf, accessed on 3/4/2008, p. 10.

[128]   Farmers Agents' Group, *Farmers Agents' Group Benefits Program Enrollment Guide 2004,* www.farmersagentsbenefits.com/farm/pdf/FarmersGuide2004.pdf, accessed on March 4, 2008

67.2    Second, some TPPs have used percentage coinsurance provisions that would cause different cost-sharing amounts than those of plans with co-payments. For instance, in 2004, Lockheed Martin's three-tier formulary had coinsurance of 20 percent of the price for a generic drug, 30 percent for a preferred brand, and 50 percent for a non-preferred brand. The plan, administered by PharmaCare, a large PBM, likely would have covered most drugs, including Neurontin.[129]

68.    In summary, "[m]ultiple-tier copayment drug benefit plans are a heterogenous lot;" there may be variation in the scope of drugs included on the formulary, the presence and strength of prior authorization requirements, the number of tiers, co-payment levels and the magnitude of differences across tiers, and other characteristics.[130] Thus it is not surprising that TPPs would vary regarding the management of Neurontin prescribing for specific off-label uses and the net cost of reimbursement for each off-label use. In my opinion, individualized inquiry would be required to sort out which TPPs might have been injured, if any, and by how much.

69.    The rebates paid on Neurontin will further complicate the analysis of injury. Certain TPPs negotiated rebates based on the amount of Neurontin for which they reimbursed. These rebates thus reduce the net reimbursed cost to the TPP. The rebates were paid pursuant to individual contracts negotiated between Pfizer and the TPP or its PBM. The rebate amount actually paid may have been based on different metrics, for example, on Neurontin's formulary position. Thus, two TPPs with the same rebate contract for Neurontin may receive different rebate percentages based on the difference between the utilization of Neurontin within their member populations. Further, where an independent PBM is responsible for formulary design and rebate negotiations with pharmaceutical manufacturers, the share of rebates that the TPP actually receives will be based on the unique contract for pharmaceutical benefit management services that would have existed between the PBM and the TPP.

---

[129]    Lockheed Martin, *Total Health Prescription Drug Program*, 2004 http://custom.aetna.com/lm/retireetotalhealth/LM_prescriptiondrug.html, accessed on March 3, 2008.

[130]    Frederic R. Curtiss, "Unraveling the Effects of Tier-Copayment Drug Benefit Designs," *Journal of Managed Care Pharmacy*, Vol. 9, No. 2, March/April 2003, pp. 177–181, at 177.

v.      **TPPs use a variety of other mechanisms to affect prescribing behavior**

70.     Beyond formularies, TPPs use other healthcare management tools to influence
        prescribing behavior for specific uses.[131]  First, TPPs vary in the use of academic
        "detailing."[132]  Academic detailing (or "counter-detailing") involves having the TPP (or
        its PBM) send clinical pharmacists to physicians' offices to provide literature or other
        information that may assist in prescribing decisions.  PacifiCare of Arizona-Nevada
        reports that its combination of academic detailing and provider education has helped
        improve formulary compliance and reduce unnecessary prescription drug utilization.[133]
        Insofar as TPPs were concerned about the extent of Neurontin prescribing for specific
        off-label uses, they may have used academic detailing to educate their physicians and
        thereby influence prescribing of Neurontin for those uses.  Individualized inquiry would
        be required.

71.     Second, TPPs vary in the use of drug utilization review ("DUR") techniques, which may
        be performed retrospectively, concurrently with therapy, or prospectively (i.e., before
        medication is dispensed).[134]  DUR may focus on any number of conditions, including
        specific off-label uses, doses exceeding recommendations, duration of therapy exceeding
        recommendations, and therapeutically interchangeable alternatives.  Some large self-
        funded employers, such as Maytag and Quad/Graphics, developed their own DUR
        programs and began tracking physician prescribing patterns before the putative class
        period.[135]  BCBS-AL provided DUR to most of its clients, including Harden.[136]  To the

---

[131]   Stanley S. Wallack, Dana Beth Weinberg, and Cindy Parks Thomas, "Health Plans' Strategies To Control
        Prescription Drug Spending," *Health Affairs*, Vol. 23, No. 6, November/December 2004, pp. 141–148, at
        144, 147.

[132]   Horizon BCBS-NJ's P&T Committee has developed policies for academic detailing.  (Jan Deposition, pp.
        27–28.)  BCBS-LA experimented with an academic detailing program through Medco around 1999 or
        2000.  (Brower Deposition, p. 27.)  Caremark has also engaged in academic detailing on behalf of its TPPs.
        (Deposition of Sara Habtom (Clinical Director, Caremark), February 15, 2007, pp. 38–39.)  Some PBMs
        have engaged in academic detailing at least as early as 1998.  (Michael J. Sax and Robin Emigh, "Managed
        Care Formularies in the United States," *Journal of Managed Care Pharmacy*, Vol. 5, No. 4, July/August
        1999, pp. 289–295 at 289–290.)

[133]   Kaiser Family Foundation, March 2005, p. 73.

[134]   In 2000, 69 percent of employers reported using retrospective DUR programs.  (Kaiser Family Foundation,
        March 2005, p. 58.)

[135]   By late 1999, Maytag had established its own DUR program for its 2,000 Iowa-based employees.
        Wisconsin-based Quad/Graphics established an in-house clinic for 5,000 of its employees in 1996, and it

extent that TPPs were concerned about Neurontin prescribing for specific off-label conditions, they may have used DUR to identify those physicians and those prescriptions which might appear to be for those conditions in an attempt to influence such use. Individualized inquiry would be required.

72.     Third, TPPs vary in the use of disease management ("DM") programs.  DM involves coordinating and organizing health care delivery in order to optimize clinical and economic outcomes within a specific population, usually those with a chronic condition (e.g., diabetes, chronic pain).  Central components of DM are the evidence-based practice of medicine and compliance with clinical guidelines, generally considered to be the best practices and promulgated by medical professional organizations and clinically-oriented governmental agencies.  The use of DM has grown over the putative class period.  The number of employers reporting that they offer DM to their employees increased from 14 percent in 1995 to 53 percent in 2002.[137]

73.     A DM program could, for example, affect physician prescribing decisions for a given condition by identifying preferred therapeutic approaches or advising against the use of specific medications.  For instance, BCBS-LA has two DM programs—a diabetes program that was used for a few self-funded groups, and a congestive heart failure program for all groups.[138]  Horizon BCBS-NJ had a diabetes disease management program, which could have addressed the off-label use of Neurontin for diabetic neuropathy.[139]  BCBS-AL provided disease management services to most of its clients.[140] Individualized inquiry would be required to determine the extent to which TPPs established and used DM (or could have established and used DM) to manage the prescribing of Neurontin for specific off-label uses.

---

regularly disseminated statistics on drug utilization and physician's practice patterns.  (Business and Health.)

[136]    Dorrill Deposition, pp. 144–145, 152–153.

[137]    Kaiser Family Foundation, March 2005, p. 65.

[138]    Brower Deposition, pp. 93–94.

[139]    Ferguson Deposition, pp. 46–47, 49–50.

[140]    Dorrill Deposition, pp. 144–145.

74.     Fourth, TPPs vary in their use of therapeutic substitution programs, which focus on the use of one chemical entity instead of another to treat a particular condition.  A TPP that wanted to discourage Neurontin's use for neuropathic pain, for example, could have established a therapeutic interchange program for neuropathic pain medications, excluding Neurontin from the approved list.

