UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: | Master File No. 04-10981 |
| | Judge Patti B. Saris |
| HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD OF LOUISIANA; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated, v. PFIZER INC. and WARNER-LAMBERT COMPANY. | Magistrate Judge Leo T. Sorokin

LEAVE TO FILE GRANTED SEPTEMBER 18, 2008 |

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION

Defendants Pfizer Inc. and Warner-Lambert Company respectfully submit this supplemental memorandum of law in further opposition to plaintiffs' second motion for class certification. On September 8, 2008, plaintiffs filed with the Court the August 11, 2008 declaration of Meredith Rosenthal ("Rosenthal Decl."), which purports to estimate the number of Neurontin prescriptions that putative consumer and third-party payor ("TPP") class members purchased or reimbursed as a result of defendants' alleged misrepresentations. As explained below, Professor Rosenthal's report makes clear that plaintiffs cannot carry their burden under Rule 23 of the Federal Rules of Civil Procedure and that certification of any consumer or TPP class would therefore be inappropriate and contrary to law.

On August 29, 2007, the Court denied plaintiffs' first motion for class certification, ruling in pertinent part that plaintiffs had failed to articulate any method of identifying "*which consumer class members' Neurontin prescriptions were caused by defendants' alleged fraud . . . and which would have occurred even in the absence of the fraud.*" *In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 111–12 (D. Mass. 2007). In an attempt to avoid this fatal flaw, plaintiffs claimed that Professor Rosenthal's econometric analysis, when performed, would "prove for each indication, over time, that defendants' fraud was a substantial contributing factor for substantially *all* of the prescriptions written." *Id.* at 110 (emphasis in original). Professor Rosenthal herself had never made any such claim, but the Court nonetheless allowed plaintiffs 60 days within which to file a new motion that would supply "statistical proof" to substantiate their claim that all but a "*de minimis* number" of Neurontin prescriptions for each off-label use were caused by the alleged fraudulent statements. *Id.* at 114.

Although the Court had expressly directed plaintiffs to supply statistical proof that all but a *de minimis* number of Neurontin prescriptions for each off-label use were caused by defendants' alleged misstatements, plaintiffs did not submit Professor Rosenthal's econometric analysis in conjunction with their second motion for class certification, filed on December 19, 2007.[1] As a result, defendants, in opposing plaintiffs' second motion, were again forced to debate hypotheticals: Would Professor Rosenthal be able to locate the "enormous amount of data regarding off-label sales and defendants' promotional activities" on which she proposed to

---

[1] Instead, plaintiffs filed a report authored by Dr. Rena Conti, who estimated the number of Neurontin prescriptions for certain off-label uses over class periods defined for her by plaintiffs' counsel. Feb. 12, 2008 Dep. of Rena M. Conti, Ph.D. ("Conti Dep.") (attached as Ex. 1 to Sept. 10, 2008 Decl. of Matthew B. Rowland ("Rowland Decl.") at 458–59, 570). Dr. Conti conceded that she was not asked to offer, and was not offering, an opinion that defendants' alleged misconduct caused any one of these Neurontin prescriptions. *Id.* at 68, 432, 438–39, 470–71.

base her analysis? 244 F.R.D. at 111. Would Professor Rosenthal be able to incorporate "additional variables . . . in her analysis" to account for factors, unrelated to defendants' misconduct, that may have caused doctors to prescribe Neurontin for the relevant off-label uses? *Id.* And assuming that Professor Rosenthal's "proposed methodology [could] accomplish what it set[] out to do," would her analysis ultimately substantiate plaintiffs' claims that defendants' alleged misstatements caused "substantially *all* of the prescriptions" at issue? *Id.* at 110.

