# EXHIBIT 3
# (PART I)

312

1   UNITED STATES DISTRICT COURT
2   DISTRICT OF MASSACHUSETTS
3   MDL Docket No. 1629
4   Master File No. 04-10981
5
6   * * * * * * * * * * * * * *
7   IN RE:  NEURONTIN MARKETING, SALES          *
8   PRACTICES, AND PRODUCTS LIABILITY           *
9   LITIGATION                                   *
10  - - - - - - - - - - - - - - - - - - - - -   *
11  THIS DOCUMENT RELATES TO:                    *
12  ALL MARKETING AND SALES PRACTICES            *
13  ACTIONS                                      *
14  * * * * * * * * * * * * * *
15
16              VOLUME II
17            PAGES 312 - 546
18
19
20     CONTINUED VIDEOTAPED DEPOSITION OF
21         MEREDITH B. ROSENTHAL, Ph.D.
22
23
24  DATE:  WEDNESDAY, OCTOBER 25, 2006
25  TIME:  9:03 A.M. TO 2:35 P.M.

M. ROSENTHAL

**Page 313**

1  CONTINUED VIDEOTAPED DEPOSITION OF
2  MEREDITH B. ROSENTHAL, Ph.D., a witness
3  called on behalf of the Defendants,
4  pursuant to the Federal Rules of Civil
5  Procedure, before Jessica L. Williamson,
6  Registered Merit Reporter, Certified
7  Realtime Reporter and Notary Public in and
8  for the Commonwealth of Massachusetts, at
9  the Offices of Hare & Chaffin, 160 Federal
10  Street, Boston, Massachusetts, on
11  Wednesday, October 25, 2006, commencing at
12  9:03 a.m.
13
14  A P P E A R A N C E S
15
16  HAGENS BERMAN SOBOL SHAPIRO LLP
17    (By Edward Notargiacomo, Esq.)
18    One Main Street
19    Fourth Floor
20    Cambridge, Massachusetts  02142
21    (617) 482-3700
22    ed@hbsslaw.com
23    Counsel for the Plaintiffs

**Page 314**

1  A P P E A R A N C E S, Continued
2
3  DAVIS POLK & WARDWELL
4    (By Edmund Polubinski III, Esq.
5    and Paul Mishkin, Esq.)
6    450 Lexington Avenue
7    New York, New York  10017
8    (212) 450-4429
9    edmund.polubinski@dpw.com
10    paul.mishkin@davispolk.com
11    Counsel for the Defendants
12
13  ALSO PRESENT:
14    Rahul Guha, Cornerstone Research

**Page 315**

1           I N D E X
2  DEPONENT                          PAGE
3  MEREDITH B. ROSENTHAL, Ph.D.
4  Examination By Mr. Polubinski      315
5
6           E X H I B I T S
7  NO.                               PAGE
8  15  Document headed "ICD-9 Codes   391
       for Neurontin, From IMS File,
9      Ben Sommers, August 3, 2005"
10 16  Affidavit of C. Seth           410
       Landefeld, M.D. and Michael
11     Steiman, M.D.
12 17  Document headed "National      425
       Ambulatory Medical Care
13     Survey, 2006 Patient Record"
14
15
16
17
18
19
20  Note: Original Exhibits 15 - 17 were
21  retained by the court reporter and
22  forwarded to Veritext New York for
23  distribution.

**Page 316**

1        PROCEEDINGS              09:03:09
2        THE VIDEOGRAPHER:  Good morning.    09:03:09
3  We are recording and are now on the record.  09:03:18
4  Today's date is October 25th, 2006, and the   09:03:20
5  time is 9:03 a.m.  My name is George          09:03:23
6  Dobrentey.  I'm a legal videographer for      09:03:27
7  Veritext New York.  This is the deposition   09:03:31
8  of Meredith Rosenthal, In Re:  Neurontin      09:03:32
9  Marketing and Practices Litigation in the    09:03:35
10 U.S. District Court for the District of      09:03:37
11 Massachusetts, Master File No. 04-10981.     09:03:39
12        This deposition is being taken at     09:03:43
13 160 Federal Street in Boston,                09:03:46
14 Massachusetts.  The court reporter is        09:03:48
15 Jessica Williamson.  The counsel will state  09:03:49
16 their appearances, and the court reporter    09:03:51
17 will administer the oath.                    09:03:53
18        MR. POLUBINSKI:  Ted Polubinski       09:03:55
19 from Davis Polk representing the             09:03:57
20 defendants.                                  09:03:59
21        MR. MISHKIN:  Paul Mishkin from       09:04:00
22 Davis Polk for the defendants.               09:04:01
23        MR. GUHA:  Rahul Guha from            09:04:05
24 Cornerstone Research.                        09:04:06
25        MR. NOTARGIACOMO:  Ed                 09:04:06

2 (Pages 313 to 316)

317

1  Notargiacomo, Hagens Berman Sobol Shapiro,    09:04:08
2  for the plaintiffs.    09:04:09
3
4      MEREDITH B. ROSENTHAL, Ph.D.,
5  a witness called on behalf of the
6  Defendants, having first been duly sworn,
7  was deposed and testifies as follows:
8
9      DIRECT EXAMINATION
10
11 BY MR. POLUBINSKI:    09:04:17
12 Q. Good morning, Professor Rosenthal.    09:04:17
13 A. Good morning.    09:04:21
14 Q. You would agree that a range of factors may    09:04:22
15    influence individual doctors' individual    09:04:25
16    prescription decisions, correct?    09:04:29
17     MR. NOTARGIACOMO: Objection.    09:04:31
18 A. Yes, I would agree with that.    09:04:31
19 Q. And if a particular factor might influence    09:04:32
20    a particular describing decision, is it at    09:04:35
21    least possible that the same factor could    09:04:37
22    also influence doctors' prescription    09:04:40
23    decisions in the aggregate?    09:04:42
24     MR. NOTARGIACOMO: Objection.    09:04:44
25 A. I'm not sure if I understand, but if a    09:04:44

318

1     factor influences an individual physician    09:04:49
2     and we're looking at the aggregate and that    09:04:51
3     physician's part of that aggregate, it    09:04:54
4     would certainly play out that way.    09:04:55
5  Q. Do you have a complete list of such factors    09:04:59
6     in mind now?    09:05:01
7  A. I have not created an exhaustive list of    09:05:02
8     such factors. I list examples in the    09:05:07
9     declaration. When I have more data    09:05:10
10    according to the data that we've requested,    09:05:15
11    I'll begin to develop a more exhaustive    09:05:17
12    list of factors.    09:05:19
13 Q. Okay. We would agree, though, that you    09:05:20
14    will need to at least consider all of the    09:05:24
15    various factors that might influence    09:05:26
16    prescribing behavior in developing your    09:05:28
17    model?    09:05:30
18 A. I will consider those factors, and as I    09:05:31
19    mentioned yesterday, in particular I'm    09:05:34
20    going to focus on factors, that is, the    09:05:36
21    primary factors that drive prescribing    09:05:38
22    choices, and those factors that might be    09:05:40
23    correlated with the variables of interest    09:05:42
24    here are the off-label, allegedly illegal    09:05:45
25    off-label promotional activities.    09:05:50

319

1  Q. Before we keep going I can tell that your    09:05:52
2     voice is --    09:05:58
3  A. I'm sorry.    09:05:58
4  Q. -- that you're having trouble with your    09:05:59
5     voice, so please let me know if you need to    09:06:00
6     take breaks at any point or if we can get    09:06:02
7     water for you or anything else --    09:06:04
8  A. Thank you.    09:06:06
9  Q. -- just so you know.    09:06:06
10        What I would like to do now is go    09:06:07
11    through a list of factors, and what I would    09:06:11
12    like you to do is to tell me whether you    09:06:15
13    agree that it's possible that the following    09:06:16
14    factors could affect a doctor's decision to    09:06:19
15    prescribe Neurontin off-label in a    09:06:22
16    particular case.    09:06:24
17 A. Okay. I understand.    09:06:26
18     MR. NOTARGIACOMO: Just for    09:06:28
19    clarification, the question is whether it    09:06:28
20    would affect them -- whether it would    09:06:30
21    affect an individual doctor's prescribing    09:06:33
22    decision --    09:06:37
23     MR. POLUBINSKI: You know,    09:06:37
24    let's --    09:06:38
25     MR. NOTARGIACOMO: -- or are you    09:06:39

320

1     asking that in the aggregate?    09:06:40
2        MR. POLUBINSKI: Well, that's a    09:06:42
3     good question.    09:06:42
4  BY MR. POLUBINSKI:    09:06:42
5  Q. I'd initially been thinking we would ask    09:06:43
6     about individual doctors, but maybe just to    09:06:45
7     cut through this a little bit why don't we    09:06:48
8     ask whether these factors could affect    09:06:49
9     doctors' prescribing decisions in the    09:06:51
10    aggregate.    09:06:52
11 A. We can agree that the aggregate is the sum    09:06:53
12    of the individuals, and --    09:06:55
13 Q. Exactly. And that the two are connected in    09:06:55
14    the same way that you've just testified,    09:06:58
15    correct?    09:07:00
16 A. I can agree with that, yes.    09:07:01
17 Q. All right. The first possible factor is a    09:07:04
18    new article in a peer-reviewed medical    09:07:07
19    publication on the use of Neurontin to    09:07:09
20    treat the applicable condition?    09:07:11
21 A. That may have an effect, yes.    09:07:14
22 Q. How about a new case report in a more    09:07:16
23    informal medical publication on the use of    09:07:18
24    Neurontin to treat the applicable    09:07:20
25    condition?    09:07:21

### Page 321

1  A. Potentially that can have an effect as well 09:07:21
2     if it were disseminated. 09:07:25
3  Q. How about a new article in a peer-reviewed 09:07:26
4     medical publication or any other medium 09:07:28
5     really on the use of a drug with a similar 09:07:30
6     mechanism of action to Neurontin to treat 09:07:32
7     the applicable condition? 09:07:35
8        MR. NOTARGIACOMO: Objection. 09:07:37
9  A. That may be possible. 09:07:37
10 Q. How about a new article in a peer-reviewed 09:07:40
11    medical publication or some other medium on 09:07:42
12    the inefficacy of a different drug that had 09:07:44
13    been used to treat the applicable 09:07:47
14    condition? 09:07:48
15       MR. NOTARGIACOMO: Objection. 09:07:49
16 A. It seems like we're getting further and 09:07:49
17    further away from a main effect here, but 09:07:52
18    it's certainly possible that that could 09:07:54
19    have some effect. 09:07:55
20 Q. Okay. How about a new article in a peer- 09:07:57
21    reviewed medical publication or any other 09:08:01
22    medium on the safety of Neurontin? 09:08:03
23 A. I can imagine that having an effect on its 09:08:05
24    use, yes. 09:08:10
25 Q. How about a new article in a peer-reviewed 09:08:10

