# EXHIBIT 3
# (PART II)

M. ROSENTHAL

385

1    data, but I don't know at that particular       10:25:27
2    time if there were -- if they had clinical      10:25:29
3    trial evidence, is I assume what you            10:25:33
4    mean --                                         10:25:34
5  Q. Yeah.                                          10:25:35
6  A. -- to support another application, no, I       10:25:35
7    don't.  I believe it may be knowable, but I     10:25:38
8    don't know.                                     10:25:43
9  Q. We discussed yesterday that neuropathic        10:25:43
10    pain is one of the off-label indications at    10:25:45
11    issue in the case, correct?                    10:25:47
12 A. That's correct, neuropathic pain not           10:25:49
13    including HPN.                                  10:25:51
14 Q. PHN?                                           10:25:53
15 A. PHN.                                           10:25:54
16 Q. At least after May of 2002, right?             10:25:55
17 A. Yes.                                           10:25:57
18 Q. And why don't -- actually, for purposes of     10:25:57
19    this series of questions, why don't we         10:26:02
20    assume since it's such a mouthful to say       10:26:04
21    neuropathic pain other than PHN after May      10:26:07
22    of 2002 --                                     10:26:09
23 A. Just pain.                                     10:26:10
24 Q. -- can I just say pain?                        10:26:11
25 A. Pain.                                          10:26:12

386

1  Q. Great.  Okay.  Subject to further              10:26:13
2    instructions from your counsel, your model     10:26:15
3    would seek to measure the additional           10:26:17
4    incremental prescriptions for pain,            10:26:20
5    correct?                                        10:26:22
6  A. Again, assuming that -- I understand that      10:26:22
7    some of the legal issues are in flux, or at    10:26:28
8    least that's my understanding about which      10:26:30
9    indications, but if I were told that pain      10:26:32
10    was one of the indications that we were       10:26:33
11    looking at, that's what I would do.            10:26:35
12 Q. Okay.  We discussed that Neurontin has been    10:26:36
13    approved for the treatment of neuropathic     10:26:42
14    pain throughout Europe and elsewhere          10:26:44
15    yesterday, correct?                            10:26:46
16 A. I believe we did discuss that, yes.            10:26:46
17 Q. Okay.  Let's assume for a moment that a        10:26:48
18    class member would have paid for a            10:26:51
19    prescription in the United States for         10:26:52
20    Neurontin to treat neuropathic pain and the   10:26:56
21    prescription worked, the patient's pain       10:26:59
22    went away.  Had that patient received that    10:27:00
23    prescription in the United States, your       10:27:04
24    model would conclude that class member        10:27:08
25    would have been impacted and would suffer     10:27:10

387

1    economic damages; is that correct?             10:27:12
2  A. As I've been directed by counsel to assume     10:27:14
3    that the relevant measure of economic          10:27:17
4    damages here is what was paid for the          10:27:20
5    units of Neurontin induced by the allegedly    10:27:21
6    illegal promotion, so, yes.                    10:27:26
7  Q. And if the patient received the very same      10:27:27
8    prescription from a doctor in Europe whose     10:27:30
9    regulatory authority tells her that            10:27:32
10    Neurontin is effective for treatment of       10:27:34
11    neuropathic pain, would that patient have     10:27:36
12    been impacted and suffer economic damages?    10:27:38
13 A. The question of the patient in Europe is       10:27:42
14    outside the realm of that which I've been     10:27:44
15    asked to consider.  They're not in the        10:27:46
16    class here, so I don't know what you mean.     10:27:47
17    This is based on a legal theory about, you    10:27:50
18    know, what -- based on a legal theory about   10:27:54
19    what the illegal behavior was, and I'm        10:27:57
20    directed to look at the economic              10:27:59
21    consequences of that.                          10:28:02
22 Q. I guess what I'm asking is maybe just from     10:28:02
23    your perspective, are the economic            10:28:05
24    consequences of the prescription that's       10:28:07
25    written in Europe any different from the      10:28:09

388

1    economic consequences for the prescription    10:28:11
2    that's written in the States for the same     10:28:14
3    indication?                                    10:28:16
4  A. I'm not sure with what you mean by "the       10:28:16
5    economic consequences."                        10:28:18
6  Q. The economic consequences for the             10:28:19
7    individual patient.                             10:28:21
8  A. The consequences that I have --               10:28:22
9  Q. And/or -- I'm sorry.  For the individual       10:28:23
10    patient and/or whatever entity is paying     10:28:26
11    for the individual patient's prescription?    10:28:28
12 A. If you want to ask whether the effects are    10:28:31
13    likely to differ on health status, whether   10:28:35
14    the effects are likely to differ in Europe   10:28:40
15    versus the U.S., I have no reason to          10:28:42
16    believe that the health effects differ, but  10:28:44
17    I've not been asked to consider those        10:28:46
18    health effects.                                10:28:47
19 Q. Right.  I'm asking about the economic          10:28:48
20    effects.  You know, what you say in your      10:28:50
21    report that you do in the very first page     10:28:52
22    is that you analyze whether consumers or      10:28:55
23    third-party payers would have and continue    10:29:06
24    to be impacted and suffer economic damages,   10:29:08
25    and so I guess what I'm asking is whether     10:29:12

20 (Pages 385 to 388)

M. ROSENTHAL

**389**

```
1    those same individuals or entities would        10:29:14
2    have been any more impacted or suffer any        10:29:18
3    more economic damages in the United States       10:29:20
4    for the exact same prescription as they          10:29:22
5    would have had they been prescribed the          10:29:25
6    same drug in Europe.                     10:29:29
7 A. That's again -- excuse me.  My conclusions       10:29:30
8    are based on being directed to assume that       10:29:33
9    there were no clinical benefits to be            10:29:35
10   counted against the spending, and so that        10:29:39
11   conclusion is relevant to that model where       10:29:41
12   those clinical benefits cannot be shown.         10:29:43
13   So you're asking me to assume a different        10:29:46
14   framework in which those clinical benefits       10:29:49
15   can be shown to exist, and so -- is that         10:29:50
16   what you would like me to assume?                10:29:54
17 Q. No, I don't think so.  I'm just sort of         10:29:55
18   looking at what the practical reality of         10:30:04
19   the situation is and what the economic           10:30:06
20   impacts of it are.  Is there any greater         10:30:09
21   economic impact on the patient than we           10:30:12
22   talked about in the United States than the       10:30:14
23   patient in Europe?                    10:30:15
24 A. I guess I need to -- again, I'm sorry, I        10:30:17
25   don't mean to be difficult, but I need to        10:30:21
```

**390**

```
1    make some assumption about the clinical          10:30:22
2    effectiveness of the drug, and if you want       10:30:24
3    me to assume that drug was clinically            10:30:27
4    effective for those patients who got it in       10:30:30
5    the U.S. in a similar way to those patients      10:30:32
6    who got it in Europe, then the difference        10:30:35
7    would be the total spending on the drug,         10:30:36
8    which, as you know, is much less in Europe.      10:30:38
9 Q. I guess here's my question:  Is there any        10:30:40
10   reason that that assumption -- that you can      10:30:42
11   think of that that assumption should be any      10:30:44
12   different for a patient in the U.S. than a       10:30:45
13   patient in Europe?                    10:30:47
14 A. I don't know of any reason, but, again,         10:30:49
15   I've not been asked to consider this case.       10:30:51
16 Q. Okay.  Your report says that you intend to      10:31:05
17   group diagnoses into five categories by          10:31:07
18   reference to ICD-9 codes, correct?              10:31:09
19 A. I did categorize -- excuse me, can I look       10:31:12
20   at that again in my report?                10:31:16
21 Q. Sure.  I think it's on Page 16, Footnote        10:31:18
22   64.                            10:31:51
23   (Discussion off the record.)                10:31:51
24 A. I see there's a typo in there, too.             10:31:52
25 Q. What's the typo that you mentioned you          10:31:57
```

**391**

```
1    noticed?                        10:31:59
2 A. That says "IVD" in the very last              10:31:59
3    characterization of ICD-9.  Yes, so this         10:32:02
4    was sort of a preliminary grouping of            10:32:10
5    indications, but as we talked about before,      10:32:11
6    when we look individually by indication,         10:32:15
7    there may be some change -- my                 10:32:20
8    understanding is there may be some change        10:32:21
9    in which indications I'm asked to look at         10:32:23
10   specifically.                       10:32:25
11 Q. So these may not be the groups -- the           10:32:26
12   groupings that you ultimately use at the         10:32:29
13   end of the day; is that your --                10:32:30
14 A. Ultimately.  This is sort of based on my        10:32:32
15   preliminary examination of those ICD-9           10:32:34
16   codes and what was in the original               10:32:36
17   complaint.                        10:32:39
18 Q. Okay.                          10:32:45
19    MR. POLUBINSKI:  Let's mark the               10:32:48
20   next document.                      10:32:48
21    (Exhibit No. 15, Document headed             10:32:49
22   "ICD-9 Codes for Neurontin, From IMS File,       10:32:49
23   Ben Sommers, August 3, 2005," marked for         10:32:49
24   identification.)                      10:32:49
25 Q. All right.  I'm handing you a document that     10:33:06
```

**392**

```
1    we've marked as Rosenthal Exhibit 15.            10:33:08
2 A. Thank you.                       10:33:12
3 Q. Can you take a look at the document and let      10:33:13
4    me know when you've had a chance to look         10:33:15
5    through it.                       10:33:18
6 A. Yeah.                          10:33:19
7 Q. Do you recognize this document?                10:33:19
8 A. In the way that I would recognize a             10:33:20
9    document that I looked at about a year ago,      10:33:22
10   but, yes, it does look familiar.                10:33:24
11 Q. Okay.  This document was produced to the        10:33:26
12   defendants in January 2006 by plaintiffs'        10:33:28
13   counsel.  Do you know why it would have          10:33:34
14   been produced to us?                    10:33:35
15 A. I don't know.  Perhaps in relationship to a     10:33:36
16   data request.                       10:33:46
17 Q. Okay.  Did you review this document in          10:33:47
18   connection with your work on this matter at      10:33:48
19   all?                           10:33:50
20 A. I certainly reviewed it.  Not being an          10:33:50
21   expert in clinical coding myself, I              10:33:52
22   wouldn't say that I could have checked it        10:33:53
23   in any real sense.  Is that what you're          10:33:56
24   asking?  I'm familiar with it.                10:33:58
25 Q. Okay.  Did you rely on the document in any      10:34:05
```

21 (Pages 389 to 392)

M. ROSENTHAL

393

1    way in your report, in your analysis?    10:34:07
2  A.  Not -- since there is no data analysis in    10:34:08
3    my report, the answer is no.  We wanted to    10:34:15
4    get a sense of the categories of data.  As    10:34:19
5    I mentioned -- as we discussed yesterday,    10:34:26
6    looking at the -- some data from the    10:34:28
7    Franklin case that had been produced from    10:34:30
8    the National Disease and Therapeutic Index,    10:34:32
9    they have data by ICD-9 code.  We're trying    10:34:36
10    to understand those data a little better.    10:34:39
11    So we wanted to take a preliminary grouping    10:34:41
12    of those ICD-9 codes to see how they mapped    10:34:45
13    to these categories.    10:34:48
14  Q.  Okay.  Can you tell me the circumstances in    10:34:52
15    which the document was prepared, so in    10:34:54
16    other words, who asked for it to be    10:34:59
17    prepared?    10:35:00
18  A.  I'm not sure who asked for it to be    10:35:01
19    prepared.  Again, when these data came to    10:35:06
20    light in the Franklin case, we wondered    10:35:08
21    what we would learn from them, how relevant    10:35:11
22    they were.  We didn't want to rely on the    10:35:13
23    groupings necessarily that had been done by    10:35:15
24    previous experts.  As we mentioned    10:35:21
25    yesterday, it was an attachment to their    10:35:24

394

1    report.  And so it was either myself or    10:35:26
2    potentially Ms. Rushnawitz that asked for    10:35:29
3    this categorization to be done.    10:35:31
4  Q.  Okay.  And would it have been something    10:35:34
5    that was commissioned on or about August    10:35:37
6    3rd of 2005, which is the date that appears    10:35:39
7    at the top of the document?    10:35:41
8  A.  I think it may have been updated around --    10:35:46
9    I honestly -- I'm sorry, I just don't know.    10:35:48
10    I assume that that's the correct date --    10:35:50
11  Q.  That's fine.    10:35:52
12  A.  -- because it's there.    10:35:52
13  Q.  Do you know who Ben Sommers is?    10:35:53
14  A.  I do.    10:35:55
15  Q.  Who's Ben Sommers?    10:35:56
16  A.  He's a medical student that occasionally    10:35:57
17    works with us.    10:35:59
18  Q.  When you say "us," what do you mean?    10:36:02
19  A.  With Greylock McKinnon.    10:36:03
20  Q.  Do you know if he's compensated for the    10:36:04
21    work that he does?    10:36:10
22  A.  I'm certain that he is.    10:36:10
23  Q.  Do you have any sense for why his name    10:36:11
24    wouldn't have appeared on any of the    10:36:13
25    invoices that we received?    10:36:14

