# EXHIBIT 3
# (PART III)

M. ROSENTHAL

| 465 | |
|---|---|
| 1 | independent variables across the top and   12:06:25 |
| 2 | across the bottom, and there's a   12:06:27 |
| 3 | correlation coefficient that goes with each   12:06:29 |
| 4 | one.  In that correlation coefficient,   12:06:31 |
| 5 | usually people look for -- if there's a   12:06:33 |
| 6 | correlation of .8 or above, then that's   12:06:34 |
| 7 | deemed to be a problem.  That's sort of a   12:06:37 |
| 8 | rule of thumb rather than a precise number,   12:06:40 |
| 9 | but one can also look at linear   12:06:44 |
| 10 | combinations of variables in the   12:06:46 |
| 11 | correlations there.   12:06:47 |
| 12 | Q.  When you say "a correlation of Point A or   12:06:48 |
| 13 | above" --   12:06:51 |
| 14 | A.  I'm sorry, .8.   12:06:51 |
| 15 | Q.  Oh, I see.  Okay.   12:06:53 |
| 16 | A.  I beg your pardon.   12:06:55 |
| 17 | Q.  Not at all.  I'm sorry I misheard.  What   12:06:59 |
| 18 | are the consequences of not addressing   12:07:02 |
| 19 | multicollinearity in a regression model?   12:07:05 |
| 20 | A.  Well, if it's extreme, many software pages   12:07:08 |
| 21 | will simply drop the variables, they won't   12:07:12 |
| 22 | be able to estimate the model at all.  And   12:07:15 |
| 23 | otherwise, it can lead to, again, these   12:07:18 |
| 24 | very large standard errors.  So it can make   12:07:22 |
| 25 | the situation where it's impossible to pull   12:07:26 |

| 466 | |
|---|---|
| 1 | apart the effects of that -- of the two   12:07:28 |
| 2 | highly correlated variables.  All of these   12:07:30 |
| 3 | effects depend on the type of model as   12:07:38 |
| 4 | well.   12:07:39 |
| 5 | Q.  Now, it's correct that one reason that   12:08:00 |
| 6 | multicollinearity may be found in your   12:08:02 |
| 7 | model is that promotional efforts are often   12:08:04 |
| 8 | intentionally coordinated; is that correct?   12:08:06 |
| 9 | A.  I mean, that seems like a reasonable   12:08:10 |
| 10 | assumption that they may be coordinated.   12:08:16 |
| 11 | Q.  Right.  I think --   12:08:18 |
| 12 | A.  When you say "often," I just don't have any   12:08:22 |
| 13 | data, so often coordinated, but --   12:08:25 |
| 14 | Q.  The reason I use the terminology --   12:08:26 |
| 15 | A.  Did I say "often"?   12:08:29 |
| 16 | Q.  -- that's what you say in the second-to-   12:08:31 |
| 17 | last sentence of Footnote 63.   12:08:33 |
| 18 | A.  I believe that they can certainly be   12:08:35 |
| 19 | coordinated.   12:08:38 |
| 20 | Q.  Would you disagree with what you wrote here   12:08:39 |
| 21 | as to the possibility -- or the fact   12:08:42 |
| 22 | that promotional efforts are often   12:08:45 |
| 23 | intentionally coordinated?   12:08:48 |
| 24 | A.  No, I'm sorry, I don't disagree with that   12:08:49 |
| 25 | statement.   12:08:51 |

| 467 | |
|---|---|
| 1 | Q.  Now, what that means is that there could be   12:08:56 |
| 2 | multicollinearity between some of the   12:08:57 |
| 3 | on-label promotional variables on the one   12:08:59 |
| 4 | hand and some of the off-label promotional   12:09:02 |
| 5 | variables on the other hand, correct?   12:09:05 |
| 6 | A.  I believe it's possible.  I guess, I was   12:09:06 |
| 7 | thinking more in terms of if you have an   12:09:09 |
| 8 | event, then you follow up with free samples   12:09:11 |
| 9 | or something.  The coordination of   12:09:14 |
| 10 | off-label and on-label, I guess it would   12:09:17 |
| 11 | sort of depend on what exactly we were   12:09:19 |
| 12 | talking about, but it seems possible that   12:09:21 |
| 13 | they could be coordinated.   12:09:23 |
| 14 | Q.  Right.  And so that -- all right.  Well,   12:09:24 |
| 15 | let's assume for purposes of these   12:09:30 |
| 16 | questions that multicollinearity does exist   12:09:32 |
| 17 | between --   12:09:34 |
| 18 | A.  Okay.   12:09:35 |
| 19 | Q.  -- on-label and off-label promotional   12:09:35 |
| 20 | variables in your model.   12:09:37 |
| 21 | A.  Yes.   12:09:38 |
| 22 | Q.  How would you address that?   12:09:38 |
| 23 | A.  Well, I do think, as I mentioned, it might   12:09:42 |
| 24 | be necessary to selectively eliminate some   12:09:44 |
| 25 | variables, and in this context I would do   12:09:46 |

| 468 | |
|---|---|
| 1 | so in the most conservative way.  So if   12:09:48 |
| 2 | there were events closely timed, just as an   12:09:50 |
| 3 | example, events closely timed for on- and   12:09:55 |
| 4 | off-label promotion and I couldn't separate   12:09:58 |
| 5 | them in the model, I would have to trade   12:10:00 |
| 6 | that all to be on-label use.   12:10:03 |
| 7 | Q.  Now, when you talk about selectively   12:10:06 |
| 8 | eliminating some variables, that would be   12:10:09 |
| 9 | simply dropping one of the two   12:10:10 |
| 10 | multicollinear variables in order to   12:10:14 |
| 11 | address the problem.  Is that a correct   12:10:16 |
| 12 | understanding?   12:10:18 |
| 13 | A.  Essentially, yes.   12:10:18 |
| 14 | Q.  And that's typically sort of the easiest   12:10:20 |
| 15 | way of addressing this problem?   12:10:23 |
| 16 | A.  So either dropping variables or changing   12:10:25 |
| 17 | specification in some way.  You can imagine   12:10:27 |
| 18 | in some examples changing the way those   12:10:29 |
| 19 | variables were specified would reduce the   12:10:31 |
| 20 | collinearity.   12:10:33 |
| 21 | Q.  Okay.  Now, if there was multicollinearity   12:10:35 |
| 22 | between certain on-label promotional   12:10:40 |
| 23 | activities on the one hand and off-label   12:10:42 |
| 24 | promotional activities on the other hand --   12:10:46 |
| 25 | well, why don't I withdraw the question --   12:10:49 |

40 (Pages 465 to 468)

M. ROSENTHAL

469

1 A. Okay.                                    12:10:49
2 Q. -- and state it more precisely.         12:10:49
3      If there is multicollinearity         12:10:53
4 between certain on-label variables and     12:10:53
5 on-label promotional variables and         12:10:56
6 off-label promotional variables on the     12:10:57
7 other hand, you wouldn't simply be able to  12:10:59
8 drop one set of those variables from your   12:11:03
9 equation; is that right?                    12:11:06
10 A. Essentially, in my view, in that situation  12:11:07
11 I would have to not attribute the effect   12:11:11
12 of -- those two variables I couldn't       12:11:14
13 separate them, right?  So they have -- they  12:11:16
14 appear to have some common effect, but if I  12:11:18
15 exclude one, there's bias.  Generally in    12:11:20
16 this model you do the best you can, but I   12:11:24
17 wouldn't -- so that is, you choose which    12:11:26
18 one to exclude for the purposes of the      12:11:29
19 model, but I wouldn't attribute -- then     12:11:31
20 attribute that effect to the allegedly      12:11:34
21 illegal activities because I couldn't fully  12:11:37
22 identify those.                            12:11:39
23 Q. Right.  In other words, you wouldn't be  12:11:40
24 able to account for what the relative       12:11:42
25 effects were on Q?                         12:11:43

470

1 A. Right.  So I would have to assume -- to be  12:11:44
2 conservative, I would have to assume that   12:11:46
3 they were all coming from the illegal       12:11:48
4 activities.                                12:11:49
5 Q. And in such a circumstance you would      12:11:49
6 potentially -- well, I'll withdraw that     12:12:08
7 question.                                  12:12:13
8 A. Okay.                                    12:12:13
9 Q. All right.  How many observations do you  12:12:13
10 think you'll have for purposes of          12:12:41
11 estimating the models that you propose?     12:12:42
12 A. I can't say how many observations I'll have  12:12:43
13 at this point.  You mean the underlying     12:12:46
14 data from the NDTI or the --               12:12:51
15 Q. Yeah.                                    12:12:53
16 A. I don't know at this point what will be the  12:12:53
17 basis for that.  The way this is described,  12:12:55
18 this time series model, essentially they'll  12:12:58
19 use an aggregated monthly data on the       12:13:02
20 left-hand side.  That will be based on a    12:13:04
21 different sample size depending on which    12:13:07
22 data source appears to be the most         12:13:09
23 appropriate.                              12:13:11
24 Q. Okay.  But in terms of the number of      12:13:11
25 observations, what we would be talking     12:13:15

471

1 about, I guess, would be one observation    12:13:16
2 per month for the length of the class       12:13:19
3 period?                                    12:13:21
4 A. That's essentially what an aggregate model  12:13:21
5 looks like, yes.                           12:13:23
6 Q. Right.  And so that's -- without actually  12:13:24
7 sitting down and doing the math, would that  12:13:27
8 be a reasonable way of coming up with the   12:13:29
9 number of observations that you would       12:13:32
10 imagine using in your model?              12:13:35
11 A. Right.  So there are -- there's as many    12:13:37
12 observations as there are months and       12:13:41
13 diagnose -- times diagnoses, right?        12:13:43
14 Q. Okay.                                    12:13:47
15 A. And potentially dosages.  But essentially  12:13:51
16 you're right.                              12:13:56
17 Q. Okay.  To what extent do the number of    12:13:56
18 observations limit the number of           12:14:01
19 independent variables that you can use in   12:14:03
20 your analysis?                             12:14:05
21 A. There is a natural limit there in terms of  12:14:06
22 what's called degrees of freedom, so at     12:14:09
23 some --                                    12:14:13
24 Q. What is -- go ahead.                      12:14:13
25 A. Well, so degrees of freedom have to do with  12:14:14

472

1 the number of observations and the number   12:14:19
2 of -- sorry, observations and variables and  12:14:21
3 you're right, the number of observations -- 12:14:28
4 certainly the number of independent         12:14:30
5 variables cannot exceed the number of       12:14:32
6 observations.                              12:14:34
7 Q. So is that the natural limit that you      12:14:34
8 described in your first answer?            12:14:40
9 A. That's the extreme limit, but clearly      12:14:42
10 sooner than that you would run out of power  12:14:46
11 to test anything within reasonable bounds.  12:14:49
12 And so it's a matter of how much power      12:14:52
13 you're looking for.                        12:14:55
14 Q. When you say "sooner than that," you mean  12:14:56
15 when the number of independent variables    12:15:00
16 approaches but doesn't yet reach --         12:15:03
17 A. That's right.                            12:15:05
18 Q. -- the total number of observations?     12:15:06
19 A. That's right.                            12:15:08
20 Q. Okay.  And that the one-to-one ratio is an  12:15:08
21 extreme limit?                             12:15:12
22 A. Very extreme.                            12:15:13
23 Q. What's a less extreme limit?            12:15:15
24 A. I think it's really going to depend here on  12:15:18
25 what kinds of power we're looking for in    12:15:23

41 (Pages 469 to 472)

M. ROSENTHAL

473

```
 1   the analysis.  Generally speaking, of         12:15:26
 2   course, we're going to look for more          12:15:31
 3   degrees of freedom than just one or two,      12:15:33
 4   so, you know, I can't really say what's a     12:15:36
 5   less extreme limit.  There will be a          12:15:40
 6   natural limit.  As we continue to add         12:15:42
 7   variables, the standard errors are going to   12:15:44
 8   get larger and larger.  And at some point     12:15:47
 9   it'll be hard to find a significant effect    12:15:50
10   of any kind.                                  12:15:52
11 Q.  Is that what you mean when you refer to the  12:15:57
12   power of the analysis that we're looking      12:15:59
13   for?                                          12:16:02
14 A.  Yes.  And so that's a function of the        12:16:02
15   number of variables you include but also of  12:16:04
16   the underlying variability in the dependent  12:16:06
17   variable, as well as the variability of the  12:16:09
18   independent variables.                        12:16:11
19 Q.  Okay.  How, if at all, would you account     12:16:11
20   for continuing effects of promotional        12:16:18
21   spending and activities beyond the month in  12:16:21
22   which they occur in your model?               12:16:24
23 A.  There are a couple possible ways.  A simple  12:16:28
24   approach is to include what's called the     12:16:31
25   stock of promotional activities, and so      12:16:33
```

