UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981<br><br>Judge Patti B. Saris<br>Mag. Jude Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLASS ACTIONS | |
| HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUECROSS/BLUESHIELD OF LOUISIANA; UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs<br><br>     v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br><br>          Defendants. | |

**CLASS PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
<u>SECOND MOTION FOR CLASS CERTIFICATION</u>**

# I.  INTRODUCTION AND SUMMARY OF ARGUMENT

In response to Professor Rosenthal's report, Defendants offer a number of arguments that have already been rejected, and others that are unfounded.[1]  First, Defendants argue that *no* class can be certified because Prof. Rosenthal's report fails to demonstrate that all but a *de minimis* number of the Neurontin prescriptions at issue were caused by Defendants' fraud.  The Court made it clear that this requirement applies only to the Consumer Class, not the Third Party Payor ("TPP") Class.  Prof. Rosenthal's model demonstrates that over 99% of the Neurontin prescriptions for bipolar and other mood disorders, and over 99% of the Neurontin prescriptions for neuropathic and nociceptive pain written by physicians other than neurologists, would not have occurred but for Defendants' fraud, more than satisfying the *de minimis* standard.

Second, Defendants complain that Prof. Rosenthal does not measure the impact of Defendants' fraudulent marketing campaign.  This is incorrect.  Prof. Rosenthal uses Defendants' detailing and promotional expenditures and other factors to assess the impact of Defendants' fraud.

Third, Defendants argue that Prof. Rosenthal's model fails to account for other factors that may have caused the off-label prescriptions.  This criticism can be leveled at any economic model, and goes to weight, not admissibility.  Prof. Rosenthal's model focuses on the variables with the strongest demonstrated relationship to the variable of interest, as required by economic theory.

---

[1] While Plaintiffs originally requested 11 pages to respond to Defendants' Supplemental Memorandum, the Court's Sept. 17, 2008 Electronic Order granting Defendants' Motion for Leave to File Supplemental Memorandum imposes no such page limit.  A number of Defendants' arguments range far beyond the contours of Prof. Rosenthal's report, necessitating a somewhat longer response.

Fourth, Defendants take issue with Prof. Rosenthal's assumptions that detailing to non-neurologists was both off-label and fraudulent. These assumptions are well-supported by the record.

Fifth, Defendants argue that they are entitled to present individual proof to rebut Plaintiffs' evidence of causation, defeating certification. Acceptance of Defendants' argument would effectively repeal Rule 23 in most consumer fraud cases, as Defendants can always call individual class members to attempt to rebut some aspect of the class-wide proof offered by plaintiffs. As the Court has previously held in ruling on a discovery matter, Plaintiffs may put on class-wide proof; Defendants may put on individual proof; and the trier of fact will determine the outcome.

Defendants' arguments why a TPP Class cannot be certified are similarly unavailing. The Court has already held that Plaintiffs may show that individual TPPs were damaged using statistical proof. TPP reimbursement policies vary little with respect to Neurontin, and any such variation impacts neither the calculation of class-wide nor individual damages. Finally, Defendants' "pass through" defense has already been rejected by this Court as a factual matter, is at odds with controlling authority, and, if adopted, would leave pharmaceutical manufacturers free to defraud TPPs with impunity.

## II.   DEFENDANTS' CRITICISMS OF DR. ROSENTHAL'S REPORT ARE UNFOUNDED

Defendants confuse Class Plaintiffs' burden as the party moving for class certification with the burden of proof at trial. It is well settled that the burden to satisfy Rule 23 "is of a different order than the party's burden of proof at trial." *Salvas v. Wal-Mart Stores, Inc.*, --- N.E..2d ---, 2008 WL 4291637 **11 (Mass. 2008) (holding that trial court abused discretion in excluding expert report relying on allegedly unreliable business records). "At the pretrial class

action stage, the plaintiffs must 'provid[e] information sufficient to enable the motion judge to

form a reasonable judgment that the class meets the requirements of rule 23; they do not bear the

burden of producing evidence sufficient to prove that the requirements [of rule 23] have been

met.'" *Id*. (quoting *Weld v. Glaxo Wellcome Inc.*, 746 N.E.2d 522 (Mass. 2001)); *see also*

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).

> **A.** **Over 99% of Neurontin Prescriptions for Bipolar and Other Mood Disorders, and Over 99% of Neurontin Prescriptions for Neuropathic and Nociceptive Pain Written by Physicians Other Than Neurologists, Were the Result of Defendants' Fraud**

Defendants argue that no class can be certified because Prof. Rosenthal's report does not

show that all but a *de minimi*s number of prescriptions for each off-label use were caused by

Defendants' fraudulent promotion.  Defendants' Supplemental Memorandum of Law in

Opposition to Plaintiffs' Second Motion for Class Certification ("Supp. Mem.") at 3.  As a

threshold matter, the Court has made it clear — repeatedly — that this requirement applies only

to the Consumer Class, not the TPP Class.[2]

The Court found this case "troublesome because defendants allegedly used a national

marketing scheme to promote a fraud.  If true, they should not get off scot-free if there is a

practical statistical way to address the difficult causation issues."  244 F.R.D. at 114.  To balance

its concern about certifying "an overbroad [consumer] class with members who were not

injured" (*id*. at 113), the Court held that "[i]f only a de minimis number of doctors prescribed

---

[2] *See In re Neurontin Marketing and Sale Practices Litig.*, 244 F.R.D. 89, 114 (D. Mass. 2007) ("A *different* problem in manageability exists for TPPs which reimburse for Neurontin for many plan beneficiaries.  If Dr. Rosenthal has an accurate methodology for calculating that, say, 85% of all Neurontin prescriptions for migraines resulted from a fraudulent marketing campaign, it seems reasonable for a TPP to allege that 85% of its reimbursements for that indication were a result of the fraud.") (emphasis added).  The Court confirmed this at the hearing on Plaintiffs' Renewed Motion For Class Certification:  "Assume for a minute there's a finding by a jury that you committed a fraud, you don't have to prove the stuff with precision.  In other words, if you can prove statistically X percent is for bipolar, and there was a fraudulent piece of the campaign, and it caused the third-party payor to pay."  Reporter's Transcript of Motion Hearing on Class Certification, April 16, 2008 ("Class Cert. Hrg. Tr.") at 23:15-20.

