**Dr. Thomas L. Perry Inc.**
Clinical Pharmacology, High Blood Pressure, General Internal Medicine
Department of Medicine, University Hospital
2211 Wesbrook Mall, Vancouver, B.C. V6R 2P1, CANADA
office telephone: (604) 822-7134; office fax: (604) 822-7897

August 10, 2008

Thomas M. Greene and Ilyas J. Rona
Greene & Hoffman
33 Broad Street, 5th Floor
Boston, MA 02109

Dear Mr. Greene and Mr. Rona,

**Re: NEURONTIN – expert opinion on efficacy and effectiveness for pain**

**EXECUTIVE SUMMARY**

**Based on a thorough and scientifically valid analysis of all relevant double blind randomized clinical trials (DBRCT), Neurontin is not an effective drug for the treatment of neuropathic pain. My thorough review and meta-analysis of available published and unpublished evidence shows that Neurontin (gabapentin) has at best a clinically insignificant average effect on pain scores. The proportion of patients who recognize "improvement" on a Patient Global Impression of Change scale at the end of studies is roughly matched by the proportion of patients who experience adverse events. In the real world, to which the concept of "effectiveness" applies, patients taking Neurontin (gabapentin) should be expected to accrue less benefit and more harm. Thus, in my opinion, Neurontin (gabapentin) has not been demonstrated to be an effective treatment for pain.**

**Therefore, it should be obvious that it was inappropriate to recommend Neurontin (gabapentin) as "first-line" treatment for "neuropathic pain" or any other pain. In addition, my detailed review of evidence showed clearly that alternative analgesics, notably morphine, control pain better than gabapentin. Amitriptyline and other tricyclic antidepressants (TCA) appear from DBRCT comparing them with <u>placebo</u> to have greater benefit than gabapentin; however the direct comparison trials (against gabapentin) are too small and insufficiently well reported to prove whether TCA are better in the real world. In my opinion, the widespread "expert" recommendation of Neurontin (gabapentin) as "first-line"**

treatment was based on commercial, rather than scientific or medical considerations – and derived largely from "experts" who were unaware of the full data from unpublished trials.

Finally, it is my opinion that Neurontin (gabapentin) is completely ineffective for the treatment of non-neuropathic pain. The relatively large acute pain trials I reviewed cast serious doubt on the notion that gabapentin is an efficacious analgesic, as opposed to a soporific drug.

Parke-Davis/Pfizer marketed Neurontin (gabapentin) as an effective drug for the treatment of neuropathic pain through the use of misleading, incomplete or omissive statements. The marketing transcended any reasonable bounds of evidence and succeeded principally by withholding the unpublished data which were well known to Parke-Davis/Pfizer.

Parke-Davis/Pfizer also recommended, through the use of misleading, incomplete or omissive statements, that Neurontin (gabapentin) be used as first-line treatment for neuropathic pain. Parke-Davis/Pfizer crafted an elaborate campaign to "pull the wool over the eyes" of practicing doctors, and no doubt also of patients afflicted by pain. The companies went to great lengths to ensure that their messages were not filtered through the appropriate sieves such as disinterested and competent independent peer review, for reality checking.

It was crucial for the companies to exaggerate the purported benefits of Neurontin, "push the dose", and play down Neurontin's well documented adverse effects in order to maximize off-label use for the much larger populations of patients with other chronic pain conditions who might at least purchase several months worth of the drug – even if they could not be persuaded to renew prescriptions further. It is a sad but all too common reflection on the medical profession that it collaborated so obsequiously in this endeavour.


## FULL CLINICAL PHARMACOLOGIC OPINION


By letter dated March 4, 2008 and subsequent discussions both in Boston (April 1-3, 2008) and by telephone, you requested me to prepare a clinical pharmacological expert opinion on the evidence available from double blind randomized clinical trials regarding the efficacy and effectiveness of the prescription drug gabapentin when used to treat pain. You have also asked me to comment on the marketing of this drug in respect to claims you are making against the Defendant. At your request, I duly signed and returned to you a confidentiality agreement respecting documents you shared with me of which the confidentiality remains under Court protection in the United States.

With your permission, I engaged the assistance of two people to help me complete the large amount of work required to produce my opinion, within the looming deadline of August 1, 2008:

1. Vijaya Musini, M.D., M.Sc., my colleague in the University of British Columbia Department of Anesthesiology, Pharmacology and Therapeutics, is a recognized Canadian expert in critical appraisal of clinical trials and in systematic review. Dr. Musini assisted me in completing a systematic review to the standards of the Cochrane Collaboration, in particular with the meta-analysis using Cochrane RevMan software. She is an experienced member of the Cochrane Hypertension Group. Dr. Musini will send you her CV by email.

2. Kelsey Innes, B.Sc., a graduate of the University of Victoria (mathematics and statistics), who assisted in the critical appraisal and in summarizing some of the clinical trials of gabapentin for pain (mostly unpublished).

I have personally supervised and checked the work of Dr. Musini and Ms. Innes and assume responsibility for the thoroughness and accuracy of all the work reported to you as appendices, and upon which my opinion relies. Dr. Musini and Ms. Innes have each signed and returned to you by fax the confidentiality agreement with respect to documents protected by the U.S. Court.

This is my report, for which I assume full responsibility. It relies on my general scientific and medical education and background, and also on medical scientific reports which I reviewed during my own independent research, as well as on information and reports of which I am otherwise generally aware. I also reviewed specifically the materials you sent me, which are itemized in a number of Appendices at the end of this report.

I reserve the right to supplement or modify this report if new information becomes available to me, or if I have the opportunity to review further reports from published literature, unpublished studies, or other documents relevant to my opinion.

My compensation for this work is at a rate of U.S. $400/hour. I am sending you separately a CV.

The following are the law cases in which I have provided expert witness testimony at trial or during pre-trial Examination for Discovery since 2004:

1. Borglund v. Fraser Valley Health Region et al., Supreme Court of British Columbia, 2006 BCSC 1338, Registry: Vancouver (Civil)

2. Regina v. James Swanney, Supreme Court of British Columbia, 2006 BCSC 1766, Registry: New Westminster (Criminal)

For your convenience and that of the Court, I have prepared an Executive Summary attached to this report, which is based upon the full report, and which includes my answers to your specific questions. The same questions are posed and answers proposed in this complete report, in the context of the approach that I took to answering them.

## I) **PROFESSIONAL QUALIFICATIONS:**

I graduated from the McGill University Medical School in 1978. I then took a rotating internship at Dalhousie University Medical School, and postgraduate training in Internal Medicine at the University of British Columbia. I achieved Fellowship of the Royal College of Physicians of Canada in 1985. From 1986-89, with a Fellowship from the Medical Research Council of Canada, I pursued additional subspecialty training in Clinical Pharmacology at the Karolinska Institute Department of Clinical Pharmacology in Stockholm and in the Department of Pharmacology and Therapeutics at UBC. My training focused on the metabolism of tricyclic antidepressant drugs by the liver, and on understanding how they cause the adverse effect of postural hypotension (low blood pressure) in humans.

Currently I practice hospital-based general internal medicine on the medical wards of the University Hospital and the Vancouver General Hospital, in Vancouver, British Columbia. I also teach medicine and clinical pharmacology in all four years of the undergraduate medical curriculum of the UBC Faculty of Medicine and in the General Internal Medicine postgraduate training program.

My outpatient practice is mainly with patients with high blood pressure and especially the treatment of chronic pain. I am one of relatively few physicians in B.C. who receives consultations for pain from around our province of 4 million people. I am frequently called upon to assess hospitalized patients and outpatients who are receiving complex regimens of prescription medications. Much of my daily bedside and hospital ward teaching involves helping medical students, and sometimes clinical pharmacists, to understand the practical aspects of drug actions in human beings. This includes the practical aspects of pharmacokinetics and pharmacodynamics, the understanding of when and how drugs exert their effects in individual human beings.

Like other general internists in academic practice, I am involved continuously in teaching concepts of evidence based medicine. This involves the rational application to an individual patient of the scientific knowledge gained from randomized clinical trials (experiments) conducted in large populations of patients. My work at the UBC Therapeutics Initiative (UBC TI) involves critical appraisal of such experiments in order to understand what the published results of clinical trials really mean for clinical practice. I have been privileged to work at the UBC TI amongst a group of physicians, epidemiologists, and pharmacists who have together received international stature for the meticulousness and reliability of our work, and the careful, unbiased conclusions we have drawn in our drug assessment reports to the British Columbia Ministry of Health's drug benefit program and the abbreviated versions published in our Therapeutics Letters and on our website (www.ti.ubc.ca).

I have sent you electronically a copy of my CV, including publications from the last 10 years. I do not keep track of all of my teaching and speaking engagements on my CV but could muster and report them if required.

## II)  QUESTIONS YOU POSED TO ME:

These are the specific questions you posed to me:

### a) Science questions:

1.  Based on a thorough and scientifically valid analysis of all relevant RCTs is Neurontin an effective drug for the treatment of neuropathic pain?

2.  Was it appropriate to recommend Neurontin as first-line treatment for neuropathic pain?

3.  Can any findings of efficacy in PHN be extrapolated to other neuropathic pain conditions?

### b) Marketing questions:

1.  Based on a review of their marketing documents, did Defendants market Neurontin as an effective drug for the treatment of neuropathic pain through the use of misleading, incomplete or omissive statements?

**2.**  Based on a review of their marketing documents, did Defendants recommend through the use of misleading, incomplete or omissive statements that Neurontin be used as first-line treatment for neuropathic pain?

3.  Based on a review of their marketing documents, did Defendants claim through the use of misleading, incomplete or omissive statements that findings of efficacy in PHN could be extrapolated to other neuropathic pain conditions?

I have reported my brief answers to these questions in the executive summary accompanying this detailed and comprehensive report.   Below I discuss the purposes of my report in more detail, and the approach taken to answering your specific questions and the more general scientific questions that I needed to pose to myself in order to provide you with what I consider reasonable answers.

## III)   PURPOSE OF REPORT:

**a)**        **The main purpose of this report is to provide you with a balanced, scientifically accurate and valid assessment of the efficacy and effectiveness of gabapentin for various pain syndromes.**  As I explained to you when we met in Boston on April 1-3, 2008, I must base my opinion upon a detailed and thorough review of all available evidence from **double blind randomized controlled trials (DBRCT)** which compared gabapentin with placebo, "active placebo", or with drugs known or thought to have analgesic properties.   As is standard in modern medical science, evidence derived

from open label trials (where the patients and investigators are aware of each patient's treatment) may be useful to **formulate** hypotheses, but is unreliable for **testing** such hypotheses.  Long experience has taught that **only DBRCT offer reliable evidence**.

However, even the interpretation of relatively high quality and difficult or expensive experiments may be fraught with various biases.  Anyone who follows the media will be aware that medical conclusions and standard practice which were thought to be based on "evidence" relatively securely derived from DBRCT often turn out to be spurious, wrong, and sometimes even deliberately misleading.  Throughout medical history, this has been true of most practices once thought to be "standard of care", e.g. bleeding with leeches (thought to have caused the deaths of King Charles II and President George Washington amongst many others) or the use of antimony and mercury for various ailments in the pre-scientific era.  More recent examples include the utility of beta-blockers for peri-operative medicine, or the mass application of SSRI antidepressants and "atypical" (new) antipsychotic drugs to millions of people now widely recognized to have been unlikely to benefit.  Selective publication of part, but not all of the evidence concerning rofecoxib (Vioxx) in the New England Journal of Medicine (NEJM) in 2000 and concerning celecoxib (Celebrex) in the Journal of the American Medical Association (JAMA) in 2000 provided a classic example of how relatively sophisticated peer reviewers, medical journal editors, and readers of journal articles may be misled - even by studies which appear to represent the highest available quality of medical research.  This mis-publication fooled literally hundreds of thousands of doctors worldwide, including most academic "experts", and led to a revolution in how the best medical journals now attempt to verify the accuracy, validity and integrity of research reports submitted for publication.  This "new enlightenment" has only begun and applies only to the few best medical scientific journals whereas countless others continue to apply low standards to determining whether information submitted for publication is likely to be accurate or representative of the real truth.

A series of brief articles (Therapeutics Letters) on the UBC Therapeutics Initiative website (www.ti.ubc.ca) summarized what was known about the real facts from the rofecoxib and celecoxib studies at various stages between 1999-2004.  These articles demonstrate that it was possible early on to discern glimpses of the truth.  Representing the work of a sophisticated team which collectively spent hundreds of hours to understand what the published rofecoxib and celecoxib trials were really reporting, the Therapeutics Letters do not even hint at the amount of intellectual work  and experience necessary for an outsider (someone without access to complete privately-held data) to develop a well-informed opinion.

When you asked me to consider the Neurontin (gabapentin) case, I guessed that the academic work necessary to form an opinion would be onerous and time consuming, but I did not fully comprehend how complex this assignment would be, given the myriad ways that experiments with gabapentin were reported, and the nature and volume of the unpublished experimental reports.

My academic interest in the questions you posed derives partly from my considerable experience in the treatment of hospitalized patients and outpatients suffering from acute or chronic pain.  As a specialist in general internal medicine and in pain

treatment, I have assessed clinically hundreds of patients who have taken gabapentin. Although I have occasionally prescribed gabapentin as a trial of therapy for pain, almost all of the patients I have assessed who were taking this drug were prescribed gabapentin for pain by other physicians.  Gabapentin is used rarely in Canada for epilepsy.

In my daily practice of medicine in a major medical teaching centre, I utilize my specialized post-graduate training and expertise in clinical pharmacology, including my understanding of how drug kinetics and dynamics apply to individual patients.  My work at the University of British Columbia medical school typically involves combining this knowledge and understanding with my academic experience in critical appraisal of clinical trial reports to formulate what I hope to be wise and rational judgments about the role of drugs in alleviating human suffering or improving health.  Similarly, my clinical pharmacologic opinion in this report also applies my background knowledge and experience to questions which are critically relevant to understanding how the **average group outcomes** observed in DBRCT might be applied wisely to the rational use of a drug in clinical practice which is always directed at **individual patients**.  For example, I will consider:

- the **timing of benefit and harm** experienced by patients taking gabapentin
- the **relationship between dose and therapeutic or toxic effects** (benefit and harm)
- how results might be expected to compare during **routine clinical use of gabapentin** for the same purposes or conditions for which gabapentin treatment was studied during DBRCTs – the question of "effectiveness" vs. "efficacy"

Without the prudent clinical application of such knowledge, it is difficult or impossible for a doctor to translate **efficacy** results (the ability of a drug to produce a given result during a controlled experiment under "ideal" circumstances) into clinical **effectiveness.  Effectiveness** is ultimately the ability of a drug to cause more good than harm in **real life**.  The prescribing physician who wants to be **effective** obviously must attempt to maximize the proportion of patients who benefit from a therapy while minimizing the proportion who suffer harm from the same therapy.

**b)**      **The second purpose of this report** is to provide my opinion as to whether the intensive marketing campaign conducted on behalf of Neurontin (gabapentin) by Parke-Davis/Pfizer in the United States was **misleading, incomplete or omissive** in its depiction of the efficacy or clinical effectiveness of Neurontin (gabapentin) for the treatment of "neuropathic pain" or other pain.   This question is to be considered in light of the evidence I now know, from my review of unpublished as well as published studies, was available to Parke-Davis/Pfizer at the time, as well as my review of internal marketing documents from those two companies.

I have tried to approach this question by imagining that I had been a pain specialist or any other fair-minded and intelligent physician attending one of the "advisory group" meetings, or any of the sponsored meetings where Neurontin (gabapentin) was promoted, or that I had read any of the "enduring materials" distributed

by non-academic or academic organizations entitled to provide CME credits to American physicians.  I have asked myself whether the information contained in those documents, slide presentations, sponsored (non-peer reviewed) journal supplements and commercial journals and in the "advisory group" discussions:

- was generally intellectually honest;
- presented a fair balance of information on potential benefits and harms likely to arise in a patient taking gabapentin;
- conformed to professional and ordinary ethics insofar as the presentation respected an audience member's or reader's right and responsibility to be fully informed of the facts in such as way as to protect the interests of patients;
- was "ethical to patients" - that is, the presentation did not encourage the audience to recommend or prescribe gabapentin in ways that could be expected to be deleterious to patients;
- was "disinterested" – that is, the interests of patients who might be exposed to gabapentin were placed ahead of the financial interests of the manufacturer or the physicians in attendance;
- was "honest and transparent" – that is, the presentations or "enduring materials" or "infomercials" reflected appropriately full disclosure of the potential or real conflicts of interest of "experts" remunerated by the manufacturer (including but not limited to the amounts paid to such "experts" to participate in promotional advisory board meetings or presentations, and disclosure of whether the "authors" of materials circulated actually wrote those materials or disclosed "ghost authorship" when they did not write them, in such a way that an audience member could make an informed independent judgment about the overall credibility of the information presented;
- was complete insofar as all experimental evidence bearing on the efficacy or effectiveness of gabapentin was disclosed, once it was available

   **Note that reading documents is hardly the same as attending a live presentation.**  Anyone who has participated in such meetings (or who might have read the Parke-Davis/Pfizer materials I reviewed) would understand that meetings held for doctors at nice hotels in desirable locations have their own group dynamic and culture. Pharmaceutical manufacturers, or the third parties they contract to run such meetings, do not spend tens or hundreds of thousands of dollars to organize them with the expectation that the content will be purely rational.  Were that their intent, they could save a great deal of money by using print media or the internet.  **The emotional dimension of human contact with "experts" or "Key Opinion Leaders" is the real purpose and outcome of such meetings.**

## IV)  BACKGROUND – FORMULATION OF ACADEMIC QUESTIONS TO BE ADDRESSED IN ORDER TO ANSWER YOUR SCIENTIFIC QUESTIONS:

In thinking about how to approach the daunting assignment you gave me, I began with the following considerations:

a)  observations and thinking about how gabapentin has been and is currently utilized for pain treatment in my local community (Vancouver and British Columbia, Canada);

b)  my own experience from treating pain with prescription drugs of multiple classes (acetaminophen, NSAIDs, opioids, tricyclic antidepressants, anticonvulsants) and with teaching medical students, post-graduate trainees, and practicing doctors about effective and rational use of drugs for pain control;

c)  observation of how pain is treated in the large hospitals where I work, including how nurses and doctors assess and treat pain, and discussions with doctors, nurses, and physiotherapists about the effects of gabapentin;

d)  general medical literature discussion of pain treatment (journals, books, websites)

e)  the Cochrane Pain Group's discussion, not limited to the Cochrane systematic review of gabapentin (see below) but also including the Oxford Pain Internet Site (http://www.jr2.ox.ac.uk/bandolier/booth/painpag/);

f)  discussion with colleagues involved in systematic reviews of various drugs licensed in Canada

**I derived the following key questions** to guide me and my colleague Dr. Musini and assistant Ms. Innes in our systematic review of evidence about gabapentin's effects on pain in **outpatients**.  I considered that gabapentin's possible effects in the immediate post-operative setting for **hospitalized patients** were not relevant to the much broader question of gabapentin use by prescription in **outpatients**.  These questions are not necessarily listed in order of their clinical importance.  Ultimately, for any one patient the most important question is relatively straightforward and simple: **"How will this drug help me to get on with my life in ways that are important to me?"**

**Question 1a)**  What is the available evidence from DBRCT concerning the **average (mean) effect of gabapentin** for various painful conditions, in comparison with placebo or with active analgesic comparators?

**Question 1b)**  What is the clinical meaning for **individual patients** of any such average (mean) effect observed for an experimental **group**?

Questions 1a and 1b are important because a valid estimate of any benefit from gabapentin can be made only by considering all available clinical trial results (to avoid publication bias by publication only of results deemed to be positive) and because effects observed in clinical trials, which may be statistically significant, are not necessarily **clinically significant**.

**Question 2a)**  What is the available evidence from DBRCT concerning the **average (mean) toxicities (harms) of gabapentin** when used for pain, in comparison with placebo or with active analgesic comparators?

**Question 2b)**  What is the clinical meaning **for individual patients who experience toxicity (harm)**, e.g. those who drop out early from DBRCT because of "adverse events", or who just drop out?

Questions 2a and 2b are important because any clinical benefits achieved by a drug are meaningless unless weighed against the **harms** associated with the same treatment.

**Question 3a)**  What is the available evidence from DBRCT about the **percentage (%)** of patients who experience a **clinically meaningful benefit (to them)** from the use of gabapentin to treat pain?

**Question 3b)**  How does this % compare with the % who experience a **clinically meaningful harm**?

Questions 3a and 3b are important because they may provide an estimate of the probability that an individual patient may realize a clinically meaningful benefit (Number Needed to Treat, NNT) or harm (Number Needed to Harm, NNH).  Note that in the real world setting (outside the confines of a DBRCT with scrupulous inclusion and exclusion criteria) the NNT will generally be higher (less favourable), while the NNH will generally be lower (less favourable).  The balance of benefit/harm will generally be considerably less favourable in the real world, than in a typical clinical trial run from a specialized referral base.

**Question 4a)**  What is the available evidence from DBRCT concerning the relationship of gabapentin **dose** to clinically meaningful response (benefit)?  For example, is there convincing evidence that larger doses "work better" than smaller doses (e.g. 900 mg/day vs. 300 mg/day, or 3600 mg/day vs. 900 mg/day or vs. 1800 mg/day)?

**Question 4b)**  What is the available evidence from DBRCT concerning the relationship of gabapentin **dose** to clinically meaningful toxicity (harms)?  For example, is there convincing evidence that larger doses are more likely to cause neurological adverse effects than smaller doses (e.g. 900 mg/day vs. 300 mg/day, or 3600 mg/day vs. 900 mg/day or vs. 1800 mg/day)?

**Question 4c)**  Is any other meaningful evidence available which bears on the questions of **dose-dependence** of benefit(s) or harm(s) for gabapentin?

Questions 4a, 4b and 4c are important because "experts" who promoted use of gabapentin for pain generally advised "pushing the dose" or "titration to side effects".  This encouraged a widespread belief that in an individual patient, a larger dose may be expected to "work better" than a smaller dose, whereas the same experts suggested that

many patients develop tolerance to adverse effects.  General clinical pharmacologic principles and international experience with countless drugs suggest that large doses are more likely than small doses to cause significant harms.  Conversely for most drugs the benefits accrue disproportionately at the lower end of the licensed human dose range (e.g. drugs for high blood pressure, drugs for stomach acid suppression, beta blockers, and most, if not all, pain drugs).

**Question 5a)**  What is the available evidence from DBRCT concerning the relationship of **duration** of gabapentin therapy to realization of a clinically meaningful response (benefit)?

**Question 5b)**  What is the available evidence from DBRCT concerning the relationship of **duration** of gabapentin therapy to experience of a clinically meaningful toxicity (harm)?

**Question 5c)**  Is there any other meaningful evidence available which bears on the questions of **duration** of therapy-dependence of benefit(s) or harm(s) for gabapentin?

Questions 5a, 5b, and 5c are important because "experts" who promoted use of gabapentin for pain generally advised (by analogy to prevalent but usually non-evidence based treatment methods of drug therapy for depression) that patients should be encouraged to persist with therapy despite initial therapeutic failure, in the hope that the drug may require "time to work".  In contrast, some "experts" indicated at least anecdotally, and close examination of the results of DBRCT suggest that therapeutic effect or toxicity may be apparent **very early in treatment**.

