# EXHIBIT  A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x  MDL Docket No. 1629

THIS DOCUMENT RELATES TO:                        Master File No. 04-10981

ALL CLASS ACTIONS                                     Judge Patti B. Saris

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x  Magistrate Judge Leo T.
                                                      Sorokin
HARDEN MANUFACTURING CORPORATION;
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,           PROPOSED
dba BLUECROSS/BLUESHIELD OF LOUISIANA;                DOCUMENT
INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL
52 HEALTH BENEFITS TRUST; GERALD SMITH; and
LORRAINE KOPA, on behalf of themselves and all others
similarly situated, v. PFIZER INC. and WARNER-LAMBERT
COMPANY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' SUPPLEMENTAL REPLY IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc.*
*and Warner-Lambert Company*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .......................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.  CERTIFICATION OF ANY CLASS IN THIS CASE
    WOULD BE FLATLY INCONSISTENT WITH FEDERAL
    AND RELEVANT STATE PRECEDENT ........................................................ 3

II. PROFESSOR ROSENTHAL'S ANALYSIS CANNOT
    FURNISH COMMON PROOF OF CAUSATION ............................................ 7

    A.  Professor Rosenthal's Analysis Cannot Supply Proof of Class-
        Wide Causation Because It Rests on the Assumption that Detailing
        Is the Driver of Physicians' Decisions To Prescribe Neurontin for
        the Relevant Off-Label Uses ...................................................................... 8

    B.  Professor Rosenthal's Model Fails Even to Account for the
        Principal Components of the Alleged Fraudulent Scheme ....................... 12

    C.  Professor Rosenthal's Assumption that Substantially All Detailing
        Is Actionable Is Factually Unsupported and Legally Flawed .................. 13

    D.  Professor Rosenthal's Reliance on Unsubstantiated and
        Unjustifiable Assumptions Renders Her Report an Inadequate
        Basis for Certification .............................................................................. 15

III. NUMEROUS OBSTACLES PRECLUDE THE
     CERTIFICATION OF ANY TPP CLASS ...................................................... 16

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

PAGE

*Ala. Assoc. Gen. Contractors Inc. v. Pfizer Inc.*, No. 03-CV-2006-001242.00, slip op.
(Ala. Cir. Ct. Montgomery County Apr. 29, 2008) .................................................. 16

*Bazemore v. Friday*, 478 U.S. 385 (1986) ............................................................. 16

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435 (2d Cir. 1999) ......................................... 16

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ............................................. 7

*Bridge v. Phoenix Bond & Indem. Co.*, 121 S.Ct. 2131 (2008) .............................. 5,18

*Brown v. Am. Honda (In re New Motor Vehicles Can. Exp. Antitrust Litig.)*, 522
F.3d 6 (1st Cir. 2008) ............................................................................................ 6,11

*Cooper v. S. Co.*, 390 F.3d 695 (11th Cir. 2004) ..................................................... 16

*Coward. v. ADT Sec. Sys.*, 140 F.3d 271 (D.C. Cir. 1998) ..................................... 16

*Grovatt v. St. Jude Med., Inc. (In re St. Jude Med., Inc., Silzone Heart Valve
Prods. Liab. Litig.)*, 522 F.3d 836 (8th Cir. 2008) .......................................... *passim*

*Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258 (1992) ..................................... 20

*Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977) ........................................................ 19

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*,
196 F.3d 818 (7th Cir. 1999) ......................................................................... 18,19,20

*Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*
("*Vioxx*"), 929 A.2d 1076 (N.J. 2007) *(per curiam)* ...................................... *passim*

*Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006) ........................................... 19

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ............................. *passim*

*Meijer, Inc. v. Barr Pharm., Inc.*, No. 05-2195(CKK), 2008 WL 3903389
(D.D.C. Aug. 11, 2008) ........................................................................................ 19

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
354 F.3d 661 (7th Cir. 2004) ................................................................................ 15

*Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036 (7th Cir. 1991) ............. 16

PAGE

*In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ........................... 7

*In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89 (D. Mass. 2007) ............... 5,7,11,18

*In re Neurontin Mktg. & Sales Practices Litig.*,
   433 F. Supp. 2d 172 (D. Mass. 2006). ............................................................................... 8,14

*In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20 (D. Mass. 2007) ......... 19

*Salvas v. Wal-Mart Stores, Inc.*, 452 Mass. 337, 893 N.E.2d 1187 (2008) ................................... 6

*In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007) ..........................*passim*

**Statutes and Rules**

Fed. R. Civ. P. 23 ................................................................................................................... 1,6

**Other Authorities**

Ernst R. Berndt, *Pharmaceuticals in U.S. Health Care:  Determinants of Quantity and
   Price*, 16 J. ECON. PERSP. 45 (2002) ...................................................................................... 11

Natalie Mizik & Robert Jacobson, *Are Physicians "Easy Marks"?:  Quantifying the
   Effects of Detailing and Sampling on New Prescriptions*, 50 MGMT. SCI. 1704 (2004) ... 11,15

## PRELIMINARY STATEMENT

In their response, plaintiffs concede that four of the five proposed consumer classes cannot be certified because their putative causation expert Professor Meredith Rosenthal admits that—even under the counterfactual assumptions she was instructed by counsel to adopt—a substantial percentage of prescriptions for the relevant off-label uses were not caused by defendants' alleged misconduct.  Plaintiffs nonetheless contend that a consumer class should be certified for bipolar disorder, and propose for the first time to certify consumer classes for migraine and neuropathic pain prescriptions "written by physicians other than neurologists." (Class Pls.' Response to Defs.' Supp. Mem. L. Opp'n Pls.' Second Mot. Class Cert. ("Pls.' Br.") (Dkt # 1453) at 5 & 6 n.8.)  Plaintiffs also contend that five TPP classes should be certified, despite the fact that these classes include many TPPs who have no claim because, *inter alia*, they have encouraged and *continue to encourage* off-label Neurontin use by their insureds.