75.     If, however, a TPP member's physician had not prescribed Neurontin for a specific off-label use, presumably another product would have been prescribed instead.  To the extent that that other product might have had a higher net reimbursement cost than Neurontin, one may conclude that the TPP did not suffer economic injury as a result of the off-label prescription for Neurontin.  If, instead of prescribing Neurontin for a specific off-label use, a product with a lower net reimbursement cost would have been prescribed, then a determination of economic injury may require a comparison of the two net reimbursement costs.  In such circumstances, individualized inquiry would be required to determine which alternative product would have been prescribed and what the net reimbursement cost difference would have been, if any.

### vi.     TPPs vary in members' use of specific drugs

76.     For a number of reasons, there is wide variation across TPPs in terms of covered individuals' use of prescription drugs.  This variation is in part due to differences in the employers and the characteristics of their covered employees.[141]  For instance, the prevalence of self-funding varies across states and across employers in various industries.[142]  In 2004, only 35 percent of workers in the mining, construction and wholesale industries were covered under self-funded arrangements compared to 73 percent of workers in the manufacturing, transportation, communication and utilities industries who were covered under self-funded arrangements.[143]  Neurontin use likely varies across industries because workers in some industries are more likely to be injured

---

[141]     Cindy Parks Thomas, Stanley S. Wallack, et al, "Impact of Health Plan Design and Management on Retirees' Prescription Drug Use and Spending, 2001," *Health Affairs*, December 4, 2002, pp. W408–W419, at W411.

[142]     Christina H. Park, "Prevalence of Employer Self-Insured Health Benefits: National and State Variation," *Medical Care Research and Review*, Vol. 57, No. 3, September 2000, pp. 340–360, at 347–353.

[143]     Kaiser Family Foundation, 2004, "Exhibit 10.7 – Percentage of Covered Workers Under Different Funding Arrangements, by Industry, 2004,"p. 127.

or develop medical conditions that cause pain, for example, than those working in other industries.

77.    TPP variation in benefit design often reflects efforts to achieve different balances between access to health care (e.g., broader or narrower networks, longer or shorter lists of approved medications[144]), the cost of care, and the varying needs of the insured population (e.g., a younger or older population with different disease prevalence).  The variation occurs not only across employers within a market, but across geographic markets.  Some TPPs have more covered lives under restrictive formularies in some markets than in other markets.[145]  For example, TPP clients in Louisiana markets primarily use three- or five-tiered open formularies or HSA-style high deductible plans, while some of the Northeast and West Coast employer groups use closed formularies with more restrictions such as prior authorization.[146]  Even though BCBS-LA was aware that Neurontin was being prescribed for off-label uses, and that instituting prior authorization programs would have been cost-effective, it did not implement such a program ostensibly because its clients in the Louisiana market did not want these restrictions on drug use.[147]

78.    Two employers that purchase the same insurance product may have very different patterns of drug utilization due to differences in the age/sex distribution of their employees, due to differences in their occupations and associated risk (e.g., of injury and resulting pain), or due to differences (e.g., across states) in income, lifestyle, and environmental factors that may affect health status.  For example, Express Scripts found wide regional variation in prescription drug use per capita; for some classes of

---

[144]    The number of drugs on different formularies varies—even by a factor of two.  See Trude and Christianson Study, p. 72.

[145]    Ford Deposition, p. 22.

[146]    Ford Deposition, pp. 27–28, 85–86 (Northeast markets); Brower Deposition, pp. 68–69 (West Coast markets).

[147]    Ford Deposition, pp. 138–140.

medications, there was a two- to three-fold difference between the states with the lowest and highest utilization rates.[148]

79.    Some of the variation in prescription drug use across TPPs cannot be explained by demographic factors; instead, it is a reflection of different physician practice patterns, for example, in different localities or health care delivery settings.[149]  There may also be differences in interventions that are accepted by the plan members, employers, and physicians.  A recent study of healthcare benefit industry stakeholders found that most large unionized and public employers who purchase health insurance products were generally unable to introduce significant employee cost sharing measures due to union and political pressures.[150]  Some staff- and group-model HMOs (including Group Health Cooperative of Puget Sound in Seattle, Washington, and Kaiser Permanente in Orange County, California) resisted three-tier formulary designs—even when they were requested by employers—because the TPPs had already implemented programs to reduce pharmacy costs through physician education and management of prescribing.[151]

80.    Furthermore, cultural differences may induce different attitudes towards prescribing restrictions.[152]  "[T]here are different areas of the country; some have a heavier hand… in managed care, and others are not very managed-care friendly.  So [in] those areas of the country where there is a lot of managed care, you probably see a lot more prior authorization going on… [I]t's driven by the market."[153]  Individualized inquiry would be required to determine the impact of these differences on prescribing of Neurontin for specific off-label uses and net reimbursement cost for all off-label uses.

---

148    Express Scripts, Atlas of Prescription Drug Utilization for the United States, 2001, in "Wide Variation in Pharmacy Utilization," *Managed Care Outlook*, September 2001.

149    Jonathan P. Weiner, Alan Lyles et al, "Impact of Managed Care on Prescription Drug Use," *Health Affairs*, Spring 1991, pp. 140–154, at 144.

150    Trude and Christianson Study, pp. 69, 73–74.

151    Trude and Christianson Study, pp. 71–72.

152    "Alaskans don't like to be told what to do", explains benefits consultant Colleen Savoie, and thus the low level of drug limitations in Alaska.  (Savioe Deposition, pp. 130–131.)

153    Coleman Deposition, p. 52.

## V.    CONCLUSION

81.   In summary, there is heterogeneity in TPPs' roles and responsibilities, sophistication, use
      of formularies, and use of other mechanisms for affecting physician prescribing behavior.
      The result is different prescribing patterns for specific -uses and different net
      reimbursement costs.  All TPPs either used or had available to them sophisticated
      pharmaceutical benefit management services.  Some of these services may have explicitly
      approved specific off-label uses of Neurontin.  Others may have used different methods
      to control prescribing of Neurontin for specific off-label uses.  All of the TPPs, because
      they negotiated contracts for cost-sharing, reimbursement and manufacturer rebates may
      have paid different amounts for Neurontin.  In some cases, the prescription alternative to
      Neurontin for each specific off-label use, by patient, might have had a higher net
      reimbursement cost and one may determine no economic injury as the result.  Thus, it is
      my opinion that without individualized inquiry, it would not be possible appropriately to
      assess impact and injury on a class-wide basis.  Broad-based estimates would
      inappropriately conceal the true differences among TPPs regarding the use and net
      reimbursement cost of Neurontin for each specific off-label condition over the duration of
      the putative class period.

      I declare under the penalty of perjury that the foregoing is true and correct, to the best of
      my knowledge, information and belief.


      *Greg Bell*

      Gregory K. Bell, PhD
      Executed on:  March 14, 2008.



**Exhibit A**

---

# GREGORY K. BELL
Executive Vice President

Ph.D. Business Economics,
Harvard Graduate School of Arts and Sciences/
Harvard Graduate School of Business Administration

M.B.A. Harvard Graduate School of
Business Administration

B.A. Simon Fraser University

Dr. Bell, executive vice president at CRA International, is responsible for CRA's business consulting platform and he is also the practice leader for Life Sciences.  In addition, he is a principal member of the firm's Finance, Intellectual Property, and Transfer Pricing practices.  As an expert witness, Dr. Bell frequently testifies on damages in intellectual property, finance, and antitrust litigation. Dr. Bell's business consulting engagements focus on the economics of business strategy, working with firms to develop sustainable competitive advantages in specific product markets.  He has led and consulted to numerous projects concerning game theory and competitive strategy, global launch strategy, product pricing and positioning, capital budgeting and real options, and cost-benefit analyses.