Now that plaintiffs have, at long last, unveiled Professor Rosenthal's report, defendants can respond to that report—as it exists, not as plaintiffs wish it to be—and address its implications for plaintiffs' pending motion for class certification. *See generally Brown v. Am. Honda* (*In re New Motor Vehicles Can. Exp. Antitrust Litig.*), 522 F.3d 6, 29–30 (1st Cir. 2008) (noting utility of evaluating class certification in light of a "more fully developed record"). For the reasons set forth below, defendants respectfully submit that Professor Rosenthal's report establishes that plaintiffs cannot meet their burden of showing that the prerequisites to class certification are met.

*First*, even if Professor Rosenthal's report were accepted at face value, no plaintiff class could be certified for the off-label "uses" that remain at issue. In its August 29, 2007 opinion, the Court held that it would reconsider its denial of plaintiffs' motion for class certification only if plaintiffs proffered "statistical proof" that all but a "*de minimis* number" of Neurontin prescriptions for each off-label use were caused by defendants' alleged misstatements. *Neurontin*, 244 F.R.D. at 114. Professor Rosenthal's report establishes that plaintiffs cannot carry their burden. By Professor Rosenthal's own account, depending on the off-label use at issue, as many as 72.1% of total prescriptions were written for reasons *other than* defendants'

alleged misconduct. *See* Rosenthal Decl. attach. G.[2] Because plaintiffs remain unable to identify "*which* . . . class members' Neurontin prescriptions were caused by defendants' alleged fraud . . . and which would have occurred even in the absence of the fraud," *Neurontin*, 244 F.R.D. at 111–12, plaintiffs are right back where they started. Demonstrating that defendants' alleged misstatements actually caused a class member to purchase Neurontin will require individual proof, and certification must therefore be denied.[3]

*Second,* Professor Rosenthal's analysis does not support class certification because she does not assess the impact of the alleged off-label marketing campaign on doctors' prescribing decisions, as plaintiffs claimed she would. Plaintiffs assured the Court that Professor Rosenthal's analysis would be based on an "enormous amount" of "meticulously compiled" data regarding defendants' alleged promotional activities. *Neurontin*, 244 F.R.D. at 111. The analysis presented in Professor Rosenthal's report, however, does not rely on such data. As recognized in the Court's August 29, 2007 opinion, plaintiffs have alleged that "[d]efendants' off-label promotion strategy had two broad components," a "publication strategy," in which

---

[2] According to Professor Rosenthal's own estimates of the number of actionable Neurontin prescriptions for each relevant off-label use and her estimates of the percentage of total Neurontin prescriptions for each use that actionable prescriptions represent, as many as 8,900,000 neuropathic pain prescriptions, 1,460,000 nociceptive pain prescriptions, 1,750,000 migraine prescriptions, 71,000 bipolar prescriptions, and 3,580,000 prescriptions for doses over 1800 mg/day were caused by factors *other than* defendants' alleged misconduct. Rosenthal Decl. attach. G. None of these numbers can be plausibly classified as "*de minimis.*"

[3] Professor Rosenthal's conclusions illustrate the dangers of the *post hoc ergo propter hoc* fallacy. Defs.' Mem. L. Opp'n Class Pls.' Renewed Mot. Class Cert. (Dkt # 1174) at 16–19. Dr. Conti, the economist whose report plaintiffs submitted in conjunction with their renewed motion for class certification, concluded that the number of Neurontin prescriptions written for each relevant off-label use had been low prior to the inception of defendants' alleged fraud, and had risen dramatically thereafter. Plaintiffs argued, on the basis of Dr. Conti's conclusions, that substantially all Neurontin prescriptions written for the relevant off-label uses were caused by defendants' alleged misrepresentations. Professor Rosenthal's regression analysis—for all its flaws—illustrates the fallacy of this argument. Although Dr. Conti concluded that the number of Neurontin prescriptions for migraine grew more than ten-fold following the launch of defendants' alleged fraudulent marketing campaign, Professor Rosenthal asserts that defendants' alleged misrepresentations account for only 27.9% of Neurontin prescriptions for migraine. *Compare* Feb. 21, 2008 Revised Decl. of Rena Conti (Dkt # 1142) (Rowland Decl. Ex. 2), *with* Rosenthal Decl. attach. G.