### Page 322

1     medical publication or some other medium on 09:08:15
2     the safety of a different drug that has 09:08:17
3     been used to treat the applicable 09:08:18
4     condition? 09:08:20
5        MR. NOTARGIACOMO: Objection. 09:08:20
6        MR. POLUBINSKI: What's -- can I 09:08:22
7     ask what the grounds of the objection are? 09:08:23
8        MR. NOTARGIACOMO: I think "or any 09:08:25
9     other medium" is vague. It could just be 09:08:28
10    about anything, so that's my objection. I 09:08:31
11    think the questions are vague. 09:08:33
12       MR. POLUBINSKI: All right. Well, 09:08:34
13    let me just -- let me hone it. That's 09:08:35
14    fine. 09:08:37
15 BY MR. POLUBINSKI: 09:08:38
16 Q. A new article in any medical publication on 09:08:38
17    the safety of a different drug that had 09:08:43
18    been used to treat the applicable 09:08:45
19    condition? 09:08:47
20       MR. NOTARGIACOMO: Objection. 09:08:48
21 A. Yes, that could have an effect. 09:08:48
22 Q. How about an initiative by a manufacturer 09:08:50
23    to disseminate any of those publications? 09:08:55
24 A. Yes, that could certainly have an effect as 09:08:57
25    well. 09:09:01

### Page 323

1  Q. How about a continuing medical education 09:09:01
2     seminar addressing the use of Neurontin to 09:09:04
3     treat the applicable condition? 09:09:06
4  A. I'm sorry, so that's the main thing we're 09:09:07
5     talking about, right? So this is a 09:09:13
6     continuing education seminar on whatever 09:09:15
7     the indication, was the original subject 09:09:17
8     here that we're looking at. 09:09:20
9  Q. And the use of Neurontin to treat that 09:09:21
10    condition. 09:09:24
11 A. Yes, certainly. 09:09:24
12 Q. How about a more informal talk given by -- 09:09:24
13    just a more informal talk maybe given by an 09:09:28
14    authority in the field that addresses the 09:09:31
15    use of Neurontin to treat the applicable 09:09:32
16    condition? 09:09:34
17 A. Potentially that could have an effect as 09:09:34
18    well. 09:09:38
19 Q. How about a continuing medical education 09:09:38
20    seminar that addresses the use of a drug 09:09:40
21    with a similar mechanism of action to 09:09:42
22    Neurontin to treat the applicable 09:09:44
23    condition? 09:09:46
24 A. Again, similarly it could have an effect. 09:09:46
25 Q. How about a continuing medical education 09:09:50

### Page 324

1     seminar on the inefficacy of a different 09:09:52
2     drug that had been used to treat the same 09:09:55
3     condition we've been talking about? 09:09:57
4  A. Yes, that could have an effect, too. 09:09:58
5  Q. How about an informal conversation among 09:10:01
6     doctors about the doctor's clinical 09:10:03
7     experience in the use of Neurontin to treat 09:10:06
8     the condition that we're talking about? 09:10:08
9  A. Yes, that could affect prescribing 09:10:09
10    patterns, too. 09:10:13
11 Q. How about an informal conversation among 09:10:15
12    doctors about their clinical experience on 09:10:17
13    the use of a drug with a similar mechanism 09:10:19
14    of action to Neurontin to treat the 09:10:21
15    applicable condition? 09:10:22
16 A. I'm losing score here, but I think if we 09:10:24
17    haven't already covered that one, I think 09:10:28
18    that, yes, that could have an effect. 09:10:29
19 Q. Okay. How about a change in formal 09:10:31
20    practice guidelines within an institution 09:10:33
21    or a professional group? 09:10:37
22 A. Can you explain what you mean by "formal 09:10:38
23    practice guidelines"? 09:10:42
24 Q. Do you have an understanding of what a 09:10:44
25    formal practice guideline might be with 09:10:47

4 (Pages 321 to 324)

**325**

1  respect to a prescription drug?
2  A. Yes. My understanding is often guidelines
3  are not specific to drugs, so usually the
4  guidelines refer to class of drugs or to
5  the pharmaceutical treatment following
6  surgery, for example, but there may be
7  guidelines that are specific to a specific
8  drug in terms of whether to use it only
9  after a patient has failed on something
10 else, for example. So are those the kinds
11 of guidelines that you're talking about?
12 Q. Yeah. Let's focus on the latter that
13 you've just described --
14 A. Okay.
15 Q. -- that sort of deal with the use of a
16 particular prescription drug. Could a
17 change in those guidelines affect the
18 prescription of Neurontin for a particular
19 off-label condition?
20 A. Assuming such guidelines existed that were
21 specific to Neurontin, yes.
22 Q. And the same would be true for informal
23 practice guidelines, the same way they
24 would be for more formal ones?
25 A. Can you tell me what you mean by "informal

**326**

1  practice guidelines"?
2  Q. Why don't -- why don't I withdraw the
3  question and just -- I'll withdraw the
4  question, that's fine.
5  A. Okay.
6  Q. How about a new development in the
7  underlying science in the particular field
8  that relates to the particular indication?
9  A. So you mean the basic science --
10 Q. Yes.
11 A. -- underpinnings?
12    I guess if -- I don't know how
13 those kinds of changes translate into
14 clinical practice. That information would
15 have to disseminate somehow.
16 Q. Should it have disseminated somehow, could
17 it have impacted doctors' prescribing
18 behavior with respect to Neurontin for that
19 indication?
20 A. I guess potentially, again, it seems second
21 order relative to clinical changes.
22 Q. How about a discussion of the use of
23 Neurontin in a medical school class to
24 treat the applicable condition?
25 A. What effect would it have on current

**327**

1  practice? Because it seems tenuous to me,
2  but...
3  Q. What about an effect on practice at some
4  point in the future?
5  A. Perhaps at some point in the future it
6  could have an effect if those students took
7  that knowledge and used it in practice
8  subsequently.
9  Q. How about a change in the availability of
10 therapeutic substitutes for treating a
11 particular condition?
12 A. That would certainly have an effect.
13 Q. How about FDA approval of Neurontin for a
14 related use?
15 A. That can potentially have an effect as
16 well.
17 Q. How about FDA approval of a drug with a
18 similar mechanism of action to Neurontin
19 for the applicable use?
20 A. I'm sorry, could you repeat it? I'm again
21 losing all --
22 Q. Yeah, sure.
23 A. -- the questions.
24    MR. POLUBINSKI: Do you want to
25 read it back.

**328**

1  A. Thank you.
2     (Record read.)
3  A. Yes, that could have an effect.
4  Q. How about FDA approval of a drug with a
5  similar mechanism of action to Neurontin
6  for a related use?
7  A. Potentially that could have an effect as
8  well. Again, it seems second order.
9  Q. How about approval of Neurontin for the
10 applicable use in another country?
11 A. I guess possibly it could have an effect.
12 I think it's an empirical question. I
13 don't actually know.
14 Q. Okay. And when you say "it's an empirical
15 question," what does that mean?
16 A. I mean, it's not clear to me that
17 physicians in this country would be
18 influenced by -- would know or be
19 influenced by what was proved in other
20 countries.
21 Q. But you couldn't rule out the possibility
22 without examining the data; is that
23 correct?
24 A. That's correct. If I were interested in
25 that question, I would need to look at the

Page 329

```
 1    data.                                          09:14:17
 2  Q. How about approval of Neurontin for a         09:14:17
 3    related use in another country?                09:14:21
 4  A. Yes, that could have an effect in the same    09:14:22
 5    way.                                           09:14:26
 6  Q. An approval of a drug with a similar          09:14:26
 7    mechanism of action for the applicable use     09:14:29
 8    in another country?                            09:14:31
 9  A. Yes.                                          09:14:33
10  Q. How about a change in information on          09:14:35
11    Neurontin in the Physicians' Desk              09:14:37
12    Reference?                                     09:14:40
13  A. Yes. I guess depending on what kind of        09:14:42
14    information you're talking about, if it        09:14:44
15    were salient information of some kind. I'm     09:14:45
16    not sure what kind of information you're       09:14:48
17    talking about.                                 09:14:49
18  Q. Well, let's think of a couple of examples.    09:14:52
19  A. Okay.                                         09:14:54
20  Q. What about a change to the long list of       09:14:55
21    possible adverse events; could that have an    09:14:57
22    impact on prescribing behavior?                09:15:01
23  A. Potentially.                                  09:15:02
24  Q. How about a warning on the label?             09:15:02
25  A. Potentially.                                  09:15:04
```

Page 330

```
 1  Q. Okay. How about a change in information in    09:15:05
 2    the Physicians' Desk Reference on other        09:15:12
 3    drugs with a similar mechanism of action?      09:15:14
 4  A. That could potentially have an effect again   09:15:15
 5    in substitution.                               09:15:18
 6  Q. Okay. How about information posted on a       09:15:19
 7    bulletin board on the Internet about           09:15:20
 8    Neurontin and treating the applicable          09:15:24
 9    condition?                                     09:15:26
10  A. I suppose plausibly that someone could use    09:15:27
11    that information.                              09:15:31
12  Q. How about more specifically information       09:15:33
13    that's posted on a medical information site    09:15:34
14    on the Internet on treatment of the            09:15:37
15    applicable condition with Neurontin?           09:15:40
16  A. I guess that could also have an effect        09:15:42
17    potentially.                                   09:15:45
18  Q. How about detailing visits about Neurontin?   09:15:52
19  A. As we discussed yesterday, we'd certainly     09:15:55
20    expect detailing visits to affect all          09:15:58
21    prescribing.                                   09:16:01
22  Q. How about detailing visits about              09:16:02
23    competitive drugs?                             09:16:05
24  A. Yes, those should have an effect as well.     09:16:06
25  Q. Provision of samples of Neurontin without     09:16:08
```

Page 331

```
 1    any other informational content?               09:16:10
 2  A. I'm --                                        09:16:13
 3  Q. Does my question make sense?                  09:16:16
 4  A. So you mean a detailer who comes, drops off   09:16:17
 5    samples and runs away without discussing       09:16:20
 6    the drug?                                      09:16:22
 7  Q. Without actually getting in to speak with     09:16:22
 8    the doctor.                                    09:16:25
 9  A. We think free samples do have an effect       09:16:25
10    independently of the detailing visit,          09:16:28
11    although it's often difficult to tell.         09:16:29
12  Q. How about provision of samples of             09:16:31
13    competitor drugs without any other             09:16:34
14    informational content?                         09:16:35
15  A. Yes, that would have an effect.               09:16:37
16  Q. How about dissemination of the                09:16:38
17    manufacturer's own literature or brochures     09:16:39
18    or things like that?                           09:16:42
19  A. Potentially that would have an effect.        09:16:42
20  Q. What about the relative cost or price of      09:16:46
21    Neurontin relative to -- withdrawn.            09:16:50
22      How about the cost of Neurontin              09:16:53
23    relative to competitor drugs?                  09:16:55
24  A. Cost to whom?                                 09:16:57
25  Q. Good question. Let's take, for example,      09:16:58
```