395

1  A.  I honestly don't know.    10:36:16
2  Q.  Do you know what your instructions or Ms.    10:36:22
3    Rushnawitz's instructions were to Mr.    10:36:26
4    Sommers in preparing this document?    10:36:28
5  A.  I'm not 100 percent sure about the exact    10:36:32
6    instruction, but I believe it went    10:36:35
7    something like this:  Given that we have a    10:36:37
8    list of ICD-9 codes from that National    10:36:40
9    Disease and Therapeutic Index database, I    10:36:43
10    believe that these are all the ICD-9 codes    10:36:47
11    for which Neurontin was prescribed and that    10:36:49
12    he was then instructed to categorize them    10:36:54
13    into major groups, and I believe he was    10:36:56
14    given the categories as well.    10:37:00
15  Q.  Okay.    10:37:01
16  A.  Okay.    10:37:05
17  Q.  On the subject of the categories maybe if I    10:37:05
18    could just -- well, I'll withdraw that    10:37:12
19    question.    10:37:14
20    Do you know if we wrote the    10:37:14
21    commentary that appears on the document?    10:37:15
22    So, for example, under the first heading,    10:37:18
23    which is "Seizures & Epilepsy," there is an    10:37:20
24    italicized notation that says, "These are    10:37:24
25    all variants on seizure disorders."    10:37:27

396

1  A.  I believe those are his notes, yes.    10:37:28
2  Q.  Okay.  All right.  Now, I think we've    10:37:30
3    discussed before that you expect that    10:37:43
4    you'll receive data for your model that's    10:37:44
5    broken down by ICD-9 codes?    10:37:46
6  A.  Again, one of the major sources of data    10:37:48
7    that I talked about yesterday would be    10:37:50
8    these kinds of data from the National    10:37:51
9    Disease and Therapeutic Index, and those    10:37:54
10    are broken down by ICD-9 codes.    10:37:55
11  Q.  Is there any other data other than the NDTI    10:37:57
12    data that you imagine would be broken down    10:38:00
13    by ICD-9 codes?    10:38:02
14  A.  There's a similar database that I've    10:38:03
15    learned about subsequently that's produced    10:38:05
16    by Verispan.  I haven't worked with those    10:38:07
17    data myself, but I believe they are also    10:38:09
18    broken out by ICD-9 codes.  They're    10:38:11
19    referenced --    10:38:17
20  Q.  How about -- how about data from -- I'm    10:38:19
21    going to have to just give you the acronyms    10:38:20
22    since I don't know --    10:38:22
23  A.  That's okay.    10:38:22
24  Q.  -- what all the letters stand for, but    10:38:22
25    NAMCS?    10:38:26

22 (Pages 393 to 396)

M. ROSENTHAL

397

1  A.  Yeah, I reference those as well in my          10:38:27
2     declaration.  It's possible that I'll use       10:38:30
3     the NAMCS data, if that's okay, N-A-M-C-S.      10:38:33
4  Q.  Do you know if they're broken down by ICD-9    10:38:38
5     codes as well?                                  10:38:41
6  A.  They have condition codes.  I believe          10:38:41
7     they're ICD-9 codes as well.                    10:38:42
8  Q.  Okay.  Now, setting aside the data that you    10:38:50
9     mentioned before that was produced in the       10:38:58
10    Franklin case, which we can talk about          10:38:59
11    later --                                        10:39:02
12 A.  Okay.                                          10:39:02
13 Q.  -- have you collected any of this data yet?    10:39:03
14 A.  We have sent a request for data to the         10:39:05
15    defendants, but I do not yet have access to     10:39:08
16    these kinds of data aside from the Franklin     10:39:10
17    case, yeah.                                     10:39:13
18 Q.  All right.  You haven't sought to collect      10:39:14
19    the data from any of these sources,             10:39:16
20    directly from any of these sources,             10:39:19
21    correct?                                        10:39:21
22 A.  No, I have not done so for a variety of        10:39:21
23    reasons.  One, it's very expensive to           10:39:24
24    obtain data from IMS Health directly, and       10:39:27
25    two, they don't allow this data to be used      10:39:31

398

1     for litigation purposes.                        10:39:33
2  Q.  You mentioned IMS.  Is that also true of       10:39:34
3     NAMCS?                                          10:39:39
4  A.  The NAMCS is available publicly.  And I'm      10:39:40
5     sorry, I have looked in general at those        10:39:45
6     data to see the frequency with which           10:39:48
7     Neurontin shows up, for example.                10:39:51
8  Q.  Okay.  Okay.  Let's look at Rosenthal          10:39:52
9     Exhibit 15 a lot more closely.                  10:40:00
10 A.  Okay.                                          10:40:01
11 Q.  If you flip through it, you'll see that        10:40:00
12    there are four different bold headings that     10:40:09
13    appear in this document.  The first one is      10:40:14
14    "Seizures & Epilepsy."  The second one is       10:40:17
15    "Psychiatric Diagnoses/Mental Illness," the     10:40:23
16    third one is "Pain," and the last one is        10:40:26
17    "Migraine," correct?                            10:40:32
18 A.  That's correct.                                10:40:34
19 Q.  Would you agree that these roughly             10:40:34
20    correspond, maybe even not so roughly           10:40:37
21    correspond, with the different groupings        10:40:40
22    that are referenced in Footnote 64 of your      10:40:44
23    declaration?                                    10:40:47
24 A.  Yes, that's correct.                           10:40:47
25 Q.  Who decided on this particular aggregation?    10:40:54

399

1  A.  This aggregation, again, was provided to us    10:40:56
2     by Ben Sommers.                                 10:41:01
3  Q.  Do you have an understanding for what          10:41:02
4     dictated which ICD-9 codes belonged in          10:41:07
5     which group?                                    10:41:10
6  A.  His knowledge of the clinical issues           10:41:16
7     related to each of these conditions.            10:41:18
8  Q.  But it was a determination he made based on    10:41:19
9     his own clinical knowledge?                     10:41:23
10 A.  That's right.                                  10:41:24
11 Q.  Did he have input from you or Ms.              10:41:25
12    Rushnawitz at all on the subject?               10:41:28
13 A.  Of how to categorize these?  No, we were       10:41:29
14    seeking some understanding from him about       10:41:32
15    how these things generally played out.          10:41:34
16 Q.  Okay.  Your ability to accurately              10:41:35
17    disaggregate, in your mind, by indication       10:41:46
18    will depend on the correctness or accuracy      10:41:47
19    of the ICD-9 codes?                             10:41:50
20 A.  My ultimate analyses, this analysis --         10:41:53
21 Q.  Not necessarily this document.  Let's set      10:41:57
22    this document to one side for purposes of       10:41:58
23    this question.  But just the accuracy of --     10:42:00
24    well, depending on your ability to              10:42:03
25    accurately group indications by ICD-9 code,     10:42:05

400

1     correct?                                        10:42:09
2  A.  In terms of those categories which I'm         10:42:09
3     ultimately directed by counsel are to be        10:42:13
4     the indications to be considered for            10:42:16
5     damages, yes.                                   10:42:17
6  Q.  And in the same way your ability to            10:42:25
7     distinguish between on-label and off-label      10:42:27
8     prescriptions of Neurontin will depend on       10:42:28
9     your being able to accurately group             10:42:30
10    diagnoses using ICD-9 codes, correct?           10:42:35
11 A.  That's correct.                                10:42:38
12 Q.  So to put it another way, without data from    10:42:43
13    whatever source it is, whether it's NDTI or     10:42:46
14    NAMCS, broken down by indication your model     10:42:49
15    would not be able to separate out on-label      10:42:52
16    from off-label prescriptions; is that           10:42:55
17    correct?                                        10:42:59
18 A.  Though as we discussed yesterday there's a     10:42:59
19    simplified version of the model that            10:43:03
20    wouldn't distinguish them, that would look      10:43:04
21    at the effects of off-label prescribing on      10:43:06
22    total prescriptions, but as you noted           10:43:09
23    yesterday, it's not as good a model, it's       10:43:13
24    not as detailed a model as the model where      10:43:14
25    we break it out indication by indication.       10:43:17

23 (Pages 397 to 400)

401

```
1      That is a model that can be run.          10:43:19
2   Q. Right.  But I guess if we were interested    10:43:20
3      in separating out on-label prescriptions     10:43:22
4      from off-label prescriptions?            10:43:24
5   A. Clearly we need to be able to identify       10:43:25
6      them.                        10:43:28
7   Q. Right.  And the way to identify them is      10:43:28
8      with ICD-9 codes, correct?           10:43:29
9   A. That certainly seems to be the way that I    10:43:31
10     would think about going about it.  Right     10:43:32
11     now I can't think of another way to do it,    10:43:33
12     but there may be other kinds of disease      10:43:36
13     groupings.  ICD-9 is obviously the most      10:43:38
14     commonly used disease grouping.          10:43:43
15  Q. And as you sit here today, that's the way    10:43:44
16     that you envision doing this?  You can't      10:43:48
17     think of another way that you can do it?     10:43:49
18  A. As I sit here today, I would expect to use   10:43:49
19     diagnosis codes, yes.               10:43:51
20  Q. Did you discuss the use of those groups     10:43:53
21     with anybody else other than Ms. Rushnawitz    10:43:56
22     and Mr. Sommers?                10:43:58
23  A. I'm sorry, I don't know what you mean by    10:43:59
24     that question.  Did I discuss --         10:44:00
25  Q. The use of -- that's a slightly confused    10:44:02
```

402

```
1      question, I think.               10:44:10
2   A. Okay.                       10:44:10
3   Q. All right.  We discussed yesterday how --    10:44:11
4      and to some degree today as well how       10:44:23
5      counsel would instruct you which          10:44:26
6      indications to run through your model,      10:44:27
7      correct?                     10:44:28
8   A. That's correct.                 10:44:29
9   Q. And it would be through their instructions   10:44:29
10     that you would seek to exclude any uses for   10:44:42
11     which there have been no -- there had been    10:44:44
12     no fraudulent promotion?             10:44:45
13  A. That's correct.                 10:44:48
14  Q. And you wouldn't be conducting any analysis   10:44:51
15     yourself as to whether defendants promoted    10:44:54
16     Neurontin for a given off-label use?        10:44:55
17  A. I wouldn't be conducting any analysis       10:44:57
18     myself to identify what falls into that      10:45:02
19     category, yes.                  10:45:03
20  Q. Okay.  At this point I'm assuming they       10:45:04
21     haven't yet identified any ICD-9 codes that   10:45:09
22     are listed on Rosenthal Exhibit 15 that you   10:45:12
23     would not include in your analysis --       10:45:15
24  A. No.  I --                    10:45:15
25  Q. -- is that correct?               10:45:17
```

403

```
1   A. That's correct.  I have not received       10:45:17
2      specific instructions from counsel.  In my    10:45:20
3      reading of the complaint as -- even the      10:45:22
4      original complaint that these categories     10:45:27
5      are described in broader terms.  I don't     10:45:29
6      recall that they used ICD-9 codes there.     10:45:32
7   Q. Would you agree with me that the document   10:45:35
8      that -- well, would you agree with me that    10:45:39
9      Rosenthal 15 contains an exceedingly broad,   10:45:43
10     maybe even wildly overinclusive list of      10:45:50
11     possible ICD-9 codes to include in your      10:45:54
12     analysis?                     10:45:57
13  A. This document -- my understanding of what's   10:45:57
14     in this document is that it includes every    10:46:01
15     ICD-9 code for which Neurontin is         10:46:04
16     prescribed.  I don't know if any were      10:46:05
17     excluded, so it's a complete list.         10:46:10
18  Q. Okay.  Fair enough.  I think just to sort    10:46:13
19     of follow up on that question, if you can     10:46:19
20     turn to the second-to-last page.         10:46:21
21  A. Okay.                       10:46:23
22  Q. These pages aren't -- or maybe they are     10:46:23
23     numbered on yours.                10:46:26
24  A. 97.                        10:46:27
25  Q. Yeah, GMA97, thank you.  At the very bottom   10:46:28
```

404

```
1      of the page there is an italicized notation   10:46:33
2      that reads, "The last page or so is filled    10:46:34
3      with non-neuropathic pain" -- oh, I'm       10:46:37
4      sorry.                      10:46:37
5   A. Sorry.  96.  I'm with you now.         10:46:45
6   Q. Let me start again.  So we're looking at     10:46:47
7      GMA96, and what I'm looking at is the       10:46:49
8      italicized notation at the very bottom of     10:46:52
9      the page which reads, "The last page or so    10:46:53
10     is filled with non-neuropathic pain -- i.e.    10:46:55
11     your nerves work fine, you've just got a     10:46:58
12     major injury -- so Neurontin really isn't     10:47:01
13     the recommended drug, but who knows what      10:47:03
14     doctors are giving."               10:47:05
15        That would suggest to you -- that     10:47:07
16     would confirm your sense that this is an      10:47:08
17     inclusive list, correct?             10:47:09
18  A. Right.  Again, he was trying to categorize   10:47:11
19     everything in the list in some way and to     10:47:14
20     explain to us what these things really were   10:47:17
21     in laymen's terms.                10:47:20
22  Q. Here's a question for you:  Do you expect    10:47:30
23     that it would be you or plaintiffs' counsel   10:47:35
24     or somebody else who would seek to        10:47:39
25     translate the indications at issue in the     10:47:41
```