474

```
 1   that's a discounted sum of, say,              12:16:36
 2   promotional spending over time.  So imagine  12:16:39
 3   you have in your model current spending      12:16:44
 4   plus a discounted sum of all previous        12:16:46
 5   spending.                                     12:16:49
 6 Q.  How would you arrive at the discount if you  12:16:50
 7   are using a stock?                            12:16:53
 8 A.  It can be estimated, and there are           12:16:53
 9   depreciation rates available in the          12:16:57
10   literature that have been fairly commonly    12:16:59
11   used.  But it can be estimated in the model  12:17:01
12   itself.                                       12:17:07
13 Q.  Is it the case that the effects of           12:17:07
14   off-label promotion would diminish over      12:17:14
15   time?                                         12:17:17
16 A.  It's been found for other promotional        12:17:17
17   efforts that there is this pattern of        12:17:20
18   diminishing effects over time, so they       12:17:23
19   don't disappear between Month 1 and Month    12:17:28
20   2, but they depreciate.  So I would expect   12:17:32
21   them to last over time at a diminishing      12:17:35
22   rate, yes.                                    12:17:39
23 Q.  The literature that you referred to, does    12:17:42
24   it refer to a constant rate across           12:17:44
25   different prescription drugs, or does it     12:17:47
```

475

```
 1   vary from drug to drug, from promotion to    12:17:48
 2   promotion?                                    12:17:51
 3 A.  You know, I would have to double-check, but  12:17:52
 4   my recollection of the literature is that    12:17:54
 5   generally they estimate one depreciation     12:17:57
 6   rate for the whole class of drugs that       12:17:59
 7   they're looking at:  So I'm thinking of      12:18:02
 8   Professor Berndt's paper, which I believe    12:18:06
 9   looks at proton pump inhibitors, a specific  12:18:09
10   class of drugs.  I think they have one       12:18:12
11   depreciation rate for all the drugs.         12:18:13
12 Q.  Okay.  You had mentioned that one way of     12:18:17
13   doing this would be through stock analysis,  12:18:22
14   stock variable.  Are there other ways that   12:18:28
15   you can think of through which you could do  12:18:32
16   this analysis?                               12:18:33
17 A.  You could actually put the lagged values on  12:18:34
18   the right-hand side.                          12:18:37
19 Q.  What does that mean?                          12:18:39
20 A.  It means not only putting this month's       12:18:40
21   spending but last month's spending,          12:18:42
22   spending from the month before and estimate  12:18:45
23   explicitly those coefficients for each one.  12:18:48
24 Q.  So in other words, making them separate      12:18:51
25   independent variables?                       12:18:53
```

476

```
 1 A.  That's right.                                12:18:53
 2 Q.  Each month's spending?                       12:18:54
 3 A.  That's right.                                12:18:55
 4 Q.  And the same would be true of each month's   12:18:56
 5   promotional activities, if that's the        12:18:59
 6   way -- you know, if you ended up using       12:19:01
 7   lagged values on the right-hand side?        12:19:04
 8 A.  If one chose to do that, yes.                12:19:05
 9 Q.  Will you use a similar lag structure for     12:19:13
10   the M variable?                              12:19:15
11 A.  Potentially all of these variables, as you   12:19:16
12   know, are -- they vary over time, and it     12:19:21
13   may be appropriate to include either lags    12:19:24
14   or some estimate of the stock of prior       12:19:26
15   activities, so but possibly.                 12:19:30
16 Q.  Would you use a similar lag structure for    12:19:40
17   the XJT variable as well?                     12:19:42
18 A.  It would depend on the specific variable we  12:19:44
19   were talking about, but potentially, yes.    12:19:50
20   I don't know that -- I mean, we certainly    12:19:57
21   look for these kinds of effects over time    12:19:59
22   for each of the variables.  I don't know     12:20:04
23   that there's data to suggest that they       12:20:05
24   exist for all types of promotion, but we     12:20:07
25   would investigate that.                      12:20:09
```

M. ROSENTHAL

477

1  Q. Can I direct your attention to Paragraph        12:20:15
2     34b) --                                         12:20:18
3  A. Okay.                                           12:20:19
4  Q. -- of your declaration. It's on Page 15.        12:20:20
5  A. Yes.                                            12:20:28
6  Q. And I want to look specifically at the          12:20:28
7     first bullet point.                             12:20:31
8  A. Okay.                                           12:20:32
9  Q. If you read the tail end of the paragraph       12:20:33
10    before the bullet point, it reads, "It may      12:20:37
11    be necessary to --                              12:20:39
12 A. Uh-huh.                                         12:20:40
13 Q. -- "experiment with non-linear versions of     12:20:41
14    Equation 1." What types of non-linear          12:20:43
15    versions of Equation 1 do you plan on          12:20:49
16    experimenting with?                            12:20:52
17 A. So, for example, it may be appropriate to       12:20:52
18    suggest that the underlying trend in           12:20:54
19    off-label use of Neurontin is not linear       12:20:57
20    but quadratic or CORDIC or something else.     12:21:01
21    As you can imagine, a diffusion curve for a    12:21:05
22    drug, a natural diffusion curve would --       12:21:08
23    might not be linear.                           12:21:10
24 Q. Maybe you could imagine that.                   12:21:11
25 A. So there --                                     12:21:11

478

1  Q. I was an English major, so it's harder for      12:21:13
2     me to imagine that.                             12:21:16
3  A. There are early adopters, and then people       12:21:17
4     start learning about a specific drug, and       12:21:19
5     so it picks up in the rate. And so that         12:21:21
6     might be more consistent with either a          12:21:23
7     quadratic, which would include a squared        12:21:26
8     term, or a cubic, which would include a         12:21:28
9     third degree term. So you could put in          12:21:32
10    literally time and time squared.                12:21:36
11 Q. Sure. Sure. Is there any reason why you         12:21:38
12    wouldn't conduct the same experiments with      12:21:40
13    Equation 2 in addition to Equation 1?           12:21:42
14 A. In either one they both have an underlying      12:21:45
15    time trend.                                      12:21:48
16 Q. Okay. But there's no reason why the              12:21:49
17    statement that's in this first bullet point     12:21:54
18    wouldn't also apply with respect to             12:21:55
19    modifications that you might make to the        12:21:58
20    model in Equation 2?                            12:22:01
21 A. No. Perhaps the text is unclear, but these     12:22:02
22    were intended to be broader issues that         12:22:04
23    would apply to all models.                      12:22:06
24 Q. That makes sense to me.                          12:22:07
25 A. Okay.                                            12:22:08

479

1  Q. I just wanted to be clear about it.             12:22:09
2        MR. POLUBINSKI: Now, I'm at a               12:22:13
3     decent stopping point for a break now. We      12:22:17
4     can either break for lunch, or I'm happy to    12:22:20
5     keep going for a little while, whatever        12:22:22
6     your preference is.                            12:22:24
7        THE WITNESS: This is a good time           12:22:26
8     for me, I guess, as opposed to going          12:22:27
9     another hour, so...                           12:22:29
10       MR. POLUBINSKI: Sure. Okay.               12:22:29
11    Let's break then.                             12:22:30
12       THE WITNESS: Okay.                        12:22:30
13       MR. POLUBINSKI: Go off the               12:22:32
14    record.                                       12:22:33
15       THE VIDEOGRAPHER: The time is             12:22:33
16    12:22, and we are off the record.             12:22:38
17    (Lunch recess taken.)                         12:22:45
18
19
20
21
22
23
24
25

480

1        AFTERNOON SESSION                          12:22:54
2        THE VIDEOGRAPHER: The time is             13:12:27
3     1:12 p.m., and we are back on the record.     13:12:30
4                                                    13:12:30
5     (MEREDITH B. ROSENTHAL, Ph.D., Resumed.)      13:12:30
6     DIRECT EXAMINATION, Continued                 13:12:30
7                                                    13:12:32
8  BY MR. POLUBINSKI:                                13:12:32
9  Q. So, Professor Rosenthal, I think you           13:12:33
10    testified that you have not actually           13:12:39
11    attempted to run a version of your model       13:12:41
12    yet, correct?                                  13:12:42
13 A. That's correct.                                13:12:43
14 Q. And you haven't yet collected all of the       13:12:43
15    data that you would need to do so; is that     13:12:45
16    correct, too?                                  13:12:48
17 A. That's correct.                                13:12:49
18 Q. So you don't yet know for certain precisely    13:12:49
19    what data you will be able to collect; is      13:12:53
20    that correct?                                  13:12:55
21 A. That's correct beyond the examples that        13:12:55
22    I've shown you and mentioned in my             13:12:59
23    declaration of data sources that I've seen.    13:13:01
24 Q. Right. But you do -- you would need to         13:13:03
25    collect additional data beyond what you've     13:13:07

43 (Pages 477 to 480)

M. ROSENTHAL

481

1    already seen in order to run your model,          13:13:09
2    correct?                                13:13:11
3  A.  I would say that's true.  I certainly need     13:13:11
4    additional data on the allegedly illegal        13:13:16
5    activities.                             13:13:20
6  Q.  Okay.  So therefore you don't know whether     13:13:21
7    there are any possible deficiencies or any      13:13:22
8    deficiencies in the data that you would         13:13:25
9    claim to collect?                       13:13:27
10  A.  I don't know what the deficiencies of the      13:13:28
11    data that I haven't seen yet are, no.          13:13:30
12  Q.  Precisely.                            13:13:32
13  A.  Yes.                                 13:13:33
14  Q.  And you also haven't identified yet all of     13:13:33
15    the possible variables that may impact         13:13:37
16    prescription behavior?                     13:13:39
17  A.  That's correct.                        13:13:39
18  Q.  And you don't yet know what endogeneity        13:13:40
19    problems you might encounter in the course      13:13:46
20    of your work?                           13:13:49
21  A.  Without the data I can't again run those       13:13:50
22    tests and examine the data, no, so I           13:13:53
23    don't -- I can't see that yet.                13:13:56
24  Q.  Right.  So you don't know for sure whether     13:13:57
25    you'll be able to address or correct them?       13:14:00

482

1  A.  I know that there are standard approaches       13:14:02
2    available for correcting those problems,        13:14:06
3    for addressing those problems.  I guess I'm     13:14:08
4    not sure what you mean.                   13:14:10
5  Q.  Right.  You don't yet know the extent to       13:14:11
6    which those standard methods will enable        13:14:14
7    you to create a sufficiently reliable model      13:14:17
8    because you haven't done it yet?              13:14:21
9  A.  I guess that may be true.  Again, I've run      13:14:23
10    models like this before and overcome           13:14:26
11    similar problems, and of course the rest       13:14:30
12    the published literature has as well, so I      13:14:32
13    guess I feel fairly confident that the         13:14:34
14    tools are out there that will be able to do      13:14:36
15    that.                                  13:14:39
16  Q.  But you haven't actually done it yet?          13:14:39
17  A.  But I have not done that.                 13:14:41
18  Q.  And you don't know precisely what             13:14:42
19    multicollinearity problems you may            13:14:43
20    encounter in the course of your work?         13:14:45
21  A.  That's correct.                        13:14:46
22  Q.  And you don't know whether the estimates       13:14:48
23    that you ultimately reach based on the data     13:14:50
24    that you're able to collect will be           13:14:53
25    statistically significant, correct?           13:14:56

483

1  A.  That's correct.                        13:14:56
2  Q.  Are you familiar with the concept of fit in     13:15:00
3    the context of a regression analysis?         13:15:01
4  A.  Yes.                                 13:15:03
5  Q.  What is fit?                          13:15:05
6  A.  Well, in very general terms it's how well      13:15:06
7    the model you've constructed actually         13:15:08
8    matches up with the data themselves, and        13:15:11
9    one measure of fit might be how well you        13:15:16
10    can predict the variables of interest.         13:15:18
11  Q.  Okay.  And one way to describe it would be     13:15:21
12    to say the better the fit of a model is,        13:15:25
13    the better it describes reality?              13:15:27
14  A.  That seems like a fair way to describe it,     13:15:28
15    yes.                                  13:15:31
16  Q.  Okay.  And you don't know what the fit of     13:15:31
17    your model will be before you actually run      13:15:36
18    the regression, correct?                   13:15:38
19  A.  Certainly not.                         13:15:38
20  Q.  And it's certainly possible that after        13:15:41
21    running the model you could discover it has     13:15:42
22    a poor fit?                            13:15:44
23  A.  I guess it would depend on what you mean by    13:15:47
24    "a poor fit."  There will be a range.  If       13:15:49
25    we were, for example, looking at a measure      13:15:53

484

1    like the R squared, which is the percent of     13:15:54
2    the variation that you explain,              13:15:56
3    effectively, there are -- I can't predict       13:15:58
4    what that R squared is going to be right        13:16:01
5    now.                                  13:16:03
6  Q.  Do you have an understanding now for what       13:16:04
7    an acceptable R squared would be?             13:16:07
8  A.  It actually typically depends on the class     13:16:09
9    of model you're doing, right?  So --          13:16:14
10  Q.  Sorry.                               13:16:17
11  A.  That's okay.                          13:16:17
12    -- in certain models we expect to             13:16:19
13    a find better fit than others, time series      13:16:21
14    models.  Generally, we can explain the fair     13:16:27
15    amount of the variation, so it would really     13:16:30
16    depend.  In the published literature you'll     13:16:33
17    see R squareds varying from, you know,         13:16:36
18    below .1 to much, much higher.               13:16:40
19  Q.  Is there a threshold beyond which -- a         13:16:42
20    threshold in terms of R squared beyond         13:16:53
21    which you would deem a model to be            13:16:55
22    insufficiently reliable for purposes of        13:16:58
23    your work in this case?                    13:17:01
24  A.  At this point I certainly have not           13:17:02
25    considered such a threshold.                13:17:05