Neurontin for an off-label condition, and then off-label prescriptions skyrocketed after a fraudulent campaign for that indication," the Court would "consider statistical proof as sufficient to demonstrate that most purchasers in that period were injured." *Id.*

The Court may have borrowed the "de minimis" concept from *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 398, 813 N.E.2d 476 (Mass. 2004), a case the Court found presented "similar circumstances." 244 F.R.D. at 114.[3] In *Salvas*, the Supreme Judicial Court reversed the lower court's decertification of a wage and hour class against Wal-Mart, based, *inter alia*, on the following "error[] of law":

> [C]iting *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 813 N.E.2d 476 (2004), the [trial] judge concluded that the plaintiffs had failed to demonstrate that the number of uninjured class members was "de minimis." [¶] The dicta in the *Aspinall* case cited by the judge does not, either directly or by necessary implication, graft a separate, de minimis test onto rule 23 class actions to narrow or solidify the traditional analysis of predominance . . . . One of the great strengths of the rule 23 class action device is its plasticity. Case-by-case considerations of practicality and fairness have enabled rule 23 certification decisions to adapt appropriately to a variety of contexts, even within the same litigation. By undercutting that intended flexibility, a bright-line de minimis requirement would vitiate the purpose of class actions.

*Salvas*, 2008 WL 4291637, at \*\*14-\*\*15 (citations and footnotes omitted).[4]

---

[3] *See Aspinall*, 442 Mass. at 405 (Cordy, J., dissenting) ("I agree with the court that, in principle, class certification should not be impeded by the presence of a de minimis number of uninjured class members who are difficult to identify with specificity."). *See also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 346 (E.D. Mich. 2001) ("[t]hat Plaintiffs may be unable to establish injury as to a few class members will not defeat class certification where they show widespread injury to the class"); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("[T]he fact that certain members of plaintiffs' class escaped injury altogether would not preclude certification or destroy the class's prima facie case of impact. Unless it is clear that no ultimate consumers were damaged, the exact amount each may have sustained is an issue to be treated at the damages phase of the litigation.") (citations and internal quotations omitted).

[4] The court identified these purposes in the immediately following citation to federal and New Jersey law, the same mix applicable in this case: "*See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Newberg* [2 A. Conte & H.B. Newberg, Class Actions (4th ed. 2002)] at § 4.36 at 314 ("Class actions were designed not only to compensate victimized group members, but also to deter violations of the law, especially when small individual claims are involved"); *Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 105, 922 A.2d 710 (2007), quoting *Riley v. New Rapids Carpet Ctr.*, 61 N.J. 218, 225, 294 A.2d 7 (1972) (noting that restrictive readings of class-action rule that require individual suits for small individual losses result in "no deterrence to further aggressions")." 2008 WL 4291637, at \*\*15. Plaintiffs commend *Salvas* to the Court for its further
(footnote continued on next page)

As set forth in the table attached as Exhibit A to this memorandum,[5] Prof. Rosenthal concludes that over 99% of the Neurontin prescriptions for bipolar and other mood disorders,[6] and over 99% of the Neurontin prescriptions for neuropathic and nociceptive pain written by physicians other than neurologists,[7] would not have occurred but for Defendants' fraud, clearly

---

consideration in determining the degree to which Defendants can escape liability to the consumers whose health and safety they gambled with, and keep the billions of dollars wrested from them by burying good science under piles of misinformation, carefully manufactured and systematically disseminated to the entire medical establishment by ghost writers and shills masquerading as independent and unbiased providers of medical education.  Whatever profit is not drained from this scheme remains as an incentive to further mischief.

[5] The table is excerpted from the August 11, 2008 expert report of Dr. Raymond Hartman (Rona Decl., Exh. G), and summarizes, by indication, Prof. Rosenthal's calculations of the number and percentage of Neurontin prescriptions caused by Defendants' fraud, as well as Dr. Hartman's  calculation of the resulting damages to the TPP Class and the Consumer Class.

[6] There were nearly *twelve million* Neurontin prescriptions for bipolar and other mood disorders during the relevant time period, 99.4% of them as a result of Defendants' fraudulent off-label marketing activities.  *See* Declaration of Meredith Rosenthal: Estimate of Units Paid for by Neurontin Endpayers that Resulted from Alleged Fraudulent Marketing by Defendants dated August 11, 2008 ("Rosenthal Decl.," Exh. F to Rona Decl.), Attachment G (11,710,680/.994 = 11,781,368).  Defendants' argument that the remaining 71,000 prescriptions (11,781,368 – 11,710,680), representing a mere 0.6% of the total, is *not de minimis* is nothing short of ridiculous.

[7] As discussed below, Prof. Rosenthal's model relies on the amount spent on detailing to physician groups who ordinarily do not treat Neurontin's approved uses to measure the impact of Defendants' fraudulent off-label marketing campaigns.  All such detailing was necessarily fraudulent, because it promoted Neurontin's use for indications for which it had either been proven ineffective or for which there was no scientific evidence of efficacy.  However, neurologists were also the target of Defendants' original, "on-label" marketing efforts in the area of epilepsy, and they continued to be detailed throughout the class period for both on and off-label uses, rendering it more difficult to determine the amount of legitimate versus illegitimate promotion directed to that physician group.  Prof. Rosenthal parses the two by assuming that "but for the alleged conduct the Defendants would only have promoted Neurontin to neurologists at a level consistent with maintaining its sales for approved uses from the beginning of the earliest Class Period," and that the excess constituted off-label promotion.  See Rosenthal Decl. ¶¶ 46-47.  Because Prof. Rosenthal must assume that all of the details up to the first level were on-label (a highly conservative assumption), she is likely underestimating the fraudulent, off-label details to which neurologists were exposed.  This may well account for the lower percentage of fraudulent off-label prescriptions calculated for the neurologist group.  In other words, while the *actual* rate of fraudulent off-label prescriptions may not in fact be substantially lower for the neurologist group, due to the limitations on the available data, Prof. Rosenthal's model may underestimate these figures.  The expert report of Dr. Rena Conti shows the dramatic influence that the fraudulent marketing campaign in the areas of pain and migraine had on neurologists, whose prescriptions for these indications surged at the same time that their epilepsy prescriptions began to steadily decline.  *See* Revised Declaration of Rena Conti, Ph.D. in Support of Plaintiff's Renewed Motion for Class Certification dated: February 21, 2008 ("Conti Decl.," Dkt. No. 1142) Fig. 21 (revised).  Because most migraine prescriptions were written by neurologists, the limitations on Prof. Rosenthal's analysis discussed above also probably undercount the number and percentage of prescriptions for migraine that resulted from Defendants' fraud.