**Question 6: What experimental approach could clarify the most efficacious and effective drug treatment(s) for "neuropathic" pain?  Why don't we have this information now?**

Question 6 is important because the rational patient and/or the rational prescribing doctor might well ask, *"What is the best available treatment for my condition?"*  (The New York Times of July 29, 2008 provides a striking example of how U.S. Senator Ted Kennedy used this rational approach not only to analyse therapeutic options for his malignant brain tumour, but also applied it earlier to therapeutic dilemmas affecting his children and friends.  The same article points out that even many highly educated or sophisticated Americans still expect to delegate this responsibility to their physicians.)  In certain circumstances, high quality scientific experimentation has provided reasonably certain answers to such questions, for example:

- thiazide diuretics, as initial treatment for high blood pressure, typically provide the best available results in prevention of premature death, ischemic heart disease, and stroke, at the lowest price and probably with the fewest adverse effects, according to multiple RCT;

- coronary bypass surgery is better than conservative medical treatment or percutaneous coronary intervention (angioplasty, coronary stenting) under specific circumstances demonstrated in RCT

Providing a rational, experimentally based answer to Question 6 would require DBRCT aimed at discovering the truth, no matter where it lies.  This is the general approach taken in the Gilron study (NEJM 2005), although the crossover design becomes so complex that I found a thorough and fair interpretation to be much more difficult than it looks.  Large, objective and meticulous DBRCT performed in the real world setting (effectiveness trials) could reliably answer the following questions about neuropathic or other pain treatment in various conditions, just as they have for other medical issues:

a)  Which treatment (e.g. traditional opioids such as morphine, "untraditional opioids" such as methadone, gabapentin, pregabalin, carbamazepine, tricyclic antidepressants, etc.) provides the best group **mean** pain relief?

b)  Which treatment provides the **fewest and least clinically significant adverse effects**?

c)  Which treatment provides the **best overall functional result**? (a combination of relatively good benefit and relatively little harm, e.g. the ability to continue working or return to work, school, or important family activities)

d)  What is the **probability** that an individual patient will achieve clinically or functionally meaningful benefit or harm, for each treatment? **(NNT, NNH)**

Why have such studies not been done for "neuropathic pain", with the rare exception of such innovative trials as Gilron's (NEJM 2005) or the other less prominent trials comparing active treatments?  I am aware of several plausible answers, all of which are probably pertinent:

a)  Regulatory bodies such as the U.S. FDA do not require evidence that a drug is superior to appropriate comparator drugs, only that it is superior to placebo.  Thus the manufacturer's interest lies primarily, and often exclusively, in attempting to demonstrate superiority over placebo.

b)  There is a risk to running experiments which compare active treatments.  One treatment may "win", while others lose.  This may complicate or torpedo the marketing of new products.  It is especially risky for products which remain on patent but for which the manufacturer has only a limited interval to recoup development costs and produce profit.  A trial showing disadvantage to a new product vs. an older product would effectively kill the new one.  As an example, Pfizer has not to my knowledge sponsored trials comparing its formerly patent-protected product Neurontin (gabapentin) with the newly patented, licensed and anointed "successor" Lyrica (pregabalin).  This is a striking omission which has not been corrected by any independent trialist, and if any studies were done by Pfizer, their results are unknown.  Thus we have no idea whether pregabalin (Lyrica) is **equivalent, superior or inferior to gabapentin (Neurontin)** for any benefits or harms, whether in a clinical trial setting or in the real world.   An experiment showing equivalence, let alone inferiority of pregabalin (Lyrica) to

gabapentin could be predicted to *"kill the goose that will lay the next multi-billion dollar egg"*.

c)  Academically-inspired or independent DBRCT (e.g. trials sponsored by public agencies like the U.S. NIH, Veterans Administration, the United Kingdom NHS or the Canadian CIHR) are expensive and hard to organize.  Although such trials were once the mainstay of medical progress, for decades they have played second fiddle to drug-company designed, organized, and managed trials for most clinical issues.  Only issues judged to be of the utmost importance (e.g. some cardiovascular and cancer trials) have escaped this trend.  In the 30 years I have been involved in academic medicine, the independence of medical scientific investigation has withered, in favour of industrial dominance of the questions posed, the methods used to answer them, and even the reporting of results. This is now widely recognized and lamented.  (See JAMA, April 16, 2008 for articles describing how the sponsors of trials prepare the results for publication, then recruit academic "ghost authors" or "key opinion leaders"/KOL's to assume authorship - http://jama.ama-assn.org/content/vol299/issue15/index.dtl)

These are some of the reasons why we do not see major parallel group DBRCT utilizing what would likely be the optimal strategy to determine the truth, a strategy exemplified by the ALLHAT trial for treatment of high blood pressure (reported in 2002).  For patients with **painful diabetic neuropathy**, for example, it would be exceedingly useful to know the results of a large real world trial, comparing not only important but highly subjective endpoints (e.g. pain scores) but also **"hard endpoints"** such as hospitalization, infections, amputations, kidney function, heart disease, and overall mortality.  A rational real world DBRCT could generate meaningful and reliable answers by using some of the following strategies:

- Comparing placebo with gabapentin, and opioid (e.g. morphine), or also with a fourth arm (e.g. amitriptyline), to assess whether one treatment has overall superiority;

- Re-randomization of "therapeutic failures" randomized to one arm to an alternative drug, to learn whether patients who do not achieve good outcomes with one therapeutic option might do better with another;

- Follow-up of all patients for the most meaningful outcomes, including total mortality, total serious adverse events (SAE), specific important adverse events, functional improvement from disability, overall pain and/or goals pre-specified by the patients themselves.  The latter technique for experimentation, in which the patient and/or family determine the goal(s) of therapy, has been explored in experimental studies of drug therapy in Alzheimer disease, which show that it is feasible to study in a group the same kinds of outcomes which patients and their physicians routinely seek within a therapeutic relationship.

## V)  BACKGROUND CONSIDERATIONS - MEDICAL TREATMENT OF PAIN:

Painful peripheral diabetic neuropathy (PDPN) and post-herpetic neuralgia (PHN), considered prototypical examples of "neuropathic" pain, were the original conditions for which gabapentin was used widely, other than for epilepsy.  It is clear that Parke-Davis/Pfizer used these conditions as "levers" to expand the unapproved (off-label) prescription of Neurontin (gabapentin) for pain.  Therefore, I will also use them as examples to set the background for what a competent physician and a rational patient would try to achieve in a therapeutic alliance to address the patient's clinical problem of pain.

The distinction between "somatic" or "visceral" versus "neuropathic" pain is rather arbitrary, since all pain is ultimately experienced by or through neurons in the brain.  For example, pain from an inter-vertebral disc protrusion or an epidural abscess or tumour deposit could be considered "somatic" or "neuropathic", depending how one looks at it.  Parke-Davis/Pfizer was quick to point out to its "advisory boards" that millions of Americans suffer from chronic back pain and headache, both conditions not traditionally designated "neuropathic".  The afflicted person experiences the same suffering, regardless of how the condition is labeled by "experts".  This fact is well known to anyone who has faced chronic pain.  Thus, rational therapeutic principles that apply to "neuropathic" pain apply generally to any painful condition.


## a) General background:

**Painful diabetic peripheral neuropathy** is often part of a spectrum of diabetic complications including painless neuropathy and large or small vessel arterial (or venous) disease.  **These conditions pose the continuous threat of devastating local or systemic infections, especially those arising in the feet from lacerations, pressure sores or ulcers caused by the loss of sensation and impaired circulation in the toes and feet.**  Any drug like gabapentin which compromises alertness or reduces sensory perception, contributes to or causes falls, or causes edema (tissue fluid collection, typically manifested mostly in the feet), holds the potential to be extremely dangerous in patients at high risk of infections arising in the diabetic foot.  Double blind randomized controlled trials (DBRCT) enroll selected patients judged to be at the **least risk** for such complications (e.g. without significant kidney impairment, without significant or unstable heart disease, and able to participate and expected to survive the duration of a clinical trial), whose experience during a brief trial will almost certainly **exaggerate the apparent benefits** of drug therapy while **underestimating the harms to be expected in a more representative population.**

**Postherpetic neuralgia (PHN)** can disable a patient with spontaneous pain or cause an exaggerated and painful response to stimuli that are not normally painful (allodynia, dysesthesia).  When it affects a limb, or if the pain is severe, PHN may also affect mobility.  Often, pain disturbs sleep.  **Most patients with significant pain, especially of longer duration, are elderly; many if not most of these are debilitated by other conditions.**  As with PDPN, results from DBRCT enrolling patients with PHN

are virtually guaranteed to **exaggerate the benefits but minimize the harms** associated with drug therapy in this population which is mostly elderly and suffers multiple co-morbidities which increase frailty.

**There is a constantly increasing pressure and tendency to polypharmacy amongst patients with diabetes, and also amongst the elderly patients most likely to suffer significant pain from a reactivation episode of *Herpes zoster* (PHN).** The trend to polypharmacy intensified greatly in the 1990's, partly as a byproduct of the rise of "evidence-based medicine" and the influence of "treatment guidelines" encouraged by medical organizations, pharmaceutical manufacturers, "disease associations", and government, HMO's or other third party payers. Especially in the litigation prone United States, guidelines often assume the status of "standard of care" - even when they are clearly **not** based on good scientific evidence or obviously biased by sponsorship or conflicts of interest amongst the "consensus guideline developers".

Given this context for a typical patient consulting a doctor for relief of pain arising from either PDPN or PHN, the rational and ethical physician should consider drug treatment options with reference to the patient's other health issues, **including potential interactions of a drug which affects the central nervous system with many other drugs in simultaneous use by the same patient.**

This is obviously a totally different situation from that of a patient enrolled in a typical DBRCT, where exclusion criteria and prohibition of potentially dangerous or interacting medicines is likely to render safe outcomes more likely than in the real world. It is rather like the difference between giving a teenager the keys to the car for a driving lesson from a licensed driving school, as opposed to providing the keys to the same car for a big Saturday night on the town. The encounter with a typical pain patient in clinical practice embodies a much more complex therapeutic decision process for both patient and physician than that of most DBRCT or the typical clinical case scenario presented by a manufacturer-sponsored "pain treatment expert" during an after-dinner lecture.

### b) <u>What are the goals of drug therapy for PDPN and PHN (or any other pain)?</u>:

Common sense goals for both conditions are relatively easy to define for clinical practice. The patient typically seeks a prescription for the relief of suffering. Pain inhibits her/his general enjoyment of life, and may interfere with everyday functions such as social interactions, activities of daily living (dressing, bathing, walking), or with sleep. Obvious goals of drug (or non-drug) therapy include:

1) **Preservation of general health, and avoidance of harm, including death and serious adverse effects.** Although this may not be an explicitly stated goal of therapy, it is the cardinal underlying principle of ethical medical practice since the time of Hippocrates: *"primum non nocere"*.

2) **Pain relief which the patient finds meaningful**: for example, a successfully treated patient might state at follow up: ***"I feel much better now"*** or ***"It still bothers me, but not nearly so much as before"***.

3) **Restful sleep, when pain has disturbed sleep: this goal normally applies to the night time, and clinical utility depends critically on avoidance of daytime somnolence or potentially dangerous adverse effects such as dizziness.** Where improvement of sleep is the main goal, a relatively short-lived drug treatment may be desirable and pharmacologically rational, as opposed to an around-the-clock effect.

4) **Maintenance or improvement of overall function**, including the ability to read, write, perform household tasks, do routine computations (e.g. for banking or bill paying), hold conversations, and maintain physical fitness through aerobic exercise. Note that drugs which may improve sleep often impair overall function. This is one reason, for example, that benzodiazepines are not approved for long term use as hypnotics.

5) **Maintenance or restoration of happiness** (mood) in a patient in whom chronic pain has led to depression or despondency, or to relationship issues with a spouse or partner.

Note that while DBRCT of pain treatment interventions (notably drugs) often attempt to measure aspects of these **qualitative goals of therapy**, common sense suggests that achieving such qualitative or even categorical (yes/no, success/failure) goals differs markedly from recording a change on a "pain scale" or on a "SF-36 QOL" form. Measurement scales typically utilized in DBRCTs may have meaning, and may have been negotiated between manufacturers and the US FDA as surrogate endpoints considered acceptable for clinical trials. The development and popularization of such measurement scales may have generated impressive *curricula vitae* for academics and led to promotions, awards and peer recognition. But it is important to recall that the average suffering patient might be more inclined to ask in regard to a proposed new prescription**: *"What's in it for me?"***

**One striking aspect of the promotional materials I reviewed was the graphic labeled (Pfizer_MYoder_0002511) which shows that as of 2001, "Less than 20% of New Patients Are Refilling NTN (Neurontin/gabapentin) Prescriptions After Four Months".** The same graphic shows that only 35-39% of patients renewed prescriptions after the first month, although they would almost certainly have been under influence (if not frank pressure) from their physician(s) to renew and **probably to increase the dose**. **By 11 months, only 5-7% of Americans prescribed Neurontin were renewing their prescriptions.**

**In 2001, most such prescriptions would have been written with the goal of pain relief. This renewal pattern obviously contrasts markedly with how highly effective analgesics, such as morphine and other opioids, are utilized by patients with chronic pain.** Although neurologists may have been slightly more persuasive than primary care doctors during 2001, this graphic indicates that approximately 95% of all American patients were making their own consuming decisions, **probably because they were not achieving meaningful relief from chronic pain, or they disliked the toxicities of gabapentin.** For convenience, I have reproduced this very telling graphic below. It may have been a well known (and perhaps dreaded image) amongst Parke-Davis/Pfizer marketing staff, but I doubt that it would have featured on the "Neurontin" website, or any similar public venue.

Neurontin: Clinical pharmacologic opinion of Dr. Thomas L. Perry, August 10, 2008    17



**Graphic apparently presented by Parke-Davis/Pfizer at "advisory board" meeting. (Pfizer_MYoder_0002511)**

**c) What should a doctor strive to AVOID when treating pain?**

Drug (or non-drug) therapies for pain **should NOT**:

1) **Increase mortality**.

2) **Increase serious or symptomatic morbidity** (e.g. by causing visual impairment, confusion, impaired concentration or thinking, impaired balance and consequent falls, fractures or other injuries, nausea, vomiting, anorexia, or weight loss/weight gain, or exacerbation of the chronic complications of diabetes such as infection, edema and impaired wound healing, kidney dysfunction, congestive heart failure or myocardial infarction, etc.).

Both mortality and morbidity (as Serious Adverse Events/SAE) are typically recorded and measured in DBRCT, although their interpretation is contentious, since SAE as well as mortality may be difficult to relate to the experimental intervention. In general, a prudent physician should be concerned if DBRCT demonstrate higher mortality or morbidity (as total SAE or patients experiencing SAE), from an experimental intervention, even when this effect is "considered unrelated by investigators". Our academic group at the UBC Therapeutics Initiative has seen a number of examples where early signals from DBRCT regarding total mortality and total SAE turned out to be meaningful warnings that new drugs were inferior to comparators, even though these drugs cleared licensing hurdles in the United States and Canada and elsewhere (e.g. the

antibiotic grepafloxacin (Raxar) and the analgesic/anti-inflammatory rofecoxib (Vioxx) – both withdrawn from the market relatively soon after licensing/marketing).

**d)  Timing of pain relief:**

Typically both patient and physician seek prompt relief of pain.  In the post-anesthetic recovery room or for a surgical patient receiving "patient-controlled analgesia" (PCA) on a hospital ward, the goal is to relieve pain almost immediately.  A doctor dealing with severe acute pain (e.g. migraine headache) in her/his office or a nurse treating pain in the emergency room (e.g. renal colic) typically aims for obvious benefit within 2-30 minutes.  **Even a "consumer" using an over-the-counter oral analgesic such as acetaminophen, ASA, or ibuprofen expects pain relief within minutes to hours** – an expectation reinforced by countless television advertisements featuring actors posing as golfers, swimmers, Tai Chi practitioners and even dancing marionettes.  While the placebo effect often has a significant role in such prompt relief, there is no clinical question that opioids and NSAIDs work promptly when they work well.

For chronic pain which is primarily "physical" in cause (as opposed to chronic psychological states), it is typically more reasonable to aim for meaningful pain relief within hours or days, and it may require a few weeks to be certain whether the benefits of any treatment outweigh its disadvantages (harms).  But Franklin's motto that *"a penny saved is a penny earned"* is also not the appropriate metaphor for pain treatment.  Analgesia is not like investing in education or government bonds.  Both the suffering patient and the compassionate prescribing doctor seek a benefit which will not be delayed for months or years.  A drug whose effect is not obvious enough to avoid the necessity for doctors to "push the dose" or to urge patients to "hang in there" is unlikely to be helpful to most people.

**e)  Currently available drug choices for "neuropathic" pain:**

In principle, any drug which is a known analgesic should be considered for treatment of "neuropathic" pain, just like any other pain.  The efficacy of opioids for pain was established in the Orient well before the time of Christ, and recognized by medical greats such as Thomas Sydenham and Sir William Osler as *"God's own medicine"*.  Morphine and other opioids (e.g. codeine, hydrocodone, hydromorphone, oxycodone, meperidine, fentanyl, methadone) would not have acquired this reputation were it not for their almost immediate and dramatic effects on severe pain.  Although they also have significant adverse effects, these are often surprisingly benign and when present (e.g. constipation) can usually be managed effectively.  Thus the benefit of opioid analgesia overwhelms the harm when appropriate patients are treated, making opioids the mainstay of treatment of cancer pain because they so dramatically improve the lives of patients.

Fortunately for Americans, the attitudes of the medical establishment and the U.S. Government have mellowed from the era of near paranoia over the potential for drug dependency, diversion of opioids to non-medical uses, or "addiction".  However, the lack

of pharmaceutical manufacturer interest in conventional opioids such as morphine due to their relatively low price (off-patent) may have synergized with the former establishment fear of such drugs. **This may explain the paradox that for three decades many drugs which were almost certainly less efficacious and considerably more dangerous than opioids (e.g. anticonvulsants, antidepressants, antipsychotics, anti-dysrhythmics, and topical capsaicin/pepper extract) enjoyed relatively unfettered use for off-label pain indications**.

Both the prevalent "opioid-phobia" and the perceived lack of commercial benefit to manufacturers may have limited the design of experimental studies of pain control using opioids in non-cancerous conditions such as PDPN and PHN. Unlike major cardiovascular or cancer studies, for which there is an established tradition of government-supported and academically-designed research, **virtually all large pain studies are manufacturer-funded.** With the exception of one placebo-controlled study utilizing a controlled-release formulation of oxycodone, one does not find experimental studies of opioids for "neuropathic" pain, even though this had become established practice for experienced physicians. Not until 2005 was a study comparing gabapentin with morphine published (Gilron 2005, see below). The scientific and clinical importance of an experiment **comparing gabapentin with the most efficacious known analgesic (morphine)** is attested by the publication of Dr. Gilron's study as a major article in the New England Journal of Medicine.

By 2004 opioids were officially recommended by established American medicine as one legitimate option for painful peripheral neuropathy. (Dubinsky RM et al. Practice parameter: treatment of postherpetic neuralgia: an evidence-based report of the Quality Standards Subcommittee of the American Academy of Neurology. Neurology 2004; 63: 959-65)

Tricyclic antidepressants (imipramine, amitriptyline, nortriptyline, desipramine, etc.) have shown modest efficacy (vs. placebo) for painful peripheral neuropathy and have the advantage of very low cost (off patent). Unfortunately they carry virtually inevitable anti-cholinergic and alpha-blocking adverse effects, although some patients clearly tolerate and benefit from them. It is interesting that such adverse effects were considered less important by pharmaceutical manufacturers while tricyclics were still under patent protection – for many years, tricyclics were promoted as "miracle drugs" for depression. Although there was a storm of interest in and promotion of SSRI and other new antidepressant drugs for pain, there is no conclusive evidence that they are effective for "neuropathic" or any other pain. Multiple experiments demonstrate lack of efficacy.

Anticonvulsant drugs (anti-epileptic drugs, AED) have been used with very limited success in "neuropathic" pain and have found no role in other types of pain. Typically they are at best modestly effective, and unfortunately they often produce significant adverse effects in the elderly. However, carbamazepine appears to be convincingly beneficial for some people with trigeminal neuralgia, a relatively rare condition; occasionally a dramatic benefit is observed. Unfortunately we have very little information about how the older drugs (e.g. carbamazepine, phenytoin) might compare directly with newer anticonvulsants (e.g. gabapentin, pregabalin, topiramate, lamotrigine, etc.), as manufacturers of new drugs are unlikely to sponsor, let alone design such experiments which run the risk of showing that an old (off patent) drug is superior or

equivalent to a new drug.  For certain drugs which were heavily promoted for off-label (non-indicated) use in pain, e.g. topiramate (Topamax) there is abundant clinical evidence that the results are terrible for patients.  Little if any analgesic benefit is achieved, but there is a wealth of sometimes frightening toxicities.  Where a drug like topiramate has gained an official indication for a painful condition like migraine, a rational inspection of the evidence shows clearly that the new drug is not superior to, and likely markedly inferior to a comparator (e.g. propranolol for migraine).

Non-steroidal anti-inflammatory drugs (NSAIDs, e.g. ibuprofen, naproxen, diclofenac, ASA, "COX-2 selective inhibitors"/coxibs) and acetaminophen typically have very limited utility for "neuropathic pain", especially for PDPN or PHN, and the NSAID class (including the newer on-patent drugs) risks impairment of renal function, cardiovascular function and/or gastrointestinal bleeding.  Renal and cardiovascular effects are especially problematic in diabetics given their common co-morbidities, and all NSAID toxicities are especially dangerous in old people.

In Canada and Europe, prescription of opioids for chronic non-malignant pain is increasingly common.  The advantages of opioids include remarkable efficacy for moderate to severe pain, safety for the GI tract, the kidneys, the liver, the heart, and other organs, and (depending on the drug and preparation) modest cost.  The disadvantages are well known, including the risk of respiratory depression, somnolence or mental impairment, constipation, and occasionally dose-limiting nausea or vomiting or confusion/delirium.   Professional bodies in Canada, in deference to the significant pharmacologic advantages of opioids, officially sanctioned their use for chronic non-malignant pain in advance of their counterparts in the United States.  (e.g.: Evidence-based recommendations for medical management of chronic non-malignant pain: chapter 7. Neuropathic pain, College of Physicians and Surgeons. Nov 2000. http://www.cpso.on.ca/publications/pain.PDF, accessed July 18, 2008)  Hence, the most appropriate comparator drug class for clinical trials in significant pain is almost certainly the opioid class.

**e) How common are PDPN and PHN?**

This is a relevant question, as much of the marketing of gabapentin (Neurontin) by Parke-Davis and Pfizer tended to exaggerate (at least by implication) the prevalence of these conditions.  This approach, which appears to me to have been accepted uncritically by members of "advisory boards", is hardly unique to the field of pain.  Inflation of the true incidence and prevalence of depression and other conditions, is now referred to as "disease mongering".   For Neurontin (gabapentin), the implication by the manufacturer, or the inference by its audiences, that PDPN and PHN represent virtual "epidemics" of inadequately treated pain may also have functioned as a "lever" to increase the use of this drug for **other purposes** for which there was no relevant experimental evidence whatsoever.  Chronic back pain, for example, is so ubiquitous that "market creep" of gabapentin into this sector would have or did represent a "gold mine" for the manufacturer.

While both **painful diabetic peripheral neuropathy (painful DPN)** and **postherpetic neuralgia (PHN)** cause significant suffering, their true incidence and prevalence is not known.

### 1) **Painful diabetic peripheral neuropathy (PDPN):**

PDPN is a **small subset** of a much more common condition, diabetic peripheral neuropathy (DPN).   Many diabetic patients experience **painless** neuropathy.  Indeed, it is the inability to sense normal painful stimuli which leads to one of the most feared complications of diabetes: silent infection of the toes and feet, which can lead to chronic infection, partial limb amputation, prolonged hospital stays, high medical costs, and premature death. Estimates of the prevalence of **DPN** are irrelevant to the prevalence of **painful diabetic peripheral neuropathy (PDPN)**, for which a reliable estimate is **unavailable.**   The most reasonable prevalence estimates for diabetic neuropathy sufficiently painful to warrant drug therapy ranges from 1% - 10% of chronic diabetics. (Dyck PJ et al. The prevalence by staged severity of various types of diabetic neuropathy, retinopathy, and nephropathy in a population-based cohort: the Rochester Diabetic Neuropathy Study.  Neurology 1993; 43: 817-24;  Boulton A.  Management of Diabetic Peripheral Neuropathy. Clinical Diabetes 2005; 23: 9-15)

### 2) **Post-herpetic neuralgia (PHN):**

A U.S. administrative database study comprising over 2.8 million people found an overall **incidence of *Herpes zoster*** infection of 3.2/1,000 person-years.  (Insinga RP et al. The incidence of herpes zoster in a United States administrative database. J of Gen Internal Medicine 2005; 20: 748-753)  Of 9,152 apparent cases of *Herpes zoster*, 48% occurred in people $\geq$ age 60, and over 10% in people $\geq$ age 80.  Such estimates apply to acute *Herpes zoster* reactivation, **of which only a small minority progress to PHN**.  A prospective Icelandic study of 421 patients with clinically diagnosed acute *Herpes zoster* may provide a more realistic estimate of the prevalence of a persistent pain syndrome – PHN.  (Helgason S et al. Prevalence of postherpetic neuralgia after a first episode of herpes zoster: prospective study with long term follow up. BMJ 2000; 321: 794-6)  This experiment reflects the experience of over one third of the Icelandic population during a 5.5 year interval.  In patients < 60 years old, PHN was present 3 months post-onset of acute *Herpes zoster* reactivation in only 1.8%, and was "mild" in all cases.  Amongst patients aged > 60, pain persisted in 20% at 3 months, but in only 2% was pain described as "severe".  At 12 month follow-up, 403/417 evaluable patients were **pain free**, whereas 14 of the original 421 patients reported mild pain (12) or moderate pain (2).  No patient complained of "severe" pain at 12 month follow-up. The report concludes,**"…*the risk of longstanding pain has been overemphasized in trials of drug treatments"*.  A retrospective analysis of a Dutch general practice database comprising 49,000 patients suggested annual incidence of *Herpes zoster* reactivation of 3.4/1000 patients/year.  Amongst such patients presenting with acute *Herpes zoster*, the overall prevalence of PHN 1 month later was 6.5%, but had declined to 2.6% by 3 months.  Of 133 patients aged $\geq$ 75, the 1-month prevalence was 18%, but declined to 9% by 3 months.  (Opstelten W et al.  Herpes zoster and postherpetic neuralgia: incidence and risk indicators using a general practice research database. Fam Pract 2002; 19: 471-475)  In summary, the true

prevalence of clinically significant pain from PHN is unknown, but as for PDPN, it is likely to be **much lower** than implied by the introductory or discussion sections of many research or review articles on this topic, or in the intensive marketing campaign conducted by Parke-Davis/Pfizer for Neurontin.  **As noted above, the major burden of chronic pain from PHN occurs in elderly patients, who are the most vulnerable to the adverse effects of gabapentin or other analgesics.**

## VI)  <u>MY APPROACH TO ANSWERING QUESTIONS TO BE ADDRESSED:</u>

### a)  Initial review of available clinical trials and search for reliable systematic reviews:

You presented me in March 2008 with a massive amount of information in the form of electronic (PDF) versions of various published and unpublished reports of randomized controlled trials (both open and double blind) utilizing gabapentin for treatment of various painful conditions.  These included painful diabetic peripheral neuropathy (PDPN), postherpetic neuralgia (PHN), various post-operative causes of "neuropathic pain", "neuropathic pain" associated with cancer, "neuropathic pain" associated with spinal cord injury, and pain associated with dental procedures, osteoarthritis and with orthopedic surgical operations.  Some of the documentation of DBRCT experiments was in the form of detailed formal clinical trial reports compiled by the sponsoring pharmaceutical manufacturer (Parke-Davis or Pfizer), with appendices often exceeding 1300 pages – and some much longer!   Most academic students of clinical trials literature, let alone practicing doctors, will not have seen this type of "in-house" report previously.  I could see from differences apparent in the full PDPN 945-210 trial report(s) that it would be necessary to compare the published DBRCT reports with the original "in-house" complete trial report(s), where the latter were available.