Plaintiffs' arguments are entirely inconsistent with the factual record in this case and squarely at odds with federal law under Rule 23.  The cases make clear that no class action can be certified where, as here, plaintiffs allege that defendants' statements caused them to pay for a supposedly ineffective prescription drug, but cannot dispute that vast numbers of class members have no claim because their physicians were never exposed to any alleged misstatement and prescribed Neurontin for reasons independent of any alleged misconduct.  As plaintiffs acknowledge, Professor Rosenthal concludes that a substantial majority of prescriptions for certain off-label uses were caused by fraud only because she was asked to assume what she set out to prove:  she *assumed* that detailing is the driver of physicians' prescription decisions, and further *assumed*, on the instruction of counsel, that substantially all detailing was fraudulent. Not only are these assumptions contradicted by the record evidence, but they are entirely

1

inappropriate at this advanced stage of the litigation.  Fact discovery has been completed, yet plaintiffs continue to attempt to base class certification on assumptions provided by counsel rather than on the factual record.  Were there any basis to believe that virtually all detailing was improper, plaintiffs surely would have supplied it to Professor Rosenthal.  In any event, even if her analysis constituted proof of class-wide causation, defendants are legally entitled to rebut it not simply by retaining their own economist and engaging in a battle of the experts, but by offering direct evidence regarding the reasons for individual prescription decisions.  The courts have not only found that defendants are entitled to offer such evidence, but that their right to do so defeats class certification.

Several additional obstacles preclude certification of any TPP class.  *First*, many TPPs have affirmatively promoted and continue to promote Neurontin for the relevant off-label uses.  In other words, the litigation position adopted in these cases is diametrically opposed to their business position.  For any such TPP, defendants' alleged conduct cannot be the proximate cause of any reimbursement.  The extent to which this is the case will vary from TPP to TPP and can only be ascertained by resort to individual inquiry.  *Second*, plaintiffs' effort to certify a TPP class depends on yet another unjustifiable assumption—that patterns of Neurontin usage are identical across each TPP's insured population.  To determine patterns of Neurontin usage among each TPP's insureds will require consideration of each TPP's policies with regard to Neurontin, the demographics of its insureds, and other individual factors.  *Third*, to ascertain whether each TPP suffered an injury, it is necessary to compare the costs that each TPP actually incurred against the costs it would have incurred absent defendants' alleged conduct, as well as to consider the extent, if any, to which each TPP's costs exceeded the additional premiums that it collected from its insureds to cover the projected costs of increased Neurontin utilization.  These

comparisons require individual inquiries into the relative costs of Neurontin and therapeutic

alternatives under each TPP's pharmaceutical supply arrangements, and examination of each

TPP's books and records, thereby precluding class certification.  A denial of the class

certification motion would not end this litigation, as the TPPs can sue, and have sued, on similar

theories on their own in separate suits, which are a superior means of resolving this dispute given

the critical differences between and among the TPPs.

**ARGUMENT**

## I.   CERTIFICATION OF ANY CLASS IN THIS CASE WOULD BE FLATLY INCONSISTENT WITH FEDERAL AND RELEVANT STATE PRECEDENT

Certification of any class in this case would be flatly inconsistent with the overwhelming

body of federal and relevant state precedent.  *See, e.g., Grovatt v. St. Jude Med., Inc. (In re St.

Jude Med., Inc., Silzone Heart Valve Prods. Liab. Litig.*), 522 F.3d 836, 838–40 (8th Cir. 2008);

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225–26 (2d Cir. 2008); *In re TJX Cos. Retail

Sec. Breach Litig.*, 246 F.R.D. 389, 396 (D. Mass. 2007); *see also Int'l Union of Operating

Eng'rs Local No. 68 Welfare Fund v. Merck & Co.* ("*Vioxx*"), 929 A.2d 1076, 1087–89 (N.J.

2007) (*per curiam*).  The Eighth Circuit in *St. Jude*, the Second Circuit in *McLaughlin*, the New

Jersey Supreme Court in *Vioxx*, and Judge Young of this Court in *TJX* each faced a question

substantially similar to the question that now confronts this Court:  Where plaintiffs allege that

physicians were deceived by "a national marketing campaign" that misrepresented a prescription

drug's safety or efficacy in a "consistent, singular, uniform' fashion," may their claims be

certified notwithstanding direct evidence that many physicians were never exposed to a

misstatement or that their prescribing decisions were caused by factors independent of any such

misstatement?  *McLaughlin*, 522 F.3d at 223–27; *see St. Jude*, 522 F.3d at 838–39; *TJX*, 246

F.R.D. at 395–99; *Vioxx*, 929 A.2d at 1081–82.

3

Each of these courts answered this question in the negative. *See St. Jude*, 522 F.3d at 839–42; *McLaughlin*, 522 F.3d at 223; *TJX*, 246 F.R.D. at 397–98; *Vioxx*, 929 A.2d at 391. Each court recognized that "proof of misrepresentation—even widespread and uniform misrepresentation—only satisfies half of the equation." *McLaughlin*, 522 F.3d at 223. The other half—proof that the misrepresentation was the proximate cause of plaintiff's injury—"cannot be the subject of general proof" where, as here, individual proof is needed to establish that each class member's prescribing physician "personally received a material misrepresentation," and that his or her belief in that misrepresentation was the proximate cause of the class member's loss. *Id.*; *see St. Jude*, 522 F.3d at 839; *TJX*, 246 F.R.D. at 396–97; *Vioxx*, 929 A.2d at 1087.

The courts concluded that evidence of aggregate shifts in consumer preferences cannot supply proof that individual class members or their physicians were deceived. *See McLaughlin*, 522 F.3d at 225; *Vioxx*, 929 A.2d at 392 ("To the extent that plaintiff intends to rely on a single expert . . . in place of a demonstration of an ascertainable loss or in place of proof of a causal nexus between defendant's act and the claimed damages, . . . plaintiff's proofs would fail."). Moreover, even if such evidence could somehow obviate the requirement that "*plaintiffs . . . present direct proof of individual reliance*," there would surely be no basis on which to "*prohibit [defendants]* from presenting direct evidence that an individual plaintiff (or his or her physician) did not rely on representations from [defendants]." *St. Jude*, 522 F.3d at 840 (emphases in original). Plaintiffs' efforts to distinguish these precedents make no sense:

- Plaintiffs purport to distinguish *McLaughlin* on the basis that the Second Circuit found that class members may have chosen to smoke light cigarettes for reasons unrelated to the defendant's misstatements. (*See* Pls.' Br. at 15 n.30.) This purported distinction ignores the extensive evidence assembled in this case that physicians prescribed Neurontin for off-label uses and TPPs endorsed the prescription of Neurontin for these uses for reasons unrelated to defendants' alleged misstatements. *See infra* pp. 8–10, 17–18 & n.14.