## EXPERIENCE

## Business

1992–Present    *Executive Vice President*, CRA International, Boston, MA

- Dr. Bell is responsible for CRA's global business consulting practices.

- Dr. Bell directs CRA's global Life Sciences practice.

1987    *Management Consultant*, Alliance Consulting Group, Boston, MA

- Dr. Bell designed a market research program for a consumer electronics client's new product development.

1986    *Associate*, Corporate Finance, Wood Gundy, Vancouver, Canada

- Dr. Bell participated in drafting the prospectus and in marketing the initial public offering of a sportswear manufacturer.

1982–1985    *Chartered Accountant*, Pannell Kerr Forster, Victoria, Canada

- Dr. Bell provided financial accounting, auditing, taxation, and related management consulting services, focusing on special projects involving accounting theory, financial forecasts, and business valuations.

- He also developed a course to prepare the national firm's articling students for the uniform final examination, an examination required to receive the designation of chartered accountant.

- Dr. Bell placed eighth in Canada on the 1983 uniform final examination and was named to national honor roll.

## Academic

1991–1992    *Visiting Assistant Professor*, Economics Department, Northeastern University.

- Dr. Bell was responsible for undergraduate courses in industrial organization, managerial economics, and principles of microeconomics.

1991–1992    *Lecturer*, Economics Department, Harvard University.

- Dr. Bell developed the senior-level undergraduate course, "Economics of Business Strategy."

*Section Leader*, Economics Department, Harvard University.

- Dr. Bell led sections in industrial organization.

1990–1991    *Research Associate*, Economics Department, Harvard University.

- Dr. Bell conducted mergers and acquisitions analysis.

1982    *Research Assistant*, Economics Department, Simon Fraser University.

- Dr. Bell performed capital markets analysis.

## PUBLICATIONS

"Global Pricing Strategies for Pharmaceutical Product Launches." With P. Rankin and T. Wilsdon. Chapter 2 of *The Pharmaceutical Pricing Compendium*, pp. 13–23, Urch Publishing Ltd, 2003.

"Cost Implications of Low Molecular Weight Heparins as Prophylaxis Following Total Hip and Knee Replacement." With S. Goldhaber. *Vascular Medicine* (February 2001).

"Economic Outcomes Analysis of Implantable Cardioverter Defibrillators." With M. Stanton. *Circulation* (March 2000).

"Clinical Realities and Economic Considerations: Economics of Intrathecal Therapy." With Samuel J. Hassenbusch et al. *Journal of Pain and Symptom Management* (September 1997).

"Cost-Effectiveness Analysis of Spinal Cord Stimulation in Treatment of Failed Back Surgery Syndrome." With D. Kidd and R. North. *Journal of Pain and Symptom Management* (May 1997).

"Irreversible Investments and Volatile Markets: A Study of the Chemical Processing Industry." With J. Campa. *Review of Economics and Statistics* (February 1997).

"Volatile Exchange Rates and the Multinational Firm: Entry, Exit, and Capacity Options." In L. Trigeorgis (ed.), *Real Options in Capital Investment*. Westport, CT: Praeger, 1995, pp. 163–181.

"Innovation in Cardiac Imaging." With S. Finkelstein and K. Neels. *Medical Innovation at the Crossroads,* Volume 5. Washington, DC: Institute of Medicine, National Academy Press, 1995, pp. 125–154.

"Illustrative Case Problem." With D. Wright. Chapter 13 in Deloris R. Wright, *U.S. Transfer Pricing Guide: Practice and Policy*. CCH, 1995.

"Irreversible Investments and Volatile Exchange Rates: Theory and Evidence." Ph.D. Thesis, Harvard University, 1992.

## PRESENTATIONS

"Damages:  Lost Profits, Consequential Damages, Damages for Non-Patented Items, Best Practices for the Use of Experts."  Panel participant for The Fifth Annual Sedona Conference on Patent Litigation, Sedona, AZ, October 2004.

"Patent Damages:  Engineering and Regulatory Work-Arounds."  Calculating and Proving Patent Damages, Law Seminars International, Reston, Virginia, June 14, 2004.

"Pricing Strategy and the Product Line."  Pricex 2003, Chicago, IL, June 11, 2002.

"Reasonable Royalties for Emerging Technologies."  Chaired Panel for The Third Annual Sedona Conference on Patent Litigation, Sedona, AZ, November, 2002.

"Does Price Matter?  Pricing, Game Theory, and the Economics of Business Strategy."  Pricex 2002, Chicago, IL, April 30, 2002.

"eCommerce and Strategy for the Pharmaceuticals Industry."  Chairman for The Canadian National e-Pharma Summit II, Toronto, Canada, June 26–27, 2001.

"Exports and Flexible Production Technologies in Volatile International Markets."  4th Annual Conference on Real Options, Cambridge, UK, July 7–8, 2000.

"The Valuation of Oil Drilling Rights: A Real Options Case Study."  2nd Annual Conference on Real Options, Chicago, IL, June 11–12, 1998.

"Prejudgment Interest."  Conference: Charles River Associates' Economists' Perspectives on Antitrust Today—Session: Topics in Calculating Damages, Boston, MA, April 30, 1998.

"Designing Licenses that Maximize Client Profits."  American Intellectual Property Law Association Spring Meeting, Minneapolis, MN, April 23, 1998.

"Economics of Therapy."  Nonmalignant Pain Management Roundtable, Memphis, TN, January 9, 1997.

"How to Structure Risk-Sharing Contracts to Put Teeth in Disease Management."  Congress on Health Outcomes and Accountability, Washington, DC, December 10–13, 1995.

Balancing Low and High Risk Projects."  Institute for International Research, Portfolio Planning & Management Conference, Philadelphia, PA, October 23–25, 1995.

"Capitated Pricing for Pharmaceuticals."  Medical Marketing Association National Meeting, Monterey, CA, June 1995.

"Evaluating the Cost-Effectiveness of Pharmaceuticals."  Anti-Rheumatic Guidelines and International Society for Rheumatic Therapeutics, Scottsdale, AZ, May 1995.

"The Role of Pharmacoeconomics in the Drug Approval Process."  Anti-Rheumatic Guidelines and International Society for Rheumatic Therapeutics, Scottsdale, AZ, May 1995.

"Compliance with Section 482."  With D. Wright.  Institute for International Research, *Practical Approaches to Transfer Pricing* conference, New Orleans, LA, February 22–23, 1995.

"XYZ Corporation: A Case Study in Transfer Pricing."  With D. Wright.  Institute for International Research, *Practical Approaches to Transfer Pricing* conference, New Orleans, LA, February 22–23, 1995.

"Medtronic's Spinal Cord Stimulation Systems: Reimbursement and Marketing Strategy."  Sloan School, Massachusetts Institute of Technology, Cambridge, MA, June 1993.

"Exports and Production Technology under Volatile Exchanges Rates."  Stanford University, Stanford, CA, February 1992.

"Capacity and Volatile Exchange Rates: A Study of the Chemical Processing Industry."  London Business School, London, United Kingdom, March 1991; University of Michigan, Ann Arbor, MI, March 1991; University of British Columbia, Vancouver, BC, February 1991; Kellogg School of Management, Northwestern University, Evanston, IL, January 1991.