defendants allegedly misrepresented Neurontin's efficacy for off-label uses in articles and studies published in medical journals, and a "peer selling" strategy, in which defendants misrepresented Neurontin's efficacy for off-label uses at educational or professional seminars. *Id.* at 93. Remarkably, neither component of the alleged off-label promotion strategy figures into Professor Rosenthal's analysis. Professor Rosenthal concedes that she is "unable to account systematically" for the influence of either "published literature" or alleged "off-label marketing events and campaigns" on prescribing. Rosenthal Decl. ¶¶ 46, 53. Because the influence of the principal components of defendants' alleged off-label marketing campaign on doctors' prescribing decisions cannot be ascertained absent recourse to individual proof, plaintiffs' renewed motion for class certification should be denied.

*Third*, Professor Rosenthal's analysis cannot establish class-wide causation because it "fail[s] to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998). Professor Rosenthal previously testified that there were numerous factors, unrelated to defendants' alleged misconduct, that could have caused doctors to prescribe Neurontin for the relevant off-label uses.[4] Plaintiffs assured the Court that Professor Rosenthal would include "additional variables . . . in her analysis" to account for these factors. 244 F.R.D. at 111. She has not done so. Professor Rosenthal's regression analysis fails to account for these factors, and is instead predicated on an assumption that detailing (visits by sales representatives to doctors' offices) is the driver of every

---

[4] These factors include positive clinical trials regarding Neurontin's use to treat off-label conditions; widespread use of other, similar AEDs for the same or similar off-label conditions; approvals in other countries of Neurontin's use for these off-label conditions; physicians' and patients' positive experiences with Neurontin for off-label conditions; and TPP policies encouraging off-label use of Neurontin (and later, generic gabapentin). *See, e.g.*, Oct. 25, 2006 Meredith B. Rosenthal Dep. at 320–64 (Rowland Decl. Ex. 3).

doctor's decision to prescribe Neurontin for the relevant off-label uses. *See* Rosenthal Decl. ¶ 24, 33 (acknowledging that her models assume that Parke-Davis's spending on detailing is the "key explanatory variable" in doctors' decisions to prescribe Neurontin).

*Fourth*, Professor Rosenthal's reliance on an unjustifiable assumption that detailing is the primary driver of doctors' decisions to prescribe Neurontin is compounded by her reliance on additional, unsubstantiated—and unsubstantiable—assumptions. In particular, Professor Rosenthal assumes, on instruction of counsel, that from the proposed class periods' inceptions through mid-2002, *all* detailing to physicians in 27 of the 28 specialty groups she considers was both off-label and fraudulent. *See* Rosenthal Decl. ¶¶ 46, 47, attachs. I.1, I.4.[5] These assumptions are not only at odds with the testimony of every prescribing doctor deposed in this action and related state actions, but to demonstrate their truth would require testimony from tens of thousands of doctors who prescribed Neurontin to consumer class members or TPP insureds.

*Fifth*, even if Professor Rosenthal's analysis were admissible evidence of class-wide causation, it could not justify certification of any class because defendants would be entitled to present individual proof to rebut its conclusions. Defendants' "right to introduce this type of evidence at trial in order to rebut [Professor Rosenthal's] assertion of [causation], creat[es] precisely the type of 'individualized evidentiary issue [that is] a persuasive reason for denying certification.'" *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389, 396 (D. Mass. 2007); *see also Grovatt v. St. Jude Med., Inc. (In re St. Jude Med., Inc., Silzone Heart Valve Prods. Liab. Litig.)*, 522 F.3d 836, 838–40 (8th Cir. 2008); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225–26 (2d Cir. 2008).