Page 332

```
 1    the cost to a consumer who's paying for the    09:17:05
 2    prescription him or herself.                   09:17:07
 3  A. So you mean a change in the co-payment, for   09:17:08
 4    example?                                       09:17:10
 5  Q. Uh-huh. Or for somebody who's not insured     09:17:11
 6    or for whom the prescription isn't insured.    09:17:14
 7  A. That price in theory would have an effect.    09:17:17
 8    As you know, these price effects are hard      09:17:20
 9    to identify because of the fact that most      09:17:22
10    people don't pay those prices out of           09:17:24
11    pocket.                                        09:17:26
12  Q. Okay. How about a change in the relative      09:17:26
13    cost or price of a drug paid by third-party    09:17:30
14    payers, reimbursement for the drug?            09:17:35
15  A. Potentially there could be some kind of       09:17:36
16    effect there. It's not clear that it's a       09:17:38
17    linear effect, that there is an effect for     09:17:40
18    every increment that has to do with the --     09:17:44
19    at some level the relative price may           09:17:46
20    matter.                                        09:17:47
21  Q. How about insurance coverage guidelines for   09:17:49
22    Neurontin?                                     09:17:51
23  A. Can you explain what you mean by "insurance   09:17:52
24    coverage guidelines"? Just simply whether      09:17:56
25    it's covered or not?                           09:17:58
```

333
1  Q. Yeah.
2  A. Certainly whether it's covered or not will
3     have an effect on its use.
4  Q. And will whether or not a competitor drug
5     is covered have an effect on Neurontin's
6     use for that condition -- for the
7     applicable condition?
8  A. Yes.
9  Q. Now, we've been talking about insurance
10    coverage guidelines. How about coverage
11    guidelines for PBMs? Do you know what I'm
12    talking about when I say PBM?
13 A. I do know what you're talking about when
14    you say PBM. And, again, do you mean just
15    whether or not it's covered?
16 Q. I do.
17 A. Okay. Then the same way, must ensure that
18    a PBM is acting essentially as the insurer
19    for pharmaceuticals, so...
20 Q. How about the use of a prior authorization
21    program by a third-party payer for
22    Neurontin?
23 A. If a third-party payer required prior
24    authorization, that would have an effect on
25    Neurontin prescribing.

334
1  Q. Do you know what a disease management
2     program is?
3  A. I do. Do you?
4  Q. Why don't I ask you to tell me what it is,
5     at least as you understand it.
6  A. Disease management programs are usually
7     condition-specific, although sometimes
8     they're more complex efforts to coordinate
9     and improve the quality of care for people
10    with chronic diseases, clearly.
11 Q. Okay. Would the implementation of a
12    disease management program have an
13    impact -- an implementation of a disease
14    management program that offers guidelines
15    in the treatment of the applicable
16    condition have an impact on the use of
17    Neurontin to treat that condition?
18 A. Again, if that program had guidelines that
19    were specific to Neurontin therapy, then
20    that could have an effect.
21 Q. Are you familiar with the term "academic
22    detailing"?
23 A. I am.
24 Q. What does that mean?
25 A. Academic detailing is an effort to inform

335
1     physicians about pharmaceutical therapies
2     generally, it could be on any topic, but
3     pharmaceutical therapies in the same way
4     that the industry does but using scientific
5     data instead of commercial promotional
6     information. So it's one-on-one. That's
7     the important piece of it, is that it's
8     peer-to-peer, one-on-one counseling.
9  Q. Would the implementation of an academic
10    detailing program on Neurontin have an
11    impact on prescription behavior with
12    respect to Neurontin?
13 A. If such a program were targeting Neurontin
14    use, then yes.
15 Q. All right. How about the availability of
16    Neurontin on a hospital or insurance
17    formulary?
18 A. Whether it's on the formulary would be
19    similar to whether it's covered, so yes,
20    the same way.
21 Q. And how about the availability of a
22    competitor drug on a formulary, an
23    insurance or hospital formulary?
24 A. Yes, same.
25 Q. How about a decision by a hospital to bar

336
1     acceptance of samples by its professionals?
2  A. Yes, I would expect that to have some
3     effect.
4  Q. How about a newspaper article reflecting
5     concerns about improper promotion by
6     defendants for off-label uses?
7  A. I suppose that could have some effect as
8     well.
9  Q. And you're familiar with the Franklin case;
10    you testified about that yesterday?
11 A. Yes.
12 Q. How about a news broadcast on the Franklin
13    case; would that have an impact on doctors'
14    prescribing behavior of Neurontin?
15 A. Potentially.
16 Q. How about an advertisement by a law firm
17    seeking to recruit individuals who have
18    taken Neurontin to file personal injury
19    lawsuits against the defendants?
20 A. I guess I'm not sure how those would get
21    out to physicians, but if physicians saw
22    such advertisements, possibly.
23 Q. So am I correct that your model would need
24    to at least consider whether to take into
25    account each of the factors that we've just

Page 337

1  discussed in determining the effects of          09:22:15
2  off-label promotional events and                 09:22:17
3  expenditures on total aggregate                  09:22:19
4  prescriptions of Neurontin?                      09:22:21
5  A. So the model -- in setting up the model       09:22:22
6  I'll consider those factors that I deem to       09:22:26
7  be important determinants of quantity and        09:22:30
8  in particular where I would spend most of        09:22:33
9  my time worrying about those where the           09:22:36
10 timing is correlated with the off-label          09:22:38
11 promotions, the levels. The intensity of         09:22:40
12 these other factors could be correlated and      09:22:44
13 therefore confused with the off-label            09:22:47
14 promotions.                                      09:22:48
15     In addition, there are elements of           09:22:50
16 the model intended to capture some of these      09:22:53
17 other factors. For example, by using time        09:22:55
18 trends, linear quadratic time trends to          09:22:59
19 capture other secular trends in what's           09:23:04
20 happening in the market by including             09:23:07
21 variables on other drugs. So certainly           09:23:09
22 those factors would be considered and            09:23:12
23 incorporated either explicitly or captured       09:23:14
24 in the time trend, the secular trend.            09:23:16
25 Q. Okay. Just so I understand it, though, I      09:23:19

Page 338

1  think you are saying that you would need to      09:23:21
2  at least consider the various factors that       09:23:23
3  we talked about?                                 09:23:25
4  A. Can we agree what "consider" means?           09:23:26
5  Q. Consider to the extent they need to be        09:23:29
6  reflected in your model.                         09:23:32
7  A. Certainly I'll consider a wide range of       09:23:33
8  factors, including the types that we've          09:23:35
9  just discussed.                                  09:23:38
10 Q. Do you know how many in total there could     09:23:39
11 be?                                              09:23:43
12 A. No, I don't think it's possible to say.       09:23:43
13 And certainly the numbers depend on whether      09:23:47
14 you define them as finely as you have done       09:23:49
15 or if you, say, consider, you know,              09:23:52
16 promotional efforts of competitors, new          09:23:54
17 drug introduction, so there may be many          09:24:00
18 that we consider.                                09:24:01
19 Q. There could be -- withdrawn.                  09:24:06
20     How do you plan to consider these            09:24:08
21 different factors?                               09:24:11
22 A. Well, I will start with the literature on     09:24:12
23 what -- the impact of promotion on drug          09:24:16
24 utilization and look at models that have         09:24:21
25 been done in the past and what factors           09:24:23

Page 339

1  they've included, and certainly of course        09:24:25
2  those do include things like, as you've          09:24:29
3  mentioned, competitor new drug entry into        09:24:31
4  the class, competitors' promotional              09:24:35
5  efforts, other secular trends that may           09:24:38
6  affect prescribing.                              09:24:41
7  Q. Aside from reviewing the literature to see    09:24:42
8  what past models have done, what else would      09:24:46
9  you need to do?                                  09:24:48
10 A. The first place I would start is the          09:24:49
11 literature for sure. I may consult some of       09:24:52
12 my clinical colleagues as well.                  09:24:54
13 Particularly I may try to find experts in        09:24:57
14 the treatment -- in the areas of treatment       09:24:58
15 for the indications that ultimately I'm          09:25:01
16 asked to model the indications.                  09:25:05
17 Q. Do you need, yourself, to actually look at    09:25:06
18 data with respect to some number or all of       09:25:09
19 these factors to figure out whether they         09:25:11
20 had a measurable impact on prescription          09:25:13
21 decisions?                                       09:25:17
22 A. Not necessarily. Modeling strategies          09:25:17
23 generally -- and economics you start with a      09:25:20
24 good theoretical model and include those         09:25:23
25 variables that should theoretically be           09:25:26

Page 340

1  included. There is, of course, some point        09:25:28
2  when you're specifying the model itself          09:25:30
3  that you need to look at data. You can't         09:25:33
4  always include all variables because of          09:25:34
5  high degrees of correlation, for example.        09:25:36
6  Then at that point I would need to see           09:25:40
7  data, but the starting point is really to        09:25:41
8  develop a good theory.                           09:25:43
9  Q. But at some point -- I guess would you rely   09:25:46
10 on your theory alone, then, to rule out          09:25:49
11 whether to consider individual factors in        09:25:51
12 running your model?                              09:25:55
13 A. Not alone, but in some cases I might rely     09:25:56
14 alone on the theories. For example, there        09:26:00
15 are some things that I wouldn't include,         09:26:03
16 the ambient temperature based on the theory      09:26:06
17 that it has no affect on Neurontin               09:26:09
18 prescribing, and so I wouldn't consider          09:26:12
19 data on that.                                    09:26:14
20 Q. Fair enough. I think what we're talking       09:26:14
21 about are the factors that we've just            09:26:16
22 discussed. For purposes of those factors         09:26:18
23 do you anticipate relying on the literature      09:26:19
24 to exclude any of them from your analysis?       09:26:21
25 A. I would anticipate relying on the             09:26:24

8 (Pages 337 to 340)

### Page 341

| | | |
|---|---|---|
| 1 | literature and data where possible, but it | 09:26:27 |
| 2 | does seem possible to me that I won't have | 09:26:29 |
| 3 | data on every one of those factors, and | 09:26:31 |
| 4 | then I would rely on theory and the | 09:26:33 |
| 5 | literature as to whether it was an | 09:26:35 |
| 6 | important factor. | 09:26:41 |
| 7 | Q. Maybe just to get a little more precision | 09:26:54 |
| 8 | on this why don't we go back and look at a | 09:26:57 |
| 9 | few of these individual things -- | 09:27:00 |
| 10 | A. Okay. The ones you mentioned? | 09:27:00 |
| 11 | Q. Yeah, a few of the factors that we | 09:27:01 |
| 12 | discussed -- | 09:27:03 |
| 13 | A. Okay. | 09:27:03 |
| 14 | Q. -- that you said might impact physician | 09:27:03 |
| 15 | prescribing behavior. Let's start with the | 09:27:05 |
| 16 | first one, which is an article in a peer- | 09:27:09 |
| 17 | reviewed medical publication on the use of | 09:27:12 |
| 18 | Neurontin to treat the applicable | 09:27:13 |
| 19 | condition. | 09:27:15 |
| 20 | A. Okay. | 09:27:15 |
| 21 | Q. How do you anticipate that you would go | 09:27:15 |
| 22 | about finding out whether you would include | 09:27:20 |
| 23 | that particular publication -- whether you | 09:27:22 |
| 24 | would include publication of a particular | 09:27:24 |
| 25 | article in your model? | 09:27:25 |