24 (Pages 401 to 404)

M. ROSENTHAL

405

1    case at whatever the appropriate time is          10:47:44
2    into the ICD-9 that are listed here              10:47:49
3    for purposes of deciding what to include in      10:47:51
4    your model?                                      10:47:54
5  A. That's a good question. Having not reached      10:47:55
6    that juncture of the investigation, it          10:47:59
7    would certainly not be me. I think the          10:48:01
8    question is whether it would be a clinical      10:48:04
9    expert under their direction or a clinical     10:48:06
10    expert under my direction who incidentally     10:48:09
11    wouldn't be a medical student but a real       10:48:11
12    clinical expert in this area. I don't know     10:48:14
13    at this time. I guess, again, I don't          10:48:17
14    understand exactly the legal issues around     10:48:23
15    what's in and what's out.                      10:48:25
16  Q. Okay.                                          10:48:26
17  A. But by no means would I as an economist       10:48:30
18    decide which ICD-9 codes map to which         10:48:33
19    indications.                                   10:48:40
20  Q. But in any event, the process hasn't yet      10:48:40
21    been done?                                     10:48:43
22  A. No, that hasn't. This really is just a        10:48:43
23    grouping of all the existing data into some   10:48:46
24    categories that we could understand what      10:48:49
25    they meant.                                    10:48:51

406

1  Q. So you don't know yet if you would have       10:48:52
2    difficulty matching ICD-9 codes with the      10:48:55
3    indications that are still relevant to the    10:48:58
4    case, because you haven't had to conduct      10:49:00
5    that analysis yet?                            10:49:03
6  A. I have not conducted that analysis yet.      10:49:04
7  Q. How do you propose to treat PHN for          10:49:08
8    purposes of your grouping?                    10:49:12
9  A. Again, as we discussed before, I'm not       10:49:13
10    entirely clear as to how that's going to be 10:49:16
11    treated legally, whether PHN is going to be  10:49:18
12    included as an indication to be analyzed.    10:49:20
13    And if it were, again, I think the issue     10:49:24
14    would be the same, consulting the            10:49:26
15    appropriate clinical expert as to which      10:49:29
16    ICD-9 codes would characterize PHN. I        10:49:31
17    don't know, sitting here, which those are.   10:49:34
18  Q. Okay. Would you agree at this point that     10:49:35
19    it would likely be important to be able to   10:49:42
20    isolate PHN prescriptions by ICD-9 codes     10:49:43
21    given that it's an on-label use for some     10:49:47
22    period of the class and it's an off-label    10:49:49
23    use for some period of the class?            10:49:51
24  A. I'm sorry, I just -- I haven't fully         10:49:53
25    thought about how to do that because I       10:49:56

407

1    haven't considered --                          10:49:58
2  Q. I'm just -- all I'm asking is whether you     10:49:59
3    would agree that it's something that you      10:50:01
4    would need to do.                             10:50:03
5  A. It might be important if I need to exclude    10:50:04
6    them.                                         10:50:07
7  Q. Okay. Or if you need to decide how to        10:50:07
8    group them?                                   10:50:09
9  A. You mean in the period after approval, for   10:50:10
10    example?                                      10:50:17
11  Q. Either one.                                   10:50:17
12  A. Well, in the period before approval it      10:50:18
13    might be included with other neuropathic    10:50:22
14    pain, might it not?                          10:50:24
15  Q. Okay.                                        10:50:26
16  A. In the period after it might be important   10:50:26
17    to decide how to identify it --              10:50:29
18  Q. Fair enough.                                 10:50:29
19  A. -- depending on, again --                    10:50:31
20  Q. Fair enough. Could you take a second and    10:50:32
21    look through Rosenthal Exhibit 15 and find   10:50:36
22    for me the code for postherpetic neuralgia?  10:50:38
23       MR. NOTARGIACOMO: Objection.             10:50:44
24  A. Can you just tell me the answer to that      10:50:47
25    question? I'm assuming that it's not here,   10:50:49

408

1    but...                                         10:50:51
2  Q. Your assumption, as far as I'm aware, is     10:50:52
3    correct, but I don't want to be the one to   10:50:54
4    represent that to you.                        10:50:56
5  A. Okay. Well, then I'll need a few minutes.    10:50:56
6  Q. Take your time.                               10:50:59
7       (Witness reviews document.)               10:51:00
8  A. To the best of my ability to understand      10:52:07
9    these clinical terms, I don't see            10:52:09
10    postherpetic neuralgia. I certainly don't    10:52:11
11    see those specific words.                     10:52:13
12  Q. Do you have any understanding for why it's   10:52:14
13    not on the list?                              10:52:16
14  A. No, I don't.                                  10:52:16
15  Q. There is no code for postherpetic           10:52:19
16    neuralgia, is there?                          10:52:21
17  A. I have no knowledge of whether there is or   10:52:21
18    isn't.                                        10:52:24
19  Q. So as you sit here today, though, you're    10:52:24
20    not aware of a way to isolate prescriptions  10:52:28
21    of Neurontin for PHN; is that correct?       10:52:30
22  A. I am not aware of a way to do that at this   10:52:32
23    point, no. I can imagine one could combine   10:52:36
24    codes for the -- as we talked about          10:52:38
25    yesterday, I'm not really clear whether      10:52:44

25 (Pages 405 to 408)

postherpetic neuralgia is related to herpes 10:52:46
or herpes zoster, but in any case there is 10:52:49
some underlying condition that I believe 10:52:52
it's related to. There may be some way to 10:52:53
identify postherpetic neuralgia by looking 10:52:55
at a combination of neuropathic pain and 10:52:56
the underlying condition codes for both of 10:52:59
those, but as I sit here today, I do not 10:53:01
know how I would implement that. 10:53:04
Q. Okay. Both yesterday and today you 10:53:05
testified that you reviewed some data that 10:53:11
you understood came from NDTI that was 10:53:15
produced by defendants in the Franklin 10:53:17
case? 10:53:19
A. Yes, that's right. 10:53:20
Q. And when I asked about that data, you 10:53:21
referred me to Footnote 72 of your 10:53:23
declaration, correct, which is Exhibit 1 to 10:53:26
your deposition? 10:53:30
A. And Footnote 73, yes. 10:53:35
Q. Okay. Footnote 72 reads, "Counsel has 10:53:40
already provided a roll out of these data 10:53:42
and conducted preliminary analysis with 10:53:44
them. The data that I have reviewed 10:53:45
clearly allow for identifying prescription 10:53:47

patterns by diagnosis." 10:53:49
Did I read that correctly? 10:53:52
A. Yes, you did. 10:53:53
Q. And you just referred me to Footnote 73 as 10:53:54
well -- 10:53:58
A. Yes. 10:53:58
Q. -- which refers to Pages 63 to 65 of 10:53:58
Exhibit B to the affidavit of C. Seth 10:54:04
Landefeld, M.D. and Michael Steiman, M.D. 10:54:08
and I take it that that document contains 10:54:17
the materials that you reference in 10:54:19
Footnote 72? 10:54:21
A. That's correct. 10:54:22
Q. And that therefore that's the information 10:54:25
that you've reviewed to clearly allow for 10:54:27
identifying prescription patterns by 10:54:31
diagnosis? 10:54:32
A. And, again, the list of ICD-9 codes that 10:54:32
goes along with that, yes. 10:54:36
MR. POLUBINSKI: Okay. Now let's 10:54:37
mark the next exhibit. 10:54:39
(Exhibit No. 16, Affidavit of C. 10:54:39
Seth Landefeld, M.D. and Michael Steiman, 10:54:39
M.D., marked for identification.) 10:54:56
Q. Okay. I'm handing you a document that's 10:54:57

been marked as Rosenthal Exhibit 16. Can 10:54:58
you turn to the specific pages that are 10:55:11
referenced in Footnote 73 of your 10:55:12
declaration -- 10:55:15
A. Okay. 10:55:15
Q. -- which is to say Pages 63 to 65 of 10:55:15
Exhibit B. 10:55:18
A. Okay. 10:55:31
Q. These three pages are the pages that you 10:55:31
had in mind, correct? 10:55:33
A. That's right, particularly the -- I'm 10:55:34
sorry, I can't see the page numbers, 63. 10:55:37
Q. Okay. And if you flip back to Page 62 -- 10:55:39
A. Okay. Yes. 10:55:44
Q. -- the top of 62 reads, "Appendix 1: Use 10:55:48
of gabapentin - national and Medicaid 10:55:54
program estimates." 10:55:57
A. Yeah. 10:56:01
Q. So the graphs that you referred to in 10:56:01
Footnote 73 are part of Appendix 1 to this 10:56:05
report; is that correct? 10:56:09
A. That's my understanding, yeah. 10:56:09
Q. Are you aware that the graphs on Pages 63 10:56:11
to 65 were created by the lawyers, Greene 10:56:23
and Hoffman? 10:56:26

A. I believe that that's right, that analysis 10:56:27
was done by the lawyers, yes, which is why 10:56:29
I don't -- didn't use it specifically. 10:56:31
Q. Okay. Did you review the underlying report 10:56:36
to which this document is attached as an 10:56:38
exhibit? 10:56:40
A. I may have. We certainly tried to learn 10:56:40
where the data came from, what assumptions 10:56:44
they made in plotting the data, yes. 10:56:48
Q. Okay. If we could look at Page 43 -- 10:56:54
A. Okay. 10:57:00
Q. -- of the report that is attached as 10:57:00
Exhibit B to this declaration. That report 10:57:05
is called "Expert Consultant's Report, 10:57:10
United States ex rel Franklin versus 10:57:14
Pfizer, Inc., et al., prepared by Michael 10:57:17
Steiman, M.D., C. Seth Landefeld, M.D., 10:57:20
Mary-Margaret Chren, M.D." 10:57:25
A. I'm sorry, you've lost me. At which page? 10:57:28
Q. It's Page 43 of the -- 10:57:31
A. Okay. 10:57:33
Q. -- of Exhibit B, the underlying report. 10:57:33
MR. NOTARGIACOMO: I'm sorry, I 10:57:38
don't see that language on Page 43. 10:57:39
A. (Indicating.) 10:57:43

**413**

1 Q. That's Page 43.                         10:57:44
2 A. I'm in the right place?                  10:57:45
3 Q. Yes.                                     10:57:46
4 A. Okay.  Sorry.                            10:57:47
5     MR. NOTARGIACOMO: You've just          10:57:48
6  read something that -- I'm not sure where  10:57:49
7  it came from.                              10:57:51
8     MR. POLUBINSKI: Yeah, what I just      10:57:54
9  read was the title of the report itself,   10:57:55
10 the title of what Exhibit B actually is.   10:57:56
11 A. Yes.                                    10:57:56
12    MR. POLUBINSKI: It's an expert         10:57:56
13 consultant's report.                       10:57:58
14 A. Okay.                                   10:57:58
15    MR. NOTARGIACOMO: Okay.  Where         10:57:59
16 is -- I'm just asking where that language  10:57:59
17 is.  What page?                            10:58:01
18    MR. POLUBINSKI: Page 1 of Exhibit      10:58:01
19 B.                                         10:58:02
20 A. Yeah.                                   10:58:03
21    MR. POLUBINSKI: I was reading it       10:58:09
22 really just to give context of what Exhibit 10:58:10
23 B really is.  I want focus on Page 43.     10:58:12
24 BY MR. POLUBINSKI:                         10:58:16
25 Q. If you could focus with me on the first two 10:58:17

**414**

1  sentences at the top of the page.  They    10:58:23
2  read, "Documents provided by Pfizer/Parke- 10:58:27
3  Davis document massive growth in the use of 10:58:31
4  gabapentin for unapproved uses over the    10:58:34
5  mid- and late 1990s (RXD)" with a reference 10:58:38
6  to Footnote 10, "These are explained       10:58:44
7  graphically in Appendix 1."                10:58:47
8     You would agree that these             10:58:51
9  sentences refer to the graphs on Pages 63  10:58:51
10 to 65 that you cite --                      10:58:58
11 A. Yes.                                    10:58:59
12 Q. -- in your declaration, correct?        10:58:59
13 A. Yes.                                    10:59:00
14 Q. Can you take a look at Footnote 10, please, 10:59:01
15 of your report.                            10:59:03
16 A. Yeah.                                   10:59:04
17 Q. It's Footnote 10.  That reads, "This data 10:59:04
18 was compiled by Green and Hoffman from     10:59:10
19 documents received by Pfizer/Parke-Davis.  10:59:13
20 The original source of this data is        10:59:15
21 unclear, and we do not have clear          10:59:17
22 confirmation of the units of measurement   10:59:19
23 (e.g. we cannot be sure if they represent  10:59:21
24 the number of unique prescriptions, the    10:59:24
25 number of one month supplies of medications 10:59:27