44 (Pages 481 to 484)

M. ROSENTHAL

485

1  Q. All right.  In Paragraph 41 of your          13:17:09
2     declaration, which is Exhibit 1 --          13:17:22
3  A. Okay.                          13:17:24
4  Q. -- you write at the beginning of the          13:17:25
5     paragraph that "Sufficient data exists to          13:17:28
6     implement and estimate these models."          13:17:30
7  A. I see that.                    13:17:35
8  Q. Based on what you've just told me, are you     13:17:35
9     certain that that's true?               13:17:43
10 A. Again, there are two sets of variables.          13:17:48
11    One relates to the utilization of          13:17:52
12    Neurontin, and not having looked at the          13:17:55
13    National Disease and Therapeutic Index          13:17:59
14    data, I'm aware of what's contained in the          13:18:02
15    National Ambulatory Medical Care survey, I          13:18:06
16    feel confident that these data are          13:18:08
17    available.  On the promotional side I've          13:18:10
18    seen documents from defendants that show          13:18:12
19    representative data that I think would be          13:18:15
20    sufficient to estimate -- to model those          13:18:18
21    right-hand side variables, the on- and          13:18:22
22    off-label promotional meetings and events.          13:18:24
23         I have not seen a complete set of          13:18:28
24    them as relates to all the allegations that          13:18:31
25    I will ultimately be asked to estimate the          13:18:34

486

1     impact of, but what I've seen suggests that          13:18:35
2     those data exist.               13:18:39
3  Q. At the time that you wrote the statement          13:18:40
4     you certainly hadn't collected obviously          13:18:47
5     all of the data that you would envision          13:18:50
6     using in your model, correct?          13:18:53
7  A. That's correct.                    13:18:55
8  Q. Why don't we see if we can, you know, try          13:18:55
9     as best we can to isolate the specific          13:19:22
10    kinds of data here --               13:19:22
11 A. Okay.                          13:19:22
12 Q. -- that we're talking about, and I think          13:19:22
13    what you write here is that in the third          13:19:22
14    sentence there are two key types of data          13:19:23
15    that are necessary for you to run your          13:19:28
16    analysis and that those two types of data          13:19:33
17    are "data on patterns of promotional          13:19:35
18    spending and data on use of Neurontin."  Is          13:19:40
19    that correct?                    13:19:46
20 A. That's correct.                    13:19:46
21 Q. Let's look first at data on patterns of          13:19:46
22    promotional spending.  Which data on          13:19:51
23    patterns of promotional spending would you          13:19:53
24    think are necessary for you to run your          13:19:56
25    model?                          13:20:00

487

1  A. So the data on promotional spending would          13:20:02
2     vary depending on the model, but generally          13:20:06
3     speaking, promotion by the type of          13:20:08
4     activity, so, for example, if there was          13:20:13
5     spending on consumer advertising versus          13:20:15
6     detailing overall for Neurontin, and then          13:20:21
7     as it relates to these allegations.          13:20:26
8  Q. What do you mean by "as it relates to these     13:20:34
9     allegations"?                    13:20:37
10 A. So, again, if we determined that spending          13:20:37
11    that's related to supporting research          13:20:42
12    projects for physicians, that this was          13:20:45
13    subject to the allegations -- there's some          13:20:48
14    allegations to that effect in the          13:20:50
15    complaint, as I recall -- that funds were          13:20:52
16    given to physicians to do these trials with          13:20:54
17    a purpose that was other standard research          13:20:58
18    purposes.  And so I would have the overall          13:21:02
19    promotional spending as well as spending on          13:21:07
20    those types of interpromotional activities,          13:21:10
21    if I can use that broad term, that are          13:21:13
22    allegedly illegal.               13:21:14
23 Q. Would your data need to be broken down --          13:21:17
24    well, for the data on promotional spending          13:21:22
25    do you envision that it would be company          13:21:25

488

1     data or publicly available data?          13:21:27
2  A. I believe it was a combination of company          13:21:28
3     data and publicly available data.  If we          13:21:30
4     called the IMS Health -- that publicly          13:21:32
5     available data, which, as you know, there          13:21:35
6     is some issue about using those without          13:21:37
7     subpoena.                          13:21:39
8  Q. Right.  Would you need -- would either one          13:21:41
9     by itself be sufficient, or would you need          13:21:48
10    both, company data and third-party          13:21:50
11    data?                          13:21:54
12 A. If I only had the publicly available --          13:21:55
13         MR. NOTARGIACOMO:  Go ahead.          13:21:58
14         THE WITNESS:  It's okay to go          13:22:00
15    ahead?                          13:22:00
16         MR. NOTARGIACOMO:  Yeah.          13:22:01
17 A. If I only had the publicly available data,          13:22:01
18    then I would need some other data to allow          13:22:03
19    me to allocate spending to the alleged          13:22:07
20    illegal activities versus the standard          13:22:10
21    legal promotional activities.          13:22:15
22 Q. And that data would be company data, is          13:22:17
23    what you're envisioning?               13:22:19
24 A. Perhaps company data.  I'm not entirely          13:22:21
25    clear if it weren't company data where it          13:22:24

45 (Pages 485 to 488)

M. ROSENTHAL

489

1    would come from.  It seems possible it          13:22:28
2    could come from third parties, for example,     13:22:30
3    from those companies that ran meetings and      13:22:33
4    events for the defendants.                       13:22:35
5  Q. For the sort of data that we were just         13:22:36
6    talking about would you need -- would you        13:22:46
7    need that broken down reliably by                13:22:51
8    indication?                                       13:22:54
9  A. I would need to be able to attach it to an     13:22:54
10   indication.  In some instances, as you          13:22:57
11   might imagine, there would be a natural         13:22:59
12   connection.  So, for example, if there were     13:23:01
13   funds provided to a psychiatrist to do a        13:23:04
14   small case series on the use of Neurontin       13:23:07
15   for bipolar disorder, then that would be        13:23:10
16   clearly linked to the indication for            13:23:13
17   bipolar disorder.  But in general, I would      13:23:15
18   need to be able to link it to the specific      13:23:17
19   indication or indications that were the         13:23:19
20   subject of the promotional activity.            13:23:21
21 Q. Would you also need this data on a monthly     13:23:23
22   basis?                                           13:23:27
23 A. It would not necessarily be true that every    13:23:31
24   variable needs to be on a monthly basis.        13:23:33
25 Q. Why not?                                        13:23:36

490

1  A. Well, for one thing, the spending might        13:23:36
2    just happen at a point in time, and I could     13:23:38
3    code it in for the month in which it            13:23:42
4    happened, right?  And for another, if there     13:23:44
5    were only annual spending available, I          13:23:48
6    could use annual data.                           13:23:50
7  Q. Now, if the data that you're describing        13:23:51
8    isn't available either in company documents     13:24:10
9    or in the sort of third-party documents         13:24:10
10   that you described for some point in time        13:24:10
11   during the class period, what impact would      13:24:11
12   that have on your ability to do your             13:24:13
13   analysis?                                         13:24:14
14 A. It would sort of depend on exactly what        13:24:14
15   you're talking about.  If I were missing,       13:24:18
16   say, one month in the middle of a longer        13:24:20
17   period, it might be possible to                  13:24:22
18   interpolate, so that is essentially to          13:24:24
19   assume a consistent trend between the point     13:24:27
20   before the data missing and the point           13:24:30
21   after.  It would depend.                         13:24:32
22 Q. Okay.  And if it were something more than      13:24:34
23   just a month in a larger period?                13:24:36
24 A. It might not be possible to do the analysis    13:24:38
25   for that period of time.                         13:24:40

491

1  Q. Do you need data on each of the factors        13:24:41
2    that you hypothesize in XKT?                     13:24:46
3  A. Each of the factors that I decide are          13:24:48
4    relevant to put into XKT I would need data      13:24:51
5    for.                                              13:24:54
6  Q. What sorts of data would you envision          13:24:54
7    collecting?                                       13:24:57
8  A. I guess, you know, those XKT events -- I       13:24:57
9    have to remember my own model.  The KT are       13:25:04
10   the off-label promotional events.               13:25:06
11 Q. You're welcome to --                           13:25:08
12 A. Yeah, thank you.                               13:25:08
13 Q. -- refer to it if you like.                    13:25:09
14 A. Subscripts, they fade over time.              13:25:10
15 Q. I'm glad it's not just me.                     13:25:14
16 A. Yeah, so those are -- the meetings, events     13:25:16
17   that are subject to the allegations.  And      13:25:22
18   so, again, having seen some documents and       13:25:24
19   some documents in Franklin that show that       13:25:29
20   these events are tracked by the defendants,     13:25:31
21   those are the kinds of data I would imagine     13:25:35
22   would go into XKT.                               13:25:37
23 Q. And I assume as we've discussed before that    13:25:39
24   the data for both promotional activities        13:25:49
25   and promotional spending will need to           13:25:51

492

1    distinguish between proper and improper         13:25:53
2    marketing?  And for purposes of that            13:25:59
3    question I think improper -- why don't we       13:26:03
4    just agree that "improper" means something      13:26:06
5    that would generate liability in this case?     13:26:09
6  A. Okay.  Thank you.  That's useful.  Yes, as     13:26:11
7    we've discussed, I would need to be able to     13:26:16
8    distinguish them, and if there were such an     13:26:19
9    occasion at which I could not distinguish       13:26:21
10   in a particular case, I would need to           13:26:24
11   attribute that to proper promotional           13:26:26
12   activities.                                      13:26:30
13 Q. All right.  The other category of data that    13:26:30
14   you say you need to collect is data on the      13:26:39
15   use of Neurontin?                                13:26:42
16 A. Yes, that's right.                             13:26:44
17 Q. For that data were you envisioning that you    13:26:45
18   would need company data or third-party          13:26:49
19   data?                                            13:26:55
20 A. The third-party data I had in mind for that    13:26:55
21   would be the, for example, the National        13:26:58
22   Disease and Therapeutic Index data or the      13:27:02
23   NAMCS.                                           13:27:04
24 Q. Had you envisioned that you would also         13:27:04
25   collect company data, or would you rely         13:27:11

46 (Pages 489 to 492)

M. ROSENTHAL

493

```
 1    exclusively on the third-party data that          13:27:13
 2    you described?                                     13:27:15
 3  A. The company data play a role, as you know,        13:27:15
 4    in giving a total number of units sold, so         13:27:17
 5    the company invoice data would be used to          13:27:20
 6    get the universe by condition -- I mean,           13:27:24
 7    sorry, not by condition, by dosage site.           13:27:29
 8  Q. And the company data presumably would not         13:27:32
 9    distinguish between off-label and on-label         13:27:38
10    prescriptions?                                     13:27:41
11  A. The company probably has data from IMS            13:27:41
12    again on those distinctions, but in their          13:27:45
13    own data systems I don't expect them to            13:27:49
14    track that, no, as opposed to data they            13:27:51
15    purchase.                                          13:27:54
16  Q. Okay. At least as far as the third-party          13:27:54
17    data goes, we discussed the need for those         13:28:01
18    data to be broken down reliably by                 13:28:02
19    indication, correct?                               13:28:05
20  A. That's correct.                                   13:28:06
21  Q. And would you need monthly data for each of       13:28:06
22    those, for whichever data set you end up           13:28:08
23    using?                                             13:28:16
24  A. No, not necessarily.                              13:28:16
25  Q. Why not?                                          13:28:17
```

494

```
 1  A. Well, monthly is just one way of                  13:28:19
 2    categorizing this. If some of the data are         13:28:21
 3    only available annually, we can only use           13:28:23
 4    annual data and then interpolate across            13:28:26
 5    months.                                            13:28:29
 6  Q. If you needed to use annual data, wouldn't        13:28:29
 7    that mean that you would have fewer                 13:28:35
 8    observations with which to conduct your            13:28:36
 9    analysis?                                           13:28:39
10  A. If, for example, we're only using it for a        13:28:39
11    variable, what essentially you have is             13:28:42
12    you've reduced variation because you've            13:28:45
13    taken an annual variable and stretched it          13:28:47
14    across months. So in effect you're right,          13:28:50
15    you have reduced power.                            13:28:51
16  Q. Okay. And the consequences of reduced             13:28:52
17    power are?                                          13:28:56
18  A. Well, again, it may make the confidence           13:28:58
19    intervals basically around the estimates           13:29:01
20    larger, the harder to find a significant           13:29:04
21    event.                                             13:29:07
22  Q. All right. Let's look at 41a) in                   13:29:07
23    particular --                                      13:29:30
24  A. Okay.                                             13:29:31
25  Q. -- Paragraph 41a) of your declaration.            13:29:31
```