satisfying even a "*de minimis*" standard for certification of a Consumer Class as to these

indications.[8]

B.     **Prof. Rosenthal's Model Assesses the Impact of Defendant's Fraudulent Marketing Campaign**

Defendants complain that Prof. Rosenthal's analysis fails to assess the impact of the

"peer selling" and "publication strategy" components of Defendants' off-label marketing

campaign.  Supp. Mem. at 4-5.  As Prof. Rosenthal forthrightly explains in her report,

Defendants either did not keep — or did not produce in discovery — sufficient records of their

off-label promotional expenditures to permit them to be analyzed directly.  Rosenthal Decl., ¶¶

46, 53.  However, "[t]he IMS Health promotional spending data reported by specialty . . . capture

detailing to physicians who do not typically treat the conditions for which Neurontin is

approved," epilepsy and post-herpetic neuralgia (PHN).  *Id.*

The principle factors Prof. Rosenthal's model uses to measure impact on off label

prescriptions, spending on detailing and journal advertising, are highly correlated with the

publication strategy and peer-selling to physicians.  That is to say that over time spending on

detailing and spending on publication and peer-selling rise and fall together.  Use of spending on

detailing and journal advertisement in Prof. Rosenthal's model captures the effect of the peer-

selling activities and publication strategy.[9]

---

[8] Class Plaintiffs recognize that the definitions of the Consumer Neuropathic Pain Subclass and Consumer Nociceptive Pain Subclass will have to be modified to exclude Neurontin prescriptions written by neurologists, which account for only 14.3% (2,989,865/20,775,263) and 8.8% (710,787/8,103,212) of the total Neurontin prescriptions written for these indications, respectively.  *See* Exh. A.  This limitation by prescriber specialty is an objective criteria, and therefore poses no obstacle to class certification.  *See Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria-thus rendering unnecessary an evidentiary hearing on each claim.").

[9] Prof. Rosenthal has testified on this issue in deposition.  "I use detailing to capture the effect of the alleged off-label promotions.  So what I measure is detailing.  But as we discussed earlier, I believe it's likely to pick up the related allegations with regard to meetings and events and other spending that's correlated with detailing."  (footnote continued on next page)

- 6 -

The link between spending on detailing and other promotional activities is supported by well accepted economic literature in the field,[10] as well as the allegations and facts of the case. Defendants used detailing as a way to facilitate the peer-to-peer selling and the publication strategy. Defendants used sales representatives to hand out journal reprints that were central to the "publication strategy."[11] Defendants also used sales representatives to invite physicians to the peer-to-peer marketing events.[12]

### C.   The Factors Incorporated into Prof. Rosenthal's Analysis Are Valid and Appropriate

Defendants complain that Prof. Rosenthal's model does not control for a myriad of other factors that may influence physician-prescribing decisions, and assumes that "detailing is the driver of every doctor's decision to prescribe Neurontin." Supp. Mem. at 5-6. This argument is unavailing, as such criticisms go to the weight of the evidence, not its admissibility.[13] Defendants' argument also runs directly contrary to the opinion of its own econometrics expert, Prof. Fiona Scott Morton, who criticized Prof. Rosenthal's then-current model as too

---

[9] Moreover, "by leaving them [meetings, CME's or other types of events] out, we're probably being conservative, although, I would expect that the meetings and events would be highly correlated with detailing." Deposition of Merideth B. Rosenthal dated July 9 2008 ("Rosenthal PA Depo.") at 123:3-9. The same is true for the publication strategy. When asked about including the effects of publications, Prof. Rosenthal responded "Publications don't directly enter into the model. To the extent that they were used, for example, in detailing, that would get picked up in the detailing estimates." *Id.* at 113:20-23.

[10] *See August 2005 Declaration of Meredith Rosenthal* in this matter, Section V. See also, E.R. Berndt, L. Bui, D. Reiley and G. Urban, "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market," *American Economic Review*, Vol. 85, No. 2, at 100-105 (May 1995); J. Rizzo, "Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs," *Journal of Law and Economics*, 42:1, at 89-116 (1999); C. King, III, "Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs," Boston MA: *Harvard Business School Working Paper No. 01-014* (2000); and F. Gonul, F. Carter, E. Petrova and K. Srinivasan, "Promotion of Prescription Drugs and Its Impact on Physician Choice Behavior," *Journal of Marketing*, 65:3, at 79-90 (2001).

[11] *See, e.g.*, WLC_CBU_020336; WLC_CBU_033332 (Rona Decl., Exhs, A, B).

[12] *See, e.g.*, MDL_VENDORS_008271; PFIZER_CGROGAN_0022377 (Rona Decl., Exhs. C-D).

[13] *See Salvas*, 2008 WL 4291637 *9 (failure to take account of additional factors affected expert report's probativeness, rather than admissibility) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (holding, in a case involving statistical regression analysis, that failure to include variables will affect the analysis' probativeness, not its admissibility, unless regression analysis is so incomplete as to be inadmissible as irrelevant).

complicated, and pointed to a paper by another of Defendants' experts, Dr. Pradeep Chintagunta, as an example of a "simpler model" that had an "advantage over Dr. Rosenthal's proposal."[14] The advantage?  Dr. Chintagunta used a single variable in his model, "*expenditures on detailing*."  *Id*. (emphasis added).  Defendants advocated Prof. Rosenthal's current approach — until she adopted it.

Prof. Rosenthal selected promotional expenditures as the key explanatory variable in her model because promotional expenditures are the most important determinant affecting the number of prescriptions of a particular drug.  This is especially true when looking at changes over time, as Prof. Rosenthal's model does.[15]  Prof. Rosenthal presents a series of compelling charts which illustrate the strong correlation between Neurontin promotion and prescriptions:

---

[14] Declaration of Professor Fiona Scott Morton dated: December 21, 2006 ("Morton Report") at 27-28.

[15] Prof. Rosenthal was also questioned about this in her deposition in the Pennsylvania case:  "So I believe that you are suggesting that the other drug features, let's say side effects for example, are going to be important determinants of sales.  This is true, but when we're looking at sales over time, as I am in this regression, we want to think about factors that vary over time, and promotion is the one that is most important."  Rosenthal PA Depo. at 50-51.