Facing this task, as would many people experienced with reading and performing systematic reviews, I reverted to the practical approach of looking for a **Cochrane systematic review** pertaining to the use of gabapentin for pain. The most recent review, published in 2005 (Wiffen PJ, McQuay HJ, Edwards JE, Moore RA.  Gabapentin for acute and chronic pain.  The Cochrane Database of Systematic Reviews 2005, Issue 3.  Art. No.: CD005452. DOI: 10.1002/14651858.CD005452) is based on a revision of an earlier review of the use of anticonvulsants to treat pain.  Unfortunately, while the new version contains some additional information, it is sufficiently flawed that it did not spare me the task of performing my own systematic review, for the following reasons:

1. The Cochrane review had no access to the unpublished reports obtained by Greene & Hoffman, which contain large amounts of data and include studies which **did not find a significant benefit from gabapentin.**  These studies were not submitted to, nor published in medical journals, nor made available to the general medical or scientific reader, nor even (apparently) to "medical advisory boards" which consulted for Parke-

Davis or Pfizer. (I found no evidence in the promotional materials I reviewed that the **unpublished** trial results, or even the **existence** of trials which generated negative findings, were shared with physicians and scientists who attended such "advisory board" or "CME" meetings.  There must have been literally dozens, if not hundreds of opportunities for Parke-Davis/Pfizer and its medical agents (including the "clinical investigators" who participated in the unpublished trials) to share the unpublished evidence with the very doctors who were being encouraged to prescribe Neurontin.  Given that no one appears to have availed him or herself of such opportunities for full disclosure, it is not surprising that academics or physicians outside what one might call the "Neurontin circle" might have been even more ignorant of what remained occult.)  Hence, the Cochrane 2005 systematic review of gabapentin is **irremediably compromised by "publication bias"**, although the Cochrane reviewers at Oxford University may not have realized this.  During my visit to your Boston office in April 2008, you showed me internal e-mail correspondence from Pfizer indicating that Pfizer had been in touch with Professors Wiffen and McQuay during the preparation of the 2005 updated review.  Presumably Pfizer could have shared all remaining unpublished data with the Oxford pain group so as to render the updated 2005 review complete and authoritative, had the company so wished.  The Cochrane 2005 review authors dealt with this question only by stating that *"Publication bias was not explored as current methods are not reliable"*. (Wiffen PJ et al. 2005. p. 3)

2.  Similarly, the Cochrane reviewers did not enjoy access even to the real (unexpurgated) details of published clinical trials (e.g. Gorson 1999).  The original unpublished but detailed study publications (ParkeDavis/Pfizer documents critically appraised in an Appendix to my report) show that some of the statistics utilized for the Cochrane review **do not correspond with the real data**.  Notably, the denominators for the placebo and gabapentin groups are at times inappropriately recorded.  Restricting the denominator to only some of the subjects (e.g. those who completed the trial) violates conventional "intention to treat (ITT)" principles, which are designed to ensure that all experimental subjects are accounted for, not just those whose outcomes please or interest the investigators.  The Cochrane 2005 "methods of the review" section states explicitly that *"Intention-to-treat analysis was not carried out and patients who dropped out of studies were not included in the analysis"*.  I cannot understand why this approach was taken, given the well known problems that arise in the interpretation of studies from which experimental subjects are lost to follow up.

3.  Two trials included in the 2005 Cochrane review appear to be of very doubtful veracity, such that I could not myself conclude that it was reasonable to compare them in a systematic review with the other, apparently genuine trials.  The Cochrane reviewers state that they confirmed from Perez 2000 that the study was randomized and double blind, but this does not seem plausible from the original study report, a < 1-page letter in the American Journal of Medicine.  Similarly, the Cochrane reviewers took at face value Simpson 2001, a peculiar study published in a new and obscure journal, the purported results of which Pfizer and its expert correspondent Dr. Robert Dworkin considered highly suspicious. (Pfizer_LKnapp_0060187-91 and 0083148-50)  The publication of Simpson 2001 in the  Journal of Clinical Neuromuscular Disease 2001 does not meet standard reporting requirements.  The Cochrane reviewers could have, but did not note

this.  However, had they been aware of Pfizer's concerns about the validity (or even real existence) of this study, I wonder whether they would have chosen to include this study in their systematic review.

4.  Two trials included in the Cochrane 2005 review (Dirks 2002 and Pandey 2002) are of doubtful relevance to the questions I was asked to address.  Dirks 2002 relates to very brief (4 hour) post-operative assessment of surgical patients for endpoints not shared with and of very doubtful relevance to other studies, whereas Pandey 2002 relates to ventilator-dependent patients with Guillain-Barre syndrome, a very specialized situation also not relevant to the other studies or the questions I sought to answer.  (I subsequently identified a large number of other surgical or peri-operative studies which are similarly irrelevant to the outpatient prescribing of gabapentin, which is evidently the basis for the lawsuit in which my opinion is sought.)

5.  The Cochrane review is also technically flawed insofar as the Forrest plot figures are mislabeled.  This makes it difficult to know what outcomes are being reported, and would lead the lazy or superficial reader to peruse only the Abstract and perhaps accept the conclusions at face value, without troubling to figure out what the mislabeled Forrest plots really mean.  Furthermore, the numbers utilized do not always correspond from one figure to another, nor with the real figures available from the full (unpublished) trial reports.  The authors conclude "enrichment bias" only for studies that specify exclusion of patients who did not achieve satisfactory pain relief on gabapentin, whereas I conclude at least potential "enrichment bias" for studies (e.g. Backonja 1998, Rowbotham 1998) which excluded patients previously treated with or "hypersensitive" to gabapentin.  In my opinion, such exclusions could selectively remove from the randomized population those patients who had failed to receive benefit from, or who experienced toxicity from gabapentin, rather than fairly representing "all comers" presenting for screening.  Unfortunately, despite the eminence of its authors, the Cochrane 2005 review is generally too sloppy to be considered reliable, even if one were not aware of the omitted unpublished studies which comprise a very substantial fraction of all patients experimentally exposed to gabapentin in DBRCT.

6.  Additional studies have been completed and reported (relatively large unpublished reports and smaller published studies) since completion and publication of the Cochrane review.

When I looked initially at the 2005 Cochrane systematic review in your Boston offices on April 1st, you may recall that I was surprised at the mislabeling of figures and convinced that I could not be looking at the final published Cochrane systematic review.  I confirmed that I was by an independent search, and notified the lead author (PJ Wiffen) by email.  He subsequently confirmed by return email the mislabeling of figures and indicated his plan to correct this.

I later identified another more recent systematic review of the treatment of painful diabetic neuropathy (Wong MC, Chung JWY, and Wong TKS.  Effects of treatment for symptoms of painful diabetic neuropathy: systematic review. BMJ 2007;335:87; doi:10.1136/bmj.39213.565972.AE).  However this review did not obviate

the need for our own meticulous systematic review, as it only concerned one condition (PDPN) and enjoyed no access to the **unpublished** experimental data for gabapentin.

On July 29, 2008 you sent me electronically an "Expert Report of Nicholas P. Jewell, Ph.D." prepared by Dr. Jewell of the University of California School of Public Health, and bearing the same date.  This document is discussed briefly later in my report.

**b)  Decision to undertake our own systematic review:**

It thus became apparent that I would have to undertake my own systematic review involving a complete and thorough critical appraisal of all available trials (published and unpublished) and a meta-analysis of those trial outcomes which are amenable to meta-analysis (pre-defined standardized outcomes common to more than 1 DBRCT).  Before proceeding to detailed evaluation of the results of individual trials, my Vancouver colleagues and I discussed and agreed on the following strategy for an independent Cochrane systematic review, utilizing the standard Cochrane hierarchy of clinical outcomes adapted to this project.  We were influenced as appropriate by the principles adopted by Wiffin PJ et al in the 2005 Cochrane review of gabapentin.  Note that a fundamental principle of such reviews is that the methodology should be transparent, the strategy clear, the quality of the work unimpeachable and the results **reproducible** by anyone following the same strategy. Obviously it would be desirable for the results of my systematic review to be made public at the earliest possible opportunity.

**c) Strategy for independent Cochrane systematic review of gabapentin for pain**

**Background:**

Controlled trials of gabapentin for pain use varying outcomes, some of which are incompatible for meta-analysis.  There is no "consensus" on the most meaningful outcomes in acute or chronic pain.  Some frequently proposed useful measures include:

- Percentage of patients achieving $\geq$ 50% reduction of individual pain scores on numerical rating scale (NRS) or visual analog scale (VAS) at pre-specified "endpoint" vs. baseline;
- Percentage of patients achieving $\geq$ 2-point reduction in a 10-point NRS (or VAS);
- Percentage of patients achieving "much" or "moderate" overall improvement, rated as either 1 or 2 on a self-rated 7-point categorical rating scale, the Patient Global Impression of Change (PGIC), or an analogous 7-point scale.

Note that the mean difference in pain scores between groups, unless dramatic, tells one almost nothing about how the individual patients have responded, or the probability that one patient treated by one doctor can expect meaningful benefit (or harm).

We considered this variability in how results of drug studies for pain are reported and interpreted.  After considering how the Cochrane Pain Group (Wiffen PJ et al) chose

its hierarchy of outcome measures for the 2005 Cochrane systematic review of gabapentin, as well as other views on meaningful outcomes in pain studies and basic common sense concerning outcomes most meaningful to patients suffering from clinically significant pain, we agreed on the following outcome hierarchy before commencing our meta-analysis.  The hierarchy follows the usual Cochrane practice for ordering the importance of events which occur during a DBRCT, i.e. mortality, serious adverse events, etc. – a standard of reporting common to the best modern clinical trials:

**Hierarchy of outcomes** adopted on July 8, 2008 for meta-analysis (all by true Intention to Treat/ITT, whereby all patients exposed to at least one dose of the study drug are accounted for).

1.  Mortality (typically not expected in short term pain studies, except for cancer)

2.  Serious adverse events (SAE)

3.  Withdrawals due to adverse events (WDAE)

4.  Total withdrawals

5.  Total adverse events (AE, as patients experiencing AE and as individual most clinically relevant adverse events (where available and comparable across multiple studies)

6.  Validated measures or obvious measures of improvement in global function including return to work, study, activities of daily living

7.  $\geq 50\%$ reduction in pain score (NRS, VRS) from baseline to endpoint (categorical variable, as used by Cochrane pain group), **where this was a pre-defined primary or secondary endpoint in a trial** (avoids post-hoc analysis; any drop out from a trial whose categorical status is not reported will be assumed **not** to have achieved the desirable outcome)

8.  Mean between-group difference in change of pain score (NRS, VRS) from baseline to pre-defined endpoint by true intention to treat (ITT) – **where this was the pre-defined primary endpoint in a trial** (NB: where true ITT is impossible due to missing observations, we will discuss for that trial the potential bias arising from substitution of last observation carried forward (LOCF) data, or omission of data from early drop-outs)

9.  % of patients achieving "much improved" or "moderately improved" (categorical variable, as used by Cochrane pain group) on Patient Global Impression of Change (PGIC, values 1 ["much improved"] and 2 ["moderately improved"] on a 7-point ordinal scale) **where this was a pre-defined primary or secondary endpoint in a trial**  (avoids post-hoc analysis; any drop out from a trial whose score is not reported will be assumed **not** to have achieved the desirable outcome)

10. Descriptive statistics:

    a) Total adverse events (AE) experienced during each study which reported total AE (one patient may experience more than one AE – such statistics are not suitable for meta-analysis)

    b) Summary of PGIC for all studies which reported this 7-point outcome as table and graphical (histogram) presentation (predetermined rule, July 8, 2008: presentation will be by total numerator = total N for each treatment arm for each of 7 PGIC categories [1, 2, … 7] divided by the true denominator = total N randomized to each treatment group) across all studies, for placebo, gabapentin, or other comparators)

**Search strategy:**

    Along with my colleague Dr.Vijaya Musini, I used a variety of conventional search strategies as well as frequent Google searches and searches prompted by identification of references from research reports of RCT, reviews, systematic reviews, Parke-Davis/Pfizer promotional materials, the unpublished Parke-Davis and Pfizer documents you sent me in March 2008 as a CD, and any other source we could identify. We identified some references missed by the conventional computer-based search strategies.  Some of these have also been missed by other authors of review articles and systematic reviews featuring gabapentin.  We decided to exclude trials which dealt only with the peri-operative setting, on the grounds that the results are inapplicable to the outpatient setting and the methodology is typically entirely different from the outpatient trials.  Dr. Musini ran several formal computerized literature searches using strategies including the following approaches.  The results of these searches are widely available and therefore redundant to list in this report, but they are available upon request.

**Database: EMBASE <1980 to 2008 Week 29>**
Search Strategy:
--------------------------------------------------------------------------------
1    gabapentin.mp. or exp GABAPENTIN/ (10805)
2    randomized clinical trial.mp. (6809)
3    randomised clinical trial.mp. (849)
4    randomized.mp. (247310)
5    randomised.mp. (33532)
6    2 or 3 or 4 or 5 (263104)
7    double blind.mp. (102116)
8    1 and 6 and 7 (365)
9    neuropathic pain.mp. or Neuropathic Pain/ (7571)
10    8 and 9 (66)
11    from 10 keep 1-66 (66)

**Database: Ovid MEDLINE(R) 1950 to Present with Daily Update**
Search Strategy:

```
--------------------------------------------------------------------------------
1    gabapentin.mp. or exp GABAPENTIN/ (2667)
2    randomized clinical trial.mp. (7560)
3    randomised clinical trial.mp. (873)
4    randomized.mp. (359665)
5    randomised.mp. (35941)
6    2 or 3 or 4 or 5 (368424)
7    double blind.mp. (118040)
8    1 and 6 and 7 (229)
9    neuropathic pain.mp. or Neuropathic Pain/ (4843)
10    8 and 9 (40)
11    [from 10 keep 1-66] (0)
12    1 and 6 and 9 (88)
13    from 10 keep 1-40 (40)
```

**Database: MEDLINE and**
**Database: Cochrane database of systematic reviews: Key words : gabapentin,**
**randomized , double blind, neuropathic pain**

**Database: DARE**

**Database: Cochrane CENTRAL**

**Database: International Pharmaceutical Abstracts <1970 to July 2008>**
**Search Strategy:**

```
--------------------------------------------------------------------------------
1    gabapentin.mp. or exp GABAPENTIN/ (540)
2    randomized clinical trial.mp. (440)
3    randomised clinical trial.mp. (40)
4    randomized.mp. (20022)
5    randomised.mp. (1821)
6    2 or 3 or 4 or 5 (21582)
7    double blind.mp. (13775)
8    1 and 6 and 7 (24)
9    from 8 keep 1-24 (24)
```

      The only DBRCTs discovered through a search independent of these techniques are apparently unreported trials, described only in press releases and brief webpage articles on the website (http://www.depomedinc.com/view.cfm/1285/Our-Pipeline) of Depomed Inc. of Menlo Park, CA.  I sent e-mail requests for additional details to the company on July 27 and July 29, 2008 for additional details, but these were not responded to.  The trials are described briefly below, since there is no information suitable for critical appraisal, summary, nor for meta-analysis, but the failure to publish the results may reflect information which is relevant to my overall conclusions.

**List of references reviewed and critically appraised:**

The Appendix labeled "APPENDIX – GABAPENTIN PROJECT Pain Studies Summary Matrix – FINAL – August 7, 2008 – Dr. Thomas L. Perry" lists the published and unpublished studies critically appraised, including the few studies which we deemed inappropriate to include in our meta-analysis.  The following studies were not critically appraised: Simpson 2001 (of questionable validity, see discussion below), 1032-004/720-04481.pdf (sub-study of gastroprotection, irrelevant), McCleane 2000 (not suitable for meta-analysis due to inadequate reporting), Spira 2001 (migraine prophylaxis study, not suitable for meta-analysis). The full bibliographic references are included in the left hand columns of this matrix.

**Critical appraisal of articles:**

I began the critical appraisal of articles by comparing the published and unpublished reports of the Gorson and Backonja trials reporting the use of gabapentin for PDPN to identify the key issues for critical appraisal.  I then constructed tables to use as templates so that we could perform a similar critical appraisal for each study we identified.  What may not meet the eye is the enormous amount of work necessary to review thoroughly the unpublished reports, as well as to understand the subtle implications of omissions or varying ways of presenting data in the published reports (whether Parke-Davis/Pfizer designed trials or independently designed experiments).

The individual critical appraisal study summaries of trials are presented in an Appendix to my report designated **GABAPENTIN PROJECT Study detail summaries.**  This includes:

- 25 published and unpublished study reports describing experimental use of gabapentin for chronic pain which were suitable for meta-analysis of at least some outcomes;
- 6 study reports describing use of gabapentin for acute pain which were not suitable for our meta-analysis of chronic pain outcomes;
- 2 published study reports describing use of gabapentin for chronic pain which were not suitable for meta-analysis due to reporting or study quality issues.

Due to the immense time requirement of this project, I reviewed and accepted the summaries of the 5 unpublished acute pain trials prepared by Ms. Kelsey Innes, without having attempted to review personally the hundreds or thousands of pages in the PDF versions of the trial reports.  Ms. Kelsey demonstrated a meticulous mathematical approach which I checked carefully for the chronic pain studies of Gorson, Rowbotham and Rice; I am therefore confident of the accuracy of her extraction of results into the following study detail summaries: Protocol 1035-001 and Protocol 1035-001, Addendum B, both concerning pain after dental surgery; Protocol 1035-002 concerning post-operative pain after major orthopedic surgery; Protocol 1032-001 concerning post-

operative dental pain; and 1032-002/3 concerning pain from osteoarthritis (see Appendix).

**These unpublished trials concern acute pain.  They are not suitable for meta-analysis with the chronic pain trials**.  **However, they are highly relevant to the questions you posed, and fascinating insofar as they show unequivocally and repeatedly that gabapentin is not useful for a variety of types of acute pain.**  It is a pity that they were not published soon after their completion and Parke-Davis/Pfizer's internal and confidential reporting of the results during the year 2000.

### Presentation of evidence (Appendices):

**1.  Matrix of studies identified and critically appraised:**

You supplied me on April 1, 2008 with a matrix of studies of which you were aware.  I retained the basic structure of the matrix but modified the headings or presentation slightly so as to identify trials in the chronological order in which the trials were conducted.  Because of the large numbers of electronic documents to be handled, it became impractical to renumber the studies when we identified 3 more trials on July 26-28, 2008.  Therefore the final 3 trials (Study No. 23, 24, 25) in the chronic pain section of the matrix are **not** shown in the appropriate chronological order.  The matrix also serves as the reference list for studies reviewed, including the unpublished Parke-Davis/Pfizer studies.  **This matrix is labeled: APPENDIX - GABAPENTIN PROJECT Pain Studies Summary Matrix - FINAL – August 8, 2008, Thomas L. Perry, M.D.**

**2.  Detailed critical appraisal study summaries:**

This Appendix, GABAPENTIN PROJECT Study detail summaries, presents the basic methodology, outcomes, and statistical or critical appraisals of each study reviewed in detail, along with my observations or conclusions particular to each study.

**3.  Meta-analysis summary tables:**

The evidence regarding outcomes from the above hierarchy is extracted from the critical appraisal of each DBRCT (and safety outcomes as appropriate from open RCT) in the form of summary tables presented in the appendix for each study meta-analysed.  These are labeled as: **APPENDIX - GABAPENTIN PROJECT Pain Studies Summary Outcomes for Meta-Analysis - FINAL – August 8, 2008 AND July 30, 2008, Thomas L. Perry, M.D.**

**4.  Meta-analysis Forrest plot figures:**

Forrest plots, popularized by the Cochrane Collaboration, provide a simple way to summarize large amounts of data in a format that can easily be understood and

interpreted by people familiar with the format.  These will be familiar to any medical scientists, physicians experienced with the modern medical scientific literature, and epidemiologists or clinical trial specialists who may look at this report.  Hopefully they will also be intelligible to the Court.  These are presented for the outcomes described above, using data from those studies which contribute usable data to the meta-analysis (see our pre-determined rules of July 8, 2008 above).  The Forrest plots are labeled as: **APPENDIX - GABAPENTIN PROJECT Forrest plot outcomes of Meta-Analysis - FINAL – July 30, 2008, Thomas L. Perry, M.D.**

**NB:**  The Forrest plot analyses represent results obtainable by a meticulous critical appraisal of published and unpublished reports.  For some of the unpublished reports, because of the detail available to someone willing to read them meticulously, it is possible to be more certain of numerators and denominators for experimental groups (placebo, gabapentin at various doses) and for outcome measures (total AE, NRS mean pain score, PGIC, etc.) than for some of the published reports.  However such analyses (Forrest plot, meta-analysis, systematic review) are still only as reliable as the data input into the statistical analysis software (Cochrane RevMan).  Therefore I reserve the right to modify the Forrest plots and any other aspect of this analysis should I subsequently receive information indicating that the data inputs are incorrect in any way, or if additional data suitable for meta-analysis come to light (e.g. further unpublished trials, or published trials missed by the literature search technique).  For example, I understand from you that Pfizer performed an additional post-hoc analysis of the Serpell trial of patients with "mixed neuropathic pain" (945-306).  I have not seen this post-hoc analysis, but I understand that it may have been performed to segregate patients with PHN from those with PDPN or with other causes of "neuropathic pain" (e.g. CPRS, who constituted 28% of the patients in this trial).  Were the results of this analysis available, it might be possible to re-analyse the data from the Serpell trial (945-306) so as to EXCLUDE data from patients with PHN and/or to analyse ONLY data from patients with PDPN, depending on how these results are presented in Pfizer documents or reports.

## VII) <u>EVIDENCE GLEANED FROM SYSTEMATIC REVIEW</u>:

The beauty of the Forrest plot analysis is that it provides apparently simple answers to certain questions.  By pooling all the available information from all relevant DBRCTs it yields, for example, the "weighted mean difference" (WMD), the apparent best estimate of the mean effect of gabapentin vs. placebo on an 11-point pain scale.  For a categorical endpoint, meta-analysis yields a number needed to treat (NNT) with gabapentin (vs. placebo), e.g. for one patient to experience a $\geq$ 50% reduction in the same pain scale from baseline to study "endpoint".  The results of these comparisons are presented below in the order of the outcomes hierarchy described above:

### <u>Hierarchy of outcomes</u>:

NB: During labeling of our Forrest plots the code numbers (e.g. "Outcome 03", or "Outcome 04") may not be consistent.  I have listed the "Outcomes" in the form they are shown in the Forrest plots, but ordered the English language outcomes (e.g. "Mortality", "Total Withdrawals") in the same order as in our prespecified hierarchy of outcomes.

### 1.  Mortality, Outcome 01:

In short term studies there is **no difference** between gabapentin and placebo (RR with 95% CI = 0.92 (0.21, 3.97), and (from the few small pertinent DBRCT which are meta-analysable) **no difference** between gabapentin and active comparators.

### 2.  Serious adverse events (SAE), Outcome 02:

In short term studies there is **no difference** between gabapentin and placebo (RR with 95% CI = 1.15 (0.74, 1.77), and **no difference** between gabapentin vs. active comparators (RR with 95% CI = 1.21 (0.47, 3.10).

### 3.  Withdrawals due to adverse events (WDAE), Outcome 04:

In short term studies there is a **statistically significant difference** between gabapentin and placebo (RR with 95% CI = 1.36 (1.07, 1.73), **favouring placebo over gabapentin**. **Significantly more patients treated with gabapentin withdrew from trials due to adverse events, with absolute risk increase = 2.9%, NNH =35**, typically over a short period (days to a few weeks). Among the much smaller number of patients enrolled in trials of gabapentin vs. active comparators (total patients = 210, vs. total patients 2,708 for placebo-controlled trials of gabapentin for pain) **no difference** is observed between gabapentin vs. active comparators (RR with 95% CI = 1.21 (0.47, 3.10).

### 4.  Total withdrawals, Outcome 03:

In short term studies there is **no difference** between gabapentin and placebo (RR with 95% CI = 1.06 (0.90, 1.24), and **no difference** between gabapentin vs. active comparators (RR with 95% CI = 1.04 (0.55, 1.94)

**5.  Total number of patients with adverse events (AE), Outcome 09:**

In short term studies there is a **statistically significant difference** between gabapentin and placebo (RR with 95% CI = 1.25 (1.17, 1.34) **favouring placebo over gabapentin**. **Significantly more patients treated with gabapentin than with placebo experienced AE, with absolute risk increase = 12.4%, NNH = 8,** typically over a short period (days to weeks).  In the only trial of gabapentin vs. active comparator (amitriptyline) which reports this outcome in a form suitable for meta-analysis **no difference** is observed between gabapentin vs. amitriptyline (see Forrest plot for Morello trial).

**Patients treated with gabapentin experienced significantly more of the following AE's, compared with those treated with placebo (not all trials compare similar outcomes, see Forrest plot Appendix for further details):**

   a)  **Dizziness: absolute risk increase 17.8%, NNH = 6**
   b)  **Somnolence:  absolute risk increase 15.3%, NNH = 7**
   c)  **Confusion: absolute risk increase 10.1%, NNH = 10**
   d)  **Ataxia: absolute risk increase 10.1%, NNH = 10**
   e)  **Lethargy: absolute risk increase 10.1%, NNH = 10**
   f)  **Aesthenia: absolute risk increase 4%, NNH = 25**
   g)  **Lightheadedness: absolute risk increase 13.4%, NNH = 7.5**
   h)  **All CNS events: absolute risk increase 12.5%, NNH = 8**
   i)  **Edema: absolute risk increase 8.9%, NNH = 11**

This shows that the chance that highly selected patients (with lower than average risk for adverse events and higher than average expectation of benefit) would experience an adverse event during gabapentin short term therapy (vs. placebo) was approximately the same as the chance that they would perceive a benefit (see below).

**6.  Validated measures or obvious measures of improvement in global function including return to work, study, activities of daily living:**

No trials reported this outcome.  No relevant information is available as the scores utilized in various trials do not report hard outcomes such as the above.

**7.  ≥ 50% reduction in pain score (NRS, VRS) from baseline to endpoint, Outcome 07:**

In short term studies there is a **statistically significant difference** between gabapentin and placebo (RR with 95% CI = 1.72 (1.36, 2.17) **favouring gabapentin over placebo**. **Significantly more patients treated with gabapentin than with placebo rated their pain as reduced by ≥ 50%, with absolute difference = 13%, NNT = 8,** at the end of study.  However, the definition of such "responders" in most studies appears to include people who dropped out early, almost certainly including some who dropped out because of adverse effects.  Thus the benefit may not be unmitigated.  In the only trial of gabapentin vs. active comparator (nortriptyline) which reports this outcome in a form

suitable for meta-analysis **no difference** is observed between gabapentin vs. amitriptyline (see Forrest plot for Chandra trial).