4

- Plaintiffs' distinction of *St. Jude*—on the basis that it "hinged on some patients not receiving any representations about the medical device" at issue, (Pls.' Br. at 15 n.30)— likewise ignores the fact that none of the doctors deposed in this and related cases had any recollection of receiving any representation from defendants' sales representatives regarding Neurontin's off-label uses. *See infra* pp. 8–10, 14 & n.10.

- Plaintiffs seek to distinguish *TJX* on the basis that Judge Young, in examining the plaintiffs' claims under Massachusetts consumer protection law, focused on reliance, which plaintiffs contend is not an element of the claims they have asserted in this case. Both state and federal appellate courts, however, have concluded that the causation elements of plaintiffs' claims will likewise require individual proof that plaintiffs or their physicians were deceived. *See Vioxx*, 929 A.2d at 1088; *see also Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2144 (2008) ("Of course, none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that someone relied on the defendant's misrepresentations. In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." (citation omitted)).

In fact, certification of a class in this case would be far less defensible than it would have been in *St. Jude*, *McLaughlin*, *TJX*, or *Vioxx*. As this Court has recognized, in *McLaughlin*, the alleged "misrepresentations were prominently displayed on *every* pack of cigarettes purchased by *every* consumer." *In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 114 (D. Mass. 2007) (emphases in original). Here, by contrast, plaintiffs are unable "to identify which prescribing physicians were exposed to defendants' [allegedly] fraudulent misstatements," *id.* at 111, much less to identify any prescriptions that those supposed misstatements caused. Likewise, the medical devices and prescription drugs at issue in *St. Jude* and *Vioxx* were withdrawn from the market following disclosure of the information that the defendants in those cases allegedly had misrepresented, *St. Jude*, 522 F.3d at 837; *Vioxx*, 929 A.2d at 1080, lending at least some credence to the plaintiffs' contentions that physicians would not have implanted or prescribed those products had the truth been disclosed. Here, by contrast, Neurontin continues to be prescribed off-label to tens of thousands of patients, many of whom, like plaintiffs' expert Raymond Hartman, have taken it for years and continue to be satisfied with its results. *See*

*generally McLaughlin*, 522 F.3d at 226 (continued purchases of the defendants' products furnished "compelling evidence" that purchases were influenced by motivations other than the defendants' alleged misstatements).

Plaintiffs urge the Court to reject the holdings of these cases outright, yet fail to cite a single federal case in support of their position.[1]  Plaintiffs argue that adherence to the legal principles stated in *St. Jude*, *McLaughlin*, *TJX* and *Vioxx* "would effectively repeal Rule 23" because "[d]efendants can always call individual class members to attempt to rebut some aspect of the class-wide proof offered by plaintiffs." (Pls.' Br. at 2, 14.)  This argument demonstrates a complete misapprehension of Rule 23.  A class can be certified only where proving the claims of the class representatives would prove the principal elements of all class members' claims, because the facts underlying all claims are materially the same.  Fed. R. Civ. P. 23(b)(3); *see Brown v. Am. Honda (In re New Motor Vehicles Can. Exp. Antitrust Litig.)*, 522 F.3d 6, 19–20 (1st Cir. 2008) (common issues do not predominate if the "causal link between the [alleged] violation and the damages sought by" each class member "cannot be established through common proof").  Here, plaintiffs concede, as they must, that the facts underlying putative class members' claims materially differ, but nonetheless seek to certify a class.  Moreover, what is at

---

[1] Apparently dissatisfied with federal precedent addressing Rule 23 of the Federal Rules of Civil Procedure, plaintiffs instead turn to *Salvas v. Wal-Mart Stores, Inc.*, 452 Mass. 337, 893 N.E.2d 1187 (2008), a state precedent addressing Massachusetts state class certification law.  *Salvas*, however, was not a case in which plaintiffs alleged that class members were defrauded or deceived, and so did not present any of the issues of individual causation that preclude certification in this case.  Instead, *Salvas* involved a class of current and former Wal-Mart employees who contended that Wal-Mart had withheld compensation for time worked and denied or cut short rest and meal breaks to which they were entitled.  *Id.* at 338–39.  The Massachusetts Supreme Judicial Court concluded that class certification was proper in light of "overwhelming evidence that all of the class members . . . were subject to the *identical* terms and conditions regarding breaks and off-the-clock work, which (according to company policy) were to be followed stringently."  *Id.* at 370 (emphasis added).  Here, however, there is no "overwhelming evidence" that each class member's physician was detailed on Neurontin, or that misstatements made on that detail visit caused the physician to prescribe Neurontin off-label.  Instead, the overwhelming evidence is that many, if not most, prescribing doctors were never detailed at all and prescribed Neurontin off-label for reasons unrelated to defendants' alleged misconduct.  *See infra* pp. 8–10, 14 & n.10.

stake here is not the possibility that defendants may "'defeat the showing of causation as to a few individual class members.'" (Pls.' Br. at 14 & n.29 (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996)).) As the evidentiary record confirms, here, as in *St. Jude*, *McLaughlin*, *TJX* and *Vioxx*, individual issues of causation are likely to arise for *each and every* class member. *See Neurontin*, 244 F.R.D. at 114 (concluding that, "to establish causation and injury the plaintiffs would need to conduct inquiries into the prescribing decisions of each class member's physician," which as a practical matter, "would flood the Court with a torrent of individual trials"). Indeed, every one of the prescribing physicians deposed in this action and related actions has testified that she or he began prescribing, and continues to prescribe, Neurontin for the relevant off-label uses for reasons unrelated to defendants' alleged misconduct—usually for the simple reason that the medication works in their own and their patients' experiences. *See infra* pp. 8–10.

Plaintiffs also suggest that the predominance of individual questions need not preclude certification of the proposed classes because defendants "may put on individual proof" at a class trial. (Pls.' Br. at 2.) To rebut plaintiffs' assertion that a given physician's decision to prescribe Neurontin to a class member was caused by defendants' misconduct, defendants will need to present testimony from *that physician*. And a class trial in which a single jury hears and weighs the testimony of thousands of physicians who prescribed Neurontin to members of the putative class would be singularly unmanageable.