## Testimony

Expert report and deposition on behalf of Plaintiffs in *Aventis Pharmaceuticals Inc. and sanofi-aventis US LLC* v. *Barr Laboratories, Inc.*, (January, February 2008).  United States District Court for the District of Delaware, Civil Action No. 06-286 (GMS).

Expert report on behalf of F. Hoffmann-La Roche in *Amgen Inc. v. F. Hoffmann-La Roche Ltd* (January 2008).  Arbitral Tribunal, ICC No. 14826.

Expert report and trial testimony on behalf of Plaintiff in *Church & Dwight Co., Inc.* v. *Abbott Laboratories.* (August, October 2007, January, February 2008).  United States District Court for the District of New Jersey, Civil Action No. 05 CV 2142 (GEB).

Affidavit and deposition on behalf of Defendants in the matter of *State of Wisconsin* v. *Amgen Inc., et al.* (July, August 2007).  State of Wisconsin Circuit Court, Dane County, Case No. 04 CV 1709.

Expert report and deposition on behalf of Barr Pharmaceuticals, Inc., in *Meijer, Inc., et al.* v. *Warner Chilcott Holdings Company III, LTD., et al.*, (June, August 2007).  United States District Court for the District of Columbia, Civil Action Nos:  05-2195 (CKK), 06-00494 (CKK), and 06-00795 (CKK).

Declaration on behalf of Teva Pharmaceuticals in the matter of *Abbott Laboratories et al.* v. *Sandoz, Inc. et al.* (April 2007).  United States District Court for the Northern District of Illinois Eastern Division, No. 07-CV-1721.

Expert reports on behalf of Enzo Biochem, Inc., et al. in *Enzo Biochem, Inc.* v. *Applera Corp. et al.* (February, March, April 2007).  United States District Court, District of Connecticut, Civil Action No. 3-04-CV-929(JBA).

Merits report and declarations on behalf of Defendants regarding the states of Montana (CV-02-09-H-DWM) and Nevada (02-CV-00260-ECR) in *Pharmaceutical Industry Average Wholesale Price Litigation* (February, May 2007).  United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-CV-12257-PBS.

Affidavit, expert report and trial testimony on behalf of Respondent in the matter of *Warren Lammert, et al.* (January, September, November 2007).  United States of America, Securities and Exchange Commission, Administrative Proceeding, File No. 3-12386.

Affidavit and testimony on behalf of Respondent in the matter of *Teva Neuroscience G.P.-S.E.N.C. and the medicine "Copaxone".*  (January, February 2007).  Patented Medicine Prices Review Board, Ottawa, Canada.

Expert reports on behalf of Barr Pharmaceuticals, Inc., et al. in *Federal Trade Commission and State of Colorado v. Warner Chilcott Holdings Company III, LTD., et al.*, (December 2006, January 2007).  United States District Court for the District of Columbia, Civil Action Nos:  05-2179 (CKK) and 05-2182 (CKK).

Expert report and deposition testimony on behalf of MedImmune, Inc. in *Biosynexus, Inc. v. Glaxo Group Limited and MedImmune, Inc.*, (November 2006, January 2007).  Supreme Court of the State of New York, County of New York, Index No. 604485/05,

Expert report on behalf of Plaintiffs in *TAP Pharmaceutical Products, Inc., et al.* v. *Atrix Laboratories, Inc., et al.* (October and November 2006).  United States District Court, Northern District of Illinois, Case No. 03-C-7822.

Affidavit on behalf of Defendants in *State of Alabama* v. *Abbott Laboratories, Inc., et al.* (September 2006).  Circuit Court of Montgomery County, Alabama, Civil Action No. 2005-219.

Expert report on behalf of Plaintiffs in *GlaxoSmithKline Holdings (Americas) Inc. et al.* v. *Commissioner of Internal Revenue* (August 2006).  United States Tax Court, Docket Nos. 5750-04 and 6959-05.

Expert report and testimony on behalf of Respondent in *Roche Diagnostics GmbH* v. *SmithKline Beecham Pharma GmbH & Co. KG* (July, November 2006).  ZCC Arbitration No. 516.

Affidavit on behalf of Pharmacia Corporation in *State of Connecticut* v. *Pharmacia Corporation* (May 2006).  Superior Court of Connecticut, Complex Litigation Docket at Tolland, Docket No. X07-CV-03 0083297S.

Affidavit on behalf of Roxane Laboratories, et al. in *State of Connecticut* v. *Roxanne Laboratories, et al.* (May 2006).  Superior Court of Connecticut, Complex Litigation Docket at Tolland, Docket No. TTD-X07-CV-03 0083296S.

Expert Report on behalf of Defendant in *Affinion Loyalty Group, Inc.* v. *Maritz, Inc.* (April 2006).  United States District Court, District of Delaware, Civil Action No. 04-360.

Expert report, affidavit and testimony on behalf of Bristol-Myers Squibb in *Pharmaceutical Industry Average Wholesale Price Litigation* (March, November, December 2006).  United States District Court, District of Massachusetts, Civil Action No. 01-CV-12257-PBS.

Expert report and deposition testimony on behalf of Plaintiff in *LoJack Corporation v. Clare, Inc.* (December 2005, January 2006, March 2006).  Commonwealth of Massachusetts Superior Court, Civil Action No. 03-00627.

Expert report and deposition testimony on behalf of Defendant in *PHT Corporation v. Invivodata, Inc.* (November, December 2005).  U.S. District Court of Delaware, C.V. No. 04-60 GMS.

Expert report and deposition testimony on behalf of Defendant in *PHT Corporation v. CRF, Incorporated* (November, December 2005).  U.S. District Court of Delaware, C.V. No. 04-61 GMS.

Expert reports and testimony on behalf of GlaxoSmithKline Inc. in *Her Majesty The Queen v. GlaxoSmithKline* (October 2005, January, April 2006).  Tax Court of Canada, Court File No. 98-712(IT)G.

Expert report and deposition testimony on behalf of Plaintiffs in *IVPCare, Inc. v. Harvard Pilgrim Health Care, Inc.* (October, November 2005).  Superior Court Department of the Trial Court, Commonwealth of Massachusetts, Civil Action No. 03-5058-BLS.

Expert reports and deposition testimony on behalf of Plaintiffs in *Pharmacia & Upjohn Company, LLC v. Sicor Inc., et al.* (September 2005, February, April, October 2006).  U.S. District Court of Delaware, C.A. No. 04-833 (KAJ).

Expert reports and deposition testimony on behalf of Wyeth, Inc. in *Applera Corporation et al.* v. *Wyeth, Inc.* (August, September, October 2005).  Circuit Court for Montgomery County, Maryland, Civil Action No. 242761.

Expert reports and deposition testimony on behalf of Defendant Medco Health Solutions, Inc., et al. in *U.S. Government* v. *Merck-Medco et al.* (August, September, October, November 2005).  U.S. District Court, Eastern District of Pennsylvania, No. 00-CV-737.

Expert reports and deposition testimony on behalf of Defendant FMC Corporation in *Microcrystalline Cellulose Antitrust Litigation* (April, May, June 2005).  U.S. District Court, Eastern District of Pennsylvania, Master File No. 01-CV-111 (O'Neill, J.) MDL No. 1402.

Expert report on behalf of Defendants in *Robert J. Swanston* v. *TAP Pharmaceutical Products, Inc., et al.* (February 2005).  Superior Court of the State of Arizona in and for the County of Maricopa, Cause No. CV2002-004988.

Expert reports on behalf of Joint Services International, B.V. in *Joint Services International, B.V.* v. *O'Neill, Inc.* (January, April 2005).  London Court of International Arbitration, LCIA Arbitration No. 3513.