---

[5] Professor Rosenthal assumes that all detailing to 22 of these groups was off-label and fraudulent for the entirety of each class period. *See id.*

6

*Finally*, Professor Rosenthal's report fails to address, much less resolve, the numerous, additional obstacles to certification of any TPP class. To establish injury, each TPP plaintiff must, at a minimum, present evidence that defendants' alleged misrepresentations caused doctors to prescribe Neurontin for a relevant off-label use to *its own*—as opposed to other TPPs'—insureds. *See In re Rezulin Prods. Liab. Litig.*, 524 F. Supp. 2d 436, 441 (S.D.N.Y. 2007) (rejecting plaintiff TPP's argument that it was entitled to recovery in the absence of such evidence as an impermissible effort to invoke the "fraud-on-the-market theory" outside the securities fraud context); *Ala. Assoc. Gen. Contractors Inc. v. Pfizer Inc.*, No. 03-CV-2006-001242.00, slip op. at 4–5 (Ala. Cir. Ct. Montgomery County Apr. 29, 2008) (attached as Ex. 4 to Sept. 10, 2008 Decl. of Matthew B. Rowland ("Rowland Decl.")) (concluding that plaintiff TPP failed to establish injury where it did not "produce even one prescribing physician who would testify that he or she was influenced in any way by Pfizer's allegedly improper marketing campaign to write an off-label Neurontin prescription for one of [the plaintiff's own insureds]").[6] Professor Rosenthal does not opine that plaintiffs can identify injured members of the putative TPP class through any means short of the "torrent of individual trials" that doomed plaintiffs' prior motion for class certification. *Neurontin*, 244 F.R.D. at 114.

Nor does Professor Rosenthal opine that plaintiffs can overcome a more basic impediment to certification—TPPs' inability to "distinguish between payments for on- and off-label prescriptions, or among the indications"—without resort to individual proof. *Neurontin*, 244 F.R.D. at 115. Plaintiffs have proposed to surmount this obstacle to class certification by

---

[6] *See generally Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1, 13–14 (1st Cir. 2007) (affirming dismissal on summary judgment of plaintiff medical providers' RICO claim where plaintiffs relied on experts' declarations that defendants "use[d] their audit practices . . . as a means of forcing providers to accept unilateral changes to the[ir] contract[s]," but failed to adduce evidence that "plaintiffs themselves ever acquiesced to these demands").

7

assuming that "individuals taking Neurontin for a particular indication [are] evenly distributed across the population," and using simple arithmetic to calculate the likelihood that a given TPP paid for Neurontin prescribed for a given use and to estimate the amount that it paid. Reply Mem. L. Supp. Pls.' Renewed Mot. Class Cert. (Dkt # 1184) at 5. As defendants' expert Dr. Gregory Bell has explained, however, variations among TPPs' policies toward Neurontin and among their insured populations render plaintiffs' assumption indefensible and their proposed methods untenable. *See* Mar. 14, 2008 Decl. of Gregory K. Bell, Ph.D. ("Bell Decl.") (Rowland Decl. Ex. 5) ¶¶ 8–10, 21, 58–60, 70–74, 76–81. For example, information obtained from named plaintiffs and publicly available sources indicates that numerous TPPs have employed prior authorization, quantity limits and other measures to restrict the uses of Neurontin for which they will reimburse. *See id.* ¶¶ 59.1, 59.10; Dec. 21, 2006 Decl. of Martin Caron ("Caron Decl.") (Rowland Decl. Ex. 6) ¶¶ 3–5 (noting that one survey identified 190 TPPs that had placed Neurontin on prior authorization). TPPs' implementation of these measures ensures that reimbursement of Neurontin for the relevant off-label uses will vary dramatically from one TPP to the next, and that methods "based on nationwide averages that make[] no effort to adjust for the variegated nature of the businesses included in the classes" can neither identify class members nor reasonably approximate any damages they might have suffered. *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 308 (5th Cir. 2003) (concluding that plaintiffs "failed to demonstrate that common issues of fact predominate[d] over . . . individual issues of fact" in these circumstances); *cf. Neurontin*, 244 F.R.D. at 113 (holding that "certification is inappropriate 'unless the class description is sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member'").