### Page 342

| | | |
|---|---|---|
| 1 | A. In that case of those articles, if there | 09:27:28 |
| 2 | were significant studies published, new | 09:27:32 |
| 3 | data published on Neurontin, in all | 09:27:34 |
| 4 | likelihood we would search PubMed and find | 09:27:36 |
| 5 | those articles and look to see about their | 09:27:41 |
| 6 | timing and see whether it made sense to | 09:27:43 |
| 7 | include them in the model. | 09:27:46 |
| 8 | Q. And so you would analyze each individual | 09:27:50 |
| 9 | article as to whether it fit that -- fit | 09:27:52 |
| 10 | those criteria? | 09:27:54 |
| 11 | A. In all likelihood the number of articles | 09:27:55 |
| 12 | providing new data on Neurontin is a | 09:27:58 |
| 13 | reasonable number that we can find in the | 09:28:00 |
| 14 | literature review and decide which of them | 09:28:02 |
| 15 | provides new data on either effects or side | 09:28:05 |
| 16 | effects of Neurontin. | 09:28:09 |
| 17 | Q. What would you believe the reasonable | 09:28:10 |
| 18 | number to be for purposes of your last | 09:28:14 |
| 19 | answer? | 09:28:16 |
| 20 | A. You mean whether it would be feasible? | 09:28:16 |
| 21 | Q. Yeah. | 09:28:19 |
| 22 | A. I don't know. Something less than a | 09:28:19 |
| 23 | thousand. | 09:28:21 |
| 24 | Q. Okay. But it's at least possible that some | 09:28:21 |
| 25 | number less than a thousand articles would | 09:28:35 |

### Page 343

| | | |
|---|---|---|
| 1 | have had some impact on prescribing | 09:28:38 |
| 2 | behavior of Neurontin -- | 09:28:41 |
| 3 | MR. NOTARGIACOMO: Objection. | 09:28:42 |
| 4 | Q. -- for off-label uses? | 09:28:43 |
| 5 | A. I believe I've already said it's at least | 09:28:44 |
| 6 | possible. | 09:28:46 |
| 7 | Q. Okay. We also talked about new articles in | 09:28:46 |
| 8 | peer-reviewed medical publications on the | 09:28:55 |
| 9 | use of drugs with similar mechanisms of | 09:28:59 |
| 10 | action to Neurontin to treat conditions. | 09:29:01 |
| 11 | How would you go about determining whether | 09:29:04 |
| 12 | that's a factor that you would include in | 09:29:06 |
| 13 | your model? | 09:29:08 |
| 14 | A. I think in that case I would need to | 09:29:09 |
| 15 | consult a clinical expert in those areas. | 09:29:12 |
| 16 | Clearly I couldn't make that judgment about | 09:29:15 |
| 17 | whether it was a similar mechanism. | 09:29:18 |
| 18 | Q. And once -- well, first question is, you | 09:29:28 |
| 19 | haven't consulted a clinical expert on that | 09:29:30 |
| 20 | now, I take it? | 09:29:32 |
| 21 | A. No, I have not. | 09:29:32 |
| 22 | Q. Okay. And then when you did, if you came | 09:29:33 |
| 23 | up with a list of drugs with a similar | 09:29:37 |
| 24 | mechanism of action, would you do the same | 09:29:39 |
| 25 | sort of search of PubMed that you described | 09:29:42 |

### Page 344

| | | |
|---|---|---|
| 1 | before -- | 09:29:45 |
| 2 | A. Poten -- | 09:29:45 |
| 3 | Q. -- for articles? | 09:29:46 |
| 4 | A. Sorry. I'm still cutting you off. | 09:29:47 |
| 5 | Potentially in combination with | 09:29:52 |
| 6 | some input from said clinical expert, so it | 09:29:54 |
| 7 | would certainly make sense to use some | 09:29:56 |
| 8 | clinical expertise on what were the | 09:30:02 |
| 9 | important trends in treatment in this area. | 09:30:04 |
| 10 | Q. Okay. One of the other factors that we | 09:30:06 |
| 11 | discussed was a continuing medical | 09:30:16 |
| 12 | education seminar addressing the use of | 09:30:18 |
| 13 | Neurontin to treat an applicable condition. | 09:30:20 |
| 14 | How would you go about determining whether | 09:30:22 |
| 15 | a particular seminar would have had an | 09:30:25 |
| 16 | impact on prescribing behavior? | 09:30:27 |
| 17 | A. So in part we have seen data collected by | 09:30:28 |
| 18 | Parke-Davis, fill in Warner-Lambert there. | 09:30:34 |
| 19 | Q. We can say defendants, to make it easier. | 09:30:39 |
| 20 | A. Defendants. The defendants have some data | 09:30:41 |
| 21 | on CME, continuing medical education, for | 09:30:42 |
| 22 | Neurontin. They have documented events and | 09:30:47 |
| 23 | attendance, that sort of thing. So we do | 09:30:50 |
| 24 | have some data there. And so I would start | 09:30:53 |
| 25 | with that. | 09:30:57 |

345
1  Q. Are there any other sources of data that
2     you would look to on this, or would that be
3     the principal source?
4  A. I think that would be the principal source.
5     There are also data collected by IMS Health
6     in the aggregate on meetings and events
7     associated with drugs, including Neurontin
8     and Neurontin's competitors.
9  Q. Okay. In terms of the first category of
10    data, the data from defendants, is it your
11    understanding that that data will include
12    information about events that the
13    defendants didn't sponsor? When I say
14    "events," I mean continuing medical
15    education events.
16 A. I'm not altogether clear on whether they
17    only have data on events that they
18    sponsored or events where they had
19    sponsored a speaker, for example, so made a
20    payment for a physician to give a talk
21    about research. So it may be that there
22    are some meetings and events that they
23    don't have direct spending -- direct record
24    of.
25 Q. Is it your view that meetings or events

346
1     that weren't supported by the defendants
2     could have had an impact on prescribing
3     behavior of Neurontin for off-label uses?
4  A. Potentially.
5  Q. And how would you go about finding out
6     whether those events had a measurable
7     impact?
8  A. I think at this point I haven't tried to
9     get all the data on this, but I guess as a
10    starting place I would start with the
11    relevant medical societies. So, again,
12    condition by condition there would be
13    different relevant medical societies.
14 Q. When you say you would start with the
15    relevant medical societies, what would you
16    do?
17 A. So contact, excuse me, the medical
18    education staff at the medical societies
19    for neurology, for psychiatry, yes, as was
20    relevant, see what kind of data they had.
21 Q. And what impact would it have on your
22    analysis if they didn't have data
23    stretching back to the beginning of the
24    class period, 1994?
25 A. Then I would have to consider other

347
1     mechanisms for modeling that effect.
2  Q. What other mechanisms would you consider?
3  A. So in part the time trend might pick up
4     these kinds of events. The other variables
5     that we talked about, including publication
6     of new articles, might pick up the timing
7     of these events. If the publication of new
8     articles, you know, was -- as you may know,
9     the timing of publication of new releases
10    is often coordinated with national
11    meetings.
12        So, for example, you always see
13    the latest results of cardiovascular
14    disease clinical trials come out at the
15    same time as the big CME events for
16    cardiovascular specialists. And so I
17    looked at those kinds of data.
18 Q. When you say in your last answer "pick up
19    the timing of these events" --
20 A. Yes.
21 Q. -- can you tell me what that means?
22 A. It would be because the events in the model
23    essentially would be capturing a point in
24    time. There are indicator variables as I
25    described, so if there was an event, there

348
1     would be a variable for the point in time
2     at which that happens, and then potentially
3     the time since the event, and therefore if
4     a meeting and an article come out at the
5     same time, they essentially are capturing
6     the same information as far as the model's
7     concerned.
8  Q. Assuming that the two are coordinated?
9  A. Right.
10 Q. How would you decide whether they're
11    sufficiently coordinated that you would be
12    able to use that analysis?
13 A. Well, I would have to review on a case-by-
14    case basis.
15 Q. When you say "a case-by-case basis," would
16    that be with respect to each individual
17    event?
18 A. Again, I think in this area I would consult
19    someone who's an expert in the treatment of
20    this particular condition for a way to
21    prioritize what are the important meetings,
22    for example, what were the important
23    clinical findings from this era.
24 Q. And, again, just going back to where you
25    would come up with a list of meetings,

### 349

1   other than reaching out to the relevant          09:35:23
2   medical societies?                               09:35:25
3   A. And defendants' own data. Again, IMS          09:35:26
4   Health tracks these, tracks spending for         09:35:31
5   events, meetings and events, and I would         09:35:32
6   look to other data sources in the industry.      09:35:35
7   Q. Okay. Let's go on to one of the other         09:35:37
8   factors.                                         09:35:40
9   A. Okay.                                         09:35:40
10  Q. One of the other things that we agreed        09:35:41
11  might impact prescribing behavior in the         09:35:43
12  aggregate would be an informal conversation      09:35:45
13  among doctors -- or informal conversations       09:35:49
14  among doctors -- let's put it that way --        09:35:52
15  A. Yes.                                          09:35:54
16  Q. -- about the doctors' clinical experience     09:35:54
17  in the use of Neurontin to treat the             09:35:57
18  applicable condition. How would you decide       09:35:58
19  whether to incorporate that into your            09:36:00
20  model?                                           09:36:02
21  A. So clearly that would not be incorporated     09:36:02
22  into the model. That's -- as we talked           09:36:04
23  about yesterday, the model doesn't include       09:36:08
24  every factor. It's a simplification of           09:36:11
25  reality that focuses on major factors and        09:36:15

### 350

1   particularly those that might be correlated      09:36:19
2   with the variable of interest, again, the        09:36:21
3   allegedly illegal promotional activity.          09:36:24
4           And so in the case of                    09:36:27
5   conversations between doctors I have no          09:36:28
6   reason to believe that those, other than         09:36:32
7   those caused by the allegedly illegal            09:36:34
8   activities, would be correlated with the         09:36:36
9   allegedly illegal activities. And in             09:36:40
10  effect transmission of information among         09:36:43
11  physicians would be captured in that time        09:36:46
12  trend.                                           09:36:49
13  Q. How confident are you that conversations      09:36:49
14  among doctors couldn't be correlated with        09:36:55
15  off-label promotion in some way? So in           09:36:57
16  other words, you know, isn't it possible at      09:36:59
17  least that, you know, by virtue of, you          09:37:01
18  know, buzz in the medical community, for         09:37:07
19  lack of a better word, about a particular        09:37:09
20  off-label use that the defendants would          09:37:10
21  increase off-label promotion?                    09:37:11
22  A. Well, again, the model will took to the       09:37:12
23  specific timing of the promotional events,       09:37:16
24  and so if the buzz preceded the promotional      09:37:18
25  events or activities, then the buzz would        09:37:21