**415**

1  dispensed, et cetera).  The classification 10:59:29
2  of individual diagnoses into categories and 10:59:33
3  disease was performed by Greene and Hoffman 10:59:36
4  and briefly reviewed by us."               10:59:36
5 A. I see that.                             10:59:39
6 Q. Have you been able to determine the     10:59:50
7  original source of the data or the units of 10:59:52
8  measurement that Drs. Landeman (sic),      10:59:55
9  Steiman and Chren were not able to?        10:59:59
10 A. We confirmed with the office of Mr. Chren. 11:00:03
11 I don't know Mr. Hoffman, or Ms. Hoffman.  11:00:07
12 I don't know.  But with Mr. Chren that     11:00:09
13 these data -- the original source of the   11:00:11
14 data was the National Disease and          11:00:13
15 Therapeutic Index report from IMS.  And so 11:00:17
16 we learned about that data set in          11:00:20
17 particular, and the data set records       11:00:22
18 prescribing by physicians at an office     11:00:26
19 visit.                                     11:00:29
20 Q. Have you actually reviewed the underlying 11:00:31
21 data set yourself?                          11:00:33
22 A. I have -- not the underlying data set, no. 11:00:34
23 I've seen the spreadsheets from which the  11:00:38
24 graphs were developed, but I did not use   11:00:40
25 the data myself because I didn't have the  11:00:46

**416**

1  original data set, so I couldn't confirm if 11:00:47
2  they were used appropriately.              11:00:49
3 Q. Okay.  When you say you saw the          11:00:51
4  spreadsheets that were prepared from the   11:00:55
5  underlying data --                         11:00:56
6 A. That list those diagnosis codes.        11:01:01
7 Q. Okay.  Are those documents that are      11:01:02
8  referred to in the list of documents       11:01:06
9  considered in your report?                 11:01:07
10 A. Again, I don't -- I guess I don't know if 11:01:08
11 it's -- that's separate from this document 11:01:12
12 itself.  I guess the spreadsheets I did    11:01:15
13 see, I don't know that they're not -- I    11:01:19
14 don't know that they're in my list, no.    11:01:21
15    MR. POLUBINSKI: We'd ask that you      11:01:25
16 or plaintiffs' counsel identify what the   11:01:26
17 spreadsheets are.  Insofar as they're      11:01:28
18 documents that have actually been produced 11:01:30
19 by defendants, we would be grateful to know 11:01:31
20 what the Bates number of those documents   11:01:33
21 are.  Insofar as they're documents that    11:01:35
22 were actually prepared for Dr. Rosenthal's 11:01:38
23 use, Professor Rosenthal's use in preparing 11:01:41
24 her declaration, we call for their         11:01:44
25 production.                                11:01:46

27 (Pages 413 to 416)

M. ROSENTHAL

417

1  A. I believe they were part of the Franklin          11:01:46
2     production itself, but...                          11:01:49
3           MR. NOTARGIACOMO: I'll look into             11:01:50
4     it.                                                11:01:52
5           THE WITNESS: Okay.                           11:01:52
6  Q. All right. Aside from the spreadsheets            11:02:06
7     that we've just talked about that summarize        11:02:07
8     this data --                                       11:02:09
9  A. Yeah.                                              11:02:10
10 Q. -- have you reviewed any other NDTI data          11:02:10
11    for your work in this case?                        11:02:13
12 A. No, I have not.                                    11:02:14
13 Q. We can set that document to one side.             11:02:26
14 A. Okay. Thank you.                                   11:02:28
15 Q. So in your declarations you've proposed           11:02:49
16    using two different data sets to collect           11:02:52
17    data on actual Neurontin prescriptions by          11:02:54
18    diagnosis, correct?                                11:02:56
19 A. In my original declaration I believe I            11:02:57
20    named the NDTI, if it's okay to use that          11:02:59
21    abbreviation, and the NAMCS data as leading        11:03:02
22    candidates.                                        11:03:06
23 Q. Okay.                                              11:03:06
24 A. In my response to Argenbright I also note          11:03:06
25    the existence of this Verispan competitor.         11:03:09

418

1  Q. Okay. Have you ever used the data from the         11:03:11
2     Verispan competitor before?                        11:03:15
3  A. No, I have not.                                     11:03:16
4  Q. Have you made any inquiries at all as to           11:03:17
5     the categories of data that might be               11:03:19
6     available to you through that source?              11:03:21
7  A. The staff spoke, so that would have been           11:03:22
8     Mr. Augusteijn in all likelihood spoke to a        11:03:27
9     salesperson at Verispan to ask about what          11:03:29
10    the data contained and confirmed that it           11:03:31
11    was similar in structure to the NDTI.              11:03:34
12 Q. Are you aware of any differences between           11:03:36
13    the Verispan data and the NDTI data in             11:03:44
14    terms of the differences that would be             11:03:48
15    relevant to the work that you are doing --         11:03:53
16    that you would contemplate doing in this           11:03:54
17    case?                                              11:03:56
18 A. I believe they have different sample sizes.        11:03:57
19    I don't know the exact sample size for the         11:03:59
20    Verispan data set, but in the other                11:04:00
21    comparisons between NAMCS -- sorry, between        11:04:03
22    IMS Health and Verispan for their                  11:04:06
23    promotional data, for example, they survey         11:04:09
24    a different set of physician offices.              11:04:11
25 Q. Is it your sense that one set of data would        11:04:14

419

1     be any more reliable than the other set?           11:04:16
2  A. I believe they're both large data sets that        11:04:19
3     are widely used, but I haven't evaluated           11:04:24
4     whether one is better than the other yet.          11:04:27
5  Q. How would you envision using these three           11:04:28
6     different data sets in your work?                  11:04:40
7  A. Well, I guess, again, I would sort of              11:04:42
8     evaluate first which database offered the          11:04:45
9     largest samples, the most detailed breakout        11:04:50
10    by diagnosis, for example, assuming they're        11:04:54
11    not all identical, and then primarily we           11:04:57
12    would likely look at monthly units of             11:05:01
13    Neurontin by diagnosis, potentially by            11:05:06
14    dosing, by NDC code.                               11:05:10
15 Q. When you say "potentially by dosing," what         11:05:14
16    do you mean by "potentially"?                      11:05:18
17 A. Well, it's not clear to me at this point           11:05:18
18    whether we roll up dosages or break them           11:05:21
19    out separately and estimate separate models        11:05:24
20    for each of them.                                  11:05:26
21 Q. When you say "roll up dosages," you mean?          11:05:30
22 A. Essentially add together extended units for        11:05:32
23    each dose.                                         11:05:35
24 Q. At this point do you envision that you             11:05:37
25    would need all three, or do you imagine            11:05:49

420

1     that they would be to some degree or              11:05:50
2     another redundant?                                 11:05:54
3  A. I guess at this point I would imagine, in         11:05:55
4     all likelihood, using more than one, given         11:06:01
5     that they're available, perhaps confirming         11:06:04
6     results with one or another. I'm not              11:06:06
7     entirely sure, if one were to prove really         11:06:09
8     superior to the others, then I would likely        11:06:11
9     only use one. But if there were different         11:06:13
10    strengths and weaknesses, I might                  11:06:16
11    triangulate results with two.                      11:06:18
12 Q. How would you determine whether one data          11:06:19
13    set's superior to another?                         11:06:22
14 A. Well, largely having to do with the sample        11:06:23
15    size and the ability to break out these            11:06:25
16    diagnoses.                                         11:06:32
17 Q. I take it that that's not work that you've         11:06:32
18    done yet, looking into the different sample        11:06:38
19    sizes for each of these three data sets?           11:06:40
20 A. There was a little bit of that in my              11:06:42
21    response to Dr. Argenbright, as you may            11:06:45
22    recall in that report.                             11:06:48
23 Q. Aside from what's set forth in your               11:06:55
24    declaration, have you done any analysis at         11:06:57
25    this point about the sample size through          11:06:59

28 (Pages 417 to 420)

M. ROSENTHAL

---

421

1  competing possibilities?                    11:07:01
2  A. I have a general sense from having used    11:07:03
3     these data before that the NDTI has a      11:07:06
4     bigger sample size, for example, than the  11:07:10
5     NAMCS, but, again, I have not used the     11:07:12
6     Verispan data, so I don't know precisely   11:07:14
7     what their sample is.                  11:07:16
8  Q. Have you done any work to date on the      11:07:20
9     relative strengths and weaknesses of the  11:07:24
10    different data sets in breaking           11:07:27
11    prescriptions out by indication?          11:07:30
12 A. Today I have not, no.                   11:07:33
13 Q. Why not?                            11:07:34
14 A. Because I -- what I viewed as my task with  11:07:34
15    regards to the data, this report was to    11:07:41
16    identify a number of data sets that would  11:07:45
17    provide plausible sources of information   11:07:46
18    for breaking out use by diagnosis, and it  11:07:48
19    appears that both the NDTI and the NAMCS   11:07:53
20    have those data, and at the time that I    11:07:57
21    must actually do the analysis decide which 11:08:00
22    of those is more appropriate.            11:08:02
23 Q. Do you have to decide based on what further 11:08:04
24    inquiry of NDTI or NAMCS?               11:08:14
25 A. And no doubt the literature as well.       11:08:17

---

422

1  Q. But there's no reason why you couldn't have 11:08:19
2     conducted that analysis at this stage?     11:08:22
3  A. And I made preliminary investigations into  11:08:23
4     the characteristics of these data sets that 11:08:27
5     I found sufficient to draw my conclusion   11:08:29
6     that the data would be available for the   11:08:30
7     analysis.                           11:08:31
8  Q. All of these data sets are derived from     11:08:35
9     samples, correct?                     11:08:37
10 A. Yes, that's true.                      11:08:38
11 Q. And so there will be some amount of        11:08:41
12    inaccuracy that will be built into the     11:08:44
13    data?                             11:08:45
14 A. There is what's termed sampling error in    11:08:46
15    every sample-based estimate.            11:08:49
16 Q. Here's another general question about the   11:08:52
17    data:  I'm assuming that the patient       11:08:56
18    information in each of these data sets is   11:08:59
19    ultimately confidential?               11:09:00
20 A. When you say "patient information," do you  11:09:03
21    mean Mrs. Jones, her insurance number, that 11:09:07
22    kind of patient information?             11:09:09
23 Q. I guess the ultimate question that I'm      11:09:10
24    getting at is, none of these data would    11:09:12
25    enable you to determine the diagnosis      11:09:15

---

423

1  associated with any given identifiable       11:09:20
2  patient's prescription; is that correct?    11:09:22
3  A. Can I -- may I restate that --           11:09:24
4  Q. Sure.                             11:09:28
5  A. -- just to make sure I understand it? I    11:09:28
6     can't use these data to then link back to  11:09:30
7     an individual patient?                 11:09:32
8  Q. Precisely.                         11:09:35
9  A. Yes, that's true.                     11:09:36
10 Q. And so that the data that you would        11:09:39
11    collect, of course, would be used only in   11:09:41
12    the aggregate analysis that we've been     11:09:42
13    talking about for the past day and a bit?  11:09:44
14 A. That's correct.                      11:09:46
15 Q. Okay.  And then it wouldn't be appropriate  11:09:46
16    for any sort of patient-by-patient        11:09:49
17    analysis?                          11:09:50
18 A. Again, when you say "patient-by-patient,"   11:09:51
19    you mean really a specific patient --      11:09:54
20 Q. Sure.                             11:09:57
21 A. -- as opposed to you could do a patient     11:09:57
22    level analysis, but that's not identifying  11:09:59
23    a specific patient.                   11:10:00
24 Q. What do you mean by "a patient level       11:10:02
25    analysis," what you just said?           11:10:03

---

424

1  A. For example, you could imagine running a    11:10:05
2     logistic regression, a model looking at the 11:10:09
3     probability that an individual receives a   11:10:12
4     prescription for Neurontin as a function of 11:10:14
5     the variables in the NAMCS, for example,   11:10:18
6     private insurance coverage, for example.    11:10:22
7     That would be a patient level analysis, but 11:10:26
8     you still don't identify Mrs. Jones.       11:10:28
9  Q. Right.  Right.  Okay.  Let's talk about --  11:10:29
10    let me go back to your last answer.  Can   11:10:45
11    you do what you just described in your last 11:10:47
12    answer with the NDTI data set?           11:10:48
13 A. I am not certain at what level of detail -- 11:10:50
14    again, since I don't have the raw data     11:10:55
15    themselves, I'm not certain what level of   11:10:57
16    detail is available in the NDTI, that NAMCS 11:10:59
17    is a patient level, it's a visit level     11:11:01
18    database.  I understand the NDTI is        11:11:06
19    structured and sampled in a similar way, so 11:11:08
20    it may be possible to.                 11:11:09
21 Q. But you don't know, as we sit here today,   11:11:10
22    whether you could go back to individual     11:11:12
23    patient records in the NDTI database?      11:11:14
24 A. I do not, as we sit here today.           11:11:16
25 Q. Let's talk about the NAMCS database for a   11:11:21