495

```
 1  A. Okay.                                             13:29:36
 2  Q. I'm sorry, Paragraph 41a) of your                  13:29:36
 3    declaration, Exhibit 1.                            13:29:39
 4  A. Okay. I'm with you now.                           13:29:40
 5  Q. Great. You write here that "As a matter of        13:29:41
 6    good business practice, companies such as          13:29:46
 7    the Defendants' document marketing                 13:29:48
 8    activities by product line and in extensive        13:29:50
 9    detail"; is that correct?                          13:29:53
10  A. That's correct.                                   13:29:55
11  Q. Now, has your preliminary review suggested        13:29:56
12    to you that defendants in this case                13:30:09
13    maintain this data?                                13:30:11
14  A. In my review I've seen documentation,             13:30:12
15    again, like the strategic grid that we            13:30:15
16    discussed yesterday that is Footnote 71            13:30:18
17    here. And so information about this                13:30:22
18    promotional effectiveness system that's in        13:30:28
19    Footnote 70, that indicates the ability to        13:30:30
20    track some promotional activities and their       13:30:34
21    effects.                                           13:30:38
22  Q. Other than these two categories, can you         13:30:38
23    think of any other sorts of documents that        13:30:41
24    you've seen to date at least that was --          13:30:44
25  A. That than --                                     13:30:44
```

496

```
 1  Q. -- in this category?                             13:30:46
 2  A. Actually, I see the previous footnote as         13:30:47
 3    well, but you're right, these categories          13:30:49
 4    are promotional marketing strategy and            13:30:52
 5    analyses of the effectiveness of marketing        13:30:57
 6    as the major categories. I understand that        13:31:01
 7    product profits -- excuse me, product             13:31:04
 8    profit and loss statements are often              13:31:07
 9    constructed as well, and so brand by brand        13:31:10
10    there will be promotional and sales               13:31:13
11    spending.                                          13:31:15
12  Q. Have you seen those documents in this case?      13:31:15
13  A. I confess I can't remember. I could check       13:31:18
14    my footnotes to see if I've noted one of         13:31:23
15    these here.                                        13:31:25
16  Q. You're welcome to take a look if you would      13:31:25
17    like.                                             13:31:28
18  A. Okay. There doesn't seem to be a reference      13:31:28
19    in this section at least. It's probably          13:31:39
20    profit and loss. I may have seen them for         13:31:40
21    other drugs.                                       13:31:42
22  Q. But you don't recall having seen them for       13:31:46
23    Neurontin?                                         13:31:48
24  A. I'm not certain, yeah. Footnote 68 talks        13:31:48
25    about documents that I can picture now           13:31:52
```

47 (Pages 493 to 496)

M. ROSENTHAL

|  | 497 |
|---|---|
| 1 | where they look at promotional spending for |
| 2 | Neurontin across the customer business |
| 3 | units, which is not quite the same as the |
| 4 | product profit and loss. |
| 5 | Q. Okay. How certain are you that there's a |
| 6 | complete set of documents containing all of |
| 7 | this data for all of the periods of time |
| 8 | that your model will cover? |
| 9 | A. Can I take that in pieces? |
| 10 | Q. Sure. |
| 11 | A. First, I know that sources like IMS Health |
| 12 | track promotional spending by category |
| 13 | routinely and that those data exist. |
| 14 | Second, I know, having looked at some of |
| 15 | these discovery documents, having consulted |
| 16 | with Professor King about whom we spoke |
| 17 | yesterday, Charles King, that companies do |
| 18 | track their marketing expenditures at the |
| 19 | very least and their effects generally as |
| 20 | routine matter of, as I say here, good |
| 21 | business practice. |
| 22 | So I feel quite confident that |
| 23 | these documents existed at one time. I |
| 24 | guess I can't say for sure that the |
| 25 | defendants can still produce those |

Timestamps (column 497):
13:31:53, 13:31:56, 13:31:58, 13:32:06, 13:32:08, 13:32:15, 13:32:19, 13:32:23, 13:32:26, 13:32:29, 13:32:30, 13:32:36, 13:32:39, 13:32:44, 13:32:46, 13:32:48, 13:32:51, 13:32:55, 13:32:58, 13:33:00, 13:33:02, 13:33:03, 13:33:06, 13:33:08, 13:33:11

|  | 498 |
|---|---|
| 1 | documents, whether they existed. And what |
| 2 | I've seen in discovery suggests that the |
| 3 | discovery materials may yield some of these |
| 4 | data. |
| 5 | Q. Okay. Let me take your answer in pieces. |
| 6 | The first piece relates to the IMS data, |
| 7 | correct? |
| 8 | A. Yes. |
| 9 | Q. I think we discussed before how the IMS |
| 10 | data on promotional activity at least |
| 11 | wouldn't distinguish from indication to |
| 12 | indication -- |
| 13 | A. That's correct. |
| 14 | Q. -- is that correct? |
| 15 | A. Overall, yes. |
| 16 | Q. The second piece relates to your |
| 17 | conversations with Professor King, correct? |
| 18 | A. Yes. |
| 19 | Q. And that if I understand it correctly, |
| 20 | Professor King advised you that companies |
| 21 | as a general matter do tend to track |
| 22 | promotional spending; is that correct? |
| 23 | A. Pharmaceutical companies in particular. |
| 24 | Q. Okay. Does your conversation with |
| 25 | Professor King suggest to you that the |

Timestamps (column 498):
13:33:13, 13:33:15, 13:33:19, 13:33:21, 13:33:22, 13:33:26, 13:33:29, 13:33:29, 13:33:29, 13:33:33, 13:33:37, 13:33:39, 13:33:40, 13:33:40, 13:33:41, 13:33:42, 13:33:46, 13:33:49, 13:33:49, 13:33:53, 13:33:56, 13:34:00, 13:34:01, 13:34:10, 13:34:11

|  | 499 |
|---|---|
| 1 | defendants necessarily would have done this |
| 2 | tracking of Neurontin by indication for |
| 3 | every period of time that's covered by the |
| 4 | class period? |
| 5 | A. That's a very comprehensive statement, and |
| 6 | I would say my understanding, again, having |
| 7 | seen selected documents in Franklin, |
| 8 | documents that form the basis of the |
| 9 | complaint, is that these data were tracked |
| 10 | extensively, and I can think of no reason |
| 11 | why there would be any point in time that |
| 12 | the defendants would have stopped tracking |
| 13 | them. I can't think of any reason why |
| 14 | there would be a gap. |
| 15 | Q. Could there be a point in time before which |
| 16 | they started tracking prescriptions by |
| 17 | indication -- |
| 18 | A. Possibly. |
| 19 | Q. -- promotional expenditures by indication? |
| 20 | A. That's possible. |
| 21 | Q. And you don't know whether the documents |
| 22 | would reflect that one way or the other? |
| 23 | A. I don't know whether I could establish that |
| 24 | with the documents I've reviewed yet. If |
| 25 | that were to be the case, then I guess |

Timestamps (column 499):
13:34:18, 13:34:21, 13:34:26, 13:34:29, 13:34:31, 13:34:38, 13:34:42, 13:34:45, 13:34:46, 13:34:49, 13:34:52, 13:34:55, 13:34:57, 13:34:59, 13:35:00, 13:35:03, 13:35:06, 13:35:06, 13:35:07, 13:35:10, 13:35:10, 13:35:12, 13:35:14, 13:35:17, 13:35:19

|  | 500 |
|---|---|
| 1 | there would not be sufficient support for |
| 2 | analysis for those time periods. |
| 3 | MR. POLUBINSKI: Okay. Why don't |
| 4 | we take just a quick break to change the |
| 5 | tape? |
| 6 | THE WITNESS: Okay. I'll take |
| 7 | advantage so we don't have to break again. |
| 8 | MR. POLUBINSKI: The time is 1:35. |
| 9 | This is the end of Tape 2 -- Tape 3, excuse |
| 10 | me, and we're off the record. |
| 11 | (Recess taken.) |
| 12 | THE VIDEOGRAPHER: The time is |
| 13 | 1:39. This is the beginning of Tape 4, and |
| 14 | we're back on the record. |
| 15 | BY MR. POLUBINSKI: |
| 16 | Q. So, Professor Rosenthal, I'm going to ask |
| 17 | you to dig a document out of the stack of |
| 18 | exhibits that's sitting next to you. |
| 19 | A. Okay. |
| 20 | Q. If you could look for Rosenthal Exhibit 12, |
| 21 | that would be great. Can I help you find |
| 22 | it? |
| 23 | A. Okay. It's the promotional grid. Got it. |
| 24 | Thank you. |
| 25 | Q. The bottom of the stack, of course. |

Timestamps (column 500):
13:35:23, 13:35:25, 13:35:30, 13:35:31, 13:35:33, 13:35:34, 13:35:36, 13:35:38, 13:35:43, 13:35:45, 13:35:48, 13:38:53, 13:38:57, 13:39:01, 13:39:02, 13:39:02, 13:39:05, 13:39:07, 13:39:10, 13:39:10, 13:39:14, 13:39:31, 13:39:32, 13:39:34, 13:39:35

48 (Pages 497 to 500)

M. ROSENTHAL

501

1  A. Yes, of course. Okay. I have it.                 13:39:37
2  Q. Rosenthal Exhibit 12 is the document that        13:39:42
3     we discussed yesterday that is cited in           13:39:44
4     Footnote 71, correct?                             13:39:46
5  A. That is correct.                                  13:39:48
6  Q. It's the 1998 Strategic Plan and A&P             13:39:48
7     Allocation Grid, right?                           13:39:52
8  A. Right.                                            13:39:54
9  Q. And that this is the document that you           13:39:54
10    identify in 41a) that you write permits you       13:39:57
11    to track spending on off-label promotions         13:40:04
12    in the form of speaking engagements and           13:40:09
13    consultancies; am I getting that right?           13:40:11
14 A. I'm sorry, can I just see where you're           13:40:16
15    reading?                                          13:40:20
16 Q. Yeah, of course. It's the language on the       13:40:20
17    carry-over sentence at the end of the page.       13:40:23
18 A. Okay.                                             13:40:26
19 Q. I'll read the sentence for you. It's            13:40:29
20    "Finally, I have seen numerous agreements         13:40:29
21    such as Bates-stamped document V084073 to         13:40:31
22    078 that track spending on off-label              13:40:38
23    promotion in the form of speaking                 13:40:41
24    engagements and consultancies."                   13:40:42
25 A. Right. So, for example, you'll see rows         13:40:47

502

1     that say "Physician honoraria and travel,"       13:40:49
2     "Speakers Bureau"?                                13:40:51
3  Q. Where are you looking?                            13:40:53
4  A. Under "Local Tactics."                            13:40:54
5  Q. This is on the first page of the document?       13:40:57
6  A. On the first page, yes, sorry.                    13:40:58
7  Q. Okay. Just a general question about the          13:41:01
8     document. We did agree that this is a             13:41:05
9     prospective document, correct?                    13:41:06
10 A. Right. You indicated that, and I agree.          13:41:07
11    It makes sense. It's a strategic plan,           13:41:10
12    so...                                             13:41:14
13 Q. And just so that I'm square on this, can        13:41:20
14    you point to any documents that actually          13:41:23
15    demonstrate what defendants actually spent        13:41:25
16    on the promotion -- actually spent for            13:41:27
17    promotion of Neurontin?                           13:41:29
18 A. This grid, if in fact it is only a plan,        13:41:30
19    doesn't show that. Again, as I mentioned          13:41:35
20    before in the promotional effectiveness           13:41:40
21    system, those kinds of activity -- tracking       13:41:42
22    mechanisms look at actual events, spending        13:41:45
23    and their effects.                                13:41:49
24 Q. Those are the documents that you referred       13:41:54
25    to in Footnote 70?                                13:41:56

503

1  A. That's right. Let me just verify that, but      13:41:57
2     I believe that's right. Yes.                      13:42:04
3  Q. All right. Looking at this document and         13:42:07
4     again sort of just looking at the first           13:42:09
5     page, is there a way that you can discern         13:42:11
6     off-label promotional spending versus             13:42:18
7     on-label promotional spending just on the         13:42:20
8     basis of this document?                           13:42:22
9  A. Well, if we're looking at the planned           13:42:24
10    spending and taking that as representative        13:42:32
11    of what actually happened, as you see, the        13:42:33
12    heading on the first page says "Expend            13:42:37
13    Neurontin use on epilepsy through the             13:42:40
14    introduction of monotherapy." So that's           13:42:43
15    for a particular off-label use, and then          13:42:45
16    there's spending associated with it.              13:42:48
17 Q. I guess, didn't we agree that the               13:42:49
18    physicians who would be targeted, for lack        13:42:56
19    of a better word, by the sorts of                 13:42:59
20    activities described in Section 1 here of         13:43:05
21    on the first page would be epileptologists,       13:43:08
22    correct?                                          13:43:12
23 A. That's correct.                                  13:43:12
24 Q. And that some amount of this activity could     13:43:12
25    well be directed to on-label uses of             13:43:21

504

1     Neurontin as adjunctive therapy for              13:43:25
2     treatment of seizures?                            13:43:27
3  A. Well, in my view, this grid shows              13:43:28
4     defendants' own estimate of the dollars to       13:43:33
5     be spent promoting monotherapy. Whether or       13:43:37
6     not it's for the same individuals, I'm not       13:43:39
7     sure that I understand your point.               13:43:43
8  Q. Let me -- let's -- let me ask you this: Is     13:43:44
9     the spending that's envisioned in this           13:43:50
10    document organized annually or by monthly        13:43:53
11    outlays?                                          13:43:56
12 A. My understanding is that this is for the       13:43:57
13    entire year 1998.                                13:44:00
14 Q. Would you be able to create a monthly         13:44:02
15    series of promotional expenditures using a      13:44:07
16    document like this?                              13:44:09
17 A. Again, as I mentioned before, if some         13:44:10
18    variables are only available on an annual       13:44:13
19    basis, I would interpolate them, excuse me,     13:44:15
20    interpolate the monthly data and thereby        13:44:19
21    lose some power, but this is frequently         13:44:23
22    done in studies like this.                      13:44:26
23 Q. Okay.                                           13:44:28
24 A. Okay.                                           13:44:28
25 Q. You can set this one, too, aside.             13:44:29