**Attachment E.1: Comparison of
Depreciated Value of Promotion Stock to Psychiatrists
and Bipolar Use by Psychiatrists**

This chart illustrates Neurontin's promotional stock (the value of promotional spending to a

particular physician specialty discounted to take account of the rate at which the effect of that

promotion decreases over time) and use of Neurontin by psychiatrists.[16]  Even without

sophisticated statistical analysis, this chart suggests a very strong and positive relationship

between promotion to psychiatrists and their prescription of Neurontin.  Prof. Rosenthal presents

---

[16] Defendants' detailing to psychiatrists for off-label uses was pervasive.  Dr. John Abramson writes that "[i]n
September 1997, there were zero or close to zero 'details' (i.e. visits by drug reps) to psychiatrists.  By February
1999…there were about 7,300 calls [per month] from drug reps to psychiatrists to discuss Neurontin use."  Expert
Report of John Abramson, MD. dated: August 11, 2008 ("Abramson Report," Exh. N) at 115.  Citing Pfizer's 2002
operating plan, Dr. Abramson points out how detailing reflected the "pattern of CME," as "only 20% of samples and
25% of details were provided to neurologists (the one specialty most likely to be prescribing Neurontin as adjunctive
therapy for seizure disorder).  Psychiatrists received the most samples and details (55 and 43% of total,
respectively), followed by PCPs [Primary Care Physicians] and 'others.'"  *Id*. at 10.

- 9 -

a series of equally compelling charts for each of the other physician specialty groups and indications at issue in this case in Attachments E1-E8 of her declaration.

Defendants' criticism that Prof. Rosenthal's model does not control for all other factors[17] that may influence prescribing is true of any economic model, which cannot possibly account for every factor that may affect the variable of interest.[18]  The real question is not whether the model accounts for all of the possible factors,[19] but whether, given the variable of interest (in this case the number of Neurontin prescriptions) the model accounts for the variables that are most important and, most critically, that it includes those factors that are known to have an effect on the variable of interest.[20]

### D.     The Assumptions Made By Prof. Rosenthal Are Reasonable and Supported by the Record

Defendants claim that Professor Rosenthal relies on an invalid assumption that all detailing to non-neurologists, prior to the FDA-approval of Neurontin for post-herpetic neuralgia

---

[17] In addition to promotional spending, Dr. Rosenthal's models include "a price index for Neurontin, an index of competitor prices, and total competitor prices, and total competitor promotional spending."  Rosenthal Decl., ¶ 33.

[18] See Reply Declaration of Meredith Rosenthal, filed as Exhibit I to Revised Declaration of Ilyas J. Rona Filed in Support of Plaintiffs' Motion for Class Certification (Dkt. No. 645) at 11 ("Dr. Scott Morton does not acknowledge what every economist knows:  models are a simplification of reality by definition and therefore all models are missing some factors that affect the dependent variable.").

[19] The principal alternative factor advanced by Defendants, "positive clinical trials regarding Neurontin's use to treat off-label conditions" (Supp. Mem. at 5 n.4), is debunked in the following section.  See also, Neurontin, 244 F.R.D. at 111 (finding "with such a large bump-up in off-label sales immediately following a promotional campaign, it seems more likely that the increase was not due to the diffusion of new knowledge about the 'basic science' of the brain.").

[20] See Andrew C. Harvey, The Econometric Analysis of Time Series, at 5 (MIT Press, 1990) ("From the statistical point of view, the key feature of a simple model is that it contains a small number of parameters.…In explaining household expenditure on food we are well aware of influences other than income and household size.  Occupation, education, social class, and age are all relevant factors, but in formulating [the model], it is hypothesized that income and household size are the dominating influences.  Very little explanatory power is lost by relegating the other factors to the disturbance term, but a good deal is gained by focusing the analysis on the variables which really matter.").

(PHN) in mid-2002, was both off-label and fraudulent.  Both of these assumptions are fully supported by the record.

As to the assumption that that all such promotions were off-label, Prof. Rosenthal made the simple and straightforward assumption that "Parke-Davis, absent the illegal activities [*i.e.*, off-label promotion], would not have undertaken promotional activities, including both detailing and journal advertising, to psychiatrists or any other specialties that did not treat epilepsy or PHN."  Rosenthal Decl., ¶ 46.  Defendants call this assumption "unjustifiable" and "unsubstantiated," but offer no explanation as to why, for example, they would detail psychiatrists on Neurontin, when psychiatrists have no "on-label" use for the medication.  In fact, Defendants' internal data shows that there were no appreciable details on psychiatrists prior to the commencement of the fraud, and only a *de minimis* number of psychiatrists prescribed Neurontin during that time period.  By late 1998, however, psychiatrists had become the most frequently detailed specialty,[21] surpassing even neurologists, and this surge in detailing did not result in any growth in psychiatrists' on-label prescriptions of Neurontin.[22]  In late 2000, an internal memo to Pfizer's sales force reveals that Pfizer *itself* believed that the only legitimate detailing of Neurontin — based on its "recently acquired understanding" of the illegality of the "off-label" promotion — was to neurologists,[23] the only physician group likely to prescribe

---

[21] Rosenthal Decl., ¶ 27.  As Dr. Rosenthal also notes, "[s]pending on detailing to psychiatrists was particularly high during the period between June 1998 and November 2000, after which it ended abruptly. This clearly demarcated period of detailing to psychiatrists is consistent with documents produced by the Defendants surrounding an alleged campaign to encourage the use of Neurontin for bipolar and other mood disorders."  *Id.*, ¶ 28 (citations omitted).

[22] Revised Declaration of Rena Conti, Ph.D. in Support of Plaintiff's Renewed Motion for Class Certification dated: February 21, 2008 ("Conti Decl.," Dkt. No. 1142) Fig. 19 (revised).

[23] In late 2000, after Pfizer had taken over Parke Davis, and in light of the allegations that had been made public in the *Franklin* case, Pfizer attempted (but ultimately failed) to set their house in order and to put appropriate restrictions on the off-label marketing of Neurontin.  The memo states that as a result of the criminal investigation and civil suit related to Neurontin and in order to "avoid even the appearance of engaging in inappropriate sales and marketing activity for Neurontin . . .Neurontin detailing responsibilities will be limited only to the US RON sales (footnote continued on next page)

Neurontin for epilepsy.[24]  The ban on detailing was more communicated more succinctly and

emphatically in a 2004 memo, which contained the following directive:  "No calls on Psychs!!!!"

*See* PFIZER_JSCHULTZ_0000393 (Rona Decl., Exh. E).