**8.  Mean change from baseline in NRS/VAS pain score, Outcome 06:**

In short term studies there is a **statistically significant difference** between gabapentin and placebo (WMD with 95% CI = -0.78 (-0.99, -0.58) **favouring gabapentin over placebo.  Gabapentin was associated with a weighted mean difference by the end of study (LOCF) of –0.78, vs. placebo, on an 11-point scale.**  No trial of gabapentin vs. active comparator  reports this outcome in a form suitable for meta-analysis.

**9.  PGIC "moderately or much improved" as % of patients, Outcome 05:**

In short term studies there is a **statistically significant difference** between gabapentin and placebo (RR with 95% CI = 1.78 (1.53, 2.07) **favouring gabapentin over placebo. Significantly more patients treated with gabapentin than with placebo rated themselves "moderately or much improved", with absolute difference = 17.2%, NNT = 6.**  No trial of gabapentin vs. active comparator reports this outcome in a form suitable for meta-analysis.

**10. Descriptive statistics:**

Total adverse events (AE) are reported by study in the **APPENDIX –GABAPENTIN PROJECT – Summary tables for Forrest plot analysis.**  They are not amenable to analysis since they have no appropriate denominators (one patient may have more than one AE).  Histograms of outcomes on PGIC have been included in some of the study detailed summary reports, and an overall histogram is also presented.


**What does this all mean?**

It is important not to "lose sight of the forest for the trees".  Overall, this analysis shows that for the available published and unpublished studies of gabapentin for chronic pain:

a) The average apparent benefit on an 11-point pain score over a number of weeks, compared with placebo, was less than 1 point (best estimate: 0.78 point, range of statistically valid estimate: about 0.6 to 1 point on an 11-point scale).  This overall best estimate of the "benefit" of gabapentin is essentially clinically meaningless.  It is substantially less than the estimate of the effect of this "primary outcome" obtained from the published trials which formed the basis for the aggressive marketing of Neurontin by Parke-Davis/Pfizer and its medical allies.

b) The probability that a patient might achieve a more clinically meaningful benefit, expressed as the chance of achieving a $\geq$ 50% reduction in the same pain score from start to finish of the clinical trial (or withdrawal from it) looks on the surface

to be somewhat more interesting: one of eight patients taking gabapentin rather than placebo might expect this outcome; NNT = 8.

c)   Similarly, one in six patients taking gabapentin rather than placebo could expect to achieve "moderate or much improvement" on end of study PGIC, NNT = 6.

In return, about one in thirty-five people taking gabapentin rather than placebo could expect to be forced out of a short term study, due to gabapentin's adverse effects, NNH = 35.  Similarly, one in eight patients taking gabapentin rather than placebo could expect an adverse effect such as dizziness, somnolence, impaired thinking (confusion), lack of energy (lethargy, asthenia), or edema.

Unfortunately, even the most intensive analysis of study reports provides little real understanding of what this all really means.  **The patients do not truly speak to us through the publications, whether to describe their experience of adverse effects (harms) or of benefits.**  And real understanding of the clinical significance of these results is not quite so simple for the following crucial reasons:

a)   The clinical trials typically recruited only the healthiest available patients, taking the fewest interacting drugs, and with the fewest risk factors predictive of trouble with gabapentin, such as impaired kidney function, impaired mental or cognitive status, etc.  This concern relates to the question of effectiveness, since harms from gabapentin are virtually certain to be higher in the real world than in the "glass fishbowl" environment of a DBRCT.

b)   The trials mostly did not enroll patients previously exposed to gabapentin, or who had experienced untoward effects or no benefit from gabapentin.  This "enriched" the study populations so as to artificially favour gabapentin, and one would not expect these results to reflect subsequent real world experience.  This also relates to the question of effectiveness, since it is reasonable to expect that the DBRCT exaggerated any apparent benefits of gabapentin, compared with the real world.

c)   An outcome such as the $\geq 50\%$ reduction in pain appears superficially to be rather attractive.  Yet it has no known meaning in real life – for example, it is not known whether a patient experiencing a 50%, or even a 75% reduction on a pain scale might return to work, sporting activities, or escape seclusion to resume an active social life.  Furthermore, the design of some major trials appears to have allowed patients who **dropped out of the trials** because of adverse events to count as "responders" (pain score reduction $\geq 50\%$), even if they were burdened by side effects.  This makes no clinical sense, as it would be equivalent in some ways to an inebriated person who is "feeling no pain".

d)   The unblinding effect referred to below must almost certainly have exaggerated the apparent benefits of gabapentin.  Most patients who enroll in clinical trials do so in the hope of a personal benefit.  Those who enroll them seldom reflect in person the supposed "equipoise" (uncertainty as to whether a drug will "work")

reflected in submissions to ethics committees – they are inevitably enthusiasts for the new treatment.  Thus patients who suspect they are taking the active drug are more likely to experience "benefit" than those who suspect they are taking the placebo.  It is clear from several experiments that formally tested blinding that it is hard to keep people blinded when they take gabapentin, and this is also suggested by Professor Jewell's analysis.

### Sensitivity analyses:

Professor Nicholas P. Jewell's report dated July 29, 2008 raises the specific question of whether the Backonja 1998 trial results favouring gabapentin over placebo for change in mean NRS pain scores over 8 weeks may be **mostly or completely related to unblinding**, and indeed may not represent a true analgesic effect of gabapentin.  Note that the same criticism likely applies to many or all of the other studies we meta-analysed, and some of them frankly disclose unblinding due to the toxicity of gabapentin (notably van de Vusse 2004).

Although unblinding may inject a systemic bias into all trials of gabapentin, we repeated the Forrest plot meta-analysis after extracting **only the data from the Backonja 1998 trial in PDPN**.  Similarly because PHN has an obviously different pathophysiology and clinical character from PDPN or other pain syndromes, and because gabapentin holds US FDA approval for this indication, **we also repeated the same analysis after extracting only the data from the two trials of gabapentin for treatment of PHN (Rowbotham 1998 and Rice 2001).**  The results of these sensitivity analyses are as follows.

**a)  All pain trials of gabapentin vs. placebo EXCEPT Backonja 1998:**

The weighted mean difference (WMD) in pain score declines trivially from – 0.78 to –0.74, still favouring gabapentin. (Sensitivity Analysis No. 1, p.12, vs. p.7 of the Forrest plot Appendix for gabapentin vs. placebo)   There is little difference because the number of patients in the Backonja trial is small, compared with all other trials.  There is a much larger difference between the point estimate for the Backonja trial and the other 3 trials in PDPN seen in the full data Forrest plot (Forrest plot Appendix for gabapentin vs. placebo, p.7).   Similarly, removing the Backonja trial data does not change the estimate of NNT for PGIC from 6 (Forrest plot Appendix for gabapentin vs. placebo, p.13).

**b)  All pain trials of gabapentin vs. placebo EXCEPT PHN trials:**

This sensitivity analysis reveals a more interesting result, at least for the mean difference in pain score, which shrinks (with extraction of the PHN data) to a point estimate of – 0.36 which is now barely statistically significant (95% CI, - 0.63, -0.09) almost touching the vertical line of equivalence on the Forrest plot (Forrest plot Appendix for gabapentin vs. placebo, p.15).  Similarly, with the PHN trial data extracted, the chance of "moderate or much improvement" on PGIC is slightly less favourable to gabapentin, increasing

from NNT = 6 to NNT = 6.7 (Appendix, p. 14), while the probability of achieving a $\geq$ 50% reduction in pain score during the trial declines commensurately from NNT = 8 to NNT = 9 (Appendix, p. 16).

These results give us the best available summary of the effects of gabapentin vs. placebo in DBRCT.  However, they still omit information from additional unpublished trials such as those performed on behalf of Depomed Inc. using a slow release formulation of gabapentin vs. placebo for PDPN and for PHN.  It is possible that inclusion of data from these and any other unreported trials still unknown to me might further refine the estimate of gabapentin effects from meta-analysis.

## How should Dr. N.P. Jewell's report affect interpretation of this meta-analysis?

This is a crucial point.  After re-analysing the individual patient data from the 165 patients randomized in the Backonja 1998 study of gabapentin for PDPN, Dr. Jewell concluded that unblinding of the gabapentin recipients by adverse effects inescapably altered the results so as to create artificially the statistical impression of an analgesic effect.  The final sentence at page 14/15 in Dr. Jewell's report is telling: ***"It is my view that my new, more thorough, analysis completely undermines the claims of treatment efficacy made in Backonja et al."***

Although I have read and comprehend Dr. Jewell's report, I defer to his statistical expertise and acumen in a specialty different from my own.  However, it should obviously be unsettling to anyone who wants to seek truth from the clinical trial data. **The same concerns had troubled me as I read the scientific reports of clinical trials.** Well before I was aware of Dr. Jewell's interest in this matter, let alone his opinion, it struck me as obvious in many of the DBRCT reports (both published and unpublished) that early adverse effects must unblind the patients, and often the examiners.  In the Backonja trial, for example, 3 of 84 patients randomized to gabapentin withdrew during the first 7 days (at days 2, 5, and 7) and were dropped from the analysis.  My detailed reading of the full unpublished trial report left me wondering about the same question as that ultimately addressed statistically by Professor Jewell.  See my detailed 6-page critical appraisal study summary in the Appendix, which was virtually complete on April 7, 2008, long before I saw Dr. Jewell's opinion on July 29, 2008.  Van de Vusse 2004, who may have looked most scrupulously for this effect, found that **unblinding of both patients and doctors** was obvious and significant, because the toxicity of gabapentin was so apparent to those taking it. (See also this study detailed summary in Appendix.)

Let me re-emphasize that when patients expect more benefit from a new drug to which they gain privileged access in a clinical trial, unblinding should be **expected** to increase the apparent effect of the drug in a way which might not occur under routine use, when expectations are inevitably lower.

There is no reason to think that the other large DBRCT were exempt from the effect observed by Dr. Jewell in the Backonja trial.  This convinces me that even our

meta-analysis of gabapentin vs. placebo **significantly exaggerates the apparent analgesic effects of the drug.  Since these are small to negligible to begin with, Dr. Jewell's re-interpretation of the Backonja trial to the effect that gabapentin has essentially <u>no analgesic effect</u> is perfectly consistent with our results.**


<u>**May additional evidence from unpublished DBRCT yet come to light?**</u>

**It may.  Indeed it probably will in the "fullness of time"**.  While double checking on July 26-28, 2008 via a Google internet search for any additional studies we might have missed inadvertently, I was able to identify the following:

**a) Additional information regarding dose-effect relationships:**

Rowbotham MC, Diamond C et al.  Gabapentin for painful HIV neuropathy blinded, randomized trial comparing high and low doses. (Abstract, 10th World Pain Conference 2002) – found at http://www.painstudy.ru/10wcp/anticonvulsants.htm.  I could not find any formal publication of this study, which was sponsored by an external research grant from Parke-Davis/Pharmaceuticals/Pfizer Inc.  Dr. Rowbotham acknowledged that he had been a consultant to and received grant support from the sponsor. This study compared gabapentin at 900 mg/d with gabapentin at 3600 mg/d, but the abstract does not suggest that there was any placebo group.  The abstract results and conclusions read as follows:

*"RESULTS: Sixty-five subjects formed the ITT sample.  Subjects on low dose GBP reported a 28% reduction in pain compared to 41% reduction with high dose GBP (p=.12).  In the EE sample (n=58), pain declined by 30% with low dose GBP and 46% with high dose GBP (p=.04).  Secondary measures showed numerical advantages with high dose GBP, but none reached statistical significance.*
*"CONCLUSIONS: Pain declined during 4 weeks of gabapentin therapy at both 900 and 3600 mg/day.  Secondary measures also favored high dose gabapentin, but more subjects discontinued the study due to adverse effects..."*

When I asked Mr. Rona of Greene & Hoffman by telephone whether he was aware of this study or any further publication, he replied that he had information describing significant costs absorbed by Parke-Davis/Pfizer to finance the study.  **Why was this study of Professor Rowbotham's never published?   The obvious explanation is that publication or release of the complete study results would have provided additional evidence that the overall effects of larger doses of gabapentin were undesirable.**

**b)  Evidence that additional trials were performed:**

At (http://www.clinicalstudyresults.org/documents/company-study_1926_0.pdf) I found a 6-page PDF document identified as (01000006060590\1.1\Approved\20-Sep-2006 11:36) and also identified as (PhRMA Clinical Study Synopsis Protocol A9451004 06

September 2006 Final).  This is a report of a "Phase 4" (post-marketing) 11-week open-label multicenter study of gabapentin titrated to a clinical effect, or to 3600 mg/d in 10 study centers in Brazil.  This study was initiated in 2003 and completed in August 2004.  I cannot tell whether the results may have been published or utilized in some other standard "published" format I could not locate, whether in Brazil or elsewhere.  However, like the Rowbotham study noted immediately above, this Pfizer document may hint that other studies of gabapentin for pain were performed under Parke-Davis/Pfizer sponsorship, some of which might provide scientifically useful information which has not yet been revealed.  Since Parke-Davis and Pfizer had no compunction about republication of studies in multiple formats and venues, it is unlikely that any conclusive positive study results would have been kept secret.

As an open-label study, the only contribution this Brazilian study (A9451004) can make to my understanding of gabapentin is its report that only 74/95 patients completed the trial (21 discontinued), 8/95 discontinued to adverse events, and that the proportion of patients experiencing adverse events was at the higher end of the range found in other studies, e.g.:

- somnolence 32/95 (34%)
- dizziness 28/95 (30%)
- edema 14/95 (15%)

While Brazilians are recognized internationally for many things, somnolence is not one of their defining national characteristics.  This study may inadvertently have provided further evidence that the CNS toxicity (neurotoxicity) of gabapentin is dose-dependent but the presentation of results does not make this clear.

### c)  Additional DBRCT of gabapentin for PDPN and PHN with unavailable results:

The most intriguing finding I made was by looking for additional gabapentin trials by searching various on-line clinical trial registries.  This led me on July 26, 2008 to the website of Depomed, a California pharmaceutical company developing slow or controlled release formulations of off-patent drugs, including gabapentin.  The Depomed website (http://www.depomedinc.com/view.cfm/1285/Our-Pipeline) includes press releases and very brief summaries of several DBRCT of gabapentin whose results could add to our understanding of this drug (in the setting of DBRCT) but are not available.  I attempted to obtain more detailed results from the company by e-mails on July 27 and July 28, 2008 but obtained only an auto-acknowledgement from Mr. Thadd Vargas of Depomed indicating that my e-mail had been received and read on July 30, 2008.  This is what can be learned from the company website:

**i. PDPN:**  A multicenter, 4-week, double-blind, placebo-controlled Phase II clinical trial randomized 147 patients to 3 treatment groups – Gabapentin GR (slow release) 3000 mg/d as a once daily dose, Gabapentin GR (slow release) 3000 mg/d divided as a twice daily dose, or placebo.  A Depomed press release dated December 12, 2006 suggests that the combined gabapentin groups achieved a mean difference of -1.19 on an 11-point NRS

(Likert) pain scale compared with placebo, and suggests this was statistically significant ("p = 0.002").  **However, it also suggests that this effect may have been seen predominantly in the once daily dose of 3000 mg, as opposed to the divided dose group (still 3000 mg/d), where the difference was  -0.49 points, "p=0.190".**  While Depomed's CEO John W. Fara, Ph.D. (himself a former Pfizer senior executive) indicated in the press release that *"We are enthusiastic about sharing these data with companies that have expressed an interest in partnering Gabapentin GR with us …"*, he may not have been quite so enthusiastic as he sounded on paper, as the results do not seem to have been published.  Neither has the slow release formulation of gabapentin been brought to market.  This suggests to me that a more thorough analysis of the data might leave a disinterested observer less "enthusiastic".  It is intriguing that Dr. Sherwyn Schwartz, a co-author of the Backonja 1998 JAMA report on gabapentin for DPN, is cited in this press release as favouring the nocturnal effects of Gabapentin GR.  It would be interesting to know Dr. Schwartz' full interpretation of these same data.

**ii. PHN:**  A multi-centre, 10-week, double-blind, placebo-controlled "Phase 3" clinical trial randomized 407 patients to 3 treatment groups – Gabapentin GR 1800 mg/d as a once daily dose (presumably also in the evening), Gabapentin GR 1800 mg/d divided as a twice daily dose, or placebo.  **The press release dated July 10, 2007 indicates that at the 10-week study endpoint, the primary outcome of mean reduction in 11-point NRS pain score was 1.83 for once daily Gabapentin GR, 1.72 for twice daily Gabapentin GR at the same total daily dose of 1800 mg/d, but 1.43 for placebo.  The difference (-0.40 or –0.29, depending on the group) was not statistically significant.** As in so many of the previously reported (or unpublished) trials of gabapentin, the reporting of secondary outcomes in this press release suggests that gabapentin has a pronounced sedative effect.  The same press release indicates that Depomed CEO Dr. Fara regarded the results as *"…very surprising and disappointing to us…"*  and a later article on the Depomed website indicates that a further Phase 3 trial involving approximately 450 PHN patients was initiated in March 2008, comparing Gabapentin GR once/day at 1800 mg/d with placebo, again over a 10-week period.

**Presumably it has not been possible for Depomed to gain licensure for Gabapentin GR, or interest from commercial partners, on the basis of the negative results obtained from the Phase 3 study described above.  From the brief description available on the company website, this appears to be the largest single DBRCT of gabapentin vs. placebo for any variety of pain.**

**One cannot help but note that this large DBRCT in PHN (N = 407) achieved a mean separation of about –0.29 to –0.40 vs. placebo on the 11-point NRS pain scale, a result strikingly similar to that found in the unpublished Pfizer 945-1008 study of PDPN, which was conducted on 389 patients during 2002-2003.  Full access to the results of the above-referenced Depomed trial in PHN, might cast into doubt the efficacy of gabapentin even for the specific and approved indication of PHN.**

**Taken together, the above information about studies whose results have not been fully disclosed suggests that there may be <u>yet more information hidden from</u>**

**the public eye.   If disclosed, as it ought to have been, the real facts might fundamentally alter the results of our meta-analysis – and force "expert" medical perceptions of gabapentin to align themselves more closely with reality.**

### Evidence gleaned directly from the individual trial reports:

Just as one should not "lose sight of the forest for the trees", a meta-analysis is not intended to obscure the "trees" (real facts) from view.  Meta-analysis should help in the search for truth, not hide it.  One would be **obtuse** to ignore important information obtained from a careful review of the available trial reports which relates to the rational clinical questions I proposed earlier in this report.   Before re-approaching these questions, consider some examples of what can be learned from detailed scrutiny of the individual trials:

a)  The following example from a large unpublished trial of gabapentin for PDPN conducted in Europe from 1999-2000 (Reckless 2000) casts a very different light on the question of whether gabapentin has any mean efficacy for pain.  The first figure, excerpted from the unpublished final study report, shows the trial design.

**Parke-Davis 945-224 – European Multinational trial of gabapentin for PDPN, 1998-99 (Reckless) – UNPUBLISHED FINAL STUDY REPORT dated February 7, 2000, p. 43/3214**



FIGURE 2. Number of Patients in the Course of the Study (Screening and Double-Blind Phase)

The graph on this page is excerpted from the same report, showing the observed pain score changes over time. **Need one point out that this graph did not achieve wide circulation amongst the Parke-Davis/Pfizer advisory boards, let alone the general medical world? How many people outside of these two companies have seen this graph?**

**Parke-Davis 945-224 (Reckless) – European multinational study, UNPUBLISHED from page 53/3214, final study report dated February 7, 2000 plus appendices.**



FIGURE 3: Weekly Mean Pain Score (Double-Blind Phase, ITT Population)

**In the same study, even a post-hoc "Responder Analysis" looking for patients who had achieved $\geq$ 50% reduction in pain score, found no difference:**

**Parke-Davis 945-224 (Reckless) – European multinational study, UNPUBLISHED**
**(from 945-224 Final Study Report, p. 57/3214)**

In an additional analysis responders were evaluated. Responders were defined as patients with at least 50% reduction in pain score from baseline to Week 7/Termination, who did not withdraw from the study due to lack of efficacy and did not take any forbidden medication during the study days included in the endpoint calculation. Seven patients with at least 50% reduction in pain were defined as non-responders because they took forbidden medication during the days included in the calculation (placebo: pat. no. 8908; 600 mg gabapentin: 1513, 7209; 1200 mg gabapentin: 5701, 5804, 7905, 8102). Table 15 displays the responders in the treatment groups.

TABLE 15. Responders/Non-responders (ITT Population)

| | Treatment Group | | | |
|---|---|---|---|---|
| | Placebo | Gabapentin 600 mg | Gabapentin 1200 mg | Gabapentin 2400 mg |
| | N = 77 | N = 82 | N = 82 | N = 83 |
| Responders, N (%) | 19  (24.7) | 13  (15.9) | 33  (40.2) | 25  (30.1) |
| Non-Responders, N (%) | 58  (75.3) | 69  (84.1) | 49  (59.8) | 58  (69.9) |
| Total, N (%) | 77 (100.0) | 82 (100.0) | 82 (100.0) | 83 (100.0) |

FIGURE 9: PGIC Score (Double-Blind Phase, ITT Population)

At the end of the double-blind treatment phase in all treatment groups a substantial number of patients assessed their own status as very much or much improved. The percentage of patients with this positive evaluation was higher in the 1200 and 2400 mg gabapentin group than in the placebo or 600 mg gabapentin group. Correspondingly, the number of patients who felt no change or a deterioration of the status was lower in the 1200 and 2400 mg gabapentin group than in the placebo or 600 mg gabapentin group.

A statistical test did not show a statistically significant difference between the gabapentin groups and the placebo group concerning PGIC (p>0.05, ANOVA).

**(945-224 PDPN – summary of PGIC from p. 72/3214 in final report February 6, 2000)**

The above histogram from the same study (Reckless 2000, unpublished) shows no improvement from gabapentin on PGIC and indicates that the effect is not dose-dependent.  It is little wonder that this study was so effectively buried, and Parke-Davis/Pfizer did not make the mistake of replicating it.

Looking **very closely at another study (Rice 2001)** is also revealing.  Consider the example of time course of NRS pain score during treatment with G=1800 mg/d or G=2400 mg/d vs. placebo.  Unfortunately in copying this from a PDF of the original document I have **lost the symbol key**, but the upper line in this case is the placebo, while the lower two lines represent G=1800 mg/d or G=2400 mg/d.

**NB: the curves separate by 1 week (at 1200 mg/d during titration) but <u>do not separate further.</u>**  This may be analogous to the early adverse effect-associated difference in group mean pain scores discerned by Professor Jewell.  It is not clear if this analysis is true ITT, ITT-LOCF, or if some dropouts are not included in pain scores, which may further bias the interpretation of this study (in favour of gabapentin).

**From: Rice et al (published 2001) – April 3, 2000; final study report
945-430-295  appendices, p. 181/1357.**



Looking at the details in a critical appraisal of the detailed unpublished report of the same study (Rice, published 2001) turned up another surprise.  **Could differences in pain, including "responders" or favourable comparison on PGIC possibly relate to more frequent use of amitriptyline in the gabapentin groups?**  (The Table on the next page is copied from Appendix C.2, p. 183/1357 but **abbreviated** for space reasons by

Neurontin: Clinical pharmacologic opinion of Dr. Thomas L. Perry, August 10, 2008    46

omitting drugs which alphabetically follow "dihydrocodeine".  Apart from amitriptyline, I could discern no numerically apparent differences between the groups of patients taking gabapentin vs. placebo.  **However, amitriptyline, which is known to reduce pain in PHN, was more often used by the patients taking gabapentin in both arms of the Rice study than by the placebo group**.)

RR 430-00124                    183 of 1357

Appendix C.2
Neuropathic Pain Medications

Number of patients

Study drug

|  | gaba 1800 | gaba 2400 | placebo |
|---|---|---|---|
| Generic name |  |  |  |
| ACETYLSALICYLIC ACID | 0 | 0 | 1 |
| AMITRIPTYLINE | 31 | 32 | 22 |
| ANADIN /UNK/ | 0 | 0 | 2 |
| APOREX | 14 | 16 | 11 |
| BENZYDAMINE HYDROCHLORIDE | 0 | 0 | 1 |
| CAPSAICIN | 0 | 1 | 0 |
| CARBAMAZEPINE | 0 | 1 | 2 |
| CODEINE PHOSPHATE | 0 | 1 | 3 |
| DIAMORPHINE | 0 | 1 | 0 |
| DICLOFENAC | 0 | 0 | 2 |
| DIHYDROCODEINE | 3 | 3 | 1 |

**From: Rice et al (published 2002) – April 3, 2000; unpublished final study report for 945-430-295  appendices, p. 183/1357.**

**A**mitriptyline was more often used by the patients taking gabapentin in both arms of the Rice study (N=115 randomized for G1800, N=108 randomized for G2400) than by the placebo group (N=111).  Could this influence the pain score results, and other results which depend on it (including sleep)?

Here is another example of why **looking at the details of studies is so crucially important.**  The **unpublished final study report** of Rice et al (published 2002) in appendices at page 197/1357 suggests that the 50% "responder" analysis counts withdrawals due to lack of efficacy as failures, **but allows other withdrawals (e.g. WDAE) to be counted using the patient's final week's pain scores (LOCF).  Thus, "responders" may include people who have to withdraw from the experiment due to toxicity.  This does not appear to make clinical sense.**  By analogy a patient taking morphine who experiences dangerous respiratory depression or disturbing mental status changes would not be considered a clinical success or a "responder", even though pain is almost inevitably suppressed in the presence of significant CNS toxicity from opioids.