## II.    PROFESSOR ROSENTHAL'S ANALYSIS CANNOT FURNISH COMMON PROOF OF CAUSATION

No class should be certified for the additional reason that Professor Rosenthal's conclusions—and hence plaintiffs' purported proof of class-wide impact—rest on assumptions, rather than evidence. *See, e.g.*, *Blades v. Monsanto Co.*, 400 F.3d 562, 570 (8th Cir. 2005)

(affirming denial of class certification where plaintiffs' expert assumed class-wide impact and "plaintiffs, in turn . . . asked the Court to rely on this conclusion as support for class certification"). Professor Rosenthal simply *assumes* that detailing is the driver of decisions to prescribe Neurontin off-label and further *assumes*, on instruction of counsel, that substantially all detailing was fraudulent. Plaintiffs offer no evidence to support these critical assumptions. In adopting these assumptions, Professor Rosenthal not only fails to account for the impact that factors unrelated to defendants' alleged misconduct had on doctors' decisions to prescribe Neurontin, but also renders her analysis completely irrelevant to the alleged fraud. *See* Report & Recommendation (Dkt # 269) at 42–52; *see In re Neurontin Mktg., Sales Practices., & Prods. Liab. Litig.*, 433 F. Supp. 2d 172, 186 (D. Mass. 2006) (adopting Report and Recommendation except as outlined in opinion). Plaintiffs have no evidence and no expert that even purports to offer proof of a causal nexus between doctors' decisions to prescribe Neurontin for relevant off-label uses and the allegations that allowed plaintiffs to survive defendants' motion to dismiss.

A. **Professor Rosenthal's Analysis Cannot Supply Proof of Class-Wide Causation Because It Rests on the Assumption that Detailing Is the Driver of Physicians' Decisions To Prescribe Neurontin for the Relevant Off-Label Uses**

Professor Rosenthal's analysis is not class-wide proof of causation because her analysis "assume[s] that 'detailing is the driver of every doctor's decision to prescribe Neurontin'" (Pls.' Br. at 7),[2] an assumption that finds no support in the evidentiary record. More than a dozen prescribing doctors have been deposed in this case and related state consumer class actions. Of

---

[2] (*Accord* Pls.' Br. at 8 (conceding that Professor Rosenthal's analysis rests on an assumption that detailing is "the most important determinant affecting the number of prescriptions of a particular drug").) Plaintiffs elsewhere assert that "Prof. Rosenthal's model focuses on the variables with the strongest *demonstrated* relationship to the variable of interest," (Pls.' Br. at 1 (emphasis added)), but never explain what evidence "demonstrates" that detailing bears a stronger relationship than other variables (such as prescribing experience) to prescriptions of Neurontin for the relevant off-label uses.

these, nearly half testified that they were *never* detailed on Neurontin.[3]  The remainder testified

that all of the information they received from sales representatives regarding Neurontin was

strictly limited to its labeled uses, and that they prescribed Neurontin off-label for reasons

independent of defendants' alleged misconduct.[4]

Prescribing doctors testified that they prescribed Neurontin off-label for the following

reasons:  Eight testified that they prescribed Neurontin off-label because they observed the

benefits that Neurontin had provided to their patients and patients treated by their colleagues.[5]

Four doctors testified that they prescribed Neurontin off-label because they were aware that other

anti-epileptic drugs ("AEDs") were effective in treating the condition at issue, and believed that

Neurontin, an AED with a benign side-effect profile and better ease of administration, would

---

[3] (*See* Sept. 22, 2008 Deposition of Dr. Amy Fitzsimmons ("Fitzsimmons Dep.") (attached as Ex. 5 to the Oct. 14, 2008 Declaration of Matthew B. Rowland ("Rowland Decl.")), at 24 (never detailed on Neurontin); Feb 13, 2008 Deposition of Dr. John Arness ("Arness Dep.") (attached as Ex. 18 to the Mar. 14, 2008 Declaration of Matthew B. Rowland ("3/14/08 Rowland Decl.")), at 65–66 (same); Feb. 6, 2008 Deposition of Dr. Jerrold Gray ("Gray Dep.") (3/14/08 Rowland Decl. Ex. 14), at 109–10, 116–18, 146–47 (has no recollection of ever having received any information relating to Neurontin from a sales representative or at a company-sponsored event and would, in any event, have never based a prescription decision on such information); Feb. 1, 2008 Deposition of Dr. Robert F. Haynsworth, Jr. ("Haynsworth Dep.") (3/14/08 Rowland Decl. Ex. 10), at 15, 80 (does not see sales representatives); Aug. 30, 2005 Deposition of Dr. E. Michael Okin ("Okin Dep.") (Rowland Decl. Ex. 4), at 50–52 (never discussed Neurontin with a sales representative); Aug. 18, 2005 Deposition of Dr. Richard J. Brown ("Brown Dep.") (Rowland Decl. Ex. 3), at 76–77 (never detailed on Neurontin).)

[4] (*See* Oct. 7, 2008 Deposition of Dr. Kenneth Hoellein ("Hoellein Dep.") (Rowland Decl. Ex. 8), at 17; Oct. 3, 2008 deposition of Dr. Thomas Graham ("Graham Dep.") (Rowland Decl. Ex. 7), at 49–50; Sept. 30, 2008 Deposition of Dr. Brian Ahlstrom ("Ahlstrom Dep.") (Rowland Decl. Ex. 6), at 14; Mar. 11, 2008 Declaration of Dr. Beverley Grimm ("Grimm Decl.") (3/14/08 Rowland Decl. Ex. 40), ¶¶ 3–4, 8; Feb. 2, 2008 Deposition of Dr. Gregory Rogers ("Rogers Dep.") (3/14/08 Rowland Decl. Ex. 12), at 94–97; Feb. 1, 2008 Deposition of Dr. Rick T. Waldo ("Waldo Dep.") (3/14/08 Rowland Decl. Ex. 11), at 15–17, 22, 88–89, 100–01, 118; Nov. 12, 2006 Deposition of Dr. Vithal Dhaduk ("Dhaduk Dep.") (3/14/08 Rowland Decl. Ex. 5), at 111–15, 180–81; Nov. 11, 2006 Declaration of Dr. Thomas Craparo (3/14/08 Rowland Decl. Ex. 36) ¶¶ 3–4, 6–7; Nov. 1, 2006 Deposition of Dr. Kylene Huler ("Huler Dep.") (3/14/08 Rowland Decl. Ex. 3), at 87; Dec. 4, 2004 Deposition of Dr. Douglass Barrett ("Barrett Dep.") (Rowland Decl. Ex. 2), at 68–93.)