Expert report and deposition testimony on behalf of Defendants in *RoseMarie Ryan-House, et al.* v. *GlaxoSmithKline, et al.* (December 2004).  United States District Court, Eastern Division of Virginia, Civil Action No. 2:02cv442.

Expert reports, tutorial, affidavit and testimony on behalf of Fast Track Defendants in *Pharmaceutical Industry Average Wholesale Price Litigation* (December 2004 and March, November, December 2006).  United States District Court, District of Massachusetts, Civil Action No. 01-CV-12257-PBS.

Expert report and deposition testimony on behalf of Yangtze Optical Fibre and Cable Company Ltd. in *Yangtze Optical Fibre and Cable Company LTD.* v. *Lucent Technologies Inc.* (November 2004, March 2005).  United States District Court, District of Massachusetts, Civil Action No. 03CV11413EFH.

Expert report and deposition testimony on behalf of Defendants in *Medtronic Vascular, Inc.* v. *Boston Scientific Corporation, et al.*, (July, August 2004).  United States District Court, District of Delaware, Civil Action No. 98-478 SLR.

Expert report and deposition testimony on behalf of Mylan Laboratories, Inc., et al., in *Lorazepam & Clorazepate Antitrust Litigation* (May, June 2004).  United States District Court, District of Columbia, MDL No. 1290 (TFH).

Affidavit on behalf of Novopharm Limited in *Pfizer Canada et al.* v. *The Minister of Health and Novopharm Limited* (May 2004).  Federal Court, Court File No. T-2448-03.

Expert report and deposition testimony on behalf of Bayer AG and Bayer Corporation in *Ciprofloxacin Hydrochloride Antitrust Litigation* (April, May 2004).  United States District Court, Eastern District of New York, Master File No. 1:00-MD-1383.

Affidavit and testimony on behalf of Novopharm Limited in *Merck & Co et al.* v. *The Minister of Health and Novopharm Limited* (April, August 2004).  Federal Court, Court File No. T-1627-03.

Expert report and deposition testimony on behalf of SRU BioSystems et al. in *Corning Incorporated et al.* v. *SRU BioSystems et al.* (April, May 2004).  United States District Court, District of Delaware, Civil Action No. 03-633-JJF.

Expert reports and testimony on behalf of Respondent in *Roche Diagnostics GmbH* v. *SmithKline Beecham (Cork) Ltd* (January, April, July 2004).  ZCC Arbitration No. 362.

Expert report and testimony on behalf of Hans-Werner Hector in *Hans-Werner Hector* v. *The Bank of America Corporation et al.* (January, April 2004).  American Arbitration Association.

Expert report on behalf of Enzo Biochem, Inc. in *Enzo Biochem, Inc.* v. *Gen-Probe, Inc. et al.* (December 2003).  United States District Court, Southern District of New York, Civil Action No. 99-4548 (AKH).

Expert report on behalf of Defendants in *Truitt Enterprises et al.* v. *Union Security Life Insurance Company et al.* (November 2003).  United States District Court, District of Maryland (Northern Division), Civil Action No. 03-1422.

Expert report and deposition testimony on behalf of Plaintiffs in *DataSafe, Inc. et al.* v. *Federal Express Corporation et al.* (August 2003, January 2004).  Commonwealth of Massachusetts, Superior Court Department, Civil Action No. 01-2590.

Expert report on behalf of SmithKline Beecham Animal Health Inc. in *SmithKline Beecham Animal Health Inc.* v. *Her Majesty The Queen* (July 2003).  The Court of Queen's Bench, File No. 95-1077 (IT) G.

Expert report on behalf of Bayer Corporation in *Cipro Cases I & II* (June 2003). Superior Court of the State of California, County of San Diego, JCCP.  Proceeding Nos. 4154 and 4220.

Expert reports and deposition testimony on behalf of Defendants in *Johnson Matthey Inc.* v. *Research Corporation, et al.* (March, April 2003). United States District Court, Southern District of New York, Case No. 01-CV-8115 (MBM).

Expert report and deposition testimony on behalf of Bayer AG in *Anne Cunningham, et al.* v. *Bayer AG, et al.* (March, April 2003). Supreme Court of the State of New York, County of New York, Index No. 603820-00.

Expert reports and deposition testimony on behalf of Plaintiff in *Star Scientific* v. *R.J. Reynolds Tobacco Company* (January, March 2003, October 2004). United States District Court for the District of Maryland, Southern Division, Case No. AW 01-CV-1504 and AW 02-CV-2504.

Expert report and deposition testimony on behalf of Defendants in *Tyco Adhesives LP* v. *Olympian Tape Sales, Inc. et al.* (August, October 2002). United States District Court, District of Massachusetts, Civil Action No. 00-11965-NG.

Expert report on behalf of Defendant in *Cook Incorporated* v. *Boston Scientific Corporation* (August 2002). United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 01-CV-9479.

Deposition testimony and trial testimony on behalf of Defendants in *Engelhard Corporation* v. *Research Corporation, et al.* (July, October 2002). Supreme Court of the State of New York, County of New York, Index No. 601847/98.

Expert report and testimony on behalf of Plaintiffs in *Biovail Laboratories Incorporated* v. *Mylan Pharmaceuticals, Inc.* (July 2002, January 2003). American Arbitration Association, Case No. 50T13329601.

Expert reports and deposition testimony on behalf of Plaintiffs in *Novartis Consumer Health, Inc.* v. *Elan Transdermal Technologies et al.* (June, July, August 2002). United States District Court Southern District of Florida, Miami Division, Civil Action No. 01-1120-CIV-MOORE.

Expert report on behalf of Defendants in *Frederick F. Buechel, M.D. and Michael J. Pappas, Ph.D.* v. *John N. Bain, John G. Gilfillan, III et. al.* (March 2002). Supreme Court of the State of New York County of New York, No. 106963/95.

Expert reports and deposition testimony on behalf of Defendants in *National Rural Electric Cooperative Association et al.* v. *Breen Capital Services Corporation et al.* (February 2002, October 2004). United States District Court of New Jersey, Civil Action No. 2:00cv00722.

Expert report on behalf of Aesculap in *Aesculap AG & Co. et al.* v. *Walter Lorenz Surgical, Inc.* (November 2001). United States District Court for Northern District of California, No. C00-02394-MJJ.

Certification on behalf of Defendants in *Louise Garretson et al.* v. *CSFBTLC Trust II et al.* (October 2001). United States Superior Court for the District of New Jersey, No. HUD-L-3117-00.

Expert report and trial testimony on behalf of C.R. Bard, Inc., in *N.M.T. Medical, Inc.* v. *C.R. Bard, Inc.* (April 2001).  American Arbitration Association, AAA Case No. 11 199 00973 00.

Expert report and trial testimony on behalf of Boston Scientific Corp., et al. in *Boston Scientific Corp. et al.* v. *Medtronic AVE, Inc.* (March and April 2001).  American Arbitration Association, AAA File No. 50 T 133 00307 00.

Expert report and deposition testimony on behalf of Defendants in *DuPont Pharmaceuticals, et al.* v. *Molecular Biosystems, Inc., et al.* (January and February 2001).  United States District Court for the District of Delaware, Civ. No. 99-273 (JJF).

Expert reports on behalf of BASF in *Sawgrass Systems, Inc.,* v. *BASF Corporation* (December 2000, January 2001).  United States District Court for the District of South Carolina, Civ. 2:98-3574-11 and 2:99-912-1.