Variations among TPPs' policies toward Neurontin and the demographics of their insured populations also render it impossible for plaintiffs to "identify eligible (i.e., injured) class members." *Neurontin*, 244 F.R.D. at 112; *id.* at 113 (noting plaintiffs' failure to "identif[y] a single case where a court certified an over-broad class with members who were not injured"). As defendants' expert Dr. Bell has explained, many TPPs recommend or require the use of Neurontin to treat off-label conditions such as mood disorders, diabetic peripheral neuropathy, the treatment of cancer pain, chronic low back pain, and migraine. *See* Bell Decl. (Rowland Decl. Ex. 5) ¶ 59. In many instances, TPPs, including plaintiffs now before this Court, have made these recommendations or imposed these requirements after this lawsuit was instituted. *Id.* To determine whether a given TPP is an eligible class member—in particular, whether its reimbursement was caused by defendants' alleged misstatements or by its own actions—will necessarily require examination of its policies toward Neurontin. Because TPPs' varied policies demonstrate that they are differently situated in terms of their Neurontin utilization, and because defendants are entitled to defend against individual TPPs' claims by introducing evidence of these policies, the putative TPP classes cannot be certified. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513–14 (7th Cir. 2006) ("proposed class was not sufficiently definite to warrant class certification" in similar circumstances), *cert. denied*, 127 S. Ct. 2952 (2007); *see also TJX*, 246 F.R.D. at 398 (predominance requirement not satisfied in these circumstances).

Therefore, even if identification of eligible TPP class members and computation of their damages were susceptible to statistical analysis, these analyses necessarily would be individual—reflecting among other factors, the policies that each TPP adopted toward Neurontin. As Judge Weinstein recognized in refusing to certify a TPP class in similar circumstances, "epidemiological, demographic statistics and the operation of the law of large

9

numbers can not determine what each member of the class paid on behalf of its members." *In re Simon II Litig.*, 208 F.R.D. 490, 492–93 (E.D.N.Y. 2002) (Weinstein, J.). These determinations instead require examination of "[t]he books of each and the details of management," which in turn "require[s] extensive discovery and trial time" and precludes class certification. *Id.* at 493 (concluding that a putative TPP class failed to satisfy Rule 23(b)(3)'s manageability requirement in these circumstances); *cf. Neurontin*, 244 F.R.D. at 114–15 (noting that "[a] different problem in manageability exists for TPPs" and that "[i]t is unclear if that problem can be resolved statistically"). Professor Rosenthal's analysis does not suggest otherwise.

Individual inquiries into TPPs' books and management would be required to identify injured class members for another reason as well. A TPP is not injured simply by virtue of having been "called upon to reimburse for prescriptions that . . . would not have been written" but for misstatements made to "patients and the medical community concerning the safety and efficacy" of a prescription drug. *Rezulin*, 524 F. Supp. 2d at 441–42. Instead, to ascertain whether a TPP suffered an injury, "it is necessary to consider both the income and the expenditure sides of the insurer's balance sheet." *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 824 (7th Cir. 1999). This, in turn, requires comparisons of "the costs [each TPP] actually incurred against the costs [it] would have incurred" absent defendants' alleged conduct, and inquiries into the extent, if any, to which each TPP's costs exceeded the additional premiums that it collected from its insureds to cover the projected costs of increased Neurontin utilization. *Id.* at 823–24. Professor Rosenthal's report again fails to propose any means of determining whether a given TPP plaintiff has suffered injury (in the form of a compensable "net outlay," *id.*) short of individual inquiry into that TPP's books and the details of its management.

## CONCLUSION

For all the foregoing reasons, plaintiffs' pending motion for class certification should be denied.

Dated: September 10, 2008

Respectfully submitted,

DAVIS POLK & WARDWELL

By:  /s/James P. Rouhandeh
      James P. Rouhandeh

450 Lexington Avenue
New York, NY 10017
Tel:  (212) 450-4000

-and-

HARE & CHAFFIN

By:  /s/David B. Chaffin
      David B. Chaffin

160 Federal Street
Boston, MA 02110
Tel:  (617) 330-5000

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*