### 351

1   be captured as something other than caused       09:37:25
2   by the allegedly illegal activities.             09:37:29
3           And so because I'll be looking at        09:37:31
4   the specific time of these events and            09:37:34
5   separating out secular trends, which would       09:37:35
6   include the sort of natural diffusion of         09:37:38
7   information about Neurontin, I'm fairly          09:37:40
8   confident that those things can be               09:37:43
9   separated.                                       09:37:45
10  Q. If they couldn't be separated, your results   09:37:52
11  would be biased; is that correct?                09:37:57
12  A. If there was a correlation between them,      09:37:58
13  then there would be some bias, yes.              09:38:04
14  Q. And if they were correlated -- well, I'll     09:38:12
15  withdraw the question.                           09:38:17
16          All right. One of the other              09:38:20
17  things that we discussed was changes in          09:38:23
18  practice guidelines within an institution        09:38:26
19  or professional group on the use of              09:38:29
20  Neurontin to treat a particular condition?       09:38:31
21  A. Yes.                                          09:38:34
22  Q. We agreed that that could potentially         09:38:34
23  impact prescribing behavior in the               09:38:36
24  aggregate, correct?                              09:38:37
25  A. Yes, we did.                                  09:38:38

### 352

1   Q. How would you go about determining whether    09:38:39
2   or not to include that factor in your            09:38:42
3   model?                                           09:38:43
4   A. I guess, again, in this case it would make    09:38:44
5   sense to consult a clinical expert for the       09:38:47
6   conditions considered.                           09:38:49
7   Q. What information would you get from the       09:38:50
8   clinical expert?                                 09:38:52
9   A. About standard practices in terms of          09:38:52
10  guidelines. Guidelines are variably used,        09:38:57
11  as you know, by condition, for cancer, for       09:39:02
12  example. Cancer treatment is almost purely       09:39:06
13  protocol-driven. That's well-known. Many         09:39:08
14  other kinds of conditions there are very         09:39:11
15  few protocols for treatment, particularly        09:39:15
16  specific protocols about drugs. So I would       09:39:17
17  talk to clinical experts to understand           09:39:20
18  better the patterns of treatment with            09:39:22
19  regard to these protocols.                       09:39:24
20  Q. Would you expect the clinical expert to be    09:39:28
21  able to provide you with information about       09:39:30
22  implementation of particular practice            09:39:34
23  guidelines at particular institutions?           09:39:36
24  A. It's not clear to me that that would be       09:39:37
25  relevant until I consulted with the              09:39:40

M. ROSENTHAL

Page 353

1   clinical expert to find out whether         09:39:42
2   guidelines such as these are used at all.   09:39:43
3 Q. Fair enough. But at this point you haven't 09:39:46
4   had that consultation?                      09:39:48
5 A. At this point I have not had that          09:39:49
6   consultation.                               09:39:51
7 Q. All right. One of the other factors that   09:39:52
8   we discussed was a new development in the   09:39:53
9   underlying science of the particular field? 09:39:55
10 A. Yes.                                      09:39:59
11 Q. Assuming that that were disseminated      09:39:59
12  somehow to the prescribing public, how      09:40:02
13  would your model seek to take that into     09:40:06
14  account?                                    09:40:08
15 A. Well, again, I think it would make sense to 09:40:08
16  look at large significant trends in basic   09:40:11
17  science as it relates to these particular   09:40:15
18  types of drugs and conditions, and that     09:40:17
19  would take some clinical expertise, some    09:40:19
20  scientific expertise.                       09:40:21
21 Q. And so is that another category of issues 09:40:24
22  on which you would consult with a clinical  09:40:26
23  expert?                                     09:40:28
24 A. I think that probably would be --         09:40:28
25 Q. And the consult -- go ahead. I'm sorry, I 09:40:31

Page 354

1   didn't mean to cut you off.                 09:40:34
2 A. -- would be in the category of             09:40:36
3   understanding better the clinical decisions 09:40:37
4   around each specific condition that I       09:40:40
5   model, and all of these factors, trends and 09:40:43
6   treatment, new drugs, new science, would be 09:40:45
7   part of that conversation.                  09:40:48
8 Q. And what information would you seek to get 09:40:51
9   out of the conversation, at least with      09:40:57
10  respect to this particular issue, a new     09:40:58
11  development in the underlying science?      09:41:01
12 A. So, again, potentially it's not altogether 09:41:03
13  clear to me that this is relevant, so the   09:41:06
14  new development in the science may have a   09:41:08
15  similar effect, for example, on all drugs   09:41:12
16  in the therapeutic class, and therefore it  09:41:16
17  may not enter the model in the same way.    09:41:18
18  So I guess I would hope to understand in    09:41:21
19  talking with a clinical expert if there     09:41:23
20  were trends that were likely to change the  09:41:26
21  off-label uses, change the use of off-label 09:41:29
22  prescribing.                                09:41:32
23       And so I think without a specific      09:41:33
24  example it's hard for me to tell you        09:41:37
25  exactly how that would enter the model, but 09:41:39

Page 355

1   if there was information, for example,      09:41:41
2   suddenly that this -- the whole class of    09:41:44
3   drugs is -- becomes clear that it's less    09:41:47
4   useful for treating this condition, then I  09:41:50
5   would expect that to have an effect, not    09:41:53
6   only on Neurontin prescribing, but on       09:41:56
7   prescribing of competitor drugs for the     09:41:58
8   same off-label uses.                        09:42:00
9 Q. Okay. Let's take that example that you    09:42:02
10  just gave.                                  09:42:04
11 A. Okay.                                     09:42:05
12 Q. If you learned -- if you learned that there 09:42:05
13  were trends of that kind, that it became    09:42:10
14  clear that, you know, at some point in time 09:42:13
15  that this whole class of drugs is less      09:42:17
16  useful in treating the applicable           09:42:19
17  condition, how would you seek to            09:42:21
18  incorporate that into your model?           09:42:22
19 A. Generally speaking, through another       09:42:24
20  variable about the dissemination, another   09:42:27
21  indicator variable about the dissemination  09:42:30
22  of that information, and it could be        09:42:32
23  modeled again as in the more detailed model 09:42:34
24  that I described in my declaration using a  09:42:36
25  comparison drug that should have the same   09:42:40

Page 356

1   effect.                                     09:42:42
2 Q. How would you determine the timing of that 09:42:43
3   effect?                                     09:42:51
4 A. Based on publication of literature, in all 09:42:51
5   likelihood.                                 09:43:01
6 Q. All right. Here's another one: How about  09:43:04
7   FDA approval of a drug with a similar       09:43:06
8   mechanism of action for the applicable use? 09:43:08
9   We talked about how this might impact       09:43:11
10  prescribing behavior in the aggregate. How  09:43:13
11  would you go about -- how do you go about   09:43:16
12  determining how to incorporate that into    09:43:19
13  your model?                                 09:43:22
14 A. If there were a new entrant in the class, I 09:43:22
15  would in all likelihood include the entry   09:43:27
16  of that drug as part of the model.          09:43:28
17 Q. How would you identify which drug to      09:43:36
18  include?                                    09:43:38
19 A. Can you explain --                        09:43:38
20 Q. In other words, how would you identify    09:43:42
21  whether a particular drug other than        09:43:43
22  Neurontin is relevant in terms of an        09:43:44
23  additional approval by the FDA?             09:43:46
24 A. Sorry, I'm still not sure that -- so      09:43:48
25  whether a drug is a clinical substitute for 09:43:55

12 (Pages 353 to 356)

M. ROSENTHAL

Page 357

1  Neurontin for a particular indication, how    09:43:58
2  would I identify that?    09:44:00
3  Q. Let's just back up. I think we had agreed    09:44:01
4     that FDA approval of a drug with a similar    09:44:03
5     mechanism of action for the applicable use    09:44:07
6     might impact physicians' prescribing    09:44:10
7     behavior in the aggregate; is that right?    09:44:13
8         MR. NOTARGIACOMO: Objection,    09:44:14
9     asked and answered.    09:44:15
10 A. Yes. And I think I understood that to    09:44:16
11    mean --    09:44:19
12 Q. Okay.    09:44:19
13 A. -- a drug that was potentially    09:44:19
14    substitutable for Neurontin --    09:44:22
15 Q. Fair enough.    09:44:22
16 A. -- for the treatment.    09:44:24
17 Q. Okay. Fair enough. How would you come up    09:44:25
18    with a list of drugs that would potentially    09:44:27
19    be substitutable for Neurontin?    09:44:29
20 A. Again, such a list would be developed in    09:44:30
21    consultation with a clinical expert in the    09:44:33
22    area.    09:44:35
23 Q. Okay. And, again, you haven't had that    09:44:35
24    consultation at this point?    09:44:38
25 A. No, I have not.    09:44:40

Page 358

1  Q. How about approval of a drug with a similar    09:44:41
2     mechanism of action for the applicable use    09:44:55
3     in another country? We agreed that that    09:44:57
4     might impact physician prescribing    09:44:59
5     behavior. How would you go about    09:45:02
6     determining whether to incorporate that    09:45:03
7     factor into your model?    09:45:05
8         MR. NOTARGIACOMO: Objection.    09:45:06
9  A. That factor, I would expect to have    09:45:10
10    information on that from defendants. I'm    09:45:11
11    sorry, are we talking about Neurontin?    09:45:14
12 Q. We're talking about a drug with a similar    09:45:15
13    mechanism of action.    09:45:17
14 A. I'm -- it's not clear to me that that's    09:45:18
15    going to be an important factor, and I    09:45:21
16    haven't thought about how to incorporate    09:45:23
17    it. I believe that we're getting further    09:45:25
18    and further away from the central issue.    09:45:28
19 Q. How would you determine whether it's an    09:45:34
20    important factor or not? You said it's not    09:45:35
21    clear to you now whether or not it is.    09:45:37
22 A. I guess, you know, I would review the data,    09:45:39
23    and to my knowledge, that kind of factor is    09:45:42
24    not generally included looking at use of    09:45:46
25    drugs, for example, in all the studies that    09:45:48

Page 359

1     we've looked at before, so it's not clear    09:45:50
2     to me that there's a very strong tie there.    09:45:53
3         So, you know, I would certainly    09:45:55
4     consider that in reviewing the literature    09:45:57
5     and sort of developing the theoretical    09:46:00
6     model, but it seems like a second order    09:46:04
7     issue to me at this point.    09:46:06
8  Q. Without yet having reviewed the data or --    09:46:07
9  A. Without having seen the complete data yet.    09:46:10
10 Q. We'll only do this for a couple more.    09:46:13
11    Information posted on a medical    09:46:22
12    information site on the Internet related to    09:46:25
13    use of Neurontin for treatment of the    09:46:27
14    applicable condition, we agreed that that    09:46:29
15    might impact prescribing behavior in the    09:46:32
16    aggregate, correct?    09:46:34
17         MR. NOTARGIACOMO: Objection.    09:46:35
18 A. That's correct.    09:46:35
19 Q. How would you go about determining whether    09:46:37
20    or not to include that factor in your    09:46:41
21    model?    09:46:43
22 A. I think that would fall -- I mean, I would    09:46:44
23    certainly have to consider it, but I think    09:46:46
24    that falls in the category of factors that    09:46:48
25    are in the background. I have no    09:46:50