---

29 (Pages 421 to 424)

M. ROSENTHAL

425

1  second.                                    11:11:23
2  A. Okay.                                   11:11:23
3  Q. You talked about sampling error?        11:11:23
4  A. Yes.                                     11:11:25
5  Q. With regard to NAMCS, in view of the         11:11:25
6      potential for built-in sampling error, have      11:11:32
7      you devised some method to calculate       11:11:35
8      standard errors for frequencies, percents    11:11:36
9      and rates?                              11:11:39
10  A. Have I devised the method?  In the NAMCS      11:11:42
11     they give you enough information to be able     11:11:45
12     to compute those confidence intervals,       11:11:48
13     standard errors.  They have weights,       11:11:52
14     sampling weights.                        11:11:54
15  Q. Did NAMCS have standard weights that they     11:11:55
16     provide for purposes --                   11:11:59
17  A. They did, yes.                           11:12:00
18  Q. -- of your analysis?                      11:12:00
19  A. Yes.                                     11:12:00
20        (Discussion off the record.)          11:12:12
21        MR. POLUBINSKI:  Let's mark the        11:12:20
22  next exhibit.                               11:12:20
23        (Exhibit No. 17, Document headed       11:12:21
24  "National Ambulatory Medical Care Survey,       11:12:21
25  2006 Patient Record," marked for            11:12:21

426

1  identification.)                             11:12:22
2  Q. Okay.  We've just handed you a document       11:12:38
3      that's marked as Rosenthal Exhibit 17.  Do     11:12:42
4      you recognize this?                      11:12:45
5  A. I believe it's the data collection         11:12:45
6      instrument for the NAMCS.                11:12:47
7  Q. Which is to say that this is the document     11:12:48
8      that doctors would fill out to provide      11:12:53
9      information as part of the NAMCS survey?      11:12:56
10  A. That's my understanding, yes.            11:12:58
11  Q. Have you ever reviewed this before?        11:13:01
12  A. I have seen it before, but I have certainly    11:13:02
13     not reviewed it in detail recently.        11:13:07
14  Q. Let's look at Section 5.  It's about       11:13:09
15     halfway down the page.                    11:13:12
16  A. Okay.                                    11:13:13
17  Q. You'll see three spaces for three different    11:13:14
18     diagnoses in letter A -- under letter A,     11:13:18
19     correct?                                11:13:22
20  A. Yes.                                     11:13:22
21  Q. And under letter B you'll see sort of 15 or    11:13:23
22     20 additional boxes that a doctor could      11:13:27
23     check as additional conditions a patient     11:13:30
24     might have?                              11:13:32
25  A. Yes, I see that.                         11:13:32

427

1  Q. And then if we look down at Section 10,      11:13:35
2      which reads "Medications & Immunizations."    11:13:38
3  A. Yes, I see that.                          11:13:41
4  Q. You'll see that there are listed -- well,     11:13:43
5      there are eight spaces there under the      11:13:46
6      heading "Medications & Immunizations,       11:13:49
7      correct?                                11:13:51
8  A. Yes.                                     11:13:51
9  Q. Is there any way that you can see to tie      11:13:52
10     individual medications prescribed back to     11:13:56
11     individual diagnoses on this record?        11:13:58
12  A. If there's more than one of either, then,     11:13:59
13     no, then you can't make that connection.     11:14:05
14     You're correct that one weakness of the     11:14:14
15     NAMCS is that the prescription is not       11:14:15
16     directly connected with the diagnosis code.    11:14:19
17  Q. Okay.  So putting a little context on your    11:14:21
18     observation, in this case if a given record    11:14:28
19     contained a diagnosis for migraine,        11:14:33
20     assuming that migraine is one of the       11:14:35
21     indications that you run through your       11:14:37
22     model --                                11:14:38
23  A. Okay.                                    11:14:39
24  Q. -- and also a diagnosis for epilepsy and it    11:14:39
25     contained a prescription for Neurontin as    11:14:42

428

1      well --                                 11:14:44
2  A. Yeah.                                    11:14:44
3  Q. -- you wouldn't have any way of knowing      11:14:44
4      whether that prescription was written for     11:14:46
5      an off-label use, correct?                11:14:47
6  A. If that were the case, I think the         11:14:48
7      conservative assumption would have to be to    11:14:51
8      categorize that as an on-label use.        11:14:54
9  Q. Okay.   And with respect to the NDTI data     11:14:56
10     set, generally speaking, what's your source    11:15:13
11     of the -- or what's your understanding of     11:15:16
12     the source of the data that underlies that    11:15:18
13     data set?                               11:15:21
14  A. The underlying data set, I believe, is      11:15:25
15     collected in a similar way to the NAMCS.     11:15:27
16     Again, doctors are asked to fill out data     11:15:29
17     collection forms similar to this, my        11:15:32
18     understanding, for the NDTI.             11:15:35
19  Q. Have you ever seen a copy of the survey      11:15:37
20     form for NDTI?                          11:15:39
21  A. I have not, no.                          11:15:39
22  Q. Are you aware of whether it differs from     11:15:43
23     the NAMCS data set?                      11:15:45
24  A. My understanding from having reviewed the    11:15:48
25     Argenbright report -- sorry, is that okay?    11:15:51

30 (Pages 425 to 428)

VERITEXT/NEW YORK REPORTING COMPANY

M. ROSENTHAL

429

1 Q. You can go ahead and answer. That was not        11:15:55
2    quite the question that I meant to ask, but       11:15:58
3    why don't you go ahead and give the answer.       11:16:00
4    Your understanding from the Argenbright --        11:16:00
5 A. My understanding from reviewing the              11:16:01
6    Argenbright report and the supporting            11:16:03
7    documents that he provided is that with the      11:16:05
8    NDTI there is a one-to-one link between          11:16:07
9    diagnosis and prescription, but I've not         11:16:11
10   verified that myself.                            11:16:16
11 Q. Okay. Do you know whether you'll have           11:16:17
12   access to individual survey forms when you       11:16:24
13   request data from IMS, the NDTI data?            11:16:27
14 A. Do you mean the model or the actual one         11:16:29
15   that was filled out?                             11:16:32
16 Q. I mean ones that were actually filled out.      11:16:33
17 A. I would not expect so. I would not expect       11:16:35
18   that one could get those from NAMCS either,      11:16:38
19   although the database is structured exactly      11:16:42
20   in the same way.                                 11:16:45
21 Q. Okay. We can set this one aside, too.           11:16:46
22 A. Okay.                                           11:16:51
23      MR. NOTARGIACOMO: Is it time for              11:16:53
24   another five-minute break?                       11:16:53
25      MR. POLUBINSKI: If you'd like,                11:16:54

430

1    that's fine with me.                             11:16:56
2      THE WITNESS: Is that okay? Just               11:16:57
3    five minutes.                                    11:16:58
4      MR. POLUBINSKI: Of course, yeah.              11:16:59
5      THE VIDEOGRAPHER: The time is                 11:17:01
6    11:17. This is the end of Tape 2, and we        11:17:03
7    are off the record.                              11:17:07
8      (Recess taken.)                               11:17:08
9      THE VIDEOGRAPHER: The time is                 11:28:45
10   11:28. This is beginning of Tape 3, and we      11:28:47
11   are back on the record.                          11:28:49
12 BY MR. POLUBINSKI:                                 11:28:50
13 Q. Professor Rosenthal, just to go back for        11:28:50
14   one second to Rosenthal Exhibit 15, there's      11:28:54
15   one issue I just want to make sure is            11:28:58
16   clear.                                           11:29:02
17 A. Okay.                                           11:29:02
18 Q. I may not have it clearly on the record.        11:29:02
19   Your testimony was that Mr. Sommers would        11:29:06
20   have done the aggregation or the groupings       11:29:09
21   that appear on this list, correct?              11:29:11
22 A. That's correct.                                 11:29:14
23 Q. Are you aware of whether somebody would         11:29:14
24   have instructed him about the different          11:29:18
25   categories into which to group the               11:29:20

431

1    individual costs?                                11:29:22
2 A. I believe -- as I stated, I believe that we     11:29:23
3    gave him the categories.                         11:29:26
4 Q. Okay.                                            11:29:28
5 A. I'm not absolutely sure of that, but I          11:29:28
6    believe that we did.                             11:29:31
7 Q. Terrific. That's the point I wanted to          11:29:32
8    clarify.                                         11:29:35
9 A. Okay.                                            11:29:35
10 Q. Okay. In Exhibit 1, your report, Paragraph     11:29:36
11   37, you propose to "introduce a                  11:29:44
12   contemporaneous comparator or control drug       11:29:50
13   that could serve as a yardstick" as a            11:29:54
14   further refinement of your equation; is          11:30:00
15   that correct?                                     11:30:02
16 A. That's correct.                                 11:30:02
17 Q. Have you done that analysis yet?               11:30:02
18 A. As we've discussed, I don't have the data      11:30:05
19   to do these analyses yet, so I have not          11:30:08
20   done that analysis, either.                      11:30:10
21 Q. What data would you use to do that             11:30:11
22   analysis?                                         11:30:14
23 A. The data that I would use to do that           11:30:14
24   analysis would be very similar to the data       11:30:18
25   that we've discussed already on the              11:30:21

432

1    quantity side, so perhaps the NDTI or the        11:30:25
2    NAMCS or that other Verispan data set that       11:30:28
3    we discussed.                                     11:30:32
4 Q. And I assume that the data that you would       11:30:33
5    use would both be Neurontin data and data        11:30:35
6    for whatever the proposed comparator would       11:30:38
7    be?                                              11:30:41
8 A. That's correct.                                  11:30:41
9 Q. Do you definitely plan on doing this            11:30:45
10   analysis with a contemporary comparator in       11:30:47
11   your model?                                       11:30:51
12 A. I guess I'm not entirely sure yet whether      11:30:57
13   the circumstances will make that              11:30:59
14   appropriate, so depending on exactly what       11:31:00
15   kinds of promotional activities we're           11:31:02
16   talking about, which indications we're          11:31:04
17   talking about, then it may be appropriate       11:31:07
18   to do that, but I guess it definitely is a      11:31:08
19   word that I feel is maybe a little too          11:31:13
20   strong, but I think in all likelihood I'll      11:31:17
21   look to comparator drugs, at least examine      11:31:19
22   their trends.                                    11:31:22
23 Q. And why would you anticipate you would do      11:31:24
24   that, in all likelihood?                         11:31:26
25 A. That's simply a good way of getting a          11:31:27

31 (Pages 429 to 432)

M. ROSENTHAL

433

```
 1    better approximation of the true effect.      11:31:33
 2 Q. If you weren't able to do this analysis,      11:31:41
 3    would you still be able to get a reliable      11:31:44
 4    approximation of the true effect?             11:31:50
 5 A. Well, I guess I'm not sure why I wouldn't      11:31:52
 6    be able to do the analysis, but if I          11:31:58
 7    weren't for some reason able to do the        11:32:01
 8    analysis, then it would depend on the         11:32:03
 9    underlying circumstances, so a comparator     11:32:06
10    drug allows for breaking out essentially      11:32:10
11    other secular trends. If those secular        11:32:13
12    trends were unimportant, then it wouldn't     11:32:16
13    matter.                                       11:32:18
14 Q. But at this point you don't know; is that     11:32:21
15    correct?                                      11:32:23
16 A. At this point I couldn't say for sure.        11:32:23
17 Q. Do you plan on -- withdrawn.                  11:32:27
18       Would you depend on using one drug         11:32:29
19    or more than one in your comparator           11:32:31
20    analysis?                                     11:32:33
21 A. At this point I can't really say for sure.    11:32:34
22    I would need to review the data and again     11:32:36
23    the clinical issues related to these          11:32:41
24    comparison drugs.                             11:32:46
25 Q. How will you decide whether you use one or    11:32:47
```

434

```
 1    more than one?                                11:32:49
 2 A. Well, I guess it would depend again on for    11:32:54
 3    a particular indication how many drugs were   11:32:57
 4    substitutes for Neurontin for that            11:33:00
 5    indication.                                   11:33:02
 6 Q. Would it depend on other things or just       11:33:04
 7    that?                                         11:33:05
 8 A. It might depend on other things as well,      11:33:06
 9    but I would say that's sort of the first      11:33:08
10    thing that I would consider.                  11:33:10
11 Q. Okay. You suggest in Paragraph 37 that        11:33:10
12    Dilantin --                                   11:33:20
13 A. Yes.                                          11:33:20
14 Q. -- might be an appropriate comparator drug?   11:33:20
15 A. It was a hypothetical, yes. As you know,      11:33:23
16    Dilantin is used for some of the same         11:33:25
17    indications.                                  11:33:27
18 Q. How confident are you that Dilantin might     11:33:28
19    be an appropriate comparator drug?            11:33:31
20 A. I'm not sure what you mean by "how            11:33:35
21    confident." I think it makes for a good       11:33:38
22    example, but in the ultimate analysis I       11:33:40
23    would look to, again, clinical input on       11:33:42
24    which drugs were being used for the same      11:33:45
25    indications, as well as the data              11:33:48
```