49 (Pages 501 to 504)

M. ROSENTHAL

505

```
 1 A. Okay.  I'll leave it on the top.          13:44:36
 2 Q. All right.  Let me direct your attention to   13:44:54
 3    Paragraph 7d) on Page 5 of your              13:44:56
 4    declaration, Exhibit 1 to your deposition.   13:44:59
 5 A. I'm sorry?                                   13:45:05
 6 Q. Paragraph 7d).                               13:45:06
 7 A. 70?                                          13:45:07
 8 Q. Uh-huh.                                      13:45:09
 9 A. And then -- okay.  I'm sorry.  I'm sorry,    13:45:09
10    Paragraph 70 of my --                        13:45:17
11 Q. 7d).                                         13:45:18
12 A. 7d), oh, sorry.  It would be -- thought I was losing it.   13:45:21
13 Q. We're going backwards.                       13:45:26
14 A. That's a shame.                              13:45:28
15 Q. Yeah, well, not for long.                    13:45:29
16 A. All right.                                   13:45:30
17 Q. Okay.                                        13:45:31
18 A. Okay.                                        13:45:35
19 Q. So in this paragraph you write that          13:45:36
20    "Parke-Davis made the explicit calculation   13:45:38
21    that seeking FDA approval would not be       13:45:40
22    worthwhile, given the short remaining        13:45:42
23    patent life for Neurontin," correct?          13:45:44
24 A. That's correct.                              13:45:47
25 Q. What's the basis for that statement?         13:45:47
```

506

```
 1 A. That comes -- and you'll see there are       13:45:49
 2    footnotes there in the documents, but        13:45:53
 3    essentially it's a summary of my             13:45:55
 4    understanding of what the complaint was      13:45:57
 5    saying.                                      13:45:59
 6 Q. What's the extent of your knowledge about    13:45:59
 7    the process involved in a manufacturer       13:46:07
 8    seeking approval from the FDA for            13:46:10
 9    additional indications for an existing       13:46:12
10    drug?                                        13:46:15
11 A. My knowledge is fairly rudimentary on that   13:46:17
12    subject, and my understanding is that        13:46:21
13    additional clinical tests need to be done.   13:46:23
14 Q. Do you have any knowledge for how expensive  13:46:26
15    the process might be?                        13:46:27
16 A. I understand that undertaking clinical       13:46:28
17    trials, particularly randomized control     13:46:31
18    double-blind trials, is very expensive in    13:46:34
19    general, and so I mean, it's well-known      13:46:37
20    that under the process of drug development,  13:46:41
21    that is, getting approval from the FDA, is   13:46:46
22    expensive and is essentially a barrier to    13:46:48
23    entry for new drugs.                         13:46:51
24 Q. Do you have any knowledge of how long the    13:46:52
25    process can take of running the clinical     13:46:59
```

507

```
 1    trials and then seeking the approval from    13:47:00
 2    the agency?                                  13:47:02
 3 A. Again, I've certainly seen discussions in    13:47:03
 4    the policy literature about how long it      13:47:06
 5    takes to get FDA approval.  There have been  13:47:10
 6    efforts, as you know, over the last decade   13:47:13
 7    or two to try to shorten that length of      13:47:16
 8    time, but so my understanding is that it's   13:47:18
 9    a substantial consideration, that it takes   13:47:21
10    quite a while.                               13:47:24
11 Q. By "quite a while," are we talking years?    13:47:25
12 A. It would be -- that would be my -- again,    13:47:28
13    my not terribly expert opinion on this is    13:47:31
14    that it would take a couple of years, and    13:47:35
15    it would represent a significant sum of      13:47:36
16    money to undertake.                          13:47:39
17 Q. Would you agree with the assumption that     13:47:40
18    manufacturers of prescription drugs are by   13:47:45
19    and large rational economic actors?          13:47:47
20 A. And if you mean profit-maximizing firms, I   13:47:53
21    would agree with that assumption.            13:47:56
22 Q. And so based on that assumption, would you   13:48:05
23    say that it's also a reasonable assumption   13:48:08
24    that Parke-Davis, as you lay it out here     13:48:14
25    (indicating) in your declaration, that       13:48:17
```

508

```
 1    Parke-Davis made the implicit calculation    13:48:18
 2    that they wouldn't earn sufficient profit    13:48:20
 3    to make seeking an additional use            13:48:24
 4    worthwhile?                                  13:48:26
 5 A. That is my understanding, that it was an     13:48:27
 6    explicit (sic) calculation, yes.             13:48:30
 7 Q. All right.  Let me ask you a hypothetical    13:48:35
 8    question on this.  Assume the manufacturer   13:48:37
 9    had a drug whose patent will run out in      13:48:42
10    three years --                               13:48:44
11 A. Okay.                                        13:48:45
12 Q. -- and discovers that this drug which has    13:48:45
13    already been approved by the FDA for one     13:48:57
14    condition is almost surely effective for an  13:48:59
15    additional unapproved condition.  The        13:49:01
16    manufacturer estimates that it will cost     13:49:05
17    them $2 million and two years to complete    13:49:07
18    the studies they need to complete and to     13:49:11
19    end -- assuming that the results are         13:49:16
20    favorable in those studies, to secure the    13:49:17
21    FDA approval of that new use.                13:49:19
22    I have no sense of whether those             13:49:22
23    numbers -- they're probably low-balled in    13:49:24
24    a, you know, in a serious way, but for       13:49:27
25    purposes of this hypothetical let's use      13:49:29
```

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                                            516-608-2400

**509**

1  them.                                          13:49:30
2      And then they estimate that the            13:49:31
3  potential profit for the drug over the one     13:49:33
4  year of its remaining patent life after the    13:49:35
5  two-year approval period is a million          13:49:37
6  dollars. What would you imagine the            13:49:42
7  manufacturer would choose to do in that        13:49:43
8  circumstance?                                  13:49:45
9  A. I'm sorry, I think I lost some important    13:49:46
10 elements of the word problem. I need a         13:49:49
11 pencil, but what was the cost of the           13:49:52
12 clinical trials? It took two years to --       13:49:53
13 Q. Two years and 2 million, just so we keep    13:49:56
14 the numerals simple.                           13:49:58
15 A. That's right. Excellent. We're good.        13:49:59
16 Right. So, again, you know, I believe that     13:50:00
17 there's a math calculation. It's a simple      13:50:02
18 one. If the profits are a million dollars      13:50:04
19 and the cost is $2 million, no matter what     13:50:07
20 discount rate you use, you come to a           13:50:09
21 conclusion that it doesn't make sense to go    13:50:11
22 through the process.                           13:50:14
23 Q. Okay. And you wouldn't suggest the          13:50:14
24 manufacturer has done anything wrong by not    13:50:17
25 going through the process?                     13:50:19

**510**

1  A. No.                                         13:50:20
2  Q. Does it matter for purposes of your answer  13:50:24
3  whether the drug is or isn't effective for     13:50:26
4  the supplemental use?                          13:50:28
5  A. For the calculation?                        13:50:29
6  Q. For the answer to your -- answer to the     13:50:32
7  last question, which is that they haven't      13:50:36
8  done anything wrong in not seeking approval    13:50:37
9  for the additional use.                        13:50:40
10 A. Well, we're getting --                      13:50:41
11     MR. NOTARGIACOMO: Economically,            13:50:46
12 morally, legally? Where are we now?            13:50:46
13     MR. POLUBINSKI: Professor                  13:50:48
14 Rosenthal answered the question.               13:50:50
15 Q. What were you thinking when you answered    13:50:50
16 it?                                            13:50:56
17 A. I believe I was trapped. But in the first   13:50:57
18 example I was speculating on the cost/         13:51:01
19 benefit comparison, and in no way did the      13:51:03
20 rightness of launching the drug for that       13:51:05
21 indication enter into my calculation. I        13:51:11
22 was merely comparing the $2 million to the     13:51:14
23 million dollars. That was a profit-            13:51:16
24 maximizing decision.                           13:51:17
25 Q. Sure.                                       13:51:18

**511**

1  A. And if you want me to say something about   13:51:19
2  whether or not it's right if there's no        13:51:21
3  effectiveness, then I need to use some         13:51:23
4  other standard. I don't know what the          13:51:25
5  right standard to use is there.                13:51:27
6  Q. Okay. Are you aware of any standard, I      13:51:29
7  guess, under which it would be wrong for       13:51:32
8  them not to go and seek additional approval    13:51:34
9  for that use?                                  13:51:36
10     MR. NOTARGIACOMO: Objection.               13:51:38
11 A. I'm not aware of any standard to evaluate   13:51:39
12 that decision.                                 13:51:43
13 Q. Okay. Now, let me ask you also to assume    13:51:44
14 just for purposes of this question that        13:51:54
15 Neurontin is 100 percent effective for a       13:51:57
16 given off-label use. Could you imagine the     13:51:59
17 defendants making a rational economic          13:52:04
18 decision to even pursue FDA approval           13:52:07
19 for that use based on the amount of time       13:52:09
20 left in the patent life of the drug?           13:52:11
21 A. Again, my response to your original         13:52:14
22 question didn't assume anything about          13:52:17
23 effectiveness. So the economic -- rational     13:52:19
24 economic decision was just one about costs     13:52:21
25 and benefits in terms of profitability --      13:52:23

**512**

1  Q. And --                                      13:52:27
2  A. -- and therefore I would respond the same   13:52:27
3  way.                                           13:52:30
4  Q. Okay. And that they could in fact make a    13:52:30
5  rational economic decision not to even         13:52:33
6  sponsor a single clinical trial?               13:52:35
7  A. Yes, absolutely. The rational economic      13:52:36
8  decision is based only on profits.             13:52:41
9  Q. And their decision to do that or not to do  13:52:44
10 that wouldn't mean anything with regard to     13:52:52
11 whether Neurontin was or wasn't perfectly      13:52:57
12 effective for that use?                        13:53:00
13 A. Again, I believe that one can abstract that 13:53:01
14 decision in terms of purely profits and        13:53:08
15 that it could be the same decision no          13:53:10
16 matter what the effectiveness is, and so I     13:53:12
17 think the answer is yes, but I believe I've    13:53:15
18 already answered it, unless I haven't been     13:53:17
19 clear.                                         13:53:19
20 Q. No, that's fine -- right. I guess by        13:53:19
21 itself, then, the fact that Neurontin was      13:53:22
22 not approved by the FDA for a given use        13:53:24
23 doesn't mean that Neurontin wasn't             13:53:27
24 perfectly effective for that use?              13:53:28
25 A. By itself that does not indicate anything   13:53:31

51 (Pages 509 to 512)

                                                              513
1    about the true effectiveness of Neurontin,          13:53:34
2    no.                                    13:53:36
3  Q. Okay.  All right.  You've said in your            13:53:41
4    model that you proposed to quantify the            13:53:47
5    effect of wrongful conduct on a class-wide         13:53:49
6    level, correct?                          13:53:53
7  A. Uh-huh.                               13:53:53
8  Q. I take it you'll -- that you expect to be         13:53:53
9    able to quantify the extent of the impact          13:53:58
10   suffered by each of the subclasses.  So in          13:54:01
11   other words, the consumer subclass as well          13:54:04
12   as the third-party payer subclass, correct?        13:54:07
13 A. That's correct.                         13:54:09
14 Q. Do you know how large the third-party payer       13:54:09
15   subclass is?                            13:54:13
16 A. Can you tell me what you mean by "large"?          13:54:13
17   You mean number of members --               13:54:17
18 Q. Yes.                                 13:54:17
19 A. -- or number of dollars?                    13:54:18
20 Q. Number of members.                      13:54:17
21 A. I don't know the number of members.  If you       13:54:21
22   look at third-party payers, commercial            13:54:26
23   insurers generally, the number is in the         13:54:31
24   several hundred.  If you add in the Taft-         13:54:34
25   Hartley plans, there are probably another        13:54:39

                                                              514
1    hundred or so.  That's order of magnitude.         13:54:41
2  Q. Are there others that you would have to          13:54:45
3    include?                              13:54:46
4  A. On the third-party payer side?                13:54:47
5  Q. Yeah.                                13:54:49
6  A. I believe the commercial plans -- the Taft-       13:54:49
7    Hartley funds and the commercial plans are        13:55:02
8    the principal members of the third-party         13:55:03
9    payer subclass.  I could check the             13:55:05
10   complaint.                             13:55:07
11 Q. And I guess just adding up the two             13:55:07
12   categories that you've just described, I          13:55:13
13   guess we would agree that the, to the best        13:55:16
14   of your knowledge now, the third-party           13:55:19
15   payer subclass would be at least several         13:55:21
16   hundred entities large, possibly over a          13:55:24
17   thousand?                             13:55:27
18 A. Possibly.                             13:55:27
19 Q. Okay.  I assume that your model would seek        13:55:28
20   to determine aggregate impact on the third-       13:55:39
21   party payer subclass; is that correct?           13:55:41
22 A. I have been asked to develop a model to          13:55:43
23   estimate aggregate impact, yes.              13:55:45
24 Q. And that your model wouldn't purport to          13:55:47
25   determine whether each member, each            13:55:50