    As to the assumption that all promotion for off-label indications was fraudulent, Class

Plaintiffs have proffered six different expert reports that demonstrate that there was no legitimate

scientific basis to encourage the prescription of Neurontin for the off-label indications at issue,[25]

supporting the assumption that all detailing to physicians not treating FDA-approved indications

for Neurontin furthered the misconception of Neurontin's efficacy.  Dr. Dickersin, Plaintiffs'

publication bias expert, concludes that "[t]he documents I reviewed represent a remarkable

---

force (approximately 150 representatives).  Ron representatives will only call on Neurologists for Neurontin."
Pfizer_DLinden-000331.

[24] Indeed, analysis performed by Plaintiffs' expert Dr. Rena Conti confirms that the overwhelming majority of on-label prescriptions for Neurontin were written by Neurologists.  *See* Conti Decl., Figs. 19-22 (revised).

[25] Dr. Jeffery Barkin, Plaintiffs' bipolar expert, writes: "the scientific evidence demonstrates quite clearly that gabapentin is ineffective as a treatment for bipolar disorder and should not be used."  Report on the Use of Neurontin for Bipolar and Other Mood Disorders dated July 25, 2008 (Rona Decl., Exh. K) at 1.  Despite this evidence, Dr. Barkin finds that the fraudulent marketing message "was consistently and repetitively delivered."  *Id.* at 20.  Similarly, Dr. Thomas L. Perry, Plaintiffs' pain expert, writes: "Based on a thorough and scientifically valid analysis of all relevant double blind randomized clinical trials (DBRCT), Neurontin is not an effective drug for the treatment of neuropathic pain."  Neurontin: Clinical pharmacologic opinion of Dr. Thomas L. Perry, dated August 10, 2008 (Rona Decl., Exh. L), at 1-2.  Despite this evidence, Dr. Perry finds that: "Parke-Davis/Pfizer could not afford for the <u>truth</u> to surface from studies which produced unfavourable results… It was better to keep repeating the mantra of the Backonja and Rowbotham studies, distort the basically negative results from 945-271 (Serpell) and hope that Serpell's published report would be little noticed and less carefully read, and ensure that doctors would forget or never learn about Gorson's trial and the small independent trials…"  Dr. David Kessler, former head of the FDA, finds that the FDA came to similar conclusions regarding Neurontin's efficacy for the broad indication of neuropathic pain.  Expert Report of David A. Kessler, M.D. dated July 31, 2008 (Rona Decl., Exh. J), at 15.
Dr. Douglas McCrory, Plaintiffs' migraine expert, writes: "the randomized double-blind, placebo-controlled trials of gabapentin versus placebo, considered together, fail to consistently or convincingly demonstrate that gabapentin is effective for migraine prophylaxis."  Report on gabapentin (Neurontin®) for migraine prophylaxis: evaluation of efficacy, effectiveness and marketing (Rona Decl., Exh. M), at 18.  Despite this negative evidence, Dr. McCrory finds the following: "My evaluation of the marketing materials points to a pattern of suppressing the results of negative randomized double-blind, placebo-controlled clinical trials."  *Id.* at 1.  With respect to DPN, Dr. Nicholas Jewell concludes that the study aggressively promoted by Defendants as positive "provides no basis of any clinical efficacy for gabapentin over placebo in reducing pain."  Expert Report of Dr. Nicholas P. Jewell, Ph.D., dated July 29, 2008 (Rona Decl., Exh. I), at 1.  With respect to high doses, Dr. Brian Alldredge concludes:  "The highest quality evidence failed to establish a dose-related effect (i.e., continued improvement in efficacy) at dosages above 1800 mg/day."  Expert Consultant Report  Prepared by: Brian Alldredge, PharmD (Rona Decl., Exh. P), at 1.  Despite this known lack of a dose-related effect, Dr. Allredge states that "the marketing materials/practices used by Parke-Davis/Pfizer with regard to efficacy claims for gabapentin doses above 1800 mg/day were incomplete and misleading."  *Id.* at 55.

- 12 -

assemblage of evidence of reporting biases that amount to outright deception of the biomedical community, and suppression of the scientific truth concerning the effectiveness of Neurontin for migraine, bipolar disorders, and pain."[26]  As a result, even if Pfizer's sales representatives had detailed doctors with information that accurately matched the biomedical literature, it would have been false and misleading.

Professor Rosenthal has observed that "virtually all of the growth in Neurontin prescribing beginning in 1996 was attributable to off-label use."  Rosenthal Decl. at 11.  This growth occurred during a time period where Defendants spent between $500,000 and in excess of $2,000,000 *per month* on physician detailing.  Rosenthal Decl. at 13.  There are only two possible explanations for this:  either (a) Defendants spent all of this money on detailing Neurontin as a treatment for epilepsy to a wide array of specialties, none of whom (except neurologists) treat epilepsy, and continued to spend it month after month and year after year despite the continued lack of growth in prescriptions for epilepsy by these physician specialty groups, while off-label prescriptions written by these same groups skyrocketed by sheer coincidence; or (b) Defendants spent the money on off-label detailing, which resulted in huge growth in prescription-writing for the off-label indications they detailed.  Prof. Rosenthal's assumptions are fully justified.  *See Neurontin*, 244 F.R.D. at 111 ("It stands to reason that Pfizer believes its promotional campaign has an impact because it spends so much time and money on marketing and evaluating its effect.").

---

[26] Reporting and other biases in studies of Neurontin for migraine, psychiatric/bipolar disorders, nociceptive pain, and neuropathic pain ("Dickersin Report," Rona Decl., Exh. O), at 4.

**E.**    **Defendants' Presentation of Individual Proof to Rebut Evidence of Causation Does Not Defeat Class Certification**

Defendants argue that their right to present individual proof in response to Plaintiffs' class-wide proof of causation defeats certification.  This argument, if accepted, would effectively repeal Rule 23 as to most consumer fraud cases — despite the Supreme Court's pronouncement in *Amchem* that "[p]redominance is a test readily met" in such cases (521 U.S. at 625) — as competent defense counsel can *always* find a reason to put on individual proof in an attempt to rebut class-wide evidence of liability, whether on the issue of causation, reliance (where a presumption of reliance applies),[27] or some other element of liability.[28]  The Court has already intuited the correct resolution of this issue, ruling, in connection with a discovery dispute, that Plaintiffs may put on their aggregate proof of Neurontin's ineffectiveness; defendants may attempt to rebut that proof by calling individual treating physicians; and the trier of fact will determine the outcome.  *See* Electronic Order entered Sept. 28, 2006 re [478] Motion for Reconsideration.[29]  The cases cited by Defendants are distinguishable.[30]

---

[27] The presumption of reliance that the Supreme Court recognized for securities claims in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) is a rebuttable one, and the defendant may show "that an individual plaintiff traded or would have traded despite his knowing the statement was false." *Id*. at 249-50.  However, this possibility has never been thought to preclude certification of securities class actions.