### 7.2 Secondary Analyses

### 7.2.1 Objective B

Patients achieving a 50% or greater reduction in mean pain scores between baseline and end of treatment will be described as responders.  Where the baseline and end of treatment mean pain scores are defined as described above.  Comparison the percentage of patients responding to gabapentin 1800mg and placebo will be compared using Cochran Mantel-Haenszel Chi-Square procedures, stratifying by cluster in the model. The procedure will be repeated to compare gabapentin 2400mg and placebo.  Patients withdrawing due to lack of efficacy will be regarded as treatment failure irrespective of the pain reduction experienced.  All other withdrawals will be assessed using the final week's pain scores as defined in the primary objective.

### 7.2.2 Objective C

Protocol 945-295  IAP
Page 6 of 11
C:\dmautop\temp\App D1.doc

**Excerpt of Protocol 945-295 taken from unpublished final study report of Rice et al (published 2002) in appendices at page 197/1357.  Patients who withdraw due to adverse events are defined as eligible to be counted as "responders" (successes).**

What can be learned from the very interesting experiment of Dr. Ian Gilron, the first and still the only known experiment comparing gabapentin with a strong opioid in a chronic pain model?  (Gilron I, Bailey JM et al.  Morphine, Gabapentin, or their Combination for Neuropathic Pain. N Engl J Med 2005; 352: 1324-34.)  This a complicated multiple-crossover experiment which is difficult to understand (see Study No. 15 study detail summary in appendices).  Looking carefully at the original Figure 2A from the publication, gabapentin appears to "work" in 2/4 periods, but "not to work" in the other 2/4 periods.  The group numbers are small, and a significant portion of the patients did not complete the trial or even complete 2 periods (allowing at least 1 comparison between at least 2 of 4 possible treatments).  Below is our presentation of the same data, re-formatted to make it easier to compare the individual treatments (active "placebo"/lorazepam; gabapentin; morphine; morphine plus gabapentin).  Because of how the data are presented in the publication, we have had to make some interpolations to derive data for the graph below (see details in Study No. 15 study detail summary, appendix).

This figure suggests that in an experiment with patients suffering pain from PHN or PDPN, gabapentin has virtually no effect, compared with active placebo (lorazepam), considering that the gabapentin group starts from a somewhat lower baseline pain score. The curves on the graph are parallel.

**From Study No. 15 study detail summary, p. 14/14 – Appendix to this report**



As a final but interesting example of what can be learned from a close reading of even the published reports, consider a relatively early report from a single pain clinic in Northern Ireland, published in an obscure journal. (McCleane GJ.  Does gabapentin have an analgesic effect on background, movement and referred pain ? A randomized, double-blind, placebo controlled study.  The Pain Clinic 2001;13:103 – see Study number 23 in APPENDIX – GABAPENTIN PROJECT Pain Studies Summary Matrix – FINAL – August 8, 2008, Thomas L. Perry, M.D.)  This is an interesting if little known study report, which unlike the study of Simpson 2001, has the ring of truth to it.  It is worth thinking about what a single experienced and observant physician in one pain clinic with access to many patients and no axe to grind may be able to teach us about the use of gabapentin for back pain in the real world of clinical practice.

In this DBRCT completed in 2000 or earlier (dates not specified, published 2001) 80 typical outpatients were randomized to take either gabapentin titrated to 1200 mg/d (N = 40) or placebo (N = 40) in a 6 week parallel group design.  The exclusion of patients who had previously taken gabapentin "or were known to be sensitive to it" is likely to have "enriched" the study population so as to favour gabapentin.  Even so, only 31/40 patients randomized to gabapentin completed the trial, vs. 34/40 taking placebo.  Adverse effects were numerically greater in the gabapentin group than in the placebo group.  The meta-analysable data are included in our meta-analysis.

Here is what I find most interesting about this low profile study, which may give us a much more realistic picture of how well gabapentin "works" in real life:

a) of 40 patients exposed to gabapentin 1200 mg/d for up to 6 weeks, only 13 wished to continue it at the end of the trial;

b) of these 13/40, only 5 wished to continue gabapentin 2 months later, after having the opportunity to titrate the dose further up to 3600 mg/d.

c) the gabapentin patients' consumption of other analgesics declined only negligibly;

d) the overall effect reported for back pain at rest (probably the closest equivalent to an average NRS/VAS weekly pain score, since most patients with back pain tend to be sedentary) was not significantly different for gabapentin vs. placebo (We used this outcome statistic as the closest equivalent to the primary outcomes of other trials in our meta-analysis).

Dr. McCleane, an experienced Northern Irish specialist who may have personally assessed the patients (and may himself not have been effectively blinded) commented dryly that:

*"The results of this study suggest that gabapentin has some effect on movement pain and referred pain, but that this effect is small.  Furthermore, the benefit of a small reduction in these pains gained by taking four gabapentin capsules with no improvement in mobility and only a marginal reduction in concomitant analgesic consumption is open to question.  Two months after the end of the study, only 5 of the 40 patients originally*

*receiving gabapentin judged the benefit to be sufficient to warrant continued treatment with the drug…It is our experience of many hundreds of patients treated with gabapentin that individuals from this part of the world do not tolerate the doses used by others* (here he references the Backonja and Rowbotham 1998 JAMA publications) *and that, when greater doses are used, the side-effects outweigh any analgesic benefit."*

This is certainly a different conclusion than obtains from the more enthusiastic published clinical trials, but might be close to the true thoughts of participants (whether clinical investigators or their experimental subjects/patients) who participated in the negative unpublished trials.  I say it has the ring of truth, because it reminds me strongly of the Parke-Davis/Pfizer market research graphic which presented virtually the same message, couched in terms of the troubling economic implications for the manufacturer, at about the same time (2001) as Dr. McCleane published his article!

## What can be learned from the unpublished acute pain studies?

The unpublished acute pain studies constitute another important data set that was not suitable for meta-analysis with studies of gabapentin for chronic pain.  These results, accessible to me only because of the Neurontin litigation, add a crucial dimension to understanding the whole body of evidence as to whether gabapentin is an efficacious or effective analgesic.  The total enrolment was 1171 patients, who mostly received a single dose of gabapentin or the alternative study drugs, including placebo.

Fortunately I can review this evidence succinctly, since the conclusions are so obvious.  See the Appendices to my report for the 5 study detail summary documents prepared by my junior but meticulous colleague Kelsey Innes, B.Sc.  These summarize unpublished Parke-Davis trials conducted in the United States during 1999 and early 2000.  All trials were completed and reported on in formal Parke-Davis/Pfizer unpublished research reports by 2000.  The co-investigators ought to have been aware of the results, as access to results and intent to publish them would normally be requirements for approval of a clinical trial by a research ethics board.

**These trials show uniformly and conclusively that gabapentin is <u>not</u> efficacious for acute pain, whether it is acute pain experienced after a dental operation, acute pain experienced after major orthopedic surgery, or acute pain from osteoarthritis, including pain extending for up to 28 days.  The osteoarthritis experiment suggests that even at a very low dose of 250 mg/d taken for up to 28 days, gabapentin caused the typical adverse events of edema, dizziness, somnolence and asthenia.**

**In contrast, the same studies demonstrated that acetaminophen, naproxen, and hydrocodone all worked relatively well for pain, and that the experimental model could easily separate their effects from placebo with statistical significance.**

**Put simply, acetaminophen (Tylenol and other brands) at 1000 mg single dose, naproxen at 250-550 mg single dose, and hydrocodone at 5-10 mg single dose all worked for pain.  Gabapentin did not.**

**It is sad but not surprising that these studies were never published.  They could have been expected to decimate the market for gabapentin.  The evidence from the osteoarthritis experiment (study 1031-002; research report 720-04479) demonstrating numerically increased incidence of typical adverse events, but at rates substantially lower than when larger doses of gabapentin were used, might have been especially dangerous, had it surfaced in the year 2000 or soon thereafter. It would be logical to expect this evidence to undermine (perhaps fatally) the widespread contention that adverse effects of gabapentin were not dose-dependent.**

The interesting experiment of Berry 2005 in acute herpes zoster (shingles) might be interpreted as inconsistent with the above.   However, pain from herpes zoster is a markedly different phenomenon from virtually any other type of pain, with the possible exception of trigeminal neuralgia.   This experiment did not compare gabapentin with an active comparator such as hydrocodone, naproxen, amitriptyline, or even acetaminophen. Therefore, it is impossible to tell whether the effect of gabapentin for acute shingles pain is equivalent to, better than, or inferior to established analgesics for acute pain from shingles.

## IX)  Answers to my own clinically relevant questions:

I posed these questions near the beginning of this opinion to provide a reader open to a rational consideration of the evidence available from DBRCT with a framework for a clinically meaningful interpretation of that evidence.  Let me now reiterate those questions and provide the answers which strike me as reasonable after more than four months of intensive study and thought.

Question 1a)  What is the available evidence from DBRCT concerning the average (mean) effect of gabapentin for various painful conditions, in comparison with placebo or with active analgesic comparators?

**Answer 1a)  For chronic pain, the average (mean) effect of gabapentin, in comparison with placebo, is probably almost zero (no effect).  It may exceed zero slightly in the artificial setting of DBRCT.  However, the overall 0.78 point change favouring gabapentin over placebo on an 11-point pain scale resulting from our meta-analysis almost certainly exaggerates the true effect obtainable in the real world.  There is no evidence that gabapentin is superior to established analgesic drugs (opioids, TCA's, etc.) for any painful condition.**

**For acute pain, the answer is even simpler.  Gabapentin has no beneficial effect whatsoever, and is clearly inferior to acetaminophen, naproxen, or hydrocodone.**

Question 1b)  What is the clinical meaning for individual patients of any such average (mean) effect observed for an experimental group?

**Answer 1b)  For chronic pain, the meta-analysis suggests that at best 1 in every 6-8 patients might achieve a clinically meaningful benefit.  However this apparent "benefit" observed in DBRCTs ignores the roughly equal proportion of patients who would be harmed by the same treatment.  In the real world the balance of harms is likely to exceed the benefits of gabapentin.  For acute pain there is no benefit whatsoever from gabapentin, only harm.**

Question 2a)  What is the available evidence from DBRCT concerning the average (mean) toxicities (harms) of gabapentin when used for pain, in comparison with placebo or with active analgesic comparators?

**Answer 2a)  Gabapentin can be expected to harm about 1 in 8 relatively healthy people who are unlikely to be representative of the patients typically most exposed to this drug.  In real life, I would expect the toxicity of gabapentin to be much higher.  For example, it is almost certain that in the real world of medical practice and prescribing in North America, far more than 1 in 6-7 people experience "dizziness" or "lightheadedness" or "ataxia" (balance disturbance) or "somnolence" or "impaired thinking or concentration" or other CNS adverse effects from gabapentin.**

Question 2b)  What is the clinical meaning for individual patients who experience toxicity (harm), e.g. those who drop out early from DBRCT because of "adverse events", or who just drop out?

**Answer 2b)  This is where the DBRCT fail to give any true impression of how gabapentin likely affects people in the real world.  It is rational to expect that older patients, and especially frail elderly who are vulnerable to polypharmacy, infections, the adverse effects of edema (including infection risk and the chance of being misdiagnosed with kidney disease, venous or lymphatic obstruction, or heart failure) suffer adverse effects of gabapentin much more frequently and seriously than the controlled trials imply, for example as gabapentin-related:**

- **falls and fractures**

- **mental impairment (which often leads to the prescription of more drugs and may lead to inappropriate diagnosis of "dementia" or "cognitive impairment")**

- **motor vehicle accidents caused by or involving drivers taking gabapentin**

- **over sedation and sedentarism with all its long term implications**

- **impaired wound healing of foot or leg ulcers leading to additional treatment costs and/or delay in recovery or worse**

Note that consequences of such adverse events may be long term or even permanent (e.g. disability or death from falls and fractures), something not reflected in the clinical trial reports from populations of less vulnerable experimental subjects.

Question 3a)  What is the available evidence from DBRCT about the percentage (%) of patients who experience a clinically meaningful benefit (to them) from the use of gabapentin to treat pain?

Question 3b)  How does this % compare with the % who experience a clinically meaningful harm?

**Answers 3a and 3b)  I have dealt with these questions in my answers above.  For chronic pain it is likely that at least as many people are harmed by gabapentin as might benefit from it in some way.  For acute pain there is nothing but harm.**

Question 4a)  What is the available evidence from DBRCT concerning the relationship of gabapentin dose to clinically meaningful response (benefit)?  For example, is there convincing evidence that larger doses "work better" than smaller doses (e.g. 900 mg/day vs. 300 mg/day, or 3600 mg/day vs. 900 mg/day or vs. 1800 mg/day)?

Question 4b)  What is the available evidence from DBRCT concerning the relationship of gabapentin dose to clinically meaningful toxicity (harms)?  For example, is there convincing evidence that larger doses are more likely to cause neurological adverse effects than smaller doses (e.g. 900 mg/day vs. 300 mg/day, or 3600 mg/day vs. 900 mg/day or vs. 1800 mg/day)?

Question 4c)  Is any other meaningful evidence available which bears on the questions of dose-dependence of benefit(s) or harm(s) for gabapentin?

**Answers 4a, 4b and 4c)  Interpreted in the light of general clinical pharmacological principles and common sense, I found no evidence from DBRCT for <u>dose-dependence</u> of benefit from gabapentin.  On the other hand, it is apparent that larger doses of gabapentin cause more frequent adverse effects.  (I have not discussed these issues in detail in the text of this opinion, but I have considered dose-effect relationships in the critical appraisal of each individual published and unpublished trial – see appendix.)**

**Gabapentin would truly have to be a "wonder drug" dissimilar to virtually all other drugs known to affect the brain, were it not to cause more neurotoxicity at higher doses or concentrations.  It may be spared some toxicity by dose-dependent absorption kinetics (the absorbed dose and the plasma or brain concentrations of gabapentin may not rise proportionately to the ingested dose), but those who "push the dose" of gabapentin in ignorance of such basic pharmacologic principles and the evidence available from DBRCT and clinical experience do so at the expense of their patients.**

Question 5a)  What is the available evidence from DBRCT concerning the relationship of duration of gabapentin therapy to realization of a clinically meaningful response (benefit)?

Question 5b)  What is the available evidence from DBRCT concerning the relationship of duration of gabapentin therapy to experience of a clinically meaningful toxicity (harm)?

Question 5c)  Is any other meaningful evidence available which bears on the questions of duration of therapy-dependence of benefit(s) or harm(s) for gabapentin?

**Answers 5a, 5b and 5c)  If there were a benefit from gabapentin, it would accrue early in treatment.  The experiment of Berry 2005 in acute herpes zoster (shingles) suggests that healthy patients can discern the effect of a 900 mg dose of gabapentin within 1.5 hours (or less), although the unpublished experiments for acute dental and joint or post-operative pain show that the results are not generalizable.  The chronic pain studies all show that any observed separation of gabapentin from placebo groups (even if it was due to unblinding caused by the adverse effects of gabapentin) also occurs early, typically by the first observation visit after baseline. If observations had been scheduled before 2 weeks, any clinically discernable effect (whether good or bad) might well have been evident by then.  Although many "experts" retained by Parke-Davis/Pfizer to market gabapentin (see below) asserted frequently that patients adjust to the adverse effects of gabapentin, I did not find any convincing evidence of this in the clinical trials, and many suggestions to the contrary.  That is consistent with my own clinical experience with patients who have taken or take gabapentin.**

Question 6)  What experimental approach could clarify the most efficacious and effective drug treatment(s) for "neuropathic" pain?  Why don't we have this information now?

**Answer 6)  I have alluded above to an experimental approach that might answer this question, and to the reasons why pharmaceutical companies will not design nor sponsor such experiments.  The independent experiment of Gilron does show that it is possible to answer such questions.  He found that morphine was more efficacious than gabapentin for neuropathic pain from PDPN and PHN, but suggested that gabapentin seemed to add some additional effect.  I am not convinced that this is the correct interpretation of his experiment, which presents an extremely challenging intellectual exercise.  Please see the detailed summary prepared by Ms. Innes and me in the appendix.  One of the clearest insights into the real meaning of this study came from our reconstruction of a graph summarizing the results by drug, reproduced earlier in this opinion as well as in the appendix.**

**X) Comparison of my expert clinical pharmacologic opinion with the expert opinion of Dr. Shawn Bird (neurologist, University of Pennsylvania) dated November 29, 2006:**

You provided me with a copy of this opinion.  The opinion is brief (6 pages, plus 5 pages of references), whereas Dr. Bird's CV is long (17 pages).  It is obvious that my opinions about the evidence concerning the efficacy of Neurontin (gabapentin) in DBRCT, let alone its clinical effectiveness (extrapolation of such trials to the general population of potential patients and) or its real utility in clinical practice (medical judgment based on real life experience) are much more conservative than those of Dr. Bird.   Whence arises this difference of opinion?  I see a number of reasons why we may have arrived at different conclusions:

1. Dr. Bird's literature review includes uncontrolled experiments and case reports which do not provide the same quality of scientific evidence as properly performed and reported DBRCT.  It also refers to and appears to depend at least partially upon DBRCT pertaining to situations **not relevant** to the questions you are asking.  For example, very brief studies in post-operative patients in a hospital nursing setting, which study primarily the consumption of opioid analgesic in patients recovering from general anesthesia, are not relevant to the outpatient setting where patients receive gabapentin from a pharmacy under prescription.  Although I found Dr. Bird's report helpful in drawing my attention to certain studies that I had previously missed (e.g. van de Vusse 2004), I note that Dr. Bird also missed certain studies that I was able to uncover with the help of Dr. Musini's computerized literature search. (e.g. McCleane 2001)

2. Dr. Bird relied upon the Cochrane 2005 systematic review (Wiffen PJ, McQuay H et al) as the "highest level of evidence".  Perhaps he was unaware that the Cochrane review included some studies which may not have been genuine (Simpson 2001) or which are unlikely to have been genuinely double-blind and were inadequately reported (Perez 2000).  He does not refer to the mis-labeling of the Forrest plots in the Cochrane 2005 review, and may not have read this report carefully or completely.  Many busy physicians rely on abstracts to obtain their impressions of complex reports.  Were Dr. Bird to repeat the exercise I have performed in the last few months, he might be less sanguine about the conclusions of the 2005 Cochrane systematic review.

3. Dr. Bird may have been unaware of the major **unpublished** studies of gabapentin vs. placebo for chronic "neuropathic" pain (945-224 Reckless 2000 for PDPN; 945-271 Gordh 2003 for POPP; 945-1008 Parsons 2005 for PDPN) which had long since been completed and reported internally, but not publicly disclosed by Parke-Davis/Pfizer.  Similarly, Dr. Bird's report shows no sign that he was aware of the **unpublished acute pain studies** completed by Parke-Davis/Pfizer in 1999-2000, all of which had been reported internally by 2000.  Had he been aware of these data, I think his opinion must obligatorily have been tempered, if not different; and he should have disclosed and referred to these results in his opinion.  I would be most interested to learn Dr. Bird's interpretation of the detailed experimental results of unpublished studies summarized in the Appendices to this report, should he be allowed to read it.  When Dr. Bird completed

his report on November 29, 2006, he would presumably not have been aware of the Depomed trials of Gabapentin GR, of which the results (as incompletely reported subsequently on the manufacturer's website) would also oblige any independent medical scientist to reassess one's understanding of the evidence.

4.  I consider it unlikely that Dr. Bird reviewed the published or unpublished DBRCT of gabapentin as **meticulously** as did I and my colleagues Dr. Musini and Ms. Innes. Without doing so, it is really impossible to understand accurately the numbers of patients, the incomplete or misleading reporting of outcomes, and the complex issues of statistical analysis raised – let alone face the issues of unblinding discussed in Professor Jewell's report.

5.  Dr. Bird does not deal with the question of what drugs are **suitable comparators** for gabapentin for active treatment experiments (e.g. morphinan opioids, methadone, tricyclic antidepressants, carbamazepine).  All of these have at least some putative clinical trial evidence for efficacy in neuropathic pain, and morphine is clearly demonstrated by the Gilron 2005 experiment to have efficacy markedly superior to gabapentin.

### XI)  How did Parke-Davis/Pfizer market Neurontin so successfully?

The following is a general itemized summary of the information I reviewed, by year, starting with the calendar year 1995.  I have summarized as succinctly as possible my impression of the content, apparent intent, and potential import of statements, positions, opinions, events, or planned actions referred to in documents I reviewed.  I have referenced such items to the "Bates number" of key pages, for easy identification of the relevant sources.  I will refer to Neurontin and gabapentin interchangeably, since patent protection ensured that Neurontin was the only brand of gabapentin available in the United States during these years.

**1995:**

1.  A document entitled "Marketing Assessments Neurontin in Neuropathic Pain and Spasticity" dated July 31, 1995 shows that Parke-Davis had developed a strategic plan to expand the utilization of Neurontin (gabapentin) well before it commenced to design and sponsor randomized clinical trials.  (WLC_Franklin_0000166608 et seq.)  This was an international effort, involving company staff from Holland and Germany, as well as the United States.  Page 1 of the letter from Olivier Brandicourt of Parke-Davis Product Planning in Morris Plains, NJ accompanying distribution of this document within Parke-Davis is telling:

*"The results of the recommended exploratory trials in neuropathic pain, if positive, will be publicized in medical congresses and published …"*

The main document shows that Parke-Davis' principal interest was what it saw as a large and lucrative market for Neurontin in pain therapy, as opposed to the relatively limited market which might be available for spasticity, e.g. from multiple sclerosis. Preliminary contacts with physicians at various pain management centres had allowed Parke-Davis to come up with a list of potential investigators, including Dr. Gorson who later became the first that we are aware of to complete a DBRCT with Neurontin for PDPN. The potential market for PDPN was thought to be "moderate in size", at about $200 million U.S. per annum in 1995. I find it intriguing that a table on page 11 of this document refers to the efficacy of acetaminophen with codeine (e.g. Tylenol #3) for "neuropathic pain" as clearly superior ("+++" vs. "+") to that of amitriptyline, which it termed the "gold standard" of therapy. The same table categorized the analgesic efficacy of gabapentin as unknown.

Amongst "opportunities" this document states with respect to "neuropathic pain" (NP) at page 14: *"The NP market is undervalued due to the inexpensive cost per day of therapy associated with generic antidepressants, and generic narcotic and nonnarcotic analgesics."* Page 15 proposed that "Neurontin Development" could begin by pooling open label data from several centers known to be experimenting informally with Neurontin for pain, and by arranging for *"investigators* (to) *present this data at neurology and pain conferences"*. This could be followed by partial funding and drug supply for "exploratory" trials in several U.S. pain management centres using identical protocols, from which data might later be pooled for publication. *"This will facilitate a rapid completion of studies which could be rapidly highlighted at the neurology and pain congresses in 1996/1997."*

Page 1 of the document (WLC_Franklin_0000166608 et seq.) reveals that the urgency to get such trials under way promptly and to disseminate any "positive" results (covering letter) derived from the expected expiry of the patent extension in 1999. To use a Canadian metaphor, if there were going to be a Klondike gold rush, it was essential to get on the first boat to Skagway and over the Chilkoot Pass before winter closed the window of opportunity. It was, so to speak, "North to Alaska and full steam ahead!"

**1996:**

2. An article appears by Dr. Rudolph H. de Jong of the University of South Carolina School of Medicine (de Jong RH. Neurontin: Pie in the Sky or Pie on the Plate? Pain Digest 1996; 6:143-6) labeled as a "Guest Editorial". (MDL_Vendors_086685-6) A Google search (July 29, 2008) suggests that this article was rather widely cited thereafter, even though it appeared in an obscure new journal (Volume 6). Interestingly Dr. de Jong's editorial indicates that he had been using gabapentin off-label for various pain syndromes but typically at relatively low doses: ***"From 600 to 900 mg per day, given in three divided doses of 200 or 300-mg tablets – after initial up titration – is a good target for gauging analgesic effectiveness. If inadequate or no relief is obtained from 1200 mg gabapentin per day, little is likely to be gained from further dose escalation."*** (emphasis added) Although Dr. de Jong acknowledged the potential of larger doses, he also pointed out that ***"Since pain patients, by the very nature of their symptoms, are heavy consumers of analgesics and coanalgesics with potential CNS-depressant effect, it stands to reason that gabapentin be prescribed with circumspection."*** (emphasis

added)  This relatively conservative **early message** about the off-label use of gabapentin is scarcely echoed in the marketing campaign of subsequent years (see below).

**1997:**

3.  As early as June 6, 1997 Parke-Davis sponsored a series of "continuing medical education" fora, initially entitled "Emerging Concepts on the Use of Anticonvulsants". (WLC_FRANKLIN_0000066844, et seq).  These were used to introduce the concept of "Treating the Neuropathic Pain Syndromes".  Different speakers were invited to present what appear to have been similar materials and ideas, e.g. Dr. David R. Longmire on May 10, 1997 (Saratoga Springs NY), Dr. Charles E. Argoff on May 16, 2997 (Rye Brook, NY), Dr. Alexander Mauskrop on May 30, 1997 (Newport RI), and again Dr. Longmire on June 7, 1997 (Rochester, NY).  The speakers' titles suggest that the doctors delivering the speeches were interchangeable.  I presume they were members of a paid "speakers bureau" for Parke-Davis, and may indeed have been interchangeable, insofar as they may have undergone similar training regarding the materials and/or slides to be presented, notably a set of "Key Presentation Slides" of the same name (WLC_CBU_180737).  Dr. Ahmad Beydoun also lectured during two of the above May 1997 sessions, on "Current Decisions in Treatment Options: Finding a Place for Newer AEDs".  Many presentations of a similar nature followed.  The presenters had no evidence from DBRCT of gabapentin for pain, as there was no such evidence until the Gorson trial was completed (at about the same time, mid-1997).  This did not stop presenters from making standardized favourable references to anecdotal clinical evidence (WLC_CBU_180753 et seq).  **The common themes of these presentations appear to me to have been to:**

a) Introduce Neurontin (gabapentin) **favourably** to a broad audience;

b) Introduce the notion that gabapentin might have efficacy for non-approved uses outside the field of epilepsy (for which Neurontin was licensed but little used) – a hypothesis for which there was **no scientific evidence**;

c) Encourage the notions that **larger doses** of gabapentin might be better tolerated than the audience knew or suspected to be the case, and that **larger doses were more likely to be efficacious** for some medical purpose(s) –  an idea for which there was **no evidence and indeed evidence to the contrary** from the monotherapy clinical trials in epilepsy;

d) Stimulate a **good feeling or "buzz"** about Neurontin as an up-and-coming drug of the future – in the **absence of evidence** that it was efficacious or effective outside of the approved but little used indication for epilepsy.