[5] (*See* Hoellein Dep. (Rowland Decl. Ex. 8) at 16; Graham Dep. (Rowland Decl. Ex. 7) at 22–23; Ahlstrom Dep. (Rowland Decl. Ex. 6) at 17–18; Fitzsimmons Dep. (Rowland Decl. Ex. 5) at 39–40; Rogers Dep. (3/14/08 Rowland Decl. Ex. 12) at 42–44; Haynsworth Dep. (3/14/08 Rowland Decl. Ex. 10) at 14–15, 32, 45; Dhaduk Dep. (3/14/08 Rowland Decl. Ex. 5) at 33–34, 36–37, 41–42, 46–49, 86–87; Huler Dep. (3/14/08 Rowland Decl. Ex. 3) at 65; Brown Dep. (Rowland Decl. Ex. 3) at 63–64.)

offer similar benefits.[6]  Other doctors cited developments in basic science and the reimbursement

policies of their patients' insurers as reasons motivating their prescribing decisions.[7]  Professor

Rosenthal's analysis does not attempt to account for these and other variables that doctors cited

as motivating their decisions to prescribe Neurontin off-label even though she acknowledged that

these were potential causes of prescriptions and that she intended to measure their effects.  (Oct.

25, 2006 Deposition of Meredith B. Rosenthal (9/10/08 Rowland Decl. (Dkt # 1438) Ex. 3), at

320–64.)  Her assumption, despite all evidence to the contrary, that virtually all prescribing

decisions were motivated by detailing and her failure to measure the effects of other causal

factors renders her analysis incapable of establishing class-wide causation, thereby precluding

certification of any consumer or TPP class.

Plaintiffs' remaining efforts to justify their counterfactual assumption that detailing is the

driver of every doctor's decision to prescribe Neurontin off-label likewise fail.  Plaintiffs' refer

to defendants' expert Professor Fiona Scott Morton's comment that a "simpler model" would

have an "advantage over Dr. Rosenthal's proposal."  (Pls.' Br. at 7–8 (quoting Dec. 21, 2006

Fiona Scott Morton Decl. ¶¶ 81–82).)  As plaintiffs' acknowledge, however, Professor Scott

Morton addressed her comments not to the analysis that Professor Rosenthal actually undertook,

but to the analysis that plaintiffs assured the Court that Professor Rosenthal would undertake—

an analysis that promised to incorporate numerous variables to account for articles, meeting and

events, as well as factors, unrelated to defendants' alleged misconduct, that caused doctors to

---

[6] (*See* Graham Dep. (Rowland Decl. Ex. 7) at 18–20; Ahlstrom Dep. (Rowland Decl. Ex. 6) at 16; Grimm Decl. (3/14/08 Rowland Decl. Ex. 40) ¶ 3; Arness Dep. (3/14/08 Rowland Decl. Ex. 18) at 24–25).)

[7] (*See* Hoellein Dep. (Rowland Decl. Ex. 8) at 46 (noting that he can't get coverage from one insurer, Keystone Mercy Health, for other drugs he might prescribe instead of Neurontin); Fitzsimmons Dep. (Rowland Decl. Ex. 5) at 20, 32 (noting that insurers will pay for Neurontin where they might not pay for some of the newer alternative medications); Haynsworth Dep. (3/14/08 Rowland Decl. Ex. 10) at 21–22, 26–29, 44–45).)

prescribe Neurontin for the relevant off-label uses, *see Neurontin*, 244 F.R.D. at 111.  Professor

Scott Morton simply opined that such an analysis would likely prove impossible to undertake—

an opinion that has been vindicated by Professor Rosenthal's decision to abandon that analysis.

Nor does academic literature supply any basis for plaintiffs' assumptions regarding

detailing.  When pressed to provide support for the assumption, Professor Rosenthal identified

three sources that she claimed supported the proposition that promotion is the most important

determinant of prescribing decisions.  (July 9, 2008 Deposition of Meredith B. Rosenthal

("Rosenthal PA Dep.") (Rowland Decl. Ex. 1) at 50–52.)  None, however, says anything of the

kind.  *E.g.*, Ernst R. Berndt, *Pharmaceuticals in U.S. Health Care:  Determinants of Quantity

and Price*, J. ECON. PERSP. Vol. 16, No. 4, at 45, 54 (2002) (opining that "insurance coverage,"

rather than "marketing efforts," has been the most important determinant of prescription drug

utilization).  Not only does the academic literature fail to support plaintiffs' assumption that

detailing is the most important determinant of prescribing decisions, but the literature has

reached no consensus regarding the importance of detailing to those decisions.  Natalie Mizik &

Robert Jacobson, *Are Physicians 'Easy Marks'?: Quantifying the Effects of Detailing and

Sampling on New Prescriptions*, 50 MGMT. SCIENCE 1704, 1705 (2004) (noting that "empirical

studies investigating the issue have been subject to data or methodological limitations that

restricted their ability to control for potential biases and have come to contradictory conclusions

regarding even the central issues," including "the effect of detailing on prescriptions").

Plaintiffs also point to a chart that overlays Professor Rosenthal's cumulative "promotion

stock" variable with use of Neurontin by psychiatrists in an effort to support their assumption

that detailing determined doctors' decisions to prescribe Neurontin off-label.  (Pls.' Br. at 9.)

The chart, however, shows that psychiatrists' Neurontin use continued to increase for *two years*

after Pfizer stopped detailing to psychiatrists (*id.*), and in any event, cannot satisfy the rigorous standard for providing an evidentiary basis to plaintiffs' "novel" and "complex" theory of causation. *See Brown*, 522 F.3d at 26.