Expert reports and deposition testimony on behalf of Plaintiffs in *Apothecon, Inc., et al.* v. *Barr Laboratories, Inc., et al.* (November 2000, April 2001, June 2005, January, February, March 2006).  United States District Court for the District of Southern New York, No. 98 Civ. 0861 (RWS) and No. 99 Civ. 3687 (RWS).

Expert report on behalf of Wold Trona Company, Inc., in *Wold Trona Company, Inc.* v. *SNC-Lavalin America, Inc., et al.* (October 2000).  United States District Court for the District of Wyoming, Civ. No. 00CV-1008B.

Expert reports, deposition testimony, and trial testimony on behalf of SciMed Life Systems, Inc., and Boston Scientific Corporation in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc., et al.* (August, November, and December 2000).  United States District Court for the District of Delaware, Civ. No. 97-550-SLR.

Expert reports and deposition testimony on behalf of SciMed Life Systems, Inc., and Boston Scientific Corporation in *Cordis Corporation* v. *Boston Scientific Corporation and SciMed Life Systems Inc.* (August and November 2000).  United States District Court for the District of Delaware, Civ. No. 98-197-SLR.

Expert report and deposition testimony on behalf of SciMed Life Systems, Inc., and Boston Scientific Corporation in *Advanced Cardiovascular Systems, Inc. and Guidant Sales Corporation* v. *SciMed Life Systems, Inc. and Boston Scientific Corporation* (November and December 1999).  United States District Court for the District of Indiana, IP 98-1108-C-H/G.

Affidavit on behalf of Novopharm Ltd. in *Apotex Fermentation Inc. and Apotex Inc.* v. *Novopharm Ltd. et al.* (October 1999).  The Court of Queen's Bench, File No. CI 93-01-73733.

Expert report and deposition testimony on behalf of Bausch & Lomb, Inc., in *Disposable Contact Lens Antitrust Litigation* (July 1999, August 1999).  United States District Court for the District of Florida, 94-MDL 1030-J-20A.

Expert reports and trial testimony on behalf of Procter & Gamble Inc. in *Unilever PLC et al.* v. *Procter & Gamble Inc. et al.* (January 1999, December 1999).  Federal Court of Canada, T-2534-85.

Expert report for mediation submitted on behalf of Breen Capital in *City of Jersey City* v. *Breen Capital* (December 1998).  Superior Court of New Jersey, C-57-98.

Expert reports, deposition testimony, and trial testimony on behalf of Braintree Laboratories, Inc., in *Braintree Laboratories, Inc.,* v. *Nephro-Tech, Inc., et al.* (November 1998, September 1999, June 1999, October 1999).  United States District Court for the District of Kansas, 96-CV-2459.

Expert report on behalf of Artegraft, Inc., in *Ethicon Inc. and Johnson & Johnson Consumer Products Inc.* v. *Artegraft, Inc.* (September 1998).  American Arbitration Association, File 18-199-00136-96.

Expert report and deposition testimony on behalf of Astro-Valcour, Inc., in *The Dow Chemical Corporation* v. *Astro-Valcour, Inc.* (June 1998, July 1998).  United States District Court for the Northern District of New York, 95-CV-1357.

Expert reports and deposition testimony on behalf of Glaxo Wellcome in *Emory University* v. *Glaxo Wellcome* (February 1998, August 1998, September 1998).  United States District Court for the Northern District of Georgia, 96-CV-1754.

Expert reports and deposition testimony on behalf of Glaxo Wellcome in *Emory University* v. *Glaxo Wellcome* (November 1997, March 1998, April 1998).  United States District Court for the Northern District of Georgia, 96-CV-1868.

Expert reports on behalf of American Home Products in *Johnson & Johnson* v. *American Home Products* (June 1996).  United States District Court for the Eastern District of Pennsylvania, 94-CV-1388.

Testimony on behalf of Novo Nordisk in *Genentech, Inc.* v. *Novo Nordisk A/S et al.* (May 1996).  United States District Court for the Southern District of New York, 96-CV-1755.

## HONORS AND AWARDS

Dean's Doctoral Fellow, Harvard Graduate School of Arts and Sciences/ Harvard Graduate School of Business Administration.

George Baker Scholar, John Thayer Scholar, Frank Knox Memorial Fellow, McKenzie King Traveling Scholar, Harvard Graduate School of Business Administration.

Governor General's Gold Medal, Gordon Shrum Scholar, Simon Fraser University.

**Exhibit B**

**Materials Relied Upon**


**Legal Memoranda, Declarations, and Reports**

Plaintiffs' Renewed Motion for Class Certification, December 19, 2007.
Declaration of Rena Conti in Support of Plaintiff's Renewed Motion for Class Certification, December 19, 2007.


**Depositions**

Deposition of Elizabeth R. Boudreaux, November 8, 2006.
Deposition of Michael Brodeur, July 26–27, 2007.
Deposition of Robert Dwight Brower, September 20, 2007.
Deposition of Fred Grant Brown, October 19–20, 2005.
Deposition of Albert L. Carver, July 12–13, 2007.
Deposition of Imelda Concepcion Coleman, September 19, 2007.
Deposition of Rena M. Conti, February 12–13, 2008.
Deposition of Barry S. Davis, October 26, 2007.
Deposition of Lee Dorrill, January 26, 2006.
Deposition of Jared Ferguson, January 30, 2006.
Deposition of Milam W. Ford, January 19–20, 2006.
Deposition of James G. Gengelbach, October 10, 2007.
Deposition of Saba Habtom, February 15, 2007.
Deposition of Susan Hoomaian, November 15, 2006.
Deposition of Saira A. Jan, November 2, 2006.
Deposition of Valera M. Kingsley, January 12–13, 2006.
Deposition of Walter Eugene Matthews, December 14, 2005.
Deposition of Mirta Millares, October 2, 2007.
Deposition of Colleen Savoie, January 16, 2006.
Deposition of Susan M. Scheid, July 24, 2007.


**Publicly-Available Documents**

"Aetna Takes Mail-order In-House; Ends Contract with Express Scripts," *Drug Cost Management Report* , November 2002.
"Calculating PBM Market Share," *Drug Cost Management Report* , June 2002.
"Clients, Covered Lives for Selected Pharmacy Benefit Management Firms," *Managed Healthcare Executive* , December 2003.
"FDA Grants Alpharma Final Approval and First-To-File Status for Gabapentin Tablets," *PR Newswire US* , October 22, 2004.

"Health Plan Strategies for Pharmacy Benefit Management," *Managed Care Week*, January 13, 2003.

"Health Plan Strategies for Pharmacy Benefit Management," *Managed Care Week*, May 2, 2005.

"Neurontin cleared for marketing; uncontrolled epilepsy patients to benefit," *Business Wire*, January 3, 1994.

"Pfizer Receives FDA Approval to Market Neurontin® for Post-Herpetic Neuralgia," *PRNewswire*, May 28, 2002.

Academy of Managed Care Pharmacy, *Common Practices in Formulary Management Systems*, June 2000.

Austin, Bonnie, "Pharmaceutical Formularies: The Right Formulary for Cost and Utilization," Academy Health, *Changes in Health Care Financing and Organization Findings Brief*, Vol. 7, No. 5, August 2004.

Baker, Sharon, "Self-Funded HMOs on the Rise," *Managed Care*, May 2002.

Barrueta, Anthony, Kaiser Foundation Health Plan, Inc., HealthCare Hearings.