Page 360

1     theoretical reason to believe it's    09:46:52
2     correlated with the off-label prescribing,    09:46:53
3     the illegally -- excuse me, the allegedly    09:46:58
4     illegal off-label prescribing activities.    09:47:01
5  Q. Okay. Let me ask you a couple things about    09:47:03
6     that. When you say you think it's    09:47:05
7     something that's in the background, what    09:47:06
8     does that mean?    09:47:08
9  A. There's a notion that there are many    09:47:08
10    unmeasurable factors that may have small    09:47:11
11    effects on the decision to prescribe a drug    09:47:14
12    or take a drug and that the model would not    09:47:19
13    capture every one of these factors, would    09:47:23
14    capture the major ones and those that I    09:47:25
15    believe have the greatest potential to be    09:47:28
16    confounded with the variable of interest.    09:47:31
17 Q. Okay. Do you have an understanding as to    09:47:32
18    the extent to which doctors might consult    09:47:34
19    medical information sites in making    09:47:36
20    treatment decisions?    09:47:38
21 A. I don't have any -- you mean, do I have a    09:47:39
22    quantitative estimate of that?    09:47:42
23 Q. (No verbal response.)    09:47:43
24 A. I do not.    09:47:44
25 Q. Do you have any sense for that, I mean,    09:47:45

13 (Pages 357 to 360)

Page 361

1 whether it's something that doctors might 09:47:47
2 do in deciding how to treat their patients? 09:47:48
3 A. I don't have a sense that that is 09:47:50
4 scientifically backed up, so I wouldn't 09:47:57
5 want to give you my just general 09:48:00
6 impression. 09:48:02
7 Q. Yeah, I guess I'm just trying to 09:48:02
8 understand, I think, what the -- you know, 09:48:03
9 what -- at least at this point what the 09:48:04
10 basis is for your assumption that this 09:48:05
11 would be an issue that's in the background. 09:48:07
12 A. The basis for my assumption is that it's -- 09:48:10
13 there's no reason to believe that suddenly 09:48:13
14 that would start happening independently. 09:48:15
15 Again, independently it's happening at just 09:48:17
16 the same time that defendants began 09:48:21
17 promoting their drug for an off-label use. 09:48:24
18 Q. You would agree that it's at least possible 09:48:33
19 that the defendants would be monitoring the 09:48:34
20 same medical information websites that 09:48:35
21 doctors might be, correct? 09:48:37
22 A. It is at least possible, but, again, since 09:48:39
23 I'm relying on timing for identification in 09:48:43
24 my model, if the website preceded the 09:48:45
25 defendants' allegedly illegal activities, 09:48:49

Page 362

1 it would get picked up in the time trend 09:48:52
2 and not picked up in those variables that 09:48:54
3 represent the activities. 09:48:57
4 Q. How would you go about determining when the 09:48:58
5 postings on the website would have 09:49:00
6 occurred? 09:49:02
7 A. Again, I wouldn't -- that's not the way the 09:49:02
8 model would work. I determine when the 09:49:06
9 allegedly illegal activities occurred, and 09:49:09
10 these other activities that may change over 09:49:11
11 time that may diffuse over time would get 09:49:13
12 picked up in the time trend. 09:49:16
13 Q. Right. But I guess what we're talking 09:49:19
14 about, I guess -- well, withdrawn. 09:49:22
15 If you're relying on the timing to 09:49:23
16 separate out any possible correlation 09:49:26
17 between the two, isn't it important to know 09:49:27
18 the timing that the posting on the medical 09:49:29
19 information website -- the timing of the 09:49:32
20 posting on the particular medical 09:49:35
21 information website? 09:49:37
22 A. It's only important to separate out if it 09:49:38
23 is miraculously simultaneous to the timing 09:49:47
24 of the events that I'm modeling; that is, 09:49:51
25 it doesn't -- it's not that it's going on 09:49:56

Page 363

1 at the same time but that it begins -- it 09:49:57
2 has a similar pattern over time. And so 09:50:00
3 that's -- and rather than test for any 09:50:02
4 possible events that might have had that 09:50:05
5 same timing, one has to consider whether 09:50:07
6 it's possible for events to have the same 09:50:09
7 idiosyncratic patterns as the events of 09:50:12
8 interest here. 09:50:15
9 Q. Let me ask it another way. Are you aware 09:50:22
10 of any way, as you sit here now, in which 09:50:25
11 you would be able to determine the timing 09:50:30
12 of postings on the Internet on medical 09:50:31
13 information websites on the use of 09:50:35
14 Neurontin to treat certain off-label -- 09:50:36
15 certain off-label conditions? 09:50:41
16 A. It's not an issue I've looked into, no, 09:50:42
17 so... 09:50:45
18 Q. And assuming that the posting of 09:50:45
19 information on the use of Neurontin to 09:50:53
20 treat an applicable condition does have an 09:50:56
21 impact on prescribing behavior and assuming 09:50:59
22 that it's possible at least that it's 09:51:02
23 correlated with the defendants' promotion 09:51:03
24 for that off-label use, isn't it important 09:51:07
25 that you be able to tell which came first, 09:51:13

Page 364

1 a posting on the medical information 09:51:16
2 website or the promotion? 09:51:18
3 MR. NOTARGIACOMO: Objection, 09:51:21
4 asked and answered. 09:51:23
5 A. I think, again, that's -- the way the model 09:51:23
6 works is that if they're exactly -- if you 09:51:27
7 want me to assume that they happen at 09:51:33
8 exactly the same time, then they are 09:51:36
9 perfectly correlated and by definition 09:51:41
10 can't be separated, but when you do an 09:51:44
11 event study such as this, we look at the 09:51:47
12 timing of the event of interest. We don't 09:51:50
13 then measure every other event, and in part 09:51:54
14 some of the identification comes from the 09:51:59
15 fact that we can compare, for example, 09:52:01
16 treatment -- treatment for the particular 09:52:05
17 indication by use of Neurontin with other 09:52:08
18 drugs in the same class at the same time to 09:52:12
19 get additional identification. 09:52:15
20 So if that information were 09:52:17
21 disseminated and were broadly about the 09:52:19
22 use, for example, of anticonvulsants for 09:52:22
23 bipolar disorder, then we could see it 09:52:25
24 being picked up in these other drugs and 09:52:27
25 separate out the activities there from what 09:52:29

14 (Pages 361 to 364)

365

1 was going on with Neurontin. So there are 09:52:32
2 ways of identifying that in part, but the 09:52:34
3 general strategy is not to look at the 09:52:36
4 timing of every possible confounding event 09:52:38
5 but to be as detailed as possible about the 09:52:41
6 events in question. 09:52:44
7 (Pause.) 09:53:17
8 Q. Okay. We discussed yesterday that in order 09:53:18
9 to conduct your analysis, you or somebody 09:53:20
10 would need to determine whether a given 09:53:24
11 factor or a given expenditure is subject to 09:53:26
12 the alleged violations; is that correct? 09:53:28
13 A. That I would be directed by counsel about 09:53:30
14 which particular activities were subject to 09:53:34
15 the action in question, yes. 09:53:36
16 Q. Maybe -- well, let's -- I think that's one 09:53:40
17 of the things that I would like to try to 09:53:45
18 unwind. 09:53:47
19 A. Okay. 09:53:48
20 Q. We did agree that it's important to 09:53:48
21 determine which factors fall within XJT and 09:53:50
22 which factors fall within XKT? 09:53:55
23 A. Yes, that's right. 09:53:58
24 Q. Okay. Is it correct that you are going to 09:53:59
25 be relying on counsel to identify whether 09:54:04

366

1 each individual factor should fall within 09:54:07
2 XKT or XJT? 09:54:09
3 A. I'm not sure if I understand precisely, but 09:54:11
4 maybe I could give an example -- 09:54:16
5 Q. Sure. 09:54:17
6 A. -- of what I expect to learn. That, for 09:54:18
7 example, I expect the counsel to tell me 09:54:20
8 for which indications the promotional 09:54:26
9 activities appear to be illegal and for 09:54:29
10 which ones are being pursued, so for 09:54:33
11 example, maybe the commercial activities 09:54:36
12 with regard to some indications will be 09:54:37
13 considered allegedly illegal and some 09:54:40
14 won't. That will, of course, determine 09:54:44
15 which indications I model in general. 09:54:45
16 And then in particular it may be 09:54:48
17 deemed that certain kinds of activities, 09:54:50
18 meetings and events versus dinners, will be 09:54:54
19 considered to be the activities that 09:54:57
20 counsel's determined are part of the 09:55:03
21 allegations ultimately, and those are the 09:55:05
22 ones that I will be looking at the effects 09:55:07
23 of. But in part also it may be that some 09:55:09
24 things are not separable, as we talked 09:55:19
25 about yesterday. 09:55:21

367

1 So, for example, detailing, if in 09:55:21
2 the data I can't determine whether the 09:55:24
3 detailing was for an indication using 09:55:26
4 information that was allegedly illegal in 09:55:32
5 the sense that it's going to be part of 09:55:35
6 this action, then those would have to be 09:55:37
7 left in the other side of promotion, the 09:55:41
8 routine -- what's considered to be routine 09:55:47
9 and legal promotional activities? 09:55:49
10 Q. In terms of the last determination that you 09:55:51
11 just discussed -- 09:55:53
12 A. Yeah. 09:55:55
13 Q. -- who's making that decision, you or 09:55:55
14 counsel or somebody else? 09:55:57
15 A. Well, in part it would have to do with the 09:55:58
16 data in consultation with counsel about 09:56:01
17 what the Court has indicated they can look 09:56:05
18 at in terms of -- so we -- you know, as we 09:56:08
19 discussed yesterday, I'm confused about the 09:56:11
20 difference between fraudulent and illegal, 09:56:12
21 but if there is some nuance there and 09:56:14
22 certain kinds of information is deemed to 09:56:18
23 be -- that we won't look at the impact of 09:56:21
24 that, then that would have some 09:56:23
25 determination of what goes in XJT versus 09:56:25

368

1 XKT. 09:56:28
2 Q. Do you expect that you would make that 09:56:28
3 determination or that that determination 09:56:31
4 would be made by someone at least on an 09:56:34
5 activity-by-activity basis? 09:56:35
6 A. I would imagine it would be categories of 09:56:37
7 activities. 09:56:41
8 Q. So in other words, I guess, let's think 09:56:42
9 about -- let's think about meetings. 09:56:44
10 A. Okay. 09:56:48
11 Q. I'm assuming that individual meetings could 09:56:49
12 qualify as factors in either XJT or XKT in 09:56:52
13 your model, right? 09:56:57
14 A. Yes, that's correct. 09:56:57
15 Q. You need to determine with respect to each 09:56:59
16 individual meeting, correct, whether it 09:57:03
17 falls into XJT or XKT? 09:57:04
18 A. That's correct. 09:57:07
19 Q. Is the same true of specific continuing 09:57:07
20 medical education seminars? 09:57:10
21 A. Potentially, yes. 09:57:12
22 Q. Is the same true of detailing visits? 09:57:13
23 A. Detailing, I think we would have to make an 09:57:16
24 aggregate determination. I have seen some 09:57:21
25 detailed data on detailing reports that 09:57:22

15 (Pages 365 to 368)