435

```
 1    themselves.                                   11:33:49
 2 Q. All right. Let's just use Dilantin as an      11:33:59
 3    example for how you would do this analysis.   11:34:02
 4 A. Okay.                                         11:34:04
 5 Q. Would you have to look into the relative      11:34:08
 6    efficacy of Dilantin for both its FDA-        11:34:10
 7    approved use and for its off-label uses?      11:34:16
 8 A. I don't believe that would be factor in the   11:34:20
 9    analysis. Again, I would rely on some         11:34:21
10    clinical expertise as to the extent to        11:34:24
11    which Dilantin makes for a good comparison    11:34:27
12    for the particular indication in question,    11:34:29
13    so perhaps if I provide a little more         11:34:32
14    detail, it'll help. Then we can talk about    11:34:34
15    that. So imagine the following scenario:      11:34:38
16       Both Dilantin and Neurontin are           11:34:40
17    used for some off-label indication, I'm not   11:34:42
18    even sure what the right indication to        11:34:47
19    choose is here, but let's say there is one.   11:34:49
20    We observe that they were used by             11:34:51
21    neurologists for the same off-label use.      11:34:53
22    Perhaps it's a form of pain. And then I       11:34:56
23    could look over time at these allegedly       11:35:00
24    illegal activities related to Neurontin and   11:35:05
25    see if my model suggested they were having    11:35:06
```

436

```
 1    an effect on Dilantin use for the same        11:35:09
 2    off-label use.                                11:35:11
 3       If there -- if those -- the model          11:35:12
 4    suggested there was an effect on Dilantin,    11:35:15
 5    I would interpret that as the model picking   11:35:17
 6    up some secular trend, and I could break      11:35:19
 7    that out of the ultimate estimate.            11:35:22
 8 Q. Maybe I'm misunderstanding your report, but   11:35:25
 9    I'm assuming that what you would be doing     11:35:30
10    with the comparator drug, among other         11:35:32
11    things, is comparing trends and off-label     11:35:34
12    prescribing of that comparative drug --       11:35:36
13    comparator drug to the trends and off-label   11:35:38
14    prescribing with Neurontin, correct?         11:35:41
15 A. In the context of a regression model, but,    11:35:41
16    yes, you're correct.                          11:35:44
17 Q. Right.                                        11:35:45
18 A. It's what's called a difference-in-           11:35:45
19    difference estimate.                          11:35:48
20 Q. Sure. Wouldn't you agree that one of the      11:35:50
21    things that could impact the trends and       11:35:52
22    off-label prescribing of the comparator       11:35:54
23    drug would be that drug's efficacy in         11:35:56
24    treating the particular off-label use at      11:35:58
25    issue?                                        11:36:00
```

32 (Pages 433 to 436)

M. ROSENTHAL

**437**

1  A. Yes, but you're assuming -- okay. I'm not                    11:36:00
2     sure if -- let me try to be really clear              11:36:04
3     about what I'm trying to estimate. I'm           11:36:07
4     only trying to use Dilantin to pick up any        11:36:09
5     secular trends that may commonly affect           11:36:12
6     this class of drugs and their off-label           11:36:15
7     use. If indeed Dilantin is not viewed as          11:36:18
8     an effective substitute -- well, first of         11:36:22
9     all, then it wouldn't make a very good            11:36:24
10    comparator.                                  11:36:28
11 Q. That's my question.                            11:36:28
12 A. Well, again, the choice of comparators will        11:36:29
13    be made on the basis of clinical                 11:36:31
14    substitutability for the condition. So if         11:36:33
15    there's no off-label use for Dilantin for          11:36:35
16    this particular condition, for example,           11:36:37
17    because it's not believed to be                   11:36:39
18    efficacious, it wouldn't be a very good           11:36:41
19    comparator.                                  11:36:44
20 Q. Fair enough. I guess my question is, how        11:36:44
21    do you anticipate making that                    11:36:47
22    determination?                                11:36:48
23 A. I expect to get clinical input as to which        11:36:48
24    drug's to be used but also to look at the          11:36:51
25    data that break out use by diagnosis,             11:36:53

**438**

1     and -- but nonetheless, I think it's              11:36:58
2     important to put in context your question.         11:37:00
3     So imagine the Dilantin is used sometimes          11:37:02
4     but that most physicians view it as               11:37:05
5     inferior.                                    11:37:07
6         Well, that's not really the                  11:37:08
7     problem. I'm trying to look at breaking            11:37:11
8     out its trend. If indeed its trend is not          11:37:13
9     coinciding with these off-label events,            11:37:16
10    there will be no real effect there. There          11:37:18
11    will be nothing to break out. But if              11:37:20
12    Dilantin use seems to be going up at the          11:37:23
13    same time as Neurontin use, then that's a         11:37:25
14    measure of some other factor that I'm not         11:37:28
15    capturing, and that can be netted out of          11:37:30
16    the estimate, the quantity induced by the         11:37:32
17    off-label promotion. That's sort of the           11:37:34
18    purpose of a difference-in-difference            11:37:37
19    analysis is to prove your identification.          11:37:38
20 Q. Right. I guess let me try to ask the             11:37:46
21    question by reference --                         11:37:47
22 A. Okay.                                       11:37:49
23 Q. -- to a different possibility. Would you          11:37:49
24    need to conduct analysis in deciding which        11:37:51
25    comparator drug to use and to what the side       11:37:57

**439**

1     effect profile is of that comparator drug,          11:37:58
2     so Dilantin in the example that we've been         11:38:01
3     talking about?                               11:38:04
4  A. So let me be clear again. Only to the            11:38:05
5     extent that there are changes over time in         11:38:09
6     that side effect profile or the knowledge         11:38:11
7     about that side effect profile that               11:38:13
8     coincide with the off-label promotion. So          11:38:16
9     there's not -- I didn't write down a model         11:38:19
10    here so I can understand how it's not             11:38:21
11    entirely clear from the general way that           11:38:23
12    I've talked about it, but what's key here          11:38:25
13    is there -- we'd looked to see if the model         11:38:29
14    predicted an impact on Dilantin or some           11:38:31
15    other drug's use from the off-label               11:38:36
16    promotions related to Neurontin. And we          11:38:38
17    would assume, make a conservative               11:38:42
18    assumption that any effects we see are             11:38:44
19    really from something else in the                 11:38:46
20    environment and that we should separate           11:38:49
21    those and not attribute those to the               11:38:51
22    allegedly illegal activities.                     11:38:58
23        And so that would be the purpose            11:38:58
24    here, and so cross-sectional differences in         11:38:59
25    effectiveness or side effect profiles,            11:39:01

**440**

1     they're irrelevant to that piece of              11:39:04
2     information. They don't -- there's no --          11:39:05
3     doesn't confound that estimate.                  11:39:07
4  Q. That's because you're looking at changes in       11:39:08
5     the trend as opposed to the trend itself?         11:39:10
6  A. I'm looking at changes in the trend             11:39:12
7     particularly as they relate to the               11:39:15
8     allegedly illegal promotional activities,          11:39:18
9     not just -- I'm not just comparing trends          11:39:20
10    side by side. This is all in the context           11:39:22
11    of this regression model, so an interaction        11:39:23
12    effect.                                      11:39:27
13 Q. Okay. I guess a more general question, how        11:39:33
14    confident are you that a sufficiently             11:39:44
15    similar comparator drug actually exists for        11:39:45
16    Neurontin?                                  11:39:48
17 A. I think this would vary by indication, and        11:39:48
18    I guess I don't feel comfortable making a         11:39:51
19    blanket statement.                            11:39:55
20 Q. Okay. In Paragraph 38 of your report you         11:39:56
21    write that you might further refine your          11:40:06
22    model by seeking to make "contemporaneous         11:40:08
23    comparisons across geographical or clinical        11:40:13
24    submarkets"?                                11:40:16
25 A. Yes. I see that.                              11:40:26

33 (Pages 437 to 440)

M. ROSENTHAL

441

1  Q. Right.  And I believe that you also write           11:40:27
2     that your analysis here will be "informed          11:40:33
3     by a detailed understanding of the                 11:40:35
4     institutional context affecting prescribing        11:40:37
5     behavior" -- or "prescription behavior"?           11:40:40
6  A. Uh-huh.                                  11:40:42
7  Q. What does that mean?                        11:40:43
8  A. Let me just see in what sentence that              11:40:44
9     appears.                              11:40:53
10 Q. Sure.  That was --                         11:40:53
11 A. Yeah.                                11:40:54
12 Q. It appears in the second paragraph of             11:40:54
13    Paragraph 38.                          11:40:56
14 A. Okay.  Great.  Let me just read it for a           11:40:57
15    sec to make --                          11:41:01
16 Q. Sure.                                11:41:03
17 A. -- so I don't --                          11:41:03
18        (Witness reviews document.)                11:41:04
19 A. I think the general notion that I was             11:41:12
20    thinking about there in particular, we're          11:41:14
21    talking about clinical submarkets, thinking         11:41:17
22    about, for example, by specialty, so where          11:41:20
23    some of the activities may be focused on            11:41:23
24    particular specialties, as we may have             11:41:26
25    discussed yesterday, the specialties differ         11:41:28

442

1     in terms of, excuse me, the extent to which        11:41:31
2     they may go to different meetings, they may         11:41:34
3     have different practice settings, and so if         11:41:38
4     there's an opportunity to get some              11:41:40
5     identification there, particularly if some         11:41:41
6     of the defendants' documents suggest             11:41:45
7     marketing specific to certain geographic           11:41:48
8     areas, certain specialties, that may be            11:41:51
9     another way of doing the same kind of             11:41:54
10    difference-in-difference analysis.              11:41:56
11 Q. So what you're saying, though, is that            11:41:58
12    prescribing behavior may well differ             11:42:00
13    depending on those different factors that          11:42:03
14    you've just outlined in your last answer?          11:42:05
15 A. Right.  So cross-sectionally it may, and if         11:42:07
16    there's evidence of the promotional             11:42:10
17    activities targeting one of those areas,           11:42:12
18    geographic is obviously the easiest one to         11:42:14
19    describe.  We have evidence of a big              11:42:17
20    meeting in Boston.  We might seek to try to         11:42:18
21    identify its effect.  We're looking at            11:42:21
22    Boston physicians prescribing versus             11:42:22
23    California physicians prescribing.             11:42:25
24 Q. Uh-huh.  Where do you anticipate your             11:42:27
25    information would come from to enable you          11:42:29

443

1     to do this analysis?                       11:42:31
2  A. Well, again, I would say this is -- as you         11:42:32
3     can tell the way the model moves along            11:42:34
4     through the paragraphs, this is the part           11:42:36
5     that -- I mean, it's not clear to me that          11:42:38
6     there are databases where one can look at          11:42:40
7     both geography and specialty and diagnosis.        11:42:42
8     IMS Health does have databases where one           11:42:47
9     can look at prescribing overall by              11:42:50
10    geography and where one can look at             11:42:52
11    prescribing by specialty.                   11:42:54
12        I can certainly imagine the              11:42:58
13    defendants track those kinds of data in           11:42:58
14    their own work.  But I haven't seen             11:43:02
15    detailed data that I'm certain would             11:43:05
16    support this kind of analysis.  So it's the         11:43:07
17    kind of thing that I would like to explore         11:43:09
18    though, if possible.                      11:43:11
19 Q. Okay.  But you haven't yet done that?             11:43:12
20 A. I have not done that.                      11:43:12
21 Q. And you're not aware of whether the data          11:43:13
22    would exist yet to enable you to do it?           11:43:16
23 A. There are certainly -- again, there are           11:43:18
24    data by geography and specialty, and there         11:43:19
25    are data by diagnosis.  I'm not sure             11:43:22

444

1     whether the two things can be linked             11:43:23
2     effectively.  I mean, certainly in the            11:43:25
3     NAMCS they can because it's a patient level         11:43:28
4     database.  In the NAMCS one could look            11:43:30
5     certainly by specialty and then by              11:43:32
6     diagnosis.                            11:43:34
7  Q. You're familiar with the concept of              11:43:35
8     endogeneity in the context of regression          11:43:44
9     analysis?                            11:43:46
10 A. I am.                                11:43:46
11 Q. Is it correct to say that endogeneity            11:43:47
12    occurs when one or more independent             11:43:51
13    variables is correlated with the error           11:43:53
14    term?                               11:43:55
15 A. Yes.                               11:43:56
16 Q. And that a specific kind of endogeneity           11:43:57
17    might occur when dependent and independent        11:44:01
18    variables are jointly determined?             11:44:04
19 A. Yes.                               11:44:06
20 Q. Just to help me make sure I understand            11:44:06
21    this, what I'll do is give you a              11:44:10
22    hypothetical, and I'll ask you if you can         11:44:13
23    tell me if it'll present an endogeneity          11:44:14
24    problem.                             11:44:18
25 A. Okay.                               11:44:18