                                                              515
1    individual member of the third-party payer        13:55:51
2    subclass suffered an injury as a result of         13:55:53
3    the conduct at issue?                      13:55:55
4  A. Well, as you know, in sort of the context         13:56:00
5    of a class like this you're looking at           13:56:03
6    aggregate impact that is common to all the        13:56:05
7    class members, so -- but I don't identify        13:56:08
8    if what you mean is to look specifically at       13:56:10
9    Blue Cross/Blue Shield of Kansas City and        13:56:13
10   their effects.                          13:56:15
11 Q. Okay.  We've discussed before in your           13:56:16
12   declaration how physicians -- let's            13:56:23
13   actually look at Paragraph 12.               13:56:26
14 A. 12, thank you.  Okay.                      13:56:29
15 Q. We've discussed before how in your             13:56:40
16   declaration how physicians "face numerous        13:56:43
17   constraints, including limited time and          13:56:45
18   cognitive ability to digest the continuous       13:56:48
19   flow of information about new treatments"?       13:56:50
20 A. Yes.                                 13:56:53
21 Q. Will that statement be true of at least         13:56:53
22   some of the third-party payers as well?          13:56:59
23 A. I'm not sure what you mean by that.             13:57:01
24 Q. Would you agree that third-party payers do        13:57:07
25   process to some degree information about         13:57:12

                                                              516
1    the different treatments for which they          13:57:15
2    reimburse?                            13:57:17
3  A. I believe that third-party payers make          13:57:17
4    coverage decisions.  For example, they make       13:57:21
5    coverage decisions -- I don't know the          13:57:25
6    extent to which -- I know that they            13:57:29
7    incorporate some of this information that I       13:57:31
8    believe was referenced yesterday through         13:57:33
9    the Drugdex which tracks studies on             13:57:35
10   particular uses of particular drugs, and so       13:57:39
11   if that's what you mean by they sort of          13:57:41
12   incorporate new information in their             13:57:44
13   policies -- is that the kind of thing that       13:57:46
14   you had in mind?                         13:57:47
15 Q. Yeah.  And do -- third-party payers, I'd         13:57:48
16   assume to some degree at least, make            13:57:51
17   coverage decisions about whether they'll         13:57:53
18   reimburse for particular drugs for            13:57:56
19   particular uses, correct?                   13:57:57
20 A. To some degree they make those policies.         13:57:58
21   As you know, they don't tend to apply those       13:58:02
22   policies patient by patient.               13:58:05
23 Q. Sure.  No, of course.                     13:58:08
24 A. So for example --                        13:58:10
25 Q. Of course.                            13:58:12

M. ROSENTHAL

517

1  A.  Right.  Okay.                                    13:58:12
2  Q.  But in the context of making decisions          13:58:13
3      about what to cover and what not to cover,       13:58:16
4      they do receive and process information          13:58:18
5      about various treatments?                        13:58:21
6  A.  I imagine that there's a function in the         13:58:23
7      third-party payers where they do this -- I       13:58:25
8      guess what I'm having a little trouble with      13:58:28
9      is I can see how this happens for an             13:58:30
10     initial coverage decision.  I don't know          13:58:32
11     the extent to which third-party payers            13:58:34
12     revisit existing drugs with regard to new         13:58:35
13     indications.                                      13:58:38
14  Q.  Could you imagine that the answer to that       13:58:39
15     question might vary from third-party payer        13:58:41
16     to third-party payer?                             13:58:43
17  A.  Perhaps.                                         13:58:44
18  Q.  That some of them might revisit this on         13:58:44
19     several occasions?                                13:58:48
20  A.  Again, since I'm not entirely sure the          13:58:50
21     extent to which this happens at all, I            13:58:53
22     could imagine that it would happen               13:58:57
23     differentially, so that's certainly in the        13:58:59
24     realm of possibility.                             13:59:00
25  Q.  All right.  Also in Paragraph 12 you write      13:59:01

518

1      the "Physicians are often not aware of the       13:59:14
2      latest scientific evidence on treatments          13:59:17
3      and rely heavily on commercial sources of         13:59:22
4      information, such as pharmaceutical company       13:59:24
5      promotional materials."                           13:59:26
6          In terms of awareness of the                  13:59:32
7      latest scientific evidence, would your            13:59:34
8      statement as it's laid out here in your           13:59:39
9      declaration be true of third-party payers?        13:59:41
10  A.  Again, it's sort of a -- I'm having a           13:59:43
11     little trouble casting the third-party            13:59:48
12     payer as medical decision-makers because          13:59:50
13     they're so enormous, to ask would the medical     13:59:51
14     director of a third-party payer be aware of       13:59:54
15     the latest scientific evidence to some            13:59:57
16     degree?                                           14:00:00
17  Q.  Okay.                                            14:00:03
18  A.  I suppose.                                       14:00:03
19  Q.  And that degree would vary from third-party     14:00:04
20     payer to third-party payer?                       14:00:06
21  A.  I suppose.                                       14:00:07
22  Q.  There might be some third-party payers that     14:00:08
23     may not even have a medical director as          14:00:10
24     such?                                             14:00:12
25  A.  That, I have trouble believing.                 14:00:12

519

1  Q.  Okay.                                            14:00:15
2  A.  But I can believe that medical directors         14:00:15
3      vary.                                             14:00:18
4  Q.  Okay.  All right.  You state in Paragraph        14:00:18
5      33 of your declaration -- actually Footnote       14:00:25
6      49.                                               14:00:37
7  A.  Okay.  49?                                        14:00:37
8  Q.  Yeah.                                             14:00:39
9          -- that "price plays a relatively            14:00:42
10     minor role here because most patients             14:00:43
11     receiving Neurontin are covered by                14:00:47
12     insurance so they only pay" -- "they only         14:00:49
13     face the co-payment amount."                      14:00:51
14         Does price play a similarly minor            14:00:55
15     role in decision-making on reimbursement by       14:00:57
16     third-party payers?                               14:01:00
17  A.  I think it would depend on the situation,       14:01:01
18     but clearly -- so can I be a little               14:01:03
19     specific here for a second?                       14:01:06
20  Q.  Please.                                          14:01:08
21  A.  So the price we're talking about in the         14:01:08
22     Rizzo model and in general is --                  14:01:10
23  Q.  In the which model?                              14:01:14
24  A.  I'm sorry, in the Rizzo model in Footnote       14:01:16
25     49, R-I-Z-Z-O, is something like that AWP         14:01:18

520

1      price.  In all likelihood it's the AWP, the      14:01:22
2      list price for the drug.  And most of these       14:01:25
3      models are about overall consumption of the       14:01:30
4      drug.  So sort of looking at total units          14:01:32
5      consumed as a function of this list price,        14:01:34
6      the relationship is not all that clear,           14:01:37
7      because, again, the individuals pay               14:01:41
8      something out of pocket.                           14:01:43
9          So now you're asking, I think,               14:01:44
10     does that same list price affect a third-         14:01:46
11     party payer's coverage decision?  I think         14:01:50
12     it would depend -- for the most part              14:01:53
13     third-party payers cover -- open                  14:01:56
14     formularies are the most common form, so          14:01:59
15     they cover all drugs.  They may put                14:02:01
16     differential co-payments for certain              14:02:03
17     kinds of high cost drugs in cases where           14:02:05
18     they have lower cost substitutes in                14:02:09
19     general.  It'll depend on the class of            14:02:11
20     drugs, but you can imagine there's some           14:02:13
21     very high cross-biological drugs that don't        14:02:15
22     have high co-payments simply because there         14:02:18
23     aren't alternatives, and so using that kind        14:02:21
24     of co-payment mechanism doesn't make sense         14:02:23
25     for trying to get consumers to try a              14:02:24

53 (Pages 517 to 520)

M. ROSENTHAL

521

1    different drug.                          14:02:26
2  Q. All right. And different third-party      14:02:27
3    payers, I take it, could make different    14:02:28
4    decisions on this even with respect to the 14:02:29
5    same drug; is that correct?               14:02:32
6  A. In the cross-section there may be         14:02:33
7    differences in co-payments. There         14:02:36
8    certainly are differences in co-payments.  14:02:38
9  Q. Okay. The third-party payers, generally  14:02:40
10   speaking, have a significant economic stake 14:02:42
11   in persuading or directing physicians not  14:02:45
12   to prescribe drugs for indications for     14:02:48
13   which they're known to be ineffective; is  14:02:51
14   that correct?                            14:02:54
15 A. Could you read that back? I just ---     14:02:54
16       MR. POLUBINSKI: If you could read    14:03:01
17   it, that would be great.                  14:03:02
18       (Record read.)                       14:03:18
19       MR. NOTARGIACOMO: Objection.        14:03:18
20 A. I guess the way you phrase that, it's    14:03:19
21   certainly true that third-party payers     14:03:29
22   generally do better when spending is less, 14:03:31
23   and given that they want to constrict      14:03:38
24   spending, eliminating ineffective use makes 14:03:42
25   more sense than effective use, but that    14:03:44

522

1    statement doesn't characterize very well  14:03:46
2    what we know about how the market works in 14:03:48
3    this area. There are lots of treatments   14:03:52
4    that are known to be ineffective, low      14:03:54
5    effectiveness that are covered.           14:03:58
6  Q. Do third-party payers have different ways 14:04:07
7    of affecting physician or patient decision- 14:04:09
8    making with respect to drugs that they    14:04:12
9    believe to be ineffective for treating     14:04:14
10   particular indications?                   14:04:18
11       MR. NOTARGIACOMO: Objection.        14:04:19
12 A. The -- yes, there are financial incentives, 14:04:20
13   pre-authorization requirements, for       14:04:27
14   example, and, of course, coverage         14:04:30
15   decisions.                              14:04:35
16 Q. Okay. Let's talk about some of these. All 14:04:35
17   right. How about a prior authorization    14:04:47
18   program; could you describe just briefly  14:04:48
19   how such a program would work in this     14:04:53
20   context?                                14:04:55
21 A. A prior authorization program might, for  14:04:55
22   example, require that a physician supply   14:04:58
23   some clinical information about a patient  14:05:01
24   before the prescription drug would be     14:05:03
25   reimbursed.                             14:05:06

523

1  Q. I think we agreed in some of the early    14:05:09
2    questions that we did today that the       14:05:16
3    implementation of a prior authorization    14:05:18
4    program might impact prescription decisions 14:05:19
5    in the aggregate. Am I correct on that?    14:05:22
6  A. So it would depend on how the prior       14:05:24
7    authorization program -- well, let's say,  14:05:26
8    for example, it was for any patient getting 14:05:28
9    Neurontin there had to be a prior         14:05:30
10   authorization. That would certainly affect 14:05:31
11   overall prescribing of any kind. If the    14:05:34
12   prior authorization were specific to       14:05:36
13   off-label use, then it would have that more 14:05:38
14   specific effect.                         14:05:41
15 Q. Will your model take into consideration all 14:05:42
16   of the occasions in which third-party      14:05:44
17   payers implemented prior authorization    14:05:46
18   programs for Neurontin?                   14:05:48
19 A. My model will again focus on the main     14:05:49
20   predictors of the use of Neurontin for    14:05:56
21   off-label uses, and in particular the      14:05:58
22   concern is with regard to those variables  14:06:02
23   that might occur with a pattern over time  14:06:04
24   identical to the allegedly illegal         14:06:09
25   activities. So to the extent that there -- 14:06:12

524

1    that my research shows that there's a      14:06:16
2    concern, there's a simultaneous effect of  14:06:18
3    these kinds of formulary decisions or prior 14:06:23
4    authorization programs, then I'll try to   14:06:25
5    model it.                               14:06:29
6        In reality, though, as you know,       14:06:30
7    if, for example, you were to posit a story  14:06:32
8    such as is follows: Defendants increase    14:06:36
9    off-label promotions, third-party payers   14:06:38
10   make it harder and harder to get Neurontin 14:06:40
11   for off-label use, it'll just -- it'll bias 14:06:41
12   my estimate downwards if I don't model     14:06:46
13   those. It's really only -- if you can tell 14:06:49
14   a story, again, about they're being        14:06:51
15   correlated in time that it causes a        14:06:53
16   problem. And in this case that story would 14:06:55
17   really have to be one that would result in  14:06:56
18   a downward bias in the estimate of the     14:06:58
19   impact.                                14:07:00
20 Q. Okay. Let's talk about financial          14:07:00
21   incentives, too. That was another --      14:07:03
22 A. Okay.                                14:07:06
23 Q. -- category of ways in which third-party  14:07:06
24   payers might affect physician prescribing  14:07:08
25   decisions. What sorts of financial        14:07:11

54 (Pages 521 to 524)