[28] *See Newberg on Class Actions*, § 4.26 (4th ed. 2008) ("defendants frequently focus on questions that are conceded to be individual ones and contend that their resolution precludes a determination which upholds predominance of common issues.  Courts should not nit pick, but should view the class structure as a whole."); *see also Margaret Hall Found., Inc. v. Atlantic Finan. Mgt., Inc.,* 1987 WL 15884, at *4 (D. Mass. July 30, 1987) ("a determination of predominance requires a common sense judgment regarding what the case is really about, and whether it would be more efficient to try the case as a class suit.").

[29] *See also NASDAQ*, 169 F.R.D. at 523 (S.D.N.Y. 1996) ("The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing [generalized damage] as to all.") (citations and internal quotations omitted); *Peil v. Speiser*, 97 F.R.D. 657, 660 (E.D. Pa. 1983) (certifying securities class action and finding question of non-reliance an issue for the fact-finder, stating the "possibility that defendants may have a right to show nonreliance for each class member and that they may wish to exercise this right is not enough to defeat a class action."); *Arthur Young & Co. v. U.S. Dist. Court*, 549 F.2d 686, 695 (9th Cir. 1977) ("defendants have relied on isolated instances of alleged non-reliance by certain claimants, coupled with the existence of the oral programs, to show they will expend substantial amounts of court and jury time to disprove (footnote continued on next page)

781808.3

## III.   DEFENDANTS' ARGUMENTS CONCERNING PURPORTED ADDITIONAL OBSTACLES TO CERTIFICATION OF A TPP CLASS ARE NOTHING NEW

Defendants' claims regarding the "obstacles to certification of any TPP class" (Supp. Mem. at 7) are merely a rehash of arguments that have already been raised and lost.  First, Defendants argue that "to establish injury, each TPP plaintiff must, at a minimum, present evidence that defendants' alleged misrepresentations caused doctors to prescribe Neurontin for a relevant off-label use to its own — as opposed to other TPPs' — insureds."  Supp. Mem. at 7. Commenting on this point at the April 2008 class certification hearing, the Court stated that: "Statistically you can probably show, if there were fraud, that the third party payers were injured."[31]  Plaintiffs have done so.[32]

---

reliance. We find these instances of questionable evidentiary significance for purposes of making a Rule 23 determination.").

[30] *In re TJX Cos. Retail Security Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007), focuses on plaintiffs' negligent misrepresentation claim, of which reliance is an element.  Reliance is not an element of either Plaintiffs' New Jersey Consumer Fraud Act claim or, as the Supreme Court has clarified, the RICO claims.  *See Bridge v. Phoenix Bond & Indem. Co.*, 128 S.Ct. 2131, 2139 (2008).  *In re St. Jude Medical, Inc.*, 522 F.3d 836 (8th Cir. 2008), arising under Minnesota's consumer fraud statute, hinged on some patients not receiving any representations about the medical device.  *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), foundered because "each plaintiff in this case could have elected to purchase light cigarettes for any number of reasons, including a preference for the taste and a feeling that smoking Lights was 'cool.'"  *Id.* at 225.  Here, physicians prescribed Neurontin for their patients for only one conceivable reason:  they believed it was effective for the particular off-label condition, and Defendants were the source of virtually all such information.

[31] Cl. Cert. Hrg. Tr. at 6:25 – 7:1.  *See also* id. at 27:15-17 ("It's hard for me to believe that on a third-party payor basis, you can't prove at least causation, that there was an injury.).  *See also* n.2, *supra*.

[32] As set forth at p. 11 of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1184), a TPP with 3,248 members would have a 99% probability of having paid for Neurontin prescriptions for all five indications.  A probability of 90% requires only half that number, 1,624.  Prof. Rosenthal's report establishes that 99.4% of the total prescriptions for bipolar, 84.7% of the total prescriptions for nociceptive pain, and 70% of the total prescriptions for neuropathic pain were the result of Defendants' fraud.  *See* Exh. A.  With average membership of 160,000 each, there can be little doubt that virtually all of the approximately 1,300 commercial insurance plans in the United States, and the vast majority of Taft-Hartley Funds, with an average of 3,600 members each, were injured with respect to all five indication subclasses at a 90%-99% confidence level.  *See* Dkt. No. 1184 at 11-12.  Plaintiffs have already responded fully to Defendants' challenge to Dr. Conti's assumption that that "individuals taking Neurontin for a particular indication [are] evenly distributed across the population" (Supp. Mem. at 7-8), and will not duplicate their response here.  *See* Dkt. No. 1184 at 5-6 & n.7.

- 15 -

Next, Defendants renew their argument that "variations in TPP reimbursement practices"
render Plaintiffs' "proposed methods untenable" (Supp. Mem. at 8), but any such variations[33]
are not problematic in this case.  To the extent that any reimbursement practices prevented any
Neurontin prescriptions from being written or filled, they will not be captured in any damage
calculations, at either the aggregate or individual TPP level.  To the extent that any
reimbursement practices affected the price paid by the TPP for any Neurontin prescriptions
filled, or the copay paid by the consumer for those prescriptions, these cost figures have been
accurately captured in the IMS data, which compiles this information at the individual
prescription/pharmacy level.  *See* Certification of Karrie M. Hontz, of IMS Health Incorporated
(Dkt. No. 639) (describing compilation and reliability of IMS data).  Accordingly, the aggregate

---

[33] Defendants point to a 2006 report from MediMedia USA, Inc. in support of their conclusion that "reimbursement of Neurontin for the relevant off-label uses will vary dramatically from one TPP to the next." Def. Mem. at 8.  In fact, a close look at the record, including Defendant's own documents, the MediMedia report, and Plaintiffs' expert response to Dr. Bell's report shows that overwhelmingly TPPs and PBMs have been very uniform in their reimbursement policies toward Neurontin.  For example, the MediMedia report indicates 190 TPPs have instituted prior authorization with respect to Neurontin.  Supp. Mem. at 8, Rowland Decl., Exh. 6.  However, this represents less than 4.3% of the 4,329 TPPs surveyed (Exh. 6, ¶4), which is hardly an indication that policies "vary dramatically from one TPP to the next," as Defendants contend.