Reading the electronic or paper records some 11 years later strains the eyes and leaves one little inspired.  However, I can well imagine from personal experience of similar marketing events in nice hotels (typically presented as "CME" and eligible for maintenance of competence CME credits) that the "buzz" created by these presentations was **real and exciting** for those in attendance.  I see no indication from the materials I reviewed that realistic Conflict of Interest (COI) declarations were made to the audiences. Even recent history in a time of greater scrutiny suggests that meaningful COI declarations would have been highly unlikely.

4.  A "continuing medical education" program sponsored by Louisiana State University Medical Center-Shreveport entitled "Managing the pain of diabetic neuropathy" commenced in November 1997.  One of the first pages of the "enduring materials" document (WLC_Franklin_00080453) provides typically non-informative "declarations" by "faculty" of "no significant conflict of interest disclosed".  In my general medical and academic medical experience this is a **meaningless statement**.  As a former legislator and member of the Executive Council (provincial Cabinet) in British Columbia who was subject to meaningful and enforced Conflict of Interest legislation, I find such declarations non-credible or even pathetic, rather than laughable.  Again the gist of these "CME" presentations was to promote pharmacotherapy generally, and gabapentin specifically.  For example:

a)  Dr. Roger E. Kelley (WLC_FRANKLIN_0000080457) promoted the notion that **cost should not stop patients from taking a drug**, arguing that *"…When cost is an issue, patients are likely to give up on a medication much sooner, … **For example, someone may say a medication is 'intolerable' when, in reality, side effects are mild."*  (emphasis added)  This may be a peculiarity of the United States.  I have never in my career heard any patient confuse cost with clinical tolerability.  I think most intelligent patients would be offended by the above remark.

b)  Dr. Gloria M. Galloway (WLC_FRANKLIN_0000080462 et seq) promoted the notion of using gabapentin at doses of 1800-3600 mg/day.  At this time, there was no clinical trial evidence supporting the use of gabapentin for this purpose, and Parke-Davis was well aware that 1 trial (Gorson) had been completed and produced negative results in PDPN at 900 mg/day.  I have no way of knowing whether Dr. Galloway was aware of Dr. Gorson's results.

c)  A "post-test" component designed ostensibly to provide CME credit for doctors can more realistically be construed as a promotion for **"non-evidence based medicine"** (WLC_FRANKLIN_0000080472) insofar as it promoted the "advantages to the use of gabapentin in the management of painful diabetic neuropathy" in the absence of any real evidence.

**1998:**

4.  The Cleveland Clinic Foundation also participated in this process, via a "closed symposium" held on July 24, 1998.  This was presumably intended not only to maintain the "buzz" but to be disseminated as "Proceedings" in the Cleveland Clinic Journal of Medicine (Supplement 1 to Volume 65, 1998).  The technique of supplement publication avoids peer review, but allows publication in what appear to most relatively naïve doctors to be highly prestigious and presumably reliable medical journals.  The acknowledgement of "an educational grant from Parke-Davis" is less prominent and typically such acknowledgements appear on an inside page of the original journal or reprint.  (Pfizer_TMartin_0001739)  A presentation by Dr. Harold H. Morris of the Cleveland Clinic promoted the concept that because gabapentin does not require liver metabolism, it might be **safer** than alternative anticonvulsant drugs and states that *"…The most common adverse effects of gabapentin are somnolence, ataxia, dizziness, and fatigue.  Significant side effects, however, are uncommon and rarely necessitate withdrawal of the drug."*

(Pfizer_TMartin_0001754)  This statement strikes me as calculated to encourage use of Neurontin with relatively little regard for its pharmacodynamics, including its interactions with other drugs affecting the brain, commonly taken by patients who might use gabapentin.  A presentation by Dr. Edward Covington alluded to the Backonja 1998 JAMA study as "in press", although Dr. Covington was not a co-author of that study, which was not to be published until December 2, 1998.  (Pfizer_TMartin_0001762)  It is interesting that Dr. Covington pointed out the **sedative effects of gabapentin**, which he felt might be useful for sedative drug withdrawal syndromes.  He described an almost immediate effect from his own observations, something that contrasts with the general push for long periods of treatment (weeks to months) and gradual dose escalation (see below).

5.  A series of Parke-Davis documents (WLC_CBU_000222 et seq) contain a vivid "play by play" description starting on October 1, 1998  of how Parke-Davis planned the "launch" of the JAMA reports of DBRCT of gabapentin for PHN and PDPN.    This included such strategies as:

a)  a multi-pronged launch of the scientific publications on December 2, 1998 to be coordinated if possible with the institutional bases (universities) of the principal authors Backonja and Rowbotham, the JAMA itself, and relevant "disease organizations" – Drs. Backonja and Rowbotham were to figure prominently in this campaign;

b) an attempt to develop a **"consensus conference"** for the use of antiepileptic drugs (AED) for pain at the Curacao Southern Clinical CME Event in January 1999 (presumably a highly desirable destination at that time of year for "consensus developers");

c) a wide range of meetings of **"Neuropathic Pain Advisory Boards"** composed of neurologists, anesthetists, pain specialists, and primary care physicians (estimated cost about $2,000 per physician attending), and a wide series of "CME Dinner Meeting Series" on "New advances in pain management" featuring doctors **trained at a cost of about $2,000 per trainee** who would be provided with "slide kits"; (WLC-CBU_000229);

d) A highly sophisticated news and **"infomercial"** (my terminology) campaign extending to the use of video "infomercials" to **"captive" airplane audiences and a "blast e-mail"** to physicians and infiltration of internet "bulletin boards" devoted to pain treatment (WLC-CBU_000232-238 et seq)

One important strategic plank in this campaign appears to have been to systematically exaggerate the prevalence of painful diabetic neuropathy and post-herpetic neuropathy.  This is borne out in the "Neurontin Studies/JAMA Video News Release/B-Roll" designed by Makovsky & Company of New York City for Parke-Davis.  (WLC-CBU_123550 et seq)  Note the "Suggested Studio Lead-In": *"There's encouraging news today for **millions of Americans** who suffer from an unrelenting condition called chronic neuropathic pain…"*  (emphasis added)  It must have been encouraging indeed for bored passengers to view such good news, presented by confident white-coated doctors and a

mellifluent voiceover announcer, especially after wedging themselves into the cramped quarters of a trans-continental airplane.

Although it was not unusual at the time (and remains unfortunately common in 2008), it is noteworthy that the putative beneficial effects of Neurontin were couched in these "infomercials" in **relative, rather than absolute terms**, e.g. for PHN, *"importantly, almost twice as many patients treated with Neurontin (16%) were pain-free versus those treated with placebo (8.8%) at the end of the trial"* (WLC-CBU_123550). Would the "buzz" have been quite so vibrant if Parke-Davis or its medical allies had stated that of all patients treated with gabapentin for PHN, about 7% of patients similar to those enrolled in the Rowbotham trial might expect to be "pain-free" at the end of 8 weeks, thanks to the treatment? I doubt it. **The latter way of explaining clinical trial results reflects more accurately the real benefit of the treatment.** But it is obviously **much less attractive** to the average person to present a number needed to treat (NNT) of 14, which can be expressed in plain English by saying: "If you and fourteen of your peers take this drug, one of you will really like it." No wonder drug companies and others promoting medical treatments still prefer to advertise **relative, as opposed to absolute** changes – the relative approach sells much better.

Apparently, Parke-Davis marketers hoped this campaign might produce a sales increase in the range of $46 to $70 million in the first year. (WLC-CBU_000261)

6. (WLC-CBU_028473) gives a simple example of how Parke-Davis utilized a third party, the seemingly independent "Institute for Continuing Healthcare Education" (Philadelphia, PA) to deliver its message as a 1 hour "audioconference" delivered by Dr. Ahmad Beydoun of the University of Michigan Medical School (second author of Backonja 1998). While labeled (or disguised) as "Continuing Medical Education", and made eligible for official CME credit, this program was available 24 hours a day through a toll-free long distance telephone number: 1-888-836-2764. This was obviously not a 2-way exchange between a university faculty member and an inquiring audience. I would suspect it was more likely to appeal to a physician desperately seeking to meet a "CME quota" before the end of the calendar year 1998 to prepare for re-licensure or hospital privileging. An objective observer from outside of the medical world might recognize this sort of presentation as "propaganda".

7. (Pfizer_LeslieTive_0002824 et seq.) demonstrates how these messages were converted into slide kit presentations which could be made available directly to doctors, presumably the various local "Key Opinion Leaders" favoured by Parke-Davis. (I have not recently been offered this sort of slide set by a pharmaceutical company, although I would find a few examples handy for teaching my medical students and postgraduate medical trainees about how marketing influences distort the interpretation of clinical trial results.) The *"Commentary"* sections beneath the bottom of some slide sets appear to be suggestions as to what the speaker using the slide set might say when making a standardized presentation which he/she had not personally prepared. Is it likely that such medical "experts" or "KOL's" disclosed to their audience: *"By the way, I didn't prepare these slides – they were made by Parke-Davis who paid me to learn how to present them to you"*? I doubt it. I have seen many academic physicians sneak such slides into their "grand medical rounds" or similar ostensibly academic presentations. Sometimes they

flaunt their dependence on external coaches or purveyors of packaged content. Often the more inexperienced members of the audience, even in a university teaching hospital, cannot tell the difference between genuine academic content and "infomercial". That is why such approaches work so well. Much more money is expended in North America on pharmaceutical advertising to physicians than on real medical education because the advertising, in all its forms, works.

Again, one can scarcely perceive in these dry paper or electronic files the full impact achievable in a live presentation through the personal warmth, self-deprecating humour, and sense of confidence which a good medical "expert" can inspire when performing before a willing medical audience. Physicians are no more immune than anyone else to seduction by power and perception. But even the paper materials reveal Parke-Davis/Pfizer's systematic effort to **exaggerate the prevalence of painful diabetic neuropathy** - as opposed to all diabetic neuropathy, which is typically **not** painful but causes reduced sensation. (Pfizer_LeslieTive_0002865 et seq.) The general technique of the slide sets is to mix **what appears to be "science"** (e.g. "basic pharmacology of gabapentin" or "pathophysiology of diabetic neuropathy") with marketing in such a way as to give the **illusion of education while steering the audience in a very specific direction.** W. B. Yeats' famous quotation, *"Education is not the filling of a pail, but the lighting of a fire"* did not apply in these sessions. Physicians in attendance at such sessions were having their "pails filled". It was Neurontin's "fire" that was to be lit.

For example, the suggested slide commentary describing the change in mean pain scores for PDPN (Backonja 1998) reads *"Mean pain scores were significantly lower in patients receiving gabapentin compared with those receiving placebo at weeks 2 through 8."* (Pfizer_LeslieTive_0002897) A more thorough, accurate, and balanced description of the same data would have presented the numbers of patients still present at each observation point (to adequately reflect drop outs from the experimental groups). An objective presenter would have pointed out that the modest difference in mean pain score between the gabapentin group and the placebo group was observed at a dose of 1800 mg/d by week 2, that any such difference may well have been present earlier, and that the difference between groups **did not increase as the dose was later increased to 2400 mg/d and then to 3600 mg/d.** Unfortunately, I found **no balanced interpretation of the data** in any of the slide presentations I reviewed. Similarly, a slide for the PHN study (Rowbotham 1998) fails to point out that higher doses after week 2 of the trial produced no further separation of the gabapentin group from the placebo group for mean pain scores, but it is unlikely that this was emphasized by presenters. (Pfizer_LeslieTive_0002929)

**Rare moments of candour can be found in the slide sets.** A slide entitled "Overview of Adverse Events" discloses that in the PHN study (Rowbotham 1998) the gabapentin group experienced almost twice as many adverse events (278 total AE vs. 151 for the placebo group), a statistic not reported in the JAMA article and not otherwise knowable without access to the confidential final study report. (Pfizer_LeslieTive_0002942) Whether this slide (which is reproduced incompletely) was utilized in what must already have been long-winded presentations, I cannot tell. But a closely following slide (Pfizer_LeslieTive_0002944) again underplays the significance of neurological adverse

effects from gabapentin, and the *"Commentary"* suggests blithely that *"Despite doses of gabapentin up to 3600 mg/day in a population with an average age of 73 years, no serious drug-related adverse events were reported"*.  Given what was already known clearly from clinical trial experiments about the incidence of somnolence, dizziness, "asthenia", ataxia and edema caused by gabapentin, it strikes me that this was an open invitation for doctors in the audience to prescribe or precipitate neurotoxicity.  Although the slide sets typically presented the study inclusion and exclusion criteria, how many doctors in the audience would recall by the end of the presentation that these strict inclusion and exclusion limits for participation in the DBRCTs virtually guaranteed that the results would **not** be applicable to the real world?  That is the difference between true continuing medical education and advertising or propaganda.  **Education fosters inquiry and reflection; advertising (propaganda) smothers both.**

**1999:**

8.  The Institute for Continuing Health Care Education of 210 West Washington Square in Philadelphia, PA revealed its hand in a letter dated February 2, 1999 addressed to David Simpson, DO of Farmington Hills, Michigan.  The labeling on this paper document (VOX027405 at the bottom right corner) is somewhat different from other "Bates numbers".  Just above that it also bears the numbers CCI 06087.  Either way it is a revealing insight into the Institute.  Here are some tantalizing excerpts:

*"February 2, 1999*

*"David Simpson, DO*
*2859 Orchard Lake Road*
*Suite 200*
*Farmington Hills, Michigan 48334*

*"Dear Dr. Simpson:*

*"The Institute for Continuing Health Care Education invites you to become a faculty member for a series of Continuing Medical Education programs supported by an educational grant from Parke-Davis.  These CME programs will consist of dinner programs, grand rounds and telephone conferences X* (sic) *all to be conducted throughout 1999. The program is one of several nationwide efforts in continuing medical education known as the **National Initiatives in Continuing Medical Education**.  The current program is entitled, **Reevaluating Neuropathic Pain Treatment Algorithms: New Data in the Management of Diabetic Peripheral Neuropathy and Postherpetic Neuralgia**...* (emphasis in original)

*"Qualified speakers will be entitled to conduct CME-certified presentations.  These presentations will reevaluate the role of anticonvulsants in the treatment algorithm of both diabetic peripheral neuropathy and postherpetic neuralgia in the light of new data.  You will be provided with a lecture curriculum to complement your personal slides for your presentations.*

*"For faculty training, we ask that  you listen to a taped CME telephone presentation delivered by program chair, Ahmad Beydoun, M.D…. Please dial 1-888-836-2764 at your convenience …* (emphasis in original)

"!      *An honorarium will be provided for each lecture that you deliver.*
"!      *Travel and accommodation expenses related to your participation will be fully reimbursed according to normal guidelines on such expenses…"*

(exclamation marks in original, as shown).  The letter was signed by Theresa Gaulthier of the **"National Initiatives"** staff.

I find this one of the most intriguing of all the documents I perused, because there are subsequent intimations (see calendar year **2003** below) that the same Dr. David Simpson later appears to have come under suspicion by senior Pfizer staff of having made mischievous use of the slide sets.  Pfizer staff became aware of this possibility when Dr. Robert Dworkin (an eminent academic pain specialist with a real research record) drew to their attention in 2003 his concerns about Dr. Simpson's unusual publication in a 2001 edition of the obscure Journal of Clinical Neuromuscular Disease of an article with purported methodology and results strikingly similar to that of the Backonja 1998 trial.  Dr. Simpson's 2001 article itself states that an earlier partial version of his apparent study of gabapentin and venlafaxine for DPN had been presented at the 23rd Annual Electrodiagnostic Medicine Course in September 2000.  Whether Parke-Davis ever knew about Dr. Simpson's real or non-existent clinical trial in 1999 or later is unclear to me.  However, the observed similarities between Dr. Simpson's 2001 publication and the 1999 Parke-Davis slide sets suggest that Parke-Davis and its agent the Institute for Continuing Health Care Education later achieved a significant if unintended "spin-off" from their wide duplication and circulation of the Neurontin slide sets to "faculty members".

9.  The full frontal promotion of Neurontin continued as planned the previous October by Parke-Davis.  A beautiful example is what appears superficially to be a new "medical journal", labeled "Progress in Neurology Volume 1, Number 1 March 1999". (WLC-CBU_079302)  The use of another third party, the "Dannemiller Memorial Educational Foundation", may have side-stepped more traditional and appropriate academic requirements for certification of CME, and the "Faculty Disclosure" is superficial and given little prominence in small print.  Although the materials are clearly labeled as "supported by an educational grant from Parke-Davis", they do not even hint at Parke-Davis' ambitious marketing plan (described in the documents referred to above) to use Dannemiller as what might be termed an "external validator".  The use of a medical journal format might be expected to mislead the reader into believing that the content was subjected to an external peer review.  This is obviously not the case.  The overall structure is designed to make advertising look like continuing medical education.

The aggressive "roll-out" of Neurontin after the JAMA publications was continued by Dr. Michael J. McLean, speaking at "Treating the Aging – New Options for Pain, Psychiatry, Epilepsy, Stroke", an event held at the Marriott Marquis hotel in Atlanta,GA.  Dr. McLean couched gabapentin (Neurontin) as *"the new"*, contrasted with other

anticonvulsant drugs (antiepileptic, AED) such as carbamazepine, which *"will represent the old"*. (MDL_Vendors_085847)  This is out and out attention-seeking marketing language, not scientific or medical language.  It is comparable to how self-promoting biologists refer to their discovery of a "new" yet ancient biological species, or how anthropologists may describe an isolated  Brazilian aboriginal tribe as "new".  Both carbamazepine and gabapentin are artificial chemical compounds which are latecomers to the human environment, both were discovered within 1-2 decades; thus if one is "new" then so is the other.  The context of Dr. McClean's remarks must have been to raise excitement about a drug largely because it was "new", rather than because of its own merits, relative to other treatment options (drug or non-drug).  This is how all newly licensed drugs are sold.  Only the most experienced physicians and the most discerning of patients prefer "old drugs" to "new ones"!   The latter class of physicians are the old hands who joke to their students: *I always try to prescribe a lot of the new drugs during their first six months on the market, while they still work!"*  This is of course intended to be facetious, although in my experience some medical students are already so socialized to believe that "new" = "better" that they miss the joke.

10.  By November 1999 Dr. Ahmad Beydoun continued promotion of Neurontin in another Parke-Davis/Dannemiller Memorial Education Foundation product, "New Pharmacologic Options for the Management of Neuropathic Pain – A Practical Treatment Guide", also designated for official CME credit. (SH_0044640 et seq). As in other such documents, the discussion of "Diabetic Neuropathy" appears calculated to exaggerate the prevalence of painful diabetic peripheral neuropathy (PDPN).  **No specific claim for the prevalence of PDPN is made**.  **Instead, estimates of prevalence for all diabetic neuropathy (most of which is not painful) are presented and highlighted.**  For example, a sidebar emphasizes in bold type that ***"… In another study …neuropathy was diagnosed in 61% of patients with diabetes."*** (emphasis in original, SH_0044654)

Similarly, the cited prevalence of ongoing pain from post-herpetic neuralgia (PHN) strikes me as grossly exaggerated, compared with more reliable published estimates (see my discussion earlier in this report).  The article attributed to Dr. Beydoun trumpets, ***"Pain lasting more than one year is estimated to occur in 22% of PHN patients over 55 years of age and in 48% of patients over 70 years of age."***  (SH_0044654-7)

Dr. Beydoun's discussion of alternatives for treating pain in PDPN and PHN, such as opioid analgesics, was brief, superficial, and unbalanced.  He noted that in one small study comparing oxycodone with placebo for PHN, *"… 75% of patients treated with oxycodone reported adverse events that included constipation ,nausea, and sedation"*, but not whether in clinical experience patients adjust to such adverse effects, as they were purported to adjust to the adverse effects of gabapentin. (SH_0044664)  The highlighted comment ***"Opioid narcotics are rarely used for the treatment of neuropathic pain and should be reserved for patients who have failed other treatment modalities"*** (emphasis in original) constitutes pure opinion, and is contrary to the view expressed in 1995 by Parke-Davis' own marketing department (see paragraph 1, **1995** in this section).

This article may not even have been written by Dr. Beydoun - it would be unusual for an academic physician to use the redundant phrase ***"Opioid narcotics"***.  In this document the discussion of gabapentin's safety is somewhat more balanced than elsewhere, noting:

*"The side effects most commonly associated with gabapentin include somnolence, dizziness, and generalized fatigue.  However, most of the side effects typically subside within 2 weeks.  Some patients might develop nystagmus, ataxia, or weight gain.  A nonpitting peripheral edema is dose related and age related; it is most commonly experienced by elderly patients treated with high doses..."* (SH_0044664)  Similarly, Dr. Beydoun notes that *"... some patients respond to daily doses as low as 100 mg..."*

However, while the assertion that adverse effects of gabapentin "typically subside within 2 weeks" might conceivably be correct, I have been unable to find anything in the clinical trial or unpublished reports that supports this.  Repetition of this mantra by "experts" is not supported by the experimental evidence, such as it is, even from open trials like the Brazilian trial A945-1004 referenced above.  It flies in the face of clinical experience and comments made by various doctors who participated in "advisory boards".

**Gabapentin was now being promoted as "First-Line Therapy"** (as an alternative to tricyclic antidepressants) for painful neuropathies other than trigeminal neuralgia, **with opioids relegated to "Fourth-Line Therapy"** behind strange choices (already or later proven to have no useful clinical value for pain) such as mexilitine, SSRI antidepressants, phenytoin, and lamotrigine!  The sponsor (Parke-Davis) and unidentified formulators of these materials protected themselves from chastisement by the US FDA by placing small asterisks indicating that virtually all such uses were "not approved for this indication". (SH_0044684-5)

11.  There is **still no mention in these materials** of the less favourable results from other trials, already known or likely to have been known to Parke-Davis, if not Dr. Beydoun, by this time, i.e.:

- Gorson (trial completed by 1997, results known to Parke-Davis by August 23, 1997

- Reckless (trial completed September 1999, blind broken by Parke-Davis statisticians October 26, 1999)

12.  As **1999** came to a close, the "roll-out" planned in October 1998 continued to reach a broad audience via additional non peer-reviewed publications, e.g. "Supplement to Clinical Geriatrics The Clinical Authority in the Care of the Mature Patient" (CDM 0022270) The ultimate message attributed to Dr. Keith R. Edwards was simple: *"The statement that amitriptyline is the 'gold standard' for treatment of painful diabetic neuropathy or postherpetic neuralgia is probably outdated, given the comparable efficacy of gabapentin with a greater safety profile."* (CDM 0022270)

13.  Parke-Davis ended **1999** with the Neurontin wind full in its sails. (WLC_CBU_175636 et seq) strikes me as a good example of how the "Neurontin Advisory Board" meetings were used by Parke-Davis, assisted by "IntraMed Educational Group", to utilize or manipulate physicians for the promotion of Neurontin (gabapentin). In this case, Texan doctors in the Houston area convened at the Omni Hotel in Houston on December 1, 1999 to listen to Dr. Ahmad Beydoun and for "dialogue".  The meeting summary prepared by Alissa Sklaver of IntraMed and addressed to Cyndy Phillips of

Parke-Davis on December 13, 1999, shows that *"Parke-Davis's goal for the meeting was to gain information from the attendees on how they can better market Neurontin in the future, and how their current marketing strategies are working and being perceived."* (sic)  Ms. Phillips presented images of new 600 and 800 mg tablets of Neurontin.  Dr. Beydoun referred not only to the Backonja (945-210) and Rowbotham (945-211) trials, but also to a migraine prophylaxis protocol (945-220).  I am not familiar with this protocol, which did not show up during my review of pain, unless it is the Australian study (Spira 2003), which its authors describe in Neurology 2003 as "investigator-initiated" but supported by Parke-Davis.  Dr. Beydoun again comes across in the written notes as somewhat more conservative in his views about gabapentin dost-titration than Parke-Davis.  The notes suggest there was a lot of speculation amongst attendees about various potential uses for gabapentin, something presumably intended by Parke-Davis to maintain the Neurontin "buzz".

14.  (WLC_CBU_072249 et seq) shows that by December 21, 1999 Parke-Davis had also involved Medscape, another internet-based commercial source of "CME" for physicians, through an "educational grant", now involving Dr. Gary Bennett (Ph.D.), Dr. Robert Dworkin (Ph.D.) and Dr. Bruce Nicholson in a program entitled "Anticonvulsant Therapy in the Treatment of Neuropathic Pain".  Parke-Davis was concerned about rivalry from two other drugs (topiramate/Topamax and lamotrigine/Lamictal) approved in the USA only as anticonvulsants but rapidly gaining market share for off-label uses.  (Both of these drugs have subsequently been demonstrated to be very toxic, especially topiramate, and virtually useless for pain.)