**B.     Professor Rosenthal's Model Fails Even to Account for the Principal Components of the Alleged Fraudulent Scheme**

As discussed in defendants' supplemental brief, Professor Rosenthal's assumption that detailing is the driver of every doctor's decision to prescribe Neurontin severs defendants' alleged misconduct from plaintiffs' asserted harms:  The alleged misconduct pertains almost exclusively to alleged misstatements made in medical journal articles and at educational or professional seminars, *Neurontin*, 244 F.R.D. at 111, but Professor Rosenthal is "unable to account" for any influence that these articles or seminars may have had on doctors' prescribing decisions.  (Declaration of Meredith Rosenthal, dated Aug. 11, 2008 (attached as Ex. F to Rona Declaration (Dkt # 1450)) ¶¶ 46, 53.)

Plaintiffs respond to this criticism by stating that, although Professor Rosenthal purports to isolate the effect of "detailing" on prescription drug sales, she has not in fact done so:  The prescriptions that Professor Rosenthal attributes to detailing in fact include numerous prescriptions wholly unconnected to detailing, but connected to a host of "correlated" variables for which Professor Rosenthal's model does not explicitly account.  (Pls.' Br. at 6.)  Without having undertaken any comparison of defendants' detailing expenditures and their expenditures on other alleged promotional activities, plaintiffs cannot know whether their "allegations with regard to meetings and events" are correlated with detailing expenditures (Pls.' Br. at 6 n.9).[8]

---

[8] Professor Rosenthal has conceded that she has done no specific analysis of the impact on prescriptions of any other type of alleged improper promotion besides detailing (Rosenthal PA Dep. (Rowland Decl. Ex. 1) at 123); that she has not analyzed the amounts of money that defendants spent on other types of promotional activities

Correlated variables, however, plainly *do* include *non-promotional* factors such as physicians' knowledge of and experience with Neurontin, which like Professor Rosenthal's cumulative detailing measure, grows steadily over time. Indeed, as defendants' experts will demonstrate, a corrected version of Professor Rosenthal's model that incorporates "time trends" to serve as proxies for this knowledge and experience produces drastically different results and virtually no statistically significant conclusions. Because Professor Rosenthal's analysis is unable to segregate prescriptions attributable to detailing from prescriptions attributable to a host of correlated factors—such as physicians' knowledge and experience with Neurontin—that do not give rise to liability, her analysis cannot furnish plaintiffs with proof of class-wide causation.

### C.     Professor Rosenthal's Assumption that Substantially All Detailing Is Actionable Is Factually Unsupported and Legally Flawed

Plaintiffs also acknowledge that Professor Rosenthal's analysis rests on "assumptions" that "all detailing to non-neurologists" and the vast majority of detailing to neurologists "was both off-label and fraudulent." (Pls.' Br. at 2.) Plaintiffs assert that "[t]hese assumptions are well-supported by the record" (*id.*), but nowhere in their response identify any portion of the evidentiary "record" that would lend them support.[9]

Instead, plaintiffs simply assert that "[a]ll such detailing was necessarily fraudulent, because it promoted Neurontin's use for indications for which it had either been proven

---

besides detailing (*id.* at 125); and that she does not know how the patterns of expenditures on detailing and other promotional activities compare to one another (*id.* at 125–26).

While plaintiffs claim that "well accepted economic literature" establishes that detailing is always highly correlated with a pharmaceutical company's other promotional efforts (Pls.' Br. at 6–7 & n.10), the articles they cite say no such thing.

[9] Plaintiffs cite Pfizer's termination of detailing to psychiatrists as evidence substantiating Professor Rosenthal's assumption that all detailing to psychiatrists was off-label and fraudulent. The fact that Pfizer ended detailing to psychiatrists "to avoid *even the appearance* of engaging in inappropriate sales and marketing activity for Neurontin" (Pls.' Br. at 11 n.23 (emphasis added)), however, is hardly evidence that all such detailing constituted acts indictable under the federal mail and wire fraud statutes.

ineffective or for which there was no scientific evidence of efficacy." (Pls.' Br. at 5 n.7). This assertion is both factually unsupported and legally flawed.

Every physician deposed in this action and related state consumer class actions who recalled ever having been detailed on Neurontin—neurologists and non-neurologists alike—testified that statements made by defendants' sales representatives were strictly limited to Neurontin's labeled uses.[10] Some doctors testified that records indicating detail visits represented instances in which defendants' representatives had delivered Neurontin samples to doctors' offices following the doctors' own requests for such samples.[11]

From a legal standpoint, this assertion rests on the supposition that any positive statement regarding an off-label use (*e.g.*, a truthful anecdotal report) is fraudulent in the absence of "scientific evidence of efficacy." This Court has held otherwise. *See* Report & Recommendation (Dkt # 269) at 43–46, 48–50; *see In re Neurontin Mktg., Sales Practices., & Prods. Liab. Litig.*, 433 F. Supp. 2d 172, 186 (D. Mass. 2006) (adopting Report and Recommendation except as outlined in opinion).

Plaintiffs' assertion also disregards the fact that a detail visit may prompt increased prescriptions for any number of reasons unrelated to a prescribing doctor's belief in a pharmaceutical sales representative ("PSR")'s claim regarding a drug's efficacy. "[M]ere

---

[10] *See supra* note 4. The same holds true of prescribing doctors deposed in the related products liability actions. For example, Dr. William A. Crotwell, III, an orthopedic surgeon who treated products liability plaintiff Joseph Owens, testified that the only uses of Neurontin that defendants' representatives had discussed with him were its labeled uses—"the seizures, shingles, that sort of thing" (May 1, 2007 Deposition of Dr. William A. Crotwell, III ("Crotwell Dep.") (Rowland Decl. Ex. 9), at 17–18), testimony that he steadfastly maintained under cross-examination by plaintiffs' counsel. (*See id.* at 17 ("They never told me that it was for any off-label."); *id.* at 23 (defendants' representatives "never never mentioned off-label using of [Neurontin] to me"); *id.* at 25 ("I still don't think they discussed it with me."); *id.* at 26 ("This is the, I think, what fifth time? To my best recollection, they did not discuss off-label use of [Neurontin].").)