Borzi, Phyllis C., *ERISA Health Plans: Key Structural Variations and Their Effect on Liability*, Center for Health Services Research and Policy, George Washington University, School of Public Health and Health Services, September 2002

Bourreau, Thomas, Express Scripts, Healthcare Hearings.

Chung, Richard, "Alternate Financial Incentives in Multi-tiered Formulary Systems to Improve Accountability for Outcomes," *Journal of Managed Care Pharmacy*, Vol. 9, No. 4, July/August 2003.

CIGNA, Anticonvulsants for chronic low back pain, http://www.cigna.com/healthinfo/tn9237.html, accessed on February 12, 2008.

Cowen and Company, *Therapeutic Categories Outlook: 2007*, October 2007

Curtiss, Frederic R., "Unraveling the Effects of Tier-Copayment Drug Benefit Designs," *Journal of Managed Care Pharmacy*, Vol. 9, No. 2, March/April 2003.

Edlin, Mari, "Plans Ponder Their Pharmacy Role: Do It Themselves or Farm It Out to a PBM?," *Managed Healthcare Executive*, November 2002.

Employee Benefit Research Institute, *Employment-Based Health Care Benefits and Self-Funded Employment-Based Plans: An Overview*, April 2000.

Express Scripts, *"Epilepsy Drug Doesn't Prevent Migraines,"* February 11, 2008, https://www.drugdigest.org/DD/Articles/News/0,10141,612538,00.html, accessed on March 11, 2008.

Express Scripts, *"Pain: How is it treated?,"* December 2007, http://www.drugdigest.org/DD/HC/Treatment/0,4047,20,00.html,, accessed on March 11, 2008.

Faith Lyman Ham, "An HMO primer - structural classification of health maintenance organizations," *Business and Health*, June 1989.

FTC-DOJ Hearings, Health Care and Competitive Law and Policy, *Panel Discussion: Pharmaceutical Benefits Managers*, June 26, 2003.

Health Policy Alternatives, *Pharmacy Benefit Managers: Tools for Managing Drug Benefit Costs, Quality, and Safety*, PCMA, August 2003.

Hieber, Klaus A., "Pharmacy Benefit Administration Options," *Journal of Managed Care Pharmacy*, Vol. 2, No. 3, May/June 1996.

Hoadley, Jack, *Cost Containment Strategies for Prescription Drugs: Assessing the Evidence in the Literature*, Kaiser Family Foundation, March 2005.

International Foundation of Employee Benefit Plans, *2005 Directory of Multiemployer & Public Health Care Purchasing Coalitions.*

Kaiser Family Foundation, *2006 Employer Health Benefits Survey*, September 2006.

Kaiser Family Foundation, *Employer Health Benefits 2004 Annual Survey.*

Kelley, Ellen, "What Do My Medicines Do For Me?," *MS Connections*, National MS Society, Winter 2004.

Mandelker, Jeannie, "Controlling the Cost of Branded Drugs - Use of Formularies," *Business and Health* , November 1993.

Marquis, M. Susan, and Long, Stephen H., "Who Helps Employers Design Their Health Insurance Benefits?" *Health Affairs* , January/February 2000.

Mayo Clinic, *Off-label Drugs and Medical Devices: Get the Facts* , October 1, 2007, http://www.mayoclinic.com/health/off-label/DI00088, accessed on March 9, 2008.

Meyer, Harris, "Indemnity insurance; down but not out - indemnity health insurance," Business and Health, May 1996.

Mullins, C. Daniel, Palumbo, Francis B., and Saba, Mojdeh, "Formulary Tier Placement for Commonly Prescribed Branded Drugs: Benchmarking and Creation of a Preferred Placement Index," *The American Journal of Managed Care* , Vol. 13, No. 6, Part 2 , June 2007.

Neurontin Product Label, Revised January 2007.

Park, Christina H., "Prevalence of Employer Self-Insured Health Benefits: National and State Variation," *Medical Care Research and Review* , Vol. 57, No. 3, September 2000, pp. 340–360.

Reynolds, Mark, "Third Party Administrators: Their Unique and Specific Role - California Consumer Alert: AB 1672," *Los Angeles Business Journal* , April 12, 1993.

Sax, Michael J., and Emigh, Robin, "Managed Care Formularies in the United States," *Journal of Managed Care Pharmacy* , July/August 1999, pp. 289–295.

Trude, Sally, Christianson, Jon B. et al, "Employer-Sponsored Health Insurance: Pressing Problems, Incremental Changes," *Health Affairs* , Vol. 21, No. 1, January/February 2002, pp. 66–75.

Wallack, Stanley S., Weinberg, Dana Beth, and Parks Thomas, Cindy, "Health Plans' Strategies To Control Prescription Drug Spending," *Health Affairs* , Vol. 23, No. 6, November/December 2004, pp. 141–148.

Wang, Y. Richard, and Pauly, Mark V., "Spillover Effects of Restrictive Drug Formularies on Physician Prescribing Behavior: Evidence from Medicaid," *Journal of Economics & Management Strategy* , Vol. 14, No. 3, Fall 2005.

Weiner, Jonathan P.,  Lyles, Alan et al, "Impact of Managed Care on Prescription Drug Use," *Health Affairs* , Spring 1991, pp. 140–154.

Woodward, Nancy Hatch, "Is Self-Funded Health a Path for Small Firms," *HR Magazine* , Vol. 51, No. 8, August 2006.

## Benefit Manuals, Formularies, and Guidelines

Aetna Pennsylvania, *Small Business Solutions* , October 2004, http://www.einsurancecare.com/pdfs/pa_sbs.pdf, accessed on March 4, 2008.

Aetna, *Member Guide US HealthCare Preferred Medication Program* , 1997.

Aetna, *Pharmacy Clinical Policy Bulletins (Anticonvulsants),* January 1, 2006, http://www.aetna.com/products/rx/data/anticonvulsantscpb.html, accessed on December 20, 2008.

Aetna, *Pharmacy Clinical Policy Bulletins* , *Subject: Anticonvulsants* , January 1, 2006.

Aetna, *Preferred Drug (Formulary) Guide* , January 2005, http://www.familyhealthofdelaware.com/files/preferred.pdf, accessed on March 11, 2008.

Aetna, *Preferred Drug Guide (3-Tier/Open Formulary Plan)* , 2007, http://hrdev.ouhsc.edu/documents/1/Benefits/FormularyGuide.pdf, accessed on March 11, 2008.

Aetna, *Preferred Drug Guide (3-Tier/Open Formulary Plan)* , 2008, http://www.ithaca.edu/hr/pdf/benefits/aetna/aetna-rx-3tier-2008.pdf, accessed on March 11, 2008.

Blue Cross and Blue Shield of Vermont, "The Complete Preferred Brand-Name Drug List," *Fine Points* , Vol. 16, No. 1, Winter 2005, http://www.bcbsvt.com/pages/PDFs/FinePoints_Winter%202005.pdf, accessed on March 1, 2008.