Page 369

```
 1    show what was discussed during the            09:57:27
 2    detailing visit, but without seeing the       09:57:28
 3    data it's not clear to me how detailed        09:57:30
 4    we'll be able to be on each of these          09:57:34
 5    different promotional activities. So once     09:57:37
 6    I have all the data, it'll be a lot clearer   09:57:40
 7    whether there is an aggregate decision or a   09:57:44
 8    much more detailed analysis.                  09:57:46
 9 Q. In the case of expenditures, how do you      09:57:53
10    anticipate identifying which spending         09:57:57
11    should be characterized as O and which        09:57:58
12    spending should be categorized as M for       09:58:00
13    purposes of your model?                       09:58:03
14 A. Again, I don't have complete data yet, but   09:58:04
15    in the data -- some of the data that I've    09:58:06
16    seen in the discovery documents, as I         09:58:08
17    illustrate in my declaration a few            09:58:10
18    examples, it does seem like defendants        09:58:12
19    break out spending for specific               09:58:15
20    indications, for example, as it relates to    09:58:17
21    bipolar disorder, as an example.              09:58:18
22 Q. Will you be relying entirely on defendants   09:58:23
23    breaking out the data as between improper    09:58:28
24    activity on the one hand and proper           09:58:35
25    activity on the other hand?                   09:58:39
```

Page 370

```
 1 A. It's not clear to me that entirely is the    09:58:40
 2    right characterization of that. Again, I     09:58:44
 3    haven't pulled all the data together, but I  09:58:46
 4    do believe the defendants' own tracking of   09:58:49
 5    their promotional activities will be a       09:58:51
 6    prime source of information here. But as     09:58:53
 7    we discussed also, there may be other kinds  09:58:55
 8    of information such as publications that     09:58:58
 9    appear in the general literature.            09:59:00
10 Q. How would publications that appear in the   09:59:03
11    general literature inform your               09:59:06
12    understanding of whether a particular        09:59:07
13    expenditure should be categorized as O or    09:59:09
14    M?                                           09:59:13
15 A. Sorry. I was back on X. So in terms of      09:59:16
16    spending, I believe it'll largely come from  09:59:23
17    defendants' data, but, again, I can't say    09:59:25
18    that will be exclusively true.               09:59:27
19 Q. Can you think, as you sit here today, of    09:59:29
20    anything other than defendants' data that    09:59:31
21    would provide you any insight on the         09:59:33
22    determination of whether a particular        09:59:35
23    expenditure is O or M?                       09:59:37
24 A. I would look again to data sources such as  09:59:39
25    those that I've described before, IMS        09:59:42
```

Page 371

```
 1    Health, Verispan, that do track promotional   09:59:46
 2    spending, and I don't know all the details    09:59:49
 3    of all their products, but they do track      09:59:50
 4    prescriptions by diagnosis. It's possible     09:59:53
 5    that they have more detailed data on          09:59:55
 6    promotional spending as well.                 09:59:58
 7 Q. But you haven't conducted that analysis yet  09:59:59
 8    or made those inquiries of IMS or Verispan   10:00:07
 9    yet?                                          10:00:10
10 A. With regard to the promotional data, not    10:00:10
11    yet, no.                                     10:00:12
12 Q. Why not?                                     10:00:13
13 A. I've not been asked to bring data together  10:00:14
14    for this. I found potential data sources    10:00:16
15    in the discovery documents and also by      10:00:19
16    talking to IMS Health and Verispan about    10:00:23
17    their prescribing data to satisfy me that   10:00:25
18    the data were available to estimate this    10:00:28
19    model.                                      10:00:31
20 Q. But this particular aspect of data you      10:00:33
21    didn't speak with them about; is that        10:00:35
22    right?                                       10:00:38
23 A. Not as supplementing defendants' data, but  10:00:38
24    I observed that defendants tracked their    10:00:41
25    spending in a fairly detailed way.          10:00:43
```

Page 372

```
 1 Q. When do you expect the determination of     10:00:47
 2    whether a particular expenditure would fall 10:00:56
 3    into O on the one hand or M on the other    10:00:58
 4    hand would occur?                           10:01:00
 5 A. When do I suspect that would occur?         10:01:01
 6 Q. (No verbal response.)                       10:01:03
 7 A. I guess I'm not really clear what you mean. 10:01:06
 8    At the point at which I'm asked to proceed  10:01:09
 9    with estimating my model, which I have not  10:01:11
10    been asked to do yet, then I would begin to 10:01:16
11    gather the data and specify all the         10:01:19
12    variables, and at that point that would be  10:01:23
13    relevant, whenever that is.                 10:01:25
14 Q. Again, in the case of sampling you would    10:01:28
15    agree that some kinds of sampling are not   10:01:36
16    subject to the alleged violations; is that  10:01:39
17    correct?                                    10:01:40
18 A. Yes, I would agree with that.               10:01:40
19 Q. But you also understand that some kinds do  10:01:45
20    constitute allegedly improper promotion for 10:01:47
21    purposes of this case?                      10:01:50
22 A. I believe it was described in the           10:01:51
23    allegations, yes.                           10:01:53
24 Q. How do you intend to differentiate between  10:01:54
25    appropriate sampling and improper sampling  10:01:58
```

Page 373

| | | |
|---|---|---|
| 1 | for purposes of your analysis? | 10:02:00 |
| 2 | A. To the extent that it's possible to use | 10:02:01 |
| 3 | defendants' own tracking of those data. | 10:02:04 |
| 4 | Q. Is that something that you've done yet? | 10:02:07 |
| 5 | A. As we discussed yesterday, looking at the | 10:02:10 |
| 6 | strategic documents, they talk specifically | 10:02:13 |
| 7 | in those documents about use of samples. | 10:02:14 |
| 8 | Q. When you refer to "these documents," both | 10:02:18 |
| 9 | in this context and in your previous | 10:02:20 |
| 10 | answers, I'm assuming that the documents | 10:02:23 |
| 11 | you're referring to would be included | 10:02:25 |
| 12 | within the documents that you list as | 10:02:26 |
| 13 | having relied on in your declaration? | 10:02:28 |
| 14 | A. Yes, in particular that strategic grid we | 10:02:30 |
| 15 | looked at yesterday is the one I'm talking | 10:02:34 |
| 16 | about. | 10:02:36 |
| 17 | Q. And so it's those sorts of documents, the | 10:02:36 |
| 18 | strategic-grid-type documents, that you | 10:02:41 |
| 19 | anticipate relying on for purposes of doing | 10:02:43 |
| 20 | this analysis? | 10:02:45 |
| 21 | A. And we understand from other materials that | 10:02:46 |
| 22 | defendants have tracked the profitability, | 10:02:50 |
| 23 | return on investment related to their | 10:02:52 |
| 24 | promotional activities, and so we would | 10:02:54 |
| 25 | look for those kinds of documents as well. | 10:02:56 |

Page 374

| | | |
|---|---|---|
| 1 | Q. Have you reviewed any of those documents to | 10:03:01 |
| 2 | date? | 10:03:04 |
| 3 | A. I've reviewed a large number of documents | 10:03:06 |
| 4 | at one point, but I don't recall seeing any | 10:03:09 |
| 5 | specific accounting documents on these | 10:03:11 |
| 6 | return on investment models. I know that | 10:03:14 |
| 7 | they are referenced, and I note some | 10:03:16 |
| 8 | references in my declaration. There's | 10:03:19 |
| 9 | promo track analyses. | 10:03:22 |
| 10 | Q. Anything else? | 10:03:30 |
| 11 | A. I believe there's a footnote in my | 10:03:31 |
| 12 | declaration that lists a couple of | 10:03:32 |
| 13 | examples, but I believe promo track was the | 10:03:34 |
| 14 | principal and -- promotional effectiveness | 10:03:36 |
| 15 | system that they have. | 10:03:41 |
| 16 | THE WITNESS: Maybe a short break? | 10:03:50 |
| 17 | MR. POLUBINSKI: Sure. Sure. | 10:03:51 |
| 18 | Let's take a break. That's fine. | 10:03:52 |
| 19 | THE VIDEOGRAPHER: The time is | 10:03:54 |
| 20 | 10:04. This is the end of Tape 1, and we | 10:03:56 |
| 21 | are off the record. | 10:03:58 |
| 22 | (Recess taken.) | 10:03:59 |
| 23 | THE VIDEOGRAPHER: The time is | 10:14:05 |
| 24 | 10:14. This is the beginning of Tape 2, | 10:14:18 |
| 25 | and we are back on the record. | 10:14:19 |

Page 375

| | | |
|---|---|---|
| 1 | BY MR. POLUBINSKI: | 10:14:21 |
| 2 | Q. So, Professor Rosenthal, in the case of | 10:14:21 |
| 3 | detailing, whether or not a given detailing | 10:14:33 |
| 4 | visit is appropriate, will necessarily | 10:14:35 |
| 5 | depend on what's said in the course of that | 10:14:38 |
| 6 | visit; is that correct? | 10:14:41 |
| 7 | A. Whether or not the allegations apply to | 10:14:41 |
| 8 | that detailing visit, you mean? | 10:14:44 |
| 9 | Q. Yes. | 10:14:46 |
| 10 | A. Okay. That seems like that's the right way | 10:14:46 |
| 11 | to characterize it, what's said, what's | 10:14:51 |
| 12 | disseminated. | 10:14:53 |
| 13 | Q. Right. And that like sampling not all | 10:14:54 |
| 14 | detailing is subject to the alleged | 10:15:00 |
| 15 | violations? | 10:15:02 |
| 16 | A. I think that's right. | 10:15:02 |
| 17 | Q. With respect to detailing, how do you | 10:15:03 |
| 18 | intend to differentiate between appropriate | 10:15:08 |
| 19 | detailing and allegedly improper detailing? | 10:15:11 |
| 20 | A. With respect to detailing, I have two kinds | 10:15:13 |
| 21 | of information that I think will be | 10:15:17 |
| 22 | relevant, one -- and forgive me, I forget | 10:15:18 |
| 23 | the names of these reports, but one is | 10:15:24 |
| 24 | information on the detailing visits | 10:15:27 |
| 25 | themselves that the physicians who are | 10:15:30 |

Page 376

| | | |
|---|---|---|
| 1 | detailed provide that describes what was | 10:15:32 |
| 2 | discussed during the visit, and, two, again | 10:15:37 |
| 3 | are the strategic and marketing documents | 10:15:40 |
| 4 | that I've seen that quantify detailing for | 10:15:43 |
| 5 | specific indications. | 10:15:49 |
| 6 | Q. With respect to the first, to what extent | 10:15:56 |
| 7 | do you expect -- well, withdrawn. | 10:16:01 |
| 8 | Would you expect to make an | 10:16:03 |
| 9 | individual determination as to each | 10:16:06 |
| 10 | specific detailing visit and whether that | 10:16:08 |
| 11 | detailing visit constituted improper or | 10:16:10 |
| 12 | proper behavior? | 10:16:13 |
| 13 | A. I would expect to make a determination in | 10:16:14 |
| 14 | the aggregate as to the proportion of | 10:16:16 |
| 15 | detailing that would fall into those | 10:16:18 |
| 16 | categories, so not -- I don't believe that | 10:16:20 |
| 17 | that's what you mean by "individual | 10:16:24 |
| 18 | determination" like visit per visit, but to | 10:16:27 |
| 19 | characterize overall. | 10:16:30 |
| 20 | Q. Fair enough. But you've used this data on | 10:16:32 |
| 21 | individual visits to inform your | 10:16:36 |
| 22 | conclusions about -- to inform your | 10:16:37 |
| 23 | aggregate conclusions? | 10:16:39 |
| 24 | A. At this time I think that data is to be one | 10:16:40 |
| 25 | of the things I use to try to break apart | 10:16:44 |