34 (Pages 441 to 444)

M. ROSENTHAL

445

1  Q. Imagine that your dependent variable is        11:44:19
2     violent behavior, your independent variable    11:44:23
3     is watching violent television shows.          11:44:26
4  A. Okay.                          11:44:29
5  Q. You want to run a regression to test the       11:44:29
6     hypothesis that watching violent television    11:44:32
7     shows causes violent behavior. You might       11:44:35
8     imagine further that some people have an       11:44:38
9     underlying propensity towards -- to engage     11:44:39
10    in violent behavior which might also cause     11:44:42
11    them to watch more violent television         11:44:45
12    shows. Is my hypothetical clear?              11:44:48
13 A. I understand perfectly.                11:44:52
14 Q. If the hypothetical model didn't account       11:44:53
15    for the underlying propensity to engage in    11:44:55
16    violent behavior, would there be an           11:44:57
17    endogeneity problem?                    11:45:01
18 A. Yes.                          11:45:03
19 Q. And would it likely tend to overestimate       11:45:03
20    the degree to which watching violent          11:45:06
21    television shows causes violent behavior?     11:45:10
22 A. Yes.                          11:45:12
23 Q. Why is that?                      11:45:12
24 A. You mean in layman's terms?              11:45:12
25 Q. That would be great, since you're speaking     11:45:19

446

1     to lay people, yeah.                  11:45:20
2          MR. NOTARGIACOMO: Or English.        11:45:21
3  A. Essentially there's this omitted factor       11:45:23
4     that causes both things, causes the TV        11:45:26
5     watching and the violent behavior. So it's    11:45:28
6     the kind of -- endogeneity, generally it      11:45:31
7     can be considered a form of omitted          11:45:33
8     variable bias, too. There's this omitted     11:45:36
9     factor or third factor that causes both,     11:45:39
10    and now you've attributed the causal effect   11:45:42
11    of that factor to the factor that you have   11:45:44
12    included on the right-hand side.            11:45:46
13 Q. What are the consequences of leaving          11:45:48
14    possible endogeneity like the endogeneity    11:45:51
15    that we just talked about in a regression    11:45:53
16    model unaddressed?                    11:45:55
17 A. Well, essentially it causes a bias either     11:45:55
18    up or down.                      11:46:00
19 Q. Okay. The results wouldn't be reliable,        11:46:02
20    correct?                        11:46:04
21 A. The term "reliable" has other statistical     11:46:04
22    meanings, so can we say that they would be    11:46:07
23    biased?                        11:46:09
24 Q. Sure. Why don't you tell me what you think     11:46:10
25    biased means just so --                11:46:13

447

1  A. Either too large or too small.            11:46:14
2  Q. Okay. And I guess to, you know, maybe put      11:46:16
3     it in a slightly more technical way, it       11:46:23
4     would mean the coefficients that you're       11:46:26
5     trying to estimate would be overestimated    11:46:28
6     or underestimated, correct?              11:46:30
7  A. That's correct.                     11:46:31
8  Q. Now, here's a question. Failure to address     11:46:39
9     the endogeneity of one variable could        11:46:41
10    adversely affect the reliability of the      11:46:43
11    estimates for coefficients of other         11:46:45
12    variables even if those variables aren't     11:46:47
13    endogenous; is that correct? Is my          11:46:51
14    question --                      11:46:52
15 A. If they're correlated with the omitted        11:46:53
16    variable as well.                   11:46:55
17 Q. Okay. Now, as they're written in this         11:46:55
18    simple form in your declaration here,        11:46:59
19    neither equation one nor equation two        11:47:01
20    addresses on its face at least the          11:47:04
21    possibility that off-label promotion is      11:47:06
22    endogenous, correct?                  11:47:09
23 A. Neither of the equations explicitly address   11:47:10
24    endogeneity. Obviously the timing of these   11:47:16
25    interventions is intended to do so, and I    11:47:18

448

1     believe, but I would have to check, that     11:47:21
2     there's a footnote about exploration of IV   11:47:23
3     modeling, but --                   11:47:27
4  Q. Why don't --                      11:47:27
5  A. -- of the models themselves.             11:47:28
6  Q. Sure. Why don't we -- why don't we check      11:47:30
7     the footnote that I've been able --          11:47:30
8  A. Okay.                          11:47:30
9  Q. -- to find at least --                11:47:33
10 A. Okay. That's good.                   11:47:33
11 Q. -- which is Footnote 63 on Page 16.           11:47:34
12 A. Excellent.                      11:47:37
13 Q. Are you there?                     11:47:39
14 A. Yes.                          11:47:40
15 Q. Okay. You write that "I will further          11:47:40
16    explore and address through statistical      11:47:44
17    tests and alternative specifications the     11:47:47
18    possible endogeneity of off-label          11:47:49
19    promotion."                      11:47:53
20         Did I read that correctly?           11:47:53
21 A. Yes, you did.                     11:47:54
22 Q. So you would agree that off-label promotion    11:47:55
23    in your model is possibly endogenous,        11:47:58
24    correct?                        11:48:02
25 A. Possibly, yes.                     11:48:02

35 (Pages 445 to 448)

M. ROSENTHAL

449

```
 1  Q.  Is it possible that on-label promotion      11:48:03
 2      could also be endogenous?                   11:48:11
 3  A.  On-label promotion could be endogenous to   11:48:13
 4      off-label use?                              11:48:16
 5  Q.  Yes.                                        11:48:17
 6  A.  I suppose -- I would need to think about it 11:48:17
 7      for a minute.  So what's the omitted        11:48:21
 8      variable there?  Well --                    11:48:24
 9  Q.  You're going to help me.                    11:48:29
10  A.  One could perhaps always construct a        11:48:31
11      scenario in which there's an omitted        11:48:35
12      variable, so on-label promotion, one of the 11:48:37
13      ways to try to fully specify the effects of 11:48:43
14      on-label use on off-label use is to put in  11:48:48
15      that on-label promotion, because otherwise  11:48:52
16      that would be an omitted variable, and also 11:48:55
17      time to put in variables like time since    11:48:57
18      the launch of the drug which captures the   11:49:00
19      natural diffusion of on-label and off-label 11:49:02
20      uses.                                       11:49:05
21          And so in a model you could always      11:49:06
22      construct a scenario in which there was     11:49:09
23      some omitted factor that was correlated and 11:49:11
24      then therefore some endogeneity here.  But  11:49:14
25      I can't think of a mechanism.               11:49:17
```

450

```
 1  Q.  Okay.  Let me ask -- describe, you know, a  11:49:19
 2      generic example here.                       11:49:26
 3  A.  Okay.                                       11:49:28
 4  Q.  Endogeneity could well occur here because a 11:49:29
 5      drug company might adjust its level of      11:49:31
 6      promotional spending activities in response 11:49:33
 7      to the quantity of the drug sold; is that   11:49:36
 8      right?                                      11:49:40
 9  A.  It addresses -- I'm sorry, it adjusts the   11:49:40
10      quantity of spending on on-label promotion  11:49:44
11      due to the quantity of -- that it sells.    11:49:47
12  Q.  Just for purposes of the example, let's not 11:49:50
13      even worry about on-label versus off-label. 11:49:52
14      We could talk about it -- why don't we talk 11:49:55
15      about off-label promotion just to make it   11:49:57
16      simple.  Let me just spin out the question  11:49:59
17      again.                                      11:50:05
18  A.  Okay.                                       11:50:05
19  Q.  That endogeneity might well occur because a 11:50:05
20      manufacturer might adjust its level of      11:50:09
21      promotional spending or other activities    11:50:11
22      related to off-label uses in response to    11:50:13
23      the quantity of the drug sold for those     11:50:15
24      off-label uses?                             11:50:18
25  A.  Well, if we weren't distinguishing on-label 11:50:19
```

451

```
 1      and off-label, then certainly there is an   11:50:22
 2      argument that promotional spending responds 11:50:25
 3      to the level of sales.                      11:50:28
 4  Q.  And so endogeneity might well occur in a    11:50:30
 5      circumstance like that?                     11:50:32
 6  A.  It might well, but I think we're just       11:50:33
 7      trying to distinguish here between on- and  11:50:37
 8      off-label.                                  11:50:40
 9  Q.  Okay.  Fair enough.  And I guess I'm happy  11:50:40
10      at this point to leave the on-label/        11:50:44
11      off-label distinction.                      11:50:47
12  A.  Okay.                                       11:50:48
13  Q.  Now, just referring again just to the       11:50:48
14      off-label uses, failure to account for the  11:50:50
15      sort of endogeneity that I described in my  11:50:53
16      last question would likely produce too high 11:50:55
17      an estimate of the impact of off-label      11:51:00
18      promotion, correct, failure to account for  11:51:02
19      that endogeneity?                           11:51:06
20  A.  If that endogeneity proves to be, you know, 11:51:07
21      statistically shown, then, yes, that's      11:51:11
22      right.                                      11:51:13
23  Q.  Here's another general question:            11:51:13
24  A.  Okay.                                       11:51:19
25  Q.  Is it possible that your model could omit a 11:51:19
```

452

```
 1      variable that affects both drug demand and  11:51:25
 2      drug promotion?                             11:51:29
 3  A.  Certainly it's always possible.  I will try 11:51:30
 4      to consider all the important variables     11:51:34
 5      that might affect certainly my left-hand-   11:51:36
 6      side variable.                              11:51:40
 7  Q.  Okay.  Would that be an endogeneity         11:51:41
 8      problem, just terminologically, or would it 11:51:43
 9      be something else?                          11:51:45
10  A.  Well, omitted variable bias to the extent   11:51:46
11      that we worry about it, it's because it's   11:51:49
12      causing -- it has a correlation with the    11:51:52
13      variable that you care about, here the      11:51:55
14      allegedly illegal activities, and with the  11:51:57
15      left-hand side variables, so they're the    11:52:00
16      same thing for our purposes here.           11:52:03
17  Q.  Okay.                                       11:52:06
18  A.  Unless we're -- I'm sorry, unless we're     11:52:10
19      talking about the simultaneity that you     11:52:12
20      mentioned before, but I think we were       11:52:16
21      talking about a third variable, yes?        11:52:17
22  Q.  I think that's right.  Let's move on to --  11:52:18
23  A.  Okay.                                       11:52:22
24  Q.  -- another part of -- or I guess another    11:52:22
25      piece of this sentence in Footnote 63 --    11:52:26
```

36 (Pages 449 to 452)

M. ROSENTHAL

453

```
 1 A. Okay.                                   11:52:30
 2 Q. -- in which you say that you "will further      11:52:31
 3    explore and address through statistical        11:52:35
 4    tests and alternative specifications          11:52:37
 5    possible endogeneity."                    11:52:40
 6       What statistical tests do you have      11:52:45
 7    in mind?                              11:52:47
 8 A. Well, there's the Hausman test for          11:52:47
 9    endogeneity. Excuse me. That's the         11:52:49
10    principal test for endogeneity.              11:52:54
11 Q. Can you tell me what the Hausman test is?       11:52:56
12 A. Well, I can't tell you exactly what goes       11:52:57
13    into the test. I'd have to say I would       11:52:59
14    have to look at the test itself, but it        11:53:01
15    essentially looks for that correlation you     11:53:02
16    talked about in the residuals and the        11:53:05
17    variable that -- of interest. So if --        11:53:07
18    those error terms, they have to do with the     11:53:13
19    correlation of the residuals. I actually      11:53:16
20    don't know the exact math on the test. I      11:53:18
21    can look it up, but...                   11:53:21
22 Q. Have you ever used it before?             11:53:22
23 A. Sure.                              11:53:25
24 Q. In what context?                       11:53:28
25 A. Well, as an example, in my work on direct      11:53:29
```

454

```
 1    consumer advertising.                    11:53:32
 2 Q. Any other context that you can think of?       11:53:34
 3 A. No, but it's a pretty common test. I'm        11:53:37
 4    sure I've used it in other contexts.         11:53:41
 5 Q. Okay. Any other statistical tests other       11:53:45
 6    than the Hausman test that you talked about    11:53:53
 7    that you might run, or is that the one that    11:53:56
 8    you would expect you would use?            11:53:58
 9 A. That's the main test, but of course this       11:54:00
10    will all be in the context of a larger set      11:54:02
11    of specification tests about -- excuse me.      11:54:04
12    You want to correctly specify the time        11:54:07
13    relationships, in particular in this model     11:54:11
14    with regard to lags, with regard to whether    11:54:14
15    it's a linear trend or a quadratic trend,      11:54:16
16    these specification issues are important      11:54:20
17    for getting good estimates as well.         11:54:21
18 Q. Now, the specification issues that you       11:54:24
19    talked about, are those the alternative       11:54:26
20    specifications that you referred to in this     11:54:27
21    sentence, or is it something else?          11:54:30
22 A. The alternative specifications that I         11:54:31
23    referred to in the sentence include         11:54:33
24    different ways of modeling time itself, as     11:54:35
25    well as potentially examining instrumental     11:54:38
```