VERITEXT/NEW YORK REPORTING COMPANY

M. ROSENTHAL

525

1    incentives would you have in mind when you          14:07:16
2    answer the question?                        14:07:19
3 A. I think the chief ones in this realm would         14:07:19
4    be consumer co-payments.                    14:07:21
5 Q. That the co-payments would differ from drug       14:07:26
6    to drug?                              14:07:29
7 A. As you're probably aware, they don't             14:07:31
8    typically differ from drug to drug, but            14:07:34
9    there are categories of drugs. There are          14:07:37
10   preferred drugs, not preferred drugs,             14:07:39
11   generic drugs, which are typically all the         14:07:42
12   best category of drugs.  And so the             14:07:44
13   co-payments vary across those categories.        14:07:47
14 Q. The best category of drugs from the             14:07:50
15   perspective of the third-party payers,            14:07:52
16   correct?                             14:07:53
17 A. That's right.  So where a generic exists         14:07:55
18   for a particular molecule --                  14:07:57
19 Q. Right.                               14:07:57
20 A. -- yeah.                             14:07:59
21 Q. Is this the same thing as a situation in         14:07:59
22   which a TPP, or third-party payer, has a         14:08:01
23   different tier within its formulary?             14:08:03
24 A. That's right, those are exactly those kinds      14:08:05
25   of tiers.                             14:08:07

526

1 Q. We talked also, I think, earlier today            14:08:12
2    about disease management programs?           14:08:13
3 A. We did.                             14:08:14
4 Q. Is that a way that a third-party payer           14:08:17
5    might be able to affect prescribing             14:08:19
6    behavior with respect to Neurontin?            14:08:21
7 A. If there were a disease management program,     14:08:22
8    for example, for one of the off-label           14:08:27
9    indications, is that what you had in mind?       14:08:31
10 Q. Sure.                              14:08:31
11 A. So let's say bipolar disorder.                14:08:34
12 Q. Or one that relates to one of the off-label     14:08:36
13   indications --                          14:08:39
14 A. Okay.                              14:08:39
15 Q. -- in some way.                        14:08:39
16 A. It might -- I'm afraid my in-depth              14:08:40
17   knowledge of disease management programs is    14:08:41
18   not deep enough to tell you if they specify      14:08:44
19   certain drugs, but if you ask me to assume      14:08:48
20   that the disease management program had        14:08:51
21   recommendations with regards to drugs,          14:08:53
22   disease management programs generally work     14:08:56
23   around physicians and patients. They don't      14:08:59
24   tend to get involved in the physician/          14:09:01
25   patient decision-making.                   14:09:03

527

1    So they are third-party payers'             14:09:04
2    efforts, I think, generally speaking, to        14:09:10
3    overcome the lack of coordination in the        14:09:12
4    health care system itself.  So it seems        14:09:14
5    strange to me to think about a disease        14:09:18
6    management program trying to affect           14:09:19
7    physician decision-making.  Usually instead   14:09:21
8    they contact patients directly and say,        14:09:23
9    "You should lose weight.  You should be       14:09:25
10   taking your medications," but they don't --     14:09:26
11   they're not in a position actually treat       14:09:29
12   the patient.  They advise the patient on       14:09:31
13   behavior.                            14:09:33
14 Q. And through their advising the patient on       14:09:33
15   behavior, could you imagine that that's        14:09:36
16   something that could conceivably impact the    14:09:37
17   extent to which a physician was -- or a        14:09:39
18   patient, rather, received prescriptions for    14:09:43
19   Neurontin for an off-label use?              14:09:44
20 A. Possibly.  Again, it's not very consistent      14:09:46
21   with my vision of the way these programs       14:09:50
22   work, but I think it could be possible,         14:09:53
23   yes.                               14:09:55
24 Q. Do you know what a drug utilization review     14:09:59
25   program is?                          14:10:01

528

1 A. Yes.  So like standard utilization review,       14:10:02
2    drug utilization review is a way of            14:10:07
3    generally retrospectively looking at          14:10:13
4    patterns of drug use, and typically it's an     14:10:15
5    informational review.  So, for example,        14:10:18
6    you could do drug utilization review at the     14:10:23
7    individual physician level.  We look at all     14:10:26
8    your prescribing patterns for your           14:10:28
9    epileptic patients, just to take an           14:10:31
10   example, and we compare those to your        14:10:33
11   peers'.                             14:10:35
12      We give you that information and          14:10:36
13   say, "Look, Dr. Smith, you're an outlier.      14:10:37
14   You're using a lot more of this expensive      14:10:40
15   drug X and everyone else is using Y."         14:10:43
16   That's a typical drug review program.         14:10:45
17 Q. Okay.  Can we take a look at Paragraph        14:10:47
18   27b).                              14:11:03
19 A. Okay.                              14:11:03
20 Q. 27d), I'm sorry.                        14:11:03
21 A. Okay.                              14:11:09
22 Q. In 27d) you refer to marketing literature       14:11:10
23   by -- you might have to help me with the       14:11:21
24   pronunciation, Manchanda, Chintagunta and   14:11:25
25   Gertzis --                           14:11:29

55 (Pages 525 to 528)

M. ROSENTHAL

529

1 A. That sounds right to me. 14:11:32
2 Q. Okay. 14:11:32
3     -- that report that "detailing has 14:11:43
4    a significant positive impact on the number 14:11:45
5    of prescriptions written for a drug by the 14:11:50
6    physician." 14:11:52
7 A. Yes. 14:12:02
8 Q. Do you have a view as to the qualifications 14:12:03
9    of Professors Manchanda, Chintagunta and 14:12:05
10   Gertzis to reach this conclusion? 14:12:09
11 A. The qualifications? My understanding of 14:12:11
12   the authors -- the first author in 14:12:15
13   particular, that he's a marketing professor 14:12:17
14   at the University of Chicago. I'm afraid I 14:12:20
15   don't know the other authors. 14:12:22
16 Q. Okay. With respect to the first author -- 14:12:23
17 A. Yeah. 14:12:26
18 Q. -- do you know anything more about what he 14:12:27
19   does at the University of Chicago? 14:12:30
20 A. I do not. I just -- I believe he's a 14:12:31
21   marketing professor there. 14:12:34
22 Q. Okay. On the subject of detailing, you had 14:12:35
23   mentioned academic detailing before? 14:12:41
24 A. Yes. 14:12:43
25 Q. Is that another means through which a 14:12:45

530

1    third-party payer could seek to affect 14:12:53
2    prescription writing decisions by 14:12:55
3    physicians? 14:12:57
4 A. Theoretically. I'm not actually aware of, 14:12:59
5    other than demonstration projects, 14:13:03
6    third-party payers having academic 14:13:05
7    detailing programs, but in theory it could. 14:13:07
8 Q. Okay. Would you agree that at some level 14:13:10
9    at least each third-party payer can and 14:13:33
10   generally did make its own decisions on 14:13:37
11   which uses of Neurontin it would reimburse 14:13:40
12   for? 14:13:42
13       MR. NOTARGIACOMO: Objection. 14:13:42
14 A. Well, I think that's a somewhat complicated 14:13:43
15   statement. As you know, Neurontin is an 14:13:47
16   oral pharmaceutical that patients purchase 14:13:51
17   through a retail pharmacy, pick up at the 14:13:54
18   pharmacy and third-party payers reimburse 14:13:57
19   through pharmaceutical claims. Those 14:14:00
20   claims, as you know, do not include 14:14:03
21   diagnosis codes. So whether a third-party 14:14:06
22   payer could in practice require such 14:14:11
23   diagnostic information through, for 14:14:15
24   example, a pre-authorization program as we 14:14:18
25   described before, I would say it is 14:14:21

531

1    possible, at very high cost to do, of 14:14:22
2    course, for all Neurontin prescriptions. 14:14:26
3       They would have to consider the 14:14:28
4    problem with potentially preventing 14:14:29
5    appropriate Neurontin prescriptions, 14:14:32
6    consider the problem of making their 14:14:35
7    physicians in their network very angry 14:14:36
8    about the extra work. But in theory they 14:14:39
9    could request that clinical information be 14:14:43
10   provided and therefore construct such a 14:14:45
11   detailed policy. 14:14:49
12 Q. Okay. Would you agree that to the extent 14:14:53
13   that an individual third-party payer made a 14:15:14
14   conscious affirmative decision not to 14:15:16
15   implement a pre-authorization program along 14:15:18
16   the lines of what you've just described, 14:15:21
17   despite its belief that Neurontin was 14:15:24
18   ineffective for some number of off-label 14:15:26
19   uses, that by virtue of that conscious 14:15:34
20   decision the rational purpose of 14:15:36
21   described -- allegedly unlawful promotion 14:15:38
22   described in the complaint was not a direct 14:15:40
23   cause of any loss to that third-party 14:15:42
24   payer? 14:15:46
25       MR. NOTARGIACOMO: Objection, 14:15:46

532

1    calls for a legal conclusion. 14:15:47
2 Q. Well, I'm not -- let's clarify the 14:15:48
3    question. I'm not asking for a legal 14:15:51
4    conclusion, I'm just asking for a -- your 14:15:52
5    own economic analysis as to causality. 14:15:54
6 A. Could you perhaps -- 14:16:00
7       MR. NOTARGIACOMO: I'm going to 14:16:01
8    still object on the same basis. 14:16:02
9 A. Could you please restate it in some chunks? 14:16:04
10   Because I'm a little unclear. So I assume 14:16:10
11   that the third-party payer knows Neurontin 14:16:13
12   to be ineffective? 14:16:22
13 Q. Sure. For a given off-label indication or 14:16:16
14   any number of off-label indications -- 14:16:20
15 A. So -- 14:16:22
16 Q. -- or at least that it believes Neurontin 14:16:24
17   to be ineffective? 14:16:26
18 A. It knows or believes Neurontin to be 14:16:28
19   ineffective, and it knows -- I'm not sure 14:16:31
20   how -- that Neurontin's being used for 14:16:35
21   these off-label indications given that they 14:16:36
22   don't have a prior authorization program. 14:16:40
23   I guess that's the problem with -- if I 14:16:44
24   assume that they know Neurontin to be 14:16:47
25   ineffective and they know that it's being 14:16:49

56 (Pages 529 to 532)

M. ROSENTHAL

533

1    used for those off-label uses --                 14:16:51
2  Q. Right.  And maybe they learned that it's        14:16:53
3    being used for the off-label uses by             14:16:55
4    watching Dateline or something like that         14:16:57
5    and seeing a piece about David Franklin,         14:16:59
6    his case?                                14:17:05
7  A. Okay.  Although I don't think that tells        14:17:06
8    them, you know, how it's being used --           14:17:08
9  Q. Fair enough.                           14:17:11
10 A. -- in their population necessarily.  Then       14:17:11
11   why is the cause of that off-label use not       14:17:15
12   still the allegedly illegal promotional          14:17:19
13   activities?                             14:17:24
14 Q. I guess my question goes to the extent that     14:17:28
15   the third-party payer knows that the            14:17:34
16   allegedly illegal activities are going on,       14:17:38
17   and it affirmatively decides not to             14:17:40
18   implement a program through which it would       14:17:42
19   not need to reimburse for those                 14:17:43
20   indications, how can it be said that the         14:17:49
21   promotional activity resulted in the loss        14:17:51
22   to that third-party payer?                 14:17:58
23      MR. NOTARGIACOMO:  Objection,           14:17:59
24   calls for a legal conclusion.               14:18:00
25 A. Well, in my view, that really does ask a        14:18:01

534

1    legal question, because then you could pose      14:18:04
2    a case where there's always some means by        14:18:08
3    which someone can avert fraud, but if it's       14:18:10
4    very, very high cost, I mean, how can you        14:18:12
5    say that that's the fault of the person who      14:18:15
6    was defrauded?  And that's a really poor         14:18:17
7    sort of coffee-table legal opinion, and          14:18:22
8    so -- but that's sort of where your             14:18:24
9    question leads me, so I'm afraid I can't         14:18:25
10   really respond.                          14:18:28
11 Q. Okay.  I won't ask you for the coffee-          14:18:29
12   table --                                14:18:31
13 A. Okay.                                  14:18:31
14 Q. -- legal opinion.                        14:18:32
15 A. Thank you.  I know it's offensive.             14:18:33
16 Q. No, not at all.                          14:18:35
17      All right.  Wouldn't you agree              14:18:36
18   though that the class does -- the third-         14:18:37
19   party payer subclass does contain a wide        14:18:39
20   range of third-party payers that range from     14:18:41
21   large multi-state insurance companies with      14:18:44
22   many employees to small local businesses        14:18:46
23   with just a few employees?                 14:18:49
24 A. I would imagine that to be true, yes.          14:18:50
25 Q. And that you would agree that -- I assume,     14:18:53

535

1    that in view of this, the third-party           14:18:54
2    payers would have varying levels of             14:18:56
3    knowledge or sophistication as to efficacy      14:18:58
4    of various drugs for various indications?       14:18:59
5  A. Again, as I said before, I would agree that    14:19:01
6    there's probably variation along those          14:19:05
7    lines.                                  14:19:07
8  Q. And you would also agree that your model       14:19:07
9    doesn't seek to account for those              14:19:09
10   differences from third-party payer to          14:19:11
11   third-party payer because it's an aggregate     14:19:13
12   model?                                  14:19:16
13 A. That's correct.                          14:19:16
14 Q. What analysis, if any, have you done into      14:19:16
15   the amount and quality of the medical          14:19:24
16   claims data that are maintained by the         14:19:25
17   different third-party payers?               14:19:27
18 A. Specific to this case?                     14:19:28
19 Q. Uh-huh.                               14:19:35
20 A. I have not planned to use claims data         14:19:36
21   specifically in the models that we've          14:19:38
22   discussed, so I have not looked into those      14:19:40
23   data.  I have extensive experience using        14:19:43
24   claims data both on the prescription drug       14:19:47
25   and in general, so I have a general sense       14:19:49