Plaintiffs have also served  the Expert Report of Kimberly P. McDonough dated August 11, 2008 ("McDonough Report," Rona Decl., Exh. H).  Dr. McDonough addresses each of the drug utilization techniques identified as the source of variation by Dr. Bell, including formulary treatment, P&T committee review, electronic claim edits, prior authorization, and drug utilization review.  Dr. McDonough explains why these techniques are ill-suited for use by TPPs in attempting to control Neurontin prescriptions, that all TPPs and PBMs face the same considerations and limitations as related to Neurontin, and that as a result, Neurontin has enjoyed virtually complete formulary acceptance with very few restrictions.  Dr. McDonough opines that "TPPs rarely adopt coverage limitations for drug categories such as oncologics, anti-convulsants, and ant-retroviral therapy that are used to treat serious diseases . . . . Because Neurontin is indicated for the treatment of epilepsy, a disease that is very serious and sometimes difficult to treat, it has been widely accepted in a preferred position on most TPP formularies . . . .In my experience working with TPPs and their P&T Committees, these organizations are very hesitant to create any barriers that would prevent access to effective products for patients suffering from seizures."  McDonough Report at 15-16.  Surveys and discussions conducted by and for Defendants support Dr. McDonough's conclusions and are summarized in her report.

TPP damages will be accurate,[34] as will the individual shares claimed by TPPs based on their own expenditures.

Defendants argue that their expert, Dr. Bell, has explained "that many TPPs recommend or *require* the use of Neurontin to treat off-label conditions," making it impossible to determine "whether its reimbursement was caused by defendants' alleged misstatements or by its own actions" (Supp. Mem. at 9) (emphasis added), but Dr. Bell does *not* say that any TPP *required* the use of Neurontin, nor do any of the 16 examples he gives of TPP formulary or other actions. *See* March 14, 2008 Decl. of Gregory Bell, Ph.D. (Rowland Decl., Exh. 5) ¶ 59.[35]

Any TPP "recommendations" to use Neurontin were undoubtedly influenced by the same pervasive disinformation campaign as were the physicians writing the prescriptions.  As Dr. Bell explains, the P&T Committees which make such "recommendations" are "generally composed of independent physicians who represent every area of therapeutic expertise, a practicing clinical pharmacist, the medical director, and a representative of the quality assurance department."  *Id*., ¶ 49.  Dr. Dickersin, Plaintiff's expert on publication bias, found that Defendants implemented a "publication strategy meant to convince physicians of Neurontin's effectiveness and misrepresent or suppress negative findings."  Dickersin Report at 4.  As a result, the "information about Neurontin's effectiveness, as disseminated in the published literature" was "untrustworthy and invalid."  *Id.* at 52.  Similarly, in his 123-page report, which has 400 footnotes, Dr. John Abramson catalogues the corrosive influence that Defendants' marketing campaign had on

---

[34] *See also In re Zyprexa Prod. Liab. Litig.*, --- F. Supp. 2d ----, 2008 WL 4097408 (E.D.N.Y. Sept. 5, 2008) ("reasonably accurate estimates can be made of the total out-of-pocket payments made by the class for Zyprexa over the class period. . . . [I]n the 'data rich' pharmaceutical field, expenditure information by year, source of payment (e.g., third-party payors, government payors, insurance copay or cash consumers), . . . are available.").

[35] Indeed, aside from Kaiser, an atypical HMO that employs its own physicians and will undoubtedly exclude itself from the TPP Class, it is difficult to comprehend how any insurance company could "require" any physician in its provider network to prescribe Neurontin to his or her patients for any indication, let alone an off-label use.

"traditionally independent and trusted sources of information upon which physicians rely in making informed prescribing decisions" (Abramson Report at 4), explaining that Defendants implemented a strategy "to exert control and influence over the sources of information upon which physicians relied when prescribing Neurontin for non-FDA approved, scientifically unsubstantiated indications and doses." *Id.* at 123.  In sum, Plaintiffs have produced competent and detailed expert testimony that Defendants had so "poisoned the well" with disinformation that any TPP recommendations to use Neurontin for the off-label indications at issue cannot be divorced from Defendants' fraud.

Finally, Defendants repeat their argument that each TPP must deduct from its recovery "the additional premiums that it collected from its insureds to cover the projected costs of increased Neurontin utilization," which requires an examination of each TPP's "books and management," ostensibly defeating certification.  Supp. Mem. at 10.  This Court has already considered and rejected the factual underpinnings of this argument in the *AWP* litigation.  As the Court explained:

> [D]efendants argue that the . . . costs [of prescription drugs] are in effect passed on to the insureds such that BCBSMA suffers no injury.  [¶]  The evidence does not support this conclusion.  First, there is as much as a two year lag period between the time when BCBSMA incurs a cost and the time when those costs may be incorporated into the rate setting process used to determine premiums. . . . *See In re Terazosin Hydrochloride Antitrust Litig*., 220 F.R.D. 672, 690 (S.D. Fla. 2004) ("[T]o the extent that any third-party payer did charge its insureds a higher premium because of a drug company's monopolistic activities, the charging of a higher premium in the future cannot be accurately described as a 'pass on' of those charges.  The record is clear that the purpose of a future projection is, as the name implies, to estimate anticipated future costs.").

*In re Pharmaceutical Ind. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 96-97 (D. Mass. 2007).  *See also*, *Terazosin*, 220 F.R.D. at 690 ("the record indicates, and Defendants concede,

- 18 -

that the third-party payers take no account of the expected impact of individual drugs . . . on claims when determining premiums to be charged").

Defendants' argument fails as a matter of law, as well.  In support of their argument, Defendants cite *Int'l. Broth. of Teamsters, Loc. 734 Health & Welf. Trust Fund v. Philip Morris, Inc.*, 196 F.3d 818, 824 (7th Cir. 1999), an antitrust and RICO case seeking to recover the cost of treating injured smokers.  The case holds that because the funds' injuries were purely derivative of physical injuries to their insureds, they were too remote to permit recovery under either the Sherman Act or RICO.  *Id.* at 823-26.  The so-called "pass-on" defense discussed in *dicta* in *Teamsters* is irreconcilable with *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1967), which expressly holds that no such defense is available in an action under the federal antitrust laws.  *Id.* at 491-94.  *See also Meijer, Inc. v. Barr Pharmaceuticals, Inc.*, --- F. Supp. 2d ---, 2008 WL 3903389, *22 (D.D.C. Aug. 11, 2008) (rejecting pass-on defense in generic suppression case).