**<u>2000</u>:**

15.  The "Neurontin fever" (my term) continued to mount.  If none of the speakers' bureau members literally headed "North to Alaska", that may be because the population of Alaska was too small to bother with or because Alaskans, like extreme northern Canadians, do not feel pain.  (WLC_CBU_164409 et seq) shows that in January 2000 similar "Speakers Bureau" presentations continued virtually everywhere in the "lower 48".  For example "Advanced Perspectives in the Management of Neurological Disorders", a large conference held in Scottsdale, AZ attracted not only 8 "Marketing Managers", "Area Business Managers" or "Territory Managers" and 1 "Medical Liaison" from Parke-Davis as well as 5 prominent members of the "Speakers Bureau" or "Faculty", but 98 "South Central Region" U.S. physicians and 38 "West Region" physicians.  Judging by the addresses, these were primarily community (non-academic) physicians.  Notes from this meeting labeled "Lecture Summaries and Panel Discussions" suggest that the lead "Faculty" member, Dr. Martha J. Norrell of Columbia University, promoted the concept that (at least for epilepsy) **gabapentin up-titration was remarkably safe**: *"The data on tolerability suggests that patient tolerability not lost as titrate upwards.  Tolerability issues will be apparent with initiation but not with titration. The only side effect emergency with higher dosage was somnolence."* (sic) (WLC_CBU_164418)  Intriguingly, Dr. Beydoun is cited as suggesting with respect to treatment of PDPN with gabapentin (from study 945-210, JAMA 1998) that: *"As early as week 2, there was significant improvement that was maintained.  **If there will be a***

*response, it will appear early.  No high doses needed. Placebo data exhibited a bell shaped curve while the gabapentin group shifted to the left with the majority being improved and pain free…"* (emphasis added) (WLC_CBU_164423) Dr. Beydoun's relatively conservative message that a patient should be able to tell early in treatment whether gabapentin could provide any useful balance of benefit vs. harm, and his suggestion that this was usually ascertainable at low doses, seems to have been **buried in these minutes**, compared with the dominant message to **"push the dose"**, or that the "majority" of gabapentin-treated patients were pain free (something clearly not in accordance with the evidence, compared with placebo).  Sample comments excerpted on the last page of this internal report document how the meeting psychology worked as intended, e.g. the comment of one attendee: *"My utilization for Neurontin was rapidly falling down in direct relationship to a rapid climb for my utilization of Topiramate. Thanks to current information learned on this meeting I will reverse that trend."* (sic) (WLC_CBU_164432)

16.  (WLC_CBU_076620 et seq) gives a clear example of the dominant **"push the dose"** message, now incorporated by Dr. Charles E. Argoff in "Management of Neuropathic Pain Syndromes – A Supplement to Neurology Reviews, Clinical Trends & News in Neurology, March 2000".  What appears superficially to be a "medical journal" is in fact a publication of "Partners in Medical Communications", made possible through an "unrestricted educational grant from Parke-Davis".  All but one of the speakers (including Dr. Miroslav M. Bakonja) disclosed in fine print at page 2 associations (grants, Speaker's bureau, consultant) with Parke-Davis and other pharmaceutical companies.  Although this material was "designated" for 2 hours official CME, like similar documents referred to above (and below), this description is by any reasonable standard a euphemism for "infomercial advertising".  Dr. Argoff of the "Pain Management Centre", Syosset, NY emphasized: *"It is important not to underdose gabapentin when managing PHN; the average maximally effective dose in the recently published controlled trial was 3,600 mg (with an average participant age of over 70).  In practice, I have seen many patients who were told to stop gabapentin due to apparent lack of efficacy at doses of 1,800 mg or less.  The available data strongly suggest that this is not appropriate, absent significant side effects. (63)"* (emphasis added,WLC_CBU_076638)  The reference (63) is to the Rowbotham 1998 trial of gabapentin for PHN, which used a forced titration schedule to 3,600 mg/day, **but this trial does NOT show greater efficacy for higher doses.**  This trial also excluded patients who had previously taken gabapentin, and may have thereby artificially reduced the apparent toxicity of gabapentin.  Dr. Argoff's message in print is an obvious **misunderstanding, distortion, or misrepresentation of the experimental evidence**, and is inconsistent with what can be discerned from a careful examination of all trial data.  Interestingly, the sentence cited above **does not state** that increasing the gabapentin dose above 1,800 mg/d improves results, **although it is obviously crafted to encourage doctors to use higher gabapentin doses!**  Did Dr. Argoff in fact write this article published via "Partners in Medical Communications"?

17.  (WLC_CBU_164379) refers to a presentation at the Westin Hotel in Denver, CO by Dr. Beydoun, who was now suggesting that for **epilepsy**, dose titration of gabapentin beyond 1800 mg/d to 3600 mg/d or even 4800 mg/d *"… indicated that the side effect profile was very similar at 3600 mg as compared to the profile at 1800 mg … The*

*investigators found dissociation between the dose and side effect profile ...*"   This remark relates to **epilepsy**, and I do not know whether the published or unpublished data confirm this claim, which lay outside of my mandate to review gabapentin for pain treatment.   In response to a questioner identified only as "Phillips", Dr. Beydoun responded that in treatment of epilepsy *"If they do experience adverse events, they'll tell you right away.   If they tolerate the drug, they will tolerate it early on."* (WLC_CBU_164380)  I find this response more consistent with my own clinical experience with gabapentin and with other drugs acting on the central nervous system.   It would be a very unusual drug indeed for which increasing doses did not increase adverse effects.   Dr. Beydoun again insisted that most side effects of gabapentin are transient, e.g. *"... It's important to let the patients know that there is a 1 in 5 chance of developing side effects and they will lessen after 10 days..."*   I could find no evidence from the clinical trial reports satisfying me that this is correct, although it would not be unprecedented for patients to accommodate to adverse effects, just as many accommodate to pain.   Had I been an attendee at these presentations, it might have been easier for me to discern whether Parke-Davis' real strategy was to encourage the use of high doses of Neurontin in epilepsy to pave the way for "dose-creep" in pain.   From a strictly commercial point of view, if Parke-Davis could persuade doctors that they were "underdosing" their patients, at least another few weeks or months of Neurontin sales could be racked up for each sufficiently gullible or desperate patient.   This reminds me of  the Las Vegas approach to separating gamblers from their money: if you haven't won yet at the slots, the big payoff is probably "right around the corner".   Many gamblers have believed this over the years; few have been right.

18.  Dr. Michael McClean of the Vanderbilt University School of Medicine was at full throttle by April 13, 2000 when he appeared for a meeting of the "Parke-Davis Advisory Board on Neurontin" at the Adam's Mark Hotel in St. Louis, MO on April 13, 2000. (MDL_Vendors_057668 et seq).   After what I would consider a pseudoscientific prelude (How many practicing doctors who attend pharmaceutical "advisory board" meetings recall or care what a "zwitterion" is, amusing as it may be to pronounce this word in German?), Dr. McClean turned up the heat, arguing that Neurontin had *"...no interactions with other drugs... therapeutic efficacy skyrockets when you increase the dosage... The therapeutic index is 4-20.   It means that there is a wide range of doses to try and you won't compromise tolerability when you're trying to reach efficacy.   The useful dose range is about 900-4800 mg/day..."*   In this presentation he was talking about treatment of epilepsy, but while I agree with him that gabapentin may be safer or easier to eliminate (through two healthy kidneys) than some other CNS-active drugs, I consider these comments both rash and at times incomprehensible.   I can not imagine what he meant by a "therapeutic index of 4-20", as it is clear that some people experience marked neurotoxicity at doses as low as 100 mg/day, whereas others tolerate 4800 mg/day with no apparent effect, either beneficial or harmful.   Dr. McClean's presentation suggests to me that he was more familiar with gabapentin data than most other "faculty" at meetings of this nature, perhaps from epilepsy studies which I have not reviewed.   For example at (MDL_Vendors_057671) he pointed out that about 10% of patients (presumably those treated for epilepsy) may gain 5-10 pounds, within minutes of dismissing gabapentin-induced edema in elderly patients as "reversible".   Overall, this presentation strikes me as less than appropriately cautious or restrained for a faculty member at a leading medical school noted for its program in clinical pharmacology.  **An unidentified physician in the**

**audience**, responding to a question from Parke-Davis Area Business Manager Steve Goodrum at (MDL_Vendors_057673) **seems to have provided a reality check** by stating: ***"The only people I use it on complain about side effects at low doses. The more I use it, they worsen. I've taken them off before they reach adequate doses."*** This message does not seem to have left the room, let alone appear in subsequent Neurontin advertising. A little later during the same meeting, Parke-Davis Medical Liason Dan Thomson helped answer an attendee's question about using Neurontin on fibromyalgia patients: *"The literature background for Neurontin is overwhelming. We would be happy to send you all the information about these cases."* I wonder what he was referring to – presumably anecdotal case reports of which Parke-Davis was aware. Would Mr. Thomson have been equally enthusiastic to distribute the reported comments of the previous questioner?

**I think that most ethical physicians would recognize this level of hucksterism as fraudulent,** but the ratings indicate that the attendees (specifically selected because they were already generous prescribers of Neurontin and known to be friendly to Parke-Davis) saw it differently – see the enthusiastic if not rapturous responses excerpted at (MDL_Vendors_057667).

18. Dr. McClean made similar presentations espousing generous doses of Neurontin for neuropathic pain, for example at a similar meeting at the Jefferson Hotel in Richmond, VA. (MDL_Vendors_056840 et seq.) Had I attended one of these meetings and listened to an apparently eminent academic physician from a major medical school, I think I might have expected Dr. McClean to alert me if there were contradictory evidence from any studies other than those he cited in his 3 references to gabapentin (one of them an editorial). (MDL_Vendors_056847). By now, the Morello trial comparing gabapentin with amitriptyline for PDPN had been published (1999), and the Reckless (945-224) trial report had been finalized by Parke-Davis. Recall that the unpublished but now completed Reckless trial showed no dose-dependent efficacy for gabapentin (indeed no efficacy whatsoever for the primary outcome) but at least a strong suggestion of dose-dependent toxicity. It was a much larger trial than that of Backonja and therefore more definitive. Similarly, Gorson's negative trial at 900 mg/d had been published, albeit selectively and incompletely so as to paint a better picture than the reality of the trial. Why are these not mentioned? What of the four large trials in acute pain, none of which had shown any analgesic benefit from gabapentin and all of which had been completed, analysed and reported within Parke-Davis by early 2000? **Was Dr. McClean really unaware of this information? If so, he was effectively duped. If he had been aware of it, then his audience was duped, and he should have been ashamed to present a slide set without so much as a pro forma conflict of interest declaration. I wonder what the Vanderbilt University School of Medicine would think of this now? Note that Dr. McClean was not alone. The same observations could be made about any other physicians with close ties to Parke-Davis, who by 2000 ought to have surmised or inquired about the possibility of negative trials.**

19. Excerpts from a Parke-Davis Neurontin Advisory Board Meeting held on June 20, 2000 in Alabama afford additional fascinating but disturbing insights into how Parke-Davis utilized what are now called local "Key Opinion Leaders" (KOL's) to get its

message across. (Pfizer_TMartin_0002200 et seq)  These KOL's were also useful to help Parke-Davis understand what forces were determining Neurontin's market share for epilepsy and off-label uses.  The "Attendee List" shows what appear to be neurologists and/or psychiatrists from small and large towns throughout the southeastern USA.  The "advisory board" was clearly **advisory to Parke-Davis for marketing, not for medical issues.**  Members advised that to gain more market, *"Neurontin just needs to emphasize off-label indications."* (Pfizer_TMartin_0002205)  Doctors present were impressed that Neurontin was in fact a *"...model to get indication for one thing* (epilepsy) *and then use it for everything else"*.  (Pfizer_TMartin_0002205)  It is also apparent that Parke-Davis was keen to see specialists push the Neurontin dose.  Tammy Martin, CNS Area Business Manager for Parke-Davis Southeast CBU: *"How many of you have patients who come to you and say that they have tried the drug and it didn't work?  Are they willing to try it again"?*  Responding "attendee": ***"They didn't try enough.  They were lowballing the dose.  It takes effort to get them to retry it."*** (emphasis added) (Pfizer_TMartin_0002207)

Again, Dr. Ahmad Beydoun, co-author of the Backonja 1998 trial in PDPN, pointed out that when gabapentin was used for PHN (Rowbotham 1998) an effect on pain scores appeared as early as week 2, the first assessment date after baseline. (Pfizer_TMartin_0002211)  Once more, Dr. Beydoun was more conservative in his dosing recommendations than other Parke-Davis spokesmen like Dr. Michael J. McClean, stating that *"for new patients, most do well on 9(00)-1200 mg (per day)"*. (Pfizer_TMartin_0002211)  However, Dr. Beydoun's relative restraint may have been useful primarily to temper audience perceptions about Parke-Davis' control of the agenda, as his conservatism was not the overall message, which clearly favoured **much higher doses**.  Dr. Jeff Robinson (PhD) of Parke-Davis Medical Affairs is cited as having remarked that *"Gabapentin is an amino acid and thus is a safe product."* (Pfizer_TMartin_0002212)  This obviously incorrect statement gives some flavour of the "scientific" tenor of such meetings.  Their real purpose is betrayed by the comments from "attendees" on the final page of the meeting summary, e.g. ***"I would like to have stock options in your company as an advisor" or "The comment by Jeff that it (gabapentin) is the same as an amino acid will be a great selling point."*** (emphasis added) (Pfizer_TMartin_0002216)

20.  Dr. Misha-Miroslav Backonja was now also into the act.  He is listed for example as a speaker at a similar event held on June 10, 2000 at the Westin William Penn Hotel in Pittsburgh, PA, although no content appears under his name in this document. (SH_0064559.0076474)  I cannot tell from this what Dr. Backonja had to say, I would be curious to know and also to learn whether he disclosed to his audiences a reasonable conflict of interest declaration.  (I noted serendipitously that Dr. Backonja may not always have been scrupulous with conflict declarations.  Via the on-line access to the publication history of the van de Vusse 2004 study on use of gabapentin for CPRS-1 [see appendix, Study No. 7] I learned that Dr. Backonja was a peer reviewer for that publication.  This information is freely available on the BMC Neurology website linked automatically to the web reference I have listed in the appendix.  The other reviewer for the van de Vusse paper, Dr. Wouter W.A. Zuurmond, completed a "Declaration of competing interests" by disclosing *"yes, I have performed a lecture for Pfizer and*

*received a fee for it*".  In contrast, Dr. Backonja responded on May 24, 2004 to the same question with the answer *"none"*.  This seems unlikely to have been a reasonable answer, although it is possible that by 2004 Dr. Backonja had severed all ties with Parke-Davis/Pfizer.)  As of June 2000, financial connections between Dr. Backonja and Parke-Davis were certainly extant, and one would suspect that Dr. Backonja, (like Dr. McClean and Dr. Beydoun) might have been amongst the most likely people outside of Parke-Davis/Pfizer to have known the results of the unpublished trials available by mid-2000.  **What did he say about them, and to whom?**

21.  Yet another meeting in San Francisco on July 20, 2000 now involved Dr. Edgar Ross, Director of the Pain Management Centre at the prestigious Brigham and Women's Hospital of Boston, MA in sharing the glad tidings about Neurontin. (Pfizer_JMarino_0002191)  Dr. Ross' slides appear different from the other slide sets and are more idiosyncratic.  He was still referring to only two trials of gabapentin for PDPN (PDN) and PHN, although he also made a point of referring to *"8 patients* (who) *had advanced HIV"* in whom he appears to suggest that gabapentin was *"very effective"*.  I could not tell what study he may have been referring to.  The last slide in the set (Pfizer_JMarino_0002192) is enigmatic.  A "seeing-eye" dog is about to fail its final test by leading a blind man directly into a jet engine.  **Could this be a reference to the "blind leading the blind" with respect to Neurontin?   Perhaps Dr. Ross was indeed unaware of the unpublished results on which Parke-Davis had now been sitting for months.**

22.  Even Professor Robert Dworkin, who later documents show enjoyed a close working relationship with Parke-Davis/Pfizer for many years, made no allusion to the unpublished trials at the same "Worldwide Pain Conference". (Pfizer_JMarino_0002198)  Although Professor Dworkin's remarks are sufficiently carefully written that they remain technically accurate, he too gave the "Worldwide" conference no hint that there was more to the story than he was saying.  Why did he not refer to the Gorson study, which had failed to show benefit of gabapentin in PDPN, or Morello which the independent VA investigators interpreted as evidence to continue choosing TCA as "first-line" therapy?  Professor Dworkin had ties to Parke-Davis, and had published sub-analyses of the Backonja 1998 study.  **Could he too have been kept outside the "Parke-Davis/Pfizer" circle of knowledge?  Was Parke-Davis deceptive with Dr. Dworkin, or was Dr. Dworkin deceptive to his audience in San Francisco and elsewhere about the real facts?  One cannot have it both ways.**  Given the later record showing that Dr. Dworkin was keen to check the authenticity of what he considered the highly suspicious 2001 report of Dr. Simpson, I wonder whether Dr. Dworkin was kept in the dark like the rest of the world.  **If so, how must he have felt when he eventually learned about the unpublished gabapentin studies in September 2001?** (see below)

23.  In September 2000 the parade was joined by publication of yet another supplement "supported by an educational grant from Parke-Davis", this time in the Clinical Journal of Pain (another relatively minor journal of which Dr. Dworkin was an Associate Editor), reporting "Proceedings of a Symposium" held on August 23, 1999 in Vienna, Austria. (Pfizer_AFannon_0008126 et seq.)  Here, Dr. Nadine Attal of Boulogne, France

presented a table labeled "Placebo-controlled studies in neuropathic pain …" which purported to show that only 1 trial had been conducted with gabapentin for PDPN, and 1 trial for PHN, both "positive".  (Pfizer_AFannon _0008138).  **This is not only incorrect, but frankly misleading or deceptive.**  We now know that by the time this publication appeared, the much larger Reckless 945-224 trial had been completed and reported on. Dr. Attal mentioned and cited the 1997 Gorson trial (published 1999) but did not include it in the table as a negative trial.  Even the Perez trial from Monterrey, Mexico (which I have considered insufficiently reported to include in meta-analysis) had at least been published.  One could criticize Dr. Attal for incompleteness, inadvertent ignorance of the unpublished Reckless trial, or sloppiness, but where were the supplement editor and the company that supported publication with an "educational grant" when it came to full disclosure?  What was the **educational** point of publishing incorrect and misleading information?

24.  I found similar evidence of sloppiness, or perhaps "ghost writing", in a document of whose title the first word "Interface" has a rather disturbing Rorschach-like quality.  It is otherwise entitled "Neurology & Psychiatry Diagnostic and Treatment Issues EME Enduring Manual Monograph based on proceedings of symposia held January 16, 1999; February 12, 2000 …" (SH_0044769)  This document is labeled as sponsored by the Albert Einstein College of Medicine and "made possible through an unrestricted educational grant from Pfizer Inc." but I suspect that Einstein would have been disappointed to see his name associated with it.  The document is labeled "CONFIDENTIAL" on every page, but appears to have been intended for release in October 2000.  A chapter attributed to Dr. Michael J. McClean incorrectly cites the numbers of patients assigned to the gabapentin arms in the Backonja 1998 and Rowbotham 1998 clinical trials. (SH_0044844)   While this is a trivial error easily correctable by the reader by a look at the original publications, it makes one wonder how closely Dr. McClean was involved in the authorship.  Who might have read this monograph, and what was its real intended purpose?


**2001:**

25.  Perhaps the most telling of all the documents I reviewed is that labeled (Pfizer_MYoder_0002511).  I have reproduced and discussed this earlier in this report, but I cannot tell when it was produced – only that it refers to disappointing prescription renewals for Neurontin during 2001.  Parke-Davis/Pfizer had clearly realized by now that there was much less money to be made if people stopped using their product after only a month or two.

26.  Dr. Roy Freeman of the Harvard Medical School now joined the fray with what strikes me as a **specific mission to encourage doctors to "push the dose"** of Neurontin. (SH_0064559.0093275 et seq.)  From this mysterious document , also stamped "CONFIDENTIAL" on every page, we learn something about the price Pfizer was willing to pay for a "hired gun".  A letter from John Christensen, Faculty Liason for IntraMed Educational Group (a contractor to Pfizer under yet another "educational

grant") apparently wrote to Dr. Freeman on January 18, 2001 proposing an honorarium of **$2,000 per program ("Clinical Success Factors in Managing Neuropathic Pain")** which was to be "given to you on the day of the program". (SH_0064559.0093292) Naturally, expenses were also covered or reimbursed.  Dr. Freeman was scheduled to deliver three such lectures out of a total of 10 scheduled for the period March-June 2001. The key message in Dr. Freeman's talk seems to have been the idea that ***"Therapeutic actions for neuropathic pain typically require doses of around 2400 mg, however, anecdotally, doses up to 4 Gm/day* (4000 mg/d)** *have been used."* (emphasis added) (SH_0064559.0093282 )  **This message was not supported by any evidence, contradicted the frequent more conservative advice offered to company-sponsored fora by Dr. Beydoun, and is not referenced in the article.  It is frankly deceptive, in my opinion.**  Dr. Freeman was also long out of date when he wrote that *"Although no head to head trials of gabapentin versus a tricyclic antidepressant or a standard anti-convulsant such as carbamazepine have been reported, many pain specialists are now using gabapentin as a first line drug for neuropathic pain ..."*  Dr. Freeman's chapter seems to be undated, so I cannot tell when he wrote this presentation (if it was indeed his primary work), but the reference list shows reports through 2000, whereas Morello's study of gabapentin vs. amitriptyline for PDPN was published in 1999, indexed by PubMed and MEDLINE, and certainly known to me by the year 2000. Needless to say, there is no indication that Dr. Freeman informed his audience of the results of the Reckless trial.

27.  Dr. Ahmad Beydoun may have been more cautious in how he appears to have presented his opinions about Neurontin (at least to the extent one can judge from printed documents as opposed to the live performance, which surely must have been more entertaining), yet he too must have been on the gravy train.  For example, he appeared on June 2, 2001 at the Hyatt Regency Coral Gables in Coral Gables, FL.  A table from his presentation (MDL_Vendors_094818) still referred only to the Backonja and Rowbotham studies, although it was now over 3 years since initiation and about 2 years since completion of the larger European PDPN trial (Reckless 945-224), and over a year since the final trial report had been completed and signed off at Parke-Davis.  Neither was the Gorson trial mentioned.  The Serpell study of mixed neuropathic pain (945-306) had been completed in the U.K. and the internal research report was finished.  Even the reasonably large Nordic study (Gordh, 945-271) was nearing completion.  Had Dr. Beydoun been aware of the negative acute pain trials of gabapentin, he might have considered them irrelevant to neuropathic pain, but I think an academically honest presentation would have had to mention such results to the audiences, let alone some of the bad news for Neurontin that had already emerged, or was continuing to emerge from the chronic pain clinical trials.

**In light of what I now know, I find the table referenced above to be clearly misleading, omissive, and/or deceptive.**  In Dr. Beydoun's defence, I must state that he appears to have "stuck to his guns" (even if hired) in continuing **not to recommend the huge doses of gabapentin** that others like Dr. Freeman and Dr. McClean were now espousing. (MDL_Vendors_094823)  Perhaps Pfizer felt it could overcome any of Dr. Beydoun's reticence about "mega-dosing" (my term) by massaging (figuratively) the

attendees in the hotel corridors.  Like others in the Pfizer stable of speakers, Dr. Beydoun was quick to apply the term "first-line therapy" to gabapentin for neuropathic pain (along with TCAs).  I still see no thoughtful, let alone scientifically based discussion of oral opioids as alternative "first-line treatment" for serious pain, although Pfizer now knew conclusively from the 1999-2000 acute pain experiments that opioids and naproxen were efficacious for acute pain of various types, whereas **gabapentin was not.**

The use of the term **"first-line"** appears to me to be a political or marketing term, not a medical or scientific one.  To understand this better, see my long discussion of the goals of pain treatment, earlier in this report.

28.  Not long after this, on September 6, 2001, Pfizer convened a meeting of very senior academic experts on pain research at the Crowne Plaza Hotel in Ann Arbor, MI, to review the possibility of a New Drug Application to the U.S. FDA seeking an indication for Neurontin (gabapentin) for PHN and DPN.  (Pfizer_LeslieTive_0013555).  Presumably the outside experts (Dr. Mitchell Max of NIH, Professor Robert Dworkin and Dr. Gary Bennett and Paul Leber) were put under confidentiality agreements which would have precluded them from later disclosing what they learned from Pfizer in order to prepare for this meeting.

**The results of the Reckless (945-224), Serpell (945-306) and Nordic (945-371, Gordh) studies were now revealed to the outside experts.**  According to the available notes (Pfizer_LeslieTive_0013556), Dr. Max was as authoritative as he was succinct: *"You're done."*  Although Dr. Dworkin was not quoted verbatim, the notes show on the same page that he found the (Reckless, 945-224) *"... large placebo-controlled negative dose-response (600, 1200, 2400 mg/d) study, in which 2400 mg appeared worse than 1200 mg, striking"*.  Apparently he advised that another positive, well controlled study would be needed to "overcome this study" (note taker's words, not Dr. Dworkin's).  Amongst other things, there was consensus that, "Importantly, gabapentin is not effective in non-neuropathic models of pain."  Presumably this conclusion was based on the Nordic (945-371, Gordh) study, as I saw no indication that the acute pain study results were revealed to the outside experts in preparation for or during the September 6, 2001 meeting.

**The cat was out of the bag, but the room was sealed, so to speak.  Unlike the royal chamber at Elsinore, the walls did not "have ears".  The seal was highly effective.**

**I can now answer some of the questions I posed in paragraph 22 above.  There can be little doubt that even Dr. Dworkin had been kept in the dark about the emerging negative results for Neurontin.  Consider the year 2001.  Pharmacia (now Pfizer) had similarly controlled access to the real data about celecoxib (Celebrex) in order to fool the Journal of the American Medical Association into publishing an inaccurate, misleading, deceptive, and ultimately fraudulent account of the "CLASS Study" only one year earlier. (JAMA. 2000;284:1247-1255)  The editorialist who endorsed celecoxib in the same issue of JAMA later complained to the media that he would not have done so, had he know the real facts,** although an astute and meticulous reader could have discerned that there was something wrong with the JAMA report about Celebrex.  (See our series of Therapeutics Letters on celecoxib at www.ti.ubc.ca, which

made our University of British Columbia academic group, the UBC Therapeutics Initiative, very unpopular at the time.  Our analysis was ultimately vindicated and has strengthened our reputation for academic honesty.)