[11] (*E.g.*, Crotwell Dep. (Rowland Decl. Ex. 9) at 30 (stating that any records indicating that a Warner Lambert representative had visited him likely reflected occasions on which the representative had provided Dr. Crotwell samples in response to Dr. Crotwell's own request).)

exposure and salience effects might lead to a temporary increase in prescribing following a PSR visit." Mizik & Jacobson, *supra*, at 1705. Or a doctor might prescribe a drug based on information the PSR provided concerning the drug's safety, ease of administration, or insurance coverage. (*See, e.g.*, Hoellein Dep. (Rowland Decl. Ex. 8) at 26.) Plaintiffs draw no distinction between prescriptions traceable to the assertedly fraudulent or admittedly non-fraudulent aspects of a detail visit. Plaintiffs instead deem all prescriptions correlated with detailing expenditures a basis for liability, a conclusion that depends on both the insupportable factual assumption that every detail visit included fraudulent statements as to all five relevant off-label uses, and the improper legal conclusion that liability should attach even when a doctor plainly did not base his or her prescribing decision on a claim of efficacy for one off-label use, but prescribed it for an altogether different use or for an altogether different reason.[12]

### D. Professor Rosenthal's Reliance on Unsubstantiated and Unjustifiable Assumptions Renders Her Report an Inadequate Basis for Certification

Because Professor Rosenthal's analysis—plaintiffs' purported common proof of causation both as to consumers and TPPs—is wholly untethered to any evidence in this case, no class can be certified. *See, e.g.*, *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 666 (7th Cir. 2004) (refusing to accept an expert's conclusion where the conclusion rested on an "assumption, and not the events under study": "Garbage in, garbage out."). Citing *Bazemore v. Friday*, 478 U.S. 385 (1986), plaintiffs protest that Professor Rosenthal's failure to account for

---

[12] Plaintiffs' proposal to certify two consumer classes limited to prescriptions for an off-label use written "by a non-neurologist" is driven purely by Professor Rosenthal's unwarranted assumptions regarding detailing and bears no correspondence to reality. A patient suffering from neuropathic pain, for instance, may be referred by her primary care physician to a neurologist, may be prescribed Neurontin by the neurologist, and may continue taking Neurontin after returning to her primary care physician. Under plaintiffs' analysis, the initial prescriptions by the neurologist are excluded from class liability as they may well have arisen from causes other than the alleged misconduct. When the patient returns to the care of his or her primary care physician, however, all prescriptions from that point forward are deemed to have been proximately caused by alleged fraud.

*any* factors, other than detailing, that may have caused off-label prescriptions "goes to weight, not admissibility" (Pls.' Br. at 1), but this furnishes no basis for certifying any class in this case.

*Bazemore* "did not hold that any statistical report, no matter how many critical variables were missing, should automatically present a jury question." *Cooper v. S. Co.*, 390 F.3d 695, 718 (11th Cir. 2004); *see Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999). Indeed, courts have routinely found regression analyses that fail to account for "major factors" "'so incomplete as to be inadmissible as irrelevant.'" *Coward v. ADT Sec. Sys.*, 140 F.3d 271, 274 (D.C. Cir. 1998) (quoting *Bazemore*, 478 U.S. at 400); *see Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1047 (7th Cir. 1991).[13]

Furthermore, even if the patent inadequacies of Professor Rosenthal's model do not render it inadmissible, but only diminish its evidentiary "weight" as plaintiffs insist, the insubstantial weight of her analysis only reinforces the necessity of allowing defendants to rebut her conclusions with direct evidence pertaining to individual doctors' prescribing decisions.

## III.    NUMEROUS OBSTACLES PRECLUDE THE CERTIFICATION OF ANY TPP CLASS

Because each TPP, to prevail on its claims, must present evidence that defendants' alleged misstatements caused physicians to write off-label Neurontin prescriptions for its own insureds, *Ala. Assoc. Gen. Contractors Inc. v. Pfizer Inc.*, No. 03-CV-2006-001242.00, slip op. at 4–5 (Ala. Cir. Ct. Montgomery County Apr. 29, 2008) (9/10/08 Rowland Decl. (Dkt # 1438) Ex. 4), the same obstacles that preclude certification of the consumer classes preclude certification of the TPP classes as well. There are also additional obstacles to certification of any TPP class.

---

[13] In *Bazemore*, the factors that the plaintiffs omitted from their regression analyses were not major factors because the defendants' own statistical analyses "reached substantially the same results as did those of the plaintiffs." *Cooper*, 390 F.3d at 718 (citing *Bazemore*, 478 U.S. at 401). By contrast, excluded factors must be deemed major where, as here, "the defendants' analyses [incorporating those factors] expressly contradict[s] those of the plaintiffs." *Cooper*, 390 F.3d at 718; *see supra* p. 12.

*First*, the TPP subclass cannot be certified because it is impossible for plaintiffs to prove that defendants' conduct was the proximate cause of *each* TPP class member's loss on a classwide basis.  Discovery of the named TPP plaintiffs makes clear that some number of class members *encouraged*—and continue to this day to encourage—the use of Neurontin for off-label uses, including mood disorders such as bipolar, neuropathic pain such as diabetic peripheral neuropathy, the treatment of cancer pain, chronic low back pain, and migraine; indeed, some TPPs *require* their insureds to try Neurontin before they will reimburse for prescription drugs approved by the FDA to treat these conditions. [14]  (Declaration of Gregory K. Bell, Ph.D., dated Mar. 14, 2008 ("Bell Decl.") (3/14/08 Rowland Decl. Ex. 35) ¶ 59; Nov. 1, 2006 Deposition of Dr. Thaddeus Poe (3/14/08 Rowland Decl. Ex. 4), at 21; Sept. 22, 2008 Deposition of Dr. Amy Fitzsimmons (Rowland Decl. Ex. 5), at 24.)  To determine whether a given TPP is an "eligible (i.e., injured) class member[]," *Neurontin*, 244 F.R.D. at 112, will require an examination of that