Caremark, *Patient Education: Gabapentin capsules or tablets* , February 2, 2008, https://www.caremark.com/wps/portal/!ut/p/kcxml/04_Sj9SPykssy0xPLMnMz0vM0Y_QjzKLN4j38wbJgFjGpv qRqCKO6AJmgYFwIV-P_NxUoESkOZBvaOGjH6IfpO-tH6BfkBsaGlFunA4Ay71AtQ!!/delta/base64xml/L0lDVE83b0pKN3VhQ1NZS0NsRUtDbEVBIS9vUG9nQUV JUWhDRU1ZaENHSVFJU0ZHHVp6Q0FJQlFVaFM0SSEvNEIxaWNvblFWd0d4T1VUb0s3OVlRN0RtRzRS MkhLTnhpQSEhLzdfMF8xOEwvNS9zcGZfQWN0aW9uTmFtZS9zcGZfQWN0aW9uW9uTGlzdGVuZXIxvc3BmX3 N0cnV0c0FjdGlvbi8hMmZodG1sZ1ITJmdmlldJdyEyZkRydWdJbmZvQWN0aW9uLmRvITNmY29tbWFuZD1nZX RvYnJhLmFzcCEyeyOnNmNwbnVtPTTI3MQ!!#7_0_18L, accessed on March 11, 2008.


CIGNA, *Anticonvulsants for cancer pain,*  November 4, 2005, http://www.cigna.com/healthinfo/tv7394.html, accessed on February 12, 2008.

CIGNA, *Anticonvulsants for chronic low back pain* , February 15, 2006, http://www.cigna.com/healthinfo/tn9237.html, accessed on February 12, 2008.

CIGNA, *Anticonvulsants for restless legs syndrome* , April 4, 2007, http://www.cigna.com/healthinfo/ue4969.html, accessed on February 12, 2008.

CIGNA, *Gabapentin for hot flashes* , May 26, 2006, http://www.cigna.com.pe/healthinfo/tn9903.html, accessed on February 12, 2008.

CIGNA, *Multiple Sclerosis (MS)* , March 23, 2006, http://www.cigna.com/healthinfo/hw190814.html, accessed on February 12, 2008.

CIGNA, *The CBH Provider Connection* , 3rd Quarter 2002, Volume III.

Express Scripts, *2005 Express Scripts National Preferred Alpha Formulary List* , December 31, 2004, http://eracpeople.enterprise.com/pdf/us/en/drug_US_en_ESIFormularyDetailed2005.pdf, accessed on February 29, 2008.

Express Scripts, Atlas of Prescription Drug Utilization for the United States, 2001, in "Wide Variation in Pharmacy Utilization," *Managed Care Outlook* , September 2001.

Express Scripts, *White Paper: Formulary Development at Express Scripts* , http://www.express-scripts.com/ourcompany/news/formularyinformation/development/formularyDevelopment.pdf, accessed on February 29, 2008.

Farmers Agents' Group, Benefits Program *Enrollment Guide* , 2004, https://www.farmersagentsbenefits.com/farm/pdf/FarmersGuide2004.pdf, accessed March 4, 2008.

Humana, *Humana Changes Drug List and Dispensing Limits* , 1st Quarter 2005, http://www.humana.com/providers/NewsLetters/HumanaWeb1stQ05/articles/changes_drug_list.html, accessed on March 1, 2008.

Humana, *Prescription Drug Guide - Humana Formulary (List of Covered Drugs),*  2006, http://www.humana-medicare.com/misc/druglist2006.pdf, accessed on March 11, 2008.

Humana, *RX4 Drug List  (Drug List of most commonly prescribed),*  July 1, 2004, http://www.legendserv.com/humana%20group/Humana%20Drug%20List.pdf, accessed on March 11, 2008.

Institute of Medicine*, Description and Analysis of the VA National Formulary* , 2000.

Keystone Mercy Health Plan, "Formulary Update," *Script Notes* , First Quarter 2003, http://www.keystonemercy.com/pdfs/pharmacy/scriptnotes/notes_1Q_2003.pdf, accessed on March 1, 2008.

Lovelace Health Plan, *Lovelace Health Plan for the Federal Employees Health Benefits Program, 2007* , 2007, http://www.opm.gov/insure/07/brochures/pdf/73-079.pdf, accessed 3/1/2008.

Lovelace Health Plan, *Three Tier Formulary Drug List, Member: 2005* , 2005, http://www.lovelacehealthplan.com/pdf/LHP%20three%20tier.pdf, accessed on March 1, 2008.

Lovelace Health Plan, *Two Tier Formulary Drug List, Member: 2005* , 2005 http://www.lovelacehealthplan.com/pdf/LHP%20two%20tier.pdf, accessed March 1, 2008

Lovelace Health Plan, *Two-Tier Formulary Drug List, Member: 2007,* 2007, http://www.lovelacehealthplan.com/pdf/LHP%20TWO-TIER%20FORMULARY%20FINAL.pdf, accessed on March 1, 2008.

Maricopa Health Plan and UPH, *Drug Formulary* , December 1, 2006, http://www.uniteddrugs.com/PBM/Documents/MaricopaHealthPlan.pdf, accessed on February 15, 2008.

Medco, *Pain – The basic facts* , Source: National Multiple Sclerosis Society, June 4, 2003, http://www.medcohealth.com/medco/consumer/ehealth/ehsarticle.jsp?BV_SessionID=@@@@1445139669.120 5352984-mm739700734126@@@@&BV_EngineID=ccdiadedigidkflcfklcgffdghfdfgk.0&articleID=NMSS%3acomp%3a pain_the+basic+facts, accessed on March 11, 2008.

Medco, *Sensimotor polyneuropathy* , Source: A.D.A.M., Inc., January 2008, http://www.medcohealth.com/medco/consumer/ehealth/ehsarticle.jsp?BV_SessionID=@@@@1941554822.120 5353396-mm241347627611@@@@&BV_EngineID=ccdiadedigidkflcfklcgffdghfdfgk.0&articleID=000750adam,

Mercy Health Plans, *2006 Preferred Drug Formulary* , 2006, http://www.mercyhealthplans.com/ers/2007/Formulary.pdf, accessed on March 3, 2008.

Mercy Health Plans, *PremierPlus Options 2007 Formulary* , June 1, 2007, http://www.mercyhealthplans.com/about/products/joplin/options/SPJOPFormulary.pdf, accessed March 3,

Mercy Health Plans, *Provider Update* , Summer 2004, http://premierhealthplansmo.com/provider/newsletter/Provider%20Update_Summer%202004.pdf, accessed on February 15, 2008.

Passport Health Plan, *Provider Bulletin* , Vol. 6, Issue 2, 2006, http://www.passporthealthplan.com/pdf/providercenter/providercom/bulletin/2006/vol6iss2.pdf, accessed on March 1, 2008.

Prime Therapeutics, "Formulary Updates" (Additions to the BCBS Formulary), *Prime Perspective* , Issue No. 8, September 2001.

St. John's Health Plan, *St. John's PremierPlus - HMO and PremierPlus Options – PPO Standard Drug Plan Formulary* , November 9, 2005.

University Health System, *Memorandum* , *Subject: Formulary & Subsidy Actions* , March 19, 2001, https://labs-sec.uhs-sa.com/clinical_int/RefDocs/MAR01MEM.PDF, accessed on March 3, 2008.

University of Michigan, *The University of Michigan Formulary* , February 1, 2008, http://www.umich.edu/~benefits/forms/drugname.pdf, accessed on February 15, 2008.

**Websites**

Fortune 500, 1995-2006, 2004 Full List,
http://robots.cnnfn.com/magazines/fortune/fortune500_archive/full/2004/1.html, and
http://robots.cnnfn.com/magazines/fortune/fortune500_archive/full/2004/101.html, accessed on March 11, 2008.

http://www.accessdata.fda.gov/scripts/cder/drugsatfda

http://www.epilepsy.com/epilepsy/seizure_medicines

http://www.epilepsyfoundation.org/answerplace/Medical/treatment/medications/typesmedicine

The Merk Manual, http://www.merck.com/mmpe/sec19/ch300/ch300d.html