17 (Pages 373 to 376)

### Page 377

```
 1    the detailing spending.                      10:16:46
 2 Q. With respect to the information on those     10:16:52
 3    individual detailing visits, how would you   10:16:54
 4    intend to distinguish between fraudulent     10:16:56
 5    detailing on the one hand and detailing      10:16:59
 6    that was not fraudulent on the other hand?   10:17:01
 7 A. Again, determination of what's fraudulent    10:17:03
 8    or illegal in some other manner, I would     10:17:05
 9    expect counsel to advise me on how to        10:17:07
10    categorize that.                             10:17:12
11 Q. So will counsel be making the individual     10:17:13
12    determinations about whether a specific      10:17:15
13    detailing visit involved fraudulent          10:17:17
14    behavior or not?                             10:17:20
15       MR. NOTARGIACOMO: Objection. I            10:17:21
16    think that mischaracterizes her testimony.   10:17:22
17       MR. POLUBINSKI: Well, I am asking         10:17:24
18    her the question.                            10:17:24
19       MR. NOTARGIACOMO: Fair enough.            10:17:25
20 A. I would expect to get input. I would         10:17:26
21    expect to be advised on what kinds of        10:17:29
22    things I should count in the allegedly       10:17:30
23    illegal bucket and what kinds of things I    10:17:35
24    shouldn't.                                   10:17:37
25 Q. And so you would get -- do you imagine you   10:17:37
```

### Page 378

```
 1    might get guidelines or some other sort of   10:17:38
 2    instruction that would enable you to make    10:17:40
 3    this determination yourself?                 10:17:42
 4 A. That might be the case. Without knowing      10:17:43
 5    exactly how this will play out, I can't      10:17:44
 6    say.                                         10:17:48
 7 Q. All right. Aside from the events that we     10:18:16
 8    discussed earlier this morning that might    10:18:17
 9    impact aggregate quantities of Neurontin     10:18:19
10    prescribed for off-label uses, I'm going to  10:18:22
11    give you a much, much shorter list now and   10:18:25
12    ask you whether the following would be       10:18:27
13    additional individual factors that might     10:18:30
14    play into an individual physician's          10:18:33
15    prescribing decision. And if we can go       10:18:35
16    through each one and if you can just tell    10:18:36
17    me whether or not they might or might not,   10:18:38
18    that would be great.                         10:18:40
19       The first one is an individual --         10:18:41
20    is an individual doctor's medical school     10:18:42
21    education.                                   10:18:44
22 A. Would affect prescribing patterns in         10:18:44
23    general.                                     10:18:49
24 Q. And a decision on whether or not to          10:18:49
25    prescribe Neurontin for an off-label use in  10:18:51
```

### Page 379

```
 1    a given case?                                10:18:54
 2 A. I suppose it might.                          10:18:54
 3 Q. How about the doctor's fellowships that he   10:18:55
 4    or she might have had after their medical    10:18:58
 5    school?                                      10:19:02
 6 A. It might. And may I just say that all of     10:19:03
 7    these factors seem like second order to a    10:19:09
 8    decision about off-label prescribing.        10:19:11
 9 Q. How about the patient's specific systems?    10:19:13
10 A. Yes, that might affect prescribing.          10:19:15
11 Q. And that that wouldn't be a second order     10:19:19
12    impact in a particular individual            10:19:22
13    prescription decision?                       10:19:25
14 A. As to whether or not the prescription for    10:19:25
15    Neurontin were given versus some other       10:19:30
16    drug? I mean, certainly the symptoms would   10:19:32
17    be relevant.                                 10:19:34
18 Q. How about the patient's medical history?     10:19:35
19 A. Yes, that would be relevant.                 10:19:37
20 Q. How about other medications that the         10:19:39
21    patient might be taking at the time?         10:19:41
22 A. Yes.                                         10:19:42
23 Q. How about a specific request from a          10:19:42
24    specific patient?                            10:19:46
25 A. Possibly.                                    10:19:49
```

### Page 380

```
 1 Q. How about the doctor's individual            10:19:50
 2    independent review of the scholarly          10:19:55
 3    literature?                                  10:19:58
 4 A. Yes, I believe we talked about that          10:19:58
 5    yesterday.                                   10:20:01
 6 Q. And how about the doctor's individual        10:20:01
 7    consultation of medical information          10:20:06
 8    websites on the Internet?                    10:20:08
 9 A. Yes.                                         10:20:09
10 Q. Okay. We discussed yesterday the fact that   10:20:09
11    Neurontin was approved to treat PHN in       10:20:23
12    2002, correct?                               10:20:26
13 A. Yes, correct.                                10:20:27
14 Q. Have plaintiffs' counsel instructed you at   10:20:27
15    this point to make any particular            10:20:31
16    assumptions with respect to Neurontin's      10:20:33
17    efficacy in treating PHN?                    10:20:35
18 A. For the purposes of my work, I'm to          10:20:37
19    consider only the total quantity induced     10:20:43
20    without regard to efficacy.                  10:20:46
21 Q. Okay. Let me put it another way. Do you      10:20:47
22    know whether plaintiffs' counsel will ask    10:20:51
23    you to include prescriptions for PHN prior   10:20:53
24    to May 2002 in your analysis in the model?   10:20:56
25 A. I don't know at this point exactly which     10:20:58
```

18 (Pages 377 to 380)

M. ROSENTHAL

### Page 381

```
 1    indications will be included in the final          10:21:00
 2    analysis, no.                                      10:21:03
 3  Q. But those indications would have been             10:21:05
 4    off-label uses, correct, prescriptions of          10:21:07
 5    Neurontin for PHN prior to May 2002?               10:21:08
 6  A. That's certainly described in the                 10:21:11
 7    allegations, so...                                 10:21:14
 8  Q. On the other hand, because Neurontin was          10:21:15
 9    approved for treatment of PHN in May of            10:21:18
10    2002, I think we can be confident that you         10:21:20
11    would not seek to include prescriptions of         10:21:24
12    Neurontin for PHN after that date in your          10:21:28
13    model, correct?                                    10:21:31
14  A. I think I'm probably going to need a little       10:21:37
15    more direction on the legal issues here.           10:21:38
16    As you know, promotional activities have a         10:21:41
17    long-lived impact, and so there will be            10:21:45
18    some continued impact of promotional               10:21:48
19    activities that took place before the              10:21:51
20    approval, but I don't know where that              10:21:53
21    stands as a legal matter. As an economic           10:21:57
22    matter there are effects.                          10:21:59
23  Q. I guess here's my question:                       10:22:01
24  A. Okay.                                             10:22:04
25  Q. As set forth in your declaration the class        10:22:04
```

### Page 382

```
 1    includes, among others, "individuals who           10:22:12
 2    for purposes other than resale, purchased,         10:22:20
 3    reimbursed, and/or paid for Neurontin for          10:22:22
 4    indications not approved by the FDA."              10:22:25
 5  A. So from a legal perspective it sounds like        10:22:29
 6    those uses may be out, but you understand          10:22:31
 7    what I mean by the --                              10:22:36
 8  Q. I do. I understand --                             10:22:36
 9  A. -- effects might be --                            10:22:36
10  Q. -- precisely. I don't -- I'm not --               10:22:36
11  A. -- lasting?                                       10:22:37
12  Q. And I'm not taking issue with that. The           10:22:38
13    only thing I'm saying is that just by              10:22:42
14    reference to the definition of the class in        10:22:45
15    this case, you wouldn't expect to include          10:22:47
16    prescriptions for PHN after it was approved        10:22:53
17    by the FDA in your analysis of impact on           10:22:56
18    the class?                                         10:23:00
19  A. Not being a legal expert, I'm not sure -- I       10:23:01
20    wouldn't necessarily have read that that           10:23:04
21    way, but as you read it, perhaps that's the        10:23:07
22    right interpretation of the class                  10:23:09
23    definition.                                        10:23:11
24  Q. If counsel instructs you to include               10:23:12
25    prescriptions for PHN prior to May 2002, I         10:23:15
```

### Page 383

```
 1    think you had said this before, but let me         10:23:21
 2    confirm, your model would assume that all          10:23:22
 3    such prescriptions for PHN are ineffective;        10:23:25
 4    is that right?                                     10:23:28
 5  A. Essentially the model does not account for        10:23:28
 6    any health benefits from the prescriptions.        10:23:30
 7  Q. And so you would include all PHN                  10:23:32
 8    prescriptions from that time frame in the Q        10:23:37
 9    number that you provide to Dr. Hartman for         10:23:40
10    him to calculate damages; is that correct?         10:23:43
11  A. If so directed by counsel, that's what I          10:23:45
12    would do, yes.                                     10:23:47
13  Q. Are you aware of any reason why Neurontin         10:23:50
14    would have been less effective in treating         10:23:52
15    PHN prior to the FDA's supplemental                10:23:55
16    approval in 2002 than it was after?                10:23:58
17  A. I'm not aware of any reason, no.                  10:24:00
18  Q. Do you have an understanding for why              10:24:04
19    defendants sought approval for Neurontin to        10:24:05
20    treat PHN when they did?                           10:24:07
21  A. I'm not sure what you mean by "why." Why          10:24:09
22    that timing and not another --                     10:24:19
23  Q. Sure.                                             10:24:20
24  A. -- or not at all?                                 10:24:20
25  Q. Yeah, what the circumstances were that            10:24:21
```

### Page 384

```
 1    would have driven the defendants to seek           10:24:23
 2    approval for PHN at that time?                     10:24:26
 3  A. I don't think I do know the answer to that,       10:24:27
 4    no.                                                10:24:30
 5  Q. Okay. And you don't know, do you, whether         10:24:31
 6    defendants had information at the time that        10:24:34
 7    might have supported approval for another          10:24:36
 8    indication, do you?                                10:24:38
 9  A. Not as I sit here. I know there are               10:24:38
10    numerous discovery documents about                 10:24:43
11    strategic planning for obtaining new               10:24:46
12    indications with the FDA on a variety of           10:24:49
13    these conditions, but as I sit here, I             10:24:52
14    can't tell you if there was anything else          10:24:54
15    in the works at the time.                          10:24:56
16  Q. And I guess the -- going back to what I           10:24:57
17    think my question was, which may not have          10:25:02
18    been perfectly phrased, do you know whether        10:25:04
19    defendants had information or data at the          10:25:06
20    time that would have actually supported an         10:25:09
21    application for approval of another                10:25:12
22    indication from the FDA?                           10:25:16
23  A. And so, again, I'm afraid my answer wasn't        10:25:18
24    clear, either. I know there are discovery          10:25:21
25    documents that talk about those kinds of           10:25:23
```