455

```
 1    variables analysis, which is a two-stage      11:54:41
 2    model where one predicts the variable of      11:54:44
 3    interest here, the allegedly illegal         11:54:49
 4    promotions and uses that predicted value      11:54:52
 5    instead of the number itself.              11:54:54
 6       So to address your earlier concern      11:54:55
 7    about the simultaneity between promotional    11:54:58
 8    spending and the quantity of the drug        11:55:02
 9    prescribed, for example, you could use an     11:55:05
10    instrumental variables analysis there.        11:55:08
11    That may be appropriate depending on what     11:55:10
12    the data show.                        11:55:12
13 Q. Okay. So in terms of the -- I just want to     11:55:12
14    make sure I have a complete sense of the      11:55:23
15    different approaches that you might use to     11:55:24
16    address endogeneity. Is there anything       11:55:26
17    else other than what you've just described,    11:55:29
18    the Hausman test, the specification test      11:55:30
19    that you discussed an answer or two ago,      11:55:32
20    the work that you would do that you just      11:55:37
21    described as being -- falling within the      11:55:39
22    category of alternative specifications?       11:55:42
23 A. I haven't considered all the possibilities,    11:55:45
24    but I would say those are probably among      11:55:48
25    the most important. And clearly in this      11:55:50
```

456

```
 1    context, understanding the timing of the      11:55:52
 2    specific events and spending relative to      11:55:56
 3    the use and modeling that timing           11:55:59
 4    appropriately is really a critical part of     11:56:03
 5    this question.                        11:56:05
 6       In your example of violent            11:56:09
 7    behavior, part of the problem is we don't     11:56:12
 8    know which came first. And here in many      11:56:14
 9    cases we know when the median was relative    11:56:16
10    to the use.                          11:56:20
11 Q. If you can't tell which came first, does      11:56:23
12    that make it impossible to unravel an        11:56:24
13    endogeneity problem?                   11:56:28
14 A. It doesn't make it impossible. Using         11:56:31
15    instrumental variables analysis for example    11:56:33
16    doesn't rely on timing.                   11:56:41
17 Q. Are there any other ways other than         11:56:42
18    instrumental variable analysis that you       11:56:44
19    could -- that you don't rely on timing to     11:56:46
20    unwind an endogeneity problem?           11:56:49
21 A. Instrumental variables would be sort of the    11:56:51
22    chief candidate.                       11:56:55
23 Q. Okay.                             11:56:57
24 A. To the extent that the endogeneity problem    11:56:57
25    relates to observables one can also do some   11:57:00
```

37 (Pages 453 to 456)

M. ROSENTHAL

457

1  kind of propensity score matching.    11:57:03
2  Q.  Some what?    11:57:05
3  A.  Some of kind of matching.  If we had two    11:57:06
4     groups again, a group of doctors that    11:57:08
5     should be effected and a group that    11:57:11
6     shouldn't, we could do some matching    11:57:12
7     between those and look at the difference in    11:57:14
8     the effects and estimate that as the    11:57:17
9     impact.    11:57:20
10 Q.  Doing the sort of matching that you just    11:57:21
11    described would require getting data from    11:57:23
12    individual doctors, though, I take it?    11:57:25
13 A.  Or, again, if we looked at submarkets or    11:57:26
14    subgroups of specialties so not initially    11:57:31
15    individual doctors but groups.    11:57:36
16 Q.  And you'd need to be able to -- well, I'll    11:57:39
17    withdraw the question.    11:57:41
18 A.  Okay.    11:57:42
19 Q.  So one of the things that you've just been    11:57:42
20    discussing is instrumental variable    11:57:47
21    analysis?    11:57:49
22 A.  Uh-huh.    11:57:51
23 Q.  For clarity of the record and for my own    11:57:51
24    edification, could you tell me what an    11:57:56
25    instrumental variable is?    11:57:58

458

1  A.  An instrumental variable is something    11:57:59
2     that's correlated with the variable of    11:58:02
3     interest, let's call it promotional    11:58:05
4     spending for argument, but is not other    11:58:07
5     than through the variable of interest    11:58:10
6     correlated with your outcome of interest,    11:58:12
7     use.  So it predicts promotional spending    11:58:16
8     but only to the extent that through    11:58:21
9     promotional spending does it predict the    11:58:23
10    outcome itself.  It doesn't have any    11:58:26
11    independent effect on the outcome.    11:58:28
12 Q.  Is it correct to say that an instrumental    11:58:29
13    variable must be uncorrelated with the    11:58:34
14    error term?    11:58:35
15 A.  Instrumental variable must be uncorrelated    11:58:36
16    with the error term in the primary    11:58:41
17    regression or in the logistic regression    11:58:45
18    that it's in.    11:58:49
19 Q.  Can you explain to me what that means in --    11:58:56
20 A.  Well, the instrumental variable itself, if    11:58:58
21    we -- I mean, there are two ways of    11:59:01
22    thinking about instrumental variables,    11:59:03
23    whether it's going to -- you're talking    11:59:04
24    about a two-step regression or putting the    11:59:05
25    instrument directly into the regression,    11:59:08

459

1  let's assume that there's this first model    11:59:10
2  you develop that says there's some    11:59:12
3  characteristics that you control for    11:59:16
4  everything that predicts promotional    11:59:17
5  spending, including for this instrumental    11:59:20
6  variable which again has the    11:59:22
7  characteristics of not being correlated    11:59:23
8  with the outcome of interest.  It doesn't    11:59:25
9  cause the outcome of interest, so it    11:59:28
10 shouldn't be correlated with the residuals,    11:59:30
11 either.    11:59:32
12     And so that's sort of a -- that's    11:59:32
13 how you choose your instrumental variable.    11:59:34
14 And then you take that model and you    11:59:37
15 predict something, and then the second    11:59:38
16 model you predict -- take that predicted    11:59:39
17 value plus all those other control    11:59:41
18 variables but not -- not now your    11:59:44
19 instrument.  Your instrument is excluded    11:59:46
20 from the second stage.    11:59:48
21     And so by selection the variable    11:59:50
22 that you choose to use in the first stage    11:59:53
23 and not the second stage, your instrument,    11:59:55
24 should not be correlated with the residuals    11:59:58
25 in the first -- in the second stage.    12:00:00

460

1  Q.  Okay.  Is the equation that you do in the    12:00:08
2     first stage the equation that will actually    12:00:15
3     generate the results at the end of the day    12:00:17
4     that you'll use in your model, or is it the    12:00:19
5     second stage --    12:00:21
6  A.  It's the second stage.    12:00:21
7  Q.  Okay.    12:00:22
8  A.  You can think of the first stage as a way    12:00:26
9     to try to remove the bias.    12:00:27
10 Q.  Okay.  Putting it another way, setting    12:00:33
11    aside the questions, I think, about the    12:00:41
12    error term, you want a variable that is not    12:00:43
13    correlated with the dependent variable but    12:00:46
14    is as highly correlated as possible with    12:00:49
15    the endogenous or suspect variable?    12:00:52
16 A.  Not correlated except again through.  So    12:00:56
17    some variable that will predict promotion    12:00:59
18    will be correlated with the outcome of    12:01:01
19    interest, but only through promotion and    12:01:03
20    not through a different channel, okay?    12:01:06
21 Q.  Okay.  Insofar as you use instrumental    12:01:08
22    variables to try to identify or correct for    12:01:27
23    endogeneity, would you need an instrumental    12:01:29
24    variable for each component of the X    12:01:31
25    variable, you know, promotional activities,    12:01:34

38 (Pages 457 to 460)

M. ROSENTHAL

461

```
 1   as well as an instrumental variable for        12:01:36
 2   each -- or for the O variable, the             12:01:38
 3   promotional spending?                          12:01:40
 4 A. Potentially they would be different           12:01:41
 5   variables, yes.                        12:01:47
 6 Q. When you say "potentially," what do you       12:01:47
 7   mean?                           12:01:49
 8 A. I guess if you show that there's              12:01:49
 9   endogeneity for each of those X variables,     12:01:51
10   then we would have to look for an              12:01:54
11   instrumental variable for each of them, but    12:01:57
12   it's not necessarily clear that they have      12:02:03
13   to be different instrumental variables.        12:02:04
14   They may have some similar set of              12:02:08
15   instruments and multiple instruments.          12:02:11
16 Q. What analysis, if any, have you already       12:02:14
17   undertaken at this point to determine          12:02:16
18   whether instrumental variables could be        12:02:18
19   used in your model to address endogeneity?     12:02:19
20 A. I haven't -- again, I don't have the data     12:02:23
21   to do this analysis, so I haven't              12:02:26
22   determined that instrumental variables is      12:02:28
23   needed, and I certainly haven't begun to       12:02:29
24   develop those models.                  12:02:34
25 Q. So I take it you haven't identified           12:02:35
```

462

```
 1   possible instrumental variables yet?           12:02:39
 2 A. No.  There are some that have been used in           12:02:40
 3   the literature, as you may know.               12:02:41
 4 Q. What are the ones that you have in mind?              12:02:45
 5 A. For detailing and sampling the literature    12:02:46
 6   has used, I believe, variables having to do    12:02:53
 7   with staffing in the pharmaceutical           12:02:59
 8   companies for advertising, media prices.       12:03:01
 9   Sort of the category of instruments that       12:03:08
10   people often look to, not the only            12:03:10
11   category, but a category of instruments        12:03:12
12   that people often look to are the supply       12:03:15
13   prices for whatever you're trying to get at    12:03:16
14   here, so this is essentially a demand          12:03:19
15   model.                          12:03:23
16       So you can put in what it costs to        12:03:23
17   do the advertising instead of the             12:03:25
18   advertising itself.  Those are commonly        12:03:27
19   used, as well as other measures.  We used      12:03:32
20   one having to do with the order of entry of    12:03:35
21   the drug in that case across all conditions    12:03:38
22   in a therapeutic class, but in this case it    12:03:41
23   would be for a particular condition.           12:03:43
24 Q. Were there any others that you can think      12:03:47
25   of?                          12:03:57
```

463

```
 1 A. Those are some examples.               12:03:58
 2 Q. Okay.  All right.  Let's turn back to Page    12:03:59
 3   16, Footnote 63.                    12:04:25
 4 A. Okay.                          12:04:28
 5 Q. And look at the second-to-last sentence       12:04:28
 6   there.  It reads, "Likewise, it is possible    12:04:29
 7   that multicollinearity among independent       12:04:37
 8   variables may be found, since promotional      12:04:40
 9   effects" -- "since promotional efforts,"       12:04:43
10   excuse me, "are often intentionally            12:04:45
11   coordinated.  While multicollinearity can      12:04:47
12   complicate estimation of the model and         12:04:50
13   produce large estimated standard errors,       12:04:52
14   alternative specifications can be              12:04:55
15   developed."                     12:04:57
16       You refer in these sentences to          12:05:00
17   multicollinearity, correct?             12:05:01
18 A. Yes, that's right.                   12:05:03
19 Q. And by "multicollinearity," am I right that    12:05:05
20   you mean a situation in which two or more      12:05:08
21   of the independent variables are highly        12:05:11
22   correlated with one another?            12:05:14
23 A. That's correct.                   12:05:15
24 Q. And you would agree that in your model it's    12:05:15
25   possible that multicollinearity among          12:05:22
```

464

```
 1   independent variables may be found,            12:05:24
 2   correct?                        12:05:25
 3 A. That's correct.                   12:05:26
 4 Q. Have you done any analysis to determine       12:05:26
 5   whether such multicollinearity in fact         12:05:29
 6   exists?                         12:05:31
 7 A. No, I have not.  Again, I do not have the     12:05:31
 8   data yet to do these analyses.                 12:05:34
 9 Q. How would you determine when you have the     12:05:37
10   data whether variables in your model were      12:05:38
11   multicollinear?                     12:05:44
12 A. Essentially one can look at a first pass at    12:05:45
13   the correlation matrix across independent      12:05:50
14   variables, correlation of --             12:05:53
15 Q. Can you tell me what that means, please?      12:05:54
16 A. Well, the correlation is essentially the      12:05:57
17   extent to which these variables co-vary        12:06:01
18   over time, and so if there's a high degree     12:06:03
19   of correlation, for example, in two of the     12:06:07
20   right-hand side variables, this leads to,      12:06:12
21   again, this problem with the standard          12:06:16
22   errors.                         12:06:19
23       And generally sort of looking at         12:06:19
24   those covariates there's a matrix.  Imagine    12:06:21
25   that, you know, there's a list of your         12:06:24
```

39 (Pages 461 to 464)