536

1    of those data.                          14:19:51
2  Q. Okay.  But you don't plan on using them in     14:19:52
3    your analysis in this case?                14:19:54
4  A. I believe there are places where they might    14:19:55
5    be informative, but in general, as we          14:19:59
6    talked about, I plan to use the National        14:20:02
7    Disease and Therapeutic Index data for the      14:20:04
8    quantities and then the promotional data        14:20:07
9    for promotional spending.                  14:20:09
10 Q. Would you agree that individual third-party    14:20:22
11   payers may have delegated decision-making       14:20:24
12   authority regarding reimbursement for          14:20:26
13   prescription drugs to different entities        14:20:28
14   that I'll refer to by acronyms, and maybe       14:20:30
15   we can go through them one by one.  The         14:20:34
16   first is TPAs, the second are PBMs, and the     14:20:36
17   third are EBCs.                          14:20:39
18      MR. NOTARGIACOMO:  Objection.           14:20:41
19 Q. Are you familiar with any of those three      14:20:42
20   groups of acronyms?                      14:20:44
21 A. Two, and I could guess what the third is,      14:20:45
22   but --                                 14:20:46
23 Q. Well, let's work on just the two that          14:20:47
24   you --                                 14:20:49
25 A. Excellent.                            14:20:49

57 (Pages 533 to 536)

M. ROSENTHAL

537

1 Q. Okay.                                         14:20:50
2 A. Third-party administrators, they              14:20:50
3    essentially process claims data for --        14:20:53
4    often for these plans like Taft-Hartley       14:20:59
5    funds.  They have a third-party               14:21:01
6    administrator.  Third-party administrator     14:21:04
7    runs claims through a repricing system, so    14:21:07
8    they adjudicate claims, pay claims, that      14:21:11
9    kind of thing.                                14:21:14
10       PBMs have a -- so the TPAs,               14:21:15
11    they're -- maybe just to give a sense,        14:21:18
12    they're administrative entities.  They --     14:21:21
13    most of what they do is about processing      14:21:26
14    the bills.                                    14:21:28
15       PBMs, pharmacy benefit managers,          14:21:29
16    in contrast do a lot more.  They set          14:21:34
17    formularies in particular, as well as         14:21:38
18    process claims.  They often have mail order   14:21:42
19    facilities of their own.  And I don't know    14:21:44
20    what the last one is, but I can make it up.   14:21:52
21 Q. Don't make it up.                             14:21:55
22       Would you agree that the extent to        14:21:56
23    which and the manner in which individual      14:22:00
24    TPPs delegate decision-making authority to    14:22:02
25    either PBMs or TPAs will vary from third-     14:22:06

538

1    party payer to third-party payer?             14:22:09
2 A. I would assume that the specific functions    14:22:14
3    they ask the -- particularly the TPAs to      14:22:18
4    undertake could vary.                         14:22:21
5 Q. Okay.  I think you also said -- and correct   14:22:25
6    me if I'm getting this wrong -- that          14:22:28
7    individual third-party payers may have        14:22:30
8    different policies regarding coverage of      14:22:31
9    prescription drugs for off-label uses?        14:22:34
10 A. I believe that's true.                       14:22:36
11 Q. Okay.  Would you also agree that different   14:22:38
12    third-party payers even with the same         14:22:41
13    policies regarding coverage may have          14:22:43
14    different enforcement practices with          14:22:45
15    respect to those policies?                    14:22:48
16 A. That may be true as well.                    14:22:49
17 Q. Would you agree that differing policies of   14:22:52
18    TPPs or different enforcement practices of    14:23:00
19    TPPs could alter the effect of the           14:23:03
20    allegedly unlawful promotional activities    14:23:09
21    with respect to each individual TPP?         14:23:13
22 A. Let's be clear for a moment.                 14:23:15
23 Q. That would be good for a change, right?      14:23:18
24 A. The difference in policies as a general      14:23:21
25    term across third-party payers may affect    14:23:25

539

1    their sort of cross-sectional impact.         14:23:31
2    Those differences will not confound my        14:23:34
3    estimates of the aggregate impact because,    14:23:37
4    again, there's no reason to believe that      14:23:42
5    they're correlated over time precisely with   14:23:44
6    the allegedly illegal activities.  So         14:23:46
7    they're not confounding the aggregate         14:23:49
8    estimate.                                      14:23:50
9       If you want me to say that a TPP          14:23:53
10    that requires prior authorization for         14:23:56
11    Neurontin will be differently affected than   14:23:58
12    when it doesn't -- is that your question?     14:24:01
13 Q. That had been the question, yeah.            14:24:03
14 A. Okay.  I'm sorry.  So it is true that there  14:24:05
15    will be a different quantum of effect         14:24:08
16    across TPPs depending on whether, for         14:24:11
17    example, they have prior authorization for    14:24:13
18    Neurontin.                                    14:24:15
19 Q. Now, just to make sure I understand your     14:24:20
20    answer, it is the case that changes in        14:24:24
21    policies regarding coverage of Neurontin      14:24:29
22    for off-label uses or changes in              14:24:31
23    enforcement practices of those policies       14:24:33
24    could affect prescription-writing behavior    14:24:36
25    in the aggregate, correct?                    14:24:39

540

1       MR. NOTARGIACOMO:  Objection,             14:24:41
2    asked and answered.                           14:24:43
3 A. Yes.  Those changes could affect             14:24:43
4    prescription-writing behavior, but, again,    14:24:47
5    they would not confound my estimates unless   14:24:50
6    they were correlated.  And one would think    14:24:52
7    they would be negatively correlated, if       14:24:55
8    anything.                                      14:24:57
9 Q. Would you agree that different third-party    14:25:03
10    payers were responsible for ensuring          14:25:06
11    substantially different membership            14:25:09
12    demographics?                                 14:25:11
13 A. The third-party payers have different kinds   14:25:12
14    of patients that they cover, yes.             14:25:18
15 Q. Different kinds of beneficiaries, right?      14:25:19
16 A. That's right, yes.                            14:25:21
17 Q. And that the percentage of women versus the  14:25:23
18    percentage of men covered might vary from     14:25:28
19    TPP to TPP?                                   14:25:30
20 A. I would guess that this might happen for a    14:25:32
21    large population probably not so much, but    14:25:37
22    some of the smaller ones potentially.         14:25:39
23 Q. How about general age demographics again?    14:25:41
24 A. Potentially there might be some variation,    14:25:45
25    yes.                                          14:25:47

58 (Pages 537 to 540)

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                       516-608-2400

M. ROSENTHAL

541

1 Q. Region of the country?                    14:25:49
2 A. Surely.                                    14:25:50
3 Q. Occupations of the people who are covered?  14:25:50
4 A. By definition with the Taft-Hartley plans.  14:25:54
5 Q. In view of these differences, isn't it     14:25:57
6    necessarily the case that the effect of the 14:26:05
7    alleged promotional activity on individual  14:26:07
8    TPP class members could vary from TPP to    14:26:10
9    TPP?                                        14:26:12
10 A. Again, individual TPPs, the magnitude of   14:26:17
11    the effect, for example, because they have 14:26:22
12    many patients on Neurontin versus not many 14:26:24
13    patients on Neurontin, could certainly     14:26:27
14    vary.                                      14:26:29
15 Q. Okay. Would you agree that the cost        14:26:29
16    containment programs that we described     14:26:38
17    earlier, prior authorization programs,     14:26:39
18    things like that, may very well have       14:26:41
19    changed over time with respect to even an  14:26:43
20    individual third-party payer?              14:26:46
21 A. That certainly may be true. Again, I don't 14:26:47
22    see how it would confound the estimates I'm 14:26:53
23    concerned about, but they may have changed. 14:26:56
24       MR. POLUBINSKI: Okay. Why don't         14:27:00
25    we take a break.                           14:27:01

543

1       MR. POLUBINSKI: -- as much as --        14:35:14
2       MR. NOTARGIACOMO: As much as I'd        14:35:15
3    love to fight with you.                    14:35:17
4       MR. POLUBINSKI: Yeah. It's              14:35:18
5    always a pleasure. We can go off the       14:35:19
6    record.                                    14:35:22
7       THE VIDEOGRAPHER: The time is           14:35:22
8    2:35. This is the end of Tape 4. The       14:35:24
9    deposition is concluded, and we are off the 14:35:29
10    record.                                    14:35:32
11       (Whereupon the deposition was          14:35:32
12    adjourned at 2:35 p.m.)                    14:35:36
13
14
15
16
17
18
19
20
21
22
23
24
25

542

1       MR. NOTARGIACOMO: Okay.                 14:27:02
2       THE VIDEOGRAPHER: The time is           14:27:03
3    2:27. We are off the record.               14:27:04
4       (Recess taken.)                         14:27:05
5       THE VIDEOGRAPHER: The time is           14:34:30
6    2:34, and we are back on the record.       14:34:35
7       MR. POLUBINSKI: All right. I            14:34:38
8    don't have any further questions at this   14:34:39
9    time, but I would like to say that the     14:34:41
10    defendants reserve the right to continue   14:34:43
11    the deposition in the event that Professor 14:34:45
12    Rosenthal offers new or revised opinions at 14:34:47
13    some point later in the case or in the     14:34:49
14    event that plaintiffs produce additional   14:34:51
15    documents that should have been produced   14:34:53
16    prior to this deposition.                  14:34:54
17       MR. NOTARGIACOMO: I have no other       14:34:55
18    questions for the plaintiffs. I believe we 14:34:59
19    should conclude the deposition, but if it  14:35:04
20    turns out that there's an issue, we can    14:35:05
21    fight about that later.                    14:35:07
22       MR. POLUBINSKI: Exactly. I think        14:35:08
23    we -- it's not ripe for fighting about at  14:35:09
24    this time --                               14:35:14
25       MR. NOTARGIACOMO: Absolutely.           14:35:14

544

2  CASE: IN RE: NEURONTIN MARKETING, SALES
   PRACTICES, AND PRODUCTS LIABILITY
3  LITIGATION
4         ERRATA SHEET
5  INSTRUCTIONS: After reading the transcript
   of your deposition, note any change or
6  correction to your testimony and the reason
   therefor on this sheet.  DO NOT make any
7  marks or notations on the transcript volume
   itself.  Sign and date this errata sheet
8  (before a Notary Public, if required).
   Refer to Page 546 of the transcript for
9  errata sheet distribution instructions.
10 PAGE  LINE
          CHANGE:
11        REASON:
          CHANGE:
12        REASON:
          CHANGE:
13        REASON:
          CHANGE:
14        REASON:
          CHANGE:
15        REASON:
          CHANGE:
16        REASON:
          CHANGE:
17        REASON:
          CHANGE:
18        REASON:
          CHANGE:
19        REASON:
          CHANGE:
20        REASON:
21
   I have read the foregoing transcript of my
22 deposition and except for any corrections
   or changes noted above, I hereby subscribe
23 to the transcript as an accurate record of
   the statements made by me.
24
25       _____

59 (Pages 541 to 544)

M. ROSENTHAL

545

1    United States District Court
2    District of Massachusetts
3         I, Jessica L. Williamson, Registered,
4    Merit Reporter, Certified Realtime Reporter
5    and Notary Public in and for the
6    Commonwealth of Massachusetts, do hereby
7    certify that MEREDITH B. ROSENTHAL, Ph.D.,
8    the witness whose deposition is
9    hereinbefore set forth, was duly sworn by
10   me and that such deposition is a true
11   record of the testimony given by the
12   witness.
13        I further certify that I am neither
14   related to or employed by any of the
15   parties in or counsel to this action, nor
16   am I financially interested in the outcome
17   of this action.
18        In witness whereof, I have hereunto set
19   my hand and seal this 30th day of October,
20   2006.
21
22
23        Jessica L. Williamson, RMR, RPR, CRR
24        Notary Public, CSR No. 138795
25        My commission expires: 12/18/2009

546

1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3
4         The original of the Errata Sheet has
5    been delivered to Edward Notargiacomo, Esq.
6         When the Errata Sheet has been
7    completed by the deponent and signed, a
8    copy thereof should be delivered to each
9    party of record and the ORIGINAL delivered
10   to Edmund Polubinski III, Esq. to whom the
11   original deposition transcript was
12   delivered.
13
14        INSTRUCTIONS TO DEPONENT
15
16        After reading this volume of your
     deposition, indicate any corrections or
17   changes to your testimony and the reasons
     therefor on the Errata Sheet supplied to
18   you and sign it.  DO NOT make marks or
     notations on the transcript volume itself.
19   REPLACE THIS PAGE OF THE TRANSCRIPT WITH
20   THE COMPLETED AND SIGNED ERRATA SHEET WHEN
21   RECEIVED.
22
23
24
25

60 (Pages 545 to 546)

VERITEXT/NEW YORK REPORTING COMPANY