Neither of the cases cited by Defendants involve the situation presented here[36] — an action to recover amounts paid for a product alleged to be *completely worthless* and sold by fraudulent means, brought by the parties who paid for that product directly.  Recognition of a "pass-on" defense under such circumstances would give pharmaceutical companies *carte blanche* to market snake oil as a cure for cancer, as long as the insurance companies who paid for the drug were able to project its cost.  Insured consumers could only recovery their copays; the

---

[36] Defendants also cite *In re Rezulin Prods. Liab. Litig.*, 524 F. Supp. 2d 436 (S.D.N.Y. 2007), which rejects Louisiana's attempt to recover payments for "prescriptions that otherwise would not have been written at prices that otherwise could not have been charged" but for defendants' fraud.  *Id.* at 441.  The case makes no mention of the "pass-on" theory urged by Defendants here.  *Rezulin* characterizes Louisiana's claims as pursuing a "fraud on the market" theory (*id.* at 441), a term that describes a presumption that all available information is reflected in the price of a security.  *See Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).  This is not a "pricing" case, and is more analogous to the sale of *counterfeit* stock certificates than *overpriced* stock.

insurers who pay most of the cost of the worthless drug could not recover their expenditures from the manufacturer; and the manufacturer could keep its ill-gotten gains.  No case so holds.

In any event, it is not necessary to resolve the issue at this juncture, as the New Jersey Consumer Fraud Act contains an alternative, statutory disgorgement remedy, providing, in lieu of damages, that any person violating the NJCFA "shall be liable for a refund of all monies acquired by means of any practice declared herein to be unlawful."  N.J.S.A. 56:8-2.11. Plaintiffs unjust enrichment claim likewise focuses on Defendants' ill-gotten gains.  *See Commonwealth of Mass. v. Mylan Laboratories*, 357 F. Supp. 2d 314, 324 (D. Mass. 2005) (Saris, J.) ("The Restatement of Restitution sets forth some circumstances in which a plaintiff has been permitted to recover the enrichment of another in excess of his impoverishment under the doctrine of unjust enrichment.") (citation omitted).

Respectfully submitted,

Dated:  October 1, 2008                      GREENE & HOFFMAN


By:   /s/ Thomas M. Greene
        Thomas M. Greene, Esq.

33 Broad Street, 5th Floor,
Boston, MA  02109

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP


By:   /s/ Barry R. Himmelstein
        Barry R. Himmelstein, Esq.

275 Battery Street, 30th Floor
San Francisco, CA  94111-3339


BARRETT LAW OFFICE


By:   /s/ Don Barrett
        Don Barrett, Esq.

404 Court Square North
P.O. Box 987
Lexington, MS  39095

LAW OFFICES OF DANIEL BECNEL, JR.


By:   /s/ Daniel E. Becnel, Jr.
        Daniel E. Becnel, Jr., Esq.

106 W. Seventh Street
P.O. Drawer H
Reserve, LA  70084

DUGAN & BROWNE


By:   /s/ James R. Dugan
        James R. Dugan, Esq.

650 Poydras Street, Suite 2150
New Orleans, LA  70130

781808.3

HAGENS BERMAN SOBOL SHAPIRO LLP


By:   /s/ Thomas M. Sobol
      Thomas M. Sobol, Esq.

One Main Street, 4th Floor
Cambridge, MA  02142

Attorneys for Plaintiffs and the Class

781808.3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served

pursuant to Case Management #3 on October 1, 2008.

/s/  Barry Himmelstein

- 23 -

**EXHIBIT A**

781808.3

| | | SUMMARY OF PROF. ROSENTHAL'S RESULTS * | | MONETARY DAMAGES BY CLASS, INDICATION AND SPECIALTY ($) ** | | |
|---|---|---|---|---|---|---|
| *Indication* | *Class Period* | *Fraudulent Prescriptions* | *Percent of Fraudulent to Actual Prescriptions* | *TPP Class\*\*\** | *Consumer Class* | *Total TPP & Consumer Classes* |
| **BIPOLAR** | 11/95 - 12/04 | | | | | |
| Psychiatrists | | 11,710,680 | 99.4% | 623,312,892 | 253,506,376 | 876,819,268 |
| **MIGRAINE** | 9/95 - 12/04 | | | | | |
| Neurologists | | 679,075 | 27.9% | 36,090,652 | 14,519,940 | 50,610,592 |
| **NEUROPATHIC PAIN** | 7/95 - 12/04 | | | | | |
| Neurologist Specialty | | 2,989,865 | 25.1% | 162,385,268 | 65,207,055 | 227,592,323 |
| Other Specialties | | 6,060,055 | 99.8% | 323,728,679 | 130,393,974 | 454,122,653 |
| PHN Specialty | | 11,725,342 | 100.0% | 627,507,460 | 252,197,244 | 879,704,704 |
| **Total: Neuropathic Pain** | | 20,775,263 | 70.0% | 1,113,621,407 | 447,798,274 | 1,561,419,680 |
| **NOCICEPTIVE PAIN** | 9/95 - 12/04 | | | | | |
| Neurologist Specialty | | 710,787 | 32.9% | 37,967,312 | 15,296,815 | 53,264,127 |
| Other Specialties | | 2,153,170 | 99.8% | 114,432,168 | 45,696,003 | 160,128,172 |
| PHN Specialty | | 5,239,256 | 100.0% | 282,803,564 | 113,516,752 | 396,320,316 |
| **Total: Nociceptive Pain** | | 8,103,212 | 84.7% | 435,203,043 | 174,509,571 | 609,712,615 |
| **DOSES > 1800 MG/DAY** | 3/95 - 12/04 | 2,147,674 | 37.5% | 115,075,923 | 46,324,188 | 161,400,111 |
| **TOTAL** | | 43,415,904 | | 2,323,303,917 | 936,658,349 | 3,259,962,266 |

\*    Source: Rosenthal Declaration, Attachment G.

\*\*   As described below in Section III, Prof. Rosenthal's Fraudulent Prescriptions are the starting point for my analysis and these quantities are adjusted for      use in my damage calculations.  For example, Medicaid units are removed for the calculation of TPP damages.

\*\*\* Damages to the TPP Class do not include damages to the Coordinated Plaintiffs.

781808.3