**Dr. Dworkin would have been well aware of this scandal, which brought international attention to the need to reform medical journal standards and practices.  I wonder whether he was feeling that he too had been bamboozled.  But Dr. Dworkin and the other outside experts consulted by Pfizer in September 2001 may now have been muzzled by a Pfizer confidentiality agreement.  Dr. Dworkin apparently remained happy to maintain a cordial relationship with the company. (see below)**

29.  Nothing stopped Pfizer from proceeding apace with its indoctrination of a "Primary Care and Neurology Advisory Board" on November 8, 2001. (Pfizer_RGlantzman_0049084 et seq.)  Low back pain was now to be considered a "condition associated with neuropathic pain" (Pfizer_RGlantzman_0049091) with a prevalence 3-4 times greater than that attributed to diabetic neuropathy, which itself was probably exaggerated (as all diabetic neuropathy, not PDPN).  Backonja's and Rowbotham's studies were again presented *ad nauseam* and even Serpell's study (945-430) was now introduced into "evidence" (Pfizer_RGlantzman_0049119 et seq.).

Slides apparently prepared for or by Suzanne Doft, Director, Neurontin US Marketing Team (identified at: Pfizer_LeslieTive_0074392) are labeled in their left lower corner "Xtec Media Job X2855 Doft".  There is a clue at (Pfizer_RGlantzman_0049119) that the slides had been in preparation for some time, since the reference for a description of 945-430 was given as "Source: Serpell, MG, Pain 2000 (Submitted)".  The published version of Serpell's study (Serpell, MG, Neuropathic Pain Study Group.  Gabapentin in neuropathic pain syndromes: a randomized, double-blind, placebo-controlled trial. Pain 2002; 99: 557-66) indicates that the article was not submitted to Pain until April 10, 2001, which implies that it may have had an interesting "prepublication history".  Parke-Davis/Pfizer of course had not only enjoyed access to the study results since it's completion in February 2000, but had been responsible for their analysis.  Dr. Serpell, after all, was merely a consultant paid for his "independent help and advice on this project". (Pain 2000, p 565)  The slide set notes beginning at (Pfizer_RGlantzman_0049120) suggest that this version was prepared for presentation by Dr. Serpell *"...as you will see when Dr. Serpell goes through the patient population."*

**Did Parke-Davis/Pfizer succeed with the mischievous, if not devious interpretation of the study data suggested in the bottom notes at (Pfizer_RGlantzman_0049121)?** Here I note what appears to be a **prompt**, suggesting that the presenter (Dr. Serpell himself, if possible) introduce the slide to an audience with the commentary that *"It would be interpreted from this graph that there are no benefits to be gained from prescribing 2400 mg, **however, when we consider the response in relation to duration of disease there is a distinction between the 1800 and 2400 mg dosage groups**."* (emphasis added)  If this were not "torturing the data until they speak the desired words", then it would surely have amounted to putting the desired words into the speaker's mouth!

I have no knowledge of what manuscript Dr. M.G. Serpell and colleagues may have submitted to the journal Pain on April 10, 2001 (shown as the submission date in the 2002 published article), a manuscript virtually certainly prepared by Parke-Davis/Pfizer for the "ghost authorship" of Dr. Serpell. **However, Serpell and the "Neuropathic Pain Study Group" certainly made no such claim in the final Pain article reporting on 945-430 (Serpell, Pain 2002). On the contrary, the authors were at pains to suggest in their discussion that the purported clinical benefits of treatment were apparent <u>early</u>, and Figure 3 of the published report claimed statistical significance at 1-4 weeks, <u>before any patient had reached 2400 mg/d</u>.**

**Anyone who reads Serpell 2002 (Pain) or my detailed study summary (Appendix), let alone anyone who digests the information available in the full unpublished study report from Parke-Davis dated May 5, 2002 will see that the above interpretation of 945-330, purporting a greater benefit at higher doses, is a totally fallacious and frankly duplicitous perversion of what the study showed.** A follow-on slide strikes me as intended to rub in the message by labeling with the title "Neuropathic Pain – Efficacy Summary" a slide which shows only the titration schedule of the published (or soon to be published) U.S. and U.K. studies, and which properly should have been entitled "Titration Schedules". (Pfizer_RGlantzman_0049122)

**The only possible interpretation I can make of this slide set is that it was a bold-faced attempt to manipulate physicians into prescribing larger doses of gabapentin than they might otherwise have chosen – by flying in the face of the truth!** But the audience could scarcely have realized in a matter of a few minutes or hours what has taken me months of thinking and hard work to discern. **Of course, Pfizer would have known that. There is no mistaking that Pfizer used this to its advantage.**

30.   The same documents, beginning at (Pfizer_RGlantzman_0049128 et seq.) show that Pfizer was now moving to follow the advice received barely two months earlier in Ann Arbor. New multi-centre trials were now planned for the European Union and the United States, presumably to "overcome" the Reckless (945-224) trial, which was starting to live fully up to its name! Pfizer was again going to push the dose of gabapentin towards a target of 3600 mg/d. The United States trial appears to have unfolded as what became 945-1008, for which the original protocol is dated December 4, 2001 although the first patient was not enrolled until April 4, 2002. (See detailed summary report in my Appendix.) Unlabelled Pfizer documents which I reviewed indicate that by May 2003 the proposed new European trial had already been cancelled. It appears to have been labeled as "945-1007". Another trial was proposed, apparently for Japan, Australia, and perhaps Latin America ("JAALA", 945-1009) and at one point planning for an investigator meeting was underway for early 2003. (Pfizer, also an unnumbered document)

There seems to have been a virtually frantic attempt to use the notion of these newly proposed or planned trials to encourage more prescribing of Neurontin, utilizing the "advisory boards" or "KOL's" as their main "change agents". (see for example:

Pfizer_LeslieTive_0042341 et seq.; Pfizer_RGlantzman_0053265 et seq.; Pfizer_RGlantzman_0059497 et seq.)

**I find the latter document** (Pfizer_RGlantzman_0059497 et seq.) **particularly unsettling,** because a Pfizer "Neuropathic Pain Advisory Board Focus on the Specialist" meeting, or a series of such meetings (dates are not clear to me) was **moderated and introduced by Dr. Roland W. Moskowitz**, Professor of Medicine and Director of the Arthritis Research Centre at Case Western Reserve University School of Medicine in Cleveland, OH.  The slide sets for these sessions are replete with recitations of Pfizer's noble mission as well as its global economic power, although (perhaps fortuitously, to spare me from choking) the ellipse labeled "Values" is not legible in the version I reviewed of a slide labeled "Pfizer Mission: Purpose, Mission, Values" (Pfizer_RGlantzman_0059500 et seq.)

**What disturbs me about Dr. Moskowitz' involvement is that as a principal investigator in the 1999-2000 short term trial of gabapentin for pain in osteoarthritis, he was in a privileged position to know that gabapentin was not efficacious for acute pain, and that the company had not revealed the results of its multiple experiments to the world.  Effectively the trust of patients who participated in trials approved by ethics boards had been breached.  An ethical ethics review board normally will insist that trial results must not be hidden from the public.  Did Dr. Moskowitz share what he knew about these acute pain trials with the "attendees" at any session which he may have proceeded to moderate?**

31.  At (Pfizer_RGlantzman_0059500 et seq.) it becomes apparent that Pfizer had carefully studied the attitudes of neurologists, pain specialists and primary care doctors to learn as much as it could about the psychology of how they titrated Neurontin for patients in pain.  The "Research Conclusion" (Pfizer_RGlantzman_0059595 et seq.) is that "Few physicians are titrating up to the maximum dose of 3600 mg, as outlined in the new product profile."

The use of the word "Pivotal Studies" in a graph designed to show how specialists and particularly generalists were deficient in their "dosing and titration behaviours" is striking.  (Pfizer_RGlantzman_0059598)  **"Pivotal studies" were those that Pfizer liked, not those which it disliked and whose results it kept hidden** (e.g. 1032-002 in osteoarthritis for which Dr. Moskowitz was a principal investigator, or the much-feared Reckless 945-224 trial, or the soon-to-be completed 945-1008).  It is important to understand that the term "pivotal" has no scientific meaning, but it definitely has a psychological and political meaning: **in this sense "pivotal" means the information or disinformation required to cause doctors to pivot toward their prescription pads.**

The next slide in the sequence (Pfizer_RGlantzman_0059599 et seq.) suggests to me that doctors invited to such meetings by Pfizer were being "pivoted" into the belief that they were contributing in some way based on their clinical expertise to "research", when in point of fact they were really experimental subjects in a marketing exercise.  Where this extends to "workshops" intended to help specialist doctors develop the language

appropriate to use in consultation reports as a "one-paragraph response persuading your colleague to prescribe Neurontin", the border between "research" and manipulation has clearly been transgressed.  This reminds me somehow of the "re-education camps" of the old Chinese communist regime during the Cultural Revolution which most Westerners considered intellectually and ethically repugnant.

**What would have been going through the minds of physicians who might put themselves into the position of attending such workshops?  Did such "workshops" really proceed with physicians as participants, or were they only figments of someone's fevered imagination in the marketing departments at Pfizer?  What would their patients have thought, had any such physicians disclosed their recent indoctrination whilst writing out a prescription for Neurontin?**  Astute patients sometimes draw their own conclusions from inspection of their doctors' office walls, their desks, their apparel, and even by noticing from the patient waiting area any delicious lunchtime deliveries to doctors' receptionists.

**2002: (some of the above documents are undated, but may be from 2002)**

32.  There was now a "full court press" to bring the Neurontin glad tidings to managed care organizations, for example at a meeting held on March 3-4, 2002 at the Disney BoardWalk Resort in Orlando, FL.(Pfizer_LeslieTive_0074344 et seq.)   This was for the "PBM Managed Care Advisory Board" and attended by senior managers and executives of organizations such as Merck-Medco, Caremark, Walgreens Health Initiative, and VAMC Denver.  A phalanx of Pfizer marketing staff including Suzanne Doft (Director, US Neurontin Marketing Team), Valerie Flapan (Corporate Counsel) and Dr. Leslie Tive (Medical Director/Team Leader) were joined by three "Health Strategies Group" attendees whose role I cannot imagine. (Pfizer_LeslieTive_0074381)

The slide set for this presentation appears to have been more colourful than what was typically used for doctors.  I was impressed by the striking photograph of Dr. Silas Weir Mitchell, Civil War surgeon, accompanying his vivid and excruciating description of "causalgia", a particularly venal prototype of neuropathic pain. (Pfizer_LeslieTive_0074344 et seq.)  I wonder whether the PBM managers were fooled as easily as the physicians by presentation of many of the same slides, e.g. the now-outdated Serpell figure, which still bore the legend "Source: Serpell, MG, Pain 2000 (Submitted)" even though the 2002 Pain article's publication history shows that the manuscript was still undergoing prolonged revision at this time. (Pfizer_LeslieTive_0074378)

Was the audienc impressed by the presentation of "SF-36 Results: NEURONTIN in Painful DPN" which might strike a neutral observer as showing nothing? (Pfizer_LeslieTive_0074381)  Pfizer was still touting the coming "US/EU Study of NEURONTIN in Painful Diabetic Neuropathy" (the unpublished/suppressed 945-1008 and the later-cancelled 945-1007) and the "JAALA Study of NEURONTIN in Painful Diabetic Neuropathy" as well as a new "Chronic Pain Screener" test to identify more

patients - perhaps those too "patient" to complain that they needed Neurontin, so to speak. (Pfizer_LeslieTive_0074383)

**Presumably this presentation left the impression with PBM managers that there was and ongoing active research program to better characterize the optimum (large) Neurontin doses.  It must certainly have been calculated to ensure that the institutional buyers of Neurontin would not discover the results of the Reckless trial, let alone the findings from 945-271 (Nordic Trial, Gordh) which were now known (completed 2001) or those later compiled from 945-1008.  What would the same managers now think?**

33.  A similar presentation (Pfizer_RGlantzman_0149235 et seq.) was made by Pfizer on June 24, 2002 to its "Managed Care and Long Term Care Neuropathic Pain Advisory Board", although the slides pertaining to the Serpell study were now labeled: "Source: Serpell, MG, Pain 2000 (Submitted)".  **Were there any question that Pfizer's manipulation of the results and implications of the Serpell trial was accidental, this presentation clarifies that the real lessons of this study were still being distorted – deliberately and <u>systematically</u>.**  (Pfizer_RGlantzman_0149269 et seq.)

34.  Pfizer convened another meeting at its offices in Sandwich, England on July 2, 2002, to which it invited Dr. Andrew Rice of the Pain Research Group, Department of Anesthesetics, Imperial College School of Medicine (and lead author of the second published trial in PHN, Rice 2002) as well as Professor Martin Koltzenburg of the Institute of Child Health & Neurology at the National Hospital for Neurology & Neurosurgery, University College London.  Important Pfizer managers from England, Ann Arbor, New York, and Groton (England) attended.  (Pfizer_LKnapp_0070537 et seq.)  The Englishmen were less than impressed with the American approach to pain quantification and wanted to see outcomes that were clearly meaningful for patients.  They wanted to see original data published, and felt that the Pfizer data bases might contain meaningful answers to many important questions.  For example, *"Does the degree of pain relief correspond with the number of side effects ...?"*  In the clinic, they were concerned that *"...the most important side effects of gabapentin are dizziness and somnolence with oedema also significant in the elderly..."*  They perceived amitriptyline as more effective than gabapentin ($\geq$ 50% reduction of pain score in 50% of patients vs. 34% of patients for gabapentin).  As the note taker recorded dryly, *"This needs improvement."*

Pfizer executives, notably Larry Alphs of Ann Arbor (Pfizer_LKnapp_007056), were alarmed at the first paragraph of the minutes (Pfizer_LKnapp_0070539) which read: *"Current treatment options are limited.  In the clinic most patients are not on single therapies.  This may be due to the inadequacy of individual treatments, ... **The success of gabapentin is not due to its efficacy, it is less efficacious than Tricyclic antidepressants (TCA), but is due to a more acceptable side effect profile…"** (emphasis added)  From their point of view, Neurontin was now the "meat in the Sandwich", so to speak.

It strikes me that in their hearts and minds, Pfizer staff had already realized that Neurontin's days were numbered, partly because it now required an increasingly hard flogging to induce doctors to write long and high dose prescriptions for Neurontin or to convince patients to renew them.  Even more important may have been the looming patent expiry for Neurontin.  Pfizer may have needed to concentrate its corporate energies on learning from the Neurontin experience before the imminent launch of Lyrica, its heir apparent.

**What conclusions can be drawn from this chronology?**

**1.  It was crucial for Parke-Davis/Pfizer to exaggerate the purported benefits of Neurontin, "push the dose", and play down Neurontin's well documented adverse effects in order to maximize off-label use.  If doctors' attention could be attracted through the selective use of data from the published PHN and PDPN trials, it would be possible to expand the prescription of Neurontin to the much larger patient populations affected by other chronic painful conditions** (e.g. chronic back pain or "fibromyalgia").  **In a demographic this large, the purchase of several months' worth of Neurontin would be lucrative for Pfizer – even if the patients stopped taking it and could not be persuaded to renew such prescriptions.**

**2.  Parke-Davis/Pfizer could not afford for the <u>truth</u> to surface from studies which produced unfavourable results.  It must have realized even before completion of the large unpublished United States primary care study in PDPN** (945-1008, Parsons, unpublished report dated March 24, 2005) **that there was little point pursuing further studies of Neurontin when a new drug was coming fast down their "pipeline".  It would have been imperative to begin marketing pregabalin (Lyrica) before its patent cycle also began to wind down.  It was better to keep repeating the mantra of the Backonja and Rowbotham studies, distort the basically negative results  from 945-271 (Serpell) and hope that Serpell's published report would be little noticed and less carefully read, and ensure that doctors would forget or never learn about Gorson's trial and the small independent trials (e.g. McCleane 2001, van de Vusse 2004).  After all, these more independently published trial results basically supported the English experts' take on Neurontin at Sandwich: gabapentin was not an impressive drug and the small Morello 1999 trial had already suggested that for most patients amitriptyline was a more practical option.**

**3.  When it came to disclosure, neither Parke-Davis/Pfizer nor its "hired guns" acquitted themselves honestly.  The records I reviewed showed example after example of distortion of the evidence by doctors who ought to have known better.  This was amplified by the creative "spin" of the marketing personnel who were**

**ubiquitous at "continuing medical education events" and used Parke-Davis/Pfizer's ample resources to ensure that their message was tightly controlled, and that their Key Opinion Leaders (KOL's) stayed "on message".**

**4.  It is a sad but all too common reflection on my own profession and on the state of academic medicine that so many physicians, including prominent university based clinical and basic "investigators", collaborated so obsequiously in this endeavour.**

In Middlemarch, George Eliot's penultimate novel, Dr. Tertius Lydgate is heroic partly because he has turned his back on medical hucksterism.  He is the prototype reformer who recognizes that a doctor cannot both prescribe and dispense medicines without an inherent conflict of interest.  The author Mary Anne Evans (George Eliot) was aware that British physicians influenced by the Nineteenth Century's exciting new scientific influence on medicine were beginning to realize the prescribing/dispensing conflict.  Like the fictional Dr. Lydgate, they were starting to eschew the dispensing of drugs and limit themselves to prescription.

This hard-won and courageous separation of physicians' prescribing decisions from the economic returns that accompany dispensing was not inevitable.  After all, naturopaths, pharmacists, veterinarians, optometrists, and other professionals or quasi-professionals recommend (prescribe) and sell drugs, vitamins and other "supplements" or "health foods" from which they derive a significant part of their income.  The decision to avoid conflict of interest was a major ethical step for physicians, and it represented a potential triumph for patient interests over those of the health service provider.  It is iniquitous that pharmaceutical manufacturers have since undermined this ethical accomplishment so systematically and with such nearly ubiquitous success.

In the case of Neurontin, documents I reviewed provide so many examples of misleading, incomplete or omissive statements by physicians, marketing representatives, or even by key "investigators" that one becomes depressed in thinking about how easily human beings can be manipulated.  But as Abraham Lincoln is said to have stated: "You can fool some of the people all of the time, and all of the people some of the time, but you can not fool all of the people all of the time."  Neurontin (gabapentin) is probably a drug whose time is nearly up.

Preparing this opinion required substantially more work, thought, and time than I had initially imagined, but I have learned a great deal from this review.  I hope my report and its Appendices also provide you and the Court with additional insight into the matters to be considered at litigation.  Perhaps my observations will also assist anyone interested in understanding what it would take to reform our system of drug licensing, marketing, and medical education so as to foster the interests of patients' above all others.  This is

important not only in the United States but in any other countries whose governments believe that the interests of their citizens should come first.

I thank again my colleagues Dr. Vijaya Musini and Ms. Kelsey Innes for their hard work in assisting me to meet the Court's deadline for submission of this report. However I am solely responsible for its content.

Sincerely,

Thomas L. Perry, M.D., FRCPC
Clinical Assistant Professor
Department of Anesthesiology, Pharmacology & Therapeutics and
Department of Medicine
University of British Columbia
Vancouver, B.C.  CANADA

File: GABAPENTIN CLINICAL PHARMACOLOGICAL OPINION – FINAL – Thomas L. Perry, M.D. – August 10, 2008

# **List of Documents Reviewed**

Documents

|     |     |
| --- | --- |
| 1.  | CDM0022270 |
| 2.  | MDL_VENDORS_046284 |
| 3.  | MDL_VENDORS_056827 |
| 4.  | MDL_VENDORS_057666 |
| 5.  | MDL_VENDORS_085846 |
| 6.  | MDL_VENDORS_085867 |
| 7.  | MDL_VENDORS_086643 |
| 8.  | MDL_VENDORS_094765 |
| 9.  | PFIZER_AFANNON_0008126 |
| 10. | PFIZER_BPARSONS_0000073 |
| 11. | PFIZER_BPARSONS_0001128 |
| 12. | PFIZER_JMARINO_0002157 |
| 13. | PFIZER_JMARINO_0002191 |
| 14. | PFIZER_LCASTRO_0027113 |
| 15. | PFIZER_LCASTRO_0043325 |
| 16. | PFIZER_LESLIETIVE_0002581 |
| 17. | PFIZER_LESLIETIVE_0002824 |
| 18. | PFIZER_LESLIETIVE_0013555 |
| 19. | PFIZER_LESLIETIVE_0034253 |
| 20. | PFIZER_LESLIETIVE_0042341 |
| 21. | PFIZER_LESLIETIVE_0049975 |
| 22. | PFIZER_LESLIETIVE_0074344 |
| 23. | PFIZER_LKNAPP_0006623 |
| 24. | PFIZER_LKNAPP_0009569 |
| 25. | PFIZER_LKNAPP_0009830 |

26.    PFIZER_LKNAPP_0013491

27.    PFIZER_LKNAPP_0024958

28.    PFIZER_LKNAPP_0050385

29.    PFIZER_LKNAPP_0055357

30.    PFIZER_LKNAPP_0060187

31.    PFIZER_LKNAPP_0070537

32.    PFIZER_LKNAPP_0070545

33.    PFIZER_LKNAPP_0070547

34.    PFIZER_LKNAPP_0083148

35.    PFIZER_MYODER_0002471

36.    PFIZER_NMANCINI_0024603

37.    PFIZER_RGLANZMAN_0049084

38.    PFIZER_RGLANZMAN_0053265

39.    PFIZER_RGLANZMAN_0059497

40.    PFIZER_RGLANZMAN_0149235

41.    PFIZER_TMARTIN_0001736

42.    PFIZER_TMARTIN_0002022

43.    PFIZER_TMARTIN_0002200

44.    SH_0006934

45.    SH_0012453

46.    SH_0030111

47.    SH_0036543

48.    SH_0044640

49.    SH_0044769

50.    SH_0045500

51.    SH_0064559.0072317

52.    SH_0064559.0076474

53.    SH_0064559.0093275

54.   SH_0064559.0093290

55.   SH_0064559.0096673

56.   SH_0064559.0096785

57.   WLC_CBU_000221

58.   WLC_CBU_013197

59.   WLC_CBU_028461

60.   WLC_CBU_028473

61.   WLC_CBU_072249

62.   WLC_CBU_076620

63.   WLC_CBU_079302

64.   WLC_CBU_092879

65.   WLC_CBU_093708

66.   WLC_CBU_123550

67.   WLC_CBU_164376

68.   WLC_CBU_164409

69.   WLC_CBU_175636

70.   WLC_CBU_180727

71.   WLC_CBU_180735

72.   WLC_FRANKLIN_0000015522

73.   WLC_FRANKLIN_0000035723

74.   WLC_FRANKLIN_0000035726

75.   WLC_FRANKLIN_0000035728

76.   WLC_FRANKLIN_0000035747

77.   WLC_FRANKLIN_0000035750

78.   WLC_FRANKLIN_0000035751

79.   WLC_FRANKLIN_0000050304

80.   WLC_FRANKLIN_0000066844

81.   WLC_FRANKLIN_0000073645

82.   WLC_FRANKLIN_0000080451

83.   WLC_FRANKLIN_0000082494

84.   WLC_FRANKLIN_0000090053

85.   WLC_FRANKLIN_0000090214

86.   WLC_FRANKLIN_0000090215

87.   WLC_FRANKLIN_0000090220

88.   WLC_FRANKLIN_0000092698

89.   WLC_FRANKLIN_0000098315

90.   WLC_FRANKLIN_0000098352

91.   WLC_FRANKLIN_0000100273

92.   WLC_FRANKLIN_0000166608

93.   WLC_FRANKLIN_0000199743

94.   WLC_FRANKLIN_0000199997

95.   VOX027405

96.   Additionally, please the documents referred to in the Report and Appendices

## Publications

1.   Catherine Arnst, "Conquering Pain: New Discoveries and Treatments Offer Hope", Business Week, March 1, 1999.

2.   Dubinsky RM et al. Practice parameter: treatment of postherpetic neuralgia: an evidence-based report of the Quality Standards Subcommittee of the American Academy of Neurology. Neurology 2004; 63: 959-65.

3.   Dyck PJ et al. The prevalence by staged severity of various types of diabetic neuropathy, retinopathy, and nephropathy in a population-based cohort: the Rochester Diabetic Neuropathy Study.  Neurology 1993; 43: 817-24;  Boulton A.  Management of Diabetic Peripheral Neuropathy. Clinical Diabetes 2005; 23: 9-15

4.   Helgason S et al.  Prevalence of postherpetic neuralgia after a first episode of herpes zoster: prospective study with long term follow up. BMJ 2000; 321: 794-6

5.   Opstelten W et al.  Herpes zoster and postherpetic neuralgia: incidence and risk indicators using a general practice research database. Fam Pract 2002; 19: 471-475

6.   Wong MC, Chung JWY, and Wong TKS.  Effects of treatment for symptoms of painful diabetic neuropathy: systematic review. BMJ 2007;335:87

7.  McCleane GJ.  Does gabapentin have an analgesic effect on background, movement and referred pain? A randomized, double-blind, placebo controlled study.  The Pain Clinic 2001;13:103

8.  de Jong RH.  Neurontin: Pie in the Sky or Pie on the Plate?  Pain Digest 1996; 6:143-4

9.  Additionally, please see the references to published articles in the Report and Appendices

Websites

1.  Evidence-based recommendations for medical management of chronic non-malignant pain: chapter 7. Neuropathic pain, College of Physicians and Surgeons. Nov 2000. http://www.cpso.on.ca/publications/pain.PDF, accessed July 18, 2008.

2.  http://www.depomedinc.com/view.cfm/1285/Our-Pipeline

3.  http://www.painstudy.ru/10wcp/anticonvulsants.htm

4.  http://www.clinicalstudyresults.org/documents/company-study_1926_0.pdf

5.  Additionally, please see the websites referred to in the Report and Appendices

Research Reports

1.  430-00124

2.  430-00125

3.  720-03908

4.  720-04130

5.  720-04378

6.  720-04455

7.  720-04471

8.  720-04479

9.  720-04481

10. 720-04483

11. 720-30044

12. 720-30049

13. 744-00664

14. 744-00669

15. 995-00070

16. Research Report for Study 945-210

17. Research Report for Study 945-211

18. Research Report for Study 945-220

19. Research Report for Study 945-224

20. Research Report for Study 945-224

21. Research Report for Study 945-306

22. Research Report for Study 945-306

23. Research Report for Study 945-371

24. Research Report for Study 945-430

25. Additionally, please the research reports referred to in the Report and Appendices