---

[14] Examples of TPPs who have recommended Neurontin's off-label use or required it as part of a step therapy are by no means limited to Kaiser, which plaintiffs now characterize as "an atypical HMO that . . . will undoubtedly exclude itself from the TPP Class." (Pls.' Br. at 17 n.35.)  Defendants' expert Dr. Gregory Bell lists several examples of other TPPs that either explicitly encouraged the use of Neurontin for certain off-label uses or implemented step therapy protocols allowing reimbursement for Neurontin in treating conditions such as neuropathic pain following trial of another drug.  (Bell Decl. (3/14/08 Rowland Decl. Ex. 35) ¶ 59 (listing TPPs including Cigna, Horizon BlueCross BlueShield, Maricopa Health Plan of Phoenix, Arizona, Mercy Health Plans of Chesterfield, Missouri, Passport Health Plan's Kentucky Medicaid formulary, and University Health System of San Antonio, Texas).)  Additionally, plaintiff Aetna has recognized Neurontin's efficacy for DPN, panic disorder, and social phobia; required insureds diagnosed with DPN to try Neurontin or another drug before Aetna will reimburse them for Cymbalta (a drug approved by the FDA for this use); and identified Neurontin to prescribing doctors as an effective treatment for migraine as part of its evidence-based Migraine Management Program.  (*See id.* ¶ 59.1 (citing National P & T Committee Executive Summary (Rowland Decl. Ex. 10), at AETNA 001882–890); 2008 Aetna Online Medicare Drugbase (3/14/08 Rowland Decl. Ex. 42), at AET020273–76; Dear Physician Letter, dated March 2006 (3/14/08 Rowland Decl. Ex. 39), at AET007900.)

Plaintiffs also suggest that any TPP recommendations or requirements were "undoubtedly influenced by the same pervasive disinformation campaign as were the physicians writing the prescriptions." (Pls.' Br. at 17.)  Plaintiffs may hypothesize that this is so, but evidence suggests otherwise.  Notably, both Kaiser and Aetna have been parties to this litigation for years, yet each continues, notwithstanding its knowledge of all allegations made and discovery produced, to recommend and in some instances require Neurontin's off-label use.  Moreover, if any TPP is to recover on the theory its own recommendations and requirements were caused by defendants' alleged misconduct, it will need to present individual evidence to support that theory, individual evidence that precludes class certification. *See Vioxx*, 929 A.2d at 390–91.

TPP's policies toward Neurontin to determine whether its own policies recommending or requiring Neurontin's use "constitute[d] an intervening cause breaking the chain of causation between petitioners' misrepresentations and respondents' injury." *Bridge*, 128 S. Ct. at 2144.

*Second*, even if identification of eligible TPP class members and computation of their damages were susceptible to statistical analysis, these analyses necessarily would be individual—reflecting among other factors, the policies that each TPP adopted toward Neurontin. Before statistics from one population can be extrapolated to another, there must be some evidence that the variables of interest are distributed evenly among the two populations. Plaintiffs have not presented such evidence, and defendants' expert Dr. Bell has demonstrated that Neurontin prescribing patterns will vary among TPPs, depending on their policies toward Neurontin and the demographics of their insured populations. (*See* Bell Decl. (3/14/08 Rowland Decl. Ex. 35), ¶¶ 76–80.) A given TPP's utilization of Neurontin for a given off-label use may be well below national average utilization; in many instances—as in the case of the 4.3% of TPPs who imposed prior authorization on Neurontin (Pls.' Br. at 16 n.33)—levels of utilization for particular uses may be zero. In these circumstances, estimating the likelihood that a TPP has paid for Neurontin prescribed for an off-label use based on national statistics will erroneously include within the class numerous TPPs that never reimbursed for the relevant off-label use.

*Third*, certification of any TPP class is inappropriate because comparing "the costs [each TPP] actually incurred against the costs [it] would have incurred" absent defendants' alleged conduct, *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 824 (7th Cir. 1999), will require individual proof. In particular, this cost comparison will require inquiries into the therapeutic alternatives available to each TPP's insureds and the relative costs of those alternatives under each TPP's individual pharmaceutical

18

supply arrangements.  Certification of any TPP class is also improper because examination of each TPP's books and records will be necessary to ascertain whether the costs that that TPP incurred from defendants' alleged conduct exceeded additional premiums that it collected from its insureds to cover the projected costs of increased Neurontin utilization.  *Teamsters*, 196 F.3d at 824.  Plaintiffs' suggestion that the Court allow TPPs to recover expenditures without regard to the increased premiums they collected to offset those expenditures is inconsistent with the law and would lead to windfall recoveries for some of the largest insurers in the United States.

The cases that plaintiffs cite as legal authority supporting their argument are inapposite. In each of those cases, the TPP plaintiffs were *direct* victims of the defendants' alleged misconduct who paid *overcharges* resulting from reliance on a misstated pricing benchmark, *see In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 31, 33 (D. Mass. 2007), or from the defendants' anticompetitive conduct, *see Meijer, Inc. v. Barr Pharm., Inc.*, No. 05-2195 (CKK), 2008 WL 3903389 (D.D.C. Aug. 11, 2008).  In each instance, the court permitted the plaintiffs "to recover the full amount of the overcharge," consistent with the rule that generally spares "direct purchasers . . . the burden of litigating the intricacies of pass-on." *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 745–46 (1977).

Plaintiffs, by contrast, do not seek recovery for an illegal overcharge.  (Pls.' Br. at 19 n.36 ("[t]his is not a pricing case"); *Kloth v. Microsoft Corp.*, 444 F.3d 312, 320 (4th Cir. 2006) (*Illinois Brick* rule applies where plaintiffs seek "recovery for illegal overcharges").)  Moreover, the link between defendants' alleged misstatements and the TPPs' asserted harms is indirect and any recovery is "purely contingent on the harm suffered by the [insureds]." *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  In these circumstances, the Seventh Circuit has held, a TPP, if it can recover at all, can recover only to the extent that the expenditures resulting

19

from defendants' alleged misconduct exceeded the additional income it collected to offset increased prescription drug utilization. *Teamsters*, 196 F.3d at 824. Because ascertaining the existence of any "net outlay" will require examination of each TPP's books, certification of any TPP class is improper.

## CONCLUSION

For all of the foregoing reasons, and those set forth in defendants' initial opposition papers, plaintiffs' new motion should be denied.

Dated: October 14, 2008

DAVIS POLK & WARDWELL

By:    /s/James P. Rouhandeh
       James P. Rouhandeh

450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000

-and-

HARE & CHAFFIN

By:    /s/David B. Chaffin
       David B. Chaffin

160 Federal Street
Boston, MA 02110
Tel: (617) 330-5000

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*